1          **UNITED STATES DISTRICT COURT**

2            **FOR THE DISTRICT OF ARIZONA**

3              _____

4
   **Victor Parsons, et al., on**      )
5   **behalf of themselves and all**   )
   **others similarly situated;**      )
6   **and Arizona Center for**         )
   **Disability Law,**                 )
7                                      )   No. **CV 12-00601-PHX-DKD**
              Plaintiffs,              )
8                                      )
        vs.                            )   Phoenix, Arizona
9                                      )   August 8, 2017
   **Charles Ryan, Director,**          )   9:03 a.m.
10  **Arizona Department of**           )
   **Corrections; and Richard**        )
11  **Pratt, Interim Division**         )
   **Director, Division of Health**    )
12  **Services, Arizona Department**    )
   **of Corrections, in their**        )
13  **Official capacities,**            )
                                       )
14              Defendants.            )
   _____  )
15

16

17    **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

18         <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

19                 (*Evidentiary Hearing*)

20

21  Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

1                    <u>A P P E A R A N C E S</u>

2    **For the Plaintiffs:**

3            EIDENBACH LAW PC
             By:  **Kirstin T. Eidenbach, Esq.**
4            P.O. Box 91398
             Tucson, AZ 85752

5
             ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
6            By:  **Maya S. Abela, Esq.**
             177 N. Church Avenue
7            Suite 800
             Tucson, AZ 85701

8
             PRISON LAW OFFICE
9            By:  **Donald Specter, Esq.**
             By:  **Corene Kendrick, Esq.**
10           1917 5th Street
             Berkeley, CA 94710

11
     For the Defendants:

12
             STRUCK WIENEKE & LOVE, P.L.C.
13           By: **Timothy J. Bojanowski, Esq.**
             By: **Rachel Love, Esq.**
14           By: **Anne M. Orcutt, Esq.**
             3100 W. Ray Road
15           Suite 300
             Chandler, AZ 85226

16
             OFFICE OF THE ATTORNEY GENERAL - Phoenix
17           By:  **Lucy M. Rand, Esq.**
             1275 W. Washington Street
18           Phoenix, AZ 85007

19

20

21

22

23

24

25

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|----------|--------|-------|----------|---------|
| CHARLES RYAN | | | | |
| By Mr. Struck | 16 | | | |
| By Mr. Specter | | 22 | | |
| | | | | |
| RICHARD PRATT | | | | |
| By Ms. Kendrick | 41 | | | |
| | | | | |
| JEFFREY VAN WINKLE | | | | |
| By Ms. Love | 117 | | | |
| By Ms. Eidenbach | | 172 | | |
| | | | | |
| NORMAN TWYFORD | | | | |
| By Ms. Love | 195 | | | |
| By Ms. Eidenbach | | 234 | | |

INDEX OF EXHIBITS

| DEFENDANTS' EXHIBIT | IDENT | RECEIVED |
|---------------------|-------|----------|
| 1    Aerial view of East Unit at Florence Complex | 139 | 140 |
| 2    Photographs - East Unit | 140 | 149 |
| 3    Process and the times for the Open nurse's line at South Unit | 132 | 134 |
| 4    Aerial view of South Unit at Florence Complex | 150 | 151 |
| 5    Photographs - South Unit | 152 | 164 |
| 6    Process and the times for the Open nurse's line at East Unit | 131 | 131 |
| 8    Photographs - Santa Cruz Unit Perryville | 206 | 216 |
| 9    Photo - Thermometer and temperature Readings | 230 | 234 |
| 10   Photographs Perryville Medical Unit | 216 | 234 |

01:43PM

| | PLAINTIFFS' EXHIBIT | RECEIVED |
|---|---|---|
| 12 | 6-5-17, 6-6-17 Nursing Notes:  Ashworth | 116 |
| 13 | Grievance L02-007-17 and documents Mr. AG | 116 |
| 14 | Perryville Grievance B42-008-017 | 116 |
| 15 | 5-4-17 Grievance Y02-03417 | 116 |
| 16 | 6-1-17 e-mail:  Open Sick Call | 116 |
| 17 | 5-25-17 Minutes Douglas Mohave Town Hall | 116 |
| 18 | 12-2-16 notes 24 HNR Sick Call/IGA Contracts | - |
| 19 | 1-31-17 Memo Florence Globe DW to K. Curran | 116 |
| 20 | 11-29-16 Memo to all Florence-North inmates | 116 |
| 21 | Grievance A02-058-017 | 116 |
| 22 | 5-15-17 email:  Open Sick Call Plan | 116 |
| 23 | 11-23-16 emails:  Open Sick Call | 116 |
| 24 | 12-2-16 email:  12 Hour Nurses Line | 116 |
| 25 | 4-10-17 email: Follow Up to Medical Meeting | 116 |
| 26 | 12-7-16 email: New HNR process Perryville | 116 |
| 27 | 12-7-16 email: Open Sick Call | 116 |
| 28 | Undated Document showing Nursing Line Hours | 116 |
| 29 | 5-15-17 email: Redirection for HNR boxes | 116 |
| 30 | 12-7-16 email:  Open Sick Call Starting 12-5-16 | 116 |
| 31 | 12-2-16 email:  New Process for HNRs | 116 |
| 32 | 3-17-17 email:  Medical Clearance | 116 |
| 33 | 2-16-17 email:  Copy of HNR Box v Sick Call | 116 |
| 34 | 2-7-16 email: HNRs | 116 |
| 35 | 1-18-17 email:  Identification and Standardization of eOMIS chronic care | 116 |
| 36 | 1-4-17 email:  Requested info for Corizon Inmate | 116 |
| 37 | 3-17-17 email:  Encrypted - Unpaid Claims | 116 |
| 38 | 3-3-17 email: Pharmaceuticals | 116 |
| 39 | June 2017 Arizona Monthly Staffing Report | 116 |
| 40 | 6-7-17 email:  Exam Tables | 116 |

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1              P R O C E E D I N G S

2          THE MAGISTRATE CLERK:  Civil Case Number 12-601,

3  Parsons, et al., versus Ryan, et al., on for evidentiary

4  hearing.

5          THE COURT:  Would counsel please state their                09:03AM

6  appearances for the record.

7          MR. SPECTER:  Donald Specter and Corene Kendrick from

8  the Prison Law Office.

9          MS. EIDENBACH:  Kirsten Eidenbach for the prisoner

10  plaintiff class.  Behind me is Maya Abela for the Arizona          09:03AM

11  Center for Disability Law.

12          MR. STRUCK:  Daniel Struck, Tim Bojanowski, Rachel

13  Love, and Anne Orcutt for the defense.

14          THE COURT:  Thank you very much.  I also see that we

15  have Director Ryan here this morning.  I'd like to start out by    09:03AM

16  addressing you, sir.

17          It is the tradition of the Supreme Court of the United

18  States for justices of the court to read from the bench

19  decisions which are deemed of particular importance.  Although

20  as a magistrate judge I am the lowest federal judge, I             09:03AM

21  nevertheless hold in my hands the judicial power of the United

22  States, and I must assure that this power is respected in all

23  instances of its application.  Our system of government, with

24  its separation of powers among three branches, which has served

25  us so well for 229 years requires no less.                         09:04AM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1    Director Ryan, in the final paragraph of your July 27,

2    2017 e-mail, you refer to my order as, quote, "preconceived,"

3    close quote.  Webster's defines preconceived to mean, quote,

4    "to form as an opinion prior to actual knowledge or

5    experience," close quote.  The recent retaliation addressed in          09:04AM

6    my July 25 order was not the first time the Court addressed the

7    subject of retaliation.  The Court previously conducted an

8    emergency telephonic hearing when the plaintiffs' lawyers

9    reported what they had seen with their own eyes; inmates who

10   spoke with them were immediately ticketed for the minor                09:05AM

11   infraction of having their shirttails out.  I made it clear at

12   that hearing that I would countenance no retaliation of any

13   kind for actions associated with the Court's information

14   gathering function.  I also made it clear that corrections

15   officials should find another time to ticket for minor                 09:05AM

16   infractions than soon after inmates have provided information

17   about their medical care.  I made it crystal clear that I

18   wanted no hint of retaliation that would chill the inmates'

19   willingness to come forward with information.

20        Defendants' lawyers objected during that incident             09:05AM

21   because they felt they did not have an opportunity to present

22   their side of the story.  Just as now, I, of course, provided

23   that opportunity.  What did defendants' lawyers do?  Nothing.

24   Despite repeated invitations and reminders from me, defendants'

25   lawyers never sought or pursued their day in court on this             09:05AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1   issue.   Thus, defendants' lawyers left unchallenged the

2   on-the-scene report from plaintiffs' lawyers that they had

3   witnessed retaliation.   Thus perhaps you can understand how

4   this left me with the, quote, "actual knowledge or experience,"

5   close quote, of retaliation on the yard.                    09:06AM

6           Then moving forward to the recent inmate witnesses'

7   testimony before me, all of them expressed a fear of

8   retaliation.   I assured them that I could count on defendants'

9   lawyers to protect them from any retaliation, even though I

10   learned at that same hearing that the witnesses had been rolled    09:06AM

11   up and their possessions boxed on the day of their traveling to

12   court.   The defendants' lawyers remedied this misstep

13   immediately, but then I heard from plaintiffs' lawyers again

14   that their clients experienced changes in their conditions of

15   confinement immediately after their testimony to me, which they    09:06AM

16   perceived as adverse.   Thus I had again a prima facie case of

17   retaliation.   I know that these witnesses believe that they

18   have experienced retaliation.   I then conduct another emergency

19   hearing where I learn more about the circumstances of these

20   adverse actions, and none of the circumstances as explained to    09:07AM

21   me in light of my previous admonition that there be no

22   retaliation makes sense to me.

23           The defendants' lawyers presented counter arguments

24   which I told them did not even pass the straight face test.   I

25   described them as hyperbolic and preposterous.   I then returned    09:07AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1    all inmates to the status they were in before they testified.

2    That is the least dramatic remedial action that a court can

3    take.  I did so late on a Friday afternoon upon hearing

4    witnesses -- hearing of witnesses' concern that they were in

5    danger over the weekend.  So I returned us to the status quo,          09:07AM

6    and I afforded the opportunity for a hearing and I required

7    that there be no retaliation.

8         In compliance with this order, Director Ryan, you have

9    sent an e-mail directing your staff to comply with my order but

10   you included language which challenged the legitimacy of the          09:08AM

11   order.  You and I are in the same business.  Every moment of

12   our working lives we are focused on preserving the society

13   where the rule of law prevails, in other words, adherence to a

14   common understanding of principles of conduct defined by the

15   founders' constitution and the laws of our representative            09:08AM

16   assemblies.  In our system it has been since *Marbury v. Madison*

17   the province of the judicial branch to say what the law is.  If

18   one disagrees with what the law as so decreed is, then there is

19   the right to appeal or to change the law but not to undermine

20   the legitimacy of the judiciary in pronouncing the law.  Thus,        09:08AM

21   I would think this would be something that you, of all people,

22   would understand, as you supervise tens of thousands of people

23   who have not followed the law but we hope to inculcate in them

24   an understanding of what an ordered society requires because

25   almost all of your charges will some day return to our cities         09:09AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing

```
 1   and towns and neighborhoods.
 2            Prominent public service like you, Director Ryan, can
 3   greatly influence whether we live in a society where there is
 4   respect for the law, even laws with which you disagree.  The
 5   tone of leadership matters on this, and whether you refer to a        09:09AM
 6   court ruling when you address your troops as, quote,
 7   preconceived, close quote, or as the recently convicted sheriff
 8   in our county who thought that he could do as he wished
 9   notwithstanding contrary orders of the Court or references to
10   so-called judges.                                                     09:09AM
11            All of this disrespect for the rule of law, something
12   I have never experienced of this kind or seen in nearly 30
13   years of being a lawyer or 16 years as a judge.  I worry where
14   this all leads.  I worry that it sends a message that we only
15   follow the laws that we think are right, or that we can choose        09:09AM
16   whether we wish to do what is necessary to follow the law.
17            This case is fundamentally about a failure of the
18   Department of Corrections to follow the law of this case.  For
19   years, your promise to provide the health care required by the
20   stipulation has failed.  This promise has not been met.  All of      09:10AM
21   my time in this case is focused on one thing:  Compliance with
22   the promise of health care in accordance with the stipulation.
23   Your comments in the context of this long-term failure to do
24   what the law requires with respect to providing health care to
25   your charges potentially thwarts my efforts to enforce the           09:10AM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1  stipulation and potentially commits a broader assault against

2  the rule of law.  Imagine how you would feel if you directed

3  your wardens not to take a specific action but in communicating

4  that message your warden then also said to his or her staff

5  that the director's decision is preconceived, not based on the      09:10AM

6  full story, and you all are doing a great job.  That is how I

7  felt when I read your e-mail.  I then ordered that you provide

8  me with all written communication that was associated with

9  communicating my order prohibiting retaliation.  I saw there

10  statements of your staff which indicated to me that they      09:11AM

11  embraced the core value of my order, unimpaired by your mixed

12  message.  I hope that that's an accurate representation.

13          However, notwithstanding what is written, your e-mail

14  left me with a great concern that you did not fully embrace

15  your absolute obligation to follow to the letter and to the      09:11AM

16  spirit the rulings of this Court until they are reversed by me

17  or by the Court of Appeals or by the Supreme Court.  That is

18  what the rule of law requires, nothing less, nothing qualified,

19  nothing diluted by disparagement.

20          We can now proceed with any preliminary matters that      09:11AM

21  counsel need to raise before we hear the witnesses.  Anything

22  from the plaintiffs' side?

23          MR. SPECTER:  No, Your Honor.

24          THE COURT:  Mr. Struck?

25          MR. STRUCK:  Yes, Your Honor.  I would like to make a      09:11AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1    few comments based upon what the Court just stated.

2            THE COURT:  Surely.

3            MR. STRUCK:  First of all, I want to say that Director

4    Ryan has great respect for the law.  And the comments with

5    respect to the preconception in the order were based upon his      09:12AM

6    actually having sat in on the telephonic hearing that occurred

7    on the 21st.

8            THE COURT:  I was aware that he was present.

9            MR. STRUCK:  Yes.  And I know you were aware.  The

10   fact that there were eight individuals that were prepared to       09:12AM

11   testify, and I understand there might have been time

12   constraints by the Court that precluded that from happening,

13   and the fact that the Court made a determination that there was

14   retaliation based upon statements by counsel for plaintiff and

15   hearsay upon hearsay in some instances of some of the inmates      09:12AM

16   without hearing any of the evidence with respect to why these

17   actions actually took place with respect to the two individuals

18   who were concerned about being retaliated against.

19          Your Honor, I have represented not just ADC but

20   CoreCivic, every county in this state, and I will tell you I       09:13AM

21   have had about 1,300 lawsuits that I have defended with respect

22   to inmates.  And in the vast majority of them, there's always a

23   claim for retaliation.  That is something that prisoners go to

24   when they believe that something is happening that they don't

25   like, they automatically assume, well, I'm being retaliated       09:13AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1   against.  At no time until this case has there ever been a

2   finding of retaliation in any of the cases I have ever handled.

3   We were going to be here on September 11th, and we will present

4   evidence with respect to why these things happened to these two

5   individuals and explain to the Court that it was merely the          09:13AM

6   normal actions of prison operations.  It had nothing to do with

7   this lawsuit, with the exception of the inmates who were asked

8   if they wanted to move closer to the health facility if they

9   had trouble ambulating which, by the way, they weren't forced

10  to move.  They were just asked if they wanted to, which seems      09:14AM

11  to be a reasonable response to concerns that there are people

12  that are handicapped and are too far away from the health

13  facility to attend.

14          That is not retaliation.  At least that's our

15  position, that's not retaliation.  The concern that the            09:14AM

16  director has is with respect to the due process.  And I know

17  the Court holds due process just as high as the respect for the

18  law.  Due process is the cornerstone of our judicial system.

19  And we would like the opportunity, and you have granted us that

20  opportunity.  But right now, we have an order of retaliation       09:14AM

21  based upon, in part, statements made by counsel for plaintiff.

22  And by my review of the transcripts, because I wasn't at the

23  hearing on the 14th or the 21st, but I understood that the

24  Court believed that in the past, he had heard from other

25  inmates who went to settlement conferences that they believed      09:15AM

1    they were retaliated against and had spoken to inmates who were

2    out of the system who believe they were retaliated.

3          The director was responding to his concern that the

4    Court was implying that there's some sort of unofficial policy

5    at the Department of Corrections to retaliate against inmates      09:15AM

6    as a result of lawsuits, and that is not the case.  They take

7    retaliation claims very serious.  They take misconduct claims

8    very seriously.  And it was an affront to the director to being

9    told that his 9,500 employees are retaliating against the

10   inmates in their charge.                                           09:15AM

11         And that, I think, is where the preconception comment

12   in the e-mail came from.  The director -- and I was at the

13   video conference.  The director was very strong in his comments

14   to the wardens and deputy wardens that there was to be no

15   retaliation.  There's no ifs, ands, or buts about the              09:16AM

16   director's position with respect to retaliation.  Simply

17   because he doesn't agree with your finding that retaliation

18   occurred is not disrespect to the Court.  Thank you.

19         THE COURT:  Two issues:  First, I don't believe

20   there's a finding on the 25th of July order with respect to        09:16AM

21   retaliation.  I believe that it states that all of these

22   developments strongly suggest retaliatory action.  The Court in

23   that same order sets forth the hearing for the opportunity for

24   you to present your side of the story, but I hold the status

25   quo by returning the inmates to their previous condition and I     09:16AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1   also explain in detail how it is that the Court comes to its

2   conclusion that it's a reasonable response to the developments

3   in this case to indicate that there is a strong suggestion of

4   retaliatory action.  It is, I think, wrong to characterize it

5   as being a finding of that given that we are having a hearing                09:17AM

6   on it; and secondly, I don't believe I found that 96 -- did you

7   say 9600 people had engaged in retaliatory conduct?  That's,

8   again, hyperbolic, not helpful here.

9         MR. STRUCK:  I'm sorry.  That's how many employees are

10   at the Department of Corrections.                                            09:17AM

11         THE COURT:  I understand.  What you said is I accused

12   9600 people of retaliatory conduct.  There's nothing in the

13   order that says that.  That kind of hyperbole is not helpful.

14         MR. STRUCK:  It is not meant to be hyperbole, Your

15   Honor, at all.                                                              09:17AM

16         THE COURT:  The transcript will indicate what it says.

17         MR. STRUCK:  And the portion of the order I'm

18   referring to is on Page 3 where you state, "The temporal

19   proximity between their protected conduct and the adverse

20   actions are too close in time to reasonably be viewed as                    09:17AM

21   anything but retaliatory."  If that's not a finding that it's

22   retaliation, please accept my apology and I look forward to

23   presenting evidence on the 11th to show the Court that it is

24   not retaliation.

25         THE COURT:  Right.  As it stands, as I say, it's a                    09:18AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing

```
 1    prima facie showing of retaliation unrebutted yet, but we will

 2    have the opportunity to hear from the defendants on that point.

 3    But I think it is wrong to characterize this as a finding given

 4    that I did give you the opportunity for a hearing.  Why would

 5    the Court conduct a hearing if it had already decided?  But       09:18AM

 6    what I did is I returned to the status quo, and I also

 7    cautioned again that there be no retaliation, something that is

 8    been very plain, I hoped, but as I saw in this courtroom you

 9    have a different saw of what the rollup and the boxing is.  I

10    listened to Ms. Love explain to me why that happens.  It didn't  09:18AM

11    make any sense to me, and I don't think it would make any sense

12    to a reasonable person that when someone comes off to court

13    that they need to have their possessions boxed up to protect

14    them when, in fact, they would be at court the same amount of

15    time, I imagine, that they would be at work.  That's what Ms.    09:19AM

16    Love told me.

17          MR. STRUCK:  Not typically, Your Honor.  Typically

18    they go to Maricopa County and they spend the night at the

19    Maricopa County Jail.  That's generally where inmates within

20    the Department of Corrections go.                                09:19AM

21          THE COURT:  Did that happen in this case with these

22    witnesses?

23          MR. STRUCK:  No.

24          THE COURT:  No.  It didn't happen.  Thank you.  You

25    may sit down.                                                    09:19AM
```

1          So are you going to call, or are you going to call?

2  Who is going to call?

3          MR. STRUCK:  We're going to call Director Ryan.

4          THE COURT:  Sir, would you please step forward to the

5  clerk of the court and be sworn.                                   09:19AM

6          (The witness was sworn.)

7          THE MAGISTRATE CLERK:  Thank you.  Please have a seat.

8          THE COURT:  Good morning again, Director Ryan.  If you

9  would kindly move the microphone closer.  Thank you.

10         You may proceed.                                           09:20AM

11                          CHARLES RYAN,

12  a witness herein, having been first duly sworn by the clerk to

13  speak the truth and nothing but the truth, was examined and

14  testified as follows:

15                       DIRECT EXAMINATION

16  BY MR. STRUCK:

17  Q.  Good morning.  Would you state your name, please?

18  A.  Charles Ryan.

19  Q.  And by whom are you employed?

20  A.  The Arizona Department of Corrections.                        09:20AM

21  Q.  And what is your position?

22  A.  Director.

23  Q.  How long have you been the director of the Arizona

24  Department of Corrections?

25  A.  I have been the director since January 30th, 2009.            09:20AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Direct

1  Q.  How long have you been with the Department of Corrections?

2  A.  I began my career with the Department of Corrections in

3  1977.  I retired June 30th of 2003 then I returned to the

4  Department on January 30th, 2009.

5  Q.  You don't have to describe every job you have held, but          09:20AM

6  what's the range of positions that you have held?

7  A.  Started as a program officer after I had served as a case

8  analyst, then I was a classification officer, classification

9  administrator.  I was a deputy warden at the time known as

10  assistant superintendent of a maximum security facility.  For a     09:21AM

11  period of time I designed, staffed, and activated all prisons

12  under construction.  Then I became a warden of the Winslow

13  prison and was there for eight years.  I was the senior warden

14  over Florence and Eyman for two years followed by being the

15  deputy director of institutions for seven years and then my        09:21AM

16  last year I was the interim director for a little less than a

17  year and then I retired.

18  Q.  Now, you have been asked by the Court to appear today to

19  let Judge Duncan know how you were able to -- or how you

20  managed to -- or how you accomplished providing information to      09:21AM

21  the employees at the Department of Corrections with respect to

22  the judge's order not to retaliate against individuals who were

23  participating in Parsons hearings.

24          Can you explain how you did that?

25  A.  Yes.  I saw the -- attended the telephonic hearing and I        09:22AM

1    heard the judge's order to go ahead and return the inmates to

2    their former status.  Following the hearing on the 21st, then a

3    number of us regrouped, we had a conversation, and I directed

4    that those inmates be returned to their former status.  Then

5    the following week on the 25th an order in fact was issued by          09:22AM

6    the magistrate judge.  I read that order.  And then I crafted

7    the e-mail that has been referenced.  I worked with my general

8    counsel in finalizing that.  The distribution on that e-mail is

9    rather lengthy but it certainly included the executive team and

10   the wardens.                                                          09:23AM

11        In that e-mail, I indicated that in a few days

12   following there would be a video conference hearing and that

13   e-mail and the order in fact would be a topic at that video

14   conference.

15   Q.  In the e-mail, what was the purpose of your e-mail?              09:23AM

16   A.  The purpose of my e-mail was to comply with the Court order

17   to direct all staff without exception to follow that order to

18   the letter.  So that there absolutely would be no

19   misunderstanding whatsoever by any employees that there would

20   be no retaliation or harassment or intimidation against any          09:24AM

21   inmate in the department.

22   Q.  Do you expect your orders to be followed?

23   A.  Absolutely.

24   Q.  And this e-mail went to you said who exactly did it go to?

25   A.  It went to a number of employees by specific name and then       09:24AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Direct

1    categorically it went to the executive team and all wardens,

2    and they were directed to convey that message and the order to

3    all of the employees under their charge.

4    Q.  And how was that done?

5    A.  It was conveyed to them electronically by e-mail with the            09:25AM

6    Court's order as an attachment.  Thereafter, it's my

7    understanding that those wardens and deputy wardens went ahead

8    and conducted their own briefings at their facilities and units

9    and conveyed that information to their staff.

10   Q.  And that would include line staff, everybody?                         09:25AM

11   A.  The line staff would have received the information through

12   a briefing as they do not have predominantly the majority of

13   them do not have e-mails.

14   Q.  When you're talking line staff, we're talking about

15   corrections officers?                                                     09:25AM

16   A.  Yes, sir.

17   Q.  Do you have respect for the Court?

18   A.  Of course I do.

19   Q.  Do you have respect for the law?

20   A.  Absolutely.                                                           09:26AM

21   Q.  There was comments that were read by the Court prior to the

22   hearing with respect to a portion of your e-mail at the end

23   when you talk about that you believed that it was the judge's

24   order was preconceived.  Why did you put that in there?

25   A.  I put that in there after I had listened in the emergency            09:26AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Direct

1    hearing on the 21st.  It gave me the impression that the Court

2    was predetermining a finding.  It's my understanding, I

3    believe, on the hearing on the 14th, and that information was

4    conveyed to me by counsel, that the magistrate judge had

5    indicated based on his experience in settlement cases that he          09:27AM

6    often believed that there was retaliation on going in the

7    Department of Corrections.  So to me, that was planting a seed.

8    When I listened to the emergency hearing it was for the most

9    part, what sounded like a discussion or an encounter between

10   our counsel and the magistrate judge and the Court was --            09:27AM

11   conveyed that he was pressed for time and he had to catch a

12   plane.  The Court also indicated that he intended as necessary

13   that he would micro manage this case.

14           Now, back to my video conference and that was a

15   meeting that probably took about an hour and half, and the           09:28AM

16   first 10 minutes of which at most, were devoted to the e-mail

17   and reference to the order, I asked everyone involved in that

18   hearing video conference, excuse me, if they had any questions.

19   And there were probably, round number, 100 people involved in

20   that video conference and no one asked a single question.  I         09:28AM

21   emphasized following the fact that no one asked any questions I

22   said ensure that the order is complied with.  The magistrate

23   judge is on record as saying he will micromanage this case.

24   Q.  How did you convey -- I mean when you conveyed to the folks

25   on the video conference with respect to following the order,         09:29AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Direct

1   was it done strongly?

2   A.  It mostly certainly was.  I read the e-mail.  I believed in

3   what I wrote.  I did it with emphasis.  And there was no

4   question and I don't believe any uncertainty on the part of the

5   people in the conference room or with the people on the video          09:29AM

6   conference.  I believe all people understood the message that

7   was being conveyed.  You follow that order to the letter.

8   Q.  Do you take claims of retaliation seriously?

9   A.  I most certainly do.

10  Q.  Why is that?                                                       09:30AM

11  A.  Because it's unprofessional.  It's a violation of our code

12  of ethics.  It's a violation of policy.  It's a violation of

13  our investigation policies.  And inmates are not committed to

14  the Department of Corrections to be subjected to harassment.

15  They are committed to the Department of Corrections and removed        09:30AM

16  from society and that is their sanction or their punishment.

17  They are not sent to the Department of Corrections to be

18  punished.

19  Q.  What happens if there is a determination of retaliation

20  with respect to one of your employees on a prisoner?                   09:30AM

21  A.  They are subject to investigation and if it is determined

22  that the allegations are sustained against the employee then

23  they are subject to disciplinary action.

24  Q.  And has that occurred over your tenure as director?

25  A.  It absolutely has.                                                 09:31AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

```
 1   Q.  No more questions.

 2          THE COURT:  Thank you.  Any cross-examination?

 3          MR. SPECTER:  Yes, Your Honor.

 4                      CROSS-EXAMINATION

 5   BY MR. SPECTER:                                              09:31AM

 6   Q.  You have -- Mr. Ryan, we have met before.  You know who I

 7   am, Don Specter?

 8   A.  I do.

 9   Q.  Okay.  Do you have the e-mail in front of you?

10   A.  I do not.                                                09:31AM

11   Q.  May I approach?

12          THE COURT:  You may.

13          MR. SPECTER:  You have the e-mail.

14          THE COURT:  I do.

15   By MR. SPECTER:                                              09:31AM

16   Q.  On direct examination from Mr. Struck you just told the

17   Court that you have respect for the rule of law and respect for

18   the Court, is that right?

19   A.  Yes.

20   Q.  Do you believe it was respectful to the rule of law and   09:32AM

21   respectful for the Court for you to write in the e-mail that

22   the Court heard only one side of the story?

23   A.  I believe that's what I had heard in that hearing.

24   Q.  Do you believe it was respectful to the Court to say that

25   the Court's order was based on only bare allegations of inmates  09:32AM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

1    when the Court had heard the testimony of those inmates?

2    A.  I believe it was the bare information.

3    Q.  Do you believe it was respectful to the rule of law and the

4    Court when you told your staff in that e-mail that the order

5    was disappointing?                                          09:33AM

6    A.  I don't believe it was disrespectful.

7    Q.  Do you believe it was respectful to the Court or to the

8    rule of law that the when you told your staff that the order

9    was issued before the Court had heard any actual evidence when

10   it actually had heard testimony of inmates?                 09:33AM

11   A.  I believe the Court had heard limited information, and I

12   don't believe that our counsel had been afforded an adequate

13   opportunity to examine those witnesses.

14   Q.  You understand that courts in this country are supposed to

15   make their rulings based on evidence and the rule of law and   09:33AM

16   they are not supposed to make judgments based on their

17   preconceived ideas of what the results should be?  Do you

18   understand that?

19   A.  Fundamentally, yes.

20   Q.  So do you believe it was respectful to Judge Duncan or the  09:33AM

21   rule of law to tell your staff that his order was preconceived?

22   A.  Mr. Specter I do not believe that was being disrespectful

23   to the Court.  Based on what I had heard, I believe that to be

24   the case.

25   Q.  So isn't it true that by telling your staff all those     09:34AM

1    things that we just mentioned, that you just testified about,

2    that Judge Duncan, the message you were sending to your staff

3    was that Judge Duncan was not justified in issuing his order,

4    that it could possibly be rescinded, and some of the people on

5    your staff might understand that to mean that they didn't have          09:34AM

6    to comply with that order.  Isn't that true?

7    A.  No, it's not.

8    Q.  Then, well, last night I was trying to find in your

9    policies that are on line a policy against retaliation against

10   prisoners for exercising their right to the Court.  I couldn't          09:35AM

11   find it.  Was I missing something, a written policy?

12   A.  Yes.  There is written policy relative to the code of

13   conduct, the code of ethics.

14   Q.  I looked at those, sir.

15   A.  Harassment.                                                          09:35AM

16   Q.  I didn't see any words about retaliation in those policies.

17   Am I mistaken?

18   A.  I believe you are mistaken.  And if I could look at the

19   policies, I don't memorize them, but I, too, looked at those

20   policies last evening as well.                                          09:35AM

21   Q.  Okay.  So the department's policy as far as you understand

22   it is to prohibit retaliation against prisoners for exercising

23   their right of access to the Court, is that right?

24   A.  There is to be no retaliation against inmates for

25   exercising their right.                                                 09:36AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

```
1    Q.  And that's your personal policy as well, right?

2    A.  That is the professional position of the Department of

3    Corrections.

4    Q.  And that's your position in part because you want these

5    people who testified and others to be able to testify freely,      09:36AM

6    voluntarily, and provide what they believe is accurate

7    information to the Court.  Isn't that correct?

8    A.  Yes.

9    Q.  Yet you made all these what I will call disparaging remarks

10   about the Court's processes and judgment and order and the         09:36AM

11   circumstances that led the Court to issue this order when the

12   order itself does nothing more than direct you to follow your

13   own policy.  Isn't that true?

14   A.  I don't believe I was being disparaging to the Court.  I

15   think that is your statement.  Whether there is disagreement or     09:36AM

16   not, the Court's order is that.  It is the order and it was to

17   be followed and is being followed.

18   Q.  Why did you find it necessary to make those comments about

19   the Court's order when your own policy is consistent with the

20   Court's order?  Why did you make those -- why did you believe       09:37AM

21   it was necessary to make those comments?

22   A.  I made those comments because I did not believe that all of

23   the information had been put forth and I wanted our employees

24   to understand that I would be working with our counsel to try

25   and present additional information to influence the Court in        09:37AM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

```
 1   its decision.
 2   Q.  Don't you understand that some people could have read those
 3   comments and believed you were trying to undermine the
 4   legitimacy of the Court's order regardless of your intent?
 5             MR. STRUCK:  Asked and answered.                        09:38AM
 6             THE COURT:  Overruled.
 7             THE WITNESS:  Repeat your question, please.
 8   BY MR. SPECTER:
 9   Q.  Don't you believe that some people who read that e-mail,
10   especially the last few paragraphs, could have taken that to     09:38AM
11   mean that you were trying to undermine the legitimacy of The
12   court's order?
13             MR. STRUCK:  Calls for speculation.
14             THE COURT:  Overruled.
15             THE WITNESS:  No, I don't.                              09:38AM
16   BY MR. SPECTER:
17   Q.  So you were on the telephone call where you were the --
18   during the emergency status conference hearing on July 21st,
19   were you not?
20   A.  Yes.                                                         09:38AM
21   Q.  And you heard what the Court said and you heard what your
22   counsel said, correct?
23   A.  Yes.
24   Q.  And you heard the Court say -- this is on Page 13 -- that
25   you take the issues -- the judge is referring now to Ms. Love,   09:39AM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

1  and through her, you and your staff, that there will be no

2  change in the status of any kind unless you can demonstrate to

3  me that there is a danger to people on the prison yard or some

4  other very convincing reason that you take any action within

5  the facility that changes the status of somebody who comes to          09:39AM

6  my court to testify.

7       Do you recall the judge saying that?

8  A.  Yes.

9  Q.  And do you recall the judge saying, quote, "I essentially

10  said somebody gets a gold pass or a freedom of being written up      09:40AM

11  for a shirttail or any other similar minor infraction close in

12  any time to when they communicate to the plaintiffs or they

13  communicate to me.  They get a free pass on that."

14       Do you recall that, too?

15  A.  Yes.                                                              09:40AM

16  Q.  Now, after that hearing, did you take any action to follow

17  the status of the prisoners who testified in your court, I

18  mean, in this court, to find out whether they were being

19  subject to any of the kind of minor infractions that the Court

20  referred to?                                                         09:40AM

21  A.  On the 21st?

22  Q.  No, subsequently.

23  A.  I think we had discussion with counsel but I don't recall

24  specifically that we were focused on any individual inmate.

25  Q.  So you didn't issue an order asking your staff to keep you        09:41AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

1    apprised of any change in the status or giving minor

2    infractions to the prisoners who were a subject of the hearing

3    on the 14th, is that right?

4    A.  We were talking about the 21st.  Now you are saying the

5    14th.                                                                              09:41AM

6    Q.  Prisoners testified on July 14th.  Do you understand that?

7    A.  Yes, but I was not at the hearing on the 14th and I don't

8    believe at the time I had read the transcript from that

9    hearing.

10   Q.  The Court in the July 1st (sic) telephone conference was          09:41AM

11   concerned about retaliation against those prisoners who

12   testified on the 14th.  Do you understand that?

13   A.  Yes.

14   Q.  Did you take any action to direct your staff to provide you

15   with information on the change of status of any of those            09:42AM

16   inmates who testified at the hearing on July 14th?

17   A.  No.

18   Q.  Do you know that Ms. Ashworth testified in this case?

19   A.  Yes.

20   Q.  And you were aware of the fact that her cellmate was moved       09:42AM

21   shortly after she testified?

22   A.  I believe that occurred within a few days.

23   Q.  Right.  And that you were aware that Judge Duncan ordered

24   that her cellmate be returned to Ms. Ashworth 's cell?

25   A.  Yes.                                                                            09:42AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

1  Q.  Did you meet with Ms. Ashworth's cellmate?

2  A.  No.

3  Q.  Is there a policy at Perryville which provides that the

4  inmates, including Ms. Ashworth, can open their cell door so as

5  to increase the circulation of the air during this time of          09:43AM

6  substantial heat?

7          MR. STRUCK:  Your Honor, this is going beyond the

8  scope of the purpose of Director Ryan's testimony.  We can

9  provide testimony with respect to Perryville and Ms. Ashworth

10  on the 11th when we have the hearing.                              09:43AM

11          THE COURT:  How is it related to retaliation, Mr.

12  Specter?

13          MR. SPECTER:  I will show you in two questions.

14          THE COURT:  Overruled.

15          THE WITNESS:  Ask your question again.                     09:43AM

16  BY MR. SPECTER:

17  Q.  Are you aware that there's a policy of allowing prisoners

18  in Perryville and in Ms. Ashworth's unit to have their cell

19  doors open so that the air can circulate more freely?

20  A.  I'm not intimately familiar with the operational procedure     09:43AM

21  at the unit that the inmate you are referencing is assigned.

22  Q.  Okay.

23          MR. SPECTER:  Can I approach again, Your Honor?

24          THE COURT:  You may.

25          Thank you.  Do you have an extra copy perhaps for Ms.      09:44AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

```
 1   Brown?
 2   BY MR. SPECTER:
 3   Q.  Director Ryan, what I have just handed you is an e-mail
 4   that we received from Lucy Rand who is one of your counsel in
 5   this case.  It is dated Sunday, August 6, at 7:22 p.m.  And if        09:44AM
 6   you look at the third paragraph down, do you see that where it
 7   says, "Further"?
 8   A.  Yes.
 9   Q.  Could you read that paragraph or that sentence please?
10   A.  Certainly.  "Further, the inmates in this housing area are        09:45AM
11   able to leave their cells open so as to receive air from the
12   common areas which increases air circulation and reduces the
13   likelihood of uneven temperatures."
14   Q.  Right.  We received information from Ms. Ashworth during a
15   phone call yesterday that she, despite this, despite what Ms.         09:45AM
16   Rand wrote, that she was given a ticket for having her cell
17   door open on Saturday?
18            MR. STRUCK:  Objection, Your Honor.
19            THE COURT:  Just a second.  What's the objection?
20            MR. STRUCK:  Counsel is testifying.  That's hearsay.        09:45AM
21            THE COURT:  He's asking a question based on what his
22   client told him.  He can ask him.  It's not dependent upon the
23   truth of the statement.  He's just asking a question about it
24   overruled.
25            THE WITNESS:  What's your question?                         09:46AM
```

UNITED STATES DISTRICT COURT

1    BY MR. SPECTER:

2    Q.   My question is we were told by Ms. Ashworth during a legal

3    phone call on Saturday that she received a ticket for having an

4    open cell door after she was told, consistent with Ms. Rand's

5    e-mail, that she may have her cell door open in this time of        09:46AM

6    extreme heat in order to increase the circulation of air in the

7    cell.   My question is, do you know anything about that?

8    A.   No.

9    Q.   Would you be concerned about that if it is true?

10   A.   Yes.                                                          09:46AM

11   Q.   And why would you be concerned about it?

12   A.   If it, in fact, has been the practice to allow the cell

13   door to be open to allow for better or more even air flow and

14   the door was not, that would be concerning.

15   Q.   And would you be concerned that because of the fact that      09:46AM

16   Ms. Ashworth has testified in this case, in this courtroom,

17   that it is -- that the ticketing is another act of retaliation

18   or a act of retaliation?

