Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen*
*Swartz, Sonia Rodriguez, Christina Verduzco,*
*Jackie Thomas, Jeremy Smith, Robert Gamez,*
*Maryanne Chisholm, Desiree Licci, Joseph*
*Hefner, Joshua Polson, and Charlotte Wells, on*
*behalf of themselves and all others similarly*
*situated*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-DKD |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

LEGAL136820538.1

# TABLE OF CONTENTS

I.     Introduction ................................................................................................ 1

II.    Recovery of Attorneys' Fees and Costs under the Stipulation................................ 3

III.   Plaintiffs are Entitled to Recover All of Their Requested Fees and Costs and
       a 2.0 Multiplier Enhancement ................................................................... 5

       A.    Calculation of Reasonable Attorneys' Fees ................................... 5

             1.    Documentation Supporting Reasonableness ..................... 7

             2.    Determination of the Hourly Rate ..................................... 7

             3.    Calculation of the Lodestar ............................................ 8

       B.    The *Kerr* Factors Support an Award of the Full Lodestar and an
             Enhancement ............................................................................. 9

             1.    The Time and Labor Required ......................................... 10

             2.    The Novelty and Difficulty of the Issues ........................ 10

             3.    The Skill Required to Perform the Legal Services............ 11

             4.    The Preclusion of Other Employment by the Attorneys
                   Involved in the Case ...................................................... 11

             5.    The Customary Fee in Similar Litigation........................ 12

             6.    Time Limitations Imposed by the Clients or Circumstances........... 12

             7.    The Results Obtained by the Lawsuit .............................. 13

             8.    The Experience, Reputation, and Ability of the Attorneys.............. 13

             9.    The Undesirability of the Case........................................ 13

             10.   The Nature and Length of the Professional Relationship with
                   the Clients.................................................................... 14

             11.   Awards in Similar Cases ................................................ 14

             12.   A Fees Enhancement is Justified by Plaintiffs' Counsel's
                   Superior Performance and the Need to Attract Competent
                   Counsel........................................................................ 15

                   a.    Superior Performance and Excellent Results..................... 16

                   b.    Attracting Competent Counsel.............................. 22

       C.    Plaintiffs are Entitled to Recover Litigation Expenses and Costs,
             Including Expert Costs ............................................................. 22

IV.    Conclusion .......................................................................................................... 23

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Director, OWCP,*
    91 F.3d 1322 (9th Cir. 1996) ................................................................. 23

*Blum v. Stenson,*
    465 U.S. 886 (1984) .................................................................... 10, 13

*Carruthers v. Israel,*
    No. 76-06086, _____ F. Supp. 3d _____, 2017 WL 3531471
    (S.D. Fla. Aug. 15, 2017) ............................................................. 7, 15

*Chalmers v. City of Los Angeles,*
    796 F.2d 1205 (9th Cir. 1986) ........................................................... 12

*City of Burlington v. Dague,*
    505 U.S. 557 (1992) ........................................................................ 9

*Farrar v. Hobby,*
    506 U.S. 103 (1992) ..................................................................... 4, 5

*Fischer v. SJF-P.D. Inc.,*
    214 F.3d 1115 (9th Cir. 2000) ............................................................. 5

*Gates v. Deukmejian,*
    987 F.2d 1392 (9th Cir. 1992) ............................................................. 8

*Graves v. Arpaio,*
    633 F. Supp. 2d 834 (D. Ariz. 2009) .............................................. passim

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ..................................................................... 5, 6

*Johnson v. Georgia Highway Express, Inc.,*
    488 F.2d 714 (5th Cir. 1974) ...................................................... passim

*Kelly v. Wengler,*
    822 F.3d 1085 (9th Cir. 2016) ..................................................... passim

*Kerr v. Screen Extras Guild, Inc.,*
    526 F.2d 67 (9th Cir. 1975) ........................................................ passim

*Klein v. City of Laguna Beach,*
    810 F.3d 693 (9th Cir. 2016) .............................................................. 5

*Moore v. James H. Matthews & Co.,*
    682 F.2d 830 (9th Cir. 1982) ............................................................ 14

*Morales v. City of San Rafael,*
    96 F.3d 359 (9th Cir. 1996) ............................................................ 9, 10

*Oviatt v. Pearce,*
    954 F.2d 1470 (9th Cir. 1992) ............................................................ 9

**CASES (CONT.)**

*Padgett v. Loventhal,*
   706 F.3d 1205 (9th Cir. 2013) ................................................................. 6

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air,*
   478 U.S. 546 (1986) ................................................................. 10, 11, 13

*Perdue v. Kenny A. ex rel. Winn,*
   559 U.S. 542 (2010) ................................................................. 15, 16

*Perez v. Cate,*
   632 F.3d 553 (9th Cir. 2011) ................................................................. 7

*Planned Parenthood of Cent. & N. Ariz. v. State of Ariz.,*
   789 F.2d 1348 (9th Cir. 1986) ................................................................. 13

*Stivers v. Pierce,*
   71 F.3d 732 (9th Cir. 1995) ................................................................. 4

*Tex. State Teachers Ass'n v. Garland Indep. School Dist.,*
   489 U.S. 782 (1989) ................................................................. 4

*Webb v. Ada Cty.,*
   285 F.3d 829 (9th Cir. 2002) ................................................................. 7

*Woods v. Carey,*
   722 F.3d 1177 (9th Cir. 2013) ................................................................. 22

**STATUTES**

42 U.S.C. § 1988 ................................................................. 3

42 U.S.C. § 1988(b) ................................................................. 3

42 U.S.C. § 1997e ................................................................. passim

42 U.S.C. § 1997e(d) *et seq.* ................................................................. 3

42 U.S.C. § 1997e(d)(3) ................................................................. 7

**RULES**

Fed. R. Civ. P. 23 ................................................................. 3

Fed. R. Civ. P. 23(h) ................................................................. 3

Plaintiffs, by and through their undersigned counsel, hereby move this Court pursuant to the Stipulation (Doc. 1185 ¶¶ 43-44) for an order awarding Plaintiffs' attorneys' fees and costs, including expert costs, incurred in enforcing the provisions of the Stipulation through June 30, 2017.[1]

## I.   Introduction

In October 2014 the parties reached a settlement agreement (the "Stipulation") in this class action filed on behalf of approximately 34,000 Arizona Department of Corrections ("ADC") prisoners and the Arizona Center for Disability Law ("Plaintiffs"). This Court found the Stipulation to be "fair, adequate, and reasonable," and it went into effect on February 18, 2015.  [Doc. 1458 at 1]  Under the Stipulation, Defendants agreed to comply with the Stipulation's terms as well as monitor their compliance with 103 health care performance measures.  [Doc. 1185 ¶¶ 8-10]

Since then, Plaintiffs have engaged in extensive and sustained efforts to enforce the terms of the Stipulation, serving upon Defendants multiple notices of non-compliance with the health care performance measures, and filing several motions to enforce, as well as ongoing enforcement documentation requested by the Court.[2]  As a result of Plaintiffs'

---

[1] This motion for fees and costs is for the enforcement of the Health Care Performance Measures only.   Fees for enforcement of the Maximum Custody Performance Measures will be sought separately.  Fees in this motion are only sought for the ACLU National Prison Project ("NPP") and the Prison Law Office ("PLO").  Fees are not being sought for the work performed by the ACLU of Arizona, Perkins Coie, LLP, or the Arizona Center for Disability Law.

