UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

```
Victor Antonio Parsons, et al,)
                              )
          Plaintiffs,         )      2:12-cv-00601-DKD
                              )
       vs.                    )      Phoenix, Arizona
                              )       August 24, 2017
Charles L. Ryan, et al,       )        10:02 a.m.
                              )
          Defendants.         )
_____)
```

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC STATUS HEARING

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2


 3     For the Plaintiffs:

 4               Eidenbach Law, PLLC
                 By: KIRSTIN T. EIDENBACH, ESQ. (via telephone)
 5               PO Box 91398
                 Tucson, AZ  85752
 6
                 Prison Law Office
 7               By: CORENE T. KENDRICK, ESQ.  (via telephone)
                 1917 5th Street
 8               Berkeley, CA 94710

 9               ACLU – Washington DC
                 By: DAVID CYRUS FATHI, ESQ. (via telephone)
10               915 15th Street NW, 7th Floor
                 Washington, DC  20005
11
                 Arizona Center for Disability Law
12               By: MAYA ABELA, ESQ. (via telephone)
                 177 N. Church Avenue, Suite 800
13               Tucson, AZ 85701

14

15     For the Defendants:

16               Struck Wieneke & Love, PLC
                 By: TIMOTHY JAMES BOJANOWSKI, ESQ.  (via telephone)
17                   RACHEL LOVE, ESQ.
                 3100 W. Ray Road, Suite 300
18               Chandler, AZ  85226

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
1                        P R O C E E D I N G S

2              (Proceedings resume at 10:02 a.m.)

3              COURTROOM DEPUTY:  Civil case number 12-601, Parsons,

4    et al. versus Ryan, et al., on for a telephonic status hearing.

5              THE COURT:  Counsel, please announce.

6              MR. FATHI:  Good morning, Your Honor.

7              This is David Fathi of the ACLU National Prison

8    Project for the plaintiff class.

9              THE COURT:  Thank you.  Good morning.

10             MS. KENDRICK:  Good morning.

11             This is Corene Kendrick from the Prison Law Office for

12   the plaintiff class.

13             THE COURT:  Thank you.  Good morning.

14             MS. EIDENBACH:  Good morning.

15             This is Kirstin Eidenbach for the prisoner plaintiff

16   class.

