CV-12-00601-PHX-DKD, September 13, 2017

1           **UNITED STATES DISTRICT COURT**

2           **FOR THE DISTRICT OF ARIZONA**

3                  _____

4

**Victor Antonio Parsons, et al.,**      )

5                          )

                    Plaintiffs,      )   CV-12-00601-PHX-DKD

6                          )

            vs.          )   Phoenix, Arizona

7                          )

                          )   September 13, 2017

8   **Charles L. Ryan, et al.,**         )   9:04 a.m.

                          )

9                    Defendants.      )

_____)

10

11

12

13   **BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

14             **TRANSCRIPT OF PROCEEDINGS**

15             **EVIDENTIARY HEARING - DAY 2**

16                (Pages 1 through 173)

17

18

19

20

21   Transcriptionist:

     **Elaine Cropper**

22   Sandra Day O'Connor U.S. Courthouse

     401 West Washington Street, SPC 35

23   Phoenix, Arizona  85003-2150

     602.322.7245/(fax) 602.322.7253

24

     Proceedings Recorded by Electronic Sound Recording

25   Transcript Produced by Transcriptionist

                United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

1                          **I N D E X**

2                          **TESTIMONY**

3   **WITNESS**              **Direct    Cross    Redirect    Recross**

4     ROBERT KAY                9       36        66                  68
      JASON JARDINE            75      102       121
5     TANNA GUALCO           135      153       164

6

7                        **E X H I B I T S**

8   Number                                        Ident  Rec'd

9   2    July 21, 2017 ADOC Information Report      59
         Number 17-B01-01561 from Sgt. Overly to DW
10        Oros regarding "Inmates Scheid and Smith"

11  9    IR generated for Inmate Ashworth           56     130

12  15   DC44 for Inmate Angela Ashworth            24

13  16   Internal assignment sheet for Brianda      25
         Alvarez
14
    17   Internal assignment sheet for Inmate Donna  26
15       Scheid

16  18   Inmate Letter from Brianda Alvarez to       20
         Officer Kay dated June 29, 2017
17
    19   DC71, ADC Inmate Cell Assignment           27
18       Screening, Report for Inmate Brianda
         Alvarez and Angela Ashworth
19
    20   DI21, Key Inmate Actions Detail, Report    44
20       for Inmate Brianda Alvarez

21  31   ASPC - Perryville Target Searches Log       87    134

22                          **RECESSES**

23                                           Page   Line

24  (Recess at 10:45; resumed at 10:58.)        74     25
    (Recess at 12:15; resumed at 1:16 p.m.)    130     19
25

                    United States District Court

3

CV-12-00601-PHX-DKD, September 13, 2017

1                          **APPEARANCES**

2

For the Plaintiffs:

3

4          **CORENE T. KENDRICK, ESQ.**
           Prison Law Office
           1917 5th St.
5          Berkeley, CA  94710
           510.280.2621/(fax) 510.280.2704

6
           **KIRSTIN T. EIDENBACH, ESQ.**
7          Eidenbach Law, P.C.
           P.O. Box 91398
8          Tucson, AZ  85752
           520.477.1475

9
           **MAYA STOCK ABELA, ESQ.**
10         Arizona Center for Disability Law - Tucson, AZ
           177 N. Church Ave., Ste. 800
11         Tucson, AZ  85701
           520.327.9547/(fax) 520.884.0992

12
For the Defendants:
13         **RACHEL LOVE, ESQ.**
           **TIMOTHY J. BOJANOWSKI, ESQ.**
14         Struck, Love, Bojanowski & Acedo, P.L.C.
           3100 W. Ray Rd., Ste. 300
15         Chandler, AZ  85226
           480.420.1600/(fax) 480.420.1696

16
           **LUCY M. RAND, ESQ.** (Present telphonically)
17         Office of the Attorney General
           15 South 15th Avenue
18         Phoenix, AZ  85007
           602.542.7683/(fax) 602.542.7670

19

20

21

22

23

24

25

                    United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

1                           **P R O C E E D I N G S**

2

3       (Proceedings begin at 9:04.)

4       (Court was called to order by the courtroom deputy.)

5              THE COURT:  Thank you.  Please be seated.          09:04:03

6              MAGISTRATE JUDGE CLERK:  Civil case number 12-601,

7    *Parsons, et al. v. Ryan, et al.*, on for continuation of

8    evidentiary hearing.

9              THE COURT:  Thank you.  Would you please announce for

10   the record?                                                  09:04:20

11             MS. KENDRICK:  Good morning, Your Honor.  This is

12   Corene Kendrick, Prison Law Office, for the plaintiff.

13             THE COURT:  Thank you.

14             MS. EIDENBACH:  Good morning, Your Honor.  Kirstin

15   Eidenbach for the prisoner plaintiff class.                  09:04:27

16             MS. ABELA:  Good morning.  Maya Abela for the Arizona

17   Center for Disability Law.

18             THE COURT:  Good morning.

19             MS. LOVE:  Good morning, Your Honor.  Rachel Love and

20   Tim Bojanowski for the defendants.                           09:04:41

21             THE COURT:  Thank you.  Good morning.

22             Following up what we did at the close of yesterday,

23   and that is the evidentiary hearing on the Tucson retaliation

24   allegations, I wanted to check in with counsel to see whether

25   they also contemplated that that would be the time for the   09:04:52

CV-12-00601-PHX-DKD, September 13, 2017

1    recent Perryville retaliation allegations contained in Ms.                    09:04:58

2    Eidenbach's affidavit.

3            MS. LOVE:  Your Honor, from defendants' standpoint,

4    we would probably -- I'm not sure we would be able to get both

5    complex allegations done in one day.  Probably -- Ms. Eidenbach   09:05:22

6    and I are speaking to each other with our eyes across counsel

7    table.

8            THE COURT:  Okay.  I don't need an answer now.  Since

9    there isn't one that's readily at hand, sometime confer about

10   that and let the Court know.  Thank you.                          09:05:40

11           Anything else that we need to address preliminarily?

12           MS. KENDRICK:  Your Honor, just a follow-up on

13   yesterday's discussion regarding the expert.  I confirmed, and

14   my office last night re-sent to defendant's counsel all of the

15   documents that the office previously sent to Mr. Millar.          09:05:57

16           THE COURT:  Okay.  So he hadn't received them before

17   or he just received them now or you confirmed that you've --

18           MS. KENDRICK:  I confirmed that Mr. Millar received

19   them a couple weeks ago whenever it was that you asked us to do

20   it.  And I also confirmed that defendants' counsel, just to be    09:06:11

21   safe, were all re-sent the link to the documents.

22           THE COURT:  Okay.  But it sounds like you don't know

23   whether or not, at the time that they were originally provided

24   to Mr. Millar that they were also provided to defendants.

25           MS. KENDRICK:  I couldn't -- I couldn't determine         09:06:29

United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

1    that from talking to the staff, no.                                    09:06:31

2            THE COURT:  Okay.  Well, I drafted a letter to him

3    this morning that covers this situation and let's him know

4    that -- well, if it's true and maybe the defendants --

5    Mr. Struck was unsure yesterday.  He didn't -- I think he   09:06:45

6    didn't know for sure whether or not he had received the

7    documents.  But now that you all have, perhaps what you can do

8    is take steps to see whether there's anything that you think

9    that Mr. Millar should also have in front of him and I'll amend

10   my letter to say that it's possible that the defendants haven't  09:07:08

11   yet had a chance to present their documents, if any.

12           MR. BOJANOWSKI:  Your Honor, I'll confirm that we

13   did, in fact, receive the documents yesterday but they re-sent

14   them again this morning because there was a glitch in the

15   manner in which they were sent.  So they got re-sent this   09:07:27

16   morning and the last I knew, we are able to now open the link

17   that was provided to the documents so hopefully we can get

18   those over to Mr. Struck for review and proceed from that.

19           THE COURT:  Okay.  And it has been confirmed I guess

20   on your side that the first time you got what plaintiffs had   09:07:53

21   presented to Mr. Millar was just yesterday?

22           MR. BOJANOWSKI:  Yes.  It was received yesterday

23   but --

24           THE COURT:  Was that the first time that you saw it?

25           MR. BOJANOWSKI:  That's the first time I saw it, Your   09:08:03

United States District Court

7

CV-12-00601-PHX-DKD, September 13, 2017

1   Honor.  If they sent to it Mr. Struck separately and it was not   09:08:05

2   copied, I don't know.  All I'm saying is I know that it got

3   received by me and my assistant who kind of runs the case and

4   then she couldn't open the link and then she, you know, was

5   able to get that figured out and we can get those documents   09:08:23

6   over to Mr. Struck.

7                THE COURT:  Okay.  All right.

8           So we turn now to defendants to continue the hearing.

9                MS. LOVE:  Yes, Your Honor and we just received a

10   notification that Lucy Rand is on the phone.   09:08:37

11               THE COURT:  I see.

12               MS. LOVE:  If the phone is on.

13               THE COURT:  Well, we had the phone line open until

14   about 9:03 and nobody had called in, so rather than hold it

15   open because she hadn't appeared on time and I didn't want to   09:08:49

16   interrupt proceedings.  I think if people are going to appear

17   telephonically, they need to appear at the time that we call

18   the case.  Otherwise, we hold a phone line open and that is not

19   fair to the bridge.  But now that you say that she's available,

20   we can pause for a moment and see what we need to do to bring   09:09:06

21   her in.

22          So you can communicate to Ms. Rand that if she tries

23   to call in now, she should be able to gain access to a line

24   that is open to the Court?  Thank you.

25               Please call your witness.   09:10:04

United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

 1          MS. LOVE:  Your Honor, defendants call Officer Kay.        09:10:06

 2     K-A-Y.

 3          MAGISTRATE JUDGE CLERK:  May I have your first name,

 4     please.

 5          THE WITNESS:  Robert.                                       09:10:23

 6          MAGISTRATE JUDGE CLERK:  And it's K-A-Y?

 7          THE WITNESS:  Yes, ma'am.

 8          THE COURT:  Please raise your right hand.

 9       (ROBERT KAY, a witness herein, was duly sworn or

10     affirmed.)                                                       09:10:27

11          MAGISTRATE JUDGE CLERK:  Thank you.  Please step

12     around to the witness stand.

13          MS. LOVE:  Your Honor, if we may, as I consulted with

14     Ms. Kendrick right now, may we have the entire stack of

15     exhibits put in front of the witness?  That way Ms. Kendrick    09:10:45

16     and I can be as efficient as possible as going through them.

17          THE COURT:  Surely.

18          MS. LOVE:  Thank you, Your Honor.  Plaintiffs and

19     defendants.

20          THE COURT:  So Officer Kay, we're going to ask you to      09:10:58

21     do some work here this morning and it's probably more efficient

22     this way but these are the defendants' exhibits.  So when

23     somebody says -- it's most likely to be Ms. Love who says this,

24     turn to one of the exhibits in this pile.  If anybody, and it

25     more than likely would be the plaintiff's lawyer, asks you, it   09:11:22

ROBERT KAY - Direct

1    would be in this pile.                                              09:11:25

2                    **DIRECT EXAMINATION**

3    BY MS. LOVE:

4    Q.   Sir, would you please state your name for the record?

5    A.   Robert Kay.                                                    09:11:33

6    Q.   And Mr. Kay, where are you have employed?

7    A.   Arizona Department of Corrections, ASPC Perryville, San

8    Pedro Unit.

9    Q.   What is your position with the Arizona Department of

10   Corrections?                                                        09:11:43

11   A.   I am an accountability officer for San Pedro Unit.

12   Q.   What does it mean to be an accountabilies officer?

13   A.   I am in charge of their housing when they come in, when

14   they leave, any internal moves that need to be made, anything

15   like that I take care of.                                           09:11:57

16   Q.   And is that exclusively for the San Pedro Unit at the

17   Perryville complex?

18   A.   Yes.

19   Q.   How long have you worked for the Arizona Department of

20   Corrections?                                                        09:12:05

21   A.   Five years.

22   Q.   And have you worked any other positions besides

23   accountability officer?

24   A.   I was -- worked the yard and then from there I went to

25   accountability.                                                     09:12:14

United States District Court

ROBERT KAY - Direct

1  Q.   When you worked the yard, did you work at the Perryville          09:12:15

2  complex?

3  A.   Yes.  San Pedro.

4  Q.   So your entire five years ago has been on the San Pedro

5  Unit?                                                                   09:12:22

6  A.   Yes, ma'am.

7  Q.   Could you explain for us and for the Court as an

8  accountability officer, what is your chain of command?  What is

9  your reporting chain?

10 A.   I have -- it's myself and then I report to my supervisor,         09:12:36

11 which would be Sergeant Rash and Lieutenant West, who is in

12 charge of support also.  So it would be Sergeant Rash,

13 Lieutenant West, and then Captain Bailey and DW Aguilar now.

14 Q.   Do you also report to the deputy warden of the unit?

15 A.   Yes, Deputy Warden Aguilar, yes.                                  09:12:56

16 Q.   What is the custody level of the San Pedro Unit?

17 A.   Minimum.

18 Q.   And is it an open yard?

19 A.   Yes, ma'am.

20 Q.   On the San Pedro unit there at Perryville, is there               09:13:07

21 movement of inmates on and off of the yard, newly assigned to

22 the yard, leaving the yard on a daily basis?

23 A.   Yes, ma'am, pretty much every day there's something,

24 somebody coming in, somebody leaving.  Some in house that needs

25 to be taken care of or something ago along that.  Generally        09:13:25

11

ROBERT KAY - Direct

1    there's always something.                                              09:13:28

2    Q.    On an average day, how many movements might you have of an

3    inmate newly accepted onto the San Pedro yard?

4    A.    Average, three probably in a day.

5    Q.    How about an average of inmates leaving the San Pedro        09:13:45

6    yard?

7    A.    About the same.  My numbers say pretty much the same.

8    It's pretty much even in, even out.

9    Q.    And what is the total inmate capacity or bed count

10   available for the San Pedro Unit?                                   09:14:00

11   A.    It can hold 432 physical inmates.

12   Q.    And is the San Pedro Unit divided into yards?

13   A.    Yes, ma'am.

14   Q.    And how do you designate the yards?  Do you call them a

15   certain name?                                                       09:14:12

16   A.    A yard and B yard.

17   Q.    How many inmates on each yard?

18   A.    216 per yard max.

19   Q.    And is the A yard and B yard, are those inmates able to

20   mix with each other for recreation, for --                         09:14:22

21   A.    For recreation they are allowed to mix.  They are not

22   allowed to yard visit but they are allowed to open yard, open

23   areas.  They are allowed to all congregate.

24   Q.    What do you mean by the term "yard visit"?

25   A.    An A yard inmate is not allowed to go to B yard and          09:14:39

United States District Court

12

ROBERT KAY - Direct

1  socialize with their friends on B yard and B yard is vice          09:14:43

2  versa.

3  Q.   Is there fencing that physically separates A yard and B

4  yard?

5  A.   No, ma'am.                                                     09:14:51

6  Q.   So how do you control or how is it controlled on the San

7  Pedro Unit that A yard inmates and B yard inmates wouldn't be

8  able to visit?

9  A.   Generally, your yard officers know who their inmates are

10 on their yards because they work yards, so they know pretty       09:15:04

11 much their inmate population.  So they know if they are working

12 B yard and they see somebody they know lives on A yard over

13 there, they know they are not supposed to be there so they can

14 redirect them to go back to their yard or go out into the -- a

15 common area where everybody can talk.                             09:15:20

16 Q.   Are A yards and B yards separate buildings so that there

17 is some geographical separation?

18 A.   Yes.  There's geographical separation between the two,

19 yes.

20 Q.   On an average day, within the San Pedro Unit is there        09:15:40

21 movement made where you may have cell mate changes versus an

22 inmate coming new to the yard or leaving the yard?

23 A.   Yes.

24 Q.   Is it a daily happening, a weekly happening, monthly?

25 A.   It can be daily.  It's random.  It happens at different      09:15:58

ROBERT KAY - Direct

```
 1   times.  I mean, it can -- depending on what's going on with        09:16:02
 2   movement, I can have some in-houses.  I'll rehouse some inmates
 3   together and bring in some new ones or I'll just house them
 4   together.  So that's random.  That is -- I can go two or three
 5   days and not do any or I can have a week where I do a bunch.        09:16:21
 6   Q.   When you say in-house, is that a term that you use in
 7   house to denote cell mate change movement versus a new inmate
 8   onto the yard or an inmate leaving the yard?
 9   A.   Yes, ma'am.
10   Q.   As the accountability officer, are you the person who          09:16:38
11   facilities or assigns inmates to a new cell when they are newly
12   incoming into the yard?
13   A.   Yes, ma'am.
14   Q.   Are you, as the accountability officer, also the person
15   who facilities, quote unquote, in-house move where you may have    09:16:52
16   a change in cell inmates already assigned to the yard?
17   A.   Yes, ma'am.
18   Q.   What kind of circumstances would prompt an in-house move
19   where you're merely changing cell mates already living on the
20   unit versus a new inmate coming onto the unit?                      09:17:12
21   A.   It can be any number of things.  Typically, it will be an
22   in-house move can be -- I'll have three or four open beds and
23   I'll rehouse a couple of inmates that are already there.  Say I
24   have a dangerous coming in so I can't house dangerous and
25   non-dangerous, I'll rehouse a couple of inmates to free up a        09:17:33
```

14

ROBERT KAY - Direct

1    cell for a dangerous inmate, so I'll have to make that move    09:17:36

2    that we consider an in-house move.

3         I'll take inmates that are single celled that don't

4    have bunkies and I'll combine them together to give me one

5    whole cell for maybe two more inmates that are coming in, that    09:17:49

6    kind of stuff.  Lower bunk chronos, anybody that needs a lower

7    bunk for whatever reason, Medical gives them one, they will

8    come see me, I'll have to facilitate that move to get them to

9    move to get them that lower bunk.

10   Q.   Are in-house moves ever facilitated because cell mates,    09:18:09

11   existing cell mates, may not be getting along with each other?

12   A.   Yes.

13   Q.   How frequently are in-house moves made because inmates are

14   having difficulties living with each other?

15   A.   That is random.  It can be once a week.  It can be two or    09:18:26

16   three a week.  It all depends on what kind of inmate letters

17   come in.  What seldom happens, when we're not there, there's

18   mediation done by supervisors and these two inmates can't get

19   along and they will ask me to separate them when I come in the

20   next day.  They can still be on the same unit together, they    09:18:47

21   the just can't live together any more, so we'll just separate

22   them and move them in with somebody else and take care of it

23   that way.

24   Q.   When facilitating in-house moves, do inmates ever have the

25   opportunity to give their preference of who they would like to    09:19:03

United States District Court

ROBERT KAY - Direct

1  live with such that that is a consideration that you may make?         09:19:09

2  A.   They -- we generally don't let them pick their bun keys.

3  We'll pick them or I will pick them for them.

4  Q.   Why is it that you generally do not allow an inmate to

5  pick their bunkie?                                                      09:19:26

6  A.   They have a tendency to try to get together with their

7  girlfriends or stuff like that so they can be in the same cell

8  together.   So if they request a bunkie, I -- me personally, I

9  don't let them pick their bunkie just because of issues that

10  can happen with that.                                                   09:19:48

11  Q.   What are the kind of issues that could happen if inmates

12  are allowed to choose who they get to live with?

13  A.   One, they all try to do it then if they can.   Then

14  there's -- like I said, they like to try to be with their

15  girlfriends so you have the issues that rise out of that, you          09:20:07

16  know.   The PREA issues if that happens or if they break up,

17  then it creates drama on the yard and there's a whole bunch of

18  issues involved with that so you just -- I don't.

19           THE COURT:   I'm sorry to interrupt but you used a

20  word that I didn't understand.   The PREA issues.                      09:20:27

21           THE WITNESS:   PREA.

22           THE COURT:   What does that stand for?

23           THE WITNESS:   Prison Right Elimination Act.

24  BY MS. LOVE:

25  Q.   So when you say they may want to get together and you used        09:20:39

United States District Court

ROBERT KAY - Direct

```
 1    the term "girlfriends," do you mean girlfriends just because       09:20:41
 2    they are friendly with each other or are you talking about
 3    something more than that?
 4    A.   I'm talking about something more than that.
 5    Q.   Okay.  As in sexual relations between the two inmates?        09:20:50
 6    A.   Yes.  Yes, ma'am.
 7    Q.   As the accountability officer, do you use a certain
 8    process or procedure to match up cell mates?
 9    A.   First and foremost, I use the DC71 screen to make sure
10    they match.                                                        09:21:14
11    Q.   And walk us through that process and tell us how you would
12    determine whether or not two inmates were live together in the
13    same cell.
14    A.   So I go to the screen.  I'll pull them up, I'll put their
15    ADC numbers in there.  That will give me -- that screen will       09:21:26
16    pop up and tell me if they are dangerous or not dangerous.
17    That's criteria.  If they are both non-dangerous, they can be
18    housed together.  Then I control down farther and the next
19    thing I try to do myself is we have mental health scores one
20    through three.  I try to put ones and ones and ones and twos       09:21:43
21    and twos and twos and threes together.  I try to keep them kind
22    of close to their mental health scores, just because you are in
23    are cell setting and the doors close and you are in that cell
24    with that person all night long and there are mental health
25    issues on our yard.                                                09:22:03
```

United States District Court

ROBERT KAY - Direct

1        So if I can avoid putting one with a three, I try to        09:22:04

2   do that.  So this is something I do myself.

3   Q.   Is it fair to say, then, when you are looking to match up

4   two cell mates, there are certain criteria you have to look at

5   but are you also looking to see do you believe based upon        09:22:17

6   mental health score would the inmates be compatible together?

7   A.   Yes, and if I know the inmate.  Because I have been there

8   five years, I know a few of them.  I kind of know them.  I

9   don't know-know them know them.  But I know -- I kind of have

10  an idea if they will be a good bunkie for somebody or not.       09:22:37

11  Q.   So you also use your familiarity with your inmate

12  population at San Pedro to consider whether or not two inmates

13  might be appropriate to live together?

14  A.   Yes, ma'am.

15  Q.   When you're making in-house moves and changing cell mates,  09:22:56

16  do you have any procedure by which you're required to keep two

17  inmates -- let's say they are on B yard and one inmate is

18  having a problem with a cell mate and needs to move somewhere

19  else, do you keep them on B yard?  Do you put them on A yard?

20  Do you send them to another unit?  How does that work?          09:23:12

21  A.   If they can say they can be housed on the same unit, they

22  have to put it in writing.  If they say they can be housed at

23  the same unit, then we will keep them on the same unit.  And,

24  generally, I will just switch cells.  If it's so bad that they

25  can't stand each other, then I'll switch yards that way.  I     09:23:28

ROBERT KAY - Direct

1  start -- normally I'll just do it -- because it's easier to do          09:23:32

2  it in-house on the same yard rather than having to move

3  somebody to a different yard.  And then if that yard is full,

4  then I have to take somebody off that yard that maybe doesn't

5  want to move and I have to put them on a different yard.  So I          09:23:44

6  try to keep everything on the same yard first.  Then I go --

7  yeah, same yard first and then the other yard and then if they

8  don't get along and they can't do it, then to a different unit

9  from there.

10  Q.   So based on your experience as accountability officer in          09:24:03

11  the last five years, has it been your experience where if two

12  cell mates aren't able to get along in a cell setting, they may

13  be able to just switch cells but still be able to get along on

14  the same yard?

15  A.   Yes, ma'am.                                                       09:24:18

16  Q.   Is it more frequent that that situation happens versus

17  needing to move inmates to separate yards or vice versa?

18  A.   It's generally -- generally, that's -- the first is

19  correct.  It's easier to keep them on the same yard, yes,

20  because normally it's not -- they don't hate each other.  They         09:24:32

21  don't want to fight each other.  It's normally hygiene issues,

22  personality conflicts, stuff like that.  Minor stuff where they

23  just can't -- they just don't mesh and if they are out of that

24  cell with that person, they are mine.

25  Q.   And are you making in-house moves such as that when               09:24:55

United States District Court

19

ROBERT KAY - Direct

```
 1  there's hygiene issues, personality issues, et cetera, to avoid   09:24:58
 2  an escalating situation between the two of them in the cell
 3  such that they get into a fight and you're trying to prevent
 4  that?
 5  A.   Yes, ma'am.                                                   09:25:07
 6  Q.   Do you know whether or not Angela Ashworth is currently
 7  assigned to the San Pedro Unit?
 8  A.   Yes, ma'am, she is.
 9  Q.   Do you know whether that was the case in June and July of
10  2017?                                                              09:25:21
11  A.   Yes, ma'am.
12  Q.   In July of 2017, did you facilitate any cell mate moves
13  where Angela Ashworth's cell mate was moved out of her cell and
14  a new cell mate moved in?
15  A.   Yes, ma'am.                                                   09:25:39
16  Q.   Do you know when that occurred approximately?
17  A.   Not off the top of my head, I don't know the exact date.
18  Q.   What were the circumstances that prompted the move of
19  Angela -- the cell mate of Angela Ashworth out of her cell and
20  a new cell mate in?                                                09:25:56
21  A.   I had received an inmate letter from Inmate -- I think it
22  was Avila stating that she was having bunkie issues and I
23  already had one from her and she had given me another one on my
24  way to the morning meeting that morning.  So she had stopped me
25  outside of medical where she was standing because I have to       09:26:16
```

United States District Court

ROBERT KAY - Direct

1  walk that way to go there and she handed me a letter and I said   09:26:18
2  I would take it.  I was going to the morning meeting.  I would
3  bring it up at the morning meeting because she said it was
4  getting pretty bad and I would discuss it and we would see if
5  we could get something taken care of for her.   09:26:30
6  Q.   Are you aware that on July 14 of 2017, Inmate Angela
7  Ashworth was transported here to federal court to testify in
8  the *Parsons v. Ryan* lawsuit?
9  A.   That morning when I came in, I had noticed they had sent
10 her to court, yes.   09:26:48
11 Q.   Do you know if that was specifically coming to testify
12 here in federal court in the *Parsons v. Ryan* lawsuit?
13 A.   No, ma'am, I did not.
14 Q.   So the information that you had was just merely that she
15 had gone out to District Court?   09:27:00
16 A.   Yeah.  The information I had was on my movement sheet.  It
17 said that, gave her name, ADC number, and she was out to court
18 and that is the only thing I knew, she was out to court.
19 Q.   I would like for you to look in front of you in
20 defendants' exhibits, there's a folder marked as Exhibit   09:27:20
21 Number 18.
22        If you could take a look at Exhibit Number 18 and
23 tell me, first of all, whether or not you recognize the
24 document contained in Exhibit Number 18?
25 A.   Yes, ma'am, I do.   09:27:38

United States District Court

ROBERT KAY - Direct

1  Q.   Can you tell us what is the document contained in Exhibit        09:27:39
2  Number 18?
3  A.   This is the inmate letter, one of the inmate letters I
4  received from Inmate Alvarez.
5  Q.   And what is the date of the inmate letter?               09:27:48
6  A.   6-29 of '17.
7  Q.   And what was the subject matter of the letter that
8  Ms. Alvarez wrote generally?
9  A.   Excuse me?
10 Q.   Just generally?                                           09:28:08
11 A.   I would have to read it real quick.  It has been a while
12 since I've read this inmate letter.
13 Q.   Sure.  Take your time to read it and then I may ask you a
14 couple of questions.  Just let me know when you're done.  Take
15 your time.                                                    09:28:25
16 A.   Okay.  So her basic issue was her bunkie was taking her
17 stuff and using it while she was up at nighttime in Rio where
18 it was air-conditioned.  And she also was not pulling her fair
19 share of keeping her room clean.
20 Q.   Is this the inmate letter that you spoke of that you had   09:29:18
21 received from Ms. Alvarez prior to her move into the cell
22 occupied by Inmate Ashworth?
23 A.   Yes, ma'am.
24 Q.   Inmates who write letters advising that they may have an
25 issue with their cell mate, are those letters that go          09:29:40

United States District Court

ROBERT KAY - Direct

1  specifically to you as the accountability officer?                            09:29:43

2  A.   Yes, ma'am.

3  Q.   And when you would receive -- well, this letter is dated

4  June 29 of 2017; correct?

5  A.   Yes, ma'am.                                                              09:29:52

6  Q.   Did you take any specific action with respect to this June

7  29, 2017 inmate letter?

8  A.   At the time I had not.  We were -- we would normally go to

9  a Housing Committee.  Unless it says something really bad in

10 here that I'm in fear for mid life or I was assaulted or          09:30:06

11 something like that, I just hang onto it until the housing

12 committee will meet and we'll sit and talk about them.

13         We hadn't met on this group of letters yet so I

14 hadn't taken any action on that.

15 Q.   Had you had any conversations with Ms. Alvarez, just a       09:30:22

16 face-to-face kind of conversation where you discussed that she

17 had complaints that she was having some difficulty living with

18 her cell mate?

19 A.   With her, I don't remember specifically.  I remember

20 getting her letter.  I remember the conversation before that     09:30:39

21 morning going to meeting and talking but that doesn't mean that

22 she didn't.  Because when I go walk the yards, I'm very popular

23 because I'm in charge of the housing.  They come up and they

24 tell me whatever issues they are having.  And I don't remember

25 if she was one of the ones that came up to me and verbally said  09:30:57

United States District Court

ROBERT KAY - Direct

1    something or she didn't.                                          09:31:00

2    Q.   Did you have a conversation with Ms. Alvarez on the day

3    she was moved into the cell occupied by Ms. Ashworth?

4    A.   Yes.

5    Q.   Do you remember how that conversation went, what each --   09:31:09

6    what she said, what you said, where you were at?

7    A.   The basic -- basic -- in a nutshell was she said, "Hey,

8    it's getting worse.  Same issues except it's just getting

9    worse," and she gave me that letter.

10         So I said, "Okay.  I'm going to the morning meeting.   09:31:26

11   We'll talk about it.  I'll let you know afterwards what

12   happens."  So we went to the morning meeting.  We talked about

13   it, said yes.  And so I never talked to her again after that.

14   I called down to the yard and said, "Hey, take this inmate

15   here, move her here, move this inmate here."                   09:31:41

16   Q.   When you say you went to the morning meeting and talked

17   about it, can you describe for us what meeting you're speaking

18   of, who was at the meeting?

19   A.   It would have been myself, probably Captain Bailey, DW

20   Oros, COIV at the time, and maybe a couple supervisors sitting  09:31:56

21   around, whoever was at the basic morning meeting was that day.

22   Q.   When you facilitate and do a match for an in-house cell

23   mate move, is that -- is the move -- does it need to be

24   approved by anybody up your chain of command or do you just

25   have carte blanche to do whatever move you want?              09:32:18

United States District Court

24

ROBERT KAY - Direct

1   A.   I pretty much have carte blanche to do whatever I want.   I   09:32:21

2   can -- like this, I had permission to do so it was -- it was --

3   and I was approved.   They didn't say, "Hey, take this inmate

4   and move her here, here."   They said, "Take this inmate and

5   find her and move her," so I took this inmate and found her and   09:32:38

6   moved her.

7   Q.   During the morning meeting that you are speaking of, is

8   that when you received permission to move Ms. Alvarez?

9   A.   Yes.

10  Q.   Was there a discussion in that meeting of who she would be   09:32:48

11  paired with or was it, "Yes, you may move her," but not a

12  discussion of who you would move her with?

13  A.   There was no discussion of who to move her with, just to

14  move her.

15  Q.   If you could look for me at Defendants' Exhibit Number 15   09:33:05

16  in front of you which is already in evidence.   And first let me

17  know if you recognize what this document is?

18  A.   That's a DC44, her housing screen.

19  Q.   For which inmate?

20  A.   Ashworth.   09:33:28

21  Q.   Are you able to tell, by looking at the printout of this

22  screen, where Ms. Ashworth -- what cell she was living in in

23  June and July of 2017?

24  A.   B41, 12 upper.

25  Q.   And 12 upper means what, the upper bunk?   09:33:41

United States District Court

ROBERT KAY - Direct

1   A.   The upper bunk, yes.                                          09:33:45

2          THE COURT:  Can I interrupt for a second?  When you

3   said DC71 before, what does that refer to?

4          THE WITNESS:  DC71 screen is their housing screen.

5   It's their compatibility screen basically.  It tells you if   09:33:55

6   they match, like I said.

7          THE COURT:  And the DC44 is the screen that shows you

8   what their assignment history is?

9          THE WITNESS:  What their bed is, yes.

10         THE COURT:  Okay.  Thank you.                              09:34:07

11  BY MS. LOVE:

12  Q.   Are you aware of whether or not Ms. Ashworth, as of --

13  well, first let me ask you this.  Were you on duty yesterday?

14  A.   Yes.

15  Q.   Do you know whether or not as of yesterday, Ms. Ashworth  09:34:15

16  was still celled in B41, cell 12?

17  A.   Yes, ma'am, she is.

18  Q.   If you could take a look for me now at Exhibit Number 16

19  which is in evidence already and let me know if you recognize

20  what this document is?                                          09:34:38

21  A.   It's the same thing, a housing screen for Inmate Alvarez.

22  Q.   And are you able to tell whether or not, on July 19 of

23  2017, if she moved into the cell occupied by Inmate Ashworth?

24  A.   Yes, ma'am.

25  Q.   Was she subsequently moved out of that cell at any time   09:34:56

United States District Court

ROBERT KAY - Direct

1    later?                                                              09:34:59

2    A.    Yes, ma'am, she was.

3    Q.    On what date?

4    A.    7-21 when she was moved to San Carlos Unit.

5    Q.    If you could now take a look for me at Exhibit Number 17      09:35:11

6    which is in evidence.

7              Do you recognize that document?

8    A.    Yes, ma'am.

9    Q.    What document is that?

10   A.    It's a housing screen for Inmate Scheid.                      09:35:24

11   Q.    Are you able to tell from the housing screen for Inmate

12   Scheid whether or not, on July 19 of 2017, if she was living in

13   cell B41 -- I'm sorry, in B41, cell 12, which was at the same

14   time occupied by Inmate Ashworth?

15   A.    On which date now?                                            09:35:45

16   Q.    On 7-19.

17   A.    7-19 --

18   Q.    Prior to 7-19?

19   A.    Prior to 7-19, yes, ma'am, she was.

20   Q.    And was she moved out of cell 12 that was occupied by         09:35:55

21   Inmate Ashworth on the 19th?

22   A.    Yes, ma'am.

23   Q.    Can you tell whether or not from this document whether on

24   July 21 she was moved back in to B41, cell 12 with Inmate

25   Ashworth?                                                           09:36:08

United States District Court

ROBERT KAY - Direct

1   A.   Yes, ma'am, she was.                                            09:36:09

2   Q.   Are you aware as of yesterday being on duty whether or not

3   Inmates Ashworth and Scheid still live together in B41, cell

4   12?

5   A.   Yes, ma'am, they are still together.                           09:36:18

6   Q.   Now, if you could take a look at for me Exhibit Number 19

7   which is in evidence and take as much time as you need to look

8   at that document and let me know if you recognize what it is.

9   A.   This is the '71 screen for Inmates Alvarez and Ashworth.

10  Q.   Isn't that what you referred to, and I may have your        09:36:45

11  wording wrong, but as the match screen, compatibility screen?

12  A.   Yes.   Compatibility screen.

13  Q.   Actually, before I ask you questions about this document,

14  let's back up.

15         On the screen Inmate Alvarez is moved into the cell        09:36:57

16  occupied by Inmate Ashworth?

17  A.   Yes, ma'am.

18  Q.   And Inmate Scheid was moved out of that same cell?

19  A.   Yes, ma'am.

20  Q.   How did it come about that it was matched up that Inmate    09:37:11

21  Alvarez, who had been having a problem with her cell mate, gets

22  matched with Inmate Ashworth versus any other inmate on the San

23  Pedro Unit?

24  A.   Completely random.   What happened was if you look at where

25  she was housed before, she was like two doors down.   So I have    09:37:32

United States District Court

ROBERT KAY - Direct

```
 1   a board in front of me at my deck where I sit.  So I looked at    09:37:36
 2   the board and she's there so I then start going -- I went down.
 3   Bump, bump, bump, oh, there's a lower bunk.  I know Scheid
 4   technically didn't need a lower bunk.  I know Inmate Ashworth.
 5   I've dealt with her since she's been there.  We have been there   09:37:54
 6   together.  Inmate Ashworth, as far as I know, is a good bunkie.
 7   I've never really had complaints about her or anything.  So
 8   there was a good bunk right there.  It's right there.  They are
 9   separated and I just made the move.
10   Q.   Why was it that you were looking for a lower bunk to move    09:38:13
11   Ms. Alvarez?
12   A.   Pregnant inmate gets a lower bunk so I moved her.  I have
13   to move her from a lower bunk into a lower bunk.  I can't put
14   her into an upper bunk.
15   Q.   Is your office located on the San Pedro Unit?                09:38:28
16   A.   Yes, ma'am.
17   Q.   Is it in a certain specified area?
18   A.   It's in the yard office.
19   Q.   And can you give us -- you're telling us that you looked
20   at a board?                                                       09:38:39
21   A.   Yes.
22   Q.   Can you give us just in a word description a visual, if we
23   were sitting in your office, what would that board look like?
24   A.   I have two -- my desk sits -- say my desk is sitting right
25   here.  I have a wall that is probably another three feet, four    09:38:49
```

ROBERT KAY - Direct

1    feet from my desk.  And there's two big white boards with          09:38:53

2    magnetic boards that have inmates' names, ADC numbers and

3    there's housing.  It tells me where each inmate lives.

4            So if you were to look at a count sheet and pull it

5    up and look at the count sheet and then look at the board,        09:39:10

6    everything is the same.  So you start with B11 -- actually

7    starts A yard on the left so it would be A11, 01, and then

8    you'll have a lower bunk and upper bunk and it goes down two,

9    three, four and goes all the way through.  And one board sits

10   here and then like B yard sits kind of almost right in front of   09:39:27

11   me.  So that's kind of how it looks.

12   Q.  Okay.  So then if -- could you take a look for me and go

13   back to Exhibit 16?

14   A.  Yes.  Okay.

15   Q.  And this is the cell assignment sheet or the internal         09:39:52

16   assignment sheet for Brianda Alvarez; correct?

17   A.  Yes, ma'am.

18   Q.  Now, if we're looking at this document and it says for the

19   date of April 11 of 2017, if we follow across that line, it

20   says B41 08 L.  Does that mean cell 8, lower bunk?                09:40:08

21   A.  Yes u ma'am.

22   Q.  And then we see that on July 19 of 2017, B41, 12L, so cell

23   12, lower bunk?

24   A.  Yes, ma'am.

25   Q.  So if -- just giving us a descriptive, since we're not        09:40:24

ROBERT KAY - Direct

1   there looking at the unit, if she moved from B41, cell 8 to                         09:40:29

2   B41, cell 12, are we talking like literally moving four doors

3   down like location-wise?

4   A.   She was in wing four.  She went to wing three so she

5   didn't go very far, just like right around the corner is all           09:40:46

6   the farther she went.

7   Q.   But in the same building?

8   A.   Same building, same yard.

9   Q.   So when you say you were looking at the boards in your

10  office knowing you needed a lower bunk for Ms. Alvarez and             09:40:56

11  you're looking at that board, you're going down and you see,

12  okay, there's a lower bunk available in the cell occupied by

13  Ashworth and Scheid, Scheid doesn't need a lower bunk,

14  Ms. Ashworth, to your knowledge, is a good cellie?

15  A.   Yeah.                                                             09:41:15

16  Q.   It's a close proximity move where you're on the same yard.

17  Is that what you were looking at?

18  A.   Close proximity, familiarity with the inmate, then if you

19  look at the '71 screen, both their mental health scores are,

20  like, ones so that was another factor into it.                        09:41:31

21          When I . . .

22  Q.   So now if I can take you back, I'm having you switch

23  around; but if you can go back now to Exhibit Number 19, which

24  I think you just had in front of you which we were referring to

25  as the match or compatibility screen, is this screen something        09:41:48

United States District Court

ROBERT KAY - Direct

1   you would have generated to see if they were compatible or a          09:41:57

2   match to live together?

3   A.   Yes.

4   Q.   Is this something that you did in conjunction with the

5   cell mate move of Inmate Alvarez in with Inmate Ashworth,           09:42:11

6   before looking at your board and thinking, hey, I could pair

7   her with Inmate Ashworth or after?

8   A.   After.  I looked at a board to find inmates because, like

9   I said, the board is right there.  So I visually go down it so

10  I say hey, there's an inmate, punch in the numbers.  The           09:42:28

11  numbers work.  So I made the move.

12  Q.   And looking at Exhibit Number 19, there's a Roman numeral,

13  a few lines or third line down that says Mandatory Criteria,

14  can you explain for us, you know, what information is

15  contained, what are you looking at as you decide whether or not    09:42:49

16  two inmates are a match to live together?

17  A.   For an in-house move, it's basically I look at the current

18  conviction, violent offense.  It says both say no.  If there's

19  one no, one yes, I can't do it.  It won't let me do it.  That

20  death sentence we don't worry about.                              09:43:10

21  Q.   Let me stop you there.  When you're looking at the current

22  conviction and violent offense, is that under Roman numeral A

23  and then C under Mandatory Criteria?

24  A.   Yes, ma'am, current conviction, violent offense.

25  Q.   So if we follow that over, there's two nos, is that          09:43:27

United States District Court

ROBERT KAY - Direct

1    looking at both Inmate Ashworth and Imate Alvarez?                09:43:30

2    A.   Yes, ma'am.

3    Q.   And then what else do you look at?

4    A.   For them, for that would be just -- the only thing I would

5    look at would be their mental health and medical scores or       09:43:42

6    mental health scores.

7    Q.   And is that category under Roman numeral II, Other

8    Evaluation Criteria, subsection K?

9    A.   Yes, ma'am.

10   Q.   And if we follow that over under column A, there's a        09:43:57

11   three, slash, one and then under column B, there's a one,

12   slash, one, how does that show that they are a match?  Can you

13   explain for us how that works?

14   A.   They do everything by numbers, one through three, one

15   being the least.  How do I put this?  So Inmate Alvarez is a     09:44:14

16   pregnant inmate so she's a medical three.  She would probably

17   have been a one or two.  So that -- so much I don't worry about

18   so much the medical score as I do the mental health one which

19   ones and ones are like golden in DOC.  So I seen that and I

20   seen they both weren't -- non-dangerous inmates so it was a      09:44:43

21   really good match.

22   Q.   And for columns A and B denoting the two inmates, it's the

23   number after the slash that is the mental health score that

24   you're looking at?

25   A.   Yes, ma'am.                                                 09:44:55

United States District Court

ROBERT KAY - Direct

1   Q.   Did either of the inmates, Ms. Alvarez or Ms. Ashworth,          09:44:56

2   have STG status according to this match sheet?

3   A.   No, ma'am.

4   Q.   Okay.  So you look at your board.  You see that Inmate

5   Scheid can move out of that lower bunk and Inmate Ashworth is,        09:45:11

6   per your information, a good cellie.  You do the match sheet

7   and then what happens next?

8   A.   After -- that they match?  I just call down to the yard

9   and tell the yard officer, whoever is working that yard, to

10  tell whichever inmates they were, in this case Alvarez, to move       09:45:27

11  in to 41, 12 lower, and have Scheid move in to -- I don't

12  remember what cell it was but into that other cell and I --

13  yeah.

14  Q.   Were you present when the inmate -- when Inmate Scheid was

15  moved out of the cell occupied by Inmate Ashworth and moved to        09:45:46

16  a different location?

17  A.   No, ma'am.

18  Q.   Do you know whether or not the cell that Inmate Scheid was

19  moved to, was it still on the B yard?

20  A.   Yes, ma'am.                                                      09:45:55

21  Q.   Were then Inmates Ashworth and Scheid still able to visit

22  with each other, interact when they weren't in their cells?

23  A.   Yes, ma'am.

24  Q.   In what context or in what environment?

25  A.   The smoking area and nonsmoking area, that whole yard area       09:46:11

United States District Court

34

ROBERT KAY - Direct

1    on B yard is accessible to them.  They go out, leave their          09:46:14

2    cells and go into the smoking section, smoke cigarettes and

3    play cards and do whatever they do.

4    Q.   Would they also go to recreation together when offered if

5    they chose to go?                                                    09:46:26

6    A.   Yeah.  Recreation, they walk the track together.

7    Q.   Would they eat together if they chose to?

8    A.   Yes, yeah.  Kitchen is on their yard.

9    Q.   After the move was made where Inmate Scheid was moved out

10   of the cell occupied by Ms. Ashworth, did you ever have any         09:46:41

11   discussions with either Inmate Ashworth or Inmate Scheid in

12   which they made any complaints to you about the cell move?

13   A.   Not too long after they had run me down on the yard after

14   I was delivering count sheets and said -- I don't want to

15   rephrase this wrong but basically they said they know -- how        09:47:06

16   can I say this?  We know it wasn't your doing or basically

17   something like that.  Which it was my doing.  I'm the one that

18   moved them so, yeah.  They run me down.  I don't know, I talk

19   to them.  I have no problems with either one of those inmates.

20   Q.   Did you have any response for them when they said           09:47:32

21   something to the effect of, "We know it wasn't you," or

22   whatever they said to you?

23   A.   I just told them it was a move I had to make and I just

24   made the move.  That was the easiest move for me to do so

25   that's what I did.                                                  09:47:44

United States District Court

35

ROBERT KAY - Direct

1   Q.   Do you know why, on July 21 of 2017, Inmate Scheid was          09:47:50

2   moved back to the cell occupied by Ms. Ashworth?

3   A.   I was pretty much told to put those two inmates back

4   together.

5   Q.   Were you told a reason why?                                     09:48:00

6   A.   I figured it out, yes.

7   Q.   How did you figure it out?

8   A.   It was -- basically, I heard that Your Honor called and

9   said they those two inmates will be put back together, so they

10  were put back together.                                             09:48:14

11  Q.   And they remain together today; correct?

12  A.   Yeah.

13  Q.   Do you on the San Pedro Unit, do you have any directives

14  there to not move inmates Scheid or Inmate Ashworth from their

15  current cell assignment?                                            09:48:29

16  A.   Yes, ma'am, I do.

17  Q.   Are there any other inmates that you've received direction

18  to do not change their housing or their cell mates?

19  A.   Yes, ma'am.

20  Q.   Do you know -- can you recall off the top of your head the     09:48:43

21  names of those inmates?

22  A.   Inmate Sears, Inmate Ceres-Ceres, Inmate Cottrell, Inmate

23  Ashworth, Inmate Scheid, there's one more.  Off the top of my

24  head, I don't remember who it is.

25  Q.   Is Inmate Kisha Irvins also on that list?                      09:49:10

United States District Court

36

ROBERT KAY - Cross

1   A.   Yes, Irvins.                                                     09:49:14

2   Q.   And who provided you the directive that these -- this

3   category of inmates, that their cell assignments or cell mates

4   should not be changed?

5   A.   That came from the DWOP as far as remember.                      09:49:24

6   Q.   The Deputy Warden of Operations?

7   A.   Yes, ma'am.

8   Q.   Is that Deputy Warden of Operations Twyford?

9   A.   Yes, ma'am.

10  Q.   And how do you -- how do you implement that?  Do you have        09:49:34

11  to remember it off the top of your head?  Do you have it

12  documented somewhere?

13  A.   An email came out with all of the inmates so I forwarded

14  it to all the supervisors on all shifts and said, "Hey, not to

15  be moved under any circumstances."  On my board -- I have a        09:49:52

16  magnetic board.  I have a little legend per se and it's got a

17  red dot on it and then each inmate's cell has a red dot on it

18  that highlights that those inmates are together and they are

19  not to be moved or touched.

20  Q.   Officer, those are all the questions that I have for you.      09:50:20

21  Thank you.

22          THE COURT:  Thank you.

23          Plaintiffs' cross-examination?

24          **CROSS - EXAMINATION**

25  \\\

United States District Court

ROBERT KAY - Cross

| | | |
|---|---|---|
| 1 | BY MS. KENDRICK: | 09:50:41 |
| 2 | Q.   Good morning.  How are you? | |
| 3 | A.   Good.  How are you? | |
| 4 | Q.   Good.  I just want to run through some of the things that | |
| 5 | you talked about earlier. | 09:50:46 |
| 6 | When Ms. Love asked you if you were familiar or knew | |
| 7 | Ms. Ashworth, you said you've dealt with Ms. Ashworth since she | |
| 8 | got there.  And I was just wondering if you could explain what | |
| 9 | you meant by that? | |
| 10 | A.   Just interactions.  I've never -- dealing with somebody, | 09:51:04 |
| 11 | just a phrase that I've used.  I have talked to her.  I'm sure | |
| 12 | at one time or another I searched her cell.  I've done | |
| 13 | something.  But when I say "dealt," I just -- I'm dealing with | |
| 14 | her.  I'm not -- I don't know.  How do I want to phrase this? | |
| 15 | Just I know her as an inmate.  That's basically all it is. | 09:51:27 |
| 16 | Q.   And before coming to testify, did you speak with anybody | |
| 17 | besides the attorneys about your testimony today? | |
| 18 | A.   No, ma'am. | |
| 19 | Q.   And did you review any documents to prepare to testify | |
| 20 | today? | 09:51:49 |
| 21 | A.   Just with what I went over with my attorney? | |
| 22 | Q.   And what were those documents? | |
| 23 | A.   It was the DC44.  The DC71 screens basically. | |
| 24 | Q.   Okay.  And as the accountability officer, what other | |
| 25 | duties do you have besides arranging the in-house moves and the | 09:52:06 |

United States District Court

38

ROBERT KAY - Cross

 1  transfers in and out?  What other duties are part of an                    09:52:12

 2  accountability officer's portfolio so to speak?

 3  A.   I do -- for my unit, I do accountability.  I do -- I have

 4  a couple of reports I have to do every month.  A couple times.

 5  Regional demographic reports is part of my duties.  For my unit  09:52:28

 6  I'm also the SDS officer.

 7  Q.   Could you --

 8  A.   SDS is Safety Data -- it's the old MSDS system.  It's

 9  chemicals and anything chemical related.  I have multiple hats

10  I wear for our unit and I do fire safety for our unit, too.  So  09:52:46

11  that's what -- three of my duties.

12  Q.   And when you say accountability, does that mean making

13  sure that the actions of the staff comport with ADC policies

14  and procedures?

15  A.   I'm not following you on that, ma'am.                               09:53:05

16  Q.   Well, so we've heard from a person, Ms. Lee, who is the

17  deputy warden of compliance and she said her role is to ensure

18  that prison-wide there's compliance and people are accountable

19  and they are, you know, following policy.  So I was just

20  curious if within San Pedro you were kind of the person who had  09:53:23

21  that similar sort of role.

22  A.   No.  No.  I don't -- my job is accountability officer

23  basically is -- I bring inmates in from other units and I send

24  inmates out to other units or I release inmates.  I do

25  releases.  Like I said, I'm in charge of their internal            09:53:41

ROBERT KAY - Cross

```
 1   housing.  What else?  I have to make sure everything is right    09:53:45
 2   because count sheets have to come out and inmates have to be
 3   where they are supposed to be.  Count is where accounting for
 4   the inmates are where they are supposed to be is basically what
 5   it boils down to.                                                09:54:04
 6   Q.   And as part of being accountable for where people are, are
 7   you involved in the process of transporting individuals off the
 8   institution's grounds?
 9   A.   No, ma'am.
10   Q.   Okay.  Who would do that?                                   09:54:12
11   A.   So transport -- transportation will normally like to go to
12   court or something like that?
13   Q.   Court or medical.
14   A.   Court or medical, transportation does that.  There's a
15   certain -- we have a certain transportation team and that is    09:54:23
16   their job to pick up inmates from the units and take them to
17   their predesignated areas they have to go, medical, court --
18   well, court not necessarily.  Court -- in this case, I think it
19   was a DOC transport.  But, generally, court is counties come
20   and do because when they go to court, they go to court and they  09:54:43
21   are gone for a while.
22   Q.   Are you familiar with department order 909 about what
23   happens to people's property when they leave the institution
24   grounds?
25   A.   Yes, ma'am.                                                 09:54:56
```

United States District Court

40

ROBERT KAY - Cross

| | | |
|---|---|---|
| 1 | Q.   And what happens if somebody is just going off grounds for | 09:54:57 |
| 2 | the day? | |
| 3 | A.   Generally speaking, off grounds for the day their stuff | |
| 4 | would stay in their cell. | |
| 5 | Q.   And what happens if they are going off grounds for at | 09:55:08 |
| 6 | least overnight or multiple nights? | |
| 7 | A.   Their stuff7 is inventoried and rolled up and put in | |
| 8 | storage. | |
| 9 | Q.   Do you have any role in supervising or overseeing the | |
| 10 | role-up of individuals' property? | 09:55:23 |
| 11 | A.   Generally, no.  I do once in a while if we're short-short. | |
| 12 | I'll go help with a roll-up or something.  But, generally, it's | |
| 13 | the officer on the yard that -- actually, graves will do the | |
| 14 | roll-ups for the units. | |
| 15 | Q.   Graves? | 09:55:40 |
| 16 | A.   Grave shift. | |
| 17 | Q.   Okay.  Making sure that's not a person's name. | |
| 18 | A.   No.  Graveyard shift.  I'm sorry. | |
| 19 | Q.   Okay.  If you could look at the exhibits in front of you, | |
| 20 | Exhibit 18, which is that inmate letter that you got from | 09:55:52 |
| 21 | Ms. Alvarez? | |
| 22 | A.   This one? | |
| 23 | Q.   Look at the tabs.  I'm not sure. | |
| 24 | A.   Okay. | |
| 25 | Q.   Could you go down to the bottom of the -- what she wrote, | 09:56:14 |

41

ROBERT KAY - Cross

1   the third line up and read what she wrote starting with the        09:56:18

2   words "I have"?

3   A.    "I have a friend in A yard her name is Allen who was

4   willing to move but I'm not sure.  I would just like to get out

5   of this room if possible.  Thank you."                             09:56:32

6   Q.    So as you read that, does that -- do you interpret what

7   Ms. Alvarez is writing to say that she wants to move in with

8   Ms. Allen or that Ms. Allen is willing to move out of her cell,

9   wherever it is, to free up a space for Ms. Alvarez?

10            MS. LOVE:  Objection.  Speculation.                      09:56:52

11            THE COURT:  Overruled.

12            THE WITNESS:  From the way she worded it, it sounds

13   like Allen is willing to move in with.

14   BY MS. KENDRICK:

15   Q.    You interpret this that Allen wants to move in with her?    09:57:08

16   A.    Yes, ma'am.

17   Q.    Is that how you interpreted it when you received this

18   inmate letter?

19   A.    No, ma'am.  I didn't worry about who wants to live with

20   who.                                                              09:57:19

21   Q.    Okay.  And you referred to a housing committee.

22   A.    Yes, ma'am.

23   Q.    And that is a group of individuals who reviews these sorts

24   of inmate letters and then decides whether or not people would

25   be moved?                                                         09:57:32

United States District Court

ROBERT KAY - Cross

1    A.    Yes, ma'am.

2    Q.    How frequently does the housing committee meet?

3    A.    Generally every two to three weeks.

4    Q.    So these are -- I just want to walk through the process of

5    just anyone asking for a move.  So step one would be that she

6    fills out an inmate letter and addresses it to you?

7    A.    Yes, ma'am.

8    Q.    And then step two is you get the letter and --

9    A.    I would screen it.

10   Q.    And I believe you said you look at it to make sure there's

11   nothing like urgent or life-threatening?

12   A.    Yes, ma'am.

13   Q.    And then what do you do?  Do you just put it in a stack

14   to --

15   A.    I have a stack and I save them and then I'll take them to

16   the meeting and when we meet and I'll go through them.  I kind

17   of -- how do I do this?  Prescreen them.  How long they have

18   lived with their bunkie.  Basically, when we go that way, they

19   know, you know, this bunkie has been together for two weeks and

20   she wants to move already.

21   Q.    And if you could turn to Exhibit 19, I believe what you

22   called the DC71 screen.

23          If you could perhaps clarify something for us.  If

24   I'm looking at this report, how would I know what day you input

25   the information?

United States District Court

ROBERT KAY - Cross

1   A.   That I don't know on that.                                    09:59:13

2   Q.   Do you see that at the top right it says 8-2-17 and then

3   9:28?

4   A.   Yes.

5   Q.   So would that be the time that the information was input?     09:59:23

6   A.   I'm not going to say yes or no because I don't know,

7   ma'am.  I don't -- I don't know.  I've never had that come up.

8   Q.   Okay.  And did you do a DC71 report for Ms. Scheid and the

9   individual whose cell she moved into?

10  A.   Yes.                                                          09:59:48

11  Q.   Do you know what it showed in terms of compatibility?

12  A.   I don't remember off the top of my head, ma'am.

13  Q.   Were you asked to create or produce that report to the

14  attorneys to use in this hearing?

15  A.   No, ma'am.                                                    10:00:04

16  Q.   Do you know if anybody else was asked to generate the

17  report for the attorneys?

18  A.   No, ma'am.

19  Q.   So as you sit here today, can you tell us anything about

20  the compatibilities between Ms. Scheid and the cell mate she     10:00:14

21  was moved in with?

22  A.   I can -- the only thing I can tell you is they were a

23  match because this screen will not let me house anybody that

24  does not match together.

25  Q.   What do you mean that the screen will not allow you to       10:00:31

United States District Court

ROBERT KAY - Cross

| | | |
|---|---|---|
| 1 | house somebody?  Because can't you still just pick up the phone | 10:00:33 |
| 2 | and call the yard and say, "Move Ms. X to this cell"? | |
| 3 | A.   No.  It doesn't work like this.  This is the very first | |
| 4 | step I have to do to move somebody.  So I go to this screen. | |
| 5 | It doesn't show it on here -- actually it does, kind of.  Down | 10:00:48 |
| 6 | to the bottom where it says three, and it says SID, and | |
| 7 | recommend SR, that little thing there.  My SID code goes there. | |
| 8 | So I put my SID in there saying that they match and they can | |
| 9 | being housed together.  So after that is done and I enter, they | |
| 10 | are matched.  I have to do that before I can even house them | 10:01:11 |
| 11 | because if I go to the 44 screen to house them and I try to | |
| 12 | house them together and I have not done this screen, it won't | |
| 13 | let me put that inmate in that cell. | |
| 14 | Q.   Okay.  Did you say sit code? | |
| 15 | A.   SID.  We have SID numbers for our -- | 10:01:28 |
| 16 | Q.   Like SID. | |
| 17 | A.   SID.  SID numbers we have to put in for this. | |
| 18 | Q.   Okay.  Please have patience for me as I ask you to explain | |
| 19 | every acronym. | |
| 20 | A.   No, that's fine. | 10:01:43 |
| 21 | Q.   And if you could turn to Exhibit 20.  And this says at the | |
| 22 | top left corner DI21.  Could you explain for us what this | |
| 23 | report is? | |
| 24 | A.   This report I've never seen before.  I don't know what | |
| 25 | this one is. | 10:02:17 |

United States District Court

ROBERT KAY - Cross

1    Q.   So this is not a screen that you see in --

2    A.   No.  It's not a screen that I use in my job.

3    Q.   Okay.  And do you see under current action where it lists

4    the date as 7-20-2017 at 2:56 a.m. and then underneath it, it

5    says cell assignment override?

6    A.   Okay.

7    Q.   Does that mean that the approval was done on July 20?

8            MS. LOVE:  Objection.  Foundation.  As the witness

9    testified, he's never seen this.

10           THE WITNESS:  I don't know, ma'am.

11   BY MS. KENDRICK:

12   Q.   Do you have any idea who would know the answer to that

13   question?

14   A.   No, ma'am.  I don't.  It would be somebody above my pay

15   grade.

16   Q.   Okay.  And you said you have been the accountability

17   officer for five years?

18   A.   Three years.

19   Q.   Three years.  And at San Pedro for five years?

20   A.   Yes, ma'am.

21   Q.   Where did you work before Pedro?

22   A.   My dad owned a repair shop for semis and so that's what I

23   did.

24   Q.   So you've only worked for the department for five years?

25   A.   Five years, yes, ma'am.

United States District Court

ROBERT KAY - Cross

1   Q.   Okay.  What time is the morning meeting that you were          10:03:32
2   referring to earlier?
3   A.   Tuesdays and Fridays 8:15, Monday and the rest of the time
4   it's 8:30, so I'm not sure what day this was.
5   Q.   You said Tuesdays and Fridays at 8:15 and --                   10:03:57
6   A.   The rest of the week is 8:30 roughly.
7   Q.   So you described a bit about how you chose where you put
8   Ms. Alvarez, the pregnant inmate, but I didn't hear a lot of
9   discussion about how you chose where Ms. Scheid was moved to.
10  So I would like to ask you some questions about that.            10:04:21
11  A.   Okay.
12  Q.   First of all, do you remember, was the individual who
13  Ms. Scheid was moved in with, was she single celled or did she
14  also have a bunkie?
15  A.   I do not remember.                                           10:04:37
16  Q.   Okay.  And to take a step back, you described this process
17  where sometimes people come in and it's almost like a domino
18  effect of having to move this person to this cell, this person
19  to this cell to ensure compatibility?
20  A.   Yes, ma'am.                                                  10:04:52
21  Q.   Does ADC have a term for that?  I know in the California
22  system they call it, quote, compacting?
23  A.   No.  I've never heard a term for it.
24  Q.   Okay.  But that sort of concept of --
25  A.   Yes.  That sort of concept when you're full, especially     10:05:06

United States District Court

ROBERT KAY - Cross

1   when you're full, one move affects multiple people.          10:05:10

2   Q.   It becomes like a set of dominoes or something?

3   A.   Yes.

4   Q.   So you don't remember if moving Ms. Alvarez set off one of

5   these chain of events of multiple moves?                     10:05:22

6   A.   I don't remember, no.

7   Q.   And do you remember if on July 21 when -- pursuant to

8   Judge Duncan's order, you had to move Ms. Scheid back into

9   Ms. Ashworth's cell, did that generate a chain of additional

10  moves or was it just she was moved back and then Ms. Alvarez 10:05:48

11  was moved somewhere?

12  A.   Actually, I think Ms. Ashworth was single celled at the

13  time because we had just moved all of the -- I think we had

14  just moved all of the pregnant inmates off of our yard so I

15  think -- I'm not 100 percent sure but I think she might have  10:06:03

16  been single celled so it was just a straight back into her

17  cell.

18  Q.   Okay.  So if you flip to Exhibit 16, which was the

19  internal assignments report for Ms. Alvarez --

20  A.   Yes.                                                     10:06:27

21  Q.   -- it shows that on 7-21-17 she was moved to location B42,

22  building A11, bed 07 low.  Is location B42 on the Pedro yard?

23  A.   No.  B42 is San Carlos Unit?

24  Q.   And why was she moved to Carlos?

25  A.   We had moved all the pregnant inmates from our yard to San 10:06:52

United States District Court

ROBERT KAY - Cross

1    Carlos, all of them, 20, like 20 of them.                    10:06:55

2    Q.   And that move just happened to happen on July 21, the same

3    day?

4    A.   Yeah, it looks like it.

5    Q.   Why were the pregnant women moved from Pedro to Carlos?   10:07:12

6    A.   I'm not 100 percent sure why.  I know that I was told it

7    was like a 20 for 20.  We are sending all the pregnant inmates

8    were going to Carlos and they were sending us a bunch of

9    inmates to take their place.

10   Q.   And who told you to do this move?                        10:07:33

11   A.   Ms. Currier.

12   Q.   Warden Currier?

13   A.   Yes, ma'am.

14   Q.   And she didn't explain why the pregnant women were being

15   moved?                                                        10:07:42

16   A.   Not to me, no.

17   Q.   Did anyone else give you an explanation, either on the

18   21st or afterwards, as to why the pregnant women were being

19   moved?

20   A.   I was being told they were moved because San Carlos has  10:07:55

21   air-conditioning because as the way it was going there, every

22   night the inmates were going up into visitation and sleeping in

23   visitation where it was AC.  So rather than to keep doing that,

24   they just packed them all up and sent them to Carlos where it

25   has AC.                                                       10:08:10

49

ROBERT KAY - Cross

| | | |
|---|---|---|
| 1 | Q.    Because is it correct that until this move to Carlos, all | 10:08:11 |
| 2 | female prisoners who were pregnant were all housed at Pedro? | |
| 3 | A.    Minimum custody, yes. | |
| 4 | Q.    Okay.  And you described the process when you looked at | |
| 5 | your board and you just went down until you saw a low bunk was | 10:08:35 |
| 6 | available and that was Ms. Scheid because she didn't have a | |
| 7 | doctor's note for a low bunk? | |
| 8 | A.    Yes, ma'am.  That was the first one I stopped at. | |
| 9 | Q.    So you normally just go along to the first one? | |
| 10 | A.    Yeah.  Like I said, my board is right there.  I just | 10:08:52 |
| 11 | looked over and I went down and it was like, boom, boom, boom. | |
| 12 | Q.    Did you look for any empty cells? | |
| 13 | A.    I don't know if I had any empty cells at the time or not. | |
| 14 | I'm sorry. | |
| 15 | Q.    Did you look for any cells where the person was single | 10:09:08 |
| 16 | celled but could have a roommate? | |
| 17 | A.    That's what I mean by empty cell.  I don't know if I | |
| 18 | have -- I don't remember if I had any available beds at that | |
| 19 | time. | |
| 20 |         THE COURT:  How has the summer been generally with | 10:09:25 |
| 21 | the capacity? | |
| 22 |         THE WITNESS:  I run between -- hopeful 432 physical. | |
| 23 |         THE COURT:  I'm sorry.  You said you run 132? | |
| 24 |         THE WITNESS:  432. | |
| 25 |         THE COURT:  Oh, yes.  Right.  432. | 10:09:36 |

ROBERT KAY - Cross

```
 1        THE WITNESS:  So 432 fiscal inmates.  And I'll run        10:09:37
 2   anywhere between 428 and 432 I keep -- generally, they keep me
 3   pretty full.
 4        THE COURT:  Okay.  So it's fair to say that for the
 5   summer it's true that the lowest you ever were at was 428 and   10:09:48
 6   the highest you were at the was the capacity of 432?
 7        THE WITNESS:  It might have been a little lower.  It
 8   fluctuates day by day.  A week or so ago I was down to like 426
 9   but as soon as they know those kind of beds are available, they
10   fill me up.                                                     10:10:09
11        THE COURT:  So is it fair to say if I was trying to
12   identify the lowest possible number, that it would be 426 over
13   the course of the summer?
14        THE WITNESS:  Average?
15        THE COURT:  Well, no.  I just want to know if I           10:10:21
16   picked any day in the summer, what could be the lowest number
17   of your count on that day?
18        THE WITNESS:  429, 430 is where I normally run.
19        THE COURT:  Okay.  All right.
20        And so when you told me before that each yard had         10:10:36
21   half of the number?
22        THE WITNESS:  Yes.  216.
23        THE COURT:  When you said 432 at the capacity, it's
24   216.  So if it's at 426, the number is 213; is that right?
25        THE WITNESS:  Yes.                                        10:10:51
```

51

ROBERT KAY - Cross

1              THE COURT:  Okay.  And so is it fair for me to

2     conclude that among the variables that you have on your board

3     that you have to deal with is that you essentially have about

4     210 choices to make in terms of who gets moved where?

5              THE WITNESS:  Not necessarily because we have

6     dangerous inmates.

7              THE COURT:  Right.  I know but you apply that

8     process?

9              THE WITNESS:  Yes.  Yeah.  Those are automatically

10    not even considered and then, like I said, actually I think if

11    you even look at the time, when I did it, it was after the

12    morning meeting so to make the move to get ready for count, I

13    had to do it fast.  So it was probably even quicker, quickest

14    easiest, fastest one to get done.  That was it.

15             THE COURT:  Why did it have to be done fast?

16             THE WITNESS:  Count is at 11.

17             THE COURT:  But why couldn't it have waited to the

18    next day?

19             THE WITNESS:  Generally, when they are approved for a

20    move, I do the move right away.

21             THE COURT:  I see.  And I gather that the decision to

22    move all of the pregnant inmates, you received no warning of

23    that in advance?

24             THE WITNESS:  I had heard rumors that they were going

25    to go but I didn't know until it actually happened.

United States District Court

10:10:52

10:11:11

10:11:18

10:11:41

10:11:52

10:12:09

ROBERT KAY - Cross

1          THE COURT:  Because if you had heard that Ms. Alvarez    10:12:15

2    was going to be moved --

3          THE WITNESS:  No.

4          THE COURT:  I mean if you heard rumors about all of

5    the pregnant inmates are going to be moved, I wonder why you    10:12:21

6    took a step to move her that happened to be just three days

7    before it actually did happen that she would have been moved

8    anyhow?

9          THE WITNESS:  It was an approved move so when

10   approved moves -- when moves get approved, I don't generally    10:12:39

11   wait.  If it's something I can take care of right then and

12   there, I will take care of it right then and there.  That way

13   it's done.  I don't have to worry bought it.  Count screens are

14   right, no scratches, nothing.  Everything gets moving,

15   everybody gets moved, everything is done.  I don't have    10:12:56

16   anything to worry about.

17          As far as the rumor, that rumor had been flying

18   around for a while.  I said the whole time that I thought they

19   should have been there but -- above my pay grade so I can't do

20   my job based off of rumors per se.  I have an inmate that is    10:13:12

21   having a problem, I need to take care of that and get that

22   fixed as soon as possible so it doesn't become a bigger

23   problem.

24          THE COURT:  And if it's all right, I'll go ahead and

25   ask another question that was on my mind.  I may have a couple    10:13:24

United States District Court

ROBERT KAY - Cross

1    of other questions as well.  But you've told us that there were                    10:13:29

2    two letters and we have one of them here in evidence, the

3    letter on the 29th of June, and you testified that this was the

4    first letter and then you testified that you received a second

5    letter from Ms. Alvarez on the day of the meeting.                                 10:13:43

6          Do you still have that second letter?

7          THE WITNESS:  I could not find it, sir, no.

8          THE COURT:  Do you keep the letters?

9          THE WITNESS:  Generally I do.  I don't know where

10   that one went.  I have no idea where that one went.                                 10:13:55

11         THE COURT:  Thank you.

12         Thank you, Ms. Kendrick.

13   BY MS. KENDRICK:

14   Q.   So your testimony is that Ms. Alvarez approached you

15   before the morning meeting and gave you a second inmate letter?                     10:14:05

16   A.   Yes, ma'am.

17   Q.   Okay.  And do you remember if she said that there were

18   additional problems or --

19   A.   She said it was escalating.  It was getting worse and I

20   don't remember exactly what she had written in her letter, but                      10:14:20

21   like I said, I said I was going to the morning meeting.  I

22   would bring it up in the morning meeting and discuss it and see

23   if we can get it taken care of.

24   Q.   And to go back to when we were talking about the process,

25   you review the inmate letter and put it in a holding bin until                      10:14:39

United States District Court

ROBERT KAY - Cross

1  the housing committee meets.  So the housing committee meets.    10:14:44

2  When the housing committee meets, are you sitting there as a

3  group in front of the big board?

4  A.    No.  We set up in the conference room up front of our

5  unit, a round table, and I pull out the letters and I read them    10:14:54

6  off and we discuss them.

7  Q.    So you just discuss the request itself?

8  A.    Yes.

9  Q.    You don't request the ramifications of we should move, you

10 know, this inmate in with -- at cell nine versus cell 12.  You    10:15:10

11 don't get into the weeds like that?

12 A.    No.

13 Q.    And what do you do with these inmate letters after the

14 housing committee meetings?

15 A.    I send a copy of them back to the inmate with their    10:15:22

16 approved or denied and I move the inmate.

17 Q.    Are these forms like carbon copies in triplicate?

18 A.    No.  They are generally -- no, they are not.

19 Q.    So you make a xerox copy?

20 A.    Yes, ma'am.    10:15:39

21 Q.    Do you scan a copy of the inmate letter to the prisoner's

22 central files or --

23 A.    No, ma'am.  No.

24 Q.    So you don't know what happened to the letter that you

25 said you got on July 19?    10:15:53

ROBERT KAY - Cross

 1   A.   No, ma'am.  I don't remember where it went.          10:15:55

 2            THE COURT:  So the 29th of June letter that we do

 3   have, was that scanned into the system?

 4            THE WITNESS:  No.

 5            THE COURT:  So do you have just a traditional old    10:16:02

 6   style file of paper pieces with respect to all of your inmates

 7   in a file cabinet.

 8            THE WITNESS:  Yes, sir.

 9            THE COURT:  I see.

10   BY MS. KENDRICK:                                            10:16:09

11   Q.   And are they filed chronologically or by the inmate?

12   A.   I just pretty much by the date.  I put them in from the

13   beginning of the year to the end of the year.

14            THE COURT:  So they are not individualized as to each

15   inmate.  You just have a --                                 10:16:22

16            THE WITNESS:  I just keep a copy of it.

17            THE COURT:  Thank you.

18   BY MS. KENDRICK:

19   Q.   And I believe you told the judge that you had to make this

20   move quickly because of the count.  How did you select the   10:16:33

21   person with whom Ms. Scheid was moved into?

22   A.   I don't recall.

23   Q.   Yes, so the meeting is at nine; is that right?

24   A.   Meeting is at 8:30 generally.

25   Q.   Finishes at nine?                                       10:16:57

ROBERT KAY - Cross

1   A.   9, 9:15, 9:30.  It depends on what is going on.  Sometimes          10:16:58
2   they are short and sweet.  Sometimes they are a little bit more
3   involved.

4           THE COURT:  So you felt you needed to get everything
5   done with respect to this move before 11 a.m.?                          10:17:08

6           THE WITNESS:  Before 10.  It depends when I turn my
7   count sheets in and go to the yards and drop off everything and
8   come back up and get ready for count.

9           MS. KENDRICK:  May I approach, Your Honor?

10          THE COURT:  You may.                                            10:17:22

11          MS. LOVE:  Your Honor, I have an additional copy if
12  you would like --

13          THE COURT:  That would be helpful, just so that
14  everybody can be on the same page.  Thank you.

15      (Exhibit Number 9 was marked for identification.)                   10:18:12

16  BY MS. KENDRICK:

17  Q.   Do you recognize this document.  Exhibit 9?

18  A.   Yes, ma'am.

19  Q.   What is it?

20  A.   It's an IR I was asked to generate for the move.                   10:18:22

21  Q.   Do you write IRs for each bed move?

22  A.   No, ma'am.

23  Q.   Why did you write an IR for this bed move?

24  A.   Because I was told to write an IR explaining why the move
25  was made because this was going on.                                     10:18:39

United States District Court

57

ROBERT KAY - Cross

1   Q.   Who asked you to write the IR?                          10:18:46

2   A.   Ms. Lee.  DW Lee.

3   Q.   Deputy Warden Lee.  Okay.

4   A.   Yeah.

5   Q.   And on the top right corner it says report number      10:18:53

6   17-BO1-01652 and then underneath it, it says report date.

7   8-2-2017.  Was that the date that you were asked to write the

8   report?

9   A.   Yes, ma'am.

10  Q.   Had you made notes when Ms. Alvarez approached you on the  10:19:12

11  19th?

12  A.   Made notes?  No, ma'am.

13  Q.   Okay.  Did you make a note of the time that you spoke with

14  her on the 19th?

15  A.   No, ma'am.                                              10:19:28

16  Q.   So in the report, where you put the time of 8:15, is that

17  your best estimate?

18  A.   That's the time that she approached me outside medical.

19  Q.   Okay.  And then underneath the summary you wrote -- well,

20  first of all, could you read out loud the summary that you    10:19:49

21  wrote there?

22  A.   (Reading) On the above date, the approximate time, ICOII

23  Kay was approached by Inmate Alvarez, ADC 317257, stating she

24  was still having issues with her cell mate and the situation

25  was escalating.  I advised Inmate Alvarez that I was headed to  10:20:06

United States District Court

ROBERT KAY - Cross

1   the morning meeting and I would bring this issue up with DW          10:20:10
2   Oros after that meeting.
3   Q.   Do you know why there's no reference to being given an
4   inmate letter by Ms. Alvarez?
5   A.   No, ma'am.                                                       10:20:27
6   Q.   Does this refresh your memory about whether or not you
7   were given an inmate letter by Ms. Alvarez?
8   A.   To the best of my knowledge, I believe she did give me an
9   inmate letter.
10  Q.   But you didn't put it in the report that you wrote on          10:20:41
11  August 2?
12  A.   No, ma'am.
13  Q.   And then underneath your statement and your signature it's
14  written, quote, DW Oros approved the move of Inmate Alvarez to
15  a cell mate meeting criteria and it's signed by Crystal Lee,        10:21:01
16  title, DW.  Do you know how Ms. Lee -- what the basis was for
17  Ms. Lee to make this statement?
18  A.   No, ma'am.  You would have to ask her that.
19  Q.   Okay.  Was Ms. Lee present when you met with DW Oros about
20  this bed move?                                                       10:21:26
21  A.   No.
22  Q.   Do you remember if when you spoke about this at the
23  morning meeting, was it a separate one-on-one with Deputy
24  Warden Oros to discuss the bed move?
25  A.   This bed move was at the end of the meeting.  It wasn't a       10:21:41

United States District Court

ROBERT KAY - Cross

1    one-on-one.                                                    10:21:45

2    Q.   But normally at a morning meeting, you wouldn't discuss

3    bed moves?

4    A.   Not unless there's an issue.   I mean, we discuss them once

5    in a while.   Something will pop up, an IR when we go through    10:21:54

6    the stuff in the morning meet and we'll discuss it but

7    generally, no.

8    Q.   And were you involved at all with Ms. Scheid's move back

9    to the cell with Ms. Ashworth on July 21 after Judge Duncan

10   ordered it?                                                    10:22:13

11   A.   Yes, I moved her back myself.

12   Q.   Okay.   Did you write an information report about that

13   move?

14   A.   No, ma'am.

15   Q.   Why not?                                                  10:22:20

16   A.   Normal operation for me is I don't write information

17   reports on movement.

18   Q.   Would you have written one if you had been ordered to do

19   so?

20   A.   If they wandered -- yes.                                  10:22:34

21   Q.   Could you look for an exhibit that is marked as Exhibit 2?

22           THE COURT:   I think you'll find that in the expando.

23   BY MS. KENDRICK:

24   Q.   Let me know when you're done reading it.

25   A.   Okay.                                                     10:24:15

United States District Court

ROBERT KAY - Cross

1    Q.   Do you know who Sergeant Overly is?                      10:24:16

2    A.   He's swing shift Sergeant.

3    Q.   And you work with him on Pedro Unit?

4    A.   Yes.

5    Q.   And when you go through officer training, are you trained   10:24:29

6    on how to complete an information report?

7    A.   Yes.

8    Q.   And as part of the training, are you trained to include

9    and list all staff that are involved in an incident that is the

10   subject of an information report?                             10:24:44

11   A.   Yes.

12   Q.   Do you have any idea why Sergeant Overly would not have

13   mentioned that you were part of the move?

14   A.   I have no idea.

15   Q.   Okay.                                                     10:25:02

16        And, again, I just want to be clear.  So your

17   testimony is that you do not remember how you selected the

18   individual who Ms. Scheid was moved in with?

19   A.   Yes, ma'am.

20        MS. KENDRICK:  Thank you, Your Honor.  I have nothing      10:25:24

21   further.

22        THE COURT:  Officer Kay, I have a couple of questions

23   but we'll also give a chance to Ms. Love to ask any further

24   questions that she would want to ask.

25        As the accountability officer, I have come to             10:25:36

United States District Court

ROBERT KAY - Cross

1  understand that you play a key role with respect to inmates who    10:25:40

2  are arriving from outside and being transferred from another

3  facility and a role in people who are being transferred out and

4  so you coordinate some aspects of that.  Do you have any

5  personal interaction with the inmates on the day that they    10:25:58

6  leave your responsibility or with the arriving inmates on the

7  day that they come in?

8         THE WITNESS:  Very limited if any.  I mean,

9  generally, the departures are gone before I get there.  I'm

10  there at seven so they are up like six in the morning.    10:26:18

11  Arrivals, sometimes I tell them -- I'll tell them where they

12  are going to be living.  If I'm behind and busy and don't have

13  all of my stuff done yet and not sure where they are going to

14  go, I'll have them sit and wait and tell them personally where

15  they are going to go or walk over to Property and tell them    10:26:35

16  where they are going to go.  But my interaction when they

17  arrive is very limited.

18         THE COURT:  So what percentage of the time do you

19  have an in-person interaction with somebody who is arriving or

20  leaving?    10:26:48

21         THE WITNESS:  Almost zero.

22         MS. KENDRICK:  Okay.  And then with respect to people

23  who are leaving and arriving, do you have any role in the

24  dealing with their prescription drug medication?

25         THE WITNESS:  No.    10:27:10

ROBERT KAY - Cross

```
 1          MS. KENDRICK:  So that's not part of anything that          10:27:17
 2     you do to make sure if somebody is leaving, to be sure that
 3     there's a check through medical to see that they are leaving
 4     with the prescriptions or medications that they had in the time
 5     that they were with you?                                          10:27:26
 6          THE WITNESS:  No.  That is not -- I have nothing to
 7     do with that.
 8          MS. KENDRICK:  Do you know who is responsible for
 9     that?
10          THE WITNESS:  Medical as far as I know.                      10:27:30
11          MS. KENDRICK:  Okay.  All right.
12          When someone goes to court, you testified about the
13     different treatment of their belongings, whether they are going
14     just for a day or for greater than a day, who makes the
15     determination about whether a roll-up needs to be done?          10:28:06
16          THE WITNESS:  So what happens is graves gets a sheet,
17     a movement sheet, for the next day and they look on it and they
18     say inmate A is -- A, B, C are being released.  They say you
19     have inmate D over here who is going to court.  They look at
20     and that they say, okay, there and there, and they roll them      10:28:27
21     up.
22          Now, in this case, I know about because I actually
23     caught it that morning when I came in to work.  It was already
24     pretty much fixed before the phone call was made.  Inmate
25     Scheid was on the movement report to go out to court so graves   10:28:45
```

ROBERT KAY - Cross

1  seen it as she's going out to court.  Graves didn't know it was        10:28:51
2  a day trip.  So they roll her up --

3          THE COURT:  Do you mean Ashworth?

4          THE WITNESS:  Ashworth, I'm sorry.  Inmate Ashworth
5  going to court so they roll her up.  They don't know that she's        10:29:02
6  going for a day.  I didn't even know she was going out until I
7  came in and I seen it.  And there was something wasn't right in
8  the way they did the out to court on the side where they put
9  out to court.  So I had called the movement officer, complex
10 movement officer, and asked her what was going on.  And that's        10:29:18
11 when we found out it was a day trip and that she would be
12 coming back that day.  And then I let my supervisors know what
13 was going on because if I remember right, I'm 99 percent sure,
14 I had to not receive an inmate because I had to keep Inmate
15 Scheid's bed for her so I had to not take one in.  So I        10:29:38
16 couldn't really take one in because she didn't come off my
17 numbers.

18          Because if they go out to court, I count for them
19 physically, I have to know where they are.  They are on my
20 board, on my numbers, but they are not my physical number.  So        10:29:51
21 that bed, all of a sudden, becomes an open bed, an available
22 bed for an inmate coming in.  Do you understand what I'm
23 saying?

24          THE COURT:  Not entirely.  Maybe I can go back and
25 ask some more pointed questions that will help me understand.        10:30:05

United States District Court

ROBERT KAY - Cross

 1    You said you caught a glitch.                                    10:30:09

 2              THE WITNESS:  Yes.

 3              THE COURT:  What is it that you actually caught?

 4              THE WITNESS:  Just that she was going out to court

 5    and -- you would have to see the sheet.  It says, like,          10:30:15

 6    release, it will say CSBD, service begin date, sentencing date,

 7    give you a little short description.  And normally over in

 8    court it says the court that they are going out to.  Well, this

 9    one said something different.  It wasn't what was normally in

10    that box.                                                        10:30:35

11              So I seen that and I figured it out.  I went to put

12    it on my sheet, my own personal movement sheet that I keep

13    track of all of the moves that I do.  It wasn't right so I

14    called Complex Movement and asked her what was going on and she

15    found out that she was just a day trip to court.  We took       10:30:50

16    her -- I guess we took her to court and brought her to court,

17    our transportation team.

18              So when graves -- graves don't know.  So they see it

19    as she's a roll-up so they roll her stuff up to go out to court

20    and put it in storage.  So by her not -- me figuring out that   10:31:08

21    she was not going to court, she was never put out to court, so

22    she had never left her bed.  She was always assigned to that

23    bed.  She never left that bed.

24              THE COURT:  But when people usually go to court, does

25    that then create an open space in that bed space?              10:31:26

United States District Court

ROBERT KAY - Cross

1          THE WITNESS:  Yes.                                    10:31:30

2          THE COURT:  I see.  So when somebody comes back in,

3    they will potentially be reassigned to another bed space?

4          THE WITNESS:  Yes.  Because to go to court, you don't

5    know how long you're going to be out to court.  So you'll come   10:31:40

6    back, you'll go out to court, DOC sees, "Hey we have a bed

7    here.  We'll send somebody from RNA over," send somebody from

8    another unit that comes down on the custody level and give her

9    that bed.

10         So and then when she comes back, then I have to find    10:31:56

11   her a bed and by just finding her a bed, I won't receive

12   somebody from RNA that day.  They will hold onto that inmate.

13   I'll bring my inmate back in and rehouse that inmate and if

14   they are not gone super long, I normally put them back in their

15   same cell.  If they are gone for a long period of time, then    10:32:16

16   I'll put them back in a different cell.  I try to keep them on

17   the same yard or something like that because if not, then I'll

18   be getting an inmate letter saying, "Hey, can I go back to my

19   yard," or something like that.

20         THE COURT:  There's another question that I have that   10:32:31

21   is based upon the testimony that you've given that you deal

22   with an email system at the department and I gather that's

23   true.  You have a lot of interaction through email with your

24   professional colleagues?

25         THE WITNESS:  Yeah.                                    10:32:53

United States District Court

66

ROBERT KAY - Redirect

 1          THE COURT:  So this is a document that I'm not going       10:32:56

 2    to ask you about what the document says.  I'm going to ask you

 3    about what it says in the email date stamp.  This is Exhibit 1

 4    to the hearing and the portion that I've highlighted says that

 5    it was sent on Saturday, the 21st of July 2017, and then it       10:33:09

 6    gives the time.  I can tell you that for sure the 21st of July

 7    was a Friday.  It wasn't a Saturday.  Do you have any idea as

 8    to how that could happen?

 9          THE WITNESS:  I have no idea.

10          THE COURT:  Have you ever seen anything like that          10:33:27

11    before where there's been an incongruity between the day and

12    the date on the stamp on the email?

13          THE WITNESS:  No, sir.

14          THE COURT:  So now, Ms. Love, any redirect?

15          MS. LOVE:  Yes, Your Honor, just a few questions.          10:33:40

16                    **REDIRECT EXAMINATION**

17    BY MS. LOVE:

18    Q.   If you could look at Exhibit 19 again for me, Defendants'

19    Exhibit 19.

20    A.   Okay.                                                        10:34:14

21    Q.   And this is the DC71 screen; correct?

22    A.   Yes, ma'am.

23    Q.   Did I understand your testimony correctly in response to

24    Ms. Kendrick's questions that you would have to input the

25    information of Ms. Alvarez and Ms. Ashworth into this DC71       10:34:25

United States District Court

67

ROBERT KAY - Redirect

1    screen before you were able to make the move of Ms. Alvarez                10:34:31

2    into Ms.-- the cell occupied by Ms. Ashworth?

3    A.    Yes, ma'am.

4    Q.    So do you know whether or not the date on the top right

5    corner of 8-2-17 that would be a date denoting the print date?            10:34:44

6    A.    That might be the print date.   I don't know.

7    Q.    And in response to the questions posed to you by Your

8    Honor, you testified that on the day that Ms. Alvarez came to

9    testify here in court in July --

10          THE COURT:   You mean Ms. Ashworth?                                  10:35:06

11          MS. LOVE:   I'm sorry, Ms. Ashworth.

12   BY MS. LOVE:

13   Q.    -- that you did obtain information that Ms. Ashworth was

14   only going to be out to court for one day; correct?

15   A.    Yes, ma'am.                                                           10:35:14

16   Q.    And was that information important to you because then you

17   saved her bed so to speak while she was out to court?

18   A.    Yes, ma'am.

19   Q.    And on average, do you have approximately three inmates

20   incoming onto the unit each day?                                           10:35:32

21   A.    If you average it out, it's probably about three, yes,

22   ma'am.

23   Q.    So obtaining this information that Ms. Ashworth was out to

24   court for only one day enabled you to return her to her cell

25   that she previously occupied versus filling that spot with a              10:35:44

United States District Court

ROBERT KAY - Recross

1   new incoming inmate?                                          10:35:48

2   A.    Yes, ma'am.

3   Q.    The move that you made of Ms. Alvarez into Ms. Ashworth's

4   cell and then Ms. Scheid out to a different cell, was that move

5   made by you in retaliation for Ms. Ashworth testifying and      10:36:03

6   participating in this lawsuit?

7   A.    No, ma'am.

8   Q.    Was that move made in retaliation as against Ms. Scheid

9   for participating in this lawsuit in any way?

10  A.    No, ma'am.                                              10:36:17

11  Q.    Thank you.

12           MS. LOVE:  No more questions.

13           THE COURT:  Ms. Kendrick, any questions?

14           MS. KENDRICK:  Yes, Your Honor.  Actually, I have a

15  little bit of recross based on your questions.                 10:36:23

16           THE COURT:  That's entirely fair and understandable.

17                     **RECROSS - EXAMINATION**

18  BY MS. KENDRICK:

19  Q.    So when Judge Duncan was asking you about the date of the

20  transport list, you said that you, quote, caught the glitch --  10:36:34

21  A.    Yes.

22  Q.    -- when you were looking at the system?

23  A.    Yeah.  Well, it's a sheet.  It's a movement sheet that

24  gets printed out so graves knows who is going home, who is

25  coming in the next day.  It's basically just a movement sheet   10:36:52

United States District Court

ROBERT KAY - Recross

1  for that day's moves.

2  Q.   And you said it had a strange notation or was the notation

3  blank?

4  A.   No.   There was something there.   I don't remember what it

5  says but it wasn't what was normally would be in that box.

6  That's what caught my eye.

7  Q.   So normally it would say something like Maricopa County?

8  A.   It gives a number, Maricopa County I think is 507.   It

9  will give the county number that's where they are going to

10 court.   If I remember right, I think this one said Maricopa

11 DOC transport or something like that instead of what was

12 normally in there.   That's why it drew a red flag.

13 Q.   And so you said you then called the complex?

14 A.   Complex movement officer.

15 Q.   The complex movement officer, okay.   And who was this

16 person?

17 A.   COII Green.

18 Q.   And Officer Green, did he or she --

19 A.   She.

20 Q.   She, she was the one who said Ashworth is just going for

21 the day?

22 A.   Yes.

23 Q.   Okay.   What did you do after that?

24 A.   I didn't -- there's nothing I had to do.   I just -- she

25 wasn't going to go so I didn't have to do anything.   I mean, I

10:36:54

10:37:04

10:37:21

10:37:42

10:38:01

10:38:13

ROBERT KAY - Recross

1   just put her on my movement sheet as going out to court for the        10:38:18

2   day is all I did because she didn't go to court.  Her bed was

3   there.  She was never in the -- and the computer was never

4   taken out of her bed so that bed was still hers when she came

5   back.  The only thing she didn't have was her property because   10:38:34

6   it got rolled up.

7   Q.   And when you learned that she was coming back for the day,

8   did you contact anybody at the property office to say, "I think

9   her property maybe rolled up in mistake"?

10  A.   No.                                                         10:38:50

11  Q.   Did you inform a supervisor that her property may have

12  been rolled up by mistake?

13  A.   No.  I didn't think it was a mistake.

14  Q.   Okay.  Thank you.

15         MS. KENDRICK:  I have nothing further.                    10:39:02

16         THE COURT:  Officer Kay, I thank you for coming.  I

17  don't have any more questions for you and I just want to check

18  with Ms. Love to see if she has any questions.

19         MS. LOVE:  No further questions, Your Honor.

20         THE COURT:  Okay. but I do need to say something to       10:39:15

21  you because I have the pleasure of having you in my courtroom

22  and the chance to speak to you so that you can perhaps

23  understand why it is that I am doing what I am doing.

24         I don't know whether you understand that I am here

25  not by my choice but by necessity of my job, what I am supposed  10:39:33

United States District Court

ROBERT KAY - Recross

1    to do.  The parties in the case settled a lawsuit about health        10:39:38
2    care at the Arizona Prison System and it required the
3    defendants to do certain things and the hope was when the case
4    was settled, that those certain things would all be done.

5            The settlement provided for a mechanism of correcting        10:39:51
6    failures to satisfy these promises in the settlement and that
7    mechanism involves me and that means that I have to jump into
8    your world.  It's not something that I like to do because I
9    understand and have heard today that I interfered with your
10   world when I directed that matters be returned to the status        10:40:16
11   quo before Ms. Ashworth testified.  I understand that created
12   additional work for you that is not part of what is, I'm sure,
13   a very business and full day with what you have without some
14   judge in Phoenix telling you what is on your new list.

15           But the problem is the issue that I was addressing          10:40:41
16   today, and the issue that I was addressing then, is one that is
17   very important for me to address and that is the subject of
18   whether or not people feel free to talk to their lawyers.  When
19   I say "people," I mean the inmate members of the plaintiffs'
20   class to talk to their lawyers and to talk to me.                    10:41:00

21           And every witness who came here who was an inmate and
22   sat in that chair told me that they were fearful of
23   retaliation, and I then made it clear that there would be no
24   retaliation.  But I also had conversations in court before with
25   the lawyers about what could constitute retaliation and it's        10:41:23

United States District Court

ROBERT KAY - Recross

1   actually more than just whether retaliation actually happened.   10:41:29

2           You testified here today that you had no retaliatory

3   intent in these changes that happened here.  But the problem is

4   everybody on the yard doesn't know what's in your head.  All

5   they know is what they see.  And what they saw is that somebody   10:41:45

6   came to Phoenix, testified here about something that was a

7   problem for the State, and that shortly after that person --

8   well, on the day they saw that the person was rolled up and

9   they also saw that they were unrolled but then they learned

10  that very close in time to the testimony that that person was   10:42:04

11  transferred -- suffered a change in roommate situation that she

12  didn't like.

13          And so people on the yard looking at that could well

14  think that it was retaliation.  And so the problem is whether

15  it was true or not, it still has the dangerous effect of   10:42:23

16  chilling the willingness of people to tell me the truth and so

17  I have to guard against that.

18          So I have created a rule in the case that says that

19  if you want to take some action against an inmate that changes

20  their circumstances in a way that they would view, or others   10:42:41

21  would view, as disfavorable or if you wanted to take

22  disciplinary action, you have to have an awfully good reason to

23  do it close in time to when they have testified in court

24  because people looking at it will think that it is retaliation,

25  whether it is or not.   10:42:58

United States District Court

ROBERT KAY - Recross

1        And so I understand that that impairs and intrudes      10:42:59

2   upon your role and that is to try to make the best judgments

3   that you can about where to place whom.  Now, I understand that

4   it interferes with the disciplinary rules of the prison but I

5   frequently, as we all frequently face in life, times when we    10:43:17

6   have two competing worthy goals that conflict and the worthy

7   goal, on one hand, is you doing your job; disciplinary rules on

8   the other side is me protecting the free flow of information

9   that is vital to the job that I have to do here from any kind

10  of chilling.                                                    10:43:36

11       So we've got two good purposes but sometimes they

12  conflict and so like all of us when we have conflicting good

13  purposes, sometimes we have to choose one.  We have to weigh

14  one and I have weighed that the importance of this information

15  connection to the lawyers and to me so that I can be as wise as  10:43:54

16  I possibly can in doing something that is not my job.  I didn't

17  grow up with a professional career in the Department of

18  Corrections and I don't understand it as well as you do, but I

19  have to try to learn about it because I make decisions and I

20  don't want to make bad decisions.  And one of the ways that I    10:44:10

21  get a better chance at making a good decisions is if I get

22  information about what's going on.  So I try to learn as much

23  as I can.

24       So I have made a decision that the weighing here

25  means that I do have to interfere with your life, your          10:44:24

United States District Court

1   professional judgment to protect this greater interest.          10:44:29

2          Now, I don't cut off the opportunity of the

3   defendants to say to me, "Judge, your rule of no adverse action

4   close in time to when somebody comes to court cannot be safely

5   applied here because we have to now reevaluate the wing," and    10:44:44

6   so defendants always have the chance to tell me that if

7   somebody should trump it.

8          But I also have experience in the case where there

9   have been allegations that people have been written up for

10  shirttail infractions close in time to when they talk to the     10:44:59

11  lawyers.  So whether that's true or not that it happened, it

12  was pretty easy for me to weigh that I didn't want to have

13  everybody skirting away from talking to the lawyers because

14  they were going to be written up for a shirttail or some minor

15  infraction.  So I simply said, "You get a free pass on any       10:45:18

16  minor infraction close in time that you talk to the lawyers or

17  to me," and so that's the necessity of what I've had to do to

18  protect this important link of communication.

19         So thank you for listening to that.  Thank you for

20  coming to Court here today and have a safe drive back.           10:45:36

21         THE WITNESS:  All right.  Thank you.

22      (Witness excused.)

23         THE COURT:  We'll take a ten-minute break.  Thank

24  you, all.

25      (Recess at 10:45; resumed at 10:58.)                         10:58:00

                    United States District Court

```
 1              (Court was called to order by the courtroom deputy.)          10:58:18
 2                   THE COURT:  Thank you very much.  Please be seated.
 3                   And we're ready for defendants' next witness.
 4                   MS. LOVE:  Your Honor, the defendants call
 5      Officer Jardine.                                                      10:58:26
 6                   THE COURT:  Officer Jardine, if you would please step
 7      forward to the clerk of the Court to be sworn.
 8                   MAGISTRATE JUDGE CLERK:  Spell your first and last
 9      name.
10                   THE WITNESS:  J-A-S-O-N, last name is J-A-R-D-I-N-E.     10:58:33
11              (JASON JARDINE, a witness herein, was duly sworn or
12      affirmed.)
13                   THE COURT:  Good morning and welcome.  The microphone
14      is not attached to the desk there so that you can move it
15      closer so that you don't have to be leaning forward and get it       10:59:05
16      close to your mouth.  Thank you, sir.
17                            DIRECT EXAMINATION
18      BY MS. LOVE:
19      Q.   Sir, will you please state your full name for the record?
20      A.   My name is Jason Scott Jardine.  J-A-R-D-I-N-E.                  10:59:14
21      Q.   Who is your employer?
22      A.   Arizona Department of Corrections.
23      Q.   And what complex do you work at?
24      A.   I work at Perryville Complex.
25      Q.   Do you work on a certain unit?                                  10:59:28
```

JASON JARDINE - Direct

| | | |
|---|---|---|
| 1 | A.   I am assigned to Complex Unit but I'm attached to the San | 10:59:29 |
| 2 | Pedro Unit. | |
| 3 | Q.   What is your position with the Arizona Department of | |
| 4 | Corrections? | |
| 5 | A.   I'm a COII is my rank and I work as a Special Security | 10:59:36 |
| 6 | Unit officer which we call SSU. | |
| 7 | Q.   How long have you worked for the Arizona Department of | |
| 8 | Corrections? | |
| 9 | A.   December will be five years. | |
| 10 | Q.   What positions have you held with the Arizona Department | 10:59:48 |
| 11 | of Corrections in the last five years? | |
| 12 | A.   Originally I was a COII on the yard, and from that time I | |
| 13 | went to a support position as the V gate officer at the Santa | |
| 14 | Cruz Unit and then from there I went to the SSU Unit. | |
| 15 | Q.   The entirety of your five-year career have you worked at | 11:00:05 |
| 16 | the Perryville Complex? | |
| 17 | A.   Yes, ma'am. | |
| 18 | Q.   Prior to your five years that you have served the Arizona | |
| 19 | Department of Corrections, did you work in corrections | |
| 20 | previously? | 11:00:16 |
| 21 | A.   I did, yes, ma'am. | |
| 22 | Q.   Where at? | |
| 23 | A.   North Carolina Department of Corrections. | |
| 24 | Q.   How long did you work for the North Carolina Department of | |
| 25 | Corrections? | 11:00:23 |

United States District Court

77

JASON JARDINE - Direct

1   A.   Eight and a half years.                                           11:00:23

2   Q.   What positions did you hold with the North Carolina

3   Department of Corrections?

4   A.   I started out of as a Correctional Officer II.  I went to

5   a training officer and then from there I was promoted to        11:00:33

6   Sergeant.  And I was a Sergeant there for five and a half

7   years.

8   Q.   You used the term SSU.

9   A.   Yes, ma'am.

10  Q.   Can you tell us again what SSU stands for?                  11:00:43

11  A.   SSU stands for Special Security Unit.  It's -- the duties

12  include monitoring security threat group affiliations and

13  actions.  Also we're responsible for conducting all of the

14  documentation, implementing the search lists and urinalysis

15  lists for the unit.                                             11:01:05

16  Q.   You said a moment ago that you're assigned to Complex but

17  you're attached to the San Pedro Unit.  Did I hear that

18  correctly?

19  A.   Yes, ma'am.

20  Q.   Can you explain for us and for the Court what it means to  11:01:16

21  be assigned to Complex but then attached to San Pedro?

22  A.   My direct supervisor is a Complex Sergeant,

23  Sergeant Mendez.  He's my first-line supervisor.  On a daily

24  basis, I will go down to the San Pedro Unit and I will work

25  there.  And I, obviously, work for the deputy warden at that    11:01:33

United States District Court

JASON JARDINE - Direct

1    unit and chief of security at that unit and that's my daily                    11:01:36

2    place of business.

3    Q.    What is your -- within -- is your direct chain of command?

4    Who do you report up to?

5    A.    Sergeant Mendez and then we have Lieutenant Dominico.        11:01:49

6    She's retiring so they are waiting to replace her.   And the

7    major, Major Fernandez.   The Deputy Warden of Operations,

8    Mr. Twyford, and then, obviously, Ms. Currier, the warden.

9    Q.    Is your chain of command also up through the chain at the

10   San Pedro Unit?                                                    11:02:07

11   A.    Yes, ma'am.

12   Q.    As an SSU officer, is one of your duties the detection and

13   control of contraband into and out of the facility?

14   A.    Correct.

15   Q.    What does that entail?                                       11:02:29

16   A.    I generate a monthly list, random and target searches.

17   The randoms are generated through a computer program that we

18   have.   It computes bed numbers and cell numbers only.   I don't

19   know the names of who is going to be on that list.   I annotate

20   those numbers onto a list and I put it into a folder that is       11:02:49

21   for searches.   I do the same for UAs as well, urinalysis.

22   We'll do the same thing for that.

23   Q.    Are you the only SSU officer assigned or attached to the

24   San Pedro Unit?

25   A.    Yes, ma'am.                                                  11:03:06

United States District Court

JASON JARDINE - Direct

1  Q.   How important is the control of contraband to the safe and          11:03:17
2  orderly operation of a prison facility based upon your training
3  and experience?
4  A.   It's paramount.  It's one of the most important things
5  that we do.  You know, some people might think small things are          11:03:28
6  not as important as others.  You know, we're trained where we
7  look at it as every piece of contraband is not good.  Because
8  at least it leads to bigger and bigger things.  If we can stop
9  it at a lower level, that's good.  Even if it's a pair of
10 tweezers, that could lead to something else.                              11:03:47

11       A lot of times no contraband is found and we did come
12 to find out later on it's a test run to see if they can get
13 something else through things like that, bigger things, so it's
14 actually paramount and it's a daily thing we have to deal with
15 every single day.                                                         11:04:04
16 Q.   Can you give us a rundown of a little brainstorm of what
17 are the types of items that in a prison setting are considered
18 contraband?
19 A.   Contraband is anything that is not issued by the
20 department.  Anything that is personal that is, again, not               11:04:18
21 bought at the stores there that is on site.  Anything that is
22 not authorized to be sent in through family members or friends.
23 At the end of the day, it's anything that is not authorized by
24 the State or issued by the State or not provided by the State.
25 Q.   Are items that are not issued by the State or authorized            11:04:36

United States District Court

JASON JARDINE - Direct

1    by the State that could be used as a weapon be considered          11:04:40

2    contraband?

3    A.    Say that again please.

4    Q.    Are items that are not issued by the State that could be

5    used -- or items that are found in a prison facility that could    11:04:51

6    be used as a weapon considered contraband?

7    A.    Yes, ma'am.  That would be, that would be a big find of

8    something that could be used as a weapon.  A pencil could be

9    used as a weapon.  We have obviously different classes of

10   severity.  You know, we have nuisance contraband.  It might be     11:05:14

11   a postcard that doesn't belong to an inmate.  But if we find

12   things like a pencil that an inmate is not supposed to have.

13   Even needles.  Needles could be used for tattoo guns which,

14   obviously, is a health risk for the inmates.

15           So we always look at anything potentially that could       11:05:33

16   be a weapon.  Anything could be used as a weapon.

17   Q.    As part of contraband control, are you also looking for

18   detection of the introduction of drugs into the facility?

19   A.    Yes.  I would equate drugs as important as weapons as

20   well.  Drugs, a lot of these ladies, they come in, they have       11:05:56

21   had, you know, previous experience with drugs and stuff.  And

22   so we definitely want to try to control the introduction of it

23   to the unit.

24   Q.    And, unfortunately, do drugs make their way into the

25   Perryville Complex at times?                                       11:06:12

United States District Court

JASON JARDINE - Direct

```
1   A.    Absolutely.                                              11:06:13

2            THE COURT:  And you know that because of the positive

3   urinalysis tests?

4            THE WITNESS:  That's part of it, yes, sir.

5   BY MS. LOVE:                                                   11:06:22

6   Q.    Do you also ever, based upon your experience there at

7   Perryville, actually find actual drugs within the facility?

8   A.    Yes, we have.  Recently we had a search of a particular

9   building and we found, you know, pills that were hidden in a

10  bathroom, pills that, you know, are controlled substance.      11:06:36

11  We've also -- at the San Pedro Unit recently we've had a

12  visitor bring drugs in to an inmate.  Also, again, recently

13  somebody -- we believe somebody brought in drugs through a

14  visitation to an inmate and the two inmates overdosed.  So it's

15  a problem.  It's a prevalent problem.                          11:07:01

16  Q.    Based on your experience, what are the ways such as

17  contraband such as drugs are able to make their way into the

18  prison complex?

19  A.    Obviously, visitors can bring it in.  Inmates that go

20  off-site, another institution or the unit, they could have     11:07:15

21  drugs dropped off there.  It could be mailed in.  Staff,

22  unfortunately, will bring drugs in.  But those are some of the

23  most common, common ways that we're aware of.

24  Q.    You stated earlier that as part of your job as an

25  SSU officer, there are random searches or random search lists  11:07:40
```

United States District Court

82

JASON JARDINE - Direct

| | | |
|---|---|---|
| 1 | that you generate? | 11:07:44 |
| 2 | A.   Yes, ma'am. | |
| 3 | Q.   Do you also do targeted searches? | |
| 4 | A.   Yes, ma'am. | |
| 5 | Q.   And are the targeted searches physical searches of cells? | 11:07:48 |
| 6 | Are they urinalysis?  What do you mean? | |
| 7 | A.   A target search is a search of an inmate's cell, her | |
| 8 | housing assignment.  So if an inmate is in a particular cell, | |
| 9 | if she's on the target list, that cell will be searched. | |
| 10 | Q.   And as to SSU officer attached to San Pedro, do you | 11:08:06 |
| 11 | generate a targeted search list on a monthly basis? | |
| 12 | A.   Yes, ma'am, every month. | |
| 13 | Q.   Do you, as the SSU officer attach to San Pedro, generate a | |
| 14 | monthly urinalysis search list? | |
| 15 | A.   It's a urinalysis list.  It's for the inmate to be given a | 11:08:27 |
| 16 | UA, urinalysis test, so it's not necessarily a search.  It's a | |
| 17 | UA, yes, ma'am. | |
| 18 | Q.   So can I break down the searches that, as part of your | |
| 19 | duties, you oversee into three categories:  Random searches, | |
| 20 | targeted search list and then the urinalysis? | 11:08:43 |
| 21 | A.   Urinalysis also has two.  There's a random and there's a | |
| 22 | target list.  So there's actually four lists. | |
| 23 | Q.   The random searches, are those random cell searches? | |
| 24 | A.   Yes, ma'am. | |
| 25 | Q.   And how are those generated? | 11:09:00 |

United States District Court

JASON JARDINE - Direct

1  A.   We have a computer-based program.  It's just a link click                    11:09:01

2  on it.   Click the complex that you want.  Obviously, it's

3  Perryville.   And then from there I go down to San Pedro, click

4  on it and it shoots out a list.   I print that list off and then

5  based off those cell numbers, I annotate them onto the search                    11:09:18

6  list by cell number and bed number and I put it in the book and

7  those are the ones they do.

8  Q.   When you say "they do," do persons other than you actually

9  physically carry out the searches?

10  A.   Searches.  Oh, yes, ma'am.  It's the line staff.  Staff                    11:09:34

11  that works down on the yards, yes, ma'am.

12  Q.   And when the random cell search list is generated, do you

13  know or do you see an inmate name attached to the random list

14  or is it by cell number?

15  A.   It's cell number and bed number.  I have no idea who is                     11:09:54

16  actual -- who that name -- who that cell belongs to.  That is

17  why it's random.

18  Q.   Are there a certain number of random searches that are

19  performed on a monthly basis?

20  A.   On the sheet that I fill it out, I believe there are 20                     11:10:10

21  spaces.  I fill those spaces up and then I'll attach a blank

22  sheet on the backside in case they have extras later on.

23  Q.   And as to urinalysis, you testified that there's both a

24  random urinalysis listing and then a targeted urinalysis list?

25  A.   Yes, ma'am.                                                                 11:10:30

United States District Court

84

JASON JARDINE - Direct

Q.   And how does that work?  How could somebody -- why would

somebody be on a targeted list versus a random?

A.   The random list as well as comes through that computer

program.  The target list, it's based on information received,

any type of information that I may receive, used in

documentation such as in the case of somebody that works off

site, if they work out at the animal shelter, if they work as a

tram driver.

          Also if they work around -- like in Televerde, which

is civilian contractors and things like that, potentially they

could have -- bring stuff in.  But it's based off the policy

which is, you know, STGs, which is security tech routes,

previous drug history with being caught with drugs before,

positive UAs in the past, information that maybe informants

give to me, confidential informants.  Some of the times, a lot

of times it's anonymous letters I get.  So those sometimes will

put somebody on a target list.

          Most of the time what I do, though, is I'll go down

in the alpha roster.  It will have work assignments and I try

to pick a couple that are outside of the unit or in areas that

potentially they could get drugs and that's how the target list

is made up.

Q.   And then let's talk about the targeted cell search list.

How do you determine what inmates make their way onto the

targeted cell search list?

United States District Court

11:10:30
11:10:43
11:11:02
11:11:23
11:11:39
11:11:59

85

JASON JARDINE - Direct

```
 1   A.    It's a little bit different.  I use the guidelines          11:12:00
 2   obviously.  The policy as a guideline.  It is a little bit
 3   different because it's not just inmates that are going
 4   off-site.  It's inmates that can work inside the institution as
 5   well.  As we spoke about earlier, there's numerous ways,         11:12:11
 6   numerous things that could be considered weapons:  Pencils,
 7   office supplies, things they shouldn't have, paint.
 8          So you might find on a target list inmates that go
 9   off-site or inmates that are on-site that work in particular
10   areas, the kitchen, painters, maintenance workers, inmates that 11:12:29
11   work in office settings.  Because of the potential contraband,
12   which may be office supplies, things like that, paint, even the
13   groundskeepers sometimes because they are out on the yards.
14   Sometimes they could find a loose fence tie or something like
15   that which could be considered a weapon, so that is how the     11:12:49
16   target list comes about.
17   Q.    Do you know whether or not Inmate Angela Ashworth is
18   assigned to the San Pedro Unit?
19   A.    She is.
20   Q.    Currently?                                                 11:13:06
21   A.    Yes, ma'am.
22   Q.    Do you know whether or not she was assigned to the San
23   Pedro Unit in June and July of this year?
24   A.    She was, yes, ma'am.
25   Q.    Do you know whether or not in July of this year           11:13:17
```

United States District Court

86

JASON JARDINE - Direct

1   Ms. Ashworth was placed on a targeted search list?                    11:13:19

2   A.   She was not for July.  She was placed on a listing for

3   August.  The list was generated in the last week of July.

4   Q.   Is that a list that you yourself generated?

5   A.   Yes, ma'am.                                                       11:13:29

6   Q.   Now, the targeted search list that she was placed on in

7   July of this year, was it the targeted urinalysis list or the

8   targeted cell search list?

9   A.   It was a search list.

10  Q.   The cell search list?                                            11:13:43

11  A.   Yes, ma'am.

12  Q.   Prior to testifying here today, had you been asked by any

13  of your superiors why Inmate Ashworth was placed on the

14  targeted search list for August of this year?

15  A.   They did.  I either misheard or misunderstood.  I thought        11:14:04

16  they were talking about the UA list.  I remember her being on

17  the list.  I thought it was a UA list.  I came to find out

18  later it was actually a search list she was on.  It was just an

19  oversight on my part when I answered.  So when they asked me if

20  she had been on the list, I was assuming it was a UA list, but       11:14:21

21  really it was the search list that she was on.

22  Q.   And were you contacted by Northern Region Operations

23  Director Ernie Trujillo with that question as to whether or not

24  she had been placed on a targeted list in August?

25  A.   I was, yes, ma'am.                                               11:14:36

87

JASON JARDINE - Direct

1   Q.   And when were you contacted by Mr. Trujillo?                          11:14:37

2   A.   It was a little after 12 o'clock on the 11th.  It was

3   Monday, September 11, roughly.

4   Q.   And you provided him information initially that she had

5   been placed on a targeted UA list?                                        11:14:49

6   A.   I did.

7   Q.   And how was that mistake made?

8   A.   I had the -- I pulled the files out and looked at them.  I

9   thought we were talking about UAs.  I saw the name.  Again,

10  oversight on my part, didn't look at the top that said search   11:15:04

11  list.  The forms are similar.  They are not exactly same.  And

12  I obviously have Mr. Trujillo on the phone, you know, you are a

13  little -- trying to get things together.  And so, yeah, I did

14  confirm that she was on the UA list.

15         Like I said, about an hour or so later, maybe two          11:15:23

16  hours later, we come to find out that, no, it was actually a

17  search list.

18  Q.   And so that was an innocent mistake that you made as to

19  providing information to Mr. Trujillo that she was on the UA

20  target list versus the cell search list?                        11:15:39

21  A.   That is correct.

22  Q.   I would like to show you what's been marked as Exhibit 31

23  that than marked for identification and there on that folder in

24  front of you are a whole bunch of tabbed documents.

25  A.   Okay.                                                       11:15:57

United States District Court

JASON JARDINE - Direct

1  Q.   And at the end, hopefully, you will see one that has a                11:16:03

2  number 31 on the tabs.

3            Do you have that in front of you?

4  A.   Yes, ma'am.

5  Q.   If you could take a look at what is in Exhibit 31 and tell            11:16:15

6  me whether or not you recognize what is in that folder.

7  A.   I do.

8  Q.   What is it?

9  A.   These are the search lists, target search lists, for

10  September.  It's a target search list for August.  It's an                11:16:37

11  additional target search for day shift for the month of August

12  as well and then a target search list for July and an extra

13  sheet for July as well, target searches.

14  Q.   Okay.  So is this target search list a list, the ones for

15  July, August, and September that are part of Exhibit Number 31,          11:16:58

16  are these the lists you yourself generate?

17  A.   Yes, ma'am, it is.

18  Q.   And these are the lists you yourself generated for July,

19  August, and September of this year?

20  A.   That is correct, yes, ma'am.                                         11:17:11

21  Q.   And these are the target search lists that you, in the

22  normal course of your operations as an SSU officer, generate on

23  a monthly basis?

24  A.   That is correct.

25            MS. LOVE:  Defendants move to admit.                            11:17:24

United States District Court

JASON JARDINE - Direct

 1          THE COURT:  Any objection?                           11:17:25

 2          MS. KENDRICK:  Well, the second page of the exhibit,

 3   there's a line crossed out so we would object until there's

 4   some sort of explanation about that line.

 5          MS. LOVE:  Sure.  I'm fine doing that.  We'll go      11:17:39

 6   through the information and then I'll move to admit after.

 7          THE COURT:  Okay.

 8   BY MS. LOVE:

 9   Q.   Let's just go through these pages one by one.  So the

10   first page of Exhibit Number 31, this is the target cell search  11:17:48

11   list for what month?

12   A.   September 2017.

13   Q.   And where can we tell that?

14   A.   If you look up in the upper left-hand corner, it says Date

15   and slightly to the right of that it says September 2017.       11:18:03

16   Q.   And can you describe, because the Court and plaintiffs'

17   counsel, this is our first time seeing these kinds of lists,

18   can you explain what information is contained on this search

19   list?

20   A.   If you -- obviously, at the very top is the institution     11:18:16

21   name, Perryville.  And then below that is listed Target

22   Searches and then I handwrite in what shift is going to have

23   that list for that month.  For that month it was swing shift.

24   And then of course it was the date and the month and the year.

25          We have a date so that date when the officer goes and    11:18:37

United States District Court

JASON JARDINE - Direct

1    does those searches, they are going to write the date in at          11:18:40

2    that time.  And then on time they are going to write down the

3    time that the search began.  And next to that is going to be

4    inmate name.  Those are handwritten in by myself.  Also the

5    ADC number of that inmate.  That is handwritten by myself as          11:18:52

6    well.  The location is where that inmate lives, okay?  The

7    staff that conducts the searches, they annotate that into the

8    sheet right here or they will call it in to Main Control and

9    say, for example, on the first one, they will say at 1420

10   Inmate Burke was cell searched.  Negative results.                    11:19:10

11           The officer in Main Control will put in -- will look

12   up that inmate and find her bed number and put it on there,

13   annotate who did the search, that was Officer Storm.  They will

14   annotate if the inmate was present when the search was

15   conducted, yes.  If no, they will put "no" and then of course         11:19:29

16   the result, negative or positive.  If there's a positive find,

17   they will obviously seize the property, do an IR number,

18   information report, and put the IR number on that sheet.  That

19   way when do audits, they can reference it.

20   Q.   And if no contraband is found during the cell search, is         11:19:48

21   that noted by a "negative" in the results category?

22   A.   Yes.  Or if they find nuisance contraband, they will put

23   nuisance in there.

24   Q.   What is nuisance contraband?

25   A.   Nuisance contraband will be anything that isn't                  11:20:03

United States District Court

JASON JARDINE - Direct

 1  necessarily deemed a hazard or security issue or potentially a   11:20:05

 2  weapon.  That could be -- like I said earlier, it could be

 3  somebody else's potato chips, you know, or we know this inmate

 4  doesn't have any money but yet she had some potato chips in

 5  there or maybe a pair of shoes that don't belong to her.   11:20:20

 6  That's officer's discretion if he wants to issue disciplinary

 7  on that.

 8  Q.   On the first page of Exhibit Number 31, which is the

 9  September list, we can see on the date and time that some of --

10  there's some of those are filled in, some are blank.  Why is   11:20:41

11  that?  Is that because this is the current document that is in

12  use right now?

13  A.   That is correct.  The ones that are blank have not been

14  conducted yet.  They have the period of the month to complete

15  all of these.   11:20:52

16  Q.   How does it work or what are your expectations as to the

17  SSU officer as to when the target searches get done, are they

18  done Tuesday at 5 o'clock?  Are they done randomly?

19  A.   Once they are put in the book, the shift command, which is

20  usually the Lieutenant or Sergeant, he will say if he has   11:21:13

21  staff, "We are going to do searches today."  He may call an

22  officer and say, "Hey, we're going to do some searches today."

23  The officer will get a book and say, "I'm going to do five or

24  six searches today," and then he/she will go and do those

25  searches.   11:21:29

United States District Court

JASON JARDINE - Direct

1  Q.   Where is the target search book kept?

2  A.   The search book is kept in Main Control at San Pedro Unit.

3  Q.   And as the SSU officer attached to San Pedro, do you

4  regularly review the target search list to see where you're at

5  in the month as to what -- have the searches been done, what

6  are the results, et cetera?

7  A.   I try to do it on a daily basis.  It doesn't always happen

8  on a daily basis because I might not be at my unit that day.  I

9  might be doing other things but I try to do it on a daily basis

10  to ensure that we're getting them done because at the end of

11  the month they all have to be completed.

12      Weekly we have to go to a star intel meeting and

13  we've got to show how many searches were done that week.  It's

14  annotated and I need to make sure that I don't go to the intel

15  meeting with a big fat zero and that some searches have been

16  done.

17  Q.   If you turn to page two of Exhibit Number 31, can you tell

18  us specifically what month this search log pertains to?

19  A.   This is August 2017 target search list.

20  Q.   And before I do that, because I will forget, can you go

21  back to page one for me?

22  A.   Yes, ma'am.

23  Q.   And on the inmate list of names that were subject to the

24  target search list, do you see Inmate Angela Ashworth's name on

25  this list?

United States District Court

11:21:30

11:21:46

11:22:02

11:22:16

11:22:37

11:22:50

JASON JARDINE - Direct

1   A.   No, ma'am.                                                    11:22:53

2   Q.   And did you put her on the target search list for

3   September of this year?

4   A.   No, ma'am.

5   Q.   Are the inmates advised that they are going to be subject    11:22:59

6   to a search pursuant to the target search list?

7   A.   No, ma'am.

8   Q.   And why is that?

9   A.   We don't want to, obviously, be predictable in what we do.

10  The inmates are very smart and a lot of times they are going to  11:23:11

11  figure it out.  That's why specifically I don't do a group of

12  one work crew.  So I wouldn't like, for example, Televerde, the

13  minute one of them gets hit with a search, they are going to

14  know, "Oh, we are the ones getting searched today."  Now Dog

15  Pound are thinking, "I have a free month because they are doing  11:23:28

16  Televerde," so I try to mix it up.

17  Q.   So is the purpose of not providing notice and mixing it up

18  so that the inmates don't what is happening so if they do have

19  contraband or are hiding it, that they aren't getting rid of

20  it?                                                               11:23:46

21  A.   Yes, ma'am.

22  Q.   Okay.  Back to page two of Exhibit 31.  And if you also

23  look at page three of Exhibit 31, is that page three also for

24  the August target search list?

25  A.   Yes, ma'am.  That's an extra.  Can I explain that real       11:24:01

United States District Court

JASON JARDINE - Direct

1  quick because it's going to be a little confusing?  Obviously,    11:24:07

2  in the month of -- I try to switch them up per month.   One

3  month swing shift will get targets.  The next month they will

4  get randoms.  It doesn't always work out that way but I try to

5  switch it up.  If you go to page three where it says target    11:24:21

6  searches for day shift, that's an extra one.  Day shift had

7  random searches for the month of August.  But those are just

8  random.

9          But along the course of their daily duties, if they

10  come across an inmate they suspect may have contraband, they    11:24:33

11  will go and do a search at that time even though she's not on

12  that list.  That would be considered a target search.  So we

13  don't want day shift annotating things on swing shift.  So I

14  give them an extra sheet so they can annotate it in here.

15  Q.   Now going back to page two of Exhibit 31, was Inmate    11:24:48

16  Angela Ashworth's name ever on the target search list for

17  August of 2017?

18  A.   She was.

19  Q.   And did you yourself put her on the target search list?

20  A.   I did.    11:25:05

21  Q.   Can -- are you able to tell us where on page two of

22  Exhibit Number 31, which is the August search list, where her

23  name is at?

24  A.   It's where it's Xed out, written over and her name and

25  ADC number and location are blacked out.    11:25:19

United States District Court

JASON JARDINE - Direct

1   Q.   Do you know who Xed out and drew through the line where          11:25:22

2   Inmate Ashworth's name previously was?

3   A.   Well, originally Lieutenant Papworth was on duty and he

4   saw it, caught it, obviously, and he put I believe "void void"

5   and it said "void per Lieutenant Papworth."                           11:25:38

6        When I came in the next day -- it had to be the next

7   day because he comes on swing shift -- I saw it, didn't know

8   why it was void.  I had no idea.  I didn't know what it was

9   about.  I believe at the morning meeting it was explained that

10  he had taken her off because *Parsons v. Ryan* and the situation     11:25:52

11  with Ms. Ashworth.

12       So I went back and Xed it out and intentionally

13  blacked out her name even more.  The reason why is staff, they

14  see this list, they do their searches.  I didn't want anybody

15  asking, "Oh, why is this guy taken off," you know, this            11:26:10

16  inmate's name.  I don't know who knew what's going on with Ms.

17  Ashworth or not.  I just thought it was best.  It's not there.

18  They don't have to ask questions about it and it's a done deal

19  and as far as I was concerned, it was a dead issue.

20  Q.   Did you have any disagreement with the fact that               11:26:29

21  Lieutenant Papworth had taken Ms. Ashworth off the target

22  search list?

23  A.   No.  I was actually relieved a little bit because I had no

24  idea that there was an issue with Ms. Ashworth.  I had no idea.

25  So when it was explained to me, I thought, oh, I'm glad            11:26:41

United States District Court

JASON JARDINE - Direct

```
 1   Lieutenant Papworth caught it.  If it would have been brought      11:26:44
 2   to my attention, I would have gone back and done it myself but
 3   it had already been done already.
 4   Q.   When you say there was an issue with Ms. Ashworth, what do
 5   you mean?                                                          11:26:56
 6   A.   I don't know the details.  I just know she had been
 7   mentioned or something about a lawsuit.  I don't know the
 8   details of it.  I had never had interaction with Ms. Ashworth.
 9   I didn't know what was going on with it.  When she wanted the
10   lits, her name never even registered to me.  It was another       11:27:06
11   name -- I think in her case, it was based on that she was a
12   tram driver.  Afterwards, like I said, when it was voided --
13   because probably -- I don't think it's ever happened where an
14   inmate was voided like that.  So, obviously, I asked about it
15   and then I was enlightened as to why it was taken off.  It made    11:27:21
16   perfect sense.
17   Q.   When you may have had Ms. Ashworth's name on the target
18   search list for August, did you have any information that she
19   was participating in the Parsons *v. Ryan* lawsuit in any way,
20   shape, or form?                                                    11:27:38
21   A.   You know, maybe I'm ignorant to the fact.  I had no idea.
22   I didn't know she was involved with *Parsons Ryan* or anything.
23   Her name didn't even register to me.  Only after when I found
24   out why it was taken off did I understand.
25   Q.   Were you aware that -- when you placed Ms. Ashworth's name    11:27:54
```

United States District Court

JASON JARDINE - Direct

1   on the target search list for August, were you aware that she

2   had been transported out of the complex to come here to the

3   federal courthouse to testify in July?

4   A.   No, I had no idea.  If I know that an inmate is gone to

5   Court, which I rarely do because that's not my place of

6   business, if I know an inmate is gone to court, I probably

7   won't put them on the list because she may not be there.  It's

8   just a wasted spot on the list.

9        So if I would have known she was gone to court --

10  obviously, we don't know when she's coming back.  Court might

11  be one day.  Might be who knows how long.  I probably wouldn't

12  have put her on the list if I would have known that, but I

13  don't look up that information.  I basically put the list

14  together and then that's it.

15  Q.   Let's talk about now why you placed Inmate Ashworth on the

16  target cell search list.

17  A.   She was put on solely because of her job assignment.

18  She's a tram driver.  It's officially listed as a maintenance

19  driver.  It's a tram driver.  So that's normally some of the

20  ones that I put on the list.  That's a normal occurrence.

21  Q.   So when you went down and made your list did you look down

22  and say, "Okay.  Ashworth, I want her on the list," or was it

23  you are looking who is working at this job and, "I am going to

24  put someone on the list"?

25  A.   If you look at the alpha roster, the names are on the

11:27:58

11:28:11

11:28:26

11:28:37

11:28:56

11:29:11

United States District Court

JASON JARDINE - Direct

```
 1   left-hand side followed by their ADC number and to the                    11:29:14
 2   right-hand side it's their job assignments.  I'll scroll down
 3   and I'll say, "I'm going to put some tram drivers on this
 4   month.  I'm going to put some Televerde workers on this month,
 5   some inmates that work at the paint crew," and I'll just       11:29:29
 6   randomly select those based on that -- on where they work at
 7   and I'll put them on the list.
 8           Also, inmates that go on the list are inmates that
 9   have gotten information about that may be doing something they
10   shouldn't be doing.  They will go on the list.  Obviously      11:29:42
11   inmates that have been caught before having contraband brought
12   in, whether it's drugs or contraband, they will go on the list
13   and that is basically how that list is created.
14   Q.   Do you know what days a week -- are you provided what days
15   a week each inmate works on their job, like what their duty    11:30:03
16   schedule is or their work schedule?
17   A.   I could look it up.  I'm not necessarily provided that.  I
18   have access to that.  If I go to the work screen, I can see
19   what days they work.
20   Q.   Do you know what days a week Inmate Ashworth works as a    11:30:17
21   tram driver?
22   A.   She works Friday, Saturday and Sunday.  I don't know about
23   Monday but I know she works over the weekends.
24   Q.   What is your concern specifically as to contraband control
25   with respect to a tram driver?                                 11:30:33
```

JASON JARDINE - Direct

1  A.   The San Pedro Unit, as most units, I don't know what the          11:30:40

2  percentage is, probably 90 percent of the visits are on the

3  weekends.  I believe San Pedro, for example, we have visits,

4  night visits, on Tuesdays I believe but all the other visits

5  are on the weekends.                                                   11:30:53

6       Well, you've got to figure I believe last weekend or

7  the weekend before, they might have had over the course of

8  Saturday or Sunday 70 visits, maybe more.  So you've got to

9  figure maybe two, three people per visit, looking at 140 people

10 coming strictly to the San Pedro Unit.                                11:31:09

11      The tram drivers, they will bring in those civilians,

12 they visitors, these family members, to the San Pedro unit.  On

13 top of that, there are also tram drivers that drive the Pedro,

14 they also drive the San Carlos as well which has 1250 inmates.

15 You can imagine how many visits they have.  So these ladies          11:31:26

16 that are driving the trams, they are driving untold number of

17 civilians over the course of two days.  And so -- and it's

18 happened in the past where, you know, conversations are struck

19 up and things happen and, you know, so that's one of the

20 reasons why tram drivers are put on the target list.                 11:31:46

21 Q.   And is that because they have an increased contact with

22 the public who may be coming in -- may be bringing in items and

23 distributing them to inmates that they are not approved by and

24 should have in the facility?

25 A.   I think it would be safe to say that tram drivers have          11:32:02

United States District Court

JASON JARDINE - Direct

1    more contact with civilians than anybody else except maybe          11:32:05

2    inmates -- even inmates that go off-site/off-site, I think tram

3    drivers probably have far more contact with civilians every

4    single weekend.

5    Q.   When you do a selection for your target search list each       11:32:21

6    month, do you focus on a particular job?  Do you rotate and

7    say, "This month I'm going to look at tram drivers and next

8    month I'm going to look at maintenance workers"?

9    A.   As I stated earlier, it's no select number.  It might be

10   two or three tram drivers.  It might be five of them and as        11:32:35

11   well as that, it might be two or three inmates that work at,

12   you know, the kitchen.  It might be two or three inmates that

13   work on the groundskeeper crew.  I try to keep a different

14   number.  Like I said, one thing we don't want to do in our job

15   is pattern.  You don't want to pattern.                            11:32:51

16           The inmates are super, super smart and lot of times

17   they know things before I even know it.  So, yeah, I try to

18   keep it -- a mixture there.  And, you know, for the most part,

19   I know.  I think it works pretty well.

20   Q.   When you place Inmate Ashworth's name on the August target    11:33:07

21   search list, did you have any specific intel that she was

22   involved in the introduction of contraband into the facility?

23   A.   No, ma'am.

24   Q.   So her selection was based merely upon her job as a tram

25   driver?                                                            11:33:20

United States District Court

JASON JARDINE - Direct

1    A.   There was no other reason.   Just for that reason.          11:33:21

2    Q.   If you can look at page four of Exhibit Number 31, pages

3    four and five actually, and are these the target search lists

4    for San Pedro Unit for July of 2017?

5    A.   Yes, ma'am.                                                  11:33:47

6    Q.   Is Inmate Angela Ashworth's name anywhere on the target

7    search list for July of 2017?

8    A.   No, ma'am.

9    Q.   When Ms. Ashworth was removed from the August target

10   search list and her name crossed out by you, did that           11:34:16

11   effectively take her out of the mix?  She was not going to be

12   searched that month?

13   A.   That is correct.  The only way she would be searched that

14   month is if she had behavior that would constitute us doing a

15   target search on her, you know, or if she -- I don't know, just  11:34:30

16   if she was to get in a fight, then obviously we're going to go

17   and search the two people that get into a fight, search their

18   cells just to see if there's documentation as to why they got

19   in a fight, try to figure it out.  Other than that, she would

20   not have been on any list unless, like I said, her behavior      11:34:52

21   warranted it.

22   Q.   Do you have any information that since July of 2017 to as

23   we sit here today whether or not Ms. Ashworth has indeed been

24   subject to a target search, cell search?

25   A.   I looked back all the way as far as June and I didn't see   11:35:07

United States District Court

JASON JARDINE - Cross

1   her on any list.  I can't speak for before that, but I don't      11:35:11

2   remember seeing her name previously.  So if she was, she may

3   have been.  I don't know.  I couldn't tell you.

4   Q.   No further questions.  Thank you.

5        THE COURT:  Ms. Kendrick?                                    11:35:23

6                    **CROSS - EXAMINATION**

7   BY MS. KENDRICK:

8   Q.   So Officer Jardine, I'm going to walk us a little bit more

9   through Exhibit 31 but I'm going to make an effort not to use

10  any inmate's name or full number so I will try to use just the   11:35:49

11  last two numbers and their first initial.

12  A.   Yes, ma'am.

13  Q.   So, hopefully, we can both together try to do that.

14  A.   Sure.

15  Q.   So, first of all, if you could turn to the third page of    11:36:02

16  Exhibit 31 and there's only one individual listed, her ADC

17  number ends in 85 and in the column under Staff Name it says

18  Jardine.  Is that you?

19  A.   That is correct.

20  Q.   Is that your handwriting all the way across on that line?   11:36:21

21  A.   Yes, ma'am.

22  Q.   Okay.  Because sometimes it's whoever does the search

23  writes kind of the last three columns?  Like the name, was an

24  inmate present?

25  A.   Typically no, ma'am.  No, ma'am.  Normally, if an officer   11:36:37

United States District Court

JASON JARDINE - Cross

1   does a search, and he will call it in to Main Control either on       11:36:42

2   the radio or he'll walk up there or sometimes they will hand

3   write it in themselves.  They will get the book and put it in.

4   Typically, an officer will call Main Control and say, for

5   example, "Hey, Main Control this is Jardine.  I just did a       11:36:54

6   search at this place on this inmate, contraband was found," et

7   cetera, et cetera.

8           In my case when I do my searches, I'll go get the

9   book myself and hand write it in myself.

10  Q.    Okay.  So I guess I just want to also establish that this      11:37:07

11  handwriting on page three is a good example of what your

12  handwriting looks likes?

13  A.    Yes, ma'am.

14  Q.    Okay.  When you create these reports, roughly how many

15  days before the start of the month do you put them together?      11:37:27

16  A.    It's typically the last week of the previous month.  For

17  example, for August, I would -- sometimes the last week of July

18  I will put it together when I have available time.  So it takes

19  about an hour, so I want to make sure I have the time to do it

20  uninterrupted so it's usually typically the last week of the      11:37:44

21  month.

22  Q.    And so for these targeted lists, you said some of them

23  it's because you're going through like the job lists, and we

24  can talk about that, but other times it was because you found

25  information to add someone to a list?      11:37:59

United States District Court

JASON JARDINE - Cross

1   A.   Yes. We call them kites but inmate letters.   Sometimes                    11:38:01

2   inmates will come and tell me and sometimes I have informants

3   that don't want to be named and they will come and see me and

4   give me information.

5   Q.   When that happens, do you update the list for the month in    11:38:12

6   which the person tells you or do you kind of hold onto that

7   information until the day you're creating the list for the

8   upcoming month?

9   A.   So once the list is made, the list doesn't get changed.

10  As far as I'm concerned, it does not get changed.  So if an       11:38:27

11  inmate comes to me two days after the list is in the books, so

12  there it is, inmate comes to me and says, "Hey, Mr. Jardine,

13  let you know you might want to go search so-and-so because

14  she's got a tattoo in there."  I will go down there and search

15  that cell or I'll have the Sergeant or supervisors have          11:38:43

16  somebody go down and search that cell for a tattoo gun.  Once

17  that search is done, it's going to be put on this list.

18  Q.   It will be added?

19  A.   On the extra sheet, on the extra -- the sheet that we're

20  looking at that's an extra sheet.  There's no names on there     11:39:00

21  but if these situations arises, then they will go on here.

22  Q.   Okay.  And I think you may have been speaking a little

23  quickly but with your example, were you referring to a tattoo

24  gun?

25  A.   Yes.  For example, a tattoo gun.                             11:39:13

United States District Court

JASON JARDINE - Cross

1   Q.   Okay.  I just want to make sure I heard you correctly.          11:39:15

2        And when you hand write the names and the numbers,

3   before you stick it in the book that is kept in Central

4   Control, do you make a copy for your records or any purpose at

5   all?                                                                 11:39:33

6   A.   I do not.  It goes into the book and that's the only copy

7   there.

8   Q.   So that's the only copy in the universe that would exist

9   would be what was put in the book?

10  A.   I believe so, yes, ma'am.  That's the only list I make, it    11:39:40

11  goes in the book and that's it.

12  Q.   Are there policies or local operating procedures or any

13  sort of memorandum that sets out kind of the process and

14  procedure for setting up these target lists?

15  A.   They go through some criteria for target list for searches    11:39:56

16  and for the UAs.

17  Q.   I guess what I'm trying to get at is, you said, you know,

18  you go down the list of the jobs and you say, "Well, I want to

19  take a couple tram drivers, a couple of people who work at the

20  animal shelter," do you have any training or written             11:40:12

21  instructions that say when doing that, you know, pick every

22  X person, something like that, or how do you do that part?

23  A.   No.  There's nothing in writing saying pick every other

24  person but it says in my -- in my post orders is, you know,

25  searches are conducted on a daily basis as needed to control      11:40:34

United States District Court

JASON JARDINE - Cross

1   contraband, to recover stolen property, and that is what I base   11:40:37

2   it off of.  And also based on information gathered.

3          I -- I take an alpha roster as part of the

4   information that I have at my disposal to select targets.

5   Q.   Okay.  And also this document that we're looking at, at   11:40:55

6   the top for all four pages it says Target Searches.  So I'm

7   curious, do you have a similar document that at the top might

8   say Random Searches?

9   A.   Yes, ma'am.

10  Q.   But that's kept in the same binder together?   11:41:12

11  A.   Yes, ma'am.

12  Q.   Okay.  Televerde, that's the company that contracts with

13  the department to have the prisoners do, like, phone

14  solicitation calling; is that right?

15  A.   Yes, ma'am.   11:41:30

16  Q.   So what is it about being on the telephone that makes it

17  necessary to search them more often?

18  A.   Well, for Televerde it's a very nice setting.  It's a very

19  clean setting.  It's like a business office in there.  And

20  there's a lot of office supplies in there.  There's obviously   11:41:46

21  the contract workers are in there.  They are with these inmates

22  from like 6 a.m. to 5 p.m. or 10, 12 hours a day.  Those

23  workers, they come in and bring food for themselves for lunch.

24  It has been known in the past, and it has been caught in past,

25  where inmates will have some of that food in their cells.   11:42:04

United States District Court

JASON JARDINE - Cross

1  Obviously it was given to them.  Big thing, though, is office          11:42:07
2  supplies, anything like that they shouldn't be having.
3  Q.    Okay.  So it's more about the office supplies than the
4  fact that they are on the telephone randomly calling people?
5  A.    Well, part of my duties is also to monitor telephone          11:42:19
6  calls, not those telephone calls, obviously, but there is a
7  failsafe, a catch so that in order for them to get on the phone
8  to do their business, it has to be, for lack of a better term,
9  approved by the contract workers.
10 Q.    Okay.                                                         11:42:35
11 A.    In other words, they kind of know who they are talking to.
12 Q.    Okay.  And you mentioned the visitation on the weekends as
13 being part of the reason for the tram drivers being searched.
14 What are the hours of visitation at San Pedro?
15 A.    Well, it's not actually correct, ma'am.  That is not the    11:42:53
16 sole reason tram drivers are picked, just because of visitation
17 on the weekends.  We do have visits on Tuesdays as well but
18 it's not just that either.  Inmates, they are going outside of
19 our fences, outside of San Pedro.  They are driving those
20 trams, you know, eight hours a day, or six hours a day or       11:43:08
21 whatever the work schedule is, and they get out at times, take
22 a break.  They switch crews and that's done on the outside of
23 San Pedro Unit.  I've found contraband at those switch sites.
24 I haven't found major contraband but found notes passed from
25 inmates from other units, so it's not just because of the      11:43:27

United States District Court

JASON JARDINE - Cross

1   visits.                                                          11:43:29

2   Q.   So what are the hours of visitation on the weekends?

3   A.   There's two blocks of visits.  I believe -- I might have

4   the numbers off.  I believe the first block is eight to 12 I

5   believe and the second one is, like, one to five or one to     11:43:41

6   four, 12 to four, something like that.

7   Q.   And that is Saturdays and Sundays?

8   A.   Yes, ma'am.

9   Q.   And the Tuesday night visitors, what time --

10  A.   I believe it's a food visit or night visit.  They come in  11:43:53

11  the evening time on Tuesdays, yes, ma'am.

12  Q.   And that is in the evening?

13  A.   That is in the evening.

14  Q.   Okay.  What time is that?

15  A.   I'm not for sure.  I'm not there.  It's after I leave.      11:44:02

16  It's probably after 5 o'clock I'm assume.

17  Q.   Okay.  Does it go until midnight?

18  A.   No, ma'am.

19  Q.   What's the graveyard shift?

20  A.   For staff?                                                  11:44:14

21  Q.   For staff or for inmates that work the graveyard shift.

22  A.   As tram drivers?

23  Q.   As anything.

24  A.   Well, we do have some inmates that will go up the complex

25  I believe and they do cleaning crews and stuff like that or --  11:44:27

JASON JARDINE - Cross

1  I don't know their exact hours.  And some inmates that go to
2  work at the kitchen and they get up at 3 a.m. and have to be at
3  kitchen at like 4 o'clock or something.

4  Q.   What about for the tram drivers?

5  A.   I believe they 24 hours.

6  Q.   For the graveyard shift?

7  A.   The total trams are running are 24 hours.  I believe the
8  inmates work six hours, so I'm not for sure what their exact
9  hours are.

10  Q.   Would it be midnight to six a.m.?

11  A.   It could be, yes, ma'am.

12  Q.   So if you're driving a tram from midnight to 6 a.m., are
13  there outside visitors on the tram with you?

14  A.   There shouldn't be.

15  Q.   It would just be staff?

16  A.   Staff.

17  Q.   How did you know which days of the week Ms. Ashworth works
18  as a tram driver?

19  A.   Because I looked it up.

20  Q.   Okay.  Do you know what shift she works?

21  A.   I do not.  I just saw that she works on the weekends.

22  Q.   Oh, so you remembered she works on the weekends but you
23  didn't remember she worked graveyard shift?

24  A.   I just looked it up on the day of the 11th as a matter of
25  fact.  Before that I didn't know what shift she worked or what

11:44:30

11:44:42

11:44:54

11:45:07

11:45:20

11:45:35

JASON JARDINE - Cross

1   day she worked.                                                      11:45:38

2   Q.   So when did you look her up on the work shift to see the

3   dates of the week?

4   A.   I wanted to -- I sent a screen shot to Mr. Trujillo and

5   that is when I pulled it up.                                        11:45:52

6   Q.   Okay.  So Monday was when you looked it up?

7   A.   Yes, ma'am.

8   Q.   Okay.  Otherwise, you have an incredible memory if it was

9   from July.

10  A.   No.                                                            11:46:03

11  Q.   So I believe you testified when Ms. Love was asking you

12  about your conversation with Mr. Trujillo that he called you

13  approximately 11 or 12 o'clock on Monday?

14  A.   I believe it was around 12ish, a little after 12 maybe,

15  something like that.                                                11:46:19

16  Q.   Was it after count or --

17  A.   Yeah.  It was after count because I had somebody in the

18  office at the time and I had them leave, obviously.  So I

19  believe it was after 12.  I don't know the exact time, between

20  12 and one I would say possibly.                                    11:46:31

21  Q.   And do you remember for approximately how long you were

22  speaking with Mr. Trujillo?

23  A.   Less than five minutes, six minutes, four minutes.

24  Q.   Did you and Mr. Trujillo or anybody else exchange emails,

25  phone calling or text messages on Monday about Ms. Ashworth?       11:46:51

United States District Court

JASON JARDINE - Cross

| | | |
|---|---|---|
| 1 | A.   I got a phone call from Deputy Warden of Operations | 11:46:56 |
| 2 | Mr. Twyford and Mr. Profiri. | |
| 3 | Q.   Joseph Profiri? | |
| 4 | A.   Yes, ma'am. | |
| 5 | Q.   And who is he? | 11:47:10 |
| 6 | A.   Southern Regional Operations Director. | |
| 7 | Q.   When did Mr. Profiri call you? | |
| 8 | A.   I believe it was actually on the same call with | |
| 9 | Mr. Twyford and then he put them on the phone. | |
| 10 | Q.   So what time was that? | 11:47:20 |
| 11 | A.   I do not recall. | |
| 12 | Q.   Was it after you spoke with Mr. Trujillo? | |
| 13 | A.   I don't recall.  I might have spoke to him first and | |
| 14 | Mr. Trujillo later.  I really don't remember. | |
| 15 | Q.   Okay.  And I believe you said that you were kind of | 11:47:35 |
| 16 | scrambling because you know Mr. Trujillo is Northern Regional | |
| 17 | Operations Director and calling you and asking questions and | |
| 18 | you made what Ms. Love called a, quote, innocent mistake and | |
| 19 | said it was a UA list.  I believe you have testified that a | |
| 20 | couple hours later, you realized that that was a mistake and | 11:47:57 |
| 21 | she was on a UA list? | |
| 22 | A.   Correct.  I gave the paperwork and, actually, I brought | |
| 23 | copies to the DWOP, Mr. Twyford, and he's the one that actually | |
| 24 | caught it and said, "Hey, I thought she wasn't on a UA list." | |
| 25 |         And I said, "Oh, I thought she was." | 11:48:12 |

JASON JARDINE - Cross

1            And then he said, "No.  She's on a search list."

2            And I looked at it and I was like, "Oh.  Uh-oh."  And

3    by then it was too late, you know, so I guess he made a text to

4    say, "Hey, Jardine made a mistake," and, yeah, it was

5    unfortunate.

6    Q.   So there's a lot of breakdown there.  You said Deputy

7    Warden Twyford called you and said he was the one who caught

8    that it was not a UA list or was it you?

9    A.   I actually took it up there to them, the pages to him,

10   dropped them off, you know, okay, and blah, blah, blah, and

11   that was it.  I was actually outside with my boss and

12   Mr. Twyford came out and got us and said, "Hey," and pointed

13   out the discrepancy and I didn't know what to say.  I looked at

14   him again and I said, "I made a mistake."  There was nothing

15   else I could do it about it.  I made a mistake.

16   Q.   Yes.  People make mistakes.  So that was a couple hours

17   after you talked to Trujillo?

18   A.   Yes, ma'am.  I believe so.

19   Q.   But it was not at the time that you were on the phone with

20   Mr. Twyford and Mr. Profiri?

21   A.   No.  At the time, they were assuming it was a UA list.

22   Q.   Okay.  And do you remember approximately what time you had

23   that conversation with Mr. Twyford about the search list?

24   A.   Yeah.  It had to be -- it was after 3 o'clock because on

25   my way out -- it would have to be after 3 o'clock because I

11:48:14

11:48:27

11:48:41

11:48:59

11:49:11

11:49:27

United States District Court

JASON JARDINE - Cross

| | | |
|---|---|---|
| 1 | went up there on my way out and dropped off the paperwork to | 11:49:30 |
| 2 | him. | |
| 3 | Q.   And did you call, email or text Mr. Trujillo to clarify | |
| 4 | the mistake about what type of search Ms. Ashworth was subject | |
| 5 | to? | 11:49:44 |
| 6 | A.   Did I? | |
| 7 | Q.   You personally? | |
| 8 | A.   No. | |
| 9 | Q.   Do you know if Mr. Twyford the? | |
| 10 | A.   I know he brought this to my attention.  He started | 11:49:54 |
| 11 | texting.  I have no idea who he was texting.  Obviously, I'm | |
| 12 | not privy to that information.  He said, "Have a good day," and | |
| 13 | we left. | |
| 14 | Q.   So you observed him send something sort of message using | |
| 15 | his telephone as he was talking to you? | 11:50:07 |
| 16 | A.   Well, you know what, well, he was on his -- he was texting | |
| 17 | I don't know who, what it was about.  He said, "Have a good | |
| 18 | day," and we left. | |
| 19 | Q.   Okay.  So I want to go back to Exhibit 31 and the second | |
| 20 | page, which is the August 2017 target searches swing shift | 11:50:26 |
| 21 | search log? | |
| 22 | A.   Yes, ma'am. | |
| 23 | Q.   And we see that line that we were talking about earlier | |
| 24 | that has all of the Xs out that you testified was where | |
| 25 | Ms. Ashworth was listed and there are 14 names underneath hers | 11:50:40 |

United States District Court

JASON JARDINE - Cross

1  and they all appear to be in your handwriting.  Is that         11:50:50

2  correct?

3  A.   Yes, ma'am.  The whole list is in my handwriting and their

4  ADC number.

5  Q.   So the five names above the Xs were also written by you?    11:51:00

6  A.   Yes, ma'am.

7  Q.   Do you have any idea why your handwriting appears to

8  change dramatically between the top of the line and bottom of

9  the line?

10 A.   Between the very last line and the first line?             11:51:21

11 Q.   Correct.

12 A.   I don't think it does.

13 Q.   Okay.

14 A.   Are you talking about --

15 Q.   Where it says Inmate Name where the names of the inmates    11:51:32

16 are listed?

17 A.   Yes, ma'am.

18 Q.   The first five names?

19 A.   Yes, ma'am.

20 Q.   If you compare the handwriting to the names underneath the  11:51:37

21 X, does the handwriting look the same to you?

22 A.   Yes.  That's my handwriting.

23 Q.   Okay.  So I want to ask you also about some of these notes

24 that are at the bottom of the chart?

25 A.   Yes, ma'am.                                                 11:51:57

United States District Court

JASON JARDINE - Cross

1   Q.   The first thing under the table is there's an asterisk and        11:51:58

2   it says Search Types:  R equals random, T equals target, P

3   equals pat, S equals strip, CA equals common area, HAA equals

4   Harris after action.

5           Is that information that you write into the chart or        11:52:27

6   does that go in that third column that is preprinted with the

7   ward "Target"?

8   A.   It's preprinted, yes, ma'am.

9   Q.   So how would an officer know whether the person was going

10  to have a search of their cell versus a search of their body?     11:52:41

11  Do you have things that are preprinted that say "pat" or

12  "strip"?

13  A.   It's a whole different list.  I do not generate those

14  lists.  Those lists are -- there's a list like that at the V

15  gate, the vehicle gate.  There's lists at visitation.  When       11:52:57

16  they conduct pat searches or trip searches, they annotate them

17  on a whole different sheet.

18  Q.   Okay.  Thank you.

19          And what does Harris after action mean?

20  A.   It's a term we don't use any more.  Harris after action      11:53:11

21  report is basically when an inmate leaves, let's say she goes

22  home so she packs up her stuff and goes home.  That cell is now

23  empty.  Staff member should go behind and search that cell when

24  it's empty to ensure that nothing was left behind so that it is

25  clean for the next inmate to move in.  That way if something is   11:53:29

United States District Court

JASON JARDINE - Cross

1  in there, the new inmate isn't caught with something that

2  somebody else left for her.

3  Q.   Okay.   Thank you for the clarification.

4  A.   Yes, ma'am.

5  Q.   And the next line under the table there's a double

6  asterisk and it reads, quote, if the inmate is not present for

7  a search, document the reason why in the Inmate Present column.

8  A.   That's correct.

9  Q.   So where -- is that the column that is the second from the

10 right-hand side?

11 A.   Yes, ma'am.

12 Q.   Why did people not write reasons next to the word "no"?

13 A.   Not following through.  And that's -- that shouldn't be

14 that way.  That is when an inmate is not present, you know,

15 you're supposed to put in there, you know, where is she at.

16 Q.   And you stated that you try to review these logs every day

17 or so just to kind of keep tabs on how things are going?

18 A.   Yes, ma'am.  I try to.

19 Q.   Okay.  Are you responsible for following up with these

20 officers as to why they did not properly document the search?

21 A.   Yes, ma'am.  I'll --

22        MS. LOVE:  Objection, Your Honor.  Relevance, beyond

23 the scope of this hearing where we already have testimony that

24 indeed Ms. Ashworth was never searched.  So going now off onto

25 a tangent as to documentation as to how others are searched is

11:53:33

11:53:42

11:54:01

11:54:19

11:54:36

11:54:50

United States District Court

117

JASON JARDINE - Cross

1   beyond the scope of this hearing and irrelevant.                        11:54:54

2        THE COURT:  Thank you.  Overruled.

3        THE WITNESS:  So, yes, ma'am.  So I try to do it on a

4   daily basis.  Does it always happen on a daily basis?  No.  As

5   I explained before, and what I'll do is I will bring it up     11:55:05

6   to -- and I don't want to step on a supervisor's toes because

7   the supervisors are the ones issuing out these searches.  On a

8   daily basis you know as they go.

9        I do my best to bring it to the supervisor's

10  attention saying, "Hey, you know, make sure we are referring   11:55:18

11  these things out," and bring it up in my morning meeting and

12  put it out, "Hey, can supervisors let their staff know?"  It's

13  a work in progress.  It's not always perfect.

14  BY MS. KENDRICK:

15  Q.   Okay.  So you just let led to my next question.  Do you   11:55:31

16  assign the officers who dot searches or do the supervisors make

17  those assignments for the day?

18  A.   The supervisors do that, ma'am.

19  Q.   Can officers just sign up and volunteer to go do a search

20  that day?                                                       11:55:44

21  A.   We would love it.

22  Q.   Okay.  Is that a yes or a no?

23  A.   That would be -- yes, absolutely.  They have every right

24  to say, "Hey, I want to do some searches today.  Can I please

25  do some searches?"  Yeah, they could do that.                   11:55:56

United States District Court

JASON JARDINE - Cross

1    Q.   Okay.  And do you document anywhere the source or the    11:55:58

2    basis for putting somebody on the list?  Or the reason why?

3    A.   No, ma'am.  I do not.

4    Q.   And do you keep some sort of record of or scope of these

5    so that you know when you're putting together a list, "Hey, I    11:56:15

6    picked that tram driver two months ago.  She was negative.

7    Maybe when I'm randomly picking I shouldn't randomly pick her

8    again"?

9    A.   I have -- I keep a whole 12 months worth so when I go

10   through and doing my target list, I'll go back and look at the    11:56:31

11   previous months to make sure they are not on there twice.  Now,

12   it doesn't mean somebody is not going to be on there twice.

13   I'm not going to say any names obviously.  Inmate was caught

14   bringing some things into visitation.

15   Q.   But my question was, if the person had been searched two    11:56:50

16   months prior, was negative, no contraband, if you randomly

17   selected her name again, would you say, "Well, maybe not this

18   tram driver, a different tram driver"?

19   A.   That is normally how I would do it.  It doesn't mean

20   somebody won't be on there two months in a row, even three    11:57:04

21   months in a row.  As I said before, searches are conducted on a

22   daily basis as needed.  I definitely don't try to hit somebody

23   up over and over again because, obviously, it looks like I'm

24   necessarily picking on them.  There are some cases where an

25   inmate was going to be on that list a lot more than others    11:57:22

JASON JARDINE - Cross

1    because of their previous actions.                                  11:57:25

2         As far as just being a tram driver for no other

3    reason, you shouldn't be on there two times in a row.

4    Q.   Okay.   Thank you.

5         MS. KENDRICK:   I have nothing further Your Honor.    11:57:34

6         THE COURT:   Thank you.   I have a couple of questions.

7         Officer Jardine, on the same page that we've been

8    talking about, and that is the page that is in Exhibit 31 but

9    is the second page of that exhibit, and it's the August list

10   that has the crossed-out place where Ms. Ashworth was listed,  11:57:48

11   are there any other tram drivers on this list?

12        THE WITNESS:   There was.   I don't remember who they

13   were.   Obviously, when all of this kind of came about, just out

14   of curiosity, I went back and said, "Hey, who did I pick that

15   month?"   And all I had to do was look at -- there are so many  11:58:10

16   names on this list, I know why they are on there.   It's for

17   other reasons, not because of the work assignments.   It's for

18   other reasons but for the most part, there were some Televerde

19   inmates, some that work at the animal shelter.   There was a

20   painter I believe on there and one or two more tram drivers.   I  11:58:26

21   don't know the exact number though, sir.

22        THE COURT:   Okay.   And do you know how long

23   Ms. Ashworth had been a tram driver?

24        THE WITNESS:   She's been a tram driver since middle

25   of May I believe, sir, of this year.                            11:58:38

United States District Court

JASON JARDINE - Cross

1        THE COURT:  And how do you know that?                    11:58:41

2        THE WITNESS:  Again, as all of this is kind of going

3   on, I knew that -- like I said, I did the screen shot.  I knew

4   she was a tram driver.  I knew there was no other reason for

5   her to be on there but just to cover myself to make sure that I   11:58:51

6   wasn't losing my mind, I went to the work coordinator and asked

7   them, "Hey, can you look up this name and see how long has she

8   been a tram driver?"  And she had been a tram driver since May

9   she told me.

10       THE COURT:  And why did you want to check to make         11:59:05

11   sure you weren't losing your mind?  Why was it important to see

12   how long she was a tram driver?

13       THE WITNESS:  Sir, I've got to tell you, working in

14   this environment, you always want to, you know -- it's cliché,

15   cross your Ts, dot your Is.  I had no concern as to why she was   11:59:17

16   on there.  I know I hadn't done anything wrong and it was fine.

17   But curiosity, that's my job.  I want to go and look and see

18   what -- I knew she had been a tram driver I guess because I had

19   no other reason to put her on there.  I didn't know her.  I had

20   never really spoke to her.  I have never heard intel on her.      11:59:36

21   So, obviously, when I looked and saw she was a tram driver, I

22   saw she was on there.  My next question was, how long was she a

23   tram driver?  It was just natural progression of curiosity.

24   That's all.

25       THE COURT:  Okay.  Thank you.                             11:59:54

United States District Court

JASON JARDINE - Redirect

| 1 | Any redirect? | 11:59:55 |

MS. LOVE:   Just a few questions.

**REDIRECT EXAMINATION**

BY MS. LOVE:

Q.   Officer Jardine, if you could look back again at Exhibit
31 for us and on page two, you were asked questions about
Ms. Kendrick as to why -- where in the column for Inmate
Present, yes or no, for the ones that had a no, you were asked
questions as to why there was given no reason; correct?

A.   That is correct.

Q.   And you talked about it was -- well, whether or not the
officer was complete and wrote it down or not.  Summarizing --

A.   Can I asked something to that?

Q.   Sure.

A.   You know, obviously, we don't want to do a search when an
inmate is not there because she could always go back and say we
put something there or whatever.  If you look at the -- in that
column where it says "no," there's two officers' names that are
listed.  So if an inmate is not there, there's going to be two
officers there to protect ourselves.  It doesn't account for
the fact that they should have put in where the inmate was at.
You know, that's something that would be addressed obviously.
I don't think there was any illicit reasons why it was not
there.

Q.   If you could look at page one of Exhibit 31 under the

United States District Court

JASON JARDINE - Redirect

1    column for Inmate Present, yes or no, are there three          12:01:14

2    indications where it indicates no, that the inmate was not

3    present?

4    A.    There are one, two, three cases there.

5    Q.    For each of those, does it state the location of the     12:01:28

6    inmate just like you said you would expect that an officer

7    would write if they are not present, where they were at?

8    A.    That is correct.  I know in the past when somebody and,

9    again, I'm not saying it's right or wrong.  I know in the past,

10   even when I first started at DOC here in Arizona, if someone    12:01:45

11   put "no" and they didn't put down where they were at, sometimes

12   an officer would think, well, they are on the yard, she's doing

13   rec time, or they didn't know where they were at and they just

14   put "no" there.  They don't know exactly where they are at.

15   Q.    So for the September list that is an ongoing list now, the 12:02:03

16   first note also says next to it Class; correct?

17   A.    Yes, ma'am.

18   Q.    The second category for a "no" and where the inmate wasn't

19   present it also says Class?

20   A.    Yes, ma'am.                                               12:02:15

21   Q.    And the third one says "no" and then it says Televerde; is

22   that correct?

23   A.    That is correct.

24   Q.    You were also asked questions about tram drivers or jobs

25   and shifts they work, whether they work graveyard shift or day  12:02:24

United States District Court

JASON JARDINE - Redirect

1    shift on cross examination.  I just wanted to follow up with                    12:02:28

2    you on that.

3           Based upon your training and experience as an

4    SSU officer, are tram drivers still at risk of engaging in

5    introduction of contraband whether they work a day shift or a        12:02:40

6    graveyard shift?

7    A.   It's the same to me.  You know, yes, the visitors are

8    there during the daytime and there was a lot of visitors.  But

9    visitors aren't the only ones that are doing things they

10   shouldn't be doing at times with inmates.  And a lot of times       12:02:55

11   it's not even another person involved.  It could be inmates

12   just passing notes or leaving notes on the side of their route

13   as they travel.

14          It would be really easy for any shift for an inmate

15   driving a tram to slow down, throw out a note or something like     12:03:09

16   that at a specific place and then another tram driver that

17   works -- that goes to the other units pick it up and take it

18   over there.  That could happen.  That could easily happen.  It

19   doesn't really matter what shift you work.  If it didn't matter

20   if they were on graveyards, then they wouldn't be at work at        12:03:26

21   those times.

22   Q.   No further questions.  Thank you.

23          THE COURT:  Did my questions engender any questions,

24   Ms. Kendrick?

25          MS. KENDRICK:  No, sir.                                      12:03:36

United States District Court

JASON JARDINE - Redirect

1          THE COURT:  I have just one more question.                    12:03:37

2          THE WITNESS:  Yes, sir.

3          THE COURT:  And it's not about the content of an

4    email but I gather in your work that you have a lot of

5    experience with the email system at the department?        12:03:49

6          THE WITNESS:  Yes.  Yes, sir.

7          THE COURT:  So one of the things that has been

8    apparent to me in this Exhibit 1 is what I've highlighted and I

9    wanted to ask you about that, and that is that at the sent

10   column where it has the day and the date and the time, it says   12:04:08

11   Saturday, the 21st of July 2017, and then it lists the time.

12   And I can tell you for sure that the 21st of July was not a

13   Saturday.  It was Friday.

14         THE WITNESS:  Okay.

15         THE COURT:  Do you have any idea how that could        12:04:24

16   happen?

17         THE WITNESS:  That is a movement issue.

18         THE COURT:  No.  No.  I'm not worried about the

19   content.  This looks to me something like the email program

20   generates automatically.  When you print out an email, it      12:04:37

21   prints out the screen of -- at least for my office, if I print

22   out an email, it prints out my screen on the email and one of

23   the things that is included is the date and the time that it

24   was sent and then is what seems to be here.  It's the to, CC.

25   So it's that heading and it has been printed here and what it   12:04:54

United States District Court

JASON JARDINE - Redirect

1   shows is something that is just not right.  It says as the day,        12:04:58

2   the 21st of July when the 21st of July was actually a Friday.

3   Do you have any idea?

4            THE WITNESS:  I have not a clue.

5            THE COURT:  Have you ever seen any kind of an              12:05:09

6   incongruity like that between the day and the day?

7            THE WITNESS:  I've never noticed anything like that

8   before.

9            THE COURT:  Okay.  Thank you.

10           So the last thing I have to say is because I have the      12:05:19

11  pleasure of having you in my courtroom and having you right in

12  front of me and so that means that I can talk to you about why

13  it is I'm doing this, because I think people don't fully

14  understand and I can fully appreciate that if I am working at

15  Perryville, I'm wondering why is a judge in Phoenix interfering   12:05:35

16  with my life.  So there are probably a lot of people who are in

17  your position who naturally have that reaction.  You know,

18  we're trying to do the best job we can and so why is this judge

19  doing this?

20           Well, it sounds from your answers that you understand    12:05:50

21  that there was a legal case called *Parsons v. Ryan*, and you

22  used those words.  And you may also understand that it was a

23  lawsuit about health care measures and that the parties agreed

24  to settle it.  In other words, the defendant, the State, and

25  the plaintiffs class agreed to settle the lawsuit.  The           12:06:08

JASON JARDINE - Redirect

1    settlement produced an agreement and that agreement includes          12:06:14
2    certain promises and what kind of health care steps the State
3    would take with respect to the plaintiff class and to do
4    certain other things.  And the hope at the time was that those
5    things would happen, but the agreement contemplated the               12:06:30
6    possibility that they might not.  In that circumstance, the
7    agreement also provided for a judge, me, here now, to make sure
8    that those promises were realized.

9          And what that means is that I have to jump into the
10   position of being a manager in the prison system to try to see        12:06:53
11   what the problem is, what the failure is with respect to
12   meeting these promises, what kind of solutions are available
13   and then moving toward implementing those solutions.  That
14   means necessarily that I'm jumping into a context that I don't
15   fully understand.  I don't have your years of experience in           12:07:15
16   corrections.  I can't possibly know everything that you know.
17   That is a problem.

18         The way that I can deal with that problem is to make
19   sure that my learning about it, learning about the problems
20   that I'm addressing, is as full and accurate as possible.             12:07:32

21         The stipulation provides for a mechanism for that but
22   also there's another mechanism.  The one that is in the
23   stipulation is for the plaintiffs' lawyers to have an
24   opportunity to visit the prison and to talk with the prisoners
25   and so that's why they do that.  That is because they are the         12:07:50

JASON JARDINE - Redirect

1   ones who sort of in that role are my eyes and ears on the                    12:07:54

2   ground because I can't go and do it as often as they can.  So

3   they do that and they talk to people and the people are the

4   class members, the inmates, and then they bring that

5   information to me.  So there's this pipeline of information          12:08:10

6   that comes from the yard to me through the lawyers.

7           There's another pipeline and it's when people sit in

8   that chair and so I've had people in that chair who are inmates

9   who were providing this information to me.  And I will tell you

10  that every single one of them has told me that they were          12:08:25

11  fearful that if they came and spoke to me that they would be

12  retaliated against for that.  And I assured them that there

13  would be no retaliation and then we had allegations that there

14  was retaliation.

15          And I have before this summer, prior to this summer,       12:08:42

16  I have addressed the issue of retaliation because it is a very

17  serious concern for me because I know that if there is a fear

18  of retaliation, it will chill this pipeline, the free-flowing

19  pipeline will become frozen and nothing will move.  I won't get

20  that information.  People will scatter when the lawyers come        12:09:02

21  and they won't be willing to come here and tell me the truth if

22  they think there is retaliation.

23          Now, I have heard people tell me that there was no

24  retaliation and even assuming that everybody is telling me the

25  truth, I still have to deal with the issue of retaliation          12:09:18

United States District Court

JASON JARDINE - Redirect

1  because the specter of retaliation, the possibility of                    12:09:21
2  retaliation is as dangerous to my pipeline as real retaliation.

3          And here's how that works:  Somebody comes here,
4  testifies to me and a couple days later they go back to the
5  yard and some kind of change happens in their circumstance that           12:09:39
6  they view as being adverse or other inmates view as adverse.
7  Those other people can't know about -- let's say this was a
8  random.  They wouldn't know that it was random that they would
9  watch and they would see, oh, somebody came to court and
10 testified.  Later they are searched.                                       12:10:03

11         So even if it's random and you could show 100 percent
12 it was random, it still would have a danger to my pipeline.  It
13 still would have that freezing potential.

14         So what I have to do is deal with that reality that
15 the perception can be as dangerous as what is actually true, so            12:10:23
16 what that has meant is I have provided for a rule that says
17 that you can't take any adverse action against an inmate or a
18 disciplinary action close in time to when they testify because
19 then that avoids the risk of people perceiving it as
20 retaliation.                                                               12:10:41

21         Now, I understand that when I do that, I am
22 interfering with sort of your job one and that is to run a safe
23 prison.  And oftentimes that requires the following of rules
24 and, as you described, standard procedures that result in these
25 searches of you trying to do your job.                                     12:10:56

United States District Court

JASON JARDINE - Redirect

1    So all of a sudden, this Phoenix judge is saying, no,    12:10:58

2  you can't do it.  You are thinking in your head no, I have to

3  pull her off the list because it could -- well, I understand

4  that imposition on you and the down side to it on this side of

5  the house about the disciplinary concern, but there's this    12:11:09

6  other side that I've talked about and that is maintaining the

7  pipeline of information.

8    So it's frequently true in life that we encounter two

9  goods that can't be respected at the same time and so we have

10  to weigh which one are we going to favor at a particular time.    12:11:25

11    And the way that I've weighed this is I have said

12  that if you want to take an adverse action against an inmate or

13  a disciplinary action against an inmate close in time to when

14  they testify, you're going to have to give me a very good

15  reason why it had to be done then.  So I've said this to the    12:11:41

16  defendants' lawyers and I will listen to them when they want to

17  give me a very good reason.  But if there isn't a very good

18  reason, because if it is, as you say, is a nuisance infraction

19  as you say, somebody's shirttail is out and they get ticketed

20  close in time to when they talked to the lawyers, that, to me,    12:12:01

21  is going to have the same danger as if it had been done like it

22  was retaliation because it looks like retaliation.  So I say

23  you can't do it because you're chilling my process.  And that's

24  why you're here.

25    And my hope is that we get this thing resolved so    12:12:15

United States District Court

JASON JARDINE - Redirect

| | | |
|---|---|---|
| 1 | that you can get back to your business and the plaintiffs will | 12:12:17 |
| 2 | get the health care that they were promised and we'll all be | |
| 3 | done with this.  But until then I'm going to be in your hair | |
| 4 | and I'm sorry about that, but I want you to understand that | |
| 5 | it's necessary.  And I thank you for coming here today and | 12:12:29 |
| 6 | listening to this just now. | |

         Thank you, sir.  Have a good day.

         THE WITNESS:  Thank you.  I appreciate it.

         THE COURT:  So shall we come back an hour from now?
Is that enough time for everybody.

         MS. KENDRICK:  Yes, Your Honor.  Just one
housekeeping thing.  I forgot to move into evidence Exhibit 9.

         THE COURT:  Any objection?

         MR. BOJANOWSKI:  No objection, Your Honor.

         THE COURT:  Nine will be received.  Thank you.

         So we'll be back at 1:15.  I'm sorry for keeping
everybody past the noon hour.  Thank you.

     (Exhibit Number 9 was admitted into evidence.)

     (Recess at 12:15; resumed at 1:16 p.m.)

     (Court was called to order by the courtroom deputy.)

         THE COURT:  Thank you.  Please be seated.

         Another housekeeping matter.  You probably saw from
the docket, or maybe it hasn't dropped yet, but we receive
periodically -- meaning "we" the Court -- letters from inmates
and others directed to the subject matter of the cases seeking

United States District Court

JASON JARDINE - Redirect

1  relief or other things from the Court.  And what we do                01:16:35

2  routinely with those letters, whether in this case or others,

3  is we respond in a letter to the person who sends the letter

4  saying that we're unable to communicate with you in this way.

5  The Court can only consider matters that are filed in cases, et      01:16:55

6  cetera.

7          But in this case, when we receive matters from people

8  who appear to be class members, what we do is communicate back

9  to them saying that we cannot communicate with you in this way.

10 We can communicate through your lawyer.  And we send a copy of       01:17:11

11 that letter and a copy of what the Court received to both

12 counsel.  So you probably have already seen that.  We've done

13 that.

14         But the other thing that I thought I probably also

15 ought to let you know is that we do the same thing, but there's      01:17:28

16 no written record of it, when we receive a non-written

17 communication from somebody who is associated with it appears a

18 class member.  We respond that we're not able to communicate

19 with them in that way and we provide the information to

20 plaintiffs' counsel.  We had been told, meaning all of us, it's     01:17:48

21 not the royal "we" but we have been told that Ms. Eidenbach was

22 the contact person so we have been giving your name.  Is that

23 what you would like to have happen?

24         MS. EIDENBACH:  That is fine with me, Your Honor.

25 You can also give them the Prison Law Office's contact as they       01:18:05

United States District Court

JASON JARDINE - Redirect

1    handle quite a few of the family end prisoner contacts as well.    01:18:11

2            THE COURT:  All right.  Thank you very much.

3            Alrighty.  Anything else?

4            MS. KENDRICK:  Well, just to clarify something you

5    said, you said that you send a copy of that letter and response    01:18:21

6    to counsel?

7            THE COURT:  Right.  If they sent to the Court, then

8    they put it in the public discourse.  I don't think it's

9    appropriate for me to be sending an *ex parte* communication back

10   to one side without communicating with the other.    01:18:34

11           So if you want, I can destroy the letters but I think

12   that's not a good idea.

13           MS. KENDRICK:  No.  No.  The question was just

14   more -- is it Ms. Eidenbach that the clerk's office has been

15   copying on these responses?  Because my office has never    01:18:51

16   received a copy of something that the Court has sent to a class

17   member.

18           THE COURT:  Okay.  I'll double-check.

19           Have you received any, Ms. Eidenbach?

20           MS. EIDENBACH:  Not that have been designated as    01:19:02

21   coming from your chambers.

22           FEMALE VOICE:  They have been docketed.

23           MS. EIDENBACH:  Okay.  Yeah, and we read them on the

24   docket.

25           FEMALE VOICE:  Some of them have been docketed.    01:19:10

United States District Court

JASON JARDINE - Redirect

1        THE COURT:  So what happened this week that sort of

2   brought it to my attention again is I had thought that it was

3   not a good idea for them to be on the docket, and that was

4   because I didn't know whether there would be personal

5   information that would be disclosed such that were we routinely

6   ask the lawyers to redact from documents, so it occurred to me

7   that the better thing to do was to return the letter to -- or

8   forward the letter to plaintiffs' counsel with a copy to

9   defendants.

10        MS. EIDENBACH:  Yes.  I think that's a good procedure

11   to follow.

12        THE COURT:  Okay.  Thank you also.

13        MS. LOVE:  Your Honor, during the testimony --

14        MR. BOJANOWSKI:  Your Honor, could I be the person

15   designated to receive the letters on behalf of defendants?

16        THE COURT:  Of course.

17        MR. BOJANOWSKI:  Thank you.

18        THE COURT:  Surely.  We'll try to do that.

19        MS. LOVE:  During the testimony of the last witness,

20   Officer Jardine, I preliminarily moved Exhibit Number 31 into

21   evidence and then there was an objection on foundation.  We

22   laid that.  I forgot to do that at the end so at this time,

23   defendants do move for admission of Exhibit Number 31.

24        THE COURT:  Any objection?

25        MS. KENDRICK:  No, sir.

United States District Court

JASON JARDINE - Redirect

1        THE COURT:  Thank you.  31 will be received.                    01:20:12

2      (Exhibit Number 31 was admitted into evidence.)

3        THE COURT:  So the next witness, please.

4        MR. BOJANOWSKI:  Your Honor, the next witness would

5    be relating to the HNR box issue.  We brought back one of our    01:20:18

6    nurses that had been here before.  It will be a Tanna Gualco is

7    the person that we would call and it would be the only nurse

8    that we're going to have since having three saying the same

9    thing --

10       THE COURT:  Doesn't make any sense?                           01:20:40

11       MR. BOJANOWSKI:  It doesn't make any sense.

12       MS. KENDRICK:  But defendants listed a different

13   nurse.  Ms. Gibson.

14       MR. BOJANOWSKI:  She, unfortunately, went into the

15   hospital so we had to substitute.                                 01:20:49

16       THE COURT:  All right.  We'll see where this leads.

17   If there's a problem that we need to in fairness consider that

18   fact, we will.

19       Welcome back.  Again, step forward to the clerk of

20   the Court who will administer the oath.                           01:21:01

21       MAGISTRATE JUDGE CLERK:  Is your fist name spelled

22   T-A-N-N-A?

23       THE WITNESS:  Yes.

24       MAGISTRATE JUDGE CLERK:  And can you spell your last

25   name, please.                                                     01:21:02

United States District Court

TANNA GUALCO - Direct

```
 1            THE WITNESS:  G-U-A-L-C-O.                          01:21:02

 2        (TANNA GUALCO, a witness herein, was duly sworn or

 3    affirmed.)

 4            THE COURT:  Please have a seat in the witness stand.

 5            Counsel, I'm going to approach just out of           01:22:01

 6    efficiency.

 7            Well, I'm sorry for the confusion here.  I had to

 8    address a couple of preliminaries with respect to what counsel

 9    had said before you came in the room which caused me to think

10    that maybe you were somebody else and so I needed to make sure 01:23:10

11    that I was on right page, so that's why we did that little bit

12    of stall.  My apologies for that but welcome.

13            THE WITNESS:  Thank you.

14            THE COURT:  Please.

15            MR. BOJANOWSKI:  Thank you, Your Honor.              01:23:21

16                         DIRECT EXAMINATION

17    BY MR. BOJANOWSKI:

18    Q.  Would you please state your name for the record and spell

19    your last name?

20    A.  Tanna Marie Gualco.  G-U-A-L-C-O.                        01:23:25

21    Q.  Are you currently employed?

22    A.  Yes.

23    Q.  Where are you employed?

24    A.  Eyman Complex.

25    Q.  And what unit?                                           01:23:36
```

United States District Court

TANNA GUALCO - Direct

1   A.   Meadows.                                                          01:23:37

2   Q.   And what's the security level at that unit?

3   A.   It is a three.

4   Q.   What does that mean?

5   A.   It's the classification.  It's the lower classification.          01:23:49

6   Four and five are the higher custody in the closed yard.

7   Q.   Is it an open yard?

8   A.   It is.

9   Q.   Who are you employed by?

10  A.   Corizon.                                                          01:24:03

11  Q.   And how long have you been so employed?

12  A.   Since June of last year.

13  Q.   And how long have you worked at the Meadows Unit at the

14  Eyman?

15  A.   Since June of last year.                                         01:24:11

16  Q.   All right.  Have you worked at any other ADC facilities?

17  A.   No.

18  Q.   And what position do you hold with Corizon at the Eyman

19  facility?

20  A.   Assistant Director of Nursing.                                   01:24:27

21  Q.   Okay.  Are you an R.N., L.P.N.?

22  A.   R.N.

23  Q.   R.N., okay.  Are you familiar with the HNR boxes that are

24  used at the Meadows Unit?

25  A.   Yes, I am.                                                       01:24:46

TANNA GUALCO - Direct

Q.   Could you describe in a broad overview to the Court how it                01:24:47
is that those boxes are used currently?

A.   Currently, they are for prescription drop-offs.  If an
inmate needs med refilled or reordered, that's where they would
put their HNR.                                                                 01:25:03

Q.   Was there a time when the HNR boxes were not just used for
prescriptions?

A.   Yes.

Q.   And do you remember when that was, when that transition
took place?                                                                    01:25:18

A.   I don't.

Q.   All right.  So maybe you could explain to the Court in a
general sense how the HNR boxes were used before that they were
changed over?

A.   Before the HNR boxes were for any medical need.  If they                  01:25:29
needed dental, mental health, they needed to be seen on Nurse
Line or pharmacy all the HNRs would go in the box.  The night
nurse would then pick them up and triage them so that the next
day that they could see the nurse, dental or whoever they
needed to see.                                                                 01:25:53

Q.   So whatever time that the inmate put the HNR in the box,
they would have to wait to the next day before they would be
seen by somebody?

A.   Yes.

Q.   All right.                                                                01:26:02

United States District Court

TANNA GUALCO - Direct

1      Are you familiar with the open clinic concept that is
01:26:10

2 now currently in place at your unit?

3 A.   Yes.

4 Q.   And go ahead and explain what that is and how that works

5 in a general sense.
01:26:19

6 A.   So now each building has their designated times that are

7 posted in their housing and outside of the health unit to bring

8 up their completed HNRs.  And then the night nurse triages,

9 sees the ones that need to be seen and then refers the

10 others -- if it's a pharmacy drop-off for refill or they need
01:26:38

11 medical supplies, the nurse night nurse triages them and gets

12 them taken care of that day.

13 Q.   If I understand what you're saying correctly is there's

14 basically two different ways HNRs come into the health units.

15 Is that accurate?
01:26:58

16 A.   Yes.

17 Q.   The one way is through the -- what are now called

18 prescription boxes; right?

19 A.   Yes.

20 Q.   And then the other way is that the inmate brings the HNR
01:27:08

21 with them when they come to the clinic; correct?

22 A.   Yes.

23 Q.   When is the inmate -- excuse me.  You said all of these

24 HNRs are then triaged by the triage nurse in the morning;

25 right?
01:27:26

United States District Court

TANNA GUALCO - Direct

1   A.   Yes.                                                          01:27:27

2   Q.   And what time does that occur?

3   A.   7 o'clock.

4   Q.   Is that the time the clinic opens?

5   A.   The clinic is open 24/7 but Nurse Line, the first two        01:27:32

6   buildings are called out at 7 o'clock because their time is

7   from 7 to 8:30.

8   Q.   And is that the time that the inmates need to appear at

9   the clinic to be processed or be seen with their HNR in hand?

10  A.   Yep.  Once the officer calls their building, that's their   01:27:50

11  go time where they can come up with their HNR and be seen.

12  Q.   And do you see all of the inmates that present themselves

13  between 7 and 8:30?

14  A.   We see every single one.

15  Q.   If somebody shows up at 8:31, what happens to that inmate?  01:28:04

16  A.   It's triaged based off of urgency.  If someone has a

17  broken hand, we're going to see -- obviously see them but if

18  it's I'm having allergies, then they will have to wait because

19  the next two buildings are already lining up for their HNR

20  time.                                                             01:28:24

21  Q.   Okay.  Are there notices or signs or posters or something

22  like that that are in the unit that tell inmates the times that

23  they are supposed to show up at medical if they want to see a

24  nurse?

25  A.   Yes.  They are posted right outside of the health unit and  01:28:43

United States District Court

TANNA GUALCO - Direct

1   each building has it posted in their runs.                              01:28:46

2   Q.   The HNR forms that are used by the inmates, do you know

3   where those are located and how an inmate would go about

4   obtaining one?

5   A.   They can either get them from their officers in their      01:29:16

6   housing units or they can come up to medical and get one from

7   the health unit officer.

8   Q.   Okay.  So if they wanted to get one, say they were in a

9   building that was not their turn to show up for Nurse Line,

10  could they still just come up and get an HNR?                    01:29:32

11  A.   Oh, yeah, m'hum.

12  Q.   Okay.  And you said that the HNRs are then in each of the

13  housing units as well?

14  A.   Yes.  All of the officers should have, yeah.

15  Q.   When you were working at the Eyman facility at the Meadows  01:29:54

16  Unit when the HNR boxes were used by inmates to actually seek

17  Nurse Line care, about how many requests were received by the

18  health unit on average in a day?

19  A.   It would really vary.  It could be 20.  It could be 50.

20  Q.   Okay.  Just depending.  Now, were those HNRs that were put  01:30:17

21  in the boxes when they were used in that fashion?  Did they

22  also include things for dental care, mental health care,

23  prescription refills, supplies for mental health people who

24  needed journals and books and things like that?  It was all

25  collected in one place.  Is that what was happening?            01:30:41

United States District Court

TANNA GUALCO - Direct

1   A.   Yes.                                                          01:30:45

2   Q.   And so the nurse would then triage all of that stuff and

3   then get it to the appropriate entity for follow-up?

4   A.   Right.

5   Q.   Now, under the open clinic procedure, how many people come   01:30:57

6   to open clinic with an HNR on an average day?

7   A.   About the same, 20 to 50.

8            THE COURT:  20 to 50, I'm sorry, did you say?

9            THE WITNESS:  Yes.

10           THE COURT:  And before did you say 20 to 50 also?        01:31:11

11           THE WITNESS:  Yes.

12           THE COURT:  Okay.  Thank you.

13  BY MR. BOJANOWSKI:

14  Q.   And so with the numbers that you're seeing, are you able

15  to actually see all of those people in that day?                  01:31:20

16  A.   Every single person that presents with a physical, mental

17  complaint is seen right then and there.  However, the ones that

18  aren't, we still get the ones that come up for prescription

19  refills or checking the status of their supplies, those ones

20  don't need to wait and seen on Nurse Line.  Those are ones that   01:31:42

21  we can address and let them know.

22  Q.   Is everyone that is showing up now with the HNR, are they

23  all seeking to be seen or are some of them just coming up with

24  an HNR for, like, the supplies or prescription refill or maybe,

25  you know, they want a test result or a lab result, something      01:32:13

United States District Court

TANNA GUALCO - Direct

1   like that?  Are those people still coming up to the open clinic          01:32:15

2   to drop that off?

3   A.   Yes.

4   Q.   Do they have to be seen?  The person who says, "Look, all

5   I want is a refill on my prescription," do they have to be seen          01:32:24

6   at that time or is it processed like in the normal course?

7   A.   They don't have to wait.  We just let them know, "Okay.

8   I'll get this filled for you.  You'll get your receipt that it

9   was filled on this date and this time," and they don't have to

10  wait in the health unit.                                                 01:32:41

11  Q.   Okay.

12        Now, when the inmates come up to the medical unit

13  with an HNR, do they have to sign in or does somebody log them

14  in or is there some kind of record that is made with regard to

15  who showed up, when they showed up, what they are seeking?  Is           01:33:04

16  there anything like that that is done?

17  A.   When they come in, they put their nametag up on the board

18  under Nurse Line triage so that way we can keep track of who is

19  coming first, to see who came first.  And then there's -- our

20  Nurse Line log who we see on our Nurse Line, we put each                 01:33:24

21  inmate's name and who they are referred to that day.  And then

22  at the end of the day, we have copies of all of them.  But

23  that's our way of seeing.

24  Q.   Is there a time that is recorded or something like that

25  that they actually appeared at the unit with their HNR?                  01:33:43

United States District Court

TANNA GUALCO - Direct

1 A. No.                01:33:49

2 Q. What happens, if a person were to show up with their HNR,

3 they put their badge on the board like you said and then they

4 leave?

5 A. Sometimes they like to go outside and smoke so the officer 01:34:01

6 will go get them and let them know they have to come in.  Other

7 times the officer will have to call them, call their housing or

8 figure out where they went and ask them, "Are you still wanting

9 to be seen?"  And most of the time they come in, decide they

10 want to be seen for something and then decide that they don't 01:34:17

11 want to sit and they will just leave.

12 Q. Okay.

13   THE COURT:  For these people who decide after they

14 have come, put they are name up on -- their ID on the board and

15 they decide they want to leave and they take their ID from the 01:34:36

16 board, there is no written record that exists in the clinic

17 office that they have come and/or left?

18   THE WITNESS:  Once we get their HNR in our hand, if

19 they leave, they have to come back and sign refusal because

20 technically we've already touched that HNR, so we have to see 01:34:53

21 them, especially if they have a physical complaint.

22   But if they come in while we're seeing somebody else

23 and they have an HNR to turn in and they realize, "I don't

24 actually want to be seen today," and they take off, we don't

25 have any way to document anybody like that.      01:35:08

United States District Court

144

TANNA GUALCO - Direct

 1          THE COURT:  So when somebody arrives and they put          01:35:11

 2   their name up on the board, they wait either inside or outside

 3   because the line is too long maybe, so they might be outside;

 4   is that right?

 5          THE WITNESS:  There's plenty of seating in our health      01:35:19

 6   unit.

 7          THE COURT:  Oh, in your health unit, there's plenty

 8   inside?

 9          THE WITNESS:  Yes.

10          THE COURT:  Okay.  I'm sorry for speaking over you.        01:35:25

11          So when they have done that, put their name up on the

12   board and then taken a seat, when is it that they hand in their

13   HNR?

14          THE WITNESS:  I always -- when I run my Nurse Line,

15   as soon as I'm done seeing an inmate, I go out to get the next    01:35:41

16   and ask if there's any others that have shown up to be seen on

17   Nurse Line and at that time I take their HNRs.

18          THE COURT:  So at 7:30 when you open, there's a line

19   of people outside?

20          THE WITNESS:  No.                                          01:35:56

21          THE COURT:  There's never a line at 7:30?

22          THE WITNESS:  For meds.  Meds are going on at that

23   time.  But for Nurse Line, when they call them out at 7

24   o'clock, they kind of trickle in one by one so there's not

25   really like a long line of people.                               01:36:07

United States District Court

TANNA GUALCO - Direct

1      THE COURT:  So at 7 o'clock when you open and people
2  come in, they walk in and they have an HNR and they -- do they
3  at that moment hand in their HNR as they are putting their tag
4  up on the board or do they put their tag up on the board and
5  wait in the seat to be called when somebody looks at the board
6  and says, "Who is this person?  Where are you?"

7      THE WITNESS:  Yes.

8      THE COURT:  It's the latter?

9      THE WITNESS:  Yes.

10      THE COURT:  All right.  So when people arrive at
11  seven and you have a group of people who are sitting there in
12  their chairs with their HNRs and then they put their name on
13  the board and you come out the first time, you take the
14  nametags from everybody that is there?

15      THE WITNESS:  Right.

16      THE COURT:  How soon again do you return to see if
17  there are more HNRs or to see if there's more names on the
18  board.

19      THE WITNESS:  Oh, every 15 minutes.

20      THE COURT:  And if you don't mind, Mr. Bojanowski,
21  I'll go ahead and ask another question that I had before.

22      MR. BOJANOWSKI:  Go ahead.

23      THE COURT:  The Med Line that you described from 7 to
24  8:30, when do you usually finish seeing all of those people?

25      THE WITNESS:  It varies.  Sometimes we're done by

United States District Court

01:36:10

01:36:25

01:36:35

01:36:52

01:36:59

01:37:15

TANNA GUALCO - Direct

```
 1  7:30 for that building and then they will call out for the next    01:37:17
 2  so that we can get urgent ones in sooner.
 3            THE COURT:  And does the 7 to 8:30 for Meadows ever
 4  push into the next building's time?
 5            THE WITNESS:  Not very -- no.                             01:37:30
 6            THE COURT:  Thank you.
 7            Thank you.
 8            MR. BOJANOWSKI:  Thank you, Your Honor.  You
 9  eliminated several of my questions.
10  BY MR. BOJANOWSKI:                                                 01:37:39
11  Q.   So we talked about the 7 to 8:30 time frame.  Are there
12  other time frames that the nursing lines run through the day
13  aside from the 7 to 8:30?
14  A.   Yes.  The 7 to 8:30 is only two buildings.  There's eight
15  buildings total.  So the first two buildings, their time is    01:37:58
16  from 7 to 8:30.  And then 8:30 to 10 are the next two and so
17  on.
18  Q.   Okay.  And at the same time that nurse lines are being run
19  on this unit, the Med Pass is occurring as well; correct?
20  A.   Yes.                                                          01:38:13
21  Q.   All right.  And the clinic, I think you said, is open
22  seven days a week, 24 hours a day?
23  A.   Yes.
24  Q.   Is there somebody there during that time?
25  A.   There's an R.N. on my yard 24/7.                              01:38:31
```

United States District Court

TANNA GUALCO - Direct

1   Q.   And you mentioned that the waiting area provides seating          01:38:47

2   for the inmates who are waiting to be seen.   How many seats are

3   there within the waiting area at this unit?

4   A.   There's about 20, 25.

5   Q.   And I think you said it's a first come, first serve             01:39:05

6   situation?

7   A.   Yes.

8   Q.   From your experience anyway, do you have any idea how

9   quickly inmates are seen by the staff during Nurse Line?  Is it

10  once every five minutes, 15 minutes, 35 minutes?  Do you have      01:39:28

11  an idea of what an average wait time would be?

12  A.   An average wait, we probably spend about ten minutes per

13  inmate unless it's something that needs extensive care and

14  needs more time.

15  Q.   All right.  Have you ever seen anybody having to wait more    01:39:47

16  than, say, an hour and a half, the 7 to 8:30?

17  A.   No.  No more than an hour and a half.

18  Q.   Anybody ever have to wait more than, say, three hours?

19  A.   No.

20  Q.   As far as the staff is concerned in this Meadows Unit         01:40:08

21  clinic during Nurse Line, how many nurses are actually working

22  within that unit to provide the care that is needed for the

23  inmates to be seen?

24  A.   We have one Nurse Line nurse and two Med Pass nurses.

25  Q.   Are there other staff that work in the unit as well?          01:40:30

United States District Court

TANNA GUALCO - Direct

1   A.   We have our on-site provider during the week as well as a      01:40:34
2   CNA.
3   Q.   Could you give us, in a general sense, of the kinds of
4   things that the Nurse Line does as far as providing care to the
5   inmate population?                                                  01:41:05
6   A.   Wound care.  We can help -- like if they come in for a
7   mental health complaint, instead of waiting to be referred to
8   be referred to mental health for, like, crosswords, puzzles, we
9   help out with that, too; and then just our Nurse Line
10  assessments to triage and send them to the right person that       01:41:30
11  they need to see, whether it's the dentist, mental health or
12  the provider.
13  Q.   Had you run the pill pass line, have you run that before,
14  too?
15  A.   Oh, yes.                                                       01:41:50
16  Q.   And how does that function on a day-to-day basis?
17  A.   The morning Med Pass is around an hour and then the PM Med
18  Pass is a little bit longer.  It takes about an hour and a
19  half.
20  Q.   And how does the process work?  Can you give the judge a      01:42:08
21  general idea of how it works at the Meadows Unit?
22  A.   Yes.  The officer will call out for east side and then all
23  of the east side inmates will come over and get their meds.
24  And then once the line is pretty much done, they will call out
25  for the west side so that they are not all out there waiting at     01:42:26

United States District Court

TANNA GUALCO - Direct

1    one time.                                                          01:42:31

2    Q.   Now, we had talked a little bit about the staffing and I

3    think you said there's a nurse on duty 24/7.  Is that an R.N.

4    that is on duty?

5    A.   The night nurses are L.P.N.s and then the day shift nurses    01:42:45

6    are R.N.s and L.P.N.s.

7    Q.   Who runs the nursing lines?

8    A.   An R.N.

9    Q.   And you said you had a provider that is assigned to your

10   unit?                                                              01:43:02

11   A.   Yes.

12   Q.   And how often is the provider there on the unit?

13   A.   Four to five days a week.

14   Q.   For how many hours?

15   A.   She does like four tens or five eight-hour shifts.           01:43:12

16   Q.   As far as the provider giving care to the inmate, does the

17   inmate have to be scheduled to see a provider or can they be

18   seen during the open clinic call when they show up with an HNR?

19   A.   If it's something that is very concerning because they

20   have to start out from Nurse Line, then a lot of the times I'll   01:43:51

21   go over to the provider officers and say, "Hey, can you come

22   look at this guy?"  In that way I can get him seen by a

23   provider, get verbals for antibiotics or anything else that

24   needs to be ordered or if it's not so urgent, then I refer them

25   to the provider.                                                  01:44:11

TANNA GUALCO - Direct

1  Q.   So that if it's an urgent matter upon triage and review of       01:44:12

2  the patient, you immediately get that person over to the

3  provider for care.   If it's a routine matter, they are then

4  scheduled --

5  A.   Yep.       01:44:27

6  Q.   -- later?

7       Okay.   How do you go about scheduling somebody for a

8  routine visit?

9  A.   So we have our Nurse Line list so we put down each

10 inmate's name, their number housing location and then there's a       01:44:39

11 comments box and in that comment, that's when we put routine,

12 urgent or emergent referral, whether it be to medical provider,

13 dental, or mental health.   And then at the end of the day that

14 list gets faxed over to a CNA who does the scheduling for the

15 provider.       01:44:58

16 Q.   Okay.   Are you aware or have you ever heard of a policy

17 whereby an inmate is required to see a nurse between two and

18 three times before they are ever referred to a provider?   Have

19 you ever heard of such a policy or seen such a policy?

20 A.   No.       01:45:17

21 Q.   So from your testimony, I take it that based upon the

22 patient's presentation, the nurse is left with the discretion

23 as to whether to refer that person to a provider regardless of

24 how many times they have had nurse visits?

25 A.   Correct.       01:45:40

United States District Court

TANNA GUALCO - Direct

1   Q.   Now, the HNR, once it's received and once the patient is    01:45:58
2   seen, is there some documentation that is put on the HNR that
3   says what occurred or is that just something that is put into
4   the electronic medical record?
5   A.   Yes.  On their HNR there's two boxes and on the first one,   01:46:14
6   that is how we triage so we would put NL for Nurse Line, MH for
7   mental health, and then the bottom box is the plan or action of
8   care and that's where we put seen on Nurse Line, referred to
9   provider.
10  Q.   And do you know what happens to the HNR after it's all      01:46:31
11  filled out?
12  A.   Yes.  We keep the original copy and then the three copies
13  underneath we hand to the inmate.
14  Q.   Okay.  So it's a three-copy document or three pages or
15  two?                                                              01:46:47
16  A.   Three or four.  I think there's four total.
17  Q.   Okay.  So how do you go about getting the copy of the
18  filled-out HNR to the inmate?
19  A.   If they are not seen right then and there, then we put it
20  in a -- this box that is labeled each building and so the       01:47:03
21  mail -- the property, whoever picks them up to deliver mail
22  will come get them from the health unit and deliver them.
23  Q.   If they are seen right away, is it filled out and then you
24  tear off the copy for the inmate and hand it to them before
25  they leave?  Is that the way it's done?                          01:47:25

United States District Court

TANNA GUALCO - Direct

1   A.   Yes.                                                                    01:47:27

2   Q.   Are you aware of or have you ever seen an instance where

3   an inmate has appeared at the open clinic with his HNR and has

4   been refused treatment or refused medical care?

5   A.   No.                                                                     01:47:58

6           THE COURT:  Even if they arrive after hours and it's

7   not emergent?

8           THE WITNESS:  If it's after hours and it's not

9   emergent, then we let them know, "Please fill it out and come

10  back when your building is called."                                         01:48:15

11          THE COURT:  And when I mean after hours, I mean not

12  at their designated time?

13          THE WITNESS:  Yes.

14  BY MR. BOJANOWSKI:

15  Q.   Have you heard any complaints about any of the inmates               01:48:29

16  from any of the open clinic procedure or concept?

17  A.   No, I haven't.

18  Q.   Do you like the open clinic concept?

19  A.   I do.

20  Q.   Why?                                                                    01:48:43

21  A.   Couple reasons.  They get seen way sooner than before and

22  also it holds them accountable.  Before when we had the boxes,

23  we would have to make a list and then have the officer call

24  each building and call these inmates down and sometimes we

25  would be looking for these inmates all day.  Have to track them            01:49:00

United States District Court

TANNA GUALCO - Cross

 1    down and then finally the Sergeant would have to go and bring                    01:49:05

 2    them down, so it just caused a lot more work.

 3              So now if they need to be seen, they come down and

 4    they are seen.

 5    Q.   All right.                                                                  01:49:18

 6              MR. BOJANOWSKI:  Your Honor, I have no further

 7    questions at this time.

 8              THE COURT:  Thank you.

 9              And now the plaintiffs' attorney will have a chance

10    to ask you questions.                                                           01:49:29

11              THE WITNESS:  Okay.

12              MS. KENDRICK:  Just as a housekeeping measure, does

13    the clerk still have the exhibits from the last time we did the

14    HNR hearings?

15              THE COURT:  Thank you.  So these aren't numbered                      01:49:56

16    exhibits.  The lawyers may refer to them and ask to look for

17    and pull out the one.

18              THE WITNESS:  Okay.

19              MS. KENDRICK:  Thanks.  I figured I would ask now

20    before we got too far along.                                                    01:50:08

21                        **CROSS - EXAMINATION**

22    BY MS. KENDRICK:

23    Q.   Ms. Gualco, how do I pronounce your last name?

24    A.   Gualco?

25    Q.   Gualco.  Okay.  How long have you been an R.N.?                            01:50:15

United States District Court

TANNA GUALCO - Cross

| | | |
|---|---|---|
| 1 | A.    Since April of 2016. | 01:50:20 |
| 2 | Q.    And how long have you been licensed in Arizona? | |
| 3 | A.    Since April of 2016. | |
| 4 | Q.    And have you registered or worked as a nurse in any other | |
| 5 | state besides Arizona? | 01:50:34 |
| 6 | A.    No. | |
| 7 | Q.    And what is your educational background? | |
| 8 | A.    Before nursing school? | |
| 9 | Q.    No.   In nursing school. | |
| 10 | A.    Educational background? | 01:50:45 |
| 11 | Q.    Did you get a bachelor's degree? | |
| 12 | A.    R.N., associate's degree. | |
| 13 | Q.    Did you meet with anybody about your testimony today? | |
| 14 | A.    No. | |
| 15 | Q.    Did you review any documents before coming to testify | 01:50:58 |
| 16 | today? | |
| 17 | A.    No. | |
| 18 | Q.    How many hours a week do you work? | |
| 19 | A.    It varies.   40 to 60. | |
| 20 | Q.    What are your regularly assigned work hours? | 01:51:10 |
| 21 | A.    My assigned hours are seven to 3:30. | |
| 22 | Q.    What days of the week? | |
| 23 | A.    Monday through Friday. | |
| 24 | Q.    And so that's five shifts a week? | |
| 25 | A.    Yes. | 01:51:31 |

TANNA GUALCO - Cross

1   Q.   And you said sometimes up to 60 hours.  Is that working          01:51:31
2   overtime?
3   A.   Yes.
4   Q.   And how often do you cover other shifts or work overtime?
5   A.   Quite frequently.  I'm a supervisor so especially when I'm       01:51:43
6   on call, I have to cover other yards or weekend shifts.
7   Q.   Do you volunteer to do overtime or are you told to work
8   overtime?
9   A.   It's a requirement for my position.
10  Q.   When is the last time that you had a week that you did not       01:52:09
11  do at least one overtime shift?
12  A.   Last week.
13  Q.   And before that?
14  A.   A couple weeks maybe.
15  Q.   Okay.  Why are you quite frequently doing overtime?             01:52:20
16  A.   Because if there's call-outs and I'm on call, I have to
17  cover the shifts.
18  Q.   Call out means if a nurse calls in sick?
19  A.   Correct, yes.
20  Q.   And how many vacancies are there for the nurses right now        01:52:35
21  at Eyman?
22  A.   I'm unaware.
23  Q.   You don't know?
24  A.   I don't know.
25  Q.   As the assistant director of nursing, do you oversee or         01:52:46

United States District Court

TANNA GUALCO - Cross

1   supervise the shift nurses on the other yards at Eyman?                  01:52:50

2   A.   No.   I'm just the ADON my unit.

3   Q.   So Eyman has five units; correct?

4   A.   Yes.

5   Q.   And there's an ADON for each unit?                                  01:53:02

6   A.   Correct.

7   Q.   Is that also used interchangeably with shift nurse or is

8   that something different?

9   A.   Interchangeable as in?

10  Q.   As a description.  Because I've gone on tours and people           01:53:13

11  have told me, "Hi, I'm the shift nurse for, you know, Rynning

12  Unit," or something like that.  So is that the same type of

13  person?  Is it a different way of describing your position?

14  A.   I'm just the supervisor of the unit so I help out as

15  needed.                                                                  01:53:30

16  Q.   Okay.

17          THE COURT:  She's asking whether the title Assistant

18  Director of Nursing, is that what ADON stands for?

19          THE WITNESS:  Yes.

20          THE COURT:  She's asking whether that title is a              01:53:41

21  synonym for the title shift nurse.

22          THE WITNESS:  Oh, no.

23          THE COURT:  Have you heard the term "shift nurse"

24  before?

25          THE WITNESS:  Like the regularly scheduled shift             01:53:52

TANNA GUALCO - Cross

1    nurses that we have?                                              01:53:54

2          THE COURT:  Just the term "shift nurse," is that not

3    a common term to designate people's role?

4          THE WITNESS:  Like a day shift nurse, yeah.

5    BY MS. KENDRICK:                                                  01:54:03

6    Q.   Or the charge nurse?

7    A.   Yes.  That is.

8    Q.   You're the charge nurse?

9    A.   Yes.  Yes.

10         THE COURT:  Okay.  I'm sorry.  Thank you.                   01:54:08

11         THE WITNESS:  Maybe I didn't understand that wording.

12   BY MS. KENDRICK:

13   Q.   My fault.  And you've described the open clinic at Rynning

14   and there's five units at Eyman.  Do you know if all five units

15   are running open clinic or just some of them?                    01:54:21

16   A.   Just three of the five.

17   Q.   Which ones?

18   A.   Rynning, Cook, and Meadows.

19   Q.   Okay.  And I believe you testified earlier that people

20   that are seeking mental health care have to physically come to   01:54:40

21   the clinic and put in an HNR --

22   A.   Yes.

23   Q.   -- to be seen?

24   A.   M'hum.

25   Q.   And do you or the other R.N.s working Nurse Line have any    01:54:48

United States District Court

TANNA GUALCO - Cross

1    mental health training?                                      01:54:55

2    A.    Like specific mental health training?  No.

3    Q.    Okay.  So you made some comment when Mr. Bojanowski was

4    talking about how the HNRs -- something about giving people

5    puzzles or journals to do.  Is that the common response that   01:55:17

6    the nurses have when people have an HNR raising a mental health

7    issue?

8    A.    They could just request puzzles for their anxiety and we

9    can go over to mental health and say, "Is this okay?  Can we

10   give it to them?"  So we'll give them their puzzles.  But we   01:55:35

11   have to see every single person that puts in a mental health

12   complaint on our Nurse Line.

13   Q.    And do you -- when you see these people on the Nurse Line

14   with the mental health complaints, do you charge them the $4?

15   A.    If they are not SMI, yes.                               01:55:53

16   Q.    Even if it's just to give them a puzzle?

17   A.    No.  No.  If they are asking for something like a puzzle,

18   that is taken care of right then and there because that's not

19   an issue that should have to wait.

20   Q.    If somebody coming in with an HNR who says like they need  01:56:09

21   clean catheters, would they have to wait or is there kind of a

22   separate line they could go be part of?

23   A.    I give that to the CNA.  That's the CNA's responsibility.

24   Q.    So is the CNA-- strike that.

25         Are people also being seen with nurses with scheduled   01:56:30

United States District Court

TANNA GUALCO - Cross

1  appointments.  So, for example, somebody who needs his blood          01:56:33

2  pressure checked every day or somebody needs wound care?

3  A.    Yeah.   That's the treatment line.   So the CNA does the

4  blood pressures if she's there.   And on the weekends, it's the

5  nurses and then when they call up for each building's HNRs they       01:56:47

6  also do treatments at that time for each of these buildings

7  during those times.

8  Q.    Okay.

9          THE COURT:  Excuse me.   Are you going to explore more

10 about the treatment line?                                            01:57:00

11         MS. KENDRICK:  I was but you are the judge.

12         THE COURT:  Please.   I'll wait then.   Go ahead.

13 BY MS. KENDRICK:

14 Q.    So with the treatment line -- so you're saying -- so, for

15 example, from 7 to 8:30 which buildings are that come in?            01:57:10

16 A.    Six and seven.

17 Q.    Six and seven.   So that would be the same time that

18 anybody who needs their blood pressure checked or wound care

19 who lived in six and seven, they would be scheduled at that

20 same time, too?                                                      01:57:26

21 A.    The treatments and wound care, yes.   The CNA has her own

22 way of doing the blood pressure checks throughout the day.

23 Q.    And if a person is insulin-dependent diabetic and they

24 need to have their blood tested, do they go to the treatment

25 line or is that something separate?                                  01:57:41

TANNA GUALCO - Cross

1   A.   There are scheduled times for the diabetics to have their          01:57:44

2   finger sticks, but they know it's open policy if they feel low

3   or high, they can come in and we can check it right then and

4   there.

5   Q.   But regularly scheduled times for people with diabetes to          01:57:55

6   come for the finger stick, is that during the a.m. and p.m.

7   pill call line?

8   A.   No.   They have their own designated.   They do it like 4:30

9   in the morning for a.m. and 4:30 p.m.

10          THE COURT:   Everybody who is an insulin-dependent               01:58:15

11  diabetic who is having a blood glucose determination with the

12  finger stick is scheduled for 4:30 a.m. and 4:30 p.m. but that

13  they also can come anytime otherwise if they want if they feel

14  that they are high ore low?

15          THE WITNESS:   Yes.   They may come in saying, "I feel           01:58:33

16  like I'm going to crash," and we'll check it and if they need

17  glucose, we can give it to them right then and there.   And

18  there also is a 12 o'clock pill pass that's a mix of special

19  meds for workers and there's about seven or eight diabetics

20  that come at that time, too, to get their finger sticks and     01:58:47

21  insulin that is scheduled at that time.

22  BY MS. KENDRICK:

23  Q.   And approximately how many people with diabetes would you

24  estimate are on Meadows yard total?

25  A.   About 60.                                                          01:59:01

United States District Court

TANNA GUALCO - Cross

1  Q.   So if they start at 4:30 in the morning, when are they        01:59:05
2  done seeing everybody?
3  A.   I'm not there until 7 o'clock in the morning so I can't
4  give a time.
5  Q.   Have you ever shown up at 7 o'clock in the morning and        01:59:18
6  seen people who are diabetic still waiting to get their finger
7  stick?
8  A.   No.
9  Q.   And you leave at 3:30 normally so you're not there for the
10 4:30 p.m. finger checks?                                          01:59:30
11 A.   No.   Normally I'm there late.   Like 6:30 on Monday and 5
12 o'clock yesterday.   And I've helped with insulins in the
13 evening, and it takes about an hour and 15 to an hour 1/2 for
14 p.m. so it's about the same for morning time.
15 Q.   And are there -- how would you characterize like the         01:59:47
16 people in Meadows yard?   Are there a lot of older men or is it
17 kind of a young yard where there are lots of the workers?   You
18 know, if you had to kind of describe --
19 A.   It's a good mix of young and very old.
20 Q.   Okay.   And are there people with mobility impairments who   02:00:12
21 are housed there?
22 A.   Yes.
23 Q.   Are they assigned to specific housing units?
24 A.   Yes.
25 Q.   Do you know which ones they are?                             02:00:20

United States District Court

TANNA GUALCO - Cross

1   A.   Seven.                                                      02:00:21

2   Q.   Just housing unit seven?

3   A.   Building seven.  That's where all the wheelchair guys are.

4   It's the closest building to the health unit.

5   Q.   And do you have -- could you estimate for us roughly how    02:00:30

6   many people who use wheelchairs you think live on Meadows?

7   A.   I have no idea.  I don't know.

8   Q.   How about people who using walkers or canes?

9   A.   I don't know.

10  Q.   And you said it's first come, first serve for the open      02:00:48

11  clinic.  But is there any sort of special dispensation made

12  where say somebody in a wheelchair is kind of allowed to jump

13  the line and be seen first even if he doesn't show up at 7

14  o'clock on the dot?

15  A.   That all would depend on the nature of his complaint.  If    02:01:07

16  he comes in with chest pain, absolutely; but if he comes in

17  because he stubbed his toe, then he would have to wait.

18  Q.   Okay.  So what happens to the open clinic if an emergency

19  ICS is called during that time?

20  A.   Then the Nurse Line nurse stops what she's doing and         02:01:26

21  responds.

22  Q.   And are the people who are waiting sent back to their

23  units or are they just told to wait there in the clinic until

24  the nurse comes back?

25  A.   They just wait right there in the health unit.               02:01:39

United States District Court

TANNA GUALCO - Cross

1   Q.   And I believe Judge Duncan had asked you about what          02:01:52
2   happened if there were still people at 8:30.  So, like, you
3   have the 7 to 8:30 window and at 8:30 there are still people
4   waiting to be seen.  What would happen?  And I believe you said
5   that they would still be seen?          02:02:08
6   A.   Yes.  Yeah.
7   Q.   So do you have -- do you run into a situation where kind
8   of over the course of the day that there's more and more of a
9   wait or do you feel like you can clear it and catch up?
10  A.   Yeah.  It's cleared and everyone is taken care of within   02:02:20
11  their time frame.
12  Q.   Okay.  Do you have any sort of -- so I think you've also
13  said a couple of times, both in answers to Mr. Bojanowski and
14  Judge Duncan, that if somebody showed up outside of their
15  building's assigned hours and it wasn't emergency, that you     02:02:37
16  say, "Come back tomorrow"?
17  A.   Correct.
18  Q.   Do you guys have any sort of written guidelines or
19  instructions about what complaints or symptoms warrant seeing
20  them outside of their kind of assigned time frame versus        02:02:53
21  saying, "Come back tomorrow"?
22  A.   No.  We don't.
23          MS. KENDRICK:  I have nothing further, Your Honor.
24          THE COURT:  Mr. Bojanowski?
25

United States District Court

TANNA GUALCO - Redirect

**REDIRECT EXAMINATION**

02:03:08

BY MR. BOJANOWSKI:

Q.   As far as seeing a patient who you say, "Come back
tomorrow" for -- I mean, you're relying on your training, your
experience, you know, the standard of care in the industry to          02:03:24
make the determination as to whether that person needs to be
seen emergently or not.  Is that the decision-making process?

A.   Yeah.  And the ones that come up and we tell them to come
back tomorrow during your time is very rare because they are
all very aware of the scheduled time.  So that kind of incident        02:03:46
from happening is -- doesn't happen often.

Q.   So what you're doing is, even though there's no written
guideline or policy in place, you're relying on your medical
judgment to make the determination as to what the condition of
the patient is and whether they need to be seen immediately            02:04:07
because if it were an emergent situation, you would see them;
right?

A.   Yes.

Q.   All right.  Even if they didn't have an HNR in their hand?

A.   Yes.                                                               02:04:19

Q.   Okay.

      MR. BOJANOWSKI:  Nothing further, Your Honor.

      THE COURT:  Ma'am, I have just a couple of questions.

I want to go back to the schedule for the blood glucose testing

for the insulin-dependent diabetic.  The 4:30 time, what time          02:04:30

United States District Court

TANNA GUALCO - Redirect

1    are inmates awakened at the facility?                          02:04:37

2              THE WITNESS:  I'm not sure.

3              THE COURT:  And do you know, is there a time that

4    they are -- that they have to be up and about?

5              THE WITNESS:  I'm not aware.                          02:04:49

6              THE COURT:  Don't know.  It just strikes me that for

7    a lot of people, 4:30 would be very early.  And if they had

8    their druthers, they would like to pull their covers up over

9    their eyes and wait in bed a little longer, which would suggest

10   to me that maybe you don't have a lot of people at 4:30 in the  02:05:02

11   blood glucose test line.  Is that true or not?  You don't know?

12             THE WITNESS:  I'm not there that early, so I don't

13   know.

14             MR. BOJANOWSKI:  You don't know because you don't

15   work there at that time.  But you don't have any sense of       02:05:14

16   seeing records indicating how many people show up at 4:30?

17             THE WITNESS:  Yeah, there's the medical no-show

18   report that they run every day so that would show if they did

19   not show.  And then we would have to have them come and sign

20   refusals.  I do know that a lot of the insulin guys are workers 02:05:30

21   so they -- it actually works good for their schedule because

22   they go over to another yard and their maintenance or work in

23   the kitchen or bakery or other yards.

24             THE COURT:  So the 4:30 blood glucose time is also

25   the time for people to receive their morning insulin dose?      02:05:48

TANNA GUALCO - Redirect

1           THE WITNESS:  Yes.                                    02:05:51

2           THE COURT:  So it's not really actually voluntarily

3   for people to show up at 4:30.  They have to show up at 4:30.

4   If they don't, that means they have missed their morning

5   insulin and you go look for them if they don't come; is that  02:06:02

6   right?

7           THE WITNESS:  M'hum.

8           THE COURT:  Okay.  So everybody gets tested at 4:30

9   and the people that are on split dose must come back at 4:30 as

10  well for their afternoon dose?                                02:06:14

11          THE WITNESS:  Yes.

12          THE COURT:  And must they test with a finger stick at

13  that time, too?

14          THE WITNESS:  Yes.

15          THE COURT:  So it's both required that they have       02:06:19

16  their insulin and have a finger stick?

17          THE WITNESS:  Yes.

18          THE COURT:  And then for people who need a midday

19  dosing of insulin they come in at noon?

20          THE WITNESS:  12 o'clock.                             02:06:29

21          THE COURT:  But it's not required that they have a

22  blood glucose test then?

23          THE WITNESS:  They do.  They do a finger stick each

24  time.

25  \\\

                    United States District Court

TANNA GUALCO - Redirect

1        THE COURT:  So each time somebody is administered          02:06:37

2    insulin, before that happens, they receive a blood glucose

3    test?

4        THE WITNESS:  Yes.

5        THE COURT:  Now, with respect to people that want to       02:06:44

6    come and have an additional test because they don't think they

7    feel quite right, how often does that happen during the day?

8        THE WITNESS:  It doesn't happen often.

9        THE COURT:  If somebody comes in and they say, "I

10   don't feel quite right," and they test at 100 and they come    02:06:56

11   back the next day and say, "I don't feel quite right," and they

12   test at 100.  And you see that maybe they are not so good at

13   guessing about what it is, do you counsel them about not coming

14   back and doing that?  How do you react to that?

15       THE WITNESS:  Well, if they don't feel well, I just        02:07:14

16   do the normal assessment that I would do, ask them if it's, you

17   know -- "Is it stomach issues?"  Because if they are not

18   feeling well, it could be a number of things.  And if it's

19   something they need to see the provider for, maybe get some

20   labs drawn, then we could refer them to the provider to have    02:07:27

21   that done.

22       THE COURT:  I'm asking this in part because it just

23   strikes me that these people who show up and want to have a

24   blood glucose test at the moment are probably interrupting your

25   day.  You're in the middle of treating some other patient, so   02:07:41

United States District Court

TANNA GUALCO - Redirect

1    you have to stop everything and deal with that and it would          02:07:44

2    maybe make me think that that might be one reason that you

3    would want to make sure that there was a good reason to have it

4    and that you would have a little bit of push back sometimes.

5    Is that fair to think or no?                                         02:07:55

6            THE WITNESS:  We have two Med Pass nurses.  So for

7    them to have an hour Med Pass and then in between we're

8    stocking, refilling meds, they are doing other things but it

9    takes two seconds to check someone's sugar.  So if the Nurse

10   Line nurse is busy, there's two Med Pass nurses that can check       02:08:10

11   it for them.

12           THE COURT:  So are you saying nobody there really

13   views it as an imposition or a burden to have somebody come in

14   and ask for blood glucose?

15           THE WITNESS:  No.                                            02:08:21

16           THE COURT:  Now, there's also the other side of it.

17   Each one of those strips cost some amount of money, maybe close

18   to a dollar.  I don't know.  But is there any sense about

19   trying to restrict people who are maybe asking for too many of

20   these?                                                               02:08:34

21           THE WITNESS:  No.

22           THE COURT:  Never heard of that?

23           THE WITNESS:  Nope.

24           THE COURT:  Okay.

25           Did my questions engender any other questions,               02:08:37

United States District Court

| | | |
|---|---|---|
| 1 | counsel? | 02:08:40 |
| 2 | MS. KENDRICK:  No, sir. | |
| 3 | MR. BOJANOWSKI:  No, sir. | |
| 4 | THE COURT:  You're done.  Thank you so much. | |
| 5 | Appreciate you coming in and talking with us.  Have a good rest | 02:08:43 |
| 6 | of the day. | |
| 7 | THE WITNESS:  Thank you. | |
| 8 | THE COURT:  You can just leave those exhibits there. | |
| 9 | (Witness excused.) | |
| 10 | THE COURT:  Is that it from the defendants' side? | 02:09:02 |
| 11 | MR. BOJANOWSKI:  Yes, Your Honor. | |
| 12 | THE COURT:  And do we have any more witnesses from | |
| 13 | the plaintiffs' side? | |
| 14 | MS. KENDRICK:  No, sir. | |
| 15 | THE COURT:  Okay.  So we've finished the HNR | 02:09:10 |
| 16 | testimony.  Both with respect to the HNR issue and with respect | |
| 17 | to the retaliation issue, I need to ask you all whether you | |
| 18 | would like to have an opportunity to submit written briefs | |
| 19 | regarding these issues. | |
| 20 | Plaintiffs? | 02:09:25 |
| 21 | MS. KENDRICK:  Yes, please. | |
| 22 | THE COURT:  All right.  How much time would you like? | |
| 23 | MS. KENDRICK:  Two weeks. | |
| 24 | THE COURT:  Okay. | |
| 25 | So that will be the deadline, two weeks from today, | 02:09:32 |

United States District Court

1    14 days to file any written briefing regarding these two                        02:09:35

2    issues.

3              And defendants would like how much time to respond?

4         MS. KENDRICK:  Well, actually, Your Honor, we didn't

5    request the briefing on the retaliation so we don't feel we       02:09:48

6    have any sort of burden of proof.  So I believe defendants

7    should go first on that issue and we can go on the HNRs.

8         THE COURT:  Well, I'm going to give everybody a

9    chance to -- I mean usually -- I'm not saying the briefing is

10   going to determine the burden.  It's just I need an order.  And   02:10:08

11   since this is mixed, it just seems to me it that makes sense to

12   put plaintiffs first, give the defendants a chance to respond,

13   you get the chance to reply so everybody has an opportunity to

14   speak because we've got two issues.  It just seems to make

15   sense to do it that way.                                          02:10:25

16        MS. KENDRICK:  Well, it's just more we weren't the

17   ones who demanded the hearing on retaliation so . . .

18        MS. LOVE:  Your Honor, the issue is they filed the

19   notice of retaliation and, therefore, it is their burden to

20   prove retaliation such that your previous order issued after     02:10:38

21   the 7-21 hearing would stand because then there is actual

22   proof.  Because at the hearing, based upon counsel's statements

23   and averments in the notice, you wanted to restore to status

24   quo and then allow this opportunity to present evidence.  So it

25   is defendants' position that it is plaintiffs' burden of proof   02:10:58

United States District Court

1  to actually prove retaliation so that your order stays in

2  effect.

3          THE COURT:  I know what I want to do is I want to

4  hear from both sides, if they want to be heard on the issue,

5  and it seems to me that's not unfair in this circumstance to

6  have plaintiffs go first.  So you'll go first and how much time

7  would you like to respond?

8          MR. BOJANOWSKI:  I'm a little confused.

9          THE COURT:  Here's what's going to happen.  The

10 plaintiffs are going to file in two weeks their papers that

11 address the issue of the retaliation and also address the issue

12 of the removal of the HNR boxes.  Then you're going to have a

13 chance to respond to both of those issues.  I'm asking how much

14 time would you like?

15         MS. LOVE:  14 days from plaintiffs' filing.

16         THE COURT:  And how much time would you like for

17 reply?

18         MS. KENDRICK:  One week.

19         THE COURT:  Okay.  So seven days.

20         Is there anything else we need to address today?

21         MS. KENDRICK:  Not from us.

22         THE COURT:  Okay.

23         MR. BOJANOWSKI:  Nothing further, Your Honor.

24 ///

25 ///

                 United States District Court

1          MS. LOVE:  No, Your Honor.  Thank you.                    02:11:52

2          THE COURT:  All right.

3          Thank you, all, very much.

4     (Whereupon, these proceedings recessed at 2:12 p.m.)

5                        * * * * *                                   02:11:56

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

```
 1                  C E R T I F I C A T E                        02:11:56

 2

 3           I, ELAINE M. CROPPER, do hereby certify that I am

 4     duly appointed and qualified to act as Official Court Reporter

 5     for the United States District Court for the District of       02:11:56

 6     Arizona.

 7

 8           I FURTHER CERTIFY that the foregoing pages constitute

 9     a full, true, and accurate transcript of all of that portion of

10     the proceedings contained herein, had in the above-entitled    02:11:56

11     cause on the date specified therein, and that said transcript

12     was prepared under my direction and control, and to the best of

13     my ability.

14

15           DATED at Phoenix, Arizona, this 18th day of             02:11:56

16     September, 2017.

17

18

19

20                             s/Elaine M. Cropper                    02:11:56

21                             _____

22                             Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                    02:11:56


                        United States District Court
```