1                    **UNITED STATES DISTRICT COURT**

2                   **FOR THE DISTRICT OF ARIZONA**

3                       _____

4

   **Victor Parsons, et al., on**      )
5  **behalf of themselves and all**    )
   **others similarly situated;**      )
6  **and Arizona Center for**          )
   **Disability Law,**                 )
7                                       )    No. **CV 12-00601-PHX-DKD**
                **Plaintiffs,**         )
8                                       )
        vs.                             )    Phoenix, Arizona
9                                       )    September 11, 2017
   **Charles Ryan, Director,**          )    9:01 a.m.
10 **Arizona Department of**            )
   **Corrections; and Richard**        )
11 **Pratt, Interim Division**         )
   **Director, Division of Health**    )
12 **Services, Arizona Department**    )
   **of Corrections, in their**        )
13 **Official capacities,**            )
                                        )
14              **Defendants.**         )
   _____ )
15

16

17      **BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

18           <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

19             (*Evidentiary Hearing Re: Retaliation*)

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

<u>A P P E A R A N C E S</u>

**For the Plaintiffs:**

        EIDENBACH LAW PC
        By:  **Kirstin T. Eidenbach, Esq.**
        P.O. Box 91398
        Tucson, AZ 85752

        ACLU - Washington DC
        By:  **David C. Fathi, Esq.**
        915 15th Street NW
        7th Floor
        Washington, DC 20005

        ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
        By:  **Maya S. Abela, Esq.**
        177 N. Church Avenue
        Suite 800
        Tucson, AZ 85701

        PRISON LAW OFFICE
        By:  **Corene Kendrick, Esq.**
        1917 5th Street
        Berkeley, CA 94710

For the Defendants:

        STRUCK LOVE BOJANOWSKI & ACEDO PLC
        By: **Daniel Struck, Esq.**
        By: **Rachel Love, Esq.**
        3100 W. Ray Road
        Suite 300
        Chandler, AZ 85226

Appearing Telephonically:

        OFFICE OF THE ATTORNEY GENERAL - Phoenix
        By:  **Lucy M. Rand, Esq.**
        1275 W. Washington Street
        Phoenix, AZ 85007

1                        **I N D E X**

2   **WITNESS:**              **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**

3   KIM CURRIER
    By Ms. Love               6                        69
4   By Ms. Kendrick                        29

5   ELIZABETH OROS
    By Ms. Love               75
6   By Ms. Kendrick                        105

7   CHRISTOPHER PAPWORTH
    By Mr. Fathi              132                       168
8   By Ms. Love                            166

9   CRYSTAL LEE
    By Mr. Fathi              174                       201
10  By Ms. Love                            199

11  ERNEST TRUJILLO
    By Ms. Love              208
12  By Ms. Kendrick                        218

13  JEFFREY VAN WINKLE
    By Ms. Love              233
14  By Ms. Kendrick                        239

15  JOHN MATTOS
    By Ms. Love             246
16  By Mr. Fathi                           259
    By The Court            271
17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                      **INDEX OF EXHIBITS**

2      **EXHIBIT**                                    **IDENT**      **RECEIVED**
       **PLAINTIFFS**

3

4      1        July 21, 2017 e-mail from Currier
                Re:  Inmate Scheid movement           37             39
5      2        July 21, 2017 ADOC Information
                Report 17-B01-01561-Scheid and
6               Smith                                 39             39
       3        July 19, 2017 e-mail from Currier
7               Re:  Inmate Ashworth                  39             45
       4        July 14, 2017 e-mail from Twyford
8               Re:  E-mailing DSC04219, DSC0420,
                DSC04221, DSC04222, DSC04223          39             45
9      5        August 2, 2017 e-mail from Lee
                Re:  Inmate Ashworth                  63             153
10     6        July 28, 2017 e-mail from Bailey
                Re:  Fwd:  Info                       45             54
11     7        July 14, 2017 e-mail from Twyford
                Re:  E-mailing DSC04219, 4220, 4221
                4222 and 423                          54             58
12     8        August 8, 2017 e-mail from Wilder
                Re: FW: Policy Regarding
13              Retaliation                           224            228

14     **DEFENDANTS**

15     15       Movement Screen                       91             93
       16       Internal Assignment Sheet
16              B. Alvarez                            93             95
       17       Internal Assignment Sheet
17              Donna Scheid                          95             97
       18       6-29-17 Inmate Letter from
18              B. Alvarez                            36             58
       19       Cell Assignment Screening
19              Alvarez/Ashworth                      97             102
       20       Key Inmate Actions Detail
20              B. Alvarez                            102            103
       24       Aerial Photo Florence South Unit      236            237
21     26       Photos, Dorm 9                        250            258
       29       Inmate Letters re:  Movement          240            241
22     30       Memo from Mattos to Trujillo
                Re:  Allegations by Inmate Oyenik     264            277

23

24

25

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation

1              P R O C E E D I N G S

2          THE MAGISTRATE JUDGE CLERK:  Civil Case Number 12-601,

3    Parsons, et al., versus Ryan, et al., on for retaliation

4    hearing.

5          THE COURT:  Counsel, please announce.                    09:01AM

6          MR. FATHI:  Good morning, Your Honor.  David Fathi

7    from the ACLU National Prison Project for the plaintiff class.

8          THE COURT:  Thank you.  Good morning.

9          MS. KENDRICK:  Good morning.  Corene Kendrick, Prison

10   Law Office, for the prisoner plaintiff class.                  09:01AM

11         THE COURT:  Thank you.  Good morning.

12         MS. ABELA:  Good morning.  Maya Abela for the Arizona

13   Center for Disability Law.

14         THE COURT:  Thank you.  Good morning.

15         MS. LOVE:  Good morning, Your Honor.  Rachel Love and    09:01AM

16   Dan Struck for the defendants.

17         THE COURT:  Thank you.  Good morning.

18         Have you all talked about the order of service this

19   morning or are there issues preliminarily we need to talk about

20   first?                                                         09:01AM

21         MR. FATHI:  I don't think so, Your Honor.  We had

22   presumed that the defendants would go first.

23         THE COURT:  Okay.  Are you all ready to call your

24   witness?

25         MS. LOVE:  Yes, Your Honor.  Defendants call Warden      09:02AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1    Kim Currier.

2         MS. KENDRICK:  Your Honor, to the extent there's any

3    other witnesses in the courtroom, we ask that they be excluded.

4         THE COURT:  Is there anybody else present?

5         MR. STRUCK:  No, Your Honor.  And I also wanted to        09:02AM

6    note I believe Ms. Rand might be on the phone.

7         THE COURT:  Thank you very much.  The Rule has been

8    invoked so everybody take care to make sure the witnesses are

9    advised of what that means for them.

10        Good morning, Warden.  Would you please step forward      09:02AM

11   to the clerk to be sworn.

12        THE WITNESS:  Good morning.

13        (The witness was sworn.)

14        THE COURT:  You may proceed.

15                       KIMBERLY CURRIER,

16   a witness herein, having been first duly sworn by the clerk to

17   speak the truth and nothing but the truth, was examined and

18   testified as follows:

19                       DIRECT EXAMINATION

20   BY MS. LOVE:

21   Q.  Would you please state your name for the record?

22   A.  Kimberly Ann Currier.

23   Q.  Who is your employer?

24   A.  Arizona Department of Corrections.

25   Q.  What is your position?                                     09:03AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1    A.   Warden.

2    Q.   Warden of which complex?

3    A.   The Perryville complex.

4    Q.   How long have you worked for the Arizona Department of

5    Corrections?                                                    09:03AM

6    A.   A little over 27 years.

7    Q.   In your career with the Arizona Department of Corrections,

8    can you take us through the different positions that you have

9    worked?

10   A.   Yes.  I started out at as a corrections court officer in 1990.  I  09:03AM

11   promoted to the programs area to what they call now a CPO.

12   Then I promoted to Correctional Officer IV.  And from

13   Correctional Officer IV I promoted to deputy warden.  I had a

14   couple of deputy warden positions from Perryville to Lewis and

15   then back to Perryville as a deputy warden of operations and    09:04AM

16   then to the warden.

17        MR. FATHI:  Excuse me, Your Honor.  Could the warden

18   move the microphone closer?

19        THE COURT:  Of course.

20   BY MS. LOVE:                                                     09:04AM

21   Q.   How long have you served as the warden of the Perryville

22   complex?

23   A.   About a year and a half.

24   Q.   What are your duties as warden?

25   A.   I oversee the entire operations in the security part of the  09:04AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

```
 1    complex.  I equate it to like the mayor of a little city.
 2    Q.  And the Perryville complex, what is the total inmate
 3    population of Perryville complex?
 4    A.  Today we have 4023.
 5    Q.  All female inmates?                                      09:04AM
 6    A.  All female inmates.
 7    Q.  How many units?
 8    A.  We have eight.
 9    Q.  Can you explain for us how the operations of the complex
10    are managed as you go from warden and down your chain of     09:04AM
11    command involving operation of the units?
12    A.  So from me it goes down to deputy warden of operations.  I
13    also have a major that's over the security side of it, and I go
14    down to each one of the deputy wardens of the units, and I do
15    have two associate deputy wardens as well.                   09:05AM
16    Q.  Are the associate deputy wardens assigned to a particular
17    unit or across the complex?
18    A.  Yes.  I have one that's assigned to the San Carlos Unit and
19    one to the Lumley Unit.
20    Q.  What custody levels does the Perryville complex house?   09:05AM
21    A.  Close custody, medium custody, and minimum custody.
22         THE COURT:  Could I interrupt for just a moment?
23    Would this be an okay time for me to interject a question about
24    something I have always wondered about, and that is the
25    demarkation between people who have the title warden and deputy  09:05AM
```

UNITED STATES DISTRICT COURT

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:   Retaliation - Currier - Direct

1    warden and then those who have military rankings, like major,

2    for example?  Is there an interplay or is there dual tracks of

3    how people come up the ranks?

4            THE WITNESS:  I couldn't tell you that.  I'm not sure.

5            THE COURT:  Well, if somebody is a major, let's say,                09:06AM

6    and then they become your position as a warden of the entire

7    complex, do they leave then behind the sort of major title or

8    do they become a General or Colonel?

9            THE WITNESS:  No.  They would leave the major position

10   and would most likely go into the associate deputy warden and        09:06AM

11   deputy warden on up.

12           THE COURT:  So people your position often times do

13   have this past history of having military ranks.  I see.  Thank

14   you.  I'm sorry.

15   BY MS. LOVE:                                                          09:06AM

16   Q.  Is Angela Ashworth an inmate incarcerated at the Perryville

17   complex?

18   A.  Yes.

19   Q.  Do you know what unit she lives in?

20   A.  The San Pedro Unit.                                              09:06AM

21   Q.  Do you know whether or not in July of 2017 Angela Ashworth

22   also lived on the San Pedro Unit?

23   A.  Yes.

24   Q.  What is the custody level of the San Pedro Unit?

25   A.  Minimum custody.                                                  09:06AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1    Q.  And do you know how many, approximately, inmates are

2    assigned to the San Pedro Unit?

3    A.  I couldn't give you an exact total, but around 468.

4    Q.  Is the San Pedro Unit considered an open yard?

5    A.  Yes.                                                      09:07AM

6    Q.  What does that mean?

7    A.  It means that inmates are free to go about during the day

8    except during count times and not after 8:00 at night.

9    Q.  And when you say "free to go about" what do you mean by

10   that?                                                         09:07AM

11   A.  They can leave their cells.  They can recreate on the rec

12   yard.  They can go to education.  They can go to classes, just

13   pretty much be out.  They can go in and out of their cells if

14   they want to.

15   Q.  And the San Pedro Unit, then, it's a cell setting versus,  09:07AM

16   for instance, a dorm setting?

17   A.  Yes.

18   Q.  Inmates, two inmates assigned to a cell?

19   A.  Yes.

20   Q.  And as warden of the Perryville complex, are you aware of  09:07AM

21   the lawsuit called Parsons versus Ryan that we're here about

22   today?

23   A.  Yes, I am.

24   Q.  And you are aware that it's a class action lawsuit

25   regarding medical care, mental health care, and max custody?   09:07AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1    A.  Yes.

2    Q.  And are you aware that all the inmates at the Perryville

3    complex are class members in this lawsuit?

4    A.  Yes.

5    Q.  Are you aware that on July 14 of 2017, Inmate Ashworth came      09:08AM

6    to this Court, this courtroom, and testified?

7    A.  Yes.

8    Q.  Do you know whether or not Inmate Ashworth's property was

9    quote, unquote, rolled up before she came to court that day?

10   A.  Yes, it was.                                                     09:08AM

11   Q.  Could you explain for us and for the Court what the term

12   "roll up" means?

13   A.  It means that the inmate's property is inventoried by

14   either two officers or the officer and the inmate, and it's

15   packed away and secured.                                            09:08AM

16   Q.  Where is it packed away and secured?

17   A.  There's two areas; the complex -- or the unit mail and

18   property area or they will have a special room, usually behind

19   the main control, where there's a room that they put their

20   property.                                                           09:08AM

21   Q.  And what is the purpose of rolling up an inmate's property

22   who is going to be transported outside the complex for a court

23   hearing?

24   A.  To make sure there's no theft; to secure their property.

25   Q.  And theft from who?                                             09:09AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1    A.  Other inmates.

2    Q.  Let's go back now and backtrack.  If you receive an order,

3    the complex receives an order for an inmate to be transported

4    outside the complex, what is the process by which personnel

5    there at your complex are advised that there's a transport,                09:09AM

6    that they need it to be ready for transport?  Walk us through

7    how that process works.

8    A.  So it generally comes down from the complex records area to

9    the units.  The unit movement officers get a list of the

10   inmates that are going to be going and they make a list for the            09:09AM

11   staff of who will be going to court, being released.  There's

12   various reasons that they would, you know, they might be going

13   to another unit within the complex.  So it goes from the

14   records area down to the unit movement officers and from the

15   unit movement officers to the shift.                                       09:10AM

16   Q.  And when in, time-wise, when in preparation for a transport

17   is an inmate's property rolled up if they're going to be

18   transported, timelines?

19   A.  They like to do it either towards the very end of swing

20   shift or at the beginning of the graveyard shift or sometime              09:10AM

21   during the graveyard shift so the inmates have their property

22   for the most amount of time before they roll it up for

23   movement.

24   Q.  If an inmate is transported out of the complex for a

25   medical appointment is their property rolled up?                           09:10AM

 1   A.  If they are going to be gone overnight, yes.

 2   Q.  If an inmate is transported out to court but only going to

 3   be out to court for one day, is their property rolled up in the

 4   normal course of operations?

 5   A.  Well, and that's -- we don't normally have inmates that go        09:10AM

 6   to court for one day.  That's a rarity.  In fact, the entire

 7   time I have worked at the Perryville complex I don't remember

 8   an inmate going to court and coming back the same day.  Our

 9   policy is if an inmate is going to court their property is

10   rolled up and secured.  And that's in Department Order 909           09:11AM

11   which is inmate property.  It states in there that inmates will

12   have their property secured if they are going to court.

13   Q.  On July 14th of 2017, were you personally aware that Inmate

14   Ashworth was going to be transported to court to testify here

15   in this hearing?                                                     09:11AM

16   A.  Yes, I knew that she was going to.

17   Q.  Was there any, from you or from any staff that you are

18   aware of, any consideration of whether or not because she was

19   going to be returning that same day, if outside your normal

20   transports that usually last overnight, that her property would     09:11AM

21   stay in her cell versus being secured?

22   A.  Nobody had that conversation.  So she would have gone --

23   she went on the movement list as a court hearing, and the staff

24   looked at that and automatically rolled it up.

25   Q.  Is there any particular reason why there wasn't a                09:12AM

1    determination made to have her property stay in her cell while

2    she was out to court just because it was going to be one day

3    versus an overnight stay?

4    A.  I don't think honestly that anybody thought about it

5    because it's so out of the normal.  It's not something we do on    09:12AM

6    an everyday basis.  In fact, every time an inmate goes to court

7    they go on to the movement list as going to court and they

8    automatically are rolled up.  I think if they would have

9    thought about them going for the day or they would have asked

10   then maybe that would have made a difference.  Then we would    09:12AM

11   have kept the property there for the day.

12   Q.  Did you receive notification on July 14th that Inmate

13   Ashworth had testified here in court that she was concerned

14   about her property and that she felt that it could be

15   retaliation for testifying?    09:13AM

16   A.  Yes.  After the fact, yes.

17   Q.  And did you yourself look into the chain of events to see

18   whether or not her property was indeed rolled up for the day

19   while she was out to court?

20   A.  Yes.    09:13AM

21   Q.  Did you, in looking into that, find any evidence whatsoever

22   that her property was rolled up that day in retaliation for

23   coming to court to testify?

24   A.  No.  It's normal business.  I think, honestly, the staff

25   saw going out to court and it's so automatic that they just    09:13AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1    rolled it up.

2    Q.  Is the concern of inmate theft while an inmate may be out

3    to court something that is theoretical to you?  Is it something

4    that, based upon your experience, you have seen happen?

5    A.  Based on my experience I have seen that happen, yes.          09:13AM

6    Q.  In what context?

7    A.  Inmates leave, and their property is not rolled up for

8    whatever reason, mistakes happen, and their items are stolen

9    especially their TVs, their high dollar items; fans, TVs,

10   walkmans, those types of things.  But they will take whatever    09:14AM

11   is in there.

12   Q.  Would inmate -- well, Inmate Ashworth, on the day of July

13   14, 2017 when she testified here in court, did she have a

14   cellmate?

15   A.  Yes.  I believe she did.                                     09:14AM

16   Q.  Would Inmate Ashworth be able to make a decision such as

17   I'm going to be out to court today.  I want to make sure my

18   property isn't tampered with by anyone.  I want have to my cell

19   door closed all day.  Would she be able to do that?

20   A.  Not with a cellmate in there, no.                            09:14AM

21   Q.  When an inmate returns from a courtroom or a court run,

22   just in the normal course of operations, is there a specified

23   time period where an inmate's property would be returned to

24   them?

25   A.  It depends on what time they get back.  If it's really late  09:14AM

UNITED STATES DISTRICT COURT

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1    in the day and all of the operations staff or support staff are

2    gone they probably would get it the next morning.  But if they

3    get back early enough in the day they get it that day.

4    Q.  If an inmate came back from court on a Friday, for

5    instance, and because of traffic didn't make it back until the            09:15AM

6    evening, would there, based upon your knowledge, training, and

7    experience, be a delay such that the inmate may not get their

8    property until that next Monday?

9    A.  That might occur, yes.

10   Q.  If an inmate doesn't have their property returned to them,           09:15AM

11   is there personal property -- are they afforded any other types

12   of, I guess, facility-issued property until they get their

13   personal property back?

14   A.  Yes.  They would give them some clothing and some bedding

15   and a little hygiene packet to make sure they could make it             09:15AM

16   through the weekend.

17   Q.  After Ms. Ashworth returned from court on July 14th, was

18   her property returned to her that same day?

19   A.  Yes.  In fact, I stayed to make sure that her property was

20   returned to her that night.                                             09:16AM

21   Q.  Do you know whether or not Inmate Ashworth has ever made

22   any claim that while her property was secured, while she was

23   here at court, that her property was tampered with, destroyed,

24   lost, stolen, anything of that nature?

25   A.  I'm not aware of that.                                              09:16AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:   Retaliation - Currier - Direct

1    Q.  So you are aware that Inmate Ashworth testifies here in

2    court on the 14th of July.  Did you then become aware at any

3    later date that on the 19th, several days later, Inmate

4    Ashworth's cellmate had been moved out of her cell and she had

5    a new incoming cellmate?                                    09:16AM

6    A.  Yeah.  At some point I was advised, but I don't remember

7    the exact date.

8    Q.  And when you were advised that there had been a change in

9    her cellmate, were you also aware that Inmate Ashworth was

10   making allegations that she believed that that cellmate change  09:17AM

11   was in retaliation for her testifying here in July?

12   A.  I was informed about that at some point, yes.

13   Q.  Did you then take any action as warden to look into the

14   cellmate move to see if there was any evidence that that

15   cellmate move was a result of retaliation by any of your staff  09:17AM

16   because she testified here in court in July?

17   A.  Yes.  I checked with the unit administrator at the time to

18   see what the move was about, and I was given the information on

19   why the move took place.

20   Q.  And what is your understanding as to why the move took     09:17AM

21   place?

22   A.  The move was two inmates, two other inmates besides

23   Ashworth and her cellmate were having some issues.  They had

24   been having some issues for quite a while.  They had been

25   trying to work it out and they just couldn't get along         09:17AM

1    together.  It had come to a point where they couldn't live

2    together anymore.  So the movement officer looked to see who he

3    could have a match with for one of the inmates in that room.

4    Inmate Sheid, I believe, Ashworth's cellie, was a match for one

5    of the inmates from the other room.  They wanted to make that          09:18AM

6    move so that, number one, there would be a match, there would

7    be compatibility, and we try not to move the inmates off their

8    yard.  That would have kept her on the yard.  Because even

9    though the two were having an issue living together, they

10   didn't have an issue getting along outside of that environment.       09:18AM

11   So we don't like to move them so they have stability.  Because

12   they build friendships, networks of their own.  So we were able

13   to keep her on that yard.

14   Q.  Are you speaking of keeping Inmate Sheid on the yard?

15   A.  Sheid and the other two inmates.  They all stayed on the          09:18AM

16   same yard.  They just went to different cells.

17   Q.  Was that B yard?

18   A.  I believe so.

19   Q.  So if they are still able to live on the same yard but not

20   in the same cell, are those inmates then able to interact and         09:18AM

21   socialize on a daily basis if they wish to do so?

22   A.  Yes.

23   Q.  And in the context of what, at recreation?  Out on open

24   yard?

25   A.  Yes.  All of that.                                                09:19AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1          THE COURT:  Can I understand, on this rearrangement

2   because of the rooming issues of the two inmates, when you were

3   considering what change to make, did you have a -- in light of

4   what you said about the neighborhoods and people's friends, are

5   we talking about a group of 400 that you are trying to keep          09:19AM

6   somebody in the same neighborhood or a smaller group?

7          THE WITNESS:  Smaller group.

8          THE COURT:  So what's the size of that group?

9          THE WITNESS:  I think in that situation there's about

10  168 inmates on that one particular yard.                            09:19AM

11         THE COURT:  So as you were figuring what shift to make

12  you have 168 components, inmates to consider on whom to move

13  around?

14         THE WITNESS:  The moving officer did, yes, sir.

15         THE COURT:  Thank you.                                       09:19AM

16  BY MS. LOVE:

17  Q.  And as to movement and change of cellmates, is this

18  something at the Perryville complex that happens on a daily

19  basis for multiple inmates?  Is it something that happens once

20  a month?  What kind of frequency are we talking about?             09:20AM

21  A.  It's daily.  It's daily depending on what's going on.  It

22  could be a variety of issues.

23  Q.  As warden, are you required to approve every single

24  cellmate change move that happens at your complex?

25  A.  No.                                                            09:20AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

```
 1    Q.  And who makes the approval for such moves?

 2    A.  That goes through the unit DWs, the administrators.  The

 3    ADW if the DW is not there.

 4    Q.  When you say -- I'm going to translate the terms for you.

 5    When you say DW, you mean deputy warden?                        09:20AM

 6    A.  Yes.  I'm sorry.

 7    Q.  ADW is?

 8    A.  Associate deputy warden.

 9    Q.  Are there ever instances where you, as warden, do become

10    involved in a determination as to whether two inmates can live 09:20AM

11    together?

12    A.  I imagine I could be, but I can't think of an instance

13    where I really was.

14    Q.  Based upon your looking into the reasons for the cellmate

15    change involving inmates Ashworth and Sheid, was there any      09:21AM

16    information or evidence that led you to believe that the

17    cellmate change was made in retaliation for Inmate Ashworth

18    testifying here in court?

19    A.  Absolutely not.

20    Q.  Are you aware that Inmate Ashworth has made allegations     09:21AM

21    that during those few days that she had a different cellmate

22    other than Inmate Sheid, that officers -- she was fearful

23    because officers had entered her cell at night to take the

24    temperature of her cell?

25    A.  I was made aware of that later on, yes.                     09:21AM
```

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1   Q.  Did you look into those allegations?

2   A.  Yes, I did.  We were doing temperature checks up until

3   11:00 at night.  About 11:20 that night you could see the

4   officer that went in there to do a temperature check.  He was

5   in there for a short period of time and came out.  And I didn't    09:21AM

6   watch that video.  This is what I was told by the unit

7   administrator.

8   Q.  Would it be normal course of operations for an officer to

9   enter an inmate's cell at 11:00 or after to check a temperature

10  of a cell?                                                          09:22AM

11  A.  Yes.  At that time, yes.

12  Q.  When you say "at that time," what do you mean by that?

13  A.  We are no longer doing the 11:00 temperature checks at

14  night.

15  Q.  Was there a particular reason, to your knowledge, that an       09:22AM

16  inmate -- or that officers would enter specifically Inmate

17  Ashworth's cell versus any other cell to check temperature?

18  A.  The cellmate she had at the time was pregnant, and we were

19  doing temperature checks on all the pregnant inmates.

20  Q.  Temperature checks of their cells?                              09:22AM

21  A.  Yes.

22  Q.  Were the pregnant inmates still sleeping in the cells at

23  night?  Because Inmate Ashworth alleges she was alone.

24  A.  I believe on that night the pregnant inmate was sleeping in

25  the visitation area because the cell temperature was higher        09:22AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

1   than 86 degrees.  So the officer would still temp it out trying

2   to see if any mitigation factors had helped to bring that

3   temperature down so she could go back to her cell.

4   Q.  Now, if an inmate such as the cellmate of Inmate Ashworth,

5   she's pregnant, she's sleeping in visitation.  Are there cots          09:23AM

6   or beds in visitation?  How does it work that the inmates are

7   moved to visitation to sleep?

8   A.  They take their mattress and their bedding and they sleep

9   basically on the floor on their mattress.

10  Q.  If it's 11:00 or a little after at night and the                   09:23AM

11  temperature then is below 86, is it normal course of

12  operations, then, even though it's later in the night to move

13  the inmates back to their cells if maybe even they are already

14  asleep on the floor?

15  A.  We would have given them that option.  If they wanted to           09:23AM

16  stay in visitation they could have stayed.

17  Q.  And why would it be that that late into the evening that

18  the inmates would be provided an option to return to their cell

19  or not?  Is there a reason for that?

20  A.  That's because that's the last temperature check that's            09:23AM

21  taken.  So if the inmate was awake, I wouldn't expect the

22  officers would wake them up, but if the inmate was awake and

23  they wanted to go back into their cell they would have offered

24  them.  Because it's not very comfortable to sleep on their

25  mattress in the visitation area.  If they wanted to go back to         09:24AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

 1    their cell, they could.

 2    Q.  On the San Pedro Unit, would it be normal course of

 3    operations for officers to check the temperature of,

 4    specifically, of the cells where pregnant inmates had been

 5    sleeping but had moved been moved to visitation?          09:24AM

 6    A.  Yeah.  Like I said, those were set times that they would do

 7    it, and they would take those temperatures to see if they could

 8    put the inmates back in those cells.

 9    Q.  Are random temperature checks also made of other cells in

10    the San Pedro Unit besides inmates who may be pregnant?    09:24AM

11    A.  Yes.  They randomly pick cells.  The reason they did

12    pregnant inmates was in consultation with the medical staff

13    that it probably would be in their best interest to have their

14    temperatures taken and it shouldn't be higher than 86 degrees.

15    Q.  Do you have any information as to whether or not Inmate   09:25AM

16    Ashworth has made any reports at the complex or facility level

17    that the officers who entered her cell to check the temperature

18    threatened her?

19    A.  I believe I heard something like that, yes.

20    Q.  What did you hear about that?                          09:25AM

21    A.  I think I believe that she said they were coming in her

22    cell at night and threatening her and scaring her, something to

23    that effect.

24    Q.  And were you able to find any information to validate that

25    allegation?                                                09:25AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

 1    A.  No.  Unit administrator talk to the officer that did the

 2    temperature checks and he said absolutely not.  He did not have

 3    any conversation with her.  And then a review of the video

 4    showed he went in and right out.  And nobody else went in the

 5    cell after that.                                              09:25AM

 6    Q.  Are you aware of whether or not Inmate Ashworth to date has

 7    made any allegations that officers who entered her cell

 8    tampered with her property?

 9    A.  No.

10    Q.  Or assaulted her?                                        09:26AM

11    A.  No.

12    Q.  Was Inmate Shied ultimately moved back to return as the

13    cellmate of Inmate Ashworth?

14    A.  Yes.

15    Q.  Why was that?                                            09:26AM

16    A.  The emergency telephonic court hearing said that we needed

17    to move her back, so we moved her back that day.

18    Q.  And were you present telephonically for the emergency

19    hearing regarding retaliation on July 21st of 2017?

20    A.  Yes, I was.                                              09:26AM

21    Q.  And you were prepared to be called as a witness to testify?

22    A.  Yes, I was.

23    Q.  No further questions.

24         THE COURT:  Before plaintiffs, let me ask just a

25    couple of questions.                                         09:26AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

 1          The first question is with respect to what happens

 2     when you said an inmate went to testify at court and that it

 3     had been your experience that that was usually a multiple day

 4     experience so they were rolled up for that.  When they would

 5     finish their testimony and come back, were they returned -- are      09:27AM

 6     they returned to their original cell?

 7          THE WITNESS:  Yes.

 8          THE COURT:  And that, I gather, is something you could

 9     say with respect to Perryville but you don't know whether

10     that's true at other facilities?                                      09:27AM

11          THE WITNESS:  No.  I'm not sure.

12          THE COURT:  And I guess I will say this also, you

13     should maybe be told by me the reason that I'm in your life

14     interfering with what you do, which is your professional

15     business.  And it is simply because the parties here agreed to       09:27AM

16     resolve a case, and that they agreed, the defendants, the

17     Department of Corrections, agreed to do certain things.  For

18     the most part they have not been able to accomplish many of

19     those things.  They have accomplished some, but there have been

20     some very grave departures from the expectations.                    09:28AM

21          So that meant that under the agreement the two parties

22     entered into I needed to step in and become more of a manager

23     of what I hoped would be managed by you all.  And so it's not

24     as if I'm jumping into something that I'm looking for an

25     opportunity to do.  It's something I am compelled to do.             09:28AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Direct

 1          Unfortunately, I don't have the ability to suddenly

 2   have all your experience, 20 years, in corrections.  So I can't

 3   know as much as you can.  But the stipulation tries to give me

 4   the next best thing, and that is the ability to have the

 5   plaintiffs' lawyers working with their clients providing          09:28AM

 6   information to me and also to allow me to have people come in

 7   court and tell me what is going on.

 8          So this fact-finding purpose that I have, and on the

 9   telephone call you just referred to, I'm sure you remember me

10   talking about this also, this fact-finding mechanism of having    09:29AM

11   people feeling completely comfortable reporting things about

12   what may affect this communication chain to their lawyers and

13   to me is very important.  And so I need to make sure that

14   there's not even a hint of any idea that people could be

15   retaliated against.                                               09:29AM

16          In this case, we have heard about this, and there are

17   issues that are still pending on whether or not I can

18   conclusively determine whether there has been retaliation.  But

19   there certainly has been -- there have been presentations to me

20   that would make, even if it's not retaliation, a reasonable       09:29AM

21   person to think it would be retaliation.

22          And so take, for example, what you have told me about

23   the reassignment of the roommate.  It's close in time to the

24   testimony, and so somebody is in a situation where they are

25   comfortable with their roommate.  They come to court and          09:30AM

1   testify.  That comfort is disrupted very close in time to the

2   testimony, you say for legitimate and penological purposes, but

3   somebody looking at it just from the outside could say there

4   were a number of factors that would make people think it was

5   retaliatory.  It was close in time.  It was disruptive and          09:30AM

6   created an uncomfortable situation for someone who had been in

7   a previous comfortable situation with what you talked about,

8   and that is people like to be in their same kind of routines

9   and they like to have that.

10          So somebody could look at it and not understand your         09:30AM

11  side of it and think that it is retaliation, but also even if

12  that person was wrong about it, it felt like retaliation.  So

13  other inmates who look at this, they think, oh, this is what

14  happens when you come and talk to the Court and tell them what

15  happened, or this is what happens if you talk to the lawyers, a     09:30AM

16  comfortable situation is suddenly no longer there for you.  You

17  are moved.

18          And so what I have done away, and what I will continue

19  to do, is make sure if there are changes in somebody's

20  situation close in time to when they testify to me or when they     09:31AM

21  report to their lawyers, I'm going to be examining that very

22  closely and I'm going to be saying things like this:  You have

23  168 other multiples that you could have switched.  Find one of

24  those other ones close in time.  Don't interfere with

25  somebody's situation because some other inmate looking at that      09:31AM

1    will think it could be retaliation, even if you say you looked

2    into it and it wasn't.  Somebody else could think that.  And if

3    some other inmate thinks that they are going to be restricted

4    if you come back to me and you say, yeah, we had 168

5    opportunities but we looked through and 166 of them and none of     09:31AM

6    them worked, here's why none of them worked, I will listen to

7    that.  I will give you the opportunity to pursue that.

8          But that's going to be a burden you are going to have

9    to meet with me.  You are going to have to explain to me why it

10   is that you couldn't find 166 other people to do this rather     09:32AM

11   than these two close in time to when somebody testifies.  I

12   appreciate that's interfering in your life and it's making it

13   difficult for what is going on.  But I have got many problems

14   here, and your problem is one of them, but also I have got my

15   problem.  And that is the defendants agreed to do something     09:32AM

16   they haven't done.  And I have to compel them to do it.  I have

17   to learn about that.  I have to get information, and this

18   process of hearing from the inmates is critically important to

19   that.  So I have to sometimes say your problems have to be

20   weighed with mine, and that is a necessity, unfortunately.     09:32AM

21         So I say this hoping that you can understand what my

22   perspective is, hoping that you can maybe even appreciate it a

23   little bit but also telling you that I'm sorry.  I don't want

24   to be interfering in your knowledge and your role, but I have

25   to.  It's simply what is required by the law in this case to     09:32AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

```
 1    deal with a very important issue, and that is providing the
 2    healthcare that was promised under the stipulation.
 3           So thank you for listening to that.  I will give the
 4    plaintiffs an opportunity.  Or actually, Ms. Love, if anything
 5    I said engendered any questions you certainly can ask those      09:33AM
 6    now.
 7           MS. LOVE:  No further questions.
 8           THE COURT:  Thank you.  Plaintiffs, please.
 9                    CROSS-EXAMINATION
10    BY MS. KENDRICK:                                                09:33AM
11    Q.  Good morning.
12    A.  Good morning.
13    Q.  Did you speak with anyone about your testimony today?
14    A.  No, other than my attorney.
15    Q.  Did review any documents to prepare for today's testimony?  09:33AM
16    A.  Yes.
17    Q.  What did you look at?
18    A.  I looked at some e-mails.
19    Q.  What e-mails were those?
20    A.  Some e-mails that were between myself and Deputy Warden      09:33AM
21    Lee.
22    Q.  And what did they pertain to?
23    A.  Inmate Ashworth.
24    Q.  Specifically what about Ms. Ashworth?
25    A.  I don't have the e-mails in front of me.  I can't remember   09:34AM
```

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:   Retaliation - Currier - Cross

```
 1    verbatim.
 2    Q.  I'm not asking you to recite it verbatim.  I'm just talking
 3    about the actual substance.  Was it about the move of her
 4    cellmate?
 5    A.  I think one of them was about the move of her cellmate.  I       09:34AM
 6    think another one was about a jumpsuit.
 7    Q.  Jumpsuit.  Okay.  And you spoke about Department Order 909
 8    which governs when prisoners property is, so to speak, rolled
 9    up.  Department Order 909 only applies to overnight trips, is
10    that correct?                                                         09:34AM
11    A.  It can be interpreted that way.  The way it's written it
12    could be interpreted either overnight or a one-day trip.
13    Q.  Doesn't Department Order 909 actually specifically say
14    overnight?
15    A.  I don't believe so.  I think it says overnight specifically      09:34AM
16    for a medical run.  I don't know what it says for a court
17    appearance.
18          THE COURT:  But if we were having inmate witnesses
19    testify in the future, and we made arrangements to make sure
20    that we finished their testimony in just one day, it would be        09:35AM
21    possible to make sure that none of them were rolled up on the
22    days they came for those single appearances without too much of
23    a burden?
24          THE WITNESS:  Absolutely.
25    BY MS. KENDRICK:                                                      09:35AM
```

1    Q.  I'd like to read to you Subsection 1.8 of Department Order

2    909.

3    A.  Okay.

4    Q.  And it says, "When an inmate is removed from an assigned

5    cell or housing unit overnight for medical care, a court          09:35AM

6    appearance, or other such temporary reasons the appropriate

7    staff member shall ensure the inmate's property is inventoried

8    and securely stored until the inmate returns."

9         So again, Department Order 909 only refers to

10   overnight trips, is that correct?                                 09:35AM

11   A.  Again, it says specifically overnight for medical, comma, a

12   court appearance.  It doesn't say overnight.  I can't say for

13   sure that that means overnight for court appearances as well.

14   Q.  Were you provided a copy of the subpoena that was filed at

15   Docket 2159-1 and addressed to you that asked you to deliver      09:36AM

16   Ms. Ashworth to the courtroom on July 14th?

17   A.  Yes.

18   Q.  Did you see that this document and this subpoena said that

19   she would be returned at the end of the day, at the end of the

20   hearing?                                                          09:36AM

21   A.  Yes, I did.

22   Q.  So you were aware that she was not going out overnight?

23   A.  Yes.

24   Q.  Are you aware that the other woman who testified on July

25   14, Ms. Keys, also had her property rolled up?                    09:36AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

 1   A.   Yes.

 2   Q.   Were you personally involved in these roll-ups?

 3   A.   No.

 4   Q.   Do you know who ordered the roll-ups?

 5   A.   It goes through the movement officer.                      09:36AM

 6   Q.   So even though you got a subpoena directed at you, this

 7   trip was treated as if it was just a regular trip to court?

 8   A.   I believe it was.

 9   Q.   Who was in charge of overseeing it if not you?

10   A.   The unit administrators.                                   09:37AM

11   Q.   Is that the same thing as the deputy warden?

12   A.   Yes.

13   Q.   And you said that roll-ups are done to safeguard the

14   person's property, is that correct?

15   A.   Yes.                                                       09:37AM

16   Q.   But you testified that the cell doors are left unlocked

17   during the day, correct?

18   A.   Yes.

19   Q.   So how are people's properties safeguarded when they are

20   going to school or to work?                                     09:37AM

21   A.   They are still on the unit at that point.  And sometimes

22   they go back and forth.  They have break times.  They have the

23   opportunity to go back and forth to their cells.

24   Q.   But they don't go to school or they don't work inside their

25   cells, correct?                                                 09:37AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

```
 1    A.  That's correct.

 2    Q.  Are you aware that the two male prisoners from Florence

 3    prison who testified on July 14th did not have their property

 4    rolled up?

 5    A.  I believe I was told that, yes.                              09:37AM

 6    Q.  So you have stated that you were following policy.  Does

 7    that mean Florence was violating Department Order 909?

 8    A.  Like I said, I think that's ambiguous in the policy.  You

 9    could interpret it either way.

10    Q.  Has anyone ever told you how to interpret Department Order  09:38AM

11    909?

12    A.  No.

13    Q.  So you can't say whether or not Florence violated policy?

14    A.  No.

15    Q.  Who did you communicate with about Ms. Ashworth being       09:38AM

16    rolled up on July 14th?

17    A.  I believe it was Deputy Warden Lee or -- I'm not sure.  It

18    was either Deputy Warden Lee or Deputy Warden Oros.

19    Q.  And was this done face-to-face?  By text message?

20    Telephone?  E-mail?                                             09:38AM

21    A.  Over the e-mail and the telephone.

22    Q.  And was that about both Ms. Ashworth and Ms. Keys?

23    A.  Yes.  Well, I talked to the deputy warden at the Santa Cruz

24    Unit which was, I believe, Ms. Echols.

25    Q.  And you testified earlier that people are transferred -- up 09:39AM
```

1    to a daily basis transfers occur?

2    A.   Yes.

3    Q.   And you testified that normally, you are not personally

4    involved in these transfers?

5    A.   That's true.                                              09:39AM

6    Q.   Are you notified of transfers?

7    A.   Yes.

8    Q.   Every transfer?

9    A.   Yes.

10   Q.   How are you notified?                                     09:39AM

11   A.   E-mail.

12   Q.   Who sends the e-mail?

13   A.   From the records area, our records department, offender

14   information unit.

15   Q.   Is this some sort of auto generated e-mail?               09:39AM

16   A.   Yeah.   It goes out to a group of folks.

17   Q.   And do you review this e-mail every day when you get it?

18   A.   Yes.

19   Q.   And did you get that e-mail about the move on July 19th?

20   A.   I'm sure I did.                                           09:39AM

21   Q.   Did the name Donna Sheid ring a bell for you when you saw

22   it?

23   A.   No.

24   Q.   Who typically makes the decision that a prisoner is going

25   to be moved from one housing location to another?             09:40AM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re: Retaliation - Currier - Cross

1    A.  It usually goes from the movement officer to the deputy

2    warden.

3    Q.  What is a movement officer?

4    A.  The movement officer is a correctional officer that is in

5    charge of the movement for the unit.                          09:40AM

6    Q.  What level are they?  CO-2?

7    A.  C0-2.

8    Q.  Is that their full time job?

9    A.  Yes.

10   Q.  And are they responsible if somebody was moving, say, from  09:40AM

11   San Pedro to San Carlos units, they would handle that as well?

12   A.  They would be involved in that process, yes.

13   Q.  What's an information report?

14   A.  It's a report that somebody puts information in.

15   Q.  When are they completed?                                  09:40AM

16   A.  Generally whenever there's something that happens.

17   Q.  Are they completed every time a prisoner is transferred

18   from one location to another?

19   A.  Not always.

20   Q.  Do you know if an information report was completed on July  09:40AM

21   19th when Ms. Sheid was moved?

22   A.  I don't believe so.

23   Q.  And you have testified that you are familiar with this move

24   we're talking about.  Ms. Sheid did not request that move, did

25   she?                                                          09:41AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

 1   A.  I don't believe so.

 2   Q.  Do you know who made the decision to transfer Ms. Sheid on

 3   July 19th?

 4   A.  I'm not 100 percent positive.

 5   Q.  Do you know who the movement officer is for San Pedro Unit?  09:41AM

 6   A.  I couldn't tell you who that is right now.

 7   Q.  Do you know who could tell me?

 8   A.  Deputy Warden Oros.

 9   Q.  Did you have any role to transfer Ms. Sheid on the 19th?

10   A.  No.                                                         09:41AM

11   Q.  I'm going to show you something that the defendants have

12   marked as their Exhibit 18.  Could you take a look at that and

13   review it?

14   A.  Okay.

15   Q.  This is an inmate letter written by a prisoner, last name   09:43AM

16   Alvarez?

17   A.  Yes.

18   Q.  And she's requesting to be moved out of her cell?

19   A.  Yes.

20   Q.  Is this the individual that was moved in with Ms. Ashworth?  09:43AM

21   A.  I couldn't say for sure, but I think so.

22   Q.  Okay.  And she writes on the third from the bottom line, "I

23   have a friend in A yard, her name is Allen, who was willing to

24   move out but I'm not sure.  I would just like to get out of

25   this room if possible."                                        09:43AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

```
 1              Do you know if any efforts were made to contact this
 2   Ms. Allen to see if she was willing to switch cells with Ms.
 3   Alvarez?
 4   A.  No, I do not.
 5   Q.  Do you know if any other prisoners were asked if they were    09:43AM
 6   willing to move out to make a space for Ms. Alvarez?
 7   A.  No, I do not.
 8   Q.  Do you know who might know the answer to that question?
 9   A.  Probably Officer Kay or Deputy Warden Oros.
10   Q.  Who is Officer Kay?                                            09:43AM
11   A.  The movement officer, I believe.
12   Q.  So that's the individual to whom this letter is addressed?
13   A.  Yes.
14              THE COURT:  Is there just one movement officer for the
15   unit?                                                             09:44AM
16              THE WITNESS:  Yes.
17              THE COURT:  So this Officer Kay is refreshing your
18   recollection about who the movement officer is?
19              THE WITNESS:  Yes.
20              MS. KENDRICK:  May I approach, Your Honor?             09:44AM
21              THE COURT:  You may.
22   BY MS. KENDRICK:
23   Q.  I'm going to show you what's been labeled as Plaintiff's
24   Exhibit 1 and 2.
25              Have you seen Exhibit 1 before?                        09:44AM
```

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1    A.  Yes.

2    Q.  And you are listed as a recipient of this e-mail.  Is that

3    correct?

4    A.  Yes.

5    Q.  Did you see it at the approximate date and time it was                09:44AM

6    sent?

7    A.  It says it was sent on Saturday 7/21 at 8:25:29 p.m.

8    Q.  And it says S-A-T.  Do you understand that to be short for

9    Saturday?

10   A.  Yes.                                                                  09:45AM

11   Q.  July 21st was actually a Friday.  Do you have any idea why

12   this e-mail would say it was sent on a Saturday?

13   A.  I don't remember.

14   Q.  Would you please read the body of the e-mail out loud?

15   A.  It says, "On the above date and approximate time of 1908             09:45AM

16   hours, Captain Bailey" --

17   Q.  I'm sorry.  Exhibit 1.

18   A.  Oh.  I'm sorry.  Says, "Attached is the IR for the movement

19   conducted of Inmate Sheid, Number 310573, by Captain Bailey and

20   Sergeant Overly."                                                        09:45AM

21   Q.  And you testified earlier that normally an incident report

22   is not done when somebody is moved.  Do you know why an

23   incident report was done for this move?

24   A.  I am not sure.

25   Q.  Now, let's look at Exhibit 2.  What is this document?               09:45AM

1    A.  It's an IR, information report.

2    Q.  And about halfway down the page on the left-hand side it

3    lists the time at 1908 on 7/21/17.  Is that correct?

4    A.  Yes.

5    Q.  And other than this e-mail exchange and this incident          09:46AM

6    report, do you have any other communications with anybody about

7    Ms. Sheid being moved in and out of the cell?

8    A.  I don't recall.  I'm sure there's probably an e-mail.

9           MS. KENDRICK:  Your Honor, we would like to move

10   Exhibits 1 and 2 into evidence.                                    09:46AM

11          THE COURT:  Any objection?

12          MS. LOVE:  No objection.

13          THE COURT:  They will be received.

14   BY MS. KENDRICK:

15   Q.  I'm going to show you a couple more exhibits.  These are       09:46AM

16   Plaintiff Exhibits 3 and 4.

17          Now, first, looking at Plaintiff's Exhibit 3, if you

18   want to just take a look at that for a minute or two, read

19   through it.

20          Have you seen this document before?                         09:47AM

21   A.  Yes.

22   Q.  And if we start on the third page, which is the first

23   e-mail in the route, that's an e-mail that you sent on July 14

24   at 5/19 to Adalia Cerrillo?

25   A.  Yes.                                                           09:48AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1    Q.  Who is Ms. Cerrillo?

2    A.  She's our facility health administrator.

3    Q.  Do you remember sending this e-mail to Ms. Cerrillo?

4    A.  Yes.

5    Q.  Could you please read what you wrote?                    09:48AM

6    A.  Says, "Adalia, there is some type of medical issue with her

7    on 6/5/17 and evidently she went to medical but there is no

8    documentation according to the nurse at Pedro this afternoon.

9    The nurse did say the inmate showed up with an HNR on 6/7/17

10   complaining about an allergy or something.  Can you look into    09:48AM

11   this and see if the inmate was seen on 6/5, and if so, what it

12   was for or about?"

13   Q.  What prompted you to send this e-mail?

14   A.  I don't remember, to be honest with you.

15   Q.  And if we go to the second page it appears that Ms.         09:48AM

16   Cerrillo responded at 5/27, is that correct?

17   A.  Yes.

18   Q.  And could you please read Ms. Cerrillo's response?

19   A.  Says, "She was seen in the morning when she came back from

20   her appointment and told by the nurse that if she had any signs  09:49AM

21   or symptoms from her medical procedure to present to medical.

22   The following day the inmate came in and reported that Sergeant

23   Coleman refaced to initiate an ICS when she started having an

24   allergic reaction.  The inmate and her cellie wrote inmate

25   letters and we also reported it to Ms. Oros who said they were   09:49AM

 1   conducting an investigation.  We took it to the DW because it

 2   wasn't the first the inmates made complaints of the same nature

 3   with the same sergeant.  Hope this helps."

 4   Q.  What did you do in response to this information from Ms.

 5   Cerrillo?                                                          09:49AM

 6   A.  I asked the unit DW, which was Ms. Oros, to look into it

 7   further to see if she could find out what had happened or

 8   occurred with this Sergeant Coleman issue.

 9   Q.  Prior to receiving this e-mail, were you aware of other

10   complaints regarding Sergeant Coleman not calling ICS's for      09:49AM

11   women?

12   A.  No.

13   Q.  You stated that you contacted Deputy Warden Oros.  Did you

14   do anything else in response to this information?

15   A.  No.  Deputy Warden Oros looked into it.                       09:50AM

16   Q.  And then the first page of this document is an e-mail from

17   Ms. Oros to you on July 19, 4:53.  Is this her report back to

18   you?

19   A.  Yes.

20   Q.  Did you receive any additional information back from her      09:50AM

21   besides this?

22   A.  Yes.

23   Q.  And she states in the last paragraph that, quote, "I did

24   advise the allegations and I was able to meet with Lieutenenat

25   Papworth last week to discuss the issues with him so we could     09:50AM

 1    start to see what happened.  Unfortunately Lieutenant Papworth

 2    left on vacation, and today was Sergeant Coleman's first day

 3    back."

 4         Did she provide you any additional updates after

 5    speaking again with Sergeant Coleman or Lieutenant Papworth?          09:50AM

 6    A.  Yes.

 7    Q.  What was that additional update?

 8    A.  She talked to Sergeant Coleman who had additional

 9    information that he put in a supplemental report.

10    Q.  Supplementing what report?                                        09:51AM

11    A.  Well, he put in an additional information report saying

12    what had happened during that situation.

13    Q.  So did Deputy Warden Oros direct Sergeant Coleman to write

14    an incident report about what happened on June 5th?

15    A.  I'm sure she did.                                                 09:51AM

16    Q.  So when you say "supplemental report" you don't know if a

17    report had been done at the time in June?

18    A.  No.

19    Q.  If you could next look at Plaintiff's Exhibit 4.  Again

20    just take a look at it and let me know when you are done              09:51AM

21    reviewing it.

22         So it appears this starts off as an e-mail from you to

23    Rachel Love and Nicole Taylor on July 14th at 2:30, e-mailing

24    photographs?

25    A.  Yes.                                                             09:52AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1    Q.   What were these photos of?

2    A.   I believe they were the outside of the Santa Cruz medical

3    waiting area.

4    Q.   Why were you sending them?

5    A.   I was asked to send them.                                    09:52AM

6    Q.   And then at 3:22, Dr. Taylor sends you a response asking

7    you to access anything related to Ashworth's Number 315041

8    indicating that on 6/5 she needed an ICS to be activated due to

9    allergic reaction around 5 p.m., correct?

10   A.   Yes.                                                         09:53AM

11   Q.   And it appears on the first page of this that you e-mailed

12   it to Crystal Lee and Janah Barreras?

13   A.   Yes.

14   Q.   And copied Mr. Twyford?

15   A.   Yes.                                                         09:53AM

16   Q.   We know who Ms. Lee and Mr. Twyford are.  Who is Janah

17   Barreras?

18   A.   She's the CO-4.  She's the program supervisor.

19   Q.   For San Pedro Unit?

20   A.   Yes.                                                         09:53AM

21   Q.   Is Dr. Taylor's e-mail to you what prompted you to send the

22   e-mail that's Exhibit 3 to Adalia Cerrillo?

23   A.   I believe so.

24   Q.   And going up Page 1, it appears that Ms. Lee responded to

25   you and relayed some information that she had obtained from     09:53AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1   Officer Western, correct?

2   A.  Yes.

3   Q.  And what did you say in response to Ms. Lee?

4   A.  That I wanted her to have a conversation with Sergeant

5   Coleman about this.                                          09:54AM

6   Q.  Could you read what you wrote at 4:24 p.m.?

7   A.  Yes.  "I want someone to have a conversation with Sergeant

8   Coleman about this.  We are not medical and we do not make

9   decisions such as this.  He needs some redirection on this."

10  Q.  Do you know if Deputy Warden Lee spoke to Sergeant Coleman   09:54AM

11  about his behavior?

12  A.  I don't believe she did, because I think Deputy Warden Oros

13  came back after that point in time, and he was not available on

14  that date.

15  Q.  Did Deputy Warden Oros or anyone else ever provide you with   09:54AM

16  additional details of these other incidents when Sergeant

17  Coleman refused to call an ICS?

18  A.  I don't know what other incidents you are recalling, you

19  are talking about.

20  Q.  In Exhibit 3, Ms. Cerrillo says that she notified the   09:54AM

21  deputy warden because it was not -- it was, quote, "not the

22  first time that inmates made complaints of the same nature with

23  the same sergeant."

24  A.  I advised you I was not aware of any other issues.

25  Q.  So your deputies never provided you additional information   09:55AM

45

```
 1    about what she was referring to?

 2    A.  I don't know if they were provided any information.

 3    Q.  So they did not -- did they provide you information?

 4    A.  No.

 5    Q.  Do you know if any disciplinary action was taken against    09:55AM

 6    Sergeant Coleman for his actions?

 7    A.  There was not.

 8    Q.  Was he reassigned off San Pedro Unit?

 9    A.  No, he was not.

10    Q.  Do you know if any disciplinary action was taken against    09:55AM

11    Officer Western?

12    A.  No, there was not.

13    Q.  Was she moved off of Pedro unit?

14    A.  No, she was not.

15    Q.  She still works at Pedro unit?                              09:55AM

16    A.  No, actually she's transferred, but that didn't have

17    anything to do with this.

18            MS. KENDRICK:  Your Honor, we would like to move

19    Exhibits 3 and 4 into evidence.

20            THE COURT:  Any objection?                              09:55AM

21            MS. LOVE:  No objection.

22            THE COURT:  They will be received.

23    BY MS. KENDRICK:

24    Q.  Next I'm going to show you what's been marked as

25    Plaintiff's Exhibit 6.  Again, take your time to look at it.   09:56AM
```

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:   Retaliation - Currier - Cross

1    A.   I'm ready.

2    Q.   So on the third and fourth page, this originates as an

3    e-mail that you sent on July 27, 2017 at 3:52 p.m., correct?

4    A.   Yes.

5    Q.   And it's addressed to multiple individuals.  Who are these          09:56AM

6    people, their titles?

7    A.   The deputy wardens and associate deputy wardens.

8    Q.   So this covers all of the units at Perryville?

9    A.   Yes.

10   Q.   And you have sent this -- in the first paragraph you write,          09:56AM

11   "I need to know daily if there are any issues with anything

12   regarding the below listed inmates.  Also these inmates and

13   their cellies are not to be moved for any reason.  Contact

14   myself or DWOP Twyford if you feel a need to move them for

15   anything and we will be the final authority."                            09:57AM

16          Were you notified after you sent this e-mail that any

17   of the listed inmates were going to be moved or their cellmates

18   were going to be moved?

19   A.   I don't believe so.  I don't recall that.

20   Q.   And then you go on to say in your second paragraph, quote,          09:57AM

21   "Don't change their jobs unless you have approval from the DWOP

22   or I.  And I even want to know if they receive any disciplinary

23   for any reason.  We literally need to know anything no matter

24   how trivial it may seem about these inmates."

25          Do you recall being notified about any proposed or                09:57AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

```
 1    actual job changes?

 2    A.  I don't believe so, no.

 3    Q.  How about any of these women receiving a disciplinary

 4    ticket?

 5    A.  I believe there was an instance where Inmate Sheid had          09:58AM

 6    taken some lipstick out on her job, and they had talked to her

 7    about that.  And we resolved that by just telling her to not to

 8    do that any further, but she didn't get a ticket.

 9    Q.  By taking it do you mean she was carrying with her in her

10    pocket?                                                             09:58AM

11    A.  No, she is not to -- it was lipstick.  It wasn't Chapstick,

12    so it's a violation.

13    Q.  You mean "taking" carrying with her.  You don't mean

14    "taking" as in she stole it?

15    A.  No.  She had it with her.                                       09:58AM

16    Q.  And then on the fourth page your next paragraph, you state,

17    "Ensure you have them identified in some way and ensure your

18    supervisors know how to advise you of anything that occurs with

19    these inmates.  Please make sure your staff do not talk to

20    inmates about any of this as well.  It seems like we have a         09:59AM

21    problem discussing things with inmates that we should not be

22    discussing with them."

23          What were you referring to when you said, quote, "We

24    have a problem discussing things with inmates that we should

25    not be discussing with them," close quote?                         09:59AM
```

1    A.  I didn't want them to talk about the retaliation issue in

2    front of the inmates to give them the impression that there was

3    any retaliation based on, you know, their testimony or being a

4    part of the lawsuit.

5    Q.  But what was the basis for saying, "It seems like we have a     09:59AM

6    problem"?  That implies that the problem already exists.

7    A.  You know, I don't remember why I wrote that, to be on

8    honest with you.  Just trying to cover all my bases.

9    Q.  If you go back to the third page of Exhibit 6, Lieutenant

10   Papworth responded to your e-mail on 7/28/17 at 8:26 a.m.          10:00AM

11   Could you read Lieutenant Papworth's message?

12   A.  He says, "Donna Sheid has been placed in a jumpsuit until

13   August 11.  I'm not sure who authorized this.  There should be

14   a disciplinary sanction for inmate's due process.  We have

15   circumvented the disciplinary process here.  This may become an    10:00AM

16   issue in lieu of what's going on right now.  As a matter of

17   fact we have approximately 10 inmates in jumpsuits who may or

18   may not have even a ticket written before being sanctioned to a

19   jumpsuit."

20        MS. LOVE:  Your Honor, I'm going to object to the line        10:00AM

21   of questioning on Inmate Sheid when we are here on a

22   retaliation hearing as a result of plaintiff's notice of

23   retaliation regarding Inmates Ashworth and Oyenik.  Inmate

24   Sheid has never come to the Court and made any statements or

25   any averments or any opinions she believes she's been             10:01AM

1    retaliated against.

2            THE COURT:  Thank you.  The objection is overruled.

3    We're learning about more for the process.  Thank you.

4    BY MS. KENDRICK:

5    Q.  I would note for the record Ms. Shied did provide with you          10:01AM

6    a written statement as an affiant.  What does it mean, Warden,

7    to be placed in a jumpsuit?

8    A.  Evidently, they were putting inmates who had some rule

9    violations in a jumpsuit.  I'm not sure why they were doing

10   that.                                                                    10:01AM

11   Q.  Is there a policy about putting people in jumpsuits?

12   A.  No, there is not.

13   Q.  So what does this physically mean that you are in a

14   jumpsuit?

15   A.  It means that they put them in an orange jumpsuit versus            10:01AM

16   their regular clothes.

17   Q.  And regular clothes for women is an orange T-shirt and

18   orange pants?

19   A.  Yes.

20   Q.  Why would being placed in a jumpsuit be considered                  10:01AM

21   punishment?

22   A.  I don't know.  I imagine they don't want to wear a

23   jumpsuit.  I wouldn't to wear a jumpsuit.  I would want to wear

24   my regular clothes.

25   Q.  Why would you not want to wear a jumpsuit?                          10:02AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

 1   A.  Just because it's not very fashionable looking or I don't

 2   know.

 3   Q.  Pain to go to the bathroom?

 4   A.  Probably.  You have to take it all off.

 5   Q.  Is putting people in jumpsuits a practice at all units at      10:02AM

 6   Perryville or just San Pedro?

 7   A.  No.  I think that was just happening at San Pedro.

 8        THE COURT:  Before this e-mail came to your attention

 9   you had never heard of this jumpsuit practice ever?

10        THE WITNESS:  No, I didn't know they were doing that.      10:02AM

11        THE COURT:  Thank you.

12   BY MS. KENDRICK:

13   Q.  Do you know what the basis was for an inmate being placed

14   in the jumpsuit?

15   A.  No, I don't.                                                   10:02AM

16   Q.  Who would know the answer to that question?

17   A.  Deputy Warden Oros.

18   Q.  Or possibly Lieutenant Papworth?

19   A.  Probably.

20   Q.  Do you know who could authorize putting someone in a          10:02AM

21   jumpsuit?

22   A.  No, I don't.

23   Q.  Do you know if anybody higher up reviewed the decisions to

24   put people in jumpsuits?

25   A.  No, I don't.                                                   10:02AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1   Q.  Lieutenant Papworth refers to a disciplinary process that

2   was circumvented and, quote, "may become an issue."  Do you

3   know what the disciplinary process was that staff were supposed

4   to follow?

5   A.  I'm not sure what the issues were that they were put in a          10:03AM

6   jumpsuit for, so no.

7   Q.  You were not copied on this e-mail from Lieutenant Papworth

8   to Deputy Warden Lee, but when were you notified that Ms. Shied

9   had been placed in a jumpsuit?

10  A.  I don't remember.                                                  10:03AM

11  Q.  Do you remember who told you?

12  A.  No.  I don't remember that either.  I know that I told them

13  to stop.

14  Q.  Who did you tell to stop?

15  A.  I'm assuming the unit deputy warden.                              10:03AM

16  Q.  You don't remember when you told the unit deputy warden?

17  A.  As soon as I was made aware of it I stopped it.

18  Q.  Do you remember when you were told there were 10 inmates in

19  jumpsuits that may or may not have had a ticket written?

20  A.  No, I don't remember.                                            10:04AM

21  Q.  Do you know if any of those 10 inmates were among the women

22  that were listed in your original e-mail?

23  A.  I don't believe they were, but I can't say 100 percent they

24  weren't.

25  Q.  And if you turn to Page 2 of this exhibit, Deputy Warden          10:04AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

```
 1    Lee forwards Mr. Papworth's e-mail to someone named Pedro

 2    Rivera with the message:  Was disciplinary issued?

 3            Do you know who Pedro Rivera is?

 4    A.  He's the disciplinary coordinator for the unit.

 5    Q.  San Pedro?                                              10:04AM

 6    A.  Yes.

 7    Q.  Does each unit have its own disciplinary coordinator?

 8    A.  Yes, they do.

 9    Q.  And if you turn to the first page, Mr. Rivera responds to

10    Ms. Lee and then copies somebody named Eoin Bailey and Larry   10:04AM

11    Garner.  And Pedro Rivera writes, quote, "I did not see her on

12    a ticket.  Per the captain and DW Oros, security places inmates

13    in jumpsuits for 30 days when they are not in compliance.

14    Approval from the shift commander."

15            Do you know who the captain is for San Pedro?        10:05AM

16    A.  Yes, Eoin Bailey.

17    Q.  Who is this Larry Garner?

18    A.  He's the new program supervisor over there.  Ms. Barreras

19    left.

20    Q.  Who is the shift commander that Mr. Rivera refers to?    10:05AM

21    A.  There are several shift commanders, lieutenants and

22    sergeants.

23    Q.  Okay.  And then Ms. Lee responds at 2:01 p.m. so within

24    three minutes of Mr. Rivera, and she writes, "Per warden, this

25    restriction is lifted."                                     10:05AM
```

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:   Retaliation - Currier - Cross

1           Did you order that Ms. Sheid be taken out of the

2    jumpsuit?

3    A.   Yes.

4    Q.   Did you order that the other 10 inmates be taken out of

5    jumpsuits?                                                      10:06AM

6    A.   Yes.

7    Q.   So it's fair to say that you learned of this practice at

8    some point before 2 p.m. on July 28th?

9    A.   Yes.

10   Q.   Did you take any steps to investigate why Ms. Sheid and the  10:06AM

11   other women were placed in jumpsuits?

12   A.   I talked to the unit deputy warden, and she said that that

13   had been a common practice over there for various disciplinary

14   violations, and that's when I told her to stop.

15   Q.   Was any disciplinary action taken against the deputy warden  10:06AM

16   for this practice of putting people in jumpsuits?

17   A.   No.

18   Q.   When did Ms. Oros stop being the deputy warden of San Pedro

19   unit?

20   A.   I don't remember the exact date.                          10:06AM

21   Q.   Was it in the past month?

22   A.   Yes.

23   Q.   Did her departure have anything to do with these incidents?

24   A.   Absolutely not.

25           MS. KENDRICK:   Your Honor, we would like to move       10:07AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:   Retaliation - Currier - Cross

```
 1   Exhibit 6 into evidence.
 2              THE COURT:  Any objection?
 3              MS. LOVE:  No objection.
 4              THE COURT:  6 will be received.
 5   BY MS. KENDRICK:                                          10:07AM
 6   Q.  I'm going to show you what's been marked as Exhibit 7.
 7   A.  Okay.
 8   Q.  So this looks identical to what was marked as Exhibit 4,
 9   correct, except it has an additional message sent by Deputy
10   Warden Lee to you.  Is that correct?                      10:08AM
11   A.  Yes.
12   Q.  And this is sent on July 14th at 4:47, and she writes to
13   you, "We will be having a conversation and starting an AI on
14   this Monday."
15              What is an AI?                                 10:08AM
16   A.  It's an administrative inquiry.
17   Q.  Do you know if an AI was done?
18   A.  There was not one.
19   Q.  Why not?
20   A.  Because additional information received from him was    10:08AM
21   contradictory to what we were initially told.
22   Q.  So why would contradictory information mean that no inquiry
23   is done?
24   A.  Because he provided additional information that made me
25   believe that he followed protocols.                      10:08AM
```

1    Q.  So whose information was he contradicting?

2    A.  The initial information that we were given prior to him

3    being talked to that said in the e-mail that he didn't call a

4    medical ICS.

5    Q.  So this refers to a conversation with Officer Western where          10:09AM

6    she reports that Sergeant Coleman would not call an ICS for Ms.

7    Ashworth?

8    A.  Correct.

9    Q.  Are you saying that Sergeant Coleman contradicted Officer

10   Western and said he did call an ICS?                                     10:09AM

11   A.  No.  That's not what I'm saying.

12   Q.  What are you saying?

13   A.  Sergeant Coleman reported that the inmate had been seen

14   earlier in the day.  She was having some kind of issue.  He was

15   called.  He went down, talked to the inmate, talked to medical,         10:09AM

16   somebody in medical.  And I don't remember the exact verbiage,

17   but it was something to the effect of if you send her up here

18   we're just going to send her back to her cell.  She's got a

19   follow-up appointment, that they basically didn't need to see

20   her.  So that's why they didn't call the ICS.                           10:09AM

21   Q.  So you are saying that Sergeant Coleman was following

22   protocol when he did not call an ICS?

23   A.  There was no reason.  ICS is for a serious medical issue.

24   And at that point, he had talked to medical and they said it

25   wasn't a serious issue.                                                 10:10AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1          THE COURT:  But medical hadn't seen her in the time

2    that she had left and so Coleman's reporting what he said, he's

3    seen, or he's aware of and you have written an e-mail saying

4    Sergeant Coleman, we're not supposed to be making medical

5    decisions.  So, in fact, you did defer to him in that process          10:10AM

6    by allowing him to make a medical decision because that is the

7    decision that stopped her from getting back to medical.

8          THE WITNESS:  In consultation with medical that day.

9          THE COURT:  Yeah, but medical hadn't seen her.  She's

10   reporting new symptoms, new pain, and she's asked the                  10:10AM

11   supervisor on the unit or whatever the -- what is her name

12   again?  I don't remember her name.  She's asked to be -- to

13   have an ICS because she said that they told me to call an ICS.

14   He then finally responds after, I guess, three inquiries from

15   her, goes over and says, she's breathing, so that's fine.  And        10:11AM

16   then he goes and they say to her, to him, he testifies here and

17   says they said to me, this is Sergeant Coleman, if her

18   situation has changed, I think, for the worse, or changed, then

19   she needs to be seen.

20         But he had no way of knowing whether it had changed             10:11AM

21   from when they had seen.  So what you have done, I think, here

22   by giving Coleman a pass is you have contradicted your e-mail

23   in which you said we're not medical.  We're not supposed to be

24   making these decisions.  Coleman did make that decision.  He

25   stopped her from getting back to medical.                             10:11AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1           THE WITNESS:  Well, he relayed the information from

2     the inmate, whatever was going on, to medical who said that

3     they didn't need to see her.

4           THE COURT:  How would they know whether her situation

5     had changed?                                                    10:11AM

6           THE WITNESS:  Based on the information he gave them.

7           THE COURT:  Coleman couldn't give anybody in medical

8     an update because he had no baseline.  He had not seen her

9     originally.  They had seen her originally.  She's reporting my

10    symptoms are worse, and he then takes that information, my     10:12AM

11    symptoms are worse, and the medical people say to him, if the

12    situation hasn't changed there's nothing we can do.  They have

13    no way of knowing whether the situation has changed because

14    they haven't seen her and Coleman has no way of knowing whether

15    the situation has changed because he didn't see her originally. 10:12AM

16          So again, what happened here, just so how know how I

17    perceive it, you that you had Sergeant Coleman making a medical

18    decision that he had no qualifications to do, something you

19    wrote to him and said, you made a medical decision.  You

20    shouldn't be doing this.  That's exactly what he did here.     10:12AM

21          THE WITNESS:  Okay.

22          MS. KENDRICK:  Your Honor, I'd like to move Exhibit 7

23    into evidence.

24          THE COURT:  Any objection?

25          MS. LOVE:  No objection.                                 10:12AM

UNITED STATES DISTRICT COURT

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

```
1              THE COURT:  It will be received.

2              MS. KENDRICK:  I'd also like to move defendant's

3    Exhibit 18 into evidence.

4              MS. LOVE:  No objection.

5              THE COURT:  I gather there's no objection there.  It    10:13AM

6    will be received as well.

7    BY MS. KENDRICK:

8    Q.  Warden, are you familiar with something that's called a

9    target search list?

10   A.  Yes.                                                          10:13AM

11   Q.  What is that?

12   A.  Depending on various factors, they will put inmates on a

13   targeted list if they have reason to suspect that there's any

14   kind of contraband or any kind of untoward things going on.

15   Q.  You just said a lot of things that I want to unpack there.    10:13AM

16            Who is they?

17   A.  Usually it's your unit administrator or your Special

18   Security Unit staff.

19   Q.  So again, when you use the phrase "unit administrator" are

20   you referring to the deputy warden?                              10:13AM

21   A.  Yes.  I'm sorry.

22   Q.  And you said also security staff?

23   A.  Yeah.  There's a Special Security Unit.  They are called

24   SSU, Special Security Unit.

25   Q.  What does SSU do?                                             10:13AM
```

1   A.  They specifically look into issues with inmates.  They deal

2   with gang activity, drugs, those types of things.

3   Q.  And you said that the person could be on there because

4   there's a suspicion of contraband or, quote, untoward things.

5   Could you explain to us what you mean by untoward things?                   10:14AM

6   A.  Well, you know, if you hear something on a phone call that

7   they are talking about escape or bringing in drugs, or there's

8   just so many different things depending on what's going on.

9   Q.  As warden, what are your duties with respect to the target

10  search list?                                                                10:14AM

11  A.  I generally don't have involvement.  The unit deputy

12  wardens handle that.

13  Q.  Are you notified who is on the target search list for each

14  unit for a given month?

15  A.  No.  I don't believe I get a list of those.                            10:14AM

16  Q.  And is it set up that if you are put on a search list you

17  are put on the list for a discrete period of time or

18  indefinitely?

19  A.  It could be either/or depending on the severity of what

20  they have you on the list for.                                             10:15AM

21  Q.  And what does it mean if a prisoner is placed on a target

22  search list?  What are the consequences that she experiences?

23  A.  That they will be targeted, searched periodically.  There's

24  no time frame given or anything like that.

25  Q.  What ADC policy guides the targeted searches?                          10:15AM

UNITED STATES DISTRICT COURT

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

 1    A.  I couldn't give you that off the top of my head.

 2    Q.  Is it in the written policies as far as you know?

 3    A.  They do have a policy on that, yes.

 4    Q.  And to your knowledge, does the policy spell out the type

 5    of circumstances or reasons for which a person would be placed      10:15AM

 6    on the search list?

 7    A.  Not having that policy in front of me, I couldn't tell you.

 8    Q.  But if one were to look, wanted to know the, kind of, the

 9    grounds for it would that be the most logical place to start?

10    A.  I believe so, yes.                                              10:16AM

11    Q.  And how frequently are people searched when they are on the

12    search list?  Daily?

13    A.  I couldn't tell you.  It just depends.

14    Q.  I believe that you testified that before you were the

15    warden you were the deputy warden of operations and also a          10:16AM

16    deputy warden?

17    A.  Yes.

18    Q.  Were you involved in targeted searches when you were a

19    deputy warden?

20    A.  Yes.                                                            10:16AM

21    Q.  When was that?

22    A.  Year and a half ago.

23    Q.  Like what year?

24    A.  Year and a half ago I was deputy warden of operations.

25    Prior to that I was a deputy warden.                               10:16AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1   Q.  And what unit were you the deputy warden of?

2   A.  I have been the deputy warden of Santa Maria, Piestewa, the

    Barchey Unit.

4   Q.  The Barchey Unit?

5   A.  At Lewis.                                                    10:16AM

6   Q.  And when you were the deputy warden at those units, how

7   frequently were people searched when they were on the targeted

8   list?

9   A.  And again, it depends.  I couldn't give you an exact number

10  of times, because it depends on what they are on there for and   10:17AM

11  what's going on, if there's suspicious activity going on, that

12  they need to check them once a week.  I'm not aware of them

13  ever being done once a day.

14  Q.  But it could be more than once a week?

15  A.  It could be.                                                 10:17AM

16  Q.  Who oversees these searches?

17  A.  Usually your special unit security staff.

18  Q.  And could you describe these searches?

19  A.  They go through and they look through their boxes of

20  property, they look through their cell.  They look to see if     10:17AM

21  they can find any contraband items.  Generally in my experience

22  they are looking for drug-type paraphernalia.

23  Q.  And when they are looking at their property, do they look

24  at the prisoner's legal mail and legal documents?

25  A.  No.  They will go through and see if there's anything in     10:17AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

 1  box, but they don't read their documents.

 2  Q.  Are you aware that the Ninth Circuit has twice in the last

 3  few years criticized the Department of Corrections' policy

 4  about the reading of legal mail and legal documents?

 5          MS. LOVE:  Objection, Your Honor, to this line of                10:18AM

 6  questioning where there has been no evidence submitted by the

 7  plaintiffs that Ms. Ashworth has ever been even subjected to

 8  the kind of search that plaintiffs are now questioning this

 9  witness about.

10          THE COURT:  This is a foundational question.                     10:18AM

11  Overruled.

12          THE WITNESS:  No.  I'm not aware.

13  BY MS. KENDRICK:

14  Q.  Are you aware of any recent changes to ADC policies about

15  reading legal mail and legal documents?                                  10:18AM

16          MS. LOVE:  Objection.  Relevance, foundation.

17          THE COURT:  Overruled.

18          THE WITNESS:  No, I'm not.

19  BY MS. KENDRICK:

20  Q.  And when the searches are conducted is the individual's             10:18AM

21  body also searched?

22          MS. LOVE:  Same objections.

23          THE COURT:  Overruled.

24          THE WITNESS:  No.  I don't know what you mean about

25  their body.  Are they pat searched?                                      10:18AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1   BY MS. KENDRICK:

2   Q.  Pat searched or strip searched or body cavity searched?

3   A.  They could be, but that's not always the case.  Depends on

4   if they suspect something or not; if the dog hit on them or

5   they saw them conceal something.  That's not mandatory that            10:19AM

6   they would do that.

7   Q.  But they do have the option of doing body searches if they

8   desire?

9   A.  Well, a strip search, yeah, they could.

10  Q.  And a pat-down?                                                    10:19AM

11  A.  Yes.

12  Q.  They would have to get a warrant for a body cavity search?

13  A.  Yeah.  We don't -- well, I don't know if they would have to

14  get a warrant but there would have to be some kind of system

15  involved.                                                             10:19AM

16  Q.  Okay.  I'm going to show you what's been marked as

17  plaintiff's Exhibit 5.

18  A.  Okay.

19  Q.  Have you seen this document before?

20  A.  No.                                                               10:20AM

21  Q.  So it appears to be an e-mail exchange dated August 2nd,

22  2017, at 2:25 from Lieutenant Papworth to Deputy Warden Lee and

23  Captain Bailey?

24  A.  Yes.

25  Q.  And the subject line is "Inmate Ashworth, Number 315041"?         10:20AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1    A.  Yes.

2    Q.  And this is the same Ms. Ashworth we have been talking

3    about this morning?

4    A.  Yes.

5    Q.  Could you read what Lieutenant Papworth wrote to Ms. Lee?          10:20AM

6          MS. LOVE:  Objection.  Hearsay, relevance, and

7    foundation where the witness has just testified she's never

8    seen this document before.

9          THE COURT:  She's just asked her to read it.

10   Overruled.                                                            10:20AM

11   BY MS. KENDRICK:

12   Q.  Could you just read it out loud?

13   A.  Yeah.  It says, "FYI.  SSU has placed this inmate on my

14   target search list for the month.  Would you like for me to

15   proceed with this search or remove her from the list?  The           10:21AM

16   inmate could perceive the search as retaliatory for the

17   lawsuit."

18   Q.  Were you notified by Ms. Lee that Ms. Ashworth had been put

19   on the target search list?

20   A.  No, I was not.                                                    10:21AM

21   Q.  Were you aware that she had been put on the target search

22   list?

23   A.  No, I was not.

24   Q.  As you sit here right now and look at this e-mail, is this

25   the first time you have become aware that she was on the search      10:21AM

1    list for August?

2    A.  Yes.

3    Q.  But your testimony is that you are not aware, but in that

4    e-mail that you sent on July 28th at Exhibit 6, you said you

5    wanted to know daily if anything came up with any of these          10:21AM

6    prisoners, correct?

7    A.  Yes.  That is correct.

8    Q.  And that e-mail went to Deputy Warden Lee?

9    A.  Yes.  I believe so.

10   Q.  Well, let's take a look if you would like at Exhibit 6.          10:21AM

11   Page 3 at the bottom of the page.  I misspoke.  I'm sorry.  You

12   sent that e-mail on July 27th, Thursday.

13   A.  Yeah.  Her name is on there.

14   Q.  So you have no idea who placed Ms. Ashworth on the target

15   search list?                                                         10:22AM

16   A.  No, I don't.

17   Q.  And you don't know why she was placed on the target search

18   list?

19   A.  I do not.

20        MS. KENDRICK:  I have nothing further, Your Honor.             10:22AM

21        THE COURT:  Does it look to you from what's in this

22   marked for identification as Exhibit 5 that people were not

23   complying with your directive to let you know about any

24   possible adverse consequences to any of these inmates on the

25   list?                                                                10:22AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1          THE WITNESS:  Yeah, I can only assume since I wasn't

2    made aware of this.

3          THE COURT:  But it looks to you like somebody didn't

4    let you know what you wanted to be told?

5          THE WITNESS:  Yes.                                    10:22AM

6          THE COURT:  Just a couple of quick questions, if I

7    could.

8          So that I can understand the differences with respect

9    to the roles, I understand from the e-mails that somebody who

10   has the title disciplinary coordinator in the case of Pedro    10:23AM

11   Rivera, he's a CO-3?

12         THE WITNESS:  Yes.

13         THE COURT:  Now, Crystal Lee, who is deputy warden of

14   compliance, is how many levels above that, would you say?

15         THE WITNESS:  At least a couple.  Two or three.        10:23AM

16         THE COURT:  Okay.  And then a shift commander

17   typically has the rank of what?

18         THE WITNESS:  A lieutenant or a sergeant.

19         THE COURT:  Okay.  Thank you.  Last, with respect to

20   the movement officer, is this person also responsible for     10:23AM

21   coordinating movements of inmates who move from a unit to

22   another unit?

23         THE WITNESS:  Yes.

24         THE COURT:  You may be aware that one of the problems

25   that we have had with the compliance with the stipulation is   10:23AM

```
 1   making sure that medications follow inmates.  Do you know

 2   whether the movement officers have any responsibility for

 3   following up on that?

 4          THE WITNESS:  They don't.

 5          THE COURT:  Would there be a reason that wouldn't be a     10:23AM

 6   good idea to task them with that responsibility, for instance,

 7   to say you can't move somebody until all the ducks are in line,

 8   and one of the ducks -- among the ducks I could think of, you

 9   have to have the transportation in place.  You have to have the

10   space available at the new place.  So this movement officer is     10:24AM

11   checking to make sure, is there a van or bus that can take the

12   person?  Is there room at the place we are going to?  Are there

13   any other reasons we shouldn't be moving?  Why couldn't you

14   task that movement officer with the additional responsibility,

15   don't move anybody until you have got your medications in a     10:24AM

16   place so they have the ability to make sure they continue to

17   get it?

18          THE WITNESS:  Usually the shift supervisor is involved

19   in that process because generally the movement officer is gone

20   for the day after the moves are done.  They are generally done     10:24AM

21   after they have generated the list and they are gone for the

22   day.  And they are only moved within the complex there.  We

23   have no other female facilities so they don't go to any --

24          THE COURT:  I guess I'm sort of -- since I have you

25   here at this moment, I will agree you are just responsible for     10:24AM
```

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1    something that is unlike any other because you can't transfer

2    somebody to another unit because there's no other place that

3    holds women, I'm just asking you, based on your knowledge of

4    the responsibilities of the different people whether or not it

5    seems like the movement officer would be somebody who, as I          10:25AM

6    just described it here, from my position, albeit of limited

7    knowledge, it just seems I am imagining this person does check

8    off boxes to make sure, can we go forward with this movement?

9    And it sort of would seem to me, and maybe I should ask this

10   question, is the movement officer somebody who has to sign off    10:25AM

11   on the movement before it happens?

12           THE WITNESS:  Yeah.  There's paperwork they have to do

13   to make sure it gets entered into the computer.

14           THE COURT:  Because you mentioned the shift

15   supervisor.  I have to tell you it's not working.  This is one    10:25AM

16   of the most abysmal failures to comply, and it just seems to me

17   one of the easiest ones to solve because, obviously, the task

18   of moving somebody involves moving parts, and this is just

19   another moving part.  So since you can get the van in place you

20   can get the idea that the space has to be available, you can     10:26AM

21   check off those boxes why can't we check off the medication

22   box?  Because what's happening is people are being transferred

23   and they show up and they don't have their meds and it results

24   in an extended delay in getting their meds back on line.  And a

25   lot of the meds cannot be interrupted without an adverse         10:26AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Redirect

```
 1   effect.
 2              Thank you for that answer.  Did that generate any
 3   further questions from you?
 4              MS. KENDRICK:  Actually, it did.
 5              THE COURT:  Go ahead.                          10:26AM
 6   BY MS. KENDRICK:
 7   Q.  Just as a clarification, the women in Perryville can
 8   transfer back and forth to Phoenix facility's in-patient mental
 9   health, correct?
10   A.  That's correct.                                      10:26AM
11   Q.  My second question, based on what he asked you, does Deputy
12   Warden Lee report to you?
13   A.  Yes.
14   Q.  That's all.
15              THE COURT:  Thank you.  Ms. Love.             10:26AM
16                      REDIRECT EXAMINATION
17   BY MS. LOVE:
18   Q.  Warden, you were looking at Exhibit Number 5.
19   A.  Yes.
20   Q.  In front of you regarding Ms. Ashworth being removed from   10:27AM
21   the SSU target search list?
22   A.  Yes.
23   Q.  It does indicate on there in the middle of the first page
24   of Exhibit 5 that, indeed, Ms. Ashworth was removed from the
25   SSU --                                                   10:27AM
```

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation

1   A.  Yes.

2   Q.  -- search list?

3   A.  Yes.

4   Q.  So do you have any information otherwise that indeed she

5   was searched despite the fact it says right here she was            10:27AM

6   removed?

7   A.  No.

8           MS. LOVE:  No further questions.

9           THE COURT:  Ma'am, thank you very much.  I appreciate

10  your time today.                                                    10:27AM

11          THE WITNESS:  Just leave this here?

12          THE COURT:  Yes.  That's fine.

13          We'll take a 10-minute break and be back.  Thank you

14  all.

15          (Recess from 10:27 a.m. until 10:41 a.m.)                   10:27AM

16          THE COURT:  Thank you.  Please be seated.

17          Couple of things.  First, the defendants kindly

18  provided copies of the exhibits to the court staff attorneys.

19  I appreciate that.  Plaintiffs didn't, I don't believe.  So I

20  guess you can fix that right now, looks like.                       10:41AM

21          Second thing is, I think we need to pause for a moment

22  and reflect on what we just learned.  We learned from the

23  warden with responsibility for a major segment of the inmate

24  population in Arizona, some 4,000 inmates, that she was present

25  on the phone call where I instructed that there would be no         10:41AM

1   retaliation.  She then sent an e-mail to her staff, which I

2   commended her for doing in my mind, that it would require daily

3   information about anything that could be perceived as

4   retaliation.  And she had no effect on what this Exhibit 5

5   demonstrates.  And that is, people went ahead and didn't or          10:42AM

6   went ahead with some kind of action, put that person on the

7   list.  We know that the person was put on the list, because the

8   e-mail says, "I removed her from the list."  So to be removed

9   you have to be on the list.  We don't know when that happened.

10  But we also know during the time period from my directive from    10:42AM

11  the emergency hearing and her directive from the e-mail that

12  she be notified that neither of those things appeared to have

13  been complied with.

14          I also, anticipating defendants' arguments, because

15  this is not a fully developed record on this e-mail, but it        10:42AM

16  raises again for me the real specter that your method,

17  defendants, of communicating with the people who are supposed

18  to effectuate what I say here is not working.  You send it to

19  the wardens, and the wardens do what looks to me like they are

20  supposed to.  The director, we had a conversation, he and I,       10:43AM

21  about our differences of opinion about the overall content of

22  his message, but that message included what I wanted it to

23  include.  And I would also say that Warden Currier's directive

24  included what I wanted it to conclude.

25          But what we have learned here are two things:  First       10:43AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation

1    it appears that it was not complied with; and two, we learned

2    that the warden doesn't know what's going on on the ground.

3    She doesn't know about the jumpsuits.  She doesn't know what

4    the prison mail situation is.  So I don't know who it is that

5    has to be informed, whether I have to go personally speak with          10:44AM

6    every person who works for the Department of Corrections, but

7    something is not working.  The method of communication that the

8    defendants' counsel and the defendants' senior staff is using

9    to communicate the directives of the Court, and again, it's not

10   just in this retaliation context.  It's in other contexts as          10:44AM

11   well, where we have heard there are contrary messages and mixed

12   messages.  I understand it's a big system, but it's a command

13   and control system with military components of it of people who

14   are responsible for one another up the chain of command and

15   down the chain of command.          10:44AM

16        And it sounds like to me, I mean, I have told you it's

17   not working from my perspective.  I don't know whether the

18   reason it's not working is because it's not designed to work.

19   Some of what I have listened to makes they think that an

20   administrative investigation is opened with respect to whether          10:45AM

21   or not Ms. Ashworth received the care she should have had, and

22   it appears that that's turned off at the moment that Sergeant

23   Coleman says, oh, no, this is what happened.  Well, Sergeant

24   Coleman is in no position to turn off this investigation.

25   Sergeant Coleman is at the heart of it.          10:45AM

1      So if you decide -- and by the way, I say that because

2  he was incredibly incredible in the witness stand in this

3  courtroom.  I would say he lied in front of me, and that's what

4  I think he did.  And the idea that Sergeant Coleman would be

5  the person who would be the turning off of this investigation        10:45AM

6  based upon what he said happened, again, demonstrates that your

7  system doesn't work.  This is serious.  If you are interested

8  in trying to solve the problem it means an administrative

9  investigation that is real and not something that is just CYA.

10  It's supposed to find out what really happened.                       10:46AM

11      And Sergeant Coleman was incredible.  The corrections

12  Officer Warner -- I keep forgetting her name.  Just a second.

13  Western.  The corrections Officer Western was, to my view,

14  completely credible.  And contradicted Coleman.  And when I

15  heard both of them it was clear to me who was telling the truth     10:46AM

16  and who wasn't.

17      And I also will say, if you look back at the

18  transcript, when I inquired with Sergeant Coleman about whether

19  or not she said she was in pain and he said, no, she was in

20  discomfort, and I asked him, did she use that word, a word that     10:47AM

21  really only somebody as stilted in their language as I or maybe

22  somebody from the British Isles would use.  I have never heard

23  anybody say, I am in discomfort, when they are in pain.  And

24  frankly, if you will look at the transcript, you will see who

25  introduced the word "discomfort" in that testimony.  It was I.      10:47AM

1    And so his avowal that he was 100 percent sure she used the

2    word "discomfort" I think is belied by the transcript but also

3    belied by the e-mail we saw this morning in which he reports

4    that he observed that she was breathing, and that cut off the

5    ICS that he was going to call.  Even though he told me on the          10:47AM

6    stand that if she was in pain he would have said that.  He

7    denied, of course, that she was in pain.  But nothing in the

8    notes reflects that there was anything discomfort or pain.  It

9    was simply the ridiculous assessment that she was breathing and

10   that was enough.                                                       10:48AM

11          You may call your next witness.

12          MS. KENDRICK:  Your Honor, before -- may I approach

13   the staff attorney with a set of exhibits?

14          THE COURT:  Of course.  Thank you.

15          MS. LOVE:  Defendants call Elizabeth Oros.                      10:48AM

16          THE COURT:  Good morning, ma'am.  If you would please

17   step forward to the clerk to be sworn.

18          (The witness was sworn.)

19          THE COURT:  Good morning, ma'am, and welcome.

20          THE WITNESS:  Good morning.  How are you?                       10:48AM

21          THE COURT:  Thank you.  Well.  You may proceed.

22                       ELIZABETH OROS,

23   a witness herein, having been first duly sworn by the clerk to

24   speak the truth and nothing but the truth, was examined and

25   testified as follows:

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1                      DIRECT EXAMINATION

2    BY MS. LOVE:

3    Q.  Will you please state your name for the record?

4    A.  Elizabeth Ann Oros.

5    Q.  Who is your employer?                                   10:49AM

6    A.  Community Corrections, Department of Corrections.

7    Q.  How long have you worked for Community Corrections?

8    A.  A month.

9    Q.  And where did you work prior to that?

10   A.  Arizona Department of Corrections.                      10:49AM

11   Q.  Why did you leave the Arizona Department of Corrections?

12   A.  I retired.

13   Q.  How long did you work for the Arizona Department of

14   Corrections before your retirement?

15   A.  A little over 20 years.                                 10:49AM

16   Q.  What is your current position with Community Corrections?

17   A.  I'm a programs manager for the reentry center and we help

18   offenders reintegrate back into society.

19   Q.  And specifically what are your duties in your new position?

20   A.  I'm still learning them, but we help bring people from the  10:49AM

21   community in to help the offenders with getting jobs, getting

22   skills, coming in and speaking to them as guests to help them

23   overcome substance abuse, and more of a support system.

24   Q.  And are these services provided for offenders who are

25   incarcerated with the Department of Corrections and now are    10:50AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

```
 1    going to be released back into the community?

 2    A.  Not to the same degree.  We do have programming inside the

 3    Department but this one is a little bit more intense so that we

 4    can really get them the support they need so that they are not

 5    going back to substance abuse and they can be productive          10:50AM

 6    citizens in the community.

 7    Q.  At the time that you retired from the Arizona Department of

 8    Corrections, what was your position?

 9    A.  Deputy warden.

10    Q.  Deputy warden where?                                          10:50AM

11    A.  San Pedro Unit.

12    Q.  At which complex?

13    A.  Perryville.  Sorry.

14    Q.  And how long had you been assigned as the deputy warden of

15    the San Pedro Unit at Perryville prior -- before you retired?     10:51AM

16    A.  Probably going on three and a half, four years maybe.

17    Q.  And what were your duties a deputy warden at San Pedro?

18    A.  As administrator of the unit, I am responsible to supervise

19    my staff, make sure I have enough staffing, attend to the needs

20    of the inmates, make sure we have programming for them, you       10:51AM

21    know, just basic administrative duties.

22    Q.  Approximately how many employees did you supervise as

23    deputy warden of San Pedro?

24    A.  I probably had probably 30-plus staff of my security staff

25    but I also have other staff that are on the unit, my education    10:51AM
```

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1    staff.  They don't report to me, but they are still part of my

2    unit so I kind of watch them.  I also have medical there.  I

3    have the librarian there.  We have vendors.  We have Keefe

4    which is the store vendor.  We have Televerde there as well.

5    All of that fell under me even though I don't directly                  10:52AM

6    supervise them.

7              THE COURT:  Can I interrupt for just a second?

8              Just so I understand, is the warden -- I'm sorry -- as

9    the deputy warden, you are the boss of that unit.  Is that fair

10   to say?                                                                 10:52AM

11             THE WITNESS:  Yes.

12             THE COURT:  And then you report to the warden of

13   Perryville, is that right?

14             THE WITNESS:  Yes.

15             THE COURT:  Is it fair to say that the warden of        10:52AM

16   Perryville is the boss of Perryville?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  So that's where the buck stops for

19   Perryville, with the warden?

20             THE WITNESS:  Yes.                                            10:52AM

21             THE COURT:  And for San Pedro, when you were there the

22   buck stopped with you except that you had a boss above you who

23   was the warden?

24             THE WITNESS:  Yes.

25             THE COURT:  All right.  Thank you.                            10:52AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1    BY MS. LOVE:

2    Q.  Approximately you when were warden of San Pedro, and I just

3    want to focus your attention on the time period of July 2017, a

4    couple months ago, about a month and-a-half ago, what was your

5    approximate bed capacity, inmate bed capacity of the San Pedro          10:53AM

6    Unit?

7    A.  432.

8    Q.  Was the unit divided into multiple yards?

9    A.  I have two yards, yes.

10   Q.  And so was it -- do you take that total population and           10:53AM

11   divide it by two for your yards, or was one yard bigger than

12   the other?

13   A.  No, they were both the same equivalent in size.  Each side

14   had A, B -- well, we changed it.  Like housing unit A had A, B,

15   D, and D runs.  Same would be for housing unit B; A, B, C, and      10:53AM

16   D runs.

17   Q.  So it was Yard A and Yard B?

18   A.  Uh-huh.

19   Q.  That's a yes?

20   A.  Yes.  I'm sorry.  Yes.                                          10:53AM

21   Q.  In July of 2017, what was the custody level of the San

22   Pedro Unit?

23   A.  Minimum custody.

24   Q.  Was the San Pedro Unit considered an open yard?

25   A.  Yes, it is.                                                     10:53AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1   Q.  What does it mean to be an open yard?

2   A.  An open yard means that when the yard is open and we're not

3   locked down for count or any other special circumstance, the

4   inmates are free.  They can come out of their cells.  They can

5   go to the yard.  They can go to any classes that they are                 10:54AM

6   scheduled for.  They can just socialize.  They are not confined

7   to their cells and only let out at specific times.

8   Q.  Are inmates allowed to socialize with each other in a cell

9   that is not their own?

10  A.  No.                                                                    10:54AM

11  Q.  How many inmates are generally assigned to a cell at San

12  Pedro Unit?

13  A.  Two.

14  Q.  I want to take you and back you up now a little bit.  If

15  you could take us through in basic terms the steps of your                10:54AM

16  career within the Arizona Department of Corrections, what

17  position did you start at and how did you progress through the

18  ranks?

19  A.  I started with the Department actually as an administrative

20  assistant I and then, because I had my degree, I was able to              10:54AM

21  take advantage of fast track program that they, the Department,

22  was offering.  And I tested and became a Correctional Officer

23  III.  And then through the years, I promoted to Correctional

24  Officer IV, associate deputy warden and then deputy warden.

25  Q.  Did you serve as deputy warden at any other units besides              10:55AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1    San Pedro?

2    A.  Yes.  My career started in Yuma.  Then I went to Tucson and

3    then I transferred to Perryville.

4    Q.  Did you serve as deputy warden at each of those three

5    complexes.                                                        10:55AM

6    A.  No.  In Yuma I was a CO-3 and CO-4.  I transferred to

7    Tucson as a CO-4 and then promoted to an associate deputy

8    warden and then to a deputy warden.  Then I transferred to

9    Perryville as a deputy warden.

10   Q.  When you were in Tucson, which unit were you deputy warden   10:55AM

11   of?

12   A.  Initially, I was assigned to the Rincon minors unit as an

13   associate deputy warden, and then they promoted me to deputy

14   warden of the Catalina Unit.

15   Q.  How long were you deputy warden of the Catalina Unit?        10:55AM

16   A.  Probably a little over a year.  I can't remember.  Probably

17   a little over a year.

18   Q.  And what is your educational background?

19   A.  I have a degree in economics from the University of

20   Arizona.                                                         10:56AM

21   Q.  I want to turn your attention now to July of 2017 at the

22   San Pedro Unit.

23   A.  Okay.

24   Q.  First question for you is:  Do you recall whether or not

25   Angela Ashworth was an inmate assigned to the San Pedro Unit     10:56AM

 1   in, let's take the time period of June/July of 2017?

 2   A.  Yes.

 3   Q.  And were you aware on July 14th of 2017 that Inmate

 4   Ashworth had been transported out of the complex to come here

 5   to this federal courthouse to testify in the Parsons versus          10:56AM

 6   Ryan lawsuit?

 7   A.  No, ma'am.  We have movement off my yard all the time for

 8   medical, court runs, and because that's standard operating

 9   business, I mean, I usually don't get a list of names.  I just

10   know that inmates go out, inmates come back in.  So                  10:57AM

11   specifically that she left, no, I did not.

12   Q.  And did you -- let's take that time period of July 14th of

13   2017, were you aware that inmate Angela Ashworth was serving as

14   a witness for the plaintiffs in the Parsons versus Ryan

15   lawsuit?                                                             10:57AM

16   A.  No, ma'am.

17   Q.  Are you aware whether or not after July 14th of 2017 when

18   she came here to testify in court, if she had a cellmate

19   change?

20   A.  Yes.                                                             10:57AM

21   Q.  And as the deputy warden of the San Pedro Unit, is that

22   cellmate change that occurred a move that you, yourself,

23   approved?

24   A.  Yes.  I approve most of the moves that happen unless it's

25   an emergency when I'm not at work.                                   10:58AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1    Q.  Can you take us through and explain to the Court the

2    process how, if an inmate -- if there's going to be a cellmate

3    change, what goes into the process to determine if there's

4    going to be a move, where the inmate is going to be moved, who

5    they are going to be paired with.  In a general sense, how does      10:58AM

6    that process work, or how did it work in July of 2017?

7    A.  If there is a -- just general movement?

8    Q.  Yes.

9    A.  So if an inmate is coming to my facility, to my unit, the

10   accountability officer gets a list of the movement the day         10:58AM

11   prior.  And the first thing he looks at is to see if they're

12   appropriate for the yard, to make sure there's no do not house

13   with issues, safety concerns, and then he will start looking at

14   cells -- he will see if there are violent or non-violent

15   offenses per the A.R.S. and then he will try to find somebody     10:58AM

16   that he can house them with that matches our criteria.  And

17   they just plug the numbers into the computer and to this screen

18   we have and it will tell them if they match all the criteria.

19   And then that's how we initially place inmates on the yard.

20   Q.  What kind of criteria is the computer program looking at?     10:59AM

21   A.  It's looking to see if there are violent and non-violent

22   offenses; it's looking to see how much time they have left;

23   it's looking to look at their age; it's looking at their

24   medical, mental health score, do not house with, it's flagging

25   all those things.  If it meets all the criteria that's in the     10:59AM

1    computer then it allows the move.  It allows for us to house

2    them together.

3    Q.  And if they are -- let's take the now, that's the general

4    way this occurs, is there a different protocol or is there a

5    different system different or different factors at play if a                    10:59AM

6    cellmate change needs to be made because inmates in the same

7    cell aren't getting along?

8    A.  Yes.  And because my unit is not an open setting, it's a

9    cell, I'm really restricted as to the housing criteria on how

10   to place them.  So when inmates write us and tell us that they                  11:00AM

11   can't live together, that they are having personal conflict or

12   something, we view all those and then generally we review them

13   probably every week to two weeks depending on the volume and

14   we'll go through them and then we'll make a decision as a group

15   whether we're going to move them or not.  And if we move them                   11:00AM

16   all I do tell, I tell the accountability officer these have

17   been approved for movement.  And what he will look at is the

18   same criteria as when they are first getting there.  He is

19   going to look to try to do the least amount of moves as

20   possible because they have to roll up the property and move it                  11:00AM

21   to the new location.  So he tries to do the least amount of

22   moves to accommodate what we have requested.

23   Q.  When you say the least amount of moves, do you mean trying

24   to keep the inmates on the same yard that they are already on?

25   What do you mean by that?                                                       11:01AM

1    A.  Yeah, possibly, so that they are not having to move across

2    yards or even displacing a lot -- to make one move having to

3    displace three or four other people, so we try to consolidate

4    it as much as we can.

5    Q.  You said that if an inmate is having a problem or                11:01AM

6    difficulty living with a cellmate they are assigned to that

7    they write you.  What do you mean that they write you?

8    A.  They don't write me.  They write the accountability officer

9    and they will say, I don't know.  They say things like me and

10   my cellie are not getting along.  They don't clean their cell.    11:01AM

11   They are stealing from us.  They have a whole bunch of

12   different reasons, but generally that's what it is.  Some will

13   ask specifically to live with specific inmates.  Some say I

14   don't care where you put me, just move me.

15   Q.  How frequent is it that when you were deputy warden of the     11:01AM

16   San Pedro Unit that there would be inmates that are complaining

17   I can't live with my cellmate because they are not getting

18   along or are there a multitude of issues that you just gave me?

19   Is it common, something that would happen every week?

20   A.  It was definitely something that regularly happened.  I       11:02AM

21   would always ask in the morning, how many inmate letters do we

22   have?  He would say, we have enough for a meeting this week.

23   Generally every two weeks, two and-a-half weeks, we would have

24   enough to bring them in and review them.

25   Q.  When you say "he" when you would ask him about the            11:02AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1   letters --

2   A.  My accountability officer.

3   Q.  Who is that?

4   A.  Officer Kay.

5          THE COURT:  Is there just one for San Pedro, just          11:02AM

6   Officer Kay is it?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  What level is Officer Kay?

9          THE WITNESS:  He's an officer, just an officer.

10          THE COURT:  So what corrections officer 1, 2, 3?          11:02AM

11          THE WITNESS:  They are all Correctional Officer IIs.

12          THE COURT:  2.  Okay.  Thank you.

13          THE WITNESS:  Uh-huh.

14   BY MS. LOVE:

15   Q.  You also testified every week or two you would get together  11:03AM

16   to discuss internal or cell moves?

17   A.  Yes, ma'am.

18   Q.  Who would be part of this group that would be discussing

19   whether or not cellmate moves should occur or not occur?

20   A.  It would be myself, the CO-4, the captain, accountability    11:03AM

21   officer, and the SSU officer if he was available.

22   Q.  And what input or information would each of the different

23   levels of personnel participating in this group provide?

24   A.  Just different things that would -- sometimes they would

25   have more information as to why they were requesting a move,     11:03AM

1   like they would know that maybe some of them were in an

2   intimate relationship or trying to create one, or they knew

3   that there was really issues, like they weren't getting along.

4   There was discord, and maybe they were trying to facilitate

5   moves for that.                                            11:04AM

6   Q.  So I guess in a general sense, would it be fair to say that

7   you are looking to see if an inmate is complaining that she

8   can't get along with her cellmate, is it legitimate or is it

9   for other purposes such as manipulation?

10  A.  Yes.  And I will tell you, because I have some inmates or I   11:04AM

11  have some inmates on my unit that were -- they had some mental

12  health issues and they were tough to live with, you know.  So

13  we knew when after 30 days if their cellmate was saying, hey,

14  you really need to move, we already knew it's because it's hard

15  to live with that.  So we kind of make a move to alleviate,      11:04AM

16  give somebody else a chance to kind of manage them because they

17  were difficult to live with.

18  Q.  What concerns as to manipulation would you be looking at or

19  would be on your radar when you are assessing whether or not a

20  move, a cellmate move was legitimate or if it was for some       11:04AM

21  other purpose outside I just really can't get along with an

22  inmate?

23  A.  We would be looking to see if maybe there was some kind of

24  illegal activity they were trying to collaborate, like maybe

25  getting together so they could talk about drugs, how to get      11:05AM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

 1    them into the facility or if they didn't get along with

 2    somebody, they were trying to get somebody closer to them so

 3    they could potentially harm them.  So those are the things we

 4    would consider before we do any type of moves to see what the

 5    real reason is.                                              11:05AM

 6    Q.  If an inmate would suggest, I have a friend, inmate X, Y, Z

 7    over in this cell or this yard, I'd like to move over there,

 8    does that raise any concerns or red flags?

 9    A.  Yes.

10    Q.  Why?                                                     11:05AM

11    A.  Generally because -- it's different in male facilities.

12    I'm looking more at the violence and if they are trying to set

13    things up so they can foster drugs or criminal activity on the

14    unit.  At Perryville it's a little bit different.  It's more

15    the intimate relationships.  And PREA was always a concern for 11:06AM

16    me so I knew if they were trying to get in to live with

17    somebody there was always some kind of information they were in

18    a relationship.  So we wouldn't allow those ones.

19    Q.  And sexual relationships between inmates in custody is

20    something that's prohibited, correct?                        11:06AM

21    A.  Yes.

22    Q.  Do you have personal knowledge as to what precipitated the

23    cellmate move of Inmate Ashworth's cellmate out of her cell in

24    July of 2017?

25    A.  Yes.  What happened was that I guess she initially wrote an 11:06AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

 1    inmate letter requesting a move.  I can't remember the inmate

 2    that made the letter.  There was an inmate that wrote a letter.

 3    She was pregnant at the time, and she requested to be moved.

 4    She was not getting along with her cellmate.

 5         So Officer Kay had it so we could review it but then        11:07AM

 6    something happened and the inmate approached the officer,

 7    Officer Kay, before he came up to briefing and she said, hey,

 8    my wish is getting worse.  I need to move from this cell.

 9         MS. KENDRICK:  Objection.  Hearsay, Your Honor.

10         THE COURT:  Overruled.                                      11:07AM

11    BY MS. LOVE:

12    Q.  Go ahead.

13    A.  So the officer said I'm on my way to briefing.  I will

14    discuss it with the deputy warden.  He said hey, Ms. Oros, I

15    can't remember the inmate's name.  She has having an issue and  11:07AM

16    because she's pregnant, I am concerned for her health.  I don't

17    want anything happening or her getting in any type of physical

18    altercation.  So I said, hey, go ahead and move her.  So the

19    moves were made.  I don't tell him where to move her, I just

20    approve the move and he makes the moves best he can on his      11:07AM

21    side.

22    Q.  Do you recall whether or not you reviewed the inmate letter

23    that you speak of?

24    A.  Not at the time I didn't.  I didn't see it until later.

25    Q.  Did you see it later after the move occurred?              11:08AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1    A.  Yes, after the move occurred.

2    Q.  I'd like to show you what has been admitted into evidence

3    as Exhibit Number 18.  It should be in front of you, may be in

4    front of you.  If you could take a look at Exhibit Number 18,

5    which is already admitted into evidence, and tell me if you          11:08AM

6    recognize this document.

7    A.  Yes, ma'am.  I recognize it.

8    Q.  And what is this document?

9    A.  This is the inmate letter by Inmate Alvarez to Officer Kay

10   requesting to be moved out of her cell because she was having       11:08AM

11   issues with her current cellmate over alleged -- because she

12   thought she was stealing from her.

13   Q.  And do you remember whether or not you saw this inmate

14   letter before the move occurred with the cellmate move of

15   Inmate Ashworth or after?                                            11:09AM

16   A.  After.

17   Q.  Do you recall why you reviewed the inmate letter that you

18   are speaking of and looking at here at Exhibit 18 after the

19   move occurred?

20   A.  I reviewed it after because of the questions that came from      11:09AM

21   Ms. Currier asking for more information about the move.

22   Q.  And what kind of questions, if you recall, was Warden

23   Currier asking you about the move?

24   A.  She just wanted to know why the cellmate of Inmate Ashwood

25   (sic) was moved and what happened, what was the reasoning            11:09AM

 1   behind it.  So we explained it to her, and actually there was

 2   more than -- I think it was a three-way move because we had to

 3   keep Alvarez on a bottom bunk and there was a couple moves that

 4   happened in the same cell block, same pod.

 5   Q.  And the information that Officer Kay had provided you as to          11:10AM

 6   the history of Ms. Alvarez making complaints that she couldn't

 7   live with her cellmate, was that consistent with the

 8   information provided in Ms. Alvarez's inmate letter at Exhibit

 9   18?

10   A.  Yes.  Yes, it was.                                                   11:10AM

11   Q.  If you take a look back for me at Exhibit Number 18, and at

12   the bottom, the last three lines from the bottom, it states, "I

13   have a friend in A yard.  Her name is Allen who is willing to

14   move but I'm not sure.  I would just like to get out of this

15   room if possible.  Thank you."                                          11:10AM

16          Do you see where it says that?

17   A.  Yes, ma'am, I do.

18   Q.  As deputy warden, if you receive information that an inmate

19   is not getting along with their cellmate and is requesting to

20   live here, as she says, well, she says she has a friend in A            11:11AM

21   yard, is that something that you would attempt to accommodate?

22   A.  Not so much.  If they want to move and they are

23   legitimately having an issue, they are really not going to care

24   where I put them.  They are just going to want to get away from

25   the situation.  But like I said, on our side, on the security          11:11AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

 1    side, we look at doing the least amount of moves so we can

 2    disrupt the least amount of people in this process.

 3    Q.  And do you recall whether or not it was inmate Brianda

 4    Alvarez who was moved into Ms. Ashworth's cell?

 5    A.  Yes, ma'am, it was.                                    11:11AM

 6    Q.  Do you recall whether or not Ms. Ashworth lived on B yard

 7    or A yard?

 8    A.  No, I don't.

 9    Q.  Do you recall whether or not after the move was made of Ms.

10    Alvarez into Ms. Ashworth's cell that Ms. Alvarez made a      11:11AM

11    complaint saying I don't want to live with Ms. Ashworth.  I

12    would like to go live with another inmate, perhaps Ms. Allen,

13    or was she satisfied with the move?

14    A.  I received no complaints from Ms. Alvarez.

15    Q.  Do you know how long Ms. Ashworth and Ms. Alvarez lived   11:12AM

16    together in the same cell?

17    A.  I want to say a couple days.

18    Q.  I'd like to show you now what's been marked for

19    identification as Defendants' Exhibit 15.

20         MS. LOVE:  Your Honor, may I approach?                  11:13AM

21         THE COURT:  You may.

22    BY MS. LOVE:

23    Q.  If you could take a look at Exhibit 15 and tell me, first

24    of all, whether you recognize this document.

25    A.  This is our movement screen.  Shows where the inmate is   11:13AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1    housed at the time, and it's showing that Ms. Ashworth lives on

2    Baker yard cell 41, bed 12 upper.

3    Q.  And is this document or this screen referred to as Internal

4    Assignments?

5    A.  Yes.                                                          11:13AM

6    Q.  And is this a document that shows what cell and what unit

7    and what yard an inmate may live in and the historical for

8    that?

9    A.  Yes.

10   Q.  And it's a document kept in the normal course of operations  11:13AM

11   of the Arizona Department of Corrections?

12   A.  Yes, ma'am.

13   Q.  And can you tell from this document, for Inmate Ashworth,

14   which cell she was living in in July of 2017?

15   A.  Baker 41, 12 upper.                                           11:14AM

16   Q.  So Baker 41, does that refer to B yard as we were --

17   A.  B yard, cell 41, bed 12, upper.

18   Q.  And the U means upper?

19   A.  Yes.

20   Q.  Does that mean upper bunk?                                    11:14AM

21   A.  Upper bunk.

22   Q.  So inmates are assigned specifically to a bunk within a

23   cell.  They don't get to choose, is that correct?

24   A.  Correct.

25        MS. LOVE:  Defendants move for admission of Exhibit         11:14AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

```
 1    15.

 2              THE COURT:  Any objection?

 3              MS. KENDRICK:  No, sir.

 4              THE COURT:  It will be received.

 5    BY MS. LOVE:                                          11:14AM

 6    Q.  I would now like to show you what defendants have marked

 7    for Exhibit 16 for identification.

 8              Your Honor, may I approach?

 9              THE COURT:  You may.

10    BY MS. LOVE:                                          11:14AM

11    Q.  If you can take a look at Number 16 and tell me, first of

12    all, whether or not you recognize this document.

13    A.  I recognize it.

14    Q.  And is this also an internal assignment document kept in

15    the normal course of Arizona Department of Corrections       11:15AM

16    operations?

17    A.  It is.

18    Q.  And who is this internal assignment history sheet for?

19    A.  It is for Inmate Alvarez.

20    Q.  And does this document show whether or not on July 19th of  11:15AM

21    2017 Ms. Alvarez moved to B-41, cell 12, lower?

22    A.  In August it shows that she moved to B-42.  Wait.

23    Q.  I wanted to direct your attention to whether or not it

24    shows on July 19 of 2017 if she moved?

25    A.  Yes.  I found it.  B-41, 12 lower.                 11:16AM
```

1    Q.  And where did she move from?  Can you tell that from this

2    document?

3    A.  She moved from B-41 A lower.

4    Q.  So she moved to a different cell but on the same yard at

5    San Pedro Unit at B yard?                                              11:16AM

6    A.  Yes.

7    Q.  And does the indication of B-42 -- I'm sorry -- B-41 12 L,

8    does that mean a lower bunk?

9    A.  Yes.

10   Q.  Do you know whether or not there was a specific reason why     11:16AM

11   Ms. Alvarez was assigned to a lower bunk?

12   A.  Yes.  She was pregnant.

13   Q.  Are all pregnant inmates assigned to lower bunks?  Is that

14   standard procedure.

15   A.  Yes.                                                               11:16AM

16   Q.  And can you tell from this document when Ms. Alvarez moved

17   out of B-41 cell 12?

18   A.  July 21st.

19   Q.  Of 2017?

20   A.  Of 2017.                                                           11:17AM

21   Q.  And by comparing Exhibit Numbers 15 and 16, did these

22   documents show that Ms. Alvarez and Ms. Ashworth lived together

23   in B-41 cell number 12 from July 19th through July 21st only?

24   A.  Can you ask me that question again?

25   Q.  Yes.  By comparing both of these exhibits, Exhibit 15 and    11:17AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1   16, do these documents show that during the time period of July

2   19th, 2017, through July 21st, 2017, that Inmate Brianda

3   Alvarez and Inmate Angela Ashworth lived together in B-41 cell

4   12?

5   A.  Yes, ma'am.                                              11:18AM

6          MS. LOVE:  May I approach, Your Honor?

7          THE COURT:  You may.

8          MS. LOVE:  Your Honor, defendants move for admission

9   of Exhibit Number 16.

10         THE COURT:  Any objection?                            11:18AM

11         MS. KENDRICK:  No, Your Honor.

12         THE COURT:  It will be received.

13  BY MS. LOVE:

14  Q.  If you could take a look at Exhibit Number 17 and tell me

15  if you recognize that document.                             11:18AM

16  A.  Yes, I do.

17  Q.  Is this an internal assignment sheet for Inmate Donna

18  Sheid?

19  A.  Yes, it is.

20  Q.  Does this document show that on July 19th of 2017, Ms.    11:19AM

21  Alvarez was moved out of B-41 cell 12, which was Ms. Ashworth's

22  cell, or the cell Ms. Ashworth lived in, to B-31 Cell 9?

23         MS. KENDRICK:  Objection.  Misstates.  I think she

24  means Ms. Sheid, not Ms. Alvarez.

25         MS. LOVE:  You are correct.  I will re-ask the         11:19AM

 1    question.  Please strike that.

 2    BY MS. LOVE:

 3    Q.  Does this internal assignment sheet for Donna Sheid show

 4    that on July 19, 2017, she moved from B-41, cell 12, into B-31,

 5    cell 9?                                                            11:19AM

 6    A.  Yes, ma'am, it does.

 7    Q.  And does it also reveal that on July 21st, Ms. Sheid moved

 8    back into cell B-41, cell 12?

 9    A.  Yes, it does.

10    Q.  Do you know why Ms. Sheid was moved back into Ms.            11:20AM

11    Ashworth's cell on July 21st of 2017?

12    A.  Yes, ma'am.

13    Q.  Why is that?

14    A.  We got a directive to move her back.

15    Q.  And a directive from the Court?                             11:20AM

16    A.  Yes, ma'am.

17    Q.  And was that move indeed made?

18    A.  Yes, ma'am, it was.

19    Q.  And you confirmed it was made?

20    A.  Yes, ma'am.                                                 11:20AM

21    Q.  And were you indeed present on the telephone during the

22    July 21st 2017 hearing regarding retaliation?

23    A.  I was.

24    Q.  And ready to testify as a witness?

25    A.  I was.                                                      11:20AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

 1   Q.  So you, yourself, heard the Court, Judge Duncan's,

 2   directive?

 3   A.  Yes, I did.

 4   Q.  And you followed orders and made sure that cell move was

 5   made?                                                             11:20AM

 6   A.  Yes, ma'am.

 7          MS. LOVE:  Defendants move for admission of Exhibit

 8   17.

 9          THE COURT:  Any objection?

10          MS. KENDRICK:  No, sir.                                    11:20AM

11          THE COURT:  It will be received.

12   BY MS. LOVE:

13   Q.  Next I would like to show you what defendants have marked

14   as Exhibit Number 19.

15          Your Honor, may I approach?                                11:21AM

16          THE COURT:  You may.

17   BY MS. LOVE:

18   Q.  Ms. Oros, can you take a look at Exhibit Number 19 and tell

19   us if you recognize this document?

20   A.  Yes, I do.                                                    11:21AM

21   Q.  And what is the document contained in Defendants' Exhibit

22   Number 19?

23   A.  This is a cell assignment screening, and this is where I

24   was explaining earlier where they put in the numbers and the

25   computer checks to make sure that they are compatible to live    11:21AM

```
 1    together.
 2    Q.  And is this an inmate cell assignment screening form
 3    comparing Inmate Brianda Alvarez and Inmate Angela Ashworth?
 4    A.  Yes, it is.
 5    Q.  Can you take us through what information is provided on
 6    this cell assignment screening form?
 7    A.  Yes.  The first thing it looks at is their custody internal
 8    risk score.  Then it looks at their years to release, their
 9    current conviction for violent offense, death sentence, see if
10    they have a life sentence, if they have any STG status, if they
11    are in a protective custody status.  And it looks at their
12    disciplinary for the past two years, major and minor.  And then
13    it looks to see if they have pending disciplinary, looks at
14    both their medical and mental health scores, it looks to see if
15    they have health restrictions and what their sex offense status
16    is.
17    Q.  And under the mandatory criteria under A, it says:  CU/IR
18    and risk.  Do you know what that means?
19    A.  Yes.  That's her in custody and internal risk score.
20    Q.  Can you explain for us as we're looking at this document
21    under the column accountability A and B column, what does that
22    mean?
23    A.  That's talking about the inmate, so Inmate Alvarez at the
24    top would be A, and Ashworth would be B.
25    Q.  And on that line you have Inmate A, which is Ms. Alvarez
```

11:22AM
11:22AM
11:22AM
11:23AM
11:23AM

1    showing a 2/2 and inmate B which is Ashworth showing a 2/1.  Do

2    you know what that means?

3    A.  Yes.  So that's a classification that we give the inmates

4    when they first arrive to the Department of Corrections.  And

5    what that's telling me is she's a minimum custody inmate with          11:23AM

6    an internal risk score of a 2, and Ms. Ashworth is a minimum

7    custody inmate with an internal risk score of a 1.

8    Q.  So in the screening form were Inmates Ashworth and Alvarez

9    a match to live together based upon the CU/IR risk?

10   A.  Yes, ma'am.                                                        11:24AM

11   Q.  Even though one was a 2/2 and one was a 2/1?

12   A.  Yes.

13   Q.  Why is that?

14   A.  Well, it's a classification.  There's several factors that

15   go into determining these numbers.  They look at the current          11:24AM

16   offense.  They look at past offenses.  They look and see if

17   they have had length of sentence.  They look at programming.

18   They look at disciplinary violent tendencies.  And then it

19   scores them out.  It's an automated system that scores them

20   out.                                                                   11:24AM

21          And all that's telling us is that how we house them is

22   through the first number, and that's the custody.  And that's

23   what tells us what unit they are going to be at, what custody

24   unit.  These are both minimum custodies.  The 2s and 1s, I

25   really can't tell you without looking at their classification         11:24AM

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

1    why it scored them that way.  But I will tell you it's nothing

2    that would alert me at not housing them together.  That's

3    standard.

4    Q.  And neither of inmates, either Ms. Ashworth or Mr. Alvarez,

5    were STG status, is that correct?                          11:25AM

6    A.  No.

7    Q.  What does STG mean?

8    A.  They have criminal activity for gangs.

9    Q.  And based upon the screening form, did it indicate that

10   either of the two inmates, Ms. Ashworth or Ms. Alvarez, had  11:25AM

11   major or minor disciplinary violations?

12   A.  No, ma'am.

13   Q.  In the past two years?

14   A.  No, ma'am.

15   Q.  Based upon this screening form, are we able to tell as I  11:25AM

16   look at it, plaintiffs' counsel, and the judge looks at it

17   whether these two inmates are a match to live together?

18   A.  Yes.  They are a match.

19   Q.  How do we know that as we look at this document?

20   A.  If it wasn't a match, it would flag and it would -- when we 11:25AM

21   would go in to put in our recommendation it would flag us and

22   tell us there's a contradiction.  It would highlight the area

23   that there 's an issue with.  So if we wanted to still house

24   them together we would actually have to go into the system and

25   put a written justification as to why we would want to do that. 11:26AM

 1   Q.  And you, yourself, approving the move of Ms. Alvarez into

 2   Ms. Ashworth for the two of them to live together in the same

 3   cell on July 19th of 2017, is this a screen you would have

 4   looked at to make the approval for the move?

 5   A.  So what happens is there's a three-part phase on this form.    11:26AM

 6   So the accountability officer goes in and does the housing and

 7   then there's no -- there was no flags so it automatically

 8   prompts to go to the CO-4.  She does a review of it and then

 9   when she's done and puts in her SID, then it prompts to my

10   screen and then I go through it and I just confirm what has    11:26AM

11   already been reviewed.

12   Q.  Can you explain to us how this automated system works?  Are

13   you looking at Ms. Ashworth and Ms. Alvarez and just randomly

14   saying, I wonder if Ms. Ashworth works as a match, or I wonder

15   if Ms. Smith works?  Is it an automated system that picks?    11:27AM

16   A.  No, it's not an automated system that picks.  He's just

17   looking, the accountability officer, kind of looks to see where

18   the best moves would be.  Like I said, he looks at different

19   things, where there's a vacancy.  If he knows they have had

20   prior issues with other inmates before, he's looking to see how    11:27AM

21   he can best do the move without affecting too many people or

22   things on the unit.  So he just makes moves.  I'm not really

23   sure.  But the system doesn't pick them.

24        THE COURT:  So he's got to figure out in the first

25   instance, who the potential candidates are?    11:27AM

CV 12-601 -   September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  The machine, the computer program, doesn't

 3      come up with potential candidates among the eligible people?

 4              THE WITNESS:  Correct.

 5              MS. LOVE:  Defendants move for admission of Exhibit          11:27AM

 6      Number 19.

 7              THE COURT:  Any objection?

 8              MS. KENDRICK:  No, sir.

 9              THE COURT:  Exhibit 19 will be received.

10              MS. LOVE:  May I approach?                                   11:28AM

11              THE COURT:  You may.

12      BY MS. LOVE:

13      Q.  Ms. Oros, if you would look at what defendants have marked

14      as Exhibit Number 20 for identification and tell me if you

15      recognize this document.                                           11:28AM

16      A.  Yes.

17      Q.  And what -- can you explain for the Court what is this

18      document and what does it tell us?

19      A.  I'm not really familiar with this document, because I don't

20      see this part of it.  But just by looking at it, it's going to    11:28AM

21      tell you what the last current action was, and that it was a

22      cell assignment, and it was approved and it was done on 7-20 at

23      256 location B01.

24      Q.  Is this indicating approval of the move of Ms. Alvarez into

25      the cell occupied by Ms. Ashworth?                                 11:29AM

1   A.  I'm going to say yes, even though the move was done -- I

2   believe it was on the 19th, correct?  I believe it was done on

3   the 19th.

4   Q.  Do you see your name in the middle of this document?

5   A.  Right.  I do see that.                                    11:29AM

6   Q.  Does that indicate your approval of the move?

7   A.  Yes, it does.

8   Q.  For the move for Ms. Alvarez into B-41, 12, cell 12?

9   A.  Uh-huh.  Right.

10        MS. LOVE:  Defendants move for admission of Exhibit     11:29AM

11   Number 20.

12        THE COURT:  Any objection?

13        MS. KENDRICK:  No, sir.

14        THE COURT:  It will be received.

15   BY MS. LOVE:                                                 11:29AM

16   Q.  As you sit here today, Ms. Oros, knowing that you approved

17   the move of Ms. Alvarez into the cell occupied by Ms. Ashworth

18   on July 19th, and the subsequent inquiry as to whether or not

19   the move was in any way retaliatory for Ms. Ashworth testifying

20   in this case, do you have any indication whatsoever that that  11:30AM

21   pairing was because Ms. Ashworth had come to court and

22   testified in this case?

23   A.  No, ma'am.

24        MS. LOVE:  Those are all the questions I have.

25        THE COURT:  Thank you.                                  11:30AM

104

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

```
 1          Ms. Kendrick.  And while the plaintiffs lawyer comes
 2   up I just want to ask a quick question, Ms. Oros, based really
 3   on your experience of having worked at the Department of
 4   Corrections for such a long time.  What I'm showing you has
 5   been admitted into evidence as Exhibit 1.  And it's not that        11:30AM
 6   I'm showing it to you because of the content of it.  I don't
 7   really care about that.  I have highlighted instead the date
 8   sent.  And the date sent indicates a date that doesn't match
 9   the day.  I will tell you that the date indicated there is a
10   Friday and not a Saturday.                                          11:31AM
11          Do you have any understanding or explanation of why
12   that could be?
13          THE WITNESS:  Yes.  What happened is after we got out
14   of the meeting with you, we had to go back but we had to wait.
15   Ms. Sheid was working so she didn't get off work until 7.  So      11:31AM
16   we got ahold of the duty officer at the time and to ensure that
17   he got it done he had the sergeant write us an information
18   report just to document that your wishes were done.  That's why
19   it happened that way.
20          THE COURT:  I wasn't clear in my question.                  11:31AM
21          THE WITNESS:  Okay.
22          THE COURT:  I'm sorry.  Do you see how it says on
23   sent, it says Saturday, 7-21-2017.  7-21-2017 was a Friday.
24   And so this appears to be just a standard printout of an e-mail
25   but the day and the date don't match.  And I just wondered if      11:32AM
```

CV 12-601 -  September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Direct

```
 1    you had any ideas why that could happen.

 2              THE WITNESS:  No, sir.

 3              THE COURT:  Never saw that in the time you worked

 4    there?

 5              THE WITNESS: No, sir.                        11:32AM

 6              THE COURT:  All right.  Thank you.

 7              THE WITNESS:  Sorry.

 8              THE COURT:  Thank you.

 9                    CROSS-EXAMINATION

10    BY MS. KENDRICK:                                     11:32AM

11    Q.  Good morning.

12    A.  Good morning.

13    Q.  Good to see you again.

14              Did you speak with anybody before testifying about

15    your testimony today?                                11:32AM

16    A.  Other than legal counsel?

17    Q.  Besides the attorneys, yes.

18    A.  No, ma'am.

19    Q.  Did you review any documents to prepare?

20    A.  Just the ones provided when I met with legal counsel.  11:32AM

21    Q.  You provided them to --

22    A.  No.  No.  They showed them to me.

23    Q.  Okay.  And what were these documents?  What types of

24    documents were they?

25    A.  They were the movement screens.  She had the movement  11:33AM
```

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1   screens and I think the inmate letter.

2   Q.  The inmate letter from Ms. Alvarez that we were looking at?

3   A.  Yes, ma'am.

4   Q.  And you said you work for Community Corrections now?

5   A.  Yes, ma'am.                                              11:33AM

6   Q.  Is that a State of Arizona agency?

7   A.  Yes.

8   Q.  Is it still considered part of ADC?

9   A.  Yes.

10  Q.  And why did you move to this different department of ADC? 11:33AM

11  A.  Because I retired.

12  Q.  So you retired but then started working again for the

13  Department?

14  A.  Yes and went to a different division.  Yes.  I retired from

15  Department of Corrections, and then I got hired on at Community 11:33AM

16  Corrections working in another division.

17  Q.  Okay.  And you are aware that this Ms. Ashworth, she

18  testified on July 14 in this case, correct?

19  A.  I am, yes.

20  Q.  I believe you testified that at the time you weren't aware  11:34AM

21  that she was going to testify?

22  A.  No.  I didn't know she was going out to court.

23  Q.  Okay.  Do you remember being given a copy of the subpoena

24  signed by Judge Duncan that ordered her to come to court?

25  A.  I'm thinking that probably went to our OIU and they put the  11:34AM

**CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross**

1    movement list, put it in the computer, and then it generates to

2    tell the staff to get her ready for transportation the next

3    day.  Those usually don't come directly to us as a unit deputy

4    warden.

5    Q.  You used a new acronym what's OIU?                        11:34AM

6    A.  That's records, the records department.

7    Q.  So records is the one who creates --

8    A.  Uh-huh.

9    Q.  -- the list.

10           Are you familiar with Department Order 909 which is   11:34AM

11   about transporting prisoners and storing their property?

12   A.  I know 909, yes.

13   Q.  Do you know if it only applies to people who are going out

14   to medical or out to court overnight?

15   A.  You mean as far as --                                     11:35AM

16   Q.  As far as rolling people's property up.

17   A.  Generally inmates will have their property rolled up if

18   they are going to be gone for an extended amount of time.  And

19   in some cases, medical, if we don't know, will roll it up just

20   to secure their property.                                     11:35AM

21   Q.  But if they were just going to, say, out to the doctor for

22   the day would their property be rolled up?

23   A.  No, ma'am.

24   Q.  And if they were just going out to a court hearing or a

25   mediation for the day, would their property be rolled up?     11:35AM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1    A.  No, ma'am.

2    Q.  Are you aware that all of Ms. Ashworth's property was

3    rolled up before she came to testify here for the day?

4    A.  I wasn't.  But I guess when I was briefed on it I think

5    that you had called the unit.                                11:36AM

6         THE COURT:  I didn't call the unit.  I addressed it in

7    a hearing.

8         THE WITNESS:  So my officer was kind of nervous and

9    he's like we already fixed it.  We didn't realize she was going

10   to be gone only a day based on the information they got.  So he   11:36AM

11   goes graveyards rolled it up, but we already got everything

12   back.  It's all taken care of.

13   BY MS. KENDRICK:

14   Q.  Do you know who it was who decided to roll up her property?

15   A.  No.  Generally, just the standard operating procedure is   11:36AM

16   that those types of roll-ups are done on graveyard so that the

17   inmate's ready for transport first thing in the morning and

18   their property is stored so they don't have any loss or damage.

19   Q.  Okay.  And you said that you didn't know that she was

20   coming to court, but do you remember meeting me a couple days   11:36AM

21   before July 14 when I came to meet with Ms. Ashworth for a

22   couple hours?

23   A.  I remember you coming to visit.  I didn't realize she was

24   going to go to court.  I have attorneys come all the time.

25   Q.  Okay.  And Ms. Love had asked you some questions about   11:37AM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1    transfers, and so I just want to follow up with some of my own

2    questions.

3    A.  Okay.

4    Q.  So you said that the normal process is that every two weeks

5    or so there's a group of you that sits down and looks at the          11:37AM

6    requests and decides whether moves will occur?

7    A.  Those are not transfers.  Those are just in-house moves.

8    Q.  Okay.

9    A.  Yes.

10   Q.  So the more appropriate word to use to describe what          11:37AM

11   happened to Ms. Sheid is an in-house move versus a transfer?

12   A.  Yes.  She requested an in-house move.

13   Q.  Ms. Sheid did not?

14   A.  Not Ms. Sheid, Ms. Alvarez did.

15   Q.  So for these in-house moves it's a group of you that meets          11:37AM

16   every couple weeks?

17   A.  Generally two or three weeks, yes.

18   Q.  So the decision to move somebody, the normal process is

19   it's a group consensus?

20   A.  Yes, ma'am.          11:38AM

21   Q.  And I believe we were looking at Exhibit 18.  I don't know

22   if you could pull it out, the inmate letter.  So at the bottom,

23   third from the bottom, Ms. Alvarez writes, "I have a friend in

24   A yard, her name is Allen, who was willing to move but I'm not

25   sure."          11:38AM

UNITED STATES DISTRICT COURT

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1          So earlier when Ms. Love was questioning you, she was

2   asking you questions as if Ms. Alvarez was requesting to live

3   with Ms. Allen, right?

4   A.  Uh-huh.

5   Q.  But based on what Ms. Alvarez is actually saying, she's          11:38AM

6   saying Ms. Allen is willing to move.  Would that mean Ms. Allen

7   is willing to create a vacancy for her?

8   A.  I couldn't answer that.  I don't know that they had a

9   conversation with Ms. Allen.

10  Q.  But she is not explicitly saying I want to move in with Ms.      11:39AM

11  Allen, is she?

12  A.  No, she's not.  She just says she wants to move.

13  Q.  Okay.  And you testified that you authorized Officer Kay to

14  move Ms. Alvarez prior to this kind of group meeting to look at

15  the letter?                                                         11:39AM

16  A.  Yes, only because he thought there was an urgency when she

17  approached him.

18  Q.  Okay.  And I want to look at Exhibit 19.  That's the inmate

19  cell assignment screening report.

20         So is this something that's done before inmates are          11:39AM

21  moved in together?

22  A.  Yes.

23  Q.  And it's important to do it before they move in together

24  because you need to know if there's any potential areas for

25  conflict, right?                                                    11:40AM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1    A.  Correct.

2    Q.  And you need to know the risk of harm to the individuals,

3    correct?

4    A.  Correct.

5    Q.  If that's the case, do you know why this report is dated          11:40AM

6    August 2nd, 2017?

7    A.  It may be the day that they actually printed it.

8    Q.  So how would you know the date that this report was run?

9    A.  I don't know what date this report was run.  I know that in

10   order to house an inmate they have to go through this screen.          11:40AM

11   You can't even put them in a house without going through this.

12   So it would have had to have been done the day she did it

13   because we all signed off after that.

14   Q.  So would it have been Officer Kay who ran this screening

15   report?                                                                11:40AM

16   A.  It's not that -- you don't run the report.  You put the

17   people in.  If they match then it allows you to go to the

18   screen that you actually house the inmates in.  So it's not a

19   report that's run.

20   Q.  Do you know who entered the information here?                      11:41AM

21   A.  I'm going to say Officer Kay because he's the one that

22   housed them.

23   Q.  In the normal course of business he is the one who does

24   this?

25   A.  Yes.                                                               11:41AM

1   Q.  But you have no way of knowing when, like what day or what

2   time he ran this report?

3   A.  I'm going to have to say it's the day that they were housed

4   together because that's when it shows up on AIMS.  So on 7-21

5   when she shows up in her new cell assignment, this had to have          11:41AM

6   been done in order for that process to have been completed on

7   AIMS.

8   Q.  And Ms. Sheid was moved into another cell, correct?

9   A.  Yes, ma'am.

10  Q.  And do you have any record or knowledge of the cell             11:41AM

11  assignment screening being done for Ms. Sheid and the

12  individual whose cell she moved into?

13  A.  There would have had to have been, if it's on AIMS as

14  housed there, this had to have been done prior.  You have to go

15  through this to get into the housing and the bedding.               11:42AM

16  Q.  And if you could flip to Exhibit 17, I just have a question

17  about some of the acronyms in there.

18       This is the internal assignments report from Ms.

19  Sheid?

20  A.  Yes, ma'am.                                                     11:42AM

21  Q.  So about the sixth column over, it says S-T-A-F.  Do you

22  know what that stands for?

23  A.  Where are you at?  Are you on the top legend right here at

24  the --

25  Q.  Yeah.  S-T-A-F?                                                 11:43AM

113

```
 1    A.  S-T-A-F.  That's staff.  That's the CO-3 that the inmate is

 2    now assigned to.

 3    Q.  Okay.  So this does not show who actually authorized or

 4    performed a move?

 5    A.  No.  That would be on the first sheet you showed me.          11:43AM

 6    Because in order for this to show up here, they have to have

 7    completed the other one.  And they put in all this information.

 8    Q.  Okay.

 9    A.  Okay?

10    Q.  Sorry to make you go through all of them.  If you look at     11:43AM

11    Number 20, please.

12    A.  Sure.  Okay.

13    Q.  So this is the inmate actions detail for Ms. Alvarez?

14    A.  Yes.

15    Q.  And Ms. Love had you go through it and you said that          11:44AM

16    because your name is on there, it would indicate that you

17    approved?

18    A.  Yes, ma'am.

19    Q.  Okay.  What does override mean?

20    A.  I'm not really sure, because I'm not real familiar with      11:44AM

21    this particular screen because I think this is like if you

22    wanted to go and see something that happened with an inmate.

23    But if -- it's all generated, I think, from the Exhibit 18.  So

24    I'm not sure what the override is because there was nothing

25    that needed to be overridden.                                    11:44AM
```

 1   Q.  Okay.  And it's dated 7-20-17 at 2:56.  I assume that's

 2   military time.

 3   A.  7-20-2017 at 2:56.

 4   Q.  So would that be the time the information was input?

 5   A.  You know, I can't -- I'm not going to be able to respond to        11:44AM

 6   that because I don't understand.  Everything else is a 7-21.  I

 7   don't understand where this is coming from.

 8   Q.  Well, wasn't she moved on 7-19?

 9   A.  7-19.  So then this would have populated, I'm thinking,

10   when it goes through his phase, which is the accountability,          11:45AM

11   and then it goes to the CO-4 and then it goes to me.  It could

12   have been I finalized it on the 20th.

13   Q.  Okay.  That's all the questions I have about that one.

14          I'm going to walk you through some of the other

15   exhibits that are in front of you.  Hopefully they are in            11:45AM

16   numerical order.

17   A.  I'm going to try to move that.  One second.  Okay.

18   Q.  Do you see an Exhibit 1 and 2?

19   A.  Yes, I do.

20   Q.  And Judge Duncan already asked you about Exhibit 1 and how       11:46AM

21   it said Saturday the 21st.

22          You received this e-mail as well, correct?

23   A.  Yes.

24   Q.  And Exhibit 2 is an information report that was written by

25   Sergeant Overly?                                                     11:46AM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1    A.  Yes, ma'am.

2    Q.  And do the officers normally write information reports when

3    they transfer prisoners?

4    A.  When they move them?

5    Q.  When they move them.                                          11:46AM

6    A.  Not generally.  We did it in this case just so that we

7    could make sure that the Court order was satisfied.  They may

8    sometimes do it if there's extenuating circumstances, but

9    generally, no.

10   Q.  Okay.  Could you turn next to what's labeled Exhibit 3?      11:46AM

11   A.  Uh-huh.

12   Q.  So just take your time and take a look at it.

13   A.  Okay.

14   Q.  So this is an e-mail that Warden Currier forwarded to you,

15   correct?                                                         11:47AM

16   A.  Yes, ma'am.

17   Q.  And what she forwarded to you was something written by a

18   person named Adalia Cerrillo?

19   A.  Yes.  She's in the correspondence.

20   Q.  Who is Ms. Cerrillo?                                         11:47AM

21   A.  She's the facility health administrator for Corizon.

22   Q.  Okay.  And this is about Inmate Ashworth, correct?

23   A.  Yes.

24   Q.  And it's about Sergeant Coleman refusing to initiate an ICS

25   for Ms. Ashworth when she had an allergic reaction, correct?     11:47AM

UNITED STATES DISTRICT COURT

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1   A.  Yes.

2   Q.  And Ms. Cerrillo writes that the inmate -- quote, "The

3   inmate and her cellie wrote inmate letters, and we also

4   reported it to the Ms. Oros who said they were conducting an

5   investigation.  We took it to the DW because it wasn't the        11:48AM

6   first time that inmates made complaints of the same nature with

7   the same sergeant."

8        Do you remember when Ms. Cerrillo contacted you about

9   Sergeant Coleman refusing to call an ICS for Ms. Ashworth?

10  A.  What she was -- I was gone when this specific incident        11:48AM

11  happened.  I wasn't at work.  So when I returned back to work,

12  she -- I don't even know where we talked at.  I think it was at

13  a meeting.  And she had mentioned to me there was an

14  altercation with -- not an altercation, but a discussion

15  between Sergeant Coleman and her medical staff.  And I told her  11:48AM

16  I need you to have your staff give me the information.  I need

17  an information report.  And that took almost two weeks to get

18  from them.

19  Q.  And the date that Sergeant Coleman did not call an ICS was

20  June 5, 2017?                                                     11:49AM

21  A.  Well, I know that's the day they have concerns about what

22  he did.  I don't know after -- I mean, I don't know that he did

23  or didn't at that time when I was getting all this information.

24  Q.  Do you remember how many days after that happened that you

25  were notified by the Corizon healthcare staff?                   11:49AM

1    A.   Probably within the next week that I returned is when Ms.

2    Cerrillo mentioned it to me and I requested the information

3    report from the staff that actually had the direct knowledge.

4    And then that took at least another 10 days to get.

5    Q.   But you were ultimately provided a written report?        11:49AM

6    A.   Uh-huh.

7    Q.   And do you remember who wrote the report?  Was it a nurse

8    or Ms. Cerrillo?

9    A.   It was a nurse, and I can't remember who.

10   Q.   Was it Nurse Miller?                                       11:50AM

11   A.   I don't remember.

12   Q.   Okay.  And Ms. Cerrillo states that you were notified

13   because this was not the first time inmates made complaints of

14   the same nature with the same sergeant.  Were you aware that

15   other women had made similar complaints about Sergeant Coleman? 11:50AM

16   A.   No, ma'am, I wasn't.

17   Q.   So it was only when you were notified by the Corizon staff?

18   A.   Yes, ma'am.

19   Q.   And then on the first page of Exhibit 3, you send an e-mail

20   to Warden Currier in response?                                 11:50AM

21   A.   Yes, ma'am.

22   Q.   And in your third paragraph you say, "I was able to meet

23   with Lieutenant Papworth last week to discuss the issues with

24   him so we could start to see what happened."

25        What did you discuss with Lieutenant Papworth?            11:51AM

118

1    A.  I think by that time I had received the IR, and I wanted to

2    get with Papworth because then I think that's when the first

3    knowledge I had of CO Western being involved in the incident

4    and Coleman.  I just needed to get more information to talk to

5    them about their side of what happened that day.  And I think          11:51AM

6    that's what I was talking with Papworth about is to get the

7    information in writing from both of those staff.

8    Q.  So you directed Lieutenant Papworth to get --

9    A.  Yes.

10   Q.  -- information reports written by those two?                       11:51AM

11   A.  Yes.

12   Q.  Is it common to ask officers to write information reports

13   six weeks after an incident?

14   A.  Yes.  I mean, if we are having allegations and I need to

15   look into them, then yes.                                              11:52AM

16   Q.  Have you ever had staff write information reports six weeks

17   after an incident besides this time?

18   A.  Well, if we request it, I mean, generally, the information

19   reports are written then.  But in this case, because

20   information came from an outside source and I wanted to get all        11:52AM

21   the facts together, I went to the lieutenant and requested that

22   he get the information in writing from his staff.

23   Q.  Right.  But I guess my question is, had you ever done this

24   before with an incident where six weeks later you asked your

25   staff to do it, or is this the first time you --                       11:52AM

1   A.  In incidents where I'm investigating things, yes.

2   Q.  And in your message to Warden Currier you also say, "Today

3   was Sergeant Coleman's first day back."  Do you remember where

4   he had been?

5   A.  I want to say he was on vacation.                    11:53AM

6   Q.  And after you sent this e-mail to the warden, did you meet

7   with Sergeant Coleman personally to discuss what happened?

8   A.  I think I waited until after I got his IR, his information

9   report.  Then we did have a meeting with him.

10  Q.  What did you discuss with Sergeant Coleman?          11:53AM

11  A.  The contents of his information report and to explain what

12  had happened during this incident.

13  Q.  And did you review with him what the healthcare staff and

14  CO Western had alleged happened?

15  A.  I'm not sure about Western but definitely about medical.  11:53AM

16  Q.  Okay.  And did you instruct him that he needed to call

17  ICS's when prisoners asked for them in the future?

18  A.  Not at that time, no, I didn't.  We were still going over

19  what actually happened.

20  Q.  And did you instruct Sergeant Coleman he was not to       11:54AM

21  retaliate against Ms. Ashworth for testifying about what she

22  went through?

23  A.  I can't recall that I told him that.

24  Q.  Do you know if any disciplinary actions were taken against

25  Sergeant Coleman for his actions with regard to Ms. Ashworth?  11:54AM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1   A.  No.  Not to my knowledge.

2   Q.  Was he reassigned from San Pedro Unit after Ms. Ashworth

3   testified?

4   A.  No.

5   Q.  Do you know if any disciplinary actions were taken against        11:54AM

6   Officer Western?

7   A.  No.

8   Q.  Was she reassigned from San Pedro Unit after this

9   investigation?

10  A.  She was not reassigned as a result of this investigation.        11:55AM

11  She was already approved to move to complex prior to this

12  happening.

13  Q.  Okay.  I will ask you now to take a look at what's marked

14  as Exhibit 6.

15      THE COURT:  Before you move on, can I ask a question          11:55AM

16  about the last one?

17      THE WITNESS:  This one?

18      THE COURT:  Yeah.  Ms. Oros, this is the same kind of

19  question that I asked before with respect to Exhibit 3.  And I

20  have highlighted two of the date sequences.  At the top of it,       11:56AM

21  it says to you from Kimberly Currier, and it states sent

22  Thursday, July 19, 2017 at 5 p.m. and 58 seconds.  And then

23  below that it seems to be the previous e-mail, and it's from

24  you to Warden Currier, and it states, it strangely spelled out

25  completely the word Wednesday whereas before it actually             11:56AM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

 1    doesn't say Thursday, it says T-H-U-R.  And the next one says

 2    Wednesday, completely spelled out, and it also has spelled out

 3    July 19 whereas above it doesn't spell out July.  It just uses

 4    the numeral 7.  So this strange circumstance where the to/from,

 5    sent seems not to follow the same format.  It's also true with      11:57AM

 6    the time.  The top one on the first page of Exhibit 3 says

 7    5:00:58 p.m. the one below says 4:53 p.m.  And I just want to

 8    ask you if you have, through your experience, any idea as to

 9    why that different standard format would be used on the same

10    e-mail printout page?                                               11:57AM

11            THE WITNESS:  I have no idea, sir.  It may be the way

12    they set up our accounts.  I don't know.  IT does that.

13            THE COURT:  Okay.  And the other thing you will note,

14    it gets the day and date wrong again, you can see.  Do you

15    agree the day and date are wrong there?                             11:57AM

16            THE WITNESS:  Well, they are different.

17            THE COURT:  So one of them is true.  One of them is

18    not but we don't know why.  But when you send an e-mail can you

19    control what the day or time --

20            THE WITNESS:  No, sir.                                      11:58AM

21            THE COURT:  To your knowledge?

22            THE WITNESS:  I can't even change who it's from.  It's

23    all preset.

24            THE COURT:  Thank you for that interruption.

25    BY MS. KENDRICK:                                                    11:58AM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1   Q.  Sure.  If you could take a look at Exhibit 6, please.

2   A.  Okay.

3   Q.  And it's, again, an e-mail chain.  So you might want to

4   start at the next to last page and work your way up.

5   A.  Okay.                                                    11:58AM

6   Q.  So this started out as an e-mail sent by Warden Currier on

7   July 27 to a bunch of people including you?

8   A.  Uh-huh.

9   Q.  Bottom of Page 3.  And it's about a list of inmates where

10  she's asking that she wants any information given to her daily   11:59AM

11  that involves them?

12  A.  Right.

13  Q.  Right.  Do you remember getting this e-mail?

14  A.  Yes.

15  Q.  And if you could turn to the last page, Page 4, the first   11:59AM

16  full paragraph says, "Ensure you have them identified in some

17  way and ensure your supervisors know to advise you of anything

18  that occurs with these inmates.  Please make sure your staff do

19  not talk to inmates about any of this as well.  It seems like

20  we have a problem discussing things with inmates that we should  11:59AM

21  not be discussing with them."

22         Do you understand what she is referring to with that

23  statement?

24  A.  I don't.  And I wouldn't even have asked her because the

25  day she sent this was my last day of work.                   11:59AM

1   Q.  Then if you look at the third page.

2   A.  Yes, ma'am.

3   Q.  Lieutenant Papworth is sending an e-mail to Deputy Warden

4   Lee, is that correct?

5   A.  Yes.                                                          12:00PM

6   Q.  And he states that, "Donna Sheid has been placed on a

7   jumpsuit until August 11th."

8          What does it mean to be placed in a jumpsuit?

9   A.  When the inmates have been given warnings to be in grooming

10  compliance, and I'm talking about their self-grooming, and they   12:00PM

11  don't follow it, they are issued a disciplinary.  And at the

12  end of the disciplinary process the sanction is they are placed

13  in a jumpsuit for 30 days.

14  Q.  So is this done the first time they have a grooming

15  violation or after repeated violations?                           12:00PM

16  A.  You know, staff are pretty lenient, I would say.  But

17  generally when it comes to an issue where they are not in

18  compliance it's been because they had numerous times they have

19  been given opportunities to conform.

20  Q.  And is this jumpsuit sanction, is this something that's in   12:01PM

21  ADC policies?

22  A.  To put them in a jumpsuit?

23  Q.  Yes.

24  A.  It's not listed in there, it's just an other that you can

25  put them in a jumpsuit if they are not going to conform to       12:01PM

**CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross**

1    grooming policies.

2    Q.  So if I were to look at ADC's departmental orders on

3    disciplinary sanctions there would not be referral to placement

4    in a jumpsuit?

5    A.  No, I don't believe so.                                    12:01PM

6    Q.  And do you know if this jumpsuit sanction is done on all

7    units at Perryville?

8    A.  No.  I don't know that.

9    Q.  Okay.  Have you ever worked at other units besides San

10   Pedro?                                                          12:02PM

11   A.  Not at Perryville, no.

12   Q.  Okay.  So this was something that was done at San Pedro

13   Unit?

14   A.  Uh-huh.

15   Q.  And were you aware that the jumpsuit sanction existed?     12:02PM

16   A.  Yes.

17   Q.  Were you the one who came up with the idea for this

18   sanction?

19   A.  I don't know that I came up with it, but I enforced it when

20   they are not following grooming compliance.                    12:02PM

21   Q.  Was this jumpsuit sanction something that you were doing

22   the entire three and-a-half years you were deputy warden at

23   Pedro unit?

24   A.  Yes, ma'am.

25   Q.  Do you know if it was being done before you came?          12:02PM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1   A.  No, I don't.

2   Q.  So with your arrival, this started?

3   A.  When I arrived at Pedro Unit, all the executive staff was

4   new there; the captain, myself, CO-4, everybody was new there.

5   There just happened to be a mass change at that same time so we          12:02PM

6   all came in new.

7   Q.  Do you remember whose idea it was to start doing this as a

8   sanction?

9   A.  No, ma'am.

10  Q.  And you testified earlier, I believe, in response to the             12:03PM

11  judge's question, that you are the boss of San Pedro, right?

12  A.  I'm the administrator, yes.

13  Q.  So if this were going on it would have to -- this sanction,

14  it would have to be with your approval, correct?

15  A.  Yes, ma'am.                                                          12:03PM

16  Q.  And were the prisoners who came to San Pedro Unit, were

17  they provided any sort of written information describing this

18  jumpsuit sanction and what violations could get them placed in

19  a jumpsuit?

20  A.  Yes.  I don't know if they are given written, but they are,         12:03PM

21  when they are given warnings, they are told you guys need to be

22  in compliance or else we're going to have to put you in

23  jumpsuits.

24  Q.  And why is being placed in a jumpsuit considered

25  punishment?                                                             12:03PM

1    A.  I don't know that it's punishment.  It's just that when

2    they are walking around the yard with their pants hanging down

3    and their underwear showing, they are not in compliance, we

4    give them opportunity to pull their pants up, tuck their shirts

5    in, I remind them they are young ladies and they need to act          12:04PM

6    that way.  If they are not doing that, not conforming and we

7    have given them opportunities, then the only other thing is

8    disciplinary.

9    Q.  So have you instructed your officers that they need to

10   document when they observe women who are not adhering to the          12:04PM

11   grooming standards so that there's a record that she was warned

12   repeatedly before she was placed?

13   A.  I don't give them that order because -- I mean, they could

14   probably do it in a pass down in their journal.  It's not

15   something formal or given a warning to get compliance.               12:04PM

16   Q.  And as deputy warden, were you notified when women were

17   quote, unquote, placed in a jumpsuit?

18   A.  Not really because it went through the process.  If they

19   got a disciplinary, the only ones I ever see on my desk are

20   major rule violations because I have to sign off on them.  So        12:05PM

21   they could even get it as a minor rule violation.  So I don't

22   really see those.

23   Q.  So you just referred to a process, and Lieutenant Papworth

24   actually refers to this as a disciplinary sanction after due

25   process.  So could you describe the due process?                     12:05PM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1    A.  I think in his case he's saying she didn't get a

2    disciplinary and they just put her in it.  This is what I'm

3    getting from this, from this e-mail.  She was put into it but

4    she hadn't received a disciplinary.  So it didn't go through

5    the proper process is what I'm getting from this.          12:05PM

6    Q.  Okay.  I know you were not copied on this e-mail, but as

7    deputy warden were you aware Ms. Sheid had been placed in a

8    jumpsuit?

9    A.  No, I wasn't.

10   Q.  Do you know who placed her in a jumpsuit?              12:06PM

11   A.  No, I don't.

12   Q.  Do know why she was placed in a jumpsuit?

13   A.  No, ma'am.

14   Q.  Did anyone ever contact you and tell you that she had been

15   placed in a jumpsuit?                                      12:06PM

16   A.  No, ma'am.

17   Q.  So as you sit here and read this, this is the first time

18   you learned she had been placed in a jumpsuit?

19   A.  Yes.

20   Q.  And Lieutenant Papworth says, quote, "As a matter of fact, 12:06PM

21   we have approximately 10 inmates in jumpsuits who may or may

22   not have even had a ticket written before being sanctioned to a

23   jumpsuit," close quote.

24   A.  Right.

25   Q.  Did you know that there were 10 inmates had who had been   12:06PM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1    put in jumpsuits without due process?

2    A.  No.

3    Q.  Do you know if any of those 10 women were individuals that

4    Warden Currier asked to be notified if any adverse actions were

5    taken against them?                                              12:06PM

6    A.  No, ma'am.

7            THE COURT:  Are you close to an ending point, or are

8    you close to a place that we could take the break at noon?

9            MS. KENDRICK:  I have one more exhibit, sir, so five

10   minutes.                                                         12:07PM

11           THE COURT:  What kind of redirect?

12           MS. LOVE:  It would depend on what the next category

13   of questions she has.  But otherwise, there may be none at this

14   point.

15           THE COURT:  How much time -- I'm trying to be           12:07PM

16   respectful of people's calendars.

17           MS. KENDRICK:  I estimate maybe five minutes maximum.

18           THE COURT:  Is it all right if we continue for five

19   more minutes?

20           Okay.  Please.                                          12:07PM

21   BY MS. KENDRICK:

22   Q.  If you could flip to Plaintiffs' Exhibit 7.  Do you see

23   that?

24   A.  Yes.

25   Q.  And it's a message that Deputy Warden Lee sent to the       12:07PM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1    warden and to you.  And this is about Ms. Ashworth again.  And

2    Deputy Warden Lee says, "We will be having a conversation and

3    starting an AI on this on Monday."  What's an AI?

4    A.  Administrative inquiry.

5    Q.  Okay.                                                        12:08PM

6    A.  And in order for me to start that you need to have

7    information reports.

8    Q.  Okay.  And so this was with regard to the allegation about

9    Sergeant Coleman's behavior?

10   A.  Uh-huh.                                                      12:08PM

11   Q.  Because right below there's a message to you from the

12   warden that says, "We are not medical and we do not make

13   medical decisions such as this"?

14   A.  Right.

15   Q.  So was an administrative inquiry done?                       12:08PM

16   A.  No, because I could not get the information reports from

17   medical.  And when I did receive them we were out of time

18   frames.

19   Q.  Out of time frames for what?

20   A.  To file an administrative inquiry.                           12:08PM

21   Q.  Is the administrative inquiry the precursor to some sort of

22   disciplinary sanction to a staff member?

23   A.  The administrative inquiry gathers all the facts and looks

24   at everything.  And based on that we decide if there's

25   progressive disciplinary that needs to be done.  It doesn't     12:09PM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

```
 1   always mean they are going to get anything.
 2   Q.  What is the time frame?
 3   A.  I want to say it's 10 days.  I think that's from the date
 4   of incident.
 5   Q.  From the date of incident or the date of discovery?        12:09PM
 6   A.  Probably could be either one.
 7   Q.  Do you understand how --
 8   A.  If my date of discovery was September 14, I still had not
 9   received the information reports.  I don't have them with me so
10   I can't tell you the dates.  I just know that when I received   12:09PM
11   it we were out of that time frame.
12   Q.  So the actual incident happened on June 5th.  I will tell
13   you this.
14   A.  Right.
15   Q.  So if we were going off the date of incident the 10 days   12:09PM
16   would have been June 15, correct?
17   A.  Right.  But I wasn't even working because I was duty
18   officer.  I wasn't even on site when the original incident
19   happened so when I came back a week later is when I started
20   trying to get some information and trying to get more           12:10PM
21   information from medical is what took longer.
22   Q.  So it sounds like you started the clock from when you
23   learned about the incident?
24   A.  Yes.
25   Q.  Okay.  And so you are saying if you don't have the          12:10PM
```

 1   information you can't do the inquiry because the 10 days ended,

 2   correct?

 3   A.  For an administrative inquiry, yes.

 4   Q.  So does that mean that if somebody doesn't provide

 5   information that's been requested, the inquiry stops?          12:10PM

 6   A.  No.  I mean, we're still going to look at it.  It's just

 7   really hard for me to base any kind of discipline if I don't

 8   have all the information.

 9   Q.  And where is this 10-day limit written down?  Do you know?

10   A.  It's in our policy.  I can't tell you which one.  Probably   12:10PM

11   601.  I don't know.

12   Q.  But it's your understanding --

13   A.  Uh-huh.

14   Q.  -- in your 20 years?

15   A.  Yes.                                                       12:11PM

16   Q.  Okay.  Thank you.  I have nothing further, Your Honor?

17        THE COURT:  Thank you.  Any redirect?

18        MS. LOVE:  No redirect.

19        THE COURT:  Ms. Oros, thank you very much.  I

20   appreciate you coming to court today and talking with us.  Have  12:11PM

21   a good rest of your day.

22        Thank you.  How many more witnesses do you have, Ms.

23   Love?

24        MS. LOVE:  Your Honor, I have three witnesses related

25   to Mr. Oyenik's claim but then plaintiffs also have two         12:11PM

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Oros - Cross

1    additional witnesses they have listed regarding the Perryville

2    claim.

3              THE COURT:  So we should come back at 1:15 then.  Is

4    that all right with everybody?  Thank you all.

5              (Recess from 12:11 p.m. until 1:16 p.m.)                12:11PM

6              MR. FATHI:  Your Honor, if the Court is amenable, we

7    discussed with counsel finishing the Perryville witnesses and

8    then moving on to the Florence witnesses.

9              THE COURT:  Makes sense.

10             MR. FATHI:  In that case, plaintiffs call Lieutenant    01:17PM

11   Papworth.

12             THE COURT:  Sir, would you please step forward to the

13   clerk of the court right here, and the oath will be

14   administered.

15             (The witness was sworn.)                                01:17PM

16             THE COURT:  Good afternoon, Lieutenant.  Welcome.

17                      CHRISTOPHER PAPWORTH,

18   a witness herein, having been first duly sworn by the clerk to

19   speak the truth and nothing but the truth, was examined and

20   testified as follows:

21                       DIRECT EXAMINATION

22   BY MR. FATHI:

23   Q.  Good afternoon, Lieutenant.

24   A.  Good afternoon.

25   Q.  Would you please state your full name.                        01:18PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1    A.   Christopher Brian Papworth.

2    Q.   Lieutenant Papworth, did you review any documents in

3    preparation for your testimony today?

4    A.   Yes, I did.

5    Q.   And what were they?                                          01:18PM

6    A.   They were the e-mails that I sent to my supervisor.

7    Q.   And who is your supervisor?

8    A.   At that particular time it was Deputy Warden Crystal Lee.

9    Q.   And approximately how many e-mails are we talking about

10   here?                                                             01:18PM

11   A.   I do believe it was two.

12   Q.   Any other documents you reviewed in preparation for today?

13   A.   No, sir.

14   Q.   Lieutenant, you might want to pull that microphone a little

15   bit closer.  That will save you from having to lean forward.      01:18PM

16          THE COURT:  Thank you for minding that courtesy, Mr.

17   Fathi.

18   BY MR. FATHI:

19   Q.   Lieutenant, did you speak with anyone about your testimony

20   today?                                                            01:18PM

21   A.   No, I did not.

22   Q.   Did you speak with the lawyers for the State?

23   A.   Yes, I did.

24   Q.   Anyone besides them?

25   A.   No.  Not that I can recall.                                  01:19PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1   Q.  Lieutenant, what is your occupation?

2   A.  I am the shift commander at Perryville Prison.  I currently

3   work as a correctional lieutenant.

4   Q.  And are you shift commander for the entire prison or for a

5   particular unit?                                          01:19PM

6   A.  Just for a particular shift on a particular unit.

7   Q.  Which shift and which unit?

8   A.  Swing shift at the San Pedro Unit.

9   Q.  How long have you held that particular position?

10  A.  I have currently been assigned to that particular unit for  01:19PM

11  about a year and a half.

12  Q.  And before that did you work at the Perryville Prison or

13  elsewhere?

14  A.  Yes.  I was assigned to complex.  I was complex shift

15  commander.                                                01:19PM

16  Q.  So how long have you worked at the Perryville Prison, all

17  tolled?

18  A.  Approximately 19 years.

19  Q.  In your current assignment what are your work hours?

20  A.  I work from 1:15 to 9:15 at night.                    01:19PM

21  Q.  And you mentioned that your immediate supervisor was Deputy

22  Warden Lee, is that correct?

23  A.  Yes, I do believe pertaining to the e-mails, yes.

24  Q.  Do you have more than one immediate supervisor?

25  A.  Yes, I do.                                            01:20PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1    Q.  And who are all your supervisors?

2    A.  My immediate supervisor would be Captain Eoin Bailey, the

3    COS at San Pedro Unit.  And then I have an ADW -- or excuse

4    me -- I have a CO-4 that oversees me when the deputy warden and

5    the captain are on site.                                      01:20PM

6    Q.  And what is the CO-4's name?

7    A.  I don't know what his first name.  Last named is Garner.

8    G-A-R-N-E-R, Garner?

9    Q.  Thank you.  And who else supervises you?

10   A.  I do believe that would be it at that particular unit.    01:20PM

11   Q.  Okay.  So --

12   A.  Well, let me just -- now there's an administrative duty

13   officer after hours.  When all those people leave I do have a

14   designated, what we call, an ADO that comes around as our point

15   of contact after hours if we have any questions regarding any  01:21PM

16   incidents.

17   Q.  Who is that person?

18   A.  It varies depending on the schedule.

19   Q.  Could you just explain for the Court, it sounds like you

20   might have described a chain of command.  Could you start from 01:21PM

21   the top and go down?

22   A.  Just for the unit or for the whole prison?

23   Q.  Well, for your -- your particular line of authority.

24   A.  It's going to be the deputy warden, the captain, the CO-4,

25   and then there's myself and then the sergeants and then the    01:21PM

1   officers.

2   Q.  And the deputy warden you referred to, that's still as we

3   sit here today Deputy Warden Lee?

4   A.  No.  That is -- we have a new deputy warden, Mr. Aguilar.

5   I don't recall what his first name is.  Ramil Aguilar.                  01:21PM

6   Q.  When did Deputy Warden Aguilar start?

7   A.  I would say it was approximately three weeks ago, but I

8   might be mistaken on that.

9   Q.  So Deputy Warden Lee was in that position until about three

10  weeks ago?                                                              01:22PM

11  A.  Yes, sir.

12  Q.  And what is Deputy Warden Lee's position now?

13  A.  I do believe she's the deputy warden of compliance at

14  Perryville, but I could be mistaken on that because I don't

15  follow them after they leave in their assignments.                     01:22PM

16          THE COURT:  Can I interrupt?  How did the ADO fit into

17  this and what does at ADO stand for?

18          THE WITNESS:  The ADO is the administrative duty

19  officer.  They are the point of contact after hours for any of

20  the subsequent units to contact if we had any questions              01:22PM

21  regarding any incidents or direction or guidance.

22          THE COURT:  So when one of the people that you

23  described as being above you isn't around because it's not

24  during their time of being on shift, there is always somebody

25  who is an ADO that you can go to?                                      01:22PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

```
 1            THE WITNESS:  Yes.  Depending on the circumstances of

 2   what happened at the unit that would be the person that we

 3   would contact first and let them know what's going on.  And

 4   they would, in turn, probably contact who they needed to

 5   contact.                                                          01:23PM

 6            THE COURT:  Thank you.

 7            MR. FATHI:  Thank you, Your Honor.

 8   BY MR. FATHI:

 9   Q.  Lieutenant, so when Deputy Warden Lee was your supervisor

10   up until about three weeks ago, was she deputy warden for the    01:23PM

11   San Pedro Unit?

12   A.  Yes.  That was her current assignment, I do believe.

13   Q.  And you are saying that now you believe she's deputy warden

14   of compliance?

15   A.  I can't say that for a fact, I just -- it would just be      01:23PM

16   hearsay on my part because that's what I was told.

17   Q.  That's fine.

18   A.  Her assignment might be something different.

19   Q.  But when she was your supervisor she was --

20   A.  She was deputy warden of my unit.                            01:23PM

21   Q.  Lieutenant, we need to be careful not to talk over each

22   other so the court reporter --

23   A.  I apologize.

24   Q.  Quite all right.

25            So what are your duties as a lieutenant currently?       01:24PM
```

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1   A.  Inmate management, staff management.  I have light to

2   medium administrative duties.  Also I facilitate training for

3   the staff.

4   Q.  Anything else?

5   A.  Quite a bit.  I didn't know if you wanted me to go down on        01:24PM

6   the day-to-day operations of what I do.  I work in many

7   capacity.

8   Q.  Why don't you tell us what a typical workday of yours is

9   like.

10  A.  Well, assigning and scheduling staff, two-week projections       01:24PM

11  to assigning and scheduling staff for training, online

12  training; ensuring we have adequate staffing levels; ensuring

13  that the officers are keeping up with their course security

14  practice; ensure that they are doing their health and welfare

15  checks and all the assigned duties we give them and they are        01:24PM

16  meeting expectations on a day-to-day operations.  That's

17  including walking and talking and dealing with the inmates,

18  answering all their questions.

19  Q.  I gather you are assigned to the San Pedro Unit, is that

20  right?                                                               01:25PM

21  A.  That's correct.

22  Q.  So your duties are limited to that one unit.  You are

23  not -- you don't have duties that encompass other units,

24  correct?

25  A.  There are exceptions if I'm asked to go to another unit for      01:25PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1   the day and help out.

2   Q.  But in the normal course of events your duties are at San

3   Pedro?

4   A.  Yes, sir.

5   Q.  Lieutenant, I take it you are familiar were a prisoner    01:25PM

6   named Angela Ashworth?

7   A.  Yes, I am.

8   Q.  And she lives on the San Pedro Unit?

9   A.  That's correct.

10  Q.  And you are aware that Ms. Ashworth testified in this case  01:25PM

11  on July 14th?

12  A.  No.  I'm not aware of that.

13  Q.  You are not aware of that?

14  A.  I am not aware of that.

15  Q.  Were you aware before you came here today that Ms. Ashworth  01:25PM

16  had testified in this case at all?

17  A.  I know she was involved in a case, but I'm not aware of her

18  physically coming here and testifying.

19  Q.  So when I just asked you that question that was the very

20  first you had ever heard of that?                            01:26PM

21  A.  Her coming here and testifying?  Yes.

22  Q.  But you did know that she had some involvement in this

23  case, is that right?

24  A.  Yes, I did.

25  Q.  And when did you first become aware of that?              01:26PM

1   A.  That was probably when, you know, I actually don't know if

2   it was due to an e-mail that I received or, you know, I don't

3   recall.  I don't recall exactly when I first learned of it.

4   Q.  Are you aware that Judge Duncan has issued an order that

5   there be no retaliation against any prisoner who provides          01:26PM

6   information to the Court in this case?

7   A.  Yes.  I am aware of that.

8   Q.  Lieutenant, are you aware of something called a target

9   search list?

10  A.  Yes, I am.                                                     01:26PM

11  Q.  What is the target search list?

12  A.  Those are designated cells that are given to my staff that

13  are to be completed within a time frame every month.

14  Q.  You mean the searches are to be completed?

15  A.  Yes, the searches.                                             01:27PM

16  Q.  What is your role in relation to the target search list?

17  A.  The SSU officer, the Special Security Unit designee, hands

18  me the list every month and it's my responsibility to ensure

19  those get done.  I disseminate those to the staff and make sure

20  they are done in a timely manner throughout the month.            01:27PM

21  Q.  So on about a monthly basis, you are notified of who is on

22  the target search list for San Pedro Unit?

23  A.  I'm not aware of who is on the list until I'm actually

24  given the list.

25  Q.  But you are given a list on approximately a monthly basis?    01:27PM

1   A.  Yes.  That's correct.

2   Q.  And what does it mean if a prisoner is placed on a target

3   search list?  What implications does that have for the

4   prisoner?

5   A.  Well, I don't know the implications for the inmate other          01:28PM

6   than the fact that we're given these searches to complete.  And

7   I guess the ramifications that the inmate feel, they may feel

8   they are being singled out.  But I don't know how these are

9   generated, the lists are generated.  I just know that I'm

10  supposed to carry them out and make sure they are completed          01:28PM

11  every month.

12  Q.  I'm sorry.  I think my question wasn't clear.  I just meant

13  what happens to prisoners who are on the targeted search list?

14  And I gather what happens to them is they get searched, is that

15  right?                                                               01:28PM

16  A.  Oh, that's correct.  We go down there and we go through

17  everything and make sure the cell is in compliance.

18  Q.  And once a prisoner is on the list, who decides how often

19  that prisoner gets searched, when it happens?  Who makes those

20  sort of detailed decisions?                                          01:29PM

21  A.  That doesn't come out of my office.  I think that's

22  designated from the Special Security Unit that designate that.

23  I'm not sure how that's generated, depending on if we have any

24  knowledge, if there's something else that would lead us to

25  believe there's an issue down in one of the cells that would         01:29PM

1    initiate a search.  Other than that, I don't have any knowledge

2    of how they put that list together.

3    Q.  Okay.  But you do get a written list every month of who is

4    on the list, correct?

5    A.  That's correct.                                          01:29PM

6    Q.  And when you get that list, is it just their names and

7    numbers or does it include, for example, how frequently they

8    are supposed to be searched?

9    A.  Well, we actually get two lists that are alternated from

10   day shift to swing shift.  Last month I got a random cell      01:29PM

11   search list for the month.  The month before that it was a

12   target.  So they alternate it back and forth.  We get randoms

13   and targets.  This particular one we're talking about I ended

14   up getting the target.

15   Q.  And for how long can a prisoner be on the target search    01:30PM

16   list?  Is the prisoner only on the list for a single month or

17   can it be longer than that?

18   A.  No, just for the month.

19   Q.  I assume it's possible, though, to put the same prisoner on

20   the list for two months?                                      01:30PM

21   A.  There have been occurrences where we have.  I'm not sure

22   how that happened.  But not for consecutive months, but it

23   might be the third month out.

24   Q.  And when a prisoner is on the target search list they could

25   have their cell searched, correct?                            01:30PM

1    A.   That's correct.

2    Q.   And they could have their person searched, correct?

3    A.   That's correct.

4    Q.   They could be subject is to a strip search?

5    A.   That's correct.                                              01:30PM

6    Q.   Are there written policies that govern the target search

7    list?

8    A.   Well, our policies dictate where it enables us to search

9    particular areas.  We do have policies regarding searches, yes.

10   Q.   Right.  But I'm asking is there a specific policy or any     01:31PM

11   kind of written document that governs the target search list in

12   particular how that list is generated and so on?

13   A.   Not to my knowledge.

14   Q.   So as far as you know, there's nothing written governing

15   this process?                                                     01:31PM

16   A.   No.

17   Q.   So from what you just testified, I gather, to your

18   knowledge, there's no written criteria for how prisoners get

19   placed on the target search list?

20   A.   I don't have any idea what the criteria is.                  01:31PM

21   Q.   We heard testimony earlier today that a prisoner may be

22   placed on the list, for example, for suspicion of gang

23   activity, is that right?

24   A.   That's correct.

25   Q.   For suspicion of drugs?                                      01:31PM

1    A.   Yes.

2    Q.   For suspicion of planning to escape?

3    A.   That's correct.

4    Q.   Any other reasons that you are aware of?

5    A.   Those are pretty good ones.                          01:32PM

6    Q.   Any other that you are aware of?

7    A.   Stolen property might be in their room, narcotics, things

8    of that nature.

9    Q.   Can any ADC custody staff person decide to put a prisoner

10   on the target search list?                                01:32PM

11   A.   No.

12   Q.   Who decides?

13   A.   Usually that comes from one of the supervisors.  It's run

14   up the chain for authorization to make sure it's warranted.

15   Q.   So supervisors meaning what level and above?          01:32PM

16   A.   It could be the officers having knowledge of something

17   going on in a particular cell.  They would contact the sergeant

18   and if the sergeant wasn't available they would contact myself.

19   Q.   So a line officer can place someone on the target search

20   list?                                                      01:32PM

21   A.   No, they cannot place somebody on the target.  They can

22   just give information.  They can't physically write somebody's

23   name down on a target cell search for someone to do.  This

24   would happen in real time and we would have an authorization

25   for the search to commence at that time particular time if it  01:33PM

1    was warranted.  But they would not be writing anybody's name on

2    a list.

3    Q.  If I understand your testimony, you are saying that an

4    officer could make a suggestion that someone be put on the

5    list, is that correct?                                        01:33PM

6    A.  Only if the evidence warranted it or if they had prior

7    knowledge.

8    Q.  Who makes the final decision as to that is on target search

9    list?

10   A.  That could come from the sergeant or myself depending on   01:33PM

11   what information -- when you say placing the name on a list,

12   it's not placing a name on a list to do at a later time.  What

13   we're doing is at that moment and time when the information is

14   coming through, we're targeting the cell at that particular

15   time.                                                          01:33PM

16   Q.  All right.  Let me back up a little bit.  I thought you

17   testified that every month you received from the SSU a target

18   search list?

19   A.  Yes.  That's correct.

20   Q.  So if we're talking about that list, who makes the decision  01:34PM

21   what names go on that list?

22   A.  I don't know.

23   Q.  Lieutenant, can you see if you have Exhibit 5 in that pile

24   in front of you?

25   A.  Okay.                                                      01:34PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1    Q.  Lieutenant, please take a moment and look at that document

2    and let me know when you are ready to answer questions.

3    A.  I'm ready.

4    Q.  Okay.  Have you seen this document before?

5    A.  Yes, I have.                                                      01:34PM

6    Q.  This appears to be some e-mail exchanges dated August 2nd,

7    2017, between you and a person named Crystal Lee and a person

8    named Eoin, E-O-I-N Bailey.  Who are those people?

9    A.  Crystal Lee at that time was my deputy warden and Eoin

10   Bailey is my captain.                                                 01:35PM

11   Q.  Do you remember sending and receiving these e-mails?

12   A.  I do.

13   Q.  Are these among the e-mails that you reviewed for your

14   testimony today?

15   A.  Yes, sir.  This is one of them.                                   01:35PM

16   Q.  Now, the subject of one of these e-mails is I/M Ashworth.

17   That's the Angela Ashworth we have just been discussing, right?

18   A.  I do believe so.

19   Q.  And at the bottom of the first page of Exhibit 5 is an

20   e-mail from you to Ms. Lee and Captain Bailey, correct?                01:35PM

21   A.  That's correct.

22   Q.  Sent at 1:25 p.m. on August 2nd, 2017?

23   A.  That's correct.

24   Q.  Could you please read aloud what you wrote in that e-mail?

25   A.  Yes.  "FYI.  SSU has placed the inmate on my target search        01:35PM

1    list for the month.  Would you like me to proceed with the

2    search or remove her from the list?  The inmate could perceive

3    the search as retaliatory for the lawsuit."

4    Q.  So it sounds like as of August 2nd you were aware that Ms.

5    Ashworth had some involvement with this case, correct?                01:36PM

6    A.  Correct.

7    Q.  And SSU, remind us what that stands for.

8    A.  Special Security Unit.

9    Q.  How many people were placed on the target search list for

10   this month that you are referring to here?                           01:36PM

11   A.  I don't recall exactly, but it was probably 30.

12   Q.  And is 30 just for San Pedro or for the entire Perryville

13   complex?

14   A.  It's for San Pedro.

15   Q.  How many people are on the target search list in an average      01:36PM

16   month?

17   A.  Between 20 and 30.

18   Q.  Who specifically made the decision to place Ms. Ashworth on

19   the target search list?

20   A.  I don't know.                                                    01:36PM

21   Q.  Did you ever try to find out?

22   A.  No, I did not.  I just sent this e-mail.

23   Q.  And in your e-mail, you posed the question, quote, "Would

24   you like for me to proceed with the search or remove her from

25   the list?"  Unquote, correct?                                       01:37PM

 1   A.   That's correct.

 2   Q.   Did either DW Lee or Captain Bailey respond to your

 3   question?

 4   A.   I don't think initially or immediately.  But Deputy Warden

 5   Lee did.                                                            01:37PM

 6   Q.   I'm sorry?

 7   A.   Deputy Warden Lee did.

 8   Q.   Approximately when did she respond?

 9   A.   Well, this is only after I sent a second e-mail telling her

10   that I had removed her from the list, and then she responded       01:37PM

11   back and she responded at 3:07 Wednesday, on August 2nd.

12   Q.   Okay.  Well, let's go in chronological order.  Moving up

13   the page, the next e-mail was sent by you to the same two

14   recipients about half hour later, 2:53 p.m.  Correct?

15   A.   Yes.                                                           01:38PM

16   Q.   Please read aloud what you wrote in that e-mail.

17   A.   "I removed her from the list."

18   Q.   "Her" being Ms. Ashworth?

19   A.   Yes.

20   Q.   And "the list" being the target search list?                  01:38PM

21   A.   Yes, sir.

22   Q.   Now, how did you go about removing Ms. Ashworth from the

23   list?

24   A.   I crossed out her name.  And since I facilitate the

25   searches for that list, it was my decision not to have her cell    01:38PM

1    searched.

2    Q.  So it was simply a matter of physically crossing out her

3    name on the list?

4    A.  That's correct.

5    Q.  Was the fact that you removed her from the list documented          01:38PM

6    in any way other than this e-mail?

7    A.  No, it was not.

8    Q.  Now, you had just e-mailed Deputy Warden Lee and Captain

9    Bailey and you had asked them if you should proceed with the

10   search or remove Ms. Ashworth from the list, correct?                   01:38PM

11   A.  That's correct.

12   Q.  And yet you decided to remove her from the list without

13   waiting for an answer to your question, correct?

14   A.  That is correct.

15   Q.  And why did you do that?                                            01:39PM

16   A.  I felt it was the right thing to do.

17   Q.  Had any decision been made to add Ms. Ashworth to the

18   target search list for some other month in the future?

19   A.  Not to my knowledge.

20   Q.  Was she added for the current month, September?                     01:39PM

21   A.  Not to my knowledge, no.

22   Q.  But you have received the target search list for September,

23   right?

24   A.  The target search list for September, I don't think I had

25   an opportunity to review it.                                           01:39PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1   Q.  But you have received it?

2   A.  I do believe we did.

3   Q.  But you haven't reviewed it?

4   A.  I don't get it personally.  It goes into a book and I have

5   to go retrieve the book.  It's not usually held in my office.    01:39PM

6   I was just trying to recall whether I had a chance to review

7   it, and I don't believe I did.

8   Q.  But you believe it's been received?

9   A.  Yes.

10  Q.  But you haven't reviewed it?                                 01:40PM

11  A.  I have not reviewed it.

12  Q.  Don't you need to review it in order to make sure the

13  searches are conducted?

14  A.  I do that periodically through mid-month to see where they

15  are at.                                                          01:40PM

16  Q.  When was the target search list received?

17  A.  I don't know.  It doesn't come directly to me.  It goes

18  from the designee, the SSU designee to the book.  So I probably

19  check it about the first week of the month to ensure it's there

20  but I don't recall ever checking for September.                  01:40PM

21  Q.  Okay.  So here we are, September 11, so obviously you did

22  not check it during the first week of September.  Is that

23  right?

24  A.  That's correct.  A lot of times it's just delegated to my

25  supervisors and I ensure these are getting done.  So it         01:40PM

UNITED STATES DISTRICT COURT

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1   wouldn't be unusual for me not to review this stuff.

2   Q.  I want to be very clear, Lieutenant, because I thought you

3   testified that you're responsible for making sure the searches

4   are done, correct.

5   A.  That's correct.                                          01:41PM

6   Q.  So in order to do that, don't you have to review the list

7   fairly promptly after you receive it?

8   A.  Well, when I get a chance to I look at the list and see

9   where they are at, ensure my expectations are being met.

10  Q.  But as of today, September 11th, you have not yet reviewed  01:41PM

11  the list for September?

12  A.  No, I have not.

13  Q.  Okay.  Now, I think you testified that sergeants can

14  approve putting someone on the list.  Is that correct?

15  A.  Only if they have reasonable cause to do so.              01:41PM

16  Q.  And who decides if they have reasonable cause to do so?

17  A.  They would do it from the information that's being

18  provided.  But again, they don't put anybody on a list.  This

19  is information coming up off the yard at a specific time

20  regarding an infraction that may have occurred or we have       01:41PM

21  reasonable suspicion or reasonable cause there may be something

22  that we need to go check.

23  Q.  But it sounds like a sergeant could convey information that

24  would lead to someone being placed on the list.  Is that

25  correct?                                                       01:42PM

1    A.  No, they don't convey information to the Special Security

2    Unit to have someone placed on a target list.  If they have

3    reasonable cause to do so they would search the cell

4    immediately for the officer's safety and the safety of the

5    other inmates.                                                    01:42PM

6    Q.  Okay.  Lieutenant, I think I understand your testimony but

7    I want to make a clear differentiation between searches that

8    can be done on an ad hoc basis because an officer or Sergeant

9    believes there's reasonable cause.  That's one thing.  And then

10   the target search list, that's something else, correct?          01:42PM

11   A.  Yes.  To answer your question, nobody has the authorization

12   to place anybody on a target search list but the designee of

13   the SSU unit.

14   Q.  And who are the designees of the SSU unit?

15   A.  My particular unit it's Officer Jardine.  I don't know what  01:42PM

16   his first name is.

17   Q.  And is he the only person who can do that?

18   A.  To my knowledge, yes.

19   Q.  On San Pedro Unit?

20   A.  Yes, sir.                                                     01:43PM

21   Q.  So none of your sergeants have the power to suggest that

22   someone be placed on the target search list?

23   A.  No.

24   Q.  Now, let's go back to Exhibit 5.  We just discussed your

25   e-mail in which you wrote, "I removed her from the list."  And   01:43PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1    then at 3:07 on August 2nd, Crystal Lee responds, quote, "Good

2    call," end quote.  Do you see that?

3    A.  Yes, sir.

4    Q.  Now, you said earlier that you did receive response to your

5    e-mail from Deputy Warden Lee.  Was this e-mail the response    01:43PM

6    you were referring to?

7    A.  She only responded back to me after the second e-mail I

8    sent.

9    Q.  Have you had any other discussion with Ms. Lee about this

10   issue, the issue of Ms. Ashworth being on the target search    01:44PM

11   list, anything other than this e-mail exchange in Exhibit 5?

12   A.  No, I have not.

13   Q.  Other than these e-mail exchanges that we're looking at in

14   Exhibit 5, have you had any other communication with any other

15   person about Ms. Ashworth being on the target search list?  And  01:44PM

16   I mean to include e-mail, telephone, face-to-face, text,

17   anything?

18   A.  Not to my recollection, but I don't believe I did.

19          MR. FATHI:  Your Honor, we move the admission of

20   Exhibit 5.                                                       01:44PM

21          THE COURT:  Any objection?

22          MS. LOVE:  No objection.

23          THE COURT:  5 will be received.

24   BY MR. FATHI:

25   Q.  Lieutenant, could you please pick up Exhibit 6 if you have   01:44PM

1    it before you.

2              THE COURT:  Before you move on to that, could I ask a

3    follow-up question about Exhibit 5?  When I took a look at

4    this, Lieutenant Papworth, and I saw that on August 2nd at 2:25

5    you sent an e-mail directed to Crystal Lee and copied to your          01:45PM

6    Captain Bailey, providing this information and stating, "Would

7    you like for me to proceed with this search or remove her from

8    the list," and then I saw about 20 minutes later there was an

9    e-mail directed to a different directed recipient, and that is

10   it was then to Captain Bailey and copied to Crystal Lee in            01:45PM

11   which you said, "I removed her from the list."

12             It struck me that likely what happened is that there

13   was a phone call or a personal conversation between you and

14   Captain Bailey in which you were reporting to him that you had

15   followed up on what he had given you in response to your             01:45PM

16   request to him, and that is, would you like me to proceed.  It

17   looked to me like he had given an answer that just wasn't

18   recorded in this e-mail.  And Mr. Fathi has just asked whether

19   you had any other communication and you said not that you

20   recall.                                                              01:46PM

21             But I want to make sure of that.  You didn't have any

22   other communication in this 20-minute time period with anybody

23   else who gave you further direction to answer the question?

24   Just to make sure you understand what my position is, it seems

25   off that I would ask a superior of mine, what would you like me      01:46PM

1    to do, and then before I had an answer back from that superior

2    I took the action myself.  That would seem odd to me.

3              THE WITNESS:  Your Honor, I did not completely

4    understand you question.  You have to understand my line of

5    thinking at that particular time when I didn't receive a                    01:46PM

6    response back from the deputy warden I just went ahead and I

7    made the decision to do that, and I went ahead and followed my

8    chain of command which would have been my captain.  I did not

9    receive any kind of phone call or anybody guiding me in that

10   decision.  It was just my thought process, my line of thought             01:46PM

11   at that point.

12             THE COURT:  Thank you.

13   BY MR. FATHI:

14   Q.  In light of Judge Duncan's question, I just want to make

15   sure I understand your testimony.  So other than the e-mails              01:47PM

16   that are reflected in Exhibit 5, you have had no other

17   communication with any other person, with any person, about the

18   issue of Ms. Ashworth being on the target search list.  Is that

19   correct.

20   A.  Not to my recollection, but I don't believe I did.                    01:47PM

21   Q.  All right.  Let's look at Exhibit 6, please.  Actually you

22   can set it down for a moment.  We'll get to it in a minute.

23             Lieutenant, are you familiar with a prisoner named

24   Donna Sheid?

25   A.  She's an inmate that's been assigned to San Pedro Unit,               01:47PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1    yes.

2    Q.  She was Ms. Ashworth's cellmate, correct?

3    A.  I do believe so.

4    Q.  And then Ms. Sheid was moved to a different cell on July

5    19th, correct?                                                    01:47PM

6    A.  I'm not sure of the time.  I wasn't on San Pedro at that

7    particular time.

8    Q.  Are you aware that Ms. Sheid was moved to a different cell

9    on July 19th?

10   A.  From what I understand she was.                               01:48PM

11   Q.  And Ms. Sheid didn't ask to be moved, correct?

12   A.  I have no knowledge of that.

13   Q.  Who made the decision to move Ms. Sheid?

14   A.  I don't know.

15   Q.  Did you have any role in the decision to move Ms. Sheid?      01:48PM

16   A.  No, sir, I did not.

17   Q.  As the Lieutenant for San Pedro Unit, are you notified of

18   all bed moves?

19   A.  No, I am not.

20   Q.  Who is authorized to make a bed move?                         01:48PM

21   A.  That would come -- that's on a daily standard operating

22   procedure that we have that happens during the day when we have

23   releases and incoming inmates that come in.  The accountability

24   officer does a lot of the moves and places the inmate on a

25   daily basis.                                                      01:48PM

1    Q.  Who was the accountability officer at San Pedro July 19th?

2    A.  I don't know.  I wasn't there.

3    Q.  I understand you weren't there.  But you don't know who the

4    accountability officer is?

5    A.  I know who the accountability officer is, but I'm not sure      01:49PM

6    who was there on that particular day.  He may or may not have

7    been there.

8    Q.  How many accountability officers are there at San Pedro

9    Unit?

10   A.  We have one designated but we have several people who work      01:49PM

11   in his capacity if he's not there.

12   Q.  Who is the designated accountability officer?

13   A.  That would be Officer Kay.  I'm not sure what his first

14   name is.

15   Q.  Is anyone besides the accountability officer authorized to      01:49PM

16   make a bed move?

17   A.  Yeah; myself and the captain, CO-4, deputy warden,

18   depending on the circumstances.

19   Q.  But your testimony is you had absolutely no role in the

20   move of Ms. Sheid?                                                  01:49PM

21   A.  No, sir.  I was assigned to another unit at that particular

22   time.

23   Q.  As a normal -- in a normal course of business do you

24   approve all bed moves into or out of San Pedro Unit?

25   A.  No, I do not.                                                   01:50PM

**CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct**

1   Q.  Is there someone who has to approve all bed moves into or

2   out of San Pedro Unit?

3   A.  Well, that would be the accountability officer that does

4   all the moves.  They are all designated from central office and

5   from the program staff.                                          01:50PM

6   Q.  I'm sorry.  Is it your testimony that all moves have to go

7   through central office?

8   A.  Not all moves, no.  Just the designated ones for releases.

9   Q.  So when Ms. Sheid was transferred from one cell to another

10  within the Perryville complex, that would not have had to go     01:50PM

11  through central office?

12  A.  No, sir, it would not have.

13  Q.  About how many bed moves occur in a given month either into

14  or out of San Pedro Unit?

15  A.  It varies.  It could range anywhere from 10 to 30 in a       01:50PM

16  month.

17  Q.  And how often does it happen approximately that a bed move

18  occurs and is then reversed in the next few days?

19  A.  That would be highly unusual.

20  Q.  And you are aware that Ms. Sheid's move was reversed two     01:51PM

21  days after it occurred, correct?

22  A.  I'm only aware after the judge's order to have her removed

23  back, sir.

24  Q.  But as you sit here today, you are aware that that

25  happened?                                                        01:51PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1    A.   I am aware that happened, yes.

2    Q.   And I gather from your testimony that's a highly unusual

3    event?

4    A.   Yes.

5    Q.   Now, would you please look at Exhibit 6.  And it consists    01:51PM

6    of four pages.  So please take your time and look it over and

7    let me know when you are ready to answer questions.

8    A.   Okay.

9    Q.   I'm going to ask you to initially look at the third page

10   which has the number in the lower right-hand corner that ends    01:52PM

11   in a 3.  Are you there?

12   A.   I'm there.

13   Q.   Have you seen this document before?

14   A.   Yes, I have.

15   Q.   And what we have on the lower portion of Page 3, or I guess  01:52PM

16   it's the middle portion of Page 3, this appears to be an e-mail

17   from you to DW Lee written at 8:26 a.m. on July 28th of this

18   year.  Do you remember sending this e-mail?

19   A.   I do.

20   Q.   And would you please read the body of the e-mail out loud?   01:52PM

21   A.   "Donna Sheid, 310573, has been placed in a jumpsuit until

22   August 11th.  I'm not sure who authorized this.  This should be

23   a disciplinary sanction after inmate's due process.  We have

24   circumvented the disciplinary process here and this may become

25   an issue in lieu of what's going on right now.  As a matter of   01:53PM

```
 1   fact, we have approximately 10 inmates who may --
 2              THE COURT:  Just slow down.  Thank you.
 3              THE WITNESS:  Who may or may not have had even a
 4   ticket written before being sanctioned to a jumpsuit.
 5   BY MR. FATHI:                                              01:53PM
 6   Q.  What does it mean for a prisoner to be placed in a
 7   jumpsuit?
 8              MS. LOVE:  Your Honor, for the record we renew our
 9   objection as to relevance and beyond the scope of this
10   retaliation hearing where Inmate Sheid has made no allegations  01:53PM
11   of retaliation with respect to being put in a jumpsuit.
12              THE COURT:  Thank you.  Overruled.
13              THE WITNESS:  Can you ask the question again?
14   BY MR. FATHI:
15   Q.  Sure.  What does it mean for a prisoner to be placed in a  01:53PM
16   jumpsuit?
17   A.  That means they failed to comply with our grooming
18   policies, and they have been sanctioned to wear a jumpsuit
19   which there's only really one way to wear it.
20   Q.  And this is meant to be a sanction or punishment, correct?  01:53PM
21   A.  Well, it's a sanction.
22   Q.  Why was Ms. Sheid placed in a jumpsuit?
23   A.  I don't know.
24   Q.  Did you ever try to find out?
25   A.  No, I did not.                                          01:54PM
```

1   Q.  Now you write in your e-mail, quote, "I'm not sure who

2   authorized this," end of quote.

3           Did you ever find out who authorized putting Ms. Sheid

4   in a jumpsuit?

5   A.  From my understanding this comes out of the shift                     01:54PM

6   commander's office, and I'm not sure which supervisor

7   authorized that.  So to answer your question, no, I never found

8   out who authorized it.  At that particular time we did have a

9   few inmates who were in jumpsuits so.  So I was just expressing

10  my thoughts to my supervisor that I felt we were kind of          01:54PM

11  putting the cart before the horse on this particular situation.

12  Q.  Tell me more about that.

13  A.  Well, I mean, the inmate has a due process, usually the

14  progressive disciplinary is that we verbally reprimand or

15  verbally try to correct the inmate's behavior before issuing      01:55PM

16  disciplinary.  That's the way we usually do that.  If that

17  fails we issue disciplinary.  We let the coordinator work with

18  the inmate at that point, and they are the ones who divvy out

19  the sanctions, whether that be extra duty or loss of privileges

20  or the jumpsuit.  That shouldn't initially come out of our        01:55PM

21  office.  That's what I was expressing.

22  Q.  So as I understand your testimony, the way it's supposed to

23  have happened is the prisoner gets a disciplinary ticket, has a

24  hearing, and then if found guilty, this can be the sanction,

25  correct?                                                          01:55PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1    A.  Well, that's correct, but before that, we try to show some

2    discretion out there and we try to give them verbal directions

3    before we issue disciplinary.  So if they fail to comply with

4    our verbal directives then we go to the disciplinary process.

5    Then we let the process take care of itself.                    01:55PM

6    Q.  And to your knowledge, was that process, the disciplinary

7    process, used in Ms. Sheid's case?

8    A.  I'm not sure.  I wasn't sure if she was issued disciplinary

9    or if she wasn't.

10   Q.  To your knowledge, did she receive any kind of due process   01:56PM

11   before being placed in a jumpsuit?

12   A.  Not to my knowledge.

13   Q.  To your knowledge, did she receive a disciplinary ticket

14   before being placed in a jumpsuit?

15   A.  Not to my knowledge.                                        01:56PM

16   Q.  Then you write in your e-mail, quote, "As a matter of fact,

17   we have approximately 10 inmates in jumpsuits who may or may

18   not have even had a ticket written before being sanctioned to a

19   jumpsuit," end of quote.

20        I'd like you to turn to Page 4, the next page of          01:56PM

21   Exhibit 6.  And there you will see a list of eight prisoners.

22   Do you see that?

23   A.  Yes.

24   Q.  Were any of those prisoners on that list besides Ms. Sheid

25   among the 10 prisoners who you mentioned who were in jumpsuits?  01:56PM

1    A.  I don't recall.

2    Q.  To your knowledge or to your understanding, was the process

3    by which Ms. Sheid was placed in a jumpsuit consistent with ADC

4    disciplinary policy?

5    A.  Not to my knowledge.  I don't know what happened with that.          01:57PM

6    I have no knowledge of it.

7    Q.  I'm sorry.  Is it your testimony that she was placed in a

8    jumpsuit consistent, that the requirements of the ADC policy

9    were met in her case?

10   A.  No.  I'm sorry.  It's my testimony that the inmate had          01:57PM

11   failed to follow the grooming policies, and that's the reason

12   she was placed in a jumpsuit.

13   Q.  Right.  I'm asking you a different question.  I understood

14   your testimony to be that before the prisoner can be placed in

15   a jumpsuit they are supposed to be given a disciplinary ticket,          01:57PM

16   have a due process hearing, and then if they are found guilty

17   they can receive that sanction.  Correct?

18   A.  That's correct.

19   Q.  And my question is, to your knowledge was that process

20   followed in Ms. Sheid's case?          01:57PM

21   A.  Not to my knowledge.

22   Q.  Would you look at the second page of Exhibit 6.  And it

23   appears that what happened here is Deputy Warden Lee forwarded

24   your e-mail to someone named Pedro Rivera.  Who is Mr. Rivera?

25   A.  Mr. Rivera is our disciplinary coordinator at San Pedro.          01:58PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1    Q.  Would you please read what Ms. Lee wrote to Mr. Rivera?

2    A.  She wrote, "Was disciplinary issued?"

3    Q.  And going back to the first page, this appears to be Mr.

4    Rivera's response to Ms. Lee.  Would you please read what

5    Rivera wrote?                                                          01:58PM

6    A.  He wrote, "Good afternoon.  I did not see her on a ticket.

7    Per the captain and Deputy Warden Oros, security places inmate

8    in a jumpsuit for 30 days when they are not in compliance.

9    Approval from the shift commander."

10   Q.  Who is the shift commander?                                        01:59PM

11   A.  Well, I am, and my counterpart on day shift is Lieutenant

12   Jeanne West.  And then my counterpart on night shift is

13   Lieutenant Manzur.  I'm not sure what his first name is.

14   Q.  So there are a total of three shift commanders on San

15   Pedro?                                                                 01:59PM

16   A.  That's correct.

17   Q.  And I believe you testified you did not approve this,

18   correct?

19   A.  That is correct.

20   Q.  So it would have been one of the other two?                        01:59PM

21   A.  I don't know if it was one of them or if it was somebody

22   else.

23   Q.  Well, Mr. Rivera writes, "Approval from the shift

24   commander."

25   A.  That's correct.                                                    01:59PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1  Q.  Now, assuming that that is correct, I believe you testified

2  there are three shift commanders?

3  A.  That's correct.

4  Q.  And you are one of them?

5  A.  That's correct.                                              01:59PM

6  Q.  It was not you?

7  A.  It was not me but if I was to make assumptions, I guess I

8  would assume it was one of them.

9  Q.  Thank you.  At the top of the first page of Exhibit 6 there

10 is an e-mail from Deputy Warden Lee from you to others sent at   02:00PM

11 2:01 p.m. on July 28th.  Do you see that?

12 A.  I do.

13 Q.  Do you remember receiving this e-mail?

14 A.  I do.

15 Q.  Please read it out loud.                                     02:00PM

16 A.  It says, "Per warden, this restriction is lifted."

17 Q.  And the reference to the warden, who did you understand

18 that to be?

19 A.  That would have been Kimberly Currier.

20 Q.  The warden of the Perryville complex?                        02:00PM

21 A.  Yes, sir.

22 Q.  Other than these e-mail exchanges that we see in Exhibit 6,

23 I'm going to ask you the same question again.  Have you had any

24 communication with any other person about Ms. Sheid being

25 placed in a jumpsuit?                                            02:00PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1   A.  No, sir, I did not.

2   Q.  Okay.  One second, please.

3           That's all I have.  Thank you, Lieutenant.

4           THE COURT:  Lieutenant, we're going to give an

5   opportunity for the defendants' counsel to ask you some          02:01PM

6   questions if they have any.  But before that happens, because

7   you have been listed on e-mails that have been admitted into

8   evidence here, and it sounds to me from what I have heard that

9   you have a substantial amount of experience communicating via

10  e-mail, I want you to address something that has become evident  02:01PM

11  to me, and that is something that's hard for me to explain when

12  I see how an e-mail system printout is provided that has what

13  looks to be an erroneous date.

14          So Exhibit 1 I'm showing you, do you see the part I

15  have highlighted there?  It says that this e-mail is sent on     02:01PM

16  Saturday the 21st of July.  And I can tell you for sure that

17  the 21st of July is Friday.  Did you ever see anything like

18  this in any of the e-mails you have ever dealt with, an

19  incorrect date with what appears to be an automatic generated

20  date?                                                            02:02PM

21          THE WITNESS:  Not to my recollection.  I don't recall

22  seeing anything like that.

23          THE COURT:  Okay.  Thank you.  Ms. Love.

24                     CROSS-EXAMINATION

25  BY MS. LOVE:                                                     02:02PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Direct

1   Q.  Lieutenant, as I understand your testimony, SSU generates

2   search lists that may be a target list or may be a random list?

3   A.  That's correct, ma'am.

4   Q.  And the SSU search list, whether it is random or target,

5   that is a list that is generated at the complex level versus at   02:02PM

6   your unit level, is that correct?

7   A.  I do believe so, yes.

8   Q.  Are you provided information from SSU as to why an inmate

9   may be placed on a target search list?

10  A.  No, I am not.   02:02PM

11  Q.  As to questions that you were asked about inmates being

12  placed in jumpsuits, now, the normal uniform of an inmate is a

13  two-piece?

14  A.  T-shirt, pants, shoes, and socks.

15  Q.  And the jumpsuit obviously is a one-piece?   02:03PM

16  A.  Yes.

17  Q.  Does the jumpsuit prevent inmates who have been violating

18  the grooming policy from, for instance, forces them to --

19  there's no shirt to keep tucked in?

20  A.  Yes.  It allows them to be in compliance.   02:03PM

21  Q.  As well as if they are wearing their pants too low, the

22  jumpsuit addresses that issue as well?

23  A.  Yes, it does.

24          MS. LOVE:  No further questions.

25          THE COURT:  Any redirect?   02:03PM

1

2                          REDIRECT EXAMINATION

3    BY MR. FATHI:

4    Q.   Lieutenant, when you receive the target search list, you

5    said it's a list of prisoners, obviously, is that right?          02:04PM

6    A.   That's correct.

7              MS. LOVE:  Your Honor, objection.  Beyond the scope of

8    cross.

9              THE COURT:  I can't tell from that question.

10   Overruled.                                                         02:04PM

11   BY MR. FATHI:

12   Q.   Are you provided, when you receive the target search list,

13   information what to look for when you search these prisoners?

14   A.   No, I am not.

15   Q.   So you have no idea what you are looking for?                 02:04PM

16   A.   Well, yes, my training detects what I'm looking for but I'm

17   not provided with any information on the list.

18   Q.   So with a particular prisoner, you don't know if you are

19   looking for drugs or weapons or escape plans.  None of that

20   information is provided to you?                                    02:04PM

21             MS. LOVE:  Objection, Your Honor.  Beyond the scope of

22   cross.

23             THE COURT:  It is beyond the scope of cross, but it's

24   helpful nevertheless.  Overruled.

25             THE WITNESS:  Can you ask the question again, please?    02:04PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Redirect

1   BY MR. FATHI:

2   Q.  So when you receive the target search list and you have to

3   search these people, you are not given any information with

4   regard to this particular prisoner whether you are looking for

5   drugs or weapons or escape plans, no information at all as to          02:05PM

6   what to look for?

7   A.  That's correct.  We're not given any information.

8          MR. FATHI:  Thank you.

9          THE COURT:  Any recross?

10         MS. LOVE:  No, Your Honor.  Thank you.                           02:05PM

11         THE COURT:  Lieutenant, you are not the first person

12  who has appeared in uniform, but I'm going to ask you this

13  question because I'm still confused about something that I

14  really want to understand.  And that is there seems to be a

15  component of corrections staff who are in uniform that have        02:05PM

16  military kind of demarkations.  You are a lieutenant and others

17  are sergeants.  Then also there's this CO-1, CO-2 and CO-3.  In

18  fact, it sounds like a C0-4 is superior to you.  If you could

19  just give me a handbook on how to understand all this.

20         THE WITNESS:  You want a particular chain of command        02:05PM

21  flow chart, so to speak?

22         THE COURT:  Sure.  How do these two kinds of

23  demarkations exist at the same time and how do they

24  interrelate?

25         THE WITNESS:  Well, it's almost like a parallel            02:06PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Papworth-Redirect

1    universe.  We have the program side of our particular unit on

2    every particular unit, and we have the security side.  We have

3    the program officers that are also considered security staff

4    but they are program staff.  They deal mostly with the inmates'

5    programming and the rec, recreation activities and their                02:06PM

6    release dates or tentative release dates.

7            So the flow chart would be the officers and then it

8    would be the CO-3s and the sergeants.  We're talking pay grade,

9    chain of command.  Then there would be the lieutenants, then --

10   I'm sorry.  I missed the sergeants.  You have the officers, you         02:06PM

11   have the CO-3s and the sergeants, then the lieutenants, the

12   captain and the CO-4 are the same pay grade.  They are kind of

13   at the same level, so to speak.

14           THE COURT:  One is programming and one is security?

15           THE WITNESS:  Yeah.  So they oversee -- the captain            02:07PM

16   oversees more of the security side.  CO-4 oversees the program

17   officers and programming and ensure all of that stuff is

18   getting done, release dates and times.

19           THE COURT:  It's not unusual for the flow of people

20   who become deputy wardens or wardens to come from both of those        02:07PM

21   sides?

22           THE WITNESS:  It's not unusual at all.

23           THE COURT:  Thank you very much.  I have one more

24   thing I wanted to say, simply because you are there and I am

25   here.  And I'm interfering in your life.  I understand that.           02:07PM

1    And it's important for me to have a personal conversation with

2    everybody who comes here, because I want people to understand

3    that this is not my choice to do this.  It is my desire to be

4    as little in your hair as I possibly can.  The problem is that

5    the law requires me to do things under an agreement that was          02:07PM

6    reached between the plaintiffs and the defendants here on how

7    to resolve healthcare issues.  And what that agreement

8    originally contemplated is that everything would be in

9    compliance and there wouldn't be any problem and there wouldn't

10   be any need for a judge to be interfering.                            02:08PM

11        It turns out there has not been that compliance and

12   the stipulation agreement between the parties requires me to

13   then get involved and to try to make sure we get to compliance.

14        In order for me to do that as intelligently as

15   possible, I have to do something that I can't do, and that is          02:08PM

16   get the experience that you and other career officers have

17   about how to be involved in prison management.  I can't get

18   that in a short period of time.  That's a reality.

19        That reality causes me to want to do the next best

20   thing, and that is to make sure information flows into this           02:08PM

21   courtroom as efficiently and truthfully as possible.  And the

22   stipulation contemplates two methods for that to happen at

23   least.  One of the methods is information communicated by the

24   plaintiffs' class to their lawyers then communicated to me, and

25   also in my role as supervising this case, when people testify         02:09PM

1   in that seat that's important, too, to help me understand to

2   try to get to school as quickly as I can to learn as much as I

3   can so I'm not making stupid decisions asking you to do things

4   that make no sense.

5        In order for that information to work people who sit          02:09PM

6   in that chair, whether they are inmates or not, need to

7   understand that they should feel free to tell me the truth.

8   And the problem is that if you have a change in conditions

9   whether it's for an inmate or not, but it's all been inmates in

10  here.  I have not heard about retaliation against anybody other     02:09PM

11  than an inmate.  But if there is retaliation against an inmate

12  that will chill that communication process.  And even though I

13  have heard testimony from people that there was no retaliation

14  on the part of ADOC staff, because of the close proximity in

15  time to actions that were taken to when people were in that        02:10PM

16  chair, they then go back to the yard and something happens they

17  view to be adverse.  Whether or not it is true that it was

18  taken in retaliation, it was viewed by that person as

19  retaliation, but what's worse is it was viewed by others who

20  are in the yard who think, oh, this is what happens when          02:10PM

21  somebody comes to court.

22        And so whether it's true or not, I need to make sure

23  that we don't allow that perception -- when I say "true or

24  not," the retaliation true or not, I need to make sure the

25  perception doesn't exist because the perception in this case is    02:10PM

1   as dangerous to my purposes as the reality.  So that's why I

2   said that you can't take correctional disciplinary action to

3   someone close in time to when they have done something that's

4   part of this information exchange.

5           And I understand that that interferes with your          02:11PM

6   purposes with respect to trying to manage your prison

7   population because I understand that disciplinary actions are

8   necessary sometimes, and that it's also better if they are

9   taken on a consistent basis.  I understand that I'm interfering

10  with that.  But I have competing goals.  And the goal that     02:11PM

11  requires me to do my job here of having that information

12  exchange cannot be achieved if its is in an environment where

13  the free expression of beliefs is chilled.  So I have to take

14  these steps.

15          I wanted you to hear this so you understood it wasn't   02:11PM

16  just a judge flying off doing something because he thought his

17  orders weren't being complied with.  I understand and

18  appreciate that it is complicating to your life.  It's not my

19  preference.  My preference is that these people out here would

20  solve the problem.  They have not solved the problem.  It's up  02:11PM

21  to me to do it and in order for me to do it I have to interfere

22  with your life.  I wanted to explain this to you so that

23  perhaps you could get an understanding of why I do it and

24  maybe, perhaps, an understanding of why it is done.

25          Thank you.                                              02:12PM

```
 1                THE WITNESS:  Thank you.
 2                THE COURT:  You may be excused.  Thank you for coming.
 3                THE WITNESS:  Thank you.
 4                THE COURT:  You may call your next witness.
 5                MR. FATHI:  Thank you, Your Honor.  Plaintiffs call          02:12PM
 6   Crystal Lee.
 7                THE COURT:  Ma'am, would you please step forward to
 8   the clerk of the court here so she can administer the oath.
 9                (The witness was sworn.)
10                THE MAGISTRATE JUDGE CLERK:  Thank you.  Please step        02:12PM
11   to the witness stand.
12                THE COURT:  Good afternoon and welcome.
13                THE WITNESS:  Thank you.
14                          CRYSTAL LEE,
15   a witness herein, having been first duly sworn by the clerk to
16   speak the truth and nothing but the truth, was examined and
17   testified as follows:
18                          DIRECT EXAMINATION
19   BY MS. LEE:
20   Q.  Good afternoon, Ms. Lee.                                             02:13PM
21   A.  Hello.
22   Q.  You might want to pull that microphone a little bit closer
23   just so you can be heard without having to lean into it.
24   A.  Okay.
25   Q.  Would you state your name, please?                                   02:13PM
```

UNITED STATES DISTRICT COURT

1    A.  Crystal Lee.

2    Q.  Ms. Lee, did you review any documents in preparation for

3    your testimony today?

4    A.  I reviewed e-mails that were sent to me.

5    Q.  E-mails sent to you by whom?                                02:13PM

6    A.  By Lieutenant Papworth.

7    Q.  Anyone else?

8    A.  No.  I believe that was it.

9    Q.  And about how many e-mails are we talking about here?

10   A.  Two.                                                         02:13PM

11   Q.  Did you review any other documents in preparation for your

12   testimony today?

13   A.  No.

14   Q.  Did you speak with anyone about your testimony today?

15   A.  Just the attorney.                                          02:14PM

16   Q.  No one else besides the attorneys?

17   A.  No.

18   Q.  All right.  What is your occupation as we sit here today?

19   Because I understand it's recently changed.

20   A.  I'm the deputy warden of compliance at the Perryville       02:14PM

21   Prison.

22   Q.  And how long have you held that position?

23   A.  Since May of this year, May 2015.

24   Q.  May of 2017?

25   A.  17.  Sorry.  Yes.                                           02:14PM

1   Q.  There was some testimony earlier that you were, in July,

2   deputy warden over the San Pedro Unit.  Is that incorrect?

3   A.  That is incorrect.  I was the acting in place of Ms. Oros

4   after she retired.  That would have been August.

5   Q.  All right.  So you have been deputy warden of compliance          02:14PM

6   since May of this year.

7   A.  Uh-huh.

8   Q.  And then what was the period during which you were acting

9   for Ms. Oros?

10  A.  From the beginning of August until last week.                     02:14PM

11  Q.  And you were acting as deputy warden of the San Pedro Unit?

12  A.  Correct.

13  Q.  So you were essentially doing two jobs for that period?

14  A.  Correct.

15  Q.  What are your duties as deputy warden of compliance?              02:15PM

16  A.  I travel around the complex and ensure that the units are

17  following all the policies.

18  Q.  So compliance, I take it, refers to compliance with ADC

19  policies?

20  A.  Correct.                                                          02:15PM

21  Q.  Do you have any role in ensuring compliance with the

22  settlement in this case, the Parsons versus Ryan case?

23  A.  I don't have a direct role in ensuring compliance.

24  Q.  So we're really talking about compliance with ADC policies?

25  A.  Correct.                                                          02:15PM

1    Q.  Does that include the disciplinary policy?

2    A.  Yes.

3    Q.  Does that include policies relating to searches of

4    prisoners?

5    A.  Yes.                                                    02:15PM

6    Q.  Are there any other deputy wardens at Perryville?

7    A.  Yes.

8    Q.  Can you give me their title first?

9    A.  Deputy Warden Kim Johnson.

10            THE COURT:  Was Ms. Rand on the phone?            02:16PM

11            THE MAGISTRATE JUDGE CLERK:  Ms. Rand, are you

12   appearing telephonically now?

13            MS. RAND:  Yes, Your Honor.

14            THE COURT:  We heard some kind of recording.  Was

15   there anybody else on the phone you are aware of?          02:16PM

16            MS. RAND:  I don't know.  It was just asking whether

17   or not we wanted to continue the conference call so I pressed

18   the Number 2 to allow us to continue.

19            THE COURT:  Sorry for the interruption.

20   BY MR. FATHI:                                               02:16PM

21   Q.  Let me rephrase, Ms. Lee.  I'm asking first for the title.

22   You are deputy warden of compliance.  Others are deputy warden

23   for --

24   A.  Of the units.  Each unit has a deputy warden.

25   Q.  And there's eight units, as I recall?                  02:17PM

```
 1    A.   There's seven.

 2    Q.   And there's also a deputy warden of operations, correct?

 3    A.   Correct.

 4    Q.   So there's you, there's the deputy wardens for each unit,

 5    deputy warden for operations.  Are there any other deputy          02:17PM

 6    wardens?

 7    A.   No.

 8    Q.   Do you report directly to Warden Currier?

 9    A.   Yes.

10    Q.   I take it that as deputy warden of compliance your duties      02:17PM

11    are not limited to one particular unit but they encompass all

12    units at Perryville, is that right?

13    A.   Correct.

14    Q.   What's the total prisoner population at Perryville,

15    approximately?                                                      02:17PM

16    A.   I couldn't say.  I'm not sure.

17    Q.   Can you estimate?

18    A.   3500.  I'm not sure really.

19    Q.   Now, I take it you are familiar with a prisoner named

20    Angela Ashworth, correct?                                          02:17PM

21    A.   Yes.  I have met Ms. Ashworth.

22    Q.   How did you come to know her?

23    A.   The first time I have ever encountered Ms. Ashworth is when

24    she came back.  I was in the office when she received her

25    property.                                                          02:18PM
```

1   Q.  I'm sorry.  I didn't hear you.

2   A.  When she came back from a court hearing I was in the office

3   as she received her property.  That's when I first met her.

4   Q.  So you are aware that Ms. Ashworth testified in this case

5   on July 14th, correct?                                          02:18PM

6   A.  Yeah.  Not until that date, but yes.

7   Q.  So that was the first time, to your knowledge, you had met

8   Ms. Ashworth?

9   A.  Yes.

10  Q.  And I take it you are also aware that Judge Duncan has       02:18PM

11  issued an order that there be no retaliation against any

12  prisoner who provides information to the Court in this case?

13  A.  Yes.

14  Q.  You are aware of that?

15  A.  Yes.                                                         02:18PM

16  Q.  Are you familiar with something called a target search

17  list?

18  A.  A search list by the Special Security Unit.

19  Q.  Well, the title we have been given is target search list.

20  Is that what you are saying it is?                              02:19PM

21  A.  I don't know that there's really a title, but yes, targeted

22  list.

23  Q.  What is your understanding of what the target search list

24  is?

25  A.  A targeted search list is put together by the special       02:19PM

1    security officers based on information they have that might

2    lead us to believe that an inmate could be compromising

3    security somehow or in some way might be planning to.

4    Q.  And as deputy warden of compliance what are your duties

5    with regard to the target search list.                    02:19PM

6    A.  I have none.

7    Q.  Are you notified of who is on the target search list for

8    each unit for a given month?

9    A.  No, I am not.

10   Q.  Do you have any role in deciding who is on the list?    02:19PM

11   A.  No, I am not.  I do not.

12   Q.  Who decides who is on the target search list?

13   A.  The special security officers and unit supervisor.

14   Q.  Who is the supervisor of the SSU officers?

15   A.  Sergeant Mendez.                                        02:20PM

16   Q.  Is it possible for other staff to essentially suggest

17   someone for the target search list to say to the SSU officers,

18   we think you should put this person on the list?

19   A.  Staff members report to SSU information that they have and

20   SSU makes that determination whether or not they need to     02:20PM

21   further investigate it.

22   Q.  So it's possible for any officer to provide information to

23   SSU that they believe a certain prisoner might need to be

24   searched, correct?

25   A.  Yes.                                                    02:20PM

1   Q.  And what does it mean if a prisoner is placed on the target

2   search list?  What does that mean for the prisoner's life?

3   A.  Targeted search list, it can mean that they are going to

4   get a urinalysis.  It can mean we can also look at their mail a

5   little closer.                                              02:21PM

6   Q.  And it could also involve searches of their cell, right?

7   A.  Yes.

8   Q.  And it could also involve strip searches, correct?

9   A.  Correct.

10  Q.  For how long can a prisoner be on the target search list?  02:21PM

11  Are you just on the list for a month or can you be on for

12  longer than a month?

13  A.  I don't know.

14  Q.  Are there written policies that govern the target search

15  list?                                                       02:21PM

16  A.  Not that I'm aware of.  I don't know.

17  Q.  You are not aware of any written policies?

18  A.  I'm new to this position.  That's not one I have read yet.

19  Q.  Are you aware of any written criteria for what kinds of

20  reasons people would be placed on the target search list?    02:21PM

21  A.  No.

22  Q.  Ms. Lee, you should have before you Exhibit 5.  Would you

23  please see if you can find that.  Do you have it?

24  A.  Yes.

25  Q.  Would you take a look at it and let me know when you are  02:22PM

UNITED STATES DISTRICT COURT

1    ready to answer questions?

2    A.   Okay.

3    Q.   Have you seen this document before?

4    A.   Yes.

5    Q.   Is this one of the e-mails that you reviewed in preparation    02:22PM

6    for today?

7    A.   Yes.

8    Q.   So this appears to be some e-mail exchanges dated August

9    2nd of 2017 between you and Chris Papworth and Eoin Bailey.

10   Who are those people?                                              02:22PM

11   A.   Eoin Bailey is the captain of San Pedro Unit.  Chris

12   Papworth is the lieutenant on swing shift at San Pedro Unit.

13   Q.   Are those people under your supervision?

14   A.   While I was acting deputy, yes.

15   Q.   Were you the acting deputy on August 2nd?                     02:22PM

16   A.   Yes.

17   Q.   So at that time they were under your supervision?

18   A.   Yes.

19   Q.   Are they under your supervision today?

20   A.   No.                                                          02:23PM

21   Q.   Do you remember sending and receiving these e-mails?

22   A.   I don't remember sending the e-mails.  I send lots of

23   e-mails.

24   Q.   Do you have any reason to doubt that you sent and received

25   these e-mails?                                                    02:23PM

1    A.   No.

2    Q.   Now, the subject line is I/M Ashworth.  Do you see that?

3    A.   Yes.

4    Q.   That's the Angela Ashworth we have been discussing,

5    correct?                                                          02:23PM

6    A.   Correct.

7    Q.   And at the bottom of the page is an e-mail from Chris

8    Papworth to you and to Captain Bailey sent at 2:25 p.m. on

9    August 2nd, correct?

10   A.   Correct.                                                     02:23PM

11   Q.   Could you please read aloud what Lieutenant Papworth wrote?

12   A.   "FYI.  SSU has placed this inmate on my target search list

13   for the month.  Would you like for me to proceed with this

14   search or remove her from the list?  This inmate could perceive

15   the search as retaliatory for the lawsuit."                      02:23PM

16   Q.   Thank you.  How many people were on the target search list

17   for this month?

18   A.   I don't know.

19   Q.   How many people are on the target search list in an average

20   month?                                                           02:24PM

21   A.   I don't know.

22   Q.   Who specifically placed Ms. Ashworth on the target search

23   list?

24   A.   I don't know.

25   Q.   Have you ever tried to find out?                            02:24PM

1    A.   No.

2    Q.   Why was Ms. Ashworth placed on the target search list?

3    A.   I don't know.

4    Q.   Did you ever try to find out?

5    A.   No.                                                          02:24PM

6    Q.   Now, Lieutenant Papworth asked you in this e-mail, quote,

7    "Would you like for me to proceed with this search or remove

8    her from the list," correct?

9    A.   Correct.

10   Q.   And what did you do when you received that e-mail from     02:24PM

11   Lieutenant Papworth?

12   A.   I responded -- oh, after he sent another e-mail that he had

13   removed her from the list I responded, "Good call."

14   Q.   Did you receive the 2:25 -- let me ask it a different way.

15   Did you see the 2:25 p.m. e-mail before he sent the 2:53 p.m.   02:24PM

16   e-mail, or did you see them both at the same time?

17   A.   I saw them both at the same time.

18   Q.   And is there a reason that you did not respond to the 2:25

19   p.m. e-mail?

20   A.   I just hadn't seen it yet.                                  02:25PM

21   Q.   So walk me through the steps through which Ms. Ashworth was

22   removed from the target search list.

23   A.   I don't have that information.

24   Q.   Did you document her removal in any way other than this

25   e-mail that we're looking at?                                   02:25PM

1   A.  No, just this e-mail.

2   Q.  Did you ever verify that Ms. Ashworth had actually been

3   removed from the target search list?

4   A.  No, I did not.

5   Q.  Now, at this time you knew, by August 2nd you knew that Ms.      02:25PM

6   Ashworth had testified in this courtroom, correct?

7   A.  Correct.

8   Q.  And you knew Judge Duncan ordered no retaliation against

9   anyone who testified in this courtroom, correct?

10  A.  Correct.                                                          02:26PM

11  Q.  Now, as you said, at 2:53 p.m., Lieutenant Papworth

12  e-mailed you again and he wrote, quote, "I removed her from the

13  list," end quote, correct?

14  A.  Correct.

15  Q.  Now, Lieutenant Papworth had just asked if he should        02:26PM

16  proceed with the search or remove Ms. Ashworth from the list,

17  correct?

18  A.  Correct.

19  Q.  And you hadn't responded because you hadn't seen his

20  e-mail?                                                              02:26PM

21  A.  Correct.

22  Q.  And yet he went ahead and removed her without waiting from

23  a response from you, correct?

24  A.  Correct.

25  Q.  Was that appropriate for him to do that?                         02:26PM

UNITED STATES DISTRICT COURT

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Lee-Direct

1    A.  Yes, it was.

2    Q.  And in response to Lieutenant Papworth's e-mail you wrote,

3    quote, "good call," end quote, correct?

4    A.  Correct.

5    Q.  What did you mean by that?                              02:26PM

6    A.  I meant that was a good decision.

7    Q.  Has there been any decision to add Ms. Ashworth to the

8    target search list for the month of August?

9    A.  No.  Not that I'm not aware.

10   Q.  Would you be aware of it if it had happened?            02:27PM

11   A.  No.

12   Q.  Other than these e-mail exchanges have you had any other

13   communication with anyone about Ms. Ashworth being on the

14   target search list?  By that I mean to include e-mails,

15   telephone, in person, text, any communication of any nature?  02:27PM

16   A.  No.

17   Q.  Did you tell Warden Currier that Ms. Ashworth had been

18   placed on the target search list?

19   A.  No, I did not.

20   Q.  Did you think that was something Warden Currier would want  02:27PM

21   to know?

22   A.  I didn't find a reason for her to know.

23   Q.  Let's look at Exhibit 6, which you also should have before

24   you.  Again, please take your time and let me know when you are

25   ready to answer questions.                                 02:28PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Lee-Direct

1   A.   Okay.

2   Q.   Let's start on the third page of the e-mail, which has a

3   .0003 in the lower right-hand corner.  Do you see that?

4   A.   Uh-huh.

5   Q.   So what we have on the bottom of that page is a July 27          02:28PM

6   e-mail from Warden Currier to a number of people, including

7   you, correct?

8   A.   Correct.

9   Q.   Do you recall receiving this e-mail?

10  A.   Yes.                                                             02:28PM

11  Q.   And Warden Currier writes, quote, "I need to know daily if

12  there are any issues with anything regarding the below listed

13  inmates."

14          Do you see that?

15  A.   Yes.                                                             02:29PM

16  Q.   And then running onto the next page she writes, "I even

17  want to know if they receive any disciplinary for any reason,"

18  end of quote.  Do you see that?

19  A.   Yes.

20  Q.   She goes on, quote, "Ensure you have them identified in        02:29PM

21  some way and ensure your supervisors know to advise you of

22  anything that occurs with these inmates," end of quote.  Do you

23  see that?

24  A.   Yes.

25  Q.   Ms. Ashworth is listed as one of those inmates, correct?       02:29PM

 1   A.  Correct.

 2   Q.  But you didn't think it was important to tell Warden

 3   Currier Ms. Ashworth had been placed on the targeted search

 4   list?

 5   A.  That e-mail was sent on the 27th.  Because she had been          02:29PM

 6   taken off the list and nothing happened, so there was nothing

 7   to advise Ms. Currier of.

 8   Q.  Now, you are familiar with a prisoner named Donna Sheid,

 9   correct?

10   A.  By name, yes.                                                    02:30PM

11   Q.  Have you ever met Ms. Sheid?

12   A.  Not that I know of.  I may have encountered her.  I don't

13   know her.  I have never introduced myself to her.

14   Q.  Now, Ms. Sheid was Ms. Ashworth's cellmate, correct?

15   A.  Correct.                                                        02:30PM

16   Q.  And Ms. Sheid was moved to a different cell on July 19,

17   correct?

18   A.  Correct.

19   Q.  Ms. Sheid didn't ask for that move, correct?

20   A.  As far as I know.                                               02:30PM

21   Q.  Who made the decision to move her?

22   A.  The decision was made by the movement officer after

23   consulting with the deputy warden at that time.

24   Q.  And who was the deputy warden at that time?

25   A.  Liz Oros.                                                       02:30PM

1    Q.   Did you have any role in the decision to move Ms. Sheid?

2    A.   I did not.

3    Q.   Would you please look again at Exhibit 6.

4    A.   Okay.

5    Q.   And again, we're going to start on the third page.  Do you          02:30PM

6    have it?

7    A.   Yes.

8    Q.   Okay.  On the third page about halfway down, two-thirds of

9    the way down, there's an e-mail to you from a number of people,

10   including Lieutenant Papworth, sent on July 28th, 2017 at 8:15          02:31PM

11   a.m.

12          Do you see that?

13   A.   Yes.

14   Q.   Do you remember sending that e-mail?

15   A.   Yes.                                                                02:31PM

16   Q.   Could you please read aloud the body of your e-mail, just

17   that one sentence?

18   A.   "Reply that you read and understand the below directive."

19   Q.   And the below directive is the e-mail from Warden Currier

20   that we just discussed, correct?                                        02:31PM

21   A.   Yes.

22   Q.   So why did you send this e-mail?

23   A.   Because it was said to notify our supervisors and those

24   were all the supervisors of San Pedro Unit.

25   Q.   Would you turn back to the fourth page, please.                    02:31PM

1    A.   Okay.

2    Q.   In the first full paragraph of Warden Currier's e-mail she

3    writes, quote, "It seems like we have a problem discussing

4    things with inmates that we should not be discussing with

5    them," end of quote.  Do you see that?                              02:32PM

6    A.   Yes.

7    Q.   What did Warden Currier mean by that?

8    A.   I don't know.

9    Q.   Did you ask her?

10   A.   No.                                                            02:32PM

11   Q.   You didn't think it was important to know what the warden

12   meant by that?

13   A.   No.

14   Q.   All right.  Back to Page 3 of Exhibit 6, a little bit

15   higher up on the page it's an e-mail sent from Lieutenant          02:32PM

16   Papworth to you at 8:26 a.m. on July 28th.

17        Do you remember receiving that e-mail?

18   A.   Yes.

19   Q.   Could you please read the body of Lieutenant Papworth's

20   e-mail.                                                             02:32PM

21   A.   "Donna Sheid, 310573, has been placed into -- or in a

22   jumpsuit until August 11th.  I'm not sure who authorized this.

23   This should be a disciplinary sanction after the inmate's due

24   process.  We have circumvented the disciplinary process here

25   and this may become an issue in lieu of what's going on right     02:32PM

1    now.  As a matter of fact, we have approximately 10 inmates in

2    jumpsuits who may or may not have been given a ticket written

3    before the sanction to jumpsuit."

4    Q.  Now, it appears that Lieutenant Papworth was responding to

5    your e-mail sent earlier that day at 8:15 a.m.  Would you agree    02:33PM

6    with that?

7    A.  Yes.

8          MS. LOVE:  Your Honor, continuing objection to line of

9    questioning regarding Inmate Sheid.  Exceeds the scope of

10   Plaintiffs' notice of allegations of retaliation by inmates       02:33PM

11   Ashworth and Oyenik only.  This inmate has never made any

12   allegations of being retaliated against by being placed in a

13   jumpsuit.

14         THE COURT:  Thank you.  Overruled.

15   BY MR. FATHI:                                                      02:33PM

16   Q.  You received a response to your 8:15 a.m. e-mail to

17   Lieutenant Papworth.  Did you ever receive any other response

18   to your e-mail pertaining to these eight women Warden Currier

19   had listed?

20   A.  I don't recall, but if I did, it's I read, I understand,      02:33PM

21   and they just sent it back that they read the e-mail.  But I

22   don't remember who all responded.

23   Q.  So to the best of your recollection, you don't recall

24   receiving any other substantive response other than this one

25   from Lieutenant Papworth?                                         02:34PM

1    A.  Correct.

2    Q.  What does it mean for a prisoner to be placed in a

3    jumpsuit?

4    A.  Given a jumpsuit to wear.

5    Q.  Instead of the usual uniform, correct?                    02:34PM

6    A.  Correct.

7    Q.  Are there written policies that govern when and why a

8    prisoner can be put in the jumpsuit?

9    A.  None that I could quote you right now.

10   Q.  Are you aware of any written policies?                    02:34PM

11   A.  No.

12   Q.  Placing a prisoner in a jumpsuit is meant to be a

13   disciplinary sanction, correct?

14   A.  Correct.

15   Q.  Who has the power to authorize placing a prisoner in a    02:34PM

16   jumpsuit?

17   A.  I don't know.

18   Q.  Can any officer do it?

19   A.  I don't know.

20   Q.  Why was Ms. Sheid placed in a jumpsuit?                   02:35PM

21   A.  I don't know.

22   Q.  Did you ever try to find out?

23   A.  No, I did not.

24   Q.  Lieutenant Papworth writes in his e-mail, quote, "I'm not

25   sure who authorized this," end of quote.  Who authorized     02:35PM

1   putting Ms. Sheid in a jumpsuit?

2   A.   I don't know.

3   Q.   Did you ever try to find out?

4   A.   No.

5   Q.   Lieutenant Papworth also writes in his e-mail, quote, "This   02:35PM

6   should be a disciplinary sanction after the inmate's due

7   process," end of quote.

8        To your knowledge, did Ms. Sheid receive any kind of

9   due process before she was put in the jumpsuit?

10  A.   According to the rest of the e-mail, no.   02:35PM

11  Q.   And Lieutenant Papworth goes on, quote, "As a matter of

12  fact, we have approximately 10 inmates in jumpsuits who may or

13  may not have had even a ticket written before being sanctioned

14  to a jumpsuit," end of quote.

15       Is Lieutenant Papworth's statement correct?   02:36PM

16  A.   Yes.  There were more than one inmate.

17  Q.   When you found that out, did that concern you?

18  A.   Yes, because I needed to decide whether or not they had

19  disciplinary.

20  Q.   First of all, how many prisoners in jumpsuits were there?   02:36PM

21  A.   I don't know.

22  Q.   Well, Lieutenant Papworth says approximately 10.  Was it

23  approximately 10?

24  A.   I would believe that, yes.

25  Q.   So what did you do after you received this statement from   02:36PM

1    Lieutenant Papworth about these approximately 10 prisoners in

2    jumpsuits?

3    A.   I verified whether or not the disciplinary had been

4    written.

5    Q.   And how did you do that?                                      02:36PM

6    A.   I asked the disciplinary coordinator.

7    Q.   Did you do that in an e-mail or face-to-face?

8    A.   I believe it was in an e-mail.

9    Q.   On the second page of Exhibit 6 there's an e-mail from you

10   to Pedro Rivera at 1:49 p.m. on July 28th.  Is that the e-mail   02:36PM

11   you are referring to?

12   A.   Yes.

13   Q.   And then on the first page of Exhibit 6, Mr. Rivera

14   responds at 1:58 p.m. on the same day.  Could you read the

15   first line of his response, please?                              02:37PM

16   A.   "Good afternoon.  I did not see her on a ticket."

17   Q.   So it seems like Mr. Rivera interpreted you only to be

18   asking about Ms. Sheid, is that correct?

19   A.   Correct.

20   Q.   So how did you find out about those other nine or 10        02:37PM

21   prisoners who are in jumpsuits?

22   A.   I believe I asked verbally if any of them had disciplinary

23   on a different time.

24   Q.   What answer did you receive?

25   A.   None of them had disciplinary.                              02:37PM

UNITED STATES DISTRICT COURT

1   Q.  What did you do when you found that out?

2   A.  I immediately told them to give them their clothing back

3   and in the future they would have to go through disciplinary

4   first.

5   Q.  So I take it that you are concluding Ms. Sheid did not          02:38PM

6   receive a disciplinary ticket before she was placed in a

7   jumpsuit?

8   A.  Correct.

9   Q.  Was the process by which Ms. Sheid was placed in a jumpsuit

10  consistent with ADC policy?                                        02:38PM

11  A.  She did not go through disciplinary, so no.

12  Q.  Did you notify Warden Currier about this situation?

13  A.  I don't recall if I did or not.

14  Q.  Would you look at the last page of Exhibit 6.  Ms. Sheid is

15  one of the prisoners about whom Warden Currier asked to be         02:38PM

16  notified if anything happened, correct?

17  A.  Uh-huh.  Yes.

18  Q.  But you don't recall if you let Warden Currier know about

19  Ms. Sheid being placed in the jumpsuit?

20  A.  The e-mail indicates I did.  I did call her or talk to her     02:38PM

21  and that's when she said --

22  Q.  Well, let's get to that.  First page of Exhibit 6, 7-28-17

23  at 1:58 p.m., you get the response from Mr. Rivera, correct?

24  A.  Correct.

25  Q.  Who is Mr. Rivera, by the way?                                 02:39PM

1    A.   Disciplinary coordinator of San Pedro.

2    Q.   And three minutes later you write, quote, "Per warden, this

3    restriction is lifted," end of quote, correct?

4    A.   Correct.

5    Q.   So what happened in those three minutes?                    02:39PM

6    A.   I would have called her.

7    Q.   Is that your surmise, or is that your recollection?

8    A.   It was actually my recollection.  I do remember asking

9    about it or notifying her of it.

10   Q.   So you called her on the phone?                             02:39PM

11   A.   Yes.

12   Q.   And what was the conversation?

13   A.   I don't recall the exact conversation, just the information

14   that was provided in the e-mail.

15   Q.   And what did she say?                                       02:39PM

16   A.   I asked her if she would like me to lift that restriction,

17   and she said yes.

18   Q.   Well, Mr. Rivera is speaking only about Ms. Ashworth,

19   right?

20   A.   Correct.                                                    02:40PM

21   Q.   Because he says, "I did not see her on a ticket," correct?

22   A.   Correct.

23   Q.   And you write back, "Per warden, this restrictions is

24   lifted"?

25   A.   Correct.                                                    02:40PM

1   Q.  So you were only talking about Ms. Sheid?

2   A.  I was in this e-mail, yes.

3   Q.  So did you ever take any steps to make sure all the other

4   prisoners in jumpsuits were removed from jumpsuit status?

5   A.  Yes, I did.                                                02:40PM

6   Q.  And when did you do that?

7   A.  I directed the captain verbally to ensure that his staff

8   put those inmates back in their clothing and issue out the

9   means by which they would possibly get a jumpsuit later, that's

10  through disciplinary only.                                     02:40PM

11  Q.  And when did that conversation happen?

12  A.  I'm not sure.  I don't recall.

13  Q.  Well, approximately.  This e-mail exchange is on July 28th.

14  Was it after that?

15  A.  Same day, next day.  Very close in proximity.              02:40PM

16  Q.  Did Ms. Sheid ever receive an apology for being placed in

17  the jumpsuit?

18  A.  Not that I recall.

19  Q.  Did Ms. Sheid ever receive any acknowledgment that she had

20  been treated in a way that was inconsistent with ADC policy?   02:41PM

21  A.  Not that I'm aware.

22  Q.  Was there any disciplinary or corrective action taken with

23  respect to the persons who placed Ms. Sheid in the jumpsuit?

24  A.  No.  Not that I know of.

25  Q.  Was any sort of administrative investigation done into the 02:41PM

UNITED STATES DISTRICT COURT

1   circumstances of how and why Ms. Sheid was placed in the

2   jumpsuit?

3   A.  No.

4   Q.  Other than these e-mail exchanges in Exhibit 6 and the

5   conversations that you have testified to, have you had any          02:41PM

6   other communication with anyone about Ms. Sheid and these other

7   prisoners being placed in a jumpsuit?

8   A.  Not that I can recall.

9   Q.  Are you aware of the jumpsuit sanction being used at other

10  yards at Perryville besides San Pedro?                              02:42PM

11  A.  No.

12  Q.  Now, you testified that your duties as deputy warden of

13  compliance encompass all units, correct?

14  A.  Correct.

15  Q.  So you are responsible for knowing what goes on and for the     02:42PM

16  compliance with ADC policy in all units, correct?

17  A.  I'm responsible for viewing and reporting the compliance so

18  they can fix it if it's not in compliance.

19  Q.  So you are responsible for ensuring compliance with ADC

20  policy --                                                           02:42PM

21  A.  Yes.

22  Q.  -- in all units?

23  A.  Yes.

24  Q.  Correct?

25  A.  Yes.                                                            02:42PM

1    Q.  Has San Pedro staff been directed in writing to stop

2    placing people in jumpsuits without any disciplinary process?

3    A.  None that I have received.

4    Q.  Have you initiated such notification?

5    A.  I don't believe I have.                                    02:42PM

6    Q.  Why not?

7    A.  Because I gave it to the captain, the chief of security and

8    he was addressing his staff.

9    Q.  And did the captain or chief of security issue a written

10   notification that this policy was to stop?                     02:43PM

11   A.  If he did I did not receive a carbon copy of it or

12   anything.

13   Q.  Does that not seem like an important thing to do to ensure

14   that these violations do not happen again?

15   A.  It would be better for him to include me, yes.             02:43PM

16   Q.  That's all I have.  Thank you very much.

17            THE COURT:  Thank you.  Ms. Love.

18                      CROSS-EXAMINATION

19   BY MS. LOVE:

20   Q.  Deputy Warden, do you have any information that Inmate      02:43PM

21   Ashworth was placed on an SSU target search list because she

22   had testified in this Parsons versus Ryan case?

23   A.  No.

24   Q.  And she indeed was taken off the list?

25   A.  She was taken off the list.                                02:43PM

```
 1    Q.  And therefore she was not searched, correct?

 2    A.  Correct.

 3    Q.  You have worked at complexes other than Perryville,

 4    correct?

 5    A.  Correct.                                              02:43PM

 6    Q.  Including Lewis complex?

 7    A.  Lewis complex, yes.

 8    Q.  Other complexes?

 9    A.  No, just Lewis.

10    Q.  Just Perryville and Lewis?  That's a yes?            02:44PM

11    A.  Yes.

12    Q.  Are inmates, based upon your experience with ADC at these

13    two complexes, ever placed in jumpsuits because they are on

14    transport?

15    A.  Yes.                                                  02:44PM

16    Q.  Are inmates in restrictive housing placed in jumpsuits?

17    A.  Yes.

18    Q.  So there's other inmates within the system who wear

19    jumpsuits?

20    A.  Yes.                                                  02:44PM

21    Q.  From time to time?

22    A.  Yes.

23    Q.  No other questions.

24         THE COURT:  I have a question about just trying to

25    understand the e-mails.  We have seen that your name is on a  02:44PM
```

UNITED STATES DISTRICT COURT

 1   number of e-mails, so I gather this is a frequent part of your

 2   life at work.

 3           THE WITNESS:  Yes.

 4           THE COURT:  I'm showing you what has been admitted as

 5   Exhibit 1, and there's a highlighted portion of it that I just    02:44PM

 6   want you to focus on.  It says Saturday, July 21st, 2017.  And

 7   I can tell you for sure that July 21st is not a Saturday.  It's

 8   a Friday.  Have you ever seen some kind of inconsistency like

 9   this on an e-mail before?

10           THE WITNESS:  No.                                         02:45PM

11           THE COURT:  Do you have any idea how something like

12   this would happen?

13           THE WITNESS:  IT, computer glitch.  No idea.

14           THE COURT:  Just a glitch as far as you would know?

15           THE WITNESS:  Yeah.                                       02:45PM

16           THE COURT:  The last thing I need to say to you is

17   because you have suffered the inconvenience of coming to

18   court --

19           MR. FATHI:  Excuse me, Your Honor.  I have very brief

20   redirect.                                                         02:45PM

21           THE COURT:  You may.  I'm sorry.

22           MR. FATHI:  I'm sorry.  Literally two questions.

23   Maybe four questions.

24                       REDIRECT EXAMINATION

25   BY MR. FATHI:                                                     02:45PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Lee-Cross

1   Q.  Was Ms. Sheid being transported when she was put in the

2   jumpsuit?

3   A.  No.

4   Q.  Were any of the other prisoners who were put in the

5   jumpsuit being transported?                                  02:45PM

6   A.  No.

7   Q.  Was Ms. Sheid housed in maximum custody when she was put in

8   the jumpsuit?

9   A.  No.

10  Q.  Were any of the other prisoners who were put in the        02:45PM

11  jumpsuit housed in maximum custody?

12  A.  No.

13  Q.  Thank you.

14          THE COURT:  Thank you.  And I'm sorry for not giving

15  you that opportunity.                                         02:46PM

16          So I have been the reason that you have had to leave

17  your place of work and come here, and I have to explain to you

18  why that is in hopes that you, perhaps, understand that maybe

19  there's a purpose for it.  And the reason that I'm interfering

20  with your life, and I don't do so without a great deal of      02:46PM

21  reservation, because I know that I cannot make good decisions

22  that are fully informed about the prison as well as somebody

23  who works there and has worked there for a lot of years.  So I

24  understand that.

25          But I also understand that I'm interfering in making   02:46PM

UNITED STATES DISTRICT COURT

 1    decisions that are affecting how you do things there.  I want

 2    you to at least understand what my perspective is.  The parties

 3    here, the plaintiffs and the defendants, reached an agreement

 4    to resolve a lawsuit.  And they decided to do that willingly.

 5    Both of them agreed to settle the lawsuit.  And the lawsuit      02:47PM

 6    provided for certain performance measures for healthcare and

 7    maximum custody issues to be met.

 8            The stipulation that was the settlement of the

 9    lawsuit, the agreement that bound the parties, provided for

10    this to happen.  But it also contained a power in it to address  02:47PM

11    the situation if it should happen that these performance

12    measures were not satisfied.  They were not complied with.

13    That mechanism is me, the Court.  I am supposed to try to come

14    up with a way to accomplish what the parties agreed to

15    accomplish.  When I say "parties" here it's the defendants who   02:47PM

16    haven't complied and met this performance measure.  So it's the

17    Department of Corrections healthcare provisions that are really

18    the focus here.  And I have been trying to work to try to get

19    those issues in compliance.

20            In order for me to do that, I have to make decisions      02:47PM

21    that I have already said interfered with how you do things and

22    may be somewhat uninformed.  That's a fact.  I cannot fix that.

23    I cannot have in my head automatically the experience you have

24    in your head, the experience of all the people who devote their

25    lives to this profession.  Can't do that.  But the parties have  02:48PM

1    agreed to put this decision-making power in my hands.  So given

2    that I understand I have this limitation on experience and

3    knowledge, the next best thing is for me to make sure that

4    there are open pipelines of that information coming to me.  And

5    it happens in a couple of ways.  It happens in the plaintiffs'          02:48PM

6    class, the inmates talking to their lawyers; it happens when

7    the inmates and people like you come and sit in that chair and

8    you tell me what happens.

9           In order for that to happen in a way that is most

10   successful and, in fact, probably the only way that it can              02:48PM

11   happen, is if people understand that there will be no adverse

12   consequences flowing from telling me the truth about what

13   happened.  And so that's why this retaliation issue is a big

14   one for me.  And it's important, I think, for you to understand

15   it's not simply limited to whether or not retaliation actually          02:49PM

16   occurred, because people have sat in that chair throughout

17   today and told me I took no retaliatory steps.  And I believe

18   them, what I have heard.  I don't believe that people who

19   testified here today were just trying to tell me things.  In

20   fact, there are some things that make me think there were               02:49PM

21   efforts to try to make sure there was compliance.  There were

22   your e-mails focused on this.  There were e-mails from the

23   warden focused on this saying this is what the judge said and

24   this is what you have to do.  So those are good things.

25          The problem is, in this case, adverse consequences              02:49PM

1    came to people close in time to when they had sat in that chair

2    or they had provided information to the lawyers or to the

3    Court.  What happens then is the people themselves perceive

4    that they have been retaliated against and the other people on

5    the yard perceive that they have been retaliated against.  So          02:50PM

6    it doesn't really matter whether it's true or not that there

7    was a retaliatory purpose.  There is a perception of

8    retaliation.  And actually, that can be as poisonous to my

9    process as actual retaliation.  So I need to shut it down.  I

10   need to make sure that it doesn't happen.                              02:50PM

11          Now, there are consequences of this.  I understand

12   that I, again, am interfering with your professional purposes

13   and your best judgment about how to do things when I intercede,

14   when I say a decision has been made that this person should be

15   relocated and when I say it's close in time to when somebody          02:50PM

16   testified, I have to undo that to make sure no one on the yard

17   perceives that it's a retaliatory consequence because the

18   perception is as dangerous.  So I need to make sure there's

19   almost like a get out of jail free card for people who commit a

20   violation.                                                            02:51PM

21          And I did that just about a year ago when people were

22   given tickets for having their shirttails out close in time

23   that it was reported to me they talked to the lawyers.  I said

24   you have to find another time, not close in time, to decide to

25   enforce that rule.  If someone talks to the lawyers or they           02:51PM

1    come talk to me in court you have to have a very good reason to

2    why you needed to use that disciplinary power at that time

3    because of the chilling effect on the communication that I

4    need.

5           So I understand that there is a problem of conflicting    02:51PM

6    interest.  On the one hand you want to be able to enforce the

7    rules and you want to have things work appropriately, and you

8    feel maybe offended there's some judge in Phoenix telling you

9    what to do when there's no retaliatory purpose.  I have this

10   other value I have to weigh.  The other value is making sure    02:52PM

11   this information comes freely to the lawyers and to the Court.

12   So sometimes that interest is so important to preserve that I

13   have to, like all of us in our lives, professional and

14   personal, weigh things and make a judgment.  Not saying that

15   either of them are wrong but saying in a certain circumstance    02:52PM

16   one of them gets more weight.  So that's why I am doing this.

17          I thank you for listening to me as I explain it to you

18   so that you understand it's not just some person who is simply

19   issuing orders without a purpose to it.  There is a purpose to

20   it, and that I appreciate that it's cumbersome, burdensome to    02:52PM

21   you.  But it's unfortunately necessary for the role that the

22   parties have given me in this case.

23          So I thank you for coming here today and have a safe

24   travels back.

25          THE WITNESS:  Thank you.                                  02:52PM

1    THE COURT:  So why don't we take a 15-minute break and

2    we'll come back.  Thank you.

3         (Recess from 2:52 p.m. until 3:11 p.m.)

4    THE COURT:  Please be seated.  Just a housekeeping

5    matter so I don't forget.  Defendants filed Document 2294, and    03:11PM

6    there is an affidavit of declaration that references an

7    Attachment A to declaration.  I think if I'm reading this right

8    it looks to me like maybe I see what's denominated as

9    Attachment A.  The declaration itself seems to reference an

10   Attachment A and it doesn't seem to be the referenced document.    03:11PM

11   So if you could double check Document 2294-1.  Thank you.

12        So that concludes the plaintiffs' Perryville

13   witnesses, is that right?

14        MR. FATHI:  Correct, Your Honor.

15        THE COURT:  So now we're back to the defendants moving    03:11PM

16   on to the others.

17        MS. LOVE:  Your Honor, as to the allegations by Inmate

18   Oyenik as to the Florence complex, we first call Ernie

19   Trujillo.

20        THE COURT:  Would you please step forward to the clerk    03:12PM

21   be sworn.

22        (The witness was sworn.)

23        THE COURT:  Good afternoon and welcome.  Please have a

24   seat.  And you know probably this already but the microphone is

25   not attached.  So if you need to move it closer to you on that    03:12PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation

1    stand it is not attached to the desk so you don't have to lean

2    forward.

3            THE WITNESS:  Thank you.

4            MS. LOVE:  Your Honor, I have to correct what I said

5    as to allegations out of Florence.  Mr. Trujillo does have          03:12PM

6    information related to Perryville about allegations of that SSU

7    tracking sheet that he was been able to obtain information

8    today.  So we would like to address that as well.

9            THE COURT:  You may.

10                       ERNEST TRUJILLO,

11   a witness herein, having been first duly sworn by the clerk to

12   speak the truth and nothing but the truth, was examined and

13   testified as follows:

14                      DIRECT EXAMINATION

15   BY MS. LOVE:                                                         03:13PM

16   Q.  Would you please state your name for the record.

17   A.  Earnest Trujillo.

18   Q.  Who is your employer?

19   A.  Arizona Department of Corrections.

20   Q.  What is your position?                                          03:13PM

21   A.  I'm the northern region operations director.

22   Q.  How long have you held that position?

23   A.  I've been a regional operations director for approximately

24   six years.

25   Q.  What are your duties as the northern region operations          03:13PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Trujillo-Direct

1   director?

2   A.  I'm responsible for direct supervision of five wardens

3   whose prison complexes are in the northern region; the Eyman

4   complex, the Florence complex, the Lewis complex, the Phoenix

5   complex, and the Winslow complex.                          03:13PM

6   Q.  And is your title as northern region operations director

7   sometimes through this litigation we have referred to you as

8   the NROD.  Is that the acronym for, I guess, your position?

9   A.  Yes.

10  Q.  Is there also a counterpart to your position as NROD that  03:13PM

11  oversees operations for other complexes, state-run complexes in

12  the state?

13  A.  Yes.  Our 10 state-operated facilities fall into two

14  regions; the southern region and the northern region.  Mr. Joe

15  Profiri is the southern region operations director.          03:14PM

16  Q.  What complexes are part of the southern region?

17  A.  The southern region consists of the Douglas complex, the

18  Safford complex, the Tucson complex, the Perryville complex and

19  the Yuma complex.

20  Q.  And as region operations directors for both southern and   03:14PM

21  northern regions, do you also assist each other with duties at

22  your differing complexes where needed?

23  A.  Yes.  We're quite interchangeable.

24  Q.  And when you say that as your duties as the northern region

25  operations director you supervise the wardens at five complexes  03:14PM

 1   tell us more about what does that mean to supervise the

 2   wardens?

 3   A.  I guess direct supervise is a little bit of a loose term

 4   because they are responsible for direct management and

 5   providing oversight to their individual prison complexes.  As      03:15PM

 6   regional operations director we are more responsible to be in

 7   the prison yards, interface with the inmates, interface with

 8   the staff, continually monitoring for best practices, policy

 9   compliance, looking for always continued opportunities for

10   continuous improvement.                                            03:15PM

11   Q.  As far as a chain of command goes within the Arizona

12   Department of Corrections, the wardens that you supervise in

13   the northern region, are you their direct report?

14   A.  Yes.  They are my direct report.

15   Q.  And then up the chain of command do you have a chain of        03:15PM

16   command above you to whom you report?

17   A.  Yes.  I report to the division director for prison

18   operations, Carson McWilliams.

19   Q.  And do you know where the chain of command goes from there

20   above Mr. McWilliams?                                              03:16PM

21   A.  Yes.  He reports to the director of the agency, Mr. Ryan.

22   Q.  What is your educational background?

23   A.  I have a high school diploma.  I have numerous years of

24   training through the military as well as through the agency.  I

25   graduated from the Arizona Institute for Public Executives,        03:16PM

1    also hold a certified public manager's certificate and a

2    theology degree as an ordained Roman Catholic Deacon.

3    Q.   Which branch of the military did you serve in?

4    A.   Marine Corps.

5    Q.   How many years?                                          03:16PM

6    A.   Four years.

7    Q.   How long have you worked for the Arizona Department of

8    Corrections total?

9    A.   I am a retiree from the corp retirement system.  I retired

10   in 2005 after 20 years of service then rehired into an ASRS     03:17PM

11   position as the emergency preparedness administrator for the

12   agency where I served until 2007.  I left and broke service

13   with the agency and returned back in 2009 where I have been

14   serving since.

15   Q.   Can you take us just basically and quickly through the     03:17PM

16   different positions that you have held during your career in

17   corrections?

18   A.   Every uniformed rank from correctional officer through

19   major; administrators of what is now the Kasson cell blocks but

20   then it was a standalone unit as Cell Block 6; deputy warden,   03:17PM

21   deputy warden of operations; and warden at Safford, twice at

22   Eyman, and once at Lewis.

23   Q.   In total, how many years did you, across those complexes,

24   did you serve as a warden?

25   A.   Approximately, let's see, five years.                     03:18PM

1    Q.  And as the NROD for the Arizona Department of Corrections,

2    you are aware of the Parsons versus Ryan lawsuit?

3    A.  Yes.

4    Q.  And indeed, you do often attend court hearings, is that

5    correct?                                                          03:18PM

6    A.  That's correct.

7    Q.  And within the information you would receive from the court

8    hearings and orders made by the judge, do you carry that down

9    on your chain of command to the wardens and advise them of the

10   status and the happenings within this lawsuit?                    03:18PM

11   A.  Yes.

12   Q.  Are you aware of whether inmate Angela Ashworth is

13   currently incarcerated at the Perryville complex?

14   A.  I am aware.

15   Q.  Are you aware of whether or not in July of this year, 2017,   03:18PM

16   Ms. Ashworth was placed on an SSU target search list?

17   A.  Yes.  But to clarify, it was not a target search list.  It

18   was a target list for urinalysis testing.

19        MR. FATHI:  Objection, Your Honor.  Lack of

20   foundation.  The previous witness testified that the target       03:19PM

21   search list is maintained at the complex level, and Mr.

22   Trujillo does not supervise the Perryville complex.

23        THE COURT:  This, again, is a foundational objection.

24   I mean, it's a foundational question.  Are you aware of whether

25   or not in July of this year, 2017, Ms. Ashworth was placed on     03:19PM

1    an SSU target search list.  So he can answer that question.

2    Overruled.

3    BY MS. LOVE:

4    Q.  How did you obtain the information that Ms. Ashworth in

5    July of this year was placed on an SSU target list for          03:19PM

6    urinalysis?

7    A.  At the request of counsel and direction of counsel, I made

8    a phone call out to the Perryville complex and spoke to the SSU

9    officer who generated that list.

10   Q.  Do you know what that SSU officer's name is?              03:19PM

11   A.  If I may refer to my notes.

12   Q.  Yes.

13   A.  I don't work with him every day.  It's Correctional Officer

14   Jason Jardine.

15   Q.  Were you able to determine, through your conversation with  03:20PM

16   Officer Jardine, as to why Ms. Ashworth was placed on an SSU

17   target list for urinalysis?

18        MR. FATHI:  Objection, Your Honor.  Hearsay.  Your

19   Honor, the defendants knew very well this was going to be an

20   issue.  They could have brought the person Mr. Trujillo spoke   03:20PM

21   with in as a witness to testify based on firsthand knowledge.

22        THE COURT:  I'm going to overrule the objection and

23   hear the answer.  If it turns out there's some unfairness that

24   seems to have been generated by hearing what this witness has

25   found out, then we'll go down that road.  For now the objection 03:20PM

```
 1    is overruled.

 2            THE WITNESS:  Would you please rephrase the question

 3    or ask it again?

 4            MS. LOVE:  Could the court reporter read the question

 5    back?                                                          03:21PM

 6            (The question was read back by the court reporter.)

 7            THE WITNESS:  Yes.  Officer Jardine advised me that he

 8    compiles the target UA list on a monthly basis.  He said

 9    that -- he looked up the tram drivers, for example, and Inmate

10    Ashworth is a tram driver for the complex that drives the      03:21PM

11    various personnel and everyone around the complex to deliver

12    them to the units.  Being a tram driver, she fell under

13    Department Order 709.02 where because they have so much contact

14    with public, they also are referred for urinalysis testing on a

15    random basis.  And the department order says inmates assigned   03:21PM

16    to off site work locations, which that would fall into because

17    it's not within their secure unit, external to that institution

18    can be placed on a U/A, urinalysis list.

19    BY MS. LOVE:

20    Q.  Were you able to confirm whether or not Ms. Ashworth was    03:22PM

21    indeed taken off the SSU target list for urinalysis?

22    A.  Officer Jardine told me that he did speak with Lieutenant

23    Papworth who advised him that he was removing her from that

24    list and that the urinalysis was never done.

25    Q.  I want to turn your attention now to July 14 of 2017.  Are  03:22PM
```

1   you aware that two inmates from the Florence complex were

2   transported to this courthouse to testify regarding removal of

3   HNR boxes?

4   A.  Yes.

5   Q.  Do you know who those inmates were that came here to          03:22PM

6   testify on July 14th?

7   A.  One was Inmate Oyenik from the South Unit and I don't

8   remember the inmate's name from the East Unit.

9   Q.  But you are aware that there were two?

10  A.  Yes.                                                          03:23PM

11  Q.  On July 14th of 2017, did you make a request to any

12  facility personnel at the Florence complex to determine whether

13  or not the two inmates who had testified here in court on that

14  day had their property intact when they returned to the

15  facility?                                                         03:23PM

16  A.  Yes.

17  Q.  And why did you do that?

18  A.  In speaking to counsel, I was advised that inmates from the

19  Perryville complex had had their property taken from their cell

20  and stored pending their return to the complex.  I wanted to     03:23PM

21  make sure that when the inmates at the Florence complex had

22  returned to the complex, to their units, that they indeed had

23  their property.

24  Q.  Who did you speak to, or who did you make a request to to

25  facilitate that confirmation?                                    03:24PM

1    A.  I contacted the deputy warden of operations, Jeff Van

2    Winkle.

3    Q.  Did you do that by e-mail or phone?

4    A.  I spoke to him by phone.

5    Q.  What did you tell him?                                        03:24PM

6    A.  I told him to have someone in the unit go see each inmate

7    and verify that he had all of his property in his possession.

8    Q.  Did you receive verification from Deputy Warden Van Winkle

9    as to whether or not the inmates could confirm one way or

10   another whether they had all their property intact when they    03:24PM

11   returned to the Florence complex?

12   A.  Yes.  Mr. Van Winkle then responded by e-mail advising me

13   that both inmates did have all their property.

14   Q.  No further questions.

15           THE COURT:  Thank you.  Cross-examination.              03:24PM

16           MR. FATHI:  Your Honor, as a threshold measure we

17   would renew our hearsay objection and move to strike Mr.

18   Trujillo's testimony.  The defendants have provided no reason

19   why they could not have brought someone with personal knowledge

20   to give the testimony that Mr. Trujillo just gave as hearsay.   03:24PM

21           THE COURT:  All right.  Thank you.

22           MS. LOVE:  Your Honor, defendants would like to

23   respond to make the record that any allegations that Ms.

24   Ashworth has been placed on -- or was placed on and thereafter

25   removed from an SSU search list is not any allegations that Ms. 03:25PM

```
 1    Ashworth has ever made; that she feels that she was subject to
 2    retaliation because of that and that was not any information
 3    that has -- or allegation that was contained in the plaintiffs'
 4    notice regarding retaliation filed in July nor ever alleged in
 5    any pleading or otherwise up to this date.  So that is why we          03:25PM
 6    wanted to provide information to the Court to explain this as
 7    it came up today and as defendants had previously objected to
 8    the scope of the testimony on issues outside the scope of the
 9    plaintiffs' notice.
10             THE COURT:  Well, the motion to strike is denied for          03:25PM
11    the reason that the Court frequently turns upon counsel and
12    doesn't see any harm in turning, in this instance, to somebody
13    who is reporting information in their line authority about what
14    they have found out with respect to an issue that is of great
15    concern to the Court.  And so it seems to me that the purposes          03:26PM
16    of the hearsay rule here are not served.  And again, I don't
17    see any prejudice to the plaintiffs being able to address this
18    if it turns out that some infirmity associated with what we
19    have heard from Mr. Trujillo needs to be redressed by another
20    witness.                                                               03:26PM
21             Anything beyond that, Mr. Fathi?
22             MR. FATHI:  May we have a moment to look at Mr.
23    Trujillo's notes, please?
24             THE COURT:  Do you mind, sir?
25             THE WITNESS:  No.  I don't mind.                              03:26PM
```

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Trujillo-Direct

 1          MS. LOVE:  Your Honor, if I could take a look at that

 2    I believe that the notes may be work product based upon

 3    conversations that Mr. Trujillo and I had.  There may be

 4    portions that are not.  If I could take a look first.

 5          THE COURT:  You can look first.                         03:26PM

 6          MR. FATHI:  Your Honor, he did refer to them during

 7    his testimony.

 8          THE COURT:  He did.  It's unlikely this interposition

 9    from Ms. Love is going to be successful since they were before

10    the witness when he testified.                                03:27PM

11          MS. LOVE:  Your Honor, counsel may review.

12                    CROSS-EXAMINATION

13    BY MS. KENDRICK:

14    Q.  Good afternoon, Mr. Trujillo.

15    A.  Good afternoon.                                           03:28PM

16    Q.  How are you doing?

17    A.  Okay.

18    Q.  Good.  Good to see you again.

19    A.  Thank you.

20    Q.  According to your notes here, and I can hand this back to  03:29PM

21    you if you would like, it says that Officer Jardine instructed

22    you that this was done pursuant to Department Order 709.02?

23    A.  That is the policy that he referred to.

24    Q.  And that she was placed on the target list on July 24th?

25    A.  Yes.                                                      03:29PM

1    Q.   What is Department Order 709.02 about?

2    A.   That is regarding our urinalysis program.

3    Q.   Okay.  And I will just read to you what it says.  I'm

4    representing to you that I'm looking at it on the website.

5    It's about inmate urine collection, and it has a section called          03:29PM

6    targeted testing.  And it says, quote, "Inmates designated for

7    targeting testing shall be subject to frequent urinalysis based

8    on their own exhibited behavior and status as a high risk

9    alcohol or drug user.  In addition to frequent urinalysis these

10   inmates may also be placed on non-contact visitation status for          03:30PM

11   an indefinite period at the discretion of the deputy warden or

12   administrator to prevent drug smuggling activity during

13   visitation."

14        Did Officer Jardine tell you that she had exhibited

15   behavior that indicated she was a high risk alcohol or drug              03:30PM

16   user?

17   A.   Officer Jardine did not.

18        MS. LOVE:  Objection, Your Honor, to reading into the

19   record a portion of the policy that's up on a computer screen

20   without showing the witness the entirety of the policy.                 03:30PM

21        THE COURT:  Is there part of it that under the rule of

22   completeness that you think needs to be furnished?

23        MS. LOVE:  There could be because she's reading from

24   a portion I am not seeing.

25        MS. KENDRICK:  Do you want to come see it?                         03:31PM

1          THE COURT:  Take a look at it.

2          MS. KENDRICK:  I read to there and then you

3    interrupted me, so I can keep reading it.

4    By MS. KENDRICK:

5    Q.  So the policy goes on to state, quote, "Inmates in secure          03:32PM

6    facilities who meet any of the following criteria shall be

7    considered at high risk of abuse of alcohol and illegal drugs,

8    inmates convicted of illegal drug use or smuggling related

9    disciplinary violations."

10          Did Officer Jardine tell you that she fell into that          03:32PM

11   category?

12   A.  No.

13   Q.  Second is, "Inmates convicted of alcohol-related

14   disciplinary violations."  Did he tell you that she fell into

15   that category?          03:32PM

16   A.  No.

17   Q.  Number 3 is, quote, "Inmates suspected of being involved in

18   any documented or undocumented smuggling activity in any

19   location within the institution," close quote.

20          Did he tell you that she had been suspected of being          03:32PM

21   involved in smuggling?

22   A.  No.

23   Q.  4 was, quote, "Inmates who exhibit any abnormal behavior

24   that may be attributed to drug or alcohol abuse," close quote.

25          Did he report that she showed that behavior?          03:32PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Trujillo-Cross

1   A.   No.

2   Q.   5 is, quote, "Inmates who have alcohol/drug classification

3   scores of 4 or 5 as outlined in Department Order 801.  Did he

4   tell you that she had a drug classification score of 4 or 5?

5   A.   No.                                                           03:33PM

6   Q.   Number 6 is, quote, "Inmates are assigned to off-site work

7   locations external of institution grounds."

8        Is a tram driver an off-site work location external of

9   institution grounds?

10  A.   Yes.                                                          03:33PM

11  Q.   Where is it off site?

12  A.   It's off their normal institution where they are housed.

13  It's on a prison complex.

14  Q.   She drives the tram within the Perryville complex, correct?

15  A.   Correct.                                                      03:33PM

16  Q.   And that's the Perryville institution?

17  A.   That is the Perryville complex.  I believe Inmate Ashworth

18  is housed in the San Pedro Unit.

19  Q.   Right.  So the nomenclature is unit for where you live and

20  institution or complex for the larger facility, correct?         03:33PM

21  A.   Not necessarily.

22  Q.   On what basis do you say that?

23       THE COURT:  It says external of its institution

24  grounds.  That surely sounds to me that if you cross the fence

25  outside of the Department of Corrections.  Why would there be     03:34PM

1   any other interpretation of that?

2           THE WITNESS:  Your Honor, the interpretation comes

3   from the fact that she is outside the secure perimeter of her

4   prison unit.

5           THE COURT:  It could have said that.  It could have        03:34PM

6   said "prison unit."  Instead it says "institution grounds."  So

7   we refer to the prison institution.  Since I grew up in this

8   state, you drive by Florence, that was the institution that

9   whole big place.  Again, I'm just saying it's straining

10  credibility in my opinion of what your interpretation is.       03:34PM

11          THE WITNESS:  It's a wide definition, sir.  One of the

12  issues we run into with this is the tram drivers especially

13  have a lot of contact with the public because the public has to

14  come in to the prison in order to get to the place to the

15  different units for the people that they are going to visit,     03:35PM

16  volunteers coming in, employees, et cetera.  So the exposure to

17  that many people, especially from the outside, raises the risk

18  of the possibility of contraband, drugs specifically, being

19  passed to those tram drivers.

20          So anyplace that has trams within our department, the     03:35PM

21  tram drivers are all subject to targeted testing.

22  BY MS. KENDRICK:

23  Q.  So, Mr. Trujillo, you are saying that an off-site work

24  location such as going to the egg farm, like many of the

25  Perryville women do, is comparable to driving a tram between     03:35PM

1    the complex headquarters in the San Pedro Unit?

2    A.   Clearly the Hickman's Egg Ranch is a considerable distance

3    farther.  However, being outside your secure perimeter of your

4    unit, yeah, it is comparable.

5    Q.   So you use the word "institution" to refer to units?        03:35PM

6    A.   Yes, we do.

7    Q.   Is that ADC policy?

8    A.   I don't have the policy in front of me that would give me

9    exact definition.  Again, it's an interpretation.

10   Q.   And are the SSU officers given the discretion on how to     03:36PM

11   interpret what Number 6 means about off-site work location

12   external of the institution grounds?

13   A.   The SSU officers are given parameters for how to make a

14   selection for their compilation of the random UA list, and the

15   tram drivers are included.                                       03:36PM

16   Q.   Okay.  For the sake of completion, I will just list for you

17   the seventh criteria for people to get targeted UA is, quote,

18   "Inmates who participate in drug and alcohol treatment

19   programs."

20          Did Officer Jardine tell you that she participates in    03:36PM

21   a drug and alcohol treatment program?

22   A.   No.

23   Q.   So according to your interpretation of the word

24   "institution" whenever I see the word "institution" in an ADC

25   policy, that means a unit?                                       03:37PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Trujillo-Cross

1   A.  It could mean unit or complex.

2   Q.  How can it mean both things at the same time?

3   A.  Because they are all located in the same location, in the

4   same place.

5   Q.  All right.  I think this horse is dead.                    03:37PM

6       You testified that you directed the Florence officials

7   to make sure that Mr. Oyenik and the other individual, his name

8   is Mr. Blocksom, had not had their property rolled up, correct?

9   A.  No.

10  Q.  What did you testify to then?                              03:37PM

11  A.  I testified to instructing the deputy warden of operations

12  to have someone go verify that they had their property in their

13  possession.

14  Q.  Okay.  And were you present when this individual or

15  individuals went and spoke with the two people who testified?   03:37PM

16  A.  No.

17  Q.  So you have no firsthand knowledge of what was said to Mr.

18  Oyenik?

19  A.  No.

20  Q.  I'm going to show you an exhibit that's been marked as      03:37PM

21  Plaintiffs' Exhibit 8.

22  A.  Okay.

23  Q.  Have you had a chance to review it?

24  A.  Yes.

25  Q.  And this was something that was e-mailed to Charles Ryan    03:38PM

1  and several other individuals, including you, on August 8 from

2  Andrew Wilder, correct?

3  A.  Yes.

4  Q.  Who is Andrew Wilder?

5  A.  Andrew Wilder is the director of communications for the          03:38PM

6  Department.

7  Q.  And he is forwarding to you an e-mail that he sent to a

8  reporter named Katie Campbell at the Arizona Capitol Times,

9  correct?

10        MS. LOVE:  Objection, Your Honor.  Exceeds the scope          03:39PM

11  of the direct examination.

12        THE COURT:  Overruled.

13        THE WITNESS:  The answer is yes.

14  BY MS. KENDRICK:

15  Q.  And on the third page of the document, the one that has         03:39PM

16  .0003 at the bottom right corner, it appears that Ms. Campbell

17  was requesting any written policy the Department has regarding

18  retaliation against inmates, correct?

19  A.  Correct.

20  Q.  And just now, you reviewed this document and looked at what      03:39PM

21  Mr. Wilder sent to Ms. Campbell, correct?

22  A.  Correct.

23  Q.  Does that comport with your understanding of what the ADC

24  policies and employee handbooks say about retaliation?

25        MS. LOVE:  Objection.  Foundation, relevance.               03:39PM

1          THE COURT:  What's the foundation objection?

2          MS. LOVE:  Foundation as to "does all of this," versus

3    specifying after a three-page document specifically what she is

4    referring to on the open-ended question of:  Is this your

5    understanding regarding retaliation?                          03:40PM

6          THE COURT:  Overruled.

7          THE WITNESS:  It is a general understanding, yes.

8    BY MS. KENDRICK:

9    Q.  And are you familiar with the order that Judge Duncan

10   issued regarding not taking retaliation against prisoners who   03:40PM

11   provide him information relevant to this case?

12   A.  Yes.

13   Q.  Having reviewed the summary of the policies prepared by Mr.

14   Wilder, can you explain to me how the judge's order does

15   nothing more than reiterate what is already the written policy   03:40PM

16   of the Department?

17          MS. LOVE:  Objection.  Foundation, calls for an

18   opinion unrelated to the issue of specific allegations made by

19   Oyenik and Ashworth.  I don't even understand what the question

20   means.  She's asking for an opinion as to what the judge's      03:41PM

21   order is.  It's asking for a legal conclusion, interpretation

22   of an order unrelated to, what, or related to what?

23          THE COURT:  Thank you.  Overruled.

24          THE WITNESS:  I think I would need to take a look at

25   the judge's specific order and compare it to this to see how    03:41PM

 1    you want the comparison done.  I understand what he means by

 2    expecting no retaliation.

 3    BY MS. KENDRICK:

 4    Q.  But to the extent the judge's order reiterates what these

 5    policies say, for example, quote, "Retaliation is                       03:41PM

 6    unacceptable."  We maintain, quote, "We maintain an environment

 7    that is humane and equitable to both employees and inmates."

 8            MS. LOVE:  Same objections.

 9            THE COURT:  There has not been a question yet, I don't

10    think.                                                                   03:41PM

11            MS. KENDRICK:  Yeah.  I'd like to get to it, if

12    possible.

13            THE COURT:  Okay.

14    BY MS. KENDRICK:

15    Q.  So having this as your written policy and being told to              03:42PM

16    follow your policies about retaliation, is there any

17    contradiction in that sort of order and instruction?

18            MS. LOVE:  Foundation.  Relevance.

19            THE COURT:  Overruled.

20            THE WITNESS:  I don't see a contradiction, no.                   03:42PM

21            MS. KENDRICK:  Okay.  Your Honor, we would like to

22    move Exhibit 8 into evidence.

23            THE COURT:  Any objection?

24            MS. LOVE:  Same objection.  Foundation and relevance.

25            THE COURT:  Overruled.  8 will be received.                      03:42PM

1          MS. LOVE:  And hearsay.

2          THE COURT:  8 will be received.

3          MS. KENDRICK:  I have nothing further, Your Honor.

4          THE COURT:  Ms. Love.

5          MS. LOVE:  Nothing further.                                03:42PM

6          THE COURT:  Director Trujillo, I know you have heard

7   me talk a lot about the subject of how I'm not happy that I'm

8   interfering in your life.  And I know you have been in the room

9   when I have said before whether -- I think you were in the room

10  when I said it most recently when you were in the room, and I    03:42PM

11  think, if remember correctly, at Eyman.

12         THE WITNESS:  I have been at all the tours at Eyman.

13  I was at Lewis with you as well.

14         THE COURT:  I meant to say Lewis.  That's the most

15  recent.  You are right.  Thank you.                              03:43PM

16         So I know you have heard my regret about how I'm in a

17  situation that I would prefer would not have me here.  But the

18  agreement that the parties agreed to requires me to do it.  And

19  so the part you haven't heard me talk about as much was one

20  that was the subject of the testimony that you haven't heard     03:43PM

21  previously today.  And it is the importance of maintaining the

22  line of communication that helps me to be less -- the least

23  unproductively intervening in your whole process.  And that

24  requires me to try to do something admittedly I can't.  I

25  cannot get to your level of knowledge and experience in how you  03:43PM

1    do your job.

2         Nevertheless, I have been asked to make decisions

3    about how best to accomplish the goals of the stipulation.  In

4    fact, it's not simply asked.  I'm compelled to do it.  And so

5    what I want to do is I want to be as educated as I can.  And          03:44PM

6    the best way for me to do that is to make sure the information

7    that comes to me is free, open, and without fear.  That's why

8    retaliation is such a big issue.

9         And even though people have testified in that chair

10   today from the Department of Corrections that they had no           03:44PM

11   retaliatory purpose, I needed to explain to you and to each of

12   them that it's not just the retaliatory purpose that is the

13   evil here; it is the retaliatory perception because it can be

14   as dangerous to my process.  What I mean by that is that if

15   somebody perceives, whether it's an inmate or another inmate on     03:44PM

16   the yard, sees a disciplinary action or adverse action close in

17   time to when somebody has sat in that chair or close in time to

18   when they have talked to the plaintiffs, they will perceive

19   that is retaliation.  It may not be true.  It may be that it

20   was coincidental.  We have heard testimony from the defendants      03:45PM

21   today that things that could be perceived as retaliatory were

22   actions that were just coincidental.

23        The problem is those coincidences have the same

24   adverse impact on the information exchange where people will

25   perceive they cannot feel comfortable coming to that chair         03:45PM

1   because what they saw, without knowing all the back story, is

2   they saw testimony followed close in time by adverse

3   consequence, whether it's that you are getting a new roommate

4   or something else, it's perceived by people.

5        So the purpose of my rather broad brush rule about no        03:45PM

6   retaliation that doesn't get into the weeds of what the

7   individual decision making is is because I have to weigh two

8   competing goods, meaning things you want to have happen, and

9   that is enforcement of the disciplinary rules at the prison to

10  protect people, and also at the same time to encourage this     03:46PM

11  information exchange.  But as I have explained, they can

12  collide, and especially if disciplinary action is taken close

13  in time or an adverse change in circumstances is taken close in

14  time to when somebody has testified.

15       And so balancing those two competing goals requires me      03:46PM

16  to interpose myself in your decision making to try to preserve

17  this information flow, which I can't get any other way.  I have

18  to make sure people feel free that when they come here that

19  they are not retaliated against.  That's why it's got kind of a

20  broad brush approach that may sometimes interfere with the      03:46PM

21  particulars of that other goal, that's a worthy goal, that is

22  imposing and requiring people to follow the rules at the

23  prison.

24       So in this case it was suggested to me earlier we have

25  not resolved it yet about whether it was true or not, but the   03:46PM

1    suggestion was people who have talked to the plaintiffs'

2    lawyers are having write-ups for having their shirttails out.

3    So my initial view on that would be, you don't get to give

4    people a ticket for having shirttails out close in time to when

5    they talk to the plaintiffs' lawyers.  Find another time to          03:47PM

6    enforce that rule because of the chilling effect of people

7    thinking they don't want to talk.

8           So that's the second part of what you maybe haven't

9    heard as fully.  That's why I wanted to say it to you so you

10   understood that when I say the first part, that I'm serious.         03:47PM

11   I'm not trying to do this to be somebody that's got a new job.

12   I have plenty of jobs here without trying to interpose myself

13   into your life.  I just am compelled to do it, and I have to

14   protect this information flow.

15          Now, the rule against having witness in the courtroom         03:47PM

16   has been applied to you today so you haven't learned about

17   what's happened today.  And a transcript will be prepared, and

18   there will be no offense to the rule of exclusion of witnesses

19   for you to look at that transcript.

20          But what that transcript will suggest, perhaps, to            03:48PM

21   you, that suggested to me, is that even though I had a very

22   direct conversation at the emergency hearing when I was in San

23   Francisco and everybody else was on the phone about

24   retaliation, and even though the director sent a directive, and

25   that I saw that people in the chain of command did follow            03:48PM

1    through on that, what I learned today is that there seemed to

2    be some failure in that communication, that the word wasn't

3    getting out to everybody who needed to have it.  And that

4    actions that could be perceived as retaliation could have

5    continued to occur.                                          03:48PM

6           So when you look at that transcript in your capacity

7    that you say is part of your job, and that is to how we can do

8    things better, keep an open mind to seeing whether or not you

9    see if there were, as I describe, which you may disagree with,

10   as I describe them as failures in this critical function.  That  03:48PM

11   is, when I speak to you, when I speak to the director, when I

12   speak to the warden, I kind of expect that the word does get

13   down to every single person from the lowest level corrections

14   officer on up that they understand this.

15          And if you can take a look at that and see in your own  03:49PM

16   mind, if you happen to agree with me about any of these

17   failures, offering suggestions to other people on your staff,

18   perhaps your defendants' lawyers, about what I can do to try to

19   make sure that we don't have to take more time like this

20   because, unfortunately, this retaliation specter, and again, I  03:49PM

21   say specter, understanding that it could be a ghost, it's not

22   real, but the ghost is what's scary here.  And I have to make

23   sure that there's no ghost.  So even though it may not have a

24   corporeal body, I have to deal with the ghost.

25          Anything my comments engendered with respect to what  03:49PM

```
 1    counsel may wish to say?

 2             MS. LOVE:  No, Your Honor.

 3             MS. KENDRICK:  No, sir.

 4             THE COURT:  Thank you very much.  Take your usual

 5    seat.                                                     03:50PM

 6             You may call your next witness, please.

 7             MS. LOVE:  Defendants call Jeff Van Winkle.

 8             THE COURT:  Thank you.

 9             Mr. Van Winkle, if you will step forward to the clerk

10    of the court to be sworn.                                 03:50PM

11             (The witness was sworn.)

12             THE COURT:  Good afternoon, sir.  Thank you.  I

13    imagine you have had some patience today.  You have been

14    waiting and I'm sorry.

15             THE WITNESS:  It's okay, Your Honor.  Thank you.   03:51PM

16                       JEFFREY VAN WINKLE,

17    a witness herein, having been first duly sworn by the clerk to

18    speak the truth and nothing but the truth, was examined and

19    testified as follows:

20                       DIRECT EXAMINATION

21    BY MS. LOVE:

22    Q.  Please state your name for the record.

23    A.  Jeffrey Van Winkle.

24    Q.  You are the deputy warden of operations at ASPC Florence

25    complex?                                                  03:51PM
```

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Van Winkle-Direct

1   A.  That's correct.

2   Q.  And you testified last month regarding the removal of the

3   HNR boxes at the Florence complex, correct?

4   A.  Yes, ma'am.

5   Q.  Are you aware that on July 14 of 2017, two inmates from the   03:51PM

6   Florence complex were transported here to this courtroom to

7   testify regarding removal of the HNR boxes?

8   A.  Yes, ma'am.

9   Q.  And do you know who those inmates were?

10  A.  Inmate Oyenik from South Unit and Inmate Blocksom from East   03:51PM

11  Unit.

12  Q.  On July 14th of 2017, that same day that they testified,

13  did you receive any direction to confirm with those two inmates

14  whether or not when they returned to the facility their

15  property had remained intact?   03:52PM

16  A.  Yes, ma'am, I did.

17  Q.  Who did you receive that request from?

18  A.  From our northern region operations director, Mr. Trujillo.

19  Q.  And do you recall what information Northern Region

20  Operations Director Trujillo provided to you?   03:52PM

21  A.  He called me, it was almost 5:00 on Friday the 14th, and

22  asked if I was able to verify that both of those inmates had

23  come back from court and had their property.

24  Q.  And did you do so?

25  A.  Yes, ma'am, I did.   03:52PM

1    Q.  How did you go about doing that?

2    A.  I called over to South Unit and spoke with Deputy Warden

3    Mattos, John Mattos, and asked him to verify that Inmate Oyenik

4    had his property and spoke to CO-4 Bohuszewicz at East Unit and

5    asked her to verify if Inmate Blocksom had his property.          03:52PM

6    Q.  Did you receive confirmation back from both of those deputy

7    wardens that Inmate Blocksom and Inmate Oyenik did have their

8    property and it was intact?

9    A.  Yes.

10   Q.  How did you receive that communication?                       03:53PM

11   A.  I got a phone call from Deputy Warden Mattos stating that

12   he had personally checked the property, verified that the

13   inmate did, in fact, have it at South Unit and received a phone

14   call back from CO-4 Bohuszewicz stating the same, Inmate

15   Blocksom had his property on him.                                  03:53PM

16   Q.  Did you provide -- when you spoke to Deputy Warden Mattos

17   at South Unit, did you provide Deputy Warden Mattos with any

18   background information as to why you were making the request?

19   A.  No, ma'am.

20   Q.  When you testified here last month regarding the removal of   03:53PM

21   the HNR boxes, do you remember going through a photographic

22   tour of the South Unit, a very detailed one for us?

23   A.  Yes, ma'am, I do.

24   Q.  Upon return, sometime after returning and your testimony

25   did you start to question whether or not you had mislabeled a     03:54PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Van Winkle-Direct

1   diagram?

2   A.  Yes, ma'am, I did.

3   Q.  Has that bothered you very much?

4   A.  Extremely.

5   Q.  Would you like to take the opportunity today to correct          03:54PM

6   what you had mislabeled when you testified earlier, or last

7   month?

8   A.  Yes, ma'am.  That would be greatly appreciated.

9           MS. LOVE:  Your Honor, would that be permissible?

10          THE COURT:  Of course.                                       03:54PM

11          MS. LOVE:  Your Honor, may I approach?

12          THE COURT:  You may.

13  BY MS. LOVE:

14  Q.  Warden, if you could take a look at Exhibit Number 24.

15  A.  Yes, ma'am.                                                      03:54PM

16  Q.  Do you recognize what Exhibit Number 24 is?

17  A.  Yes, ma'am.  It's an overview of South Unit.

18  Q.  And is this a photograph that when you testified last month

19  you had made indications on the photograph as to where certain

20  units were located when explaining the location of the medical      03:54PM

21  unit and the different dorms and testifying?

22  A.  Yes, ma'am, I did.

23  Q.  And did you realize after that you had made a mistake in

24  your labeling?

25  A.  Yes, ma'am.  I went back to my office the next day and were      03:55PM

1  looking through the photos and had a very bad feeling that I

2  had mislabeled one of the dorms.  And then that was confirmed

3  by you that, yes, ma'am, I had miss labeled one of the dorms.

4  Q.  Can you tell us how -- or can you tell us how you

5  mislabeled, explain that and re-correct it for us with markings      03:55PM

6  on this diagram as to the corrected location?

7  A.  I mislabeled Dorm 1.  Actually the one that I circled is

8  Dorm 3 and not Dorm 1.  So I would like to correct that.

9  Q.  So if you could just draw a circle around where Dorm 1 is

10  located and indicate so?                                              03:55PM

11          MS. KENDRICK:  Your Honor, may I approach?

12          THE COURT:  You may.  Just like before, Ms. Kendrick

13  is going to take a look.  She wasn't a very good proctor last

14  time but maybe she will be this time.

15          THE WITNESS:  I wasn't very good at labeling, sir.          03:56PM

16          MS. LOVE:  Your Honor, defendants move for admission

17  of Exhibit Number 24.

18          THE COURT:  Any objection.

19          MS. KENDRICK:  No, sir.

20          THE COURT:  That will be received.                          03:56PM

21  BY MS. LOVE:

22  Q.  Next if you will take a look at Exhibit Number 25 that's in

23  front of you.  Do you recognize the photograph Exhibit Number

24  25 which is also one that you testified to at the hearing last

25  month?                                                               03:56PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Van Winkle-Direct

1   A.  Yes, ma'am.

2   Q.  And this is labeled South Unit Health Unit proximity to

3   Dorm 1, correct?

4   A.  That's correct.

5   Q.  Did you realize after your testimony that you had                03:56PM

6   inadvertently mislabeled this photograph?

7   A.  Yes, ma'am, I did.

8   Q.  Would you like to correct that today?

9   A.  Yes, ma'am, I would, greatly.

10  Q.  What is the correction you would like to make?                   03:57PM

11  A.  I believe in this photo we are alluding to fact that the

12  dorm in the back of the picture is Dorm 1 when, in fact, that

13  is Dorm 3.  Dorm 1 lies behind that.

14  Q.  Could you then just in the labeling that is already on the

15  photo perhaps cross out Number 1 and make that a 3?                 03:57PM

16  A.  Yes, ma'am.

17  Q.  So looking at this photograph can you just tell us

18  generally in relation to Dorm Number 3 that we're looking at,

19  which is Dorm Number 3?  The blue building?

20  A.  Yes, ma'am, it is.  Gray and blue.                              03:57PM

21  Q.  Where would Dorm Number 1 be in relationship to Dorm Number

22  3 that is pictured?

23  A.  It would be two buildings behind that particular dorm.

24  Q.  No further questions.

25          THE COURT:  Any cross?                                      03:57PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Van Winkle-Direct

 1          MS. KENDRICK:  Yes, sir.

 2                      CROSS-EXAMINATION

 3   BY MS. KENDRICK:

 4   Q.  So you previously testified Dorm Number 1 was the dormitory

 5   closest to the medical clinic, correct?                    03:58PM

 6   A.  Yes, ma'am, I did.

 7   Q.  It's, in fact, two buildings away from the medical clinic,

 8   correct?

 9   A.  Yes, ma'am, it is.

10   Q.  And you testified that you asked Deputy Warden Mattos to go  03:58PM

11   speak with Mr. Oyenik, correct?

12   A.  Yes, ma'am.

13   Q.  Were you present for this conversation between Mr. Mattos

14   and Mr. Oyenik?

15   A.  No, ma'am, I was not.                                  03:58PM

16   Q.  So you have no personal firsthand knowledge about what was

17   said that evening to Mr. Oyenik by Mr. Mattos?

18   A.  No, ma'am, I don't.

19   Q.  And I believe you testified before last month that the

20   deputy warden went to Units 7 and 8 to ask people with        03:58PM

21   disabilities if they wanted to move to Building 1?

22   A.  Yes, ma'am.

23   Q.  And that was on Monday, July 17th?

24   A.  I don't remember the date, ma'am, but that sounds right

25   around the correct time.  Yes, ma'am.                      03:59PM

1    Q.  You testified that the prisoner signed inmate letters?

2    A.  Yes, ma'am.

3    Q.  I'm showing you what's been marked as Defendants' Exhibit

4    29.  If you could just quickly flip through those and tell me

5    what date the prisoner signed these inmate letters?                03:59PM

6    A.  The 17th of July, 2017.

7    Q.  Okay.  And you previously testified that Mr. Mattos had

8    told you that he had prisoners sign inmate letters that day he

9    went to talk to them, correct?

10   A.  Just to make sure that we're not -- we're talking about the   03:59PM

11   date that he went to talk to them about moving to Dorm 1,

12   correct?

13   Q.  Correct.

14   A.  Not the day he went to talk to Mr. Oyenik.

15   Q.  Yes.  Those are two separate things.                           04:00PM

16   A.  Yes, ma'am.

17   Q.  So if those are signed and dated July 17th, is it safe to

18   surmise July 17th was the date that DW Mattos went there?

19   A.  Yes, ma'am.

20   Q.  And you did not go along with DW Mattos, correct?              04:00PM

21   A.  No, ma'am.

22   Q.  So you don't know what exactly was said by DW Mattos to the

23   prisoners, do you?

24   A.  No, ma'am, I don't.

25   Q.  Do you know why Mr. Mattos went to these units on July         04:00PM

1   17th?

2   A.   Just to find out whether any inmates wanted to move closer

3   to the new health unit.

4   Q.   Did you order Deputy Warden Mattos to go make these

5   announcements?                                                        04:00PM

6   A.   No, ma'am.

7   Q.   Do you know if anybody ordered him to make those

8   announcements?

9   A.   Not to my knowledge, ma'am, no.

10          MS. KENDRICK:  I have nothing further.                        04:01PM

11          THE COURT:  Any redirect?

12          MS. LOVE:  Nothing further.

13          MS. KENDRICK:  I would like to move Exhibit 29 into

14   evidence.

15          MS. LOVE:  No objection.                                      04:01PM

16          THE COURT:  29 will be received.

17          Because of something you haven't testified about but

18   because of your experience in working at the Department of

19   Corrections and I am imagining your frequent use of the e-mail

20   system, I'm going to ask you a question if you happen to able       04:01PM

21   to answer something that's been troubling me.  That's with

22   respect to something that's been admitted as Exhibit 1, this

23   highlighted portion I'm showing you says the e-mail was sent on

24   Saturday the 21st of July, 2017.  And I can tell you for sure

25   that the 21st of July was a Friday.                                  04:01PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Van Winkle-Cross

1          Do you have any idea why that might show up on the

2   printout of an e-mail?

3          THE WITNESS:  I do not, Your Honor.

4          THE COURT:  Have you ever noticed any kind of

5   incongruity like this in the past?                                    04:01PM

6          THE WITNESS:  No, sir, I have not.

7          MR. STRUCK:  Your Honor, I wanted the Court to be

8   aware we're checking into that issue.  We think it might be

9   when the ESI was actually downloaded that that stamp got put on

10  there because the folks that are sitting behind us took a look    04:02PM

11  at that and say, well, they don't ever have those kinds of

12  stamps.  We're checking with the technological folks.  Maybe

13  we'll be able to get an answer to your question.

14         THE COURT:  Thank you.  It's just so curious.  You

15  could understand by maybe what you just said that could explain   04:02PM

16  how the date could be wrong but it doesn't seem to suggest how

17  an incongruity can exist between the day and the date.  It just

18  is very puzzling.

19         Last time that you were in court I expressed my

20  appreciation for you to come to court.  And I have since then     04:02PM

21  thought that it was also important to make sure that people

22  understood why it was that I was so focused on retaliation even

23  when there would be a suggestion that there would be no

24  retaliation on the record.

25         And I guess because of your position as a deputy           04:03PM

UNITED STATES DISTRICT COURT

1    warden and the opportunity to talk to you again here today, I

2    just want to take just a couple minutes to tell you exactly why

3    it is I do this.  Because on one level you could say wait a

4    minute, I know the system.  I know that in these circumstances

5    there were good reasons for what we did.  It wasn't                04:03PM

6    retaliatory.  Why is the judge off on this kind of frolic and

7    detour.

8         Well, the reason is because the stipulation that I'm

9    enforcing requires me to get information from a couple of

10   sources.  And that information on one source starts with the      04:03PM

11   inmates talking to their lawyers.  And the second source is

12   when people come here and testify, or when they are just

13   thinking in their heads do they want to talk?  Do they want to

14   send a letter?  So I have to make sure that that information

15   pipeline is completely open.  And the problem is, even if         04:04PM

16   retaliation is not real because you know it's not real, the

17   specter of it, what I have called a ghost of the retaliation,

18   is really as poisonous as it is when it's in its concrete form.

19   So that means that I apply a very broad brush approach to this.

20   That is, if I hear that there's been some change in somebody's    04:04PM

21   conditions of confinement or there's been some kind of

22   disciplinary action that's taken close in time to when they

23   have testified here in court or provided information to their

24   lawyers, that creates, for people who are watching what

25   happens, the appearance of what looks like retaliation.           04:04PM

 1          So whether it's true or not, it is as poisonous to my

 2   process of having the open communication.  And I appreciate

 3   that when I apply this broad brush approach I'm interfering

 4   with something that is an important goal of yours, and that is

 5   to make sure the rules are followed.  But often times in life      04:05PM

 6   we run into two competing goals that are both worthy and both

 7   good but both can't be satisfied at the same time.  So we have

 8   to make a choice.  We have to weigh which one are we going to

 9   focus on at one point.

10          Just to give you an example of how I looked at things,      04:05PM

11   it's unresolved as exactly what happened but there was a

12   suggestion earlier in the case that when people talked to the

13   plaintiffs' lawyers they immediately got a write-up for having

14   their shirttails out without saying that we know for sure

15   whether that happened or not.  If it did happen, even if their     04:05PM

16   shirttails were out, my rule would be find another time to

17   sanction them for the shirttail.  Because even though you have

18   got a good reason for the rule of having shirttails in, it is

19   interfering when applied close in time to when somebody

20   testifies or when they talk to the lawyers.  If that kind of       04:06PM

21   infraction is imposed it could create the perception that there

22   was retaliation and that perception is poisonous to my free

23   flowing exchange.

24          So that exchange is so important that I have to

25   sometimes say to you all, you have to subvert this other goal      04:06PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Van Winkle-Cross

1   for a while, or if you think that it's so important that I have

2   made the wrong call on the balancing, I'm always giving the

3   lawyers an opportunity to make the case to me.  Tell me why it

4   was so important to say no shirttails on this day when the

5   lawyers were there.  And if you can make a good argument to          04:06PM

6   that, I will listen to it and I will act.  But if it's true

7   that it was a shirttail thing on the day, I would say find

8   another day to impose that rule.

9            And so that's why we have to be really careful, all of

10  us, in this process to make sure that that pipeline of            04:06PM

11  information is open and that it's unimpaired by any fear of

12  retaliation.  And so that's why when people have an adverse

13  consequence come to them close in time to when they provided

14  that information, we have to maybe sometimes say we're not

15  going to impose that consequence because we have the danger of    04:07PM

16  creating a perception on the yard that this is what happens.

17           So I thank you for listening.  I thank you for coming

18  here again today and being so patient waiting all the time.

19  Thank you, sir.

20           Please call your next witness.                           04:07PM

21           MS. LOVE:  Your Honor, defendants call Deputy Warden

22  John Mattos.

23           THE COURT:  Sir, if you would please step forward to

24  the clerk of the court to be sworn.  Thank you.

25           (The witness was sworn.)                                 04:08PM

 1        THE COURT:  Good afternoon, sir.  I'm sorry that we

 2   probably made you wait a long time.

 3        THE WITNESS:  It's okay.

 4                    JOHN MATTOS,

 5   a witness herein, having been first duly sworn by the clerk to

 6   speak the truth and nothing but the truth, was examined and

 7   testified as follows:

 8                 DIRECT EXAMINATION

 9   BY MS. LOVE:

10   Q.  Would you please state your name for the record?          04:08PM

11   A.  John Paul Mattos.

12   Q.  Who is your employer?

13   A.  The State of Arizona Department of Corrections.

14   Q.  What is your position?

15   A.  I'm a deputy warden at the South Unit in the Florence      04:08PM

16   complex.

17   Q.  How long have you served as the deputy warden at the South

18   Unit at the Florence complex?

19   A.  Just over a year.  13 months right now.

20   Q.  How long have you worked for the Department of Corrections? 04:09PM

21   A.  Total about 17 years.

22   Q.  What positions have you held during your 17-year career?

23   A.  I was a Correction Officer II, started at Eyman.  Then I

24   was a Corrections Officer III, programs officer there in

25   Tucson, then a Corrections Officer IV in Tucson and associate   04:09PM

1    deputy warden in Eyman complex at the Special Management Unit.

2    Q.  Prior to starting your career in corrections with the

3    Arizona Department of Corrections, was that your first

4    go-around, I guess, in corrections or do you have other

5    experience?                                                    04:09PM

6    A.  No, ma'am.  I actually started in Hawaii.  I was a

7    correction officer there, also a correctional sergeant.  Spent

8    a little bit of time there, decided to move to Arizona and

9    continue working that career.

10   Q.  How long did you work in corrections with the State of      04:09PM

11   Hawaii?

12   A.  Approximately 8 to 10 years.

13   Q.  What are your duties as the deputy warden at Florence South

14   Unit?

15   A.  I'm the lead administrator for the unit.  I oversee daily   04:10PM

16   operations.  I assure that all the security functions are met

17   for the public safety and I also address the issues for the

18   unit as far as budget, personnel issues, and also deal with our

19   contracted vendors and other entities that do come into the

20   prison system.                                                 04:10PM

21   Q.  What is your inmate counts at the South Unit?

22   A.  Last I had was 922.  Our population can go up to 967 at my

23   unit.

24   Q.  Is the South Unit considered a special population?

25   A.  Yes, it is.  We do house sex offenders there.             04:10PM

1   Q.  Is it an open yard?

2   A.  Yes, it is.

3   Q.  And what do you mean by "open yard"?

4   A.  We generally open up in the morning, and the only times we

5   close is during count times or if there's a major situation          04:11PM

6   that we need to pool our resources.  But other than that we

7   remain open until 8:00 at night.

8   Q.  Is inmate Robert Oyenik currently assigned to the South

9   Unit?

10  A.  Yes, he is.                                                       04:11PM

11  Q.  Was he assigned to the South Unit in June and July of 2017?

12  A.  Yes, from my knowledge.

13  Q.  Are you aware of whether or not on July 14th of 2017 Mr.

14  Oyenik was transported here to the federal courthouse to

15  testify in the Parsons versus Ryan litigation?                       04:11PM

16  A.  Yes, ma'am.

17  Q.  And did you receive any direction on that same date to

18  verify with Mr. Oyenik whether when he returned to the South

19  Unit that his property was intact?

20  A.  Yes, I did.                                                       04:11PM

21  Q.  Who did you receive that directive from?

22  A.  Deputy Warden of Operations Jeff Van Winkle called me.  I

23  was already on the yard.  I told him okay, let me go run and

24  check.  He asked me to see if the Inmate Oyenik had his

25  property.  I said, okay, no problem.  I'm out here already.  It      04:12PM

```
 1    was the end of the day so I was finishing some stuff up with a
 2    couple sergeants and a lieutenant.  We walked over to his
 3    building.  He was asleep.  I kind of said it, you know, hey,
 4    Mr. Oyenik, I need to check if you have all your property.  And
 5    he kind of woke up in a daze.  And I said, do you have all your      04:12PM
 6    property?  He said yeah.  He asked me why.  I said I just need
 7    to make sure and then I left.  And I went and called Mr. Van
 8    Winkle and explained to him, hey, just confirmed it myself that
 9    the property was there.
10    Q.  Did you ever make any statement to Mr. Oyenik that the          04:12PM
11    judge called and said, you accused me of taking all your
12    property?
13    A.  No, ma'am.
14    Q.  You said Mr. Oyenik was asleep when you made contact with
15    him?                                                                04:13PM
16    A.  Yes, he was.
17    Q.  Where was he asleep, like on his bed?
18    A.  Yeah.  He was in his bunk.  And he had his fan on top of
19    his boxes stacked in front of him.  So, you know, I went in
20    there and I said, Inmate Oyenik.  And he was kind of like in a     04:13PM
21    grog.  When he woke up I asked him, do you have all your
22    property?  He asked why, and I said yes, I just need to know.
23    Do you have all your stuff?  He said yes.  I said okay, good,
24    and I left.
25    Q.  Did you confirm with Deputy Warden of Operations Van Winkle    04:13PM
```

1    that Mr. Oyenik had stated he had all of his property intact?

2    A.  Yes.  As soon as I got out of the building I called him up

3    told him over the phone, hey, I just confirmed myself he's got

4    his property.  And I left for the day.  I was already running

5    late because it was past 5 and, you know, I usually leave at 5.    04:13PM

6    But I was doing something else.

7    Q.  Do you recall what dorm Mr. Oyenik lives in?

8    A.  He lives in Dorm 9.

9           MS. LOVE:  Your Honor, may I approach?

10          THE COURT:  You may.                                        04:14PM

11   BY MS. LOVE:

12   Q.  Warden, if you could take a look at Exhibit 26 in front of

13   you, tell me if you recognize what is in Exhibit 26?

14   A.   Okay.  This is Dorm 9 and it's the entrance into Abel run,

15   and then it's the run where Mr. Oyenik lives.                      04:14PM

16   Q.  Let me stop you there.  Is Exhibit Number 26, is that

17   comprised of four photographs?

18   A.  Yes.

19   Q.  Looking at Page 1 of Exhibit Number 26, is this the door

20   and the entrance to Dorm Number 9?                                 04:14PM

21   A.  Yes, it is.

22   Q.  And Page 2 of Exhibit Number 26, what does this photograph

23   show?

24   A.  That would be the entryway into Abel run in Lincoln Dorm,

25   or Dorm 9.                                                         04:15PM

1   Q.  Page 3 of Exhibit Number 26, what does this photograph

2   show?

3   A.  That would be a picture of the entire run with beds on

4   either side.

5   Q.  Is this the run Mr. Oyenik lives in?                    04:15PM

6   A.  Yes, it is.

7   Q.  As you look at this photo, are you able to tell us which --

8   at what approximate location Mr. Oyenik lives and the location

9   where you contacted him on July 14th?

10  A.  Sure.  You see the large fan in the middle of the run?   04:15PM

11  He's right about there.  That's about where his bed is on the

12  left-hand side.

13  Q.  Is that where you asked the question of him of whether he

14  had his property?

15  A.  Yes, ma'am.                                             04:15PM

16  Q.  And he was laying on his bunk?

17  A.  Yes, ma'am.

18  Q.  Page 4 of Exhibit Number 26, what does that photograph

19  show?

20  A.  That's just a little bit closer of the back part of the run 04:15PM

21  so you could see how -- when you start walking in, you can see

22  how far apart they are.

23  Q.  Do you know whether or not Mr. Oyenik is assigned to the

24  bunk that's in front of the black fan or in the back of?

25  A.  I think --                                              04:16PM

 1          THE COURT:  Sorry sir.  We have a lawyer appearing

 2   telephonically and apparently the service that provides that

 3   telephonic link reminds us that we have been on the phone.

 4          THE WITNESS:  Well, what's happening is the bunk

 5   that's right behind it is his bunk.                            04:16PM

 6   BY MS. LOVE:

 7   Q.  When you had the conversation with Mr. Oyenik that day

 8   about his property, were there other inmates in the dorm?

 9   A.  There could have been.  I didn't notice it.  It would

10   probably be about the same as what we have here because this is  04:16PM

11   about the same time for the picture, that the picture was

12   taken.  It was about 5:30, 5:45 in the afternoon, so hard to

13   say because that's when we are doing our dinner line.  So I'm

14   pretty sure there was inmates in there.

15   Q.  Were there any other facility staff with you when you had  04:17PM

16   the conversation with Mr. Oyenik?

17   A.  Yes.  There was two sergeants and a lieutenant that was

18   with me.

19   Q.  And was there any particular reason that you took them with

20   you to talk to Mr. Oyenik?                                     04:17PM

21   A.  No.  Not necessarily.  They weren't there for him.  They

22   were just with me on the yard because I was looking for other

23   things.  We were having an issue with our programs area, and I

24   needed to retrieve a thumb drive that had a program on it that

25   I wanted to review before one of our CO-3s was going to start  04:17PM

1    that program.  They were just with me looking for the thumb

2    drive in the CO-3's office that's in Building 7 which is

3    relatively close to building 9.  And generally whenever I go on

4    a yard the supervisors tend to want to be with me so if I see

5    anything they can address it.                                    04:18PM

6    Q.  Are you aware of whether or not Mr. Oyenik has made any

7    claims that as a result of you having a conversation with him

8    maybe in front of other inmates about his property that he has

9    been assaulted or intimidated by other inmates because of that

10   conversation you had with him?                                   04:18PM

11   A.  Only when I received the brief that I was accused of

12   confronting him in front of inmates and causing him to have a

13   hardship, which I didn't think I did because I just asked him

14   about his property.  So really, I didn't know about that.

15   Q.  In this year of 2017, has the medical unit there on South   04:18PM

16   Unit moved locations?

17   A.  Yes, it has, ma'am.

18   Q.  And why?

19   A.  So when I arrived there about a year ago, I had a lot of

20   complaints when I would have my town hall meetings with the     04:18PM

21   inmates, and a lot of the complaints were the medical lines

22   were a little longer than whatnot.  So through a process with

23   my shift commanders we discussed moving our medical.  And when

24   we did, that happened about February of last year, and when it

25   was decided we were going to move it it was for the intense     04:19PM

1    purpose of creating a better flow for our medical unit.

2    Q.  When was the medical unit actually moved locations?

3    A.  It was moved July of this year, the 9th.

4    Q.  Are there particular dorms where you house inmates who are

5    considered ADA inmates there at the South Unit?                      04:19PM

6    A.  Yes.  Yes, we do.

7    Q.  Where?

8    A.  I have Dorm 1, Dorm 7, and Dorm 8.

9    Q.  When you moved the medical units, where -- can you just

10   describe for us where physically you moved it, physically,          04:19PM

11   where from to where to?

12   A.  So it was in the back of our unit.  It was considered

13   our -- the farthest area in the back of our unit.  I moved it

14   to the front area of our unit where we have a little bit more

15   control of traffic.                                                 04:20PM

16   Q.  Was it also a bigger space?

17   A.  Very much so.  I was able to have, I think it was a total

18   of four offices gained and a waiting lobby and a waiting area

19   outside.

20   Q.  When you moved the medical unit up towards the front of the     04:20PM

21   complex then physically that made it farther away for the

22   inmates, ADA inmates, who are housed in Dorm 7 and 8, correct?

23   A.  Yes, ma'am.

24   Q.  Did you provide the inmates housed in Dorms 8 and 7, the

25   ADA inmates, the opportunity to move up to Dorm Number 1 which      04:20PM

1   is closer to the new medical unit?

2   A.  Yes, we did.  That was part of the plan that was in place

3   to do that.  We went in and we talked to them about it.

4   Q.  Do you know approximately when the movement to Dorm 1 was

5   offered to the ADA inmates in Dorms 7 and 8?                    04:21PM

6   A.  I would say the 17th.

7   Q.  And why was it the 17th?  Was there any particular reason

8   it was the 17th of July that the offer was made?

9   A.  That was about a week after we had already moved medical

10  and some of the other issues that we were telling with on the  04:21PM

11  yard itself were starting to become evident.  And I needed to

12  take the next step in the plan, which was already to move some

13  of the inmates if they wanted to.  It's a matter of if I was

14  going to move them then I would have to make the ADA

15  accommodations.  So I would need to know how many inmates would 04:21PM

16  want to move so I can do that.

17  Q.  Did you make the offer to the inmates, the ADA inmates

18  housed in Dorm 7 and 8 to move to Number 1 as a result of

19  anything that Mr. Oyenik may have testified to here in court on

20  July 14th?                                                     04:21PM

21  A.  No, ma'am.  No, ma'am.  This was done because I already

22  knew that it was going to be a problem, because some of the

23  inmates that are in 7 and 8, it's a four-minute walk, I think,

24  from where they live now to the new medical.  So in order to

25  accommodate a little bit more, because the plan was to improve  04:22PM

1    overall medical facility, we had to take that into

2    consideration.

3    Q.  How did you accomplish providing the inmates the

4    opportunity to move up to Dorm 1, the ADA inmates that were in

5    7 and 8?                                                          04:22PM

6    A.  I went down there myself and I met with the inmates and

7    talked to them about moving.  And I explained to them exactly

8    if you want to move, that's fine.  If you don't, that's fine.

9    But I need to know so I know what I need to do to make

10   accommodations, you know.  There's nowhere in the unit where I   04:22PM

11   can put all of them together.  So I have to be able to make

12   accommodations wherever we're going to be putting them.

13   Q.  Did you ask the inmates to write inmate letters just

14   indicating what their choice was whether they wanted to move or

15   not move?                                                        04:23PM

16   A.  Yes, ma'am.

17   Q.  Why did you ask them to write inmate letters?

18   A.  For my tracking and documentation purposes so the inmates

19   that did want to move, I would have documentation so that I

20   would know what plan I would need to take to move forward.       04:23PM

21   Q.  So you are looking to see, do I have documentation of what

22   are the numbers, how many people want to move?

23   A.  Exactly, ma'am.

24   Q.  Were the inmates advised they could change their minds

25   later?                                                           04:23PM

1    A.  Yeah.  There was never a time that the inmate had to make

2    their final decision.  The inmate letter wasn't even a

3    requirement.  I asked them to do it so I would have that

4    paperwork to document that.

5    Q.  Sitting here today, if an inmate who previously in July          04:23PM

6    said I want to stay in Dorm 8 but, say, tomorrow wishes to move

7    to Dorm 1, could they make that request?

8    A.  Sure.

9    Q.  Were any inmates who lived in Dorms 8 or 7 forced to move

10   to Dorm 1?                                                          04:24PM

11   A.  No.

12   Q.  Were there any inmates in Dorm 7 or 8 in July when you had

13   that conversation with them as to their choice, were there any

14   that chose to move to Dorm 1?

15   A.  Yes.  I had two.                                                04:24PM

16   Q.  If you take a look at Exhibit Number 29 that is in front of

17   you, do you recognize the documents that are in Exhibit 29?

18   A.  Yes.  These are the inmate letters I requested that they

19   fill out.

20        MS. LOVE:  Defendant's move for admission of Exhibit          04:24PM

21   Number 29 which may actually already be in evidence through

22   plaintiffs.

23        THE COURT:  Any objection?

24        MS. KENDRICK:  29 has already been admitted, but yes,

25   no objections.                                                     04:24PM

1          THE COURT:  Thank you.

2          MS. LOVE:  I believe I forgot to move 26 into evidence

3    which were the photos of Dorm 9.

4          MS. KENDRICK:  We don't see the relevance, but no

5    objections.                                                  04:25PM

6          THE COURT:  That will be received as well.

7    BY MS. LOVE:

8    Q.  Mr. Oyenik, he lives in Dorm 9, correct?

9    A.  Yes, ma'am.

10   Q.  Not in 8 or 7?                                           04:25PM

11   A.  No, ma'am.

12   Q.  Not in 1?

13   A.  Not in 1.

14   Q.  He's not an ADA inmate?

15   A.  Not that I know of.                                      04:25PM

16         MS. LOVE:  Those are all the questions I have, Warden.

17   Thank you very much.

18         THE COURT:  Any cross-examination?

19         MR. FATHI:  Yes, Your Honor.  In addition, we were

20   just provided earlier today an additional document that counsel  04:25PM

21   acknowledged should have been provided in discovery.  But in

22   any event we have it now and we would like to make it an

23   exhibit.

24         So if I may have a minute to mark them.

25         THE COURT:  You may.                                   04:25PM

1          MR. FATHI:  Thank you.

2                    CROSS-EXAMINATION.

3    BY MR. FATHI:

4    Q.  Good afternoon, Mr.  Mattos.

5    A.  Good afternoon.                                    04:26PM

6    Q.  And you testified about what you call ADA dorms, is that

7    correct?

8    A.  Yes, sir.

9    Q.  Are you familiar with the U.S. Department of Justice's ADA

10   accessibility guidelines?                              04:26PM

11   A.  I'm familiar with it.

12   Q.  You have reviewed those?

13   A.  Not reviewed them totally, but I am familiar with some of

14   their guidelines.

15   Q.  I'm sorry.  If you haven't reviewed them how are you       04:26PM

16   familiar with them?

17   A.  I'm not a maintenance specialist, sir, so I would not be

18   able to answer to those exact specifications.  I do know that

19   ADA accommodations and ADA needs are met through our facilities

20   operations.                                            04:26PM

21   Q.  Have you ever reviewed the U.S. Department of Justice's ADA

22   Accessibility Guidelines?

23   A.  Sure.  Yes.

24   Q.  Which year's edition have you reviewed?

25   A.  If I'm not mistaken it was 2010.                    04:27PM

1    Q.  When was the last time you reviewed those?

2    A.  Maybe a couple weeks ago.

3    Q.  And did you review them from start to finish?

4    A.  No.  I was just looking for references.

5    Q.  How long have you been -- excuse me.  Did you review any          04:27PM

6    documents in preparation for your testimony today?

7    A.  Not really.  I mean, I have seen the pictures.

8    Q.  Other than the photos that have been admitted as Exhibit

9    26, you didn't review any documents in preparation for your

10   testimony today?                                                      04:27PM

11   A.  I don't know what you mean by documents, sir.

12   Q.  I mean words written on a piece of paper?

13   A.  Okay.  I mean, but I don't know what documents.  I review

14   hundreds of documents daily within my duties.  I don't know

15   which documents you are talking about, sir.                           04:27PM

16   Q.  I'm asking if you reviewed any documents to help you

17   prepare for your testimony today?

18   A.  No.  Not that I know of.  I didn't read anything.  There

19   was nothing that somebody prepared for me.

20   Q.  Putting aside something that someone prepared for you, did        04:28PM

21   you review any documents in preparation for your testimony

22   today?

23   A.  Again, no.  I'm going to say no.

24   Q.  Did you talk to anyone in preparation for your testimony

25   today?                                                                04:28PM

```
 1   A.   Yes.

 2   Q.   And who was that?

 3   A.   Ms. Love.

 4   Q.   Anyone besides Ms. Love?

 5   A.   Not for my testimony, no.                              04:28PM

 6   Q.   You seem to be qualifying your response.  What I'm asking

 7   is did you talk about the fact that you would be testifying

 8   today, the subject matter of your testimony today, what you

 9   were going to be testifying today to anyone other than Ms.

10   Love?                                                       04:28PM

11   A.   My wife.

12   Q.   Anyone other than Ms. Love and your wife?

13   A.   No.

14   Q.   Okay.  How long have you been familiar with Mr. Oyenik?

15   A.   From July 14th.                                        04:29PM

16   Q.   You did not know him before July 14?

17   A.   No, I did not.  I have never had any dealings with him.  I

18   never spoke to him before that date.

19   Q.   So you know that Mr. Oyenik testified in this courtroom on

20   July 14th?                                                  04:29PM

21   A.   Sure.

22   Q.   And when did you learn that fact?

23   A.   On July 14th.

24   Q.   And how did you learn that fact?

25   A.   In the morning when they were preparing transportation they 04:29PM
```

1    advised me he was leaving out for hearing in Judge Duncan's

2    court.  So I was like, okay, good, you know.  They notified me

3    because I'm the administrator for the unit.

4    Q.  And you testified that you spoke to Mr. Oyenik on July 14th

5    after he returned from court, correct?                          04:29PM

6    A.  Yes.

7    Q.  So you knew when you spoke to him that he had been earlier

8    that day testifying in Judge Duncan's courtroom?

9    A.  Sure.

10   Q.  Now, you testified that you had -- there were two sergeants  04:30PM

11   and a lieutenant present when you spoke to Mr. Oyenik?

12   A.  Yes, sir.

13   Q.  Is it your standard practice to have other officers present

14   when you speak to prisoners?

15   A.  Actually, yeah, it is.  As I'm the administrator of the      04:30PM

16   unit, when I go out on the yard, the supervisors tend to want

17   to walk with me because if I want to address something, let's

18   say there's some compliance issues or maybe there's some trash

19   out in the yard, that is what they come along on the walk for.

20   It's just like any other person that represents a company or    04:30PM

21   runs a company.  If they are going to go out there, their

22   supervisor that they use will go with them so that they can

23   address anything that's going on.  That's the reason why any

24   yard, when I was an officer, I used to do the same thing when

25   my supervisors came on the yard.  I would make sure, hey,        04:30PM

1    what's going on?  What do you need me to do?  Same thing

2    supervisors do with me.

3    Q.  The reason I'm asking is it does seem, given everything

4    else that the prison staff has to do, it does seem a bit

5    inefficient to have four, yourself, two sergeants, and a          04:31PM

6    lieutenant all going to talk to one prisoner.  But your

7    testimony is that's pretty much standard practice?

8    A.  Okay.  So the shift commander runs the shift.  One of the

9    sergeants was a support sergeant so he's in charge of the work

10   crews.  The other sergeant is the kitchen sergeant so if I tour  04:31PM

11   the kitchen, and usually when I go on the yard I tour the

12   kitchen, that's the reason why he -- generally the shift

13   sergeants won't come with me.  It would just be the shift

14   commander.  The shift sergeants will take care of the shift,

15   and then the support Sergeant will always go with me because if  04:31PM

16   I see a project that needs to get done they will write it down,

17   they will get the work orders in, and they'll get that

18   completed.

19   Q.  Are your testimony is that it's not unusual to have --

20   A.  Not at all.  Every Wednesday.                                04:31PM

21   Q.  We need to try to not talk over each other so the court

22   reporter can write everything down.  Okay?

23   A.  Okay.

24   Q.  Thank you.  Now, I want you to tell me using your exact

25   words or as close to your exact words as you can what you said   04:32PM

1    to Mr. Oyenik on July 14th.

2    A.  Oyenik.  Hey, I need to know if you have your property.

3    And then when he asked why, I said I just need to know if you

4    have all your property.  And he stated, yeah, I got it all.  He

5    looked bewildered.  And I left.  I had no reason to be in there    04:32PM

6    at all except to check for his property.  So I wasn't trying to

7    stay there any longer.

8    Q.  But when you spoke to Mr. Oyenik you did mention the fact

9    that he had just been in court, correct?

10   A.  No.  I'm going to tell you the truth, if I did I don't    04:32PM

11   remember saying those exact words.  I do remember asking him if

12   he had his property.  If I said, do you have your property

13   after returning from court?  I might have said something like

14   that, sure.

15           MR. FATHI:  May I approach, Your Honor?    04:33PM

16           THE COURT:  You may.

17           THE WITNESS:  Is that for me?

18   BY MR. FATHI:

19   Q.  Yes.

20   A.  Okay.    04:33PM

21   Q.  Mr. Mattos, I have shown you what's been marked as

22   Defendant's Exhibit 30.  Please take a minute and look at it

23   and let me know when you are able to answer questions.

24   A.  Okay.  I'm ready.

25   Q.  What is this document?    04:33PM

1   A.  This is a document that I was asked to send to my northern

2   regions operations director.  He oversees the complex that I

3   work at.  And it was explaining what it is that happened with

4   the situation with Mr. Oyenik.

5   Q.  So you wrote this document?                                    04:33PM

6   A.  Yes, I did.

7   Q.  Okay.

8   A.  It's dated July 19.  That's when I wrote it.

9   Q.  If you look down about six lines, about two-thirds of the

10  way, two-thirds of the way across the page from the left, you    04:34PM

11  write, I stated, quote, "No, I just needed to confirm you had

12  your property after returning from court," end of quote.

13  A.  Sure.  If I wrote that.

14  Q.  Then that's what you said?

15  A.  Yes.                                                          04:34PM

16  Q.  Let's talk about this document a little bit more.

17  A.  Sure.

18  Q.  You said you were asked to write it?

19  A.  Yes.

20  Q.  By whom?                                                      04:34PM

21  A.  By Mr. Trujillo.  It's titled to him.

22  Q.  And when did Mr. Trujillo ask you to write this document?

23  A.  If I'm not mistaken, that same day.  That's why it's dated

24  on the 19th.

25  Q.  And you actually wrote this on July 19th?                     04:34PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Mattos-Cross

1   A.  Yes.

2   Q.  Did Mr. Trujillo say why he was asking you to write this?

3   A.  Because there was a complaint made about Mr. Oyenik stating

4   that I supposedly said that the judge called me, which I don't

5   know where he got that from.                                    04:35PM

6   Q.  And how did you learn that that complaint had been made?

7   A.  Excuse me?

8   Q.  How did you learn that that complaint had been made by Mr.

9   Oyenik?

10  A.  I guess the complaint had already been forwarded to me.  It  04:35PM

11  was already filed, so I had the documentation.  So Mr. Trujillo

12  wanted me to give an explanation so then that way he understood

13  what was going on that day.

14  Q.  So you had been given a copy of a document that was written

15  by the plaintiffs' attorneys that described Mr. Oyenik's        04:35PM

16  complaint?

17  A.  Yes.  Well, I wasn't given a copy.  I was told about what

18  was being claimed against me.

19  Q.  Well that's what I want to be precise about.  So you

20  weren't shown any written version of Mr. Oyenik's complaint?    04:35PM

21  A.  Not at that time, no.

22  Q.  As of the time you wrote this memo you had not seen

23  anything in writing about Mr. Oyenik's complaint?

24  A.  No.

25  Q.  It had been described to you?                               04:36PM

1    A.  From what I remember, yes.

2    Q.  Described to you by whom?

3    A.  By Mr. Trujillo.  He was there at my unit that day.

4    Q.  Is it your -- when you speak to a prisoner is it your

5    normal practice to document that in a memo to Mr. Trujillo?          04:36PM

6    A.  No.  Not always.  Sometimes when it's concerning other

7    things it is.

8    Q.  Before this July 19th document, when was the last time you

9    had documented your conversation with a prisoner in a memo to

10   Mr. Trujillo?                                                        04:36PM

11   A.  Maybe I would say right around May.

12   Q.  Of this year?

13   A.  Yeah.

14   Q.  And what --

15   A.  I have about seven or eight inmates on my yard that are          04:36PM

16   very litigious, so I keep in constant contact with Mr. Trujillo

17   because of them.

18   Q.  So if I understand your testimony, the last time you wrote

19   a memo similar to this to Mr. Trujillo about your conversation

20   with a prisoner would be about May of this year?                     04:37PM

21   A.  I would say so, yeah.

22   Q.  So you testified that on July 17th, you went to Building 8,

23   correct?

24   A.  Building 7 and 8.

25   Q.  7 and 8.                                                         04:37PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Mattos-Cross

1   A.   Yes.

2   Q.   And remind me what other prison staff were with you at that

3   time.

4   A.   When I went on the 17th?

5   Q.   Yes.                                                            04:37PM

6   A.   So I had our case managers and our programs manager, so

7   that would be the CO-3s and CO-4s.  They were with me when we

8   did that.

9   Q.   So how many other prison staff in addition?

10  A.   Four.  Oh, and my associate deputy warden also.                 04:37PM

11  Q.   Yourself plus five other people?

12  A.   Yeah.

13  Q.   And again, using your exact words or as close to your exact

14  words as you can recall, please tell me what you said.

15  A.   I kind of just said, hey, I'm down here to see if any of       04:38PM

16  you guys want to be relocated.  If you guys do want to be

17  relocated then you guys just need to let me know or you can

18  fill out this inmate letter if you don't want to, so that way I

19  have documentation.  So then that way I can make my

20  arrangements because I needed to make -- to finish my medical     04:38PM

21  move.

22  Q.   I think you testified no one instructed you to do that,

23  correct?

24  A.   You know what?  No.  I was not instructed to do it.  That

25  was already part of the plan I had set in place back in           04:38PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Mattos-Cross

1    February.

2    Q.   But specifically going to Unit 7 and 8 on July 17, that was

3    your idea, correct?

4    A.   Yes.

5    Q.   Why did you decide to go on that particular day?          04:38PM

6    A.   My health unit was open for a little over a week already.

7    I saw some of the problems, the complaints was already coming

8    in with the inmates.  So I went down there to address the

9    inmates.

10         When the inmates are having concerns and they bring it    04:39PM

11   to my supervisors then I will go down there and discuss it with

12   them so that way we can come to an agreement on how we need to

13   go forward with handling the issue.

14   Q.   In your conversations with the prisoners on July 17th, are

15   you 100 percent sure that you at no point mentioned Mr.         04:39PM

16   Oyenik's name?

17   A.   Sir, I'm not going to say I'm 100 percent sure.  But no, I

18   did not mention Mr. Oyenik's name.

19   Q.   I'm sorry, you are not 100 percent sure?

20   A.   There's never any time I can be 100 percent sure.          04:39PM

21   Q.   In your conversations with those prisoners on July 17th,

22   are you 100 percent sure that you made no mention of this case,

23   the Parsons versus Ryan case?

24   A.   I am 100 percent sure I cannot say that.

25   Q.   Why did you ask the prisoners to sign letters expressing    04:40PM

1    their views on where they wanted to be?

2    A.  So again, my medical move was not a one-day thing.  It was

3    a months in process plan, and that was part of the plan.  The

4    plan was to remove any inmates that did not want to be in

5    Buildings 8 and 7 anymore and move them closer.  If they did          04:40PM

6    not want to move then we would address that in other ways which

7    I was able to address in other ways so that our medical unit's

8    functions would work way better than what it was the months

9    previous to me being there.

10   Q.  Now, it's generally true, of course, that prisoners don't        04:40PM

11   get to decide where they are housed, correct?

12   A.  I would say most of the time.

13   Q.  So when was the last time that you went to a housing unit

14   and asked the prisoners to complete letters setting forth their

15   wishes about where they would like to be housed?                     04:41PM

16   A.  I would say me, personally, this would have been the first

17   one -- the last time.  But I have program staff that usually

18   take care of that and then that gets forwarded to me.  That's

19   usually who takes care of that.  This was a whole different

20   issue, because I was actually -- we were in the middle of the        04:41PM

21   big plan of moving medical.  But other than that, if I have

22   inmates who want to move, they will submit inmates letters

23   through the case manager and the case manager will bring it to

24   the programs manager and they will sit down with me and discuss

25   the inmate's move.  If we think it's a legitimate move for           04:41PM

1    improvement of the inmate's status then we'll move.

2    Q.  I'm not asking about cases in which prisoners, on their own

3    initiative, write to you and say they would like to move.  I'm

4    asking when was the last time before July 17 you went into a

5    housing unit and instructed a number of prisoners to write          04:42PM

6    letters expressing their wishes on where they want to be

7    housed?

8    A.  I have never done that because this is the first time I

9    have ever moved the medical unit.  The only reason I was there

10   was to move them because of the medical unit.  No other reason.    04:42PM

11   Q.  Nothing further.  Thank you.

12           Thank you, Mr. Mattos.

13           MS. LOVE:  No further questions.

14           THE COURT:  I have a couple questions.

15                          EXAMINATION                                  04:42PM

16   BY THE COURT:

17   Q.  Keep open, if you could, this Exhibit 30, the July 19th

18   memorandum that you prepared for regional director Trujillo.

19   Take a look at the sentence that starts halfway down a little

20   before that where it says, "On the 17th of July 2017 I reported    04:42PM

21   to South Unit for the day."

22           What does that mean that you reported to South Unit

23   for the day?

24   A.  That's just the standard way we would present a document or

25   stating what's going on so that they know this is how it           04:43PM

1    starts.  It's just I have been an officer working in

2    corrections for the last 27 years, so it's a way that I write

3    reports, and it kind of flows into everything else I write.

4    Generally I will start with dates so I will start with times

5    and I'll put proximates because it's the way I have been                      04:43PM

6    trained to do my report writing and stuff.

7    Q.  So it does or doesn't mean you were planing to be there the

8    whole day?

9    A.  No, I wouldn't have been there the whole day.  What it is,

10   is that's a Monday.  On Mondays I might get called away for          04:43PM

11   meetings because of the weekend and whatnot.

12   Q.  Okay.  And so you then traveled to Unit 7 and 8, is that

13   right?

14   A.  Yes, sir.

15   Q.  Or Dorm 7 and 8?                                                           04:44PM

16   A.  Yes, sir.

17   Q.  And what time of day did you do that?

18   A.  Oh, right in the morning.  I think it was right after my

19   morning meeting, so 8:30.

20   Q.  8:30?                                                                      04:44PM

21   A.  Yes.

22   Q.  How much time did you spend in Dorms 7 and 8?

23   A.  Oh, had to have been at least an hour.

24   Q.  Had you made arrangements with the people in charge of 7

25   and 8 so that they knew you were coming?                                      04:44PM

1    A.  Yeah.  The sergeant that was in my morning meeting, the

2    lieutenant, he actually let the staff know we were coming down

3    there.

4    Q.  So you just told the staff on the day of the meeting you

5    were coming that day?                                           04:44PM

6    A.  Yeah, to housing unit 7 and 8.

7    Q.  So there was no advance warning to them that you would be

8    coming?

9    A.  No.  Not at all.

10   Q.  And it says a little bit later on you were able to speak to   04:44PM

11   everybody.  How is it that it happened that everybody was there

12   on an open yard?  Why would it just turn out that everybody

13   would be there, and you would be able to do that?

14   A.  So at 8:30 is when our pill call is just finishing up, so

15   all the inmates are making it back to their dorm.  So when I     04:45PM

16   went into the dorm, I went to Dorm 7 first.  When I went into

17   Dorm 7, majority of those guys are wheelchair inmates.  I think

18   I have 60 or some in there.  Most of those inmates were already

19   in there in their wheelchairs.  Once the inmates found out I

20   was down there talking to the inmates in their areas most of     04:45PM

21   the inmates in Building 8 made their way back up.  When I went

22   to Building 8 they all -- we met right there right along the

23   day room and run of Building 8 and I had a long conversation

24   with all of them, talking to all of them about the reason we

25   need to look at these different changes.                         04:45PM

UNITED STATES DISTRICT COURT

1       I wasn't trying to punish nobody or move anybody out

2   of spite.  My concern was, I'm improving the medical.  I had

3   complaints about medical.  My goal was to improve medical.

4   Right now I have improved medical.  I have improved it.  The

5   times are way faster.  The wait times are less.  I have a                04:46PM

6   better waiting area.  Everything about it is better except one

7   little thing.  It was a little farther away.  So we made other

8   arrangements for that.

9   Q.  Okay.  And when you said that you and your staff were

10  interviewing inmates, did you do that on an individual basis or         04:46PM

11  did you talk to them as a group?

12  A.  In a group.  We was on the run talking with them, like case

13  managers were down there.  They were the ones that had the

14  inmate letters passing them out.  My programs manager, who is a

15  CO-4, and my associate deputy warden, they were along with me           04:46PM

16  and we were explaining to them this is why we're asking this.

17  This is why we're doing this.  It was all laid out to 45

18  different inmates.  I mean, I have nothing else except hey, I

19  need the notice so that way we can make arrangements.

20  Q.  When did you decide you were going to go on the 17th and            04:47PM

21  talk to everybody at 7 and 8?

22  A.  Like I said, right after my morning meeting.

23  Q.  But you had no idea before that morning meeting you were

24  going to go that day?

25  A.  Well, it was part of the phase plan that I had already laid         04:47PM

1    out in a draft that I had done.  Phase 1 was moving our CO-3s

2    into the housing units.  Phase 2 was getting the new medical

3    unit ready.  Phase 3 was moving medical into medical, the new

4    medical.  Phase 4 was talking to the inmates seeing who wants

5    to move closer.  Phase 5 was providing a better area for them                04:47PM

6    with more waiting area.  Now Phase 6 is I'm going to be redoing

7    the old medical into something else.

8    Q.  When did you decide that Phase 4 talking to the inmates

9    would occur on the 17th of July?

10   A.  The reason why I chose that was because during that first              04:47PM

11   week I had -- our medical unit opened.  That's when a lot of

12   the complaints were coming in.  So I already knew I had to

13   address the inmates.  So instead of waiting for the whole week

14   I asked my management team that was in the morning meeting with

15   me, I asked them, I said hey, we're going to go down there                  04:48PM

16   right now.  We're going to talk to these people and we're going

17   to ask them, if you guys want to move closer we're going to

18   make arrangements for you.

19   Q.  A different category of questions.  You were asked to see

20   whether or not Mr. Oyenik had his property or not after he had             04:48PM

21   come to court.  When somebody comes to court, do they usually

22   have their property collected and inventoried?

23   A.  It all depends, sir.  So if they are going overnight to

24   court, yes, we're going to get all their property, inventory

25   it, hold it in the property room.  If they go on a medical run             04:48PM

1   and, let's say, it turns into where they get admitted into

2   hospital, we'll go down there, inventory their property, and

3   we'll take it into the property room.  If it's a day trip, no,

4   we are not going to necessarily inventory their property.

5          Just so happened the day before Mr. Oyenik had his          04:49PM

6   legal call with his legal team, and that's when we were told he

7   was going out for a day trip the next day.  When they are told

8   that, our staff react with a day trip meaning they are just

9   going to leave his property where it's at.

10  Q.  Then when someone is away for a longer time, whether it's      04:49PM

11  admission to the hospital or a court providing that takes

12  multiple days and their property is inventoried, when they

13  return, are they returned to the same bed that they were in

14  before?

15  A.  I'm going to say nine times out of 10, yes, we try to.  But    04:49PM

16  because of the influx of inmates coming into units sometimes

17  holding the bed is not feasible because we have inmates.  In a

18  week's time we could change over 40 to 50 inmates in one area,

19  okay.  Some units in a period of a month, you can lose half of

20  your population through different things; court, medical,         04:50PM

21  moving to another unit.

22         So generally, when an inmate comes back, we try to

23  give them back the same bed because it's easier for us.  It's

24  actually an easier process than to try and move him around

25  because he's already set in where he's living.  And that's        04:50PM

1   generally what we do in our unit.  I don't think I have ever

2   moved an inmate if we didn't have to because of court or

3   medical.

4   Q.  Okay.  The last question is one that I'm only asking you

5   because you work with, I'm assuming, the e-mail at the prison a        04:50PM

6   lot.  And we're trying to not address the subject of this

7   e-mail, but really, the way the e-mail has been marked.  And

8   this is Exhibit 1, and I'm showing to you the part that I have

9   highlighted where it says that it was sent on Saturday the 21st

10  of July, 2017.  And I can tell you for sure that the 21st of       04:51PM

11  July wasn't Saturday.  It's a Friday.  Do you have any idea how

12  this happened?

13  A.  I can't say that I know how that would happen.

14  Q.  Have you ever seen something like this before?

15  A.  No.  No.  Generally when you do an e-mail it's --        04:51PM

16  Q.  Automatic.

17  A.  I thought it was.

18  Q.  Last, I just wanted to explain to you why it is --

19  actually, before I do that, did any of my questions engender

20  any additional questions from counsel?        04:51PM

21          MS. LOVE:  No, Your Honor.

22          MR. FATHI:  No, Your Honor.  But I realized I

23  neglected to move the admission of Exhibit 30.

24          THE COURT:  Any objection?

25          MS. LOVE:  No objection.        04:51PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Mattos

 1          THE COURT:  30 will be received.

 2          Warden, the last thing that I want to talk to you

 3  about by way of explanation of why it is that I'm so focused on

 4  this retaliation issue.  It's not that I'm trying to interfere

 5  with your life and your business of running a good prison.                04:52PM

 6  It's simply because the parties here entered into an agreement

 7  to provide healthcare to inmates.  And my hope was when they

 8  entered into that agreement that it would be satisfied.  And

 9  what's happened is it hasn't been satisfied.  Things that the

10  Department had promised to do hadn't been delivered yet.                  04:52PM

11          So the agreement in that circumstance requires me to

12  step in and try to figure out a way to solve the problem.  Now,

13  I understand that I have a big limitation there, and that is I

14  don't have 30 years of experience and I can't get that

15  experience.  So I cannot even hope to be close to doing what              04:52PM

16  you do on a daily basis with as much knowledge and experience

17  as you have.

18          But nevertheless, I'm required to be a decision-maker.

19  That's a problem when you take somebody who perhaps is not best

20  suited for it to be doing it.  But that's a requirement here              04:53PM

21  because the people who are the most knowledgeable haven't been

22  able to solve the problem.  So I have to step in and do it.

23          Now, in order for me not to make things worse and to

24  have a reasonable shot at trying to make things better, I have

25  to have accurate information about what's happening on the                04:53PM

1    yard.  And there are really mechanisms for that that the

2    agreement provide for.  And one of those mechanism is that the

3    lawyers for the inmates can talk to them and learn about things

4    going on, and that's important for me because they then give

5    that information to me.  So that's part of what my schooling          04:53PM

6    is, to try to make sure that I don't make uninformed decisions.

7           The other important avenue of information comes from

8    people who sit in that chair, and that is people who come to

9    court and testify.  I need to make sure that everybody who

10   comes here or anybody who talks to a plaintiffs' lawyer feels        04:54PM

11   completely free of any fear of retaliation.  And I am not

12   saying that there has been retaliation when I talk to you about

13   this.  In fact, I just want to push that to the side.  Instead

14   I want to talk to you about why it is I'm still concerned even

15   if people think there was retaliation.  And here's the problem       04:54PM

16   I have got.

17          The folks who know most, maybe, about whether or not

18   there was retaliation are the witnesses to it, but I can't

19   always get the full picture from that because people's memories

20   aren't always 100 percent.  Also, sometimes people have             04:54PM

21   different recollections of things so I can't get to the nut of

22   whether it's true or not.  That's a problem I have to deal

23   with.

24          Also the other problem I have to deal with is whether

25   it's true or not almost doesn't matter if the retaliation           04:54PM

 1   perception is there.  That's enough to do the damage to my

 2   information exchange.  If people on the yard think that

 3   somebody has been retaliated against, even if it's not true,

 4   that can be as damaging to the process that I have here because

 5   it will shut people up.  It will chill them.  They won't come          04:55PM

 6   forward because they will think a bad thing will happen.  Now,

 7   if that's a reality, and I'm afraid it is a reality that people

 8   can react to the perception, I need to guard against that

 9   perception.  And the way that I have done it is I have created

10   a rule that says you really can't take any adverse action              04:55PM

11   against somebody; you can't change their housing situation, you

12   can't give them a ticket, you can't take disciplinary action,

13   to somebody close in time to when they have come to court or

14   provided information to their lawyers.  Because everybody else

15   watching that, if they see somebody gets a ticket after they           04:55PM

16   come to court, they think that's retaliation.  I don't want to

17   go down that road and they will shut up.  I can't have that

18   happen.

19         So I understand that I have no got a difficulty where

20   I have competing goals.  I have a very valid goal that you want        04:56PM

21   to enforce the rules.  You want to impose tickets where they

22   are deserved.  I also have the danger that happens if that

23   occurs close in time to when somebody is testifying.  So I have

24   set a rule you can't ticket somebody close in time unless you

25   have got a really good reason for it because it has such a             04:56PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation-Mattos

1    dangerous effect.  So that will mean that in some cases maybe

2    there's a good reason to issue a ticket.  Maybe there's a good

3    reason to do a disciplinary action.  But it's so damaging to my

4    information pipeline that I can't allow it to happen unless

5    there's a really good reason.  And I have never cut off the            04:56PM

6    defendants from being able to tell me there's a really good

7    reason.

8             But to give you an example, imagine people are

9    ticketed for having shirttails out after they talked to the

10   plaintiffs' lawyers.  I will say find another time other than       04:56PM

11   close in time to ticket these people after they talk to the

12   plaintiffs' lawyers.  Why?  Because even though they broke the

13   rule, I can't let it be perceived there was any retaliatory

14   action.

15            So you tilt your head and say that just can't be          04:57PM

16   right, but I have to tell you that is right from my

17   perspective.  And that is, I have got competing goals and I

18   have to balance them.  On the one hand you say you have rule

19   about shirttails that's got to be followed.  On the other hand

20   if you impose that rule close in time to when people testify       04:57PM

21   before me or talk to the plaintiffs' lawyers, other people on

22   the yard will think it's retaliation.  Whether or not it's

23   retaliation doesn't matter.  It's whether they think it's

24   retaliation and that thought about it is enough to deter them,

25   perhaps, from talking to me.                                       04:57PM

1          So I will say that when people have come to court or

2     talked to their lawyers, they will get a period of time where

3     there's going to be an extra high burden that you are going to

4     have to explain to me as to why it was necessary to sanction

5     them at that time even though we understood that there was a          04:57PM

6     risk to my other goal.  And that's because even though there

7     are two good goals, imposing rules and making sure there's free

8     flow of information.  Sometimes in life we run into competing

9     goals where both can't operate at the same time so we have to

10    weigh, which one is more important at the particular time.          04:58PM

11          I, in my job in this case, have weighed in the

12    circumstance like the one I just described to you, that the

13    information conduit is more important than the disciplinary

14    purpose in the yard.  I tell that to you just so that you

15    understand that I'm not trying to interfere with your life or          04:58PM

16    any of the senior staff or even the very lowest correction

17    officer.  I'm not trying to interfere with their judgment about

18    what's going on for no good reason.  I am doing this because I

19    need to make sure I know the information is coming in because I

20    have to be operating on the very best information.  Otherwise,          04:58PM

21    I will make things worse.  So the best shot I have to try to

22    make things better is to get this information, make sure it's

23    accurate, and make sure people aren't frightened about telling

24    me what's going on at any particular time.

25          So I thank you for listening.  Thank you for coming          04:59PM

1    here and for being so patient today.

2              THE WITNESS:  Not a problem.

3              THE COURT:  Have a good afternoon.

4              Did that exhaust the witness list?

5              MS. LOVE:  It did, Your Honor, for today.  However,       04:59PM

6    couple issues have come up today that we request the

7    opportunity, if the Court is so inclined or interested to hear,

8    for a couple of additional witnesses which because we have this

9    three-day span with the Wednesday hearing being a continuation

10   of the HNR box issue, and I believe only one witness listed,      04:59PM

11   that that could be accomplished that day.

12             Two subject matters:  First of all, as we have spoken

13   here today, the issue of Ms. Ashworth and being placed on that

14   SSU search list, again, plaintiffs have, through their exhibits

15   today, questioned witnesses about this.  However, again, that     04:59PM

16   wasn't the subject of their original notice of retaliation nor

17   has it been in any pleadings or advisements from counsel to

18   defendants since then.

19             So, yes, Mr. Trujillo testified as to what he found

20   out secondhand from the facility, if Your Honor is interested     05:00PM

21   we are willing and able to bring in SSU Officer Jardine who is

22   the one who decided to put Ms. Ashworth on the list instead of

23   hearing it first or secondhand.

24             The second subject matter is as to the move of Ms.

25   Ashworth -- sorry, not her move -- the move of her cellmate out   05:00PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation

1    for those three days, I advised plaintiffs' counsel this

2    morning, and this is my personal mistake, that in doing the

3    E-discovery production as ordered by the Court, I am the one

4    who went through and coded documents in a computer system as to

5    produce or not produce.  An attachment to an attorney/client                    05:00PM

6    privileged e-mail did contain an IR, an information report that

7    was written by this Officer Kay who is the one who did the

8    match of the inmates Ms. Oros testified to.

9            And because the Court had the question today, and I

10   did provide a copy to Ms. Kendrick and Mr. Fathi and told them                  05:01PM

11   that was my mistake, just a simple coding, because the Court

12   asked the question today, I believe, of Ms. Oros or another

13   witness as to why was Ms. Ashworth picked as a possible match

14   versus any number of other inmates who could have been a match,

15   we would request the opportunity to bring in Officer Kay and                    05:01PM

16   explain to the Court what went into that officer's process to

17   where he or she came up with Inmate Ashworth is where Inmate

18   Alvarez moves into.

19           So because the Court had that question we would like

20   the opportunity to bring in Officer Kay in and explain that to                  05:01PM

21   you.

22           THE COURT:  Mr. Fathi, I'm inclined to permit the

23   defendants to do that.  Any reason you would object?

24           MS. KENDRICK:  Yes, Your Honor.  We object for several

25   reasons.  First of all, the placement of Ms. Ashworth on the                   05:02PM

1   targeted search list, we were not aware of that until we were

2   provided the responsive documents on August 31st.  So there was

3   no way that it could have been in the notice, also because she

4   was placed on the list after the notice.

5          With regard to Officer Kay, again, they have been on        05:02PM

6   notice for some period of time that there were a great deal of

7   questions about why Ms. Sheid was moved out.  And the

8   defendants knew, when we provided them with our list of

9   exhibits, all eight of our exhibits, that they were fully

10  capable of reviewing those eight exhibits and figuring out what  05:02PM

11  the subject would be, including the fact that there would be

12  questions about this targeted search list.  So they could have

13  provided those same witnesses at the same time.

14         So our objection is simply that this has stretched on

15  for long enough and that we don't need additional witnesses.     05:03PM

16         MS. LOVE:  As to the exchange of exhibits, Your Honor,

17  it is my understanding that the exhibits were exchanged and --

18  exchanged between the parties after defendants' witness and the

19  parties' witness list was filed, so that didn't come into play.

20  But moreover, just because plaintiffs list an exhibit doesn't   05:03PM

21  mean we don't have the opportunity to object to relevance and

22  outside the scope of the retaliation claims because the

23  retaliation claims focused on the move of Ms. Ashworth, not

24  this SSU.

25         So all we want to do is provide the Court the             05:03PM

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation

1    opportunity to have the full picture of the information.

2              THE COURT:  All right.  So you may.

3              MS. LOVE:  Thank you.

4              THE COURT:  Anything else we need to take up?

5              MS. KENDRICK:  Yes, Your Honor.  We would ask that you      05:03PM

6    direct defendants to withdraw their Exhibits 21, 22, and 23

7    because all three of them include the individual's social

8    security numbers.  And pursuant to Federal Rule of Civil

9    Procedure 5.2, social security numbers must be redacted before

10   being provided or submitted to a court.      05:04PM

11             THE COURT:  So this should be fixed.  So kindly do

12   that, just substitute.

13             MS. LOVE:  We can redact and resubmit.

14             THE COURT:  Thank you.  Anything else?

15             MS. KENDRICK:  I guess just in terms of logistics,      05:04PM

16   they listed one person for the hearing on Wednesday.  Were you

17   planning to call these two individuals first or what were you

18   going to do, Rachel?

19             MS. LOVE:  Whatever you would like.  We're being

20   accommodating to the Court and plaintiffs' counsel.      05:04PM

21             THE COURT:  Why don't you meet and confer about that

22   and just have it squared away the day before so that you know

23   who is going when.

24             MS. KENDRICK:  Just one other thing I would note, Your

25   Honor, is these two people they are calling to testify are not      05:04PM

1    individuals for whom we have any information or any discovery.

2    Our previous discovery request was to the names of individuals

3    that they had said about a month ago they were going to call to

4    testify.  So again, we object to them being produced because we

5    will not be prepared to properly cross-examine them because we          05:05PM

6    have been provided no information except for this late produced

7    information report.

8         THE COURT:  I understand.  And you should understand

9    also that if you can demonstrate to me how you were prejudiced

10   by this, then you will get an opportunity to redress that even          05:05PM

11   by recalling these witnesses at a time that you have had time.

12   We might, as we think we learned today, all of us together,

13   learned some things, even that weren't expected from either

14   side to be learned.

15        So having those people here in court that the                      05:05PM

16   defendants would like the opportunity to present so that they

17   could have their picture, I think it will be useful.  If it

18   turns out plaintiffs believe they have been prejudiced because

19   you didn't have a chance to think about it in advance or have

20   discovery, feel free to take some reasonable amount of time as          05:06PM

21   discovery examination if you wish to ask about any documents or

22   matters that you think might be within the witness's

23   possession.

24        MS. KENDRICK:  Thank you, sir.

25        THE COURT:  Anything else?                                         05:06PM

UNITED STATES DISTRICT COURT

CV 12-601 - September 11, 2017-Evidentiary Hearing re: Retaliation

1          MS. LOVE:  Nothing further from defendants.

2          MS. KENDRICK:  No, sir.  Nothing further.

3          THE COURT:  Thank you all.  See you tomorrow morning

4    at 9.

5          (Proceeding concluded at 5:06 p.m.)                    05:06PM

1

2

3

4

5                    C E R T I F I C A T E

6

7         I, LAURIE A. ADAMS, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15        DATED at Phoenix, Arizona, this 20th day of September,

16  2017.

17

18                           s/Laurie A. Adams
                             _____
19                           Laurie A. Adams, RMR, CRR

20

21

22

23

24

25