1          **UNITED STATES DISTRICT COURT**

2            **FOR THE DISTRICT OF ARIZONA**

3          _____

4

   **Victor Parsons, et al., on**    )
5  **behalf of themselves and all**  )
   **others similarly situated;**    )
6  **and Arizona Center for**        )
   **Disability Law,**               )
7                                    )   No. **CV 12-00601-PHX-DKD**
              Plaintiffs,            )
8                                    )
          vs.                        )   Phoenix, Arizona
9                                    )   September 12, 2017
   **Charles Ryan, Director,**       )   9:02 a.m.
10 **Arizona Department of**         )
   **Corrections; and Richard**      )
11 **Pratt, Interim Division**       )
   **Director, Division of Health**  )
12 **Services, Arizona Department**  )
   **of Corrections, in their**      )
13 **Official capacities,**          )
                                     )
14            Defendants.            )
   _____   )
15

16

17    **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

       **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
18
                 **(*Status Hearing*)**
19

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

<u>A P P E A R A N C E S</u>

**For the Plaintiffs:**

        EIDENBACH LAW PC
        By:  **Kirstin T. Eidenbach, Esq.**
        P.O. Box 91398
        Tucson, AZ 85752

        ACLU - Washington DC
        By:  **David C. Fathi, Esq.**
        By:  **Amy Fettig, Esq.** (Appearing Telephonically)
        915 15th Street NW
        7th Floor
        Washington, DC 20005

        ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
        By:  **Maya S. Abela, Esq.**
        177 N. Church Avenue
        Suite 800
        Tucson, AZ 85701

        PRISON LAW OFFICE
        By:  **Corene Kendrick, Esq.**
        1917 5th Street
        Berkeley, CA 94710

For the Defendants:

        STRUCK LOVE BOJANOWSKI & ACEDO PLC
        By: **Timothy J. Bojanowski, Esq.**
        By: **Rachel Love, Esq.**
        By: **Daniel Struck, Esq.**
        By: **Kevin Hanger, Esq.**
        By: **Timothy Ray, Esq.**
        3100 W. Ray Road
        Suite 300
        Chandler, AZ 85226

        OFFICE OF THE ATTORNEY GENERAL - Phoenix
        By:  **Lucy M. Rand, Esq.** (Appearing Telephonically)
        1275 W. Washington Street
        Phoenix, AZ 85007

1              P R O C E E D I N G S

2          THE MAGISTRATE JUDGE CLERK:  Civil Case Number 12-601

3   Parsons et al. versus Ryan et al., on for status hearing.

4          THE COURT:  Counsel, please announce.

5          MR. FATHI:  Good morning, Your Honor.  David Fathi and    09:02AM

6   on the phone is my colleague, Amy Fettig, from the ACLU

7   National Prison Project for the plaintiff class.

8          THE COURT:  Thank you.

9          MS. KENDRICK:  Good morning.  Corene Kendrick from the

10  Prison Law Office for the plaintiff class.                      09:03AM

11         THE COURT:  Thank you.

12         MS. EIDENBACH:  Good morning.  Kirsten Eidenbach for

13  the prisoner plaintiff class.  And behind me is my co-counsel,

14  Maya Abela, from the Arizona Center for Disability Law.

15         THE COURT:  Thank you.  Good morning.                    09:03AM

16         MR. BOJANOWSKI:  Your Honor, Tim Bojanowski, Rachel

17  Love, Kevin Hanger, Tim Ray.  And Mr. Struck is caught in

18  traffic and will be here within the next few minutes on behalf

19  of defendants.

20         THE COURT:  Thank you very much.  And that's            09:03AM

21  everybody?

22         MS. RAND:  Lucy Rand from the Attorney General's

23  Office.

24         THE COURT:  Okay.  Thank you.

25         Let's proceed to the July reports, Mr. Bojanowski,       09:03AM

CV 12-601 - September 12, 2017 - Status Hearing

1  starting with Performance Measure 11, newly prescribed provider

2  ordered formulary medications will be provided to the inmate

3  within two business days after prescribed or on the same day if

4  prescribed stat.

5          MR. BOJANOWSKI:  Your Honor, what I'm going to try to    09:04AM

6  do here is something maybe a little bit different than what

7  we've done in the past to both streamline it, give the Court

8  the information, provide plaintiffs the information, and give

9  us a better record of what's being done here during the course

10  of the hearing.                                               09:04AM

11          So late last night we finalized a document that I'd

12  like to give to the Court, plaintiffs' counsel, that details

13  out of the each of the performance measures, what the

14  performance measure is, what the past year of numbers are, with

15  the July preliminary number included in a graphic format.  And   09:04AM

16  then if something is non-compliant right underneath that will

17  be what the problem is that we identified and then what the

18  action plan is to take care of it.  And then that way I don't

19  have to turn around and ask people.  It's clear.  Plaintiffs

20  will have it.                                                 09:05AM

21          And then what we'll do is going forward, we'll have a

22  record of this that we can then supplement so everybody knows,

23  okay, we did this.  We did that.  This was a problem.  That was

24  a problem.  Because it's very cumbersome to go back to the

25  transcript and look at it and so I'm hopeful that then we can   09:05AM

CV 12-601 - September 12, 2017 - Status Hearing

1   have this in place and then going forward actually file it

2   before the hearing so that everybody's got it ahead of time.

3   Because it's the first time we did it we were really pushing

4   last night, which is part of the reason why I wasn't here

5   yesterday was trying to get everything put together so we could    09:05AM

6   make our hearings much more efficient and we can maybe proceed

7   a little bit quicker if that's all right with the Court.

8            THE COURT:  Let's take a look at what you have got.

9            MR. BOJANOWSKI:  It's not going to be an exhibit, Your

10   Honor.    09:06AM

11            THE COURT:  We've got already a stumbling block here,

12   and that is we have inadequate copies.  Obviously it's hard --

13            MR. BOJANOWSKI:  I may have extra copies.

14            THE COURT:  Okay.

15            (Discussion off the record between counsel.)    09:06AM

16            MR. BOJANOWSKI:  Could we have a moment, Your Honor?

17            THE COURT:  You can.

18            MR. BOJANOWSKI:  Judge, do you need an extra copy?

19            THE COURT:  If you have an extra it would be helpful

20   for the staff attorneys to have it over there.  Thank you.    09:08AM

21            All right.  So let's go forward with kind of a hybrid

22   method, and that is because people haven't had time to digest

23   and it makes more sense, I think, for us to have that time to

24   digest in common with one another.  So the hybrid method is I

25   will address each of these individual performance measures,    09:08AM

CV 12-601 - September 12, 2017 - Status Hearing

1    take a look at what Mr. Bojanowski has provided to us, and

2    identify the issues.

3            So with Performance Measure 11 we turn to Eyman and we

4    see that in June we had 62, and here in July we have 64.  So

5    Eyman continues to be a very serious problem here.  What Mr.        09:08AM

6    Bojanowski has written is:  Eyman has increased the number of

7    inventory control employees from three full time employees to

8    four full time employees.  And, of course, I need to interject

9    my typical question is when did that happen, the increased

10   number of employees?                                               09:09AM

11           MR. BOJANOWSKI:  Within the last month, Your Honor.

12           THE COURT:  So I will make a note here within the last

13   month from 11-12-17.

14           Now one IC will be assigned to each yard.  Medications

15   will be delivered to each IC at their yard to process and get      09:09AM

16   ready for distribution to patients.  The facility site has

17   reviewed and is adopting the process used by Tucson which has

18   been more successful.  Site leadership will be meet with ADC's

19   regional directors of operations regarding a proposed process

20   change to include handing out keep on person medications during    09:09AM

21   pill call.

22           This review and adopting the process, when is the time

23   frame on that?

24           MR. BOJANOWSKI:  It's set for next Tuesday.

25           THE COURT:  So you are saying that a week from today,       09:10AM

CV 12-601 - September 12, 2017 - Status Hearing

1    the 19th of September, is when you would adopt this process

2    that's been more successful in Tucson?

3              MR. BOJANOWSKI:  Yes.  That's when Mr. Pratt will be

4    meeting with the Corizon representatives.

5              THE COURT:  Then with respect to Florence, for the          09:11AM

6    first time since, looks like, September of '16, Florence has

7    dropped below meeting the compliance standard here and says

8    Corizon will be implementing rotating medical line nurses.

9    When?

10             MR. BOJANOWSKI:  You are on Florence, Your Honor?          09:11AM

11             THE COURT:  I'm now on Florence.  Yes.

12             MR. BOJANOWSKI:  Yes.  That was the second half of

13   August.  The supplemental information on that, Your Honor.

14             THE COURT:  Yes.

15             MR. BOJANOWSKI:  Is that they hired five LPNs and 10        09:12AM

16   RNs to increase response.  I'm cross-referencing my other note

17   in my notepad here.

18             THE COURT:  So hired five LPNs and 10 RNs.  And when

19   was that?

20             MR. BOJANOWSKI:  I believe that was the second part of     09:12AM

21   August.

22             THE COURT:  And you say "hired."  Is that when they

23   started or is that when they were hired?

24             MR. BOJANOWSKI:  I can't answer that, Your Honor.  I

25   don't know for sure.                                                 09:13AM

CV 12-601 - September 12, 2017 - Status Hearing

1    THE COURT:  And do you know how many RNs or LPNs may

2  have left during the same time period?

3    MR. BOJANOWSKI:  I do not.

4    THE COURT:  But that report about what the staffing

5  is, that's a monthly report that Corizon provides to the          09:13AM

6  Department.  Is that correct?

7    MR. BOJANOWSKI:  Correct.

8    THE COURT:  So if we looked at that report we would be

9  able to see what the net was of staffing for the month.

10  Obviously it doesn't make a lot of sense to focus on just the    09:13AM

11  new if we're losing people.

12    MR. BOJANOWSKI:  Correct.  I do not have that report

13  with me.

14    THE COURT:  All right.

15    MR. BOJANOWSKI:  I was looking for it.                         09:13AM

16    MS. KENDRICK:  Excuse me, sir.  Would you prefer

17  plaintiffs make our comments at the end?

18    THE COURT:  Since we're working this out on a new

19  method, do you have a preference?  Would you rather address

20  facility by facility, or would you like to say overall?         09:14AM

21    MS. KENDRICK:  It might be easier to do it facility by

22  facility but it might be faster to wait till the end of

23  Performance Measure 11.  I defer to you, obviously, whatever

24  you prefer.

25    THE COURT:  If you have got handy notes that allow you        09:14AM

UNITED STATES DISTRICT COURT

CV 12-601 - September 12, 2017 - Status Hearing

1   to go through each one of these I will go through Performance

2   Measure 11 and identify the ones we should be focused on then

3   turn to you.  You can tell me what you want to say about those

4   and also include any others you want to address.  Then we'll

5   have the dialogue.                                              09:14AM

6            MS. KENDRICK:  Okay.  Thank you.

7            THE COURT:  So then we've got the same problem with

8   Lewis returning to a previous failure.  And the corrective

9   action plan, Corizon will continue with the current corrective

10  action plan which has increased compliance by 7 percent.        09:14AM

11           Boy, how do you come to that conclusion?  7 percent

12  from where?  When?  I'm trying to look to where something adds

13  up to 72 minus 7 is 65.  Where?  How are you saying that, Mr.

14  Bojanowski?  Do you see what my problem is?

15           MR. BOJANOWSKI:  I see what your problem is.  Now I'm   09:15AM

16  regretting saying it.  So that's why I'm looking my notes.

17           That would not be accurate, Your Honor.  It may have

18  been that was lifted from some prior information.

19           THE COURT:  Okay.  So then we cross out starting at

20  Corizon.  Where do we stop crossing out, at the end of the --   09:16AM

21           MR. BOJANOWSKI:  At the beginning would be just the

22  first sentence.

23           THE COURT:  So ending at performance measures.

24           So under the current corrective action plan medication

25  will be placed -- so again, that's kind of ambiguous with       09:16AM

CV 12-601 - September 12, 2017 - Status Hearing

1    respect to timing because it says:  Under the current plan

2    medication will be placed.  Usually when you would say under

3    the current plan medication is placed.  Instead you are using

4    the future tense so that leads the question is that something

5    that's going to start, or is it already in place?  What's with          09:16AM

6    this medication placed in designated bins upon arrival?  What's

7    the operative date with respect to that?

8            MR. BOJANOWSKI:  I believe that started in July.

9            THE COURT:  When you say "believe," again, makes me

10   think, are you sure?                                                     09:17AM

11           MR. BOJANOWSKI:  I'm not absolutely sure, but in

12   discussing this with the representatives of Corizon it was my

13   understanding that this was something that beginning on July

14   1st, 2017, these things were happening.

15           THE COURT:  All right.  So that means that it's not             09:17AM

16   working because we know from July's preliminary numbers

17   something that started on July 1st that would have been sampled

18   for July.

19           MR. BOJANOWSKI:  These would reflect June data, the

20   July preliminary.                                                       09:17AM

21           THE COURT:  Really?  Are you sure?  Here we are in

22   September.  I think we're getting July numbers.  We already had

23   the June numbers.

24           MR. BOJANOWSKI:  I'm sorry.  I always get that messed

25   up.                                                                     09:17AM

1    THE COURT:  Mr. Bojanowski, I have a lot of tolerance

2  for how difficult this is, because I have made missteps.  But

3  really, it doesn't -- the error that you just made is so

4  profound that it's just not off the tip of your tongue as to

5  what month we're talking about is staggering to me.  And, you          09:18AM

6  know, this ought to be your full time job.  And so among the

7  people in the room, those two tables in front of me, it ought

8  to be their full time job.  So everybody ought to be up to

9  speed on this.  You have got a cast of thousands.  My God.  I

10  look at the last pleading you filed and your firm has got,          09:18AM

11  what, seven, eight people listed on it.  You have got the

12  Attorney General's Office, the biggest law firm in the state.

13  And the lawyer who is here before the Court on a grave matter

14  of health and safety for 30-some, you know, the count I don't

15  know today, but someplace between 35,000 and 40,000, is that          09:18AM

16  right, you know, of people whose lives are at stake here.  And

17  the lawyer who is the lead on this point doesn't even know what

18  month we're talking about.

19    MR. BOJANOWSKI:  I apologize.  Your Honor, it was a

20  late night and so I apologize.  Trying to get this put together          09:19AM

21  I honestly made a mistake.  You are absolutely correct.  These

22  are July numbers.  So starting in July, it doesn't appear that

23  this is yet gaining traction but right now the plan is to stay

24  with what we've got here to see if we can get that, you know,

25  to move.          09:19AM

CV 12-601 - September 12, 2017 - Status Hearing

1          THE COURT:  All right.

2          MR. BOJANOWSKI:  Because there are many different

3     facets of this plan that are being tweaked to hope to get

4     compliance.

5          THE COURT:  The record should reflect the presence of          09:19AM

6     Mr. Struck.  And the reason that I am making a point of that is

7     that Mr. Struck's name is at the head of the firm that the

8     State has retained to defend itself in this action.  And we

9     were just engaged in a remonstration of your firm and your

10    lawyers and the State's lawyers in this case because Mr.          09:20AM

11    Bojanowski has made probably three errors in a row.  The most

12    recent one was not knowing what month we were talking about.

13    And he misspoke and he said that the numbers we were talking

14    about were the June numbers.

15          And what struck me is that that is not something that          09:20AM

16    is so within his core about how on top of it he is about the

17    problem so that was striking to me.  But then it also followed

18    on another error that we just highlighted in this new method of

19    reporting to the Court where we identified that the sentence,

20    the lead sentence in the corrective measure for Lewis which is          09:20AM

21    at 72 percent for Performance Measure 11 which is, again, a

22    fundamental performance measure with respect to care that's

23    provided to the patients but also certainly one of the easiest

24    to address and one that the Court tried to address and you

25    appealed with respect to getting outside formulary methods.          09:21AM

CV 12-601 - September 12, 2017 - Status Hearing

1   And so we learned that the corrective action plan, the lead

2   sentence has to be crossed out because it was drawn from

3   someplace that doesn't belong here.

4        So the reason that I'm remonstrating so long is not

5   out of, as I said to start, out of an idea that I'm trying to     09:21AM

6   hold people to a ridiculous standard.  People make mistakes and

7   I get that.  But the history of this case is filled with such

8   mistakes and also filled with the profound mistake of failing

9   to address these performance measures.  And so at some point I

10  can't just do what is my natural nature, and that is to say       09:21AM

11  let's all just try to do better and be short and not focused on

12  my remonstration.  And as uncomfortable as it is for me to do

13  this because I respect the lawyers on both sides, but I need to

14  increase the level of the game here.  And I have been trying to

15  do that.                                                          09:22AM

16       As I said before Mr. Struck came in, you have a cast

17  of thousands on your pleadings.  You have, I think -- I didn't

18  count but it looked to me like seven lawyers in your firm

19  devoted to this.  You have got the largest law firm in the

20  state that is available to represent the defendants.  And I       09:22AM

21  need you to be at 100 percent.  I can't devote 100 percent of

22  my time to this case but damn well you ought to be.

23       So the amount of time that I have just devoted to this

24  is I hope likely to produce a different change of view.  I

25  appreciate the effort that you took in staying up late to get     09:23AM

1    it together but it's not as if this hearing was a surprise to

2    anybody and that this was not our standard procedure.  So if

3    you were going to change the way we did things you kind of

4    needed to come out in your Olympic game to make sure that it

5    was right.  And the idea that we have already identified these          09:23AM

6    errors makes me doubt the whole thing.  And that's really what

7    has been part of my problem here is that I hear over and over

8    again about mistakes, and then we think we get things straight

9    with respect to how the monitoring is supposed to be conducted

10   and then I hear from the plaintiffs that, yet again, it                  09:24AM

11   continues.

12          And then I learn about -- just yesterday I learned

13   about a directive that looks right that goes from the director.

14   Then I see e-mails that go to subordinates below the wardens

15   and it all looks right and then I hear that they are not                 09:24AM

16   following what the directives say.

17          So it's not as if I'm just cherry picking and saying

18   this is the bad apple.  It's looking like the tree is diseased.

19   And this can be fixed by focused care and understanding that

20   making sure that you just erode all credibility that you have            09:24AM

21   with me with respect to me giving benefit of the doubt when I

22   get presented what should be obviously apparent, and you miss

23   that.  And then with respect to obvious problems that you

24   haven't been able to fix over long term, it makes me think that

25   there's some so profoundly systemic error here that you'd               09:25AM

CV 12-601 - September 12, 2017 - Status Hearing

1  almost think the tree needs to be cut down and a new one

2  planted.  It's just it's very, very troubling.

3         So let's pick up where we were.  Performance Measure

4  11, I was reading about, under the current corrective plan, the

5  medication will be placed.  And we have learned that that          09:25AM

6  started on July 1st.  If unable to get medication from

7  Pharmacor within 24 hours an off-site pharmacy will be

8  utilized.

9         So that's, if we check, if we see going forward from

10  July 1st that somebody didn't get medication from Pharmacor      09:26AM

11  within 24 hours we'll be able to see some indication in the

12  medical record that an off-site pharmacy was utilized.  Is that

13  correct?

14         MR. BOJANOWSKI:  That's correct.

15         THE COURT:  Site leadership is also requesting a          09:26AM

16  report be created to determine what medications are needed by

17  yard to better ensure if medication is not received it may be

18  subsequently obtained from a backup pharmacy.  The nursing

19  staff will document the number of tablets, not the number of

20  cards.  What's that mean?                                        09:26AM

21         MR. BOJANOWSKI:  Documenting the actual -- each card

22  may contain 30 tablets.  So they are documenting each of the

23  tablets that are involved instead of saying, well, I gave out

24  two cards instead of 60 tablets.

25         THE COURT:  Oh.  So these are blister packs?              09:27AM

1          MR. BOJANOWSKI:  Right.

2          THE COURT:  So they are the cards that have pills

3    attached to them.

4          MR. BOJANOWSKI:  Right.  You punch them out.

5          THE COURT:  Got it.  Additionally, an inventory          09:27AM

6    control employee is assigned to the medication room for each

7    unit under assistant director of nursing supervision.  Pharmacy

8    manifests are reviewed daily for the next day to assess that

9    all orders are scheduled to be on the next day shipment.

10         Is that something that started on the 1st of July as       09:27AM

11   well?

12         MR. BOJANOWSKI:  I believe that is the case, Your

13   Honor, yes.  Because that was -- that's kind of a double-check

14   situation.

15         THE COURT:  So again, we know for sure that the          09:27AM

16   double-check hasn't worked because it started on July 1st and

17   we are at 70 percent, 72 percent.

18         Any medications that are not on the manifest or that

19   are ordered stat are obtained from the clinic stock or backup

20   pharmacy if not available in clinic stock.  This is not         09:28AM

21   terribly helpful, this sentence, because it doesn't say with

22   what kind of time period.  I mean, obviously, this is something

23   that the backup pharmacy, you can't tell whether the antecedent

24   date they are talking about is the 24 hours if an off-site

25   pharmacy is going to be used.  So I will just point out that     09:28AM

1    that's -- any medications that are not on the manifest or that

2    are ordered stat are obtained from the clinic stock.  I guess I

3    must say it's overall really hard for me to use as a benchmark

4    here because, first I guess I should ask you what is the

5    manifest?                                                          09:28AM

6         MR. FATHI:  That's the order.  So if you order -- if

7    the medications are ordered they would be on that.  So say it

8    wasn't on that and you didn't have it in clinic stock then you

9    would go to your backup pharmacy as your third line of defense,

10   so to speak.                                                       09:29AM

11        THE COURT:  It sounds like from you what just said

12   what you mean by manifest is a prescription or no?  The

13   manifest is the inventory list of what they maintain at the

14   pharmacy at the facility.

15        MR. BOJANOWSKI:  What they are ordering from              09:29AM

16   Pharmacor.

17        THE COURT:  All right.

18        MR. BOJANOWSKI:  The daily order.

19        THE COURT:  Okay.  Any medications that are not on the

20   manifest.  So the manifest is the cumulative order that goes       09:29AM

21   off to Corizon's national pharmacy distributor and are obtained

22   from the clinic stock.  So the clinic stock sounds like what's

23   locally there.

24        MR. BOJANOWSKI:  It's at the facility.

25        THE COURT:  So any medications that are not on the            09:30AM

CV 12-601 - September 12, 2017 - Status Hearing

1    manifest.  So what this is telling us is that the manifest is

2    used for things that are not available from clinic stock.

3            MR. BOJANOWSKI:  Well, it could be in clinic stock,

4    okay.

5            THE COURT:  Yeah.                                    09:30AM

6            MR. BOJANOWSKI:  They maintain a certain clinic stock

7    at the facility so it could be used.  But the clinic stock is

8    kind of a backup stock of medications that are used on an

9    as-needed basis.  So you would order, say, aspirin, put it on

10   the manifest, and it would come in within 24 hours.  You would  09:30AM

11   still have aspirin in the clinic stock so that if you are doing

12   the double-check of the manifest and you say, gee, well, that

13   aspirin is not on that manifest for this patient you would go

14   to the clinic stock and pull it.  If you went to the clinic

15   stock and said, oh, my God we are out of as aspirin, then you   09:30AM

16   would go to your backup pharmacy to get aspirin.

17           THE COURT:  All right.  I'm taking that to mean that

18   if it's not on the manifest the reason they didn't put it on

19   the manifest is they figured they didn't have it at the

20   regional distribution center for Corizon.  Is that the idea?    09:31AM

21           MR. BOJANOWSKI:  No.  That would be at the regional

22   distribution center.  It may have been a stat order so it

23   didn't make it onto the manifest.  I don't know the exact

24   circumstance.  But the manifest is the order form.

25           THE COURT:  Okay.  All right.                        09:31AM

1          Perryville is at 94 percent; Phoenix at 100 percent;

2     Safford at 93 percent; Tucson, 85 percent; Winslow at 87; Yuma

3     at 94.

4          So Ms. Kendrick.

5          MS. KENDRICK:  Thank you, sir.                        09:32AM

6          A few points.  To begin with, with the Lewis

7     corrective action plan that was put into effect according to

8     Mr. Bojanowski, he believes, on July 1st of using off-site

9     pharmacy, we would just note for the Court that you ordered

10    defendants on November 10th, 2016, to use off-site resources if   09:32AM

11    necessary for this performance measure, not only at Lewis, but

12    also at Eyman and Florence prisons.  So that begs the question

13    why the corrective action plan at Lewis is not being

14    implemented at the other two institutions that are subject to

15    the Court's order that is now 10 months old.              09:33AM

16          Specifically going through the specific institutions,

17    with regard to Eyman facility, they state that they have

18    assigned one inventory control employee to each yard.  I would

19    just note for the record that Eyman prison actually has five

20    units or yards.  So it's unclear how four employees will cover   09:33AM

21    five yards.  So that is not an accurate statement that there

22    will be one inventory control employee assigned to each yard.

23          THE COURT:  Why don't you just stop there.  Is Ms.

24    Kendrick right about that, Mr. Bojanowski?  Does it look like

25    this is another error?                                   09:33AM

CV 12-601 - September 12, 2017 - Status Hearing

1          MR. BOJANOWSKI:  There may -- there's an IC that is

2    assigned to more than one yard.

3          THE COURT:  It says:  Now one IC will be assigned to

4    each yard.  So there's no way to read that consistent with what

5    you just said, right?                                        09:34AM

6          MR. BOJANOWSKI:  Can I have a moment, Your Honor?

7          THE COURT:  Surely.

8          MR. BOJANOWSKI:  Your Honor, I don't know the answer

9    to that.  I'm going to have to verify with Corizon what, you

10   know, the assignments are.                                   09:34AM

11         THE COURT:  We have people in this room who know how

12   many yards there are, right, and we have heard --

13         MR. BOJANOWSKI:  There's five yards.

14         THE COURT:  There's five yards.

15         MR. BOJANOWSKI:  There's no doubt about that.          09:34AM

16         THE COURT:  So we know that we have increased to four

17   full time employees and now one IC will be assigned to each

18   yard.

19         MR. BOJANOWSKI:  Right.

20         THE COURT:  So I think we have enough information      09:35AM

21   before us in this room right now to say that now one IC will be

22   assigned to each yard is not true.  I mean, obviously, being

23   honest with me, starting now will be helpful for you continuing

24   to say somehow that you don't know the answer to this question

25   when we know there are five yards and you have a sentence that 09:35AM

1    says now one IC will be assigned to each yard.

2         MR. BOJANOWSKI:  That is not accurate, Your Honor.

3         THE COURT:  Thank you so much.  That's helpful.

4         MR. BOJANOWSKI:  I agree.

5         THE COURT:  I need 100 percent honesty from everybody                09:35AM

6    every time.  I don't need people to spin or to play games and

7    to say things that are not true.  Words have meaning here in

8    court.

9         MR. BOJANOWSKI:  I understand, Your Honor.  I'm not

10   trying to spin anything.  I'm trying to figure out how the                09:35AM

11   assignments are being levied here at the facility as far as the

12   five yards are concerned.  Again, I'm trying to put these

13   documents together and be as accurate as I can.  And I

14   apologize to the Court as to the inaccuracies.

15        So again, what I intend to do is I will certainly                    09:36AM

16   supplement these documents to allow the Court to have as much

17   information as possible, the idea being to bring this out and

18   let the Court have a look at it.  So that's my effort here.

19   Okay.  And I apologize that it's got some bumps in the road,

20   but I'm truly trying to give the Court and plaintiffs' counsel            09:36AM

21   a good way of looking at this and do the best I can to get this

22   put together.  And this is our initial run at this, and again,

23   I apologize if there are some inaccuracies here.  And I will

24   tell you definitively we're going to tighten this up.  I will

25   get more dates put in so we know when things are happening so             09:36AM

1    that we don't have these kinds of questions.  Because this

2    doesn't save time, okay.  The idea is to try and save time so

3    the Court's got a thing that it can look at and say, okay, I

4    understand what this is, okay.  That's what I'm trying to do

5    here, all right.  And as you can see, I have got a lot of these      09:37AM

6    that we went through to try and get this information put

7    together in a definitive form.

8            And I apologize if there are mistakes here and there

9    throughout these documents let's point them out.  Let's examine

10   them.  We can get supplemental information put in so that the       09:37AM

11   Court's got the information it needs to go forward.  I truly

12   want to do that, Judge.

13           THE COURT:  Well, one of the ways you can avoid, and

14   maybe you have already done this, one of the ways you can avoid

15   having to have to be pushed by me to the edge of a branch and      09:37AM

16   then have me saw the branch off and have your butt hitting the

17   ground, one of the ways you can avoid that is before you submit

18   something to the Court, before you say something to the Court,

19   run it by your best due diligence check.  And what that means

20   is asking the people who are the ones who know.  So there are      09:38AM

21   people who are behind you in this courtroom.  There are people

22   who are not in the courtroom who are Corizon employees and

23   probably ADOC employees who know these things and if you showed

24   it to them they would say to you, oh, you can't be saying this.

25   This isn't true.  And then you would fix it.                       09:38AM

1        And it would do two things:  One, we would avoid this

2    delay of time; but two, you would build the credibility so that

3    every time I read something now I think in my head it really

4    needs to be doubly, triply, quadruply tested because I can't

5    really believe them because half the time they tell me things          09:38AM

6    that aren't true.

7        MR. BOJANOWSKI:  Again, and part of the problem was

8    the timing of the situation, because this was our first time

9    through, it just -- we just weren't able to get it tightened up

10   as much as we would like, okay.  And, you know, like I said          09:38AM

11   before, going forward now that we've got the template in place,

12   my goal is to have this tightened up and filed with the Court

13   and over to the plaintiffs so that people can say, and then the

14   plaintiffs can say to me, hey, wait a minute, what about this,

15   you know, before we get into court.  That's the goal here,          09:39AM

16   Judge.

17       So I appreciate the Court's instruction and certainly

18   we are going to tighten this document up and we're going to see

19   some warts on this today, and that's okay.  All right.  Because

20   it will help us in tightening these things up going forward.          09:39AM

21       THE COURT:  Okay.

22       MR. BOJANOWSKI:  That's what we want to do, because I

23   want the Court to have the information because there is a lot

24   of good information in here that the Court needs.  And that's

25   what I want to get to you.          09:39AM

CV 12-601 - September 12, 2017 - Status Hearing

1      THE COURT:  All right.  Thank you.  Please continue.

2      MS. KENDRICK:  Okay.  I'm not sure where we left off.

3  But so we covered that.

4      THE COURT:  I can tell you where you left off.  It was

5  on Eyman Performance Measure 11 where we addressed the no one          09:39AM

6  IC will be assigned to each yard.

7      MS. KENDRICK:  Okay.  Thank you.

8      Just as another kind of global comment on Performance

9  Measure 11, in our filing with the Court regarding the Court's

10 order to show cause that we filed at Docket 2214, we requested          09:40AM

11 that the Court include in its future orders and requests for

12 reporting Eyman, Lewis, and Tucson prisons because of their

13 persistence in chronic substantial non-compliance.  Because we

14 do believe that that is the only way there will be some sort of

15 accountability.  It's troubling that all of these measures went        09:40AM

16 into effect on July 1st, but there's no reflection in the July

17 numbers.

18     Going again specifically turning to Florence prison,

19 again, we share your concern that while it's great that 15

20 nurses were hired, it's unclear how many nurses had left, and          09:40AM

21 so it's unclear to us whether this is actually a net increase

22 of 15 or if this is just staunching the blood loss of

23 hemorrhaging employees.

24     THE COURT:  And you get these reports every month

25 about the staffing levels, right?                                      09:41AM

UNITED STATES DISTRICT COURT

1          MS. KENDRICK:  Correct.

2          THE COURT:  So maybe I can task you to take a look at

3    that net number and give me a report next month on what you

4    see?

5          MS. KENDRICK:  The most recent reports that we would          09:41AM

6    have would be for July 2017, so we could -- I mean, as we're

7    sitting here today, Ms. Eidenbach could pull up the June and

8    July staffing reports and compare the two.  I would just

9    suggest to Your Honor that you could also ask defendants to

10   provide you those monthly staffing reports that show statewide          09:41AM

11   and institution by institution the number of employees.  I

12   mean, we're more than happy to do that but it may be

13   informative to you as well.

14         THE COURT:  Well, I will ask you to let me know if you

15   see that there's some reason that I shouldn't credit the          09:41AM

16   defendants with telling me that they have five LPNs and 10 RNs,

17   rely upon you to tell me, well, that's great but again, this is

18   how many you lost.  So if you just -- I have not received that

19   kind of argument from you before, and it may be something that

20   you have been paying attention to and the net hasn't been          09:42AM

21   something that was a serious issue.

22         But I guess I think that because you get these reports

23   and you have a greater -- I mean, as I say, people at counsel

24   tables here have a greater familiarity than me with what these

25   numbers can mean.  So I would ask you to highlight that side of          09:42AM

1   it where it's necessary for it to be highlighted.  It may be

2   that it's not an issue and that's one less thing that has to

3   come across my --

4        MS. KENDRICK:  Yes.  We're happy to do that and we

5   shall do that in the future.  It's possible that Mr. Bojanowski    09:42AM

6   or one of the many Corizon people could answer the question

7   whether these are 15 additional brand new FTEs or if they are

8   just already previously contracted FTEs.

9        THE COURT:  Does anybody know the answer to that

10  question, Mr. Bojanowski?                                          09:43AM

11       MR. BOJANOWSKI:  We do not, Your Honor.  This is at

12  Florence, and as you can see from our chart, Florence has been

13  doing rather well for quite sometime.  Unfortunately it fell

14  below this last month.

15       MS. KENDRICK:  Okay.  And so on Lewis prison -- well,         09:43AM

16  so I guess one other thing with the Corrective Action Plan is

17  it's unclear what the role of the nursing staff would be in

18  ensuring that prescribed medication is provided.  You know,

19  this performance measure hinges greatly on the fact that the

20  medication is being -- the order is being sent to Oklahoma        09:43AM

21  where Corizon's subsidiary is located and then the medication

22  is being shipped from Oklahoma to Arizona where it's then

23  distributed.  So to the extent nursing staff have a role it

24  would be very much at the tail end of distributing the

25  medication once it arrives at the institution.                    09:44AM

1          So we have talked about this off-site problem of the

2   medication and the pharmacy being in Oklahoma before in our

3   expert reports as a potential root cause of the chronic

4   non-compliance with this performance measure, which also keys

5   into Your Honor's previous order about them using outside          09:44AM

6   resources.

7          THE COURT:  Have you looked at whether or not the

8   delay that results in the failure to comply with this

9   performance measure when the Oklahoma resource is used is due

10  to a delay that occurs from the time the order has been placed    09:44AM

11  and then the medication is received at the requesting Arizona

12  facility, or is it perhaps what I think could be addressed by

13  the staffing issue, and that is when I have been told when I

14  visited the prisons that the staff -- or what I have observed

15  and been told is that it looks like an in-box problem and that    09:45AM

16  there are just too many stacks of paper to go through in terms

17  of placing those orders.  So if you had more people who were

18  able to do that at the point that would be before the order is

19  placed, that could be addressed by this.  I just wonder if you

20  have looked at where that delay occurs.                           09:45AM

21          MS. KENDRICK:  I mean, obviously, we haven't looked at

22  it systematically like every single person who is in a monthly

23  CGAR.  But from the reviews that have been done by our expert

24  looking at medical records and then when we have looked at

25  prisoners' medical records, when they write us and say I didn't   09:45AM

1    get my medication, is that it does appear to be more of the

2    latter problem that it may be getting to the institution but

3    then it takes a few days to get out.

4              That said, you know, we have received and we have seen

5    documents in the past, for example, in one of the recent          09:46AM

6    productions for the open HNR boxes.  One of the documents that

7    we received, and I believe it was actually introduced into

8    evidence as an exhibit, was some correspondence about issues

9    with getting medication from Oklahoma to Arizona because of

10   some sort of weather or logistical or UPS delay.                   09:46AM

11             But I do think Your Honor's instincts is correct that

12   it's more kind of on the tail end where, you know, because of

13   the distance, you don't have much margin for time for the

14   nurses to get the medications out.  And so that just compounds

15   it and gives them a very narrow window of time to get the          09:46AM

16   medication out and still meet that two-day requirement.

17             THE COURT:  All right.  Thank you.

18             MS. KENDRICK:  And just on Lewis prison, again, just a

19   few comments.  We do agree with the Court's assessment that

20   it's unclear reading this the dates when things started.  We       09:47AM

21   would also note that we continue to share the Court's

22   frustration with the use of the future tense and the passive

23   tense in reading their corrective action plan, you know.  It

24   states, medication will be placed in bins.  And as we read it,

25   the question that we kept asking is by whom, by whom.  It says     09:47AM

1    manifests are reviewed.  It's unclear who is doing this.

2    Medications are obtained.  Again, it doesn't say who is doing

3    these things.

4         And so we just think that more of a focus on the

5    corrective action plans on the who, what, when, where, why and          09:47AM

6    hows would be helpful for all of us.

7         MR. BOJANOWSKI:  I think our next plan will strive to

8    include that information, Your Honor, as well.

9         THE COURT:  Thank you.

10        MR. BOJANOWSKI:  I'm trying to make notes on each of          09:48AM

11   these so we can start to include some additional info.

12        THE COURT:  Okay.  So as we conclude this discussion

13   about Performance Measure 11, I will give you a heads-up about

14   where we stand with respect to the Court's imposition of

15   sanctions because this is one that is a likely candidate for          09:48AM

16   that.  My plan today was to hear about the July numbers so that

17   I could, before issuing my order starting the clock on the

18   sanctions mechanism, have the most recent data and making sure

19   that we're focusing people's attention on the areas that are of

20   the greatest need rather than suffering from the lag that is          09:48AM

21   always part of this case of delayed reporting.

22        And then once I have that information from today, I

23   will then, as part of today, also ask the plaintiffs' counsel

24   after we have worked through what are on their items on their

25   agenda, with respect to continuing issues they think may exist          09:49AM

1   with respect to whether or not the monitoring has been in

2   compliance with the Court orders and therefore numbers that

3   would suggest non-compliance may not be correct leading to that

4   conclusion.  And so then once I have the current update of

5   where we stand and also can factor into that whether or not I          09:49AM

6   think that I have concerns about the numbers that I have been

7   receiving, I then will issue the order identifying which

8   performance measures and which particular facilities are the

9   ones that the defendants are on notice with respect to the

10  sanction that I'm going to impose.                                      09:50AM

11        And I have reviewed the materials that have been

12  submitted to me with respect to the authority of the Court to

13  do this, and I think that if I comply with the contempt

14  procedure I clearly do.  And so I reject the defendants'

15  argument and the order will explain in detail why I think that.        09:50AM

16  But I do reject the defendants' argument that that's not a tool

17  that was plainly enumerated with respect to the Court's power

18  to use any lawful means.

19        And so, at the end of today, I will be in my position

20  to then get the written order to you all putting the defendants        09:50AM

21  on notice about where we stand with respect to a final

22  opportunity to cure the deficiencies that are the most serious

23  ones identified in the case.

24        Performance Measure 13:  Chronic and psychotropic

25  medications renewals will be completed in a manner such that           09:51AM

CV 12-601 - September 12, 2017 - Status Hearing

1    there is no lapse or interruption in medication.  For Douglas

2    reported at 93; for Eyman at 94; for Florence at 88; for Lewis

3    at 95; Perryville at 100; Tucson at 94; Yuma at 92.

4         And Ms. Kendrick, anything you wanted to say?

5         MS. KENDRICK:  We're very pleased to see these levels        09:51AM

6    and we certainly hope that defendants are capable of sustaining

7    it.

8         THE COURT:  Indeed.  That's my dream, too.

9         Performance Measure 14:  Any refill for a chronic care

10   or psychotropic medication that is requested by a prisoner       09:51AM

11   between three and seven business days prior to the prescription

12   running out will be completed in a manner such that there is no

13   interruption or lapse in medication.  Douglas is reported at

14   100 percent; Eyman at 94; Florence at 95; Lewis at 100;

15   Perryville at 100; Tucson, 95; Yuma, 100.                        09:52AM

16        Ms. Kendrick.

17        MS. KENDRICK:  Your Honor, we would just observe that

18   we discussed this last month that Douglas in the month of June

19   had an N/A, and we expressed our concern with that because of

20   the fact that it is a large prison.  And there are prisoners     09:52AM

21   there who are on chronic care and psychotropic medications, and

22   so it, for us, raised a lot of questions about the methodology

23   that was used and the source documents that in a prison of

24   several thousand people not a single person had a refill of

25   medication.  Mr. Bojanowski, last month, said that they would    09:53AM

1    try to supplement the record and look at the worksheets and the

2    CGAR data and see what happened and see what the source was.

3    There is no update on that, so it's unclear what happened.

4        However, in their chart here they are showing an N/A

5    as 100 percent.  And this Court has made clear that a not

6    applicable is not a compliance month.  It is neither compliant

7    nor non-compliant, it is just not applicable.  So this chart,

8    to us, does not accurately reflect what happened last month.

9        THE COURT:  Okay.  An update on your inquiry, Mr.

10   Bojanowski?

11       MR. BOJANOWSKI:  I thought I cleared that up at the

12   last hearing, Your Honor.  I'm pretty positive that I had the

13   information and provided it to the Court.  To be honest with

14   you, I was -- I thought I did.

15       MS. KENDRICK:  I'm looking at the transcript, Your

16   Honor, and Mr. Bojanowski at Page 95, Line 20 says, Your Honor,

17   quote, "Your Honor, we're going to have to look at it again.

18   Maybe we can supplement the record with some kind of

19   information for the Court.  But we just don't have an answer

20   right now.  We're going to have to go back and pull the data

21   from the CGAR and have a look and see what happened," close

22   quote.

23       MR. BOJANOWSKI:  There was nothing else?

24       MS. KENDRICK:  And on Page 97, he says, quote, "Your

25   Honor, because it's a preliminary finding I will certainly run

1    down and make sure that whatever we've got is accurate and

2    report that to the Court," close quote.

3            THE COURT:  I'm sorry, Mr. Bojanowski.  If you wanted

4    we could make the transcript available.

5            MR. BOJANOWSKI:  Your Honor, I thought I answered the     09:54AM

6    question.  I was confirming with Mr. Pratt.  He thought I did

7    too.  Maybe it was later in the day.  But I will believe if

8    Corene says there's nothing in the transcript.  I had thought I

9    had addressed that issue that day.

10           THE COURT:  Ms. Kendrick, the day of the transcript      09:56AM

11   you were looking at is?

12           MS. KENDRICK:  August 9.

13           THE COURT:  Thank you.

14           (Discussion off the record.)

15           THE COURT:  Okay.  So Page 104 is the part that Mr.      09:58AM

16   Bojanowski is recollecting and continues on to 105 in which Mr.

17   Bojanowski, over the noon hour, had identified an explanation

18   as to this.  And he said that it was during the reporting

19   period no inmates made a request for renewal, and Ms. Kendrick

20   later on says that:  I would just note that if these people     09:58AM

21   requested refills in May and April it begs the question why

22   these people -- it says three in the transcript but I think it

23   means these people -- didn't make request refills in June --

24   oh.  It's the same three people.  I see.  You are referring to

25   three people.  So I would just note that if three people -- I'm   09:59AM

CV 12-601 - September 12, 2017 - Status Hearing

1    sorry.  My eyesight is not so great.  I would just note that if

2    three people requested refills in May and April it begs the

3    request why three people didn't make request refills in June if

4    it's the same three people.  Nonetheless, I guess we're just

5    going to have to take Mr. Bojanowski at his word here on this        09:59AM

6    cause.

7          So it seems like Mr. Bojanowski's memory is right.  We

8    did close it out at that time.  So this time the branch gets

9    sawed off on your side.

10         MS. KENDRICK:  All right.  Fair enough.  Thank you for         09:59AM

11   the reminder.  I had forgotten about that.

12         Your Honor, while we were doing that, Ms. Eidenbach

13   was looking at some of the past staffing reports with regard to

14   the issue of hiring the nurses.  As an initial matter, we

15   discovered that, in fact, we do not have the July staffing         10:00AM

16   numbers.  That report was not produced to us by defendants.  We

17   only have the May and June ones and in comparing them, the

18   number of contracted RNs at Florence in both months was 16.4

19   positions, and the number of contracted LPNs was 24.4.  There

20   was a loss of the equivalent of 2.8 full time equivalent LPNs       10:00AM

21   from May to June.

22         So unfortunately, the staffing reports do not provide

23   any additional information for us as it appears on whether

24   these 15 new positions are newly contracted, additional

25   positions, or replacements.                                         10:00AM

CV 12-601 - September 12, 2017 - Status Hearing

1        THE COURT:  Okay.  Would you frame an interrogatory to

2   the defendants and serve it on them and ask them to respond to

3   the staffing number that you need to be able to make a

4   conclusion about where we stand with respect to the net gain or

5   loss?                                                          10:01AM

6        MS. KENDRICK:  Yes.  And we would also request that

7   they provide us with the July staffing report.

8        THE COURT:  The June one is dated what day?

9        MS. KENDRICK:  So they provide it to us approximately

10  mid month of the following month.  So like we got the June      10:01AM

11  report mid-July.  We should have gotten the July report

12  mid-August but we have just checked every office's system, and

13  we can't seem to find a record of getting the July report in

14  late August when we got the other documents.  There was a large

15  document production so we may not have noticed that we didn't    10:01AM

16  get it until just now when we were looking for it.

17       THE COURT:  Mr. Bojanowski, would you send over the

18  July report today to the plaintiffs?

19       MR. BOJANOWSKI:  Yes.

20       MS. RAND:  Your Honor, this is Lucy Rand.  And I will      10:01AM

21  make sure that report is provided today if it's available.  I

22  thought we had produced it, but I will make sure I find out

23  where it is and get it produced if it's not already produced.

24       THE COURT:  Okay.  Thank you.

25       MS. RAND:  Thank you.                                      10:02AM

UNITED STATES DISTRICT COURT

CV 12-601 - September 12, 2017 - Status Hearing

1    THE COURT:  Is that it for Performance Measure 14?

2    MS. KENDRICK:  Yes, sir.

3    THE COURT:  All right.  Thank you.

4    Performance Measure 35:  All inmate medications, KOP

5    and DOT, will be transferred with and provided to the inmate or    10:02AM

6    otherwise provided at the receiving prison without

7    interruption.  Douglas is reported at 88; Eyman, 48.  And

8    there's a discourse here.  Corrective action plan all

9    facilities, well let me peek ahead.  Oh, dear.  Okay.  The "oh,

10   dear" is because I see that Florence is at 55, and that Lewis    10:03AM

11   is at 42 and Perryville is at 100; Phoenix is at 100; Safford

12   is at 100; Tucson is 86; Winslow has dropped out of compliance

13   at 70; and Yuma has dropped out of -- it's still out of

14   compliance at 84.

15   MR. BOJANOWSKI:  Your Honor, I can -- I know that    10:03AM

16   there's a rather lengthy explanation plan of the corrective

17   action plan there that goes on for two and-a-half pages.  But

18   we did, for today's hearing, we had the Monitoring Bureau take

19   a look at some August prelim numbers to maybe give the Court an

20   idea of where we're trending.  These are obviously preliminary.    10:04AM

21   THE COURT:  What are they based on?  Tell us about how

22   you came to find these numbers.  Did you follow the monitoring

23   guide the same procedure you just applied?

24   MR. BOJANOWSKI:  Yeah.  We did it ahead of time.

25   THE COURT:  Okay.    10:04AM

1        MR. BOJANOWSKI:  Okay.  So that -- because we wanted

2   to see --

3        THE COURT:  So in the last week or so somebody could

4   look at August and accelerate the process for August?

5        MR. BOJANOWSKI:  Correct.  Because we wanted to see          10:04AM

6   whether this -- there's been a lot of work done, as I have

7   explained to the Court in the past two hearings, there's been a

8   lot of work done on this measure to see if we can't get this

9   fixed.  And as you can see, we've got some facilities that now

10  are doing well, but I wanted to at least before we start to get     10:05AM

11  into the weeds here, to let the Court know where we're

12  trending.

13        THE COURT:  Sure.

14        MR. BOJANOWSKI:  So the Eyman facility is currently

15  showing 48.  The August prelim is 64.  Still not at compliance,     10:05AM

16  but it's pushed up a bit.  We've got Florence is at 55.  They

17  have pushed up to 58.  Lewis is at 42.  They have moved up to

18  85.  Phoenix is going to be 100 percent again.  Let's see.  Who

19  did I miss?  Safford I don't have.  Tucson is at 90 percent.

20  Winslow is at 81 percent.                                          10:06AM

21        THE COURT:  I'm sorry.  I didn't follow.  Because you

22  were giving me previously the July and August.

23        MR. BOJANOWSKI:  I'm sorry.

24        THE COURT:  So Tucson was 90, you say?

25        MR. BOJANOWSKI:  Hold on.  Yes.  Currently at 86,            10:06AM

CV 12-601 - September 12, 2017 - Status Hearing

1    moved up to 90.

2         THE COURT:  Okay.

3         MR. BOJANOWSKI:  Winslow currently at 70, moved up to

4    81.

5         THE COURT:  Okay.                                    10:06AM

6         MR. BOJANOWSKI:  And Yuma, Yuma I don't have an August

7    prelim on at this point.

8         THE COURT:  All right.

9         MR. BOJANOWSKI:  That one did not get completed.

10        THE COURT:  Okay.  So going then --                  10:06AM

11        MR. BOJANOWSKI:  So the PM 35 corrective action plan

12   that you see is a systemwide action plan for all facilities.

13        THE COURT:  A transfer -- I'm reading from the

14   corrective action plan for Performance Measure 35:  A transfer

15   screening is performed by a qualified healthcare professional  10:07AM

16   on all intersystem transfers to ensure that all patient keep on

17   person, KOP, and direct observation therapy, DOT medications,

18   are transferred with and provided to the patient without

19   interruption.

20        So this started when?                               10:07AM

21        MR. BOJANOWSKI:  This started, end of June is when we

22   started working on it and then put the plan in place, started

23   the end of June.  So this is the plan.  But it's been going

24   through several reviews as time goes on to tighten it up.  So I

25   think this is the most current.                          10:08AM

CV 12-601 - September 12, 2017 - Status Hearing

1    THE COURT:  Were any substantive changes made to

2   having a transfer screening to ensure that -- I mean,

3   obviously, to ensure suggests that you would make sure that it

4   happened.  And what we know is that it did not happen in 56

5   percent of the cases that were sampled.  So that ensurity has          10:08AM

6   really not been working there.  And I guess the next paragraph

7   of providing this to Corizon, is Corizon -- well, I see the

8   next paragraph.  Let me read it for the record.  The complex

9   accountability officer at the sending facility is responsible

10  for providing a daily list of inmates transferring out of the         10:09AM

11  facility the next day to Corizon medical records and health

12  services administration.

13    So this providing of this information to Corizon, do

14  we know when that started, or has that always been the case or

15  do you have any idea?                                                  10:09AM

16    MR. BOJANOWSKI:  It's always been the case.

17    THE COURT:  All right.  Then the next paragraph:  Once

18  received, Corizon personnel reviews the patient's health record

19  to ensure that the patient is appropriate for transfer.  A

20  nurse transfer sending encounter must be created in the               10:09AM

21  electronic offender management information system, eOMIS.

22  Additionally, an intra-system transfer form must be added

23  through the standard forms for standard forms section.  The

24  intra-system transfer form is printed from eOMIS to later be

25  placed with the inmate's chart and DOT medications, if                10:10AM

1    applicable.  Once a patient has been determined appropriate for

2    transfer, the physical medical chart and DOT medication will be

3    pulled by the intake nurse or medical records liaison and

4    placed in a banker's box.  Any DOT medications later pulled by

5    the intake nurse are placed in the same box.                   10:10AM

6          So at least up to these last two paragraphs, when did

7    this start happening about the banker's box and putting the

8    medication in?

9          MR. BOJANOWSKI:  This has been a process that's been

10   in place.  It's being tightened up to assure accountability of  10:11AM

11   people who are involved in the process.  So some of these

12   things have been in place for a long period of time and some of

13   this is new stuff that's part of the plan to try and get the

14   compliance increased.

15         THE COURT:  I guess I'm trying to figure out whether     10:11AM

16   this is referring to a plan that's been in place or a process

17   that's been in place.  If it's a process that's been in place

18   then I guess you would be representing to me that it has been

19   happening.  If it's a plan that's been in place it's been what

20   people have been instructed to do but perhaps hasn't happened.  10:11AM

21   Do you have an idea about which it is?

22         MR. BOJANOWSKI:  I think it's more along the lines of

23   a plan because it's part of the policy.

24         THE COURT:  We know whether or not it's been

25   happening.  We know it's been part of what people are told to   10:11AM

1   do but we don't know if it's been happening or not.  And this

2   obviously only addresses the medications that are taken under

3   supervision and not those that are kept on the person.

4           And then more specifically, for each transferring

5   patient who is prescribed medications in eOMIS the intake nurse   10:12AM

6   or the assistant director or nursing as the designated backup

7   at the sending facility is required to gather all DOT

8   medications from the unit medication room for each inmate with

9   active drug prescription orders on the movement list, and print

10  the drug prescription orders list from eOMIS showing active      10:12AM

11  medications only.  KOP medications must also be labeled.

12  Compare the physically available medications to the active list

13  on drug prescription orders.  If medications are not available,

14  make arrangements for next dose administration from clinic

15  stock or backup pharmacy.  An explanation must be provided for    10:12AM

16  currently prescribed medications, KOP and DOT, that are not

17  present on the drug prescription order sheet.  For special

18  needs patients, notification must be provided to key

19  individuals identified on the intra-system transfer contact

20  list at the receiving facility.  In the event that a patient      10:13AM

21  states that he does not take or does not want any of the

22  medications, a signed refusal form (AZDOC Form 1101-4) must be

23  completed, and the transfer summary will also document the

24  refusal.  The refusal form shall be attached to the transfer

25  summary sheet and scanned at the receiving site within two        10:13AM

CV 12-601 - September 12, 2017 - Status Hearing

1    business days.  Furthermore, if KOP medications are packed in

2    the inmate's property an information report, (IR), must be

3    written.  Injectable or temperature controlled medications will

4    be forwarded to the receiving facility by the IC LPN.

5         Next paragraph.  Place DOT and KOP attestation stamps         10:13AM

6    on the printed active drug prescription order sheet.  The

7    patient must initial all KOPs in his possession and also sign

8    the departure attestation.

9         Next paragraph, review the medication administration

10   schedule for each prescribed DOT and administer any necessary    10:14AM

11   doses prior to the inmate departure.

12        Next paragraph, place all DOT medications in a clear

13   sealed bag along with the printed active drug prescription

14   order sheet for that inmate.  Each inmate's medical records --

15        MR. BOJANOWSKI:  It's the same paragraph.                    10:14AM

16        THE COURT:  -- and sealed bag of medications shall be

17   placed in a hard-sided plastic tote bin that is sealed with a

18   red tag for each final destination.  Records are grouped by

19   complex.  Both Corizon staff and an officer shall sign the

20   AZDOC discharge transfer sheet (705-6) confirming items are      10:14AM

21   present and sealed.  A large quote "M" close quote will be

22   documented in the top right-hand corner of the form to indicate

23   that medications are enclosed in the bin.  The bin shall then

24   be placed on the same vehicle as the inmates.  And then it says

25   security staff shall complete an IR for statewide departures to  10:15AM

CV 12-601 - September 12, 2017 - Status Hearing

1    identify discrepancies and transferred medications.

2         New paragraph.  At the receiving facility the complex

3    accountability officer will provide a daily list of inmates

4    transferring into the facility the next business day to Corizon

5    medical records and health services administration.                    10:15AM

6         New paragraph.  The intake nurse at the receiving

7    facility shall unpack the inmate patient's DOT medication bags

8    from the tote.  The intake nurse will then compare the contents

9    of the bag to the dug prescription order sheet that indicates

10   active medications.  Each inmate patient is required to sign       10:15AM

11   the inmate drug prescription order sheet to indicate all of

12   their medications are present.  If a patient refuses to sign

13   then the box must be checked indicating a refusal to sign.

14   Upon discovery of any missing medications, the intake nurse

15   shall notify site leadership to coordinate immediate             10:16AM

16   procurement of needed medications.  The inmate nurse will also

17   review the medication administration schedule for each

18   medication and administer any necessary doses at the time of

19   arrival.  The intake nurse will then release patients with

20   their KOP medications and stock DOT medications.                  10:16AM

21        New paragraph.  Security staff shall complete an IR

22   for statewide arrivals to identify discrepancies in transferred

23   medications.  The transfer summary sheet is also scanned into

24   eOMIS.  Inmate patients who are received from Alhambra

25   designated as condemned (death row) or enhanced housing inmates   10:16AM

CV 12-601 - September 12, 2017 - Status Hearing

1    will be taken directly to the Browning unit to have the full

2    intake process completed.  This patient will not have

3    medications as they will be directly received from the county

4    jail and, therefore, no medical records or medications will

5    travel with these patients.                                    10:17AM

6          So the question that I have is this plan, is it in

7    place now or where do we stand?

8          MR. BOJANOWSKI:  It is in place.

9          THE COURT:  And when did that start?

10          MR. BOJANOWSKI:  It began the end of June.            10:17AM

11          THE COURT:  End of June?

12          MR. BOJANOWSKI:  Yes, sir.

13          THE COURT:  So at the end of June, this plan that I

14    just read that, if effectuated, would result in 100 percent

15    compliance, we know in July and August didn't in half the cases  10:17AM

16    nearly in Florence and a little better than that at Eyman, or

17    the other way around.  Florence is at 58 and Eyman is at 64.

18    And so this is not a good plan.  It's not working.

19          MR. BOJANOWSKI:  Well, it just got put into place,

20    Your Honor, and we have to train the people, okay, and make     10:18AM

21    sure that they are aware of whatever new duties are there,

22    making sure that bins are appropriately being utilized, are

23    being tagged.  There's a lot of different procedures here that

24    people need to be made accountable for.  So I am seeing, you

25    know, measures trending upward that has not occurred for quite   10:18AM

1    sometime.  So. . .

2         THE COURT:  Well, what have you done to -- I mean you

3    have this information that people are not complying with this

4    plan.  So what have you done to make sure that every day that

5    they are complying with this plan?                          10:18AM

6         MR. BOJANOWSKI:  We are just following up on a daily

7    basis to try and get the compliance numbers up, Your Honor,

8    which is why I was looking at those August numbers and trying

9    to report that we obviously are having some effect in getting

10   compliance with this measure given the trending of these     10:19AM

11   numbers.

12        MR. STRUCK:  Your Honor, this might be a good time to

13   report on the contract amendment.  Because one of the issues

14   that has been frustrating to the Court and to plaintiffs and to

15   ADC is the fact that there was a $90,000 cap on the sanctions. 10:19AM

16   So the sanctions were $5,000 for each performance measure at

17   each facility, but at 90,000 it stopped.  And so the contract

18   was amended so that as of November 1st there will be no cap on

19   the sanctions.

20        So a lot of these performance measures, you know,       10:20AM

21   these plans are all well and good but if they are not followed,

22   it's not doing anybody any good.  And so at least from the

23   perspective of the defendants, removing that cap will provide

24   the Department with a sufficient stick to get Corizon to train

25   their people to follow these plans.                          10:20AM

CV 12-601 - September 12, 2017 - Status Hearing

1    THE COURT:  I guess I have to interrupt for a second,

2    because it's not been clear to me that this performance measure

3    is a Corizon problem.  From what I have understood is that it

4    is more a shared problem with respect to who is going to -- I

5    mean, Corizon is not transporting people from one facility --    10:20AM

6    from one institution to another.

7    MR. STRUCK:  That's true.

8    THE COURT:  The Department is.  So the idea that there

9    -- it would be really, I would imagine, pretty possible for

10   people solely within the Department of Corrections' control,    10:21AM

11   meaning their own employees, to do these things that are listed

12   here, and that is to show up and say, I need to have the

13   medications for this person who is standing next to me who is

14   about to get on the bus to go over to a different institution.

15   But in any event, we'll take up that subject later on because I    10:21AM

16   would like to get through all of this.  But it is something

17   that we should discuss.

18   So I have articulated how I'm skeptical about the idea

19   that this has been sufficiently put in place.  You say, Mr.

20   Bojanowski, it's in place as of the end of June, but then I see    10:22AM

21   in July and August, still when you say trending but going from

22   48 to 64 and 55 to 58 is not great.

23   So Ms. Kendrick.

24   MS. KENDRICK:  Thank you, Your Honor.  At the outset,

25   we would also note that since this plan has been in place since    10:22AM

1    June it's troubling that for three of the institutions that

2    have been chronically non-compliant since March of 2015, they

3    either went down or stayed the same.  So from June to July,

4    Eyman went from 48 to 48; Florence went from 64 dropping nine

5    points to 55 in July; and Lewis went down to an abysmal 42.        10:22AM

6    Lewis has not been compliant with this performance measure in

7    over a year if not longer.

8         The Court also included these institutions along with

9    Phoenix and Tucson in the order to show cause, and we agree

10   that the Court needs to issue an order including them.  When      10:23AM

11   the defendants reported on their performance on this

12   performance measure for the time period from June, mid-June to

13   mid-July, they had over a thousand separate incidents of

14   non-compliance at the institutions in the Court's order.  So we

15   think that clearly there is something going on because that      10:23AM

16   covered part of that time period where this new plan was in

17   place.  So that was the discrete number of individuals that

18   were affected and that were non-compliant for at least half of

19   that time period.

20        With regard to their corrective action plan, obviously      10:23AM

21   it sounds better than what they were doing before so we are

22   glad to have it.  You know, I guess again, there are some

23   things where there's still some vagaries.  So, for example, on

24   the first page of the corrective action plan, third paragraph,

25   it talks about Corizon personnel reviewing a patient health       10:24AM

1    record.  Again, it doesn't say who this person is, so again,

2    that makes it difficult to ensure accountability because if we

3    don't know who the position or the individual is that's

4    supposed to be doing these things, how will supervisors know to

5    hold people accountable for not doing what they are required to    10:24AM

6    do?

7         It's also a little unclear going on to the second page

8    when they talk about the process of how they are boxing up the

9    medications into a banker's box to put on the bus with the

10   prisoner when he is being moved.  It's unclear whether -- why    10:24AM

11   the keep on person medications, since they are called keep on

12   person medications can't be kept on the person while they are

13   on the bus.  Obviously, there's certain medications that,

14   perhaps, you don't need to carry in your pocket with you at all

15   times but there are others, for example, nitroglycerin for    10:25AM

16   heart conditions, asthma medication, sometimes diabetes

17   medication, that an individual literally needs to have within

18   an arm's reach of him.  So it's unclear if they are requiring

19   all KOP medications to be boxed up.  If that is the case it's

20   problematic because if something happens to that box that    10:25AM

21   individual will not have his or in some cases her medication

22   closely with them.

23         The final comment on the actual process is once it

24   gets to the receiving facility, so that's the third page of

25   defendant's report, is that it states that the intake nurse at    10:25AM

1    the receiving facility shall unpack the inmate patient's

2    medication bags from the totes.

3            And one of the issues that Mr. Bojanowski has

4    identified in past months that he said was a cause of

5    non-compliance was that sometimes the transportation staff were    10:26AM

6    not taking the prisoner to the main institution clinic to be

7    processed for intake but was rather taking him directly to the

8    unit.  So, you know, at Lewis prison, for example, there's

9    eight units.  They are all kind of separate.  So rather than

10   going to the main Lewis intake health unit the drivers may be    10:26AM

11   going straight to the yard where the person is listed.

12           So it's unclear from this whether there has been an

13   explicit instruction to transportation staff that all people

14   who are being transported need to first go to the main clinic

15   or wherever this intake nurse, wherever he or she is located to    10:26AM

16   ensure that this actually happens.  Because if the people are

17   still being taken directly to their housing unit, then it's

18   unclear what's going to happen with the intake nurse process.

19           THE COURT:  So you told me something that I didn't

20   know, and that is that there was, in addition to the individual    10:27AM

21   clinics in each of the units, there is an overall institutional

22   medical unit that people are processed through for -- when they

23   arrive, and that's where they have their initial medical

24   processing?

25           MS. KENDRICK:  At some of the prisons.  That is my    10:27AM

1    understanding from going to the tour -- on tours.  So, for

2    example, the Lewis prison has a main medical that they call the

3    hub.  My understanding from what I have been told by staff when

4    I have gone on tours is that people coming in are supposed to

5    go there first and then they are taken.  Other institutions          10:27AM

6    like Eyman where it's more geographically disbursed, they have

7    a separate clinic on each unit so there's no, like, overall

8    institution intake clinic.

9         THE COURT:  So you are just now providing something

10   for defendants to be aware of as a possible glitch that could        10:28AM

11   adversely -- or be reflected in the fact that this plan that's

12   in place hasn't produced the numbers.  You are making an

13   observation now about one such cause you think might be.  You

14   don't know but you are letting them know that could be a

15   possible cause.                                                       10:28AM

16        MS. KENDRICK:  Correct because as you noted, you said

17   this isn't just a Corizon problem this is a shared problem.

18   Because there's two groups of actors here.  There's the

19   corrections transportation staff and there's the healthcare

20   staff.  So it's just a little unclear how they are going to         10:28AM

21   handle that intake.  And it may very well be that depending

22   upon which institution is the receiving facility they are going

23   to have to do intake a little bit differently because they may

24   or may not have that main medical hub to funnel them through.

25        THE COURT:  I've got it.  Okay.  Thank you.  Anything          10:28AM

1    else on this performance measure?

2         MS. KENDRICK:  No, sir.

3         THE COURT:  Anything you wanted to say in response,

4    Mr. Bojanowski?

5         MR. BOJANOWSKI:  No.  I made notes of her comments.    10:29AM

6         THE COURT:  Thank you.  Let's take a 10-minute break.

7    We'll be back at 20 to.  Thank you.

8         (Recess from 10:29 a.m. until 10:42 a.m.)

9         THE COURT:  I had a thought after conferring with the

10   staff attorneys about how best to take advantage of your new    10:42AM

11   method, Mr. Bojanowski, of this report that we have been going

12   through.  The reason that we were able to come up with the

13   transcript cite regarding the Douglas issue was that we have

14   been trying to bring together every position the Court has

15   taken and counsel have taken with respect to the performance    10:43AM

16   measures over time.  So we have three notebooks about a foot

17   tall that relate to and collate all of the discussion about the

18   individual performance measures.  So we have been working on

19   that for, I think, the same reason that Ms. Kendrick has

20   probably a similar thing because she's frequently been telling    10:43AM

21   us what we said before with everybody, sometimes getting it

22   right and sometimes not.

23        But in any event, it's a good idea and it's a good

24   idea in terms of making sure that we're making continuity and

25   with respect to how I look at things making sure I'm not    10:43AM

1    listening to an explanation of why there has been a failure and

2    not appreciating that I have been given that same explanation

3    before and not appreciating the date when it was in place so

4    that I can really hold everybody's feet to the fire.

5           And so we have done that and will continue to do that,    10:44AM

6    but with respect to -- and maybe we need to come up with a name

7    for this preliminary summary that you have provided for us of

8    all of these performance measures, Mr. Bojanowski.  But I think

9    it would be helpful with respect to how we go forward and how

10   you update it just as you update the graph portion of it going   10:44AM

11   forward each on month.  I think when you update the basis for

12   non-compliance and the corrective action plan that you keep the

13   previous statements in place.  So make it a living document,

14   one that grows rather than gets replaced.  So, for example,

15   where you tell us, as I just read through, the plan in place    10:45AM

16   for addressing the transfer of medications the next month when

17   we get this preliminary summary that same language should be in

18   place but you will then have a dateline that says updated for

19   the October hearing.  And that way I will have the most recent

20   plan and basis for non-compliance in front of me, but I will    10:45AM

21   also have the next most recent one and then as time goes on the

22   previous ones as well.  So that would be helpful if you kindly

23   do that.

24         MR. BOJANOWSKI:  That was my intention, Your Honor.

25   It was something to where we could now track so that -- and we   10:45AM

1    could add the dates and such.  So, yes, I take the Court's

2    suggestion.

3            THE COURT:  You got there first.

4            MR. BOJANOWSKI:  We may even do a redline type version

5    or something like that.                                    10:46AM

6            MR. STRUCK:  We'll probably date it in bold, the new

7    information and each proceeding month the new information will

8    be bolded.

9            THE COURT:  Thank you.  However you work it, just make

10   sure the old is there as well as the new.  Thank you.        10:46AM

11           Performance Measure 37, sick call inmates will be seen

12   by an RN within 24 hours after an HNR is received, (or

13   immediately if identified with an emergent need, or the same

14   day if identified as having an urgent need.)

15           Eyman reporting at 86 percent; Florence, 92 percent;   10:46AM

16   Lewis, 87; Tucson, 100; Winslow, 93; Yuma, 100.

17           Ms. Kendrick.

18           MS. KENDRICK:  Well, Your Honor, we're glad to see

19   that these continue to be above the compliance level; however,

20   we would just note for the record that as shown in our ongoing  10:47AM

21   hearings about the open sick call process and the removal of

22   the HNR boxes, that the defendants' numbers are overinflating

23   compliance because they have had multiple witnesses testify

24   that they only count the HNRs that are received and processed

25   by a nurse.  And they do not log all HNRs so there's no record  10:47AM

CV 12-601 - September 12, 2017 - Status Hearing

1    of the entire universe of people who were seeking medical

2    assistance but only those that were completed.

3            So it does kind of raise a question, though, given

4    what they have said is their methodology why their numbers,

5    despite that, aren't 100 percent if they are only counting the          10:47AM

6    HNRs of people who are seen.  And the three facilities all did

7    go down in a blip; Eyman, Florence, and Lewis, still above

8    compliance but we hope that that is not a downward trend.

9            But, again, we reiterate our position that the

10   methodology being used is flawed and the numbers are not                 10:48AM

11   reliable because they are not counting all HNRs received as

12   they used to do when they had HNR boxes that collected all of

13   them.

14           THE COURT:  And this will be a topic tomorrow, and

15   also I was -- I will mention now that I'm wondering if in your           10:48AM

16   recent tours whether you spoke to your clients about the

17   subject generally and maybe be in a position to provide

18   additional information from your observations in conferring

19   with the inmate class with respect to how they see the HNR box

20   affecting their ability to get care.                                     10:48AM

21           MS. KENDRICK:  Yeah.  We did speak with quite a few

22   women at Perryville two weeks ago, and we will be happy to

23   share that information with the Court tomorrow.

24           THE COURT:  All right.  Thank you.

25           Performance Measure 39:  Routine provider referrals             10:49AM

1   will be addressed by a medical provider and referrals requiring

2   a scheduled provider appointment will be seen within 14

3   calendar days of the referral.

4           Eyman at 39 percent; Florence at 74 percent; Lewis at

5   73 percent; Perryville at 93 percent; Tucson at 97 percent;                10:49AM

6   Winslow at 97 percent; Yuma at 96 percent.  And the identified

7   issue with respect to Florence is difficulty in hiring a

8   sufficient number of providers.  Corrective action plan, two

9   new providers have been hired.  One provider started two weeks

10  ago, so that means we're talking about the end of August, and               10:50AM

11  the second starts on October 1st.  The additional staffing is

12  anticipated to aid in reaching full compliance.

13          What kind of providers are these two providers?

14          MR. BOJANOWSKI:  I do not know for sure, Your Honor.

15  I do not want to guess.                                                      10:50AM

16          THE COURT:  All right.

17          MR. BOJANOWSKI:  I will make a note, though, to add

18  that.

19          THE COURT:  And the same point we have talked about

20  before whether or not there's been a net increase or net                    10:50AM

21  decline or whether it's no movement because of departures.

22          Then Lewis, Lewis has a vacant provider position and

23  had another provider out of the country for three weeks leading

24  to delays in referrals and provider scheduling.  To remedy

25  issues with meeting compliance levels, Corizon has hired a site             10:51AM

1    medical director who begins in December after his current

2    employment contract expires.  In the interim, a locum has been

3    brought in to serve as a provider and the facility now has use

4    of the regional medical director to provide additional care.

5    The facility is also taking steps to schedule all provider          10:51AM

6    referrals within seven rather than 14 days to ensure that the

7    14-day window is met.

8            So the facility is taking steps to -- can you provide

9    any more concrete information?  I laugh just because, "is

10   taking steps to schedule all provider referrals," I mean, you       10:51AM

11   mean they are working toward that as a goal or they have done

12   it or where do we stand?

13           MR. BOJANOWSKI:  I think that what we're going to do

14   is the change the methodology so that it is a seven-day window

15   rather than a 14-day window.                                        10:52AM

16           THE COURT:  But that hasn't been put in place yet?

17           MR. BOJANOWSKI:  It has not been finalized.  So it's

18   in process now to get that set as a requirement for the

19   providers, similar to the rounding issue where we decreased the

20   number of hours for rounds to meet the 72-hour window.  Similar     10:52AM

21   concept.

22           THE COURT:  And again, the addition of a site medical

23   director, I wonder where that fits in the report that I have

24   seen, the monthly report with respect to the different

25   identified providers that need to be in place, where that          10:52AM

1    person fits with respect to the different roles, the different

2    titles.  I would be interested in that also, be interested in

3    exactly how the regional medical director is helping.  Is this

4    a person who is coming to the site, or what's going on with

5    that?                                                          10:53AM

6               MR. BOJANOWSKI:  Yes.

7               THE COURT:  How often?

8               MR. BOJANOWSKI:  I don't know.

9               THE COURT:  Do you know when that started?

10              MR. BOJANOWSKI:  I do not.  I will add that in my list  10:53AM

11   of additional information.

12              THE COURT:  Okay.  Ms. Kendrick.

13              MR. BOJANOWSKI:  And it may be, Your Honor, I'm going

14   to obtain some additional information and supplement this

15   document within the next couple of weeks.  I mean, I'd like to  10:53AM

16   do that.  So all these notes I'm going to take, I will try and

17   get some answers to the Court ASAP.

18              THE COURT:  Thank you.  Ms. Kendrick, with respect to

19   39.

20              MS. KENDRICK:  Yes, Your Honor.  This performance     10:53AM

21   measure, the Court not only found them substantially

22   non-compliant but ordered them to find outside resources to

23   ensure compliance with this performance measure in your

24   November 2016 order.

25              We're concerned about the problems at Florence and    10:54AM

CV 12-601 - September 12, 2017 - Status Hearing

1   Lewis, because while we're glad that they are getting two new

2   providers, again, as we discussed at the August 9th hearing and

3   recorded in the transcript, there was a shortage of providers

4   at Florence according to the June staffing reports.  So it

5   doesn't appear that these would be necessarily additional          10:54AM

6   contracted positions but just filling the vacant ones.

7          And also, we were told that telemedicine was going to

8   be used at Florence to make up for the gap and that

9   telemedicine provider encounters started in June.  So the fact

10  that the number is unchanged and is still substantially            10:54AM

11  non-compliant is troubling.

12         At Lewis prison we were told last month that the

13  reason for non-compliance was because there were 10 new nurses

14  that had been hired and were not doing what they needed to do

15  in terms of making sure referrals were made to the providers,     10:55AM

16  but that they had been trained in June and that we would see an

17  improvement in July.  And unfortunately it dropped by 10

18  percent.  There's -- it's unclear if whether the training of

19  the nurses took any effect or not, but it appears that it's not

20  working.  And again, it states that there's a vacant provider     10:55AM

21  position so they are not creating additional provider

22  positions.

23         Finally, defendants filed a document recently that is

24  in response to a grievance that plaintiffs used as an exhibit

25  that involved a response by medical staff that told a prisoner    10:55AM

1    that he needed to be seen three times on nurse's line by a

2    provider before being referred.  And defendants filed a

3    response and a declaration from the facility health

4    administrator about it and stated that, you know, that was not

5    the policy and that they had been informed.                    10:56AM

6           I will tell the Court that when we were at Perryville

7    and Ms. Eidenbach and Ms. Abela were with me for that trip,

8    every single woman I interviewed, I asked her specifically have

9    you ever been told that there is a policy that you have to be

10   seen more than once on nurse's line before you can see a       10:56AM

11   provider?  And every single one of them that I interviewed said

12   yes, I have been told that unless it's an emergency.

13          So again, we're glad that Mr. Pratt has filed

14   declarations and told the Court that that's not the case, that

15   we have a declaration from this facility health administrator,  10:56AM

16   but we are extremely troubled about what message has actually

17   trickled down to the line nurses who are telling this to the

18   prisoners still today.

19          I don't know if Ms. Eidenbach or Ms. Abela would also

20   like to share with you what they were told in their interviews, 10:57AM

21   but I made a point when I spoke with the women when I was there

22   to ask this question because it is something that has really

23   kept coming up over and over and despite the denials by

24   defendants that this is not their policy, it's never been their

25   policy, I find it incredibly striking that in three days of     10:57AM

1    interviewing prisoners when I ask them that question every

2    single person who I asked that question of said yes, I have

3    been told that.

4         THE COURT:  Did your question provide any insight as

5    to whether or not the inmates were telling you about          10:57AM

6    experiences that they have had in the past, for instance, have

7    you ever been told, that could be over a period of time that

8    would not include, perhaps, more recent times where maybe a

9    previous errant message had been communicated.  But do you have

10   a sense about whether this is on ongoing perception from your   10:58AM

11   clients?

12        MS. KENDRICK:  Yes, because most of the time I

13   followed it up with the follow-up question of:  When was the

14   last time you were told that?

15        THE COURT:  What did you learn?                            10:58AM

16        MS. KENDRICK:  The responses I got were temporal.

17   Some of them were, well, the last time I went to the nurse's

18   line was April or March.

19        THE COURT:  Can you recall now the most recent one

20   where somebody told you that they were told that?              10:58AM

21        MS. KENDRICK:  I think it was somebody said -- so we

22   were at the end of August.  They said it was early August that

23   they were told that.  So, you know, some of them were saying,

24   oh, I think it was like a year ago.  But that's just digging

25   down asking that question.  So yeah, I would ask that follow-up  10:58AM

1    question.  I haven't had a chance to go through my notes make

2    some sort of big analysis.  But it was a striking theme over

3    and over and over again.

4            THE COURT:  So we know that we have a report from the

5    field, and I will address you, Mr. Pratt.  We know we have a          10:58AM

6    report from the field that the inmates don't have the sense

7    that this is not a rule.  And we have inmates who have reported

8    at least one so we at least have anecdotal report of somebody

9    who is very recent in time saying that they were told that they

10   had to be seen multiple times before they could be referred to     10:59AM

11   a provider.  And the affidavits that I have from the defendant

12   indicates it isn't true.

13           And so I would ask you to communicate directly to the

14   Perryville unit to the people at Corizon who are responsible

15   there to take what steps you can to make sure that they             10:59AM

16   understand that this cannot be a policy and that the Court has

17   heard information that suggests that there needs more to be

18   done to make sure that people are not under a misapprehension,

19   whether or not they are inmates or the Corizon staff.

20           Mr. Bojanowski, do you have any objection with me           11:00AM

21   asking this to be done?

22           MR. BOJANOWSKI:  May I have a moment, Your Honor?  I

23   don't have an objection.  I just wanted to confer because I

24   think I may have a potential solution to the issue that I will

25   communicate to the Court.                                           11:00AM

CV 12-601 - September 12, 2017 - Status Hearing

1          THE COURT:  Thank you.

2          MR. BOJANOWSKI:  Your Honor, because this seems to be

3     an ongoing issue, maybe the way to handle it is by way of we

4     can post this on inmate bulletin boards.  We can put it on the

5     inmate television, put it in town hall meetings.  Those kinds

6     of things can be done on the inmate side so that the inmates

7     are aware that this is not the policy, and it's not a

8     requirement.  And then on the other side, the staffing side, we

9     will communicate with the facility health administrators and

10    the regional people to get a communique put down to the staff,

11    maybe even post it in the medical units as well like we post

12    those butterfly signs that give everybody notice you can get a

13    yearly checkup or something like that.

14          That may then allow the information to get to

15    everybody at Perryville so that there's no miscommunication.

16    Because there must be something going on if Ms. Kendrick is

17    saying she's hearing this, but maybe somebody said it happened

18    last year or it happened a few months ago.  You know, I think

19    by doing that, I think we can communicate it rather clearly and

20    maybe take care of that issue.

21          THE COURT:  I think it's a wonderful idea, and I

22    embrace it and accept it and just would ask that in 21 days you

23    provide a notice to the Court that includes a copy of the

24    notice that you have posted, where you have posted it, how you

25    have posted it, how you have communicated it to both sides of

11:02AM

11:02AM

11:03AM

11:03AM

11:03AM

CV 12-601 - September 12, 2017 - Status Hearing

 1   the house, to the inmates and to the healthcare staff.  Thank

 2   you.

 3             Anything else on this performance measure?

 4             MS. KENDRICK:  No.  We think that's a great plan that

 5   Mr. Bojanowski proposed.                                    11:04AM

 6             THE COURT:  Thank you.  Performance Measure 40:

 7   Urgent provider referrals are seen by a medical provider within

 8   24 hours of the referral.  Eyman at 89; Tucson, 100; Eyman, 93;

 9   Florence, 95.

10             MR. BOJANOWSKI:  Your Honor, you are on a different   11:04AM

11   measure there.  There's only two facilities involved here.

12             THE COURT:  You are right.  My mistake.  Thank you

13   kindly.

14             So Ms. Eidenbach.  Sorry, Ms. Kendrick.

15             MS. KENDRICK:  We have nothing.  We just hope that    11:04AM

16   they keep the sustained compliance.

17             THE COURT:  Thank you.  Performance Measure 44:

18   Inmates returning from an inpatient hospital stay or ER

19   transport with discharge recommendations from the hospital

20   shall have the hospital's treatment recommendations reviewed    11:05AM

21   and acted upon by a medical provider within 24 hours.  Eyman,

22   93 percent; Florence, 95 percent; Lewis, 100 percent; Phoenix,

23   71 percent; Safford, 100 percent; Tucson, 94 percent; Yuma, 100

24   percent.  And then with respect to Phoenix, basis for current

25   non-compliance, discharge documents were not scanned into the   11:05AM

1    online medical record system of eOMIS timely after the inmates

2    returned from off site.  More specifically, although the

3    providers were reviewing and signing the original documents

4    that return to the facility with the inmate, the nurses were

5    adding these to off site consult paperwork where they were not          11:06AM

6    being scanned into the appropriate fields in eOMIS or listed

7    under the appropriate subtitles, making it difficult to find

8    them and verify the original discharge orders were being

9    followed.  Effective July 1, 2017, a new policy has been put in

10   place where upon return from the hospital the nurse performing        11:06AM

11   the, quote, "return from off site" close quote, encounter will

12   ensure that the hospital's discharge recommendations have been

13   reviewed and signed by the provider.  That nurse will then take

14   the signed recommendations directly to medical records where

15   they will be immediately and correctly scanned into eOMIS.  In       11:06AM

16   the event the patient returns during swing shift or graveyard

17   when medical records is not on site, the nurse will place the

18   document in the box of the assistant director of nursing who

19   will ensure that the process outlined above is followed as soon

20   as medical records comes in the following days.                       11:06AM

21          So was this, from your investigation, just a one-time

22   glitch, Mr. Bojanowski?

23          MR. BOJANOWSKI:  I don't know that it was a

24   one-time -- I wouldn't describe it as a one-time glitch.  I

25   think it was a process problem that was identified in how they       11:07AM

1    were handling the documents when they would return.  So in

2    order to tighten that up, we made one person now responsible to

3    assure that that documentation is appropriately signed off by

4    the provider and appropriately scanned into the right location

5    within eOMIS.  Because when you are in eOMIS sometimes it's a          11:07AM

6    little bit difficult to locate documents.  So if the monitor

7    can't find the document in the appropriate location they are

8    going to mark them as non-compliant.

9            So that's essentially what was happening at Phoenix.

10   So we tried to tighten that up so that those documents are in          11:07AM

11   the appropriate location in a timely fashion.

12           THE COURT:  I see.  Ms. Kendrick.

13           MS. KENDRICK:  I was just wondering if counsel has any

14   explanation as to why they have no data for July for Safford,

15   Tucson, and Yuma prisons.                                             11:08AM

16           MR. BOJANOWSKI:  Safford is there.  Oh.  Hold on just

17   a second.

18           THE COURT:  Did I not read Safford?

19           MR. BOJANOWSKI:  No, Your Honor.  I'm sorry.  Ms.

20   Kendrick is correct.  At the time of the prep of the documents        11:08AM

21   I didn't have the data.  So I have got data that I can report

22   to the Court off my master sheet.

23           THE COURT:  Okay.

24           MR. BOJANOWSKI:  I'm sorry.  I forgot, all right.  So

25   it's Safford, Tucson, and Yuma?                                       11:09AM

CV 12-601 - September 12, 2017 - Status Hearing

1       MS. KENDRICK:  Yes.

2       THE COURT:  Oh.  I see.  Ms. Kendrick is referring to

3   the bolded asterisks at the bottom of Safford and Tucson, I

4   see, in which it states no compliance percentage available for

5   July 2017 yet.                                          11:09AM

6       MR. BOJANOWSKI:  Okay.  So Safford is at 100 percent,

7   yes, for July.  Tucson is at 89 percent for July.  Yuma is at

8   100 percent for July.

9       THE COURT:  Anything further on 44, Ms. Kendrick?

10      MS. KENDRICK:  No, sir.                             11:10AM

11      THE COURT:  Performance Measure 45:  On-site

12  diagnostic services will be provided the same day if ordered

13  stat or urgent or within 14 calendar days if routine.

14  Florence, 92 percent; Lewis, 94 percent; Tucson, 91; percent;

15  Douglas -- no.  That's it.                              11:10AM

16      Any comments, Ms. Kendrick?

17      MS. KENDRICK:  Just a question on the Florence one

18  where they state that an additional staff member has been

19  assigned to Central Unit once a week to provide additional

20  support related to lab draws, when that started happening.    11:11AM

21      MR. BOJANOWSKI:  That's a continuation of the action

22  plan, and I don't have a date.  I can supplement that as to

23  when that actually started.

24      THE COURT:  All right.  Performance Measure 46:  A

25  medical provider will review the diagnostic report, including  11:11AM

1    pathology reports, and act upon reports with abnormal values

2    within five calendar days of receiving the report at the

3    prison.  Douglas, 100 percent; Eyman, 62 percent; Florence, 92

4    percent; Lewis, 87 percent; Perryville, 79 percent; Phoenix, 94

5    percent; Safford, 80 percent; Tucson, 87 percent; and Winslow,    11:12AM

6    90 percent; and Yuma, 78 percent.

7         And then with respect to Eyman, basis for

8    non-compliance, it appears that providers will timely review

9    diagnostic and pathology reports, were timely reviewing

10   diagnostic pathology reports, but were not acting upon them --    11:12AM

11   yes.  That's what it would seem to be.  Corrective action plan

12   currently under review, will supplement.  So I guess it's time

13   to supplement.

14        MR. BOJANOWSKI:  Your Honor, I had some notes on this

15   that I will try and get typed up in here.  But there's new       11:13AM

16   regional data analysis going out two times a week to assist

17   Eyman in making sure that these reports are acted upon.

18        THE COURT:  When did that start?

19        MR. BOJANOWSKI:  That started, I would say, let's see.

20   What is today's date?  12th.  Started at the beginning of this    11:13AM

21   month, I believe.  Could I have a moment, Your Honor?

22        THE COURT:  Yes.

23        MR. BOJANOWSKI:  I believe it was at the beginning of

24   this month that that is now happening out of the regional

25   office.                                                          11:14AM

CV 12-601 - September 12, 2017 - Status Hearing

1          THE COURT:  So started --

2          MR. BOJANOWSKI:  I will check on that and add that in

3     the supplemental.

4          THE COURT:  Okay.  And then with respect to

5     Perryville, the basis for non-compliance you say that you can          11:14AM

6     supplement at a later date.  I gather you do or don't --

7          MR. BOJANOWSKI:  I have limited information, but it

8     has to do with a new site medical director starting this week.

9          THE COURT:  Ms. Kendrick.

10          MR. BOJANOWSKI:  It's already in there.  I'm sorry.          11:15AM

11          MS. KENDRICK:  Your Honor, I was just looking back at

12     the transcript from August 9, and we discussed this performance

13     measure beginning around Page 119, if the Court is so inclined

14     to look at it.  With regard to Eyman, Mr. Bojanowski reported

15     the same thing last month, that providers were doing the review          11:15AM

16     but were not taking action, and that a new procedure was

17     implemented in mid-June so that providers would take actions

18     and that there would be spot checks and that this was happening

19     not only at Eyman but systemwide.

20          So while there has been improvement from 46 percent to          11:15AM

21     62 percent at Eyman in July since this new process went into

22     place, it is concerning that it is still non-compliant.

23          And also, you know, Mr. Bojanowski had said even

24     earlier in the summer that the providers had been trained that

25     they needed to act upon it, so it's a little confusing that          11:16AM

1    he's now saying that at the beginning of the month a new

2    process had been put in place because it's unclear if this new

3    process that went into place at the beginning of this month, if

4    he's referring to the same thing he referred to at June and

5    August hearings or if this is something additional.                    11:16AM

6            MR. BOJANOWSKI:  I think this is an additional

7    process.  The other things I believe I was talking about were

8    at the site level.  This is now coming from the regional office

9    so that they can try and tighten up the oversight of these

10   reports.                                                               11:16AM

11           THE COURT:  I do happen to have a recollection.  I

12   made note of wanting to focus on the performance measures where

13   I was told at the last status conference that Corizon was

14   engaging in a real time analysis meeting on a daily basis to

15   make sure that certain things were being satisfied.  And I         11:17AM

16   cannot remember whether this was one of the performance

17   measures in which that was discussed.  Do you have anything

18   there that would answer that question?

19           MS. KENDRICK:  I'm just checking, Your Honor.  I can't

20   remember if this was the one where Ms. Almanza got up and        11:17AM

21   answered a lot of questions that you had.

22           THE COURT:  I cannot remember, unfortunately.  Okay.

23   All right.  Thank you.  Well, seems like one that would be

24   susceptible to that kind of analysis where you could just take

25   a look where you are using this regional data manager, whatever   11:18AM

1    the term was.  This person could take a look at real time to

2    see whether or not it's happening because the real time will

3    afford you the opportunity to fix it and avoid non-compliance.

4    So it's one of those ones where you would imagine somebody

5    could probably get the problem solved if they were aware of it      11:18AM

6    that it was happening just at that moment.

7           MS. KENDRICK:  Your Honor?

8           THE COURT:  Go ahead.

9           MS. KENDRICK:  Just one other thing we would note for

10   the Court in your previous order to show cause from June 14th,      11:18AM

11   you did include most of these institutions in that order, and

12   we think that ongoing real time reporting showing every single

13   instance of non-compliance would hopefully motivate defendants

14   to come into compliance with this performance measure.

15          THE COURT:  Thank you.  Performance Measure 47:  A          11:19AM

16   medical provider will communicate the results of the diagnostic

17   study to the inmate upon about request and within seven

18   calendar days of the date of the request.  Douglas at zero.

19   The sample size was a single inmate.  The provider on duty

20   failed to respond in a timely fashion to that single inmate        11:19AM

21   resulting in a zero compliance rate.  Further information as to

22   the basis for these issues is currently under review.  Will

23   supplement upon completion.  Corrective action plan, the

24   provider that failed to comply with this performance measure

25   has been terminated.  Corizon also implemented a new communique    11:19AM

1    process as addressed in greater detail below and in Document

2    2294 and Document 2296 filed with the Court on September 8,

3    2017.

4            Eyman, 42 percent; Florence, 38 percent; Lewis, 35

5    percent; Perryville, 77 percent; Phoenix, 100 percent; Tucson,

6    68 percent; Winslow, 100 percent; Yuma, 83 percent.  And stated

7    in the accompanying Eyman report, basis for non-compliance,

8    providers are not communicating the results of the diagnostic

9    study within time frame.  Corrective action plan, sick call

10   nurses and CNAs will receive additional training on the

11   appropriate process for addressing requests for diagnostic test

12   results from inmates including the need to, upon receipt of an

13   inmate's HNR request for lab radiology reports, print the

14   related results communique, have the yard provider sign off on

15   the results, and issue it to the inmate before they leave the

16   sick call area, in other words, ensuring that inmates are

17   provided their test results at the time their HNR is received

18   in person.

19           So we hear about additional training to include this

20   measure when can we expect that this measure will be imposed?

21           MR. BOJANOWSKI:  This has already been imposed.  Are

22   you asking the date that the training occurred?

23           THE COURT:  Well, I may be not be remembering, but I

24   don't remember that I was told that before that that was one of

25   the methods here.  Was I?

11:20AM
11:20AM
11:21AM
11:21AM
11:22AM

CV 12-601 - September 12, 2017 - Status Hearing

1      MR. BOJANOWSKI:  No.  This is the measure that we were

2  -- we redesigned the eOMIS system to print it off, and then we

3  were putting it in the inmate mail.

4      THE COURT:  Right.  I don't remember that anybody ever

5  told me before that instead of doing that you were going to                11:22AM

6  print it out for them when they asked for it and then give it

7  to them.  But I guess there's also the cases where the result

8  hasn't come in yet where the request for the result comes at

9  the same time that they are drawing the lab or ordering the

10  radiology test.  Am I misunderstanding here?                              11:22AM

11      MR. BOJANOWSKI:  The idea was that we were going --

12  this is the one where we were going to send all the lab results

13  out.  Okay.  The measure is measuring an inmate who submits an

14  HNR for a lab result, okay.

15      THE COURT:  Right.                                                    11:23AM

16      MR. BOJANOWSKI:  So what we were trying to do then is

17  to just take all lab results that come in would go out.  Okay.

18  They would come in to the facility or whatever the results

19  were, they get sent out into the inmate mail.  That's the goal

20  that we're trying to attain, okay.                                       11:23AM

21      So the result of that is that those inmates that now

22  have an HNR and make a request, if they didn't get, say, the

23  result in the normal course they may make a request or they got

24  the result and they make the request anyway.  So then this

25  would hopefully pick up those people who actually come in with              11:23AM

CV 12-601 - September 12, 2017 - Status Hearing

1    an HNR and say, I want my lab results, and then we could get

2    the lab results to them right then and there.  That's the idea.

3            THE COURT:  I was asking, I didn't think I had ever

4    heard of that before.

5            MR. BOJANOWSKI:  Correct.  Yes.                              11:24AM

6            THE COURT:  Okay.  I think that's a good idea.

7            MR. BOJANOWSKI:  Well, what we're finding is that

8    there are fewer and fewer HNR requests for lab results as a

9    result of the new procedure.  And so your compliance becomes

10   harder and harder because there's fewer and fewer files that   11:24AM

11   you look at.  So if you have three requests for HNRs, an HNR

12   request, and you miss one, you know, you are at 66 percent.

13   See what I'm saying?

14           THE COURT:  I do see what you are saying, but again,

15   it raises, I think, another issue.  I had thought that one of   11:24AM

16   the ideas with respect to the open call and avoiding the HNR

17   boxes is that it would increase the availability of this

18   information.  And if people aren't submitting the same number

19   of requests, it makes me wonder, is this a hint that maybe the

20   new process is not as useful with respect to meeting the needs  11:25AM

21   of this performance measure which previously was entered into

22   upon the assumption that there were these HNR requests that

23   could be put in a box that would result in somebody learning

24   within seven days what the results were.

25           So if the numbers dropped off, that raises a whole       11:25AM

1    'nother issue to me.  But --

2          MR. BOJANOWSKI:  So the idea would be that if they

3    show up we would want to give them the info right then and

4    there.  I mean, they are there.

5          THE COURT:  I think that makes perfect sense, I agree,    11:25AM

6    but the other point that I just made.

7          And so then there's an additional paragraph on Eyman,

8    eOMIS the relevant electronic records system, has also been

9    upgraded to allow the provider to print out the communique for

10   the inmate when requesting lab or X-ray results which will be    11:26AM

11   mailed by the CAN to the inmate or, if the inmate is present,

12   will be given directly to the provider on duty.  So since we

13   have heard about this before, I gather that this upgrade took

14   place sometime ago.  Is that right?

15         MR. BOJANOWSKI:  Correct.    11:26AM

16         THE COURT:  About when, do you remember?

17         MR. BOJANOWSKI:  I think I reported that before at

18   another hearing, Your Honor.

19         THE COURT:  Okay.  All right.

20         MR. BOJANOWSKI:  To be honest with you, I don't    11:26AM

21   recall.  There is a typo there.  It should be CNA not CAN.

22         THE COURT:  I wondered.

23         MR. BOJANOWSKI:  CNA.

24         THE COURT:  Then Florence, the corrective action plan

25   is sick call nurses and CNAs will receive additional training,    11:26AM

1    and this is the same as the previous, looks to me, same as the

2    next paragraph.  And then additionally, after the provider has

3    reviewed the diagnostic study, notated the action taken and

4    printed it, the assistant director of nursing will enter a

5    chart note advising that on the given date the communique was          11:27AM

6    sent to the inmate.  In addition, if the diagnostic study is

7    normal, when the nurse sends the communique to the inmate,

8    he/she will enter a chart note stating that on a given date the

9    communique was sent to the inmate.  The nurse or CNA will call

10   the site medical director for review of any lab results and           11:27AM

11   issue the communique upon review.

12          And then with respect to Lewis, there was a longer

13   basis for non-compliance.  Medical providers are not

14   communicating the results of the diagnostic study to the

15   inmates within time frame.  Further information as to the basis        11:28AM

16   for this -- these issues is currently under review.  Will

17   supplement upon completion.

18          Do you have anything more for us this morning?

19          MR. BOJANOWSKI:  I don't have any additional

20   information, Your Honor.                                              11:28AM

21          THE COURT:  All right.  The corrective action plan

22   includes one of the paragraphs from the previous facilities.

23   No, it doesn't.  It's not exactly.  It's different.

24          MR. BOJANOWSKI:  Lewis and Perryville are essentially

25   the same, Your Honor.                                                11:28AM

CV 12-601 - September 12, 2017 - Status Hearing

1    THE COURT:  Okay.  So Lewis says the eOMIS system was

2    upgraded at the end of June to provide for an electronic

3    communique that is printed and given to the inmate.  The

4    training and development manager provided additional training

5    and education to all staff on this change at the time of the          11:29AM

6    upgrade.  The AFHA is monitoring requests for diagnostic test

7    results to ensure the communique is sent to the inmate within

8    seven days of requesting results.

9    If an inmate is scheduled for an appointment with a

10   provider to discuss the results of any lab or diagnostic            11:29AM

11   testing that appointment may not be rescheduled to ensure that

12   the inmate is seen within the seven-day time frame.

13   And then Perryville includes the corrective action

14   plan just -- no.  I think it is just using the acronym is no

15   longer employed, it's just assistant directors of nursing are      11:29AM

16   monitoring requests for diagnostic test results to ensure that

17   a communique is sent to the inmate within seven days of

18   requesting results.

19   So all of this effort to try to change and to upgrade

20   obviously is not getting us where we need to be.  And also,          11:30AM

21   from my site tour of one facility, it does seem that there are

22   hurdles in the processing that is discussed here.  And so I

23   think there are many issues that are associated with this,

24   including whether or not the mail system is set up to do this,

25   whether it is done, whether relying upon the date that the          11:30AM

1   chart indicates that notice was sent, if that simply means that

2   that was when it was printed out and put in the out box for

3   mail and it somehow enters the part of the system that is

4   unclear to me that works, and that is to get mail to the

5   individual inmates.  That's not a very helpful date.  I can't          11:31AM

6   really apply the mailbox rule when I don't know that the

7   mailbox -- the justification for the mailbox rule that works in

8   civil law outside of a penal facility should appropriately

9   apply.

10          So I offer those as my initial observations but then          11:31AM

11   turn to plaintiffs' counsel.

12          MS. KENDRICK:  Just as an initial observation, Mr.

13   Bojanowski said that the reason that some of these institutions

14   are non-compliant is because they are receiving fewer HNRs

15   requesting diagnostic test results, and we would just observe          11:31AM

16   that is not surprising given that they removed all the HNR

17   boxes and that was how people submitted the HNRs requesting the

18   results of diagnostic tests.  So now if they have to go down to

19   the open clinic to submit an HNR to say, what was the result of

20   my biopsy, there very well may be fewer HNRs.  So that excuse          11:32AM

21   doesn't hold much water.

22          We looked at defendants' filing recently with the

23   declarations from the wardens and the facility health

24   administrators about the new system, and just a couple of

25   observations, with the 10 facility health administrators, five          11:32AM

1    out of the 10 declarations, the ones from Douglas, Lewis,

2    Perryville, Phoenix, and Yuma, in those declarations the

3    facility health administrator again said that the prisoner

4    needs to submit an HNR and that's when the process starts.

5         So if what Mr. Bojanowski has said here and said                    11:32AM

6    previously that they are going to automatically do that

7    regardless of request then it raises the question of whether

8    these five facility health administrators are aware of that

9    being the plan for how to get this information out.

10        And also just with two of the wardens' statements,                  11:33AM

11   Douglas and Safford, the declarations were pretty sparse.  They

12   just described how the mail system works at the prisons.  They

13   didn't actually talk about the communiques themselves and how

14   they are going to be communicated to the prisoner.

15        THE COURT:  With respect to Ms. Kendrick's first                    11:33AM

16   point, any response, Mr. Bojanowski?

17        MR. BOJANOWSKI:  As far as the submission of the HNRs

18   is the measure, one is, you know, that's when the time frame

19   starts.  As far as inmates getting to the medical unit, that's

20   the procedure that's in place.  They can go to the medical unit       11:33AM

21   with their HNR and request their diagnostic test results.  It

22   doesn't make any difference, you know, if they were to put it

23   into a box it would get processed in a day or so and then they

24   might get their results to them after they were scheduled for

25   an appointment maybe.                                                     11:34AM

1      THE COURT:  And I'm sorry, I wasn't precise in my

2  question.  I wasn't actually referring to that point.  I was

3  referring to the two points that she made after that.  So I

4  apologize.  And the first one was the representation that we

5  have that this would be an automatic process and that five of      11:34AM

6  the wardens had said no, we have to have a specific request.

7  And I do recall you saying that they were just going to embark

8  upon a plan that would result in the automatic notification of

9  diagnostic studies.

10      MR. BOJANOWSKI:  Yes.  That's exactly what we are          11:35AM

11  trying to get in place and do, is that when the study comes in,

12  gets printed, signed off, gets sent.  So that's, you know, but

13  we're talking thousands and thousands of these things.

14      THE COURT:  We're talking five wardens who didn't get

15  that concept.                                                  11:35AM

16      MS. KENDRICK:  Facility health administrators.

17      THE COURT:  I'm sorry, five facility health

18  administrators.  Sorry.  Do you understand what she said?  What

19  she said is that among the affidavits, we had five facility

20  healthcare administrators saying kind of the opposite of what   11:35AM

21  you have been saying, and that is, this was going to be an

22  automatic process.  When there was a diagnostic report, it was

23  going to be mailed.  Then they say no, we're only going to do

24  that if they ask for it.  So that's different.  I mean, it's

25  sort of as if somebody has been tasked to focus on the          11:35AM

1    performance measure and you would naturally say what these five

2    people had said because the performance measure says at the

3    date of request.  But you have been telling us this was going

4    to be obviated, this whole thing, because everybody was going

5    to get them automatically when they were generated.                    11:36AM

6             MR. BOJANOWSKI:  And I don't know that the automatic

7    system is fully working so that it's this automatic system.

8    We're still receiving HNRs for the processing of it.  So yes,

9    as far as this measure is concerned, when you are looking at

10   this measure, it is tied to an HNR.  The goal is to try and      11:36AM

11   say, look, you don't need to do that anymore because you

12   already should have your diagnostic study.  That's the idea.

13   That was the thinking, was to say, you know, in instead of only

14   responding to the HNRs, we wanted to try this new system.  And

15   that's the idea.  But right now we're still operating under     11:36AM

16   both.

17            THE COURT:  It does seem fractured.

18            MR. BOJANOWSKI:  Well, it's because inmates will

19   submit HNRs.  I can't stop them from doing that.  If they want

20   to -- you know, even if we send them a diagnostic study, they   11:37AM

21   may decide well, yeah, I got this but, you know, I want to talk

22   to the doctor.

23            THE COURT:  But if it's documented that those results

24   were communicated, whether it's at the insistence of the inmate

25   or by an automatic process, we know that they will have         11:37AM

1    received the results and I don't think we'll get into the

2    problem about whether or not this is a non-possible to be

3    non-compliant record because nobody is going to fight the fact

4    that if somebody got it within a previous time before the

5    request, that that was okay.                                    11:37AM

6              And so, you know, the focus here had been different

7    and it just is, again, a little bit troubling to the Court that

8    what's been communicated to me about what was going to be part

9    of the plan to try to address this is not something fully

10   embraced by people at five facilities.                          11:38AM

11             MS. KENDRICK:  Well, and perhaps I was not clear

12   enough for Mr. Bojanowski, but just to illustrate if you

13   compare Exhibit 10 and Exhibit 11, which are two different

14   declarations at Docket 2296-2, one is the declaration from the

15   Douglas facility health administrator; the other is from the   11:38AM

16   Eyman facility health administrator, so they are narrating

17   their understanding of how the process is now working.  And one

18   of them in Exhibit 10 from Douglas, the facility health

19   administrator says, you know, the process is the inmate

20   requests the study by an HNR.  It's reviewed.  It's triaged.   11:38AM

21   It's conveyed to a provider, then the provider prints it out.

22   Then in Exhibit 11, which is the Eyman facility health

23   administrator, she describes a process that sounds very similar

24   to what Mr. Bojanowski has described to us repeatedly at the

25   court about what the new process is going to be.                11:39AM

1      So what my concern is, is, you know, it's not about

2  what queues off of what, it's just the simple fact that as we

3  have observed repeatedly, is that it doesn't always seem that

4  things are getting communicated clearly to the field.  And if

5  we have five declarations from five facility health                    11:39AM

6  administrators that describe a process that we have been told

7  is no longer going to be in place, it raises the question about

8  whether or not these facility health administrators are aware

9  that defendants and Corizon's regional leadership are making an

10 entirely different change to it.  It's not -- I'm not              11:39AM

11 commenting on the merits pros and cons of what approach, I'm

12 just simply observing for the Court's sake and defendants' sake

13 that their plan has not, apparently, sunk down to 5 to 10

14 facility health administrators and that is concern to us and we

15 want to raise that early on so it's clearly communicated to all   11:40AM

16 10 institutions that this is what they have planned to do to

17 come into compliance.

18      THE COURT:  Thank you.  That is what I was trying to

19 express, too.

20      MR. BOJANOWSKI:  I have made a note of the comment and        11:40AM

21 we'll follow up.

22      THE COURT:  Thank you.  Additionally on this

23 performance measure.

24      MS. KENDRICK:  Yes.  Ms. Eidenbach has something else

25 to say about this performance measure.                           11:40AM

CV 12-601 - September 12, 2017 - Status Hearing

1      THE COURT:  Thank you.

2      MS. EIDENBACH:  Your Honor, during the tours at

3  Perryville, I heard a couple of things relating to this

4  performance measure that were troubling.  One, I received

5  pretty widespread reports that women are not getting the        11:40AM

6  results, ever, of their diagnostic tests.  And when they do,

7  the way that those tests are communicated to them is simply:

8  The results of your lab test are normal.  It doesn't tell them

9  which test.  It doesn't tell them what day the test was done

10  on.  It gives them absolutely no context which then leaves them  11:41AM

11  no choice but to submit an HNR, which a lot of them have

12  hesitation to do that because of the cost.

13      But the communique that they are receiving in the mail

14  is pretty much useless information because they have no idea

15  even which lab test it is they are receiving their results for.  11:41AM

16  It just simply says the results of your lab test are normal.

17  And they get this in a variety of different forms.  Sometimes

18  it's printed.  Sometimes some of them even reported that they

19  were handwritten.

20      MR. BOJANOWSKI:  Your Honor, in order to follow up,        11:41AM

21  defendants would request the identity of the inmates who have

22  made these comments so we can at least look at their medical

23  records and actually see what it is they are talking about.  So

24  if plaintiffs could provide the listing of inmates who have

25  made these complaints to defendants, we can then appropriately  11:42AM

1    follow up and find out what is going on out at Perryville.

2         MS. EIDENBACH:  Your Honor, we object to that.  We are

3    not going to provide our clients' identities, particularly not

4    at Perryville where we have repeatedly observed retaliation for

5    participation in this lawsuit.  But we would be happy to                11:42AM

6    provide the units on which these complaints were made so

7    defendants can follow up with their employees and Corizon

8    employees to make sure there is a consistent approach in place.

9         THE COURT:  The corrective action plan uses a term

10   that now, in light of this discussion, has been illuminated as        11:42AM

11   ambiguous to me which says, "Print the related results

12   communique."  I gather if it had just said related results,

13   then I would expect that to be the values that were reported in

14   the report.  But when it says "Related results communique," I

15   suppose that that could be taken to include something that I          11:43AM

16   would think would not be satisfactory.  And that is what you

17   just reported, and that is the results were normal without any

18   reference to what the test was or to where on normal it was.

19   It seems a basic matter that if you are going to communicate

20   lab and radiology results you get to see the report that was          11:43AM

21   generated out of those reports.  That just seems to be a matter

22   of common sense to me.

23        So I would ask you to take a look at this and find out

24   what's happening at Perryville and at the other facilities to

25   see whether or not what is -- well, what is meant by when you         11:43AM

1    tell me that you are printing the related results communique,

2    are you providing the results with the identity of the test and

3    when it was administered and what the values were that were

4    reported?  Let me know about that.  Because obviously, as I

5    hinted to you, I'm going to be very suspect of something that's          11:44AM

6    complying with this performance measure if it's simply telling

7    somebody that your test results were normal.

8            Anything else on this performance measure?

9            MS. KENDRICK:  No, sir.

10           THE COURT:  Okay.  Performance Measure 50:  Urgent          11:44AM

11   specialty consultations and urgent specialty diagnostic

12   services will be scheduled and completed within 30 calendar

13   days of the consultation being requested by the provider.

14   Florence is at 49 percent; Lewis at 93 percent; Perryville, 93

15   percent; Phoenix, 100 percent.  And with respect to Florence          11:44AM

16   the basis for the issue with non-compliance currently under

17   review, will supplement upon completion.  Corrective action

18   plan, the site scheduler was educated on scheduling

19   appointments on the soonest date provided by the specialist.

20   ADC has identified a sergeant to work directly with schedulers          11:45AM

21   from both sites to ensure that appointments are met.  The start

22   date for the new procedure was August 14, 2017, at which time

23   the transport teams were combined.

24           I guess I have got some questions about this

25   paragraph.  Is it meant to refer to, when it says "both sites"          11:45AM

1    what is the reference?

2        MR. BOJANOWSKI:  I think I mentioned this at the last

3    hearing where we were combining the Eyman and Florence

4    transport teams because we were running into a shortage of

5    available transports out of Florence to actually physically          11:46AM

6    move the inmate from the facility to the outside provider.  So

7    part of that was a restructuring of the operations, ADC

8    operations, to combine that transport.

9        And I think I mentioned that at the last hearing that

10   that's what was going to happen and that, as you can see, did        11:46AM

11   occur.  I do have some supplemental information that.

12       THE COURT:  And it looks like this was one of the ones

13   where Corizon said it was going to do the real time monitoring

14   or no?

15       MR. BOJANOWSKI:  Yes.  This is a daily review one that           11:46AM

16   we had talked about last time.  So the schedulers and site

17   medical director are meeting with the facility health

18   administrator each day to review the status of each request and

19   to get that inmate seen in a timely fashion.  So we can see --

20   we see almost a 20 percent increase at Lewis, but the Florence       11:47AM

21   went down by 4 percent.  So Florence was where we had our

22   transportation issues.  Do I have Eyman here?  No, I don't.

23       THE COURT:  Did you finish?

24       MR. BOJANOWSKI:  No.  I think I was done.  I was

25   looking for some other data that I just don't have at my             11:48AM

1    fingertips, and I was trying to give you the most recent data

2    from my notes that may not have been incorporated into the

3    document yet.

4              THE COURT:  All right.  Ms. Kendrick.

5              MS. KENDRICK:  We're very troubled by the fact that      11:48AM

6    they cannot seem to get into compliance with this.  And again,

7    we are unclear why, if they are looking at this every day, that

8    they can't seem to address the problem.  For us, one of the

9    biggest concerns has been the utilization management process

10   when we're talking about 30 calendar days for a consultation to   11:48AM

11   be requested and -- to be scheduled and completed within 30

12   days of the urgent request.  If we have this utilization

13   management process as part of it where Corizon headquarters

14   reviews the request and decides whether to approve or deny it,

15   that builds in a time crunch for this scheduler who is then      11:49AM

16   trying to, if it is approved, find somebody to take it.  We

17   also, you know, again, point out that it's unclear whether

18   Corizon has enough contractors for specialties.  If this is a

19   factor, this is something that really hasn't been addressed in

20   corrective action plans.  But in light of some of the evidence   11:49AM

21   that we had as exhibits last month in the hearing about

22   subcontractors reporting that they were no longer taking

23   specialty clients because of Corizon's failure to pay their

24   bills.  We, again, are concerned that this corrective action

25   plan perhaps is not as comprehensive as it needs to be to       11:50AM

1    address the systemic problems underlying non-compliance with

2    specialty consults.

3            THE COURT:  This may be a particular area that the

4    Court's expert can assist with respect to identifying whether

5    or not this is a cause that you just described.                    11:50AM

6            MS. KENDRICK:  We certainly hope so, Your Honor.

7            THE COURT:  Performance Measure 51:  Routine specialty

8    consultations will be scheduled and completed within 60

9    calendar days of the consultation being requested by the

10   provider.                                                          11:50AM

11           Douglas, 93; Eyman, 60; Florence, 69; Perryville, 100;

12   Phoenix, 74; Safford, 95; Tucson, 65; Yuma, 89.  And with

13   respect to Eyman, corrective action plan, a daily meeting is

14   held with the clinical coordinator to identify referrals that

15   need for information and ensure that the information is            11:51AM

16   obtained from the provider and sent back to review by the UM

17   team.  Additionally, a weekly meeting with the site is also

18   held by the ARMD to review cases that need information.

19   Concerns for ATPs will also be addressed at that time.

20           And is this a daily meeting plan that was put in place    11:51AM

21   in the middle of August?  Is that when this started?

22           MR. BOJANOWSKI:  Correct, Your Honor.

23           THE COURT:  Is it August 14?

24           MR. BOJANOWSKI:  Yes.  I believe it's consistent with

25   the other measure.  It kind of is the same group.                 11:51AM

1     THE COURT:  Same as stated for Florence.  And then

2  Phoenix has a different statement.  Off site consults are

3  reviewed at least twice a week by the clinical coordinator,

4  herein after CC.  The CC is now required to confirm the

5  appointment several days in advance and to ensure that all        11:52AM

6  necessary paperwork has been completed.  The CC will confirm

7  with security that transportation for the off site appointment

8  will be available.  And is this also something that started on

9  or about August 14th?

10     MR. BOJANOWSKI:  Correct, Your Honor.                        11:52AM

11     THE COURT:  Now, in Tucson we see that starting in

12  April 2017 it became a requirement for the clinical

13  coordinator, herein after CC, to switch from paper tracking to

14  Excel spreadsheets so that tracking could be streamlined.

15  Corizon also replaced the CC position.  The new CC finished      11:53AM

16  training in mid-June and has since implemented many of the

17  necessary changes that were designed to help track this

18  performance measure.  And this person should not be given great

19  accolades for his or her new job because the July report of 65

20  percent reflects this change to no great success.               11:53AM

21     Ms. Kendrick.

22     MS. KENDRICK:  Your Honor, this was the performance

23  measure where we had a long discussion last month about that

24  daily 3:30 call that the providers were having.  So it is a

25  little concerning.  Maybe in August we will see an improvement.  11:53AM

CV 12-601 - September 12, 2017 - Status Hearing

1    But the continued and chronic substantial non-compliance is

2    troubling.   In response to your order to show cause we had

3    asked that the Court include several of the facilities to

4    require real time tracking of every instance.   We have

5    requested it at Eyman, Florence, and Tucson.   So, again, we                    11:54AM

6    reiterate that request.

7            THE COURT:   Anything further in response, Mr.

8    Bojanowski?

9            MR. BOJANOWSKI:   No, Your Honor.

10           THE COURT:   All right.   Well, the mechanism that the              11:54AM

11   Court's likely to embark upon will hopefully result in the

12   contracting party to want to assure that such measures are

13   taken, because the consequence for these kinds of failures can

14   be grave, I think.

15           Performance Measure 52:   Specialty consultation                   11:54AM

16   reports will be reviewed and acted on by a provider within

17   seven calendar days of receiving the report.

18           Eyman, 41 percent; Florence, 46, percent; Lewis, 91

19   percent; Perryville, 96 percent; Tucson, 86 percent; Yuma, 71

20   percent.   With respect to Eyman, the basis for non-compliance            11:55AM

21   is explained as providers have not been reviewing consult

22   reports in the timeline required by this measure.   The Eyman

23   facility also has had -- also had a turnover on the clinical

24   coordinator position, which is critical and centric to the

25   processes involved in compliance to this measure.   It was also           11:55AM

1   discovered that two of the providers at Eyman did not fully

2   understand the requirements within this performance measure and

3   are being coached by their leadership.

4        I guess we need to fill in the time on all of these

5   things.  When was it discovered that providers had not been                11:56AM

6   reviewing consult reports in the timeline required by the

7   measure?

8        MR. BOJANOWSKI:  May I have a moment, Your Honor?

9        THE COURT:  Certainly.  You can anticipate in your

10  moment that I'm going to ask for a date at the end of every one            11:56AM

11  of these sentences.

12        MR. BOJANOWSKI:  A what?

13        THE COURT:  A date.

14        MR. BOJANOWSKI:  A date?

15        THE COURT:  Yeah.                                                     11:56AM

16        MR. BOJANOWSKI:  I don't have an answer, Your Honor.

17  I'm not sure of the date.  That would have to be something I

18  would have to get to the Court.  And as I indicated going

19  forward, we're going to have more of the dates plugged into

20  this.                                                                      11:56AM

21        THE COURT:  Okay.  The reason the date is important is

22  that I need to know when the problem was identified and when it

23  was occurring as well as knowing when the remedial measures

24  were put in place so that I can tell when the data is reported

25  to me about the performance measure compliance whether it                  11:57AM

1   reflects the previously unidentified problem, the previously

2   addressed problem, and so that we can make an intelligent

3   decision about going forward.

4        The corrective action plan also seeks that information

5   as well because it says today, aging exception reports are          11:57AM

6   provided to the providers on a daily basis.  So the question

7   is, okay, good.  It's today, the 12th of September, but when

8   did this start with aging exception reports provided to the

9   providers on a daily basis?

10       MR. BOJANOWSKI:  I was actually provided the today          11:57AM

11  information on 9-5, so I put today in there.  It should be as

12  of 9-5.

13       THE COURT:  The site scheduler will review receipt of

14  specialist recommendations daily, which will be subsequently

15  date stamped and uploaded into the electronic medical record.     11:58AM

16  The review will be placed on the provider's work list.  The

17  scheduler will review daily to ensure that the provider has

18  completed the review.  The providers will be educated that if

19  recommendations come directly to the provider they should

20  notify the scheduler so the proper procedure can be completed     11:58AM

21  with the review.

22       And then regarding Florence, the basis for

23  non-compliance is that providers are not reviewing the

24  specialty consultation reports within time frame.  Further

25  information relating to this facility is currently under          11:58AM

1    review.  Will supplement upon completion.  The correction

2    action plan, the site scheduler will review receipt of

3    specialist recommendations daily which will be subsequently

4    date stamped and uploaded into the EMR.  The review will be

5    placed on the provider's work list.  The scheduler will review          11:59AM

6    daily to ensure that the provider has completed the review.

7    The providers will be educated that if recommendations come

8    directly to the provider they should notify the scheduler so

9    the proper procedure can be completed within the review.  The

10   recommendations will be reviewed with the SMD to ensure          11:59AM

11   compliance.

12            And when did this start?

13            MR. BOJANOWSKI:  Again, these reports I received on

14   9-5, Your Honor.

15            THE COURT:  Okay.  So we don't know that it did start.          11:59AM

16            MR. BOJANOWSKI:  I don't know the exact date.

17            THE COURT:  I mean, we don't know that it even started

18   on the 5th because it said the site scheduler will review.

19            MR. BOJANOWSKI:  Right.

20            THE COURT:  So the answer is we don't know.          11:59AM

21            MR. BOJANOWSKI:  I don't.

22            THE COURT:  Okay.  In Tucson there is a continued

23   action plan, providers, CNA/MA, and the clinical coordinator

24   have been trained on how to pull a consult completed results

25   received report.  The providers, CNA/MA, clinical coordinator,          12:00PM

1    and site medical director will pull the report daily, Monday

2    through Friday.  The provider will review the outside consult

3    notes and then mark in the action taken section of the consult,

4    quote, "consult completed, practitioner reviewed," close quote.

5    The facility health administrator and site medical director          12:00PM

6    will also designate a person to run a weekly consult completed

7    report as a double check system that notes are being reviewed

8    in the seven-day time frame.  Thorough training with a

9    PowerPoint on how to run the reports and switch the status on

10   to consult completed including the time frames was provided to      12:01PM

11   this site.  Additionally, reports are being run at the UM

12   office two times per week.

13           Do you know when this was implemented?

14           MR. BOJANOWSKI:  I do not.

15           THE COURT:  The basis for non-compliance essentially        12:01PM

16   states that it's not happening and further information will be

17   provided upon review.  The corrective action plan, providers

18   and the clinical coordinator have been trained on how to pull a

19   consult completed/results received report.  The provider and on

20   site medical director will pull the report daily Monday through     12:01PM

21   Friday.  The provider will review the outside consult notes and

22   indicate that they have been practitioner reviewed.  The

23   facility health administrator and site medical director will

24   also designate a person to run a weekly consult completed

25   report to double check that notes are being reviewed in the         12:02PM

1   seven-day time frame.  Any understanding of when this was put

2   in place?

3          MR. BOJANOWSKI:  No, Your Honor.  I will supplement.

4          THE COURT:  Ms. Kendrick?

5          MS. KENDRICK:  Your Honor, not to sound like a broken      12:02PM

6   record, but again, we share the concern about the fact that so

7   much of this is written aspirationally and in the future tense

8   and so it's hard to say when these processes would be in place.

9   Last month at the August 9 hearing, Mr. Bojanowski said that

10  with this performance measure that Corizon's regional office     12:02PM

11  was reviewing and running these reports several times a week to

12  see if they could track the problem.

13         So we certainly hope that this real time monitoring is

14  continuing.  I think only one of the corrective action plans

15  actually mentions the regional office's role.  So we hope       12:02PM

16  that's continuing with all institutions.

17         Just as kind of two housekeeping things, first of all,

18  the Phoenix facility was substantially non-compliant the past

19  three months.  It was at 45 percent in June, 70 percent in May,

20  and 55 percent in April.  And defendants did not prepare a      12:03PM

21  report on that, but if they have the number for July we request

22  that information.

23         THE COURT:  Thank you for pointing that out because I

24  had turned in reliance upon what Mr. Bojanowski had prepared

25  rather than using my own chart.                                 12:03PM

1          MR. BOJANOWSKI:  Phoenix?

2          MS. KENDRICK:  Yes.

3          MR. BOJANOWSKI:  Phoenix is not before the Court right

4   now.  Are you just looking to find it out?  You just want to

5   know?                                                          12:03PM

6          MS. KENDRICK:  Yes, please.

7          MR. BOJANOWSKI:  Okay.  That's fine.  That's why it's

8   not included, Judge.  It's not as part of a non-compliance

9   finding.

10         THE COURT:  Right.  I understand that.  But in terms     12:03PM

11   of what my focus is, I think that I believe, I don't know, but

12   if the plaintiffs have already moved and I haven't ruled on it,

13   my ruling on the potential application of the sanction could

14   also include the determination, if the plaintiffs had moved for

15   it, that I would include additional facilities and performance  12:04PM

16   measures that are subject to the Court's corrective action.

17         MR. BOJANOWSKI:  I was just trying to explain why it

18   wasn't --

19         THE COURT:  Sure.  I understand that.  Go ahead.

20         MR. BOJANOWSKI:  Phoenix is at 92 percent.              12:04PM

21         THE COURT:  Good.

22         MS. KENDRICK:  So just to go on to note, actually,

23   what the Court just said, Eyman, they did prepare a report and

24   it is subject -- it is one of the institutions and performance

25   measures that is in our pending enforcement motion that we      12:04PM

1   filed at the end of August.  Phoenix has not because it's only

2   been more recently they have come into non-compliance and we

3   have to go through that entire process.

4          THE COURT:  Mediation process.

5          MS. KENDRICK:  Yes, sir.                        12:04PM

6          And the final thing was that there was this reference

7   on Tucson to a PowerPoint that was used to train staff and we

8   would just request that defendants provide a copy of the

9   written PowerPoint training to the Court and to plaintiffs'

10  counsel so that we could review it.                    12:05PM

11         THE COURT:  Would you please do that?

12         Okay.  Let's take our noon break.  We'll come back at

13  1:30.

14         Yes, Ms. Rand.

15         MS. FETTIG:  No.  I apologize, Your Honor.  This is    12:05PM

16  Amy Fettig on the line.

17         THE COURT:  Sorry.

18         MS. FETTIG:  No worries.  I did want to ask the Court,

19  however, we wanted to address something you brought up at the

20  last status conference about the max custody enforcement       12:05PM

21  motion.  And I know that Ms. Love also needs to leave today,

22  and I didn't want the Court to address it if both of us weren't

23  present.

24         THE COURT:  I see.  So Ms. Love and you both are not

25  going to be around this afternoon.  Is that what you are       12:06PM

CV 12-601 - September 12, 2017 - Status Hearing

1   saying?

2          MS. FETTIG:  Yes.  That might be a problem.  I think

3   it would be better if both of us were present.  So if we could

4   address that issue now or right after lunch, if that works

5   better for the Court.                                    12:06PM

6          THE COURT:  Ms. Love, are you going to be available at

7   1:15?

8          MS. LOVE:  Yes, Your Honor.

9          THE COURT:  So if we take this issue up at 1:15 we'll

10  be able to accommodate everybody's schedule?  Is that all   12:06PM

11  right?

12         MS. FETTIG:  That would be much appreciated, Your

13  Honor.  Thank you so much.

14         THE COURT:  Thank you.  That's what we'll do.  We'll

15  be back at 1:15, not the 1:30 as I said before.  Thank you.  12:06PM

16         (Recess from 12:06 p.m. until 1:17 p.m.)

17         THE COURT:  Who wants to speak first on max custody?

18         MS. FETTIG:  Your Honor, this is Amy Fettig.  And

19  again, thank you for addressing this issue.  I know that the

20  healthcare measures can sometimes overwhelm this case.     01:17PM

21         THE COURT:  No disregarded stepchildren in my family.

22         MS. FETTIG:  Your Honor, at the last status hearing,

23  and I'm sorry I was not there, I know you addressed the max

24  custody enforcement motion with Ms. Eidenbach and requested a

25  new proposed order.  I read the transcript because I had a few  01:17PM

1    questions and rather than try to guess I thought it would be

2    better just to have a little conversation with you.

3              THE COURT:  Okay.

4              MS. FETTIG:  So --

5              THE COURT:  Go ahead.                                    01:18PM

6              MS. FETTIG:  Okay.  My understanding is that I'm

7    guessing part of the concern for your proposed order is that

8    time has passed, and since the motion was filed and the

9    proposed order was filed, the parties, with the Court's

10   guidance and sometimes rulings, have come up with a monitoring   01:18PM

11   guide for the maximum custody performance measures that we hope

12   will solve a lot of problems we saw in the previous monitoring

13   methodology and the documentation, and indeed that we only have

14   about two months of data.  Things are looking better.

15             So that monitoring guide does provide some of the      01:18PM

16   answers to the methodology, those issues that we have raised in

17   the motion.  We're not yet sure if it's going to answer all of

18   them, but it does address part of what the proposed order asked

19   for, and that is a plan to deal with the monitoring issue.  So

20   that we do think the monitoring is a good first step there.      01:19PM

21   The problem, of course, remains from March 2015 to September

22   2016 in the motion we're concerned with the erroneous findings

23   and the methodology and want the monitoring guide to have time

24   actually to do its magic and actually confirm findings that are

25   based on methodology and that are accurate.  So the time still   01:19PM

CV 12-601 - September 12, 2017 - Status Hearing

1    remains.  We want the promise in the stipulation, the time the

2    stipulation thought it would take to mature.  But certainly

3    reconfiguring based on the fact we're now monitoring this

4    methodology makes sense to me.  Am I correct that's sort of

5    what the Court was speaking of along those lines?                01:19PM

6          THE COURT:  Yes.  As I said last time, what I was

7    concerned about is that the passage of time had suggested that

8    maybe the issue was different, that it maybe had moved from one

9    of about the handbooks to one being where there were issues

10   about whether or not the information was accurate about whether  01:20PM

11   what was being reported in the handbooks was a true reflection

12   of the inmate's intent to remain in the cell or not.  So I just

13   had a sense that things were in motion and I didn't want to be

14   addressing something that was so dated.

15         So what is the plaintiffs' proposal that the Court          01:20PM

16   need do now with respect to this issue?

17         MS. FETTIG:  Well, Your Honor, we believe that now

18   that we've got the monitoring guide in place and there are

19   better methodologies, hopefully, in place to do that monitoring

20   and it hopefully be more accurate.  But our position is that we  01:20PM

21   need more time.  We had 19 months of monitoring.  It was a bit

22   of a morass so we would like to see these new methodologies and

23   the work of DW Hackney have time to come to fruition so that

24   the original stipulation, which is about two years, there's

25   enough time for the monitoring measures to be accurate for us    01:21PM

CV 12-601 - September 12, 2017 - Status Hearing

1   to have confidence in the findings that we are given each month

2   in those CGARs.  So it is a matter of, to some extent, time.

3          Now, Your Honor, you addressed the issue briefly at

4   the last status hearing that the separate issue of the refusal

5   rate, and that's refusal rate for programs and out-of-cell          01:21PM

6   exercise by both the SMI and non-SMI population.  That is

7   certainly an issue within the motion to enforce.  That issue is

8   partially addressed in the monitoring guide to allow for

9   greater documentation when a pattern of refusals happen.  We've

10  seen that a couple of times but, of course, that has only been    01:22PM

11  going for two months as well.

12         So what I would propose here is that we need, if the

13  Court is concerned about the freshness of data, that we do six

14  months of monitoring of the refusal rates to see if they are

15  going down.  Now, we had previously proposed, my best instincts   01:22PM

16  would say an expert is necessary because we do think there are

17  various reasons why programs and out-of-cell times are being

18  refused by SMI and non-SMI population.  It's a complicated

19  issue.  We gave you a sense of that in the declaration of Dr.

20  Stewart as well as the plaintiffs' declaration so I don't know    01:22PM

21  that it's immediately solvable.  But I do think that a

22  monitoring period to see if we can get it down.

23         And what I'm going to propose is a slightly different

24  wrinkle, and this is based on the plaintiffs' experience

25  subsequent to the motion to enforce working with defendants and   01:23PM

1    defendants' counsel, Ms. Love, on the use of force notice of

2    substantial non-compliance.  Now, we have not filed it with the

3    Court yet, but I know Ms. Love is comfortable with me saying

4    that the director is about to sign a mediation agreement.  I

5    think that mediation agreement is a solid one.  We worked well     01:23PM

6    together.  We were able to come to an agreement to, I think,

7    actually really move the ball forward on the use of force

8    provision to really ensure that ADC staff have additional

9    skills that they need to especially deal with difficult

10   seriously mentally ill people in a more safe manner.  We have     01:23PM

11   demonstrated that we can worked together and so what I would

12   propose is a six-month period of time in which we're going to

13   surveil that refusal rate to see if they actually go down, that

14   plaintiffs' counsel and defendant work together to come up with

15   some strategies to try to ensure those refusal rates come down.    01:24PM

16   I think it's going to take more than one strategy, to be honest

17   with you.

18           But I'm willing to sit down and roll up my sleeves

19   with defendants to try to come up with a way to ensure that the

20   substantive changes in the stipulation to reduce isolation even    01:24PM

21   more than just the documentation become real.  Because that's

22   ultimately the goal, to have the men and women and kids who are

23   in the ADC get out of isolation, engage in productive

24   activities, and not suffer the damage of isolation.

25   Unfortunately, refusal rates, there are various reasons why        01:24PM

1    that happens.  In the end what it means is we're not creating

2    better neighbors and that's ultimately, of course, the most

3    public safety argument that there is there.

4            So those are some of the issues that I would envision

5    in a revised proposed order.                                    01:25PM

6            THE COURT:  Okay.  Ms. Love.

7            MS. LOVE:  Your Honor, a couple points on response.

8    As to Ms. Fettig's speaking of different ideas that would make

9    it into a proposed order, at the baseline, of course, our

10   position is the motion to enforce should be denied for all of   01:25PM

11   the reasons that are set forth in the briefing which Your Honor

12   has said that you have carefully studied at least three times

13   on both sides and the data.  So we stand by our position that

14   the entirety of that motion should be denied.

15           As to the monitoring, we have come to an agreement on    01:25PM

16   the monitoring guide.  And as we developed that agreement for

17   additional protocols on the monitoring guide, as those went in

18   to place either by agreement of the parties or the Court's

19   assistance with us on that, those were done live time.  So we

20   didn't wait until the monitoring guide was finished.  As        01:25PM

21   changes and agreements were made, that went into our way of

22   monitoring.

23           So it isn't a situation where on a specific date the

24   new guide went into effect.  That has been an ongoing process

25   since last fall as we have developed it.  But even with the     01:26PM

1   development of the additions to the monitoring guide, mostly

2   through agreement, some through guidance from the Court, that

3   does not throw out the almost two years of data monitoring and

4   compliance reporting that defendants did up to that point.  So

5   we do not concede anything in our position on the motion to                   01:26PM

6   enforce and still request that it be denied.

7           As to erroneous findings as set forth in our pleadings

8   or plaintiffs' objection or different position on the data, we

9   believe that the motion to enforce is an inappropriate vehicle

10  by which to challenge that.  At the point that defendants move             01:26PM

11  for termination of provisions related to max custody, that is

12  the point, in defendants' opinion, to move for a challenge to

13  the actual data.

14          As to Ms. Fettig's ideas on what this proposed order

15  would look like, what we would like is a proposed written order           01:27PM

16  so that we can see the specifics of what Ms. Fettig is

17  proposing and then an opportunity to provide objections or a

18  position on that proposed order so we can see it in writing of

19  all the specifics and then respond to that.

20          As to the issue of rates of refusals, again, we stand             01:27PM

21  by our pleadings in our response to the motion to enforce that

22  the stipulation governs the offering of time out of cell, not

23  the actual rate of which an inmate decides to take or not take

24  advantage of those opportunities.  So as we set forth in our

25  pleadings, an expert is not necessary nor is an analysis of               01:27PM

1    actual refusal rates when, A, we don't have evidence before the

2    Court from plaintiffs of a widespread reason of refusal rates

3    that are anything untoward other than plaintiffs saying they

4    don't like the statistics.  And again, though the stipulation

5    provides for offering the time out of cell, not a monitoring of          01:28PM

6    actual is there a refusal and why do we need to look into that.

7            But at the baseline of this, we would like to see what

8    Ms. Fettig's proposals are on a proposed revised order and an

9    opportunity to object.

10           THE COURT:  All right.  On this point that you                   01:28PM

11   addressed close to the end here, and that is that there is no

12   information that suggests there was anything untoward with

13   respect to the failure of inmates to take advantage of what was

14   offered, I raised that a little bit last month because I asked

15   whether there was going to be a tour opportunity for the                 01:28PM

16   plaintiffs to confer with their clients to see whether there

17   was something that they were saying that was relevant to the

18   subject of whether the offer was being successfully made.

19   Because as I read the performance measure, it does talk about

20   being offered.  It doesn't really address whether there is some         01:29PM

21   other reason for a failure or failure to accept.

22           Now, I can imagine that there could be something

23   within the offer problem if there was something unique about

24   the circumstances of this population such that if the offer was

25   one that was frightening or objectionable for some reason then         01:29PM

1    the offer could be defective.  But if it is otherwise an offer

2    that would seem to be fair and respectful of these individuals'

3    needs and then there was some other reason that they just chose

4    not to do it, the stipulation doesn't say you have to get them

5    out.  It says you have to offer.                                  01:30PM

6         And so I'm a little bit sensitive to the argument that

7    you make that that is the requirement of the stipulation.  It's

8    the offer.  And I would want to hear about whether there was

9    something detective about the offer, and that's why I asked

10   about whether the plaintiffs would have any information from a   01:30PM

11   tour on this subject.

12        Were you able to follow up on that at all, Ms. Fettig?

13        MS. FETTIG:  Your Honor, first of all, I would point

14   to the fact that we have the unrebutted testimony of Dr. Pablo

15   Stewart who looked at the refusal rates, especially the SMI      01:30PM

16   refusal rates, and testified that clinically the refusal rates

17   were so grave, were so high, it was a clinical red flag, that

18   the individuals in those units in isolation are actually

19   extremely high.  And in the normal course of business for

20   mental health you would perform interventions in order to make   01:31PM

21   sure they were adhering to treatment, that they were going out

22   of their cell, that they were participating in programming.

23        THE COURT:  But all of that is language that is

24   different.  It's language that you could envision that you

25   could have had in an agreement, but you didn't.  You said        01:31PM

1     offer.

2           MS. FETTIG:  Meaningfully, now offering to somebody

3     who is seriously mentally ill means you have to do it in a

4     clinically appropriate way.

5           THE COURT:  Okay.                                              01:31PM

6           MS. FETTIG:  So our concern here is that -- and Dr.

7     Stewart enumerated in his declarations the various reasons why

8     seriously mentally ill patients don't adhere to treatment

9     especially in a correctional setting.  None of those have been

10    explored by defendants.  What we would like to see is, okay,          01:32PM

11    we've got these enormous clinical refusal rates.  We have got

12    difficulties getting people out of their cell.  They are

13    seriously mentally ill.  There's a high acuity here.  How do we

14    offer them programming in a way people are going to accept it?

15    So a genuine offer is what's necessary here.                          01:32PM

16          By the same token, the non-SMI population, we gave you

17    a sense in the motion about the various reasons we found in the

18    plaintiff class why people were refusing, you know, fear to

19    leave their cell, harassment by officers, an unsafe

20    environment.  I imagine every once in a while somebody is going       01:32PM

21    to refuse to go out of their cell, for example, for recreation.

22    When it's 115 degrees when we were at Perryville earlier this

23    month I could definitely imagine why somebody would not want to

24    be out on that yard because it was so hot, so brutally,

25    brutally hot.  But that's not what we're talking here.  We're         01:33PM

1    talking about a year of data showing extreme rates of refusal,

2    good weather and bad.  So that certainly is an issue.

3         With the Perryville population, slightly different.

4    Defendants are no longer monitoring Perryville because they

5    claim it is close custody and so the programming for the SMI          01:33PM

6    and than the non-SMI is pretty different on non-existent.  So

7    we weren't able to -- it would be like comparing apples and

8    oranges.  You know, the situation may be -- we have been to

9    Lewis.  We have been to Eyman.  We have been to Florence.  We

10   heard similar things from clients.  Quite frankly, we did get        01:33PM

11   some declarations but not everybody is unafraid to testify.

12   And so it is difficult to get hundreds of people to agree to

13   sign a declaration when they think they are going to be

14   targeted.

15        So we provided you what we could what we see as a               01:33PM

16   sample of the reasons and are willing to sit down and be

17   constructive about coming up with solutions so the offer made

18   in the stipulation is made real.

19        THE COURT:  So I guess what I'm hearing is you think

20   that the Perryville opportunity to talk to your clients wasn't       01:34PM

21   particularly useful because it's a different population and

22   that sort of remains to be seen as you do your other tours

23   later on in this fall.  Is there some other place you are

24   visiting where you will run into a population that you think is

25   the right one to be talking to?                                      01:34PM

1    MS. FETTIG:  Well, certainly, we can arrange that.  I

2    mean, partially this is the reason why I'm suggesting as an

3    update to the proposed order that there be a surveillance

4    period to see, okay, is the refusal rate going down?  Is the

5    new monitoring methodology that requires a pattern of refusal          01:34PM

6    to be addressed at least by correctional staff going to solve

7    some of this problem?  At this point, we don't know.

8    THE COURT:  Okay.  Well, here's what I think makes

9    sense to do in light of what Ms. Love has said regarding their

10   willingness to take a look at your proposed order.  It seems to        01:35PM

11   make sense for you to draft that and to file it so that she can

12   have an opportunity to converse with you about it and also to

13   file any objections that they would like to have.  And then I

14   would have the opportunity to look at that.  During that time

15   period that we're doing that process some of what you are             01:35PM

16   asking for, Ms. Fettig, will occur, and that is the passage of

17   time.  So I would propose to go forward that way.

18   MS. FETTIG:  I think that makes sense, Your Honor, to

19   get some language out there so that you can review it and so

20   that Ms. Love can review it.                                           01:35PM

21   THE COURT:  Okay.  Anything else on this issue?

22   MS. FETTIG:  No, Your Honor.  Not from the plaintiffs'

23   side.

24   MS. LOVE:  No, Your Honor.

25   THE COURT:  All right.  Thank you.  Thank you very                     01:36PM

1    much.

2            MS. LOVE:  Thank you, Your Honor.

3            MS. FETTIG:  Thank you.

4            THE COURT:  Mr. Bojanowski, I took the lunch time to

5    take a look at the remaining preliminary summary that you          01:36PM

6    looked at and I left it on my desk.  Forgive me.  I'm going to

7    go get it.

8            Thank you very much.  That's the first time I told the

9    lawyers I'd be right back and it really did happen.

10           One of the things I noted over the lunch hour to add      01:37PM

11   to the list of things is when you work on developing this

12   document, which I appreciate, is just -- and you may have

13   already thought about this -- add page numbers, please.

14           MR. BOJANOWSKI:  We'll do that.

15           THE COURT:  Thank you.  We're to 54.                       01:37PM

16           MR. BOJANOWSKI:  Correct.

17           THE COURT:  Chronic disease inmates will be seen by

18   the provider as specified in the inmate's treatment plan no

19   less than every 180 days unless the provider documents a reason

20   why a longer time frame can be in place.                          01:37PM

21           And Eyman reports 64 percent; Florence, 83 percent;

22   Lewis, 88; Perryville, 94; Phoenix, 96; Tucson, 94; Winslow,

23   90; and Yuma, 96.  And then the explanation attached to Eyman

24   says that you will supplement.  Do you know anything more

25   today?                                                            01:38PM

CV 12-601 - September 12, 2017 - Status Hearing

1        MR. BOJANOWSKI:  Yes, Your Honor.  I'm going off my

2   notes again that this appeared to be a tracking problem by

3   nursing staff at the Eyman facility.  In addition, there was an

4   increase in providers and a site medical director at that

5   location.                                                        01:38PM

6        I believe another provider is going to be added in

7   September to assist.  They are trying to develop a spreadsheet

8   that can be used by nursing personnel to better track this

9   because it's 180-day timeline.  So that's, at this point, the

10  information I have on PM 54 at Eyman.  And I will -- this will    01:39PM

11  be one of the ones I will supplement with some dates and such.

12       THE COURT:  Okay.  It will be helpful to have the

13  dates and also helpful to know what kind of provider.

14       MR. BOJANOWSKI:  All right.

15       THE COURT:  And then with respect to Florence.          01:39PM

16       MR. BOJANOWSKI:  I don't have any other additional

17  information other than what's already provided on the document.

18       THE COURT:  And do we know whether the telemedicine

19  has been employed?  It says continue to utilize telemedicine

20  and on site providers.                                          01:40PM

21       MR. BOJANOWSKI:  I know it was there, and I think I

22  reported last month, if I recall correctly, that we were going

23  to increase the availability of it.  But I'm not sure if this

24  was the measure that I reported it at this particular facility.

25       THE COURT:  So you will make an inquiry as to see       01:40PM

CV 12-601 - September 12, 2017 - Status Hearing

1    whether or not this is one where there's actually something to

2    show for the telemedicine and the online providers?  Because

3    it's sad to see a deterioration after such a substantial

4    uptick.

5         So okay.  Ms. Kendrick.                          01:40PM

6         MS. KENDRICK:  Yes, Your Honor.  In our response to

7    the Court's June order to show cause at Docket 2214, we

8    proposed that the Court include in its final intensive

9    monitoring scheme Eyman facility because the non-compliance

10   there has just been stubborn and doesn't seem to be getting    01:41PM

11   fixed.  We were told last month by Mr. Bojanowski and Ms.

12   Almanza from Corizon that the vacant position had been filled

13   for the provider and that telemedicine capacity was being

14   doubled.  So we, again, echo the Court's concern and request

15   that, to the extent possible, we can have more detail.  So, for  01:41PM

16   example, the number of hours of telemedicine per week that is

17   being done at Eyman and now in this case also at Florence, that

18   sort of information would be very useful in the future.

19        THE COURT:  All right.  Well, Eyman is on my radar

20   screen for the stepped-up enforcement measure.              01:41PM

21        66:  An IPC medical provider encounter will occur at a

22   minimum of every 72 hours.  Florence reports 70 percent; Lewis

23   at 90; Perryville at 75 percent; Tucson at 70 percent.  And

24   with respect to Florence, the corrective action plan is that

25   medical providers will complete rounds every 48 hours,         01:42PM

CV 12-601 - September 12, 2017 - Status Hearing

1   including weekends, to ensure that inmates are seen well within

2   the 72-hour time frame.  I thought we were already there.

3        MR. BOJANOWSKI:  We were doing that.  That is a

4   continuation of the plan, Your Honor.

5        THE COURT:  Do we know -- I can't remember as I sit      01:42PM

6   here when that every 48 hours plan went into place.  You talked

7   about it last month, I think.

8        MR. BOJANOWSKI:  I believe it was either last month or

9   the month before.

10        THE COURT:  Ms. Kendrick might be able to tell us.      01:43PM

11        MR. BOJANOWSKI:  I'm thinking it was put into place in

12   June.

13        THE COURT:  That would be alarming.

14        MR. BOJANOWSKI:  Yeah.

15        THE COURT:  So in June, it was a decision to address      01:43PM

16   this failure by increasing the frequency of the rounds to 48

17   hours, but not only didn't that work but it dropped the

18   performance.

19        MR. BOJANOWSKI:  It did because there was a shortage

20   of a provider there, and so we had to get a locum that was put      01:43PM

21   into place in mid-September.

22        THE COURT:  All right.  So it really, when you say --

23        MR. BOJANOWSKI:  That's the reason why it dropped at

24   Florence was because we lost a provider.

25        THE COURT:  So it didn't happen because there was no      01:44PM

CV 12-601 - September 12, 2017 - Status Hearing

1    provider to do it?

2              MR. BOJANOWSKI:  Correct.

3              THE COURT:  Okay.  Ms. Kendrick.

4              MS. KENDRICK:  Your Honor, last month there was

5    reference and discussion by Mr. Bojanowski that they had          01:44PM

6    implemented the every 48-hour requirement, but unfortunately it

7    appears that neither the Court nor I pressed him for the date

8    that that started.

9              THE COURT:  He just told us just now it started June

10   1.  We at least have that.                                        01:44PM

11             MS. KENDRICK:  So again, we think this is such a

12   critically important performance measure and, you know, the

13   people that are in an infirmary, they are in an infirmary for a

14   reason.  They are very, very sick.  Our expert, Dr. Wilcox, has

15   noted that, you know, 72 hours is the very outside window.  You   01:44PM

16   really need to be seeing people with the frequency as

17   necessitated by their medical condition, which may be multiple

18   times a day.

19             So the fact that they can't even hit 48 hours, which

20   is kind of the outside window, despite the sustained attention   01:45PM

21   of the Court on this measure, we believe that this performance

22   measure and these institutions really need to be included in

23   the Court's order that directs them for more intensive

24   reporting to the Court and plaintiffs and the possibility of

25   fines for non-compliance.                                         01:45PM

1    THE COURT:  Well, I think that that's very reasonable,

2  because if, as we have spent time talking about this in the

3  past, if people are sick enough to be deemed to be what is in

4  the prison's equivalent of a hospital and an inpatient

5  infirmary, that it would seem to me that you do need to make          01:45PM

6  sure that they are seen, and that the obvious remedy is one

7  that we have talked about before, is that if you are not able

8  to provide the kind of care that you say you can provide, I

9  mean, that's what this is about.  This is saying we agree that

10  everybody needs to be seen within 72 hours.  And there's a          01:46PM

11  reason that you come to that conclusion, because everybody

12  understands that these people are sick enough to have that.

13    So you think that when you are under such close

14  monitoring it's because things could go south on a pretty

15  likely -- more likely situation, and that if nobody is there to     01:46PM

16  sort of catch up on that they can go really south.  And there

17  is, as I say, an obvious solution to this, and that is, don't

18  house people that you are not able to protect in your housing.

19  And if you can't, put them in the hospital or put them in

20  another facility where you can make sure that those people can      01:46PM

21  be seen within what your expert says and what everybody, I

22  think, could recount from your own experience what is a very

23  reasonable requirement or not one that you would think that

24  anybody would miss.  So it's just alarming to me, upsetting,

25  and confounding how it is that somebody can run an IPC and          01:47PM

 1    think that it's okay to go on for months and months and months

 2    like this.

 3         Okay.  Performance Measure 80:  MH-3A prisoners shall

 4    be seen a minimum of every 30 days by a mental health

 5    clinician.  What did I do with Lewis?  Lewis at 99; Perryville      01:47PM

 6    at 94; Tucson at 97.  Any comment, Ms. Kendrick?

 7         MR. FATHI:  Yes, Your Honor.  Performance Measure 80,

 8    81, and 92 all set forth requirements that something happen

 9    every X days.  And in its recent order, Document 2225, the

10    Court set forth the correct monitoring methodology for those      01:48PM

11    measures that essentially requires the exclusion of files that

12    could not possibly be found non-compliant and the drawing of

13    additional files to replace them.

14         I just want to point out that none of these measures

15    through June of 2017 were calculated in accordance with the       01:48PM

16    Court's order, and we don't know if July 2017 was because we

17    haven't yet received those CGAR reports.  So this comment

18    applies to 80, 81, and 92.

19         THE COURT:  Yeah.  And what we do know is that the

20    defendants, as of last month, said that they were employing the   01:48PM

21    methodology employed by the Court.  But you are right to say

22    that these previous time periods, it's not clear.

23         MR. FATHI:  Thank you, Your Honor.

24         THE COURT:  Performance Measure 81 as provided here by

25    Mr. Bojanowski are MH-3A prisoners who are prescribed             01:49PM

1   psychotropic medications seen a minimum of every 90 days by a

2   mental health provider.  Eyman, 100; Tucson, 97.  And the

3   reason that I paused, I didn't think these institutions were a

4   focus of ours.  But I see they are included.  Maybe just --

5           MR. BOJANOWSKI:  Did I miss one?                    01:49PM

6           THE COURT:  No, you just included 81 and I don't think

7   it's --

8           MR. FATHI:  Your Honor, it is subject to, I believe,

9   your first order finding substantial non-compliance.

10          THE COURT:  It is.  Thank you.  I will fix that,      01:50PM

11  meaning I won't -- well, I may well need not to do it in light

12  of -- it looks like we shouldn't be spending our time on it.

13          85:  MH-3D prisoners shall be seen by a mental health

14  provider within 30 days of discontinuing medication.  Eyman, 96

15  percent; Florence, 96 percent; Lewis, 91 percent; Perryville,   01:50PM

16  88 percent; Tucson, 97 percent; Yuma, 96 percent.

17          Mr. Fathi.

18          MR. FATHI:  Yes, Your Honor.  On June 14 the Court set

19  forth orally the prescribed monitoring methodology for

20  Performance Measures 85 and 86, and the defendants are not yet   01:50PM

21  complying with that methodology.  This is set forth as Item 5

22  on our agenda today.

23          THE COURT:  And I took a look -- we can go ahead and

24  address it now.  I think it makes sense to address it now.

25          MR. BOJANOWSKI:  Your Honor, that's incorrect.  We are   01:51PM

1  using the Court's methodology for the July results.  He doesn't

2  have the CGARs yet, the actual CGAR documents, so he's probably

3  unable to do any kind of analysis.  But I had conferred with

4  Dr. Taylor to confirm that the monitoring methodology that the

5  Court had indicated it wanted filed in June was, in fact,        01:51PM

6  applied to the July analysis.  So these numbers in PM 85 and 86

7  reflect the Court's order.

8          THE COURT:  So this is new news from the last time you

9  filed anything on paper on this point.  Is there any reason to

10 think that this issue hasn't been put into a place where what   01:51PM

11 you sought you achieved?

12         MR. FATHI:  Well, I don't know, Your Honor.  The

13 defendants produced a new version of their monitoring guide on

14 August 25th, and that version did not include the Court's

15 order.  As Mr. Bojanowski said, I haven't seen the July CGAR    01:52PM

16 results, so if he tells me that starting with the July CGAR

17 results they are complying with the Court's methodology, even

18 though they haven't put it in the monitoring guide, of course I

19 believe him.  What we provided the Court is an example of the

20 June CGAR results which they were not complying.                01:52PM

21         THE COURT:  So what would be the next step to make

22 sure that the monitoring guide includes the appropriate

23 language with respect to addressing this performance measure?

24 Where are you in that process so we can make sure we docket

25 when to look at this to make sure it's reflected in the rules?  01:52PM

1    We have Dr. Taylor telling Mr. Bojanowski we we're doing it on

2    the ground, but you say, well, it's not in the current

3    monitoring guide.

4            MR. FATHI:  Correct, Your Honor.

5            THE COURT:  So where do we stand on getting it into

6    that?

7            MR. FATHI:  I think that's really a question for

8    defendants, Your Honor.  If they tell us today that they are

9    going to make that change, then that's fine.  We will await

10   their new monitoring guide.

11           MR. BOJANOWSKI:  We actually made the change in the

12   monitoring guide and sent it over to Mr. Fathi.  We have not

13   heard yet as to the proposed modification.

14           THE COURT:  When did you send it over?  He said the

15   last one he got was the 26th of August.

16           MR. STRUCK:  It was August 25th.

17           THE COURT:  August 25th is what the transcript said.

18           MR. BOJANOWSKI:  Wasn't there a change included?

19           MR. FATHI:  Your Honor, I'm perfectly willing to

20   accept this as an oversight.  But the August 25th monitor

21   guide, which is the most recent one we have provided, the

22   methodology for 85 and 86 is not compliant with the Court's

23   order.  And we have appended that as Document 2291-1 at 135

24   through 1 -- excuse me, 133 through 136.

25           MR. BOJANOWSKI:  I'm pretty sure we had some

1    modifications to that language, so I will go back to my office

2    and look at that modification and I can get that over to Mr.

3    Fathi pretty quick.

4              THE COURT:  Okay.

5              MR. FATHI:  Could we have a date, Your Honor?  Again,      01:54PM

6    the Court ruled in June, so we would like this to be addressed.

7              THE COURT:  How soon can you take a look at that and

8    get it over to Mr. Fathi?

9              MR. BOJANOWSKI:  By this Friday, Your Honor.

10             THE COURT:  Thank you.  I gather the same goes for      01:54PM

11   with respect to 86.

12             MR. FATHI:  Correct, Your Honor.

13             THE COURT:  So we'll wait and see what happens.

14   Otherwise, 86, if those numbers are right, and they may not be

15   because they may be based upon the previous adoption, we'll      01:55PM

16   just wait and see what the CGARs show when it is agreed by

17   everybody that this correct method of monitoring has been

18   employed.

19             Performance Measure 92:  MH-3 and above prisoners who

20   are housed in a maximum custody shall be seen by a mental      01:55PM

21   health clinician for a one-on-one or group session a minimum of

22   every 30 days.  And for Eyman, 100 percent; Florence, 100

23   percent; Lewis, 100 percent; Perryville, not applicable; and

24   Tucson, not applicable.

25             Mr. Fathi.      01:55PM

CV 12-601 - September 12, 2017 - Status Hearing

1    MR. FATHI:  First, the same comment I made earlier

2  regarding the Court's ruling on the every X days measures.

3  Secondly, we do not agree that this performance measure is not

4  applicable at Perryville and Tucson, but I guess that can be

5  addressed when and if the defendants move to be released from      01:56PM

6  these measures.

7    THE COURT:  Understood.  And is the same correction to

8  the monitoring guide with respect to this performance measure

9  necessary?

10    MR. FATHI:  That correction has been made in the          01:56PM

11  monitoring guide.

12    THE COURT:  All right.  Thank you.

13    93:  Mental health staff (not to include LPNs) shall

14  make weekly rounds of all MH-3 and above prisoners who are

15  housed in maximum custody.  Eyman, 80 percent; Florence, 100      01:56PM

16  percent; Lewis, 95 percent; Tucson, not applicable.  And then

17  with respect to Eyman, the basis for non-compliance is stated

18  to be there appears to have been a computer problem where notes

19  were input into the computer system but the notes were not

20  saved leading to perceived lack of compliance.  ADC is           01:57PM

21  following up on determining whether a computer problem caused a

22  documentation failure for one week.  And it further says with

23  respect to the corrective action plan that Corizon is looking

24  to whether to implement fail safe data redundancies.

25    So what the defendants are saying is this falloff to        01:57PM

UNITED STATES DISTRICT COURT

CV 12-601 - September 12, 2017 - Status Hearing

1    80 percent from a performance measure that has been in

2    compliance since July 2016 is due to a failure to input data

3    that would have hopefully reflected compliance if the past is

4    prologue.  Any further comment, Mr. Fathi?

5            MR. FATHI:  We think implementing fail safe data        01:57PM

6    redundancies would be a good idea.  Excuse me --

7            THE COURT:  Same objection about --

8            MR. FATHI:  We do not agree this measure 93 is not

9    applicable at Tucson.

10           THE COURT:  Understood.                                 01:57PM

11           Performance Measure 94:  All prisoners on a suicide or

12   mental health watch shall be seen daily by a licensed mental

13   health clinician or on weekends or holidays by a registered

14   nurse.  Douglas reporting at 94 percent; Eyman, 97 percent;

15   Florence, 87 percent; Perryville, 93 percent; Phoenix, 73       01:58PM

16   percent; Tucson, 72 percent.  And with respect to Phoenix, the

17   basis for non-compliance is stated to be a single provider

18   failed to appropriately document contact with inmates on

19   suicide watch or mental health watch.  And the corrective

20   action plan states that the provider that failed to properly    01:58PM

21   document was terminated from --

22           MR. BOJANOWSKI:  Your Honor, before you read that into

23   the record, I need to modify a couple of things on this that I

24   made some mistakes on that I want to make sure it's clear that

25   it shouldn't read "the provider" it should read "the            01:58PM

1    clinician."  So if the Court would modify that, that would be

2    most helpful.  Then in the last sentence of the paragraph, it

3    reads, "Then a second ADC security staff member."  That's not

4    accurate.  It should read that a second Corizon person, open

5    paren, the FHA, close paren, will then review the notes to          01:59PM

6    assure proper charting.  There was a problem with my acronyms

7    in inputting this.  So I just wanted to make sure the Court was

8    clear on the action plan.

9           THE COURT:  And how is a clinician not a provider?

10           MR. BOJANOWSKI:  The providers prescribe and a              01:59PM

11    clinician does not.

12           MR. FATHI:  If I may add, Your Honor, the provider and

13    clinician are defined completely differently in the

14    stipulation.

15           THE COURT:  I understood, but I guess I was thinking        02:00PM

16    that maybe something was being said other than the idea that

17    generally provider does include clinician.  But in this

18    performance measure it has to be a clinician -- it has to be a

19    licensed mental health clinician.  And so since it didn't say

20    that, I didn't know why it was different.                          02:00PM

21           MR. FATHI:  And this will come up in a little bit

22    again, Your Honor, but provider and clinician are mutually

23    exclusive categories.  In the mental health context, a provider

24    is a psychiatrist or a mental health nurse practitioner; a

25    clinician is a psychologist or psychology associate.               02:00PM

 1          THE COURT:  Oh.  Okay.  Thank you.

 2          MR. FATHI:  Now I'm overlapping categories.

 3          THE COURT:  Thank you very much.  So then to reflect

 4   this correction, the clinician that failed to properly document

 5   was terminated from Corizon two weeks ago.  So that's two weeks    02:01PM

 6   ago from the 5th of September?

 7          MR. BOJANOWSKI:  Yes, Your Honor.

 8          THE COURT:  Corizon will provide more training to

 9   providers.  So that should say instead also clinicians?

10          MR. BOJANOWSKI:  Yes, Your Honor.                           02:01PM

11          THE COURT:  Relating to importance of documentation,

12   Corizon will also offer daily review, again, of clinicians'

13   charting to assist.  Corizon will further create a hard stop in

14   eOMIS prior to testing implementation that will not permit the

15   employee to move forward absent addressing this issue.  Corizon   02:01PM

16   is a creating templates in the eOMIS system for use by

17   clinicians and nurses, or should it be clinicians, providers,

18   and nurses?

19          MR. BOJANOWSKI:  Clinicians.

20          THE COURT:  ADC security is working to identify            02:01PM

21   inmates on watch to remit the information to the Corizon mental

22   health provider nurse.  Is that the term?

23          MR. BOJANOWSKI:  It's, again, the clinician, Your

24   Honor.

25          THE COURT:  Okay.  ADC plans on identifying the            02:02PM

1   locations of the watches by first count at 11 a.m., then a

2   second ADC Corizon person, the FHA, will review notes to assure

3   property charting.

4          MR. BOJANOWSKI:  Part of the system will be a real

5   time auditing situation by the FHA.  I did want to mention that      02:02PM

6   the hard stop that is in this particular measure is in testing

7   during this month, during the month of September.

8          THE COURT:  So we can write down that the hard stop

9   will be in testing during September?

10         MR. BOJANOWSKI:  Correct.                                      02:02PM

11         THE COURT:  And implemented when the testing is

12   concluded?

13         MR. BOJANOWSKI:  Correct.  Yeah.  I'm assuming that

14   the testing will show that it, in fact, works, and that once

15   that happens, then that can be put in systemwide.                   02:03PM

16         THE COURT:  And the real time auditing is set to begin

17   when?

18         MR. BOJANOWSKI:  I don't know, Your Honor.  I would

19   speculate that it would be September 5th again, but I don't

20   want to go off on a limb.                                           02:03PM

21         THE COURT:  Okay.  Yeah.  There have been some

22   hurricane winds here today.

23         MR. BOJANOWSKI:  Yes.

24         THE COURT:  So the real time, is it going to be on a

25   daily basis or weekly?  Do you have an understanding about          02:03PM

1  that?

2          MR. BOJANOWSKI:  It is daily.

3          THE COURT:  And then Tucson, the basis for

4  non-compliance is two nurses failed to note file the inmate was

5  seen when inmate was placed on watch.  There was one RN on          02:03PM

6  evening duty that missed two notes.  A provider is failing to

7  note the offer to be seen by mental health provider and refusal

8  of being seen in the notes.  Corizon is removing the provider.

9  Is, again, the provider term inept here?

10         MR. BOJANOWSKI:  Yeah.  It's clinician again, Your          02:04PM

11  Honor.  It's my understanding the psychologist was, in fact,

12  terminated.

13         THE COURT:  Do you know when?

14         MR. BOJANOWSKI:  Between September 5th and today.  So

15  it would be within the last week.                                  02:04PM

16         THE COURT:  Does Dr. Taylor know what's the situation

17  with respect to filling this hole, if any, of missing this

18  person?

19         DR. TAYLOR:  Yes, Your Honor.  They actually have

20  every position already filled for psychologists.  He was a        02:05PM

21  locum psychologist, registry psychologist, that they had a

22  contract with up through the end of September.  They decided to

23  terminate it early.  They had all positions filled and he

24  continued to make the same error month after month.

25         THE COURT:  I see.  Thank you.                              02:05PM

127

1           Mr. Fathi.

2           MR. FATHI:  Well, as a threshold matter, Your Honor,

3    as we discussed, "clinician" and "provider" have two completely

4    different meanings under the stipulation.  So the fact that the

5    person who prepared these corrective action plans apparently          02:05PM

6    doesn't know the difference does not inspire confidence.

7    Again, we share the Court's concern about the effect that

8    terminating these, apparently, two different clinicians will

9    have on the compliance not only with this measure but with

10   other measures.  I'm unclear if Dr. Taylor was discussing the        02:06PM

11   situation at Phoenix or Tucson.

12          THE COURT:  I guess I thought that it was addressed to

13   Tucson, but let me ask whether that was a correct assumption.

14          DR. TAYLOR:  Yes, that is correct.  Just one

15   psychologist.  There was -- the two nurses referred to in here       02:06PM

16   were not terminated.  They were reinstructed on what to do.

17   But the one psychologist was terminated, and those positions

18   are already filled at Tucson.

19          MR. FATHI:  And what about Phoenix, where another

20   clinician was terminated two weeks ago?                              02:06PM

21          DR. TAYLOR:  I don't actually know their fill rate.  I

22   haven't asked.  But we can look into that.

23          MR. FATHI:  Whatever faults this person may have had,

24   they are probably better than nobody.  So we are concerned that

25   the vacancy --                                                       02:06PM

1    THE COURT:  Certainly the need for having these people

2    where we have a general sense of staff below those

3    requirements, the levels that the State has set.  And so

4    whenever we hear about somebody leaving it immediately raises

5    in my ears and, perhaps, everybody else's ears the worry about          02:07PM

6    whether we have now learned news that will make things better.

7    It's just not getting rid of somebody who has caused a problem

8    it's raising the specter that we are now even worse off in this

9    situation with respect to having desired positions and

10   contracted positions filled.                                            02:07PM

11        MR. FATHI:  Exactly, Your Honor.

12        With regard to Phoenix and the hard stop that will not

13   permit the employee to move forward absent addressing this

14   issue I'm not sure what is meant by "move forward."

15        THE COURT:  All right.  So can you help answer that              02:07PM

16   question?

17        MR. BOJANOWSKI:  I don't think I understand the

18   question.

19        MR. FATHI:  Well, where someone writes you are going

20   to create a hard stop in eOMIS that will not permit the               02:08PM

21   employee to move forward absent addressing this issue, I don't

22   understand what's meant by "move forward"?

23        MR. BOJANOWSKI:  Dr. Taylor can probably provide a

24   little bit more detail than myself.

25        THE COURT:  Go ahead.                                            02:08PM

1          DR. TAYLOR:  The first part of the note is considered

2    the subjective section of the note.  And before you can finish

3    the objective, assessment, plan, and education portions of the

4    note, they would have to address what type of setting they saw

5    the individual in.  Because what we continue to find is they          02:08PM

6    are likely seeing them in confidential settings, but if they

7    don't affirmatively state that we're not counting them.  So

8    they have to affirmatively state what setting they are seeing

9    them in.  And if, in fact, they are not seeing them in a

10   confidential setting they have to indicate what measures they        02:08PM

11   took:  I offered that and they refused.  So they can't finish

12   their note and close it out until they answer that first part

13   because that seems to be the failure for the watches over and

14   over again is not proactively stating where you are seeing

15   them.  They are simply seeing them in these settings and not         02:09PM

16   documenting that.  And I have been unable to count those

17   contacts.

18          THE COURT:  I see.  Does that answer the question?

19          MR. FATHI:  It does.  Thank you, Your Honor.

20          One final question.  We were told that the reference         02:09PM

21   to ADC security staff in the second to last line was an error.

22   There's another reference to ADC security in the fourth to last

23   line.  I'd just like to know if that's an error, too, or is

24   that actually correct?

25          MR. BOJANOWSKI:  That's correct.                              02:09PM

CV 12-601 - September 12, 2017 - Status Hearing

1          THE COURT:  I don't know what that means.

2          MR. BOJANOWSKI:  It should read ADC security.

3          THE COURT:  So it is correct?

4          MR. BOJANOWSKI:  The language as stated is correct.

5          THE COURT:  Okay.  ADC security should be there where          02:09PM

6    it's first mentioned but should be replaced by Corizon person

7    FHA in the second time that ADC security staff person is

8    mentioned.

9          MR. FATHI:  Could we have a little clarification on

10   how security staff is going to identify inmates on watch?  My          02:10PM

11   experience on tours is that the inmates are on watch are in the

12   watch area so they are easily identified.  If there's something

13   beyond that that's being contemplated, we would like to know

14   about it.

15         MR. BOJANOWSKI:  Dr. Taylor will fill in some of that          02:10PM

16   detail.

17         DR. TAYLOR:  So sometimes they overflow out of the

18   watch pods and they may overflow into a specific area, but

19   sometimes they overflow into other areas that mental health

20   staff may not be aware that there's an inmate that overflowed          02:10PM

21   when on watch maybe the night before and moved to a run they

22   are not aware of.  So they want to make sure they know exactly

23   what cell locations they are in every day just to make sure

24   they don't miss anybody.  So that second check is happening by

25   11 a.m. each day.          02:10PM

CV 12-601 - September 12, 2017 - Status Hearing

1          THE COURT:  Okay.

2          MR. FATHI:  Thank you.

3          THE COURT:  Performance Measure 98:  Mental health

4    HNRs shall be responded to within time frames set forth in the

5    mental health technical manual.  And Douglas reporting at 100          02:11PM

6    percent; Eyman, 98 percent; Florence, 97 percent; Lewis, 98

7    percent; Phoenix, 89 percent; Safford, 100 percent; Tucson, 95

8    percent; Winslow, 100 percent; and Yuma, 81 percent.

9          The basis for non-compliance is stated to be a

10   psychologist provider recently retired.  Corizon has not yet          02:11PM

11   utilized outside resources to supplement care since provider

12   retirement because there are no community resources to draw

13   upon.  So I gather this is a report as of 9-5, but do we know

14   when "recently retired" means, what the start date?

15         MR. BOJANOWSKI:  Well, Your Honor, initially,          02:11PM

16   technically speaking, the Yuma facility at PM 98 is not subject

17   to a notice of non-compliance but it was included.  Let me make

18   another technical change to what is going on here.  The

19   psychologist should be replaced by psychiatric provider in both

20   the first paragraph and the second paragraph.          02:12PM

21         But in any event, even though this is not subject to a

22   notice of non-compliance and is not before the Court, the

23   Corrective Action Plan is to increase our telepsych and we're

24   looking for more community resource support to see if we can

25   obtain some individuals who are providing services to some of          02:12PM

```
 1    the local jails and see if maybe we can get them under contract
 2    as well to provide us some coverage on a short notice
 3    situation.
 4          So that's what's going on at Yuma under this measure.
 5    And historically, Yuma has done extremely well with this          02:13PM
 6    particular measure having only failed three times since this
 7    agreement was entered into.
 8          THE COURT:  All right.  Anything you wanted to say,
 9    Mr. Fathi?
10          MR. FATHI:  Yes, Your Honor.  Again, given that we          02:13PM
11    still have this apparent confusion between psychologist and
12    provider, I would like it if Mr. Bojanowski could go through
13    and with each time either of those term appears tell us if it's
14    correct or if it's in error.
15          THE COURT:  Didn't he just do that?                         02:13PM
16          MR. FATHI:  No.  There are several times it appears
17    under the corrective action plan.
18          THE COURT:  I see.  I see.  Yes.  You are right.  I'm
19    sorry.
20          Do you see that, Mr. Bojanowski?                            02:14PM
21          MR. FATHI:  Excuse me.
22          THE COURT:  I'm sorry.
23          MR. FATHI:  Corizon recently hired a new psychologist.
24    Should that be psychiatrist?
25          MR. BOJANOWSKI:  Psychiatric provider.                      02:14PM
```

CV 12-601 - September 12, 2017 - Status Hearing

```
 1              THE COURT:  And then the second to the last line a
 2   temp psychologist?
 3              MR. BOJANOWSKI:  Same.
 4              THE COURT:  Should be a psychiatric provider?
 5              MR. BOJANOWSKI:  Right.  I have to tighten up on my    02:14PM
 6   mental health terminology, Your Honor.  I apologize.
 7              THE COURT:  Okay.  Thank you.
 8              MR. FATHI:  And in the second line, provider is
 9   correct?
10              MR. BOJANOWSKI:  Yes.                                  02:14PM
11              MR. FATHI:  Okay.  A couple of additional
12   observations, Your Honor.  The defendants purport to quote
13   Performance Measure 98 as requiring compliance with the time
14   frame set forth in the current mental health technical manual.
15   That's not Performance Measure 98.  Performance Measure 98       02:14PM
16   requires compliance with the time frames set forth in the April
17   18th, 2014 version of the technical manual.  So it appears that
18   the defendants are not monitoring compliance with the
19   performance measure as set forth in the stipulation.
20              MR. BOJANOWSKI:  The time frames are the same in both  02:15PM
21   manuals.
22              DR. TAYLOR:  There has been no modifications to those
23   time frames in either the 2014 or the 2015 technical manual.
24              THE COURT:  Good.
25              MR. FATHI:  We believe at a minimum the performance    02:15PM
```

1    measure should be accurately written down.

2            THE COURT:  Well, obviously, when you see things like

3    this in reporting, in the CGARs, things that for most of them

4    don't come before the Court, and you see an issue like this you

5    can raise it and try to make sure that what you think is                02:15PM

6    happening is in accord with what the performance measure says.

7    I think the defendants are entitled to notice about that and it

8    seems as a matter of general principle that you really

9    shouldn't make a unilateral change to the performance measure.

10   But it sounds like it's not even worth the time I have devoted          02:16PM

11   to it because the time periods are the same.

12           MR. BOJANOWSKI:  I'm not quite sure that's correct,

13   Your Honor, but I will check that.

14           THE COURT:  That's why you should do this.  You should

15   check and see if it's worth the candle, and if it is you bring          02:16PM

16   it up.

17           MR. FATHI:  Couple of additional comments, Your Honor.

18   The comment Ms. Kendrick made earlier about the open clinic

19   model and how the fact that only the HNR is only counted when

20   and if the prisoner makes it to the front of the line and               02:16PM

21   presents the HNR and that inflates the compliance figures, that

22   also applies to this one because this measure is about

23   compliance with the time frames once the HNR is submitted.

24           THE COURT:  All right.

25           MR. FATHI:  And finally, given that part of the                  02:16PM

1   corrective action plan is shifting a provider from the Phoenix

2   facility -- that the corrective action plan is shifting a

3   provider from the Phoenix facility to the Yuma facility, again,

4   we have previously expressed our concern about robbing Peter to

5   pay Paul and our view that this is not a permanent or                    02:17PM

6   sustainable solution.

7           THE COURT:  Understood.  All right.  Thank you.

8           MS. KENDRICK:  Your Honor.

9           THE COURT:  Yes.

10          MS. KENDRICK:  We had previously requested when we           02:17PM

11  started down this path that if Mr. Bojanowski does have the

12  scores for all the measures at all the institutions that he

13  provide the ones that are in the pending motion before the

14  Court so that we have a sense of when that briefing is done if

15  there's any that, perhaps, will be not necessarily included.        02:17PM

16          THE COURT:  If Mr. Bojanowski has those handy that

17  would be helpful.

18          MS. KENDRICK:  I can also tell you what they are, Mr.

19  Bojanowski, if you would like so you could --

20          MR. BOJANOWSKI:  Or you can send me an e-mail and I         02:17PM

21  will report it to you.  It's not before the Court.

22          THE COURT:  In the past what we've done is we have

23  listened to it because I think it is relevant to where I'm

24  headed.  I think it would be helpful to do it now if we could.

25          MR. BOJANOWSKI:  If she reads off just the measure and     02:18PM

UNITED STATES DISTRICT COURT

1    the facility.

2         THE COURT:  Good.  Thank you.

3         MS. KENDRICK:  I can do that.  Performance Measure 6,

4    provider orders will be noted daily with time, date, and name

5    of person taking the orders off at Eyman.                    02:18PM

6         MR. BOJANOWSKI:  92 percent.

7         MS. KENDRICK:  Performance Measure 12, medical record

8    will contain documentation of refusals or no shows at Eyman and

9    Florence.

10        MR. BOJANOWSKI:  Eyman, 91 percent; Florence, 97         02:18PM

11   percent.

12        MS. KENDRICK:  Okay.  Performance Measure 15, inmates

13   who refuse prescribed medication or no show will be counseled

14   by a QHCP after three consecutive refusals at Eyman, Florence,

15   Lewis, and Tucson.                                           02:19PM

16        MR. BOJANOWSKI:  Florence, 86 percent.  Did you say

17   Lewis?

18        MS. KENDRICK:  I said Eyman, Florence, Lewis, and

19   Tucson, yes.

20        MR. BOJANOWSKI:  Lewis, 48; Eyman, 27; Tucson, 100.     02:19PM

21   Did I get them all?

22        MS. KENDRICK:  Yes.

23        THE COURT:  Are you in a position to offer any

24   comments with respect to the two that are substantially below

25   compliance?                                                  02:19PM

CV 12-601 - September 12, 2017 - Status Hearing

1    MR. BOJANOWSKI:  I don't have any information on these

2  at this point, so I can't really make any kind of comment.

3    THE COURT:  All right.  Thank you.

4    MS. KENDRICK:  Performance Measure 20, medical AIMS

5  entries are accurately completed within three business days        02:19PM

6  from the entry in the medical record.  And that would be Eyman,

7  Florence, Lewis, Perryville, Phoenix, and Tucson.

8    MR. BOJANOWSKI:  Eyman is at 90 percent; Florence is

9  at 93 percent; Lewis is at 81 percent; Perryville at 93

10  percent.  Did you say Phoenix?                                     02:20PM

11    MS. KENDRICK:  Yes.

12    MR. BOJANOWSKI:  Phoenix at 74 percent; and Tucson at

13  100 percent.

14    MS. KENDRICK:  Thank you.  And then Performance

15  Measure 24, emergency medical response bags are checked daily,     02:20PM

16  inventoried monthly, and contain all required essential items

17  at Lewis prison.

18    MR. BOJANOWSKI:  Lewis is at 88 percent.

19    MS. KENDRICK:  Okay.  Performance Measure 42, a

20  follow-up sick call encounter will occur within the time frame     02:20PM

21  specified by the medical or mental health provider.  And that's

22  at Eyman, Florence, Lewis, and Perryville.

23    MR. BOJANOWSKI:  Eyman is at 41 percent; Florence is

24  at 51 percent; Lewis is at 85 percent; and Perryville is at 87

25  percent.                                                           02:21PM

1        MS. KENDRICK:  Okay.  Then Performance Measure 49,

2    patients for whom a provider's request for specialty services

3    is denied are told of the denial by a medical provider at the

4    patient's next scheduled appointment no more than 30 days after

5    the denial, and the provider documents in the patient's medical       02:21PM

6    record the provider's follow-up to the denial.  And the motion

7    covers Douglas, Eyman, Florence, Perryville, Phoenix, and

8    Tucson.

9        MR. BOJANOWSKI:  Douglas at is 100 percent; Eyman is

10   at 30 percent; Florence is at 80 percent; Perryville -- did you       02:21PM

11   say Perryville?

12       MS. KENDRICK:  Yes.

13       MR. BOJANOWSKI:  Perryville is at 100 percent; Phoenix

14   is at 100 percent; and Tucson is at 15 percent.

15       MS. KENDRICK:  Okay.  Performance Measure 50, which is       02:22PM

16   urgent specialty consultations and urgent specialty diagnostic

17   services will be scheduled and completed within 30 calendar

18   days of the consultation being requested by the provider.  And

19   this is at Perryville.

20       MR. BOJANOWSKI:  Perryville is at 93 percent.       02:22PM

21       MS. KENDRICK:  And then Performance Measure 51, which

22   is routine specialty consultations will be scheduled and

23   completed within 60 calendar days of the consultation being

24   requested by the provider.  This is at Douglas, Perryville, and

25   Yuma.       02:22PM

CV 12-601 - September 12, 2017 - Status Hearing

1     MR. BOJANOWSKI:  Douglas is at 93 percent; Perryville

2  is at 100 percent; Yuma is at 89 percent.

3     MS. KENDRICK:  I think you actually already gave us

4  the score for the next one on Performance Measure 52.

5     So Performance Measure 55, which is disease management

6  guidelines will be implemented for chronic diseases.  That's at

7  Eyman prison.

8     MR. BOJANOWSKI:  68 percent.

9     THE COURT:  And Performance Measure 67, in an IPC

10  registered nurses will conduct and document an assessment at

11  least once every shift.  Graveyard shift assessments can be

12  welfare checks.  This was for Lewis IPC.

13     MR. BOJANOWSKI:  70 percent.

14     MS. KENDRICK:  Performance Measure 72, which is

15  inmates who refused prescribed diets for more than three

16  consecutive days will receive follow-up nutritional counseling

17  by a QHCP.  That's at Eyman.

18     MR. BOJANOWSKI:  100 percent.

19     MS. KENDRICK:  Performance Measure 91, which is mental

20  health MH-5 prisoners who are actively psychotic or actively

21  suicidal shall be seen by a mental health clinician or mental

22  health provider daily.  And that's at Phoenix.

23     MR. BOJANOWSKI:  80 percent.

24     MS. KENDRICK:  Performance Measure 94, which you may

25  have already -- okay.  So that -- Performance Measure 94 is

02:23PM
02:23PM
02:23PM
02:24PM
02:24PM

1    about the suicide watch and the measure -- the motion covers

2    Phoenix and Yuma.  And you provided us the Phoenix number but

3    not the Yuma number.

4            MR. BOJANOWSKI:  87 percent.

5            MS. KENDRICK:  Then Performance Measure 97, a mental          02:25PM

6    health provider treating a prisoner via telepsychiatry shall be

7    provided in advance of the telepsychiatry session the

8    prisoner's intake assessment, most recent mental health

9    treatment plan, laboratory reports, if applicable, physician

10   orders, problem list, and progress notes from the prisoners to    02:25PM

11   most recent contacts with a mental health provider.  And that

12   was for Phoenix.

13           MR. BOJANOWSKI:  89 percent.

14           MS. KENDRICK:  And then the last one you already gave

15   us.  It was for Performance Measure 98 at Douglas.               02:25PM

16           MR. BOJANOWSKI:  At Douglas?

17           MS. KENDRICK:  Yeah.  You gave us that number already.

18           MR. BOJANOWSKI:  100 percent.

19           MS. KENDRICK:  Thank you, Mr. Bojanowski.

20           THE COURT:  And were these the combined inquiry about       02:25PM

21   those performance measures subject to a motion to enforce the

22   stipulation as well as notice of non-compliance or just one or

23   the other?

24           MS. KENDRICK:  This was just for the motion that was

25   filed with the Court on August 28th at Docket 2253.  We do have   02:26PM

CV 12-601 - September 12, 2017 - Status Hearing

 1   a pending notice of non-compliance that we served on defendants

 2   on August 28th as well, so we are waiting for their response

 3   within the 30 days as set out in the stipulation.

 4        THE COURT:  And with respect to the motion to enforce,

 5   I wonder if anything you have heard now would cause you to want      02:26PM

 6   to refine that and decide that, perhaps, the Court's focus

 7   shouldn't be on those.

 8        MS. KENDRICK:  I think we would have to look at it

 9   closer because I'm writing these down.

10        THE COURT:  I don't mean to say that you should do so           02:26PM

11   now, but I wonder if maybe the first of next week or something

12   you could let us know by a notice of saying if there are any

13   that you think that in light of this information don't need to

14   move forward in that part of the process, that we'll take that

15   information from you.  If you want to stand pat, let us know         02:26PM

16   that, too.  Is that all right?

17        MS. KENDRICK:  Sure.  That's fine.  I guess it does

18   raise kind of a broader question, though, Your Honor, because

19   all of these measures that are in the notice defendants have

20   conceded are substantially non-compliant using the definition      02:27PM

21   in the stipulation and the one that the Court issued in Docket

22   2030.  So in that sense, they are substantially non-compliant.

23   They are what they are.  I guess the question is, if the Court

24   just wants things that are more current to be in a motion to

25   have a formal finding so how --                                     02:27PM

1    THE COURT:  Well, here's what I was thinking.  Having

2    us devote our resources to the most vital areas to address, the

3    ones that are continuing to sort of be inflamed rather than

4    ones that may look like, perhaps, you made a judgment call this

5    one was on the cusp and we're going to go ahead and pursue it          02:27PM

6    but then you see a subsequent month and you think, all right.

7    Maybe it's not worth pursuing this one so that we can make sure

8    the resources of everyone involved are devoted against the ones

9    that continue to be real problems.  That's all I was wondering.

10   MS. KENDRICK:  So one thing, as an initial matter, a          02:28PM

11   couple times Mr. Bojanowski did reveal the preliminary August

12   numbers.  So I think to the extent they have August CGAR

13   numbers for those measures that would also be helpful to us as

14   well, because otherwise given the 45-day lag, we're not going

15   to see an August CGAR until the middle of October.  But he was          02:28PM

16   able to give the Court some preliminary numbers from August

17   CGARs 10 days into the month of September.  So if they are

18   capable of doing that, I think that would also be incredibly

19   helpful for us before making that decision because

20   unfortunately, what we have seen, and I think you can see it          02:29PM

21   when you look at the charts, is this is a bit of a feeling of a

22   game of whack-a-mole.  So there's some measures where it's just

23   a sea of yellow, non-compliance when you look at the charts and

24   there's others where it goes up and down.  So our hesitation of

25   taking things off the table, so to speak, and taking the          02:29PM

CV 12-601 - September 12, 2017 - Status Hearing

1   Court's attention and our attention off of it is that because

2   there's not that focus on them, because they looked nice for

3   the last two or three months, then suddenly they plummet.  And

4   we don't want to have to restart the process and bring another

5   motion to the Court.  That is what we are struggling with.    02:29PM

6         THE COURT:  I was really thinking out loud a thought

7   that occurred to me that maybe could have made sense, but in

8   light of what you said, I'm not going to interfere with the

9   method that you decided to proceed.  If you want to bring

10  something to my attention to change that, under the rules you   02:30PM

11  certainly can.  Otherwise I won't importune you to do anything

12  more than what you have already done.

13        MS. KENDRICK:  Thank you.  No, but I think this was a

14  helpful conversation to have.

15        THE COURT:  Thank you.  I'd like to next address the     02:30PM

16  state of affairs with respect to Mr. Millar and the expert.

17  Does anybody feel -- or maybe both sides can give me an update

18  on where things stand.  Last time we talked about it I had

19  arranged for information to be provided, and I haven't checked

20  in to see whether that information has been provided, whether   02:30PM

21  there have been follow-up questions or where things stand.

22        MS. KENDRICK:  Yes, Your Honor.  So my colleague,

23  Alison Hardy, has been the one that's been in contact with Mr.

24  Millar.  And my understanding from her is our office did

25  provide the information that you had suggested that we send to  02:31PM

CV 12-601 - September 12, 2017 - Status Hearing

1    him.  And as far as I know, we have not heard back from him

2    since providing him that information.  I think it was about a

3    week or two ago.

4         THE COURT:  Okay.  And did the defendants provide any

5    information on their side to him?                              02:31PM

6         MR. STRUCK:  No, Your Honor.  It's my recollection

7    that the Court asked the plaintiffs to provide the information.

8         THE COURT:  I think I said what they should do is send

9    it off to him, copy to you, and then if there was anything that

10   you thought should be added, that you have the opportunity to   02:31PM

11   do that.

12        MR. STRUCK:  I'd have to go -- I don't know that I was

13   copied on the information with respect to what Ms. Hardy

14   provided Mr. Millar.  So I will have to take a look at that.

15        MS. KENDRICK:  It was our admin staff, and they sent     02:31PM

16   it in a giant Dropbox file.  So I can confirm whether or not

17   the Struck Wieneke firm was copied on it.  I assume that's our

18   general practice to do so.

19        THE COURT:  Double check, and if it wasn't, do so.

20        And then what I would do, what I will do, is I will      02:32PM

21   send a letter and e-mail it to Mr. Millar, copy to you all,

22   asking him whether he has what he needs and where he stands

23   with respect to getting back to the Court regarding his scope

24   of work and budget.  Okay?

25        MS. KENDRICK:  Sounds good.                              02:32PM

1      THE COURT:  On the plaintiffs' agenda next we have the

2   temperature logs.  And I have looked at the declaration that

3   Mr. Fathi has submitted, and I have looked at the 300 some

4   pages attached to that.  And a couple of initial observations:

5   It seems to lack, as Mr. Fathi points out in a number of          02:32PM

6   instances, an internal integrity that would suggest that it's

7   information that can be relied on both with respect to what is

8   not there and, in some cases, what is there and, in one

9   particular case where it looks like data was inputted for dates

10  in time that followed the production of the documents.  So      02:33PM

11  maybe you all, two sides here, the plaintiffs and defendants,

12  have had a chance to discuss this in the interim from when what

13  has been filed and what I have reviewed, and maybe there's an

14  update about this.  But it is a subject that I do think we need

15  to address.                                                       02:33PM

16      Has there been any further discussion, Mr. Fathi?  Is

17  it Ms. Rand who is on this topic?

18      MR. FATHI:  I don't know, Your Honor.  We have not

19  heard from the defendants since filing that declaration Friday.

20      THE COURT:  And who would be responding?                      02:33PM

21      MS. RAND:  Your Honor, plaintiff has not attempted to

22  contact us about this.  The only time they actually asked us

23  anything was in an e-mail that is attached to Mr. Fathi's

24  declaration.  So no, the plaintiffs have not tried to contact

25  us to work this out.                                              02:34PM

CV 12-601 - September 12, 2017 - Status Hearing

1      THE COURT:  All right.  And you read the pleading, not

2    the pleading, but the document that Mr. Fathi filed with his

3    affidavit with the attachment?

4      MS. RAND:  Yes, I have.

5      THE COURT:  Okay.  Can we address those issues that he    02:34PM

6    raised therein today?

7      MS. RAND:  Yes, we can.

8      THE COURT:  Okay.

9      I'm sorry.  You are cutting out.  What did you last

10   say?                                                       02:34PM

11     MS. RAND:  I said would you like me to -- well, do you

12   want to direct how we go about this or did you want me to just

13   start down the list?

14     THE COURT:  Well, you can start down the list.

15     MS. RAND:  Okay.  According to Mr. Fathi's list here,    02:34PM

16   he's saying that there are missing temperature readings.  From

17   what I have been told by the ADC, their policy is that they

18   don't have to take temperature readings when the temperatures

19   are of a certain level.  So Mr. Fathi, although the Court

20   ordered us to produce readings from all of the facilities     02:35PM

21   starting on June 1st, a lot of the facilities did not have

22   actual temperature readings because they weren't required to

23   take them when the temperature is of a certain level.  And so

24   Mr. Fathi's first objection is that there are a lot of missing

25   temperatures.                                               02:35PM

1        Not only that but he also, from what I understand,

2    this temperature reading is related to the inmate's ability --

3    to their sensitivity to taking psychotropic medications and

4    sensitivity to heat.  Mr. Fathi is insisting we take

5    temperatures outdoors where the inmates are not housed, things        02:36PM

6    like that.  So I'm a little bit baffled as to what exactly --

7    why Mr. Fathi is claiming we have to take outdoor temperatures

8    as well as indoor temperatures, et cetera.  So does Mr. Fathi

9    have anything to say about that?

10        THE COURT:  Well, I have something to say about that.        02:36PM

11    The first is the requirement that you say that the Department

12    doesn't have to take temperatures unless it meets a certain

13    temperature, is that a written requirement that is someplace?

14    Is it a regulation or a rule?

15        MS. RAND:  From what I understand is it's not a        02:36PM

16    written policy, no.  No.  It's not written in the policy, but

17    it's a general requirement that if it's over 100 or over that

18    they take temperatures because, obviously, if it's a certain

19    temperature, there's no need to take temperatures.  So I'm

20    going to give you an example, like if it was -- let's say        02:37PM

21    Douglas, I believe, which is at a higher elevation or Winslow

22    which is at a higher elevation, they don't have the searing

23    high temperatures.

24        THE COURT:  Boy, that's not what I saw.  I saw searing

25    temperatures in Douglas.  In fact, it surprised me.  Let me ask        02:37PM

CV 12-601 - September 12, 2017 - Status Hearing

1   you this in particular.  You mentioned 100 degrees but then at

2   other times you seem to not know what the threshold is.  Do you

3   know what the threshold is?

4        MS. RAND:  Are you talking about me?  If I know the

5   threshold for what?                                          02:37PM

6        THE COURT:  Yes.  Do you, as a lawyer for the

7   Department of Corrections, know what this threshold is that you

8   say triggers the obligation to comply this unwritten policy?

9        MS. RAND:  I was told it was 100 degrees or more.

10       THE COURT:  So the policy is that if the outside        02:37PM

11   temperature is 100 degrees or more, that triggers an obligation

12   to conduct the temperature checks that are reflected in the

13   sheets that you provided to us for the various institutions.

14   Is that correct?

15       MS. RAND:  I'm not -- apparently I didn't get the full  02:38PM

16   information, because I didn't distinguish between indoor and

17   outdoor temperatures.  I can't tell you whether it was based on

18   outdoor temperatures.  I was told when the temperature gets to

19   be 100 degrees or more, according to the DOC's policy they are

20   to start taking the temperatures.  So they take the temperature 02:38PM

21   to determine whether it's 100 degrees or more, but they don't

22   record it anywhere if it's not.

23       THE COURT:  So you are saying that -- the next

24   question that I had is answered by the idea that they do check

25   to see if the temperature is, outside, above 100 degrees and if 02:38PM

CV 12-601 - September 12, 2017 - Status Hearing

1    it is then they take the internal temperature.  If not, they

2    don't.  But they don't record anywhere the outside temperature

3    so that people like me who are interested in this subject can

4    check to see whether or not they are complying with your

5    unwritten policy?                                           02:39PM

6            MS. RAND:  Again, I can't distinguish between where

7    the temperatures are taken indoors or outdoors because I have

8    been only told the temperature is taken and if it's 100 degrees

9    or more they continue to take temperature reading and record

10   them.  I didn't distinguish indoors or outdoors.  It just said  02:39PM

11   100 degrees or more.

12           THE COURT:  The problem that I have is that the

13   stipulation says that if people are suffering a heat

14   intolerance associated with their psychotropic medicine and

15   other methods aren't able to address that, they cannot be     02:39PM

16   confined in a place where it's greater than 86 degrees.  And

17   the way that I would test that is to know whether or not the

18   facility housing units have a temperature greater than 86

19   degrees so that I know that I have a risk or not of having

20   people who are placed in that situation.                     02:40PM

21           And so if you don't provide for me some firm method to

22   evaluate whether this requirement has been satisfied, making

23   sure that the places where such people would live do not exceed

24   86 degrees, then I have a real problem.  And I'm really very

25   flummoxed by the idea here that somebody could think that they  02:40PM

1    could be in compliance with this performance measure by keeping

2    a log of temperatures that doesn't tell you when the policy,

3    this unwritten policy, is triggered and what the temperatures

4    are.  When you look at the documents where you have in the same

5    facility empty boxes and filled boxes, it would make one think                 02:41PM

6    that if there is a satisfaction of the 100-degree threshold, if

7    that's the right one, there's something wrong with the data.

8          And I have to say these 300 pages just wreak of

9    something wrong with the data.  And it's not just the places

10   where you say it's 300 degrees because somebody thought it was                  02:41PM

11   somehow okay to write down 300 degrees and hand that in as

12   being their official report when any conscious person would

13   understand that that can't possibly be true.

14         So what you need to do is you need to get a better

15   handle on this data and that you need to figure out whether                     02:41PM

16   what you said is true, and that is whether or not this

17   100-degree trigger is really what the unwritten policy requires

18   and then you need to communicate to people that you cannot have

19   a compliance system that relies upon temperature measures that

20   are invoked without telling the -- or without recording so that                02:42PM

21   the evaluator can determine whether or not you failed to comply

22   with the ascertainment of the measures even under your policy.

23         I don't know whether a temperature of 100 degrees is

24   the appropriate trigger.  I simply don't know whether the

25   ambient temperature at a facility outside of 95 degrees could                   02:42PM

1    produce a temperature in excess of 86.  So I don't know whether

2    there's a good reason for your 100-degree threshold.  But it

3    seems to me the best way to know whether or not this measure is

4    complied with is to have, at the very least, some kind of data

5    reporting that gives the evaluator a greater comfort that you            02:43PM

6    actually can accurately report what the temperatures are in the

7    places I am concerned about.  And that is where the inmates

8    will be if they have a heat in tolerance illness that cannot be

9    addressed by some other needs.

10            MS. RAND:  Okay.  Your Honor, may I also speak when           02:43PM

11    you are finished?

12            THE COURT:  Go ahead.

13            MS. RAND:  One of the issues here is that the people

14    that have heat intolerance also have to say that they have heat

15    intolerance.  So if there's nobody reporting heat intolerance       02:43PM

16    then it doesn't make sense that they are recording all of these

17    temperatures just on the hope that somebody would have or the

18    chance that somebody would have a heat intolerance.  A lot of

19    these facilities also don't have people that suffer from heat

20    intolerance, meaning they don't have people that are on              02:44PM

21    psychotropic medications.  There's a lot of outlying facilities

22    where everybody is at work during the day.  They are already

23    outdoors in the heat themselves doing whatever it is they are

24    doing, fighting fires, things like that.  They are not even in

25    the buildings.  The buildings clear out at different                 02:44PM

 1   facilities.  They clear out.  Inmates are not even in the

 2   facilities.  So it seems to me that those facilities don't

 3   necessarily have to have temperatures taken all the time

 4   because the inmates aren't even in the buildings.  And also

 5   some of the --                                               02:44PM

 6       THE COURT:  You said if there's nobody reporting heat

 7   intolerance.  Do you know that that is true, that there are

 8   facilities where nobody is reporting heat intolerance?  Do you

 9   know that's true.

10       MS. RAND:  I will pull up the heat intolerance log.      02:44PM

11   We have been producing the heat intolerance log and there's not

12   people from every single facility reporting heat intolerance.

13       THE COURT:  So the logs also report people who have

14   been treated for heat illnesses?

15       MS. RAND:  Right.  What they are saying is the people    02:45PM

16   that have reported any kind of, I guess, what they consider

17   heat intolerance and then they investigate it to find out

18   whether it actually is a heat intolerance related to

19   psychotropic medication, we have had people before that said I

20   was hot.  Plaintiffs said they were hot, they were suffering a 02:45PM

21   heat intolerance, when the person was saying I'm hot when I

22   stand outdoors in the sun.  And, yes, everybody would be hot

23   when they stand outdoors in the summertime.  It's not

24   necessarily a heat intolerance.  It just means you are getting

25   hot.  So the intolerance -- I'm trying to find the log, pardon  02:45PM

CV 12-601 - September 12, 2017 - Status Hearing

1    me, while I speak.

2         THE COURT:  I mean, surely everybody in Arizona who is

3    outside is hot.  And, in fact, some people who are in Arizona

4    inside healthcare facilities at a prison complex between here

5    and Gila Bend is hot.  So it is hot.  But I can sweat and so      02:46PM

6    when I sweated in that clinic that I have talked to you all

7    about before, I was cooling.  But people who are on

8    psychotropic medicines have a reduced ability to sweat, so they

9    can cook, rather than relieve heat.  So even though my hearing

10   aids were destroyed I was cooling myself, so I can do that.       02:46PM

11   But these people can't.  So just sort of saying everybody is

12   hot doesn't address the issue when somebody is presenting with

13   a heat illness.

14        And so I gather rather than having me further opine

15   about what is just logical problems with this, I first learned    02:46PM

16   about it in the settlement conference when I dealt with counsel

17   for the defendants and the plaintiffs about the topic and we

18   discussed it at length and I learned much more about it.  I

19   will turn to Mr. Fathi now and ask him about these heat logs

20   that are supposed to be produced with respect -- or at least      02:47PM

21   what Ms. Rand's represented are produced with respect to sort

22   of the triggering event about whether a particular facility

23   needs to be subject to this greater concern about temperatures.

24        MR. STRUCK:  Your Honor, would it be helpful if you

25   have Dr. Taylor explain how they track the heat intolerance of    02:47PM

1    individual inmates?

2         THE COURT:  Let me give Mr. Fathi a shot to go first

3    then we'll turn to Dr. Taylor.

4         MR. FATHI:  Your Honor, when we were here on June 14th

5    the National Weather Service had issued a warning for a          02:47PM

6    potentially deadly heat wave for the following week.  And we

7    raised our concerns about our clients, particularly those on

8    psychotropic medications.  And the defendants told us, don't

9    worry.  We're monitoring the situation.  Everything is fine.

10   Well, we now know that's not true.  We know at that at a large   02:48PM

11   number of facilities they weren't even taking the temperatures

12   even during that record heat wave in the third week of June.

13   If you look at Paragraph 9 of my declaration, Document 2291, it

14   lists all the facilities where no temperatures were taken

15   during that period.  And it's a long list.  It includes         02:48PM

16   Browning Unit, which is a maximum security unit where prisoners

17   are locked in their cell sometimes 24 hours a day.  It includes

18   Florence North Unit where prisoners live in tents.  It includes

19   Phoenix Baker Unit which is an in-patient health facility where

20   all or virtually all the prisoners are on psychotropic          02:48PM

21   medications.  It's shocking that no temperatures were being

22   taken during a record heat wave that the National Weather

23   Service had warned was potentially lethal.

24         As for Ms. Rand's allegation that there aren't people

25   on psychotropic meds at certain facilities, we went through     02:49PM

1    this last month.  That's not true.  According to the documents

2    produced to us by defendants, all 10 facilities have people on

3    psychotropic medications.  As for the suggestion that we should

4    wait for someone to manifest heat illness before we take the

5    temperatures, that's just absurd.  We have heard testimony          02:49PM

6    about -- from Deputy Warden Twyford, among others, about

7    remedial measures that are supposed to be implemented when the

8    temperature reaches 86 degrees.  How can those remedial

9    measures be implemented if nobody is taking the temperature?

10          And, as the Court said, the defendants can't possibly        02:49PM

11   comply with the stipulation's requirement to keep people on

12   psychotropic meds suffering from a heat intolerance reaction

13   where nothing else has abated that reaction, they can't

14   possibly comply with the requirement to keep them someplace

15   under 85 degrees, again, if they don't take the temperatures.       02:50PM

16          So we would ask the defendants be ordered to take

17   daily temperature readings throughout the day at every unit

18   housing prisoners on psychotropic medications.  Now, there's

19   probably some seasonal limit that could be placed on that.  I

20   would defer to the Court as a native Arizonan as to what months     02:50PM

21   it makes sense to require that.  But that is an absolute

22   requirement of basic health, safety, and compliance with the

23   stipulation.

24          THE COURT:  Well, the former part of what you just

25   said, an absolute requirement of basic health and safety, is a      02:50PM

1    different question.  The question I have to be focused on is

2    whether or not there's a violation of the stipulation.  And the

3    stipulation does have triggering aspects with respect to

4    whether the temperature becomes relevant, doesn't it?

5         MR. FATHI:  Well, the requirement to house someone in          02:51PM

6    85 degrees or cooler does, yes, it does have triggering

7    requirements.  But my point is, you can't wait until someone

8    gets sick to even start taking the temperatures.  That's just

9    not a practical way to go about it.  We need to know what the

10   temperatures are so that we know if there's a place that you          02:51PM

11   can put someone that's cooler than 85 degrees.

12        THE COURT:  Well, let me give you a hypothetical.

13   Someone presents to the health clinic of the prison and

14   exhibits signs of heat intolerance and the care provider says

15   we have a case of heat intolerance.  Go check and see if his or      02:51PM

16   her cell is 86 degrees or above.  And then the person comes

17   back after having checked and says it's 83 degrees.  Then at

18   that moment, it would seem that there would be compliance with

19   the stipulation.

20        You would then have a continuing obligation with              02:52PM

21   respect to that person's cell to find out whether at 10:00 at

22   night the temperature was above 85, whether it's 6 in the

23   morning, you would have to have some regularized basis, I

24   think, common sense, to make sure the temperature doesn't ever

25   go above that.                                                       02:52PM

1      But with respect to the cell next door it wouldn't

2  matter whether the temperature was 87 degrees if there was not

3  somebody housed there who had presented and been diagnosed and

4  treated without success for heat illness under the stipulation.

5      MR. FATHI:  Well, Your Honor, two responses to that:          02:52PM

6  First of all, given the temperature data we have seen with

7  missing data, with obviously incorrect data, with fabricated

8  data that was made up in advance, we have very little

9  confidence in the ability of the State to engage in that kind

10  of targeted time-sensitive proactive work that you describe.        02:53PM

11  We think it is much more practical, much more likely to happen

12  in the real world if those temperatures are simply taken as a

13  matter of course in any housing area where people who are

14  potentially subject to this performance measure are housed

15  during the hot season of the year.                                  02:53PM

16      The second measure, if I could propose a counter

17  hypothetical, let's say the person on psychotropic medications

18  suffers a heat intolerance reaction and the temperature in

19  their cell turns out to be 90 degrees and they are not -- they

20  haven't been taking temperatures in the facility.  They don't       02:54PM

21  know what the temperatures are.  What are they going to do with

22  that person?

23      THE COURT:  Well, not put them back in their cell.  Do

24  what they do with the pregnant women at Perryville and put them

25  in the air-conditioned rec room.                                    02:54PM

1          MR. FATHI:  Again, Your Honor, if they are not taking

2     the temperatures, how do they know?

3          THE COURT:  There is an obligation to take the

4     temperature.  And you would not be in compliance with this

5     performance measure if you had somebody who presented with a          02:54PM

6     heat intolerance disorder that could not be treated by some

7     other means, and if it turned out that their cell was above 86

8     degrees.  So you would have to have, in that record, some

9     determination about that record to believe that that person's

10    cell was not at 86 or above.  So you would have to have that.          02:54PM

11         And I guess I will go back to the question I asked

12    before, and that is about this log about people who have been

13    determined have to heat intolerance, Ms. Rand says there are

14    places where nobody in the facility has been diagnosed.

15         MR. FATHI:  I don't honestly know if that's true, Your          02:55PM

16    Honor.  What we do know is that all 10 facilities have people

17    on psychotropic medications who are at risk of having a heat

18    intolerance reaction.  Now, whether at all 10 facilities the

19    defendants have actually recognized that, I honestly don't know

20    the answer to that question.          02:55PM

21         THE COURT:  And this log, you have been receiving it,

22    about this heat intolerance log?

23         MR. FATHI:  We have, Your Honor.  What we would also

24    like to receive, however, is the list of all prisoners, all

25    patients who have been transferred to a setting lower than 85          02:55PM

1    degrees pursuant to the requirements of the stipulation.

2    Because that will allow us to see if the kind of interventions

3    that you are proposing could happen are actually done in the

4    real world.

5             THE COURT:  And these logs --                           02:55PM

6             MS. RAND:  That sounds really undoable, Your Honor,

7    that we could locate every single location in the prison system

8    that's 86 degrees on a specific date for who or who was not

9    transferred to those locations in the 10 different prison

10   complexes.  I don't see a futility in doing that as well, but   02:56PM

11   that's an impossibility.

12            THE COURT:  That's not what he said.  He said he

13   wanted to see a record of people who were transferred to a

14   different place because of the fact that their cell was too

15   hot.  Is that right, Mr. Fathi?                                 02:56PM

16            MR. FATHI:  Correct, Your Honor.

17            THE COURT:  That's a different thing.

18            MS. RAND:  And we produced the log to him and it's a

19   very, very short list.  We produced that log.

20            MR. FATHI:  If I could be clear, Your Honor, that's    02:56PM

21   not the same document.  The logs they produced are people who

22   have reported a heat intolerance reaction.  They haven't

23   produced records of people who have actually been transferred

24   pursuant to the requirements of the stipulation.  It may be

25   that based on what we're hearing they have never done that.  If 02:56PM

1    that's the case, we would like to know that.  But if they have

2    been complying with the stipulation by transferring people in

3    appropriate cases to places where it's cooler than 85 degrees

4    we would like that list.  And it certainly seems if this is as

5    small a number as Ms. Rand represents, it certainly seems like          02:57PM

6    an easy thing to produce.

7            MR. STRUCK:  Your Honor, I believe the heat

8    intolerance log that we provide to them has in the notes if

9    someone has to be transferred to a cell that's a lower

10   temperature.  That's already included in the log.  So that              02:57PM

11   information has already been provided to plaintiffs.  And we

12   agree with the Court's interpretation of the stipulation with

13   respect to this particular issue.  There has to be a prisoner

14   who is taking psychotropic medication who actually suffers a

15   heat intolerance reaction, and then the Department is supposed          02:57PM

16   to take all reasonable available steps to prevent heat injury

17   or illness.  And if all steps have failed to abate the heat

18   intolerance reaction, at that point they would be transferred

19   to a housing area where the cell temperature does not exceed 85

20   degrees Farenheit.                                                      02:58PM

21           THE COURT:  Mr. Fathi, if you wouldn't mind taking a

22   look at the transcript from the last hearing when the heat

23   emergency issue was discussed, you said that the defendant said

24   they would check the temperatures in every place.  Could you

25   give me the citation?                                                   02:58PM

1          MR. FATHI:  Excuse me, Your Honor.  I didn't say they

2     specifically said they would check the temperatures.  They told

3     us not to worry, they were on top of the situation, words to

4     that effect.  If I said that they specifically --

5          THE COURT:  No.  I just wanted to understand better      02:58PM

6     what you were saying had been said.

7          MR. FATHI:  Your Honor, there's no disagreement, I

8     don't think, about what the stipulation requires.  I think the

9     disagreement is whether it is possible or likely that the

10     defendants will be able to comply with it if they are not      02:58PM

11     taking any temperatures even during a 120-degree heat wave as

12     occurred in June.

13          THE COURT:  I don't think it's likely.  But let's say

14     at Eyman there's nobody who has been treated for heat

15     intolerance, even though you are about to tell me that's not    02:59PM

16     true.

17          MR. FATHI:  No.  Different document.

18          THE COURT:  Let's just say if there's nobody at Eyman

19     who has been treated for heat intolerance then where do I have

20     the power to require anybody to take the temperature?          02:59PM

21          MR. FATHI:  Well, because we don't -- this is not a

22     damages case, Your Honor, where we need to wait until someone's

23     been injured or killed before the Court has --

24          THE COURT:  No, but I can't require them, I mean, I

25     can't find them to be not in compliance until I have a report   02:59PM

1    that there has, through the monitoring practices, been an

2    identified non-compliance.  And so this issue of the heat is

3    one that is reasonable to talk about in general sense about

4    whether or not it's humane or right to have people in extreme

5    temperatures exposed to those extreme temperatures.                    03:00PM

6            But that's not the charge that I have been given.  The

7    charge I have been given is to look at this performance

8    measure, and the performance measure says that before I have to

9    be talking to the defendants about what the temperatures are, I

10   have to have some inmate who didn't get what the stipulation        03:00PM

11   promised, and that is a presentment with a heat intolerance

12   that cannot be treated through another means and then a

13   placement in a place where the temperature is too hot.

14           Now, I agree with you that if the first two criteria

15   are satisfied I would want to be able to know what the               03:00PM

16   temperature was.  That would be part of determining whether

17   there was compliance or not.  So if the first two steps are

18   satisfied then you need to tell me what the temperature is.

19   But if the first two steps are not satisfied, if somebody has a

20   heat intolerance that has been addressed by other means,            03:01PM

21   changing the drug, for example, then I don't need to know what

22   the temperature is under the terms of the stipulation.  It may

23   be right or of interest for the citizens of Arizona to know

24   what their fellow citizens who are incarcerated are enduring in

25   the summers.  That may be a reasonable thing.  But it's not          03:01PM

1    what I am to look at.

2            So think about this as we take a 15-minute break.

3    We'll come back and pick up the subject again.  Thank you.

4            (Recess from 3:01 p.m. until 3:15 p.m.)

5            THE COURT:  We're turning to the topic of the heat          03:15PM

6    intolerance.  Couple of things I will say before I give you a

7    chance to say whatever else you want to say.  In reflecting, it

8    is obvious to me that it is the 12th of September, and that for

9    the current period we have, perhaps, hopefully, reached a

10   point where the continued danger for the next several months          03:16PM

11   will not exist because it will be fall, winter, and spring.

12   That said, there will come a time where this will be an issue

13   again, and I will not be so slow to spool up on it because of a

14   couple of things that have happened here.  And that is that I

15   have seen real problems with respect to how the State has          03:16PM

16   reported its data.  And so I have a real suspicion about that

17   and so that I can put everybody on notice that the tendering of

18   these kinds of numbers completely reaffirms what I said earlier

19   today that the State needs to up its game with respect to how

20   it provides information, I just -- this kind of reporting of          03:17PM

21   numbers that can't possibly be true and the possibility the

22   dates obviously suggest that they were not created when they

23   said they were created, whether it was with intent or not or

24   whether it's an accident or it's a typo, these kinds of things

25   just erode the credibility of what's reported and cause me to          03:17PM

1    think that I have to look to secondary measures to assure that

2    the stipulation is complied with.

3            And so returning to what was the theme right before

4    the break that I was articulating, it is my view that, my

5    power, to address that recordation of temperature necessarily          03:18PM

6    requires that temperature is relevant at a particular facility.

7    And if there is no one in that facility who is, in the words of

8    the stipulation, taking psychotropic medication and suffers a

9    heat intolerance reaction, if there's nobody who has done that

10   then I think that I don't go down the road of addressing the          03:18PM

11   temperature issue.

12           Now, I don't know that it's necessarily true that

13   everybody who suffered a heat intolerance reaction would have

14   that charted.  But I think that the stipulation doesn't require

15   that those magic words be used.  If there is somebody who has          03:18PM

16   fainted and they have been rehydrated in a cooled medical

17   facility, it would be possible for someone to look at that

18   chart and to argue that this was actually a heat intolerance

19   reaction that wasn't recognized, and then we would want to look

20   at what steps were taken to see whether or not there was              03:19PM

21   compliance.  And if those other available steps were not --

22   failed to abate the heat intolerance reaction, then the

23   prisoner will be transferred to a housing area where the cell

24   temperature does not exceed 85 degrees.  At that point then I

25   have the power and desire to know what the temperatures are.          03:19PM

CV 12-601 - September 12, 2017 - Status Hearing

1          And so in this time period between now and when the

2     weather turns warm again, I think both sides can be

3     anticipating that this argument will be one that will likely be

4     present for us, and that that means that the State should have

5     all of its ducks in a row with respect to making sure that it's     03:19PM

6     reporting information that it is accurate, that it is

7     internally consistent and not subject to any obvious attack.

8          At the same time, the plaintiffs can be further -- I

9     mean, I think I have asked this question before, Mr. Fathi,

10    about whether or not people who are taking psychotropic                03:20PM

11    medicines are warned about this so that they know that they

12    have this potential vulnerability and so that they can express

13    the right words that would maybe inform an uninformed

14    healthcare provider who didn't maybe know about the heat

15    intolerance issue that they are suffering that.  Of course, you     03:20PM

16    would prefer and would think that people would recognize that

17    as a fact when looking at a chart and seeing a psychotropic

18    medicine being administered and then seeing somebody who is

19    presenting with the kinds of symptoms that would be associated

20    with a heat intolerance reaction.  But I have been told, I        03:21PM

21    believe, in the past that this is something that's being

22    communicated to people about their vulnerability so they can be

23    sensitive to it so they can take some role in making sure that

24    the these issues are addressed.

25          Then the last thing that I would say is that the              03:21PM

1    outside temperatures matter because the staging areas for the

2    healthcare facilities are outside in many cases, and so there's

3    no opportunity for people to escape the heat.  So when we have

4    heard about people fainting in the line, one could maybe think

5    that was a heat intolerance reaction and that it's relevant as        03:21PM

6    to whether or not the temperatures in the yard, in the

7    detention areas, their cells, their areas, are at a temperature

8    that does not expose them to a risk.

9            But I think that the stipulation gives me the power to

10   look into those temperatures if I know that there's somebody         03:22PM

11   there who is at risk.  Ms. Rand has told me there are places

12   where there are no people at risk so that I don't need to go

13   down that temperature road.  Whether that's true or not can be

14   verified by looking at these logs, perhaps, but also by taking

15   a look at the charts to see whether the logs have missed           03:22PM

16   something.  That's, again, part of what can be done to identify

17   this potential problem.

18           MS. RAND:  Your Honor, can I make one more comment,

19   please?

20           THE COURT:  You may.                                          03:22PM

21           MS. RAND:  Okay.  Going down the list of temperature

22   logs that Mr. Fathi provided, I wanted to make note that Lewis

23   Eagle Point and Lewis Sunrise the temperature logs were not

24   produced because those facilities are cooled by air

25   conditioners and so the ADC did not take temperature logs for       03:22PM

1    that area.  For the special management area, that area no

2    longer exists as a separate area and was incorporated in one of

3    the logs already produced.  The same as what I believe the --

4            THE COURT:  Hold it, Ms. Rand.  We lost you.  We

5    weren't able to hear -- the court reporter was not able to                03:23PM

6    hear.  The last facility that you mentioned.

7            MS. RAND:  The Perryville women's treatment unit is

8    incorporated into the Perryville Santa Maria log.  All of the

9    ASPC Phoenix logs were provided.  The Miles log is incorporated

10   into the Safford Fort Grant log.  The Tucson Rincon logs were            03:24PM

11   provided.  And all of the Yuma, Cheyenne, Cibola, Dakota, and

12   La Paz temperature logs were provided.

13           Additionally, we understood that the logs that were

14   provided for, I believe it was Perryville, were provided in

15   error because someone had copied a former spreadsheet in order           03:24PM

16   to copy the format and had inadvertently not deleted out the

17   data.  And so when they were produced the data was from a

18   previous spreadsheet.  It was not data fabricated.  It was a

19   data that was from a previous spreadsheet, copied the format

20   over, but had inadvertently forgot to delete the data prior to           03:24PM

21   sending it over to the attorneys.  So we wanted to let you know

22   that.

23           And we also have updated figures if you -- that we

24   will be producing which is why some of the temperature logs had

25   some errors in them was because some of the prisons were                 03:25PM

1    writing the temperatures in a separate log and then when all of

2    the temperatures were asked for they had to transfer the

3    figures into these spreadsheets, and there was some inaccurate

4    inputting of the transferring of information from the previous

5    log into the combined log.  So it was just a matter of a fact          03:25PM

6    that someone had inadvertently pressed a key that was

7    incorrect, and once -- if some people once in a while you press

8    a wrong button and the next one is wrong and the next one is

9    wrong because you pressed the wrong button.  So we are getting

10   updated figures that are from the original logs and we're             03:25PM

11   updating them so that we will provide the corrected logs.

12          THE COURT:  A couple of reactions to what you said.

13   First, just so you know what my view would be in the future if

14   this issue arose again with respect to places that are

15   refrigerated as to opposed to air cooled, air conditioners           03:26PM

16   break.  So if there is a need to know what the temperature is,

17   there continues to be a need to know the temperature is

18   verified it remains safe.  So I don't care if it's refrigerated

19   or swamp cooled.  It matters to me what the temperature

20   actually is.  Also, thermostats can be set.  So you can have a        03:26PM

21   refrigeration unit and set it at a temperature above the safe

22   threshold here.

23          Second, if the watch word of our case is that if it's

24   not in the chart it didn't happen, the corollary to that is if

25   you put it in a chart and you produce that to the other side,         03:26PM

1    everybody will assume that that's what you are telling us the

2    fact is and we will react and we will devote time to it and

3    energy to it.  So, again, the defendants have to increase the

4    level of their game.  They have to make sure that they are not

5    producing information where people have pushed the wrong button    03:27PM

6    or copied and cut and pasted something that represents what

7    isn't true.  I read each of these 300 pages.  Sounds to me like

8    you didn't, Ms. Rand.  And that is your obligation to do it.

9    Because if you would have read it, you would have seen what I

10   saw.  I didn't need Mr. Fathi to highlight, to sign post for me    03:27PM

11   what errors there were.  Many of them were obvious.  And so I

12   will expect that in the future.

13          Now, Mr. Fathi, any more you wanted to say?

14          MR. FATHI:  Thank you, Your Honor.  I think Ms. Rand

15   has just made a better case than I ever could about why we need    03:27PM

16   accurate, reliable, non-fabricated temperature records in this

17   case.  And I do, with the Court's indulgence, want to say just

18   a little bit more about this.  When I was speaking earlier

19   there was some laughter on the other side.  And this is not a

20   laughing matter.  The vulnerability of people on psychotropic      03:28PM

21   medications to heat injury and death is real.  People suffer

22   irreparable brain damage.  People die from this.  And the

23   defendants will not be able to comply with the requirements of

24   the stipulation if they are not measuring the temperatures in

25   their own facilities.  The fact that they are not measuring        03:28PM

1    temperatures in an in-patient mental health unit is a recipe

2    for disaster.

3           The Court has observed, and we have heard, this is a

4    paramilitary organization, and it needs clear rules and bright

5    lines.  Just as Sergeant Coleman was not qualified to determine          03:28PM

6    whether someone needed to go to medical or not, line staff are

7    not qualified to make an individual ad hoc determination

8    whether we need to take the temperature today or not.  Those

9    temperatures should be taken on a regular, daily, ongoing

10   basis.  It is minimally intrusive.  I have yet to hear a reason          03:29PM

11   why the defendants are so reluctant to do it.

12          We think that the Court has ample authority as part of

13   its enforcement power of this stipulation to require that the

14   temperatures be taken.  The Court is not required to wait until

15   someone is injured or dies before requiring defendants to do            03:29PM

16   what any public building should be doing in the first place and

17   measuring their temperatures.

18          THE COURT:  And before I give Ms. Rand an opportunity

19   to say what she wanted to say, I will respond directly to you,

20   Mr. Fathi.  And that is, I'm not waiting for somebody to die or          03:29PM

21   suffer a serious medical injury.  I'm waiting to be shown where

22   it is a fact that there are people in a facility who have a

23   heat intolerance disorder that has not been able to be

24   addressed by other means such that it then becomes necessary

25   for me to be concerned about the temperature of the unit.  Once          03:29PM

 1    I'm shown that prerequisite is satisfied, then I will order and

 2    require that the temperature be ascertained on a regularized,

 3    trustworthy, complete basis so that I can avoid the danger that

 4    would be -- that is addressed by this provision of the

 5    stipulation.                                                    03:30PM

 6         Ms. Rand.

 7         MR. STRUCK:  Your Honor, may I speak with respect to

 8    what Mr. Fathi had to say?  First of all, we understand what

 9    the stipulation requires.  We also understand the Court's

10    concern about getting accurate, reliable information, and we    03:30PM

11    agree it's very important that everyone get accurate, reliable

12    information.  And we will strive to provide that information to

13    the Court and to plaintiffs.

14         With respect to Mr. Fathi's comment about laughter,

15    that did not occur.  I don't understand why he's injecting that 03:30PM

16    into the record.  This is not a laughing matter.  We take this

17    very seriously and we track folks who have potential heat

18    intolerance issues very closely.  And you have people that are

19    dedicated to providing them with healthcare, and they care

20    about their clients because they are their patients.  And so we 03:31PM

21    take offense to any suggestion that we think this is a laughing

22    matter, because we don't.

23         THE COURT:  Thank you.  When I go to the pharmacist

24    and receive a prescription, the pharmacist says to me in every

25    case, have you had this medication before?  If I say yes, they  03:31PM

UNITED STATES DISTRICT COURT

1   then say, so you don't need to be counselled about it?  And so

2   I always say yes, I don't need to.  But then if I say I haven't

3   had it before, they say we would like you to be counseled about

4   it.  And I can resist that, but they then offer that

5   counseling.                                                    03:31PM

6          When that counseling is offered for people on

7   psychotropic medicines that carry this risk of heat

8   intolerance, are they counseled about this danger?

9          MR. STRUCK:  They are counseled about it.  In fact,

10  Dr. Taylor and I had a conversation about that just at the     03:32PM

11  break.  They are counseled and advised with respect to

12  potential heat intolerance issues, particularly since we live

13  in Arizona.

14         THE COURT:  Right.  And that's why it's different than

15  for somebody who lives in an air-conditioned world, such as I, 03:32PM

16  where I work in an air-conditioned world, I live in an

17  air-conditioned world, I travel in my car in an air-conditioned

18  world, it may not be so natural for my healthcare provider to

19  say if you are on this drug you need to be aware of heat

20  intolerance, though I know if I take doxycycline they tell me   03:32PM

21  to avoid the sun.  It exposes you to a greater sensitivity to

22  the sun, which is different than a heat intolerance.  I know

23  they are always careful about that because, apparently, it's a

24  very short exposure that can be problematic.

25         But it does seem exactly what you say is true, that if   03:32PM

1    you have people who are spending a lot of their lives on an

2    open yard that's un air-conditioned or working in the field or

3    the lands of the institution and are in air-cooled facilities

4    whereas our state gets warmer and warmer, I mean, you read it

5    in the reports, I think that the State probably needs to          03:33PM

6    understand that maybe what worked in 1945 with having

7    evaporative coolers is not part of our future, that they just

8    will not work in a way that can be -- I mean, it was

9    inhospitable for the woman who was the Corizon employee who was

10   trying to provide healthcare in the clinic that was air-cooled.   03:33PM

11           So I think the future holds the idea that more money

12   will have to be spent for infrastructure to deal with the fact

13   that our state getting warmer.

14           MR. FATHI:  Your Honor, may I raise a just couple of

15   discovery questions?                                              03:33PM

16           THE COURT:  Yes.

17           MR. FATHI:  We have since had a chance to look at the

18   so-called heat reaction lists provided by the defendants.  They

19   do not indicate if someone was transferred to an 85-degree or

20   cooler environment so we would request that a list of such        03:34PM

21   people be provided.

22           THE COURT:  How many people are on the list?

23           MR. FATHI:  For February to July, at the Perryville

24   institution, there are a total of 35 people on the list.  The

25   list is titled, "Heat Reaction List."  This is Page ADCM          03:35PM

1    1001607.  A total of 35 people on the list.  Some say no

2    indication of reaction; others say things like possible

3    hyperthermia, possible orthostatic hypotension, hyperthermia,

4    and so on.

5           THE COURT:  All right.  So for these hyperthermia          03:35PM

6    people, you could take a look at eOMIS and see whether they

7    were given -- whether there were other steps that were taken

8    that failed to abate the heat intolerance reaction, and that

9    would be charted, I gather.

10          MR. FATHI:  I don't know that the move, if there was a     03:35PM

11   move, would be charted, Your Honor.  Again, we have assumed

12   that the defendants are monitoring their compliance with this

13   so that they would have such a list.  And again, if the answer

14   is they have never in the two and-a-half years of the

15   stipulation moved someone pursuant to that requirement, then we  03:36PM

16   would like to know that.  But presumably they know who they

17   have moved as required by the stipulation.

18          THE COURT:  Dr. Taylor, do you happen to know anything

19   about this?

20          DR. TAYLOR:  I apologize.  Which part?                     03:36PM

21          THE COURT:  You were talking.  It's no reason to

22   apologize.  I looked up and asked the question.  I'm sorry.  I

23   started asking you the question before I looked up, so that's

24   why I didn't appreciate that you were talking to Mr. Struck.

25          The question is:  Are you aware of whether or not          03:36PM

CV 12-601 - September 12, 2017 - Status Hearing

1    there is any record kept of people who have had a heat

2    intolerance reaction that hasn't been able to be resolved by

3    other means who have been transferred to other places that --

4    to a housing area where the temperatures do not exceed 85

5    degrees?                                                          03:36PM

6            DR. TAYLOR:  Yes, Your Honor.  There has been one such

7    individual throughout the state that was moved.  We can add a

8    column onto the log that they have, because we do track that.

9    And that one individual was moved to a location that does not

10   go above 85 degrees.                                             03:37PM

11           THE COURT:  And how about the previous step?  If all

12   other steps have failed to abate the heat intolerance reaction,

13   the prisoner will be transferred.  Do you keep a list if all

14   other steps have failed?

15           DR. TAYLOR:  Yes, we do.  We keep a note section that    03:37PM

16   we track on this date they were seen, on this date this

17   happened, basically running through the notes throughout eOMIS

18   to see who saw them when, what was handled, were the

19   medications changed, were they given ice and a fan, did that

20   resolve the issue, and then if, in fact, they were moved.        03:37PM

21           THE COURT:  That's for people who were on this heat

22   intolerance log?

23           DR. TAYLOR:  Correct.

24           THE COURT:  Could you produce that to the plaintiffs

25   so they can see that?                                            03:37PM

UNITED STATES DISTRICT COURT

CV 12-601 - September 12, 2017 - Status Hearing

1      DR. TAYLOR:  We can update the log with the additional

2  information so they know -- and maybe we need to make columns

3  that say moved, yes or no.

4      THE COURT:  Sounds like the list or the report already

5  exists or is been being maintained already about the other        03:38PM

6  measures that are taken and things like that?

7      DR. TAYLOR:  Yeah.  It's not in table format, it's

8  more in notes.  So I think we need to put it into table so it's

9  a little bit easier to digest.  Because it's very wide.  It has

10 nursing encounters, psychiatric encounters, follow-up            03:38PM

11 encounters.  It's in all the notes from eOMIS combined into a

12 note format.

13     THE COURT:  So it's in a note format and it's already

14 been prepared with respect to these inmates who have a

15 demonstrated heat intolerance?                                   03:38PM

16     DR. TAYLOR:  We actually track, just to be clear,

17 anybody who has anything that looks like it might be on

18 psychotropic medications, we track them through.  So that's why

19 on the log you will see sometimes potential for hyperthermia or

20 potential for orthostatic hypotension.  We still track those     03:38PM

21 through even beyond that to make sure there isn't a reaction

22 that's being missed.  So we track everybody through to make

23 sure.

24     THE COURT:  And what I thought I understood you to say

25 is there is already a document or a report that you have that     03:39PM

UNITED STATES DISTRICT COURT

1    includes all that information that you have described, but you

2    say you could add a way that would make it handier for somebody

3    to look at.  I'm trying to understand is this already a report

4    that exists?

5            DR. TAYLOR:  It does.  It's probably not in the most    03:39PM

6    usable format because it's in a notes format.  So it has

7    everything jumbled into a note section.  So we need to clean it

8    up.

9            THE COURT:  What I'm thinking about is giving Mr.

10   Fathi the chance to choose which he would rather have.          03:39PM

11           DR. TAYLOR:  Sure.

12           MR. FATHI:  Well, Your Honor, again, I think there's

13   two separate issues here.  Going forward it sounds like Dr.

14   Taylor is offering to add to these monthly reports indication

15   of whether the person was moved or not, and that would be very  03:39PM

16   helpful.  But we're also interested in what has happened for

17   the first two and-a-half years of the stipulation.  I thought I

18   understood Dr. Taylor to say there's only one person they had

19   ever moved.  If that's the case we would like to know who that

20   was.  If there's more than one we would like to know who those  03:40PM

21   people were, too.  We would like both of those things.

22           THE COURT:  Again, you didn't answer my question about

23   whether you want the report she was describing in its current

24   existing form or whether you want to have it redone so that

25   it's not just in a notes format.                                03:40PM

1          MR. FATHI:  We would prefer the latter provided

2     there's no loss of information in the transition.

3          THE COURT:  Can you do that, Dr. Taylor?

4          DR. TAYLOR:  Yes, we can do that.

5          THE COURT:  How far back does it go?                    03:40PM

6          DR. TAYLOR:  So you had ordered us to come up with a

7     process by which to pull that data a little bit more

8     automatically.  So I believe that began November of 2016, and

9     so we have gone back and pulled ones that weren't pulled

10    automatically into that which adds a bunch of other pieces into  03:41PM

11    there.  But you had asked us for a process that we would set up

12    so that we can pull that data automatically out.  And I believe

13    it was November of 2016.  So from that point it has specific

14    criteria that were met, and those were included from that

15    point.                                                       03:41PM

16         THE COURT:  Okay.  Good.  So provided in the way that

17    Mr. Fathi has preferred and that is to have it with the -- not

18    in the notes format but I guess you said the table format or

19    some other way you thought would be more serviceable, do that

20    for that time period and also provide the identity of the     03:41PM

21    person who was transferred.

22         DR. TAYLOR:  Absolutely.

23         MR. FATHI:  Your Honor?

24         THE COURT:  Yes.

25         MR. FATHI:  Just a couple more things.              03:41PM

1          THE COURT:  Surely.

2          MR. FATHI:  We would like to just confirm that the

3     defendants will continue to provide temperature readings at

4     least through the end of September other than the fabricated

5     readings from the one institution.  I believe the most recent          03:42PM

6     one we received were about August 10th so we wanted to make

7     sure we would get them through the end of September.

8          THE COURT:  Any objection, Ms. Rand, to providing the

9     numbers as you get them?  You said you had some updated numbers

10    and I gather you were willing to produce those.  Any objection          03:42PM

11    to producing the numbers as you have them through the end of

12    September?

13         MS. RAND:  Your Honor, can you please repeat?

14    Apparently the call dropped for a moment or I couldn't hear

15    anything that Mr. Fathi said.          03:42PM

16         THE COURT:  What Mr. Fathi asked is he would like to

17    continue to receive the information that you have received from

18    the different facilities that have been recording temperatures

19    through the end of September.

20         MS. RAND:  Okay.  And just going forward, when would          03:42PM

21    the Court ask us to begin monitoring temperatures?  Would that

22    be May or June?

23         THE COURT:  I'm sorry.  I don't understand the

24    question.

25         MS. RAND:  Well, you said there's usually a time          03:42PM

1    period where the temperatures should be taken, and we would

2    like to have prior notice of that.

3              THE COURT:  I see.  I understand.  I understand.  Yes.

4    I understand what you are asking.

5              I think that 100 percent sure that you need to do so                03:43PM

6    in May, but my experience is that there's also a possibility of

7    a spike in temperatures in April.  So if you were being as safe

8    as you wanted to be, as I think you would want to be, you might

9    want to think about doing it in April but certainly no later

10   than the start of May.                                                        03:43PM

11             MS. RAND:  Okay.  Thank you, Your Honor.

12             MR. FATHI:  And finally, Your Honor, we request an

13   evidentiary hearing on the collection of temperature data at

14   the Perryville facility in light of the fabricated data that

15   was produced.  This particular fabrication was obvious because              03:43PM

16   data was filled in for dates that have not yet occurred, but

17   there may well be other fabrications that are not obvious on

18   their face.  So in light of the fact there are, according to

19   the defendants' report, about 1,500 psychotropic medications in

20   effect at Perryville, we need to know what the real temperature            03:44PM

21   data are for that facility.  And we need to know if this

22   instance of fabrication is isolated or the tip of the iceberg.

23             THE COURT:  Before I set that, what I'm going to ask

24   you to do is meet and confer with Ms. Rand and to give her a

25   chance to explain to you in a way that doesn't have her over              03:44PM

1    the speaker here.  I wasn't fully able to follow her

2    explanations she offered.  It sounded like maybe one of the

3    explanations she offered addressed Perryville.  I'm not sure

4    about that because I couldn't follow every word.  I would ask

5    you to have a conversation in a way where you could understand          03:44PM

6    one another more completely.  And you would then determine

7    whether or not it looks like we have an issue of fabrication

8    here in which case we'll pursue an evidentiary hearing as you

9    have asked.  But if there's some other more innocent

10   explanation, including negligence, then maybe it doesn't               03:45PM

11   warrant anything more than the upgrading that we have already

12   had.

13            MR. FATHI:  Thank you, Your Honor.

14            MS. RAND:  Your Honor, could I provide that

15   explanation now because I don't think it's warranted.  What I          03:45PM

16   previously said was they were --

17            THE COURT:  Ms. Rand, when the Court asks you to not

18   do it over the loud speaker because I'm having trouble hearing

19   you because, for whatever reason, you cut in and out, and that

20   I ask you to have a conversation with Mr. Fathi, I would ask           03:45PM

21   you please not to do what I said is not working for me.  And

22   that is, I can't understand everything that you are saying

23   about this and I don't want to spend more time on it in court

24   where I have got multipliers of expense going on.  I'd like to

25   reduce that multiplier in a more efficient way and have you            03:45PM

1    just have that conversation.  If it turns out the conversation

2    means we have to bring it back into court then we'll do it.

3    I'm hoping maybe we don't.  So thank you.

4            MS. RAND:  Thank you.

5            THE COURT:  So next on the plaintiff's agenda is          03:46PM

6    defendants' failure to produce declarations regarding searches

7    undertaking pursuant to plaintiffs' document request.  Where do

8    we stand on that?

9            MR. FATHI:  Your Honor, you may recall that earlier

10   this summer, I believe it was in June and July, we had some      03:46PM

11   telephonic discovery disputes and regarding the fact that

12   defendants had produced very few and, in some cases, no

13   documents in response to plaintiffs' document requests.  And in

14   response, Ms. Rand sent e-mails to various ADC and Corizon

15   staff seeking responsive documents and she asked them, the       03:46PM

16   recipients, to sign and return a declaration whether or not

17   they had responsive documents.

18           And at the July 10th hearing, Ms. Rand told the Court

19   that she was getting responses back from those e-mails she had

20   sent out.  And so we have repeatedly requested that those        03:47PM

21   declarations, whether they say that the person had responsive

22   documents or not, be produced.  But Ms. Rand has declined to do

23   so.

24           THE COURT:  I thought she did produce some of those.

25           MR. FATHI:  None of the declarations, Your Honor.        03:47PM

CV 12-601 - September 12, 2017 - Status Hearing

```
 1    None.

 2              THE COURT:  Ms. Rand.

 3              MS. RAND:  Yes.  Some of the declarations that I had

 4    in hand I was hesitant to produce, first of all, because

 5    plaintiffs had stated that previous declarations were not          03:47PM

 6    accurate.  And so when I told Mr. Fathi, I provided Mr. Fathi

 7    the e-mails, saying this is what I provided to the e-mail

 8    recipient, he said well, this is not good enough.  So then I

 9    went and did another e-mail request to everyone, and I just did

10    that recently, and so I don't believe that the old declarations   03:48PM

11    are going to still be accurate.  And rather than produce

12    inaccurate declarations, I opted not to produce anything.

13              And I believe I told Mr. Fathi this, that I was in the

14    process of doing that, and what he basically said was it

15    doesn't relieve your obligation to provide the previous           03:48PM

16    declarations which, again, I was trying not to produce anything

17    that is inaccurate.  And so I'm in the process of reviewing

18    them.  Now, I have been out of the office.  I only returned to

19    the office yesterday, so I haven't had a lot of time to do that

20    but I was out for about a week or so, a little more than a week   03:48PM

21    and so I have not had a chance to do that yet.

22              THE COURT:  Were the declarations that Mr. Fathi has

23    requested that you are worried are inaccurate, were those

24    executed?  Were they signed?

25              MS. RAND:  They were signed back in July.               03:49PM
```

1          THE COURT:  Go ahead and produce those to Mr. Fathi,

2     please.

3          MS. RAND:  Okay.  And if they are inaccurate, is

4     that -- I mean, are you saying produce them inaccurate or

5     accurate regardless?                                          03:49PM

6          THE COURT:  Well, I would think in your cover letter

7     if you think they are inaccurate you would be wise to say why

8     you think they are inaccurate.  But if they have been executed

9     and you have them, somebody swore under oath that it was true.

10         MS. RAND:  All right.                                     03:49PM

11         MR. FATHI:  Thank you, Your Honor.  Point 6A on our

12    agenda involves the joint defense agreement between the Arizona

13    Department of Corrections and Corizon.  When, as part of this

14    exchange we have just discussed, Ms. Rand withheld an e-mail

15    that was between defendants' counsel and Corizon employees on   03:49PM

16    the ground that ADC and Corizon have a joint defense agreement.

17    And more recently, in connection with the discovery that was

18    provided for yesterday's hearing, there were a couple of

19    e-mails, again, between defense counsel and Corizon employees

20    and between defense counsel and Corizon counsel that were also  03:50PM

21    withheld.

22         So if defendants are relying on this joint defense

23    agreement to withhold otherwise discoverable information, we

24    would ask the agreement be reviewed by the Court to see if it

25    does, in fact, justify that withholding.                       03:50PM

1          THE COURT:  Who would like to speak to this?

2          MR. STRUCK:  I will, Your Honor.  We've had a joint

3    defense agreement with Corizon since Corizon contracted with

4    ADC when Wexford left the scene.  Plaintiffs had an opportunity

5    to ask for this information during the discovery of this case.          03:50PM

6    This case is now settled.  The joint defense agreement remains,

7    and it entitles defense counsel for ADC and defense counsel for

8    Corizon, who the Court has recognized is the agent, or the

9    plaintiffs have argued is the agent of ADC, to communicate

10   without having the communications discovered.          03:51PM

11         So if the Court would like to look at the joint

12   defense agreement, I have no problem.  If they would have asked

13   for it in discovery way back when, we probably would have

14   provided it.  I have done that before in other cases.

15         THE COURT:  Well, in light of the fact that I gather          03:51PM

16   that your privilege log will, at times, rely upon this joint

17   defense agreement so that the plaintiffs understand what the

18   parameters of that, I think it's still relevant, even though

19   the case is settled, it's still going on where you are

20   asserting the privilege and demonstrating the basis for it in          03:51PM

21   the privilege log, seems to me that privilege log would still

22   apply.  So it would seem the plaintiffs should have a chance to

23   review the agreement.

24         MR. STRUCK:  I will say, Ms. Love had a conversation

25   with Mr. Fathi about this issue and requested that Mr. Fathi          03:51PM

1   tell her which particular e-mails he was talking about and he

2   refused to do so.  So I think perhaps the parties should meet

3   and confer with respect to these e-mails first before having to

4   involve the Court regarding that.

5        THE COURT:  Again, what about my basic position, and          03:52PM

6   that is if the privilege log is going to reflect documents that

7   you are asserting a privilege that is under a joint defense

8   agreement, and obviously, the two froms would indicate where

9   that would be invoked, it seems to me that they are entitled to

10  know what the scope of that agreement is so that they know what   03:52PM

11  is potentially covered and not covered by the privilege.  It

12  just seems to be, as you suggest, something is intuitively

13  right would have been your response if they had asked for it in

14  a way that you thought was more timely.  I think it does still

15  remain relevant.                                                  03:52PM

16       MR. FATHI:  Just for the record, Your Honor, what Mr.

17  Struck said is false.  When Ms. Love asked me which were the

18  e-mails I was referring to, I suggested that because I didn't

19  know the numbers off the top of my head, I suggested she do a

20  word search for Corizon which is how I had found them.  I did     03:53PM

21  not refuse to tell her which e-mails I was referring to.

22       THE COURT:  All right.  Turning next to the

23  plaintiffs' agenda Item 7, defendants update regarding the

24  implementation of the eOMIS electronic communiques, I think we

25  already addressed that.  Anything in there we didn't touch        03:53PM

1   upon, Mr. Fathi?

2          MS. KENDRICK:  No.

3          THE COURT:  All right.  Thank you.

4          Sounded from the earlier responses that we don't

5   really know where things stand with respect to the proposed        03:53PM

6   extension of the telemedicine program, or do we, Mr.

7   Bojanowski?

8          MR. BOJANOWSKI:  Your Honor, we do.  We at least have

9   an update.  So as you know, we have been trying to work with

10  University of Arizona to expand telemedicine in various areas,     03:54PM

11  and the University of Arizona has declined to extend

12  telemedicine saying that there simply wasn't enough -- there

13  weren't enough referrals for them to do it.  So we are now

14  working with -- we have reached out to the Mayo Clinic, Dignity

15  Health, Banner Health, and Virtual Health to try and expand       03:54PM

16  these services.

17         THE COURT:  So is it fair to say that the previous

18  used program is over as well, or just the proposal of extending

19  it is over?

20         MR. BOJANOWSKI:  I believe --                               03:54PM

21         THE COURT:  I'm just trying to understand when you

22  tell us that's one of the remedial measures we just ignore it

23  whenever it's mentioned or whether we can still --

24         MR. BOJANOWSKI:  I will have to follow up on that,

25  Your Honor.  I was under the impression that what was being        03:55PM

1   provided was going to be continued but they just simply weren't

2   going to expand into the other areas that we wanted such as

3   HIV.  We couldn't produce enough HIV patients for them to see

4   on a regular basis to, apparently, justify them becoming

5   involved.  And I'm using HIV as just an example.                    03:55PM

6        THE COURT:  Ms. Rand, I wonder if you could move your

7   mouth away from the mouthpiece for a little bit.

8        MS. RAND:  Certainly.  Apologize.

9        THE COURT:  Mr. Fathi, anything more you wanted to

10  say, or Ms. Kendrick?                                               03:55PM

11       MS. KENDRICK:  First off, I didn't catch the fourth

12  entity you said they are reaching out to.

13       MR. BOJANOWSKI:  Virtual Health.

14       THE COURT:  What kind of institution is that?

15       MR. BOJANOWSKI:  It's apparently a telemedicine              03:56PM

16  organization.

17       THE COURT:  A company that provides a service for a

18  fee.

19       MR. BOJANOWSKI:  Right.

20       THE COURT:  I see.                                             03:56PM

21       MS. KENDRICK:  And just to clarify, we have been told

22  over the course of our tours and I believe in court that the

23  existing telemedicine program included telepsychiatry and also

24  infectious disease.  So was the referral to saying they don't

25  want to treat HIV patients just some hypothetical?  Because        03:56PM

189

1   that would tend to indicate that they are terminating the

2   infectious disease coverage, which they are providing to all

3   prisoners statewide.

4          MR. BOJANOWSKI:  I simply don't know the answer to

5   that.                                                              03:56PM

6          THE COURT:  Any other -- obviously, this status topic

7   will be continued to next month.

8          MS. KENDRICK:  Clearly, Your Honor, we will make sure

9   to include it on next month's agenda.  I think we would just

10  observe that to the extent that many of these corrective action   03:57PM

11  plans that we covered today included telemedicine as part of

12  the remedial plan, I feel like we now will have to go back to

13  our offices and go back and look at those remedial plans again

14  because this will throw this into disarray especially if we

15  were looking at remedial plans using the future tense saying      03:57PM

16  telemedicine will be utilized or telemedicine will be expanded

17  and then at 3:57 p.m. we're told, guess what?  It's not

18  expanding.  That kind of throws a wrench in things.

19         MR. BOJANOWSKI:  I think we're conflating two

20  different things.  Telemedicine expansions that many times we      03:57PM

21  talk about in the remedial measures are things that we are

22  retaining physicians to handle through Corizon as opposed to

23  getting telemedicine from a third party entity like the

24  University of Arizona.  We're trying to expand the reach of

25  telemedicine.  So we have doctors like Corizon employees that      03:58PM

1    participate in the telemedicine.

2            THE COURT:  Right.

3            MR. BOJANOWSKI:  So these people at these institutions

4    would not be Corizon employees but we would enter into a

5    contractual relationship with the entity to then expand what          03:58PM

6    the services are that we have.

7            THE COURT:  Well, the reason that I think this issue

8    listed in the plaintiffs' agenda has such poignancy is that it

9    was in the past presented to the Court that was something that

10   was more concrete and because you were dealing with the              03:58PM

11   University of Arizona and because you had somebody stand up and

12   tell me where the negotiations were standing, I think I seized

13   upon that as a hope.  And I guess if it's now a hope that's

14   changing or diminishing, I'd like to know.

15           So for the next month, if you could understand that          03:59PM

16   I'd like a full update about where things stand with the

17   representations that have been previously made and we'll go

18   look at our book and see where you have mentioned the

19   University of Arizona, and maybe you can do that too so you

20   will be prepared to know the areas where we will want to know        03:59PM

21   whether those previous representations at the University of

22   Arizona would be turned to are, in fact, included with what's

23   going to continue or is in the areas where it's not likely to

24   continue or not likely to be completed to fruition.

25           MS. KENDRICK:  Your Honor, we would request that             03:59PM

1  defendants or Corizon bring to the court and have prepared to

2  provide this information somebody who, perhaps, is engaged in

3  these negotiations and has actual firsthand knowledge because

4  it is quite apparent that at these hearings it turns into a

5  giant game of telephone of counsel for the defendants looking    04:00PM

6  behind them, getting whispers, answering saying, I believe this

7  might be the case or I know this might be the case.  And then a

8  month later we're back in here.  We might have some written

9  document in the interim that shows that, oh, what was said was

10 not quite true or it's a little different or we're still        04:00PM

11 negotiating.

12       So if the person who is supposedly the source of the

13 information and the update could actually physically come here

14 to answer the questions that Your Honor has for them, we may

15 have for them, we think that would be the most productive and   04:00PM

16 efficient use of everybody's time versus hearing some sort of

17 vague update based on phone calls last week with somebody from

18 Corizon.  Just have the person come here so that we have the

19 person who is actually the most knowledgeable one about the

20 status as we are sitting in the courtroom at that moment.       04:00PM

21       THE COURT:  Well, with respect to the telephone game,

22 that's true from much of what our experience has been.  But we

23 are now embarked upon a method we're emulating some of what you

24 have done with respect to your keeping the timeline going on

25 what's been said in the past.  We have now matched that, I      04:01PM

1    think, and are in a position to do it.  And Mr. Bojanowski has

2    too with this living document that's a preliminary summary.  So

3    I think we're moving to a place where, hopefully, that path

4    won't be prolonged.

5        But with respect to the University of Arizona, because    04:01PM

6    it has been something that has been such a focus, and because

7    we have had somebody stand up whose name I can't remember right

8    now tell us what the status was and to give us an understanding

9    about what it was from the horse's mouth, I think it would make

10   sense to have the horse come back.                             04:01PM

11       So I agree if you could do that to give us a more

12   first person representation about where things stand so I can

13   get a better sense.  Because we have put a lot of eggs in this

14   basket.  It has come up a lot.

15       Okay.  The next agenda item is somewhat related to the    04:02PM

16   topic of tomorrow.  Whether it makes sense to address it

17   tomorrow or address it today, Mr. Fathi, what do you think or

18   Ms. Kendrick?

19       MS. KENDRICK:  Well, we got a little bit more, I

20   think, yesterday when the deputy warden of operations from      04:02PM

21   Florence came and testified about the actual location of the

22   building, so I don't know if this would be addressed tomorrow

23   to the extent there is any update.  I mean, this was more as a

24   placeholder because we were told in July that the construction

25   was still ongoing and that there may be a change.  However, I   04:02PM

CV 12-601 - September 12, 2017 - Status Hearing

1   would just note that that arises from the hearing that we had

2   on July 14th and then subsequent to that they did go, as the

3   deputy warden testified, and talk to the people about it.  So I

4   believe that perhaps this is a subject that we can take off of

5   the agenda for the future.                                    04:03PM

6        THE COURT:  What about part B, the placement of

7   medication refill boxes.  Has that been addressed?

8        MS. KENDRICK:  Actually, no, so I am clarified.  A, I

9   think we can take off.  The placement of the medication refill

10  boxes, I think, is something we don't yet know.  And I don't   04:03PM

11  believe that the nurse testifying tomorrow is from Florence.

12       THE COURT:  I see.  Do you have any information about

13  this on the defendants' side about the placement of the

14  medication refill boxes in areas that are inaccessible?

15  Because we heard in the past that these HNR boxes serve this   04:03PM

16  function and the HNR boxes were oftentimes in the place where

17  the inmates dined and so I'm -- and that they were being

18  removed.  So I think that's why we have talked about it.

19       MR. STRUCK:  Your Honor, and specifically they are

20  asking about lockdown situations.  And based upon -- Ms. Love  04:04PM

21  spoke to the deputy warden with respect to this issue, and it's

22  our understanding that during lockdowns inmates are -- medical

23  staff actually comes to the units with medication and/or

24  inmates who need to go to medical are transported to medical

25  during lockdowns.  So that's our understanding.  So there isn't 04:04PM

UNITED STATES DISTRICT COURT

CV 12-601 - September 12, 2017 - Status Hearing

1    a need for this medication refill box during the lockdown

2    situation.

3          THE COURT:  Ms. Kendrick, anything you wanted to add?

4          MS. KENDRICK:  Not on that, no.

5          THE COURT:  All right.  Plaintiffs then ask if            04:04PM

6    defendants can provide any additional information where you

7    stand with the request for proposal on the new contract.

8          MR. STRUCK:  I do know bids have been received.  There

9    is very little information I can provide because of state

10   procurement laws, and I can -- I don't have the information    04:05PM

11   with respect to dates, but I could provide to the Court and

12   counsel, probably tomorrow, with dates that I can provide

13   information or dates upon which I can provide more information

14   without violating the state procurement code.

15         THE COURT:  I understand.  The bidders are kept           04:05PM

16   confidential for a period of time, for example.

17         MR. STRUCK:  Right.

18         THE COURT:  That would be helpful so plaintiffs know

19   when to put it on their agenda.  Thank you.

20         The defendants wanted to talk about the contract          04:05PM

21   amendment, and I have read it.  But go ahead and say what you

22   wanted to say.

23         MR. STRUCK:  Well, I just wanted -- there's been, in

24   the past, that the Court has expressed frustration as have

25   plaintiffs, as have my clients with respect to not having a big  04:06PM

1   enough stick with regarding being able to get Corizon to comply

2   with the contract.  And so based upon those frustrations, the

3   Corizon and ADC agreed to modify the contract to lift the cap

4   on the penalty.  So as of November 1st there will be no cap

5   with respect to the $5,000 per facility per performance measure          04:06PM

6   penalty.

7           In addition, the Department agreed to provide some

8   carrots to Corizon with respect to positive performance

9   regarding performing in excess of, you know, 90 percent,

10  meeting or exceeding 90 percent of the performance measure                04:06PM

11  statewide.  And I'm talking I think there's 849 performance

12  measures that deal with medical, dental, and mental health.  If

13  Corizon can meet 90 percent of those performance measures then

14  there's additional incentives even above and beyond the 90

15  percent that's kind of set forth in this modification.  So we              04:07PM

16  view it as a very positive movement towards getting Corizon,

17  our contractor, to comply with the contract as promised.

18          THE COURT:  Okay.  This is something that's important

19  to the Court, because it factors into what I have to consider

20  about the motivational factors that influence behaviors that              04:07PM

21  are linked to satisfaction of performance measures.  So I do

22  want to understand the economic and incentive components of

23  this.  I had a couple of off-the-cuff questions meaning that I

24  wondered if I could pose to you and hear what you had to say.

25          It looked to me like the $3.5 million incentive cap,              04:08PM

1    the carrot, the most that can be paid is $3.5 million.  It

2    looked to me, after a rough analysis, that that likely will be

3    satisfied and that this amendment provides for an additional

4    payment to Corizon for 3.5.  At the same time, it made me

5    wonder, therefore, what is the implication of removing the          04:08PM

6    $90,000 cap on the penalty side?  And one of the things that I

7    thought could give me some information about that is I believe

8    I recall Mr. Pratt testifying, at least with respect to one

9    month, what the amount would have been if the cap didn't

10   operate.                                                             04:09PM

11         And I wondered if the State had undertaken that kind

12   of analysis so that we could use that past information as some

13   kind of help to inform me to try to predict what's going to

14   happen in the future, and that is, what kind of implication is

15   it when you have a contract that provides for X number of           04:09PM

16   dollars to be paid for the contractor and then you agree that

17   you are going to pay them an additional $3.5 million

18   potentially while saying that we're getting rid of a cap.  Is

19   it the kind of thing where the amount of the penalty could be

20   so completely swamped that it doesn't become an incentive.  And     04:09PM

21   so that was a question I wondered maybe if you could answer.

22         MR. STRUCK:  I think I understand your question.  And

23   it's my understanding that there have been times in the past

24   when if there was no cap the penalty would have exceeded,

25   easily exceeded half million dollars in a month period of time.     04:10PM

UNITED STATES DISTRICT COURT

1    So just doing the math, the penalty is a big stick, much bigger

2    than the $3.5 million potential cap.  The State would more than

3    gladly pay the extra 3.5 million and not seek any penalties if

4    Corizon could just comply with the contract.  That's the goal.

5    The goal is compliance with the contract.                          04:10PM

6         So the Corizon's incentive will be to comply with the

7    performance measures because if they don't, the penalties are

8    going to be pretty stiff without any kind of a cap on the

9    penalty.  And they won't necessarily obtain the 3.5 million if

10   they don't perform.  They have to do a pretty good job          04:11PM

11   performing at 90 percent or above in order to get these

12   incentives.

13        THE COURT:  So many of the performance measures are at

14   that benchmark already.

15        MR. STRUCK:  They are, but this also requires them to      04:11PM

16   maintain the performance measures, which is also important.

17   Even the performance measures that they have easily exceeded,

18   there was a concern, I think, maybe addressed by the plaintiffs

19   or raised by the plaintiff that if performance measures drop

20   off based upon the defendants' motion that then there will be   04:11PM

21   another situation where you are robbing Peter to pay Paul and

22   the emphasis will go off of those performance measures and onto

23   the ones that are still under court supervision.

24        So this will allow the ADC to keep the pressure on

25   Corizon with respect to those performance measures that they    04:11PM

1    have been performing at.  They won't be able to be dropped off

2    and if they do they will be penalized.

3            THE COURT:  The real number, if there hadn't been a

4    cap in the past that I recall Mr. Pratt testifying about, you

5    saying you heard of one instance where it was a half million        04:12PM

6    dollars, is there some document that exists that tells us what

7    that real number, not subject to the cap, has been for the

8    months before now?

9            MR. STRUCK:  I don't know if there is.  There may very

10   well be.                                                            04:12PM

11           THE COURT:  Mr. Pratt maybe knows?

12           MR. PRATT:  Your Honor, we track this each month, and

13   looking at the potentials that would have failed at a cost of

14   5,000 each month, they are running, from February through June,

15   is the notes I have got here, they are running anywhere from        04:12PM

16   268 to 278 per month at a $5,000 clip.

17           THE COURT:  So to repeat that, from February until

18   June, the lowest per-month assessment if you didn't have the

19   cap would have been 268.

20           MR. PRATT:  Correct.                                        04:13PM

21           THE COURT:  And the highest would have been 280?

22           MR. PRATT:  278.

23           THE COURT:  Okay.  Thank you for providing that.

24           MS. KENDRICK:  268 is not a multiple of five, so is

25   that 268 non-compliant performance measures multiplied by five?     04:13PM

1          MR. PRATT:  Correct.

2          MR. STRUCK:  We're calculating the monetary amount.

3          MS. KENDRICK:  So the dollar amount, if it's 268

4    non-compliant performance measures, times 5,000, would be $1.34

5    million.                                                              04:13PM

6          MR. PRATT:  No, the number failed.

7          THE COURT:  Let's make sure we're not two ships

8    passing in the sea.

9          MS. KENDRICK:  He's offering numbers that aren't

10   divisible by five, and if each one is $5,000 that doesn't add       04:14PM

11   up.

12         MR. STRUCK:  We'll solidify this and provide this to

13   the Court tomorrow.

14         THE COURT:  Please.  That would be helpful.  Thank

15   you.                                                                 04:14PM

16         Okay.  And then the defendants' desire, have you all

17   had a chance to meet and confer about when we can have this

18   hearing regarding the Tucson alleged retaliation?

19         MR. STRUCK:  I provided some dates, albeit it was

20   early this morning, and we haven't had an opportunity yet to        04:14PM

21   come up with a date.  We think that in terms of the Tucson

22   retaliation that will take one day.  And I provided them some

23   dates in October.  I'm not sure if the Court's available but

24   we'll try and meet and confer before tomorrow.

25         MS. KENDRICK:  Or we did confer, we just haven't had a        04:14PM

CV 12-601 - September 12, 2017 - Status Hearing

 1    chance to respond.  So of the four dates you proposed, Thursday

 2    October 12 would be the best if that works for the Court.  The

 3    following week is the Ninth Circuit arguments in this case.  So

 4    we will not be able to come to Phoenix for that.

 5            THE COURT:  Would the morning -- do you think you need        04:15PM

 6    the whole day?

 7            MR. STRUCK:  Probably.

 8            THE COURT:  We'll check.  Just a second.

 9            How far out are our monthly status conferences

10    scheduled?  I took a look at a month later on and I didn't see        04:16PM

11    one scheduled.  Does anybody happen to know that?

12            THE MAGISTRATE JUDGE CLERK:  They are here on October

13    11 and then the next one after that is November 8 and then

14    tentatively scheduled one on December 13, but we're on duty

15    that week.                                                            04:16PM

16            THE COURT:  And then is January scheduled?

17            THE MAGISTRATE JUDGE CLERK:  Not yet.

18            THE COURT:  So we're set to convene October what,

19    please?

20            THE MAGISTRATE JUDGE CLERK:  11.                              04:17PM

21            THE COURT:  11th which is the day before the 12th.

22    We're investigating.  And then the 8th of November and then the

23    13th of December but there are no dates set after that.  Have

24    you all talked about possible dates after that?

25            MS. KENDRICK:  We were only given dates in October.          04:17PM

UNITED STATES DISTRICT COURT

1        THE COURT:  No.  No.  No.  I'm talking about on the

2   monthly, going forward.

3        MS. KENDRICK:  I think it was about eight months ago

4   or so said you just wanted to do these the second Wednesday of

5   every month.                                              04:17PM

6        THE COURT:  Is everybody assuming that?

7        MS. KENDRICK:  I have that in my calendar in

8   perpetuity.

9        THE COURT:  Good.  So we'll conduct that hearing on

10  the 12th then.                                            04:17PM

11       MR. STRUCK:  Thank you.

12       MR. BOJANOWSKI:  Is the status hearing then the 11th?

13       THE COURT:  Yes.  Then we will have the evidentiary

14  hearing on the Tucson retaliation allegations on the 12th.

15       Anything else we need to address this afternoon?     04:18PM

16       MS. KENDRICK:  Not from plaintiffs.

17       MR. STRUCK:  No, Your Honor.

18       THE COURT:  Tomorrow at 9 then.  Thank you all.

19       (Proceeding concluded at 4:18 p.m.)

20

21

22

23

24

25

1

2

3

4

5                    C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 21st day of September,

16   2017.

17

18                              s/Laurie A. Adams
                                _____
19                              Laurie A. Adams, RMR, CRR

20

21

22

23

24

25