1   Kathleen E. Brody (Bar No. 026331)
    **ACLU FOUNDATION OF ARIZONA**
2   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
3   Telephone: (602) 650-1854
    Email: kbrody@acluaz.org
4
    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
5   *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
    *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
6   *Desiree Licci, Joseph Hefner, Joshua Polson, and*
    *Charlotte Wells, on behalf of themselves and all others*
7   *similarly situated*

    **[ADDITIONAL COUNSEL LISTED ON**
8   **SIGNATURE PAGE]**

9   Sarah Kader (Bar No. 027147)
    Asim Dietrich (Bar No. 027927)
10  **ARIZONA CENTER FOR DISABILITY LAW**
    5025 East Washington Street, Suite 202
11  Phoenix, Arizona 85034
    Telephone: (602) 274-6287
12  Email: skader@azdisabilitylaw.org
              adietrich@azdisabilitylaw.org
13
    *Attorneys for Plaintiff Arizona Center for Disability Law*
14
    **[ADDITIONAL COUNSEL LISTED ON**
    **SIGNATURE PAGE]**
15

16              UNITED STATES DISTRICT COURT

17                  DISTRICT OF ARIZONA

18  Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-DKD
    Dustin Brislan; Sonia Rodriguez; Christina
19  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph      **PLAINTIFFS' RESPONSE TO**
20  Hefner; Joshua Polson; and Charlotte Wells, on       **DEFENDANTS' MOTION TO**
    behalf of themselves and all others similarly        **TERMINATE MONITORING**
21  situated; and Arizona Center for Disability Law,     **(DOC. 2251)**

22                    Plaintiffs,

23        v.

24  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
25  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
26  capacities,

27                    Defendants.

28

LEGAL137059590.1

1

## TABLE OF CONTENTS

2

Page

INTRODUCTION ........................................................................................... 1

I.     DEFENDANTS HAVE THE BURDEN OF PROOF. .............................. 2

II.    DEFENDANTS' MONITORING METHODOLOGY HAS BEEN
       PROVEN TO BE SO UNRELIABLE THAT THEIR SELF-
       REPORTED FINDINGS OF COMPLIANCE CANNOT SUPPORT
       TERMINATION OF MONITORING. .......................................................... 2

III.   DEFENDANTS REFUSE TO PROVIDE UNDERLYING DATA
       THAT FORM THE BASIS OF THEIR FINDINGS OF
       COMPLIANCE, SO THAT THE COURT AND PLAINTIFFS'
       COUNSEL CAN REVIEW AND VERIFY THE ACCURACY OF
       DEFENDANTS' FINDINGS .......................................................................... 4

IV.    DEFENDANTS HAVE FAILED TO SHOW THAT THEY ARE
       ENTITLED TO TERMINATION BASED UPON THE FINAL
       VERSION OF THE MONITOR GUIDE...................................................... 6

       A.    Court Ordered and Agreed-Upon Changes That Affect More
             Than One Performance Measure......................................................... 7

             1.    Defendants Improperly Claim as Compliant Months
                   When They Ignored the Stipulation's Definition of the
                   Word "Seen." .......................................................................... 7

             2.    Defendants Improperly Claim as Compliant Months
                   When They Relied Upon Their "Partial Credit"
                   Methodology. .......................................................................... 9

             3.    Defendants improperly count as compliant months in
                   which a performance measure was not applicable................ 10

             4.    Intake performance measures (33, 34, 62, 75, 76)................ 14

       B.    Court Ordered and Agreed-Upon Changes That Affect
             Individual Performance Measures..................................................... 15

V.     DEFENDANTS IMPROPERLY SEEK TO TERMINATE
       MONITORING OF PERFORMANCE MEASURES WHERE THEY
       ARE NOT SUBSTANTIALLY COMPLIANT.......................................... 37

       A.    Defendants seek termination of monitoring for performance
             measures where their own data show substantial
             noncompliance. ................................................................................. 37

       B.    Defendants improperly seek termination of monitoring for
             performance measures which have previously been found
             substantially noncompliant by the Court, or are the subject of a
             pending Motion to Enforce or a pending Notice of Substantial
             Noncompliance.................................................................................. 38

## INTRODUCTION

Plaintiffs have been raising their concerns with Defendants' methodology for monitoring compliance with the Stipulation's health care performance measures since mid-2015, and since that time have continued to highlight myriad examples of nonsensical monitoring practices.  [*See, e.g.*, Doc. 1561-2 at 3-20 (10/15/15 Notice of Substantial Noncompliance); Doc. 2046 (Plaintiffs' Statement Regarding Evidentiary Hearings on Monitoring); Doc. 2087 (Plaintiffs' Reply In Support of Statement Regarding Evidentiary Hearings)]  The Court has already found that much of the methodology that Defendants have used for the past two years is invalid.  [*See, e.g.*, Docs. 1673, 1745, 1831, 1833, 1907, 1915, 1918, 1933, 1951, 2119, 2124, 2185, 2225]  This March and April, the Court held hearings on Defendants' monitoring methodology, and after listening to several days of testimony by the monitors and their supervisors, concluded that there remain "great chasms of competence."  [4/17/17 Tr. at 671:18]  Plaintiffs have shown and the hearings have revealed such profound flaws in Defendants' methodology that their self-reported CGAR data are not sufficiently reliable to merit termination of monitoring.  [*See generally* Docs. 2046, 2087]

Furthermore, it is only in recent months that all of Defendants' monitors were instructed to list all of the class members whose files were reviewed for a particular performance measure, thus ensuring that an "audit trail" exists so that Plaintiffs' counsel or the Court can confirm the accuracy of the reported CGAR scores.  There is no audit trail available for most of Defendants' findings of compliance from March 2015 through December 2016.  For that reason alone, Defendants' motion must be denied in its entirety unless and until they can provide the underlying data that form the basis for their self-report of compliance, as required by Paragraph 32 of the Stipulation.

Additionally, for many of the performance measures in Defendants' motion, Defendants rely on CGAR scores that were calculated using methodologies that the Court has explicitly rejected—and instructed them repeatedly that they would need to recalculate if they wish to terminate monitoring—or using methodologies that Defendants

1    subsequently agreed to change. [Doc. 1951 at 1-2] Finally, for some of the measures in

2    Defendants' motion, they seek to escape the Stipulation when they cannot do so for

3    reasons including: (a) they ignore that recent scores for some performance measures meet

4    the Stipulation's definition of substantial noncompliance; (b) they seek to terminate

5    monitoring of performance measures that are the subject of a pending Motion to Enforce

6    the Stipulation (Doc. 2253), or Notice of Noncompliance (Doc. 2254-1, Ex. 9); and

7    (c) they seek to terminate monitoring of performance measures for which the Court has

8    found them to be substantially noncompliant, and has not terminated that finding based

9    upon Defendants' remedial plan. [*See* Doc. 1951 at 1-2]

10       For all of these reasons, Defendants' motion should be denied.

11   **I.    DEFENDANTS HAVE THE BURDEN OF PROOF.**

12       Defendants bear the burden of proving that they are entitled to the termination of

13   monitoring.  *See Graves v. Arpaio*, 623 F.3d 1043, 1048-49, 1051 (9th Cir. 2010);

14   *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 1007 (9th Cir. 2000).  "The 'burden'

15   in a civil case involves not one but two elements: the burden of going forward with proof

16   (the burden of 'production') and the burden of persuading the trier of fact (the burden of

17   'proof')."  *Lew v. Moss*, 797 F.2d 747, 751 (9th Cir. 1986).

18       The *only* evidence Defendants submit in support of their motion is their self-

19   reported CGAR scores.  [*See* Doc. 2251-1 at 39-64]  As explained in detail below,

20   Defendants' CGAR scores fail to establish that they are entitled to termination of

21   monitoring.  Accordingly, their motion must be denied.

22   **II.   DEFENDANTS' MONITORING METHODOLOGY HAS BEEN PROVEN
         TO BE SO UNRELIABLE THAT THEIR SELF-REPORTED FINDINGS OF**
23       **COMPLIANCE CANNOT SUPPORT TERMINATION OF MONITORING.**

24       As detailed in Plaintiffs' Statement Regarding Evidentiary Hearings on

25   Monitoring, (Doc. 2046), and Plaintiffs' Reply Brief, (Doc. 2087), Defendants are

26   incapable of or unwilling to accurately and reliably monitor their contractor's compliance

27   with the Stipulation and Performance Measures.  Plaintiffs categorized the profound flaws

28

in Defendants' monitoring uncovered by those hearings, which fatally undermine Defendants' CGAR results, into broad categories, including:

1. Defendants have failed to properly randomize source documents used by monitors;

2. Problems and questions raised by the source documents themselves—who is preparing them, who is inputting the information that is used in the source documents, and whether the source documents listed in the Monitor Guide are what the monitors actually use to determine compliance;

3. Idiosyncratic auditing and reporting practices of the individual monitors which lead to inconsistent results for the same performance measure, prison-by-prison or month-to-month, and sampling of cases or files for which it is mathematically or temporally impossible for there to be noncompliance; and

4. Defendants' "rebuttal" system, created without notification to the Court or Plaintiffs, which allows headquarters staff to change monitors' date and time stamped entries and findings in the CGARs at Corizon's request, without notice to the monitors, or any indication apparent on the face of the CGARs[.]

[Doc. 2046 at 5][1]

These larger systemic problems with how Defendants monitor their compliance with the Stipulation were manifested in a myriad of examples catalogued extensively in Plaintiffs' briefing regarding methodology.   [*See generally* Docs. 2046 and 2087] Plaintiffs incorporate by reference the numerous illustrative examples detailed in these and other prior filings.

Defendant Pratt admitted that, "When we created this Monitoring Bureau, honestly we didn't know what we were doing because we had never done it before."  [4/17/17 Tr. at 641:19-21]   After hearing this evidence, the Court concluded that "this education process has informed me in a way that has raised serious concerns about the quality and the dependability of the monitoring program that the defendants currently have in place." [*Id.* at 671:10-13]   In light of that conclusion, the Court should not now rely upon Defendants' self-report of compliance to terminate monitoring.

---

[1] All citations to the case docket are to the page number assigned by the Court's Electronic Case Filing system.

III.   **DEFENDANTS REFUSE TO PROVIDE UNDERLYING DATA THAT FORM THE BASIS OF THEIR FINDINGS OF COMPLIANCE, SO THAT THE COURT AND PLAINTIFFS' COUNSEL CAN REVIEW AND VERIFY THE ACCURACY OF DEFENDANTS' FINDINGS.**

The Stipulation requires that "Plaintiffs' counsel and their experts shall be able to review any documents that form the basis of the MGAR reports and be able to interview the ADC monitors who prepared those reports."[2]  [Doc. 1185 ¶ 32]  From the start of monitoring until the December 2016 CGARs, Defendants' monitors did not consistently record or document within the CGAR reports which files were reviewed to make the determination of compliance.   [3/8/17 Tr. at 20:23-21:1 (Monitor Kathy Campbell testified "We're starting to do that" in response to the question whether the monitors list in the CGAR every chart they review)]  Rather, this information was maintained by the monitors in a variety of handwritten or computer documents, with each monitor reporting a different system for maintaining their worksheets or lists, including different systems for preserving the records.  [Doc. 2046 at 22-23 (citing 3/8/17 Tr. at 99:12-15 and 114:4-8; 3/21/17 Tr. at 141:10-19, 141:23-142:8, 142:17-25, 143:8-12, 211:6-21), 24 (citing 3/21/17 Tr. at 247:13-15 and 247:23-248:4)]

As a result of Defendants' failure to create an audit trail by listing all records reviewed for the CGARs in 2015 and 2016, it is now impossible for Plaintiffs' counsel to verify that the records counted as compliant were, indeed, compliant.  However, on the occasions when Defendants did provide the monitors' worksheets, even a cursory review of the medical records relied upon by Defendants to establish compliance uncovered egregious inaccuracies.   [*See, e.g.*, Doc. 1561-2 at 14-15 (monitor counting dental appointments, return from specialty care, or chronic care appointments as "urgent referrals"); 17 (counting mental health clinical contacts as having occurred, when in fact

---

[2]  At the time the parties settled the case, Defendants monitored their contractor's compliance with the privatization contract via monthly audits called Monitoring Green-Amber-Red, or "MGAR" reports, and the parties incorporated this term into the Stipulation.  Defendants subsequently renamed these reports Compliance Green-Amber-Red, or "CGAR" reports.

1  the encounters had been cancelled); 17-18 (counting the file of a prisoner who was

2  discharged from ADC custody in 1989 as compliant); 18 (counting as compliant where

3  the documented date of the encounter was in the future); *see also id.* at 47-56; *see also*

4  Doc. 1625 at 6 for a summary of the history of Plaintiffs raising concerns with

5  methodology prior to filing their enforcement motion]

6      Prior to the Spring 2017 evidentiary hearings, Plaintiffs raised this problem with

7  Defendants.  On December 30, 2016, Plaintiffs' counsel wrote Defendants, asking

8          [W]e request that Defendants ensure that a complete record
           has been kept since March 2015, and will be kept going
9          forward, listing all individual health care records that were
           reviewed by the monitors in creating the CGARs, so that there
10         is an audit trail to confirm the accuracy of the reports, and to
           assist in performing re-audits of past CGARs.
11

12  [Doc. 1922-1 at 5]

13      Disregarding the requirement of Paragraph 32 of the Stipulation, Defendants

14  refused to provide the underlying documents that form the basis of their findings of

15  compliance.  Counsel for Defendants instead took the position that "Defendants do not

16  agree to create a comprehensive list of all charts reviewed for the CGARs since the

17  beginning of the Stipulation, as there is no requirement for Defendants to do so under the

18  Stipulation." [Doc. 1922-1 at 10]

19      Compounding the inability to identify which prisoners' medical charts were

20  reviewed for the CGARs is Defendants' "rebuttal process," whereby they provide Corizon

21  with the one-sided opportunity to challenge findings of noncompliance, and if ADC

22  headquarters monitors agree with Corizon's challenge, manually alter the CGAR findings.

23  [*See* Doc. 2046 at 31-35]

24      Unless and until Defendants provide the underlying documents and information

25  that form the basis of their findings of compliance in 2015 and 2016, Plaintiffs have no

26  way of assessing the accuracy of those findings, upon which Defendants' motion is based.

27  Therefore, the Court should deny Defendants' motion in full.

28

**IV.    DEFENDANTS HAVE FAILED TO SHOW THAT THEY ARE ENTITLED TO TERMINATION BASED UPON THE FINAL VERSION OF THE MONITOR GUIDE.**

This Court has ruled as follows:

> Defendants are under no obligation to apply the Final Monitoring Guide's procedures retroactively.  However, if Defendants want to persuade the Court that a given Performance Measure[] at a given facility is compliant with the Stipulation, then *Defendants will have to show that this PM/facility was compliant under the Final Monitoring Guide's procedures.*  The Court expects that this situation would arise for Defendants in at least three contexts: in response to a Motion to Enforce, when moving to terminate a finding of noncompliance under a remediation plan, *and when moving to terminate the Court's oversight.* (Doc. 1185 at ¶¶ 10, 20)

[Doc. 1951 at 1-2 (emphasis added, footnote omitted)]

This ruling is compelled by Circuit precedent.  In *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2512 (2016), the Ninth Circuit held that a judicial interpretation of a contract term is effective from the date of the contract's inception.  "[A] contract provision has only one true meaning – what it meant when written – even though the parties may later dispute the correct interpretation."  *Id.* at 1165.  Therefore, "[o]nce a court has interpreted an ambiguous contract provision that is and has *always been* the correct interpretation from its formation."  *Id.* (emphasis in original).

For a large number of Performance Measures, the parties have agreed to change the methodology used, and/or the Court has found Defendants' initial monitoring methodology to be invalid and has provided the correct methodology.  Those agreed-upon changes and rulings are effective as of the Stipulation's effective date, February 18, 2015.  *See Pauma Band, supra.*  However, Defendant Pratt testified in May 2017 that no performance measures had been recalculated pursuant to the Court's orders or the parties' agreements other than certain mental health measures at ASPC-Winslow, and Defendants

1    offer no evidence that any such recalculation has occurred since he testified.   [*See*

2    Doc. 2087 at 5 citing 5/10/17 Tr. at 769:16-22]³

3

4          **A.**     **Court Ordered and Agreed-Upon Changes That Affect More Than One Performance Measure.**

5          There have been changes to methodology that affect more than one performance

6    measure, and to the extent Defendants are claiming compliance on those measures without

7    re-calculating their scores, their motion must be denied.

8

9          **1.**     **Defendants Improperly Claim as Compliant Months When They Ignored the Stipulation's Definition of the Word "Seen."**

10         The Stipulation defines "seen" as follows:

11           Interaction between a patient and a Medical Provider, Mental

12           Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential

13           setting.   *With respect to Mental Health staff, means an encounter that takes place in a confidential setting outside the*

14           *prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter.*

15   [Doc. 1185-1 at 5 (emphasis added)]   Consistent with this definition, the Court has ruled

16   that a cellfront contact can satisfy the Stipulation's requirement that a patient be "seen"

17   only "if an inmate refuses to leave the cell or if the prison is on lockdown."   [Doc. 1745 at

18   1; *see also* Doc. 1756-1 at 78]   In addition, the Court has repeatedly ruled that group

19

_____

20        ³ The changes to the Monitor Guide arose from a combination of Court orders, and

21   negotiated and agreed-upon changes.   The agreed-upon changes came about after extensive Court-ordered negotiations.   The Court's ruling (Doc. 1951 at 1-2) and the

22   holding of the Ninth Circuit in *Pauma Band* apply whether the change results from a litigated court order or from the parties' agreement that is "so ordered" with the approval

23   of the Court; to hold otherwise would create a perverse incentive to litigate rather than negotiate over disputed terms, thus undermining judicial economy.   *See United States v.*

24   *Bus. Recovery Servs., LLC*, No. CV11-390-PHX-JAT, 2011 WL 4915192, at *4 (D. Ariz. Oct. 17, 2011) ("The Court hopes the parties will diligently work together to resolve any

25   discovery disputes before bringing disputes to the Court's attention"), *aff'd sub nom. United States ex rel. F.T.C. v. Bus. Recovery Servs. LLC*, 488 F. App'x 188 (9th Cir.

26   2012); *Roberts v. Clark Cty. Sch. Dist.*, 312 F.R.D. 594, 603 (D. Nev. 2016) ("Chief Justice Roberts stated that lawyers representing adverse parties 'have an affirmative duty

27   to work together, and with the court, to achieve prompt and efficient resolutions of disputes'") (*quoting* John Roberts, 2015 Year-End Report on the Federal Judiciary

28   (Dec. 31, 2015) at 6, available at http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf)]

1  encounters do not satisfy the Stipulation's requirement that a patient be "seen."

2  [Doc. 1673 at 4-5; Doc. 1745 at 2-3; Doc. 1907 at 2-3]

3      Defendants seek to terminate monitoring with respect to the following performance

4  measures affected by the Court's orders regarding the meaning of the word "seen:"

5   • **PM 74 ("All female prisoners shall be <u>seen</u> by a licensed mental health clinician within five working days of return from a hospital post-partum"):**

6   Perryville [Doc. 2251 at 8]

7      Defendants have failed to demonstrate when they began to monitor compliance

8  with PM 74 consistent with the Court's orders regarding the definition of "seen." Indeed,

9  as recently as January 2017, Defendants' Monitor Guide directed monitors to count group

10  encounters as satisfying PM 74's requirement that the patient be "seen." [Declaration of

11  Corene Kendrick ("Kendrick Decl.") Ex. 5 at 100]  Nor have Defendants demonstrated

12  that they have recalculated the CGAR scores for PM 74 using the final monitoring

13  procedures.  Accordingly, their motion must be denied with respect to this measure.[4]

14

15   • **PM 76 ("If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be <u>seen</u> by a mental health clinician within fourteen days of his or her arrival into ADC."):** Eyman, Perryville, Phoenix, and Tucson [Doc. 2251 at 8]

16

17      Defendants have failed to demonstrate when they began to monitor compliance

18  with PM 76 consistent with the Court's orders regarding the definition of "seen." Indeed,

19  as recently as January 2017, Defendants' Monitor Guide directed monitors to count group

20  encounters as satisfying PM 76's requirement that the patient be "seen."  [Kendrick Decl.

21  Ex. 5 at 102; *see also* Doc. 1756-1 at 641 (same instruction in Nov. 11, 2016 Monitor

22  Guide)]  Nor have Defendants demonstrated that they have recalculated the CGAR scores

23  for PM 76 using the final monitoring procedures.  Accordingly, their motion must be

24  denied with respect to this measure.

25

26  _____

27  [4] Moreover, spot-checks of the underlying records for this PM reveal multiple errors, all in Defendants' favor.  [*See* Kendrick Decl. ¶¶ 7-11 (despite PM 74's requirement of "a licensed mental health clinician," Defendants repeatedly counted as compliant contacts by unlicensed clinicians and by a nurse)]

28

1

2

- **PM 89 ("MH-5 prisoners shall be <u>seen</u> by a mental health clinician for a 1:1 session a minimum of every seven days"):** Phoenix [Doc. 2251 at 8]

3   Defendants have failed to demonstrate when they began to monitor compliance

4   with PM 89 consistent with the Court's orders regarding the definition of "seen." Indeed,

5   in April 2016, Defendants' Monitor Guide directed monitors to count "segregation visits"

6   and "suicide watch" as satisfying PM 89's requirement that the patient be "seen." [*See*

7   Doc. 1626-2 at 122][5]  Nor have Defendants demonstrated that they have recalculated the

8   CGAR scores for PM 89 using the final monitoring procedures.   Accordingly, their

9   motion must be denied with respect to this measure.

10

11
### 2.   Defendants Improperly Claim as Compliant Months When They Relied Upon Their "Partial Credit" Methodology.

12   In late 2016, Defendants unilaterally adopted a "partial credit" method for PMs 16,

13   66, 67, 69, 89, 91, 93, 94, and 95.  On December 14, 2016, the Court ruled that this

14   methodology was invalid.  [Doc. 1831 at 1-2]  Accordingly, the months during which

15   Defendants employed this methodology must be counted as noncompliant.[6]  Defendants

16   seek to terminate monitoring with regard to the following PMs and institutions for which

17   this order is applicable:

18
19
- PM 16 ("Perpetual inventory medication logs will be maintained on each yard."): Douglas, Safford, and Winslow [Doc. 2251 at 9]

20
- PM 66 ("In an IPC, a Medical Provider encounter[] will occur at a minimum every 72 hours."): Perryville [Doc. 2251 at 10]

21
22
- PM 89 ("MH-5 prisoners shall be <u>seen</u> by a mental health clinician for a 1:1 session a minimum of every seven days"): Phoenix [Doc. 2251 at 8]

23
- PM 93 ("Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody."): Florence, Lewis, Perryville, Phoenix, and Tucson [Doc. 2251 at 9]

24

25   [5] Defendants took the position that "suicide watch" encounters could be conducted at cellfront until the Court's order of November 8, 2016.  [*See* Doc. 1745 at 1]

26   [6] Defendant Pratt asserts in his declaration that Defendants do not claim compliance for PM 16, 66, 69, and 93 for the months during which this method was used. [Doc. 2251-1 at 11 n.1, 28 n.2, 29 n.3, 34 n.4]  But this is false; in every case, Defendants' chart lists compliant scores—often 100%—for the PMs and months in question.  [*See id.* at 42, 55, 56, 62]  Furthermore, Defendants make no such claim regarding PM 89.

27

28

1

2

**3.     Defendants improperly count as compliant months in which a performance measure was not applicable.**

3      Defendants' motion is based upon Paragraph 10(b) of the Stipulation, which

4  provides:

5          **b.     Termination of the duty to measure and report on a**
           **particular performance measure:** ADC's duty to measure
6          and report on a particular performance measure, as described
           in Paragraph 9, terminates if:
7                  i. The particular performance measure that applies to a
           specific complex is in compliance, *as defined in sub-*
8          *paragraph A of this Paragraph*, for eighteen months out of a
           twenty-four month period; and
9                  ii. The particular performance measure has not been out
           of compliance, *as defined in sub-paragraph A of this*
10         *Paragraph*, for three or more consecutive months within the
           past 18-month period.

11

12  [Doc. 1185 at 4-5 (emphasis added)]

13      Paragraph 10(a), in turn, defines "compliance" as follows:

14         **a.     Determining   substantial   compliance   with   a**
           **particular performance measure at a particular facility:**
15         Compliance with a particular performance measure identified
           in Exhibit B at a particular complex shall be defined as
16         follows:
                          * * *
17                 iii. After the first twenty four months after the effective
           date of this Stipulation, meeting or exceeding an eighty-five
18         percent (85%) threshold for the particular performance
           measure *that applies to a specific complex*[.]

19

20  [Doc. 1185 at 4 (emphasis added)][7]  When the parties to a contract define a term used in

21  the contract, that definition is conclusive.  *See, e.g., St. Paul Fire & Marine Ins. Co. v.*

22  *Muniz*, 19 Ariz. App. 5, 6, 504 P.2d 546, 548 (1972) ("While insurance contracts are

23  construed most favorably to the insured where the meaning of the language is doubtful,

24  such rule is inapplicable when the language is not doubtful and is defined within the

25  contract itself.  Therefore, we find that 'ownership' has been defined by the contract, and

26

27  _____

28      [7]  The definition of "compliance" for the first twenty-four months of the Stipulation
       is identical, except that the required percentages are lower.  [*Id.*]

1    as such terms of the contract exclude coverage"); *Schwab v. State Farm Fire & Cas.*
2    *Co.*, 27 Ariz. App. 747, 751, 558 P.2d 942, 946 (1976) (same).

3        Earlier in this case, Defendants contended that a month in which a Performance
4    Measure does not require them to take any action at all (indicated by the notation "N/A,"
5    or "not applicable") should count as a compliant month.  [*See* Doc. 1863 at 9 n.10;
6    Doc. 1900 at 5 n.2]  But this cannot be squared with the definition of "compliance" set
7    forth in the Stipulation.  A month in which a Performance Measure does *not* "appl[y] to a
8    specific complex," and in which Defendants accordingly do *not* "meet[] or exceed[] an
9    eighty-five percent (85%) threshold," plainly cannot be counted as compliant.
10   Accordingly, the Court has ruled that a month in which a Performance Measure is "N/A"
11   at a given complex is neither compliant nor noncompliant; it simply drops out of the
12   analysis and is not counted.  [*See* 2/8/17 Tr. at 45:18-20 ("I should also, I think, address
13   what it means to have an N/A, and I think that those just don't get counted. It's not for or
14   against, it's just pulled out")][8]

15       Disregarding the Court's order, Defendants have counted "N/A" months as
16   "compliant" in compiling their list of PMs that they claim satisfy the requirements of
17   Paragraph 10(b).  If "N/A" months are excluded from the calculation as required by the
18   Court's order, Defendants have failed to show compliance for the following PMs at the
19   following institutions:

20   • PM 15 ("Inmates who refuse prescribed medication (or no show) will be
21     counseled by a qualified health care provider (QHCP) after three consecutive
        refusals"):  Douglas and Safford [*See* Kendrick Decl. Ex. 1 (Plaintiffs'
22      Annotated Review of Doc. 2251-1) at 4]

23

24   ───────────────────
25       [8] The preceding discussion pertains to PMs that are generally applicable at a
     facility, but are "N/A" in a given month. For example, PM 74 ("All female prisoners shall
26   be seen by a licensed mental health clinician within five working days of return from a
     hospital post-partum") was "N/A" at the Perryville facility in June 2015 and September
27   2016 (see Doc. 2251-1 at 57), presumably because no women gave birth in those months.
     By contrast, PM 74 is listed as "N/A" every month at every male prison. [*Id.*] Plaintiffs
28   obviously do not contend that Defendants are required to monitor PM 74 at facilities
     housing only male prisoners.

- PM 25 ("A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency."): Douglas, Eyman, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma. [*See id.* at 7]

- PM 26 ("Responses to health care grievances will be completed within 15 working days of receipt (by health care staff) of the grievance."): Douglas, Phoenix, Safford, Winslow [*See id.*]

- PM 29 ("Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P-C-02."): Douglas, Tucson [*See id.* at 8]

- PM 33 ("All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility."): Eyman [*See id.* at 9]

- PM 34 ("A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility."): Eyman [*See id.*]

- PM 35 ("All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption."): Perryville [*See id.*]

- PM 40 ("Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral."): Douglas, Safford [*See id.* at 10]

- PM 41 ("Emergent provider referrals are seen immediately by a Medical Provider."): Douglas, Perryville, Phoenix, Safford, Winslow [*See id.* at 11]

- PM 43 ("Inmates returning from an inpatient hospital stay or ER transport will be returned to the medical unit and be assessed by a RN or LPN on duty there."): Safford [*See id.*]

- PM 47 ("A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request."): Safford, Winslow [*See id.* at 12]

- PM 48 ("Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record."): Eyman, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma [*See id.*][9]

- PM 49 ("Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial."): Lewis, Safford, Winslow [*See id.* at 13]

---

[9] Defendants did not measure their compliance with PM 48 or 49 until the July 2016 CGARs, because until that point they took the position that since Corizon's corporate nomenclature for a denial is "Alternate Treatment Plan" (or "ATP"), there were no denials for the monitors to review. [*See* Docs. 1561-1 at 6; 1626-1 at 38-39]

- PM 62 ("All prisoners are screened for tuberculosis upon intake."): Eyman [*See id.* at 16]

- PM 72 ("Inmates who refuse prescribed diets for more than 3 consecutive days will receive follow-up nutritional counseling by a QHCP."): Douglas, Perryville, Phoenix, Safford, Winslow, Yuma [*See id.* at 18]

- PM 75 ("A mental health assessment of a prisoner during initial intake shall be completed by mental health staff by the end of the second full day after the prisoner's arrival into ADC."): Eyman [*See id* at 19]

- PM 76 ("If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within fourteen days of his or her arrival into ADC."): Eyman, Perryville, Phoenix, and Tucson [*Id.*]

- PM 93 ("Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody."): Perryville, Phoenix, and Tucson [*See id.* at 24][10]

- PM 97 ("A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider."): Douglas, Safford, Winslow [*See id.* at 25]

- PM 99 ("Peer reviews shall be conducted as set forth in the MHTM (rev. 4/18/14), Chapter 1, Section 3.0."): Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma [*See id.*]

- PM 101 ("Dental assistants will take inmate histories and vital signs and dental radiographs (as ordered) by the Dentist."): Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma [*See id.* at 26]

Accordingly, Defendants' motion to terminate must be denied with respect to these measures.

---

[10] Beginning in September 2016 (Tucson) and December 2016 (Perryville), Defendants have listed PM 93 as "not applicable" at these two facilities every month, based upon their claim that conditions at those institutions have changed so fundamentally that they no longer constitute "maximum custody." Plaintiffs challenge this assertion, and plan to submit evidence, based upon their recent tour of Perryville, that conditions there are essentially unchanged. Plaintiffs request that the Court follow the procedure it employed when Defendants made a similar claim regarding the Florence facility: the Court ordered them to provide "competent, admissible evidence demonstrating that (1) the enumerated facilities no longer house maximum custody inmates and (2) the conditions of close custody are substantially different from maximum custody such that close custody inmates would not otherwise qualify for protection under DI-326." [Doc. 1745 at 2]

1              4.      **Intake performance measures (33, 34, 62, 75, 76).**

2          The Court ordered on September 6, 2016 that PM 33, 34, 75, and 76, all of which

3    involve "intake" of prisoners, apply to parole violators as well as those newly committed

4    to ADC.  [Doc. 1673 at 2-3][11]  Prior to the Court's order, Defendants did not apply these

5    PMs to parole violators.  [*See* Doc. 1644 at 8:24-25 (Defendants' assertion that "The

6    Stipulation Does Not Require Defendants To Monitor Parole Violators as Intakes"); *see*

7    *also* Doc. 1627 at 7 (parole violator's ADC medical record "shows that he received no

8    intake screening, and indeed no attention of any kind from health care staff, before he

9    hanged himself on March 9, 2016"); Doc. 1539 ¶ 68 (parole violator who died from

10   complications of suffering withdrawal from his daily heroin habit not seen by provider)]

11   Defendants have failed to show that they have re-calculated these measures as required by

12   the Court's order.  [*See* Kendrick Decl. Ex. 2 at 1-2 (as of Feb. 17, 2017, Defendants had

13   not modified their Monitor Guide to state that these measures apply to parole violators)]

14   Accordingly, their motion must be denied with respect to these PMs[12]:

- PM 33 ("All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility."):  Eyman, Perryville, Phoenix, Tucson [Doc. 2251 at 5]

- PM 34 ("A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility."): Eyman, Perryville, Phoenix, Tucson [*Id.*]

- PM 62 ("All prisoners are screened for tuberculosis upon intake."): Eyman, Perryville, Phoenix, Tucson [*Id.* at 7]

- PM 75 ("A mental health assessment of a prisoner during initial intake shall be completed by mental health staff by the end of the second full day after the prisoner's arrival into ADC."): Eyman, Perryville, Phoenix, and Tucson [*Id.* at 8]

---

[11]  Although Doc. 1673 does not explicitly address PM 62, that measure is also an "intake" measure and therefore is controlled by the Court's order that "the Intake PMs apply to all inmates, including those whose parole was revoked."  [Doc. 1673 at 3]

[12]  In addition, Defendants did not apply PMs 33, 34, 62, 75 and 76 to Eyman at all until approximately December 2015.  [*See* Doc. 1626-1, Ex. 4, at 21 (Nov. 24, 2015 letter from Rand to Eidenbach, stating "Defendants agree to monitor incoming death row inmates who bypass traditional intake facilities")]

- PM 76 ("If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within fourteen days of his or her arrival into ADC."): Eyman, Perryville, Phoenix, and Tucson [*Id*. at 8]

**B.     Court Ordered and Agreed-Upon Changes That Affect Individual Performance Measures.**

Defendants have entirely failed to show that they are "compliant under the Final Monitoring Guide's procedures" (Doc. 1951 at 1-2) with respect to the following performance measures:

**PM 5 ("Medical Records will be accurate, chronologically maintained, and scanned or filed in the patient's chart within two business days, with all documents filed in their designated location.")**

Defendants seek to terminate monitoring of PM 5 at Douglas, Safford, Winslow, and Yuma. [Doc. 2251 at 4] The parties did not agree upon the methodology for this performance measure until October 14, 2016. [Doc. 1626-1 at 77; Doc. 1756-1 at 35] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 5 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 6 ("Provider orders will be noted daily with time, date, and name of person taking the orders off.")**

Defendants seek to terminate monitoring of PM 6 at Douglas, Safford, Winslow, and Yuma. [Doc. 2251 at 4, 10] The parties did not agree upon the methodology for this performance measure until October 14, 2016. [Doc. 1756-1 at 35] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 6 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 7 ("Medical record entries will be legible, and complete with time, name stamp and signature present.")**

Defendants seek to terminate monitoring of PM 7 at Douglas, Florence, Safford, Winslow and Yuma.  [Doc. 2251 at 4, 10]    The parties did not agree upon the methodology for this performance measure until October 14, 2016.  [Doc. 1756-1 at 35] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 7 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 8 ("Nursing protocols/NETS will be utilized by nurses for sick call.")**

Defendants seek to terminate monitoring of PM 8 at Douglas, Eyman, Florence, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.  [Doc. 2251 at 4]  The parties did not agree upon the methodology for this performance measure until October 14, 2016. [Doc. 1626-1 at 77; Doc. 1756-1 at 35-36]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 8 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 9 ("SOAPE format will be utilized in the medical record for encounters.")**

Defendants seek to terminate monitoring of PM 9 at Douglas, Florence, Lewis, Perryville, Safford, Tucson, Winslow, and Yuma.  [Doc. 2251 at 4]  The parties did not agree upon the methodology for this performance measure until October 14, 2016. [Doc. 1626-1 at 78; Doc. 1756-1 at 36]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 9 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 10 ("Each patient's medical record will include an up‑to‑date Master Problem list.")**

Defendants seek to terminate monitoring of PM 10 at Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Winslow, and Yuma.  [Doc. 2251 at 4]  The parties did not agree upon the methodology for this performance measure until October 14, 2016.  [Doc. 1626-1 at 78; Doc. 1756-1 at 36]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 10 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 11 ("Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT.")**

Defendants seek to terminate monitoring of PM 11 at Douglas, Perryville, Phoenix, Safford, and Winslow.[13]   [Doc. 2251 at 4]   The parties did not agree upon the methodology for this performance measure until October 14, 2016.  [Doc. 1626-1 at 78; Doc. 1756-1 at 27, 36]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 11 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 12 ("Medical record will contain documentation of refusals or 'no shows'.")**

Defendants seek to terminate monitoring of PM 12 at Douglas, Safford, and Yuma [Doc. 2251 at 4]  The parties did not agree upon the methodology for this performance measure until October 14, 2016.  [Doc. 1626-1 at 72, 76; Doc. 1756-1 at 26]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 12 using the final monitoring procedures.   Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

---

[13]  The Court found Defendants substantially noncompliant with PM 11 at Winslow on May 20, 2016.  [Doc. 1583 at 2] *See infra* Part V.B.

1

2
**PM 13 ("Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication.")**

3        Defendants seek to terminate monitoring of PM 13 at Phoenix, Safford, Winslow,

4   and Yuma.[14]  [Doc. 2251 at 4, 9]  However, it was not until November 8, 2016 that the

5   parties reached an agreement upon the monitoring methodology to be used for this

6   performance measure.  [Doc. 1756-1 at 78]  Defendants have failed to demonstrate when

7   they began to monitor compliance using the final methodology, and have not shown that

8   they recalculated PM 13 using the final monitoring procedures.  Accordingly, their motion

9   to terminate monitoring with regard to this measure must be denied.

10

11

12
**PM 14 ("Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication.")**

13        Defendants seek to terminate monitoring of PM 14 at Douglas, Safford and

14   Winslow.[15]  [Doc. 2251 at 9, 10]  The parties did not agree upon the methodology for this

15   performance measure until November 6, 2016.  [Doc. 1756-1 at 37, 46, 52-53, 74, 78]

16   Defendants have failed to demonstrate when they began to monitor compliance using the

17   final methodology, and have not shown that they recalculated PM 14 using the final

18   monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to

19   this measure must be denied.

20

21
**PM 15 ("Inmates who refuse prescribed medication (or no show) will be counseled by a QHCP after three consecutive refusals.")**

22        Defendants seek to terminate monitoring of PM 15 at Douglas, Perryville, Phoenix,

23   Safford, Winslow, and Yuma.  [Doc. 2251 at 4]  The parties did not agree upon the

24   methodology for this performance measure until November 9, 2016.  [Doc. 1756-1 at 27,

25   37]  Defendants have failed to demonstrate when they began to monitor compliance using

26

27        [14]  The Court found Defendants substantially noncompliant with PM 13 at Yuma on May 20, 2016.  [Doc. 1583 at 2]  *See infra* Part V.B.

28        [15]  The Court found Defendants substantially noncompliant with PM 14 at Douglas on May 20, 2016.  [Doc. 1583 at 2]  *See infra* Part V.B.

the final methodology, and have not shown that they recalculated PM 15 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 16 ("Perpetual inventory medication logs will be maintained on each yard.")**

Defendants seek to terminate monitoring of PM 16 at Douglas, Safford, and Winslow. [Doc. 2251 at 9] The parties did not agree upon the methodology for this performance measure until December 14, 2016. [Doc. 1756-1 at 27, 37, 46, 53, 74, 78-79] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 16 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 17 ("The Medication Administration Record (MAR) will reflect dose, frequency, start date and nurse's signature.")**

Defendants seek to terminate monitoring of PM 17 at all ten institutions. [Doc. 2251 at 4] The parties did not agree upon the methodology for this performance measure until November 9, 2016. [Doc. 1626-1 at 80; 1626-2 at 37; Doc. 1756-1 at 37, 46, 53, 74, 79] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 17 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 18 ("Daily delivery manifests will be kept in binders located in medication rooms on each yard/complex and will be reviewed and initialed daily by an LPN or RN.")**

Defendants seek to terminate monitoring of PM 18 at Douglas, Eyman, Florence, Phoenix, Safford, Winslow, and Yuma. [Doc. 2251 at 4] The parties did not agree upon the methodology for this performance measure until October 14, 2016. [Doc. 1626-1 at 80; Doc. 1756-1 at 27, 38] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they

recalculated PM 18 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 19 ("Perpetual inventory medications will be signed off on the Inmate's individual MAR.")**

Defendants seek to terminate monitoring of PM 19 at Douglas and Safford. [Doc. 2251 at 4]  The parties did not agree upon the methodology for this performance measure until November 8, 2016.  [Doc. 1756-1 at 46, 53, 75, 79]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 19 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 20 ("Medical AIMs entries are accurately completed within 3 business days from the entry in the medical record.")**

Defendants seek to terminate monitoring of PM 20 at Douglas.  [Doc. 2251 at 5] The parties did not agree upon the methodology for this performance measure until October 14, 2016.  [Doc. 1626-1 at 80; Doc. 1756-1 at 27, 38]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 20 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 21 ("Inmates who are paroled or released from ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contracted vendor.")**

Defendants seek to terminate monitoring of PM 21 at all ten institutions. [Doc. 2251 at 5]  The parties did not agree upon the methodology for this performance measure until November 8, 2016.  [Doc. 1626-1 at 80; Doc. 1756-1 at 38, 47, 75, 79] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 21 using final

monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 22 ("Non-formulary requests are reviewed and approved, disapproved, or designated for an alternate treatment plan (ATP) within two business days of the prescriber's order.")**

Defendants seek to terminate monitoring of PM 22 at all ten institutions. [Doc. 2251 at 5]  The parties did not agree upon the methodology for this performance measure until October 19, 2016.   [Doc. 1626-1 at 80; Doc. 1756-1 at 27-28, 38]

Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 22 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 25 ("A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency.")**

Defendants seek to terminate monitoring of PM 25 at all ten institutions. [Doc. 2251 at 5]  The parties did not agree upon the language for the methodology of this performance measure until July 28, 2017.   [Doc. 1626-1 at 81; Doc. 1626-2 at 45; Doc. 1756-1 at 47, 54-55, 75, 79; Doc. 2227-1 at 7, 10, 13-16, 25; Kendrick Decl. Ex. 4 at 1]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 25 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 26 ("Responses to health care grievances will be completed within 15 working days of receipt (by health care staff) of the grievance.")**

Defendants seek to terminate monitoring of PM 26 at all ten institutions. [Doc. 2251 at 5]  The parties did not agree upon the methodology for this performance measure until November 8, 2016. [Doc. 1756-1 at 47, 55, 79-80]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 26 using the final monitoring procedures.

Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 28 ("Every medical provider will undergo peer reviews annually with reviews and recommended actions documented.")**

Defendants seek to terminate monitoring of PM 28 at Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Winslow, and Yuma.  [Doc. 2251 at 5]  The parties did not agree upon the methodology for this performance measure until November 9, 2016.  [Doc. 1756-1 at 47, 55, 80]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 28 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 29 ("Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P‑C‑02.")**

Defendants seek to terminate monitoring of PM 29 at Douglas, Stafford, and Tucson   [Doc. 2251 at 5]  The parties did not agree upon the methodology for this performance measure until November 9, 2016.  [Doc. 1626-1 at 82; Doc. 1756-1 at 38-39, 47-48, 55]   Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 29 using the final monitoring procedures.   Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 33 ("All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility.")**

Defendants seek to terminate monitoring of PM 33 at Eyman, Perryville, Phoenix, and Tucson.  [Doc. 2251 at 5]  The Court ordered Defendants to include returning parolees in this measure on September 6, 2016.  [Doc. 1673 at 2-3; Doc. 1915 at 2; *see also* Doc. 1626-1 at 17-18, 24-25, 29]  However, as of February 17, 2017  Defendants had still not made all requested changes to this PM.  [Kendrick Decl. Ex. 2 at 1-2]  Defendants have failed to demonstrate when they began to monitor compliance using the final

methodology, and have not shown that they recalculated PM 33 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 34 ("A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility.")**

Defendants seek to terminate monitoring of PM 34 at Eyman, Perryville, Phoenix, and Tucson. [Doc. 2251 at 5] The Court ordered Defendants to include returning parolees in this measure on September 6, 2016. [Doc. 1673 at 2-3; Doc. 1915 at 2; *see also* Doc. 1626-1 at 17-18, 24-25, 30] However, as of February 17, 2017 Defendants had still not made all requested changes to this PM. [Kendrick Decl. Ex. 2 at 1-2] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 34 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 35 ("All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption.")**

Defendants seek to terminate monitoring of PM 35 at Douglas, Perryville, and Safford. [Doc. 2251 at 5] The Court ordered Defendants on December 14, 2016 to use a methodology of measuring compliance by looking at the first required dose of medication at the receiving institution. [Doc. 1831 at 2] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 35 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 36 ("A LPN or RN will screen HNRs within 24 hours of receipt.")**

Defendants seek to terminate monitoring of PM 36 at Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma. [Doc. 2251 at 5, 10] The parties did not agree on the methodology for this performance measure until October 14, 2016. [Doc. 1626-1 at 70, 75; Doc. 1756-1 at 25] Defendants have failed to

1  demonstrate when they began to monitor compliance using the final methodology, and

2  have not shown that they recalculated PM 36 using the final monitoring procedures.

3      Moreover, since the move to Defendants' so-called "open clinic" system of triaging

4  health needs requests (HNRs), Defendants' practice of only logging and recording the

5  HNRs of prisoners who make it to the front of the line and are actually seen is falsely

6  inflating compliance with multiple performance measures in which compliance hinges on

7  the time elapsed between submission of the HNR and the prisoner being seen.[16]  [*See, e.g.*,

8  8/9/17 Tr. at 109:1-110:10]   For these reasons, Defendants' motion to terminate

9  monitoring with regard to this measure must be denied.

10 **PM 37 ("Sick call inmates will be seen by an RN within 24 hours after an HNR is
   received (or immediately if identified with an emergent need, or on the same day if**

11 **identified as having an urgent need).")**

12     Defendants seek to terminate monitoring of PM 37 at Douglas, Phoenix, Safford,

13 and Winslow.[17]  [Doc. 2251 at 6]  The parties did not agree on the methodology for this

14 performance measure until October 14, 2016.  [Doc. 1626-1 at 70, 75; Doc. 1756-1 at 25]

15 Defendants have failed to demonstrate when they began to monitor compliance using the

16 final methodology, and have not shown that they recalculated PM 37 using the final

17 monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to

18 this measure must be denied.

19 **PM 39 ("Routine provider referrals will be addressed by a Medical Provider and
   referrals requiring a scheduled provider appointment will be seen within fourteen**

20 **calendar days of the referral.")**

21     Defendants seek to terminate monitoring of PM 39 at Douglas, Phoenix, Safford,

22 and Winslow.  [Doc. 2251 at 6]  The parties did not agree upon the methodology for this

23 performance measure until March 30, 2016.  [Doc. 1626-1 at 25-26, 31, 46; Doc. 1626-2

24 at 60-61]  Defendants have failed to demonstrate when they began to monitor compliance

25 using the final methodology, and have not shown that they recalculated PM 39 using the

26 _____

27     [16]  This problem of inflated compliance also exists with regard to PM 37, 39, 40,
   41, 102, and 103, discussed below.
       [17]  The Court found Defendants substantially noncompliant with PM 37 at Winslow

28 on May 20, 2016.  [Doc. 1583 at 2]  *See infra* Part V.B.

final monitoring procedures.   Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 40 ("Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral.")**

Defendants seek to terminate monitoring of PM 40 at Douglas, Florence, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.[18]   [Doc. 2251 at 6]   The parties did not agree upon the methodology for this performance measure until March 30, 2016.  [Doc. 1626-1 at 20, 26-27, 32, 46; Doc. 1626-2 at 62]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 40 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 41 ("Emergent provider referrals are seen immediately by a Medical Provider.")**

Defendants seek to terminate monitoring of PM 41 at Douglas, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.  [Doc. 2251 at 6]  The parties did not agree upon the methodology for this performance measure until March 30, 2016. [Doc. 1626-1 at 20, 27, 33, 46; Doc. 1626-2 at 63]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 41 using the final monitoring procedures.   Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 42 ("A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider.")**

Defendants seek to terminate monitoring of PM 42 at Douglas, Lewis, Phoenix, Safford, Winslow, and Yuma.[19]  [Doc. 2251 at 6, 10]  The parties negotiated the language of this measure in April and October 2016, but reached an impasse.  [Doc 1626-1 at 70-

---

[18]  The Court found Defendants substantially noncompliant with PM 40 at Tucson on April 24, 2017.  [Doc. 2030 at 2]  *See infra* Part V.B.
[19]  Plaintiffs' pending Motion to Enforce the Stipulation seeks a finding of substantial noncompliance with PM 42 at Lewis.  [Doc. 2253 at 5]  *See infra* Part V.B.

71, 75; Doc. 1756-1 at 26]  On January 26, 2017 the Court ordered Defendants to submit a modification to the follow-up encounters log as the source document.  [Doc. 1915 at 3; *see generally* 1/26/17 Tr. at 79:6-80:8]   The Court observed that "[t]he concern that I think plaintiffs would articulate, and one that I have, too, is that if this is only a log that you have done follow-ups on, how will it be helpful in determining whether or not 42 has been satisfied because you are only checking among those that you followed up with…" [1/26/17 Tr. at 79:6-12]  Plaintiffs can find no indication that Defendants ever submitted a revised source document to the Court.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 43 ("Inmates returning from an inpatient hospital stay or ER transport will be returned to the medical unit and be assessed by a RN or LPN on duty there.")**

Defendants seek to terminate monitoring of PM 43 at all ten institutions. [Doc. 2251 at 6]  The parties did not agree upon the methodology for this performance measure until October 14, 2016.   [Doc. 1626-1 at 71, 75-76; Doc. 1756-1 at 26] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 43 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 45 ("On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine.")**

Defendants seek to terminate monitoring of PM 45 at Douglas, Eyman, Florence, Perryville, Phoenix, Safford, Winslow, and Yuma.  [Doc. 2251 at 6, 9; Doc. 1756-1 at 81] The parties did not agree upon the methodology for this performance measure until November 9, 2016.  [Doc. 1626-1 at 42, 50-51; Doc. 1756-1 at 48, 81]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 45 using the final monitoring procedures.   Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 46 ("A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison.")**

Defendants seek to terminate monitoring of PM 46 at Safford and Winslow. [Doc. 2251 at 6]  The parties did not agree upon the methodology for this performance measure until May 1, 2017.  [Doc. 1626-1 at 42, 50-51; Doc. 1756-1 at 48; Doc. 2106-1 at 20]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 46 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 47 ("A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request.")**

Defendants seek to terminate monitoring of PM 47 at Safford and Winslow.[20] [Doc. 2251 at 6, 10]  Defendants are in the process of implementing remedial plans with regard to this PM at all ten institutions, and have not yet reached agreement on methodology for evaluating compliance, as the new system of notifying patients of their test results has not yet been fully implemented.  [*See, e.g.*, Doc. 2227-1 at 7, 25; 7/14/17 Tr. at 237-39; Doc. 2291-1 at 3-4; *see generally* Docs. 2296, 2296-1, 2296-2]  As the methodology is not yet finalized, Defendants cannot show that they have recalculated PM 47 using the final monitoring procedures, and their motion to terminate monitoring with regard to this measure must accordingly be denied.

**PM 48 ("Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record.")**

Defendants seek to terminate monitoring of PM 48 at Eyman, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.[21]  [Doc. 2251 at 6]  As plainly shown in

---

[20] The Court found Defendants substantially noncompliant with PM 47 at all ten institutions on October 7, 2016.  [Doc. 1709 at 1-2] *See infra* Part V.B.
[21] Plaintiffs notified Defendants on August 28, 2017 of their substantial noncompliance with PM 48 at Tucson.  [Doc. 2254-1 at 40] *See infra* Part V.B.

1   their filing, (Doc. 2251-1 at 50), Defendants did not start monitoring this PM at all until

2   the July 2016 CGARs because of their position that since Corizon uses the phrase

3   "alternate treatment plan" to refer to denials, there were no "denials" for them to audit or

4   monitor.  [*See* Doc. 1626-1 at 38-39, 47-48, 52; Doc. 1626-2 at 72-73]  The parties also

5   did not reach agreement on the methodology to be used for this PM until October 18,

6   2016.  [Doc. 1756-1 at 49]  Defendants have failed to demonstrate when they began to

7   monitor compliance using the final methodology, and have not shown that they

8   recalculated PM 48 using the final monitoring procedures.  Accordingly, their motion to

9   terminate monitoring with regard to this measure must be denied.

10

11  **PM 49 ("Patients for whom a provider's request for specialty services is denied are
    told of the denial by a Medical Provider at the patient's next scheduled appointment,
12  no more than 30 days after the denial, and the Provider documents in the patient's
    medical record the Provider's follow-up to the denial.")**

13      Defendants seek to terminate monitoring of PM 49 at Lewis, Safford, and

14  Winslow.  [Doc. 2251 at 6]  As plainly shown in their filing, (Doc. 2251-1 at 51),

15  Defendants did not start monitoring this PM at all until the July 2016 CGARs because of

16  their position that since Corizon uses the phrase "alternate treatment plan" to refer to

17  denials, there were no "denials" for them to audit or monitor.  [*See* Doc. 1626-1 at 38-340,

18  47-48, 53, 55, 63; Doc 1626-2 at 74-75]   .   Accordingly, their motion to terminate

19  monitoring with regard to this measure must be denied.

20  **PM 50 ("Urgent specialty consultations and urgent specialty diagnostic services will
    be scheduled and completed within 30 calendar days of the consultation being
21  requested by the provider.")**

22      Defendants seek to terminate monitoring of PM 50 at Douglas, Eyman, Lewis,

23  Phoenix, Safford, Winslow, and Yuma.  [Doc. 2251 at 6]  The parties did not agree upon

24  the methodology for this performance measure until November 9, 2016.  [Doc. 1626-1 at

25  40-41, 48-49, 55-56, 63; Doc. 1626-2 at 76-77; Doc. 1756-1 at 49, 57, 76, 81-82]

26  Defendants have failed to demonstrate when they began to monitor compliance using the

27  final methodology, and have not shown that they recalculated PM 50 using the final

28

1    monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to
2    this measure must be denied.

3
4    **PM 51 ("Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider.")**

5            Defendants seek to terminate monitoring of PM 51 at Phoenix, Safford, and
6    Winslow.  [Doc. 2251 at 6]  The parties did not agree upon the methodology for this
7    performance measure until November 9, 2016.  [Doc. 1626-1 at 40-41, 48-49, 55-56; Doc
8    1626-2 at 78-79; Doc. 1756-1 at 49, 57, 76, 81-82]  Defendants have failed to demonstrate
9    when they began to monitor compliance using the final methodology, and have not shown
10   that they recalculated PM 51 using the final monitoring procedures.  Accordingly, their
11   motion to terminate monitoring with regard to this measure must be denied.

12
13   **PM 52 ("Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report.")**

14           Defendants seek to terminate monitoring of PM 52 at Lewis, Phoenix, Safford, and
15   Winslow.[22]  [Doc. 2251 at 6]  The parties did not agree upon the methodology of this
16   performance measure until May 1, 2017.  [Doc. 1626-1 at 76; Doc. 2106-1 at 20]
17   Defendants have failed to demonstrate when they began to monitor compliance using the
18   final methodology, and have not shown that they recalculated PM 52 using the final
19   monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to
20   this measure must be denied.

21   **PM 53 ("Treatment plans will be developed and documented in the medical record by a provider within 30 calendar days of identification that the inmate has a chronic disease.")**
22

23           Defendants seek to terminate monitoring of PM 53 at all ten prison complexes.
24   [Doc. 2251 at 6]  The parties did not agree upon the methodology for this performance
25   measure until October 19, 2016.  [Doc. 1626-1 at 41-42, 49-50, 56, 64; Doc. 1756-1 at 49]
26   Defendants have failed to demonstrate when they began to monitor compliance using the

27
28           [22]  Plaintiffs notified Defendants on August 28, 2017, that they are substantially noncompliant with PM 52 at Phoenix.  [Doc. 2254-1 at 40] *See infra* Part V.B.

1  final methodology, and have not shown that they recalculated PM 53 using the

2  monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to

3  this measure must be denied.

4  **PM 54 ("Chronic disease inmates will be seen by the provider as specified in the**

5  **inmate's treatment plan, no less than every 180 days unless the provider documents**
   **a reason why a longer time frame can be in place.")**

6       Defendants seek to terminate monitoring of PM 54 at Phoenix, Safford, Winslow,

7  and Yuma.[23]  [Doc. 2251 at 6, 9]  The parties did not agree upon the methodology for this

8  performance measure until April 5, 2016.  [Doc. 1626-1 at 41-42, 49-50, 56; Doc. 1626-2

9  at 83-84]  Defendants have failed to demonstrate when they began to monitor compliance

10  using the final methodology, and have not shown that they recalculated PM 54 using the

11  final monitoring procedures.  Accordingly, their motion to terminate monitoring with

12  regard to this measure must be denied.

13  **PM 55 ("Disease management guidelines will be implemented for chronic diseases.")**

14       Defendants seek to terminate monitoring of PM 55 at Douglas, Perryville, Phoenix,

15  Safford, Winslow, and Yuma.  [Doc. 2251 at 6, 9]  The parties did not agree upon the

16  methodology for this performance measure until April 5, 2016.  [Doc. 1626-1 at 83;

17  Doc. 1756-1 at 39, 49]  Defendants have failed to demonstrate when they began to

18  monitor compliance using the agreed upon methodology, and have not shown that they

19  recalculated PM 55 using the final monitoring procedures.  Accordingly, their motion to

20  terminate monitoring with regard to this measure must be denied.

21

22  **PM 57 ("A Medical Provider will order prenatal vitamins and diet for a pregnant**
    **inmate at the inmate's initial intake physical examination.")**

23       Defendants seek to terminate monitoring of PM 57 at Perryville.  [Doc. 2251 at 7]

24  The parties did not agree upon the methodology for this performance measure until

25  October 14, 2016.  [Doc. 1626-1 at 83; Doc. 1756-1 at 28]  Defendants have failed to

26  demonstrate when they began to monitor compliance using the final methodology, and

27  _____

28       [23]  The Court found Defendants substantially noncompliant with PM 54 at Phoenix
    and Yuma on May 20, 2016.  [Doc. 1583 at 2]  *See infra* Part V.B.

have not shown that they recalculated PM 57 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 59 ("Inmates will be screened for TB on an annual basis.")**

Defendants seek to terminate monitoring of PM 59 at Douglas, Eyman, Florence, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.  [Doc. 2251 at 7, 10]  The parties did not agree upon the methodology for this performance measure until October 14, 2016.  [Doc. 1626-1 at 72, 76; Doc. 1756-1 at 26]  Defendants have failed to demonstrate when they began to monitor compliance using the agreed upon methodology, and have not shown that they recalculated PM 59 using the final monitoring procedures. Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 60 ("All female inmates ages 21 to 65 will be offered a Pap smear at the inmate's initial intake physical examination, and every 36 months thereafter unless more frequent screening is clinically recommended.")**

Defendants seek to terminate monitoring of PM 60 at Perryville.  [Doc. 2251 at 7] The parties did not agree upon the methodology for this performance measure, and ultimately the Court ordered a methodology on December 14, 2016.  [Doc. 1626-1 at 21, 27-28, 34; Doc. 1831 at 2]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 60 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 63 ("In an IPC, an initial health assessment will be completed by a Registered Nurse on the date of admission.")**

Defendants seek to terminate monitoring of PM 63 at Florence, Lewis, Perryville, and Tucson.  [Doc. 2251 at 7, 9]  The parties did not agree upon the methodology for this performance measure until October 14, 2016.  [Doc. 1626-1 at 84; Doc. 1756-1 at 39] Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 63 using the final

1  monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to

2  this measure must be denied.

3

4  **PM 64 ("In an IPC, a Medical Provider evaluation and plan will occur within the next business day after admission. ")**

5       Defendants seek to terminate monitoring of PM 64 at Florence, Lewis, and

6  Perryville.  [Doc. 2251 at 7]  The parties did not agree upon the methodology for this

7  performance measure until October 14, 2016.  [Doc. 1626-1 at 84; Doc. 1756-1 at 39]

8  Defendants have failed to demonstrate when they began to monitor compliance using the

9  final methodology, and have not shown that they recalculated PM 64 using the final

10 monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to

11 this measure must be denied.

12

13 **PM 65 ("In an IPC, a written history and physical examination will be completed by a medical provider within 72 hours of admission.")**

14      Defendants seek to terminate monitoring of PM 65 at Florence, Lewis, Perryville,

15 and Tucson.  [Doc. 2251 at 7]  The parties did not agree upon the methodology for this

16 performance measure until October 14, 2016.  [Doc. 1626-1 at 84; Doc. 1756-1 at 39]

17 Defendants have failed to demonstrate when they began to monitor compliance using the

18 final methodology, and have not shown that they recalculated PM 65 using the final

19 monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to

20 this measure must be denied.

21

22 **PM 68 ("In an IPC, Inmate health records will include admission orders and documentation of care and treatment given.")**

23      Defendants seek to terminate monitoring of PM 64 at Florence, Perryville, and

24 Tucson.  [Doc. 2251 at 7]  The parties did not agree upon the methodology for  this

25 performance measure until October 14, 2016.  [Doc. 1626-1 at 84; Doc. 1756-1 at 39]

26 Defendants have failed to demonstrate when they began to monitor compliance using the

27 final methodology, and have not shown that they recalculated PM 68 using the final

28

1  monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to

2  this measure must be denied.

3  **PM 75 ("A mental health assessment of a prisoner during initial intake shall be
   completed by mental health staff by the end of the second full day after the
4  prisoner's arrival into ADC.")**

5          Defendants seek to terminate monitoring of PM 75 at Eyman, Perryville, Phoenix,

6  and Tucson.  [Doc. 2251 at 8]  The Court ordered Defendants to include returning

7  parolees in this measure on September 6, 2016. [Doc. 1673 at 2-3; Doc. 1915 at 2; *see*

8  *also* Doc. 1626-1 at 17-18 n. 1]  However, as of February 17, 2017 Defendants had still

9  not made all requested changes to this PM.  [Kendrick Decl. Ex. 2 at 1-2]  Defendants

10  have failed to demonstrate when they began to monitor compliance using the final

11  methodology, and have not shown that they recalculated PM 75 using the final monitoring

12  procedures.  Accordingly, their motion to terminate monitoring with regard to this

13  measure must be denied.

14  **PM 76 ("If the initial mental health assessment of a prisoner during initial intake is
    not performed by licensed mental health staff, the prisoner shall be seen by a mental
15  health clinician within fourteen days of his or her arrival into ADC.")**

16          Defendants seek to terminate monitoring of PM 76 at Eyman, Perryville, Phoenix,

17  and Tucson.  [Doc. 2251 at 8]  The Court ordered Defendants to include returning

18  parolees in this measure on September 6, 2016.  [Doc. 1673 at 2-3; Doc. 1915 at 2; *see*

19  *also* Doc. 1626-1 at 17-18 n.1]  However, as of February 17, 2017 Defendants had still not

20  made all requested changes to this PM.  [Kendrick Decl. Ex. 2 at 1-2]  Defendants have

21  failed to demonstrate when they began to monitor compliance using the final

22  methodology, and have not shown that they recalculated PM 76 using the final monitoring

23  procedures.  Accordingly, their motion to terminate monitoring with regard to this

24  measure must be denied.

25  **PM 78 ("All mental health treatment plans updates shall be done after a face-to-face
    clinical encounter between the prisoner and the mental health provider or mental
26  health clinician").**

27          Defendants seek to terminate monitoring of PM 78 at Eyman, Florence, Lewis,

28  Perryville, Phoenix, Tucson, and Yuma.  [Doc. 2251 at 8]  The protocol for this PM

1  requires that "Each record that is reviewed for treatment plan compliance will also be
2  reviewed for a face-to-face SOAPE note dated the same date."  [Doc. 1185-1 at 31]  In
3  other words, all records reviewed for PM 77, which governs treatment plans, must also be
4  reviewed for PM 78.

5  However, for the first 21 months of the Stipulation, Defendants failed to comply
6  with this requirement.  [*See* Doc. 1782 (11/29/16) at 12 ("The monitor does not review
7  charts that did not have a treatment plan updated during the monitored month")]  On
8  December 23, 2016, the Court ordered that "each record from PM 77 must be reviewed
9  for compliance with PM 78."  [Doc. 1833 at 2-3]

10  Defendants have failed to demonstrate when they began to monitor compliance
11  with PM 78 consistent with the Court's order.  Nor have they shown that they have
12  recalculated the CGAR scores for PM 78 using the final monitoring procedures.
13  Accordingly, their motion must be denied with respect to this measure.

14  **PM 79 ("If a prisoner's mental health treatment plan includes psychotropic
medication, the mental health provider shall indicate in each progress note that he or
15  she has reviewed the treatment plan.")**

16  Defendants seek to terminate monitoring of PM 79 at Eyman, Florence, Lewis,
17  Perryville, Phoenix, Tucson, and Yuma.  However, the monitoring methodology for this
18  PM has not yet been finalized by the parties.  [*See* Kendrick Decl. Ex. 3 (8/25/17 email
19  from Defendants to Plaintiffs) ("We made an additional change [in the Monitor Guide] to
20  PM 79 so that the sample mirrors the Stipulation protocol. … Please let us know if you are
21  in agreement with the revisions to PM 79")][24]  Accordingly, Defendants cannot show that
22  "this PM/facility was compliant under the Final Monitoring Guide's procedures"
23  (Doc. 1951 at 1-2), and their motion to terminate monitoring with regard to this measure
24  must be denied.

25
26
27
28

---

[24]  Plaintiffs have responded with a counter-proposal.

1
2

**PM 93 ("Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody")**

3      Defendants seek to terminate monitoring of PM 93 at Florence, Lewis, Perryville,

4   Phoenix, and Tucson.[25]   [Doc. 2251 at 9]   The parties did not agree upon the final

5   monitoring methodology for this Performance Measure until November 5, 2016.   [*See*

6   Doc. 1626-1 at 86; Doc. 1756-1 at 41, 64, 71]   Thereafter, Defendants unilaterally

7   changed the methodology for this PM by adopting their "partial credit" method, which the

8   Court invalidated on December 14, 2016.  *See* Part IV.A.2, *supra.*  Defendants have failed

9   to demonstrate when they began to monitor compliance with PM 93 using the agreed-

10  upon methodology.   Nor have they shown that they have recalculated the CGAR scores

11  for PM 93 using the final monitoring procedures.   Accordingly, their motion must be

12  denied with respect to this measure.[26]

13
14

**PM 96 ("A reentry/discharge plan shall be established no later than 30 days prior to release from ADC for all prisoners who are MH- 3 or above")**

15      Defendants seek to terminate monitoring of PM 96 at Eyman, Florence, Lewis,

16  Perryville, Tucson, and Yuma.   The parties did not agree upon the final monitoring

17  methodology for this Performance Measure until November 5, 2016.  [*See* Doc. 1626-1 at

18  87; Doc. 1756-1 at 29, 41, 64-65, 71]  Defendants have failed to demonstrate when they

19  began to monitor compliance with PM 96 using the agreed-upon methodology.   Nor have

20  they shown that they have recalculated the CGAR scores for PM 96 using the final

21

22

23      [25] The Court found Defendants substantially noncompliant with PM 93 at Eyman, Florence, Lewis, and Tucson on May 20, 2016. [Doc. 1583 at 2]  *See infra* Part V.B.

24      [26] In addition, the Stipulation's agreed protocol for PM 93 states that "[t]he Records reviewed for Performance Measure #92 will also be reviewed for compliance with this performance measure."  [Doc. 1185-1 at 33]   However, for several months

25  Defendants disregarded this requirement, frequently sampling 50 records for PM 92 and only 20 or 10 for PM 93.  [*See* Doc. 2046 at 25; *see also* Kendrick Decl. ¶¶ 12-13 and

26  Ex. 10 (CGARs from multiple months and institutions in which Defendants sampled 50 records for PM 92 and a much smaller number for PM 93)]   Although Defendants

27  awarded themselves compliant scores (frequently 100%) for all of these months, their failure to adhere to the plain language of the protocol requires that these months be

28  counted as noncompliant.

monitoring procedures.  Accordingly, their motion must be denied with respect to this measure.[27]

**PM 97 ("A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider").**

Defendants seek to terminate monitoring of PM 97 at Douglas, Eyman, Florence, Perryville, Safford, Tucson, Winslow, and Yuma.  The protocol for this PM requires review of "10 records (if available) from each yard utilizing telepsychiatry."  [Doc. 1185-1 at 35]   But until recently, Defendants were instead reviewing 10 telepsychiatry appointments, even if those ten appointments involved fewer than 10 different individuals. [*See* 4/17/17 Tr. at 621:13-21]  On July 13, 2017, the Court ruled that Defendants' method was impermissible, and ordered them to review the records of 10 different individuals. [*See* 7/13/17 Tr. at 61:10-18; Doc. 2185 at 2]

Defendants have failed to demonstrate when they began to monitor compliance with PM 97 consistent with the Court's order.  Nor have they shown that they have recalculated the CGAR scores for PM 97 using the final monitoring procedures. Accordingly, their motion must be denied with respect to this PM.

**PM 101 ("Dental assistants will take inmate histories and vital signs and dental radiographs (as ordered) by the Dentist.")**

Defendants seek to terminate monitoring of PM 101 at all ten institutions. [Doc. 2251 at 9]  The parties did not agree upon the methodology for this performance measure until December 14, 2016.  [Doc. 1626-2 at 135; Doc. 1756-1 at 50, 57-58, 76, 85; Doc. 1782 at 19-20; Doc. 1831 at 2]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 101 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

---

[27]  Plaintiffs notified Defendants on August 28, 2017, that they are substantially noncompliant with PM 96 at Tucson.  [Doc. 2254-1 at 41]  *See infra* Part V.B.

**PM 102 ("Routine dental care wait times will be no more than 90 days from the date the HNR was received.")**

Defendants seek to terminate monitoring of PM 102 at Douglas, Eyman, Florence, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.  [Doc. 2251 at 9]  The parties did not agree upon the methodology for this performance measure until October 14, 2016.  [Doc. 1626-1 at 69-70, 74-75; Doc. 1756-1 at 25]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 102 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**PM 103 ("Urgent care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received.")**

Defendants seek to terminate monitoring of PM 103 at Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.  [Doc. 2251 at 9, 10]  The parties did not agree upon the methodology for this performance measure until October 14, 2016.  [Doc. 1626-1 at 69-70, 74-75; Doc. 1756-1 at 25]  Defendants have failed to demonstrate when they began to monitor compliance using the final methodology, and have not shown that they recalculated PM 103 using the final monitoring procedures.  Accordingly, their motion to terminate monitoring with regard to this measure must be denied.

**V.   DEFENDANTS IMPROPERLY SEEK TO TERMINATE MONITORING OF PERFORMANCE MEASURES WHERE THEY ARE NOT SUBSTANTIALLY COMPLIANT.**

   **A.   Defendants seek termination of monitoring for performance measures where their own data show substantial noncompliance.**

Defendants seek to terminate monitoring of performance measures where their own data show substantial noncompliance with the measure.  Defendants' motion to terminating monitoring with regard to the following measures and institutions must be denied:

- PM 14 ("Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication."): Winslow (not compliant 18 out of 24 months; four consecutive months of noncompliance (August-November 2015) [*See* Kendrick Decl. Ex. 1 at 4]

- PM 15 ("Inmates who refuse prescribed medication (or no show) will be counseled by a QHCP after three consecutive refusals."): Perryville (three consecutive months of noncompliance in March, April, and May 2017) [*See id.*]

- PM 42 ("A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider."): Lewis (not compliant 18 out of 24 months) [*See id.* at 11]

- PM 50 ("Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider."): Eyman (three consecutive months of noncompliance in January, February, and March 2017), Yuma (not compliant 18 out of 24 months) [*See id.* at 13]

- PM 52 ("Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report."): Lewis (three consecutive months of noncompliance in March, April, and May 2017) [*See id.*]

- PM 53 ("Treatment plans will be developed and documented in the medical record by a provider within 30 calendar days of identification that the inmate has a chronic disease."): Lewis (four consecutive months of noncompliance in March, April, May, and June 2017) [*See id.* at 14]

- PM 96 ("A reentry/discharge plan shall be established no later than 30 days prior to release from ADC for all prisoners who are MH-3 or above."): Tucson (three consecutive months of noncompliance in March, April, and May 2017) [*See id.* at 22]

**B.    Defendants improperly seek termination of monitoring for performance measures which have previously been found substantially noncompliant by the Court, or are the subject of a pending Motion to Enforce or a pending Notice of Substantial Noncompliance.**

Defendants seek to terminate monitoring of performance measures where the Court has previously found them substantially noncompliant, and has not terminated that finding pursuant to Defendants' remedial plan.  [*See* Doc. 1951 at 1-2 (noting that a need to recalculate past CGAR scores may arise "when [Defendants] mov[e] to terminate a finding of noncompliance under a remediation plan")]  Defendants also move to terminate monitoring of Performance Measures that are currently the subject of Plaintiffs' pending Motion to Enforce (Doc. 2253), where Counsel for Defendants have conceded Defendants' substantial noncompliance, or are the subject of Plaintiffs' August 28, 2017

Notice of Substantial Noncompliance (Doc. 2254-1, Ex. 9).  Defendants' motion to terminating monitoring with regard to the following measures and institutions must therefore be denied:

- PM 11: Winslow, Yuma [Doc. 1583 at 2]
- PM 13: Yuma [Doc. 1583 at 2]
- PM 14: Douglas [Doc. 1583 at 2]
- PM 37: Winslow [Doc. 1583 at 2]
- PM 40: Tucson [Doc. 2030 at 2]
- PM 42: Lewis [Doc. 2253 at 5]
- PM 47: Safford, Winslow [Doc. 1709 at 1-2]
- PM 48: Tucson [Doc. 2254-1 at 40]
- PM 52: Phoenix [Doc. 2254-1 at 40]
- PM 54: Phoenix, Yuma [Doc. 1583 at 2]
- PM 93: Florence, Lewis, Tucson [Doc. 1583 at 2]
- PM 96: Tucson [Doc. 2254-2 at 41]

## CONCLUSION

For all of the reasons set forth herein, Defendants' Motion to Terminate Monitoring should be denied.

Dated:  September 25, 2017

**PRISON LAW OFFICE**

By:  s/ Corene Kendrick
Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com
          rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Victoria Lopez (Ill. 6275388)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@aclu.org
              afettig@aclu.org
              vlopez@aclu.org

*Admitted *pro hac vice*.  Not admitted
  in DC; practice limited to federal
  courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    kbrody@acluaz.org

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.L.L.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:    kirstin@eidenbachlaw.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**

By:   s/ Maya Abela
        Sarah Kader (Bar No. 027147)
        Asim Dietrich (Bar No. 027927)
        5025 East Washington Street, Suite 202
        Phoenix, Arizona 85034
        Telephone:  (602) 274-6287
        Email:     skader@azdisabilitylaw.org
                        adietrich@azdisabilitylaw.org

        Rose A. Daly-Rooney (Bar No. 015690)
        J.J. Rico (Bar No. 021292)
        Jessica Jansepar Ross (Bar No. 030553)
        Maya Abela (Bar No. 027232)
        **ARIZONA CENTER FOR
        DISABILITY LAW**
        177 North Church Avenue, Suite 800
        Tucson, Arizona 85701
        Telephone:  (520) 327-9547
        Email:
            rdalyrooney@azdisabilitylaw.org
                jrico@azdisabilitylaw.org
                jross@azdisabilitylaw.org
                mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on September 25, 2017, I electronically transmitted the above

3 document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4 Notice of Electronic Filing to the following CM/ECF registrants:

5

Michael E. Gottfried
6                           Lucy M. Rand
Assistant Arizona Attorneys General
7                    Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov
8
Daniel P. Struck
9                           Rachel Love
Timothy J. Bojanowski
10                       Nicholas D. Acedo
Ashlee B. Fletcher
11                         Jacob B. Lee
Kevin R. Hanger
12                        Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
13                    dstruck@strucklove.com
rlove@strucklove.com
14                 tbojanowski@strucklove.com
nacedo@strucklove.com
15                  afletcher@strucklove.com
jlee@strucklove.com
16                   khanger@strucklove.com
tray@strucklove.com
17

18                   *Attorneys for Defendants*

19

20                                      s/ D. Freouf

21

22

23

24

25

26

27

28