CV-12-00601-PHX-DKD, September 13, 2017

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3                  _____

4
     Victor Antonio Parsons, et al.,      )
5                                         )
                        Plaintiffs,       )   CV-12-00601-PHX-DKD
6                                         )
                   vs.                    )   Phoenix, Arizona
7                                         )
                                          )   September 13, 2017
8    Charles L. Ryan, et al.,             )   9:04 a.m.
                                          )
9                       Defendants.       )
     _____  )

10

11

12

13   BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

14              TRANSCRIPT OF PROCEEDINGS

15              EVIDENTIARY HEARING - DAY 2

16                 (Pages 1 through 173)

17

18

19

20

21   Transcriptionist:
     **Elaine Cropper**
22   Sandra Day O'Connor U.S. Courthouse
     401 West Washington Street, SPC 35
23   Phoenix, Arizona  85003-2150
     602.322.7245/(fax) 602.322.7253
24
     Proceedings Recorded by Electronic Sound Recording
25   Transcript Produced by Transcriptionist

              United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

1                        **I N D E X**

2                        **TESTIMONY**

3   **WITNESS**              **Direct**   **Cross**   **Redirect**   **Recross**

4   ROBERT KAY                   9       36        66                     68
    JASON JARDINE               75      102       121
5   TANNA GUALCO               135      153       164

6

7                   **E X H I B I T S**

8   Number                                           Ident  Rec'd

9   2     July 21, 2017 ADOC Information Report          59
          Number 17-B01-01561 from Sgt. Overly to DW
10        Oros regarding "Inmates Scheid and Smith"

11  9     IR generated for Inmate Ashworth              56    130

12  15    DC44 for Inmate Angela Ashworth               24

13  16    Internal assignment sheet for Brianda         25
          Alvarez
14
    17    Internal assignment sheet for Inmate Donna    26
15        Scheid

16  18    Inmate Letter from Brianda Alvarez to         20
          Officer Kay dated June 29, 2017
17
    19    DC71, ADC Inmate Cell Assignment              27
18        Screening, Report for Inmate Brianda
          Alvarez and Angela Ashworth
19
    20    DI21, Key Inmate Actions Detail, Report       44
20        for Inmate Brianda Alvarez

21  31    ASPC - Perryville Target Searches Log         87   134

22                        **RECESSES**

23                                                Page   Line

24  (Recess at 10:45; resumed at 10:58.)           74     25
    (Recess at 12:15; resumed at 1:16 p.m.)       130     19
25

                    United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

1                              **APPEARANCES**

2

For the Plaintiffs:

3
         **CORENE T. KENDRICK, ESQ.**
4        Prison Law Office
         1917 5th St.
5        Berkeley, CA  94710
         510.280.2621/(fax) 510.280.2704
6
         **KIRSTIN T. EIDENBACH, ESQ.**
7        Eidenbach Law, P.C.
         P.O. Box 91398
8        Tucson, AZ  85752
         520.477.1475
9
         **MAYA STOCK ABELA, ESQ.**
10       Arizona Center for Disability Law - Tucson, AZ
         177 N. Church Ave., Ste. 800
11       Tucson, AZ  85701
         520.327.9547/(fax) 520.884.0992
12
For the Defendants:
13       **RACHEL LOVE, ESQ.**
         **TIMOTHY J. BOJANOWSKI, ESQ.**
14       Struck, Love, Bojanowski & Acedo, P.L.C.
         3100 W. Ray Rd., Ste. 300
15       Chandler, AZ  85226
         480.420.1600/(fax) 480.420.1696
16
         **LUCY M. RAND, ESQ.** (Present telphonically)
17       Office of the Attorney General
         15 South 15th Avenue
18       Phoenix, AZ  85007
         602.542.7683/(fax) 602.542.7670
19

20

21

22

23

24

25

                        United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

1                    **P R O C E E D I N G S**

2

3        (Proceedings begin at 9:04.)

4        (Court was called to order by the courtroom deputy.)

5              THE COURT:  Thank you.  Please be seated.                    09:04:03

6              MAGISTRATE JUDGE CLERK:  Civil case number 12-601,

7    *Parsons, et al. v. Ryan, et al.*, on for continuation of

8    evidentiary hearing.

9              THE COURT:  Thank you.  Would you please announce for

10   the record?                                                           09:04:20

11             MS. KENDRICK:  Good morning, Your Honor.  This is

12   Corene Kendrick, Prison Law Office, for the plaintiff.

13             THE COURT:  Thank you.

14             MS. EIDENBACH:  Good morning, Your Honor.  Kirstin

15   Eidenbach for the prisoner plaintiff class.                           09:04:27

16             MS. ABELA:  Good morning.  Maya Abela for the Arizona

17   Center for Disability Law.

18             THE COURT:  Good morning.

19             MS. LOVE:  Good morning, Your Honor.  Rachel Love and

20   Tim Bojanowski for the defendants.                                    09:04:41

21             THE COURT:  Thank you.  Good morning.

22             Following up what we did at the close of yesterday,

23   and that is the evidentiary hearing on the Tucson retaliation

24   allegations, I wanted to check in with counsel to see whether

25   they also contemplated that that would be the time for the           09:04:52

                        United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

1  recent Perryville retaliation allegations contained in Ms.                    09:04:58
2  Eidenbach's affidavit.

3          MS. LOVE:  Your Honor, from defendants' standpoint,
4  we would probably -- I'm not sure we would be able to get both
5  complex allegations done in one day.  Probably -- Ms. Eidenbach    09:05:22
6  and I are speaking to each other with our eyes across counsel
7  table.

8          THE COURT:  Okay.  I don't need an answer now.  Since
9  there isn't one that's readily at hand, sometime confer about
10  that and let the Court know.  Thank you.                          09:05:40

11          Anything else that we need to address preliminarily?

12          MS. KENDRICK:  Your Honor, just a follow-up on
13  yesterday's discussion regarding the expert.  I confirmed, and
14  my office last night re-sent to defendant's counsel all of the
15  documents that the office previously sent to Mr. Millar.          09:05:57

16          THE COURT:  Okay.  So he hadn't received them before
17  or he just received them now or you confirmed that you've --

18          MS. KENDRICK:  I confirmed that Mr. Millar received
19  them a couple weeks ago whenever it was that you asked us to do
20  it.  And I also confirmed that defendants' counsel, just to be    09:06:11
21  safe, were all re-sent the link to the documents.

22          THE COURT:  Okay.  But it sounds like you don't know
23  whether or not, at the time that they were originally provided
24  to Mr. Millar that they were also provided to defendants.

25          MS. KENDRICK:  I couldn't -- I couldn't determine         09:06:29

United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

 1   that from talking to the staff, no.                        09:06:31

 2            THE COURT:  Okay.  Well, I drafted a letter to him

 3   this morning that covers this situation and let's him know

 4   that -- well, if it's true and maybe the defendants --

 5   Mr. Struck was unsure yesterday.  He didn't -- I think he   09:06:45

 6   didn't know for sure whether or not he had received the

 7   documents.  But now that you all have, perhaps what you can do

 8   is take steps to see whether there's anything that you think

 9   that Mr. Millar should also have in front of him and I'll amend

10   my letter to say that it's possible that the defendants haven't  09:07:08

11   yet had a chance to present their documents, if any.

12            MR. BOJANOWSKI:  Your Honor, I'll confirm that we

13   did, in fact, receive the documents yesterday but they re-sent

14   them again this morning because there was a glitch in the

15   manner in which they were sent.  So they got re-sent this    09:07:27

16   morning and the last I knew, we are able to now open the link

17   that was provided to the documents so hopefully we can get

18   those over to Mr. Struck for review and proceed from that.

19            THE COURT:  Okay.  And it has been confirmed I guess

20   on your side that the first time you got what plaintiffs had   09:07:53

21   presented to Mr. Millar was just yesterday?

22            MR. BOJANOWSKI:  Yes.  It was received yesterday

23   but --

24            THE COURT:  Was that the first time that you saw it?

25            MR. BOJANOWSKI:  That's the first time I saw it, Your  09:08:03

CV-12-00601-PHX-DKD, September 13, 2017

```
 1  Honor.  If they sent to it Mr. Struck separately and it was not    09:08:05
 2  copied, I don't know.  All I'm saying is I know that it got
 3  received by me and my assistant who kind of runs the case and
 4  then she couldn't open the link and then she, you know, was
 5  able to get that figured out and we can get those documents        09:08:23
 6  over to Mr. Struck.
 7          THE COURT:  Okay.  All right.
 8          So we turn now to defendants to continue the hearing.
 9          MS. LOVE:  Yes, Your Honor and we just received a
10  notification that Lucy Rand is on the phone.                       09:08:37
11          THE COURT:  I see.
12          MS. LOVE:  If the phone is on.
13          THE COURT:  Well, we had the phone line open until
14  about 9:03 and nobody had called in, so rather than hold it
15  open because she hadn't appeared on time and I didn't want to     09:08:49
16  interrupt proceedings.  I think if people are going to appear
17  telephonically, they need to appear at the time that we call
18  the case.  Otherwise, we hold a phone line open and that is not
19  fair to the bridge.  But now that you say that she's available,
20  we can pause for a moment and see what we need to do to bring     09:09:06
21  her in.
22          So you can communicate to Ms. Rand that if she tries
23  to call in now, she should be able to gain access to a line
24  that is open to the Court?  Thank you.
25          Please call your witness.                                  09:10:04
```

United States District Court

CV-12-00601-PHX-DKD, September 13, 2017

1          MS. LOVE:  Your Honor, defendants call Officer Kay.
2    K-A-Y.                                                         09:10:06
3          MAGISTRATE JUDGE CLERK:  May I have your first name,
4    please.
5          THE WITNESS:  Robert.                                    09:10:23
6          MAGISTRATE JUDGE CLERK:  And it's K-A-Y?
7          THE WITNESS:  Yes, ma'am.
8          THE COURT:  Please raise your right hand.
9       (ROBERT KAY, a witness herein, was duly sworn or
10   affirmed.)                                                     09:10:27
11         MAGISTRATE JUDGE CLERK:  Thank you.  Please step
12   around to the witness stand.
13         MS. LOVE:  Your Honor, if we may, as I consulted with
14   Ms. Kendrick right now, may we have the entire stack of
15   exhibits put in front of the witness?  That way Ms. Kendrick  09:10:45
16   and I can be as efficient as possible as going through them.
17         THE COURT:  Surely.
18         MS. LOVE:  Thank you, Your Honor.  Plaintiffs and
19   defendants.
20         THE COURT:  So Officer Kay, we're going to ask you to   09:10:58
21   do some work here this morning and it's probably more efficient
22   this way but these are the defendants' exhibits.  So when
23   somebody says -- it's most likely to be Ms. Love who says this,
24   turn to one of the exhibits in this pile.  If anybody, and it
25   more than likely would be the plaintiff's lawyer, asks you, it  09:11:22

ROBERT KAY - Direct

1    would be in this pile.                                              09:11:25

2                       **DIRECT EXAMINATION**

3    BY MS. LOVE:

4    Q.   Sir, would you please state your name for the record?

5    A.   Robert Kay.                                                    09:11:33

6    Q.   And Mr. Kay, where are you have employed?

7    A.   Arizona Department of Corrections, ASPC Perryville, San

8    Pedro Unit.

9    Q.   What is your position with the Arizona Department of

10   Corrections?                                                       09:11:43

11   A.   I am an accountability officer for San Pedro Unit.

12   Q.   What does it mean to be an accountabilities officer?

13   A.   I am in charge of their housing when they come in, when

14   they leave, any internal moves that need to be made, anything

15   like that I take care of.                                          09:11:57

16   Q.   And is that exclusively for the San Pedro Unit at the

17   Perryville complex?

18   A.   Yes.

19   Q.   How long have you worked for the Arizona Department of

20   Corrections?                                                       09:12:05

21   A.   Five years.

22   Q.   And have you worked any other positions besides

23   accountability officer?

24   A.   I was -- worked the yard and then from there I went to

25   accountability.                                                    09:12:14

United States District Court

ROBERT KAY - Direct

1  Q.   When you worked the yard, did you work at the Perryville      09:12:15

2  complex?

3  A.   Yes.  San Pedro.

4  Q.   So your entire five years ago has been on the San Pedro

5  Unit?                                                               09:12:22

6  A.   Yes, ma'am.

7  Q.   Could you explain for us and for the Court as an

8  accountability officer, what is your chain of command?  What is

9  your reporting chain?

10 A.   I have -- it's myself and then I report to my supervisor,    09:12:36

11 which would be Sergeant Rash and Lieutenant West, who is in

12 charge of support also.  So it would be Sergeant Rash,

13 Lieutenant West, and then Captain Bailey and DW Aguilar now.

14 Q.   Do you also report to the deputy warden of the unit?

15 A.   Yes, Deputy Warden Aguilar, yes.                             09:12:56

16 Q.   What is the custody level of the San Pedro Unit?

17 A.   Minimum.

18 Q.   And is it an open yard?

19 A.   Yes, ma'am.

20 Q.   On the San Pedro unit there at Perryville, is there          09:13:07

21 movement of inmates on and off of the yard, newly assigned to

22 the yard, leaving the yard on a daily basis?

23 A.   Yes, ma'am, pretty much every day there's something,

24 somebody coming in, somebody leaving.  Some in house that needs

25 to be taken care of or something ago along that.  Generally       09:13:25

ROBERT KAY - Direct

1   there's always something.                                        09:13:28

2   Q.   On an average day, how many movements might you have of an

3   inmate newly accepted onto the San Pedro yard?

4   A.   Average, three probably in a day.

5   Q.   How about an average of inmates leaving the San Pedro      09:13:45

6   yard?

7   A.   About the same.  My numbers say pretty much the same.

8   It's pretty much even in, even out.

9   Q.   And what is the total inmate capacity or bed count

10  available for the San Pedro Unit?                               09:14:00

11  A.   It can hold 432 physical inmates.

12  Q.   And is the San Pedro Unit divided into yards?

13  A.   Yes, ma'am.

14  Q.   And how do you designate the yards?  Do you call them a

15  certain name?                                                   09:14:12

16  A.   A yard and B yard.

17  Q.   How many inmates on each yard?

18  A.   216 per yard max.

19  Q.   And is the A yard and B yard, are those inmates able to

20  mix with each other for recreation, for --                      09:14:22

21  A.   For recreation they are allowed to mix.  They are not

22  allowed to yard visit but they are allowed to open yard, open

23  areas.  They are allowed to all congregate.

24  Q.   What do you mean by the term "yard visit"?

25  A.   An A yard inmate is not allowed to go to B yard and        09:14:39

ROBERT KAY - Direct

1    socialize with their friends on B yard and B yard is vice                09:14:43

2    versa.

3    Q.    Is there fencing that physically separates A yard and B

4    yard?

5    A.    No, ma'am.                                                          09:14:51

6    Q.    So how do you control or how is it controlled on the San

7    Pedro Unit that A yard inmates and B yard inmates wouldn't be

8    able to visit?

9    A.    Generally, your yard officers know who their inmates are

10   on their yards because they work yards, so they know pretty            09:15:04

11   much their inmate population.  So they know if they are working

12   B yard and they see somebody they know lives on A yard over

13   there, they know they are not supposed to be there so they can

14   redirect them to go back to their yard or go out into the -- a

15   common area where everybody can talk.                                   09:15:20

16   Q.    Are A yards and B yards separate buildings so that there

17   is some geographical separation?

18   A.    Yes.  There's geographical separation between the two,

19   yes.

20   Q.    On an average day, within the San Pedro Unit is there            09:15:40

21   movement made where you may have cell mate changes versus an

22   inmate coming new to the yard or leaving the yard?

23   A.    Yes.

24   Q.    Is it a daily happening, a weekly happening, monthly?

25   A.    It can be daily.  It's random.  It happens at different          09:15:58

United States District Court

ROBERT KAY - Direct

```
 1   times.  I mean, it can -- depending on what's going on with      09:16:02
 2   movement, I can have some in-houses.  I'll rehouse some inmates
 3   together and bring in some new ones or I'll just house them
 4   together.  So that's random.  That is -- I can go two or three
 5   days and not do any or I can have a week where I do a bunch.      09:16:21
 6   Q.   When you say in-house, is that a term that you use in
 7   house to denote cell mate change movement versus a new inmate
 8   onto the yard or an inmate leaving the yard?
 9   A.   Yes, ma'am.
10   Q.   As the accountability officer, are you the person who        09:16:38
11   facilities or assigns inmates to a new cell when they are newly
12   incoming into the yard?
13   A.   Yes, ma'am.
14   Q.   Are you, as the accountability officer, also the person
15   who facilities, quote unquote, in-house move where you may have   09:16:52
16   a change in cell inmates already assigned to the yard?
17   A.   Yes, ma'am.
18   Q.   What kind of circumstances would prompt an in-house move
19   where you're merely changing cell mates already living on the
20   unit versus a new inmate coming onto the unit?                    09:17:12
21   A.   It can be any number of things.  Typically, it will be an
22   in-house move can be -- I'll have three or four open beds and
23   I'll rehouse a couple of inmates that are already there.  Say I
24   have a dangerous coming in so I can't house dangerous and
25   non-dangerous, I'll rehouse a couple of inmates to free up a      09:17:33
```

14

ROBERT KAY - Direct

1   cell for a dangerous inmate, so I'll have to make that move          09:17:36

2   that we consider an in-house move.

3            I'll take inmates that are single celled that don't

4   have bunkies and I'll combine them together to give me one

5   whole cell for maybe two more inmates that are coming in, that      09:17:49

6   kind of stuff.  Lower bunk chronos, anybody that needs a lower

7   bunk for whatever reason, Medical gives them one, they will

8   come see me, I'll have to facilitate that move to get them to

9   move to get them that lower bunk.

10  Q.   Are in-house moves ever facilitated because cell mates,        09:18:09

11  existing cell mates, may not be getting along with each other?

12  A.   Yes.

13  Q.   How frequently are in-house moves made because inmates are

14  having difficulties living with each other?

15  A.   That is random.  It can be once a week.  It can be two or       09:18:26

16  three a week.  It all depends on what kind of inmate letters

17  come in.  What seldom happens, when we're not there, there's

18  mediation done by supervisors and these two inmates can't get

19  along and they will ask me to separate them when I come in the

20  next day.  They can still be on the same unit together, they        09:18:47

21  the just can't live together any more, so we'll just separate

22  them and move them in with somebody else and take care of it

23  that way.

24  Q.   When facilitating in-house moves, do inmates ever have the

25  opportunity to give their preference of who they would like to      09:19:03

United States District Court

15

ROBERT KAY - Direct

1   live with such that that is a consideration that you may make?    09:19:09

2   A.   They -- we generally don't let them pick their bun keys.

3   We'll pick them or I will pick them for them.

4   Q.   Why is it that you generally do not allow an inmate to

5   pick their bunkie?                                                09:19:26

6   A.   They have a tendency to try to get together with their

7   girlfriends or stuff like that so they can be in the same cell

8   together.   So if they request a bunkie, I -- me personally, I

9   don't let them pick their bunkie just because of issues that

10  can happen with that.                                            09:19:48

11  Q.   What are the kind of issues that could happen if inmates

12  are allowed to choose who they get to live with?

13  A.   One, they all try to do it then if they can.   Then

14  there's -- like I said, they like to try to be with their

15  girlfriends so you have the issues that rise out of that, you    09:20:07

16  know.   The PREA issues if that happens or if they break up,

17  then it creates drama on the yard and there's a whole bunch of

18  issues involved with that so you just -- I don't.

19        THE COURT:   I'm sorry to interrupt but you used a

20  word that I didn't understand.   The PREA issues.                09:20:27

21        THE WITNESS:   PREA.

22        THE COURT:   What does that stand for?

23        THE WITNESS:   Prison Right Elimination Act.

24  BY MS. LOVE:

25  Q.   So when you say they may want to get together and you used   09:20:39

United States District Court

ROBERT KAY - Direct

 1   the term "girlfriends," do you mean girlfriends just because                    09:20:41

 2   they are friendly with each other or are you talking about

 3   something more than that?

 4   A.   I'm talking about something more than that.

 5   Q.   Okay.  As in sexual relations between the two inmates?         09:20:50

 6   A.   Yes.  Yes, ma'am.

 7   Q.   As the accountability officer, do you use a certain

 8   process or procedure to match up cell mates?

 9   A.   First and foremost, I use the DC71 screen to make sure

10   they match.                                                                      09:21:14

11   Q.   And walk us through that process and tell us how you would

12   determine whether or not two inmates were live together in the

13   same cell.

14   A.   So I go to the screen.  I'll pull them up, I'll put their

15   ADC numbers in there.  That will give me -- that screen will        09:21:26

16   pop up and tell me if they are dangerous or not dangerous.

17   That's criteria.  If they are both non-dangerous, they can be

18   housed together.  Then I control down farther and the next

19   thing I try to do myself is we have mental health scores one

20   through three.  I try to put ones and ones and ones and twos         09:21:43

21   and twos and twos and threes together.  I try to keep them kind

22   of close to their mental health scores, just because you are in

23   are cell setting and the doors close and you are in that cell

24   with that person all night long and there are mental health

25   issues on our yard.                                                              09:22:03

United States District Court

ROBERT KAY - Direct

1    So if I can avoid putting one with a three, I try to          09:22:04

2    do that.  So this is something I do myself.

3    Q.   Is it fair to say, then, when you are looking to match up

4    two cell mates, there are certain criteria you have to look at

5    but are you also looking to see do you believe based upon       09:22:17

6    mental health score would the inmates be compatible together?

7    A.   Yes, and if I know the inmate.  Because I have been there

8    five years, I know a few of them.  I kind of know them.  I

9    don't know-know them know them.  But I know -- I kind of have

10   an idea if they will be a good bunkie for somebody or not.      09:22:37

11   Q.   So you also use your familiarity with your inmate

12   population at San Pedro to consider whether or not two inmates

13   might be appropriate to live together?

14   A.   Yes, ma'am.

15   Q.   When you're making in-house moves and changing cell mates,  09:22:56

16   do you have any procedure by which you're required to keep two

17   inmates -- let's say they are on B yard and one inmate is

18   having a problem with a cell mate and needs to move somewhere

19   else, do you keep them on B yard?  Do you put them on A yard?

20   Do you send them to another unit?  How does that work?          09:23:12

21   A.   If they can say they can be housed on the same unit, they

22   have to put it in writing.  If they say they can be housed at

23   the same unit, then we will keep them on the same unit.  And,

24   generally, I will just switch cells.  If it's so bad that they

25   can't stand each other, then I'll switch yards that way.  I      09:23:28

United States District Court

ROBERT KAY - Direct

```
 1   start -- normally I'll just do it -- because it's easier to do    09:23:32
 2   it in-house on the same yard rather than having to move
 3   somebody to a different yard.  And then if that yard is full,
 4   then I have to take somebody off that yard that maybe doesn't
 5   want to move and I have to put them on a different yard.  So I    09:23:44
 6   try to keep everything on the same yard first.  Then I go --
 7   yeah, same yard first and then the other yard and then if they
 8   don't get along and they can't do it, then to a different unit
 9   from there.
10   Q.  So based on your experience as accountability officer in     09:24:03
11   the last five years, has it been your experience where if two
12   cell mates aren't able to get along in a cell setting, they may
13   be able to just switch cells but still be able to get along on
14   the same yard?
15   A.  Yes, ma'am.                                                  09:24:18
16   Q.  Is it more frequent that that situation happens versus
17   needing to move inmates to separate yards or vice versa?
18   A.  It's generally -- generally, that's -- the first is
19   correct.  It's easier to keep them on the same yard, yes,
20   because normally it's not -- they don't hate each other.  They   09:24:32
21   don't want to fight each other.  It's normally hygiene issues,
22   personality conflicts, stuff like that.  Minor stuff where they
23   just can't -- they just don't mesh and if they are out of that
24   cell with that person, they are mine.
25   Q.  And are you making in-house moves such as that when          09:24:55
```

United States District Court

ROBERT KAY - Direct

1   there's hygiene issues, personality issues, et cetera, to avoid          09:24:58

2   an escalating situation between the two of them in the cell

3   such that they get into a fight and you're trying to prevent

4   that?

5   A.   Yes, ma'am.          09:25:07

6   Q.   Do you know whether or not Angela Ashworth is currently

7   assigned to the San Pedro Unit?

8   A.   Yes, ma'am, she is.

9   Q.   Do you know whether that was the case in June and July of

10  2017?          09:25:21

11  A.   Yes, ma'am.

12  Q.   In July of 2017, did you facilitate any cell mate moves

13  where Angela Ashworth's cell mate was moved out of her cell and

14  a new cell mate moved in?

15  A.   Yes, ma'am.          09:25:39

16  Q.   Do you know when that occurred approximately?

17  A.   Not off the top of my head, I don't know the exact date.

18  Q.   What were the circumstances that prompted the move of

19  Angela -- the cell mate of Angela Ashworth out of her cell and

20  a new cell mate in?          09:25:56

21  A.   I had received an inmate letter from Inmate -- I think it

22  was Avila stating that she was having bunkie issues and I

23  already had one from her and she had given me another one on my

24  way to the morning meeting that morning.  So she had stopped me

25  outside of medical where she was standing because I have to          09:26:16

United States District Court

ROBERT KAY - Direct

| 1 | walk that way to go there and she handed me a letter and I said | 09:26:18 |

1   walk that way to go there and she handed me a letter and I said      09:26:18
2   I would take it.  I was going to the morning meeting.  I would
3   bring it up at the morning meeting because she said it was
4   getting pretty bad and I would discuss it and we would see if
5   we could get something taken care of for her.                        09:26:30
6   Q.   Are you aware that on July 14 of 2017, Inmate Angela
7   Ashworth was transported here to federal court to testify in
8   the *Parsons v. Ryan* lawsuit?
9   A.   That morning when I came in, I had noticed they had sent
10  her to court, yes.                                                   09:26:48
11  Q.   Do you know if that was specifically coming to testify
12  here in federal court in the *Parsons v. Ryan* lawsuit?
13  A.   No, ma'am, I did not.
14  Q.   So the information that you had was just merely that she
15  had gone out to District Court?                                     09:27:00
16  A.   Yeah.  The information I had was on my movement sheet.  It
17  said that, gave her name, ADC number, and she was out to court
18  and that is the only thing I knew, she was out to court.
19  Q.   I would like for you to look in front of you in
20  defendants' exhibits, there's a folder marked as Exhibit          09:27:20
21  Number 18.
22       If you could take a look at Exhibit Number 18 and
23  tell me, first of all, whether or not you recognize the
24  document contained in Exhibit Number 18?
25  A.   Yes, ma'am, I do.                                              09:27:38

United States District Court

ROBERT KAY - Direct

1   Q.   Can you tell us what is the document contained in Exhibit                    09:27:39
2   Number 18?
3   A.   This is the inmate letter, one of the inmate letters I
4   received from Inmate Alvarez.
5   Q.   And what is the date of the inmate letter?                                    09:27:48
6   A.   6-29 of '17.
7   Q.   And what was the subject matter of the letter that
8   Ms. Alvarez wrote generally?
9   A.   Excuse me?
10  Q.   Just generally?                                                              09:28:08
11  A.   I would have to read it real quick.  It has been a while
12  since I've read this inmate letter.
13  Q.   Sure.  Take your time to read it and then I may ask you a
14  couple of questions.  Just let me know when you're done.  Take
15  your time.                                                                        09:28:25
16  A.   Okay.  So her basic issue was her bunkie was taking her
17  stuff and using it while she was up at nighttime in Rio where
18  it was air-conditioned.  And she also was not pulling her fair
19  share of keeping her room clean.
20  Q.   Is this the inmate letter that you spoke of that you had                      09:29:18
21  received from Ms. Alvarez prior to her move into the cell
22  occupied by Inmate Ashworth?
23  A.   Yes, ma'am.
24  Q.   Inmates who write letters advising that they may have an
25  issue with their cell mate, are those letters that go                             09:29:40

United States District Court

ROBERT KAY - Direct

1   specifically to you as the accountability officer?                                    09:29:43

2   A.   Yes, ma'am.

3   Q.   And when you would receive -- well, this letter is dated

4   June 29 of 2017; correct?

5   A.   Yes, ma'am.                                                                        09:29:52

6   Q.   Did you take any specific action with respect to this June

7   29, 2017 inmate letter?

8   A.   At the time I had not.  We were -- we would normally go to

9   a Housing Committee.  Unless it says something really bad in

10  here that I'm in fear for mid life or I was assaulted or          09:30:06

11  something like that, I just hang onto it until the housing

12  committee will meet and we'll sit and talk about them.

13          We hadn't met on this group of letters yet so I

14  hadn't taken any action on that.

15  Q.   Had you had any conversations with Ms. Alvarez, just a       09:30:22

16  face-to-face kind of conversation where you discussed that she

17  had complaints that she was having some difficulty living with

18  her cell mate?

19  A.   With her, I don't remember specifically.  I remember

20  getting her letter.  I remember the conversation before that     09:30:39

21  morning going to meeting and talking but that doesn't mean that

22  she didn't.  Because when I go walk the yards, I'm very popular

23  because I'm in charge of the housing.  They come up and they

24  tell me whatever issues they are having.  And I don't remember

25  if she was one of the ones that came up to me and verbally said  09:30:57

United States District Court

23

ROBERT KAY - Direct

1    something or she didn't.                                        09:31:00

2    Q.   Did you have a conversation with Ms. Alvarez on the day

3    she was moved into the cell occupied by Ms. Ashworth?

4    A.   Yes.

5    Q.   Do you remember how that conversation went, what each --  09:31:09

6    what she said, what you said, where you were at?

7    A.   The basic -- basic -- in a nutshell was she said, "Hey,

8    it's getting worse.  Same issues except it's just getting

9    worse," and she gave me that letter.

10          So I said, "Okay.  I'm going to the morning meeting.    09:31:26

11   We'll talk about it.  I'll let you know afterwards what

12   happens."  So we went to the morning meeting.  We talked about

13   it, said yes.  And so I never talked to her again after that.

14   I called down to the yard and said, "Hey, take this inmate

15   here, move her here, move this inmate here."                   09:31:41

16   Q.   When you say you went to the morning meeting and talked

17   about it, can you describe for us what meeting you're speaking

18   of, who was at the meeting?

19   A.   It would have been myself, probably Captain Bailey, DW

20   Oros, COIV at the time, and maybe a couple supervisors sitting  09:31:56

21   around, whoever was at the basic morning meeting was that day.

22   Q.   When you facilitate and do a match for an in-house cell

23   mate move, is that -- is the move -- does it need to be

24   approved by anybody up your chain of command or do you just

25   have carte blanche to do whatever move you want?               09:32:18

United States District Court

24

ROBERT KAY - Direct

1  A.   I pretty much have carte blanche to do whatever I want.  I    09:32:21

2  can -- like this, I had permission to do so it was -- it was --

3  and I was approved.  They didn't say, "Hey, take this inmate

4  and move her here, here."  They said, "Take this inmate and

5  find her and move her," so I took this inmate and found her and    09:32:38

6  moved her.

7  Q.   During the morning meeting that you are speaking of, is

8  that when you received permission to move Ms. Alvarez?

9  A.   Yes.

10 Q.   Was there a discussion in that meeting of who she would be    09:32:48

11 paired with or was it, "Yes, you may move her," but not a

12 discussion of who you would move her with?

13 A.   There was no discussion of who to move her with, just to

14 move her.

15 Q.   If you could look for me at Defendants' Exhibit Number 15    09:33:05

16 in front of you which is already in evidence.  And first let me

17 know if you recognize what this document is?

18 A.   That's a DC44, her housing screen.

19 Q.   For which inmate?

20 A.   Ashworth.                                                     09:33:28

21 Q.   Are you able to tell, by looking at the printout of this

22 screen, where Ms. Ashworth -- what cell she was living in in

23 June and July of 2017?

24 A.   B41, 12 upper.

25 Q.   And 12 upper means what, the upper bunk?                      09:33:41

United States District Court

ROBERT KAY - Direct

1   A.   The upper bunk, yes.                                              09:33:45

2            THE COURT:  Can I interrupt for a second?  When you

3   said DC71 before, what does that refer to?

4            THE WITNESS:  DC71 screen is their housing screen.

5   It's their compatibility screen basically.  It tells you if    09:33:55

6   they match, like I said.

7            THE COURT:  And the DC44 is the screen that shows you

8   what their assignment history is?

9            THE WITNESS:  What their bed is, yes.

10           THE COURT:  Okay.  Thank you.                               09:34:07

11  BY MS. LOVE:

12  Q.   Are you aware of whether or not Ms. Ashworth, as of --

13  well, first let me ask you this.  Were you on duty yesterday?

14  A.   Yes.

15  Q.   Do you know whether or not as of yesterday, Ms. Ashworth    09:34:15

16  was still celled in B41, cell 12?

17  A.   Yes, ma'am, she is.

18  Q.   If you could take a look for me now at Exhibit Number 16

19  which is in evidence already and let me know if you recognize

20  what this document is?                                          09:34:38

21  A.   It's the same thing, a housing screen for Inmate Alvarez.

22  Q.   And are you able to tell whether or not, on July 19 of

23  2017, if she moved into the cell occupied by Inmate Ashworth?

24  A.   Yes, ma'am.

25  Q.   Was she subsequently moved out of that cell at any time    09:34:56

United States District Court

26

ROBERT KAY - Direct

 1   later?                                                        09:34:59

 2   A.   Yes, ma'am, she was.

 3   Q.   On what date?

 4   A.   7-21 when she was moved to San Carlos Unit.

 5   Q.   If you could now take a look for me at Exhibit Number 17   09:35:11

 6   which is in evidence.

 7              Do you recognize that document?

 8   A.   Yes, ma'am.

 9   Q.   What document is that?

10   A.   It's a housing screen for Inmate Scheid.              09:35:24

11   Q.   Are you able to tell from the housing screen for Inmate

12   Scheid whether or not, on July 19 of 2017, if she was living in

13   cell B41 -- I'm sorry, in B41, cell 12, which was at the same

14   time occupied by Inmate Ashworth?

15   A.   On which date now?                                    09:35:45

16   Q.   On 7-19.

17   A.   7-19 --

18   Q.   Prior to 7-19?

19   A.   Prior to 7-19, yes, ma'am, she was.

20   Q.   And was she moved out of cell 12 that was occupied by   09:35:55

21   Inmate Ashworth on the 19th?

22   A.   Yes, ma'am.

23   Q.   Can you tell whether or not from this document whether on

24   July 21 she was moved back in to B41, cell 12 with Inmate

25   Ashworth?                                                  09:36:08

United States District Court

ROBERT KAY - Direct

1  A.   Yes, ma'am, she was.                                    09:36:09

2  Q.   Are you aware as of yesterday being on duty whether or not

3  Inmates Ashworth and Scheid still live together in B41, cell

4  12?

5  A.   Yes, ma'am, they are still together.                    09:36:18

6  Q.   Now, if you could take a look at for me Exhibit Number 19

7  which is in evidence and take as much time as you need to look

8  at that document and let me know if you recognize what it is.

9  A.   This is the '71 screen for Inmates Alvarez and Ashworth.

10 Q.   Isn't that what you referred to, and I may have your      09:36:45

11 wording wrong, but as the match screen, compatibility screen?

12 A.   Yes.  Compatibility screen.

13 Q.   Actually, before I ask you questions about this document,

14 let's back up.

15        On the screen Inmate Alvarez is moved into the cell     09:36:57

16 occupied by Inmate Ashworth?

17 A.   Yes, ma'am.

18 Q.   And Inmate Scheid was moved out of that same cell?

19 A.   Yes, ma'am.

20 Q.   How did it come about that it was matched up that Inmate  09:37:11

21 Alvarez, who had been having a problem with her cell mate, gets

22 matched with Inmate Ashworth versus any other inmate on the San

23 Pedro Unit?

24 A.   Completely random.  What happened was if you look at where

25 she was housed before, she was like two doors down.  So I have  09:37:32

United States District Court

ROBERT KAY - Direct

| | |
|---|---|
| 1 | a board in front of me at my deck where I sit.  So I looked at | 09:37:36 |
| 2 | the board and she's there so I then start going -- I went down. |
| 3 | Bump, bump, bump, oh, there's a lower bunk.  I know Scheid |
| 4 | technically didn't need a lower bunk.  I know Inmate Ashworth. |
| 5 | I've dealt with her since she's been there.  We have been there | 09:37:54 |
| 6 | together.  Inmate Ashworth, as far as I know, is a good bunkie. |
| 7 | I've never really had complaints about her or anything.  So |
| 8 | there was a good bunk right there.  It's right there.  They are |
| 9 | separated and I just made the move. |
| 10 | Q.   Why was it that you were looking for a lower bunk to move | 09:38:13 |
| 11 | Ms. Alvarez? |
| 12 | A.   Pregnant inmate gets a lower bunk so I moved her.  I have |
| 13 | to move her from a lower bunk into a lower bunk.  I can't put |
| 14 | her into an upper bunk. |
| 15 | Q.   Is your office located on the San Pedro Unit? | 09:38:28 |
| 16 | A.   Yes, ma'am. |
| 17 | Q.   Is it in a certain specified area? |
| 18 | A.   It's in the yard office. |
| 19 | Q.   And can you give us -- you're telling us that you looked |
| 20 | at a board? | 09:38:39 |
| 21 | A.   Yes. |
| 22 | Q.   Can you give us just in a word description a visual, if we |
| 23 | were sitting in your office, what would that board look like? |
| 24 | A.   I have two -- my desk sits -- say my desk is sitting right |
| 25 | here.  I have a wall that is probably another three feet, four | 09:38:49 |

United States District Court

ROBERT KAY - Direct

1   feet from my desk.  And there's two big white boards with          09:38:53

2   magnetic boards that have inmates' names, ADC numbers and

3   there's housing.  It tells me where each inmate lives.

4          So if you were to look at a count sheet and pull it

5   up and look at the count sheet and then look at the board,        09:39:10

6   everything is the same.  So you start with B11 -- actually

7   starts A yard on the left so it would be A11, 01, and then

8   you'll have a lower bunk and upper bunk and it goes down two,

9   three, four and goes all the way through.  And one board sits

10  here and then like B yard sits kind of almost right in front of   09:39:27

11  me.  So that's kind of how it looks.

12  Q.   Okay.  So then if -- could you take a look for me and go

13  back to Exhibit 16?

14  A.   Yes.  Okay.

15  Q.   And this is the cell assignment sheet or the internal        09:39:52

16  assignment sheet for Brianda Alvarez; correct?

17  A.   Yes, ma'am.

18  Q.   Now, if we're looking at this document and it says for the

19  date of April 11 of 2017, if we follow across that line, it

20  says B41 08 L.  Does that mean cell 8, lower bunk?              09:40:08

21  A.   Yes u ma'am.

22  Q.   And then we see that on July 19 of 2017, B41, 12L, so cell

23  12, lower bunk?

24  A.   Yes, ma'am.

25  Q.   So if -- just giving us a descriptive, since we're not       09:40:24

United States District Court

ROBERT KAY - Direct

 1  there looking at the unit, if she moved from B41, cell 8 to      09:40:29

 2  B41, cell 12, are we talking like literally moving four doors

 3  down like location-wise?

 4  A.   She was in wing four.  She went to wing three so she

 5  didn't go very far, just like right around the corner is all   09:40:46

 6  the farther she went.

 7  Q.   But in the same building?

 8  A.   Same building, same yard.

 9  Q.   So when you say you were looking at the boards in your

10  office knowing you needed a lower bunk for Ms. Alvarez and      09:40:56

11  you're looking at that board, you're going down and you see,

12  okay, there's a lower bunk available in the cell occupied by

13  Ashworth and Scheid, Scheid doesn't need a lower bunk,

14  Ms. Ashworth, to your knowledge, is a good cellie?

15  A.   Yeah.                                                      09:41:15

16  Q.   It's a close proximity move where you're on the same yard.

17  Is that what you were looking at?

18  A.   Close proximity, familiarity with the inmate, then if you

19  look at the '71 screen, both their mental health scores are,

20  like, ones so that was another factor into it.                 09:41:31

21          When I . . .

22  Q.   So now if I can take you back, I'm having you switch

23  around; but if you can go back now to Exhibit Number 19, which

24  I think you just had in front of you which we were referring to

25  as the match or compatibility screen, is this screen something 09:41:48

United States District Court

ROBERT KAY - Direct

1    you would have generated to see if they were compatible or a          09:41:57

2    match to live together?

3    A.    Yes.

4    Q.    Is this something that you did in conjunction with the

5    cell mate move of Inmate Alvarez in with Inmate Ashworth,           09:42:11

6    before looking at your board and thinking, hey, I could pair

7    her with Inmate Ashworth or after?

8    A.    After.  I looked at a board to find inmates because, like

9    I said, the board is right there.  So I visually go down it so

10   I say hey, there's an inmate, punch in the numbers.  The            09:42:28

11   numbers work.  So I made the move.

12   Q.    And looking at Exhibit Number 19, there's a Roman numeral,

13   a few lines or third line down that says Mandatory Criteria,

14   can you explain for us, you know, what information is

15   contained, what are you looking at as you decide whether or not     09:42:49

16   two inmates are a match to live together?

17   A.    For an in-house move, it's basically I look at the current

18   conviction, violent offense.  It says both say no.  If there's

19   one no, one yes, I can't do it.  It won't let me do it.  That

20   death sentence we don't worry about.                                09:43:10

21   Q.    Let me stop you there.  When you're looking at the current

22   conviction and violent offense, is that under Roman numeral A

23   and then C under Mandatory Criteria?

24   A.    Yes, ma'am, current conviction, violent offense.

25   Q.    So if we follow that over, there's two nos, is that           09:43:27

United States District Court

ROBERT KAY - Direct

1   looking at both Inmate Ashworth and Imate Alvarez?                    09:43:30

2   A.    Yes, ma'am.

3   Q.    And then what else do you look at?

4   A.    For them, for that would be just -- the only thing I would

5   look at would be their mental health and medical scores or           09:43:42

6   mental health scores.

7   Q.    And is that category under Roman numeral II, Other

8   Evaluation Criteria, subsection K?

9   A.    Yes, ma'am.

10  Q.    And if we follow that over under column A, there's a           09:43:57

11  three, slash, one and then under column B, there's a one,

12  slash, one, how does that show that they are a match?  Can you

13  explain for us how that works?

14  A.    They do everything by numbers, one through three, one

15  being the least.  How do I put this?  So Inmate Alvarez is a         09:44:14

16  pregnant inmate so she's a medical three.  She would probably

17  have been a one or two.  So that -- so much I don't worry about

18  so much the medical score as I do the mental health one which

19  ones and ones are like golden in DOC.  So I seen that and I

20  seen they both weren't -- non-dangerous inmates so it was a          09:44:43

21  really good match.

22  Q.    And for columns A and B denoting the two inmates, it's the

23  number after the slash that is the mental health score that

24  you're looking at?

25  A.    Yes, ma'am.                                                    09:44:55

United States District Court

ROBERT KAY - Direct

 1    Q.   Did either of the inmates, Ms. Alvarez or Ms. Ashworth,          09:44:56
 2    have STG status according to this match sheet?
 3    A.   No, ma'am.
 4    Q.   Okay.  So you look at your board.  You see that Inmate
 5    Scheid can move out of that lower bunk and Inmate Ashworth is,       09:45:11
 6    per your information, a good cellie.  You do the match sheet
 7    and then what happens next?
 8    A.   After -- that they match?  I just call down to the yard
 9    and tell the yard officer, whoever is working that yard, to
10    tell whichever inmates they were, in this case Alvarez, to move      09:45:27
11    in to 41, 12 lower, and have Scheid move in to -- I don't
12    remember what cell it was but into that other cell and I --
13    yeah.
14    Q.   Were you present when the inmate -- when Inmate Scheid was
15    moved out of the cell occupied by Inmate Ashworth and moved to      09:45:46
16    a different location?
17    A.   No, ma'am.
18    Q.   Do you know whether or not the cell that Inmate Scheid was
19    moved to, was it still on the B yard?
20    A.   Yes, ma'am.                                                     09:45:55
21    Q.   Were then Inmates Ashworth and Scheid still able to visit
22    with each other, interact when they weren't in their cells?
23    A.   Yes, ma'am.
24    Q.   In what context or in what environment?
25    A.   The smoking area and nonsmoking area, that whole yard area     09:46:11

United States District Court

ROBERT KAY - Direct

1   on B yard is accessible to them.  They go out, leave their                09:46:14

2   cells and go into the smoking section, smoke cigarettes and

3   play cards and do whatever they do.

4   Q.   Would they also go to recreation together when offered if

5   they chose to go?                                                          09:46:26

6   A.   Yeah.  Recreation, they walk the track together.

7   Q.   Would they eat together if they chose to?

8   A.   Yes, yeah.  Kitchen is on their yard.

9   Q.   After the move was made where Inmate Scheid was moved out

10  of the cell occupied by Ms. Ashworth, did you ever have any                09:46:41

11  discussions with either Inmate Ashworth or Inmate Scheid in

12  which they made any complaints to you about the cell move?

13  A.   Not too long after they had run me down on the yard after

14  I was delivering count sheets and said -- I don't want to

15  rephrase this wrong but basically they said they know -- how               09:47:06

16  can I say this?  We know it wasn't your doing or basically

17  something like that.  Which it was my doing.  I'm the one that

18  moved them so, yeah.  They run me down.  I don't know, I talk

19  to them.  I have no problems with either one of those inmates.

20  Q.   Did you have any response for them when they said                     09:47:32

21  something to the effect of, "We know it wasn't you," or

22  whatever they said to you?

23  A.   I just told them it was a move I had to make and I just

24  made the move.  That was the easiest move for me to do so

25  that's what I did.                                                         09:47:44

United States District Court

ROBERT KAY - Direct

Q.   Do you know why, on July 21 of 2017, Inmate Scheid was         09:47:50
moved back to the cell occupied by Ms. Ashworth?
A.   I was pretty much told to put those two inmates back
together.
Q.   Were you told a reason why?                                   09:48:00
A.   I figured it out, yes.
Q.   How did you figure it out?
A.   It was -- basically, I heard that Your Honor called and
said they those two inmates will be put back together, so they
were put back together.                                           09:48:14
Q.   And they remain together today; correct?
A.   Yeah.
Q.   Do you on the San Pedro Unit, do you have any directives
there to not move inmates Scheid or Inmate Ashworth from their
current cell assignment?                                           09:48:29
A.   Yes, ma'am, I do.
Q.   Are there any other inmates that you've received direction
to do not change their housing or their cell mates?
A.   Yes, ma'am.
Q.   Do you know -- can you recall off the top of your head the    09:48:43
names of those inmates?
A.   Inmate Sears, Inmate Ceres-Ceres, Inmate Cottrell, Inmate
Ashworth, Inmate Scheid, there's one more.  Off the top of my
head, I don't remember who it is.
Q.   Is Inmate Kisha Irvins also on that list?                     09:49:10

United States District Court

ROBERT KAY - Cross

1   A.    Yes, Irvins.                                                    09:49:14

2   Q.    And who provided you the directive that these -- this

3   category of inmates, that their cell assignments or cell mates

4   should not be changed?

5   A.    That came from the DWOP as far as remember.                    09:49:24

6   Q.    The Deputy Warden of Operations?

7   A.    Yes, ma'am.

8   Q.    Is that Deputy Warden of Operations Twyford?

9   A.    Yes, ma'am.

10  Q.    And how do you -- how do you implement that?  Do you have       09:49:34

11  to remember it off the top of your head?  Do you have it

12  documented somewhere?

13  A.    An email came out with all of the inmates so I forwarded

14  it to all the supervisors on all shifts and said, "Hey, not to

15  be moved under any circumstances."  On my board -- I have a        09:49:52

16  magnetic board.  I have a little legend per se and it's got a

17  red dot on it and then each inmate's cell has a red dot on it

18  that highlights that those inmates are together and they are

19  not to be moved or touched.

20  Q.    Officer, those are all the questions that I have for you.      09:50:20

21  Thank you.

22          THE COURT:  Thank you.

23          Plaintiffs' cross-examination?

24              **CROSS - EXAMINATION**

25  \\\

United States District Court

ROBERT KAY - Cross

| | |
|---|---|
| 1 | BY MS. KENDRICK: | 09:50:41 |
| 2 | Q.   Good morning.  How are you? |
| 3 | A.   Good.  How are you? |
| 4 | Q.   Good.  I just want to run through some of the things that |
| 5 | you talked about earlier. | 09:50:46 |
| 6 | When Ms. Love asked you if you were familiar or knew |
| 7 | Ms. Ashworth, you said you've dealt with Ms. Ashworth since she |
| 8 | got there.  And I was just wondering if you could explain what |
| 9 | you meant by that? |
| 10 | A.   Just interactions.  I've never -- dealing with somebody, | 09:51:04 |
| 11 | just a phrase that I've used.  I have talked to her.  I'm sure |
| 12 | at one time or another I searched her cell.  I've done |
| 13 | something.  But when I say "dealt," I just -- I'm dealing with |
| 14 | her.  I'm not -- I don't know.  How do I want to phrase this? |
| 15 | Just I know her as an inmate.  That's basically all it is. | 09:51:27 |
| 16 | Q.   And before coming to testify, did you speak with anybody |
| 17 | besides the attorneys about your testimony today? |
| 18 | A.   No, ma'am. |
| 19 | Q.   And did you review any documents to prepare to testify |
| 20 | today? | 09:51:49 |
| 21 | A.   Just with what I went over with my attorney? |
| 22 | Q.   And what were those documents? |
| 23 | A.   It was the DC44.  The DC71 screens basically. |
| 24 | Q.   Okay.  And as the accountability officer, what other |
| 25 | duties do you have besides arranging the in-house moves and the | 09:52:06 |

United States District Court

ROBERT KAY - Cross

1   transfers in and out?  What other duties are part of an                    09:52:12

2   accountability officer's portfolio so to speak?

3   A.   I do -- for my unit, I do accountability.  I do -- I have

4   a couple of reports I have to do every month.  A couple times.

5   Regional demographic reports is part of my duties.  For my unit  09:52:28

6   I'm also the SDS officer.

7   Q.   Could you --

8   A.   SDS is Safety Data -- it's the old MSDS system.  It's

9   chemicals and anything chemical related.  I have multiple hats

10  I wear for our unit and I do fire safety for our unit, too.  So  09:52:46

11  that's what -- three of my duties.

12  Q.   And when you say accountability, does that mean making

13  sure that the actions of the staff comport with ADC policies

14  and procedures?

15  A.   I'm not following you on that, ma'am.                        09:53:05

16  Q.   Well, so we've heard from a person, Ms. Lee, who is the

17  deputy warden of compliance and she said her role is to ensure

18  that prison-wide there's compliance and people are accountable

19  and they are, you know, following policy.  So I was just

20  curious if within San Pedro you were kind of the person who had  09:53:23

21  that similar sort of role.

22  A.   No.  No.  I don't -- my job is accountability officer

23  basically is -- I bring inmates in from other units and I send

24  inmates out to other units or I release inmates.  I do

25  releases.  Like I said, I'm in charge of their internal         09:53:41

ROBERT KAY - Cross

1    housing.  What else?  I have to make sure everything is right                09:53:45

2    because count sheets have to come out and inmates have to be

3    where they are supposed to be.  Count is where accounting for

4    the inmates are where they are supposed to be is basically what

5    it boils down to.                                                            09:54:04

6    Q.   And as part of being accountable for where people are, are

7    you involved in the process of transporting individuals off the

8    institution's grounds?

9    A.   No, ma'am.

10   Q.   Okay.  Who would do that?                                              09:54:12

11   A.   So transport -- transportation will normally like to go to

12   court or something like that?

13   Q.   Court or medical.

14   A.   Court or medical, transportation does that.  There's a

15   certain -- we have a certain transportation team and that is         09:54:23

16   their job to pick up inmates from the units and take them to

17   their predesignated areas they have to go, medical, court --

18   well, court not necessarily.  Court -- in this case, I think it

19   was a DOC transport.  But, generally, court is counties come

20   and do because when they go to court, they go to court and they     09:54:43

21   are gone for a while.

22   Q.   Are you familiar with department order 909 about what

23   happens to people's property when they leave the institution

24   grounds?

25   A.   Yes, ma'am.                                                           09:54:56

United States District Court

ROBERT KAY - Cross

1   Q.   And what happens if somebody is just going off grounds for       09:54:57

2   the day?

3   A.   Generally speaking, off grounds for the day their stuff

4   would stay in their cell.

5   Q.   And what happens if they are going off grounds for at        09:55:08

6   least overnight or multiple nights?

7   A.   Their stuff7 is inventoried and rolled up and put in

8   storage.

9   Q.   Do you have any role in supervising or overseeing the

10  role-up of individuals' property?                                 09:55:23

11  A.   Generally, no.  I do once in a while if we're short-short.

12  I'll go help with a roll-up or something.  But, generally, it's

13  the officer on the yard that -- actually, graves will do the

14  roll-ups for the units.

15  Q.   Graves?                                                       09:55:40

16  A.   Grave shift.

17  Q.   Okay.  Making sure that's not a person's name.

18  A.   No.  Graveyard shift.  I'm sorry.

19  Q.   Okay.  If you could look at the exhibits in front of you,

20  Exhibit 18, which is that inmate letter that you got from         09:55:52

21  Ms. Alvarez?

22  A.   This one?

23  Q.   Look at the tabs.  I'm not sure.

24  A.   Okay.

25  Q.   Could you go down to the bottom of the -- what she wrote,     09:56:14

United States District Court

ROBERT KAY - Cross

| | |
|---|---|
| 1 | the third line up and read what she wrote starting with the | 09:56:18 |
| 2 | words "I have"? |
| 3 | A.   "I have a friend in A yard her name is Allen who was |
| 4 | willing to move but I'm not sure.  I would just like to get out |
| 5 | of this room if possible.  Thank you." | 09:56:32 |
| 6 | Q.   So as you read that, does that -- do you interpret what |
| 7 | Ms. Alvarez is writing to say that she wants to move in with |
| 8 | Ms. Allen or that Ms. Allen is willing to move out of her cell, |
| 9 | wherever it is, to free up a space for Ms. Alvarez? |
| 10 |           MS. LOVE:  Objection.  Speculation. | 09:56:52 |
| 11 |           THE COURT:  Overruled. |
| 12 |           THE WITNESS:  From the way she worded it, it sounds |
| 13 | like Allen is willing to move in with. |
| 14 | BY MS. KENDRICK: |
| 15 | Q.   You interpret this that Allen wants to move in with her? | 09:57:08 |
| 16 | A.   Yes, ma'am. |
| 17 | Q.   Is that how you interpreted it when you received this |
| 18 | inmate letter? |
| 19 | A.   No, ma'am.  I didn't worry about who wants to live with |
| 20 | who. | 09:57:19 |
| 21 | Q.   Okay.  And you referred to a housing committee. |
| 22 | A.   Yes, ma'am. |
| 23 | Q.   And that is a group of individuals who reviews these sorts |
| 24 | of inmate letters and then decides whether or not people would |
| 25 | be moved? | 09:57:32 |

United States District Court

ROBERT KAY - Cross

1    A.    Yes, ma'am.                                                    09:57:33

2    Q.    How frequently does the housing committee meet?

3    A.    Generally every two to three weeks.

4    Q.    So these are -- I just want to walk through the process of

5    just anyone asking for a move.  So step one would be that she     09:57:43

6    fills out an inmate letter and addresses it to you?

7    A.    Yes, ma'am.

8    Q.    And then step two is you get the letter and --

9    A.    I would screen it.

10   Q.    And I believe you said you look at it to make sure there's   09:57:53

11   nothing like urgent or life-threatening?

12   A.    Yes, ma'am.

13   Q.    And then what do you do?  Do you just put it in a stack

14   to --

15   A.    I have a stack and I save them and then I'll take them to    09:58:04

16   the meeting and when we meet and I'll go through them.  I kind

17   of -- how do I do this?  Prescreen them.  How long they have

18   lived with their bunkie.  Basically, when we go that way, they

19   know, you know, this bunkie has been together for two weeks and

20   she wants to move already.                                        09:58:25

21   Q.    And if you could turn to Exhibit 19, I believe what you

22   called the DC71 screen.

23         If you could perhaps clarify something for us.  If

24   I'm looking at this report, how would I know what day you input

25   the information?                                                  09:59:00

United States District Court

43

ROBERT KAY - Cross

1   A.   That I don't know on that.                                    09:59:13

2   Q.   Do you see that at the top right it says 8-2-17 and then

3   9:28?

4   A.   Yes.

5   Q.   So would that be the time that the information was input?      09:59:23

6   A.   I'm not going to say yes or no because I don't know,

7   ma'am.  I don't -- I don't know.  I've never had that come up.

8   Q.   Okay.  And did you do a DC71 report for Ms. Scheid and the

9   individual whose cell she moved into?

10  A.   Yes.                                                          09:59:48

11  Q.   Do you know what it showed in terms of compatibility?

12  A.   I don't remember off the top of my head, ma'am.

13  Q.   Were you asked to create or produce that report to the

14  attorneys to use in this hearing?

15  A.   No, ma'am.                                                    10:00:04

16  Q.   Do you know if anybody else was asked to generate the

17  report for the attorneys?

18  A.   No, ma'am.

19  Q.   So as you sit here today, can you tell us anything about

20  the compatibilities between Ms. Scheid and the cell mate she     10:00:14

21  was moved in with?

22  A.   I can -- the only thing I can tell you is they were a

23  match because this screen will not let me house anybody that

24  does not match together.

25  Q.   What do you mean that the screen will not allow you to        10:00:31

United States District Court

ROBERT KAY - Cross

```
 1  house somebody?  Because can't you still just pick up the phone      10:00:33
 2  and call the yard and say, "Move Ms. X to this cell"?
 3  A.   No.  It doesn't work like this.  This is the very first
 4  step I have to do to move somebody.  So I go to this screen.
 5  It doesn't show it on here -- actually it does, kind of.  Down    10:00:48
 6  to the bottom where it says three, and it says SID, and
 7  recommend SR, that little thing there.  My SID code goes there.
 8  So I put my SID in there saying that they match and they can
 9  being housed together.  So after that is done and I enter, they
10  are matched.  I have to do that before I can even house them     10:01:11
11  because if I go to the 44 screen to house them and I try to
12  house them together and I have not done this screen, it won't
13  let me put that inmate in that cell.
14  Q.   Okay.  Did you say sit code?
15  A.    SID.  We have SID numbers for our --                        10:01:28
16  Q.    Like SID.
17  A.    SID.  SID numbers we have to put in for this.
18  Q.    Okay.  Please have patience for me as I ask you to explain
19  every acronym.
20  A.    No, that's fine.                                            10:01:43
21  Q.    And if you could turn to Exhibit 20.  And this says at the
22  top left corner DI21.  Could you explain for us what this
23  report is?
24  A.    This report I've never seen before.  I don't know what
25  this one is.                                                      10:02:17
```

United States District Court

45

ROBERT KAY - Cross

1   Q.   So this is not a screen that you see in --                    10:02:19

2   A.   No.  It's not a screen that I use in my job.

3   Q.   Okay.  And do you see under current action where it lists

4   the date as 7-20-2017 at 2:56 a.m. and then underneath it, it

5   says cell assignment override?                                     10:02:43

6   A.   Okay.

7   Q.   Does that mean that the approval was done on July 20?

8            MS. LOVE:  Objection.  Foundation.  As the witness

9   testified, he's never seen this.

10           THE WITNESS:  I don't know, ma'am.                        10:03:01

11  BY MS. KENDRICK:

12  Q.   Do you have any idea who would know the answer to that

13  question?

14  A.   No, ma'am.  I don't.  It would be somebody above my pay

15  grade.                                                             10:03:09

16  Q.   Okay.  And you said you have been the accountability

17  officer for five years?

18  A.   Three years.

19  Q.   Three years.  And at San Pedro for five years?

20  A.   Yes, ma'am.                                                   10:03:21

21  Q.   Where did you work before Pedro?

22  A.   My dad owned a repair shop for semis and so that's what I

23  did.

24  Q.   So you've only worked for the department for five years?

25  A.   Five years, yes, ma'am.                                       10:03:32

United States District Court

ROBERT KAY - Cross

1   Q.   Okay.  What time is the morning meeting that you were                    10:03:32

2   referring to earlier?

3   A.   Tuesdays and Fridays 8:15, Monday and the rest of the time

4   it's 8:30, so I'm not sure what day this was.

5   Q.   You said Tuesdays and Fridays at 8:15 and --                             10:03:57

6   A.   The rest of the week is 8:30 roughly.

7   Q.   So you described a bit about how you chose where you put

8   Ms. Alvarez, the pregnant inmate, but I didn't hear a lot of

9   discussion about how you chose where Ms. Scheid was moved to.

10  So I would like to ask you some questions about that.                         10:04:21

11  A.   Okay.

12  Q.   First of all, do you remember, was the individual who

13  Ms. Scheid was moved in with, was she single celled or did she

14  also have a bunkie?

15  A.   I do not remember.                                                       10:04:37

16  Q.   Okay.  And to take a step back, you described this process

17  where sometimes people come in and it's almost like a domino

18  effect of having to move this person to this cell, this person

19  to this cell to ensure compatibility?

20  A.   Yes, ma'am.                                                              10:04:52

21  Q.   Does ADC have a term for that?  I know in the California

22  system they call it, quote, compacting?

23  A.   No.  I've never heard a term for it.

24  Q.   Okay.  But that sort of concept of --

25  A.   Yes.  That sort of concept when you're full, especially                  10:05:06

United States District Court

                          ROBERT KAY - Cross

 1   when you're full, one move affects multiple people.          10:05:10
 2   Q.    It becomes like a set of dominoes or something?
 3   A.    Yes.
 4   Q.    So you don't remember if moving Ms. Alvarez set off one of
 5   these chain of events of multiple moves?                     10:05:22
 6   A.    I don't remember, no.
 7   Q.    And do you remember if on July 21 when -- pursuant to
 8   Judge Duncan's order, you had to move Ms. Scheid back into
 9   Ms. Ashworth's cell, did that generate a chain of additional
10   moves or was it just she was moved back and then Ms. Alvarez  10:05:48
11   was moved somewhere?
12   A.    Actually, I think Ms. Ashworth was single celled at the
13   time because we had just moved all of the -- I think we had
14   just moved all of the pregnant inmates off of our yard so I
15   think -- I'm not 100 percent sure but I think she might have  10:06:03
16   been single celled so it was just a straight back into her
17   cell.
18   Q.    Okay.  So if you flip to Exhibit 16, which was the
19   internal assignments report for Ms. Alvarez --
20   A.    Yes.                                                    10:06:27
21   Q.    -- it shows that on 7-21-17 she was moved to location B42,
22   building A11, bed 07 low.  Is location B42 on the Pedro yard?
23   A.    No.  B42 is San Carlos Unit?
24   Q.    And why was she moved to Carlos?
25   A.    We had moved all the pregnant inmates from our yard to San  10:06:52

                     United States District Court

ROBERT KAY - Cross

| | | |
|---|---|---|
| 1 | Carlos, all of them, 20, like 20 of them. | 10:06:55 |
| 2 | Q.   And that move just happened to happen on July 21, the same | |
| 3 | day? | |
| 4 | A.   Yeah, it looks like it. | |
| 5 | Q.   Why were the pregnant women moved from Pedro to Carlos? | 10:07:12 |
| 6 | A.   I'm not 100 percent sure why.  I know that I was told it | |
| 7 | was like a 20 for 20.  We are sending all the pregnant inmates | |
| 8 | were going to Carlos and they were sending us a bunch of | |
| 9 | inmates to take their place. | |
| 10 | Q.   And who told you to do this move? | 10:07:33 |
| 11 | A.   Ms. Currier. | |
| 12 | Q.   Warden Currier? | |
| 13 | A.   Yes, ma'am. | |
| 14 | Q.   And she didn't explain why the pregnant women were being | |
| 15 | moved? | 10:07:42 |
| 16 | A.   Not to me, no. | |
| 17 | Q.   Did anyone else give you an explanation, either on the | |
| 18 | 21st or afterwards, as to why the pregnant women were being | |
| 19 | moved? | |
| 20 | A.   I was being told they were moved because San Carlos has | 10:07:55 |
| 21 | air-conditioning because as the way it was going there, every | |
| 22 | night the inmates were going up into visitation and sleeping in | |
| 23 | visitation where it was AC.  So rather than to keep doing that, | |
| 24 | they just packed them all up and sent them to Carlos where it | |
| 25 | has AC. | 10:08:10 |

ROBERT KAY - Cross

1  Q.   Because is it correct that until this move to Carlos, all          10:08:11

2  female prisoners who were pregnant were all housed at Pedro?

3  A.   Minimum custody, yes.

4  Q.   Okay.  And you described the process when you looked at

5  your board and you just went down until you saw a low bunk was          10:08:35

6  available and that was Ms. Scheid because she didn't have a

7  doctor's note for a low bunk?

8  A.   Yes, ma'am.  That was the first one I stopped at.

9  Q.   So you normally just go along to the first one?

10  A.   Yeah.  Like I said, my board is right there.  I just          10:08:52

11  looked over and I went down and it was like, boom, boom, boom.

12  Q.   Did you look for any empty cells?

13  A.   I don't know if I had any empty cells at the time or not.

14  I'm sorry.

15  Q.   Did you look for any cells where the person was single          10:09:08

16  celled but could have a roommate?

17  A.   That's what I mean by empty cell.  I don't know if I

18  have -- I don't remember if I had any available beds at that

19  time.

20       THE COURT:  How has the summer been generally with          10:09:25

21  the capacity?

22       THE WITNESS:  I run between -- hopeful 432 physical.

23       THE COURT:  I'm sorry.  You said you run 132?

24       THE WITNESS:  432.

25       THE COURT:  Oh, yes.  Right.  432.          10:09:36

United States District Court

ROBERT KAY - Cross

1     THE WITNESS:  So 432 fiscal inmates.  And I'll run        10:09:37

2 anywhere between 428 and 432 I keep -- generally, they keep me

3 pretty full.

4     THE COURT:  Okay.  So it's fair to say that for the

5 summer it's true that the lowest you ever were at was 428 and   10:09:48

6 the highest you were at the was the capacity of 432?

7     THE WITNESS:  It might have been a little lower.  It

8 fluctuates day by day.  A week or so ago I was down to like 426

9 but as soon as they know those kind of beds are available, they

10 fill me up.                                                     10:10:09

11     THE COURT:  So is it fair to say if I was trying to

12 identify the lowest possible number, that it would be 426 over

13 the course of the summer?

14     THE WITNESS:  Average?

15     THE COURT:  Well, no.  I just want to know if I          10:10:21

16 picked any day in the summer, what could be the lowest number

17 of your count on that day?

18     THE WITNESS:  429, 430 is where I normally run.

19     THE COURT:  Okay.  All right.

20     And so when you told me before that each yard had        10:10:36

21 half of the number?

22     THE WITNESS:  Yes.  216.

23     THE COURT:  When you said 432 at the capacity, it's

24 216.  So if it's at 426, the number is 213; is that right?

25     THE WITNESS:  Yes.                                        10:10:51

United States District Court

ROBERT KAY - Cross

1          THE COURT:  Okay.  And so is it fair for me to          10:10:52

2   conclude that among the variables that you have on your board

3   that you have to deal with is that you essentially have about

4   210 choices to make in terms of who gets moved where?

5          THE WITNESS:  Not necessarily because we have          10:11:11

6   dangerous inmates.

7          THE COURT:  Right.  I know but you apply that

8   process?

9          THE WITNESS:  Yes.  Yeah.  Those are automatically

10  not even considered and then, like I said, actually I think if   10:11:18

11  you even look at the time, when I did it, it was after the

12  morning meeting so to make the move to get ready for count, I

13  had to do it fast.  So it was probably even quicker, quickest

14  easiest, fastest one to get done.  That was it.

15         THE COURT:  Why did it have to be done fast?          10:11:41

16         THE WITNESS:  Count is at 11.

17         THE COURT:  But why couldn't it have waited to the

18  next day?

19         THE WITNESS:  Generally, when they are approved for a

20  move, I do the move right away.                               10:11:52

21         THE COURT:  I see.  And I gather that the decision to

22  move all of the pregnant inmates, you received no warning of

23  that in advance?

24         THE WITNESS:  I had heard rumors that they were going

25  to go but I didn't know until it actually happened.          10:12:09

52
ROBERT KAY - Cross

1      THE COURT:  Because if you had heard that Ms. Alvarez          10:12:15
2  was going to be moved --

3      THE WITNESS:  No.

4      THE COURT:  I mean if you heard rumors about all of
5  the pregnant inmates are going to be moved, I wonder why you      10:12:21
6  took a step to move her that happened to be just three days
7  before it actually did happen that she would have been moved
8  anyhow?

9      THE WITNESS:  It was an approved move so when
10  approved moves -- when moves get approved, I don't generally     10:12:39
11  wait.  If it's something I can take care of right then and
12  there, I will take care of it right then and there.  That way
13  it's done.  I don't have to worry bought it.  Count screens are
14  right, no scratches, nothing.  Everything gets moving,
15  everybody gets moved, everything is done.  I don't have          10:12:56
16  anything to worry about.

17      As far as the rumor, that rumor had been flying
18  around for a while.  I said the whole time that I thought they
19  should have been there but -- above my pay grade so I can't do
20  my job based off of rumors per se.  I have an inmate that is     10:13:12
21  having a problem, I need to take care of that and get that
22  fixed as soon as possible so it doesn't become a bigger
23  problem.

24      THE COURT:  And if it's all right, I'll go ahead and
25  ask another question that was on my mind.  I may have a couple   10:13:24

United States District Court

ROBERT KAY - Cross

```
 1    of other questions as well.  But you've told us that there were     10:13:29
 2    two letters and we have one of them here in evidence, the
 3    letter on the 29th of June, and you testified that this was the
 4    first letter and then you testified that you received a second
 5    letter from Ms. Alvarez on the day of the meeting.                  10:13:43
 6             Do you still have that second letter?
 7             THE WITNESS:  I could not find it, sir, no.
 8             THE COURT:  Do you keep the letters?
 9             THE WITNESS:  Generally I do.  I don't know where
10    that one went.  I have no idea where that one went.                 10:13:55
11             THE COURT:  Thank you.
12             Thank you, Ms. Kendrick.
13    BY MS. KENDRICK:
14    Q.   So your testimony is that Ms. Alvarez approached you
15    before the morning meeting and gave you a second inmate letter?     10:14:05
16    A.   Yes, ma'am.
17    Q.   Okay.  And do you remember if she said that there were
18    additional problems or --
19    A.   She said it was escalating.  It was getting worse and I
20    don't remember exactly what she had written in her letter, but      10:14:20
21    like I said, I said I was going to the morning meeting.  I
22    would bring it up in the morning meeting and discuss it and see
23    if we can get it taken care of.
24    Q.   And to go back to when we were talking about the process,
25    you review the inmate letter and put it in a holding bin until      10:14:39
```

United States District Court

ROBERT KAY - Cross

1   the housing committee meets.  So the housing committee meets.          10:14:44

2   When the housing committee meets, are you sitting there as a

3   group in front of the big board?

4   A.   No.  We set up in the conference room up front of our

5   unit, a round table, and I pull out the letters and I read them   10:14:54

6   off and we discuss them.

7   Q.   So you just discuss the request itself?

8   A.   Yes.

9   Q.   You don't request the ramifications of we should move, you

10  know, this inmate in with -- at cell nine versus cell 12.  You    10:15:10

11  don't get into the weeds like that?

12  A.   No.

13  Q.   And what do you do with these inmate letters after the

14  housing committee meetings?

15  A.   I send a copy of them back to the inmate with their         10:15:22

16  approved or denied and I move the inmate.

17  Q.   Are these forms like carbon copies in triplicate?

18  A.   No.  They are generally -- no, they are not.

19  Q.   So you make a xerox copy?

20  A.   Yes, ma'am.                                                 10:15:39

21  Q.   Do you scan a copy of the inmate letter to the prisoner's

22  central files or --

23  A.   No, ma'am.  No.

24  Q.   So you don't know what happened to the letter that you

25  said you got on July 19?                                         10:15:53

ROBERT KAY - Cross

1   A.   No, ma'am.  I don't remember where it went.                    10:15:55

2        THE COURT:  So the 29th of June letter that we do

3   have, was that scanned into the system?

4        THE WITNESS:  No.

5        THE COURT:  So do you have just a traditional old    10:16:02

6   style file of paper pieces with respect to all of your inmates

7   in a file cabinet.

8        THE WITNESS:  Yes, sir.

9        THE COURT:  I see.

10  BY MS. KENDRICK:                                             10:16:09

11  Q.   And are they filed chronologically or by the inmate?

12  A.   I just pretty much by the date.  I put them in from the

13  beginning of the year to the end of the year.

14       THE COURT:  So they are not individualized as to each

15  inmate.  You just have a --                                  10:16:22

16       THE WITNESS:  I just keep a copy of it.

17       THE COURT:  Thank you.

18  BY MS. KENDRICK:

19  Q.   And I believe you told the judge that you had to make this

20  move quickly because of the count.  How did you select the   10:16:33

21  person with whom Ms. Scheid was moved into?

22  A.   I don't recall.

23  Q.   Yes, so the meeting is at nine; is that right?

24  A.   Meeting is at 8:30 generally.

25  Q.   Finishes at nine?                                       10:16:57

United States District Court

ROBERT KAY - Cross

1    A.    9, 9:15, 9:30.  It depends on what is going on.  Sometimes    10:16:58

2    they are short and sweet.  Sometimes they are a little bit more

3    involved.

4              THE COURT:  So you felt you needed to get everything

5    done with respect to this move before 11 a.m.?    10:17:08

6              THE WITNESS:  Before 10.  It depends when I turn my

7    count sheets in and go to the yards and drop off everything and

8    come back up and get ready for count.

9              MS. KENDRICK:  May I approach, Your Honor?

10             THE COURT:  You may.    10:17:22

11             MS. LOVE:  Your Honor, I have an additional copy if

12   you would like --

13             THE COURT:  That would be helpful, just so that

14   everybody can be on the same page.  Thank you.

15        (Exhibit Number 9 was marked for identification.)    10:18:12

16   BY MS. KENDRICK:

17   Q.    Do you recognize this document.  Exhibit 9?

18   A.    Yes, ma'am.

19   Q.    What is it?

20   A.    It's an IR I was asked to generate for the move.    10:18:22

21   Q.    Do you write IRs for each bed move?

22   A.    No, ma'am.

23   Q.    Why did you write an IR for this bed move?

24   A.    Because I was told to write an IR explaining why the move

25   was made because this was going on.    10:18:39

United States District Court

ROBERT KAY - Cross

1    Q.    Who asked you to write the IR?                                    10:18:46

2    A.    Ms. Lee.  DW Lee.

3    Q.    Deputy Warden Lee.   Okay.

4    A.    Yeah.

5    Q.    And on the top right corner it says report number               10:18:53

6    17-BO1-01652 and then underneath it, it says report date.

7    8-2-2017.  Was that the date that you were asked to write the

8    report?

9    A.    Yes, ma'am.

10   Q.    Had you made notes when Ms. Alvarez approached you on the       10:19:12

11   19th?

12   A.    Made notes?  No, ma'am.

13   Q.    Okay.  Did you make a note of the time that you spoke with

14   her on the 19th?

15   A.    No, ma'am.                                                       10:19:28

16   Q.    So in the report, where you put the time of 8:15, is that

17   your best estimate?

18   A.    That's the time that she approached me outside medical.

19   Q.    Okay.  And then underneath the summary you wrote -- well,

20   first of all, could you read out loud the summary that you            10:19:49

21   wrote there?

22   A.    (Reading) On the above date, the approximate time, ICOII

23   Kay was approached by Inmate Alvarez, ADC 317257, stating she

24   was still having issues with her cell mate and the situation

25   was escalating.  I advised Inmate Alvarez that I was headed to        10:20:06

United States District Court

58

ROBERT KAY - Cross

1   the morning meeting and I would bring this issue up with DW          10:20:10

2   Oros after that meeting.

3   Q.   Do you know why there's no reference to being given an

4   inmate letter by Ms. Alvarez?

5   A.   No, ma'am.                                                      10:20:27

6   Q.   Does this refresh your memory about whether or not you

7   were given an inmate letter by Ms. Alvarez?

8   A.   To the best of my knowledge, I believe she did give me an

9   inmate letter.

10  Q.   But you didn't put it in the report that you wrote on           10:20:41

11  August 2?

12  A.   No, ma'am.

13  Q.   And then underneath your statement and your signature it's

14  written, quote, DW Oros approved the move of Inmate Alvarez to

15  a cell mate meeting criteria and it's signed by Crystal Lee,         10:21:01

16  title, DW.  Do you know how Ms. Lee -- what the basis was for

17  Ms. Lee to make this statement?

18  A.   No, ma'am.  You would have to ask her that.

19  Q.   Okay.  Was Ms. Lee present when you met with DW Oros about

20  this bed move?                                                       10:21:26

21  A.   No.

22  Q.   Do you remember if when you spoke about this at the

23  morning meeting, was it a separate one-on-one with Deputy

24  Warden Oros to discuss the bed move?

25  A.   This bed move was at the end of the meeting.  It wasn't a       10:21:41

ROBERT KAY - Cross

1    one-on-one.                                                    10:21:45

2    Q.   But normally at a morning meeting, you wouldn't discuss

3    bed moves?

4    A.   Not unless there's an issue.  I mean, we discuss them once

5    in a while.  Something will pop up, an IR when we go through    10:21:54

6    the stuff in the morning meet and we'll discuss it but

7    generally, no.

8    Q.   And were you involved at all with Ms. Scheid's move back

9    to the cell with Ms. Ashworth on July 21 after Judge Duncan

10   ordered it?                                                    10:22:13

11   A.   Yes, I moved her back myself.

12   Q.   Okay.  Did you write an information report about that

13   move?

14   A.   No, ma'am.

15   Q.   Why not?                                                  10:22:20

16   A.   Normal operation for me is I don't write information

17   reports on movement.

18   Q.   Would you have written one if you had been ordered to do

19   so?

20   A.   If they wandered -- yes.                                  10:22:34

21   Q.   Could you look for an exhibit that is marked as Exhibit 2?

22          THE COURT:  I think you'll find that in the expando.

23   BY MS. KENDRICK:

24   Q.   Let me know when you're done reading it.

25   A.   Okay.                                                     10:24:15

United States District Court

ROBERT KAY - Cross

1    Q.    Do you know who Sergeant Overly is?                      10:24:16

2    A.    He's swing shift Sergeant.

3    Q.    And you work with him on Pedro Unit?

4    A.    Yes.

5    Q.    And when you go through officer training, are you trained    10:24:29

6    on how to complete an information report?

7    A.    Yes.

8    Q.    And as part of the training, are you trained to include

9    and list all staff that are involved in an incident that is the

10   subject of an information report?                              10:24:44

11   A.    Yes.

12   Q.    Do you have any idea why Sergeant Overly would not have

13   mentioned that you were part of the move?

14   A.    I have no idea.

15   Q.    Okay.                                                    10:25:02

16         And, again, I just want to be clear.  So your

17   testimony is that you do not remember how you selected the

18   individual who Ms. Scheid was moved in with?

19   A.    Yes, ma'am.

20         MS. KENDRICK:  Thank you, Your Honor.  I have nothing    10:25:24

21   further.

22         THE COURT:  Officer Kay, I have a couple of questions

23   but we'll also give a chance to Ms. Love to ask any further

24   questions that she would want to ask.

25         As the accountability officer, I have come to           10:25:36

United States District Court

ROBERT KAY - Cross

1    understand that you play a key role with respect to inmates who          10:25:40

2    are arriving from outside and being transferred from another

3    facility and a role in people who are being transferred out and

4    so you coordinate some aspects of that.  Do you have any

5    personal interaction with the inmates on the day that they          10:25:58

6    leave your responsibility or with the arriving inmates on the

7    day that they come in?

8              THE WITNESS:  Very limited if any.  I mean,

9    generally, the departures are gone before I get there.  I'm

10   there at seven so they are up like six in the morning.          10:26:18

11   Arrivals, sometimes I tell them -- I'll tell them where they

12   are going to be living.  If I'm behind and busy and don't have

13   all of my stuff done yet and not sure where they are going to

14   go, I'll have them sit and wait and tell them personally where

15   they are going to go or walk over to Property and tell them          10:26:35

16   where they are going to go.  But my interaction when they

17   arrive is very limited.

18             THE COURT:  So what percentage of the time do you

19   have an in-person interaction with somebody who is arriving or

20   leaving?          10:26:48

21             THE WITNESS:  Almost zero.

22             THE COURT:  Okay.  And then with respect to people

23   who are leaving and arriving, do you have any role in the

24   dealing with their prescription drug medication?

25             THE WITNESS:  No.          10:27:10

ROBERT KAY - Cross

1        THE COURT:  So that's not part of anything that you    10:27:17

2  do to make sure if somebody is leaving, to be sure that there's

3  a check through medical to see that they are leaving with the

4  prescriptions or medications that they had in the time that

5  they were with you?                                           10:27:26

6        THE WITNESS:  No.  That is not -- I have nothing to

7  do with that.

8        THE COURT:  Do you know who is responsible for that?

9        THE WITNESS:  Medical as far as I know.

10       THE COURT:  Okay.  All right.                            10:27:32

11       When someone goes to court, you testified about the

12  different treatment of their belongings, whether they are going

13  just for a day or for greater than a day, who makes the

14  determination about whether a roll-up needs to be done?

15       THE WITNESS:  So what happens is graves gets a sheet,    10:28:10

16  a movement sheet, for the next day and they look on it and they

17  say inmate A is -- A, B, C are being released.  They say you

18  have inmate D over here who is going to court.  They look at

19  and that they say, okay, there and there, and they roll them

20  up.                                                           10:28:32

21       Now, in this case, I know about because I actually

22  caught it that morning when I came in to work.  It was already

23  pretty much fixed before the phone call was made.  Inmate

24  Scheid was on the movement report to go out to court so graves

25  seen it as she's going out to court.  Graves didn't know it was  10:28:51

63

ROBERT KAY - Cross

1    a day trip.  So they roll her up --                                    10:28:54

2              THE COURT:  Do you mean Ashworth?

3              THE WITNESS:  Ashworth, I'm sorry.  Inmate Ashworth

4    going to court so they roll her up.  They don't know that she's

5    going for a day.  I didn't even know she was going out until I    10:29:05

6    came in and I seen it.  And there was something wasn't right in

7    the way they did the out to court on the side where they put

8    out to court.  So I had called the movement officer, complex

9    movement officer, and asked her what was going on.  And that's

10   when we found out it was a day trip and that she would be        10:29:21

11   coming back that day.  And then I let my supervisors know what

12   was going on because if I remember right, I'm 99 percent sure,

13   I had to not receive an inmate because I had to keep Inmate

14   Scheid's bed for her so I had to not take one in.  So I

15   couldn't really take one in because she didn't come off my      10:29:42

16   numbers.

17             Because if they go out to court, I count for them

18   physically, I have to know where they are.  They are on my

19   board, on my numbers, but they are not my physical number.  So

20   that bed, all of a sudden, becomes an open bed, an available    10:29:54

21   bed for an inmate coming in.  Do you understand what I'm

22   saying?

23             THE COURT:  Not entirely.  Maybe I can go back and

24   ask some more pointed questions that will help me understand.

25   You said you caught a glitch.                                    10:30:09

United States District Court

ROBERT KAY - Cross

1           THE WITNESS:  Yes.                                    10:30:12

2           THE COURT:  What is it that you actually caught?

3           THE WITNESS:  Just that she was going out to court

4    and -- you would have to see the sheet.  It says, like,

5    release, it will say CSBD, service begin date, sentencing date,   10:30:20

6    give you a little short description.  And normally over in

7    court it says the court that they are going out to.  Well, this

8    one said something different.  It wasn't what was normally in

9    that box.

10          So I seen that and I figured it out.  I went to put       10:30:36

11   it on my sheet, my own personal movement sheet that I keep

12   track of all of the moves that I do.  It wasn't right so I

13   called Complex Movement and asked her what was going on and she

14   found out that she was just a day trip to court.  We took

15   her -- I guess we took her to court and brought her to court,    10:30:55

16   our transportation team.

17          So when graves -- graves don't know.  So they see it

18   as she's a roll-up so they roll her stuff up to go out to court

19   and put it in storage.  So by her not -- me figuring out that

20   she was not going to court, she was never put out to court, so   10:31:13

21   she had never left her bed.  She was always assigned to that

22   bed.  She never left that bed.

23          THE COURT:  But when people usually go to court, does

24   that then create an open space in that bed space?

25          THE WITNESS:  Yes.                                       10:31:30

United States District Court

ROBERT KAY - Cross

1    THE COURT:  I see.  So when somebody comes back in,
2  they will potentially be reassigned to another bed space?                   10:31:30

3    THE WITNESS:  Yes.  Because to go to court, you don't
4  know how long you're going to be out to court.  So you'll come
5  back, you'll go out to court, DOC sees, "Hey we have a bed        10:31:43
6  here.  We'll send somebody from RNA over," send somebody from
7  another unit that comes down on the custody level and give her
8  that bed.

9    So and then when she comes back, then I have to find
10  her a bed and by just finding her a bed, I won't receive         10:31:58
11  somebody from RNA that day.  They will hold onto that inmate.
12  I'll bring my inmate back in and rehouse that inmate and if
13  they are not gone super long, I normally put them back in their
14  same cell.  If they are gone for a long period of time, then
15  I'll put them back in a different cell.  I try to keep them on   10:32:19
16  the same yard or something like that because if not, then I'll
17  be getting an inmate letter saying, "Hey, can I go back to my
18  yard," or something like that.

19    THE COURT:  There's another question that I have that
20  is based upon the testimony that you've given that you deal      10:32:35
21  with an email system at the department and I gather that's
22  true.  You have a lot of interaction through email with your
23  professional colleagues?

24    THE WITNESS:  Yeah.
25  \\\

United States District Court

ROBERT KAY - Redirect

1      THE COURT:  So this is a document that I'm not going

2  to ask you about what the document says.  I'm going to ask you

3  about what it says in the email date stamp.  This is Exhibit 1

4  to the hearing and the portion that I've highlighted says that

5  it was sent on Saturday, the 21st of July 2017, and then it

6  gives the time.  I can tell you that for sure the 21st of July

7  was a Friday.  It wasn't a Saturday.  Do you have any idea as

8  to how that could happen?

9      THE WITNESS:  I have no idea.

10      THE COURT:  Have you ever seen anything like that

11  before where there's been an incongruity between the day and

12  the date on the stamp on the email?

13      THE WITNESS:  No, sir.

14      THE COURT:  So now, Ms. Love, any redirect?

15      MS. LOVE:  Yes, Your Honor, just a few questions.

16                  **REDIRECT EXAMINATION**

17  BY MS. LOVE:

18  Q.   If you could look at Exhibit 19 again for me, Defendants'

19  Exhibit 19.

20  A.   Okay.

21  Q.   And this is the DC71 screen; correct?

22  A.   Yes, ma'am.

23  Q.   Did I understand your testimony correctly in response to

24  Ms. Kendrick's questions that you would have to input the

25  information of Ms. Alvarez and Ms. Ashworth into this DC71

United States District Court

ROBERT KAY - Redirect

<table>
<tr><td>1</td><td>screen before you were able to make the move of Ms. Alvarez</td><td>10:34:31</td></tr>
<tr><td>2</td><td>into Ms.-- the cell occupied by Ms. Ashworth?</td><td></td></tr>
<tr><td>3</td><td>A.   Yes, ma'am.</td><td></td></tr>
<tr><td>4</td><td>Q.   So do you know whether or not the date on the top right</td><td></td></tr>
<tr><td>5</td><td>corner of 8-2-17 that would be a date denoting the print date?</td><td>10:34:44</td></tr>
<tr><td>6</td><td>A.   That might be the print date.  I don't know.</td><td></td></tr>
<tr><td>7</td><td>Q.   And in response to the questions posed to you by Your</td><td></td></tr>
<tr><td>8</td><td>Honor, you testified that on the day that Ms. Alvarez came to</td><td></td></tr>
<tr><td>9</td><td>testify here in court in July --</td><td></td></tr>
<tr><td>10</td><td>          THE COURT:  You mean Ms. Ashworth?</td><td>10:35:06</td></tr>
<tr><td>11</td><td>          MS. LOVE:  I'm sorry, Ms. Ashworth.</td><td></td></tr>
<tr><td>12</td><td>BY MS. LOVE:</td><td></td></tr>
<tr><td>13</td><td>Q.   -- that you did obtain information that Ms. Ashworth was</td><td></td></tr>
<tr><td>14</td><td>only going to be out to court for one day; correct?</td><td></td></tr>
<tr><td>15</td><td>A.   Yes, ma'am.</td><td>10:35:14</td></tr>
<tr><td>16</td><td>Q.   And was that information important to you because then you</td><td></td></tr>
<tr><td>17</td><td>saved her bed so to speak while she was out to court?</td><td></td></tr>
<tr><td>18</td><td>A.   Yes, ma'am.</td><td></td></tr>
<tr><td>19</td><td>Q.   And on average, do you have approximately three inmates</td><td></td></tr>
<tr><td>20</td><td>incoming onto the unit each day?</td><td>10:35:32</td></tr>
<tr><td>21</td><td>A.   If you average it out, it's probably about three, yes,</td><td></td></tr>
<tr><td>22</td><td>ma'am.</td><td></td></tr>
<tr><td>23</td><td>Q.   So obtaining this information that Ms. Ashworth was out to</td><td></td></tr>
<tr><td>24</td><td>court for only one day enabled you to return her to her cell</td><td></td></tr>
<tr><td>25</td><td>that she previously occupied versus filling that spot with a</td><td>10:35:44</td></tr>
</table>

United States District Court

ROBERT KAY - Recross

1  new incoming inmate?                                    10:35:48

2  A.   Yes, ma'am.

3  Q.   The move that you made of Ms. Alvarez into Ms. Ashworth's

4  cell and then Ms. Scheid out to a different cell, was that move

5  made by you in retaliation for Ms. Ashworth testifying and      10:36:03

6  participating in this lawsuit?

7  A.   No, ma'am.

8  Q.   Was that move made in retaliation as against Ms. Scheid

9  for participating in this lawsuit in any way?

10 A.   No, ma'am.                                          10:36:17

11 Q.   Thank you.

12          MS. LOVE:  No more questions.

13          THE COURT:  Ms. Kendrick, any questions?

14          MS. KENDRICK:  Yes, Your Honor.  Actually, I have a

15 little bit of recross based on your questions.           10:36:23

16          THE COURT:  That's entirely fair and understandable.

17                    **RECROSS - EXAMINATION**

18 BY MS. KENDRICK:

19 Q.   So when Judge Duncan was asking you about the date of the

20 transport list, you said that you, quote, caught the glitch --   10:36:34

21 A.   Yes.

22 Q.   -- when you were looking at the system?

23 A.   Yeah.  Well, it's a sheet.  It's a movement sheet that

24 gets printed out so graves knows who is going home, who is

25 coming in the next day.  It's basically just a movement sheet   10:36:52

United States District Court

ROBERT KAY - Recross

1  for that day's moves.                                              10:36:54

2  Q.   And you said it had a strange notation or was the notation

3  blank?

4  A.   No.   There was something there.   I don't remember what it

5  says but it wasn't what was normally would be in that box.          10:37:04

6  That's what caught my eye.

7  Q.   So normally it would say something like Maricopa County?

8  A.   It gives a number, Maricopa County I think is 507.   It

9  will give the county number that's where they are going to

10 court.   If I remember right, I think this one said Maricopa       10:37:21

11 DOC transport or something like that instead of what was

12 normally in there.   That's why it drew a red flag.

13 Q.   And so you said you then called the complex?

14 A.   Complex movement officer.

15 Q.   The complex movement officer, okay.   And who was this        10:37:42

16 person?

17 A.   COII Green.

18 Q.   And Officer Green, did he or she --

19 A.   She.

20 Q.   She, she was the one who said Ashworth is just going for      10:38:01

21 the day?

22 A.   Yes.

23 Q.   Okay.   What did you do after that?

24 A.   I didn't -- there's nothing I had to do.   I just -- she

25 wasn't going to go so I didn't have to do anything.   I mean, I    10:38:13

ROBERT KAY - Recross

1   just put her on my movement sheet as going out to court for the          10:38:18

2   day is all I did because she didn't go to court.  Her bed was

3   there.  She was never in the -- and the computer was never

4   taken out of her bed so that bed was still hers when she came

5   back.  The only thing she didn't have was her property because    10:38:34

6   it got rolled up.

7   Q.    And when you learned that she was coming back for the day,

8   did you contact anybody at the property office to say, "I think

9   her property maybe rolled up in mistake"?

10  A.    No.                                                          10:38:50

11  Q.    Did you inform a supervisor that her property may have

12  been rolled up by mistake?

13  A.    No.  I didn't think it was a mistake.

14  Q.    Okay.  Thank you.

15          MS. KENDRICK:  I have nothing further.                     10:39:02

16          THE COURT:  Officer Kay, I thank you for coming.  I

17  don't have any more questions for you and I just want to check

18  with Ms. Love to see if she has any questions.

19          MS. LOVE:  No further questions, Your Honor.

20          THE COURT:  Okay. but I do need to say something to        10:39:15

21  you because I have the pleasure of having you in my courtroom

22  and the chance to speak to you so that you can perhaps

23  understand why it is that I am doing what I am doing.

24          I don't know whether you understand that I am here

25  not by my choice but by necessity of my job, what I am supposed   10:39:33

United States District Court

ROBERT KAY - Recross

 1  to do.  The parties in the case settled a lawsuit about health        10:39:38

 2  care at the Arizona Prison System and it required the

 3  defendants to do certain things and the hope was when the case

 4  was settled, that those certain things would all be done.

 5      The settlement provided for a mechanism of correcting        10:39:51

 6  failures to satisfy these promises in the settlement and that

 7  mechanism involves me and that means that I have to jump into

 8  your world.  It's not something that I like to do because I

 9  understand and have heard today that I interfered with your

10  world when I directed that matters be returned to the status        10:40:16

11  quo before Ms. Ashworth testified.  I understand that created

12  additional work for you that is not part of what is, I'm sure,

13  a very business and full day with what you have without some

14  judge in Phoenix telling you what is on your new list.

15      But the problem is the issue that I was addressing        10:40:41

16  today, and the issue that I was addressing then, is one that is

17  very important for me to address and that is the subject of

18  whether or not people feel free to talk to their lawyers.  When

19  I say "people," I mean the inmate members of the plaintiffs'

20  class to talk to their lawyers and to talk to me.        10:41:00

21      And every witness who came here who was an inmate and

22  sat in that chair told me that they were fearful of

23  retaliation, and I then made it clear that there would be no

24  retaliation.  But I also had conversations in court before with

25  the lawyers about what could constitute retaliation and it's        10:41:23

United States District Court

ROBERT KAY - Recross

1    actually more than just whether retaliation actually happened.   10:41:29

2          You testified here today that you had no retaliatory

3    intent in these changes that happened here.  But the problem is

4    everybody on the yard doesn't know what's in your head.  All

5    they know is what they see.  And what they saw is that somebody   10:41:45

6    came to Phoenix, testified here about something that was a

7    problem for the State, and that shortly after that person --

8    well, on the day they saw that the person was rolled up and

9    they also saw that they were unrolled but then they learned

10   that very close in time to the testimony that that person was   10:42:04

11   transferred -- suffered a change in roommate situation that she

12   didn't like.

13         And so people on the yard looking at that could well

14   think that it was retaliation.  And so the problem is whether

15   it was true or not, it still has the dangerous effect of   10:42:23

16   chilling the willingness of people to tell me the truth and so

17   I have to guard against that.

18         So I have created a rule in the case that says that

19   if you want to take some action against an inmate that changes

20   their circumstances in a way that they would view, or others   10:42:41

21   would view, as disfavorable or if you wanted to take

22   disciplinary action, you have to have an awfully good reason to

23   do it close in time to when they have testified in court

24   because people looking at it will think that it is retaliation,

25   whether it is or not.   10:42:58

United States District Court

ROBERT KAY - Recross

1       And so I understand that that impairs and intrudes              10:42:59

2  upon your role and that is to try to make the best judgments

3  that you can about where to place whom.  Now, I understand that

4  it interferes with the disciplinary rules of the prison but I

5  frequently, as we all frequently face in life, times when we       10:43:17

6  have two competing worthy goals that conflict and the worthy

7  goal, on one hand, is you doing your job; disciplinary rules on

8  the other side is me protecting the free flow of information

9  that is vital to the job that I have to do here from any kind

10 of chilling.                                                        10:43:36

11      So we've got two good purposes but sometimes they

12 conflict and so like all of us when we have conflicting good

13 purposes, sometimes we have to choose one.  We have to weigh

14 one and I have weighed that the importance of this information

15 connection to the lawyers and to me so that I can be as wise as    10:43:54

16 I possibly can in doing something that is not my job.  I didn't

17 grow up with a professional career in the Department of

18 Corrections and I don't understand it as well as you do, but I

19 have to try to learn about it because I make decisions and I

20 don't want to make bad decisions.  And one of the ways that I      10:44:10

21 get a better chance at making a good decisions is if I get

22 information about what's going on.  So I try to learn as much

23 as I can.

24      So I have made a decision that the weighing here

25 means that I do have to interfere with your life, your            10:44:24

1    professional judgment to protect this greater interest.          10:44:29

2            Now, I don't cut off the opportunity of the

3    defendants to say to me, "Judge, your rule of no adverse action

4    close in time to when somebody comes to court cannot be safely

5    applied here because we have to now reevaluate the wing," and    10:44:44

6    so defendants always have the chance to tell me that if

7    somebody should trump it.

8            But I also have experience in the case where there

9    have been allegations that people have been written up for

10   shirttail infractions close in time to when they talk to the    10:44:59

11   lawyers.  So whether that's true or not that it happened, it

12   was pretty easy for me to weigh that I didn't want to have

13   everybody skirting away from talking to the lawyers because

14   they were going to be written up for a shirttail or some minor

15   infraction.  So I simply said, "You get a free pass on any       10:45:18

16   minor infraction close in time that you talk to the lawyers or

17   to me," and so that's the necessity of what I've had to do to

18   protect this important link of communication.

19           So thank you for listening to that.  Thank you for

20   coming to Court here today and have a safe drive back.          10:45:36

21           THE WITNESS:  All right.  Thank you.

22       (Witness excused.)

23           THE COURT:  We'll take a ten-minute break.  Thank

24   you, all.

25       (Recess at 10:45; resumed at 10:58.)                        10:58:00

                    United States District Court

```
 1            (Court was called to order by the courtroom deputy.)          10:58:18
 2            THE COURT:  Thank you very much.  Please be seated.
 3            And we're ready for defendants' next witness.
 4            MS. LOVE:  Your Honor, the defendants call
 5   Officer Jardine.                                                        10:58:26
 6            THE COURT:  Officer Jardine, if you would please step
 7   forward to the clerk of the Court to be sworn.
 8            MAGISTRATE JUDGE CLERK:  Spell your first and last
 9   name.
10            THE WITNESS:  J-A-S-O-N, last name is J-A-R-D-I-N-E.          10:58:33
11       (JASON JARDINE, a witness herein, was duly sworn or
12   affirmed.)
13            THE COURT:  Good morning and welcome.  The microphone
14   is not attached to the desk there so that you can move it
15   closer so that you don't have to be leaning forward and get it        10:59:05
16   close to your mouth.  Thank you, sir.
17                          DIRECT EXAMINATION
18   BY MS. LOVE:
19   Q.   Sir, will you please state your full name for the record?
20   A.   My name is Jason Scott Jardine.  J-A-R-D-I-N-E.                   10:59:14
21   Q.   Who is your employer?
22   A.   Arizona Department of Corrections.
23   Q.   And what complex do you work at?
24   A.   I work at Perryville Complex.
25   Q.   Do you work on a certain unit?                                   10:59:28
```

76

JASON JARDINE - Direct

1    A.    I am assigned to Complex Unit but I'm attached to the San        10:59:29

2    Pedro Unit.

3    Q.    What is your position with the Arizona Department of

4    Corrections?

5    A.    I'm a COII is my rank and I work as a Special Security           10:59:36

6    Unit officer which we call SSU.

7    Q.    How long have you worked for the Arizona Department of

8    Corrections?

9    A.    December will be five years.

10   Q.    What positions have you held with the Arizona Department         10:59:48

11   of Corrections in the last five years?

12   A.    Originally I was a COII on the yard, and from that time I

13   went to a support position as the V gate officer at the Santa

14   Cruz Unit and then from there I went to the SSU Unit.

15   Q.    The entirety of your five-year career have you worked at         11:00:05

16   the Perryville Complex?

17   A.    Yes, ma'am.

18   Q.    Prior to your five years that you have served the Arizona

19   Department of Corrections, did you work in corrections

20   previously?                                                           11:00:16

21   A.    I did, yes, ma'am.

22   Q.    Where at?

23   A.    North Carolina Department of Corrections.

24   Q.    How long did you work for the North Carolina Department of

25   Corrections?                                                          11:00:23

United States District Court

77

JASON JARDINE - Direct

1   A.   Eight and a half years.                                          11:00:23

2   Q.   What positions did you hold with the North Carolina

3   Department of Corrections?

4   A.   I started out of as a Correctional Officer II.   I went to

5   a training officer and then from there I was promoted to        11:00:33

6   Sergeant.   And I was a Sergeant there for five and a half

7   years.

8   Q.   You used the term SSU.

9   A.   Yes, ma'am.

10  Q.   Can you tell us again what SSU stands for?               11:00:43

11  A.   SSU stands for Special Security Unit.   It's -- the duties

12  include monitoring security threat group affiliations and

13  actions.   Also we're responsible for conducting all of the

14  documentation, implementing the search lists and urinalysis

15  lists for the unit.                                            11:01:05

16  Q.   You said a moment ago that you're assigned to Complex but

17  you're attached to the San Pedro Unit.   Did I hear that

18  correctly?

19  A.   Yes, ma'am.

20  Q.   Can you explain for us and for the Court what it means to   11:01:16

21  be assigned to Complex but then attached to San Pedro?

22  A.   My direct supervisor is a Complex Sergeant,

23  Sergeant Mendez.   He's my first-line supervisor.   On a daily

24  basis, I will go down to the San Pedro Unit and I will work

25  there.   And I, obviously, work for the deputy warden at that   11:01:33

JASON JARDINE - Direct

| | |
|---|---|
| 1 | unit and chief of security at that unit and that's my daily | 11:01:36 |
| 2 | place of business. |

Q.    What is your -- within -- is your direct chain of command?
Who do you report up to?

A.    Sergeant Mendez and then we have Lieutenant Dominico.    11:01:49
She's retiring so they are waiting to replace her.  And the
major, Major Fernandez.  The Deputy Warden of Operations,
Mr. Twyford, and then, obviously, Ms. Currier, the warden.

Q.    Is your chain of command also up through the chain at the
San Pedro Unit?    11:02:07

A.    Yes, ma'am.

Q.    As an SSU officer, is one of your duties the detection and
control of contraband into and out of the facility?

A.    Correct.

Q.    What does that entail?    11:02:29

A.    I generate a monthly list, random and target searches.
The randoms are generated through a computer program that we
have.  It computes bed numbers and cell numbers only.  I don't
know the names of who is going to be on that list.  I annotate
those numbers onto a list and I put it into a folder that is    11:02:49
for searches.  I do the same for UAs as well, urinalysis.
We'll do the same thing for that.

Q.    Are you the only SSU officer assigned or attached to the
San Pedro Unit?

A.    Yes, ma'am.    11:03:06

United States District Court

JASON JARDINE - Direct

1    unit and chief of security at that unit and that's my daily    11:01:36
2    place of business.
3    Q.    What is your -- within -- is your direct chain of command?
4    Who do you report up to?
5    A.    Sergeant Mendez and then we have Lieutenant Dominico.    11:01:49
6    She's retiring so they are waiting to replace her.  And the
7    major, Major Fernandez.  The Deputy Warden of Operations,
8    Mr. Twyford, and then, obviously, Ms. Currier, the warden.
9    Q.    Is your chain of command also up through the chain at the
10   San Pedro Unit?    11:02:07
11   A.    Yes, ma'am.
12   Q.    As an SSU officer, is one of your duties the detection and
13   control of contraband into and out of the facility?
14   A.    Correct.
15   Q.    What does that entail?    11:02:29
16   A.    I generate a monthly list, random and target searches.
17   The randoms are generated through a computer program that we
18   have.  It computes bed numbers and cell numbers only.  I don't
19   know the names of who is going to be on that list.  I annotate
20   those numbers onto a list and I put it into a folder that is    11:02:49
21   for searches.  I do the same for UAs as well, urinalysis.
22   We'll do the same thing for that.
23   Q.    Are you the only SSU officer assigned or attached to the
24   San Pedro Unit?
25   A.    Yes, ma'am.    11:03:06

United States District Court

JASON JARDINE - Direct

1   Q.   How important is the control of contraband to the safe and          11:03:17
2   orderly operation of a prison facility based upon your training
3   and experience?
4   A.   It's paramount.  It's one of the most important things
5   that we do.  You know, some people might think small things are        11:03:28
6   not as important as others.  You know, we're trained where we
7   look at it as every piece of contraband is not good.  Because
8   at least it leads to bigger and bigger things.  If we can stop
9   it at a lower level, that's good.  Even if it's a pair of
10  tweezers, that could lead to something else.                           11:03:47
11        A lot of times no contraband is found and we did come
12  to find out later on it's a test run to see if they can get
13  something else through things like that, bigger things, so it's
14  actually paramount and it's a daily thing we have to deal with
15  every single day.                                                      11:04:04
16  Q.   Can you give us a rundown of a little brainstorm of what
17  are the types of items that in a prison setting are considered
18  contraband?
19  A.   Contraband is anything that is not issued by the
20  department.  Anything that is personal that is, again, not             11:04:18
21  bought at the stores there that is on site.  Anything that is
22  not authorized to be sent in through family members or friends.
23  At the end of the day, it's anything that is not authorized by
24  the State or issued by the State or not provided by the State.
25  Q.   Are items that are not issued by the State or authorized          11:04:36

United States District Court

JASON JARDINE - Direct

1   by the State that could be used as a weapon be considered                    11:04:40

2   contraband?

3   A.   Say that again please.

4   Q.   Are items that are not issued by the State that could be

5   used -- or items that are found in a prison facility that could   11:04:51

6   be used as a weapon considered contraband?

7   A.   Yes, ma'am.  That would be, that would be a big find of

8   something that could be used as a weapon.  A pencil could be

9   used as a weapon.  We have obviously different classes of

10  severity.  You know, we have nuisance contraband.  It might be    11:05:14

11  a postcard that doesn't belong to an inmate.  But if we find

12  things like a pencil that an inmate is not supposed to have.

13  Even needles.  Needles could be used for tattoo guns which,

14  obviously, is a health risk for the inmates.

15          So we always look at anything potentially that could     11:05:33

16  be a weapon.  Anything could be used as a weapon.

17  Q.   As part of contraband control, are you also looking for

18  detection of the introduction of drugs into the facility?

19  A.   Yes.  I would equate drugs as important as weapons as

20  well.  Drugs, a lot of these ladies, they come in, they have      11:05:56

21  had, you know, previous experience with drugs and stuff.  And

22  so we definitely want to try to control the introduction of it

23  to the unit.

24  Q.   And, unfortunately, do drugs make their way into the

25  Perryville Complex at times?                                      11:06:12

United States District Court

JASON JARDINE - Direct

1  A.   Absolutely.                                                         11:06:13

2           THE COURT:   And you know that because of the positive

3  urinalysis tests?

4           THE WITNESS:   That's part of it, yes, sir.

5  BY MS. LOVE:                                                             11:06:22

6  Q.   Do you also ever, based upon your experience there at

7  Perryville, actually find actual drugs within the facility?

8  A.   Yes, we have.   Recently we had a search of a particular

9  building and we found, you know, pills that were hidden in a

10 bathroom, pills that, you know, are controlled substance.               11:06:36

11 We've also -- at the San Pedro Unit recently we've had a

12 visitor bring drugs in to an inmate.   Also, again, recently

13 somebody -- we believe somebody brought in drugs through a

14 visitation to an inmate and the two inmates overdosed.   So it's

15 a problem.   It's a prevalent problem.                                  11:07:01

16 Q.   Based on your experience, what are the ways such as

17 contraband such as drugs are able to make their way into the

18 prison complex?

19 A.   Obviously, visitors can bring it in.   Inmates that go

20 off-site, another institution or the unit, they could have          11:07:15

21 drugs dropped off there.   It could be mailed in.   Staff,

22 unfortunately, will bring drugs in.   But those are some of the

23 most common, common ways that we're aware of.

24 Q.   You stated earlier that as part of your job as an

25 SSU officer, there are random searches or random search lists        11:07:40

United States District Court

82

JASON JARDINE - Direct

1    that you generate?                                                          11:07:44

2    A.    Yes, ma'am.

3    Q.    Do you also do targeted searches?

4    A.    Yes, ma'am.

5    Q.    And are the targeted searches physical searches of cells?   11:07:48

6    Are they urinalysis?  What do you mean?

7    A.    A target search is a search of an inmate's cell, her

8    housing assignment.  So if an inmate is in a particular cell,

9    if she's on the target list, that cell will be searched.

10   Q.    And as to SSU officer attached to San Pedro, do you        11:08:06

11   generate a targeted search list on a monthly basis?

12   A.    Yes, ma'am, every month.

13   Q.    Do you, as the SSU officer attach to San Pedro, generate a

14   monthly urinalysis search list?

15   A.    It's a urinalysis list.  It's for the inmate to be given a  11:08:27

16   UA, urinalysis test, so it's not necessarily a search.  It's a

17   UA, yes, ma'am.

18   Q.    So can I break down the searches that, as part of your

19   duties, you oversee into three categories:  Random searches,

20   targeted search list and then the urinalysis?              11:08:43

21   A.    Urinalysis also has two.  There's a random and there's a

22   target list.  So there's actually four lists.

23   Q.    The random searches, are those random cell searches?

24   A.    Yes, ma'am.

25   Q.    And how are those generated?                          11:09:00

United States District Court

JASON JARDINE - Direct

1  A.   We have a computer-based program.  It's just a link click                    11:09:01

2  on it.   Click the complex that you want.  Obviously, it's

3  Perryville.   And then from there I go down to San Pedro, click

4  on it and it shoots out a list.  I print that list off and then

5  based off those cell numbers, I annotate them onto the search                     11:09:18

6  list by cell number and bed number and I put it in the book and

7  those are the ones they do.

8  Q.   When you say "they do," do persons other than you actually

9  physically carry out the searches?

10 A.   Searches.  Oh, yes, ma'am.  It's the line staff.  Staff                      11:09:34

11 that works down on the yards, yes, ma'am.

12 Q.   And when the random cell search list is generated, do you

13 know or do you see an inmate name attached to the random list

14 or is it by cell number?

15 A.   It's cell number and bed number.  I have no idea who is                       11:09:54

16 actual -- who that name -- who that cell belongs to.  That is

17 why it's random.

18 Q.   Are there a certain number of random searches that are

19 performed on a monthly basis?

20 A.   On the sheet that I fill it out, I believe there are 20                       11:10:10

21 spaces.   I fill those spaces up and then I'll attach a blank

22 sheet on the backside in case they have extras later on.

23 Q.   And as to urinalysis, you testified that there's both a

24 random urinalysis listing and then a targeted urinalysis list?

25 A.   Yes, ma'am.                                                                   11:10:30

United States District Court

84
JASON JARDINE - Direct

1   Q.   And how does that work?  How could somebody -- why would                    11:10:30

2   somebody be on a targeted list versus a random?

3   A.   The random list as well as comes through that computer

4   program.  The target list, it's based on information received,

5   any type of information that I may receive, used in                              11:10:43

6   documentation such as in the case of somebody that works off

7   site, if they work out at the animal shelter, if they work as a

8   tram driver.

9        Also if they work around -- like in Televerde, which

10  is civilian contractors and things like that, potentially they                   11:11:02

11  could have -- bring stuff in.  But it's based off the policy

12  which is, you know, STGs, which is security tech routes,

13  previous drug history with being caught with drugs before,

14  positive UAs in the past, information that maybe informants

15  give to me, confidential informants.  Some of the times, a lot                   11:11:23

16  of times it's anonymous letters I get.  So those sometimes will

17  put somebody on a target list.

18       Most of the time what I do, though, is I'll go down

19  in the alpha roster.  It will have work assignments and I try

20  to pick a couple that are outside of the unit or in areas that                   11:11:39

21  potentially they could get drugs and that's how the target list

22  is made up.

23  Q.   And then let's talk about the targeted cell search list.

24  How do you determine what inmates make their way onto the

25  targeted cell search list?                                                       11:11:59

United States District Court

85

JASON JARDINE - Direct

1   A.   It's a little bit different.  I use the guidelines          11:12:00

2   obviously.  The policy as a guideline.  It is a little bit

3   different because it's not just inmates that are going

4   off-site.  It's inmates that can work inside the institution as

5   well.  As we spoke about earlier, there's numerous ways,          11:12:11

6   numerous things that could be considered weapons:  Pencils,

7   office supplies, things they shouldn't have, paint.

8           So you might find on a target list inmates that go

9   off-site or inmates that are on-site that work in particular

10  areas, the kitchen, painters, maintenance workers, inmates that  11:12:29

11  work in office settings.  Because of the potential contraband,

12  which may be office supplies, things like that, paint, even the

13  groundskeepers sometimes because they are out on the yards.

14  Sometimes they could find a loose fence tie or something like

15  that which could be considered a weapon, so that is how the      11:12:49

16  target list comes about.

17  Q.   Do you know whether or not Inmate Angela Ashworth is

18  assigned to the San Pedro Unit?

19  A.   She is.

20  Q.   Currently?                                                   11:13:06

21  A.   Yes, ma'am.

22  Q.   Do you know whether or not she was assigned to the San

23  Pedro Unit in June and July of this year?

24  A.   She was, yes, ma'am.

25  Q.   Do you know whether or not in July of this year             11:13:17

United States District Court

86

JASON JARDINE - Direct

1   Ms. Ashworth was placed on a targeted search list?

2   A.   She was not for July.  She was placed on a listing for

3   August.  The list was generated in the last week of July.

4   Q.   Is that a list that you yourself generated?

5   A.   Yes, ma'am.

6   Q.   Now, the targeted search list that she was placed on in

7   July of this year, was it the targeted urinalysis list or the

8   targeted cell search list?

9   A.   It was a search list.

10  Q.   The cell search list?

11  A.   Yes, ma'am.

12  Q.   Prior to testifying here today, had you been asked by any

13  of your superiors why Inmate Ashworth was placed on the

14  targeted search list for August of this year?

15  A.   They did.  I either misheard or misunderstood.  I thought

16  they were talking about the UA list.  I remember her being on

17  the list.  I thought it was a UA list.  I came to find out

18  later it was actually a search list she was on.  It was just an

19  oversight on my part when I answered.  So when they asked me if

20  she had been on the list, I was assuming it was a UA list, but

21  really it was the search list that she was on.

22  Q.   And were you contacted by Northern Region Operations

23  Director Ernie Trujillo with that question as to whether or not

24  she had been placed on a targeted list in August?

25  A.   I was, yes, ma'am.

United States District Court

11:13:19

11:13:29

11:13:43

11:14:04

11:14:21

11:14:36

JASON JARDINE - Direct

1    Q.   And when were you contacted by Mr. Trujillo?                11:14:37

2    A.   It was a little after 12 o'clock on the 11th.  It was

3    Monday, September 11, roughly.

4    Q.   And you provided him information initially that she had

5    been placed on a targeted UA list?                              11:14:49

6    A.   I did.

7    Q.   And how was that mistake made?

8    A.   I had the -- I pulled the files out and looked at them.  I

9    thought we were talking about UAs.  I saw the name.  Again,

10   oversight on my part, didn't look at the top that said search   11:15:04

11   list.  The forms are similar.  They are not exactly same.  And

12   I obviously have Mr. Trujillo on the phone, you know, you are a

13   little -- trying to get things together.  And so, yeah, I did

14   confirm that she was on the UA list.

15          Like I said, about an hour or so later, maybe two        11:15:23

16   hours later, we come to find out that, no, it was actually a

17   search list.

18   Q.   And so that was an innocent mistake that you made as to

19   providing information to Mr. Trujillo that she was on the UA

20   target list versus the cell search list?                       11:15:39

21   A.   That is correct.

22   Q.   I would like to show you what's been marked as Exhibit 31

23   that than marked for identification and there on that folder in

24   front of you are a whole bunch of tabbed documents.

25   A.   Okay.                                                      11:15:57

United States District Court

JASON JARDINE - Direct

1   Q.   And at the end, hopefully, you will see one that has a                11:16:03

2   number 31 on the tabs.

3            Do you have that in front of you?

4   A.   Yes, ma'am.

5   Q.   If you could take a look at what is in Exhibit 31 and tell            11:16:15

6   me whether or not you recognize what is in that folder.

7   A.   I do.

8   Q.   What is it?

9   A.   These are the search lists, target search lists, for

10  September.  It's a target search list for August.  It's an               11:16:37

11  additional target search for day shift for the month of August

12  as well and then a target search list for July and an extra

13  sheet for July as well, target searches.

14  Q.   Okay.  So is this target search list a list, the ones for

15  July, August, and September that are part of Exhibit Number 31,           11:16:58

16  are these the lists you yourself generate?

17  A.   Yes, ma'am, it is.

18  Q.   And these are the lists you yourself generated for July,

19  August, and September of this year?

20  A.   That is correct, yes, ma'am.                                         11:17:11

21  Q.   And these are the target search lists that you, in the

22  normal course of your operations as an SSU officer, generate on

23  a monthly basis?

24  A.   That is correct.

25            MS. LOVE:  Defendants move to admit.                            11:17:24

United States District Court

JASON JARDINE - Direct

1    THE COURT:  Any objection?                                    11:17:25

2    MS. KENDRICK:  Well, the second page of the exhibit,

3  there's a line crossed out so we would object until there's

4  some sort of explanation about that line.

5    MS. LOVE:  Sure.  I'm fine doing that.  We'll go           11:17:39

6  through the information and then I'll move to admit after.

7    THE COURT:  Okay.

8  BY MS. LOVE:

9  Q.   Let's just go through these pages one by one.  So the

10  first page of Exhibit Number 31, this is the target cell search   11:17:48

11  list for what month?

12  A.   September 2017.

13  Q.   And where can we tell that?

14  A.   If you look up in the upper left-hand corner, it says Date

15  and slightly to the right of that it says September 2017.         11:18:03

16  Q.   And can you describe, because the Court and plaintiffs'

17  counsel, this is our first time seeing these kinds of lists,

18  can you explain what information is contained on this search

19  list?

20  A.   If you -- obviously, at the very top is the institution      11:18:16

21  name, Perryville.  And then below that is listed Target

22  Searches and then I handwrite in what shift is going to have

23  that list for that month.  For that month it was swing shift.

24  And then of course it was the date and the month and the year.

25    We have a date so that date when the officer goes and       11:18:37

United States District Court

JASON JARDINE - Direct

|  |  |  |
|---|---|---|
| 1 | does those searches, they are going to write the date in at | 11:18:40 |

does those searches, they are going to write the date in at

that time.  And then on time they are going to write down the

time that the search began.  And next to that is going to be

inmate name.  Those are handwritten in by myself.  Also the

ADC number of that inmate.  That is handwritten by myself as

well.  The location is where that inmate lives, okay?  The

staff that conducts the searches, they annotate that into the

sheet right here or they will call it in to Main Control and

say, for example, on the first one, they will say at 1420

Inmate Burke was cell searched.  Negative results.

        The officer in Main Control will put in -- will look

up that inmate and find her bed number and put it on there,

annotate who did the search, that was Officer Storm.  They will

annotate if the inmate was present when the search was

conducted, yes.  If no, they will put "no" and then of course

the result, negative or positive.  If there's a positive find,

they will obviously seize the property, do an IR number,

information report, and put the IR number on that sheet.  That

way when do audits, they can reference it.

Q.   And if no contraband is found during the cell search, is

that noted by a "negative" in the results category?

A.   Yes.  Or if they find nuisance contraband, they will put

nuisance in there.

Q.   What is nuisance contraband?

A.   Nuisance contraband will be anything that isn't

11:18:52

11:19:10

11:19:29

11:19:48

11:20:03

United States District Court

JASON JARDINE - Direct

1   necessarily deemed a hazard or security issue or potentially a        11:20:05

2   weapon.  That could be -- like I said earlier, it could be

3   somebody else's potato chips, you know, or we know this inmate

4   doesn't have any money but yet she had some potato chips in

5   there or maybe a pair of shoes that don't belong to her.              11:20:20

6   That's officer's discretion if he wants to issue disciplinary

7   on that.

8   Q.   On the first page of Exhibit Number 31, which is the

9   September list, we can see on the date and time that some of --

10  there's some of those are filled in, some are blank.  Why is         11:20:41

11  that?  Is that because this is the current document that is in

12  use right now?

13  A.   That is correct.  The ones that are blank have not been

14  conducted yet.  They have the period of the month to complete

15  all of these.                                                         11:20:52

16  Q.   How does it work or what are your expectations as to the

17  SSU officer as to when the target searches get done, are they

18  done Tuesday at 5 o'clock?  Are they done randomly?

19  A.   Once they are put in the book, the shift command, which is

20  usually the Lieutenant or Sergeant, he will say if he has           11:21:13

21  staff, "We are going to do searches today."  He may call an

22  officer and say, "Hey, we're going to do some searches today."

23  The officer will get a book and say, "I'm going to do five or

24  six searches today," and then he/she will go and do those

25  searches.                                                             11:21:29

JASON JARDINE - Direct

1   Q.   Where is the target search book kept?                          11:21:30

2   A.   The search book is kept in Main Control at San Pedro Unit.

3   Q.   And as the SSU officer attached to San Pedro, do you

4   regularly review the target search list to see where you're at

5   in the month as to what -- have the searches been done, what     11:21:46

6   are the results, et cetera?

7   A.   I try to do it on a daily basis.  It doesn't always happen

8   on a daily basis because I might not be at my unit that day.  I

9   might be doing other things but I try to do it on a daily basis

10  to ensure that we're getting them done because at the end of    11:22:02

11  the month they all have to be completed.

12        Weekly we have to go to a star intel meeting and

13  we've got to show how many searches were done that week.  It's

14  annotated and I need to make sure that I don't go to the intel

15  meeting with a big fat zero and that some searches have been    11:22:16

16  done.

17  Q.   If you turn to page two of Exhibit Number 31, can you tell

18  us specifically what month this search log pertains to?

19  A.   This is August 2017 target search list.

20  Q.   And before I do that, because I will forget, can you go     11:22:37

21  back to page one for me?

22  A.   Yes, ma'am.

23  Q.   And on the inmate list of names that were subject to the

24  target search list, do you see Inmate Angela Ashworth's name on

25  this list?                                                       11:22:50

United States District Court

93

JASON JARDINE - Direct

1   A.   No, ma'am.                                                    11:22:53

2   Q.   And did you put her on the target search list for

3   September of this year?

4   A.   No, ma'am.

5   Q.   Are the inmates advised that they are going to be subject    11:22:59

6   to a search pursuant to the target search list?

7   A.   No, ma'am.

8   Q.   And why is that?

9   A.   We don't want to, obviously, be predictable in what we do.

10  The inmates are very smart and a lot of times they are going to    11:23:11

11  figure it out.  That's why specifically I don't do a group of

12  one work crew.  So I wouldn't like, for example, Televerde, the

13  minute one of them gets hit with a search, they are going to

14  know, "Oh, we are the ones getting searched today."  Now Dog

15  Pound are thinking, "I have a free month because they are doing    11:23:28

16  Televerde," so I try to mix it up.

17  Q.   So is the purpose of not providing notice and mixing it up

18  so that the inmates don't what is happening so if they do have

19  contraband or are hiding it, that they aren't getting rid of

20  it?                                                                 11:23:46

21  A.   Yes, ma'am.

22  Q.   Okay.  Back to page two of Exhibit 31.  And if you also

23  look at page three of Exhibit 31, is that page three also for

24  the August target search list?

25  A.   Yes, ma'am.  That's an extra.  Can I explain that real        11:24:01

United States District Court

JASON JARDINE - Direct

1    quick because it's going to be a little confusing?  Obviously,        11:24:07
2    in the month of -- I try to switch them up per month.   One
3    month swing shift will get targets.  The next month they will
4    get randoms.  It doesn't always work out that way but I try to
5    switch it up.  If you go to page three where it says target      11:24:21
6    searches for day shift, that's an extra one.  Day shift had
7    random searches for the month of August.  But those are just
8    random.

9           But along the course of their daily duties, if they
10   come across an inmate they suspect may have contraband, they     11:24:33
11   will go and do a search at that time even though she's not on
12   that list.  That would be considered a target search.  So we
13   don't want day shift annotating things on swing shift.  So I
14   give them an extra sheet so they can annotate it in here.
15   Q.   Now going back to page two of Exhibit 31, was Inmate        11:24:48
16   Angela Ashworth's name ever on the target search list for
17   August of 2017?
18   A.   She was.
19   Q.   And did you yourself put her on the target search list?
20   A.   I did.                                                      11:25:05
21   Q.   Can -- are you able to tell us where on page two of
22   Exhibit Number 31, which is the August search list, where her
23   name is at?
24   A.   It's where it's Xed out, written over and her name and
25   ADC number and location are blacked out.                        11:25:19

JASON JARDINE - Direct

1   Q.   Do you know who Xed out and drew through the line where          11:25:22
2   Inmate Ashworth's name previously was?
3   A.   Well, originally Lieutenant Papworth was on duty and he
4   saw it, caught it, obviously, and he put I believe "void void"
5   and it said "void per Lieutenant Papworth."                          11:25:38

6         When I came in the next day -- it had to be the next
7   day because he comes on swing shift -- I saw it, didn't know
8   why it was void.  I had no idea.  I didn't know what it was
9   about.  I believe at the morning meeting it was explained that
10  he had taken her off because *Parsons v. Ryan* and the situation    11:25:52
11  with Ms. Ashworth.

12        So I went back and Xed it out and intentionally
13  blacked out her name even more.  The reason why is staff, they
14  see this list, they do their searches.  I didn't want anybody
15  asking, "Oh, why is this guy taken off," you know, this             11:26:10
16  inmate's name.  I don't know who knew what's going on with Ms.
17  Ashworth or not.  I just thought it was best.  It's not there.
18  They don't have to ask questions about it and it's a done deal
19  and as far as I was concerned, it was a dead issue.
20  Q.   Did you have any disagreement with the fact that               11:26:29
21  Lieutenant Papworth had taken Ms. Ashworth off the target
22  search list?
23  A.   No.  I was actually relieved a little bit because I had no
24  idea that there was an issue with Ms. Ashworth.  I had no idea.
25  So when it was explained to me, I thought, oh, I'm glad             11:26:41

United States District Court

JASON JARDINE - Direct

 1  Lieutenant Papworth caught it.  If it would have been brought          11:26:44
 2  to my attention, I would have gone back and done it myself but
 3  it had already been done already.
 4  Q.   When you say there was an issue with Ms. Ashworth, what do
 5  you mean?                                                             11:26:56
 6  A.   I don't know the details.  I just know she had been
 7  mentioned or something about a lawsuit.  I don't know the
 8  details of it.  I had never had interaction with Ms. Ashworth.
 9  I didn't know what was going on with it.  When she wanted the
10  lits, her name never even registered to me.  It was another          11:27:06
11  name -- I think in her case, it was based on that she was a
12  tram driver.  Afterwards, like I said, when it was voided --
13  because probably -- I don't think it's ever happened where an
14  inmate was voided like that.  So, obviously, I asked about it
15  and then I was enlightened as to why it was taken off.  It made       11:27:21
16  perfect sense.
17  Q.   When you may have had Ms. Ashworth's name on the target
18  search list for August, did you have any information that she
19  was participating in the Parsons *v. Ryan* lawsuit in any way,
20  shape, or form?                                                      11:27:38
21  A.   You know, maybe I'm ignorant to the fact.  I had no idea.
22  I didn't know she was involved with *Parsons Ryan* or anything.
23  Her name didn't even register to me.  Only after when I found
24  out why it was taken off did I understand.
25  Q.   Were you aware that -- when you placed Ms. Ashworth's name       11:27:54

United States District Court

JASON JARDINE - Direct

1  on the target search list for August, were you aware that she

2  had been transported out of the complex to come here to the

3  federal courthouse to testify in July?

4  A.   No, I had no idea.  If I know that an inmate is gone to

5  Court, which I rarely do because that's not my place of

6  business, if I know an inmate is gone to court, I probably

7  won't put them on the list because she may not be there.  It's

8  just a wasted spot on the list.

9        So if I would have known she was gone to court --

10 obviously, we don't know when she's coming back.  Court might

11 be one day.  Might be who knows how long.  I probably wouldn't

12 have put her on the list if I would have known that, but I

13 don't look up that information.  I basically put the list

14 together and then that's it.

15 Q.   Let's talk about now why you placed Inmate Ashworth on the

16 target cell search list.

17 A.   She was put on solely because of her job assignment.

18 She's a tram driver.  It's officially listed as a maintenance

19 driver.  It's a tram driver.  So that's normally some of the

20 ones that I put on the list.  That's a normal occurrence.

21 Q.   So when you went down and made your list did you look down

22 and say, "Okay.  Ashworth, I want her on the list," or was it

23 you are looking who is working at this job and, "I am going to

24 put someone on the list"?

25 A.   If you look at the alpha roster, the names are on the

United States District Court

11:27:58

11:28:11

11:28:26

11:28:37

11:28:56

11:29:11

JASON JARDINE - Direct

1   left-hand side followed by their ADC number and to the          11:29:14
2   right-hand side it's their job assignments.  I'll scroll down
3   and I'll say, "I'm going to put some tram drivers on this
4   month.  I'm going to put some Televerde workers on this month,
5   some inmates that work at the paint crew," and I'll just        11:29:29
6   randomly select those based on that -- on where they work at
7   and I'll put them on the list.

8           Also, inmates that go on the list are inmates that
9   have gotten information about that may be doing something they
10  shouldn't be doing.  They will go on the list.  Obviously       11:29:42
11  inmates that have been caught before having contraband brought
12  in, whether it's drugs or contraband, they will go on the list
13  and that is basically how that list is created.
14  Q.  Do you know what days a week -- are you provided what days
15  a week each inmate works on their job, like what their duty     11:30:03
16  schedule is or their work schedule?
17  A.  I could look it up.  I'm not necessarily provided that.  I
18  have access to that.  If I go to the work screen, I can see
19  what days they work.
20  Q.  Do you know what days a week Inmate Ashworth works as a      11:30:17
21  tram driver?
22  A.  She works Friday, Saturday and Sunday.  I don't know about
23  Monday but I know she works over the weekends.
24  Q.  What is your concern specifically as to contraband control
25  with respect to a tram driver?                                  11:30:33

United States District Court

JASON JARDINE - Direct

A.   The San Pedro Unit, as most units, I don't know what the | 11:30:40
percentage is, probably 90 percent of the visits are on the
weekends.  I believe San Pedro, for example, we have visits,
night visits, on Tuesdays I believe but all the other visits
are on the weekends. | 11:30:53

     Well, you've got to figure I believe last weekend or
the weekend before, they might have had over the course of
Saturday or Sunday 70 visits, maybe more.  So you've got to
figure maybe two, three people per visit, looking at 140 people
coming strictly to the San Pedro Unit. | 11:31:09

     The tram drivers, they will bring in those civilians,
they visitors, these family members, to the San Pedro unit.  On
top of that, there are also tram drivers that drive the Pedro,
they also drive the San Carlos as well which has 1250 inmates.
You can imagine how many visits they have.  So these ladies | 11:31:26
that are driving the trams, they are driving untold number of
civilians over the course of two days.  And so -- and it's
happened in the past where, you know, conversations are struck
up and things happen and, you know, so that's one of the
reasons why tram drivers are put on the target list. | 11:31:46
Q.   And is that because they have an increased contact with
the public who may be coming in -- may be bringing in items and
distributing them to inmates that they are not approved by and
should have in the facility?
A.    I think it would be safe to say that tram drivers have | 11:32:02

United States District Court

JASON JARDINE - Direct

1   more contact with civilians than anybody else except maybe                    11:32:05

2   inmates -- even inmates that go off-site/off-site, I think tram

3   drivers probably have far more contact with civilians every

4   single weekend.

5   Q.   When you do a selection for your target search list each        11:32:21

6   month, do you focus on a particular job?  Do you rotate and

7   say, "This month I'm going to look at tram drivers and next

8   month I'm going to look at maintenance workers"?

9   A.   As I stated earlier, it's no select number.  It might be

10  two or three tram drivers.  It might be five of them and as       11:32:35

11  well as that, it might be two or three inmates that work at,

12  you know, the kitchen.  It might be two or three inmates that

13  work on the groundskeeper crew.  I try to keep a different

14  number.  Like I said, one thing we don't want to do in our job

15  is pattern.  You don't want to pattern.                           11:32:51

16          The inmates are super, super smart and lot of times

17  they know things before I even know it.  So, yeah, I try to

18  keep it -- a mixture there.  And, you know, for the most part,

19  I know.  I think it works pretty well.

20  Q.   When you place Inmate Ashworth's name on the August target   11:33:07

21  search list, did you have any specific intel that she was

22  involved in the introduction of contraband into the facility?

23  A.   No, ma'am.

24  Q.   So her selection was based merely upon her job as a tram

25  driver?                                                            11:33:20

United States District Court

JASON JARDINE - Direct

1    A.   There was no other reason.   Just for that reason.          11:33:21

2    Q.   If you can look at page four of Exhibit Number 31, pages

3    four and five actually, and are these the target search lists

4    for San Pedro Unit for July of 2017?

5    A.   Yes, ma'am.                                                  11:33:47

6    Q.   Is Inmate Angela Ashworth's name anywhere on the target

7    search list for July of 2017?

8    A.   No, ma'am.

9    Q.   When Ms. Ashworth was removed from the August target

10   search list and her name crossed out by you, did that          11:34:16

11   effectively take her out of the mix?  She was not going to be

12   searched that month?

13   A.   That is correct.  The only way she would be searched that

14   month is if she had behavior that would constitute us doing a

15   target search on her, you know, or if she -- I don't know, just  11:34:30

16   if she was to get in a fight, then obviously we're going to go

17   and search the two people that get into a fight, search their

18   cells just to see if there's documentation as to why they got

19   in a fight, try to figure it out.  Other than that, she would

20   not have been on any list unless, like I said, her behavior     11:34:52

21   warranted it.

22   Q.   Do you have any information that since July of 2017 to as

23   we sit here today whether or not Ms. Ashworth has indeed been

24   subject to a target search, cell search?

25   A.    I looked back all the way as far as June and I didn't see  11:35:07

United States District Court

JASON JARDINE - Cross

1    her on any list.  I can't speak for before that, but I don't      11:35:11

2    remember seeing her name previously.  So if she was, she may

3    have been.  I don't know.  I couldn't tell you.

4    Q.   No further questions.  Thank you.

5         THE COURT:  Ms. Kendrick?                                    11:35:23

6                    **CROSS - EXAMINATION**

7    BY MS. KENDRICK:

8    Q.   So Officer Jardine, I'm going to walk us a little bit more

9    through Exhibit 31 but I'm going to make an effort not to use

10   any inmate's name or full number so I will try to use just the   11:35:49

11   last two numbers and their first initial.

12   A.   Yes, ma'am.

13   Q.   So, hopefully, we can both together try to do that.

14   A.   Sure.

15   Q.   So, first of all, if you could turn to the third page of    11:36:02

16   Exhibit 31 and there's only one individual listed, her ADC

17   number ends in 85 and in the column under Staff Name it says

18   Jardine.  Is that you?

19   A.   That is correct.

20   Q.   Is that your handwriting all the way across on that line?   11:36:21

21   A.   Yes, ma'am.

22   Q.   Okay.  Because sometimes it's whoever does the search

23   writes kind of the last three columns?  Like the name, was an

24   inmate present?

25   A.   Typically no, ma'am.  No, ma'am.  Normally, if an officer   11:36:37

United States District Court

JASON JARDINE - Cross

1    does a search, and he will call it in to Main Control either on    11:36:42

2    the radio or he'll walk up there or sometimes they will hand

3    write it in themselves.  They will get the book and put it in.

4    Typically, an officer will call Main Control and say, for

5    example, "Hey, Main Control this is Jardine.  I just did a    11:36:54

6    search at this place on this inmate, contraband was found," et

7    cetera, et cetera.

8            In my case when I do my searches, I'll go get the

9    book myself and hand write it in myself.

10   Q.   Okay.  So I guess I just want to also establish that this    11:37:07

11   handwriting on page three is a good example of what your

12   handwriting looks likes?

13   A.   Yes, ma'am.

14   Q.   Okay.  When you create these reports, roughly how many

15   days before the start of the month do you put them together?    11:37:27

16   A.   It's typically the last week of the previous month.  For

17   example, for August, I would -- sometimes the last week of July

18   I will put it together when I have available time.  So it takes

19   about an hour, so I want to make sure I have the time to do it

20   uninterrupted so it's usually typically the last week of the    11:37:44

21   month.

22   Q.   And so for these targeted lists, you said some of them

23   it's because you're going through like the job lists, and we

24   can talk about that, but other times it was because you found

25   information to add someone to a list?    11:37:59

United States District Court

104

JASON JARDINE - Cross

1    A.    Yes. We call them kites but inmate letters.   Sometimes          11:38:01

2    inmates will come and tell me and sometimes I have informants

3    that don't want to be named and they will come and see me and

4    give me information.

5    Q.    When that happens, do you update the list for the month in          11:38:12

6    which the person tells you or do you kind of hold onto that

7    information until the day you're creating the list for the

8    upcoming month?

9    A.    So once the list is made, the list doesn't get changed.

10   As far as I'm concerned, it does not get changed.   So if an          11:38:27

11   inmate comes to me two days after the list is in the books, so

12   there it is, inmate comes to me and says, "Hey, Mr. Jardine,

13   let you know you might want to go search so-and-so because

14   she's got a tattoo in there."   I will go down there and search

15   that cell or I'll have the Sergeant or supervisors have          11:38:43

16   somebody go down and search that cell for a tattoo gun.   Once

17   that search is done, it's going to be put on this list.

18   Q.    It will be added?

19   A.    On the extra sheet, on the extra -- the sheet that we're

20   looking at that's an extra sheet.   There's no names on there          11:39:00

21   but if these situations arises, then they will go on here.

22   Q.    Okay.  And I think you may have been speaking a little

23   quickly but with your example, were you referring to a tattoo

24   gun?

25   A.    Yes.  For example, a tattoo gun.          11:39:13

United States District Court

JASON JARDINE - Cross

1   Q.   Okay.  I just want to make sure I heard you correctly.                    11:39:15

2        And when you hand write the names and the numbers,

3   before you stick it in the book that is kept in Central

4   Control, do you make a copy for your records or any purpose at

5   all?                                                                           11:39:33

6   A.   I do not.  It goes into the book and that's the only copy

7   there.

8   Q.   So that's the only copy in the universe that would exist

9   would be what was put in the book?

10  A.   I believe so, yes, ma'am.  That's the only list I make, it    11:39:40

11  goes in the book and that's it.

12  Q.   Are there policies or local operating procedures or any

13  sort of memorandum that sets out kind of the process and

14  procedure for setting up these target lists?

15  A.   They go through some criteria for target list for searches   11:39:56

16  and for the UAs.

17  Q.   I guess what I'm trying to get at is, you said, you know,

18  you go down the list of the jobs and you say, "Well, I want to

19  take a couple tram drivers, a couple of people who work at the

20  animal shelter," do you have any training or written            11:40:12

21  instructions that say when doing that, you know, pick every

22  X person, something like that, or how do you do that part?

23  A.   No.  There's nothing in writing saying pick every other

24  person but it says in my -- in my post orders is, you know,

25  searches are conducted on a daily basis as needed to control    11:40:34

United States District Court

JASON JARDINE - Cross

1   contraband, to recover stolen property, and that is what I base          11:40:37

2   it off of.  And also based on information gathered.

3          I -- I take an alpha roster as part of the

4   information that I have at my disposal to select targets.

5   Q.   Okay.  And also this document that we're looking at, at          11:40:55

6   the top for all four pages it says Target Searches.  So I'm

7   curious, do you have a similar document that at the top might

8   say Random Searches?

9   A.   Yes, ma'am.

10  Q.   But that's kept in the same binder together?          11:41:12

11  A.   Yes, ma'am.

12  Q.   Okay.  Televerde, that's the company that contracts with

13  the department to have the prisoners do, like, phone

14  solicitation calling; is that right?

15  A.   Yes, ma'am.          11:41:30

16  Q.   So what is it about being on the telephone that makes it

17  necessary to search them more often?

18  A.   Well, for Televerde it's a very nice setting.  It's a very

19  clean setting.  It's like a business office in there.  And

20  there's a lot of office supplies in there.  There's obviously          11:41:46

21  the contract workers are in there.  They are with these inmates

22  from like 6 a.m. to 5 p.m. or 10, 12 hours a day.  Those

23  workers, they come in and bring food for themselves for lunch.

24  It has been known in the past, and it has been caught in past,

25  where inmates will have some of that food in their cells.          11:42:04

United States District Court

JASON JARDINE - Cross

1    Obviously it was given to them.  Big thing, though, is office          11:42:07

2    supplies, anything like that they shouldn't be having.

3    Q.    Okay.  So it's more about the office supplies than the

4    fact that they are on the telephone randomly calling people?

5    A.    Well, part of my duties is also to monitor telephone          11:42:19

6    calls, not those telephone calls, obviously, but there is a

7    failsafe, a catch so that in order for them to get on the phone

8    to do their business, it has to be, for lack of a better term,

9    approved by the contract workers.

10   Q.    Okay.                                                          11:42:35

11   A.    In other words, they kind of know who they are talking to.

12   Q.    Okay.  And you mentioned the visitation on the weekends as

13   being part of the reason for the tram drivers being searched.

14   What are the hours of visitation at San Pedro?

15   A.    Well, it's not actually correct, ma'am.  That is not the       11:42:53

16   sole reason tram drivers are picked, just because of visitation

17   on the weekends.  We do have visits on Tuesdays as well but

18   it's not just that either.  Inmates, they are going outside of

19   our fences, outside of San Pedro.  They are driving those

20   trams, you know, eight hours a day, or six hours a day or          11:43:08

21   whatever the work schedule is, and they get out at times, take

22   a break.  They switch crews and that's done on the outside of

23   San Pedro Unit.  I've found contraband at those switch sites.

24   I haven't found major contraband but found notes passed from

25   inmates from other units, so it's not just because of the          11:43:27

United States District Court

JASON JARDINE - Cross

1  visits.                                                              11:43:29

2  Q.   So what are the hours of visitation on the weekends?

3  A.   There's two blocks of visits.  I believe -- I might have

4  the numbers off.  I believe the first block is eight to 12 I

5  believe and the second one is, like, one to five or one to     11:43:41

6  four, 12 to four, something like that.

7  Q.   And that is Saturdays and Sundays?

8  A.   Yes, ma'am.

9  Q.   And the Tuesday night visitors, what time --

10 A.   I believe it's a food visit or night visit.  They come in  11:43:53

11 the evening time on Tuesdays, yes, ma'am.

12 Q.   And that is in the evening?

13 A.   That is in the evening.

14 Q.   Okay.  What time is that?

15 A.   I'm not for sure.  I'm not there.  It's after I leave.      11:44:02

16 It's probably after 5 o'clock I'm assume.

17 Q.   Okay.  Does it go until midnight?

18 A.   No, ma'am.

19 Q.   What's the graveyard shift?

20 A.   For staff?                                                   11:44:14

21 Q.   For staff or for inmates that work the graveyard shift.

22 A.   As tram drivers?

23 Q.   As anything.

24 A.   Well, we do have some inmates that will go up the complex

25 I believe and they do cleaning crews and stuff like that or --   11:44:27

JASON JARDINE - Cross

1    I don't know their exact hours.  And some inmates that go to
2    work at the kitchen and they get up at 3 a.m. and have to be at
3    kitchen at like 4 o'clock or something.                          11:44:30
4    Q.   What about for the tram drivers?
5    A.   I believe they 24 hours.                                    11:44:42
6    Q.   For the graveyard shift?
7    A.   The total trams are running are 24 hours.  I believe the
8    inmates work six hours, so I'm not for sure what their exact
9    hours are.
10   Q.   Would it be midnight to six a.m.?                           11:44:54
11   A.   It could be, yes, ma'am.
12   Q.   So if you're driving a tram from midnight to 6 a.m., are
13   there outside visitors on the tram with you?
14   A.   There shouldn't be.
15   Q.   It would just be staff?                                     11:45:07
16   A.   Staff.
17   Q.   How did you know which days of the week Ms. Ashworth works
18   as a tram driver?
19   A.   Because I looked it up.
20   Q.   Okay.  Do you know what shift she works?                    11:45:20
21   A.   I do not.  I just saw that she works on the weekends.
22   Q.   Oh, so you remembered she works on the weekends but you
23   didn't remember she worked graveyard shift?
24   A.   I just looked it up on the day of the 11th as a matter of
25   fact.  Before that I didn't know what shift she worked or what  11:45:35

JASON JARDINE - Cross

 1   day she worked.                                                    11:45:38

 2   Q.   So when did you look her up on the work shift to see the

 3   dates of the week?

 4   A.   I wanted to -- I sent a screen shot to Mr. Trujillo and

 5   that is when I pulled it up.                                       11:45:52

 6   Q.   Okay.   So Monday was when you looked it up?

 7   A.   Yes, ma'am.

 8   Q.   Okay.   Otherwise, you have an incredible memory if it was

 9   from July.

10   A.   No.                                                           11:46:03

11   Q.   So I believe you testified when Ms. Love was asking you

12   about your conversation with Mr. Trujillo that he called you

13   approximately 11 or 12 o'clock on Monday?

14   A.   I believe it was around 12ish, a little after 12 maybe,

15   something like that.                                               11:46:19

16   Q.   Was it after count or --

17   A.   Yeah.   It was after count because I had somebody in the

18   office at the time and I had them leave, obviously.   So I

19   believe it was after 12.   I don't know the exact time, between

20   12 and one I would say possibly.                                   11:46:31

21   Q.   And do you remember for approximately how long you were

22   speaking with Mr. Trujillo?

23   A.   Less than five minutes, six minutes, four minutes.

24   Q.   Did you and Mr. Trujillo or anybody else exchange emails,

25   phone calling or text messages on Monday about Ms. Ashworth?      11:46:51

United States District Court

JASON JARDINE - Cross

1  A.   I got a phone call from Deputy Warden of Operations                    11:46:56

2  Mr. Twyford and Mr. Profiri.

3  Q.   Joseph Profiri?

4  A.   Yes, ma'am.

5  Q.   And who is he?                                                         11:47:10

6  A.   Southern Regional Operations Director.

7  Q.   When did Mr. Profiri call you?

8  A.   I believe it was actually on the same call with

9  Mr. Twyford and then he put them on the phone.

10 Q.   So what time was that?                                                 11:47:20

11 A.   I do not recall.

12 Q.   Was it after you spoke with Mr. Trujillo?

13 A.   I don't recall.  I might have spoke to him first and

14 Mr. Trujillo later.  I really don't remember.

15 Q.   Okay.  And I believe you said that you were kind of             11:47:35

16 scrambling because you know Mr. Trujillo is Northern Regional

17 Operations Director and calling you and asking questions and

18 you made what Ms. Love called a, quote, innocent mistake and

19 said it was a UA list.  I believe you have testified that a

20 couple hours later, you realized that that was a mistake and         11:47:57

21 she was on a UA list?

22 A.   Correct.  I gave the paperwork and, actually, I brought

23 copies to the DWOP, Mr. Twyford, and he's the one that actually

24 caught it and said, "Hey, I thought she wasn't on a UA list."

25       And I said, "Oh, I thought she was."                          11:48:12

JASON JARDINE - Cross

1          And then he said, "No.  She's on a search list."

2          And I looked at it and I was like, "Oh.  Uh-oh."  And

3  by then it was too late, you know, so I guess he made a text to

4  say, "Hey, Jardine made a mistake," and, yeah, it was

5  unfortunate.

6  Q.   So there's a lot of breakdown there.  You said Deputy

7  Warden Twyford called you and said he was the one who caught

8  that it was not a UA list or was it you?

9  A.   I actually took it up there to them, the pages to him,

10 dropped them off, you know, okay, and blah, blah, blah, and

11 that was it.  I was actually outside with my boss and

12 Mr. Twyford came out and got us and said, "Hey," and pointed

13 out the discrepancy and I didn't know what to say.  I looked at

14 him again and I said, "I made a mistake."  There was nothing

15 else I could do it about it.  I made a mistake.

16 Q.   Yes.  People make mistakes.  So that was a couple hours

17 after you talked to Trujillo?

18 A.   Yes, ma'am.  I believe so.

19 Q.   But it was not at the time that you were on the phone with

20 Mr. Twyford and Mr. Profiri?

21 A.   No.  At the time, they were assuming it was a UA list.

22 Q.   Okay.  And do you remember approximately what time you had

23 that conversation with Mr. Twyford about the search list?

24 A.   Yeah.  It had to be -- it was after 3 o'clock because on

25 my way out -- it would have to be after 3 o'clock because I

United States District Court

JASON JARDINE - Cross

1    went up there on my way out and dropped off the paperwork to          11:49:30

2    him.

3    Q.    And did you call, email or text Mr. Trujillo to clarify

4    the mistake about what type of search Ms. Ashworth was subject

5    to?                                                                   11:49:44

6    A.    Did I?

7    Q.    You personally?

8    A.    No.

9    Q.    Do you know if Mr. Twyford the?

10   A.    I know he brought this to my attention.  He started          11:49:54

11   texting.  I have no idea who he was texting.  Obviously, I'm

12   not privy to that information.  He said, "Have a good day," and

13   we left.

14   Q.    So you observed him send something sort of message using

15   his telephone as he was talking to you?                              11:50:07

16   A.    Well, you know what, well, he was on his -- he was texting

17   I don't know who, what it was about.  He said, "Have a good

18   day," and we left.

19   Q.    Okay.  So I want to go back to Exhibit 31 and the second

20   page, which is the August 2017 target searches swing shift          11:50:26

21   search log?

22   A.    Yes, ma'am.

23   Q.    And we see that line that we were talking about earlier

24   that has all of the Xs out that you testified was where

25   Ms. Ashworth was listed and there are 14 names underneath hers       11:50:40

United States District Court

114

JASON JARDINE - Cross

| | |
|---|---|
| 1 | and they all appear to be in your handwriting.  Is that | 11:50:50 |
| 2 | correct? |
| 3 | A.   Yes, ma'am.  The whole list is in my handwriting and their |
| 4 | ADC number. |
| 5 | Q.   So the five names above the Xs were also written by you? | 11:51:00 |
| 6 | A.   Yes, ma'am. |
| 7 | Q.   Do you have any idea why your handwriting appears to |
| 8 | change dramatically between the top of the line and bottom of |
| 9 | the line? |
| 10 | A.   Between the very last line and the first line? | 11:51:21 |
| 11 | Q.   Correct. |
| 12 | A.   I don't think it does. |
| 13 | Q.   Okay. |
| 14 | A.   Are you talking about -- |
| 15 | Q.   Where it says Inmate Name where the names of the inmates | 11:51:32 |
| 16 | are listed? |
| 17 | A.   Yes, ma'am. |
| 18 | Q.   The first five names? |
| 19 | A.   Yes, ma'am. |
| 20 | Q.   If you compare the handwriting to the names underneath the | 11:51:37 |
| 21 | X, does the handwriting look the same to you? |
| 22 | A.   Yes.  That's my handwriting. |
| 23 | Q.   Okay.  So I want to ask you also about some of these notes |
| 24 | that are at the bottom of the chart? |
| 25 | A.   Yes, ma'am. | 11:51:57 |

United States District Court

JASON JARDINE - Cross

1   Q.   The first thing under the table is there's an asterisk and       11:51:58

2   it says Search Types:  R equals random, T equals target, P

3   equals pat, S equals strip, CA equals common area, HAA equals

4   Harris after action.

5        Is that information that you write into the chart or       11:52:27

6   does that go in that third column that is preprinted with the

7   ward "Target"?

8   A.   It's preprinted, yes, ma'am.

9   Q.   So how would an officer know whether the person was going

10  to have a search of their cell versus a search of their body?       11:52:41

11  Do you have things that are preprinted that say "pat" or

12  "strip"?

13  A.   It's a whole different list.  I do not generate those

14  lists.  Those lists are -- there's a list like that at the V

15  gate, the vehicle gate.  There's lists at visitation.  When       11:52:57

16  they conduct pat searches or trip searches, they annotate them

17  on a whole different sheet.

18  Q.   Okay.  Thank you.

19       And what does Harris after action mean?

20  A.   It's a term we don't use any more.  Harris after action       11:53:11

21  report is basically when an inmate leaves, let's say she goes

22  home so she packs up her stuff and goes home.  That cell is now

23  empty.  Staff member should go behind and search that cell when

24  it's empty to ensure that nothing was left behind so that it is

25  clean for the next inmate to move in.  That way if something is       11:53:29

United States District Court

JASON JARDINE - Cross

1    in there, the new inmate isn't caught with something that                      11:53:33

2    somebody else left for her.

3    Q.    Okay.  Thank you for the clarification.

4    A.    Yes, ma'am.

5    Q.    And the next line under the table there's a double                        11:53:42

6    asterisk and it reads, quote, if the inmate is not present for

7    a search, document the reason why in the Inmate Present column.

8    A.    That's correct.

9    Q.    So where -- is that the column that is the second from the

10   right-hand side?                                                               11:54:01

11   A.    Yes, ma'am.

12   Q.    Why did people not write reasons next to the word "no"?

13   A.    Not following through.  And that's -- that shouldn't be

14   that way.  That is when an inmate is not present, you know,

15   you're supposed to put in there, you know, where is she at.                    11:54:19

16   Q.    And you stated that you try to review these logs every day

17   or so just to kind of keep tabs on how things are going?

18   A.    Yes, ma'am.  I try to.

19   Q.    Okay.  Are you responsible for following up with these

20   officers as to why they did not properly document the search?                  11:54:36

21   A.    Yes, ma'am.  I'll --

22         MS. LOVE:  Objection, Your Honor.  Relevance, beyond

23   the scope of this hearing where we already have testimony that

24   indeed Ms. Ashworth was never searched.  So going now off onto

25   a tangent as to documentation as to how others are searched is                 11:54:50

United States District Court

JASON JARDINE - Cross

1    beyond the scope of this hearing and irrelevant.                                    11:54:54

2              THE COURT:  Thank you.  Overruled.

3              THE WITNESS:  So, yes, ma'am.  So I try to do it on a

4    daily basis.  Does it always happen on a daily basis?  No.  As

5    I explained before, and what I'll do is I will bring it up       11:55:05

6    to -- and I don't want to step on a supervisor's toes because

7    the supervisors are the ones issuing out these searches.  On a

8    daily basis you know as they go.

9              I do my best to bring it to the supervisor's

10   attention saying, "Hey, you know, make sure we are referring     11:55:18

11   these things out," and bring it up in my morning meeting and

12   put it out, "Hey, can supervisors let their staff know?"  It's

13   a work in progress.  It's not always perfect.

14   BY MS. KENDRICK:

15   Q.   Okay.  So you just let led to my next question.  Do you     11:55:31

16   assign the officers who dot searches or do the supervisors make

17   those assignments for the day?

18   A.   The supervisors do that, ma'am.

19   Q.   Can officers just sign up and volunteer to go do a search

20   that day?                                                        11:55:44

21   A.   We would love it.

22   Q.   Okay.  Is that a yes or a no?

23   A.   That would be -- yes, absolutely.  They have every right

24   to say, "Hey, I want to do some searches today.  Can I please

25   do some searches?"  Yeah, they could do that.                    11:55:56

United States District Court

JASON JARDINE - Cross

1    Q.    Okay.  And do you document anywhere the source or the

2    basis for putting somebody on the list?  Or the reason why?

3    A.    No, ma'am.  I do not.

4    Q.    And do you keep some sort of record of or scope of these

5    so that you know when you're putting together a list, "Hey, I

6    picked that tram driver two months ago.  She was negative.

7    Maybe when I'm randomly picking I shouldn't randomly pick her

8    again"?

9    A.    I have -- I keep a whole 12 months worth so when I go

10   through and doing my target list, I'll go back and look at the

11   previous months to make sure they are not on there twice.  Now,

12   it doesn't mean somebody is not going to be on there twice.

13   I'm not going to say any names obviously.  Inmate was caught

14   bringing some things into visitation.

15   Q.    But my question was, if the person had been searched two

16   months prior, was negative, no contraband, if you randomly

17   selected her name again, would you say, "Well, maybe not this

18   tram driver, a different tram driver"?

19   A.    That is normally how I would do it.  It doesn't mean

20   somebody won't be on there two months in a row, even three

21   months in a row.  As I said before, searches are conducted on a

22   daily basis as needed.  I definitely don't try to hit somebody

23   up over and over again because, obviously, it looks like I'm

24   necessarily picking on them.  There are some cases where an

25   inmate was going to be on that list a lot more than others

11:55:58
11:56:15
11:56:31
11:56:50
11:57:04
11:57:22

JASON JARDINE - Cross

1   because of their previous actions.                                    11:57:25

2          As far as just being a tram driver for no other

3   reason, you shouldn't be on there two times in a row.

4   Q.   Okay.  Thank you.

5          MS. KENDRICK:  I have nothing further Your Honor.        11:57:34

6          THE COURT:  Thank you.  I have a couple of questions.

7          Officer Jardine, on the same page that we've been

8   talking about, and that is the page that is in Exhibit 31 but

9   is the second page of that exhibit, and it's the August list

10  that has the crossed-out place where Ms. Ashworth was listed,    11:57:48

11  are there any other tram drivers on this list?

12         THE WITNESS:  There was.  I don't remember who they

13  were.  Obviously, when all of this kind of came about, just out

14  of curiosity, I went back and said, "Hey, who did I pick that

15  month?"  And all I had to do was look at -- there are so many    11:58:10

16  names on this list, I know why they are on there.  It's for

17  other reasons, not because of the work assignments.  It's for

18  other reasons but for the most part, there were some Televerde

19  inmates, some that work at the animal shelter.  There was a

20  painter I believe on there and one or two more tram drivers.  I  11:58:26

21  don't know the exact number though, sir.

22         THE COURT:  Okay.  And do you know how long

23  Ms. Ashworth had been a tram driver?

24         THE WITNESS:  She's been a tram driver since middle

25  of May I believe, sir, of this year.                             11:58:38

United States District Court

JASON JARDINE - Cross

1          THE COURT:  And how do you know that?                    11:58:41

2          THE WITNESS:  Again, as all of this is kind of going

3     on, I knew that -- like I said, I did the screen shot.  I knew

4     she was a tram driver.  I knew there was no other reason for

5     her to be on there but just to cover myself to make sure that I   11:58:51

6     wasn't losing my mind, I went to the work coordinator and asked

7     them, "Hey, can you look up this name and see how long has she

8     been a tram driver?"  And she had been a tram driver since May

9     she told me.

10          THE COURT:  And why did you want to check to make         11:59:05

11    sure you weren't losing your mind?  Why was it important to see

12    how long she was a tram driver?

13          THE WITNESS:  Sir, I've got to tell you, working in

14    this environment, you always want to, you know -- it's cliché,

15    cross your Ts, dot your Is.  I had no concern as to why she was   11:59:17

16    on there.  I know I hadn't done anything wrong and it was fine.

17    But curiosity, that's my job.  I want to go and look and see

18    what -- I knew she had been a tram driver I guess because I had

19    no other reason to put her on there.  I didn't know her.  I had

20    never really spoke to her.  I have never heard intel on her.     11:59:36

21    So, obviously, when I looked and saw she was a tram driver, I

22    saw she was on there.  My next question was, how long was she a

23    tram driver?  It was just natural progression of curiosity.

24    That's all.

25          THE COURT:  Okay.  Thank you.                             11:59:54

JASON JARDINE - Redirect

1      Any redirect?                                                    11:59:55

2          MS. LOVE:   Just a few questions.

3                  **REDIRECT EXAMINATION**

4   BY MS. LOVE:

5   Q.   Officer Jardine, if you could look back again at Exhibit    12:00:01

6   31 for us and on page two, you were asked questions about

7   Ms. Kendrick as to why -- where in the column for Inmate

8   Present, yes or no, for the ones that had a no, you were asked

9   questions as to why there was given no reason; correct?

10  A.   That is correct.                                             12:00:24

11  Q.   And you talked about it was -- well, whether or not the

12  officer was complete and wrote it down or not.  Summarizing --

13  A.   Can I asked something to that?

14  Q.   Sure.

15  A.   You know, obviously, we don't want to do a search when an   12:00:37

16  inmate is not there because she could always go back and say we

17  put something there or whatever.  If you look at the -- in that

18  column where it says "no," there's two officers' names that are

19  listed.  So if an inmate is not there, there's going to be two

20  officers there to protect ourselves.  It doesn't account for    12:00:53

21  the fact that they should have put in where the inmate was at.

22  You know, that's something that would be addressed obviously.

23  I don't think there was any illicit reasons why it was not

24  there.

25  Q.   If you could look at page one of Exhibit 31 under the       12:01:09

                United States District Court

JASON JARDINE - Redirect

1    column for Inmate Present, yes or no, are there three                    12:01:14

2    indications where it indicates no, that the inmate was not

3    present?

4    A.    There are one, two, three cases there.

5    Q.    For each of those, does it state the location of the               12:01:28

6    inmate just like you said you would expect that an officer

7    would write if they are not present, where they were at?

8    A.    That is correct.  I know in the past when somebody and,

9    again, I'm not saying it's right or wrong.  I know in the past,

10   even when I first started at DOC here in Arizona, if someone          12:01:45

11   put "no" and they didn't put down where they were at, sometimes

12   an officer would think, well, they are on the yard, she's doing

13   rec time, or they didn't know where they were at and they just

14   put "no" there.  They don't know exactly where they are at.

15   Q.    So for the September list that is an ongoing list now, the       12:02:03

16   first note also says next to it Class; correct?

17   A.    Yes, ma'am.

18   Q.    The second category for a "no" and where the inmate wasn't

19   present it also says Class?

20   A.    Yes, ma'am.                                                       12:02:15

21   Q.    And the third one says "no" and then it says Televerde; is

22   that correct?

23   A.    That is correct.

24   Q.    You were also asked questions about tram drivers or jobs

25   and shifts they work, whether they work graveyard shift or day        12:02:24

United States District Court

JASON JARDINE - Redirect

1   shift on cross examination.  I just wanted to follow up with          12:02:28

2   you on that.

3        Based upon your training and experience as an

4   SSU officer, are tram drivers still at risk of engaging in

5   introduction of contraband whether they work a day shift or a        12:02:40

6   graveyard shift?

7   A.   It's the same to me.  You know, yes, the visitors are

8   there during the daytime and there was a lot of visitors.  But

9   visitors aren't the only ones that are doing things they

10  shouldn't be doing at times with inmates.  And a lot of times        12:02:55

11  it's not even another person involved.  It could be inmates

12  just passing notes or leaving notes on the side of their route

13  as they travel.

14       It would be really easy for any shift for an inmate

15  driving a tram to slow down, throw out a note or something like      12:03:09

16  that at a specific place and then another tram driver that

17  works -- that goes to the other units pick it up and take it

18  over there.  That could happen.  That could easily happen.  It

19  doesn't really matter what shift you work.  If it didn't matter

20  if they were on graveyards, then they wouldn't be at work at         12:03:26

21  those times.

22  Q.   No further questions.  Thank you.

23       THE COURT:  Did my questions engender any questions,

24  Ms. Kendrick?

25       MS. KENDRICK:  No, sir.                                         12:03:36

United States District Court

JASON JARDINE - Redirect

1        THE COURT:  I have just one more question.                    12:03:37

2        THE WITNESS:  Yes, sir.

3        THE COURT:  And it's not about the content of an

4   email but I gather in your work that you have a lot of

5   experience with the email system at the department?         12:03:49

6        THE WITNESS:  Yes.  Yes, sir.

7        THE COURT:  So one of the things that has been

8   apparent to me in this Exhibit 1 is what I've highlighted and I

9   wanted to ask you about that, and that is that at the sent

10  column where it has the day and the date and the time, it says   12:04:08

11  Saturday, the 21st of July 2017, and then it lists the time.

12  And I can tell you for sure that the 21st of July was not a

13  Saturday.  It was Friday.

14       THE WITNESS:  Okay.

15       THE COURT:  Do you have any idea how that could           12:04:24

16  happen?

17       THE WITNESS:  That is a movement issue.

18       THE COURT:  No.  No.  I'm not worried about the

19  content.  This looks to me something like the email program

20  generates automatically.  When you print out an email, it       12:04:37

21  prints out the screen of -- at least for my office, if I print

22  out an email, it prints out my screen on the email and one of

23  the things that is included is the date and the time that it

24  was sent and then is what seems to be here.  It's the to, CC.

25  So it's that heading and it has been printed here and what it    12:04:54

United States District Court

JASON JARDINE - Redirect

1   shows is something that is just not right.  It says as the day,   12:04:58

2   the 21st of July when the 21st of July was actually a Friday.

3   Do you have any idea?

4           THE WITNESS:  I have not a clue.

5           THE COURT:  Have you ever seen any kind of an   12:05:09

6   incongruity like that between the day and the day?

7           THE WITNESS:  I've never noticed anything like that

8   before.

9           THE COURT:  Okay.  Thank you.

10         So the last thing I have to say is because I have the   12:05:19

11   pleasure of having you in my courtroom and having you right in

12   front of me and so that means that I can talk to you about why

13   it is I'm doing this, because I think people don't fully

14   understand and I can fully appreciate that if I am working at

15   Perryville, I'm wondering why is a judge in Phoenix interfering   12:05:35

16   with my life.  So there are probably a lot of people who are in

17   your position who naturally have that reaction.  You know,

18   we're trying to do the best job we can and so why is this judge

19   doing this?

20         Well, it sounds from your answers that you understand   12:05:50

21   that there was a legal case called *Parsons v. Ryan*, and you

22   used those words.  And you may also understand that it was a

23   lawsuit about health care measures and that the parties agreed

24   to settle it.  In other words, the defendant, the State, and

25   the plaintiffs class agreed to settle the lawsuit.  The   12:06:08

JASON JARDINE - Redirect

1   settlement produced an agreement and that agreement includes          12:06:14
2   certain promises and what kind of health care steps the State
3   would take with respect to the plaintiff class and to do
4   certain other things.  And the hope at the time was that those
5   things would happen, but the agreement contemplated the               12:06:30
6   possibility that they might not.  In that circumstance, the
7   agreement also provided for a judge, me, here now, to make sure
8   that those promises were realized.

9          And what that means is that I have to jump into the
10  position of being a manager in the prison system to try to see        12:06:53
11  what the problem is, what the failure is with respect to
12  meeting these promises, what kind of solutions are available
13  and then moving toward implementing those solutions.  That
14  means necessarily that I'm jumping into a context that I don't
15  fully understand.  I don't have your years of experience in           12:07:15
16  corrections.  I can't possibly know everything that you know.
17  That is a problem.

18         The way that I can deal with that problem is to make
19  sure that my learning about it, learning about the problems
20  that I'm addressing, is as full and accurate as possible.             12:07:32

21         The stipulation provides for a mechanism for that but
22  also there's another mechanism.  The one that is in the
23  stipulation is for the plaintiffs' lawyers to have an
24  opportunity to visit the prison and to talk with the prisoners
25  and so that's why they do that.  That is because they are the         12:07:50

United States District Court

JASON JARDINE - Redirect

1    ones who sort of in that role are my eyes and ears on the          12:07:54

2    ground because I can't go and do it as often as they can.  So

3    they do that and they talk to people and the people are the

4    class members, the inmates, and then they bring that

5    information to me.  So there's this pipeline of information      12:08:10

6    that comes from the yard to me through the lawyers.

7            There's another pipeline and it's when people sit in

8    that chair and so I've had people in that chair who are inmates

9    who were providing this information to me.  And I will tell you

10   that every single one of them has told me that they were        12:08:25

11   fearful that if they came and spoke to me that they would be

12   retaliated against for that.  And I assured them that there

13   would be no retaliation and then we had allegations that there

14   was retaliation.

15           And I have before this summer, prior to this summer,      12:08:42

16   I have addressed the issue of retaliation because it is a very

17   serious concern for me because I know that if there is a fear

18   of retaliation, it will chill this pipeline, the free-flowing

19   pipeline will become frozen and nothing will move.  I won't get

20   that information.  People will scatter when the lawyers come     12:09:02

21   and they won't be willing to come here and tell me the truth if

22   they think there is retaliation.

23           Now, I have heard people tell me that there was no

24   retaliation and even assuming that everybody is telling me the

25   truth, I still have to deal with the issue of retaliation        12:09:18

United States District Court

JASON JARDINE - Redirect

1   because the specter of retaliation, the possibility of                    12:09:21

2   retaliation is as dangerous to my pipeline as real retaliation.

3           And here's how that works:  Somebody comes here,

4   testifies to me and a couple days later they go back to the

5   yard and some kind of change happens in their circumstance that  12:09:39

6   they view as being adverse or other inmates view as adverse.

7   Those other people can't know about -- let's say this was a

8   random.  They wouldn't know that it was random that they would

9   watch and they would see, oh, somebody came to court and

10  testified.  Later they are searched.                                      12:10:03

11          So even if it's random and you could show 100 percent

12  it was random, it still would have a danger to my pipeline.  It

13  still would have that freezing potential.

14          So what I have to do is deal with that reality that

15  the perception can be as dangerous as what is actually true, so  12:10:23

16  what that has meant is I have provided for a rule that says

17  that you can't take any adverse action against an inmate or a

18  disciplinary action close in time to when they testify because

19  then that avoids the risk of people perceiving it as

20  retaliation.                                                             12:10:41

21          Now, I understand that when I do that, I am

22  interfering with sort of your job one and that is to run a safe

23  prison.  And oftentimes that requires the following of rules

24  and, as you described, standard procedures that result in these

25  searches of you trying to do your job.                                   12:10:56

JASON JARDINE - Redirect

1    So all of a sudden, this Phoenix judge is saying, no,          12:10:58

2  you can't do it.  You are thinking in your head no, I have to

3  pull her off the list because it could -- well, I understand

4  that imposition on you and the down side to it on this side of

5  the house about the disciplinary concern, but there's this        12:11:09

6  other side that I've talked about and that is maintaining the

7  pipeline of information.

8    So it's frequently true in life that we encounter two

9  goods that can't be respected at the same time and so we have

10 to weigh which one are we going to favor at a particular time.    12:11:25

11   And the way that I've weighed this is I have said

12 that if you want to take an adverse action against an inmate or

13 a disciplinary action against an inmate close in time to when

14 they testify, you're going to have to give me a very good

15 reason why it had to be done then.  So I've said this to the      12:11:41

16 defendants' lawyers and I will listen to them when they want to

17 give me a very good reason.  But if there isn't a very good

18 reason, because if it is, as you say, is a nuisance infraction

19 as you say, somebody's shirttail is out and they get ticketed

20 close in time to when they talked to the lawyers, that, to me,    12:12:01

21 is going to have the same danger as if it had been done like it

22 was retaliation because it looks like retaliation.  So I say

23 you can't do it because you're chilling my process.  And that's

24 why you're here.

25   And my hope is that we get this thing resolved so           12:12:15

United States District Court

JASON JARDINE - Redirect

1   that you can get back to your business and the plaintiffs will      12:12:17

2   get the health care that they were promised and we'll all be

3   done with this.  But until then I'm going to be in your hair

4   and I'm sorry about that, but I want you to understand that

5   it's necessary.  And I thank you for coming here today and       12:12:29

6   listening to this just now.

7            Thank you, sir.  Have a good day.

8            THE WITNESS:  Thank you.  I appreciate it.

9            THE COURT:  So shall we come back an hour from now?

10  Is that enough time for everybody.                                12:12:38

11           MS. KENDRICK:  Yes, Your Honor.  Just one

12  housekeeping thing.  I forgot to move into evidence Exhibit 9.

13           THE COURT:  Any objection?

14           MR. BOJANOWSKI:  No objection, Your Honor.

15           THE COURT:  Nine will be received.  Thank you.           12:12:48

16           So we'll be back at 1:15.  I'm sorry for keeping

17  everybody past the noon hour.  Thank you.

18       (Exhibit Number 9 was admitted into evidence.)

19       (Recess at 12:15; resumed at 1:16 p.m.)

20       (Court was called to order by the courtroom deputy.)        12:12:58

21           THE COURT:  Thank you.  Please be seated.

22           Another housekeeping matter.  You probably saw from

23  the docket, or maybe it hasn't dropped yet, but we receive

24  periodically -- meaning "we" the Court -- letters from inmates

25  and others directed to the subject matter of the cases seeking   01:16:29

United States District Court

JASON JARDINE - Redirect

| | |
|---|---|
| 1 | relief or other things from the Court.  And what we do | 01:16:35 |
| 2 | routinely with those letters, whether in this case or others, |
| 3 | is we respond in a letter to the person who sends the letter |
| 4 | saying that we're unable to communicate with you in this way. |
| 5 | The Court can only consider matters that are filed in cases, et | 01:16:55 |
| 6 | cetera. |

But in this case, when we receive matters from people who appear to be class members, what we do is communicate back to them saying that we cannot communicate with you in this way. We can communicate through your lawyer.  And we send a copy of that letter and a copy of what the Court received to both counsel.  So you probably have already seen that.  We've done that.

But the other thing that I thought I probably also ought to let you know is that we do the same thing, but there's no written record of it, when we receive a non-written communication from somebody who is associated with it appears a class member.  We respond that we're not able to communicate with them in that way and we provide the information to plaintiffs' counsel.  We had been told, meaning all of us, it's not the royal "we" but we have been told that Ms. Eidenbach was the contact person so we have been giving your name.  Is that what you would like to have happen?

MS. EIDENBACH:  That is fine with me, Your Honor. You can also give them the Prison Law Office's contact as they

United States District Court

JASON JARDINE - Redirect

1    handle quite a few of the family end prisoner contacts as well.    01:18:11

2             THE COURT:  All right.  Thank you very much.

3             Alrighty.  Anything else?

4             MS. KENDRICK:  Well, just to clarify something you

5    said, you said that you send a copy of that letter and response    01:18:21

6    to counsel?

7             THE COURT:  Right.  If they sent to the Court, then

8    they put it in the public discourse.  I don't think it's

9    appropriate for me to be sending an *ex parte* communication back

10   to one side without communicating with the other.    01:18:34

11            So if you want, I can destroy the letters but I think

12   that's not a good idea.

13            MS. KENDRICK:  No.  No.  The question was just

14   more -- is it Ms. Eidenbach that the clerk's office has been

15   copying on these responses?  Because my office has never    01:18:51

16   received a copy of something that the Court has sent to a class

17   member.

18            THE COURT:  Okay.  I'll double-check.

19            Have you received any, Ms. Eidenbach?

20            MS. EIDENBACH:  Not that have been designated as    01:19:02

21   coming from your chambers.

22            FEMALE VOICE:  They have been docketed.

23            MS. EIDENBACH:  Okay.  Yeah, and we read them on the

24   docket.

25            FEMALE VOICE:  Some of them have been docketed.    01:19:10

United States District Court

JASON JARDINE - Redirect

1        THE COURT:  So what happened this week that sort of    01:19:13

2   brought it to my attention again is I had thought that it was

3   not a good idea for them to be on the docket, and that was

4   because I didn't know whether there would be personal

5   information that would be disclosed such that were we routinely   01:19:24

6   ask the lawyers to redact from documents, so it occurred to me

7   that the better thing to do was to return the letter to -- or

8   forward the letter to plaintiffs' counsel with a copy to

9   defendants.

10        MS. EIDENBACH:  Yes.  I think that's a good procedure   01:19:37

11   to follow.

12        THE COURT:  Okay.  Thank you also.

13        MS. LOVE:  Your Honor, during the testimony --

14        MR. BOJANOWSKI:  Your Honor, could I be the person

15   designated to receive the letters on behalf of defendants?   01:19:47

16        THE COURT:  Of course.

17        MR. BOJANOWSKI:  Thank you.

18        THE COURT:  Surely.  We'll try to do that.

19        MS. LOVE:  During the testimony of the last witness,

20   Officer Jardine, I preliminarily moved Exhibit Number 31 into   01:19:56

21   evidence and then there was an objection on foundation.  We

22   laid that.  I forgot to do that at the end so at this time,

23   defendants do move for admission of Exhibit Number 31.

24        THE COURT:  Any objection?

25        MS. KENDRICK:  No, sir.   01:20:11

JASON JARDINE - Redirect

1          THE COURT:  Thank you.  31 will be received.                    01:20:12

2      (Exhibit Number 31 was admitted into evidence.)

3          THE COURT:  So the next witness, please.

4          MR. BOJANOWSKI:  Your Honor, the next witness would

5   be relating to the HNR box issue.  We brought back one of our    01:20:18

6   nurses that had been here before.  It will be a Tanna Gualco is

7   the person that we would call and it would be the only nurse

8   that we're going to have since having three saying the same

9   thing --

10         THE COURT:  Doesn't make any sense?                         01:20:40

11         MR. BOJANOWSKI:  It doesn't make any sense.

12         MS. KENDRICK:  But defendants listed a different

13  nurse.  Ms. Gibson.

14         MR. BOJANOWSKI:  She, unfortunately, went into the

15  hospital so we had to substitute.                                 01:20:49

16         THE COURT:  All right.  We'll see where this leads.

17  If there's a problem that we need to in fairness consider that

18  fact, we will.

19         Welcome back.  Again, step forward to the clerk of

20  the Court who will administer the oath.                           01:21:01

21         MAGISTRATE JUDGE CLERK:  Is your fist name spelled

22  T-A-N-N-A?

23         THE WITNESS:  Yes.

24         MAGISTRATE JUDGE CLERK:  And can you spell your last

25  name, please.                                                     01:21:02

United States District Court

TANNA GUALCO - Direct

```
 1            THE WITNESS:  G-U-A-L-C-O.                        01:21:02
 2         (TANNA GUALCO, a witness herein, was duly sworn or
 3    affirmed.)
 4            THE COURT:  Please have a seat in the witness stand.
 5            Counsel, I'm going to approach just out of          01:22:01
 6    efficiency.
 7            Well, I'm sorry for the confusion here.  I had to
 8    address a couple of preliminaries with respect to what counsel
 9    had said before you came in the room which caused me to think
10    that maybe you were somebody else and so I needed to make sure  01:23:10
11    that I was on right page, so that's why we did that little bit
12    of stall.  My apologies for that but welcome.
13            THE WITNESS:  Thank you.
14            THE COURT:  Please.
15            MR. BOJANOWSKI:  Thank you, Your Honor.            01:23:21
16                      DIRECT EXAMINATION
17    BY MR. BOJANOWSKI:
18    Q.   Would you please state your name for the record and spell
19    your last name?
20    A.   Tanna Marie Gualco.  G-U-A-L-C-O.                    01:23:25
21    Q.   Are you currently employed?
22    A.   Yes.
23    Q.   Where are you employed?
24    A.   Eyman Complex.
25    Q.   And what unit?                                       01:23:36
```

United States District Court

TANNA GUALCO - Direct

1   A.   Meadows.                                                    01:23:37

2   Q.   And what's the security level at that unit?

3   A.   It is a three.

4   Q.   What does that mean?

5   A.   It's the classification.  It's the lower classification.   01:23:49

6   Four and five are the higher custody in the closed yard.

7   Q.   Is it an open yard?

8   A.   It is.

9   Q.   Who are you employed by?

10  A.   Corizon.                                                    01:24:03

11  Q.   And how long have you been so employed?

12  A.   Since June of last year.

13  Q.   And how long have you worked at the Meadows Unit at the

14  Eyman?

15  A.   Since June of last year.                                    01:24:11

16  Q.   All right.  Have you worked at any other ADC facilities?

17  A.   No.

18  Q.   And what position do you hold with Corizon at the Eyman

19  facility?

20  A.   Assistant Director of Nursing.                              01:24:27

21  Q.   Okay.  Are you an R.N., L.P.N.?

22  A.   R.N.

23  Q.   R.N., okay.  Are you familiar with the HNR boxes that are

24  used at the Meadows Unit?

25  A.   Yes, I am.                                                  01:24:46

TANNA GUALCO - Direct

1   Q.   Could you describe in a broad overview to the Court how it      01:24:47
2   is that those boxes are used currently?
3   A.   Currently, they are for prescription drop-offs.  If an
4   inmate needs med refilled or reordered, that's where they would
5   put their HNR.                                                       01:25:03
6   Q.   Was there a time when the HNR boxes were not just used for
7   prescriptions?
8   A.   Yes.
9   Q.   And do you remember when that was, when that transition
10  took place?                                                          01:25:18
11  A.   I don't.
12  Q.   All right.  So maybe you could explain to the Court in a
13  general sense how the HNR boxes were used before that they were
14  changed over?
15  A.   Before the HNR boxes were for any medical need.  If they        01:25:29
16  needed dental, mental health, they needed to be seen on Nurse
17  Line or pharmacy all the HNRs would go in the box.  The night
18  nurse would then pick them up and triage them so that the next
19  day that they could see the nurse, dental or whoever they
20  needed to see.                                                       01:25:53
21  Q.   So whatever time that the inmate put the HNR in the box,
22  they would have to wait to the next day before they would be
23  seen by somebody?
24  A.   Yes.
25  Q.   All right.                                                      01:26:02

United States District Court

TANNA GUALCO - Direct

1          Are you familiar with the open clinic concept that is          01:26:10

2   now currently in place at your unit?

3   A.   Yes.

4   Q.   And go ahead and explain what that is and how that works

5   in a general sense.                                              01:26:19

6   A.   So now each building has their designated times that are

7   posted in their housing and outside of the health unit to bring

8   up their completed HNRs.  And then the night nurse triages,

9   sees the ones that need to be seen and then refers the

10  others -- if it's a pharmacy drop-off for refill or they need    01:26:38

11  medical supplies, the nurse night nurse triages them and gets

12  them taken care of that day.

13  Q.   If I understand what you're saying correctly is there's

14  basically two different ways HNRs come into the health units.

15  Is that accurate?                                                01:26:58

16  A.   Yes.

17  Q.   The one way is through the -- what are now called

18  prescription boxes; right?

19  A.   Yes.

20  Q.   And then the other way is that the inmate brings the HNR    01:27:08

21  with them when they come to the clinic; correct?

22  A.   Yes.

23  Q.   When is the inmate -- excuse me.  You said all of these

24  HNRs are then triaged by the triage nurse in the morning;

25  right?                                                           01:27:26

United States District Court

TANNA GUALCO - Direct

1    A.    Yes.                                                          01:27:27

2    Q.    And what time does that occur?

3    A.    7 o'clock.

4    Q.    Is that the time the clinic opens?

5    A.    The clinic is open 24/7 but Nurse Line, the first two        01:27:32

6    buildings are called out at 7 o'clock because their time is

7    from 7 to 8:30.

8    Q.    And is that the time that the inmates need to appear at

9    the clinic to be processed or be seen with their HNR in hand?

10   A.    Yep.  Once the officer calls their building, that's their    01:27:50

11   go time where they can come up with their HNR and be seen.

12   Q.    And do you see all of the inmates that present themselves

13   between 7 and 8:30?

14   A.    We see every single one.

15   Q.    If somebody shows up at 8:31, what happens to that inmate?    01:28:04

16   A.    It's triaged based off of urgency.  If someone has a

17   broken hand, we're going to see -- obviously see them but if

18   it's I'm having allergies, then they will have to wait because

19   the next two buildings are already lining up for their HNR

20   time.                                                               01:28:24

21   Q.    Okay.  Are there notices or signs or posters or something

22   like that that are in the unit that tell inmates the times that

23   they are supposed to show up at medical if they want to see a

24   nurse?

25   A.    Yes.  They are posted right outside of the health unit and   01:28:43

TANNA GUALCO - Direct

1  each building has it posted in their runs.                          01:28:46

2  Q.   The HNR forms that are used by the inmates, do you know

3  where those are located and how an inmate would go about

4  obtaining one?

5  A.   They can either get them from their officers in their         01:29:16

6  housing units or they can come up to medical and get one from

7  the health unit officer.

8  Q.   Okay.  So if they wanted to get one, say they were in a

9  building that was not their turn to show up for Nurse Line,

10  could they still just come up and get an HNR?                      01:29:32

11  A.   Oh, yeah, m'hum.

12  Q.   Okay.  And you said that the HNRs are then in each of the

13  housing units as well?

14  A.   Yes.  All of the officers should have, yeah.

15  Q.   When you were working at the Eyman facility at the Meadows   01:29:54

16  Unit when the HNR boxes were used by inmates to actually seek

17  Nurse Line care, about how many requests were received by the

18  health unit on average in a day?

19  A.   It would really vary.  It could be 20.  It could be 50.

20  Q.   Okay.  Just depending.  Now, were those HNRs that were put  01:30:17

21  in the boxes when they were used in that fashion?  Did they

22  also include things for dental care, mental health care,

23  prescription refills, supplies for mental health people who

24  needed journals and books and things like that?  It was all

25  collected in one place.  Is that what was happening?             01:30:41

United States District Court

TANNA GUALCO - Direct

1  A.   Yes.                                                              01:30:45

2  Q.   And so the nurse would then triage all of that stuff and

3  then get it to the appropriate entity for follow-up?

4  A.   Right.

5  Q.   Now, under the open clinic procedure, how many people come        01:30:57

6  to open clinic with an HNR on an average day?

7  A.   About the same, 20 to 50.

8           THE COURT:  20 to 50, I'm sorry, did you say?

9           THE WITNESS:  Yes.

10           THE COURT:  And before did you say 20 to 50 also?            01:31:11

11           THE WITNESS:  Yes.

12           THE COURT:  Okay.  Thank you.

13  BY MR. BOJANOWSKI:

14  Q.   And so with the numbers that you're seeing, are you able

15  to actually see all of those people in that day?                      01:31:20

16  A.   Every single person that presents with a physical, mental

17  complaint is seen right then and there.  However, the ones that

18  aren't, we still get the ones that come up for prescription

19  refills or checking the status of their supplies, those ones

20  don't need to wait and seen on Nurse Line.  Those are ones that       01:31:42

21  we can address and let them know.

22  Q.   Is everyone that is showing up now with the HNR, are they

23  all seeking to be seen or are some of them just coming up with

24  an HNR for, like, the supplies or prescription refill or maybe,

25  you know, they want a test result or a lab result, something          01:32:13

United States District Court

142

TANNA GUALCO - Direct

```
 1  like that?  Are those people still coming up to the open clinic    01:32:15
 2  to drop that off?
 3  A.    Yes.
 4  Q.    Do they have to be seen?  The person who says, "Look, all
 5  I want is a refill on my prescription," do they have to be seen    01:32:24
 6  at that time or is it processed like in the normal course?
 7  A.    They don't have to wait.  We just let them know, "Okay.
 8  I'll get this filled for you.  You'll get your receipt that it
 9  was filled on this date and this time," and they don't have to
10  wait in the health unit.                                           01:32:41
11  Q.    Okay.
12         Now, when the inmates come up to the medical unit
13  with an HNR, do they have to sign in or does somebody log them
14  in or is there some kind of record that is made with regard to
15  who showed up, when they showed up, what they are seeking?  Is     01:33:04
16  there anything like that that is done?
17  A.    When they come in, they put their nametag up on the board
18  under Nurse Line triage so that way we can keep track of who is
19  coming first, to see who came first.  And then there's -- our
20  Nurse Line log who we see on our Nurse Line, we put each           01:33:24
21  inmate's name and who they are referred to that day.  And then
22  at the end of the day, we have copies of all of them.  But
23  that's our way of seeing.
24  Q.    Is there a time that is recorded or something like that
25  that they actually appeared at the unit with their HNR?            01:33:43
```

United States District Court

TANNA GUALCO - Direct

1   A.   No.                                                                    01:33:49

2   Q.   What happens, if a person were to show up with their HNR,

3   they put their badge on the board like you said and then they

4   leave?

5   A.   Sometimes they like to go outside and smoke so the officer   01:34:01

6   will go get them and let them know they have to come in.  Other

7   times the officer will have to call them, call their housing or

8   figure out where they went and ask them, "Are you still wanting

9   to be seen?"  And most of the time they come in, decide they

10  want to be seen for something and then decide that they don't    01:34:17

11  want to sit and they will just leave.

12  Q.   Okay.

13       THE COURT:  For these people who decide after they

14  have come, put they are name up on -- their ID on the board and

15  they decide they want to leave and they take their ID from the   01:34:36

16  board, there is no written record that exists in the clinic

17  office that they have come and/or left?

18       THE WITNESS:  Once we get their HNR in our hand, if

19  they leave, they have to come back and sign refusal because

20  technically we've already touched that HNR, so we have to see    01:34:53

21  them, especially if they have a physical complaint.

22       But if they come in while we're seeing somebody else

23  and they have an HNR to turn in and they realize, "I don't

24  actually want to be seen today," and they take off, we don't

25  have any way to document anybody like that.                      01:35:08

TANNA GUALCO - Direct

1    THE COURT:  So when somebody arrives and they put          01:35:11
2    their name up on the board, they wait either inside or outside
3    because the line is too long maybe, so they might be outside;
4    is that right?

5    THE WITNESS:  There's plenty of seating in our health       01:35:19
6    unit.

7    THE COURT:  Oh, in your health unit, there's plenty
8    inside?

9    THE WITNESS:  Yes.

10    THE COURT:  Okay.  I'm sorry for speaking over you.        01:35:25

11    So when they have done that, put their name up on the
12    board and then taken a seat, when is it that they hand in their
13    HNR?

14    THE WITNESS:  I always -- when I run my Nurse Line,
15    as soon as I'm done seeing an inmate, I go out to get the next   01:35:41
16    and ask if there's any others that have shown up to be seen on
17    Nurse Line and at that time I take their HNRs.

18    THE COURT:  So at 7:30 when you open, there's a line
19    of people outside?

20    THE WITNESS:  No.                                          01:35:56

21    THE COURT:  There's never a line at 7:30?

22    THE WITNESS:  For meds.  Meds are going on at that
23    time.  But for Nurse Line, when they call them out at 7
24    o'clock, they kind of trickle in one by one so there's not
25    really like a long line of people.                         01:36:07

TANNA GUALCO - Direct

 1          THE COURT:  So at 7 o'clock when you open and people

 2    come in, they walk in and they have an HNR and they -- do they

 3    at that moment hand in their HNR as they are putting their tag

 4    up on the board or do they put their tag up on the board and

 5    wait in the seat to be called when somebody looks at the board

 6    and says, "Who is this person?  Where are you?"

 7          THE WITNESS:  Yes.

 8          THE COURT:  It's the latter?

 9          THE WITNESS:  Yes.

10          THE COURT:  All right.  So when people arrive at

11    seven and you have a group of people who are sitting there in

12    their chairs with their HNRs and then they put their name on

13    the board and you come out the first time, you take the

14    nametags from everybody that is there?

15          THE WITNESS:  Right.

16          THE COURT:  How soon again do you return to see if

17    there are more HNRs or to see if there's more names on the

18    board.

19          THE WITNESS:  Oh, every 15 minutes.

20          THE COURT:  And if you don't mind, Mr. Bojanowski,

21    I'll go ahead and ask another question that I had before.

22          MR. BOJANOWSKI:  Go ahead.

23          THE COURT:  The Med Line that you described from 7 to

24    8:30, when do you usually finish seeing all of those people?

25          THE WITNESS:  It varies.  Sometimes we're done by

United States District Court

01:36:10

01:36:25

01:36:35

01:36:52

01:36:59

01:37:15

TANNA GUALCO - Direct

| | |
|---|---|
| 1 | 7:30 for that building and then they will call out for the next | 01:37:17 |
| 2 | so that we can get urgent ones in sooner. |

3          THE COURT:   And does the 7 to 8:30 for Meadows ever

4   push into the next building's time?

5          THE WITNESS:   Not very -- no.                               01:37:30

6          THE COURT:   Thank you.

7          Thank you.

8          MR. BOJANOWSKI:   Thank you, Your Honor.   You

9   eliminated several of my questions.

10  BY MR. BOJANOWSKI:                                                 01:37:39

11  Q.   So we talked about the 7 to 8:30 time frame.   Are there

12  other time frames that the nursing lines run through the day

13  aside from the 7 to 8:30?

14  A.   Yes.   The 7 to 8:30 is only two buildings.   There's eight

15  buildings total.   So the first two buildings, their time is     01:37:58

16  from 7 to 8:30.   And then 8:30 to 10 are the next two and so

17  on.

18  Q.   Okay.   And at the same time that nurse lines are being run

19  on this unit, the Med Pass is occurring as well; correct?

20  A.   Yes.                                                         01:38:13

21  Q.   All right.   And the clinic, I think you said, is open

22  seven days a week, 24 hours a day?

23  A.   Yes.

24  Q.   Is there somebody there during that time?

25  A.   There's an R.N. on my yard 24/7.                             01:38:31

United States District Court

TANNA GUALCO - Direct

1    Q.   And you mentioned that the waiting area provides seating          01:38:47

2    for the inmates who are waiting to be seen.  How many seats are

3    there within the waiting area at this unit?

4    A.   There's about 20, 25.

5    Q.   And I think you said it's a first come, first serve            01:39:05

6    situation?

7    A.   Yes.

8    Q.   From your experience anyway, do you have any idea how

9    quickly inmates are seen by the staff during Nurse Line?  Is it

10   once every five minutes, 15 minutes, 35 minutes?  Do you have        01:39:28

11   an idea of what an average wait time would be?

12   A.   An average wait, we probably spend about ten minutes per

13   inmate unless it's something that needs extensive care and

14   needs more time.

15   Q.   All right.  Have you ever seen anybody having to wait more      01:39:47

16   than, say, an hour and a half, the 7 to 8:30?

17   A.   No.  No more than an hour and a half.

18   Q.   Anybody ever have to wait more than, say, three hours?

19   A.   No.

20   Q.   As far as the staff is concerned in this Meadows Unit          01:40:08

21   clinic during Nurse Line, how many nurses are actually working

22   within that unit to provide the care that is needed for the

23   inmates to be seen?

24   A.   We have one Nurse Line nurse and two Med Pass nurses.

25   Q.   Are there other staff that work in the unit as well?           01:40:30

TANNA GUALCO - Direct

1   A.   We have our on-site provider during the week as well as a          01:40:34
2   CNA.
3   Q.   Could you give us, in a general sense, of the kinds of
4   things that the Nurse Line does as far as providing care to the
5   inmate population?                                                      01:41:05
6   A.   Wound care.  We can help -- like if they come in for a
7   mental health complaint, instead of waiting to be referred to
8   be referred to mental health for, like, crosswords, puzzles, we
9   help out with that, too; and then just our Nurse Line
10  assessments to triage and send them to the right person that           01:41:30
11  they need to see, whether it's the dentist, mental health or
12  the provider.
13  Q.   Had you run the pill pass line, have you run that before,
14  too?
15  A.   Oh, yes.                                                          01:41:50
16  Q.   And how does that function on a day-to-day basis?
17  A.   The morning Med Pass is around an hour and then the PM Med
18  Pass is a little bit longer.  It takes about an hour and a
19  half.
20  Q.   And how does the process work?  Can you give the judge a          01:42:08
21  general idea of how it works at the Meadows Unit?
22  A.   Yes.  The officer will call out for east side and then all
23  of the east side inmates will come over and get their meds.
24  And then once the line is pretty much done, they will call out
25  for the west side so that they are not all out there waiting at        01:42:26

United States District Court

TANNA GUALCO - Direct

1    one time.                                                          01:42:31

2    Q.    Now, we had talked a little bit about the staffing and I

3    think you said there's a nurse on duty 24/7.  Is that an R.N.

4    that is on duty?

5    A.    The night nurses are L.P.N.s and then the day shift nurses   01:42:45

6    are R.N.s and L.P.N.s.

7    Q.    Who runs the nursing lines?

8    A.    An R.N.

9    Q.    And you said you had a provider that is assigned to your

10   unit?                                                              01:43:02

11   A.    Yes.

12   Q.    And how often is the provider there on the unit?

13   A.    Four to five days a week.

14   Q.    For how many hours?

15   A.    She does like four tens or five eight-hour shifts.          01:43:12

16   Q.    As far as the provider giving care to the inmate, does the

17   inmate have to be scheduled to see a provider or can they be

18   seen during the open clinic call when they show up with an HNR?

19   A.    If it's something that is very concerning because they

20   have to start out from Nurse Line, then a lot of the times I'll   01:43:51

21   go over to the provider officers and say, "Hey, can you come

22   look at this guy?"  In that way I can get him seen by a

23   provider, get verbals for antibiotics or anything else that

24   needs to be ordered or if it's not so urgent, then I refer them

25   to the provider.                                                  01:44:11

TANNA GUALCO - Direct

1   Q.   So that if it's an urgent matter upon triage and review of          01:44:12

2   the patient, you immediately get that person over to the

3   provider for care.   If it's a routine matter, they are then

4   scheduled --

5   A.   Yep.                                                                01:44:27

6   Q.   -- later?

7        Okay.   How do you go about scheduling somebody for a

8   routine visit?

9   A.   So we have our Nurse Line list so we put down each

10  inmate's name, their number housing location and then there's a         01:44:39

11  comments box and in that comment, that's when we put routine,

12  urgent or emergent referral, whether it be to medical provider,

13  dental, or mental health.   And then at the end of the day that

14  list gets faxed over to a CNA who does the scheduling for the

15  provider.                                                               01:44:58

16  Q.   Okay.   Are you aware or have you ever heard of a policy

17  whereby an inmate is required to see a nurse between two and

18  three times before they are ever referred to a provider?   Have

19  you ever heard of such a policy or seen such a policy?

20  A.   No.                                                                01:45:17

21  Q.   So from your testimony, I take it that based upon the

22  patient's presentation, the nurse is left with the discretion

23  as to whether to refer that person to a provider regardless of

24  how many times they have had nurse visits?

25  A.   Correct.                                                           01:45:40

United States District Court

TANNA GUALCO - Direct

```
 1   Q.   Now, the HNR, once it's received and once the patient is      01:45:58
 2   seen, is there some documentation that is put on the HNR that
 3   says what occurred or is that just something that is put into
 4   the electronic medical record?
 5   A.   Yes.  On their HNR there's two boxes and on the first one,      01:46:14
 6   that is how we triage so we would put NL for Nurse Line, MH for
 7   mental health, and then the bottom box is the plan or action of
 8   care and that's where we put seen on Nurse Line, referred to
 9   provider.
10   Q.   And do you know what happens to the HNR after it's all         01:46:31
11   filled out?
12   A.   Yes.  We keep the original copy and then the three copies
13   underneath we hand to the inmate.
14   Q.   Okay.  So it's a three-copy document or three pages or
15   two?                                                                01:46:47
16   A.   Three or four.  I think there's four total.
17   Q.   Okay.  So how do you go about getting the copy of the
18   filled-out HNR to the inmate?
19   A.   If they are not seen right then and there, then we put it
20   in a -- this box that is labeled each building and so the          01:47:03
21   mail -- the property, whoever picks them up to deliver mail
22   will come get them from the health unit and deliver them.
23   Q.   If they are seen right away, is it filled out and then you
24   tear off the copy for the inmate and hand it to them before
25   they leave?  Is that the way it's done?                            01:47:25
```

TANNA GUALCO - Direct

1   A.   Yes.

2   Q.   Are you aware of or have you ever seen an instance where

3   an inmate has appeared at the open clinic with his HNR and has

4   been refused treatment or refused medical care?

5   A.   No.

6          THE COURT:  Even if they arrive after hours and it's

7   not emergent?

8          THE WITNESS:  If it's after hours and it's not

9   emergent, then we let them know, "Please fill it out and come

10  back when your building is called."

11         THE COURT:  And when I mean after hours, I mean not

12  at their designated time?

13         THE WITNESS:  Yes.

14  BY MR. BOJANOWSKI:

15  Q.   Have you heard any complaints about any of the inmates

16  from any of the open clinic procedure or concept?

17  A.   No, I haven't.

18  Q.   Do you like the open clinic concept?

19  A.   I do.

20  Q.   Why?

21  A.   Couple reasons.  They get seen way sooner than before and

22  also it holds them accountable.  Before when we had the boxes,

23  we would have to make a list and then have the officer call

24  each building and call these inmates down and sometimes we

25  would be looking for these inmates all day.  Have to track them

United States District Court

01:47:27

01:47:58

01:48:15

01:48:29

01:48:43

01:49:00

TANNA GUALCO - Cross

1    down and then finally the Sergeant would have to go and bring          01:49:05
2    them down, so it just caused a lot more work.
3            So now if they need to be seen, they come down and
4    they are seen.
5    Q.   All right.                                                        01:49:18
6            MR. BOJANOWSKI:  Your Honor, I have no further
7    questions at this time.
8            THE COURT:  Thank you.
9            And now the plaintiffs' attorney will have a chance
10   to ask you questions.                                                  01:49:29
11           THE WITNESS:  Okay.
12           MS. KENDRICK:  Just as a housekeeping measure, does
13   the clerk still have the exhibits from the last time we did the
14   HNR hearings?
15           THE COURT:  Thank you.  So these aren't numbered              01:49:56
16   exhibits.  The lawyers may refer to them and ask to look for
17   and pull out the one.
18           THE WITNESS:  Okay.
19           MS. KENDRICK:  Thanks.  I figured I would ask now
20   before we got too far along.                                          01:50:08
21                   **CROSS - EXAMINATION**
22   BY MS. KENDRICK:
23   Q.   Ms. Gualco, how do I pronounce your last name?
24   A.   Gualco?
25   Q.   Gualco.  Okay.  How long have you been an R.N.?                  01:50:15

United States District Court

TANNA GUALCO - Cross

|   |   |   |   |
|---|---|---|---|
| 1 | A. | Since April of 2016. | 01:50:20 |

Q.   And how long have you been licensed in Arizona?

A.   Since April of 2016.

Q.   And have you registered or worked as a nurse in any other

state besides Arizona?                                    01:50:34

A.   No.

Q.   And what is your educational background?

A.   Before nursing school?

Q.   No.  In nursing school.

A.   Educational background?                               01:50:45

Q.   Did you get a bachelor's degree?

A.   R.N., associate's degree.

Q.   Did you meet with anybody about your testimony today?

A.   No.

Q.   Did you review any documents before coming to testify    01:50:58

today?

A.   No.

Q.   How many hours a week do you work?

A.   It varies.  40 to 60.

Q.   What are your regularly assigned work hours?           01:51:10

A.   My assigned hours are seven to 3:30.

Q.   What days of the week?

A.   Monday through Friday.

Q.   And so that's five shifts a week?

A.   Yes.                                                   01:51:31

TANNA GUALCO - Cross

1   Q.   And you said sometimes up to 60 hours.  Is that working                01:51:31

2   overtime?

3   A.   Yes.

4   Q.   And how often do you cover other shifts or work overtime?

5   A.   Quite frequently.  I'm a supervisor so especially when I'm             01:51:43

6   on call, I have to cover other yards or weekend shifts.

7   Q.   Do you volunteer to do overtime or are you told to work

8   overtime?

9   A.   It's a requirement for my position.

10  Q.   When is the last time that you had a week that you did not             01:52:09

11  do at least one overtime shift?

12  A.   Last week.

13  Q.   And before that?

14  A.   A couple weeks maybe.

15  Q.   Okay.  Why are you quite frequently doing overtime?                    01:52:20

16  A.   Because if there's call-outs and I'm on call, I have to

17  cover the shifts.

18  Q.   Call out means if a nurse calls in sick?

19  A.   Correct, yes.

20  Q.   And how many vacancies are there for the nurses right now              01:52:35

21  at Eyman?

22  A.   I'm unaware.

23  Q.   You don't know?

24  A.   I don't know.

25  Q.   As the assistant director of nursing, do you oversee or               01:52:46

TANNA GUALCO - Cross

1   supervise the shift nurses on the other yards at Eyman?          01:52:50

2   A.   No.  I'm just the ADON my unit.

3   Q.   So Eyman has five units; correct?

4   A.   Yes.

5   Q.   And there's an ADON for each unit?                          01:53:02

6   A.   Correct.

7   Q.   Is that also used interchangeably with shift nurse or is

8   that something different?

9   A.   Interchangeable as in?

10  Q.   As a description.  Because I've gone on tours and people     01:53:13

11  have told me, "Hi, I'm the shift nurse for, you know, Rynning

12  Unit," or something like that.  So is that the same type of

13  person?  Is it a different way of describing your position?

14  A.   I'm just the supervisor of the unit so I help out as

15  needed.                                                          01:53:30

16  Q.   Okay.

17         THE COURT:  She's asking whether the title Assistant

18  Director of Nursing, is that what ADON stands for?

19         THE WITNESS:  Yes.

20         THE COURT:  She's asking whether that title is a          01:53:41

21  synonym for the title shift nurse.

22         THE WITNESS:  Oh, no.

23         THE COURT:  Have you heard the term "shift nurse"

24  before?

25         THE WITNESS:  Like the regularly scheduled shift          01:53:52

United States District Court

TANNA GUALCO - Cross

1  nurses that we have?                                                      01:53:54

2         THE COURT:  Just the term "shift nurse," is that not

3  a common term to designate people's role?

4         THE WITNESS:  Like a day shift nurse, yeah.

5  BY MS. KENDRICK:                                                          01:54:03

6  Q.   Or the charge nurse?

7  A.   Yes.  That is.

8  Q.   You're the charge nurse?

9  A.   Yes.  Yes.

10        THE COURT:  Okay.  I'm sorry.  Thank you.               01:54:08

11        THE WITNESS:  Maybe I didn't understand that wording.

12 BY MS. KENDRICK:

13 Q.   My fault.  And you've described the open clinic at Rynning

14 and there's five units at Eyman.  Do you know if all five units

15 are running open clinic or just some of them?               01:54:21

16 A.   Just three of the five.

17 Q.   Which ones?

18 A.   Rynning, Cook, and Meadows.

19 Q.   Okay.  And I believe you testified earlier that people

20 that are seeking mental health care have to physically come to    01:54:40

21 the clinic and put in an HNR --

22 A.   Yes.

23 Q.   -- to be seen?

24 A.   M'hum.

25 Q.   And do you or the other R.N.s working Nurse Line have any    01:54:48

United States District Court

TANNA GUALCO - Cross

1   mental health training?                                           01:54:55

2   A.   Like specific mental health training?  No.

3   Q.   Okay.  So you made some comment when Mr. Bojanowski was

4   talking about how the HNRs -- something about giving people

5   puzzles or journals to do.  Is that the common response that   01:55:17

6   the nurses have when people have an HNR raising a mental health

7   issue?

8   A.   They could just request puzzles for their anxiety and we

9   can go over to mental health and say, "Is this okay?  Can we

10  give it to them?"  So we'll give them their puzzles.  But we    01:55:35

11  have to see every single person that puts in a mental health

12  complaint on our Nurse Line.

13  Q.   And do you -- when you see these people on the Nurse Line

14  with the mental health complaints, do you charge them the $4?

15  A.   If they are not SMI, yes.                                   01:55:53

16  Q.   Even if it's just to give them a puzzle?

17  A.   No.  No.  If they are asking for something like a puzzle,

18  that is taken care of right then and there because that's not

19  an issue that should have to wait.

20  Q.   If somebody coming in with an HNR who says like they need  01:56:09

21  clean catheters, would they have to wait or is there kind of a

22  separate line they could go be part of?

23  A.   I give that to the CNA.  That's the CNA's responsibility.

24  Q.   So is the CNA-- strike that.

25       Are people also being seen with nurses with scheduled      01:56:30

United States District Court

TANNA GUALCO - Cross

 1  appointments.  So, for example, somebody who needs his blood          01:56:33

 2  pressure checked every day or somebody needs wound care?

 3  A.    Yeah.  That's the treatment line.  So the CNA does the

 4  blood pressures if she's there.  And on the weekends, it's the

 5  nurses and then when they call up for each building's HNRs they     01:56:47

 6  also do treatments at that time for each of these buildings

 7  during those times.

 8  Q.    Okay.

 9          THE COURT:  Excuse me.  Are you going to explore more

10  about the treatment line?                                           01:57:00

11          MS. KENDRICK:  I was but you are the judge.

12          THE COURT:  Please.  I'll wait then.  Go ahead.

13  BY MS. KENDRICK:

14  Q.    So with the treatment line -- so you're saying -- so, for

15  example, from 7 to 8:30 which buildings are that come in?          01:57:10

16  A.    Six and seven.

17  Q.    Six and seven.  So that would be the same time that

18  anybody who needs their blood pressure checked or wound care

19  who lived in six and seven, they would be scheduled at that

20  same time, too?                                                     01:57:26

21  A.    The treatments and wound care, yes.  The CNA has her own

22  way of doing the blood pressure checks throughout the day.

23  Q.    And if a person is insulin-dependent diabetic and they

24  need to have their blood tested, do they go to the treatment

25  line or is that something separate?                                 01:57:41

United States District Court

TANNA GUALCO - Cross

1   A.   There are scheduled times for the diabetics to have their                    01:57:44

2   finger sticks, but they know it's open policy if they feel low

3   or high, they can come in and we can check it right then and

4   there.

5   Q.   But regularly scheduled times for people with diabetes to                    01:57:55

6   come for the finger stick, is that during the a.m. and p.m.

7   pill call line?

8   A.   No.   They have their own designated.   They do it like 4:30

9   in the morning for a.m. and 4:30 p.m.

10          THE COURT:   Everybody who is an insulin-dependent                         01:58:15

11   diabetic who is having a blood glucose determination with the

12   finger stick is scheduled for 4:30 a.m. and 4:30 p.m. but that

13   they also can come anytime otherwise if they want if they feel

14   that they are high ore low?

15          THE WITNESS:   Yes.   They may come in saying, "I feel                     01:58:33

16   like I'm going to crash," and we'll check it and if they need

17   glucose, we can give it to them right then and there.   And

18   there also is a 12 o'clock pill pass that's a mix of special

19   meds for workers and there's about seven or eight diabetics

20   that come at that time, too, to get their finger sticks and                      01:58:47

21   insulin that is scheduled at that time.

22   BY MS. KENDRICK:

23   Q.   And approximately how many people with diabetes would you

24   estimate are on Meadows yard total?

25   A.   About 60.                                                                    01:59:01

United States District Court

TANNA GUALCO - Cross

1  Q.    So if they start at 4:30 in the morning, when are they                01:59:05

2  done seeing everybody?

3  A.    I'm not there until 7 o'clock in the morning so I can't

4  give a time.

5  Q.    Have you ever shown up at 7 o'clock in the morning and                01:59:18

6  seen people who are diabetic still waiting to get their finger

7  stick?

8  A.    No.

9  Q.    And you leave at 3:30 normally so you're not there for the

10 4:30 p.m. finger checks?                                                     01:59:30

11 A.    No.   Normally I'm there late.   Like 6:30 on Monday and 5

12 o'clock yesterday.   And I've helped with insulins in the

13 evening, and it takes about an hour and 15 to an hour 1/2 for

14 p.m. so it's about the same for morning time.

15 Q.    And are there -- how would you characterize like the                   01:59:47

16 people in Meadows yard?   Are there a lot of older men or is it

17 kind of a young yard where there are lots of the workers?   You

18 know, if you had to kind of describe --

19 A.    It's a good mix of young and very old.

20 Q.    Okay.   And are there people with mobility impairments who             02:00:12

21 are housed there?

22 A.    Yes.

23 Q.    Are they assigned to specific housing units?

24 A.    Yes.

25 Q.    Do you know which ones they are?                                       02:00:20

United States District Court

TANNA GUALCO - Cross

1   A.   Seven.                                                    02:00:21

2   Q.   Just housing unit seven?

3   A.   Building seven.  That's where all the wheelchair guys are.

4   It's the closest building to the health unit.

5   Q.   And do you have -- could you estimate for us roughly how   02:00:30

6   many people who use wheelchairs you think live on Meadows?

7   A.   I have no idea.  I don't know.

8   Q.   How about people who using walkers or canes?

9   A.   I don't know.

10  Q.   And you said it's first come, first serve for the open    02:00:48

11  clinic.  But is there any sort of special dispensation made

12  where say somebody in a wheelchair is kind of allowed to jump

13  the line and be seen first even if he doesn't show up at 7

14  o'clock on the dot?

15  A.   That all would depend on the nature of his complaint.  If  02:01:07

16  he comes in with chest pain, absolutely; but if he comes in

17  because he stubbed his toe, then he would have to wait.

18  Q.   Okay.  So what happens to the open clinic if an emergency

19  ICS is called during that time?

20  A.   Then the Nurse Line nurse stops what she's doing and       02:01:26

21  responds.

22  Q.   And are the people who are waiting sent back to their

23  units or are they just told to wait there in the clinic until

24  the nurse comes back?

25  A.   They just wait right there in the health unit.            02:01:39

United States District Court

TANNA GUALCO - Cross

1  Q.   And I believe Judge Duncan had asked you about what                02:01:52

2  happened if there were still people at 8:30.  So, like, you

3  have the 7 to 8:30 window and at 8:30 there are still people

4  waiting to be seen.  What would happen?  And I believe you said

5  that they would still be seen?                                          02:02:08

6  A.   Yes.  Yeah.

7  Q.   So do you have -- do you run into a situation where kind

8  of over the course of the day that there's more and more of a

9  wait or do you feel like you can clear it and catch up?

10 A.   Yeah.  It's cleared and everyone is taken care of within         02:02:20

11 their time frame.

12 Q.   Okay.  Do you have any sort of -- so I think you've also

13 said a couple of times, both in answers to Mr. Bojanowski and

14 Judge Duncan, that if somebody showed up outside of their

15 building's assigned hours and it wasn't emergency, that you         02:02:37

16 say, "Come back tomorrow"?

17 A.   Correct.

18 Q.   Do you guys have any sort of written guidelines or

19 instructions about what complaints or symptoms warrant seeing

20 them outside of their kind of assigned time frame versus            02:02:53

21 saying, "Come back tomorrow"?

22 A.   No.  We don't.

23           MS. KENDRICK:  I have nothing further, Your Honor.

24           THE COURT:  Mr. Bojanowski?

25

United States District Court

TANNA GUALCO - Redirect

**REDIRECT EXAMINATION**

1                                                                    02:03:08

BY MR. BOJANOWSKI:

2

Q.   As far as seeing a patient who you say, "Come back

3

tomorrow" for -- I mean, you're relying on your training, your

4

experience, you know, the standard of care in the industry to    02:03:24

5

make the determination as to whether that person needs to be

6

seen emergently or not.  Is that the decision-making process?

7

A.   Yeah.  And the ones that come up and we tell them to come

8

back tomorrow during your time is very rare because they are

9

all very aware of the scheduled time.  So that kind of incident  02:03:46

10

from happening is -- doesn't happen often.

11

Q.   So what you're doing is, even though there's no written

12

guideline or policy in place, you're relying on your medical

13

judgment to make the determination as to what the condition of

14

the patient is and whether they need to be seen immediately      02:04:07

15

because if it were an emergent situation, you would see them;

16

right?

17

A.   Yes.

18

Q.   All right.  Even if they didn't have an HNR in their hand?

19

A.   Yes.                                                         02:04:19

20

Q.   Okay.

21

        MR. BOJANOWSKI:  Nothing further, Your Honor.

22

        THE COURT:  Ma'am, I have just a couple of questions.

23

I want to go back to the schedule for the blood glucose testing

24

for the insulin-dependent diabetic.  The 4:30 time, what time    02:04:30

25

TANNA GUALCO - Redirect

1   are inmates awakened at the facility?                          02:04:37

2           THE WITNESS:  I'm not sure.

3           THE COURT:  And do you know, is there a time that

4   they are -- that they have to be up and about?

5           THE WITNESS:  I'm not aware.                           02:04:49

6           THE COURT:  Don't know.  It just strikes me that for

7   a lot of people, 4:30 would be very early.  And if they had

8   their druthers, they would like to pull their covers up over

9   their eyes and wait in bed a little longer, which would suggest

10  to me that maybe you don't have a lot of people at 4:30 in the  02:05:02

11  blood glucose test line.  Is that true or not?  You don't know?

12          THE WITNESS:  I'm not there that early, so I don't

13  know.

14          MR. BOJANOWSKI:  You don't know because you don't

15  work there at that time.  But you don't have any sense of      02:05:14

16  seeing records indicating how many people show up at 4:30?

17          THE WITNESS:  Yeah, there's the medical no-show

18  report that they run every day so that would show if they did

19  not show.  And then we would have to have them come and sign

20  refusals.  I do know that a lot of the insulin guys are workers 02:05:30

21  so they -- it actually works good for their schedule because

22  they go over to another yard and their maintenance or work in

23  the kitchen or bakery or other yards.

24          THE COURT:  So the 4:30 blood glucose time is also

25  the time for people to receive their morning insulin dose?     02:05:48

TANNA GUALCO - Redirect

1          THE WITNESS:  Yes.                                    02:05:51

2          THE COURT:  So it's not really actually voluntarily

3   for people to show up at 4:30.  They have to show up at 4:30.

4   If they don't, that means they have missed their morning

5   insulin and you go look for them if they don't come; is that   02:06:02

6   right?

7          THE WITNESS:  M'hum.

8          THE COURT:  Okay.  So everybody gets tested at 4:30

9   and the people that are on split dose must come back at 4:30 as

10  well for their afternoon dose?                                 02:06:14

11         THE WITNESS:  Yes.

12         THE COURT:  And must they test with a finger stick at

13  that time, too?

14         THE WITNESS:  Yes.

15         THE COURT:  So it's both required that they have        02:06:19

16  their insulin and have a finger stick?

17         THE WITNESS:  Yes.

18         THE COURT:  And then for people who need a midday

19  dosing of insulin they come in at noon?

20         THE WITNESS:  12 o'clock.                               02:06:29

21         THE COURT:  But it's not required that they have a

22  blood glucose test then?

23         THE WITNESS:  They do.  They do a finger stick each

24  time.

25  \\\

United States District Court

TANNA GUALCO - Redirect

1    THE COURT:  So each time somebody is administered          02:06:37

2  insulin, before that happens, they receive a blood glucose

3  test?

4          THE WITNESS:  Yes.

5    THE COURT:  Now, with respect to people that want to         02:06:44

6  come and have an additional test because they don't think they

7  feel quite right, how often does that happen during the day?

8          THE WITNESS:  It doesn't happen often.

9    THE COURT:  If somebody comes in and they say, "I

10  don't feel quite right," and they test at 100 and they come     02:06:56

11  back the next day and say, "I don't feel quite right," and they

12  test at 100.  And you see that maybe they are not so good at

13  guessing about what it is, do you counsel them about not coming

14  back and doing that?  How do you react to that?

15    THE WITNESS:  Well, if they don't feel well, I just         02:07:14

16  do the normal assessment that I would do, ask them if it's, you

17  know -- "Is it stomach issues?"  Because if they are not

18  feeling well, it could be a number of things.  And if it's

19  something they need to see the provider for, maybe get some

20  labs drawn, then we could refer them to the provider to have     02:07:27

21  that done.

22    THE COURT:  I'm asking this in part because it just

23  strikes me that these people who show up and want to have a

24  blood glucose test at the moment are probably interrupting your

25  day.  You're in the middle of treating some other patient, so    02:07:41

United States District Court

TANNA GUALCO - Redirect

1  you have to stop everything and deal with that and it would          02:07:44

2  maybe make me think that that might be one reason that you

3  would want to make sure that there was a good reason to have it

4  and that you would have a little bit of push back sometimes.

5  Is that fair to think or no?                                         02:07:55

6          THE WITNESS:  We have two Med Pass nurses.  So for

7  them to have an hour Med Pass and then in between we're

8  stocking, refilling meds, they are doing other things but it

9  takes two seconds to check someone's sugar.  So if the Nurse

10 Line nurse is busy, there's two Med Pass nurses that can check  02:08:10

11 it for them.

12         THE COURT:  So are you saying nobody there really

13 views it as an imposition or a burden to have somebody come in

14 and ask for blood glucose?

15         THE WITNESS:  No.                                           02:08:21

16         THE COURT:  Now, there's also the other side of it.

17 Each one of those strips cost some amount of money, maybe close

18 to a dollar.  I don't know.  But is there any sense about

19 trying to restrict people who are maybe asking for too many of

20 these?                                                               02:08:34

21         THE WITNESS:  No.

22         THE COURT:  Never heard of that?

23         THE WITNESS:  Nope.

24         THE COURT:  Okay.

25         Did my questions engender any other questions,              02:08:37

United States District Court

```
 1   counsel?                                                    02:08:40

 2              MS. KENDRICK:  No, sir.

 3              MR. BOJANOWSKI:  No, sir.

 4              THE COURT:  You're done.  Thank you so much.

 5   Appreciate you coming in and talking with us.  Have a good rest  02:08:43

 6   of the day.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  You can just leave those exhibits there.

 9         (Witness excused.)

10              THE COURT:  Is that it from the defendants' side?  02:09:02

11              MR. BOJANOWSKI:  Yes, Your Honor.

12              THE COURT:  And do we have any more witnesses from

13   the plaintiffs' side?

14              MS. KENDRICK:  No, sir.

15              THE COURT:  Okay.  So we've finished the HNR  02:09:10

16   testimony.  Both with respect to the HNR issue and with respect

17   to the retaliation issue, I need to ask you all whether you

18   would like to have an opportunity to submit written briefs

19   regarding these issues.

20              Plaintiffs?                                     02:09:25

21              MS. KENDRICK:  Yes, please.

22              THE COURT:  All right.  How much time would you like?

23              MS. KENDRICK:  Two weeks.

24              THE COURT:  Okay.

25              So that will be the deadline, two weeks from today,  02:09:32
```

United States District Court

1   14 days to file any written briefing regarding these two                02:09:35

2   issues.

3          And defendants would like how much time to respond?

4          MS. KENDRICK:  Well, actually, Your Honor, we didn't

5   request the briefing on the retaliation so we don't feel we             02:09:48

6   have any sort of burden of proof.  So I believe defendants

7   should go first on that issue and we can go on the HNRs.

8          THE COURT:  Well, I'm going to give everybody a

9   chance to -- I mean usually -- I'm not saying the briefing is

10  going to determine the burden.  It's just I need an order.  And          02:10:08

11  since this is mixed, it just seems to me it that makes sense to

12  put plaintiffs first, give the defendants a chance to respond,

13  you get the chance to reply so everybody has an opportunity to

14  speak because we've got two issues.  It just seems to make

15  sense to do it that way.                                                 02:10:25

16         MS. KENDRICK:  Well, it's just more we weren't the

17  ones who demanded the hearing on retaliation so . . .

18         MS. LOVE:  Your Honor, the issue is they filed the

19  notice of retaliation and, therefore, it is their burden to

20  prove retaliation such that your previous order issued after            02:10:38

21  the 7-21 hearing would stand because then there is actual

22  proof.  Because at the hearing, based upon counsel's statements

23  and averments in the notice, you wanted to restore to status

24  quo and then allow this opportunity to present evidence.  So it

25  is defendants' position that it is plaintiffs' burden of proof          02:10:58

United States District Court

1  to actually prove retaliation so that your order stays in

2  effect.

3         THE COURT:  I know what I want to do is I want to

4  hear from both sides, if they want to be heard on the issue,

5  and it seems to me that's not unfair in this circumstance to

6  have plaintiffs go first.  So you'll go first and how much time

7  would you like to respond?

8         MR. BOJANOWSKI:  I'm a little confused.

9         THE COURT:  Here's what's going to happen.  The

10  plaintiffs are going to file in two weeks their papers that

11  address the issue of the retaliation and also address the issue

12  of the removal of the HNR boxes.  Then you're going to have a

13  chance to respond to both of those issues.  I'm asking how much

14  time would you like?

15         MS. LOVE:  14 days from plaintiffs' filing.

16         THE COURT:  And how much time would you like for

17  reply?

18         MS. KENDRICK:  One week.

19         THE COURT:  Okay.  So seven days.

20         Is there anything else we need to address today?

21         MS. KENDRICK:  Not from us.

22         THE COURT:  Okay.

23         MR. BOJANOWSKI:  Nothing further, Your Honor.

24  ///

25  ///

1        MS. LOVE:  No, Your Honor.  Thank you.                02:11:52

2        THE COURT:  All right.

3        Thank you, all, very much.

4     (Whereupon, these proceedings recessed at 2:12 p.m.)

5                    *  *  *  *  *                              02:11:56

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

1                        C E R T I F I C A T E                          02:11:56

2

3          I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of        02:11:56

6    Arizona.

7

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled     02:11:56

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15         DATED at Phoenix, Arizona, this 18th day of               02:11:56

16   September, 2017.

17

18

19

20                              s/Elaine M. Cropper                   02:11:56

21                         _____

22                          Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                   02:11:56


                    United States District Court