1   Kathleen E. Brody (Bar No. 026331)
2   **ACLU FOUNDATION OF ARIZONA**
    3707 North 7th Street, Suite 235
3   Phoenix, Arizona 85013
    Telephone: (602) 650-1854
    Email: kbrody@acluaz.org
4
5   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
    *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
    *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
6   *Desiree Licci, Joseph Hefner, Joshua Polson, and*
    *Charlotte Wells, on behalf of themselves and all others*
7   *similarly situated*

8   **[ADDITIONAL COUNSEL LISTED ON**
    **SIGNATURE PAGE]**

9   Sarah Kader (Bar No. 027147)
    Asim Dietrich (Bar No. 027927)
10  **ARIZONA CENTER FOR DISABILITY LAW**
    5025 East Washington Street, Suite 202
11  Phoenix, Arizona 85034
    Telephone: (602) 274-6287
12  Email: skader@azdisabilitylaw.org
           adietrich@azdisabilitylaw.org
13
    *Attorneys for Plaintiff Arizona Center for Disability Law*
14
    **[ADDITIONAL COUNSEL LISTED ON**
15  **SIGNATURE PAGE]**

16              UNITED STATES DISTRICT COURT

17                    DISTRICT OF ARIZONA

18  Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-DKD
    Dustin Brislan; Sonia Rodriguez; Christina
19  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph       **PLAINTIFFS' STATEMENT**
20  Hefner; Joshua Polson; and Charlotte Wells, on        **ON THE COURT'S ORDER**
    behalf of themselves and all others similarly         **REGARDING**
21  situated; and Arizona Center for Disability Law,      **RETALIATION (DOC. 2209)**

22                          Plaintiffs,

            v.
23
    Charles Ryan, Director, Arizona Department of
24  Corrections; and Richard Pratt, Division Director,
    Division of Health Services, Arizona Department of
25  Corrections, in their official capacities,

                            Defendants.
26

27

28

1

## INTRODUCTION

2       On July 25, 2017, this Court issued an Order "directing Defendants and Counsel
3  for Defendants that no actions be taken that harass, intimidate, or otherwise retaliate
4  against the witnesses who have provided the Court information, either via oral testimony
5  or written statements."  [Doc. 2209 at 4, hereinafter "Order"]  The factual basis for the
6  Order was the Notice regarding actions that testifying witnesses experienced after
7  testifying and/or providing written statements to the Court on July 14, 2017, which they
8  experienced as retaliatory.  [*See generally* Doc. 2190; *see also* Doc. 2191] The Court also
9  relied upon clear and controlling caselaw as the legal basis for its Order. [Doc. 2209 at 3]
10  Defendants demanded an evidentiary hearing regarding the allegations made by the
11  testifying witnesses.  After two days of hearings, it is clear that the Court's Order is amply
12  supported by the facts in evidence.

13       Defendants' witnesses confirmed that most, if not all, of the actions described in
14  the Notice occurred.  Defendants attempted to characterize these acts as nothing more than
15  a series of unfortunate events or innocent mistakes that coincidentally occurred in the
16  hours and days after the July 14 hearing, but their witnesses offered contradictory
17  explanations -- and at times no explanation -- for these actions.  In fact, in the course of
18  preparing for the evidentiary hearings and reviewing relevant documents, it emerged that
19  there were *additional* adverse actions taken against two class member witnesses that could
20  reasonably be interpreted as retaliatory.

21       Defendants appear to not understand that even if their employees had the purest of
22  motives, and these were all merely coincidental actions or innocent mistakes, a reasonable
23  person could interpret their actions as retaliatory, as the testifying witnesses did.  Any
24  reasonable person could foresee that Defendants' actions would chill, if not outright
25  silence, other plaintiff class members from providing relevant information to the Court
26  and/or Plaintiffs' counsel.  Finally, Defendant Ryan confirmed that ADC policies prohibit
27  retaliation, (8/8/17 Tr. at 21:12), which invites the question why he took such great
28  personal offense to the Court's Order, if it only reiterates ADC policy.

1

2                                    **EVIDENCE**

3          Plaintiffs submit the following evidence to confirm that the factual basis for the

4    Court's Order was sound.   Additional facts that came to light during these hearings

5    bolstered, rather than lessened, the need for such an order.

6          **Perryville**

7          ***Actions Detailed In Plaintiffs' Notice (Doc. 2190)***

8          Defendants admit that both plaintiff class members from ASPC-Perryville who

9    came to the court to testify had their property "rolled up" the night of July 13, 2017.

10   [9/11/17 Tr. at 11:8-10 (Ashworth); 31:24-32:1 (Keys)]  Warden Currier testified this was

11   pursuant to Department Order ("DO") 909, which "states in there that inmates will have

12   their property secured if they are going to court." [9/11/17 Tr. at 13:10-12]  However, DO

13   909 actually states that "[w]hen an inmate is removed from an assigned cell or housing

14   unit *overnight* for medical care, a court appearance, or other such temporary reasons, the

15   appropriate staff member shall ensure the inmate's property is inventoried and securely

16   stored until the inmate returns." [*See* Declaration of Corene Kendrick, filed herewith,

17   "Kendrick Dec." Ex. 1 at 8 (DO 909, § 909.04, 1.8) (emphasis added)]  When confronted

18   with the policy's plain language, Ms. Currier implausibly argued that the serial comma

19   separating the words "for medical care" and "a court appearance" meant that the word

20   "overnight" did not modify "a court appearance."  [9/11/17 Tr. at 31:11-13]  In contrast,

21   San Pedro Deputy Warden Oros conceded that people who are sent out of the prison for a

22   court hearing or a mediation for the day should not have their property rolled up.  [*Id.* at

23   107:24-108:1; see also 9/13/17 Tr. 40:1-4 (Officer Kay confirming that someone going

24   off-grounds for the day has their property stay in the cell)]  And notably, ASPC-Florence

25   institution staff adhered to the policy and did not roll up the property of the two men who

26   came from that prison to court to testify.

27          Adding to the confusion about what happened to the Perryville class members, Ms.

28   Currier testified that unit movement officers receive a list from the complex records area

1    and then pass it on to the shift officers. [9/11/17 Tr. at 12:2-15; see also 32:4-5 ("Q.  Do

2    you know who ordered the roll-ups?  A. It goes through the movement officer.")]   But

3    Officer Kay, the San Pedro Unit movement officer, testified that he did not order the roll-

4    up of the witness from that unit. [9/13/17 Tr. at 63:4-8]

5          Defendants also confirmed Plaintiffs' allegation that Donna Scheid, who provided

6    a written statement to the Court and is the cellmate of testifying witness Angela

7    Ashworth, was moved involuntarily out of their shared cell five days after the July 14

8    hearing. [Doc. 2190 at 5:10-11; 9/11/17 Tr. at 35:23-36:10, 81:17-25] Defendants

9    provided a plethora of information regarding the compatibility of Ms. Ashworth and her

10   temporary cellmate, a pregnant woman, but that was never at issue.  [See Doc. 2190 at

11   5:18-19 ("Ms. Ashworth does not have a concern about this individual, but rather what it

12   means to have a pregnant roommate.") citing Doc. 2191 ¶ 12]  Defendants produced one

13   of the allegedly two inmate letters written by the pregnant woman requesting a move, but

14   witnesses would not agree that this woman's written statement that "I have a friend in A

15   yard, her name is Allen, who was willing to move out but I'm not sure," should be

16   interpreted to mean that there was a potential volunteer willing to give up her bed for the

17   pregnant woman, and instead said they interpreted this to mean the pregnant woman was

18   asking to go live with the friend.[1]   [9/11/17 Hg. Defs' Ex. 18 (emphasis added); 9/11/17

19   Tr. at 109:21-110:12; 9/13/17 Tr. at 40:25-41:16]   The movement officer, Mr. Kay,

20   additionally testified that he did not remember looking for any empty cells in which he

21   could house the pregnant woman.  [9/13/17 Tr. at 49:12-19]

22         Plaintiffs' Notice also brought to the Court's attention the concerns articulated by

23   Ms. Scheid about the person with whom she was housed temporarily.  [Doc. 2190 at 5:12-

24   16]  In contrast to the many exhibits and testimony by the deputy warden and movement

25

26         [1] Mr. Kay testified that this woman submitted two written inmate letters requesting
     a move, but could not locate the second one that he stated he was given on July 19 that
27   created the impetus and urgency for the move.  [9/13/17 Tr. at 21:1-6; 53:1-10; 54:24-
     55:16]  An incident report that he wrote two weeks after the move does not reference a
28   second inmate letter.  [9/11/17 Plaintiffs' Exhibit 9]

officer detailing the compatibility of Ms. Ashworth and the pregnant woman who moved in with her (which again, was *not* a concern that Plaintiffs raised), Defendants conspicuously provided *no* information during the hearings about the compatibility of Ms. Scheid and her temporary cellmate.  [*See, e.g.* 9/11/17 Hg. Plfs' Ex. 9; Defs' Exs. 15-17, 19-23; 9/11/17 Tr. at 98:5-100:18; 112:10-14; 9/13/17 Tr. at 24:15-25:9; 30:22-33:3; 43:13-18]   Officer Kay, the movement officer, after testifying at length about the compatibility between Ms. Ashworth and her new cellmate, testified he had no memory of the results of any compatibility screening between Ms. Scheid and her temporary cellmate, and denied having knowledge of the circumstances of Ms. Scheid's move. [9/13/17 Tr. at 33:11-12; 43:11-12; 43:19-24; 46:7-15; 47:4-6; 55:20-22; 60:16-19] Further, Mr. Kay testified that if the compatibility screening referred to as the "DC 71" screen showed that two people were incompatible, then the move could not occur.  [*Id*. at 43:22-44:13]  Deputy Warden Oros testified to the opposite. [9/11/17 Tr. at 100:23-25 ("So if we wanted to still house them together we would actually have to go into the system and put a written justification as to why we would want to do that.")]  Ms. Oros could not explain why the "Inmate Actions Detail" print-out (9/11/17 Hg. Defs' Ex. 20) stated "Cell Assgn Override" or what "override" would have referred to in this case.  [*Id*. at 113:19-25]  Mr. Kay also could not explain the meaning of the report for Exhibit 20 either.  [9/13/17 Tr. at 45:2-15 ("[i]t would be somebody above my pay grade" who would explain the meaning of the dates and times)]  Therefore, Defendants do not dispute Ms. Scheid's concerns and allegations that she articulated about her cell move.

There also was conflicting information about the circumstances of Ms. Scheid's return to the cell on July 21 after the Court's verbal order, that calls into question either the credibility and veracity of one of Defendants' witnesses, or the credibility and veracity of Defendants' documentation.  Officer Kay was asked, "[W]ere you involved at all with Ms. Scheid's move back to the cell with Ms. Ashworth on July 21 after Judge Duncan ordered it?" to which he responded, "Yes, I moved her back myself."  [9/13/17 Tr. at 59:8-11]  But his testimony is flat-out contradicted by the email and Incident Report

1    written by Sergeant Overly, who reported to Warden Currier on July 21 that the move was

2    completed by Sgt. Overly and Captain Bailey. [*See* 9/11/17 Hg. Plfs' Exs. 1 and 2; *see*

3    *also* 9/13/17 Tr. at 59:21-60:14 (officers are trained to include and list all staff that are

4    involved in an incident that is the subject of an information report)] [2]

5        Defendants also confirmed Ms. Ashworth's allegation that she was sleeping alone

6    in her cell the night of July 19, 2017 because her new cellmate who was pregnant was

7    sleeping in the air conditioned Visitation Unit with other pregnant women because the

8    temperature was over 86 degrees, and confirmed that custody staff entered her cell

9    ostensibly to take the temperature, which startled and scared her. [Doc. 2190 at 6:17-26;

10   9/11/17 Tr. at 21:1-7] Warden Currier testified that the reason custody staff entered Ms.

11   Ashworth's cell during nighttime was to check the temperature because her roommate was

12   pregnant, but then admitted the pregnant roommate was not in the cell at the time staff

13   went into Ms. Ashworth's cell. [9/11/17 Tr. at 21:15-22:1] The implausible explanation

14   offered by Ms. Currier was the pregnant roommate (who was sleeping in air conditioning

15   in Visitation) might have wanted to wake up, and return to the cell to sleep, if she were

16   told that the cell temperature had dipped below 86 degrees.  [*Id*. at 22:1-16][3]

17       Plaintiffs' Notice to the Court also reported that Ms. Scheid alleged that on the date

18   of the July 14, 2017 hearing, she (Ms. Scheid) was approached by the officer who did not

19   call the ICS for Ms. Ashworth, and was told that the officers "agreed that we saw nothing

20   wrong with Ashworth."  [Doc. 2190 at 4-5; Doc. 2191 at ¶ 9]  Officer Western testified

21   that she could not recall having a conversation with Ms. Scheid on July 14, 2017, (8/9/17

22   _____

23       [2] Additionally, despite Plaintiffs' Counsel's and the Court's best efforts to get an
     explanation, none of the witnesses asked could explain why the date/time stamp of Exhibit
24   1 said "Sat[urday] 7/21/2017" when July 21, 2017 was a Friday. [9/11/17 Tr. at 38:5-13
     (Currier); 104:22-105:2 (Oros); 166:6-22 (Papworth); 200:24-201:13 (Lee); 241:17-242:3
25   (Van Winkle); 277:4-17 (Mattos); 9/13/17 Tr. at 65:20-66:9 (Kay); 124:7-125:4 (Jardine)]
     *See also* 9/11/17 Tr. at 120:18-121:19 (Court's questions regarding discrepancies in
     Plaintiffs' Exhibit 3)]
26       [3] For what they're worth, (*see, e.g*., Doc. 2291 at ¶¶ 6-13), the temperature logs
     recently produced by Defendants for the San Pedro Unit for the night of July 19, 2017, at
27   11 pm, showed temperatures in the cells ranging from 84 degrees to 90 degrees.  [See
     Kendrick Decl., Ex. 2 (ADCM1002524)]  The "Temperture [sic] Log" does not indicate
28   which cells were checked that night. [*Id*.]

Tr. at 33:12-16), even though she was instructed to fill out an Incident Report on July 14 in the wake of Ms. Ashworth's testimony.   [*Id.* at 26:16-27:7]   The Court's Order mistakenly attributes this encounter as occurring with Ms. Ashworth, (*see* Doc. 2209 at 2:18-24), however the allegation came from Ms. Scheid.  [Doc. 2190 at 4:26-5:4]  This minor error does nothing to alter the retaliatory and intimidating nature of the encounter.

In sum, the factual allegations in Plaintiffs' Notice regarding actions taken against Perryville witnesses, that formed the basis of the Court's Order, have been confirmed. Therefore, the Court's Order stands.

### Actions That Occurred After The Court's Verbal and Written Orders

Documents produced for the hearing uncovered two additional adverse actions taken at Perryville *after* Plaintiffs' Notice and the Court's Order that a reasonable person could interpret as retaliatory or chilling.   While Counsel for Defendants objected to questions about Ms. Scheid being forced to wear a jumpsuit for 30 days without due process and Ms. Ashworth's placement on a targeted search list, (*see, e.g.,* 9/11/17 Tr. at 191:8-14), these acts are relevant to Defendants' compliance with the Court's Order, and offer additional factual support for the need for the Order.   After learning of these two acts, the Court observed:

> I think we need to pause for a moment and reflect on what we just learned. We learned from the warden with responsibility for a major segment of the inmate population in Arizona, some 4,000 inmates, that she was present on the phone call where I instructed that there would be no retaliation.  She then sent an e-mail to her staff, which I commended her for doing in my mind, that it would require daily information about anything that could be perceived as retaliation.  And she had no effect on what this Exhibit 5 demonstrates.  And that is, people went ahead and didn't or went ahead with some kind of action, put that person on the list.  We know that the person was put on the list, because the e-mail says, "I removed her from the list." So to be removed you have to be on the list.  We don't know when that happened.  But we also know during the time period from my directive from the emergency hearing and her directive from the e-mail that she be notified that neither of those things appeared to have been complied with.
>
> I also, anticipating defendants' arguments, because this is not a fully developed record on this e-mail, but it raises again for me the real specter that your method, defendants, of communicating with the people who are supposed to effectuate what I say here is not working.  You send it to the wardens, and the wardens do what looks to me like they are supposed to. The director, we had a conversation, he and I, about our differences of

opinion about the overall content of his message, but that message included what I wanted it to include. And I would also say that Warden Currier's directive included what I wanted it to [i]nclude.

But what we have learned here are two things: First it appears that it was not complied with; and two, we learned that the warden doesn't know what's going on on the ground. She doesn't know about the jumpsuits. She doesn't know what the prison mail situation is. So I don't know who it is that has to be informed, whether I have to go personally speak with every person who works for the Department of Corrections, but something is not working. The method of communication that the defendants' counsel and the defendants' senior staff is using to communicate the directives of the Court, and again, it's not just in this retaliation context. It's in other contexts as well, where we have heard there are contrary messages and mixed messages. I understand it's a big system, but it's a command and control system with military components of it of people who are responsible for one another up the chain of command and down the chain of command.

[9/11/17 Tr. at 70:21-72:15]

As the Court alluded to in its remarks, it ordered by verbal instruction on July 21 and in writing on July 25, 2017 that no actions or changes in status be taken against witnesses. [7/21/17 Tr. at 13:15-25; Doc. 2209 at 4] The Court directed Defendants to provide the Order to ADC employees, (Doc. 2209 at 4), which Defendant Ryan did on July 27, 2017. [Doc. 2222-1 at 8-9] That same day, Warden Currier notified her deputies of the names of the women who had provided the Court information, and instructed her deputies that "I need to know 'daily' if there are any issues with anything regarding the below listed inmates. [. . .] We literally need to know about 'anything' no matter how trivial it may seem, about these inmates." [9/11/17 Hg. Plfs' Ex. 6 at 3-4] Unfortunately, as the Court observed, something was lost in translation from the Court's orders, to the instructions and directives from Defendant Ryan and Perryville Warden Currier, down to custody staff. [*See, e.g*., 9/11/17 Tr. at 70:22-71:7, 71:15-72:15] Testimony from the various Perryville administrators and custody officers also illustrated a remarkable lack of curiosity or thoroughness in investigating the circumstances of these acts.

### Jumpsuits

First, it was only due to the discovery document production that Plaintiffs' counsel (and the Court) learned that Ms. Scheid had been "placed in a jump suit" – in an act that Lieutenant Papworth wrote "circumvented the disciplinary process." [9/11/17 Hg. Plfs'

Ex. 6 at 3]  Ms. Oros explained that women may be ordered to wear a jumpsuit for 30 days (as opposed to a shirt and pants) after receiving a disciplinary ticket following numerous  "warnings to be in grooming compliance [. . .] and they don't follow it," and after the women "had numerous times they have been given opportunities to conform." [9/11/17 Tr. at 123:9-11, 123:18-19]  Ms. Oros gave an example of "walking around the yard with their pants hanging down and their underwear showing. […] I remind them that they are young ladies and they need to act that way." [*Id*. at 126:2-6][4]

Compounding an already Kafkaesque situation, Warden Currier testified that Ms. Scheid was placed on this jumpsuit status as a result of her taking lipstick instead of Chapstick to her job, a workplace location where apparently only Chapstick is allowed for purposes of lip hydration.  [*Id*. at 47:3-15]  Defendants offered no evidence that Ms. Scheid defiantly and repeatedly carried lipstick to work, and/or had disregarded prior instructions to not bring her lipstick to work, as this unofficial and unwritten jumpsuit sanction applied on San Pedro Unit, as articulated by Ms. Oros and Lt. Papworth in their testimony, should have given her "numerous" opportunities to conform to grooming policies.  Lieutenant Papworth testified

> Q. ... I understood your testimony to be that before the prisoner can be placed in a jumpsuit they are supposed to be given a disciplinary ticket, have a due process hearing, and then if they are found guilty they can receive that sanction. Correct?
>
> A. That's correct.
>
> Q. And my question is, to your knowledge was that process followed in Ms. Scheid's case?
>
> A. Not to my knowledge.

[9/11/17 Tr. at 163:13-21; *see also id*. at 195:9-11 (DWOP Lee: "Q. Was the process by which Ms. Scheid was placed in a jumpsuit consistent with ADC policy? A: She did not go through disciplinary, so no.")]

---

[4] Ms. Scheid is 57 years old.  Two attorneys of record for Plaintiffs (Ms. Eidenbach and Ms. Kendrick) separately have met Ms. Scheid in person and can attest that she most definitely was not displaying undergarments or wearing pants below her hips.

In fact, Ms. Oros testified she did not know why Ms. Scheid was sanctioned to be in a jumpsuit, and testified that it was not until she was in court on September 11 that she learned this had happened to Ms. Scheid and ten other women in July (when she was still deputy warden) without first having a disciplinary ticket written. [9/11/17 Tr. at 127:6-128:2] Lt. Papworth testified he did not know the reason Ms. Scheid was ordered to be placed in a jumpsuit and did not make any effort to find out why or who made the order, (*Id*. at 160:22-25), but that it would have been a shift commander (not him) who made that decision. [*Id*. at 165:1-8] Deputy Warden of Compliance Lee similarly testified she did not know why Ms. Scheid was ordered in a jumpsuit, or who was responsible for that order, and had not investigated the answers to those questions. [*Id*. at 192:20-193:4; 197:25-198:3] She also did not know if any written directive was given to San Pedro staff to stop placing people in jumpsuits without due process. [*Id*. at 199:1-15]

Warden Currier testified there is no policy about putting people in jumpsuits, that she thinks it was something that only occurred at San Pedro Unit, and "I'm not sure why they were doing that." [9/11/17 Tr. at 49:8-12; 50:5-7] Ms. Currier also testified she did not know this jumpsuit sanction even existed or was occurring until she learned of Ms. Scheid's status, (*Id*. at 50:8-10), but Ms. Oros testified the punitive use of jumpsuits had been a practice at the unit for at least three and a half years. This raises a question of how the warden did not know this practice was going on, or never had observed women in San Pedro wearing jumpsuits. [*Id*. at 124:21-24; *see also id*. at 200:12-22 (prisoners "from time to time" wear jumpsuits because they are in restrictive housing or being transported); *id*. at 202:1-12 (neither Ms. Scheid nor the other 10 women ordered to wear jumpsuits were in restrictive housing or being transported)]

### Targeted Search List

The second act subsequent to the Court's Order, that Plaintiffs' Counsel and the Court only learned about due to the document production, was that in the last week of July, testifying witness Ms. Ashworth was placed on a "target search list" to be searched at some point in the month of August. [9/11/17 Hg. Plfs' Ex. 5 at 1; 9/13/17 Tr. at

103:14-17]  A person who is placed on a target search list could be subject to urinalysis tests, cell searches, or strip searches.  [9/11/17 Tr. at 142:24-143:5; 181:3-9]  Lieutenant Papworth accurately characterized in his testimony that the "ramifications that the inmate[s] feel" from being on a targeted search list includes that, "they may feel they are being singled out."  [*Id*. at 141:6-8]

Deputy Warden Lee testified that while she had been notified on August 2, 2017 that Ms. Ashworth was on the targeted search list, she did not bother to notify Warden Currier because "I didn't find a reason for her to know."  [*Id*. at 186:17-22]  In fact, Ms. Currier testified under oath that the first time she learned that Ms. Ashworth had been placed on the target search list for August was when she was shown the email during her testimony on September 11.  [*Id*. at 64:24-65:2]  Accordingly, she could not provide any information about what happened.  [*Id*. at 65:14-19]

Officer Jardine, the Special Security Unit (SSU) officer who testified he was responsible for creating target search lists and for placing Ms. Ashworth on the search list, stated he does not document anywhere the source of information or the reason why he has put a particular individual on the targeted search list for a given month.  [9/13/17 Tr. at 118:1-3]  He testified that "inmates that go on the list" include those "that may be doing something they shouldn't be doing," (*id*. at 98:8-10), but he had no specific intelligence that Ms. Ashworth was involved in the introduction of contraband.  [*Id*. at 100:20-101:1]  Rather, he said, he placed her on the list because she works as a tram driver on Friday, Saturday, and Sundays, and "90 percent  of the visits are on the weekends" and the "tram drivers, they will bring in those civilians, they [sic] visitors, these family members. . . these ladies that are driving the trams, they are driving untold number of civilians over the course of two days. . . I think tram drivers probably have far more contact with civilians every single weekend."  [*Id*. at 98:22-23; 99:1-100:4]  However, on cross-examination, Officer Jardine acknowledged that given Ms. Ashworth drives the tram at night, and not during visitation times, she would not have any contact whatsoever with civilians or visitors.  [*Id*. at 108:2-8; 109:10-14; *see also* Doc. 2190 at 6 ("Ms. Ashworth also reported

1  that she has a job that she works from midnight to 6 am on Thursday, Friday, and

2  Saturday nights…")]

3      Northern Regional Operations Director Trujillo purported to provide information

4  regarding the circumstances of Ms. Ashworth being placed on what he testified was a

5  urinalysis (UA) test list, (9/11/17 Tr. at 212:17-18); however, it subsequently was shown

6  that she was not on such a list.  His inaccurate testimony led to a line of cross-examination

7  questioning that was a blind alley.  [*Id*. at 219:1-223:22][5]  When Mr. Trujillo testified,

8  Plaintiffs' Counsel objected to it as meritless hearsay. [9/11/17 Tr. at 213:18-21]  Two

9  days later, Defendants conceded that what Mr. Trujillo testified to under oath was, indeed,

10  inaccurate hearsay, but attempted to minimize his false testimony as simply yet another

11  "innocent mistake." [9/13/17 Tr. at 87:18]

12                                    *******

13  **<u>Florence</u>**

14      Testifying witness Ronald Oyenik reported to Plaintiffs' counsel that on July 14, a

15  few hours after he returned to Florence-South Unit after testifying, Deputy Warden

16  Mattos approached him while he was on his bed, asked him if he had all of his property,

17  and loudly stated in front of others, "The judge called and said you accused me of taking

18  all of your property" which made Mr. Oyenik feel "rattled" and "targeted."  [Doc. 2190 at

19  3; Doc. 2191 at ¶¶ 3-4]  Deputy Warden Mattos testified and confirmed that he went to

20  Mr. Oyenik's building at the end of the day on July 14 to ask Mr. Oyenik if he had his

21  property.  [9/11/17 Tr. at 248:25-249:9]  Mr. Mattos initially testified that he did not make

22  the statement to Oyenik that "you accused me of taking all your property," (*id.* at 249:10-

23

24          [5] This line of questioning also led to Mr. Trujillo's stubborn insistence that the
     word "institution" could plausibly be used interchangeably with the word "unit," and
25   accordingly Ms. Ashworth's job as a tram driver within the Perryville institution meant
     she met the criteria set out in DO 709.02 for urinalysis testing that includes "inmates who
26   are assigned to off-site work locations external of institution grounds"  [9/11/17 Tr. at
     221:6-223:9, 223:23-224:5; *see also* Kendrick Dec. Ex. 3 at 3-4 (DO 709.02, § 1.1.1.1
27   (available at https://corrections.az.gov/sites/default/files/policies/700/0709.pdf))]    The
     Court deemed Mr. Trujillo's interpretation of the language in DO 709 as "straining
28   credibility." [9/11/17 Tr. at 222:9-10]

13), but subsequently testified "I'm going to tell you the truth, if I did I don't remember saying those exact words. I do remember asking him if he had his property. If I said, do you have your property after returning from court? I might have said something like that, sure." [*Id*. at 264:10-14]

However, the memorandum that Mr. Mattos wrote on July 19, 2017 regarding Mr. Oyenik's allegations, confirms that he did go speak to Mr. Oyenik the night Mr. Oyenik returned to Court. [9/11/17 Hg. Defs' Ex. 30]  The Court is thus faced with divergent accounts of what was said: an account from Mr. Oyenik who has absolutely nothing to gain and everything to lose from bringing this allegation to the Court's attention, and an account from someone whose testimony fluctuated from flippant to forgetful.  [*See, e.g.,* 9/11/17 Tr. at 265:5-13 ("Q. So you wrote this document?  A. Yes, I did.  Q. Okay.  A. It's dated July 19. That's when I wrote it.  Q. If you look down about six lines, about two-thirds of the way, two-thirds of the way across the page from the left, you write, I stated, quote, 'No, I just needed to confirm you had your property after returning from court,' end of quote.  A. Sure. *If I wrote that*.") (emphasis added)]

Mr. Oyenik also reported that on July 17, 2017, DW Mattos and other custody staff went to Dorms 7 and 8, which are designated to house people with disabilities, told people living there they could move to a building closer to the new location of the medical clinic, and instructed people who did not want to move that they had to sign waiver documents saying they were fine in their current location.  [Doc. 2190 at 4:1-11; Doc. 2191 at ¶ 5] Mr. Oyenik's concern was that this event could result in the other prisoners blaming him or labeling him as the cause of the move.  [Doc. 2190 at 4:12-14; Doc. 2191 at ¶ 6]

Mr. Mattos confirmed that he had gone to the dorms housing people with mobility disabilities on July 17 to tell them they could move to Dorm 1, and had those who did not want to move out of the designated buildings to sign inmate letters to that effect.  [9/11/17 Tr. at 254:24-255:6, 256:3-16; 268:13-21; see also 9/11/17 Hg. Defs' Ex. 30]  Defendants provided 45 signed refusals for the hearing.  [9/11/17 Hg. Defs' Ex. 29]  This comports with Mr. Oyenik's account of what occurred on July 17, 2017 in the ADA dorms.

1      Therefore, the essential factual allegations in Plaintiffs' Notice regarding actions

2  that occurred at Florence-South and Mr. Oyenik's response to them, that formed the basis

3  of the Court's Order, are not disputed.

4  **CONCLUSION**

5      For the reasons stated herein, the Court's Order is amply supported by the factual

6  record and should stand.

7

8  Dated:  October 4, 2017              **PRISON LAW OFFICE**

9                           By:  s/ Corene Kendrick

10                              Donald Specter (Cal. 83925)*
                            Alison Hardy (Cal. 135966)*

11                              Sara Norman (Cal. 189536)*
                            Corene Kendrick (Cal. 226642)*

12                              Rita K. Lomio (Cal. 254501)*
                            **PRISON LAW OFFICE**

13                              1917 Fifth Street
                            Berkeley, California 94710

14                              Telephone:  (510) 280-2621
                            Email:    dspecter@prisonlaw.com

15                                        ahardy@prisonlaw.com
                                      snorman@prisonlaw.com

16                                        ckendrick@prisonlaw.com
                                      rlomio@prisonlaw.com

17                            *Admitted *pro hac vice*

18                            David C. Fathi (Wash. 24893)*

19                            Amy Fettig (D.C. 484883)**
                          Victoria Lopez (Ill. 6275388)*

20                            **ACLU NATIONAL PRISON
                          PROJECT**

21                            915 15th Street N.W., 7th Floor
                          Washington, D.C. 20005

22                            Telephone:  (202) 548-6603
                          Email:    dfathi@aclu.org

23                                        afettig@aclu.org
                                    vlopez@aclu.org

24                            *Admitted *pro hac vice*.  Not admitted

25                           in DC; practice limited to federal
                         courts.

26                            **Admitted *pro hac vice*

27

28

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:    kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    kbrody@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

1

2

**ARIZONA CENTER FOR DISABILITY LAW**

3

By:   s/ Maya Abela

4

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)

5

5025 East Washington Street, Suite 202
Phoenix, Arizona 85034

6

Telephone:  (602) 274-6287
Email:    skader@azdisabilitylaw.org

7

           adietrich@azdisabilitylaw.org

8

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)

9

Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)

10

**ARIZONA CENTER FOR DISABILITY LAW**

11

177 North Church Avenue, Suite 800
Tucson, Arizona 85701

12

Telephone:  (520) 327-9547
Email:

13

   rdalyrooney@azdisabilitylaw.org
        jrico@azdisabilitylaw.org

14

        jross@azdisabilitylaw.org
        mabela@azdisabilitylaw.org

15

*Attorneys for Arizona Center for Disability Law*

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on October 4, 2017, I electronically transmitted the above

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General

7

Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

8

9

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski

10

Nicholas D. Acedo
Ashlee B. Fletcher

11

Jacob B. Lee
Kevin R. Hanger

12

Timothy Ray
STRUCK LOVE BOJANOWSKI & ACEDO, P.L.C.

13

dstruck@strucklaw.com
rlove@strucklaw.com

14

tbojanowski@strucklaw.com

15

nacedo@strucklaw.com
afletcher@strucklaw.com

16

jlee@strucklaw.com
khanger@strucklaw.com

17

tray@strucklaw.com

18

*Attorneys for Defendants*

19

s/ Corene Kendrick

20

21

22

23

24

25

26

27

28