Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
*Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
*Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
*Desiree Licci, Joseph Hefner, Joshua Polson, and*
*Charlotte Wells, on behalf of themselves and all others*
*similarly situated*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
          adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, Plaintiffs, v. Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, Defendants. | No. CV 12-00601-PHX-DKD **PLAINTIFFS' STATEMENT REGARDING DEFENDANTS' REMOVAL OF HEALTH NEEDS REQUEST (HNR) BOXES** |

1

**INTRODUCTION**

2        On May 15, 2017, Defendants unilaterally announced that they were going to

3  discontinue the use of Health Needs Request (HNR) boxes at minimum and medium

4  security institutions and units as an avenue for class members to request and access

5  medical, dental, and mental health care.  [Doc. 2106-1 at 11-12]  Instead, Defendants

6  stated, prisoners would have to go to the nurse's line "open clinics" with a HNR and wait

7  to be seen on a first-come, first-served basis.

8        Plaintiffs objected to the unilateral decision to remove the HNR boxes because it

9  created an unnecessary barrier to access to health care, and repeatedly have expressed

10  their concerns to Defendants and the Court since the announcement.  Dr. Todd Wilcox

11  informed the Court that the removal of the HNR boxes "amounts to nothing more than a

12  blatant attempt to avoid accountability and to eliminate the only traceable audit trail of

13  patient requests for care" and "would guarantee a decrease in actual access to healthcare

14  within the system. . ."  [Doc. 2103 at ¶¶ 27-28]  Dr. Wilcox's declaration remains entirely

15  uncontradicted.

16        The Court ordered the parties to bring forth witnesses and evidence regarding

17  whether the removal of the HNR boxes would reduce class members' access to health

18  care, and/or adversely impact the accuracy of CGAR results for some performance

19  measures.  [6/14/17 Tr. at 111:23-25] The Court has ruled  that the burden would be on

20  the Defendants to show that the removal of HNR boxes does not impact the reliability of

21  CGAR results, or access to care.  [*Id*. at 111:15-18 ("I do think that the burden is on the

22  defendants to show me how it is that the stipulation's enforcement is not encumbered by

23  the removal of something that is specified in the stipulation.")]

24        Defendants clearly have failed to meet the burden. The evidence shows Plaintiffs'

25  concerns are well-founded.  Defendants' witnesses reported, and documents show, that

26  they now only track the HNRs of people who are actually seen on the nurse's line, which

27  therefore falsely inflates the compliance scores of multiple performance measures that are

28  triggered by the submission of an HNR.  This limitation negatively impacts the reliability

1    of CGAR data.

2          The evidence also showed that under this new system, (a) at some prisons, there is

3    a severely limited window of time to access care each day and people are turned away

4    from the clinic if they come outside their allotted time slot; (b) people seeking dental or

5    mental health care are made to see a nurse without relevant training and are charged $4

6    before their HNR is even referred to the appropriate discipline; (c) there are often long

7    waits, sometimes in harsh conditions, to see a nurse; and (d) people with disabilities face

8    additional physical barriers to accessing care.

9          Therefore, Plaintiffs seek an order directing Defendants to re-install the boxes so

10   that class members can request medical care either by going to the open clinic and waiting

11   to see the nurse, or by submitting a HNR and being called to the nurse's line the next day.

12   Such a dual system of accessing medical care would ensure people have multiple avenues

13   by which they can seek medical care, and address the recordkeeping and CGAR reliability

14   concerns inherent in only logging the HNRs of people who are actually seen by a nurse.

15   Patients seeking mental health or dental care should be able to submit their HNRs in the

16   boxes so the requests are referred to those disciplines for scheduling in accordance with

17   the requirements of PMs 98, 102, and 103, and so people are not charged $4 to see a nurse

18   with no mental health or dental training before being referred to the appropriate discipline.

19   This dual-track approach to access care comports with the Court's prior suggestion of

20   "moving to the new system but then preserving as the fallback position for those who

21   might otherwise find this to be an obstacle. . ." [6/14/17 Tr. at 111:19-21]

22   **I.   The Removal of HNR Boxes Impacts The Accuracy of Multiple Performance
       Measure Results and Inflates CGAR Compliance Rates**

23
24         Plaintiffs' counsel and their expert repeatedly have expressed concern that the

25   removal of the HNR boxes and Defendants' practice of only accepting and logging the

26   HNRs of the patients who ultimately are seen on nurse's line inflates rates of compliance

27

28

for multiple performance measures that have their compliance timeframes connected to when a prisoner submits a HNR or is seen by a nurse.[1] [*See, e.g.,* 6/14/17 Tr. at 78:18-20; 81:23-25; 85:21-23] Dr. Wilcox observed that removing the boxes where all HNRs were collected "would make it virtually impossible to recreate the timeline of care that is critical in many cases for providers (and for monitors) to review. [. . .] This will overestimate and inflate compliance with the timeframe requirements for providers to see patients in PM 39 and 40, as it suppresses the true number of patients who needed to be seen by the provider." [Doc. 2103 at ¶ 28-29] This concern was shared by the Court:

> THE COURT: [...] my original concern when I saw that, is because there are a number of provisions in the stipulation, or in the performance measures, that are triggered [and] that are put in play by this HNR deposit of a request. . .
>
> [. . .] [Y]ou can't decide that a performance measure that requires this thing to be monitored by when an HNR is deposited, you can't just remove the mailbox unilaterally. [. . .]
>
> I need to hear how it is that I have an assurance that the performance measure that was going to let me know whether or not a requirement of the

---

[1] The relevant performance measures include:

- PM 36 (A LPN or RN will screen HNRs within 24 hours of receipt)
- PM 37 (Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need)
- PM 39 (Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral.)
- PM 40 (Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral.)
- PM 41 (Emergent provider referrals are seen immediately by a Medical Provider)
- PM 42 (A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider.)
- PM 98 (Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0.)
- PM 102 (Routine dental care wait times will be no more than 90 days from the date the HNR was received.)
- PM 103 (Urgent [dental] care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received.).

[Doc. 1185-1 at 10, 15]

stipulation was being satisfied is going to fail now because a single side has decided to remove the triggering mechanism.

[6/14/17 Tr. at 74:5-75:2]

Counsel for Defendants at the June 14, 2017 hearing assured the Court that the HNR would be "processed just like it usually is." [*Id.* at 75:10; *see also id.* at 75:11-12 ("THE COURT: So they get docketed in the same way? MR. BOJANOWSKI: Right.")] However, this was not true, as Defendants subsequently admitted that the only HNRs that are logged (or "docketed," to use the Court's term) and processed are those of the people who are actually seen by the nurse:

> THE COURT: [I]s there a sign-in sheet for people that show up in the new sick call method? Do people sign in when they arrive?
>
> MR. BOJANOWSKI: [. . .] Apparently not.
>
> THE COURT: Wouldn't that be a good idea? Wouldn't that be a good way to give you at least something to counter plaintiff's [sic] concerns with? It would be a trackable document as to when somebody showed up. Not saying it's ideal.
>
> MR. PRATT: [. . .] "[I]t's not when they show up that they sign in and they wait to be seen.
>
> [. . .]
>
> MR. BOJANOWSKI: At the point when they submit the HNR to the nurse, they sign a piece of paper saying I'm here.
>
> THE COURT: Okay. That doesn't address any of the problems we talked about before.

[*Id.* at 94:15-95:21]

Class member Mark Blocksom testified that at Florence East Unit, the HNR is not processed until the patient is seen by the nurse. [7/14/17 Tr. at 19:19-23]   Assistant Director of Nursing Tanna Gualco confirmed that at Eyman Meadows Unit, nursing staff only record and log the HNRs of the prisoners who are actually seen by the nurses.

> THE COURT: For these people who decide after they have come, put they are name up on -- their ID on the board and they decide they want to leave and they take their ID from the board, there is no written record that exists in the clinic office that they have come and/or left?
>
> THE WITNESS: Once we get their HNR in our hand, if they leave, they have to come back and sign refusal because technically we've already

touched that HNR, so we have to see them, especially if they have a physical complaint.  But if they come in while we're seeing somebody else and they have an HNR to turn in and they realize, "I don't actually want to be seen today," and they take off, we don't have any way to document anybody like that.

[9/13/17 Tr. at 143:13-25]

Accordingly, this means that all performance measures that rely upon the "HNR log" as the source document for monitoring (not just the ones listed at footnote 1 that measure timeframes from submission of the HNR) are implicated by this incomplete universe of HNRs, because unlike the HNR boxes that collected all requests for health care made by individuals, the open clinic system only reflects the persons who were actually seen on nurse's line.[2]  [7/14/17 Tr. at 190:21-191:6 (Ms. Ashworth testifying that the HNR her cellmate filled out for her on June 5, 2017, when she had an allergic reaction and chemical burns from iodine being used on her eyes (7/14/17 Hg. Plfs' Ex. 6) was not accepted by the nurse and handed back to her); *id*. at 93:22-94:3; 97:19-98:11; 98:15-22 (Mr. Oyenik testifying that with the HNR box system, prisoners had a written record of their treatment plan)].

Nurse Gualco testified she preferred not having HNR boxes because "it holds them [patients] accountable" as nurses no longer have to make lists and schedule appointments and have custody bring patients to the appointments. [9/13/17 Tr. at 152:22-25]  While the removal of the HNR boxes apparently has resulted in less work for nursing and custody staff, class members in need of medical care are not the only people that should be held accountable.   Defendants must also be held accountable to ensure that they are not artificially inflating their compliance rates for multiple performance measures by unilaterally eliminating the HNR submittal process that was in place and relied upon when the Stipulation was executed.

---

[2] The most recent version of the Monitoring Guide provided to Plaintiffs, dated August 25, 2017, lists six  performance measures that use the HNR log as a source document.  [*See* Doc. 2291-1 at 28, 30, 64, 65, 77, 156 (PMs 5, 7, 36, 37, 47, 98)]

## II. Removal of the HNR Boxes Adversely Impacts Class Members' Ability to Access Health Care

### A. Defendants' Witnesses Could Not Explain The Change in Position Regarding Maintaining HNR Boxes

In his January 18, 2017 declaration describing the newly enacted open clinic process, (Doc. 1873-1), Defendant Pratt stated that

> If an inmate wishes to submit an HNR outside of the hours in which the clinic is open for his/her housing unit, the inmate may submit the HNR in the HNR collection box.  The HNR will be triaged by nursing staff, and the inmate will be seen during the next open period for his/her housing unit, such that the inmate is still seen within 24 hours of the HNR request, and the HNR is still tracked for performance measures 36 and 37.

[Doc. 1873-1 at ¶ 20]

However, at some point prior to making the May 15, 2017 announcement of the unilateral removal of the HNR boxes, Defendants obviously decided to remove them. Unfortunately, Defendant Pratt testified he was unable to remember the most basic details of the genesis of the boxes' removal, including why the decision was made, when the idea of removing the boxes was first raised, or whether the idea to remove the boxes originated with Corizon or ADC. [8/8/17 Tr. at 52:4-10] Rather than provide witnesses capable of remembering basic details of the circumstances and reasoning behind the removal of the boxes, all but one of Defendants' other witnesses designated for the HNR box evidentiary hearings were instead called in an unsuccessful attempt to contradict the July 14 testimony of prisoner witnesses.  (*i.e*., Sgt. Coleman and CO Western, the two Perryville officers who refused to call an ICS for Ms. Ashworth during her allergic reaction; Mr. Twyford and Mr. Van Winkle, deputy wardens of Perryville and Florence showing pictures of clinic space and housing units, attempting to contradict concerns raised by Ms. Keys and Mr. Oyenik about physical access for people with disabilities).

Plaintiffs' position that the removal of the HNR boxes would erect a barrier to care was shared by some of Defendants' employees. On December 7, 2016, Perryville monitor Mark Haldane emailed his supervisor, Kathy Campbell, reporting on how the new open clinic system was working in its first week of operation. He informed Ms. Campbell that

1   the Corizon facility health administrator ("FHA") at the prison had "reported that
2   according to Rolly Maldonado, as soon as the open sick call is in place and implemented
3   that the HNR boxes were going away. *I said that was in direct contradiction to what I was*
4   *told today, which is that they are never going away because it is an access to care issue*."
5   [8/8/17 Hg. Plfs' Ex. 27 at 2 (emphasis added)][3]  When the HNR boxes were removed at
6   ASPC-Safford, the FHA noted, "They tried this many years ago and changed. Why do we
7   always go backwards?"  [8/8/17 Hg. Plfs' Ex. 22 at 1]

8         Defendant Pratt testified expectedly that he had no memory of a December 7, 2016
9   meeting where monitors were told (or at least Mr. Haldane was told) that boxes "are never
10  going away because it is an access to care issue."  [8/8/17 Tr. at 48:10-16]  Mr. Pratt also
11  could not remember a December 2, 2016 teleconference of top administrators that he
12  attended (as memorialized in an email sent that day) that was about the "12 hour nurses
13  line effective Monday 12/5/16" where discussion included "HNR boxes must be kept –
14  they are not going away." [8/8/17 Tr. at 44:14-16; 46:11-19; 8/8/17 Hg. Plfs' Ex. 24 at 2]

15        Meanwhile, Senior Vice President of Corizon Health, Roland Maldonado, who in
16  December was telling Corizon FHAs that HNR boxes would be taken out, (*see* 8/8/17
17  Plfs' Ex. 27 at 2), was a proponent of removing the boxes.  He contacted Mr. Pratt and
18  ADC Deputy Director McWilliams on February 16, 2017, to complain that "the sick call
19  process is reverting back to a HSR box system." [8/8/17 Hg. Plfs' Ex. 33 at 1]  Mr.
20  Maldonado noted that, "I suspected based on my experience in other states that *if allowed*
21  *to use the box or to come to an open call that the population will always take the easiest*
22  *route and go to the box*."  [*Id.*] (emphasis added) Accordingly, this top national Corizon
23  executive acknowledged that the HNR boxes provide the "easiest" access to care
24  compared to the open clinic system.

25        While Mr. Pratt testified under oath that he could not remember details of what
26
27        [3] Mr. Maldonado is the Senior Vice President of Corizon Health. [*See* 8/8/17 Hrg.
    Plfs' Ex. 33 at 1]
28

might have happened between December 2016 and May 2017 to change ADC's position on HNR boxes, but on May 15, 2017 he emailed his senior staff and Corizon's regional director, and asked if other health care requests that did not require being seen by nursing could continue to use the HNR boxes, and offered a few examples. [8/8/17 Hg. Plfs' Ex. 29]  His colleague Kathy Campbell from the monitoring bureau said in response that she thought the boxes should be completely removed to "eliminate this issue" of people using the HNR boxes to request and access care. [*Id*.]  Nicole Taylor, the mental health monitor, wrote that she "completely agree[d]" with Ms. Campbell's sentiment to eliminate this "issue," bizarrely punctuating her support for entirely removing boxes and a relied-upon avenue for access to care with a smiley face. [*Id*.]  Mr. Pratt testified that unlike Ms. Campbell or Dr. Taylor, who thought the ongoing use of the boxes to request care was an "issue," he did not think it was a problem that patients used the boxes. [8/8/17 Tr. at 54:19-20]  Mr. Pratt also testified that unlike his colleagues, he does not think the boxes should be completely removed.  [8/8/17 Tr. at 54:21-24]

### B. The Limited Hours that Prisoners Can Obtain Medical Care at Open Clinic Creates a Barrier to Care

On January 18, 2017, Defendants assured the Court that, "To accommodate the open clinic concept and to ensure that all inmates are being seen within 24 hours of receipt of an HNR, the medical clinics at each of the participating complexes—Florence, Eyman, Perryville, Lewis, Tucson, and Yuma—are now open from 7:00 am to 7:00 pm." [Doc. 1873 at 2] Likewise, Defendant Pratt signed a declaration that same day, stating to the Court that "With the implementation of the open clinic concept, nursing lines generally run from 7:00 am to 7:00 pm at the participating complexes. . ."  [Doc. 1873-1 at ¶ 15] Despite this sworn statement, he now denies ever stating to the Court that nurse's line ran for 12 hours, or that this ever actually occurred.  [*See* 8/8/17 Tr. at 47:7-10 (Cross Examination of Mr. Pratt:  "Q. Isn't it the case that you have previously told the Court in declarations that nurse's line runs from 7 to 7?  A. No. There's availability, but nurse lines don't run 7 to 7 typically.")]

1      While there may not be the patient demand at some units to require that nurse's

2   line be open and staffed from 7 am to 7 pm, the point is that Defendants repeatedly made

3   this representation to the Court in January, while their internal documents show that it was

4   *never* the case.  The evidence and testimony presented confirms that nurse's line, indeed,

5   did not and currently does not run for 12 hours a day as Defendants repeatedly stated. [*See*

6   *e.g.,* 8/8/17 Hg. Plfs' Exs. 16 at 2-4 (Douglas Gila and Mohave Units' nurse's line from 8-

7   10:30 am and 1:30-3:00 pm; Papago Unit 9:30-10:30); 17 at 1 (same); 19 at 1 (Florence

8   Globe unit changed hours on January 31, 2017 to run four hours a day); 23 at 3 (Florence

9   FHA writing on November 23, 2016 that "[t]he Warden received clarification that we DO

10  NOT have to have Open Sick Call available for 12 hours/day. . ."); Ex. 28 (undated

11  document showing start and stop times at Eyman, Florence, Lewis, Phoenix, and

12  Winslow); *see also* 7/14/17 Tr. at 14:16-18; 17:14-17 (Florence East from 7 am-4 pm);

13  8/8/17 Tr. at 77:14-23 (open clinic at Douglas from 8:00-10:30 am and 1:30-3:00 pm)]  In

14  June 2017, as the system of no HNR boxes and open clinic was unveiled at ASPC-

15  Douglas, the Corizon FHA noted that the hours were limited, and boasted to prison

16  officials, "We're attempting to 'train' the inmates to report w/in the first 15 minutes of

17  sick call. . ." [8/8/17 Hg. Plfs' Ex. 16 at 1]  Defendant Pratt did not know that the

18  prisoners at Douglas had been told that they had to appear at the clinic in the first 15

19  minutes that it is open, or they would be turned away, but characterized this statement to

20  mean "it's an education to let the inmates know that if they are late they will have to wait

21  until the next day."  [8/8/17 Tr. at 77:5-8; 78:12-16; 78:21-22]

22      Furthermore, the practice at many institutions and units is that blocks of time are

23  reserved for certain buildings.  As a result, if people seek care outside their building's

24  allotted time slot, they will be turned away.  Among the grievances produced by

25  Defendants from ASPC-Lewis was one from a patient with a congenital heart defect and

26  history of open heart surgery, who filed a grievance about being turned away from the

27  clinic the evening of December 8, 2016, when he was experiencing chest pains and his

28  blood pressure was measured at 110/10, because he had come to the clinic once and the

complex hub once earlier in the day. [8/8/17 Hg. Plfs' Ex. 13 at ADCM959519 and AG000001] Mr. Pratt confirmed that blood pressure of 110/10 is dangerous and a person could die with such low blood pressure, but questioned the accuracy of the blood pressure, even though that was what was documented in the eOMIS medical record, and when the patient had seen a pediatric cardiologist two months earlier, the cardiologist noted that he was suffering from "profound hypotension" because the Corizon providers were (incorrectly) prescribing nitrates to treat his chest pain. [8/8/17 Tr. at 80:4-11, 81:6-19, 82:10-15; 83:6-84:21; Plfs' Ex. 13 at AG00002] Mr. Pratt testified he did not know if there was a policy or practice that a patient could not be seen more than once in the same day at the clinic. [Id. at 78:23-25]

Mr. Oyenik testified that he had observed ADC staff at the Florence South clinic turn prisoners away because they were not there during their building's allotted time slot. [7/14/17 Tr. at 85:1-5] Ms. Keys testified that she had been turned away by a nurse at the Perryville Santa Cruz clinic while suffering pain from a gallstone because it was after 12 noon, and she was told that only the people who worked could go to the clinic in the afternoon. [Id. at 132:3-4; 134:20-135:12] She also testified that she had seen another woman who was doubled up in pain and had been wheeled to medical being turned away for treatment. [Id. at 137:19-138:3]. And Ms. Ashworth testified at length about how she suffered a severe allergic reaction to iodine drops that were put in her eyes for a June 5, 2017 medical procedure. She reported that she and her bunkmate went to the clinic in the afternoon because of her swollen eyes and the rash, swelling, and redness she had on her face, and they were told by the San Pedro clinic nurse that the clinic was not accepting HNRs. The nurse handed back the HNR Ms. Ashworth's bunkmate had filled out without logging it, and told them to go back to their housing unit. [Id. at 188:18-189:4; 189:19-191:24; 7/14/17 Hg. Plfs' Ex. 6 (HNR filled out by bunkmate)] Ms. Ashworth's symptoms of her allergic reaction included swollen eyes, redness of her face, a rash, and she was in pain. [Id. at 193:12-20] Officer Western confirmed that Ms. Ashworth had gone to the clinic the afternoon of June 5, 2017, and was turned away because "their HNR

hours are from 12:30 until 2" and "it was almost cutoff … to submit an HNR."  [8/9/17 Tr. at 12:2-6; 13:13-14; 15:2-4]

Eyman Meadows Assistant Director of Nursing Gualco testified that at her clinic, different buildings are assigned specific time slots, and if a person comes to the clinic when it is not their building's designated timeslot, "we let them know, 'Please fill it out and come back when your building is called.'" [9/13/17 Tr. 152:8-13]  She offered an illustrative example that eerily echoed what happened to Ms. Ashworth:

> Q. If somebody shows up at 8:31, what happens to that inmate?
>
> A. It's triaged based off of urgency. If someone has a broken hand, we're going to see -- obviously see them but if it's ["]I'm having allergies,["] then they will have to wait because the next two buildings are already lining up for their HNR time.

[Id. at 139:15-20]

Ms. Gualco also confirmed that the nurses do not have any written guidelines or instructions about what complaints or symptoms would warrant seeing a patient outside his building's assigned timeslot.  [Id. at 163:18-22]

### C. Defendants' Policy Requiring Patients Seeking Mental Health or Dental Care To Have an Unnecessary and Expensive Nurse's Line Visit Creates a Needless Barrier to Care

In his January 18, 2017 declaration about the open clinics, Defendant Pratt stated that people seeking dental or mental health care would not have their HNRs processed through the open clinic nurse's line prior to seeing staff from the respective disciplines. Rather, these requests would be reviewed, triaged, and referred to the appropriate discipline.  He avowed,

> The open clinic was developed by Corizon and ADC in direct response to the Court's November 10, 2016 Order requiring outside transports and was intended to ensure Defendants' compliance with performance measure 37, which requires that inmates be seen within 24 hours of submission of a Health Needs Request (HNR) for routine medical care.
>
> HNRs for routine dental care and mental health care continue to be addressed through referrals to dental and mental health staff and must be seen within the timelines provided in the Stipulation.
>
> [. . .] If the HNR is for routine dental care or mental health care, the inmate is referred to dental or mental health staff and must be seen within the

timeframes set forth in the Stipulation. If the HNR is for routine medical care, the inmate is seen the same day by an RN or a medical provider as required by PM 37.

[Doc. 1873-1 at ¶¶ 11, 12, 18; *see also* 8/8/17 Hg. Plfs' Ex. 23 at 1 (ADCM967762) (Florence FHA writing on November 23, 2016 that HNR boxes will be kept in place "to keep up with Dental, MH and a back up plan in case…things change down the road") (ellipses in original); 7/14/17 Tr. at 152:5-11 (Ms. Keys testified that when HNR boxes were in place, people were not made to be seen on nurse's line when requesting dental or mental health care)]

Notably, in the same paragraph (¶ 18) where Mr. Pratt refers to HNRs that are "for routine dental care or mental health care," he distinguishes HNRs filed "for routine medical care," where "the inmate is seen the same day by an RN or a medical provider as required by PM 37." [Doc. 1873-1 at ¶ 18] Mr. Pratt was asked, "So [on] January 18th request[s] for dental and mental health were not forced to go to the nurse's line?" and in response he said, "Prior to that, no." [8/8/17 Tr. at 65:9-11] Nurse Gualco testified that when the HNR boxes were in place, the nurses would collect and triage the HNRs, review them, and give the HNRs seeking non-medical care to the appropriate discipline – the patients were not seen on nurse's line. [9/13/17 Tr. at 137:12-20; 140:20-141:4]

However, at some point this changed, (Mr. Pratt testified he could not remember when, *see* 8/8/17 Tr. at 65:12-14), and now people seeking mental health or dental care cannot put the request in a box or drop it off at the clinic, but rather are required to report to nurse's line, wait in line, see a nurse who is untrained in mental health or dentistry, pay $4 for the encounter, and *then* have the HNR referred to the proper discipline. The only explanation Defendant Pratt could offer for the mandate that dental and mental health patients first be seen on nurse's line is that the change was made "for consistency." [*Id*. at 76:1-2] In response to the Court's questions, Mr. Pratt initially testified that a person would not pay an additional $4 charge to see the mental health staff, (*id*. at 63:20-64:5), but then subsequently confirmed that unless a person has a SMI (seriously mentally ill) designation, he or she will be charged an *additional* $4 when seeing mental health staff.

1    [*Id.* at 63:9-10; 70:4-15]

2         While Mr. Pratt testified he didn't think that this additional $4 nurse's line charge

3    would create a disincentive for people to seek mental health care, (8/8/17 Tr. at 62:20-

4    63:9), given the reality of the pennies an hour that prisoners are paid (if they even have a

5    job), it is reasonable to conclude that prisoners will be deterred from requesting mental

6    health care or dental care.  [7/14/17 Tr. at 66:22-23 (Mr. Oyenik is paid 15 cents an hour

7    to work on a construction crew); 179:8-10 (Ms. Ashworth is paid 30-35 cents an hour to

8    drive a tram); *see also* Doc. 2103 at ¶¶ 30-31 (Dr. Wilcox opining that the $4 copay is a

9    disincentive to request care and that at 15 cents an hour, a nurse's line visit with a $4

10   copay is the equivalent of 26 hours and 40 minutes of labor)].[4]  In light of this spring's

11   rash of suicides of people in ADC custody (four suicides in twenty days), Defendants

12   should not erect any additional barriers to care, especially mental health care.  [*See* Doc.

13   2091 at ¶¶ 5, 7-9 (Decl. of Pablo Stewart, M.D.) (only one out of these four people who

14   died by suicide was classified as SMI)]

15   **D. Since Class Members Cannot Use HNR Boxes to Request Health Care,**
16   **They Are Forced To Wait for Longer Periods of Time, Often in Harsh**
     **Conditions**

17        No citation to authority is necessary to support the proposition that Arizona suffers

18   from extreme and harsh temperatures; that is abundantly apparent to anyone in the state

19   between the months of March and October.  Testimony and grievances filed by class

20   members described having to spend long periods of time in the outdoors waiting to be

21   seen by a nurse, as opposed to when they could request health care through an HNR

22   deposited in a box, and then be scheduled for an appointment at a specific time.  As class

23

24        [4] To illustrate how staggering a $4 copay is for an incarcerated person paid 15
25   cents an hour pursuant to the 13th Amendment, consider that it is equivalent to a free
     person paid an annual salary of $50,000 (which works out to $961.54 a week, or $24.04
26   an hour on a 40-hour work week) being charged a co-pay of $641 for a brief encounter
     with a registered nurse (26.67 hours' worth of salary).  The prisoner's payment of a total
27   of $8 to see nurse's line and then dental (or mental health) staff is comparable to $1,282
     for the person making $50,000 a year.

28

members no longer have that option available to them as a means to request medical, mental health, or dental care, they now must wait longer to be seen.

Mr. Blocksom testified that at Florence East unit, there are normally no more than two or three persons who can wait inside the clinic, and all others wait outside. [7/14/17 Tr. at 18:18-21] There are some shaded areas, but in the summer, "it can be pretty brutal" because "[i]t's all exposed." [*Id*. at 20:12-18; 49:23-50:16]   He testified seeing people waiting for open clinic "falling out" due to heat, and that the longest he has had to wait was three and a half hours. [*Id*. 20:25-21:4; 52:6-20]  He noted, "I have gone up there for morning meds, come back for afternoon meds, and they are still there waiting." [*Id*. at 34:4-5]  He has seen people give up and leave the open clinic after waiting.  [*Id*. at 34:11-35:5]  He testified that some people choose not to go to open clinic or medication line when the line is particularly long or when it is very hot. [*Id*. at 34:17-35:5]

Mr. Oyenik similarly testified that he has personally seen people waiting for insulin line or open clinic give up and leave, because they were outside and it was too hot to continue to wait. [*Id*. at 83:13-15; 94:20-95:1]  He testified that there were seven seats inside the new clinic for people who were waiting for pill line (also known as "med pass"), but the people who were waiting for the open clinic had to wait outside. [*Id*. at 94:4-16]  He also testified that approximately in the middle of May, he observed a person have some sort of seizure while waiting in the sun.  [*Id*. 83:23-84:4]  He testified that there was no shade for the people waiting outside except for an overhang of the building that covers part of a bench, "but it's not far enough out to keep you out of the sun." [*Id*. at 74:18-75:11; 75:20-22]  He stated, "we all get up in there as close as we can to the window and that's as far as you can get. But if you are in . . . a wheelchair there's no getting in closer. . ..  You are out there in the sun." [*Id*. at 75:14-19]

Ms. Ashworth similarly described how the women waiting to see the nurse at San Pedro unit wait outside, and that she has never seen people waiting inside. [7/14/17 Tr. at 182:22-183:2] They wait on a concrete bench outside the clinic, which only on one side is partially shaded by the overhang of the building's roof, and there are no misters, but there

1    is an Igloo jug of water.  [*Id.* at 183:5-184:5]  She testified that people are seen first come,

2    first served, and there is no policy or practice that people with disabilities who use

3    wheelchairs, or pregnant women, can jump to the front of the line to be seen sooner and

4    not have wait as long.  [*Id.* at 184:25-185:15]  She testified that she has seen people

5    waiting for open clinic leave the line and not be seen, and she also has seen people

6    suffering adverse effects from the heat while waiting outside. [*Id.* at 186:14-187:3][5]  Ms.

7    Keys similarly testified that she had observed "a lot of people" leaving the nurse's line

8    because of the heat.  [*Id.* at 137:11-14]

9          Three weeks after class members testified, Defendants called deputy wardens to

10    show pictures and testify about physical plant improvements and accommodations for

11    people with disabilities at Perryville and Florence, many that they admitted had only been

12    recently installed. [*See, e.g.*, 8/8/17 Tr. at 190:22-25 (newly installed misters at Florence-

13    South)]  Defendants' witnesses confirmed the descriptions offered by class members.

14    Perryville Deputy Warden Twyford confirmed Ms. Keys' testimony that the caged-in

15    enclosure near the clinic where Santa Cruz prisoners wait for open clinic in the morning is

16    in the sun. [8/8/17 Tr. at 213:16-21 ("And in the morning, the morning sun will shine

17    toward the waiting area that's right here. And within eyeshot across from there the inmates

18    will congregate on the shaded side.  But 11:00, 10:00, depending on the summer/winter

19    hours, the shade covers the holding enclosure you see in this picture and they congregate

20    there.")][6]  However, as Ms. Keys testified, she cannot get in the holding enclosure cage

21    outside the clinic that offers some shade, due to her wheelchair, and clinic staff do not

22    allow people to wait inside.  [7/14/17 Tr. at 136:20-137:8, 162:3-10]

23

24          _____

25          [5] *See also* Doc. 2291-1 at 273-277 (numerous temperature readings between 100 and 110 degrees in "medical holding enclosures" at ASPC-Safford; *id.* at 288-290 (multiple readings exceeding 110 degrees in holding areas and ramadas at ASPC-Yuma).

26          [6] Mr. Twyford testified that the hours for people to show up for open clinic at Santa Cruz were 7 to 9 am, and they will wait past 9 am until they are seen, (8/8/17 Tr. at 205:2-

27    10), so the arrival of shade in the holding cage at 10 or 11 am is of limited value to women in the cages or outside the cage in a wheelchair when their wait begins at 7 am.

28

### E. Removing the HNR Boxes Erects a Barrier for People With Disabilities to Access Health Care, In Violation of Law

Defendants are obligated by law to provide equal access to health care services for people with disabilities in ADC custody as they do for all other class members. According to the National Council on Disability, "[p]eople with disabilities tend to be in poorer health and to use health care at a significantly higher rate than people who do not have disabilities," and "are affected disproportionately by barriers to care."[7]  Counsel for Plaintiff Arizona Center for Disability Law ("ACDL") reported to the Court that ACDL is concerned that the removal of the HNR boxes creates a barrier to care for people with disabilities.  Counsel noted:

> It's a principal tenet of serving individuals with disabilities that you provide multiple options to access a program, information, what have you. We are very concerned that removal of these HNR boxes is going to erect another barrier for those prisoners with disabilities to be able to access the healthcare system that operates in the prisons.

> It's anecdotal evidence, but I have been on many of these monitoring tours and I have spoken with prisoners that have mobility impairments that make it difficult for them to get around. Some have expressed to me that it's difficult for them to get to the HNR box to drop the HNR and have relied on aids or their cellmates to do that for them so they can have access to medical. If they are going to be required to be waiting in line at a health clinic it could be yet another barrier and perhaps prevent them from accessing the care that they need in disproportionate numbers. . ..

[6/14/17 Tr. at 110:9-25]

Not only is providing multiple options of access a basic tenet of serving people with disabilities, the concept of equal access is a cornerstone of the Americans with Disabilities Act (ADA).  [*See* 28 C.F.R. § 35.130(b)(1)(iii) ("A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability— [...]Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal

---

[7] NATIONAL COUNCIL ON DISABILITY, THE CURRENT STATE OF HEALTH CARE FOR PEOPLE WITH DISABILITIES 10 (Sept. 30, 2009), *available at* https://www.ncd.gov/rawmedia_repository/0d7c848f_3d97_43b3_bea5_36e1d97f973d.pdf.

1    opportunity to obtain the same result, to gain the same benefit, or to reach the same level

2    of achievement as that provided to others. . .”); *see also* 28 C.F.R. § 35.130(b)(1);

3    42 U.S.C. § 12132 (“[N]o qualified individual with a disability shall, by reason of such

4    disability, be excluded from participation in or be denied the benefits of the services,

5    programs, or activities of a public entity, or be subjected to discrimination by any such

6    entity.”)]   The ADA applies to state prison systems, (*Penn. Dep't of Corr. v. Yeskey*,

7    524 U.S. 206, 213 (1998)); Defendants are thus bound by federal disability law.

8        To that end, ADC has a policy, Department Order 108: Americans with Disabilities

9    Act Compliance, that has the stated purpose of ensuring “that all job applicants,

10    employees, contractors, visitors *and inmates* are provided barrier-free access to facilities,

11    services, programs and activities…consistent with reasonable accommodation and

12    security requirements.” [DO 108 at 2, (effective date May 9, 2014) available at

13    https://corrections.az.gov/sites/default/files/policies/100/0108.pdf (emphasis added)]   As

14    was demonstrated consistently during the evidentiary hearings on the HNR box removal,

15    Defendants have failed to make the medical care services required by the Stipulation,

16    ADC policy, and federal law, available on an equal basis for class members with

17    disabilities.

18        Multiple witnesses confirmed that a person seeking medical care, dental care, or

19    mental health care on a yard where the open clinic system is operating must wait in line

20    and be seen on nurse's line prior to obtaining care or a referral to a provider or the

21    appropriate discipline. [*See, e.g.,* 9/13/17 Tr. at 158:10-15; *see also* 8/8/17 Tr. at 62:11-

22    19] This has the effect of increasing the number of trips that people with disabilities must

23    make to the clinic to seek care. [7/14/17 Tr. at 143:11-18]   Ms. Keys, who is a full-time

24    wheelchair user with significant medical needs, testified that when there was a HNR box

25    on the Santa Cruz Unit, it was near the chow hall, closer to her building. [*Id.* at 130:22-

26    131:8; 141:5-17; 143:11-21; 151:13-23]   She could either put in a HNR when going to

27    chow, or have others put in the HNR for her. [*Id.* at 140:24-141:4]   She described the path

28    of travel from her housing unit to the clinic as “paved but it's kind of falling apart.” [*Id.* at

-17-

138:21-25] She also testified that she currently did not have a wheelchair pusher assigned to her to take her to the clinic, that she had to wait for an officer to call a pusher, or rely upon other prisoners who lived near her to push her up the ramp from her cell. [*Id.* at 138:11-16]

When Perryville Deputy Warden Twyford testified the next month, he testified that Ms. Keys recently was assigned an aide, approximately two weeks after her testimony. [8/8/17 Tr. at 202:5-18] He testified that previously, as Ms. Keys testified, the Santa Cruz unit had an ad hoc system of on-call ADA workers, but had switched two weeks ago to a system in which a specific aide is assigned to a specific mobility impaired person who uses a wheelchair. [*Id.* at 202:25-203:6] According to his notes, there were three women at Santa Cruz who were fulltime wheelchair users (including Ms. Keys), and another 20 who were intermittent wheelchair users, and under the new system, 17 workers employed to assist the people with disabilities. [*Id.* at 200:25-201:19] This change in system was also made at San Pedro Unit, where there are seven people who use wheelchairs. [*Id.* at 203:8-15] He also confirmed that the only medication refill box now on the Santa Cruz unit is outside the medical clinic. [*Id.* at 211:11-212:12] He did not have details about the number of people on Santa Cruz and San Pedro Units who use canes or other non-wheelchair mobility devices, or if these individuals have access to an ADA aide if necessary. [*Id.* at 242:7-19].

Mr. Oyenik testified that with the move of the medical clinic at Florence South in early July from a location adjacent to the dorms designated for people with mobility impairments (Dorms 7 and 8-Baker), to a new location outside the yard near the administrative building, the distance was much longer for the mobility impaired people to navigate, on sidewalks that "are pretty much well chewed up." [7/14/17 Tr. at 67:2-12; 67:25-68:8; 69:9-71:6] He also testified that the HNR box that previously had been very close to ADA dorms 7 and 8 near the chow hall had been removed, and the only way to get a HNR in front of health care staff or to put in a medication refill request was to physically take it to the clinic outside the main fence of the yard (and the clinic is

1    inaccessible and the fence is locked during lockdowns).  [*Id.* at 76:7-9; 76:20-77:24]

2         Florence Deputy Warden Van Winkle, apparently called to contradict Mr. Oyenik

3    on August 8, 2017, testified and showed pictures ostensibly of the outside and inside of

4    Dorm 1, which he said was closest to the new clinic.  [*See, e.g.*, 8/8/17 Tr. at 150:20-

5    151:1; 152:19-154:1]  He admitted that pictures taken inside Dorm 1 showed that the

6    clearance space between beds for people in wheelchairs was not comparable to that in the

7    ADA-designated Dorms 7 and 8.  [*Id.* at 188:11-189:15; 190:1-5; 8/8/17 Hg. Defs' Ex. 5,

8    pages 5, 12-13]  He stated that people with disabilities may not have wanted to move out

9    of Dorm 7 because it is air conditioned.  [*Id.* at 189:17-18]  Mr. Van Winkle testified he is

10   not familiar with ADA construction guidelines and dimensions needed to accommodate

11   people with disabilities, but that the maintenance supervisor reviews construction plans.

12   [*Id.* at 173:4-19]  As a result, Mr. Van Winkle had no actual knowledge that the current

13   "ADA units" or the new unit met the ADA construction requirements; he was not aware

14   of any documentation showing compliance; and his basis for saying units are "ADA

15   compliant" was because bars were installed.  [*Id.* at 173:16-23;174:15-17; 182:5-183:10]

16        However, one month later Deputy Warden Van Winkle returned to the courthouse

17   on September 11, 2017, to inform the Court and others that a cornerstone of his prior

18   testimony had been in error – that on August 8, he had misidentified in the photographs,

19   and misstated in his testimony, that Dorm 1 was the closest building to the clinic (8/8/17

20   Tr. at 150:20-151:1), when in reality Dorm 1 has two other dormitories in between it and

21   the clinic.  [9/11/17 Tr. at 235:20-237:10; 237:22-238:23; 239:4-9] [8]

22        Mr. Van Winkle testified that he did not have any information about how open

23   clinic hours of operation or similar signage information is provided to people with visual

24   disabilities, or how people with auditory disabilities waiting outside are notified and made

25   _____

26        [8] Unlike DWOP Van Winkle, Mr. Oyenik correctly identified Dorm 1 on the aerial
     photo, which while making a record, Counsel for Plaintiffs described as "the building
27   shaped like an H that is farthest to the right and to the top of three units."  [7/14/17 Tr. at
     71:19-72:7; *see also* 7/14/17 Hg. Plfs' Ex. 2]

28

1   aware that it is their turn to be seen. [8/8/17 Tr. at 175:7-176:4]. Additionally, he had no

2   knowledge about the number of people on East Unit or South Unit who have disabilities

3   and use mobility assistance devices other than wheelchairs, but knew that there were such

4   individuals on the units.  [*Id.* at 176:24-177:11]. He also admitted that neither he nor any

5   of his subordinates had ever actually talked to people with disabilities to see if they were

6   having problems getting to the new medical clinic, and that the basis for his statement that

7   there were no problems was that – as far as he knew – no ICSs had been called for a

8   person falling on the sidewalk on the way to the clinic.  [*Id*. at 183:11-184:2]

9       Even setting aside the physical plant barriers at ADC facilities, the removal of

10  HNR boxes from the yards as an option for seeking medical care disproportionately

11  burdens people with disabilities. With the removal of the HNR boxes, a person with

12  disabilities can no longer have someone else place the HNR in the box on his or her

13  behalf, and then be called the next day for an appointment at a specific time.  And given

14  the limited – and on some yards nonexistent – indoor waiting area for clinics, those people

15  with sun or heat sensitivity due to psychotropic and other medications face exposure to the

16  sun and significant heat when waiting in the nurse's line. [7/14/17 Tr. at 75:8-11; 75:20-

17  22] The first-come, first-served system does not allow people who use wheelchairs to

18  move to the front of the line to be seen regardless of whether they have a disability-related

19  need to do so: they must wait along with everyone else. [*Id*. at 74:14-17 (Florence East);

20  *id*. at 185:9-12 (Perryville San Pedro); 9/13/17 Tr. at 162:10-17 (Eyman Meadows)]

21                                      **CONCLUSION**

22      Defendants have failed to carry their burden.  For the reasons set forth above,

23  Plaintiffs seek an Order directing Defendants to re-install the HNR boxes so that class

24  members can request medical care either by going to the open clinic and waiting to see the

25  nurse, or by submitting a HNR and being called to the nurse's line the next day.  Such a

26  dual system of accessing medical care would ensure patients have multiple avenues by

27  which they can request care, and address recordkeeping and CGAR reliability concerns

28  inherent in only logging the HNRs of people who are actually seen by a nurse.  Patients

1   seeking mental health or dental care should be able to submit HNRs in the boxes so the

2   requests are referred directly to those disciplines for scheduling in accordance with PMs

3   98, 102, and 103, and they are not charged $4 to see a nurse with no mental health or

4   dental training before being referred to the appropriate discipline.

5          A proposed order is attached hereto.

6

7   Dated:  October 4, 2017                    **PRISON LAW OFFICE**

8                                              By:  __/s Corene Kendrick__
9                                                    Donald Specter (Cal. 83925)*
                                                     Alison Hardy (Cal. 135966)*
10                                                   Sara Norman (Cal. 189536)*
                                                     Corene Kendrick (Cal. 226642)*
11                                                   Rita K. Lomio (Cal. 254501)*
                                                     **PRISON LAW OFFICE**
12                                                   1917 Fifth Street
                                                     Berkeley, California 94710
13                                                   Telephone:  (510) 280-2621
                                                     Email:    dspecter@prisonlaw.com
14                                                             ahardy@prisonlaw.com
                                                              snorman@prisonlaw.com
15                                                            ckendrick@prisonlaw.com
                                                              rlomio@prisonlaw.com
16
                                                     *Admitted *pro hac vice*
17
                                                     David C. Fathi (Wash. 24893)*
18                                                   Amy Fettig (D.C. 484883)**
                                                     Victoria Lopez (Ill. 6275388)*
19                                                   **ACLU NATIONAL PRISON
                                                     PROJECT**
20                                                   915 15th Street N.W., 7th Floor
                                                     Washington, D.C. 20005
21                                                   Telephone:  (202) 548-6603
                                                     Email:    dfathi@aclu.org
22                                                            afettig@aclu.org
                                                              vlopez@aclu.org
23
                                                     *Admitted *pro hac vice*.  Not admitted
24                                                    in DC; practice limited to federal
                                                      courts.
25                                                   **Admitted *pro hac vice*
26
27
28

-21-

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:     kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     kbrody@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
             agerlicher@perkinscoie.com
             jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: _s/ Maya Abela_
    Sarah Kader (Bar No. 027147)
    Asim Dietrich (Bar No. 027927)
    5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
    Telephone:  (602) 274-6287
    Email:    skader@azdisabilitylaw.org
              adietrich@azdisabilitylaw.org

    Rose A. Daly-Rooney (Bar No. 015690)
    J.J. Rico (Bar No. 021292)
    Jessica Jansepar Ross (Bar No. 030553)
    Maya Abela (Bar No. 027232)
    **ARIZONA CENTER FOR DISABILITY LAW**
    177 North Church Avenue, Suite 800
    Tucson, Arizona 85701
    Telephone:  (520) 327-9547
    Email:
      rdalyrooney@azdisabilitylaw.org
      jrico@azdisabilitylaw.org
      jross@azdisabilitylaw.org
      mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on October 4, 2017, I electronically transmitted the above

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5

6                          Michael E. Gottfried
                           Lucy M. Rand
7                  Assistant Arizona Attorneys General
                   Michael.Gottfried@azag.gov
8                    Lucy.Rand@azag.gov

9                          Daniel P. Struck
                           Rachel Love
10                  Timothy J. Bojanowski
                    Nicholas D. Acedo
11                    Ashlee B. Fletcher
                      Jacob B. Lee
12                    Kevin R. Hanger
                      Timothy Ray
13        STRUCK LOVE BOJANOWSKI & ACEDO, P.L.C.
                  dstruck@strucklove.com
14                 rlove@strucklove.com
              tbojanowski@strucklove.com
15                nacedo@strucklove.com
              afletcher@strucklovem.com
16                  jlee@strucklove.com
               khanger@strucklove.com
17                  tray@strucklove.com

18                *Attorneys for Defendants*

19                                          s/ DRAFT

20

21

22

23

24

25

26

27

28