# Exhibit 1

Nos. **16-17282**, 17-15302 (Consolidated)

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

VICTOR ANTONIO PARSONS, et al.,

*Plaintiffs-Appellees,*

v.

CHARLES L. RYAN, et al.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Arizona,
Case No. 2:12-cv-00601-DKD

---

## DEFENDANTS-APPELLANTS'
## OPENING BRIEF

---

<div style="display:flex">

Mark Brnovich
ARIZONA ATTORNEY GENERAL
Michael E. Gottfried
Assistant Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
(602) 542-4951
Michael.Gottfried@azag.gov

Daniel P. Struck
Nicholas D. Acedo
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
(480) 420-1600
dstruck@swlfirm.com
nacedo@swlfirm.com

</div>

*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ...................................................................1

ISSUE STATEMENT.......................................................................................5

PERTINENT STATUTORY/RULE PROVISIONS...........................................5

STATEMENT OF THE CASE ..........................................................................8

    A.    The Lawsuit.......................................................................8

    B.    The Stipulation ..................................................................8

    C.    The Dispute .....................................................................12

SUMMARY OF THE ARGUMENT ................................................................17

LEGAL ARGUMENT......................................................................................18

    I.    THE DISTRICT COURT EXCEEDED ITS AUTHORITY
        TO ENFORCE THE STIPULATION ..........................................18

        A.    Standard of Review............................................................18

        B.    The District Court Unlawfully Re-Wrote the
            Stipulation to Require 100% Compliance .........................18

        C.    The Outside-Transport Order Creates an Incredible
            Risk of Public Harm .........................................................21

    II.    THE DISTRICT COURT ERRED IN CERTIFYING THE
        OUTSIDE-TRANSPORT ORDER AS COMPLIANT
        WITH THE PLRA .......................................................................26

        A.    Standard of Review............................................................26

        B.    The District Court Never Determined a Constitutional
            Violation Occurred ...........................................................26

CONCLUSION.................................................................................................27

CERTIFICATION OF COMPLIANCE............................................................29

**TABLE OF CONTENTS**
**(continued)**

**Page**

CERTIFICATE OF SERVICE ............................................................................30

STATEMENT OF RELATED CASES .............................................................31

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bell v. Wolfish*
   441 U.S. 520 (1979)...................................................................25

*Brown v. Plata*
   563 U.S. 493 (2011)...................................................................26

*Catlin v. United States*
   324 U.S. 229 (1945)....................................................................2

*City of Emeryville v. Robinson*
   621 F.3d 1251 (9th Cir. 2010) ...................................................18

*Coopers & Lybrand v. Livesay*
   437 U.S. 463 (1978)....................................................................3

*Delay v. Gordon*
   475 F.3d 1039 (9th Cir. 2007) ...............................................4, 18

*Doi v. Halekulani Corp.*
   276 F.3d 1131 (9th Cir. 2002) ...................................................18

*Flores v. Lynch*
   828 F.3d 898 (9th Cir. 2016) .......................................................4

*Gastile v. Virga*
   15-16294, 2016 WL 6520090 (9th Cir. Nov. 3, 2016).....................3

*Gates v. Gomez*
   60 F.3d 525 (9th Cir. 1995) .........................................................4

*Goodman v. Newzona Inv. Co.*
   421 P.2d 318 (Ariz. 1966) ....................................................19, 20

*Isaak v. Massachusetts Indem. Life Ins. Co.*
   623 P.2d 11 (Ariz. 1981) ...........................................................19

*Jeff D. v. Andrus*
   899 F.2d 753 (9th Cir. 1989) .....................................................19

*Juanes v. Lyzwinski*
   8:10-CV-459 ATB, 2013 WL 3713419 (N.D. N.Y. July 12, 2013)................4

*Olliver/Pilcher Ins., Inc. v. Daniels*
   715 P.2d 1218 (Ariz. 1986) ........................................................19

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Parsons v. Ryan*
  289 F.R.D. 513 (D. Ariz. 2013),
  *aff'd*, 754 F.3d 657 (9th Cir. 2014)....................................................8

*Pelletier v. Fed. Home Loan Bank of San Francisco*
  968 F.2d 865 (9th Cir. 1992) ..........................................................3

*Sierra Forest Legacy v. Rey*
  577 F.3d 1015 (9th Cir. 2009) .......................................................25

*Stefano v. City of Long Beach*
  621 F. App'x 404 (9th Cir. 2015) ....................................................3

*Stone v. City of San Francisco*
  968 F.2d 850 (9th Cir. 1992) ..........................................................2

*Tabi v. Ortega*
  649 F. App'x 413 (9th Cir. 2016) ....................................................3

*United States v. Martin*
  226 F.3d 1042 (9th Cir. 2000) ........................................................4

*United States v. Washington*
  761 F.2d 1404 (9th Cir. 1985) ........................................................2

*Wilcox v. Arpaio*
  753 F.3d 872 (9th Cir. 2014) ..........................................................3

*Zepeda v. U.S. I.N.S.*
  753 F.2d 719 (9th Cir. 1983) ........................................................25


**Statutes**

18 U.S.C. § 3626(a)(1)(A) ................................................. 6, 17, 25, 27
28 U.S.C. § 1291................................................................. 2, 3, 4, 5
28 U.S.C. § 1292................................................................................4
28 U.S.C. § 1292(a)(1)........................................................................6
28 U.S.C. § 1331.................................................................................1
28 U.S.C. § 1343.................................................................................1

# TABLE OF AUTHORITIES
## (continued)

<u>**Page**</u>

**Rules**

Rule 23(e), Federal Rules of Civil Procedure.......................................................12

Rule 60(b), Federal Rules of Civil Procedure ...................................................4, 7

Rule 4(a)(1)(A), Federal Rules of Appellate Procedure......................................5

Rule 4(a)(4)(A)(vi), Federal Rules of Appellate Procedure ...............................5

Rule 4(a)(4)(B)(ii), Federal Rules of Appellate Procedure ................................5

Rule 26(a)(1)(C), Federal Rules of Appellate Procedure ...................................5

**Other Authorities**

2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010) ...................................8

2011 Ariz. Legis. Serv. 1st Sess. Ch. 278 (H.B. 2011) .......................................8

# JURISDICTIONAL STATEMENT

**1.**     Plaintiffs-Appellees represent a class of inmates who challenged the provision of health care and the conditions of confinement in the Arizona Department of Corrections ("ADC"), pursuant to 42 U.S.C. § 1983. (Dkt. 1.)[1] The district court had subject-matter jurisdiction of this class-action lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343. (Id.) The parties resolved the matter through a Stipulation, whereby ADC agreed to comply with certain performance measures for a conditional period of time. (ER 100-119.) The parties further agreed that disputes concerning compliance with the Stipulation would ultimately be submitted to United States Magistrate Judge David Duncan for resolution. (ER 98-99; ER 113, ¶ 36.)

**2a.**     This appeal (No. 16-17282) is taken from a post-Stipulation Order, requiring Defendants-Appellants[2] to perform additional measures not required by the Stipulation, under the guise of enforcing the Stipulation, to procure compliance. (ER 8-12.) Specifically, the district court ordered Defendants to "use all available community health care services including, but not limited to,"

_____

[1] "Dkt." refers to the district court docket. "ER" refers to the Excerpts of Record. "Doc." refers to this Court's docket.

[2] Defendants-Appellants are Charles Ryan, Director of ADC, and Richard Pratt, Assistant Director of ADC's Health Services Contract Monitoring Bureau. (Dkt. 1; ER 64, ¶¶ 3, 7.) Both (collectively "Defendants") were named in their official capacity only. (Dkt. 1.)

transporting inmates to outside providers (emergency rooms, urgent care centers, etc.) within a specific period of time after the expiration of the time required by the Stipulation if they are unable to provide the inmates the necessary care within the facility within the Stipulation's time-frame ("Outside-Transport Order").  (ER 10-11.)  Defendants' obligations under the Stipulation are still ongoing.

The district court's Outside-Transport Order is a "final" decision and therefore appealable under 28 U.S.C. § 1291.  Although a "final decision" is normally "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," "[it] is sometimes appropriate to give the finality requirement a practical rather than a technical construction." *United States v. Washington*, 761 F.2d 1404, 1406 (9th Cir. 1985) (quoting *Catlin v. United States*, 324 U.S. 229, 233-34 (1945)). "This is particularly true when post-judgment orders are involved" because "[t]he policy against and the probability of piecemeal review is not as decisive a consideration after judgment as before judgment since the underlying dispute is already settled." *Id*.; *see also Stone v. City of San Francisco,* 968 F.2d 850, 854 (9th Cir. 1992) (post-judgment contempt order imposing sanctions final for purposes of § 1291).

Though a judgment was never entered in this case, the parties' Stipulation is the functional equivalent because it terminated the underlying merits of this suit. (ER 101, ¶ 4.)   The Stipulation also authorized the district court to enforce

compliance with the Stipulation. (ER 113, ¶ 36.) That will necessarily result—and has resulted here—in post-Stipulation orders interpreting and enforcing its terms. These orders are final in the sense that there is nothing more for the district court to do; there is not a subsequent order or judgment that can be entered that would render it *more* final. Consequently, an appeal from the Outside-Transport Order is the only way Defendants can seek appellate review. *See Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 873 (9th Cir. 1992) ("To constitute an appealable 'final decision' under 28 U.S.C. § 1291, an order 'must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.'") (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)).

This Court has exercised appellate jurisdiction over similar post-settlement agreement orders under § 1291. *See, e.g.*, *Gastile v. Virga*, 15-16294, 2016 WL 6520090, *1 (9th Cir. Nov. 3, 2016) (appeal from order granting motion to enforce settlement agreement in § 1983 action) (unpublished disposition); *Tabi v. Ortega*, 649 F. App'x 413 (9th Cir. 2016) (appeal from post-settlement agreement order) (unpublished disposition); *Stefano v. City of Long Beach*, 621 F. App'x 404 (9th Cir. 2015) (same); *Wilcox v. Arpaio*, 753 F.3d 872, 875 (9th Cir. 2014) (appeal from order granting motion to enforce settlement agreement in § 1983); *cf.*

*Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016) (appeal from remedial order stemming from consent decree); *Gates v. Gomez*, 60 F.3d 525, 528 (9th Cir. 1995) (same).  It should do so here.[3]

    **2b.**    This appeal is also taken from the district court's Order denying Defendants' Motion for Relief from the Outside-Transport Order.  (ER 1-7.)  That Motion was filed pursuant to Fed. R. Civ. P. 60(b) ("[T]he court may relieve a party … from a final judgment, order, or proceeding for … any other reason that justifies relief.").  (ER 32-33.)  If the underlying Outside-Transport Order is considered "final" for purposes of § 1291, it is necessarily "final" for purposes of Rule 60(b).  *See United States v. Martin*, 226 F.3d 1042, 1048 n.8 (9th Cir. 2000) (noting that Rule 60(b) "applies only to motions attacking final, appealable orders"); *Juanes v. Lyzwinski*, 8:10-CV-459 ATB, 2013 WL 3713419, at *3 (N.D. N.Y. July 12, 2013) (acknowledging that Rule 60(b) is appropriate motion to challenge order enforcing settlement agreement) (unpublished disposition).  An order denying a Rule 60(b) motion is appealable under § 1291.  *See Delay v. Gordon*, 475 F.3d 1039, 1041 (9th Cir. 2007).

    **3.**    The district court entered the Outside-Transport Order on November 10, 2016.  (ER 12.)  Defendants filed their notice of appeal on

---

[3] Alternatively, this Court has jurisdiction under 28 U.S.C. § 1292 (courts of appeals have jurisdiction of appeals from interlocutory orders "granting, continuing, [or] modifying" injunctions").

December 12, 2016.  (ER 30-31.)  The district court entered the Order denying Rule 60(b) relief on February 6, 2017.  (ER 7.)  Defendants filed an amended notice to include an appeal from that Order on February 24, 2017.  (ER 13-14.) The notices were timely filed pursuant to FRAP 4(a)(1)(A), 4(a)(4)(A)(vi), 4(a)(4)(B)(ii), and 26(a)(1)(C).[4]

## ISSUE STATEMENTS

**1.**     Did the district court **(a)** exceed its legal authority by effectively re-writing the terms of the parties' Stipulation to require 100% compliance, and **(b)** abuse its discretion in issuing an order that poses a significant risk to public safety?

**2.**     Did the district court commit manifest error by granting prospective relief and certifying that its order is narrowly drawn and the least intrusive means to correct a constitutional violation, when it never found a constitutional violation occurred?

## PERTINENT STATUTORY/RULE PROVISIONS

### 28 U.S.C. § 1291

> The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction

---

[4] Defendants filed their Rule 60(b) Motion for Relief on November 23, 2016, thirteen days after the district court entered its Outside-Transport Order. (ER 32.) *See* FRAP 4(a)(4)(A)(vi) (Rule 60 motion for relief extends time to appeal if filed within 28 days after judgment is entered).

of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 U.S.C. § 1292(a)(1)

**(a)** Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

**(1)** Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court.

## 18 U.S.C. § 3626(a)(1)(A)

**(a) Requirements for relief.--**

**(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff

or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

**Fed. R. Civ. P. 60(b)**

**(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

**(1)** mistake, inadvertence, surprise, or excusable neglect;

**(2)** newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

**(3)** fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

**(4)** the judgment is void;

**(5)** the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

**(6)** any other reason that justifies relief.

## STATEMENT OF THE CASE

### I.       RELEVANT FACTS

#### A.       The Lawsuit

In March 2012, Plaintiffs—thirteen inmates in the custody of ADC, and the

Arizona Center for Disability Law—filed this class-action lawsuit in the United

States District Court for the District of Arizona.  (Dkt. 1.)  The complaint alleged

inadequate health care and unlawful conditions of confinement, in violation of the

Eighth Amendment, and sought declaratory and injunctive relief.[5]    (Id.)    The

district court certified a class (health care allegations) and a subclass (conditions-

of-confinement allegations) in March 2013, which this Court subsequently upheld.

*See Parsons v. Ryan*, 289 F.R.D. 513 (D. Ariz. 2013), *aff'd*, 754 F.3d 657 (9th Cir.

2014).

#### B.       The Stipulation

On the eve of trial, the parties entered into a settlement agreement

("Stipulation"), whereby ADC agreed to comply with 103 health care performance

measures (attached as Exhibit B to the Stipulation) for a conditional period of

---

[5] Beginning in July 2012, a legislative mandate privatized the provision of health care to ADC inmates. *See* 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010); 2011 Ariz. Legis. Serv. 1st Sess. Ch. 278 (H.B. 2011). Corizon Inc. has been the private vendor providing health care since March 2013.  (Dkt. 344.)

time.[6]  (ER 102, ¶ 8; ER 126-134.)  Settlement negotiations were conducted before
United States Magistrate Judge David Duncan.  (ER 167.)  The purpose of the
Stipulation was to settle the case; Defendants denied all allegations in the
complaint.  (ER 101, ¶¶ 4-5.)  Under the Stipulation, Defendants were required to
"comply with the health care performance measures set forth in Exhibit B."
(ER 102, ¶ 8.)  Paragraph 10.a defines compliance:

> a. **Determining substantial compliance with a particular performance measure at a particular facility:** Compliance with a particular performance measure identified in Exhibit B at a particular complex shall be defined as follows:
>
> * * *
>
> ii. For the second twelve months after the effective date of this Stipulation, meeting or exceeding <u>an eighty percent (80%) threshold</u> for the particular performance measure that applies to a specific complex, determined under the procedures set forth in Paragraph 9[.]

(ER 103, ¶ 10.a.ii., underlined emphasis added.)[7]

---

[6] The Stipulation also requires Defendants to comply with nine performance measures specific to conditions of confinement for maximum custody inmates (the Subclass), but those performance measures are not at issue here. (ER 105, ¶ 18; ER 156-158.)

[7] The compliance rate for the first 12 months of the Stipulation was 75%. (ER 103, ¶ 10.a.i.) The compliance rate after the first 24 months of the Stipulation is 85%. (ER 103, ¶ 10a.iii.) Because the Order was issued in the "second twelve months after the effective date of" the Stipulation, the Brief focuses on that time period. The issue and arguments do not change once the compliance rate elevated to 85%.

Compliance with the performance measures is measured and reported monthly at each of ADC's ten complexes. (ER 102, ¶ 9.a.) For most performance measures (and particularly those relevant here), ADC contract monitors review once a month a random sample of inmate medical records applicable to the measure, for each unit at the facility (or specified units/facilities), and determine whether those records comply with the requirements for the measure for the audited month. (ER 28-29, ¶¶ 17-21; ER 142, 146, 148, 151-152.) The percentage of records showing compliance for each measure is tabulated and reported to Plaintiffs' counsel and the court. (Id.) Thus, if the performance measure calls for a sampling of ten medical records and eight indicate compliance, then that unit/facility will receive an 80% for that performance measure for that month. Not all performance measures apply to every facility. (ER 131-133.) This measurement and reporting process determines "whether ADC has complied with particular performance measures at particular complexes."[8] (ER 102, ¶ 10.)

_____

[8] This process also determines "whether the health care provisions of this Stipulation may terminate as to particular performance measures at particular complexes." (ER 102-103, ¶ 10.) Under Paragraph 10.b, "ADC's duty to measure and report on a particular performance measure" terminates if "[t]he particular performance measure that applies to a specific complex is in compliance, as defined in [Paragraph 10.a], for eighteen months out of a twenty-four month period" and "[t]he particular performance measure has not been out of compliance, as defined in [Paragraph 10.a], for three or more consecutive months within the past 18- month period." (ER 103-104, ¶ 10.b.) Defendants cannot move to terminate the Stipulation for a period of four years from the date of the district court's approval. (ER 114, ¶ 37.)

Under the terms of the Stipulation, Plaintiffs' counsel and their experts have access to the facilities, staff, contractors, inmates, and documents necessary to properly evaluate whether Defendants are complying with the performance measures. (ER 111, ¶ 29.)  In the event Plaintiffs' counsel believe Defendants have failed to "substantially comply in some significant respect," they must provide Defendants a notice of substantial non-compliance. (ER 112, ¶ 30.)  The parties are then required to meet and confer in good faith to try and resolve the dispute informally.  (Id.)  If they cannot resolve the dispute informally, the parties are required to mediate the dispute before a selected magistrate judge.  (ER 112, ¶ 31.)  If the dispute is not resolved in mediation, Plaintiffs may then file a motion to enforce the Stipulation in the district court.  (Id.)

The parties agreed, and the district court ordered, that Judge Duncan conduct all further proceedings in the case, and thus he would be responsible for ruling on motions to enforce the Stipulation.  (ER 98-99.)  If Judge Duncan finds that Defendants have "not complied with the Stipulation," he is required to first order Defendants to submit a plan to remedy the identified deficiencies.  (ER 113, ¶ 36.)  If that plan does not remedy the deficiencies, Judge Duncan

> retain[s] the power to enforce this Stipulation through all remedies provided by law, except that the Court shall not have the authority to order Defendants to construct a new prison or to hire a specific number or type of staff unless Defendants propose to do so as part of a plan to remedy a

> failure to comply with any provision of this Stipulation.
> In determining the subsequent remedies the Court shall
> consider whether to require Defendants to submit a
> revised plan.

(ER 113-114, ¶ 36.)  On February 25, 2015, Judge Duncan (hereafter, "the district

court") approved the Stipulation, as required by Fed. R. Civ. P. 23(e).  (ER 92-97.)

Thus, monitoring and compliance began in March 2015.

### C.    The Dispute.

In April 2016, Plaintiffs filed a motion to enforce the Stipulation, alleging

substantial non-compliance with several health care performance measures.  (Dkt.

1535, 1554, 1562.)  The district court ordered Defendants to submit a remedial

plan to cure deficiencies identified in a subset of those performance measures.

(ER 89-91.)  Defendants submitted a remedial plan as requested, and the district

court approved that plan.  (Dkt. 1608, 1608-1; ER 87-88.)

At a November 9, 2016 Status Conference, the district court indicated that

after several months of application, the remediation plan did not fully cure the

deficiencies.   (ER 39-44.)   The deficiencies centered on non-compliance with

certain performance measures' time-frames (e.g., sick call inmates must be seen

within 24 hours of receiving an medical request ("HNR")).  (Id.)  The district court

stated it was considering issuing an order that would require Defendants to

immediately transport an inmate to an outside provider within an hour or day

(depending on the performance measure) of the expiration of the performance

measure's time-frame if the inmate did not receive the care required by the performance measure within that time-frame.  (ER 41-44, 53-54.)

The following day, despite signaling that it would allow Defendants an opportunity to brief the issue (ER 45), the district court issued a formal order adopting its prior proposal:

> Defendants shall use all available community health care services including, but not limited to, commercial pharmacies, community-based practitioners, urgent care facilities, and hospitals (collectively, "Outside Providers") to provide the health care services required in the Stipulation's Performance Measures. This shall happen immediately following the expiration of the time-frame detailed in each PM.  For example, if a PM requires Defendants to provide an inmate with a specific type of care within 24 hours (or 14 days), then Defendants shall have this inmate seen by an appropriate Outside Provider in hour 25 (or day 15).

(ER 11.)  This Outside-Transport Order technically applied to nine health care performance measures at only certain facilities.[9]  (ER 12, 89-90; Dkt. 1608-1, 1609, 1609-1, 1668 at 10.)  Of those nine performance measures, only six

---

[9]  Performance Measure ("PM") 11 (Eyman, Florence, and Lewis); PM 13 (Florence, Lewis, and Perryville); PM 37 (Eyman, Lewis, Tucson, and Yuma); PM 39 (Eyman, Florence, Lewis, Perryville, Tucson); PM 46 (Douglas, Florence, Perryville, Tucson, and Yuma); PM 54 (Tucson); PM 66 (Tucson); PM 85 (Florence, Lewis, and Tucson); and PM 92 (Perryville).  (ER 12, 89-90; Dkt. 1608-1, 1609, 1609-1, 1668 at 10.)

realistically could require Defendants to transport inmates outside the complex (and therefore implicate the Court's Order):

> **PM 37**   Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need).
>
> **PM 39**   Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointments will be seen within fourteen 14 days of the referral.
>
> **PM 54**   Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place.
>
> **PM 66**   In an IPC, a Medical Provider encounter will occur at a minimum every 72 hours.
>
> **PM 85**   MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications.
>
> **PM 92**   MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days.

(ER 129-131, 133.) This directive became effective on December 9, 2016. (ER 12.)

After securing the transcript of the November 9 Status Conference, and reviewing the Outside-Transport Order in context, it became apparent that the district court intended for the Order to impose a 100% compliance rate (instead of 80%) with respect to the affected performance measures:

14

> MR. BOJANOWSKI: [I]f every inmate has to be transported out that's not seen within 24 hours, then that means there has to be 100 percent compliance.
>
> THE COURT: That's right.
>
> MR. BOJANOWSKI: Is that what the Court is ordering -
>
> THE COURT: That's right.
>
> MR. BOJANOWSKI: - is 100 percent compliance?
>
> THE COURT: That's right. …

(ER 51; see also ER 43 ["at hour 25 everybody who wasn't seen in those first 24 hours will be seen by an RN"]; ER 50 ["if you're not seen by an RN within 24 hours in hour 25, all those who were not seen in the first 24 hours have to go to some other provider, urgent care, the emergency room, someplace else. They have to be seen by an RN. So all of those people will have to be seen by an RN."].)  The district court sharply disagreed that the Stipulation required only 80% compliance with every performance measure:

> THE COURT: [T]he stipulation at no place with respect to the provisional services limits it to 80 percent. The individual performance measures in many cases say all the inmates will be seen. But where they don't say it, it's obvious from the context that that's what's supposed to happen.

(ER 52.)  The court went on to explain that, in its view, the 80% benchmark served only two purposes: (1) it is an "alert mechanism" that, when triggered (i.e., compliance falls below 80%), allows Plaintiffs to begin the resolution process; and

(2) it gives "the defendants an opportunity in [a] graduated mechanism to" terminate the Stipulation. (ER 49-53.) Once compliance fell below that benchmark, that benchmark "served its role and is no longer applicable to the action that the Court takes with respect to accomplishing its measures." (ER 52-53.)

Defendants filed a Motion for Relief from Final Order, pursuant to Rule 60(b), arguing that the district court exceeded its authority under the terms of the Stipulation by engrafting a 100% compliance rate. (ER 32-33.) Defendants also argued that the Outside-Transport Order imposed an impossible burden, and one that potentially exposed hundreds of inmates, staff, outside healthcare providers, and the public to serious risk of harm. (Id.) Defendants requested an evidentiary hearing so that it could present additional evidence on these risks. (ER 34.)

The district court denied the Motion (and request for a hearing), and doubled-down on its determination that "the Stipulation requires 100% compliance with the performance measures" and that the graduated compliance rates were merely "the trigger for the imposition of a remediation plan." (ER 4, 6.) Regarding the potential risk to public safety, the district court noted that Defendants could avoid that risk altogether if it provided the requisite health care within the time-frames required by the performance measures, and that the public safety risk did not outweigh the risk to the health and safety of inmates who do not timely receive health care. (ER 5.)

Finally, at Plaintiffs' suggestion and over Defendants' objection (Dkt. 1845), the district court amended the Order by adding that it "extended no further than necessary to correct the violation of the Federal right, and was the least intrusive means necessary to correct the violation of the Federal right as required by 18 U.S.C. § 3626(a)(1)(A)."[10]  (ER 6.)  The district court made that finding despite the absence of any finding of a constitutional violation.  (Id.)

## SUMMARY OF THE ARGUMENT

In entering the Outside-Transport Order, the district court exceeded its authority under the Stipulation—to enforce the Stipulation through all remedies "provided by law"—because it effectively re-wrote the terms of the Stipulation and imposed upon Defendants an obligation that the parties did not bargain for: 100% compliance.  The court's belief that the Stipulation already requires 100% compliance is belied by its plain language.  The Order also imposes an impossible burden on Defendants and one that places public safety at risk.  Transporting dozens—if not hundreds—of inmates outside the prison to community emergency rooms, urgent care centers, and doctors' offices on an hourly/daily basis is

---

[10] In their Response to Defendants' Motion for Relief from Order, Plaintiffs requested the district court to modify its Outside-Transport Order to include this certification so that it complied with the Prison Litigation Reform Act ("PLRA"). (Dkt. 1806 at 18-20.)

incredibly dangerous.  The district court abused its discretion in failing to give deference to that risk or exploring other solutions.

Finally, the district court committed clear error when it ordered the prospective relief and certified its Order as compliant with the PLRA without ever finding that a constitutional violation occurred. A constitutional violation is a necessary prerequisite to prospective relief in prisoner litigation cases like this one. The court's gratuitous certification was error.

## LEGAL ARGUMENT

### I.  THE DISTRICT COURT EXCEEDED ITS AUTHORITY TO ENFORCE THE STIPULATION.

#### A.  Standard of Review

A district court's enforcement of a settlement agreement, *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1136 (9th Cir. 2002), and the denial of a Rule 60(b) motion, *Delay v. Gordon*, 475 F.3d 1039, 1043 (9th Cir. 2007), are reviewed for an abuse of discretion.  The "interpretation of a settlement agreement is a question of law subject to de novo review."  *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010).

#### B.  The District Court Unlawfully Re-Wrote the Stipulation to Require 100% Compliance.

The district court only retained the "power to enforce this Stipulation through all remedies *provided by law*[.]"  (ER 113, ¶ 36, emphasis added).  The law does not authorize a court to eliminate, re-write, or add provisions to a contract

entered into between parties.[11]  *See Olliver/Pilcher Ins., Inc. v. Daniels*, 715 P.2d 1218, 1221 (Ariz. 1986) ("[T]he court cannot create a new agreement for the parties to uphold the contract."); *Isaak v. Massachusetts Indem. Life Ins. Co.*, 623 P.2d 11, 14 (Ariz. 1981) ("It is not within the power of this court to revise, modify, alter, extend, or remake a contract to include terms not agreed upon by the parties.") (Internal quotation marks omitted); *Goodman v. Newzona Inv. Co.*, 421 P.2d 318, 320 (Ariz. 1966) (stating that court's "duty is confined to the construction or interpretation of the one which the parties have made for themselves").  Consequently, the law did not empower the district court to re-write the Stipulation.  But it did just that.

The Stipulation requires Defendants to "comply with the health care performance measures set forth in Exhibit B."  (ER 102, ¶ 8.)  It then expressly defines what compliance means: "Compliance with a particular performance measure identified in Exhibit B at a particular complex shall be defined as … meeting or exceeding an eighty percent (80%) threshold for the particular performance measure that applies to a specific complex."  (ER 103, ¶ 10.a.)  Thus, under the plain language of the Stipulation, Defendants need only maintain an 80% compliance rate to satisfy its obligations under the Stipulation.  *See Goodman*,

---

[11] The interpretation and enforcement of settlement agreements is governed by principles of state (Arizona) law. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989).

421 P.2d at 320 ("Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto.").

The district court's Outside-Transport Order effectively requires 100% compliance—*every* subject inmate must be seen within an hour or day of the expiration of the performance measure's deadline. Although the district court clarified in its Order denying Defendants' Rule 60(b) Motion that the requirements of the Outside-Transport Order do not kick in until and unless Defendants fail to meet the 80% compliance rate (ER 3), there is no way to draw that line. Defendants have no way of knowing in real time if Corizon's medical staff is at 80% compliance (or more or less) at any given hour or on any given day facility-wide.  Performance is measured on a monthly basis and reported approximately a month after that.  (ER 70-86.)  If it turns out compliance was below 80%, by the time Defendants and Corizon know that, they obviously cannot go back in time and increase performance to 100% in the 25th hour or 15th day.  That leaves Defendants just one choice: ensure that *every* inmate is seen within 24 hours/14 days (100% compliance), because, if they don't, they risk violating the district court's Outside-Transport Order.

The result is this: the Court has effectively changed the agreed-upon performance measure's time-frame and compliance rate.  For example, under the

Stipulation, Defendants must comply with the 24-hour HNR performance measure (PM 37) 80% of the time.  But under the Court's Order, Defendants must comply with a 25-hour HNR performance measure 100% of the time—i.e., every sick call inmate must be seen by a registered nurse within 25 hours, 100% of the time.  Each of the involved performance measures are similarly overridden.

Finally, the district court's conclusion—that the 80% compliance rate is only a benchmark that triggers the imposition of a remediation plan (Paragraph 30) and serves as a guide to termination (Paragraph 10.b)—is flatly contradicted by Paragraph 10, which states that the 80% compliance rate also determines "whether ADC has complied with particular performance measures at particular complexes." (ER 102, ¶ 10.)  The district court erroneously interpreted the Stipulation and exceeded its authority in issuing the Outside-Transport Order.

### C.   The Outside-Transport Order Creates an Incredible Risk of Public Harm.

The district court recognized that its Outside-Transport Order was "not ideal," "cumbersome, more expensive," and less "efficient" than other possible remedies.  (ER 43, 47-48, 54.)  But it is much more than that:  the Order poses a grave danger to hundreds of inmates, staff, outside healthcare providers, and the public.  (ER 58, 61, ¶¶ 16, 31-32.)  A 100% compliance rate is simply not possible, which is why Defendants could not and did not agree to it.  (ER 65-67, ¶¶ 11, 17.) For example, in August 2016, inmates submitted a total of 10,311 HNRs at the four

complexes that are subject to PM 37 and the Outside-Transport Order.  (ER 65-66, ¶¶ 12-15.)  Four facilities did not reach the 80% benchmark for the performance measure requiring that a sick call inmate be seen by a registered nurse within 24 hours of triaging an HNR.  (ER 69.)  Requiring Defendants to transport those inmates who were not seen within 24 hours to an off-site emergency room or urgent care center within the 25th hour (or within the following day for other performance measures) will require dozens of inmates—of all custody levels, including maximum custody and protective custody—to be escorted by dozens of security staff into the public each hour (and hundreds of inmates and their respective security staff each day).[12]  (ER 58-59, ¶¶ 17-18, 21.)

Flooding these public healthcare centers with dozens of inmates, waiting for hours, can present a significant safety risk to the civilian men, women, and children awaiting care, hospital staff, security staff, and the inmates.[13]  (ER 59-60,

---

[12] This is in addition to the emergency medical transports and specialty appointment transports that already occur on a daily basis. In August 2016, there were 196 total emergency medical transports outside the prison complexes, 1,358 specialty appointment transports outside the prison complexes, and 111 inmates were admitted to the hospital for extended inpatient care.  (ER 67, ¶ 19.)

[13] Most ADC facilities are located in small, remote, communities with sparse, outside medical resources. (ER 60, ¶ 25.) For example, the emergency room at the Florence Hospital in Florence, Arizona is about the size of a living room. (ER 60, ¶ 26.) Though the Florence Hospital routinely sees inmates under emergency circumstances, it does not have the capacity, ability, or staff to see more than a few inmates at a time. (ER 60, ¶ 27.) The next closest hospital to the Eyman and Florence facilities is in Casa Grande or Apache Junction, Arizona – both at least an

¶¶ 21, 26.)  The district court's Outside-Transport Order also presents an unprecedented threat to security because it could give inmates never-before-available knowledge of when they will be sent out for medical appointments. (ER 61, ¶ 29.)  ADC has historically concealed from inmates the specific date and time they are scheduled for a medical appointment in order to prevent them from communicating this operational information to others on the outside, which is a critical penological practice designed to prevent escapes and other criminal activity.  (Id.)  The district court's Order eviscerates this crucial security measure and can expose an untold number of people to serious risk of harm.  (Id.)

The number of outside transports anticipated on an hourly and daily basis are also logistically impossible.  (ER 59, ¶ 22.)  ADC simply does not have enough vehicles to accommodate the potential volume of inmate transports.  (Id.)  Separate vehicles are needed to transport each custody level, which can include general population, minimum custody, medium custody, maximum custody, close custody, protective custody, and sex offenders.  (Id.)  Mixing classifications could place both inmates and staff, along with the public, at risk of serious harm.  (Id.)  ADC policy also requires two officers to escort each inmate sent off-site.  (ER 59-60, ¶ 23.)  ADC simply does not have enough security staff to assist with these daily,

---

hour away – adding to the impossibility of staffing, and the commensurate dangers inherent in such transports, which sometimes involve vehicle accidents and breakdowns.  (ER 60, ¶ 28.)

high-volume transports.  (Id.)  For example, if just ten inmates were sent out a day, it would require at least twenty officers to be with those inmates at all times (officers are required to stay with each inmate sent off-site until they are secured back at the facility).  (Id.)  Transporting hundreds of inmates on a daily basis is unmanageable and far beyond ADC's institutional capacity.  (Id.)

The substantial numbers of security staff required to transport so many inmates off-site will also mean that there will be substantially less security staff left behind at the facility, which can present a clear and present danger to the inmates, staff, and the public, and jeopardize the safe, secure, and orderly operation of the entire prison system.  (ER 60, ¶ 24.)  In addition, substantially less security staff at the prison means far fewer staff remain behind to assist with critical inmate programming, therapy, and other out-of-cell activities, which are all required under the Stipulation.  (Id.)  On high-volume transport days (which could conceivably be every day), the facility would be forced to go on lockdown because of the lack of security staff, which brings inmate programming, therapy, and out-of-cell activity to a screeching halt for hours, and even days.  (Id.)  The Court's Order also gives inmates the extraordinary opportunity to deliberately overwhelm the system by flooding their facilities with otherwise routine or unnecessary HNRs, knowing that medical staff would not be able to see each of them within a 24-hour period, just to trigger the requirement that the facility send them off-site, giving them either an

opportunity for escape, criminal activity, or just a change of scenery.  (ER 61, ¶ 30.)

"When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009); *see also Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 728 n.1 (9th Cir. 1983) (stating that "injunctive relief should be narrowly tailored to remedy the specific harms shown by plaintiffs").  In civil actions involving prison conditions, like this one, a court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a)(1)(A).  District courts must also defer to the expert judgment of corrections officials regarding practices needed "to preserve internal order and discipline and to maintain institutional security."  *Bell v. Wolfish*, 441 U.S. 520, 548 (1979).

The district court's Outside-Transport Order runs far afield from these directives.  Although it allows Defendants to attempt to summon healthcare providers to the facility to provide treatment (and hire more staff) to help remedy the situation, those alternatives will not eliminate the need to transport inmates off-site in order to satisfy the Court's 100% compliance rate.  The court should have at least considered other alternatives, as the Stipulation requires. (ER 114, ¶ 36 ["In

determining the subsequent remedies the Court shall consider whether to require Defendants to submit a revised plan."].)  For example, shortly after the Order, ADC and Corizon developed and implemented an open-clinic concept at the facilities, which allows inmates to walk their HNRs to the medical clinic during certain hours of the day to be seen and treated.  (ER 15-25.)  Early indications are that backlogs have decreased.  (Id.)  This and other solutions could have been raised and discussed, but the district court denied Defendants' request for a hearing.  Instead, it opted for a remedy with potentially dangerous ramifications. That was an abuse of discretion.

## II.   THE DISTRICT COURT ERRED IN CERTIFYING THE OUTSIDE-TRANSPORT ORDER AS COMPLIANT WITH THE PLRA.

### A.   Standard of Review

A district court's legal determinations under the PLRA are reviewed de novo.  *See Brown v. Plata*, 563 U.S. 493, 512 (2011).

### B.   The District Court Never Determined a Constitutional Violation Occurred.

The PLRA places restrictions on the grant of prospective relief in prisoner litigation cases like this one.

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary *to correct the violation of the Federal right* of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further

> than necessary to correct the violation of the Federal
> right, and is the least intrusive means necessary *to*
> *correct the violation of the Federal right*.

18 U.S.C. § 3626(a)(1)(A) (emphasis added).  Thus, a court cannot order

prospective relief unless it first finds a constitutional violation.  The district court

has never found that Defendants violated Plaintiffs' constitutional rights, nor did it

make any related factual findings in its Outside-Transport Order or Order denying

Defendants' Rule 60(b) Motion for Relief.  (ER 1-12.)  Yet it certified that the

Outside-Transport Order fully complied with § 3626(a)(1)(A)—that it was

"narrowly drawn," "extends no further than necessary," and is "the least intrusive

means" "to correct the violation of the Federal right."  (ER 6.)  That is plain error.

## CONCLUSION

For these reasons, the Court should vacate the district court's Outside-

Transport Order and Order denying Defendants' Rule 60(b) Motion for Relief.

RESPECTFULLY SUBMITTED this 22nd day of March, 2017.

STRUCK WIENEKE & LOVE, P.L.C.


By     s/ Nicholas D. Acedo
     Daniel P. Struck, #012377
     Nicholas D. Acedo, #021644
     STRUCK WIENEKE & LOVE, P.L.C.
     3100 West Ray Road, , Suite 300
     Chandler, Arizona  85226
     (480) 420-1600
     dstruck@swlfirm.com
     nacedo@swlfirm.com

     *Attorneys for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.　　This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:  This brief contains 6,361 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iiii).

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010:  14 point Times New Roman

　　　　DATED this 22nd day of March, 2017.

　　　　　　　　　　　　　　STRUCK WIENEKE & LOVE, P.L.C.


　　　　　　　　　　　　　　By＿＿s/ Nicholas D. Acedo＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　Daniel P. Struck, #012377
　　　　　　　　　　　　　　　　Nicholas D. Acedo, #021644
　　　　　　　　　　　　　　　　STRUCK WIENEKE & LOVE, P.L.C.
　　　　　　　　　　　　　　　　3100 West Ray Road, , Suite 300
　　　　　　　　　　　　　　　　Chandler, Arizona  85226
　　　　　　　　　　　　　　　　(480) 420-1600
　　　　　　　　　　　　　　　　dstruck@swlfirm.com
　　　　　　　　　　　　　　　　nacedo@swlfirm.com
　　　　　　　　　　　　　　　　*Attorneys for Defendants-Appellants*

29

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

     Maya Abela
     Daniel Clayton Barr
     Kathleen Erin Brody
     David Cyrus Fathi
     Amelia M. Gerlicher
     Alison Hardy
     Sarah E. Kader
     Corene Thaedra Kendrick
     Rita Katherine Lomio
     Caroline Nason Mitchell
     Sara Norman
     Daniel J. Pochoda
     Donald Specter
     John Laurens Wilkes
     Jose de Jesus Valdez Rico

s/ Nicholas D. Acedo

## STATEMENT OF RELATED CASES

This appeal, No. 16-17282, has already been consolidated with the appeal in No. 17-15302. (Doc. 13.) Currently pending in these consolidated appeals is Defendants-Appellants' request to consolidate a third appeal, *Parsons et al. v. Ryan et al.*, No. 17-15352. (Doc. 14.) Like Nos. 16-17282 and No. 17-15302, appeal No. 17-15352 derives from the same underlying matter, is an appeal taken from a post-Stipulation order, and challenges the district court's interpretation of the Stipulation. In appeal No. 17-15352, Defendants are challenging the district court's conclusion that certain performance measures applicable to the Stipulation's Subclass apply to close custody inmates (in addition to maximum custody inmates). (Dkt. 1833, 1847, 1918.) Thus, all three appeals involve the application of contract interpretation and construction principles to the same document with the same litigation history as the backdrop. All three appeals also involve a common jurisdictional question: whether a party may file a Rule 60(b) motion from a post-Stipulation order.

3309715.1