**EXHIBIT 6**

**EXHIBIT 6**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **HANNAH SABATA; DYLAN CARDEILHAC; JAMES CURTRIGHT; JASON GALLE; RICHARD GRISWOLD; MICHAEL GUNTHER; ANGELIC NORRIS; R.P.**, a minor; **ISAAC REEVES; ZOE RENA;** and **BRANDON SWEETSER**, on behalf of themselves and all others similarly situated, | Civil Action No. _____ |
| **PLAINTIFFS,** | **CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| **V.** | |
| **NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES; SCOTT R. FRAKES,** in his Official Capacity as Director of the Nebraska Department of Correctional Services; **HARBANS DEOL,** in his Official Capacity as Director of Health Services of the Nebraska Department of Correctional Services; **NEBRASKA BOARD OF PAROLE; JULIE MICEK,** in her Official Capacity as the Board of Parole Acting Parole Administrator; and **DOES 1 to 20,** inclusive, | |
| **DEFENDANTS.** | |

# TABLE OF CONTENTS

**Page**

I.   NATURE OF THE CASE ................................................................ 1

II.   JURISDICTION ........................................................................ 3

III.   VENUE ................................................................................ 3

IV.   PARTIES .............................................................................. 3

V.   FACTUAL ALLEGATIONS ............................................................ 20

    A.   Overview of the NDCS System and NDCS Defendants ..................... 20

        1.   Chronic Overcrowding at NDCS Facilities ....................... 23

        2.   Flawed Parole System ............................................. 24

        3.   Understaffing, Lack of Training, and Lack of Resources ....... 25

        4.   Dangerous Consequences for Public Safety in Nebraska ......... 27

    B.   NDCS Defendants Routinely Overuse and Improperly Use Isolation ...... 29

    C.   NDCS Defendants Provide Constitutionally Inadequate Health Care ..... 35

    D.   NDCS Defendants and BOP Defendants Violate the ADA and
        Rehabilitation Act .............................................. 51

VI.   CLASS ACTION ALLEGATIONS ..................................................... 63

    A.   The NDCS Class .................................................. 63

        1.   Fed. R. Civ. P.23(a)(1): Impracticability of Joinder .......... 63

        2.   Fed. R. Civ. P.23(a)(2): Commonality ........................... 63

        3.   Fed. R. Civ. P.23(a)(3): Typicality ............................ 64

        4.   Fed. R. Civ. P.23(a)(4): Adequacy of Representation ............ 64

        5.   Fed. R. Civ. P.23(b) ........................................... 64

    B.   The Isolation Subclass ........................................... 65

        1.   Fed. R. Civ. P.23(a)(1): Impracticability of Joinder .......... 65

        2.   Fed. R. Civ. P.23(a)(2): Commonality ........................... 66

        3.   Fed. R. Civ. P.23(a)(3): Typicality ............................ 66

        4.   Fed. R. Civ. P.23(a)(4): Adequacy of Representation ............ 66

        5.   Fed. R. Civ. P.23(b) ........................................... 67

    C.   The Disability Subclass .......................................... 67

        1.   Fed. R. Civ. P.23(a)(1): Impracticability of Joinder .......... 67

        2.   Fed. R. Civ. P.23(a)(2): Commonality ........................... 68

**TABLE OF CONTENTS**
(continued)

Page

| | 3. | Fed. R. Civ. P.23(a)(3): Typicality ............................................................. 69 |
| | 4. | Fed. R. Civ. P.23(a)(4): Adequacy of Representation ............................. 69 |
| | 5. | Fed. R. Civ. P.23(b) ................................................................................... 69 |
| VII. | CLAIMS FOR RELIEF | ........................................................................... 70 |
| VIII. | PRAYER FOR RELIEF | .......................................................................... 81 |

## I. NATURE OF THE CASE

1.     Nebraska state prisons are in a state of chaos that endangers the health, safety, and lives of prisoners and staff alike on a daily basis. For over twenty years, Nebraska state prisons have been overcrowded, under-resourced, and understaffed. The result is a dangerous system in perpetual crisis. Prisoners are consistently deprived of adequate health care, including medical, dental, and mental health care, and denied accommodations for their disabilities. Nebraska state prisoners, including juveniles, suffer in conditions of extreme isolation, sometimes for years. This treatment of Nebraska's prisoners violates their rights under the Eighth Amendment to the United States Constitution and under federal statutes protecting persons with disabilities.

2.     Prisoners have been left to suffer with untreated or undiagnosed medical conditions, many of them serious, due to the lack of timely access to adequate health care. One prisoner suffering from poorly treated diabetes lost 90% of his vision in one eye from the disease. Another prisoner suffered a heart attack and was left to die alone in his cell while other prisoners yelled for help that came far too late. On multiple occasions leading up to his death, this prisoner had complained of chest pain and shortness of breath, but medical staff failed to provide necessary follow-up care or to appreciate the critical nature of his condition. Staff ignore prisoners' suicide attempts as "attention seeking" and place prisoners with psychiatric disabilities in isolation as a punishment for self-mutilation, where the prisoners' condition only further deteriorates. According to a December 2016 Department of Justice report, the rate of suicides in Nebraska Department of Correctional Services ("NDCS") facilities is more than 30% above the national average for state prisons, and more than double the rate of the federal Bureau of Prisons.

3.     Prisoners who are blind, deaf, or hard of hearing are denied access to adequate health care and other programs and services due to Defendants' failure to provide accommodations, including auxiliary aids and services. Prisoners with mobility disabilities are

1

denied accommodations and support, leaving them to rely on other prisoners for help, which puts them at risk of injury and exploitation and excludes them from programs and services provided in inaccessible locations.

4.      These conditions have contributed to frequent violence at Nebraska's prisons. In the past two years alone, riots have left multiple staff members injured and four prisoners dead. In addition, the overuse of isolation, inadequate mental health care, and the failure to provide rehabilitation and pre-release and reentry planning have led to dangers not only to prisoners and staff, but to public safety. These failures have been cited as a precipitating cause of the recent crimes of Nikko Jenkins, who killed four people within days of his release without parole supervision, after serving two years in isolation.

5.      Despite these events, repeated warnings from prison staff, multiple reports by outside consultants, and recommendations from the Nebraska Legislature, Defendants have failed to take effective action to address these long-standing and well-known deficiencies. They have instead acted with deliberate indifference to the unconstitutional and discriminatory conditions and treatment of Nebraska's prisoners, resulting in unnecessary and avoidable pain, suffering, permanent injuries, and deaths.

6.      Plaintiffs, and the class of prisoners they seek to represent, request injunctive and declaratory relief to compel Defendants Nebraska Department of Correctional Services, Scott R. Frakes, and Harbans Deol (collectively, "NDCS Defendants"); and Nebraska Board of Parole and Julie Micek (collectively, "BOP Defendants") to immediately remedy the overcrowded, discriminatory, and unconstitutional conditions of Nebraska's prisons. Plaintiffs seek injunctive relief to compel Defendants to provide prisoners with constitutionally adequate health care, including medical, dental, and mental health care, and cease the unlawful and excessive use of

isolation. Plaintiffs further seek injunctive relief to compel Defendants to provide

accommodations, auxiliary aids, and services to, and to cease discriminating against, prisoners

with disabilities. Finally, Plaintiffs seek injunctive relief to abate the extreme overcrowding in

Nebraska prisons, which is a primary cause of the Constitutional and statutory violations

described in this complaint.

## II. JURISDICTION

7.      This action arises under the United States Constitution and 42 U.S.C. § 1983.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

8.      This Court has jurisdiction over Plaintiffs' claims arising under Title II of the

Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act

("Rehabilitation Act") and the regulations promulgated thereunder, pursuant to 28 U.S.C.

§§ 1331 and 1343.

9.      This Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive

relief pursuant to 28 U.S.C. §§ 2201 and 2202. This Court also has authority under the ADA (42

U.S.C. § 12205), Section 504 of the Rehabilitation Act (29 U.S.C. § 794a(b)) and 42 U.S.C.

§ 1988 to award Plaintiffs their reasonable attorneys' fees, litigation expenses, and costs.

## III. VENUE

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because

Defendants reside in the District of Nebraska; venue is also proper pursuant to 28 U.S.C.

§ 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims

occurred in the District of Nebraska.

## IV. PARTIES

11.     Plaintiff HANNAH SABATA is a 24-year-old female prisoner incarcerated in the

Nebraska Correctional Center for Women ("NCCW").  She was most recently detained on June

3

17, 2013. SABATA has schizophrenia and is HIV positive. Throughout her time at NDCS, she has experienced lapses and delays in receiving prescription medications for her HIV disease. This exacerbates her disabilities and places her at increased risk of harm. She has been housed in isolation several times at NCCW, frequently because of her schizophrenia, and her stays in isolation regularly last more than one month. In total, she has spent more than two years in isolation, which has exacerbated her psychiatric disability and increased her risk of suicide.

12.     SABATA was twice placed on regimens where she was only served nutraloaf for 9 consecutive meals (3 days). This occurred while she was already in isolation as punishment for failing to return a food tray on one occasion and for throwing a food tray on another.

13.     SABATA is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). SABATA is serving a sentence that allows for parole eligibility pursuant to Neb. Rev. Stat. § 83-1, 110. SABATA intends to request a parole hearing once eligible to do so, but she will require accommodations in order to complete the parole hearing process.

14.     Plaintiff DYLAN CARDEILHAC is a 19-year-old male prisoner incarcerated in the Tecumseh State Correctional Institute ("TSCI"). He was incarcerated as a juvenile in the Nebraska Correctional Youth Facility ("NCYF") from 2014 until June of 2017. CARDEILHAC has been put into isolation and placed in restraints on multiple occasions and has received inadequate and untimely medical care.

15.     CARDEILHAC was diagnosed with bipolar disorder when he was 13 years old. As a result, CARDEILHAC experiences shifts in mood, energy, and activity levels ranging from extremely elated (manic episodes) to very sad and hopeless (depressive episodes). Being placed in isolation and in restraints exacerbates these symptoms. NDCS has mismanaged his medication and treatment. In July 2016, CARDEILHAC attempted to overdose on an unknown medication

4

after he had been able to hide several days' worth of doses in his cheek without medical staff members' knowledge. Only nine months later in March 2017, CARDEILHAC was able to attempt another overdose by swallowing 16 pills.

16.     In March of 2017, CARDEILHAC spent 48 hours in five-point restraints without a mattress after attempting suicide. Although staff was supposed to check on him every two hours, they sometimes failed to check on him for three to four hours at a time. On several occasions, CARDEILHAC urinated on himself while restrained, after being told to do so by staff who refused to allow him to go to the bathroom. In May 2017, CARDEILHAC spent another 24 hours in five-point restraints. Prior to these events CARDEILHAC was held in isolation for several consecutive months during 2016. While in isolation, he had the water shut off to his cell for up to 72 hours at a time, had reading material and toilet paper taken away, and had to shower in shackles. During this time he suffered mental deterioration and exacerbation of his psychiatric disability. He has been placed in isolation for infractions as minor as "horseplay" and even for expressing suicidal thoughts. Housing in isolation has exacerbated his psychiatric disability and increased his risk of suicide. Since being transferred to TSCI, CARDEILHAC has been housed in isolation and has been told that he will remain there through at least the end of 2017.

17.     During his time in NDCS, CARDEILHAC was served only nutraloaf for 12 consecutive meals (4 days) after he threw a milk carton out of his cell when he was in isolation at NCYF. He has also been denied access to a prescribed splint that the doctor ordered him to wear on his hand for six to eight weeks due to an injury he suffered when he was at NCYF.

18.     CARDEILHAC is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). CARDEILHAC is serving a sentence that allows for parole eligibility pursuant to Neb. Rev. Stat. § 83-1,110. CARDEILHAC intends to request a parole hearing once

eligible to do so, but he will require accommodations in order to complete the parole hearing process.

19.     Plaintiff JAMES CURTRIGHT is a 52-year-old male prisoner incarcerated in the Lincoln Correctional Center ("LCC"); he has been incarcerated in NDCS facilities since July 3, 1986. CURTRIGHT is deaf and a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). He relies on American Sign Language ("ASL") to communicate and requires an ASL interpreter to allow him to communicate effectively with persons who do not know ASL.

20.     CURTRIGHT has never had his communication needs assessed. He has repeatedly requested access to a videophone to allow him to telecommunicate using ASL but has not been provided with one. He was denied access to a Telecommunications Device for the Deaf/Teletype ("TDD/TTY") for over four years, during which time he was completely unable to make phone calls to his friends and family.

21.     CURTRIGHT has serious mental health needs, but he cannot meaningfully participate in mental health counseling due to a lack of ASL interpreters and/or mental health staff fluent in ASL. It takes weeks for LLC to schedule an ASL interpreter for a mental health consultation, so CURTRIGHT's mental health care is consistently delayed, putting him at risk of serious harm or injury. In the past, he attended mental health treatment sessions in which the only mode of communication was passing written notes, a method which is slow, laborious, and often conveys incomplete information.

22.     CURTRIGHT also requires videos to be captioned to allow him to understand the information presented. He currently cannot understand any of the television or video programming provided at NDCS because they do not have captions. Some of these videos

6

include educational programs with information about managing finances, employment

assistance, and instructions on "how to get out" as well as emergency broadcast information and

medical information. CURTRIGHT knows of no policy or practice of notifying him of fire and

tornado alarms and as a result, he is at risk of harm or injury in an emergency. Without

captioning, CURTRIGHT is afraid he is missing out on critical information. Nor can he fully

participate in recreational television programming with other prisoners. In connection with the

Prison Rape Elimination Act, NDCS facilities have posters directing prisoners to call a certain

telephone number if they are victims of sexual assault while incarcerated. CURTRIGHT is

unable to call the number because of his disability, and he is unaware of any alternative practice

or policy that would allow him to contact the hotline.

     23.    While incarcerated in NDCS, CURTRIGHT has been rejected for jobs because of

his disability. He tried to become a medical porter and believes that he was not selected because

he is deaf.

     24.    In June 2017, CURTRIGHT requested to be assigned to a specific NDCS

caseworker who CURTRIGHT knows is fluent in ASL, so that he could communicate effectively

with his caseworker. This request was denied without explanation. The lack of NDCS staff

qualified to communicate using ASL and the limited access to interpreters results in effectively

isolating CURTRIGHT from those around him and renders him unable to effectively

communicate his needs, improperly subjects him to disparate treatment, and places his mental

and physical health in jeopardy by interfering with his ability to receive adequate health care,

including medical, mental health, and dental care.

     25.    CURTRIGHT is serving a sentence that allows for parole eligibility pursuant to

Neb. Rev. Stat. § 83-1,110. CURTRIGHT intends to request a parole hearing once eligible to do

so, but he will require accommodations, including an ASL interpreter, in order to fully participate in, understand and complete the parole hearing process.

26.     Plaintiff JASON GALLE is a 42-year-old male prisoner incarcerated in the Nebraska State Penitentiary ("NSP") since February 22, 2010. GALLE has chronic pain and mobility limitations after being shot in the femur during his arrest. Despite repeated requests for treatment to remove the bone fragments and set the fracture, NDCS Defendants have not approved him for surgery. This injury causes him such pain that he was often unable to bend over or to stand for more than 15 minutes at a time. The pain is so severe that he is unable to exercise, and he frequently skips meals in order to avoid walking on his leg. This has caused him to lose an alarming amount of weight.

27.     At various points in the past GALLE was given crutches and a cane to assist him with mobility, but in the summer of 2016, they were taken away because NDCS did not think he was using them enough and that he did not need them. Despite his mobility limitations, GALLE has been, and continues to be, housed in a cell without grab bars and without access to a shower with grab bars or a shower chair to allow him to bathe safely. GALLE has been forced to go up and down flights of stairs to get to his cell, to medical, and to other areas. In particular, in order to get to the medical areas, GALLE must go up two flights of stairs, which is painful due to his femur injuries. Recently, in July 2017, GALLE re-broke his femur and now cannot stand unassisted.

28.     GALLE has also recently experienced dental pain but has avoided seeking dental care due to a fear that NDCS dentists will extract his tooth, even if it can be saved. He has a broken partial denture that has not been addressed for months.

29.     GALLE has been diagnosed with paranoid schizophrenia, and he has been

hospitalized for a psychotic episode. He has also been diagnosed with depression and anxiety.

His psychiatric disabilities were exacerbated when he was placed in five-point restraints for an

indeterminate length of time in February 2012. His time in restraints was so traumatic that

GALLE now avoids seeking mental health treatment for fear of being restrained again. GALLE

was housed in isolation off and on from 2012 to 2014 for attempting to commit suicide, and this

isolation only intensified his suicidal thoughts and increased his risk of suicide. Following a

suicide attempt in 2014, GALLE was denied medication for his psychiatric disabilities and given

no reason for the denial other than a general statement that it was due to his "abuse" of

medications. GALLE was on a prescription medication regimen, but when he failed a drug test,

NDCS punished him by immediately terminating his medication regimen. This abrupt stoppage

in treatment caused GALLE severe physical withdrawal symptoms, and despite not having failed

a drug test for 12–18 months, GALLE has not been re-approved to take medication.

   30.    GALLE is a person with disabilities as defined in 42 U.S.C. § 12102 and 29

U.S.C. § 705(9)(B). GALLE is serving a sentence that allows for parole eligibility pursuant to

Neb. Rev. Stat. § 83-1, 110. GALLE intends to request a parole hearing once eligible to do so,

but he will require accommodations in order to complete the parole hearing process.

   31.    Plaintiff RICHARD GRISWOLD is a 53-year-old male prisoner incarcerated in

TSCI; he has been incarcerated since June 11, 2008. He has multiple disabilities including severe

chronic hip problems that limit his mobility, requiring the use of a walker and a wheelchair.

   32.    GRISWOLD underwent hip replacement surgery while in NDCS custody and has

since experienced chronic hip pain. Despite repeated requests for treatment to alleviate the hip

pain, GRISWOLD has not been provided any surgical or medical procedure to repair his hip.

Instead, NDCS medical staff prescribe a regimen of pain relievers, but these medications are

ineffective. His hip pain is so extreme that he frequently misses medical appointments because the pain is too severe to move, and no accommodation is made to enable him to access medical care. These missed appointments have led to NDCS staff chastising GRISWOLD and saying that he "must be an active participant in [his] own medical care" if he wants to feel better. GRISWOLD cannot access the gym or his classes at TSCI because they are located in areas without wheelchair ramps. In order to attend these classes, he needs a prisoner porter to lift him. If a porter is not available, GRISWOLD cannot attend his programming.

33.     In February 2012, GRISWOLD began displaying symptoms consistent with amyotrophic lateral sclerosis (ALS, also known as Lou Gehrig's Disease), including tremors and difficulty swallowing, but he was not seen by a neurologist until August 2015. Though ALS was eventually ruled out, GRISWOLD still has no formal diagnosis for his condition despite its persistence. Instead, he has been overmedicated with a drug called Amitriptyline. In May 2014, a blood test showed that the level of Amitriptyline in GRISWOLD's blood greatly exceeded the reference range and that he needed to be evaluated immediately for signs of toxicity. The excessive amounts of pain medication and Amitriptyline being prescribed to GRISWOLD in lieu of appropriate treatment has caused him to experience kidney and liver disease. He has been told by NDCS medical staff that he is suffering from kidney failure.

34.     GRISWOLD is legally blind in one eye. The Nebraska Commission for the Blind has sent GRISWOLD assistive devices such as magnifying glasses with lights, a talking alarm clock, and a talking watch, but NDCS Defendants withheld these items for months. Due to his blindness, GRISWOLD cannot complete grievance forms on his own, and NDCS Defendants have failed to provide accessible grievance forms or to assist him in filling out the forms.

35.     GRISWOLD has been diagnosed with bipolar disorder and post-traumatic stress

10

disorder. From January 2012 to June 2015, GRISWOLD was housed in isolation, and his

monthly mental status examinations amounted to little more than 13 "yes" or "no" questions

despite the fact that GRISWOLD continually requested treatment for his psychiatric disabilities

and suicidal thoughts. Though isolation served to exacerbate his psychiatric disabilities, he was

kept in isolation continuously for three and a half years.

      36.    GRISWOLD is a person with disabilities as defined in 42 U.S.C. § 12102 and 29

U.S.C. § 705(9)(B). GRISWOLD is serving a sentence that allows for parole eligibility pursuant

to Neb. Rev. Stat. § 83-1, 110. GRISWOLD intends to request a parole hearing once eligible to

do so, but he will require accommodations in order to complete the parole hearing process.

      37.    Plaintiff MICHAEL GUNTHER is a 62-year-old male prisoner incarcerated in

NSP; he has been incarcerated since April 15, 2005. GUNTHER has become blind since being

incarcerated: the mismanagement of his diabetes caused him to lose 90% of his vision in one

eye, and a physical injury which resulted in the loss of all vision in his remaining eye. His

prescription medications to treat diabetes have not been effective and he has been unable to have

them properly adjusted, exacerbating his symptoms and increasing the risk that he will suffer

serious harm. As a result of Defendants' failure to properly treat his diabetes, GUNTHER has

several diabetic ulcers on his lower extremities, causing him pain and increasing the likelihood

that he will require amputation. His diabetes has also caused neuropathy in his hands, legs and

feet, which makes using a walking/probing cane increasingly difficult. Additionally, the

neuropathy makes using a traditional blood sugar meter more difficult to use , and when batteries

ran out on the meter GUNTHER was able to use, NDCS Defendants refused to replace the

batteries.

      38.    Rather than provide adequate care and accommodations, NDCS Defendants have

accused GUNTHER of being intentionally difficult while serving his sentence..

39.     Because GUNTHER lost his sight while incarcerated, his ability to negotiate his environment is especially limited. GUNTHER was first provided a white tapping cane and a brief training by the Commission for the Blind while incarcerated, but NDCS Defendants have not trained him to use the cane effectively, nor has he been given any other accommodations or training for his blindness. GUNTHER has taught himself to navigate by counting his steps to various "landmarks" such as trash cans, but this is made difficult because NDCS staff regularly move objects around in his vicinity in order to confuse him. NDCS staff have also tripped him and put objects in his path.

40.     NDCS staff do not adequately clear the area of snow during the winter, and GUNTHER is unable to use his landmarks; because of this obstacle, he has gone days without eating during snowstorms because he has to walk outside to get to the dining area. The yard at NSP is very hilly and lacks accessible paths of travel. As a result, GUNTHER has experienced several falls during his time in NDCS custody. In February 2016, GUNTHER slipped on ice and needed medical attention for injuries to his face and legs. It is difficult and sometimes dangerous for him to access portions of the yard, including the church, the main commissary, the library and the barber shop. Because he lost his vision while incarcerated, GUNTHER has never had the opportunity to learn Braille and has no way to read written documents, and he has had to rely on other prisoners to help him make requests and access information. GUNTHER has been provided talking clocks, books on tape and Braille blocks by the Commission for the Blind, but these accommodations have been periodically confiscated by NDCS Defendants.

41.     GUNTHER also suffers from inadequate dental care and as a result he is limited in what he can eat and suffers continuous pain and discomfort. He has been on a "waiting list"

for more than a year and a half to have his broken dentures repaired or replaced. GUNTHER relies on the assistance of other prisoners to assist him with various tasks, such as filling out forms and preparing food, putting him at risk of exploitation.

42.     GUNTHER is a person with disabilities as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). GUNTHER is serving a sentence that allows for parole eligibility pursuant to Neb. Rev. Stat. § 83-1, 110. GUNTHER intends to request a parole hearing once eligible to do so, but he will require accommodations in order to complete the parole hearing process.

43.     Plaintiff ANGELIC NORRIS is a 42-year-old female prisoner incarcerated in NCCW; she was most recently detained on January 6, 2014. NORRIS is legally blind, and she is also diagnosed with a developmental disability and bipolar disorder. She suffers from hypertension for which she is not receiving adequate treatment, putting her at increased risk of further harm.

44.     NORRIS has been housed in isolation intermittently for her entire time at NCCW. She has frequently been housed in isolation because of her intellectual and psychiatric disabilities and as punishment for behaviors related to her blindness. NDCS Defendants alleged that NORRIS was using her walking cane to assault officers and placed her in isolation for an indeterminate length of time. She has also routinely been placed in isolation for threatening self-harm.

45.     NORRIS cannot fill out her own grievance forms due to her blindness and NDCS staff fail to assist her, despite the fact that her counsel sent a letter requesting that NDCS staff assist her with filing grievances. She has been provided with talking clocks, Braille blocks, and walking canes by the Commission for the Blind, but these accommodations have been routinely confiscated by NDCS staff. Because NDCS staff have prevented NORRIS from having access to

reading and writing materials she can use, she is unable to participate in group therapy and group classes because they rely on written materials. Defendants refuse to provide these documents in an alternate form for her use. In October 2014, NORRIS requested a transcription machine (an audio recording or text to Braille converter) so that she could take notes and more actively participate in NDCS programming. NDCS staff told NORRIS they would "investigate" but they never provided her with the equipment and gave no rationale for denying her request. NDCS staff also routinely claim that NORRIS is exaggerating her disabilities for attention and fail to provide her accommodations.

46.     NORRIS is a person with disabilities as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). NORRIS is serving a sentence that allows for parole eligibility pursuant to Neb. Rev. Stat. § 83-1, 110. NORRIS intends to request a parole hearing once eligible to do so, but she will require accommodations in order to complete the parole hearing process.

47.     Plaintiff R.P. is a 17-year-old juvenile male prisoner incarcerated in the NCYF and was most recently detained on January 15, 2016. He suffered an injury during his arrest, and he suffers from severe paranoia. R.P. experiences auditory hallucinations, and on occasion he has refused to drink water while incarcerated because he believes it is poisoned. R.P. has experienced panic attacks and anxiety attacks since 2014.

48.     He has routinely been housed in isolation at NCYF, where he is kept in his cell for 23 hours a day without TV or radio access. While in isolation, R.P. is only allowed to exercise outside 30 minutes a day, and this exercise is confined to a small pen. Despite only having been in custody approximately 18 months, he has been placed in restraints so frequently that he has scarring on his wrists and ankles. R.P. has been pepper sprayed by officers for failure to come to his cell door; his failure to come to the door was a product of his psychiatric

disabilities, and he was so frightened by the officers' entry into the room in riot gear with pepper spray that he voided his bladder and bowels.

49.    R.P. is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). R.P. is serving a sentence that allows for parole eligibility pursuant to Neb. Rev. Stat. §83-1, 110. R.P. intends to request a parole hearing, but he will require accommodations in order to complete the parole hearing process.

50.    Plaintiff ISAAC REEVES is a 19-year-old male prisoner incarcerated in NSP since June 2017. He was incarcerated as a juvenile in NCYF from November of 2013 until June of 2017. REEVES has been diagnosed with depression, and he suffers from panic and anxiety attacks. He has been noted to be "probable" for PTSD, and overt psychotic symptoms and manic behaviors have been witnessed by NDCS medical staff. REEVES has told NDCS staff that he struggles to sleep because he hears voices in his head.

51.    While a juvenile at NCYF, REEVES spent significant time in isolation and was confined to his room for 23 hours a day without television or radio. During one period in isolation, he was placed on a diet of only nutraloaf for 30 consecutive meals (10 days) as punishment for throwing a food tray. The nutraloaf was so disgusting that REEVES often elected not to eat. REEVES was pepper sprayed by NDCS custodial staff while in NCYF. REEVES has also spent significant amounts of time in five-point restraints, including for several days in May 2016 following a suicide attempt. REEVES tried to kill himself at least three times in isolation, including an attempted hanging, an attempted stabbing with a weapon made from the metal light switch, and an episode in which he bit his own left wrist down to the bone. Despite these attempts, REEVES was repeatedly placed in isolation for expressing suicidal thoughts. During his time in isolation, REEVES suffered dramatic weight loss (approximately 30 pounds). In total,

REEVES spent more than a year in isolation at NCYF.

52.     After being transferred out of NCYF, REEVES was brought to the Diagnostic and

Evaluation Center ("DEC") and placed in five-point restraints for five to six days. REEVES was

forced to soil himself while restrained, and the staff mocked him, telling them they would put

him in diapers. On another occasion at NSP, REEVES was placed in five-point restraints for four

to five days, and staff again mocked and punished him for soiling himself.

53.     REEVES has experienced severe long-term harm from his time in isolation at

NCYF. His eyes are so sensitive to sunlight that it is often hard for him to see. REEVES paid to

have his glasses tinted, but the protection was inadequate and he has not been provided other

accommodations by NDCS. REEVES suffers daily from anxiety attacks and night terrors from

his time in isolation and in five-point restraints. REEVES is fearful of accepting mental health

care and medications because he fears he would be required to go back to the DEC, where he

was in five-point restraints after a suicide attempt.

54.     REEVES has experienced dental pain, and NDCS medical staff was incapable of

performing a full examination because he was in isolation. The dentist did not see him until over

six months later,.

55.     REEVES is a person with a disability as defined in 42 U.S.C. § 12102 and 29

U.S.C. § 705(9)(B). REEVES is serving a sentence that allows for parole eligibility pursuant to

Neb. Rev. Stat. § 83-1, 110. REEVES intends to request a parole hearing once eligible to do so,

but he will require accommodations in order to complete the parole hearing process.

56.     Plaintiff ZOE RENA is a 30-year-old female prisoner incarcerated in NCCW

since July 24, 2015. She is committed under the name Cassie Zoubek, but her legal and preferred

name is Zoe Rena. RENA has been housed in isolation while in NDCS custody, including as

punishment for protesting NDCS staff failure to appropriately clean her cell after her cellmate

contracted Methicillin-resistant Staphylococcus aureus (MRSA), a potentially fatal bacterial

infection.

57.    RENA has repeatedly requested treatment for tooth, mouth, and jaw pain, but

NDCS staff withheld or delayed treatment, causing her pain and discomfort. On both June 24,

2016 and July 13, 2016, NDCS medical staff noted she had abscesses in her mouth following an

earlier procedure, but they did nothing to treat them. RENA did not have any dental care until

August 23, 2016, two full months after the abscesses were first noted, and did not receive

appropriate treatment for her condition. RENA has also had a tooth pulled even though it was

only chipped and could have been saved; on another occasion, she went to the dentist for what

she thought was a root canal, only to have more teeth pulled. She has had three teeth pulled in

the approximately two years she has been in NDCS custody. RENA is afraid to go back to the

dentist because she thinks the dentist will just pull more of her teeth.

58.    RENA experienced a menstrual cycle that lasted for three consecutive months;

she was given an ultrasound of her ovaries and uterus, but was never told the results and was

never informed of a treatment plan. RENA has experienced a chronic skin rash that causes

significant discomfort. The rash did not occur before she was incarcerated, and NDCS staff have

been unable to diagnose and properly treat this condition. NDCS staff told her that they do not

employ a dermatologist; nor will they send her to a dermatologist for treatment. RENA is serving

a sentence that allows for parole eligibility pursuant to Neb. Rev. Stat. § 83-1, 110. RENA

intends to request a parole hearing once eligible to do so.

59.    Plaintiff BRANDON SWEETSER is a 45-year-old male prisoner incarcerated in

NSP and was most recently detained on June 25, 2015. SWEETSER has Hepatitis C but was

deemed ineligible for treatment in NDCS facilities because his illness is not sufficiently advanced. Without treatment, his Hepatitis C continues to worsen and causes him unnecessary pain and suffering.

60.     SWEETSER underwent surgery for a perforated bowel in January 2016. Since then, he has been in chronic pain and he struggles to walk and move his limbs due to the pain. In the medical unit post-operation, doctors told SWEETSER to walk around each hour to prevent blood clots and support recovery. Due to understaffing, no one assisted with walking and instead he spent eight to ten hours a day shackled to a bed. Because of his inability to walk as the doctors had instructed him, SWEETSER's legs and ankles became swollen, which made all movement difficult and painful. SWEETSER was supposed to see a specialist outside NDCS six to eight weeks after his procedure to check his progress, but he did not see a specialist for a full year. For the first eleven months following surgery, the pain was so intense that he only left his cell for food, and would regularly skip meals because he was in too much pain to move. SWEETSER has difficulty showering and dressing, and he is often bedridden 20 hours a day from the pain. SWEETSER experiences severe pain whenever he must go up or down a flight of stairs, and almost everywhere in the prison that SWEETSER needs to access requires use of stairs. NDCS medical staff have not determined what is wrong with SWEETSER, and his condition has persisted. His only remedy has been prescription pain medication, but he has not received any further medical or surgical procedure to address the root cause of the pain. Recently, SWEETSER has experienced back pain and a golf ball-sized lump on his left shoulder, but medical staff informed SWEETSER that they would not "waste taxpayer money" on anything that was not life-threatening.

61.     SWEETSER has also been diagnosed with paranoid schizophrenia and sometimes

experiences visual and auditory hallucinations. SWEETSER has not received consistent mental

health care while in NDCS custody, and his paranoid schizophrenia has worsened as a result.

SWEETSER was previously prescribed an injection medication, but it had such serious side

effects that he stopped treatment and has not been prescribed an alternative. He has repeatedly

requested treatment for addiction, but his requests have been denied because he is not close

enough to parole eligibility. SWEETSER is a person with a disability as defined in 42 U.S.C.

§ 12102 and 29 U.S.C. § 705(9)(B). SWEETSER is serving a sentence that allows for parole

eligibility pursuant to Neb. Rev. Stat. § 83-1, 110. SWEETSER intends to request a parole

hearing once eligible to do so, but he will require accommodations in order to complete the

parole hearing process.

62.     Defendant Nebraska DEPARTMENT OF CORRECTIONAL SERVICES

("NDCS") is a public entity duly organized and existing under the laws of the State of Nebraska.

NDCS employs 50 or more persons and is ultimately responsible for, and retains ultimate

authority over, the operation of Nebraska state prisons, including the housing and treatment of

Plaintiffs and the class they seek to represent. NDCS receives state and federal funds for the

operation of the state prisons and has received such funds at all times relevant to this complaint.

63.     Defendant SCOTT R. FRAKES is the Director of NDCS, and he is sued herein in

his official capacity. At all times relevant hereto, he has acted under color of state law.

64.     Defendant HARBANS DEOL is the Medical Director of NDCS, and he is sued

herein in his official capacity. At all times relevant hereto, he has acted under color of state law.

65.     Defendant NEBRASKA BOARD OF PAROLE ("BOP") is a public entity duly

organized and existing under the laws under the state of Nebraska. The BOP employs 50 or more

persons and is ultimately responsible for, and retains ultimate authority over, the operation of

parole eligibility notifications, hearings, and ongoing review of parole eligibility for Plaintiffs and the class they seek to represent. The BOP receives state and federal funds and has received such funds at all times relevant to this complaint.

66.     Defendant JULIE MICEK is the Board of Parole's Acting Parole Administrator, Director of Supervision and Services and is the liaison between Parole Administration and the Board of Parole. She is sued herein in her official capacity. At all times relevant hereto, she has acted under color of state law.

67.     Plaintiffs are ignorant of the true names and capacities of Defendants sued in this complaint as DOES 1 through 20, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named Defendants is personally responsible in some manner for the occurrences alleged in this complaint.

68.     At all times mentioned in this complaint, each Defendant was the agent of the others and was acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them was committed on behalf of every other Defendant.

## V. FACTUAL ALLEGATIONS

**A.      Overview of the NDCS System and NDCS Defendants**

69.     NDCS Defendants (Defendants NDCS, FRAKES, and DEOL) are responsible for operation of all NDCS facilities, which currently house approximately 5,228 prisoners. The mission of NDCS is to "keep people safe." The NDCS system comprises ten facilities: Community Corrections Centers in Lincoln and Omaha ("CCC-L" and "CCC-O"), DEC, LCC, NCCF, NCYF, NSP, Omaha Correctional Center ("OCC"), TSCI, and Work Ethic Camp ("WEC").

70.    CCC-L and CCC-O are community residential programs that offer work release, educational release, furloughs, community activity passes, ABE/GED and substance abuse programming, among others, and house men and women classified at Community A or B custody levels. WEC is a minimum security facility for males that is integrated with the Administrative Office of the Courts, Probation and the Board of Parole. DEC processes all adult males sentenced to the NDCS and also houses those sentenced by the court for assessment, interstate transfers, and returned parolees and escapees. LCC and OCC house medium and minimum security male prisoners. TSCI houses medium, maximum, and death-sentenced male prisoners. NSP is the state's oldest facility and houses male prisoners of all security levels. NCYF houses all male juveniles from early adolescence to age 21 years 10 months. NCCW houses minimum, medium, and maximum security female prisoners.

71.    As Director of NDCS, Defendant FRAKES is responsible for overseeing the incarceration and supervision of prisoners in NDCS. Nebraska law provides that Defendant FRAKES is also responsible for the "housing, treatment, [and] medical and mental health services" of all persons in the custody of NDCS. Further, he is responsible for guaranteeing that "the department shall provide a community standard of health care to all [prisoners]," which means "medical care of the type, quality, and amount that any individual residing within the community in question would expect to receive in that community." For all purposes herein, healthcare "means all medical care provided by or on behalf of the department [of correctional services] and includes the practice of medicine and surgery, . . . pharmacy, nursing care, dental care, optometric care, . . . [and] mental health care." Further, Defendant FRAKES is responsible for selecting and supervising a Medical Director to oversee the healthcare of prisoners at NDCS. It is Defendant FRAKES' responsibility to ensure that all prisoners are treated in a reasonable

and humane manner and to ensure all conditions of confinement are lawful and constitutional.

72.      Defendant FRAKES knows that NDCS is dangerously overcrowded, severely

understaffed, and that its policies, practices and procedures result in an ongoing substantial risk

of serious and avoidable pain, suffering, injury and death to NDCS prisoners.

73.      Defendant DEOL is Medical Director for NDCS. As Medical Director, Defendant

DEOL is responsible for the coordination of all clinical services, the selection and supervision of

all clinical staff employed by or under contract with NDCS, the training of clinical staff, training

and procedures to address medical emergencies, the development and implementation of disease

and condition-specific treatment protocols, and developing and implementing a system of timely

access to health care for prisoners. He is responsible for developing and implementing protocols

consistent with the community standard of care addressing (a) treatment of gastrointestinal

bleeds; (b) detection and treatment of all communicable diseases; (c) treatment of gender-

specific problems; (d) treatment of diabetes; (e) treatment of hypertension; (f) treatment of

headaches; (g) utilization of surgical procedures; (h) control of infection; (i) provision of dental

care; and (j) provision of age-specific and gender-specific routine health maintenance.

74.      Nebraska law also states that Defendant DEOL is responsible for ensuring "that

each facility has at least one designated medical doctor on call at all times and that each facility

housing more than five hundred [prisoners] has at least one full-time medical doctor assigned to

that facility…". Additionally, Defendant DEOL must "establish an acute care clinic in each of

the correctional facilities and ensure that each clinic is staffed by at least one medical doctor,

physician assistant, or advanced practice registered nurse . . . .". Defendant DEOL must also

make sure that "[a]ll medical treatment protocols developed, approved, and implemented by the

department shall be based upon a community standard of health." Further, Defendant DEOL, as

medical director, "shall develop and implement medical treatment protocols regarding the use of drugs, devices, or biologicals for the treatment of [prisoners] and shall ensure that those protocols are consistent with a community standard of health care."

75.    Defendant DEOL knows that NDCS is severely overcrowded, dangerously understaffed, and that its policies, practices and procedures result in an ongoing substantial risk of serious and avoidable pain, suffering, injury and death to NDCS prisoners.

**1.    Chronic Overcrowding at NDCS Facilities**

76.    NDCS facilities are chronically and severely overcrowded.

77.    According to NDCS' Quarterly Datasheet for January – March 2017, NDCS facilities house approximately 5,228 prisoners, despite their combined institutional capacity of only 3,275 prisoners. On average, across all ten NDCS facilities, Nebraska prisons are operating at 159% capacity, while some facilities are at nearly 200% capacity, and the DEC is at over 300% capacity.

78.    NDCS facilities have been overcrowded for over twenty years, and during that time the problem has worsened.

79.    In 1997, a Strategic Capital Facilities Master Plan commissioned by NDCS ("1997 NDCS Master Plan") found that, as of January 14, 1997, the NDCS system was operating at 142% of design capacity.

80.    In 2006, NDCS commissioned a Strategic Capital Facilities Master Plan ("2006 NDCS Master Plan") to update the 1997 NDCS Master Plan. The 2006 NDCS Master Plan found dangerous levels of overcrowding and recommended the addition of more bed space, particularly drug treatment, minimum security, and community custody beds.

81.    In 2014, NDCS again commissioned a Strategic Capital Facilities Master Plan ("2014 NDCS Master Plan") to update the 2006 NDCS Master Plan. Overcrowding was still

found to be at critical levels, and in the eight years between the reports, bed count went down by more than 400 while prisoner population increased by over 600, creating even more strain on the system. According to the 2014 Master Plan, in October 2013, NDCS was at 150.61% capacity. This critical overcrowding has long been known to NDCS Defendants and was recognized as "an urgent need for resolution, either by reducing the population or increasing the number of beds."

82.     As a result of overcrowding, two or more prisoners are frequently housed in cells designed for one—and many prisoners are even double-celled in tiny isolation cells. Prisoners are also crammed into common areas that have been made into makeshift sleeping quarters, with temporary plastic floor cots (known as "boats") serving as beds.

83.     Despite NDCS Defendants' knowledge of the persistent and severe overcrowding at NDCS facilities for over twenty years, they have not acted to alleviate it.

84.     A 2015 report prepared by the Council of State Governments Justice Center projected that Nebraska's prisons would reach 170% capacity by 2020 despite a *decline* in crime and arrests. Nebraska's incarcerated population increased 19 percent between 2004 and 2013, the seventh largest percentage increase of any State in the country, while nationally the incarceration rate declined by 2% for that same time period. The 2015 Justice Center report attributed the increases in population in part to (1) the fact that prisoners with short sentences are consuming scarce space and prison resources, instead of being sentenced to probation, while receiving little or no treatment or post-release supervision, and (2) the need to reform the sentencing and parole systems.

**2.     Flawed Parole System**

85.     The Board of Parole's ("BOP") policies and practices exacerbate the overcrowding problem at NDCS facilities. BOP's responsibilities include, but are not limited to, (a) determining the time of release on parole of committed prisoners eligible for release,

including recommending whether a prisoner should be authorized for furlough or work release privileges; (b) notifying prisoners of their eligibility for parole; (c) holding parole hearings and setting conditions for parole; and (d) performing a review of prisoner records on a regular basis to determine whether parole is warranted. Despite the NDCS' professed focus on rehabilitation, many prisoners are not given the opportunity to seek parole, and instead serve their maximum sentences or "jam out." In some facilities, prisoners are required to complete certain programming before they are considered parole-eligible—programming which is not available to them due to overcrowding and lack of resources. And across NDCS facilities, prisoners with disabilities are discriminated against in the parole system, unable to access and navigate proceedings that are inaccessible to them and required to complete programs that are not available to them. As a result of these policies and practices, fewer prisoners are paroled, inflating the overall prison population and harming public safety. Large numbers of NDCS prisoners "jam out" and are released to the community without any parole supervision.

### 3.   Understaffing, Lack of Training, and Lack of Resources

86.    NDCS facilities are drastically and dangerously understaffed. For those staff that NDCS does employ, training is minimal, overtime is abused, and turnover is high.

87.    A December 2016 Committee Report to the Nebraska Legislature found that NDCS was experiencing severe understaffing of both custodial and clinical staff.  Vacancies in allocated positions were very high and turnover was also high.  According to the report, as of July 2016, there were almost 200 protective service staff vacancies across NDCS and 34 vacancies in mental health, including a critically low number of psychologists (only 11 out of 23 positions filled). The turnover rate across all NDCS positions is almost 24%, and the turnover rate in protective service staff positions is almost 31%. Defendant FRAKES has himself stated that a turnover rate exceeding 15% creates instability and management issues. Even the Office of

25

Inspector General of the Nebraska Correctional System has recognized that "NDCS is in a staffing crisis." Turnover in NDCS has skyrocketed; in 2015, 565 positions experienced turnover and in 2016, 613 positions experienced turnover.  In addition, the NDCS Behavioral Health Administrator has testified that NDCS needs more psychologists than the current *full* allocation, especially to address the treatment needs of prisoners held in isolation.

88.     Typically, correctional officers work 12-hour shifts. Mandatory overtime, where NDCS staff are required to work an additional four hours before or after their 12-hour shifts to cover a vacancy, is common. In addition, correctional staff are often assigned duties outside their job classification because of staff shortages. These dangerous practices put staff and prisoners in danger because staff are overextended and asked to perform duties they may not be trained to perform.

89.     New employees are often being trained by other new staff, who are not yet sufficiently qualified to train others. Defendant FRAKES is fully aware of the staffing and training problems at NDCS facilities. He has previously referred to NDCS as "treading water" where filling vacancies was concerned. Additionally, Inspector General reports have repeatedly documented the staffing crisis. Defendant FRAKES has also surveyed his staff on the culture of NDCS, and employees have frequently referred to staffing difficulties. One employee commented in response to an internal survey that the job is "sink or swim and a lot are sinking." Other "[e]mployees consider the ratio of [prisoners] to employees out of balance."

90.     Inadequate resources for programming and insufficient staffing leads staff to believe that NDCS is simply "warehousing" prisoners. Staff report that employees do not "know what the hell they're doing" and remark that "without resources, good luck" rehabilitating anyone.

### 4. Dangerous Consequences for Public Safety in Nebraska

91.     All of these conditions present a grave danger to prisoners, staff, and the public. The NDCS Defendants' failure to remedy these conditions has had disastrous consequences.

92.     In 2013, prisoner Nikko Jenkins was released directly into society after being confined in isolation for two years. Within days of his release, he killed four people. Jenkins' extended isolation and lack of mental health treatment has been cited as a contributing factor in his subsequent violence.

93.     In response to the Jenkins case, the Nebraska Legislature passed Legislative Resolution 424, which created the Department of Correctional Services Special Investigative Committee ("Committee"). The Committee examined the use of isolation and the mental health treatment and programming available to prisoners. A report issued on December 15, 2014, detailed sixteen recommendations, including establishing the Office of Inspector General of the Nebraska Correctional System to conduct audits and investigations, mandating declaration of a correctional system overcrowding emergency when NDCS population exceeds 140%, and reforming the use of isolation.

94.     In the following year, the Legislature reconstituted the Committee in order to evaluate the progress made on the December 2014 recommendations. The Committee held hearings on staffing, overcrowding, mental and behavioral health treatment, programming, and isolation in NDCS.

95.     The Committee issued a report on December 22, 2016, which found that despite the 2014 recommendations, overcrowding remains an acute problem at NDCS. Design capacity was not increased, in large part because NDCS could not staff a new facility given the staffing crisis with existing facilities. Resources were not allocated to increase capacity, and legislation intended to change criminal sentences did not clear the Nebraska Legislature. The 2016 report

also found that the absence of sufficient and appropriate programming for prisoners is directly

linked to both increased staff assaults and overcrowding (because prisoners cannot complete the

programs required for parole), and that continued programming deficiencies pose a risk to public

safety, as prisoners released without having attended appropriate programming are more likely to

reoffend. The 2016 report also found that, despite the recommendations made in the 2014 report,

the absence of appropriate mental health care continued to result in problems, including the

overuse of isolation, which exacerbates prisoners' psychiatric disabilities, suicidality, and self-

mutilation.

96.     Overcrowding, understaffing, and underfunding of services at NDCS facilities has

also led to dangerous and increasingly frequent prison riots.

97.     On May 10–11, 2015, two prisoners died when several hundred prisoners rioted at

TSCI in what has become known as the "Mother's Day Riot." The riot lasted for more than ten

hours, during which uncontrolled prisoners assaulted staff and destroyed more than $2,000,000

in property. Prisoners provided staff and media a list of grievances motivating their actions;

arbitrary use of isolation, inadequate programming, inadequate staffing, and overcrowding were

the four primary grievances. Moreover, the severity and duration of the riot suggest there were

inadequate staff on hand to follow appropriate riot response protocol.

98.     Two years later, on March 2, 2017, some 40 prisoners rioted again at TSCI,

resulting in the deaths of two more prisoners and injuries to dozens more. Only two weeks after

that, on March 16, 2017, another outburst of violence at TSCI resulted in injuries to four staff

members. One month later, on April 19, 2017, three staff members were injured after an

altercation with a prisoner; two of those staff members required treatment at a nearby hospital.

99.     Most recently, on April 7, 2017, prisoners started a fire in the dangerously

overcrowded DEC facility, which was operating at 300% of capacity on the day of the incident. During the incident, non-rioting prisoners were locked in their cells for hours and forced to inhale smoke from the fires. Overcrowding and inadequate staffing by NDCS Defendants have been cited as causes for this incident.

100.    Overcrowding, understaffing, and underfunding of services at NDCS facilities also prompts less severe outbreaks of violence and protest by prisoners, including incidents that resulted in injuries to prison staff. On at least four occasions since 2015, NDCS facilities have been placed on lockdown during these incidents.

101.    Poor conditions and overcrowding at NDCS facilities also have serious consequences for the mental health of Nebraska prisoners. Emblematic of this mental health epidemic is the high rate of suicides in NDCS facilities. According to a U.S. Department of Justice report, from 2001 to 2014, the suicide rate in Nebraska prisons was 21 per 100,000 prisoners, more than 30% higher than the national average for state prisons of 16 per 100,000.

102.    Despite these powerful incentives for change, the NDCS Defendants have failed to remedy the overcrowded, understaffed, and underfunded conditions plaguing the NDCS system.

103.    These conditions are the primary cause of the Constitutional and statutory violations described herein, including (1) substandard health care, including medical, mental health, and dental care for prisoners, (2) overuse and improper use of isolation, including isolation of juveniles; and (3) discrimination against and failure to accommodate prisoners with disabilities.

**B.    NDCS Defendants Routinely Overuse and Improperly Use Isolation**

104.    NDCS Defendants' policies and practices with respect to housing prisoners in isolation violate the Eighth Amendment's prohibition on cruel and unusual punishments, the

29

Americans with Disabilities Act, and the Rehabilitation Act.

105.     NDCS Defendants use the term "restrictive housing" to encapsulate immediate segregation, disciplinary segregation, administrative confinement, and intensive management. For purposes of this complaint, Plaintiffs refer to all of the above, collectively, as "isolation."

106.     NDCS Defendants have long overused isolation in violation of the Eighth Amendment and other federal law. During a six-week period in 2014, approximately 950 of the state's 5,100 prisoners—almost one in five—were held in some form of isolation, an excessive use of this dangerous practice.

107.     NDCS Defendants' policies and practices permit the use of isolation without restriction on juveniles, despite the knowledge that isolation of juveniles may cause or worsen depression, paranoia and outbursts in anger, and increased risk of suicide and other permanent harms.

108.     Due to critical levels of overcrowding, NDCS Defendants use isolation beds as "extra beds" for prisoners of all custody levels, with no functional difference in housing between medium and maximum security. Prisoners have long complained that the decision to put a prisoner into isolation is arbitrary and often retaliatory; this complaint was the first on a handwritten list of grievances offered by the prisoners during the TSCI Mother's Day Riot.

109.     In addition, overcrowding in NDCS facilities routinely leads to NDCS Defendants assigning two prisoners to an isolation cell designed for one (referred to as "double celling"); the two prisoners are often confined together for upwards of 22 hours per day in a cell that can be as small as a parking space. This practice can have deadly consequences. On April 15, 2017, a prisoner in an isolation cell at TSCI summoned correctional officers to assist his unresponsive cellmate; the cellmate, Terry Berry, eventually died, and the prisoner has been charged with first-

degree murder. Nebraska State Ombudsman staff commented to the press, in reference to two prisoners being housed in an isolation cell: "Why were there two people in that one cell?"

110. The large majority of adult prisoners in isolation in NDCS are held in four facilities: LCC, OCC, NSP, and TSCI. Conditions of isolation are designed to minimize human contact and environmental stimulation. Isolation cells are constructed completely of concrete and have small box windows. Isolation units where prisoners are kept in five-point restraints are entirely without windows. Many isolation cells completely lack personal property, including televisions and radios. Prisoners with disabilities are often deprived of their auxiliary aids, such as Braille blocks, talking clocks, walking canes, and TDD/TTY machines.

111. Prisoners in isolation often go months or years without any meaningful human interaction. Unless they are fortunate enough to receive a brief medical or legal appointment or a visit, prisoners are isolated from virtually all human contact. Their only regular interaction with another human being occurs when correctional staff deliver their food trays, or place them in restraints and strip-search them while taking them to or from their cell. The lack of human contact is so severe that some prisoners have taken to smearing their own feces on the wall just to get someone to talk to them.

112. Prisoners in isolation lack access to the programming, such as the Violence Reduction Program, that is available to prisoners in general population.

113. Instead of using isolation as punishment for only the most serious rules infractions, NDCS Defendants commonly place prisoners in isolation for technical and non-serious violations, including "horseplay" or being in an unauthorized area.

114. NDCS Defendants enforce a policy that makes "mutilation of self" a punishable infraction. Thus, prisoners with psychiatric disabilities, rather than being treated for their self-

31

mutilation, suicidality, or other signs and symptoms of psychiatric disabilities, are disciplined for the manifestations of their disabilities and placed in isolation. These disability-related behaviors are often exacerbated by isolation.

115.    NDCS Defendants have a policy and practice of punishing prisoners in isolation by denying them normal food and instead serving them only nutraloaf, a tasteless and disgusting loaf of starches and grains. Prisoners are often served nutraloaf for every meal for several consecutive days. Nutraloaf is so distasteful and inedible that prisoners sometimes stop eating altogether. Serving nutraloaf as punishment is banned in the prison systems of several states; other states require a hearing with due process protections before a nutraloaf-only diet can be imposed. NDCS Defendants' policy and practice permits the arbitrary and capricious use of nutraloaf punishment without any hearing.

116.    The devastating effects of these conditions of extreme social isolation and environmental deprivation are well known to NDCS Defendants. Isolation has long been recognized as damaging to mental and physical health. Recently, a study from the New York Academy of Medicine showed that experiencing isolation makes a prisoner 2.5 times more likely to experience symptoms of post-traumatic stress disorder (PTSD). Other research indicates that suicide and self-mutilation rates are far higher for prisoners in isolation. Isolation exacerbates psychiatric disabilities, and it can lead to cognitive deterioration and heightened stress-related symptoms. Isolation can also exacerbate, and in some cases cause, physical and/or psychiatric disabilities, including gastrointestinal disorders, insomnia, eyesight deterioration, heart palpitations, migraines, and profound fatigue. Even those who endure the effects of isolation better than others are subjected to intolerable conditions, as they are forced to endure the hallucinations and screaming of other prisoners suffering the debilitating effects of isolation.

117.    In 2015, the United Nations General Assembly adopted the U.N. Standard

Minimum Rules for the Treatment of Prisoners, known as the "Nelson Mandela Rules." These

rules explicitly prohibit "[i]ndefinite" or "[p]rolonged" isolation; the latter is defined as "a time

period in excess of 15 consecutive days." The Rules stress that isolation is a measure of last

resort and should only be used "for as short a time as possible and subject to independent review,

and only pursuant to the authorization by a competent authority."  By contrast, new rules in the

Nebraska Administrative Code which took effect in 2016 still refer to isolation of less than thirty

days as "short term" and contemplate "longer-term restrictive housing" "primarily as a behavior

management intervention."  72 Neb. Admin. Code, ch. 1, §§ 003.03, 003.04. When a prisoner is

assigned to "longer-term restrictive housing," the rules only require review of the prisoner's

assignment every three months. *Id.* at § 004.03(B)(iv).

118.    The Nelson Mandela Rules also provide that isolation is prohibited in the case of

youth under the age of 18. The U.S. Department of Justice has similarly advised that juveniles

should not be placed in isolation and that corrections officials should limit, whenever possible,

use of isolation against "young adults," classified as those ages 18–24 at the time of conviction.

When juveniles are housed in isolation, a maximum stay of less than four hours is indicated.

New York has recently agreed to ban isolation for juveniles in state prisons. Policies and

practices at NDCS facilities stand in stark contrast to these recommendations. During fiscal year

2016, NDCS officials housed almost 200 prisoners aged 17–21 in isolation. Moreover, juvenile

prisoners have described being placed in isolation for months on end for up to 23 hours a day.

119.    NDCS policies, procedures, and practices do not provide for effective monitoring

of prisoners in isolation. For those without a mental health diagnosis, mental health professionals

check in only once every 90 days on prisoners in isolation. The American Bar Association

recommends that any prisoner in segregated housing for more than 24 hours meet in-person with qualified mental health professionals, and that correctional staff log prisoners' behaviors daily.

120.    NDCS Defendants routinely use five-point restraints on prisoners in isolation, and this use is improper and punitive. The American Bar Association standard on use of restraints clearly states that "four- or five-point restraints should be used only if a prisoner presents an immediate and extreme risk of self-injury or injury to others" and that such restraints should only be used "after less restrictive forms of restraint have been determined likely to be ineffective." Five-point restraints are especially dangerous because they can lead to death by asphyxiation or strangulation. When their use is unavoidable, it must be supervised by a qualified health care professional. During the entire time the prisoner is in restraints, the American Bar Association recommends that prisoners are video- and audio-recorded, and prisoners should be checked every fifteen minutes by medical staff to evaluate the continued need for restraint and to ensure prisoner safety. NDCS mental health staff monitor patients in behavioral restraints as infrequently as once every 12 hours. Prisoners have also been restrained to hard beds with no mattresses.

121.    With respect to isolation of prisoners, the NDCS Defendants employ policies, practices, and procedures that cause undue pain, suffering, and risk of harm to prisoners at NDCS facilities. These include the following:

    a)    Using isolation as a punishment for a prisoner's mental health crises or request for mental health care;

    b)    Placing prisoners with psychiatric disabilities in isolation instead of in secure or appropriate treatment beds;

    c)    Housing prisoners in isolation for long periods of time without adequate

34

supervision or mental health care;

       d)      Using nutraloaf as punishment;

       e)      Using five-point restraints as punishment, without adequate supervision, or for unnecessarily long periods of time;

       f)      Using pepper spray on prisoners with psychiatric disabilities;

       g)      Providing inadequate suicide prevention programs and monitoring of prisoners in isolation who are at risk of suicide and failure to remove suicide hazards from isolation cells;

       h)      Using isolation on juvenile prisoners without restrictions and without regard to the inherently increased dangers it poses for juveniles, including increased risk of pain, suffering, and permanent harm, including death by suicide.

122.    NDCS Defendants' ongoing policies and practices of imposing harsh and deprived conditions on prisoners in isolation, rather than supportive housing and mental health treatment of prisoners who express suicidal ideation, self-mutilate, or attempt suicide, evidence the deliberate indifference of Defendants FRAKES and DEOL to the substantial risk of serious harm, mutilation, and death from these isolation policies and practices. These policies and practices discourage prisoners from seeking mental health care and increase the risk of self-harm and suicide.

## C.    NDCS Defendants Provide Constitutionally Inadequate Health Care

123.    NDCS Defendants' policies and practices result in health care that violates the Eighth Amendment's prohibition on cruel and unusual punishments. Defendants FRAKES and DEOL are deliberately indifferent to such violations. NDCS Defendants are required by law to provide the "community standard of health care" to all prisoners, but they fall far below that measure. NDCS Defendants are well aware of severe system-wide deficiencies that have caused

and continue to cause significant harm to the prisoners in their custody, yet they have failed to take reasonable measures to abate this impermissible risk of harm.

124.   NDCS Defendants fully control all aspects of health care available to prisoners, including medical, mental health, vision, hearing, and dental care. NDCS Defendants prohibit prisoners from obtaining any medications without approval from NDCS Defendants. NDCS Defendants control whether prisoners have medical devices like hearing aids. Prisoners at NDCS cannot be seen by any medical professionals, inside or outside of NDCS, without approval from NDCS Defendants. Prisoners cannot receive laboratory or other diagnostic testing without approval from NDCS Defendants. In short, prisoners are at the mercy of NDCS Defendants for all aspects of their health care.

125.   NDCS Defendants maintain insufficient numbers of health care professionals to provide minimally adequate care to the more than 5,200 prisoners in their custody. There are not sufficient health care staff to timely respond to prisoners' requests for medical evaluations and treatment; to adequately screen, monitor, and provide follow-up care to prisoners who are suffering from serious and chronic illnesses; or to treat prisoners on an emergency basis. The small number of health care staff that NDCS Defendants do employ are not sufficiently trained.

126.   The failure to provide adequate health care, including mental health, medical, and dental care, begins at intake. When prisoners are newly admitted to NDCS, they are sent to DEC. There, prisoners are evaluated for medical or mental health conditions, though given that DEC consistently operates at 300% of its capacity, this process can take weeks or months. During the intake process, NDCS Defendants often fail to identify prisoners with chronic illness and other disabilities including hypertension, asthma, and diabetes. Female prisoners are not routinely provided with pregnancy tests, even when they report a recent rape. Prisoners entering the NDCS

36

system are not properly screened for psychiatric, intellectual, sensory and physical disabilities, or other behavioral needs. This causes significant risk of harm by exacerbating prisoners' disabilities; causing harm and injury to prisoners with chronic illnesses and disabilities; and placing them in inappropriate housing settings, which puts them at risk of violence and exploitation.

127.    The substandard care continues throughout prisoners' incarceration in NDCS facilities. Medical screening procedures and appointments are routinely conducted in non-confidential and non-sanitary treatment space and hallways. Prisoners in isolation receive mental health "check-ins" which are conducted through the door of the cell, within earshot of other prisoners and correctional staff, compromising confidentiality and quality of care.

128.    If prisoners are seen by health care staff at all, they often experience substantial delays in receiving those appointments. Prisoners also experience long delays before they are seen and treated by outside specialists, before they receive surgery at outside facilities, or before they receive dental care. Further, NDCS Defendants fail to timely review and act on laboratory and testing results, which in turn delays the prisoners' receipt of critical care, or means that they receive no care at all. As a result of these deficiencies, prisoners with disabilities or serious and life-threatening conditions unnecessarily suffer and are put at risk of harm.

129.    When prisoners do finally receive care, it is often compromised by the inadequate training and supervision of overworked medical staff, who fail to: timely and appropriately identify medical, mental health, vision, hearing, and dental problems during the screening and intake process at the DEC; properly process and timely respond to prisoners' requests for medical evaluation; evaluate and treat prisoners who were undergoing care for chronic or serious conditions prior to being incarcerated at NDCS; respond to emergency medical situations and

requests for emergency medical treatment from prisoners; timely order and review diagnostic testing; timely refer prisoners to medical specialists or outside medical facilities; effectively treat prisoners discharged from the hospital or infirmary; and maintain adequate medical records.

130.    Because the screening process is inadequate to identify prisoners with disabilities or serious or chronic health care problems, prisoners are at a significant risk of serious harm. For example, prior to being brought to NDCS, one female prisoner was sexually assaulted and impregnated. When she was admitted to NDCS in June 2016, she reported to NDCS that she had been raped six months earlier. She was never tested to see if she was pregnant. Neither she nor medical staff realized she was pregnant until September 2016, when she complained of back pain and bloody vaginal discharge. She was told she was simply constipated and was given ibuprofen. Around ten hours later, after excruciating pain and more blood loss, she was finally taken to the hospital. She gave birth less than one hour later. Her prior blood loss and lack of medical care was so severe that she needed a blood transfusion following her labor.

131.    NDCS Defendants fail to ensure that prisoners who are deaf or hard of hearing, or have other communication disabilities and use ASL as their primary method of communication, are provided with qualified sign language interpreters to ensure effective communication with health care staff. Without interpretation, these prisoners are not able to explain to medical care providers the symptoms they are experiencing, and medical staff are not able to explain the benefits and risks of treatments, medications, and procedures so that prisoners can provide their informed consent.

132.    NDCS Defendants routinely release prisoners with serious medical conditions from NDCS facilities without providing them with services to ensure that their medical care is not disrupted. NDCS Defendants' policies and practices for the provision of continuing health

care, including medical, mental health, and dental care services, upon a prisoner's release are systemically inadequate. NDCS Defendants fail to adequately train custody and medical staff how to appropriately release prisoners with serious medical conditions so that such prisoners can continue their medical care. Prisoners taking prescribed medications are released without either a supply of or a prescription for those medications. NDCS Defendants do not schedule follow-up appointments in the community, nor are prisoners provided with sufficient referrals or information about where they may receive health care services.

133.    With respect to prisoners' health care, including mental health, medical, and dental care, NDCS Defendants have failed and continue to fail in at least the following ways:

a)    Failure to provide timely access to care, with excessive and often dangerous delays for everything from routine to emergency care;

b)    Failure to promulgate and follow adequate policies for screening, diagnosing, monitoring, and providing follow-up care to prisoners, especially those with chronic conditions;

c)    Insufficient numbers of health care professionals to provide even minimal care to the more than 5,200 prisoners in NDCS;

d)    Insufficient numbers of custody staff to transport prisoners to health care encounters, both within NDCS facilities and at community medical facilities;

e)    Inadequate training, policies, and procedures for custody staff who respond to health care emergencies;

f)    Inadequate physical space to conduct private medical screenings and appointments, resulting in breaches of prisoners' confidentiality and dangerous and unsanitary conditions;

g)      Failure to provide a reliable way for prisoners to alert staff to their need for evaluation or care, or to complete a grievance process when care is denied;

h)      Failure to perform diagnostic testing to diagnose and treat serious medical conditions, including psychiatric disabilities, diabetes, pregnancy, and high blood pressure;

i)      Irregular, inaccurate, and incomplete medical records for prisoners, failure to satisfy minimum standards of record-keeping (for example, failure to document progress reports or the rationale for changing a medication), and a failure to train staff to properly maintain these records, resulting in risk of misdiagnosis or inappropriate treatment;

j)      Failure to timely provide prisoners with the medications, tests, and procedures that have been ordered by their physicians, including colonoscopies and mammograms;

k)      Failure to institute, track, and provide periodic dental, medical, and mental health testing and screening based on factors such as age and gender necessary to timely identify and to prevent otherwise avoidable pain, suffering, and death;

l)      Failure to timely refer prisoners to outside specialists or surgeons when needed and to follow through on specialist recommendations;

m)      Failure to ensure continuity of care when prisoners are released from NDCS facilities, including assistance with applications for Supplemental Security Income and veteran's benefits;

n)      Failure to make accommodations for prisoners with disabilities who cannot adequately access health care without such accommodations; and

o)      Failure to maintain an appropriate formulary of medications and to

establish and implement appropriate policies and procedures for medication management

and distribution to prisoner patients.

134.    NDCS Defendants' health care policies and practices are deficient and

inadequate, subjecting prisoners to a substantial risk of unnecessary suffering, serious injury,

clinical deterioration, or death. Defendants FRAKES and DEOL have knowledge of the deficient

and inadequate policies and practices and the resulting substantial risk of serious, avoidable, and

unnecessary harm and suffering to NDCS prisoners, but have failed to remedy these deficiencies.

135.    There are many examples of substandard medical care at NDCS facilities. In

addition to the experiences of the named plaintiffs, NDCS Defendants' deliberate indifference to

prisoners' serious medical needs has resulted in at least the following specific instances:

a)      Six-month delay in providing a prisoner's prescribed antidepressants,

causing exacerbation of her disability and unnecessary pain;

b)      Denial of care because a prisoner's release from NDCS custody is

allegedly imminent;

c)      Repeated delays in providing prescribed medication for an epileptic

prisoner, resulting in two separate incidents of a seizure, during which the prisoner was

injured;

d)      Denial of prescription medication needed to control a prisoner's

psychiatric disability; when the prisoner was subsequently unable control his disruptive

outbursts, he was placed in isolation as punishment;

e)      Unreasonable delay in taking an x-ray of a prisoner's shoulder after he

was attacked and badly injured by another prisoner, causing him additional pain and

injury;

    f)       Failure to provide an MRI and other care for a prisoner's arthritic knee, allowing it to deteriorate to the point that full knee replacement may be necessary;

    g)       Delaying required MRI and CT scans for a prisoner because it "cost too much," allowing the condition to deteriorate and cause unnecessary pain and injury;

    h)       Failure to evaluate a prisoner with increasing abdominal pain, liver problems, and weight loss for cancer or organ failure, placing the prisoner at risk of exacerbation of the illness, pain, and injury;

    i)       Delaying a prisoner's pelvic ultrasound and colonoscopy for months because NDCS Defendants lacked transportation to take her to the facility, during which time the prisoner suffered avoidable pain and injury;

    j)       Providing insufficient care to a prisoner suffering from liver lesions and pancreatitis because NDCS Defendants were short-staffed and could not make time to send him to an outside specialist;

    k)       Failure to provide follow up care to a prisoner who has repeatedly displayed abnormal EKG findings and decreased liver function that indicated possible Hepatitis C infection, causing the prisoner pain and injury and placing the prisoner at substantial risk of harm;

    l)       Failure to provide care for a prisoner with heart problems, low blood platelets, and a fatty liver, causing the prisoner pain and injury;

    m)     Failure to follow up on a prisoner's abnormal mammogram results, placing the prisoner at significant risk of injury; and

    n)      Inadequate vision care, including a failure to provide prisoners with more

than one pair of eyeglasses per year, even if prisoners' glasses are lost or broken.

136.    The substandard care provided by NDCS defendants has had deadly

consequences. On August 11, 2016, Rolland Jones, a prisoner at the Nebraska State Penitentiary

(NSP), died of a myocardial infarction. In the four weeks leading up to his death, he repeatedly

complained to medical staff of shortness of breath, chest pain, and dizziness on exertion. A

subsequent NDCS review concluded that during many of those visits, the "critical nature of his

complaint was not appreciated." Though he was prescribed nitroglycerin, it was never ordered

for him, and no labs or electrocardiograms were ever conducted. Jones suffered a massive heart

attack; neighboring prisoners kicked and punched their cell doors, yelling "medical emergency,"

for 15 to 20 minutes before any staff arrived. When staff arrived at Jones' cell, no CPR or AED

was administered, nor did any staff member even check for a pulse. Fellow prisoners reported

that Jones had complained of chest pain that morning, but he had been refused medical

treatment.

137.    NDCS Defendants' policies and practices for dental care are deficient and

inadequate, subjecting prisoners to a substantial risk of unnecessary suffering, serious injury,

clinical deterioration, or death. Defendants FRAKES and DEOL have knowledge of these

deficient and inadequate policies and practices and the resulting substantial risk of harm and

suffering to NDCS prisoners, but they have failed to remedy these deficiencies.

138.    NDCS Defendants' dental care consists almost exclusively of extracting teeth,

even if a much less invasive procedure is medically appropriate. Rarely are other treatments

provided, despite prisoners' requests for services such as fillings and root canals, rather than

extraction. Prisoners regularly face the terrible dilemma of keeping a tooth and suffering pain, or

ending the pain and losing a tooth that otherwise could be saved. Extractions of teeth that could

be salvaged are so common that many prisoners will not visit the dentist because they know they will just lose their teeth, regardless of the underlying problem.

139.    NDCS Defendants either do not provide dentures or provide dentures that fit so poorly as to be unusable. This causes prisoners difficulty eating, potentially leading to poor nutrition, and also causes discomfort, embarrassment, and pain. Prisoners report mouth ulcers which often go untreated for months.

140.    NDCS Defendants' policies, procedures, and practices do not provide for routine dental screening and annual and other periodic dental examinations and treatment necessary for dental health and to avoid pain, suffering, and dental disease.

141.    Prisoners are entirely dependent on the NDCS Defendants for all mental health care. According to NDCS records, as of September 2016, just over 50% of the NDCS population had a mental health diagnosis; of those 2,703 prisoners with a diagnosis, 1,560 prisoners had co-occurring mental health and substance abuse diagnoses, and 201 prisoners had a "Seriously Mentally Ill" diagnosis.

142.    NDCS Defendants' policies and practices for mental health care are deficient and inadequate, subjecting prisoners to a substantial risk of deteriorating psychiatric disabilities, extreme and unnecessary anguish and suffering, and death. Defendants FRAKES and DEOL have knowledge of these deficient and inadequate policies and practices and the resulting substantial risk of serious harm to NDCS prisoners, but have failed to remedy these deficiencies.

143.    NDCS Defendants fail to adequately identify, track, and treat the psychiatric disabilities of newly arriving prisoners during the screening and intake process. The intake process and mental health evaluation can take months, and during this wait, all prescribed medications are confiscated and prisoners are not given the prescription medication they need.

44

Medications also regularly fail to accompany prisoners when they are transferred from one NDCS facility to another. This results in disrupted treatment, unnecessary suffering, and exacerbation of illness.

144.     Continuity of care for prisoners with psychiatric disabilities and other mental health needs is deficient. Critical understaffing and inadequate recordkeeping has created a system where mental health staff at NDCS facilities are often unaware of concurrent medical conditions or whether prisoners are in fact taking their psychiatric medications as prescribed. NDCS Defendants currently have no psychiatrists on staff for the entire prison system. Psychiatric medications are instead being prescribed by nurse practitioners, without appropriate supervision. Additionally, Nebraska law provides that a court order to provide a prisoner with involuntary psychiatric medication requires the testimony of two psychiatrists concerning the patient's need for treatment. Without psychiatrists on staff, NDCS Defendants are unable to obtain these life-saving court orders.

145.     Defendant DEOL is aware of the lack of psychiatrists on staff at NDCS facilities and has not remedied this crisis. He has acted with deliberate indifference to the risk of harm posed by inadequate psychiatric care and understaffing.

146.     Neither health care nor corrections staff are adequately trained to recognize signs and symptoms of psychiatric disabilities and refer to mental health staff those prisoners exhibiting such signs and symptoms. Instead, prisoners with psychiatric disabilities are often ignored, mocked, or even punished for their disabilities.

147.     NDCS Defendants do not adequately monitor prisoners with psychiatric disabilities. In isolation units, mental health staff only rarely conduct mental status examinations. Some NDCS facilities are so understaffed that mental health staff can only provide basic

surveillance, and little or no actual treatment.

148.    Medication management in general is systemically inadequate; medications are self-administered except in skilled nursing areas, and they are delivered to prisoners by untrained custody staff, using a fishing tackle box. This self-administration process has allowed prisoners to hide pills and then later take a large number of pills at once to attempt suicide. Basic sanitation is not maintained, as staff members do not wear gloves or wash hands between prisoner visits. Staff members have prisoners themselves write down how many pills the prisoner took during medication rounds, even though policy requires staff members to do this recording. Medication rooms are not always secured, allowing prisoners to steal medication.

149.    In NCCW, medication distribution now occurs at a central location too small to accommodate prisoners who need treatment. The line of prisoners stretches outside the door, regardless of rain or temperature. This puts disabled and elderly prisoners at significant risk of harm or injury.

150.    NDCS medication management is also deficient because it breaches patient confidentiality. A medication distribution system must include confidential communication with the prisoner by a health care staff member about the risks and side effects of the medication. The NDCS medication system fails to conduct these conversations; if they do occur, they are not confidential because they take place within earshot of other prisoners and staff.

151.    Overcrowding and understaffing make the provision of adequate mental health care all but impossible. As of September 2016, 34 of 161 (21%) behavioral and mental health positions in NDCS were vacant. This level of understaffing leads to heightened disruptions and inability to provide necessary services, as well as high turnover for existing staff, creating a vicious cycle of understaffing. Defendants were informed in July 2015 by their own consultant,

Dr. Bruce Gage, that their mental health care policies, procedures, and practices were dangerous and deficient in many ways. NDCS does not have access to licensed psychiatric hospital beds, and no community hospitals will accept prisoners as patients. As a result, prisoners with severe psychiatric disabilities are treated in the residential units, or sometimes in the infirmary, when they are in psychiatric crisis or require hospitalization. DEC is the only facility with suicide watch cells; if a prisoner needs monitoring, he or she must be transferred to this facility. This is especially problematic given that DEC is commonly operating at 300% of its capacity.

152.    The mental health facilities at LCC and NCCW are outdated and not suicide proof. NCCW's most secure mental health unit is not suicide proof and has second tier floors from which jumping and hanging are possible. The LCC facilities were described by Dr. Gage as having a high risk of suicide and as "archaic and austere." The secure mental health units at LCC are only marginally suicide proof, and there is no programming space. Meetings with mental health staff in these LCC units are not confidential, and the entire facility, including the mental health residential unit, is not ADA compliant.

153.    NSP has no residential mental health unit and lacks the capacity or the resources to treat prisoners with psychiatric disabilities, in spite of the fact that as of July 2015, over 28% of NSP prisoners were on psychotropic medications. The mental health building at NSP consists only of office space, so all prisoners must be seen elsewhere and share space with the rest of the facility. This reduces productivity and prevents confidential communications between patients and mental health staff. All NDCS facilities also lack adequate programming to assist prisoners with psychiatric disabilities.

154.    NDCS Defendants often house prisoners with psychiatric disabilities in isolation, putting them at substantial risk of serious harm. Understaffing and overuse of isolation for

47

prisoners with psychiatric disabilities go hand in hand. Due to the severely understaffed mental

health program, corrections officers frequently move patients with psychiatric disabilities to

isolation for lack of a better way to deal with them. Of the 313 prisoners in isolation in

September 2016, two-thirds (209) had diagnosed psychiatric disabilities. Once in isolation, these

prisoners' disabilities and psychiatric symptoms generally worsen, sometimes catastrophically.

For example, on July 27, 2014, a prisoner at TSCI named Patrick Howley committed suicide

while in isolation, despite his repeated requests to be placed in an observation unit for recurring

and urgent suicidal thoughts. NDCS staff left him in isolation, failed to perform safety checks,

mocked him, and failed to remove the biohazard bag that Howley eventually used to kill himself.

155.    The conditions in isolation are extremely punitive and restrictive. NDCS

Defendants permit prisoners in isolation to have only one to two hours of out-of-cell time per

day. During that time period, prisoners are expected to shower, exercise, and use the telephone.

Prisoners are generally released from their cells individually, meaning they are alone even when

outside their cells. As a result, there are very few opportunities for human interaction.

156.    At Unit 2B in TSCI, a maximum security unit, prisoners with psychiatric

disabilities are double-celled in isolation for 23 hours a day, deprived of visiting opportunities

available to other prisoners, and denied programming and mental health care. These prisoners

routinely engage in extreme and potentially lethal acts of self-harm.

157.    These conditions significantly increase the risk that prisoners with psychiatric

disabilities will deteriorate. A significantly disproportionate percentage of prison suicides occur

in isolation units. Because of the risks posed by isolation to prisoners with psychiatric

disabilities, a consensus has developed that prisoners with psychiatric disabilities should be

placed in isolation only if absolutely necessary and for only brief periods of time. For example,

American Bar Association standards recommend that "no prisoner diagnosed with serious mental illness should be placed in long-term segregated housing." Additionally, the Nelson Mandela Rules prohibit isolation in the case of prisoners with psychiatric disabilities when those conditions would exacerbate their disabilities. The Inter-American Commission on Human Rights has specifically established that isolation "should be absolutely prohibited . . . for persons with mental disabilities."

158.    By contrast, NDCS Defendants often place prisoners with psychiatric disabilities in isolation as punishment for breaking the rules or being deemed "difficult," regardless of whether their behavior results from their disabilities or whether isolation will aggravate their disabilities.

159.    NDCS Defendants do not have adequate safeguards in place to ensure that prisoners with psychiatric disabilities are protected from isolation. In fact, rather than only placing prisoners with psychiatric disabilities in isolation when absolutely necessary, NDCS Defendants have a policy and practice of placing prisoners with psychiatric disabilities in isolation solely because of their psychiatric disabilities. NDCS, which is critically understaffed in mental health staff, often uses isolation for prisoners with psychiatric disabilities for lack of available, legitimate treatment options or for punitive purposes.

160.    While NDCS Defendants do not systematically record the specific rationale for moving a prisoner to isolation, some corrections officers' notes of reasons for prisoner transfers include "mental health stabilization" or "mental health," suggesting that the prisoner was placed in isolation because of his or her psychiatric disabilities.

161.    NDCS Defendants also enforce a policy that makes "mutilation of self" a punishable infraction. Thus, prisoners with psychiatric disabilities, rather than being treated for

their suicidality, self-mutilation, or other signs of psychiatric distress, are punished for the

manifestations of their disabilities and placed in isolation, aggravating their underlying

disabilities, and putting them at grave risk of serious injury or death.

162.    NDCS Defendants have placed prisoners with schizophrenia in isolation, further

exacerbating their disabilities. One LCC prisoner has been in isolation for 20 years despite being

diagnosed with schizophrenia. His placement in isolation is because of his  psychiatric disability,

and his symptoms have been exacerbated by his time in isolation. Another prisoner has been in

isolation at NCCW for more than two years despite a diagnosis of schizophrenia that would

greatly benefit from human contact and non-isolated housing.

163.    NDCS Defendants house prisoners with serious psychiatric disabilities and

intellectual disabilities in isolation, in violation of the ADA. Prisoners with disabilities may not

be placed in isolation due solely to their disabilities or out of mere convenience, and instead must

be housed in the most integrated and least restrictive setting appropriate to their needs.

164.    NDCS Defendants employ a flawed grievance procedure for prisoners who are

denied health care. When prisoners are denied care, they are told to fill out a standard grievance

form. Custody staff routinely deny prisoners' requests for health care even in emergency

situations, directing them to submit a grievance instead.

165.    The grievance process is difficult for prisoners to understand and follow. NDCS

requires prisoners to file informal grievances within three calendar days of the incident, and staff

must respond within ten business days. Appealing the response must be done at two levels, and

prisoners are required to adhere to very strict deadlines. Prisoners are also required to provide

several attachments to their appeals, which can be difficult for prisoners who do not understand

that they are required to keep these grievances and responses.

166.    NDCS Defendants also fail to provide adequate grievance opportunities to prisoners in isolation, and they fail to provide assistance to those prisoners who, due to physical, intellectual, or psychiatric disability, are unable to grieve on their own.

167.    Grievance forms are not freely available in the housing units, particularly in the isolation units. NDCS Defendants do not adequately train staff in how to provide, appropriately process, and timely respond to grievance forms.

**D.    NDCS Defendants and BOP Defendants Violate the ADA and Rehabilitation Act**

168.    NDCS Defendants incarcerate significant numbers of individuals with disabilities, as that term is defined in the ADA and the Rehabilitation Act. NDCS Defendants routinely fail to provide these prisoners with accommodations to ensure equivalent access to programs and services offered at NDCS facilities. NDCS Defendants' failure to accommodate prisoners with disabilities not only denies them access to programs and services, but also puts them at risk of injury or victimization by other prisoners. Moreover, NDCS Defendants' failure to accommodate prisoners with disabilities results in the provision of inadequate health care, including medical, dental, and mental health care, and the violation of prisoners' due process rights in NDCS disciplinary and parole hearings.

169.    Under the ADA and the Rehabilitation Act, NDCS Defendants must create and maintain a system to identify and track individuals with disabilities and the accommodations they require, but NDCS Defendants fail to do so.

170.    NDCS Defendants routinely fail to identify prisoners with disabilities upon intake and thereafter. NDCS staff responsible for conducting the intake process are not adequately trained how to identify and track individuals with disabilities, and therefore frequently fail to properly assess prisoners with disabilities upon intake. This failure results in the provision of inappropriate housing and inadequate accommodations, discriminating against prisoners with

51

disabilities by denying them access to NDCS and BOP programs, services, and activities, and placing them at risk of injury or exploitation.

171.   NDCS Defendants do not maintain any central list, electronic or otherwise, of prisoners with disabilities and the accommodations they require. NDCS Defendants do not maintain adequate information about prisoners' disabilities and related accommodations in the prisoners' custody or medical files. To the extent that NDCS Defendants maintain any information about a prisoner's disabilities, custody, medical, and clerical staff are not provided with access to the information in a manner that would timely and effectively inform them of a prisoner's disabilities and required accommodations. NDCS Defendants do not adequately train staff to maintain records or information about prisoners' disabilities and necessary accommodations.

172.   The lack of an adequate disability and accommodation tracking system results in substantial injuries to prisoners with disabilities. Without an adequate tracking system, medical and custody staff have no easily accessible means to determine whether a prisoner has a disability, and what, if any, accommodations a prisoner requires. Consequently, NDCS Defendants fail to provide prisoners with needed accommodations, or they withdraw without justification accommodations that have already been provided.

173.   NDCS Defendants do not provide an effective or functional grievance system for prisoners with disabilities or a method for prisoners with disabilities to mark their grievance as disability-related. NDCS Defendants routinely deny prisoners with disabilities access to grievance forms. NDCS Defendants lack adequate policies and procedures instructing NDCS staff on how to respond if prisoners with disabilities request accommodations through means other than the grievance process.

174.     NDCS Defendants do not provide prisoners with adequate notice of how to request reasonable accommodations for their disabilities. As a result, prisoners with disabilities are not informed of any specific process for complaining about disability discrimination or requesting disability accommodations.

175.     Prisoners with disabilities that impair communication require appropriate auxiliary aids and services to ensure effective communication and equal access to programs and services. NDCS Defendants fail to provide such auxiliary aids and services, including qualified sign language interpreters, captioning, hearing aids, strobe fire alarms and other auxiliary aids. NDCS Defendants fail to adequately train staff on how and when to provide such auxiliary aids and services. NDCS Defendants further fail to assess prisoners' need for auxiliary aids and services.

176.     NDCS Defendants do not provide prisoners who are deaf or hard of hearing or have speech impairments with qualified sign language interpreters or other auxiliary aids during the intake process, which harms these prisoners by preventing them from communicating specific concerns, including emergency medical issues, and understanding NDCS Defendants' policies and practices.

177.     NDCS Defendants fail to provide equal access to telecommunications by failing to provide a videophone that provides access to Video Relay Service for prisoners who rely on sign language to communicate effectively or a TDD/TTY machine for prisoners who do not sign and cannot use the conventional telephone. When NDCS Defendants do provide a TDD/TTY machine, it is often broken and ineffective.

178.     NDCS Defendants also fail to provide prisoners who are deaf or hard of hearing or have speech impairments with sign language interpreters, hearing aids, or other auxiliary aids

to permit participation in other NDCS programs and services, including religious services and educational and vocational classes.

179.     NDCS Defendants do not provide equal access to television to prisoners who are deaf or hard of hearing. Most non-disciplinary housing units have televisions installed for prisoners to watch, but either NDCS Defendants have not installed televisions with the capability to display closed captioning or they refuse to alter the settings to the televisions to display closed captioning. Additionally, informational programs regarding NDCS services and programs are not always created with captions to make them accessible.

180.     NDCS Defendants fail to provide sign language interpreters, hearing aids, or other auxiliary aids at disciplinary hearings, and accordingly deny such prisoners the same opportunity to participate in disciplinary hearings afforded to prisoners without disabilities.

181.     NDCS Defendants fail to provide prisoners who are deaf or hard of hearing or have speech impairments with sign language interpreters, hearing aids, or other auxiliary aids and services for interactions with NDCS medical, mental health, and dental care staff, despite the critical importance of these interactions. NDCS Defendants fail to provide these auxiliary aids and services despite their knowledge that these prisoners cannot effectively communicate without them, and that without these aids and services prisoners with hearing disabilities are at an increased risk that medical, mental health, or dental illnesses will not be diagnosed or will be misdiagnosed.

182.     NDCS Defendants lack any policy, practice, or system for notifying prisoners with hearing disabilities of announcements for meals, visitors, medical appointments, and other general notifications.

183.     NDCS Defendants endanger prisoners who are deaf or hard of hearing by failing

to institute any system for visually identifying prisoners who are deaf or hard of hearing. Without a system of visual identification, there is an increased risk that NDCS staff will interpret the prisoner's actions as a willful failure to comply with an order, rather than as a failure to hear and understand the order. As a result, prisoners who are deaf or hard of hearing are at an increased risk of disciplinary proceedings and use force for failure to comply with an order that they have not heard.

184.    NDCS Defendants lack any policy, practice, or system for notifying prisoners with disabilities of emergencies, including alarms, fires, and tornadoes. NDCS facilities do not have a visual or tactile alarm system to alert prisoners with disabilities. Thus, there is an increased risk that these prisoners may not be aware of an emergency, or may not receive needed assistance during the emergency, and they are therefore at increased risk of injury or death should one occur.

185.    NDCS Defendants lack any policies or practices to ensure that prisoners with mobility disabilities are safely evacuated from NDCS facilities in the event of an emergency. The emergency exits in NDCS, to the extent they exist, are not accessible to prisoners in wheelchairs. As a result, prisoners with mobility disabilities are at increased risk of injury or death in an emergency.

186.    NDCS Defendants lack policies and practices to ensure that prisoners with disabilities who require assistive devices, including, but not limited to, wheelchairs, walkers, crutches, canes, braces, tapping canes, hearing aids, and pocket talkers, as accommodations are provided with and are allowed to retain those devices. NDCS Defendants fail to adequately train staff to timely and appropriately provide assistive devices to prisoners with disabilities.

187.    NDCS Defendants' policies, practices, and procedures authorize staff to initiate

disciplinary proceedings and use force against prisoners who fail to follow orders. Correctional

staff are not trained to communicate with prisoners with disabilities. NDCS rules and

correctional officer verbal orders can be difficult or impossible for someone with a psychiatric or

developmental disability to understand and follow. NDCS Defendants' policy and practice

includes use of force against prisoners for failure to comply with an order, including the use of

Tasers, pepper spray, pepper balls, and lethal firearms, without accommodation or modification

for prisoners with disabilities.

188.    Multiple NDCS facilities were constructed or altered after the enactment of the

ADA, including the CCC-L, which opened in 1993, NCYF, which opened in 1998, and TSCI

and WEC, which both opened in 2001. Additionally, the NCCW and OCC were both

significantly altered after the enactment of the ADA. However, these and other NDCS facilities

are not fully accessible and lack features such as grab bars to allow prisoners with mobility

disabilities to shower and toilet safely and independently. Upon information and belief, there are

additional barriers throughout NDCS facilities including narrow doorways, raised lips and steps,

steep slopes, inaccessible dining tables and yards, and inaccessible exercise equipment. NDCS

facilities also lack adequate ramps for prisoners using wheelchairs, walkers, crutches, canes,

braces, or other assistive devices.

189.    NDCS Defendants fail to ensure that prisoners with disabilities are placed in

housing units and beds that are accessible and safe. NDCS Defendants fail to adequately train

staff on how to house prisoners with disabilities in accessible and safe housing and how to

provide prisoners with disabilities equal and meaningful access to programs and services.

190.    The housing units at NDCS facilities differ in their design and level of

inaccessibility to prisoners with disabilities. Some of the housing units are dormitories, where

many beds, including triple bunks, are placed in an open area that is shared by the prisoners. Other units are divided into a number of cells in which one or two prisoners are housed. Cells that house two prisoners typically have bunk beds in them. Some of the housing units in NDCS are located up a flight of stairs, while others are on the ground floor.

191.    NDCS Defendants assign prisoners to housing without taking into account prisoners' disability-related limitations. Because of NDCS Defendants' general failure to identify and track prisoners with disabilities, NDCS Defendants make housing decisions without sufficient information regarding prisoners' accommodation needs, thereby increasing the risk that a prisoner with disabilities will be assigned to a housing unit that is not accessible.

192.    NDCS Defendants offer numerous programs, services, and activities that are not accessible to prisoners who are blind. Classes and programs at NDCS facilities frequently use printed materials that are not provided to blind prisoners in an accessible format. NDCS Defendants also  fail to offer auxiliary aids such as talking calculators. Instruction to prisoners with vision disabilities is therefore less effective than instruction to sighted prisoners.

193.    NDCS Defendants have no system in place to allow blind prisoners to access any prison services that require reading or writing. Instead, blind prisoners must generally rely on other prisoners for assistance, putting them at risk of exploitation. Blind prisoners have no access to literacy programs because Defendants have refused to provide competent instruction in Braille.

194.    NDCS Defendants do not provide blind prisoners with any mobility or orientation training to allow them to navigate NDCS facilities independently. Nor do they consistently provide blind prisoners with auxiliary aids and services, like white canes, that would afford them some independence.

195.    NDCS Defendants have failed to provide blind prisoners with the necessary auxiliary aids and services and reasonable modifications that would allow them to read and write mail privately and independently. Instead, blind prisoners are forced to rely on sighted prisoners to use the mail services, putting them at risk of exploitation, particularly due to the personal and confidential nature of personal and legal mail.

196.    NDCS Defendants place prisoners with psychiatric disabilities in isolation in violation of the ADA. Prisoners with psychiatric disabilities whom NDCS Defendants have placed in isolation include a prisoner with schizophrenia at LCC who has been in isolation for more than 20 years, a prisoner with bipolar disorder at LCC who has been in isolation for more than 3 years, and a prisoner with autism at TSCI who has been in and out of isolation during his time in NDCS.

197.    Prisoners with disabilities who do not receive needed accommodations are susceptible to exploitation and abuse by other prisoners. For example, in exchange for help getting to the toilet, shower, or meals, or communicating with prison staff, prisoners with disabilities may be required to pay other prisoners. Instead of receiving assistance from prison staff, prisoners with mobility impairments have had to rely on other prisoners to help them perform intimate functions, which further exposes the disabled prisoner to risk of exploitation, including sexual coercion.

198.    NDCS Defendants also fail to provide appropriate accessible transportation to prisoners with mobility disabilities, including sufficient vans with ramps and securements to safely transport wheelchair users.

199.    Prisoners with disabilities are also discriminated against by Defendants BOP and MICEK ("BOP Defendants") in the context of parole. The Nebraska Legislature has affirmed the

importance of parole as a program for the supervised release of prisoners making the transition from confinement to responsible citizenship. The Legislature has stated its intent that committed prisoners who are eligible for parole have the opportunity to complete the final stages of their sentences on parole. All committed prisoners are eligible for parole when the prisoner has served one half of the minimum term of his or her sentence as provided in Nebraska Revised Statutes §§ 83-1, 107 and 83-1, 108. BOP Defendants are informed on a regular basis of all committed prisoners who are expected to become eligible for release on parole within the next three months and are required to hold a parole review of such eligible prisoners not later than sixty days prior to the date a prisoner becomes eligible for parole.

200.    BOP is governed by Nebraska Board of Parole Rules ("BOP Rules") adopted and promulgated in accordance with Nebraska Revised Statutes §§ 81-1848, 81-1850, and 83-188 through 83-1, 127.01. BOP Defendants' duties include, but are not limited to, (a) reviewing the record of every committed prisoner to determine whether parole is warranted; (b) determining the time of release on parole of committed prisoners eligible for release; (c) implementing the utilization of a validated risk and needs assessment in coordination with NDCS; (d) fixing the conditions of parole; (e) keeping records of BOP's actions and notifying the Director of NDCS of BOP's decisions; and (f) recommending prisoner authorization for furlough or work release privileges pursuant to Neb. Rev. Stat. § 83-184.

201.    BOP Rules contain no processes, policies, or procedures for providing reasonable modifications or auxiliary aids or services to prisoners with disabilities, and contain no processes, policies, or procedures for prisoners with disabilities to request such modifications and aids or services.

202.    BOP Defendants conduct regular reviews of prisoners' parole eligibility. Pursuant

to BOP Rules, a review that takes place within twelve months prior to a prisoner's parole

eligibility date or any review that occurs after a prisoner's parole eligibility date is known as a

"Key Review." At Key Reviews, BOP personnel conducting the review are to advise the prisoner

of specific tasks, action steps, and recommendations that will give the prisoner his or her best

chance of being granted parole. Such tasks and steps include, but are not limited to, completion

of department programming, final risk and needs assessments, behavioral and reentry planning

requirements, and maintaining a clean disciplinary record.

203.    BOP Defendants have no process, policy, or practice in place for providing

reasonable modifications, auxiliary aids or services, or otherwise ensuring effective

communication with prisoners with disabilities at Key Reviews. Thus, prisoners with disabilities

are disproportionately burdened because they are put at increased risk of failing to understand

and comply with the information given at Key Reviews.

204.    Because prisoners with disabilities are routinely denied reasonable modifications

and auxiliary aids and services to allow them to access programming required for parole, they are

disproportionately burdened on account of their disabilities in the parole process. In other words,

they risk being denied parole solely because of their disabilities. BOP Defendants are aware that

such reasonable modifications and auxiliary aids and services are routinely not made available to

prisoners with disabilities.

205.    Additionally, reasonable modifications and auxiliary aids and services are

routinely not provided to prisoners with disabilities within the context of NDCS's disciplinary

processes. This failure disproportionately burdens prisoners on account of their disabilities,

putting them at an increased risk of being denied parole on the basis of their disciplinary record.

BOP Defendants are aware that such reasonable modifications and auxiliary aids and services are

routinely not made available to prisoners with disabilities.

206.   Pursuant to BOP Rules, prisoners must be interviewed and have their records reviewed by two or more members of the BOP within sixty days before the expiration of their minimum terms ("Prisoner Interview"). The information discussed at such reviews includes, but is not limited to, the prisoner's conduct, employment, and attitude during incarceration, and reports of the prisoner's physical and mental health examinations. If the review indicates the prisoner is reasonably likely to be granted parole, BOP must schedule a Parole Hearing where the prisoner may present evidence and be represented by counsel.

207.   BOP Defendants have no process, policy, or practice in place for providing reasonable modifications, auxiliary aids or services, or otherwise ensuring effective communication with prisoners with disabilities at Prisoner Interviews, disproportionately burdening them due to their disabilities by putting them at increased risk of being denied parole due to a failure to understand and comply with the information given at Prisoner Interviews.

208.   BOP Defendants have no process, policy, or practice in place for providing reasonable modifications, auxiliary aids or services, or otherwise ensuring effective communication with prisoners with disabilities at Parole Hearings, placing them at disproportionate risk of being denied parole due to a failure to understand and comply with the information given at Parole Hearings and an inability to effectively present evidence.

209.   Factors considered by BOP at Parole Hearings include, but are not limited to, the prisoner's: (a) personality, including any apparent development in his or her personality which may promote or hinder his or her conformity to the law; (b) intelligence; (c) employment history; (d) mental or physical makeup including any disability or handicap which may affect his or her conformity to the law; (e) conduct in the facility; and (f) behavior and attitude. These factors

discriminate on the basis of disability both explicitly and implicitly.

210.    The factors used by BOP also discriminate on the basis of disability because they function as eligibility criteria which tend to screen out prisoners with disabilities on the basis of the prisoner's "personality," "intelligence," "conduct," and "behavior." They further disproportionately screen out prisoners with disabilities on the basis of their past employment history because people with disabilities are more likely to be unemployed or underemployed.

211.    Prisoners may waive the opportunity to participate in the Prisoner Interview and Parole Hearing by submitting a waiver form. BOP Defendants have no process, policy, or practice for providing reasonable modifications, auxiliary aids or services, or otherwise ensuring effective communication in explaining the consequences of such a waiver to prisoners with disabilities. As such, prisoners with disabilities are disproportionately burdened due to their disabilities because they are more likely to waive participation due to a failure to understand the waiver form or the consequences of such a waiver.

212.    Prisoners denied parole may make a request for rehearing; however, BOP Defendants have no process in place for providing reasonable modifications, auxiliary aids or services, or for effectively communicating to prisoners with disabilities the procedures for requesting a rehearing. As such, prisoners with disabilities are at a disproportionate risk of failing to request a rehearing.

213.    Due to the actions and omissions of BOP Defendants, prisoners with disabilities are disproportionately likely to be denied parole due to their disabilities. As a result, prisoners with disabilities are more likely to remain incarcerated longer than their non-disabled peers due solely to their disabilities. The actions and omissions of BOP Defendants not only discriminate on the basis of disability, but also significantly contribute to the overcrowding and unsafe

conditions in NDCS facilities.

## VI. CLASS ACTION ALLEGATIONS

**A.     The NDCS Class**

214.     Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs

SABATA, CARDEILHAC, CURTRIGHT, GALLE, GRISWOLD, GUNTHER, NORRIS, R.P.,

REEVES, RENA, and SWEETSER (collectively, the "NDCS Class Plaintiffs") bring this action

on behalf of themselves and a class of all persons who are now, or will in the future be, subjected

to the health care (including medical, mental health, and dental care) policies and practices of

NDCS (hereinafter, the "NDCS Class").

### 1.     Fed. R. Civ. P.23(a)(1): Impracticability of Joinder

215.     The NDCS Class is so numerous that joinder of all class members is

impracticable. NDCS confines approximately 5,200 prisoners, all of whom are subject to the

health care policies and practices of NDCS. All NDCS prisoners are at risk of developing serious

medical, mental health, or dental conditions while confined, and there are hundreds if not

thousands of prisoners at any given time who already have such conditions. As a result of

Defendants' policies and practices, all NDCS prisoners receive or are at risk of receiving

inadequate health care while in NDCS facilities. In addition, the class is fluid, as new prisoners

enter NDCS and others are released on a daily basis.

216.     NDCS Class members are identifiable using records maintained in the ordinary

course of business by the NDCS.

### 2.     Fed. R. Civ. P.23(a)(2): Commonality

217.     There are multiple questions of law and fact common to the entire NDCS Class,

including:

           a)       Whether Defendants' failure to operate a system that provides minimally

adequate health care, including medical, dental, and mental health care, poses a

substantial risk of serious harm.

   b) Whether Defendants have been deliberately indifferent to the serious

health care needs, including medical, dental, and mental health care needs, of class

members, and to the risk posed by their failure to maintain an adequate health care

system.

   c) Whether the extreme level of overcrowding in NDCS facilities interferes

with the provision of adequate health care.

218. Defendants are expected to raise common defenses to these claims, including

denying that their actions violated the law.

### 3. Fed. R. Civ. P.23(a)(3): Typicality

219. The claims of the NDCS Class Plaintiffs are typical of those of the NDCS Class,

as their claims arise from the same policies, practices, and courses of conduct, and their claims

are based on the same theory of law as the Class claims.

### 4. Fed. R. Civ. P.23(a)(4): Adequacy of Representation

220. Each of the NDCS Class Plaintiffs will fairly and adequately represent the

interests of the NDCS Class and will diligently serve as a class representative. Their interests are

co-extensive with those of the NDCS Class, and they have retained counsel experienced in class

action litigation and in litigation involving the rights of prisoners. Putative Class Counsel possess

the experience and resources necessary to fairly and adequately represent the Class.

### 5. Fed. R. Civ. P.23(b)

221. This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1)

because the number of class members is approximately 5,200, and the prosecution of separate

actions by individuals would create a risk of inconsistent and varying adjudications, which in

turn would establish incompatible standards of conduct for Defendants. Additionally, the prosecution of separate actions by individuals could result in adjudications with respect to individual class members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

222.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the NDCS Class are common to and apply generally to all members of the Class. All statewide health care policies are centrally promulgated, disseminated, and enforced from NDCS central headquarters by Defendants. The injunctive and declaratory relief sought is appropriate and will apply as a whole to all members of the NDCS Class.

**B.      The Isolation Subclass**

223.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs SABATA, CARDEILHAC, GALLE, GUNTHER, GRISWOLD, NORRIS, R.P., REEVES, AND RENA (collectively, the "Isolation Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of all NDCS prisoners who are now, or will in the future be, subject to isolation ("Isolation Subclass"). "Isolation" is defined as confinement in a cell for 22 or more hours per day.

**1.      Fed. R. Civ. P.23(a)(1): Impracticability of Joinder**

224.    The Isolation Subclass is so numerous that joinder of all Subclass members is impracticable. There are hundreds of prisoners who have been, are, or will be in isolation at an NDCS facility. During a six-week period in 2014, approximately 950 of the state's 5,100 prisoners (18.6%) were in some form of isolation. The proposed subclass also includes prisoners who will be subject to isolation in the future. Therefore, the Isolation Subclass is so numerous that joinder of all Subclass members is impracticable.

225.    The Subclass members are identifiable using methods of assessment and/or
records maintained in the ordinary course of business by the NDCS.

**2.      Fed. R. Civ. P.23(a)(2): Commonality**

226.    There are questions of law and fact common to the entire Isolation Subclass,
including but not limited to:

> a)      Whether Defendants' policy and practice of not providing a housing
> environment free of debilitating isolation and inhumane conditions to prisoners subjected
> to isolation poses a substantial risk of serious harm;

> b)      Whether Defendants have been deliberately indifferent to the Isolation
> Subclass members' risk of injury and harm from the debilitating isolation and inhumane
> conditions to which they are subjected.

> c)      Whether the extreme overcrowding in NDCS facilities contributes to the
> misuse and abuse of isolation.

227.    Defendants are expected to raise common defenses to these claims, including
denying that their actions violated the law.

**3.      Fed. R. Civ. P.23(a)(3): Typicality**

228.    The claims of the Isolation Subclass Plaintiffs are typical of those of the Isolation
Subclass, as their claims arise from the same policies, practices, and courses of conduct, and
their claims are based on the same theory of law as the Subclass claims.

**4.      Fed. R. Civ. P.23(a)(4): Adequacy of Representation**

229.    Each of the Isolation Subclass Plaintiffs will fairly and adequately represent the
interests of the Isolation Subclass and will diligently serve as a class representative. Their
interests are co-extensive with those of the Isolation Subclass, and they have retained counsel
experienced in complex class action litigation and prisoners' rights litigation. Putative Class

66

Counsel possess the experience and resources necessary to fairly and adequately represent the Isolation Subclass.

**5.      Fed. R. Civ. P.23(b)**

230.    This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the Isolation Subclass includes hundreds of persons at any given time, and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants. Additionally, the prosecution of separate actions by individuals could result in adjudications with respect to individual class members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

231.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Isolation Subclass are common to and apply generally to all members of the subclass. All statewide isolation policies are centrally promulgated, disseminated, and enforced from NDCS central headquarters by Defendants. The injunctive and declaratory relief sought is appropriate and will apply as a whole to all members of the Isolation Subclass.

**C.    The Disability Subclass**

232.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs SABATA, CARDEILHAC, CURTRIGHT, GALLE, GRISWOLD, GUNTHER, NORRIS, R.P., REEVES, and SWEETSER (collectively, the "Disability Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of all persons with disabilities who are now or will be in the future confined at any NDCS facility ("Disability Subclass").

**1.      Fed. R. Civ. P.23(a)(1): Impracticability of Joinder**

233.    The Disability Subclass is so numerous that joinder of all class members is

impracticable. The exact number of members of the Disability Subclass is unknown. However, according to data from the 2011-2015 American Community Survey 5-Year Estimates conducted by the United States Census, of the total civilian noninstitutionalized population, more than 202,000 Nebraskans have a disability, which is approximately 11% of the state's population. Assuming an identical rate of disability among the Nebraska prison population of 5,200, there are approximately 575 persons with disabilities in NDCS facilities at any given time. In addition, the Disability Subclass is fluid, as new prisoners enter NDCS and others are released.

234.    The Disability Subclass members are identifiable using methods of assessment and/or records maintained in the ordinary course of business by NDCS Defendants.

**2.     Fed. R. Civ. P.23(a)(2): Commonality**

235.    There are questions of law and fact common to the entire Disability Subclass, including but not limited to:

a)      Whether Defendants' policies and practices discriminate against prisoners with disabilities on account of their disabilities;

b)      Whether Defendants' policies and practices deny prisoners with disabilities the benefits of the services, programs, or activities of a public entity;

c)      Whether Defendants' failure to reasonably accommodate prisoners with disabilities violates the Americans with Disabilities Act;

d)      Whether Defendants' failure to reasonably accommodate prisoners with disabilities violates section 504 of the Rehabilitation Act;

e)      Whether the extreme level of overcrowding in the NDCS system interferes with the accommodation of prisoners with disabilities.

236.    Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

### 3.    Fed. R. Civ. P.23(a)(3): Typicality

237.    The claims of the Disability Subclass Plaintiffs are typical of those of the Disability Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the Subclass claims.

### 4.    Fed. R. Civ. P.23(a)(4): Adequacy of Representation

238.    Each of the Disability Subclass Plaintiffs will fairly and adequately represent the interests of the Disability Subclass and will diligently serve as a class representative. Their interests are co-extensive with those of the Disability Subclass, and they have retained counsel experienced in complex class action litigation, disability law, and prisoners' rights litigation. Putative Class Counsel possess the experience and resources necessary to fairly and adequately represent the Disability Subclass.

### 5.    Fed. R. Civ. P.23(b)

239.    This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the Disability Subclass includes hundreds of persons at any given time, and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants. Additionally, the prosecution of separate actions by individuals could result in adjudications with respect to individual class members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

240.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Disability Subclass are common to and apply generally to all members of the subclass. All statewide policies regarding the treatment of prisoners with disabilities are centrally promulgated, disseminated, and enforced from NDCS and BOP central headquarters by

Defendants. The injunctive and declaratory relief sought is appropriate and will apply as a whole to all members of the Disability Subclass.

## VII.  CLAIMS FOR RELIEF

**First Cause of Action**
(ALL PLAINTIFFS v. DEFENDANTS FRAKES and DEOL)
(42 U.S.C. § 1983; Eighth Amendment)

241.    By their policies and practices described herein, Defendants FRAKES and DEOL subject all Plaintiffs and the NDCS Class to a substantial risk of serious harm from inadequate health care, including medical, mental health, and dental care. These policies and practices have been, and continue to be, implemented by Defendants FRAKES and DEOL and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the NDCS Class' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

242.    Defendants FRAKES and DEOL have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

**Second Cause of Action**
(ISOLATION SUBCLASS v. DEFENDANTS NDCS, FRAKES and DEOL)
(42 U.S.C. § 1983; Eighth Amendment; Americans with Disabilities Act; Rehabilitation Act)

243.    By their policies and practices described herein, Defendants NDCS, FRAKES, and DEOL subject the Isolation Subclass to a substantial risk of serious harm from conditions in isolation, including but not limited to inadequate physical exercise, inadequate nutrition, inadequate mental health treatment, excessive use of five-point restraints, and conditions of extreme social isolation and environmental deprivation. These policies and practices have been and continue to be implemented by Defendants NDCS, FRAKES, and DEOL and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their

70

official capacities, and are the proximate cause of the Plaintiffs' and the Isolation Subclass'

ongoing deprivation of rights secured by the United States Constitution under the Eighth

Amendment, the ADA, and the Rehabilitation Act.

244.    Defendants FRAKES and DEOL have been and are aware of all of the

deprivations complained of herein, and have condoned or been deliberately indifferent to such

conduct.

**Third Cause of Action**
(DISABILITY SUBCLASS v. ALL DEFENDANTS)
(Americans with Disabilities Act, 42 U.S.C. § 12132)

245.    The ADA prohibits public entities from denying "a qualified individual with a

disability...the benefits of the services, programs, or activities of [the] public entity" because of

the individual's disability. 42 U.S.C. § 12132. The term "public entity" is defined in the ADA to

include "any State or local government" and "any department agency, special purpose district, or

other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1); 28 C.F.R.

§ 35.104. NDCS and BOP are "public entities" for purposes of the ADA.

246.    NDCS Defendants are legally responsible for all violations of the ADA

committed by NDCS staff and contractors who provide programs, services, or activities,

including but not limited to medical, mental health, and dental care services, to prisoners within

NDCS facilities. *See* 28 C.F.R. § 35.130(b)(1).

247.    The BOP Defendants are legally responsible for all violations of the ADA

committed by BOP staff and/or contractors who provide programs, services, or activities,

including but not limited to parole-related services, to prisoners within NDCS facilities. *See* 28

C.F.R. § 35.130(b)(1).

248.    Disability Subclass Plaintiffs and the Disability Subclass have disabilities that

substantially limit major life activities. Disability Subclass Plaintiffs and members of the

Disability Subclass are qualified—with or without reasonable modifications—to participate in the programs, services, and activities offered by NDCS and BOP. Thus, members of the Disability Subclass are, and Plaintiffs represent, qualified individuals with disabilities within the meaning of 42 U.S.C. §§ 12102, 12131, and 28 C.F.R. §35.104.

249.    The programs, services, and activities that NDCS Defendants provide to prisoners include, but are not limited to, sleeping, eating, showering, toileting, communicating with those outside the prison by mail and telephone, exercising, entertainment, safety and security, the prison's administrative, disciplinary, and classification proceedings, medical, mental health, and dental services, the library, educational, vocational, substance abuse, and anger management classes, and discharge services. NDCS' programs, services, and activities are covered by the ADA.

250.    The programs, services, and activities that BOP Defendants provide to prisoners include, but are not limited to, Prisoner Interviews, Key Reviews, Parole Hearings, and re-hearings. BOP's programs, services, and activities are covered by the ADA.

251.    Under the ADA, NDCS and BOP must provide prisoners with disabilities reasonable modifications, removal of architectural, communication, or transportation barriers, and appropriate auxiliary aids and services so that they can avail themselves of and participate in all programs and activities offered by the NDCS and BOP Defendants.

252.    Congress directed the United States Department of Justice ("DOJ") to write regulations implementing the ADA's prohibition against discrimination. 42 U.S.C. § 12134. Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Title II of the ADA. 28 C.F.R. § 35.101 *et seq.* These regulations include regulations specific to adult detention and correctional facilities. 28 C.F.R. § 35.152.

253.    NDCS and BOP Defendants have violated the rights of Disability Subclass Plaintiffs and members of the Disability Subclass secured by Title II of the ADA and its implementing regulations.

254.    NDCS and BOP Defendants have failed to inform the Disability Subclass about their rights under the ADA while detained in NDCS facilities, as required under 28 C.F.R. § 35.106. A public entity must "administer services, programs, and activities in the most integrated setting appropriate to" an individual's needs and is therefore prohibited from unnecessarily segregating or isolating the individual. 28 U.S.C. § 35.130(d). Public entities responsible for the operation or management of adult detention and correctional facilities "shall ensure that [prisoners] or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity—(i) Shall not place [prisoners] or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available; (ii) Shall not place [prisoners] or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment; (iii) Shall not place [prisoners] or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed; and (iv) Shall not deprive [prisoners] or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed." 28 C.F.R. § 35.152(b)(2). Furthermore, a public entity may not "deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities." 28 C.F.R. § 35.130(b)(2).

255.    When NDCS Defendants house individuals with disabilities in isolation due to

73

their disabilities, they deny Plaintiffs and the Disability Subclass the opportunity to participate in

services, programs, or activities that are in the most integrated setting appropriate to their needs

and that are not separate or different from those offered to their nondisabled peers. A public

entity may not (1) "impose or apply eligibility criteria that screen out or tend to screen out an

individual with a disability or any class of individuals with disabilities from fully and equally

enjoying any service, program, or activity, unless such criteria can be shown to be necessary[,]"

28 C.F.R. § 35.130(b)(8); or (2) "utilize criteria or methods of administration . . . that have the

effect of subjecting qualified individuals with disabilities to discrimination on the basis of

disability . . . or the purpose or effect of defeating or substantially impairing accomplishment of

the objectives of the public entity's program with respect to individuals with disabilities[.]" 28

C.F.R. §35.130(b)(3)(i)(ii). Public entities responsible for the operation or management of adult

detention and correctional facilities "shall ensure that qualified [prisoners] or detainees with

disabilities shall not, because a facility is inaccessible to or unusable by individuals with

disabilities, be excluded from participation in, or be denied the benefits of, the services,

programs, or activities of a public entity, or be subjected to discrimination by any public entity."

28 C.F.R. § 35.152(b)(1). Defendants must "operate each service, program, or activity so that the

service, program, or activity, when viewed in its entirety, is readily accessible to and usable by

individuals with disabilities" and must "implement reasonable policies, including physical

modifications to additional cells in accordance with the 2010 [accessibility] Standards, so as to

ensure that each [prisoner] with a disability is housed in a cell with the accessible elements

necessary to afford the [prisoner] access to safe, appropriate housing," 28 C.F.R. § 35.150(a); 28

C.F.R. § 35.152(b)(3).

     256.    NDCS Defendants have violated the ADA by denying persons with disabilities

access to programs, services, or activities due to the presence of physical barriers at NDCS facilities and by housing prisoners with disabilities in inaccessible housing.

257.   NDCS Defendants have imposed eligibility criteria and methods of administration that screen out persons with disabilities and subject them to discrimination by housing prisoners with disabilities in isolation due to their disability and failing to remedy physical barriers that deny persons with disabilities full and equal enjoyment of programs, services, and activities offered at NDCS facilities. NDCS Defendants have not shown that such criteria are necessary for the provision of the service, program, or activity being offered or that such requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities, as required by 28 C.F.R. § 35.130(h).

258.   The criteria used by BOP Defendants in determining whether to grant parole screens out, or tends to screen out, individuals with disabilities on the basis of disability in violation of 28 C.F.R. § 35.130(b)(8). BOP Defendants have not shown that such criteria are necessary for the provision of the service, program, or activity being offered or that such requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities as required by 28 C.F.R. § 35.130(h).

259.   In providing any aid, benefit, or service, a public entity "may not . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service," "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity

enjoyed by others," or "provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others." 28 C.F.R. § 35.130(b)(1)(i)-(iv).

260.   A public entity "shall make reasonable modifications in policies, practices, or procedure when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7). Reasonable modifications that NDCS Defendants and BOP Defendants are required to make include but are not limited to: (1) implementing an identification/tracking system for reasonable modifications in NDCS facilities; (2) modifying assistive device policies so that such devices will be provided and not removed when deemed needed in all areas of NDCS; (3) providing staff training to ensure that reasonable modifications for individuals are implemented; and (4) making the grievance system effective for prisoners with disabilities including by adding a method for grievances to be marked as disability-related. BOP Defendants have no process in place for allowing a prisoner with disabilities to request or receive auxiliary aids and reasonable modifications to access BOP programs, services, and activities, including Prisoner Interviews, Key Reviews, and parole hearings, including any appeals, as required by the ADA.

261.   Defendants' failure to modify their policies and practices disproportionately burdens the Disability Subclass by reason of their disabilities. But for the fact that members of the Disability Subclass have disabilities, they would not require these reasonable modifications which they are being denied by Defendants.

262.   The regulations implementing Title II of the ADA also require public entities to prepare and implement a Self-Evaluation and Transition Plan to evaluate and improve the

accessibility of their facilities as required by 28 C.F.R. § 35.150. BOP Defendants and NDCS Defendants have failed to prepare and implement an adequate and complete Self-Evaluation and have similarly failed to prepare an adequate and complete Transition Plan. A self-evaluation was initiated in 1994, but it was not completed, and it has not been updated to encompass new NDCS facilities and programs.

263.    Public entities are also required to take appropriate steps to ensure that communications with persons with disabilities are as effective as communications with others, including furnishing appropriate auxiliary aids and services where necessary to ensure an equal opportunity to participate in and enjoy the benefits of a service, program, or activity. 28 C.F.R. § 35.160. NDCS and BOP Defendants fail to provide appropriate auxiliary aids and services including videophones, ASL interpreters, Braille, or other accessible formats to ensure effective communications with individuals with disabilities.

264.    Upon information and belief, NDCS facilities have been altered in a manner that affects their usability since January 26, 1992, and the altered portions of the facilities are not readily accessible to and usable by individuals with disabilities in violation of 28 U.S.C. § 35.151(b)(1). Pursuant to 28 U.S.C. §35.151(c)(1), physical alterations that commence after July 26, 1992 must comply with the DOJ's Standards for Accessible Design published on July 26, 1991 and republished as Appendix D to 28 CFR Part 36 ("1991 Standards") or with the Uniform Federal Accessibility Standards ("UFAS"). Portions of NDCS Facilities, including but not limited to the Nebraska Correctional Center for Women and the Omaha Correctional Center, have been altered post-1992. In particular, large sections of the NCCW were altered in 2004 and 2009, and an additional housing unit was added to the OCC in 1994.

265.    Upon information and belief, areas of NDCS facilities have been constructed after

July 26, 1992 and are not in compliance with the 1991 Standards or UFAS. Pursuant to 28

U.S.C. § 35.151(4), an "alteration that affects the usability of or access to an area of a facility

that contains a primary function shall be made accessible so as to ensure that, to the maximum

extent feasible, the path of travel to the altered area and the restrooms, telephones, and drinking

fountains serving the altered area are readily accessible to and usable by individuals with

disabilities, including individuals who use wheelchairs …" A "primary function" is a major

activity for which the facility is intended. 28 U.S.C. § 35.151(b)(4)(i).

266.    Upon information and belief, NDCS Defendants have altered the usability of

areas that contain primary functions but have failed to make the path of travel to such areas

readily accessible to individuals with disabilities, including individuals who use wheelchairs, in

violation of 28 U.S.C. § 35.151(4).

267.    With respect to medical and long-term care facilities in jails, prisons, and other

detention and correctional facilities, public entities are required to apply the 2010 Standards

technical and scoping requirements for those facilities, irrespective of whether those facilities are

licensed, for alterations and construction occurring after the applicable dates. 28 U.S.C.

§ 35.151(k)(3). Upon information and belief, NDCS Defendants and BOP Defendants fail to

apply these standards.

**Fourth Cause of Action**
(DISABILITY SUBCLASS v. ALL DEFENDANTS)
(Rehabilitation Act, 29 U.S.C. § 794)

268.    Section 504 provides, in pertinent part that "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of his or her disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving federal financial assistance[.]" 29 U.S.C. § 794(a).

269.    All Defendants were, at all times relevant to this action, and are currently

78

recipients of federal financial assistance within the meaning of the Rehabilitation Act and

provide a program or activity including all the operations of the recipient which includes all

programs and activities offered by NDCS and BOP. 29 U.S.C. § 794(a).

270.    Disability Subclass Plaintiffs and the Disability Subclass they represent are

qualified individuals with disabilities as defined in the Rehabilitation Act as they all have

impairments that substantially limit a major life activity, and they were or are all residents of

NDCS facilities qualified—with or without reasonable accommodation—to participate in the

programs, services, and activities offered by NDCS and BOP. 29 U.S.C. § 705(20)(B); 28 C.F.R.

§ 41.32.

271.    Defendants have violated the rights of Plaintiffs and members of the Disability

Subclass secured by Section 504 and its implementing regulations.

272.    The DOJ is charged under Executive Order 12250 with coordinating the

implementation of Section 504 of the Rehabilitation Act of 1973. 28 C.F.R. § 41.1. In providing

any aid, benefit, or service, a recipient of federal financial assistance "may not . . . [d]eny a

qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or

service," "[a]fford a qualified handicapped person an opportunity to participate in or benefit from

the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified

handicapped person with an aid, benefit, or service that is not as effective in affording equal

opportunity . . . as that provided to others," "[o]therwise limit a qualified handicapped person in

the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others," or "provide

different or separate aids, benefits, or services to individuals with disabilities or to any class of

individuals with disabilities than is provided to others unless such action is necessary to provide

qualified individuals with disabilities with aids, benefits, or services that are as effective as those

provided to others." 45 C.F.R. § 84.4(b)(i)(iv), (vii).

273.    A public entity also may not "deny a qualified individual with a disability the

opportunity to participate in services, programs, or activities that are not separate or different,

despite the existence of permissibly separate or different programs or activities." 45 C.F.R.

§ 84.4(b)(3). By housing Disability Subclass Plaintiffs and members of the Disability Subclass in

more restrictive housing, Defendants exclude them from participating in and deny them the

benefits of Defendants' education and rehabilitative programs, services, and activities solely by

reason of their disabilities.

274.    Defendants also deny prisoners with mobility disabilities access to programs and

activities due to the physical inaccessibility of NDCS facilities, including housing prisoners with

disabilities in inaccessible cells and without access to accessible showers and by holding

programs and classes in inaccessible spaces.

275.    Defendants fail to make reasonable modification to their policies, practices, and

procedures even though such modifications are necessary to avoid discriminating against

Disability Subclass Plaintiffs and members of the Disability Subclass by, *inter alia*, not

identifying and tracking prisoners with disabilities who require reasonable accommodations,

failing to provide an effective accessible grievance procedure, failing to provide effective

communication and auxiliary aids, and failing to provide other reasonable modifications to

policies and practices to avoid discrimination on the basis of disability. BOP Defendants have no

process in place for allowing prisoners with disabilities to request or receive auxiliary aids and

services and reasonable modifications of BOP programs, services, and activities, as required by

29 U.S.C. § 794(a). Specifically, BOP Defendants have failed to provide any process for

requesting and/or receiving reasonable modifications in its practices and policies regarding

notification of parole eligibility and in the conduct of the parole hearings themselves, thereby subjecting people with disabilities to a greater likelihood of being denied parole solely by reason of their disabilities.

276.    A recipient of federal financial assistance may not "utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap" and/or "(ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons . . ." 45 C.F.R. § 84.4(b)(4)(i), (ii). BOP Defendants, in determining whether to grant parole, use criteria that subject individuals with disabilities to discrimination solely on the basis of disability in violation of 45 C.F.R. § 84.4(b)(4). By their policy and practice of discriminating against and failing to reasonably accommodate prisoners with disabilities, all Defendants violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and disproportionately burden the Disability Subclass by reason of their disabilities.

## VIII. PRAYER FOR RELIEF

277.    Plaintiffs and the class and subclasses they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs and the class and subclasses they represent have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless Plaintiffs and the class and subclasses they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

278.    WHEREFORE, Plaintiffs and the class and subclasses they represent request that this Court grant them the following relief:

A.    Declare that the suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (2);

B.    Adjudge and declare that the acts, omissions, policies, and practices of Defendants, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, as described herein, are in violation of the rights of Plaintiffs and the class and subclasses they represent under the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act;

C.    Preliminarily and permanently enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting Plaintiffs and the class and subclasses they represent to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

D.    Order Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm suffered by Plaintiffs and the class and subclasses they represent as a result of Defendants' policies and practices set forth herein. Defendants' plan shall include, at a minimum, the following:

a)    Population: Policies and procedures for population management so that the number of prisoners is kept at a level that can be safely managed.

b)    Staffing:  Policies and procedures to increase the numbers of trained correctional staff to ensure the safety and security of the prisoner population.

c)    Classification and Housing: Policies and procedures to classify and house prisoners to ensure their safety and security.

d)    Screening: Policies and procedures that reliably screen for medical, dental,

and mental health conditions that require treatment.

e)      Health Care Access: Policies and procedures that provide prisoners with timely access to health care.

f)      Health Care Staffing: Policies and procedures to provide prisoners with timely access to sufficient numbers of qualified and competent clinicians who can provide routine, urgent, emergency, and specialty health care.

g)      Emergency Response: Policies and procedures for timely and competent responses to health care emergencies.

h)      Medication and Supplies: Policies and procedures for timely, secure, and accurate prescription and distribution of medications and supplies necessary for medically adequate care.

i)      Chronic Care: Policies and procedures for timely access to competent care for chronic diseases.

j)      Mental Health Treatment: Policies and procedures for: timely access to necessary treatment by qualified staff for serious mental health needs, including medication, therapy, inpatient treatment, suicide prevention, and suicide watch; access to hospitalization and inpatient care; prohibitions or limitations on the use of seclusion and restraints; disciplinary policies and practices regarding persons with psychiatric disabilities that appropriately consider their disabilities; and training of corrections and health care staff to recognize and treat prisoners' psychiatric disabilities.

k)      Environmental Conditions: Policies and procedures to improve basic sanitary conditions that do not promote the spread or exacerbation of diseases or infections, including but not limited to reducing overcrowded conditions at NDCS

facilities.

l)      Quality Assurance: Policies and procedures for a regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies.

m)      Isolation: Policies and procedures prohibiting confinement of Plaintiffs and the Isolation Subclass under conditions of social isolation and sensory deprivation that put prisoners at substantial risk of serious physical and mental harm.

n)      Health Insurance Portability and Accountability Act of 1996 (HIPAA) Compliance: Policies and practices to bring NDCS facilities into HIPAA compliance in relation to patient information, medical records, and medical treatment.

o)      Accommodation for Prisoners with Disabilities: Policies and practices to ensure that members of the Disability Subclass are not denied the benefits of, or participation in, programs, services, and activities offered by NDCS and BOP; that prisoners with disabilities are timely identified, tracked, and assessed; have their disabilities accommodated; are provided with an effective grievance procedure; are provided with all needed assistive devices and other accommodations; and receive effective communication in all settings, including but not limited to health care, classification, discipline, and parole proceedings.

279.    Order Defendants to make all programs and services accessible and available to prisoners with disabilities as required by the ADA and Rehabilitation Act.

280.    Enter a prisoner release order pursuant to 18 U.S.C. § 3626(a)(3).

281.    Award Plaintiffs the costs of this suit, and reasonable attorneys' fees and litigation expenses, pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794, and other

applicable law.

282.    Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction.

283.    Appoint the undersigned counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g).

284.    Award such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED, this 16th day of August, 2017.

By:    _____

David Fathi (Wash. Bar No. 24893)*
*Pro Hac Vice Admission Application Pending*
NATIONAL PRISON PROJECT of the
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, D.C.  20005-2302
Telephone:  (202) 548-6603
Facsimile:  (202) 393-4931
Email:  dfathi@aclu.org

*Not admitted in DC; practice limited to
federal courts

By: _____

Michael W. Bien (Cal. Bar No. 096891)
Kara Janssen (Cal. Bar No. 274762)
*Pro Hac Vice Admission Applications Pending*
ROSEN BIEN GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
Email:  mbien@rbgg.com

By: _____

Christopher M. Young (Cal. Bar No. 163319)
*Pro Hac Vice Admission Application Pending*
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Telephone:  (619) 699-4748
Facsimile:  (619) 764-6748
Email:  christopher.young@dlapiper.com

Dawn M. Jenkins (Tex. Bar No. 24074484)
*Pro Hac Vice Admission Application Pending*
DLA Piper LLP (US)
1000 Louisiana Street, Suite 2800
Houston, TX 77002
Telephone: (713) 425-8454
Facsimile: (713) 300-6054
Email:  dawn.jenkins@dlapiper.com

Jennifer Eldridge (Il. Bar No. 6323859)
*Pro Hac Vice Admission Application Pending*
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
Telephone: (312) 368-3914
Facsimile:  (312) 251-5815
Email: jennifer.eldridge@dlapiper.com

By: _____

Amy A. Miller #21050
ACLU OF NEBRASKA
134 S. 13th Street, Suite 1010
Lincoln, Nebraska 68508
Telephone: (402) 476-8091 ext. 106
Facsimile: (402) 476-8135
Email: amiller@aclunebraska.org


By: _____

Robert E. McEwen #24817
Kenneth M. Smith #25552
NEBRASKA APPLESEED CENTER FOR LAW
IN THE PUBLIC INTEREST
941 O Street, Suite 920
Lincoln, Nebraska 68508
Telephone: (402) 438-8853
Facsimile: (402) 438-0263
Email: rmcewen@neappleseed.org


By: _____

Debra Patkin (MD # 1012160018) *Pro Hac Vice*
*Admission Application Pending*
NATIONAL ASSOCIATION OF THE DEAF
8630 Fenton Street, Suite 820
Silver Spring, Maryland 20910
Telephone: (301) 587-1788
Facsimile: (301) 587-1791
Email: debra.patkin@nad.org


**ATTORNEYS FOR PLAINTIFFS**

87