Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Jacob B. Lee, Bar No. 030371
Kevin R. Hanger, Bar No. 027346
Timothy M. Ray, Bar No. 029191
Richard M. Valenti, Bar No. 031533
Jamie D. Guzman, Bar No. 022095
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
afletcher@strucklove.com
jlee@strucklove.com
khanger@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-DKD <br><br><br> **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO TERMINATE PERFORMANCE MEASURES** |

## INTRODUCTION

The Stipulation is self-terminating upon satisfaction of Paragraph 10(b)'s requirements. (Dkt. 1185 at 4-5.) Defendants have met those requirements for many performance measures, as detailed in their Motion to Terminate Monitoring, and further below. Because the Stipulation does not require Defendants to justify their compliance upon termination, to the extent Plaintiff challenges the findings, it is their burden to establish Defendants' scores are flawed. They failed to do this. Instead, their Response casts sweeping accusations of "flawed" methodology, without describing which performance measure's methodology is flawed, how it is flawed, or how Defendants' scores were impacted.

## I.   DEFENDANTS' COMPLIANCE IS GOVERNED BY THE STIPULATION.

### A.   Defendants' Monitoring Automatically Terminated Upon Compliance with Paragraph 10(b) of the Stipulation.

Plaintiffs appear to misunderstand the guiding contractual provision governing termination. The Stipulation unequivocally states that a performance measure *terminates* once Defendants have fulfilled their obligations under Paragraph 10(b). As long as the performance measure satisfies the termination criteria set forth in Paragraph 10(b), the performance measure terminates by operation of that provision. There is nothing ambiguous about Paragraph 10(b)'s termination directives. It must be followed according to its terms. *See Longnecker v. Am. Exp. Co.*, 23 F. Supp. 3d 1099, 1106 (D. Ariz. 2014) ("[W]hen parties bind themselves by a lawful contract, a court must give effect to that contract as written if the terms are clear and unambiguous.").

Although Paragraph 10(b) is controlling, what it does not require is equally telling. For example, the Stipulation does not state that Defendants *may* seek to terminate monitoring. In fact, the Stipulation does not even anticipate that Defendants have to request permission to terminate monitoring. Even this Court's circumscribed enforcement authority under Paragraph 36 of the Stipulation confirms that Defendants do not need to seek Court approval for termination. Paragraph 36 only governs instances where ADC is

*not* compliant.  In fact, Paragraph 36 states nothing at all about the procedures governing termination.  That is because it did not need to: Paragraph 10(b) makes clear that the termination of Defendants' monitoring and reporting duties is self-executing.  *See Hallett v. Morgan*, 296 F.3d 732, 741 (9th Cir. 2002) ("The district court did not need to rule on Defendants' motion to terminate these already expired provisions.").

Further, nothing in the Stipulation states that if Defendants' monitoring changes, the conditions in Paragraph 10(b) are somehow nullified.  To the contrary, the Stipulation states nothing about Defendants' monitoring at all.  If Plaintiffs wanted to include a provision in the Stipulation affording them the opportunity to restart the 24-month clock for termination, they should have bargained for it.  Alternatively, as this Court has reminded the parties, if Plaintiffs want to modify the termination provision, "then they must do so with 'a writing signed by all representatives of all parties at the time of modification.'"  (Dkt. 1673, citing Stipulation ¶ 40.)

Finally, in contrast to the automatic termination set forth in Paragraph 10(b), the Stipulation does anticipate a formal motion to terminate the entire Stipulation for a period of four years in Paragraph 37.  The express inclusion of the term elsewhere in the Stipulation (Paragraph 37) implies its intentional exclusion when omitted (Paragraph 10(b)).  *See Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001).

## B.    Plaintiffs Bear the Burden to Prevent Termination.

Plaintiffs contend that Defendants bear the burden of proof to prove that termination is warranted.  *See* Resp. at 2 (citing *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010) and *Gilmore v. People of the State of Cal.*, 220 F.3d 987 (9th Cir. 2000)).  However, *Graves* and *Gilmore* involved termination of relief under the PLRA, specifically 18 U.S.C. § 3626(b).  *See Graves*, 623 F.3d at 1048 ("When a party moves to terminate prospective relief under § 3626(b), the burden is on the movant to demonstrate that there are no ongoing constitutional violations, that the relief ordered exceeds what is necessary to correct an ongoing constitutional violation, or both.") (citing *Gilmore*, 220 F.3d at 1007-08).  Defendants are not moving to terminate prospective relief under the

PLRA or § 3626(b)—they are ceasing their duties to monitor and report pursuant to the Stipulation.   Plaintiffs also rely on *Lew v. Moss* in support of their burden of proof argument.   797 F.2d 747 (9th Cir. 1986).   But *Lew* involved diversity jurisdiction and addressed which party bore the burden of proof to show domicile, not termination.   *Id*. at 751.   Therefore, *Graves*, *Gilmore*, and *Lew* are inapposite.

Because Paragraph 10(b) of the Stipulation makes clear that Defendants' monitoring and reporting duties automatically terminate once its provisions have been satisfied, it is *Plaintiffs'* obligation to prevent the automatic termination.   *See Skinner v. Lampert*, 457 F. Supp. 2d 1269, 1276 (D. Wyo. 2006) ("The burden is upon the Plaintiffs to prevent termination of the Remedial Plan."); *see also Hallet*, 296 F.3d at 744 ("[T]he Judgment expired by its own terms unless Plaintiffs proved that the Prison's mental health and dental services violated the Eighth Amendment.").

## C.     The Monitoring Guide Is Not Part of the Stipulation.

Plaintiffs repeatedly argue that because Defendants have changed the Monitoring Guide since the inception of the Stipulation, Defendants are unable to terminate certain performance measures even though those performance measures have complied with Paragraph 10(b).   Plaintiffs are wrong.   The Monitoring Guide is not (and has never been) part of the Stipulation.   To hold that changes to the Monitoring Guide affect Defendants' ability to terminate performance measures under Paragraph 10(b) is to rewrite the Stipulation.   Courts cannot rewrite contracts under the guise of interpretation:

> While the parties to a contract often request the courts, under the guise of interpretation or construction, to give their agreement a meaning which cannot be found in their written understanding . . . the courts properly and steadfastly reiterate the well-established principle that it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make. In other words, the interpretation or construction of a contract does not include its modification or the creation of a new or different agreement; a court is not at liberty to revise, modify, or distort an agreement while professing to interpret or construe it and has no right to make a different contract from that actually made by the parties.

Williston on Contracts, *Standards of Interpretation*, § 31:5 (May 2017).   The Ninth Circuit agrees: "[I]t is a familiar principle of contract law that unless a contract is

voidable, [courts] must enforce it as drafted by the parties, according to the terms employed, and may not make a new contract for the parties or rewrite their contract while purporting to interpret or construe it." *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1195 (9th Cir. 2007) (citations omitted).

The Stipulation did not call for, much less require, a Monitoring Guide, nor is it incorporated. In fact, there is absolutely no reference to Defendants' Monitoring Guide anywhere in the Stipulation. Plaintiffs cannot defy the termination provision of Paragraph 10(b) simply because changes have been made to Defendants' Monitoring Guide. To do so would entirely rewrite the Stipulation.

In addition, the Stipulation is an integrated contract and can only be modified by an agreement of the parties with a signature of those representative parties to be bound. The Monitoring Guide contains no such required acknowledgement or signature which would modify the terms of the Stipulation and, as such, cannot be incorporated into the Stipulation. The Stipulation is clear that it is an integrated agreement. Paragraph 40 of the Stipulation states as follows, "This is an integrated agreement and may not be altered or modified, except by a writing signed by all representatives of all parties at the time of modification."

Because the parties have not modified the Stipulation in accordance with the integration clause, the Plaintiffs cannot rely upon the content of the Monitoring Guide to alter the requirements of the terms contained within the Stipulation. Further, the reliance by Plaintiffs upon the monitoring methodology set forth in the Monitoring Guide is misplaced as that methodology is not a part of the parties' contract and cannot be used to require action on the part of the Defendants in order to obtain compliance of any particular performance measure.

**D.    Plaintiffs' Delay in Bringing Interpretation Issues Does Not Extend Termination Timing Under Paragraph 10(b).**

In arguing that certain flaws in Defendants' monitoring forecloses termination, Plaintiffs cite their Statement Regarding Evidentiary Hearings on Monitoring (Dkt. 2046)

to show how they have broadly criticized Defendants' monitoring. Plaintiffs filed their Statement, however, just a few short months ago—on May 8, 2017. Notably, this was *after* the termination became effective under Paragraph 10(b), and was also curiously *after* Defendants filed their Notice of Termination of Monitoring Pursuant to Paragraph 10(b). (Dkt. 2040.)

More importantly, however, Plaintiffs cannot levy concerns with Defendants' monitoring more than two years after it occurred and then force the termination clock to start anew. If the Court indulges Plaintiffs' arguments, this would create an incentive for Plaintiffs to only raise monitoring concerns just before a performance measure terminates so that Defendants would have another full two years before the performance measure terminates. That is not how the Stipulation was designed. Plaintiffs should be estopped from benefiting from their own delay.

### E.     Termination Is Not Contingent On Plaintiffs' Audit.

Plaintiffs' argument that they are required to "audit" Defendants' CGAR scores before any termination can occur fundamentally misunderstands Paragraph 10(b) of the Stipulation. Nothing in the Stipulation requires Plaintiffs' auditing as a condition precedent to termination under Paragraph 10(b).

In addition, Plaintiffs' argument that it is "impossible" for them to verify that the records counted were compliant because Defendants have "fail[ed] to create an audit trail" and have disregarded the requirement of Paragraph 32 of the Stipulation by "refus[ing] to provide the underlying documents that form the basis of their findings of compliance" lacks merit for three reasons. (See Resp. at 4:17-19, 5:13-15.)

First, nothing in the Stipulation requires Defendants to create an audit trail. In support of their position, Plaintiffs cite one sentence from Paragraph 32: "Plaintiffs' counsel and their experts shall be able to review any documents that form the basis of the MGAR reports and be able to interview the ADC monitors who prepared those reports." (Id. at 4:4-6.) This sentence, however, merely allows Plaintiffs access to documents that form the basis of the reports. It does not, as Plaintiffs argue, require Defendants to create

1   a list of all charts reviewed for the CGARs.  (Dkt. 1922-1 at 10.)

2          Second, the worksheets the monitors utilize to formulate the CGARs were made

3   available for Plaintiffs' inspection during Plaintiffs' prison tours as required by Paragraph

4   32.  Therefore, Defendants have not "[d]isregard[ed] the requirement of Paragraph 32 of

5   the Stipulation."  (Resp. at 5:13.)

6          Third, Plaintiffs have access through eOMIS to the underlying documents that form

7   the basis of compliance, and therefore, it is not "impossible" for them to verify that the

8   records counted were compliant.  Instead, Plaintiffs main complaint seems to be that the

9   information was not "consistently record[ed] or document[ed] within the CGAR reports."

10  (Resp. at 5:6-9.)  This does not mean, however, that the information does not exist.  It

11  does.  (Id. at 5:11-16; see also Id. at 8, n.4.)  Furthermore, there is no requirement in the

12  Stipulation that indicates where the monitors are to record or document which files were

13  reviewed.  As Plaintiffs recognize, the monitors each have their own method for recording

14  and tracking which records they reviewed for compliance.  (Id. at 4:11-16.)

15         Plaintiffs also take issue with Defendants' rebuttal process with Corizon calling it a

16  "one-sided opportunity [for Corizon] to challenge findings of noncompliance."  (Id. at

17  5:19-23.)  Not so.  The rebuttal process serves two important functions. (Exhibit 1,

18  Declaration of Kathleen Campbell, ¶ 7.)  First, it operates as a "checks and balances"

19  system to ensure the reported CGAR numbers are accurate.  (Id.)  For example, if a

20  monitor reports a non-compliant finding for a particular measure, Corizon has the

21  opportunity to review the underlying records themselves and dispute the reported finding.

22  (Id.)  Such disputes must be supported by specific documentation, i.e., portions of inmate

23  records that were compliant with the measure's requirements.  (Id.)  Second, it serves as a

24  teaching tool to educate monitors on mistakes that may be made.  (Id.)

25         The rebuttal process itself is twofold.  (Id. at ¶ 8.)  Step one occurs at the site level

26  with Corizon personnel where the monitor will discuss the preliminary results with site

27  personnel and allow them an opportunity to research how the result was reached.  (Id. at

28  ¶ 9.)  If site personnel believe there was an inaccuracy or error, they may present their

research to the monitor, who may revise the preliminary finding based on the accuracy of the site personnel's research.  If, however, the monitor is dissatisfied with the research provided, and believes the preliminary finding is accurate, the preliminary finding will stand.  (Id. at ¶ 10.)  Once the preliminary findings are entered into the CGARs, a second step to the rebuttal process is available.  (Id. at ¶ 11.)

Step two is a formal rebuttal process that occurs between Corizon's regional office and ADC's compliance team (Kathleen Campbell, Richard Pratt, and Vanessa Headstream).  (Id. at ¶ 12.)  If Corizon wishes to challenge a finding, they may do so by submitting a Rebuttal Form.  (Id. at ¶ 13.)  Upon submission of the Rebuttal Form, ADC reviews its contents and decides whether to amend the CGAR based on the information provided by Corizon.  (Id. at ¶ 15.)  If Corizon is correct, the finding will be changed. (Id.)  The rebuttal process is collaborative, and assists both Corizon and ADC in ensuring that the CGARs are accurately and appropriately reported.  (Id. at 16.)

In sum, it is evident that the rebuttal process between Corizon and ADC is not a "one-sided opportunity to challenge findings of noncompliance" but rather a collaborative "checks and balances" system that is meant to ensure accurate reporting of CGAR numbers.

## II.   **DEFENDANTS ARE ENTITLED TO TERMINATION BASED UPON THE INTERPRETATION OF THE STIPULATION BY THE COURT.**

### A.   **The Definition of "Seen"**

Only three measures subject to Defendants' Motion are affected by the Court's definition of "seen": 74 (Perryville); 76 (Eyman, Perryville, Phoenix, and Tucson), and 89 (Phoenix).

Performance Measure ("PM") 74 requires all female prisoners to be seen by a licensed mental health clinician within five working days of return from a hospital post-partum.  (Exhibit 2, Declaration of Nicole Taylor, ¶ 4.)  PM 76 requires the initial mental health assessment of an inmate be performed by a licensed mental health staff or that the inmate be seen by a mental health clinician within 14 days of his or her arrival into ADC.

1    (Id. at ¶ 5.)  While the Court's Order regarding the definition of "seen" ordered that group

2    contacts do not count toward compliance, group contacts have never been counted to

3    determine compliance with these measures.  (Id. at ¶ 6.)  Group contacts are not counted

4    for these measures.  (Id. at ¶ 7.)  Post-partum women would never be seen in a group

5    setting, and those needing a 14-day follow up after intake would not be assigned to a

6    group within such a short time period.  (Id.)  Prior to the implementation of the "Final

7    Monitor Guide," the methodology for PMs 74 and 76 included the following language:

8
> A contact may be documented in multiple electronic entries,
> including, but not limited to:  individual contact, segregation

9
> visit (refusal or lockdown), group note, scheduled sick call,
> unscheduled sick call, suicide watch (refusal, lockdown, or

10
> conducted in confidential setting), etc.

11   (Id. at ¶ 8.)  This language simply advised monitors that contacts *may* be documented in

12   any of the listed entries, including group notes.  (Id. at ¶ 9.)  While groups have never

13   been counted for PMs 74 and 76, on occasion, a provider will accidently select "group

14   note" from the drop down menu when initiating an individual contact.  (Id. at ¶ 10.)  To

15   ensure these individual contacts were still captured, we included "group note" in the

16   methodology for these measures.  (Id.)

17           Therefore, because group contacts have never been counted for these measures,

18   Defendants' CGAR scores are compliant under the Final Monitor Guide's methodology

19   for these measures.

20           **B.    The "Partial Credit" Issue**

21           Plaintiffs are correct that on December 14, 2016, the Court invalidated the "partial

22   credit" methodology.  (Dkt. 1831 at 1-2.)  But this invalidation does not change the fact

23   that Performance Measures 16, 66, 89, and 93 [1] met the definition of substantial

24   compliance.  (Dkt. 2251 at 8-10.)  Plaintiffs do not argue otherwise.

25

26

27   _____
     [1] While Plaintiffs' Response discusses additional measures subject to the "partial
28   credit" Order, Defendants only moved to terminate PMs 16, 66, 89, and 93. (Dkt. 2251 at
     8-10.)

                                             8

The "partial credit" methodology was employed for *one* month in October 2016. Upon receipt of the Court's Order invalidating the methodology, this practice ceased. And, as Defendants specifically state in their Motion, they did not count October 2016 data for these measures when moving to terminate.  (Dkt. 2251-1 at 11 n.1, 28 n.2, 29 n.3, 34 n.4.) [2]  As such, these measures terminated as outlined in Defendants' Motion. Plaintiffs assert no other argument with respect to these measures.    Defendants therefore request the Court to issue an Order finding that Defendants no longer have to measure or report compliance with them.

### C.    "Not Applicable"[3]

While this Court has considered that a "N/A" designation is "neither compliant nor noncompliant," an N/A designation must be counted for termination purposes or absurd results will follow.  (Dkt. 1956 at 67:23-69:23 [after discussing N/A's and the potential for absurd results, the Court stated it was "not going to be opposed to listening to common sense arguments at any point"].)

**PM 15:** Douglas and Safford

It is possible that there may have been no inmates who refused prescribed medication (or no showed) at these particular facilities for the given months with an N/A designation.

**PM 25:**  Douglas, Eyman, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma

At these facilities, the first responders were correctional officers.  There may not have been an ICS requiring a medical response.

**PM 26:**  Douglas, Phoenix, Safford, Winslow

It is possible that there may have been no health care grievances for a particular month where an N/A was entered.

---

[2] While Defendants did not specifically state this with respect to PM 89, it is true for that measure as well.

[3] Defendants are currently investigating the N/A designations for the particular PM/facility identified in this section.  Defendants may provide the Court with additional data.

**PM 29:** Douglas, Tucson

Because the PM involves an annual review, it is possible that not every month had a nurse due for an annual review.

**PM 33:** Eyman

It is possible that there may have been no intakes at Eyman for the particular months where there is an N/A designation.

**PM 34:** Eyman

It is possible that there may have been no intakes at Eyman for the particular months where there is an N/A designation.

**PM 35:** Perryville

It is possible that there may have been no transfers for the particular N/A months as Perryville is the only female facility and therefore there are rarely intersystem transfers. The only potential transfers would be to Phoenix's mental health unit.

**PM 40:** Douglas, Safford

It is possible that there may have been no urgent provider referrals at these facilities due to a typically healthier inmate population.

**PM 41:** Douglas, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma

It is possible that there may have been no emergent provider referrals at these particular facilities for the given months with an N/A designation.

**PM 43:** Safford

It is possible that there may have been no inmates returning from an inpatient hospital stay or ER transport because there is no IPC at Safford and those inmates that require an inpatient hospital stay or ER transport may be transferred to a facility to accommodate their medical needs.

**PM 47:** Safford, Winslow

It is possible that there may have been no diagnostic study for a Medical Provider to communicate with an inmate at these facilities for the particular months with an N/A designation.

**PM 48:**  Eyman, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma

It is possible that there were no denials of requests for specialty services as an alternative treatment plan may have been implemented.

**PM 49:**  Lewis, Safford, Winslow

It is possible that there may have been no denials of requests for specialty services as an alternative treatment plan may have been implemented.

**PM 62:**  Eyman

It is possible that there may have been no prisoners screened for intake as there is no intake at Eyman or there may not have been any parole violations.

**PM 72:**  Douglas, Perryville, Phoenix, Safford, Winslow, Yuma

It is possible that there may have been no inmates who refused prescribed diets.

**PM 75:**  Eyman

It is possible that there may have been no intakes at Eyman because Eyman does not have an intake.

**PM 76:**  Eyman, Perryville, Phoenix, Tucson

It is possible that all intake assessments may have been done by licensed staff, which would result in a N/A because the measure only addresses non-licensed staff.

**PM 93:**  Phoenix Tucson

It is possible that there may have been no max custody prisoners at these facilities. Therefore, this may be an example of an N/A that may lead to an absurd result.

**PM 97:**  Douglas, Safford, Winslow

It is possible that there may have been no telepsychiatry sessions due to the lack of mental health population.  It is likely that those inmates that PM 97 would apply to may have been transferred to different facility.

**PM 99:**  Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, Yuma

It is possible that there may have been no peer reviews during the reported periods.

**PM 101:**  Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma

It is possible that another dental professional may have taken the inmate histories, vital signs, and dental radiographs.

Thus, those facilities that have had a "N/A" designation for more than two years for a reason: the performance measure may *never* apply to that facility.

**D.**    **"Intake Issue"**

The Court's Order regarding the Final Monitor Guide requires only that Defendants show that a PM/facility was compliant under the Final Monitor Guide. (Dkt. 1951.)[4] Here, while the Court expanded the scope of records to be pulled for intake measures in September 2016, this expansion did not invalidate Defendants' previous scores. Indeed, under the Final Monitor Guide, Defendants' scores for PMs 33, 34, 62, 75, and 76, for the months relevant to termination, remain accurate. Plaintiffs assert no other argument with respect to these measures. Defendants therefore request the Court issue an Order finding that Defendants no longer have to measure or report compliance with them.

**E.**    **Additional Measures Subject to Defendants' Motion to Terminate**

Because the Monitor Guide is not part of the Stipulation, Defendants are not required to apply those changes which the parties agreed upon.

Therefore, the following measures are not required to be applied retroactively as they are not subject to a Court-ordered interpretation of the terms of the Stipulation: PMs 14, 16, 21, 39, 45, 46, 48, 49, 50, 51, 59. And, for the measures outlined below, there are additional reasons they are not required to be applied retroactively:

---

[4] Defendants maintain their position that there is no requirement in the Stipulation that requires compliance with a "Final Monitor Guide," as the Monitor Guide is not a part of the Stipulation. And because it is not a part of the Stipulation, as a matter of law, it cannot have retroactive application. Without waiving their position, on January 13, 2017, the Court ordered Defendants to provide to Plaintiffs and the Court a final version of the Monitor Guide that incorporated all of the Court's rulings no later than January 18, 2017 (Dkt. 1862 at 2:18-21). In connection with the January 18, 2017 deadline, Defendants' filed a Notice of Provision of Final Version of Monitor Guide as to PMs 1-103. (Dkt. 1872.)

**PMs 5, 6, 7, 8, 9, 10, 11, 12:** These measures are not subject to a court ordered change and therefore are not required to be applied retroactively. Even if they were, the parties did not change the methodology with respect to these measures. And while Plaintiffs claim the parties did not agree to language for these measures until October 14, 2016, they fail to attach or cite to the language allegedly proposed or documentation to support a change was made. (Dkt. 2344 at 17.) Instead, they cite to correspondence where Plaintiffs' counsel "request clarification regarding the methodology," suggest that "more specificity . . . would be helpful," suggest "extraneous" detail be omitted, or that certain instruction be made "more explicit." (Dkt. 1626-1 at 35, 72, 77, 78; Dkt. 1756-1 at 26, 27, 35, 36.) Such clarification cannot be said to have changed the methodology, and Plaintiffs provide no examples to support their conclusion it did. In fact, none of the correspondence cited by Plaintiffs discussed any proposed language changes. Monitoring has terminated with respect to these measures as outlined in Defendants' Motion. (Dkt. 2251.) Unlike court orders that have changed when charts can be counted compliant, these stylistic changes were not substantive and are not required to be applied retroactively. Importantly, Plaintiffs offer no argument regarding the adequacy of Defendants' CGAR results. As such, recalculation under the Final Monitor Guide is fruitless as the same procedures apply.

**PM 13:** Plaintiffs allege the parties did not agree on methodology for this measure until November 8, 2016. (Dkt. 2344 at 20.) Again, Plaintiffs fail to cite to any proposed methodology changes for this measure. Any changes made to the methodology were stylistic and did not impact compliance scores.

**PM 15:** The only change cited by Plaintiffs for this measure was a change in how random records were selected – the process went from selecting odd or even numbers, to randomizing the data prior to selecting files. (Dkt. 2344 at 20.) Such change is not substantive and is not subject to re-audit.

**PM 17:** The only changes cited by Plaintiffs for this measure were stylistic changes to make the methodology "more clear" (Dkt. 1756-1 at 53.) Such change is not substantive and is not subject to re-audit.

**PM 18:** Plaintiffs cite to no change in monitoring methodology for this measure. Instead, they cite to correspondence where Plaintiffs request clarification as to the number and type of records reviewed for this measure. (Dkt. 2344 at 21.)

**PM 19:** Plaintiffs cite to no change in monitoring methodology for this measure and fail to explain how the correspondence cited in support changed the methodology. (Dkt. 2344 at 22.)

**PM 20:**   The only change cited by Plaintiffs is stylistic. Specifically, the parties agreed to list the source documents in both the "Source of Records/Review" section and "Methodology" section. (Dkt. 1626-1 at 80; Dkt. 1756-1 at 27, 28.)

**PM 22:**   The only documentation Plaintiffs cite in support is correspondence where Plaintiffs inquire into how the randomization process operates, and Defendants explain. (Dkt. 1626-1 at 80; 1756-1 at 27-28, 38.)   There was no change to this measure's monitoring methodology.

**PM 25:**   The "change" to this measure involved explaining and defining the terms "Basic Life Support" and "Medical Emergency." (Dkt. 1756-1 at 54-55.)   Further defining and explaining these terms did not change the way in which this measure was monitored.

**PM 26:**   The documents cited by Plaintiffs show no indication the methodology was changed for this measure.   Rather, they indicate that the parties agreed to update the source documents for this measure. (Dkt. 1756-1 at 47, 55, 79-80.)

**PM 28:**   The monitoring methodology was not changed for this measure.   Instead, as supported by Plaintiffs' own documents, the parties agreed to clarify the providers subject to review under this measure. (Dkt. 1756-1 at 55.)

**PM 29**:   The documents referenced by Plaintiffs for this measure do not reflect any changes to monitoring methodology. Instead, they contain questions by Plaintiffs regarding the monitoring process. (Dkt. 1626-1 at 82.)

**PMs 36, 37:**   There has been no change to these measures' monitoring methodology, and the documents Plaintiffs cite support this. Indeed, the only "change" that was made was to limit the source document to the HNR log, so as to be consistent with other measures. (Dkt. 1626-1 at 70, 75; Dkt. 1756-1 at 25.)[5]

**PMs 40, 41:**   The only changes cited by Plaintiffs were changes to source documents and inclusion of definitions. (Dkt. 1626-1 at 20, 26-27, 32, 46; Dkt. 1626-2 at 62.)

**PM 42**: There has been no agreement on Court ordered changes to the methodology for this measure, and Plaintiffs fail to cite to any.

---

[5] Plaintiffs' allegation that the "open-clinic" system has somehow inflated scores is irrelevant here, where there has been no change to monitoring methodology. (Dkt. 2344 at 26).

14

**PM 43:**   Plaintiffs cite only to correspondence where they suggest, and Defendants implement, a spreadsheet that combines the source documents for this measure.  (Dkt. 1626-1 at 71, 75-76; Dkt. 1756-1 at 26.)  There was no change to the monitoring methodology.

**PM 47:** There has been no agreement on Court ordered changes to the methodology for this measure, and Plaintiffs fail to cite to any. That a new system is being implemented for notifying patients of test results does not change the fact there has been no changes to the methodology. (Dkt. 2344 at 29.)

**PM 52:**[6]  The Final Monitor Guide was provided to Plaintiffs and the Court on January 18, 2017. (Dkt. 1872.) Because Defendants are only obligated to apply its methodology, and because the change cited by Plaintiffs was implemented five months after finalization of the Final Monitor Guide, Defendants are not required to apply it retroactively. (Dkt. 1951.)

**PMs 53, 54:**  The correspondence cited by Plaintiffs fails to demonstrate how the monitoring methodology changed and/or how compliance scored were affected by such change.

**PM 55:** The correspondence cited by Plaintiffs fails to demonstrate how the monitoring methodology changed and/or how compliance scored were affected by such change. Indeed, the correspondence cited by Plaintiffs contains inquiries as to whether Defendants utilize disease management guidelines in monitoring this measure, and Defendants confirmation of same. (Dkt. 1626-1 at 83.)

**PM 57:** Plaintiffs' correspondence reflects only that the sample size was increased for this performance measure. (Dkt. 1756-1 at 28.) But the actual methodology was not altered and Plaintiffs make no argument to support that increase of the sample size altered compliance rates.

**PM 60:**   The only thing that changed for this measure was how Pap smears were being offered to inmates.  (Dkt. 1831 at 2.)  The monitors, however, have always monitored this measure to determine whether it was offered. Therefore, changing the way in which it is offered does not alter the compliance scores for this measure.

**PMs 63, 64, 65, 68:**  The parties agreed only to change how files were selected for these measures (first ten records vs. random records).  This change was not substantive and did not alter compliance scores.

---

[6] While Plaintiffs cite to Dkt. 1626-1 at 76 in support of this measure, that correspondence contains no discussion regarding PM 52.

**PM 79:**  The Final Monitor Guide was provided to Plaintiffs and the Court on January 18, 2017.  (Dkt. 1872.)  Because Defendants are only obligated to apply its methodology, and because this measure is substantially compliant under that methodology, it must be terminated.  That Plaintiffs desire to make additional changes to the methodology is irrelevant. (Dkt. 2344 at 36.)

**PM 96:**  Changing the language in the Monitor Guide to make it more "explicit" is not a substantive change subject to re-audit. (Dkt. 1756-1 at 29.)

**PM 97:**  The Final Monitor Guide was provided to Plaintiffs and the Court on January 18, 2017. (Dkt. 1872.) Because Defendants are only obligated to apply its methodology, and because this measure is substantially compliant under that methodology, it must be terminated.

**PMs 101, 102, 103:**  The documentation cited by Plaintiffs fails to indicate what changes were made and how they substantively affected the monitoring methodology. (Dkt. 2344 at 38.) For PMs 102 and 103, the correspondence reflects only that Plaintiffs requested clarification regarding the monitoring process and requested to review screen shots of Smallwood's Dental Services' CDS system. (Dkt. 1756-1 at 25.)

### F.    Defendants' Data Supports Termination.

Plaintiffs argue that Defendants seek to terminate performance measures that Defendants own data shows substantial non-compliance.  (Resp. at 37:24-25.)   Plaintiffs, however, misunderstand the standard.  In order to show non-compliance, Plaintiffs must show that a PM/facility is (1) non-compliant for seven of 24 months and (2) three consecutive months are non-compliant.[7]  (Dkt. 2030 at 1:24-26.)  Thus, Plaintiffs must show both (1) and (2) for a PM/facility to be non-compliant.

**PM 14 Winslow:**  This PM/facility terminated at the end of March 2017.  (Dkt. 2030 at 8:18.)  Plaintiffs allege that the PM/facility was both non-compliant for seven out

---

[7] The Court's Order (Dkt. 2030) defined substantial compliance for purposes of Paragraph 10(b) as no more than six (6) months of non-compliance.  However, because the Stipulation permits termination with only 18 months of compliance, six months of non-compliance within the 24-month period would still satisfy Paragraph 10(b)'s conditions for termination. As a result, termination is not permitted under the Stipulation if there are seven months—not six months—of non-compliance.

of 24 months and there were three consecutive months of non-compliance. (Resp. at 38.)

It appears that Plaintiffs are counting the N/A's as non-compliant as there are five N/As

between April 2015 and March 2017.  But as Plaintiffs mention, the Court has said that an

N/A is neither compliant nor non-compliant.  (See 2/8/17 Tr. at 45:18-20.)  But the Court

has also said that it would consider common sense arguments when determining whether

or not a matter should be removed from the Stipulation.  (Dkt. 1956 at 53:15-20, 67:23-

69:23.)  Here, it *may* be possible that there were no inmates that fit the requirements of

PM 14 at Winslow.

**PM 15 Perryville:** This PM/facility terminated at the end of February 2017.  (Dkt.

2251 at 3:19.)  Plaintiffs allege it is non-compliant because there are three consecutive

months of non-compliance in March-April 2017.  (Resp. at 38.) These consecutive months

of non-compliance are inconsequential, however, as this PM/facility terminated by

operation of contract at the end of February 2017.  Importantly, Plaintiffs do not show that

this specific PM/facility failed to meet both requirements for non-compliance between

March 2015 and February 2017.  (Dkt. 2030 at 1:24-26.)

**PM 42 Lewis:**  This PM/facility terminated at the end of February 2017.  (Dkt.

2251 at 5:9.)  Plaintiffs only allege this PM/facility was not complaint for 18 out of 24

months.  (Resp. at 38.)  Importantly, however, there are not three consecutive months that

are non-compliant.  Therefore, Plaintiffs have not met the definition of non-compliance.

(Dkt. 2030 at 1:24-26.)

**PM 50 Eyman and Yuma:** This PM/facilities both terminated at the end of

February 2017. (Dkt. 2251, at 5:20.)   At Eyman, Plaintiffs allege there were three

consecutive months of non-compliance between January and March 2017.  (Resp. at 38.)

But PM 50 at Eyman terminated by operation of contract at the end of February 2017, and

therefore, the March non-compliance is irrelevant.  Regardless, Plaintiffs have not shown

the other half of non-compliance, i.e. seven of 24 months.  At Yuma, Plaintiffs allege that

it was not compliant 18 out of 24 months. (Id.) But Plaintiffs do not show there were three

consecutive months of non-compliance.  Therefore, Plaintiffs fail to show PM 50 at Yuma

17

is non-compliant in accordance with the Court's definition.  (Dkt. 2030 at 1:24-26.)

**PM 52 Lewis:**  The PM/facility terminated at the end of February 2017. (Dkt. 2251 at 5:23.)   Plaintiffs only allege that there were three consecutive months of non-compliance in March-May 2017. (Resp. at 38.)   But because monitoring terminated by operation of contract in February 2017, the non-compliance in those months is inconsequential.  In sum, Plaintiffs have failed to show non-compliance between March 2015 and February 2017 as defined by the Court.  (Dkt. 2030 at 1:24-26.)

**PM 53 Lewis:**  The PM/facility terminated at the end of February 2017. (Dkt. 2251 at 5:24-25.)  Plaintiffs only allege there were four consecutive months of non-compliance between March-June 2017. (Resp. at 38.) But because monitoring terminated by operation of contract in February 2017, the non-compliance in those months is inconsequential.  In sum, Plaintiffs have failed to show non-compliance between March 2015 and February 2017 as defined by the Court.  (Dkt. 2030 at 1:24-26.)

**PM 96 Tucson:**  The PM/facility terminated at the end of February 2017. (Dkt. 2251 at 7:13-14.)   Here, Plaintiffs allege there are three consecutive months of non-compliance between March-May 2017. (Resp. at 38.)  But because monitoring terminated by operation of contract in February 2017, the non-compliance in those months is inconsequential.  In sum, Plaintiffs have failed to show non-compliance between March 2015 and February 2017 as defined by the Court. (Dkt. 2030 at 1:24-26.)

### G.   Measures Subject to a Remediation Plan Are Not Prohibited From Terminating.

The fact that some performance measures have remediation plans does not somehow prevent termination.  The Stipulation certainly did not carve out an exception for performance measures with remediation plans.  In applying the Paragraph 10(b)'s clear terms, termination is required.  *See Longnecker*, 23 F. Supp. 3d at 1106.

## III.   PLAINTIFFS' WAIVED ANY ARGUMENTS ON CERTAIN PERFORMANCE MEASURES.

Plaintiffs' Response does not specifically challenge any of the following performance measures:  PM 1 (All 10 facilities); PM 3 (All 10 facilities); PM 4 (Lewis,

Perryville, Tucson); PM 30 (All 10 facilities); PM 31 (All 10 facilities); PM 32 (All 10 facilities); PM 38 (Douglas, Eyman, Florence, Lewis, Perryville, Safford, Tucson, Winslow, and Yuma); PM 56 (Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Winslow, and Yuma); PM 58 (Perryville); PM 70 (Florence, Lewis, Perryville, and Tucson); PM 71 (Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, and Winslow).  Because Plaintiffs have not challenged those performance measures at the particular facilities, Plaintiffs have waived any challenge as to those measures/facilities. *See Muniz v. El Paso Marriott*, 773 F. Supp. 2d 674 (W.D. Tex. 2011) (holding that a plaintiff's failure to address claims in response to defendant's motion waives those arguments).  The Court should confirm Defendants must no longer monitor or report on these Performance Measures.

## **CONCLUSION**

In conclusion, Defendants respectfully request the Court affirm the termination of the performance measures submitted by Defendants because they are compliant with the terms of the Stipulation.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED this 27th day of October 2017.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/Daniel P. Struck
        Daniel P. Struck
        Rachel Love
        Timothy J. Bojanowski
        Nicholas D. Acedo
        Ashlee B. Fletcher
        Jacob B. Lee
        Kevin R. Hanger
        Timothy M. Ray
        Richard M. Valenti
        Jamie D. Guzman
        3100 West Ray Road, Suite 300
        Chandler, Arizona  85226

        Arizona Attorney General Mark Brnovich
        Office of the Attorney General
        Michael E. Gottfried
        Lucy M. Rand
        Assistant Attorneys General
        1275 W. Washington Street
        Phoenix, Arizona 85007-2926

        *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:                     ahardy@prisonlaw.com

Amelia M. Gerlicher:         agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

Amy B. Fettig:                    afettig@npp-aclu.org

Asim Dietrich:                    adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Caroline N. Mitchell:        cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:         ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:        DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

David Cyrus Fathi:           dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:               dspecter@prisonlaw.com

Jessica Pari Jansepar Ross:   jross@azdisabilitylaw.org

John Howard Gray:          jhgray@perkinscoie.com; slawson@perkinscoie.com

John Laurens Wilkes:       jlwilkes@jonesday.com, dkkerr@jonesday.com

Jose de Jesus Rico:          jrico@azdisabilitylaw.org

Kathleen E. Brody            kbrody@acluaz.org

Kirstin T. Eidenbach:       kirstin@eidenbachlaw.com

Maya Abela                      mabela@azdisabilitylaw.org

Rose Daly-Rooney:          rdalyrooney@azdisabilitylaw.org

Sara Norman:                   snorman@prisonlaw.com

Sarah Eve Kader:            skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org

Rita K. Lomio:                 rlomio@prisonlaw.com

Victoria Lopez:               vlopez@aclu.org

21

1

2     I hereby certify that on this same date, I served the attached document by U.S.
Mail, postage prepaid, on the following, who is not a registered participant of the
3 CM/ECF System:

4    N/A

5              /s/Daniel P. Struck

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28