Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
15 South 15th Avenue
Phoenix, Arizona 85007
Telephone: (602) 542-1645
Fax: (602) 542-3393
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Jacob B. Lee, Bar No. 030371
Kevin R. Hanger, Bar No. 027346
Timothy M. Ray, Bar No. 029191
Richard M. Valenti, Bar No. 031533
Jamie D. Guzman, Bar No. 022095
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
afletcher@strucklove.com
jlee@strucklove.com
khanger@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-DKD <br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT REGARDING DEFENDANTS' REMOVAL OF HEALTH NEEDS REQUEST (HNR) BOXES (DOC. 2365)** |

Plaintiffs' Statement Regarding Defendants' Removal of Health Needs Request (HNR) Boxes ("Motion")[1] is much ado about an issue not governed by the Stipulation. Plaintiffs' Motion fails to show Defendants violated the Stipulation or that the Court has any authority to grant the relief they seek. Plaintiffs' concern appears to be not that the new open clinic system is denying inmates access to health care—of which Plaintiffs have presented no evidence—but that Defendants' compliance scores will exceed the 85% threshold required by the Stipulation on those Performance Measures ("PM") that require certain actions to happen within a defined time after an HNR is received by medical staff—i.e., PMs 36, 37, 98, 102, and 103. (Doc. #1185-1.) Perversely, it seems Plaintiffs (or at least their counsel) would prefer that Defendants revert to the old collection box system in which administrative burdens associated with the HNR collection and triage process would often result in inmates being seen more than 24 hours after the HNR was received.

The Stipulation is silent as to how HNRs are to be collected, requiring only that they be timely screened, and the inmates timely seen, after the HNRs are received by medical staff. Neither Plaintiffs nor the Court have any authority to modify this purely operational change from a collection box system to an open clinic system. Even if they did, Plaintiffs have not shown that any changes are necessary. During a time-consuming and expensive hearing process that spanned multiple days over a period of three months, Plaintiffs presented nothing but anecdotal evidence from a mere handful of inmates, one

---

[1] Plaintiffs' "Statement" is actually a motion that requests the following relief: that Defendants reinstall HNR boxes on all yards from which they were removed and permit inmates to submit HNRs in the boxes; that Defendants not require inmates seeking mental health or dental care to be seen in the nursing line before being referred to the appropriate discipline and that such inmates not be charged $4 for the same; that Defendants confirm to the Court within four weeks of the date of the Order that they have reinstalled the HNR boxes; and that Defendants and/or Corizon confirm to the Court within four weeks of the date of the Order that they have implemented the policy changes listed above. (Doc. #2365-1.)

1

of whom testified he actually prefers the new open clinic system to the old collection box system. The Court should deny Plaintiffs' request for relief in its entirety.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      LEGAL ARGUMENT**

    **A.      Plaintiffs' Motion Seeks Relief Beyond The Stipulation And The Power Of The Court To Enforce It.**

The Stipulation gives the Court jurisdiction "over all disputes between and among the parties *arising out of this Stipulation*," as well as the power to "enforce this Stipulation through all remedies provided by law." (Doc. #1185 at ¶¶35-36) (emphasis added.) The Court has recognized that its authority is limited to "enforcement of the performance measures and it's not a general habitability dominion that [it has]." (Ex. 1 at 6:22-25.) The central issue raised by Plaintiffs' Motion, however—Defendants' removal of the HNR collection boxes and transition from a collection box system to an open clinic system—is not governed by the Stipulation, and therefore not within the Court's jurisdiction. Plaintiffs are not entitled to any of the relief they seek, and the Court may not grant it.

For each PM listed in Exhibit B to the Stipulation, Exhibit C describes a protocol, agreed upon by the parties, by which the PM will be measured for compliance. (Doc. #1185 at ¶9; Doc. #1185-1.) Only five PMs—namely 36, 37, 98, 102, and 103—explicitly require particular actions within a defined time after an HNR is *received*. (Doc. #1185-1.) None of the five PMs say anything about how the HNRs are to be either submitted by inmates or collected/received by staff. (Id.) Nor do they state, as the Court appeared to believe at the June 14, 2017 status hearing, that they are assessed based on when the HNR is "deposited." (Ex. 2 at 74:5-18.) Similarly, none of the associated protocols give any guidance, let alone set any requirements or restrictions, as to the same. (Doc. #1185-1.)

It should not be surprising, then, that Plaintiffs have not identified any PMs or protocols in the Stipulation that require the use of HNR collection boxes or that preclude ADC from using a different system. ADC's transition to an open clinic system is a purely operational change to the manner in which inmates access health care, intended by

2

Defendants to provide inmates more timely access to routine health care, as inmates are now seen on the same day they submit their HNRs.[2] (Doc. #2136-1 at ¶41.)

The amount of time and resources that have been devoted to an issue that is outside both the Stipulation and the Court's power to enforce it is staggering. Because there is no legal basis for the relief Plaintiffs seek, their Motion should be denied in its entirety.

### B. Plaintiffs' Motion Is Not Ripe For Resolution.

The Stipulation outlines the procedure to be followed in the event Plaintiffs believe Defendants are not complying with the PMs and other provisions of the Stipulation. (Doc. #1185 at ¶¶29-31.) First, Plaintiffs are required to provide Defendants with a Notice of Substantial Non-Compliance. (Id. at ¶30.) Defendants then have 30 days to respond in writing, after which the parties have 30 days to meet and confer in a good faith effort to resolve the dispute. (Id.) If the issue cannot be resolved informally, the parties are required to mediate the dispute with a Magistrate Judge. (Id. at ¶31.) If the dispute has not been resolved by mediation within 60 days, then—and only then—either party may file a motion to enforce the Stipulation. (Id.)

Plaintiffs first notified Defendants of their concerns regarding the removal of the HNR boxes in a letter dated May 17, 2017. Notably, the letter, like Plaintiffs' Motion, failed to identify any particular provision of the Stipulation that was violated by the removal. Defendants were not provided 30 days to respond in writing. Instead, Plaintiffs' counsel requested that the parties discuss the issue during a June 2, 2017 telephone call regarding Plaintiffs' March 2017 Notice of Substantial Non-Compliance.

Following the call, Plaintiffs' counsel sent another letter stating that Plaintiffs intended to raise the issue with the Court at the June 14, 2017 status hearing, which they did. At the conclusion of that hearing, the Court set an evidentiary hearing on the matter

---

[2] Neither the National Correctional Commission on Health Care ("NCCHC") nor the American Correctional Association ("ACA") standards require the use of HNR collection boxes. (Doc. #2136-1 at ¶51.) In fact, correctional systems in other states have recently begun using open clinic systems similar to ADC's. (Id. at ¶52.)

3

1  for the next month. (Ex. 2 at 111:13-25, 115:3-11.) The evidentiary hearing spanned five
2  days over a period of three months, after which Plaintiffs requested briefing. (Ex. 3 at
3  169:15-21.) Plaintiffs then filed their Motion on October 4, 2017. (Doc. #2365.)

4     Even if the issue were within the Stipulation, Plaintiffs' Motion is procedurally
5  improper. Defendants were not given the opportunity to respond to Plaintiffs' concerns in
6  writing before the parties met and conferred, and the issue was never mediated. Plaintiffs'
7  failure to follow the procedures agreed upon by the parties renders the issue premature
8  and not ripe for resolution at this time.

9     **C. Plaintiffs Have Failed To Demonstrate They Are Entitled To Relief.**

10     Even if (1) the issue of Defendants' removal of the HNR collection boxes were
11  within the Stipulation, and therefore the Court's power to enforce it, and (2) Plaintiffs had
12  followed the proper procedures before filing their Motion, Plaintiffs have failed to show
13  any actual and systemic detriment to their ability to access health care as a result of the
14  change from the collection box system to the open clinic system that would entitle them to
15  the relief they seek.

16     **1. Plaintiffs presented insufficient evidence.**

17     As of October 27, 2017, the most recent date for which historical daily count sheets
18  are publicly available, ADC had 33,953 inmates in its state-operated facilities. (*See*
19  https://corrections.az.gov/sites/default/files/DAILY_COUNT/Oct2017/10272017_count_s
20  heet_0.pdf, last accessed October 27, 2017.) Plaintiffs, however, presented only anecdotal
21  evidence from four inmates and have failed to show these inmates' experiences are
22  representative of those of the wider inmate population. Even accepting everything these
23  inmates stated as true, the experiences of four inmates provide no basis for the Court to
24  require Defendants to make changes to a system that serves tens of thousands.

25     This is especially true where one of Plaintiffs' witnesses (i.e., 25% of Plaintiffs'
26  witnesses)—Mark Blocksom—actually prefers the current open clinic system over the old
27  HNR collection box system:

28

> It's nice because you can see the nurse quicker through the open clinic. You don't have -- you have some control. You can go up there and actually request something. If you are willing to do that, make the effort and sit there and wait, you know you will get seen that day, when as before with an HNR you didn't know when it would be processed and you would be put on the nurse's line.
>
> . . .
>
> THE COURT: But if we just focus on that issue, which is better, open clinic, HNR, are there any advantages that you saw to the HNR system over the open clinic system with respect to this contact with the nursing line?
>
> THE WITNESS: No. I can't see any real advantages to the HNR box, honestly. In terms of access, the open clinic is actually better.

(Ex. 4 at 29:11-17, 30, 12-18.)

To the extent such anecdotal evidence is relevant, Florence complex Deputy Warden of Operations ("DWOP") Van Winkle spoke to eight or nine inmates at the Florence complex, one of whom said his normal wait time at the open clinic is only 15-20 minutes. (Ex. 5 at 142:22-143:17.) DWOP Van Winkle also confirmed that in the two months prior to the August 8, 2017 hearing, there were no activations of the Incident Command System ("ICS") at the Florence complex involving inmates who experienced a medical condition in which heat was a factor while they were waiting for either the pill line or the open nursing line. (Id. at 170:21-171:5.) Plaintiffs have failed to present sufficient evidence to the Court to justify the sweeping relief they seek.

### 2. Plaintiffs' witnesses lacked personal knowledge.

Much of the evidence presented by Plaintiffs was hearsay and/or pure speculation, particularly the inmate witnesses' testimony about the length of time they have seen other inmates waiting in the nursing line or the reasons other inmates have given up their place in line. For example, Mr. Blocksom testified that the longest he recalls "seeing" someone wait for their turn to be seen in the nursing line was seven hours. (Ex. 4 at 33:23-34:5.) His basis for that testimony, though, was that he claims to have seen the same person waiting in line when he went to get his morning medications and again when he went to

5

get his afternoon medications. (Id.) Since he was not waiting in line with these unidentified inmates—the longest he personally has ever waited in the nursing line is about three and a half hours—Mr. Blocksom cannot say with any certainty whether these inmates left and came back, waited inside for any amount of time, were there twice in the same day for two separate issues, etc.[3] (Id. at 20:25-21:4.)

Mr. Blocksom also testified that he has seen people leave the open clinic waiting line because of the heat, but his basis for that testimony was that he saw people get irritated in line from his vantage point in his cell. (Id. at 34:11-25.) Mr. Blocksom cannot say with any certainty what these unidentified inmates were angry or irritated about, or what else they had going on that might have prevented them from waiting in line.[4] Such speculative testimony does not justify Plaintiffs' requested relief.

### 3. Plaintiffs failed to show any harm caused by the change.

#### a. Inmates are actually seen faster under the new system.

Under the old system, inmates were required to drop their HNRs in the collection box on their housing unit and then wait to be called out to medical. (Doc. #2136-1 at ¶42.) Several procedural/administrative steps were then required in order for an inmate to be seen by nursing staff. First, a nurse had to go around to each collection box and collect the HNRs each day. (Id. at ¶44.) Second, the HNRs would be sorted by discipline and triaged. (Id.) Third, the nurse would create an appointment schedule. (Id.) Fourth, security would print and deliver appointment slips to each inmate alerting them they would be seen at medical the following day. (Id.) If an inmate did not show for their appointment, security would have to track them down, which could sometimes take all day. (Ex. 3 at 152:18-

---

[3] Plaintiffs appear to assume, without any citation to supporting authority, that having to wait for a few hours to see a nurse for a routine matter presents an issue of constitutional significance. Anyone who has ever waited to be seen in an emergency room or an urgent care office is familiar with such wait times.

[4] Presumably, however, if the conditions for which the inmates were waiting were sufficiently important to them, they would have waited until they were called in order to resolve them.

153:4.) At the earliest, inmates would be seen the day after they submitted their HNRs, and often two days after submission. (Doc. #2136-1 at ¶43.) When they were called out, inmates would be called to medical as a group. (Id. at ¶45.) Upon arrival at the medical clinic, inmates would have to wait to be seen by nursing. (Id.)

Under the new system, which was developed in response to the Court's November 10, 2016 outside transport order (Doc. #1754) and to ensure compliance with PM 37, inmates in minimum and medium custody units report directly to the medical clinic with a completed HNR in hand and present it to the nurse. (Doc. #1873-1 at ¶11; Doc. #2136-1 at ¶41.) They are seen the same day they submit their HNRs. (Doc. #2136-1 at ¶41.) Inmates who only require a medication refill are not required to be seen on the nursing line, but can drop their HNRs in the collection boxes that have been relocated and repurposed for medication refill requests. (Id. at ¶46; Ex. 5 at 54:1-3.)

Thus, inmates are typically seen sooner under the new system than they were under the old system, as they are now seen on the same day, which is the intent of PM 37 (as well as the Stipulation in general). Plaintiffs' counsel expressed concern at the hearings that the new open clinic system would "inflate" compliance scores, but their concerns are unfounded. PM 37 requires only that inmates with routine issues be seen within 24 hours of receipt of the HNR; that inmates with urgent needs be seen the same day as the HNR is received; and that inmates with emergent needs be seen immediately upon receipt of the HNR. (Doc. #1185-1.) The evidence before the Court is that the new open clinic system is helping to meet that measure. Even Plaintiffs' expert, Dr. Wilcox, has not claimed that removal of the HNR boxes would result in decreased services to inmates or that the open clinic system is not working.[5] If the ultimate goal of the Stipulation is to improve inmate

---

[5] Plaintiffs mischaracterize the statements made by Dr. Wilcox in his declaration, which demonstrate a misunderstanding of the new open clinic system in the first place. Dr. Wilcox appears to believe that the open clinic system eliminates the use of HNRs altogether. (Doc. #2103 at ¶27) ("I have been informed that Corizon has proposed eliminating Health Needs Requests (HNRs) entirely for accessing healthcare at medium-security and minimum-security prisons.") In this context, Dr. Wilcox expressed concern that the change would allow Defendants to "avoid accountability" and that it would

7

health care, it seems antithetical that Plaintiffs would insist Defendants revert to a process burdened with administrative inefficiencies over a streamlined process that better ensures inmates are timely seen by medical staff.

Moreover, "inflation" implies that Defendants are somehow "cooking the books" and taking credit for nursing evaluations that never actually occurred. Defendants deny any such actions in the strongest terms, and Plaintiffs have presented the Court no evidence to the contrary. Plaintiffs have also failed to show that wait times in the open clinic nursing line are longer than wait times were during the collection box system group call out, or to explain how a wait time of a few hours in the open clinic nursing line for routine medical care is so unconstitutionally burdensome as to require Court intervention.[6]

Admittedly, the new open clinic system requires some inmate accountability, as inmates are required to come to the medical clinic during their housing unit's assigned times.[7] (Doc. #1873-1 at ¶17; Ex. 3 at 152:18-153:4; Ex. 5 at 134:22-135:2.) Inmates are informed of their unit's hours in a variety of ways. For example, in the East Unit at Florence complex, the open clinic nursing line hours—i.e., 0700 to 1630, seven days a week—are posted on the bulletin boards on the yard as well as on the CCTV system. (Ex. 5 at 129:23-130:10, 131:1-3, 16-19.) As long as an inmate arrives in the clinic with their

---

"eliminate the only traceable audit trail of patient requests for care" and result in fewer referrals to providers, which "will overestimate and inflate compliance with the timeframe requirements for providers to see patients in PMs 39 and 40." (Id. at ¶¶27-29.) Dr. Wilcox did not, as Plaintiffs claim, opine that removal of the *HNR collection boxes* would produce these results. (*See* Doc. #2365 at 3:3-8.)

[6] Plaintiffs' arguments regarding the conditions under which inmates are allegedly required to wait for their turn to be seen are a red herring. Under the old system, Plaintiffs would have to wait for their turn to be seen after being called to medical as a group. They have failed to show that the conditions under which they waited then were any better—or in any way different—than the conditions under which they wait now for their turn to be seen in the nursing line, or why their waiting now imposes a burden of constitutional significance, where it did not before.

[7] The open clinics have hours to accommodate inmate workers, and inmates who are too sick to go to work may skip work to go to the open clinic instead. (Doc. #2136-1 at ¶47.)

1  HNR before their unit's allotted hours end, they will be seen that day. (Doc. #1873-1 at
2  ¶19; Ex. 3 at 163:1-11; Ex. 5 at 134:15-135:2, 205:2-10.)

3  Plaintiffs apparently overlook the fact that the open clinic system, like the HNR
4  collection box system, is primarily concerned with requests for *routine* medical care. If an
5  inmate arrives outside of their unit's assigned timeframe, and their issue is not urgent,
6  they will be told to come back the next day. (Ex. 3 at 163:12-17.)[8] If, however, the inmate
7  presents with an emergency, they will be seen right away, even if they do not have an
8  HNR in hand. (Id. at 164:3-20.) If an inmate is unable to go to the medical unit, or if it is
9  outside the inmate's unit's assigned open clinic hours, security staff can also initiate an
10 ICS for urgent or emergent medical needs. (Doc. #1873-1 at ¶22; Doc. #2136-1 at ¶50;
11 Ex. 5 at 55:4-56:1, 166:23-168:5.)

**b.    Inmates are not charged an additional $4 to receive mental health or dental care.**

Plaintiffs mischaracterize Defendant Pratt's testimony during the August 8, 2017 continued evidentiary hearing to claim that inmates seeking mental health or dental care are being charged an "additional" $4 copay under the new open clinic system. Following a confusing line of questioning by Plaintiffs' counsel, Defendant Pratt clarified, in response to the Court's questions, that all the open clinic system changed is how and when inmates seeking mental health or dental care are being referred:

> THE COURT: Paragraph 12 says, "HNRs for routine dental care and mental health care continue to be addressed through referrals to dental and mental health staff and must be seen within the timelines provided in the stipulation." So that was true, we can agree, on the 18th of January 2017. But what Ms. Kendrick has just elicited from you is that sometime after that,

---

[8] This appears to be what happened with Angela Ashworth, who testified that she was "turned away" from the clinic on June 5, 2017 when she attempted to be seen for an alleged allergic reaction to iodine that had been put in her eyes by an outside provider. (Ex. 4 at 188:18-191:24.) Ms. Ashworth admitted she was seen by a nurse, however, who did not observe "anything alarming or anything going on" and said to come back during regular clinic hours the next day. (Id. at 190:20-25.) The nurse also told her that if she experienced any swelling, redness, etc., to have an ICS issued. (Id. at 191:21-24.)

9

>that no longer became true?
>
>THE WITNESS: No. That's not the case. They are still referred. It's just whether or not they are referred at the time that they see the nurse or if they put it in an HNR box they are referred from the HNR box.
>
>THE COURT: I see. All right. That clarifies my question. That seems to cast a different light on it, Ms. Kendrick.
>
>BY MS. KENDRICK: Q. We can move on.
>
>THE COURT: I'm sorry?
>
>MS. KENDRICK: I'm ready to move on.
>
>THE COURT: Well, again, when you make points that seem to get a purchase with me and I ask subsequent questions that seem to undercut that, it would seem reasonable to say, oh, it looks like my supposition of my question wasn't accurate. If I'm missing something that means that your question still has some purchase, tell me what that is. But it looks like the question by the answer has been cleared up.

(Ex. 5 at 66:1-25.)

Defendant Pratt further testified quite clearly that although an inmate seeking mental health or dental care will be charged $4 for the initial visit to the open clinic nursing line, they will not be charged for the subsequent referral visit to mental health or dental, an explanation the Court accepted:

>THE COURT: And each of those times, the first time with the nurse and the second time with the mental health specialist, lower case S, meaning just the wide range of mental health providers, each of those encounters results in a $4 charge?
>
>THE WITNESS: No. The initial encounter would; a referral would not.
>
>THE COURT: So the subsequent visit with the mental health specialist does not ever involve a $4 charge if they paid the $4 originally?
>
>THE WITNESS: Yes.
>
>THE COURT: Okay. Thank you.

(Id. at 63:20-64:6.)

1  This clarification was necessitated by the following line of questioning by
2  Plaintiffs' counsel:

3  Q.  And if a patient wants to see mental health, she has to physically go to the nurse's line and submit an HNR there, right?
4

5  A.  Yes.

6  Q.  And wait to be seen by a nurse, right?

7  A.  She will be seen when she presents the HNR.
8
9  Q.  Okay. And are the prisoners charged $4 for this triage encounter?

10  A.  In most circumstances, yes.

11  Q.  Are you concerned that this $4 charge would create a disincentive for people to seek mental health care?
12

13  A.  No.

14  Q.  Why not?

15
16  A.  Why?

17  Q.  Because if they have to pay $4 to see a nurse before they can see mental health?

18
19  A.  They are being seen. They are being evaluated by the nurse to see what their issues are. If it's something emergent they are taken care of right away. Otherwise it's a referral to mental health and there will be no charge for mental health.
20
21
22  Q.  Nobody is charged for mental health?

23  A.  No. That's not what I said.

24  Q.  Who is charged for mental health care?

25
26  A.  Most inmates are charged. But you have got SMI, minors, folks that are in infirmaries, they are not charged.

27  (Id. at 62:11-63:10.)
28

11

1  Defendant Pratt was not asked during this line of questioning about any *additional*
2  charges—only about charges for the initial nursing line visit. He did, however, clarify
3  once again that after an inmate seeking mental health care is charged $4 for the initial
4  nursing line visit, they would not be charged for the mental health referral. Following that
5  questioning, Plaintiffs' counsel asked the general question of who is charged for mental
6  health care to which Defendant Pratt replied that, generally speaking, most inmates are
7  charged for mental health care. This necessarily includes the $4 visit to the open clinic
8  nursing line, unless the inmate has a serious mental illness ("SMI"), is a minor, or is
9  already in an infirmary. (Ex. 6 at ¶¶15-17.)

10  Pursuant to Department Order 1101, health care fees may be charged to inmates for
11  each health care appointment and emergency treatment initiated or required by an HNR.
12  (Id. at ¶10.) An inmate makes a health care appointment by completing an HNR and
13  submitting it to medical. (Id. at ¶11.) Health care fees will not be charged where visits are
14  requested by medical, dental, or mental health staff or are due to a referral to another
15  discipline. (Id. at ¶12.)

16  Under the old collection box system, the first visit of an inmate seeking mental
17  health care, for example, would be with mental health, as their HNR would be triaged by
18  medical, and they would be referred to mental health, sight unseen. (Id. at ¶13.) As such,
19  they would be charged the $4 copay at the time of their mental health visit, unless they
20  had an SMI, were a minor, or were in an infirmary. (Id. at ¶14.)

21  Under the new open clinic system, an inmate seeking mental health care is charged
22  $4 for the initial visit to the nursing line, as it is a health care appointment initiated by an
23  HNR. (Id. at ¶15.) The inmate is then referred to mental health, but is not charged an
24  additional $4, as the mental health visit is, at that point, a visit due to a referral to another
25  provider. (Id. at ¶16.) If the inmate seeking mental health care has an SMI, is a minor, or
26  is in an infirmary, they will not be charged the $4 copay at either the nursing line visit or
27  the mental health visit. (Id. at ¶17.)

28

1    Under either system, an inmate seeking mental health care or dental care is only
2    possibly subject to one $4 copay. (Id. at ¶18.) If an inmate is mistakenly charged for both
3    the nursing line visit and the referral visit, the charges will be reviewed and refunds will
4    be issued as necessary. (Id. at ¶19.)

5    This was illustrated by an incident raised at the August 8, 2017 hearing regarding
6    an inmate at the Yuma complex who disputed a $4 charge on his account statement after
7    he was seen in the nursing line and referred to mental health. (Ex. 5 at 69:11-70:15.) The
8    inmate was under the impression that he would not be charged for the visit because it was
9    mental health related. (Id.) The response from the Director of Nursing ("DON") was as
10   follows:

> I reviewed your medical file and do see that you were seen on nurse line March 16, 2017 for hearing voices. You are charged for that visit as you were seen by the nurse regarding your complaint. You then referred -- you are then referred to mental health where there is no charge for that. You, at any time, could have refused the nurse line and still be referred to mental health. The charge will remain on your banking statement.

15   (Id. at 69:21-25.) Defendant Pratt confirmed that the DON's response was proper. (Id. at
16   70:4-15.) Plaintiffs' attempts to twist Defendant Pratt's testimony are disingenuous and
17   misleading and should be disregarded by the Court.

18              **c.      Inmates with disabilities do not face increased barriers to care.**

19   Plaintiffs' concerns that the new open clinic system presents a barrier to health care
20   to inmates with disabilities are unfounded. Plaintiffs fail to acknowledge that even under
21   the collection box system, inmates with disabilities had to make their way to medical to be
22   seen by nursing after they were called out, and fail to show how this becomes more
23   burdensome simply because they do it before being seen instead of after being seen. To
24   the extent inmates seeking mental health or dental care might potentially be required to
25   make two trips under the new system, Plaintiffs fail to acknowledge that all inmates—not
26   just those with disabilities—must do so, and have presented no evidence of any inmates
27   with disabilities who have been precluded from receiving care as a result.
28

13

1    Plaintiffs' concerns regarding the allegedly increased difficulty faced by inmates in wheelchairs such as Dominique Keys appear to have been resolved by the testimony of DWOP Twyford, cited in Plaintiffs' Motion, regarding changes that were recently made in Ms. Keys' unit and another unit at Perryville, including the employment of 17 inmates as ADA aides. (Doc. #2365 at 17:18-18:15.) Plaintiffs also fail to acknowledge that, as demonstrated above, under the collection box system, inmates with disabilities had to wait for their turn to be seen during their group call out, and fail to show how this becomes more burdensome simply because they do it before being seen instead of after being seen.

Plaintiffs rely on the testimony of Ronald Oyenik to raise concerns regarding the relocation of the medical unit at Florence South, who testified the move increased the distance "for the mobility impaired people to navigate." (Doc. #2365 at 18:20-24.) To the extent this is relevant to a motion seeking a change in the procedure of HNR submissions (which it is not), DWOP Van Winkle testified that inmates in the ADA dorms were given the opportunity to move to a dorm closer to the medical clinic; only two inmates accepted. (Ex. 5 at 135:17-136:3.) The option remains open. (Id. at 137:24-138:13.) Additionally, the deputy warden employed more ADA aides to assist inmates with mobility issues in getting to the medical clinic and allows those inmates to come out 15 minutes early (after count is complete, but before the yard opens) to allow them to get to the clinic and get in line first. (Id. at 136:4-15.)

Plaintiffs argue that removal of the HNR boxes disproportionately burdens inmates with disabilities, but have provided no evidence that this has actually occurred. To the contrary, the testimony that has been presented to the Court—and cited by Plaintiffs in their Motion—shows that Defendants are sensitive to the needs of such inmates and have taken steps to minimize any burdens to the extent possible.

**II.    CONCLUSION**

The Stipulation does not require Defendants to use any particular procedure to collect HNRs, nor does it preclude Defendants from using the open clinic system, taking the current dispute outside the Court's power to enforce the Stipulation. Even if this were

14

not the case, Plaintiffs' Motion is procedurally improper, and Plaintiffs have not provided the Court sufficient evidence to justify the sweeping relief they seek. Plaintiffs' Motion should therefore be denied in its entirety.

DATED this 1st day of November 2017.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/Timothy J. Bojanowski
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Jacob B. Lee
Kevin R. Hanger
Timothy M. Ray
Richard M. Valenti
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried
Lucy M. Rand
Assistant Attorneys General
15 South 15th Avenue
Phoenix, Arizona 85007

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Amy B. Fettig: | afettig@npp-aclu.org |
| Asim Dietrich: | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Caroline N. Mitchell: | cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| Jessica Pari Jansepar Ross: | jross@azdisabilitylaw.org |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| John Laurens Wilkes: | jlwilkes@jonesday.com, dkkerr@jonesday.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Kathleen E. Brody | kbrody@acluaz.org |
| Kirstin T. Eidenbach: | kirstin@eidenbachlaw.com |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Sarah Eve Kader: | skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org |
| Rita K. Lomio: | rlomio@prisonlaw.com |
| Victoria Lopez: | vlopez@aclu.org |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Timothy J. Bojanowski