☒ FILED ☐ LODGED

**Nov 02 2017**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

Michael J. Cohn #288721
ASPC Lewis/Stiner, 5A21
P.O. Box 3100
Buckeye, AZ 85326

UNITED STATES DISTRICT COURT

| Parsons, et al. | 2:12 cv 601-DKD |
| v. | The Moral Equivalent of Genocide |
| Ryan, Etal | Hon, David K. Duncan |

I, Michael J. Cohn, class plaintiff, respectfully submit the attached supplement I will file in the ARIZONA Supreme Court. This is for the Court's information.

Respectfully Submitted,

Michael J. Cohn, Ed.D.
Michael J. Cohn, Ed.D.
Prisoner Rights Advocate

Certificate of Service

per General Order 14-17
Original efiled to:      on: 11/2/17
Clerk of the U.S. Dist. Ct.

copy to:      on: 11/2/17
Attorney General

0 fo 20

Michael J. Cohn #258721
ASPC Lewis / STINER 5P21
P.O. Box 3100
Buckeye, AZ 85326

ARIZONA Supreme Court

| STATE OF ARIZONA APPELLEE v. | CR-17-0253 PR |
|---|---|
| | COURT OF APPEALS No. 1CA-SA-17-0140 |
| Michael J. Cohn APPELLANT Petitioner Pro Per | CR2023-114147-001 |
| | Supplement: New material Facts. |

I, Michael J. Cohn, Appellant in the above Captioned case, respectfully advise the court of New material Facts pertaining to my sentence. Per the attached _United Press International_ column, the extreme, wanton, disregard for inmate rights crosses the line to a "Moral Equivalent of Genocide" (my term) in my opinion.

Neglect is the weapon of choice. Rather than gas chambers or ovens, the state of Arizona, by and through the highly placed managerial agents of the Arizona Department of corrections and its Corizon Health accomplice are serial murderers of inmates with a sophisticated criminal Enterprise to cover their agenda; allegedly. Under the color of business/altruism, ADC/corizon systematically annihilate inmates (undessirables), also across state lines /multiple jurisdictions as reported by _prison Legal News_ in multiple columns since 2014, inmates (such as in Rikers Island, NY) are murdered by neglect. Although Corizon lost the Rikers Island contract, their atrocities continue in other jurisdictions such as Arizona. In the attached column, A. Ariant Judge Duncan reportedly is quoted, "ALL of this disrespect for the rule of law," Duncan fired back, "is something I

have never experienced or seen in nearly 30 years of being a lawyer, or in 16 years as a judge."

The hostile culture of ADC is reflected in the reported comments of a correctional officer, "Those fuckins ACLU lawyers. Who the fuck do they think they are telling us what we can and cannot do to inmates? I can do whatever I want, when I want," reportedly.

The State of Arizona is the worst offender to my knowledge. Atrocities in ADC continue unabated, apparently aided and abetted by the State's judicial system. The Courts continue double jeopardy by sentencing defendants to ADC and resisting providing relief as previously stated by the petitioner in this instant matter.

Injunctive Relief

1) Injunctive relief should be ordered in this case. I request release to Community Supervision for the duration of my sentence so I can have my choice of medical providers.

2) An injunction suspending sentences to ADC should be instituted immediately, pending a culture change in ADC that is rehabilitative rather than punitive.

3) This matter should be referred to Dept. of Public Safety for criminal investigation of ADC's/Corizon's atrocities.

A Post-Modern Holocaust is occurring, has occurred and will occur in the future if the Courts abdicate responsibility for the ADC atrocities. I respectfully urge the court to be part of the solution, not part of the problem.

Respectfully submitted,                Date: 10/25/17

   Michael J. Cohn

    Michael J. Cohn

I declare under penalty of perjury that the contents herein are
true and correct to the best of my knowledge and understanding
as a Pro Per litigant.

           Certificate of Service

  Original to:           on:
Clerk of the Supreme Ct.
1501 W, Washington #402
Phoenix, AZ 85007

  Copy to:            on:
  Attorney General
  1275 W. Washington
  Phoenix, AZ 85003

  Judge Shelly K. Stephens
   125 W. Madison
   Phoenix, AZ 85003

# Judge Threatens Arizona Prison Officials With Contempt For 'Pervasive and Intractable Failures'

reason.com /blog/2017/10/12/judge-threatens-arizona-prison-officials

C.J. Ciaramella                 10/12/2017

WILL POWERS/UPI/NewscomA federal judge said Tuesday he is considering holding Arizona prison officials in contempt of court for their "pervasive and intractable failures" to abide by a 2014 agreement to improve care of inmates in the state prison system.



Three years ago, the Arizona Department of Corrections agreed to settle a federal class-action lawsuit filed by the American Civil Liberties Union (ACLU) and several other law firms by taking steps to improve medical care inside its prisons. The lawsuit, filed in 2012, followed media investigations and persistent allegations of fatally inadequate medical care by the department's medical provider, Corizon.

Prison officials have been accused of defying court orders and intimidating inmate witnesses as they resisted complying with the settlement. An increasingly exasperated U.S. Magistrate Judge David K. Duncan issued an order Tuesday calling on the department to show why it should not be held in civil contempt for failing to meet the guidelines and benchmarks in the agreement.

Duncan's order came after he hauled Arizona Department of Corrections Director Charles Ryan into his court in August to address allegations that guards were retaliating against inmates who testified about poor conditions inside the state's prisons. When Duncan ordered the department to stop any such retaliation, Ryan sent an email to his staff saying the ruling was "disappointing," and that they "deserved better."

In another court filing in September, an ACLU lawyer says she overheard an Arizona correctional officer say to several fellow officers, "Those fucking ACLU lawyers. Who the fuck do they think they are telling us what we can and cannot do to inmates? I can do whatever I want, whenever I want."

"All of this disrespect for the rule of law," Duncan fired back, "is something I have never experienced or seen in nearly 30 years of being a lawyer, or in 16 years as a judge."

If Ryan is held in civil contempt, he would join the company of former Maricopa County sheriff Joe Arpaio, a fellow Arizonan and one of America's most anachronistic and cruelest lawmen. President Trump pardoned Arpaio this summer after he was found guilty of both criminal and civil contempt of court.

Andrew Wilder, a spokesperson for the department, says in a statement to *Reason* that it is "firmly committed to holding its current contracted health care provider, Corizon, accountable for its contractual responsibility to provide inmates the constitutionally-mandated health care to which they are entitled."

"Moreover, ADC already has taken significant and concrete actions to encourage Corizon to meet the specific performance measures under the Parsons Stipulation," Wilder continues.

However, in 2016, when the ACLU and other lawyers for the plaintiffs filed complaints that the Arizona Department of Corrections had failed to comply with the settlement, local media outlet 12 News reported that it was still being "inundated with emails and phone calls from families of prisoners alleging their loved ones are not getting the treatment they need."

The news outlet 12 News published an investigation in 2014 revealing that, despite Corizon's $125 million annual contract with the state, Arizona inmates faced disastrous delays in physical and mental health treatment. Separate reports by doctors touring Arizona prisons also found stomach-churning conditions and neglect. *Courthouse News*, summarizing the reports, described it as "an understaffed system in which an inmate died with infected lesions swarmed by flies, a man who ate his own feces was never seen by a psychiatrist, and a woman swallowed razor blades while allegedly under constant watch."

One of the doctors described a 30-year-old inmate who was given less than a year to live after extreme delays in detection and treatment of testicular cancer led to the disease spreading to his internal organs.

Corene Kendrick of the Prison Law Office in Berkeley, California, told the *Phoenix New Times* this week that her office is still getting "dozens of letters each week" from prisoners suffering from serious medical conditions. "This spring, four people committed suicide in three weeks, and our mental health expert's report indicated the suicides were tied to inadequate or nonexistent mental health care," she wrote.

In a press statement, director of the ACLU National Prison Project David Fathi says the Arizona prison system remains out of control.

"It was three years ago this week that the Arizona Department of Corrections signed the settlement agreement in this case over prison health care so inadequate that it leads to needless suffering and even death," Fathi said. "The fact that the Department of Corrections is still grossly out of compliance with the settlement is proof that the department is profoundly broken, leaving the thousands of prisoners under its control with scant access to medical care."

5 of 20

## The Moral Equivalent of Genocide II

Reportedly, one (1) inmate dies in Arizona prisons every week from medical neglect.[2] It is obvious to me that the highly placed managerial agents of the Arizona Dept. of Corrections intend to neglect inmates even unto their death or suffering unto death. How have I come to this conclusion? 1) Failure to comply with the stipulated settlement agreement to improve medical care agreed upon in 2015, allegedly. 2) Appealing the "motion to enforce "stipulation" in federal court, (2:12 CV 601-DKD, Appl), 2016), Dec. 2016,

Rather than use precious taxpayer funds to improve medical care, the State of Arizona, its accomplice the Arizona Department of Corrections, file a specious legal action to what end? Inmates and their families, the plaintiffs in trying to improve medical care are taxpayers. Inmates pay sales tax on their commissary purchases, yet inmates are a "disfavored minority," often viewed as subhuman by authorities and the general public. Thus, it is easier to view inmates as not deserving of adequate medical care or even worse, worthy of neglect even in light of the current standards of human decency.

Despite the lipservice that the Arizona Dept. of Corrections cares about inmates receiving quality medical care, it is obvious to me that ADC's actions contradict their words.

In 2009, the Director wrote a letter to the medical staff in response to their concerns that ADC medical care had fallen below National standards. It is now almost 2017 and the situation has not been remedied. The intent to neglect is apparent to me as almost a decade has passed without remedies that are meaningful

to the inmates. In fact, I recently reviewed ADC policy #1100, (10/22/16) "Inmate Access to Healthcare," and found that the Stipulation had for the most part, not been incorporated into policy.

If ADC was serious about providing adequate medical care, it is reasonable to believe the changes would be reflected in policy. (10/22/16

Treating a class of people as subhuman with the intent to let them die is a form of genocide. It is quieter than gas chambers, gunfire and crematoriums, It is more subtle and easier to seemingly pass off as medical errors. Yet, the deaths results are just as lethal. Perhaps prosecutors are willing to make deals in some cases as they are aware that ill defendants may suffer more while in prison. Prosecutors may allow double jeopardy by inadequate medical care, using inadequate medical care as a punishment in addition to confinement. More than one punishment for the same crime is "double jeopardy." [1,2]

What is most disturbing is that judges are aware of the conditions of confinement, yet refuse to take meaningful action. In a conversation with a former criminal judge, he said there is a separation between the judicial branch of state government and the executive branch, which has responsibility for the Arizona Dept. of Corrections." Judges have no influence on the executive branch. Yet this answer is obfuscation. Judges have statutes and tools they can use to override mandatory sentencing laws, such as writs of Mandamus or Habeas Corpus. Yet in Arizona, it can be political suicide for a judge to look "soft on crime" so perhaps rather than protect the constitutional rights of the citizen, judges turn a blind eye to what is happening in ADC. Just like the holocaust, onlookers and underlings have a responsibility to object to genocide by

1) AZ. Republic, 11/17/16, B57, 11/07/16
2) U.S. v. Kelsor
3) July 20, 2018 Settlement Conference, P132013-1274
4) Nuremberg Trials

mistreatment of prisoners. 4)

What is needed is a "Profile in Courage." A judge or judges need to stand up and say, "I will not sentence another inmate to ADC until the mess in ADC medical care is cleaned up." There is not only a moral imperative to address the "moral equivalent of genocide" occurring in ADC, but for judicial courage in the face of tyranny.

Judges take an oath to uphold the Constitution of the U.S.D. and have a legal/ethical Code of Canons that require integrity, diligence and propriety. Sentencing inmates/defendants requires more thought than ever, in my opinion, as the pendulum has swung too far in the direction of the State. More balance is needed and judges should have more discretion in the sentencing process than mandatory sentencing statutes allow.

There is no place for vigilanteism in the field of corrections. Those who seek to add more suffering to the confined should be reigned in and mitigation for inmates suffering atrocities should be provided. There are alot of military veterans in ADC. The V.A. may have failed them in terms of not providing adequate attention, resulting in greater odds for criminal behavior. Now, I wonder, if corrections also fails them, a circumstance of unspeakable tragedy.

I hope the reader will contact their state senator/representative or Governor and insist on improving inmate medical care. It is the decent thing to do.

Michael J. Cohn                    Date: 12/26/16

Michael J. Cohn, Ed.D. #28872

ASPC Lewis 1st Inky 5A20

P.O. Box 3100

Buckeye, AZ 85326

2    G of 20

# More Jurisdictions Don't Renew Corizon Contracts –
# Including Big Loss in New York City

*by Greg Dober*

RECENT NEWS FOR FOR-PROFIT PRISON and jail healthcare provider Corizon with respect to contract renewals has not been good. In June 2015, it was announced that two of the company's clients, the New York City jail system – including Rikers Island – and the Allegheny County Jail in Pennsylvania, would not be renewing their contracts with Corizon to provide medical services to prisoners. In both cases, the contracts were not renewed due to issues related to the company's performance.

The jails are at opposite ends of the size spectrum, with Rikers holding approximately 11,000 prisoners and the Allegheny County Jail housing approximately 2,000. Yet Corizon was unable to effectively manage either facility, resulting in the loss of the contracts. Both New York City and Allegheny County chose not to have the contract rebid to any of the other large private medical care providers, such as Centurion, Naphcare or Wexford Health Sources.

Additionally, according to an April 2015 news report, "since 2012, Corizon has lost statewide contracts covering 84,000 inmates in Maine, Maryland, Minnesota and Pennsylvania." [See: *PLN*, March 2014, p.1]. Corizon also lost its contract to provide medical care in Tennessee prisons, while the District of Columbia recently decided not to contract with the company for its jail system and the Florida Department of Corrections is rebidding Corizon's medical care contract following reports of an increasing number of prisoner deaths.

## New York City and Rikers Island

ON JUNE 10, 2015, NEW YORK CITY Mayor Bill de Blasio announced he would not renew Corizon's contract to provide healthcare at Rikers Island and other city jails; the $126.6 million contract is set to expire on December 31, 2015. According to *DNAinfo New York*, the company's contracts are actually worth over $400 million. Corizon was awarded a $126.6 million contract for management of medical services in the city's jail system. The city also awarded Correctional Medical Associates of NY (CMA of NY) a $270 million contract to provide health care to jail prisoners, and awarded Correctional Dental Associates of NY (CDA of NY) $8.98 million to provide dental care. CMA of NY has the same corporate address as Brentwood, Tennessee-based Corizon, and prior to 2012, CDA of NY was registered as PHS

Dental Services, Inc. PHS, or Prison Health Services, was a predecessor to Corizon [See: *PLN*, July 2015, p.1].

Corizon (and previously PHS) had provided health care at New York City jails since 2001. According to media reports, Corizon is allegedly responsible for over a dozen prisoner deaths due to inadequate treatment. The most recent contract, which was renewed in 2012, was awarded despite poor performance by the company in prior years. Incredibly, New York City officials agreed to indemnify Corizon from lawsuits to induce the firm to renew its contract. The *New York Times* noted that Corey Johnson, a city councilman who held hearings on health care at Rikers in March 2015, said Corizon had been a "failure" and the city's decision to indemnify the company was "unconscionable."

Corizon and government officials often note that health care for prisoners is adequate so long as it meets a basic standard of care. At Rikers, even the basic standard was not always met by Corizon. For example, a 20-year-old prisoner who complained of chest pains and difficulty breathing for several days received no treatment for his condition. The prisoner died of a ruptured aorta. In another case, a 32-year-old prisoner complaining of stomach pain and blood in his stools was not given medical care. Only after other prisoners protested did he receive treatment. However, it came too late and the prisoner died from a bacterial infection.

The worst case of medical neglect at Rikers may be that of Bradley Ballard. Ballard, a diabetic prisoner with severe schizophrenia, was placed in a segregation cell in a mental observation ward on [...] and folding a T-shirt into the shape of a phallic symbol and waving it at a female guard. Little did Ballard realize that such simple, non-violent acts would result in his death at the jail.

Ballard died a week later on September 11, 2013 after he was deprived of insulin and locked in his cell without food or running water, including a working toilet, for several days. The *New York Times* noted that a warden, an assistant deputy warden



# William L Schmidt
## ATTORNEY at LAW, P.C.

### Have you been seriously injured?
### Wrongly convicted? Denied parole?

Accidents & Appeals & Police Brutality
*Federal • State • Local*

Civil Rights, Writs, Parole Hearings, Transfers
Classification, Visiting, Medical

*Providing Justice Throughout California by Air*

377 W. Fallbrook, Suite 205, Fresno, CA 93711
P.O. Box 25001, Fresno, CA 93729-5001
911civilrights@gmail.com
559.261.2222

guards, doctors, mental health clinicians, nurses and other jail employees made at least 57 visits to Ballard's cell as he slowly deteriorated. Despite his worsening condition, staff did nothing to assist him despite the abhorrent stench of urine and feces emitting from his cell.

Though guards, doctors and other employees were visibly repulsed by the smell, none would help Ballard. When medical personnel finally arrived to remove Ballard from his cell, they handed two prisoner workers a blanket and gloves and instructed them to go in and get him. The prisoners, covering their faces due to the stench, said later that Ballard tried to move but was unable to stand or walk. After he was placed on a gurney and wheeled into the hallway, the medical staff saw that he had tied a rubber band tightly around his genitals, where it had remained unnoticed until the flesh began rotting.

In a subsequent lawsuit filed by Ballard's family, the complaint noted, "Mr. Ballard was clearly on the brink of death, yet he lay neglected on the gurney," and medical staff "held back, unwilling even to touch his body. For an inexcusable period, they continued to stand idly by and do nothing." The complaint also stated that "On June 3, 2014 following an autopsy ... the Medical Examiner declared Mr. Ballard's death a homicide." See: *Griffin v. City of New York*, U.S.D.C. (S.D. NY), Case No. 1:14-cv-07329-NRB.

In June 2015, the New York City Department of Investigations (DOI) released the findings of its review of Corizon's performance. The report focused on mental health clinicians and aides employed by Corizon, and noted alarming gaps in the company's hiring procedures, including criminal background checks. For example, a Corizon records clerk was arrested when he was caught smuggling a straightedge razor into Rikers; investigators from the DOI ran his prints and found he had done a 13-year stint in prison for kidnapping. Another applicant listed as many as 13 prior criminal convictions, but was hired without a detailed explanation regarding the circumstances of the convictions. Other findings by the DOI included failures to adequately check professional licenses, applicant references and prior employment history. The report criticized Corizon for hiring employees who had few qualifications or did not meet minimum qualifications for mental health aide positions. It also faulted the city's Department of Corrections for requiring the company to obtain fingerprint cards from job applicants but failing to process hundreds of the cards over several years.

Corizon's CEO said he "would have preferred to stay in New York," adding, "If at all possible, one day we'd love to get back."

After Corizon's contract expires at the end of the year, medical care for prisoners in New York City's jail system will be provided by the city's public Health and Hospitals Corporation.

## Allegheny County Jail

FOLLOWING ELEVEN DEATHS WITHIN AN 18-month period at the Allegheny County Jail in Pittsburgh, Pennsylvania, county executive Rich Fitzgerald announced that the jail's contract with Corizon would not be renewed after expiring at the end of August 2015.

In September 2013, Corizon was awarded a two-year, $23 million contract to provide health care services to prisoners at the Allegheny County Jail. However, problems with the company's performance began almost immediately. A prisoner jumped from a tier at the jail in October 2013 and was severely injured; he was not transported to the hospital until the following day. Within hours of his transfer, he died at the hospital from injuries sustained in the fall. Early on in the contract there were problems related to the proper and timely distribution of medication to prisoners, lack of adequate recordkeeping procedures, and staffing cuts that resulted in fewer registered nurses, physicians and mental health care personnel.

## New Titles Available in PLN's Bookstore



**Criminal Law in a Nutshell,** by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**



**Advanced Criminal Procedure in a Nutshell,** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95**



**Criminal Procedure: Constitutional Limitations,** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95**

❏ *Criminal Law in a Nutshell*   ❏ *Advanced Criminal Procedure in a Nutshell*   ❏ *Criminal Procedure*

Amount enclosed (add $6 s&h for orders under $50, free shipping over $50) _____

By ❏ check  ❏ new postage stamps  ❏ credit card  ❏ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**PRISON LEGAL NEWS**   PO Box 1151 • Lake Worth, FL 33460   Tel (561) 360-2523 • www.prisonlegalnews.org

## A DEGREE/ORDINATION FROM PRISON

Correspondence Courses via mail
PO BOX 530212, Debary, FL 32753

Tuition from as little as $12.95 per month

**Free** evaluation! Send us a self addressed stamped envelope

Associates - Ph D | Accredited
**International Christian College & Seminary**
www.iccscampus.com

## Corizon Losing Renewals (cont.)

In 2014 the jail recorded seven medical-related deaths, a rate well above the national average for a facility of its size. The inadequate care provided by Corizon resulted in health care workers organizing with the United Steel Workers of America (USW). That process became mired in litigation against Corizon when, in February 2014, a Catholic nun who worked as a registered nurse at the jail was allegedly fired for union organizing activities. Sister Barbara Finch was dismissed after she openly expressed concerns at a meeting regarding patient safety and care. The USW filed an unfair labor complaint against Corizon over Finch's dismissal, and a settlement was eventually reached that allowed her to retain her job. [See: *PLN*, March 2014, p.1].

During the first five months of 2015, four more prisoners died due to health care-related issues. The first was Frank Smart, Jr., 39. Despite telling staff that he needed his seizure medications, Smart was told he would have to wait a few days. He died within 48 hours of his arrival at the jail; according to a medical examiner's report, his death was caused by a seizure disorder and being "physically restrained in [a] prone position." One of Smart's nine children, Tiara Smart, filed a wrongful death suit against Corizon and the county in Common Pleas Court in July 2015.

Allegheny County Controller Chelsa Wagner conducted an audit of Corizon's contract. The audit, released in December 2014, cited 14 areas in which the company allegedly failed to perform contractually-required services, ranging from failure to maintain emergency equipment and inadequate staffing to long delays in providing prisoners with physical exams and medication. [See: *PLN*, March 2015, p.30].

Apparently fed up with the many problems related to Corizon's performance, Allegheny County decided not to renew its contract with the company. As of September 1, 2015, the Allegheny Health Network began providing medical care at the jail.

### El Paso and Santa Barbara Counties

AT THE EL PASO COUNTY JAIL IN TEXAS, Corizon had held the contract for health care services since 2009. However, county officials began negotiations with the University of Texas Health System and the Emergence Health Network of El Paso to provide prisoner medical and mental health services at the facility. Corizon's contract expired and the company was granted a six-month extension until December 31, 2015 to continue to provide medical care for prisoners. The expired contract was worth approximately $8 million per year.

In Santa Barbara County, California, the county's contract with Corizon expired on June 30, 2015. Although jail officials

wanted to renew the contract, county commissioners granted only a 4-month extension, putting the $9.8 million annual contract on hold. At issue was deaths of prisoners at the facility, complaints of understaffing and medication shortages.

One of the prisoners who died, Raymond Herrera, 52, was serving 10 days in jail for probation violations. According to a news report, he started having convulsions in his cell in June 2015, then passed out, hit his face against a railing and had another seizure. He was "eventually" taken to a hospital, where he died due to a ruptured spleen caused by cirrhosis of the liver. A local group, Families ACT!, claimed that substandard care by Corizon employees was a contributing factor in Herrera's death.

### Conclusion

IN A JUNE 2015 INTERVIEW WITH The Marshall Project, Corizon CEO Dr. Woodrow Myers noted that losing contracts is part of the business. When asked about contract losses at Rikers Island and in Maine, Minnesota, Pennsylvania and Maryland, Myers replied, "It's a lumpy business, you win some, you lose some."

That attitude may well describe the outcome of the smaller contracts in Allegheny, El Paso and Santa Barbara counties, but for a company that has had its rating repeatedly downgraded by Moody's, a research and risk assessment agency, the loss of the $400 million Rikers Island contract may be more problematic. In Moody's last downgrade of Corizon's bond rating in August 2014, the agency stated, "The rating action reflects the company's continued operating performance weakness and the further deterioration of credit metrics beyond Moody's previous expectations, attributable to recent contract losses, margin declines from competitive pricing pressure on renewed contracts, and delays in the realization of earnings from ~ ... ... ... contracts."

... ... while sometimes "losing some," the loss of the lucrative Rikers contract may become a larger issue for the ratings agency – and a bigger problem for Corizon – than Dr. Myers is willing to acknowledge.

Sources: *www.DNAinfo.com*, *NY Daily News*, *The New York Times*, *Pittsburgh Post-Gazette*, *CBS2-NY*, *www.marshallproject.org*, *El Paso Times*, *Santa Maria Sun*, *www.modernhealthcare.com*, *www.triblive.com*



## FREE BOOK!

Get *The Habeas Citebook* with purchase of a 4-year subscription to *Prison Legal News*. Offer good for new subscriptions and renewals.

Special limited time only! All sales final and no refunds. Order now for this great deal worth $49.95.

**Prison Legal News** • PO Box 1151 • Lake Worth, FL 33460
Tel (561) 360-2523 • www.prisonlegalnews.org

"I'm not touching him," said the guard. The cause of Woods' death was later ermined to be a bleeding ulcer; on the y he died, he reportedly had almost a art of blood in his stomach. His family s filed a lawsuit against the city for his ronizingly painful and slow death" while ards "stood idly by." See: *Woods v. City of w York*, U.S.D.C. (S.D. NY), Case No. 15-cv-01542-PAC.

In a particularly troubling case, on February 5, 2014, Rikers prisoner and homeless teran Jerome Murdough, 56, was found ad in his cell from heat exhaustion. He ul been arrested for trespassing after seeking shelter in a stairwell on the roof of a ousing project on a cold night in Harlem, id was jailed because he couldn't afford a 2,500 bond.

Murdough was taking medication for oth bipolar disorder and schizophrenia, hich made him more susceptible to higher mperatures. He died after an equipment alfunction in his cell caused the temperature to climb to over 100 degrees. Jail mployees did not check on him for at least our hours even though he was in a special bservation unit for prisoners with mental ealth problems. "He basically baked to eath," said one official.

"He wasn't just some old homeless erson on the street. He was loved. He had life. He had a family. He had feelings," ated Wanda Mehala, sister of the U.S. Marine Corps veteran. Murdough's family ued the city, which agreed to settle the case n November 2014 for $2.25 million.

"Mr. Murdough essentially got the death penalty simply for being arrested for trespassing," said attorney Derek Sells, who represented the family.

## Jail Healthcare Under Scrutiny

*City Council Holds Hearings*

As Mayor de Blasio and the DOC Commissioner were announcing reforms aimed at curbing violence at Rikers Island, the New York City Council was conducting hearings on whether to renew a contract with Corizon Health – the jail's private healthcare provider – amid allegations of shoddy and negligent medical treatment. Of the 98 prisoner deaths in the city's jail system from 2009-2014, fifteen raised concerns over the quality or timeliness of the care provided.

"The allegations that have mounted over the years suggest that Corizon is failing to provide comprehensive and safe services to people under their care," said City Councilman and Health Committee Chairman Corey Johnson at a March 3, 2015 hearing. "These reports suggest that treatment provided to inmates may have been a factor in at least 15 deaths over the past five years and that these deaths may have been preventable."

Jail medical facilities are not under the jurisdiction of the DOC; instead, they fall under the control of the city's Department of Health and Mental Hygiene. Corizon holds a $126.6 million contract for management of medical services and a $38.98 million contract for dental care, while medical care for New York City's jail system is provided through a $270 million contract with Correctional Medical Associates of New York, P.C. (CMA). CMA is an affiliate of Corizon Health, and according to state records the company shares the same principal executive office as Corizon in Brentwood, Tennessee.

Dr. Calvin Johnson, Corizon's chief medical officer, and CMA president Dr. Jay Cowan were grilled by city council members at the hearing.

"The de Blasio administration stepped up, came up with tens of millions of dollars to try to change course at Rikers Island after years of violence and endemic, systematic problems," said Councilman Johnson. "You've been there for a long time. You were there in the [former Mayor Michael] Bloomberg years and you were there in the de Blasio years. I am not hearing anything specific about what you all have recommended to make the place a better place."

Councilwoman Inez Barron blasted the doctors for not mentioning recent prisoner deaths in their testimony at the hearing. "It sends the signal that those lives are perhaps not as important as other lives, and I'm very offended that you wouldn't at least mention that that's a big problem," she told them.

Dr. Johnson said that was not the impression Corizon was trying to convey. "We recognize these individuals who have lost their lives or who have been injured, not as numbers, not as indiscriminate pieces of information, but as people," he told the council. "We certainly understand and respect your indignation."



FreedomLine
Serving You With Excellence Since 2009

We make it simple

You reach your loved ones by calling a local number
That's a lot cheaper than calling long distance... it's all that simple

Only $2.50 per month for the number
Calls to anywhere in the U.S. are only 5¢ per minute
To Mexico 15¢, to Canada - 11¢, to just about anywhere else in the world - 31¢
No Contract, No Credit Check, No Setup Fee, No Cancellation Fee, No Early Termination Fee
Cancel anytime, any money left on the account is refunded.

Any time you refer a new customer, and they sign up, you both get 300 free minutes! Some restrictions apply. Details upon request.

Tell Your Folks to Sign Up or at www.freedomline.net

Or Mail FreedomLine · PO Box 1480, Coopersville, MI 49404 · Classified Ad in this and every issue

## Rikers Island Violence (cont.)

As early as October 2014, Councilman Johnson had called for an examination of Corizon's performance and raised the option of terminating the city's contract with the firm.

"Given that Corizon's contract is up for renewal next year, we have to take a serious look at whether they are an appropriate contracted provider," he said at the time. "From everything I've learned so far, I don't think they are."

City officials had downgraded Corizon's performance evaluation from "good" in 2012 to "fair" in 2013, citing the company's performance in mental observation units. The evaluation noted that Corizon had failed to demonstrate consistent leadership and had provided deficient treatment for mental health patients in several units.

In 2013, a panel of psychiatrists from New York University and Yale University submitted a report to the Board of Correction that listed numerous deficiencies in Corizon's provision of medical care in the city's jail system; the company has also faced scrutiny in a number of other jurisdictions, including Arizona, Florida, Kentucky and Pennsylvania. [See: *PLN*, March 2015, p.30; March 2014, p.1].

Sparking some of the ire at the City Council's Health Committee hearing in March 2015 was a review of cases where prisoners had died because they were denied medications, not diagnosed properly or not treated in a timely manner.

"We can go through, case-by-case, but what are you doing to stop this?" Johnson asked the Corizon and CMA executives. "Because I don't want to come back, three years from now, after a contract's renewed and we have more of these awful cases that we're hearing about because people are being denied the treatment that they deserve."

*Deaths, Injuries Due to Inadequate Care*

Some of the cases involving prisoner deaths at Rikers Island and other city jail facilities were particularly egregious.

On September 11, 2013, Bradley Ballard, 39, died in his cell after he was abandoned for six days without receiving his medication. The New York State Commission of Correction (SCOC), the agency that oversees jails and prisons, issued a report that blamed his death on gross incompetence by Rikers medical staff and guards.

The details of Ballard's death "shock the conscience," the report stated, noting that the mentally ill prisoner, who was jailed on a parole violation, had been placed in solitary for dancing provocatively in front of a guard. Once in segregation Ballard was ignored and denied medication for his diabetes and schizophrenia. At one point, the report said, he went 11 days without receiving insulin. Another time he was observed banging on his cell door and wrapping a ligature around his penis to cut off the circulation, which resulted in an infection.

Ballard was confined in his cell "for six days prior to his death," the report found, "and was denied access to his life supporting prescribed medications, denied access to medical and psychiatric care, denied access to essential mandated services such as showers and exercise periods and denied running water for his cell."

The December 16, 2014 SCOC report described how a warden, assistant warden, guards, nurses and other jail employees visited Ballard at least 57 times over the six-day period as his health deteriorated – but none took any action to help him.

The day before he died, Ballard was found lying naked in his cell, covered in his own feces and having difficulty breathing. It took medical personnel an hour-and-a-half to respond to a call for help, and still no one entered his cell. Instead, guards directed two other prisoners to place Ballard on a gurney. He was taken to a clinic at the jail where he went into cardiac arrest, then transferred to Elmhurst Medical Center and declared dead two hours later.

Ballard's death sparked protests by the New York City Jails Coalition because no one was charged with a crime, even though his death was ruled a homicide.

"I think [Rikers guards] are liable for my son's death, and they need to be punished before it happens to any other parents' son," said Ballard's mother, Beverly Ann Griffin, who has since filed a wrongful death suit that remains pending. See: *Griffin v. City of New York*, U.S.D.C. (S.D. NY), Case No. 1:14-cv-07329-NRB.

"Had Ballard received adequate and appropriate medical and mental health care and supervision and intervention when he became critically ill, his death would have been prevented," the SCOC report concluded. "The events that caused Ballard's death were directly caused by the compounded failures of NYC DOC and its contracted medical provider."

In January 2006, John Loadholt was jailed awaiting trial for drug possession when he died from an asthma attack. At least that was the official story his family received. However, in October 2014, following an investigation by the SCOC, they learned the truth. A guard had discovered Loadholt at 2:30 a.m., desperately trying



**Affordable Inmate Calling Services**
Keeping you Connected while saving you money!

2 vanity #s for $15 + tax /month. Additional #s $1.50 each
One flat monthly rate. NO charge to add/remove #s.
NO setup fee with referral. NO transfer fees. 100% BOP Compliant.
Federal Prisons Only!

Contact Us
Inmate Only: inmates@aicsll.net
Families www.aicsll.net  bill@aicsll.com  1-866-

to operate his asthma pump. When asked what was wrong Loadholt could only reply, "having a little difficulty." It took about 10 minutes until Loadholt and the guard started walking to the infirmary, but Loadholt didn't make it far before he collapsed. The guard took his pulse and called for assistance, but by then it was too late; Loadholt was dead.

SCOC Commissioner Frederick C. Lamy blamed the jail's healthcare provider. "Loadholt's asthma was inadequately managed by [Corizon precursor] Prison Health Services (PHS), a business corporation holding itself out as a medical provider," he said.

The SCOC detailed in a report how Loadholt was not taken to numerous medical appointments and that PHS never followed up on the missed appointments. State investigators found that because PHS consistently overbooked its appointment schedule, staff routinely cancelled many appointments.

John's brother, Ken Loadholt, a 20-year veteran New Jersey prison guard, said he knew firsthand "the size of the neglect" that killed his brother. He blamed himself

for not learning the truth sooner. "I went [to the morgue] because I wanted to know exactly what happened," he stated. But when the coroner gave him a death certificate, which listed his brother's death as being due to complications from asthma and methadone treatment, Ken felt something was wrong because methadone is a treatment for heroin addiction. His brother didn't use heroin.

"I allowed my association with the law enforcement community to get in the way of learning the truth earlier," he added. "It really saddens me because it's not that hard to give someone adequate medical treatment."

In another case involving medical neglect at Rikers, by April 7, 2013, prisoner Andy Henriquez, 19, had been begging for help for days. He had a torn aorta that was leaking blood into his groin, and suffered from chest pain and shortness of breath as he cried for help from his solitary confinement cell. That day, a doctor visited him and prescribed hand cream – and even wrote the wrong name on the prescription. Henriquez was found dead a few hours later. He had initially complained of chest pains seven

months before he died, and although he was seen by medical staff, a cardiac exam was never performed. In December 2014, Corizon agreed to settle a lawsuit filed by Henriquez's family for an undisclosed "seven figure" amount.

Rikers prisoner Mark Johnson died of a bacterial infection in May 2013 even though he had been complaining for days about bloody stools. It wasn't until his fellow prisoners united in protest that he received medical care, but it came too late; even after emergency surgery, Johnson passed away.

"It is heartbreaking. He should have gone to the hospital," said his mother, June Broer. "With antibiotics he could be alive today." She filed a lawsuit against the city and Corizon over her son's death, and the suit remains pending. On June 3, 2015, the district court ordered the city to produce the full morbidity and mortality review conducted by the Department of Health and Mental Hygiene into Johnson's death. See: *Broer v. City of New York, U.S.D.C.* (S.D. NY), Case No. 1:14-cv-03838-AKH.

In yet another example of inadequate medical care by Corizon staff, Rodney Cot-



**Save on Prescription Eyeglasses & Shades**

Send for a **FREE** Catalog
Money Back Guarantee

**Prism Optical, Inc.**
10954 NW 7th Ave
Dept: LN0715
Miami, FL 33168

Inquiries from Friends and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com

prism
OPTICAL, INC



## Rikers Island Violence (cont.)

ton, 51, incarcerated at the city's Manhattan Detention Complex, experienced a six-day erection in 2011 – a painful condition known as priapism that was a side effect of antidepressants he was taking. Two Corizon doctors, Craig Metroka and Landis Barnes, failed to send him to a hospital until his condition worsened and he required surgery. As a result, he became impotent. Cotton filed a lawsuit in state court that is scheduled to go to trial in July 2015.

Dr. Barnes was implicated in another incident involving questionable medical care when he told a prisoner to throw away part of his middle finger, which had been cut off when a guard closed a cell door in June 2014. Rudolph Richardson, held at the Manhattan Detention Complex, said he begged Barnes to save the finger by putting it on ice; the physician "reluctantly" agreed, and the finger was later reattached at an outside hospital. Richardson filed a lawsuit in federal court alleging medical malpractice and civil rights violations, which remains pending. See: *Richardson v.*

*City of New York*, U.S.D.C. (S.D. NY), Case No. 1:15-cv-00543-LAK-AJP.

### Corizon Loses DOC Contract

In addition to the injuries and deaths described above, other prisoners have suffered paralysis, amputations and loss of vision due to poor medical care by Corizon. On May 29, 2015, *The Intercept*, a publication of First Look Media, published a lengthy feature article on deficient medical treatment provided to women prisoners at the Rose M. Singer Center on Rikers.

"There has been a rash of really tragic and unacceptable incidences on Rikers as it relates to Rikers inmates not getting the health care that they require and deserve," observed City Councilman Corey Johnson.

In August 2014, Corizon was fined $71,000 by the Occupational Safety and Health Administration for a "willful violation" of OSHA regulations, for failing to protect its employees from violence at Rikers Island. The agency cited an increase in assaults against the company's nurses, doctors and mental health staff.

Ten months later, on June 10, 2015, Mayor de Blasio announced that the city

would not renew its contract with Corizon to provide medical care in the jail system when the contract expires at the end of this year.

"We have an essential responsibility to provide every individual in our city's care with high-quality health services – and our inmates are no different," he said.

After the Corizon contract expires, medical care will be provided by New York City's Health and Hospital Corporation, a public benefit company.

"We're pleased to hear that the city is discontinuing the use of Corizon and making other arrangements for providing medical care in the jails," declared John Boston, director of The Legal Aid Society's Prisoners' Rights Project. "Medical care has been a major source of complaints from our clients in jail, and they complain about the care they get from Corizon."

De Blasio's decision to end the city's contract with the company followed a June 2015 report by the DOI that found Corizon was responsible for "significant breakdowns" in medical care for prisoners. A more detailed account of Corizon's loss of its New York City jail contract will appear in a future issue of *PLN*.

### Mental Illness and Solitary Confinement

BEGINNING IN OCTOBER 2013, THE New York City Board of Correction (BOC) conducted a five-month study of the DOC's solitary confinement practices to determine how the agency compared with a variety of national standards. Interviews with prisoners and recreation logs from Central Punitive Segregation Units (CPSUs) over a three-month period formed the basis for the agency's research. The BOC randomly selected 14 days to get an average of "how many prisoners and what proportion of the total population went outdoors [for recreation] that day."

Rikers' largest CPSU is located at the Otis Bantum Correctional Center, where prisoners are housed in 7 by 12-foot cells for 23 hours a day for weeks, months and even years at a time.

Numerous studies that found extended periods of segregation negatively impact a prisoner's physical and mental health led to a requirement that the DOC provide prisoners in solitary confinement a minimum... However, investigators noted that prisoners spent

## New Titles Available in PLN's Bookstore



**Criminal Law in a Nutshell**, by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**



**Advanced Criminal Procedure in a Nutshell**, by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95**



**Criminal Procedure: Constitutional Limitations**, by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95**

☐ Criminal Law in a Nutshell   ☐ Advanced Criminal Procedures in a Nutshell   ☐ _____

Amount enclosed (add $6 S&H for orders under $50, free shipping over $50) _____

By ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**PRISON LEGAL NEWS**   PO Box _____ • Tel (561) 360-2523 • www.prisonlegalnews.org

# Michigan: Class-action Suit Alleges Systematic Deficiencies in Prison Dental Care

A MICHIGAN FEDERAL DISTRICT COURT has allowed portions of a lawsuit challenging the adequacy of dental care provided to state prisoners to proceed.

Michigan prisoners Robert Johannes, Michael Woroniecki, Phillip Turner and Roger Stephenson alleged the dental care they received while incarcerated was constitutionally inadequate, and sought class-action status for their claims. [See: *PLN*, Dec. 2015, p.33].

On September 25, 2015, the court denied without prejudice a motion to certify the class. The defendants, Michigan Department of Corrections (MDOC) Director Heidi Washington and Dr. Dalton Sanders, then moved for summary judgment, and a magistrate judge recommended their motion be granted. Before the district court were the parties' objections to that report and recommendation.

The prisoners asserted "systematic deficiencies in how the defendants choose to deliver dental care, due to the reduction in the number of dentists hired, and the issuance of a modified policy directive requiring a minimum two years wait once you enter a prison to even be placed on a waiting list and requiring a prisoner to wait five years for replacement of dentures."

The amended complaint encompassed those and five class-related claims, including unwritten MDOC practices of extracting rather than repairing teeth, and refusing or delaying treatment for broken teeth, in violation of the Eighth Amendment.

The defendants argued the prisoners had failed to exhaust administrative remedies as required under the Prison Litigation Reform Act. The district court agreed in part and found one of the plaintiffs' claims moot.

Stephenson claimed he "suffered severe and prolonged pain" while waiting for his dentures, which he received in June 2014. The court found that mooted his claim for injunctive relief and raised concerns regarding his representation of the other class members as to that claim, requiring further briefing.

The issue of exhaustion came down to an MDOC policy requiring prisoners to include "[d]ates, times, places, and names of all those involved in the issue being grieved." It was undisputed the prisoners did not name either Washington or Dr. Sanders in their grievances.

The district court held that under *Jones v. Bock*, 549 U.S. 199 (2007), a prisoner need not include the names of prison officials in grievances unless required by an institutional rule, while *Reed-Bey v. Pramstaller*, 603 F.3d 322 (6th Cir 2010) [*PLN*, May 2011, p.49] held that where prison officials overlooked the procedural failing and issued a merits-based ruling on the grievance, they waived the right to raise a failure-to-exhaust defense.

The court also found that the grievances contesting systematic MDOC policies gave prison officials notice of the plaintiffs' claims, and that Washington could be held liable for policies that "plausibly [were] implemented or enforced by the Director of the MDOC."

In the end, on March 31, 2016 the district court granted in part the defendants' motion for summary judgment, dismissed Woroniecki's and Turner's claims against Dr. Sanders, dismissed Johannes' and Turner's claims against Washington, and allowed all other claims to proceed.

The court found that Stephenson's claim was moot because he had received his dentures while the suit was pending and he did not seek monetary damages. The case remains ongoing, with the plaintiffs represented by attorneys Daniel E. Manville and Robert Gittleman. See: *Johannes v. Washington*, U.S.D.C. (E.D. Mich.), Case No. 2:14-cv-11691-LJM-MKM; 2016 U.S. Dist. LEXIS 43165. ◼

# Prisoner Deaths, Labor Conflicts Precipitate Loss of CA County Corizon Contract

*by Derek Gilna*

I N AUGUST 2016, THE ALAMEDA COUNTY, California Board of Supervisors unanimously voted to end its ties with Corizon Health, Inc., and awarded a contract for county jail medical services to California Forensic Medical Group (CFMG).

The contract, worth $135 million over a three-year period, was issued to CFMG over the protestations of Alameda County Sheriff Greg Ahern. As reported by local news outlet KTVU, Ahem had received more than $100,000 in campaign contributions from Corizon.

Corizon and Prison Health Services (which merged with Correctional Medical Services to form Corizon in 2011) had been contracted to provide medical care at two Alameda County jails since 1988. Precipitating the loss of the Alameda County contract were complaints of poor medical services, claims of negligent prisoner deaths and labor conflicts.

In 2010, the family of an Alameda County prisoner, Martin Harrison, allegedly the victim of inadequate medical care, received an $8.3 million settlement from Corizon and the county. According to the attorney representing Harrison's family, the settlement was the largest of its kind in California history. [See: *PLN*, March 2015, p.54].

In a December 2, 2013 letter to the Alameda County Sheriff's Office, Dr. Calvin Benton of Oakland, California wrote that a prisoner with obstructive sleep apnea almost died as a result of being denied an easily-obtained CPAP machine while in custody. The prisoner, who suffered from respiratory failure, pneumonia and sepsis, had to be taken to a local hospital by ambulance. Dr. Benton noted that CPAP machines generally rent for approximately $100 per month.

In July 2015 another Alameda County jail prisoner, Mario Martinez, 29, suffered an asthma attack and died. He had been complaining of obstructive nasal polyps and had obtained multiple court orders directing Corizon to treat his condition. In February 2016, Martinez's family filed a wrongful death lawsuit against Corizon and Sheriff Ahern, which remains pending. See: *Martinez v. Corizon Health*, U.S.D.C. (N.D. Cal.), Case No. 4:16-cv-00881-JSW.

In 2015, hundreds of nurses who worked for Corizon in Alameda County's

jail system threatened to go on strike, citing staff shortages that forced them to handle excessively high numbers of incarcerated patients. Following the Harrison settlement, the company laid off 67 licensed vocational nurses.

"Since then they hired a bunch of temporary workers, but people would come in, work two days, and say, 'This is crazy, I quit,'" said National Union of Healthcare Workers (NUHW) organizer Dennis Dugan. "They couldn't retain people."

Those conditions, according to the nurses, compromised their ability to deliver proper medical care. A notice of the impending strike, required under the nurses' labor contract, was served on Corizon, and after unsuccessful negotiations for a new contract a federal mediator issued a "cooling off" period to try to spark an agreement.

As stated by NUHW president Sal Rosselli, "The staffing situation in the jail is in crisis right now. [Registered nurses] are responsible for giving medications to over 100 patients a day, at a time when Corizon's profits are unprecedented. It's time for Corizon to make less of a profit."

Corizon's own records indicated that it had been sued over a hundred times for medical negligence, due to inadequate care that resulted in unnecessary suffering and deaths. Millions of dollars were paid in settlements by the company, which, according to NUHW, "prioritizes its bottom line over the welfare of inmates by aggressively cutting staffing levels, withholding care from inmates, retaliating against whistleblowers, and denying adequate pay and benefits to caregivers."

NUHW made that statement in a letter to the Washington, D.C. City Council, which was considering contracting with Corizon to provide medical care in the District of Columbia's jail system. The Council ultimately rejected the contract. [See: *PLN*, Oct. 2015, p.20].

Regardless, the reality of medical care for Alameda County jail prisoners will likely remain a bleak one; CFMG, like its competitor Corizon, has a history of litigation based on complaints of deficient medical care. [See: *PLN*, April 2016, p.1].

Sources: Think Progress; letter to the DC Council by Sal Rosselli, President, NUWH (April 10, 2015); www.sfgate.com; www.ktvu.com; www.sfchronicle.com

## Australia Uses Recidivism-Based Performance Contract at Private Prison

CURRENTLY A THIRD OF ALL AUSTRALIAN women prisoners return to prison following their release, but a new pilot program initiated by the government in the state of Western Australia hopes to change those recidivism rates.

According to a November 28, 2016 news report, international conglomerate Sodexo will receive 15,000 Australian dollars ($11,000 U.S.) for each prisoner who stays out of prison for two years post-release, provided the number of such successful former prisoners surpasses a certain level.

Rebecca Hamilton, director of strategic policy at Western Australia's Department of Corrective Services, said the move was intended to ease overcrowding in the state's women's facility. She added that the UK has had measurable success with a similar program.

"So basically what we're saying to Sodexo is if you can successfully provide programs for a woman so she doesn't reoffend then we'll pay you more for that than we will for a woman who comes back into the system," Hamilton explained.

Sodexo has held the contract to operate the 256-bed Melaleuca Remand & Reintegration Facility since June 2016. Western Australia's two other private prisons are both run by UK-based Serco. John Welsch, secretary for the Western Australian Prison Officers' Union, criticized the decision by public officials to let Sodexo manage the women's facility.

"The government is basically telling experienced public sector staff that they are not up to the [job] of managing the new prison, and it would prefer to give the contract to one of the world's largest multinational corporations instead," he said.

In the United States, tying contract performance awards to reductions in recidivism is presently being tried in Pennsylvania, at privately-operated halfway houses. [See: *PLN*, Sept. 2014, p.50; April 2013, p.44].

Source: *www.rt.com*



**FREE! 12 FREE ISSUES!**

Send self addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!

Quarterly drawing WINS $100! **(Void in New York)** (Last Quarter's winner from **Gatesville, TX.)**

TELL YOUR FRIENDS!   ACT NOW!!!

PO Box 2063 • Fort Walton Beach FL. 32549

www.InmateMagazineService.com

**Inmate Magazine Service Inc.**

JULY 24, 2014

Login (/users/login/) or Sign up (/users/register/)

# Prison Legal News (/)

*Dedicated to Protecting Human Rights*

# Corizon Needs a Checkup: Problems with Privatized Correctional Healthcare

Located on MARCH 15, 2014 by Greg Dober (/news/author/greg-dober/) published in Prison Legal News March, 2014 (/news/issue/25/3/), page 1
Filed under: Private Prisons (/search/?selected_facets=tags:Private%20Prisons), Washenkul/Geo Group (/search/?selected_facets=tags:Washenkul/Geo%20Group), CMS (/search/?selected_facets=tags:CMS), Prison Health Services (/search/?selected_facets=tags:Prison%20Health%20Services), Wexford Health Services (/search/?selected_facets=tags:Wexford%20Health%20Services), Systemic Medical Neglect (/search/?selected_facets=tags:Systemic%20Medical%20Neglect), Medication (/search/?selected_facets=tags:Medication), Misdiagnosis (/search/?selected_facets=tags:Misdiagnosis), Medical Misconduct (/search/?selected_facets=tags:Medical%20Misconduct), Private Contractors (/search/?selected_facets=tags:Private%20Contractors), Systemic%20Medical%20Neglect, Private Contractors (/search/?selected_facets=tags:Systemic%20Medical%20Neglect), Medical Neglect/Malpractice (/search/?selected_facets=tags:Medical%20Neglect/Malpractice). Location: United States of America (/search/?selected_facets=location:994).

Corizon, the nation's largest for-profit medical services provider for prisons, jails and other detention facilities, was formed in June 2011 through the merger of Prison Health Services (PHS) and Correctional Medical Services (CMS).

In April 2013, the debt-rating agency Moody's downgraded Corizon's nearly $360 million worth of debt to a rating of B2 – an indication the company's debt is highly speculative and a high credit risk. According to Moody's, the rating downgrade was due to an "expectation of earnings volatility following recent contract losses, margin declines from competitive pricing pressure on new and renewed contracts, and Moody's belief that Valitas [Corizon's parent corporation] will be unable to restore metrics to levels commensurate with the prior B1 rating over the near to intermediate term."

Valitas Health Services is majority owned by Beecken Petty O'Keefe & Company, a Chicago-based private equity management firm. Beecken's other holdings are primarily in the healthcare industry.

On September 23, 2013, Moody's again downgraded Corizon's debt rating and changed the company's rating outlook from "stable" to "negative." The following month Corizon announced that it had replaced CEO Rich Hallworth with Woodrow A. Myers, Jr., the former chief medical officer at WellPoint Health. Hallworth, who had been appointed Corizon's CEO in 2011, previously served as the president and CEO of PHS. At the same time that Hallworth was replaced, Corizon president Stuart Campbell also stepped down.

### Prison Medical Care for Profit

According to Corizon's website, the company provides healthcare services at over 530 correctional facilities serving approximately 378,000 prisoners in 28 states. In addition, Corizon employs around 14,000 staff members and contractors. The company's corporate headquarters is located in Brentwood, Tennessee and its operational headquarters is in St. Louis, Missouri.

The 2011 merger that created Corizon involved Valitas Health Services, the parent company of CMS, and America Service Group, the parent company of PHS. The Nashville Business Journal reported the deal was valued at $250 million.

"Corizon's vision is firmly centered around service – to our clients, our patients and our employees," Campbell said at the time. "To that we add the insight of unparalleled experience assisting our client partners, and caring professionals serving the unique healthcare needs of [incarcerated] patients."

Corizon has around $1.5 billion in annual revenue and contracts to provide medical services for the prison systems in 13 states. The company also contracts with numerous cities and counties to provide healthcare to prisoners held in local jails; some of Corizon's larger municipal clients include Atlanta, Philadelphia and New York City (including the Rikers Island jail). Additionally, the company has its own in-house pharmacy division, PharmaCorr, Inc.

The prison healthcare market has flourished as state Departments of Corrections and local governments seek ways to save money and reduce exposure to litigation. [See: PLN, May 2012, p.22]. Only a few major companies dominate the industry. Corizon's competitors include Wexford Health Sources, Armor Correctional Health Services, NaphCare, Correct Care Solutions and Centurion Managed Care – the latter being a joint venture of MHM Services and Centene Corporation. Around 20 states outsource all or some of the medical services in their prison systems.

As Corizon is privately held, there is little transparency with respect to its internal operations and financial information, including costs of litigation (or their surviving family members) sue the company, often alleging inadequate medical care.

For example, when Corizon was questioned by the news media in Florida during a contract renewal, the company initially tried to prevent the release of its litigation history, claiming it was a "trade secret."

In 2012, Corizon agreed to settle a lawsuit filed against PHS – one of its predecessor companies – by Prison Legal News, seeking records related to the resolution of legal claims against the firm in Vermont. Based on the records produced pursuant to that settlement, PHS paid out almost $1.8 million in just six cases involving Vermont prisoners from 2007 to 2011. [See: PLN, Dec. 2012, p.16].

Companies like Corizon provide healthcare in prisons and jails under the HMO model, with an emphasis on cutting costs – except that prisoners have no other options to obtain medical treatment except through the contractor.

### Arizona DOC

A former Corizon nurse had her license suspended and is currently under investigation by the Arizona State Board of Nursing for incompetence. In January 2014, nurse Patricia Talboy was accused of contaminating vials of insulin at three units at the ASPC-Lewis prison, potentially exposing two dozen prisoners to HIV or hepatitis.

Talboy reportedly used a needle to stick prisoners' fingers to check their blood sugar levels. She then used the same needle to draw insulin from vials of the medication utilized for multiple prisoners, possibly contaminating the insulin in the vials. After placing the vials back into inventory, other staff members may have unknowingly used them to dispense insulin.

"Every indication is that the incident is the result of the failure by one individual nurse to follow specific, standard and well-established nursing protocols when dispensing injected insulin to 24 inmates," Arizona Department of Corrections (ADC) director Charles L. Ryan said in a January 9, 2014 statement.

Talboy's failure to follow procedures was discovered after a prisoner told a different nurse about the issue. Corizon reportedly delayed three days before publicly reporting the incident; in a press release, the company admitted that one of its nurses had been involved in "improper procedures for injections." Talboy received her nursing license in August 2012 and became an RN in June 2013; as a rookie nurse, Corizon likely paid her less than more experienced nurses.

Following the insulin-related incident, the company was ordered to develop a comprehensive plan that includes "supplemental training and competency testing procedures for blood glucose testing and administration of insulin," as well as "nurse-peer reporting education to ensure professional accountability" and "patient awareness education on injection protocols."

Granted, Corizon isn't alone with respect to such incidents. In August 2012, a nurse employed by the ADC's previous medical services contractor, Wexford Health Sources, contaminated the insulin supply at ASPC-Lewis through improper injection protocols, potentially exposing 112 prisoners to hepatitis C. [See: PLN, July 2013, p.1].

/2014/...../15/corizon-needs-a-checkup-problems-with-priv...   7/24/2014

Corizon Needs a Checkup: Problems with Privatized Correctional Healthcare | Prison Legal News ~ Page ... ...

Corizon has a three-year, approximately $370 million contract to provide medical care in Arizona state prisons, which began in March 2013. The contract award generated controversy because former ADC director Terry Stewart was hired by Corizon as a consultant; current director Charles Ryan had previously worked under Stewart, raising a potential conflict of interest. Ryan denied any improprieties.

According to a report by the American Friends Service Committee released in October 2013, titled "Death Yards: Continuing Problems with Arizona's Correctional Health Care," medical services in Arizona prisons did not improve after Corizon replaced Wexford as the ADC's healthcare contractor. "Correspondence from prisoners; analysis of medical records, autopsy reports, and investigations; and interviews with anonymous prison staff and outside experts indicate that, if anything, things have gotten worse," the report stated.

"Death Yards"

**Florida DOC**

In 2013, the Florida Department of Corrections (FDOC) awarded Corizon a five-year, $1.2 billion contract to provide medical services to state prisoners in north and central Florida. Wexford Health Sources was contracted to provide similar services in the southern region of the state for $240 million. [See: PLN, May 2012, p.24]. The wholesale privatization of healthcare in Florida's prison system followed a 2011 legislative decision to disband the state's Correctional Medical Authority, which had oversight over prison medical care. [See: PLN, May 2012, p.30].

The contracts were part of the Republican administration's initiative to expand privatization of government services, including prison management and healthcare, in spite of previous setbacks. In 2006, PHS withdrew two months into an almost $800 million contract to provide medical care to Florida prisoners; at that time, the company said the contract was not cost-effective and claimed it would lose money.

The 2013 contract awards to Corizon and Wexford followed a two-year legal fight. In 2011, AFSCME Florida and the Federation of Physicians and Dentists/Alliance of Healthcare and Professional Employees filed suit challenging the prison healthcare contracts, in an effort to protect the jobs of nearly 2,600 state workers.

On June 21, 2013 the First District Court of Appeals approved the privatization of medical care in FDOC facilities, overturning a ruling by the Leon County Circuit Court. The appellate court noted in its decision that "The LBC [Legislative Budget Committee] simply moved funds from different line items within the Department's Health Services' program, providing additional funds for contracts that the Department otherwise had the authority to enter." See Crews v. Florida Public Employers Council 79, 113 So.3d 1063 (Fla. Dist. Ct. App. 1st Dist. 2013).

Under the terms of the FDOC's contract with Corizon, the company must provide medical care to Florida state prisoners for 7% less than it cost the FDOC in 2010. When entering into the contract, state officials apparently had few concerns about the numerous lawsuits previously filed against Corizon, and no hard feelings toward the company's predecessor, PHS, when it terminated its 2006 contract to provide medical services to Florida prisoners because it wasn't profitable.

"Most people feel, as long as they achieve their 7 percent savings who cares how they treat inmates?" noted Michael Hallett, a professor of criminology at the University of North Florida.

**Florida Counties**

In a September 6, 2012 unpublished ruling, the Eleventh Circuit Court of Appeals affirmed a $1.2 million Florida jury verdict that found Corizon – when it was operating as PHS – had a policy or custom of refusing to send prisoners to hospitals. The Court of Appeals held it was reasonable for jurors to conclude that PHS had delayed medical treatment in order to save money. See Fields v. Corizon Health, 490 Fed.Appx. 174 (11th Cir. 2012).

The jury verdict resulted from a suit filed against Corizon by former prisoner Brett A. Fields, Jr. In July 2007, Fields was being held in the Lee County, Florida jail on two misdemeanor convictions. After notifying PHS staff for several weeks that an infection was not improving, even with antibiotics that had been prescribed, Fields was diagnosed with MRSA. PHS did not send him to a hospital despite escalating symptoms, including uncontrolled twitching, partial paralysis and his intestines protruding from his rectum. A subsequent MRI scan revealed that Fields had a severe spinal compression; he was left partly paralyzed due to inadequate medical care.

The Eleventh Circuit wrote that PHS "enforced its restrictive policy against sending prisoners to the hospital," and noted that a PHS nurse who treated Fields at the jail "testified that, at monthly nurses' meetings, medical supervisors 'yelled a lot about nurses sending inmates to hospitals." Further, PHS "instructed nurses to be sure that the inmate had an emergency because it cost money to send inmates to the hospital."

At trial, the jury found that PHS had a custom or policy of deliberate indifference that violated Fields' constitutional right to be free from cruel and unusual punishment. The jurors concluded that Fields had a serious medical need, PHS was deliberately indifferent to that serious medical need, and the company's actions proximately caused Fields' injuries. The jury awarded him $700,000 in compensatory damages and $500,000 in punitive damages. [See: PLN, March 2013, p.54; Aug. 2011, p.24].

More recently, the estate of a 21-year-old prisoner who died at a jail in Manatee County, Florida filed a lawsuit in October 2013 against the Manatee County Sheriff's Office and Corizon, the jail's healthcare provider. The complaint accuses the defendants of deliberate indifference to the serious medical needs of Jovon Frazier and violating his rights under the Eighth Amendment.

In February 2009, Frazier was incarcerated at the Manatee County Jail; at the time of his medical intake screening, staff employed by Corizon, then operating as PHS, noted that his health was unremarkable. Frazier submitted a medical request form in July 2009, complaining of severe pain in his left shoulder and arm, and a PHS nurse gave him Tylenol.

Throughout August and September 2009, Frazier submitted five more medical requests seeking treatment for his arm and shoulder. Despite the repeated complaints, Frazier was never referred to a doctor or physician assistant; on one of the requests, PHS employees saw him and recorded his vital signs. Despite being documented as routine but he was placed on the "MD's list."

An X-ray was taken on September 17, 2009 to rule out a shoulder fracture. The X-ray was negative for a fracture, and Frazier was not referred to a doctor. He submitted two more medical requests that month and five requests in October 2009 seeking treatment for his increasingly painful condition. The complaint alleges that in total, Frazier submitted 13 medical request forms related to pain over a period of three months; he was seen by a nurse each time but not examined by a physician.

On October 29, 2009, Frazier received an X-ray to determine if he had a tendon injury. An MRI was recommended and he was transported to a hospital where an MRI scan revealed a large soft tissue mass on his shoulder. A doctor at the hospital, concerned that the mass was cancerous, recommended additional tests.

After being diagnosed with osteosarcoma, a form of bone cancer, Frazier was returned to the jail and subsequently treated at the Moffitt Cancer Center, where he received chemotherapy, medication and surgery. Despite this aggressive treatment the cancer progressed and Frazier's left arm was amputated. The cancer continued to spread, however, and he was diagnosed with lung cancer in June 2011. He died within three months of that diagnosis, on September 18, 2011.

In a letter to the attorney representing Frazier's estate, Florida oncologist Howard R. Abel wrote that the lack of treatment provided by Corizon at the Manatee County Jail constituted "gross negligence and a reckless disregard to Mr. Frazier's right to timely and professionally appropriate medical care."

The lawsuit filed by Frazier's estate claims that Corizon was aware of his serious medical condition but failed to provide adequate treatment. In addition, the complaint contends the company has a widespread custom, policy and practice of discouraging medical staff from referring prisoners to outside medical practitioners and from providing expensive medical tests and procedures. Finally, the lawsuit states that "Corizon implemented these widespread customs, policies and practices for financial reasons and in deliberate indifference to [the] serious medical needs of Frazier and other inmates incarcerated at Manatee County Jail."

On January 10, 2014, U.S. District Court Judge James Moody denied Corizon's motion to dismiss the case. The company had argued that the allegations in the lawsuit failed to assert sufficient facts to establish deliberate indifference, amounted only to medical negligence and were insufficient to establish gross negligence, and failed to adequately allege a policy or custom that violated Frazier's rights." Judge Moody disagreed, finding the claim set forth in the complaint were "sufficient to establish a constitutional violation."

The Manatee County Sheriff's Office had better luck with its motion to dismiss. The Sheriff argued the complaint did not establish facts indicating that the jail had a similar practice – like Corizon – of providing deliberately indifferent medical care to prisoners. The court agreed and dismissed the claims against the Sheriff's Officer; the claims against Corizon remain pending. See: Jenkins v. Manatee County Sheriff, U.S.D.C. (M.D. Fla.), Case No. 8:13-cv-02756-JSM-TGW.

19 of 20

20 of 26

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**CONFIDENTIAL ATTORNEY-CLIENT CORRESPONDENCE**

August 2, 2017

ASPC Lewis, Stiner Unit
Michael Cohn, ADC #288721
P.O. Box 3100
Buckeye, AZ 85326

Re:   *Parsons v. Ryan*

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202 393 4930
F/202 393 4931
WWW ACLU ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC
PRACTICE LIMITED TO
FEDERAL COURTS

Dear Mr. Cohn:

We received your letter of June 14, 2017. Thank you for contacting our
office. We would like to congratulate you on completing your paralegal
studies program and commend you on all the hard work you have
undertaken to be an advocate for prisoners' rights. We are very troubled
to hear your account of thousands of inmates who are going untreated for
Hepatitis C. Unfortunately, however, we cannot provide the help you are
requesting. This office is counsel for plaintiffs in *Parsons v. Ryan*, the
federal lawsuit regarding problems with the Arizona Department of
Corrections' (ADC) medical, mental health, and dental care. The suit also
challenges inhumane conditions in the isolation units. We represent all
prisoners only with regard to the case. We are not able to provide any
individual representation, nor are we able to write an amicus brief, as you
requested.

*IAC in my opinion! mC*

I have enclosed some informational material, which contains some
standards and case law. I hope you find this information to be helpful as
you continue to pursue your claims in court.

Again, I apologize that we are not able to assist you further. We
appreciate the information you provided regarding the state of medical
healthcare at ADC. As you may know, we are currently in the monitoring
phase of *Parsons v. Ryan,* and the information you provide is valuable to
us as we work to ensure that ADC complies with the settlement
agreement.

*20 of 26*