Index of Exhibits to Declaration of Corene Kendrick


Exhibit 1    FILED UNDER SEAL
             10/20/17 Letter from A. Fletcher to D. Fathi Re: July CGARs

Exhibit 2    FILED UNDER SEAL
             10/24/17 Letter from C. Kendrick to A. Fletcher Re: July CGARs

Exhibit 3    FILED UNDER SEAL
             10/25/17 Letter from C. Kendrick to T. Bojanowski Re: PM 66 at
             ASPC-Florence infirmary

Exhibit 4    FILED UNDER SEAL
             11/2/17 Letter from C. Kendrick to T. Bojanowski Re: Accuracy of
             Florence Provider Entries Reviewed for Infirmary Performance
             Measures

Exhibit 5    Emails dated 10/26/17 and 10/30/17 from D. Fathi to Defendants'
             Counsel Re: Remedial Plans

Exhibit 6    FILED UNDER SEAL
             10/20/17 Letter from C. Kendrick to T. Bojanowski Re: Tucson Santa
             Rita

Exhibit 7    FILED UNDER SEAL
             10/20/17 Letter from C. Kendrick to T. Bojanowski Re: Telemedicine
             Licensure

Exhibit 8    10/31/17 Letter from C. Kendrick to T. Bojanowski Re: Notice to the
             Court re: Status of University of Arizona Telemedicine

Exhibit 9    FILED UNDER SEAL
             10/19/17 Letter from D. Fathi to L. Rand re: Mortality Documents

Exhibit 10   FILED UNDER SEAL
             10/20/17 (corrected 10/23/17) Letter from D. Fathi to T. Bojanowski
             re: failure to provide documents related to one class member's suicide

Exhibit 11   10/20/17 Letter from R. Valenti to D. Fathi re: Document Production

Exhibit 12   10/31/17 Letter from D. Fathi to R. Valenti re: Document Production

Exhibit 13   9/19/17 Letter from D. Fathi to T. Bojanowski re: Monitoring Guide

Exhibit 14   10/20/17 Letter from T. Bojanowski to D. Fathi re: Monitoring Guide

Exhibit 15   10/27/17 Letter from D. Fathi to T. Bojanowski re: Monitoring Guide

# Exhibit 1

# (Redacted)



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Ashlee B. Fletcher
480.420.1631
afletcher@strucklove.com

October 20, 2017

**_VIA EMAIL ONLY_**
David C. Fathi
American Civil Liberties Union Foundation
NATIONAL PRISON PROJECT
Legal Department
915 15th Street, NW – 7th Floor
Washington, DC  20005-2112

   **Re: Parsons v. Ryan**

Dear David:

  We are in receipt of your October 4, 2017 correspondence regarding monitoring of various performance measures.

**Performance Measures 1, 2, and 4 (Partial Credit Allegation)**

  Your assertion that Defendants employ the partial credit method that was invalidated by the Court on December 14, 2016, is incorrect.  Similar to measures that require the review of ten separate inmate records to determine compliance, these performance measures require the review of thirty separate days to determine compliance.  As such, they are monitored in the same fashion. Specifically, the monitor determines whether the requisite staff member was present for the requisite time period on each day of the monitored month.  If the staff member was present for the requisite time, that day is counted compliant.  If not, it is counted non-compliant.  The percentage of compliance is then determined based upon the number of compliant days.  For example, if the monitoring month has thirty days, and 15 of the days were non-compliant, the facility receives a 50% compliance score.  Indeed, this same method is employed for measures that look at inmate records.  Each file is determined to be compliant or non-compliant, and a compliance percentage is then determined.  For example, if five out of ten inmate records were non-compliant, that facility and measure would receive a 50% score for the monitoring month.  And your correspondence concedes this is the appropriate method.  *See* (October 4, 2017 from Fathi to Bojanowski re: monitoring methodology) at 6.

David C. Fathi
October 20, 2017
Page 2

Your correspondence conflates this proper monitoring methodology with the invalidated "partial credit" methodology. Under the "partial credit" methodology, each inmate's record received a percentage. For example, if an inmate was required to be seen four times within a given month, and he was only seen twice, that file received a 50% compliance score instead of a general "non-compliant" score, as detailed above. That methodology is no longer employed for any performance measure. Defendants are appropriately monitoring performance measures 1, 2, and 4, and have done so since the inception of the Stipulation.

## Performance Measure 25 (Production of Source Documents)

To monitor compliance with PM 25, random files are selected from the ER Hospital Report. The monitors then consult eOMIS to determine whether the inmate's emergency was responded to within three minutes. Answers to this inquiry are contained either in the inmate's medical records or within an SIR report generated for the incident. Not every "emergency", as defined in PM 25, results in an SIR.

Defendants will agree to provide Plaintiffs with the ER Hospital Reports utilizes for this measure, and when applicable, the corresponding SIR report.

## Performance Measure 60 (N/A)

We are confused by your assertions regarding this measure. PM 60 is specific to female inmates. Therefore, it is unclear why you claim a finding of "N/A", at the Phoenix facility (where only male inmates are processed) is somehow inaccurate. Because female intakes are not processed into the Phoenix facility, this measure does not apply to Phoenix and the "N/A" finding is proper.

## Performance Measures 44 ("Act Upon")

Hospital records are electronically imported into eOMIS. Often, this import occurs prior to the inmate actually arriving back at the facility. Thus, it is possible for the report to be reviewed and acted upon prior to the inmate's return. Our review and analysis of the specific files references in your correspondence is below:

### Lewis
- Inmate ▮▮▮▮: This file is compliant. According to the hospital records, which are accessible through eOMIS, the nurse contacted the provider on July 26, 2017 at 2026, and the provider advised to continue the inmate on the medications provided at the hospital.
- Inmate ▮▮▮▮: This inmate did have a hospital return in July. He returned from West Valley Hospital on July 22, 2017.
- Inmate ▮▮▮▮: This inmate was hospitalized during July 2017. Specifically, he was hospitalized at Abrazo hospital from July 12 – 14, 2017.
- Inmate ▮▮▮▮: This inmate was hospitalized during July 2017. Specifically, he was hospitalized at Maricopa Medical Center from June 27, 2017 – July 1, 2017.

David C. Fathi
October 20, 2017
Page 3

### Perryville

- o Inmate ████: This file is compliant.  According to the hospital records, which are accessible through eOMIS, the medications recommended by the hospital provider were ordered and continued at the complex in accordance with PM 44.
- o Inmate ████:  This file is compliant.  According to the hospital records, which are accessible through eOMIS, the medications recommended upon discharge were ordered upon the inmate's admission to the facility's infirmary.
- o Inmate ████:  Because there are no hospital discharge records for this inmate, this file was mistakenly included in random sample.  Because all nine available files were pulled from the Lumley unit for this measure, there is no file available to replace it.  As such, Defendants will adjust the July 2017 score for PM 44 at Perryville from 14/15 records compliant to 13/14 records compliant, which will result in a 92.85% compliance score.
- o Inmate ████:  A typographical error appears in the CGAR.  The correct file is #████. This file is compliant.  Defendants will correct the error in the CGAR.
- o Inmate ████:  This file is compliant.  The hospital's recommendation was to follow up with primary care in 3 – 5 days.  The provider reviewed and acted upon this recommendation on July 24, 2017.
- o Inmate ████:  This file is compliant.  The provider reviewed and acted upon the prescription recommendation on July 21, 2017.

### Safford

Three records were reviewed for this measure (████, ████, ████).  Our review of the records revealed none of the records were compliant.  Thus, while your letter suggests Defendants' score should be reduced to 50%, the score should actually be reduced to 0%.  We have amended the CGAR.

### Performance Measures 77, 80, 81

#### Eyman (PM 77)

- o Inmate ████:  This inmate's mental health treatment plan was updated within 12 months, as required by PM 77 and was correctly counted as compliant.
- o Inmate ████:  The date of the second treatment plan contains a typographical error.  A review of eOMIS would have revealed that the second treatment plan was done on June 5, 2017.  This file was correctly counted as compliant.
- o Inmate ████:  This file was incorrectly counted as compliant.  Defendants will re-audit based on a finding of non-compliance for this file.

#### Tucson (PM 77)

- o Inmate ████:  This inmate's mental health treatment plan was updated within 12 months, as required by PM 77 and was correctly counted as compliant.
- o Inmate ████:  This inmate's mental health treatment plan was updated within 12 months, as required by PM 77 and was correctly counted as compliant.

David C. Fathi
October 20, 2017
Page 4

### Tucson (PM 80)

- o Inmate ▇▇▇▇:  The date of the first treatment plan contains a typographical error. A review of eOMIS would have revealed that the first treatment plan was on July 20, 2017.  The file was correctly counted as compliant.
- o Inmate ▇▇▇▇:  The date of the second treatment plan contains a typographical error.  A review of eOMIS would have revealed that the second treatment plan was on June 27, 2017.  The file was correctly counted as compliant.
- o Inmate ▇▇▇▇:  This file was incorrectly counted as compliant.  Defendants will re-audit based on a finding of non-compliance for this file.

### Tucson (PM 81)

- o Inmate ▇▇▇▇:  This file was incorrectly counted as compliant.  Defendants will re-audit based on a finding of non-compliance for this file.

The files that were incorrectly counted as compliant were the result of human error in calculating the time between dates.  Defendants have created a "date tracker" that will check the monitor's work before submission, to ensure the time between dates was accurately counted as either compliant or non-compliant, based upon the timeframe outlined in the performance measure.  As mentioned above, Defendants will re-audit these measures at these facilities to correct the two human errors described above.

### Proposed Methodology Language for PMs 85 and 86

Defendants agree to your proposed language for PM 85.  Defendants agree to your proposed language for PM 86, with one exception to the first sentence.  A copy of Defendants' proposed revisions is attached as Exhibit 1.  Please let us know if you will agree to the revision.  Such stylistic changes to the language of this measure, however, will not alter the overall compliance of records under this measure as the Court's methodology for PM 85 has been employed since December 2016, and July 2017 for PM 86.

### Performance Measure 95

PM 95 requires that inmates discontinued from suicide watch be seen by mental health staff at certain intervals after discontinuation of their watch.  The source document for monitoring this measure, is the Suicide Watch Log.  Each facility maintains its own suicide watch log for watches that occur at that respective facility.  Because PM 95 requires inmates be seen up to 24 days after their watch was discontinued, it is not unusual for an inmate to be transferred to a different facility during that time.  As such, it is possible for an inmate to have been seen post-watch at two different facilities.  For example, while the inmates cited in your correspondence were removed from watch at Phoenix, their subsequent follow-ups were conducted at different facilities, because they were later transferred.  And, the monitor noted "N/A" for those follow-ups which were conducted at the inmate's prior facility, so as to only include data relevant to Tucson when monitoring the Tucson complex.

3100 West Ray Road | Suite 300 | Chandler, AZ 85226
480.420.1600 | STRUCKLOVE.COM

David C. Fathi
October 20, 2017
Page 5

**Performance Measures 94, 95, and 97**

The examples outlined in your correspondence for PMs 94 and 95, were incorrectly counted twice due to human error.  Defendants will agree to re-audit these measures at all facilities for July 2017, to verify no additional human errors exist.  We reviewed the files pulled for PM 97, and did not find any errors.  Finally, to help prevent similar human errors from occurring, Defendants now utilize a tracker to check for duplicative files.

**Performance Measures 98 and 99**

Your correspondence misstates what transpired at the September 12, 2017 hearing.  The Court did not order Defendants to remove the word "current", nor did it find inclusion of the word to be inappropriate.  While Mr. Fathi raised the issue with the Court, the Court noted, ". . . it sounds like it's not even worth the time I have devoted to it because the time periods are the same."  (9/12/17 Transcript 134:10 – 11).  Despite the time periods being the same, Defendants will agree to remove "current" from these CGAR forms.  It is important to also note, that the process, without or without the inclusion of the word "current", is the same.

Sincerely,

Ashlee B. Fletcher

Ashlee B. Fletcher

ABF/eap

cc:      Counsel of record

3100 West Ray Road ▎Suite 300 ▎Chandler, AZ 85226
480.420.1600 ▎STRUCKLOVE.COM

# Exhibit 2

# (Redacted)



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 24, 2017

Ms. Ashlee B. Fletcher
Struck Love Bojanowski & Acedo PLC
3100 West Ray Rd. Ste. 300
Chandler, AZ 85226

  Re: *Parsons v. Ryan*

Dear Ashlee,

  I write in response to your letter of October 20, 2017, responding to David Fathi's letter of October 4, 2017, that detailed multiple errors  uncovered in a spot-check of the July 2017 CGARs. [Doc. 2368-1 at 3-37]  We request you provide copies of the corrected CGARs for PMs 44, 77, 80, 81, 94, and 95 no later than October 31, 2017.


**PMs 1, 2, and 4**

  The parties appear to be at an impasse regarding Defendants' use of partial credit to calculate compliance with these measures.  You cite to page 6 of our October 4 letter to assert that we have conceded that this is appropriate methodology. It is unclear to what you are referring; in any event, there is no concession there.   We will seek the Court's assistance in resolving this dispute regarding Defendants' use of partial credit with these measures.

**PM 25**

  Your letter states that the source document for this measure is the ER Hospital Report. This is incorrect.  The agreed-upon methodology for PM 25 states that the source documents are not limited to the ER report, but also include Significant Incident Reports (SIRs) and Incident Reports (IRs). *See* Doc. 2291-1 at 52.

  Therefore, we reiterate our request for all underlying documents, including the SIRs and IRs.  If, as you contend, Defendants are not using these other source documents, please explain why Defendants are not following the methodology set forth in the Monitoring Guide, and for how long the source documents have been limited to only the ER Hospital Report.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

**PM 44**

**Lewis**

Thank you for the additional information, but we still contend that one of the files was noncompliant; in addition, one of the three that we indicated did not show a hospitalization appears to be noncompliant. While the other two that we indicated did not show a hospitalization appear to be compliant, one of them raises additional concerns. Therefore, Plaintiffs assert that the compliance level should have been 14/16 compliant, or 87.5%.

███████: This file is noncompliant. While the nurse documented that she read the hospital recommendations to the provider over the phone the day the patient returned from the hospital, neither the nurse nor the provider documented the reason why the provider did not act upon the hospital's treatment recommendation that the patient continue to be provided 100 mg. of gabapentin three times a day, as required by the methodology for the measure, but rather discontinued the pain medication without explanation.

███████: Thank you for the clarification of when he was hospitalized. This file appears to be noncompliant, however. The July 14 hospital discharge information included the recommendation that the patient be returned to see the specialist Dr. Merchant within 7 to 10 days, but there is no documentation that the prison provider reviewed that recommendation or that he acted upon it by requesting that follow-up specialty referral from Utilization Management.

███████: Thank you for the clarification of when he was hospitalized. However, there is no "return from offsite" eOMIS entry showing that he was seen by the nurse upon his return from the hospital on July 22. The only possibly relevant note is one made that same day by RN Aumack described as "nursing infirmary admission" but it confusingly refers to the admission as being related to a HNR dated January 24, 2017.

███████: Thank you for the clarification of when he was hospitalized. The reason for the confusion was that the nurse's return from off-site note for July 1 only stated that the patient had returned that day from a scheduled procedure of radiation treatment.

**Perryville**

You state that oftentimes hospital records are scanned and inputted into eOMIS prior to a patient returning to the facility, and that therefore it is possible for a report to be reviewed and acted upon prior to their return to the institution. For multiple patients, you assert that the "hospital records" confirm that the report was reviewed and acted upon by the prison provider. It is unclear how these hospital records, which are generated and finalized by the outside hospital, would document what actions were (or were not) taken by the Corizon prison provider. After reviewing the additional information you provided, we contend that the correct compliance level should be 10 out of 14, or 71%.

Ms. Ashlee B. Fletcher
October 24, 2017
RE: Parsons v. Ryan
Page 3

███████: We reiterate our position that this is noncompliant. There is no indication in the provider's note that he reviewed the report – the Physician's Assistant wrote that he was preemptively authorizing her admission into the infirmary and continuation of her previous prescriptions prior to her return because she was "being released back to Perryville long after I have left for the day." *See* 10/4/17 Ltr at Ex. 1. This preemptive action is not equivalent to reviewing and acting upon the report.

███████: We reiterate our position that this is noncompliant. Similar to the patient listed above, the provider entered a note that preemptively authorized nursing staff to admit the patient to the infirmary and to continue her previously prescribed medication. This is not the same as reviewing or acting upon the report.

███████: You state that this record was mistakenly included in the sample, and should not have been included because there were no hospital discharge reports scanned to her file or available. We agree that this record was inappropriately included in the sample and marked as compliant.

███████████: You note that a typographical error was made in the CGAR and the correct ADC number for the patient is ██████. She returned from the hospital on July 1, 2017 after an overdose of medication. It appears that this file is compliant.

███████: We contend that this is noncompliant. You are correct that she was seen by a medical provider three days after her return from the hospital after attempting suicide by hanging, but that does not mean that the discharge report was reviewed, and there is no documentation that the discharge report was reviewed at that time.

███████: This file is noncompliant with regard to Perryville. The 7/21/17 provider encounter you are referring to was made by a provider at ASPC-Phoenix Flamenco Mental Health, where she was transferred after the 7/17/17 return to Perryville that is described in our letter. The July 21 encounter at Phoenix was in relation to returning from the emergency room on that day, after Phoenix staff had sent her out on July 20 when she was suffering physical symptoms from inserting multiple batteries in her vagina while at the hospital on July 16, and tearing out the stitches in her arm while still at Perryville. *See* Attachment 1 (7/20/17 Phoenix provider note sending patient out to hospital).

## Safford

You state that the compliance score for PM 44 at Safford should have been 0% compliant instead of 100% compliant, and that the CGAR will be amended. Please provide a copy of the amended CGAR.

Ms. Ashlee B. Fletcher
October 24, 2017
RE: Parsons v. Ryan
Page 4

**PMs 77, 80, 81:  Multiple Errors in CGARs at Eyman and Tucson**

Your response confirms that numerous errors – all in Defendants' favor – appeared in the July 2017 CGAR reports for Eyman and Tucson.

**PM 77**

As an initial matter, we are baffled by your response regarding Patients ████, ████, and ████.  In each case, the CGARs clearly show that the patient's last two treatment plans were more than one year apart:

████ (Eyman):  Treatment plans dated 7/11/16 and 7/12/17
████ (Tucson):  Treatment plans dated 3/2/16 and 3/13/17
████ (Tucson):  Treatment plans dated 7/7/16 and 7/11/17

*See* Doc. 2368-1 at 9, Kendrick declaration Exh. A(filed under seal at Doc. 2370, 2377).

But in each case, you respond that "[t]his inmate's mental health treatment plan was updated within 12 months, as required by PM 77 and was correctly counted as compliant." 10/20/17 letter at 3.  This is manifestly false; something that was not done for more than a year obviously was not done "a minimum of every 12 months," as required by PM 77.  *See, e.g., Zuckerman v. Transamerica Ins. Co.*, 133 Ariz. 139, 140–41, 650 P.2d 441, 442–43 (1982) ("[A] clause requiring that any action . . . must be commenced within twelve months" was also described by the court as being within a "one-year period"); *Veronica T. v. Arizona Dep't of Econ. Sec.*, 212 Ariz. 7, 9, 126 P.3d 154, 156 (Ct. App. 2005) ("In this case, the . . . hearing was conducted within one year . . . [t]his complied with the statutory requirement that the court hold a permanency hearing within twelve months").[1]

Please confirm that all records in which the two treatment plans are more than 12 months apart are counted as noncompliant (e.g., a record with treatment plans completed on June 5, 2016 and  June 5, 2017 is compliant; a record with treatment plans completed on June 5, 2016 and June 6, 2017 is noncompliant).

With regard to Patient ████ (Eyman), you state that, as the result of a "typographical error," the second treatment plan was listed in the CGAR as occurring on July 31, 2017 rather than June 5, 2017.  10/20/17 letter at 3.  However, you do not dispute that the record was counted as compliant, despite the fact that the CGAR clearly showed a gap of more than 90 days between

---

[1] Consistent with the plain meaning of the Stipulation's language, Defendants' own Monitor Guide acknowledges that the record must be counted as noncompliant if the two treatment plans "were more than 90 days (or 12 months if applicable) apart."  Doc. 2291-1 at 119.

the two treatment plans (3/15/17 and 7/31/17).  Thus, the monitor was not correctly applying the requirements of the Stipulation to the data before him or her.

## PM 80

We do not understand your repeated reference to "treatment plans," since PM 80 has nothing to do with treatment plans.  Here too, you cite "typographical errors," but again do not dispute that the record of Patient ███████ (Tucson) was counted as compliant despite the fact that the CGAR clearly showed a gap of more than 30 days between clinician contacts (6/23/17 and 7/30/17).  Thus, here again, the monitor is not correctly applying the requirements of the Stipulation.  With respect to Patient ██████ at Tucson, the record is still noncompliant even under your version of the facts, as the two clinician contacts are still more than 30 days apart (5/26/17 and 6/27/17).

Please state whether you will agree to re-calculate  the July 2017 CGAR results for PM 77, 80, and 81 at all institutions and correct the compliance figures accordingly.[2]

## PMs 85 and 86

You state that "Defendants agree to your proposed language for PM 85" and "Defendants agree to your proposed language for PM 86, with one exception in the first sentence."  10/20/17 letter at 4.  But the proposed language attached to your letter differs from our proposed language in numerous ways, beginning with the very first sentence of the Methodology for PM 85.  *Compare* Doc. 2368-1 at 33-36 *with* 10/20/17 letter, Exhibit 1.  Please clarify your position on Plaintiffs' proposed language.[3]

## PM 95

As explained in our letter of October 4, the Stipulation does not permit the sample of records for one institution to include persons who were removed from suicide watch at a different institution.  Doc. 2368-1 at 12.  Moreover, Defendants are attempting to have it both ways: they include in the sample for Tucson patients who were removed from suicide watch at Phoenix, but

---

[2] We do not understand your reference to "the two human errors described above" (10/20/17 letter at 4), since you acknowledge three "typographical errors," as well three noncompliant records that were incorrectly counted as compliant.

[3] Your statement that "the Court's methodology for PM 85 has been employed since December 2016" (10/20/17 letter at 4) is incorrect.  Defendants' own CGAR report clearly shows that the January 2017 sample for PM 85 included records that could not possibly be found noncompliant, because the patient had only discontinued medication that same month.  *See* Doc. 2212 at 2:8-11.

Ms. Ashlee B. Fletcher
October 24, 2017
RE: Parsons v. Ryan
Page 6

do not verify that the post-watch contacts that were due while the patients were still at Phoenix have occurred.  You have provided no reason why patients who were removed from suicide watch at a different institution cannot be excluded from the sample, and replacement records randomly drawn until the required sample size is reached.  It appears that the Court will need to resolve this issue.

**PMs 94, 95, and 97**

You acknowledge that the same patient's file was improperly included in the sample twice for both PM 94 and PM 95 at Lewis, contrary to the requirements of the Court's order of July 13, 2017 (Doc. 2185 at 2).  You also agree to re-audit PM 94 and 95 at all facilities for July 2017; please confirm that you will also correct the CGAR compliance figures accordingly.

We look forward to your response.

Sincerely yours,

Corene Kendrick, Staff Attorney

cc:    Counsel of Record

Attachment 1

CHSS027J    Condensed Health Services Encounter      Monday October 23, 2017 03:57:44 PM

| | |
|---|---|
| ADC #: ▮▮▮▮    Inmate Name: G▮▮▮, B▮▮▮▮. <br> ENCOUNTER DATE: 07/20/2017   TIME: 10:24:10 AM   DURATION: minutes   TYPE: Provider - Sick Call - Scheduled <br> LOCATION: ASPC-PHX FLAMENCO M. HLTH FEM [B13]    SETTING: Clinic | |
| **S** | Are interpreter services needed for this inmate: No <br> NOTES: <br><br> TimeStamp: 20 July 2017 10:26:02 --- User: Ethel Winfunke (WINETH0) <br><br> 1. Called to female unit by Nursing, IM was transferred from PV female prison yesterday and reported she put 4 batteries in her vagina prior to discharge from the hospital. 2. Also asked to exam IM's bilateral wrists, s/p Laceration repair, IM also reported she bit off staples from left wrist and swallowed them. <br> Upon arrival, IM escorted into exam room by Female DOC Officer, Velanzuela. IM in yellow suicide smock and hand cuffs, ambulatory with no distress, laughing, reports she put 4 batteries from the TV remote control into her vagina while on admission at the hospital about 5 days ago, reports "I think one fell out while in the toilet and I flushed it", reports burning with urination and "black good stuff comes out". Denies abdominal pain, pelvic pain, flank pain, chills, bloody urine, nausea, vomiting, or abdominal bloating. IM reports she bit off 4 staples from left wrist and swallowed them while at PV female Prison 2 days ago. |
| **O** | NOTES: <br><br> TimeStamp: 20 July 2017 10:37:42 --- User: Ethel Winfunke (WINETH0) <br><br> HEENT: Atraumatic. PERRLA. EOMs intact. No lid lag. No trachea deviation, no palpable thyroid. No Lymphadenopathy <br> CV: RRR. S1S2 <br> Pulmo: CTA. No wheezes. No Rhonchi <br> Skin/MSK: full flexion and extension of joints, wrists, fingers, ankles, knees. Left wrist with gauze dressing + tape, removed to exam, incision well approximated with 7 staples and steri-strips, no drainage. Right wrist well-approximated with steri-strips, no drainage. No redness or swelling on both incisions. <br> Abdomen: Soft, active BS x 4. No facial grimacing with light or deep palpation, No bruit, no distention <br> GU: Chaperone by ADON, Nurse Force and DOC female officer, Valenzuela with IM's verbal consent, non-tender pubic, <br>   black drainage with foul odor from vagina with speculum insertion, visible round objects in the floor of the vagina, unable to <br>   advance speculum or retrieve objects. IM laughing through-out exam, no apparent distress. |
| **A** | RELATED PROBLEM: Other Diagnosis: Other Diagnosis Foreign body in vulva and vagina, sequela [T19.2XXS] <br> MEDICAL DIAGNOSIS: Foreign body in vulva and vagina, sequela [T19.2XXS] <br> NOTES: <br><br> TimeStamp: 20 July 2017 10:44:58 --- User: Ethel Winfunke (WINETH0) <br><br> Self-harm - Foreign objects in vagina, potential for sepsis |
| **P** | NOTES: <br><br> TimeStamp: 20 July 2017 10:46:07 --- User: Ethel Winfunke (WINETH0) <br><br> Transfer to Maricopa Medical Center for retrieval of foreign objects from vagina <br> conferred with SMD, no other suggestions <br> Remove Staples from left wrist (due to recurrent self-harm), cover incision with steri-stips <br> Daily visual check of bilateral wrists incisions + dry gauze dressing until healed |
| **E** | NOTES: <br><br> TimeStamp: 20 July 2017 10:46:43 --- User: Ethel Winfunke (WINETH0) <br> Discussed plan with IM |
| **H/S** | MH Status: Inpatient Psychiatric Treatment |
| | STAFF: Winfunke, Ethel |

PROVIDER SIGNATURE: _____

Winfunke, Ethel

# Exhibit 3

# (Redacted)



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 25, 2017

Mr. Timothy Bojanowski
Struck Love Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:     *Parsons v. Ryan,* Performance Measure 66

Dear Tim,

I write regarding our recent discovery of curious recordkeeping by the infirmary provider Stacey Stockton at ASPC-Florence that calls into question the accuracy of patients' records for purposes of monitoring compliance with PM 66 ("In an IPC, a Medical Provider encounters [sic] will occur at a minimum every 72 hours."). This recordkeeping is especially problematic in light of the fact that the Court (a) found Defendants substantially noncompliant with PM 66 at Florence on May 20, 2016, (Doc. 1583 at 2); (b) included PM 66 at Florence in its June 14, 2017 Order to Show Cause, (Doc. 2124 at 3); and (c) included PM 66 at Florence in its October 10, 2017 Order to Show Cause, (Doc. 2373 at 4).

As I noted at pages 3-4 of the enclosed advocacy letter that was sent to your office earlier today, when we reviewed the medical record of a class member at ASPC-Florence Central infirmary who alleged delays in cancer treatment, we discovered that the provider is entering the notes for Infirmary Rounds into the eOMIS system on a strangely precise basis, whereas the nursing entries are more natural looking, following no apparent pattern (Compare the attached print-outs of the provider entries versus the nursing entries ). It appears that the provider opens eOMIS to make an entry precisely on the hour; it is extremely unlikely that a human could open the computer system with this precision day after day. It is more probable, instead, that there is some sort of an automated process programmed such that eOMIS generates and automatically opens an encounter entry on the hour, such that the "provider rounds" entries appear to be within 72 hours of one another, as required by PM 66.

But it is unclear when the provider actually saw this patient, given that the encounters are not listed as "closed" until hours (or days) later. As a result, on the surface it appears that the infirmary rounds are happening within 72 hours of one another, but there is great ambiguity about

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Mr. Timothy Bojanowski
RE: PM 66
October 25, 2017
Page 2

when in that window of time the patient was seen.  Below is a list of when the provider ostensibly conducted infirmary rounds:

10/24/17 - 12:00 PM (eOMIS says encounter was from 12:00 - 4:58 pm)
10/21/17 - 5:00 PM (eOMIS says encounter was from 5:00 pm - 11:20 pm)
10/19/17 - 4:00 PM (eOMIS says encounter was from 4:00 pm - 7:38 pm)
10/17/17 - 11:00 AM (eOMIS says encounter was from 11:00 am - 4:27 pm)
10/14/17 - 6:00 PM (eOMIS says encounter was from 6:00 pm - 9:46 pm)
10/12/17 - 2:00 PM (eOMIS says encounter was from 2:00 - 5:13 pm)
10/10/17 - 12:00 PM (eOMIS says encounter was from 12:00 pm - 4:37 pm)
10/7/17 (seen by different provider) - 12:38 pm
10/5/17 - 6:00 PM (eOMIS says encounter from 6:00 pm - 8:41 pm)
10/4/17 - 12:00 pm (eOMIS says encounter from 12:00 pm - 4:17 pm)
10/1/17 - 4:00 pm (eOMIS says encounter from 4:00 pm - 8:06 pm)
9/28/17 - 6:00 pm (eOMIS says encounter from 9/28 6:00 pm - 10/1 8:06 pm)
9/26/17 - 12:00 pm (eOMIS says encounter from 9/26 12:00 pm - 10/1 8:06 pm)
9/23/17 - 6:00 pm (eOMIS says encounter from 9/23 6:00 pm - 10/2 2:12 pm)
9/22/17 - 11:00 am - listed as a chronic care appointment, not infirmary round
(eOMIS says encounter from 11:00 am - 11:16 am)
9/19/17 - 12:00 pm (eOMIS says encounter from 9/19 12:00 pm - 9/20 9:52 pm)
9/16/17 - 4:00 pm (eOMIS says encounter from 9/16 4:00 pm - 9/20 9:45 pm)
9/14/17 - 10:00 am (eOMIS says encounter from 10:00 am - 12:09 pm)
9/11/17 - 1:00 pm (eOMIS says encounter from 9/11 1:00 pm - 9/12 2:07 pm)
9/6/17 - 4:00 pm (eOMIS says encounter from 9/6 4:00 pm - 9/7 5:45 pm)
9/4/17 - 11:00 am (eOMIS says encounter from 11:00 am - 5:13 pm)
9/1/17 - 7:00 pm (eOMIS says encounter from 9/1 7:00 pm - 9/2 12:33 am)

We request that you provide an explanation as to whether Corizon has programmed eOMIS in such a manner that the infirmary rounds entries are automatically generated in prisoners' medical charts.  If this is not the case, please explain how this provider is able, day after day, to open entries precisely on the hour.  We request a response by November 1, 2017.

Thank you for your attention to this matter.

Sincerely yours,

Corene Kendrick, Staff Attorney

cc:     Counsel of Record



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 25, 2017

Lucy M. Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

RE:  *Parsons v. Ryan*, 2:12-CV-00601
Class Member in Need of Medical Care
██████████████████████ Florence - Central

Dear Ms. Rand:

I write regarding Mr. ██████ a class member at Florence-Central infirmary, who has experienced delays in the diagnosis and treatment of cancer. Mr. ██████ also reports that when he has attempted to submit HNRs regarding the status of his cancer care, medical staff have returned them to him unprocessed.  Furthermore, Mr. ██████' medical chart reflects curious recordkeeping by the infirmary provider that calls into question when and if he is actually being seen by provider staff as required by PM 66 ("In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours.").  This recordkeeping is especially problematic in light of the fact that the Court (a) found Defendants substantially noncompliant with PM 66 on May 20, 2016, (Doc. 1583 at 2); (b) included PM 66 at Florence in its June 14, 2017 Order to Show Cause, (Doc. 2124 at 3); and (c) included PM 66 at Florence in its October 10, 2017 Order to Show Cause, (Doc. 2373 at 4).

Starting in early 2017, Mr. ██████ reported to medical staff at ASPC-Winslow alarming gastrointestinal symptoms including extreme abdominal pain, nausea, vomiting, and severe and chronic constipation.  He was provided a variety of laxatives, but his symptoms did not abate.  On 6/13/17 the Winslow provider finally requested Utilization Management approve a routine consult with general surgery for a colonoscopy due to two fecal occult blood tests that were positive for blood, daily lower abdominal pain, and severe constipation.  Mr. ██████ saw the general surgeon on 7/31/17 but he had not been prepped for a colonoscopy. The specialist requested that Mr. ██████ be scheduled "ASAP" to return for a colonoscopy, and be prepped with Golytely.  The Winslow provider reviewed the report on 8/1/17, and wrote that he would

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

make another request for a colonoscopy, but there is no documentation that a request was submitted, in violation of PM 52 ("Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report.").

On August 14, 2017, Mr. ████ was sent to the Emergency Room from Winslow due to excruciating abdominal pain and an inability to defecate.  At the hospital he underwent a CT scan and colonoscopy which identified a large bowel obstruction, "worrisome for neuroplasm," and he had an emergency colostomy and was scheduled for a sigmoidectomy. He underwent the sigmoidectomy on August 23, 2017 where a very large (20 cm) cancerous tumor was removed from his colon, and he was diagnosed with Stage III colon cancer.  He also had a porta cath placed so that he could receive chemotherapy.  On August 30, 2017, he was discharged from the hospital with the instruction that he be scheduled immediately to see an oncologist and to begin chemotherapy no later than September 21, 2017.

He was admitted to the Florence Central infirmary on August 31, 2017.  The next day, the Florence provider submitted an urgent request to Utilization Management for hematology/oncology and chemotherapy, noting the hospital's instructions that he start chemotherapy no later than September 21.  Mr. ████ was not seen by the oncologist until 9/27/17, who confirmed the diagnosis of Stage III adenocarcinoma of colon, and wrote "start chemo urgently, please obtain auth. & schedule."

On October 1, 2017, the Florence provider requested another urgent consult for hematology/oncology to start the chemotherapy. She wrote:

"PATIENT SEEN AT AON [Arizona Oncology Network] FOR STAGE 3 ADENOCARCINOMA OF COLON AND NEEDS TO START CHEMO ASAP. OBTAIN AUTH AND SCEDULE [sic] XELOX AND OXALIPLATIC Q 3 WEEKS.  THANK YOU FOR YOUR ASSISTANCE WITH PROMP [sic] SCEDULING [sic] TO PREVENT DELAY OF TREATMENT.

PATIENT SEEN AND EVALUATED DURING ROUNDS. HE STATES HE CONTINUE [sic] TO FEEL LIKE THERE IS A BLOCKAGE THAT IS CAUSING HIS CONSTIPATION.  HE STATES HE FEELS LIKE HE HAS TO STRAIN AROUND SOMETHING TO HAVE BM.  HE IS CONCERNED BECAUSE THIS IS HOW HE FELT RIGHT BEFORE HE HAD SURGERY.  HE STATES THE MEDICATION TO ASSIST WITH BM DOES NOT HELP WITH THE SENSATION THAT THERE IS SOMETHING BLOCKING HIS COLON."

Despite the provider's note that Mr. ████ told her that he felt like there was still a bowel obstruction, there was no request made for additional imaging/diagnostic procedures or a colonoscopy to rule out an additional tumor.



On October 5, 2017, Mr. ███████ submitted a HNR to the medical staff requesting an update on the status of his chemotherapy. (See attached HNR dated 10/5/17). He reports that the medical staff returned the HNR to him, unprocessed, and instructed him to instead write an inmate letter, which he did. (See attached inmate letter dated 10/5/17). He reports that he did not receive a response; and his eOMIS medical record does not include a scan of this inmate letter.

It appears from a review of his medical record that Mr. ███████ finally had his first chemotherapy session on October 18, 2017, but we were unable to identify or locate a treatment plan from the specialist spelling out the frequency and duration of the chemotherapy, or if the specialist is recommending additional treatment, i.e. radiation therapy.

We request that Mr. ███████ treatment plan be located and reviewed by providers, and that it be implemented without delay or interruption. We also request that he be provided all needed pain medications and other accommodations to ameliorate the side effects of chemotherapy. To the extent Mr. ███████ continues to report that he feels as if he still has some sort of obstruction, we request that he be urgently referred for additional imaging and diagnostic procedures to rule out the recurrence of a tumor.

Finally, in reviewing Mr. ███████ medical records we noticed multiple puzzling features of the provider's entries into eOMIS for her encounters with MR. ███████ First, every "Assessment Notes" entry curiously is identical: "ASSESSMENT AND PLAN. ADENOCARCINOMA SIGMOID COLON/S/P SIGMOIDECTOMY -- FOLLOW UP FOR CHEMO. PORTA- CATH - LEFT CHEST WALL - MONITOR FOR SIGNS OF INFECTION."

The "Subjective Notes" almost always say a variation of: "PATIENT SEEN AND EVALUATED DURING ROUNDS HE IS WITHOUT QUESTIONS OR CONCERNS."

However, the most significant and curious feature of his medical records is the fact that the provider is entering the notes for Infirmary Rounds into the eOMIS system on a strangely precise basis, whereas the nursing entries are more natural looking (i.e. random times). (Compare the attached print-outs of the provider entries versus the nursing entries that show a more natural schedule/frequency of rounds). It appears that the provider opens eOMIS to make an entry precisely on the hour, which would be extremely unlikely that a human could open the computer system with this precision day after day. It is more likely, instead, that there is an automated process such that eOMIS is generating and automatically opening an encounter entry on the hour, such that the "provider rounds" entries appear to be within 72 hours of one another, as required by PM 66.

But it is unclear when the provider actually saw Mr. ███████ given the encounters are not listed as "closed" until hours (or days) later. As a result, on the surface it appears that the

Lucy M. Rand, Assistant Attorney General
Re: █████████
October 25, 2017
Page 4

infirmary rounds are happening within 72 hours of one another, but there is great ambiguity about when in that window of time Mr. ███████ was seen.  Below is a list of when the provider ostensibly had encounters with Mr. ███████ (see also attached printout of provider encounters showing each encounter but one on the hour, and compare with attached printout of nursing rounds, showing a more natural schedule of random time entries):

    10/24/17 - 12:00 PM (eOMIS says encounter was from 12:00 - 4:58 pm)
    10/21/17 - 5:00 PM (eOMIS says encounter was from 5:00 pm - 11:20 pm)
    10/19/17 - 4:00 PM (eOMIS says encounter was from 4:00 pm - 7:38 pm)
    10/17/17 - 11:00 AM (eOMIS says encounter was from 11:00 am - 4:27 pm)
    10/14/17 - 6:00 PM (eOMIS says encounter was from 6:00 pm - 9:46 pm)
    10/12/17 - 2:00 PM (eOMIS says encounter was from 2:00 - 5:13 pm)
    10/10/17 - 12:00 PM (eOMIS says encounter was from 12:00 pm - 4:37 pm)
    10/7/17 (seen by different provider) - 12:38 pm
    10/5/17 - 6:00 PM (eOMIS says encounter from 6:00 pm - 8:41 pm)
    10/4/17 - 12:00 pm (eOMIS says encounter from 12:00 pm - 4:17 pm)
    10/1/17 - 4:00 pm (eOMIS says encounter from 4:00 pm - 8:06 pm)
    9/28/17 - 6:00 pm (eOMIS says encounter from 9/28 6:00 pm - 10/1 8:06 pm)
    9/26/17 - 12:00 pm (eOMIS says encounter from 9/26 12:00 pm - 10/1 8:06 pm)
    9/23/17 - 6:00 pm (eOMIS says encounter from 9/23 6:00 pm - 10/2 2:12 pm)
    9/22/17 - 11:00 am - listed as a chronic care appointment, not infirmary round (eOMIS
        says encounter from 11:00 am - 11:16 am)
    9/19/17 - 12:00 pm (eOMIS says encounter from 9/19 12:00 pm - 9/20 9:52 pm)
    9/16/17 - 4:00 pm (eOMIS says encounter from 9/16 4:00 pm - 9/20 9:45 pm)
    9/14/17 - 10:00 am (eOMIS says encounter from 10:00 am - 12:09 pm)
    9/11/17 - 1:00 pm (eOMIS says encounter from 9/11 1:00 pm - 9/12 2:07 pm)
    9/6/17 - 4:00 pm (eOMIS says encounter from 9/6 4:00 pm - 9/7 5:45 pm)
    9/4/17 - 11:00 am (eOMIS says encounter from 11:00 am - 5:13 pm)
    9/1/17 - 7:00 pm (eOMIS says encounter from 9/1 7:00 pm - 9/2 12:33 am)

Thank you for your prompt attention to this matter.

Sincerely,

*Kendrick*

Corene Kendrick
Staff Attorney

cc:   Mr. ████████

# ARIZONA DEPARTMENT OF CORRECTIONS

## Health Needs Request (HNR)

Date: _____
Time: _____
Initials: _____

**SECTION / SECCION I**

| Inmate Name/Nombre *(Last, First M.I.) (Apellido, Nombre, Inicial)* | ADC Number/Número de ADC | Date/Fecha |
|---|---|---|
| [redacted] | [redacted] | 10-5-17 |

| Cell/Bed Number/Celda/Número de Cama | Unit/Unidad | P.O. Box/Apartado Postal | Institution/Facility/Instalación: ASPC |
|---|---|---|---|
| [redacted] | HUS | | Florence / Central |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action (Use this form to describe only one problem or issue at one time). [*Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria (Use este formulario para describir un problema a la vez!)*]

**SECTION / SECCION II**

**AREA OF INTEREST** *(Check only one block below)* / **AREA DE INTERES** *(MARQUE UN ESPACIO SOLAMENTE)* [X] Medical/Médica  [ ] Dental  [ ] FHA
[ ] Pharmacy/Farmacia  [ ] Mental Health/Salud Mental  [ ] Eyes/Ojos  [ ] Other *(specify)*/Otros *(especifique)* _____

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [¡POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

I need chemotherapy, I have cancer & have been put off numerous times. The situation has become dire. My health is in decline. Can you please schedule me for immediate chemotherapy & have no further delays.

＊Did not accept & not give written response＊

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Service fee *(excluding exemptions granted by statute)* for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo *(excluyendo las exenciones otorgadas por la ley)*. Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

Inmate's Signature/Firma del prisionero
[redacted]

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX[SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS]**

**SECTION / SECCION III**

REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA  [ ] Medical/Médica  [ ] Dental  [ ] Pharmacy/Farmacia  [ ] FHA
[ ] Mental Health/Salud Mental  [ ] Eyes/Ojos  [ ] Other/Otros *(specify) (especifique)* _____
Comments/Comentarios

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | | |

**SECTION / SECCION IV**

PLAN OF ACTION/PLAN DE ACCION

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | | |

Distribution: White/Blanca - Health Unit/Unidad de Salud, Canary, Pink & Goldenrod - Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero

This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial y no compromete a éste estado ni una subdivisión política de este estado.]

1101-10ES

ARIZONA DEPARTMENT OF CORRECTIONS

**Inmate Informal Complaint Resolution**

*Complaints are limited to one page and one issue.*

*Please print all information.*

☒ EMERGENCY Medical

| INMATE NAME *(Last, First M.I.) (Please print)* | ADC NUMBER | INSTITUTION/UNIT | DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| ████████████ | ████████ | Florence/Central | 10-5-17 |

| TO | LOCATION |
|---|---|
| AFHA Chorizon | Chorizon Admin |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I arrived at Florence Medical unit on 8-30-17 from Winslow Hospital. I have colon cancer, with cancer in lymph nodes. A port was put in on 8-30-17 for urgent upcoming chemotherapy. Doctors orders upon release from hospital were (1) to make sure to keep follow up appt with Dr on 9-7-17. Chorizon did not have me transported to follow up appt. (2) TO START CHEMOTHERAPY ON 9-21-17. As of 10-5-17, I still have not started chemotherapy. This is denial and/or delay to adequate health care and deliberate indifference. Resolution: START CHEMO IMMEDIATLY, NO MORE DELAYS

Furthermore from Jan 2017-Aug 2017 I have written numerous health needs requests concerning medical issues. These issues include; severe abdominal pain, constipation, nausea, shortness of breath, loss of appetite, etc. On or about 5-13-17 a colonoscopy was recommended by nurse practitioner in Winslow. I was not sent out for consultation for colonoscopy until 7-31-17 (approx 2½ months later). Aug 11, 12, 13, I went to medical with H4R's complaining of same issues, only extremely more painful & unbearable. Finally on 8-13, a medical ICS was called. I was almost unresponsive in cell, extreme pain, constipated for 4 days & vomited all day 8-13. Taken by stretcher to medical office, continued vomiting through nite, blood pressure dropped in morning & feeling near death, finally sent out to hospital on 8-14-17. Approx 8 months after 1st complaining of symptoms. Immediate surgery- 20 centimeter tumor removed from colon with cancer in lymph nodes. In hospital 16 days with 3 surgeries. All of these show a consistent pattern of denial & delay to adequate healthcare.

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| ████████████ | 10-5-17 |

Have you discussed this with institution staff? ☒ Yes ☐ No

If yes, give the staff member name: N.P. Stockton, RN Frazier, Consult physicians

Distribution: INITIAL: White and Canary or Copies – Grievance Coordinator; Pink or Copy – Inmate
FINAL: White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14

CHSS027A

# Health Services Encounters

Tuesday October 24, 2017 06:00:31 PM

Show Incidental Encounters: ☑    Encounter Type: [＿＿＿] [＿＿＿＿＿＿＿＿▼]

Health Services Encounters    (1 - 20 of 20)

| Date | Time | Category | Type | Staff | Location |
|------|------|----------|------|-------|----------|
| 10/24/2017 | 12:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 10/21/2017 | 05:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 10/17/2017 | 11:00 AM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 10/14/2017 | 06:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 10/12/2017 | 02:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 10/10/2017 | 12:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 10/07/2017 | 12:38 PM | Medical Provider | Provider - Infirmary Rounds | Stewart, Rodney | ASPC-F CENTRAL/U MED |
| 10/05/2017 | 06:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 10/04/2017 | 12:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 10/01/2017 | 04:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/28/2017 | 06:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/26/2017 | 12:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/23/2017 | 06:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/19/2017 | 12:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/16/2017 | 04:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/14/2017 | 10:00 AM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/11/2017 | 01:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/06/2017 | 04:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/04/2017 | 11:00 AM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |
| 09/01/2017 | 07:00 PM | Medical Provider | Provider - Infirmary Rounds | Stockton, Stacey | ASPC-F CENTRAL/U MED |

# Health Services Encounters

CHSS027A

Show Incidental Encounters: ☑　Encounter Type: [＿＿＿] [＿＿＿＿＿＿＿＿＿＿＿＿ ▼]

Health Services Encounters　　(1 - 56 of 56)

| Date | Time | Category | Type | Staff | Location |
|------|------|----------|------|-------|----------|
| 10/24/2017 | 10:30 AM | Nursing | Nurse - Infirmary Rounds | Kabongo, Claudine | ASPC-F CENTRAL/U MED |
| 10/23/2017 | 11:51 AM | Nursing | Nurse - Infirmary Rounds | Kabongo, Claudine | ASPC-F CENTRAL/U MED |
| 10/22/2017 | 07:22 AM | Nursing | Nurse - Infirmary Rounds | Owiti, Maurice | ASPC-F CENTRAL/U MED |
| 10/21/2017 | 06:42 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 10/20/2017 | 08:02 AM | Nursing | Nurse - Infirmary Rounds | Louden, Karina | ASPC-F CENTRAL/U MED |
| 10/19/2017 | 07:19 AM | Nursing | Nurse - Infirmary Rounds | Busby, Jacklyn | ASPC-F CENTRAL/U MED |
| 10/18/2017 | 08:06 AM | Nursing | Nurse - Infirmary Rounds | Busby, Jacklyn | ASPC-F CENTRAL/U MED |
| 10/17/2017 | 06:27 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 10/16/2017 | 07:11 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 10/15/2017 | 06:37 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 10/14/2017 | 07:31 AM | Nursing | Nurse - Infirmary Rounds | Kabongo, Claudine | ASPC-F CENTRAL/U MED |
| 10/13/2017 | 11:34 AM | Nursing | Nurse - Infirmary Rounds | Kabongo, Claudine | ASPC-F CENTRAL/U MED |
| 10/12/2017 | 06:44 AM | Nursing | Nurse - Infirmary Rounds | Henry, Kyle | ASPC-F CENTRAL/U MED |
| 10/11/2017 | 07:11 AM | Nursing | Nurse - Infirmary Rounds | Henry, Kyle | ASPC-F CENTRAL/U MED |
| 10/10/2017 | 07:19 AM | Nursing | Nurse - Infirmary Rounds | Marquez, Cynthia | ASPC-F CENTRAL/U MED |
| 10/09/2017 | 07:03 AM | Nursing | Nurse - Infirmary Rounds | Henry, Kyle | ASPC-F CENTRAL/U MED |
| 10/08/2017 | 07:08 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 10/07/2017 | 09:00 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 10/06/2017 | 10:52 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 10/06/2017 | 08:54 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 10/05/2017 | 10:16 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 10/04/2017 | 06:41 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 10/03/2017 | 07:44 AM | Nursing | Nurse - Infirmary Rounds | Marquez, Cynthia | ASPC-F CENTRAL/U MED |
| 10/02/2017 | 07:52 AM | Nursing | Nurse - Infirmary Rounds | Marquez, Cynthia | ASPC-F CENTRAL/U MED |
| 10/01/2017 | 10:26 AM | Nursing | Nurse - Infirmary Rounds | Marquez, Cynthia | ASPC-F CENTRAL/U MED |
| 09/30/2017 | 09:54 AM | Nursing | Nurse - Infirmary Rounds | Busby, Jacklyn | ASPC-F CENTRAL/U MED |
| 09/29/2017 | 07:21 AM | Nursing | Nurse - Infirmary Rounds | Valenzuela, Brieanna | ASPC-F CENTRAL/U MED |
| 09/28/2017 | 11:12 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 09/27/2017 | 10:52 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 09/26/2017 | 07:03 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 09/25/2017 | 06:40 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 09/24/2017 | 07:55 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 09/23/2017 | 07:03 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 09/22/2017 | 06:30 AM | Nursing | Nurse - Infirmary Rounds | Henry, Kyle | ASPC-F CENTRAL/U MED |
| 09/21/2017 | 10:05 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 09/20/2017 | 08:00 AM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 09/19/2017 | 10:09 AM | Nursing | Nurse - Infirmary Rounds | Marquez, Cynthia | ASPC-F CENTRAL/U MED |
| 09/18/2017 | 09:06 AM | Nursing | Nurse - Infirmary Rounds | Marquez, Cynthia | ASPC-F CENTRAL/U MED |
| 09/17/2017 | 07:27 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 09/16/2017 | 04:37 PM | Nursing | Nurse - Infirmary Rounds | Frazier, Neva | ASPC-F CENTRAL/U MED |
| 09/15/2017 | 07:39 AM | Nursing | Nurse - Infirmary Rounds | Marquez, Cynthia | ASPC-F CENTRAL/U MED |

| Date | Time | Category | Type | Staff | Location |
|------|------|----------|------|-------|----------|
| 09/14/2017 | 11:33 AM | Nursing | Nurse - Infirmary Rounds | Marquez, Cynthia | ASPC-F CENTRAL/U MED |
| 09/13/2017 | 07:09 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 09/12/2017 | 06:58 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 09/11/2017 | 07:54 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 09/10/2017 | 06:28 AM | Nursing | Nurse - Infirmary Rounds | Blixt, Tabitha L | ASPC-F CENTRAL/U MED |
| 09/09/2017 | 05:04 AM | Nursing | Nurse - Infirmary Rounds | Valenzuela, Brieanna | ASPC-F CENTRAL/U MED |
| 09/08/2017 | 08:51 AM | Nursing | Nurse - Infirmary Rounds | Valenzuela, Brieanna | ASPC-F CENTRAL/U MED |
| 09/07/2017 | 10:34 AM | Nursing | Nurse - Infirmary Rounds | Valenzuela, Brieanna | ASPC-F CENTRAL/U MED |
| 09/06/2017 | 10:00 AM | Nursing | Nurse - Infirmary Rounds | Valenzuela, Brieanna | ASPC-F CENTRAL/U MED |
| 09/05/2017 | 06:46 AM | Nursing | Nurse - Infirmary Rounds | Vasquez, Annette | ASPC-F CENTRAL/U MED |
| 09/04/2017 | 07:40 AM | Nursing | Nurse - Infirmary Rounds | Valenzuela, Brieanna | ASPC-F CENTRAL/U MED |
| 09/03/2017 | 11:15 AM | Nursing | Nurse - Infirmary Rounds | Watson, Audrea | ASPC-F CENTRAL/U MED |
| 09/02/2017 | 10:44 AM | Nursing | Nurse - Infirmary Rounds | Choi, Jee | ASPC-F CENTRAL/U MED |
| 09/01/2017 | 08:08 AM | Nursing | Nurse - Infirmary Rounds | Watson, Audrea | ASPC-F CENTRAL/U MED |
| 08/31/2017 | 10:01 AM | Nursing | Nurse - Infirmary Rounds | Choi, Jee | ASPC-F CENTRAL/U MED |

# Exhibit 4

# (Redacted)



# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

November 2, 2017

Mr. Timothy Bojanowski
Struck Love Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:     *Parsons v. Ryan*
        Accuracy of Florence Provider Entries Reviewed for
        Infirmary Performance Measures

Dear Tim,

I write to follow up on my October 25, 2017 letter, detailing curious recordkeeping by the infirmary Nurse Practitioner Stacey Stockton at ASPC-Florence.  In that letter, I detailed how her eOMIS entries with regard to one patient raised questions about the accuracy of information entered into his medical file for purposes of monitoring compliance with PM 66 ("In an IPC, a Medical Provider encounter[] will occur at a minimum of every 72 hours").

After receiving the August CGARs, we reviewed the medical records of all of the patients whose files were audited for PM 66 at Florence, and a sample of other patients' files that were audited for the other infirmary measures (PMs 63-65, 67-69).  [ADCM1037685-86].  We found that for patients who had infirmary encounters with NP Stockton, there were numerous entries from July through October similar to those of the patient in my October 25 letter.

We again found that the provider opens and enters notes on a strangely precise basis.  As detailed below, and in the attachments, you will see that she makes entries for multiple patients that occur *simultaneously at the precise second of the precise hour*.  There are many entries that are opened at this precise time, but the encounter is listed as being completed or closed hours, if not days, after the encounter ostensibly began.  With this large gap between when an entry is "opened" and when it the encounter is listed as ended (or closed), the electronic health record does not provide a separate record of when the encounter actually occurred.  It is impossible to know for sure when the encounter occurred in that window of time.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Mr. Timothy Bojanowski
RE: Accuracy of Florence Provider Entries
Reviewed for Infirmary Performance Measures
November 2, 2017
Page 2

I noted in my October 25 letter, "it is extremely unlikely that a human could open the computer system with this precision day after day.  It is more probable, instead, that there is some sort of an automated process programmed such that eOMIS generates and automatically opens an encounter on the hour. . ."  You have reported to the Court at recent hearings, and in the remedial plans, that one of the remediation efforts to achieve compliance with PM 66 at Florence was that Corizon would require infirmary rounds occur every 48 hours.  Having now reviewed multiple class members' medical records, we are unable to determine if Corizon has developed some sort of programmed system in eOMIS that automatically creates a provider entry every 48 to 72 hours, and that the provider then subsequently adds notes or comments to these entries.

**Given the widespread pattern, we are extremely concerned that Corizon and/or its providers are preemptively or retroactively creating infirmary provider encounter entries. It is basic medical practice that documentation occurs contemporaneously with an encounter, and not preemptively or retroactively.**  These problematic entries not only raise serious questions about Corizon's commitment to comply in reality (and not just appearance) with the requirements of the Stipulation, they also call into serious question whether Florence's compliance rates for infirmary performance measures are inflated.  The CGAR reports have shown chronic substantial noncompliance with PM 66 at Florence for two years; it is shocking to consider that these recent numbers may over-represent the degree of compliance.[1]

This matter is serious from a methodological perspective.  But the failure to accurately document provider infirmary rounds implicates one of the most important performance measures. Month after month, Judge Duncan has stressed in no uncertain terms that PM 66 is of vital magnitude, given it relates to the very sickest of patients in ADC's custody.  **We will include this matter on the November 7, 2017 status hearing agenda. We reiterate our request from my October 25 letter that Defendants or someone from Corizon provide an explanation as to whether Corizon has programmed eOMIS in such a manner that the infirmary rounds entries are automatically generated in prisoners' medical charts.**

---

[1] The Court found Defendants substantially noncompliant with PM 66 at Florence on May 20, 2016 (Doc. 1583), and the performance measure at the institution is subject to the Court's June 14, 2017 Order to Show Cause (Doc. 2124), and October 10, 2017 Order to Show Cause (Doc. 2373).  Florence's performance on PM 66 for the past nine months for which ADC has provided us data, is as follows:

| Dec | Jan | Feb | March | April | May | June | July | Aug |
|-----|-----|-----|-------|-------|-----|------|------|-----|
| 40 | 40 | 60 | 10 | 50 | 50 | 90 | 70 | 70 |

Mr. Timothy Bojanowski
RE: Accuracy of Florence Provider Entries
Reviewed for Infirmary Performance Measures
November 2, 2017
Page 3

        With regard to our more detailed review of the patient files reviewed for the infirmary performance measures in the August CGARs, we found examples of irregularities.  As you will see on the following pages, there are numerous dates and times where multiple patients had their eOMIS entry starting at precisely the same time, these two dates' examples are illustrative.

- On **August 25, 2017**, twelve patients whose files we reviewed had encounters opened at **4:00:00 pm**.  [*See* Attachment 1, printouts from 8/25/17 for: (1) (2) ▉▉▉▉▉▉▉▉ (3) ▉▉▉▉▉▉▉▉; (4) ▉▉▉▉▉▉▉▉ (5) ▉▉▉▉; (6) ▉▉▉▉▉▉▉▉; (7) ▉▉▉▉; (8) ▉▉▉▉▉▉; (9) ▉▉▉▉▉▉▉; (10) ▉▉▉▉▉ (11) ▉▉▉▉▉▉▉ (12) ▉▉▉▉▉▉▉ ]
- Similarly, ten patients all had encounters opened on **September 22, 2017** at **11:00:00 am**.  [*See* Attachment 2, printouts from 9/22/17 for: (1) ▉▉▉▉▉▉▉; (2) ▉▉▉▉▉▉▉, ; (3) ▉▉▉▉▉▉; (4) ▉▉▉▉▉; (5) ▉▉▉▉▉▉; (6) ▉▉▉▉▉; (7) ▉▉▉▉▉▉ (8) ▉▉▉▉▉▉; (9) ▉▉▉▉▉▉ (10) ▉▉▉▉▉ ]

        Below is a list of all of NP Stockton's infirmary round encounters with some of the patients whose files were reviewed in August 2017 for the infirmary performance measures. Plaintiffs have no confidence in any findings of compliance based upon these encounters for August, or any other months' CGARs that relied upon them.  We listed encounters before and after August to show that this pattern of creating entries for infirmary rounds was not limited to one month.  We also highlighted in yellow and have attached to the end of this letter encounters that on their face are temporally impossible (for example, ending time of an appointment shown as a date prior to the starting time of an appointment), or have other readily apparent irregularities.

        The following patients' files were reviewed by ADC monitor Becky Briddle for compliance with PM 66 in August, where she made a finding of substantial noncompliance at 70%.  **There were two additional records marked as compliant (▉▉▉▉, ▉▉▉▉) that, taking NP Stockton's infirmary encounter times at face value, were not compliant, and the correct compliance level should have been 50%.**

▉▉▉▉▉▉▉▉▉▉▉ (listed as compliant for August)
7/28/17 – 4:00 pm (encounter ended 4:52 pm, closed 7/29 at 7:32 am)
7/31/17 – 11:00 am (encounter ended 6:14 pm, closed 8/2 at 6:21 pm)
8/2/17 – 5:00 pm (encounter ended 8/2 at 6:26 pm, closed 8/4 at 3:33 pm)
8/4/17 – 3:00 pm (encounter ended 8/4 at 3:41 pm, closed 8/7 at 3:35 pm)
8/7/17 – 11:00 am (encounter ended 8/7 at 3:44 pm, closed 8/8 at 6:48 pm)
8/9/17 – 6:00 pm (encounter ended 8/10 at 6:49 pm, closed 8/12 at 6:42 pm)
8/12/17 – 4:00 pm (encounter ended 8/12 at 6:58 pm, closed 8/16 at 4:54 pm)

8/15/17 – 10:00 am (encounter ended 8/16 at 5:14 pm, closed 8/17 at 11:47 am)
8/18/17 – 9:00 am (encounter ended 8/18 at 4:12 pm, closed 8/19 at 7:08 am)
8/21/17 – 8:00 am (encounter ended 8/21 at 10:50 pm, closed 8/23 at 8:24 pm)
8/23/17 – 1:00 pm (encounter ended and closed 8/26 at 2:29 am)
8/25/17 – 4:00 pm (encounter ended 8/26 at 2:36 am, closed 8/26 at 7:26 pm)
8/28/17 – 12:00 pm (encounter ended and closed 8/31 at 8:08 pm)
8/30/17 – 7:00 pm (encounter ended and closed 8/31 at 8:33 pm)
9/1/17 – 7:00 pm (encounter ended and closed 9/1 at 10:42 pm)
9/4/17 – 11:00 am (encounter ended and closed 9/4 at 4:36 pm)
9/6/17 – 4:00 pm (encounter ended and closed 9/7 at 4:08 pm)
9/11/17 – 1:00 pm (encounter ended 9/11 at 11:08 pm, closed 9/12 at 1:07 pm)
9/14/17 – 10:00 am (encounter ended 9/14 at 11:08 pm, closed 9/14 at 1:35 pm)
9/16/17 – 4:00 pm (encounter ended and closed 9/19 at 2:03 pm)
9/19/17 – 12:00 pm (encounter ended and closed 9/19 at 2:33 pm)
9/22/17 – 11:00 am (encounter ended 9/22 at 2:33 pm, closed 10/2 at 12:05 pm)
9/22/17 – 6:00 pm (encounter ended 9/22 at 11:33 pm, closed 10/2 at 1:38 pm)
9/26/17 – 12:00 pm (encounter ended 9/26 at 11:33 pm, closed 10/3 at 2:26 pm)
9/28/17 – 6:00 pm (encounter ended 9/28 at 11:33 pm, closed 10/3 at 3:30 pm)
10/1/17 – 4:00 pm (encounter listed as ending 9/19 at 11:33 pm, closed 10/1 at 7:02 pm) [2]
10/4/17 – 12:00 pm (encounter ended and closed 10/4 at 3:28 pm)
10/5/17 – 6:00 pm (encounter ended 10/5 at 11:28 pm, closed 10/5 at 7:42 pm)
10/10/17 – 12:00 pm (encounter ended and closed 10/10 at 3:46 pm)
10/12/17 – 2:00 pm (encounter ended and closed 10/12 at 4:44 pm)
10/14/17 – 6:00 pm (encounter ended and closed 10/14 at 6:22 pm)
10/17/17 – 11:00 am (encounter ended 10/17 at 6:22 pm, closed 10/17 at 3:08 pm)
10/19/17 – 4:00 pm (encounter ended and closed 10/19 at 6:57 pm)
10/21/17 – 5:00 pm (encounter ended and closed 10/21 at 10:46 pm)
10/24/17 – 12:00 pm (encounter ended 10/24 at 3:50 pm, closed 10/24 at 9:08 pm)
10/26/17 – 9:00 am (encounter ended and closed 10/26 at 2:20 pm)
10/28/17 – 8:00 am (encounter ended and closed 10/28 at 10:24 am)
10/31/17 – 7:00 am (encounter ended and closed 10/31 at 9:08 am)


████████████████████████ (listed as compliant for August)
8/30/17 – 3:00 pm (encounter ended 8/30 at 4:53, closed 8/30 at 7:37)
8/31/17 – 1:00 pm (encounter and closed 8/31 at 10:12 pm)
9/1/17 – 7:00 pm (encounter ended 9/1 at 10:12 pm, closed 9/2 at 12:52)

---

[2] See Attachment 3 for a print out of this encounter.

9/4/17 – 11:00 am (encounter ended and closed 9/4 at 5:23 pm)
9/6/17 – 4:00 pm (encounter ended and closed 9/7 at 5:55 pm)
9/11/17 – 11:00 am (encounter ended and closed 9/11 at 4:18 pm)


████████████████ – (listed as compliant for August)
8/9/17 – 6:00 pm (encounter ended 8/9 at 6:29 pm, closed 8/10 at 8:25 am)
[out to hospital 8/10-8/15]
8/18/17 – 9:00 am (encounter ended 8/18 1:21 pm, closed 8/21 at 3:20 pm)
8/21/17 – 8:00 am (encounter ended 8/21 at 3:31 pm, closed 8/23 at 7:23 am)
[seen by other providers 8/23-8/31]
9/11/17 – 1:00 pm (encounter ended and closed 9/11 at 6:22 pm) [3]
9/15/17 – 3:00 pm (encounter ended and closed 9/18 at 1:35 pm)


██████████████ (listed as compliant for August)
7/26/17 – 12:00 pm (encounter ended 7/26 at 2:26 pm, closed 7/28 at 11:49 am)
7/28/17 – 4:00 pm (encounter ended 7/28 at 5:33 pm, closed 7/29 at 7:42 am)
7/31/17 – 11:00 am (encounter ended 7/31 at 7:13 pm, closed 8/1 at 6:03 pm)
8/2/17 – 5:00 pm (encounter ended 8/2 at 7:07 pm, closed 8/4 at 4:18 pm)
8/4/17 – 3:00 pm (encounter ended 8/4 at 4:20 pm, closed 8/7 at 9:40 pm)
8/7/17 – 11:00 am (encounter ended 8/7 at 9:47 pm, closed 8/10 at 6:37 am)
8/9/17 – 6:00 pm (encounter ended 8/10 at 7:47 pm, closed 8/11 at 10:05 am)
8/12/17 – 4:00 pm (encounter ended 8/12 at 7:35 pm, closed 8/14 at 11:42 am)
8/15/17 – 10:00 am (encounter ended 8/16 at 5:54 pm, closed 8/18 at 5:22 pm)
8/18/17 – 9:00 am (encounter ended 8/18 at 5:25, closed 8/21 at 11:36 pm)
8/21/17 – 8:00 am (encounter ended 8/21 at 11:38 pm, closed 8/22 at 3:43 pm)
8/23/17 – 1:00 pm (encounter ended and closed 8/26 at 3:16 am)
8/25/17 – 4:00 pm (encounter ended and closed 8/26 at 3:29 am)
8/28/17 – 12:00 pm (encounter ended and closed 8/31 at 9:24 pm)
8/30/17 – 5:00 pm (encounter ended and closed 8/31 at 9:42 pm)
9/1/17 – 7:00 pm (encounter ended and closed 9/1 at 11:31 pm)
9/4/17 – 11:00 am (encounter ended and closed 9/4 at 5:02 pm)
9/6/17 – 4:00 pm (encounter ended and closed 9/7 at 5:16 pm)

---

[3] Taking NP Stockton's and other providers' entries at face value, if Mr. ██████ file is among those reviewed for PM 66 in the September CGARs, it should be marked as noncompliant due to the gap in provider infirmary rounds between 8/31 and 9/11/17 (his medical record shows multiple nursing rounds each day, so he was not off-site).

9/11/17 – 1:00 pm (encounter ended and closed 9/12 at 1:39 pm) [4]
9/14/17 – 10:00 am (encounter ended and closed 9/14 at 11:54 am)
9/16/17 – 4:00 pm (encounter ended and closed 9/20 at 9:08 pm)
9/19/17 – 12:00 pm (encounter ended and closed 9/20 at 9:22 pm)
9/22/17 – 11:00 am (encounter ended 9/22 at 9:22 pm, closed 10/2 at 12:23 pm)
9/23/17 – 6:00 pm (encounter ended 9/23 at 9:22 pm, closed 10/2 at 1:56 pm)
9/26/17 – 12:00 pm (encounter ended 9/26 at 9:22 pm, closed 10/2 at 2:37 pm)
9/28/17 – 6:00 pm (encounter ended 9/28 at 9:22 pm, closed 10/3 at 3:47 pm)
10/1/17 – 4:00 pm (encounter ended and closed 10/1 at 7:36 pm)
10/3/17 – 12:00 pm (encounter ended 10/3 at 7:36 pm, closed 10/4 at 4:07 pm)
10/5/17 – 6:00 pm (encounter ended and closed 10/5 at 8:31 pm)
10/10/17 – 12:00 pm (encounter ended 10/10 at 11:31 pm, closed 10/10 at 4:14 pm)
10/12/17 – 12:00 pm (encounter ended and closed 10/12 at 5:05 pm)
10/14/17 – 6:00 pm (encounter ended and closed 10/14 at 9:34 pm)
10/17/17 – 11:00 am (encounter ended and closed 10/17 at 4:14 pm)
10/19/17 – 4:00 pm (encounter ended and closed 10/19 at 7:24 pm)
10/21/17 – 5:00 pm (encounter ended and closed 10/21 at 11:05 pm)
10/24/17 – 12:00 pm (encounter ended and closed 10/24 at 4:50 pm)
10/24/17 – 1:00 pm (encounter ended 10/26 at 11:50, closed 10/26 at 6:23 pm)
10/28/17 – 8:00 am (encounter ended and closed 10/28 at 2:54 pm)
10/31/17 – 7:00 am (encounter ended and closed 10/31 at 9:22 am)


███████████████ (incorrectly listed as compliant for August) [5]
7/17/17 – 7:00 am (encounter ended 7/19 at 6:41 pm, closed 7/21 at 4:30 pm)
7/21/17 – 3:00 pm (encounter ended 7/21 at 4:42 pm, closed 7/24 at 11:52 am)
7/24/17 – 8:30 am (encounter ended 7/24 at 11:55 am, closed 7/26 at 12:59 pm)
7/26/17 – 12:00 pm (encounter ended 7/26 at 1:19 pm, closed 7/27 at 3:14 pm)
7/28/17 – 4:00 pm (encounter ended 7/28 at 4:57, closed 7/30 at 9:52 am)
7/31/17 – 10:30 am (encounter ended 7/31 at 10:55, closed 8/2 at 6:27 pm)

---

[4] Taking the encounter times at their face value, if Mr. ████ file is among those reviewed for the September CGARs for PM 66, it should be marked noncompliant for the gap between infirmary rounds from 9/6 to 9/11/17.

[5] Taking the encounter times at their face value, Mr. ████'s file should have been marked noncompliant in the August CGAR, given the gap between the 8/12/17 4:00 pm infirmary round, and the next one on 8/18/17 at 9:00 am.  If his file is among those reviewed for the September CGARs, it should be marked noncompliant for the gap between the infirmary rounds on 9/6 to 9/11, and 9/11 to 9/16/17.

8/2/17 – 5:00 pm (encounter ended 8/2 at 6:29 pm, closed 8/3 at 8:30 pm)
8/4/17 – 3:00 pm (entry states that patient was seen at 1700 (5:00 pm) – appears to have been cut-and-pasted from 8/2/17 5:00 pm entry; encounter ended 8/4 at 3:50 pm, closed 8/5 at 7:50 am)[6]
8/7/17 – 11:00 am (encounter ended 8/7 at 3:53, closed 8/8 at 6:59 pm)
8/9/17 – 6:00 pm (encounter ended 8/10 at 7:00 pm, closed 8/11 at 9:59 am)
8/12/17 -4:00 pm (encounter ended 8/12 at 7:05 pm, closed 8/13 at 5:44 pm)
8/18/17 – 9:00 am (encounter ended 8/18 at 4:20 pm, closed 8/23 at 8:26 pm)
8/21/17 – 8:00 am (encounter ended and closed 8/26 at 2:40 am)
8/23/17 – 1:00 pm (encounter ended and closed 8/26 at 2:42 am)
8/25/17 – 4:00 pm (encounter ended 8/25 at 4:42 pm, closed 8/26 at 2:49 am)
8/28/17 – 12:00 pm (encounter ended and closed 8/31 at 8:47 pm)
8/30/17 – 7:00 pm (encounter ended and closed 8/31 at 9:06 pm)
9/1/17 – 7:00 pm (encounter ended and closed 9/1 at 10:45 pm)
9/4/17 – 11:00 am (encounter ended and closed 9/4 at 4:39 pm)
9/6/17 – 4:00 pm (encounter ended and closed 9/7 at 4:12 pm)
9/11/17 – 1:00 pm (encounter ended and closed 9/12 at 1:18 pm)
9/16/17 – 4:00 pm (encounter ended and closed 9/19 at 3:16 pm)
9/19/17 – 12:00 pm (encounter ended and closed 9/19 at 3:19 pm)
9/22/17 – 11:00 am (encounter ended 9/22 at 3:19 pm, closed 10/2 at 12:08 pm)
9/23/17 – 6:00 pm (encounter ended 9/23 at 10:19 pm, closed 10/2 at 1:42 pm)
9/26/17 – 12:00 pm (encounter ended 9/26 at 10:19 pm, closed 10/2 at 2:23 pm)
9/26/17 – 6:00 pm (subjective note refers to the rounds as occurring on 9/28/17, listed as ending 9/26 at 10:19 pm, closed 10/3 at 3:38 pm)[7]
10/1/17 – 4:00 pm (encounter ended and closed 10/1 at 7:09 pm)
10/4/17 – 12:00 pm (encounter ended and closed 10/4 at 3:37 pm)


███████████████████ (incorrectly listed as noncompliant in August)[8]
8/1/17 – 7:00 pm (encounter ended 8/2 at 10:03 pm, closed 8/8 at 10:47 am)
[seen by other providers 8/6, 8/8, 8/11]
8/16/17 – 1:00 pm (encounter ended 8/17 at 7:34 pm, closed 8/21 at 9:58 pm)
8/21/17 – 8:00 am (encounter ended 8/21 at 10:02 pm, closed 8/23 at 5:45 pm)
8/23/17 – 1:00 pm  (encounter ended 8/23 5:48 pm, closed 8/23 at 6:06 pm)

---

[6] See Attachment 4 for printouts of these two encounters.
[7] See Attachment 4 for a printout of this encounter.
[8] Mr. ████'s medical record does not show any provider infirmary round or encounter between NP Stockton's encounter on 8/1/17 at 7:00 pm and a round on 8/6/17 at 2:48 pm by a different provider.  Therefore, the file should have been marked as noncompliant for PM 66.

8/25/17 – 4:00 pm (encounter ended and closed 8/26 at 1:31 pm)
8/28/17 – 12:00 pm (encounter ended and closed 8/28 at 6:09 pm)
8/30/17 – 5:00 pm (encounter ended and closed 9/1 at 7:14 pm)
9/1/17 – 7:00 pm (encounter ended and closed 9/1 at 7:10 pm)
9/4/17 – 11:00 am (encounter ended and closed 9/4 at 7:24 pm)
9/6/17 – 4:00 pm (encounter ended and closed 9/7 at 8:18 pm)
9/11/17 – 1:00 pm (encounter ended and closed 9/14 at 10:12 am)
9/14/17 – 10:00 am (encounter ended and closed 9/14 at 3:09 pm)
9/16/17 – 4:00 pm (encounter ended 9/16 at 10:09 pm, closed 9/16 at 10:54 pm)
9/19/17 – 12:00 pm (encounter ended 9/19 at 10:09 pm, closed 9/23 at 10:59 pm)
9/22/17 – 11:00 am (encounter ended 9/22 at 10:09 pm, closed 9/23 at 11:38 pm)
9/23/17 – 6:00 pm (encounter ended and closed 9/23 11:44 pm)
9/26/17 – 4:00 pm (encounter ended 9/26 at 11:44 pm, closed 9/27 at 9:00 pm)
9/28/17 – 6:00 pm  (encounter ended 9/28 at 11:44 pm, closed 10/4 at 7:09 pm)
10/1/17 – 4:00 pm (encounter ended and closed 10/1 at 10:50 pm)
10/4/17 – 12:00 pm (encounter ended and closed 10/4 at 6:15 pm)
10/5/17 – 6:00 pm (encounter ended and closed 10/5 at 9:41 pm)
10/10/17 – 11:00 am (encounter ended and closed 10/10 at 6:39 pm) [9]
10/12/17 – 2:00 pm (encounter ended and closed 10/12 at 8:45 pm)
10/14/17 – 6:00 pm (encounter ended and closed 10/14 at 10:58 pm)
10/17/17 – 2:00 pm (encounter ended and closed 10/17 at 7:31 pm)
10/19/17 – 4:00 pm (encounter ended and closed 10/19 at 7:31 pm)
10/21/17 – 5:00 pm (encounter ended and closed 10/21 at 10:01 pm)
10/24/17 – 12:00 pm (encounter ended and closed 10/24 at 6:26 pm)
10/31/17 – 7:00 am (encounter ended 10/31 at 11:16 pm, closed 10/31 at 2:54 pm)

███████████████████ (listed as compliant for August)
7/16/17 – 9:00 pm (encounter ended 7/17 at 12:51 am, closed 7/19 at 3:01 pm)
7/19/17 – 12:00 pm (encounter ended 7/19 at 3:04 pm, closed 7/21 at 3:30 pm)
7/21/17 – 3:00 pm (encounter ended 7/21 at 4:04 pm, closed 7/24 at 11:38 pm)
7/24/17 – 8:30 am (encounter ended 7/24 at 11:44 am, closed 7/26 at 12:45 pm)
7/26/17 – 12:45 pm (encounter ended 7/26 at 12:53 pm, closed 11/1 at 10:49 pm)
7/28/17 – 3:00 pm (encounter ended 7/28 at 4:30 pm, closed 7/29 at 7:37 am)
7/31/17 – 11:00 am (encounter ended 7/31 at 6:03 pm, closed 8/2 at 6:16 pm)
8/2/17 – 5:00 pm (encounter ended 8/2 at 6:21 pm, closed 8/4 at 3:30 pm)

---

[9] Taking NP Stockton's entries at face value, if Mr. ████'s file is among those reviewed for the October CGARs for PM 66, it is noncompliant due to the gap in provider infirmary encounters between 10/5 and 10/10/17.

8/4/17 – 3:00 pm (encounter ended 8/4 at 3:33 pm, closed 8/7 at 3:26 pm)
8/7/17 – 11:00 am (encounter ended 8/7 at 3:34 pm, closed 8/8 at 6:33 pm)
8/9/17 – 6:00 pm (encounter ended 8/10 at 6:38 pm, closed 8/12 at 6:37 pm)
8/12/17 – 4:00 pm (encounter ended 8/12 at 6:39 pm, closed 8/15 at 12:32 pm)
8/15/17 – 10:00 am (encounter ended 8/16 at 4:45 pm, closed 8/17 at 7:15 am)
8/18/17 – 9:00 am (encounter ended 8/18 at 3:59 pm, closed 8/19 at 7:11 pm)
8/21/17 – 8:00 am (encounter ended 8/21 at 10:42 pm, closed 8/23 at 8:23 pm)
8/23/17 – 1:00 pm  (encounter ended and closed 8/26 at 2:19 am)
8/25/17 – 4:00 pm (encounter ended and closed 8/26 at 2: 22 am)
8/28/17 – 12:00 pm (encounter ended 8/30 at 2:22 pm, closed 8/31 at 7:48 pm)
8/30/17 – 5:00 pm (refers to seeing him on rounds 8/28 at 5:00 pm, encounter ended 8/30 at 6:22 pm, closed 8/31 at 8:29 pm)[10]
9/1/17 – 7:00 pm (encounter ended and closed 9/1 at 10:39 pm)
9/4/17 – 11:00 am (encounter ended and closed 9/4 at 4:25 pm)
9/6/17 – 4:00 pm (encounter ended and closed 9/7 at 3:24 pm)
9/11/17 – 10:00 am (encounter ended and closed 9/14 at 11:19 am)[11]
9/11/17 – 1:00 pm (encounter ended 9/7 at 3:24 pm, closed 9/14 at 11:16 am)[12]
9/14/17 – 10:00 am (encounter ended and closed 9/14 at 11:30 am)
9/16/17 – 4:00 pm (encounter ended and closed 9/19 at 2:06 pm)
9/19/17 – 12:51 pm (encounter ended 9/19 at 1:12 pm, closed 9/19 at 1:47 pm)
9/22/17 – 11:00 am (encounter ended 9/22 at 1:12 pm, closed 10/2 at 11:59 am)
9/23/17 – 6:00 pm (encounter ended 9/23 at 9:12 pm, closed 10/2 at 1:31 pm)
9/26/17 – 12:00 pm (encounter ended 9/26 at 2:06 pm, closed 9/27 at 10:05 pm)
9/28/17 – 6:00 pm (encounter ended 9/28 at 11:06 pm, closed 10/2 at 2:18 pm)
10/1/17 – 4:00 pm (encounter ended 10/1 at 11:06 pm, closed 10/1 at 6:51 pm)
10/4/17 – 12:00 pm (encounter ended and closed 10/4 at 3:15 pm)
10/5/17 – 6:00 pm (encounter ended and closed 10/5 at 7:16 pm)
10/10/17 – 11:00 am (encounter ended and closed 10/10 at 3:31 pm)
10/12/17 – 2:00 pm (encounter ended and closed 10/12 at 4:34 pm)
10/12/17 – 6:00 pm (addendum entered 10/14 at 9:30 pm states that the encounter was dated incorrectly and the visit actually occurred on 10/14 at 6:00 pm, but the eOMIS entry says that the encounter ended 10/12 at 11:34 pm, closed 10/14 at 9:01 pm)[13]

---

[10] See Attachment 5 for a printout of this encounter.
[11] Taking NP Stockton's entries at face value, if Mr. ████'s file is reviewed for PM 66 in September CGARs, it should be marked as noncompliant due to the gap in provider infirmary rounds between 9/6 and 9/11.  If her 8/30 5:00 pm entry actually occurred on 8/28 at 5:00 pm, then there is a gap of more than 72 hours between 8/28 at 5:00 pm and 9/1 at 7:00 pm.
[12] See Attachment 5 for a printout of this encounter.

10/17/17 – 11:00 am (encounter ended 10/17 at 11:34 pm, closed 10/17 at 3:34 pm)
10/19/17 – 4:00 pm (encounter ended 10/19 at 6:51 pm, closed 10/21 at 10:34 pm)
10/21/17 – 5:00 pm (encounter ended and closed 10/21 at 10:49 pm)
10/24/17 – 12:00 pm (encounter ended 10/24 at 2:57 pm, closed 10/24 at 3:10 pm)
10/26/17 – 9:00 am (encounter ended and closed 10/26 at 1:36 pm)
10/28/17 – 8:00 am (encounter ended and closed 10/28 at 10:21 am)
10/31/17 – 7:00 am (encounter ended and closed 10/31 at 8:41 am)


█████████████████ (listed as compliant in August)
        Mr. ██████ had four separate provider encounters (8/28, 8/30, 9/1, 9/4) that were all listed
as ending and closing within a 30 minute period on September 4, 2017.

7/14/17 – 1:00 pm (encounter ended 7/14 at 6:42 pm, closed 7/17 at 3:58 am)
7/16/17 – 9:00 pm (encounter ended 7/17 at 4:02 am, closed 7/19 at 9:36 am)
7/19/17 – 10:00 pm (encounter ended 7/20 at 12:08 pm, closed 7/23 at 9:08 pm)
7/21/17 – 3:00 pm (encounter ended 7/21 at 9:08 pm, closed 7/24 at 1:19 pm)
7/24/17 – 8:30 am (encounter ended 7/24 at 1:36 pm, closed 7/26 at 4:10 pm)
7/26/17 – 12:00 pm (encounter ended 7/26 at 4:12 pm, closed 7/27 at 6:41 am)
7/28/17 – 4:00 pm (encounter ended 7/28 at 7:02 pm, closed 7/31 at 9:03 pm)
7/31/17 – 11:00 am (encounter ended 7/31 at 9:05 pm, closed 8/2 at 7:51 pm)
8/2/17 – 5:00 pm (encounter ended 8/2 at 8:01 pm, closed 8/4 at 5:46 pm)
8/4/17 – 3:00 pm (encounter ended 8/4 at 5:49 pm, closed 8/7 at 11:21 pm)
8/7/17 – 11:00 am (encounter ended 8/7 at 11:24 pm, closed 8/10 at 8:39 pm)
8/9/17 – 6:00 pm (encounter ended 8/10 at 9:16 pm, closed 8/12 at 6:42 pm)
8/12/17 – 4:00 pm (encounter ended 8/12 at 10:47 pm, closed 8/17 at 12:59 pm)
8/15/17 – 10:00 am (encounter ended 8/15 at 10:00 am, closed 8/17 at 1:08 pm)
8/18/17 – 9:00 am (encounter ended 8/18 at 7:16 pm, closed 8/22 at 12:32 am)
8/21/17 – 8:00 am (encounter ended 8/22 at 12:41 am, closed 8/26 at 4:40 am)
8/23/17 – 1:00 pm (encounter ended and closed 8/26 at 4:42 am)
8/25/17 – 4:00 pm (encounter ended 8/26 at 4:42 pm, closed 8/26 at 7:27 pm)
8/28/17 – 4:00 pm (encounter ended and closed 9/4 at 12:48 pm)
8/30/17 – 5:00 pm (encounter ended and closed 9/4 at 12:53 pm)
9/1/17 – 7:00 pm (encounter ended and closed 9/4 at 1:06 pm)
9/4/17 – 11:00 am (encounter ended and closed 9/4 at 1:27 pm) [14]
9/6/17 – 4:00 pm (encounter ended and closed 9/7 at 6:55 pm)

---

[13] See Attachment 5 for a printout of this encounter.
[14] See Attachment 6 for printouts of these encounters.

9/11/17 – 1:00 pm (encounter ended and closed 9/12 at 2:50 pm) [15]
9/14/17 – 10:00 am (encounter ended and closed 9/14 at 4:05 pm)
9/16/17 – 4:00 pm (encounter ended and closed 9/20 at 10:57 pm)
[seen by other provider 9/18, 9/20]
9/22/17 – 11:00 am (encounter ended 9/22 at 10:57 pm, closed 10/2 at 1:14 pm)

Additionally, other infirmary patients whose files were reviewed by Ms. Briddle for compliance with PMs 63-65, or 67-69 in August also showed repeated encounters by NP Stockton.  We did not check every other file reviewed by Ms. Briddle, but rather a sampling of them.  The results are as follows:

██████████████████ (reviewed for PMs 63-65, 68)
In addition to a provider encounter that ended before it started, Mr. ██████ had four separate encounters (9/16, 9/19, 9/22, 9/23) that all closed within 25 minutes of each other on September 23. The 9/16, 9/19, 9/22 encounters all ended those same days at 9:30:00 pm.

8/1/17 – 11:00 pm (encounter ended 8/1 at 11:13 pm, closed 8/3 at 9:34 am)
[seen by other providers 8/6, 8/8, 8/11]
8/16/17 – 1:00 pm (encounter ended 8/176 at 5:49 pm, closed 8/18 at 2:23 pm)
8/21/17 – 8:00 am (encounter ended 8/21 at 6:33 pm, closed 8/23 at 4:45 pm)
8/23/17 – 1:00 pm (encounter ended and closed 8/23 at 4:52 pm)
8/25/17 – 4:00 pm (encounter ended and closed 8/26 at 12:45 am)
8/28/17 – 12:00 pm (encounter ended and closed 8/28 at 4:57 pm)
8/30/17 – 5:00 pm (encounter ended 8/30 at 5:57, closed 9/1 at 4:13 pm)
9/1/17 – 11:00 am (encounter ended 9/1 at 4:29 pm, closed 9/1 at 4:44 pm)
9/6/17 – 4:00 pm (encounter ended and closed 9/7 at 7:51 pm)
9/11/17 – 1:00 pm (encounter ended 9/7 at 7:51 pm, closed 9/13 at 10:44 am) [16]
9/14/17 – 10:00 am (encounter ended and closed 9/14 at 3:30 pm)
9/16/17 – 4:00 pm (encounter ended 9/16 at 9:30 pm, closed 9/23 at 10:10 pm)
9/19/17 – 12:00 pm (encounter ended 9/19 at 9:30 pm, closed 9/23 at 10:18 pm)
9/22/17 – 11:00 am (encounter ended 9/22 at 9:30 pm, closed 9/23 at 10:24 pm)
9/23/17 – 6:00 pm (encounter ended and closed 9/23 at 10:35 pm) [17]
9/26/17 – 4:00 pm (encounter ended 9/26 at 10:35 pm; closed 9/27 at 3:38 pm)
9/28/17 – 6:00 pm (encounter ended 9/28 at 10:35 pm; closed 10/4 at 6:57 pm)

---

[15] Taking NP Stockton's entries at face value, if Mr. ██████'s file is reviewed for PM 66 for the September CGARs, it is noncompliant due to the gap between September 6 and 11, 2017.
[16] See Attachment 7 for a printout of this encounter.
[17] See Attachment 7 for a printout of these encounters.

10/1/17 – 4:00 pm (encounter ended and closed 10/1 at 9:50 pm)
10/4/17 – 12:00 pm (encounter ended and closed 10/4 at 5:23 pm)
10/5/17 – 6:00 pm (encounter ended and closed 10/5 at 9:06 pm)
10/10/17 – 11:00 am (encounter ended and closed 10/10 at 5:20 pm)
10/12/17 – 2:01 pm (encounter ended and closed 10/12 at 5:28 pm)
10/14/17 – 6:00 pm (encounter ended and closed at 10/14 at 11:24 pm)
10/17/17 – 2:00 pm (encounter ended and closed 10/17 at 6:53 pm)
10/19/17 – 4:00 pm (encounter ended and closed 10/19 at 8:12 pm)
10/21/17 – 5:00 pm (encounter ended and closed 10/24 at 9:15 pm)
<mark>10/24/17 – 12:00 pm (encounter ended 10/21 at 9:15 pm,</mark> closed 10/24 at 8:26 pm)[18]
10/26/17 – 8:00 pm (encounter ended and closed 10/26 at 10:28 pm)
10/31/17 – 7:00 am (encounter ended and closed 10/31 at 10:23 am)

████████████████

    Mr. ██████████ had four separate provider encounters (8/28, 8/30, 9/1, 9/4) that were all listed as ending and closing within a 30 minute period on September 4, 2017.

7/14/17 – 1:00 pm (encounter ended 6:38 pm, closed 7/17 at 3:55 am)
7/16/17 – 9:00 am (encounter ended 7/17 at 3:58 am, closed 7/20 at 11:58 am)
7/19/17 – 10:00 am (encounter ended 7/20 at 12:04 pm, closed 7/23 at 9:05 pm)
7/21/17 – 3:00 pm (encounter ended 7/21 at 9:06, closed 7/24 at 1:14 pm)
7/24/17 – 8:30 am (encounter ended 7/24 at 1:16 pm, closed 7/25 at 10:44 am)
7/26/17 – 12:00 pm (encounter ended 7/26 at 4:09 pm, closed 7/27 at 6:41 am)
7/28/17 – 4:00 pm (encounter ended 7/28 at 7:56 pm, closed 7/31 at 8:58 pm)
7/31/17 – 11:00 am (encounter ended 7/31 at 9:02 pm, closed 8/1 at 9:22 pm)
8/4/17 – 3:00 pm (encounter ended 8/4 at 5:45 pm, closed 8/7 at 11:19 pm)
8/7/17 – 11:00 am (encounter ended 8/7 at 11:21 pm, closed 8/10 at 9:09 pm)
8/9/17 – 6:00 pm (encounter ended 8/10 at 9:11 pm, closed 8/12 at 6:44 pm)
8/12/17 – 4:00 pm (encounter ended 8/12 at 10:37 pm, closed 8/17 at 12:56 pm)
8/15/17 – 10:00 am (encounter ended 8/17 at 12:58 pm, closed 8/18 at 7:08 pm)
8/18/17 – 9:00 am (encounter ended 8/18 at 7:09 pm, closed 8/22 at 12:28 am)
8/21/17 – 8:00 am (encounter ended 8/22 at 12:31 am, closed 8/26 at 4:39 am)
8/23/17 – 1:00 pm (encounter ended and closed 8/26 at 4:40 am)
8/25/17 – 4:00 pm (encounter ended and closed 8/26 at 4:43 am)
<mark>8/28/17 – 12:00 pm (encounter ended and closed 9/4 at 12:35 pm)</mark>
<mark>8/30/17 – 5:00 pm (encounter ended and closed 9/4 at 12:43 pm)</mark>
<mark>9/1/17 – 7:00 pm (encounter ended and closed 9/4 at 12:50 pm)</mark>

---

[18] See Attachment 7 for a printout of this encounter.

9/4/17 – 11:00 am (encounter ended and closed 9/4 at 12:57 pm) [19]
9/11/17 – 1:00 pm (encounter ended and closed 9/12 at 2:44 pm)
9/14/17 – 10:00 am (encounter ended and closed 9/14 at 4:03 pm)
9/16/17 – 4:00 pm (encounter ended and closed 9/20 at 10:55 pm)
9/22/17 – 11:00 am (encounter ended 9/22 at 10:55, closed 10/2 at 1:09 pm)

We reviewed the records of six additional patients whose files were used for other infirmary performance measures, and found systematic patterns of encounter entries very similar to those detailed above:

1. ███████████████
2. █████████████
3. ████████████████
4. ██████████████
5. ██████████████
6. ███████████████

Thank you for your attention to this matter.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:   Counsel of Record

---

[19] See Attachment 8 for a printout of these encounters.

# Exhibit 5



**Corene Kendrick <ckendrick@prisonlaw.com>**

---

## RE: Remedial plans
1 message

---

**David Fathi** <dfathi@aclu.org>            Mon, Oct 30, 2017 at 8:17 AM
To: Ashlee Hesman <ahesman@strucklove.com>, Megan Lynch <megan@prisonlaw.com>, Lucy Rand
<Lucy.Rand@azag.gov>, Brad Keogh <bkeogh@azcorrections.gov>, Elaine Percevecz <EPercevecz@strucklove.com>,
"Michael E. Gottfried" <Michael.Gottfried@azag.gov>, Tim Bojanowski <TBojanowski@strucklove.com>, "Ybarra, Griselda"
<Griselda.Ybarra@azag.gov>, David Fathi <dfathi@aclu.org>
Cc: Kirstin Eidenbach <kirstin@eidenbachlaw.com>, Maya Abela <mabela@azdisabilitylaw.org>, Kathy Brody
<kbrody@acluaz.org>, Don Specter <dspecter@prisonlaw.com>, Alison Hardy <ahardy@prisonlaw.com>, Rita Lomio
<rlomio@prisonlaw.com>, Mae Ackerman-Brimberg <mabrimberg@prisonlaw.com>, Amber Norris <anorris@prisonlaw.com>,
Amy Fettig <afettig@aclu.org>, Victoria Lopez <vlopez@aclu.org>, Jennifer Onka <jonka@aclu.org>, Corene Kendrick
<ckendrick@prisonlaw.com>, Joe Bear <joseph@prisonlaw.com>, Tania Amarillas <tania@prisonlaw.com>, Sarah Hopkins
<sarah@prisonlaw.com>, Molly Petchenik <molly@prisonlaw.com>, "PRATT, RICHARD (RPRATT@azcorrections.gov)"
<RPRATT@azcorrections.gov>, "HEADSTREAM, VANESSA (VHEADST@azcorrections.gov)"
<VHEADST@azcorrections.gov>, Parsons Team <ParsonsTeam@strucklove.com>

Counsel:

May we please have a response to this message? *See* Doc. 2403 at 3 (ordering Defendants to produce remedial plans
by October 25, 2017).

Thanks very much.

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org
@DavidCFathi
*Not admitted in DC; practice limited to federal courts

---

**From:** David Fathi
**Sent:** Thursday, October 26, 2017 10:10 AM
**To:** 'Ashlee Hesman'; Megan Lynch; Lucy Rand; Brad Keogh; Elaine Percevecz; Michael E. Gottfried; Tim Bojanowski;
Ybarra, Griselda; David Fathi
**Cc:** Kirstin Eidenbach; Maya Abela; Kathy Brody; Don Specter; Alison Hardy; Rita Lomio; Mae Ackerman-Brimberg;
Amber Norris; Amy Fettig; Victoria Lopez; Jennifer Onka; Corene Kendrick; Joe Bear; Tania Amarillas; Sarah Hopkins;
Molly Petchenik; PRATT, RICHARD (RPRATT@azcorrections.gov); HEADSTREAM, VANESSA
(VHEADST@azcorrections.gov); Parsons Team
**Subject:** Remedial plans

Dear Tim,

At the October 11 hearing you told the Court that you would provide remedial plans for various noncompliant Performance
Measures within two weeks. *See, e.g.,* 10/11/17 Tr. at 60:3-12 (PM 51); *id.* at 62:7-19 (PM 55). Please let us know when
you will be providing these remedial plans.

Thanks very much.

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org
@DavidCFathi

*Not admitted in DC; practice limited to federal courts

# Exhibit 6

# (Redacted)



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 20, 2017

Mr. Timothy Bojanowski
Struck Love Bojanowski & Acedo PLC
3100 W. Ray Rd., Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:     *Parsons v. Ryan*
        Medical Care at ASPC-Tucson Santa Rita

Dear Tim,

In the past week, I have sent Counsel for Defendants three separate advocacy letters regarding class members at ASPC-Tucson, Santa Rita Unit, who, according to their health records, received primary medical care from, and/or had specialty care reports and procedures reviewed by, a psychiatrist. *See* Attachment A (10/17/17 Letter re: Mr. ███████ (orthopedic care); 10/19/17 Letter re: Mr. ███████ (orthopedic care); 10/20/17 Letter re: Mr. ███████ (ophthalmological and emergency cardiac care; he was also treated by the Health Services Administrator on nurse's line)).

All three individuals were seen multiple times over the summer by Leo Easley, who is listed in eOMIS with the title of "psychiatrist." However, a review of the Arizona State Boards of Medicine and Nursing websites reveals that Mr. Easley actually does not have a medical degree and thus is not a psychiatrist; rather, he is a mental health nurse practitioner. Therefore, Corizon should not be holding him out as a "psychiatrist," in violation of Arizona law. *See* Ariz. Admin. Code § R9-22-1201 ( "'psychiatrist' means a *physician* who meets the licensing requirements under A.R.S. § 32-1401 or a *doctor of osteopathy* who meets the licensing requirements under A.R.S. § 32-1800, and meets the additional requirements of a psychiatrist under A.R.S. § 36-501") (emphasis added). Furthermore, it appears that Mr. Easley's mental health license was not certified by the Arizona Board of Nursing until July 24, 2017, and was not issued until August 28, 2017, so it would have been improper to hold him out as a mental health nurse practitioner.

However, these three people are not the only Tucson-Santa Rita class members whose records we reviewed recently that were provided primary medical care by the "psychiatrist" Mr. Easley. *See* Mr. ███████████ diagnosed with tendonitis by Mr. Easley on Aug. 18, 2017);

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Mr. Bojanowski
October 20, 2017
Re: Medical Care at Tucson Santa Rita
Page 2

Mr. ██████ ████ (chronic care appointment for his asthma with Mr. Easley on April 7, 2017).[1]

We request that by October 27, 2017, Defendants and/or Corizon provide us the following information:

1. Please explain why a mental health nurse practitioner is being held out by Corizon as a psychiatrist, and if Mr. Easley is or has been counted as a psychiatrist in Tucson's staffing report.  We note that in the August 2017 staffing report for Tucson, only 50% of the psychiatrist positions were filled; it is unclear if Mr. Easley is being counted as a psychiatrist for purposes of the staffing report.
2. Is Mr. Easley currently counted as a medical or mental health provider, and for how long has he been so assigned?
3. Please explain how often the Tucson Health Services Administrator who saw Mr. ████████ sees patients on nurse's line, and his qualification to treat patients.

We look forward to your timely response to this request for information.  Thank you for your attention to this matter.

Sincerely yours,

Corene Kendrick, Staff Attorney

cc:    Counsel of Record

---

[1] I wrote you earlier today regarding Mr. ██████'s telemedicine chronic care appointment on September 25, 2017 with a medical doctor who is not licensed in the State of Arizona.

# Attachment A



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 17, 2017

Lucy M. Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

RE:     *Parsons v. Ryan*, 2:12-CV-00601
        Class Member in Need of Medical Care
        ███████, ADC ██████ Tucson - Santa Rita

Dear Ms. Rand:

I write regarding Mr. ████ who suffers from a left shoulder injury that he reports causes severe pain and completely limits his range of motion and use of his left arm.

On 7/28/17, Mr. ████ saw psychiatrist Dr. Leo Easley for follow-up regarding an x-ray of his left shoulder, which showed no broken bones. On 8/23/17, Mr. ████ again saw Dr. Easley for his inability to lift his left arm more than two or three inches, and Dr. Easley reported that Mr. ████ could not lift his arm more than 30 degrees. Dr. Easley prescribed Mr. ████ ibuprofen and prednisone for 60 days, but did not submit a request for an orthopedic consultation.

It is unclear why Mr. ████ saw a mental health provider for his orthopedic injuries.

Mr. ████ most recently submitted an HNR regarding his left shoulder pain on 9/27/17. He was not seen on the nurse's line, but on 9/28/17, a nurse referred him to see a provider. As of 10/17/17, Mr. ████ has not been seen by a provider, in violation of Performance Measure 39.

We request that Mr. ████ be referred to an orthopedic specialist for evaluation of soft tissue / ligament damage that would not be seen on an x-ray but which is causing severe pain, nerve damage, and limited use of his left arm, affecting his activities of daily living. We also request that Mr. ████ be seen immediately by a medical provider (not a mental health provider, as occurred previously) for his shoulder injury, as it has been over 14 days since the 9/28/17 referral.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Lucy M. Rand, Assistant Attorney General
Re: ███████████████
October 17, 2017
Page 2

Thank you for your prompt attention to this matter.

Sincerely,

*Ckendrick*

Corene Kendrick
Staff Attorney

cc:   Mr. ██████



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 19, 2017

Lucy M. Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

RE:     *Parsons v. Ryan*, 2:12-CV-00601
         Class Member in Need of Medical Care
         ████████████████████, Tucson - Santa Rita

Dear Ms. Rand:

I write regarding Mr. █████ who may be in need of immediate specialty care.  Mr. █████ reports that since May, he has been experiencing excruciating and radiating pain from his lower back that impacts his ability to perform activities of daily living, and that impair his mobility.

Rather than refer Mr. █████ to an orthopedic specialist or a pain clinic, Corizon's treatment to date has consisted of a psychiatrist evaluating and dutifully documenting Mr. █████s problem, without requesting any diagnostic procedures or specialty consults.

Mr. █████ reports that the most recent time he saw the mental health provider regarding his back, he was told that he would have an X-ray of his back but that to date that has not occurred.  According to his medical record, Mr. █████ saw the psychiatrist Dr. Easley regarding his back pain on 9/7/17, after being seen twice on nurse's line on 8/29/17 and 9/1/17.  The psychiatrist's objective notes documented that Mr. █████ experienced pain with range of motion and tactile stimulation to his lumbar spine.  Dr. Easley gave him an injection of Toradol, ordered a back support belt, but did not request an X-ray or specialty consult.  The nursing notes from 8/29/17 and 9/1/17 open clinic encounters document that this back pain in his lumbar area was radiating and impacting his ability to walk. Mr. █████'s medical record shows that he was also seen on provider line by the psychiatrist regarding swelling in his extremities on 7/29/17.

It is unclear why Mr. █████ saw a mental health provider for his spinal problems.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Lucy M. Rand, Assistant Attorney General
Re: ████████████
October 19, 2017
Page 2

     We request that Mr. █████ be referred to an orthopedic specialist and/or a pain clinic for evaluation and diagnosis of the cause of his severe back pain which impacts his ability to walk and complete activities of daily living. We also request that Mr. █████ be seen by a medical provider (not a mental health provider, as occurred previously), for his ongoing back pain.

     Thank you for your prompt attention to this matter.

Sincerely,

*Ckendrick*

Corene Kendrick
Staff Attorney

cc:   Mr. █████



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 20, 2017

Lucy M. Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

RE:      *Parsons v. Ryan*, 2:12-CV-00601
Class Member in Need of Medical Care
███████████████████████ Tucson - Santa Rita

Dear Ms. Rand:

I write regarding Mr. ███████ a class member who is vision impaired in both eyes and is in need of specialty care and follow up on an August eye surgery in one of the eyes. He reports that he was told that he can only have surgery on one of his eyes, but not both, pursuant to Corizon corporate policy. The Ninth Circuit has held that a prison health care "one good eye" policy violates the Eighth Amendment. *See Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014).

Mr. ███████ s treatment prior to his August eye surgery was filled with delays and shoddy recordkeeping, and he dangerously spent almost three months with a painful detached retina before it was treated. Furthermore, the provider treatment and specialty care was provided by a person who is listed as a psychiatrist, Leo Easley. Our office previously notified you regarding two other patients at Tucson who were treated by this same psychiatrist for medical conditions.

A review of the Arizona State Boards of Medicine and Nursing websites revealed that Mr. Easley actually does not have a medical degree (and thus is not a psychiatrist), but rather he is a mental health nurse practitioner. Similar to the other Tucson class members I notified you about earlier this week, there is no indication or explanation as to why a mental health provider is diagnosing and reviewing specialty medical care. In Mr. ███████'s case, the mental health nurse practitioner was diagnosing and reviewing ophthalmology and cardiac procedures.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Mr. ███████ has only had peripheral vision in his left eye for more than 10 years due to cataracts and a retinal occlusion that has not been treated.  On May 9, 2017, he filed a HNR saying that he could not see out of his OTHER eye – the right eye, describing it as "like a heavy dust cloud is obstructing my eyesight." He was seen on open sick call that day by RN Diaz, who made a referral to optometry. This request was cancelled 5/10/17 by the clinical coordinator, who wrote that Mr. ███████ needed to see a provider in order to get the referral to optometry, and she wrote that she would notify NP Easley that Mr. ███████ needed to be seen. There is no indication that Mr. ███████ was notified of the cancellation, in violation of PM 49.

Mr. ███████ did not see Mr. Easley until July 12, 2017, which -- holding aside the fact that Mr. Easley is not a medical provider -- is a violation of PM 39.[1]  Mr. Easley wrote:  "Patient 56y/o WM here due to Eye obstruction, had apt for opt. but was canceled due to needs to see provider first."  Mr. Easley's documented treatment plan was:

Consults: None
Labs: None
Appt: None
Imagine [sic]: None
Med Orders:
Spcl Med Supplies: None

1) Patient needs a [sic] eye appointment
2) Patient vision has been  evaluated on nurses line with Snellen eye chart and right eye little redness, no swelling, IM c/o right eye obscured. IM is legally blind in left eye and is concerned about right eye going out as well. Eye exam results: rt: 20/70 Both: 20/70.
3) Will complete a consult to Ophthalmology.

However, Mr. Easley did not submit a specialty request to Utilization Management for Mr. ███████ to see an ophthalmologist.

On July 15, 2017, Mr. ███████ submitted a HNR again reporting he could not see out of his right eye, which effectively renders him blind.  He was seen in response on nurse's line on

---

[1] As a side note, on May 18, 2017, custody staff initiated an ICS for Mr. ███████ after he passed out and collapsed coming out of the chow hall and suffered a head abrasion. The treating nurse's note states: "Neuro checks done within normal limits, EKG performed and scanned to NP Easley. With F/U phone call with no intervention at this time per NP Easley. Given fluids due to fluid deficit within 10 minutes Pt. was more alert and feeling much better. Stood down from ICS and pt. was released to return to his yard."  It is wholly inappropriate for a mental health nurse practitioner to review an EKG cardiac report and declare that no further treatment is needed.

Lucy M. Rand, Assistant Attorney General
Re: ███████████
October 20, 2017
Page 3

July 17, 2017. The nurse did not make a referral to provider, because Mr. ███████ was "pending optometry consult." It is unclear if the RN is referring to the previous optometry referral made by a RN on May 9, which was cancelled.

On July 18, 2017, Mr. ██████ again submitted a HNR about his eye. He was seen in response on nurse's line on July 30, 2017, a violation of PM 37. The person who saw him on nurse's line, Benjamin Schmid, is listed as having a job title of Health Services Administrator. It is unclear why Corizon administrative staff were conducting nurse's line. In any event, Mr. Schmid quoted Mr. ██████ as saying, "I've had eye issues since May. It is slowly getting worse. I can see peripherally out of my left eye. My right is getting slowly worse. I have a patch over right to help keep my left working. No pain just black spots and loss of vision." Mr. Schmid wrote that Mr. ██████ "[n]eeded to be within ~6 feet to see 'E' on eye chart." Mr. Schrmid's treatment plan was, "[w]ill follow up to assure ophthalmology appointment is completed ASAP," but there is no documentation that Mr. Schmid submitted such a request to Utilization Management.

On August 1, 2017, two days after seeing the Health Services Administrator, Mr. ██████ yet again submitted a HNR about his right eye. He was not seen, but on August 2 Mr. Easley submitted a routine request for Mr. ██████ to see optometry. This is a wholly inappropriate referral given the duration of these alarming symptoms and the severity of his condition - he should have been referred urgently to an ophthalmologist instead of a person who writes prescriptions for glasses. Mr. Easley also incorrectly noted that Mr. ██████ "right eye has been obscured for 3 days," when in actuality it had been three months. Mr. Easley correctly noted that Mr. ██████ is "legally blind in the left eye."

Mr. ██████ saw an optometrist on August 7, 2017, who found detached retina in the right eye and wrote an alarming note of "refer to retinal specialist today" That same day, Mr. Easley submitted to Utilization Management an emergent request that Mr. ██████ see an ophthalmologist.

The next day, August 8, he was seen by ophthalmologist Dr. Calonje, who confirmed the retina was detached in the right eye, and scheduled Mr. ██████ for urgent surgery on 8/17/17. Dr. Calonje also diagnosed a retinal occlusion of his left eye, cataracts in both eyes, and recommended surgical treatment to remove the cataracts in both eyes.

On August 9, 2017, Mr. Easley reviewed Dr. Calonje's specialty report. Again, it is inappropriate for a mental health nurse practitioner to be reviewing an ophthalmology report. Mr. Easley took no action on the report until six days later, August 14, when he submitted an urgent request to Utilization Management to approve the surgery scheduled for August 17. However, Mr. ██████ did not appear to have the surgery on August 17, for reasons that are not documented in his record. There is no documentation he went off-site for a surgery on August 17. Instead, it

appears the surgery was postponed a week and he had the outpatient surgery with Dr. Calonje on August 24, 2017.

Despite all the documentation showing that the eye surgery actually occurred on August 24, on August 17, Mr. Easley inexplicably submitted a request for post-surgery follow up with Dr. Calonje, stating that the surgery had occurred that day.

On August 24, 2017, the nurse saw Mr. ███████ when he returned from the outpatient surgery, and the nurse reviewed the discharge instructions. Dr. Calonje's instructions included a request that Mr. ███████ return within two weeks.  On August 25, 2017, Mr. Easley reviewed the specialist's surgery report and wrote "Patient received back from surgery must return to clinic in 2 weeks" but took no action, in violation of PM 52.  Mr. Easley did not submit a request to Utilization Management for follow up with the specialist.

On October 9, 2017, Mr. ███████ filed a HNR stating that he was told by the eye doctor that he would be scheduled for cataract surgery and asking the status of that surgery.  Mr. ███████ wrote "I still cannot see."  The nurse referred the HNR to the provider for review, which as of October 19, has not been reviewed.

Mr. ███████ reports to us that the inability to see profoundly impacts his ability to complete activities of daily living. On October 10, the nurse reviewed the HNR, but he was not seen.  We request that Mr. ███████ be referred urgently to the ophthalmologist for follow up regarding the repair to the detached retina, and for removal of the cataracts in *both* eyes.  We ask that all specialist recommendations be implemented in a timely manner, and that Mr. ███████ be seen by a medical provider, not a mental health provider.

Thank you for your prompt attention to this matter.

Sincerely,

*Clendrick*

Corene Kendrick
Staff Attorney

cc:    Mr. ███████

Exhibit 7

(Redacted)



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 20, 2017

Mr. Timothy Bojanowski
Struck Love Bojanowski & Acedo PLC
3100 W. Ray Rd., Suite. 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:   *Parsons v. Ryan*
        Licensure Status of Telemedicine Providers

Dear Tim,

At the June 14, 2017 status hearing, during a discussion of Defendants' chronic substantial noncompliance with Performance Measure 54, you stated that additional telemedicine providers had been hired to provide care to class members. *See* 6/14/17 Tr. at 252:6-8. You then had this exchange with the Court:

> THE COURT: Right. I'm wondering who the resource is they are using because we have been talking about telemedicine resources in the University of Arizona. You have talked in the past about telemedicine resources where the call is received by a provider at another one of the prison institutions. I'm trying to understand who these calls are going to because you are telling me that you are now using this as a method, and I want to understand it better.
>
> MR. BOJANOWSKI: Corizon providers. They are in other states, maybe? They are providers that do telemedicine. That's apparently their business. And, well, they are Corizon employees. They are not at another prison.

*Id.* at 252:17-253:3.

In response, I expressed several concerns regarding the use of telemedicine, including:

And finally, to the extent that they are apparently using Corizon contracted providers across the country to see patients via telemedicine that defendants provide, in writing, confirmation that all of these providers who are providing treatment via telemedicine are actually licensed to practice in the State of Arizona.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

THE COURT: Well, the monitoring of this performance measure would answer that question, wouldn't it, because the provider, the qualifications of the provider are specified or not?

MS. KENDRICK: We don't know.

THE COURT: Is it a requirement to what you just asked for of the stipulation?

MS. KENDRICK: Well, the requirement is under Arizona state law that individuals who are practicing medicine in the State of Arizona have to have a license to practice medicine.

MR. BOJANOWSKI: *And they do*.

THE COURT: All right.

MS. KENDRICK: So we would like confirmation of that in writing rather than just the avowal of counsel.

THE COURT: We have just had that avowal, and Mr. Bojanowski is to be taken at his word for that kind of statement because there's no wiggle room there.

MR. BOJANOWSKI: That's correct.

THE COURT: If we find out obviously then --

MR. BOJANOWSKI: I will get my toothbrush.

*Id*. at 254:8-255:8 (emphasis added).

In the course of reviewing the medical record of class member ███████ Tucson-Santa Rita, we observed a note that he was seen on September 25, 2017 via telemedicine for a chronic care appointment regarding his asthma, with medical doctor Dr. Hamda Awaal. *See* Attachment A. A review of the Arizona Medical Board licensing website revealed that there is nobody licensed in Arizona as either a M.D. or D.O. by that name.

We request that by October 27, 2017, Defendants and/or their contractor Corizon confirm if Dr. Awaal is licensed by the Arizona Board of Medicine to practice medicine in the State of

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Mr. Bojanowski
October 20, 2017
Re: Licensure Status of
Telemedicine Providers
Page 3

Arizona.  Additionally, we request that you provide, by that date, a complete list of all providers Corizon is currently using to provide telemedicine to class members, and for each individual, whether she or he is licensed to practice medicine in the State of Arizona.

Thank you for your attention to this matter.

Sincerely yours,

Corene Kendrick, Staff Attorney

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

# Attachment A

CHSS027C                    Health Services Encounter                    Friday October 20, 2017 06:55:42 AM

## Encounter Header

| | | | |
|---|---|---|---|
| Date*: | 09/25/2017 | Start Time*: | 08:56:31 AM |
| End Date*: | 09/25/2017 | End Time*: | 08:59:20 AM |
| Category: | Medical Provider | | |
| Type*: | Provider - Chronic Care | Encounter Close Date: | 09/25/2017 |
| Location*: | ASPC-T SANTA RITA  [C02] | Encounter Close Time: | 09:05:39 AM |
| Setting*: | Interactive Telemedicine | | |
| Staff Member*: | Awaal, Hamda | | |
| Title: | Medical Doctor | | |
| Form Type: | Chronic Care Clinic | | |

## Subjective

Are interpreter services needed for this inmate*:   No

What type of interpreter services were used for the encounter*:

Related Health Service Requests

| Request Date | Area of Interest | Request Type | Status |
|---|---|---|---|
| No Rows Found | | | |

Subjective Notes

SBJ:
Patient says he has Asthma is stable uses the rescue inhaler about a 3 time a week. He denies any SOB at this time and admits to smoking

Chronic Care Clinic Subjective

History:

Risk factors:  Obesity: ○ Y ○ N   Alcohol: ○ Y ○ N   Family history of heart disease: ○ Y ○ N

Smoker: ○ Rare/None  ● Current  ○ Former

Amount/Length: ○ Less than 10 pk yrs  ● 10-20 pk yrs  ○ More than 20 pk yrs

Diseases: CAD: ○ Y ○ N   PVD: ○ Y ○ N   CVA: ○ Y ○ N   CRD: ○ Y ○ N

Hx DKA: ○ Y ○ N ○ N/A   Other:

Last eye exam date:               Retinopathy: ○ N ○ Y   Problems with vision: ○ N ○ Y

Pulmonary:   Age of onset:        Frequency of inhaler use:

Last attack:

Prior hospitalization for asthma: ○ Y ○ N   History of intubation: ○ Y ○ N

Prior corticosteroids: ○ Y ○ N

Aggravating factors for asthma:   ☐ Change in season  ☐ Pollen  ☐ Exercise  ☐ Dust

☐ Cold  ☐ Other:

Night time awakenings with asthma within the last 30 days:

Seizures: Type: ○ Generalized Tonic Clonic(Grand Mal)   ○ Complex(partial)   ○ Absence(Petit Mal)

Approximate date of first seizure:              Date of last seizure:

Frequency:

Seizure related to:　☐ Alcohol　☐ Drug use　☐ Head injury　☐ Other:

Infectious diseases:

Infectious disease Hx:　History of men having sex with men:　○ Y　○ N　Needle sharing:　○ Y　○ N

Injectable drug use:　○ Y　○ N　Blood Transfusion before 1990:　○ Y　○ N

Alcohol Abuse:　○ Y　○ N　Nasal drug use:　○ Y　○ N　Cough:　○ Y　○ N

Night sweats:　○ Y　○ N　Fever:　○ Y　○ N　Headaches:　○ Y　○ N

Dysphagia/Odynophagia:　○ Y　○ N　Diarrhea:　○ Y　○ N　Neurologic Change:　○ Y　○ N

Visual Disturbance:　○ Y　○ N　PPD Conversion:　○ Y　○ N

Incomplete previous TB Rx:　○ Y　○ N　Recent exposure to Active TB:　○ Y　○ N

Recent weight loss/cachexia:　○ N　○ Y

Other complaints:　○ N　○ Y:

Sickle Cell Disease:

Pain:　○ N　○ Y:　☐ Long bone(pre-tibial)　☐ Hand and foot　☐ Joint　☐ Abdominal

　　　　　　　　　☐ Chest　　Describe:

Fever:　○ N　○ Y:

Recent trauma:　○ N　○ Y:

Nausea and vomiting:　○ N　○ Y:

Sortness of breath:　○ N　○ Y:

Headache:　○ N　○ Y:

Visual changes:　○ N　○ Y:

Fatigue:　○ N　○ Y:

Other symptoms:　○ N　○ Y:

Rev #: 735

---

## Objective

Vital Signs　(1 - 1 of 1)

| Taken By | Time | Temp | Pulse | Resp | Height | Weight | BP Systolic | BP Diastolic | Blood Sugar | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Oliver, Cynthia | 08:54 AM | 98.5 | 68 | | 5 5 | 195 | 112 | 60 | NA | PEAK FLOW 350 410 440 |

Objective Notes

OBJ:
Alert and oriented x 4
Lungs clear T/O, denies any SOB,
S1 S2, no murmur, denies any chest pain
PF-350, 410, 440

Chronic Care Clinic Objective

HEENT:　Nystagmus (SZ):　○ N　○ Y

　　　Gingival hyperplasia (SZ):　○ N　○ Y

　　　Ataxia:　○ N　○ Y

Eyes: Conjunctiva pale: ○ N ○ Y

Sclera icteric: ○ N ○ Y

Neck: Carotid bruit (Optional less than 50/Required greater than 50): ○ Y ○ N

Thyroid NL: ○ N ○ Y　Cervical lymph nodes NL: ○ Y ○ N

Heart: Regular Rhythm: ● Y ○ N　Murmur Present: ○ Y ● N

Gallop: ○ Y ● N

Lungs: Wheezing: ○ Y ● N　Rales: ○ Y ● N　Rhonchi: ○ Y ● N

Other:

Abdomen: Tenderness: ○ Y ● N　Mass: ○ Y ● N　Hepatomegaly: ○ Y ● N

Bowel Sounds: ● Y ○ N　Soft: ● Y ○ N　Splenomegaly: ○ Y ● N

Ext.: Pedal pulse palpable: ○ Y ○ N　Peripheral edema: ○ Y ○ N

Foot exam unremarkable: ○ Y ○ N　Leg ulcers: ○ N ○ Y

Neuro: Motor deficits: ○ Y ○ N　Sensory deficits ○ Y ○ N

Monofilament testing: ○ Y ○ N ○ NA　Skin Pallor: ○ N ○ Y:

Skin:

Spine:

Additional findings / description of fundi if visualized:

Studies: ☐ Ordered at this visit ☐ Review of previously completed with patient

Annual Lab/Immunizations: ☐ LFT ☐ TSH ☐ Flu ☐ Pneumo (5 years)

Rev #: 735

---

### Assessment

Medical Diagnosis/Complaint

| ICD Code | Diagnosis/Complaint |
|---|---|
| No Rows Found | |

Active Allergies/Health Problems/Conditions　(1 - 15 of 15)

| ID Number | Category | Type | National HIE Code(s) | Diagnosis Code | Status | Status Date | Onset Date |
|---|---|---|---|---|---|---|---|
| 001 | Allergies - Medication | Penicillin V Potassium | | | Assessed | 09/04/2014 | 09/02/2014 |
| 002 | Allergies - Other than Medications | IODINE | | | Assessed | 09/04/2014 | 09/02/2014 |
| 003 | Mental Health | Mental Health | | Alcoh dep NEC/NOS-unspec [303.90] | Assessed | 09/30/2015 | 12/04/2014 |
| 004 | Mental Health | Mental Health | | Episodic mood disord NOS [296.90] | Assessed | 12/04/2014 | 12/04/2014 |
| 005 | Mental Health | Mental Health | | | Assessed | 12/04/2014 | 12/04/2014 |
| 006 | Other Diagnosis | Nonsp rea skn test wo tb | | Nonsp rea skn test wo tb [795.51] | Assessed | 09/30/2015 | 01/06/2015 |

| ID Number | Category | Type | National HIE Code(s) | Diagnosis Code | Status | Status Date | Onset Date |
|---|---|---|---|---|---|---|---|
| 007 | Mental Health | Mental Health | | | Assessed | 06/19/2015 | 06/19/2015 |
| 008 | Mental Health | Mental Health | | | Assessed | 06/19/2015 | 06/19/2015 |
| 009 | Mental Health | Mental Health | | Alcohol dependence, uncomplicated [F10.20] | Assessed | 10/01/2015 | 10/01/2015 |
| 010 | Other Diagnosis | Nonsp rea skn test wo tb | | Nonspecific reaction to tuberculin skin test without active tuberculosis [R76.11] | Assessed | 10/01/2015 | 10/01/2015 |
| 011 | Mental Health | Mental Health | | Unspecified mood [affective] disorder [F39] | Assessed | 12/01/2015 | 12/01/2015 |
| 012 | Other Diagnosis | Other Diagnosis | SNOMED: 195967001 - Asthma (disorder) | Mild persistent asthma, uncomplicated [J45.30] | Assessed | 12/24/2015 | 12/24/2015 |
| 013 | Chronic Conditions | Asthma | SNOMED: 409663006 - 409663006 | Cough variant asthma [J45.991] | Assessed | 04/14/2016 | 04/14/2016 |
| 014 | Other Diagnosis | Other Diagnosis | SNOMED: 32398004 - 32398004 | Bronchitis, not specified as acute or chronic [J40] | Assessed | 04/14/2016 | 04/14/2016 |
| 015 | Mental Health | Mental Health | SNOMED: 19527009 - Major depression, single episode, in complete remission (disorder) | Major depressive disorder, recurrent, in full remission [F33.42] | Assessed | 11/03/2016 | 11/03/2016 |

Related Allergies/Health Problems/Conditions

| ID Number | Category | Type | National HIE Code(s) | Diagnosis Code | Status | Status Date | Onset Date |
|---|---|---|---|---|---|---|---|
| No Rows Found | | | | | | | |

Assessment Notes

ASSESSMENT:
Asthma:

Chronic Care Clinic Assessment

Has the MPL been updated?    yes

Rev #: 735

## Plan

Treatment Orders

| Category | Type | Frequency | For Days | Specify Comments |
|---|---|---|---|---|
| No Rows Found | | | | |

Active Drug Prescription Orders    (1 - 1 of 1)      [View MAR Summary]

| Prescription/Medication | National HIE Code(s) | Effective Date | Dosage | Frequency | Expiration | Status |
|---|---|---|---|---|---|---|

| Prescription/Medication | National HIE Code(s) | Effective Date | Dosage | Frequency | Expiration | Status |
|---|---|---|---|---|---|---|
| ALBUTEROL HFA (8.5GM) INHA/90 Mcg | RxNorm: 307782 - Albuterol 0.09 MG/ACTUAT Inhalant Solution;   745679 - 200 ACTUAT Al... | 04/05/2017 | 2 puffs | FOUR TIMES DAILY AS NEEDED | 10/01/2017 | Refill Ordered |

### Ordered Drug Prescriptions

| Prescription/Medication | National HIE Code(s) | Effective Date | Dosage | Frequency | Expiration | Status |
|---|---|---|---|---|---|---|
| No Rows Found | | | | | | |

### Lab Test Orders

| Lab Test Type | National HIE Code(s) | Priority | Status | Results | Value |
|---|---|---|---|---|---|
| No Rows Found | | | | | |

### X-Ray Orders

| X-Ray Body Area | Priority | Status |
|---|---|---|
| No Rows Found | | |

### Consultation Request

| Request Type | Service Type | Priority | Status |
|---|---|---|---|
| No Rows Found | | | |

### Follow-up Appointments

| Date | Time | Type | Staff | Location |
|---|---|---|---|---|
| No Rows Found | | | | |

### Patient Transfer Holds

| Type | Expiration Date | Status |
|---|---|---|
| No Rows Found | | |

### Other Actions/Procedures

| Group | Type | Approximate Begin Date | Approximate End Date | Specify Comments |
|---|---|---|---|---|
| No Rows Found | | | | |

### Plan Notes

PLAN:
Asthma: STABLE, will keep monitor with 180days RTC, educate patient on triggers and smoking cessation

### Chronic Care Clinic Plan

Management goals for this patient (Justification needed if you deviate from protocol):

STABLE

Change meds:   ● N  ○ Y:   (see orders)

Rev #: 735

### Patient Education

#### Patient Education Notes

Education;
Patient was educated regarding healthy lifestyle modifications, weight management. Also encouraged patient to tobacco

cessation. Also encouraged to place an HNR if have concerns, patient agrees on plan of care

Chronic Care Clinic Patient Education

Education (correctional adaptation): ☑ Diet/Nutrition    ☑ Smoking    ☑ Med Info    ☑ Exercise

PIFs to patient:

Rev #: 735

### Meaningful Use Measurement

☑ Demographic Information in Patient Header verified
☑ Current Medical Problem List verified (or Patient has no Medical Problems)
☑ Current Medications List verified (or Patient has no Medical Medications)    ☐ Medications List NOT verified
☑ Medication Allergies List verified (or Patient is not allergic to any Medications)

### Health Classification

Medical:   2
Mental:   2-Previously received MH services      Prognosis:   Improvable Condition
SMI:   N-No
Dental:   U-Unknown (Conversion)

Classification and Security Notes

See note of same date.

### Encounter Orders Review

Review Type*:   Pending Nurses Order      Review Staff:   Osier, Stephanie
Review Date:   09/25/2017      Review Time:   06:34:55 PM

Review Notes

Next RTC in 180days
TimeStamp: 25 September 2017 09:00:50 --- User: Hamda Awaal (AWAHA01)


TimeStamp: 25 September 2017 18:36:45 --- User: Stephanie Osier (OSIST01)

Scanned Documents/Photos

| Document Type | Date Scanned | Title | Source | Privacy Level |
|---|---|---|---|---|
| No Rows Found | | | | |

Standard Forms

| Type | Staff |
|---|---|
| No Rows Found | |

# Exhibit 8



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 31, 2017

Mr. Timothy Bojanowski
Struck Love Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:   *Parsons v. Ryan*
      Defendants' Notice to the Court Regarding Status of University of Arizona
      Telemedicine Program (Doc. 2398)

Dear Tim,

I write regarding your recent filing regarding the status of Corizon's efforts to expand telemedicine with the University of Arizona telemedicine program.  We have several questions regarding the filing, and request that someone from Corizon provide clarification at the November 7, 2017 status hearing.

As an initial matter, we note that Ms. Stover's declaration states that Corizon gathered a years' worth of "out counts" and provided them to the University of Arizona in early October to determine if additional specialty services could be provided besides infectious disease.  [See Doc. 2398-1 at ¶ 5]  This does not square with your statement to the court on September 12, 2017 that "the University of Arizona has declined to extend telemedicine saying that there simply wasn't enough – there weren't enough referrals for them to do it."  [9/12/17 Tr. at 187:11-13; *see also id.* at 188:1-5 ("MR. BOJANOWSKI: [. . .] they just simply weren't going to expand into the other areas that we wanted such as HIV. We couldn't produce enough HIV patients for them to see on a regular basis to, apparently, justify them becoming involved. And I'm using HIV as just an example.")]  **We request that Ms. Stover or some other knowledgeable person from Corizon be present at the November 7, 2017 status hearing to provide an update regarding negotiations with the University of Arizona, and to explain the statements in Ms. Stover's declaration that this information regarding the number of referrals was provided in early October, in light of your statement in September that the university had declined to extend**

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Case 2:12-cv-00601-ROS   Document 2426-1   Filed 11/03/17   Page 73 of 117

Mr. Timothy Bojanowski
RE: Defendants' Notice to the Court
Regarding Status of University of Arizona
Telemedicine Program (Doc. 2398)
October 31, 2017
Page 2

**telemedicine.**  We have repeatedly requested that a knowledgeable person or persons be produced at the hearing, and at the September 12, 2017 status hearing, the Court directed you to do so:

> THE COURT: [. . .] But with respect to the University of Arizona, because it has been something that has been such a focus, and because we have had somebody stand up whose name I can't remember right now tell us what the status was and to give us an understanding about what it was from the horse's mouth, I think it would make sense to have the horse come back.
>
> So I agree if you could do that to give us a more first person representation about where things stand so I can get a better sense. Because we have put a lot of eggs in this basket. It has come up a lot.

[9/12/17 Tr. at 192:5-14]  Defendants have thus far failed to comply with the Court's directive.

Ms. Stover also does not describe any discussions or meetings prior to early October 2017, which is concerning given Defendants' multiple past representations to the Court and Plaintiffs that Corizon officials had been working with the university for months to expand telemedicine. For example, see:

- **5/8/17 Remedial Plan** (Doc. 2051 at 6:27-7:3)
  "Corizon is evaluating the possibility of brining [sic] additional specialties onsite to avoid the need for offsite transfers. And they have successfully done this for ultrasounds. As of January 24, 2017, ultrasounds are being performed onsite at Florence. Other services, such as psychiatry, rheumatology, and primary care, are now being offered through telemedicine."

- **5/10/17 Hearing Tr**. at 154:5-10
  "MR. BOJANOWSKI: We have already and Corizon is already undertaking a review of all third party contractors to determine what we have available and what we can do to provide an expanded list of available specialty contracts. We also have expanded the telemed program, I believe, with the University of Arizona to tap into their specialty groups to assist with this."

- *Id.* at 156:14-22, 157:10-13
  "THE COURT: And when did you commence the telemedicine program with

Mr. Timothy Bojanowski
RE: Defendants' Notice to the Court
Regarding Status of University of Arizona
Telemedicine Program (Doc. 2398)
October 31, 2017
Page 3

the University of Arizona?
MR. BOJANOWSKI: It has not started yet.
THE COURT: Do you have a start date?
MR. BOJANOWSKI: What's our start date?  There's apparently a block
schedule for infectious disease right now, and we are discussing with them
expanding into other specialty areas. We have also expanded the telemed
internally. . .
[. . .]
MR. BOJANOWSKI: [. . .] Your Honor, one provider, one mid-level have been
brought on. They will be activated tomorrow.
THE COURT: In what area? What area of medicine?
MR. BOJANOWSKI: Primary care telemedicine."

- **6/14/17 Hearing Tr.** at 12:23-25
  "THE COURT: [. . .] And telemed I have been told about and these other
  remedies I have been told about before, and here we are looking at April. It's the
  same story"

- *Id*. at 13:9-13
  "THE COURT: [. . .] it seems you have been sitting on a situation where I have
  only heard about the enhanced telemedicine, I think, since December and this is
  something that hasn't been fixed since then when telemedicine has been talked
  about before."

- *Id*. at 33:7-17
  "MR. BOJANOWSKI: At Tucson, in May they increased their capacity to
  utilize the telemedicine services.  [. . .] They are also utilizing and have begun to
  utilize the services of the medical school in Tucson.
  THE COURT: And when did that start? Also in May?
  MR. BOJANOWSKI: I'd say end of May.
  THE COURT: And when did the telemedicine start? Was that end of May?
  Beginning of May?
  MR. BOJANOWSKI: Same time and it was all part of one overall plan."

- **8/9/17 Hearing Tr.** at 169:2-12
  "THE COURT: [. . .] with respect to the proposed Tele-Medicine program with

Mr. Timothy Bojanowski
RE: Defendants' Notice to the Court
Regarding Status of University of Arizona
Telemedicine Program (Doc. 2398)
October 31, 2017
Page 4

the University of Arizona, is there a further update that the defendants can give?
MR. BOJANOWSKI: There's a very -- there's not much of an update. I know that Dr. Fallhowe was meeting with them today for further discussions. That's the only information I have and I just don't have --
THE COURT: Will you report to plaintiffs on what happened after you've had a chance to confer with the doctor about what transpired?
MR. BOJANOWSKI: Yes, Your Honor."

- **9/12/17 Hearing Tr**. at 190:8-13
  "THE COURT: [. . .] it was in the past presented to the Court that was something that was more concrete and because you were dealing with the University of Arizona and because you had somebody stand up and tell me where the negotiations were standing, I think I seized upon that as a hope. And I guess if it's now a hope that's changing or diminishing, I'd like to know.  So for the next month, if you could understand that I'd like a full update about where things stand with the representations that have been previously made and we'll go look at our book and see where you have mentioned the University of Arizona, and maybe you can do that too so you will be prepared to know the areas where we will want to know whether those previous representations at the University of Arizona would be turned to are, in fact, included with what's going to continue or is in the areas where it's not likely to continue or not likely to be completed to fruition."

**We request that Corizon representatives provide information at the November 7 hearing regarding what, if any, discussions transpired with the University of Arizona regarding specialty telemedicine prior to early October 2017**.  **We also request an update regarding the negotiations with Arizona Oncology Network (Doc. 2398-1 ¶ 6 (A)), including an explanation of what specific oncology services can be provided remotely, given that much oncology treatment involves intravenous chemotherapy or in-person radiation treatment.**

With regard to the telemedicine and telepsych that is provided using in-house Corizon providers, we have several questions and comments.

Ms. Stover's declaration and the exhibits group both psychology and psychiatry under the rubric of "telepsych," which appears to account for the large majority of telehealth encounters. [Doc. 2398-1 ¶  4; Ex. 3] **We need a breakdown between these two disciplines, because they**

Mr. Timothy Bojanowski
RE: Defendants' Notice to the Court
Regarding Status of University of Arizona
Telemedicine Program (Doc. 2398)
October 31, 2017
Page 5

implicate different performance measures with different requirements.  **We also need a list of all individuals providing psychology and psychiatry services to verify licensure.  We also request an explanation for the sudden and substantial increase in "telepsych" beginning in June 2017.**  [*See id.*]

Exhibit 4 allegedly lists the schedule of all telehealth providers and telemed schedules. [Doc. 2398-1 ¶ 7; Ex. 4)  However, this only lists five providers, and cannot therefore be complete, given the number of monthly encounters listed in Exhibit 1.  **Please confirm whether this is a complete list of all telehealth providers who have provided medical or mental health care since June; if it is not, please provide such a list. We also request these individuals' first names in order to verify licensure.**

Thank you for your attention to this matter.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:    Counsel of Record

# Exhibit 9

# (Redacted)

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



October 19, 2017

**BY ELECTRONIC MAIL ONLY**

Lucy Rand
**OFFICE OF THE ARIZONA ATTORNEY GENERAL**
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

*Re:*     *Parsons v. Ryan – Missing mortality records*

Dear Lucy:

It appears that Defendants have not produced the following documents pertaining to prisoners who have died by suicide in ADC facilities:

- ██████████, ADC #██████ (died ████
  - Psychological autopsy
  - Mortality Review
  - ADC, Office of the Inspector General Investigative Report

- ██████████, ADC #██████ (died ████
  - Psychological autopsy
  - Mortality Review
  - Medical Examiner Autopsy Report

- ██████████, ADC #██████ (died ████
  - Psychological autopsy
  - Mortality Review
  - Medical Examiner Autopsy Report

Production of these documents is required by Paragraph 29 of the Stipulation (and, in the case of medical examiner reports, by agreement of the parties). *See also* Paragraph 16 ("Psychological autopsies shall be provided to the monitoring bureau within thirty (30) days of the prisoner's death and shall be finalized by the monitoring bureau within fourteen (14) days of receipt.")

Please produce these documents without further delay.

Very truly yours,

David C. Fathi

cc: All      counsel

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2

# Exhibit 10

# (Redacted)



**LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT**

October 23, 2017

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

*Re:*    **Parsons v. Ryan**
      **Suicide of** ████████████ **ADC No.** ██████ **2017**

**AMERICAN CIVIL
LIBERTIES UNION FOUNDATION**

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202 393 4930
F/202 393 4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
*ATTORNEY AT LAW\**

*\*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS*

Dear Tim:

We have reviewed documents pertaining to the death of Mr. ████ who was found hanging in his cell at Tucson-Cimarron unit on ██████ 2017.  According to the psychological autopsy, "DOC staff reported checking on Mr. ████ 31 minutes prior to finding him hanging."  ADCM1037392.  However, video of the efforts to resuscitate Mr. ████ showed "partial rigor mortis involving the buccal musculature which would make placing an ET tube difficult."  *Id.*  As the psychological autopsy acknowledges, "[t]hese findings bring into question the belief that he had been observed alive and healthy by correctional staff 31 minutes prior to being discovered."  *Id.*

Indeed, that is an understatement.  Our medical expert advises us that rigor mortis 31 minutes after death is a medical impossibility.  In other words, the correctional officers' statements that they observed Mr. ████ alive and healthy 31 minutes before he was found dead are false.[1]

_____

[1] This would not be the first time ADC staff made false statements of this nature:

> Investigations into two inmate suicides in Arizona prisons have resulted in the firings of 13 guards and sergeants and discipline against six other employees for failing to conduct security checks and then lying and covering up their mistakes.

Associated Press, "Arizona probe into inmate suicides leads to 13 firings," April 15, 2016, available at https://apnews.com/7d2b3d3cdf7e47d692c4e499a0a724a3/arizona-probes-inmate-suicides-leads-13-firings (visited October 19, 2017).

Please provide all documents reflecting any investigation that was undertaken into these false statements and any staff discipline that resulted.  In the alternative, please confirm that no such investigation or discipline has occurred.[2]

We have also reviewed Mr. ███ medical record.  The nurses' notes after the ICS was initiated confirm that Mr. ███ had been dead for some time, noting "[b]ody cold to the touch with noted cyanosis of finger beds" and "dried blood … on right side of his face."  However, the objective notes entered by RN Rodriguez and LPN Gastelum are identical, even including the same grammatical and typographical errors.  It is apparent that one nurse simply cut and pasted the other's note, or perhaps both cut and pasted from another source.  The two notes are attached.

Please let us know if it is Defendants' position that it is acceptable for health care staff to cut and paste each other's notes in this fashion.  If it is not, please produce all documents reflecting any disciplinary action taken against either of these nurses, or in the alternative, confirm that no such discipline has occurred.

Very truly yours,

David C. Fathi

Enclosure

Cc: All     counsel

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[2] The documents we have reviewed raise additional serious concerns.  The psychological autopsy notes, almost in passing, that "[b]ased on the injuries reported by the Medical Examiner, [Mr. ███ may have been assaulted prior to his death."  ADCM 1037398.  There is no indication that this possibility – certainly potentially relevant to Mr. ███ suicide – was investigated.

CHSS027J   Condensed Health Services Encounter          Friday October 20, 2017 06:52:43 AM

| | |
|---|---|
| | ADC #: [redacted]    Inmate Name: K[redacted], [redacted]<br>ENCOUNTER DATE: 05/04/2017   TIME: 03:54:32 PM   DURATION: minutes   TYPE: Nurse - ICS Response<br>LOCATION: ASPC-T CIMARRON [C11]   SETTING: Clinic |
| S | Are interpreter services needed for this inmate: No<br>NOTES: ICS response |
| | Chief Complaint: ICS reponse                                    Onset Date: 5/4/17 |
| O | NOTES: ICS called at 1506. Medical onsite at 1510. Upon arrival 42 year old white inmate found laying on his back outside cell. Unresponsive. No obvious signs of life. Negative for RR and HR. Body cold to the touch with noted cyanosis of finger beds. Dried blood was noted on right side of his face which appeared coming from the mouth. Ligature marks noted around inmates neck. Custody was directed to call 911. CPR was initiated while AED was turned on and pads placed on inmate. Mouth secretions were cleared with bulb syringe. Respirations were delivered via ambu bag hooked to oxygen at 25L/min. IV was attempted x2 without success to right arm. CPR and bagging continued until arrival of ACLS unit. ACLS continued life support measures until time of death was called at 1542. |

| | | |
|---|---|---|
| Score: 1 | Score: 1 | Score: 1 |
| Total Score: 3 | Facial: ☑ Symmetrical | If not, describe: unresponsive |
| If not, describe: ligature marks to the neck | ☑ Pale ☑ Cold | Skin: ☑ Apparent injury |
| Describe: ligature marks to the neck | | |

| | |
|---|---|
| A | NOTES: inadequate tissue perfusion related to respiratory and cardiac arrest |
| | |
| P | NOTES:<br><br>Time of death at 1542 |

| | | |
|---|---|---|
| ☑ Emergent intervention | | |
| Time: 04:14:00 PM | Practitioner notified: Young | EMS process activated: 03:10:00 PM |
| EMS arrival: 03:24:00 PM | EMS transport: 03:42:00 PM | Facility transported to: unknown |

| | |
|---|---|
| E | NOTES:<br><br>n/a |
| | |
| H/S | MH Status: No history of MH services |
| | STAFF: Rodriguez, Tiffany<br>NURSE SIGNATURE: _____ |

CHSS027J   Condensed Health Services Encounter          Friday October 20, 2017 06:52:03 AM

| | |
|---|---|
| | ADC #: [redacted]     Inmate Name: K[redacted], J[redacted]<br>ENCOUNTER DATE: 05/04/2017   TIME: 04:26:30 PM   DURATION: minutes   TYPE: Nurse - ICS Response<br>LOCATION: ASPC-T CIMARRON [C11]   SETTING: Clinic |
| S | Are interpreter services needed for this inmate: No<br>NOTES: ICS response |
| | Chief<br>Complaint: unresponsive          Onset<br>Date: 5/04/2017          Have you had this problem before?: ○ Y ⦿ N |
| O | NOTES:<br>ICS called at 1506. Medical onsite at 1510. Upon arrival 42 year old white inmate found laying on his back outside cell. Unresponsive. No obvious signs of life. Negative for RR and HR. Body cold to the touch with noted cyanosis of finger beds. Dried blood was noted on right side of his face which appeared coming from the mouth. Ligature marks noted around inmates neck. Custody was directed to call 911. CPR was initiated while AED was turned on and pads placed on inmate. Mouth secretions were cleared with bulb syringe. Respirations were delivered via ambu bag hooked to oxygen at 25L/min. IV was attempted x2 without success to right arm. CPR and bagging continued until arrival of ACLS unit. ACLS continued life support measures until time of death was called at 1542. |
| | Score: 1          Score: 1                              Score: 1 |
| | Total Score: 3    If not, describe: non responsive    If not, describe: unable to note |
| A | NOTES: see notes |
| P | NOTES: none |
| E | NOTES: unable |
| H/S | MH Status: No history of MH services |
| | STAFF: Gastelum, Adriana<br>NURSE SIGNATURE: _____ |

# Exhibit 11



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Richard M. Valenti
480.420.1615
rvalenti@strucklove.com

October 20, 2017

**_VIA EMAIL ONLY_**
David C. Fathi
American Civil Liberties Union Foundation
NATIONAL PRISON PROJECT
Legal Department
915 15TH Street, NW - 7th Floor
Washington, DC  20005-2112

      Re:    *Parsons v. Ryan*
              United States District Court of Arizona
              Cause No. 2:12-cv-00601-DKD

Dear David:

The following is Defendants' Response to your letters dated September 27, 2017, October 2, 2017, and October 4, 2017.

**I.**      **September 27, 2017 Letter**

**1. Standing Request No. 1:** The monthly staffing reports and weekly staffing schedules for each prison for the month of [ ] used to monitor compliance with Stipulation Performance Measures # 1-4 (Staffing Measures # 1-4 in the CGAR).

**Defendants' Response:** The August 2017 and September 2017 staffing reports have been produced. *See ADCM1033341-1033351* and *ADCM1036881-1036891, respectively*.

**2. Standing Request No. 2:** The monthly CQI meeting minutes for each prison to the present, used to monitor compliance with PM# 27.

**Defendants' Response:** The August 2017 CQI meeting minutes have been produced. *See ADCM1033394-1033459.*

David C. Fathi
October 20, 2017
Page 2

    **3. Request No. 50:** The "list of heat-related medications [that] has been developed and distributed to all Facility Health Administrators" (See ADCM961516).

    **Defendants' Response:** A request has been made for documents responsive to this request.

    **4. Request No. 51:** The "Heat Intolerance Log for all ten state-operated ADC prisons from Jan. 1, 2017 to present [07/1717] (See ADCM961516).

    **Defendants' Response:** The "Heat Intolerance Log" has been produced. *See ADCM1036461-1036470*.

    **5. Request No. 52:** All documents reflecting the requirement that "except at non-corridor facilities, all suicide watches will be conducted by Behavioral Health clinical staff seven days per week" (see ADCM961584).

    **Defendants' Response:** There is no requirement that at corridor facilities suicide watches will be conducted by Behavioral Health clinical staff seven days per week. Documents responsive to this request do not exist.

    **6. Request No. 53:** The Draft DI pertaining to the Transitional Housing Unit at ASPC-Tucson (see ADCM961584).

    **Defendants' Response:** Defendants intend to produce documents responsive to this request next week.

    **7. Request No. 54**: All documents reflecting the planned "population management - bed changes" set forth in the May 26, 2017 memorandum from Stacey Crabtree to Charles Ryan (see ADCM961594-98).

    **Defendants' Response**: A request has been made for documents responsive to this request.

    **8. Request No. 55:** All agendas and minutes for Director's Meetings (also known as ADC & Corizon Bi-Weekly Meetings) from January 1, 2017 to the present (agendas for 5/2/17, 5115/17, and 6/6/17 have been produced and need not be re-produced).

    **Defendants' Response:** A request has been made for documents responsive to this request.

    **9. Request No. 56:** All versions, whether final or in draft form, of the Mental Health Technical Manual or equivalent document dated June 19, 2015 or later.

    **Defendants' Response:** Documents responsive to this request do not exist.

David C. Fathi
October 20, 2017
Page 3

**10. Request No. 57:** All documents reflecting the implementation of telemedicine utilization with the University of Arizona (see ADCM961471) and the Arizona Health Information Exchange Access Portal (AZHIE) (see ADCM961472).

**Defendants' Response:**

(1) With regard to the implementation of telemedicine utilization with the University of Arizona, as Defendants indicated at the October 11, 2017 Status Hearing, Defendants plan to file a detailed declaration about this program to the Court by October 25, 2017.

(2) With regard to the AZHIE, Defendants plan to produce documents responsive to this request next week.

**11. Request No. 58:** All documents reflecting the implementation of the Offline MAR (oMAR) (See ADCM961473).

**Defendants' Response:** Documents responsive to this request do not exist.

**12. Request No. 61:** Draft (or final) Standard Operating Procedure for Medication Management and Administration During Intra-System Transfers (See ADCM961582).

**Defendants' Response:** Documents responsive to this request have been produced. *See Dkt. 2374-1 at 63-71.*

**13. Request No. 62:** Any documents relating to the system-wide and/or institution-wide discontinuation of Gabapentin (neurontin) or Tramadol as pain medications, including instructions or directives given to prescribing providers, and protocols for tapering patients off the medication.

**Defendants' Response:** No such policy exists. Documents responsive to this request do not exist.

**14. Request No. 63:** Any documents, emails, communications, plans (draft or final) relating to the conversion of maximum custody units to close custody units (See, e.g., ADCM961594).

**Defendants' Response:** A request has been made for documents responsive to this request.

**15. Request No. 64:** Temperature Logs from 06/01/2017 to present for all prison complexes. [07/14/17].

**Defendants' Response:** Defendants plan to produce documents responsive to this request next week.

David C. Fathi
October 20, 2017
Page 4

**16. Request No. 67:** All documents reflecting (1) the rejection by Dr. Malachinski, or by any other person, of patients for housing at ASPC-Phoenix based on alleged noncompliance with CGAR measures; and (2) any disciplinary or corrective action taken against Dr. Malachinski or any other person for this behavior. See RP230000025.0001-0004. [Requested 8/15/17]

**Defendants' Response:** A request has been made for documents responsive to this request.

## II.   October 2, 2017 Letter

In answer to paragraphs 1 and 2 regarding Plaintiffs' document request No. 15, "All documents reflecting, discussing, or establishing policies and/or practices related to Defendants' 'open clinic concept' [See Defs' Proposed Agenda for 12/14/16 Status Conference] and documents sufficient to show its implementation and compliance with the Court's Nov. 10, 2016 Order." (ADCM 1033352-93), Defendants have produced corrected Declarations for Erin Barlund and Jeanne Chastain at ADCM1036436-1036439 and a corrected Declaration for Ms. Chu has been produced at ADCM1036879-1036880.

In answer to paragraph 3, **"Please produce all of the documents provided to Defendants'** counsel by declarants Barlund, Briddle, Campbell, Chastain, Chu, Curran, Currier, Hacker Agnew, Haldane, Headstream, Maese, Medel, Mielke-Fontaine, Mitchell, Moody, Muse, Pearson, Reese, Roberts, Valenzuela, and Winland. In the alternative, please confirm that all of these documents have already been produced to Plaintiffs," all documents provided to Defendants' counsel by the aforementioned declarants have been produced.

In answer to Paragraph 4 regarding Plaintiffs' Requests No. 18 and 19, there are no declarations to produce at this time. A request has been made for documents responsive to these requests.

## III.   October 4, 2017 Letter

Defendants provide the following responses to Plaintiffs' requests identified in the October 4, 2017 letter as follows:

1.   PowerPoint used to train staff on Performance Measure 52 (9/12/17 Tr. at 97:5-11)

   **Defendants' Response:** The PowerPoint information has been produced at ADCM1037598-1037604.

2.   Identity of all patients transferred due to a heat intolerance reaction pursuant to Paragraph 15 of the Stipulation (Doc. 2317 at 3; 9/12/17 Tr. at 178:3-22).

   **Defendants' Response:** Refer to the "Heat Intolerance Log," which was produced at ADCM 1036461-1036470.

David C. Fathi
October 20, 2017
Page 5


3.      Joint Defense Agreement between ADC and Corizon.

**Defendants' Response:**  The requested document has been produced.

Sincerely,

Richard M. Valenti

RMV/eap

cc:      Counsel of record

# Exhibit 12

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



October 31, 2017

**BY ELECTRONIC MAIL ONLY**

Richard M. Valenti
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
rvalenti@strucklove.com

Re:     *Parsons v. Ryan*

Dear Richard,

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

We write in response to your letter of October 20, 2017, regarding Plaintiffs' document requests.

As a threshold matter, your letter states, with regard to Requests No. 53, 57, and 64, "Defendants intend to produce documents responsive to this request next week [*i.e.,* the week of October 23, 2017]." In fact, no documents were produced. Kindly produce these documents without further delay.

With regard to Requests No. 50, 54, 55, 63, and 67, your letter states "[a] request has been made for documents responsive to this request." Please let us know when these documents will be produced. In light of the fact that Corizon has a contractual obligation to produce documents to ADC upon request (*see* Doc. 2409-1 at 14-29), it is difficult to understand the extraordinary delay in producing these documents, some of which were requested in mid-July.

We also have the following questions about your responses to individual requests:

**Request No. 51:  The "Heat Intolerance Log" for all ten state-operated ADC prisons from Jan. 1, 2017 to present [7/17/17] (See ADCM961516).**

You correctly point out that you have produced responsive documents at ADCM1036461-70. However, these documents cover only through the end of August 2017. In light of the parties' agreement that temperature data through the end of September will be produced (*see* 9/12/17 Tr. at 179), kindly supplement this production to cover the period through the end of September 2017.

**Request No. 52: All documents reflecting the requirement that "except at non-corridor facilities, all suicide watches will be conducted by Behavioral Health clinical staff seven days per week" (see ADCM961584).**

A document titled "ADC & Corizon Bi-Weekly Meeting," dated June 6, 2017 and produced to Plaintiffs by Defendants, states: "[e]xcept at non-corridor facilities, all suicide watches will be conducted by Behavioral Health clinical staff seven days per week." This document is attached as Exhibit 1. By contrast, your October 20 letter states "[t]here is no requirement that at corridor facilities suicide watches will be conducted by Behavioral Health clinical staff seven days per week. Documents responsive to this request do not exist." Please explain the contradiction between these two statements.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**Request No. 57: All documents reflecting the implementation of telemedicine utilization with the University of Arizona (see ADCM961471) and the Arizona Health Information Exchange Access Portal (AZHIE) (see ADCM961472).**

With respect to the University of Arizona, you respond that "Defendants plan to file a detailed declaration about this program to the Court by October 25, 2017." However, that declaration (Doc. 2398-1) is not responsive to our request for "[a]ll documents reflecting the implementation of telemedicine utilization with the University of Arizona." Please produce those documents.

**Request No. 58: All documents reflecting the implementation of the Offline MAR (oMAR) (See ADCM961473).**

You state that "[d]ocuments responsive to this request do not exist." A document titled "Arizona Department of Corrections - Corizon Bi-Weekly Meeting," dated May 2, 2017 and produced to Plaintiffs by Defendants, lists "Offline MAR (oMAR)" under the heading "Initiatives Completed," with a "Go-live" date of April 22, 2017. This document is attached as Exhibit 2. It seems extremely unlikely that the implementation of such an initiative would not result in the creation of a single document. Please produce all responsive documents, or explain your position that no responsive documents exist.

**Request No. 61: Draft (or final) Standard Operating Procedure for Medication Management and Administration During Intra-System Transfers (See ADCM961582).**

You respond that "[d]ocuments responsive to this request have been produced. See Dkt. 2374-1 at 63-71." But the cited document is a court filing prepared by Defendants' counsel; our request seeks the documentation that was

2

distributed to custody and health care staff about the new procedure.  Please provide that documentation, as well as all other responsive documents.

**Request No. 62: Any documents relating to the system-wide and/or institution-wide discontinuation of Gabapentin (neurontin) or Tramadol as pain medications, including instructions or directives given to prescribing providers, and protocols for tapering patients off the medication.**

You respond that "[n]o such policy exists," but this is not responsive to our request, which did not allege the existence of a policy.  Please produce all documents responsive to the request as written.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**October 2, 2017 letter, Paragraph 4 (Requests No. 18 and 19).**

We do not understand your statement that "there are no declarations to produce at this time."  On June 30, 2017, Lucy Rand sent to numerous ADC and Corizon employees a request that they complete a declaration regarding their search for documents responsive to Plaintiffs' Requests No. 18 and 19, produce all such responsive documents, and "provide all documentation by Wednesday, July 12, 2017." *See* Doc. 2368-1 at 54.  Please clarify whether it is Defendants' position that no such declarations were ever executed, and no such documents ever produced, in response to this or any other requests.

We look forward to your response.

Very truly yours,

David C. Fathi

Cc:     All counsel

3

# EXHIBIT 1

Arizona Department of Corrections
ADC & Corizon Bi-Weekly Meeting
ADC RODs, Division Director, Health Services and Corizon Leadership
Tuesday, June 6, 2017 – 2:00 to 3:00 pm

**Pre-Agenda Discussion:**

| Electronic Special Needs Orders (SNOs) | Details and Process for Electronic Special Needs Orders (SNOs) | Proposed Process for Electronic Special Needs Orders (SNOs): |
|---|---|---|
| | | <ul><li>Corizon Health Providers will enter all Special Needs Orders (SNOs) in eOMIS electronic health record (EHR).</li><li>The name of the SNO, the begin date, and the expiration date will cross to AIMS.  This feed will run every 15 minutes.</li><li>Providers will print the SNOs from eOMIS, stamp and sign, and provide to the inmate patient at the time of the encounter.</li><li>A copy of the printed SNO with the provider stamp and signature will be provided the yard officer, as is the current practice with the paper SNOs.  If an email notification needs to be sent as well, Corizon will develop an appropriate distribution list in accordance with the needs of each site.</li><li>A view of the printed Electronic SNOs is provided below.  It will also include the Provider's stamp and signature.</li></ul>**NOTE:**  All providers have been notified to continue to complete paper SNOs until ADC staff have been properly notified and the HSTM can be updated. |

| ADC: ###### | | Patient: LAST NAME, FIRST NAME | | | | 1 of 1 |
|---|---|---|---|---|---|---|
| CHSS028A | | Other Actions/Procedures/Referrals | | | | Thursday May 25, 2017 04:26:18 PM |
| Other Actions/Procedures/Referrals (1 - 10 of 10) | | | | Category: | | |

| Encounter Date | Category | Type | Specify Comments | Approximate End Date | Status |
|---|---|---|---|---|---|
| 05/25/2017 | Work Clearances | Kitchen Clearance Approved | | 12/30/9999 | Active |
| 05/25/2017 | Medical ADA Restrictions/Special Needs | Bottom bunk | | 06/10/2017 | Active |
| 05/25/2017 | Medical Supplies/Special Equipment | ACE WRAP | Keep right ankle wrapped for 2 weeks | 06/08/2017 | Active |
| 05/25/2017 | Medical Supplies/Special Equipment | MEDICAL ICE | Ice right ankle for 20 minutes 3x per day for 2 days | 05/27/2017 | Active |

CONFIDENTIAL - SUBJECT TO A PROTECTIVE ORDER        PARSONS v. RYAN, USDC CV12-00601: ADCM961580

| ASPC –T-Manzanita Unit | **Transitional Housing Unit**: Refuse to House Inmates/30-minute Mental Health Watches | • Mental Health Staff will be available to monitor this program.  Except at non-corridor facilities, all suicide watches will be conducted by Behavioral Health clinical staff seven days per week.<br>• **Operations Staff and Dr. Sanchez have written a draft DI related to this transitional program. The final draft DI has been reviewed by Corizon with changes and has been forwarded to Director Ryan for approval.**<br>• Mental health staff will provide programming on this unit utilizing the "Introduction to Prison Life" model focusing on adaptive adjustment skills, information on how to access needed assistance from staff, and stress management. |

**Open Discussion:**

ADC Offender Operations Division Memo of May 26, 2017:  Population Management – Bed Changes

# EXHIBIT 2

| | |
|---|---|
| **From:** | Cole, Lynn <Lynn.Cole@CorizonHealth.com> |
| **Sent:** | Monday, May 01, 2017 1:37 PM |
| **To:** | RYAN, CHARLES; MCWILLIAMS, CARSON; PRATT, RICHARD; Maldonado, Roland; Fallhowe, Renee |
| **Subject:** | Director's Meeting Agenda 05022017 |
| **Attachments:** | Director's Meeting 05022017.1.docx |

Director Ryan:

Please find attached the agenda for the Director's Meeting of May 2, 2017 at 11:30 am.  If you need anything further in advance of the meeting, please let me know.

Thank you,

Lynn M. Cole


Lynn M. Cole
Associate Vice President of Operations
Corizon Health
615-651-9836

1

# This page was created by legal counsel to signal the beginning of the next email attachment.

# This page was created by legal counsel to signal the beginning of the next email attachment.

Arizona Department of Corrections
Corizon Bi-Weekly Meeting – Director's Office
Tuesday, May 2, 2017 - 11:30 am to 12:00 pm

Volume Indicators - Staffing:

| Open Positions - Total | Contract | Open FTEs | Operating | Open FTEs | Contract | Operating % Variance |
|---|---|---|---|---|---|---|
| 04-13-2017 | 924.95 | (48.79) | 1,004.35 | (128.37) | - 6% | -13% |
| 04-27-2017 | 924.95 | (43.50) | 1,004.35 | (122.90) | -5% | -12% |

| Open Positions - Job Title 04-27-2017 | Contract | Open FTEs | Operating | Open FTEs | Variance from Open Positions LPN / RN 04-13-2017 |
|---|---|---|---|---|---|
| LPN | 156.60 | (9.65) | 169.10 | (22.15) | -1.3 |
| RN | 178.90 | (20.60) | 190.30 | (32.00) | +1.57 |

| Staffing Changes since 04-13-2017 | FTEs | PRN |
|---|---|---|
| New Hires | 8.40 FTEs | 1.0 |
| Resignations / Terminations | 1.0  FTE | 4.0 |

Agenda Topics:

| Category | Topic(s) | Significant Updates / Next Steps (if any) |
|---|---|---|
| Hepatitis C | 1. Hepatitis C Nurse Specialist appointed. 2. Hepatitis C treatment and management | 1. Carmen Schilling appointed as Hepatitis C Nurse Specialist 4-12-17. 2. Renee FallHowe, MD, Chief Medical Officer – States to discuss. |
| Mental Health | Refuse to House Inmates/30-minute Mental Health Watches, ASPC –T-Manzanita Unit | 1. Mental Health Staff will be available to monitor this program. 2. Operations Staff and Dr. Sanchez are writing a draft DI related to this transitional program. |

**CONFIDENTIAL - SUBJECT TO A PROTECTIVE ORDER        PARSONS v. RYAN, USDC CV12-00601: ADCM961470**

| IT | 1. Friends & Family | 1. Implementation of metrics for call quality analytics and call tracking; in-process revision of outdated default email message. inmatehealthinquiry@corizonhealth.com |
| | 2. Clinical Telemedicine | 2. April 24, 2017 meeting with Arizona Telemedicine Program (ATP), University of Arizona College of Medicine – Tucson for the purposes of increasing telemedicine utilization of DOC sites for efficient and cost effective specialty consultations. |
| Compliance | 1. CGAR | 1. CGAR: Kicking off CGAR focus teams with priority emphasis on Complexes with greatest need. Two vacant monitor positions filled 5-1-17. Meeting with Richard Pratt 5-1-17 to discuss remediation plans associated with substantially non-compliant measures.<br><br>• February final CGAR overall score 91%<br>• 3 sites had 100% compliance<br>• 4 sites had overall score of ≥ 90%<br>• 2 sites had overall score of ≥ 80%<br>• 1 site had overall score of ≤ 80%<br>• CGAR compliance increases from 80% to 85% in April. |
| | 2. Status Hearings/Court Updates | 2. Plaintiff's response due to Court 5-1-17 regarding comments of the appointment of a Special Master to the Parson's case. Court Order 2030 received 4-24-17 includes the Court's definition of "substantially non-compliant" as well as a production demand for several remediation plans. |

| Compliance | 3. CGAR | 3. CGAR: Kicking off CGAR focus teams with priority emphasis on Complexes with greatest need. Two vacant monitor positions filled 5-1-17. Meeting with Richard Pratt 5-1-17 to discuss remediation plans associated with substantially non-compliant measures.<br><br>• February final CGAR overall score 91%<br>• 3 sites had 100% compliance<br>• 4 sites had overall score of ≥ 90%<br>• 2 sites had overall score of ≥ 80%<br>• 1 site had overall score of ≤ 80%<br>• CGAR compliance increases from 80% to 85% in April. |
| | 4. Status Hearings/Court Updates | 4. Plaintiff's response due to Court 5-1-17 regarding comments of the appointment of a Special Master to the Parson's case. Court Order 2030 received 4-24-17 includes the Court's definition of "substantially non-compliant" as well as a production demand for several remediation plans. |

Initiatives Outstanding:

| Issues | Action | Status |
|---|---|---|
| AZ Health Information Exchange (AZHIE) Portal Access | 1. Portal Access<br><br>2. Next Live demo of AZ HIE capabilities -<br><br>3. 4-24-17 AZ Health-e Connection rebranded | 1. Pending HSMB Confirmation of Staff and Administration Team Members<br><br>2. May 24, 2017 12:00pm – 1:00pm; register @ www.healthcurrent.org<br>3. Rebranded as 'Health Current' |

CONFIDENTIAL - SUBJECT TO A PROTECTIVE ORDER          PARSONS v. RYAN, USDC CV12-00601: ADCM961472

| | | |
|---|---|---|
| Care Alert (eOMIS) | March 14, 2017 – care coordination, focused interventions, increased resources | Pending eOMIS Enhancement – High priority status |

Initiatives Completed:

| Issues | Action | Status |
|---|---|---|
| Daily Dashboard | November 21, 2016 | Completed |
| Open Sick Call | December 5, 2016 | Completed |
| AZ Health Information Exchange (AZHIE) Membership | December 15, 2016 | Completed |
| CARES (AZ Utilization Management Outpatient Referrals) | April 1, 2017 | Completed |
| Standardized Start Times – Open Sick Call | April 11, 2017  - Reported to RODs | Completed |
| Offline MAR (oMAR) | April 22, 2017 – Go-live | Completed |

Open Discussion:

CONFIDENTIAL - SUBJECT TO A PROTECTIVE ORDER          PARSONS v. RYAN, USDC CV12-00601: ADCM961473

Exhibit 13



**LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT**

September 19, 2017

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Wieneke & Love, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@swlfirm.com

>          *Re:      Parsons v. Ryan*

Dear Tim:

**AMERICAN CIVIL
LIBERTIES UNION FOUNDATION**

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
*ATTORNEY AT LAW\**

*\*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS*

Thank you for your August 25, 2017 email (sent by Elaine Percevecz on behalf of Anne Orcutt) attaching the August 25 version of the Monitor Guide.  We have the following comments:[1]

1.  We accept your proposed language for PM 95.

2.  With respect to the PM 79, there is a discrepancy in your proposed language between "Source of Records/Review" ("All records for HC PM #81, 83, 84, 85, 88, 90") and "Methodology" ("All records reviewed for HC PM #81, 83, 85, 88, and 90").  We believe that PM 84 should be included and PM 85 excluded, as the latter involves MH-3D patients who, by definition, have discontinued medications.  In short, the source should be "All records reviewed for HC PM #81, 83, 84, 88, and 90."  Please let us know if you agree to this language.

3.  Finally, with respect to the introductory section of the Monitor Guide, the Court has said the following:

    > As I read Dr. Haney's affidavit, it occurred to me that many of these things that he talked about were things that the testimony that we have had from the people from the State who are involved in the process of record collection, that it seemed like they didn't have the benefit of what was described as kind of basic understanding in this area. And it made me think that perhaps we could address that by including it in the monitoring manual.  And I wonder if those who are working on the monitoring manual have an idea about that, about whether some

---

[1] These comments are limited to the issues identified in the August 25, 2017 email.

> of these random selection procedures should be explained to
> people who are doing it so they understand the philosophy.

7/13/17 Tr. at 67:19-68:4.  In response to the Court's remarks and Defendants' request for a draft (*id.* at 68:14-21), we sent you four double-spaced pages of text (attached hereto).

Unfortunately, the August 25 version of the Monitor Guide includes a mere two sentences on the theory and practice of random sampling (putting aside the instructions on how to use the randomization feature of Microsoft Excel).  *See id*. at 10.  The Monitor Guide entirely fails to address the importance of drawing the sample from an appropriate source (*see* Doc. 2048, ¶ 8); the need to exclude from the sample records that cannot possibly demonstrate noncompliance with the measure being assessed, and randomly draw replacement records (*id.,* ¶¶ 11-12); or the critical importance of documenting the entire process, including any changes made to the results (*id*., ¶¶ 13-15).

Please let us know if Defendants are willing to meaningfully include Dr. Haney's guidance in the Monitor Guide.

Very truly yours,

David C. Fathi

Cc:     All counsel

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2017.08.17 [DRAFT] Plaintiffs Proposed Language for Methodology Introduction

Regarding Random Sampling

Random sampling is the process of selecting a sample of cases (such as persons, patients, files, outcomes, or events) from a larger universe of cases to ensure that the sample is unbiased and, therefore, representative.  "Random sampling" has a very specific and precise meaning.  A random sample does not mean a sample that is selected in an arbitrary, haphazard, or idiosyncratic fashion.  Rather, random sampling techniques ensure that no one case from the universe of cases has any higher probability or likelihood of being included in the sample than any other.

Random sampling is done in order to maximize the representativeness of the sample—that is, to ensure that a smaller sample properly "represents" the characteristics of the larger whole or universe from which it is drawn. Sampling is typically done when the universe of cases is too large to study or analyze in its entirety. Randomly sampling from the universe of cases allows information derived from the smaller sample to be generalized to the larger universe of cases (within a margin of error that depends on the size of the sample that has been randomly drawn).

Random sampling is important in many kinds of research because it serves as a safeguard against the possibility that the sample that has been drawn (upon which inferences about the larger universe of cases will be made) was inadvertently or intentionally biased or skewed. If that were so, the sample would not faithfully represent the larger universe of cases to which researchers (or, in this instance, auditors) want to generalize.

For this reason, it is critically important that the random sample be drawn from an appropriate source.  If, for example, a random sample is to be drawn of all female

prisoners who gave birth in a given month, it is critically important that the sample is drawn from a complete and accurate list of such prisoners. Any incompleteness or inaccuracy, whether deliberate or inadvertent, in the source document from which the sample is drawn compromises the representativeness of the sample and the extent to which generalizations can be made about the population from which it is drawn.

The process of random sampling is relatively straightforward and facilitated nowadays by the ease of access to random number generators. These generators can produce random strings or sequences of numbers that allow for the randomization of cases that are selected for inclusion in the sample. The process requires all of the cases in the universe under study to be available, typically in chronological or alphabetical order. The random numbers are generated according to how many cases comprise the universe being sampled. For example, if there are 1000 cases, and an intended sample size of 100, the random number generator will provide a string or sequence of 100 non-repeating random numbers between 1 and 1000. Those numbers are then used as the basis on which to select the 100 cases (the sample) to be drawn from the larger population of 1000. For example, if 5, 7, and 139 were among the 100 random numbers generated, the 5th, 7th, and 139th cases of the alphabetically or chronologically arranged list of 1000 cases would be among those included in the sample.

Alternatively, the random number generator could be used to generate a string or sequence of 1000 non-repeating random numbers. Those numbers would then be assigned, in the order generated, to the alphabetical or chronological list of cases. After assigning the random numbers to the universe of cases, the table of cases would then be re-sorted into numerical order by the random numbers, from smallest to largest, and

the first "X" cases would be selected from that list (where "X" is the sample size desired). Omission of any of these steps will result in a sample that is not random.

Two issues slightly complicate this otherwise straightforward process. The first is the importance of defining the universe of cases in a proper way that correctly identifies the cases that actually test the hypothesis for which the sample is being drawn and the universe of cases is being analyzed. For example, in the present instance, a sample drawn to test compliance with Performance Measure 86 (requiring that "MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication") must <u>exclude</u> cases in which 90 days have not yet elapsed since the patient discontinued medications. Similarly, a sample drawn to test compliance with Performance Measure 82 (requiring "MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician") must <u>exclude</u> cases in which a patient has not yet been classified as MH-3B for 90 days. Likewise, a sample drawn to test Performance Measure 39 ("referrals requiring a scheduled provider appointment[] will be seen within fourteen calendar days of the referral") must <u>exclude</u> all referrals made less than 14 days before the sample is drawn. In each of these examples, the cases described must be excluded from the sample because they cannot possibly be found to be noncompliant, and thus do not test the hypothesis in question – that is, compliance with the relevant Performance Measure.  To include such cases in the sample would misleadingly inflate the compliance figures that are calculated based on the sample.

The second complication is related to the one just stated. Whenever it is determined that one or more of the randomly selected cases is inapplicable (that is, should not be considered as part of the universe that is being sampled), it is necessary to return to the

universe of cases and randomly select another case to include in the sample (rather than to simply discard the inappropriate cases and reduce the sample size). That is because, depending on how many discarded cases there are, the remaining sample could be unrepresentative of the properly defined universe.

Even though random sampling is relatively straightforward, it is critically important to carefully document all steps of the process that was followed, including the source from which the sample was drawn, the process by which randomization was accomplished, the origin and results of the random draw, and how the random numbers were assigned to the list or series of cases in the universe of cases from which the sample was created (including which specific cases were included). This "audit trail" permits others to recreate the process and make sure that the steps that were taken were appropriate and correctly followed.

Similarly, if the ultimate results derived from the sample (in this case, a given percentage level of compliance) are changed at any point, it is critically important that both the original values and the changed values be clearly documented, along with documentation of when and by whom the change was made and the justification for it. Under no circumstances should results be changed without this information being clearly apparent to anyone viewing the audit document.

The documentation should occur in real time rather than after the fact. For example, if it was necessary to exclude cases drawn from the universe of cases because they did not fit the selection criteria, it is important to document which cases those were, why they were excluded, and exactly how they were replaced in the sample. Again, such an audit trail allows others to ensure the appropriateness of the methods by subsequently reviewing the exact actions that were taken.

Exhibit 14



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

October 20, 2017

<u>**VIA EMAIL ONLY**</u>
David C. Fathi
American Civil Liberties Union Foundation
National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005-2112

   Re: ***Parsons v. Ryan***
     **United States District Court of Arizona**
     **Cause No. 2:12-cv-00601-DKD**

Dear David:

  We received your September 19, 2017 letter accepting our proposed language for PM 95 and discussing the proposed changes to PM 79, as well as the proposed language in the introductory section of the Monitor Guide.

  With respect to the proposed changes to PM 79, we agree that PM 84 should be included in the Methodology section and the reference to PM 85 be eliminated in the Source of Records/Review section. These changes are included in the attached redlined version of the Monitor Guide, which has been renamed to reflect the date of these latest proposals.

  With respect to the introductory section of the Monitor Guide, we considered your suggested language previously, and the August 25, 2017 redlined version reflects the extent of our amalgamation.

David C. Fathi
October 20, 2017
Page 2


        Please let us know if you agree with the revisions to PM 79 and the introductory section
on random sampling.


                                        Regards,



                                        Timothy J. Bojanowski


TJB/eap

cc:       Counsel of record

Attachments: As stated

Exhibit 15

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



October 27, 2017

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

   *Re:*    **Parsons v. Ryan**

Dear Tim:

I write in response to your letter of October 20, 2017, regarding various monitoring issues.

**Performance Measure 95**

As set forth in our letter of September 19, 2017, we believed that we had reached agreement on the Monitor Guide language for PM 95.  However, we have since discovered Defendants' practice of including in the sample for one institution patients who were removed from watch at a different institution.  *See* our letter of October 4, 2017, at 10.  We believe that this practice is inconsistent with the Stipulation; Defendants apparently disagree.  We will present this issue to the Court for resolution; additional modifications to the Monitor Guide language for PM 95 may be necessary in light of the Court's ruling.

**Performance Measure 79**

We accept the revisions for PM 79 set forth in the Monitor Guide draft that accompanied your October 20 letter (note that while the Word file for this document reads "Revised 10-20-2017," the document itself reads "Draft Revised 8/25/17").

**Introductory Section of Monitor Guide**

For the reasons stated in our September 19 letter, we do not believe Defendants are in compliance with the Court's directive to include Dr. Haney's guidance on random sampling in the Monitor Guide.

Very truly yours,

David C. Fathi

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Cc:     All counsel

2