1                    **UNITED STATES DISTRICT COURT**

2                   **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

**Victor Parsons, et al., on**    )
5  **behalf of themselves and all**  )
   **others similarly situated;**    )
6  **and Arizona Center for**        )
   **Disability Law,**               )
7                                    )   No. **CV 12-00601-PHX-DKD**
              Plaintiffs,            )
8                                    )
         vs.                         )   Phoenix, Arizona
9                                    )   October 11, 2017
   **Charles Ryan, Director,**       )   9:04 a.m.
10 **Arizona Department of**         )
   **Corrections; and Richard**      )
11 **Pratt, Interim Division**       )
   **Director, Division of Health**  )
12 **Services, Arizona Department**  )
   **of Corrections, in their**      )
13 **Official capacities,**          )
                                     )
14              Defendants.          )
   _____  )
15

16

17     **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

18          <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

19                   (*Status Hearing*)

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1                          <u>A P P E A R A N C E S</u>

2     **For the Plaintiffs:**

3              ACLU - Washington DC
               By:  **David C. Fathi, Esq.**
4              By:  **Amy Fettig, Esq. (Telephonic)**
               915 15th Street NW
5              7th Floor
               Washington, DC 20005
6
               PRISON LAW OFFICE
7              By:  **Corene Kendrick, Esq.**
               1917 5th Street
8              Berkeley, CA 94710

9              ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
               By:  **Maya S. Abela, Esq.**
10             177 N. Church Avenue
               Suite 800
11             Tucson, AZ 85701

12             EIDENBACH LAW PC
               By:  **Kirstin T. Eidenbach, Esq. (Telephonic)**
13             P.O. Box 91398
               Tucson, AZ 85752
14
      For the Defendants:
15
               STRUCK LOVE BOJANOWSKI & ACEDO PLC
16             By:  **Timothy J. Bojanowski, Esq.**
               By:  **Rachel Love, Esq.**
17             By:  **Daniel P. Struck, Esq.**
               By:  **Richard M. Valente, Esq.**
18             3100 W. Ray Road
               Suite 300
19             Chandler, AZ 85226

20             OFFICE OF THE ATTORNEY GENERAL - Phoenix
               By:  **Lucy M. Rand, Esq.**
21             1275 W. Washington Street
               Phoenix, AZ 85007
22

23

24

25

P R O C E E D I N G S

THE MAGISTRATE JUDGE CLERK:  Case Number CV 12-601, Parsons, et al., versus Ryan, set before the Court for a status hearing.

THE COURT:  Would counsel please announce.                09:04AM

MR. FATHI:  Good morning, Your Honor.  David Fathi of the ACLU National Prison Project for the plaintiff class.

THE COURT:  Thank you.  Good morning.

MS. KENDRICK:  Good morning, Your Honor.  Corene Kendrick from the Prison Law Office for the plaintiff class.     09:04AM

THE COURT:  Good morning.

MS. ABELA:  Good morning.  Maya Abela for Arizona Center For Disability Law.

THE COURT:  Good morning.  And on the telephone, anybody from plaintiffs?                                   09:04AM

MS. FETTIG:  Yes, Your Honor.  This is Amy Fettig from the ACLU National Prison Project for the plaintiffs.

MS. EIDENBACH:  This is Kirsten Eidenbach for the prisoner plaintiff class as well.

THE COURT:  Thank you.  Good morning.                     09:05AM

And in court for the defendants.

MR. BOJANOWSKI:  Your Honor, Tim Bojanowski, Rachel Love, Dan Struck, and Richard Valente for defendants.

THE COURT:  Thank you.  Good morning.  And on the telephone for defendants?                                  09:05AM

1          MS. RAND:  Lucy Rand for the Attorney General's Office

2     for defendants.

3          THE COURT:  All right.  Thank you.

4          As a preamble to our monthly gathering, I wanted to

5     lay how I view the landscape and what actions that I have been          09:05AM

6     taking and define them into categories, perhaps, so that people

7     can best understand how I'm viewing the case presently and my

8     role in it.  I have three fronts, or areas of focus in my

9     efforts to try to bring about an enforcement of the

10    stipulation.  And those three fronts are, first, what happens          09:06AM

11    here on a monthly basis, and more often than that with respect

12    to written filings and impromptu telephonic hearings where I

13    essentially am trying to mind the details of the reports that

14    indicate that there have been failures to comply with the

15    stipulation.  And as you know, from month to month, I          09:06AM

16    essentially hound the defendants on how we are doing and what

17    they have proposed and what kind of results and really trying

18    to hold the whole process accountable to try and deliver on the

19    stipulation.

20         Within this first category there are a number of          09:07AM

21    issues.  In fact, it's a very broad category, but there is,

22    are, illustrations in the agenda today of how broad it is.  One

23    of the things that is raised by Mr. Fathi's letter of October

24    4th is addressing in part some issues associated -- potential

25    issues associated with the monitoring process.  That's, of          09:07AM

course, very critical to the Court and, as you know, in the

past I have been very concerned and very focused on where there

have been suggestions of failures in the monitoring process.

Because I know that I -- the monitoring process works sometimes

because it produces information that's relevant, we all act

upon it, where it produces information where we believe there

is a trustworthiness and it's successful.  We know we can push

those issues aside from the Court's intervention because we

know that it's working in the prison complexes.

        Equally, the monitoring brings us the very dramatic

evidence of failures to comply, and so that somehow gives you

some kind of encouragement about the system because the

defendants who are going to be tagged with the consequences of

this failure to comply are also in charge of the monitoring.

And so at some point you think, well, they are bringing you

this bad information.  You can trust it because obviously

there's no reason to distrust when somebody is bringing you bad

information.

        Nevertheless, there is always the concern that you

could have intrinsic inherent biases that, even if they were

not malicious, would exist in a system of self-monitoring.

It's the old saying the fox guarding the hen house.

        So I'm also very focused on that and have been tempted

at times to think that maybe we're reaching a point where there

is sufficient questioning about it that there needs to be some

1   kind of independent audit to just verify that the process is

2   reliable and is working.  And that one of the things that I had

3   contemplated with respect to the earlier decision on the

4   application of the contempt authority and the likely

5   consequence that that would produce a payment from the                09:09AM

6   defendants would be to use that money to undertake an

7   independent audit to verify that we were actually getting the

8   right numbers.

9           That remains something that I could consider, whether

10  I have that fund of money available to me because of the             09:10AM

11  contempt sanction or whether it would just at some point become

12  necessary to do and to impose that cost upon defendants to

13  verify that the information in the stipulation is correct.

14          So this Category 1 is broad, and it requires a

15  diligence and a carefulness that is challenging to the process.      09:10AM

16  We talked about that a little bit last month where I was

17  critical, perhaps maybe harshly so, and I apologize, Mr.

18  Bojanowski, with respect to my belief that we need to be

19  raising the game altogether.  But it is challenging for us all

20  because this is a big project.  I can see in the filings, in         09:11AM

21  the docket, the enormous amount of time that is devoted to this

22  by the lawyers to effectuate the accomplishment of the

23  stipulation.

24          And so this enormous project that I have now, just

25  talking only about the first area, produces such an amount of        09:11AM

1    work that it requires significant attention to detail and

2    significant commitment of resources.  There's just simply no

3    escaping that.

4         The second, the second front is the one that we'll

5    visit with in about 20 minutes when Mr. Millar calls in, and

6    that is my belief that the problem that is largely one of

7    staffing throughout the system, one that is evident by the

8    State's own numbers which indicate the positions it believes

9    need to be filled are not filled and Mr. Millar, an expert in

10   this field, is going to undertake analysis to inform the Court

11   what it is that needs to be done to address these vacant

12   positions the State has decided it needs to fill but is unable

13   to fill.  If there are limitations that exist that somehow the

14   State believes it binds, I believe the Supremacy Clause of the

15   United States Constitution is something that is of utility here

16   and will be something that the Court has at its availability

17   notwithstanding perhaps other limitations that may exist.

18        The third category is the one that is on the docket as

19   of yesterday, and that is the Court's pursuit of its contempt

20   sanction with respect to enforcing the stipulation.

21        These three measures are all designed to do the same

22   thing, to bring about compliance with the stipulation.  We

23   tried in earnest the first front and got really nowhere in

24   terms of being done with this.  Some areas we improved

25   performance.  No doubt about that.  But the areas where we

09:11AM
09:12AM
09:12AM
09:13AM
09:13AM

continue to see and what the defendants filed last night with

respect to the most recent numbers, again, show that we are

failing.  And so the first front was hopefully going to

accomplish a resolution of that.  It didn't.  And so that's why

we now are employing the second and the third.  So these three,

my hope is, in combination.  Will accomplish what the first

didn't.

        But I wanted to give you that broad landscape so that

you understand how I'm looking at the problem.  And I guess I

should maybe at this point mention one of the remedies that I

had employed in the past, or sought to employ in the past but

was the product of an appeal, and that is the outside

providers, that plaintiffs have asked me to vacate that I do

not think I have the jurisdiction to do it.  It's something

that is a decision of the court that's been appealed.  You

can't simply turn to the lower court and say, resolve the

appeal.  We have no power to resolve an appeal once it's been

appealed.  That's solely before the Ninth Circuit.  So I will

deny that request.

        MR. FATHI:  May I?

        THE COURT:  Yes.

        MR. FATHI:  Before you rule, may I address that?

        THE COURT:  You may.

        MR. FATHI:  Thank you, Your Honor.  Obviously, we

received the defendants' filing at 7 something last night.  We

09:14AM

09:14AM

09:14AM

09:14AM

09:15AM

haven't had time to thoroughly research the issue.  But our

preliminary research indicates that what the Court can do is

indicate whether it would be inclined to grant such a motion

were the case to be remanded for that purpose.  And the

authority for that is -- excuse me one moment, Your Honor -- GC                09:15AM

and KB Investments, Inc. versus Wilson, 326 F.3d 1096, 1101,

Note 2, Ninth Circuit, 2003.  And --

THE COURT:  I just would say that your original notice

or motion to the Court didn't cite any authority for me to be

able to do this.                                                              09:16AM

MR. FATHI:  That is probably correct, Your Honor.  We

continue to believe that the Court has the authority to do it

but there's no question that the Court could follow this

process, which is to indicate that it would be inclined to

grant such a motion if the case were remanded for that purpose.               09:16AM

We're just trying to be very pragmatic here, Your Honor.  This

is an order that the defendants have not complied with.

THE COURT:  Isn't that -- I mean, you didn't seek a

stay and so -- but you also didn't -- you weren't earnest in

trying to, I mean, you mentioned it, I suppose that's fair to                 09:16AM

say, but, well --

MR. FATHI:  Your Honor, I'm not sure how we could have

sought a stay.  The defendants were the appealing party.  We

did, Your Honor, at every one of these monthly hearings, we did

point out to the Court that this measure is one on which the                  09:17AM

1    Court's -- they are subject to the Court's community resources

2    order, the defendants aren't complying with it, and the

3    defendants didn't comply and the Court didn't enforce it.  Now

4    we understand that the Court has now chosen a different

5    enforcement mechanism that is embodied in yesterday's order but      09:17AM

6    we just don't think that it makes sense to expend judicial

7    resources on an appeal of an order that now neither side

8    supports that is not being enforced that is not being complied

9    with and that is having no effect in the real world.

10           And so we would like to be able to advise the Ninth         09:17AM

11   Circuit, argument is scheduled for one week from today, October

12   18th, that the Court would be inclined to grant the motion to

13   vacate the order were the Court to remand the case for that

14   purpose.

15           THE COURT:  Boy, this is -- I mean, I could think of        09:17AM

16   all sorts of reasons why this is dangerous territory.  Because

17   I'm unaware of any of the arguments the parties have presented

18   to the Ninth Circuit.  I don't know what the nature of the

19   issue is there.  I don't know whether by vacating my order I'm

20   reducing my ability in the future to do what I thought was          09:18AM

21   originally justified and maybe would be something that I would

22   want to use again, and that is to say, if you cannot solve it

23   in house, go to the urgent care.

24           And I guess, to me, it is so fraught with these kinds

25   of dangers that it's why every judge, I think, has this             09:18AM

```
 1    internal sense that once an issue has been appealed it's before
 2    the Circuit and we should not -- I mean, certainly the Circuit
 3    has told us, the trial courts, over and over again where we
 4    attempt to dabble in an area that's been appealed, that we
 5    don't have the jurisdiction to do that.  But in any event, I        09:18AM
 6    will look at your case.  We will do that.
 7              MR. FATHI:  Your Honor, we would like the opportunity
 8    to file a brief.  Again, the defendant's paper was filed late
 9    last night.  We're prepared to do it on a very short timeline
10    if that's acceptable.                                               09:19AM
11              THE COURT:  That's perfectly fine.
12              MR. FATHI:  Could we have until Friday?
13              THE COURT:  You can take as much time as the rules
14    provide, and that's much more than Friday.  If you would like
15    to get it in by Friday I will look at it when you file it.         09:19AM
16              MR. FATHI:  Thank you, Your Honor.  Again, we would
17    like to be able to give some indication to the Court of Appeals
18    next week which way the Court is going if that's possible.  So
19    we will file something by Friday.
20              THE COURT:  Okay.                                        09:19AM
21              MR. FATHI:  Thank you.
22              THE COURT:  Let me turn to another housekeeping issue.
23    And that is just to make sure we're all on the same page with
24    respect to the future meeting dates.  We have already on the
25    calendar November 7th and 8th for various matters.  Then we        09:19AM
```

1     need to change the date that's set for -- our normal meeting in

2     December cannot happen on the 13th of December.  It could be

3     reset to either the 6th or the 20th.  And I will ask respective

4     counsel how they view those alternatives.

5             MR. BOJANOWSKI:  Did you say the 6th, Your Honor?          09:20AM

6             THE COURT:  Yes.  The 6th or the 20th.

7             MS. KENDRICK:  Your Honor, December 20th would work

8     for plaintiffs' counsel.

9             THE COURT:  Okay.

10            MR. BOJANOWSKI:  The 20th would have to be the day,          09:20AM

11    Your Honor.

12            THE COURT:  Good.  So we'll meet on the 20th of

13    December.

14            MR. FATHI:  Your Honor, speaking of housekeeping, we

15    spoke to defendants before court today about the possibility of     09:21AM

16    switching -- keeping the same two dates, November 7th and 8th

17    but just switching the order of the status hearing and

18    retaliatory hearing.  Defendants were going to check, but it

19    doesn't make sense if it's not acceptable to the Court.

20            THE COURT:  It is, and I have, I hope, made it clear         09:21AM

21    to you in the past that I don't have a particular vested

22    interest in the order of things.  It matters more on the

23    witness's availability and counsel 's schedule.  So that's fine

24    with me.

25            MR. FATHI:  Thank you, Your Honor.                          09:21AM

1          THE COURT:  Any way you would like to allocate it is

2     perfectly acceptable.

3          Then turning to January, you know we have scheduled

4     two possible dates, two dates.  We have scheduled the 9th and

5     the 10th.  If it turns out that we don't need all that time we          09:22AM

6     won't use it.  It just seemed that it was possible that we

7     might so we went ahead and set it.

8          Then we have a difficulty in February which means that

9     we have to postpone our meeting until the end of the month.

10    And I'm wondering if February 28th works for counsel.          09:22AM

11         MR. FATHI:  It's fine for plaintiffs, Your Honor.

12         MR. BOJANOWSKI:  I think that will work as well.

13         THE COURT:  Okay.  Good.  Thank you very much.  So

14    then thereafter, March through the rest of the year, unless you

15    all somehow produce an availability of exiting the stipulation          09:23AM

16    we'll meet the second Wednesday for every other month for the

17    rest of the year.  I will put that on the calendar.

18         Thank you.  We've got five minutes before Mr. Millar

19    calls in, so I can turn to maybe some other issues that can be

20    addressed in short time frame.  Perhaps the question about the          09:23AM

21    University of Arizona telemedicine, Mr. Bojanowski, I was, last

22    time, asking you to find out more, maybe to have somebody

23    explain to us because we had had somebody explain to us before

24    what was the status.  We put a lot of eggs in that basket, I

25    thought, and so that's why I was more focused on it.          09:23AM

1    MR. BOJANOWSKI:  Your Honor, I did contact Corizon

2    with regard to that issue and working with Fennemore Craig

3    counsel.  They are putting together a very detailed declaration

4    which is going to lay out what has occurred and such.  And we

5    are going to provide that to the Court by way of a filing.          09:24AM

6         THE COURT:  Okay.  Where do you think that will come?

7    When do you think that will come?

8         MR. BOJANOWSKI:  And we're going to file that before

9    the next hearing.

10        THE COURT:  Okay.                                              09:24AM

11        MR. BOJANOWSKI:  So can have that addressed in some

12   detail.

13        THE COURT:  Maybe I can go ahead and just start with

14   the preliminary question about Mr. Fathi's October 4th letter

15   which asked defendants to give an update in response by the 6th   09:24AM

16   of October and ask whether or not that has happened or not.

17        MR. FATHI:  It has not, Your Honor.

18        THE COURT:  Okay.  What's your position in responding

19   to the issues raised in the October 4th letter?

20        MR. BOJANOWSKI:  Upon receipt of the letter, Your          09:25AM

21   Honor, I sent it over to the client so we can get it out to the

22   monitors who can then actually pull the files, have a look at

23   what's occurred so that we can then, again, provide a written

24   response to the Court and plaintiffs' counsel with regard to

25   our findings.  Because Mr. Fathi's letter did touch upon a        09:25AM

1    number of different issues and such, and so we just -- it's

2    been seven days ago, so it's not been quite enough time for us

3    to get it put together.

4            THE COURT:  I'd like to provide for an opportunity for

5    you to respond and for there to be a meet-and-confer about        09:25AM

6    this.  But the issues at least raise, on a prima facie basis,

7    some very worrisome things.  So I'd like to stay on top of this

8    and to the extent that you can't get it resolved then I think

9    we'll need to have a separate telephonic conference just about

10   this letter.  But what I'd like to do is set up a timetable so   09:26AM

11   that you all will be able to report back to me whether that's

12   necessary or not and I know when that's going to happen.

13           So how much time do you think you need, Mr.

14   Bojanowski, to get everything collected and to be able to

15   respond to Mr. Fathi so you all can sit down and talk about it?  09:26AM

16           MR. BOJANOWSKI:  I'd like to respond by end of next

17   week.

18           THE COURT:  All right.

19           MR. BOJANOWSKI:  Say Friday.  I mean, I don't have a

20   calendar.  The 20th.                                             09:26AM

21           THE COURT:  So the 20th of February.  What am I

22   saying.  The 20th of October.  And then report back to the

23   Court by the 24th of October.  You all can, if you need a

24   telephonic conference, you can get on the phone together and

25   speak with Ms. Herrera and get that scheduled.  If the issues   09:27AM

1     are resolved you can communicate it in any way you see fit.

2             MR. FATHI:  Thank you, Your Honor.

3             MR. BOJANOWSKI:  Did you want us to file something

4     with the Court on the 24th, Your Honor?

5             THE COURT:  You can do it any way you see fit on the          09:27AM

6     24th.  If you need me to be on the phone for a telephonic

7     conference, get on the phone together and call Ms. Herrera and

8     get that scheduled.  If you have resolved the issue and you

9     don't need to, you can let me know any way you see fit.  You

10    can get on the phone together, you can send an e-mail over          09:27AM

11    together, copied to everybody, or you can file something.

12            MS. KENDRICK:  Your Honor, can we go back to the

13    telemedicine issue?

14            THE COURT:  Yes.

15            MS. KENDRICK:  So at the last hearing you directed Mr.       09:27AM

16    Bojanowski, and he said he would bring people that could

17    provide the detailed information that we were requesting and he

18    now says that he will provide the detailed information before

19    the next hearing.  And we just request that the Court set a

20    deadline that is sooner in time for a response so that we don't     09:28AM

21    have a filing the night before the next hearing but rather

22    there's some time for both plaintiffs' counsel and the Court to

23    review and digest what was provided.

24            THE COURT:  When would you need that by?

25            MS. KENDRICK:  Two weeks prior to the next hearing.          09:28AM

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  So that would be of.

 2              MS. KENDRICK:  25th, or 24th, I'm sorry.

 3              THE COURT:  25th.  It seems like you would be able to

 4    do that with your efforts with Corizon counsel, Mr. Bojanowski.

 5    I saw a nod.                                                        09:28AM

 6              MR. BOJANOWSKI:  You saw a nod.  So 10-25, correct?

 7              THE COURT:  Yes.  Thank you.

 8              Mr. Millar?

 9              MR. MILLAR:  Yes.  This is Mr. Millar.

10              THE COURT:  Good morning.  David Duncan here.  How are   09:29AM

11    you?

12              MR. MILLAR:  Doing well.  Thank you, sir.

13              THE COURT:  Good.  We have everybody assembled in the

14    courtroom and so we can embark upon what we were going to talk

15    about last week, and that is what your new view is, if any,        09:29AM

16    with respect to the additional information that was provided to

17    you.  My hope here is that we will be able to get your input so

18    that the Court can resolve some of the issues that have been

19    raised by the parties with respect to scope and give me an

20    opportunity to hear what you have to say and maybe ask             09:29AM

21    questions and also give the counsel an opportunity to ask any

22    questions that they might want to as well.

23              Is that sort of consistent with what you thought we

24    would be talking about?

25              MR. MILLAR:  It is.  Yes, it is.                         09:30AM
```

1           THE COURT:  Just wanted to make sure.  So you have had

2     an opportunity to take a look, and what do you think?

3           MR. MILLAR:  Well, in going through the two different

4     points of view, I think that's pretty much what we have, Judge,

5     is two very kind of different points of view on it.  I think          09:30AM

6     the plaintiffs have a very high level general sweeping

7     recommendation for what areas should be looked at.  I think the

8     defendants have a very narrow targeted approach for what they

9     would want to look at.  As I have tried to catalog the

10    different areas across the 10 facilities and the different          09:30AM

11    levels of providers, I have met 71 suggested areas of review

12    with only 16 of those being common between the two parties with

13    the plaintiffs identifying 64 areas and the defendants 23, and

14    so not a lot of overlap.  I think what you are seeing is two

15    different points of view:  One being a more broader review          09:31AM

16    based on the performance against the quality components; the

17    other one being a more narrow review against current staffing

18    vacancies over just the last four-month period.

19          THE COURT:  One of the things that occurred to me in

20    wondering about how to resolve this disagreement is if there          09:31AM

21    were certain situations where it really didn't matter in terms

22    of how much it would cost to do additional areas if they were

23    all within the same regions that you had described.  And I

24    wondered if you happened to have looked at it that way to see

25    whether or not some number of these where there is an agreement          09:31AM

1    between the plaintiffs and defendants, whether those also

2    include regions that would necessarily encapture some of the

3    greater number of areas that the plaintiffs thought should be

4    analyzed.

5            MR. MILLAR:  I have to a little extent.  I actually          09:32AM

6    did not -- I didn't price this out to the two individual

7    extremes, so to speak.

8            THE COURT:  Uh-huh.

9            MR. MILLAR:  But as I have looked at this, what I have

10   tried to do is group the employee types into four categories;        09:32AM

11   providers, which would be your medical directors, your staff

12   physicians, your APRNs, your psychiatrists, psychologists,

13   mental health MPs and your dentists, so essentially your M.D.

14   level or near M.D. level non-nursing providers.  I then grouped

15   others into a nursing group and then clinical support, which         09:33AM

16   would be your technicians and other support which would be your

17   clerks and secretaries.

18           And although the defendants had recommended looking at

19   some of the positions under clinical support and other support,

20   I'm not sure there's a lot of value in doing that in the one or      09:33AM

21   two places where that exists.  I also don't believe that to

22   take, for example, the medical directors in five of the 10

23   facilities as that's where the crossover point is, the

24   plaintiffs have recommended looking at medical directors in all

25   10 facilities, the defendants in five, and then under the staff      09:33AM

1    physicians, it's all 10 for the plaintiffs and four for the

2    defendants.  I do not believe at that level that there is much

3    savings to break it down to just those levels.  It would take

4    about the same amount of work to do in five or six of these

5    areas as it would do in all 10.  And I question the value of                09:34AM

6    the work if it were done in just the subset of those.

7              THE COURT:  Are the categories now replacing the

8    previous categorizing of using regions, or are they both

9    existing?

10             MR. MILLAR:  They are both existing.  I think when we          09:34AM

11   spoke the last time, I was categorizing the regions and then

12   just what I would call the providers.  We were looking at M.D.s

13   nurse practitioners, and then the behavioral health folks.  I

14   think in the responses from the plaintiffs and defendants they

15   have gone into a greater level of detail that has now included          09:34AM

16   some of the nursing line staff and some of the technical staff.

17   And so I have expanded what I would call the categories that we

18   would be looking at.  And so one of the things that's expanded

19   in my mind, and I now have what I would say are two options:

20   One option would be to do a market level analysis profile and a         09:35AM

21   retention analysis across the providers excluding dentists for

22   all 10 facilities which I would say fall into eight markets.  I

23   would group Eyman and Florence together and Lewis and

24   Perryville together based on the observations from plaintiffs'

25   counsel.                                                                 09:35AM

1        And so that would be -- I think that would give the

2   first level of insight for the Courts as to where the

3   challenges are.  It would also tell you where there are

4   possibly best practices.  There are some of these areas whereas

5   defendants have called out that they do have more full          09:35AM

6   staffing.  I think it would be very informative to this

7   analysis to understand why they are able to accomplish that in

8   some regions and not in others, and is that replicable in the

9   other regions.

10       And then based on the responses from both counsels,        09:36AM

11  there seems to be some interest in potentially extending that

12  to a nursing and clinical assistant or clinical tech level that

13  would be an expansion of the analysis more than I envisioned

14  the last time we spoke.

15       THE COURT:  Is that something you think makes sense?        09:36AM

16       MR. MILLAR:  Given the area that you are in, I think

17  it's the Winslow area that has the greatest amount of vacancies

18  in the nursing element, so I think nursing plays a role but

19  probably has a little bit less viability.  I think if I were

20  going to approach it I might suggest doing the providers first   09:36AM

21  and see then if some of the issues with nursing are related to

22  that, but do that as a secondary element.  If we're looking at

23  cost and scale, my estimate is that the portion to do the

24  provider element, I'm looking at a five- to six-month time

25  frame.  And some of that is due to us coming up to the          09:37AM

1    holidays.  But I think there's going to be difficulty and so we

2    have managed our budgets through that.  Either one of these

3    could be done in that time frame, either at the provider level

4    or we're looking at something in the neighborhood of $150,000.

5    To add the nursing component would probably be a 50 percent          09:37AM

6    increase on that at about 225.

7            I think there's value to do them both at once in that

8    you then have all the information there.  I'm not sure I could

9    tell you at this time if I know if that information you would

10   derive would be worth the additional 50 percent to pursue it at     09:38AM

11   this time.

12           THE COURT:  And just to make sure that I'm clear about

13   this, at the end of the process, do you believe that your

14   identification of the issues that are associated with the

15   staffing problems would also produce your recommended              09:38AM

16   resolution of that problem, actions that could be taken to

17   address the problems that you identified, is that something you

18   see within your --

19           MR. MILLAR:  Absolutely.  Absolutely.  The process

20   here is to survey and identify the situation, identify where       09:38AM

21   the issues presided, what the cause of them or root cause might

22   be, and then propose recommended solutions.  And those

23   solutions might range from a rewriting of the job descriptions

24   and responsibilities; it may be a compensation or benefit-type

25   of impact if they are falling well below or too close to market    09:39AM

1    rates, or it could be some operational issues around retention

2    and other things.  But my intent would be to not only clearly

3    identify the root causes in each market, identify where best

4    practices and success is happening within the different

5    facilities, and then come forward to you judge with a specific    09:39AM

6    set of recommended actions to work to move towards fully

7    staffing the current proposed staffing matrix.

8         THE COURT:  And your timetable of five to six months

9    means that at the end of that five or six months I would have

10   exactly that?                                                    09:40AM

11        MR. MILLAR:  Yes.

12        THE COURT:  And the variable -- go ahead.

13        MR. MILLAR:  It also means that, I mean, during the

14   interim we will be forthcoming with interim reports, things

15   that can be vetted and reviewed by both counsels.  This will be   09:40AM

16   an iterative process we would work through.  I would envision

17   having probably at least a monthly meeting with you and

18   counsels to review progress and findings and to level set or

19   redirect or refocus as data or interviews bear out the need to

20   do so.                                                           09:40AM

21        But what I would see for you, Judge, is at the end of

22   this five- or six-month period is you would have a formalized

23   report that spelled out the process, the findings, and then the

24   recommendations both from an operational or hiring standpoint.

25        THE COURT:  All right.  Was there anything else you         09:41AM

1    wanted to say before I give counsel an opportunity to say

2    anything?

3            MR. MILLAR:  No.  I think I have summarized what I

4    came away with from the documents that I have received last

5    week.                                                          09:41AM

6            THE COURT:  On the plaintiffs' side?

7            MS. KENDRICK:  Yes, Your Honor.  We reviewed the

8    recent filing that the defendants did, Docket 2347-1, which was

9    their report about the underlying causes of deficiencies in

10   performance measures.  And just to preface that, part of what   09:41AM

11   we sent to Mr. Millar was detailing the performance measures

12   that were at issue at each institution because we do believe

13   that that should also inform what type of analysis he does and

14   what positions he focuses on and not just what the staffing

15   reports show for the most recent month.                         09:42AM

16           And in reviewing defendants' filing and comparing it

17   against the staffing reports for July and August and actually

18   going back to April, we identified some discrepancies that were

19   very concerning and called into question some of the staffing

20   reports that defendants relied upon in their report to Mr.      09:42AM

21   Millar as their justification for the narrow scope that they

22   wanted him to do.

23           Just to run through a couple of them, the first one is

24   with regard to Performance Measure 51, defendants, in their

25   filing on the remedial plan, said that the cause was due to     09:42AM

1    turnover in the clinical coordinator position.  They don't say

2    how long it was vacant, but they do say that there was turnover

3    between April and August.  We went back and looked at the April

4    through August staffing reports and they always showed 100

5    percent staffing in this position.  So that, to us, raised some      09:43AM

6    questions about possible contradictions.

7           Another discrepancy we found was that for the Safford

8    prison on Performance Measure 46, defendants said, quote, "One

9    provider was out for several months from April 2017 to current

10   leading to a backlog."  And if you look at the staffing reports      09:43AM

11   for April, May, June, July, and August, each month for Safford

12   they show that the two provider positions are filled.  The two

13   provider level positions are the site medical director and then

14   the other is the nurse practitioner.

15          So we don't know what this means.  If the staffing           09:43AM

16   reports don't reflect when somebody is quote, unquote, out, we

17   wouldn't know looking at that staffing report that the position

18   was vacant.  And at Safford --

19          THE COURT:  Maybe it wasn't vacant.  Maybe he or she

20   was on medical leave or something like that so the position is      09:44AM

21   held by that person, but the person is not showing up for work.

22          MS. KENDRICK:  Right.  But the point being if you look

23   at the staffing report you wouldn't know that there is -- 50

24   percent of the providers are not there.  And so then, you know,

25   maybe they need to recruit temporary staffers.  We don't know.      09:44AM

1    But the point is the staffing reports aren't the end all be

2    all.

3           The final example comes from the Yuma prison.  And on

4    Performance Measure 46, again, they state the provider retired

5    and, quote, "After having this job posted for 351 days they        09:44AM

6    found a candidate and they hoped to fill the position by

7    October."  So for us the fact that a position for a provider

8    level was left vacant and advertised for 351 days is Exhibit 1

9    as to why Mr. Millar's analysis is needed.

10          But also, more importantly is if you look at the           09:44AM

11   staffing reports from April through August for all provider

12   levels, medical director, physician, and nurse practitioner

13   they show 100 percent staffing at Yuma.  There is no indication

14   that there had been a vacancy for 351 days.

15          So while we do find these staffing reports informative     09:45AM

16   and useful, we do share a concern that these are not the end

17   all be all and should not be the sole basis for what areas Mr.

18   Millar focuses on because, again, defendants, in their letter,

19   cite the staffing reports to say that he doesn't need to study

20   how to recruit providers at Yuma yet defendants' own remedial     09:45AM

21   plan filing describes the problems of trying to recruit a

22   provider for that prison.

23          THE COURT:  What about the nursing component of it?

24          MS. KENDRICK:  We do think that nursing staff is very

25   important to look at, you know, the fact that a couple months     09:45AM

ago, we were talking about the 15 new nurses that were hired at

the Florence prison.  We subsequently learned that these were

not, quote, new positions but filling vacancies.  And many of

those statements, and, I mean, we can go through it when we go

through their remedial plan, they do talk about hiring new          09:46AM

nurses, training new nurses.  And so our concern is that while

the percentages may look close to full but it sounds like

there's a lot of churning and turnover with turning staff.  And

the staffing model that Corizon uses is the providers are kind

of removed from the process.  The day in, day out work is done     09:46AM

by registered nurses.

        And so we think it's very important to ensure not only

that the positions are filled but that there's continuity so

that every time a person comes to the open clinic to see a

nurse they are not seeing a totally different individual each       09:46AM

time and have to start all over again.

        THE COURT:  Mr. Millar, if you did the nursing study

would you be providing any information about these continuity

issues that Ms. Kendrick just raised?

        MR. MILLAR:  I'm trying to think, Judge, what source       09:47AM

of data I would work from in order to identify those continuity

issues.  If there are payroll records or timecard or attendance

records that are available to work from, that could be

provided.  Short of that, it would take almost like a work flow

on-site analysis to do that, and that would be beyond what I       09:47AM

```
1   would contemplate for this assessment.
2        THE COURT:  Mr. Kendrick's supposition, as I
3   understand it, is to use her word there is a churning that is
4   occurring because of a change in personnel.  Generally, you can
5   imagine from all of our life experiences you do understand that
6   there are loss of efficiencies and attention to detail and
7   attention to task when you are constantly bringing in new
8   people.  It would seem to me that this supposition is something
9   that could be observable and tested.  It may be that it's hard
10  to drill down on it without the additional effort that you just
11  described but it also may be the kind of thing that when you
12  are looking at the situation from the provider level you would
13  get an understanding about whether or not this was something
14  that was appropriate to delve into further and to try to get to
15  the end point, and that is specific recommendations on how to
16  address that problem if it is identified as a problem.
17       So I wonder, as you sit in this stage of trying to
18  frame the work assignment, whether you think it makes sense to
19  say go off and look at the providers but keep sort of an eye
20  open to maybe this other issue.  Let us know along the way if
21  you think that the scope of work should be expanded to do the
22  nurses, not at the tail end of the process but engrafted into
23  what you are doing on an ongoing basis so that we would have an
24  opportunity to decide that.  Or whether based upon what you
25  have just heard from Ms. Kendrick, do you think it makes sense
```

09:48AM
09:48AM
09:48AM
09:49AM
09:49AM

1    that it makes sense because it's more likely to be productive

2    than not to embark upon it at the outset?

3          MR. MILLAR:  I think with what I have heard in this

4    discussion, I think it would be reasonable that we could build

5    in, for example, into the provider component part, especially          09:49AM

6    the interview pieces of that, some specific questions around

7    operations and nursing that would give us probably within the

8    first two or three months a good idea of what the value of

9    extending the analysis would be.  And what I might recommend,

10   judge, is that we start with that at a provider level and            09:50AM

11   assess partway through the project what the value to add the

12   nursing component would be.  We could add that midway through.

13   It may extend the final report out on the nursing beyond the

14   original five- or six-month time frame, but it wouldn't leave

15   it all the way to the end of that point in time then to pick it     09:50AM

16   up.  So it may be delayed another 30 to 45 days for completion

17   of that element.

18          That would also, I think, put under the control of the

19   courts or you all, putting out the money to do this analysis

20   with a little bit clearer picture of the value that might          09:50AM

21   provide on the nursing perspective rather than at this point me

22   taking a broad brush stroke to say, I believe this is how much

23   additional time it would take when it may, in fact, take less

24   than that if we had the information that came from the provider

25   profiling and assessment piece.                                    09:51AM

1          THE COURT:  That recommendation makes sense to me.

2          Let me ask you this:  Did you have, in your own mind,

3     a recommendation of how to proceed in light of the differing

4     views from plaintiffs and defendants on what number of

5     positions you should be looking at?                                    09:51AM

6          MR. MILLAR:  I do.  And actually, my recommendation

7     would be is that we embark on a provider-level analysis for all

8     facilities, all 10, group them into the eight regional markets

9     by combining the four that I indicated prior with the exception

10    of dentists.  I do not believe in what I have seen, unless I'm     09:51AM

11    compelled otherwise, to think that doing the elements of

12    dentistry would be meaningful at this point.

13         So we would look at everybody above a nursing level

14    for both medical and behavioral health services across all 10

15    of the facilities.  And I would do that on a one- to two-year     09:52AM

16    trend.  I do not believe that just looking at staffing over the

17    last quarter or even six months will flesh out what may be

18    ongoing issues.  I would like to see what the stability is of

19    these positions across time to see where improvements have been

20    or if we see potential patterns and cycling.  And I think        09:52AM

21    that's also a reason why moving to all facilities rather than

22    those that just show in the last four months full staffing is

23    warranted.

24         THE COURT:  Mr. Bojanowski.

25         MR. BOJANOWSKI:  I think Mr. Struck was going to.          09:53AM

```
1          THE COURT:  Mr. Struck.

2          MR. STRUCK:  Thank you, Your Honor.

3          It's the defendants' position that a more pinpointed

4   analysis should be done by Mr. Millar as opposed to this broad

5   sweeping analysis where you have facilities such as Phoenix or      09:53AM

6   Douglas that don't have this kind of problem.  It seems to be a

7   waste of resources to have Mr. Millar do an evaluation of

8   providers, for example, at those two facilities.  And I believe

9   also Safford, the three examples that Ms. Kendrick just

10  provided the Court with respect to discrepancies between the       09:53AM

11  performance measure remediation plans and the staffing patterns

12  or the staffing reports, I'm sure that there's an explanation

13  for it.  I can't provide that because it's the first time I

14  have heard of -- this discrepancy hadn't been raised to us

15  prior to just a few minutes ago.  I certainly would like an       09:54AM

16  opportunity to look into that.

17         But with respect to Mr. Millar's analysis and what the

18  Court is interested in right now, it just seems to the

19  defendants to be a waste of Mr. Millar's resources and it

20  wouldn't really provide any helpful information to the Court to    09:54AM

21  have him look at facilities that don't -- haven't had a history

22  of having difficulty recruiting and retaining providers.

23         And so that's why in our letter, in response to Ms.

24  Kendrick's letter, we proposed a more pinpointed analysis.  We

25  agree with Mr. Millar that if he's going to be doing an           09:55AM
```

1    analysis he should stick to the providers and that may provide

2    him some insight into any issues with respect to nursing level

3    staffing.  So we agree that his analysis should be limited to

4    looking at the provider levels.

5         THE COURT:  Mr. Millar, you have heard Mr. Struck say        09:55AM

6    that there were three facilities that he thought that there

7    wasn't a good argument for you to go into.  It seems it

8    wouldn't be too unfair for me to ask you to tell him why you

9    think it makes sense with respect to Phoenix, Douglas, and

10   Safford.                                                          09:55AM

11        MR. MILLAR:  I would be glad to do that.  And a lot of

12   that just comes from a consultative approach of the industry at

13   large, not just correctional healthcare.  In any systems of

14   care when we're going in to look at problems or address

15   challenges we're also looking for opportunities that would       09:56AM

16   represent where those challenges have been solved or would be

17   best practices.  It's my belief that if you have three of the

18   10 facilities that are not experiencing these challenges in

19   staffing that knowing why that is the case in them could be

20   extremely informative to the other seven as to what they could   09:56AM

21   or should be doing differently to resolve that issue.  The fact

22   that you have three currently functioning that way and that

23   Corizon or the State has not yet been able to leverage best

24   practices across the others would lead me to believe that there

25   might be a breakdown in the statewide contracts or other things  09:56AM

1    that might lend itself to a recommendation from our part to

2    approach this in a more systematic way to solve the problem

3    more consistently across all of the state's facilities and not

4    just look at the problem areas in the seven identified.  So the

5    bottom line is if there are three areas where this is not a                    09:57AM

6    problem, I am equally interested in why it is not there to

7    understand what could be applied from there in the other seven

8    facilities.

9            MS. KENDRICK:  Your Honor, may I respond to Mr.

10   Struck?                                                                         09:57AM

11           THE COURT:  You may.

12           MS. KENDRICK:  If you look at the August staffing

13   report which is filed at Docket 2352-1 and look at Douglas,

14   it's just not true that Douglas, Phoenix, and Safford don't

15   have a problem with providers.  The Douglas report shows that          09:57AM

16   their medical director position is vacant.  The Phoenix report

17   shows that their psychiatric director position is completely

18   vacant.  They are at 67 percent staffing for psychiatrists, 83

19   percent staffing for psychologist, zero percent staffing for

20   mental health director.  And with regard to Safford, it lists          09:57AM

21   that their medical director is at a .75 instead of a 1 and that

22   the nurse practitioner is at a 1 but, as I previously pointed

23   out, their remedial plan said that the provider was out so it's

24   unclear whether the staffing report is accurate.

25           So again, we think that all 10 institutions should be          09:58AM

```
1    analyzed.  We also think that it's not true that those three
2    institutions don't have a problem.  And we support Mr. Millar's
3    proposal that in a month or two he revisit the idea of
4    including nursing based upon what he learns from the provider
5    analysis in asking about nursing operations.                    09:58AM
6         THE COURT:  Well, as you know that, Mr. Struck, I had
7    some questions about how to read the staffing report.  I saw
8    what you filed and I appreciate that.  But the interpretation
9    of the staffing report from Ms. Kendrick seems awfully
10   compelling.  How is she wrong about these vacancies in Phoenix  09:58AM
11   and the other -- and Safford and Douglas?
12        MR. STRUCK:  The two positions -- or the position in
13   Safford, the medical director position, is not a hands-on
14   provider.  It's not somebody who is actually providing care.
15        THE COURT:  And that matters to me why?                    09:59AM
16        MR. STRUCK:  Well, because in terms of --
17        THE COURT:  The captain of the ship is vacant and I'm
18   supposed to think that the ship is doing fine?
19        MR. STRUCK:  In terms of providing or meeting these
20   performance measures, the important positions are the ones that 09:59AM
21   are actually providing the hands-on care.  The medical director
22   is not providing hands-on care.
23        THE COURT:  I'm sorry, with all due respect, that's
24   ridiculous.  You have chosen to have a medical director
25   position that is probably the significantly compensated         09:59AM
```

position, the significant person of responsibility.  A chain of
command system exists with respect to the prisons and exists
with healthcare.  I have seen that and learned about that.  And
so here the captain of the ship is nowhere there, and you are
saying that doesn't really matter.  And I just reject that.     09:59AM

        So next.

        MR. STRUCK:  Okay.  I appreciate the Court's point of
view.  Now, these are also facilities that don't traditionally
have problems with respect to meeting performance measures as
some of the corridor facilities are.  None of them are corridor  10:00AM
except for Phoenix.  Safford and Winslow aren't corridor
facilities and inmates who have significant problems aren't at
those facilities so it requires fewer staff.

        In responding to what Mr. Millar stated regarding
looking at these facilities to see if those practices can be     10:00AM
brought to other facilities, I think there are reasons why
staffing isn't as big of an issue in Phoenix.  One is just the
geographic location.  There simply are -- logically speaking
there are going to be more -- you are going to have a larger
demographic of healthcare providers in the Phoenix area to be    10:01AM
able to fill those positions as opposed to Yuma or Florence.

        And so with respect to Douglas and Safford, those
facilities simply don't have the number of inmates with the
medical problems that we see at the corridor facilities so they
require fewer medical staff at those facilities.  There's a      10:01AM

1   smaller staff.  So I don't know, I guess logically speaking, I

2   don't know how helpful it will be for him to look at those for

3   those areas.

4          So I guess our position is that he look at the areas

5   where there are problems with respect to filling the FTEs and          10:01AM

6   retaining those positions and focus his attention on that as

7   opposed to spending time at, you know, Douglas or Winslow, you

8   know, these locations of these facilities that are in different

9   parts of the state where there isn't really the kind of issue

10  that the Court is concerned about with respect to meeting these         10:02AM

11  performance measures.

12         THE COURT:  Well, I agree that there is some gut

13  reaction that suggests that the Phoenix answer is simple, and

14  that is both with respect to the greater density of providers,

15  but also with the idea it's an urban center and maybe it's more         10:02AM

16  attractive to live in than the other places in the rural

17  communities.  I don't know.  And that I don't know is important

18  because it's a gut reaction.  And I have an expert who has told

19  me that he thinks that it is of utility to look at this

20  facility in Phoenix notwithstanding our gut reaction.  He's             10:02AM

21  made other arguments that make a very compelling case for the

22  presentation that he advocates, and that is to look at each of

23  these facilities in a tailored way that I think makes sound

24  sense.

25         And so, Mr. Millar, I can enter an order providing for           10:03AM

1    you to embark upon it and I can, if there are -- I will make

2    sure when I do that that I address any particular issues that

3    maybe are -- that just seem so obvious that they shouldn't be

4    included, but overall, I have to say that the logic that you

5    have explained with respect to how you have defined the scope          10:03AM

6    of work seems compelling and also makes sense to the unschooled

7    person trying to be a good purchaser of services.

8            Tell me this:  Was there some writing that you thought

9    that you could provide to the Court and to the parties that

10   encapsulates what you have discussed with us, or do you feel          10:04AM

11   that you have said everything you needed to say here on the

12   record?

13           MR. MILLAR:  I think I have said most of what I need

14   to say on the record.  I think the one comment that I would

15   make, Judge, to the defendants' comment, is if there were            10:04AM

16   facilities where the staffing truly had been stable, I could

17   understand their position a little bit better except a

18   four-month window I do not believe is sufficient.  If there

19   were one of these facilities that over the prior 18 to 24

20   months had not had vacancies of greater than three months in         10:04AM

21   any of these key positions, that might be a compelling reason

22   to take a lighter stance at looking at them.  But I believe the

23   window that they propose to look at is, even from an analytic

24   standpoint, insufficient to show any trending.

25           So I would still, without that greater level of             10:05AM

1  analysis, still stand with the benefits of looking at all 10 of

2  the facilities.

3          THE COURT:  Okay.  I heard what you said with respect

4  to the record, but I am going to ask, if you don't mind,

5  submitting a written scope of work that puts it in your words          10:05AM

6  so that we have that so that I can incorporate that.

7          MR. MILLAR:  Absolutely.  I think I misunderstood your

8  question.  I think my very next step is to do that.  From my

9  company's perspective, I need to write out a full engagement

10 letter which would scope out --          10:05AM

11         THE COURT:  That's what you call it.

12         MR. MILLAR:  -- details with what the deliverables and

13 the staffing and what the proposed budget and terms of the

14 budget would be.

15         THE COURT:  Okay.  When would you be able to do that?          10:06AM

16         MR. MILLAR:  I have already started in the works.  I

17 have notified the folks here pending a positive outcome from

18 this call that we would start crafting that late this week or

19 early next week.  It's probably a 7- to 10-day process to get

20 that worked through on our end.          10:06AM

21         One question I do have is who would be the receiving

22 party for this?  In other words, who would be the client or

23 would be the person responsible for executing this agreement

24 and making payment for this agreement?

25         THE COURT:  The client will be the Court, but the          10:06AM

1    Court will be holding a subsequent hearing to give the

2    defendant an opportunity to be heard as to why it shouldn't pay

3    the entire cost.

4         MR. MILLAR:  Okay.

5         THE COURT:  And what remains -- go ahead.  What would          10:06AM

6    then be the result of that decision would be whether or not the

7    Court would impose some cost upon the plaintiffs.  But the

8    Court's present view is that this is a dilemma created by the

9    defendants and is a necessary tool to try to accomplish what

10   the parties have not been able to accomplish on their own, in     10:07AM

11   particular, the defendants have not been able to accomplish on

12   their own.

13        And so this second front of employing -- and there's a

14   reference to a statement I made before you came on the phone,

15   Mr. Millar, there's a three-point approach of the Court to try    10:07AM

16   to bring the stipulation into full compliance.  It is one to

17   monitor the performance and to address issues and cement

18   commitments to reform failures to provide the requirements of

19   the stipulation.  That's the first component.  The second

20   component is what information we learned from you in              10:08AM

21   implementation of that information.

22        The court order is designed to address, if you are

23   able to identify, solutions to these underfilled positions.

24   Third, the Court is going to embark upon an examination of

25   application of its contempt authority to try to deliver the       10:08AM

1    requirements of the stipulation.  And so the second component

2    is the one that you are focused on, and the Court has within it

3    two subset categories; one retaining you to provide this expert

4    information to the Court but then the Court will decide who

5    should pay for it among the parties before the Court.  And that    10:09AM

6    allocation is one I have expressed previously to the defendants

7    an inclination that I have, but I need to give them an

8    opportunity to be heard as to why that is not appropriate in

9    this case.  But my preliminary view is one that I have already

10   expressed to the parties in that it is appropriate here to have   10:09AM

11   the defendants bear the cost of this.

12           So that is the answer to your question, sir.  You are

13   relying on the Court's power and will make sure that you get

14   what you need when you need it before you incur costs, but that

15   has to happen in the timetable that is a bit accelerated as      10:09AM

16   well.  I would ask that you could get this to us as soon as

17   possible because I understand that my five to six months starts

18   when you get the authority and the belief that you do have the

19   money to do it.  And so I understand that that's an important

20   contingent of it.                                                10:10AM

21           MR. MILLAR:  Would it be possible, Judge, to have

22   somebody send me the description of what that client should

23   look like, whether it's the exact name, the federal court, or

24   the requisite cases so we're able to build that properly into

25   the document so they would be executable without too much        10:10AM

1    modification?

2         THE COURT:  Surely.  The United States District Court

3    for the District of Arizona.

4         MR. MILLAR:  Okay.

5         THE COURT:  Let me turn to counsel who are experienced       10:10AM

6    in this area, both defendants' and plaintiffs' counsel, to see

7    whether they have any comment on how best to proceed in light

8    of what Mr. Millar's just addressed.

9         MS. KENDRICK:  We think that he has a sound proposal,

10   and we look forward to seeing the written scope of work.  We       10:10AM

11   believe that defendants should bear the full cost of this

12   endeavor because it is a self-inflicted problem and plaintiffs

13   are not responsible for it.

14        THE COURT:  Mr. Struck.

15        MR. STRUCK:  Your Honor, it's our position that since        10:11AM

16   we're proceeding down this road this should be a cost that's

17   borne by both sides.  And we would like the opportunity the

18   Court indicated it would give us to make that argument.

19        THE COURT:  And you will have that.

20        All right.  What I will do is -- well, Mr. Millar, you       10:11AM

21   are saying that you think you can finish it by the end of next

22   week, and so that means if we could have a date, take a look at

23   your calendar and see what would be comfortable for you so that

24   I can, in the minutes here today, set that date so that we all

25   are mindful of what we need to do on the dates that are related   10:11AM

UNITED STATES DISTRICT COURT

1    to your date.

2         MR. MILLAR:  You are looking for the date, Judge, that

3    I could submit this to you?

4         THE COURT:  Yes.

5         MR. MILLAR:  I think I can commit to Friday, October          10:12AM

6    20.

7         THE COURT:  Thank you very much.

8         MR. MILLAR:  And if I'm able to submit it earlier than

9    that I will submit it at my earliest time.

10        THE COURT:  All right.  Thank you.                            10:12AM

11        Anything else anybody else needs to address while Mr.

12   Millar is on the phone?

13        MS. KENDRICK:  No, sir.

14        MR. STRUCK:  No, Your Honor.

15        THE COURT:  Mr. Millar, thank you very much for your          10:12AM

16   time this morning.  I appreciate it greatly.

17        MR. MILLAR:  Thank you very much.

18        THE COURT:  Bye-bye.

19        MR. MILLAR:  Bye.

20        THE COURT:  If we all can just take a 10-minute break         10:12AM

21   right now, we'll be right back.  Thank you.

22        (Recess from 10:12 a.m. until 10:26 a.m.)

23        THE COURT:  Mr. Bojanowski, before we proceed with

24   what you furnished last night, I think it makes sense to turn

25   to plaintiffs' motion to enforce the stipulation, Docket 2253,    10:26AM

1   and address those performance measures because some of them, I

2   think, relate to what we hear later from your report.  And when

3   I go through them we still, I think, need to adopt the hybrid

4   approach that we used last time, and that is I need to give the

5   parties an opportunity to make a record here.                    10:27AM

6        But with respect to first Performance Measure 6 at

7   Eyman that provider orders will be noted daily with time, date,

8   and name of person taking the orders, there's an agreement that

9   it's substantially noncompliant so I will make that finding.

10  And even though the defendants say that we're in a better       10:27AM

11  situation currently, I will adopt the remediation measures that

12  are discussed in the steps taken thus far section.  But let me

13  turn to plaintiffs to see if they have anything they want to

14  say about Performance Measure 6.

15       MS. KENDRICK:  Let me just get to the document, Your       10:27AM

16  Honor.

17       THE COURT:  Sure.  And you may not have anything to

18  add because it's your motion, obviously, and I'm granting the

19  relief that you sought, but I just don't want to cut you off.

20       MS. KENDRICK:  No.  That's fine.  And we hope that         10:28AM

21  there will be improvement with the steps taken so far plan.

22       THE COURT:  Okay.  I will do the same thing with

23  Performance Measure 12 for Eyman and Florence, the medical

24  record will contain documentation of refusals or no-shows, make

25  a finding that it's substantially noncompliant and adopt the    10:28AM

```
 1   measures that are proposed or discussed in the steps taken thus
 2   far as the remediation plan.
 3          I will let you interrupt me if there are any of these
 4   you want to address, Ms. Kendrick.
 5          Performance Measure 15, Eyman, Florence, and Lewis,          10:28AM
 6   inmates who refused prescribed medication or no-show will be
 7   counseled by a QHCP after three consecutive refusals and make
 8   the finding that there is substantial noncompliance and will
 9   adopt the proposed remediation plan.
10          The note is worth making about Tucson that it does not       10:29AM
11   meet the definition.  There are no three consecutive months of
12   noncompliance but we can obviously restart the process with
13   three failing months.  So I just note that.
14          MS. KENDRICK:  Your Honor, actually it does meet the
15   definition because for Tucson, seven of the 24 previous months     10:29AM
16   they were noncompliant.
17          THE COURT:  Oh.  I missed that.  Mr. Bojanowski, let
18   me turn to your response.  Just a moment.
19          MR. BOJANOWSKI:  May I have one moment, Your Honor?
20          THE COURT:  Surely.                                         10:29AM
21          MR. BOJANOWSKI:  I'm double checking the --
22          THE COURT:  No.  Your response says at Page 3 just
23   what I said, that it didn't appear to meet noncompliance but
24   Ms. Kendrick has said that it did.
25          MS. KENDRICK:  Yes, Your Honor.  If you look at the          10:30AM
```

chart that was filed with defendants' motion to terminate back

on August 25th and look at Performance Measure 15 at Tucson and

count back 24 months, you will find seven months of substantial

noncompliance.

THE COURT:  Are you seeing three in a row at any place    10:31AM

noncompliance?

MS. KENDRICK:  No, sir, but the Court's definition is

either six -- six or more months within the previous 24 months

or three in a row.  So the months in the previous 24 months is

October 2015 at 77 percent; January 2016 at 79 percent; March    10:31AM

2016 at 75 percent; November 2016 at 74 percent; December 2016

at 73 percent; February 2017 at 73 percent; and March -- I'm

sorry -- April 2017 at 44 percent.

THE COURT:  I'm sorry.  Thank you.

MS. KENDRICK:  I'm sorry, Your Honor.  I misspoke.    10:32AM

There were six.  October 2015 when they were at 77 percent the

cutoff was 75 percent.  I apologize.  The correct number is

six.  For September 2015, January 2016, March 2016, December

2016, January 2017, March 2017, and April 2017.

MR. BOJANOWSKI:  Correct.  So that would not meet the    10:32AM

definition.

MS. KENDRICK:  The definition is six or more in the

previous 24 months.

MR. BOJANOWSKI:  It's more than six.

MS. KENDRICK:  No, it's not.  It's six or more.    10:32AM

1          THE COURT:  Docket 2030 states, "Accordingly, the

2     Court has concluded that a location performance is not

3     compliant when:  One, six of 24 months are noncompliant; and

4     two, three consecutive months are noncompliant.

5          MS. KENDRICK:  Yes, Your Honor.  But as we stated in          10:33AM

6     our reply brief that while you stated those requirements in the

7     conjunctive using the word "and" you cited the termination

8     provisions of the stipulation that use the word "or."  And then

9     in a subsequent order at Docket 2118 when you clarified your

10    2017 order at Docket 2030, you said this is not correct.  It's          10:33AM

11    three or more.  So in short, we think that either six or more

12    noncompliant months or three consecutive months of

13    noncompliance is sufficient to establish non-compliance.

14         THE COURT:  And you say this was in -- where did you

15    make this argument?          10:33AM

16         MS. KENDRICK:  Yes, sir.  It's in our reply brief that

17    we filed yesterday at Docket 2372.  It's at Page 3.

18         THE COURT:  Okay.  I will hold off on that one.  I

19    didn't read what you sent yesterday.  I haven't read it yet, or

20    I did and I missed that part.  So I will read what you say and          10:34AM

21    hold off on Tucson.

22         MS. KENDRICK:  Thank you.

23         MR. STRUCK:  Your Honor, I did want the Court to also

24    refer to the actual stipulation.  It's Paragraph 10, Subsection

25    B that defines the actual termination of the -- and I believe          10:34AM

1    it supports the defendants.

2            THE COURT:  Paragraph 21B?

3            MR. STRUCK:  I'm sorry.  10.  Subsection B, which

4    specifically states, "The particular performance measure that

5    applies to a specific complex is in compliance as defined under          10:34AM

6    subparagraph A if for 18 months out of a 24-month period and

7    the particular performance measure has not been out of

8    compliance as defined in subparagraph A for three or more

9    consecutive months within the last 18-month period.

10           So I believe that the Court is correct with respect          10:35AM

11   to, I guess, was it Tucson facility.  It is in compliance at

12   this point under the terms of the stipulation.

13           MS. KENDRICK:  That is the definition for termination.

14           THE COURT:  We have dealt with this before where we

15   have had to recognize that there is a different language for          10:35AM

16   termination and that doesn't necessarily define it.  But in any

17   event, the orders of the Court that have addressed this issue

18   previously will tell us whether or not Tucson is in compliance

19   or not.  I don't really like juggling the numbers and looking

20   at the fine print right here right now, but I will do that and          10:36AM

21   issue an order on Tucson.

22           MS. KENDRICK:  Thank you, sir.

23           THE COURT:  Performance Measure 20, Eyman, Florence,

24   Lewis, Perryville, Phoenix, Tucson, medical AIM's entries are

25   accurately completed within three business days from the entry          10:36AM

1   in the medical record.  Make a finding that there is

2   substantial noncompliance and the measures identified in the

3   steps taken will be adopted.

4         Performance Measure 24 for Lewis, emergency medical

5   response bags are checked daily, inventoried monthly, and          10:36AM

6   contain all required essential items.  I'm finding that there

7   is substantial noncompliance and the steps taken thus far,

8   remediation plan, is adopted.

9         Performance Measure 42, Eyman, Florence, Perryville,

10   follow-up sick call encounter will occur within the time frame   10:37AM

11   specified by the medical or mental health provider.  There's a

12   finding of substantial noncompliance.  With respect to Eyman

13   and Florence, the proposed remediation plan is adopted.

14   Perryville, the steps taken thus far are adopted as the

15   remediation plan.  And we've got the same issue, I think, with  10:37AM

16   Lewis that we were talking about with respect to Tucson

17   perhaps, but let me hear from plaintiffs on that.

18         MS. KENDRICK:  Yes, Your Honor.  So nine of the past

19   24 months at Lewis they have been substantially noncompliant

20   and so, therefore, it meets the Court's definition.            10:37AM

21         THE COURT:  And defendants want to respond?

22         MR. BOJANOWSKI:  Your Honor, we'll agree it's

23   substantially noncompliant.

24         THE COURT:  So with respect to -- just a moment.

25   We'll find also that Lewis is noncompliant and that the steps  10:39AM

```
1    taken thus far, which are medical providers, provide the

2    certified nursing assistants each day with a list of inmates

3    they want to follow up with and the time frame for that

4    follow-up and that the CNAs will maintain a log with these

5    patients with those time frames and assure that appointments        10:39AM

6    are scheduled accordingly will be adopted as the remediation

7    plan.  Anything you wanted to add, Ms. Kendrick?

8            MS. KENDRICK:  Just for clarification, what were you

9    just reading from?  Because in their response to the motion to

10   enforce they said no remediation plan is necessary.                 10:39AM

11           THE COURT:  It's adopted as where they say it's not

12   necessary where they have told me there are steps that have

13   been taken, I have been adopting that as the remediation plan.

14           MS. KENDRICK:  For Performance Measure 42?

15           THE COURT:  I was -- you are right.  I was reading the      10:40AM

16   wrong section.  Forgive me.  I am thrown under the bus by the

17   effort to save trees by printing on both sides of the paper and

18   sometimes doing that and sometimes not doing that.  So we will

19   undo what I just said.

20           So I guess the question is since we have substantial        10:40AM

21   noncompliance what say you, Mr. Bojanowski, about trying to

22   address this issue at Lewis?

23           MR. BOJANOWSKI:  There is a plan that we supplied to

24   the Court in our --

25           THE COURT:  When we get -- I'm sorry.                       10:41AM
```

UNITED STATES DISTRICT COURT

1          MR. BOJANOWSKI:  PM 42.  It's a statewide plan.

2          THE COURT:  So if I turn to 42 of what you submitted.

3          MR. BOJANOWSKI:  Yesterday.

4          THE COURT:  Yesterday, I see a corrective plan as of

5   October 6, 2017.                                          10:41AM

6          MR. BOJANOWSKI:  Correct.

7          THE COURT:  Where to remediate the recent deficiency

8   for PM 42 at Eyman and to maintain compliance at the other

9   sites currently operating without a deficiency, Corizon staff

10  shall develop and implement or supplement, if there is an     10:41AM

11  existing procedure:  One, a procedure for all sites that

12  includes action steps to ensure all follow-ups resulting from

13  an initial sick call encounter are scheduled and occur within

14  the specific time set out in the order; and two, a

15  corresponding policy that provides the approval process for the 10:41AM

16  rescheduling, modification, and/or cancelling of a follow-up

17  for each sick call encounter that results in an order for a

18  follow-up the following shall occur:  One, the treating

19  provider or designee as permitted in the procedure shall enter

20  the patient's information on the appropriate log; two, at the  10:42AM

21  conclusion of the encounter or prior to the end of his or her

22  shift, the provider or an appropriate scheduling designee, as

23  permitted in the procedure, must schedule the follow-up in

24  eOMIS within the time frames ordered, or, if no time frame is

25  specified, within 14 days of the initial encounter unless the  10:42AM

provider indicates, quote, "no follow-up necessary" close

quote, in eOMIS; three, on a daily basis the appointed employee

shall utilize eOMIS to generate an appointment list for that

particular day; four, on a daily basis an appointed employee

shall review the appointment list and confirm that all

follow-ups are set to occur timely; five, the modification,

rescheduling or cancellation of a follow-up will not be

approved if such action would result in noncompliance with a PM

42 requirement; and six, an appointed employee shall identify

any follow-up that has been modified, rescheduled, or cancelled

without approval and immediately elevate that to site

leadership so as to allow the subject follow-up to be

rescheduled within the original time frame ordered.

        With regard to the timing of this remedial measure,

Corizon shall develop and effectuate the new policy and

procedure on or before November 1, 2017, hereinafter referred

to as effective date.  Eyman and Florence will begin

implementing this new procedure immediately.  Prior to the

effective date Corizon will communicate the policy and

procedure to all site leadership and site level providers via

e-mail, and shortly thereafter the remedial measure will be

presented by site leadership at the appropriate staff meeting

so that providers have an opportunity to discuss the same.  At

all times subsequent to this effective date, the policy and

procedure will be accessible to all Corizon employees for

52

1    reference on, quote, "MyCorizon," close quote, and in hard copy

2    form at all sites upon request.  All provider requests for a

3    copy of the policy and/or procedure in hard copy format should

4    be directed to site leadership.

5         Additionally, prior to the effective date all Corizon     10:44AM

6    providers shall be trained by site leadership or an appropriate

7    training designee on the new follow-up policy and procedure.

8    On or after December 15, 2017 Corizon compliance monitors shall

9    review an appropriate sample of entries on the logs to evaluate

10   and assess compliance with the new policy and procedure.  Any   10:45AM

11   and all compliance deficiencies discovered during this

12   monitoring exercise shall be addressed by site leadership in

13   the form of providing additional training to those providers

14   associated with the deficiency findings.

15        So first, Ms. Kendrick, thank you for correcting my       10:45AM

16   error leading me to what was a very helpful exposition of the

17   need to address Performance Measure 42 at Eyman.  And is there

18   anything you wanted to add or respond to the government's --

19   I'm sorry -- to the State's proposed remediation plan?

20        MS. KENDRICK:  They state that they are going to          10:45AM

21   implement this immediately at Eyman and Florence as of the

22   effective date of November 1st but do not state when Lewis or

23   Perryville would be implementing this policy.  So we would

24   request that information.

25        THE COURT:  Can you answer that question, Mr.             10:46AM

1    Bojanowski?

2         MR. BOJANOWSKI:  I cannot.

3         MS. KENDRICK:  And furthermore, we would request that

4    defendants provide us a written copy of the policy and

5    procedure and any written training materials that they used to         10:46AM

6    convey this information to the providers and nursing staff.

7         THE COURT:  All right.  Mr. Bojanowski, in a week can

8    you provide that information as well as the start date for the

9    other two facilities that Ms. Kendrick just identified?

10        MR. BOJANOWSKI:  I don't believe the policy has been         10:46AM

11   drafted yet.

12        THE COURT:  I see.

13        MR. BOJANOWSKI:  So I don't believe I can comply.

14        THE COURT:  It would certainly be drafted after the

15   1st of November when the training would have happened.         10:46AM

16        MR. BOJANOWSKI:  It should be.  I think -- I would

17   assume so.

18        THE COURT:  All right.  So within seven days of the

19   1st of November, provide the copies of the training information

20   and the new policy to the plaintiffs, and also inform the         10:46AM

21   plaintiffs of when the start dates are at all the facilities.

22        Thank you.  It seems to be a carefully crafted and

23   detailed and focused remediation plan.  So it would look like,

24   as just reading it aloud to you and learning about it, it would

25   seem to me that it would be difficult for it not to result in         10:47AM

```
 1   100 percent compliance.  It just seems to have all of those
 2   backstops.
 3              MR. BOJANOWSKI:  That would be our hope, Your Honor.
 4              THE COURT:  All right.  Thank you.
 5              Did someone just arrive on the telephone?  Maybe      10:47AM
 6   someone just left.
 7              Performance Measure 49, Douglas, Eyman, Florence,
 8   Perryville, Phoenix, Tucson:  Patients for whom a provider's
 9   request for specialty services is denied or told of the denial
10   by a medical provider at the patient's next scheduled            10:47AM
11   appointment no more than 30 days after the denial and the
12   provider documents in the patient's medical record the
13   provider's follow-up to the denial.
14              For Eyman, Florence, Phoenix, and Tucson,
15   substantially noncompliant, and the proposed remediation plan    10:48AM
16   is adopted.
17              With Douglas and Perryville -- did someone just join?
18              MS. FETTIG:  Your Honor, this is Amy Fettig.  I'm
19   actually rejoining because my line dropped.  My apologies to
20   the Court.                                                       10:48AM
21              THE COURT:  That's all right.  Thank you.
22              So for Douglas and Perryville, the first 16 months are
23   non-applicable so it's difficult to ascertain exactly where we
24   stand.  But in light of the fact that we have a recent trend
25   that's positive and notwithstanding that the first months were   10:48AM
```

```
 1   terrible, the Court will hold in abeyance any further decision
 2   with respect to Douglas and Perryville unless the plaintiffs
 3   can talk me out of that.
 4           MS. KENDRICK:  Well, Your Honor, we would ask that you
 5   go ahead and make the finding of substantial noncompliance for      10:49AM
 6   Douglas and Perryville because both of them were substantially
 7   noncompliant five months in a row and, given that they have
 8   been performing better more recently, hold off on remedial
 9   plans applicable to those institutions.  But we think it is
10   important that you do make that finding even if they have           10:49AM
11   improved in recent months.
12           THE COURT:  Mr. Bojanowski.
13           MR. BOJANOWSKI:  Well, I think we should hold it in
14   abeyance.  I mean, we're talking about --
15           THE COURT:  What about Ms. Kendrick's idea, and that        10:49AM
16   is no further intervention, and we'll hold that in abeyance but
17   the finding of noncompliance seems to be warranted by the
18   stipulation, terms of the stipulation.
19           MR. BOJANOWSKI:  Right.
20           THE COURT:  So that's what we'll do.  Okay.  Thank          10:49AM
21   you.
22           Performance Measure 50 for Perryville:  Urgent
23   specialty consultations and urgent specialty diagnostic
24   services will be scheduled and completed within 30 calendar
25   days of the consultation being requested by the provider.          10:50AM
```

1          For -- there is substantially noncompliance for six of

2     the last 24 months and three in a row recent months which cause

3     some real concern here.  What do the defendants -- did we see

4     something last night?  Let me turn to that.

5               MR. BOJANOWSKI:  Are you speaking of Perryville, Your          10:50AM

6     Honor?

7               THE COURT:  I am.

8               MR. BOJANOWSKI:  PM 50?

9               THE COURT:  Yep.

10              MR. BOJANOWSKI:  Perryville has been compliant since          10:50AM

11    March of 2017 for that measure.

12              THE COURT:  I don't think so.  Really?  Let me take a

13    look here.

14              You are right.  So we had 68 in February and -- of

15    '17.                                                                      10:51AM

16              MR. BOJANOWSKI:  Correct.

17              THE COURT:  And 71 in December, or was that January.

18              MR. BOJANOWSKI:  I have 90 percent in January.

19    December 2016 was 71.  November 2016 was 52.  So I have --

20              THE COURT:  Okay.  All right.  So I guess what we'll          10:51AM

21    do is we'll say continue doing what you are doing because of

22    the most recent performance measures that do look better.

23              Ms. Kendrick, anything you want to say?

24              MS. KENDRICK:  Again, this is another one where they

25    were actually substantially noncompliant five months in a row          10:51AM

1    from August 2016 through December 2016 and then they fell down

2    again in February of this year.

3            THE COURT:  Right.

4            MS. KENDRICK:  So we would ask the Court to go ahead

5    and make the finding of substantial noncompliance because it

6    does meet the definition, and hopefully they will continue to

7    improve and no remedial plans will be necessary.  But we don't

8    want it to get into a situation where they fall off the wagon

9    and we would have to restart the entire mediation,

10   meet-and-confer process.  And so we would appreciate that there

11   be a formal finding of substantial noncompliance in accordance

12   with the Court's definition.

13           THE COURT:  And what I don't have before me is what I

14   was -- and I wish I did -- but I don't have before me what I

15   was told when I last inquired about the 68 percent in February

16   and whether those were steps that we could now in retrospect

17   look back and say they worked.  Do you have any insight about

18   that, Mr. Bojanowski?  Do you remember the particulars?

19           MR. BOJANOWSKI:  I am afraid I don't.

20           MS. KENDRICK:  Mr. Fathi is actually checking from the

21   April transcript to see if there was anything discussed on the

22   record about that particular measure.

23           THE COURT:  Thank you.

24           MR. BOJANOWSKI:  For Perryville?

25           MS. KENDRICK:  Yes.

1          THE COURT:  Yes, for 50.

2          MR. BOJANOWSKI:  Since this is their initial filing

3   for this facility, I would say that probably not.

4          THE COURT:  That's a good point.

5          MR. BOJANOWSKI:  It would have been at mediation that          10:53AM

6   something would have occurred.

7          THE COURT:  Good point.  We'll make the finding of

8   noncompliance based upon the fact that it satisfies the

9   stipulation's requirement for entry into it.  But because it

10  was so bad for so many months, and then it was addressed and          10:53AM

11  looked like it was recovered in January but then falls off,

12  again, to 68 percent in February and just barely meets the

13  threshold in April, I think spending time on it hopefully will

14  get the idea that we don't want to see any further backdrop.

15         Performance Measure 51, Douglas, Perryville, Yuma:          10:54AM

16  Routine specialty consultations will be scheduled and completed

17  within 60 calendar days of the consultation being requested by

18  the provider.  Finding of substantial noncompliance.  And let's

19  see, what did the defendants say.

20         MR. BOJANOWSKI:  What were the facilities again, Your          10:54AM

21  Honor?

22         THE COURT:  Douglas, Perryville, and Yuma for 51.  You

23  say that it does not meet the Court's definition of substantial

24  noncompliance, but I don't see that in my graph for Douglas.

25  What's the plaintiffs' position on that?          10:55AM

1          MS. KENDRICK:  Our position is that Douglas has been

2    substantially noncompliant six of the past 24 months.  And in

3    addition, they were substantially noncompliant three or more

4    months in a row.

5          THE COURT:  And then we read in the defendant'          10:55AM

6    response, Douglas does not meet the Court's definition of

7    substantial noncompliance as it has only been noncompliant for

8    six of the 30 monitoring months.  But that is contrary to the

9    Court's previous order.

10         MS. KENDRICK:  It's for the period August 2016 through     10:55AM

11   January 2017, every single month it was below compliant six

12   months in a row.

13         THE COURT:  So we need a remediation plan for Douglas.

14         MR. BOJANOWSKI:  Okay.

15         MS. KENDRICK:  Actually, Your Honor, we would need a       10:56AM

16   remediation plan for all three institutions because while they

17   conceded it was substantially noncompliant at Perryville and

18   Yuma they did not provide a remedial plan.

19         THE COURT:  What you say is also true.  I was just

20   hoping to address them individually.  But it's true, Douglas,     10:56AM

21   Perryville, and Yuma are all substantially noncompliant and we

22   do need a remediation plan for all three.

23         It would seem that this intensive measure that has the

24   realtime effort to try to redirect the application of the

25   promised service and then having the backup follow-up that you   10:57AM

```
 1    show that you know how to do would seem to make sense for these

 2    three as well.

 3          MR. BOJANOWSKI:  We'll put together a plan and get it

 4    submitted to the Court, Your Honor.

 5          THE COURT:  And when will you do that?                    10:57AM

 6          MR. BOJANOWSKI:  May I have a moment?

 7          Two weeks, Your Honor.

 8          THE COURT:  So two weeks you will come up with the

 9    remediation plan.  You will file that so that the Court and

10    plaintiffs will have an opportunity to see with respect to what 10:58AM

11    you are proposing to address the failures at Douglas,

12    Perryville, and Yuma with respect to Performance Measure 51.

13          Performance Measure 52 at Eyman:  Specialty

14    consultation reports will be reviewed and acted on by a

15    provider within seven calendar days of receiving the report.   10:58AM

16    And a substantially noncompliant finding is warranted.  And the

17    Court will, in light of the present situation, adopt the

18    remediation plan proposed by the defendants.

19          Ms. Kendrick.

20          MS. KENDRICK:  Yes.  We are glad to see that they have    10:59AM

21    a detailed plan, and we hope to see improvement next month.

22          THE COURT:  All right.

23          MR. BOJANOWSKI:  Your Honor, there is a supplemental

24    plan as of October 6, 2017, within the filing that I had last

25    night.  I don't know that it needs to be read into the record,  10:59AM
```

```
 1   but it certainly supplements the current corrective action

 2   plan.

 3              THE COURT:  This is for --

 4              MR. BOJANOWSKI:  52.  I just wanted the Court to be

 5   aware there is some supplemental information in there.          10:59AM

 6              THE COURT:  I see.  You are making cross-reference to

 7   Eyman at the bottom, you are saying, on Performance Measure --

 8   no.  That's not right.

 9              MR. BOJANOWSKI:  I'm sorry.  It's the document that I

10   filed last night.                                              11:00AM

11              THE COURT:  Right.  I understand.  So you are telling

12   me that for 52, you have made a supplemental correction based

13   upon last night.  And I am looking at 52 and trying to see

14   where it says that it references Eyman.

15              MS. KENDRICK:  It's at Page 30 of the filing, Your    11:00AM

16   Honor.

17              THE COURT:  Oh.  Thank you.  I see.

18              MS. KENDRICK:  Our observation on this plan is it

19   sounds very detailed, but there's no indication what the

20   effective date would be of this policy that they state they are  11:00AM

21   going to develop and implement.

22              THE COURT:  Well, that's, as everybody knows, a big

23   issue.  What is the effective date?

24              MR. BOJANOWSKI:  It's November 1st, Your Honor.

25              THE COURT:  Effective date November 1 for the         11:01AM
```

```
 1    Performance Measure 52 additional plan for Eyman.  Thank you.
 2             MS. KENDRICK:  And we would, again, ask that to the
 3    extent any written policies or procedures or training materials
 4    are created to convey this to staff that they be provided on
 5    November 8th along with the ones for the other performance        11:01AM
 6    measure.
 7             THE COURT:  That would be helpful.  Thank you.
 8             Performance Measure 55 for Eyman:  Disease management
 9    guidelines will be implemented for chronic diseases.  There is
10    a finding of substantial noncompliance based on the fact that    11:01AM
11    there were six of the last 24 months substantially noncompliant
12    or not in compliance with the benchmark and three in a row.
13    And then if we turn to 55, from last night, we will be rewarded
14    with a remediation plan?
15             MR. BOJANOWSKI:  There is no plan that's prepared at     11:02AM
16    this point.  That is currently being investigated and we will
17    develop a plan.
18             THE COURT:  When do you hope to have that in place?
19             MR. BOJANOWSKI:  Two weeks, Your Honor.
20             THE COURT:  So the significant backlog pertaining to     11:02AM
21    chronic care patients has been identified and is under review.
22             The backlog is because of why?
23             MR. BOJANOWSKI:  I don't have that information, Your
24    Honor.
25             THE COURT:  Does anybody behind you maybe know?          11:02AM
```

```
1              MR. BOJANOWSKI:  I don't believe so, but let me check.

2         We don't have any specifics on that one, Your Honor.

3              THE COURT:  But whenever one sees the word backlog one

4    does tend to think there aren't enough people tending to the

5    task, and that tends to suggest a staffing issue.              11:03AM

6              Performance Measure 67 for Lewis:  In an IPC

7    registered nurses will conduct and document an assessment at

8    least once every shift.  Graveyard shift assessments can be

9    welfare checks.  A finding of substantial noncompliance is

10   warranted and proposed remediation plan would be adopted.      11:03AM

11             Anything you want to say, Ms. Kendrick, about this?

12             MS. KENDRICK:  Again, the remediation plan does not

13   provide an effective date that they are going to develop and

14   implement this procedure.

15             MR. BOJANOWSKI:  I believe it is November 15th, 2017  11:04AM

16   is the effective date.

17             THE COURT:  It says that at least.  Corizon shall

18   develop and effectuate the new procedure on or before November

19   15th, 2017.

20             MS. KENDRICK:  I'm sorry.  I was looking at their     11:04AM

21   response to our enforcement motion.

22             THE COURT:  No.  This is the place where you are

23   rewarded if you go to the last night filing.  And it seems like

24   it would capture all of the failures and redress them and have

25   also a backstop.  So, again, we would hope to see that this     11:04AM
```

1    would produce everything that is warranted by the stipulation

2    on Performance Measure 67.

3           And again, with respect to training materials here as

4    well, provide those to the plaintiffs.

5           Performance Measure 72, for Eyman:  Inmates who refuse       11:05AM

6    prescribed diets for more than three consecutive days will

7    receive follow-up nutritional counseling by a QHCP.  It is

8    warranted to make a substantial noncompliance finding, and the

9    Court would adopt the measure that the plaintiffs -- I'm

10   sorry -- the defendants have proposed.  I see that there is,       11:05AM

11   again, another detailed plan that seems exactly what you would

12   want to do if you had a failure to comply, so my hope is that

13   this is what will do the trick so we'll adopt that measure.

14          Ms. Kendrick, anything you wanted to say about 72 at

15   Eyman?                                                             11:06AM

16          MS. KENDRICK:  No, Your Honor.  We hadn't had a chance

17   to review this particular Corrective Action Plan, but we would,

18   again, just ask that any written policies, procedures, and

19   training materials be provided no later than November 8th.

20          THE COURT:  Okay.  Performance Measure 91, for             11:06AM

21   Phoenix:  MH-5 prisoners who are actively psychotic or actively

22   suicidal shall be seen by a mental health clinician or mental

23   health provider daily.

24          It seems to be that there is some issue with respect

25   to whether or not I can find substantial noncompliance but        11:06AM

```
 1   their issue is so significant I think that to the defendants'
 2   credit that in light of the recent drops that they have said
 3   that they have the cause of noncompliance under review and that
 4   this will be supplemented and that a remedial plan will be
 5   developed.  I think what is appropriate here is to ask you when      11:07AM
 6   that timetable is.
 7             MR. BOJANOWSKI:  Two weeks, Your Honor.
 8             THE COURT:  All right.  Mr. Fathi.
 9             MR. FATHI:  Yes, Your Honor.  We're happy to hear that
10   a remedial plan is forthcoming.  We would just point out that       11:07AM
11   this performance measure has been noncompliant for eight out of
12   the past 24 months, including three of the last four months.
13   And so it does meet the Court's definition of substantial
14   noncompliance, and we would ask that that finding be made.
15             THE COURT:  Thank you.  Let me just take a look again.    11:07AM
16             MR. BOJANOWSKI:  Your Honor, we agree it's
17   substantially noncompliant.
18             THE COURT:  All right.  So there's no issue then.
19             I guess I'm just -- I accept that and probably
20   shouldn't go routing around in this, Mr. Bojanowski, but it         11:08AM
21   looks to me like what you filed on the 2nd of October said that
22   Phoenix does not meet the Court's definition of substantial
23   noncompliance.  And when I looked -- well, in any event, I do
24   think that it is substantially noncompliant.  But I guess I'm
25   just pointing out that you told me the opposite in that             11:08AM
```

1    pleading, in that paper.

2          So Performance Measure 94 for Phoenix:  All prisoners

3    on a suicide or mental health watch shall be seen daily by a

4    licensed mental health clinician or on weekends or holidays by

5    a registered nurse.  There is a basis for a finding of          11:09AM

6    substantial noncompliance, and I would adopt the remediation

7    plan proposed.  And let me take a look here.

8          MR. BOJANOWSKI:  Did you say that was at Phoenix, Your

9    Honor?

10          THE COURT:  Yes.                                          11:09AM

11          MR. FATHI:  Your Honor, I may be missing it, but I

12    don't see a date of implementation, at least in the plan as set

13    forth in the defendants' brief at 2355.

14          THE COURT:  And I agree.  I don't see it either.  But

15    also in Performance Measure 94 for Phoenix, in the filing of    11:09AM

16    last night in Document 2374-2 at 90, I don't think there's a

17    date there either.  So when can we expect this will be adopted?

18    Oh, this is a historical inclusion.  There is no August -- I'm

19    sorry -- there is no supplement based upon yesterday's filing

20    or as of October 6th.  So if we're going just from what you     11:10AM

21    have previously done, is it in place now, Mr. Bojanowski?

22    What's happening?  Do you know what I'm talking about?  Have I

23    muddied the waters or is it clear enough?

24          MR. BOJANOWSKI:  Yeah, I'm confering right now.

25          THE COURT:  Okay.                                         11:10AM

```
 1          MR. BOJANOWSKI:  I believe this was something that we

 2   had put forth last month, if I recall correctly.  And I say

 3   that because it's not bolded or italicized typeset.  So my

 4   belief is that this is something that was put into place last

 5   month.  And I think what we're going to probably have to do is      11:11AM

 6   supplement this information concerning this particular measure

 7   and put an effective date in there.

 8          MR. FATHI:  Your Honor, I would also point out that we

 9   seem to have two different remedial plans here.  There's the

10   one set forth in the defendants' brief, Document 2355 at Pages     11:11AM

11   12 and 13, and then there's the one in the document filed last

12   night, Document 2374-2, Page 89 and 90.  So one question I have

13   is what is the relationship, if any, between those two plans?

14   Because they don't seem to have many points in common.

15          MR. BOJANOWSKI:  I think we're going to rely on 2374-2     11:12AM

16   going forward with our supplementation.

17          THE COURT:  That wouldn't seem to make sense in this

18   case because we know what is in 2374-2 before Performance

19   Measure 94 based upon what you just said because it wasn't

20   bolded or italicized.  We know it's historical.  But we have     11:12AM

21   what you filed on the 2nd of October in 2355 that does seem to

22   be a more current view of a remediation plan.  So --

23          MR. BOJANOWSKI:  Right.  And it may be that the

24   supplemental information we're going to provide will

25   incorporate what you are looking at now.     11:12AM
```

1          THE COURT:  Okay.

2          MR. BOJANOWSKI:  I want to just have -- my goal, as I

3     indicated to the Court before, is try to have one document that

4     contains the plan and not several documents that have it.  So I

5     would like to maybe take that document and get it into this          11:12AM

6     document.

7          THE COURT:  Right.  And I think that's what the

8     learning moment is here, that if you do file something that is

9     a remediation plan with a performance measure in a document,

10    that you then take care to make sure that it also makes it into     11:13AM

11    your spreadsheet that you filed last night.

12          And did we decide what we were going to call this last

13    time?  Did we come up with a name?  Do you have a name in house

14    that you call it?

15          MR. BOJANOWSKI:  I call it the graphs.  So it's not --       11:13AM

16    I really don't have a great name for it.  I'm open to

17    suggestion.

18          THE COURT:  So maybe that will be something that

19    somebody in your office can come up with some handle, because

20    it would be helpful.  We talked about this before and how all      11:13AM

21    three of us, the plaintiffs, the Court, you, have been

22    developing this centralized location to try to keep not only

23    what the reporting is but also the representations that have

24    been made about what remedial steps will be taken and then

25    moving from month to month so that we have a place, all of us.      11:14AM

1    And I embraced your doing it, and so I am wholly engaged in

2    trying to work with how to make it so that maybe at some point

3    it will become something that will obviate the need for the

4    plaintiffs and for the Court to spend as much time on this

5    because it doesn't make sense for three of us to do it all if          11:14AM

6    it's being done well in one place.

7             And so we can talk about it and try to focus on ways

8    to make sure that it's better.  We have done that by saying we

9    think we should include the historical steps taken, and then

10   you suggested that the next step you have taken is you have          11:15AM

11   bolded and you have also dated and put in italicized type the

12   next step.  Again, thinking about it in a larger sense about

13   how the graphs could be useful for us all is wise.  And then as

14   we learned here just now, including a remediation plan that was

15   submitted in a court filing in it would also be helpful.          11:15AM

16            Let me take a look at Yuma for 94.

17            MR. FATHI:  Yes, Your Honor.  The defendants have been

18   noncompliant for Yuma for six out of the past 24 months

19   including, quite concerningly, two out of the past three months

20   and, accordingly, meet the definition of substantial          11:16AM

21   noncompliance.

22            THE COURT:  Did I hear you right?  Did you just say

23   two out of the last -- two out of the past three months and

24   then six?

25            MR. FATHI:  Correct, Your Honor, May and June.          11:16AM

1          THE COURT:  So it is in substantial noncompliance.

2          MR. BOJANOWSKI:  I don't think so, Your Honor.

3          THE COURT:  You are checking on what you think.

4          MR. BOJANOWSKI:  I don't believe it is.

5          MR. FATHI:  Your Honor, the six months are August      11:17AM

6   2015, October 2015, and then the four that you see in our

7   filing, Document 2372 at Page 9.

8          THE COURT:  Any disagreement with that on the

9   defendants' side?

10         MR. BOJANOWSKI:  I think this is the six versus seven    11:17AM

11  issue that we talked about earlier today.  I have six -- I have

12  four in the last 18.  I have five in the last 24.

13         THE COURT:  Can you say what those five are?

14         MR. BOJANOWSKI:  Let me -- my type is really small.

15  Let me read.                                                    11:18AM

16         THE COURT:  I have that same problem.

17         MR. BOJANOWSKI:  Just to make sure I'm representing to

18  the Court correctly here, oh.  This is a little bigger.  This

19  is 94.  So what I'm showing is September, 70 percent, September

20  of 2015; I'm showing October 2016 at 67; December 2016 at 73;   11:18AM

21  May 2017 at 80; and June 2017 at 73.  So it's five in the last

22  24.

23         MR. FATHI:  I think you are missing August 2015 which

24  was 73 and October 2015.

25         MR. BOJANOWSKI:  That's more than 24 months.  August     11:19AM

1    of '15 would be 25 months.

2              MR. FATHI:  I guess the question, Your Honor --

3              THE COURT:  Just a second.

4              MR. BOJANOWSKI:  It's five in the last 24.

5              THE COURT:  Part of my goal here is to focus attention          11:19AM

6    where it's most warranted.  In the last two months we have had

7    100 percent and another month of compliance in the last two

8    months, right, Mr. Fathi?

9              MR. FATHI:  Well, Your Honor, I think on this

10   particular one, it hinges on whether these August preliminary          11:20AM

11   numbers are, in fact, final numbers.  In the past when we have

12   been given the numbers orally at these hearings we have been

13   told these are preliminary numbers.  I agree if the August 100

14   percent figure for Performance Measure 94 at Yuma, if we

15   consider that as a final number then I agree it just barely          11:20AM

16   misses the Court's definition.

17             THE COURT:  Mr. Bojanowski, what's been set forth is

18   your remediation plan for Phoenix for 94 in Document 2355.  Is

19   that also in operation at Yuma right now?  And is that maybe

20   why Yuma is doing better?          11:21AM

21             MR. BOJANOWSKI:  For Phoenix?

22             THE COURT:  Does Dr. Taylor know maybe?

23             MR. BOJANOWSKI:  I would venture a guess and say no,

24   because typically these problems are facility-specific in many

25   instances.  And it looks as though this 94 was          11:21AM

UNITED STATES DISTRICT COURT

```
1    facility-specific.  So I would venture a guess and say no, I
2    don't believe that that particular plan is in place in Yuma.
3              THE COURT:  All right.  Mr. Fathi, do you want to say
4    something?
5              MR. FATHI:  Well, simply that it would seem to be good    11:21AM
6    practice that if they think this is a good way to make sure
7    people who are on suicide watch get seen at one facility it
8    might be a good idea to implement that at other facilities.
9    But that is an observation.
10             THE COURT:  All right.  Well, it doesn't appear what's   11:22AM
11   before me right now that there is a substantial noncompliance
12   with this performance measure, and I'm hopeful that these last
13   two months that we have seen will be the established course for
14   the future.  So Performance Measure 97 for Phoenix, a mental
15   health provider treating a prisoner via telepsychiatry shall be  11:22AM
16   provided in advance of the telepsychiatry session the
17   prisoner's intake assessment, most recent mental health
18   treatment plan, laboratory reports, if applicable, physician
19   orders, problem list, and progress notes from the prisoner's
20   two most recent contacts with the mental health provider.       11:22AM
21   There's 19 months of N/A; three months of noncompliance; the
22   most recent six months are over the threshold.  It would look
23   to me like I don't have a basis for entering an order here at
24   this moment.
25             MR. FATHI:  Your Honor it does meet the Court's          11:23AM
```

definition of substantial non-compliance because of the three

consecutive three months of noncompliance.  We would ask for

that finding, but we would agree at the moment a remedial plan

does not seem necessary.

        THE COURT:  Mr. Bojanowski?                          11:23AM

        MR. BOJANOWSKI:  Yes, Your Honor.  He's correct.

There are three months of noncompliance, but you are looking at

the past eight months.

        THE COURT:  Right.  So what I will do is I will find

the stipulation as I found in the others where this             11:23AM

circumstance has been presented that the stipulation calls for

a finding but that we'll hold in abeyance any further action

because it looks like we are in a state of rectitude.

        Performance Measure 98 for Douglas:  Mental health

HNRs shall be responded to within the time frame set forth in   11:23AM

the mental health technical manual and the revision 4/18/14,

Chapter 2, Section 5.0.  Three months under last winter; four

good months then one bad then one good.  Mr. Fathi.

        MR. FATHI:  We would take the same position, Your

Honor.  This clearly does meet the definition of substantial    11:24AM

noncompliance, but we are willing to wait and see if -- so we

would ask for a finding of substantial noncompliance, but we

don't think a remedial plan is necessary if the present

compliance continues.

        THE COURT:  Mr. Bojanowski.                          11:24AM

```
 1              MR. BOJANOWSKI:  It does meet the definition.  There
 2    are three in a row.  We would ask the Court to hold off on a
 3    plan.
 4              THE COURT:  That's what I will do, find it is
 5    substantially noncompliance and hold off on action because it      11:24AM
 6    looks like things have improved.
 7              MR. FATHI:  Your Honor.
 8              THE COURT:  Yes.
 9              MR. FATHI:  I beg your pardon.  I know that Ms. Fettig
10    is waiting on the phone to address Items 1 and 2.  So I don't      11:24AM
11    want to break the flow, but if the Court could take those at
12    its convenience I'm sure Ms. Fettig would appreciate it.
13              THE COURT:  I appreciate that heads up.  I don't see
14    any objection to doing that.
15              I'm still a little bit puzzled because I don't know      11:25AM
16    what the defendants' view is with respect to Item 1, and that
17    is the plaintiffs' proposed revisions to the maximum custody
18    methods here.  So what are your current views?  Where do you
19    all stand?
20              MS. LOVE:  Your Honor, at the last meeting last month    11:25AM
21    we discussed that plaintiffs were going to do a revised
22    proposed order.  Of course defendants' position is still that
23    the motion should be denied.  At that last meeting we discussed
24    that plaintiffs would file a new proposed order and that then
25    defendants would have the normal time period of the 14 days to    11:25AM
```

1    respond.  Plaintiffs, on October 4th, filed that proposed

2    order.  We are going to object to it, and then we'll timely

3    file within that 14-day period of time our response to the

4    proposed order.

5           THE COURT:  So you are going to explain exactly what     11:26AM

6    your issues are.  So that's what I was hoping get.  It seems

7    like that's what I need to do, then, is give you a chance to do

8    that.

9           Ms. Fettig, anything you want to say about this?

10          MS. FETTIG:  Yes, Your Honor.  Of course, we recognize   11:26AM

11   that the defendants need an opportunity.  In fact, you gave

12   them that opportunity to respond to the proposed order, and

13   then this whole discussion will be more ripe for discussion.

14   But we did want to state on the record that in the new proposed

15   order we have focused, rather than looking at the failures in   11:26AM

16   the monitoring process and the noncompliance findings that were

17   made, we have focused more on the Court's concern of a current

18   remedial plan which is embodied in the newly-developed

19   monitoring guide that just went final a couple months ago.

20          So that's how we have revised it.  But we do want to     11:27AM

21   flag the fact that we are reserving the right to reassert all

22   of those noncompliance findings should the defendants file a

23   motion to terminate.

24          At the same time, while we filed our proposed order in

25   response to your minute order from the last status conference,  11:27AM

1   we note that you have subsequently filed an order in which you

2   dismissed the motion without prejudice to re-file.  We wanted

3   to raise with the Court what mechanism you were thinking of in

4   terms of re-filing.  Do you want both the plaintiffs and

5   defendants to re-file all of the papers that have been                11:27AM

6   previously re-filed.  That is one issue that we wanted to

7   address.

8           THE COURT:  All right.  Well, what I need to do is I

9   need to give the defendants this opportunity to respond to this

10  issue that I think is encompassed within that, and then if I          11:28AM

11  give you a chance then to submit in a reply the proposed

12  document that you believe the Court should adopt, that would be

13  a product that would be, perhaps, modified by your reaction to

14  what the defendants had to say.  Maybe not.  But in any event,

15  it would make sure that each side had an opportunity and it was       11:28AM

16  before the Court then what the plaintiffs' original proposed

17  order would be.

18          Does that address your concern?

19          MS. FETTIG:  I believe so.  So you are giving the

20  opportunity to perhaps modify the initial motion to enforce the      11:28AM

21  stipulation?

22          THE COURT:  Yes.

23          MS. FETTIG:  Okay.  Well, we will see what the

24  defendants file in light of the revised proposed order that we

25  filed last week.                                                      11:29AM

1          THE COURT:  All right.  Well, again, I'm not

2    interested in really creating difficulty for the parties in

3    light of what was housekeeping because I thought that I had

4    addressed the order.  And it was in, as I have told you, it

5    seems to have been in sort of transition and I needed to know          11:29AM

6    what really was the final version that people were -- believed

7    the Court should consider.

8          And so in this process of the defendants having an

9    opportunity to respond then you all will have an opportunity to

10   reply.  In that process, feel free to bring within this general       11:29AM

11   subject matter of what the max custody model should be.  And so

12   I think it makes sense to encapsulate all of this in this

13   procedure for briefing that we have identified.  That's at

14   least what I'm thinking unless you don't think it makes sense

15   to do it that way.          11:30AM

16          MS. FETTIG:  I think that makes sense.  I mean, would

17   it be possible for us in our filings after the defendants'

18   filed their response to the new proposed order to just reassert

19   the re-filing of the original motions to enforce?

20          THE COURT:  You certainly can do that.  If that 's          11:30AM

21   what you choose to do, that's fine.  I'm interested in what is

22   an efficient way of addressing it.  And if you find a better

23   way to address it, that's -- you're free to present it because

24   I said it was without prejudice.

25          MS. FETTIG:  Thank you, Your Honor.  We will try to be          11:30AM

1    as efficient as possible.

2             There is one other issue we wanted to bring to your

3    attention related to max custody, and that is the notification

4    that the defendants and the plaintiffs have reached agreement

5    on max custody Performance Measure Number 9, which is the use          11:31AM

6    of force provision.  That was not in the motion to enforce that

7    we have just been talking about.  It is a separate issue.

8    Judge Bade put on the docket a notification in 2336 that that

9    mediation has concluded, but I wanted to alert the Court to the

10   fact that as a result of this mediation the parties have agreed       11:31AM

11   to modify the stipulation pursuant to Paragraphs 40 and 41.

12   There are actual substantial changes to both the substance of

13   max custody Performance Number 9 as well as agreement on a

14   proposed termination date and the acts that would lead up to

15   that termination.  So there's a fairly substantial change to          11:31AM

16   the stipulation that I wanted to alert you to as the arbiter of

17   the stipulation.

18            And since we haven't -- the stipulation really has yet

19   to be modified in any meaningful way under Paragraph 40 and 41,

20   I wanted to raise with the Court what the next step should be.        11:32AM

21   Should we do a joint notice to the Court indicating the

22   changes?  Is it more appropriate for you to take a look at the

23   changes and then do an order modifying the stipulation?

24   Because this is an issue of first impression in this case, I

25   just wanted to raise this with the Court for discussion.              11:32AM

1        THE COURT:  I have reviewed the parties' agreement to

2   modify the stipulation.  I have no objection so I would enter

3   an order accepting the parties' modification of the stipulation

4   and, therefore, it becomes now an operative part of the

5   stipulation.                                                      11:32AM

6        MS. FETTIG:  All right, Your Honor.  Thank you.

7        THE COURT:  Anything else, Ms. Fettig, that was on

8   your agenda?

9        MS. FETTIG:  That's all on our agenda.  And thank you,

10  Your Honor, for addressing these issues.  I know there was a     11:33AM

11  great deal to discuss at today's status hearing.

12       THE COURT:  Indeed.  So thank you.

13       Turning now to what is Document 2374-1, and that is

14  the graphs, and I'm inclined to think that, perhaps, the best

15  way to address it is to work through them and to pause where we  11:33AM

16  reach a report for August that is below 85 percent and to

17  address each of those.

18       And so the first one that we would come to would be

19  Performance Measure 11:  Are newly-prescribed provider ordered

20  formulary medications provided to the inmate within two         11:33AM

21  business days after prescribed or on the same day if prescribed

22  stat?  And the report for August is 70 percent at Eyman and 72

23  percent for Lewis, and those are the facilities that are below

24  the threshold.  And there is a representation for Eyman that

25  there was supplemental information as of October 6, 2017 that    11:34AM

1    five replacement nurses were hired on August 14, 2017 at Eyman

2    in an effort to deal with this.  And as I look at Lewis, it

3    doesn't appear that there is any new either explanation or

4    proposed remedial measure for that deficiency.  But those are

5    my initial observations.  Ms. Kendrick.                         11:35AM

6            MS. KENDRICK:  Thank you, Your Honor.

7            First of all, I'm having to look at what was filed

8    last night against what was filed a few weeks ago by the

9    defendants, so I apologize for any --

10           THE COURT:  That's fine.  Take your time.  Again, this   11:35AM

11   amalgamation of data is something we hope to resolve but it's

12   necessary now.

13           MS. KENDRICK:  Okay.  So previously in September

14   defendants said that they were going from having four inventory

15   coordinators to five so that they would have one for each yard  11:35AM

16   at Eyman.  And I'm a little perplexed by the supplemental

17   information that they hired five replacement nurses because the

18   previous filing had made it sound like they just were adding

19   one more.

20           Also, it's unclear, and I hope that either Mr.          11:36AM

21   Bojanowski or the people from Corizon could explain these

22   inventory coordinators, what level they are; are they

23   registered nurses, are they licensed practical nurses, are they

24   certified nursing assistants.

25           And finally, in the Corrective Action Plan, they do     11:36AM

refer to the fact that they were going to adopt the medication

administration process used by Tucson.  However, they don't

state what the medication administration process is at Tucson.

And if you flip a few pages forward to Performance Measure 11

on Tucson, there's nothing written there because they say they          11:36AM

have been above compliance since June of this year.

So those are our questions and observations with

regard to Eyman.

THE COURT:  This is -- and ironically, this was the

genesis, this problem was the genesis of the Court thinking            11:37AM

about outside providers because it always seemed to me that if

you couldn't get it within two business days that you would

then go to the Walgreen's or to the CVS and you would get it

and they would have it and it would be simple enough.  And then

that was derailed in part by defendants' argument saying that          11:37AM

it wasn't -- that wasn't the problem, they actually had their

own in-house pharmacy.  It was a warehouse someplace in Kansas

or wherever.  I don't remember.  In any event, it was getting

it there and getting it delivered.  And those things seemed

like they could be redressed.                                          11:38AM

And so we're told, as Ms. Kendrick pointed out

earlier, there is a staffing change with four inventory

coordinators, each of whom were integral to the overall

performance measure, and that the previous ones weren't

sufficient and they said they were going to fix that.  And then        11:38AM

1    we have five new people hired on August 14th.  I guess there is

2    a lack of confidence that this far into the problem that we --

3    and an acute problem that we focused a lot of attention on with

4    so many months in recent history of failures to comply; 68 in

5    April, 66 in May, 62 in June, 64 in July and now 70 in August.    11:38AM

6           I see what you have written here in just one sentence,

7    hired five replacement nurses on August 14, 2017.  Are these

8    replacement nurses generally who are doing other things as well

9    or are they just tasked to do this only?  What is the story?

10          MR. BOJANOWSKI:  I don't have any other information    11:39AM

11   except that an additional -- or I should say the five

12   replacement nurses were hired.  We did correct our inventory

13   coordinator issue from last time in this document.  So it's a

14   separate position.  Inventory coordinator is not the same as

15   the --    11:39AM

16          THE COURT:  Right.  So five replacement nurses.

17   Again, in a notebook of all sorts of staffing deficiencies,

18   throwing five more nurses into Eyman when they've got bunches

19   of things that they are not getting done, how do I know that

20   these five nurses are devoted to addressing the problem in    11:40AM

21   Performance Measure 11 as a meaningful step?

22          MR. BOJANOWSKI:  I can't really speak to that.  I can

23   speak to the fact that the medication administration process

24   was implemented in September.  So these numbers are not really

25   going to reflect that implementation, which is why this    11:40AM

1    Corrective Action Plan has not yet been modified because we

2    want this plan to -- we want to see if this plan is effective

3    at this point.

4         THE COURT:  Have you taken any steps to see whether or

5    not between September 15th and now there is any result from          11:40AM

6    this?

7         MR. BOJANOWSKI:  Let me check and see if I have any

8    realtime data on that.

9         THE COURT:  I guess it would seem to me that if you

10   had these numbers of failures in a row and that if you had a         11:40AM

11   plan you would really want to check two weeks into it, how are

12   we doing today, if this was going to be a monitoring day, how

13   did we do, and get a sense about whether or not this was right

14   or not.  Because the problem is the delay, the lag time is

15   something that really dogs us but it doesn't have to dog the         11:41AM

16   people on the scene.  They can find out right now.  And it

17   seems to me I have tried everything to try to get the

18   defendants to find out right now.  And in some cases you have

19   made that progress and I'm really embracive of it and thankful

20   for it because it seems to me so obvious that that's what you        11:41AM

21   do.  But I don't have a sense here.

22        MR. BOJANOWSKI:  I don't have the realtime data for

23   this particular measure.

24        THE COURT:  Did you know whether they are even

25   looking?                                                             11:41AM

1    MR. BOJANOWSKI:  I know that they are looking.  I'm

2  pretty sure they are looking at it.  I know that they have got

3  compliance people in the office that are checking these things

4  to see if these plans are effective and then tweak them as time

5  goes on.  I simply can't report to the Court what a trend would          11:42AM

6  be outside of the upward trend from the finding that was made.

7    THE COURT:  All right.  So here's my proposed method

8  to address this.  In fact, I will give you both a chance to

9  comment on it before it becomes an actual order.  But what I

10  would like to hear at the next status conference is I would          11:42AM

11  like to hear what steps the defendants did to ascertain shortly

12  after the implementation of the September 15th plan to see

13  whether or not it was working and if they didn't take any steps

14  to find out whether or not it was working in realtime, why not?

15  Mr. Fathi or Ms. Kendrick.          11:42AM

16    MS. KENDRICK:  We look forward to that report.  We

17  would just observe that the contempt order that you issued

18  yesterday at Docket 2373 does include Performance Measure 11

19  for Eyman and Lewis, and the Court had ordered defendants to

20  start providing this realtime data as of December 1st for the          11:43AM

21  month of December.  We believe that actually the Court should

22  expand the order and request the realtime data as of November

23  1st and include the month of November in it.

24    It's still unclear whether who or what these inventory

25  coordinators are, what level of staff they are, if they are          11:43AM

1    nurses, what type of nurses.  And again, with regard to hiring

2    five replacement nurses on August 14th, we're glad to hear that

3    because their August staffing report did show shortages in LPN

4    and nursing assistants.  Unfortunately, defendants refused to

5    provide us with a September report before the hearing so I          11:43AM

6    cannot report to the Court whether there shows and increase.

7    Ms. Rand's position was that she had to wait until Corizon

8    provided the September report before she could provide it to us

9    and the Court in advance of the hearing.

10         THE COURT:  All right.  So what I'm contemplating, Mr.        11:44AM

11   Bojanowski, just so that you have it squared up in front of you

12   is that at our next status hearing you will have somebody

13   available to explain to me what steps that were taken to

14   ascertain whether or not the remedial method identified in

15   2374-1 at Page 4 and 5 for Performance Measure 11 at Eyman,         11:44AM

16   what steps were taken to see whether or not it was producing

17   results close in time to the implementation date of September

18   15th, 2017.  And if that wasn't done, what possible reason for

19   not doing it would exist, so that I can better understand it.

20         And then before I give you a chance to say what you          11:44AM

21   would like to say, I will echo what Ms. Kendrick said, and that

22   is, what is looming here is something that I think would be

23   getting everybody's attention.  And that is, this is one of the

24   most dramatically costly remedial measure failures that can be

25   imposed under the contempt front that is being employed.           11:45AM

1      So I really do think that it behooves everybody to

2   make this report to me in November, because I understand that

3   the contempt application is even more delayed, and I'm not

4   interested in that.  I'm interested in mostly getting the thing

5   fixed.  So I want to hear why it is that we're here in this          11:45AM

6   position where people don't know whether or not something that

7   was started about a month ago is working or not when the cost

8   is grave for the individual patients who are not getting

9   medications that have been prescribed for them.  And so all

10  right.  Mr. Bojanowski, anything you want to say?                    11:46AM

11      MR. BOJANOWSKI:  No.  We'll have the information to

12  the Court.

13      THE COURT:  All right.  Good.

14      So then for Lewis, there is no supplementation, so I

15  guess we're thinking that we're in the same position.  So I,        11:46AM

16  perhaps, should have saved myself some breath and said that we

17  would want to hear the same thing about Lewis about whether or

18  not this measure that was going to be put in place on the 15th

19  of September has produced any results.

20      MR. BOJANOWSKI:  That was my assumption, it would be            11:46AM

21  both facilities.

22      THE COURT:  Anything, Ms. Kendrick?

23      MS. KENDRICK:  Just an observation, Your Honor.  The

24  Corrective Action Plan for Lewis is pretty detailed, and based

25  on our review it looked like it was identical to the one at         11:47AM

1   Florence, which we're happy to see in August they came above

2   compliance from being noncompliant last month.  But then the

3   remedial plan for Eyman refers to using a process used by

4   Tucson, without articulating what this actual process is.  And

5   this is more of a global observation.  Mr. Fathi referred to          11:47AM

6   this earlier, is the idea that if something does appear to be

7   working at one institution it may behoove Corizon and the

8   defendants to implement it at all the institutions.  Because

9   otherwise, if you read this you look at what's going on at

10  Eyman and you look at what's going on at Florence and Lewis, it        11:47AM

11  looks like two different things.  But the process or the plan

12  that they develop at one facility would possibly applicable at

13  the others, and so we are concerned that these remedial plans

14  are very disjointed and vary greatly from institution to

15  institution when we're trying to address a problem with lack of       11:48AM

16  performance at multiple institutions.

17        THE COURT:  There are a number of observations you

18  have just made.  All of them seem valid.

19        MR. BOJANOWSKI:  Your Honor, I don't dispute that

20  sometimes a plan will work at one facility but that same plan         11:48AM

21  may not work at another because of the physical structure is

22  much different.  The delivery system may be a lot different.

23  Again, if a plan is working at one place and we think it will

24  work at another, sure.  I agree it is a good idea to maybe see

25  if we can't lift that plan from where it's working and place it       11:48AM

1    into another facility.  And we have done that.  But sometimes

2    it just doesn't work.  But we will have further information for

3    the Court as directed for those two facilities.

4         THE COURT:  It just seems so basic to me.  Are

5    newly-prescribed ordered formulary medications provided to the          11:49AM

6    inmate within two days after prescribed or on the same day if

7    prescribed stat.  And it just is difficult for me to

8    contemplate how it is that we are still discussing this when

9    you are in control of so many aspects of these people's lives

10   and this essential element of their healthcare.          11:49AM

11        So, as I say, basic, just seems so basic and really

12   seems like it ought to be achievable.  I'm not saying it's

13   easy.  But it's also achievable.  It's not as if it is a great

14   medical mystery or there's some confounding variable issue.  It

15   is the fact that the medication exists in the possession of the          11:50AM

16   contracted provider, it's been prescribed by the doctor, and

17   it's not received by the patient who the doctor says needs it.

18        And so, again, I guess I'm saying what I have said

19   over and over and over again, but I cannot make -- I guess I

20   feel compelled to try to make my point again to try to drive it          11:50AM

21   home that this just seems so basic and necessary and

22   appropriate.  Does that close out the necessary discussion for

23   Performance Measure 11?

24        MS. KENDRICK:  Yes, sir.

25        THE COURT:  All right.  It appears that the August          11:50AM

1    number for Performance Measure 13 all satisfy the benchmark.

2    Any comment, Ms. Kendrick?

3              MS. KENDRICK:  We certainly hope that they continue

4    to.

5              THE COURT:  All right.  Appears to be the same for        11:51AM

6    Performance Measure 14 for all facilities.

7              All right.  Performance Measure 15.  Are inmates who

8    refuse prescribed medication or no-show being counseled by a

9    QHCP after three consecutive referrals?  And so for Eyman, 36

10   percent; for Lewis, 48 percent.  And there is a basis for        11:51AM

11   noncompliance offered for Eyman.  The deficiencies identified

12   for PM 15 are rooted in the absence of a standard procedure for

13   qualified healthcare providers to utilize when a patient

14   refuses his/her medication.  To ensure compliance with PM 15,

15   qualified healthcare providers must make an appropriate entry        11:52AM

16   on the medication refusal log, complete and scan a medication

17   refusal form into eOMIS, counsel the patient in each instance,

18   and document in eOMIS the patient has been appropriately

19   counseled as to the risks and dangers associated with refusing

20   to take his/her medication.                                       11:52AM

21             The Corrective Action Plan as of October 6, 2015 the

22   defendants identify is to remediate the recent deficiencies for

23   Performance Measure 15 at the Eyman, Lewis, and Florence sites

24   and to maintain compliance at the other sites currently

25   operating without a deficiency.  Corizon Health shall develop        11:53AM

```
 1   and implement a new procedure for the administration of

 2   medication applicable at all sites that includes specific

 3   action steps for qualified healthcare providers to follow in

 4   instances when a patient refuses his or her medication.  More

 5   specifically for each instance when a patient refusions to take       11:53AM

 6   his/her medication, the procedure will require the qualified

 7   healthcare provider to:  One, immediately counsel the patient

 8   as to the risks associated with refusing to take medication

 9   necessary to treat his/her illness which is required during the

10   encounter; two, immediately filing the encounter, enter the          11:53AM

11   patient's name and information onto the medication refusal log;

12   and three, before the end of the qualified healthcare provider

13   shift on the day of the encounter, he/she shall obtain complete

14   and scan a medication refusal form into eOMIS.

15         With regard to the timing of this remedial measure,            11:54AM

16   Corizon shall develop and effectuate the new procedure on or

17   before November 15, 2017, hereinafter the effective date.

18   Prior to the effective date, Corizon will communicate the

19   procedure to all site leadership and site level qualified

20   healthcare providers via e-mail and shortly thereafter the           11:54AM

21   remedial measure will be presented to site leadership at the

22   appropriate staff meeting so that employees have an opportunity

23   to discuss the same.

24         At all times subsequent to the effective date, the

25   procedure will be accessible to all Corizon employees on,            11:54AM
```

1    quote, "myCorizon," close quote, and in hard copy form upon

2    request.

3            All qualified healthcare provider requests for a copy

4    of the procedure in hard copy format should be directed to site

5    leadership.  Additionally, prior to the effective date all                11:54AM

6    Corizon qualified healthcare providers shall be trained by site

7    leadership or an appropriate designee on the new medication

8    procedure.  On or after December 1, 2017, Corizon compliance

9    monitors shall review an appropriate sample of medication

10   refusal logs and corresponding eOMIS sections at each side to              11:55AM

11   evaluate and assess compliance with the new procedure.  Any and

12   all compliance deficiencies discovered during this monitoring

13   exercise shall be addressed by site leadership in the form of

14   providing additional training to those qualified healthcare

15   providers associated with the deficiency's findings.                      11:55AM

16           Ms. Kendrick, plaintiffs' response.

17           MS. KENDRICK:  Just as an initial matter, I'm a little

18   concerned.  We had this discussion last month about the

19   difference between a mental health clinician and a mental

20   health provider and the language being used.  The stipulation            11:55AM

21   defines QHCP to be a qualified healthcare professional and

22   specifically that it's more than just provider levels.

23   Provider is a term of art as we discussed last month.  And as

24   it's in the stipulation, medical providers are at the level of

25   a physician, nurse practitioner, physician's assistant.  Mental          11:56AM

1    health providers are at the level of psychiatrists or a

2    psychiatry nurse practitioner, basically people who are allowed

3    to prescribed medications.

4         Qualified healthcare professional is defined more

5    broadly in the stipulation and also includes nurses.  And so          11:56AM

6    it's a broader definition.  So when I read this my concern was

7    that given the limited number of providers, which is physician

8    or physician assistant nurse practitioner, this is burdening

9    the providers and so it was unclear who they were referring to

10   when they were saying qualified healthcare provider, because        11:56AM

11   it's actually qualified healthcare professionals so that could

12   include nursing staff.  We're concerned that if this is being

13   put on people who are providers as providers is defined that's

14   creating a lot of additional work for people who are already

15   working quite a lot and at some facilities there aren't enough      11:57AM

16   providers.

17         MR. BOJANOWSKI:  We appreciate the clarification by

18   plaintiffs, and we'll implement that change.

19         THE COURT:  All right.  Thank you.  Anything else?

20         MS. KENDRICK:  No, sir.  I mean, we just got it last          11:57AM

21   night.

22         THE COURT:  Okay.  Well, we'll take a break from now

23   until 1:15 and we'll have a chance to resume where we left off.

24         Thank you.

25         (Recess from 11:57 a.m. until 1:17 p.m.)                      11:57AM

```
1        THE COURT:  Is there anything anyone identified during
2   the noon hour that we need to police?  No?  Okay.  Good.
3        So then are we at Performance Measure 20?
4        MR. BOJANOWSKI:  Correct, Your Honor.
5        THE COURT:  Thank you.  So 20 has none that are below        01:17PM
6   the threshold.  24, then:  Are emergency medical response bags
7   checked daily and inventoried monthly and contain all required
8   essential items.  August for Lewis is at 75 percent.  The
9   defendants observe that it is above compliance threshold
10  without interruption since April 2017 except for August 2017.    01:18PM
11  I guess, then, has there been an inquiry as to why this
12  occurred?
13       MR. BOJANOWSKI:  There's been a preliminary inquiry as
14  to what happened, and it appears as though there was a missing
15  inventory sheet for the Rast Unit and some missing items in the  01:18PM
16  Barchey Unit in the bag itself.  So that's my preliminary
17  information.  Once again, this is one we talked about earlier
18  where we would look at and develop a plan.
19       THE COURT:  Ms. Kendrick.
20       MS. KENDRICK:  No.  We already talked about it.           01:18PM
21       THE COURT:  Okay.  Fair enough.
22       Performance Measure 27, across the board at 100
23  percent compliance.  29 at compliance.
24       And then 35:  For intersystem transfers complex to
25  complex, are all inmate medications KOP and DOT transferred      01:19PM
```

1   with and provided to the inmate or otherwise provided at the

2   receiving prison without interruption?  So August has 64

3   percent for Eyman and 58 percent for Florence and just at the

4   threshold for Lewis and at 80 percent for Yuma.

5           And then the defendants had originally told us last       01:20PM

6   month, I think it was, this is focusing on Page 2374-1 at Page

7   63 at the very bottom:  The pilot program then began on August

8   7th, 2017, impacting all facilities and it would seem then that

9   the pilot program, the remediation program, would be reflected

10  in these numbers.  And so we're seeing that that's not working.   01:20PM

11          MR. BOJANOWSKI:  Well, I think it was implemented in

12  early August.  And if you look at numbers at Eyman it tracked

13  up from 48 to 64; at Lewis from 42 to 85; we stayed at 100 at

14  Phoenix; we went from 86 to 90 at Tucson; the two facilities

15  that did not do so well were Florence -- well, hold on just a     01:21PM

16  second.  Florence, 55 to 58.  Yuma dropped 84 to 80.

17          So I think it's one of those things that reflect that

18  this plan maybe needs some additional time to take hold.  But,

19  I mean, we do have some trending upward numbers there, Your

20  Honor.  I do not have current data on this particular measure     01:21PM

21  as far as what it's looking like right now.

22          THE COURT:  And the problem is that this plan

23  incorporated the backstop, and so if you are seeing that it's

24  not working then you would think that the backstop would be

25  reinforced and that if this happened presumably, it says          01:22PM

started on the 7th of August and then for these facilities we

have on the 8th of August, assuming as logically seems right to

assume, that the errors aren't all collected later in the

month, that they maybe are spread out in the month, you would

think that this plan would have captured and fixed because it                    01:22PM

incorporates a mechanism for fixing.

        Ms. Kendrick, do you have any observations?

        MS. KENDRICK:  Yes, sir.  We're troubled by the fact

that there's still such poor performance given that three of

the four weeks in the month of August they were implementing                     01:22PM

and using their remedial plan.  And similar to Performance

Measure 11 that we discussed this morning with the pharmacy

provision, we also recommend that an in-depth analysis be done

of why there's this continued noncompliance and whether the

root cause is on the custody side of the operation or the                        01:23PM

healthcare side.

        And also note that defendants will have to provide

realtime information pursuant to the order to show cause on the

contempt order because Your Honor included Eyman, Florence,

Lewis, and Tucson in that order.  We believe that it would                       01:23PM

behoove defendants to start doing some realtime trafficking in

the month of November and not wait until December to get a real

handle of how this is playing out at each institution.

        THE COURT:  I'm looking at it to make sure that I was

remembering this correctly to see whether or not there is what                   01:24PM

1   I've been calling the backstop, whether there's some effort to

2   capture in a realtime basis within the remedial measure any

3   realtime failures.

4           MS. KENDRICK:  Yes, Your Honor.  At Page 65 in the

5   middle of the page it describes that at the receiving facility      01:24PM

6   the accountability officer will provide a daily list of the

7   people who are transferring into the facility to Corizon

8   medical records.  So one would think that that would create

9   some sort of backstop to see.

10          THE COURT:  But it actually doesn't have it, and         01:24PM

11  that's why I was reading it again.  Because it doesn't -- the

12  backstop really would be when the list is prepared that

13  somebody the next day takes a look at the list and then takes a

14  look at the inmates who are transferred to see if they are in

15  possession of their medications.  And that would be the          01:24PM

16  backstop.  So this doesn't really seem to have that.  So it's

17  not to say that what you suggest is inappropriate.  It seems to

18  suggest that it is appropriate to ask for an explanation as to

19  why this wasn't also coupled with a realtime monitoring feature

20  so that the facility itself would be in a position in real time    01:25PM

21  to identify the failure rather than to leave us here several

22  months after the fact speculating.

23          Mr. Bojanowski, what I would suggest is that we would

24  include Performance Measure 35 for these facilities that are

25  below the benchmark to hear about what efforts were undertaken    01:25PM

1    to assess in real time whether this detailed performance

2    remediation plan was working, and again, if it didn't, if there

3    were no efforts taken why that's not part of this remediation

4    plan.

5           So Performance Measure 39 -- I'm sorry -- 37, meeting          01:26PM

6    benchmark.  39, for Florence:  Are routine provider referrals

7    being addressed by a medical provider and referrals requiring a

8    scheduled provider appointment being seen within 14 calendar

9    days of the referral?  In Florence, 57 percent, and the

10   supplemental information, hired two nurse practitioners on          01:26PM

11   October 7th, 2017.  Additionally hired one M.D. on October 5th,

12   2017 to replace provider that transferred to Eyman.  Now there

13   are a total of five providers at this facility.

14          Anything that you would like to add about Florence,

15   Mr. Bojanowski?                                                      01:27PM

16          MR. BOJANOWSKI:  That's actually what has been in

17   place.  So the supplemental information is really, that's what

18   was put into place.  So it's -- they are up to five providers

19   at this facility now, so. . .

20          THE COURT:  I see.  So what we're looking at is the          01:27PM

21   previous Corrective Action Plan, the last sentence, the two new

22   providers will bring the total number of providers to five

23   which is an increase of two.  And then the supplemental

24   information that suggests that there's been hiring of two nurse

25   practitioners and one M.D., that is not new information.            01:27PM

```
1    That's supposed to be included within what had happened

2    previously?

3              MR. BOJANOWSKI:  Correct.

4              THE COURT:  All right.  And so then I guess that begs

5    the question, what's going to be put in place to deliver more        01:27PM

6    since this was already done?  Now, of course, these are August

7    numbers and this was done in September.

8              MR. BOJANOWSKI:  It was just the hiring of the new

9    staff, Your Honor, and that's really what --

10             THE COURT:  So what's the total number right now of        01:28PM

11   providers at Florence?  Is it five?

12             MS. KENDRICK:  The contract calls for 5.5, Your Honor.

13             THE COURT:  So how many do we have on the ground now

14   there?

15             MR. BOJANOWSKI:  Five.                                     01:28PM

16             THE COURT:  And then for Lewis at 76 percent, on this

17   same performance measure, the supplement says there was a

18   vacancy for the medical director whom we have already

19   established we don't really need and is unimportant.  Joke.

20   But again, that's perfectly consistent with what I would expect     01:29PM

21   because it would matter.

22             And additionally from August 28th, 2017, through

23   September 2017, an M.D. was out on PTO, this issue, again, I

24   think will be the subject of Mr. Millar's review about how,

25   where the margin is so thin where you can see such failures in      01:30PM
```

UNITED STATES DISTRICT COURT

1  meeting the performance measures where the defendants feel that

2  it's possible to explain it because an individual was out on

3  PTO, again, it's very suggestive that the resources are

4  insufficient to adequately meet the needs.

5          Ms. Kendrick, do you want to add anything about 39?                01:30PM

6          MS. KENDRICK:  Yes, sir.  But first I wanted to just

7  go back to Performance Measure 37 and note for the record that

8  as we spelled out in our recent brief about the HNR boxes being

9  removed that we think that the removal has adversely affected

10  the quality of the methodology and calls into question the         01:30PM

11  compliance levels.

12          With regard to Performance Measure 39, we, again,

13  are -- we note for the record that Florence, while they do now

14  have five providers, the contract calls for 5.5 full time

15  equivalents.  And with regard to Lewis and the vacancy for the    01:31PM

16  medical director position, they say they have hired a new part

17  time medical director who will be on site on Wednesdays.

18          THE COURT:  That's the regional medical director.  Is

19  that someone above the medical director or is that the same

20  person?  Do you know.                                                       01:31PM

21          MS. KENDRICK:  That's somebody who is above.  And

22  their previous note had said that this regional medical

23  director was on site for five days per week.  But in light of

24  Mr. Struck's representation that medical directors don't

25  provide clinical care, we're a little confused by the              01:31PM

1    significance of having a regional medical director on site

2    unless he or she is actually seeing patients the entire time

3    that they are there.

4         THE COURT:  It certainly suggests that what's been

5    represented here by the defendants is that the regional medical          01:31PM

6    director does have some role in addressing this referral need

7    called for in this performance measure.  Is that not true or is

8    it true?

9         MR. BOJANOWSKI:  The regional medical director does

10   provide hands-on care.  Mr. Struck was mistaken as to the               01:32PM

11   duties.  So the medical directors do have administrative duties

12   as well, but they do provide hands-on care at the site.

13        THE COURT:  Okay.

14        MS. KENDRICK:  And we would just note, Your Honor,

15   that the contract with Corizon calls for a total of 6.5 full            01:32PM

16   time equivalent providers levels.  And in the month of August,

17   which is the last month for which we have a staffing report or

18   information, they only had five providers.

19        THE COURT:  Which facility is that again?

20        MS. KENDRICK:  That would be Lewis, sir.                           01:32PM

21        THE COURT:  Lewis.  Okay.  Thank you.

22        Performance Measure 40, we have compliance or not

23   applicable.  Any comment there, Ms. Kendrick?

24        MS. KENDRICK:  Just it's a little concerning that an

25   entire month there were no urgent referrals at a prison with            01:33PM

1        more than 5,000 people housed on it.

2                THE COURT:  Is there a simple explanation for that in

3        that it is, in fact, true, or is there some other reason to be

4        concerned about what seems like a curious --

5                MR. BOJANOWSKI:  We actually noted the same thing that       01:33PM

6        plaintiffs had noted and are currently investigating this

7        particular finding.  So because it's a preliminary number, we

8        saw it, it looked to us to be off.

9                THE COURT:  Possibly.

10               MR. BOJANOWSKI:  Possibly off.  So it's currently           01:34PM

11       under an extended review and re-audit type process.

12               THE COURT:  All right.  Thank you.

13               Performance Measure 42.

14               MR. BOJANOWSKI:  I think we talked about this one

15       already, Your Honor.                                               01:34PM

16               THE COURT:  We did?

17               MR. BOJANOWSKI:  It was one of the new ones.

18               THE COURT:  No, I'm not disagreeing with you.

19               MR. BOJANOWSKI:  Oh.  I think we did.

20               MS. KENDRICK:  We did.                                      01:34PM

21               THE COURT:  So for 44, no reason to talk any more than

22       what we already addressed, I think, with Winslow from the

23       August notice of noncompliance.  Anything else we need to talk

24       about on 44?

25               MS. KENDRICK:  No, sir.                                     01:35PM

1           THE COURT:  Okay.  45 at Yuma is at 72 percent, are

2    on-site diagnostic services provided the same day if stat or

3    urgent or within 14 calendar days if routine?

4           MR. BOJANOWSKI:  We have some preliminary information

5    on this one.  This is still under investigation.  But we found          01:36PM

6    that some of the providers were using wrong priority codes when

7    ordering.  As an example, there were several identified A1C

8    orders that were ordered as a stat order which, apparently,

9    from what I'm told, is a routine order and so there's been some

10   instruction to providers with regard to how they are coding          01:36PM

11   their orders in the eOMIS system.  But we're still looking at

12   this one and probably will have a plan put in place.

13          THE COURT:  Ms. Kendrick, anything you would like to

14   say?

15          MS. KENDRICK:  We look forward to hearing more          01:37PM

16   information as to the reason why.

17          THE COURT:  Okay.  46:  Are medical providers

18   reviewing the diagnostic report, including pathology reports,

19   and acting upon the reports with abnormal values within five

20   calendar days of receiving a report at the prison.  And Eyman          01:37PM

21   is at 54 percent for August, and I don't see anything

22   addressing that.

23          MR. BOJANOWSKI:  I'm sorry, Your Honor.  What was your

24   question?

25          THE COURT:  Well, with respect -- are you saying that          01:37PM

what you talked about previously, the crosscheck committee is
going to show that we're going to get real results and can you
tell me if there are any reports about whether the crosscheck
committee has reported that to you?

MR. BOJANOWSKI:  Yes.  Yes.  And this is one of the
few that I do have some realtime data on.

THE COURT:  Good.

MR. BOJANOWSKI:  We did a search October 9th on spot
check.  We pulled 50 inmates reviewed from Eyman and we were
finding a 72 percent compliance rate.  We pulled 50 from
Florence, and we saw a 72 percent compliance rate.  We pulled
50 from Lewis and were showing a 94 percent compliance rate.
So the preliminary -- and that's just a spot check.  So this is
one of those ones where we indicated that there probably should
be some more time to let the plan take hold.  So that's the
data I have at this point.

THE COURT:  Well, I guess if you pulled the realtime
and you showed, just focusing on Eyman, and you had 72 percent
compliance rate, what makes you think that this realtime
assessment of the new measure is going to be addressed by
having the new measure in place longer, or why doesn't it
suggest that something else needs to be done?

MR. BOJANOWSKI:  I don't think I understand.  I mean,
we're measuring where our current plan is going.

THE COURT:  Well, right, you did.  And the current

1    plan, you told me, was at 72 percent.

2              MR. BOJANOWSKI:  Right.

3              THE COURT:  Okay.  So that's moved from 54 to 72.

4              MR. BOJANOWSKI:  Right.

5              THE COURT:  And I guess I'm thinking 72 is a failure          01:39PM

6    of greater than a third.

7              MR. BOJANOWSKI:  Oh.

8              THE COURT:  It would seem to me it's a red flag.  We

9    ought to be doing something else more.

10             MR. BOJANOWSKI:  Okay.  I understand what you are          01:39PM

11   saying.

12             THE COURT:  Yeah.  So what's the thought about that?

13             MR. BOJANOWSKI:  Well, I think that we're going to

14   have to look at it and maybe adjust the plan accordingly.

15             THE COURT:  Are there efforts being done to do that?          01:40PM

16   I mean, one of the things that is, I guess, I encourage you to

17   do this realtime reporting, and then I think that the realtime

18   reporting, when it alerts people on the scene, oh my goodness,

19   what happened yesterday didn't work.  And it's not as if I'm

20   here in October trying to address reports from August that          01:40PM

21   didn't work.  There were people there, right there, who saw

22   that what happened yesterday didn't work.  And it's a dramatic

23   not working so I guess it would seem to me that the next step

24   that anybody would take in that situation is to say, well,

25   perhaps our plan is not working.  What is our next and better          01:40PM

1    approach?  Doesn't that just strike you as right?

2          MR. BOJANOWSKI:  It does.  And certainly if it's not

3    happening now, I will make sure that it is.  I just don't have

4    the information to tell you, well, they looked at it, they saw

5    that number, and then they are tweaking the plan.  I just don't

6    have that information.

7          THE COURT:  I guess this is an example that you can

8    maybe point out and highlight for the person who will be

9    explaining to us at the next monthly meeting about whether or

10   not they were ascertaining in a realtime basis maybe we should

11   also add on to that here we have the incident where somebody is

12   getting the information.  We know about it in the realtime

13   basis.  I guess the question we would want to ask is what steps

14   did you take, then, when you had this realtime information that

15   told you that you were failing yesterday?  What did you do to

16   make sure that tomorrow you were doing something differently

17   because you really didn't therefore have to require the

18   monitors reporting back to you that you had this failure and

19   the process of the Court didn't have to get involved because

20   you knew about it right at that time.  So I guess I'd like to

21   hear about that, too.

22         MR. BOJANOWSKI:  Yes, Your Honor.  And, again, as

23   we're getting this thing tightened up we'll include that

24   additional information.

25         THE COURT:  Anything you wanted to add, Ms. Kendrick?

1          MS. KENDRICK:  Yeah.  Actually, just to go back

2    briefly to Performance Measure 44, I forgot to mention that,

3    but in Mr. Fathi's October 4th letter highlighting some of the

4    spot checks that we had done of the CGARs, Performance Measure

5    44 was one of the ones that we checked and we looked at the          01:42PM

6    files and found discrepancies between what was reported at

7    Lewis, Perryville, and Safford.  Those were the only three

8    institutions we spot checked their performance to the point

9    that with Perryville, their July report had reported that they

10   were 93 percent compliant but our review indicated that it          01:43PM

11   should have been 57 percent compliant.  So just want to note

12   that for the record.

13         On 46, we also are concerned.  We're glad that the

14   Court included four of the institutions in your order to show

15   cause for the data.  Eyman refers to the CGAR crosscheck            01:43PM

16   committee which, while it was hopefully going to catch things,

17   it doesn't appear that it has yet.  But this is yet another

18   example of something that sounds like would be a good practice

19   to implement at all institutions versus just piecemeal at

20   Eyman.                                                              01:43PM

21         THE COURT:  And did you want to say anything about

22   Florence on 46?

23         MS. KENDRICK:  We're just very concerned that it's

24   plummeted, and we hope to see some sort of remedial plan or

25   something for what's going on there.  It's been very erratic.      01:43PM

1    It went up a little bit but now it appears to be trending

2    dangerously downward again.

3            THE COURT:  Well, I think what I will do, at least

4    with my version of the transcript when it's produced, I will

5    create these equivalencies of the black box warnings that are

6    in the physician's desk reference or in prescribing information

7    where the FDA has made a determination that this is critical

8    information that should be on the forefront of people's minds

9    who are consulting the information.  They make a very black

10   border about those particular black box warnings and it's known

11   in the trade as a black box warning.

12           So I think what I will do is I will be highlighting

13   this question and the other question I have asked as black box

14   warnings moving forward, and that is, I want to hear how it is

15   that this representation about realtime information-gathering

16   has been producing or that has been producing information about

17   continual realtime failures and to see what kind of corrective

18   action is taken in real time.  That would maybe help me

19   understand how best to get to the next step.

20           And then I will also have the black box warnings about

21   cases where it seems to me that people would want to be doing

22   realtime reporting, and I want to hear about whether or not

23   they have done so and if not, why not.

24           MS. KENDRICK:  Your Honor, just one other thing with

25   regard to Performance Measure 46 is in the filing that

```
 1    defendants did in September 26th, that's at Docket 2347-1, they
 2    did include Safford prison for Performance Measure 46 because
 3    it had been noncompliant for June and July.  And they had a
 4    Corrective Action Plan, and their basis for the noncompliance
 5    was that a provider had been out from April 2017 to current and      01:45PM
 6    that the provider was not documenting things correctly.
 7    There's no comparable update in what was filed last night and
 8    so I just request that defendants share with us what the score
 9    was for that performance measure.
10              THE COURT:  Can you do that, Mr. Bojanowski?               01:46PM
11              MR. BOJANOWSKI:  Right.  We would just note for the
12    record that Safford is not one of the facilities subject to
13    notice of noncompliance.  But I would be more than happy to
14    give you the data.
15              THE COURT:  Thank you.                                     01:46PM
16              MR. BOJANOWSKI:  That would be --
17              THE COURT:  46 for Safford for August.
18              MR. BOJANOWSKI:  One moment.  87 percent.
19              THE COURT:  Thank you.
20              MR. BOJANOWSKI:  You're welcome.                           01:46PM
21              THE COURT:  47:  Are medical providers communicating
22    the results of the diagnostic studies to the inmate upon
23    request and within seven calendar days of the date of the
24    request:  Eyman is at 37 percent; Florence at 33 percent; Lewis
25    at 47 percent; Phoenix at 67 percent; Tucson at 78 percent; and     01:47PM
```

1    Winslow drops off from a pattern of uninterrupted since March

2    of 2017 of 100 percent to 50 percent; and Yuma is at 55

3    percent.

4         Mr. Bojanowski.

5         MR. BOJANOWSKI:  Yes, Your Honor.  This is the one      01:48PM

6    with the communiques that we had indicated to the Court we were

7    sending on all of the lab results.  And what we're finding is

8    that we are not receiving requests from inmates any longer for

9    their diagnostic study results.  And I note that the agenda

10   item, there was an agenda item that the plaintiffs had put out  01:49PM

11   for clarification as to what it is that is actually being sent

12   out.  I inquired as to that they are not sending the actual

13   test results.  They are sending out basically a letter saying

14   your lab results are in, they are okay, or they are abnormal

15   and you are going to be scheduled for an appointment to review  01:49PM

16   them.

17        So that's the nature of the communique, because

18   sending out a blood test result to the inmate, I'm not certain

19   that they would be able to read it.  I mean, so the idea was is

20   to give them the overall your lab results are okay, and then if  01:49PM

21   they are not, they are notified of that and then they schedule

22   them.

23        As far as the results that we're seeing on these

24   requests, the number of requests has plummeted.  We did a quick

25   check last week and pulled 1,250 HNRs and there were three in   01:50PM

1    there for lab results.  So it may be our sample size is

2    reducing quite a bit.  But bottom line is we still, because of

3    the sample size being reduced, should be able to capture those

4    and be able to address those inmates who are specifically

5    making the request in an HNR to get their test results.  So          01:50PM

6    that is something that Corizon is currently looking at with

7    regard to a modified Corrective Action Plan.

8         THE COURT:  Well, you have raised a bunch of issues

9    there.  Issue one is whether or not the removal of the HNR

10   boxes is adversely affecting the contemplated performance           01:51PM

11   measure here.  You have raised an issue about whether or not

12   the performance measure is satisfied if you are just giving

13   somebody a thumbs up or a thumbs down rather than the report of

14   the results of the diagnostic studies.  And I guess it seems to

15   me that I'd have to be persuaded as to why the results of the       01:51PM

16   diagnostic studies isn't exactly that, just the results meaning

17   what the diagnostic study found.

18        And the third issue is the overall one, and that is

19   just whether lower numbers or higher numbers, how it is that

20   these tasks can't be accomplished.  But I will turn to             01:51PM

21   plaintiffs.

22        MS. KENDRICK:  Yes, Your Honor.  I believe last month

23   you had asked defendants to clarify whether the communique

24   indicates the date and the identity of the test versus just

25   something that says your labs, you know, it was normal.            01:52PM

1    Because I believe Ms. Eidenbach raised the situation of people

2    she had spoken to where they had multiple tests so they didn't

3    know.  And I think that was when you had asked well, do you say

4    which test it was that was normal or indicate the date of the

5    test so the prisoner, if he or she is not getting the actual                    01:52PM

6    report, knows what this is referring to.  It was unclear from

7    what Mr. Bojanowski just said if that level of specificity is

8    included.

9          With regard to the sample size being small, you know,

10   there's two comments on it.  First of all, the removal of the                   01:52PM

11   HNR boxes probably has reduced the number of HNRs coming in

12   because now prisoners have to go to the open clinic and wait

13   for their results, which I believe Mr. Oyenik testified to that

14   in July.

15         The Court has included this performance measure in its                    01:52PM

16   order to show cause with regard to multiple prisons; Eyman,

17   Florence, Lewis, Phoenix, Perryville, and Tucson, so I think at

18   that point when we get the realtime data we can see if there's

19   only three requests, really, at the prison the entire month we

20   will be able to see that.                                                        01:53PM

21         The final thing that we had asked for on the agenda

22   was clarification regarding the disparities or the

23   discrepancies in the declarations by the facility health

24   administrators about how the process works where we observed

25   that five of the declarations said the person has to submit the                 01:53PM

1    HNR to get the request and the other five said we just print it

2    out for them.  And I believe Mr. Bojanowski was going to

3    investigate or make sure that the five institutions that

4    described the old process, they were actually implementing what

5    he had represented to us and the Court that was going to be                    01:53PM

6    done statewide.

7           THE COURT:  Mr. Bojanowski.

8           MR. BOJANOWSKI:  Your Honor, I think maybe what I can

9    do is provide some exemplars to the plaintiffs to show them

10   what it is that we're sending and go that route with it.                       01:54PM

11          As far as the declarations are concerned, I will have

12   to apologize, I did not attend to that and I need to

13   immediately.  I just don't have an answer for that one.

14          THE COURT:  So at one point the idea was that

15   diagnostic results would be mailed to all of the inmates and                   01:54PM

16   that this would satisfy the problem.  Then it turned out that

17   there were variances among the different facilities on how they

18   dealt with such things and such mail.

19          In light of this display of a number of facilities who

20   are not meeting this performance measure, the inquiry that                     01:55PM

21   comes to my mind is why not decide that printing out and

22   sealing in an envelope and mailing to each of the inmates on a

23   routine basis is the right way to do this?

24          MR. BOJANOWSKI:  I will certainly raise that with

25   Corizon, Your Honor.                                                           01:55PM

```
 1            THE COURT:  Plaintiffs have any objection if that were

 2    the way that it would be done?

 3            MS. KENDRICK:  No.  It seems like that would actually

 4    be quicker.  They could just push the print button, print out a

 5    copy of the report versus generating a communique.              01:55PM

 6            THE COURT:  It just seems to have an envelope with the

 7    inmate's address and you would put the results in that envelope

 8    and mail it to them.  And I gather, at least when I did the

 9    tour, at that facility there was a way for people to receive

10    mail, so it seems like that could work.                        01:56PM

11            All right.  49:  Are patients for whom a provider's

12    request for specialty services is denied told of the denial by

13    a medical provider at the patient's next scheduled appointment

14    no more than 30 days after the denial and the provider document

15    in the patient's medical record the provider's follow-up to the 01:56PM

16    denial.

17            MR. BOJANOWSKI:  I thought we talked about this one

18    already, Your Honor.

19            THE COURT:  We did with respect -- was it Tucson we

20    talked about it?                                                01:57PM

21            MR. BOJANOWSKI:  Yeah.  It -- Eyman.

22            MS. KENDRICK:  It was Douglas, Eyman, Florence,

23    Perryville, Phoenix, and Tucson.

24            THE COURT:  Okay.

25            MR. BOJANOWSKI:  I think the Court went through the      01:57PM
```

1    Eyman plan.

2            THE COURT:  Thank you.

3            Performance Measure 50:  Are urgent consultations and

4    urgent specialty diagnostic services being scheduled and

5    completed within 30 calendar days of the consultation being        01:57PM

6    requested by the provider?  And Eyman is at 78 percent;

7    Florence at 50; Lewis at 83; Tucson at 31; Safford is reported

8    as non-applicable.

9            And there is a performance plan that says for

10   Florence, and applied to others, supplemental information as of   01:58PM

11   October 6, 2017, it is too early to see the effects of the new

12   procedures referenced in the above correction action plan given

13   that it was implemented in mid-August 2017.

14           And do you know, Mr. Bojanowski, whether there's been

15   any realtime inquiry on Performance Measure 50 anywhere?          01:58PM

16           MR. BOJANOWSKI:  No, Your Honor.

17           THE COURT:  Okay.  Ms. Kendrick.

18           MS. KENDRICK:  Do you want to go through all of them

19   or just Eyman?

20           THE COURT:  You can go through all of them if you         01:58PM

21   wish.

22           MS. KENDRICK:  Well, we would think that if something

23   got implemented in mid-August that there would be a better

24   performance than 49 percent.  I would just also note that

25   Tucson scored an abysmal 31 percent, and that is a measure and    01:59PM

```
1    institution that is currently the subject of a notice of

2    noncompliance that's pending mediation at the end of November.

3    And so we're very concerned about the performance there and

4    hope that defendants will create and implement a Corrective

5    Action Plan and not wait until we finally have our mediation        01:59PM

6    after Thanksgiving or bring it to the Court for a formal

7    finding of substantial noncompliance.

8           THE COURT:  With respect to Tucson, is it a problem

9    with respect to obtaining providers who can be retained by the

10   state?  Do you have any insight as to the problem in Tucson?        01:59PM

11          MR. BOJANOWSKI:  I don't believe it's a matter of

12   hiring providers outside.

13          THE COURT:  No, I wasn't thinking about, well,

14   providers in the term of art.  I was thinking about the

15   specialty diagnostic services.  And I gather those are done at      02:00PM

16   facilities outside the prison.  I just was trying to understand

17   what it was that was such an impediment.  Is it that the people

18   aren't in the prison who can schedule it, or are there

19   financial limitations with respect to what the diagnostic

20   services can be billed for?  What is the cause?                     02:00PM

21          MR. BOJANOWSKI:  My understanding is it's an internal

22   problem with the clinical coordinator who schedules it at that

23   facility, and that's why it dropped off.  I understood that the

24   clinical coordinator left the position unexpectedly.

25          MS. KENDRICK:  Your Honor.                                   02:00PM
```

1          THE COURT:  Yes.

2          MS. KENDRICK:  If you flip forward to Performance

3    Measure 51 which is about the timeliness of routine

4    consultations.

5          THE COURT:  Uh-huh.                                    02:01PM

6          MS. KENDRICK:  For Tucson, which is at Page 26 of last

7    night's filings, they did note that the clinical coordinator

8    was doing paper tracking instead of Excel and they replaced

9    this person June 1st.  So it's a little troubling that since

10   June their performance has actually gone down.               02:01PM

11         I would also note that on Performance Measure 51 on

12   basis for noncompliance they state, quote, "Further impeding

13   compliance to this performance measure is the capacity of local

14   specialty providers specifically in the areas of cardiology and

15   urology."  So if that is the case with regard to routine       02:01PM

16   consultations it would seem that would perhaps be a factor with

17   the noncompliance with Performance Measure 50 with the urgent

18   specialty consultations.

19         THE COURT:  And with respect to these difficulties in

20   procuring the specialty consultation services identified in    02:01PM

21   Performance Measure 51 is two questions:  Is the clinical

22   coordinator person you reference in 50 the same person in 51 at

23   Tucson?  And are these -- this inability to obtain the outside

24   providers that's described in 51 also present in 50 even though

25   it's not described there in written form?  Can you answer those 02:02PM

1    questions, Mr. Bojanowski?

2           MR. BOJANOWSKI:  I don't know if it's the same person

3    or whether it's the person that was replaced that then left

4    unexpectedly.  And I didn't hear your second question.

5           THE COURT:  The second question is, again, getting        02:02PM

6    back to this issue about whether or not there are available

7    facilities that will provide the services.  51, I didn't read

8    it but I thought I heard Ms. Kendrick say there was an

9    explanation that it was a problem with respect to getting

10   people to provide these services.  Is that true, Ms. Kendrick?   02:02PM

11   Did you really say that or am I making that up?

12          MS. KENDRICK:  Yes, sir.  If you turn to Page 26 of

13   Docket 2374-2 that defendants filed last night under basis for

14   noncompliance, there's two sentences.  And the second sentences

15   is what I just read into the record.                             02:03PM

16          THE COURT:  Further impeding compliance to this

17   performance measure is the lack of capacity of local specialty

18   providers specifically in the areas of cardiology and urology.

19   So since I had asked about that question with respect to 50 and

20   you said no, that wasn't a problem, but now I see that it is a   02:03PM

21   problem with 51, I was just double-checking to see whether or

22   not the explanation given in that sentence in 51 was also

23   possibly related to 50.  And the reason that I'm asking that is

24   I want to know why.  Why is it that there is an issue with

25   capacity of local specialty providers in cardiology and         02:03PM

1    urology?

2          MR. BOJANOWSKI:  I don't have an answer for that, Your

3    Honor.

4          THE COURT:  How do we find out?

5          MR. BOJANOWSKI:  I have to go to Corizon and ask them          02:03PM

6    as to how many they have, who they are, what seems to be the

7    impediment to getting inmates seen.  Most of the times it's a

8    scheduling issue because as I have explained to the Court

9    before, specialty consult offices typically have to shut down

10   when they bring inmates in.  So it is a matter of making sure     02:04PM

11   that they can schedule the time for a group to come in and do

12   it.  So we may have four or five people that may be available,

13   but it's a scheduling issue typically is what I am told.

14         MS. KENDRICK:  Your Honor, it would seem just based on

15   basic logic that if this was a problem for a performance          02:04PM

16   measure was a requirement is broader, 60 days, that it would

17   also carry over to a performance measure where the requirement

18   is a much shorter period of time of 30 days.  That just seems

19   like basic logical extension and not necessarily needing to

20   consult with Corizon about it.  Again, I think this goes to the   02:05PM

21   point we have made in the past about the telemedicine and

22   specialties and why that is so important that they get that

23   squared away.

24         I would also just observe going through the staffing

25   reports for Tucson for the past four months, April through        02:05PM

1    August, there's one clinical coordinator position, so

2    presumably it would be the same person who is making these

3    arrangements.  And it's never been shown as vacant in any of

4    those four months.  So if part of the reason is that position

5    was vacant, it does call into question the accuracy of these        02:05PM

6    staffing reports.

7              THE COURT:  Just give me a moment.  Thank you.

8              I'm trying to clarify in my mind the timeline with

9    respect to the clinical coordinator and to see whether or not

10   it's reasonable to think that this can still be an explanation    02:07PM

11   for why the numbers are off in August when it appeared that

12   this person finished training in mid-June and between July 3rd

13   and July 24th if I'm reading this correctly on Page 26.

14             And so it would seem to be that this issue with

15   respect to the clinical coordinator is fuzzy at best.  And then   02:07PM

16   with respect to the availability of the diagnostic services,

17   maybe there's something that can be done to address this

18   problem.  And so I think I need to know exactly what the

19   problem is.

20             So rather than just have some speculation, if you       02:07PM

21   could focus and have somebody here at the next status hearing

22   who can address 51 and 52 where the facilities are failing,

23   with an ability to explain this component of the explanation

24   that is in that second sentence about the capacity of the local

25   specialty providers specifically in the areas of cardiology and   02:08PM

1    urology, I would like to understand exactly what it is that is

2    creating the road block to compliance for that reason, just not

3    the bald statement of it but just understanding exactly what it

4    is.

5            MS. KENDRICK:  And, Your Honor, I believe that's          02:08PM

6    applicable to 51 and 50.

7            THE COURT:  Did I misstate?

8            MS. KENDRICK:  I think you said 51 and 52.

9            THE COURT:  I'm sorry.  51 and 50.  And have we

10   already addressed 52.                                            02:08PM

11           MS. KENDRICK:  We have.

12           THE COURT:  Okay.  54:  Are inmates with chronic

13   disease being seen by the provider as specified in the inmate's

14   treatment plan no less than every 180 days unless the provider

15   documents a reason why a longer time frame can be in place.      02:09PM

16   And for Eyman, 72 percent; for Florence, 82 percent.  And

17   there's supplemental information, as of October 6th, nurse

18   practitioners at this facility will be working to alleviate the

19   backlog moving forward.

20           Where do we stand on the backlog?  Is it a backlog as    02:09PM

21   of now?  Is it a backlog moving forward from August?  What is

22   the story?

23           MR. BOJANOWSKI:  I don't have any realtime data on

24   this one, Your Honor, to be able to tell you what backlog

25   exists as of this time.  I know that the performance measure     02:10PM

```
1   plan indicated that there would be nurse practitioners and an

2   additional M.D. working on site a couple of -- or a weekend in

3   late September to alleviate backlog.  But I do not have current

4   data on whether that was, in fact, alleviated or, to the extent

5   it exists, what level it would be at at this point.                02:11PM

6           THE COURT:  All right.  My question was really just

7   designed to understand whether or not this reference to the

8   backlog was a backlog as of August that we thought had been

9   redressed by matters in these measures that are said to be

10  talking place in September.                                        02:11PM

11          MR. BOJANOWSKI:  I would be guessing, and I don't want

12  to do that.

13          THE COURT:  Fair enough.

14          Ms. Kendrick.

15          MS. KENDRICK:  Yeah.  Just one thing also just as a        02:11PM

16  note in this Corrective Action Plan, and defendants do this

17  throughout and I think it does create some confusion, they talk

18  about hiring additional personnel.  This came up a couple

19  months ago with the additional 15 nurses and when saying

20  additional implied they are hiring more staff.  But truly what     02:11PM

21  they are doing is filling vacant positions that are turning

22  over because if you look at the staffing reports from month to

23  month, the number of contracted providers is unchanging.

24          So we would just note that while we're glad that you

25  have filled these positions, we certainly hope the people who      02:12PM
```

```
1    were hired in May and June are still there.  It would be useful

2    to know what exactly the backlog is.  This performance measure

3    in this institution was part of your order to show cause, so we

4    will have that information realtime for the month of December.

5    But we urge the Court to either include in its order the month          02:12PM

6    of November or for defendants to be proactive and really try to

7    get a handle on what is going on at this institution with

8    realtime actual numbers of the number of class members who have

9    been affected by their noncompliance with this measure.

10           THE COURT:  All right.  So Performance Measure 55              02:12PM

11   addresses also a backlog issue.  Are disease management

12   guidelines implemented for chronic diseases, and Eyman is at 66

13   percent.  And the basis for noncompliance isn't italicized so I

14   gather that's new information.  The root cause of the

15   deficiencies identified at the Eyman complex are still being           02:13PM

16   investigated at this time.  While Corizon's analysis is still

17   ongoing a significant backlog pertaining to chronic care

18   patients has been identified and is under review.  The

19   Corrective Action Plan is upon completing the root cause

20   analysis Corizon's compliance team will review its findings           02:13PM

21   with site leadership and devise a thorough remediation plan.

22   We don't have a time indication here, so that's my first

23   question.

24           MR. BOJANOWSKI:  This is one we had talked about

25   earlier, Your Honor, and we were going to provide a plan within       02:13PM
```

1    two weeks.

2              THE COURT:  Thank you.

3              MR. BOJANOWSKI:  This is one of the new ones.

4              THE COURT:  Thank you.

5              Performance Measure 66:  Are medical provider                    02:14PM

6    encounters occurring at a minimum of every 72 hours for IPC

7    inmates.  Florence at 70 percent; Lewis at 80 percent; Tucson

8    at 80.  And the defendants have written with supplemental

9    information, "This facility recently lost a provider.  A

10   replacement provider was hired on September 5th."  That's for           02:14PM

11   Florence.  And there is no plan offered for Lewis.  But it

12   doesn't seem to be warranted as to thinking there can be no

13   plan offered for Florence -- Lewis, rather.

14             And then for Tucson, the supplemental information as

15   of October 6th states, "The facility recently lost one provider         02:14PM

16   in late August 2017 and lost three additional providers in late

17   September 2017.  One nurse practitioner was hired on September

18   18th, 2017, and another nurse practitioner was hired September

19   30th, 2017.  A part-time M.D. has also been hired but there's

20   no indication about when that hiring happened or when the start         02:15PM

21   date is."

22             I will say these couple of sentences certainly

23   highlight the need to have Mr. Millar's services here because

24   perhaps he can offer a remedial solution.

25             Ms. Kendrick.                                                  02:15PM

1          MS. KENDRICK:  Again, Your Honor, this is a

2   performance measure that defendants have been chronically

3   noncompliant.  We're pleased that your order to show cause

4   includes Florence, Lewis, and Tucson in it.

5          We would note that the August staffing report for          02:15PM

6   Tucson, the contract calls for 3.5 staff physicians and Corizon

7   has zero staff physicians listed.  And Tucson is the prison

8   that has the largest infirmary for prisoners.  It's high needs

9   and so it's extremely, extremely disturbing that we have this

10  shortage of physicians at the institution.  And that's based on  02:16PM

11  the August report.  And apparently three more providers were

12  lost in late September which is disturbing because the August

13  report shows a grand total of eight, a lot of nurse

14  practitioners.  So if there's that many that left, it's really

15  dropping to some very low numbers.  And I just can't express     02:16PM

16  these are the sickest people.

17          THE COURT:  Well, and that's -- I mean, it's the

18  sickest people but it's also people that the State has

19  represented we can take care of these people by holding them in

20  our IPC.  And then they don't have the people to provide the     02:16PM

21  services.  The alternative to an IPC is obviously an external

22  placement of some kind on an immediate basis.  And so if you

23  are presented with what these performance measures indicate,

24  and that is a failure to guard the people that you have said

25  need to be at a higher level of care because of their acute      02:17PM

1   medical condition and then you don't have the people to provide

2   that service such that you can't even do this, making sure that

3   medical encounters occur at a minimum of every 72 hours, that

4   just seems staggering to me.  And I have said these words

5   before and I'm --                                                    02:17PM

6        MS. KENDRICK:  Yes, Your Honor.  And I would also note

7   that in the previous filing defendants stated that the reason

8   they were non-compliant at Tucson was because the providers

9   thought 72 hours meant three days.  And so they were seeing

10  somebody on Friday and then they would see them on Monday and     02:17PM

11  it was three days apart but it was more than 72 hours.  So the

12  remedial plan was that beginning in mid-June the providers had

13  been instructed to do their infirmary rounds later in the day

14  on Friday and early in the morning Monday morning which seems

15  like a good practice if they are not there on the weekend.  Yet   02:18PM

16  in the month of July their performance dropped from 100 percent

17  to 70 percent.  So it seems that that Corrective Action Plan

18  did not work.  They did bump back up in August by 10 percent,

19  but they are still noncompliant.

20       THE COURT:  Thank you for that additional information        02:18PM

21  for the record.

22       MR. BOJANOWSKI:  We would note, Your Honor, that on

23  this particular performance measure this is a scoring issue

24  where we're utilizing a 10-file you get it or you don't get it.

25  In analyzing the number of encounters we're showing 96 to 98      02:18PM

1   percent of the encounters were done correctly, but because of

2   the method of scoring these things you end up with 10 files.

3   If three of them have one miss out of 300 rounds then that

4   whole file is marked as a zero.  So what we end up having here

5   is it's not reflecting what's going on in the field.          02:19PM

6          THE COURT:  I mean, actually it is.  It is reflecting

7   what's going on in the field and consistent with the parties'

8   adoption of a monitoring mechanism set forth in the

9   stipulation.  And I imagine it was important to the parties to

10  make sure that in this circumstance with an IPC that there was  02:19PM

11  a careful attention to where there were failures.  And that's

12  what this illustrates.

13         MS. KENDRICK:  And, Your Honor, to the extent that Mr.

14  Bojanowski is representing that this actually translates to 96

15  percent compliance if you look at all 300 encounters, we'll be  02:19PM

16  able to see that when they file their report in January in

17  response to your order because they will have to document every

18  single incident.  And so we will be able to say that.  But,

19  however, the fact is the Court has made clear the parties

20  agreed that this is either a yes or no for the patients.  And   02:20PM

21  while in the grand scheme of 300 possible encounters over the

22  course of a month, that one missed encounter for a particular

23  person could be quite critical because these are very sick

24  people.

25         So that is the reason why when this stipulation          02:20PM

agreement was made that we had that type of scoring because for

that one individual, that missed visit may be very critical to

him.

THE COURT:  Makes perfect sense to me what you just

said.                                                                02:20PM

Performance Measure 67:  In an IPC do registered

nurses will conduct and document an assessment at least once

every shift?  Graveyard shift assessments can be welfare

checks.  Florence is at 50 percent.  Lewis is at 70 percent.

MR. BOJANOWSKI:  This was one we covered earlier, Your     02:21PM

Honor.

THE COURT:  Yes, it is.  Thank you.  My realtime

reporting is somewhat deficient.

MS. KENDRICK:  Well, Your Honor, you actually only

found them substantially noncompliant with Lewis.                    02:21PM

THE COURT:  So we didn't talk about Florence.

MS. KENDRICK:  Florence was not part of the motion.

Florence, Perryville, and Tucson are all part of the pending

mediation at the end of November with Judge Bade, so again, we

would reiterate to defendants that they need to develop and          02:21PM

implement a Corrective Action Plan for the other three

infirmaries and not wait until after the parties have our

mediation after Thanksgiving.

THE COURT:  It would seem to be in their interest.

Mr. Bojanowski.                                                      02:21PM

1          MR. BOJANOWSKI:  Nothing further, Your Honor.

2          THE COURT:  Thank you.

3          MS. KENDRICK:  And especially the Tucson prison, Your

4     Honor, if you look at Page 54 they have been at zero percent

5     for the past four months.  Prior to that they were at 40                    02:22PM

6     percent and before that 20 and 20 percent.  So definitely they

7     need to get something in place at Tucson and not wait until we

8     have our mediation and/or bring the formal motion before the

9     Court for formal substantial noncompliance.  They need to get

10    on this now.                                                                02:22PM

11         THE COURT:  Performance Measure 72:  Do inmates who

12    refuse prescribed diets for more than three consecutive days

13    receive follow-up nutritional counseling by a QHCP.  Eyman, 83

14    percent.

15         MR. BOJANOWSKI:  We addressed this one earlier as                      02:22PM

16    well, Your Honor.

17         THE COURT:  Thank you.  Any comment from plaintiffs on

18    73?

19         MR. FATHI:  No, Your Honor.

20         THE COURT:  My page turning is taking me to                            02:23PM

21    Performance Measure 91.  Are there any before 91, Mr. Fathi,

22    that we need to address?

23         MR. FATHI:  Yes, Your Honor.  On Performance Measure

24    Number 80, I would note that is one of the measures on which we

25    found multiple noncompliant files actually being counted as                02:23PM

```
1    compliant as set forth in my letter of October 4.
2              THE COURT:  You have made that point, and I have made
3    it clear that I'm anxiously awaiting good explanation and
4    further development of that issue.
5              MR. FATHI:  Thank you, Your Honor.                      02:24PM
6              On Performance Measure 85 and 86, we still do not have
7    a final agreement on the monitoring methodology for those.  We
8    have sent the defendants our latest proposal, and we are
9    awaiting their response.
10             THE COURT:  And what is the timeline on that from the   02:24PM
11   defendants?
12             MR. BOJANOWSKI:  I think we responded.
13             MR. FATHI:  Well, we responded to you on October 4th
14   and we have not heard back.
15             MR. BOJANOWSKI:  October --                             02:24PM
16             MR. FATHI:  It's Exhibit A to the Kendrick deposition.
17   It's the October 4th letter that we have been referring to.
18             It's in my October 4th letter which also has the files
19   that were erroneously found as compliant.  There's also my
20   response to your proposal.                                        02:25PM
21             MR. BOJANOWSKI:  All right.  Your Honor, we'll get
22   back to you on that.
23             THE COURT:  Go ahead, Mr. Fathi.
24             MR. FATHI:  And I think that brings us to Performance
25   Measure 83, Your Honor -- 93.                                     02:25PM
```

1          THE COURT:  Or 91.

2          MR. FATHI:  91 we discussed earlier in the context of

3     the motion to enforce.

4          THE COURT:  Thank you.  And then is there anything you

5     wanted to say about Performance Measure 92?                    02:25PM

6          MR. FATHI:  Nothing on 92, Your Honor.

7          THE COURT:  All right.

8          MR. FATHI:  I would just note as I have in the past

9     that we do not agree that Measure 92 and 93 are not applicable

10    to Perryville and Tucson.  This is the situation where the     02:25PM

11    defendants have reclassified what was formerly max custody as

12    close custody.  And we'll be addressing that in a separate

13    motion.

14         THE COURT:  All right.  Then are we at 93?

15         MR. FATHI:  We are, Your Honor.                           02:26PM

16         THE COURT:  Are mental health staff, not to include

17    LPNs, making weekly rounds of all MH-3 and above prisoners who

18    are housed in maximum custody:  Eyman is at 80 percent;

19    Perryville is represented as not applicable, as is Tucson.

20         MR. FATHI:  Yes, Your Honor.  On 93, on Eyman,            02:26PM

21    defendants will correct me if I'm wrong.  I think the chart

22    actually says that.  The preliminary number for August is 100.

23    They were at 80 in July, which is below the compliance

24    threshold.  And I think we need some more information here

25    because when we gathered last month on September 12th, we were  02:26PM

```
 1    told that the problem here was a computer problem where notes
 2    were input into the computer system but the notes were not
 3    saved leading to a perceived lack of complains.  I assume
 4    "complains" is meant to be "compliance."  Then we were told
 5    that wasn't the problem.  The problem was actually a failure of    02:27PM
 6    an individual on the mental health staff to record the rounds
 7    appropriately.  And then under Corrective Action Plan, it says
 8    that the level of corrective action will be determined no later
 9    than the October 2017 status conference.
10          So we would like an update, what is the Corrective          02:27PM
11    Action Plan, and particularly, what has been done with the
12    individual who was not appropriately recording rounds?
13          THE COURT:  And I guess also the question just for
14    sure, which is it?  Is it 80 percent or 100 percent?
15          MR. BOJANOWSKI:  It's 100 percent, Your Honor.  Typo.       02:27PM
16          THE COURT:  So did what you have identified previously
17    turn out to be the case, and have you tied that all up?
18          MR. BOJANOWSKI:  Yes, Your Honor.
19          MR. FATHI:  I'm sorry, Your Honor.  I don't think we
20    have heard what the Corrective Action Plan is.  It says here it   02:28PM
21    will be determined no later than the October 2017 status
22    conference.
23          THE COURT:  I think what they were doing is they were
24    identifying the problem, the basis for noncompliance.  They
25    tell us what those issues were and they then said that -- I       02:28PM
```

```
 1    mean this is sort of a one off kind of situation.  Notes were
 2    not saved.  Right?
 3              MR. FATHI:  It wasn't -- the initial story was the
 4    notes were not saved.  That turned out not to be true.  And
 5    then the second was --
 6              THE COURT:  The failure of the individual on the
 7    mental health staff to record the rounds appropriately.
 8              MR. FATHI:  Exactly.  So what corrective action has
 9    been taken with regard to that problem?
10              MR. BOJANOWSKI:  Your Honor, it was a personnel issue
11    that was -- corrective action was taken with regard to that
12    individual.
13              MR. FATHI:  What does that mean?  Was the person
14    terminated?  Retrained?
15              MR. BOJANOWSKI:  The person was retrained and I
16    believe there was some discipline associated with the
17    situation.
18              MR. FATHI:  That person is still employed at the
19    facility?
20              MR. BOJANOWSKI:  As far as I know, yes.
21              MR. FATHI:  Thank you, Your Honor.
22              THE COURT:  I guess the way that I read this means
23    that I have to ask this follow-up question:  So it says that
24    it's not caused by a computer issue.  So there wasn't a failure
25    of the computer to save, it was the failure of the person to
```

02:28PM

02:29PM

02:29PM

02:29PM

02:29PM

UNITED STATES DISTRICT COURT

1    record the information appropriately.  So that was the --

2    that's the State's conclusion that this person didn't do what

3    this person was supposed to do.  It's not a failure of the

4    machine to do it.

5            MR. BOJANOWSKI:  Correct.                                   02:30PM

6            THE COURT:  So we have a common understanding that it

7    was a failure of a person, and you have now corrected that

8    person and said this is how it should be done.

9            MR. BOJANOWSKI:  Correct.

10           THE COURT:  Okay.  All right.                               02:30PM

11           Anything that needs to be said on 94?

12           MR. FATHI:  On 94, Your Honor, we already discussed

13   Phoenix.  94 on Tucson, there's just a misstatement here that I

14   need to correct that the final sentence on the page, Document

15   2374-2, Page 91, it says, "A replacement clinician was hired      02:30PM

16   before the clinician was separated from Corizon."  Then it goes

17   on to say, "With the change in clinicians, Corizon is fully

18   staffed at Tucson."  Even if we're talking about just

19   clinicians, that's not correct, Your Honor.  As we discussed

20   last month, clinician in the mental health context means either  02:31PM

21   a psychologist or a psych associate.  And as of -- one moment

22   Your Honor -- as of the August staffing report, which is the

23   latest that we have, psychologists were not fully staffed at

24   the Tucson facility.  Psychiatrists were at 50 percent.  Mental

25   health RNs were at 75 percent and recreational therapists were   02:31PM

1    at zero percent and psychologists were at 85 percent.  So I

2    wanted to correct any erroneous impression that may have been

3    left by that statement.

4         THE COURT:  So it would seem that this information

5    that has been rolled over from a previous report is, at least          02:31PM

6    for the Court's edification, correct to say that it's not

7    accurate to say that there's fully staffed with clinicians on

8    this issue at Tucson?

9         MR. BOJANOWSKI:  We'll take a look at what Mr. Fathi

10   has said and make the correction, Your Honor.                          02:32PM

11        THE COURT:  All right.  Thank you.  Anything we need

12   to say, anything more about 95?

13        MR. FATHI:  No, Your Honor.

14        THE COURT:  97 and 98.

15        MR. FATHI:  On 98, Your Honor, I need to make the                 02:32PM

16   point that Ms. Kendrick made earlier, and that is the open

17   clinic model falsely inflates the compliance rate with

18   Performance Measure 98.  So, for example, on Performance

19   Measure 98, one of the things you measure is whether certain

20   categories of HNRs of people submitting HNRs are seen by              02:33PM

21   nursing staff within 24 hours of submitting their HNR.  So if

22   you limit the universe of people submitting the HNR to those

23   who stood in line, got to the front of the line, and handed the

24   HNR to the nurse, by definition you have 100 percent compliance

25   for at least that subset of the population.  So this is a            02:33PM

concern that applies generally to performance measures where

the time -- where the clock begins with submission of the HNR.

        And then also with regard to Performance Measure 98,

we have sort of the dog that didn't bark, and that is

Performance Measure 98 at Yuma.  Yuma was at 81 percent in

July, therefore, noncompliant.  The first Corrective Action

Plan that was submitted was Document 2304-2, Page 72.  Under

Corrective Action Plan it said, "Corizon recently hired a new

psychologist.  Corizon has shifted a provider from the Phoenix

facility to Yuma as well."  Again, presumably -- well, strike

that.

        Then the next explanation was Document 2347-1, Page

112, where it says, "Corizon is continuing to look for

replacement psychiatric provider."  No reference to hiring new

psychologist, no reference to shifting a provider from the

Phoenix facility to Yuma.  And then this most recent document,

Performance 98 at Yuma is just omitted altogether.  So we would

like to know which of those prior statements, if any, are true

and what is the current plan for Performance Measure 98 at

Yuma.

        THE COURT:  And do you know the current number at

Yuma?

        MR. FATHI:  We do not, Your Honor.

        THE COURT:  I'm saying wouldn't you also want to know

that?

<pre>
 1            MR. FATHI:  Yes, Your Honor.  Thank you.

 2            THE COURT:  Can you provide that, Mr. Bojanowski?

 3            MR. BOJANOWSKI:  Current number?

 4            THE COURT:  Yes.

 5            MR. BOJANOWSKI:  Yuma is at 87 percent.  And the        02:35PM

 6   reason why it's not in the filing is because it's not subject

 7   to a motion to enforce.

 8            THE COURT:  Right.  But Mr. Fathi has raised a point

 9   about how we have come to understand some of the staffing

10   issues associated with Yuma vis-a-vis other facilities, and    02:35PM

11   that's why he was asking about it.  Thank you for that

12   information.

13            Go ahead, Mr. Fathi.

14            MR. FATHI:  Well, Your Honor, again, we would like to

15   know if these statements are true.  Corizon recently hired a   02:36PM

16   new psychologist.  That seems questionable in light of the fact

17   that according to the August 27 staffing report, Document

18   2352-1 at 14, there are no psychologist positions at Yuma at

19   all.  So we would like to know if that was a correct statement.

20            We also would like to know if it's correct that       02:36PM

21   Corizon has shifted a provider from the Phoenix facility to

22   Yuma, because for the past several months there has been one

23   and only one provider at Yuma.  There's been no inquiry.  So we

24   would like to know if either of those two statements were

25   actually true.                                                 02:36PM
</pre>

1        THE COURT:  Luckily I see Dr. Taylor is here so I will

2   give Mr. Bojanowski a chance to confer with her.

3        MR. BOJANOWSKI:  Your Honor, I'm always faced with

4   this difficulty of interpretation.  I'd rather have Dr. Taylor

5   maybe tell the Court what is going on, because I don't want to          02:37PM

6   miss something in the translation.

7        THE COURT:  Mr. Bojanowski, that's helpful, and I

8   appreciate that.  Dr. Taylor, you were talking to Mr.

9   Bojanowski when Mr. Fathi was framing his questions.  Did you

10  need him to repeat them or were you also able to gather what           02:38PM

11  they were?

12        DR. TAYLOR:  I was able to understand the question.

13        I think there was, similar to what's been pointed out

14  in the past, an inaccurate term used.  And so the term

15  "psychologist" should not have been used in that initial              02:38PM

16  statement.  It should have been "psychiatric provider."  So the

17  psychiatric provider was hired on top of the fact that they

18  pushed some resources back down to Yuma to get them back into

19  compliance, which is why in this last month you see the

20  compliance go right back up again.                                    02:38PM

21        THE COURT:  Any follow-up, Mr. Fathi?

22        MR. FATHI:  I did, Your Honor.  I remain mystified by

23  the fact that the defendants' staffing reports continue to show

24  one and only one psychiatric provider at Yuma for the past

25  several months and indeed only one psychiatric provider              02:38PM

position allocated there.  So this apparent -- this increase in

staffing has not been reflected in the defendants' staffing

reports.

So I would also like to know if it's true that Corizon

has shifted a provider from the Phoenix facility to Yuma.

DR. TAYLOR:  They shifted some of the resources from

Phoenix while shifting other resources up to Phoenix.

Sometimes you need certain providers who are able to work

certain days, and so there was a provider who was able to work

down in Yuma to provide the services that they needed, and that

individual did so down at Yuma.  So sometimes it's a little bit

of a shuffle game of this individual can work, let's say,

certain hours of the day or certain days of the week, and so

that individual will need to be working here because you can't

have maybe two lines running on the same day at the same

location.

So sometimes they have to shift them a little bit.

But what they did is they pushed the resources down to Yuma to

bring them back into compliance.

THE COURT:  I see.  So another answer is maybe without

actually describing what providers, what level of provider,

what position is being talked about and when they are in a

place with respect to different days in a given month, that

this general answer that was provided can't be verified and

probably suggests that the general answer is not particularly

1    helpful because it doesn't allow us to move from one telephone

2    pole to another to draw the dots.

3           DR. TAYLOR:  Right.  Often they won't be assigned to

4    that location, which is why the SCD will only show one person.

5    But they will provide resources there as needed as they have to        02:40PM

6    kind of shift around because some of these providers are

7    telepsych so they are not physically located at Phoenix.

8           THE COURT:  The use of the general terms without the

9    specificity does hobble the efforts to try to hold

10   accountability and to understand whether measures were in a            02:40PM

11   place on a particular time such that we can make an assessment

12   about whether they were productive or not.  So I guess we could

13   say in the future when the graphs includes information of the

14   kind that Mr. Fathi referred to from last month that it be as

15   precise as possible where there are these kinds of                     02:41PM

16   circumstances that you described at play where there are

17   components of individuals that are being shifted back and

18   forth.

19          DR. TAYLOR:  Okay.

20          MR. FATHI:  Thank you, Your Honor.  Just one                    02:41PM

21   additional point.  I would point out that according to the

22   August 2017 staffing report, Phoenix is grossly understaffed on

23   a whole number of mental health positions.  So to the extent

24   that what has been described as a net shifting of resources

25   from the Phoenix facility to the Yuma facility, it is, once           02:41PM

1     again, the robbing of Peter to pay Paul that is really not a

2     sustainable solution.

3            We would also ask that -- Ms. Kendrick said we had

4     made this request once before of Ms. Rand, and it was refused.

5     But we would ask that the September staffing report be produced          02:42PM

6     today or as quickly as possible so that we can do our own

7     analysis of these numbers.

8            THE COURT:  Ms. Rand, are you on the phone?  Okay.

9            MR. BOJANOWSKI:  My understanding of that situation is

10    that Corizon prepares that staffing report and then sends it          02:42PM

11    over to Ms. Rand.  And at the time of the request of the

12    plaintiffs, she was not in possession of that report.  It's not

13    a matter of her refusing to provide it.

14           THE COURT:  So she will get it over to the plaintiffs

15    right away.          02:42PM

16           MR. BOJANOWSKI:  As soon as it's given it will be

17    turned over.  When that will be, I can't say.

18           MR. FATHI:  Your Honor, Mr. Struck, we were speaking

19    before we began this morning, and Mr. Struck told us, and this

20    had been told to us before, that the firm is taking over all          02:43PM

21    document production.  Ms. Rand is no longer going to be

22    producing documents.  So given that it is the firm that will be

23    doing this, we would like some approximate date of when we can

24    expect this document.

25           THE COURT:  In light of the change of command, so to          02:43PM

1    speak, in terms of the document and response to discovery,

2    especially because you have submitted for this hearing as part

3    of the agenda consideration of these issues, since you just

4    learned today that there is going to be new resources available

5    for this, maybe it makes sense for you to have this                    02:43PM

6    conversation with the new person who is handling it rather than

7    having me work through it.

8         Obviously, I think that as soon as the staffing

9    reports are in the possession of the defendants you ought to

10   get them.  I'm really interested in getting as close to            02:43PM

11   realtime at every turn where I can have the benefit of making a

12   decision as to what's actually happening rather than many

13   months ago.

14        So that will address the issue with respect to

15   staffing reports for September, but I would say on these               02:44PM

16   overall pending discovery disputes, the last correspondence

17   that you had was with Ms. Rand.  You now know there's somebody

18   else in charge.  Can you follow up, the two of you, whatever

19   that is, and see what issues remain ripe, and if they are, I

20   will jump in on them.  We can do it how we do discovery               02:44PM

21   disputes all the time, and that is you get on the phone and

22   call me.

23             MR. FATHI:  May I respond, Your Honor?

24             THE COURT:  Of course.

25             MR. FATHI:  So attached to Ms. Kendrick's declaration      02:44PM

1    as Exhibits B, C, and D are three letters that we have sent to

2    defendants about documents that have been requested or indeed

3    ordered produced by the Court that we have not received.  And

4    while not all of these letters were addressed to Ms. Rand, one

5    was addressed to Mr. Bojanowski.  All of them are copied to all    02:45PM

6    of defendants' counsel, so it's not as if this comes as

7    surprise to anyone.

8            THE COURT:  But isn't it true as of up until this

9    morning when you had the conversation with Mr. Struck you

10   thought that the person who was the -- not the key point, the    02:45PM

11   central figure with respect to the defendants' position on

12   discovery was Ms. Rand?

13           MR. FATHI:  No.  That's not correct, Your Honor.  We

14   had been told previously that this was being transitioned to

15   the firm.                                                        02:45PM

16           THE COURT:  Let me ask you this and stop you there,

17   just because I can ask this question.  Is there any reason to

18   think that the representation that I saw with respect to where

19   things stand with respect to responses to requests for

20   production and interrogatories that suggest an impasse between    02:45PM

21   the State and the plaintiffs that that position is no longer

22   the actual position of the defendants, or in other words, is it

23   fair to assume that what I have read does indicate that we have

24   the defendants' position there and I have the plaintiffs'

25   position so that I can address it now?                           02:46PM

1          MR. BOJANOWSKI:  I'm sorry, Your Honor.  Maybe I'm a

2     little bit lost.  I can tell the Court this:  We are

3     transitioning the entire production of documents issue, so to

4     speak, over to our firm from Ms. Rand.  We have met with her to

5     identify, you know, specifically what is outstanding and we're          02:46PM

6     putting that together to organize it.  And then what we want to

7     do is get caught up, so to speak, in producing the records.

8     But there's a transition period, of course, where records are

9     still in Ms. Rand's possession getting shifted over to us.

10    Bates labeling has to occur.  Privilege logs, if applicable,          02:47PM

11    have to be prepared, et cetera, et cetera.  So all that is

12    being undertaken now and has been for the past week.

13         So what we want to do is we want to get caught up on

14    all outstanding requests contained in Mr. -- or the plaintiffs'

15    letters of September 27th, October 2nd, and October 4th.  And          02:47PM

16    we're, like I say, we're working to get a handle on that

17    situation because our firm was not involved in the production

18    of the documents.  That was all flowing through Ms. Rand.

19         So but we are going to work with the plaintiffs to get

20    this caught up and get these things produced.          02:48PM

21         MS. LOVE:  Your Honor, if I might add, as far as the

22    document production is concerned, we -- it's not a situation

23    where we're just looking at it and assessing it.  Our firm has

24    designated people within our firm and has had numerous meetings

25    with Ms. Rand to transition.  We have paralegals assigned.  We          02:48PM

1    have additional attorneys now on the case from our firm who

2    will be in charge of document production working with Mr.

3    Struck, Mr. Bojanowski, and I to achieve that.  Our intent is

4    not to wait and get the universe of outstanding all together in

5    one bundle and then put a dump truck of documents on                   02:48PM

6    plaintiffs' counsel.  We have plans in place.  Mr. Bojanowski,

7    Mr. Struck, and I are supervising the attorneys who will be

8    working on the document production as well as paralegals, and

9    we will be doing productions on a rolling basis to get us

10   caught up as quickly as possible and is our number one priority      02:48PM

11   at this point.

12            THE COURT:  Do this please:  By a week from Friday

13   send a letter to the plaintiffs that will include what you have

14   that you can produce that are responsive to that request.  And

15   if in that letter if you are not able to give them what they          02:49PM

16   have asked for, explain one of two things.  One, you are not

17   going to because you object and you need it to go before me; or

18   two, you need more time and say what your timeline is to get to

19   that.  So do that by a week from Friday.  And then my hope is

20   that that will resolve a number of the issues that remain to be      02:49PM

21   addressed.  And then the parties can have a final

22   meet-and-confer and then get on the phone together and call me.

23   Mr. Fathi, you are not happy with that, but I think that's what

24   we need to do.

25            MR. FATHI:  That's fine, Your Honor.  I just want to         02:49PM

```
 1    give a little bit of additional background.  These requests are

 2    not a surprise to anyone.  They include things that the Court

 3    ordered produced a month ago.  For example, the Court directed

 4    the defendants to give us updated temperature logs.

 5            THE COURT:  I know.  I'm sorry to cut you off but I'm      02:50PM

 6    over time on the court reporter and I want to give her a break.

 7    I know that there have been difficulties associated with

 8    documents but I also know that I have got somebody else in

 9    charge now who is going to, perhaps, have a different view

10    maybe and a different ability to get things done.  If that       02:50PM

11    happens, great.  So it will also mean that we won't have to

12    spend more than just what I have done right now.

13            So I'm cutting you off.  Let's go forth this way.  You

14    are not losing any arguments you need to make at the end of the

15    day if they are still vital.                                     02:50PM

16            Let's come back in --

17            MR. BOJANOWSKI:  Your Honor, I don't think there's

18    anything else on the agenda.

19            MS. KENDRICK:  There is.

20            MR. BOJANOWSKI:  What did I miss?                         02:50PM

21            MS. KENDRICK:  Number 10, the contract update.

22            MR. BOJANOWSKI:  I'm sorry.  I apologize.  I missed an

23    item.

24            (Discussion with the court reporter.)

25            THE COURT:  All right.  She's made of steel.             02:51PM
```

1          So the plaintiffs want to have some updates.  Some of

2     it, I think, are vital to my information; some you have

3     gratuitously provided in the past so that they can have an

4     understanding of the landscape of the case.  And I think that's

5     helpful for them.                                            02:51PM

6          But the part that's particularly useful for me, as I

7     have told you, I think economic incentives are vital here.  And

8     it's helpful for me to understand exactly what the nut is,

9     what's at play with respect to the State's efforts to get

10    compliance with areas I'm particularly focused on, and that is   02:51PM

11    staffing.  So those categories of issues are of interest to me,

12    but you see the others that plaintiffs have as well.

13         Did you see the agenda so you know what we're talking

14    about, Mr. Bojanowski.

15         MR. BOJANOWSKI:  Yes.  I see Item 10A is a status of   02:51PM

16    the request for proposals.  I can report to the Court that

17    those are still in negotiation.

18         THE COURT:  Okay.

19         MR. BOJANOWSKI:  That's all I can say on that.

20         THE COURT:  I understand.                              02:52PM

21         MR. BOJANOWSKI:  As far as monies assessed against

22    Corizon, Items B and C, it's my understanding Mr. Struck sent

23    an e-mail with regard to that information to everybody.

24         MS. KENDRICK:  Well, Mr. Struck's e-mail was partial

25    because he only responded to Number B, which was had the   02:52PM

1  $90,000 cap not been in place, how much money would have been

2  paid?  And he stated that it would have been 7,350,000 total

3  repaid to ADC.  But instead, because of the 90,000 cap, it was

4  only $1,440,000.

5         He did not answer the question which I think is                02:52PM

6  probably of great interest to the Court.  It's certainly of

7  great interest to us, and that is the separate monetary

8  sanction that is brought against the defendants -- I mean

9  against Corizon for failure to have position staffed above 90

10 percent and how much defendants have received in paybacks for    02:53PM

11 Corizon's failure to staff.

12        MR. BOJANOWSKI:  We may have an answer momentarily.

13        MS. LOVE:  Just for the record, I would like to note

14 that Mr. Struck is currently absent because he's currently in a

15 hearing before Judge Campbell right now.                          02:53PM

16        THE COURT:  Thank you.

17        It was a meet-and-confer.  I didn't mean to interrupt.

18 What is the status?

19        MR. BOJANOWSKI:  The staff offsets to date are

20 $3,344,229.09.                                                    02:54PM

21        THE COURT:  So that is as of what?  Sorry.  Is that

22 design defect in our table there?

23        MR. BOJANOWSKI:  Yeah.  I just turned and whacked my

24 knee.

25        THE COURT:  I'm sorry about that.                          02:54PM

1          So that is as of what?

2          MR. BOJANOWSKI:  August.

3          THE COURT:  August.

4          MR. BOJANOWSKI:  Of 2017.

5          THE COURT:  Ms. Kendrick, does that identify the

6    number that you needed?

7          MR. BOJANOWSKI:  Yes, Your Honor.  And, you know,

8    given the amount of offsets that the defendants have been given

9    back by Corizon by Corizon's failure to fill vacancies, we

10   think that the cost of Mr. Millar's analysis could easily come

11   out of this $3.3 million to date that ADC has gotten back that

12   at some point was budgeted for correctional healthcare.  We're

13   also very concerned about the --

14         THE COURT:  I didn't think of it that way.  I thought

15   of it as a way that Mr. Millar could be paid for in a way that

16   would redound to the State's benefit potentially.  So it's

17   really, what you say is true but it also can be that this money

18   if you wanted to trace the route or wanted to explain to

19   somebody why, perhaps, it was a good idea that this money

20   should go that way, it could end up saving the State money.

21         MS. KENDRICK:  Right.  But if the State had budgeted

22   this certain amount of money to go back and it came back to

23   them due to Corizon's failure to fill vacancies, it seems quite

24   logical that the roughly $150,000 Mr. Millar estimated would

25   cost to do the analysis could easily come out of this more than

02:55PM

02:55PM

02:55PM

02:56PM

02:56PM

```
1    $3 million that came back to the Department that at some point
2    had been budgeted to healthcare for class members.
3              THE COURT:  I don't disagree.  But understanding how
4    things work in budgetary situations in government, oftentimes
5    things are pigeonholed or put into one category.  But I guess       02:56PM
6    to me, the State is in a situation where it's contracting, I
7    don't know what the nature is of that contract, but we are
8    dealing with a situation where the State thinks that there
9    should be a major sanction imposed, a sanction that exposes the
10   State to money not just in the three fronts I have talked about     02:57PM
11   but also exposes it to tort liability that exists as a real and
12   practical matter as well.
13             So my view is that the $150,000, what you say is true,
14   but also can be an amount of money that the State would think
15   would be a good investment for its interests overall.               02:57PM
16             MS. KENDRICK:  We agree.  And we just also note in
17   light of Mr. Struck's e-mail to the Court and to counsel this
18   morning about the amount of sanctions that would have been
19   repaid had there not been that $90,000 cap, we are extremely
20   happy to hear that the State did amend the contract to lift         02:57PM
21   that cap on the sanctions so that in the future, there will not
22   be so much money that's basically staying on the table for
23   Corizon versus going back to the State for Corizon's failure to
24   comply with the performance measures.
25             THE COURT:  Okay.  Does that address that agenda item     02:57PM
```

1    completely?

2             MS. KENDRICK:  Yes, sir.  Well, one other thing,

3    actually, was with the staffing, there is a performance measure

4    that's about dental staffing because dentistry is subcontracted

5    by Corizon to another company called Smallwood.  And since it's          02:58PM

6    a performance measure, they only have to achieve 85 percent

7    compliance.  So if you look at the data for this performance

8    measure, Performance Measure 3, for example, the chart that was

9    attached to Mr. Pratt's declaration in support of their motion

10   to terminate, it appears that Smallwood is keeping its staffing         02:58PM

11   level for dentists just right in the sweet spot of above 85

12   percent.

13            And so our question is since that is less than the 90

14   percent threshold that is in the contract for other positions

15   whether or not the dental subcontractor has been paying any             02:58PM

16   sort of penalties for failure to have dentists staffed above 90

17   percent.

18            THE COURT:  Mr. Bojanowski.

19            MR. BOJANOWSKI:  The offset includes all providers

20   which would include dentists.                                           02:59PM

21            THE COURT:  So the answer is yes, then?  You are not

22   sure.

23            MR. BOJANOWSKI:  I'm not sure.

24            THE COURT:  Ms. Kendrick was saying, is the offset

25   also imposed before a 90 -- for subcontractors who do not               02:59PM

1    perform at 90 percent?  And it sounds like you said yes.

2        MR. BOJANOWSKI:  Right.  It's -- they are considered

3    providers so it's -- all providers are grouped, and then yes.

4        THE COURT:  Okay.  And I shouldn't have said performed

5    at 90 percent.  I should have said filled staff at 90 percent.        02:59PM

6        MR. BOJANOWSKI:  Right.

7        MS. KENDRICK:  Correct.  I guess it was just more the

8    question of whether on paper they were compliant with the

9    performance measure but then they are not compliant with the

10   requirements of the contract and there's a gray zone.              03:00PM

11       THE COURT:  Anything further from plaintiffs?

12       MR. FATHI:  No, Your Honor.

13       MS. KENDRICK:  No, sir.

14       THE COURT:  Defendants?

15       MR. BOJANOWSKI:  No, Your Honor.                              03:00PM

16       THE COURT:  Thank you for your time today.  I

17   appreciate it.  And I will see you all in November if not

18   talking to you sooner if that's necessary.

19       Thank you all.

20       (Proceeding concluded at 3:00 p.m.)                          03:00PM

21

22

23

24

25

1

2

3

4                          C E R T I F I C A T E

5

6        I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9        I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14       DATED at Phoenix, Arizona, this 19th day of October,

15   2017.

16

17                              s/Laurie A. Adams

18                              _____
                                Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT