1              **UNITED STATES DISTRICT COURT**

2            **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

   **Victor Parsons, et al., on**      )
5  **behalf of themselves and all**    )
   **others similarly situated;**      )
6  **and Arizona Center for**          )
   **Disability Law,**                 )
7                                       )   No. **CV 12-00601-PHX-DKD**
                **Plaintiffs,**         )
8                                       )
          vs.                           )   Phoenix, Arizona
9                                       )   November 7, 2017
   **Charles Ryan, Director,**         )   9:03 a.m.
10 **Arizona Department of**           )
   **Corrections; and Richard**        )
11 **Pratt, Interim Division**         )
   **Director, Division of Health**    )
12 **Services, Arizona Department**    )
   **of Corrections, in their**        )
13 **Official capacities,**            )
                                        )
14             **Defendants.**          )
   _____      )
15

16

17   **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

18            <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

19                    **(*Status Hearing*)**

20

21  Official Court Reporter:
    Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
    (602) 322-7256
24

    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

```
1                        A P P E A R A N C E S

2      For the Plaintiffs:

3              PRISON LAW OFFICE
               By:  Corene Kendrick, Esq.
4              1917 5th Street
               Berkeley, CA 94710
5
               ACLU - Washington DC
6              By:  David C. Fathi, Esq.
               915 15th Street NW
7              7th Floor
               Washington, DC 20005
8
               EIDENBACH LAW PC
9              By:  Kirstin T. Eidenbach, Esq.
               P.O. Box 91398
10             Tucson, AZ 85752

11             ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
               By:  Maya S. Abela, Esq.
12             177 N. Church Avenue
               Suite 800
13             Tucson, AZ 85701

14     For the Defendants:

15             STRUCK LOVE BOJANOWSKI & ACEDO PLC
               By: Timothy J. Bojanowski, Esq.
16             By: Rachel Love, Esq.
               By: Daniel Struck, Esq.
17             By: Richard Valente, Esq.
               3100 W. Ray Road
18             Suite 300
               Chandler, AZ 85226
19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2          THE MAGISTRATE JUDGE CLERK:  Civil Case Number 12-601,

3    Parsons, et al., versus Ryan, et al., on for a status hearing.

4          THE COURT:  Counsel, please announce.

5          MR. FATHI:  Good morning, Your Honor.  David Fathi          09:03AM

6    from the ACLU National Prison Project for the plaintiff class.

7          THE COURT:  Thank you.  Good morning.

8          MS. KENDRICK:  Good morning, Your Honor.  Corene

9    Kendrick from the Prison Law Office for the plaintiff class.

10          THE COURT:  Thank you.  Good morning.          09:03AM

11          MS. EIDENBACH:  Good morning.  Kirsten Eidenbach for

12   the prisoner plaintiff class, and behind me my co-counsel.

13   Maya Abela, from the Arizona Center for Disability Law.

14          THE COURT:  Thank you.  Good morning.

15          Anyone on the phone?  We have Mr. Millar, I think.          09:04AM

16          Good morning, Mr. Millar.  How are you.

17          MR. MILLAR:  Along with myself, Judge, I have Allison

18   Fishkind, who is from our legal team, and Lauren Keil who is

19   from our documents development department to support this call

20   as well.          09:04AM

21          THE COURT:  Thank you.  Good morning, both of you, all

22   three of you.  Thank you very much.

23          Defendants?

24          MR. BOJANOWSKI:  Your Honor, Tim Bojanowski, Rachel

25   Love, Dan Struck, and Richard Valente.          09:04AM

1          THE COURT:  Thank you.  Good morning, all.

2          Someone else was on the phone, I heard, too.  No, I

3    guess not.

4          Mr. Millar, thank you for calling in.  We need to

5    address a couple of things.  First, with respect to the                      09:04AM

6    settling of the Articles of Engagement with respect to the

7    standard terms and conditions, I know that you have heard from

8    my staff that there are issues associated with respect to what

9    I can fairly allow you to enter into because the normal kind of

10   contract that you would have with a normal entity provides for        09:05AM

11   you to have certain legal rights.  And I can't, in good

12   conscience, allow you to enter into an agreement where I know,

13   because you are contracting with the Court, who has absolute

14   immunity, that you don't have the opportunity to enforce those

15   rights.  But nevertheless, there are a couple of things that I        09:05AM

16   can say that can address those issues.

17          First, with respect to the matters that are going to

18   govern how the conduct of the project will be undertaken with

19   respect to the enforcement of my order that the defendants pay

20   for it, those provisions that respect to timing and invoicing,       09:05AM

21   those will be the guideline that I will use for enforcing my

22   order.  And so the expectation could be that you would have the

23   backing of the Court to make sure that those provisions are

24   satisfied.

25          Also, the confidentiality provisions with respect to          09:06AM

1   protective orders, we're accustomed to doing that in this case

2   and so we do have a way to protect the confidential information

3   that is acquired during the project.  But also overall, with

4   respect to what would be, perhaps, Ms. Fishkind's concern, and

5   that is, how is my client going to be protected here, I think        09:06AM

6   it's reasonable for people to understand that the normal kind

7   of practices that you engage in that would reasonably cause you

8   to want to enter into these contractible provisions where you

9   worry that somebody is not going to comply with what needs to

10  happen, this is in the context where you are a court-appointed      09:07AM

11  expert and you are serving as an agent of the Court.  And so to

12  the extent, perhaps, there are some liability concerns that Ms.

13  Fishkind has with respect to potential indemnification, I think

14  if you encounter areas where you think you have a sensitivity

15  to that you can turn to the Court and get something even beyond     09:07AM

16  what I'm saying now, and that is that you are the agent of the

17  Court.  If there is something that is of particular concern

18  that you think is necessary to do or an action you need to take

19  that is necessary to complete your work, you can always contact

20  the Court and I will evaluate the circumstances of the request     09:07AM

21  and, if appropriate, make the necessary order, enter the

22  necessary order, that will become a specific order of the Court

23  that provides for the accomplishment of that task and then,

24  therefore, it is an order of the Court.

25          So I would think that you are complying with it and       09:08AM

———November 7, 2017 - CV 12-601 - Status Hearing———

1   then that would provide, I would imagine, any kind of

2   protection that you would want to have because it is your

3   service as an agent of the Court that is being undertaken.  And

4   if somebody has an issue with that, it would seem that that

5   would be on my doorstep, not yours.  But to the extent you have          09:08AM

6   concerns about that in particular areas you should feel free to

7   raise it.  And the general statement that I make here, that I

8   think that it is true that all of the actions being undertaken

9   pursuant to this project are as an agent of the Court so that

10  we can get the information that we need to be able to enforce          09:08AM

11  the stipulation.

12          So that was the one issue I knew that we needed to

13  address, and I will give you a chance, Ms. Fishkind and Mr.

14  Millar, if you want to address it further.  But just so you

15  know what the second issue is, the last time that we had a          09:09AM

16  telephonic hearing there were some issues raised by counsel

17  here with respect to definitional terms that were in the

18  engagement letter.  And you haven't, I don't think, been made

19  aware of those, Mr. Millar, so I will give counsel an

20  opportunity to do that in short order.          09:09AM

21          But first we'll return to the issue about the terms

22  that unfortunately are your standard boilerplate, and

23  understandably so, but really don't have any application here.

24          Mr. Millar, Mr. Fishkind, anything you want to say

25  about that?          09:09AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1      MS. FISHKIND:  Judge, this is Allison Fishkind.

2      My one question is, actually, is it possible instead

3  of us entering into the engagement letter with the Court that

4  the Court would order that the defendant enter into the

5  engagement letter directly with us since we will be providing      09:10AM

6  the defendant with the services and then they will be paying us

7  because that's something contractually that I think would work

8  for both the Court and for the advisory board.

9      THE COURT:  I understand that that would be a solution

10  that would put you back into the normal pattern of how you      09:10AM

11  operate, but really, the difficulty here is that it's not that

12  you are working for the defendants.  You are working for me and

13  they are paying for it.  And so I'm uncomfortable with that

14  arrangement.  Also, I wonder, have you checked with other

15  entities that have been retained by courts to serve as experts      09:11AM

16  in this capacity?  Because I guess I know that there are -- I

17  know, from my own experience, that there are other

18  circumstances where courts have done this but I also know that

19  there are other circumstances where courts are in a position to

20  do things along the lines that you suggest.  But I have got      09:11AM

21  certain limitations both in the stipulation itself and in the

22  Prison Litigation Reform Act on how I can conduct my affairs

23  with respect to supervising this case that make it so that it's

24  not so easy to adopt that alternative that you suggest.

25      Are you really thinking that you cannot enter into      09:11AM

1    this arrangement without having that kind of proposal embraced?

2    Because I don't see a way that I can get there.

3            MS. FISHKIND:  So our biggest concern is third party

4    liability.  So we do the analysis and we do the work and we

5    make our recommendations and then something happens as a result        09:12AM

6    of those recommendations and the advisory board is viewed with

7    uncapped liability and without any form of indemnification for

8    that third party claim.  And so that's really where our biggest

9    concern is, and so it's not with the Court directly but it's

10   really for any third party complaints that come out of that.          09:12AM

11           THE COURT:  All right.  And I appreciate that.  But, I

12   mean, it's the old problem that no client likes to hear from

13   their lawyer, and that is there is nothing that I can do that

14   can stop you from being sued.  There are lots of things I can

15   do to stop you from being found to have liability, but there's        09:12AM

16   nothing I can do to stop you from being sued.  And that, I

17   think, is a cost of doing business with the Court.  There's

18   nothing I can do to protect you from being sued.

19           But there's a lot I can do to give you what I think is

20   a defense like mine, absolute, and that is any time you are           09:13AM

21   engaging in this project, and obviously, if your investigator

22   runs off the road and kills somebody, that's not what we're

23   talking about.  What we're talking about is somebody who thinks

24   that there's a change in job classification because of what has

25   happened as a result of your report and somehow they think you        09:13AM

November 7, 2017 - CV 12-601 - Status Hearing

```
 1   are liable for that.  And so as tenuous -- I mean, maybe there

 2   are less tenuous things that can be positive.  I just can't

 3   think of one now.  But in that kind of circumstance, it would

 4   seem to me that the engagement to do this analysis that results

 5   in a report that causes the Court to do something is so full of      09:14AM

 6   tiers of defenses, first of all, again, the activity itself is

 7   the product of court-ordered action; secondly, you are not

 8   going to be doing anything in this case with respect to what

 9   happens on the ground regarding the employment or staffing of

10   people in the prison system.  That's not going to be an action      09:14AM

11   that you are going to cause to happen.  You are going to inform

12   me and I'm going to decide what to do.

13          So again, I just can't see where there is that there's

14   a reasonable fear that is beyond the fact that you could be

15   sued.  And you could be sued, and unfortunately, I can't do         09:14AM

16   anything about that.  But I surely think, as we analyze it as

17   lawyers, as trying to make a good judgment as best we can, it's

18   not great exposure.

19          MS. FISHKIND:  Okay.  And is the language that would

20   go in the order something along the lines of, you know, any --      09:15AM

21   what's contained in the scope and any deliverables that come

22   out of this scope are pursuant to a court order and, therefore,

23   are protected by the same levels or something along those

24   lines?

25          THE COURT:  Well, it is the order of the Court that          09:15AM
```

1    the advisory board undertake the analysis in the engagement

2    letter to provide information to the Court that would allow the

3    Court to make the most informed decisions it could make with

4    respect to the enforcement of the stipulation.  And that all of

5    the investigation, all of the research, all of the inquiries          09:15AM

6    made on behalf of the Court in -- as identified in the advisory

7    board's engagement letter are pursuant to the order of the

8    Court to do that.  And that it is as an agent of the Court that

9    is advisory board is engaging in this activity, and that in the

10   context of this court appointment as an agent of the Court, it        09:16AM

11   would be the -- it is the Court's view that the advisory board

12   is acting on behalf of the Court.  And it is further ordered

13   that if at any time the advisory board believes that it is

14   encountering an area of concern with respect to whether or not

15   it is acting at the order of the Court, and there is action           09:16AM

16   that it believes that is necessary for the achievement of the

17   purposes of the engagement, then they may bring that

18   information to the Court and the Court will specifically

19   identify that area of concern and make an appropriate order

20   which may include the direction that that activity go forward         09:16AM

21   as a specific direction of the Court.

22          Again, the overall context is one where this

23   engagement is being pursued as a purpose of the court and as an

24   order of the Court.  And so the agent of the Court should

25   expect that it would have the protection of the Court with            09:17AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1   respect to activities that are engaged on its behalf that would

2   normally be the subject of judicial immunity.

3        If there are particular areas of concern, the Court

4   will address those so that it is clear to everyone that that is

5   the very clear understanding and expectation with respect to         09:17AM

6   anybody who is engaging in activities with the people who are

7   working for the advisory board and seeking to accomplish the

8   goals set forth in the engagement letter.

9        Does that order that I just entered on the record

10  provide the response, the explanation of the situation here          09:17AM

11  that addresses your last question, Ms. Fishkind?

12       MS. FISHKIND:  Yes.  I think that's very helpful.  I

13  will need to run this by our general counsel internally, but I

14  think I have the information I need and I think that that's

15  helpful and clear.  Thank you.                                       09:18AM

16       THE COURT:  All right.  Well, if you do think that you

17  need further clarification, again, this invitation to bring

18  that to the Court's attention is applicable now, from this

19  point forward, at any time.  And the way that you do that is

20  you contact the Court's judicial assistant, Ms. Armida Herrera,      09:18AM

21  and we will set a telephonic hearing that we will notice to

22  counsel and we'll address it on an emergent basis.  So I do not

23  want anything on this topic to be delayed because of the

24  Court's inattention to it.  And it's -- one of the ways that

25  you can make sure that the time frames are not -- are adhered        09:19AM

1    to is that if you do develop issues, let us know quickly and

2    we'll get it on the agenda that day if not the next.  Okay.

3    Thank you.

4           And then, shall I turn to you, Ms. Kendrick, first for

5    the issues that were raised on the telephonic hearing before        09:19AM

6    that Mr. Millar should be able to -- should hear about with

7    respect to definitional terms?

8           MS. KENDRICK:  Sure.  So, Mr. Millar, one question

9    that we had that we needed clarification for was that in your

10   engagement letter, you refer to advanced practice registered       09:19AM

11   nurses.  And we want to make sure that that term or the

12   provider term encompasses nurse practitioners and physician's

13   assistants.  Because within ADC and Corizon they use all three;

14   nurse practitioners, physician's assistants, and medical

15   doctors to be in the provider position.  And so we want to make     09:20AM

16   sure that they are part of your analysis.

17          MR. MILLAR:  It would be -- the intent would be to

18   include all of what we would term as physician extenders or

19   advance practitioners.

20          MS. KENDRICK:  Okay.  Thank you.  Also Mr. Fathi had a       09:20AM

21   question about the psychologists.

22          MR. FATHI:  Mr. Millar, this is an analogous issue on

23   the mental health side.  The stipulation in this case uses the

24   term mental health clinician.  And mental health clinician

25   includes both psychologists and psychology associates.  And the     09:20AM

1   Department of Corrections actually relies much more heavily on

2   psychology associates than on psychologists.  So, for example,

3   the staffing plan calls for a total of 19 psychologists and 52

4   psychology associates.  So we just want to make sure that when

5   you are looking at psychologists, that term includes psychology          09:21AM

6   associates.

7           MR. MILLAR:  Okay.  Yes.  And I think those would be

8   included under my earlier comment that we are anticipating

9   these are providers who would be at an M.D.-type level and

10  those additional providers one step down, which would include           09:21AM

11  psychology associates.

12          MR. FATHI:  Would it be possible to amend the letter

13  to make that explicit?

14          MR. MILLAR:  Absolutely.

15          MR. FATHI:  Great.  Thank you.                                   09:21AM

16          THE COURT:  Anything further from the plaintiffs'

17  side?

18          MS. KENDRICK:  No, sir.

19          THE COURT:  Mr. Bojanowski?  Mr. Struck?

20          MR. STRUCK:  No, Your Honor.                                     09:21AM

21          THE COURT:  Mr. Millar, Ms. Fishkind, the next step

22  here, so that you can get started on work, what do you feel

23  needs to happen next and what should we -- what can I do to

24  help us get to next?

25          MR. MILLAR:  One question, Judge, is we do have some             09:22AM

November 7, 2017 - CV 12-601 - Status Hearing

1    edits that we need to do but Allison and I would turn to you to

2    ask you what we need to do with our terms and conditions

3    section of the contract to make that fit our current need.

4           MS. FISHKIND:  Right.  So from my end, I will just

5    need to check internally with our general counsel, as I                09:22AM

6    mentioned, and then Lauren had assisted in culling out the

7    scope of services, so it was more in just a straight services

8    format.  And then I will just build in the confidentiality term

9    or is that something the Court pulls in?  I can just add that

10   for the services.                                                      09:22AM

11          THE COURT:  I think you can add that.  And so once you

12   get that sorted out on your end, send it over to us.  We'll

13   distribute it to counsel.  And then if it's acceptable, I will

14   make it an order of the Court and enter it on the docket.

15          MS. FISHKIND:  Okay.  Great.                                    09:23AM

16          THE COURT:  All right.  Anything else we need to raise

17   with Mr. Millar?  I see no -- okay.  Thank you all very much.

18   I appreciate the call-in.

19          MS. FISHKIND:  Great.  Thank you so much.

20          MR. MILLAR:  Thank you, Judge.                                  09:23AM

21          THE COURT:  Have a good day.

22          (Mr. Millar and Ms. Fishkind disconnected.)

23          THE COURT:  So now proceeding, I think we can use the

24   plaintiffs' agenda with the addendum of what the defendants

25   have filed with respect to their agenda items.  So then we'll        09:23AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    just work through.

2         Item 2, errors and improper monitoring methodology in

3    the July 2017 CGAR results, I have read everything that has

4    been submitted to the Court with respect to this except I did

5    not delve into the background documents that were attached.                    09:24AM

6    But I have read the conclusions, and I have read some of the

7    reporting about it.

8         These, I mean, it seems to me that there are

9    sufficient number of errors identified that cause me to have

10   serious concern about the overall rectitude of this critical              09:24AM

11   component.  And I think I need to devote substantial energy and

12   court time to making sure that these issues are fully fleshed

13   out and they just are not simply he-said-she-said kinds of

14   things.  There is an answer.  And in some cases, the counsel

15   have come to the answer themselves, and then in other cases             09:24AM

16   they seem to still have disagreements.

17        But I think just so that people understand from my

18   overall perspective, this is the foundation of everything we

19   do, the information that we get.  It's always been troubling to

20   me that to a certain extent the information-gathering component         09:25AM

21   is vested with the party who would suffer if there are issues

22   raised with it.

23        Now, I have mentioned in the past that I have been

24   impressed with the fact that the defendants have come forward

25   with very self-damaging information.  They have revealed where          09:25AM

1   they have failed to comply, and that that has given me some

2   comfort this past track record would indicate that maybe I can

3   trust it going forward.  I trust it's not, as I say,

4   necessarily an assumption of malicious intent.  It is, however,

5   just a problem that no one thinks it's a good idea to really          09:26AM

6   have people police themselves.  It's just there are biases.

7   There are inherent biases that people have.  And when you are

8   talking also about a very complex bureaucracy where people know

9   that adverse reporting can cause difficulty for higher-ups

10  there is a huge incentive to not give that adverse reporting          09:26AM

11  because, I mean, what flows flows downhill.  And so, I mean,

12  anybody just in common sense would think that this would be a

13  questionable way to do things.

14          And on the one hand, you could say that the State has

15  the desire to be an aggressive and appropriate monitor to make       09:27AM

16  sure that the contract is complied with.  But I have talked

17  about this before, and it is a reality of the case that if you

18  understand the crosscurrents here, you can see how it is that

19  there could be an alignment between the contractor and the

20  State with respect to being pleased with the fact that there         09:27AM

21  was not adverse information being reported.  And so that

22  pleasure serves everybody's interest who is capable or in

23  charge of doing it.

24          And when I say everybody, what I mean by that is the

25  contractor and the State.  If the contractor is saying              09:28AM

1   everything is fine and the State looks into it or doesn't look

2   into it they are happy with that because they want everything

3   to be fine.  But then if they look into it and they find things

4   aren't fine the State is troubled by that, too, because they

5   know that there will be a price to pay at the end of the day          09:28AM

6   because of that.  And it's either a price that's in my case or

7   it's a price with respect to what the contract will cost going

8   forward.  Because if you come back to the contractor and you

9   say you need to do these things, they will say the cost will be

10  higher and then at the end of the street here at Washington          09:28AM

11  there will be people who say we don't want the cost to be

12  higher.  So there is the potential for an unholy alliance that

13  is counter to the stipulation and counter to the people whose

14  interest the stipulation is designed to guard.

15       So this is a long way of expressing what I have                 09:28AM

16  articulated before and want to be careful to say it, because I

17  think everyone should be aware of the fact that there are these

18  potential biases that can infect the reporting mechanism that

19  is the foundation of everything that we do here.

20       So what plaintiffs revealed to the Court last month in         09:29AM

21  issues that were raised with respect to concerns about

22  reporting accuracy as compounded by the reporting to the Court

23  this month in the letters that are the attachment that suggests

24  that there are things that are provably wrong and some things

25  about which there were unanswered questions, for instance, the       09:29AM

1   reporting that may have a reasonable explanation of how it is

2   that all of the time entries can be at precisely the start of

3   the hour which is not matched by any other provider, again,

4   raises concerns.  We have addressed these concerns before where

5   people thought for the State and the monitoring component of          09:30AM

6   the temperature logs where they put down temperatures that were

7   completely impossible or put down times that were completely

8   impossible and that if the culture is that somebody can

9   actually put pen to paper in a way to do that in that instance

10  it makes one thing, how far has that spread, that contagion.          09:30AM

11          So this leaves me with what I have said, and that is I

12  need to devote considerable energy to it.  It's a very serious

13  concern of mine.  I also know that at some point it may be that

14  we will need to engage in other 706 expert with respect to

15  evaluating the quality of the monitoring program to verify that       09:30AM

16  these biases haven't infected the process to verify that enough

17  attention is being devoted to it.

18          Now I'm going to turn to respective counsel so that we

19  can hear in court, on the record, what they want to say about

20  it, but in addition to the preamble I just gave about my              09:31AM

21  overall view of it, I do also want to address something that is

22  part of this.  And that is the motion for reconsideration on

23  the timeline for the order to show cause and the data that

24  would be necessarily to be provided by the defendants with

25  respect to the imposition of contempt sanctions for failure to       09:31AM

1  comply.

2        The defendants have asked for an extension of 30 days

3  from the requirements of January 5th and January 9th, or the

4  January 5th reporting date because they say that the real time

5  reporting obligation is one that is too burdensome, impossible          09:32AM

6  to accomplish in that short time frame for December.  They say

7  they could not, by January 5, produce the December data.  The

8  plaintiffs object to that motion for reconsideration.  They say

9  that the defendants have shown that they are able to do this.

10 They have done it in the past.  The Court has compelled it and          09:32AM

11 it has happened.

12        And I'm left with two minds on it.  One is I wonder if

13 one of the things that I have come to too late in the -- I mean

14 later than I would have liked, I'm coming to it but later than

15 I would have liked, and that is an appreciation that the                09:32AM

16 mechanism for alerting me about a problem in the prison

17 complexes with respect to complying with the terms of the

18 stipulation that require such a delay in time where we're

19 looking at data that's two months old and that we have -- we're

20 about to hear this morning a presentation about issues that             09:33AM

21 have a June -- I'm sorry -- November 6 sort of let's address it

22 as of today date when we know that the numbers that demonstrate

23 that that's necessary were known by or could have been known by

24 somebody two months before.

25        I have pushed, with my black box warning we discussed            09:33AM

— November 7, 2017 - CV 12-601 - Status Hearing —

1   last time, I have pushed more and more this idea of real time

2   reporting, because I think that it is wrong to think that the

3   triggering mechanism that has this two-month delay is also

4   appropriate to use with respect to when we have identified that

5   there's a problem and the Court is in its position to try to        09:33AM

6   effect a remediation.  Once the Court is in that position, I

7   don't think that I or the defendants should be bound by this

8   idea that we're okay with this process that works with -- that

9   means that there's delay.  And anybody who is familiar with the

10  Court record in this case will know that there are reasonable      09:34AM

11  reasons for the delay, that there is a collection period that

12  ends at the end of the month, the samples are drawn, and the

13  monitors do their work.  That takes time.  The monitors then

14  have a meet-and-confer, it seems, with the contractor, and it

15  works through in a process that necessarily involves delay and     09:34AM

16  then at the end of it we get that information finally in court.

17  That is part of a process that was designed to determine

18  whether the stipulation had been complied with.

19          Once we find that that information demonstrates that

20  the stipulation terms have not been met, the Court then --         09:34AM

21  well, the mediation process is undertaken and the Court has its

22  responsibility to try to effect remedial measures.  I don't

23  think that there is any reason, once there's been this alert,

24  the warning bell has gone off and there's been a finding of

25  failure to comply, that that same delay period should govern.      09:35AM

1  I think at that point it's appropriate for me to say to the

2  State, do what you need to do to make sure that what happened

3  yesterday with respect to failure to meet into the stipulation

4  with respect to every single one of your charges will not

5  happen tomorrow and that we don't say we have this cushion          09:35AM

6  period or time to reflect or reconsider on every single day on

7  those measures you should be monitoring, how did we do the day

8  before?  Because it is something that has been shown to fail to

9  meet compliance with the stipulation.

10          As I say, I have come later to this than maybe I could    09:35AM

11  have earlier.  Maybe I should have identified this as something

12  and pushed harder on it and got us all, the State in

13  particular, into an understanding that that's how things would

14  go forward.  And I think I am moving toward that understanding,

15  nevertheless, that I have got issues there, too, because if I     09:36AM

16  do an end run around the monitoring program that the State has,

17  just so everybody, I mean, who may not understand this, and

18  it's none of the people ahead of the bar, but the people who

19  are doing the monitoring are state employees.  They are not

20  contractor's employees.  So they do have, I think -- and again,   09:36AM

21  they have been producing this information to me that I hope is

22  accurate and true.  For the contractor to be engaged in real

23  time reporting, which is who would be doing it, I think, raises

24  even more issues with respect to potential biases.  And it

25  doesn't have this safeguard measure of having the State, the      09:37AM

1    contractor, being the one looking after it.

2         And so if I push too much on real time then I run the

3    risk of doing an end run around the State's monitoring

4    capacity, and so I have to be sensitive to that.  And so these

5    conflicting views of mine have led me to a couple of                09:37AM

6    preliminary views.  The first is that I may need to have some

7    help with respect to verification.  The second is, with respect

8    to the way that I have governed things so far, I am going to

9    grant the motion for reconsideration and allow for the

10   reporting date to be moved to the 5th of February, 2018, in        09:37AM

11   part because it is reporting of the December month.  And it's

12   not simply that December is an important holiday month for many

13   people, but it is also the end of the year and for people in

14   leave status in employment it sometimes is a time where there

15   are not people available to do the work.                           09:38AM

16        So there are practical issues that I think are

17   reasonably raised in the defendants' motion for reconsideration

18   and so I would be inclined to grant that and to give you that

19   additional time.  But I also do want to try to run a careful

20   balance as I go forward with respect to pushing this idea of       09:38AM

21   real time.  And maybe one of the mechanisms that the State can

22   contemplate is that if it wishes to avoid the responsibility of

23   having to have to pay for yet another expert to make sure that

24   the stipulation can be accomplished maybe there are things it

25   can do with respect to its own monitoring program to move it       09:39AM

1   over so that it can have some greater connection to real time

2   reporting.  Because we have just learned we're getting nowhere

3   with respect to these delays, and it just seems so

4   counterintuitive that you would continue to do what doesn't

5   work.  And that also if there are people on the floor who know          09:39AM

6   that if we had to get prescriptions to people within two days

7   and we decided to look at what happened with the people whose

8   prescriptions were written two days ago and then we find out

9   that this number of people didn't get them, well what do we do

10  tomorrow rather than putting it into a report that the Court          09:39AM

11  sees that says as of November 6th, this is what we're going to

12  do going forward when we get a report that says two months ago

13  we weren't doing so well.

14          All right.  My preliminary statement has ended.

15  Plaintiffs?                                                            09:40AM

16          MS. KENDRICK:  Yes, Your Honor.

17          First of all, we welcome the Court's considering the

18  possibility of a Rule 706 expert to assist upon the

19  methodology.  That is something that we actually asked the

20  Court for earlier this year when we did the briefing after the        09:40AM

21  series of hearings on the methodologies being used for

22  monitoring.  And so we just reiterate that request and hope

23  that the Court will consider it.

24          To the extent that the Court is inclined to postpone

25  until February 5th because of the holidays and the end of the         09:40AM

1    year, just two things.  First of all, as we pointed out, there

2    is no reason why the Department or Corizon have to wait until

3    the end of the month to start gathering real time data because

4    this is not a sampling.  This is all the entire universe.

5              THE COURT:  And I do appreciate that point.                09:41AM

6              MS. KENDRICK:  So that's our first point.  However, we

7    do understand that the Court wants to be solicitous of persons

8    who celebrate the holidays.  Then we would ask that in light of

9    the Court's interest in having the most current and up-to-date

10   data, that on February 5th defendants not only provide December   09:41AM

11   2017 data but that they also provide January 2018 data.  And

12   that way we think there's two purposes for that.  First of all,

13   it will be very current and up to date; but second of all, it

14   will give the Court two months worth of data so you will have

15   two data points and be able to look and see if they manage, if   09:41AM

16   things were really bad in December were they able to pull their

17   act together in January.

18             So to the extent the Court is inclined to grant

19   defendants' motion, we ask that you would include it so that

20   they have both December and January data.                        09:41AM

21             The final thing, just a final note that we want to

22   make, is we were very, very, very disturbed by the filing by

23   the Corizon vice president who said that they would not assist

24   the Department in gathering this data.  And we laid out both

25   the case law regarding third parties and their need to comply    09:42AM

1  with court orders but also the language of the contract between

2  Corizon and the state where it clearly states that Corizon must

3  provide all reports that the State requests of them.

4          And so again, we just want to emphasize and make clear

5  that that sort of game playing is very unacceptable and very          09:42AM

6  disturbing behavior and response by the State's vendor.

7          THE COURT:  Mr. Struck.

8          MR. STRUCK:  Yes, Your Honor.  Just a couple things.

9          First, the defendants agree with the Court that real

10 time reporting would help in figuring out where the problem          09:43AM

11 areas are and fixing them in an expedient manner.  The

12 defendants were also upset with the Corizon vice president's

13 statement that they couldn't do real time reporting and have

14 been in some serious discussions with their contractor,

15 Corizon, over the past couple of weeks and are endeavoring to        09:43AM

16 come up with a method to do real time reporting primarily

17 through a software system called Pentaho.  Apparently, it's

18 easier to do on some of these performance measures than it is

19 on others.

20         The contractor has committed to fashioning the              09:43AM

21 software in a manner in which they could do real time

22 reporting, and that is something that the defendants have been

23 pushing them on very strenuously certainly over the last two

24 weeks.  But this is something that's very important to the

25 director and Mr. Pratt, and we hope to have, and we're              09:44AM

1   insisting on, whether it be through a software system or in

2   Corizon putting more bodies in the task, there be some real

3   time reporting on these 11 performance measures at these

4   facilities where they have been consistently failing.

5           So the Court -- the defendants appreciate the Court's          09:44AM

6   ruling with respect to the February reporting period, but we

7   will be pushing our contractor to provide us with the real time

8   numbers not only so we can accurately report to the Court but

9   so we can locate and determine problem areas and try and fix

10  them much more expediently than it has been being done in the          09:45AM

11  past.  The defendants are frustrated as well as the Court with

12  respect to some of these.  And some of them we agree with the

13  Court.  It doesn't make sense why there has been consistent

14  failures in some of these.  And the director is committed to

15  making sure that the contractor satisfies the contract and,          09:45AM

16  more importantly, complies with the Court's October order with

17  respect to these reporting.

18          It will allow -- the additional time will allow for

19  the contractor to put into place some of the software changes

20  that need to be done.  That will be helpful.  But we're going          09:46AM

21  to continue to push them to do it much quicker than -- we would

22  like to see real time reporting by the dates in the October

23  10th order of the Court.  But it's something that we're in

24  discussions with the contractor about right now.

25          THE COURT:  Just a second.          09:46AM

November 7, 2017 - CV 12-601 - Status Hearing

1          (Off the record discussion between the Court and his

2     courtroom deputy.)

3          THE COURT:  In February we meet later than normal, the

4     28th.  And so what I would think would be a reasonable thing to

5     do is to keep the February 5th date for December but say that          09:47AM

6     the January data would have to be available to the Court and to

7     the parties for the month of January on these measures in the

8     possible contempt order by the day before our meeting on the

9     28th.  It will give you a chance, both sides, to respond to

10    that.                                                                   09:48AM

11         Ms. Kendrick.

12         MS. KENDRICK:  So what would we be doing on February

13    5th?

14         THE COURT:  On February 5th the data for December will

15    be coming in.  But I'm going to make sure, as you suggested,          09:48AM

16    that the next time after that data comes in that we would meet

17    together in our monthly status hearing, which would be February

18    28th, that we have both December and January.

19         MS. KENDRICK:  That's fine, but we would ask that the

20    Court set the date for submitting the January data a little          09:48AM

21    sooner than the night before the hearing.

22         THE COURT:  Oh.  The January data you need -- a couple

23    of days before seems reasonable, I guess.  That's a Wednesday,

24    is it?

25         MS. KENDRICK:  We would ask for Friday, February 23rd,          09:48AM

UNITED STATES DISTRICT COURT

1    Your Honor.

2            THE COURT:  Okay.  Defendants' position?

3            MR. STRUCK:  Your Honor, we appreciate the Court's

4    ruling because we were going to have to provide this data by

5    January 5th.  But we request that -- and we're hoping that          09:49AM

6    we'll be able to get this data and that the software changes

7    will be successful -- but we would request -- I don't think it

8    would take more than a couple days for them to digest this

9    data.  We would suggest something more along the lines of

10   January -- or excuse me -- February 25th.                           09:49AM

11           THE COURT:  Is that the Monday?

12           MS. KENDRICK:  That's a Sunday.

13           MR. STRUCK:  Then the 26th.

14           THE COURT:  All right.  We'll make it the 26th for the

15   January data.                                                       09:49AM

16           Anything else on agenda Item 2 that you want to say?

17           MR. FATHI:  Yes, Your Honor.  As the Court pointed

18   out, the defendants acknowledge many of the mistakes we pointed

19   out but there are a few areas where there is a methodological

20   dispute that we need the Court to rule on.                          09:50AM

21           THE COURT:  Do you want to point those out to me which

22   ones we need to work on right now?

23           MR. FATHI:  Yes, Your Honor.

24           MS. KENDRICK:  I'm sorry.  I'm recovering from

25   bronchitis.                                                         09:50AM

*November 7, 2017 - CV 12-601 - Status Hearing*

1    THE COURT:  I'm sorry.  A lot of people, it seems,

2    have a long course of recovery with this.

3    MS. KENDRICK:  Yeah.  Thank you.

4    So the first area where we reached an impasse was with

5    Performance Measures 1, 2, and 4, and those are measures that          09:50AM

6    have to do with staffing being done on a daily basis and the

7    fact that defendants are awarding themselves partial credit for

8    that.

9    THE COURT:  Okay.  So the argument here is that the

10   defendants say that we take a look to see what number of times          09:50AM

11   in the given month that this has happened, and if it happens

12   half the time, we say that that's a 50 percent rate.  And your

13   position would be if it happens once that's not compliant.

14   All right.  And that's been the normal view of the

15   court with respect to its failure to respect this partial          09:51AM

16   credit idea.  And the difference that defendants say is

17   relevant here is because of the fact that this is a daily

18   requirement.  Is that right?  Who is on the defendants' side on

19   this?

20   MR. BOJANOWSKI:  That's correct, Your Honor.          09:51AM

21   THE COURT:  All right.  I'm unconvinced why that would

22   mean that we would treat it differently, Mr. Bojanowski.

23   MR. BOJANOWSKI:  Well, it has to do with what are we

24   measuring here is whether there's a person on site 24/7, seven

25   days a week.  So it's broken down by the number of days that a          09:52AM

1    person would be present.

2            THE COURT:  But that's not what the stipulation called

3    for.

4            Is that all you had to say about that?

5            MR. BOJANOWSKI:  Well, I think in our submission to          09:52AM

6    the Court, it explains what the methodology is.  And I guess

7    for purposes of this hearing, I was unsure how the Court wanted

8    to approach these issues, whether we were going to brief this

9    because all we have is a couple pieces of correspondence, and I

10   would suggest to the Court that perhaps we, because of the          09:52AM

11   Court's concerns, look at this in more detail if that's what

12   the Court would like to do.

13           So right now, what we've got is --

14           THE COURT:  Who is the lawyer in your office who is

15   the correspondent on these letters?                                 09:53AM

16           MR. BOJANOWSKI:  Ms. Fletcher.

17           THE COURT:  She's not here?

18           MR. BOJANOWSKI:  She is not.  And she has been the one

19   that was working with ADC and such to address the concerns

20   raised by the letter written by the plaintiffs.                     09:53AM

21           THE COURT:  Here's what I'd like to do.  What I'd like

22   to do is set a time for Ms. Fletcher and somebody on the

23   plaintiffs' -- it could be Mr. Fathi on the telephone if you

24   would like -- but I'd like to have a telephonic hearing if

25   that's what you would prefer.  But I'd like to sit down with        09:54AM

1   you and with her and go through these issues so that I can

2   singularly focus my attention on them in the series of

3   correspondence if you think that's -- among the ways for me to

4   get an understanding of some of the reporting issues that are

5   raised this is one tunnel into that place.  And if you think        09:54AM

6   that that's an efficient way for me to be engaged in it that,

7   to me, would be the right way to do it so I could have the

8   people who are most knowledgeable about the issue on both sides

9   within earshot of me as I try to understand where the truth

10  lies.                                                               09:54AM

11          MR. STRUCK:  Your Honor, I think that's a good idea.

12  And we would like to have Mr. Pratt or Dr. Taylor involved

13  because they actually are the ones that are doing the

14  monitoring.  So they could maybe answer some of your questions.

15          THE COURT:  I have no objection to that.                    09:55AM

16          Mr. Fathi, you were about to say something.

17          MR. FATHI:  Your Honor, the parties' positions are

18  fully set forth in the correspondence.  We think the Court

19  should rule now.  This is a pure legal matter of what --

20          THE COURT:  Well, this one is, but the others aren't.       09:55AM

21  I mean, the others, to a certain extent you are saying one

22  thing; she's saying another.  Some of it looks like I can think

23  that I understand, but some of them I really can't because it

24  looks like two ships passing in the night a little bit.

25          MR. FATHI:  Your Honor, with all due respect, the next      09:55AM

1   issue involving Performance Measure 77, it's a purely legal

2   question of what does 12 months mean and whether two contacts

3   that are more than a year apart were nevertheless within 12

4   months.  We don't think that requires additional discussion.

5            THE COURT:  I may be remembering the wrong one.  But          09:55AM

6   there seemed to be circumstances where you suggested things

7   like that where it was a matter of law but then it seemed like

8   Ms. Fletcher was saying on the other hand, no you are

9   misunderstanding this.

10           MR. FATHI:  Not on this one, Your Honor.                      09:56AM

11           THE COURT:  But there were others like that, weren't

12   there?

13           MR. FATHI:  I don't believe so, Your Honor.  Again,          09:56AM

14   there have been three letters now, the parties positions are

15   fully set forth.  We last wrote to the defendants about this on      09:56AM

16   October 24th.  They haven't responded.  Again, we think the

17   issues are ripe and the Court should rule today.  But

18   obviously, if the Court prefers to proceed differently, we'll

19   comply.

20           MR. BOJANOWSKI:  Your Honor, I don't want to see the         09:56AM

21   Court making rulings based on a couple of letters here.  I will

22   be honest with you.  I didn't write the letter.  I didn't have

23   the personal contact with the parties to be able to sit here

24   and argue the case with Mr. Fathi at this point.  I think it's

25   more efficient to have the people who are involved make some         09:56AM

1    kind of presentation to the Court telephonically to fully say

2    what do you mean by this or what do you mean by that.

3         So, I mean, you know, these letters are very recent

4    and it's best to proceed if the Court has these concerns with

5    the people who can best address it.                              09:57AM

6         THE COURT:  That's what we'll do.  So I would ask that

7    the counsel who would be involved, I gather that's Ms. Fletcher

8    and anybody else on the defendants' side and Mr. Fathi or

9    anybody on your side, if you would, in the next two days get on

10   the phone with one another, figure out what time works, and     09:57AM

11   then contact Ms. Herrera and we'll do it as quickly as we can.

12   If your schedules are so crowded up on the week and you are not

13   offended by it, I'm perfectly happy to do it in an evening or a

14   Saturday or Sunday as well.  Because it's telephonic, I can

15   record it in other means without imposing upon court staff      09:58AM

16   necessarily.  But I am anxious to get to it quickly.

17        MR. FATHI:  Thank you, Your Honor.

18        THE COURT:  Are there other issues -- let me ask you

19   about this -- to include in this conversation that we're

20   contemplating that go to quality of data?                       09:58AM

21        MR. BOJANOWSKI:  If I may interject, Your Honor, Item

22   Number 3 on the agenda is, I think, the same topic.  This is

23   based upon a couple of letters that have been sent to defense

24   counsel, the most recent of which is November 2nd.  I just sent

25   that off to the client and Corizon to look into the matter.     09:58AM

UNITED STATES DISTRICT COURT

**November 7, 2017 - CV 12-601 - Status Hearing**

1    This is the PM 66 --

2            THE COURT:  Right.

3            MR. BOJANOWSKI:  -- issue.  I think it's probably one

4    of those ones that would also be appropriate, because it is a

5    data source issue.                                              09:59AM

6            THE COURT:  That makes sense to me.  And I honestly

7    have nothing to respond at this time to this, because I have

8    not received data from the client nor Corizon with regard to

9    what is going on with this particular provider at the Florence

10   facility.                                                       09:59AM

11           MS. KENDRICK:  Your Honor, we would just note that we

12   first notified defendants on October 25th about the disturbing

13   pattern of this provider opening these encounters.  And so we

14   think that we could address it today.

15           Another thing is with regard to this issue about        09:59AM

16   needing Ms. Fletcher here to explain defendants' position, she

17   is a Phoenix-based attorney so we don't understand why she

18   couldn't come here this afternoon and we could just postpone

19   this matter until later in the day and come back to it.

20           THE COURT:  Well, I don't know.  As a practical         10:00AM

21   matter, I don't know what her schedule is.  I also am, as I

22   think you are, sensitive to how somebody would feel whose got a

23   bunch of things on their plate to suddenly getting a call you

24   need to be here to talk about all of these issues in a couple

25   of hours, I guess.  I also heard Mr. Bojanowski say that he     10:00AM

1   sent off an inquiry to his client about what could possibly be

2   the explanation here, and he hasn't heard back.  So he doesn't

3   know.  And so as we are here in court today, I agree it would

4   be nice to know, but I don't think there is much more I can do

5   by saying I'm going to hear this in the next week and I'm going        10:00AM

6   to be all over it and understanding what the explanation is.

7   And you know --

8         MS. KENDRICK:  No, I mean, it's just our continual

9   ongoing frustration with defendants' ongoing pattern of

10  continuing dragging things out, kicking cans down the road.            10:01AM

11  This was on the agenda we filed last Friday.  They received

12  these letters, some of them, two weeks ago.  So to

13  disingenuously say they just now sent it to their clients and

14  don't have any answer --

15        THE COURT:  He said he sent it on November 2nd.  So on            10:01AM

16  the one hand, I understand your frustration and in a certain

17  way -- I will let you know, Mr. Struck, I'm totally with the

18  plaintiffs with respect to your agenda item.  I think it's some

19  unbelievable form of chutzpah to be complaining about the

20  letters that the plaintiffs have sent you over time where                10:01AM

21  there's been a very plain demonstration.  You know, you can

22  complain that the plaintiffs don't respond to your letters or

23  that they say things that are frustrating to you but

24  fundamentally, we're only in this room because you have not

25  complied with the stipulation.  So everybody has thrown every          10:01AM

1    arrow they can to try to figure out how to get this.  We have

2    been at this for a long time and getting nowhere.  So the

3    plaintiffs have been writing you about this and you have the

4    chutzpah to say they have been sending us too many letters.

5    Well, solve the problem.  Meet the stipulation.  You won't get          10:02AM

6    these letters.

7           MR. STRUCK:  Your Honor, it has nothing to do with

8    chutzpah, okay.  We are trying to come up with a reasonable way

9    in which to resolve their questions and getting two and three

10   letters a day.  And it's -- the uptick has happened since          10:02AM

11   August.  They are continually sending letters and letters and

12   letters and filing motions and filing motions and filing

13   motions and then turning around complaining about defendants'

14   fees.  We think that they are entitled to answers to the

15   questions, but it needs to be done in a much more reasonable          10:02AM

16   way where, perhaps, we have, like we did with the document

17   production, once a month they provide us with information

18   regarding document production.

19          Right now, there are so many balls in the air, when

20   they come in here and say, oh, well we gave them this letter on          10:03AM

21   November 2nd.  We don't have a response.  They should be

22   responding right now.  Well, we're actually dealing with

23   probably 25 or 30 other requests that they are making.  I

24   understand the Court's frustration with respect to not

25   complying with some of the performance measures, but that is a          10:03AM

1    different issue than how do we proceed and get them the

2    information that they are entitled to in an expedient manner

3    instead of being peppered with letters and e-mails and motions.

4    That's all I'm asking.  It's not about chutzpah.  It's about

5    how do we do this.                                      10:03AM

6         THE COURT:  It is, because I have been around this

7    case long enough to know that there have been wholly

8    unresponsive misses sent over from the defendants to the

9    plaintiffs repeatedly, things that have astounded me.  You have

10   heard me berate your counsel in the case previously about   10:04AM

11   responsiveness, failures to respond.  And so the plaintiffs, I

12   don't think, honestly, are sitting around thing thinking how

13   they can send more letters just because the letter quotient is

14   ticking you off.  What they are doing is they are setting forth

15   in letters what they think they need to do under the terms of   10:04AM

16   the stipulation.  And they are the ones who are supposed to be

17   on this on a daily basis if it's not working.  And you are the

18   ones who need to be on it on a daily basis if it's not working

19   too.

20        And the availability of soldiers to be engaged in this   10:04AM

21   battle, I can just look at the fact that you have a law firm

22   that is larger than the plaintiffs' lawyers.  They have not

23   engaged the other lawyers who have been -- who have made

24   appearances on behalf of plaintiffs so it doesn't appear that

25   there is this secret Army that is also coming against you.  You   10:05AM

1    have essentially the people that you see in front of you in the

2    courtroom here today who are doing this work, and I have the

3    people on defendants' side who number four lawyers presently,

4    and I don't have the lawyer who is actually responsible for

5    much of this engagement.  But I also know that the State of        10:05AM

6    Arizona is represented by the largest law firm in the State of

7    Arizona.

8           So I know that it is somewhat incredulous to accept an

9    argument that you are being beaten to death by these four

10   lawyers over here who are simply sending you letters about        10:05AM

11   issues that they have.  If they want to send those letters and

12   they become abusive, you can talk to me about individual

13   letters just as both sides have done that in the past and I

14   have engaged in that.

15          But a wholesale list of saying the number is too many,     10:06AM

16   I don't think the number is too many.  If I could have full

17   time engagement of the plaintiffs' lawyers on this case, I

18   would be pleased about that.  I understand as a practical

19   reality that they have other cases.  But I also know that this

20   task that I have to try to deliver the promise of a stipulation  10:06AM

21   to the people for whom it matters, the inmates in the prison

22   system who are not getting the healthcare that was promised to

23   them, it can't be my full time job, but I wish it could.  And I

24   have told you I wish I could go live in the prison so that I

25   could understand this better because I'm just so frustrated      10:06AM

1    with getting everything months late and secondhand.  I want to

2    know whether or not what people are telling me is the truth

3    what's happening on the floor, and I'm frustrated I can't get

4    it.

5            So the next best thing that I have is the method of          10:07AM

6    the stipulation, and that is that the stipulation employs the

7    plaintiffs to do this.  And unfortunately, just as I can't

8    devote full time to it, they can't either, but I wish they

9    could.  I wish they could be on this more than they are.

10           And so I'm going to sit down with you all when you          10:07AM

11   tell me that you are available to do it, and I'm going to work

12   through these issues, but I'm not going to give any comfort or

13   support to your complaint that you think that you are getting

14   too many letters.

15           MR. STRUCK:  Again, Your Honor, it's not a complaint        10:07AM

16   with respect to the information they are asking for, it's a

17   request that it be done in a much more regimented fashion as

18   opposed to the shotgun approach that's occurring.

19           THE COURT:  Well, I'm going to leave it to them on how

20   best they need to identify issues, and I will leave it to you      10:08AM

21   to respond to them in a way that seems responsive.  Because

22   understand at the end of the day I'm going to look at the

23   letters.  I'm going to look at the response.  And if it's

24   unresolved, I'm going to decide on that individual issue.  I'm

25   not about creating a funnel that makes it necessarily easier        10:08AM

1    for you to do it because those funnels are further Procrustean

2    restrictions on me being nimble and plaintiffs being nimble in

3    trying to deal with what is a matter of life and death for a

4    lot of people.  And so I'm not interested in that.

5            Okay.  So the last question that I was asking Mr.          10:08AM

6    Bojanowski said that should we also include Number 3 in the

7    discussion about Number 2.  Are there other issues now that you

8    know how I'm going to do this that the plaintiffs think should

9    also be included in that discussion on the agenda?

10           MS. KENDRICK:  Just a minute, Your Honor.                   10:09AM

11           THE COURT:  Surely.

12           MR. FATHI:  Nothing from our side, Your Honor.

13           THE COURT:  So does that take us to Number 4?

14           MR. BOJANOWSKI:  Yes, Your Honor.

15           THE COURT:  All right.  So do we have a remediation         10:09AM

16   proposal from the defendants?

17           MR. BOJANOWSKI:  Your Honor, the remediation plans are

18   part of the document.

19           THE COURT:  The graphs?

20           MR. BOJANOWSKI:  Monthly, on the graphs, yes.               10:09AM

21           THE COURT:  So you have included this?

22           MR. BOJANOWSKI:  Those would be included.

23           THE COURT:  All right.

24           MR. FATHI:  Your Honor, just to note, we -- although

25   it was filed this morning, we have not yet been provided with      10:09AM

November 7, 2017 - CV 12-601 - Status Hearing

1   that document.  We would appreciate that.

2       MR. BOJANOWSKI:  As I explained to Mr. Fathi, I had to

3   wait for them to arrive.  They have arrived.  I will provide

4   them to them so that they can have them as we go through.  I

5   have also got a copy for Your Honor and one for --                10:09AM

6       THE COURT:  I have mine, but you still haven't seen

7   yours?

8       MS. KENDRICK:  Well, it was filed.

9       THE COURT:  But have you read it yet?

10      MS. KENDRICK:  No, Your Honor, because as we were         10:10AM

11  leaving the hotel it was filed.  We haven't been able to read

12  it on our phones yet.

13      THE COURT:  Mr. Bojanowski has a hard copy?

14      MR. BOJANOWSKI:  I do.

15      THE COURT:  We're going to take a break as much time     10:10AM

16  now as you need to take a look at it.  It makes sense for

17  everybody to look at it first.  And so we'll take a break.  Let

18  me know when you are ready for me to come back into court.

19  Okay?

20      MS. KENDRICK:  Thank you.                                 10:10AM

21      THE COURT:  Thank you.

22      (Recess from 10:10 a.m. until 10:38 a.m.)

23      THE COURT:  Thank you.  Please be seated.

24      Let me get my papers situated.  Just a moment, please.

25      First one we need to talk about is Performance Measure   10:38AM

1    11.  And what we have is continued failure with respect to

2    Eyman worse than the previous month, and Lewis really not much

3    different.  And there are these plans that are set forth with

4    respect to how to address it, the supplemental corrective

5    action, which is the date of November 6th, 2017, that the                10:39AM

6    defendants proposed.

7          What portion of this document makes it on to the

8    record?  Is this all filed?  Are these graphs filed, Mr.

9    Bojanowski?

10         MR. BOJANOWSKI:  I'm sorry.                                         10:39AM

11         THE COURT:  I'm sorry.  Is this filed?

12         MR. BOJANOWSKI:  Yes.

13         THE COURT:  All right.  Thank you.

14         MR. BOJANOWSKI:  I have -- the copy I have for you is

15   a copy of the one we filed with the file number on it.                   10:39AM

16         THE COURT:  No.  No.  That's fine.  I have the same

17   thing.  I just sometimes when I see the docket number at the

18   top it doesn't tell me whether there was some reason that it

19   would have been filed under seal or that this is a redacted

20   version.  In the past I have read all of this into the record           10:40AM

21   but if it's on the record, I don't need to do that, and

22   especially because I now know that everybody has had a chance

23   to read them.

24         So I guess the first thing that I should do then is

25   turn to the plaintiffs for their response.                              10:40AM

UNITED STATES DISTRICT COURT

**November 7, 2017 - CV 12-601 - Status Hearing**

1    MS. KENDRICK:  Yes, Your Honor.  As we noted in our

2  proposed agenda Number 6, last month the Court told defendants

3  that you wanted them to have, at this hearing, the person most

4  knowledgeable about the additional steps that had been taken

5  with regard to Performance Measure 11 given the fact that based     10:40AM

6  on the August numbers the remedial plans are not working.

7    So as an initial matter, we hope that defendants have

8  brought somebody who could answer some questions about why

9  Eyman and Lewis continue to be so substantially noncompliant

10  and it should be noted are also part of your order to show         10:41AM

11  cause.

12    THE COURT:  Okay.  So the question that is asked is

13  one that is drawn from the last hearing, the transcript at Page

14  85, you will have somebody available to explain to me what

15  steps have been taken to ascertain whether or not the remedial     10:41AM

16  measure identified at 2374-1 at Pages 4 and 5 for Performance

17  Measure 11 at Eyman, what steps were -- what steps were taken

18  to see whether or not it was providing results close in time to

19  the implementation date of September 15, 2017.  And if that

20  wasn't done, what possible reason for not doing it would exist?    10:42AM

21  Said the same thing with respect to Lewis as well.

22    What do we have?  Who can tell us about that?

23    MR. BOJANOWSKI:  Your Honor, there's been several

24  meetings with representatives from Corizon to work through and

25  identify the problems, part of which is to work to develop this    10:42AM

—— November 7, 2017 - CV 12-601 - Status Hearing ——

1    action plan.  We also internally met with some ADC personnel

2    and the monitors who actually monitor this measure to see if

3    they had some insight on what the potential problem is.  And

4    based upon those meetings, I have been told that the issues

5    with regard to Performance Measure 11 at both facilities boils          10:42AM

6    down to a documentation of the actual delivery of KOP meds to

7    the patients.

8            THE COURT:  Okay.  And I'm trying to understand how

9    that's responsive to the question that I just reiterated from

10   the last time that we were in court, and that is, I wanted to          10:43AM

11   know what steps were -- because you told me the last time that

12   an implementation of a remedial measure was taken that was

13   imposed on the 15th of September.  And I wanted to know what

14   steps were taken close in time after the 15th of December to

15   figure out whether or not it was working.  And if somebody          10:43AM

16   didn't do that, why they didn't do that.

17           MR. BOJANOWSKI:  May I have a moment, Your Honor?

18           THE COURT:  Surely.

19           MR. BOJANOWSKI:  Your Honor, if I understand your

20   question correctly, you want to know what Corizon did?  I          10:45AM

21   mean --

22           THE COURT:  I want -- what I did is you told me when

23   we were in court in October that you had put in place on the

24   15th of September steps to address this failure to comply.

25           MR. BOJANOWSKI:  That would be the plan that's          10:45AM

1    reflected in the non-bolded part.

2          THE COURT:  Right.  I understand.  So then my question

3    is, why are we hearing about this in October without an

4    understanding of what's happened between the time that this was

5    implemented and now?  Because the reporting data that I had         10:46AM

6    obviously didn't include -- didn't include the report for the

7    time period that involved implementation of the September 15th

8    measure.  With me so far?

9          MR. BOJANOWSKI:  Right.

10         THE COURT:  So my problem then was, I had you telling         10:46AM

11   me that we think we have put this in place, this measure on the

12   15th of September, but then I said, well, the real answer here

13   is because we, in October, can't be talking about it, because

14   you don't have the reporting for September.  But what I want to

15   know is what steps are being taken by people to make sure in       10:46AM

16   real time that this requirement in the performance measure is

17   being satisfied?

18         And so then we talked about it over a couple of pages

19   of the transcript.  I first identified the issue that I wanted.

20   I say, all right.  Quote, "All right.  So here's my proposed       10:47AM

21   method to address this.  In fact, I will give you both a chance

22   to comment on it before it becomes an actual order.  But what I

23   would like to hear at the next status conference is I would

24   like to hear what steps the defendants did to ascertain shortly

25   after the implementation of the September 15th plan to see         10:47AM

1    whether or not it was working.  And if they didn't take any

2    steps to find out whether or not it was working in real time,

3    why not?"

4            And then I turned to counsel and counsel have their

5    say.  And then I say, quote, "All right.  So what I'm                10:47AM

6    contemplating, Mr. Bojanowski, just so that you have it

7    squarely up in front of you, is at our next status hearing you

8    will have somebody available to explain to me what steps that

9    were taken to ascertain whether or not the remedial method

10   identified in Document 2374-1 at Page 4 and 5 for Performance     10:48AM

11   Measure 11 at Eyman, what steps were taken to see whether or

12   not it was producing results close in time to the

13   implementation date of September 15, 2017.  And if that was not

14   done, what possible reason for not doing it would exist so that

15   I can better understand it," period, close quote.                    10:48AM

16           MR. BOJANOWSKI:  Your Honor, what we have done is we

17   have met with Corizon to try and develop a system to do some

18   real time reporting.  This is one of the ones that was

19   mentioned earlier that is not yet in place to do real time

20   reporting.  So this is one of the ones we're pushing to get        10:49AM

21   that up and going through some form of a Pentaho report as

22   mentioned before.  But at this time, this one is not in a real

23   time reporting status.

24           THE COURT:  Okay.

25           MR. BOJANOWSKI:  So it's still being, the computer          10:50AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1   program is still being worked on and developed to get software

2   that can actually track this in a real time basis.

3         MS. KENDRICK:  Your Honor, may I say something?

4         THE COURT:  Well, let me just say first, that doesn't

5   answer -- well, that answers a different question.  I feel like   10:50AM

6   I'm on Jeopardy!  Was real time reporting put in place?  That's

7   the question, and the answer just given, no.  But the question

8   that I had asked was, what steps were taken?  It sounds like I

9   can assume from what you have just said that the answer to that

10  question is none.  But then the second question that remained   10:50AM

11  was if not, why not?  Why wouldn't somebody do that?

12        And so I wanted to, I said, so that I could better

13  understand it, I wanted to know why the people who were tasked

14  with doing this didn't find out in real time whether or not it

15  was working, and if they didn't, why not?  And so then I said I   10:51AM

16  would like to have the person here to tell me the answer to

17  those questions.  I said it twice for you.  And then at the

18  end, at Line 11 of Page 86, Mr. Bojanowski -- I asked Mr.

19  Bojanowski, anything you want to say after I have gone through

20  it again?  And you say, quote, "No.  We'll have the information   10:51AM

21  to the Court," period, close quote.  And I say, "All right.

22  Good."

23        And so I'm here today wanting to hear from the person

24  who would answer the question that maybe you do know the answer

25  to also, and that is, why not?  Why wasn't this done?   10:51AM

1          MR. BOJANOWSKI:  It is being done, Your Honor.

2          THE COURT:  No, close in time.  Here we are in

3    November.  I wanted to know why it is when you were telling me

4    a new plan was put in place on September 15th, somebody wasn't

5    checking to see whether or not on September 17th, the two-day      10:52AM

6    requirement was now being met by this measure on the 15th.  And

7    instead, here I am on November 6th saying, well, we have looked

8    into it and we have a new plan.  But that really wasn't where I

9    was solely focused.  I was solely focused on trying to

10   understand why it was that somebody who had come up with a plan    10:52AM

11   wasn't immediately checking to see whether it worked.  It just

12   seemed so natural that that's what you do.  Irrigate the

13   fields, son.  All right, Dad.  So I have turned on the valve.

14   Did you check to see whether the fields got filled with water?

15   No.  Well, why not, young man?  You know, so nobody does that.     10:52AM

16   Nobody doesn't check to see whether or not it works.  And if

17   there was a reason as to why they didn't, I wanted to ask the

18   young man, why didn't you check the field?  And maybe he would

19   say because every time it had worked before.  I would say all

20   right.  That makes sense.  I'd buy that.  But if it's not          10:53AM

21   something had ever worked before I would have to hear another

22   explanation as to why the field wasn't checked when you turned

23   on the valve.  I don't think I'm saying crazy stuff.  So who

24   can we call?  Who can we hear from?

25          MR. BOJANOWSKI:  Do you want someone from Corizon,           10:53AM

1   Your Honor, or someone from ADC?

2          THE COURT:  I want somebody to tell me why it was two

3   days after September 15th it wasn't checked to see whether or

4   not it was working, and if it wasn't checked, why not?  That's

5   what the assignment was.  And you said all right.  I will do          10:53AM

6   that.

7          MR. BOJANOWSKI:  It requires real time monitoring

8   which we are not set up to accomplish at this time.  And that's

9   what we're working toward is to get that real time monitoring

10  so, yes, when we turn the valve on we can see whether the water    10:54AM

11  is there or not.  And that's what we're working on, I mean,

12  from two sides.  We're pressuring Corizon to get that put into

13  place.  We are also looking internally from ADC's side from our

14  monitors to say, well, what are you seeing when you are going

15  out there?  So it's not that we're not doing anything in          10:54AM

16  checking.  We're checking to see what is happening in the field

17  to identify whether the plan is actually taking hold or not.

18  And when we determine that it's not we're looking at what is

19  the cause for this not happening.  And we think, at least from

20  ADC's side, we believe we have found a causative factor with      10:54AM

21  regard to why it is that they are missing this particular

22  measure.

23          And in speaking with Mr. Winland, who testified before

24  you, and he said, look, the medications are getting there.  We

25  know that.  The medications are going to the ICs.  We know        10:55AM

1   that.  The problem is we can't document the KOP medications

2   going to the individual inmates.

3           And so I said to Mr. Winland, Mr. Winland, what would

4   happen if they would properly document or document the KOP meds

5   going to the inmates?  He said this month would have reported      10:55AM

6   93 percent.  Now, we have tentatively done a spot check, real

7   time, of Lewis for the October number and we're coming up with

8   an 87 percent compliance rate for Lewis for the October

9   numbers.

10          So we're not sitting on our hands.  We see that the        10:55AM

11  plan is not working.  I'm trying to identify, well, wait a

12  minute, if that's not working it's got to be something else and

13  find out what that is and let's address that.  So that's the

14  water in the field.

15          THE COURT:  Okay.  Okay.                                   10:56AM

16          MR. BOJANOWSKI:  That's what I'm doing.  And so I

17  think I have identified the problem here in working with Mr.

18  Winland internally because he flat out said, you know, it's not

19  the DOT meds.  They are doing fine on those.  It's documenting

20  that card being handed to that inmate and it going into the      10:56AM

21  medical administration report.  That's what's reported to me.

22          So how do we fix that?  And that's the plan that we're

23  on the ground with the line nurse working on to say, okay, line

24  nurse at Eyman and Lewis going forward, this is what we want

25  you to do in order to make sure that it's documented in the      10:56AM

1    oMAR based upon the meds coming in and it shows up.  So I

2    understand the Court's frustration, but when we see these plans

3    in place we try to give them an opportunity, do they take hold

4    or don't they?  And if they are not taking hold, let's identify

5    that further, dig down deeper, perhaps, and look at other          10:57AM

6    things.  And that's what we did with this measure.  And like I

7    said to the Court, we did a spot check of Lewis the other day.

8    We've got a positive number there.  And as I indicated, you

9    know, according to Mr. Winland, he said that based upon his

10   review, if they would have just had the KOP meds documented     10:57AM

11   appropriately we would be sitting here with a 93 percent.

12         THE COURT:  So the follow-up question is, the Lewis

13   spot check that was put in place after you said you had gone

14   through the process and come up with this plan that was

15   supposed to solve the problem, that would suggest to me that    10:58AM

16   the plan was not in place as of November 6th.  It was actually

17   in place earlier.  So I'd like to know when was the date that

18   this plan that was enumerated here at Page 5 for -- that's for

19   Eyman -- but same one is applicable to Lewis a couple of pages

20   later, what date was that implemented?                          10:58AM

21         MR. BOJANOWSKI:  Page 5.

22         THE COURT:  So that's our court docket number.  It's

23   your Page 4, sorry.

24         MR. BOJANOWSKI:  Okay.  May I have a moment, Your

25   Honor?                                                          10:58AM

1          THE COURT:  Sure.  That's Performance Measure 11 with

2     respect to --

3          MR. BOJANOWSKI:  At Eyman.

4          THE COURT:  At Eyman.  It says Supplemental Corrective

5     Action Plan as of November 6, 2017.  As I read that, that makes        10:58AM

6     me think that's what we've done as of November 6th.  But

7     because you spot checked it before then, this makes me think it

8     was in place before then.  I want to know when it was in place.

9     Well, you didn't spot check Eyman.  You spot checked Lewis.

10    I'm sorry.                                                             10:59AM

11         MR. BOJANOWSKI:  Yeah.  We did Lewis.

12         All right.  So the newest plan that you are looking at

13    is, according to the information I just got, is being put into

14    place now.

15         THE COURT:  So you did something else that we didn't          10:59AM

16    know about or was the -- or was nothing else done other than

17    the September 15th plan?

18         MR. BOJANOWSKI:  The old plan may have been taking

19    hold at Lewis is what's happening.  But we are, you know --

20         THE COURT:  But it sounds like your conversation          10:59AM

21    indicated that the old plan didn't include this component of

22    making sure the kept on person medications were documented when

23    they were dispensed.

24         MR. BOJANOWSKI:  Correct.

25         THE COURT:  So I'm really kind of still confused about      11:00AM

1    whether or not this spot check that you are reporting is after

2    the September 15th change or whether there was some interim

3    change in addition?

4          MR. BOJANOWSKI:  No.  I do need to clarify it was not

5    a spot check.  It was for the full month of October.  So we did          11:00AM

6    look at this.

7          THE COURT:  For Lewis you looked at October?

8          MR. BOJANOWSKI:  Correct.

9          THE COURT:  What you found is that October had -- was

10   meeting the stipulation's requirements.  And was that based          11:00AM

11   upon a plan that was the September 15th plan?

12         MR. BOJANOWSKI:  September 15th plan.

13         THE COURT:  So even without this KOP issue, again,

14   that doesn't seem to make sense because you are telling me that

15   it is saying it's compliant because of this.          11:00AM

16         MR. BOJANOWSKI:  But it's at two different facilities.

17   So it may be working at Lewis but not working at Eyman.

18         THE COURT:  I see.  All right.

19         MR. BOJANOWSKI:  So we're talking about the Eyman

20   problem which is the one that we then looked at in more detail          11:01AM

21   to try and fix this immediately.

22         THE COURT:  Okay.  Anything you would like to say on

23   the plaintiffs' side?

24         MS. KENDRICK:  Oh, yes, Your Honor.

25         First of all, with all of those responses, Mr.          11:01AM

1   Bojanowski did not answer the question about why defendants

2   blew off the Court's order to provide somebody here.  It's nice

3   that he shared with us what Mr. Winland has to say but it would

4   have been helpful if Mr. Winland was there.  I would also note

5   the Court had ordered him to similarly provide people                    11:01AM

6   knowledgeable similarly for Performance Measures 35, 46, 50,

7   and 51, so I certainly hope when we get to those measures those

8   people will be here.

9          The next thing is that the Court found defendants

10  noncompliant with Performance Measure 11 on May 20 of 2016.  We    11:01AM

11  are now a year -- more than a year and a half past that, and

12  it's beyond absurd that we have one remedial plan after

13  another.  Often times the excuse is that, trust us, everything

14  is being done.  We're just not writing it down, which, I'm

15  sorry, that does not count as credit.                                    11:02AM

16         With regard to the KOP medications, our understanding

17  from the past is that the KOP medications are taken to

18  prisoners by custody staff at some prisons, so we don't know if

19  that might be part of it.  But we suggest that defendants and

20  Corizon explore who the individuals are who are handing out the    11:02AM

21  keep-on-person medications.

22         We also asked at the October hearing who these

23  inventory control nurses are, what level of staffing they are,

24  whether they are certified nursing assistants, LPNs, or

25  registered nurses.  Mr. Bojanowski last month could not answer     11:02AM

1     that question.  We would just note that according to their

2     September staffing report at Eyman they are only at 80 percent

3     staffing for certified nursing assistants and 91 percent

4     staffing for licensed practical nurses.

5           Finally, Mr. Bojanowski keeps saying that they don't          11:03AM

6     have real time data and they have no way of tracking this.  I

7     would just direct the Court's attention to the remedial plan at

8     the bottom of, I guess, which is Page 5 on the Court docket.

9     We don't have that stamp, but Page 4 in the corner, Number 9

10    states that the lead inventory control will run Pentaho reports    11:03AM

11    daily to conform compliance.

12          So if defendants are presenting this as the remedial

13    plan that has been put into place, we don't understand how you

14    can square Mr. Bojanowski's avowals here that they are

15    incapable of getting any real time data when they are telling     11:03AM

16    the Court in this filing that they are checking real time data.

17          THE COURT:  Mr. Bojanowski, is there any reason to

18    doubt that as of the 6th of November the operative date of this

19    remedial plan that these daily Pentaho reports will not produce

20    the information that we need?  I apologize for the double          11:04AM

21    negative there.  But is there any reason -- to restate it -- is

22    there any reason to think that the -- any reason for us to have

23    any doubt that the Pentaho reports will be able to, as of

24    today, provide this information?

25          MR. BOJANOWSKI:  I can't really answer to what the           11:04AM

━━━━━━ November 7, 2017 - CV 12-601 - Status Hearing ━━━━━━

1    scope of the Pentaho report is that they are running there.  As

2    far as --

3              THE COURT:  I'm sorry to interrupt.  It says as of the

4    6th of November, lead inventory control will run Pentaho

5    reports daily to confirm compliance.                    11:04AM

6              MR. BOJANOWSKI:  Right.

7              THE COURT:  So the question is, is that going to

8    happen today?

9              MR. BOJANOWSKI:  Yes.

10             THE COURT:  And will it work?                  11:05AM

11             MR. BOJANOWSKI:  As with any plan -- oh, you are

12   talking about will the report work?

13             THE COURT:  Yes, this Pentaho.  Will this happen

14   today?

15             MR. BOJANOWSKI:  Yes.                          11:05AM

16             THE COURT:  Will there be -- says a daily report.  Is

17   this going to happen today?

18             MR. BOJANOWSKI:  Well, I don't want to misrepresent

19   that it's going to happen today.

20             THE COURT:  You just did.  You already did.  Let me   11:05AM

21   make this clear to you, Mr. Bojanowski.  You misrepresented to

22   the Court because you told me that as of November 6, 2017,

23   daily reports to confirm compliance.  You then turned back and

24   you asked the Corizon counsel.  He -- I can't hear what he says

25   but it looks like he says, I don't know.  Then you come back to   11:05AM

1   me and say I can't misrepresent to the Court.  Well, you did.

2   You told me that it would work and you don't have any idea

3   whether it's going to work or not.  This has got to stop.  You

4   need to be in control of your client.  You need to be in

5   control of what your client's obligations are, and you cannot      11:06AM

6   tell me things that are represented as true.  Anybody would

7   read this and would think that as of November 6th, 2017, that

8   the following will happen:  Lead inventory control will run

9   Pentaho reports daily to confirm compliance.  So I asked a

10  simple question, is that going to happen today?  And you tell      11:06AM

11  me I don't know.  And I'm flabbergasted.

12           MR. BOJANOWSKI:  Your Honor, I'm flabbergasted, too,

13  because that was given to me by Corizon.  So I said, all right.

14  This is our plan starting today?  Fine.  That's our plan to

15  start today.  Now, this plan gets then distributed out to all     11:06AM

16  of the locations that are subject to that plan.  You are asking

17  me if a Pentaho report is being run today.  I cannot answer

18  that question.  That is the plan that it is to be run today.

19  Okay.  But I can't say to you, it is actually being run today.

20  And so I'm -- I don't want to misrepresent to the Court it is     11:07AM

21  actually happening.  The plan is being put into place today.

22  It may take a day or two for it to get going, but the plan is

23  to be put in place today.

24           So that is what I'm trying to communicate to the

25  Court.  Perhaps I'm not as eloquent as I should be.  But what     11:07AM

1    I'm trying to say is, look, the plan is going to be put in

2    place today.  Sometimes it takes some time for that actually

3    to, you know, start.  Somebody's got to push the button to

4    generate the report.  So I'm not trying to misrepresent to the

5    Court.                                                              11:07AM

6           MS. KENDRICK:  Well, that goes completely against what

7    you just said 10 minutes earlier about how they are making all

8    these reports and they have to design things.  And you put this

9    in a writing filed with the Court as a representation.  So it

10   is kind of troubling and hard for plaintiffs to believe that    11:07AM

11   Numbers 1 through 8 or 9B are happening on Performance Measure

12   11 if you sit here and say, yeah, we filed this at 8:00 this

13   morning but it could take a few days.  We could be here until

14   next week going through all of these if we have to parse every

15   single item and say, Mr. Bojanowski, is this really happening?  11:08AM

16          And I think that's the point.  It's not about being

17   eloquent or saying things.  It's just that you are filing

18   things with the Court that plaintiffs have no confidence in.

19   And your oral statements contradict what's written.  It

20   contradicts what's been said before.  And that's why we're left  11:08AM

21   with a giant mess.  That's why we're left writing you a lot of

22   letters because what are we supposed to do with this?

23          THE COURT:  Well, I know --

24          MS. KENDRICK:  I apologize, Your Honor.  I'm sorry.

25          THE COURT:  That's all right.  I just -- no, it's my     11:08AM

1   turn.

2          When I was a lawyer, I was always sensitive to the

3   idea that I was representing somebody.  And I guess I don't

4   understand how somebody turns away from the Court and talks to

5   somebody else when the Court's addressing them.  I guess it's          11:09AM

6   just a different world now, Mr. Bojanowski.  I know that when I

7   was a lawyer, for me to turn aside when the Court was talking

8   to me --

9          MR. BOJANOWSKI:  I apologize, Your Honor.

10         THE COURT:  It was plain on the record.  Everybody            11:09AM

11  knew I was talking to you.  And I guess that's all part of it.

12  But I knew that when I was representing clients, that I

13  couldn't be the person who was the most knowledgeable because I

14  wasn't the client.  But I also knew it was my word.  It was not

15  the client who would be coming around again to that judge.  It            11:09AM

16  would be me.  And I was really careful and really sensitive to

17  the idea that everything I said I had run to the ground before

18  and that I was very careful about not overstating and also

19  making sure that I went back to my client and did everything

20  that I could do to verify that I had reduced the risk to as            11:10AM

21  close to zero as I possibly could that I was saying that

22  something that I didn't know was true.

23         And so I have raised this with you before, and I

24  understand and appreciate that this is an enormous task and

25  it's very difficult for a person to have the kind of command of            11:10AM

1  all of the facts.  But when you get into this trouble that we

2  have talked about before, and that is the one where you make a

3  statement to the Court and it turns out not to be true, that

4  maybe suggests that a method needs to be designed to make sure

5  that you don't get into that again.  And maybe that means that      11:11AM

6  too much responsibility is on someone's shoulders more than can

7  humanly be done by a single person, and that maybe there needs

8  to be a division of responsibility.  We have all, as lawyers,

9  seen that in our practices where we work on cases and we think

10  that the lawyer that we're working with could be doing a better     11:11AM

11  job if they would just allocate or divide up the

12  responsibility.

13        But in any event, the bottom line here is that the

14  frustration that Ms. Kendrick expresses is my frustration,

15  because I need to know, since I can't be the one making sure        11:11AM

16  and watching myself what's happening with respect to the

17  proposed method to fix this problem that requires these daily

18  reports, I can't know whether they are going to be generated or

19  not.  But I need to know that the person who is telling me it's

20  happening is on top of it and is checking and is putting the        11:12AM

21  stakes on the line of his or her personal reputation in a frank

22  way to the client letting them know that I have put my word out

23  on this, and that means that you have to be telling me

24  absolutely everything that is true.  And if it's not, and if

25  you find out that that's not the case, whether it's a               11:12AM

1    contractor, whether it's Corizon, whether it's ADC, doesn't

2    matter.  It's all your -- it's all the defendants' side.  And

3    you need to figure out a way in this mechanism of having a

4    contractor to make sure that your obligation as a lawyer is

5    being satisfied in this courtroom.  And I am respectful of the          11:12AM

6    efforts that counsel make in this case, but I also think that I

7    don't have to go very far to look for examples that demonstrate

8    to me that something is happening here that's not right,

9    something that I would never have ever contemplated when I was

10   a lawyer.          11:13AM

11          The idea that the transcript that I could -- that I

12   read to you, that was the order of the Court that I gave you

13   last month about what should be available to me here today,

14   made it clear that without leave of Court, you couldn't not

15   have somebody here explaining this to me who -- I mean, if I          11:13AM

16   needed the lawyer's explanation I would have said that.  But I

17   didn't.  I said I wanted to have the person here telling me why

18   they decided not to do this.  You are not the decider, I don't

19   think.  You are the lawyer.  And so I don't have anybody here.

20          And so that's a warning sign to me when there's an          11:13AM

21   order of the Court that's not complied with.  We have just

22   examined one here.  And that makes me think what else is going

23   on where we have issued orders and acted on reliance on that

24   and it's not occurred.

25          And so I describe what as I say an alien world to me.          11:14AM

*November 7, 2017 - CV 12-601 - Status Hearing*

1    It's one I don't understand.  I'm going to hold on to my

2    earlier world because that is how judges have been doing it

3    since the country was founded.  And that, you know, I had a

4    small glimpse of that for my years of practice.  And I think

5    that it's not unreasonable to hold people to the standard that    11:14AM

6    when they say something to the Court that they are, A, sure

7    it's true; and B, just to make sure that it's true, they are

8    going to check before they say it.  They are going to double

9    check before they say it to the Court.  And if they are going

10   to give us something that's going to be implemented as of        11:14AM

11   November 6th, and they are not going to have a chance to say

12   whether it's going to be done daily or not, then they are going

13   to tell me that, saying we'll verify that this is being done on

14   a daily basis, not say to me that they will run reports daily

15   to confirm compliance.                                           11:15AM

16           So that's a long time talking about it.  I don't need

17   to hear any response further about it.

18           I'm going to, with respect to Performance Measure 11,

19   hope that the report from the spot check at one facility will

20   be produced in the final official report and hope that it's      11:15AM

21   also matched for the other failing performance measure.

22           But moving on, Performance Measure 12.  Plaintiffs.

23           MS. KENDRICK:  Yes, Your Honor.  We just note that

24   actually, the statement there talks about the fact that in

25   October Eyman was down one assistant director of nursing who     11:16AM

1    was out on leave and that she has since returned and that

2    another assistant director of nursing or ADON was hired and

3    will start work on November 15th.  And with the addition of

4    this ADON Eyman will have four of them.  Again, Eyman is a

5    facility with five units within it, so that means there's still

6    going to be one unit that doesn't have an assistant director of

7    nursing.  So it's unclear whatever that unit is who will be

8    checking compliance.

9            The other thing is that, again, our -- we only have

10   the September staffing report from defendants.  They haven't

11   provided the October one yet.  But it showed that at Eyman in

12   September there were five contracted assistant nursing

13   supervisor positions and only three were filled.  So we

14   certainly hope that this will improve, but first of all we

15   don't know what date this person returned, but we don't know if

16   October is going to be any better since it sounds like they

17   only had three people tasked with this.

18           THE COURT:  And to drill down on just a small point of

19   what you said, and that is the staffing report, I don't

20   remember exactly what I said last month, but this came up and

21   you raised the fact that you hadn't had the previous month's

22   staffing report.  And then I talked to defense counsel and they

23   said they would get that to you.  So you got that, I gather,

24   but you still, here we are on the 7th of November, and you

25   don't have October.  Why is that?

**November 7, 2017 - CV 12-601 - Status Hearing**

1          MR. BOJANOWSKI:  I don't have it.  It has not been

2     sent to me yet.

3          THE COURT:  I see.

4          MR. BOJANOWSKI:  As soon as I receive that report I

5     turn around and send it out.                                      11:17AM

6          THE COURT:  When is the report generated?  Do you

7     know?  Can you see from the report when it is generated?  The

8     previous months, do they inform you about that?

9          MR. BOJANOWSKI:  It's usually about the 10th of the

10    month.  This month's hearing is a little ahead of the curve, so  11:18AM

11    to speak so --

12          MS. KENDRICK:  Well, Your Honor, there's no date on

13    the September one that they provided to us.  But I would just

14    note as we noted in our response to their motion for

15    reconsideration, ADC is not a passive vessel that just sits     11:18AM

16    helplessly waiting for Corizon to deign to send them reports.

17    It clearly states in the contract that Corizon has to provide

18    reports immediately to defendants upon request.  And so there's

19    no reason why ADC cannot request that their vendor provide them

20    these reports in a timely manner prior to the hearing so that   11:18AM

21    both the Court and plaintiffs' counsel have the most current

22    information.

23          So, you know, I understand and last month Ms. Rand

24    said the same thing as Mr. Bojanowski that they just wait and

25    see whenever Corizon might deign to send it to them.  But they  11:18AM

UNITED STATES DISTRICT COURT

1    are the master in this contract, and they do have the ability

2    to tell the person, or the company that they are paying over

3    $11 million a month, could you please get us a report within a

4    few days so the judge and plaintiffs' counsel have more current

5    information.                                                          11:19AM

6         THE COURT:  Okay.  Well, going forward, because it was

7    helpful to have these staffing reports, and again, trying to

8    reduce all the lags where I can, what we'll do is we'll order

9    that the State provide staffing reports for the previous month

10   at least 48 hours in advance of our monthly meeting if -- and    11:19AM

11   if the monthly meeting is not by the 15th of a given month, by

12   the 15th of that month, whichever is earlier, unless there's

13   some demonstrated cause and that cause can be set forth by the

14   defendants in a written notice of the Court which would seek

15   leave from that order.  But that would be helpful going           11:20AM

16   forward.

17        THE COURT:  Now, should I turn to the next performance

18   measure that is at issue, or are there others that appear to be

19   satisfactory that the plaintiffs would like to discuss?

20        MS. KENDRICK:  No, sir.                                      11:20AM

21        THE COURT:  What's the next one you would like to

22   address?

23        MS. KENDRICK:  Performance Measure 15.

24        THE COURT:  15.  Okay.

25        MS. KENDRICK:  Were you going to say something?              11:21AM

1          THE COURT:  You can just let me catch up just a

2   second.  All right.

3          (Discussion off the record.)

4          THE COURT:  Yes.  Thank you.  Go ahead, Ms. Kendrick.

5          MS. KENDRICK:  Well, there's not much to say on                      11:21AM

6   Performance Measure 15 because there's been no change in the

7   plan that was previously offered as the corrective action plan.

8   But you know, 58 percent compliance at Eyman, 63 percent at

9   Lewis is troubling again.  Also, just as a note, again, last

10  month we pointed out that the stipulation defines what a QHCP       11:21AM

11  is for purposes of this performance measure and it's not a

12  provider.  It's a qualified healthcare professional, which is

13  defined more broadly than what is a provider, which is a term

14  of art for a medical doctor, a nurse practitioner, or

15  physician's assistant.  And Mr. Bojanowski said that they would    11:22AM

16  make this change.

17          So again, I will reiterate and say the same thing I

18  said last month, which is if this Corrective Action Plan is

19  putting all of the burden on these providers to do this, then

20  that is a problem because, A, they don't have adequate numbers    11:22AM

21  of providers.  That's why Mr. Millar is going to be providing a

22  report to the Court.  But they're obviously not paying

23  attention to what the stipulation says and who could do this.

24          THE COURT:  And what is the method of turning the

25  corner on Performance Measure 15 at these facilities, Mr.          11:22AM

November 7, 2017 - CV 12-601 - Status Hearing

1    Bojanowski?  Is there anything -- do you have any sense that

2    what you have talked about before, the October 6 correction

3    plan, is going to produce anything?

4            MR. BOJANOWSKI:  Well, we think it will be because we

5    are trending upward.  We went from a 36 percent to a 58                    11:23AM

6    percent.  But I'm checking with Mr. Pratt right now about the

7    definition and how the monitors are actually looking at that

8    whether they are counting just providers or does it include

9    others as Ms. Kendrick has identified.  So if I may have a

10   moment.                                                                     11:23AM

11           THE COURT:  Surely.  Please.

12           MR. BOJANOWSKI:  We're going to double-check on this

13   one to see.  If this is one where, as Ms. Kendrick suggests,

14   only providers are being counted, then that's incorrect and we

15   would have to relook at this and see if, in fact, the monitors    11:23AM

16   are not counting the other professionals that can do the

17   counseling.

18           MS. KENDRICK:  I wasn't suggesting about the

19   monitoring.  My comment was with regards to the remedial plan

20   which is burdening -- appears to be burdening providers.  But      11:24AM

21   also note that this document at the top of Page 37, it says

22   that Corizon is developing a remedial plan that's going to be

23   effectuated on or before November 15th.

24           So today is the 7th, so to the extent there's any

25   update about the status of this plan, because also on the          11:24AM

1    previous page it says Corizon shall develop and implement a new

2    procedure for the administration of medication, and then on the

3    next page says that this will be developed and effectuated on

4    or before November 15th.  So that's eight days away.

5                MR. BOJANOWSKI:  Correct.                          11:24AM

6                THE COURT:  So do you have a sense about something

7    new, different?

8                MR. BOJANOWSKI:  No.  I think that's this plan.

9                THE COURT:  Okay.  All right.

10               The plaintiffs, in their agenda, have asked if you    11:25AM

11   could let them know about Performance Measure 19 with respect

12   to Eyman, Lewis, Perryville, Phoenix, and Tucson because that's

13   pending mediation and they would like to know before they go

14   into the mediation how things are looking with respect to

15   September.  Do you happen to have that handy?                  11:25AM

16               MR. BOJANOWSKI:  For what facilities?

17               THE COURT:  For Eyman, Lewis, Perryville, Phoenix, and

18   Tucson.

19               MR. BOJANOWSKI:  Eyman is at 72; Lewis, 51;

20   Perryville, 89.  I'm sorry.  What was the other one, Your       11:25AM

21   Honor?

22               THE COURT:  Phoenix and Tucson.

23               MR. BOJANOWSKI:  Phoenix, 90; Tucson, 88.

24               THE COURT:  Thank you.  Is the next performance

25   measure plaintiffs believe should be addressed 24?             11:26AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1           MS. KENDRICK:  Yes, sir.

2           THE COURT:  So we have a supplemental information that

3    the 63 compliance rate for Lewis is based in part because of

4    the, quote, "bag tags" which demonstrate checking emergency

5    medical response bags daily, and they were not changed, that      11:26AM

6    this resulted in the ADC monitors not giving credit for

7    compliance with PM 24.  Also in one instance the clavicle

8    splint was not replaced but the remainder of the emergency

9    response bag was compliant.

10          So you think that this is reflected just in September      11:26AM

11   but also this analysis reflects what happened in August as

12   well?

13          MR. BOJANOWSKI:  I'm checking, Your Honor.

14          THE COURT:  I'm just trying to decide if it's a

15   two-off.                                                          11:27AM

16          MR. BOJANOWSKI:  Same problem.

17          THE COURT:  Anything from plaintiffs on that?

18          MS. KENDRICK:  No, sir.

19          THE COURT:  All right.  Can you elucidate about

20   Performance Measure 27 with respect to Tucson where it says      11:27AM

21   currently under review by ADC monitoring program?

22          MR. BOJANOWSKI:  We are checking the attendance at the

23   CQI meeting, so we don't know at this time whether that's

24   everybody who is supposed to attend attended the meeting.  So

25   that one is still being reviewed.                                 11:28AM

1          THE COURT:  The problem is the minutes are missing

2     or --

3          MR. BOJANOWSKI:  No.  No.  No.  We're checking to see

4     who was there, because it's an interdisciplinary meeting and so

5     there has to be a person from each of the disciplines.  And so          11:28AM

6     we're checking to see if all of those people were present at

7     the meeting.  If they are then it's 100 percent.  If they are

8     not --

9          THE COURT:  Huh.  I guess --

10         MR. BOJANOWSKI:  Hold on, Your Honor.  I get          11:28AM

11    information on the fly here.  Ms. Campbell with our office did

12    confirm last night that it was fully attended, so it would be

13    reported as 100 percent.

14         THE COURT:  Okay.  I guess this is a kind of thing

15    that you sort of wonder when it was working through the process          11:28AM

16    that has so many steps, steps that I have expressed frustration

17    because they mean that I am talking November about September

18    and you just sort of wonder why it is that the monitoring steps

19    didn't address this early on, that if there is an issue with

20    respect to that meet-and-confer that occurs with Corizon how it          11:29AM

21    is that this wouldn't have been addressed and resolved earlier.

22    See my question there why I'm asking that?

23         MR. BOJANOWSKI:  Yes.  Sometimes when, well, like when

24    we get the preliminary results we'll have discussions with

25    Corizon and they then say, well, wait a minute, there was, like          11:29AM

1    in this instance, they may say, well, there was a person there

2    and this is who that person was.  And the monitor may not have

3    picked up on the fact that that person was the person who was

4    supposed to be there.

5           And so, you know, with different measures it really is    11:29AM

6    kind of we're working with a preliminary number here.  And so

7    because there's still factors that can come into play,

8    sometimes, like here, where the preliminary numbers I first got

9    them on the 2nd and then we're trying to gather the info and

10   confirm as best we can all of those numbers system-wide.  So in    11:30AM

11   this instance, unfortunately, there was an issue raised with

12   regard to who attended that meeting, and so we wanted to go

13   back and double check it and make sure.  And we did that and

14   apparently last night it was confirmed by Ms. Campbell that, in

15   fact, everybody attended who needed to attend.  So I didn't    11:30AM

16   want to put a report in that, you know.

17          THE COURT:  So when the CGARs are -- is there a time

18   that this chain of decision making, this revelation, will be

19   reported in the CGARs so that it's transparent so that

20   everybody can understand?  This is obviously an issue that's    11:30AM

21   been raised before with respect to whether or not the

22   meet-and-confer gets documented and if some things change is it

23   documented as to why it changed.  Is this kind of after the

24   report destination also documented someplace in the CGAR?

25          MR. BOJANOWSKI:  I will have to check that, Your    11:31AM

1    Honor.

2         THE COURT:  Mr. Pratt, if you don't mind, here's what

3    my question is.  You know, I say I want to go live in the

4    prison.  I kind of also want to go live and sleep in the

5    offices where the monitors are to watch what's going on because   11:31AM

6    I really am trying to understand this.  Because it just seems

7    to me there are two issues:  One is why wouldn't the process

8    earlier on catch and identify and correct, as you tell me it

9    did here, much earlier where there is an indication that Yuma

10   failed -- not Yuma, that -- forget it -- that this one complex   11:32AM

11   failed because it didn't have the right person there.  So that

12   raises a question in my mind.  Why wouldn't that be identified

13   earlier?

14        And then it raises the subsequent question, which is

15   if it gets corrected, is that in a way that's removed from the   11:32AM

16   monitoring process?  It sounds like it because it sounds like

17   it was after the lawyers got involved and they were inquiring.

18   I want to understand how that decision making is documented

19   because it's different than what the monitors had first

20   determined the people who were charged with this               11:32AM

21   responsibility, I don't want them to get the idea -- well,

22   there are all sorts of bad things I could think about

23   collateral effects.  But I guess I want to understand the

24   process better that how it is things are changed and if it is

25   changed, is it documented in a way that everybody can see how   11:33AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    it is that something that was originally reported as being not

2    compliant ends up being compliant?  Please.

3              MR. PRATT:  The 10th business day after the month

4    results are in -- these are all preliminary findings for

5    September.  So there is a potential that if Corizon notices          11:33AM

6    something and they say, wait a minute, we can go back at that

7    point.  So these September results are not official, Judge.

8              THE COURT:  I understand.

9              MR. PRATT:  But they will be after the 10th business

10   day, and that's when the final goes in.                              11:33AM

11             Now, if there are changes between these prelims then

12   that information is just entered into the official CGAR by the

13   15th, typically by the 15th, the 10th business day.

14             Now, if there's something that changes after the 15th

15   after these are official, nothing is changed in the CGAR itself      11:34AM

16   but there's an addendum added to that performance measure for

17   that month if it's prior history.  We don't take out old stuff

18   and put in new.  We'll add an addendum to that to show what

19   changes may have taken effect or what has taken place.

20             THE COURT:  So did I understand you to say that this        11:34AM

21   preliminary number, if changed, there isn't an addendum done or

22   there is?

23             MR. PRATT:  No.  There's no addendum done.  If we find

24   an error that we made then we will go in and correct that error

25   for the record, for the official final document.                     11:34AM

1          THE COURT:  Well, but the meet-and-confer on September

2   has already happened between Corizon and the monitors, right?

3          MR. PRATT:  Corizon has received the September

4   information at this point.

5          THE COURT:  I'm using meet-and-confer as a lawyer kind          11:34AM

6   of term.

7          MR. PRATT:  Okay.

8          THE COURT:  But we heard testimony about what happens

9   is if the monitors see issues Corizon has a chance to see those

10  issues and to give feedback to the monitors to say, oh, you          11:35AM

11  have missed something here.  This one is compliant because of

12  this.

13          MR. PRATT:  Yes, sir.

14          THE COURT:  That's already happened with respect to

15  these.                                                               11:35AM

16          MR. PRATT:  That's the informal rebuttal.

17          THE COURT:  Right, the informal rebuttal.

18          MR. PRATT:  Yes.

19          THE COURT:  That already happened with respect to

20  this.  I'm wondering why the informal rebuttal didn't correct          11:35AM

21  something like this.

22          MR. PRATT:  It may not have taken place before the end

23  of the month.

24          THE COURT:  I see.  I understand.

25          MR. PRATT:  And the monitors will do their performance          11:35AM

UNITED STATES DISTRICT COURT

1    measures at different times during the month, Your Honor.  So I

2    don't know when this one was completed.  And once they are

3    completed they are given to Corizon for review.

4            THE COURT:  Okay.  Thank you.

5            MR. PRATT:  Okay.                                        11:35AM

6            THE COURT:  Anything you wanted to add, Ms. Kendrick?

7            MS. KENDRICK:  Just a couple things with regard to

8    what Mr. Pratt said.  And we did the briefing on the monitoring

9    methodology.  We pointed out that there was this lack of a

10   paper trail when the rebuttal process, both the informal        11:36AM

11   rebuttal process at the institution level and the one that Ms.

12   Campbell testified about that happens in the first 10 days.

13   And so our understanding had been that there was going to be a

14   system where all changes made by people other than the monitor

15   would show up as an addendum and not that only after the 15th   11:36AM

16   day there would be an addendum made.  Because that means when

17   we're looking at the CGARs we have no idea of knowing what the

18   original preliminary number was unless it was shared with us at

19   court.  So that's kind of a global issue not really related to

20   these two performance measures.                                 11:36AM

21           Just an observation.  I'm not sure why defendants

22   chose not to include Performance Measures 27 and 29 in this

23   filing because you have never found them noncompliant with

24   those performance measures.  So, okay, this was useful what we

25   learned from Mr. Pratt.                                         11:37AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1      THE COURT:  So you are looking a gift horse in the

2   mouth is what you are doing.

3      MS. KENDRICK:  Well, this was very illuminating but

4   somewhat off the tangent of looking at the noncompliant ones.

5      THE COURT:  Mr. Pratt, regarding the monitoring guide,   11:37AM

6   with respect to this issue of when changes are made, Ms.

7   Kendrick said that she thought there was an understanding that

8   if there were changes made anywhere in the process that that

9   would be documented.  And it sounds like that's not your

10  understanding of it.  And so I'm wondering, why wouldn't it   11:37AM

11  make sense that just like if you see a doctor and they chart

12  something and then the patient sees it and says that's not

13  right, the doctor doesn't go through and X out what was wrong,

14  they do an addendum and they say what I wrote before was wrong.

15  This is right so there's always a clear explanation of how data  11:37AM

16  is entered.  Why wouldn't that be a better way to do it?

17      MR. PRATT:  It may be, Your Honor.  But when we're

18  talking about the informal or the unofficial document, we're

19  not making a line-out and correction.  For instance, you have

20  got an incorrect inmate number.  We wouldn't go in and scratch  11:38AM

21  out the wrong number and put in the right number, we would

22  simply go in and put in the right number.

23      THE COURT:  What about the informal rebuttal.  If in

24  the informal rebuttal Corizon comes back with something and

25  says you had the wrong chart linked up with this inmate, so you  11:38AM

1   were wrong in terms of your assessment that this was not in

2   compliance and that the monitor said, oh, you are right.  We

3   made that mistake.  That wouldn't be recorded, would it?

4           MR. PRATT:  If it was in the initial findings, in the

5   preliminary findings before the 15th, if we found our error we   11:38AM

6   would go in and simply correct the record at that point.  But

7   if it's, as I said, if it's in the official record after the

8   10th business day, then we would simply go in and make an

9   addendum showing all of the old information and any new

10  information as far as corrections or anything that was changed.   11:39AM

11          THE COURT:  So it sounds like I have sort of looked at

12  this issue in the past but never really made a decision about

13  it with respect to whether or not any interim changes in what

14  the monitors first found should be reflected in the CGAR

15  record.  Is that fair to say?   11:39AM

16          MR. PRATT:  That's my understanding, yes, sir.

17          THE COURT:  Thank you.

18          MS. KENDRICK:  Again, we would just reiterate that

19  it's very troubling that Defendant Pratt has basically admitted

20  here that there is no paper trail when these adjustments are   11:39AM

21  made from what we see when they are provided to us and to the

22  Court.

23          THE COURT:  Well, in the preliminary status we have

24  now made that crystal clear that there is no paper trail.  But

25  after they are no longer in preliminary status, after the 10th   11:40AM

1    business day of the month, then they all are reflected in an

2    addendum.  Whether that needs to be changed is, I think, now an

3    issue that's squared up in front of me.

4            MS. KENDRICK:  Yes.  And the testimony and the

5    briefing that we did in June about the monitoring methodology          11:40AM

6    pointed out that this informal rebuttal process seemed to only

7    go one way to win the benefits inured to Corizon versus Corizon

8    pointing out, oh, actually, you gave us credit for something

9    where we were actually noncompliant.  So it's a bit of a

10   one-way street as well.                                                11:40AM

11           THE COURT:  Okay.  The next measure that plaintiffs

12   wanted to address is, please.

13           MS. KENDRICK:  Number 35, Your Honor.  We would just

14   note that your order to show cause that you issued last month

15   does cover Eyman, Florence, Lewis, and Tucson.  There appears          11:40AM

16   to be no change to the remedial plans despite the fact that

17   Eyman and -- Eyman at least looks to be noncompliant and

18   Florence, Eyman at 78 and Florence at 67.  And Your Honor had

19   ordered them to provide somebody who could come and provide

20   testimony to you about the additional steps taken to adjust the        11:41AM

21   remedial plans, and that was at Page 96 of the October hearing.

22   And it does not appear that we have a person here to provide

23   information nor is there any written addendum.

24           MR. BOJANOWSKI:  Your Honor, Mr. Pratt is here to

25   speak to 35 if there are questions.  But I can certainly say           11:41AM

1    that this performance measure is trending upward across the

2    board due to the significant changes in plans that have been

3    put into place.  We have now had two facilities come into

4    compliance that were previously out of compliance.  So

5    therefore, eight out of the 10 facilities are in compliance and       11:42AM

6    the remaining two are trending upwards.  The ADC has hired a

7    statewide transportation coordinator and has now implemented

8    DI-361 which sets forth procedures for transportation effective

9    October 31st, 2017.

10           So we believe that the plan that's put into place,            11:42AM

11   together with the transportation coordinator and the director's

12   instruction, are probably going to get this one into

13   compliance.  If the Court needs additional information Mr.

14   Pratt is available to speak to that.

15           THE COURT:  So in the past you have said that the            11:42AM

16   problem is largely one of coordination of what looks to be the

17   transportation side of things not so much of the healthcare,

18   not so much the people involved at Corizon, more so the

19   transportation people who would be making sure that this -- and

20   also the new custody control officers at the facilities.  And       11:43AM

21   so it sounds like what you are saying is what happened at the

22   end of October is specifically designed to address this

23   previously identified area of problem.  Is that fair?

24           MR. BOJANOWSKI:  That's fair.  The DI-361 is an inmate

25   medication transfer process specific to this.  So it's a            11:43AM

1    directive from the director's office laying out essentially a

2    procedure to be followed for these transportations.

3            THE COURT:  And don't you think it would be a good

4    idea for you to let us all have a copy of that so that we could

5    see it.                                                              11:44AM

6            MR. BOJANOWSKI:  It's available on line, I believe.

7    But if you want my copy --

8            THE COURT:  I just know that in other cases where you

9    are doing new remedial plans and this is the critical failure

10   component, you tell me, and it happens you don't tell me what    11:44AM

11   it is you are doing, it hamstrings me going forward to say,

12   well, you said you were going to do this on this day.  I would

13   like to know exactly what you are putting in place on the 31st

14   and so I would ask you to file that.

15           And then the next question I have is attendant to the    11:44AM

16   question that I asked last month with respect to this

17   performance measure as well, and that is since you have now

18   told me it's in place on the 31st of October, without sort of

19   beating a dead horse about why we didn't look at this earlier,

20   we're now on the 7th of November, what steps have you taken to   11:44AM

21   see if things are any better on the 1st, 2nd, 3rd, 4th, 5th,

22   and 6th of November?

23           MR. BOJANOWSKI:  Mr. Pratt is here to address the

24   questions.

25           THE COURT:  Thank you.                                   11:45AM

1          MR. PRATT:  Your Honor, this is a collaboration

2   between Corizon and operations in doing this.  And what we have

3   set up is daily meetings with the wardens to get feedback from

4   Corizon and their staff exactly as to how this is working each

5   day.  And they are recognizing if there are failures, and there      11:45AM

6   have been a few failures at certain points, but they are

7   following it daily to see what has to be done to fix those

8   issues.  But they are meeting on a daily basis at each

9   facility.

10          THE COURT:  And how close is this analysis?  Are you      11:45AM

11   looking at every single one of the inmates who are transferred

12   on a given day to see whether or not they are meeting

13   Performance Measure 35?

14          MR. PRATT:  Yes, sir.

15          THE COURT:  So for the first six days of this month      11:45AM

16   it's true to say that somebody has looked at every single one

17   of the transfers and knows every single one that met it and

18   every single one that didn't meet it?

19          MR. PRATT:  Yes.

20          THE COURT:  And that's going to continue for how long?      11:46AM

21          MR. PRATT:  Until we get it right.

22          THE COURT:  All right.  Anything plaintiffs wanted to

23   add?

24          MS. KENDRICK:  Just an observation that it would have

25   been helpful if they amended this filing to add that      11:46AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1  information and let us and the Court know about DI-361 because

2  we're not mind readers who are trolling the ADC website for

3  fun.  So we can't comment on this new instruction until we have

4  had a chance to look at it and review it.

5  THE COURT:  Right.  Well, you know, I can sort of cut       11:46AM

6  that down a little bit by saying that when we talked about the

7  graphs as being a method of trying to be the central place that

8  we could all turn to from month to month to see what was said

9  on month A and then we can look in month B to see what was said

10  in month A and have it all in front of us, what we have talked    11:47AM

11  about before is keeping everything here an adding it on.  And

12  it would seem to be natural as part of that that if you were

13  going to have a remedial plan that involved this directive that

14  was having specific procedures in place that were designed to

15  meet the demonstrated failure of this performance measure, you   11:47AM

16  would have included that.

17  So I guess this is another learning moment.  If you

18  are going to have parts of the plan that are addressing that

19  performance measure, put it in the graph so that we all have

20  it.  I mean, is there any good reason why we shouldn't do that,  11:47AM

21  Mr. Bojanowski?

22  MR. BOJANOWSKI:  Well, no good reason to include it.

23  THE COURT:  I'm sorry, no good reason to what?

24  Include or not include?

25  MR. BOJANOWSKI:  To not include it.  I would be more     11:47AM

1    than happy to include it.  I just received it.  It just became

2    effective on the 31st of October.  So I just received it and so

3    it's something that is --

4         THE COURT:  You received it this morning after you

5    filed the graph?                                              11:48AM

6         MR. BOJANOWSKI:  I received it yesterday.

7         THE COURT:  All right.  So I guess I'm thinking to me

8    if I received this thing that's -- just so you know how I would

9    look at it, if I wanted to give everybody this graph thing in

10   35 and I receive this detailed plan about how we're going to     11:48AM

11   address what I have told the Court in the past is the big

12   problem here with these transportation issues, I would have

13   thought the most important thing for me to do is to get that

14   into the graph so that I can show the Court in concrete terms

15   what we have done.  And it just -- I'm saying going forward it    11:48AM

16   would be helpful to --

17        MR. BOJANOWSKI:  It's why I brought it with me today,

18   Your Honor, so if the Court wanted to look at it.  But it's a

19   policy.  It's not really a remedial plan.  It's a policy.  So

20   we'll certainly put it in with the plan and reference it.  And   11:49AM

21   I intend to do that.

22        THE COURT:  So which is it?  I have got -- I'm

23   standing because I have a problem with my back.

24        Which is it?  Is it a policy or is it a remedial plan?

25   I don't understand the distinction there, because I think you    11:49AM

1   have told me that this thing on the 31st of October is the way

2   that we're going to solve this problem, and then you say, no,

3   it's not really a plan.  It's just a policy.  How do I -- don't

4   interrupt me -- how do I know the difference between the common

5   understanding that I embrace of what policy and implementation     11:49AM

6   plan, which is none, is operative in your head which somehow

7   they are different?

8           So let's stop now and understand, this directive, is

9   this part of the remedial plan that you are saying to the Court

10  is something I can rely on, or is this something other than      11:49AM

11  that?

12          MR. BOJANOWSKI:  Mr. Pratt.

13          MR. PRATT:  Your Honor, the policy is memorialization

14  of the plan, and we have adapted that plan as our current

15  policy.                                                          11:50AM

16          THE COURT:  All right.  So to say it again back to

17  you, you have seen the graphs and you see that there are these

18  bolded plans that are sometimes attached to the failing

19  remedial measures in which, for instance, let me see,

20  Supplemental Corrective Action Plan as of November 6, 2017, so  11:50AM

21  that was used as an introduction language to them, some

22  bulleted items about what was going to be done.

23          So is it fair for me to think that the policy that was

24  adopted on the 31st should be included within a supplemental

25  Corrective Action Plan as of the 31st of October 2017 with      11:50AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1   respect to Performance Measure 35 at this facility?

2           MR. PRATT:  Yes, sir, it should.

3           THE COURT:  All right.  Thank you.

4           MR. BOJANOWSKI:  It is on line and available now just

5   in case, but if the Court wants to look at this right now I'd          11:51AM

6   be more than happy.

7           THE COURT:  No, I think we have addressed it.  I am

8   just saying as part of us learning how best to use the graphs

9   this is the best way to do it.

10          MR. BOJANOWSKI:  Certainly.  And I apologize, Your          11:51AM

11  Honor.  I wish I would have included it already but I brought

12  it with me for the Court's perusal if it wanted to look at it.

13          THE COURT:  All right.  Thank you.

14          MS. KENDRICK:  Your Honor, can we go back to something

15  we were discussing just a little while ago about the rebuttals          11:51AM

16  and the addendum?

17          THE COURT:  Yes.

18          MS. KENDRICK:  At Docket 2068, which was defendants'

19  response filed May 22nd to our brief on the methodology, at

20  Page 17, Line 19, defendants write, quote, "Plaintiffs are          11:51AM

21  critical that the changes are made under the name of the

22  monitor who entered the original finding and show the entry

23  date of the original finding rather than the entry date of the

24  changed finding," citing to our filing Docket 2046 at 32.  They

25  go on, quote, "Defendants have adjusted this practice and are          11:52AM

1    now making the change in an addendum following the original

2    finding to clearly show that the information has been changed

3    following the original submission.  This change will be

4    reflected in the March 2017 CGAR report."

5            So it sounds from what Mr. Pratt said that this is not    11:52AM

6    true.

7            THE COURT:  It does sound that way.  Let me give the

8    defendants an opportunity to take a look, or do you know

9    already off the top of your head a response, Mr. Pratt?

10           MR. PRATT:  Your Honor, this is for the official    11:52AM

11   document not for the preliminary results.

12           THE COURT:  Okay.  Any reason to think that what you

13   said is beyond the official document?

14           MS. KENDRICK:  The citation to our filing was our

15   criticism about the fact that the individual monitors would do    11:53AM

16   their finding and submit it and then up at headquarters, Ms.

17   Campbell and other people would go back and change the finding

18   and it would look as if that monitor had made the change and

19   not headquarters.  And so their response was to say that there

20   would be a clearly indicated addendum.  So it has nothing to do    11:53AM

21   about within 10 business days or the like.  That was their

22   response to our concern that the people at ADC headquarters

23   were changing what the on-the-ground monitors were submitting.

24   And their response was that they had adjusted the practice so

25   that when changes are made an addendum following the original    11:53AM

———— November 7, 2017 - CV 12-601 - Status Hearing ————

1    finding to show that the information has been changed following

2    the original submission.

3           THE COURT:  Well, thank you for that citation.  I will

4    take a look at this issue again and issue an order with respect

5    to whether or not it is necessary for the application of the          11:53AM

6    stipulation to work effectively for these kinds of addenda to

7    be included within the record and any changes to be included in

8    a transparent way.  Thank you.

9           And then the next performance measure the plaintiffs

10   would like to address?                                                11:54AM

11          MS. KENDRICK:  So Performance Measure 40, actually,

12   Your Honor, this was in our proposed agenda at Number 7A, where

13   we had noted last month that we found it extremely troubling

14   that in August the Lewis institution that has more than 5000

15   prisoners had no urgent referrals to be audited.  And Mr.            11:54AM

16   Bojanowski had said that ADC was looking into it and would

17   possibly do a re-audit.  So we had first requested an update as

18   noted in the footnote, the comparably-sized institutions had

19   anywhere between 8 and 33 urgent provider referrals in the

20   month of August.                                                      11:55AM

21          And then according to this filing that defendants

22   provided, it shows that again for Performance Measure 40 at

23   Lewis, there were no urgent referrals made.  And so, again, we

24   hope that they have an update for us with regard to August and

25   an explanation as to September.                                       11:55AM

1          THE COURT:  Okay.

2          MR. BOJANOWSKI:  Your Honor, we did an investigation

3     on this, and we found that what was occurring is that because

4     of the open clinic concept inmates were immediately being seen

5     by a provider without a referral.  So what would end up          11:56AM

6     happening is that the nurse was not documenting a urgent

7     referral.  When the inmate would show up and need urgent care

8     they would just take the inmate over to the provider and they

9     would be seen right away.  And so without that referral

10    documentation in the eOMIS, the monitor can't, you know, as a    11:56AM

11    source document, they need that referral.  And without the

12    referral documentation being present, it would appear as though

13    nothing was happening when, in fact, it was.

14         So what we're doing is re-instructing the nursing

15    staff at that facility not to do that so that if there's a       11:56AM

16    person who is in need of an urgent referral, they need to make

17    the urgent referral into eOMIS and then have the inmate go over

18    to be seen.

19         THE COURT:  Forgive me if I'm missing something here.

20    But the performance measure, this is our urgent provider         11:57AM

21    referrals being seen by a medical provider within 24 hours of

22    the referral.  And so what you have described is a possible

23    explanation of this, but it seems to me that it's hard for me

24    to understand why it is that the compliance team wouldn't see

25    in the medical record that somebody who came in in the open      11:57AM

1    clinic was then seen by a provider within 24 hours of that

2    time, why that wouldn't be satisfactory.  Are they looking for

3    just a referral order and then the date of that and looking no

4    farther?  Is that what's happening?

5          MR. BOJANOWSKI:  I will have Mr. Pratt address that                11:57AM

6    issue.

7          MR. PRATT:  Your Honor, it goes to the source document

8    and they do look for referrals.  And that's what they would

9    work off of.  And if the nurse doesn't document it as a

10   referral to a provider what that requires is two sets of                 11:58AM

11   documentation.  First, the nurse has to refer it to the

12   provider and then that's closed out.  Then the provider has to

13   open up a new encounter to show that he's seeing the patient at

14   that time as opposed to one documentation where the nurse is

15   dealing with this and handing it off to the provider.  So it's           11:58AM

16   the source document that shows referrals that we work off of

17   then to work off the timing on those documents.

18         THE COURT:  Is there any possibility that Mr.

19   Bojanowski's description of how they are going to fix this will

20   create a disincentive for the intake nurses at open clinic to           11:58AM

21   make these immediate referrals in effect?

22         MR. PRATT:  Yes, Your Honor.  But it's the only way

23   we're going to be able to actually document it, which is the

24   way that it's done at the other facilities as well.  It's a

25   local educational thing for the Lewis staff to do it, so they           11:59AM

1    are doing it consistently across the state.  I understand it

2    has a disincentive.  It's more work to have to document it and

3    turn around and reopen it and do it again.  But that's what

4    we're going to have to do.

5           THE COURT:  Maybe there's something that is right to          11:59AM

6    do with respect to the parties discussing the possibility of

7    modifying this performance measure so that it is asking a

8    different question that would satisfy the plaintiffs' concerns

9    about this that wouldn't obstruct with their concerns across

10   the board.  But this hasn't been a problem.  I don't know.  But   11:59AM

11   again, I just raise it as something to be concerned about where

12   we have at a very large facility we have people making

13   decisions about what they think is an emergent situation

14   causing them to act quickly, and we're saying oh, but our rules

15   say you can't do what seems like the really right and smart      11:59AM

16   thing to do here because it gets us into trouble when we report

17   this.

18           Any comment from the plaintiffs' side on this?

19           MS. KENDRICK:  Two points, Your Honor.  First of all,

20   we have been raising our concerns about the fact that using as   12:00PM

21   the source documents going off of the open clinics and the

22   people who only submitted an HNR and actually were seen impacts

23   the reliability of the source information for multiple

24   performance measures this is an illustration of it.

25           THE COURT:  Is it really, though?  Doesn't seem like      12:00PM

1    it's the HNR problem.  It seems like it's the independent

2    action of the intake nurse who is saying I happen to know that

3    the provider is over here.  I can get you over to the provider

4    right away.

5            MS. KENDRICK:  Right.  So it's only the people who          12:00PM

6    have come in and seen the nurse that are then referred to the

7    provider so that if you are not seen by the nurse, you are not

8    referred to the provider.

9            THE COURT:  Right.

10           MS. KENDRICK:  That's the point.  So again, you know,       12:00PM

11   we had the testimony about the people who have been turned away

12   or the people who give up and leave, so they wouldn't be

13   included.  So again, that's kind of an underlying theme, as you

14   will, to it.

15           The other thing is Lewis has, I believe, eight            12:01PM

16   separate units, eight clinics, and while it would be fantastic

17   if this is true that the providers are right there in the room

18   or at the clinic with the nurses and able to see a person so

19   quickly that we don't even have to check the box on the form,

20   there are staffing reports, again, that show yet again a month    12:01PM

21   where Lewis has no medical director.  There are only one of 2.5

22   staff physicians, and they have five nurse practitioners.  So

23   it's a little unclear with a total of six providers how they

24   are ensuring this amazing coverage of the clinics where

25   everybody is just getting instantaneously seen.  I certainly     12:01PM

1    hope that that is the case, but I'm a little suspicious of it,

2    of that representation as being why there's no documentation of

3    urgent referrals happening.  Because it just doesn't seem that

4    there's enough bodies of providers there to ensure this 100

5    percent coverage and immediate response.                        12:02PM

6            THE COURT:  It does seem unlikely.  All right.  Okay.

7    Thank you.

8            All right.  Let's take the break.  We'll be back at

9    1:15.  Thank you.

10           (Recess from 12:02 p.m. until 1:19 p.m.)             12:02PM

11           THE COURT:  In the noontime ruminations of which we

12   were just talking about with respect to the difficulty where

13   the intake nurse is not making a documentation of the referal

14   that happens on an expedited place in this one place, there was

15   an idea that emerged that maybe this is just not a stipulation  01:19PM

16   modification issue but more an eOMIS notification issue, that

17   it would seem that there would be something that if this had

18   happened it could be reflected in the medical record pretty

19   easily.  So I just raise that, again, trying to think broadly

20   about possible solutions.                                       01:20PM

21           So I think we're at 42.  And 42, according to what we

22   heard in October, is that Corizon would develop and effectuate

23   a new policy and procedure on or before November 1, 2017.  It

24   doesn't seem to be reflected in the graphs.  I guess I would

25   turn to hear what that new policy is.                           01:20PM

1           MR. BOJANOWSKI:  It's the plan that was put into place

2    that we reported on in October.

3           THE COURT:  Okay.  So it's the one that's --

4           MR. BOJANOWSKI:  It's the one --

5           THE COURT:  -- set forth there.                        01:21PM

6           MR. BOJANOWSKI:  Correct.

7           THE COURT:  Okay.  Thank you.  And then it became

8    operational on the 1st of November or --

9           MR. BOJANOWSKI:  Correct.  It is operational now.

10          THE COURT:  All right.  So is what was written in      01:21PM

11   October, did that turn out to be true, that it was on or before

12   November 1?  It was at November 1?  When exactly was it?

13          MR. BOJANOWSKI:  On November 1.

14          THE COURT:  Okay.  And what kind of oversight is

15   occurring with respect to the daily steps that are enumerated  01:22PM

16   in this plan to see that since it started on the 1st of

17   November that's actually happening?

18          MR. BOJANOWSKI:  Are you saying by ADC, Your Honor?

19          THE COURT:  Well, actually, in the paragraph on the

20   top of your Page 97, it looks to me like this is               01:22PM

21   responsibilities of Corizon people.  I just want to know, it

22   says, for example, at Number 3, on a daily basis, the appointed

23   employee shall utilize eOMIS to generate an appointment list

24   for that particular day; 4, on a daily basis an appointed

25   employee shall review the appointment list and confirm that all 01:23PM

1   follow-ups are set to occur timely.  I'm just wondering who is

2   binding to make sure these things are happening now after the

3   1st of November?

4          MR. BOJANOWSKI:  May I have a moment, Your Honor?

5          THE COURT:  Surely.                                          01:23PM

6          MR. BOJANOWSKI:  I don't have information on that at

7   this point, Your Honor.  We could check with some people at ADC

8   to see if somebody has checked on this yet.

9          THE COURT:  Well, I think that's a good idea.  Thank

10  you.                                                                01:23PM

11         Ms. Kendrick.

12         MS. KENDRICK:  Just, so you are not able to identify

13  who this quote appointed employee is that's doing the

14  monitoring?

15         MR. BOJANOWSKI:  No, I think the Court was asking            01:24PM

16  about --

17         THE COURT:  Well, no, I mean, that's a separate

18  question.  And that's a fair question.  Says, on a daily basis

19  an appointed employee shall review the appointment list.  Do we

20  know, is that a single person who is kind of in a supervisory     01:24PM

21  role, or is that somebody who is among new employees who is

22  just given this task?  So it's kind of ambiguous, so I think

23  this is a separate question if I can jump in on top of Ms.

24  Kendrick.

25         MR. BOJANOWSKI:  It would be a Corizon supervisory          01:24PM

November 7, 2017 - CV 12-601 - Status Hearing

1    employee.

2         THE COURT:  Anything else?

3         MS. KENDRICK:  So yeah, the remedial plan that they

4    have talked about Eyman and Florence and them implementing on

5    November 1st, and last month, defendants were unable to say          01:24PM

6    when it would be implemented at Lewis and Perryville prisons,

7    and while Lewis just hit 85 percent and Perryville hit 90

8    percent in September, they were noncompliant before.  So we

9    just want to know whether it was November 1st as well for those

10   two institutions.                                                     01:25PM

11        THE COURT:  Do you know, Mr. Bojanowski?  Was this

12   plan also put in place there then?

13        MR. BOJANOWSKI:  That's my understanding, Your Honor.

14        THE COURT:  All right.

15        MS. KENDRICK:  The final thing, Your Honor, is we have          01:25PM

16   requested, and you had ordered, defendants to provide copies of

17   all policies and training materials that were created for

18   training the nursing staff.  And also Mr. Bojanowski was going

19   to provide an update on the status of the employee training.

20   So I just want to confirm everybody's been trained and when         01:25PM

21   they will produce the policies and training materials.

22        THE COURT:  Well, the last paragraph of the October

23   6th remediation plan says, additionally, prior to the effective

24   date, all Corizon providers shall be trained by site leadership

25   on the new policy and procedure.  So the two questions that are      01:25PM

November 7, 2017 - CV 12-601 - Status Hearing

1    on the floor now are, first, did this happen by the effective

2    date; and second, when can the training materials that were

3    provided to the employees be provided to the plaintiffs

4    counsel?

5          MR. BOJANOWSKI:  That is my understanding.  As far as          01:26PM

6    the documents are concerned, may I have a moment, Your Honor?

7          THE COURT:  Surely.

8          MR. BOJANOWSKI:  Your Honor, we have made the request

9    for the documents from Corizon and have not yet received them.

10         THE COURT:  Would you follow up and file something          01:26PM

11   with the Court in seven days indicating they have been produced

12   to the plaintiffs or why they haven't been?

13         MR. BOJANOWSKI:  Yes, Your Honor.

14         THE COURT:  Thank you.  Anything further on 42?

15         MS. KENDRICK:  No, sir.          01:26PM

16         MR. BOJANOWSKI:  Your Honor, just for purposes of the

17   record, there are training materials on several other measures,

18   so the same response is going to apply.  We'll get all the

19   measures in one.  I think there's four, three or four, there's

20   four that have a training material document request.  And so I          01:27PM

21   think instead of talking about those individually, I will just

22   collectively say that's what we'll do.

23         THE COURT:  That amalgamation is happily accepted.  So

24   with respect to all the training materials that haven't been

25   produced yet, you will produce those to the plaintiffs within          01:27PM

 1   seven days and/or file a notice with respect to any that

 2   weren't so produced as to why.

 3         Which performance measure would you like to turn to

 4   next?

 5         MS. KENDRICK:  46, Your Honor.                          01:28PM

 6         THE COURT:  Okay.

 7         MS. KENDRICK:  Oh.  Actually, Your Honor, to go back

 8   to 45.

 9         THE COURT:  All right.

10         MS. KENDRICK:  At Yuma, last month they were           01:28PM

11   noncompliant and Mr. Bojanowski said that ADC was investigating

12   the causes of noncompliance there in the remedial plan.  And so

13   I don't know if you guys got an answer on that.

14         THE COURT:  Do you have any update on what happened in

15   August in Yuma?                                              01:28PM

16         MR. BOJANOWSKI:  May I have a moment, Your Honor?

17         THE COURT:  Surely.

18         MR. BOJANOWSKI:  I simply don't have that information,

19   Your Honor, and I don't want to hazard a guess.

20         THE COURT:  Okay.  Would you please look into that     01:29PM

21   and provide a notice to the Court in seven days as to what was

22   the cause of the dropoff in August at Yuma with respect to

23   Performance Measure 45?

24         MR. BOJANOWSKI:  Yes, Your Honor.

25         THE COURT:  So we're now back to 46.                   01:29PM

1        MS. KENDRICK:  Yes, sir.

2        THE COURT:  And I see that the Corrective Action Plan

3   identified there, I guess the question that is always on my

4   mind today is what's going on with respect to making sure that

5   this is on a real time basis addressing this problem?  I gather        01:29PM

6   as of November 6th, the provider was reviewing the to do list

7   every day.  And so great, the review lists were reviewed, but

8   does that mean that what was on the to do list gets done?

9        MR. BOJANOWSKI:  I can't say what is happening

10  immediately.  What I can report to the Court is that our                01:30PM

11  investigation of the issues at Florence indicated that this is

12  a problem of the medical providers charting in a timely basis.

13  One of the suggestions, and the suggestion that we made to fix

14  this, is to add a drop-down box in eOMIS so that there's not an

15  opportunity to improperly note the file.                               01:30PM

16        So what the provider has to do is he has to report or

17  take action on a report when he sees an abnormal value and has

18  to put that in eOMIS.  And so the basic problem that we found

19  is that they are not adequately identifying the action that

20  they are taking with regard to an abnormal report.                     01:31PM

21        So in order to prevent that from occurring, the idea

22  would be in the notes section to add a drop-down box in eOMIS

23  which would then identify certain things that they could

24  essentially click on and say, all right, I have scheduled this

25  guy for an appointment, or I want to send him out for another         01:31PM

1    test or something along those lines so that the acted upon

2    portion is appropriately responded to instead of in the note

3    section the doctor says, I reviewed it.  So he reviews it but

4    he takes no action on it.  So it's not -- so the monitors are

5    finding noncompliance based upon the inadequacy of the notes.          01:32PM

6         We did find that the labs were reviewed but just

7    simply they are not documenting it appropriately.  And we're

8    trying to put things into the computer system to essentially

9    force that to happen.

10        THE COURT:  I gather what's happening in the other           01:32PM

11   facilities is that --

12        MR. BOJANOWSKI:  They are doing it correctly.

13        THE COURT:  Well, they are doing it correctly, but I'm

14   somewhat puzzled by understanding the suggested explanation of

15   what's gone wrong in Florence because it's not just the review        01:32PM

16   it's acting upon, and it would seem to me that the acting upon

17   would be pretty evident in the medical record.  You either had

18   it or you didn't.  You did or you didn't do it.  And so it's

19   just one of those things that doesn't seem like a drop box is

20   going to solve the problem.  But I have not obviously dealt on        01:33PM

21   a day-to-day basis with this performance measure and how its

22   possibly reviewed.  Maybe plaintiffs have greater insight on

23   this one.

24        MS. KENDRICK:  No, Your Honor.  Unfortunately, we

25   don't understand why they are unable to document what they are       01:33PM

1   ostensibly doing if they are doing it.  We certainly hope that

2   they will.

3           And I guess it's unclear from the filing whether this

4   is the cause of the problem at all of the institutions that are

5   noncompliant which, besides Eyman and Florence, I guess Lewis          01:33PM

6   is at 85.

7           THE COURT:  Tucson is --

8           MS. KENDRICK:  Tucson at 83 and Winslow at 80.  So

9   it's unclear whether that's the same cause for all of those

10  institutions as well.                                                   01:34PM

11          MR. BOJANOWSKI:  I can have Mr. Pratt.

12          THE COURT:  That would be helpful.

13          MR. BOJANOWSKI:  I don't want to hog the mic.

14          THE COURT:  Thank you.

15          MR. PRATT:  Hopefully I can help, Your Honor.                   01:34PM

16          THE COURT:  Thank you.

17          MR. PRATT:  I was a provider at one time.  So I will

18  tell you there's two parts to this performance measure:  One is

19  reviewing; one is acting upon.  And there are many times when I

20  was a provider that I would see, for instance, an elevated             01:34PM

21  diabetic level on a patient, which may be the norm for that

22  patient and he's under current medication.  It seems while it's

23  controlled, it's still out of normal.  And I would never

24  personally document anything that said I'm not going to do

25  anything with this, I'm just going to watch it.  I would simply        01:34PM

1    do that.  I would review the note and wait for the next

2    scheduled appointment to follow this guy again.

3            So it wasn't my history or my habit to go in and

4    document an action taken on every abnormal lab.  That's

5    something that's required in this performance measure which we       01:35PM

6    agreed to in the stipulation, I understand.  But that's a

7    little bit difficult for some providers who didn't do that

8    historically and they have to go in and document an action

9    taken for everybody abnormal lab.

10           THE COURT:  So you wouldn't really document that you       01:35PM

11   were just going to watch it and see, you wouldn't -- abnormal

12   result recognized, but it may not be of significance but we'll

13   watch it and see.  You wouldn't document that normally?

14           MR. PRATT:  I wouldn't go to the extent of saying I'm

15   just going to watch this.                                          01:35PM

16           THE COURT:  So there would be nothing anybody could

17   look in your note and see if you had taken any action.  When

18   you had taken action you decided we're going to take no

19   objection.  So that's a purposeful thing, because you have told

20   me that you think right now we can just wait on this.              01:36PM

21           MR. PRATT:  Yes.  It would be my endorsement on the

22   lab that I actually reviewed it.  So I'm responsible for what's

23   in that lab.  But without going into great detail on, I mean,

24   if this patient was scheduled for routine follow-ups it is

25   something I would simply follow on a regular visit.                01:36PM

1          THE COURT:  What would you think would be the right

2    method to try to bring these non-performing facilities into

3    compliance?

4          MR. PRATT:  Well, that's the eOMIS, the drop-down they

5    are talking about.                                          01:36PM

6          THE COURT:  What would the drop box action say?

7          MR. PRATT:  It's going to say action taken.

8          THE COURT:  So it will say you have to tell us what

9    the action is, and if it's, in fact, no action, I have decided

10   to take no action now.                                      01:36PM

11         MR. PRATT:  Yes, sir.

12         THE COURT:  I see.  Thank you.

13         MR. PRATT:  Uh-huh.

14         THE COURT:  Anything from plaintiffs additionally on

15   46?                                                         01:36PM

16         MS. KENDRICK:  Just, Your Honor, we would note that as

17   our expert Dr. Wilcox has pointed out before it's a basic tenet

18   of medical training that you do contemporaneous documentation

19   of the actions you are taking and the kind of theme is not

20   documented, not done.  And there's no way for a subsequent    01:37PM

21   provider to know what, if any, actions were taken.  So we think

22   this is a critically important performance measure and

23   certainly hope that having something that forces the provider

24   to document what action she or he is taking or if they are not

25   taking action why they are not taking action will improve.   01:37PM

1          THE COURT:  I gather that's why it's one of the

2    performance measures that was included in the stipulation.

3          MS. KENDRICK:  Yes, sir.

4          THE COURT:  Okay.  47, I gather.

5          MS. KENDRICK:  Yeah.  I see couple things.  First of          01:37PM

6    all, we are incredibly alarmed by the fact that it seems at

7    most -- many of the institutions, the performance has actually

8    gone down since this new system of having the providers print

9    out these communiques.  And defendants were going to provide an

10   update about this, including whether the facility health          01:38PM

11   administrators were clarified about the process, and they had

12   said they would provide exemplars.  And I actually brought some

13   exemplars of these communiques that were sent to me by a

14   prisoner.  I was wondering if I could share it with you.

15         MR. BOJANOWSKI:  I actually brought them as well.          01:38PM

16         MS. KENDRICK:  Maybe we should look at both of them.

17         THE COURT:  Take a look together and see if they are

18   the same.

19         MR. BOJANOWSKI:  Mine is just smaller print, so it's

20   okay.  So one box checked there and one box is checked there.          01:38PM

21   It's the same thing.

22         THE COURT:  It's like synchronized swimming.  Very

23   nice.  Thank you.

24         MS. KENDRICK:  So, Your Honor, what I provided you and

25   the clerks copies of is two examples of notifications that a          01:39PM

1    class member sent to my office recently.  The handwritten

2    questions that are written there were written by the class

3    member.  But, you know, this illustrates the point that I think

4    Ms. Eidenbach raised a couple months ago and that we have in

5    the past where there's not much information.  It just says, for          01:39PM

6    example, one of them it says normal results.  And as our client

7    wrote, what results are normal, question mark?  Because it

8    doesn't explain what it's referring to.

9            And then on the other one it just says you are going

10   to be seen and you are going to be reviewed, but again, it               01:40PM

11   doesn't tell him what's going to be discussed or when it would

12   be discussed.

13           So I think this kind of illustrates the concerns that

14   Ms. Eidenbach articulated either last month or two months ago

15   based on what she had been hearing from prisoners when she was           01:40PM

16   talking to them at Perryville.

17           THE COURT:  So this, these exemplars, the one provided

18   by the State is dated 9-15 and 9-19-2017.  And what we see is

19   an example of method that presumably was in place starting when

20   and where?  It's at Phoenix, right, Mr. Bojanowski, what you             01:40PM

21   gave?

22           MR. BOJANOWSKI:  I'm sorry, Your Honor.  I didn't

23   follow your question.

24           THE COURT:  You are talking about a document that was

25   for ASPC Phoenix Alhambra.                                               01:41PM

1          MR. BOJANOWSKI:  Correct.  And one for ASPC Yuma at

2    Cheyenne.

3          THE COURT:  Right.  And those are dated the 15th of

4    September and the 19th of September respectively?

5          MR. BOJANOWSKI:  Correct.                            01:41PM

6          THE COURT:  And when did this method of communication

7    go in place at those two facilities?

8          MR. BOJANOWSKI:  I don't have that information, Your

9    Honor.  Obviously assuming it was sometime prior to that.

10         THE COURT:  Well, I have got a couple of questions.    01:42PM

11   The first is wondering whether -- because I don't have the

12   answer -- so I am left wondering how much of September in these

13   facilities that are not meeting this compliance measure was

14   such a method of communication used?  And we really -- is it

15   fair to say we don't know?                                  01:42PM

16         MR. BOJANOWSKI:  Well, I can report to you that in

17   September, between the 1st and 30th, there were 8,937 such

18   communiques that were sent.  So I can't report to you anything

19   about August, but in the 30 days of September that was the

20   total number of these such communiques that were sent.       01:43PM

21         THE COURT:  Okay.

22         MR. BOJANOWSKI:  Now, the measure is not looking at

23   this communique, though, okay.  So the measure is if an inmate

24   requests the diagnostic study within seven calendar days are

25   they provided that information?  So that request comes in     01:43PM

1   through an HNR, okay.  What the communique is, is an attempt to

2   provide information to the inmates so they know, are the lab

3   results normal or abnormal?  And with that information, it cuts

4   down on the number of HNRs being submitted by inmates who are

5   wondering, well, I wonder what my lab test results were.                01:43PM

6          Now, the reason why there's not more information in

7   the communique is because for security purposes and protected

8   health information purposes, we don't put more information into

9   it.  In other words, if there is a patient who is being treated

10  for an STD or AIDS or Hep C or whatever it may be, they have no   01:44PM

11  way -- that inmate has no way of securing that document from

12  being obtained potentially by other inmates.  And per policy,

13  ADC policy, inmates are not provided their actual medical

14  records.  So this is a method by which we can at least give

15  them some information to help them out and then if they decide   01:44PM

16  to follow up and say, well, I want to talk to the doctor

17  anyway, they submit the HNR to get additional information.

18         But that's the nature of the communique and why that

19  was put into place.  And the information I have received is

20  yes, in fact, it has cut down on the number of HNRs by inmates   01:45PM

21  seeking just a lab test result.

22         THE COURT:  Ms. Kendrick.

23         MS. KENDRICK:  Well, if there's not many HNRs it's

24  unclear why they are incapable of answering them and achieving

25  compliance.                                                      01:45PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    THE COURT:  Hold on.  Are you saying we don't know

2  whether or not what facilities and when this communique was

3  started.  We know that 8,937 of them were issued in the month

4  of September.

5    MS. KENDRICK:  Well, actually, Your Honor, the                01:45PM

6  commentary's a little different on each one.  But I think all

7  of them say eOMIS was upgraded in late June.  And then on the

8  Lewis one, which is at Page 123, its says at least there the

9  providers were trained on the change on how to do things on

10  August 9, 2017.                                                 01:46PM

11    So the month of August they achieved 43 percent when

12  theoretically three of the weeks they should have known to do

13  this.  And then in September it went down to 34 percent.  So I

14  don't know if that August 9th applies to everything but that's

15  one place that has a date.                                      01:46PM

16    But I guess the point being if Mr. Bojanowski keeps

17  saying the reason the numbers look bad is because there's just

18  a few number of HNRs that are submitted each month, and

19  therefore, if one is off they have a low compliance level, if

20  they have four or five HNRs a month asking for the results,     01:46PM

21  it's unclear why they are not capable of printing out the

22  response within seven days.

23    MR. BOJANOWSKI:  I have Mr. Pratt who can provide

24  additional information.

25    THE COURT:  Thank you.                                        01:46PM

1      MR. PRATT:  Your Honor, one of the difficulties with

2  this is the strict requirement that it must be a medical

3  provider communicating that information to the inmate when he

4  asks for it.  If the nurse were able to simply print the

5  results off on his lab results and hand them to him, that          01:47PM

6  commonsensically would meet the requirement.  But the

7  requirement is no, it can't come from a nurse.  It has to come

8  from a provider which is an additional step above trying to get

9  this to the inmate in a reasonable amount of time.

10      THE COURT:  So does that mean the communique can never   01:47PM

11  solve that problem?

12      MR. PRATT:  No.  The communique, if it's not signed by

13  a medical provider, does not meet the requirements in the

14  stipulation in the performance measure.  The requirement says

15  that it has to come from a medical provider.                       01:47PM

16      THE COURT:  So these exemplars do satisfy it?  No,

17  they don't?

18      MR. PRATT:  If you are telling me, sir, that --

19      THE COURT:  No.  I'm asking the question.  It's signed

20  by a reviewing practitioner.                                       01:47PM

21      MR. PRATT:  Electronic signature.

22      THE COURT:  Yes.

23      MR. PRATT:  If that's acceptable the nurse can simply

24  print that off.  That's what's in eOMIS right now.  The nurse

25  can simply print that off and send it to the person asking for    01:48PM

—— November 7, 2017 - CV 12-601 - Status Hearing ——

1   those results.  If that were the case I think you would see an

2   immediate uptick in this happening.

3           MS. KENDRICK:  Your Honor.

4           THE COURT:  Yeah.

5           MS. KENDRICK:  If you look at Performance Measure 47        01:48PM

6   for Eyman, the Corrective Action Plan, also the one for

7   Florence, it talks about the fact that the corrective action

8   plan is that the nurses will do the printing out and preparing

9   the communique and that the only thing the provider has to do

10  is sign it.  So I don't understand why they are not already     01:48PM

11  doing that if that's what they told the Court at least a month

12  ago that's what they were going to do as the action plan at

13  Eyman and Florence.

14          THE COURT:  Okay.  The exemplars that have been given

15  to me, if they are given to the inmate and they have been       01:48PM

16  signed by the reviewing practitioner, would that satisfy the

17  performance measure in plaintiffs' view?

18          MS. KENDRICK:  Well, it doesn't say what test it is.

19          THE COURT:  No, I understand.

20          MS. KENDRICK:  Yeah.  I know this because there are      01:49PM

21  not that many providers.  Dr. Malachinski and Dr. Barkley are

22  providers so is Ms. Chudoff.  So they are signing it here.

23          THE COURT:  So what you are saying, then, so that I

24  can understand, is that you don't think these are sufficient

25  because they don't inform the inmate about what the test is and  01:49PM

1    about what the particular value is that's been --

2         MS. KENDRICK:  Correct.  That's our issue, not, you

3    know, it seems like the providers are signing it.  That has

4    never been before identified as the reason that because the

5    nurses can't print it out.  That's never been offered as the          01:49PM

6    reason for noncompliance and, in fact, that is actually the

7    Corrective Action Plan.

8         THE COURT:  So this whole mail idea that we've been

9    talking about for months really was a dead on arrival scene

10   from the start?                                                        01:49PM

11        MR. BOJANOWSKI:  That's the way they get to the

12   inmate.

13        THE COURT:  Well, but again, in terms of providing

14   results that provide the information that plaintiffs say that a

15   person should be entitled to have under this requirement, the         01:50PM

16   mail can never do that because it results in the inmate having

17   in his or her possession a document that security protocol says

18   they shouldn't have.

19        MR. BOJANOWSKI:  Well, the results are either normal

20   or abnormal.                                                          01:50PM

21        THE COURT:  Well, but what Ms. Kendrick is saying is

22   that's insufficient because it doesn't tell you what the test

23   was.  So somehow, this information is insufficient because

24   somebody who has had a battery of tests and they get this,

25   perhaps, a report that says your results were within acceptable       01:50PM

1    limits, no further action is needed, or maybe the other one is

2    checked, it could be a mixed bag.  I guess that's what your

3    issue is.

4         MS. KENDRICK:  Right.  I mean, it's just the language

5    of the performance measure.  So telling somebody that their          01:50PM

6    results are abnormal isn't communicating the results of the

7    study.  It's characterizing it but if somebody had blood tests

8    done --

9         THE COURT:  Right.  Right.  I understand.  So the

10   thing that I asked just a moment ago, this idea of doing it in      01:51PM

11   the mail is a dead letter, better thing to say, because it

12   couldn't be the method because you couldn't provide that

13   information.  So it had to be some kind of in person providing

14   of that information to the requesting inmate so that they could

15   see and understand what it was.  There was no idea that we          01:51PM

16   could ever communicate sufficient information in your mind to

17   satisfy this performance measure by doing it through the prison

18   mail.

19        MS. KENDRICK:  Well, I think this is actually first

20   time we have heard that they can't put information in there for     01:51PM

21   some ostensible security information.  It's protected health

22   information.  The protection belongs to the class member.  So

23   he or she is not getting something that's, you know, illicit.

24   It's their own personal health information that is being

25   communicated to them.  And Your Honor has been kind of floating     01:51PM

1    the idea for months and months and we thought the most sensible

2    one was why don't you just print out the darn report and put it

3    in an envelope and send it to them which we agree would be the

4    easiest and simplest approach.  As far as I can recall this is

5    the first time --                                                    01:52PM

6            THE COURT:  It is the first time.

7            MS. KENDRICK:  -- first time I have heard them say,

8    oh, sorry, we can't give them any sort of substantive answer

9    which it would have been helpful if they said that, say, eight

10   months ago.  So if -- I guess that means at least in our          01:52PM

11   position they are never going to be able to comply with this if

12   they are not able to supply any substantive results other than

13   to say your results are abnormal.  Don't worry.  We'll see you

14   sometime.

15           THE COURT:  Well, the rule could be met by orally         01:52PM

16   informing someone you have this positive test or abnormal test

17   that shows that you have this.  And that would be just reading

18   what the report said.  What we have heard for the first time

19   here today is that apparently there's a prison regulation that

20   says that we can't provide that in the prison mail system to      01:53PM

21   our inmates because they will end up with it in their cells,

22   which kind of is surprising to me because I have a sense many

23   of the litigants in my cases have their medical records in

24   their cells.  So I'm surprised about that.

25           I also wonder about whether or not there's concerns on    01:53PM

1   their side about the transmissions through the mail system,

2   that's not so secure as they would like and they are concerned

3   about it for that reason.  But you are right, it's the first

4   time that we have ever heard about this and it does seem to get

5   in the way of what I had been floating before as what seemed          01:53PM

6   like a reasonable method.  Because I do think that the language

7   of the stipulation requires more than the information that's

8   provided here.

9           MS. KENDRICK:  And, I mean, we have seen countless

10  times handwritten communiques, which is how they used to do it       01:53PM

11  where they would say things like your cholesterol levels were

12  whatever over whatever.  We'll talk about it next time, where

13  they do give them some details and say this was your CT cell

14  count this was your cholesterol level.  It's apparently been

15  done in the past.  If there's this policy, this is kind of the       01:54PM

16  first news we have got about it.  And we think that if that's

17  the position they are taking then they are making this

18  performance measure a nullity.

19          THE COURT:  I think I recall you saying that the

20  California prison system sent the medical -- the laboratory          01:54PM

21  report to the inmate?

22          MS. KENDRICK:  Upon request.

23          THE COURT:  Okay.

24          MS. KENDRICK:  They don't do it automatically.

25          THE COURT:  But just as here, upon request.  But in          01:54PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    California if there's a request they send the actual report

2    says this is what happened on what day, what test was done, and

3    what the value was.

4         MS. KENDRICK:  That's my understanding, either the

5    actual report or kind of a little summary, handwritten or typed    01:54PM

6    up thing that explains it.

7         THE COURT:  Okay.  What about this?  Is there such a

8    regulation, Mr. Pratt?

9         MR. PRATT:  Yes.  There's a department order that

10   restricts inmates from getting copies of their medical records.    01:55PM

11   They can review medical records, take notes on their medical

12   records.  They are not allowed to have copies of their medical

13   records.

14        THE COURT:  So none of the prisoners have in their

15   cells any of their medical records?                                01:55PM

16        MR. PRATT:  No, sir, I can't say that because we will

17   issue medical records to their legal counsel or other parties

18   upon request.

19        THE COURT:  But is it contraband for them to have it

20   in their cells?                                                    01:55PM

21        MR. PRATT:  I don't know how it's considered by

22   operations.  I am not sure.

23        THE COURT:  Do you happen to know off the top of your

24   head what the regulation is?

25        MR. PRATT:  I don't but I can find out.                       01:55PM

1           MR. BOJANOWSKI:  It's DO-1104.

2           MS. EIDENBACH:  Your Honor, during the litigation Ms.

3      Fletcher sent a letter to us.  I can find it.  It may take a

4      little time because it was sometime back, basically saying that

5      because of the Parsons litigation, prisoners who were involved          01:55PM

6      in this litigation actively were permitted to have possession

7      of their medical records in their cells.  And, in fact, when

8      we -- when our clients had possession of their medical records

9      we made sure they also had a copy of the communication from Ms.

10     Fletcher so if a corrections officer was questioning them about          01:56PM

11     whether or not they were allowed to have a copy of that file

12     they could show the corrections officer a letter from their

13     attorney that gave them permission to have it.

14          So there are quite a few prisoners that do actually

15     have copies of large portions of their medical records pursuant          01:56PM

16     to an instruction given by defense counsel.

17          MR. BOJANOWSKI:  I think that was for named plaintiffs

18     only.

19          MS. EIDENBACH:  No, it was not.

20          THE COURT:  Whatever, it is what it is, but it doesn't             01:56PM

21     necessarily define the question here because it seems to me

22     that if somebody requests that they be provided with the

23     results of diagnostic studies that they should be able to have

24     them and assume the risks, if any, of having that information

25     in their cells with the understanding, I imagine, they have             01:57PM

1   that they know what their lives are like in their cells and who

2   or what circumstances could interfere with what would be their

3   ability to hold that information confidential.

4          So I think we are in a position where I'm not going to

5   be able to see how this communique that's been shown to me in          01:57PM

6   the exemplar should be counted as being -- satisfying the

7   measure here because it doesn't report the results of

8   diagnostic studies in the way that is, I think, a fair reading

9   of this performance measure.

10         MR. PRATT:  Your Honor, if it would suffice, again,          01:57PM

11  the common sense way to handle this performance measure, if it

12  were simple enough to have the lab results printed out of eOMIS

13  and handed to the inmates, as opposed to having a provider's

14  signature on those lab results after she prints it out and then

15  having to go ahead and send it to him, if what you have there          01:58PM

16  in an exemplar is you've got a lab report that's electronically

17  signed by a provider, and that is simply handed to him, if the

18  electronic signature would suffice it would save time and, I

19  think, cut to the quick on getting this information to the

20  inmate.                                                                01:58PM

21         THE COURT:  Well, follow-up question to that, how

22  would we then be able to document, where would be the

23  documentation point to know whether or not this information had

24  been communicated to the inmate?  Would it be charted by the

25  nurse who provided it?                                                01:58PM

*November 7, 2017 - CV 12-601 - Status Hearing*

1          MR. PRATT:  Absolutely.  It would not require handing

2     information off to a provider to sign off on a lab report and

3     then turning around and sending that to the inmate.  If the

4     electronic signature would work, the nurse could simply print

5     that out, hand it to the inmate, document that it was handed to          01:59PM

6     the inmate, and it's done.

7          THE COURT:  That seems very reasonable to me, Ms.

8     Kendrick.

9          MS. KENDRICK:  We don't have an issue with electronic

10    signatures.          01:59PM

11          THE COURT:  Do you have an issue with anything he

12    said?

13          MS. KENDRICK:  No.  But what we're saying is it says

14    that a provider has to sign it, so if the signature is an

15    electronic signature, that's okay.  I don't think we're being          01:59PM

16    so literal meaning they have to sign off on it.

17          The other thing is the stipulation doesn't require

18    that the communication come in writing, you know, looking at

19    the monitoring guide, it says if the person sees a provider

20    within seven days and it's orally communicated, then that's          01:59PM

21    compliant.  So there's more than one way that they can achieve

22    compliance.  It doesn't have to be through the written

23    communiques.

24          THE COURT:  But the method that Mr. Pratt described is

25    also a way that would qualify for meeting the performance          02:00PM

1    measure in plaintiffs' view.  Is that true?

2           MS. KENDRICK:  With regard to the requirement that

3    it's a provider communicating it.  Still doesn't address the

4    fact that there's no substantive information.

5           THE COURT:  No, no.  He just told me he would print          02:00PM

6    out the report.  The nurse would print out the report of the

7    diagnostic test and that will be provided to the inmate upon

8    request.

9           MR. FATHI:  May we have a minute, Your Honor?

10          THE COURT:  Of course.                                        02:00PM

11          Thank you, Mr. Pratt.  You can stand there or you can

12   take a chair.

13          MR. PRATT:  I have been sitting long enough.

14          THE COURT:  Fair enough.

15          MS. KENDRICK:  It's fine.                                     02:00PM

16          THE COURT:  Good.  All right.  Thank you.

17          MR. BOJANOWSKI:  May I have a moment, Your Honor?

18          THE COURT:  You may.

19          So, Mr. Pratt, one more question, to move to this kind

20   of approach, how much time do you think that will take?  To        02:01PM

21   move to this approach that you just described that plaintiffs

22   would say would be okay of providing the printouts when they

23   requested, when should we think that could be in place?

24          MR. PRATT:  I can let the monitoring bureau know if

25   they are reviewing these performance measures right now and         02:01PM

1    they are looking at this one going back into the last month, if

2    they have already done that I will have them go back and

3    re-review it.

4            THE COURT:  Wait a minute.  Has this been happening?

5            MR. PRATT:  No.                                              02:01PM

6            THE COURT:  All right.  So that's the first step, make

7    it happen.

8            MR. PRATT:  I can make that effective tomorrow.

9            THE COURT:  Okay.  Why are you here just today if you

10   can do all this stuff tomorrow?  I wanted you here every day    02:01PM

11   doing this just tomorrow.

12           So what you are saying is what will happen, you will

13   send out a directive saying if an inmate requests to have the

14   result of diagnostic studies within seven calendar days of that

15   request it will be deemed -- you will take steps to provide     02:02PM

16   that those diagnostic study results will be printed out and

17   provided to the inmate within seven days of that request.  And

18   if you do that, that will be deemed to be compliant with

19   Performance Measure 47.

20           MR. PRATT:  Yes.  I will get that to the monitoring      02:02PM

21   bureau and I will also communicate that to Corizon to start

22   this immediately for any requests they have coming in.  They

23   don't have to worry about getting it to a provider.  They can

24   simply print the results out, hand them to the inmate, document

25   that, and we'll consider that compliance.                       02:02PM

1          THE COURT:  Well, that's great news.  Thank you.

2          MR. PRATT:  You're welcome.

3          THE COURT:  Did the plaintiffs want to have for their

4    mediation purposes Performance Measure 48 a report from Tucson?

5    I think I saw that.                                              02:03PM

6          MS. KENDRICK:  Yes, sir.

7          THE COURT:  Could you provide that, Mr. Bojanowski?

8          MR. BOJANOWSKI:  48, Tucson is 93 percent.

9          THE COURT:  Thank you.

10         MR. BOJANOWSKI:  You're welcome.                           02:03PM

11         THE COURT:  So with respect to 49, Ms. Kendrick.

12         MS. KENDRICK:  Well, Your Honor, I'm not quite sure --

13         THE COURT:  What to say?

14         MS. KENDRICK:  -- what to say because there's no

15    change in the action plan, which says that the new process was  02:03PM

16    going to be in place no later than November 15th.  So I suppose

17    we just need an update on what the status is of implementing

18    this new procedure.

19         THE COURT:  Okay.

20         MR. BOJANOWSKI:  I'm double-checking, Your Honor.          02:04PM

21         THE COURT:  Thank you.

22         MR. BOJANOWSKI:  To see if this is in place right now

23    or still not quite in place.

24         Your Honor, it's apparently in place right now.

25         THE COURT:  Do you know when it started?                   02:04PM

November 7, 2017 - CV 12-601 - Status Hearing

1          MR. BOJANOWSKI:  I believe it was November 1st.

2          THE COURT:  And do you know whether there's any effort

3     to see whether or not it's working?

4          MR. BOJANOWSKI:  I have no information on that, Your

5     Honor.                                                    02:04PM

6          THE COURT:  Okay.

7          MR. BOJANOWSKI:  Let me ask Mr. Pratt.

8          THE COURT:  Thank you.

9          MR. BOJANOWSKI:  Your Honor, we have not done anything

10    specifically with regard to this measure.                 02:05PM

11         THE COURT:  All right.  It includes these internal

12    time steps requirements, for example, within 24 hours of the

13    output being entered.  So many things flow down the road

14    culminating in a 28-day check to see whether or not there is a

15    risk that there's going to be a violation here.           02:05PM

16         I guess I would think that it would make sense to

17    check in on these interim dates, some of which since it started

18    on the 1st of November -- that's what you said, wasn't it, it

19    was the 1st of November?

20         MR. BOJANOWSKI:  Correct, Your Honor.               02:06PM

21         THE COURT:  Since it started on the 1st of November we

22    have already passed some of these interim dates with respect to

23    requests that would have been -- or denials that would have

24    been made, I imagine.  And so you could see whether or not you

25    were on track or not, and I guess I would want to look at that. 02:06PM

1    Anything else on 49?

2            MS. KENDRICK:  Just you noted that there were quite a

3    few steps in this process that have time frames, but it doesn't

4    appear that Number 4, it says the request shall proceed through

5    the utilization management process.  And then utilization         02:06PM

6    management will enter a determination.  There's no time frame

7    there, so I don't know if that's part of the plan to have a

8    time limitation for utilization management to process the

9    request.

10           MR. BOJANOWSKI:  It is my understanding there is not a    02:06PM

11   time limit on that.  Maybe it will be something we will look

12   at.

13           THE COURT:  As you read this you will think, well,

14   that could surely derail the train.  If that doesn't happen

15   nothing else happens, looks like, because that's what defines    02:07PM

16   the output occurring, right?  So I would look at that.  Thank

17   you.

18           So now we're to 50 and 51 and the notice regarding

19   Performance Measures 50 and 51 that includes the affidavit of

20   Greg Campbell raises all sorts of issues in my mind.  It's not   02:07PM

21   specifically tailored to issues that the Court previously

22   identified, urology and cardiology, but to the extent that the

23   issue is broader I have to deal with that issue if it is

24   broader.  But the issues include many things that I think are

25   some within my control, somewhat perhaps not within my control   02:08PM

1   but are the subject of subject matters that could be made a

2   part of somebody's agenda, maybe even just the purpose of the

3   Court.  If we read here that there are medical providers who

4   choose not to see inmates because of a concern about adversity

5   on their practices, makes one think that you could overcome                02:08PM

6   that issue by coordinating and consolidating the necessary

7   specialty provider visits and maybe making an arrangement for

8   them to happen all on one day, or travel all on one day for a

9   number of patients just in one location.  There would be

10  perhaps people who would be willing to do that.                            02:09PM

11         Further expounding upon what is just sort of a gut

12  reaction to this, I mean, if it's true that the medical

13  community is not providing this service, I think that there are

14  associations, the Arizona Medical Association, for example, I

15  can't imagine that the doctor who is the elected head of that              02:09PM

16  group would be happy to hear that there was a medical need not

17  being met in the state because people were, perhaps, concerned

18  about issues associated with having inmates in their offices at

19  certain times.  I guess I just don't see that that's something

20  we're powerlessness to address.                                           02:09PM

21         The access limitation, again, I would want to drill

22  down more on that.  I would want to know how often does this

23  come up?  From my other cases, I think I have an understanding

24  that many prisoners are seen by many specialty practitioners

25  and that there doesn't seem to be across the state of Arizona              02:10PM

1    as far as I can tell the resistance to the AHCCCS rates because

2    many people are treated under AHCCCS.  But again, if that's the

3    fact I would like to know about it because I would like to be

4    able to consider whether or not there was something I needed to

5    do to make sure that that road block was not in the way of          02:10PM

6    getting the necessary providers.

7            So those are my preliminary views to this affidavit

8    which culminate in a thought that, perhaps, the right thing

9    here is to have Mr. Campbell here in court so we can learn more

10   about my particular questions and what he represents he knows      02:10PM

11   about in broad strokes.  I mean, this is very broad and really

12   not very specific.  But the answer probably is in the

13   specifics, and I'd like to get to that as best I can.

14           So having made that preliminary statement about 50/51,

15   let me turn to plaintiffs for their reaction.                       02:11PM

16       MS. KENDRICK:  We're not quite sure if actually Mr.

17   Campbell would be the person who is most knowledgeable to talk

18   about this problem on a statewide basis because he is the

19   clinical coordinator just at one of prisons which actually is

20   not one of the prisons that you have found them substantially      02:11PM

21   noncompliant for Performance Measure 50 or 51.  So to the

22   extent there's numerous facilities, it seems it would make more

23   sense it would be somebody from regional headquarters who deals

24   with these things.

25           So, you know, the comment that there's some sort of        02:11PM

1    stigma about treating prisoners, Corizon is a corporation that

2    has contracts all across the country.  This cannot be the first

3    time that they have run into a situation where people in the

4    community or providers in the community may have some

5    hesitation about seeing prisoners.  But, you know, so I don't                02:11PM

6    necessarily think that's really a valid excuse.  They have

7    probably undoubtedly dealt with this elsewhere in the country.

8    So it seems like they could put their thinking caps on and

9    address it.

10              The other thing is that we had asked defendants for an            02:12PM

11    update on the telemedicine for specialty encounters, and we

12    were told that they were going to provide a detailed

13    declaration.  And so what we got was something that just talked

14    about negotiations and meetings that had happened since early

15    October 2017 which was troubling to us, because we have been               02:12PM

16    talking about this for months if not over a year.  And so there

17    was really no explanation as to what has happened in the

18    preceding 12 months.  Also to the extent that they have managed

19    to have some progress with the University of Arizona that would

20    be helpful to find out.  But we, again, think that the                     02:12PM

21    telemedicine is an option.

22              And then finally, I think maybe it was a few months

23    ago I somewhat jokingly cited the supremacy clause to you when

24    you asked about this limitation on the payment rates.  But, you

25    know, on the other hand I'm serious, you know, that is                     02:13PM

1   something that a federal court can do.  And if there is a state

2   law that is clearly, and the parties seem to agree, is a huge

3   barrier to providing care and achieving compliance, the Court

4   does and can have the power to waive that.

5           THE COURT:  Well, you may have mentioned it first, but   02:13PM

6   you didn't mention it last.  If you will look in last month's

7   transcript you will see that I actually mentioned it so it's

8   not something I'm unaware of.  The federal court, in its

9   responsibility to apply the Constitution of the United States

10  does turn, often times, to the supremacy clause in which the   02:13PM

11  founders established what the order of law would be.

12          The stipulation says that I can take such measures as

13  are permitted by law, but that certainly does not contemplate

14  that the State of Arizona could, through its legislative and

15  executive branch, pass a law that would obstruct the           02:14PM

16  enforcement of an action that was brought to vindicate a

17  federal constitutional right.

18          So I'm not, in the first instance, put off by that as

19  an obstacle because it is something that the federal courts

20  with respect find themselves necessarily to do from time to    02:14PM

21  time.  But obviously, too, because of the sensitivity in the

22  federal system, you do need to make sure that that is the only

23  alternative that you have to have available to effectuate the

24  difference.

25          I do think it makes sense to have the right person      02:14PM

*November 7, 2017 - CV 12-601 - Status Hearing*

1    here.  And if it's not Mr. Campbell, I'd like to hear from who

2    the right person is who can tell me what it is that is the

3    trouble in the landscape of obtaining specialty services in the

4    State of Arizona that's been cited here in a more particular

5    fashion:  How often are these issues that are generally raised          02:15PM

6    here a problem; how often is it the stigma; how often is it the

7    pay rate; how often is it the scheduling that, I guess, I think

8    it's true that many people, when they first contact a specialty

9    provider, they are told, well, Dr. So-and-so can see you in six

10   months.  Then you say, but, well, my doctor said that I need to        02:15PM

11   be seen sooner and that almost all my experience is when you

12   present that additional fact it does result in a way to get it

13   found.

14           But I will say this:  This is not -- any of this is

15   not rocket science stuff.  This is coordinating healthcare             02:15PM

16   benefits for people who you are responsible for every part of

17   their lives.  And so that means that it's not as if it's

18   undoable.  It's something that is completely doable if you

19   apply the right resources to it.

20           So I need to find out where that resource block is.            02:16PM

21   If it's a coordinating function within the state, then maybe

22   I'm back to figuring out who is better able to coordinate that

23   and figure out where that responsibility needs to be assigned.

24           All of these things are solvable problems, but they

25   are not solvable problems if you don't devote the resources.           02:16PM

November 7, 2017 - CV 12-601 - Status Hearing

1    So what we'll do is, Mr. Bojanowski, you have heard

2  what I would like to hear from a witness next week or if it's

3  more than -- not next week, next month.  If it's more than one

4  person, fine.  But in a couple of weeks, let the plaintiffs

5  know whom you are contemplating calling and so that they can          02:17PM

6  have input into that.  If there's an issue, bring it to me.

7  But I would like to hear from somebody who can really flesh out

8  what's in Mr. Campbell's affidavit so that I can understand

9  these impediments and, therefore, have a better chance of

10  applying an educated remedy.                                          02:17PM

11    MS. KENDRICK:  Well, and we would just note that their

12  declaration they filed on October 25th from a person named Juli

13  Stover of Telehealth about telemedicine talked about the fact

14  they were still in discussions with University of Arizona and

15  also with the Arizona Oncology Network.  And we had asked            02:17PM

16  defendants in a letter dated October 31st that they either

17  provide Ms. Stover or they provide information about what the

18  status is of these negotiations, because we're hopeful that

19  that maybe that could address some of the problems with these

20  performance measures.                                                02:18PM

21    THE COURT:  The reason I hounded this telemedicine

22  idea is I was being told by the State this was -- I think the

23  phrase I used before was they are putting a lot of eggs in this

24  basket.  And I wanted to know where we were in the basket.  And

25  it seems like the Easter Bunny is never coming to my house.         02:18PM

UNITED STATES DISTRICT COURT

1    It's just always in an inchoate status.  And the reason I asked

2    for specific updates about it is that if you are not going to

3    be putting your eggs in this basket, I need to find another

4    basket.  And I had been encouraged by the previous

5    representations and now discouraged by the fact it remains in          02:18PM

6    inchoate status.

7            So I think it does make sense also for next month,

8    either to have available by phone or present in court, someone

9    who can tell us where we stand with respect to the telemedicine

10   and the University of Arizona.  Again, that's been cited as a          02:19PM

11   particular element and, again, it just seems we have not closed

12   the deal there.

13           Mr. Bojanowski, do you have some late-breaking news?

14           MR. BOJANOWSKI:  I'm just trying to confirm that I can

15   actually get the person who signed the declaration on the phone        02:19PM

16   to answer the Court's questions about the telemed, because I

17   agree, there's been inconsistent information which I have given

18   to the Court over a period of many months.  And I'm reporting

19   to you what they tell me, and then it turns out, you know, that

20   maybe that's not quite right.  So I want to get to the person          02:19PM

21   at Corizon who I understand to be the head of telemedicine

22   nationally and who can speak to telemedicine in Arizona.  That

23   was the person who signed that declaration, and so I was just

24   confirming with counsel for Corizon whether we could get that

25   person telephonically is what I was trying to do.                      02:20PM

1          THE COURT:  All right.  Thank you.  No.  I appreciate

2     that.

3          Anything anybody else wishes to say regarding 50 and

4     51?  Okay.  Hearing none --

5          MS. KENDRICK:  Actually, just the additional                02:20PM

6     supplemental information for Performance Measure 50 that's

7     listed at Page 141, does that mean that it started as of

8     November 6th, or when did this process start?

9          MR. BOJANOWSKI:  It's my understanding, yes, that

10    started on that date.                                           02:20PM

11         THE COURT:  Again, this measure does include these

12    internal dates which would give somebody a ready opportunity to

13    see in real time whether or not you are on track to being able

14    to deliver the requirement in this performance measure.

15         52.  We have this November 6th supplemental              02:21PM

16    information.  And did that start on November 6th or when?  Do

17    we know?

18         MR. BOJANOWSKI:  Correct, Your Honor.

19         THE COURT:  All right.  Ms. Kendrick, anything you

20    wanted to add on it?                                            02:22PM

21         MS. KENDRICK:  No, Your Honor, just that your order to

22    show cause included for Florence for Performance Measure 52.

23    But given the fact that Eyman has plummeted from 41 percent in

24    the past two months to 24 percent in September, we think that

25    it should either be included or they should -- in that order to   02:22PM

1   show cause or that they need to provide the Court and

2   plaintiffs with real time information on February 5th.

3          THE COURT:  I will adopt that second proposal and say

4   that that will be included in the requirement for the February

5   5th report of December data.  And we'll see what is happening          02:22PM

6   if we don't get an improvement between now and then.  But it's

7   really no real optimism associated with that given that we have

8   gone from the 50s to the 40s now to the 20s in two successive

9   months.

10          54.  The supplemental correction plan as of November          02:23PM

11   6, 2017, is this also one that went into place on November 6th?

12          MR. BOJANOWSKI:  Correct, Your Honor.  I confirmed

13   with Corizon that all the -- over the break, I confirmed that

14   all of the supplemental plans are now in place that are

15   reflected in the document filed with the Court, just so that          02:23PM

16   there's clarity of the record.

17          THE COURT:  So when they see these corrective plans,

18   when the contractor sees them and they see that these deadlines

19   are required and they tell you that it's in place, do you have

20   every reason to think that they are actually going to do that?          02:24PM

21          MR. BOJANOWSKI:  Yes.

22          THE COURT:  Okay.

23          MR. BOJANOWSKI:  Yes, because we're going to be

24   checking on it.

25          THE COURT:  People aren't saying, well, I see this          02:24PM

1    aspirational goal you set here and it looks aspirational to us.

2    The tenor of the conversation is this is the order of the day.

3    This is what we have to do.

4            MR. BOJANOWSKI:  Right.  There's been numerous

5    conversations with regard to these plans whereby we are really      02:24PM

6    trying to get into some more detail.  As the Court can see

7    we're really getting very specific on what we think and what

8    they think is going to cure the problem.  I mean, I know that

9    in -- and this is kind of the purpose of having this kind of

10   document, is to get into some real specificity here.  So, yes,      02:24PM

11   that is -- this is what we are insisting be implemented.

12           THE COURT:  And I ask the question here because in the

13   past where we have seen such plans we have then come to

14   understand that they really weren't done.  But these are

15   specific and just wanted to make sure people understood that       02:25PM

16   the past wasn't a prologue of how we can treat these new ones

17   going forward.

18           MR. BOJANOWSKI:  Right.  That's why I want it in

19   writing and specific.

20           THE COURT:  Anything you wanted to say in addition on       02:25PM

21   54?

22           MS. KENDRICK:  Yes.  The supplemental information

23   refers to the fact that a chronic care nurse is going to be

24   running a Pentaho report and given we were told this morning

25   that Corizon is still in the process of doing all of the            02:25PM

1    programming to create these real time reports, I want to

2    confirm whether or not this real time report is actually

3    capable of being run as of today.

4         MR. BOJANOWSKI:  It is.

5         THE COURT:  Thank you.                                    02:25PM

6         55.  We have our disease management guidelines

7    implemented for chronic diseases, and we have another very

8    detailed plan that is set to be in place November 6th.  Based

9    upon what you just said, we know that that's true now that it

10   is in place.  Was it in place in advance of the 6th or the    02:26PM

11   start date is the 6th for this one as well?

12        MR. BOJANOWSKI:  I believe the start date is the 6th,

13   Your Honor.

14        THE COURT:  Okay.  All right.  And Ms. Kendrick.

15        MS. KENDRICK:  No.  Nothing further.                      02:26PM

16        THE COURT:  66, currently under review by ADC

17   monitoring bureau.  Is this something that we will take up when

18   we have the telephonic hearing?

19        MR. BOJANOWSKI:  We could, Your Honor.  By then we

20   should have some results.  Again, this was one of those ones    02:27PM

21   where we, in checking it here, we saw, you know, that there may

22   be some issues.  So it's being reviewed in some detail.

23        THE COURT:  Okay.  All right.  So what we'll do is

24   also address 66 at the time that we have the telephonic hearing

25   that was to address the --                                     02:27PM

1        MR. BOJANOWSKI:  If I get results prior to that I will

2   try and get a notice filed with the Court and over to

3   plaintiffs as well as with Item 27 at Tucson.

4        THE COURT:  Okay.  And how about 67.

5        MS. KENDRICK:  Your Honor, back to 66, I was hoping                02:27PM

6   that Mr. Bojanowski could actually explain what quote, unquote,

7   issues he means.  Because this is such a critical performance

8   measure.  They have been chronically noncompliant.  Your order

9   to show cause covers Florence, Lewis, and Tucson.  And as we

10  noted in that letter that we filed that's at Exhibit 4 with my     02:27PM

11  declaration, the profoundly disturbing discovery that the

12  provider at the Florence prison was opening up all of these

13  provider round encounters precisely on the hour raised some

14  major red flags to us about how any of the underlying

15  information could be used in 66.                                   02:28PM

16        So if he could explain what the issues are and then I

17  know he said that he had just sent that letter to Corizon

18  regarding that provider at Florence, but that, to us, calls

19  into question whether or not the past results, even though they

20  were pretty profoundly noncompliant at Florence, overinflated    02:28PM

21  the degree of compliance because she was somehow magically

22  opening 10, 12 encounter notes at the same precise moment and

23  counting those -- and those appear to be counted as the rounds

24  in compliance for 66.

25        THE COURT:  Since we first talked about this issue          02:29PM

1   this morning, Mr. Bojanowski, have you learned anything more

2   about that?

3           MR. BOJANOWSKI:  I have not but Mr. Pratt has,

4   perhaps, some information he would provide to the Court.

5           THE COURT:  Good.                                    02:29PM

6           MR. PRATT:  With regards to the reporting on the hour,

7   I can tell you in general when a provider goes into eOMIS they

8   can go in and document their notes and leave the time that they

9   are actually opening their note as far as part of that

10  documentation to show when they are actually putting their      02:29PM

11  results in, or they can go in and say here's the time I did my

12  rounds and that's the time they were put in and then document

13  their note.  So there's no alarm system or anything that goes

14  off at 71 hours that says you have to put a note in so it opens

15  something up.  Nothing nefarious or anything like that is being  02:29PM

16  set up.  It's just a provider has that ability to go in and say

17  I did my rounds at 8:00 and they may do rounds on several

18  patients and go back and document after the fact.

19          THE COURT:  I still don't understand how that explains

20  why it shows up at the same time, though, on these successive    02:30PM

21  documentation episodes.

22          MR. PRATT:  Well, as a provider, if I go in and I

23  start my rounds at 8:00 and I see 10 patients and then I go

24  document on those 10 patients.

25          THE COURT:  You purposely put in then 8:00?             02:30PM

1          MR. PRATT:  I can put in 8:00 for my rounds, yes, sir.

2          THE COURT:  Now knowing that information, does that

3     answer the question?

4          MS. KENDRICK:  No.  And that's actually more

5     disturbing, because our understanding with the eOMIS was that          02:30PM

6     when you open and start an entry, it starts at whatever time.

7     So, you know, with my attachment, I had for comparison the

8     nurse's entries which were more kind of normal, quote, unquote,

9     normal times.  It would say 1:26 and 53 seconds, that sort of

10    thing.  And so if the providers are able to go back and                02:31PM

11    retroactively create a note saying that we saw this person at 5

12    but then as documented at length in that letter, closing the

13    encounters hours or days later, then we don't have that

14    computer proof of when things occurred.

15         And this is a critical performance measure and so that           02:31PM

16    doesn't actually make us feel any better to know that a

17    provider can go back and create an entry at a time hours or

18    days after the fact.  I mean, again, going back to kind of the

19    tenets of basic medical practice and documentation, you know,

20    documentation should occur contemporaneously and you shouldn't        02:31PM

21    be doing it preemptively or retroactively.  You should be doing

22    it at the time.  So that's our concern.

23         THE COURT:  Let me ask this question, Ms. Kendrick, to

24    help me understand this issue and your view of it.  Under the

25    old system before computers, I gather there would be a provider       02:32PM

1    who would round on patients and then would return to his or her

2    desk and do the charting.  And that's what I -- when I have

3    been in hospitals, that's what I seem to see happening.  And

4    that all those people that you saw on that round, you would put

5    in a time of when you rounded, and you may be, as you are doing          02:32PM

6    it at your desk at 9 in the morning when you started at 8,

7    maybe some number of people would say I started this rounding

8    process at 8 so they would put in 8 for all of the people.  Is

9    that what you are saying is happening, Mr. Pratt?

10        MR. PRATT:  Yes, sir.  And the other way to document              02:32PM

11   that would be to go in and not adjust the time for the time you

12   did your rounds but to make a notation somewhere in the notes

13   to say this is a late entry.

14        THE COURT:  So for the other providers who don't have

15   this uniform zero, zero, zero, top of the hour zero, zero, zero        02:33PM

16   thing, the times that are reflected there, is that when they

17   opened up that eOMIS file to make the charting notes, or is

18   that when they put in a time as to when they say they did it?

19        MR. PRATT:  That would be the time as they said they

20   did it.                                                                02:33PM

21        THE COURT:  So all of those times are not an automatic

22   feature of when the system was opened up?

23        MR. PRATT:  As I understand it, it defaults to the

24   current time when you are putting your information in unless

25   you choose to go in and say change that time, because here's           02:33PM

1   when I actually did this.

2          THE COURT:  So it does automatically put it in.  It

3   defaults to it unless you purposely change it.  So we think

4   this provider with the zero, zero, zero, that person purposely

5   changed them to zero, zero, zero at the start of the shift?          02:33PM

6          MR. PRATT:  That's my understanding, yes.

7          THE COURT:  We have heard that Mr. Pratt will be

8   present when we meet again to talk about these issues that are

9   raised in the letter.  Percolate about it and see if there's

10  anything that remains unresolved or needs further inquiry about   02:34PM

11  whether or not it's being done appropriately.

12         MS. KENDRICK:  Well, the thing that -- I mean, one

13  other thing is, you know, we didn't search this out.  We

14  stumbled upon it when we were looking at a couple of prisoners'

15  medical records who had written us describing how they were      02:34PM

16  having some problems getting care.  It was literally just

17  looking at their medical chart and all the entries and this one

18  person in this one time would just pop out.  So it's very odd

19  because none of the other providers were doing this.  As you

20  can see the nurses don't do that for their infirmary rounds so   02:34PM

21  that's why it popped out at us.  And the fact that we have a

22  performance measure that says every 72 hours, and they can

23  retroactively go back and adjust the start times, to us does

24  raise some serious questions about the accuracy of the

25  underlying information that the monitor may be looking at.        02:35PM

1      THE COURT:  And in the old system, there wasn't any

2  kind of reliance on the equivalent of a time clock, I gather,

3  which you are saying that you maybe are comforted by in the new

4  system because the system, you thought, had been inputting

5  automatically a time that would be close in time to when the          02:35PM

6  care was actually provided.  But in the old system there wasn't

7  such a mechanism, right?

8      MS. KENDRICK:  Well, I don't know because this has

9  been -- I don't know if this is something they had did before

10  we settled the case.                                                   02:35PM

11      THE COURT:  I'm talking about the old system before

12  computers.  You always had the person who was making the note,

13  signing the note, the requirement to have to trust that person

14  I guess.  So there came with the advent of computers what was,

15  perhaps, previously not ever applied to somebody who is a            02:36PM

16  medical professional, a time clock.

17      MS. KENDRICK:  Right.

18      THE COURT:  Like the guards have when they do rounds.

19  They have to put in a key or something.  So suddenly you have

20  that.  But here it seems like you can't count upon it, but it        02:36PM

21  doesn't necessarily mean something nefarious is going on.  It

22  just means somebody has acted in a way that lots of people

23  acted before computers were used.  I think it's a right thing

24  to raise, because it looks curious when you have this outlier.

25  And obviously, we -- when I say "we," the Court relies upon you      02:36PM

*November 7, 2017 - CV 12-601 - Status Hearing*

1    to be sensitive to these things.  I sort of think about it in

2    the Harry Potter books there's this Mrs. Norris, this cat

3    that's wandering about the castle and sort of looking for

4    things that look out of the ordinary.  That's part of what I am

5    counting upon people to do in this case, both in the                02:36PM

6    plaintiffs' and defendants' side to make sure that we're

7    catching errors.  Thank you.

8         MR. PRATT:  The other thing I would add on this one,

9    Your Honor, is this is one of those you have to hit it 100

10   percent of the time in order for it to be considered compliant.    02:37PM

11   So in the overall view of when they look at 10 inmates'

12   records, which is required in the stipulation, if three of

13   those inmates missed one visit during the month they get a 70

14   percent.  Would there be in any objection to expanding that

15   beyond 10 to look at more than 10?  Because you can't hit an 85    02:37PM

16   percent when you are looking at 10 guys.  You are going to be

17   at 80 or 90.  And would there be an objection to going above

18   10?

19        THE COURT:  It's not a physical impossibility.

20        MR. PRATT:  No.                                                02:37PM

21        THE COURT:  To get to 100 percent.  It's just as a

22   practical issue you say it's harder here.  But the plaintiffs,

23   I think, are going to say this is an important performance

24   measure.  That's why we negotiated it this way.

25        MS. KENDRICK:  You took the words out of my mouth.            02:38PM

1          THE COURT:  Thank you, Mr. Pratt.  The answer is no.

2          MR. PRATT:  Answer is no, we can't look at more than

3     10?

4          THE COURT:  Right.

5          MR. PRATT:  Okay.                                      02:38PM

6          THE COURT:  I'm assuming the answer is no.  I mean, I

7     can't change -- you all can change it, but I can't change it.

8          MS. KENDRICK:  We'll have to think about it.

9          THE COURT:  Have a dialogue about it.

10         So are we at 72?                                       02:38PM

11         MR. BOJANOWSKI:  Correct, Your Honor.

12         MS. KENDRICK:  So what were the issues with 66 and 67?

13         THE COURT:  Oh, that's right, getting back to your

14    question.

15         MR. BOJANOWSKI:  I don't know exactly what the issues   02:38PM

16    are, to be honest with you.  I know that something was raised

17    with regard to how the monitoring was done, and so they are

18    looking at it.

19         THE COURT:  Next time that we talk, know the answer to

20    that question.                                              02:39PM

21         MR. BOJANOWSKI:  Okay.

22         THE COURT:  Thank you.

23         Now to 72.  It seems to be an issue that we have

24    addressed already with respect to getting -- the only thing

25    that's hanging on 72 is just getting the training materials, I  02:39PM

November 7, 2017 - CV 12-601 - Status Hearing

1    gather.  Is that right, Ms. Kendrick?

2           MS. KENDRICK:  At least that was one of them, yes.

3           THE COURT:  Anything else?

4           MS. KENDRICK:  No, sir.

5           THE COURT:  Okay.  And the next performance measure                02:39PM

6    you would like to address?

7           MR. FATHI:  Your Honor, on Performance Measures 85 and

8    86, I would point out that the parties still have not reached

9    agreement on the monitoring methodology.  We wrote to the

10   defendants about this on October 24th.  That's at Document                02:40PM

11   2426-1 at 14, and we haven't received a response.

12          MR. BOJANOWSKI:  What was the date of your letter,

13   David?

14          MR. FATHI:  October 24th.

15          THE COURT:  Do you remember what the issue was that                02:40PM

16   you were throwing back at the defendants on this?

17          MR. FATHI:  Yes, Your Honor.  The issue was that the

18   defendants sent a letter, and this was Ms. Fletcher's October

19   20th letter that said we agree with your proposed methodology

20   with a couple of exceptions.  But then the actual language they           02:40PM

21   attached was wildly different than our last proposal.  So the

22   text of the letter and the attachment just didn't go together

23   and we asked for clarification on October 24th, and we haven't

24   received a response.

25          THE COURT:  When could the plaintiffs expect a                     02:41PM

1   response?

2       MR. BOJANOWSKI:  I would say within a week, 10 days at

3   the most.  I know that Ms. Fletcher was working on a response,

4   but I don't know what the status of it is specifically.  But I

5   would say a week we should have a response.                    02:41PM

6       THE COURT:  Does it make sense to put this on the

7   agenda for the next telephonic conference?

8       MR. FATHI:  If it is not resolved by then, yes, Your

9   Honor.

10      THE COURT:  I'm just asking whether you think we        02:41PM

11  should let you continue to meet and confer to work out its way

12  on this in a week or 10 days or whether we should accelerate it

13  and have it addressed so that you get the response sooner and

14  then I have it before me when we next talk.  I don't know when

15  it is.  I'm hoping it's next week sometime.                  02:41PM

16      MR. FATHI:  Well, Your Honor, I'm a little bit

17  disappointed that it's already been two weeks and now we're

18  being told another week or 10 days.  It's not complicated.  But

19  we're happy to wait for a response and see if we can work it

20  out.                                                         02:42PM

21      THE COURT:  All right.  Thank you.

22      MR. FATHI:  And just a general comment, Your Honor, to

23  the extent that these numbers seem to show compliance, that's

24  obviously a very good thing with the proviso that these are

25  actual accurate and reliable numbers.  As we discussed earlier, 02:42PM

1    we found multiple errors in the July CGARs.  We are currently

2    reviewing the August CGARs and have similarly found multiple

3    errors there.  We haven't yet received the September CGARs, so

4    obviously we haven't reviewed those.  So we just have to append

5    a footnote to these numbers pending a review of the actual          02:42PM

6    documents.

7         THE COURT:  Well, I mean, you are repeating what I

8    said, and that is, it's important that you look for these

9    anomalies and errors.  And I'm encouraged by the fact of what I

10   know that from the satisfaction that the truffle pigs feel when    02:43PM

11   they first found a truffle, all they want to do is find more

12   truffles.  So I know you will be looking.

13        MR. FATHI:  We will, Your Honor.

14        THE COURT:  Next one.

15        MR. FATHI:  Performance Measure 91.                            02:43PM

16        THE COURT:  So we have a supplemental correction plan

17   to address the requirement that MH-5 prisoners who are actively

18   psychotic or actively suicidal being seen by a mental health

19   clinician or mental health provider daily.  And the report that

20   we have for Phoenix is at 73 percent.  And the defendants have     02:43PM

21   set forth a November 6th supplementation of a method to address

22   this problem.

23        Did this plan start on the 6th of November or before?

24        MR. BOJANOWSKI:  The plan has been put into place, but

25   I communicated to the plaintiffs this morning that a              02:44PM

—————— November 7, 2017 - CV 12-601 - Status Hearing ——————

1    recalculation was done because we found a mistake in this, and

2    the actual result is 91 percent.  And Dr. Taylor is here to

3    explain the change in that if the Court so desires.

4         THE COURT:  Surely.  Go ahead, Dr. Taylor.  Near a

5    microphone, please.  Thank you.                              02:44PM

6         DR. TAYLOR:  When looking at that performance measure,

7    the two provider contacts had been missed on that.  And so the

8    73 percent was because two of the inmates were not audited with

9    looking at the provider contact.  So when the provider contact

10   was added in, the compliance went from 73 to 91.             02:45PM

11        THE COURT:  So a provider contact that satisfies the

12   requirement of the measure, meaning met the professional

13   requirement of the performance measure had seen those people

14   for some reason the auditors didn't include that as being a

15   required contact.  Is that what you are saying?              02:45PM

16        DR. TAYLOR:  Correct.  They got missed in that.

17        THE COURT:  Mr. Fathi.

18        MR. FATHI:  Were there any -- was there any change in

19   the files reviewed?

20        DR. TAYLOR:  No.  The same files were reviewed.         02:45PM

21        THE COURT:  So you went back and you -- what prompted

22   the recheck?

23        DR. TAYLOR:  I was re-reading the question over again

24   when I was sitting in my office and went, oh, my goodness.  The

25   provider contacts.                                           02:45PM

1          THE COURT:  So you just naturally know that provider

2    contacts would have necessarily happened so you thought that

3    they couldn't possibly have not happened and so you went back

4    and that was confirmed.  I'm putting words in your mouth.  I

5    don't mean to.  I'm just trying to understand how you                    02:46PM

6    identified this error when you were looking at it.

7          DR. TAYLOR:  So I was just sitting in my office

8    thinking about what they could be doing differently and

9    realized that those got missed.  And, you know, with all the

10   auditing that we do and all the rechecking we do it was one of          02:46PM

11   those things that slipped my mind.  So I went back and looked

12   into the records and those two had provider contacts.

13         THE COURT:  Okay.  Thank you.

14         MR. FATHI:  One more question.  How many files were

15   reviewed?                                                               02:46PM

16         DR. TAYLOR:  All of the available files were reviewed,

17   so I believe there were 11.

18         THE COURT:  Thank you.

19         MR. FATHI:  Your Honor, I don't believe any fraction

20   of 11 will yield a percentage of 73.  But we'll recheck and if         02:46PM

21   there's anything to bring to the Court, we will.

22         THE COURT:  Is the 11 yielding the 91 or is the 73?

23         MR. FATHI:  What I'm saying, Your Honor, is I don't

24   think any fraction of 11 yields a percentage of 73.

25         And I don't --                                                    02:47PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1          THE COURT:  It seems to me that my question was stupid

2     now that I caught up to what you are saying and understanding

3     it.  That seems to be right, Dr. Taylor.

4          DR. TAYLOR:  Actually 8 divided by 11 --

5          MR. PRATT:  8 of 11 is 73 percent; 10 of 11 is 91          02:47PM

6     percent.

7          DR. TAYLOR:  I was saying the records I reviewed, it

8     was 8 out of 11, so those two provider contacts, and therefore

9     10 out of 11.

10          THE COURT:  Got it.  Well, thank you, Mr. Pratt.  You          02:47PM

11     have come to the rescue again but I have to note for the record

12     it was not because you are Richard Feynman and can do all this

13     in your head.  You did have a calculator at hand.  My rough

14     effort in my head totally missed this.  And so did Mr. Fathi's.

15          MR. FATHI:  Your Honor, I don't think we got an answer          02:48PM

16     to the question of when this plan went into effect.  I would

17     note that the Court had ordered that this remedial plan be

18     produced by October 25th and it was not produced until this

19     morning.  So we're interested to know whether it went into

20     effect by October 25th as required by the Court's order.          02:48PM

21          THE COURT:  Mr. Bojanowski.

22          MR. BOJANOWSKI:  The plan went into effect November

23     6th.

24          THE COURT:  November 6th.

25          MR. BOJANOWSKI:  As I had indicated before.          02:48PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1          THE COURT:  Okay.  Mr. Fathi, the next measure you

2     would like to address?

3          MR. FATHI:  Still on 91.

4          THE COURT:  Yes, sir.

5          MR. FATHI:  Page 204 at the end of Paragraph 5, there        02:48PM

6     are a number of abbreviations.  Could we have those explained?

7          MR. BOJANOWSKI:  I cannot.  I will have to supplement

8     the record.

9          THE COURT:  Bet Dr. Taylor could.  Do you think these

10    are in-house Corizon abbreviations?                              02:49PM

11         DR. TAYLOR:  Yeah.  Vice-president of behavioral

12    health, associate regional mental health director, I'm not

13    sure, I'm not sure, and then the facility health administrator.

14    But those are Corizon titles.

15         THE COURT:  So we still don't know for sure BHDT and        02:49PM

16    PRD?

17         DR. TAYLOR:  I don't know what those are.

18         THE COURT:  Would you figure that out and just

19    tomorrow let Mr. Fathi know what BHDT and PRD mean and confirm

20    that the other ones are right.                                   02:49PM

21         MR. FATHI:  Finally, Your Honor, there's references

22    here to an RN seeing the patient.  We have no objection to the

23    RN seeing the patient, but we want to make sure everyone is on

24    the same page that contact line RN does not satisfy the

25    performance measure.                                             02:50PM

1        DR. TAYLOR:  Correct.  We have not ever counted an RN

2    contact for that performance measure.

3        MR. FATHI:  So what is the purpose of having the RN

4    see the patient?

5        DR. TAYLOR:  They round in that area four times a day,      02:50PM

6    I believe, as just part of their requirements for the

7    Department of Health Services.

8        MR. FATHI:  Okay.  Well, since --

9        THE COURT:  This is to conduct the watch.  Will assign

10   a licensed MH clinician RN to conduct the watch.  That's what      02:50PM

11   you are talking about Paragraph 7?

12       MR. FATHI:  Your Honor, in Paragraph 2B and again in

13   Paragraph 7 there's reference to the person, the patient being

14   seen by an RN.  And because this is a remedial plan for a

15   performance measure that is not satisfied by the patient being      02:51PM

16   seen by an RN.  I'm just not sure why that is in there.

17       DR. TAYLOR:  That is correct.  That needs to be

18   removed, the RN piece and provider needs to be put in instead.

19       THE COURT:  So to make sure we're all on the same page

20   on 2B, where it says, "A RN will see the inmate face-to-face.      02:51PM

21   If warranted RN will contact on-call psychological for a watch

22   order," you are saying, Dr. Taylor, that what change needs to

23   be made?

24       DR. TAYLOR:  Honestly, Your Honor, I actually haven't

25   seen those.  Those came out this morning.      02:51PM

1          THE COURT:  Mr. Bojanowski, would you put it in front

2     of Dr. Taylor so she can see 2B?

3          DR. TAYLOR:  We're going to have to go through each of

4     those lines to make sure they have the right terms in there.

5     Because there is situations where they are not on a watch yet          02:52PM

6     and an RN would need to see them.  So that initial part may

7     still need to happen but I'm going to have to review the plan

8     and talk with them about changes that they make so that it's

9     completely accurate.

10          MR. BOJANOWSKI:  How about if we modify the plan and          02:52PM

11     get it to the plaintiffs and the Court within easily a week.

12          MR. FATHI:  Your Honor, I just want to raise this

13     global concern.  When this document is produced to us the

14     morning of the hearing without the relevant people having had a

15     chance to review, it's not terribly useful.  So it would be          02:52PM

16     helpful if this could be produced a little bit more in advance

17     than the morning of the hearing.

18          MR. BOJANOWSKI:  We strive to do that.  It's just that

19     we were on a compressed time frame for this particular hearing

20     because of the finalization of the preliminary numbers, getting          02:52PM

21     that out to Corizon, getting it investigated, getting a plan

22     put together, getting this document put together.  I would love

23     to get this to the plaintiffs well in advance and I'd love to

24     have a very specific review.  It's just this particular month

25     because this hearing is happening today, it was just          02:53PM

1    compressed.  And I apologize to the Court that sometimes

2    mistakes arise when we work in that compressed time frame.  It

3    just happened to be when it happened.  And so we'll get it

4    corrected and get it off to the plaintiff so it's clear what

5    the plan is.                                                      02:53PM

6              THE COURT:  Okay.  Good.

7              We're done with 91?

8              MR. FATHI:  We are, Your Honor.

9              THE COURT:  Let's take a 10-minute break.  Thank you.

10             (Recess from 2:53 p.m. until 3:09 p.m.)               02:53PM

11             THE COURT:  Important question, we have a simple

12   answer, I think.  Mr. Pratt, when you were talking about the

13   Performance Measure 46 and the new drop-down menu that would

14   require that the action be noted, is that something that's

15   already in place or is it about to be in place?  Do you know    03:09PM

16   when it's going to -- what the date is for that?

17             MR. PRATT:  I don't know the date, Your Honor.  I'm

18   advised if it hasn't happened yet -- I think it has happened.

19   I'm not sure.

20             THE COURT:  Could you check and let us know?  I mean,  03:10PM

21   if you can find out easily by sending off an e-mail let us know

22   tomorrow.

23             MR. PRATT:  Absolutely.

24             THE COURT:  Thank you.

25             Next performance measure.                             03:10PM

1     MR. BOJANOWSKI:  Before we move on, Mr. Fathi had

2  asked the definitions of those.

3     THE COURT:  Oh, you found them.

4     MR. BOJANOWSKI:  I did.

5     THE COURT:  Please.                                 03:10PM

6     MR. BOJANOWSKI:  I thought I would report those now

7  instead of tomorrow.

8     THE COURT:  Of course.

9     MR. BOJANOWSKI:  Are you there?

10     MR. FATHI:  I am.                                   03:10PM

11     MR. BOJANOWSKI:  BHDT is behavioral health data

12  technician.  And PRD is psychiatric regional director.

13     THE COURT:  Thank you.

14     MR. FATHI:  Thank you.

15     THE COURT:  Mr. Fathi.                              03:11PM

16     MR. FATHI:  Ms. Eidenbach has something.

17     THE COURT:  Thank you.

18     MS. EIDENBACH:  Your Honor, before we go on, I would

19  like to bring a matter to the Court's attention regarding

20  tomorrow's evidentiary hearing.  During the last session we   03:11PM

21  just received an additional production from the defendants of

22  documents that are responsive to our RFP regarding retaliation

23  last November in Tucson.  We have already completed and

24  de-duped the exhibit list.  Yesterday we received their

25  exhibits that contain two documents that had not been produced   03:11PM

1   to us before, Exhibit 46 and Exhibit 47.  While we're willing

2   to let these particular exhibits come in, we did want to bring

3   it to the Court's attention because last Monday, October 30th,

4   I e-mailed Mr. Struck because the majority of the production

5   that we received was strangely nonresponsive to the retaliation          03:12PM

6   situation.  In fact, most of the documents actually were dated

7   between June 2017 and September 2017.  And so I asked whether

8   his clients represented that the production was, in fact,

9   complete as produced on October 25th, 2017, and he told me that

10  it indeed was.                                                           03:12PM

11          So we have now received six additional documents.  The

12  two that we received today are perhaps the most responsive

13  because they relate to disciplinary actions that were taken

14  against two of the prisoners who were housed in House 3 at

15  Rincon Unit at the time that the retaliatory behavior occurred.          03:12PM

16          And so those are really the two most responsive

17  documents in the entire production and we just received them

18  while we were sitting in court today for the hearing that's due

19  tomorrow.  So we would like there to be no further productions,

20  you know.  We can't keep reviewing documents throughout the              03:13PM

21  evening and updating our exhibit list.

22          THE COURT:  Well, I don't think you want to say that.

23  I mean.

24          MS. EIDENBACH:  Well --

25          THE COURT:  You would like to have the production, but           03:13PM

1    you would also like to be able to argue to the Court this can't

2    be acceptable and how you are prejudiced by it and what remedy

3    you would like the Court to consider.  Shutting off the

4    information is probably not the right approach.

5            MS. EIDENBACH:  Right.  I mean, if there's going to be    03:13PM

6    a continued production, perhaps we need to reschedule the

7    hearing because we would need time to review those documents to

8    see if we need to call additional witnesses and how they relate

9    to the rest of the production.

10           THE COURT:  Because of the number of hearings that we     03:13PM

11   have set with respect to requiring steps being taken in advance

12   of that hearing, I cannot recall whether I set a particular

13   deadline for production of exhibits that would be used at the

14   retaliation evidentiary hearing.  Did I?

15           MS. EIDENBACH:  You did, Your Honor.  It was October     03:14PM

16   25th, which is the day -- I reviewed the documents that

17   defendants had produced by that day, and my e-mail on October

18   30th to Mr. Struck specifically asked whether the production

19   that had been made as of October 25th was complete and he

20   confirmed for me that it was complete.                            03:14PM

21           THE COURT:  Mr. Struck is not here.  Ms. Love.

22           MS. LOVE:  Your Honor, I can't speak to the details of

23   what the source was for the additional production today.  I'm

24   happy to go make a phone call and see if I can get an answer

25   for you.                                                          03:14PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1      THE COURT:  Do you know if Mr. Struck plans to be in

2  attendance tomorrow?

3      MS. LOVE:  Yes, he will be conducting the hearing

4  tomorrow.

5      THE COURT:  We'll be able to bring up the issue then.      03:14PM

6  Do you know if there are any other documents in the pipeline?

7      MS. LOVE:  I'm not aware of any.

8      THE COURT:  Well, we will reserve this until tomorrow

9  when we have Mr. Struck present.

10      MS. EIDENBACH:  Thank you, Your Honor.      03:15PM

11      THE COURT:  Mr. Fathi.

12      MR. FATHI:  Performance Measure 93, Your Honor, Page

13  211.

14      THE COURT:  I'm there.

15      MR. FATHI:  So the first question is, is this plan in      03:15PM

16  effect, and if so, when did it go into effect?

17      MR. BOJANOWSKI:  It is.  November 6th.

18      MR. FATHI:  And then Paragraph 4 describes action

19  taken by a mental health tech in Paragraph 5, action taken by a

20  mental health aide.  What is the difference, first, between      03:15PM

21  those two job classifications, and secondly, between the two

22  apparently quite similar tasks carried out by them.

23      MR. BOJANOWSKI:  They are the same.  We can change 8

24  to tech if you so desire.

25      MR. FATHI:  Well, Your Honor, if they are the same I'm      03:16PM

1  not sure why there's two different terms and two different

2  paragraphs that are, while similar, not identical.  Paragraph 4

3  talks about the MH tech taking brief notes on the printed MH

4  segregation visit search report, and Paragraph 5 talks about

5  the MH aide documenting the cell by cell checks in eOMIS.  So          03:16PM

6  those are two different things.

7          MR. BOJANOWSKI:  The problem is that we use the term

8  MH tech.  Corizon uses the term MH aide.  So it probably got

9  dropped in there.  It should be MH tech so there's no confusion

10 and we can make that change.                                           03:17PM

11         THE COURT:  Because everywhere else --

12         MR. BOJANOWSKI:  It's tech.

13         THE COURT:  At Number 5, MH-5 should be tech.

14         MR. BOJANOWSKI:  Correct.

15         MR. FATHI:  Your Honor, again, we would really like it          03:17PM

16 if this document could be accurate.

17         THE COURT:  No.  Totally understand that point,

18 obviously every time we identify issues like this it rings that

19 bell, beats that drum.

20         Go ahead, sir.                                                 03:17PM

21         MR. FATHI:  And then in Paragraph 6 it refers to an MH

22 lead.  What is an MH lead?  Is there one such person per

23 complex?  What are the requirement -- the minimum

24 qualifications for that position?

25         MR. BOJANOWSKI:  It's the mental health lead, and             03:17PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    there's one per complex.

2         MR. FATHI:  We have been told the mental health lead

3    is the mental health lead.  That's not terribly helpful.

4         MR. BOJANOWSKI:  Would you prefer "clinician" in there

5    Mr. Fathi?                                              03:18PM

6         THE COURT:  Dr. Taylor, what kind of person is this,

7    Dr. Taylor?

8         DR. TAYLOR:  The mental health lead is a mental health

9    clinician that's been assigned to oversee the site.  There's

10   one per complex, and they are a master's level clinician or a  03:18PM

11   psychologist.

12        THE COURT:  Thank you.

13        MR. FATHI:  So the mental health lead is always at

14   least -- always a mental health clinician?

15        DR. TAYLOR:  Correct.                              03:18PM

16        MR. FATHI:  Thank you.

17        THE COURT:  Before we go on, Ms. Fettig you said you

18   had done something with the records you received.  You said

19   they had already been something.  I didn't understand that

20   word.                                                   03:18PM

21        MS. EIDENBACH:  Are you talking to me?

22        THE COURT:  No, I am talking to you.  Yeah.  I said

23   Fettig.

24        MS. EIDENBACH:  That's okay.  I just wanted to make

25   sure I was reading your mind properly.                  03:19PM

1      THE COURT:  I'm sorry about that.  I apologize.  I

2  realized as you stared at me why you were staring at me.

3      This word that you used is one that I didn't

4  recognize.  I noticed the court reporter didn't recognize it

5  either.                                                        03:19PM

6      MS. EIDENBACH:  Okay.

7      THE COURT:  You said that you did something with the

8  records that you had received from the defendants preparatory

9  for tomorrow's hearing.  I didn't understand that word.

10      MS. EIDENBACH:  I apologize.  We de-duplicated our      03:19PM

11  exhibits.

12      THE COURT:  I think you said de-duped.

13      MS. EIDENBACH:  Apologize, yes, so we're not

14  submitting the same exhibits.  Each document is one exhibit.

15      THE COURT:  Thank you and I'm sorry for the lag on      03:19PM

16  both of those things.

17      Go ahead.

18      MR. FATHI:  Performance Measure 94.

19      THE COURT:  Thank you.

20      MR. FATHI:  Is this in effect, and if so, as of what    03:19PM

21  date?

22      MR. BOJANOWSKI:  As I indicated before, all of them in

23  this book are in effect as of November 6th.

24      MR. FATHI:  Okay.  Your Honor, a global comment about

25  Performance Measures 94, 95, and 97, as we have already pointed  03:20PM

1   out, we found in the July CGARs the defendants are not

2   complying with the Court's July 13th order, Document 2185 at 2,

3   that they have to draw files of different individuals for each

4   of these performance measures and they can't use the same

5   individual files more than once.  We have since found that even     03:20PM

6   in the August CGARs they are still not complying with the

7   Court's orders.  So all of these findings for 94, 95, and 97

8   have, in fact, not been calculated in compliance with the

9   Court's order.

10          THE COURT:  So the August errors that you                    03:20PM

11   identified --

12          MR. FATHI:  I beg your pardon?

13          THE COURT:  The August errors that you identified?

14          MR. FATHI:  Both July and August.

15          THE COURT:  Both July and August.                            03:21PM

16          MR. FATHI:  And again, we have not received the

17   September CGARs.  We just don't know about them.

18          THE COURT:  When will you get the September CGARs?

19          MR. FATHI:  We historically have gotten them the

20   middle of the month, so that would be the middle of this month.     03:21PM

21   In recent months we're getting them later and later more toward

22   the end of the month.

23          THE COURT:  Let me know if the latest CGARs show the

24   same error.

25          MR. FATHI:  We will, Your Honor.                             03:21PM

1          THE COURT:  Thank you.

2          MR. BOJANOWSKI:  Dr. Taylor may be able to provide

3     some information on this.

4          THE COURT:  Go ahead.

5          DR. TAYLOR:  Your Honor, we had already conducted a          03:21PM

6     number of the audits by the time we received the July order.

7     And so those ones we unfortunately did not go back and relook

8     at to make sure there were not any duplicates in there.  One of

9     the duplicates was actually that under telepsych for 97, that

10    the individual was at one unit and then later moved to another          03:21PM

11    unit and was seen on a subsequent date.  And in our minds, that

12    wasn't something that fell under your order, but we removed

13    that individual and added another person because the

14    performance measure says 10 files per unit.  And so it was 10

15    files per unit for the 97, but we did remove that to do what          03:22PM

16    the plaintiffs had asked.

17          We have instituted a process that we have a formula

18    that checks the dates against themselves, because with human

19    error and the couple of errors, the four or five errors that

20    were found out of the 1,500 files that were reviewed, human          03:22PM

21    error, and so we have created a formula that will check those

22    dates against each other.

23          But just to add, the plaintiff suggested that those

24    were all in our favor, and actually one of the duplicates for,

25    I believe it was watch follow-ups, ended up it was a negative          03:22PM

UNITED STATES DISTRICT COURT

1    finding that was a duplicate.  We removed the negative finding

2    per their request, re-audited an additional person, and the

3    performance score went up.  So they aren't always in our favor.

4    Oftentimes they are not.

5           So I would be interested to see what August ones they          03:23PM

6    found, because we were working really hard to make sure we took

7    the human error element out to the best of our ability.

8           THE COURT:  Have the August findings been the product

9    of a letter or not?

10          MR. FATHI:  I'm sorry.                                          03:23PM

11          THE COURT:  Did you send a letter about the August

12   issue?

13          MR. FATHI:  Not yet, Your Honor.  It is in process.

14   But unfortunately, what Dr. Taylor says isn't true.  The

15   Court's order was July 13th.  The July CGARs were prepared at        03:23PM

16   the end of August.  The August CGARs were prepared at the end

17   of September.  So there's absolutely no excuse for the

18   noncompliance with the Court's order.  And we will certainly

19   notify the Court if the September CGARs show continued

20   noncompliance.                                                        03:24PM

21          THE COURT:  Okay.  Thank you.

22          MR. FATHI:  In Paragraph 3, there's a term mental

23   health lead, which we have just discussed, mental health lead

24   slash designee.  And that term recurs in Paragraph 4, Paragraph

25   5.  What does that mean?                                             03:24PM

1    DR. TAYLOR:  So that's a situation where the mental

2  health lead might take a vacation, and then when they are gone

3  on vacation, while they are gone they designate another

4  clinician as the point of contact for that period of time where

5  they might have taken a day or two off.                        03:24PM

6    MR. FATHI:  So the designee would always be a mental

7  health clinician?

8    DR. TAYLOR:  That is correct.

9    MR. FATHI:  And there's no provision for a designee in

10  the plan for Performance 93, so does that mean it would not     03:24PM

11  occur with respect to Performance Measure 93?

12    DR. TAYLOR:  I'm sure that would occur for any

13  performance measure where somebody takes vacation or a sick day

14  and so, therefore, somebody else is placed into that position

15  to be the point of contact for that time.                      03:25PM

16    MR. FATHI:  Well, Your Honor, we, much like when

17  interpreting language in a contract, we assume that when

18  different terms are used a different meaning is intended.  So

19  what I'm trying to get to here is why, in Performance 93,

20  Measure 93, it's just mental health lead and in Performance     03:25PM

21  Measure 94 it's mental health lead slash designee.

22    THE COURT:  Take another look at this, Mr. Bojanowski,

23  to see whether or not this is highlighting an issue that since

24  somebody thought that it was important enough to be mentioned

25  in 94 should also be mentioned in 93, or whether there's some   03:25PM

1   reason the two should be treated differently.

2       MR. BOJANOWSKI:  I will look at it and consistent with

3   Mr. Fathi's suggestion, we may add the designee status to 93 as

4   well.

5       THE COURT:  Okay.  Thank you.                           03:25PM

6       MR. FATHI:  And finally, Your Honor, in Paragraph 7,

7   it refers to an RN conducting the watch.  Again, I just want to

8   make sure that we all understand that that would be compliant

9   only on a weekend or holiday.  During the week contact by an RN

10  does not satisfy the performance measure.                   03:26PM

11      MR. BOJANOWSKI:  Right.  But the measure does include

12  weekends or holidays so I think that's the reference.

13      MR. FATHI:  Okay.

14      THE COURT:  All right.

15      MR. FATHI:  Nothing further, Your Honor.               03:26PM

16      THE COURT:  Okay.

17      MR. FATHI:  Oh, I beg your pardon.  On Performance

18  Measure 95, again, as we have set forth for the Court, we have

19  a dispute about the methodology that we recently learned the

20  defendants have been including in the sample for one facility  03:26PM

21  people who were removed from watch at a different facility.

22  So, for example, we found in the sample for Tucson for July of

23  2017 people who had been removed from watch at the Phoenix

24  facility.  So again, we will need the Court to resolve that

25  issue.                                                       03:27PM

1      THE COURT:  And it sounds as though the State has a

2  different position with respect to this performance measure for

3  transfer of inmates under a performance obligation than Dr.

4  Taylor said a minute ago, and that is that they addressed your

5  concern.  Sounds like it is still an issue.                    03:27PM

6      MR. FATHI:  It is an issue.  What they want is to have

7  it both ways.  So they include in the Tucson sample the person

8  who was taken off watch in Phoenix, but they don't verify that

9  the follow-up contacts that were due while they were still at

10 Phoenix occurred.  So our position is the record is either in   03:27PM

11 the sample or it's not in the sample.  You can't say it's in

12 the sample but we're not going to count the two, two out of the

13 three required contacts.

14      DR. TAYLOR:  So those individuals are actually also on

15 the Phoenix log, and they are in the random pull for could be   03:27PM

16 pulled for audit.  And those contacts would be audited at

17 Phoenix because as he very aptly pointed out in his letter, the

18 concern is whether the action is happening at the site that you

19 are reviewing.  And so we need to know is Tucson doing what

20 they need to do, and for Phoenix, we need to know are they      03:28PM

21 doing what they need to do.  And so they are on both logs for

22 potential review.

23      But to review a Tucson inmate for those contacts that

24 were done at Phoenix doesn't make sense.  As we have shown

25 them, they are on both logs and they are available for review.  03:28PM

1    And we want to ensure that Tucson is not missing somebody who

2    transfers halfway through that three-week period and they end

3    up out on a yard without a contact.  I find that to be a very

4    important piece of this audit, because for me, that transfer is

5    a point of possible destabilization.  It's very important that        03:28PM

6    we are verifying that those watch contacts happen.  Absolutely.

7    And so that's why they have been included from day one.  They

8    have been part of the sample from day one.  And we have had

9    them on both complexes for being reviewed from day one to

10   ensure that those contacts happen no matter where they are at.        03:29PM

11          MR. FATHI:  Your Honor.

12          THE COURT:  Go ahead.

13          MR. FATHI:  Your Honor, the sample for Tucson should

14   consist of people who were removed from watch at Tucson.  The

15   way that we have dealt with this in every other performance          03:29PM

16   measure, if you draw -- if you randomly draw a record that

17   doesn't tell you what you need to know, you simply exclude that

18   record from the sample and you randomly draw another record

19   until the sample size is reached.  The defendants -- we have

20   suggested this.  The defendants have provided no reason why          03:29PM

21   that shouldn't be done with this performance measure just like

22   with every other.  But you can't simultaneously say we're going

23   to count this record in the sample but we're not going to look

24   at whether those first two contacts took place.  That just

25   doesn't make sense.  And again, there's no explanation why           03:30PM

1   those records can't just be excluded and another record

2   randomly drawn.

3            THE COURT:  Well, Dr. Taylor's point is a good one

4   with respect to inmate care, that you do want to make sure that

5   there's continuity when somebody is transferred from one                 03:30PM

6   facility to another.

7            What you are objecting to is that if somebody's name

8   is drawn from Phoenix who has been transferred to Tucson, you

9   don't like the idea that they are looking to see whether or not

10  that person who has left Phoenix is still being counted on                03:30PM

11  whether Phoenix is doing the job or not.  Is that right?

12           MR. FATHI:  It's the reverse, Your Honor.  And as a

13  matter of patient care, obviously we completely agree nothing

14  we're seeing prevents them from providing that.

15           THE COURT:  I understand.                                        03:31PM

16           MR. FATHI:  About the sampling methodology.

17           THE COURT:  Help me fix my problem here.

18           MR. FATHI:  So our position is the sample for Tucson

19  should consist of people who were removed from watch at Tucson.

20  And if you are drawing a sample for Tucson, and you see, okay,            03:31PM

21  this person is at Tucson now but they were at Phoenix three

22  weeks ago and they were removed from watch at Phoenix, you just

23  exclude that record and draw another one so that you have got a

24  sample of people who were for Phoenix -- excuse me -- for

25  Tucson who were removed from watch at Tucson.                             03:31PM

1          THE COURT:  And the reason that you think this is

2   important is that if somebody is removed for watch in Tucson,

3   you want to know whether or not the Tucson people are on task

4   with respect to making sure that they meet this performance

5   measure.  If you allow Phoenix contacts to be counted that          03:31PM

6   doesn't answer the question about whether Tucson is doing it

7   right or not?

8          MR. FATHI:  Well, it's really a more fundamental

9   question, Your Honor.  Let me give a concrete example.

10          THE COURT:  Please.                                          03:32PM

11          MR. FATHI:  Maybe that will help.  So you are drawing

12   the sample for Tucson and one of the records you draw is

13   someone who is now at Tucson but they were previously, let's

14   say they were transferred from Phoenix two weeks previously.

15   So they were taken off watch at Phoenix.  Their first required    03:32PM

16   contact between 22 and 72 hours should have happened at

17   Phoenix.  Their second required contact between seven and 10

18   days should have happened at Phoenix.

19          Our objection is that what the defendants are doing

20   now is they are not verifying that those contacts happened        03:32PM

21   because they are only looking at the contacts that were due at

22   Tucson, even though the person was taken off watch at Phoenix

23   and the first two contacts were due at Phoenix.  They just

24   don't look and see if those contacts occurred or not.  So the

25   simple solution is you just exclude that record and pick          03:33PM

1    another one.

2         THE COURT:  Forgive me for going over it again.  But

3    what you just said sounded to me like the people who are

4    transferred to Tucson are evaluated in a way that if there was

5    a failure to comply with the performance measure in Phoenix we        03:33PM

6    would never know about it with respect to that inmate.

7         MR. FATHI:  Precisely, Your Honor.

8         DR. TAYLOR:  That's not actually true, because again,

9    they are on the Phoenix log for watch follow-ups and they are

10   in that same pool to be pulled for review for whether Phoenix        03:33PM

11   conducted the watch follow-ups as required.

12        So you would end up --

13        THE COURT:  We don't know whether or not.  The problem

14   is, let's use another analogy.  You are supposed to check four

15   things with this particular performance measure:  Did A, B, C,        03:33PM

16   and D happen.  And it sounds to me like your method, Dr.

17   Taylor, says we can satisfy this performance measure if we only

18   check C and D on this particular record, on this particular

19   inmate.  Is that a fair recitation?

20        MR. FATHI:  That's exactly right, Your Honor.  Just to        03:34PM

21   be clear, what Dr. Taylor is saying, Dr. Taylor is not saying

22   we're going to check this person's -- those first two contacts

23   when we audit Phoenix.  She's just saying they are in the pull

24   for Phoenix.  They have a chance of being randomly drawn for

25   Phoenix.  But unless that happens, A, B, C are not going to be        03:34PM

1   checked for this person, and that's our objection.

2        THE COURT:  So my ruling would be if A, B, C and D,

3   the equivalent here, cannot be checked because somebody's been

4   transferred and that person would be pulled out of the sample

5   and an alternative person who was at the facility the entire          03:34PM

6   time, so A, B, C, D can be checked, can be evaluated for

7   compliance.

8        MR. FATHI:  Thank you, Your Honor.

9        DR. TAYLOR:  So removing those that have not been

10  removed from there is what you would like us to do?                    03:35PM

11       THE COURT:  Right.  You are only going to be looking

12  at people who have been there such that your evaluation can

13  determine whether or not all four of the requirements just

14  using that as an analogy were satisfied.  The problem with the

15  transferred inmates is that there is no check to see whether or        03:35PM

16  not A and B were done.

17       DR. TAYLOR:  And we can transition to that, but -- and

18  the concern, Your Honor, is the fact that we have been doing

19  this over two and-a-half years.  And this is the first time

20  this is brought up to the Court which then, in the plaintiffs'        03:35PM

21  mind, will say, well now that performance measure starts all

22  over again with auditing for the next two years for compliance

23  when we have been doing the same auditing the same way,

24  transparently, very clearly with them, no changes in any of

25  that, and it's just really challenging as a monitor to then be        03:35PM

1    faced with okay, everything you have been doing I now have a

2    problem with it at two and-a-half years.  You need to change it

3    and start over again.

4          THE COURT:  Mr. Fathi, that response provided some

5    suggestion of facts that would cause -- or I should be          03:36PM

6    considering any objection to any of the particular facts about

7    when you knew about this, et cetera.

8          MR. FATHI:  Your Honor, I am representing to you that

9    we did not know about this until we spot checked the July 2017

10   CGARs and found those examples of people who had been taken off  03:36PM

11   watch at Phoenix but were included in the Tucson sample.  There

12   has been nothing transparent about their monitoring.  There is

13   no hint in the performance measure in any of the successive

14   drafts of their monitor guide that they were including in the

15   sample for Institution A, people who had been taken off watch    03:36PM

16   at Institution B.  That's just not something that was ever made

17   known to us or that we ever could have known.

18         THE COURT:  Dr. Taylor, I don't want to put you in a

19   position where you have to be the person who feels like you are

20   obligated to respond to what may be legal arguments.  So I am    03:37PM

21   just saying to you I'm not expecting that of you but I

22   appreciate the information you have given.  I asked for a

23   counter view of sort of the facts.  The legal implications of

24   this is something that will be addressed when there is an

25   argument being made about whether or not the stipulation has     03:37PM

1    been complied with.

2            I think the legal argument that you suggested which

3    you think is also in lay person's terms a fairness argument is

4    one that your lawyers will make.  So I don't think you need to

5    feel that you have to wage that right now.                    03:37PM

6            But I just wanted to hear about whether or not Mr.

7    Fathi had known all along that this had been the way that had

8    been done and he has now told me he learned about it first in

9    July because of a spot check.

10           DR. TAYLOR:  And, Your Honor, that would be surprising  03:38PM

11   because we have had conversations about inmates being on both

12   logs at both facilities from day one.  And I had to prove to

13   him over and over again that those individuals were on both

14   logs because he was very frustrated if they would only be on

15   one log.  And so we showed him log after log where they were at  03:38PM

16   one facility and on that log for random pull and on the next

17   facility that they transferred to and on that log for the

18   random pull.  We have had multiple discussions about that to

19   ensure that they were being tracked through for all of that.

20   And so we have had that discussion.  So to say this is the   03:38PM

21   first time he's heard it, that's just not true.  We have had

22   multiple discussions about the logs.

23           MR. FATHI:  I'm afraid Dr. Taylor's memory is faulty.

24   But I think we should move on, Your Honor.

25           THE COURT:  Thank you.  Did you want to hear about 96  03:38PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    at Tucson?

2            MR. FATHI:  Yes, please, Your Honor.

3            MR. BOJANOWSKI:  It's at 95 percent.

4            THE COURT:  Thank you.  And while you have got that in

5    front of you, how about Perryville for 98?                    03:39PM

6            MR. BOJANOWSKI:  98 percent.

7            THE COURT:  Thank you.  Mr. Fathi, were there other

8    performance measures that you wanted to address?

9            MR. FATHI:  No, Your Honor.  Thank you.

10           THE COURT:  All right.  Thank you.  I think the next    03:39PM

11   agenda item is Item 8, which is the mental health provider at

12   ASPC Tucson Santa Rita to provide medical care to class

13   members, an issue raised in the Kendrick declaration.  I'm

14   hoping there's an easy answer that this is somebody who decided

15   to get an additional shingle for their sign and it doesn't mean  03:40PM

16   that their mental health provider knowledge erased any previous

17   knowledge.  But it's a reasonable question to ask.

18           MR. BOJANOWSKI:  That's exactly what happened.  So he

19   was a medical nurse practitioner transitioned into mental

20   health.  I understand that there may have been some             03:40PM

21   documentation issues with his title in the eOMIS system.  I

22   also understand that that has been fixed as far as this

23   particular person is concerned.  And I think if there's still

24   some existing entries that may be medically related where it's

25   signed off as a mental health practitioner, it's my            03:41PM

1    understanding that he can do some kind of entry into eOMIS and

2    that auto fills into those boxes.  But that's my understanding

3    of what was going on here.

4        MS. KENDRICK:  I guess we had also asked to try to

5    figure out if Corizon was holding this person out as a          03:41PM

6    psychiatrist.

7        MR. BOJANOWSKI:  No.

8        MS. KENDRICK:  That's what his title said repeatedly,

9    whether they were counting him as a psychiatrist for the

10   purposes of the staffing reports at Tucson or where they were   03:41PM

11   counting him, because he's listed as a psychiatrist.  He's

12   providing medical care.  And he's not a mental health nurse

13   practitioner until apparently August when he finally got

14   certified for that.

15       MR. BOJANOWSKI:  All right.  So the title was -- that        03:42PM

16   was the mistake in eOMIS was his title.  But he was signing as

17   an NP.  So you look at his title said that, but then he's

18   signing off on the document as an NP.  That has been corrected.

19   He's not represented as a psychiatrist, not counted as a

20   psychiatrist because the roster that we received listed him as  03:42PM

21   a nurse practitioner.

22       MS. KENDRICK:  So I guess the roster you receive --

23   but I'm asking about the staffing reports.  That was our

24   question.

25       THE COURT:  It's a reasonable question, because we've       03:42PM

1    got somebody who is wearing two hats, and if they've got one

2    hat on that means they aren't serving in the other capacity so

3    they shouldn't be counted.

4           MR. BOJANOWSKI:  He's not counted in the staffing

5    report.                                                        03:42PM

6           THE COURT:  In which way?

7           MR. BOJANOWSKI:  Not as a psychiatrist.

8           THE COURT:  Okay.  Thank you.

9           Anything further about 8?

10          MS. KENDRICK:  Well, the other question was we also     03:43PM

11   noticed with one of the class members that is -- I believe

12   it's -- he was seen by the person whose title was the assistant

13   health services administrator on the nurse's line and it was

14   unclear because our understanding was these were admin

15   positions.                                                     03:43PM

16          THE COURT:  Could you restate the question, please?

17          MS. KENDRICK:  It's described in more specific detail

18   at Docket 2426-1, Page 58.  This was a gentleman who had a

19   detached retina for three months, and he submitted an HNR about

20   his eye and he was seen by somebody whose title was health     03:43PM

21   services administrator.  And so our question was that our

22   understanding was these HSAs, as they are known, are

23   administrative staff and why a health services administrator

24   was apparently running nurse's line on July 30th.

25          THE COURT:  And if this is the first -- this is not --  03:44PM

UNITED STATES DISTRICT COURT

1    I mean, that question is in the letter so it's not the first

2    that you have heard about this.

3            MS. KENDRICK:  Correct.

4            THE COURT:  Mr. Bojanowski.

5            MR. BOJANOWSKI:  We'll have to confirm whether the HSA        03:45PM

6    is an RN, Your Honor.  And again, I don't know specifically on

7    this particular provision what occurred here.  I might have a

8    redacted -- Mr. Pratt can add.

9            THE COURT:  Yes, sir.

10           MR. PRATT:  Your Honor, it's very possible, I don't        03:45PM

11   know the specifics on this, but I can look into it.  It's very

12   possible that the HSA is an RN, and it's not abnormal for an

13   HSA to fill in if there's an RN who is absent, to go in and do

14   a line and take care of business.  So I can verify on that.

15   That's my understanding.                                          03:46PM

16           THE COURT:  That's helpful.  Thank you.

17           So we'll hear, after Mr. Pratt has a chance to

18   investigate this, whether or not the person who signed off was

19   a person who is qualified to do it.  I think that these kinds

20   of little details that are suggested in the records are          03:46PM

21   appropriate.  It's really a way to make sure that there is a

22   careful attention from everybody's perspective to whether the

23   records are right.  And sometimes those of us who are at least

24   familiar with them are left to question things that look

25   anomalus to us, and this looks anomalus.  So if there's an       03:46PM

1    explanation, that's great.  We don't need to devote more time

2    to it.  I don't want to turn off this inquiry that may lead to

3    dead ends when there is a reasonable good faith basis to think

4    it is anomalus deserving of an explanation.

5         Is there anything else in 9 the plaintiffs wanted to          03:47PM

6    raise?

7         MS. KENDRICK:  Yes.  The last portion of it, Exhibit

8    7, again, this is another thing.  We're not looking for this

9    stuff, but when we're trying to decide whether we need to do

10   individual advocacy for somebody and we're reviewing their       03:47PM

11   medical records and we see disturbing things such as somebody

12   listed as a psychiatrist reviewing an EKG report, that raises a

13   lot of alarm bells.

14        And with this person it was about one of the

15   telemedicine providers and the individual -- our question was    03:47PM

16   simply the fact that, again, the eOMIS note referred to this

17   medical Dr., Dr. Awaal, A-W-A-A-L, who was seeing somebody for

18   chronic care and plaintiffs had clearly expressed our concern

19   at the August hearing about the fact that it was unclear

20   whether the people providing primary telemedicine care were      03:48PM

21   licensed by the State of Arizona to practice medicine.  Because

22   the exceptions that are within the Arizona Revised Statutes for

23   people who are not licensed are very narrow and involves

24   basically you can only do it for very discrete purposes like

25   people in the military or medical doctors that are with the      03:48PM

1    football team that's in town.

2         So we have checked the medical board licensing

3    website, and we could not find anybody who is an M.D. or a D.O.

4    by that name.  So that was our question again as of October

5    20th, was if this person, if they're licensed as a doctor in          03:48PM

6    Arizona.  Because we could not find any determination that he

7    or she was.  I'm not sure of the person's gender.

8         THE COURT:  All right.

9         MR. BOJANOWSKI:  Your Honor, we had done the

10   investigation on this particular individual that they                   03:49PM

11   identified, and he is licensed in Arizona as a nurse

12   practitioner.

13        THE COURT:  Thank you.

14        MR. BOJANOWSKI:  They apparently looked in the medical

15   board, and I don't know what they were looking at.  But we              03:49PM

16   confirmed that the individual performing those services was, in

17   fact, licensed.

18        THE COURT:  As I recall from the letter there was an

19   annotation that he was a medical doctor and that was why they

20   looked for an M.D. licensure.                                           03:49PM

21        MS. KENDRICK:  That is correct, Your Honor.  It stated

22   that he was a medical doctor.  If you look there is a printout

23   from the record, it's at Page 65 of the Docket 2146-1, and it

24   lists his name, staff member, and says title medical doctor.

25   So that's why we looked at the medical board's website.  That's        03:50PM

1    where you find medical doctors.

2             THE COURT:  Reasonable steps.

3             Okay.  Agenda Item 10.

4             MR. FATHI:  Your Honor, this is my letter of October

5    19th.  It's at Document 2426-1, Page 78.  And we asked for          03:50PM

6    various documents relating to a number of recent suicides that

7    have taken place in the Arizona Department of Corrections.  We

8    had not received any response until yesterday afternoon.  Then

9    we received a letter from the defendants saying that they have

10   produced the psychological autopsy for the second two people      03:51PM

11   listed here.  Unfortunately, that is not true.  Both my office

12   and the Prison Law Office have searched both by name and by the

13   docket number that the defendants provided and simply no such

14   document has been produced.

15            So we would ask that the Court order production of        03:51PM

16   these documents.

17            MR. BOJANOWSKI:  You are talking about the psych

18   autopsies?

19            MR. FATHI:  Yes.  My letter of October 19, 2017.  We

20   received a letter saying that two psych autopsies had been        03:51PM

21   produced, and that is not correct.

22            THE COURT:  All right.  That's simple enough.  Just

23   get those autopsies tonight when you go back to the office and

24   bring them in tomorrow.

25            MR. BOJANOWSKI:  Can I have a moment, Your Honor?         03:51PM

November 7, 2017 - CV 12-601 - Status Hearing

1          THE COURT:  Sure.

2          MR. BOJANOWSKI:  I guess Ms. Love has the information.

3          MS. LOVE:  I'm relaying information, but the

4    information that we have is during the transition with Ms. Rand

5    handling document production to our office we were informed by          03:52PM

6    Ms. Rand that she had, in fact, produced those documents and

7    cited Bates numbers.  If plaintiffs say they never received

8    them, obviously they are in the AG's database and we will

9    reproduce.

10          THE COURT:  Okay.  Thank you.          03:52PM

11          MR. FATHI:  And then the second half of this item is

12   my letter of October 23rd, Document 2426-1, at Page 81.  This

13   involves someone who died by suicide by hanging at the Tucson

14   Cimarron Unit earlier this year.  And in the psychological

15   autopsy which we did receive for this person, it said that the          03:52PM

16   resuscitation efforts after he was found showed that partial

17   rigor mortis had set in.  It also said that custody staff

18   reported checking on this person 31 minutes before he was found

19   dead and found him alive and normal and healthy.

20          We have consulted our medical expert, and that is a          03:53PM

21   medical impossibility.  Rigor mortis does not set in within 30

22   minutes of death.  And what this means is that the statements

23   by the custody officers that they had seen him alive and

24   healthy 31 minutes previously are false.  And this would not be

25   the first time, as we noted in the letter, that custody          03:53PM

1    officers have lied about checking on someone who subsequently

2    died by suicide.

3         So we simply asked in this letter to which we have not

4    yet received any response that defendants produce all documents

5    reflecting any investigation that was undertaken into these          03:54PM

6    false statements and any staff discipline that resulted or that

7    they confirm that no such investigation has occurred.

8         MR. BOJANOWSKI:  Your Honor, initially, the allegation

9    that there's some falsification going on here is totally

10   unfounded.  Further, in light of this letter, I asked our         03:54PM

11   medical expert whether rigor mortis can set in in the neck area

12   within 30 minutes, and he said absolutely.

13        So he said in addition to that, given the nature of

14   the injury by hanging and the finding that there were broken

15   bones in the neck, it would not surprise him that there would       03:54PM

16   be some difficulty in trying to intubate a particular patient

17   at that time.

18        So I am more than happy to provide medical evidence to

19   the Court with regard to what is clearly the plaintiffs' jail

20   expert going out on a limb here.  I even checked it in the          03:55PM

21   Medical Legal Investigation of Death text to see if rigor

22   mortis can set in within 30 minutes and even the Bible for

23   pathologists indicates that it can.

24        So I don't know, you know, about Mr. Wilcox's opinion,

25   but it clearly is not impossible.  And I have got the medical       03:55PM

UNITED STATES DISTRICT COURT

1    testimony of our expert saying, oh, yes, it can happen.  And

2    given the physical nature of the injury it's not surprising

3    that somebody would have difficulty handling this patient.

4         As for the allegation that officers are lying, it's

5    unfounded and certainly not appreciated.  If he's got some kind    03:55PM

6    of evidence that somebody lied here, then pony it up to me.

7    I'd love to have a look at it because it didn't occur.

8         THE COURT:  Okay.

9         MS. LOVE:  Your Honor, if we could add to this as

10   well, this is an example of what defendants see as we are    03:55PM

11   complying with the stipulation regarding production of

12   documents.  Allegations of officer misconduct are not

13   performance measures that are measured here.  So we're getting

14   into, while obviously it is always a concern if someone dies in

15   custody, we are getting off onto a road of plaintiffs    03:56PM

16   interjecting into this lawsuit which we're looking at

17   compliance with performance measures of investigating and

18   litigating isolated incidents of things that they don't agree

19   with when they read the record.

20        So we have objections to continuing to provide    03:56PM

21   document requests on individual isolated incidents of medical

22   care that they don't disagree with when we're not dealing with

23   what we're here to deal with, which is the stipulation and

24   compliance with performance measures versus now within this

25   lawsuit, on a systemwide delivery of care, plaintiffs are now    03:56PM

1    litigating wrongs full death claims within here and that is not

2    appropriate.

3            THE COURT:  I think what the plaintiffs have asked

4    for, and they have already received with respect to this

5    inmate, are the medical records, the autopsy report and that            03:57PM

6    they are entitled to receive that.  What they have asked for in

7    addition is they wanted to know based upon their conclusion

8    that it appeared that this could not be physically possible.

9    They wanted to know whether or not any investigation had been

10   undertaken with respect to finding out whether the truth had            03:57PM

11   been told.

12           Mr. Bojanowski has satisfied himself that at least if

13   he were in charge he wouldn't undertake an investigation

14   because he believes that the supposition that rigor mortis is

15   inconsistent with this 31-minute examination, that -- so that's         03:57PM

16   the first question Mr. Fathi asked.  The second question Mr.

17   Fathi asked was whether any disciplinary action had been taken.

18   That answer, it sounds like, is no because you didn't think

19   there was any basis for it.

20           MR. BOJANOWSKI:  Correct.                                        03:58PM

21           THE COURT:  And third, Mr. Fathi asked if no

22   disciplinary action had been taken, why not.  Again, that

23   action has been provided here because you didn't think it was

24   warranted.  So I don't think, Ms. Love, we're getting into

25   areas that are turning this case into individual wrongful death         03:58PM

1   cases.  What we're doing is encouraging the plaintiffs to ask

2   questions where a reasonable person could ask this question.  I

3   know when I have dealt with dead animals and dead people that I

4   have encountered in my life I never saw rigor mortis within 30

5   minutes but you now tell me that's possible.  So it's a                    03:58PM

6   reasonable thing for somebody to wonder about, to ask a

7   question about in a context where there are these biases and

8   incentives that are contrary to truth telling.  I have heard

9   and seen had some of it in the witness box here.

10          So to ask these questions based upon that I have now,            03:58PM

11  I think, talked a bit about it to let you know that I don't

12  think asking the questions are inappropriate.  I think the

13  answers that you just gave in court here, Mr. Bojanowski, are

14  answers that can be -- could have been tendered in a written

15  response that would be a reasonable thing to happen in a case             03:59PM

16  like this that is looking at performance measures compliance

17  that require data and verified and truthful reporting.

18          So that's what I have to say about that one.  Next.

19          MR. FATHI:  Thank you, Your Honor.  May we just have a

20  clear -- I believe Mr. Bojanowski implied this -- but a clear            03:59PM

21  statement that there is no investigation of possible wrongdoing

22  by these officers?

23          THE COURT:  Do you know, Mr. Bojanowski?

24          MR. BOJANOWSKI:  Not that I'm aware of, Your Honor.

25  The investigation was complete and whatever records that were            03:59PM

1    supposed to be submitted to the plaintiffs per the stipulation

2    have been submitted.

3         THE COURT:  Could you check with the ADC and see

4    whether or not there was an investigation of the recording of

5    this person whether they had been seen within 30 minutes of his      04:00PM

6    death occurring so we can close that out.

7         MR. FATHI:  Your Honor, we have received no such

8    documents so if they exist, we would like to receive them.

9         THE COURT:  You would like to see the documents.  But

10   Mr. Bojanowski is going to answer the first question, has there      04:00PM

11   been or is there an investigation based upon any concern about

12   the credibility of this report that he was documented alive 31

13   minutes in advance.

14        MR. FATHI:  Thank you, Your Honor.  I would simply add

15   that the psychological autopsy itself notes the finding of          04:00PM

16   rigor mortis and then states, quote, "These findings bring into

17   question the belief that he had been observed alive and healthy

18   by correctional staff 31 minutes prior to being discovered,"

19   end of quote.

20        The second issue with respect to this suicide is the           04:00PM

21   notes written by two different nurses who responded to the ICS

22   when the patient was found hanging.  And we attached the notes

23   and the notes are absolutely identical, verbatim down to the

24   same typographical and grammatical errors.  So it's apparent

25   that either one cut and pasted the other's note or both of them      04:01PM

1    cut and pasted from some other source.

2          So our first question is, is this conduct that is

3    considered acceptable in the Arizona Department of Corrections

4    by medical staff?

5          MR. BOJANOWSKI:  Unfortunately for Mr. Fathi, the          04:01PM

6    notes are not exactly the same.  The objective portion of the

7    note is the same, but the subjective portions and the other

8    portions are not.  We suspect, and I have not yet confirmed,

9    that the second entry, which was much later, they utilized the

10   same objective portion of the note.  It's my understanding that   04:01PM

11   that is done in medical documenting.  And then their own

12   individual subjective analysis is in there and those are

13   different.  And I can include that in my letter response to Mr.

14   Fathi.

15         THE COURT:  Thank you.                                     04:02PM

16         MR. FATHI:  Your Honor, I would simply note that

17   contrary to what Mr. Bojanowski just said, the subjective

18   portions are also identical.  They both read "ICS response."

19   So I think the answer to my question is that it is considered

20   acceptable for nurses to cut and paste each other's notes.  Is    04:02PM

21   that correct?

22         THE COURT:  Well, that's in some ways an unfair

23   question for counsel, because it's something that I think would

24   be a question of, perhaps, an expert witness could opine

25   whether that's acceptable procedure in the medical world.  I      04:02PM

1    don't -- if there's some regulation that says or doesn't say

2    this, I suppose that that's something that Mr. Bojanowski would

3    have a handle on.  But I don't know.  I think that if you want

4    to suggest that there was something wrong about what was done

5    with respect to the reporting by the nurses in this incident            04:03PM

6    that would undercut the Court's reason to trust the validity of

7    other reporting, and I have engaged in some of that.  I have

8    asked questions of witnesses, of ADOC employees, specifically

9    designed to see whether there are issues that are present that

10   could implicate the true reporting mechanism in documents and          04:03PM

11   testimony that's come forward.  And I have uncovered that there

12   are such kinds of things, and this is not surprising to expect

13   in an institution.

14        But the inquiry that you have launched here about

15   whether or not repetition is, itself, an indication of                 04:04PM

16   incredibility, on the one hand to the lay person it looks that

17   way; on the other hand, I don't know in the professional

18   community whether this is acceptable or not.  You have raised

19   the issue.  If you want to perfect the issue I suspect turning

20   to your expert in maybe an affidavit or something to that              04:04PM

21   extent is probably more appropriate than asking Mr. Bojanowski

22   about it.

23        MR. FATHI:  Well, Your Honor, my question was is this

24   acceptable in the Arizona Department of Corrections.  And we do

25   have the director of health services for the Arizona Department        04:04PM

————November 7, 2017 - CV 12-601 - Status Hearing————

1    of Corrections here.

2              THE COURT:  That's a fair point.  Mr. Pratt.

3              MR. BOJANOWSKI:  I think it would be more appropriate

4    for us to have a discussion concerning this and respond in

5    writing.                                                        04:04PM

6              MR. FATHI:  Mr. Pratt is here, Your Honor.  I don't

7    see --

8              THE COURT:  He also started to lean up and was leaning

9    into the conversation.  And so, Mr. Pratt, can you tell us?

10   Are you familiar with this record we're talking about, these    04:05PM

11   two records?

12             MR. PRATT:  I haven't seen the document, Your Honor.

13   But the question is regarding one person's information on

14   objective findings duplicating another's.

15             THE COURT:  Is that the fair question?                 04:05PM

16             MR. FATHI:  The question is whether it's acceptable

17   for one nurse to cut and paste the note of another nurse in

18   response to an ICS.

19             MR. PRATT:  In my opinion, yes, it is acceptable.  As

20   a provider, if I were to review someone else's notes rather     04:05PM

21   than re-create them, if I agreed with them, I could cut and

22   paste them into my own notes.

23             MR. FATHI:  Thank you.

24             MR. PRATT:  While I'm here.

25             THE COURT:  You are entitled.                         04:05PM

1          MR. PRATT:  The question came up regarding

2    documentation by a FHA, and that FHA is an RN.

3          THE COURT:  Thank you.  Okay.  Thank you.

4          Are we at 11?

5          MR. FATHI:  We are, Your Honor.                    04:06PM

6          THE COURT:  What do you have to say?

7          MR. FATHI:  All right.  Last month, Your Honor, we put

8    before the Court three letters requesting various documents to

9    which we had received no response.  And the Court, in light of

10   the transition of document production responsibilities,        04:06PM

11   essentially asked us to wait and see what we got from

12   defendants' counsel.

13         What we got was a letter that told us that they would

14   produce documents the week of October 23rd.  Unfortunately,

15   that did not happen.  As of the close of -- close of business  04:06PM

16   yesterday not a single document had been produced.  Documents

17   were produced yesterday evening, unfortunately not in a format

18   that we could open.  Additional documents have been produced

19   during this hearing today.  It's clear that it's still only a

20   tiny proportion of the documents that we have requested.       04:06PM

21         But the defendants' practice of producing things the

22   night before, the morning of, or even during the hearing is not

23   conducive to an accurate review of what's been produced and

24   what's still missing.  So what I would suggest is that the

25   Court encourage the defendants to make a more complete          04:07PM

1    production, and to the extent there are remaining issues we can

2    discuss it when we speak with the Court by phone next week or

3    whenever that happens to be.

4           THE COURT:  Well, I think that should happen, and I

5    also think that if I set a deadline for discovery to be                    04:07PM

6    produced that has been the subject of a discussion in court

7    where we have talked about the letters and that I have set

8    forth where we are and, as in this case, respective of the fact

9    there was this transition from Ms. Rand to the Struck firm,

10   that if it's true that I set a deadline then I think that               04:07PM

11   deadline can only not be complied with if there is a request to

12   the Court to extend the deadline.  So I would say that.  But

13   we'll look to hear when you have a chance to open up the

14   documents you receive when we next talk about this.

15          MR. FATHI:  Thank you, Your Honor.                                04:08PM

16          THE COURT:  So make sure we keep it on the agenda for

17   next time, Number 11.

18          Number 12.

19          MR. FATHI:  Thank you, Your Honor.  The Court

20   suggested after the hearings about monitoring methodology, the       04:08PM

21   Court requested or suggested, rather, that it would make sense

22   to incorporate some of the things that Dr. Haney had said about

23   random sampling and how you take an unbiased sample, how you

24   make sure you are drawing the sample from an appropriate

25   source, how you exclude from the sample records that can't            04:08PM

1  possibly demonstrate noncompliance.  The Court suggested that

2  it would make sense to incorporate some of that into the

3  monitor guide.

4       And so we have proposed back in September, this is

5  Document 2426-1, starting on Page 106, we proposed some text to   04:09PM

6  the defendants that they could possibly include.

7       Their response was to include only two sentences from

8  what Dr. Haney has said.  And you could find those two

9  sentences in the monitor guide at 2291-1, Page 18.  We don't

10 think that the defendants have acted in compliance with the    04:09PM

11 Court's directive.

12      THE COURT:  So are you ready for me to rule on this?

13      MR. FATHI:  Yes, Your Honor.

14      THE COURT:  All right.  So I will get a written ruling

15 out unless the defendants say they need anything else to let me  04:09PM

16 know about it.

17      MR. BOJANOWSKI:  Well, Your Honor, I had taken the

18 suggested language that the plaintiffs had given to us and

19 submitted it to one of our experts to have a look, and they

20 said it wasn't accurate.  So that's why we are relying on the   04:10PM

21 language that we had submitted.  In fact -- well, that's what

22 we did.

23      THE COURT:  So you feel that you have more that you

24 want to say about this before I enter a ruling on whether -- I

25 mean, I have told you previously I was embrasive of Dr. Haney's  04:10PM

1    language on this.  And if there is good reason that I was wrong

2    about that and you think it has not been fully set forth in the

3    correspondence let me know about that and I will give you a

4    chance to file one more thing.

5         MR. BOJANOWSKI:  I'd like that chance.                    04:10PM

6         MR. FATHI:  Your Honor, may we know the identity of

7    the expert who said that Dr. Haney was wrong?

8         THE COURT:  I don't know whether they will be inclined

9    to share that with you or not.

10         MR. BOJANOWSKI:  Not at this time, Your Honor.           04:10PM

11         THE COURT:  So you need how much time to be able to

12    get the filing in on this agenda item on, Mr. Bojanowski?  14

13    days okay?

14         MR. BOJANOWSKI:  Yes, Your Honor.

15         THE COURT:  Mr. Fathi, if you want to submit any         04:11PM

16    response to that you can have seven days.

17         MR. FATHI:  Thank you, Your Honor.

18         THE COURT:  The next agenda items are the fully

19    briefed matters awaiting decision of the court.  Number 1,

20    written order is in process.  We'll get that to you.  The     04:11PM

21    motion for reconsideration I have ruled on.  And the

22    termination issue is one I need to -- I told you I would take a

23    final look at it, and I will do that and get written order out

24    on 3.

25         So then what remains for me to say to plaintiffs, are    04:11PM

—November 7, 2017 - CV 12-601 - Status Hearing—

1    there other issues you wanted to raise?  And after I heard from

2    plaintiffs, turned to them about their agenda item which I

3    think I have already addressed, but see if there are any other

4    issues or if they want to add more they can do so.  From

5    plaintiffs?                                                         04:12PM

6            MR. FATHI:  We have nothing further, Your Honor.

7            THE COURT:  Okay.

8            MR. BOJANOWSKI:  Nothing further, Your Honor.

9            THE COURT:  Okay.  All right.  So tomorrow, anything

10   we need to talk about right now?                                    04:12PM

11           MR. BOJANOWSKI:  I didn't hear you.

12           THE COURT:  Anything about tomorrow we need to talk

13   about or can we just see everybody tomorrow?

14           MS. EIDENBACH:  I don't think there's anything in

15   addition to what I said earlier.                                    04:12PM

16           THE COURT:  Thank you all.

17           (Proceeding concluded at 4:12 p.m.)

18

19

20

21

22

23

24

25

1

2

3

4

5                          C E R T I F I C A T E

6

7              I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10             I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15             DATED at Phoenix, Arizona, this 14th day of November,

16   2017.

17

18                               s/Laurie A. Adams

19                               _____

                                 Laurie A. Adams, RMR, CRR

20

21

22

23

24

25