19   A.   My concern would not be about Inmate Ashford.   It would be

20   are we consistent in our practice.   Is the door going to be       09:47AM

21   allowed to be open so that air flow can occur, it shouldn't

22   matter who the which inmate it is.

23   Q.   You gave a video conference about the judge's order?

24   A.   Yes.

25   Q.   What day was that?                                            09:47AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

```
1    A.  A week ago today.  So that I think that would have been
2    August 1st.
3    Q.  And the video conference lasted for 90 minutes?
4    A.  About 90 minutes.
5    Q.  And this video conference that technology that you used is    09:47AM
6    it your understanding that it had any recording capabilities?
7    A.  We do not have recording capability for that technology.
8    Q.  Did you make any notes prior to the conference about what
9    you were going to say?
10   A.  No.                                                           09:48AM
11   Q.  Do you know if anybody took notes during that conference?
12   A.  I don't know if anybody took notes.  They may have taken
13   notes in the institutions because the audience was 10 prison
14   complexes.  It was the wardens, the deputy wardens of
15   operations, the unit deputy wardens, the facility health        09:48AM
16   administrators, the department's health service monitors, I
17   think there was the directors of nursing from Corizon, and
18   there may have also been other nurses in the conference room at
19   my office.  It was attended by many of my executive team, my
20   general counsel, all three of the outside counsel here in the    09:49AM
21   courtroom, the AG, assistant AG Michael Gottfried, Richard
22   Pratt, the co-defendant, and some other staff.
23   Q.  So I take it you didn't talk for the whole 90 minutes?
24   A.  No.  As I have already said earlier, I called the meeting
25   to order and I asked if the everyone on the conference and in    09:49AM
```

```
 1   the conference room had read the e-mail and had read the
 2   Court's order and I got a collective affirmative response that
 3   they had.  I took the liberty of only reading the e-mail
 4   verbatim and at the conclusion of that, I asked did anyone have
 5   any questions.  No one asked a question.  That told me they          09:50AM
 6   understood what the requirement was to follow that order to the
 7   letter, and then my final comment was ensure that the order is
 8   followed to the letter.  The magistrate judge is on record
 9   saying he was going to micromanage this case.  We then went on
10   to another topic.                                                     09:50AM
11            MR. SPECTER:  No further questions.
12            THE COURT:  Thank you.  Any redirect?
13            MR. STRUCK:  No, Your Honor.
14            THE COURT:  Director Ryan, let me assure you the last
15   thing I want to do is micromanage your prisons.  I only do that      09:50AM
16   because you haven't been able to deliver what you promised to
17   deliver, and that was compliance with the stipulation's
18   requirements with respect to providing health care.  And so the
19   stipulation has a mechanism to address that failure, and that
20   mechanism requires me to first give an opportunity to you all        09:51AM
21   to try again, to try something else to see if you can work it
22   out on your proposal.  If that fails, then one of the options
23   that's open to me is to come up with the mechanism myself.
24   That's not the best method.  That means micromanaging.  It
25   means me jumping into your chair and trying to figure out what       09:51AM
```

1    I can't figure out, and that is all of the years of knowledge

2    and experience that you have.

3         But notwithstanding all of those years and experience,

4    you haven't been able to perform what I thought would be at the

5    time we settled the case pretty straightforward and likely to     09:52AM

6    occur, and that is compliance with the stipulation.  And what

7    we have now, more than two years out, is what I previously

8    described as abject failures to comply with the stipulation.

9    So that means I jump into your chair and I micromanage.  And I

10   don't want to do that.  But I can only do it to even a marginal   09:52AM

11   degree of success if I have full information, and that's why I

12   visited the yard.  I learned a couple things there that your

13   lawyer suggested maybe I can pull out of my head things that I

14   learned that are unrelated to what comes into the testimony in

15   the Court.  But I'm the fact finder and the law decider here in   09:52AM

16   this case, so I'm both.  So I pay attention to what I do.  I

17   visited one of the health clinics.  It was so hot in that

18   health clinic that I sweated so profusely that your lawyer

19   offered me paper towels.  And my hearing aid was destroyed by

20   the amount of water in my ear.  So it was that hot in that        09:53AM

21   health clinic.  I don't know what the temperature was, but I

22   knew that it was untenable.

23        So I observed that.  And that's in the context of the

24   case where I have this performance measure that requires that

25   inmates who are receiving medication that exposes them to a       09:53AM

1    greater risk of heat intolerance and ability to regulate their

2    temperatures is an issue in my case.  So I observed those

3    things, but you could easily say to me, well, there are

4    imperfections about your observation there.  It's not the whole

5    story.  And unfortunately, I can't always get the full story      09:53AM

6    because the full story would be requiring that I have your

7    knowledge and experience of your many years and also have a

8    good conduit of information.  My conduit of information is

9    impaired because I'm not on the yard.  I would like to live

10   there, actually, for a while, so that I could see myself how it   09:54AM

11   works and understand it better.

12          But I can't do that.  And so the next best thing is

13   the conduit of information that comes from the plaintiffs from

14   the monitors, and from the inmates themselves who testify.  And

15   that's important to me because just as you sit in this witness    09:54AM

16   chair five feet away from me so did those inmates and they

17   talked to me, and I was able to address credibility in a way

18   slightly different than what Mr. Struck said with respect to

19   his understanding that retaliation is a frequent theme and is

20   not to be trusted.                                                09:54AM

21          I must tell you that the witnesses who testified in my

22   court seemed incredibly credible to me.  And it may well be

23   that they are not telling the truth about the issues with

24   respect to retaliation, but there was nothing that gave me any

25   hint of that when they testified in front of me.  So I had all    09:55AM

1   of this in my head when you say that I embarked on an

2   impermissible preconceived order that was unfortunate, in your

3   words, I think.

4          But I guess the question that I asked in a broad

5   sense, I would ask to you directly.  If you directed one of          09:55AM

6   your wardens to do something that the warden thought was not

7   appropriate because it was preconceived, not based on the whole

8   story, and then that warden took your command to do what you

9   had directed, and instead, communicated to the staff this is

10  what the director says to do, but as you consider this          09:55AM

11  directive from the director, understand also that it was based

12  upon preconceived information, it was faulty, and you are all

13  doing a great job.  How would that make you feel as the

14  director if you saw that circumstance among one of your

15  wardens?          09:56AM

16          THE WITNESS:  Judge Duncan, if, in fact, something

17  like that occurred, and they did not comply with the directive,

18  then I, in fact, would have a real problem with that.  In the

19  case of your order, it has been complied to to the letter.  And

20  I took it, Your Honor, I took it seriously, what you said.          09:56AM

21  Just because I may not, with all due respect, agree with

22  everything that you communicate, I followed your order and I

23  would not violate the order.  And I did not do what has been

24  suggested by plaintiffs.

25          THE COURT:  And I guess I just would make this final          09:56AM

1   observation, and that is, how I worry about the danger of

2   including the additional language that you did, even though you

3   believe that the order was complied with, you honestly can't

4   know because you can't know what happened with every

5   interaction of your corrections officers at the lowest level,          09:57AM

6   middle level, highest level, you can't know about all of those

7   interactions.  But the best you can do is to tell them in as

8   plain and straightforward words as possible do not do this.

9        But I will just say to you, and I understand your

10   response it to, that if I were a director of corrections and I       09:57AM

11   knew that a warden had communicated my command to do something

12   but in the same breath had said that it was preconceived and

13   faulty, I would worry that even though I was getting a report

14   back that everybody had complied with my order, that I would

15   not necessarily be getting the whole picture because I had          09:58AM

16   communicated that it was okay by sort of a wink wink nod nod to

17   continue violating the order.  And that's how I read it.

18        So I understand that you have a different view but I

19   wanted to make you understand that I think that my reaction was

20   not unreasonable for the reasons that I have just expressed.        09:58AM

21        Just one more question, if I could, and that is:  One

22   of the exhibits attached in response to my order that we

23   received the written documents associated with your

24   communication of the July 25 order, one of the documents

25   mentioned another video conference on the 10th of August.  Was     09:58AM

1    that a mistake or is there another planned video conference on

2    this topic?

3             THE WITNESS:  Judge Duncan, I'm not aware of another

4    video conference.

5             THE COURT:  Okay.  All right.  And then the last thing    09:58AM

6    that I will have to say is, get me out of this business of

7    micromanaging your operation.  And the simple pathway to doing

8    that is to make sure that when Mr. Struck or Mr. Bojanowski

9    stand up in court on a monthly basis they tell me the

10   performance measures are being met at 85 percent across the    09:59AM

11   board, we get there.  I'm out of your hair.  And what's more

12   important is that the health care promise that was made to the

13   inmates is being delivered, and that's what I'm here for.  And

14   I will be micromanaging until we get into that position but

15   there's an easy pathway out of it.  You have the complete    09:59AM

16   control to do it.  So I hope you do.  Thank you, sir.

17            THE WITNESS:  Judge, thank you for taking the time.

18   And I can assure you that we will comply with your orders to

19   the letter.  There was no intention to be disrespectful to the

20   Court.  I believe, with all due respect, I want you out of this    10:00AM

21   case as bad as everybody else.

22            THE COURT:  I don't have any doubt about that.

23            THE WITNESS:  So we will continue to stay after our

24   vendor to fulfill their requirements to perform.

25            THE COURT:  And I'm sure you have read the transcript    10:00AM

1    and you understand one of the issues that I have previously

2    identified, and that is the cross current of economic

3    incentives that run between both the vendor and the State of

4    Arizona that can be counter to the purposes of the stipulation.

5             I serve as a corrective to that, and you have to keep          10:00AM

6    that in mind that there may be what looks to be a sound

7    economic decision either by the vendor or the state but one

8    that potentially could be much worse for the State if it

9    enables me or requires me to try to correct it in the means

10   that are available to me.  So I think I appreciate the chance          10:01AM

11   to be able to talk to you here today.  Thank you.

12            THE WITNESS:  Thank you, Your Honor.

13            THE COURT:  You may step down.

14            So now we can proceed with the witnesses that we had

15   previously identified regarding the HNR issue.  Is that how you        10:01AM

16   anticipate proceeding, Mr. Struck?

17            MR. BOJANOWSKI:  Your Honor, before going forth with

18   the evidentiary hearing we think that we would like to know the

19   answer to the question of the amicus issue.  Because if, in

20   fact, the Court grants that, then I would anticipate that the          10:01AM

21   Fennemore Craig attorneys would examine some of the witnesses

22   today.

23            So I was hopeful that, perhaps, the Court would

24   address that issue before we got into the evidence over the

25   next -- and the hearing tomorrow, the status hearing.  So I            10:02AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

```
 1   know -- I believe it's fully briefed at this point, and I was

 2   thinking just as a matter of logistics it may be more efficient

 3   to know that up front rather than on the back end.

 4          THE COURT:  I can give you the answer that is the

 5   answer for today, and that is that a written order is in          10:02AM

 6   preparation.  It is not issued yet.  So at present they are not

 7   in the case as amicus or any other way.

 8          MR. BOJANOWSKI:  Your Honor, I believe the plaintiffs

 9   have the next witness.  They have indicated, I believe, through

10   e-mail that they wanted to have Mr. Pratt testify.                10:02AM

11          THE COURT:  Okay.  All right.

12          MS. KENDRICK:  Were you about to call a break, sir?

13          THE COURT:  Why don't we take a 10-minute break.  That

14   way we won't have to interrupt so that we we'll get back.

15          Thank you.                                                 10:03AM

16          (Recess from 10:02 a.m. until 10:16 a.m.)

17          THE COURT:  Is everybody assembled who we need?

18          We're back on the record.  Yes, Mr. Struck.

19          MR. STRUCK:  Very quickly, I wanted the Court to know

20   that we have contacted the warden at Perryville regarding the     10:16AM

21   allegation of Ms. Ashworth.  Not only did she not get a

22   disciplinary violation, she's never had one during her stay at

23   Perryville.  So that is inaccurate.

24          THE COURT:  Okay.  Thank you.

25          (The witness was sworn.)                                   10:16AM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1      THE COURT:  Good morning, Mr. Pratt.

2      THE WITNESS:  Good morning, Judge.

3                   RICHARD PRATT,

4  a witness herein, having been first duly sworn by the clerk to

5  speak the truth and nothing but the truth, was examined and

6  testified as follows:

7                   DIRECT EXAMINATION

8  BY MS. KENDRICK:

9  Q.  Good morning.

10 A.  Good morning.                                      10:17AM

11 Q.  Welcome back.

12 A.  Thanks.

13 Q.  We missed you last month.

14      In front of you is a binder that has some of the

15 exhibits that we'll be going through this morning, so I just   10:17AM

16 wanted to direct your attention to it.

17      And we're here today to talk about the open sick call

18 system, which my understanding is you are familiar with that

19 program and that policy?

20 A.  Yes.                                               10:17AM

21 Q.  Could you turn to Tab 31, please.

22 A.  Okay.

23 Q.  This is an e-mail that you sent on December 2nd of 2016 to

24 the Monitoring Bureau, and the subject line is:  New process

25 for HNRs at Eyman, Florence, Lewis, Perryville, Tucson, and    10:17AM

1    Yuma.  And your opening statement is, "Based upon a recent

2    court order, changes will be implemented in the way that

3    inmates will be able to submit HNRs."  Doesn't that sentence

4    make it sound like court ordered the open clinic?

5    A.  Not in my opinion, no.                                    10:18AM

6    Q.  Have you ever told anyone that the Court ordered this

7    change from the old system of collecting the HNRs to the new

8    one of the open clinic?

9    A.  No.

10   Q.  Whose idea was it to go to the open clinic system?        10:18AM

11   A.  This was a mutual decision between the Monitoring Bureau

12   and Corizon in collaboration to try to determine a better way

13   to have inmates access healthcare.

14   Q.  Who at Corizon?

15   A.  I the leadership.  I don't know specifically, but the     10:18AM

16   entire leadership.

17   Q.  Did they propose the idea?

18   A.  I don't recall whether it was their proposal or our

19   proposal, but this was ongoing discussions in the way we can

20   improve access to healthcare.                                 10:18AM

21   Q.  When did you guys start discussing this?

22   A.  I don't know.

23   Q.  Was it in October?

24   A.  We have talked about improvements ever since the contract

25   came into place.                                              10:19AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    Q.   So was it before the Court's November 10 order?

2    A.   We have talked -- again, we have talked improvements on an

3    ongoing basis whenever we get together in ways to improve the

4    system.

5    Q.   So you can't say that it was in response to the Court's          10:19AM

6    order?

7    A.   No.

8    Q.   When you presented this new concept to your staff, did

9    anybody express concerns or reservations about the system?

10   A.   No; possibly questions because it was something that hadn't     10:19AM

11   been done before, but no reservations or concerns.

12   Q.   Okay.  And in your e-mail, in the second paragraph, in the

13   next to last sentence, you write, HNR boxes will not, not

14   capitalized, be removed from the yards, parenthesis, at this

15   time, close parenthesis.  This covers all HNRs regardless of       10:20AM

16   the discipline.

17           Was that accurate?

18   A.   Yes.

19   Q.   I'd like you to flip to Tab 18.  These are handwritten

20   notes from December 2nd, 2016, at 1000 hours for a               10:20AM

21   teleconference that was called 24 HNR slash sick call slash IGA

22   contracts.  Do you recognize this individual's handwriting?

23   A.   No.

24   Q.   You see on the third line it says Carson slash Richard.  Is

25   that you?                                                          10:20AM

 1   A.  I assume so, yes.

 2          MS. KENDRICK:  Your Honor, I'm sorry to interrupt.  I

 3   just realized that some of the witnesses on defendants' list

 4   are in the courtroom, and I would like to invoke the Rule.

 5          THE COURT:  All right.  Would we take care to identify   10:21AM

 6   who those witnesses are and to have the Rule enforced?

 7          MS. LOVE:  Mr. Trujillo and Mr. McWilliams will not be

 8   testifying today.

 9          THE COURT:  Does that satisfy your inquiry?

10          MS. KENDRICK:  If that's the extent of it, yeah.        10:21AM

11          THE COURT:  Okay.  Thank you.

12          MS. KENDRICK:  Sorry.

13   BY MS. KENDRICK:

14   Q.  If you go down -- do you remember being on this

15   teleconference on December 2nd?                                10:21AM

16   A.  No, I don't.

17   Q.  Do you have any reason to doubt that the notes that were

18   taken by this individual during the teleconference do not

19   reflect what he or she was hearing at the time?

20   A.  I have never --                                            10:21AM

21          MR. BOJANOWSKI:  Note an objection.  There's no

22   foundation as to who authored this, where it came from.  I

23   can't identify it and the witness has not identified it,

24   either.

25          MS. KENDRICK:  Your Honor, defendants produced this as  10:21AM

1    responsive to the open clinic document.  So in terms of

2    authentication it was clearly in their possession.

3            MR. BOJANOWSKI:  It's not a self-authenticating

4    document.

5            THE COURT:  The question is sustained.  The question    10:22AM

6    is faulty because it says, "Do you have any reason to doubt

7    that the notes that were taken by this individual during the

8    teleconference do not reflect what he or she was hearing at the

9    time?"  This witness would have no way of knowing what the

10   person who took the notes was hearing at the time.  Perhaps a    10:22AM

11   different question could be whether or not after review of the

12   notes, whether there's anything in the notes that the witness

13   disagrees with.  You can ask that question if you want.

14   BY MS. KENDRICK:

15   Q.  Have you had a chance to review the notes?    10:22AM

16   A.  No, I have not.

17   Q.  Why don't you take some time and take a look.

18   A.  And the question again?

19   Q.  Do you have any reason to doubt anything that is written

20   there is not accurate?    10:23AM

21           MR. BOJANOWSKI:  Same objection.

22           THE COURT:  Overruled.

23           THE WITNESS:  Whoever wrote this I can only assume

24   that this is what their understanding was.

25   BY MS. KENDRICK:    10:23AM

1   Q.  Okay.  So do you see under Number 1, 24 HNR slash sick call

2   the fourth dash that says HNR boxes stay, and underneath it

3   can't force IMs, inmates, to bring HNR to medical?

4   A.  Yes.

5   Q.  Do you remember having any discussion with Mr. McWilliams          10:24AM

6   or these others individuals listed as being present about why

7   you cannot force inmates to bring HNRs to medical?

8   A.  No.

9   Q.  If you turn to Tab 24.

10  A.  Okay.                                                             10:24AM

11  Q.  At the bottom of the page, there is an e-mail sent by an

12  individual named Lisa Yanez on December 2nd, 2016 at 11:23 a.m.

13          Do you know who Ms. Yanez is?

14  A.  She reports to Mr. McWilliams.

15  Q.  And at the bottom of the page she writes, "Follow-up from        10:24AM

16  discussion today."  And then if you turn the page, "HNR boxes

17  must be kept.  They are not going away."

18          Does this refresh your memory of this meeting?

19  A.  No.

20  Q.  Do you know why on December 2nd the custody operations and       10:25AM

21  Healthcare Services Monitoring Bureau were saying that HNR

22  boxes must stay?

23  A.  There was no determination made that they were going to

24  absolutely be removed at that time, as I recall.

25  Q.  Okay.  If you go down about nine bullet points, on her           10:25AM

1  e-mail it says, "Hold Corizon to the 12-hour nurse's Line 7 to

2  7."

3        What does that mean?

4  A.  I'm not sure how that's to be interpreted.  To me, it

5  sounds as if they wanted to have nurse line running 12 hours a        10:25AM

6  day.

7  Q.  Isn't it the case that you have previously told the Court

8  in declarations that nurse's line runs from 7 to 7?

9  A.  No.  There's availability, but nurse lines don't run 7 to 7

10 typically.        10:26AM

11 Q.  And if you see the last bullet point that is in bold and

12 underlined, it says, "Follow up each day to ensure Corizon is

13 checking all HNR boxes."  What does that mean?

14 A.  I can't speak for the person who wrote this.  Apparently,

15 they are asking that someone from operations looks at or talks        10:26AM

16 with Corizon to make sure that the HNR boxes are empty each

17 day.

18 Q.  Were you aware that operations staff had instructed the

19 wardens and the deputy wardens to make sure that they were

20 emptied?        10:26AM

21 A.  No.

22 Q.  If you could turn to Tab 27.

23        This is an e-mail exchange between Kathleen Campbell

24 and Mark Haldane.  Those are both people that report to you,

25 correct?        10:27AM

1   A.  Kathleen does, yes.

2   Q.  And does Mr. Haldane report to Ms. Campbell?

3   A.  Yes.

4   Q.  If you turn to the second page of the e-mail, Mr. Haldane

5   writes, "Sumi reported that according to Rolly Maldonado, as          10:27AM

6   soon as the sick call is in place and implemented that the HNR

7   boxes were going away.  I said that was in direct contradiction

8   to what I was told today, which is that they were never going

9   away because it is an access to care issue."

10          Did you participate in a meeting on December 7 with          10:27AM

11  the monitors where they were told the boxes are not going away?

12  A.  I don't recall that the monitors were ever told the boxes

13  were never going away.

14  Q.  Do you have any reason to think that Mr. Haldane is

15  misremembering what he had been told earlier in the day?          10:28AM

16  A.  I have no reason to doubt what his memory is.

17  Q.  If you flip to Exhibit 30.

18          THE COURT:  Now, you refer to it as Exhibit 30.  I

19  don't think it's been admitted.

20          MS. KENDRICK:  I'm sorry, Your Honor I misspoke.  Tab          10:28AM

21  30.

22  BY MS. KENDRICK:

23  Q.  And Sumi Erno is the Facility Health Administrator at

24  Perryville, is that correct?

25  A.  She was.          10:28AM

1    Q.  Until when?

2    A.  I believe a couple months ago.

3    Q.  Okay.  This e-mail is from December 7 so she was the

4    director or administrator then?

5    A.  She was the health administrator at that time, yes.                    10:28AM

6    Q.  So if you turn to the second page, she is listing the

7    schedule for all of the various yards at Perryville.  Do you

8    see that at the top, "The Corizon FHA has stated discourage

9    inmates from using HNR box"?

10   A.  Yes.                                                                   10:29AM

11   Q.  Do you think that's contradictory to what Mr. Haldane said

12   that very same day that boxes were not going away because it's

13   an access to care issue?

14   A.  No.

15   Q.  You think those two ideas can exist together?                         10:29AM

16   A.  The desire was to have the inmates actually bring the HNRs

17   into the open sick call as opposed to using the HNR boxes at

18   that time.

19   Q.  But at this time in December, publicly you were still

20   saying that the HNR boxes were present for people to access.              10:29AM

21   Is that correct?

22   A.  They were not being removed at that time, that's correct.

23   Q.  Okay.  I'm going to show you something that was previously

24   filed on the docket with this Court.  It's Docket 1873-1.

25          THE COURT:  Do you have an extra copy for Ms. Brown?               10:30AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1        MS. KENDRICK:  I gave you two.

2        THE COURT:  Could you run it over there?  I'm sorry to

3    make you a runner.  It's easier for you to do it on your

4    circuit.  Thank you.

5    BY MS. KENDRICK:                                              10:30AM

6    Q.  Mr. Pratt, this is a declaration that you signed under

7    penalty of perjury and filed with the Court on January 18th,

8    2017.  If you want to just take a look at it and see if you

9    remember this declaration.

10   A.  Yes.                                                      10:31AM

11   Q.  Did you write this declaration?

12   A.  No.  It was written by my legal staff for me to agree to.

13   Q.  Okay.  Did you review it before you signed it?

14   A.  Yes, I did.

15   Q.  Did you make any changes to it?                           10:31AM

16   A.  I don't recall if I did or not.

17   Q.  Okay.  If you could turn to Page 3 on the bottom, it's

18   Paragraph 20.  Could you read that, please?

19   A.  "If an inmate wishes to submit an HNR outside of the hours

20   in which the clinic is open for his slash her housing unit, the  10:31AM

21   inmate may submit the HNR in the HNR collection box.  The HNR

22   will be triaged by nursing staff and the inmate will be seen

23   during the next open period for his slash her housing unit such

24   that the inmate is still seen within 24 hours of the HNR

25   request.  And the HNR is still tracked for Performance Measures  10:32AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    36 and 37."

2    Q.  So as of January 18, you were telling the Court that the

3    HNR boxes were available for the prisoners, correct?

4    A.  Yes.

5    Q.  And did you give any indication to the Court that the HNR                10:32AM

6    boxes could potentially be removed?

7    A.  I don't know if I did or not.

8    Q.  Do you see any indication in Paragraph 20?

9    A.  No.  Not in Paragraph 20.

10   Q.  Okay.  If you could please turn to Tab 23.  This is an                    10:32AM

11   e-mail sent on February 16th, 2017, from a person named Roland

12   Maldonado at Corizon.  And it's addressed to you and to Mr.

13   McWilliams.  Who is Mr. Maldonado?

14   A.  Mr. Maldonado works for Corizon.  He is Rhonda Almanza's

15   boss.                                                                        10:33AM

16   Q.  And in his e-mail that he's forwarding to you, he is

17   telling you, quote, "Please find a graph below revealing that

18   the sick call process is reverting back to an HNR box system.

19   I suspected based on my experience in other states that if

20   allowed to use the box or come to an open call that the                      10:33AM

21   population will always take the easiest route and go to the

22   box.  I'd like to hear your thoughts on numbers and whether the

23   deterioration in open call process will meet your slash Court's

24   needs."

25          Do you remember this e-mail or this chart showing the                 10:33AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   utilization?

2   A.  Not -- no.  I don't recall this, but it's obvious that I

3   have seen it.

4   Q.  Is this what prompted the beginning of a discussion about

5   removing the HNR boxes?                                          10:33AM

6   A.  I don't know if this prompted it or if these were ongoing

7   discussions.

8   Q.  Well, if it was an ongoing discussion was it ongoing before

9   January 18th?

10  A.  It may have been up for consideration, yes.                  10:34AM

11  Q.  When you represented to the Court that the HNR boxes were

12  there and in place?

13  A.  Yes.

14  Q.  Then on the third page of the e-mail there's a chart that

15  shows for six prisons, Eyman, Florence, Lewis, Perryville,       10:34AM

16  Tucson, and Yuma, for each week, the number of patients who

17  requested medical care, mental health care, or dental care via

18  HNR box versus going to the open sick call.  What about these

19  numbers were concerning to you or Mr. Maldonado?

20          MR. BOJANOWSKI:  What tab are you on, Corene.            10:35AM

21          MS. KENDRICK:  Still on 33.

22  BY MS. KENDRICK:

23  Q.  I guess let me back up.  Mr. Maldonado expresses concern in

24  his e-mail and encloses this chart as the basis for his

25  concerns.  Upon reviewing this chart, do you share his          10:35AM

1    concerns?

2    A.  He indicates that sites report that inmates prefer the HNR

3    box to the open sick call process as they do not have to wait

4    to be seen.  When they use the box they are called down to be

5    seen by the nurse at that time as opposed to waiting in turn          10:35AM

6    and then he lists all the numbers.

7    Q.  Right.  But what is it about the numbers on their face that

8    would cause concern for him or potentially for you?

9    A.  This doesn't show any concern for me.

10   Q.  Okay.  So you did not share the concern that some people         10:35AM

11   were still using the boxes?

12   A.  No.  It is simply a fact that people are still using the

13   boxes.

14   Q.  Okay.  If you could turn to Tab 29.

15   A.  Okay.                                                             10:36AM

16   Q.  This is an e-mail that you sent on May 15 of this year with

17   the subject line "Redirection for HNR boxes on minimum and

18   medium yards."  And it's addressed to some people on your

19   staff; Ms. Barlund, Ms. Headstream, Ms. Campbell, Dr. Taylor,

20   and then Ms. Almanza from Corizon, correct?                          10:36AM

21   A.  Correct.

22   Q.  And you are asking them for feedback on, you call it,

23   quote, repurposing the HNR boxes effective June 12.  You, in

24   your e-mail say that some requests should be exempt from

25   medication refills.  Why did you feel that way?                      10:37AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   A.   Inmates don't -- they don't need to be seen for a

2   medication refill.  It's simply something they can submit.

3   It's not going to require them to be seen by nursing staff.

4   Q.   Right.  And then the last sentence of your e-mail you came

5   up with other examples such as a person who is running out of          10:37AM

6   catheters or someone who needs to review his medical records,

7   correct?

8   A.   Correct.

9   Q.   And in response, your employee, Ms. Campbell, says that she

10  believes that HNR boxes should be completely removed.  And she         10:37AM

11  says, quote, "I don't know what will stop the inmates from

12  dropping an HNR in the box wanting to be seen on sick call

13  line.  I think by removing the HNR boxes it would eliminate

14  this issue."

15       What exactly is -- she's characterizing prisoners                10:38AM

16  putting HNRs in boxes as issues.  Does that mean it's a

17  problem?

18  A.   That's not the way I read it, no.

19  Q.   Do you think it's a problem that they still use boxes?

20  A.   No.                                                               10:38AM

21  Q.   Do you agree with her that they should be completely

22  removed and people getting medication refills be forced to go

23  to the clinic?

24  A.   No.  I have never said that.

25  Q.   And then Dr. Taylor says in response to Ms. Campbell,            10:38AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    quote, "I completely agree with Kathy," with a smiley face,

2    right?

3    A.  Correct.

4    Q.  Okay.  I want to go back to your declaration, the January

5    18th one.  On Paragraph 22, you state to the Court that if an                10:38AM

6    inmate has an urgent or emergent need for medical care outside

7    the hours in which the clinic serves his/her housing unit,

8    security staff may initiate an ICS or contact medical staff who

9    may either request that the inmate be brought to an open

10   medical clinic or may come to the inmate's location.                        10:39AM

11         So it's up to custody officers to decide whether a

12   person requires medical care after hours?

13   A.  Ask that again, please.

14   Q.  Based on your statement here, it's up to custody officers

15   to decide whether a person is going to need medical care,                   10:39AM

16   right?

17   A.  No.

18   Q.  Whose deciding then, if not the officer?

19   A.  Security staff can call an ICS or an emergency if, in their

20   opinion, there's a medical emergency taking place.                          10:40AM

21   Q.  Right.  So you are asking security staff, correct?

22   A.  Asking them what?

23   Q.  To make the determination about whether it requires an

24   emergency response?

25   A.  In their opinion, if they feel that it requires an                      10:40AM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   emergency response they can call the ICS at any time, yes.

2   Q.  COs don't have medical training beyond basic first aid,

3   right?

4   A.  They receive some basic training, but, yes, it's first aid.

5   Q.  Basic first aid?                                           10:40AM

6   A.  Correct.

7   Q.  Do you think it's appropriate for officers to take this

8   gatekeeping role in accessing medical care?

9   A.  The officers are not gatekeepers for medical care.  They

10  are another set of eyes and ears on the yard to bring emergency   10:40AM

11  issues, or issues that they feel are required to be seen by

12  medical.  But they are not the gatekeepers.

13  Q.  If you could turn to Tab 41.

14      THE COURT:  How does someone in compliance with your

15  Paragraph 22 description, "If an inmate has an urgent or         10:41AM

16  emergent need for medical care outside the hours in which the

17  clinic serves his or her housing unit, a security staff may

18  initiate an ICS," how is it that the security staff is not

19  serving as a gatekeeper role in that function?

20      THE WITNESS:  It's not their ultimate determination.        10:41AM

21  If an inmate wants medical care, the officer can call medical,

22  explain the issue to them.  Medical becomes the gatekeeper at

23  that point to say, yeah, we need to see them right now or we

24  will come to the yard.  Again, if an ICS is put forth then

25  there will be a response from medical.                          10:41AM

1    THE COURT:  So is it your testimony that if an inmate

2    says I need medical care that it is not within the province of

3    the correction staff to say I'm not going to relay that

4    information to medical officer?

5    THE WITNESS:  I can't speak for each individual          10:41AM

6    officer, Judge.  But I will tell you that if an inmate says I

7    have a headache, are you okay?  The officer will talk to them.

8    The officer can report that to medical.  But I guess

9    technically if you are saying the officer -- he's the conduit.

10   He's not necessarily the gatekeeper, but he is the conduit to  10:42AM

11   go to medical.

12   THE COURT:  He's also the switch.  He's also the

13   vowel.  He or she is saying, yes, I'm going to allow that

14   information to pass through the conduit or not.  So that's what

15   I'm trying to focus on, is when you say they are not the        10:42AM

16   gatekeeper, it seems like they are the vowel.  They are the

17   gatekeeper because they are making, in the first instance, the

18   determination of what the inmate is saying, I need medical

19   care, and the officer is saying I don't think you do so I'm not

20   going to allow it to pass through the conduit.  It sounds like  10:42AM

21   from what you are saying that's something the correction

22   officer is free to do.

23   THE WITNESS:  The officer does have that ability, yes,

24   sir.

25   THE COURT:  Thank you.                                   10:42AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

```
 1   BY MS. KENDRICK:

 2   Q.  And, Mr. Pratt, if the officer declines to call an ICS, is

 3   there some sort of higher power or alternative that the

 4   prisoner can go to to seek further assistance?

 5              MR. BOJANOWSKI:  Note an objection.  Foundation.          10:43AM

 6              THE COURT:  Overruled.

 7              THE WITNESS:  I'm not exactly sure who the -- or what

 8   are you saying.  If an inmate requests from an officer I want

 9   to go see medical?

10   BY MS. KENDRICK:                                                    10:43AM

11   Q.  So here's an analogy.  I file a motion and I ask Judge

12   Duncan to do something and he says no, I can go to the Ninth

13   Circuit Court of Appeal and ask them for permission.  Is there

14   any sort of higher level to the officer who says no when the

15   request is made, or is that the end of it?                         10:43AM

16              MR. BOJANOWSKI:  Same objection.

17              THE COURT:  Overruled.

18              THE WITNESS:  I don't know the answer to that.  That's

19   probably a better question for operation staff to explain how

20   that system works.  The inmate also has the availability of, as   10:43AM

21   far as a grievance or a complaint, to put that in writing if

22   they desire.

23   BY MS. KENDRICK:

24   Q.  Okay.  Could you turn to Tab 25 please.  This is another

25   e-mail from Ms. Erno at Perryville dated April 10th, 2017 with    10:44AM
```

1   the subject line follow-up to medical meeting last week re:

2   ICS.  And she opens it to say, "To clarify access to care:

3   From our HSTM and DO," and she proceeds to list policies from

4   the technical manual and the order.  She then writes underneath

5   it, "If no ICS is called, what is the inmate refusing?  How is        10:44AM

6   medical supposed to assess inmate if no HNR is submitted or no

7   ICS is called?"

8          Does that help you understand the questions that Judge

9   Duncan and I have been asking?

10  A.  I understand what you are asking.                                  10:45AM

11  Q.  So if an ICS is not called, is there a record made of it?

12  A.  There may be from the operations side.  If the officer is

13  doing rounds he may make notes to that effect.  I don't know.

14  Q.  So you don't know if they are required to document every

15  time they have been asked for an ICS in their response?          10:45AM

16  A.  I do not.

17  Q.  Okay.  Could you turn to Tab 41.

18          And this is an e-mail chain again from Perryville from

19  June of this year.  If you could turn to the third page,

20  there's an e-mail written by Adalia Cerrillo.  She's listed as      10:46AM

21  Assistant Facility Health Administrator.  And can you read the

22  second sentence of her e-mail?

23  A.  The Tuesday June 6th?

24  Q.  Yes.

25  A.  Second sentence?                                                  10:46AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   Q.   Yes.

2   A.   "Originally when we opened up" --

3   Q.   Second sentence.

4   A.   "DOC is refusing to transport inmates to where we have the

5   proper equipment to complete certain medical procedures."          10:46AM

6   Q.   And then she goes on to say that when they set up the open

7   sick call at Lumley Unit, they set up a nurse line that used a

8   massage table for an exam chair, or exam table?  Does she say

9   that?

10  A.   Yes.                                                           10:46AM

11  Q.   And she goes on to say that they need a full exam table

12  because Dr. Enciso cannot do paps on this yard?

13  A.   Yes.

14  Q.   And then at the end of her e-mail she notes, "This is going

15  to affect our CGAR measure, Performance Measure 42, for           10:47AM

16  follow-up encounters."

17         Were you aware of this problem at Lumley?

18  A.   No.

19  Q.   If you turn to the second page of the e-mail sent the same

20  day, June 7th, by the ADON assistant director of nursing, Ms.     10:47AM

21  Ellison, she writes that, "If the inmate is housed in CMU,

22  closed management, we are told by custody staff that the inmate

23  cannot be brought to the Lumley medical area.  Custody staff

24  insists that because these inmates must be restrained, escorted

25  by two security staff, the 21 area must be shut down and they     10:47AM

1    are a risk for injury and will not be brought to medical."

2          Do you see this as officers playing the gatekeeping

3    role in access to medical care?

4          MR. BOJANOWSKI:  Same objection.

5          THE WITNESS:  It could be interpreted that way, yes.          10:48AM

6    BY MS. KENDRICK:

7    Q.  Do you personally interpret it that way?

8          MR. BOJANOWSKI:  Same objection.

9          THE WITNESS:  If there are other issues going on from

10   a security standpoint, purely security, where they cannot make          10:48AM

11   this happen, I can't speak to whether or not this person is

12   still going to be seen by medical or if it's going to happen

13   immediately or what is going to happen to get that inmate to

14   medical.  This is the first time I have ever seen this e-mail.

15   BY MS. KENDRICK:          10:48AM

16   Q.  Okay.  And then finally, on the first page of this e-mail

17   chain, Mr. Haldane, your monitor at Perryville, he does recite

18   some of the policies regarding the fact that clinical

19   encounters must occur in an appropriate clinical setting.  And

20   he states, "It is not appropriate to conduct OB/GYN exams          10:48AM

21   without an exam table with stirrups."  He then goes on the

22   fourth paragraph to say, "The medical room on B yard has no air

23   conditioning.  With humidity and heat it is not appropriate to

24   have clinic stock there as it will exceed 78 degrees."

25          Were you aware that the open clinic room on Lumley          10:49AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    yard was not air conditioned?

2    A.  No.

3    Q.  Do you agree with Mr. Haldane's assertion that a clinic

4    without air conditioning is not an appropriate place to store

5    medication?                                                          10:49AM

6    A.  If the temperatures exceed 78 degrees, yes.

7    Q.  And you stated that you were not aware of this problem.  Do

8    you know if a proper exam table versus a massage table was ever

9    put in at the Lumley clinic?

10   A.  I don't.                                                          10:49AM

11   Q.  And if a patient wants to see mental health, she has to

12   physically go to the nurse's line and submit an HNR there,

13   right?

14   A.  Yes.

15   Q.  And wait to be seen by a nurse, right?                          10:50AM

16   A.  She will be seen when she presents the HNR.

17   Q.  Okay.  And are the prisoners charged $4 for this triage

18   encounter?

19   A.  In most circumstances, yes.

20   Q.  Are you concerned that this $4 charge would create a           10:50AM

21   disincentive for people to seek mental health care?

22   A.  No.

23   Q.  Why not?

24   A.  Why?

25   Q.  Because if they have to pay $4 to see a nurse before they      10:50AM

1    can see mental health?

2    A.   They are being seen.  They are being evaluated by the nurse

3    to see what their issues are.  If it's something emergent they

4    are taken care of right away.  Otherwise it's a referral to

5    mental health and there will be no charge for mental health.      10:50AM

6    Q.   Nobody is charged for mental health?

7    A.   No.  That's not what I said.

8    Q.   Who is charged for mental health care?

9    A.   Most inmates are charged.  But you have got SMI, minors,

10   folks that are in infirmaries, they are not charged.            10:51AM

11   Q.   Okay.  So --

12        THE COURT:  Just to make sure that I understand, so if

13   somebody has a mental health care issue, they have to pay $4 to

14   explain that to the nurse who asks basic questions such as are

15   you a threat to yourself or threat to others, what are you       10:51AM

16   feeling, and records that information.  And then that nurse

17   decides whether or not a referral is appropriate to a mental

18   health care specialist.  Is that right, what happens?

19        THE WITNESS:  Basically, yes.

20        THE COURT:  And each of those times, the first time      10:51AM

21   with the nurse and the second time with the mental health

22   specialist, lower case S, meaning just the wide range of mental

23   health providers, each of those encounters results in a $4

24   charge?

25        THE WITNESS:  No.  The initial encounter would; a          10:51AM

1   referral would not.

2          THE COURT:  So the subsequent visit with the mental

3   health specialist does not ever involve a $4 charge if they

4   paid the $4 originally?

5          THE WITNESS:  Yes.                                    10:52AM

6          THE COURT:  Okay.  Thank you.

7   BY MS. KENDRICK:

8   Q.  If a person comes to open clinic with an HNR to see mental

9   health and they refuse to be seen on nurse's line, is the HNR

10  still passed on to mental health?                            10:52AM

11  A.  I don't know if it's always passed on, no.  If an inmate

12  refuses, it's kind of counterintuitive to have an inmate bring

13  in an HNR and say, I don't want to be seen.

14  Q.  I don't want to be seen by the nurse, the nurse's line.

15  A.  If an inmate is having some sort of a medical or mental    10:52AM

16  health issue, it's up to the nurse to triage that and refer

17  them appropriately.  And if they are having significant issues

18  they can be seen right away.  That's the purpose of better

19  access to healthcare through this process.

20  Q.  Okay.  Could you turn back to your declaration from January  10:52AM

21  18th, Paragraph 11?

22  A.  Okay.

23  Q.  You state that, "The open clinic was developed by Corizon

24  and ADC in direct response to the Court's November 10th, 2016

25  order requiring outside transports and was intended to ensure   10:53AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   defendant's compliance with Performance Measure 37 which

2   requires that inmates be seen within 24 hours of submission of

3   a health needs request for routine medical care."

4          Could you please read Paragraph 12?

5   A.  "HNRs for routine dental care and mental health care          10:53AM

6   continue to be addressed through referrals to dental and mental

7   health staff and must be seen within the timelines provided in

8   the stipulation."

9   Q.  So a January 18th request for dental and mental health were

10  not forced to go to the nurse's line?                            10:53AM

11  A.  Prior to that, no.

12  Q.  So when was that changed?

13  A.  I'm not exactly sure of the date.  But that, again, that is

14  the process for the open nurse line.

15  Q.  Did you or your counsel ever provide any clarification to     10:54AM

16  the Court regarding Paragraph 12 of your declaration?

17  A.  Not that I know of.

18         THE COURT:  So this representation in 12, accurate as

19  you swore that it was on the day that you issued it, thereafter

20  became no longer true.  Is that correct?                         10:54AM

21         THE WITNESS:  After the 12th?

22         THE COURT:  No.  After the date that it was executed,

23  which was on the 18th of January.

24         THE WITNESS:  January 18th?  I'm not understand the

25  question, Judge.                                                 10:54AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    THE COURT:  Paragraph 12 says, "HNRs for routine

2  dental care and mental health care continue to be addressed

3  through referrals to dental and mental health staff and must be

4  seen within the timelines provided in the stipulation."  So

5  that was true, we can agree, on the 18th of January 2017.  But        10:55AM

6  what Ms. Kendrick has just elicited from you is that sometime

7  after that, that no longer became true?

8    THE WITNESS:  No.  That's not the case.  They are

9  still referred.  It's just whether or not they are referred at

10  the time that they see the nurse or if they put it in an HNR       10:55AM

11  box they are referred from the HNR box.

12    THE COURT:  I see.  All right.  That clarifies my

13  question.  That seems to cast a different light on it, Ms.

14  Kendrick.

15  BY MS. KENDRICK:                                                      10:55AM

16  Q.  We can move on.

17    THE COURT:  I'm sorry?

18    MS. KENDRICK:  I'm ready to move on.

19    THE COURT:  Well, again, when you make points that

20  seem to get a purchase with me and I ask subsequent questions       10:55AM

21  that seem to undercut that, it would seem reasonable to say,

22  oh, it looks like my supposition of my question wasn't

23  accurate.  If I'm missing something that means that your

24  question still has some purchase, tell me what that is.  But it

25  looks like the question by the answer has been cleared up.          10:56AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    BY MS. KENDRICK:

2    Q.  Just when was it?  What was the date that this change was

3    made?

4    A.  I don't know specifically the date, but it had to be

5    relatively close to this, the time of my declaration.          10:56AM

6    Q.  Okay.  And neither you nor your counsel decided to update

7    us about it?

8           MR. BOJANOWSKI:  Note an objection, Your Honor.  I

9    think I'm confused.  I'm unaware of a change that's been made.

10          THE COURT:  That's what I'm trying to focus on.         10:56AM

11          I'm sorry for over speaking you.  Go ahead.

12          MR. BOJANOWSKI:  I think the witness has testified

13   that there hasn't been a change, quote, unquote, that the

14   policy is still consistent.  They see the nurse, there is a

15   referral if needed.  And that's what was happening in January    10:56AM

16   and is still happening today.  That's my understanding of the

17   witness's testimony.

18          THE COURT:  Hold it just a second.

19          I understand what you said, Mr. Pratt, with respect to

20   the referrals continuing to be made that there was no change     10:57AM

21   there.  But what the change is that is raised by the question

22   is whether HNRs were thereafter still sufficient to initiate

23   these referrals.  And you told the Court on the day of the

24   affidavit that HNRs for routine dental care and mental health

25   care continue to be addressed, and then after that HNRs no       10:57AM

 1    longer became -- no longer were the mechanism for these

 2    referrals.  You had to go to the open line.  Is that what you

 3    are saying the change is?

 4             THE WITNESS:  No.  I'm not even actually describing a

 5    change.  It's a change in the delivery of the HNR.  Where that          10:57AM

 6    HNR comes from is inconsequential.  That referral is still

 7    going to take place whether it comes through an HNR box or an

 8    inmate hands that HNR to the nurse.

 9             THE COURT:  And where do we stand today with respect

10    to this statement:  "HNRs for routine dental care and mental          10:58AM

11    health care continue to be addressed through referrals."  Does

12    that continue to be true?

13             THE WITNESS:  That continues to be true.

14             THE COURT:  Is there anything else that I'm missing?

15             MS. KENDRICK:  Well, Your Honor, it's very ambiguously          10:58AM

16    written, which probably makes sense since it was written by

17    counsel.  But the previous paragraph talks about compliance

18    with Performance Measure 37, which has to do with the timelines

19    for medical care treatment, and that making people come to the

20    clinic was to address that problem.  Paragraph 12 refers to the          10:58AM

21    timelines to dental and mental health care, which are contained

22    in Performance Measure 98 and, I believe, 103.

23             So when you read it like that, it appears, reading

24    Paragraph 11, that this is designed to address people

25    requesting, quote, routine medical care, and then the next          10:59AM

 1    paragraph says routine dental care and mental health care

 2    continue to be addressed through referrals.  So continue to be

 3    could be interpreted to mean that it was continuing to be the

 4    way it was before.  So if it was the case, then when did it

 5    switch that everybody had to go to the clinic, not just people          10:59AM

 6    holding the HNRs that said I have a sore throat?

 7              THE COURT:  Okay.  Thank you.

 8    BY MS. KENDRICK:

 9    Q.  And I think we have just muddied the waters instead of

10    clearing it.                                                            10:59AM

11              Tab 15, Mr. Pratt.  This is a complaint, informal

12    complaint response to a prisoner at Yuma.  I request that you

13    please only use his initials and not his full name.  It's dated

14    April 4th, 2017, by Carlie Myers, the director of nursing at

15    Yuma.  And it states that the prisoner submitted an informal           11:00AM

16    complaint regarding an HNR written by you stating you were

17    hearing voices.  You state you were advised you would not be

18    charged for the visit since it was mental health related.  You

19    state that you now have a $4 charge for that visit.

20              Could you read the next paragraph, please?                   11:00AM

21    A.  "I reviewed your medical file and do see that you were seen

22    on nurse line March 16, 2017 for hearing voices.  You are

23    charged for that visit as you were seen by the nurse regarding

24    your complaint.  You then referred -- you are then referred to

25    mental health where there is no charge for that.  You, at any          11:00AM

1  time, could have refused the nurse line and still be referred

2  to mental health.  The charge will remain on your banking

3  statement."

4  Q.  Okay.  Is that according to policy?  Does that follow

5  policy?                                                    11:01AM

6  A.  Yes.  A charge, unless this inmate is SMI, yes, the charge

7  would be appropriate.

8  Q.  So he could have refused the nurse line and still been

9  referred to mental health?

10  A.  If the nurse chose to pass that on, yes.               11:01AM

11  Q.  And if he refused nurse line and was referred to mental

12  health would he avoid that $4 charge?

13  A.  No, he should not.  At that point, I mean, if he was seen

14  on the nurse line and he had an evaluation, then the charge

15  would remain.  It would be appropriate.                    11:01AM

16  Q.  Right.  But Ms. Myers is saying here that he could have

17  refused the nurse line and still been referred to mental

18  health.

19  A.  At the discretion of the nurse, yes.

20  Q.  So if you refuse nurse line are you still charged $4?    11:01AM

21  A.  When you see mental health, is that at that point what you

22  are talking?

23  Q.  No.  If he's at nurse line with his mental health HNR and

24  says I don't want to pay $4, I'm refusing.

25  A.  No.  He should not be charged at that point.            11:02AM

1    Q.  Okay.  So that would -- from her response, is it fair to

2    conclude that a person with a mental health request can refuse

3    the nurse line, not be charged $4, and still get referred to

4    mental health?

5    A.  It's possible, yes.                                    11:02AM

6            THE COURT:  Possible but not required, right?

7            THE WITNESS:  Correct.

8    BY MS. KENDRICK:

9    Q.  If you flip to Tab 34, this is an e-mail that Dr. Taylor

10   sent you on February 7.  And she is sending it to you with high  11:02AM

11   importance saying that nursing staff at Perryville have been

12   told to only see mental health HNRs that are, quote, "emergent"

13   and the routine should be sent to mental health and not seen on

14   nurse's line.  And then she says several of the other prison

15   officials on the call said the same thing.                 11:03AM

16           Do you remember this issue?

17   A.  No.

18   Q.  And you forwarded it to Ms. Almanza at Corizon Health and

19   said, "For discussion tomorrow before court."  Do you remember

20   that discussion with Ms. Almanza before court?             11:03AM

21   A.  No, I don't.

22   Q.  Do you know what happened as to whether or not mental

23   health staff -- I mean mental health HNRs, excuse me, that are

24   routine could just be sent to mental health without being seen

25   on nurse's line?                                           11:03AM

1    A.  That's not the way the process was designed.  If that was

2    happening at some locations, it would be directed to Corizon to

3    say, they need to be seen by nursing staff, all of them.

4    Q.  So based on Ms. Taylor's e-mail here, was this something

5    that Corizon was doing on their own accord?                          11:04AM

6    A.  That's what her e-mail says, yes.

7    Q.  This wasn't something that you guys had instructed them to

8    do?

9    A.  Absolutely not.

10   Q.  Did you direct Corizon to stop doing this, or did Dr.            11:04AM

11   Taylor?

12   A.  I don't recall specifically if I did that.  My routine

13   method would be to take this straight to Ms. Almanza and say,

14   they all need to be seen by mental health, as I would assume

15   Dr. Taylor would do the same thing.                                  11:04AM

16   Q.  Do the nurses that run nursing line have special mental

17   health training?

18   A.  Such as?

19   Q.  Are they mental health RNs?

20   A.  No.                                                              11:04AM

21   Q.  Are all the nurses that conduct nurses lines RNs, or can

22   licensed practical nurses to nurse's line?

23   A.  The only ones that can do assessments are RNs.

24   Q.  Okay.  And originally, you all were only doing open clinic

25   at six prisons, is that correct?                                     11:05AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   A.  I don't know.  I will take your word for it.

2   Q.  Eyman, Florence, Lewis, Perryville, Tucson, Yuma?

3   A.  Okay.

4   Q.  And now you are rolling it out to the other four prisons,

5   is that correct?                                              11:05AM

6   A.  Yes.

7   Q.  And are these going to operate 7 to 7?

8   A.  Open nurse line will run at various times throughout the

9   day at prisons.  I'm not saying that they were open 7 to 7 for

10  everybody at every yard, but they are running every day at     11:05AM

11  every facility, yes.

12  Q.  And when did they start doing the open clinic at the four

13  other prisons?

14  A.  I don't know specifically when they started that.

15  Q.  Was it this summer?                                        11:05AM

16  A.  I think it was in June.

17  Q.  Did you -- are you aware of any pushback from custody staff

18  or health care staff at these four institutions about switching

19  to an open clinic system?

20       MR. BOJANOWSKI:  Note an objection.  Relevance.           11:06AM

21       THE COURT:  Overruled.

22       THE WITNESS:  Yes.  I was made aware of one staff

23  member's concern over this by stating that if -- wanting to go

24  back strictly to no open boxes because for some reason she felt

25  that the inmate population was abusing it and spending the time  11:06AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    coming to medical and just being able to get out of the yard

2    with an HNR and then roaming around and not actually going to

3    medical and then returning back to their housing unit.

4    BY MS. KENDRICK:

5    Q.  Did anybody from operations share that concern, the        11:06AM

6    security concern of people milling around the clinic?

7    A.  No.

8            THE COURT:  Can I interrupt for just a second?  You

9    said that this person wanted to go back strictly to no open

10   boxes.  Was that a misstatement?  Did you mean to say that the   11:07AM

11   person wanted to go back to open boxes in an HNR system?

12           THE WITNESS:  No, sir.  She indicated that she wanted

13   just the boxes again.  She didn't want the ability for them to

14   walk in with an HNR.

15           THE COURT:  So the term "no open boxes" --              11:07AM

16           THE WITNESS:  I'm sorry.

17           THE COURT:  That was a misspeaking, really.

18           THE WITNESS:  No open clinic.  I'm sorry.

19           THE COURT:  Thank you.

20   BY MS. KENDRICK:                                                11:07AM

21   Q.  Who was this individual?

22   A.  I don't recall the name.  It was one of the Corizon nurses.

23   Q.  Which prison?

24   A.  I don't remember even which prison it was.

25   Q.  All right.  Let's go to Tab 22.  So this is an e-mail from   11:07AM

1    May 15th that was sent to you by Troy Evans.  He works for the

2    Department as a monitor at Safford and Douglas, correct?

3    A.  Correct.

4    Q.  And he forwarded it to you and two of your colleagues.  And

5    he forwards a message from the Facility Health Administrator          11:08AM

6    Ann Mullen at Safford.  Is this the individual you were

7    referring to?

8    A.  No.  I don't believe so.  Again, to my recollection, it was

9    a nurse that was running one of the nurse's lines.

10   Q.  Okay.  And she says in the e-mail, "We are not broken at        11:08AM

11   Safford complex.  It is a fact that Safford has the best

12   medical run and team."  And then she says, "They tried this

13   many years ago and changed.  Why do we always go backwards?"

14        Do you know what she's referring to?

15   A.  No, I don't.                                                     11:08AM

16   Q.  How long have you been at ADC?

17   A.  2000.

18   Q.  2000.  Okay.  And in the time since you were there did they

19   ever have this open clinic model prior?

20   A.  No.                                                              11:09AM

21   Q.  Okay.  Who is Jim Taylor?

22   A.  Jim Taylor is a regional person that works for Corizon.

23   Q.  And Mr. Taylor also says in an e-mail, "I am surprised

24   about this.  McWilliams said the rural complexes would not be

25   changing."                                                          11:09AM

1           Do you know why the change was made?

2    A.  For consistency.

3    Q.  And then on the next page, Ms. Mullen states that she wants

4    the box to remain for routine dental care.  Do you have any

5    idea why somebody might want to keep the box for requests for          11:10AM

6    dental care?

7    A.  No.

8    Q.  Could it be that there's a 90-day time frame to be seen for

9    dental care?

10   A.  Whether an HNR is handed in or it's put in a box, I don't         11:10AM

11   see how that would affect a wait time.

12   Q.  Okay.  So if you could flip to Tab 16, this is regarding

13   Douglas prison.

14   A.  Okay.

15   Q.  And Vicki Smith is the health services administrator at          11:10AM

16   Douglas prison?

17   A.  At that time she was, yes.

18   Q.  Does she still work for Corizon?

19   A.  I don't know.

20   Q.  Did she used to be the regional director?                        11:10AM

21   A.  No.

22   Q.  Of operations?

23   A.  No.

24   Q.  Okay.  So she is sending an e-mail that says that it is a

25   notification to prisoners at Douglas about open clinic.  And in      11:11AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    her e-mail, she says, quote, "We're attempting to, quote,

2    'train' the inmates to report within the first 15 minutes of

3    sick call anyway, so I think this will work.  When they get

4    turned away for that 30 minutes, they will learn quickly."

5            Were you aware that the prisoners at Douglas were told    11:11AM

6    that they had to arrive at sick call in the first 15 minutes it

7    was open?

8    A.  No.

9    Q.  If you can turn the page there are the notifications that

10   went out.  And at the bottom of the page, can you read what's    11:11AM

11   underlined?

12   A.  Inmates arriving for open sick call will have 15 minutes to

13   arrive following the start of sick call.

14   Q.  Okay.  And above that the hours that are listed, those are

15   not 7 to 7, correct?                                             11:12AM

16   A.  Correct.

17   Q.  In fact, it's 8 to 10:30 for one yard and then 1330 to 1500

18   for another yard?

19   A.  Med pass and sick call for off-site workers is 4:30 in the

20   morning to 5:30; med pass for other inmates, all other inmates,  11:12AM

21   6:30 to 7:30.  Sick call for all other inmates on the north

22   yard is 8 a.m. to 10:30 and sick call for all other inmates at

23   south yard is 1330 to 1500.

24   Q.  Okay.  Can you read this memo, the second paragraph, what

25   it states?                                                       11:12AM

1  A.  "Requests for dental will be brought to open sick call for

2  review, however, dental clinics will not be operating under the

3  open sick call procedures.  Likewise, those seeking mental

4  health assistance will also present with an HNR to open sick

5  call for further referral from nursing.  Open sick call does          11:13AM

6  not apply to providers as a referral must be made from nursing

7  to see a provider."

8  Q.  So when there's a referral here to the request being

9  reviewed, does that involve an actual physical examination and

10  assessment at nursing line?          11:13AM

11  A.  Yes.

12  Q.  Back to the first page in Ms. Smith's e-mail and her

13  statement, "When they get turned away for that 30 minutes they

14  will learn quickly."  What do you take that to mean?

15  A.  It's an education to let the inmates know that if they are          11:13AM

16  late they will have to wait until the next day.

17  Q.  Are you aware of any other prison institutions or units

18  where they have a policy that the patients must arrive in the

19  first 15 minutes that the clinic is open in order to be seen?

20  A.  No.          11:14AM

21  Q.  Did you know that Douglas had implemented this policy?

22  A.  No.

23  Q.  Are you aware of any policy that a prisoner cannot be seen

24  more than once in the same day on open clinic?

25  A.  No.          11:14AM

1  Q.  Is it permissible for nurses to turn someone away on the

2  basis that the person was seen earlier in the day?

3  A.  It would be case specific.  I don't know.  Depending upon

4  what the patients problems were.

5  Q.  Okay.  If you could turn to Tab 13.                    11:14AM

6        THE COURT:  Before you move on, could you tell me if

7  it's important for me to know what the difference is between

8  med pass and sick call?  I gather what we've been talking about

9  is sick call.  But this med pass is not a procedure I'm aware

10  of.                                                        11:15AM

11        THE WITNESS:  Med pass is simply where it's direct

12  observation therapy.  They are not keep-on-person medications.

13  They are handed each pill individually each day.

14        MS. KENDRICK:  The prisoners call it pill line.

15        THE COURT:  Thank you.  Now I know what it is.  I      11:15AM

16  didn't know that term.

17  BY MS. KENDRICK:

18  Q.  So Tab 13, please.  And this is a grievance that was filed

19  at Lewis-Stiner prison with a response of February 17.  Again,

20  I ask that we all endeavor to not use this inmate's name.     11:15AM

21        If you could turn to Page 2, could you please read the

22  highlighted text in this patient's grievance regarding December

23  8, 2016?

24  A.  The highlighted section reads, "On 12-8-2016, my chest

25  pains had occurred.  I went to medical.  I was not feeling     11:16AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

```
 1   right.  My blood pressure was 110 over 10.  Two nurses check if
 2   with the same results.  I was still cleared to go back to
 3   building.  If had gotten worse CO2 blank called ICS."
 4   Q.  Okay.  Blood pressure of 110 over 10, if that's true that
 5   would be dangerous, right?                                      11:16AM
 6   A.  Yes.
 7   Q.  What can happen to a person if their blood pressure is very
 8   low?
 9   A.  They could die.
10   Q.  They could go into shock?                                   11:16AM
11   A.  They could die.
12   Q.  Okay.  And if you just flip back to Page 1, which is the
13   response to the grievance, do you see any reference to December
14   8, 2016 in this response?
15   A.  Do I see a reference to what?                               11:17AM
16   Q.  This response instead, the response instead refers to the
17   person being seen on February 3rd and being seen on February
18   9th, 2017.  But is there any response to the complaint
19   regarding the treatment on December 8th, just on the first
20   page?                                                          11:18AM
21   A.  I don't see any reference to December.
22   Q.  Okay.  So that would be an incomplete grievance response?
23   A.  Well, they didn't address the issue from December, correct.
24   Q.  Okay.  Could you turn a few pages on that tab to a document
25   that's Bates numbered AG 0001.                                  11:18AM
```

1          MR. BOJANOWSKI:  Where are you at, Corene.

2          THE WITNESS:  Where's the Bates stamp on these?

3   BY MS. KENDRICK:

4   Q.  Bottom right corner.  I apologize.

5   A.  Oh.  I have got it.  Okay.                              11:18AM

6   Q.  Okay.  Does this appear to be a printout from eOMIS for

7   this same person?

8   A.  It does.

9   Q.  And what is the date of the encounter?

10  A.  December 8th, 2016.                                     11:19AM

11  Q.  And the time?

12  A.  7:42 p.m.

13  Q.  And what does the subjective line say?

14  A.  Chief complaint:  Inmate brought to medical hub for

15  complaints of chest pain.                                  11:19AM

16  Q.  And was his blood pressure taken?

17  A.  Yes, it shows in here that it was.

18  Q.  What does it show it was?

19  A.  110 over 10.

20  Q.  All right.  And could you please read the highlighted   11:19AM

21  sentences under history of present, under notes?

22  A.  Under the objective section?

23  Q.  Yes, sir.

24  A.  "Inmate advised that he had been seen twice in the last

25  four hours including complaints about chest issues and cleared  11:19AM

```
 1  by medical and by the practitioner.  Advised inmate he needed
 2  to follow up with HNR for continued issues.  Inmate states he
 3  did fill out HNR already."
 4  Q.  Is that an appropriate response by nursing staff?
 5          MR. BOJANOWSKI:  Objection.                          11:20AM
 6          THE WITNESS:  Judgment call.  I don't know.
 7          MS. KENDRICK:  You have no opinion about this?
 8          MR. BOJANOWSKI:  Same objection.
 9          THE COURT:  Overruled.
10          THE WITNESS:  I would look at this and I would say I  11:20AM
11  would highly question the blood pressure.
12  BY MS. KENDRICK:
13  Q.  Question the blood pressure or question the response by the
14  nurse to the blood pressure?
15  A.  The blood pressure itself.                               11:20AM
16  Q.  Okay.  Could you turn the page please.  This is an outside
17  specialist report dated October 28th, 2016, by a pediatric
18  cardiologist.
19  A.  Is it possible to go back for a second?
20  Q.  Sure.                                                    11:20AM
21  A.  If you go beyond is the highlighted area on that objective
22  note.
23  Q.  Uh-huh.
24  A.  It indicates that the inmate was advised he would have to
25  wait as he had been cleared twice in four hours and he could   11:21AM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   return to his housing unit.  The inmate stated okay.  I'm being

2   denied care.  He was told he had been seen and cleared.  He

3   stated again I was denied care at 7:30 and walked out.  No

4   apparent distress, no apparent issues, and he returned to his

5   housing unit at that point.                                11:21AM

6   Q.  Okay.  So let's go to the next page.  So this is a report

7   for the same gentleman from Arizona Pediatric Cardiology from

8   October 28th, 2016.  Could you please read the highlighted text

9   that's under history of present illness without saying his

10  name?                                                      11:21AM

11  A.  "Mr. Blank is a 22-year-old male with a prior history of a

12  ventriclar septal defect requiring surgical closure.  He

13  underwent pediatric surgical closure which demonstrated

14  significant aortic insufficiency.  He therefore underwent

15  aortic valve repair with plication."                       11:22AM

16  Q.  And then in the next paragraph what is highlighted?

17  A.  "He has also received multiple doses of nitrates for relief

18  of chest pain which gave him profound hypotension and severe

19  headaches."

20  Q.  What's hypotension?                                    11:22AM

21  A.  Low blood pressure.

22  Q.  Do you still question the blood pressure reading that the

23  nurse got?

24  A.  I do.

25  Q.  Then on the third page of the report, the second page of   11:22AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1  the report under plan and recommendations, does it say

2  follow-up visit in two months?

3  A.  I'm sorry.  Where are you directing me to?

4  Q.  The next page.

5  A.  Yes.  Plan and recommendations, follow-up visit in two          11:22AM

6  months, echocardiogram complete EKG, oxygen saturation.

7  Q.  Based on this nursing note from December 8th, 2016, two

8  months later when he was to return to the cardiologist he's

9  still suffering hypotension?

10 A.  Based upon the objective findings, yes.                         11:23AM

11 Q.  Is there a problem with broken blood pressure machines at

12 Lewis-Stiner unit?

13       MR. BOJANOWSKI:  Your Honor, I will have to object.

14 It's getting into quality of care issues which is well outside

15 the scope of this hearing.                                          11:23AM

16       THE COURT:  Overruled.

17       THE WITNESS:  Not that I'm aware of.

18 BY MS. KENDRICK:

19 Q.  So you have no basis to question the accuracy of the blood

20 pressure machine that measured him at 110 over 10?                  11:23AM

21 A.  Personally, no.

22 Q.  Okay.  And you are quite familiar with the issue that we

23 have discussed in front of the Court for the past few months

24 about the Corrective Action Plan at Perryville from October

25 2016 for Performance Measure 39 that said nurses would need to      11:23AM

1    see people twice before they could make a referral to the

2    provider?

3    A.  Yes.

4    Q.  And 39 is the one that says if a nurse refers a patient to

5    a provider the patient must be seen within 14 days.  Right?          11:24AM

6    A.  Correct.

7    Q.  And the concern was that this Corrective Action Plan at

8    Perryville could impact the scores for Performance Measure 39,

9    correct?

10   A.  Yes.                                                             11:24AM

11   Q.  And the Court previously found the defendants non-compliant

12   with Performance Measure 39 at Perryville, right?

13   A.  Right.

14   Q.  It's also part of the outside order the Court issued on

15   November 2016?                                                       11:24AM

16   A.  The community resource, yes.

17   Q.  And this requirement would also mean that the patients were

18   being charged $4 twice, correct, because they had to be seen on

19   nurse's line two times?

20   A.  If they are seen twice, yes.                                     11:24AM

21   Q.  And I believe that Ms. Campbell, who works for you,

22   submitted a declaration to the Court recently about this issue?

23   Are you aware of that?

24   A.  I don't know.

25   Q.  I will show you a copy of it and we can talk about it.          11:25AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1       May I approach?

2       THE COURT:  You may.

3  BY MS. KENDRICK:

4  Q.  So if you turn to the first page of Ms. Campbell's

5  declaration at the bottom of Paragraphs 8 and 9, she states          11:25AM

6  that this CAP went into effect at Perryville in October 2016

7  and that she approved this CAP by mistake.  Correct?

8  A.  That's what it says.

9  Q.  Okay.  And then on Paragraph 13, she says that she inquired

10  with site leadership at Perryville about when the practice        11:26AM

11  stopped and she was told it stopped when the open clinic came

12  on line at Perryville in early December.  That's what it says,

13  correct?

14  A.  Correct.

15  Q.  And do you have any idea who the site leadership are at        11:26AM

16  Perryville that she may have consulted?

17  A.  At that time, I believe it was Sumi Erno who was a health

18  administrator.

19  Q.  Okay.  And are you aware of this issue coming up at any

20  other prison?                                                      11:26AM

21  A.  No.  Not particularly, no.

22  Q.  Okay.  So is it your testimony that it only happened at

23  Perryville?

24  A.  No.  I can't say that definitively but I know when this

25  issue came up, I'm not sure what facilities we were talking        11:26AM

1   about, but it was never condoned or agreed to.

2   Q.  Okay.  And after you learned about this Perryville

3   Corrective Action Plan, what steps did you take with Corizon to

4   ensure that all institutions and all units knew that this was

5   not an acceptable practice?                                    11:27AM

6   A.  I would have brought this to Corizon's leadership's

7   attention and said, this is not an acceptable practice, as

8   would Kathy Campbell, as would Vanessa Headstream, as would Dr.

9   Taylor.

10  Q.  And did they -- did the Corizon people, did you ask the    11:27AM

11  Corizon people to, for example, send an e-mail or have a

12  meeting with all of their facility health administrators or

13  medical directors or nursing directors to discuss that this is

14  not an acceptable policy?

15  A.  I didn't direct them to do that, no.                       11:27AM

16  Q.  So you did not.

17      Do you know if Corizon did take such steps?

18  A.  To my knowledge they did, yes.

19  Q.  What did they tell you they did?

20  A.  Through their education, they bring in their FHAs they      11:27AM

21  bring in DONs, they bring in their site leadership and they

22  have these discussions on a regular basis.

23  Q.  So you were told by Corizon people that they specifically

24  instructed the FHAs and the DONs to not do this?

25  A.  I was told that Corizon passed the word on to its staff     11:28AM

1   that this is not an acceptable practice, yes.

2   Q.  Okay.  Could you please turn to Tab 21.  This is an inmate

3   grievance from Florence Institution dated April 27.  Could you

4   turn to Page 27, read the highlighted text in the prisoner's

5   grievance?                                                      11:28AM

6   A.  "On April 4th, 2017, I reported a sick call line at 8:30

7   a.m., waited until 10 a.m. when I was told by CO Blank to come

8   back after count.  I returned at 12 p.m. to sick call line and

9   waited until 1:30 p.m.  At that time I was asked -- or I asked

10  CO Blank for my ID and HNR back because waiting three hours to  11:29AM

11  see a nurse was too long and that sitting on a concrete bench

12  that whole time worsens the pain and I could not stand the pain

13  any longer."

14  Q.  And could you turn to the next page, which is a response by

15  the Assistant Director of Nursing dated April 20th, 2017 and    11:29AM

16  please read the second highlighted paragraph.

17  A.  The first highlighted paragraph?

18  Q.  The second.

19  A.  The second paragraph is not highlighted.

20  Q.  Okay.  The one that begins with "Your concern."            11:30AM

21  A.  That's not highlighted.  I'm sorry.

22       "Your concern has been researched, including a review

23  of your medical records.  I am providing you with the following

24  response.  Per policy a patient must be seen by the nurse three

25  times prior to being scheduled with the provider.  I have       11:30AM

1  placed you on the provider line for follow-up next week.  As

2  far as the wait time for open sick call, it is first come,

3  first serve.  This is a large yard with a lot of inmates."

4  Q.  So is this the first time that you learned that Florence

5  was telling prisoners that they had to be seen three times on      11:30AM

6  nurse's line?

7  A.  Yes.

8  Q.  So that means the patient was charged $12, right?

9  A.  I don't know.

10 Q.  Well, each visit is $4, correct?                               11:30AM

11 A.  Potentially, yes.  I don't know if he was charged or not.

12 Q.  Why would he not be charged $4?

13 A.  The nurse may have chosen not to charge him.  I don't know.

14 Q.  So you have no reason to say he was not charged?

15 A.  Nor do I have reason to say that he was.                       11:31AM

16 Q.  Okay.

17        THE COURT:  The standard rule is every time you come

18 to nurse's line you get charged $4.

19        THE WITNESS:  That's correct.

20        MR. BOJANOWSKI:  Note an objection, Your Honor.            11:31AM

21 That's not exactly true because there are certain

22 classifications.

23        THE COURT:  That's true.

24        MR. BOJANOWSKI:  Such as if the person were indigent,

25 SMI, et cetera.                                                    11:31AM

1    THE COURT:  Yes.  That's right.  Thank you.

2  BY MS. KENDRICK:

3  Q.  Plaintiffs first brought this issue of people being told

4  they had to be seen multiple times on the line to your

5  attention and the Court's attention in the winter, right?         11:31AM

6  A.  I'm not sure when, but I know we have covered this ad

7  nauseam, and we have always stated it has never been our policy

8  that an inmate has to be seen more than once for referral.

9  Q.  Okay.

10    THE COURT:  And it wouldn't make me so sick, I              11:31AM

11  wouldn't be in an ad nauseam situation if it had been redressed

12  the first time we raised it.  And then I raise it again, and

13  Dr. Taylor and others tell me it's completely resolved.  And I

14  see something dated 4/2017, long after the nausea should have

15  been occurring and resolved and cured, and this person is        11:32AM

16  saying not only twice but three times.  You can understand how

17  this would be somewhat alarming to me when I have been told

18  repeatedly by people in the courtroom that this was not going

19  on.

20    THE WITNESS:  And alarming to myself as well and to         11:32AM

21  Corizon leadership and everyone else.  When I see something

22  like this I cringe, because it's not policy.  But I can't

23  control every situation for every person out there.  And I wish

24  I could, but I just can't.

25    THE COURT:  The respondent here from N. Williams, RN,       11:32AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    ADON, where is she in the hierarchy of things?  Do you happen

2    to know?

3            THE WITNESS:  The assistant DON at the facility would

4    report to the Director of Nursing at the facility.

5            THE COURT:  Okay.  Thank you.                          11:33AM

6            THE WITNESS:  It's a few steps removed from the

7    leadership.

8            THE COURT:  Thank you.

9    BY MS. KENDRICK:

10   Q.  And this is a first level response because it says Inmate  11:33AM

11   Informal Complaint Response.  Is that your understanding?

12   A.  Yes.

13   Q.  And the first page of this document is the inmate grievance

14   response that is signed by Spencer Sego, the Facility Health

15   Administrator, correct?                                        11:33AM

16   A.  Correct.

17   Q.  And it states that the grievance is substantiated and

18   resolved and final.  So this is as high as it goes, correct?

19   A.  At the facility level, yes, that's correct.

20   Q.  Okay.  Do you see anything here in Mr. Sego's response      11:33AM

21   repudiating the response that was provided to the first level

22   by the ADON?

23   A.  I would have to review this response based upon the actual

24   grievance itself.

25   Q.  In those two paragraphs written by Mr. Sego, does he say in 11:34AM

1    it that RN Williams is incorrect about the policy?

2    A.  No, he does not.  Again, without reviewing the grievance

3    itself, I don't know if this was brought up in the grievance or

4    if this was just part of an informal.

5    Q.  So when I asked you previously about all the steps that you      11:34AM

6    had taken since first learning about the Perryville situation,

7    you said that you asked the people at Corizon to take care of

8    it and to let people know.

9    A.  Yes.

10   Q.  What are you planning to do now when you get back to the        11:34AM

11   office about this?

12   A.  Well, I don't think I have to do a whole lot because

13   Corizon leadership is sitting at the back of the courtroom and

14   they are hearing exactly what I'm telling you in my

15   frustrations.  And that message needs to go back to the field      11:34AM

16   through Corizon.

17   Q.  And are you going to take any steps to follow up to ensure

18   that every nurse is trained that this is not the policy?

19   A.  I will work with Corizon on how they deliver that message,

20   yes.  But I'm not going to direct them in exactly what they        11:35AM

21   have to do.

22   Q.  Well, they are your contractor, right?

23   A.  They are.

24   Q.  So if the person who holds the contract asks a vendor,

25   subordinate vendor to do something, shouldn't they do it?         11:35AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    A.  They should do it but I'm not going to tell them how to do

2    it.

3    Q.  Are you going to suggest how they do it?

4    A.  I will work with them on the way to deliver that message,

5    yes.                                                                    11:35AM

6    Q.  So I think the last time that you testified, I think it was

7    in April or May, you said that the contract was up for renewal

8    and you had two bidders.  Are you still in that stage reviewing

9    the bids?

10   A.  We are.                                                             11:36AM

11   Q.  Okay.  And you are still negotiating with both bidders?

12   A.  We haven't gotten into negotiations yet.

13   Q.  So you are aware of the performance measures about timely

14   referrals to specialty care?

15   A.  Yes.                                                                11:36AM

16   Q.  And that the Court has found defendants non-compliant with

17   some of them?

18   A.  Yes.

19   Q.  And I believe it may have been you or others, that one of

20   the reasons it was so difficult for Corizon was because of the         11:36AM

21   AHCCCS rates that they have to pay?

22   A.  As far as availability of providers, yes.

23   Q.  Has ADC received complaints about Corizon not paying money

24   owed to specialists?

25   A.  Yes.                                                                11:36AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1  Q.  When?

2  A.  I received one a couple of days ago.

3  Q.  And what was that for?

4  A.  It was related to claims that were made that hadn't been

5  paid yet, and it was just brought to my attention.                11:37AM

6  Q.  How much?

7  A.  I don't know.

8  Q.  Who is the vendor or specialist?

9  A.  It was one of the hospitals.

10  Q.  Okay.  And you said that was a couple days ago?              11:37AM

11  A.  Yes.

12  Q.  Okay.  Could you turn to Tab 37.  And this is a series of

13  e-mails that you are on from March 17, 2017, and the subject

14  line is unpaid claims, correct?

15  A.  Correct.                                                      11:37AM

16  Q.  And if you flip to the start of the e-mail chain, which is

17  on Page 4, it's sent by a person named Laura Slacian from

18  Gilbert Hospital?

19  A.  Yes.

20  Q.  Her title is Director of Patient Financial Services?         11:37AM

21  A.  Yes.

22  Q.  And she opens her e-mail saying, "Attached is the

23  outstanding for Florence Hospital at Anthem:  $1,228,715.74.

24  This amount outstanding for hospital is unacceptable.  These

25  outstanding bills go back to February 2016."                     11:38AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1              Do you remember getting this e-mail?

2    A.  I do.

3    Q.  Is this the one you are referring to or a different one?

4    A.  No.  I have received one since then.

5    Q.  Was it also from Ms. Slacian?                          11:38AM

6              MR. BOJANOWSKI:  Your Honor, we'll object to this line

7    of questioning.  Again, we are so far outside the HNR box

8    process at this point.

9              THE COURT:  True enough, but I have Mr. Pratt here on

10   the issue of striking concern to me with respect to whether or  11:38AM

11   not people who are integral in the performance measures

12   generally are being paid.  So you may continue.  The objection

13   is overruled.

14   BY MS. KENDRICK:

15   Q.  The more recent one, was it also from Ms. Slacian?      11:39AM

16   A.  I believe it was, yes.

17   Q.  Was it regarding the same bill to Florence Anthem?

18   A.  No.

19   Q.  It was a different bill?

20   A.  Yes.                                                    11:39AM

21   Q.  Do you know if this $1.2 million in arrears was ever paid

22   by Corizon?

23   A.  I know Corizon addressed it.  There were several e-mails

24   going back and forth.  There were problems with some of the

25   claims.  And it was totally addressed.  And then I was        11:39AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   surprised to see an e-mail a couple of days ago from the same

2   party saying that there's some more outstanding things over the

3   last, I think, over the last two months.

4   Q.  Okay.  Can you read the paragraph that begins, "We are not

5   contracted with Corizon"?                                    11:39AM

6           MR. BOJANOWSKI:  Same objection.

7           THE COURT:  Overruled.

8           THE WITNESS:  "We are not contracted with Corizon, and

9   we are not obligated to accept AHCCCS rates for these services.

10  Florence Hospital at Anthem and Gilbert Hospital continue to   11:39AM

11  serve the inmates of Corizon in good faith and accept reduced

12  payments for services rendered.  However, Corizon has not acted

13  in good faith by paying for these services per the AZ Prompt

14  Payment guidelines.  I continue to have to constantly follow up

15  and literally beg you for payment of our bills."              11:40AM

16  BY MS. KENDRICK:

17  Q.  And the next paragraph?

18  A.  "Please accept this e-mail as demand for payment of all

19  unpaid invoices.  Payments must be made by March 24th, 2017.

20  Until such time that payment is received we will be unable to  11:40AM

21  provide elective radiology and other elective outpatient

22  services."

23  Q.  Since Florence Anthem and Gilbert Hospitals were refusing

24  to provide elective outpatient services, do you know where

25  prisoners were going for these services?                      11:40AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   A.  I don't.  Not specifically, no.

2   Q.  Could their refusal to see these patients explain

3   non-compliance with the performance measures regarding

4   specialty care in March?

5        MR. BOJANOWSKI:  Your Honor, we'll object.  There's            11:41AM

6   got to be some evidence here of patients not being seen, and

7   we're talking, you know, we get these broad brush strokes of,

8   well, this is a possibility that patients weren't seen.  Is

9   there a list of patients that counsel has that were not seen.

10       THE COURT:  Well, the question is actually directed to     11:41AM

11  the answer that you offered, Mr. Bojanowski, so the objection

12  is overruled.  We'll hear the answer.

13       THE WITNESS:  I can't point to a direct correlation,

14  because there are other providers that should be able to

15  provide that same service.  And I don't know what other          11:41AM

16  elective outpatient services they are talking about, and

17  radiology is available at most facilities.  So unless this is

18  after hours radiology or something along those lines, again,

19  it's -- can you say it's possible?  Of course.  Anything is

20  possible.  But I can't make a correlation with that             11:42AM

21  specifically.

22  BY MS. KENDRICK:

23  Q.  Okay.  So Mr. Pratt, my question was with regard to their

24  possible performance on these performance measures in March

25  being adversely affected.  And I will represent to you based    11:42AM

1    upon what information you provide me and the Court that in

2    March of this year, Eyman's score was 64 and Florence's score

3    was 59.

4         So again, my question is whether or not you think that

5    their refusal to accept elective specialty appointments          11:42AM

6    adversely affected the performance on these performance

7    measures.

8         MR. BOJANOWSKI:  Same objection.

9         THE COURT:  Overruled.

10        THE WITNESS:  The same answer.  I don't know the          11:42AM

11   reasons for non-compliance specifically during that month there

12   were.  I don't know how many of these elective radiology or

13   elective outpatient services, if any, were actually refused.  I

14   know that's what the letter says, but I don't know that that

15   happened.                                                        11:43AM

16   BY MS. KENDRICK:

17   Q.  Okay.  So when we come in here every month for our status

18   hearings one of the exercises that we go through is that we go

19   through the non-compliant performance measures.  And Mr.

20   Bojanowski announces what the numbers are for a given month and   11:43AM

21   then offers explanations as to why numbers are what they are.

22   Is that correct?

23   A.  Correct.

24   Q.  You have participated in this?

25   A.  Yes, I have.                                                 11:43AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

```
 1    Q.  Do you have any memory of when we discussed the March

 2    performance results that the fact that Corizon had not paid the

 3    hospital was offered as an explanation for non-compliance?

 4    A.  I don't.

 5    Q.  So you said you got an e-mail a few days ago.  Is it,          11:43AM

 6    again, with the Florence Anthem Hospital?

 7    A.  Yes.

 8    Q.  Do you remember roughly how much is at issue?

 9    A.  No idea.  No, I don't.

10    Q.  Is it more than a million dollars?                             11:43AM

11    A.  I don't know.

12    Q.  Is it $100?

13    A.  I don't know.

14    Q.  Back when you were dealing with this issue in March, did

15    you discuss this unpaid bill with Director Ryan?                   11:44AM

16    A.  I don't recall if I spoke directly with Director Ryan on

17    this or not.

18    Q.  Do you think this is something that would be important to

19    raise with him in your weekly meetings?

20    A.  Typically we talk about everything about the contract, so I    11:44AM

21    wouldn't be surprised if this came up in a conversation.

22    Q.  Could it potentially adversely affect patient care?

23    A.  Yes, potentially.

24    Q.  Okay.  If you could turn to Tab 36.  This is another

25    e-mail.  And if you go to the second page, it's November 21st     11:44AM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   and November 22nd.  It's from Kathleen Campbell to you and it's

2   referring to a bill from Mount Vista Hospital.  And Kathy

3   Campbell writes to you, quote, "Because it wasn't an emergency

4   and he is an alien, AHCCCS doesn't pay and Corizon is

5   responsible for paying his bill.  Apparently Corizon isn't          11:45AM

6   recognizing that they are responsible for the bill."

7           Is that true that Corizon is responsible for paying

8   the bills for non-U.S. citizens?

9   A.  Yes.

10  Q.  And then if you flip to Page 1, you forwarded this e-mail       11:45AM

11  to Ms. Almanza at Corizon on November 23rd.  And then the very

12  next entry is on January 3rd.  You re-sent it to Ms. Almanza

13  and asked her for follow-up.  What inspired your January

14  e-mail?

15  A.  They probably hadn't gotten a response yet.                     11:46AM

16  Q.  So do you keep some sort of flag system with your e-mail if

17  you don't get a response it reminds you to follow up again?

18  A.  I will, typically, as in this case, I copied myself on the

19  e-mail so it comes back to me and I leave it open until it's

20  resolved.                                                           11:46AM

21  Q.  To your knowledge, did Corizon ever pay for this patient's

22  care?

23  A.  To my knowledge they did, yes.

24  Q.  Are you aware of other times when Corizon failed to pay

25  outside specialists for medical care for non-U.S. citizens?        11:46AM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1  A.  No.

2  Q.  This failure to pay is concerning, correct?

3        MR. BOJANOWSKI:  Note an objection.  He testified they

4  did pay.

5        THE COURT:  Is that a general failure to pay?                11:46AM

6        MS. KENDRICK:  No, the failure to pay for --

7        THE COURT:  Four months.

8        MS. KENDRICK:  For four months.  Is that concerning?

9        THE WITNESS:  In this case.  If there was a dispute or

10  misunderstanding on the responsibility for it, I can understand   11:47AM

11  why it wasn't paid in the first place, yes.

12  BY MS. KENDRICK:

13  Q.  Would it be reasonable to have a concern that Corizon's

14  utilization management team has a disincentive to approve

15  outside specialty requests for a non-U.S. citizen?               11:47AM

16        MR. BOJANOWSKI:  Note an objection.

17        THE WITNESS:  I don't know anything about that

18  practice or process at all.

19        THE COURT:  I didn't hear if there was an objection.

20        MR. BOJANOWSKI:  There was, Your Honor.                    11:47AM

21        THE COURT:  What is it?

22        MR. BOJANOWSKI:  I think she's making some kind of

23  allegation that has no basis in fact that somehow utilization

24  management is actively engaged in a process whereby they refuse

25  to pay for alien citizens, or aliens.                           11:47AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

 1          THE COURT:  Overruled.

 2   BY MS. KENDRICK:

 3   Q.  Is there some reason to have some concern about this

 4   happening?

 5          MR. BOJANOWSKI:  Same objection.                    11:47AM

 6          THE COURT:  Overruled.

 7          THE WITNESS:  No.  There is no policy or procedure or

 8   reason for them to do that, no.

 9   BY MS. KENDRICK:

10   Q.  I'm not talking about a written policy.  So what is the  11:48AM

11   basis for you saying there's no reason to be concerned of this

12   incentive?

13          MR. BOJANOWSKI:  Same objection.  If we could have

14   some evidence showing it's actually happening.

15          THE COURT:  Don't need any.  Thank you.  Overruled.   11:48AM

16          THE WITNESS:  I don't know that there is an incentive.

17   I'm not sure where that's coming from.  Utilization management

18   pays claims every day through Corizon.  And this is the only

19   one that I can even reference, only because it's here, as to

20   being related to an alien.  I have not heard of this anywhere   11:48AM

21   else.

22   BY MS. KENDRICK:

23   Q.  Okay.  Are you aware of any other situations when Corizon

24   hasn't paid an outside hospital or specialist besides the three

25   that we have talked about here?                              11:48AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   A.  No.  I know there may be cases where there's questions with

2   their utilization management on the extent of bills, where

3   there's questions on whether or not bills are appropriate based

4   on hospitalization days.  That's all part of their utilization

5   management process.                                           11:49AM

6   Q.  Could you turn to Tab 39.

7   A.  Okay.

8   Q.  And is this a letter that you wrote?

9   A.  Yes.

10  Q.  And it's dated January 19, 2017, and it's addressed to Ms.  11:49AM

11  Almanza at Corizon.  The subject is November 2016 contract

12  sanctions?

13  A.  Yes.

14  Q.  And in your second paragraph, you state, "In accordance

15  with contract amendment Number 10, the maximum amount of        11:49AM

16  sanctions is $90,000 per month."

17       Who at ADC agreed to amend the contract to cap the

18  sanction amount to $90,000?

19  A.  This was done through our procurement office.

20  Q.  Were you involved in this decision to cap the fine?         11:50AM

21  A.  I was involved in the discussions, yes.

22  Q.  Okay.  Did you agree with the decision to cap the fine?

23  A.  Yes.

24  Q.  Why?

25  A.  I agreed.                                                   11:50AM

1        THE COURT:  Why?  Why did you agree?  You otherwise

2  would have complete unlimited, presumably, sanctioned ability

3  to impose fines based upon the number of failures and you

4  agreed to cap that.  Why?

5        THE WITNESS:  Just to make a common sense decision in   11:50AM

6  the moment as to what seemed reasonable at that time.

7        THE COURT:  And why did you think it was reasonable at

8  the time?

9        THE WITNESS:  It seemed punitive at that time.

10       THE COURT:  Wasn't that the purpose of the measure, to  11:51AM

11  be punitive as a punishment for failure to comply?

12       THE WITNESS:  It is.

13       THE COURT:  So if you have a graduated punitive

14  measure meaning that you can impose greater sanctions for

15  greater violations, why wouldn't that be in the State's    11:51AM

16  interest?

17       THE WITNESS:  It is in the State's interest, and this

18  is something that was not in place before.  This was a step up

19  in the sanctions.

20       THE COURT:  So the cap was an increase in the      11:51AM

21  sanctions?

22       THE WITNESS:  This cap is based upon certain -- well,

23  the letter goes on to explain how that works.  But any

24  performance measure that has the potential of extending the

25  stipulation, that would be at a $5,000 sanction for that    11:51AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

```
 1    performance measure.
 2           THE COURT:  This is bringing back a recollection that
 3    I had forgotten, and maybe you can lay more foundation if my
 4    recollection is in error.  But I do think what Mr. Pratt is
 5    saying is true that this was part of a mid-correction or an          11:51AM
 6    amendment to the contract that provided for this sanction that
 7    didn't previously exist or am I remembering that incorrectly?
 8    I just can't keep it in my mind at this moment.
 9    BY MS. KENDRICK:
10    Q.  Didn't the contract previously have a sanction of $1,000?        11:52AM
11    A.  There were much lesser sanctions leading up to this, Your
12    Honor.
13    Q.  But was it capped?
14    A.  No, it was not.
15    Q.  So the dollar amount was less per sanction but every single      11:52AM
16    violation they would get dinged for it?
17    A.  It had changed through time as we went on through this
18    process as to how we were sanctioning them.  We used to do it
19    on a quarterly basis, and then we went to -- when we entered
20    into the stipulation itself we went on a month-to-month basis        11:52AM
21    for them.
22           THE COURT:  And was your view at the time you adopted
23    this amendment that it was a more punitive measure?
24           THE WITNESS:  Yes.
25    BY MS. KENDRICK:                                                     11:52AM
```

1  Q.  And on that same page, your next sentence after that is

2  that you note that this is the ninth consecutive month that

3  Corizon's lack of compliance with the stipulated agreement has

4  resulted in a $90,000 sanction.  Is that correct?

5  A.  Correct.                                              11:53AM

6  Q.  Since January 19th, how many more of these sanctions

7  letters have you written?

8  A.  Every month we write a sanction letter.

9  Q.  And every month since January 19th has it been $90,000?

10  A.  It has.                                              11:53AM

11  Q.  So we're up to 14 months in a row?

12  A.  I'd have to look at the last one, but yeah, I will take

13  your word for it.

14          THE COURT:  How does Corizon pay the sanction?

15          THE WITNESS:  It's actually withheld from the payment  11:53AM

16  that goes to them.  It's an offset.

17  BY MS. KENDRICK:

18  Q.  And then so just on the third page of your letter, the

19  second paragraph, you note that based upon the findings for

20  November, the monthly assessment would be 75 times 5000 or   11:53AM

21  $375,000, but because the limit is set at 90,000, the fine will

22  only be 90,000, correct?

23  A.  Correct.  Correct.

24  Q.  Do you think the cap should be removed?

25  A.  It will be in the new contract.                      11:54AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    Q.  And I think you said earlier, we were talking about nurse's

2    line that it's RNs that do nurse's line?

3    A.  Yes.

4    Q.  Okay.  Could you turn to Tab 34.  And go to the next to

5    last page.  There's a chart.  Do you see it?                    11:54AM

6    A.  Yes.

7    Q.  And it's listing various prisons and then Performance

8    Measure 37 and Performance Measure 39.  And what does it say

9    for Lewis Prison under Performance Measure 37?

10   A.  LPNs were completing sick call.                            11:55AM

11   Q.  Were you aware of that happening at Lewis?

12   A.  No.

13   Q.  Is it within a licensed practical nurse's scope of practice

14   to provide treatment at nurse's line?

15   A.  They can also operate under the direction of an RN.        11:55AM

16   Q.  Okay.  What is the immediate solution for this to the

17   right?

18   A.  Only RNs will be assigned to complete the assessment

19   portion of sick call.

20   Q.  And with regard to the fines, you have testified previously 11:55AM

21   that Corizon has to pay offsets for having unfilled positions,

22   is that correct?

23   A.  Correct.

24   Q.  Do you know how much the offset was last month, roughly?

25   A.  I do not, no.                                              11:56AM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   Q.  Okay.  Could you turn to Tab 40.  This is the June 2017

2   monthly staffing report, correct?

3   A.  Yes.

4   Q.  And on the statewide list, it shows 5.75 of 10 contracted

5   medical directors and 7.2 of 14 staff physician positions are          11:56AM

6   filled?

7   A.  Yes.

8   Q.  So that would be sanctionable?

9   A.  Yes.

10  Q.  And then a little further down about halfway, it shows            11:56AM

11  dental director, 7.5 of 10 positions are filled for a 75

12  percent fill rate.  So that would be sanctionable, too?

13  A.  Yes.  It depends on what pool they fall into as far as

14  being a sanctionable group.

15  Q.  But the high level positions?                                      11:57AM

16  A.  Yes.

17  Q.  You have testified.  Okay.

18          THE COURT:  Could you remind me, what is the sanction?

19          THE WITNESS:  It's based on groups of providers and

20  different disciplines here; nurses, providers.  The hours             11:57AM

21  themselves are combined as a group and then they are looked at

22  in total as far as what percentage of time they spent.  If they

23  are less than 90 percent over more than 60 days then there's an

24  offset.

25  BY MS. KENDRICK:                                                       11:57AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1  Q.  Okay.  And the Phoenix Prison is where the inpatient mental

2  health unit is, correct?

3  A.  Yes.

4  Q.  And the most seriously mental health patients are housed

5  there?                                                          11:58AM

6  A.  The acute mentally ill.

7  Q.  Acute.  Could you flip a few pages to the Phoenix chart.

8  A.  Okay.

9  Q.  And if you look at the bottom third where this mental

10 health staff is listed, does it show zero percent psychiatric   11:58AM

11 director?

12 A.  Yes.

13 Q.  And then for psychiatrist, one out of 1.5 positions is

14 filled, 67 percent?

15 A.  Correct.                                                     11:58AM

16 Q.  For psychologists, .5 of 3.0 are filled for 17 percent?

17 A.  Correct.

18 Q.  For mental health director, Ph.D., zero of 1.0 are filled?

19 A.  Yes.

20 Q.  For recreational therapists, 1.0 of 2.0 are filled for 50   11:58AM

21 percent?

22 A.  Yes.

23 Q.  For psych tech, 5.8 of 12.1 are filled?

24 A.  Yes.

25 Q.  For 48 percent?                                             11:59AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   A.   Yes.

2   Q.   Okay.  And the Tucson Prison is where you guys have the

3   large infirmary, correct?

4   A.   We've got infirmaries at Tucson, Florence, Perryville.

5   Q.   How many beds is the Tucson one, roughly?          11:59AM

6   A.   The number's escaping me.

7   Q.   Is it the largest one?

8   A.   It is the largest, yes.

9   Q.   And you also have an in-patient unit kind of like inpatient

10  medical for people who can't live in -- you call it outpatient   11:59AM

11  housing?

12  A.   Assisted living type patients.

13  Q.   That's it.

14  A.   Yes.

15  Q.   Okay.  And you also have one of those complexes?      11:59AM

16  A.   Yes.

17  Q.   If you could turn a couple pages to the Tucson report.

18  A.   Uh-huh.

19  Q.   On the second line for staff physician, it shows that the

20  contract calls for 3.5 physicians at this prison and zero are   12:00PM

21  filled?

22  A.   Yes.

23  Q.   And for RNs, they are supposed to have 39.1 and instead

24  there's 26.8?

25  A.   Yes.                                                12:00PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1    Q.  Or 69 percent?  And also for mental health, only one out of

2    two psychiatrists and 2.4 out of 4 psychologists, correct?

3    A.  True.

4    Q.  And you stated you don't know how much Corizon has had to

5    pay for penalties because of the failure in June to staff these          12:00PM

6    positions?

7    A.  Not specifically in June.  I know we have offset them in

8    ballpark numbers about $3 million since the beginning of the

9    contract.

10   Q.  I believe you testified in May that it was 3.3.  Has there          12:00PM

11   been more since May?

12   A.  I'm just talking ballpark numbers.  I don't have them

13   memorized.

14   Q.  And you said in the new contract that there's not going to

15   be the cap on the fines.  Is there going to be the 90 percent           12:01PM

16   cutoff for staffing in the new contract, or will it be required

17   to be 100 percent staffed?

18   A.  Required to be 100 percent.

19   Q.  Okay.  And in the new contract, will the vendor be

20   responsible for paying all contempt fines if they are imposed?          12:01PM

21          MR. BOJANOWSKI:  Note an objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  I don't know where that's at in the

24   contract.

25   BY MS. KENDRICK:                                                        12:01PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   Q.  Are you involved in negotiating the contract?

2   A.  Yes.

3   Q.  Okay.

4   A.  As I said, we haven't gotten into negotiations yet.

5           THE COURT:  When does that happen?                    12:01PM

6           THE WITNESS:  I would anticipate in the next couple

7   months.

8           THE COURT:  Is it March of next year?

9           THE WITNESS:  No.  The contract itself with Corizon

10  has been extended to marry up with our fiscal year.  So it ends   12:01PM

11  actually June 30 of 2018.

12          THE COURT:  Thank you.

13  BY MS. KENDRICK:

14  Q.  And I just want to go back in closing to the discussions we

15  were talking about earlier that you had with Corizon when you     12:02PM

16  guys decided to move to the open clinic system.  Was -- at any

17  time was there any discussion about how this change would

18  impact persons with disabilities?

19  A.  I'm sure that's all part of the conversation, yes.

20  Q.  You don't specifically recall?                            12:02PM

21  A.  If there was going to be anything adversely affecting

22  anyone's ability to submit an HNR we would have covered it.

23  Q.  I have nothing further.

24          THE COURT:  Thank you.  What we'll do is we'll take

25  our noon recess.  I gather there is some examination the      12:02PM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Pratt - Direct

1   defendants would like to conduct with this witness.  Is that

2   true?

3          MR. STRUCK:  Yes, sir.

4          THE COURT:  Sir, if you would come back at 1:15 we'll

5   take it up again.  Thank you.                          12:03PM

6          (Recess from 12:03 p.m. until 1:17 p.m.)

7          THE COURT:  Thank you.  Before we turn to defendants,

8   I noted, or thought as I was leaving the bench, that none of

9   the documents that were shown to Mr. Pratt during his

10  examination by plaintiffs were admitted in evidence.  And I   01:18PM

11  think virtually all of them are not otherwise on the Court's

12  docket.  Was that the intention.

13         MS. KENDRICK:  Yes, Your Honor.  We were just going to

14  wait until the end of the day versus doing it one at a time,

15  but whatever you prefer.                                 01:18PM

16         THE COURT:  So at some point you are going to move for

17  their admission?

18         MS. KENDRICK:  Yes, sir, but since some of them are

19  used with different people, some of the exhibits are used with

20  different people we would wait until the end until all of them   01:18PM

21  had been used and admit them together.  If you want us to start

22  piecemealing them --

23         THE COURT:  I just want to do something that's

24  efficient.  And often times it's most efficient to do it at the

25  time that the exhibit is being presented to the witness.   01:18PM

1    However, because these were documents largely produced by

2    defendant, maybe there wouldn't be some number of objections.

3    I don't know.  I would just ask that at the end of the day

4    today and that before tomorrow, keeping in mind that if there

5    is going to be an evidentiary objection you would like to          01:19PM

6    address it with the witness you may lose that opportunity if

7    the witness is no longer around.  You need to take some care to

8    make sure that we don't run out of time and that if we do that

9    maybe you can, between now and tomorrow, figure out a way to

10   decide on how to address this and maybe resolve some if not all   01:19PM

11   of this.

12        MS. KENDRICK:  Would you like us to move into evidence

13   the exhibits that were used with Mr. Pratt?

14        THE COURT:  Do you wish all of them to become

15   evidence?                                                         01:19PM

16        MS. KENDRICK:  Yes, sir.

17        THE COURT:  Does the defendant have an objection to

18   that wholesale introduction?

19        MR. BOJANOWSKI:  I think there was just one exhibit

20   that we really had an objection to, and that would be at Tab       01:19PM

21   number 18, the handwritten notes of a meeting that have no

22   author on it and no foundation laid as to who prepared it.

23        THE COURT:  That would seem to be a meritorious

24   objection.  Any response to that, Ms. Kendrick?

25        MS. KENDRICK:  Well, first of all, this was how it was       01:20PM

1  objected -- presented to us, and so we have no way of figuring

2  out who wrote it.  When it was produced to us it was not

3  identified from whom it was gathered.

4       My belief is just based upon the time frame between

5  that and that subsequent e-mail that was written by Mr.                    01:20PM

6  McWilliams' assistant that summarized a meeting that happened

7  earlier in the day that it was the same individual, Ms. Yanez,

8  who wrote it.  Mr. McWilliams is here, and, I mean, we could

9  ask him a simple question for the purpose of establishing

10  whether this is his assistant's handwriting.                             01:21PM

11       THE COURT:  Mr. Bojanowski, do the defendants know who

12  prepared what has been marked for identification as Exhibit 18?

13       MR. BOJANOWSKI:  May I have a moment, Your Honor?

14       (Discussion off the record.)

15       MR. BOJANOWSKI:  It is not Ms. Yanez's handwriting and  01:21PM

16  we don't know whose it is.

17       THE COURT:  Well, I don't have a foundation for this

18  document therefore.

19       MS. KENDRICK:  Well, then I guess we would move for

20  everything but the exhibit at Tab 18 to be moved into evidence.  01:21PM

21       THE COURT:  I gather there's no objection?

22       MR. BOJANOWSKI:  Correct, Your Honor, the rest of them

23  are e-mails and such that have been identified by witnesses.

24       THE COURT:  All right.  So that would be what's been

25  marked for identification as Exhibits 12 through 41, with the  01:22PM

1    exception of Number 18, will be received into evidence.

2          Thank you.  You may proceed.

3          MS. LOVE:  Your Honor, we have discussed the following

4    approach with plaintiffs' counsel to which they agree.  We will

5    be presenting four witnesses today on operations side to                  01:22PM

6    testify to various physical plant issues as well as ICS

7    allegations related to Ms. Ashworth.  Because they need to be

8    in another location tomorrow, plaintiffs' counsel has agreed

9    that we can take them out of order.  We'll proceed with those

10   four witnesses today, and then if we still have time left in              01:22PM

11   the day, which we probably will, Mr. Pratt will retake the

12   stand.

13         THE COURT:  Very well.  Thank you.

14         MS. LOVE:  Defendants call Deputy Warden of Operations

15   Jeff Van Winkle.                                                           01:23PM

16         THE COURT:  Warden Van Winkle, would you please step

17   forward to the clerk of the court to be sworn.

18         (The witness was sworn.)

19         MR. SPECTER:  Your Honor, before the witness testifies

20   could we have a continuation of the Rule.  The witnesses should           01:23PM

21   be left outside.

22         THE COURT:  Have you identified witnesses who would be

23   subject to the Rule?

24         MR. SPECTER:  I would be relying on defense counsel.

25         MS. LOVE:  They are out of the courtroom.                           01:23PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1      THE COURT:  Thank you.

2          Good afternoon, sir.

3      THE WITNESS:  Good afternoon, Your Honor.

4      THE COURT:  You may proceed.

5                    JEFFREY VAN WINKLE,

6  a witness herein, having been first duly sworn by the clerk to

7  speak the truth and nothing but the truth, was examined and

8  testified as follows:

9                    DIRECT EXAMINATION

10 BY MS. LOVE:

11 Q.  Sir, would you please state your full name for the record.

12 A.  Jeffrey Van Winkle.

13 Q.  By whom are you employed?

14 A.  Arizona Department of Corrections.

15 Q.  How long have you been employed by the Arizona Department     01:23PM

16 of Corrections?

17 A.  This October will be 18 years.

18 Q.  What is your current position?

19 A.  I am the deputy warden of operations for the Florence

20 complex.                                                        01:24PM

21 Q.  How long have you been the deputy warden of operations at

22 the Florence complex?

23 A.  Since March of 2016.

24 Q.  Warden, can you please explain for the Court what your

25 duties are as deputy warden of operations at the ASPC Florence   01:24PM

1   complex?

2   A.   I am in charge of daily operations at Florence complex, any

3   and all operations, and assist the warden as needed.

4   Q.   And within the command structure that you operate under,

5   who do you directly report to?                                   01:24PM

6   A.   Warden Kevin Curran.

7   Q.   And who reports to you?

8   A.   I have several staff that report to me.  Major, captain at

9   operations, everybody under them, several staff.

10  Q.   What is your educational background?                        01:24PM

11  A.   I have a Bachelor of Science in Administration of Justice.

12  Q.   And can you take us through the basics of your career with

13  the Arizona Department of Corrections for almost the last 18

14  years telling us what kind of positions you have held at what

15  custody levels?                                                  01:25PM

16  A.   I have been at every custody level with the exception of

17  closed custody.  I started as a Correctional Officer II.  I

18  promoted to Correctional Officer II, sergeant.  And from there

19  went to CO-4.  From CO-4 went to ADW and from there went to

20  deputy warden and then was promoted to deputy warden of          01:25PM

21  operations.  Like I said, various custody levels throughout

22  with the exception of closed custody.

23  Q.   What does the term ADW mean?

24  A.   Associate deputy warden.

25  Q.   Where did you serve as associate deputy warden?             01:25PM

1  A.  At Browning Unit at Eyman complex.

2  Q.  What custody level was that?

3  A.  That's maximum custody.

4  Q.  How long did you serve as ADW at the Browning Unit?

5  A.  One year.                                                    01:25PM

6  Q.  DW means what?

7  A.  Deputy warden.

8  Q.  How long were you a deputy warden?

9  A.  Deputy warden for six years.

10 Q.  At what location?                                            01:25PM

11 A.  I have been a deputy warden at Aspen Unit in Phoenix

12 complex; a deputy warden at South Unit at Florence complex;

13 deputy warden at North Unit at Florence complex; deputy warden

14 at SMU-1 at Eyman complex; and now deputy warden of operations

15 at Florence complex.                                             01:26PM

16 Q.  At the Florence complex, how many total employees do you

17 all have on the security side?

18 A.  Total of 1039 employees at the complex, 954 of which are

19 security staff.

20 Q.  How many units are there at the Florence complex?           01:26PM

21 A.  There are five units total.

22 Q.  And what are the names of those units?

23 A.  We have Central Unit, East Unit, South Unit, North Unit,

24 and Globe Unit.

25 Q.  Does each unit have its own medical unit?                    01:26PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    A.  Yes, ma'am, they do.

2    Q.  I'd like to now turn your attention and talk to you about

3    the East Unit at the Florence complex.

4         Do you know what the capacity that the allowable

5    capacity is for inmates at that unit?                          01:27PM

6    A.  East Unit has a capacity of 680.

7    Q.  Do you know what the approximate current count is at East

8    Unit?

9    A.  I do not, but I have it in my notes if I am allowed to look

10   at my notes, ma'am.                                            01:27PM

11   Q.  Yes.  Are those notes that you prepared for today to tell

12   us statistics as to population levels?

13   A.  Yes, ma'am, it is.

14        Daily count at East Unit as of today is 673.

15   Q.  What is the custody level of the East Unit?                01:27PM

16   A.  It's medium custody, general population.

17   Q.  Is it an open yard?

18   A.  Yes, ma'am, it is.

19   Q.  Can you explain for us, what does an open yard mean?

20   A.  Open yard allows the inmates to move around the yard       01:27PM

21   throughout the day, normally between the hours of 6 in the

22   morning, could be 5 in the morning, all the way up until the

23   yards are closed at 8:00 at night.  They are allowed to go to

24   work, go to programming, recreation throughout the day as they

25   please.  It's an open dorm-type setting.                       01:28PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   Q.  In the open dorm-type setting there at the East Unit are

2   there counts that are conducted on a daily basis?

3   A.  Yes, ma'am.  We have five formal counts that are conducted

4   throughout the day each day.

5   Q.  What is the purpose of a count?                          01:28PM

6   A.  It is to account for every inmate incarcerated with the

7   Department of Corrections.

8   Q.  What happens with respect to an inmate who, during a time

9   of count, may be, for instance, at a program, at education or

10  down at the medical unit?  Do they have to return to their   01:28PM

11  housing area?

12  A.  No, they do not.  There is an option for an out count.  Out

13  counts are done at the area that they are at and turned into

14  count movement.  And the officer assigned to that area then

15  accounts for the inmate during that formal count.            01:28PM

16  Q.  How does an officer perform what you have termed as an out

17  count?

18  A.  They complete an out count form, meaning every inmate that

19  is at that particular area is placed on the form along with

20  their ADC number, and that form is turned into count movement 01:29PM

21  which is preparing the count.  And during the count that

22  particular officer assigned to that area physically does a face

23  to ID check of that inmate and accounts for the inmate during

24  the count.

25  Q.  And on the East Unit, the East Unit has its own medical   01:29PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    unit, correct?

2    A.  Yes, ma'am, it does.

3    Q.  Can you tell us what time the counts are performed on a

4    daily basis?

5    A.  We have daily counts at 0400, 11:00; we have counts at          01:29PM

6    1600, 2030 and 2300 hours.

7    Q.  If an inmate is at the medical unit on East, on the East

8    Unit during the time of count, do they have to return to their

9    house?  Is it a requirement they return to their dorm?

10   A.  No, ma'am.  They can be placed on an out count.                 01:30PM

11   Q.  Is there a specified person or staff member who would do an

12   out count for an inmate would be at medical?

13   A.  It would be the medical Correctional Officer II that's

14   assigned to the medical area.

15   Q.  Is there a medical officer, correctional officer assigned      01:30PM

16   to the medical unit there at East Unit on a daily basis?

17   A.  Yes, ma'am.

18   Q.  What is -- what functions do the medical officers perform?

19   A.  They provide security for the medical area.  They also

20   will, as the inmates come up, they will take the inmate's ID to    01:30PM

21   allow the nurses to know that there is an inmate waiting to be

22   seen.

23   Q.  Can you describe for us in detail at the level that you are

24   able to explain for us how does the officer take the ID cards

25   and let the medical personnel know that somebody is there to       01:30PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1  see that an inmate is there to see medical?

2  A.  As the inmate comes up to the door or window of medical he

3  will hand his ID to the officer.  The officer has a board

4  system that he places the ID on that shows the order in which

5  the inmate came up, and they are seen accordingly.                01:31PM

6  Q.  You stated earlier that the East Unit is a dorm setting?

7  A.  Yes, ma'am.

8  Q.  Can you explain for us what that means?

9  A.  An open dorm setting, it's not a singular cell.  Dorms will

10  have beds within it that is an open setting to where they are   01:31PM

11  not enclosed by four walls.

12  Q.  Is there a dorm at the East Unit where ADA inmates are

13  housed?

14  A.  Yes, ma'am.  There's actually an entire cluster, which is

15  Abel cluster.                                                    01:31PM

16  Q.  How many inmates are capable of being housed in Abel

17  cluster?

18  A.  There are 66 beds in Abel cluster.

19  Q.  And what makes Abel cluster different from another dorm

20  with respect to ADA the physical plant?                          01:32PM

21  A.  Some of the openings of the actual bed areas have been

22  enlarged to allow wheelchair access.  There has also has been

23  ADA style bars set up in the shower hut where they go and take

24  a shower, use the restroom, have sinks available to them.

25  Q.  Are you aware of how many -- currently how many inmates     01:32PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

 1   that you have at East Unit who utilize wheelchairs?

 2   A.  At East Unit there are a total of 14 inmates in

 3   wheelchairs.

 4   Q.  Does the East Unit provide any assistance or aid to inmates

 5   in wheelchairs to help them get around the unit as far as          01:32PM

 6   wheeling themselves around, or do they just have to wheel

 7   themselves?

 8   A.  No, ma'am, they do have aides assigned.  Currently there

 9   are eight assigned to East Unit.

10   Q.  How does that work as far as the assignment of the aides?     01:33PM

11   Is an aide assigned to a specific inmate?  Are they assigned

12   just to perform the function of assisting an inmate in a

13   wheelchair?  How does that work?

14   A.  They were just assigned to perform the function of getting

15   an inmate to and from a certain area.  They are not assigned      01:33PM

16   specifically to an inmate.  So one of the eight inmate ADA

17   aides could actually push two or three inmates throughout the

18   day to different areas.

19   Q.  If an inmate is utilizing a wheelchair and, for instance,

20   is in their housing unit, in their dormitory, and they need       01:33PM

21   assistance to be pushed to medical, how would the inmate summon

22   or call an aide to come help push them?

23   A.  So the officer assigned to each cluster is required to do

24   security checks.  They are required to do those within the hour

25   every hour throughout their shift throughout the day.  The        01:34PM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    inmate has the ability to tell the officer, can you please get

2    an ADA porter up so I can go to medical?  And at that time the

3    officer would call and get an inmate aide up to assist.

4    Q.  Are the inmate aides who assist with pushing the

5    wheelchairs, are they stationed in like a certain location like       01:34PM

6    an Uber station, perhaps, waiting to be called out?

7    A.  No, ma'am.  They would be assigned to their particular dorm

8    and that is their job function.  So if they are called out then

9    they report and assist the ADA inmate wherever they need to go.

10   Q.  The inmates who are assigned as wheelchair aides, do they       01:34PM

11   receive pay for doing that work?

12   A.  Yes, ma'am.  They are paid through our WIPP system.

13   Q.  I want to turn now your attention to the South Unit at the

14   Florence complex and take you through the explanation of

15   similar subject matter we just talked about.  On the South Unit    01:34PM

16   what is the capacity of that South Unit?

17   A.  South Unit's capacity is 965 inmates.

18   Q.  Do you know what today's count is, approximately?

19   A.  Today's count at South Unit is 896 inmates.

20   Q.  What is the custody level at the South Unit?                    01:35PM

21   A.  South Unit is medium custody sex offenders.

22   Q.  Is it also an open yard concept?

23   A.  Yes, ma'am.  Same style, open dorm setting.

24   Q.  Is there also a medical unit at the South Unit?

25   A.  Yes, ma'am, there is.                                           01:35PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    Q.  As far as inmates who may go to the medical unit at South,

2    is it the same as or a different way of inmates getting their

3    order, so to speak, of being seen if they go to the open nurse

4    line?

5    A.  It's the same concept as East Unit that was previously          01:35PM

6    explained.

7    Q.  Does the South Unit have any ADA dorms?

8    A.  Yes, ma'am, it does.  It's got Dorm 7, which is completely

9    ADA.  It's got Dorm 8, Abel and Baker run that are ADA, and

10   it's got Dorm 1, Charlie run, that is considered ADA.              01:36PM

11   Q.  Is it a similar situation there where the setup to

12   accommodate ADA inmates is physical plant-wise, ADA showers?

13   A.  Yes, ma'am.

14   Q.  ADA restrooms?

15   A.  Yes, ma'am.                                                    01:36PM

16   Q.  And clearance levels to allow for wheelchairs?

17   A.  Yes, ma'am, in all three areas.

18   Q.  At the South Unit, are you aware of how many inmates at the

19   South Unit require the use of a wheelchair?

20   A.  There's a total of 34 inmates that are wheelchair bound at     01:36PM

21   South Unit.

22   Q.  Do you also have wheelchair aides at the South Unit?

23   A.  Yes, ma'am.  There's a total currently of 51 assigned.

24   Q.  Is there a reason that at the South Unit there are more

25   wheelchair aides that hold that position than inmates who          01:36PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1  actually use wheelchairs?

2  A.  No particular reason.  The deputy warden recently assigned

3  more aides to that position with the movement of the medical

4  area in South Unit to accommodate those inmates that are a

5  little further away from medical.                              01:37PM

6  Q.  The wheelchair aides at the South Unit, are they likewise

7  paid for their work?

8  A.  Yes, ma'am.

9  Q.  Is it the similar setup as East Unit where if an inmate

10  needs the assistance of a wheelchair aide then a call is put    01:37PM

11  out to have an aide respond and help an inmate wherever they

12  may be?

13  A.  Yes, ma'am.

14  Q.  Where is the medical unit located currently at South Unit?

15  A.  It is currently towards the front of the unit entrance by   01:37PM

16  the admin area as you enter South Unit.

17  Q.  Is this a new location?

18  A.  Yes, ma'am, it is.

19  Q.  When did the medical unit relocate?

20  A.  July of this year.                                          01:38PM

21  Q.  And we'll use some diagrams and pictures later to walk us

22  through exactly where the move is.  But generally speaking,

23  where was the, what we term, old medical unit at the South

24  Unit?

25  A.  It was all the way in the back unit, one of the last areas  01:38PM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    next to Dorm 9 which is the furthest from the entrance to South

2    Unit.

3    Q.  When did plans begin to move the physical location of the

4    medical unit from the back of the unit up close to the front to

5    the current location?                                          01:38PM

6    A.  There's been plans in place for quite some time.  I'm not

7    exactly sure of the exact date that that took place.  I can

8    tell you with all certainty it's been about a year that those

9    plans were being made to move the medical unit.

10   Q.  What was the reason, or reasons, for the decision to move  01:38PM

11   the medical unit from the back of the unit up closer to the

12   front?

13   A.  First and foremost, it was for security for the medical

14   staff.  Of course, being a medium custody sex offender unit,

15   there was concerns with predominantly female medical staff     01:39PM

16   nurses that were walking all the way across the yard, all the

17   way to the back of the yard.  So it was a little bit more

18   security minded to place it towards the front as well as

19   convenience for those staff.

20          The area where dental is currently, that did not        01:39PM

21   change, and that's where medical is currently located.  So

22   there was a separation between dental and medical as well.

23   Q.  Have you, yourself, had an opportunity to go down there and

24   look at the new medical unit?

25   A.  Yes, ma'am, a few times.                                   01:39PM

1    Q.  Based upon the size, just talking pure size, is the new

2    location bigger than the old medical unit?

3    A.  Yes, ma'am, it is.  The waiting area is larger by far.

4    There's more office space for medical staff, mental health

5    staff, and it just -- it's a better setup than the old medical          01:40PM

6    unit as far as space goes.

7    Q.  Prior to December of 2016, how did inmates at the Florence

8    complex, and specifically we'll look at both the South Unit and

9    the East Unit, how did they seek medical care?

10   A.  Previous they would submit a health needs request and that          01:40PM

11   health needs request would be placed in a box.  Medical would

12   get the health needs request and process it as they saw fit.

13   Q.  And was there a change in approximately December of 2016 as

14   to that process?

15   A.  Yes, ma'am.                                                         01:40PM

16   Q.  What was the change?

17   A.  We now conduct open nurse's line where the inmate fills out

18   an HNR, but instead of submitting it now brings it up with them

19   to the medical area and is seen by a nurse.

20   Q.  Is there a certain time at the -- let's take the East Unit          01:41PM

21   specifically.  Let's break it down by units, okay?

22   A.  Yes, ma'am.

23   Q.  At the East Unit, is there currently a schedule as to when

24   the open nurse line is available to the inmates?

25   A.  Yes, ma'am.  It's also posted on the yard for the inmates           01:41PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    to know.

2    Q.   In addition to -- well, where is it posted?  Is it like a

3    piece of paper posted?

4    A.   Yes, ma'am.  It's a piece of paper posted and posted on the

5    inmate bulletin boards.                                          01:41PM

6    Q.   Does the East Unit have a television system where

7    notifications are also made to the inmate population as to

8    goings on at the complex or the unit?

9    A.   Yes, ma'am.  We have a CCTV system and those schedules are

10   also posted on them.                                             01:41PM

11   Q.   I want to show you what we have marked as Defendants'

12   Exhibit Number 6.  And for the Court, we -- hopefully it's in

13   front of you but we did provide in folders defendants exhibits.

14   Yes.

15           Your Honor, may I approach?                              01:42PM

16           THE COURT:  You may.

17   BY MS. LOVE:

18   Q.   Warden, if you could take a look at the document that we

19   have marked as Exhibit Number 6 and tell me if you recognize

20   that document.                                                   01:43PM

21   A.   Yes, ma'am, I do.

22   Q.   What is that document?

23   A.   This is the document that is posted so that all inmates

24   understand the process and the times for the open nurse's line

25   at East Unit.                                                    01:43PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    Q.  Now, what time is the nurse open, nurse line open to the

2    inmates at the East Unit?

3    A.  From 0700 in the morning until 1630 at night.

4    Q.  Do you see on the document that the date of that document

5    is November 30th of 2016?                                    01:43PM

6    A.  Yes, ma'am.

7    Q.  Is the schedule still, as we sit here today, the same as it

8    was on this dated memorandum of November 30 of 2016?

9    A.  Yes, ma'am, it is.

10           MS. LOVE:  Defendants move to admit Defendants'      01:43PM

11   Exhibit Number 6.

12           THE COURT:  Any objection?

13           MS. EIDENBACH:  No, Your Honor.

14           THE COURT:  Defendants' 6 will be received.

15   BY MS. LOVE:                                                 01:43PM

16   Q.  And according to the schedule the open nurse line is

17   available to the inmates at the East Unit seven days a week,

18   correct?

19   A.  Yes, ma'am, it is.

20   Q.  At the East Unit, is it based upon a building schedule such 01:44PM

21   as, for instance, Abel cluster needs to go up to see the open

22   nurse line between certain hours of time within the whole time

23   span it's open during the day, or is it just open to everybody

24   the entire span of time?

25   A.  At East Unit it's open to everybody throughout the day, no 01:44PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    specific building schedule.

2    Q.  Are there any specific provisions made for inmates who may

3    be at work, at programs, or at education during the time period

4    that the open nurse line is open?

5    A.  No, ma'am.  At East Unit, all the inmates are usually done      01:44PM

6    by 1400 hours at the unit.  So they would have time after they

7    are done with programming, education, work to go to the open

8    sick call line.

9    Q.  Now, turning your attention to the South Unit, is there a

10   schedule as to the time that the open nurse line is available      01:44PM

11   to inmates on the South Unit?

12   A.  Yes, ma'am, also posted also on CCTV.

13   Q.  I'd like to show you what defendants have marked as

14   Defendants' Exhibit Number 3.  Can you take a look at that

15   document and tell me whether or not you recognize it?             01:45PM

16   A.  Yes, ma'am, I do.

17   Q.  What is this document?

18   A.  This is the memorandum that is posted at South Unit that is

19   letting the inmates know what the process is for open nurse's

20   line as well as the hours.                                        01:45PM

21   Q.  You see the first page of this document is dated December 5

22   of 2016, is that correct?

23   A.  Yes, ma'am.

24   Q.  And towards the bottom there is an open sick call hours

25   stating that sick call hours are seven days a week, is that       01:46PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    correct?

2    A.  Yes, ma'am.  But those hours were changed, and there is an

3    addendum on that second page that shows what the current hours

4    are at South Unit for open nurse's line.

5    Q.  So the current hours of operation of the medical unit at          01:46PM

6    South is Page 2 of Exhibit Number 3?

7    A.  Yes, ma'am, it is.

8    Q.  Now, looking at Page 2 of Exhibit Number 3 with the sick

9    call hours at seven days a week, this one is broken down with

10   time periods per housing unit, is that correct?                      01:46PM

11   A.  That is correct.

12   Q.  Is there a reason that at South Unit there is a breakdown

13   for hours for the open nurse line for inmates by housing unit s

14   versus East Unit it's open all day to everybody?

15   A.  No, ma'am.  The deputy warden of that particular unit            01:46PM

16   thought that it would be best to run the schedule in this

17   fashion compared to East Unit.  They thought it would be better

18   to leave it open all day.

19   Q.  You notice at the bottom of the list of Page 2 of the

20   exhibit from 1400 hours to 1830 hours it states ACI inmates         01:47PM

21   return from work in emergencies.  What does that mean as far as

22   the schedule is concerned?

23   A.  South Unit has an ACI yard where they employ about 200

24   inmates and this gives them the opportunity to be seen on the

25   open nurse's line when they return from work.  Sometimes they        01:47PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1  don't get home from work until after hours, and this allows

2  them that time to be seen.

3          MS. LOVE:  Defendants move Exhibit Number 3 into

4  evidence.

5          THE COURT:  Any objection?                          01:47PM

6          MS. EIDENBACH:  No, Your Honor.

7          THE COURT:  3 is received.

8  BY MS. LOVE:

9  Q.  Turning back, I want to ask you a couple more questions

10 about the schedule.  If you turn to Page 2 as to the current  01:47PM

11 schedule, I'm looking at the first block of time from 0700 to

12 0830 hours.  It states that is the time period for Housing

13 Units 7, 8, and 9, is that correct?

14 A.  Yes, ma'am.

15 Q.  If an inmate does not -- if an inmate goes to the medical  01:48PM

16 unit, let's say hypothetically at 8:00, so it's between the

17 hours of 7 and 8:30, but is not seen by 8:30 does the inmate

18 have to go return back to their dormitory and wait for the next

19 day to be seen?  How does that work?

20 A.  No, ma'am.  He will automatically be seen, if he came up  01:48PM

21 and got in line, he will be seen that day.

22 Q.  So fair to say then that the building schedule is that the

23 inmate needs to physically get to the medical unit during the

24 time period assigned to their housing unit, and once they are

25 there they are still going to be seen while the medical unit is  01:48PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    open.  Would that be fair?

2    A.  That's correct.

3    Q.  Now, Housing Unit 7, 8, and 9, are any of those housing

4    units ADA units?

5    A.  Yes, ma'am.  Dorm 7 and Dorm 8 Abel and Dorm 8 Baker runs          01:49PM

6    are both ADA.

7    Q.  Housing Units 7, 8, and 9, are those housing units located

8    towards the back of the unit?

9    A.  Yes, ma'am.  All three of them are towards the very back of

10   the unit.                                                              01:49PM

11   Q.  So those would be the three units that are the furthest in

12   distance from the current location of the medical unit?

13   A.  Yes, ma'am.

14   Q.  Those are housing units that also used to be closest to the

15   old medical unit?                                                      01:49PM

16   A.  Yes, ma'am.

17   Q.  Are there any provisions that have been put in place since

18   the medical unit located up front in July of this year to

19   afford for inmates in wheelchairs who may be housed in 7, 8,

20   and 9 to be able to get up to the medical unit during the 7 to        01:49PM

21   8:30 time period?

22   A.  Couple of things happened.  The deputy warden making this

23   change understood that those dorms as being ADA were closer to

24   medical at the time and with the change they would be further.

25   He gave inmates in Dorm 7 and 8 an opportunity to move down to        01:50PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1 so that they are closer to medical if they chose to do so.

Only two inmates chose to do so.  They were moved down into

Dorm 1.  The others chose to remain there.

     Because of that, as mentioned earlier, the deputy

warden has employed more ADA aides to assist those inmates in 01:50PM

those two dorms down to medical.  And in order to help with

them getting down there in a timely fashion, they allow those

inmates and those aides to come out 15 minutes before the yard

opens after formal count is completed so they can get down

there and they can get in line first. 01:50PM

Q.  So is it essentially a situation where the nurse's line

opens at 7 a.m. for unit 7, 8, or 9, but those inmates who are

in a wheelchair are able to leave for the medical clinic at

approximately 6:45 a.m.?

A.  Yes, ma'am. 01:51PM

Q.  As deputy warden of operations of the Florence complex, is

this system with the changes that you have just spoke about

implemented in July of this year something that you, yourself,

approved of?

A.  Yes, ma'am. 01:51PM

Q.  And have you had the opportunity since these new systems

have gone into place to observe inmates making their way up to

the newly located medical unit at the times appointed in the

schedule?

A.  Yes, ma'am, a couple of times. 01:51PM

1    Q.  You spoke of the opportunity of inmates housed in 7 or 8 to

2    choose whether or not they would like to move closer to the

3    medical unit?

4    A.  Yes, ma'am.

5    Q.  Is there a housing unit that's located closer to the                    01:51PM

6    medical unit that is also ADA outfitted?

7    A.  Yes, ma'am.  Dorm 1 Charlie run is also ADA outfitted.

8    Q.  How was it communicated to the inmates, the ADA inmates in

9    Units 7 and 8 that they had the opportunity, if they chose to

10   do so, to move up closer to the Unit Number 1, Housing Unit 1?            01:52PM

11   A.  The deputy warden of the unit and the associate deputy

12   warden of the unit went to those two dorms, explained the

13   changes with medical, and asked any of the inmates if they

14   would prefer to move down closer to medical, which would be

15   Dorm 1 Charlie run.                                                        01:52PM

16   Q.  And of those inmates that were given that opportunity, two

17   chose to move up front to Unit Number 1?

18   A.  Yes, ma'am.

19   Q.  Do you have any opinion as to why it was only two inmates

20   that chose to take that opportunity?                                       01:52PM

21   A.  Dorm 7 of South Unit is the only dorm that I'm aware of,

22   and there might be one or two other ones, but Dorm 7 is AC

23   cooled.  Dorm 8 and Dorm 1 Charlie are swamp cooled.

24   Q.  The opportunity that the inmates were -- the ADA inmates

25   were provided to move up closer to Unit Number 1, was that a              01:53PM

1    one-time chance of you better take it or leave it now and

2    there's never going to be another chance?

3    A.  No, ma'am.  It was conveyed to the inmates that if they

4    choose to move up that that would be accommodated.

5    Q.  If an inmate, let's say tomorrow or today, decides that          01:53PM

6    they would rather live in the ADA accommodated areas of Unit

7    Number 1, how would an inmate go about expressing to the

8    administration that they would like to make a move?

9    A.  They can do it in person.  They can do it to any one of the

10   security staff knowing they could talk to the deputy warden        01:53PM

11   about the move or they can submit an inmate letter to the

12   deputy warden asking for that move and, as I stated, it would

13   be accommodated.

14   Q.  Were there any actions taken to document the inmates who

15   were provided the opportunity to move up to the Unit Number 1       01:54PM

16   but declined to do so at this time?

17   A.  Yes, ma'am.  They were advised to write an inmate letter to

18   state whether they wanted to move or if they declined to move

19   and did not want to move.

20   Q.  What was the reason for asking the inmates to write an          01:54PM

21   inmate letter to say whether or not they chose to take the

22   opportunity to move up to Unit Number 1?

23   A.  The deputy warden stated he did that so that an inmate

24   wouldn't come back and state I was never offered this

25   opportunity and they are not allowing me to move.                  01:54PM

1   Q.  I would like to show you what we have marked as Defendants'

2   Exhibit Number 1.  Do you recognize what this document is?

3   A.  Yes, ma'am.  It's an aerial view of East Unit at Florence

4   complex.

5   Q.  I'm going to bring you a pen, and what I would like for you    01:55PM

6   to do is so that plaintiffs' counsel and the Court can see I

7   would like for you to mark for us at the East Unit where the

8   medical unit is located.

9   A.  Yes, ma'am.

10          MS. EIDENBACH:  Your Honor, may I approach so I can        01:55PM

11  see what the witness is marking?

12          THE COURT:  You may.

13  BY MS. LOVE:

14  Q.  Why don't we do this.  I have a methodology here.  So where

15  the medical unit is located could you circle that area and mark   01:55PM

16  it with the Number 1.

17          Next, could you mark with a circle and a Number 2

18  where the chow hall is located for the East Unit?

19          And then with a circle and a Number 3 could you please

20  mark where Abel cluster is located?                               01:56PM

21          Warden, does the aerial photograph of ASPC Florence

22  East Unit with the designations of locations of medical, the

23  chow hall and Abel cluster fairly and accurately represent the

24  locations of the physical plant there at the facility

25  currently?                                                        01:57PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    A.  Yes, ma'am.

2              MS. LOVE:  Defendants move to admit Exhibit Number 1.

3              THE COURT:  Any objection?

4              MS. EIDENBACH:  No objection, Your Honor.

5              THE COURT:  Number 1 will be received.                   01:57PM

6              MS. EIDENBACH:  Could you remind us what Exhibit

7    Number we're on so I can start putting the numbers on?

8    BY MS. LOVE:

9    Q.  Warden Van Winkle, can you take a look at defendants'

10   Exhibit Number 2 that's in front of you?  It's a multi-page   01:58PM

11   exhibit.  Flip through that and tell me if you recognize what

12   you are looking at.

13   A.  Yes, ma'am, I do.

14   Q.  We are going to now take you all on a photographic tour of

15   the East Unit.  So I would like to just go through these       01:58PM

16   photographs page by page and ask you questions as to what we're

17   seeing in the photograph with relation to the medical unit and

18   the location of the Abel cluster.

19   A.  Yes, ma'am.

20   Q.  So the first page, and we'll just go in order, can you tell  01:58PM

21   us what the photograph at Page 1 of Exhibit Number 2 depicts?

22   A.  This is a ramada that provides shade and a seating area for

23   inmates that is out front of the medical unit at East Unit.

24   Q.  Is the Abel cluster depicted in this photograph at Page 1

25   of Exhibit Number 2?                                            01:59PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    A.  Yes, ma'am, it is.  It is the Quonset huts in the back of

2    the picture.

3    Q.  If this photograph were of a wider viewpoint, would we see

4    the medical unit nearby Abel cluster?

5    A.  Yes, ma'am.  As you are looking at the picture, the medical    01:59PM

6    unit would be off to your right.

7    Q.  The ramada that we see depicted in the photograph with a

8    picnic bench underneath that, is that an area where inmates who

9    are waiting to see medical in the open nurse line are permitted

10   to wait?                                                          01:59PM

11   A.  Yes, ma'am, it is.

12   Q.  Are inmates permitted to wait for the open nurse line in

13   the -- underneath the large tree that is located adjacent to

14   the ramada?

15   A.  Yes, ma'am, they are.                                         02:00PM

16   Q.  If you now look to Page 2 of Exhibit Number 2.  Can you

17   tell us what this photograph depicts?

18   A.  This is a smaller shade structure with a bench that is just

19   to the right of the ramada that you just viewed.  And in the

20   background is the front of the medical unit at East Unit.        02:00PM

21   Q.  Inmates who are waiting for the open nurse's line, are they

22   permitted to wait under this ramada in the forefront that has

23   the bench?

24   A.  Yes, ma'am.

25   Q.  Are they permitted to wait under the tree area?              02:00PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    A.   Yes, ma'am.

2    Q.   And then up in the building that's in the background, is

3    that the medical unit?

4    A.   Yes, ma'am, it is.

5    Q.   There is a structure that appears to be to the right of the        02:00PM

6    medical unit that appears that there are tables underneath.

7    What is that?

8    A.   That's an additional shaded waiting area for medical.

9    Q.   Let's go to Page 3 of Exhibit Number 2.  Can you describe

10   for us what this photograph shows?        02:01PM

11   A.   This is a culmination of the two shaded areas that we just

12   spoke about in front of the medical unit.

13   Q.   Page 4, can you describe for us what this photograph

14   depicts?

15   A.   This is the inside of Abel Hut 5, which is ADA, of a        02:01PM

16   housing area depicting the area is large enough for wheelchair

17   access for an ADA inmate.

18   Q.   As deputy warden of operations there at the Florence

19   complex, do you walk the units?

20   A.   Yes, ma'am.  I'm required to tour the units at a minimum of        02:01PM

21   once a month.

22   Q.   When is the last time that you walked the East Unit?

23   A.   I was there on Friday.

24   Q.   When you were there on Friday did you observe the open

25   nurse line?        02:02PM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   A.  Yes, ma'am, I did.

2   Q.  Approximately what time were you there at the East Unit

3   observing the open nurse line?

4   A.  Approximately 6:00 in the morning.

5   Q.  Were there inmates waiting to see medical at the time?      02:02PM

6   A.  Yes, ma'am, there was.

7   Q.  Do you remember how many?

8   A.  Approximately eight to nine inmates.

9   Q.  Did you have any conversations with the inmates who were

10  waiting for medical?                                            02:02PM

11  A.  Yes, ma'am, I did.

12  Q.  What conversations did you have?

13  A.  I asked them how they were doing and then asked them if

14  they had been waiting long.  The line had not started as of

15  yet, and I asked them what their normal wait time has been      02:02PM

16  typically.  And the response I got from one particular inmate

17  was we usually wait about 15, 20 minutes.

18  Q.  Turn now to the next page, Page 5 of Exhibit Number 2.

19  What does this photograph show?

20  A.  This is a picture of a shade tree that is to the left of    02:03PM

21  the ramada we spoke about in the first picture.

22  Q.  Again, a place for inmates who may wait to see medical?

23  A.  Yes, ma'am.

24  Q.  Now, if inmates are waiting in these different areas that

25  we have already seen so far, we have seen three ramadas, we     02:03PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    have seen a couple of large shade trees, how would an inmate

2    know that it's their turn over at the medical building if they

3    are outside waiting in these areas?

4    A.   They have to give their ID to the officer when they go up.

5    The officer, when it's the inmate's turn, if he has not brought          02:03PM

6    the inmate into the waiting area, would make a call for the

7    inmate to come up to medical to be seen.

8    Q.   When you say "make a call" how does that happen?

9    A.   He either is going to step out the door and call the

10   inmate's name verbally, or he could also call main control and         02:04PM

11   have the inmate paged to medical immediately.

12   Q.   Is there an intercom paging system?

13   A.   Yes, ma'am, there is.

14   Q.   Are there any plans at the East Unit to add misters to any

15   of the waiting areas for medical?                                       02:04PM

16   A.   Not to my knowledge.

17   Q.   Now, Page 6 of Exhibit Number 2, what does that show us?

18   A.   That shows us the ADA shower that is within the shower hut

19   for Abel cluster.  Abel cluster has one designated hut for

20   showers, bathroom, sinks.                                               02:04PM

21   Q.   Page 2 of Exhibit Number 2, what does that show us?

22   A.   This is a bathroom in the same hut, ADA accessible.

23   Q.   Page 8 of Exhibit Number 2.

24   A.   This is a picture of Abel cluster.  There is a ramada

25   located in the middle of the cluster.                                   02:05PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    Q.  Is this a different ramada from what we have seen so far in

2    the photographs or just a duplicate?

3    A.  No, ma'am.  This is a different ramada, different shade

4    area.

5    Q.  Is this also a ramada that inmates waiting for medical          02:05PM

6    could stand under?

7    A.  Yes, ma'am, they could.

8    Q.  Page 9 of Exhibit Number 2, what does that show us?

9    A.  That shows us another ramada within Abel cluster.

10   Q.  How many ramadas, covered ramadas, to your knowledge, are       02:05PM

11   available for inmates to wait underneath while they are waiting

12   for the open nurse line?

13   A.  At a minimum, five.

14   Q.  Turning now to Page 10 of Exhibit Number 2, what does the

15   photograph on Page 10 show us?                                      02:06PM

16   A.  This is the inside of the medical area where the waiting

17   area is for inmates waiting to be seen.

18   Q.  And is Page 11 of Exhibit Number 2 another viewpoint of

19   that same waiting area?

20   A.  Yes, ma'am, it is.                                              02:06PM

21   Q.  We see five chairs in these two photos that are showing the

22   same area.  Is it then that the maximum occupancy of the inside

23   waiting area of the medical unit at East approximately five

24   inmates?

25   A.  Yes, ma'am.                                                     02:06PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   Q.  How does that work?  Is there an order to which it's

2   determined whether an inmate may stay and wait inside, indoors

3   to wait for to see medical versus outdoors?  Is it first come,

4   first serve who is in the line first, or is there a different

5   analysis as to who gets to wait inside versus outside?          02:06PM

6   A.  As the inmate comes up, as I said, gives the ID, the first

7   five that give their ID would be the five that would be brought

8   in for the waiting area.  As they are seen, the security

9   officer for medical will bring in inmates as needed to fill

10  those seats and so on and so forth.                             02:07PM

11  Q.  Turn now to Page 12 of Exhibit Number 2.  What does this

12  photograph show?

13  A.  This was inmates waiting in line for the open nurse's line

14  on 8-4-17.

15  Q.  And also a shaded area?                                     02:07PM

16  A.  Yes, ma'am.  There is shade over the front of the medical

17  area.

18  Q.  What is that white box that is shown in the middle of the

19  photograph, if you know?

20  A.  That's the med refill box for East Unit.                    02:07PM

21  Q.  Is there a med refill box located anywhere else on East

22  Unit besides this location?

23  A.  No, ma'am.  Medical is the only box available.

24  Q.  How close is the medical unit to the Abel cluster, if you

25  know, in distance?                                              02:08PM

1   A.  According to Google maps, it's 297 feet.

2   Q.  Is that something you, yourself, did a Google analysis of

3   the distance?

4   A.  I actually had my maintenance supervisor do that for me,

5   ma'am.                                                          02:08PM

6   Q.  Do you know what the approximate distance is between the

7   medical unit and the chow hall at East Unit?

8   A.  I don't have that exact number, however, it's approximately

9   the same distance.

10  Q.  And the inmates on the East Unit, they eat their meals in   02:08PM

11  the chow hall?

12  A.  Yes, ma'am, they do.

13  Q.  There's just one chow hall?

14  A.  Yes, ma'am, broken up into two sides.

15  Q.  Page 13 of Exhibit Number 2, what does this show?          02:08PM

16  A.  This is the waiting area we discussed earlier that is to

17  the right of medical.

18  Q.  Just a closer up view this time?

19  A.  Yes, ma'am, it is.

20  Q.  Page 14 of Exhibit Number 2, can you tell us what this      02:08PM

21  shows us?

22  A.  This shows us the front of medical in proximity to Abel

23  cluster which is off to the left.

24  Q.  So the area to the right that shows fencing, is that the

25  medical unit?                                                   02:09PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    A.  Yes, ma'am, it is.

2    Q.  And then the hut that is with the door facing us in the

3    photograph, is that the Abel cluster?

4    A.  Yes, ma'am.  That's one hut within the cluster.

5    Q.  How many clusters, or how many huts are in the Abel          02:09PM

6    cluster?

7    A.  There are eight.

8    Q.  Page 15 of Exhibit Number 2, is this just another

9    photograph of the waiting area adjacent to the medical unit

10   that we looked at previously?                                    02:09PM

11   A.  Yes, ma'am, it is.

12   Q.  Page 16 of Exhibit Number 2, what does this show us?

13   A.  This shows us the front door to the medical area; also a

14   drinking fountain available for the inmates.

15   Q.  Where does pill call happen on the East Unit?                02:10PM

16   A.  Pill call happens in this particular area outside of the

17   window to the right of the inmate sitting in the picture.

18   Q.  And Page 17 of the Exhibit Number 2, is that just another

19   photograph of the water fountain that is there at the medical

20   unit outside?                                                    02:10PM

21   A.  Yes, ma'am.

22   Q.  Is this just to the left of the water fountain, is that the

23   pill call window that you spoke of?

24   A.  Yes, ma'am, it is.

25   Q.  And Page 18 of Exhibit Number 2, just another viewpoint of   02:10PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   the waiting area adjacent to the medical unit?

2   A.  Yes, ma'am, it is.

3   Q.  And Page 19, is that a close-up of the medical refill box

4   at the medical unit on East Unit?

5   A.  Yes, ma'am, it is.                                          02:10PM

6   Q.  And Page 20 of Exhibit Number 2, does this photograph

7   depict the medical unit at East Unit?

8   A.  Yes, ma'am, it does, along with the ADA ramp in the front

9   of the building.

10  Q.  That was going to be my next question.  We do see stairs in  02:11PM

11  the forefront up to the medical unit.  Is this ramp to the left

12  of the stairs the way the inmates who are utilizing wheelchairs

13  make their way up to get in line for the medical unit?

14  A.  Yes, ma'am, it is.

15         MS. LOVE:  Defendants move to admit Exhibit Number 2     02:11PM

16  into evidence.

17         THE COURT:  Any objection?

18         MS. EIDENBACH:  No, Your Honor.

19         THE COURT:  Defendants' 2 is admitted.

20  BY MS. LOVE:                                                    02:11PM

21  Q.  I'd like to show you now what defendants are going to mark

22  as Exhibit Number 4.

23         Warden Van Winkle, can you tell us what Exhibit Number

24  4 is, if you know?

25  A.  This is an aerial view of South Unit at Florence complex.   02:12PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1  Q.  And what I'd like for you to do, we're going to go through

2  a similar process as we did for the aerial unit for East Unit

3  where I would like you to follow my coding system, if you can.

4  And we'll mark locations of certain buildings on South Unit.

5  A.  Yes, ma'am.                                                02:12PM

6  Q.  Does this aerial photograph of South Unit at ASPC Florence

7  fairly and accurately depict the locations of the building

8  currently on South Unit?

9  A.  Yes, ma'am.  I would just like to point out it is within

10  the red-lined area of the photo.                              02:13PM

11  Q.  That was going to be my next question.  On this photograph

12  what does that -- what do the red borders show?

13  A.  That shows the area of South Unit.

14  Q.  Can you please mark for us -- how about we just use a line

15  and the Number 9 for where building Number 9 is located on     02:13PM

16  South Unit.

17  A.  Is it a line with the Number 9, ma'am?

18  Q.  With the Number 9 indicating building Number 9.

19  A.  Yes, ma'am.

20  Q.  Can you also mark with the Number 8 where building Number 8  02:13PM

21  is located.  Same for building Number 7.

22       And then with a Number 1, will you mark where building

23  Number 1 is.  And when I use the term "buildings" for buildings

24  1, 9, 8 and 7 as marked on Exhibit Number 4, are those the

25  housing units where inmates live?                             02:14PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   A.  Yes, ma'am.  Those are the dorms.

2   Q.  Can you also, using the word "old," can you draw a line and

3   indicate for us where the old medical unit was located, the

4   medical unit that was before July of this year?

5        And then with the word "new" and a line could you show    02:14PM

6   us where the new medical unit is located, the one that is

7   current?

8        Defendants move to admit Defendants' Exhibit Number 4.

9        THE COURT:  Any objection?

10       MS. EIDENBACH:  No, Your Honor.                            02:15PM

11       THE COURT:  Defendants' 4 is admitted.

12  BY MS. LOVE:

13  Q.  Also in front of you, I have placed Exhibit Number 5, which

14  I would like to go through with you for counsel and for the

15  Court.  It is another photo tour.  And as you look through      02:15PM

16  Exhibit Number 5 and flip through the multi-page exhibit, can

17  you tell me if you recognize generally what the photographs are

18  of?

19  A.  Yes, ma'am.  These are photos of South Unit.

20  Q.  Page 1 of Exhibit Number 5, can you tell us what this       02:15PM

21  photograph shows?

22  A.  This shows the med refill box that is located on the chow

23  hall at south South Unit, the dining hall.

24  Q.  What I'd like for you to do is switch back to Exhibit

25  Number 4 that is in front of you, which was the aerial          02:16PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    photograph of the South Unit.  Could you use the word "chow"

2    and could you draw a line and show us where on that aerial

3    photograph the chow hall is located?

4    A.  Yes, ma'am.

5    Q.  At the South Unit are there medical refill boxes located in          02:16PM

6    any other area at South Unit besides here at the chow hall?

7    A.  Yes, ma'am.  There's also one located at the medical area.

8    Q.  Is there a reason that on the South Unit there are two

9    locations for the medical refill box versus the East Unit where

10   there are medical refill boxes only at the medical unit?                 02:16PM

11   A.  As you can see from the photo, there's quite a bit of

12   difference between the health unit at South Unit and the chow

13   hall.  The yard being as large as it is, the deputy warden

14   wanted to ensure that there are areas where an inmate, say,

15   from Dorm 9 didn't have to walk all the way across the yard to           02:17PM

16   medical in order to drop off a med refill request.

17   Q.  In total at South Unit, how many housing units are there?

18   A.  There are nine dorms.

19   Q.  Page 2 of Exhibit Number 5, what does this photograph show

20   us?                                                                       02:17PM

21   A.  This shows us the outside of Dorm 1.

22   Q.  Are we able to tell, or can you describe for us with this

23   photograph, where the medical unit is currently located in

24   relation to this Dorm Number 1?

25   A.  This picture is showing Dorm 1 with medical would be on the          02:17PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    left of the dorm.

2    Q.  Page 3 of Exhibit Number 5?

3    A.  I'm sorry.  As I look at this photo, it's actually behind.

4    So it would be behind us from this photo as we're looking at

5    Dorm 1.                                                          02:18PM

6    Q.  It would be behind Dorm 1?

7    A.  It would be behind us as we are looking at the dorm, if

8    that makes sense.

9    Q.  Page 3 of Exhibit Number 5, what does this photograph show

10   us?                                                             02:18PM

11   A.  This shows us one Charlie inside Dorm 1 which is ADA.

12   Q.  Page 4 of Exhibit Number 5, what does this show?

13   A.  Also inside 1 Charlie run in Dorm 1 at South Unit.

14   Q.  Page 5, is that another photograph of 1 Charlie run at the

15   South Unit?                                                     02:18PM

16   A.  Yes, ma'am, showing that it is ADA accessible with

17   wheelchair.

18   Q.  Do you know how many inmates are living in Dorm 1 that use

19   wheelchairs, if you know?

20   A.  I do not have that information.                             02:19PM

21   Q.  Page 6 of Exhibit Number 5, what does this show?

22   A.  This shows Dorm 1, Charlie run's bathroom which is ADA

23   compliant.

24   Q.  Same question for Page 7 of Exhibit 5.

25   A.  Yes, ma'am.  Shows the inside of Dorm 1, Charlie run       02:19PM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   bathroom/shower area, ADA accessible.

2   Q.  And Page -- if you skip one ahead to Page 9 of Exhibit

3   Number 5, what does this photograph show?

4   A.  This is the bathroom inside of Dorm 7, which is also ADA

5   accessible.                                                          02:19PM

6   Q.  What does Page 10 of Exhibit 5 show us?

7   A.  The shower area within the same bathroom and Dorm 7, ADA

8   accessible.

9   Q.  Is Page 11 of Exhibit Number 5 another viewpoint of the ADA

10  shower and Dorm Number 7?                                            02:20PM

11  A.  Yes, ma'am, it is.

12  Q.  And what does Page 12 of Exhibit Number 5 show us?

13  A.  This is the inside of Dorm 7 showing the one side of the

14  run.

15  Q.  Is Page 13 another photograph of the inside of Dorm Number      02:20PM

16  7?

17  A.  Yes, ma'am, it is, showing wheelchair accessibility within

18  the dorm.

19  Q.  And Page 14 of Exhibit Number 5, is that just the outside

20  of Dorm Number 8?                                                    02:20PM

21  A.  Yes, ma'am, it is.

22  Q.  Is Dorm Number 8 also a dorm that has ADA accommodations?

23  A.  Half of it, two runs, 8 Abel and 8 Baker runs.

24  Q.  Page 15 of Exhibit Number 5, what does that show us?

25  A.  This is the inside of Dorm 8, and it is ADA accessible in       02:20PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   the bathroom area.

2   Q.  What about Page 16, what does that show?

3   A.  The shower area within Dorm 8 also showing ADA

4   accessibility.

5   Q.  Page 17 and 18, does this show the inside of the South Unit   02:21PM

6   dorm?

7   A.  Yes, ma'am, it does, Dorm 8.

8   Q.  Is Dorm Number 8 also outfitted with ADA accommodations?

9   A.  Yes, ma'am, half of it.  Abel and Baker run.

10  Q.  If you skip ahead a couple pages to Page 20 of Exhibit        02:21PM

11  Number 5, does that show the shower in Dorm Number 8 the ADA

12  shower?

13  A.  Yes, ma'am, it does.

14  Q.  And Page 21 of Exhibit Number 5, can you tell us what this

15  shows?                                                           02:21PM

16  A.  This is the front of the new health unit at South Unit.

17  Q.  In the photograph we see inmates gathered, correct?

18  A.  Yes, ma'am.

19  Q.  And do you know what those inmates were doing gathered in

20  this photograph?                                                 02:22PM

21  A.  No, ma'am.  I can only assume it is an open nurse's line

22  where it's a pill call.

23  Q.  Are there benches in the outdoor area right there in front

24  of the medical unit for the inmates to sit while they are

25  waiting for the open nurse line?                                 02:22PM

1  A.  Yes, ma'am, there is.

2  Q.  Is there a water fountain or water jug to provide them with

3  water?

4  A.  Yes, ma'am.  You can actually see it in the picture.  It's

5  off to the right.                                              02:22PM

6  Q.  That is what?

7  A.  That is a water fountain.

8  Q.  Are there mister systems that cool the outdoor waiting

9  unit?

10  A.  Yes, ma'am.  Along the front of the blue overhang there is  02:22PM

11  a mister system in place.

12  Q.  If you switch to the next page, Page 2 of Exhibit Number 5.

13  To the left, it appears that there's a ramada with a table

14  underneath.  Do you see that?

15  A.  Yes, ma'am, I do.                                          02:23PM

16  Q.  Is that an area where inmates who are waiting for the open

17  nurse's line can also wait?

18  A.  Yes, ma'am, it is.

19  Q.  Next page, 23.  Can you tell us what this photograph shows

20  us?                                                           02:23PM

21  A.  This is postings on the outside of the health unit letting

22  inmates know what the hours of operation are.

23  Q.  And Page 24, the next page, can you tell us what this

24  photograph shows us?

25  A.  Again, it's a posting out in the front of the medical area  02:23PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    telling inmates what the open sick call hours are for South

2    Unit.

3    Q.  Next page, which is 25 of Exhibit Number 5, can you tell us

4    what this photograph shows?

5    A.  This is the inside waiting area of the health South Unit.      02:23PM

6    Q.  Can you tell us what is on the left side?  Looks like it's

7    the black and yellow almost tape like?

8    A.  Yes, ma'am.  That area is actually to assist us with the

9    inmates coming in and lining up for pill call.  As you can see

10   in the middle of the picture, the open half door is where pill    02:24PM

11   call takes place.

12   Q.  So this is to, for lack of a better word, guide the line to

13   pill call?

14   A.  Yes, ma'am, it is.

15   Q.  So some inmates who are waiting for pill call do have the      02:24PM

16   opportunity to, for at least a portion of the time, wait inside

17   while they are waiting for pill call?

18   A.  Yes, ma'am, they do.

19   Q.  And Page 26, is that another viewpoint of the line area to

20   pill call?                                                        02:24PM

21   A.  Yes, ma'am, it is.

22   Q.  What is -- do you see in the back of the photograph, it

23   looks almost like a window with bars down, vertical bars.  What

24   is that?

25   A.  That's the officer station within the health unit.           02:24PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    Q.  And that is where a correctional officer is posted?

2    A.  Yes, ma'am, it is.

3    Q.  Next page, Page 27, what does that show us?

4    A.  That shows us the waiting area within the area we just

5    recently viewed in the health unit.                          02:24PM

6    Q.  And this is an indoor waiting area for the inmates waiting

7    for nurse's line?

8    A.  Yes, ma'am, it is.

9    Q.  And is it the same situation as East Unit that you

10   described before that depending on the order that the inmates  02:25PM

11   are going to be seen and not open nurse's line, those who are,

12   so to speak, up next may wait inside in these chairs?

13   A.  Yes, ma'am, same system in place.  Inmate comes in, hands

14   the correctional officer their ID and they are placed on a

15   board in line.                                                02:25PM

16   Q.  Next page, Page 28.  What does this show us?

17   A.  This shows us the med refill box that is located on the

18   South Unit health unit.

19   Q.  So we have a med refill box that's there at the medical

20   unit and also one at the chow hall?                           02:25PM

21   A.  Yes, ma'am.

22   Q.  Page 29, is that just a closer viewpoint of the med refill

23   box at the medical unit?

24   A.  Yes, ma'am, it is.

25   Q.  And Page 30 of Exhibit 5, is that another view of the line,  02:25PM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   the traffic line for pill call within the medical unit?

2   A.  Yes, ma'am.  This particular side of the line is for the

3   nurse's line.

4   Q.  Okay.  So once, as the line goes for both pill call and

5   open nurse line at the South Unit, as the line is forming and          02:26PM

6   medical personnel are making their way through the inmates,

7   inmates are waiting in this inside area for both pill call and

8   nurse's line?

9   A.  Yes, ma'am.  That's correct.

10  Q.  Next page, Page 31 of Exhibit Number 5.  What does this          02:26PM

11  show us?

12  A.  This shows us to the right the front of the new health

13  unit, to the left the shade structure that we viewed earlier,

14  and in the distance is Dorm 1 and shows you the proximity of

15  Dorm 1 to the health unit.                                           02:26PM

16  Q.  Page 32 of Exhibit 5, is this just another photograph of

17  the front of the medical unit?

18  A.  Yes, ma'am, it is.

19  Q.  The shaded area.  What about Page 33?  Is this another

20  viewpoint of the inside of the medical unit where the traffic       02:27PM

21  lines are forming for the open nurse line and pill call?

22  A.  Yes, ma'am.

23  Q.  And Page 34 of Exhibit Number 5, what does that show?

24  A.  This shows the front of the South Unit health unit with the

25  misting system.                                                     02:27PM

1    Q.  Page 35, same thing but a couple inmates waiting?

2    A.  Yes, ma'am.

3    Q.  To the right of the photograph, is that the drinking

4    fountain you were speaking about earlier?

5    A.  Yes, ma'am, it is.                                      02:27PM

6    Q.  Finally, Page 36 of Exhibit Number 5, is this another

7    photograph of the ramada waiting area for the medical unit?

8    A.  Yes, ma'am.  And in the distance is Dorm 1.

9    Q.  Have you, yourself, walked the distance between housing

10   unit Number 9 at the back of the unit up to the medical unit?  02:27PM

11   A.  Yes, ma'am, I have, several times.

12   Q.  How recently have you done that?

13   A.  I did it on Thursday of last week.

14   Q.  Do you know how long, approximately, it took you to walk

15   from building Number 9 up to the medical unit?              02:28PM

16   A.  It was approximately seven minutes.

17   Q.  Did you take a video of that walk that you made from

18   building Number 9 up to the medical unit?

19   A.  Yes, ma'am, I did.

20   Q.  Did you narrate that video?                             02:28PM

21   A.  Yes, ma'am, I did.

22        MS. LOVE:  And this is a little different, Your Honor,

23   because we don't have the technology in the courtroom.  I will

24   provide this proposed exhibit to plaintiffs' counsel over the

25   evening.  It's on a disk so obviously I can't move it into   02:28PM

1  evidence because we're not going to show it but I will see if

2  tomorrow it would be stipulated into evidence.

3          MS. EIDENBACH:  So we're not going to watch it right

4  now?

5          MS. LOVE:  Correct.                                    02:28PM

6          MS. EIDENBACH:  Okay.  Got it.

7  BY MS. LOVE:

8  Q.  What is the condition -- first let me ask you this:  Is

9  there a sidewalk pathway from building Number 9 all the way up

10 to the medical unit?                                           02:29PM

11 A.  Yes, ma'am, there is.

12 Q.  What about same question for building Number 7?

13 A.  Yes, ma'am.

14 Q.  And building Number 8?

15 A.  Sidewalks from every dorm to and from, yes, ma'am.         02:29PM

16 Q.  So every housing unit on South Unit has a walkway system

17 that would lead them to the medical unit?

18 A.  Yes, ma'am, it does.

19 Q.  And what is the, in your opinion as deputy warden of

20 operations, the condition of the sidewalks that make their path 02:29PM

21 from every housing unit up to the medical unit at South Unit?

22 A.  The sidewalk is in very good shape.

23 Q.  Any potholes?

24 A.  No, ma'am.

25 Q.  Any areas where there's just no sidewalk at all?           02:29PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

```
 1    A.  No, ma'am.

 2    Q.  Any hills?

 3    A.  No, ma'am.

 4    Q.  Are you aware of any incidents, let's say, since the

 5    medical unit moved up front in July of inmates having any        02:29PM

 6    problems getting to medical in a wheelchair because of the

 7    condition of the sidewalk?

 8    A.  No, ma'am.

 9    Q.  I want to switch gears now and talk to you about the ICS

10    process.                                                         02:30PM

11    A.  Yes, ma'am.

12    Q.  Is ICS a term that, as deputy warden of operations, you are

13    familiar with?

14    A.  Yes, ma'am, it is.

15         THE COURT:  Can I interrupt for just a second?  I           02:30PM

16    don't think you moved for admission of 5.

17         MS. LOVE:  I did not, Your Honor.  Thank you.  At this

18    time defendants do move for the admission of defendants'

19    Exhibit Number 5.

20         THE COURT:  Any objection?                                  02:30PM

21         MS. EIDENBACH:  Yes, Your Honor.  We object to Page 23

22    because the description provided on the face of the exhibit

23    does not accurately describe what we're looking at.  We're

24    actually, according to the sign, it's indicating that we're

25    looking at the place where pill call is held not the place      02:30PM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    where nurse line is held.  So we object on that ground.  It's

2    inaccurate.

3            MS. LOVE:  Your Honor, if we would have the

4    opportunity I could further question the witness as to whether

5    there was a mistake made in the description.                    02:31PM

6            THE COURT:  Because the pictures aren't numbered could

7    you count from backwards and tell us which one this is we're

8    talking about, Ms. Eidenbach?

9            MS. EIDENBACH:  It's the one that says insulin hours:

10   Right at the top.                                               02:31PM

11           THE COURT:  Thank you.

12           MS. EIDENBACH:  Yeah.

13           MS. LOVE:  It's 14 pages from the back.

14           THE COURT:  Thank you.

15   BY MS. LOVE:                                                    02:31PM

16   Q.  Warden Van Winkle, are you at that page, 14 pages from the

17   back?

18   A.  Yes, ma'am, I am.

19   Q.  Which is Page 23 of Exhibit Number 5.  Does the photograph

20   here depict the schedule for the open nurse line or for pill   02:31PM

21   call?

22   A.  This is for pill call.

23   Q.  And did you make a mistake in your testimony before if you

24   did describe it as the schedule for the nurse's line?

25   A.  Yes, ma'am.  If I said nurse's line then that was a        02:32PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    mistake.  Yes, ma'am.

2         MS. LOVE:  Defendants move for admission of Exhibit

3    Number 5.

4         THE COURT:  What I will do is I will correct the

5    description where it says South Unit open nurse line schedule    02:32PM

6    to say South Unit pill schedule.  Will that address the

7    plaintiffs' objection?

8         MS. EIDENBACH:  Yes, Your Honor, it will.  Thank you.

9         THE COURT:  Thank you.  5 is received.

10   BY MS. LOVE:                                                    02:32PM

11   Q.  Warden Van Winkle, will you please explain for us what the

12   term ICS means to you?

13   A.  ICS is short for instant command system.  It's a system we

14   use within the prison system any time there is any kind of

15   incident.  It can be called by officers, all security staff,    02:32PM

16   non-security staff.  And it allows us to use plain text on the

17   radios so that everybody can explain what's going on and

18   there's no confusion and we can get help to the immediate area.

19   Q.  When you say "help to the immediate area" is that

20   restricted to help needed for a medical condition?              02:33PM

21   A.  No, ma'am.  ICS can be called for any incident within the

22   prison system.

23   Q.  What kinds of incidents would an ICS be activated for?

24   A.  It could be for medical, it could be for fights, assaults,

25   it could be for mass movement of inmates, it's basically any    02:33PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

 1   incident that is not normal daily routine.

 2   Q.  And when an ICS is called, are there a certain complement

 3   of persons who are designated to respond based on the kind of

 4   incident?  How does that work?

 5   A.  Yes, ma'am.  Designated staff are on the ICS team, so when        02:33PM

 6   an ICS is activated those particular members are the responders

 7   for that incident.

 8   Q.  And an ICS team would be made up of what kind of personnel?

 9   A.  It could be made up of security staff within the unit.  It

10   is security staff that are designated.  For the most part it's        02:34PM

11   made up of Correctional Officer IIs, but it can also be

12   comprised of Correctional Officer IIIs, sergeants.

13   Q.  And is the ICS team something that is designated every

14   single day per shift?

15   A.  Yes, ma'am, it is.  It's part of our roster system.               02:34PM

16   Q.  Are there a certain number of people assigned to an ICS

17   team on any particular shift?

18   A.  Depending on the size of the unit, yes, ma'am.  Normally

19   for a smaller unit you could have three to four members.

20   Larger unit you could have five, six members.                        02:34PM

21   Q.  You explained just a moment ago, and correct me if I'm

22   wrong; I don't want to put words in your mouth, an ICS could be

23   called for a medical incident.

24   A.  Yes, ma'am.

25   Q.  What does that mean?  What would a medical incident be that       02:35PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    an ICS could be activated for?

2    A.  Again, something out of the norm if, say, for instance, we

3    had an inmate that is complaining of shortness of breath, chest

4    pains, any kind of medical distress, then an ICS can be called

5    for that particular inmate so that we can get staff and medical        02:35PM

6    personnel down to the inmate.

7    Q.  If an ICS is called for a medical incident, do medical

8    personnel respond to the inmate?  Is the inmate taken to

9    medical?  How does that work?

10   A.  It's going to depend on the situation.  More times than not    02:35PM

11   medical staff will respond to the inmate if it's a serious

12   issue or is deemed a serious issue.

13   Q.  If there is a medical ICS, how is that -- we are using the

14   term activated.  How does that happen?  Does somebody call on a

15   radio?  Does somebody call on a telephone?                             02:36PM

16   A.  The staff member more times than not is utilizing the radio

17   calling it out so all staff on the unit are aware of it.

18   Q.  Are there literal certain words that must be used on a

19   radio call?

20   A.  Yes, ma'am.  Staff are trained to utilize their name first,       02:36PM

21   stating that they are activating ICS, and then their location

22   and what the nature of the incident would be.

23   Q.  What categories of staff members are permitted to call an

24   ICS when it comes to a medical incident?

25   A.  Any staff member.                                                  02:36PM

1    Q.  From warden down to line officer and everything in between?

2    A.  Yes, ma'am.  Anybody that is working within the unit has

3    the ability to call an ICS for any incident that's out of the

4    norm.

5    Q.  If an officer, if a line officer who is, for instance,                02:36PM

6    doing security walks in a dormitory, sees a need to activate an

7    ICS, does that line officer have to seek permission from any

8    other employee in order to call an ICS?

9    A.  No, ma'am.  He can just activate the ICS.

10   Q.  Are correctional officers trained in what medical                     02:37PM

11   situations could necessitate the calling of an ICS?

12   A.  Yes, ma'am.

13   Q.  Please tell me about that training.

14   A.  They are trained within our academy, so while they are

15   going through the academy then they are trained on ICS         02:37PM

16   procedures.  There is a policy on ICS as well, and, of course,

17   experience as they go through the job would necessitate when

18   they should call ICS and when they should not.

19   Q.  Are there certain physical conditions or signs and symptoms

20   that correctional officers or any staff are trained to be a     02:37PM

21   catalyst to calling an ICS?

22   A.  Every officer is also trained in basic first aid CPR.  They

23   are trained in those trainings to look for an inmate in

24   distress such as I have described earlier, an inmate that is in

25   obvious distress or is verbalizing that he is in pain or having  02:38PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    chest pains or shortness of breath; an inmate that is bleeding

2    profusely; those type of scenarios.

3    Q.  And a supervisor does not have to approve the activation of

4    an ICS if called by a correctional officer?

5    A.  No, ma'am, they do not.                                02:38PM

6    Q.  Do any security side personnel have the authority to

7    contact medical personnel that may be on duty at the unit to

8    consult with or talk about whether an ICS should be issued

9    based upon verbal communications from an inmate?

10   A.  No.  An officer has the discretion to call an ICS when they   02:39PM

11   see fit.

12   Q.  In the normal day-to-day functioning of the Florence

13   complex, and based upon your years of experience in

14   corrections, is there ever a situation where a supervisory

15   staff may call down to medical to get some guidance on whether   02:39PM

16   or not an inmate is presenting with symptoms or a condition

17   that would necessitate the activation of an ICS?

18   A.  Yes, ma'am.  I have actually seen where officers and

19   supervisors have called medical to let them know what's going

20   on with an inmate if an inmate is complaining of any kind of   02:39PM

21   discomfort.  Our policy also allows for the shift commander to

22   call medical and tell them that they will see a particular

23   inmate for a particular condition.

24   Q.  As deputy warden of operations at the Florence complex, are

25   you notified as to any and all ICS's that may be called   02:40PM

1    complex-wide?

2    A.  Yes, ma'am.  We have a paging system where every ICS that

3    is called is put out to every administrator at the complex.

4    Q.  And when you say a paging system, what do you mean by that?

5    A.  So, for instance, if an ICS was activated at East Unit,        02:40PM

6    that activation goes through their main control.  Their main

7    control notifies all East Unit staff of the ICS.  They then

8    call our communications at the complex and let our

9    communications staff know that East Unit has gone under ICS for

10   a particular issue.  And at that point our communications       02:40PM

11   officer that received that information puts that out in an

12   e-mail to all staff at the complex.

13   Q.  As deputy warden of operations, are there occasions where

14   you might receive a phone call from staff explaining to you

15   what the nature of the ICS and what the status is?               02:41PM

16   A.  Yes, ma'am.  Depending on the nature of the ICS, if it's

17   something serious, the deputy warden, ADW or the captain, will

18   normally call myself or the warden and let us know what's going

19   on.

20   Q.  When you say "something serious" what would be a serious      02:41PM

21   situation that would prompt you receiving a phone call to where

22   you are talking directly to another person as to what the ICS

23   is about?

24   A.  There are several different instances.  A lot of them are

25   outlined in our policy in regards to significant incidents.      02:41PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   But it could be a number of different things that we deem

2   serious.  I could go through a list if needed.  I could give

3   for instances.  If an inmate, for instance, was assaulted very

4   badly, was stabbed, those are significant incidents that we

5   would be notified on.                                          02:42PM

6   Q.  If an inmate requires transport out of the complex for

7   emergency medical care, is that something that you would

8   generally receive a phone call about?

9   A.  Yes, ma'am, it is.

10  Q.  As deputy warden of operations, do you meet regularly with 02:42PM

11  medical personnel for your complex?

12  A.  Yes, ma'am, we do, once a week.

13  Q.  And who generally from the medical side attends the

14  meeting?

15  A.  The facility health administrator is at the meeting.  The  02:42PM

16  director of nursing is at the meeting.  Mental health personnel

17  are at the meeting.  And then we have all of the

18  administrators, the management team at Florence complex from

19  the warden down to the deputy wardens and the associate deputy

20  wardens of each unit.                                          02:42PM

21  Q.  If you take the period of the last two months, have you had

22  an opportunity to review whether or not there have been any

23  ICS's involving inmates who are either waiting for the pill

24  line or waiting for the open nurse line in which heat was a

25  factor to a medical condition?                                 02:43PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1   A.  Yes, ma'am.

2   Q.  And what did you find upon your review?

3   A.  We have had no incidents.

4   Q.  Is that for East Unit?

5   A.  That is for the complex.                              02:43PM

6        MS. LOVE:  Thank you, Warden.  I have no further

7   questions.

8        THE COURT:  Thank you.  We'll take a 15-minute break,

9   sir, and then the attorney for the plaintiffs will have an

10  opportunity to ask you questions.  You can step down.  Just   02:43PM

11  come back into the courtroom at 3:00.

12       THE WITNESS:  Thank you, Your Honor.

13       THE COURT:  Thank you.

14       (Recess from 2:43 p.m. until 3:00 p.m.)

15       THE COURT:  Thank you.  Couple of housekeeping matters  02:43PM

16  first.  The clerk of the court, as no surprise to the lawyers,

17  has a procedure with respect to marking items for

18  identification that are anticipated to be introduced as

19  exhibits.  And it seems that both sides really have forgotten

20  the normal practice of this courthouse and how to do that.  And  03:00PM

21  although the defendants produced an exhibit list, it wasn't one

22  that could be used because of the numbering system that was

23  employed.  And I think and rely upon the fact that you all know

24  how to do this.

25       And it just is much more helpful for the clerk of the  03:00PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Direct

1    court if you follow the practice that's used in the courthouse

2    generally, and that is marking the items that you anticipate

3    moving to introduce in accordance with the standard procedure

4    of the court in advance so the clerk of the court doesn't have

5    to do it on the fly while we're working through the documents.    03:00PM

6    She's got a number of jobs to do all at once, and adding an

7    additional one to her that could be easily avoided by the

8    lawyers doing what they normally do, usually, and that is

9    marking them in advance.

10        And the other point, it's been -- the clerk has told    03:01PM

11   me that Ms. Rand has called in but she's never announced for

12   the record.  And so the record doesn't reflect her presence

13   here and so we need to address that.  If Ms. Rand is still on

14   the phone, you need to announce or be introduced by one of your

15   co-counsel.  But in any event, you can't call in and not be on    03:01PM

16   the record so we need to be careful of that.

17        MS. RAND:  Okay.  Your Honor, this is Lucy Rand from

18   the Attorney General's Office representing the defendants.

19        THE COURT:  All right.  Thank you.  Please be seated,

20   sir.    03:01PM

21        Ms. Eidenbach, you may proceed.

22        MS. EIDENBACH:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24   BY MS. EIDENBACH:

25   Q.  Good afternoon.    03:02PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1    A.   Good afternoon.

2    Q.   I'm going to try to walk through this pretty methodically

     so we kind of stay on the same page.

4         First, I'd like to ask you whether you have any

5    expertise in determining whether or not construction or an          03:02PM

6    accommodation complies with the ADA.

7    A.   No, ma'am, I do not.

8    Q.   Is there someone at your facility who does have that

9    expertise?

10   A.   Yes, ma'am, there is.                                          03:02PM

11   Q.   Who is that person?

12   A.   That would be our maintenance supervisor.

13   Q.   And what is his or her name?

14   A.   Her name is Lila Meyer.  She's the PPOA for Florence

15   complex.                                                            03:02PM

16   Q.   And does Ms. Meyer review then all of the construction and

17   the accommodations that are made to achieve compliance with the

18   ADA?

19   A.   Yes, ma'am, she does.

20   Q.   Okay.  And has Ms. Meyer told you that the accommodations      03:03PM

21   that you have recently made that we're going to be walking

22   through are, indeed, compliant with the ADA?

23   A.   No, ma'am.  We have not had that conversation.

24   Q.   Do you know whether she's made any assessments yet?

25   A.   I do not.  However, every single addition or change to the     03:03PM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1   physical plant has to go through her for approval and her

2   review.

3   Q.  Before it occurs?

4   A.  Yes, ma'am.

5   Q.  So she reviews the plans first?                     03:03PM

6   A.  Yes, ma'am.

7   Q.  So is it your testimony today that the changes that have

8   been made, particularly to Building 1 on South Unit, are ADA

9   compliant?

10  A.  Yes, ma'am.                                          03:03PM

11  Q.  And how do you know that?

12  A.  If it was constructed and the changes were made, again,

13  going through Ms. Meyer, then I am assuming that those were

14  made and that they are ADA compliant for approval.

15  Q.  But you have no actual knowledge that they are, indeed,  03:04PM

16  compliant?

17  A.  No, ma'am, I do not.

18  Q.  And to your knowledge, has Ms. Meyer done an assessment of

19  the final construction product?

20  A.  Yes, ma'am.                                          03:04PM

21  Q.  She has.  And does she create written findings that

22  delineate her assessment?

23  A.  I'm not sure of that, ma'am.

24  Q.  You don't know whether she writes -- takes any notes or

25  writes down anything in terms of whether she's found something  03:04PM

1    to be compliant or non-compliant?

2    A.  I don't have that information, ma'am.

3    Q.  How does she communicate her findings to you ultimately?

4    A.  She will discuss them over the phone or come in my office

5    and we'll discuss any of the changes that are being made to the        03:04PM

6    complex.

7    Q.  Okay.  You testified earlier that when people are waiting

8    at medical to be seen and they may have scattered to one of the

9    shady areas to wait outside for their name to be called, one of

10   the ways they are alerted is through like a PA system or        03:05PM

11   announcement.  Is that correct?

12   A.  That option is available to the medical officer, yes,

13   ma'am.

14   Q.  Okay.  And what accommodations are made for prisoners who

15   have hearing impairments to make sure that they hear their name        03:05PM

16   being called and they don't miss their place in line?

17   A.  I don't have that information for East or South.  I'd have

18   to get with the deputy wardens and get with what their process

19   is for that.

20   Q.  Do you have that information for any yard at Florence?        03:05PM

21   A.  No, ma'am.  I would have to get that information.

22   Q.  Okay.  And the same question relating to the signs that are

23   posted regarding the hours that the open clinic is available to

24   particular housing units or, you know, work or emergency

25   situations, how do you -- what accommodations have been made        03:06PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1   for folks who cannot read or who are hearing impaired -- I'm

2   sorry -- visually impaired?

3   A.  Again, ma'am, I'd have to get with the deputy wardens to

4   find out what's been done thus far.

5   Q.  Okay.  When someone arrives at the medical unit you                03:06PM

6   testified that the medical officer takes their ID, puts it on a

7   board, and they are put on a wait list.  This is at East Unit?

8   A.  Yes, ma'am.

9   Q.  Do you know whether they keep a log of people coming up to

10  medical?  So is it written down anywhere who has handed their        03:06PM

11  IDs over, or is it just the ID is put up there and that's the

12  only action taken by the medical officer?

13  A.  Again, ma'am, I'm not sure of any log.  I'd have to get

14  with the deputy warden to find that information out.

15  Q.  Okay.  Moving for a moment to South Unit.  You just, to          03:07PM

16  clarify your testimony, the folks who decided not to move from

17  their current ADA housing to Building 1.

18  A.  Yes, ma'am.

19  Q.  They signed refusals or waivers that are kept on file?

20  A.  They filled out an inmate letter stating that they were not      03:07PM

21  interested in moving.

22  Q.  Okay.  But they can change their mind at any point?

23  A.  Yes, ma'am, they can.

24  Q.  Okay.  Are you aware of how many people at East Unit

25  prisoners at East Unit use canes?                                    03:08PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

```
 1   A.  I don't currently have that information, ma'am.

 2   Q.  What about other non-wheelchair mobility assistance devices

 3   like walkers or --

 4   A.  I only have the numbers for the wheelchair-bound inmates,

 5   ma'am.                                                            03:08PM

 6   Q.  Is that true also for South Unit?

 7   A.  Yes, ma'am.

 8   Q.  Are you aware of any prisoners at East or South Unit who

 9   use canes or other mobility non-wheelchair mobility devices,

10   not the number, just the existence of these people?              03:08PM

11   A.  Yes, ma'am.

12   Q.  Do you know if they have assistance aides provided to them?

13   A.  An ADA assisted aide would be for any inmate that is ADA --

14   made by medical as ADA.  So if they have a walker and they need

15   assistance then the ADA aide would be able to assist them as     03:09PM

16   well.

17   Q.  Who decides whether or not an aide gets assigned to a

18   prisoner?

19   A.  The aides aren't directly assigned to any particular

20   inmate.                                                          03:09PM

21   Q.  So who decides then whether a particular prisoner has

22   access to the aides who work as assistants?

23   A.  I'm sorry?

24   Q.  Do they get a chrono or SNO, something from medical saying

25   yes, I'm mobility impaired.  I have access to these aides?  And  03:09PM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1  if so, who makes that decision?  Do they show it to the officer

2  if they are in need of assistance?

3  A.  I'm not aware of any chrono or any type of documentation

4  given to the ADA inmate to tell him he has aides available.

5  But if he asks for assistance then the aides are available to          03:09PM

6  assist.

7  Q.  Even if that person hasn't been declared by medical as

8  mobility impaired under the ADA?

9  A.  I would have to check into their exact job duties as an ADA

10 aide.                                                                    03:10PM

11 Q.  Okay.  Do you know when the deputy warden hired additional

12 ADA aides at South Unit?

13 A.  Just by word of mouth from the deputy warden at South Unit,

14 he stated that additional aides were hired once the new health

15 unit was put in place.                                                   03:10PM

16 Q.  Which was approximately when?

17 A.  July.

18 Q.  Do you know if there are similar plans to hire more pushers

19 or aides at East Unit?

20 A.  Not that I'm aware of.  When I spoke to the deputy warden            03:10PM

21 at East Unit he stated that they are hired as needed.

22 Q.  Okay.  And how do they measure the need?

23 A.  I can only assume at this point, ma'am.  I would have to

24 talk with him to find out.

25 Q.  Okay.                                                                03:11PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1   A.  My assumption would be the need for them according to how

2   many inmates are asking for assistance compared to what they

3   currently have employed.

4   Q.  Other than remaining where they are, are there any

5   consequences if a prisoner declined to write an inmate letter          03:11PM

6   to move from house 7 or 8 to house 1 on South Unit?

7   A.  No, ma'am.  No consequences.

8   Q.  And is it your testimony that every wheelchair user on

9   Florence East and Florence South has access to an ADA aide at

10  least once per hour every hour that the open clinic is open and        03:11PM

11  every day that it's open?

12  A.  It's as needed.  I did not specify, nor do I know, whether

13  or not it's every hour that the open clinic is open.  It's as

14  needed by the ADA inmate.

15  Q.  Okay.  But so there's no specification that they have this         03:11PM

16  at least once per hour every hour the clinic is open?

17  A.  No.  But with the posted hours, the ADA aides know when the

18  inmates need to be up to medical for a pill call.  For

19  instance, an inmate in a wheelchair at South Unit that needs to

20  take daily meds, the ADA porter knows that he needs to be up           03:12PM

21  there every single day, and he gets out 15 minutes early before

22  the yard opens.

23  Q.  What is your understanding between the difference between

24  an ADA aide and an ADA pusher?

25  A.  One and the same.                                                  03:12PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1   Q.  Okay.  So in your estimation there's no difference between

2   the two?

3   A.  No, ma'am.  I believe that's the same WIPP code for that

4   particular job duty.

5   Q.  Do you remember where you learned that?                   03:12PM

6   A.  I'm sorry?

7   Q.  Do you remember where you learned that?

8   A.  I actually used to be in charge of capacity and WIPP as a

9   CO-4 at East Unit.

10  Q.  Have you received training on the ADA?                    03:13PM

11  A.  No, ma'am, I have not.

12  Q.  And at East and South Unit there are no individually

13  assigned aides or pushers, correct?

14  A.  Correct.

15  Q.  The move from, or the option to move from Housing Unit 7  03:13PM

16  and 8 to Housing Unit 1, was this done after July 14?  Do you

17  know?

18  A.  I don't know the specific date for that, ma'am.

19  Q.  Do you know whether it was done in response to the

20  testimony of one of our testifying prisoners?                03:13PM

21  A.  No, ma'am.  Speaking to the deputy warden at South, he made

22  it clear that it was done when the health unit was established

23  in the new location.

24  Q.  Okay.  We're going to look at a picture of this shortly.

25  But we have seen that there are chairs inside the medical areas 03:14PM

UNITED STATES DISTRICT COURT

1  for people who are waiting to be seen can sit while they are

2  waiting?

3  A.  Yes, ma'am.

4  Q.  And do you know if these chairs are all designated for the

5  open clinic, or are some also used for pill call?          03:14PM

6  A.  I don't have that information.  Initially speaking with the

7  deputy warden they were for the nurse's line inmates that were

8  waiting.

9  Q.  Just the nurse's line?

10  A.  Yes, ma'am.  As I witnessed the pill call, the inmates     03:14PM

11  moved through the line.  For the most part most of the inmates

12  were already inside standing in line so there was no need for a

13  waiting area on the day that I observed pill call at South

14  Unit.

15  Q.  Okay.  We have seen now that on the units there is, on     03:15PM

16  South Unit, there's a box, med refill box at chow and at

17  medical?

18  A.  Yes, ma'am.

19  Q.  There are two locations, correct?

20  A.  Yes, ma'am.                                                03:15PM

21  Q.  When did this happen?  Have there always been two boxes?

22  A.  To my knowledge, the second med refill box was placed at

23  the health unit in the new location when the new location was

24  opened.

25  Q.  And was the box at the chow hall ever taken down?          03:15PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1    A.  No, ma'am.  That was designated as an HNR box prior to our

2    change to a med refill box.

3    Q.  But it never got taken down?

4    A.  No, ma'am.

5    Q.  Okay.  You have testified that several areas in Buildings          03:15PM

6    7, 8, and 1 are ADA compliant and ADA accessible.  Is it your

7    testimony that the areas you have so identified are compliant

8    with the ADA construction standards?

9    A.  I can't make that statement, ma'am.

10   Q.  Okay.  So you are not sure whether the showers, the cells,        03:16PM

11   or the bathrooms in Buildings 1, 7, and 8 Abel and Baker are,

12   in fact, compliant with the ADA?

13   A.  Not without speaking to my maintenance supervisor, ma'am.

14   Q.  Ms. Meyers.  Do you have any records of any previous

15   findings she's made, not in the new construction Building 1,          03:16PM

16   but are there files that tells you, yes, this meets the

17   guidelines?  That's how I reached my conclusion that Mrs.

18   Meyer does, or you just go on the assumption that if you don't

19   get any news from her all is well?

20   A.  There's no file that I'm aware of, ma'am.  I would have to        03:17PM

21   check into that.

22   Q.  So she writes down no findings to your knowledge?

23   A.  Again, I'm not aware of that, ma'am.

24   Q.  Is it your testimony that the ramps leading to the medical

25   units are compliant with the ADA construction standards, for         03:17PM

1   example, for the slope?

2   A.  I would have to check into that as well, ma'am.

3   Q.  What did you base your testimony on earlier, then, when you

4   said that these were ADA accessible and ADA compliant areas?

5   What facts did you use to come to that conclusion?                03:17PM

6   A.  Based on the bars that were installed for assistance for

7   ADA inmates and the area is large enough for wheelchair access.

8   Q.  But you have no knowledge as to whether those changes

9   actually comply with the ADA requirements?

10  A.  No, ma'am.                                                     03:18PM

11  Q.  You testified earlier that you don't know of anyone who has

12  had trouble navigating -- anyone who is in a wheelchair or who

13  is mobility impaired who has had trouble navigating a sidewalk

14  or getting to medical in its new location.  What are you basing

15  that on?                                                          03:18PM

16  A.  There have been no ICS's in regards to an inmate falling on

17  the sidewalk.

18  Q.  So that's the only measure as to whether people have

19  difficulty doing it?

20  A.  That and the fact that I was a deputy warden there for a      03:18PM

21  year and there was never an issue with that, ma'am.

22  Q.  Do you -- have you talked to any of the prisoners to find

23  out if they are having trouble navigating that?

24  A.  No, ma'am, I have not.

25  Q.  Have any of your subordinates talked to any of the           03:19PM

1   prisoners to find out if they are having difficulty navigating?

2   A.  Not to my knowledge, ma'am.

3   Q.  Do you know of any prisoners who simply have not accessed

4   medical because the trip was too arduous or difficult?

5   A.  No, ma'am, I do not.                                      03:19PM

6   Q.  With respect to ICS's, when a prisoner requests an ICS be

7   called for medical reasons, is there any record made of that

8   request when it's denied?  I understand that there's a log when

9   ICS's actually occur.  But is there some record of requests

10  that are made and then denied?                               03:19PM

11  A.  No, ma'am, not that I'm aware of.  Inmates don't request

12  ICS.  If they have a medical need then they will talk to the

13  officer.  Again, it's the officer's discretion on whether the

14  ICS is actually activated or not or the officer can call

15  medical and say, I have got an inmate with this particular     03:20PM

16  issue.  Can you see them at this time?

17  Q.  So you are testifying that prisoners don't ask for ICSs to

18  be called when they feel they are experiencing a medical

19  emergency or an acute medical situation?

20  A.  Normally they are not asking for an ICS to be called.  They 03:20PM

21  are simply telling the officer I have got this medical

22  distress.  I need help.

23  Q.  And if the officer decides, in their estimation, that

24  there's no need to call an ICS and the ICS is not called,

25  there's no documentation anywhere that any of this occurred?    03:20PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1    A.  No, ma'am.

2    Q.  You mentioned that you have ICS teams.  Is that true for

3    both East and South?

4    A.  Yes, ma'am.  That's complex-wide.  That's actually Arizona

5    Department of Corrections wide.                                    03:21PM

6    Q.  And has that been around for a while or is this a new team?

7    A.  That's been around for as long as I have been in the

8    Department.

9    Q.  Where would that designation be listed?  Like on the board

10   when they come in or is it a weekly schedule that's printed out   03:21PM

11   and handed to staff?  How do they know that they are on the ICS

12   team?

13   A.  It is designated in briefings with the officers.

14   Supervisors let them know that they are on, whether it be an A

15   team or B team, strike team.                                       03:21PM

16   Q.  So when they are designated as part of the ICS team do they

17   remain part of that team then for some time?

18   A.  Just for their shift.

19   Q.  Just the shift?

20   A.  Yes, ma'am.                                                    03:21PM

21   Q.  Okay.  And what type of -- do they have any special

22   training or instructions when they are a member of that team?

23   A.  They are a response team, so they are responding to an

24   incident to assist the staff member that called the ICS.

25   Q.  And when they are on the ICS team, is that their only        03:22PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1    responsibility, or are they tasked with other duties during the

2    course of their shift?

3    A.   No.   They are posted as usual in their designated areas for

4    the day.   They are a responder if an ICS is activated.

5    Q.   Okay.   I'm going to try to match up the rest of the                    03:22PM

6    questions with the pictures so that we can -- so if you can

7    pull out Exhibit 2, please.   There's no easy way to do this.

8    If you can count in 13 pages to the page that has the

9    designation East Unit health unit outside waiting area.

10   A.   Yes, ma'am.                                                            03:23PM

11   Q.   Do you know when that was built?

12   A.   I do not have that knowledge, ma'am.

13   Q.   Is it new construction?

14   A.   Not to my knowledge, no, ma'am.

15   Q.   Did you see it in June of this year?                                   03:23PM

16   A.   I can't answer that with all certainty as to when that was

17   constructed.

18   Q.   So you are not sure if it was there in June 2017?

19   A.   I'm 100 percent sure it was there in June of 2017, yes.

20   I'm sorry.                                                                  03:23PM

21   Q.   That's okay.   So it's more than a month old?

22   A.   Yes, ma'am.

23   Q.   Or two.

24   A.   Yes, ma'am.

25   Q.   All right.   Now, if you can go a couple pages further to             03:24PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1    the 16th page with the designation East Unit health unit water

2    fountain.

3    A.  Yes, ma'am.

4    Q.  If you notice, there is a sign posted on the wall that

5    says, "No loitering on ramp."                                    03:24PM

6    A.  Yes, ma'am.

7    Q.  What is that sign meant to prohibit?

8    A.  I don't have that information, ma'am.  I would have to get

9    with the deputy warden of the unit.

10   Q.  So you don't know what loitering means in the context of    03:24PM

11   your complex?

12   A.  I do know what loitering means, however, inmates were not

13   being directed not to loiter when I was there watching them

14   with pill call.

15   Q.  Okay.                                                        03:24PM

16   A.  So they were on the ramp.

17   Q.  And so you are unsure whether they are allowed to actually

18   wait on the ramp while waiting for open clinic or pill call?

19   A.  Yes, ma'am.  I would have to get with the deputy warden to

20   find out what their procedure is for that.                       03:25PM

21   Q.  Okay.  All right.  Now going to Exhibit 5.  Do you have any

22   knowledge of mold infestation in the ADA bathrooms on South

23   Unit?

24   A.  No, ma'am, I do not.

25   Q.  Would you know about that if it was an issue?                03:25PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1   A.  There's a possibility I could be informed by maintenance if

2   they were aware of it, yes, ma'am.

3   Q.  But it would be outside the course of their normal duties

4   to inform you if they found mold and decided to power wash the

5   ADA showers?                                                    03:25PM

6   A.  Yes, ma'am.  Unit deputy warden would be in charge of

7   taking care of that.

8   Q.  So then you would also have no knowledge of a large hole in

9   Building 7's ADA shower that's filled with mold?

10  A.  No, ma'am.                                                  03:26PM

11  Q.  Okay.  So Exhibit 5, let's pull out Page 3 with a

12  designation South Unit, Dorm 1, C run, Exhibit -- or Page 5

13  with a designation South Unit Dorm 1, C run.  Sorry.  And Page

14  12 with the designation South Unit Dorm 7 run.  I guess we can

15  look at Page 13 as well.  Those have the same designation.      03:27PM

16          So on Pages 12 and 13 which are the Dorm 7

17  photographs.

18  A.  Yes, ma'am.

19  Q.  Do you see wheelchairs in those pictures?

20  A.  Yes, ma'am, I do.                                           03:27PM

21  Q.  And they are actually inside the sort of dorm or bed area

22  that the prisoner is in, right?

23  A.  Yes, ma'am.

24  Q.  The wheelchair fits right up next to the bed and the entire

25  cell is accessible to the prisoner in his wheelchair?           03:27PM

1    A.  Yes, ma'am.

2    Q.  Okay.  Now, if you look back at the earlier page, two

3    pages, so looking at Page 3, which is the first one, do you see

4    a wheelchair there?

5    A.  Yes, ma'am.                                           03:28PM

6    Q.  That's parked outside the cell?

7    A.  Yes, ma'am.

8    Q.  But it's your testimony that these cells are actually

9    wheelchair accessible, right?

10   A.  Yes, ma'am.                                           03:28PM

11   Q.  And then if we look at the following page we see the width

12   of that sleeping or dorm area as compared to Pages 12 and 13.

13   Do you think that the significantly narrower structure and

14   smaller size of these could have contributed to very few

15   prisoners being willing to move?                          03:28PM

16   A.  Ma'am, I have no idea why the inmates moved and why they

17   did not.  I'm only assuming why they were moving as far as the

18   air conditioner in Dorm 7.

19   Q.  Did any of them state in their inmate letters why they did

20   not want to move?                                         03:29PM

21   A.  No, ma'am, they did not.

22   Q.  Did you review the inmate letters?

23   A.  A small portion of them.  I did not review all of them.

24   Q.  Why not?

25   A.  I didn't have a chance to go through them.            03:29PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1   Q.  But you would agree that the dorm areas in Dorm 1 are

2   significantly smaller than those in Dorm 7 and, in fact, the

3   wheelchair does not move through the entire dorm area?  So the

4   entire dorm area is not actually accessible to the prisoner?

5   A.  Correct.                                                      03:29PM

6   Q.  But you consider these ADA compliant nevertheless?

7   A.  Yes, ma'am.

8   Q.  We're going to move to Page 21, which is designated South

9   Unit health unit 2.

10  A.  Yes, ma'am.                                                   03:30PM

11  Q.  This is the new health unit or the old?

12  A.  This is the new health unit.

13  Q.  The new.  Okay.

14  A.  Yes, ma'am.

15  Q.  What was that building used for previously?                   03:30PM

16  A.  That was the programs area where the CO-3s and CO-4 offices

17  were.

18  Q.  Okay.  And how long has the water fountain been there?  Was

19  it there when it used to be programming, or is it a new

20  installation?                                                     03:30PM

21  A.  That's been there for as long as I can remember, ma'am.

22  Q.  And you testified that there are misters in that area?

23  A.  Yes, ma'am.

24  Q.  That they are recently installed?

25  A.  Yes, ma'am.                                                   03:30PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1  Q.  Are they on all day?

2  A.  I would have to get with the deputy warden on the length of

3  time.  I believe they are on for the entirety of when the

4  health unit is open.

5  Q.  Can the medical staff request they be turned off?           03:31PM

6  A.  I'm sure they could, ma'am, yes.

7  Q.  And would that be accommodated?

8  A.  That would be up to the unit deputy warden or associate

9  deputy warden on the reasons for them turning it off.

10  Q.  So would you consider too much water on the sidewalk to be  03:31PM

11  an appropriate reason to request the misters be turned off?

12  A.  Possibly, yes, ma'am.

13  Q.  In June or July or August in Florence?

14  A.  Probably not.  I would not make that choice as a deputy

15  warden to turn them off during those times.                    03:31PM

16  Q.  If we go to Page 27 with the designation South Unit health

17  unit inside waiting area.  We see six chairs.  I know this is

18  nitpicky, but you testified there were seven.  So where is the

19  other chair?  Do you know?

20  A.  I don't recall testifying there were seven chairs, ma'am.   03:32PM

21  Q.  Both Corene and I wrote it down in our notes.  So you are

22  now correcting that and saying there are six chairs?

23  A.  Yes, ma'am.  If there's six chairs in the picture there are

24  six chairs.

25  Q.  Are these designated for nurse's line, or are they both     03:32PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1   used for both pill call and nurse's line or open clinic line?

2   A.   The deputy warden of the unit told me it was the health

3   unit waiting area.  He didn't designate whether it was for both

4   pill line and nurse's line.

5   Q.   And do officers, medical officers or officers who are sort       03:32PM

6   of out and about near medical, have the discretion to request

7   inmates wait outside instead of inside in these chairs?

8   A.   They would have the ability to do that, yes, ma'am.

9   Q.   And are you aware of that happening since July 14?

10  A.   No, ma'am, I'm not.                                              03:33PM

11  Q.   So it would surprise you to know, then, that Officer Hoss

12  has had the prisoners removed from the chairs and had them wait

13  outside?

14  A.   Again, I'm not made aware of that, ma'am.

15  Q.   Who would be aware of that, if anyone?                           03:33PM

16  A.   The unit administration, if they have gotten complaints

17  from the inmates.

18  Q.   Getting close.

19       Do you know if your officers take temperatures in the

20  housing units?                                                       03:34PM

21  A.   Yes, ma'am, they do.

22  Q.   Do they also take temperatures in the medical unit?

23  A.   No, ma'am, they do not.

24  Q.   Okay.  Have you -- are you aware of the procedure that they

25  use to take the temperature?                                         03:34PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

```
 1   A.  Yes, ma'am, I am.
 2   Q.  Do they hold the temperature reader -- I have never seen
 3   one -- up to the vent in order to get a temperature reading and
 4   then down at the ground to get a secondary reading?  Is that an
 5   accurate description of the procedure that they use?          03:34PM
 6   A.  Yes, ma'am, it is.
 7   Q.  So they don't measure the ambient temperature in the room.
 8   They measure it right up against the air conditioning vent and
 9   then down at the floor?
10   A.  They are walking into the dorm, they are shooting it up    03:34PM
11   high and they are shooting it down low.
12   Q.  So they are measuring the temperature in areas where people
13   are not?
14   A.  No.  This is in the dorms.
15   Q.  No.  No.  No.  I mean up towards the ceiling and down       03:35PM
16   towards the floor.  They are not measuring where people
17   actually are standing or sitting or laying?
18   A.  They are taking two readings in there, and one is high and
19   one is low.  Where the low point would be I'm not exactly sure,
20   ma'am.                                                          03:35PM
21   Q.  But no middle reading.  And do they sometimes hold the
22   temperature gauge directly up to a vent that's blowing cold
23   air?
24   A.  Not that I'm aware of, ma'am.
25   Q.  Okay.                                                       03:35PM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1         THE COURT:  Which of the units are air cooled and

2    which are refrigerated?

3         THE WITNESS:  Most of the units are air cooled.  Yes,

4    sir.

5         MS. EIDENBACH:  Your Honor, can I have one moment to          03:36PM

6    confer with my co-counsel?

7         THE COURT:  You may.

8         MS. EIDENBACH:  I think I'm just about done.

9         I have no further questions, but I would like to

10   request a copy of the written list that Mr. Van Winkle prepared    03:36PM

11   to assist him with his testimony on the stand.

12        THE COURT:  You mean the list that included the number

13   of the inmates?

14        MS. EIDENBACH:  The counts.

15        THE COURT:  That were in the count of these given             03:36PM

16   days?

17        MS. EIDENBACH:  Yes, Your Honor.

18        THE COURT:  Is there anything else on that piece of

19   paper?

20        THE WITNESS:  Other than just the unit counts, no,           03:36PM

21   sir.  ADA beds and the feet for the dorms to the health unit.

22        THE COURT:  Any objection to a photocopy for all

23   counsel of this?

24        MS. LOVE:  If I can just look at it really quick

25   first.                                                            03:37PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Van Winkle - Cross

1          THE COURT:  You may.

2          MS. LOVE:  No objection.

3          THE COURT:  Do you need the original back, sir?

4          THE WITNESS:  No, sir, I do not.

5          THE COURT:  Thank you very much.  I gather there's no          03:37PM

6    redirect.

7          MS. LOVE:  No redirect, Your Honor.  Thank you.

8          Defendants call Deputy Warden of Operations Twyford.

9          THE COURT:  Sir, if you would step forward to the

10   clerk of the court here so that she may administer the oath.          03:37PM

11         THE MAGISTRATE CLERK:  I'm sorry, sir.  I did not hear

12   your name.

13         THE WITNESS:  Norman Twyford.

14         (The witness was sworn.)

15         THE COURT:  Good afternoon.  Welcome.          03:38PM

16         THE WITNESS:  Good afternoon.

17                       NORMAN TWYFORD,

18   a witness herein, having been first duly sworn by the clerk to

19   speak the truth and nothing but the truth, was examined and

20   testified as follows:

21                     DIRECT EXAMINATION

22   BY MS. LOVE:

23   Q.  Good afternoon.  Please state your name for the record.

24   A.  Norman Twyford.

25   Q.  Mr. Twyford, who is your employer?          03:38PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    A.   The Arizona Department of Corrections.

2    Q.   How long have you worked for the Arizona Department of

3    Corrections?

4    A.   Since November of 1998.

5    Q.   What is your current position with the Arizona Department          03:38PM

6    of Corrections?

7    A.   I'm a deputy warden of operations at the Arizona State

8    Prison Complex, Perryville.

9    Q.   How long have you been the deputy warden of operations at

10   Perryville?                                                            03:38PM

11   A.   Since May of 2016.

12   Q.   What is your educational background?

13   A.   I have a Master's of Arts from Webster University, George

14   Herbert Walker School of Business.  I have a Bachelor's in

15   occupational education from Wayland Baptist University.  I'm a         03:39PM

16   Certified Corrections Executive through the Arizona -- American

17   Correctional Association.  And I'm a certified public manager.

18   Q.   Describe for us, Warden, what are your duties as deputy

19   warden of operations at the Perryville complex?

20   A.   I act as a warden in her absence.  I have direct oversight       03:39PM

21   over the physical plant, food service, motor pool, and the

22   offender information unit and the chief of security in complex

23   operations.

24   Q.   Can you take us through, a quick run through of the kinds

25   of positions that you have held with the Arizona Department of        03:39PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   Corrections during your career?

2   A.   I was a CO-1 and a sergeant; I was a training officer and

3   staff development in training for two years; I was a sergeant

4   with the Correctional Officer Training Academy.  I was a

5   lieutenant and a captain, a major, deputy warden of compliance, 03:40PM

6   a deputy warden over the units, and now the DWOC.  That was

7   spread out a little over 10 years at Perryville, three trips to

8   Lewis, and one to Phoenix, Alhambra.

9   Q.   What different custody levels have you worked during your

10  career?                                                        03:40PM

11  A.   All custody levels.

12  Q.   What is the total inmate capacity of the Perryville

13  complex?

14  A.   May I refer to my notes?

15  Q.   Yes, you may.                                             03:40PM

16  A.   Thank you.  It's one that I didn't prepare myself for.  Our

17  count is at 4,000.  But I have the San Pedro Unit and the Santa

18  Cruz Unit.

19  Q.   So the Santa Cruz -- well, let me back up.  How many

20  housing units are there at the Perryville complex?             03:40PM

21  A.   There are eight units that house inmates; the San Pedro

22  Unit, the Santa Cruz Unit, the Lumley Unit, the Piestewa Unit,

23  Santa Rosa Unit, the San Carlos Unite, the Santa Maria Unit.

24  And complex, if you count it as a unit, they have an IPC, a

25  watch unit and the minors.                                     03:41PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   Q.  And the inmate population at the Perryville complex are the

2   female inmates, correct?

3   A.  All females, yes.

4   Q.  The Santa Cruz Unit at Perryville, do you know what the

5   approximate inmate count is of the Santa Cruz unit?            03:41PM

6   A.  The inmate count of the Santa Cruz unit today is 766.

7   Their capacity is 768.  There's two vacant beds currently.

8   Q.  What is the custody level of the Santa Cruz Unit?

9   A.  Medium custody.

10  Q.  And describe for us what the living units are like at the   03:41PM

11  Santa Cruz unit.  Is it a dorm setting?  Is it a cell setting?

12  A.  They are two-person cells.

13  Q.  Is the Santa Cruz Unit an open yard?

14  A.  Yes.

15  Q.  And what does it mean in the world of corrections and      03:42PM

16  within the Arizona Department of Corrections to be an open

17  yard?

18  A.  The yard opens up shortly after the 0400 formal count

19  occurs, and the inmates return to their cell or they are out

20  counted during the subsequent formal counts and they lock down  03:42PM

21  at 2000.

22  Q.  During the day of open yard, are the inmates on the Santa

23  Cruz Unit free to go in and out of their cells?

24  A.  Yes.

25  Q.  Free to come and go to education?                          03:42PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    A.   Yes.

2    Q.   Programs?

3    A.   Yes.

4    Q.   Medical?

5    A.   Yes.                                                          03:42PM

6    Q.   And with the cell configuration of the Santa Cruz Unit is

7    the situation where you walk into, inside of a building and

8    there's cells, or do the cell doors open to the outside?  How

9    does that work?

10   A.   They open to the outside.  There's an overhang on the upper  03:43PM

11   run and the lower run, and you are just outside.

12   Q.   During times of count at the Santa Cruz Unit, are inmates

13   required to return to their cells for count?

14   A.   If they are not otherwise engaged under the supervision of

15   another corrections supervisor who has them on an out count      03:43PM

16   ahead of time, yes.

17   Q.   Does the Santa Cruz unit have its own medical unit?

18   A.   Yes.

19   Q.   If an inmate is at the medical unit during the time of

20   count, is an inmate required to go back to their house, their    03:43PM

21   cell, or can they remain in medical?

22   A.   They should remain in medical and they absolutely do.  The

23   correctional officers assigned as a medical officer will take

24   countability of the inmate and submit out counts.

25   Q.   Does the same situation apply if the inmate is education or  03:43PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    programs, for instance, during the time of count?

2    A.  Yes.

3    Q.  I want to switch your attention now to the San Pedro Unit

4    at Perryville.  At the San Pedro Unit, what is approximately,

5    if you know, today's current count?                              03:44PM

6    A.  Today is 428 and the capacity is 432.  They have four

7    vacant cells.

8    Q.  What is the custody level at the San Pedro Unit?

9    A.  Minimum.

10   Q.  At the San Pedro Unit, is it the same physical plant in    03:44PM

11   which inmates live in cells versus a dorm setting?

12   A.  Yes.

13   Q.  Two-person cells?

14   A.  Two-person cells.

15   Q.  Are the buildings configured such that the cell door opens  03:44PM

16   to the outside versus on the interior of the building?

17   A.  Yes.

18   Q.  Does the San Pedro Unit also have its own medical unit?

19   A.  Yes.

20   Q.  During times of count, if an inmate at the San Pedro Unit   03:44PM

21   is down at medical, is it the same situation at Santa Cruz

22   where the inmate would be subject to an out count such that

23   they could stay down at medical?

24   A.  Yes.

25   Q.  If you know, do you know whether there are inmates housed,   03:45PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   back to the Santa Cruz Unit, are there inmates housed at the

2   Santa Cruz Unit that are in wheelchairs?

3   A.  Yes.

4   Q.  And how many, if you know?

5   A.  I have it right here.  At Santa Cruz there's three inmates          03:45PM

6   who are bound to a wheelchair.  20 inmates have an intermittent

7   need for the wheelchair depending on the conditions that they

8   have that require it or not.

9   Q.  Are there inmates at the Santa Cruz Unit who serve as

10  wheelchair aides that assist inmates who may need to be pushed        03:45PM

11  around the unit?

12  A.  Yes.

13  Q.  Do you know how many inmates on Santa Cruz are employed in

14  this position?

15  A.  There's currently 17 employed in that position to push           03:45PM

16  people.  The three that have full time bound to their

17  wheelchair have their own individual one, and the other 14

18  serve as a fleet because not all 20 at the same time are

19  requiring the assistance of the aides.

20  Q.  Are you aware of -- or do you know which unit inmate             03:46PM

21  Dominique Keys lives on?

22  A.  Yes, I do.

23  Q.  Which unit?

24  A.  Santa Cruz.

25  Q.  Do you know if Inmate Keys is assigned a wheelchair aide?       03:46PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    A.  Yes, I do.

2    Q.  Is she assigned on an intermittent basis or a full time

3    basis?

4    A.  A full time basis.

5    Q.  And do you know how long that has been in place that she          03:46PM

6    has been assigned full time, I guess, so to speak, wheelchair

7    aide?

8    A.  Exact date I don't.  It was recent.  We had a change in the

9    assignments of the wheelchair pushers.

10   Q.  Tell me about the change in the assignments in the               03:46PM

11   wheelchair pushers.

12   A.  We previously had sort of an Uber system of wheelchair

13   pushers on demand where there was a crew of inmates that are

14   assigned and work as wheelchair pushers that would be

15   dispatched to, you know, do their job.  And since changing, I        03:47PM

16   don't have the exact dates, but as of recently, maybe two

17   weeks, the ones that are bound to the wheelchairs get their own

18   individual wheelchair pusher.

19   Q.  Do you know who Ms. Keys' wheelchair pusher aide is?

20   A.  I have to think about her name.  It's her cellmate.             03:47PM

21   Q.  And does Ms. Keys' cellmate get paid for her work in aiding

22   Ms. Keys in pushing the wheelchair?

23   A.  Yes, she does.  It's a WIPP job, which is the Work

24   Incentive Pay Plan.

25   Q.  Was there any particular reason that you are aware of as to       03:47PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    why the change has happened in the last few weeks to assign --

2    to go away from the Uber system to an inmate aide assignment

3    situation?

4    A.  To alleviate any doubt with the inmates who are bound to

5    the wheelchairs that they had inaccessibility, so they assigned    03:48PM

6    them their own.  The system we had prior was working well, and

7    this one is working equally well.

8    Q.  Do you have the same system in place as to individualized

9    assignments or, I guess, personal assignments of wheelchair

10   aides at the San Pedro Unit?    03:48PM

11   A.  Yes.  There's seven wheelchair bound inmates at the San

12   Pedro Unit.

13   Q.  And they all have individually assigned wheelchair aides as

14   well who are paid?

15   A.  Yes.    03:48PM

16   Q.  I want to talk to you now, switch gears a little and talk

17   to you about how inmates -- and we'll take them one by one --

18   but how inmates on the Santa Cruz and San Pedro Units at

19   Perryville seek medical care.

20   A.  Okay.    03:49PM

21   Q.  Currently, if an inmate desires to see anybody in the

22   medical unit, whether it's a nurse, whether it's a doctor,

23   provider of any level, how does an inmate go about seeking

24   medical care?

25   A.  They would fill out the health needs request and then they    03:49PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    would show up to the open medical lines between the hours of 7

2    to 9.  They would check in.  They would hand the medical

3    officer their identification card.  They would wait in a

4    waiting area to be cleared.  Now, if the inmate has an

5    authorized program or work assignment that otherwise has them      03:49PM

6    occupied between the hours of 7 to 9, they can come back

7    between the hours -- what unit are we on?

8    Q.  I'm sorry?

9    A.  What unit are we on?

10   Q.  Santa Cruz.                                                    03:49PM

11   A.  They can come back between the hours of 12:30 and 3 and we

12   will run that identical protocol for them there so they don't

13   have to miss work, education, or programming.

14   Q.  Does the medical unit at Santa Cruz, does the medical unit

15   close down between the hours of 9 a.m. and 12:30?  How does       03:50PM

16   that work?

17   A.  No.  They are still seeing inmates.  The open sick call

18   line is for the inmates that have care they want to be seen

19   today for.  If they were ever -- appointments are still

20   running.  The people are still getting seen by providers and      03:50PM

21   people are still getting seen for multiple other issues that

22   they have appointments to come back in here, so they are

23   simultaneously seeing inmates who line up and wait to see

24   medical with their HNR, and they have the lines they are

25   running to see people who come back who have been previously      03:50PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

 1   scheduled.

 2   Q.  If an inmate at the Santa Cruz Unit shows up with a written

 3   HNR between the hours of 7 and 9 a.m. but are not -- let's say

 4   there's 15 inmates in line and they don't get to all 15 between

 5   the hours of 7 and 9, are the inmates all turned back to the          03:51PM

 6   housing unit because they can't be seen in that two-hour

 7   window?

 8   A.  No.  7 to 9 is just to check in.  The inmates will be seen

 9   until they are done being seen.  We will keep them until we've

10   seen them all.                                                        03:51PM

11   Q.  Does the same process -- is the same process in place at

12   the San Pedro Unit?

13   A.  Yes.  The differences among the yards is who has p.m. jobs

14   and a.m. jobs.  So San Pedro is almost half the size of Santa

15   Cruz.  So the p.m. window for the inmates that are otherwise          03:51PM

16   occupied in the morning is a bit smaller.  It's 12:30 to 2 as

17   opposed to 12:30 to 3.

18   Q.  And inmates, whether it's the Santa Cruz yard or the San

19   Pedro yard, if the inmate is working a job such that they can't

20   make it to the line during the normal open line hours, they are       03:51PM

21   provided a different period of time to go to the line either

22   before or after work?

23   A.  Correct.

24          MS. EIDENBACH:  Your Honor, may I approach?

25          THE COURT:  You may.                                           03:52PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   BY MS. LOVE:

2   Q.  Warden, before you is Defendants' Exhibit Number 8 for

3   identification.  If you could look at the documents contained

4   in Exhibit Number 8 and let me know whether or not you

5   recognize the documents contained therein.                    03:52PM

6   A.  I put this together myself.  Yes, I recognize them.

7   Q.  And since you put it together yourself, can you tell us

8   generally what this packet is at Exhibit Number 8?

9   A.  Page by page?

10  Q.  Just generally, then we'll go page by page.               03:53PM

11  A.  These are photographs that demonstrate the visual layout of

12  the units that the inmates are on, the path that they take to

13  the medical and the distance and their cell environments that

14  they are in.

15  Q.  This is for the Santa Cruz Unit at Perryville, correct?    03:53PM

16  A.  Yes.  Exhibit 8 is all Santa Cruz.

17  Q.  This is something you, yourself, prepared, correct?

18  A.  Yes, I did.

19  Q.  Let's go through page by page.  And Page 1 of Exhibit

20  Number 8, can tell us what this photograph depicts?           03:54PM

21  A.  It is the walking path that one would take from Inmate

22  Keys' cell to medical.  It's approximately 800 feet.  And I

23  walked it myself, and it took me three and-a-half minutes.

24  Q.  If you could, do you have a pen up there in front of you?

25  A.  I do.                                                      03:54PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   Q.  If you could for us, to make it a little more clear on the

2   photograph, if you could circle the building that Inmate Keys

3   lives in and mark that with the Number 1.  And you have done

4   that for us?

5   A.  Yes.                                                          03:54PM

6   Q.  Could you then, with a Number 2, either with a line drawn

7   or on the building, indicate for us where the Santa Cruz

8   medical unit is?

9   A.  Okay.

10  Q.  And can you also indicate with either a line or a line and  03:54PM

11  the Number 3 where the chow hall is located for the Santa Cruz

12  Unit.

13  A.  There are four kitchen buildings at Santa Cruz with two

14  operational kitchens.  I have to think for a second.  And that

15  is just outside the -- no.  That's the other building.  This is 03:55PM

16  Number 3.

17  Q.  Can you move the microphone a little closer to you?

18  A.  Yes.

19  Q.  Okay.  And you stated that you, yourself, have walked the

20  distance from Ms. Keys' cell to the medical unit, is that       03:55PM

21  correct?

22  A.  That is correct.

23  Q.  And you measured it on Google maps?

24  A.  I did.

25  Q.  What did you find as to the distance?                       03:55PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   A.  800.83 feet on Google maps and approximately three

2   and-a-half minutes to foot walk it.

3   Q.  Is there a sidewalk pathway consistently from Ms. Keys'

4   cell all the way to the medical unit?

5   A.  The entire pathway to the medical unit from Ms. Keys' cell   03:56PM

6   is paved.

7   Q.  Have you had the opportunity to prepare a videotaped walk

8   of that pathway from the building where Ms. Keys lives up to

9   the medical unit?

10  A.  Yes, I did.   03:56PM

11  Q.  How would you describe the nature of the condition of the

12  sidewalks from the building that Ms. Keys lives in all the way

13  up to the medical unit?

14  A.  It's a sidewalk in fair condition.  It has some of minor

15  blemishes on the side or areas but nothing that can't be   03:56PM

16  avoided.

17  Q.  That can't be what?

18  A.  That can't be avoided or circumvented.

19  Q.  When you say "can't be circumvented" what do you mean by

20  that?   03:56PM

21  A.  Oh, for example, toward the education buildings prior to

22  the marking area of Number 2, there is a patch of concrete and

23  an asphalt patch in the center and concrete, and the asphalt

24  patch is somewhat uneven, but there's a direct path to either

25  side of it.  And I frequently see the inmates just take the   03:57PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   other path with the wheelchair to go around it.

2   Q.  Are you aware of any inmates who are in wheelchairs having

3   trouble getting from their building in their housing unit to

4   medical based upon any roughness in the sidewalk?

5   A.  I'm unaware of any inmates that can't make it to medical or     03:57PM

6   have expressed difficulty because of the conditions of the

7   sidewalk.

8   Q.  Can you please now turn to Page 2 of Exhibit Number 8 and

9   describe for us what this photograph shows.

10  A.  This is the view of the building that the Inmate Keys lives     03:57PM

11  in, which is the Santa Cruz Building B-Wing 4, and that is the

12  bar that takes you down to the wheelchair ramp.

13  Q.  As you sit here looking at this photograph right now, are

14  you able to pick out Inmate Keys' cell or the approximate area?

15  A.  Yeah.  I might miss it by one or two just because it's dark     03:58PM

16  in the back.

17  Q.  Could you draw a circle around the general vicinity that

18  you recall Ms. Keys' cell being located?

19  A.  Yes.  I did.

20  Q.  Is Ms. Keys' cell located on the lower level of that           03:58PM

21  building or on the upper level?

22  A.  It is on the lower level.

23  Q.  Are you -- and you told us earlier that Ms. Keys is in a

24  wheelchair.  Are you aware of that?

25  A.  Yes.                                                           03:58PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   Q.  Is there a ramp, a sidewalk ramp, that gives her access to

2   that lower level of the building and her cell?

3   A.  Yes.

4   Q.  Is that depicted in the photograph at Page 2?

5   A.  Yes.                                                        03:59PM

6   Q.  Look now, if you would, at Page 3 of Exhibit Number 8.  And

7   describe for us what this photograph shows.

8   A.  Another example of the wheelchair ramp at the Santa Cruz,

9   the same one that was in the picture previous.

10  Q.  And that does lead down to Ms. Keys' cell?              03:59PM

11  A.  Yes.

12  Q.  Page 4 of Exhibit Number 8.  Please describe for us what

13  you see there.

14  A.  That is an angle of the exit area of the wheelchair ramp

15  leading down to Ms. Keys' cell.                            03:59PM

16  Q.  And Page 5 of Exhibit Number 8, can you explain to the

17  Court and to plaintiffs' counsel what this photograph depicts?

18  A.  That is the opposite angle of the one previous, and that's

19  Ms. Keys right there sitting at her cell front.

20  Q.  In the wheelchair?                                      04:00PM

21  A.  In the wheelchair.

22  Q.  If we look at this photograph at the very, I guess, back,

23  so to speak, of the photograph, you can see an open door.  Do

24  you see that?

25  A.  Yes.                                                    04:00PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    Q.  Do you know what's in that room?

2    A.  That is the ADA shower.

3    Q.  And if you turn to the next page, which is Page 6 of

4    Exhibit Number 8.

5    A.  That's what's behind the door you saw at the end of the          04:00PM

6    hall.

7    Q.  And that is the shower?

8    A.  Yes.

9    Q.  That you just spoke of?

10   A.  Yes.                                                               04:00PM

11   Q.  Next page, Page 7 of Exhibit Number 8, can you tell us what

12   that photograph shows?

13   A.  That is the -- in the health unit area or medical offices,

14   rather, of the Santa Cruz Unit.

15   Q.  And we see inmates sitting, in the back of the photo,             04:00PM

16   inmates sitting, looks like, on a bench or a seat.  Is that

17   correct?

18   A.  That is correct.

19   Q.  Do you -- did you yourself take this photograph?

20   A.  I did.                                                            04:01PM

21   Q.  Do you know what those inmates were doing that are sitting

22   on the bench in the back?

23   A.  Waiting to see medical.

24   Q.  Is there a medical refill box located on the Santa Cruz

25   Unit?                                                                 04:01PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    A.  Yes.

2    Q.  Where is it located at?

3    A.  To the right of the door entering this unit and you can

4    depict a RX.

5    Q.  Could you circle for us the H -- or I'm sorry -- the          04:01PM

6    medical refill box that you see in the photograph that you just

7    told us about?

8    A.  Yes.

9    Q.  On the Santa Cruz Unit are there medical refill boxes at

10   any other locations other than the box you just circled on the   04:01PM

11   photograph for us?

12   A.  No, there's not.

13   Q.  Page 8 of Exhibit Number 8, what does this photograph show?

14   A.  A close-up of the box I circled on the previous page.

15   Q.  And Page 9 of Exhibit Number 8, can you describe for us      04:02PM

16   what this shows?

17   A.  This is the pill pass window, and it's adjacent to that

18   inmate holding area that you saw two or three pictures ago.

19   And that is a water pump and a water filter that feeds the

20   misting system that surrounds the inmate waiting area.           04:02PM

21   Q.  Is there a certain temperature or time of day that the

22   misters would be on for inmates waiting to see medical?

23   A.  Any time it's over 100 degrees we do the climate controls

24   or if it's uncomfortable and it's worthy of doing the climate

25   controls like the misting system we'll turn it on as well.       04:02PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1  Q.  For inmates who are waiting to see medical, and they are

2  outside, is there water provided to the inmates?

3  A.  That was on the very first picture that you saw was an

4  enclosed Igloo with ice water that is available to the inmates.

5  Q.  If you can go back in time four photos.                          04:03PM

6  A.  Okay.

7  Q.  Go backwards to the photograph that is titled:  Santa Cruz

8  Medical Inmate Waiting Area, August 4, 2017, approximately

9  3:30.  Does that photograph show the water?

10  A.  Yes, it does, yellow and red Igloo inside an enclosed         04:03PM

11  locked cabinet.

12  Q.  Besides the overhang that we see here right in front of the

13  medical unit, are there any additional areas where inmates

14  waiting to see medical can be in the shade?

15  A.  Yes.  Directly across from here is the wall of the           04:03PM

16  visitation area.  And in the morning, the morning sun will

17  shine toward the waiting area that's right here.  And within

18  eyeshot across from there the inmates will congregate on the

19  shaded side.  But 11:00, 10:00, depending on the summer/winter

20  hours, the shade covers the holding enclosure you see in this   04:04PM

21  picture and they congregate there.

22  Q.  If you can turn to the last page of Exhibit Number 8, which

23  is Page 10 of Exhibit Number 8.  Can you describe for us what

24  this photograph shows?

25  A.  So the door that we saw entering into the medical unit       04:04PM

1   adjacent to the medication refill box, this is the view

2   entering there.  Off to the right is the officer's desk where

3   they take the inmates IDs and check them in.  And then to

4   the -- that was the left in the picture.  And to the right of

5   the picture is a nurse that sees and triages the inmates.  And          04:05PM

6   all of the other doors are either treatment rooms, a restroom,

7   or tool Sharps container or storage area.

8   Q.  This area that's shown at the last page of Exhibit Number

9   8, is this a high traffic area when the medical unit is running

10  and open nurse line is running?                                          04:05PM

11  A.  Very much so.

12  Q.  Does the Santa Cruz -- in the medical unit at the Santa

13  Cruz Unit, is there a physical plant area or capability to

14  provide an indoor waiting room for the inmates?

15  A.  Not at Santa Cruz.  Every bit of space is devoted to                 04:05PM

16  medical discipline that is providing services to the inmates.

17  Q.  You spoke a moment ago that when inmates come up for the

18  open nurse line that they check in.

19  A.  That's correct.

20  Q.  How does the check-in process work, to your knowledge?               04:05PM

21  A.  The inmates come up for the open sick call.  The officer

22  allows them in, takes their ID, writes their name down on a log

23  of sorts, and organizes their names and their IDs in a

24  chronological order so that a nurse can pull people off in a

25  first come, first serve basis.                                           04:06PM

1  Q.  If an inmate is then waiting outside for their position in

2  line and to be seen, how do they know that they are next up,

3  they are next in line.  It's their turn next?

4  A.  The nurse or the staff member will come out and say, hey,

5  I'm looking for inmate whomever, and they come.                    04:06PM

6  Q.  To your knowledge, how does the pill call line work at the

7  Santa Cruz Unit?

8  A.  The inmates come up for the pill call.  They line up, hand

9  their ID.  The medical person scans their ID, gives them

10  their -- what is the word -- their -- hands them their pill      04:07PM

11  swallows, ensures they have swallowed it and go with the

12  exception of inmates in wheelchairs who go to the front of the

13  line during the pill passes.

14  Q.  The inmates that are in wheelchairs that go to the front of

15  the line, is that a process that has been put in place by        04:07PM

16  staff?

17  A.  I believe it was borne of the inmates and their own basic

18  civilities among themselves to move people in and out through

19  these processes.

20        MS. LOVE:  Defendants move Exhibit Number 8 into           04:07PM

21  evidence.

22        THE COURT:  Any objection?

23        MS. EIDENBACH:  No, Your Honor.

24        THE COURT:  8 is received.

25  BY MS. LOVE:                                                     04:07PM

1  Q.  Warden, I'd like for to you take a look at what defendants

2  have marked as Exhibit Number 10 for identification.  And let

3  me know if you recognize the documents contained in Exhibit

4  Number 10.

5          MS. EIDENBACH:  Your Honor, may I approach again?          04:09PM

6          THE COURT:  You may.

7          THE WITNESS:  Yes, I do.

8  BY MS. LOVE:

9  Q.  Is this packet -- why don't you generally describe for us

10  what is contained in this packet, Exhibit Number 10, just          04:09PM

11  generally.

12  A.  It's similar to Exhibit Number 8 in that it's an overview

13  of the unit and the photographs of the medical area and the

14  medical waiting areas.

15  Q.  Is this something you, yourself, prepared?          04:09PM

16  A.  I did myself, yes.

17  Q.  If you can take a look at Page 1 of Exhibit Number 10 for

18  us, and I want to go through the same process as we did before

19  with the Santa Cruz Unit and with -- we're going to start

20  backwards.  I'm going to mess you up on numbering.  You can use          04:09PM

21  the Number 2 and mark where the medical unit is.

22  A.  Okay.

23  Q.  Warden, are you aware of what location at Perryville Inmate

24  Angela Ashworth lives?

25  A.  Yes.          04:10PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   Q.   Where does she live?

2   A.   She lives on Building B.

3   Q.   On San Pedro Unit?

4   A.   San Pedro Unit.

5   Q.   With a Number 1, can you mark which building Ms. Ashworth          04:10PM

6   lives in?

7   A.   Yes.

8   Q.   Did you measure the distance from where Ms. Ashworth lives

9   on the San Pedro Unit to the medical unit on San Pedro?

10  A.   I measured it and I walked it, yes.                               04:10PM

11  Q.   And what was that distance?

12  A.   On the Google maps it came out to 19 -- 1199.88 feet,

13  approximately 1200 feet.

14  Q.   Did you take a video of the pathway of walking from the

15  building where Ms. Ashworth lives up to medical like you did          04:10PM

16  related to Ms. Keys?

17  A.   Yes, I did.

18  Q.   And do you remember how long, approximately, it took for

19  you to walk from the building where Ms. Ashworth lives up to

20  medical?                                                              04:11PM

21  A.   Approximately four minutes.

22  Q.   How would you describe the nature of the sidewalks on the

23  San Pedro Unit, first, just generally?

24  A.   Sidewalks are intact, and any abnormalities are noted and

25  easily circumventable.                                                04:11PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    Q.  Is there a sidewalk pathway from the building where Ms.

2    Ashworth lives consistently to the medical unit?

3    A.  Yes, there is.

4    Q.  So it's not a situation where there's a dirt field you have

5    to cross with no sidewalks?                                    04:11PM

6    A.  You do not have to cross the dirt field.  You can take the

7    sidewalk the entire way.

8    Q.  And the San Pedro Unit is an open yard as you described

9    earlier, is that correct?

10   A.  Yes.                                                        04:11PM

11   Q.  If you look at Page 2 of Exhibit Number 10, can you tell us

12   what this photograph shows?

13   A.  This is Building B where Ms. Ashworth lives.

14   Q.  And can you mark with an X generally the building area

15   where Ms. Ashworth lives?                                       04:12PM

16   A.  This should be over in this area.

17   Q.  If you look at Page 3 of Exhibit Number 10, can you

18   describe for us what this photograph shows?

19   A.  This is the medical area of the San Pedro Unit.

20   Q.  Where does pill call happen at the San Pedro Unit?          04:12PM

21   A.  Right next to the water cooler on the bench next to the

22   young lady sitting to the left of the water cooler as you look

23   at the picture.

24   Q.  Is there a shaded area for inmates to wait at the San Pedro

25   Unit for the open nurse line?                                   04:12PM

1    A.  Yeah.  The physical plan of San Pedro is a bit different in

2    that the overhang that you see in this picture versus the one

3    you saw in the Santa Cruz Unit is much deeper and provides much

4    more shade.

5    Q.  Is the system at the San Pedro Unit for inmates to get in          04:13PM

6    line, so to speak, for open nurse line the same as Santa Cruz

7    where the inmates come with their identification and they

8    provide it to the officer?

9    A.  Yes.

10   Q.  Page 4 of Exhibit Number 10, could you describe what that         04:13PM

11   photograph shows us?

12   A.  It's just a different angle to demonstrate the depth of the

13   overhang to provide the shade for the inmates waiting.  You can

14   make out off on to the right the feet of the inmate at the

15   bench close there.  The purpose of this was to see the door          04:13PM

16   that is to the right of the picture is a multi-purpose room

17   that was previously used for a women in recovery program that

18   we are in the middle of relocating that program so we can make

19   that an indoor waiting area for medical.

20   Q.  Page 5 of Exhibit Number 10, tell us, if you could, what         04:14PM

21   this photograph shows.

22   A.  That is an angle from the back of that room.  That is

23   intended to be an indoor waiting room for medical.  And it

24   shows the door entrance we were looking at moments before.  And

25   the door to the right in the picture enters into medical as         04:14PM

1    well through a back hallway.

2    Q.  When do you plan for the project to start, to convert this

3    area into an indoor waiting room for the inmates?

4    A.  I don't have a deadline for this to be completed, but we

5    typically move quickly on these once the decision is made.          04:14PM

6    Q.  Has a decision been made for this to occur?

7    A.  This is going to be the indoor waiting room for San Pedro

8    medical.

9    Q.  Page 6 of Exhibit Number 10, can you please tell us what

10   this photograph shows?                                             04:15PM

11   A.  This is the same shot that I took at Santa Cruz where you

12   open the door into medical showing the officer stationed to the

13   right -- or excuse me, to the left, and the medical nurse's

14   desk off to the right and the office spaces.

15   Q.  Is there a medical refill box located on the medical unit     04:15PM

16   at San Pedro?

17   A.  There is.  You are going to have to go back unless it's --

18   you are going to have to go back a few pages to Page Number 3.

19   So in the same spot at Santa Cruz as it was at San Pedro, right

20   underneath the no smoking sign to the right of the entrance        04:15PM

21   door, that's the medication refill box.

22   Q.  Can you, with your pen, draw a circle around that medical

23   refill box -- sorry -- medication refill box?

24   A.  Yes.

25   Q.  On San Pedro Unit are there any other medication refill        04:16PM

1   boxes located anywhere else besides at medical?

2   A.  No.

3   Q.  If you switch to the second to the last page of Exhibit

4   Number 10 which is Page 6, can you describe for us what this

5   photograph shows?                                                    04:16PM

6   A.  This would be the last page that I have.  This one?

7   Q.  Next to the last.  The one that's in your right hand.

8   There you go.

9   A.  This is the one I just described.  The entrance into the

10  medical where the officer's off to the left, the nurse is on    04:16PM

11  the right, and the treatment rooms around the periphery.

12  Q.  Last page of Exhibit 10, can you tell us what this exhibit

13  shows?

14  A.  Just a sign outside of medical relating to the inmates the

15  times that the open sick call for the inmates are 7 to 9 for   04:16PM

16  inmates who aren't in school or working and then 12:30 to 2 for

17  the inmates who would be getting off of school or work.

18  Q.  Is there similarly posted a schedule for off sick call

19  hours on the Santa Cruz Unit located at the medical unit?

20  A.  There wasn't at the time I took the picture.  I'm certain   04:17PM

21  that there is now because I said that it needed to be posted.

22  These are exposed to the inmates, and if they wanted a scratch

23  piece of paper or something it wouldn't be much for them to

24  pull it off the wall.

25  Q.  Besides seeing the posting at the medical unit as shown     04:17PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    here, the last page of Exhibit Number 10, whether it's the

2    Santa Cruz Unit or San Pedro Unit, is there any other way the

3    inmates would know what are the hours for open nurse line?

4    A.   Each inmate gets an orientation when they come to the unit

5    and the open sick call process is explained to them there.  And    04:17PM

6    it's also on our CCTV Channel 13, informative channel, that

7    repeats information that the inmates need to know.

8    Q.   As the deputy warden of operations there at the Perryville

9    complex, do you have working knowledge of the cooling systems

10   that are used to cool the inmate housing units?    04:18PM

11   A.   Yes, I do.

12   Q.   I want to speak to you now about the cooling system used in

13   the building where Ms. Keys lives on the Santa Cruz Unit.  And

14   if you could generally describe for us how are the cells on the

15   Santa Cruz Unit cooled in the summertime?    04:18PM

16   A.   Okay.  They use evaporative coolers to cool, or swamp

17   coolers to cool the units.  There's three main types of units

18   that cool it and two different ducting configurations.  So we

19   have a 10,000 CFM, cubic feet per minute, unit that pushes air

20   to 16 cells and provides cooling for 32 beds.  And we have a    04:19PM

21   six or eight CFM, 6 or 8,000 CFM unit that pushes air, cooled

22   air, to eight cells or 16 beds in the unit.

23         And the reason that you see these different sizes is

24   the institution has upgraded the evaporative cooling as

25   technology allows us.  And it was built in 1981, and it    04:19PM

1    initially had a 6,000 pushing the 16 cells and a 4,000 pushing

2    the eight cells and it used a straw media.

3        We're currently using the MasterCool system which has

4    either a six-inch honeycombed cardboard media which the water

5    flows over the media and the air is sucked, the outside dry air        04:20PM

6    is sucked through, cooled and moistened and forced into the

7    cell for the 8,000 and CFM units and the 12-inch honeycombed

8    cardboard media for the 10,000 CFM units.

9    Q.  The cells on -- in the building where Ms. Keys lives, are

10   there windows in those cells?        04:20PM

11   A.  There are windows in Ms. Keys' cell.

12   Q.  Are the windows, do the inmates have the ability to open

13   the windows?

14   A.  They do not.  At one point in the construction they did,

15   but over time and the aging building and the shifting, they        04:20PM

16   would open up and then couldn't be secured because of just the

17   shifting of the building.  So we were able to secure all of

18   them and we welded them shut.

19   Q.  By use of the cooling system there in the building where

20   Ms. Keys lives, did inmates have the opportunity to leave their        04:20PM

21   cell doors open?

22   A.  Both San Pedro and Santa Cruz they have the opportunity to

23   have their cell doors open with the exception of when we lock

24   down for count and when we close the yard.

25   Q.  What is purpose of allowing the inmate's cells to remain        04:21PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   open if they choose?

2   A.  Well, it's an open yard for one, so they can have their

3   cells open.  But they believe that it helps them with the

4   circulation in the air flow.  There is 525 cubic feet per

5   minute getting forced into that cell and we have a forced          04:21PM

6   exhaust that goes out and draws the air out regardless if the

7   door is open or closed.

8   Q.  If the, for instance, if Ms. Keys' cell door is closed is

9   there any air that could flow underneath her cell door in and

10  out, or is it literally flush with the cement?                     04:21PM

11  A.  No.  There's a space underneath the door and we have a

12  sweep.  It's demonstrated in one of the pictures previously.

13  You could see the sweep that's on the bottom of the door to

14  prevent critters and insects from coming in as well as the

15  exhaust fan that forcibly sucks the air out of the cell.           04:22PM

16  Q.  Are inmates who live in the building where Ms. Keys lives

17  permitted to have fans in their cell?

18  A.  Absolutely.  It's approved inmate property for any inmate

19  at Perryville.

20  Q.  Do you all there at the Perryville complex monitor the         04:22PM

21  temperatures in the inmate cells on the Santa Cruz unit and the

22  San Pedro Unit?

23  A.  Yes, we do.

24  Q.  How do you do that?

25  A.  We take random cell temperatures throughout the day and we     04:22PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    log them.

2    Q.  And how do you take the temperature?

3    A.  We have a thermometer that you walk into the cell and take

4    the temperature.

5    Q.  Are there required numbers of times per day that the                04:23PM

6    temperature is monitored?

7    A.  Yes.  I didn't commit that to memory or put that in my

8    notes, but they are several times a day at noon, 1400, 1600,

9    and 1800, and 2000.

10           THE COURT:  And the yard is closed at 2000 hours?             04:23PM

11           THE WITNESS:  Yes.

12           THE COURT:  So the doors are closed at 2000 hours?

13           THE WITNESS:  Yes, unless there are occasions when the

14    doors will be open after 2000 hours to mitigate extreme heat.

15    So if at 2000 hours we're taking temperatures and they are in        04:23PM

16    an acceptable threshold in the low 80s or high 70s the doors

17    will be closed.  If the inmates complain hey, it's getting hot

18    in here after the yard closes at 2000 we'll take the

19    temperature.  If it is unreasonable they will get permission

20    from the shift commander to let them keep their doors cracked,       04:24PM

21    so they can.  But we will secure it at each formal count and

22    crack them open if that be the case.

23           THE COURT:  What is the threshold temperature that

24    would allow for that?

25           THE WITNESS:  86, above 86 degrees.                          04:24PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   BY MS. LOVE:

2   Q.  Is that 86 degrees for nighttime hours, daytime hours,

3   everything?

4   A.  Yes.

5   Q.  What kind of mitigation actions besides opening doors, if    04:24PM

6   any, additional that can be taken to address temperatures that

7   pass the 86 degree threshold?

8   A.  Opening doors is obviously one of them.  Another one is to

9   go work on the evaporative cooling system on the roof.  We have

10  inmate maintenance workers who are trained in the emergency      04:24PM

11  repairs of these units.  There's not a lot of parts; the fan,

12  pads, and a water pump that flushes it over there.  And we'll

13  take an officer and an inmate work crew and go on to the roof

14  of the building and service the unit itself if there's any

15  malfunction.                                                     04:25PM

16  Q.  Are there circumstances under which inmates may be moved

17  out of their cells to a different location if certain

18  temperature thresholds are reached?

19  A.  Yes.  We were previously housing the pregnant inmates at

20  San Pedro Unit, and when the temperature would get over 86       04:25PM

21  degrees we would relocate them temporarily or overnight to the

22  visitation area, and they would sleep in visitation, which is

23  an air conditioned area.  We since moved the pregnant inmates

24  off of the San Pedro Unit to the San Carlos unit which is a

25  Butler building style unit which has an AC unit not evaporative  04:25PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    cooler.

2    Q.   When did this change in operations happen?

3    A.   Again, a few weeks ago.  I don't have the date.

4    Q.   What was the reason for the change, if you know?

5    A.   For the inmates' health and to avoid any accusations that          04:26PM

6    we weren't treating them accurately -- or carefully.

7    Q.   Do you have any information whether or not the cooling

8    system has malfunctioned, not been in working order at the

9    Santa Cruz Unit in the last two months?

10   A.   No.  We have people on the roofs of the Santa Cruz Unit on         04:26PM

11   a regular basis ensuring that the planned -- preventive

12   maintenance and planned maintenance are occurring.  There's a

13   maintenance employee dedicated to that unit that works Monday

14   through Friday and as part of their daily routines is to

15   service the unit.  And without exception they see every                04:26PM

16   evaporative cooler during the summertime months a minimum of

17   once a week.  And they respond to every allegation or every

18   complaint that it's uncomfortable to verify that all of the

19   systems are working, the two parts of the system, the exhaust

20   fan is sucking the air out and that the cooler is wetting the          04:27PM

21   pads on all sides and forcing the air in.

22   Q.   Do you have -- let's take the last two-month time frame.

23   Do you have any information that would lead you to believe that

24   the air flow or ventilation system in Inmate Keys' cell

25   specifically was not in working order?                                 04:27PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    A.   No.  I have nothing.

2              MS. LOVE:  Your Honor, may I approach?

3              THE COURT:  You may.

4              You mentioned MasterCool.  Is that a trade name?

5              THE WITNESS:  It's a brand name.                    04:27PM

6              THE COURT:  Brand name.  And do you know what the

7    maximum cooling capacity is of such a system when the ambient

8    humidity is relatively low such that an evaporative cooling

9    system would work?

10             THE WITNESS:  There's a chart available that I don't   04:27PM

11   have with me now, but at 2 percent humidity and 100 degrees

12   still pushes air out ideally at under 80 degrees in the 70s

13   which is a drastic change from 110 degrees dry air.  So the

14   higher the humidity the less the evaporative cooling works

15   because the air is already wet and wetting it any more doesn't   04:28PM

16   cool it as much as dry air.

17             THE COURT:  You mentioned 100 degrees producing a

18   temperature under 80.  So if we changed the ambient outside

19   temperature to 110 degrees, you would, I gather, be able to

20   reduce it to about 20 degrees to 90?  Is that what you are     04:28PM

21   thinking?

22             THE WITNESS:  No, because it's not a perfect 20

23   degrees under every scenario it falls under.  Even with the

24   conditions of the humidity being identical, the differences

25   between the outside temperature and the air coming in have     04:28PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1    variations depending on each.

2           THE COURT:  Right.  But I gather it doesn't get any

3    better.  If you get 20 degrees offset at 100 degrees you

4    probably don't get any better than 20 degrees offset at 110.

5           THE WITNESS:  The example I gave you was 110 degrees        04:29PM

6    bringing it down below 80.

7           THE COURT:  That's actually not what you said

8    according to the court reporter.  You said 100 degrees would

9    bring it under 80.

10          THE WITNESS:  In that case I misspoke.                      04:29PM

11          THE COURT:  You meant to say 110 would take it --

12          THE WITNESS:  To under 80 degrees at 2 percent

13   humidity.  That sticks to my head when I reviewed the graft.

14   It's like a multiplication table with the humidity across the

15   top and the temperature on the side and gives you the ranges of   04:29PM

16   its capacity as they go.

17          THE COURT:  Thank you.

18          THE WITNESS:  Thank you.

19   BY MS. LOVE:

20   Q.  Warden, if you could look at what defendants have marked as    04:29PM

21   Exhibit Number 9 for identification and let us know if you

22   recognize what is in the packet at Exhibit 9.

23   A.  That is a picture of the thermometer that we use to take

24   the temperatures in the cell.

25   Q.  Is this -- are these photographs that you, yourself,           04:30PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1  prepared?

2  A.  These are photographs I took myself, yes.

3  Q.  If you could take a look at Page 1 of Exhibit Number 9.

4  Will you tell us what this photograph shows?

5  A.  That the outside air temperature on July 14th at 12:30 was          04:30PM

6  103.3 Farenheit.

7  Q.  What complex were you taking this measurement?

8  A.  In the top of the ADA ramp on the Santa Cruz Unit outside

9  Inmate Keys' cell.

10 Q.  And why were you doing this on July 14th, 2017, at            04:30PM

11 approximately 12:30 p.m.?

12 A.  I received a call that there was an allegation of

13 inoperable cooling systems at Santa Cruz.  And they didn't have

14 any way for the air to recirculate.

15 Q.  And this device that is shown with the measurement here in      04:31PM

16 the photograph, is this a device that is regularly used at the

17 Perryville complex to take the temperature?

18 A.  I took it from the control room and it's the same one the

19 officer uses, him or herself, as they go do the temperatures.

20 Q.  So you, yourself, were assessing the temperatures?          04:31PM

21 A.  Yes.

22 Q.  If you will look at Page 2 of Exhibit Number 9, will you

23 tell us what Page 2 shows?

24 A.  Inmate Keys' cell door.

25 Q.  What about Page 3?                              04:31PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   A.  The temperature outside Inmate Keys' cell door at 12:30

2   just from moving from the sun to the shade it went to 90.1

3   degrees.

4   Q.  This is, again, a temperature that you, yourself,

5   personally assessed?                                              04:31PM

6   A.  Yes.

7   Q.  As depicted in this photograph?

8   A.  Yes.

9   Q.  The next page, Page 4 describe for us what this photograph

10  shows.                                                            04:32PM

11  A.  This is the inside of Inmate Keys' cell on July 14th.

12  Q.  And the next page, Page 5, what does this show?

13  A.  This is the supply and the exhaust vents in Inmate Keys'

14  cell.  The one with the vertical slats that's located on the

15  upper right, that is where the air comes in.  And the one off   04:32PM

16  to the edge here, off to the left, is where the air leaves.

17  Q.  When you say "where the air comes in" the one with the

18  vertical slats, that's where the air, the cool air is being

19  pumped, so to speak, into the cell?

20  A.  Yes, the supply.                                             04:32PM

21  Q.  Next page, Page 6.  Can you describe for us what this

22  photograph shows?

23  A.  That's just a close-up of the same supply cell and the

24  dimensions are 8 by 10.

25  Q.  Page 7 of Exhibit Number 9, describe for us what this       04:32PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1   photograph shows.

2   A.   That is a recirculation vent that is also in the cell, but

3   it's only operational in the winter months when we turn the

4   heater on.   So you have the heat coming into the room and being

5   recirculated through here because it's more economical to          04:33PM

6   reheat heated air with the electrical heating system but with

7   the cooling you can't re-cool humid air.   That's why it has an

8   exhaust and not a recirculation or a return if you would call

9   it that.

10  Q.   If you can switch to the next page, please, Page 8 of        04:33PM

11  Exhibit Number 10.   I'm sorry, Exhibit Number 9.   Explain for

12  us what this photograph shows us.

13  A.   The exhaust vents and the dimensions which are six inches

14  by six inches.

15  Q.   The exhaust vent is associated with the cooling system?      04:33PM

16  A.   With cooling system, correct.

17  Q.   The last page of Exhibit 9, Page 9, please describe for us

18  what this photograph shows?

19  A.   The velocity of the air coming into the unit is 944 feet

20  per minute, and the temperature of the cooled air coming into    04:34PM

21  the unit is 81.3 degrees Farenheit.   So I referenced 525 cubic

22  feet per minute earlier that is getting pumped into the cell.

23  The opening of the cell being 8 by 10 covers 80 square inches

24  and a square foot is 144 inches.   It's 55 percent of 144 so 55

25  percent of the 944 feet per minute that the velocity coming out  04:34PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1  of here equates to approximately 525 cubic feet per minute

2  going into the cell.

3  Q.  And this temperature of 81.3 degree air at the velocity of

4  944 feet per minute, was that at approximately 12:30 p.m. on

5  July 14th of 2017?                                              04:35PM

6  A.  Yes.

7  Q.  And that's something you, yourself, personally measured?

8  A.  Yes.

9        THE COURT:  With respect to this last picture where

10  you show the 944 cubic feet per minute.                        04:35PM

11        THE WITNESS:  Just feet per minute.

12        THE COURT:  Just feet per minute?

13        THE WITNESS:  Yes.

14        THE COURT:  Was the cell door open or closed?

15        THE WITNESS:  The cell door at this point was open,      04:35PM

16  but I have re-created this in a closed cell door environment in

17  other cells with the exact same results.  I don't have it here.

18  The exhaust pushes more -- much more velocity goes out of the

19  cell because it leaves through a 6 by 6 as opposed to coming in

20  the cell that comes in at an 8 by 10.                          04:35PM

21        MS. LOVE:  Warden, I have no further questions.

22        THE COURT:  Thank you.  Now the plaintiffs' attorney

23  will have an opportunity to ask you questions.  Before you step

24  away, Ms. Love, I don't think you moved for the admission of

25  either 10 or 9.                                                04:36PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Direct

1     MS. LOVE:  Correct.  Thank you, Your Honor.

2  Defendants move for admission of Defendants' Exhibit Number 9

3  and 10.

4        THE COURT:  Any objection?

5        MS. EIDENBACH:  No objection to either.                04:36PM

6        THE COURT:  It will be received.  Thank you.

7        What I'm going to do is change out the ones that you

8  have.

9        THE WITNESS:  I already gave you 8, I believe.

10        THE COURT:  How about 9.                               04:36PM

11        THE WITNESS:  There you go, sir.

12        MS. EIDENBACH:  Does the witness still have the

13  exhibits that were moved in by my co-counsel this morning or

14  are they --

15        THE COURT:  They are over here.  Just tell us which    04:37PM

16  ones you would like.  This book you mean?

17        MS. EIDENBACH:  Yep.  Perfect.

18                  CROSS-EXAMINATION

19  BY MS. EIDENBACH:

20  Q.  Good afternoon.                                          04:37PM

21  A.  Hello.

22  Q.  Are you ready?

23  A.  I am.

24  Q.  Great.  It sounds like you did quite a bit to prepare for

25  today's hearing.  In addition to the documents that you have  04:38PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1  already described particularly relating to the air conditioning

2  and swamp cooling systems, did you review any other documents

3  in preparation for today?

4  A.  Quite a few.  I can't recall off the top of my head what

5  all of them were.                                              04:38PM

6  Q.  Can you recall broad categories?

7  A.  I reviewed the morning count this morning.  I reviewed our

8  policies relating to institutional emergencies and our POST

9  orders and --

10 Q.  It's not a memory test, so that's fine.                   04:38PM

11 A.  Yeah.

12 Q.  And did you speak with anyone regarding your testimony

13 today?

14 A.  I spent some time with my physical plant manager confirming

15 the information about the evaporative cooling systems.  I spoke  04:38PM

16 to the facility health administrator about inmate emergencies

17 related to heat intolerance.  I spoke to counsel.

18 Q.  Did you speak to any of your superiors?

19 A.  I spoke to my warden.  And that would -- yes.

20 Q.  Okay.  So you testified about the area in front of Mrs.    04:39PM

21 Keys' cell?

22 A.  I did.

23 Q.  Do you recall -- and let me see.  We'll pull this up.  If

24 you look at Exhibit 8, Page 4, which is designated Santa Cruz

25 Building, B-Wing 4, lower run, August 4, 2017, approximately 3  04:40PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1    p.m.

2    A.  I don't have that.

3    Q.  You don't have Exhibit 8 anymore.  I'm sorry.  It's the

4    pictures you took.  There won't be an Exhibit 8 in there.

5    A.  I'm on Page 4.                                           04:40PM

6    Q.  Okay.  So as we look at this, there's a wet spot in front

7    of the wall.

8    A.  Yes.

9    Q.  Is that a drain?

10   A.  It is a -- leads to a drain.                             04:40PM

11   Q.  It leads to a drain.  Okay.  And is that even with the

12   sidewalk?

13   A.  No.  The channel there is to prevent water from flowing

14   over onto the sidewalk and take it to the drain.

15   Q.  Okay.  And is this the step that Ms. Keys, when she was   04:41PM

16   trying to wheel herself out of there, her wheelchair wheel got

17   caught on this and she was tossed head first into the wall?  Is

18   that the drain?

19   A.  I'm unaware of Ms. Keys' particulars except that we had an

20   ICS for an unwitnessed fall, and I believe that was the        04:41PM

21   location she was found.

22   Q.  Okay.  And are repairs being done to this drain?

23   A.  Yes.  We have intentions of improving upon it without

24   ruining its purpose, which is to keep water from flowing over

25   on to the sidewalk which would just be making it narrower.     04:41PM

UNITED STATES DISTRICT COURT

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1   Q.  Was that prompted by the accident that Ms. Keys was

2   involved in?

3   A.  It certainly raised to the level of our attention.

4   Q.  Has Ms. Keys been told she will likely have to be moved

5   away from her cell in order for that to be repaired?                    04:42PM

6   A.  I can't testify to what Ms. Keys was told.  I did not tell

7   her and I'm unaware of anyone else telling her that.

8   Q.  So you have no personal knowledge, you didn't discuss a

9   custody move with any of your staff members?

10  A.  Of Ms. Keys?                                                        04:42PM

11  Q.  Relating to Ms. Keys and the repair of the drain that

12  caused her fall?

13  A.  On the contrary.  And if my staff were having a

14  conversation and I became aware of it, I would do everything I

15  can to assure that her living conditions don't change while we          04:42PM

16  do this.

17  Q.  Okay.  Do you know if there are any plans to make an indoor

18  waiting area at Santa Cruz Unit similar to the one you

19  described at San Pedro?

20  A.  No.                                                                 04:42PM

21  Q.  No?

22  A.  No.  I'm unaware of any plans to create an indoor waiting

23  area at Santa Cruz.

24  Q.  Why not?

25  A.  The different physical plants, all of the space -- they are        04:43PM

1  not identical physical plants, although they look similar.

2  There isn't an empty pace being used as a multi-purpose room at

3  Santa Cruz as San Pedro.

4  Q.  So there's a lack of space, not a lack of need?

5  A.  The mitigations that we have in place are the misting          04:43PM

6  systems outside of there to satisfy the need.

7  Q.  Okay.  Are you aware that Ms. Keys has received a new

8  wheelchair?

9  A.  I am.

10  Q.  And this occurred after the July 14th hearing?                04:43PM

11  A.  I believe it did.

12  Q.  Have you procured other new wheelchairs?

13  A.  Yes, we have.

14  Q.  And do you know how many?

15  A.  I do not.                                                     04:43PM

16  Q.  You do not.  Okay.

17      On Santa Cruz, where are prisoners able to obtain HNR

18  forms?

19  A.  They can get them from the correctional officer who is

20  walking the yard and has face-to-face contact with them at a     04:44PM

21  minimum of every hour on San Pedro.  And at Santa Cruz there's

22  one permanently assigned to the housing unit control room which

23  I can circle on this if you would like.

24  Q.  Actually, that would be great.

25      THE COURT:  Let me trade out then the one you have           04:44PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

```
1    there for the one that's already been marked on.  Thank you

2    sir.

3    BY MS. EIDENBACH:

4    Q.  So you said the housing control unit is on Pedro?

5    A.  No.  No.                                                    04:44PM

6    Q.  Cruz?

7    A.  They can get it from both places.  Each unit has the same

8    places available for the inmate to get the HNRs.  The housing

9    unit control room officer is a permanent assignment where they

10   are statically posted in this one office and control the gates   04:45PM

11   to ingress and egress out of that unit.  And so there's always

12   someone at the window.  If you come up and say, hey, I need an

13   HNR there will be someone there.

14        At San Pedro, it's a minimum custody unit so the

15   officer goes into the control room only for the need of filling  04:45PM

16   out paperwork or doing something, but they are always out among

17   the inmates doing security checks.  So if the inmate said I

18   need that, they can say meet me outside the control room and I

19   can get you one.  And the CO-3s during business hours have them

20   in their office as well to get them.  And if they show up to     04:45PM

21   medical they can get an HNR there.  So between the control room

22   officer, the programs officer, the CO-3 and the medical unit

23   they would have access to get the health needs requests.

24   Q.  Do officers have any discretion to providing HNRs to

25   prisoners?                                                       04:46PM
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1   A.   No.

2   Q.   Would it then surprise you to hear that your officer deny

3   HNRs to prisoners when they request them?

4   A.   It would surprise me.

5   Q.   Are officers trained on HIPAA?                                    04:46PM

6   A.   Yes.

7   Q.   And are they trained that it's not permissible for them to

8   inquire as to prisoners' medical conditions in order -- or make

9   it contingent, make the receipt of an HNR contingent upon the

10  prisoner sharing her medical condition with the officer?           04:46PM

11  A.   If an officer did that, the officer would be in the wrong.

12  Q.   Okay.  What hours do the misters run?

13  A.   There's no set time for the misters to run.  Any time it

14  gets over 100 degrees they are on without question.  However,

15  it could be under 100 degrees and worthy of the misters being     04:47PM

16  on and the medical officer will turn them on if someone said

17  they are uncomfortable.

18  Q.   When you took the pictures of Ms. Keys' cell, approximately

19  how long did it take you?  How long were you in her cell?

20  A.   I believe less than five minutes.                            04:47PM

21  Q.   Okay.  And how much of that time was spent with the door

22  closed?

23  A.   Zero with the door closed.

24  Q.   So you simulated the closed door temperature readings at

25  another location?                                                  04:47PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1   A.  I said that I have gotten similar to identical results in a

2   closed cell on other buildings there.  The day in question, I

3   was, on the 14th, sent down to take pictures to refute an

4   allegation.

5   Q.  Okay.  But you didn't spend any appreciable amount of time          04:48PM

6   in her cell to assess the comfortability and you also didn't

7   spend any time in there with the door closed.  Is that correct?

8   A.  That's correct, yes.

9   Q.  Are you aware that at the July 14th hearing Ms. Rand from

10  the Attorney General's Office read off temperature readings             04:48PM

11  from cells at Perryville that were well into the 90s?

12  A.  I am not aware of Ms. Rand's testimony.

13  Q.  So you are not aware of readings well into the 90s at your

14  complex?

15  A.  I'm aware that the temperatures have reached into the 90s           04:48PM

16  and we have implemented mitigations.

17  Q.  And you said that these mitigations were implemented to

18  refute allegations that were made against you, but they weren't

19  implemented to keep those who are in your custody safe.  Is

20  that right?                                                             04:49PM

21  A.  No.

22  Q.  You have not once, sir, mentioned the well-being of the

23  prisoners in describing your mitigation attempts.  So I'm just

24  curious as to whether that was an unintentional omission, or

25  whether these mitigation attempts or mitigations were put into         04:49PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1    place in order to refute allegations and protect yourself from

2    future allegations.

3    A.   Everything we do is for the benefit of the inmates as it

4    relates to climate control.  These mitigations of leaving cell

5    doors cracked or moving inmates' houses, we have been doing                 04:49PM

6    them for years before this lawsuit ever existed.

7    Q.   Are you aware if there are any inmates who use canes or

8    other non-wheelchair mobility assistance devices at San Pedro?

9    A.   I believe they exist.  I did not educate myself on how many

10   or who they are for today's hearing.                                        04:50PM

11   Q.   Is the same true for Santa Cruz?

12   A.   The same the true for Santa Cruz.

13   Q.   Do you have any idea how many of those folks there are on

14   either of those yards?

15   A.   I do not.                                                              04:50PM

16   Q.   Do you know whether they have access to ADA aides?

17   A.   I don't have the answer to that question.

18   Q.   And are they assigned ADA aides?

19   A.   I don't have the answer to that question.

20   Q.   Do you have any training on the ADA?                                   04:50PM

21   A.   We have annual training which includes and has included ADA

22   through our leadership academies, through the correctional

23   officer training academy and the annual refresher training at

24   some point.

25   Q.   And who makes assessments of the ADA housing and the ADA              04:51PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1    facilities at Perryville to determine if they are indeed

2    compliant with the ADA?

3    A.   That would be between my facility, excuse me, the facility

4    maintenance administrator and occupational safety consultant, I

5    believe.                                                                04:51PM

6    Q.   Can you give us their names?

7    A.   James Cummings and Nathaniel Witt.

8    Q.   And do they put their findings into writing?  Do they

9    create reports?  Spreadsheets?  How do they present their

10   analysis and is it in writing?                                         04:51PM

11   A.   I'm unaware.

12   Q.   So you have never seen an analysis?

13   A.   Not that I can recall right now.

14   Q.   Have you spoken with them about whether or not the facility

15   is ADA compliant?                                                      04:51PM

16   A.   I have.

17   Q.   And what prompted that?

18   A.   For example, we moved the location of our detention unit

19   which prompted us to have to create an ADA ramp similar to the

20   one that is pictured at Santa Cruz but on a different unit to          04:52PM

21   facilitate inmates going into detention who might be wheelchair

22   bound.  And both my occupational safety consultant and my

23   physical plant manager were brought into the discussion to

24   assure that the drop-per-foot, I don't know what it is,

25   something like one inch per foot on the decline of the ramp,           04:52PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1    that the ramp was long enough, that the turnaround was long

2    enough, and that the hand rails were at the right length to

3    adequately install this ADA ramp.

4    Q.   And both of these people have the expertise necessary to

5    determine that those changes would be compliant with the ADA?          04:52PM

6    A.   I believe they do.  I don't have any firsthand knowledge of

7    their credentials outside the positions that they were hired

8    into.

9    Q.   So you base your belief solely on the fact that they

10   obtained the position that they are in?                                 04:53PM

11   A.   Yes, and the required training that they are to go through

12   as well.

13   Q.   So you understand and you are aware of what training they

14   go through?

15   A.   There is an OSHA academy, and I don't -- I'm not familiar          04:53PM

16   with the curriculum that's carried out in the OSHA academy that

17   all physical plant staff have to attend.  It's a week-long in

18   our Tucson location.  And to my understanding, that's what

19   brings them up to the level and knowledge to do their jobs.

20   Q.   So it's OSHA training not ADA training, though.  Is that           04:53PM

21   correct?

22   A.   I can't speak to if it's not ADA training because I have

23   never been there.  We just call it the OSHA academy.

24   Q.   I'd like now to have you turn your attention to the white

25   notebook to Tab 41.  I will give you a few minutes to just read         04:54PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1  over this and ask you a few questions about it.

2  A.  Is this a string of e-mails?  Start from the bottom up?

3  Q.  Yes.

4        THE COURT:  While the deputy warden is reading, let me

5  ask you about how many more questions you have.                    04:56PM

6        MS. EIDENBACH:  This is my last line of questioning.

7  So just this e-mail and then I believe that I'm done or very

8  very close to being done.

9        THE COURT:  Thank you.

10        THE WITNESS:  Okay.                                         04:56PM

11  BY MS. EIDENBACH:

12  Q.  Ready?  Okay.  So let's start with from the last page and

13  work our way forward.  First, have you seen this string of

14  e-mails before?

15  A.  This is the first time I have read this particular string  04:56PM

16  of e-mails.

17  Q.  Were you aware previously of the circumstances that are

18  described in this e-mail chain?

19  A.  Not this specific circumstance.  I'm aware that we had to

20  overcome some obstacles to set up an appropriate examination   04:57PM

21  room on the unit so that inmates didn't have to be taken all

22  the way up to the Lumley medical, that we could provide

23  services to them closer to the buildings.

24  Q.  And have the situations described in this e-mail chain been

25  remedied?                                                        04:57PM

UNITED STATES DISTRICT COURT

1  A.  I don't have an answer to that.  I know the air

2  conditioning has been remedied.  That's one that we have

3  installed an air conditioner.

4  Q.  So now there's an air conditioner in that medical unit?

5  A.  Yes.                                                      04:57PM

6  Q.  On B yard?

7  A.  On B yard.

8  Q.  Do you have any information about whether or not an

9  appropriate table has been provided so that pap smears can be

10  conducted?                                                   04:58PM

11  A.  I was just down there, and I'm scratching my head to think

12  of the table that I saw, whether it was a gurney used as an

13  exam table or if we got another table with stirrups.  And I

14  cannot recall.

15  Q.  Is that issue on your radar, though?  If it's not currently  04:58PM

16  rectified, is it something that is in the works or were you

17  just not even aware this was an issue?

18  A.  I was aware that we had challenges getting -- the first

19  challenge was getting an IT line in there for Corizon staff to

20  do their charting, and we overcame that.  The next one was the  04:58PM

21  air conditioning, and we overcame that.  This one on June 6

22  specifically I don't know.  I do know we care about Performance

23  Measure 42.  And the similar mitigations that we have had, if

24  we can't accommodate them on here because of something we're

25  not doing then we'll move heaven and earth and move the inmate  04:59PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1    to where they need to go to get the treatment.

2    Q.  So then are you surprised at the allegation that you are

3    refusing to transport inmates to where the proper equipment is

4    housed?

5    A.  This can be explained away by an overzealous officer who is        04:59PM

6    getting mixed messages between his supervisor.  When they -- I

7    mean, it would be speculation for me to explain how something

8    like this could have happened.  But they say, hey, we're going

9    to take this up here, and the officer or supervisor says no,

10   I'm told that lasts a day.  And then they get redirection and        04:59PM

11   clearance and then we make the move occur.

12   Q.  So if this was something that you knew about it would be

13   something that you would take steps to rectify because it's not

14   the appropriate response from an officer to refuse to take

15   somebody to the place where proper medical equipment is housed?      04:59PM

16   A.  Correct.

17   Q.  Is Lumley the only medical unit where you have had issues

18   with exceedingly high temperatures?

19   A.  No.  Define exceedingly high temperatures, I suppose.

20   Q.  Above 78 degrees, I guess, to be exact.                          05:00PM

21   A.  Above in the medical unit or inmates living areas?

22   Q.  No, in a medical unit.

23   A.  Oh, in the medical unit?  Those are significant emergencies

24   to us and our physical plant managers.  There have been times

25   when the HVAC system failed in a medical unit.  We take             05:00PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1    immediate steps to relocate the medication.  We have -- I have,

2    my goodness, over 20 portable air conditioning units, not

3    evaporative coolers, that can be dispatched from my warehouse

4    to anyplace to help mitigate temporary outages.  We have -- and

5    then we have our physical plant staff get on the roofs and          05:01PM

6    repair them as quickly as we can.

7    Q.   I'm asking about this just because of what happened on B

8    yard.  And I'm wondering whether there are other medical units

9    that suffer from that same defect.

10   A.   I can clarify that for you.  So B yard was previously the      05:01PM

11   office that that medical unit, that they are referring to, was

12   previously a kitchen that was run on swamp coolers only.  And

13   so when they identified the space and said, hey, we need to

14   put -- our intention is to put medical here, that ran into a

15   multitude of things that we had to do.  For example, I said the    05:01PM

16   IT had to be run in there and the air conditioner was installed

17   in there, a hand washing sink had to be installed in there.

18   And I believe we started with a gurney, and I can't speak

19   factually about what ended up as the exam table that was on

20   there.                                                              05:02PM

21   Q.   In your discussions about mitigations, was there any

22   discussion held about how to handle having prisoners in there

23   who are on psychotropic medications that are particularly

24   sensitive to heat?

25   A.   Clarify your question.  Are you asking me if when we           05:02PM

1    discuss medications, are we considering that inmates are going

2    to be treated in a health unit in excessive heat that's going

3    to have a desperate impact on their psychotropic medications or

4    their mental health because of their psychotropic medications?

5    Q.  You just asked me a longer question than I asked you.                05:02PM

6    A.  Is that the gist of the question?

7    Q.  Can you clarify what the medical room on B yard is?  Is it

8    just where the medications are housed?

9    A.  No.  There's no medications in that medical yard on B yard.

10   There is a pill pass at Lumley on B yard which does have an air          05:03PM

11   conditioner, and then there is an examination treatment room

12   separate from that that we installed the air conditioner on.

13   Q.  And so the medical unit where prisoners were seen was

14   reading -- having temperature readings above 78 degrees.  That

15   is what this e-mail is saying.                                           05:03PM

16   A.  Okay.  Yes.

17   Q.  Correct?  First page.

18   A.  On June --

19   Q.  It's the second paragraph up from the end of the last.

20   A.  Yeah.  I'm just -- this last chain doesn't have --                   05:03PM

21   Q.  It reads -- I will read it aloud.  "The medical room on B

22   yard has no air conditioning.  With humidity and heat it is not

23   appropriate to have clinic stock there as it will exceed 78

24   degrees."

25        My question is are prisoners being seen in that                     05:03PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1   medical room?

2   A.   Not since we put the -- before then?  I assume they were

3   and I can only assume based off of this information, I can't

4   say definitive seeing an inmate in there.  I know it came that

5   they had no air conditioning, it rose to our level, and we        05:04PM

6   immediately rectified it by installing an air conditioner in

7   there.

8   Q.   I'm asking you if, in your attempt to mitigate that,

9   because here it's talking about clinic stock but it's not

10  mentioning the impact that this is going to have on prisoners    05:04PM

11  who are on psychotropic medications and who, therefore, have a

12  particular sensitivity to heat.  And I'm wondering whether that

13  was part of the calculus as you were attempting to mitigate and

14  rectify this situation.  Because those prisoners are

15  particularly susceptible, and we're worried about medication,    05:04PM

16  but I don't see a mention about prisoner well-being.

17          MS. LOVE:  Objection, Your Honor.  Compound.  Where's

18  the question versus testifying?

19          THE COURT:  Overruled.

20          THE WITNESS:  I'm certain that Mr. Haldane is equally     05:04PM

21  concerned about the inmates on psychotropic medication and the

22  condition of the temperature inside that cell as is equally

23  that the clinic stock can't be in there.  We, when it came to

24  my level, that we had a space without air conditioning, my only

25  response is to put air conditioning in there for the betterment  05:05PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1    of the patient care and the clinical stock and the inmates who

2    would be adversely affected by the psychotropic medications in

3    a cell or room more than 78 degrees.

4    BY MS. EIDENBACH:

5    Q.  And are you aware of any other medical unit suffering from          05:05PM

6    the same defect at Perryville?

7    A.  Currently, no.

8    Q.  Would you expect to be aware of them if they were

9    occurring?

10   A.  If they were occurring, I meet with my health service team          05:05PM

11   and my contract monitors on a weekly basis, and if -- hopefully

12   before I would be notified of this either through our

13   electronic work order system or a nurse complaining to me, and

14   we immediately take action and rectify these situations.

15   Q.  Okay.  I have two final questions:  One, you mentioned            05:06PM

16   that, I think this was on Pedro, that when prisoners check in

17   to open clinic that it's logged.  Is there actually a written

18   log that it's written down when somebody checks in to open

19   clinic?

20   A.  It's more of a scratch paper for the officer to do their          05:06PM

21   daily work.  One comes in, one is seen, is checked off.  They

22   have a redundant system of the inmates' ID card stacked in such

23   an order that it's first in, first out, and their own little

24   notepad to see who they are going to see, who has already been

25   seen so they can leave.  For the most part they use that so          05:07PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Twyford - Cross

1   they have the information available if they have to do an

2   inmate out count if they are going to keep them over count and

3   count their inmates.

4   Q.  So yes, are those logs saved?

5   A.  No.                                                        05:07PM

6   Q.  The final question is, when prisoners are taken up to

7   visitation when the temperatures have exceeded, I think you

8   said pregnant prisoners were taken up to visitation when temps

9   were too high, what happens to anyone who needs ADA

10  accommodations in that situation.  Are there mitigating        05:07PM

11  accommodations that can be made for people who need air

12  conditioning but have mobility issues?

13  A.  I don't believe we had that situation occur while we were

14  using that protocol of pregnant inmates going up to the

15  visitation area at San Pedro.  And now it is no longer a       05:07PM

16  consideration because the pregnant inmates have all been moved

17  to the San Carlos unit.

18  Q.  But you don't have any ADA accommodations in visitation

19  were that situation to arise?

20  A.  I believe the restroom in our visitation that the inmates  05:08PM

21  would use is ADA accessible.

22  Q.  But not the bed?

23  A.  Correct.

24  Q.  Okay.  I have no further questions.

25          THE COURT:  Thank you very much.  Ms. Love, I can't,   05:08PM

 1    because of the hour, afford you the opportunity for any

 2    redirect.  Is this witness one of the witnesses that was

 3    unavailable tomorrow?

 4              MS. LOVE:  Correct, but I have no further questions.

 5              THE COURT:  That solves that problem.  Thank you very          05:08PM

 6    much.  Appreciate your time today, sir.

 7              With respect to tomorrow, I have heard, just from

 8    listening to what you have all said about the Rule and the

 9    witnesses, that there's some reduction in the witness list.

10    How many witnesses do we anticipate tomorrow morning?                   05:08PM

11              MS. LOVE:  Your Honor, from me handling operations

12    side I have two short witnesses tomorrow, a sergeant and a CO-2

13    who will testify.  And then I believe Mr. Pratt will return to

14    the stand.

15                                                                            05:09PM

16              MS. LOVE:  Ms. Kendrick and I had some conversation

17    about scheduling, and we may request the Court reschedule it to

18    another day to keep all the medical people together, the

19    nursing staff and Mr. Pratt's finalizing.  Given the agenda for

20    tomorrow, we had had a discussion before she had to leave today        05:09PM

21    that perhaps what we would do is make arrangements between our

22    offices to select another day to finish up those witnesses.

23    That was our intention, anyway.

24              THE COURT:  Trying to combine what you both said, does

25    that mean that we'll have Ms. Love's two short witnesses and            05:09PM

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1    then perhaps not have your witnesses tomorrow?

2            MR. BOJANOWSKI:  Correct.

3            THE COURT:  So we'll then be back together at 9 a.m.

4            Thank you all very much.

5            (Proceeding concluded at 5:10 p.m.)                    05:10PM

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2

3

4

5                    C E R T I F I C A T E

6

7        I, LAURIE A. ADAMS, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15        DATED at Phoenix, Arizona, this 16th day of August,

16  2017.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25