Plaintiffs attempted to reach agreement with Defendants on their fee claim for successful enforcement from October 2015 to December 2016.  But Defendants not only objected to most of the time claimed by Plaintiffs' counsel, they also refused a verbal settlement offer during a meet and confer and failed to proffer any counter-offer.  As a result of Defendants' responses to Plaintiffs' efforts to resolve the fees issue it would be futile to engage in further settlement discussions for the additional six months of time and costs requested by this motion.  [Declaration of Donald Specter ("Specter Decl."), dated August 31, 2017, ¶ 10]

[2] [See, e.g., Pls.' Mot. to Enforce the Stipulation, Apr. 11, 2016 (Doc. 1535); Pls.' Citation Summary of Substantial Noncompliance Provided to Defs., May 3, 2016 (Doc. 1562); Pls.' Resp. to Defs.' Notice of Measures in Compliance, May 19, 2016 (Doc. 1581); Pls.' Resp. to Defs.' Notice of Service of Remediation Plan, June 20, 2016 (Doc. 1610); Mot. to Enforce the Stipulation (Para. 12, 14, 15 & PM 85, 86, 94, 95, 98), July 12, 2016 (Doc. 1625); Mot. to Enforce the Stipulation (PM 47, 80, 81 and 94), Aug. 17, 2016 (Doc. 1663); Pls.' Response to Defs.' Status Report on Remediation Plan, Sept. 2, 2016 (Doc. 1668); Pls.' Briefing regarding Cell Front Mental Health Encounters,

efforts, the Court has issued numerous orders finding Defendants non-compliant with various provisions of the Stipulation, ordering Defendants to properly monitor their compliance with the Stipulation's requirements, and enforcing its terms.[3]

Defendants' repeated and sustained non-compliance has forced the Plaintiffs to engage in over two years of ongoing enforcement activities. The culmination of this overwhelming non-compliance is the Court's recent order on June 14, 2017 that Defendants' continued non-compliance shall result in an order to show cause as to why fines of $1,000 should not be imposed for every single prisoner whose medical care did not comply with the Stipulation's requirements. [Doc. 2124]

The enormous amount of work, time, effort and costs expended by Plaintiffs to enforce the Stipulation must now be compensated by the plain terms of the Stipulation. Plaintiffs therefore request an award of attorneys' fees in the amount of $593,109.80 as compensation for enforcement work through June 30, 2017. Additionally, Plaintiffs seek an enhancement to the lodestar fees of a 2.0 multiplier under the factors enumerated in

---

Sept. 20, 2016 (Doc. 1685); Pls.' Br. Regarding Defs.' Non-Compliance with Court's Order, Oct. 19, 2016 (Doc. 1717); Pls.' Statement Regarding Defs.' August 2016 CGAR Data and Defs.' Ongoing Noncompliance with the Stipulation, Nov. 7, 2016 (Doc. 1739); Pls.' Statement re Unresolved Issues Related to Defs.' Proposed Monitoring Guide and Methodology to Measure Compliance, Nov. 15, 2016 (Doc 1755); Pls.' Resp. in Opposition to Defs.' Mot. for Relief from Final Order, Dec. 7, 2016 (Doc. 1806); Pls.' Response to Defs.' Status Update (PM 80, 94), Dec. 30, 2016 (Doc. 1841); Pls.' Mot. to Enforce the Stipulation, Jan. 13, 2017 (Doc. 1863)]

[3] [*See, e.g.*, Order, May 20, 2016 (Doc. 1583) (requiring Defendants to submit remedial plan for PM 11, 13, 14, 37, 39, 46, 54, 66, 85, 92, 93, and 98); Order, Sept. 6, 2016 (Doc. 1673) (requiring compliance with paragraphs 12, 14, and 15 of the Stipulation; agreeing with Plaintiffs as to the interpretation of the performance measures' language "every X days" and "seen" for purposes of mental health encounters; agreeing with Plaintiffs that PM 33, 34, 75, and 76 apply to parole violators; finding non-compliance with PM 85, 86, 98); Order, Oct. 7, 2016 (Doc. 1709) (requiring remedial plans for PM 47, 80, 94 at certain facilities); Order, Nov. 8, 2016 (Doc. 1745) (finding cell front visits to be non-compliant with Stipulation); Order, Nov. 10, 2016 (Doc. 1754) (addressing proper monitoring of PM 86; requiring Defendants to use community health care services for certain non-compliant performance measures); Order, Jan. 13, 2017 (Doc. 1862) (raising concerns re reliability of monitoring of PM 36-37); Order, Feb. 6, 2017 (Doc. 1917) (denying Defs.' Motion for Relief); Order, Apr. 24, 2017 (Doc. 2030) (finding non-compliance as to PM 35, 39, 40, 44, 45, 50, 51, 52, 94 at certain facilities); Order, June 14, 2017 (Doc. 2124) (notifying Defendants that it would hold an Order to Show Cause hearing as to certain performance measures at specific institutions if there were no improvements in compliance in 30 days)]

1    Section III, *infra*, in the amount of $593,109.80 for a total of $1,186,219.60 in fees.  For

2    costs, Plaintiffs seek $161,461.27.  In total, Plaintiffs seek $1,347,680.87 in fees, costs

3    and enhancements.

4    **II.    Recovery of Attorneys' Fees and Costs under the Stipulation**

5         Under Rule 23 of the Federal Rules of Civil Procedure a court may award

6    attorneys' fees and costs "that are authorized by law or by the parties' agreement."  Fed.

7    R. Civ. P. 23(h).  In the Stipulation approved by the Court on February 18, 2015, the

8    parties agreed that:

9         In the event that Plaintiffs move to enforce any aspect of this
         Stipulation and the Plaintiffs are the prevailing party with
10        respect to the dispute, the Defendants agree that they will pay
         reasonable attorneys' fees and costs, including expert costs, to
11        be determined by the Court.  The parties agree that the hourly
         rate of attorneys' fees is governed by 42 U.S.C. § 1997e(d).
12

13   [Doc. 1185 ¶ 43][4]  Thus, the award of attorney fees here is based upon the agreed terms of

14   the Stipulation.  As a result, the award of fees in this matter is not contingent upon any

15   findings made pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C.

16   § 1997e(d) *et seq*.  Pursuant to the plain terms of the Stipulation, the PLRA governs the

17   award of attorneys' fees here only as to the hourly rate established under that statute.

18        While the award of attorneys' fees and costs for work done to enforce the

19   Stipulation in this case is authorized by the Stipulation itself (Doc. 1185 ¶¶ 43, 44), the

20   Stipulation uses the phrases "prevailing party" and "reasonable attorney's fees," terms

21   borrowed from 42 U.S.C. § 1988.  Section 1988 provides that a Court may grant "a

22   reasonable attorney's fee as part of the costs" to the "prevailing party" in a civil rights

23   suit.  *See* 42 U.S.C. § 1988(b).  Analysis of attorneys' fees under Section 1988 begins

24   with a determination of "prevailing party" status.  In the instant case, there can be no

25   question that Plaintiffs are the prevailing party—they have repeatedly prevailed in

26   _____

27        [4] [*See also id*. ¶ 44 (annual cap on monitoring fees "shall not apply to any work
     performed in mediating disputes before the Magistrate pursuant to paragraphs 22, 29, and
28   31 above, or to any work performed before the District Court to enforce or defend this
     Stipulation")]

enforcement motions; findings of non-compliance by this Court; and the relief repeatedly ordered.

A prevailing party is one who has "succeeded on *any* significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989) (emphasis added) (internal quotations omitted); *see also Farrar v. Hobby*, 506 U.S. 103, 111 (1992) ("Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim."). Here, Plaintiffs have continuously and repeatedly prevailed in their efforts to enforce the Stipulation. As a result of Plaintiffs' efforts, this Court repeatedly (1) has found Defendants substantially noncompliant with a myriad of performance measures at multiple institutions, (*see, e.g.*, Docs. 1583, 1709, 2030, 2124); (2) has ordered Defendants to comply with the performance measure requirements; (3) has ordered Defendants to develop remediation plans; and (4) has ordered Defendants to take necessary measures, such as using community health care resources when they cannot comply with the terms of the Stipulation. [*See, e.g.*, Docs. 1583, 1673, 1709, 1745, 1754, 1862, 2030]

That Plaintiffs did not obtain every single aspect of relief they sought over the course of multiple motions to enforce and multiple findings of Defendants' non-compliance with the Stipulation is irrelevant to the prevailing party determination. Likewise, the fact that the Court's ultimate findings of substantial noncompliance do not encompass every performance measure at every institution originally identified in a Notice of Noncompliance does not negate the fact that Plaintiffs are the prevailing party. To be considered a prevailing party "[i]t is enough that [plaintiff] succeed 'on any significant claim affording some of the relief sought, either *pendente lite* or at the conclusion of the litigation.'" *Stivers v. Pierce*, 71 F.3d 732, 751 (9th Cir. 1995) (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989)).

1
2

### III.   Plaintiffs are Entitled to Recover All of Their Requested Fees and Costs and a 2.0 Multiplier Enhancement

3       Having determined that Plaintiffs are prevailing parties, calculating the fee award is

4   a two-step process.  First, the court calculates the "lodestar figure by taking the number of

5   hours reasonably expended on the litigation and multiplying it by a reasonable hourly

6   rate."  *Fischer v. SJF-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (internal quotations

7   omitted); *see also Klein v. City of Laguna Beach*, 810 F.3d 693, 698 (9th Cir. 2016)

8   (same).

9       Second, the court must "decide whether to enhance or reduce the lodestar figure

10   based on an evaluation of the *Kerr* factors that are not already subsumed in the initial

11   lodestar calculation."[5]  *Fischer*, 214 F.3d at 1119; *see also Graves v. Arpaio*, 633 F. Supp.

12   2d 834, 842 (D. Ariz. 2009) (citing an evaluation of the *Kerr* factors as the basis for

13   enhancing or reducing the lodestar).

14       ### A.   Calculation of Reasonable Attorneys' Fees

15       The "most critical factor" in determining the reasonableness of a fee award in a

16   civil rights suit "is the degree of success obtained."  *Farrar*, 506 U.S. at 114 (quoting

17   *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).   In *Hensley*, the Supreme Court

18   considered whether the district court could grant attorneys' fees for time expended on

19   claims on which plaintiffs did not prevail.  461 U.S. at 433.   The Court held that even

20   though a plaintiff was not entitled to an award of fees for time spent on unsuccessful

21   claims unrelated to successful claims, *id.* at 434-35, "[w]here a lawsuit consists of related

22   claims, a plaintiff who has won substantial relief should not have his attorney's fee

23   reduced simply because the district court did not adopt each contention raised."   *Id.* at

24   440.   Thus, a court's duty in a complex case is not to parse out and determine fees on a

25   claim-by-claim basis, since "[m]uch of counsel's time will be devoted generally to the

26   _____

27       [5]  In *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975), the
   Ninth Circuit adopted as appropriate factors in determining a reasonable attorneys' fee the
   twelve guidelines originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488

28   F.2d 714 (5th Cir. 1974).

1  litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim

2  basis." *Id.* at 435.

3      The overwhelming majority of the hours spent by Plaintiffs related to the motions

4  to enforce the Stipulation due to Defendants' ongoing noncompliance with the

5  Stipulation's requirement of self-monitoring and their noncompliance with multiple

6  performance measures.  All of Plaintiffs' claims of noncompliance involved a common

7  core of facts and were based on related legal theories.  Accordingly, Plaintiffs' counsel

8  should recover a fully compensatory fee.  *See Hensley*, 461 U.S. at 435 (where the

9  plaintiff presents different claims for relief that "involve a common core of facts" or are

10  based on "related legal theories," the district court should not attempt to divide the request

11  for attorneys' fees on a claim-by-claim basis; instead, the court "should focus on the

12  significance of the overall relief obtained by the plaintiff in relation to the hours

13  reasonably expended on the litigation"); *see also Padgett v. Loventhal*, 706 F.3d 1205,

14  1209 (9th Cir. 2013) ("Often, attorney work will bear on multiple claims, only some of

15  which are successful.  Fees for work which relates *only* to unsuccessful claims should not

16  be awarded.  But where attorney work proves beneficial to a successful claim, district

17  courts should generally award these fees in full, even if the work is also useful to an

18  unsuccessful claim") (citing *Hensley*, 461 U.S. at 436).

19      The hours spent on prosecuting the motions to enforce, evaluating Defendants'

20  efforts to comply, and informing the Court of Defendants' continued non-compliance are

21  essentially indistinguishable; all involved the common issue of Defendants' failure to

22  comply with the Stipulation and their resulting failure to protect class members from

23  harm.   Accordingly, the hours spent on these enforcement activities are fully

24  compensable.   "Where a plaintiff has obtained excellent results, his attorney should

25  recover a fully compensatory fee.  Normally this will encompass all hours reasonably

26  expended on the litigation, and indeed in some cases of exceptional success an enhanced

27  award may be justified." *Hensley*, 461 U.S. at 435.

28

**1.      Documentation Supporting Reasonableness**

Counsel has attached documentation indicating the identity of the biller, time spent on the activity, specific description of the activity, and hourly rate charged by the biller. [Specter Decl., Exs. A, B; Declaration of David C. Fathi ("Fathi Decl."), August 31, 2017, Ex. B]    Billers kept contemporaneous track of their time and entered it in their organization's respective billing system.    [Specter Decl. ¶ 6; Fathi Decl. ¶ 10]    As appropriate, billing judgment was exercised to reduce the total number of hours.  [Specter Decl. ¶ 6; Fathi Decl. ¶ 7]

**2.      Determination of the Hourly Rate**

Having determined the number of hours reasonably spent on various activities, the next step is to determine appropriate hourly rates for the attorneys, paralegals, and law clerks who billed time.  However, because the Stipulation adopts the PLRA limit on the hourly rate for attorneys' fees—150 percent of the hourly rate established for payment of court-appointed counsel (Doc. 1185 ¶ 43; 42 U.S.C. § 1997e(d)(3))—the rate here is already pre-determined.  The Ninth Circuit has held that the baseline for the PLRA hourly rate is "the amount authorized by the Judicial Conference."  *Webb v. Ada Cty.*, 285 F.3d 829, 839 (9th Cir. 2002).  The current rate authorized by the Judicial Conference for the payment of court-appointed counsel is $146 per hour, (*see* Doc. 2044-1, Ex. 1 at 37 (*The Judiciary FY 2017 Congressional Budget Summary*)), and accordingly, 150 percent of that rate is $219 per hour.  *See also Carruthers v. Israel*, No. 76-06086, ____ F. Supp. 3d ____, 2017 WL 3531471 at *6-7 (S.D. Fla. Aug. 15, 2017) (awarding the NPP attorney fees at an hourly rate of $219, and law clerk fees at the requested rate of $160).  Likewise, the reasonable hourly rate for paralegals is also capped at $219 per hour.  *See Perez v. Cate*, 632 F.3d 553, 556-58 (9th Cir. 2011) (paralegal fees awarded to prevailing plaintiffs in prison civil rights litigation are subject to same hourly cap under the PLRA as attorney fees where award is below paralegal market rate in relevant area); *see also* Declaration of Kathy Brody ("Brody Decl."), August 31, 2017, ¶ 7 (the PLRA cap is generally lower

than Arizona market rates for first-year attorneys); Specter Decl. ¶ 11 (the billing rate for paralegals in Berkeley, California is $250).[6]

### 3. Calculation of the Lodestar

Plaintiffs' counsel spent a total of 2,745.90 hours on enforcing the Stipulation. Multiplying by the respective hourly rate of each biller yields a total lodestar of $593,109.80:

**Prison Law Office**

| Attorney/Staff | Hours | Hourly Rate | Total |
|---|---|---|---|
| Donald Specter | 174.80 | 219.00 | 38,281.20 |
| Corene Kendrick | 723.00 | 219.00 | 158,337.00 |
| Alison Hardy | 245.30 | 219.00 | 53,720.70 |
| Rita Lomio | 89.30 | 219.00 | 19,556.70 |
| Sara Norman | 17.50 | 219.00 | 3,832.50 |
| Mae Ackerman-Brimberg | 85.60 | 219.00 | 18,746.40 |
| Gwen Wu | 3.70 | 219.00 | 810.30 |
| *Paralegals* | | | |
| Amber Norris | 10.50 | 219.00 | 2,299.50 |
| Megan Lynch | 60.40 | 219.00 | 13,227.60 |
| Laura Graham | 52.70 | 219.00 | 11,541.30 |
| Sarah Hopkins | 1.70 | 219.00 | 372.30 |
| Bernadette Rabuy | 7.60 | 219.00 | 1,664.40 |
| Briana Zweifler | 6.90 | 219.00 | 1,511.10 |
| *Local Counsel* | | | |
| Kirstin Eidenbach | 337.70 | 219.00 | 73,956.30 |
| **Total** | **1816.70** | | 397,857.30 |
| **Total with 2.0 Multiplier** | | | **$795,714.60** |

---

[6] Given the lack of available counsel, *see infra* Section III.B.9, this case falls under an exception to the "local forum" rule for attorneys' fees. *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992) ("[R]ates, other than those of the forum, may be employed if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case."). Accordingly, Washington, D.C. and Berkeley, California rates should be used as a starting point for calculating NPP and PLO's lodestar, subject to the PLRA cap.

1

**ACLU National Prison Project**

2

3

| Attorney/Staff | Hours | Hourly Rate | Total |
|---|---|---|---|
| David Fathi | 641.80 | $219.00 | $140,554.20 |
| Amy Fettig | 45.30 | $219.00 | $ 9,920.70 |
| Jamelia Morgan | 67.10 | $219.00 | $ 14,694.90 |
| Sarah Goetz | 35.30 | $219.00 | $ 7,730.70 |
| Law Clerks | 102.70 | $160.00 | $ 16,432.00 |
| Paralegals | 37.00 | $160.00 | $ 5,920.00 |
| **Total** | **929.20** | | **$195,252.50** |
| **Total with 2.0 Multiplier** | | | **$390,505.00** |

4

5

6

7

8

9

> **B.    The *Kerr* Factors Support an Award of the Full Lodestar and an Enhancement**

10      The lodestar method of calculating fees is strongly presumed to be reasonable.

11   *Oviatt v. Pearce*, 954 F.2d 1470, 1482 (9th Cir. 1992) ("There is a strong presumption that

12   the lodestar figure is reasonable"); *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.8

13   (9th Cir. 1996) (the lodestar figure is presumed to be reasonable).

14      However, the twelve factors set forth in *Kerr* may be used to make adjustments to

15   the lodestar.  *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975) (citing

16   *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).   The *Kerr*

17   factors include:

18

> (1) the time and labor required, (2) the novelty and difficulty of
> the questions involved, (3) the skill requisite to perform the legal
> service properly, (4) the preclusion of other employment by the
> attorney due to acceptance of the case, (5) the customary fee, (6)
> whether the fee is fixed or contingent, (7) time limitations
> imposed by the client or the circumstances, (8) the amount
> involved and the results obtained, (9) the experience, reputation,
> and ability of the attorneys, (10) the 'undesirability' of the case,
> (11) the nature and length of the professional relationship with
> the client, and (12) awards in similar cases.

19

20

21

22

23

24

25   *Id.* at 70.   *Kerr* factors 1 through 4 and 6 are used by the court to determine the

26   reasonableness of the award.  *See Kerr*, 526 F.2d at 70; *Graves*, 633 F. Supp. 2d at 846.[7]

27

───────────

28          [7] The Supreme Court has turned away from considering the fixed or contingent
nature of the fee being charged.  *City of Burlington v. Dague*, 505 U.S. 557, 566 (1992)

Any decision to adjust the initial lodestar figure is informed by *Kerr* factors 5 and 7 through 12. *Kerr*, 256 F.2d at 70; *Graves*, 633 F. Supp. 2d at 847. Such enhancements to the lodestar for attorneys' fees in prisoner rights cases for declaratory and injunctive relief are recognized by the Ninth Circuit. *See Kelly v. Wengler*, 822 F.3d 1085, 1102-1106 (9th Cir. 2016) (upholding attorneys' fees enhancement in prisoner rights class action where attorneys demonstrated superior performance and the need to attract competent counsel).

Below, Plaintiffs set forth each of the *Kerr* factors in turn to demonstrate that the fees sought here are reasonable, and that not only should the full amount of fess requested be granted, but a 2.0 multiplier enhancement is also warranted.

### 1.    The Time and Labor Required

The first *Kerr* factor, the time and labor required, is already included in the calculation of the lodestar. *Morales*, 96 F.3d at 364 n.9. Nevertheless, some general comments about counsel's efforts are warranted. Counsel staffed this case efficiently. Kirstin Eidenbach, local counsel in Arizona, being closest to the prisons, performs client visits and coordinates nearly all prison site visits. [Specter Decl. ¶ 8] The NPP used lower-billing law clerks to perform legal research and related tasks. [Fathi Decl. ¶ 11] Whenever possible, intensive document review and analysis was conducted by paralegals and law clerks. [*Id.*]

### 2.    The Novelty and Difficulty of the Issues

The novelty and difficulty of the issues presented is presumably reflected in the calculation of the lodestar. *Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564-65 (1986). However, it is important to note that, for the purpose of determining fees, Congress considered civil rights cases to be as complex as antitrust cases. *See Blum v. Stenson*, 465 U.S. 886, 893 (1984); *see also* Declaration of Larry A. Hammond ("Hammond Decl."), August 30, 2017, ¶ 12. Indeed, the issues presented in

---

("Contingency enhancement is therefore not consistent with our general rejection of the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee."). Therefore, *Kerr* factor 6 is not discussed below.

enforcing compliance with the Stipulation were difficult.  While it is not unusual for pre-judgment cases to be hard fought, in most cases once there is agreement on a remedy there is much more cooperation and much less rancor between the parties.  This case is very unusual because the State and its lawyers have failed to cooperate in any meaningful way, necessitating protracted litigation not only to enforce the Stipulation, but also to resolve the meaning of plain and unambiguous terms.  [Specter Decl. ¶ 4]  In Plaintiffs' counsels' decades of experience it is likely the hardest fought and most litigated post-judgment prison or jail case.  [*Id*.]  This is not a run-of-the-mill case for other reasons as well; it required the marshalling and analysis of complex evidence, often from thousands of pages of medical records and other documents, working with prisoners and expert witnesses, writing declarations, participating in mediations, preparing, briefing and arguing multiple issues, and keeping up to date on ADC's efforts to comply with 103 health care performance measures.  [Specter Decl. ¶ 5]

### 3.    The Skill Required to Perform the Legal Services

Likewise, the skill required to perform the legal services provided is presumably reflected in the calculation of the lodestar.  *Del. Valley Citizens' Council*, 478 U.S. at 565.  Nevertheless, "the trial judge should closely observe the attorney's work product, his preparation, and general ability before the court.  The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration."  *Johnson*, 488 F.2d at 718.  This complex case required highly skilled lawyers and advocates.  Plaintiffs' attorneys met this standard.

### 4.    The Preclusion of Other Employment by the Attorneys Involved in the Case

"This guideline involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes."  *Johnson*, 488 F.2d at 718; *see also Kerr*, 526 F.2d at 70.  Plaintiffs' counsel already represented the certified class of ADC

prisoners at the beginning of the period for which fees are now sought.  Nevertheless, all of the work performed for which compensation is requested came with a significant opportunity cost.  David Fathi, Director of NPP, is a senior litigator who devoted the overwhelming majority of NPP's total hours on this portion of the case.  He was precluded from accepting new, potentially fee-generating work while he worked on this case.  [Fathi Decl. ¶ 17]  Donald Specter and Corene Kendrick at the PLO were likewise limited in the new work that they could take on during the period covered by this motion. [Specter Decl. ¶ 6]

### 5.  The Customary Fee in Similar Litigation

Plaintiffs have indicated the market hourly rates for their attorneys and other staff. The rates charged by the PLO are set based on prevailing market rates in the San Francisco Bay Area.  [*See* Specter Decl. ¶ 11]  The rates charged by the NPP were set with reference to the "Laffey Matrix," which is intended by the U.S. Department of Justice to be used to determine rates in the Washington, D.C. area in cases in which a fee-shifting statute permits the prevailing party to recover reasonable attorneys' fees.  [*See* Fathi Decl. ¶¶ 13-15; *id.*, Ex. D]  These rates would ordinarily be the "customary fees" charged in similar litigation.  However, since the Stipulation adopts the PLRA's cap on hourly rates, the customary fee becomes the PLRA rate cap of $219 per hour.  This is orders of magnitude less than would be recovered in litigation not governed by the PLRA. [*See* Hammond Decl. ¶ 12]

### 6.  Time Limitations Imposed by the Clients or Circumstances

"Priority work that delays the lawyer's other legal work is entitled to some premium."  *Johnson*, 488 F.2d at 718; *see also Kerr*, 526 F.2d at 70 (listing preclusion of other employment opportunities due to attorneys' acceptance of case as one of the factors courts must consider).  However, for the purposes of determining an enhancement, this factor is presumed to be already represented in the lodestar.  *See, e.g.*, *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1212 (9th Cir. 1986).

**7.      The Results Obtained by the Lawsuit**

Plaintiffs' counsel does not charge a surcharge for exceptional results.  [Specter Decl. ¶ 11; Fathi Decl. ¶ 19]  However, as discussed above, there can be no dispute that Plaintiffs' counsel obtained excellent results for the class, vigorously and repeatedly enforcing the terms of the Stipulation in the face of sustained intransigence by the Defendants.  *See supra*, Section I.

**8.      The Experience, Reputation, and Ability of the Attorneys**

The use of this factor has been limited since *Kerr* was decided.  *Del. Valley Citizens' Council,* 478 U.S. at 565.  ("'[N]ovelty [and] complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of representation,' and the 'results obtained' from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award.") (quoting *Blum,* 465 U.S. at 898-900).  It is nonetheless true that class counsel in this matter are leading national experts in prisoners' rights litigation.  The NPP, founded in 1972, is one of the most experienced groups of prisoners' rights litigators in the nation.  It has more than forty years of litigating prison conditions class actions such as this case.  [Fathi Decl. ¶¶ 4-5].  Federal courts have recognized the special expertise of NPP staff.  [*Id.* ¶ 5]  Similarly, the PLO has decades of experience bringing successful system-wide class action prisoner rights suits, including seminal cases in the Ninth Circuit and the Supreme Court.  [Specter Decl. ¶ 2]

**9.      The Undesirability of the Case**

Class action cases on behalf of prisoners are generally considered "undesirable" even by the civil rights bar, in part because they are so time-consuming and expensive to litigate.  *See* Fathi Decl. ¶ 18; *see also Planned Parenthood of Cent. & N. Ariz. v. State of Ariz.*, 789 F.2d 1348, 1354 (9th Cir. 1986) ("We recognize that the 'undesirable' nature of a case is an appropriate factor in determining attorneys' fees.").  The PLRA's fee cap serves to make such cases even more undesirable by cutting market rates substantially.  *See e.g.*, *Graves*, 633 F. Supp. 2d at 847 ("This case is considered 'undesirable' because

§ 1983 class actions on behalf of prisoners involving the conditions of confinement are exceedingly fact-intensive, time-consuming, and expensive to litigate, and the PLRA restricts the hourly rate for attorneys' fees below market.").

In the present case, finding counsel to represent the class was difficult.  There are no offices in Arizona like the PLO and the NPP.  [*See* Brody Decl. ¶ 5]  No lawyers in Arizona have the degree of experience in prisoner rights litigation or the expertise to litigate a complex, statewide, prisoner rights class action, and as a result it was necessary to bring in outside legal expertise to conduct this case.  [Brody Decl. ¶ 5]  It is also the case that no qualified lawyers in Arizona would have been willing to bring this case and others like it for the low fee rate set by the PLRA.  [Brody Decl. ¶ 6; Hammond Decl. ¶¶ 11-12]  Moreover, if the NPP and the PLO had not joined the *Parsons v. Ryan* legal team, this case would not have been brought by the ACLU of Arizona or other local counsel.  [Brody Decl. ¶ 6; Hammond Decl. ¶ 10]

### 10.   The Nature and Length of the Professional Relationship with the Clients

Plaintiffs' counsel began their relationship with the plaintiff class approximately six years ago, when the NPP and the PLO began investigating conditions in the Arizona Department of Corrections.  [Fathi Decl. ¶ 6]  Since then, counsel has maintained close contact with individual prisoners and the class as a whole, through regular visits, tours, and interviews.  [Fathi Decl. ¶ 6; Specter Decl. ¶ 3]

### 11.   Awards in Similar Cases

"The reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit." *Johnson*, 488 F.2d at 719; *see also Moore v. James H. Matthews & Co.*, 682 F.2d 830, 838 (9th Cir. 1982).  It is difficult, if not impossible, for the sake of comparison, to identify cases with identical fact patterns, procedural histories, or time necessary to obtain relief.  Indeed, every case will be distinguishable from the instant case in at least one or more ways.  Nevertheless, the cases discussed below may be instructive.  In *Graves,* a case from 2008, the attorneys

representing a plaintiff class of people detained in the Maricopa County Jail successfully defeated a motion to terminate a judgment involving conditions of confinement, although some provisions of the judgment were terminated.  As a result of the litigation in *Graves*, the Court issued an amended, enforceable judgment.  633 F. Supp. 2d at 841.  The Court awarded the NPP the full amount of attorneys' fees requested, even though some provisions of the original judgment were terminated.  *Id.* at 856 (awarding attorneys' fees in the amount of $1,239,491.63).  And in *Carruthers v. Israel*, the court awarded the NPP the full amount of fees and costs sought, approximately $800,000, plus interest from the date of judgment.  2017 WL 3531471 at *7.

### 12. A Fees Enhancement is Justified by Plaintiffs' Counsel's Superior Performance and the Need to Attract Competent Counsel

Taken together, the *Kerr* factors support both the reasonableness of the fees requested and the addition of a 2.0 lodestar enhancement.  In *Kelly v. Wengler,* the Ninth Circuit held that in both PLRA and non-PLRA cases, "the district court may enhance the lodestar when plaintiff's counsel's 'superior performance and commitment of resources' is 'rare' and 'exceptional' as compared to run-of-the-mill representation in such cases."  822 F.3d at 1103 (citing *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 553-54 (2010)) (internal citations omitted)).  Citing *Perdue*, the Ninth Circuit further noted that the district court appropriately justified an enhancement to the lodestar in finding that "plaintiffs' counsel provided 'extraordinary performance yielding extraordinary results,' and that 'the quality of the work that produced these results [was] underrepresented in the hourly fee.'"  822 F.3d at 1103.

In upholding an enhancement to the PLRA rate for plaintiffs' counsel in *Kelly*, the Ninth Circuit further noted that the district court had enhanced the lodestar because it found that "the limited fees available in prisoner civil rights cases, without enhancement, are insufficient to induce private attorneys…"  *Id.* at 1104.  Citing *Perdue,* the Ninth Circuit also noted that "[w]hen the lodestar figure based on the PLRA rate is insufficient

to induce competent attorneys to accept appointment in meritorious civil rights cases, it is by definition not a reasonable fee." *Id.* at 1104 (citing *Perdue*, 559 U.S. at 552).

As set forth below, a 2.0 enhancement of Plaintiffs' counsel's fees here is clearly justified under Ninth Circuit precedent in *Kelly*.

### a.      Superior Performance and Excellent Results

Like the attorneys in *Kelly*, Plaintiffs' counsel here demonstrated superior performance, commitment of resources, and excellent results for clients, justifying an enhancement to the lodestar.  *Id.* at 1102-04.  In the face of sustained intransigence by Defendants, Plaintiffs' counsel have vigorously and repeatedly moved to enforce the terms of the Stipulation, producing excellent results for the class.  *See, supra*, Sections I, III.B.7.  This work has taken an enormous amount of resources to achieve.  *See, supra*, Section III.B.4.  The outlay of resources and continuous work required in this case are largely a product of Defendants' conduct and litigation strategy.

Despite agreeing to the terms of the Stipulation, Defendants have persistently and pervasively failed to comply with its terms.  Plaintiffs' counsel has worked tirelessly to enforce Defendants' compliance with the Stipulation.  This work has uncovered repeated violations of multiple measures across multiple facilities, for example:

- After a year of monitoring, Plaintiffs demonstrated profound lapses in treatment in critical measures such as access to medical care (HC PM #37); chronic care visits (HC PM #54); provider encounters in the infirmary (HC PM 66); administration of medication (HC PM #11); monitoring of psychotropic medications (HC PM #81); and suicide prevention (HC PM #94).  [Doc. 1535] As a result of these systemic deficiencies, patients suffered serious injury, illness and, in some cases, death.  [Doc. 1535 at 2-3]

- In the face of Defendants' continued failure to address their ongoing and substantial noncompliance with HC PM ## 11, 13, 14, 37, 39, 46, 47, 54, 66, 80, 85, 92, 93, 94, 98, in any meaningful way, Plaintiffs' counsel rigorously analyzes Defendants' monthly data and their underlying monitoring methodology to uncover Defendants' failures and find better solutions to both comply with the Stipulation and provide the necessary care to prevent unnecessary pain, suffering and death for the Plaintiff class.  [Doc. 1739]

- Nearly two years after the Stipulation took effect, and after months of attempted negotiation and mediation with Defendants, Plaintiffs again must move to enforce multiple performance measures across multiple facilities in the face of Defendants' chronic and severe noncompliance, including HC PM ## 4, 35, 37,

39, 40, 44, 45, 50, 51, 52, 55, 73, 74, 80, 86, 87, 88, 94, 95, 97, and 98.  [Doc. 1863]

[*See also* Docs. 1562, 1581, 1610, 1625, 1663, 1717, 2214]  The results of Defendants' violations are serious delays in and outright denials of health care that place class members at serious risk of harm.  Despite Plaintiffs' counsel's relentless efforts, and the fact that the Court itself "has provided Defendants over two years to try all of their proposed solutions," for many performance measures, "nothing has worked."  [Doc. 2179 at 2]  Defendants' noncompliance and intransigence has reached such an extreme level that the Court itself is considering appointing a Rule 706 expert because the issues are so complex and the noncompliance so extensive and longstanding.  [Docs. 2029, 2043, 2045, 2067, 2083, 2084, 2133, 2134, 2138, 2140]

Indeed, the problems of Defendants' noncompliance, repeatedly pointed out by Plaintiffs' counsel in monthly updates, (*see, e.g.*, Docs. 1581, 1610, 1668, 1739, 1841), have forced the Court to finally consider the imposition of a $1,000 fine for any continuing failure by Defendants to comply with certain performance measures. [Doc. 2124 at 1-3]

For over two years, Plaintiffs' counsel has worked to help Defendants implement an appropriate and effective monitoring system.  Prior to filing their motions to enforce, Plaintiffs repeatedly notified Defendants that they were noncompliant with the terms of the Stipulation because the methodology used to measure compliance was flawed, haphazard, inconsistent and inaccurate.  [*See, e.g.*, Doc. 1625, Motion to Enforce the Stipulation, July 12, 2016, at 6 (summarizing the extensive history of Plaintiffs raising concerns with methodology prior to filing their enforcement motion)]  These efforts were unavailing.  [*See, e.g.*, Docs. 1673, 1745, 1754, 1755, 1833, 1895, 1915, 1933, 1951]

Plaintiffs' counsel have repeatedly faced Defendants' intransigence on specific monitoring issues; repeatedly prevailed on Court orders; and repeatedly been forced by Defendants' failures to return to the Court for relief.  The following are a few examples of

specific areas where Defendants have persistently used incorrect monitoring methodology or changed monitoring methodology to alter compliance findings:

- Defendants failed to comply with the Court's September 6, 2016 order, (Doc. 1673 at 4, 6), regarding the use of invalid monitoring methodology for performance measures requiring that an act be performed "every X days." Defendants' counsel claimed to be in compliance with the Court's order during an October 5, 2016 status conference. Plaintiffs disagreed and the Court directed the parties to discuss the issue to reach a common understanding. [*See* Transcript of October 5, 2016 Status Conference at 23-26] Plaintiffs wrote to Defendants but received no response and as a result were forced to brief the issue for the Court once again. [Doc. 1717 ]

- Defendants subsequently failed to comply with the Court's December 23, 2016 order, (Doc. 1833 at 1), regarding Performance Measures requiring action "every X days." [Doc. 2046 at 39-41; Doc. 2087 at 12-13; Doc. 2128, 2128-1]

- Defendants continued to count group contacts for the requirement that a patient be "seen," in violation of the Court's Order of September 6, 2016. [Doc. 1673; Doc. 2046 at 38; Doc. 2087 at 13-14]

- On November 8, 2016, the Court ordered Defendants to discontinue using cell-front contacts to satisfy the requirement that a patient be "seen," (Doc. 1745 at 1); despite this the Defendants continued using this disallowed methodology. [Doc. 2046 at 38-39; Doc. 2087 at 14]

- Defendants suddenly made a unilateral change in monitoring methodology to adopt a "partial credit" method, subsequently rejected by the Court. [Doc. 1831 at 1-2]

Defendants' sustained non-compliance, despite multiple motions to enforce and multiple court orders, ultimately resulted in a series of hearings over a two month period to finally resolve their refusal to properly monitor the Stipulation's performance measures. [*See* Doc. 1964 (3/8/17); Doc. 1980 (3/21/17); Doc. 1996 (3/28/17); Doc. 2029 (4/17/17)] After these hearings, Plaintiffs' counsel submitted voluminous pleadings and expert declarations to assist the Court in formulating a monitoring methodology that will both further compliance with the Stipulation and reflect accurate compliance findings. [Docs. 2046, 2047, 2048, 2087, 2088, 2089, 2090, 2091]

Rather than working to comply with the Stipulation or the Court's multiple orders, the Defendants have engaged in a strategy of resistance and stonewalling at every turn. For instance, they have repeatedly filed motions for reconsideration regarding issues of noncompliance and "motions for clarification" on various monitoring methodology issues.

1    [*See, e.g.*, Docs. 1707, 1752, 1774, 1779, 1821, 1824, 1942, 2135, 2136]  These frivolous

2    motions required repeated response from Plaintiffs' counsel and hours of work.  [*See, e.g.*,

3    Docs. 1772, 1806]

4          While Plaintiffs' counsel has labored continuously to overcome Defendants'

5    intransigence and non-compliance, Defendants have made this work much more difficult

6    because the representations of their counsel and even their witnesses are frequently false.

7    [*See e.g.*, Transcript of July 10, 2017 Telephonic Discovery Dispute at 10:23-11:20

8    (submission of false declaration); Transcript of July 21, 2017 Emergency Telephonic

9    Status Hearing at 25:6-9 ("THE COURT: … I learned that when I told Mr. Bojanowski,

10   that I had learned yet another thing that was the opposite of what you had told me in court

11   when I spoke to a deputy warden"); Doc. 1682 (Defendants' "Notice of Errata" admitting

12   they had submitted false CGAR numbers)]  The Court has already recognized Defendants'

13   repeated false representations:

14                  I have heard over and over again that this is going to be
                   addressed by a program that employs oftentimes the same
15                 words.  We're going to talk to the people.  We're going to
                   make sure that the right person understands what they are
16                 supposed to get.  And then subsequent months show the same
                   errant numbers and the same representations are made so you
17                 kind of at a certain point start to think people aren't really
                   listening [to] what they are saying and not even believing
18                 themselves.  They are just words that are being given that
                   don't seem to have a relationship to the reality.
19

20   [Transcript of June 14, 2017 Status Hearing at 24:11-20][8]

21   _____

22        [8]  The Court has also repeatedly expressed its displeasure with Defendants' conduct
     of the case.  [*See, e.g.*, Transcript of July 13, 2017 Status Hearing at 40:24-41:8 ("The
23   second thing that happens is that after a while when I get continued reports that don't
     seem to be borne out, I stop trusting them.  And what that means is I look for other
24   sources of information and those other sources of information are potentially more costly,
     less efficient, and disruptive to the operations of the state Department of Corrections.  And
25   I don't want to be in that situation, but I feel like I'm being funneled into a lane of traffic
     that is necessary but undesirable.  So I say these words because I think they need to be
26   said, because this is something that should not happen."); Transcript of July 14, 2017
     Status Hearing at 5:17-23 ("But as you know, I have got lots of problems with what's
27   happening on the defendants' side of the case and they know about that with respect to
     compliance with certain aspects of my orders and also facilitating what I think is efficient
28   management of the case.  And you have heard, and defendants' counsel have heard me go
     over those things.")]

The difficulties Plaintiffs' counsel encounter on a daily basis in this case have been multiplied and exacerbated by Defendants' acts of intimidation and retaliation against class members. These acts directly undermine a core function of Plaintiffs' counsel's oversight role, which is to tour facilities and speak with clients. The Court-ordered settlement grants Plaintiffs' counsel "reasonable access to the institutions [and] prisoners … necessary to properly evaluate whether Defendants are complying with the performance measures and other provisions of this Stipulation." [Doc. 1185 ¶ 29]

Despite the requirements of the Stipulation, however, Defendants' actions have created a climate of fear that makes it even more difficult for Plaintiffs' counsel to monitor compliance with the Stipulation because prisoners face the legitimate fear of retaliation for even speaking with their counsel, much less testifying before the Court.

One such incident occurred during Plaintiffs' counsel's tour of the Tucson prison complex on November 1-2, 2016, where a Deputy Warden engaged in a pattern of intimidation of prisoners by standing in close proximity to attorney-client communications, taking pictures of the cells, and announcing near the end of the visit that everyone would be ticketed (disciplined). [Doc. 1819 at 2-3] As a result of the Deputy's actions, many clients refused to speak with Plaintiffs' counsel and several indicated they were afraid of retaliation. [*Id.* at 3] During that same tour a number of clients also indicated that staff told them to "say the right thing during the tour or their lives would be made hell." [*Id.*]

At an emergency telephonic hearing on November 2, 2016 the Court heard arguments from both parties and determined that Defendants' threats to "ticket everyone" in proximity to Plaintiffs' counsel's monitoring activities made it impossible for them to carry out their Court-ordered monitoring: "[T]he application of these infractions across everybody who's participating in these interviews can reasonably be seen to chill the environment for full disclosure. And so I cannot allow that to continue." [Transcript of Nov. 2, 2016 Hrg. at 15:5-9] At that hearing the Court approved of the parties' agreement to provide a letter to the Plaintiff class assuring them that they would not face retaliation

1   for communicating with Plaintiffs' counsel. [Doc. 1819 at 4]  However, over a month

2   after Plaintiffs' counsel wrote to Defendants asking them to make good on the agreement,

3   they had not responded, necessitating further enforcement action by Plaintiffs' counsel.[9]

4   [*Id*.; *see also* Doc. 1897]

5          Despite these numerous obstacles, Plaintiffs' counsel has continuously provided far

6   more than "run-of-the-mill" representation for the Plaintiff class—indeed, excellent

7   results have been achieved.  As a result of Plaintiffs' efforts, the Court has issued

8   numerous orders finding Defendants non-compliant with various provisions of the

9   Stipulation, ordering Defendants to properly monitor their compliance with the

10  Stipulation's requirements, and enforcing its terms.  [*See, e.g*., Docs. 1583, 1673, 1709,

11  1745, 1754, 1862, 1917, 2030]  These continued and strenuous efforts most recently

12  resulted in the June 14, 2017 order stating that every single failure to comply with certain

13  health care performance measures under the Stipulation will result in an order to show

14  cause as to why the court should not impose a $1,000 fine on Defendants for each

15  violation.  [Doc. 2124]

16         While vigorously enforcing the terms of the Stipulation and its 103 health care

17  performance measures, Plaintiffs' counsel has worked tirelessly to demonstrate

18  Defendants' monitoring flaws and worked to improve and standardize their processes.  As

19  a result the Court has found that much of the methodology Defendants have used for the

20

---

21         [9] Despite the Court's clear admonition to Defendants related to retaliatory action against Plaintiffs, such obstruction continues.  Just recently Plaintiffs' counsel notified the
22  Court that witnesses called to testify at a hearing were repeatedly retaliated against by Defendants.  [Docs. 2190, 2191]  As a result the Court held an emergency telephonic
23  hearing finding changes in status of incarcerated witnesses close in time to their testimony.  [Doc. 2205]  The Court ordered Defendants not to harass, intimidate or
24  otherwise retaliate against witnesses and to submit a detailed declaration outlining steps taken to ensure the Court's orders are followed. [Doc. 2209 at 4]  The Court subsequently
25  ordered Defendant Charles Ryan to appear in Court to testify regarding compliance with its order during a Status Conference held on August 8-9, 2017.  [Doc. 2226]  Thereafter
26  the Court scheduled further hearings to address these matters on September 11, 12, and 13, 2017.  [Doc. 2236]  Plaintiffs are not seeking fees for this work at this time, as it post-
27  dates the June 30, 2017 cut-off for this motion.  These events are mentioned here as illustrative examples of the ongoing and enormous amount of work required to monitor
28  and enforce the Stipulation.

past two years is faulty.  [*See, e.g.*, Docs. 1673, 1745, 1831, 1833, 1907, 1915, 1933, 1951]  As a result of Plaintiffs' counsel's continuous and meticulous monitoring and evaluation of Defendants' compliance and the Court's resulting orders, the parties are now jointly developing a monitoring guide for all performance measures under the Stipulation.  [*See, e.g.*, Docs. 1889, 1921, 1931, 1998, 2046]

### b.      Attracting Competent Counsel

Like the Plaintiffs' counsel in *Kelly*, counsel here have also demonstrated the need to attract competent counsel to difficult and important cases, such as this one, as a justification for lodestar enhancement.  *See* 822 F.3d at 1104-05.  Attracting competent counsel to this critically important case brought on behalf of prisoners was extremely difficult due to the lack of lawyers willing and able to bring such a complicated, time-intensive case under the PLRA fee cap in the State of Arizona.  *See, supra*, Section III.B.9.  Experienced Arizona practitioner Larry Hammond states that the low rates available to attorneys under the PLRA fee cap for injunctive and declaratory prisoner rights cases foreclose qualified lawyers in Arizona from taking these important cases, despite the great need in the State for such representation.  [Hammond Decl. ¶¶ 9-14]  As in *Kelly*, an enhancement here is justified by the evidence demonstrating that an increased attorneys' fees award is necessary to ensure competent counsel in comparable cases.  822 F.3d at 1105-06.

### C.      Plaintiffs are Entitled to Recover Litigation Expenses and Costs, Including Expert Costs

A reasonable attorneys' fee includes reimbursement for expenses incurred in the litigation.  *See Woods v. Carey*, 722 F.3d 1177, 1179 n.1 (9th Cir. 2013) (§ 1988 "allows for recovery of reasonable out-of-pocket expenses that would normally be charged to a fee paying client," including "photocopying, paralegal expenses, and travel and telephone costs") (internal quotation marks, citations omitted).  Moreover, the Stipulation specifically allows Plaintiffs to seek costs, including expert costs.  [Doc. 1185 ¶ 43]

1    Itemized lists of expenses are appended to the Specter and Fathi Declarations.

2    [Specter Decl., Ex. C; Fathi Decl., Ex. C]  [*See also* Fathi Decl. ¶¶ 20-25]  Expenses for

3    which reimbursement is sought include, but are not limited to, expert consultation fees,

4    photocopying, out-of-town travel (e.g., airfare, taxis, meals, hotel), long-distance

5    telephone charges, postage and courier fees, transcripts, and other expenses that would

6    typically be billed to clients.  [*See generally* Specter Decl. ¶ 9; Fathi Decl. ¶ 20][10]

7    **IV.    Conclusion**

8    For the foregoing reasons, Plaintiffs respectfully request that the Court award them

9    $593,109.80 in attorneys' fees, a $593,109.80 enhancement to those fees under the *Kerr*

10   factors, and $161,461.27 in expenses.  In total, Plaintiffs seek $1,347,680.87 in fees, costs

11   and enhancements.

12   Respectfully submitted,

13   Dated:  August 31, 2017                    **ACLU NATIONAL PRISON PROJECT**

14                                              By:     *s/ Amy Fettig*
                                                David C. Fathi (Wash. 24893)*
15                                              Amy Fettig (D.C. 484883)**
                                                Victoria Lopez (Ill. 6275388)*
16                                              915 15th Street N.W., 7th Floor
                                                Washington, D.C. 20005
17                                              Telephone:  (202) 548-6603
                                                Email:     dfathi@aclu.org
18                                                         afettig@aclu.org
                                                           vlopez@aclu.org
19
20                                              *Admitted *pro hac vice*.  Not admitted
                                                 in DC; practice limited to federal
21                                                 courts.
                                                **Admitted *pro hac vice*

22

23

24

25

26

---

27      [10]  Plaintiffs are also entitled to "fees on fees" as compensation for their time spent
        on the instant motion.  *See Anderson v. Director, OWCP*, 91 F.3d 1322, 1325 (9th Cir.
28      1996).

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
            agerlicher@perkinscoie.com
            jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     kbrody@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
            ahardy@prisonlaw.com
            snorman@prisonlaw.com
            ckendrick@prisonlaw.com
            rlomio@prisonlaw.com

*Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:     kirstin@eidenbachlaw.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com

*Admitted *pro hac vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez;
Christina Verduzco; Jackie Thomas;
Jeremy Smith; Robert Gamez; Maryanne
Chisholm; Desiree Licci; Joseph Hefner;
Joshua Polson; and Charlotte Wells, on
behalf of themselves and all others
similarly situated*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 31, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Jacob B. Lee
Kevin R. Hanger
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
jlee@swlfirm.com
khanger@swlfirm.com

*Attorneys for Defendants*

Sarah Kader
Asim Dietrich
Rose A. Daly-Rooney
J.J. Rico
Jessica Jansepar Ross
Maya Abela
ARIZONA CENTER FOR DISABILITY LAW
skader@azdisabilitylaw.org
adietrich@azdisabilitylaw.org
rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org
mabela@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

s/ D. Freouf

LEGAL136820538.1

-26-