17             THE COURT:  Thank you.

18             MS. ABELA:  Good morning.

19             This is Maya Abela for the Arizona Center for

20   Disability Law.

21             THE COURT:  Thank you.

22             MR. BOJANOWSKI:  This is Tim Bojanowski and Rachel

23   Love for the defendants.

24             THE COURT:  Thank you.  Good morning.

25             COURTROOM DEPUTY:  And Judge, before we start, may I
```

UNITED STATES DISTRICT COURT

1    just make a brief announcement, please?

2           We have a --

3           THE COURT:  Surely.

4           COURTROOM DEPUTY:  We have a court reporter in the

5    courtroom, so if everyone can remember to announce before they

6    speak, it would be greatly appreciated.

7           Thank you.

8           THE COURT:  Very good.

9           This is David Duncan.

10          I think it makes sense, Ms. Kendrick, to turn to the

11   point that I told you would be at the forefront.  And can you

12   give us an update where things stand with respect to your

13   outstanding discovery request and the discussions that you've

14   had with Ms. Love?

15          MS. KENDRICK:  Yes, Your Honor.

16          We are at the same position we were at on Friday when

17   we had the call with you without Ms. Love.  Nothing has

18   changed.  We have not received any response from defendants

19   regarding our request and whether they were going to change

20   from their position that they were only going to provide

21   limited documents related to certain custodians that they were

22   calling, and only with regard to two of the four witnesses.

23          THE COURT:  Okay.  Ms. Love, I've looked at the

24   discovery requests that were in the letter that the plaintiffs

25   sent to you all, and tell me why you can't produce everything

1    they've asked for.

2           MS. LOVE:  Your Honor, our position is, with respect

3    to categories number 1 and 4 which relate to e-discovery

4    regarding implementation or communications by Director Ryan and

5    his response to the generalized direction to all agency staff

6    that they're talking of retaliation, that is not the subject of

7    the retaliation hearing that will go forward on September 11th,

8    as the notification that plaintiff filed in July regarding

9    alleged retaliation only pertains to inmates Ashworth and

10   Oyenik.

11          Moreover, the Court has already addressed the issue

12   with Director Ryan, who has already testified as to how

13   communications have been sent out to the agency staff, and we

14   have produced documentation related to that.  So that is our

15   position on categories 1 and 4.

16          The upcoming evidentiary hearing again on

17   September 11th only pertains to their notification regarding

18   retaliation as to Ms. Ashworth, as to her -- the property

19   roll-up and the cellmate move, and Inmate Oyenik as to being

20   questioned about property returned and allegations regarding

21   move to ADA housing at south unit 4 and central.  That is our

22   position to categories 1 and 4.

23          As to categories 2 and 3, we have agreed to provide

24   e-discovery for the custodians listed for Ms. Ashworth and

25   Mr. Oyenik, again because those are the subject matter of the

1    retaliation hearing.

2              As to category 3, the same argument also applies, and

3    we have agreed to provide e-discovery, if there is any, as

4    related to the custodians listed for Angela Ashworth and Donna

5    Scheid.

6              As to Ms. Ashworth's claims, providing e-discovery

7    regarding written communications among the custodians as to the

8    other categories of inmates listed is not appropriate where

9    the -- again, the notification of allegations of retaliation

10   only pertain to Ms. Ashworth and Mr. Oyenik.  To now go down a

11   road of providing e-discovery as to all of these other inmates

12   listed is inappropriate, and there's no -- actually have not

13   been any allegations of retaliation by these other particular

14   inmates.  So now we're going on a fishing expedition as to

15   whether -- the retaliation that the inmates have not even said

16   has -- have happened or existed.

17             The further implication of this would be to allow

18   e-discovery regarding these other categories of inmates who are

19   not making allegations -- alle -- allegations -- I'm sorry --

20   retaliation allegations at this time, to the effect that any

21   time plaintiffs' counsel says, I've spoken to this inmate or

22   they've testified in court, that on the back-end we're now

23   doing e-discovery related to those inmates when there is no

24   issue or no allegations made by the inmate.

25             The bottom line is that the September 11th hearing

1   pertains only to plaintiffs' notification filed with the Court

2   on July 20th as to inmates Oyenik and Ashworth, and does not

3   pertain to any of these other inmates.

4           THE COURT:  And then that's the -- the sum whole of

5   your objections?  Have you set forth everything you wanted to

6   say on those points?

7           MS. LOVE:  Yes.  Yes.

8           THE COURT:  Okay.

9           All right.  The defendants' objections are overruled,

10  and here's why.

11          I don't think that your fear of the snowball is

12  legitimate here because I'm not going to necessarily allow my

13  decision here to define how everything goes forward in the

14  future.  But here I have particular incidents that I have been

15  involved in, I've heard witness testimony already, I know the

16  nature of this -- of this issue in a way that affords me the

17  opportunity to be more engaged as -- as a judge to understand

18  it better.  And so if I'm on a fishing expedition as you are

19  certain of, I am less concerned about it when I know that these

20  are waters that I'm interested in.  And I am, as you know, very

21  interested in these waters.

22          I want to make sure that there is no sense of

23  retaliation.  And if it is, I want to identify it and bring it

24  out into the light so that everybody can see that this is how

25  the judge reacts if it is there.  If it's not there, then we

1    don't have that problem.  But if it is there, this is going to

2    be something that I'm going to be very thankful to have found

3    out about because in the witness testimony that I have had

4    previously on this issue, I have to say that my conclusion,

5    based upon testimony in my courtroom, is that I found the

6    State's witnesses -- witness in particular, a single witness in

7    particular -- incredible, and that caused me to believe that I

8    could not trust some of what has been presented previously.

9            And so I am going to scour down to the bottom of this

10   issue, and I will allow every inquiry that the plaintiffs have

11   asked for in their letter and overrule all of your objections.

12           The question next becomes, how soon can you get that

13   information?  If there is information that you think that

14   provides information that would be dangerous for the

15   administration of the prison, you can submit that to me for an

16   in-camera review.  But I want to get this responded to as

17   quickly as possible.

18           So how much time would you need to do that, Ms. Love?

19           MS. LOVE:  Your Honor, we've already -- we have the

20   e-discovery out to a vendor right now to be duplicated on the

21   inmates that we have already agreed to produce.  And as agreed

22   to previously, we should be able to get that out Monday or

23   Tuesday of next week.

24           We're going to now have to go through another cull of

25   e-discovery on all these other matters, and we would request

1    that defendants be able to provide that to plaintiffs' counsel,

2    notwithstanding any new information I've received regarding the

3    burden to produce it.  But we should be able to get that out a

4    week before the hearing so that everybody has it in advance.

5              THE COURT:  All right.  So you're talking about

6    Wednesday or Thursday?  What are you talking about?

7              MS. LOVE:  Well, we had already agreed with

8    Ms. Kendrick when we talked to get out the e-discovery

9    regarding Angela Ashworth and Mr. Oyenik.  We should be able to

10   have that produced by Monday or Tuesday of next week.  We would

11   then need another week --

12             THE COURT:  All right.  And then with respect -- okay.

13   You've got to get it all by -- by -- you have to get it all by

14   a week before the hearing.

15             MS. LOVE:  Okay.

16             THE COURT:  So you can't have another week.  Am I

17   misunderstanding you?

18             MS. LOVE:  Well, we're more than --

19             THE COURT:  You have to have it by a week before.

20             MS. LOVE:  Right.  And we'll -- and we'll do it on a

21   rolling basis.  That's what I -- what I mean.  We're more than

22   two weeks out from the hearing right now.

23             THE COURT:  Oh.

24             MS. LOVE:  We're about two-and-a-half weeks out.

25             So we will get the first cull that we have already

1    agreed to to Ms. Kendrick by either Monday or Tuesday of next

2    week; and then the second cull, based on your orders today,

3    we'll have that by a week before the hearing.

4              THE COURT:  Well, you -- that's before.

5              MS. LOVE:  That's before.  So we'll get it by the 5th

6    of December -- I'm sorry -- September.

7              MS. KENDRICK:  Your Honor, this is Ms. Kendrick.

8              We object to these delayed productions.  The

9    defendants have known since they received that letter that it

10   is possible that they would have to produce it.  I had the

11   phone call with Love on August 15th, at which point we

12   discussed the fact that we would try to resolve the issue on

13   the call with you of Friday last week, which Ms. Love

14   apparently did not participate in and did not notify her

15   co-counsel.  So counsel for defendants have been well aware for

16   some time that it is entirely possible that they would have to

17   produce this information.

18             A second comment I would make is that Ms. Love keeps

19   referring to it, the e-discovery, but our request is broader

20   than that.  It refers to written communications.  So to the

21   extent there is something that is not in electronic mail, that

22   would be included in our response.

23             And finally my third comment is, previously Ms. Love

24   has represented to me that there's nothing responsive from some

25   of the custodians.  And to the extent that defendants are going

1    to stick to that position, we -- our position is that they

2    can't just assert it.  Counsel needs to state in writing the

3    basis for the assertion that these custodians do not have

4    responsive documents, and they need to include and detail the

5    searches that they made to try to identify all responsive

6    information.

7           MS. LOVE:  Your Honor, there has never been a

8    representation by counsel that -- that some custodians will not

9    have anything.  I said they may not, but I never said that they

10   will not have any responsive documents.

11          MS. KENDRICK:  To the extent that --

12          THE COURT:  I'm going to continue -- here's what I'm

13   going to do.  I'm going to continue to rely upon the

14   professionalism and responsibility of counsel to comply with

15   the discovery obligations.  As I have read the discovery

16   requests in the letter, they are plain enough that anybody who

17   would need to know what subjects they cover, that's clear.

18          With respect to Ms. Kendrick's point about

19   e-discovery, it is not limited to that, so I don't know that

20   that was necessary for her to amplify, but I can't disagree

21   with what you said.  I don't know whether it was necessary to

22   amplify it, but it is certainly true that the requests do

23   include matters that are electronic and matters that are not --

24   not electronic.

25          With respect to the timing, I'm going to require that

1    all of these items responsive be produced either to me, if

2    there is a necessity for in-camera review, by 9:00 a.m.

3    Wednesday, this -- this coming Wednesday.  That's the 30th.

4    And then the items that are not produced to me for in-camera

5    review be produced no later than 9:00 a.m. Wednesday to the

6    plaintiffs' counsel.

7              And so what is the next issue, please?

8              MS. LOVE:  Your Honor, can I clarify?

9              Are you talking about September 5th, or -- or one week

10   from today?  Because we just discussed it was going to be a

11   production to plaintiffs' counsel of information related to

12   Ashworth and Oyenik, Monday or Tuesday, and then we would

13   produce the additional as ordered by the Court today by the 5th

14   of September.

15             THE COURT:  Well, if you can do the 5th of September,

16   I will certainly embrace that.

17             MS. LOVE:  Okay.  So you would like --

18             THE COURT:  No, I didn't mean to say that.  No.  No.

19   No.  I'm sorry.  I'm confused.  I'm confused.  No.

20             Why can't you produce it next Wednesday, the 30th?

21   All of --

22             MS. LOVE:  Well, we can produce the discovery as we're

23   already culling and working on as to Ashworth and Oyenik.  But

24   now based upon the Court's order, I'm going to have to do

25   additional cull of -- of much greater magnitude of e-discovery

1   that we will not be able to accomplish by next Wednesday, but

2   we can get that accomplished by September 5th.

3          THE COURT:  Well, I am going to order you to do

4   everything you can to produce as much as you possibly can by

5   the 30th, by Wednesday, next Wednesday, at 9:00 a.m. in the

6   timetable that I just announced.  If for some reason you are

7   unable to satisfy that, then at no later than 9:00 a.m.

8   identify to me where you stand with respect to the production.

9   I will expect it to be produced as soon as possible after

10  Wednesday, 9:00 a.m., if you are not able to do it.  I'm not

11  giving you until the 5th of September, because I do think it is

12  reasonable for plaintiffs to have more time than that to digest

13  and to consider how best to proceed with respect to any of that

14  information, to make sure that the time that we had set already

15  for the week of the 11th of September is wisely used.  If

16  there's a necessity for additional information, additional

17  witnesses, we need to have time to be able to react to that.

18         Again, this is -- this is a cram-down in terms of time

19  that is necessary because of the acute interest of the Court in

20  this issue, and I don't want it to be lost as a -- as a primary

21  focus while I have the opportunity to get everybody to be

22  focused on it.  So that's how we'll proceed.

23         MS. KENDRICK:  Your Honor, one other thing related to

24  the hearing.

25         THE COURT:  Yes.

1      MS. KENDRICK:  Would you like to set a date or

2  deadline for the parties to announce their witnesses to the

3  Court and to opposing counsel?

4           THE COURT:  That seems reasonable to me.

5           Can we do that also on Wednesday, the 30th?

6           MS. KENDRICK:  We would like to --

7           THE COURT:  Do you have a problem with that?

8           MS. KENDRICK:  -- Your Honor.

9           Yes, Your Honor.  This is Corene Kendrick.

10          We would have a problem with that because if it's not

11 until Wednesday the 30th that we're getting the documents --

12          THE COURT:  You make a good point.

13          MS. KENDRICK:   -- we can --

14          THE COURT:  You make a good point.  And I'm sorry that

15 I didn't think of that.  Obviously it is fine, what you have

16 just said.

17          So we'll set that deadline for the 6th of September.

18 That seems more reasonable.

19          MS. KENDRICK:  Thank you, sir.

20          THE COURT:  All right.  What other discovery issues

21 remain?

22          MR. FATHI:  Your Honor, this is David Fathi.

23          We have items 2 and 5 on the agenda that we had

24 previously provided, document 2237.  We also have some

25 additional rather urgent document production issues that have

1  arisen since the hearing last week.

2        THE COURT:  With respect to agenda item 2, that was

3  not addressed by the defendants' notice?

4        MR. FATHI:  Well, what the defendants noticed, Your

5  Honor, in -- in its August 4th order, the Court adopted the

6  plaintiffs' proposed language for monitoring those performance

7  measures that required something to be done every X days.  And

8  in its order, the Court expressly said that the Court expects

9  this methodology will be adopted in full for the June 2017 CGAR

10 results.  And in the defendant's recent filing, unfortunately

11 they admitted that they did not comply with the Court's order

12 when calculating the -- the June results.  And so what that

13 means is that the purportedly compliant CGAR scores that were

14 provided to the Court at the August 9th hearing were not

15 calculated in accordance with the Court's order and, therefore,

16 do not, in fact, establish compliance.

17        THE COURT:  I understand.  And I think that that poses

18 the issue that we have always, and that is that when you

19 embrace the idea that there is this lag on reporting, it

20 sometimes -- it's questionable whether it makes sense for us to

21 compound the lag by making the defendants go back and

22 recalculate when we know we're going to get corrected data that

23 is already late.  And so it makes sense that we should,

24 perhaps, focus on that.  I've made that point before.  I guess

25 I think that -- that the -- that that wisdom would maybe apply

1      also here.  Tell me why it wouldn't.

2          MR. FATHI:  Well, Your Honor, that brings us to

3      another issue that we wanted to raise today, that the June

4      CGARs have still not been finalized and have not been produced

5      to either plaintiffs or the Court.  So given that we are now

6      three weeks beyond the Court's August 4th order, it's not

7      apparent to us why the defendants couldn't have complied with

8      that order, given that they are -- apparently still haven't

9      finalized the June CGAR results.

10         THE COURT:  And this -- this tardy production of the

11     June CGAR is very unusual, is it not, Mr. Fathi?

12         MR. FATHI:  Well, sadly it has become more usual in

13     recent months.  We used to get them fairly reliably on the 14th

14     or 15th of the month.  But there has been more delay recently,

15     and obviously here we are today on the 24th, and we do not yet

16     have them.

17         THE COURT:  This is -- this is news to me.

18         So who on the defendants' side can talk about the

19     reason for this additional delay?  I'd like to try to go in the

20     other direction, as you've always heard.  So why are we getting

21     worse?

22         MR. BOJANOWSKI:  Your Honor, this is Tim Bojanowski.

23         The June CGAR results, I thought, were finalized and

24     produced.  But I'm now going to have to go back and check on

25     that.  If Mr. Fathi says they have not been produced, then I'll

1    have to check on that.

2            As far as the every X day calculation is concerned,

3    the actual calculations and files that were being pulled, et

4    cetera, with regard to those measures, had already been

5    completed by the time the Court had issued its order.  So

6    that -- that's why -- that's why we filed the notice as we did

7    to say, look, that -- that was already done, it was already

8    calculated, and so that's what -- that's what we have going on,

9    is just the date of the order occurred after that had been

10   complete.

11           But I will -- I will check on that.  And if, in fact,

12   they have not been produced, I'll get them produced today.

13           THE COURT:  All right.  Thank you.

14           And Mr. Fathi, with respect to how I consider this and

15   whether or not it -- it should be reworked, as I've said, I

16   think that it doesn't make sense to do that.  You always retain

17   the argument to say that there should not be any action by way

18   of removal of a performance measure from the stipulation if the

19   data was not collected in conformance with the Court's orders.

20   And so that issue always remains.  But I think we do need to

21   focus on -- on moving forward just because of the delay.  It

22   really doesn't make sense to chase our tail that way.  So

23   that's how I would resolve issue number 2.

24           And then the language for the methodology introduction

25   on 5, where do things stand there?

1    MS. EIDENBACH:  Your Honor, this is Kirstin Eidenbach

2    for the prison plaintiff class.

3         We provided proposed language to defendants last

4    Thursday, and we have yet to receive a response as to whether

5    they find that language acceptable or not.

6         THE COURT:  Okay.

7         Who on your side is handling that, Mr. Bojanowski?

8         MR. BOJANOWSKI:  I will, Your Honor.

9         Yes, we did receive that language.  We sent it over to

10   the client for review.  I believe it's been reworked, and I'm

11   fairly certain that Ms. Orcutt will be responding either today

12   or tomorrow with some revisions to that language.

13        THE COURT:  All right.  And then you'll let me know,

14   obviously, if you need Court intervention after you've taken a

15   look at that.

16        MR. BOJANOWSKI:  Yes.

17        THE COURT:  And so what are the newest -- go ahead.

18        MS. EIDENBACH:  I guess --

19        THE COURT:  What are the new issues?

20        Okay.  Thank you.

21        MR. FATHI:  Your Honor, at that -- the August 9th

22   hearing, the Court ordered the defendants to provide

23   temperature logs from all facilities that house prisoners who

24   are taking psychotropic medications, which is to say all 10

25   facilities that are at issue in this case.

1          As of today, we've received logs from only five of the

2    10 facilities, and even production from those five is only

3    partial, with significant gaps and missing data.

4          I've sent two emails to Ms. Rand about this; have not

5    received any response.  So we would ask that the remaining

6    temperature logs be produced without further delay.

7          THE COURT:  And I gather, Ms. Rand, you're no

8    longer -- you're not on the phone still; is that right?

9                    (Pause in proceedings.)

10         THE COURT:  Okay.  So you -- when did you send these

11   emails off, Mr. Fathi?

12         MR. FATHI:  I believe one was sent last Friday, and

13   one, I believe, either -- it was earlier this week.  I'll see

14   if I can quickly find it, Your Honor.

15         Yes.  One on Friday and then one yesterday.

16         THE COURT:  Okay.  And the Friday email raised the

17   issue just as you described it?  You've said that you had not

18   received what looked to be a complete production because there

19   were missing facilities, and then at those facilities that were

20   included within the -- within the temperature logs, that that

21   was incomplete.  You said that in that letter on Friday?

22         MR. FATHI:  Yes, Your Honor.

23         And then my follow-up email yesterday, after we had

24   reviewed what we did receive, identified some additional gaps

25   and missing data.  But both issues were raised in my -- in my

1    email last Friday, the 18th.

2          THE COURT:  And let me understand exactly.  So after

3    the -- the email on Friday, you did receive a subsequent

4    production from -- from Ms. Rand; is that right?

5          MR. FATHI:  No, Your Honor.  No response.

6          THE COURT:  Oh, okay.  Okay.  So the letter of -- the

7    email on Friday addressed a previous production where you found

8    deficiences.  You identified those deficiences, and you had no

9    response at all.  And so you sent another email yesterday on

10   the same topic, and you had no response to that.

11         Is that all accurate, what I just said?

12         MR. FATHI:  Correct, Your Honor.  And I should make

13   clear that while the email was addressed to Ms. Rand, other

14   counsel, including Mr. Bojanowski and Ms. Love, were copied

15   on -- on both emails.  And again, I have received no response.

16         THE COURT:  Okay.  Well, I've been respectful of the

17   fact when -- when counsel haven't been present in not

18   addressing subjects that are in the hands of that counsel, and

19   so I want to continue to be respectful of that.  But I think

20   that people have heard on this -- this phone call what is a

21   concern to me, and that is at the very first instance -- and I

22   don't know what the practice is among the lawyers in this

23   case -- but I surely know that in my own practice, I hope that

24   you understand that when you send an inquiry to me, that I

25   respond, at least letting you know that I had it on the day of

UNITED STATES DISTRICT COURT

it.  I'm not saying that everybody has to match that kind of

schedule, but I'm concerned to hear that there -- there isn't a

greater alacrity with respect to back and forth.  And I know

there's been accusations from both sides about this over the --

the time of this case, and I have addressed it before.  But I

really think that it is important to keep the dialogue going

and to just not send -- not just allow messages to sit

unresponded.

        So I -- I would ask, Mr. Bojanowski, if you would

kindly communicate with Ms. Rand and let her know that I would

like her to respond to Mr. Fathi's emails.  And I would, more

than that, like to have complete satisfaction of my order, and

that is the production of all of these temperature logs for the

facilities, because all of the facilities have people who are

on psychotropic medicines, as we've established before.

        Is that all right, Mr. Bojanowski?

        MR. BOJANOWSKI:  I will -- I will give her a call.

        THE COURT:  Okay.  Thank you kindly.

        Any other issues?

        MR. FATHI:  Yes, Your Honor.

        Plaintiffs' counsel will be touring the Perryville

facility starting on next Tuesday, and it's our consistent

practice that we produce -- we request certain documents be

produced in advance of the tour to allow us to make the tour

maximally useful.  And the defendants have, by and large,

1    accommodated that.

2           Among the documents that we requested in advance of

3    this tour are the suicide watch logs for the preceding 90 days;

4    so, with patients who were on suicide watch, the date they were

5    put on watch, and the date they were removed from watch.  And

6    the defendants have refused to produce those documents on the

7    ground that they're too voluminous.

8           Now, you may recall, Your Honor, when we had the first

9    evidentiary hearing on May 8th of this year, the defendants

10   brought the Court a big binder of documents, and that binder

11   included a document that was titled Yuma Watch Log, July

12   through November 2016.  And that document, which is exactly

13   what we're looking for for the Perryville facility, was four

14   pages long.

15          So we don't understand the objection that the same

16   document for Perryville is -- is too voluminous.  This is a

17   critical document that allows us to identify some of the most

18   vulnerable and at-risk patients.  And given the imminence of

19   the tour, we ask that it be produced today.

20          THE COURT:  Well --

21          MS. LOVE:  Your Honor -- Your Honor?

22          I'm sorry.

23          THE COURT:  Go ahead, please.

24          MS. LOVE:  This is Rachel Love.

25          Tim Bojanowski and I had communications with

1    operations at the Perryville complex yesterday as to the

2    production of those watch logs.  We have been informed -- and I

3    certainly can't speak to what was done at Yuma because I was

4    not on that tour -- but we have confirmed with the Perryville

5    facility that the watch logs -- the entirety of the watch logs

6    per the request that has been made by plaintiffs' counsel, as

7    of yesterday were still being pulled together.  But we're

8    talking about what looks like it will end up being an entire

9    banker's box to one-and-a-half banker's box worth of documents

10   on the watch log.

11          So what we would request, due to the voluminous nature

12   of those logs and the fact that on the operations side it

13   would -- and we questioned yesterday as to what it would take

14   on a personnel basis to get those documents scanned and put in

15   a format that could be produced prior, that they would have to

16   take several people off of their normal duties to sit -- to sit

17   there and scan the documents.

18          So what we would request is that that banker's box,

19   the one-and-a-half banker's box of documents that it looks like

20   it will -- will be, could be available to plaintiffs' counsel

21   during the tour on-site for inspection, which is -- there is

22   no -- I do not believe that there's any requirement in the

23   stipulation that pre-tour documents be actually produced, but

24   just under normal discovery when they're voluminous like this,

25   that they can be available for inspection, and therefore -- it

is a full four days.  So it is our position that it would be

reasonable that we have it there, that as soon as they arrive

and they can go through those documents while they're there at

the facility.  And they do have three teams --

THE COURT:  The --

MS. LOVE:  They do have three teams coming.

MR. FATHI:  Your Honor -- that's not -- I beg your

pardon.

THE COURT:  I had a question, and I guess you can

answer it as well as Ms. Love, Mr. Fathi.

Is this the first time that you've asked for the

Perryville suicide watch logs?

MR. FATHI:  No, it isn't, Your Honor.  This is a

document that's been routinely produced on all of our prior

tours, including the prior tours of Perryville.  And what

Ms. Love described is not what we're asking for.  What she

described is the unit logs where the officers write down every

10 minutes or 30 minutes that they've checked on the person who

is on watch.  That's not what we're asking for.  What we're

asking for is a list:  This is everyone who's been on watch at

Perryville in the last three months; here is the date they went

on; here is the date they came off.  This is literally three or

four pages.  And as I say, this has been produced, I believe,

at every one of our previous tours without incident.  And we

know that this document exists because this is the document

that the defendants use to draw the samples for performance

measures 94 and 95, which involve prisoners on watch.  So we

know that they have to have this list because without that

list, they couldn't do the sampling that they're required to do

for 94 and 95.

         So perhaps there's been a breakdown in communication

or a misunderstanding.  But let me be very clear now.  We are

not asking for the banker's box.  We're asking for the list

that will be three or four, five pages long.

         THE COURT:  Ms. Love, does that resolve the issue

then?

         MS. LOVE:  Sounds like it does.  We have -- well,

let's check with the facility to make sure, you know, the

document that -- sounds like it is regularly produced there.

That was just, I guess, our -- our misunderstanding, and we

were trying to be exact on what they were looking for.  So

Mr. Bojanowski and I will make a phone call to the facility

after we get off this phone call and see whether -- you know,

if that document -- hopefully exactly as Mr. Fathi says, that

it's there and it's something simple and we can get to them.

And then we'll follow-up then -- we'll follow-up then with

Mr. Fathi as to our resolution.  We were just trying to be

complete in -- in what we did.

         And also I would just tell you that since the

documents are already being culled in that banker's box, we'll

1    also still have those available during the tour, if for some

2    reason they'd like to look at those operations documents.

3              THE COURT:  Okay.

4              MR. FATHI:  Thank you much.

5              THE COURT:  Thank you.

6              Anything else?

7              MR. FATHI:  That's all I have, Your Honor.  I don't

8    know if my co-counsel may have something.

9              MS. KENDRICK:  Nothing more, Your Honor.

10             MS. EIDENBACH:  That's all I have as well, Your Honor.

11             This is Kirstin Eidenbach.

12             THE COURT:  That was Ms. Kendrick and Ms. Eidenbach in

13   order; is that right?

14             MS. KENDRICK:  Yes, Your Honor.

15             MS. LOVE:  Your Honor, this is Rachel Love.  We have

16   one final issue that we'd like to bring up as to the Perryville

17   tours next week.

18             Plaintiffs have also requested that during the tour --

19   excuse me -- that they be able to hand out business cards and

20   envelopes to the clients that they speak to.  We assume that

21   means whether they're cell-front or during the private -- the

22   private attorney-client privileged visits that they have, the

23   confidential visits.

24             We object to this occurring.  This is not anything

25   that has occurred in the past, other than when -- there has

1    been a few instances at the beginning of the tours when

2    business cards were attempted to be handed out, and we were

3    instructed by Operations and then communicated with plaintiffs'

4    counsel that pursuant to normal protocol, whether it's a

5    visitor or a legal visit, there shall be no exchange of

6    documents or anything else with the prison population for

7    security reasons because in the normal, reasonable course if

8    that were to occur, there needs to be a security review of what

9    is being handed to the inmate.  We do not believe it's

10   appropriate under any circumstances to break from those normal

11   security protocols and have plaintiffs hand out business cards

12   and envelopes because we can't see what's being produced to

13   them, and -- and what they're being given.

14           And in the course of this case, whether it's at a

15   cell-front visit or meeting with inmates, if they need the

16   address or contact information of the plaintiff counsel, then

17   perhaps if the inmate has, you know, a piece of paper and a pen

18   or pencil, they can write it down.

19           Additionally, providing inmates with supplies is

20   prohibited.  Those supplies need to be obtained in the normal

21   course of the facility for inspection reasons.

22           And the other option that plaintiffs' counsel has is

23   they know exactly who they're talking to on these interviews.

24   I would assume they keep a record of who they're speaking to.

25   And certainly because it is their client, if that person

1   desires contact information but was not able to write it down,

2   then plaintiffs' counsel can certainly write to that particular

3   inmate and say, here is the contact information.  But providing

4   inmates with -- with supplies is -- is purely prohibited by

5   normal operations.

6          THE COURT:  Do the plaintiffs have any objection to

7   providing to the prison officials upon their arrival at the

8   facility all of the cards that they would propose to hand and

9   all of the envelopes so that they can be thoroughly inspected

10  to make sure that they did not contain any contraband or any

11  untoward enclosures?

12         MS. EIDENBACH:  Your Honor -- Kirstin Eidenbach, Your

13  Honor.

14         We would have no objection to that.  But we really

15  feel that this is imperative at this point, particularly given

16  the reports of retaliation and the reports of interference with

17  our legal mail that we've received from Perryville.  We need to

18  make sure that these folks know how to get in touch with us,

19  and that they have our contract information.  And, you know, to

20  prevent us from communicating that with them by way of business

21  cards and envelopes is interfering with our ability to

22  communicate with our own clients, and to keep open the

23  information pipeline that this Court has requested the parties,

24  you know, keep open so that we can all work together to enforce

25  and implement the requirements of the stipulation.

1          THE COURT:  Well, as you all heard me say many, many

2    times before -- excuse me -- the flow of information from

3    the -- from the plaintiffs' class to their lawyers and then to

4    me, because that is the mechanism of the stipulation, that is

5    how I am to be informed in a large way about what's happening

6    there, is critically important.  And as I've said to you

7    before, if I could, I would move it.  I would live there for a

8    while and see what I could learn by direct observation.  Next

9    best thing would be to have the plaintiffs' lawyers live there,

10   but I can't order them to do that.  And so the -- maybe the

11   third best thing is to make sure that the conduit of

12   information is as free-flowing as possible.

13          So the defendants' objections are overruled.  It will

14   be ordered that the plaintiffs produce for inspection upon

15   their arrival at the prison facility -- any prison facility --

16   that they -- (pause) -- hello?

17          MS. EIDENBACH:  Hello?

18          THE COURT:  Hello.  Can you hear me still?

19          COURTROOM DEPUTY:  We can hear you.

20          MS. LOVE:  You cut off.  This is Rachel Love.

21          THE COURT:  Okay.  Thank you.

22          And so with respect to any visit in the future, the

23   plaintiffs may -- Counsel may -- and in fact, if they choose to

24   do this -- they must present for inspection the cards that they

25   would propose to distribute and the envelopes that they would

1    propose to distribute so that they may be reviewed for any

2    possible security risk.  But the cards and envelopes will be

3    allowed to be distributed by the plaintiffs' counsel to any of

4    their clients whom they wish to distribute them to.

5         Anything else from the defendants' side?

6         MS. LOVE:  Your Honor, with respect to that order,

7    that as to envelopes, that they would be limited to providing

8    the inmates that they choose to provide an envelope to, one,

9    versus providing envelopes in stacks to one particular inmate,

10   again because we don't know how voluminous this is going to be.

11   This is going to be part now of the timing and a burden on the

12   operations because we're going to have to get people in there

13   to inspect the envelopes, which does not mean opening one box

14   and looking and seeing that they're envelopes.  They're going

15   to have to go through all of them per normal protocol,

16   whether -- you know, whether it is plaintiffs' counsel or

17   whether -- anybody who would send anything into the facility.

18   Each piece has to be inspected.

19        We would therefore request that any handing of

20   envelopes from plaintiffs be limited to one each.  I don't see

21   a need that they would have -- be provided with stacks of

22   envelopes to inmates.

23        THE COURT:  I guess I --

24        MS. EIDENBACH:  Your Honor, this is Kirstin Eidenbach

25   again.

1          We -- we object to that limitation.  These are

2    envelopes that are directly addressed to members of our legal

3    team.  And so the fact that a prisoner -- I mean, I can tell

4    you right now we're not intending to give out stacks of

5    envelopes.  We may give out between one to three per person we

6    talk to, depending on how often they communicate with us.  Our

7    intention in providing these envelopes to our clients is to

8    ensure that they have the ability to contact us when the need

9    arises so that we have a free-flow of communication between us,

10   and so that no prisoner who does not have the money to afford

11   an envelope is precluded from contacting plaintiffs' counsel.

12   These are routine envelopes.

13          And as far as the inspection goes, this will be

14   occurring at the beginning of the tour, which will count

15   against the time that we are already there.  So defendants are

16   already required to have -- I mean, they have substantial teams

17   of people who join us for the tours, and I'm sure that there

18   are multiple individuals already planning to attend who are

19   capable and skilled enough to review the envelope and the cards

20   to make sure that there's no contraband, and it counts against

21   the time that we're going to be touring.  So I'm not really

22   sure --

23          THE COURT:  All right.  I'm actually embarrassed that

24   we're even talking about this at length.  The idea that I can't

25   trust lawyers to bring envelopes to a prison yard when so many

UNITED STATES DISTRICT COURT

1    people in the prison yard test positive for drugs, indicating

2    that it's like a sieve with respect to contraband getting into

3    the prison generally, the idea that I can't trust lawyers with

4    envelopes to be responsible to make sure that they're not

5    adding to the problem is preposterous again.

6           So that objection of the limitation is overruled.  You

7    can take as many envelopes as you want -- hand out as many as

8    you want.  Unless somebody can give me a good reason why that's

9    a danger -- and I haven't heard one yet -- it really is -- it's

10   silly.

11          Okay.  Next issue?

12          MS. KENDRICK:  Your Honor, this is Corene Kendrick

13   from the Prison Law Office.

14          One other thing related to the Perryville tour is that

15   we have requested that the facility or defense counsel have

16   with them a camera so that as we are touring, to the extent

17   there are things that we see that we want to have a photograph

18   of, defense counsel or defendants' employees can take a picture

19   of that, whatever that is, and then log it and produce it to us

20   after the tour.  We believe that this is very important.  This

21   is an issue that we used during litigation with our experts is

22   taking photographs.

23          And subsequent in our recent tours since we settled

24   the case, there have been occasions where we have described

25   something that we observed and it's been flatly contradicted by

```
 1    defendants.  So we believe that it is important that there are

 2    certain occasions when we need photographic proof backing up

 3    exactly what plaintiffs' counsel has observed, and we are not

 4    saying that we want to bring in the cameras or that we're

 5    taking the pictures.  We say that defendants have the cameras

 6    and take the photos.  This is something that's very routine.

 7    We do this at the Prison Law Office in all of our monitoring

 8    tours in our other cases, in the jail in state prison cases in

 9    California, and there have been no security objections to that.

10             THE COURT:  I have not heard of this issue before.

11    Have you all met and conferred about this, and there is an

12    impasse, a disagreement?

13             MS. KENDRICK:  Your Honor, we have requested this on

14    past tours and there have not been cameras present.  So I'm

15    just flagging this now.  They have not formally responded to

16    our set-up letter where we made that request by objecting to

17    it, but we don't want to get into a situation next week where

18    we're at the facility and ask about the cameras and are told

19    they are refusing to do it, and then we have to call the Court

20    and, you know, waste the Court's time and our time with an

21    urgent hearing.  So I thought that I should preemptively raise

22    that now with you for you to consider.

23             THE COURT:  All right.  Defendants, is someone

24    prepared to respond to this issue on the defendants' side?

25             MR. BOJANOWSKI:  Your Honor, this is Tim Bojanowski.
```

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | We have, in fact, had cameras available in prior tours.  There |
| 2 | isn't an objection.  I mean, Corene could have given me a call |
| 3 | on this.  We have cameras available.  This is not an issue. |
| 4 | THE COURT:  Okay.  Thank you.  Thank you. |
| 5 | MS. KENDRICK:  Sorry.  We -- |
| 6 | THE COURT:  That's why the meet and confer is helpful. |
| 7 | I -- I know, it is -- again, this idea of |
| 8 | communication -- and I understand that -- that you are |
| 9 | adversaries and that you frustrate one another's lives greatly. |
| 10 | This is a big imposition on everyone.  I understand that.  But |
| 11 | this is a case of significant importance and of great interest |
| 12 | to the parties, and so I understand that the level of |
| 13 | difficulty that is imposed and how that sometimes results in a |
| 14 | desire of not wanting to even pick up the phone or respond to |
| 15 | an email.  But I have to urge you to continue to do that |
| 16 | because the way the Court manages disputes is to make sure that |
| 17 | we are only really requiring people to spend time on them when |
| 18 | they really are an issue.  And so often we hear what we've just |
| 19 | heard today, that things really aren't issues.  And so if you |
| 20 | can try to communicate better so that you can address those -- |
| 21 | because if you do think there's an issue, it's not just my time |
| 22 | right now, it's not just your time at the hearing.  It's the |
| 23 | preparatory time.  We've just seen this over and over again |
| 24 | where people are preparing for a big argument and the big |
| 25 | argument isn't necessary.  And if -- they could have found that |

1    out with just a phone call or just an email.  So, again, I urge

2    you all to do that.

3              Anything else?

4              MR. BOJANOWSKI:  Your Honor, we had submitted a notice

5    of designation of an expert.  I was not at that hearing the

6    other day with Mr. Struck, and I was not sure whether we should

7    schedule a phone conference with that particular individual or

8    not.  And I was looking for some direction on that.

9              THE COURT:  Right.  Not unreasonable for you to raise

10   that now because I didn't last time address the proposed expert

11   from the defendants' side, from Texas.  And the reason that I

12   didn't is because as I compared the two vitaes of the

13   plaintiffs' proposed expert and the defendants' proposed

14   expert, I made an initial cut that it seemed like the

15   plaintiffs' expert was one worth pursuing for, really, any

16   significant reason, but it seemed to be borne out in our

17   discussion that we had yesterday, and that is his familiarity

18   with the Arizona environment.  And I thought that that was

19   something that was helpful.  And I didn't feel that -- that

20   that was the same, that was true.

21             Have you looked at the Texas gentleman's résumé,

22   Mr. Bojanowski?

23             MR. BOJANOWSKI:  I don't have it in front of me, but I

24   thought he had done some work here in Arizona, as well.

25             THE COURT:  All right.  Hold on just a second.

UNITED STATES DISTRICT COURT

```
 1                    (Pause in proceedings.)

 2           THE COURT:  Can you give me some more time here?

 3    Thank you.

 4           I thought I had it here.  I'm just not finding it.

 5    Just give me some time.

 6           All right.  Part of the problem is, as you, I think,

 7    know, is I'm not in the office, and so I'm a little bit slowed

 8    by the technology, but I'll get there in a second.

 9           MR. BOJANOWSKI:  I'm attempting to retrieve it as

10    well, Your Honor.

11           THE COURT:  Well, I'm impressed that I'm no slower

12    than you.

13           MR. FATHI:  Your Honor, this is David Fathi.  I have

14    it before me, if that would be helpful.

15           THE COURT:  Which docket is it in, please?

16           MR. FATHI:  2238-1.

17           THE COURT:  Thank you.

18           I need to just refresh my recollection.

19           What date was it filed?

20           MR. FATHI:  8-21.

21           THE COURT:  Oh, I found it.  Okay.  Thank you.  I

22    found it.

23           I've re-read everything, and it refreshes my

24    recollection that I did not think that this past experience was

25    as relevant to the assignment that I have presently.  It did
```

UNITED STATES DISTRICT COURT

1   not read that way to me.  I do see that he has a current -- his

2   firm has a current contract for long-term care services for the

3   BOP facility in Tucson, and he notes that in his capacity he

4   was providing patients access to long-term care services and

5   sub-special providers in a manner that transitions patients

6   from hospital level of care to long-term care facilities.  So

7   he does have some Arizona experience, that is true.

8           But the conclusion that I made when I couldn't get you

9   all to agree on a single person is that I took a look at the

10  first one, Mr. Milar, and then I had the opportunity to take a

11  look at the second one here, Mr. Allen, and I concluded that

12  Mr. Milar was a better fit.  And so our conversation yesterday,

13  which reinforced that preliminary conclusion that I made, and I

14  really don't think it's necessary for me to have to trouble

15  everybody, including Mr. Allen, with a further inquiry based

16  upon what I discovered yesterday.

17          So that can be information you can communicate to your

18  team, Mr. Bojanowski, but I should have provided it to you all

19  yesterday.

20          MR. FATHI:  Thank you, Your Honor.

21          THE COURT:  So if you all are done, there's just one

22  more thing that I need to mention, and that is, defendants have

23  filed, I think yesterday, the response that includes some

24  comment on the contempt authority.  And so the issues have been

25  joined, but I didn't know whether or not -- and I did think --

```
 1      I did previously address whether I was going to give -- whether

 2      the plaintiffs wanted an opportunity to respond to what the

 3      defendants filed yesterday.  So I need to ask that question.

 4              MR. FATHI:  Yes, Your Honor.  I think we would -- we

 5      would appreciate the opportunity to reply.

 6              THE COURT:  Well, that holds up my order if I go down

 7      the road that you want me to go down, Mr. Fathi.

 8              Get that to me as quickly as you can.

 9              MR. FATHI:  Yes, Your Honor.  And perhaps after

10      conferring with co-counsel, we may -- we may reconsider.  But

11      provisionally may we have -- may we have one week for

12      getting --

13              THE COURT:  Of course.  Yes, you may.  I mean, as I've

14      told that -- that I have already started work on this, but it

15      doesn't necessarily mean that I have made a decision about

16      whether or not plaintiffs or defendants are right on this point

17      because I didn't want to lose that time.  And so I don't mean

18      to suggest that what you would be doing would be useless, and I

19      don't mean to suggest that what the defendants sent over

20      yesterday was -- has already been decided.  It hasn't.  I just

21      thought it was useful for me to take advantage of the amount of

22      time and start work already on this.  A component of that is

23      whether it's a road I'll be heading down.  And so, as I've

24      said, I've heard from both sides that I need to give now you a

25      chance to do this, if you would like to.
```

1          MR. FATHI:  Thank you, Your Honor.

2          So we will either submit that by October -- excuse

3     me -- August 31st, or we will notify the Court that we are

4     waiving reply.

5          THE COURT:  All right.  Thank you very much.

6          Thank you all for your time today.

7          MR. FATHI:  Thank you, Your Honor.

8          MS. KENDRICK:  Thank you, Your Honor.

9             (Proceedings in recess at 10:59 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I, CHARLOTTE A. POWERS, do hereby certify that I am

 4    duly appointed and qualified to act as Official Court Reporter

 5    for the United States District Court for the District of

 6    Arizona.

 7          I FURTHER CERTIFY that the foregoing pages constitute

 8    a full, true, and accurate transcript of all of that portion of

 9    the proceedings contained herein, had in the above-entitled

10    cause on the date specified therein, and that said transcript

11    was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 8th day of September,

13    2017.

14

15                              s/Charlotte A. Powers
                                Charlotte A. Powers, RMR, FCRR
16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT