1                    **UNITED STATES DISTRICT COURT**

2                     **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

**Victor Parsons, et al., on**     )
5   **behalf of themselves and all**  )
   **others similarly situated;**     )
6   **and Arizona Center for**        )
   **Disability Law,**                )
7                                     )   No. **CV 12-00601-PHX-DKD**
             Plaintiffs,             )
8                                     )
         vs.                         )   Phoenix, Arizona
9                                     )   November 8, 2017
**Charles Ryan, Director,**          )   9:02 a.m.
10  **Arizona Department of**          )
   **Corrections; and Richard**       )
11  **Pratt, Interim Division**        )
   **Director, Division of Health**   )
12  **Services, Arizona Department**   )
   **of Corrections, in their**       )
13  **Official capacities,**           )
                                     )
14             Defendants.           )
   **_____** )
15

16

17      **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

        <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>
18
          (*Evidentiary Hearing re: Tucson Retaliation*)
19

20

21  Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

<u>A P P E A R A N C E S</u>

**For the Plaintiffs:**

        PRISON LAW OFFICE
        By:  **Corene Kendrick, Esq. (Present for a.m. only)**
        1917 5th Street
        Berkeley, CA 94710

        EIDENBACH LAW PC
        By:  **Kirstin T. Eidenbach, Esq.**
        P.O. Box 91398
        Tucson, AZ 85752

        ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
        By:  **Maya S. Abela, Esq.**
        177 N. Church Avenue
        Suite 800
        Tucson, AZ 85701

For the Defendants:

        STRUCK LOVE BOJANOWSKI & ACEDO PLC
        By: **Daniel Struck, Esq.**
        By: **Rachel Love, Esq.**
        By: **Kevin Hanger, Esq.**
        3100 W. Ray Road
        Suite 300
        Chandler, AZ 85226

1                          **I N D E X**

2  **WITNESS:**              **DIRECT**      **CROSS**      **REDIRECT**   **RECROSS**
   BRIAN CRESWELL
3  By Ms. Eidenbach         6                          38
   By Mr. Struck                         16
4
   JASON MONSON
5  By Mr. Struck            45
   By Ms. Eidenbach                      89
6
   COLE KRAGES
7  By Mr. Struck            124
   By Ms. Eidenbach                      140
8
   OSWALDO ROBLES
9  By Mr. Struck            147
   By Ms. Eidenbach                      156
10
   ASHLEY ZUERLEIN
11 By Mr. Struck            165

12 TARA DIAZ
   By Mr. Struck            175
13
   ALFRED RAMOS
14 By Mr. Struck            187

15

16

17

18

19

20

21

22

23

24

25

1                    **INDEX OF EXHIBITS**

2    **EXHIBIT**                              **IDENT**    **RECEIVED**
     31        Department Order 704            55          55
3    32        E-mail with photo - Sit-up Bench  57        77
     33        E-mail re:  Notary             64          65
4    34        E-mail with Photo re:
               Inmate Needed New ID           62          63
5    35        Photograph of Cell 3A-9        65          66
     36        Photographs of 704 Compliance
6              Issues - A run                 66          66
     37        E-mail with photo of inmate letter  71     72
7    38        E-mail re:  Getting Housing Unit
               3A in 704 compliance           73          73
8    39        E-mail re:  Visitation         77          78
     40        E-mail re:  Inmate order of Stinger  76     77
9    41        E-mail re:  Inmate diet issue  78          79
     42        E-mail re: Application for
10             Good Time                      79          80
     43        E-mail re: Inmate clothes      80          81
11   44        E-mail re:  PREA hotline sign  81          82
     45        E-mail re:  Housing Unit 3 tickets  84      88
12   48        Declaration of Brian Creswell  19          19

13

14

15

16

17

18

19

20

21

22

23

24

25

10:24AM

---11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation---

1                    P R O C E E D I N G S

2          THE MAGISTRATE JUDGE CLERK:  Civil Case Number 12-601,

3    Parsons, et al., versus Ryan, et al., on for evidentiary

4    hearing regarding Tucson retaliation.

5          THE COURT:  Would counsel please announce.                    09:03AM

6          MS. EIDENBACH:  Good morning, Your Honor.  Kirsten

7    Eidenbach for the prisoner plaintiff class.

8          THE COURT:  Good morning.

9          MS. KENDRICK:  Good morning, Your Honor.  Corene

10   Kendrick from the Prison Law Office for the prisoner plaintiff   09:03AM

11   class.

12         THE COURT:  Good morning.

13         MS. ABELA:  Good morning, Your Honor.  Maya Abela for

14   the Arizona Center for Disability Law.

15         THE COURT:  Good morning.                                   09:03AM

16         MR. STRUCK:  Good morning, Your Honor.  Dan Struck,

17   Rachel Love, and Kevin Hanger for the defendants.

18         THE COURT:  Thank you.  Good morning to you all.

19         How have you all decided we will proceed?

20         MS. EIDENBACH:  I think we will begin with Mr.             09:03AM

21   Creswell, who is incarcerated at the Tucson complex, and then

22   defendants can proceed with their witnesses.

23         THE COURT:  Thank you very much.  Please.

24         Good morning, sir.  Could you stand there for a

25   moment, please, and the clerk of the court will administer the  09:04AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation

1    oath.

2             (The witness was sworn.)

3             THE COURTROOM DEPUTY:  Thank you.  Please step around

4    to the witness stand.

5             THE COURT:  Sir, we have a bit of a problem with our     09:04AM

6    witness stand because it is at the end of steps.  And because

7    you have leg irons on I want to make sure that you are careful

8    about it.  Hold on to that part there.  Thanks.

9             You may proceed.

10                          BRIAN CRESWELL,

11   a witness herein, having been first duly sworn by the clerk to

12   speak the truth and nothing but the truth, was examined and

13   testified as follows:

14                         DIRECT EXAMINATION

15   BY MS. EIDENBACH:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Will you please state your full name and your Arizona

19   Department of Corrections number for the record?

20   A.  Brian Gabriel Creswell.  ADC Number 199771.               09:04AM

21   Q.  Thank you.  Can you spell your last name for the court

22   reporter?

23   A.  C-R-E-S-W-E-L-L.

24   Q.  You might need to move the mic just a little.

25             THE COURT:  It moves.  Just pull it.  Yeah.         09:05AM

11-8-17 - CV 12-601 - **Evidentiary Hearing re: Tucson Retaliation - Creswell - Direct**

```
 1              MS. EIDENBACH:  There we go.

 2   BY MS. EIDENBACH:

 3   Q.  Where are you currently housed in the Arizona Department of

 4   Corrections?

 5   A.  Tucson Cimarron unit.                                    09:05AM

 6   Q.  How long have you been in custody?

 7   A.  For two and-a-half years.

 8   Q.  How long have you been housed at Cimarron?

 9   A.  For the last five months.

10   Q.  How are you doing today?                                 09:05AM

11   A.  I'm fine.  How are you?

12   Q.  Good.  Thank you.

13              When were you transported here?

14   A.  This morning.

15   Q.  Around what time?                                        09:05AM

16   A.  About 5:00.

17   Q.  And did you get all of your medications this morning?

18   A.  Yes.

19   Q.  Do you have any concerns about testifying here today?

20   A.  No.                                                      09:05AM

21   Q.  Do you have any concerns about retaliation for testifying

22   here today?

23   A.  Yes.

24   Q.  What are those concerns?

25   A.  I'm concerned that they will plant something in my room and 09:05AM
```

1    try to criminally charge me with something.

2    Q.   And why are you afraid of that?

3    A.   Because it happens.

4    Q.   Has it happened to you in the past?

5    A.   No.  It has happened to other inmates.                    09:06AM

6            MR. STRUCK:  Objection, Your Honor.  Hearsay.  Move to

7    strike.

8            THE COURT:  Overruled.  It's not important.  Go ahead.

9            MS. EIDENBACH:   Thank you.

10   BY MS. EIDENBACH:                                              09:06AM

11   Q.   Why did you decide to testify today?

12   A.   Because it's right.

13   Q.   Why do you think that it's right?

14   A.   Because they did something wrong, and I decided that it

15   needs to be voiced.                                            09:06AM

16           THE COURT:  Just so that you understand, sir, the

17   objection that just was made, what I am doing is we don't have

18   a jury here today and so I'm not really concerned about some of

19   the objections that lawyers almost feel that they need to make

20   out of a part of instinct, because often times they are right  09:06AM

21   to make.

22           This objection, I'm trying to communicate to the

23   lawyers that they need to be careful when they make their

24   objections to understand that I'm not a jury, that I'm a judge,

25   and that sometimes objections are made that don't reflect sort  09:07AM

1    of the changed role.  And so when I say when there's an

2    objection and I overrule it, and I say it's not important, it's

3    me using kind of courtroom language that maybe you don't

4    understand that I should perhaps explain further, which I am

5    doing right now.  And that is when I say it's not important it    09:07AM

6    means that it's not what I'm going to be basing my decision on

7    because I understand the rules of evidence as well as the

8    lawyers do.  And I understand that what you have said about it

9    happening to other people is really part of the story that

10   animates what you are talking about.  But really, I want to be   09:07AM

11   most interested in what you, yourself, have experienced and

12   what you, yourself, are testifying about today.

13          And I'm trying to communicate to the lawyers that the

14   record here is one that is designed to inform my decision

15   making on an ongoing basis because we had allegations of        09:07AM

16   retaliation earlier and the defendants lawyers felt they didn't

17   have their chance to have their day in court on a particular

18   incident.  So we're giving them that day in court, and also as

19   part of that, in fairness, we're giving plaintiffs their day in

20   court.  That's why they have called you here today.  So I'm     09:08AM

21   going to hear what people have to say about it.

22          Thank you.  Go ahead.

23          MS. EIDENBACH:  Thank you, Your Honor.

24   BY MS. EIDENBACH:

25   Q.  Do you recall where you were housed on November 2nd, 2016?  09:08AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Direct

1    A.   November 2nd, 2016?  Yes.  I was in Rincon unit.

2    Q.   And do you remember what building you were housed?

3    A.   3C-6.

4    Q.   Okay.  How long have you been housed in at Rincon unit 3?

5    A.   At that moment, probably four or five months also.          09:08AM

6    Q.   Are you familiar with the Department's policy 704?

7    A.   Yes, I am.

8    Q.   What's your understanding of that policy?

9    A.   That you have to be in -- you have to have your shirt

10   tucked in when you are outside of your room.  You have to be   09:09AM

11   fully dressed.  When you are inside your room you have to have

12   your shirt on.  Your room has to be in compliance.  You can't

13   have your bed unmade.  You can't have the floor messy or you

14   can't have clotheslines hanging up and stuff like that.

15   Q.   And when you are not in compliance with 704, what happens?  09:09AM

16   A.   Typically, nothing, but they can give you a ticket, issue

17   you a ticket.

18   Q.   When you say "ticket" what do you mean?

19   A.   Reprimand.  You get placed on report and it ends up -- you

20   see a hearing officer and you can get loss of privileges.  You  09:09AM

21   lose your store privileges or your phone privileges.

22   Q.   And you said that often nothing happens when you are out of

23   compliance.  How often does something happen when you are out

24   of compliance?

25   A.   Never, really.                                             09:09AM

UNITED STATES DISTRICT COURT

**11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Direct**

1   Q.  Never?

2   A.  No.  No one usually gets written up for a 704 compliance.

3   They tell them to fix it, if that, and no one is rarely issued

4   a ticket for it.

5   Q.  And is that true at Cimarron and Rincon both?                    09:10AM

6   A.  Yes.

7   Q.  If you were issued a ticket, who would issue the ticket to

8   you?

9   A.  The floor officer, the CO2 working on the floor that's

10  doing the rounds.                                                    09:10AM

11  Q.  So they are the ones who typically assess compliance with

12  704?

13  A.  Yes.

14  Q.  On November 2nd, 2016, do you recall a group of people

15  coming onto your run?                                                09:10AM

16  A.  Yes, I do.

17  Q.  Were you in your cell at the time that they arrived on your

18  run?

19  A.  Yes, I was.

20  Q.  Was the door to your cell closed?                                09:10AM

21  A.  Yes, it was.

22  Q.  And on that run, when your door is closed it's also locked,

23  is that right?

24  A.  Yes.

25  Q.  Did you know at any point who the people on the tour were?       09:11AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Direct

1    A.  No.  Not at that moment I didn't.

2    Q.  When they first came on the run?

3    A.  Not when they first came in.

4    Q.  Did you eventually learn who they were?

5    A.  Yes, I did.                                            09:11AM

6    Q.  And did you recognize any of them?

7    A.  Any of the people that were on the tour?

8    Q.  Uh-huh.

9    A.  No.

10   Q.  Did you recognize any corrections officers?          09:11AM

11   A.  I recognized a couple of them, yes.

12   Q.  Do you remember who they were?

13   A.  I remember seeing the DW Monson and a couple of -- I think

14   it was a captain and couple of sergeants, none of the sergeants

15   I have ever seen before in the yard.                     09:11AM

16   Q.  How often do you see DW Monson on your run?

17   A.  Never.

18   Q.  Was this the first time?

19   A.  Yes.

20   Q.  Has he ever been involved in the 704 compliance assessment   09:11AM

21   that you described?

22   A.  I have never seen him in the building before, no.

23   Q.  So if you can take us back to November 2nd, 2016, and tell

24   us from the point that the group entered the run your memory of

25   events as they occurred that day.                        09:12AM

 1    A.  I was laying on my bunk.  Me and my cellmate were laying on

 2    our bunks and we heard a lot of commotion, people screaming.

 3    And we came down to look what was going on or try to look

 4    because how the cells are faced, we can't see what's going on

 5    down the run.  And we heard people yelling, walking back and          09:12AM

 6    forth, officers, DW Monson, a captain, and some sergeants

 7    running back and forth yelling at people.  And I realized I

 8    noticed, I guess it was ACLU lawyers going door to door talking

 9    to people.  But I couldn't hear anything, really, what was

10    going on because they were yelling the entire time.                   09:12AM

11          And then when the ACLU lawyer approached my cell door

12    to talk to me, I tried to tell her about my grievances that I

13    have about medical and I just heard -- I couldn't really talk

14    to her because they were screaming and stuff behind her and

15    yelling.  And she asked them to back up so she can talk to me        09:13AM

16    and they just continued to yell and scream at everybody about

17    704s, saying that we won't get our recreation and would be

18    issuing tickets.  At that moment she said she would come talk

19    to me when she can talk to me one on one, and that was it.

20    Q.  And do you recall who that attorney was?                         09:13AM

21    A.  Yes.  It was you.

22    Q.  Okay.  Now, you said that the corrections officers were

23    yelling things behind the lawyers who were visiting.  Do you

24    recall what they were saying?

25    A.  Everyone's getting tickets.  Take your clothesline down.         09:13AM

1    Put your shirts on.  Stuff like that.  They were just -- I

2    couldn't really hear everything they were saying.  They were

3    yelling about 704 compliance stuff.

4    Q.  And was their approach to 704 compliance that day the way

5    that it generally proceeds?                                09:14AM

6    A.  No.

7    Q.  How -- tell us how it's different from what normally

8    happens?

9    A.  Usually the floor officer, when he does count or he does

10   his 15-minute walks he just tell people, take your clothesline   09:14AM

11   down.  They don't really say anything about our shirts because

12   it's really hot in our cells unless there's a female officer

13   working.  But just take the clothesline down.  That's really

14   it.  That's the only thing they ever say.  But it's the floor

15   officer that does it.                                      09:14AM

16   Q.  And when the floor officer does the typical 704 compliance

17   assessment, does he or she take pictures?

18   A.  No.

19   Q.  Had you ever seen pictures taken of noncompliant cells?

20   A.  No.                                                    09:14AM

21   Q.  What was your interpretation of the events that occurred in

22   your run that day?

23   A.  Well, while it was happening, I told you they were trying

24   to intimidate us for us not to talk to you.  And I voiced that,

25   that they were trying to get me not to talk to you.  But I     09:15AM

 1    still wanted to talk to you.

 2    Q.   Okay.  And why did you feel that they were trying to

 3    intimidate you?

 4    A.   Because I have never seen any of that occur before, ever.

 5    I have never seen them, especially those officers in the runs,      09:15AM

 6    yelling about 704 compliance.  And how they were crowded up

 7    behind you when you were trying to talk to me, I could tell

 8    what they were doing.

 9    Q.   Okay.  And yet you still wanted to talk to me?

10    A.   Yes.                                                            09:15AM

11    Q.   Why is that?

12    A.   I have serious health concerns, and I'm not seeing --

13    getting proper medical treatment with the medical staff there

14    at Corizon.  I wanted to voice that to you so you can probably

15    get it changed.                                                     09:15AM

16    Q.   Okay.  And so you were willing to sort of risk retaliation

17    in order to report your medical?

18    A.   Yes.  My life is very important to me.

19    Q.   I have no further questions.

20              THE COURT:  Thank you.                                    09:16AM

21              Now the defendants have an opportunity to ask you

22    questions.

23              THE WITNESS:  Okay.

24              THE COURT:  Mr. Struck, please.

25              MR. STRUCK:  Thank you, Your Honor.                       09:16AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

```
 1                         CROSS-EXAMINATION
 2   BY MR. STRUCK:
 3   Q.  Good morning, Mr. Creswell.
 4   A.  Good morning.
 5   Q.  My name is Dan Struck.  I represent the director, Director    09:16AM
 6   Ryan, and Richard Pratt in the Parsons case.
 7          You and I have never met, have we?
 8   A.  No.
 9   Q.  Now, I think you testified that you had lived in that
10   housing unit for about four months before November 2nd, 2016;    09:16AM
11   is that correct?
12   A.  Correct.
13   Q.  And you hadn't ever seen anyone other than a CO2 come in
14   and say anything about any 704 violations.  Is that what your
15   testimony is?                                                    09:17AM
16   A.  That is correct.
17   Q.  Okay.  Now, you said you lived in 3C-6.  Is that Cell 6?
18   A.  Cell 6, yes.
19   Q.  Have you ever heard the C unit referred to as Charlie, the
20   Charlie unit?                                                    09:17AM
21   A.  Correct, yes.
22   Q.  And that's where you were?
23   A.  Yes.
24   Q.  You had been in there for about four months?
25   A.  Four or five months at that time.                           09:17AM
```

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

1   Q.  Now, can you tell us where -- how many cells in the run are

2   there on one side of the Charlie unit?

3   A.  On one side I'm pretty sure it's nine.

4   Q.  Does seven sound about right to you?

5   A.  No.  I think it's about eight or nine.                    09:17AM

6   Q.  You think there's about nine on each side?

7   A.  Yes.

8   Q.  And you were in 6?

9   A.  Yes.

10  Q.  Now, how far away from the entryway to the unit was your   09:17AM

11  cell?

12  A.  Probably 15 feet, 15 or 20 feet.

13  Q.  About how long would you say the whole the Charlie run is?

14  How long would estimate?

15  A.  Probably 20, 25 feet.                                      09:18AM

16  Q.  So 25 feet long.  And about how wide between the cells?

17  A.  Six feet.  Oh, between each cell?

18  Q.  No, I'm sorry.  Let me make sure I'm clear.  I think you

19  understood me right and then I -- but I want to make sure that

20  we understand each other.                                     09:18AM

21          There are cells that are facing each other and it

22  creates kind of a run, is that right?

23  A.  Correct.

24  Q.  So how far away, say, is the front of your cell from the

25  front of the cell across from you?                            09:18AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

1   A.  Probably five to six feet.

2   Q.  So in your estimate it's about six feet wide and about a

3   25-foot long run; is that right?

4   A.  Yes.  I think so.

5   Q.  Okay.  Now, you testified today that the Deputy Warden          09:18AM

6   Monson was in there, right?

7   A.  Yes.

8   Q.  And you said that the captain was in there?

9   A.  Yes.

10  Q.  Do you know who the captain was?                               09:19AM

11  A.  I have never seen the captain or the two sergeants that

12  were accompanying him.

13  Q.  Was the captain male or female?

14  A.  Pretty sure it was a male.

15  Q.  And there were two sergeants with them?                        09:19AM

16  A.  Yes.

17  Q.  And could you identify any of the sergeants?

18  A.  A male and I think a female.  I'm not sure.  I have never

19  seen them before.  Before then or after then I have never seen

20  them.                                                             09:19AM

21  Q.  Okay.  Now, you didn't testify that the warden was in

22  there?

23  A.  No.  The DW, just for that unit, the warden for that unit.

24  Q.  Do you remember providing a sworn statement to, I think it

25  was, to Ms. Eidenbach's -- an attorney that works with her,      09:20AM

 1    Jessica Ross?

 2    A.  Yes.

 3    Q.  Have you had a chance to review that recently?

 4    A.  No.

 5           MR. STRUCK:  Your Honor, I'd like to move for the    09:20AM

 6    admission of Exhibit 48, which is the declaration of Mr.

 7    Creswell.

 8           THE COURT:  Any objection?

 9           MS. EIDENBACH:  No, Your Honor, sorry.

10           THE COURT:  48 will be received.  I will have it in    09:20AM

11    front of you in just a second, sir.

12    BY MR. STRUCK:

13    Q.  Go ahead and take a look at it and let me know when you are

14    ready.  If you want to read it, you can.

15    A.  I'm ready.    09:20AM

16    Q.  Okay.  Is that your declaration, Mr. Creswell?

17    A.  Yes, it is.

18    Q.  And can you explain to us, how was this created?  Is that

19    your handwriting?

20    A.  No, it's not my handwriting.  I spoke to her and she wrote    09:21AM

21    down everything I said.

22    Q.  Okay.  Did she come down to visit you and she wrote it

23    down?

24    A.  Yes.  In the Rincon unit, yes.

25    Q.  All right.  Were you in your cell and she was outside of    09:21AM

 1    your cell, or where did this conversation take place?

 2    A.  We had a legal visitation in the visitation room.

 3    Q.  Okay.

 4    A.  Sitting at the table just directly right there.

 5    Q.  All right.  Let me call your attention to Number 5 on the        09:21AM

 6    first page of Exhibit 48.  Do you see that?

 7    A.  Yes.

 8    Q.  You state here that, "As soon as the group entered the

 9    housing area I heard shouting from ASPC staff which included

10    the warden, deputy warden, a captain, and two Sergeants."        09:21AM

11    A.  Yes.

12    Q.  Was the warden there or not there?

13    A.  I said warden meaning the deputy warden.

14    Q.  Okay.

15    A.  But I don't know if the warden was there.  I don't even        09:22AM

16    know who the warden is.

17    Q.  Okay.  But you state here warden and then deputy warden?

18    A.  Yes.  That's how I said it, yeah.

19    Q.  So is that a mistake?

20    A.  Yeah.  I meant deputy warden.  But I said -- probably said        09:22AM

21    warden, deputy warden.  That's what she wrote.

22    Q.  Did you have a chance to review this?

23    A.  Yes, I did.

24    Q.  After she wrote it.  And if there were any mistakes you had

25    a chance to correct them?        09:22AM

```
 1    A.   Yeah.   She gave me the chance to do that.

 2    Q.   All right.   Now, I think you said what called your

 3    attention to what was going on was shouting; is that right?

 4    A.   That's correct.

 5    Q.   Who was doing the shouting?                                 09:22AM

 6    A.   The ADC staff, the DW and the sergeants and the captain.

 7    Q.   So the Deputy Warden Monson, the male captain, and the two

 8    sergeants were all yelling?

 9    A.   Yes.

10    Q.   Could you tell what Deputy Warden Monson was yelling when   09:23AM

11    you first heard?

12    A.   Just screaming at people about 704 compliance, their TV

13    stands, shirts not being on, clotheslines.   They are all going

14    door to door yelling at people.

15    Q.   Did you hear anybody before anyone entered the area yell    09:23AM

16    that there's going to be females in the unit?

17    A.   No.

18    Q.   Is that typically done when there are females who visit?

19    A.   They are supposed to do that, but that doesn't usually get

20    done.                                                            09:24AM

21    Q.   And that's -- do you know why that's done?

22    A.   Yes.

23    Q.   Why?

24    A.   In case the inmates are in a state of undress, that they

25    are warned before the female staff comes onto the run just to   09:24AM
```

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

```
 1   put their clothes on or not to be exposing theirselves,

 2   anything like that.

 3   Q.  And you find that to be appropriate?

 4   A.  Yes.

 5   Q.  Okay.  And you would like to know if there's a female      09:24AM

 6   coming into your house?

 7   A.  I don't want to get in trouble for, you know, having my

 8   shirt off or using the bathroom.

 9   Q.  You don't want anyone -- someone coming up on you while you

10   are using the bathroom, a woman?                               09:24AM

11   A.  Exactly, yes.

12   Q.  So you say you heard Deputy Warden Monson yell something

13   about a TV stand?

14   A.  Yes.

15   Q.  Who was he yelling it to?  Could you tell?                 09:24AM

16   A.  I can't tell.  We can't see down the hallway.  You can only

17   see right in front of you from our window.

18   Q.  Now, you said you had never seen him before in the housing

19   unit.  Did you know who he was?

20   A.  Yes.                                                       09:25AM

21   Q.  How did you know who Deputy Warden Monson was?

22   A.  I seen him on the yard before walking back and forth from

23   the administration building to the programs building.  I have

24   seen him come and talk to the inmates.

25   Q.  Had you had an opportunity, prior to November 2nd, 2016, to 09:25AM
```

 1   talk speak with --

 2   A.  No.

 3   Q.  -- Deputy Warden Monson.

 4   A.  I haven't.

 5   Q.  Now, have you ever seen a captain come onto the housing      09:25AM

 6   unit?

 7   A.  No.

 8   Q.  Never seen a deputy warden come onto any housing unit

 9   during your stay?

10   A.  No.                                                          09:25AM

11   Q.  And I'm talking about up until today.  You have never seen

12   a deputy warden or a captain come into the housing unit?

13   A.  At Cimarron, yes; at Rincon, no.  Cimarron, yes, I have

14   seen the deputy warden come into the housing unit.

15   Q.  And you said you saw the deputy warden in the yard talking   09:25AM

16   to inmates prior to this?

17   A.  Yes.  Yes.

18   Q.  When the deputy warden is out on the yard, do inmates want

19   to go talk to him about issues?  Have you observed that?

20   A.  Yes.                                                         09:26AM

21   Q.  Is that pretty common?

22   A.  Yeah.

23   Q.  Could you see what Deputy Warden Monson was taking pictures

24   of?

25   A.  No.  I seen him with his phone.  I didn't see if he -- I     09:26AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

```
 1  didn't know he was taking pictures or anything like that.

 2  Q.  You said you didn't even know he was taking pictures?

 3  A.  No.  I seen him with his phone walking up the cells.

 4  Q.  Did you subsequently find out he was taking pictures with

 5  his phone?                                                      09:26AM

 6  A.  Yes, I did.

 7  Q.  How did you find that out?

 8  A.  Through the deposition.  I seen the pictures that were

 9  provided with the court documents.

10  Q.  So you were provided with the photographs that were taken  09:26AM

11  by Deputy Warden Monson?

12  A.  Correct.

13  Q.  Who provided you with that, with that information?

14  A.  The law firm, I believe ACLU.  Came in a big packet.

15  Q.  Could you hear what the male captain was shouting?         09:26AM

16  A.  I couldn't tell one from the other, to tell you the truth.

17  They were all yelling, pretty much the same thing to everybody.

18  Q.  And the two sergeants were yelling the same thing?

19  A.  Yeah.  They were all screaming.

20  Q.  Everyone was just yelling?                                 09:27AM

21  A.  Yes.

22  Q.  Did Ms. Eidenbach ask the ADC the staff that was near your

23  cell to move away while she was talking to you?

24  A.  Yes.  Yes, she did.

25  Q.  Did they move away?                                        09:27AM
```

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

```
 1   A.   No.

 2   Q.   They just stayed right there?

 3   A.   They stayed in the vicinity yelling at people at the other

 4   side of the run, yes.

 5   Q.   Did Ms. Eidenbach, did you hear her ask to be -- see if you      09:27AM

 6   could be pulled out of the cell and taken to a private area?

 7   A.   Yes.

 8   Q.   And what was she told?

 9   A.   I'm not sure.

10   Q.   Okay.                                                            09:27AM

11   A.   She just told me she would be back at a later date.

12   Q.   And you said you heard somebody say that you wouldn't get

13   your recreation?

14   A.   Yes.

15   Q.   Who said that?                                                   09:28AM

16   A.   Monson.  And to ticket everybody.

17   Q.   Where was he standing when he said that?

18   A.   In the front talking to the officers that work in the

19   building in the front of the hallway in the beginning of the

20   run.                                                                 09:28AM

21   Q.   By the entry into Charlie unit?

22   A.   Correct.

23   Q.   Before this commotion all started and Ms. Eidenbach and

24   her -- the other attorney came onto the unit, had a sergeant

25   done any rounds that day that you remember?                          09:28AM
```

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

1    A.   No.

2    Q.   How often do they usually walk through the unit?

3    A.   The sergeants?

4    Q.   Yeah.

5    A.   Never, unless one of the inmates called for him.          09:28AM

6    Q.   How about the CO2s?

7    A.   CO2s, they walk every 15 to 20 minutes.

8    Q.   In this group that included the deputy warden, the male

9    captain, and two sergeants, did you see any CO2s?

10   A.   Yes.  The floor officer was with them, too.             09:29AM

11   Q.   So it was the deputy warden, the male captain, two

12   sergeants.  So there were five?

13   A.   There was probably more than that.  I'm not sure.  From

14   where I can see, that's the only people that were there.

15   Q.   Did you recognize the CO2 who was in there?            09:29AM

16   A.   Yes.

17   Q.   Who was that?

18   A.   I don't remember his name.  I can't recall.

19   Q.   Can you describe him?

20   A.   I just don't even remember.  It was so long ago.       09:29AM

21   Q.   Okay.  Was he yelling as well?

22   A.   No.

23   Q.   How long was all this going on?  What would you estimate

24   the length of time that all these folks --

25   A.   Since I heard the conversation, since I heard the commotion  09:29AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

1    to when they left?

2    Q.  When they left, yeah.

3    A.  Probably 10 minutes, 10 or 15 minutes.

4    Q.  Okay.  Did you see whether -- did you see another lawyer

5    there with Ms. Eidenbach?                                09:30AM

6    A.  Yes, I did.

7    Q.  Was it the same lawyer you met with to do your declaration?

8    A.  I think it was, yes.

9    Q.  Did you see whether they were able to -- whether Ms.

10   Eidenbach was talking to anybody besides you after she was done   09:30AM

11   talking with you?

12   A.  Yes.  She, I think -- pretty sure she went to different

13   cells after mine.  She made her rounds all the way around, I

14   think.  But I couldn't see.  Like I said, I could only see

15   right in front of my cell.  I can't see what's going on down   09:30AM

16   the run.

17   Q.  I understand.  And same with attorney Jessica Ross.  Was

18   she doing --

19   A.  Correct.

20   Q.  Was she standing with Ms. Eidenbach or was she talking to   09:30AM

21   other inmates?

22   A.  Pretty sure she was talking to other inmates.  I don't

23   really remember.  She wasn't at the door when she was talking

24   to me, though.

25   Q.  Until you met her to do this statement you had never had a   09:31AM

```
 1    chance to speak --
 2    A.  Talk to her, no.
 3    Q.  Okay.  And you say that all this took place in the span of
 4    about 10 minutes, right?
 5    A.  10 to 15 minutes, yes.                              09:31AM
 6    Q.  All right.  And have you had a chance to speak with Ms.
 7    Ross or Ms. Eidenbach, say, in the last month or so?
 8    A.  Yes.
 9    Q.  And how many times?
10    A.  Once.                                               09:31AM
11    Q.  And did Ms. Eidenbach come to visit you there --
12    A.  Correct.
13    Q.  -- in the facility?
14         And how long did you meet?
15    A.  About three hours.                                 09:31AM
16    Q.  And you had a chance to look at your statement that you had
17    written before?
18    A.  Not really, no.  We talked about it.  Yeah.  I told her I
19    didn't want to look at it because I know what happened.  I
20    remember everything I said.                            09:31AM
21    Q.  Okay.  Did Deputy Warden Monson or the captain or the two
22    sergeants yell at you about 704 violations?
23    A.  Yeah.  Yes.
24    Q.  What -- specifically what?
25    A.  To put my shirt on.                                09:32AM
```

UNITED STATES DISTRICT COURT

1    Q.  So you had your shirt off?

2    A.  Yes.

3    Q.  You testified a little bit earlier that you received a

4    packet of information from your attorneys with these -- with

5    the photographs that were taken by DW Monson, is that right?    09:33AM

6    A.  Yes.

7    Q.  Do you remember, did you receive that packet of information

8    before you prepared this statement?

9    A.  No.

10   Q.  So that was -- the statement was dated January 18, 2017.    09:33AM

11   About when did you get this packet of photographs?

12   A.  After the meeting that I had when she needed the

13   declaration, probably two or three weeks after I received this

14   declaration -- before I wrote the declaration.

15   Q.  Did you receive any disciplinary as a result of the 704     09:33AM

16   violation that you were -- that was pointed out to you?

17   A.  That day, no.

18   Q.  You didn't receive any -- did you receive any disciplinary

19   as a result of anything that happened that day?

20   A.  I feel so, but yes.                                         09:34AM

21   Q.  Okay, and when was that?

22   A.  In March.

23   Q.  March of?

24   A.  March of 2016.

25   Q.  Of --                                                       09:34AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

1    A.  I'm sorry, 2017.

2    Q.  Okay.  And are you talking about the incident involving the

3    metal detector?

4    A.  No.  Oh, yes.  Yes, I am.  Yes.

5    Q.  Okay.  And I had a chance to look at that information.  You       09:34AM

6    were going through a metal detector and it went off; is that

7    right?

8    A.  Yes.

9    Q.  And at that point, you were asked -- were you asked to go

10   through the metal detector again and try and clear the metal        09:34AM

11   detector?

12   A.  Correct.

13   Q.  And did it go off again?

14   A.  Yes.

15   Q.  And were you asked one more time to go through the metal         09:34AM

16   detector?

17   A.  Several times.

18   Q.  So there were several attempts made for you to successfully

19   clear the metal detector?

20   A.  Yes.                                                            09:35AM

21   Q.  And you were not able to clear the metal detector?

22   A.  Yes.

23   Q.  And at that point you were told that you needed to be

24   searched?

25   A.  Strip searched, yes.                                            09:35AM

1   Q.  Because of the metal detector was going off; is that right?

2   A.  Yes.

3   Q.  And you refused to do that initially, correct?

4   A.  Correct.

5   Q.  And I think for about at least 45 minutes you refused, and      09:35AM

6   officers had to come down to deal with the situation; is that

7   right?

8   A.  It wasn't 45 minutes before the officers responded.  It was

9   more like probably five minutes.  Then they called the ICS

10  which is an all staff response, and that's when they all came     09:35AM

11  out.

12  Q.  And I just want to make it clear, though, that's not the

13  first time you ever received a disciplinary violation, correct?

14  A.  No, it's not.

15  Q.  In fact, you received at least three disciplinary             09:36AM

16  violations within the three months prior to the November 2nd

17  2016 visit by the ACLU, correct?

18  A.  That's probably right, yes.

19  Q.  Okay.  But on this date in March, you couldn't clear the

20  metal detector.  You were asked to do a strip search and you     09:36AM

21  refused an order to have to be strip searched; is that right?

22  A.  That's right.

23  Q.  Ultimately, you did finally agree to a strip search; is

24  that correct?

25  A.  That's correct.                                               09:36AM

11-8-17 - CV 12-601 - **Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross**

1    Q.   Now, you pled guilty to that?

2    A.   For not following staff directions, yes.

3    Q.   You did have a hearing, or you had an opportunity to have a

4    hearing and fight that disciplinary charge, did you not?

5    A.   Yes.                                                       09:36AM

6    Q.   And you chose to go ahead and plead guilty?

7    A.   Yes.

8    Q.   And I think you received, what, 30 days?

9    A.   30 days LOP, parole Class 3, and ERC days taken.

10   Q.   Can you explain what that is, please?                      09:37AM

11   A.   Parole Class 3 is the good time that I have already earned

12   from the 85 percent.  I don't recall how many days they took

13   from me that time.  And they also took days for the time I

14   would earn in the future which is the parole Class 3.

15   Q.   Did you believe that you -- it was okay that you didn't    09:37AM

16   have to clear the metal detector?

17   A.   No.  I don't believe that it was okay that I didn't clear

18   it.  The metal detector doesn't work.  It goes off on everyone.

19   I have never seen anyone be attempted or asked to strip search

20   ever.  Because everyone, the staff know that the metal          09:37AM

21   detectors don't work.  They will go off if the wind blows on it

22   or anything like that.  That's why I felt I was targeted and

23   treated differently than everyone else.  And not just that,

24   after that I was taken to CDU, the detention unit, the complex

25   detention unit for that when I have never -- no one's ever went  09:38AM

 1    to the detention unit for that at all.  They usually just go

 2    back to their cells.

 3    Q.  That's based on your understanding?

 4    A.  Yes, basically my observation.

 5    Q.  And you are saying no one has ever been put aside and          09:38AM

 6    strip -- and asked to go through a strip search when they

 7    didn't clear the metal detector?

 8    A.  Correct.

 9    Q.  You are the first one that that's ever happened to?

10    A.  That I have seen.                                             09:38AM

11    Q.  To your knowledge, that's the first one it's ever happened

12    to?

13    A.  To my knowledge, yes.

14    Q.  And so as a result of that, you believe you were singled

15    out because of what happened on November 2nd?                     09:38AM

16    A.  Yes.

17    Q.  Okay.

18          THE COURT:  I didn't know there was a deposition

19    taken.

20          MR. STRUCK:  No, there wasn't, Your Honor.  I think he      09:38AM

21    misspoke.

22          THE COURT:  Okay.  Thank you.

23    BY MR. STRUCK:

24    Q.  And that isn't the only discipline you have received since

25    November 2nd, 2016, isn't that true?                              09:39AM

1    A.   That's true.

2    Q.   Do you believe the others were retaliation as a result of

3    November 2nd incident, or were those legitimate?

4    A.   Those were legitimate.  It was only one, one other ticket.

5    But, yes, it was legitimate.                                    09:39AM

6    Q.   Okay.  And what was that disciplinary for?

7    A.   Aggravated refusal of assignment where me and multiple

8    other inmates refused to leave the rec field.

9    Q.   Refused to what?

10   A.   Leave the recreation field.                               09:39AM

11   Q.   Wasn't there also an incident in which you were asked to

12   leave a bench in front of building Number 5 and you were

13   refusing to do that?

14   A.   That was prior to the November incident.

15   Q.   It was?  Okay.  My apologies.                             09:39AM

16        What level of custody were you when you were housed in

17   the Charlie unit?

18   A.   4.

19   Q.   Is that a close custody unit?

20   A.   Yes, it is.                                               09:40AM

21   Q.   And what are you now?

22   A.   Still close custody, still 4.

23   Q.   Do you know whether you had ever actually classed out as

24   max custody?

25   A.   I am currently classed out as max custody.               09:40AM

11-8-17 - CV 12-601 - **Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross**

1   Q.  But you received the ability to stay in close custody?

2   A.  I received the override to stay in close custody.

3   Q.  Is that your reference to be in close custody as opposed to

4   max custody?

5   A.  I just don't want to be in medium custody.  Anything higher   09:40AM

6   than medium is fine with me.

7   Q.  Okay.  But max custody, close custody, is pretty much the

8   same?

9   A.  Yes.

10  Q.  And you don't want to be in medium custody for what reason?   09:40AM

11  A.  The environment.  I like my own cell.  I like to deal with

12  only one person a day, all day, instead of hundreds.

13          MR. STRUCK:  Just a moment, Your Honor.

14          THE COURT:  Sure.

15  BY MR. STRUCK:                                                    09:41AM

16  Q.  Have you ever actually been housed in max custody?

17  A.  No.

18  Q.  So you couldn't, as you sit here today, you couldn't tell

19  us the differences between max custody and close custody in

20  terms of how many hours out of the cell you are per day, that    09:41AM

21  type of thing?

22  A.  I can.  I have been in the detention unit which is the same

23  thing as max custody, multiple times.

24  Q.  Do you get more out-of-cell time in close custody than when

25  you were in the detention unit?                                  09:41AM

 1   A.  Yes.

 2   Q.  How much more?

 3   A.  Maybe four hours a week, four or five hours a week, maybe.

 4   Q.  More than when you are in the detention unit?

 5   A.  Yes.                                                    09:42AM

 6   Q.  Do you have recreational opportunities at all when you are

 7   in a close custody unit?

 8   A.  Yes.

 9   Q.  What types?

10   A.  It's usually -- at Rincon unit was every other day for     09:42AM

11   three hours, or two hours.  Depends on what time we get out

12   there.

13   Q.  Three hours, two to three hours per day?

14   A.  Every other day.

15   Q.  Every other day?                                          09:42AM

16   A.  Yes.

17   Q.  Where could you go?

18   A.  Out on the recreational field is a big caged-in area.

19   Q.  And apologies, this really is a different issue in the case

20   but since it came up, I thought Judge Duncan might be          09:42AM

21   interested.

22           THE COURT:  Go ahead.

23   BY MR. STRUCK:

24   Q.  Anything else that you can think of that you are allowed to

25   do as a close custody inmate as opposed to being, say, in the  09:42AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Cross

 1   detention unit?

 2   A.  You get to interact with other inmates.  You get to go to

 3   the chow hall to eat with all the other inmates, opposed to max

 4   custody where the food comes to your cell and you don't have

 5   any interaction with anyone but your cellmate.                   09:43AM

 6   Q.  Do you have opportunities to do any kind of programming as

 7   a close custody inmate if you wanted to?

 8   A.  If you wanted to, if they are available, which they are

 9   not.

10   Q.  Is that something you have wanted to do?                     09:43AM

11   A.  Certain ones, yes, ones I need help with, yes.

12   Q.  Which ones have you wanted to do and haven't had an

13   opportunity?

14   A.  The ICVC, the domestic violence class.

15   Q.  Is that something you have signed up for?                    09:43AM

16   A.  I'm court-ordered to take the class.

17   Q.  Have you signed up for it?

18   A.  There's no class.  I tried to sign up for it.  There's no

19   class available.

20   Q.  And have you tried to sign up for any other programming?     09:43AM

21   A.  No.

22          MR. STRUCK:  I don't have any more questions, Your

23   Honor.

24          THE COURT:  While you are standing there, Mr. Struck.

25          Mr. Creswell, you said that there were comments made      09:43AM

1    about possible loss of recreation time.  Did the Cimarron unit

2    suffer a loss of recreation time after November 2nd?

3               THE WITNESS:  I was at Rincon.

4               THE COURT:  I'm sorry, Rincon.  Thank you.

5               THE WITNESS:  Not that I have noticed.  I mean, every          09:44AM

6    day is different there.  So some days we will get recreation;

7    some days we won't when we're supposed to because they're short

8    staffed.

9               THE COURT:  But looking back to November 2nd, I think

10   you said that there were people who were shouting that there          09:44AM

11   would be write-ups for the 704 violations and threatened loss

12   of rec time for that unit.

13              THE WITNESS:  Yes.

14              THE COURT:  And I'm just asking close in time to the

15   2nd of November, was there any loss of rec time that you linked          09:44AM

16   to that --

17              THE WITNESS:  So long ago I don't remember, but I

18   don't think so.

19              THE COURT:  All right.  Thank you.  Thank you, sir.

20              Ms. Eidenbach.          09:44AM

21              MS. EIDENBACH:  Just a couple of questions, Your

22   Honor.

23                         REDIRECT EXAMINATION

24   BY MS. EIDENBACH:

25   Q.  We have talked a little bit about how long ago November          09:45AM

 1    2nd, 2016 was, but looking back on that day, do you have any

 2    doubts as to what you heard on the run from the corrections

 3    officers, the deputy warden, and the other officers who were

 4    present?

 5    A.  As in doubts of what I have heard, like what happened?          09:45AM

 6    Q.  Doubts of what you put in your declaration, what you heard

 7    and what you have testified to?

 8    A.  No.

 9    Q.  So you remember it clearly?

10    A.  Yes.                                                            09:45AM

11    Q.  And then with respect to the documents you received from

12    one of the attorneys on the ACLU team, do you recall whether

13    the documents you received had a court stamp on them?

14    A.  I don't recall.

15    Q.  Do you recall whether you were told that they were a public    09:45AM

16    court filing or that they had been filed with the Court?

17    A.  I didn't read anything like that, but I'm familiar with the

18    proceedings and I'm pretty sure that it was public information.

19    Q.  Okay.  I have no further questions, Your Honor.

20         THE COURT:  And I have just another question, Mr.             09:46AM

21    Creswell.  The reason you are here today is because of the

22    Court wanting to find out whether or not there's been any

23    retaliation associated with the Court's efforts itself having

24    you here today and what the lawyers do with respect to talking

25    to people in the prisons who are their clients.  I don't want      09:46AM

```
 1    there to be any retaliation, because I want people to be able

 2    to talk freely to their lawyers and to talk to the Court.  So

 3    you are here testifying about it.

 4            But when I listen to what you say, it seems to me kind

 5    of hard to link a November 2nd incident to something that        09:46AM

 6    happened in March.  Even though you think that it's out of the

 7    ordinary, my general understanding of the world is November to

 8    March is a long period of time.  And the idea that this has

 9    been burning in somebody's mind to be able to do that at that

10    moment when there probably are lots of opportunities between     09:47AM

11    November and March for people who are in charge of your life to

12    make your life more difficult.  And so it's only in March, five

13    months after.

14            THE WITNESS:  Can I further explain that?

15            THE COURT:  Yes.  Of course.                             09:47AM

16            THE WITNESS:  Okay.  When it happened, Monson came out

17    of nowhere.  I don't know where he came from.  And he's the one

18    who told them to put me in the CDU.  Usually anybody -- like I

19    have seen fights and all kind of crazy stuff happen, assaults

20    on staff and stuff like that, where they just go back to their   09:47AM

21    cell and they are put on 72-hour lockdown in their cell.

22    Monson came out and told them to put me in the hole, put me in

23    CDU, complex detention unit.

24            THE COURT:  Can I play the devil's advocate a little

25    bit?                                                             09:47AM
```

1          THE WITNESS:  Yes.

2          THE COURT:  Monson knows already you are a person who

3   when you are told to get off the bench you don't do it and you

4   get a write-up, right, so he knows you have got a history, at

5   least, of talking back and not doing things.  So could it be       09:48AM

6   that was retaliation, in effect, for -- or not retaliation.

7   Maybe that's the wrong word.  That would be him deciding to

8   treat you differently because he knew maybe about a past track

9   record.  Is that possible?

10          THE WITNESS:  I don't see that as possible.                 09:48AM

11          THE COURT:  Do you get what I'm saying about the

12   distance in time?

13          THE WITNESS:  Yeah.

14          THE COURT:  Do you think Monson really remembered that

15   November 2nd incident and he thought, I'm going to get this guy    09:48AM

16   here in March?

17          THE WITNESS:  I can't say what he remembered, but it

18   was just different what happened with me as happens usually

19   with anyone else with more serious situations.

20          THE COURT:  Okay.                                           09:48AM

21          THE WITNESS:  That's what I have noticed.  That's what

22   everyone else, inmates noticed.

23          THE COURT:  Before there was an objection and I

24   overruled it, but I'm now, after having heard your testimony

25   and having heard that you didn't get a ticket on November 2nd      09:48AM

```
 1   and there wasn't any rec yard sanction imposed, but that you

 2   did say when the question was asked before that other people

 3   were ticketed for the 704 violations on November 2nd, is that

 4   right?  Is that what you said.

 5            THE WITNESS:  I'm not -- they said they were going to      09:49AM

 6   get tickets.

 7            THE COURT:  You don't know whether anybody else got

 8   one?

 9            THE WITNESS:  I'm not sure.

10            THE COURT:  That's what I wanted to drill down on.  So     09:49AM

11   you know that -- well, you testified that there were threats of

12   that, but you actually have no personal knowledge about whether

13   anybody did receive a 704 ticket for clotheslines or shirt

14   tails?

15            THE WITNESS:  I'm not sure.                                09:49AM

16            THE COURT:  Okay.  Did my questioning engender any

17   other question?

18            MS. EIDENBACH:  Yes, Your Honor, it did.

19            THE COURT:  You may.

20   BY MS. EIDENBACH:                                                  09:49AM

21   Q.  You testified earlier that your declaration was signed on

22   January 18th of 2017, isn't that correct?

23   A.  Yes.

24   Q.  And do you know when that declaration was filed with the

25   Court?                                                             09:50AM
```

 1  A.  No, I don't.

 2  Q.  Okay.  But it would have been after January 18th?

 3  A.  Would have been after the 18th, yes.

 4  Q.  And when you met with Ms. Ross, you understood that your

 5  declaration was going to be part of a subsequent court filing        09:50AM

 6  that was going to occur sometime in February 2017?

 7  A.  Yes, I did.

 8          THE COURT:  And when did that filing occur?

 9          MS. EIDENBACH:  We are looking up the exact date.  I

10  have it in the exhibits.  But it was in February, so closer in       09:50AM

11  time to March than November.

12          THE COURT:  All right.  Thank you.

13          Mr. Struck.

14          MR. STRUCK:  I don't have any more questions, Your

15  Honor.                                                               09:50AM

16          THE COURT:  Now, is it your thought, Ms. Eidenbach,

17  that you would like Mr. Creswell to be available for recall

18  later on today, or can he make his way back home?

19          MS. EIDENBACH:  I will have no further questions, Your

20  Honor.                                                               09:50AM

21          THE COURT:  All right.  Mr. Struck, any objection to

22  releasing him?

23          MR. STRUCK:  He may be released.

24          THE COURT:  Thank you, sir, for coming in.  The

25  lawyers for the defendant for the State have assured me that         09:51AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Creswell - Redirect

1   anybody who comes to court here is not going to suffer any

2   retaliation, and so I am taking them at that word and expect

3   that to happen.  Really, I think that they understand that this

4   process of the Court being involved requires an information

5   exchange and a free flow of information.  Part of that is from        09:51AM

6   the plaintiff class members with their lawyers and also from

7   you to the Court here today.

8          So I don't anticipate that there would be any

9   difficulty associated with this.  But you always know the name

10   of your lawyers, and if you want to communicate with them about        09:51AM

11   anything that you think happens you can do that.  And I thank

12   you for coming in today and making your way here.  And please

13   be careful as you make your way down the stairs.  Thank you.

14          THE WITNESS:  Thank you.

15          MS. EIDENBACH:  Your Honor.        09:51AM

16          THE COURT:  Yes.

17          MS. EIDENBACH:  The date of the filing was January

18   27th, 2017, just for the Court's reference.

19          THE COURT:  Thank you.

20          Thank you, gentlemen.  Appreciate it.        09:52AM

21          So we now proceed to the defendants' witnesses?

22          MS. EIDENBACH:  Yes, Your Honor.

23          MR. STRUCK:  The defendants call Deputy Warden Monson.

24          THE COURT:  Thank you.

25          Good morning, Deputy Warden.  Please come into the        09:52AM

 1   Court and come right up in front of the court reporter so that

 2   the clerk of the court can administer the oath.

 3            THE COURTROOM DEPUTY:  Please raise your right hand.

 4            (The witness was sworn.)

 5            THE COURTROOM DEPUTY:  Thank you.  Would you please      09:53AM

 6   step over to the witness stand.

 7            THE COURT:  Good morning.

 8                           JASON MONSON,

 9   a witness herein, having been first duly sworn by the clerk to

10   speak the truth and nothing but the truth, was examined and

11   testified as follows:

12                        DIRECT EXAMINATION

13   BY MR. STRUCK:

14   Q.  Good morning, Mr. Monson.

15   A.  Good morning.                                                09:53AM

16   Q.  Can you state your name, please?

17   A.  Jason Monson.

18   Q.  What do you do?

19   A.  I am currently the deputy warden at the Rincon unit at the

20   Tucson complex.                                                  09:53AM

21   Q.  How long have you been the deputy warden there?

22   A.  Just under two years, but I was also the associate deputy

23   warden there for approximately a year.

24   Q.  How long have you worked for the Arizona Department of

25   Corrections?                                                     09:53AM

1   A.  Almost 23 years.  It will be 23 years this January.

2   Q.  And what facilities have you been assigned to?

3   A.  I started off at the Winchester unit, which was a medium

4   custody.  I was then rotated to the Cimarron unit which had --

5   Q.  Let me stop you right there.  Other than the Tucson          09:54AM

6   complex --

7   A.  Yes, Tucson.

8   Q.  -- have you worked at any other prison facility?

9   A.  Complexes, no.  Just Tucson.

10  Q.  And I interrupted you.  So you started at Winchester.  You   09:54AM

11  went to Cimarron.

12  A.  I went to Cimarron as an officer.  They were medium custody

13  and close custody.  I promoted to sergeant at Rincon.  I then

14  promoted to CO3 and went to Manzanita.  That was protective

15  custody unit.  Went to Catalina as a CO3.  They are minimum      09:54AM

16  custody.  Then went back to Winchester as a CO4 then went to

17  Cimarron again as a CO4 and then to Rincon as ADW and now

18  deputy warden.

19  Q.  Okay.  And as deputy warden, what are your duties?

20  A.  My duties are to make sure that everything that is supposed  09:55AM

21  to get done gets done.  It encompasses so much from budget,

22  feeding, security, programming.  Everything that the

23  Department's vision is, that's my job to make sure that that

24  happens.

25  Q.  And in November of 2016, did part of your responsibility     09:55AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Direct

1    include the Rincon unit?

2    A.  Yes.

3    Q.  We have heard already some testimony about a certain

4    regulation called 704.  Can you tell us what that is?

5    A.  Department Order 704 encompasses a huge, broad spectrum of          09:56AM

6    what we do in the Department.  The part of 704 that we are

7    probably addressing here today was the unit regulations or the

8    inmate regulations inside the cell.  Do you want to know why we

9    do it?

10   Q.  I would like to -- could you explain to us what the               09:56AM

11   importance is in the view of Department of Corrections

12   regarding the regulations pertaining to cell?

13   A.  Sure.  And over the course of 23 years having been an

14   officer, having been a supervisor, having been on the program

15   side and now an administrator, as an officer and a sergeant at       09:56AM

16   Rincon, you look at it from the security aspect.

17         So when you conduct 704 housing unit regulations, you

18   are making sure that there's no items on the wall so that

19   inmates aren't digging in the wall or digging through a wall.

20   You are making sure nothing is on the wall.  You are making          09:57AM

21   sure that the windows aren't covered so that as you are doing

22   an inspection you can see inside of the cell making sure that

23   their safety is good.  All of those -- making sure that they

24   don't have numerous items that are just nuisance contraband

25   like bottles, things of that nature, that you have to search        09:57AM

1    through when you are doing your searches.  That limits the

2    amount of hiding areas that they can have.

3        And another part of the security aspect is a lot of

4    these guys, majority of the time they can't control who comes

5    into their cell.  So hypothetically, I'm a nice clean                     09:57AM

6    individual.  Someone comes into my cell who is messy, dirty,

7    either doesn't clean themselves.  I've seen the whole gamut,

8    smokes.  The inmate -- and this is part of 704 -- no inmate has

9    authority over another inmate.  If you and I are celled

10   together, I can't necessarily tell you clean up your area.               09:58AM

11   Move your stuff over here.  Do this.  Do that.  Get rid of all

12   your garbage.  That's the job of the officer.  And I have seen

13   over the course of my career, if it's not done, inmates can

14   fight each other over those issues.  So that's the officer's

15   job from a security standpoint.  We enforce these rules.  We             09:58AM

16   keep it clean.  That way inmates don't have that conflict.  Any

17   animosities are directed towards the officer.

18       Another reason for it from a security standpoint is

19   sanitation.  You get a large group of individuals in these

20   areas.  If they don't maintain sanitation then, you know,               09:58AM

21   infection can break out.  And you want to make sure that people

22   are clean, people have the opportunity to be clean, disinfect

23   their areas.  That way everybody stays as healthy as can be,

24   especially in flu season.

25       Then when I became a programs officer for 704 you look               09:59AM

 1    at things from a little bit different perspective and you start

 2    thinking, these individuals are my neighbor.  They are going to

 3    be going back out into society, and you don't want to have

 4    somebody who just spent two, five, 10 years laying in their

 5    bunk not doing anything.  So 704 also encompasses you get up at          09:59AM

 6    a certain time, you make your bed, you start your day, you are

 7    productive.  So that's a programming aspect of 704.

 8            And then when you become an administrator part of 704

 9    it's an additional tool.  I look back at when I was a kid and

10    my mom would tell me to pull weeds out in the front yard and I          09:59AM

11    wouldn't do it.  And then at the end of the week those weeds

12    would be even taller and there would be more weeds.  So when I

13    tour, especially on this day, and notice that things inside

14    cells hadn't been done, you know, if a bed is not made that's

15    probably from this morning.  He probably slept in his bed.  But         10:00AM

16    if he has items taped to his wall, if he has more than four

17    boxes in the cell, that didn't just happen today.  The

18    officer's probably not doing what he's supposed to be doing on

19    a daily basis.  That's my indicator that, hey, I need to pay

20    attention and make sure that the supervisor knows this officer          10:00AM

21    is not performing at the standard we need him to perform at.

22            So from an administrative standpoint, that's what I

23    use 704 to.  When I am touring I gauge, is the officer -- if I

24    was at your house and everything looked great, I would know

25    that officer is doing his job.  And if it doesn't look good you         10:00AM

 1    know that officer is -- either doesn't know the policy, doesn't

 2    care about policy, or is afraid.  And none of those are good.

 3    So that's a management tool for us to know what level staff are

 4    performing at.

 5    Q.  Okay.  One of the things that you mentioned was covering          10:01AM

 6    windows.  What happens when -- and you are talking about -- are

 7    you talking about is there a window on the cell door or is

 8    there an exterior window you are talking about?

 9    A.  There's a window on the back of the wall close to where the

10    inmate sleeps, and then there's the window on the cell.  If          10:01AM

11    they cover the window, again, it's a security issue.  We have

12    to be able to have that visual.  We check on them.  We're in

13    continuous motion checking on the inmates.  They are in a cell

14    environment.  We want to make sure that they are safe and

15    that's how we make sure that they are safe is by that             10:01AM

16    continuous motion having that visual.

17    Q.  If the exterior window is covered, does that create

18    difficulty seeing into the cell?

19    A.  Absolutely.  I mean, at any time of the day if your cell

20    window is covered that entire cell could be very dark limiting      10:02AM

21    your visibility, the amount of light that's in there.  And

22    again, when we do our perimeter checks and we walk around,

23    we're actually checking the structural integrity of the

24    windows.  It is a prison.  And we make sure that the windows

25    are intact and their strength.  And if it's covered that's an       10:02AM

1    issue because we want to be able to see inside that cell.  We

2    want to make sure the inmate is safe.

3    Q.  So it's both for the perimeter officer as well as the

4    officer in the housing unit who is doing a safety and security

5    check?                                                        10:02AM

6    A.  Correct.

7    Q.  You said something about doing tours.  Can you tell us what

8    you mean by that?

9    A.  We tour our unit throughout the day, throughout the week.

10   On average we'll spend two hours a day touring multiple areas  10:02AM

11   of our unit.  And we're looking for everything.  So when I tour

12   a unit, I'm going to look for maintenance issues.  Do I see a

13   leak?  What is the sanitation?  Is it clean?  Do the inmates or

14   the staff have the tools they need to clean it?  I'm looking to

15   ensure that the standard that is in policy 704 is at that       10:03AM

16   standard and for the very reasons that I mentioned before.

17        I also walk and talk with inmates whenever I tour.

18   That's an opportunity for inmates to tell me anything that he's

19   having an issue about from, you know, visitation issues, phone

20   issues, anything.  I mean, again, after 23 years, any question  10:03AM

21   that inmate has I will answer; any question that staff have, I

22   will answer.  The purpose of 704 I talked about before, I have

23   given that -- I have explained those purposes multiple times to

24   staff so they know why we do our job so they understand the

25   purpose and the importance of it.  Same thing with inmates.     10:04AM

 1   Inmates will ask me that question, and I get it, maybe they

 2   don't understand.  So I let them know, sanitation, safety,

 3   these are the reasons why we do it.  And I will talk to nursing

 4   staff.  I check the kitchens, we have kitchens in there, make

 5   sure food temps are good, sanitation in the kitchen is good.  I   10:04AM

 6   make sure that security devices are operable.  Talk to staff,

 7   see what they see.  Any questions I try to answer them.

 8   Q.  In November of 2016, how many housing units were you

 9   responsible for as deputy warden?

10   A.  At Rincon, we have nine separate housing areas.  I'm also   10:04AM

11   in charge of the minors unit which has two additional so 11

12   total.  But there's only -- there's so many different areas of

13   Rincon.  It's not just general population.  At Rincon right

14   now, houses 1 through 6 were general population and there were

15   other areas that have specialty populations.   10:04AM

16   Q.  When you are doing your tour that you talk about, is this

17   something that you did at -- you tour every housing unit every

18   day?

19   A.  I don't.  In general, the goal is to tour as many places as

20   possible.  But we roughly go around an hour, two hours a day.   10:05AM

21   We like to tour a total of 10 hours per week.  But I might just

22   make it to one area depending on who I'm talking to, inmates

23   that I am talking to, asking questions.  I'm never going to

24   say, oh, I have to move on to an officer or an inmate if they

25   still have questions.  And then if I toured, let's say, the   10:05AM

1  kitchen and it took me two hours, the next day I will go to a

2  different area.

3  Q.  So you are not touring every housing unit every day.

4  That's just not possible?

5  A.  No.  That's definitely not possible.                    10:05AM

6  Q.  When you are doing your tour and you see issues that you

7  want to bring up, first of all, who do you want to bring those

8  issues up to if you see something that's not right?

9  A.  If I see a maintenance issue, I will -- my practice is I

10 will take a picture of the maintenance issue and I will send it  10:06AM

11 to my maintenance people and my support services people.  My

12 support services people will then do the work order and then

13 that e-mail notification is pretty much, you know, a picture is

14 worth a thousand words.  I send to it maintenance so they can't

15 say what's wrong with it?  You can look at that picture and    10:06AM

16 know.

17       If I'm touring and an inmate comes up to me and he

18 says, hey, I have an issue with visitation with my phone calls.

19 My general practice is I take a picture of his ID, I send it to

20 visitation.  I say call him.  He has an issue with his phone   10:06AM

21 calls.  If the inmate has an issue with getting time back or

22 his release date, I will take a picture of his ID.  I will send

23 it to his programs officer and the CO4 and I will say, call

24 this inmate back into your office and address this time back

25 issue.                                                         10:07AM

1           If I'm touring and I see issues with sanitation or

2    704, what I like to do is let's say I'm touring a housing unit.

3    And I have done this.  This is my practice.  I will tour a

4    housing unit, and I will tour and I will take pictures from the

5    door, from the window of the door.  I won't even go into the          10:07AM

6    cell, take a picture from the window of the door.  And then at

7    the end of that tour I will print out those pictures, and I

8    will write on those pictures what 704 compliance it is and I

9    will send it to all the supervisors.  I won't even tell them

10   what house it is.  And I will say, these areas are out of 704          10:07AM

11   compliance.  Because my intent is then the supervisors will

12   have to check all the areas and get all those areas up to the

13   standard.

14           If I send a picture, this is Cell 1A-1 they will just

15   go to 1A-1.  But I want them to look everywhere and in that            10:08AM

16   quest to look everywhere they are probably going to find more

17   issues and they can address it.  So that's my standard

18   practice.

19   Q.  Was that your practice before November 2nd, 2016?

20   A.  Absolutely.                                                        10:08AM

21   Q.  How long has that been your practice?

22   A.  I have been doing that practice since the Department gave

23   me a cell phone with picture capabilities.  I had provided the,

24   well, years before, at least a minimum of a year before, the

25   documentation of the photographs that I had taken and the             10:08AM

1    e-mails where I had sent this out.

2           MR. STRUCK:  Your Honor, may the witness be provided

3    with Exhibits 31 through 47, please.

4           THE COURT:  Have these previously been admitted as

5    exhibits?                                                        10:08AM

6           MR. STRUCK:  They have not yet.

7           THE COURT:  Placing before the witness those documents

8    that have been marked for identification as Exhibits 31 through

9    47.

10   BY MR. STRUCK:                                                   10:09AM

11   Q.  And if you would please take a look at Exhibit 31.  And can

12   you identify what that is?

13   A.  This looks like our DO-704, Department Order 704.

14          MR. STRUCK:  Your Honor, I move for admission of

15   Exhibit 31.                                                      10:09AM

16          THE COURT:  Any objection?

17          MS. EIDENBACH:  No, Your Honor.

18          THE COURT:  31 is received.

19   BY MR. STRUCK:

20   Q.  And is this the departmental order that was in place on     10:09AM

21   November 2nd, 2016?

22   A.  Yes.  I can look up on the top and it will have a date of

23   the revision date, and I see a September 19, 2015 is the latest

24   revision.

25   Q.  And does this document provide -- will provide the Court    10:09AM

11-8-17 - CV 12-601 - **Evidentiary Hearing re: Tucson Retaliation - Monson - Direct**

1    with all of the different areas that are covered under the 704

2    policy?

3    A.   That and more.

4    Q.   Okay.  Let's go to November 2nd, 2016.  Was there anything

5    going on that day that isn't your typical day in the Tucson           10:10AM

6    facility?

7    A.   Nothing other than the tour that came through.

8    Q.   Okay.  And what tour was that?

9    A.   The Parsons versus Ryan tour.

10   Q.   Now, have you had any kind of tours before November 2nd,          10:10AM

11   2016?

12   A.   We had one the previous year.

13   Q.   How about just tours that aren't related to this case?

14   A.   Oh, yes, all the time.

15   Q.   All right.  That's not an unusual situation to have?             10:10AM

16   A.   Not at all.

17   Q.   And why don't you tell us what you remember from the

18   morning of November 2nd, 2016.

19   A.   We were aware that they were coming in.  They arrived -- I

20   don't remember the exact order that we toured.  I think we went       10:10AM

21   to the minors unit, and then after the minors unit, we went to

22   Rincon.  And I believe they wanted to speak to an inmate

23   Layton.  I think Layton at that point in time lived in Housing

24   Unit 5, but he was a rec porter so he was on the recreation

25   field.  So we went onto the recreation field and I spoke to          10:11AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Direct

1   inmates on the recreation field.  I remember taking a picture

2   of the sit-up bench because I had asked my staff to replace the

3   upholstery on it.  I sent that out.

4   Q.  Let me stop you right there.

5   A.  Okay.                                                        10:11AM

6   Q.  Can you take a look at Exhibit 32, please.  And what is

7   that?  Identify that, please.

8   A.  That's the picture of the sit-up bench that I had asked

9   that they get that whole thing reupholstered not just taped.

10  And I sent that to my CO4s and my supports lieutenant, and I    10:12AM

11  said I have asked to get this done.  It is not.  I am assigning

12  it to you two.  Find a way to complete this.  That's it.

13  Q.  And what time did you send that e-mail?

14  A.  10:05.

15  Q.  So do you know about how long you were on the rec yard      10:12AM

16  while they were talking to Inmate Layton?

17  A.  Total approximation, 40 minutes to an hour.

18  Q.  Okay.

19  A.  And they didn't just speak to Mr. Layton.  They spoke to

20  other inmates as well.  I don't recall how many of the other   10:12AM

21  attorneys were on the rec field talking to inmates.

22  Q.  Now, when they were talking to the inmates on the yard,

23  first of all, let me ask you, who was -- was there anyone there

24  besides you?

25  A.  I believe one of our attorneys was with us.  I don't recall 10:12AM

1    how many of them.  I want to say two; my deputy warden of

2    operations.

3    Q.  Who is that?

4    A.  Vivian Baltierra.

5    Q.  Okay.                                                      10:13AM

6    A.  And a regional director, Tara Diaz.  And as we were out

7    there other staff came out.  I remember Lieutenant Flanagan was

8    out there and Lieutenant Krages.  I don't recall the officer

9    who was watching the rec field.  That's all I recall.

10   Q.  Okay.  Lieutenant Flanagan, is Lieutenant Flanagan a man or  10:13AM

11   woman?

12   A.  He's a man.

13   Q.  Now, while they are out there talking to their clients on

14   the yard, where are you and the other folks standing?

15   A.  As they were talking, I was speaking to inmates.  I          10:13AM

16   couldn't -- we maintained our distance but we also maintained a

17   visual as there was multiple ones of them.  Then if they moved

18   from one area to the next area, we would keep a visual.  Again,

19   we have tours, but it is a prison.  It is a close custody

20   environment.  We have training in case something happens.  I     10:14AM

21   don't think they do.  So worst-case scenario, you want to be

22   able to respond quickly.

23   Q.  About how far away would you say you were from the two ACLU

24   lawyers who were speaking to their clients?

25   A.  At any given time, maybe from me to you.                     10:14AM

1    Q.  All right.  Could you hear what they were saying?

2    A.  I wasn't listening.

3    Q.  If you wanted to, if you tried to listen, could you hear

4    what they were saying?

5    A.  Me, personally, I should probably get a hearing aid.  No.          10:14AM

6    I can -- you will see me turn my head.  I have difficulty

7    hearing out of my left ear.  But no.

8    Q.  At any time did Ms. Eidenbach or Ms. Ross, the lawyers who

9    were there for the plaintiffs, ask, on the rec yard, ask you or

10   anybody in your group to move away so they could speak more          10:15AM

11   privately?

12   A.  I believe one of them, when they were around a picnic table

13   as I was -- I don't remember if I was talking to an inmate or

14   staff.  I think somebody asked me to move back, and I did.

15   Q.  Did you have a problem with that?                                  10:15AM

16   A.  Not at all.

17   Q.  You understand the importance of their ability to speak to

18   their clients privately?

19   A.  Absolutely.

20   Q.  What happened after you left the rec yard?                         10:15AM

21   A.  They -- I'm not sure if they selected a specific house that

22   they wanted to go or it was a random house, but we went into

23   Housing Unit 3.

24   Q.  And how is Housing Unit 3, how is that put together?

25   What's the configuration?                                             10:16AM

60

1   A.  All of the housing units at Rincon are -- it's not a

2   perfect T, but it's A run branches off one side, C run branches

3   off the other, control room is in the center, and B run

4   branches off.  So like a T.  All of them are basically the

5   same.                                                          10:16AM

6   Q.  Is A run sometimes called Abel run?

7   A.  Yes.

8   Q.  C run is called what?

9   A.  Charlie run.

10  Q.  Can you, as far as say Charlie run, can you give us an     10:16AM

11  estimate as to how long that housing unit is once you get

12  inside?

13  A.  Approximation, I believe we looked it up.  I want to say it

14  was approximately 76 feet from the front to the back.

15  Q.  Okay.  And about what's the width from -- the cells are     10:16AM

16  facing each other down the run, is that right?

17  A.  Yes, sir.

18  Q.  And what's -- about what's the approximate width in

19  between?

20  A.  Oh, man.  I want to say at least seven feet from one wall   10:16AM

21  to the next wall, probably more.

22  Q.  Relatively narrow?

23  A.  It's wide enough, we like it wide enough in case incidents

24  happen you don't want it too narrow so that an inmate can grab

25  you.                                                           10:17AM

 1   Q.  Okay.  Now, what level classification unit is -- were Abel

 2   and Charlie?

 3   A.  All of general population at Rincon is close custody.

 4   Q.  Which run did you walk into first?

 5   A.  When we entered Housing Unit 3, we went to A run first.        10:17AM

 6   Q.  And at that time you were there with Ms. Eidenbach and Ms.

 7   Ross from the ACLU.  You think a lawyer from -- representing

 8   ADC was there as well.  Who else was there besides you when you

 9   got to the A run?

10   A.  My deputy warden of operations, Vivian Baltierra, and Tara   10:17AM

11   Diaz, the regional operations director Tara Diaz.

12   Q.  Was there any captains there?

13   A.  No, I don't believe so.

14   Q.  Any sergeants?

15   A.  No, I don't believe so.                                      10:18AM

16   Q.  Okay.  What happened once you got to the Abel run?

17   A.  When we got to Abel run, because Tara Diaz and Vivian

18   Baltierra are female, they had to announce their presence,

19   female on the run.  You have to announce it so all the inmates

20   can hear you.  Gives them an opportunity to get dressed.         10:18AM

21   Q.  Who made that announcement?  Do you remember?

22   A.  I believe both of them did.

23   Q.  Ms. Diaz and Ms. Baltierra made the announcement?

24   A.  I believe at least one of them did.

25   Q.  Is there a microphone or a loud speaker?  How was the --     10:18AM

1   how do they make the announcement?

2   A.  You have to yell it loud enough that somebody can hear it

3   in the cell 76 feet down a hallway.

4   Q.  And so once the announcement was made, what is the actual

5   announcement?  What do they say?                              10:19AM

6   A.  Female on the run.

7   Q.  And once that's made, then what happened?

8   A.  Then we walked down the run looking into cells for

9   compliance, making sure that the inmates had their shirts on.

10  I recall probably the first cell to the left, the inmate needed  10:19AM

11  a new ID.  And so I took a picture of the ID and sent it to my

12  accountability officer and said, get this inmate a new ID.  He

13  then sent my picture e-mail to CIP, central intake processing,

14  said please get this inmate a new ID.  Then we continued down

15  the run looking for 704 inspections.                         10:19AM

16  Q.  Let me back up.  How was it brought to your attention that

17  there was -- this individual needed a new ID?  Who brought that

18  to your attention?

19  A.  Tara Diaz noticed it right off the bat, said this inmate

20  needs a new ID.                                              10:20AM

21  Q.  Let me show you what's been marked as Exhibit 34.

22          Can you tell us what Exhibit 34 is?

23  A.  That was the inmate whose ID was in the window that Ms.

24  Diaz recognized this inmate needs a new ID.

25  Q.  So when the inmates are inside their cells are they       10:20AM

1    supposed to put their IDs in the window?

2    A.   That's the most convenient -- when we do our counts, we

3    have to do a face-to-ID check.  So it's convenient for the

4    inmate to put it in the window because if he doesn't put it in

5    the window then we've got to knock on your cell door during          10:21AM

6    count time and say I've got to see your ID.  So if he puts it

7    on the window, we can see it on the window, see you in your

8    area.  You are good to go, move on to the next cell.

9              MR. STRUCK:  Your Honor, move to admit Exhibit 34.

10             THE COURT:  Any objection?                                  10:21AM

11             MS. EIDENBACH:  No objection.

12             THE COURT:  34 is received.

13   BY MR. STRUCK:

14   Q.   And does Exhibit 34 include the e-mail that you sent?

15   A.   I see the e-mail that I sent.  It doesn't have his e-mail        10:21AM

16   he then forwarded to CIP.

17   Q.   What time did you send that e-mail?

18   A.   10:52.  So we must have been in Building 3 at 10:52.

19   Q.   Is it a violation of any kind for this inmate to have an ID

20   that needs to be replaced?                                           10:21AM

21   A.   Yes.  That's part of 704 policy.

22   Q.   Now was this particular inmate, was he disciplined for

23   this?

24   A.   No.

25   Q.   Why not if it's a 704 violation?                                 10:21AM

1    A.  For this, this looks like normal wear and tear.  If he had

2    crushed the ID, and then I don't even necessarily believe that

3    I would have written or anybody would have written a

4    disciplinary ticket even if he had crushed it.  The difference

5    is normal wear and tear, we replace it.  If you purposely          10:22AM

6    destroy it then we charge you.

7    Q.  Okay.  So earlier you testified that when you entered the

8    Abel run, you walked up and down, and I think you said that you

9    were looking to see if there were 704 compliance.  Why were you

10   doing that?                                                        10:22AM

11   A.  Because that's what I do every time I go anywhere.

12   Q.  I forgot to ask you about this.  Let me take a look at

13   Exhibit 33, please.  Would you identify that?

14   A.  This looks like an e-mail that I sent to my CO4s and my CO3

15   Abelowitz who is our notary at Rincon, and it looks like a        10:23AM

16   conversation when we were on the rec field, this inmate said

17   that he needed a notary.  So I sent this to my CO4 and the CO3

18   that he needs a notary.

19   Q.  So you were approached by this particular inmate and he

20   said that he needed a document notarized?                         10:23AM

21   A.  Correct.

22   Q.  All right.  And then you sent this e-mail as a result?

23   A.  I did.

24   Q.  All right.

25        MR. STRUCK:  Your Honor, move to admit Exhibit 33.           10:23AM

1              THE COURT:  Any objection?

2              MS. EIDENBACH:  No objection, Your Honor.

3              THE COURT:  33 is received.

4    BY MR. STRUCK:

5    Q.  Take a look, if you would, please, Deputy Warden Monson, at          10:24AM

6    Exhibit 35.  Would you identify that, please?

7    A.  This is a photograph of Cell 3A-9.  We are a close custody

8    yard, so when we toured down there I noted that this cell door

9    was partially opened.  When I inquired about why it was not

10   secured, they had advised me that it -- with the computer it         10:24AM

11   couldn't be secured.  It had to be keyed open.  So I took a

12   picture of the cell door making sure that I had that it was

13   open and I sent this to my captain and my supports lieutenant

14   and I said it is broken and has to be keyed.  Is this

15   acceptable?  We already had a work order on that and an           10:25AM

16   information report that was dated, I want to say, October 21st.

17   So to me, having a door that isn't perfectly functional, even

18   though we could open it with a key, my systems should always be

19   operational.  So basically, it was a, you know, I always set

20   that standard.  So I sent it to my captain and said, is this         10:25AM

21   acceptable so we could make sure it got completed quickly.

22             MR. STRUCK:  Your Honor, move to admit Exhibit 35.

23             THE COURT:  Any objection?

24             MS. EIDENBACH:  No objection.

25             THE COURT:  35 will be received.          10:25AM

```
 1   BY MR. STRUCK:

 2   Q.  Take a look, please, if you would, Deputy Warden Monson, at

 3   Exhibit 36.  Could you identify those, please?

 4   A.  These are photographs I took of 704 compliance issues as we

 5   walked down A run.                                              10:26AM

 6   Q.  And take a look at --

 7           MR. STRUCK:  Your Honor, move to admit Exhibit 36.

 8           THE COURT:  Any objection?

 9           MS. EIDENBACH:  No objection.

10           THE COURT:  36 is received.                             10:26AM

11   BY MR. STRUCK:

12   Q.  Take a look at the first photograph, please, 36.001.  Can

13   you tell us what the 704 violation you were taking a photograph

14   of was?

15   A.  There's multiple.  I can see that the inmate has -- his     10:26AM

16   cord is not plugged into the wall, so he has a TV antenna.

17   That's written policy that they can't have TV antennas.  I see

18   that he has used his prayer rug as a dust cover over his

19   counter.  You can't have that.  I can see that he had multiple

20   water bottles that were empty on the -- on his desk, and those  10:27AM

21   should be thrown away.  In general, it's not the cleanest, but

22   that's not against policy.  Oh.  He also has items extending

23   beyond the borders of his bulletin board.  And it looks like he

24   has a towel covering the window.  But that cell, I can also see

25   that the inmate has the cover.  It's gray.  I'm glad this is    10:27AM
```

 1    color.  It's gray but I can see the gray mattress underneath it

 2    but the policy says the bed will be made by 7:30 and it has to

 3    be tightly tucked.

 4    Q.  Why don't you take a look at the second photograph and tell

 5    us what 704 violations you see in Exhibit 36.002.                    10:27AM

 6    A.  You can see the cord taped to the wall, so that's not new.

 7    That didn't just happen in the morning.  That's also a TV

 8    antenna.  And then it looks like the inmate is underneath his

 9    cover and the bed has to be made by 7:30.  Looks like he's also

10    got some underwear hanging on his bed, and per policy you can        10:28AM

11    only have your towels hanging on your sheet.  So it looks like

12    he was doing laundry, which is also part of 704.

13    Q.  Is there a window covering on this one?

14    A.  I don't think there is, because I can see that light coming

15    through.                                                            10:28AM

16    Q.  Okay.  How about the next photograph, 36.003.

17    A.  Oh.  That one is my pet peeve right there.  The inmate has

18    photographs attached to the wall.  So the photographs attached

19    to the wall, the inmates are given a place which that -- it

20    appears that the brown square you see behind it is most likely      10:28AM

21    his bulletin board with nothing on it.  He should have had

22    those pictures on his bulletin board.  You can also see the

23    cord attached to the wall.  It's difficult from the photograph

24    to see if that's an antennas or those are his headphones but

25    nothing should be attached to the wall.                             10:29AM

1              The inmate has also tampered with his light fixture,

2     removed the covering and put paper and stickers on his light

3     bulb.  That's against 704.  That's also a fire hazard.  And

4     he's also underneath his covers.  And I believe from the first

5     time on the first photo we were well past 7:30.                    10:29AM

6     Q.  How about the next photograph, 36.004.

7     A.  Looks like in this one the inmate is still asleep.  He

8     has -- I believe in this one he has a covering.  He definitely

9     has, looks like, boxers hanging off the edge of his bed.  It's

10    cluttered but it's not the worst cell that I have seen.            10:30AM

11    Q.  How about the next photograph, 005?

12    A.  This inmate, again, has the TV antenna.  The top inmate is

13    in a state of undress and you cannot be in a state of undress

14    unless immediately upon return from the shower unless preparing

15    for the bed.  And obviously his bed is not made.                   10:30AM

16    Q.  Next photograph, 36.006.

17    A.  On this one you clearly see that the inmate has been doing

18    laundry in the cell and has a clothesline visible, not hidden.

19    The inmate on the top bunk is still in his bed.  And the inmate

20    on the bottom bunk has not made his bed.                           10:30AM

21    Q.  Where is he -- where are they supposed to have their

22    laundry done?

23    A.  We send out the laundry.  That way the laundry can get

24    cleaned and we know it's sanitized.  That way we can ensure

25    that the laundry is cleaned to our standard.                       10:31AM

1    Q.   Next photograph, 36.007.

2    A.   And you will notice the difference in lighting compared to

3    when they have the windows covered.  So he has his window

4    covered.  He's still asleep in his bed, beds not made, both of

5    them, there's another inmate on top.  So that's what I see          10:31AM

6    there.

7    Q.   And the last photograph, 36.008.

8    A.   You can clearly see that the light has been tampered with

9    and that they have clotheslines in plain site.  You can see the

10   outline of the door, so I can see that that is right from -- I      10:31AM

11   think it's right from the window.  And I take those pictures

12   from the window when I do it and send it out so that you can --

13   my supervisors know, I didn't go inside the cell and look

14   really, really hard to find these issues.  If you are just

15   walking through doing your count and doing your health and          10:32AM

16   welfare checks you can see it from the window.  So it should be

17   addressed.

18   Q.   And in any of these photographs can you tell which cell

19   they were taken of?

20   A.   No.  All the cells look alike.  And again, my intent was to     10:32AM

21   reflect that the 704 compliance is not being done.  The only

22   cell is just the door but you can see from my e-mail what the

23   purpose of that was.

24   Q.   Now, when you are going through taking these photographs

25   while the lawyers from the ACLU are talking to their clients,       10:33AM

1    did it occur to you that that was going to cause some sort of

2    problem with respect to maybe inmates not wanting to talk to

3    their lawyer?

4    A.  No, because it's a familiar practice that my staff and the

5    inmates have seen me do.                                        10:33AM

6    Q.  I mean, did that cross your mind at all?

7    A.  Not at all.

8    Q.  Okay.  There has been testimony that there was yelling

9    going on by you, in particular, and then some of the other

10   staff, ADC staff that were in there while the visitation was    10:33AM

11   going on in the Charlie unit.  Do you recall whether you were

12   doing any yelling of any kind?

13   A.  Yelling?

14   Q.  Yes.

15   A.  No.  I imagine that the initial -- and again, any time you   10:33AM

16   go down a run a female officer, regardless of your rank, has to

17   announce her presence.  So you have to say that initially loud

18   enough.  And then as you are talking, again, I have worked

19   Rincon for many years.  I have talked to inmates through cell

20   doors.  It's not -- you have to kind of get up in that crack.    10:34AM

21   There's an air flow and you can hear them and they can hear

22   you.  So when you are conversing with them you are kind of

23   talking in the crack.  So if I am walking down a run and I am

24   addressing issues, I'm going to speak louder than if you and I

25   were just talking right here so you can hear me.                 10:34AM

1   Q.  So if you are trying to talk to an inmate you are going to

2   be talking louder so they can hear you through the door?

3   A.  Yes, sir.

4   Q.  Okay.  While you were in either Abel or Charlie unit, was

5   anyone yelling anything about ticketing inmates for 704                10:34AM

6   violations?

7   A.  No.  My sole purpose was holding the staff member that was

8   working that housing unit accountable.

9   Q.  Did you yell anything about ticketing or disciplining these

10  inmates when you were in the Abel unit or the Charlie unit?           10:35AM

11  A.  No, sir.

12  Q.  Why not?  If you saw these violations why wouldn't you say

13  something?

14  A.  The inmates are doing what I would anticipate an inmate to

15  do unless he's given instruction to do otherwise.  So for the        10:35AM

16  photographs, and per my e-mail that I sent to the supervisors,

17  I wanted them to hold the officer accountable so that they

18  knew, hey, when you are not around, this is what the officer is

19  doing or isn't doing.

20  Q.  Okay.  Is that information -- strike that.                        10:35AM

21         Let me ask you about Exhibit 37.  What is that?

22  A.  I'm fairly certain that was handed to me when we were on

23  the rec field.  I don't know unless the inmate lived in that

24  house.  But he had sent me -- oh.  He says he had sent me an

25  inmate letter and he provided me his copy saying hey, I need a       10:36AM

 1    response from you on this.  So to ensure that on the off chance

 2    that I went back to my office and I never received his copy,

 3    because we have carbon copies, I took a photograph of it so

 4    that I knew exactly what to respond to.

 5            MR. STRUCK:  Your Honor, move to admit Exhibit 37.          10:36AM

 6            THE COURT:  Any objection?

 7            MS. EIDENBACH:  No objection.

 8            THE COURT:  37 is received.

 9    BY MR. STRUCK:

10    Q.  And there's -- looks like there's an e-mail with this.        10:36AM

11    What is that e-mail?

12    A.  I e-mailed this to myself, and that's what I will do as

13    well.  So I took a picture of it, I sent it to myself so when I

14    returned to my office I could open it up, look at it, and then

15    go through my paperwork and then respond to it.                    10:37AM

16    Q.  Okay.  And what time did you send that e-mail to yourself?

17    A.  10:56.  So he must have lived in the house.

18    Q.  And did you send that e-mail at 10:56, were you in the

19    housing unit when you sent that e-mail to yourself?

20    A.  Yes.                                                           10:37AM

21    Q.  Take a look at Exhibit 38, please.

22            MR. STRUCK:  Your Honor, move for the admission of 38.

23            THE COURT:  Any objection?

24            MS. EIDENBACH:  Most likely not, but perhaps the

25    witness could identify it first.                                   10:37AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Direct

1        MR. STRUCK:  Sure.

2   BY MR. STRUCK:

3   Q.  Would you identify Exhibit 38?

4   A.  This looks like an e-mail I sent to Lieutenant Murphy,

5   Sergeant Krages, and Sergeant May saying Housing Unit 3A, come          10:38AM

6   down, get the housing unit in 704 compliance and make a MAP

7   entry on the staff member.

8   Q.  What's a MAP entry?

9   A.  MAP entry, it stands for -- we have a policy in the 500

10  series -- Managing Accountability and Performance.  And it's         10:38AM

11  the system we use that reflects an officer's work habits.  So

12  it can reflect that you are amazing; it can reflect that you

13  are at a regular standard or that you need improvement.  And

14  that's at the end of the year, it can even, you know, at the

15  end of the year you get rated so you know where you are at.          10:38AM

16  All of us have a MAP.

17  Q.  And so you are sending this to Lieutenant Murphy.  Who is

18  Lieutenant Murphy?

19  A.  She was the Lieutenant for that shift.  So she is the shift

20  commander and then the two sergeants that were working with her          10:39AM

21  that day.

22  Q.  Did anybody come down as a result of this e-mail being sent

23  to the unit?

24  A.  Sergeant Krages came down to the housing unit.

25  Q.  Okay.  And did you talk to Sergeant Krages?                       10:39AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Direct

1  A.  Yes.  When he came down I let him know -- I showed him the

2  photographs and said, yeah, this doesn't look good.

3  Q.  Do you remember, were you in Abel or Charlie when this

4  happened?

5  A.  When he came down, they may have still been on A run but          10:39AM

6  then we proceeded to Charlie run.

7  Q.  Okay.

8  A.  I remember he was definitely there when we were on Charlie

9  run.

10  Q.  When you were having a conversation with Sergeant Krages         10:39AM

11  and showing him these photographs on your phone, where were the

12  two of you standing?

13  A.  At any point in time we could have been in the dayroom or

14  at the end of Charlie run.

15  Q.  Were you yelling to him?  Were you yelling at him?            10:40AM

16  A.  No.

17  Q.  What was your tone of voice?

18  A.  He was right next to me, so just a conversation right here.

19  Q.  Were you angry at him about the 704 violations?

20  A.  No.  This is just business.                                  10:40AM

21  Q.  What happened then?

22  A.  He talked to the officer.

23  Q.  Do you remember who the officer was?

24  A.  I know now because of this.  It was Robles.

25  Q.  Okay.  And were you there when he spoke to Officer Robles?   10:40AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Direct

1    A.  I was in the building, but I didn't speak to Robles.

2    Q.  Were you with them when he had the conversation with

3    Robles?

4    A.  He may have been next to me, but my issue is mostly with

5    the supervisors knowing the staff members' performance level.    10:41AM

6    Q.  Okay.  Now, as you are walking through these housing units,

7    do inmates call out to you?

8    A.  In that house, they may have.  I do remember that one of

9    the -- as one of the Parsons versus Ryan attorneys was touring,

10   she told me that an inmate wanted to speak to me.  So then I     10:41AM

11   walked down to the run and spoke to the inmate.

12   Q.  Was that Ms. Eidenbach or Ms. Ross?

13   A.  I don't know.

14   Q.  Let me show you Exhibit 40.  If you would identify that,

15   please?                                                          10:41AM

16   A.  40?

17   Q.  Yes.

18   A.  Okay.

19   Q.  Please identify Exhibit 40.

20   A.  This looks like an e-mail that I sent to my Lieutenant       10:41AM

21   Flanagan of support services, Sergeant Lindsay of support

22   services, and Sergeant Irby of support services.  They oversee

23   my mail and property area.  And it looks like Inmate Mata is

24   the subject, and then I advised them this inmate says he has

25   ordered a stinger.  And a stinger is an emergent heater that an  10:42AM

1    inmate can plug into the wall and put in liquid, heat up cocoa,

2    coffee, whatever he wants.  So he's ordered a stinger and has

3    the paperwork that needs to go in his file.  Advise me when the

4    action is taken.

5         So when an inmate moves they have a property file and    10:42AM

6    we compare the property file to his property.  So if that item

7    isn't in his property file then somebody might say, whoa,

8    that's not yours.  And I wanted to make sure it was in his

9    property file so if he moved that it was -- he could say yes,

10   he's the proof of purchase.  This is yours and there was no    10:43AM

11   issue.

12   Q.  And no one would take it from him?

13   A.  Correct.

14   Q.  Okay.  And the inmate approached you about this issue?

15   A.  He had to have been in the cell, so he either had to call   10:43AM

16   out to me or maybe this was the one that they said this guy

17   would like to speak to you.

18   Q.  What time did you send this e-mail to Flanagan?

19   A.  11:03.

20        MR. STRUCK:  Your Honor, I move to admit Exhibit 40.       10:43AM

21        THE COURT:  Any objection?

22        MS. EIDENBACH:  No objection.

23        THE COURT:  40 is received.

24        We'll take a break, sir.  We're going to take a break.

25   You can step down from the witness stand.  When we come back in  10:43AM

11-8-17 - CV 12-601 - **Evidentiary Hearing re: Tucson Retaliation - Monson - Direct**

```
 1    10 minutes you will come back here.

 2             MR. STRUCK:  I will let you know, Your Honor, he's

 3    going to be the longest witness of the day.

 4             THE COURT:  Okay.  Thank you.

 5             (Recess from 10:43 a.m. until 10:58 a.m.)           10:43AM

 6             THE COURT:  You may continue.

 7             MR. STRUCK:  Thank you, Your Honor.

 8    BY MR. STRUCK:

 9    Q.  A little housekeeping.  I forgot Exhibit 32, I forgot to

10    admit.  I move to admit Exhibit 32.                          10:58AM

11             THE COURT:  Any objection to 32?

12             MS. EIDENBACH:  No objection.

13             THE COURT:  32 will be admitted.  Thank you.

14    BY MR. STRUCK:

15    Q.  Deputy Warden Monson, would you take a look at Exhibit 39, 10:59AM

16    please.  Would you identify that, please?

17    A.  It looks like an e-mail I sent to myself, CO3 Abelowitz,

18    who handles the phone calls for me, visitation officer Moss who

19    also has the ability to do phone calls, and Officer Murdock who

20    at that time was there in visitation who also had the ability   10:59AM

21    to do phone calls.  And I included CO4 Evans.  Subject was an

22    inmate's name and number, and I said the phones, are they on?

23    He is having issues.

24             So my intent with that is the inmate must have told me

25    he was having phone issues.  I wanted to inquire does he have   11:00AM
```

1    phone calls, and if he does, he's not able to make phone calls

2    so please resolve it.

3    Q.  And this was when the inmate called you over in the Charlie

4    run?

5    A.  It appears so by the time.                                    11:00AM

6    Q.  What time was the e-mail sent to yourself?

7    A.  10:59.

8          MR. STRUCK:  Your Honor, move to admit Exhibit 39.

9          THE COURT:  Any objection?

10         MS. EIDENBACH:  No objection.                                11:00AM

11         THE COURT:  39 is received.

12         Mr. Struck, can I interrupt?  Because of the back

13   problem I mentioned yesterday, periodically I need to stand.

14   So please don't allow that to interfere with anything you are

15   doing.                                                             11:00AM

16         MR. STRUCK:  That's fine.

17         THE COURT:  Thank you.

18   BY MR. STRUCK:

19   Q.  Deputy Warden Monson, could you look at Exhibit 41, please.

20   Would you identify that, please?                                   11:00AM

21   A.  Appears to be an e-mail I sent to my CO4 Evans and CO4

22   Berrang about an Inmate Garcia.  This was sent from my cell

23   phone, so it says call this inmate on -- it should have been

24   in -- and find out what his diet issue is.  So he must have

25   come up to me and said that he was having an issue; whether it     11:01AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Direct

1    was the wrong diet or he wasn't getting it.  And then I wanted

2    the CO4s to call him in, talk to him and resolve his issue.

3    Q.  And he called you over to a cell in the Charlie run?

4    A.  I assume so by the time.

5    Q.  What time was that again?                                    11:01AM

6    A.  11:07.

7            MR. STRUCK:  Your Honor, move to admit Exhibit 41.

8            THE COURT:  Any objection?

9            MS. EIDENBACH:  No objection.

10           THE COURT:  41 is received.                              11:01AM

11   BY MR. STRUCK:

12   Q.  Would you please take a look at Exhibit 42.  Would you

13   identify it, please.

14   A.  This is an e-mail I sent to myself.  I think auto correct

15   changed his name but that's the correct DOC number.  That way  11:02AM

16   when I got back to my office I could see if there was any

17   documentation sent to me regarding his application to receive

18   good time back.  So I sent an e-mail to myself with his name

19   and number saying check on signing his time back.

20   Q.  And this was an issue that he wanted addressed as you were  11:02AM

21   in the Charlie run?

22   A.  He must have asked if I had received it, and I wanted to

23   check to make sure I had received the documentation.

24   Q.  What time was this e-mail sent?

25   A.  11:10.                                                      11:02AM

1              MR. STRUCK:  Your Honor, move to admit Exhibit 42.

2              THE COURT:  Any objection?

3              MS. EIDENBACH:  No objection.

4              THE COURT:  42 is received.

5     BY MR. STRUCK:                                              11:02AM

6     Q.  Please take a look at Exhibit 43.  Would you identify that,

7     please?

8     A.  This is an e-mail I sent to my Lieutenant Flanagan who is

9     in charge of support services.  That encompasses the mail and

10    property officer.  The name of the inmate I want to say was     11:03AM

11    Arub but auto correct changed it to around.  But that's the

12    correct department ADC number.  And the inmate was mentioning,

13    I have had many -- every time I spoke with this inmate, he

14    would bring up the same issue.  But when he would go up he

15    would refuse the clothes.  So I wanted him to get three long     11:03AM

16    sleeved, four boxers, four socks, three pants, two sheets.  Do

17    we have these?  If so, I think it was supposed to be give it to

18    him and take a photo of him receiving it.  That way I could

19    show here's the clothes we're giving you.  Here you are so that

20    he couldn't say that he never got them.                         11:04AM

21    Q.  And what time was this e-mail sent?

22    A.  11:14.

23    Q.  And so you had had conversations with this particular

24    inmate before regarding the same issue, the clothing issue?

25    A.  Yes.                                                        11:04AM

1   Q.  And this was an e-mail that was sent from the Charlie unit

2   or Charlie housing unit?

3   A.  Again, I will make that assumption.  I don't recall the

4   exact time that we left.  It looks like we were all -- because

5   the times are in such close proximity I would say that's a       11:04AM

6   reasonable assumption to make.

7           MR. STRUCK:  Your Honor, I move to admit Exhibit 43.

8           THE COURT:  Any objection?

9           MS. EIDENBACH:  No objection.

10          THE COURT:  Exhibit 43 is received.                       11:04AM

11  BY MR. STRUCK:

12  Q.  Please take a look at Exhibit 44.  Would you identify that,

13  please.

14  A.  This is an e-mail I sent to Lieutenant Flanagan, Sergeant

15  Irby, and Sergeant Lindsay.  It says 3A preaching hot line.      11:05AM

16  Auto correct changed it to preaching.  It's PREA, which stands

17  for the Prison Rape Elimination Act.  And what we do per our

18  policy, next to the inmate phones in the housing units we have

19  that hot line right there so that if an inmate ever has an

20  issue he doesn't have to try to remember the phone number.  The  11:05AM

21  phone number is right there.  He can call.  It's free.

22          But I saw that inmates had removed or colored over the

23  sign, and I wanted -- I sent the e-mail to them saying it's

24  painted over in sections.  That way they could come down and

25  re-stencil that information next to the phone.                   11:05AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Direct

1   Q.  And this was something you observed as you were going

2   through?

3   A.  Again, I was at the back of the run, which is where the

4   telephones are.  And as I'm standing there, we're trained

5   observers.  I noticed that that was not up to par and I wanted        11:06AM

6   it corrected.

7           MR. STRUCK:  Your Honor, move to admit 44.

8           THE COURT:  Any objection?

9           MS. EIDENBACH:  No objection.

10           THE COURT:  44 is received.                                   11:06AM

11   BY MR. STRUCK:

12   Q.  At any time when you were in the Abel or the Charlie run,

13   did either of the attorneys, plaintiffs' attorneys, ever

14   approach you or tell you, okay, could you or your folks back

15   away so we can speak privately to our clients?                       11:06AM

16   A.  I don't recall that in the house.

17   Q.  If that had occurred, what would you have done?

18   A.  I would have backed away.

19   Q.  And did you ever, ever yell or say ticket them all, give

20   them tickets, give them discipline for these violations that        11:06AM

21   you saw?

22   A.  No, I did not.

23   Q.  Why not?

24   A.  Again, the inmates issue, all those issues that we saw in

25   704, in my experience, if you ask a person to take down the         11:07AM

1    window covering, they will take down the window covering.  If

2    you ask a person, take down the clothesline, they will take

3    down the clothesline.  If you ask a person, hey, make your bed.

4    Put your shirt on.  They will make their bed and put their

5    shirt on.  The issue is not these inmates were doing something          11:07AM

6    that was so bizarre.  My issue was the staff member didn't

7    address it.

8    Q.  Do you use a term "ticket"?

9    A.  I use disciplinary.

10   Q.  Did you ever go back and check -- let me back up.                    11:07AM

11          Did you at some point learn that there was an issue

12   raised by plaintiffs' counsel regarding the tour of 3A and 3C

13   units?

14   A.  Yes.  Honestly, I don't remember if it was later in the

15   afternoon after they left or if it was the next day.  But yes,          11:08AM

16   I became aware of statements that they said that I had stated.

17   Q.  Okay.  What did you do when you heard that?

18   A.  It is what it is.  There's nothing -- I can't influence

19   what they say I said.

20   Q.  Did you make any inquiries or check to see if, in fact,             11:08AM

21   there had been discipline issued?

22   A.  Yes.  I contacted the disciplinary coordinator and asked if

23   any disciplinary had been written in Housing Unit 3.

24   Q.  And why did you do that?

25   A.  Just to verify that no, that did not occur.                         11:09AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Direct

1   Q.  Okay.  Can you take a look at Exhibit 45, please.  Would

2   you identify that?

3   A.  Looks like on the bottom section, I get up early as you can

4   see, that on the 3rd, I sent an e-mail to my disciplinary

5   coordinator CO3 Abelowitz, subject -- at 4:20 a.m., subject, "I     11:09AM

6   need to know are there any 704 discipline from Housing Unit 3

7   written yesterday.  If so, leave them on my desk."  And then

8   replied, his answer was in the subject, "Sorry, no tickets."

9   Q.  There was some testimony earlier by Mr. Creswell, Brian

10  Creswell, who is an inmate in Tucson, regarding a disciplinary     11:10AM

11  violation he received in March of 2017 regarding him refusing

12  to do a strip search after he failed to make it through a metal

13  detector.

14       Do you know anything about that?

15  A.  I vaguely recall responding to that.                          11:10AM

16  Q.  What do you -- okay.  Tell me why would you respond to

17  that?

18  A.  I would respond because, you know, I'm the deputy warden of

19  a unit, and when I hear my lieutenant initiate ICS, our

20  incident command system, and I can respond, well, I'm going to    11:11AM

21  respond.  Let me see what's going on.  So I responded.  I do

22  recall that it was -- do you want me to go into detail or

23  just --

24  Q.  Yes.  We heard about this this morning, so if you could go

25  into some.                                                        11:11AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Direct

1   A.  I remember I was in my office.  I heard the Lieutenant

2   Reinarts initiate ICS.  I went down there, and the inmates that

3   were exiting the chow hall were going directly to the

4   recreation field.  So we run them from the chow hall through

5   the walk-through scanner, which is in our education area.  So          11:11AM

6   when I had responded -- we have about 86 inmates in the housing

7   unit.  When I responded, probably half were on the recreation

8   field who cleared the scanner, been patted down, and about half

9   were waiting to go through the scanner.  And I only know it was

10  Mr. Creswell because that's who we're talking about.  But an          11:12AM

11  inmate was refusing to go through the scanner again.  And the

12  lieutenant asked him, you know, I asked him to go through it,

13  or he beeped when he came through it.  I don't remember if he

14  went through it again and beeped again or if he refused to go

15  through it, but he refused to go through the scanner.  So             11:12AM

16  that's when the lieutenant, the shift commander, activated ICS.

17  Q.  What happens when an inmate is going through a metal

18  detector and it goes off and he can't clear the metal detector?

19  What do the policy or post orders require?

20  A.  So in the policy and the post orders, what we have is if an       11:12AM

21  inmate -- because they all have to clear it.  That's just like

22  we had to clear it when we come through here.  There's a

23  reason.  There's a purpose.  If they can't clear the scanner,

24  then that's your indicator that there's some sort of suspicion.

25  Again, Rincon is a close custody yard.  You want to make sure         11:13AM

1    that nobody has either cell phones or weapons.  So if you can't

2    clear the scanner then, and multiple times, then we have to

3    strip search you just so we can make sure you don't have

4    anything that could harm another inmate or staff.

5    Q.  Is that the practice at the Tucson facility?                    11:13AM

6    A.  That's in our policy, our search policy.  Don't quote me, I

7    think DO-708 for searches.  And I think it's in the post orders

8    for yard officers and supervisors that if the shift commander

9    has suspicion to initiate either a pat search or a strip search

10   they can do it in a different location, in a private location.     11:13AM

11   Q.  Now, when you were responding to the ICS, first of all, can

12   you tell us what the ICS means?  What is that?

13   A.  Incident Command Systems.

14   Q.  And when is that called and why?

15   A.  Any time there's something that's out of the ordinary or       11:14AM

16   the need for additional resources are needed, you initiate --

17   it's also once you initiate you're forced to document it and we

18   like to have that documentation.

19   Q.  And if you are available and you hear an ICS, you are going

20   to respond?                                                        11:14AM

21   A.  Yes.

22   Q.  Did you -- when the ICS was called, did you know what

23   inmate was involved?

24   A.  No.

25   Q.  That's not something that would be included in the radio       11:14AM

11-8-17 - CV 12-601 - **Evidentiary Hearing re: Tucson Retaliation - Monson - Direct**

1    traffic?

2    A.   Sometimes they will include it in the radio traffic, but I

3    was responding.  So when I get there, I assess the situation.

4    If I need to know those details so I can send that information

5    up to my supervisors, I will.  This seemed to be a fairly, you    11:14AM

6    know, I don't -- it never escalated to the point where it got

7    way out of control.

8    Q.   Okay.  And Inmate Creswell was sent to the disciplinary

9    housing unit?

10   A.   I believe he refused to be strip searched.  He refused to    11:15AM

11   go through the scanner.  So, okay, I'm going to have to send

12   you off the unit.  And I know our process is you go, we have to

13   strip search you.  So I knew he was going to get strip searched

14   no matter what.

15   Q.   Is that something you would do in this situation no matter    11:15AM

16   who the inmate was?

17   A.   Absolutely.  It's common for an inmate to walk through a

18   scanner and it beep, and then they go through again or maybe

19   they take off -- now we have lanyards but at that time

20   sometimes they would have metal clips to hold their ID on.  And   11:15AM

21   they would take it off and then they would clear.  So it wasn't

22   uncommon for an inmate to beep and then go through or take off

23   a watch whatever it was.

24        But when they refuse to go through, that's when you

25   have -- that's unusual and you have to address it just like      11:16AM

1    anywhere that has a scanner.  You can't just let somebody walk

2    through, beep, and say have a nice day.

3    Q.  In March of 2017, did you recognize Mr. Creswell?

4    A.  Creswell is just one of the thousands of inmates I have met

5    over 23 years.                                                          11:16AM

6    Q.  Did you know who he was as you approached the ICS incident

7    in March of 2017?

8    A.  I don't recall him before or after.

9    Q.  Did you -- had you ever had an opportunity or did you ever

10   see any affidavit or sworn statement that Mr. Creswell had          11:16AM

11   signed?

12   A.  I don't believe so.

13   Q.  Okay.  Your Honor, once again, I forgot to move to admit an

14   exhibit.  I move to admit Exhibit 45?

15           THE COURT:  Any objection?                                  11:17AM

16           MS. EIDENBACH:  No objection.

17           THE COURT:  45 is received.

18   BY MR. STRUCK:

19   Q.  Deputy Warden Monson, when the plaintiffs' attorneys were

20   going through this tour and talking to inmates, did you -- do      11:17AM

21   you keep track of who they talk to?

22   A.  No.

23   Q.  Did anybody?  Was anyone keeping track, as far as you know,

24   who they talked to?

25   A.  No.                                                             11:17AM

11-8-17 - CV 12-601 - **Evidentiary Hearing re: Tucson Retaliation - Monson - Direct**

1    Q.  Why not?

2    A.  It is irrelevant to us.

3              MR. STRUCK:  No more questions, Your Honor.

4              THE COURT:  Thank you very much.  The plaintiffs'

5    lawyer will now have a chance to ask you questions.          11:18AM

6              THE WITNESS:  Okay.  Do I do anything with these?

7              THE COURT:  No.  You can keep them there.

8              THE WITNESS:  Okay.

9              THE COURT:  Ms. Eidenbach.

10                            CROSS-EXAMINATION                   11:18AM

11   BY MS. EIDENBACH:

12   Q.  Good morning.

13   A.  Good morning.

14   Q.  Did you prepare for today's hearing and your testimony at

15   today's hearing?                                             11:18AM

16   A.  I had spoke to the attorney last Wednesday.

17   Q.  Did you review any documents in preparation for today?

18   A.  He had shown me these items, and once I became aware of --

19   that there was an issue, then I had to go back through my

20   e-mails and my photographs.  So I remember doing that a year  11:19AM

21   ago.

22   Q.  So you remember doing that a year ago but not again in

23   preparation for today?

24   A.  Again, I met with him a week ago.

25   Q.  Okay.  And for how long did you meet with him,           11:19AM

1    approximately?

2    A.  I don't even think an hour.

3    Q.  Okay.  Did you discuss today's testimony with anyone

4    besides your attorney?

5    A.  No.                                                      11:19AM

6    Q.  No other custody staff?

7    A.  No.

8    Q.  Your superiors?

9    A.  Other than the fact that I was coming here, we didn't

10   discuss the specifics or I got -- you know, they reviewed my    11:19AM

11   statement.  I was provided my statement from about a year ago.

12   That was it.  And no, I didn't share that with anyone.

13   Q.  So you reviewed your declaration and your superiors also

14   reviewed your declaration?

15   A.  I don't know if my superiors had access to it.  I did not   11:20AM

16   provide it to them.  They were not in there.  They were not, to

17   my knowledge, they weren't given it.  It was just mine.

18   Q.  Okay.  So you never spoke with any of your supervisors

19   about your testimony today?

20   A.  Other than me coming here?                                 11:20AM

21   Q.  Yes.  Right.

22   A.  Me coming here, yes.  Everybody knew I was coming here.

23   What I would be asked or what my answers would be, no.

24   Q.  Did you ever review your declaration with any of your

25   superiors?                                                     11:20AM

```
 1   A.  Other than to verify, because approximately a year ago, I

 2   don't know the exact date.  When they were -- when I had to

 3   provide it and they typed it up and would send it to me, in

 4   order for my supervisors to know that I had completed this

 5   important task, I would send it to my supervisor and the         11:20AM

 6   attorneys just for verification.

 7   Q.  And did you write your declaration or did someone write it

 8   for you?

 9   A.  It was stated and then they made it look nice and legal for

10   me.                                                              11:21AM

11   Q.  Okay.  And do you know who made it look nice and legal for

12   you?

13   A.  I don't recall.  I think I was contacted by three or four

14   attorneys at different times.

15   Q.  Did you meet with them in person about your declaration?     11:21AM

16   A.  Nope.

17   Q.  Just e-mail communication?

18   A.  Phone call.  I think phone call a couple times.

19   Q.  Okay.  And was the declaration based on notes that you took

20   at the time of the incident in Tucson?                          11:21AM

21   A.  I took no notes because I didn't know that there was an

22   incident that was happening.  I was just working.  And then it

23   wasn't until later on in the day when it was like, hey, what

24   happened?  And then I had to provide the e-mails and the

25   photographs that coincided with those e-mails.  So there was no  11:22AM
```

 1    notes.  It was just what happened.

 2    Q.  And when you got the declaration back from your attorneys,

 3    did you review its contents?

 4    A.  I did.

 5    Q.  Did you make sure it was accurate?                          11:22AM

 6    A.  I think there was probably two or three adjustments.  I

 7    don't recall.  It looks fairly accurate.

 8    Q.  Okay.

 9    A.  As best as I can recall during that time.  It wasn't like

10    an instantaneous, the next day we did this.  Again, I didn't    11:22AM

11    know I was going to be asked these questions.  Otherwise it was

12    like oh, do I have to go back and recall just a day.

13    Q.  You testified earlier that you had been on a previous

14    Parsons tour approximately a year prior to the November 2016

15    tour; is that right?                                            11:22AM

16    A.  That is correct.

17    Q.  And did you take pictures on that tour?

18    A.  We were in -- I think the only area I went on that tour was

19    Housing Unit 8, and we stayed in the dayroom.  The place looked

20    fantastic.                                                      11:23AM

21    Q.  How did you know that it looked fantastic if you stayed in

22    the dayroom?

23    A.  I recall going in and seeing the floor looked like glass.

24    It was so shiny.  And I even recall it smelled like lemons.  I

25    don't know why.                                                 11:23AM

1    Q.  Do you recall testifying earlier today that you toured

2    minors at Rincon the day before November 2nd, so on November

3    1st, with the Parsons team as well?

4    A.  I don't recall if it was the day before or if it was

5    earlier in the day.  I do recall that we did tour minors.          11:23AM

6    Q.  And did you take pictures there?

7    A.  The minors unit looked great.

8    Q.  How did you know that if you weren't on the runs taking

9    pictures?

10   A.  If I'm in this room right here, what I see looks great.  I    11:24AM

11   mean, and I paid attention.  I noticed there's no dust in the

12   corners of his computer here.  There's no dust on your ledges

13   here.  I pay attention to those little details.  And when I was

14   at minors, again, the minors at that time, most of them are

15   either out to rec or were at education.  So I don't believe      11:24AM

16   there was anybody for them to walk down those runs to.  But the

17   minors unit is very small.  And the inmates, you know, if you

18   give them direction, they take that direction.  So the minors

19   unit is always running -- their standard is usually everybody

20   else's 90 percent.                                               11:24AM

21   Q.  So if a dayroom is clean then you are not going to check

22   the runs because you will assume the runs are up to the same

23   standard as the dayroom?

24   A.  I don't think that -- and again, the minors unit is two

25   buildings.  And there's not inmates down every single run.  And  11:25AM

1    I don't believe that they walked down the run.  I'm sure they

2    probably walked down the run but I only take pictures of

3    issues.  And I guess I should take pictures of good things,

4    too, and reward staff as well.  But when I'm touring, it's the

5    things that need to be corrected that stand out to me.  So if I      11:25AM

6    don't see anything that needs to be corrected, I'm not going to

7    take a photograph of it.

8    Q.  The point being that you didn't look at the runs when the

9    dayroom itself was already clean, right.  The previous Parsons

10   tour you didn't leave the dayroom because it smelled like             11:25AM

11   lemons and was glassy and at minors you didn't go down the runs

12   looking for violations because there were other areas that were

13   clean and you assumed the rest of the unit was up to the same

14   standard?

15   A.  I'm going to say I definitely walked down the runs.               11:26AM

16   There's no way I'm not going to walk down a run.  I am sure

17   that I walked down a watch run.  But, again, in a watch run

18   they are on a mental health watch, which means they don't have

19   any items.  There's not going to be any clothes that are, you

20   know, where they are not supposed to be.  There's not going to       11:26AM

21   be any boxes.  There's not going to be any TVs in there.  The

22   worst-case scenario I'm going to find is a covered window.  But

23   the staff in there, if you are on a watch and you cover a

24   window, we've got a problem.  So there's no covered windows

25   hence no photographs.                                                 11:26AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

1   Q.  And you are referring then to the previous tour in 2015

2   when you were at Housing Unit 8, the watch unit.  Is that what

3   you are --

4   A.  Yes.  I thought that's what you started off asking.

5   Q.  That's right.  I just wanted to make sure because you          11:26AM

6   testified earlier that you didn't leave the dayroom and now you

7   are telling us there's no way you wouldn't have walked down a

8   run.  So I want to make sure I understand exactly what happened

9   that day.

10  A.  Well, you are looking for -- and I apologize -- you are        11:27AM

11  looking for those exacts.  And I don't want to mislead you and

12  say there's no way that I walked down the run.  Odds are, I

13  mean, it's my job.  Odds are I pretty much walked down a run.

14  I recall I spent most of my time in the dayroom.  Those runs

15  have a lot of staff in there because it's a watch run.  So we    11:27AM

16  can watch from, again, basically the same position I was at in

17  the general population from the end.  The only difference is we

18  have to wear little vests.

19  Q.  So I would like to draw your attention back to what's been

20  admitted as Exhibit 36.  I think you should still have it in      11:27AM

21  front of you.  When was the last time that had you been to

22  housing unit 3 prior to November 2nd, 2016?

23  A.  I couldn't tell you.

24  Q.  Approximately a week?  A month?

25  A.  Anywhere between a week, two weeks.                            11:28AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

1    Q.  Okay.  Had you been there more recently than that in close

2    proximity to November 2nd?

3    A.  I don't recall.

4    Q.  Don't recall.

5    A.  It's entirely possible that an ICS happened there the day          11:28AM

6    before that I would have responded, but it wouldn't stick out

7    to me the house so much as the incident.

8    Q.  Do the violations that you documented in Exhibit 36 occur

9    overnight?

10   A.  Which photograph are you referring to?                             11:28AM

11   Q.  Any of them.

12   A.  So if I looked at 36.001, in my experience, like the inmate

13   on the top bunk where he hasn't made his bed, that could have

14   happened, you know.  But again, I don't see the sheet on there

15   so odds are he didn't take his sheet off that morning.               11:29AM

16   Q.  What about the prayer rug?

17   A.  The prayer rug, that's probably something that has been

18   there.  Definitely the antenna or the paper, those calendars,

19   those are probably placed there over a period of time.

20   Q.  And yet no one had taken pictures or asked the inmates to         11:29AM

21   comply with 704 prior to the day and time that we're on the run

22   touring, interviewing our clients?

23             MR. STRUCK:  Objection, Your Honor.  Speculation.

24             THE COURT:  Overruled.

25             THE WITNESS:  I don't think anybody would have taken        11:29AM

 1   pictures as I'm the only one other than my ADW who has a cell

 2   phone.  I'm the only one who should have a cell phone on that

 3   yard.  And I'm sure they addressed issues.  I pay attention to

 4   everything.  And the reason why I take photographs is because

 5   my standard, which is the standard, that's my job, may not be      11:30AM

 6   what the officer's interpretation is, in other words, if you

 7   tell somebody clean your room, they might think their room is

 8   clean.  It's different than if you say, I need you to sweep.  I

 9   need you to dust.  I need you to clean the corners.  I need you

10   to clean the toilet.  I need you to make the bed with the sheet     11:30AM

11   tightly tucked, the very specifics.  So I take photographs

12   because if I was to send an e-mail to my supervisor saying, hey

13   you guys, this building wasn't up to standard, I don't know if

14   their mind is going to say, oh my gosh, it was atrocious, or if

15   they are going to say a bed wasn't made.  A picture is worth a     11:31AM

16   thousand words.  That way they knew exactly what I was looking

17   at.

18   BY MS. EIDENBACH:

19   Q.  Didn't you do just that in Exhibit 38, send them a very

20   simple e-mail saying 704 was out of compliance in Housing Unit     11:31AM

21   3 without any photographs?  At least none are indicated as

22   attachments in the e-mail.

23   A.  Yeah.  I'm not sure if I made the attachment but you will

24   see I said come down.  So I wanted them to see firsthand what I

25   was looking at.                                                    11:31AM

1   Q.  Then why were the photographs necessary?

2   A.  What I do is I take photographs and then I address the

3   issue, which I have always done.  So I will take a picture and

4   then I will go down, I will print it out, and then I will write

5   the 704 violation on that photograph.  And then I will send it          11:31AM

6   out to all the supervisors.  But at this point in time, man, I

7   had seen enough.  I needed them to come down here and address

8   the issue.  I could have probably taken many, many more

9   pictures but it was all of the same violation.  I just saw

10  okay, this is enough.  You might as well come down here and          11:32AM

11  take a look for yourself.

12  Q.  Did Housing Unit 3 look like this the last time you were

13  there?

14  A.  Different inmates, different houses.  Some houses look

15  great; some houses look much worse than this.          11:32AM

16  Q.  Do you remember ever taking photographs of Housing Unit 3

17  on a different occasion?

18  A.  Specifically, no.

19  Q.  Okay.

20  A.  I have got them from other housing units, and I have those.          11:32AM

21  Q.  Do you write people up for sleeping during the day, in

22  close custody, I should say?

23  A.  It's not sleeping.  You can be in your cell on top of your

24  cover, your bed made, and you can take a nap.  That's okay.

25  And if we have inmates that are night workers, say they work in          11:33AM

1    the kitchen, they get up at 2:00 in the morning, they prepared

2    the breakfast meal and get back at 11, we have designated night

3    workers.  If you are asleep during the day, fantastic.  So

4    okay.  If I was to see an inmate sleeping, no.  And like I said

5    before, if I was to see an inmate, let's say he wasn't a night          11:33AM

6    worker, let's say he had his shirt off, we're talking about me

7    because you asked me the question.  I wouldn't write -- I would

8    address the issue.  If I address the issue and he corrects it,

9    my job is done.

10   Q.  So you mentioned earlier that these photographs were taken       11:33AM

11   with the intent of addressing your staff's failure to keep

12   Housing Unit 3 in 704 compliance; is that right?

13   A.  That is correct.

14   Q.  And when you address a staff member's failure to keep their

15   housing unit in 704 compliance, how do they rectify that?            11:34AM

16   A.  They should address it.  They should go just like I said,

17   go to the house and you say, I need you to take down the

18   clothesline.

19   Q.  So ultimately, these pictures were sort of taken one step

20   away from the prisoners actually getting initially maybe            11:34AM

21   requested and then written up if they failed to comply with 704

22   compliance.  So you took this to hold staff accountable, but

23   the only way that staff can be held accountable is for them to

24   hold prisoners accountable, right?

25   A.  No.  These photographs held the staff accountable.  Me          11:34AM

 1   contacting the supervisor, regardless of what happened, I

 2   toured at roughly 10:30.  In the day you started at 6 in the

 3   morning.  When you first come on you have already done a count.

 4   You should have addressed these issues at that time.  And then

 5   as you are touring that house.  And again, I was an officer for        11:35AM

 6   many years.  So I tour a house, you know, make your bed.  Take

 7   down the window covering.  They do it.  If they -- I continue

 8   with my day.  I give you instruction.  You have the opportunity

 9   to do it.  Please do it.  I walk through.  I come back a half

10   hour later.  If it's done and it usually is, you just have to        11:35AM

11   address it.  These people aren't -- they do it.  And what I

12   noticed was four hours into your shift, four and-a-half hours

13   into your shift you hadn't even addressed it.  So that's what I

14   was documenting.

15   Q.  How, though, is the staff member going to rectify their         11:35AM

16   failure without asking the inmates to come into compliance?  A

17   necessary component of remedying their own failure is they then

18   have to go to the prisoners who saw you coming through taking

19   pictures while they were speaking to their lawyers, and now

20   they are getting in trouble for 704 noncompliance.  Even though   11:36AM

21   it may be a couple steps down the line, these pictures were

22   ultimately to hold the prisoners accountable by way of staff

23   accountability, right?

24   A.  No.  I disagree.  Again, me taking that photograph and

25   sending it to the supervisor, that photograph, it's done.  You    11:36AM

 1   can't go back.  That's why I document it.  Because had I left

 2   with no photograph and then the officer gets his house in

 3   compliance, and then the supervisor goes down there and it

 4   looks great, he thinks man, Monson, that guy is a real

 5   stickler.  I don't see anything he was talking about.  It was          11:36AM

 6   already a done deal.  By the time I have taken those

 7   photographs and e-mailed the supervisor, you will see in that

 8   e-mail, give them a MAP entry.  That was done.

 9          Now, ideally your shift is not over with.  You should

10   continue with your job, sir.  That doesn't entitle inmate             11:37AM

11   disciplinary and clearly there was none written.

12   Q.  You testified earlier that before we went to Housing Unit

13   3, we stopped by -- we, including me and the rest of the

14   Parsons team who was touring -- stopped by the rec field; is

15   that correct?                                                         11:37AM

16   A.  Yes.  We did go on the rec field.

17   Q.  And you also testified that while you were -- while all of

18   us were on the rec field you were asked by one of the attorneys

19   to give them a little bit more space to preserve privacy,

20   right?                                                                11:37AM

21   A.  I believe so.

22   Q.  We then go to Housing Unit 3, which is close custody,

23   right?

24   A.  Yes.

25   Q.  And in a close custody unit, the cell doors are shut and          11:37AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

1   locked with the exception, I know, of the one door that was

2   malfunctioning on Abel unit, right?

3   A.  They should be unless there's a turnout.  But I think we

4   were close to count time so everybody should have been -- all

5   the cell doors should have been shut.                          11:38AM

6   Q.  Did somebody confirm that before the attorneys entered the

7   cell -- run, sorry, that all the doors were shut?

8   A.  I remember we went down A run first, so obviously one of

9   them was not secured.

10  Q.  Right.                                                     11:38AM

11  A.  And I don't recall if maybe an inmate was coming back from

12  a phone call or shower or maybe he was a porter.

13  Q.  But to take all of these pictures you had to be on the run

14  with the attorneys, right?

15  A.  I think I went ahead, so I usually go down one side then   11:38AM

16  will come up the other.

17  Q.  So you did that before the attorneys began to speak to the

18  prisoners?

19  A.  I don't know.

20  Q.  Do you recall being on the run at the same time that the   11:38AM

21  attorneys were conducting their interviews?

22  A.  Maybe at the back of a run.  The only time I recall

23  actually going down was on C run when either an inmate was

24  calling for me or that one time that a Parsons versus Ryan

25  attorney said this inmate wants to talk to you.                11:39AM

1  Q.  So you managed to take all of these pictures before any of

2  the attorneys ever got on to the runs?

3  A.  I wasn't paying attention to where you guys are.  It

4  doesn't take long.  I don't know what you guys are doing.  I

5  don't know if you were in front of me, behind me, I don't know.        11:39AM

6  Q.  Weren't you supposed to be monitoring us, though, to make

7  sure that we were safe?  So you weren't aware of our

8  whereabouts at all and yet you have testified to this Court

9  that your job as an escort on a Parsons v. Ryan tour is to

10  protect those of us who may not have the training and the        11:39AM

11  skills to respond to a potentially dangerous situation.  And so

12  now, you are telling us that you had no awareness of our

13  whereabouts on the run while you were taking these pictures?

14  A.  I don't want to commit to knowing exactly where you were.

15  I'm sure you were on the run.  I was not alone and we were on        11:40AM

16  the close custody yard.  The cell doors, I'm sure I would have

17  addressed as you saw that one cell door that was open and I

18  questioned it.  So I am sure while I wasn't paying strict

19  attention to who you were talking to or what you were doing.

20  When you work in a prison environment, you are aware of your        11:40AM

21  surroundings.  You are even aware of what's going on on a radio

22  and you don't even realize you are aware of what's going on.

23  It's just after a certain amount of time you pay attention just

24  like if I'm talking to you and somebody opens the door

25  someplace, I will probably look over there.        11:40AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

1    Q.  But you did tell us earlier that part of the job of an

2    escort on the Parsons tours is to keep a visual on the

3    attorneys?

4    A.  You were on the recreation field.  There's a bit more of a

5    risk when I have roughly 86 or more inmates out there, not          11:40AM

6    behind a cell door.  My level of awareness goes up.

7    Q.  Okay.  So you have told us that you were aware that you had

8    been already asked, in fact, by an attorney to give them

9    additional space to make sure that the privacy and

10   confidentiality of attorney/client communications was preserved    11:41AM

11   while you were on the rec field, and that the risk on a close

12   custody run is much lower, partly because the prisoners are all

13   locked in their cells with the doors closed save maybe one run

14   where there was an issue or someone was coming back.  What

15   security reason was there for any of the escorts to be on that      11:41AM

16   run with the attorneys potentially jeopardizing that privacy

17   and confidentiality necessity that you had already been made

18   aware of that day?

19   A.  I walked through, did my job checking the cells for 704

20   inspection.  When I did, then I exited.                             11:41AM

21   Q.  Why is that more important than attorney/client

22   confidentiality and privilege particularly when the purpose of

23   that tour was for the attorneys on the Parsons v. Ryan case to

24   be able to interview their clients in a confidential setting?

25   A.  It was never an intent to violate any of that.  I did the       11:42AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

1   job, walked away.  If there was an issue, I guarantee you,

2   anybody had said anything, I would have walked away.

3   Q.  Do you recall me having to ask on Charlie run that your

4   officers step away from me while I was interviewing one of my

5   clients?                                                    11:42AM

6   A.  I don't.

7   Q.  Were you asked on any of the runs to give us additional

8   space by either myself or Ms. Ross?

9   A.  On the runs, I don't recall.

10  Q.  You mentioned earlier that you were -- that you only     11:42AM

11  responded when you were approached by prisoners with issues

12  that they needed you to resolve as their DW.  Is that right?

13  A.  That I --

14  Q.  That you responded only to prisoners who approached you

15  with issues they had.                                        11:43AM

16  A.  That day or are you asking --

17  Q.  That day.  I'm asking about the very specific time when we

18  were on Abel run and Charlie run in Housing Unit 3.

19  A.  No, I don't go out soliciting.  I speak to people, whether

20  they are officers or inmates, I speak with them.  I don't     11:43AM

21  expect all of my conversations to be bad, and they are not.

22  But if an inmate has an issue, if he wants he calls me over and

23  wants to talk, I will go talk to him.

24  Q.  Did you talk to anybody on Abel run or Charlie run that

25  day?                                                          11:43AM

1    A.  Yes, on C run.  In fact one of you, like I said, one of you

2    guys actually directed me down the run to speak with an inmate.

3    Q.  Did you speak with anybody else?

4    A.  Possibly.  Once you walk down and they see me then

5    everybody is going to have a question.  And in my                      11:44AM

6    interpretation of Monson, this man wants to speak to you, then

7    I don't see a difference between this man or any other man who

8    wants to speak to me.

9    Q.  Okay.  So then you were on the runs with us, because you

10   were responding to prisoners who had asked to speak to you            11:44AM

11   excepting the one that we specifically asked you to speak to?

12   A.  Once somebody says Monson, this man wants to talk to you, I

13   did go down, I think it was C run.

14   Q.  Right.  But now you are saying that there's also a good

15   possibility though you might not specifically recall that you         11:44AM

16   spoke with other prisoners and were on the run even though

17   there was no security reason for you to be on the run at the

18   same time that attorneys were conducting attorney/client

19   interviews.

20   A.  Again, if I'm at the end of the run, and clearly through          11:44AM

21   the e-mails, inmates were -- I was addressing inmate issues, it

22   kind of sets the tone.  If one of you says Monson, this man

23   would like to talk to you, got it.  I'm going to go talk to

24   him.  You know, it wasn't said Monson, this man wants to talk

25   to you.  Please talk to him after we leave the building.  I go        11:45AM

 1    address his issue and when other people see me, oh, okay.  My

 2    interpretation of go down, this man wants to talk to you is, go

 3    down and talk to this man.  So I did and if there's other

 4    inmates asking me questions, I will answer your questions.  I

 5    will try to resolve your issues as well.                          11:45AM

 6    Q.  Wouldn't the tone have been set on the rec field where we

 7    made it very clear that we needed enough space to conduct

 8    confidential interviews?

 9    A.  Again, you are saying that, but when you -- and this is my

10    interpretation -- if we're on a run and you tell me, Monson,     11:45AM

11    this man wants to speak to you, again, I'm just doing my job.

12    I suppose had I never gone down and talked to him we could be

13    sitting in court right now and you could say, you neglected

14    this inmate.  I remember telling you this man wanted to speak

15    to you and you never even went down there and talked to him.     11:46AM

16    So I went down there and spoke to him, and then again, my

17    interpretation is if it's okay for one, why wouldn't it be okay

18    for the second one or the third one or the fourth one.

19    Q.  It just perplexes my why, if you understand the importance

20    of attorney/client confidentiality, someone in your position    11:46AM

21    would not understand that having multiple officers on the runs

22    at the same time that client interviews are being conducted

23    would jeopardize the confidentiality, particularly where, as

24    you have testified, there's no security risk.  Everyone is

25    behind locked doors.                                             11:46AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

1   A.  Again, I'm never going to say there's no security risk.

2   I'm not sure exactly what is your question is right there.

3   Q.  Why?  Why did this not ever occur to you?

4   A.  Say the whole thing again.

5          MS. EIDENBACH:  Can you read it back?                    11:47AM

6          MR. STRUCK:  Your Honor, I'm going to object to the

7   question.  It assumes many facts.

8          THE COURT:  First let's get it clear as to what the

9   question is.  The court reporter's been asked to read it back.

10         MS. EIDENBACH:  I will re-ask it.                        11:47AM

11         THE COURT:  Fair enough.

12  BY MS. EIDENBACH:

13  Q.  So I'm wondering why it never occurred to you that having

14  multiple officers on the run with the attorneys while we're

15  conducting confidential interviews in a very low security      11:47AM

16  situation, it never occurred to you that allowing that

17  situation to occur would jeopardize the tour and the privacy

18  that's necessary between attorneys and their clients.

19  A.  Again, should I answer?

20         THE COURT:  Go ahead.                                    11:47AM

21         THE WITNESS:  Again, I kind of take -- maybe just like

22  when we were on the rec field.  I don't know what your idea of

23  too close in the proximity is.  When somebody -- and I don't

24  remember who it was -- said hey, you are too close, okay.  I

25  back away.  If I'm down a run, I remember we were at the end of  11:48AM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

1   the 70 some odd foot long run, and I would, going off what

2   occurred earlier, if you say hey, this is kind of questionable

3   to me, got it.  Not an issue.  And then going with the

4   prompting of, Monson, this man wants to speak to you, then I

5   took that as, you know, this man's question is, it's okay for          11:48AM

6   you to address this man's issue.

7   BY MS. EIDENBACH:

8   Q.  So around lunchtime or shortly after lunchtime, were you

9   aware that there was an emergency hearing held with the Court

10  about the incident at Rincon unit on November 2nd?                     11:48AM

11  A.  I don't recall what -- what I got was I think later on in

12  the day, maybe 4:00-ish, and I don't recall if it was come up

13  to the office or if it was a phone call, of hey, what happened.

14  I thought the tour went really well.  I was very surprised.

15  Q.  And it was only after you heard about the hearing and the          11:49AM

16  allegations that had arisen during that hearing that you

17  verified that there had been no disciplinary action taken in

18  Housing Unit 3, right?

19  A.  Well, yeah, I wouldn't do it before.  I mean, again, it was

20  just another day at work, much like I will probably forget what        11:49AM

21  shirt or tie I'm wearing right now unless at 4:00 someone said

22  whoa, you are not allowed to wear blue in a courtroom.  What

23  shirt were you wearing?  A week later I would forget or I would

24  have no reason to remember it.  So I just went about my

25  business and later on someone says, hey, this is what the              11:50AM

1    allegations were.  What happened?  And then I had to try to

2    process and go through my e-mails and say, oh, you know, this

3    is all I did.  This is why I did it.

4    Q.  And we went through an e-mail that you sent confirming that

5    earlier in your testimony that there were no tickets.            11:50AM

6    A.  I remember, I guess it was the next day or day after, that

7    it was just to be verified that, hey, was any disciplinary

8    written?

9    Q.  And what would you have done if there had been?

10   A.  I don't know.  There never was.                              11:50AM

11   Q.  But you asked that question wanting the answer.  So what

12   would you -- I mean, you are the deputy warden.  You don't know

13   what you would do if you found out that after allegations of

14   retaliation you found out disciplinary tickets had been issued?

15   A.  I have never been in this circumstance before.              11:51AM

16   Speculation, I probably would have said oh, okay, let's try to

17   justify the reasons, and I would have matched, let's say, I

18   would have gone down there to verify okay, did this happen?

19   Ideally any disciplinary ticket written would specify what

20   section of the 704 policy it would be.  And even if a          11:51AM

21   disciplinary ticket is written, our system is set up that an

22   inmate then goes to a hearing and he can address it, say it

23   wasn't me or it wasn't my cell.

24   Q.  Do you respond to -- you said you respond to every ICS that

25   you are able to.                                                11:51AM

1  A.  Able to, it depends on able to.  I am very busy.  I spend a

2  lot of my days in meetings.  But if I'm working on something,

3  if I have a stack of something and there's a priority and I

4  have gotten through my high priority and now I'm to those

5  things that can take a week or two weeks, I'm working on it.  I          11:52AM

6  like to go out there and show my support to staff, you know.

7  Experience is worth a lot in the Department of Corrections.

8          So if my staff are operating or doing something good,

9  go ahead.  I want to see it.  I want to reward it.  I want to

10  acknowledge it.  If I can offer any sort of guidance in an ICS,          11:52AM

11  absolutely.  If I can go to it, I will.  At Rincon we have so

12  many ICS's a day, I will tell you right now, I probably am able

13  to respond to less than jeez, 5 percent of those.

14  Q.  So your previous statement that you respond any time you

15  can was a slight overstatement then?          11:52AM

16  A.  Not at all.  Any time I can.

17  Q.  Which is different than any time you are able to.

18  A.  If you say so.  It sounds like the same thing to me.

19  Q.  You, sir, said you were uncomfortable using the word

20  "able."  I'm trying to get a clear picture.          11:53AM

21          Are you aware of the court filings that were filed

22  regarding retaliation on -- regarding the retaliation on

23  November 2nd, so the briefing that the attorneys did about the

24  situation that happened at Rincon unit that day?

25  A.  I was aware that allegations were made regarding the tour.          11:53AM

1   I didn't know that it was going to become this or, you know,

2   official allegations or, you know.

3   Q.  Right.  But my question was whether you were aware that

4   there had been any court filings about the incident that

5   happened?                                                     11:53AM

6   A.  I thought this whole thing was court.  I thought everything

7   that happened was part of -- going to be discussed, whether

8   good or bad, in the courtroom.

9   Q.  What did you think your declaration was for then?

10  A.  So that you guys could review it so that a judge, an        11:54AM

11  attorney, to clarify any misunderstandings.  To be honest, I

12  thought it was kind of pretty self explanatory what my intent

13  was on all of the e-mails.

14  Q.  Did you review any of the court filings, any of the

15  plaintiffs' court filings, any of the court filings by the     11:54AM

16  Department of Corrections, motions, other declarations?

17  A.  I met with the attorney last week, reviewed what my

18  declaration was from the previous year.  I received an e-mail

19  regarding Creswell was going to be here.  Okay.

20  Q.  But you never reviewed any of the documents relating to or  11:55AM

21  leading up to the hearing today?

22  A.  Specifically other than my statement?

23  Q.  Other than your statement.

24  A.  No.

25  Q.  Now, once you became aware of the allegations of            11:55AM

1    retaliation, did you instruct your staff not to retaliate

2    against people for talking to the attorneys on Parsons v.

3    Ryan?

4    A.  Once this happened, I want to say about a month later, just

5    to make sure, we put out a memo for inmates and staff, hey,          11:55AM

6    when Parsons versus -- I learned a lot from that tour.  So to

7    prevent any future potential misunderstandings we did put out a

8    memo.

9    Q.  And how did you ensure that that was being complied with on

10   the part of the staff?                                              11:56AM

11   A.  I checked it.

12   Q.  What do you mean you checked it?

13   A.  I had instructed them to put the memos in all of the inmate

14   house units on the inmate bulletin boards and on the staff

15   bulletin board.                                                     11:56AM

16   Q.  How did you explain to the staff what might constitute

17   retaliation?

18   A.  I don't recall verbatim what the motion memo says but it's

19   pretty clear.

20   Q.  So you didn't do anything beyond what the memo said?           11:56AM

21   A.  We are a very professional organization.  It's -- we're

22   doing our job.  We did our job.  I wasn't -- I didn't go down a

23   list of things because we don't do that.  I didn't have to

24   clarify.  We don't do it.

25   Q.  But you were surprised by plaintiffs' assertions that your     11:56AM

1    behavior in Rincon unit constituted intimidation and

2    retaliation.  So if you were confused by that, why would you

3    not talk with your staff to confirm that they also understood

4    the nuances of intimidation and retaliation?

5    A.  Again, I don't remember verbatim what the memo says, but          11:57AM

6    most of this, from what my understandings was, was the

7    misinterpretation or misrepresentation of why I took the

8    photographs.  And knowing that the other people don't have cell

9    phones, I didn't see that being an issue.

10   Q.  Do you understand how a reasonable person could potentially       11:57AM

11   interpret your behavior on the run that day as intimidation not

12   the speak with the Parsons -- the plaintiffs attorneys in

13   Parsons v. Ryan?

14          MR. STRUCK:  Objection, Your Honor.  Speculation.

15          THE COURT:  Overruled.                                         11:57AM

16          THE WITNESS:  It's not a practice.  Again, the inmates

17   at the unit, the staff that I work around, this was nothing

18   new.  So I would be surprised, or I am surprised, that it was

19   conveyed that way because it's something that I always do.

20   BY MS. EIDENBACH:                                                     11:58AM

21   Q.  So nothing new potentially in terms of your behavior, but

22   November 2nd was not an ordinary day.  It was the day that a

23   group of attorneys who needed to speak privately with the

24   prisoners were touring your facility.  So that's not a normal

25   day, is it?                                                           11:58AM

```
 1   A.  I imagine it's not a normal day for you guys.  And I'm not
 2   going to say that Parsons versus Ryan tours every day, but we
 3   do have tours and we operate at a very high standard of
 4   professionalism.  I was not worried at all.  I didn't do
 5   anything that I wouldn't normally do.  I wouldn't raise my          11:58AM
 6   standard to a higher standard than I normally walk around with.
 7   You guys just happened to be with me.
 8   Q.  But wouldn't you take into account the purpose of the tour
 9   as you determine your own behavior and hold your own staff
10   accountable?                                                        11:59AM
11   A.  Can you be more specific?
12   Q.  The purpose of this tour was for plaintiffs' attorneys to
13   have confidential communications with our clients.  And I guess
14   I'm wondering whether you ever took the time to consider how
15   you could best accommodate that while maintaining the security    11:59AM
16   measures that you feel were necessary.  It sounds like you did
17   not actually contemplate that, that you were just accompanying
18   us, not keeping us in your visual awareness, and viewed this
19   day as any other day.  Is that accurate?
20        MR. STRUCK:  Objection, Your Honor.  It's compound.           11:59AM
21   It assumes facts.
22        THE COURT:  It is compound, but it's also a question
23   of whether or not it's fair to the witness.
24        Did you understand the question?
25        MS. EIDENBACH:  I can restate it.                             11:59AM
```

1          THE WITNESS:  Okay.

2          MS. EIDENBACH:  I will rephrase.

3    BY MS. EIDENBACH:

4    Q.  Did you contemplate making any sort of accommodation to

5    ensure attorney/client privilege and privacy during the Parsons                    12:00PM

6    v. Ryan tour?

7    A.  We have legal visits all the time, and when we have those

8    legal visits we have designated areas, specific at Rincon,

9    specific for if you wanted to see a client.  Say you have a

10   client.  You would come in.  We have a room that's glass.  We                       12:00PM

11   can't hear you.  It's in our administration area.  You can sit

12   there as long as you want, talk about it.  I can't see you but

13   I have a visual of you.  It's not unusual, in my experience

14   other than Parsons versus Ryan to say I want to have private

15   conversations in an area with 86 other inmates present and                          12:00PM

16   officers.  To me, it's unusual to say I want to have a private

17   conversation through a door with all of the inmates in a

18   housing unit on a run that I actually have to yell through a

19   door.

20          Again, to me, I allow -- and your idea of, you know,                         12:01PM

21   this is too close might differ from your partner's, yours might

22   be longer or farther.  That's why when on the rec field, again,

23   I don't remember who it was said can I have some space?  Gave

24   you space.  When I stayed down on the end of the run, had

25   somebody said, hey, we don't mind the visual but stay as far                        12:01PM

 1    back as you can while maintaining the visual, all of us would

 2    have done it.  And again, down the run on C run, once I was

 3    directed, oh, this inmate would like to speak to you, and I

 4    went down there, you know, had it been, oh, this inmate wants

 5    to speak to you and somebody said, no, no, not right now, okay.  | 12:01PM

 6    I apologize once I was directed.  I don't remember which one of

 7    you said it down there, that kind of set the tone to me out

 8    there, hey, stay away.

 9           And again, I don't know what your conversations were,

10    but had it been, sir, can you go to the end; sir, can you       | 12:02PM

11    leave, I would have done it immediately.

12    Q.  But you took no proactive action on your own to prepare

13    yourself or your staff from maintaining that privacy during the

14    tour, right?

15    A.  When you were there, again, when you say, hey, this is the  | 12:02PM

16    proximity, then I will follow your lead on the proximity.  And

17    then I backed away, as did my staff.  Again down the run, to

18    us, to us, this was far back.  If it was different from you,

19    you give us, sir, this is too close.  Okay.

20           THE COURT:  Ms. Eidenbach, we need to take the noon       | 12:02PM

21    break.

22           MS. EIDENBACH:  I actually think I might be done.

23           THE COURT:  Okay.

24           MS. EIDENBACH:  If I can have just a minute to review,

25    or would you prefer to reconvene after lunch?                    | 12:03PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

1          THE COURT:  Do you have any redirect?

2          MR. STRUCK:  No, Your Honor.

3          THE COURT:  Go ahead.  Take a minute.

4          MS. EIDENBACH:  Okay.  Thank you.

5          I have nothing further.  Thank you very much.          12:03PM

6          THE COURT:  Now, the lawyer for the State doesn't have

7    anything more to say.  That's when I asked about redirect.  And

8    so he says no.  So that means you are done with the

9    questioning.

10          But I have to take a moment to explain to you, because   12:03PM

11   I have been doing this regularly when people in your position

12   come here to court because I don't have a regular opportunity

13   to talk to people who are -- whose lives -- whose professional

14   lives I'm interfering with.  And I appreciate that.  I

15   appreciate that you're very busy and you have now driven here   12:03PM

16   to be in front of me to serve the purpose here.  And I have to

17   explain to you why that is so important.  Because I just don't

18   want you to think that I'm gratuitously doing it.

19          The truth of the matter is the parties here entered

20   into a settlement of a lawsuit that at the end of the process   12:04PM

21   leaves me with the responsibility of trying to accomplish the

22   purpose of that settlement if the parties aren't able to get it

23   done themselves.  And unfortunately, or fortunately, I don't

24   know, I, over a long legal career, I can't possibly know

25   everything you know about how to run a prison.          12:04PM

1           THE WITNESS:  I understand.

2           THE COURT:  So the next best thing that I can do is to

3      talk to you here, but also that can't happen very often because

4      it's too much of an imposition.  But the second or third best

5      thing that can happen is the flow of information that comes          12:04PM

6      into court that is produced through the lawyers.  And on the

7      plaintiffs' side of the case, what that is is them having

8      conversations with their clients and then bringing that

9      information to the Court.

10          Unfortunately, the issue has been raised in the case          12:05PM

11     about whether or not there is retaliation.  And the truth of it

12     is, and I don't mean to make you think that I just fly off on

13     every minor suggestion of what is the topic retaliation.  But

14     the danger from retaliation exists not only where it happens

15     but also where it looks like it might happen.  And that means     12:05PM

16     that if I hear, as happened on the 2nd of November, the fact

17     that people were being written up close in time, and that's

18     what people told me that people were being written up.  I hear

19     now there was no write-up.  I hear testimony that there were

20     threats of that, and you kind of expected that it would have      12:06PM

21     happened because you sent an e-mail saying were there any

22     disciplinary tickets from the day before.

23          So if I hear about that happening close in time to

24     when the plaintiffs' lawyers are serving the function that's

25     important to me of having this information exchange, I do worry   12:06PM

 1    that somebody who doesn't know everything you know, who doesn't

 2    know that we do it, as you have testified here, on a standard

 3    basis, and this is routine.  In some ways this wasn't routine

 4    at all because it was a real one-off for the inmates in this

 5    unit to have the ACLU lawyers walking through talking to them.        12:06PM

 6    And what they see is close in time to when these inmates are

 7    talking to the ACLU you taking pictures of these violations and

 8    comments being made by people being written up.  And so they

 9    perceive the close proximity of those two things to be

10    retaliation.  Again, as I say, it may not be retaliation.  You      12:07PM

11    testified it wasn't.  It wasn't in your mind at all.  But you

12    think you can appreciate how somebody looking at it would think

13    maybe that's a possibility.

14         And the problem I have is even if they are wrong when

15    they look at it and they come to that conclusion and it leads      12:07PM

16    them to cause to not say what they want to say, then I have had

17    the effect of retaliation, even if it didn't really

18    purposefully occur.  The problem is, if there's a threat of

19    retaliation it restricts the information exchange that I rely

20    upon.                                                              12:07PM

21         So I have to create an environment where I am trying

22    to balance two legitimate goals:  Your disciplinary goal of

23    enforcing the regulations and my goal of making sure that

24    everybody feels free to talk to the lawyers.  These two worthy

25    goals come into conflict here.  And unfortunately, what I have     12:07PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

1    to do in a case like this from time to time is I have to say

2    that on any given day, on November 1st, on October 15th, you

3    could write these things up, and there would be no suggestion,

4    no fear of retaliation.  But if you do it on the 2nd of

5    November, if you do it on the 3rd of November, if you do it                    12:08PM

6    close in time, people think, even if it's not true, in weighing

7    these two things I have to decide, you can't do that.  You

8    cannot discipline people for things that would look like they

9    have been around for a while.  And you even testified about

10   that.  I think probably the most appropriate thing you probably    12:08PM

11   agree with me was maybe to ticket the people who your COs were

12   supposed to be making sure these pictures we know weren't just

13   put up that morning and they round every 20 minutes.  So it

14   would have been obvious to them to see that there were these

15   violations.                                                                    12:08PM

16          So there were plenty of other times to be able to have

17   done it.  It so happens in this case it happened close the time

18   to when the ACLU lawyers were there.  So that's why I reached

19   out from Phoenix into your world and said, you can't do that.

20   And I just wanted you to understand I don't do it gratuitously.   12:09PM

21   I don't do it without sensitivity to the fact it doesn't impose

22   upon what is a very legitimate goal that I have got to weigh

23   them, and when it is close in time the weighing means I create

24   too much of a risk of interfering with my ability to get that

25   important information to allow it to go forward.                              12:09PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Monson - Cross

 1          Thank you for listening.  Thank you for coming up here

 2    and talking to us.  And have a good rest of the day.

 3          THE WITNESS:  Thank you.

 4          THE COURT:  Thank you all very much.  I appreciate it.

 5    We will be back at 1:30.  Thank you kindly.                    12:09PM

 6          Can we stay on the record for a moment?  I think what

 7    has been printed out is the filing that includes the Creswell

 8    affidavit.  And I'm just looking to see where that might be

 9    here.

10          MR. STRUCK:  Exhibit 48, I think.                       12:10PM

11          THE COURT:  48.  Was it in 1846?

12          MS. EIDENBACH:  No, 1897.

13          THE COURT:  Does anybody have a copy of that

14    affidavit?  Sorry, sir.  Ever watch the Columbo TV show?

15          THE WITNESS:  I have.                                   12:10PM

16          THE COURT:  There you are.  You are stuck.  Just a

17    second.

18          So I'm showing what's been marked for identification

19    as Exhibit 20.  It's also been filed in the case at Document

20    1897-1.  And it is on its face at Page 2 the declaration of   12:10PM

21    Brian Creswell.  I'm placing it before the witness and would

22    ask you, sir, to take a look at that and tell me, after you

23    have had a chance to review it, have you ever seen it before?

24          THE WITNESS:  I saw this last week on the 1st.

25          THE COURT:  Was that the first time you ever saw it?    12:11PM

1          THE WITNESS:  Yes.

2          THE COURT:  So it's true to say you never saw it

3     before last week?

4          THE WITNESS:  I have never seen it before last week.

5          THE COURT:  Did you ever hear about its existence          12:11PM

6     before last week?

7          THE WITNESS:  No.

8          THE COURT:  So no one told you that Inmate Creswell

9     had prepared an affidavit in this case?

10         THE WITNESS:  Not specifically Creswell.          12:11PM

11         THE COURT:  But had someone told you that an affidavit

12    had been prepared with respect to the November 2nd tour at the

13    prison?

14         THE WITNESS:  From my understanding, just when we --

15    after the tour it was the allegations and statements that they          12:12PM

16    thought that I made and then over the course of the past year,

17    I am sure it was mentioned that inmates, whether they were at

18    Tucson complex or someplace else, had made statements not

19    knowing specifically what inmate it was or how many there are.

20         THE COURT:  Did my questions engender any other          12:12PM

21    questions from plaintiffs?

22         MS. EIDENBACH:  No, Your Honor.

23         THE COURT:  From defendants?

24         MR. STRUCK:  No, Your Honor.

25         THE COURT:  Sir, I'm done.  Thank you very much.          12:12PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Krages - Direct

1        MS. EIDENBACH:  Your Honor, just because everybody now

2   has a copy, perhaps I will move to admit Exhibit 20.

3        THE COURT:  Any objection?

4        MR. STRUCK:  Let me take a quick look.  Is it just --

5        THE COURT:  It's actually the filing, I believe.  Oh          12:12PM

6   it also the one also has --

7        MR. STRUCK:  If exhibit --

8        THE COURT:  It's already part of the record.  I think

9   that it doesn't need to be.  It's already been filed, right?

10        MS. EIDENBACH:  Yeah.  It's filed.                             12:13PM

11        THE COURT:  I think that's okay.  Thank you all.

12        (Recess from 12:13 p.m. until 1:32 p.m.)

13        THE COURT:  You may call your next witness, please.

14        MR. STRUCK:  The defendants call Lieutenant Cole

15   Krages.                                                            01:32PM

16        THE COURT:  Good afternoon.  Please come into the well

17   of the court so the clerk of the court can administer the oath.

18        (The witness was sworn.)

19        THE COURT:  Thank you.  You may proceed.

20                    COLE KRAGES,

21   a witness herein, having been first duly sworn by the clerk to

22   speak the truth and nothing but the truth, was examined and

23   testified as follows:

24                    DIRECT EXAMINATION

25   BY MR. STRUCK:

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Krages - Direct

 1    Q.  Would you state your name, please?

 2    A.  Lieutenant Cole Edward Krages.

 3    Q.  On November 2nd, 2016, what was your rank?

 4    A.  November 2nd, 2016, I was actually a sergeant at that time.

 5    Q.  And was that your last day as a sergeant?                    01:33PM

 6    A.  That is correct.  I was actually -- November 2nd was my

 7    last day as a sergeant.  I was off November 3rd and effective

 8    November 4th I was placed at a different unit called Whetstone

 9    as a lieutenant.

10    Q.  By whom are you employed?                                    01:34PM

11    A.  Arizona Department of Corrections.

12    Q.  How long have you worked for the Department of Corrections?

13    A.  A little over 11 years.

14    Q.  Did you have any law enforcement experience prior to being

15    employed by the Department?                                     01:34PM

16    A.  No, I do not.

17    Q.  With respect to your job duties, would you tell us on

18    November 2nd, 2016, you were a sergeant.  What were your duties

19    at that time?

20    A.  My duties as a sergeant were to oversee the staff.  I was   01:34PM

21    their first line supervisor, so I was in charge of all staff

22    assigned to me at that time and then oversee the inmates as

23    well.  Sergeants duties include making sure that the officers

24    are upholding the policy and that are put forth -- the post

25    orders that are put forth for -- to follow our tactical         01:34PM

 1    priorities for the safety of the public, staff, inmate and make

 2    sure that we're doing exactly what we're supposed to do for

 3    custodial responsibility and whatnot.

 4    Q.  And where were you assigned on that day?

 5    A.  I was assigned, at that time, I was Rincon day shift.  We          01:35PM

 6    had a program going where each supervisor was specifically over

 7    a housing unit.  I was specifically assigned to Housing Unit 3.

 8    Q.  Since you have become a lieutenant have your duties

 9    changed?

10    A.  They have a little bit.  They have widened quite a bit           01:35PM

11    because now I oversee more staff.  I oversee virtually the same

12    inmate population, but I'm in charge of more duties for the

13    staff to make sure their training requirements are completed,

14    their leave balances, everything like that.  But the job part

15    as a whole is to still make sure that my sergeants are              01:35PM

16    enforcing the policy, making sure the staff are aware of the

17    policies, the procedures, the post orders, and enforcing them

18    as well.

19    Q.  Okay.  On November 2nd, 2016, was there anything going on

20    at -- there was something going on at the facility that wasn't      01:36PM

21    a normal everyday occurrence.  What was that?

22    A.  We had a tour.  We were advised that we were going to have

23    some civilians come on, some attorneys.  They were going to

24    talk to some inmates.  We needed to provide a little more

25    security than normal and just make sure that we were still         01:36PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Krages - Direct

 1   continuing normal operations, the yard wasn't locked down,

 2   feeding was its normal requisite.  It was just a heads up that

 3   we had civilians coming to tour the unit.

 4   Q.  And how did you get this heads up?

 5   A.  We were given an e-mail saying hey, just an FYI, we do have          01:36PM

 6   people coming on.  That way we know they are authorized to be

 7   on the unit not just wandering around by themselves and we can

 8   make sure they have security with them, especially at Rincon

 9   unit being a close custody unit to make sure if anything

10   happened we were able to protect them from harm.                        01:37PM

11   Q.  And what time did you go on duty on November 2nd?

12   A.  November 2nd I was on duty, my shift started at 0600 hours.

13   Q.  And when did -- did you have any responsibility or have any

14   involvement with this tour?

15   A.  I was part of the security aspect of it with the tour.              01:37PM

16   When the tour came on I believe it was approximately 0900,

17   0915.  They entered the rec field, so we went ahead and added

18   myself and approximately four or five more additional staff on

19   the rec field to provide security for them while they did a

20   walk and talk.  In case anything happened we had response ready          01:37PM

21   and on hand.

22   Q.  And so how many inmates were on the rec field at that time,

23   approximately?

24   A.  Approximately 80, 85.

25   Q.  And what custody level?                                             01:38PM

 1    A.  Close custody 4.

 2    Q.  Did while you were on the rec field, were you at all in any

 3    close proximity to -- let me back up.

 4         Did you know which lawyers were representing the

 5    plaintiffs, the inmates, there on that tour?                      01:38PM

 6    A.  No.

 7    Q.  Did you come in close proximity to any of the civilian

 8    group that was on the rec yard that day?

 9    A.  Close proximity, maybe 15, 20 feet away.  But it was

10    more -- I was actually addressing some of the inmates and        01:38PM

11    helping inmates with issues.  I couldn't even tell you who

12    anybody talked to or who anybody was on the rec field when it

13    comes to the civilians.

14    Q.  Is that a common occurrence when you go on the rec field

15    with respect to having inmates come up to you to talk about      01:39PM

16    issues they have?

17    A.  Yes, especially as a supervisor.

18    Q.  Something that happens every time you go on the rec field?

19    A.  Yes.

20    Q.  Part of your duties to handle that, those situations?        01:39PM

21    A.  Yeah.  So the way it normally works is I have the inmates

22    go to the staff first.  If the staff are unable to answer their

23    questions, then the staff normally relay them to me.  That way

24    I can then assist and see if there's something that I can

25    assist with them or answer the question better than the staff    01:39PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Krages - Direct

 1    could.

 2    Q.  About how long were you on the rec field with the tour

 3    group?

 4    A.  I would say it was approximately an hour, hour and a half.

 5    Q.  And during that hour and a half, did you have any          01:39PM

 6    interaction at all with any of the attorneys representing the

 7    inmates?

 8    A.  No.

 9    Q.  After you left -- or why did you leave the rec area?

10    A.  The whole entire, actually, tour left the rec field.  We    01:40PM

11    had turned in -- we were turning in recreation for formal count

12    at 1100 hours.  It was approximately 10:45.  We started calling

13    them off and the group, the tour group itself with the

14    civilians, exited the rec field.  The inmates went in a

15    different direction.  Once the rec field was clear I actually    01:40PM

16    proceeded back to my office.

17    Q.  Where is your office located?

18    A.  My office is located in the middle of the unit on the south

19    side of the unit.

20    Q.  What happened next with respect to this tour?              01:40PM

21    A.  I entered back into my office and took care of some issues,

22    went back and looked and I had received an e-mail saying --

23    from my deputy warden, Jason Monson, asking me to please get

24    down to Housing Unit 3 and address the 704 compliance issues.

25    Q.  And what did you do?                                       01:40PM

1    A.  I immediately grabbed my stuff, went down to Housing Unit

2    3.  When I entered the building, I saw Deputy Warden Monson on

3    Charlie run and went up, talked to him.  He kind of briefly

4    showed me a couple pictures of the 704 compliances from Abel

5    run and I then proceeded to find the floor officer that was          01:41PM

6    working the building.

7    Q.  Let me stop you right there, because I want to ask you,

8    where did this conversation with Deputy Warden Monson take

9    place?  Where he was showing you the photographs on his phone

10   of the 704 violations?                                              01:41PM

11   A.  Just inside the Charlie run slider, right next to the

12   showers.

13   Q.  That's the entrance to Charlie run?

14   A.  Correct.

15   Q.  How many cells are there in Charlie run?                        01:41PM

16   A.  14.

17   Q.  And how are they configured?

18   A.  So when you first walk in, you go about five, approximately

19   five to seven feet, and you have the shower located and about

20   another three to four feet.  You have Cell 1 on your left.  It     01:42PM

21   goes 1 through 7 on the left, 7 being at the very end of the

22   hallway.  8 is across from 7, and it comes back up towards the

23   entrance to 14.

24   Q.  And there's been testimony that it's about 76 feet long.

25   Does that sound about right?                                        01:42PM

11-8-17 - CV 12-601 - **Evidentiary Hearing re: Tucson Retaliation - Krages - Direct**

1    A.   Sounds about correct.

2    Q.   And about -- the aisle between the cells that are facing

3    each other is about seven feet wide.  Does that sound about

4    right?

5    A.   Yeah, seven, eight feet.                                    01:42PM

6    Q.   So if you are standing at the entrance with Deputy Warden

7    Monson talking to him about these issues, is Cell Number 6, is

8    that almost all the way across to the other end of the --

9    A.   Correct.  It's the second to last cell.

10   Q.   Okay.  How many feet would you say you were standing away   01:42PM

11   if the entire --

12   A.   If the entire run is 76, I'd say approximately 60.

13   Q.   60 feet away?

14   A.   60 feet away.

15   Q.   When you arrived, were all the cell doors shut?             01:43PM

16   A.   Yes.

17   Q.   When you arrived, did you see anybody else in the Charlie

18   run besides Deputy Warden Monson?

19   A.   I have no idea, to be honest with you.  My whole entire

20   thing was Deputy Warden Monson because that's who I received    01:43PM

21   the e-mail from.  I didn't really pay attention to anybody

22   else.

23   Q.   When you spoke to Deputy Warden Monson about the 704

24   issues, what was the volume level of the conversation that the

25   two of you were having?                                         01:43PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Krages - Direct

1    A.  It was a whisper, maybe just above a whisper.

2    Q.  Do you think there would be any way possible for somebody

3    in Cell Number 6 to hear what the two of you were saying when

4    he was showing you those photographs on the phone?

5    A.  No.                                                        01:43PM

6    Q.  So I interrupted you.  I think you said then you went to

7    look for the floor officer?

8    A.  Correct.

9    Q.  To address some of these 704 issues.  And before I get

10   there, what did -- what was your directive from Deputy Warden  01:44PM

11   Monson with respect to the 704 issues that he showed you on the

12   photographs up on the phone?

13   A.  My directive from the deputy warden was to get to the

14   housing unit officer to re-walk the 704s in all the runs and

15   anybody who was out of compliance, kind of make note of it, and 01:44PM

16   to address the officer via his MAP.

17   Q.  Now, when you say all the runs, are you also talking about

18   the Baker run?

19   A.  Correct.  Abel run, Baker run, and Charlie run.

20   Q.  So what did you do next?                                   01:44PM

21   A.  I located Officer Robles who was the floor officer on that

22   day in Baker run.  He was at approximately Baker 9 doing his

23   formal count, his formal face-to-ID count.

24   Q.  What is the formal face-to-ID count?

25   A.  So statewide, at 4 a.m., 11 a.m., 1600 hours, and 2030     01:45PM

1    hours, we have a formal face-to-ID count meaning that on those

2    times, statewide, everybody goes under a lockdown procedure and

3    we verify each inmate to their ID, face to ID count and mark

4    them either in their cells or if they are out to work, the

5    kitchen, something like that we have an out count to show.                        01:45PM

6    Q.   And the purpose of it being?

7    A.   The custody and control of the inmates.

8    Q.   So you went in to Baker run and you found Officer Robles.

9    What did you do -- and he was doing his count, face-to-ID

10   count.  What did you do then?                                                    01:45PM

11   A.   Him and I had a brief conversation on what I was just shown

12   about the pictures.  I advised him we needed to re-walk Abel

13   run, Baker run that he had already done, and we went ahead and

14   proceeded to walk the remaining Baker run and Charlie run

15   together while he was doing his face-to-ID count.                               01:46PM

16   Q.   Was there anybody else in the common area in Baker run

17   besides you and Officer Robles when you had this conversation?

18   A.   No.

19   Q.   What was the level of the volume level of your voices when

20   you were having the conversation?                                               01:46PM

21   A.   Over in Baker run it was just a normal conversation.

22   Q.   Did you make any comment at that time to Officer Robles

23   regarding ticketing people or giving them disciplinaries for

24   704 violations?

25   A.   Yeah.  I advised him that we were going to re-walk it,                     01:46PM

1    everybody who he had already previously addressed.  Because

2    according to his correctional service journal, in the morning

3    he had done his 704 inspection.  He had addressed the inmates

4    who were out of 704 compliance and advised them they needed to

5    get in compliance.                                              01:47PM

6    Q.   What time did that take place?

7    A.   It was approximately 0730 is what time the walk happened.

8    Q.   Was there an issue with respect to 704 problems in that

9    particular housing unit?

10   A.   Yes.  I had been overseeing that housing unit for         01:47PM

11   approximately four months, and on a continuous weekly basis, we

12   have to do a supervisor report for our housing unit, housing

13   unit report, to our lieutenant and it then goes to the captain.

14   Addressed in my housing unit inspections were consistent 704

15   noncompliance with clotheslines, pictures being hung on the     01:47PM

16   wall that are not allowed to be there, shirts not on, pants not

17   on, inmates sleeping after the 7:30 underneath the covers, beds

18   not made, so on and so forth, multiple deficiencies in that

19   area that I had been trying to address for about three months.

20   Q.   So you went, walked Baker run while he was doing his count 01:48PM

21   and then the two of you went back to Abel run?

22   A.   From Baker run we proceeded to do Charlie run, because he

23   had to finish his formal count.

24   Q.   Oh.  Okay.

25   A.   So him and I walked through Charlie run.  He finished his   01:48PM

 1    count.  Then we went and re-walked Abel run.

 2    Q.  When you went in to Charlie run, was there anybody else in

 3    there when he was doing his formal count?

 4    A.  I believe there were two females, civilians.

 5    Q.  Were there any more than just two female civilians?        01:48PM

 6    A.  Other than the deputy warden, completely unaware.

 7    Q.  The deputy warden was in there as well?

 8    A.  The deputy warden was still standing by the showers when we

 9    entered Charlie run, yes.

10    Q.  Could you see what the two civilian women were doing?       01:49PM

11    A.  They were talking to inmates at the doors.

12    Q.  What was the volume level generally in there in the Charlie

13    unit when you went in?

14    A.  There was actually no noise at all.

15    Q.  Could you hear what was being said between the civilian     01:49PM

16    women and the inmates that they were speaking to?

17    A.  No.

18    Q.  Were the doors open?

19    A.  No.

20    Q.  And so you walked -- you had to walk by each of them,       01:49PM

21    though, didn't you, for him to do his formal --

22    A.  Correct.

23    Q.  -- count.

24    A.  And one of them, I don't recall what cell it was, but we

25    actually asked her if she would take a step back just so we     01:49PM

1    could do the face-to-ID count real quick.  She said no problem.

2    She took a step back.  We did the count.  We proceeded.  She

3    stepped back up.

4    Q.  And did either one of the civilian women say anything to

5    you about, hey, give us some space.  We're trying to talk to          01:50PM

6    our clients here?

7    A.  No.

8    Q.  Did you understand them to be attorneys representing the

9    plaintiffs at that time?

10   A.  No.                                                               01:50PM

11   Q.  So how long does it take to walk through and do the face ID

12   and how long did it take you to do it in the Charlie unit?

13   A.  It takes approximately, to do it correctly, it takes

14   approximately 10 minutes per run.

15   Q.  And did you just walk right alongside Officer Robles while        01:50PM

16   he was doing that?

17   A.  Correct.

18   Q.  Did you say anything to him, the two of you talk at all

19   about while you were in Charlie run and he was doing this face

20   count, issuing disciplinaries to anybody?                            01:50PM

21   A.  Not in Charlie run, no.  As we exited Charlie run, I said

22   we're going to walk -- I advised him we were going to walk 3

23   Abel and anybody who he had already previously addressed with

24   the 704 that were not in compliance would be receiving

25   disciplinary.                                                        01:51PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Krages - Direct

1   Q.  And how loud did you say that?

2   A.  Just in a normal voice to him, because it was him and I

3   within approximately a foot and a half of each other, two feet.

4   Q.  How close were either one of the civilian attorneys to you

5   when you said that to him?                                        01:51PM

6   A.  80 to 100 feet away.  We had already exited Charlie run and

7   we were in front of the control room when I advised him of

8   that.

9   Q.  I misunderstood.  I thought you were still in Charlie run.

10  A.  This is as we exited Charlie run.                             01:51PM

11  Q.  So at any time when you were in Charlie run did you say

12  anything at all about disciplining any of the folks who were

13  violating 704 from earlier that day?

14  A.  No.

15  Q.  So what did you do next?                                      01:51PM

16  A.  We went and walked Abel run.  He re-addressed the inmates

17  and then I proceeded to leave.

18  Q.  And when you say "re-addressed" what do you mean by that?

19  A.  The ones that were out of compliance, when we re-walked it,

20  he addressed them again and advised them that they would be      01:52PM

21  placed on report but they needed -- what they needed to fix.

22  Q.  So I want to make sure I understand.  Did he say he was

23  going to place him on report, or did he say if you don't fix

24  this you are going to be placed on report?

25  A.  I don't recall exactly what he said, but he did tell them    01:52PM

1    what they needed to fix and told them they were going to be on

2    report.  I don't know, to be honest, if he said you are going

3    to be on report or you are on report.  But ultimately my

4    direction for him was to place them on report and give them

5    tickets.                                                          01:52PM

6    Q.  And did that occur?

7    A.  No.

8    Q.  And why not?

9    A.  From what the officer explained to me that day at the end

10   of the day, when I went to collect paperwork why there were no   01:52PM

11   tickets is when he went down to address them they fixed the

12   issue.

13   Q.  So he gave them another chance and they fixed it so there

14   were no disciplinaries written?

15   A.  Correct.                                                      01:53PM

16   Q.  Did Deputy Warden Monson ever direct you to issue

17   disciplinary reports to any of the inmates in Housing Unit 3

18   that day?

19   A.  No.

20   Q.  Do you understand what retaliation is?                       01:53PM

21   A.  Yes.

22   Q.  Did you have an understanding that these civilian women

23   were representing the inmates; they were their attorneys and

24   they were speaking to them?

25   A.  No.                                                          01:53PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Krages - Direct

1   Q.  That day you didn't know that?

2   A.  No.  I was unaware that they were attorneys for the

3   inmates.

4   Q.  What is your understanding or at least your practice with

5   respect to allowing inmates to speak to their attorneys?      01:54PM

6   A.  They do so in discrete -- they do it on a one-on-one area.

7   Q.  And what is your understanding with respect to whether or

8   not it is something that you should be listening to or not

9   listening to?

10  A.  No.  We are not authorized to listen to any of their legal  01:54PM

11  stuff.

12  Q.  Based on your experience working there for the last 11

13  years, do you -- have you seen any situations involving

14  officers who might be retaliating against an inmate who has

15  filed a lawsuit?                                              01:54PM

16  A.  No.  And we don't even get told which inmates file

17  lawsuits.  Strictly to take the retaliation factor out of the

18  possibility, I have no idea what inmates have or have not filed

19  lawsuits against officers or the State themselves.

20          MR. STRUCK:  Just one moment, Your Honor.             01:55PM

21          THE COURT:  Surely.

22          MR. STRUCK:  Nothing further.

23          THE COURT:  Thank you.  Now the attorneys for the

24  plaintiffs will have an opportunity to ask you questions.

25          THE WITNESS:  Okay.                                  01:55PM

1          THE COURT:  Ms. Eidenbach.

2                    CROSS-EXAMINATION

3   BY MS. EIDENBACH:

4   Q.  Good afternoon.  My name is Kirsten Eidenbach.  I'm one of

5   the prisoner plaintiffs' attorneys.                          01:55PM

6   A.  Okay.

7   Q.  I just have a few questions for you today.

8          So I want to go back to November 2nd, 2016.  And you

9   testified that the 704 noncompliance in Housing Unit 3 had been

10  an issue for you for about three months preceding that date?   01:56PM

11  A.  Correct.

12  Q.  Is that correct?  And why had you not been able to bring

13  that housing unit -- or why had your supervisor not been able

14  to bring that housing unit into compliance?

15  A.  It was a constant battle with those inmates in there.  They  01:56PM

16  had received disciplinary before for it, and we had just

17  recently started a new 90-day rotation.  Every 90 days we have

18  a post rotation.  So the officer was fairly new into that

19  housing unit, had only worked there approximately 30 days.  I

20  believe we were 30 days into our rotation.  And I was trying to  01:56PM

21  get him -- he had been addressing it, been addressing it, they

22  weren't listening, they weren't following his directives.  So

23  our next step in progressive disciplinary is to start issuing

24  disciplinary tickets.

25  Q.  And was this the first time, November 2nd, was that the    01:57PM

1  first time you had heard from Mr. Monson that he had

2  photographs of the noncompliance?

3  A.  In regards to that housing unit, yes.

4  Q.  And that's why on that particular day you took the time to

5  walk with CO2 Robles through the housing unit to address the          01:57PM

6  704 compliance issues?

7  A.  Correct.

8  Q.  So it was directly in response to Deputy Warden Monson's

9  e-mail to you, come down here and take care of this?

10  A.  With Officer Robles that one was, just because Officer          01:57PM

11  Robles happened to be in the housing unit that day.  Like I

12  stated and testified earlier, we have a weekly housing

13  inspection report we have to do which mandates that we tour our

14  housing units twice a week.  So based on the days off back then

15  on Rincon unit, they were alternating days off.  I could have          01:57PM

16  one officer have a Thursday/Friday; the next officer may have a

17  Friday/Saturday, so on, so forth.  So depending on what days I

18  had gone down there and toured, I had toured with other

19  officers as well.  It just so happened Officer Robles was the

20  floor officer that day in the housing unit.          01:58PM

21  Q.  And the previous times that 704 noncompliance had been

22  discovered, are there photographs of that?  Were photographs

23  taken of the noncompliance?

24  A.  I have not taken any photographs.  I did not take them.  I

25  had received photographs from other housing units that Deputy          01:58PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Kräges - Cross

```
 1    Warden Monson had toured, yes.

 2    Q.  When you went back to, I believe you said, Abel run?

 3    A.  Uh-huh.

 4    Q.  Your intent was to discipline anyone who was still out of

 5    compliance that day?                                          01:58PM

 6    A.  Correct.

 7    Q.  And do you know if any disciplinary tickets were issued?

 8    A.  No disciplinary tickets were issued.

 9    Q.  Why not?  Were there still prisoners out of compliance when

10    you walked the run?                                           01:59PM

11    A.  When I walked the run, yes.  But like I just testified

12    Officer Robles, I leave my housing units, when it comes to

13    disciplinary, it is their housing unit.  It is their

14    responsibility.  If they are going to use their discretion and

15    give the inmate one more chance to get in compliance before   01:59PM

16    they write the disciplinary, that's their discretion.  My order

17    was to re-walk the run.  Anybody out of compliance that you

18    addressed previously needs to receive disciplinary.

19    Q.  And to your knowledge, no disciplinary was issued at all?

20    A.  No, ma'am.                                                01:59PM

21    Q.  What about on Charlie run?

22    A.  No, ma'am.  No disciplinary out of House 3 at all that day.

23    Q.  And that was not a directive from someone other than the

24    officers?

25    A.  That disciplinary was a directive from me and me alone.   01:59PM
```

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Krages - Cross

1    Q.  Okay.  So your directive was to discipline them or to use

2    their discretion in disciplining them?

3    A.  My directive to him at that point in time was to discipline

4    them.

5    Q.  So he disobeyed you, then, by not disciplining them?          02:00PM

6    A.  He has that right.  In order -- he was given the

7    opportunity to use his discretion.  He chose to use his

8    discretion and give them one last opportunity, advise them do

9    it or else you are getting a ticket.  They chose to fix it

10   right then and there.                                            02:00PM

11   Q.  So part of your duties as a supervisor is to ensure that

12   you hold your staff accountable for any failures on their

13   part --

14   A.  Correct.

15   Q.  -- to enforce policies?                                      02:00PM

16   A.  Correct.

17   Q.  Right?  And in order to enforce 704, the staff must also

18   hold the prisoners accountable for their own compliance with

19   the policy?

20   A.  Correct.                                                     02:01PM

21   Q.  So holding staff accountable necessarily means you also

22   have to hold the prisoners accountable?

23   A.  Yes, ma'am.

24   Q.  Okay.  If a prisoner gets a warning for 704 noncompliance,

25   is that documented anywhere?                                     02:01PM

 1    A.  We have a -- a warning would consist of if I went by and

 2    told you something was out of place, then I come back later and

 3    I re-address it, make sure it's fixed.  Normally we have what's

 4    called 704 sheets that as we go through, all it's got is cell

 5    numbers on it.  We mark what's wrong.  Is it the bedding?  Is         02:01PM

 6    it the TV appliances left on, them not in their cells, did they

 7    not have their shirts on, pants on, anything like that.  And

 8    the way it used to be was that sheet was passed on for the next

 9    shift to follow up with as well so they kind of knew what was

10    going on and they were turned in at the end of the day.             02:01PM

11    Q.  Who did they get turned in to?

12    A.  Their supervisor.

13    Q.  Were there 704 sheets filled out on November 2nd, 2016,

14    with regard to 3 Abel or 3 Charlie?

15    A.  Not that I'm aware of, no.                                      02:02PM

16    Q.  Why not?

17    A.  Honestly, I have no idea.  It was in their journal that

18    they had done them, but they did not do the 704 sheets on that

19    day.

20    Q.  Okay.  So just to make sure I'm understanding you              02:02PM

21    correctly, you go by and you see 704 noncompliance initially

22    and say fix it?

23    A.  Uh-huh.

24    Q.  Next step is you come back, they still haven't complied,

25    they are given a warning, it goes on the 704 sheet.               02:02PM

 1    A.  Correct.

 2    Q.  If they are still not in compliance it's at the discretion

 3    of the housing officer whether or not to issue disciplinary

 4    from that point forward?

 5    A.  Whether or not they are going to give them one more chance          02:02PM

 6    to fix it.  At that point in time if they fail to fix it on

 7    that last chance then yes, they will receive disciplinary.

 8    Q.  Okay.  Did CO2 Robles receive a negative MAP entry as a

 9    result of the November 2nd incident?

10    A.  No, he did not, because he had initially addressed the 704s          02:03PM

11    per his correctional service journal, and then when we went

12    back through he had re-addressed and the issues were fixed.  So

13    no, he did not receive because the reason he was going to

14    receive was because we were under the impression that he did

15    not actually do his initial.  However, according to the                  02:03PM

16    correctional service journal he had completed his initial 704

17    inspection.

18    Q.  So did you receive an initial directive from DW Monson to

19    enter a MAP entry for the housing officer who was responsible

20    for the 704 noncompliance in Housing Unit 3?                             02:03PM

21    A.  Yes.

22    Q.  Okay.  And then after an investigation did you communicate

23    your findings to DW Monson?

24    A.  Yes.

25    Q.  And the two of you decided that there was going to be no             02:04PM

1    MAP entry as a result?

2    A.  I advised him that the correctional service journal shows

3    that he did actually do a 704 inspection, so we would readdress

4    it and it kind of was left at that.

5    Q.  The last question I have for you, you testified that it was    02:04PM

6    not loud on the runs in Housing Unit 3?

7    A.  Correct, because it was formal count time.

8    Q.  So all the doors were shut?

9    A.  All the doors were shut down all the runs, and you could

10   hear TVs, walkmans, stuff like that, but that was the extent of    02:04PM

11   it.  Nobody was yelling, nobody was out and about because it

12   was formal count.

13   Q.  And you testified earlier that you were unaware as to how

14   many people were actually on the run, is that right?

15   A.  Correct.    02:04PM

16           MS. EIDENBACH:  I have no further questions.

17           THE COURT:  Thank you.  Any redirect?

18           MR. STRUCK:  No, Your Honor.

19           THE COURT:  Lieutenant, you are done.  Thank you very

20   much.  I realize it's no easy thing to drive up here and it's    02:04PM

21   an imposition on your day and your work and schedule.  I'm

22   sorry about that.  But unfortunately what's necessary for me to

23   make the most important decisions as I can in the case.  That's

24   the position I'm in.  The stipulation, the settlement that was

25   reached between the plaintiffs and the State in this case    02:05PM

1    require me to make decisions.  I do not want to make decisions

2    that were not well informed.  And unfortunately, that means

3    sometimes people have to come out of their workplaces, come to

4    court, talk to me about it because although I do travel to the

5    complexes myself sometimes, it is necessary we do it on the          02:05PM

6    record here in court.

7            So I want to thank you for your time here today.

8            THE WITNESS:  Thank you.

9            THE COURT:  You may call your next witness.

10           MR. STRUCK:  Yes.  The defendants call CO2 Oswaldo          02:05PM

11   Robles.

12           THE COURT:  Thank you.

13           Good afternoon, sir.  If you would please come forward

14   into the courtroom so the clerk of the court could administer

15   the oath.                                                            02:06PM

16           THE COURTROOM DEPUTY:  Please raise your right hand.

17           (The witness was sworn.)

18           THE COURTROOM DEPUTY:  Thank you.

19                    OSWALDO ROBLES,

20   a witness herein, having been first duly sworn by the clerk to

21   speak the truth and nothing but the truth, was examined and

22   testified as follows:

23                    DIRECT EXAMINATION

24   BY MR. STRUCK:

25   Q.  Good afternoon, Officer Robles.                                  02:06PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Robles - Direct

1    A.  Good afternoon.

2    Q.  You might want to move a little closer to that microphone.

3            THE COURT:  Also, if it's more comfortable for you,

4    the microphone, it's not anchored to the desk so you can move

5    it closer if you wish.  It will help everybody to hear.          02:06PM

6            THE WITNESS:  Thank you.

7    BY MR. STRUCK:

8    Q.  Would you state your name, please?

9    A.  Oswaldo Robles.

10   Q.  Have you ever testified before?                              02:07PM

11   A.  No.

12   Q.  Judge Duncan is very nice, so you have nothing to worry

13   about.

14           THE COURT:  You saw the last person actually walked

15   out of here, so you will survive.                                02:07PM

16   BY MR. STRUCK:

17   Q.  And we just have a few questions to ask you about the

18   November 2nd 2016 tour.

19           By whom are you employed?

20   A.  Department of Corrections, State of Arizona.                 02:07PM

21   Q.  And how long have you worked there?

22   A.  A little over nine years.

23   Q.  And which facilities have you been assigned to?

24   A.  Manzanita, Rincon and currently at Winchester.

25   Q.  That's all at the Tucson complex?                            02:07PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Robles - Direct

1    A.   Correct.

2    Q.   All right.  Are you currently a Corrections Officer 2?

3    A.   Yes.

4    Q.   And what are your job responsibilities as a CO2?

5    A.   To ensure that the inmates follow directions and make sure          02:07PM

6    we have a safe institution, safe workplace environment.

7    Q.   Where were you assigned on November 2nd, 2016?

8    A.   I was assigned in Rincon unit Housing Unit 3 as a floor

9    officer.

10   Q.   And which shift were you working?                                   02:08PM

11   A.   Day shift.

12   Q.   Now, that day there was a tour involving attorneys, some

13   representing the inmates, with respect to the Parsons case

14   which is why we're here.

15        Were you aware that that tour was going to occur                    02:08PM

16   before November 2nd, 2016?

17   A.   Yes.

18   Q.   How did you become aware of that?

19   A.   We were advised in our briefing, in the morning briefings

20   that we had.                                                             02:08PM

21   Q.   So you have a morning, a daily morning briefing?

22   A.   Yes.

23   Q.   And who briefs you?

24   A.   Our sergeant or lieutenant.

25   Q.   Do you remember was it that morning the first you had heard         02:08PM

1    about this tour?

2    A.   I don't recall.

3    Q.   Okay.  Do you remember what you were told about the tour?

4    A.   Nothing, really, just they were going to be walking around

5    touring the unit.                                              02:09PM

6    Q.   Did you know whether they were going to come to your unit

7    or not?

8    A.   No.

9    Q.   So you are assigned to the Rincon unit.  What time does

10   your day begin on November 2nd?                                02:09PM

11   A.   5:45 a.m.

12   Q.   And what time do you actually get to the housing unit?

13   A.   About 6, 6 in the morning.

14   Q.   Roughly what are your responsibilities when you get to the

15   housing unit?  What do you need to do?                         02:09PM

16   A.   Just ensure all the inmates are alive and breathing, ensure

17   that they are following proper procedures as far as 704

18   compliance.

19   Q.   Okay.  And we have heard a lot about 704 today.  But what

20   is your understanding about what you need to do with respect to  02:10PM

21   704 compliance in November 2016 in the Housing Unit 3?

22   A.   Was to ensure that they have a neat, clean environment;

23   their cell areas, make sure that their stuff in is in proper

24   order, their bedding, their clothing.

25   Q.   At some point in the morning on November 2nd, did you do    02:10PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Robles - Direct

```
1    anything with respect to 704 compliance?

2    A.   Yes.  Every day we do -- when we do our inspections we walk

3    around every cell and make sure their areas are in compliance.

4    Q.   And about what time of day would you have done that on

5    November 2nd?                                                    02:10PM

6    A.   About between 7 a.m. and 8 a.m.

7    Q.   And if you see something that's not in compliance with 704,

8    what do you do about it at that time?

9    A.   I advise the inmate to correct it.  I advise the

10   individual, whatever cell it is, to correct the issue.          02:11PM

11   Q.   And how do you -- is there anywhere that you record that

12   you have actually done this?  Let me back up.

13          Do you do that in all three of the housing units,

14   Abel, Baker, and Charlie?

15   A.   Yes.                                                        02:11PM

16   Q.   And do you record that somewhere that you have done this?

17   A.   Yes.

18   Q.   Where is that recorded?

19   A.   In our journal, housing unit journal.

20   Q.   Is that some sort of a log?                                 02:11PM

21   A.   Yes.  We have a log where we enter our daily activities.

22   Q.   And so when was the first time you knew anything about this

23   tour actually coming to your housing unit that day?

24   A.   When they arrived.

25   Q.   That was your first notice?                                 02:12PM
```

1   A.   Yes.

2   Q.   And who arrived, to the best of your recollection?

3   A.   The only one familiar to me is Deputy Warden Monson.

4   Q.   And were there any other -- was there any other ADC staff

5   with him, to your knowledge?                                    02:12PM

6   A.   Not that I remember.

7   Q.   Okay.  Did you see any civilians with DW Monson?

8   A.   I don't remember.

9   Q.   You don't recall?

10  A.   I don't recall.                                            02:12PM

11  Q.   Did you have anything to do with, at the time they arrived,

12  did you have anything to do with getting them to where they

13  needed to go?

14  A.   No.

15  Q.   Now, are you the only officer assigned to Housing Unit 3 at  02:12PM

16  that time?

17  A.   No.

18  Q.   Where is the other officer?

19  A.   He remains in the control room.

20  Q.   And the control room is the room that controls the opening  02:12PM

21  and closing of doors, among other things?

22  A.   Correct.

23  Q.   So when they arrived, where were you?

24  A.   I was doing my count, my formal count, making sure all the

25  inmates are accounted for.                                      02:13PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Robles - Direct

1   Q.  How did you conduct your formal count on November 2nd?  If

2   you could just walk us through very briefly how you accomplish

3   it.

4   A.  We have our count sheet which has the inmates' names and

5   numbers and their cell locations, and we begin in Abel run and          02:13PM

6   go down cell to cell ensuring we do a face-to-ID count and also

7   ensure that they are alive and well.

8   Q.  Now, when the tour arrived, did you stop your count?

9   A.  No.

10  Q.  Why not?                                                           02:13PM

11  A.  Because it's part of my job duty, and I was trying to stay

12  out of the way, so to speak.

13  Q.  Did you see any female civilians talking to inmates at any

14  time that morning after that tour had arrived?

15  A.  Through their cell door, yes.                                      02:14PM

16  Q.  At the cell door?

17  A.  Yes.

18  Q.  Do you remember which housing or which run they were on

19  when you saw them?

20  A.  Abel run and then Charlie run.                                     02:14PM

21  Q.  And this was while you were doing the count?

22  A.  Correct.

23  Q.  At some point in time, did Lieutenant Krages, who I guess

24  was then Sergeant Krages, approach you?

25  A.  Yes.                                                               02:14PM

 1   Q.  Where were you when that happened?

 2   A.  I was doing my count on Baker run.

 3   Q.  Was there anybody else in that Baker run with you and

 4   Krages besides the two of you?

 5   A.  No.                                                           02:15PM

 6   Q.  All right.  And I mean in the common area.  Obviously the

 7   inmates were in their cells?

 8        That's a yes?

 9   A.  Yes.

10   Q.  And what did Sergeant Krages tell you?                        02:15PM

11   A.  He had asked me if I had done the 704 compliance checks

12   already.  And he advised me he was going to walk through them

13   with me the rest of the way while I do my count and just

14   advised that if -- see if I went through them, my 704s, if I

15   had corrected them or let the individuals know whatever ones     02:15PM

16   that had something to be corrected if I didn't already.

17   Q.  So that morning you had already talked to inmates in

18   both -- all three Abel, Baker, Charlie with respect to any

19   potential 704 violations?

20   A.  Correct.                                                      02:16PM

21   Q.  Did you finish your count in Baker with Sergeant Krages?

22   A.  Yes.

23   Q.  And then where did you go?

24   A.  We continued on to Charlie run.

25   Q.  When you and Sergeant Krages went into Charlie run was        02:16PM

1    anybody in there?

2    A.  Yes.

3    Q.  Who was in there?

4    A.  The tour, the individuals for the tour and DW Monson.

5    Q.  Did you speak with DW Monson?                          02:16PM

6    A.  Yes.

7    Q.  And what was discussed?

8    A.  He had taken some pictures of certain cells that were out

9    of compliance, 704 compliance, and was showing us what the

10   cells were out of compliance for.                         02:16PM

11   Q.  And while this conversation was taking place, what was the

12   volume level?  How loud were you guys talking?

13   A.  It was just low, between, you know, between us there.

14   Q.  Was there anyone walking in the unit yelling, "ticket them

15   all" or anything like that?                               02:17PM

16   A.  No.

17   Q.  Did Deputy Warden Monson give you any instruction regarding

18   issuing disciplinaries?

19   A.  No.

20   Q.  None at all?                                          02:17PM

21   A.  None at all.

22   Q.  After Deputy Warden Monson showed you these photographs on

23   his phone, what did you do next?

24   A.  I went back to the cells where these 704s were out of

25   compliance and advised them to correct them.             02:17PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Robles - Direct

1    Q.  Did you write any of them up for 704 violation?

2    A.  No.

3    Q.  How come?

4    A.  It's officer discretion as to, you know, to write

5    disciplinary reports.  And as far as once I let them know what          02:17PM

6    it was exactly that I wanted to be fixed in compliance, they

7    did it.

8    Q.  They fixed it?

9    A.  Yes.

10   Q.  Okay.                                                               02:18PM

11          MR. STRUCK:  No more questions, Your Honor.

12          THE COURT:  Thank you.  Now the attorney for the

13   plaintiffs will have an opportunity to ask you questions.

14          Ms. Eidenbach.

15                  CROSS-EXAMINATION                                        02:18PM

16   BY MS. EIDENBACH:

17   Q.  Good afternoon.

18   A.  Good afternoon.

19   Q.  My name is Kirsten Eidenbach.  I'm one of the prisoner

20   plaintiffs' attorneys.  I just have a very couple questions for         02:18PM

21   you.

22          You said that you went back to inspect whether or not

23   several of the cells in Housing Unit 3 were in compliance with

24   704 later in the day after you had spoken with the deputy

25   warden and Sergeant Krages, right?                                      02:18PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Robles - Direct

1    A.  Correct.

2    Q.  When you went back to inspect them, did you fill out any

3    sort of 704 logs since it was the second time that you had

4    advised the prisoners of their noncompliance?

5    A.  Yes.                                                          02:19PM

6    Q.  You did fill out a log?

7    A.  Yes, there is a log.

8    Q.  Did you turn that log in?

9    A.  Yes.

10   Q.  To whom?                                                      02:19PM

11   A.  It's turned in at the end of the shift to our supervisors.

12   Q.  Okay.  Why did you decide not to issue any tickets?

13   A.  Because they fixed the issue.

14   Q.  Everybody did?

15   A.  Yes.                                                          02:19PM

16   Q.  Now, Sergeant Krages testified that he had been having

17   trouble getting Housing Unit 3 in particular in compliance with

18   704 for about three months.  Were you working at Housing Unit 3

19   during those three months?

20   A.  It varies.  Various times.  They don't exactly post us at     02:19PM

21   one certain spot all the time.

22   Q.  Do you have any idea why there was such difficulty getting

23   that particular housing unit in compliance with 704?

24   A.  No, ma'am.

25   Q.  Had you ever received photographs like the ones you           02:19PM

1    received from Deputy Warden Monson the morning of November 2nd

2    before about Housing Unit 3?

3    A.  I don't have any way of receiving any photographs, just

4    whatever he showed me.

5    Q.  Had he ever shown you any photographs of Housing Unit 3 of       02:20PM

6    704 noncompliance before November 2nd?

7    A.  Not that I recall.

8    Q.  Okay.  I have no further questions.

9            THE COURT:  I have a couple of questions, please.  So

10    on the 2nd of November, 2016, you had been assigned to Housing       02:20PM

11    Unit 3 for about 30 days, is that right?

12            THE WITNESS:  It's not continuous, but yes.

13            THE COURT:  Over those 30 days, how many days do you

14    think you were working in Housing Unit 3?

15            THE WITNESS:  About at least twice a week.                   02:20PM

16            THE COURT:  And do you work five days a week?

17            THE WITNESS:  Yes.

18            THE COURT:  So on those other days of the week were

19    you in a different housing unit?

20            THE WITNESS:  Yes.                                           02:20PM

21            THE COURT:  Was there a particular housing unit or

22    more than one?

23            THE WITNESS:  More than one.

24            THE COURT:  How many?

25            THE WITNESS:  The unit has nine housing units so it          02:21PM

1    varies.

2                THE COURT:  I guess it sounds to me like since you

3    were assigned to Housing Unit 3 for at least two of the days of

4    the week, that maybe you would be assigned to a particular unit

5    or smaller number of units than just the rest of the nine or 11      02:21PM

6    if we're counting, I guess, the minor unit.  But that's maybe

7    not true.  On those other days you were -- you have no idea

8    where you would end up?

9                THE WITNESS:  No.  Every time we go into briefing,

10   depending on our staffing levels, they will place us                 02:21PM

11   differently.

12               THE COURT:  And that's the normal way that it

13   operates, somebody who is the housing officer is assigned one

14   particular unit for two days a week and then they are open for

15   all the other days?                                                  02:21PM

16               THE WITNESS:  Not necessarily.  It's basically

17   wherever like our staffing allows for the day.  So you could

18   end up there three times; you could end up there once; or you

19   could not end up there at all for that week.  Just depends on

20   the scheduling.                                                      02:22PM

21               THE COURT:  Your two days a week that you had been in

22   Housing Unit 3 for about these 30 days, I gather on each of

23   those days you did 704 inspections?

24               THE WITNESS:  Correct.

25               THE COURT:  And how did Housing Unit 3 do on those 704    02:22PM

1    inspections?

2         THE WITNESS:  There's a lot to correct, I guess, so to

3    speak, and just every time you do a walk just remind them of

4    what it is that needs to be done on there.

5         THE COURT:  Some of the pictures that I have seen are          02:22PM

6    things that likely didn't just sprout up that day.  It looked

7    to us they had maybe been there for a while.  And I gather

8    since these inspections are happening every single day, seven

9    days a week, if they are out of compliance they are told that.

10   But it also seems like telling them that probably doesn't work    02:23PM

11   very well because we saw these things that had been around for

12   a while you told me there were compliance issues and I have

13   heard from other witnesses there was compliance issues.

14        So is it fair to say this sort of method didn't work

15   very well?                                                         02:23PM

16        THE WITNESS:  You have just got to stay on it, I

17   guess, so to speak, make sure, advise them of what it is that

18   needs to be done as far as 704 compliance.

19        THE COURT:  Now, there was a time when you did see the

20   pictures Deputy Warden Monson had taken, right?                    02:23PM

21        THE WITNESS:  Correct.

22        THE COURT:  When you saw those pictures those were

23   examples of violations of 704 that he had seen when he had done

24   a walk-through on the 2nd of November, right?

25        THE WITNESS:  Correct.                                        02:24PM

1          THE COURT:  And so I guess if I were in your shoes, I

2    would worry that maybe when I'm seeing these pictures from the

3    boss about what's supposed to happen that I'm supposed to be

4    looking at every single day that I'm at work and there are

5    examples of these failures, I would think I was in trouble.          02:24PM

6    Did you think that?

7          THE WITNESS:  Yes.

8          THE COURT:  Did you have any opportunity to give an

9    explanation to the then sergeant now lieutenant about why it

10   was?                                                                 02:24PM

11         THE WITNESS:  Meaning what?

12         THE COURT:  Well, you said that you thought that when

13   you see these pictures you think you may be in trouble.  And

14   when somebody says you might be in trouble you want to say

15   well, here's the explanation.  Did you have the opportunity to     02:24PM

16   do that?

17         THE WITNESS:  No.  Well, that's the reason why I went

18   back and ensured that those certain violations were taken care

19   of.

20         THE COURT:  And you testified, I think, that then         02:24PM

21   sergeant now lieutenant, when he talked to you on the 2nd of

22   November, told you to issue discipline to the people who were

23   in violation.

24         THE WITNESS:  No.  I don't recall.

25         THE COURT:  You testified that he gave you no             02:25PM

1     direction one way or the other.

2               THE WITNESS:  Just ensure that the 704s are done.

3               THE COURT:  Well, but did he give you any direction at

4     all about whether or not you had to issue disciplinary?

5               THE WITNESS:  I don't recall.                          02:25PM

6               THE COURT:  All right.  Earlier you testified that he

7     gave you no direction one way or the other, and now you are

8     saying you don't recall?

9               THE WITNESS:  No.

10              THE COURT:  Do you remember which it is?              02:25PM

11              THE WITNESS:  No.

12              THE COURT:  You don't.  So it's fair to say the better

13    answer is you don't recall?

14              THE WITNESS:  Correct.

15              THE COURT:  If the sergeant who is superior to you had  02:25PM

16    told you to issue disciplinary and you didn't issue

17    disciplinary, do you think that that could mean that you could

18    be in trouble?

19              THE WITNESS:  It could.  But if the issue is taken

20    care of, I don't see why it would be.                          02:26PM

21              THE COURT:  Now, in the days you had been working in

22    Housing Unit 3 about two days a week in the previous 30 days, I

23    gather that you had seen issues like this before.

24              THE WITNESS:  Correct.

25              THE COURT:  And you told them to take care of them?   02:26PM

1              THE WITNESS:  Correct.

2              THE COURT:  And it sounds like they didn't.

3              THE WITNESS:  They usually would.

4              THE COURT:  They usually would.  So were you surprised

5      to see on the 2nd of November there were all these violations          02:26PM

6      that the deputy warden found.

7              THE WITNESS:  Not necessarily.  I mean, it's -- how

8      could I say -- it's not going to be perfect with regards to the

9      compliance issues.

10             THE COURT:  In your experience, how often does the          02:27PM

11     deputy warden come through and check up on 704 compliance?

12             THE WITNESS:  I wouldn't have a number for you.

13             THE COURT:  Well, on the 2nd of November this

14     happened, you end up getting pictures that the deputy warden

15     had taken.  Had that ever happened before in your experience?          02:27PM

16             THE WITNESS:  Yes.

17             THE COURT:  How many times?

18             THE WITNESS:  I wouldn't be able to say.  I wouldn't

19     have a number for that.

20             THE COURT:  Less than five?  Less than 10?  I'm not          02:27PM

21     asking exact number.  Just come into a range for me.

22             THE WITNESS:  I guess about five.

23             THE COURT:  And then in the time from November 2nd

24     until now, where have you worked?

25             THE WITNESS:  I remained at Rincon and now I work at          02:28PM

 1    Winchester.

 2              THE COURT:  When did you leave Rincon?

 3              THE WITNESS:  It was this past March.  March of '17.

 4              THE COURT:  So in the time between November 2nd and

 5    March 17, how many times did you come to understand that the      02:28PM

 6    deputy warden had gone through and checked up on the 704

 7    compliance?

 8              THE WITNESS:  From my own, personally?

 9              THE COURT:  Yes.

10              THE WITNESS:  Between five, five and 10.               02:28PM

11              THE COURT:  Thank you.  Any questions engendered by my

12    questions?

13              MR. STRUCK:  No, Your Honor.

14              MS. EIDENBACH:  No, Your Honor.

15              THE COURT:  Well, you are done.  I have to end by       02:28PM

16    saying thank you very much for coming here.  I do appreciate

17    this is not something anybody would choose to do, to drive here

18    to be in court.  And I don't allow for it to happen unless I

19    think there's a good reason for it to happen.  And I just want

20    you to understand that in this lawsuit that's now in federal      02:29PM

21    court in Phoenix, it is the role that I have to help address

22    issues that the parties attempted to settle in the lawsuit.

23    And if they are not able to get a resolution then it comes to

24    me to make decisions.

25              In order to make informed and intelligent decisions I  02:29PM

```
 1  have to hear from people like you.  And sometimes it means that

 2  it's best for it to happen here in court so you can be here and

 3  we can be on the record and we can have the lawyers present as

 4  well in this way.  I sometimes do travel to the prison and

 5  that's a helpful way for me to learn information as well.  But     02:29PM

 6  sometimes it's important and necessary for people like you to

 7  come here.  And I know it's an imposition.  I just want to say

 8  thank you and I appreciate it.

 9          THE WITNESS:  Thank you, sir.

10          THE COURT:  Have a good day.                                02:29PM

11          THE WITNESS:  You too, sir.

12          THE COURT:  Is there a next witness?

13          MR. STRUCK:  Yes, Your Honor.  The defendants call

14  Ashley Zuerlein.

15          THE COURT:  Thank you.                                      02:30PM

16          (The witness was sworn.)

17          THE COURT:  Good afternoon.  Thank you for coming.

18          THE WITNESS:  Good afternoon.

19          THE COURT:  You may proceed.

20          MR. STRUCK:  Thank you.                                     02:30PM

21                  ASHLEY ZUERLEIN,

22  a witness herein, having been first duly sworn by the clerk to

23  speak the truth and nothing but the truth, was examined and

24  testified as follows:

25
```

1                      DIRECT EXAMINATION

2    BY MR. STRUCK:

3    Q.  Would you state your name, please?

4    A.  Ashley Zuerlein.

5    Q.  And by whom are you employed?                          02:30PM

6    A.  The Arizona Attorney General's Office.

7    Q.  What do you do at the Attorney General's Office?

8    A.  I am a paralegal in LMS, so we work on various cases

9    involving inmates representing ADC.

10   Q.  Ms. Zuerlein, could you maybe pull the microphone towards   02:31PM

11   you so we can hear you.  You are a little soft spoken.

12            Now, in 2016 did you have involvement in regarding

13   these tours in the Parsons case?

14   A.  Yes, I did.  I attended one of the tours in Tucson.

15   Q.  Was that the only tour that you have attended in the     02:31PM

16   Parsons case?

17   A.  That set, which was at Tucson and Eyman.

18   Q.  So you have attended two tours?

19   A.  Yes.  They were consecutive days.

20   Q.  All right.  And what was your responsibility on the tours?   02:31PM

21   A.  During the tour I accompanied some of the plaintiffs'

22   attorneys throughout the Tucson facility.

23   Q.  And what would you -- what were you there to do?

24   A.  I was basically there to accompany the plaintiffs and ADC

25   staff members in case anything arose that needed to be      02:32PM

**11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Zuerlein - Direct**

1    addressed by counsel.

2    Q.  And did you, on November 2nd, 2016, was there more than one

3    group that was touring?

4    A.  Yes.  There were three separate groups.  I was with one

5    group that included Kirsten Eidenbach, Jessica Jansepar, Tara        02:32PM

6    Diaz, Deputy Warden Monson, and a staff member that had been

7    driving us around.

8    Q.  Okay.  And who is Tara Diaz?

9    A.  I believe she was the DWOP, the deputy warden of

10   operations.                                                         02:32PM

11   Q.  And so walk us through, then, on November 2nd, 2016, you

12   were with this particular group.  Where did you all go first?

13   A.  I believe we first went to the Rincon area at their medical

14   possibly mental health area as well.

15   Q.  And about what time did the tour begin?                         02:33PM

16   A.  I think we started around 9.

17   Q.  And so you went to the medical mental health area at

18   Rincon.  About how long were you there?

19   A.  A half hour, 45 minutes maybe.

20   Q.  And what did you -- what was being done?  What were the         02:33PM

21   plaintiffs' lawyers doing there?

22   A.  Basically talking to different staff members, medical

23   professionals to see what they did at that facility and what

24   their practices were.

25   Q.  So you left there, and where did your group go next?            02:33PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Zuerlein - Direct

1    A.  I believe we next went to an open rec yard on Rincon which

2    had close custody inmates at recreation.

3    Q.  And what did you all do at that particular rec yard?

4    A.  The plaintiffs' attorneys talked to various inmates

5    throughout the rec yard.  We kind of just observed.          02:34PM

6    Q.  How close were you as you were doing this observation?

7    A.  I don't know exactly.  It was a distance apart.  It was far

8    enough apart that I didn't feel like we were -- I didn't want

9    to be right next to them overhearing anything, so a distance.

10   Q.  So you were ensuring that you were not close enough to hear  02:34PM

11   what was said?

12   A.  I basically didn't want to hear any attorney/client

13   communications.

14   Q.  Now, I didn't ask you but what's your educational

15   background?                                                   02:34PM

16   A.  I'm an attorney.

17   Q.  How long have you been an attorney?

18   A.  Since 2007, so about 10 years.

19   Q.  And how long have you been with the Attorney General's

20   Office?                                                       02:35PM

21   A.  Originally I was with the Attorney General's Office for

22   about two years in 2013.  I left and went into private

23   practice.  I came back in 2016.

24   Q.  Are you working at the Attorney General's Office in the

25   capacity of an attorney now?                                 02:35PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Zuerlein - Direct

1   A.  When I came back in 2016 I came back in the capacity as a

2   paralegal.

3   Q.  Is that the capacity you were in when you went on this tour

4   in November?

5   A.  Yes.                                                           02:35PM

6   Q.  So you were on the rec yard and making sure that you're far

7   enough away, just kind of observing what's going on?

8   A.  Basically just observing small talk with officers.

9   Q.  How many staff members were on the yard?  Do you remember?

10  A.  I think in addition to the group that we were with, there    02:35PM

11  were maybe two, maybe three other officers.

12  Q.  Okay.

13  A.  People would come and go as well.

14  Q.  Did Ms. Eidenbach or Ms. Janespar-Ross ever have to say

15  anything to you or any of the members of your group when you      02:36PM

16  were on the rec yard to back away?

17  A.  No.  I had one discussion with her but it was inmates were

18  kind of grouping, so I just asked her if she wanted to pull

19  inmates aside to avoid any -- too much of a crowd or inmate

20  disturbance.                                                      02:36PM

21  Q.  A grouping.  And when you say "her" whom do you mean?

22  A.  I had a quick conversation with Ms. Eidenbach, just that

23  she might want to pull inmates aside if we were getting large

24  crowds.

25  Q.  Now, were you also there in case there were things that       02:36PM

1    they might need, special requests they might have?  You were

2    there to help facilitate that?

3    A.  Yes.  For example, when they were in the medical area we

4    collected various documents they wanted produced later on.

5    Q.  After you left the rec yard, where did you all -- where did       02:37PM

6    your group go?

7    A.  I believe it was the Housing Unit 3 on Rincon, and I

8    believe it was Abel.

9    Q.  Okay.

10   A.  It was a run within the area.                                     02:37PM

11   Q.  So did your entire group go into the Abel run?

12   A.  Yes.

13   Q.  How -- approximately what was the size of that particular

14   run, if you remember?

15   A.  It's pretty narrow.  It's not as wide open as a lot of the        02:37PM

16   other runs.  So it's a little tighter quarters.  Some people

17   did go outside the door or would come and go.

18   Q.  When you say "some people" --

19   A.  I'm sorry, some ADC staff members.

20   Q.  So who was standing -- were you standing in Abel run when         02:37PM

21   the plaintiffs' attorneys were talking to their clients?

22   A.  Yes.  When we first went on to the run, I noticed that

23   there was a door open at the end of the run, so I kind of

24   pulled back, not sure if we were supposed to be there yet.  Ms.

25   Diaz did go to the end of the run to see what was going on with      02:38PM

 1    the door and then came back to the initial portion of the run

 2    where you first enter.

 3    Q.  Okay.

 4    A.  And primarily staff were at that area.

 5    Q.  Before the group went out on a tour, did anyone announce          02:38PM

 6    your presence to the residents of Abel run?

 7    A.  When we first got to the run, early on, an officer walked

 8    down and informed inmates that females were present, walked

 9    down the run and would instruct them, you know, to get dressed

10    basically.                                                            02:38PM

11    Q.  Okay.  So as the two attorneys were talking to their

12    clients, you were standing where in the run?

13    A.  Towards the door.

14    Q.  Towards the door?

15    A.  Entrance of the run.                                              02:38PM

16    Q.  And were they -- describe for us how they were -- were they

17    one on one side, one on the other?  Were they together talking

18    to their clients?  What was your recollection?

19    A.  From what I recall they had gone to the end of the run and

20    were kind of alternating, switching to different inmates at a        02:39PM

21    time.

22    Q.  What was, to your recollection, what was Deputy Warden

23    Monson doing at this time?

24    A.  Initially when he came in, he had gone to the end of the

25    run where the door was open to talk to that inmate just to find      02:39PM

**11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Zuerlein - Direct**

1    out why the door was open, what was going on.  I believe he

2    walked back down to the end.  At various points when we were on

3    the run inmates would also call him to their door wanting speak

4    to him.

5    Q.  Did you observe him taking any photographs with his phone?     02:39PM

6    A.  Not on Abel.  On Charlie, yes, the second run.

7    Q.  Did you hear Deputy Warden Monson talking to any of the

8    other ADC staff about 704 violations or housing unit

9    violations?

10   A.  While we were on Charlie run he had a conversation with two     02:40PM

11   staff members basically indicating that he wasn't happy with

12   what he was seeing on the run.  It was more of a -- he felt

13   they weren't meeting their expectations.  It was more of an

14   employment conversation about job performance.

15   Q.  And how loud was that conversation?  Was it elevated or     02:40PM

16   normal?

17   A.  Normal conversational tone.

18   Q.  Where were they standing at the time that conversation took

19   place?

20   A.  They were somewhere towards the middle of the run.     02:40PM

21   Q.  You remember them being in the middle of the run?

22   A.  Somewhere towards the middle, between where I was and the

23   middle.

24   Q.  Where were you standing?

25   A.  Towards the door.     02:41PM

**11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Zuerlein - Direct**

1    Q.  And where was Ms. Eidenbach and Ms. Janespar-Ross?

2    A.  From my memory I believe they were on the other side

3    towards the end or on the other side of Monson.

4    Q.  At any time in either the Abel run or Charlie run did Ms.

5    Eidenbach or Ms. Janespar-Ross ask you to move people away so          02:41PM

6    they would have more privacy?

7    A.  Yes.  At some point while we were on Charlie run, the

8    second set, Ms. Janespar had asked us to scoot down because she

9    wanted more room.  So we backed out partially outside of the

10   run and tried to give them more space.                                 02:41PM

11   Q.  Out in hallway?

12   A.  In the hallway where there was kind of an open area between

13   the runs.

14   Q.  Could you hear the conversations that were taking place

15   between the plaintiffs' lawyers and their clients?                     02:41PM

16   A.  No.

17   Q.  Was there anyone, any ADC employee, yelling at inmates

18   about 704 issues that you recall?

19   A.  No.

20   Q.  Did you hear anyone say "ticket them, discipline them,            02:42PM

21   ticket them all," anything like that?

22   A.  No.

23   Q.  Did you hear Ms. Diaz say anything to Ms. Janespar-Ross

24   about how to more effectively communicate with their clients

25   behind the cell doors?                                                 02:42PM

**11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Zuerlein - Direct**

1    A.  At one point, I think it was on Charlie, she did explain

2    that there's a little gap along the door, where if you speak

3    through the gap you can hear each other better than trying to

4    talk through the window.

5    Q.  And you heard Ms. Diaz tell that to Ms. Janespar-Ross?                02:43PM

6    A.  Yes.  I think Ms. Diaz was relatively close to me at the

7    time.

8    Q.  Okay.  At any time when you were on Abel run or the Charlie

9    run, did Ms. Eidenbach or Ms. Janespar-Ross say anything to you

10   about their concerns about retaliation or not being, you know,          02:43PM

11   not being able to talk to their clients in a confidential

12   manner?

13   A.  Not until after we had already left the runs and had lunch.

14   Q.  That was --

15   A.  Later on down the day.                                               02:43PM

16   Q.  And at that point is around the time you called Judge

17   Duncan?

18   A.  Yes.

19   Q.  Were you surprised by the allegations?

20   A.  Yes.                                                                 02:44PM

21   Q.  Why?

22   A.  I hadn't seen any behavior that made me think that the

23   inmates were intimidated by any of the staff.  And throughout

24   that tour and at various points the inmates were asking to

25   speak to the deputy warden to have various issues addressed.            02:44PM

**11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Diaz - Direct**

1    So it almost seemed like they were seeking him out.

2            MR. STRUCK:  No more questions, Your Honor.

3            THE COURT:  Thank you very much.

4            Cross-examination, Ms. Eidenbach?

5            MS. EIDENBACH:  I have no questions.                      02:44PM

6            THE COURT:  Thank you very much for coming over.

7    Appreciate it.

8            THE WITNESS:  Thank you.

9            MR. STRUCK:  Defendants call Tara Diaz.

10           THE COURT:  Good afternoon.  Please step forward to       02:45PM

11   the center here of the courtroom so that the clerk of the court

12   may administer the oath.

13           (The witness was sworn.)

14           THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

15                        TARA DIAZ,

16   a witness herein, having been first duly sworn by the clerk to

17   speak the truth and nothing but the truth, was examined and

18   testified as follows:

19                      DIRECT EXAMINATION

20   BY MR. STRUCK:

21   Q.  Good afternoon.

22   A.  Good afternoon.

23   Q.  Would you state your name, please?

24   A.  Tara Diaz.

25   Q.  By whom are you employed?                                    02:45PM

1    A.   The Arizona Department of Corrections.

2    Q.   How long have you worked for the Department of Corrections?

3    A.   27 years.

4    Q.   And what is your current job duty title?

5    A.   Regional operations director.                              02:46PM

6    Q.   And what are your responsibilities as the regional

7    operations director?

8    A.   I am responsible for oversight of the private prisons.

9    Q.   If you could pull that microphone maybe a little bit closer

10   to you.                                                          02:46PM

11   A.   Better?

12   Q.   Yes.  That's better.

13          So in November of 2016, what was your job title?

14   A.   The same, but I was temporarily covering the southern

15   region.                                                          02:46PM

16   Q.   You were -- so you had the same job duties but at the time

17   you were covering that region for somebody else as well?

18   A.   Correct.

19   Q.   When you say "that region" what do you mean by that?

20   A.   The southern region, so Tucson, Safford, Douglas, the       02:46PM

21   southern region prisons, state prisons.

22   Q.   Is Yuma part --

23   A.   Yuma.  Perryville.

24   Q.   All right.  And so you were kind of pulling double duty at

25   that point?                                                      02:47PM

**11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Diaz - Direct**

1    A.  Correct.

2    Q.  Now, when you started with the Department of Corrections,

3    what did you say, 27 years ago?

4    A.  1990.

5    Q.  What did you start as?  What was your position?                02:47PM

6    A.  A correctional officer.

7    Q.  And you just worked your way up through the ranks?

8    A.  Correct.

9    Q.  How many different complexes have you worked at?

10   A.  Seven.                                                          02:47PM

11   Q.  Seven out of --

12   A.  10.

13   Q.  Had you ever worked at the Tucson complex before?

14   A.  No, I have not worked Tucson, Douglas, or Safford.

15   Q.  You had been to the Tucson complex before November 2nd,        02:47PM

16   2016, though, right?

17   A.  Yes.

18   Q.  With respect to what you were doing there on November 2nd,

19   2016, I mean, why did you happen to be there?

20   A.  I was there for the Parsons tours in the role of the ROD to    02:48PM

21   help facilitate the tours.

22   Q.  So you were there in case any issues arose, you were there

23   to make help them be resolved quickly?

24   A.  Correct.

25   Q.  What about special requests by plaintiffs' counsel, things     02:48PM

1    like that?

2    A.  Correct.

3    Q.  We have heard some testimony today about confidential

4    interviews between attorneys and their clients, the inmates.

5    If there had been a request by plaintiffs' counsel to have            02:48PM

6    inmates moved into a more private area, would you have been

7    able to accomplish that?

8    A.  Yes.  And we did do some private interviews during the

9    course of that tour on a unit.

10   Q.  And how was that accomplished?                                    02:49PM

11   A.  We had a list of inmates that plaintiffs' attorneys wanted

12   to see, and we put them into a room and plaintiffs' attorneys

13   were able to talk to their clients with the door slightly

14   cracked in a private manner.

15   Q.  And so it wasn't really necessary for them to have a cell         02:49PM

16   front visit with their client if they wanted something

17   different, is that correct?

18   A.  No.  They could have simply requested that, and we have

19   accommodated it.

20   Q.  Now, on the morning of November 2nd, 2016, was there more         02:49PM

21   than one group that was touring the facility?

22   A.  Yes, there was.

23   Q.  How many were there?

24   A.  I believe there was two groups.  There may have been three.

25   I don't recall exactly.  There was at least two groups.              02:49PM

1    Q.  Who was with your group?

2    A.  Ms. Eidenbach was with us; Ashlee was with us; myself; Mr.

3    Monson was with us.  There was another plaintiffs' attorney.  I

4    don't remember her name.

5    Q.  Ms. Janespar-Ross?                                           02:50PM

6    A.  I don't recall her name.

7    Q.  Okay.

8    A.  The DWOP, Ms. Baltierra, from Tucson was with us.

9    Q.  Is Baltierra a male or female?

10   A.  Female from Tucson complex.                                  02:50PM

11   Q.  By DWOP --

12   A.  Deputy warden of operations.

13   Q.  All right.

14   A.  And there may have been some others.  I don't recall.  It

15   was a year ago, a little over a year ago.                       02:50PM

16   Q.  Sure.  Almost exactly a year ago.

17           Where did your group go first, to your recollection?

18   A.  I don't recall.  I believe we went to the Cimarron unit on

19   the first day.  And I believe that's where we did the

20   interviews where we pulled out the inmates so that they could   02:50PM

21   do private interviews with their clients.  I know that on one

22   of the days we went to the medical unit, and I believe that was

23   the Rincon unit where we went and toured medical.  We also went

24   to the Rincon unit to the recreation field and stayed there for

25   quite a while where the plaintiffs talked to various inmates on 02:51PM

 1    the recreation field.  Then we moved into housing units and

 2    talked to inmates in there.

 3    Q.  Let me ask you about the visit on the rec field.  You say

 4    you were there for quite a while.  About how many inmates were

 5    on the yard, to the best of your recollect?                      02:51PM

 6    A.  I don't know.  Easily, I don't know, 60 or more.

 7    Q.  From a security standpoint, when you have an open yard with

 8    close custody inmates, what kind of challenge does that present

 9    when you have civilians on the yard?

10    A.  On a close custody yard?                                     02:52PM

11    Q.  Yes.

12    A.  There are challenges.  Close custody is a higher custody

13    yard, so we're going to want to keep a close eye on the

14    civilians, and we did.  We stayed far enough that we couldn't

15    hear conversations but we kept an eye on them.  These inmates    02:52PM

16    are not the lower custody so there's usually a little bit more

17    violence on those type of yards.  We have typically more fights

18    among inmates, more violence among inmates on those type of

19    yards, more weapons on those type of yards.  So there's a

20    challenge watching for those type of incidents, more drug-type   02:52PM

21    activity, more gang-type of activity on those yards.

22    Q.  When you have an open yard situation like this one at the

23    Rincon unit in the close custody, what kind of warning signs

24    are you looking for when you have got civilians on the yard

25    that might alert you to a potential problem?                     02:53PM

1    A.  I'm watching to make sure that inmates don't crowd around

2    the civilians where we can't see the civilians or that --

3    that's mainly what I was watching, to make sure they weren't

4    crowding around the civilians where we couldn't have direct

5    observation of them.                                        02:53PM

6    Q.  When you were on the recreation yard, did you have any

7    interaction, any conversations with either Ms. Eidenbach or the

8    other attorney regarding proximity, allowing them to -- the

9    closeness of you or any of the other ADC staff to them when

10   they were talking to their clients?                         02:53PM

11   A.  I don't think I recall having a conversation with them

12   about that.  I don't recall that.

13   Q.  Did they make any requests of you during the day that you

14   recall?

15   A.  Not on the recreation field, but yes, in the housing unit. 02:54PM

16   Q.  Let's go to the housing unit then.  So we know it was

17   Housing Unit 3 you all went to.  What did you do there first?

18   A.  When we went into the housing unit, Ms. Eidenbach, when we

19   first went in, basically asked if I was going to go down the

20   run so I said, well, yeah, I will go down the run.  So we went 02:54PM

21   down the run.  The first cell that I came to I noticed that the

22   inmate's ID was scratched.  So I basically said to the deputy

23   warden of operations, this inmate needs a new ID.  Continued

24   down, doing basically a security check, got to the end of the

25   run, noticed that an inmate's door was unsecured, told the     02:54PM

1    inmate he needed to go into the cell.  Came back out.  She

2    started talking -- both of the plaintiffs' attorneys started

3    talking to inmates and the rest of our team stayed in the front

4    of the run, so that would be the entrance of the run, while the

5    plaintiffs' attorneys were talking.  I was there for maybe 15,          02:55PM

6    20 minutes and I received a phone call on my cell phone from

7    another prison.  So I stepped out of the housing unit.

8    Q.  So during that 15 or 20 minutes did you hear any staff

9    yelling at inmates or anything like that?

10   A.  No.                                                                 02:55PM

11   Q.  Did Ms. Eidenbach or the other attorney say anything to you

12   about getting ADC staff away from them so they could have more

13   private conversations with their clients?

14   A.  Not during is that time, no.

15   Q.  So you went outside and had a phone call and did you come           02:55PM

16   back into Housing Unit 3 at any point?

17   A.  When I came back in, that team had moved to another run.

18   At that point, the officer and I walked down the run that they

19   were currently on, and Ms. Eidenbach turned to me as we were

20   coming back up from the end of the run and said that people had         02:56PM

21   been coming down there and she wasn't getting -- don't quote me

22   exactly, because this isn't a direct quote -- basically she was

23   not -- they were not being able to talk to their clients

24   privately because people were constantly right there at the

25   cell fronts with them.  And I suggested that they talk to their         02:56PM

1    clients at the back side of the door, because they could hear

2    better because there's a gap on the back side versus talking

3    through the cell window.

4    Q.  Did you say anything to anybody also about moving away from

5    them so they could have more private conversations?                     02:56PM

6    A.  No one was down there.  Everybody was at the front of the

7    run.

8    Q.  So was she maybe relating something that had happened prior

9    to your coming back to the housing unit?

10   A.  That would be an assumption.                                        02:56PM

11   Q.  You didn't witness anybody standing, any ADC --

12   A.  No.

13   Q.  -- staff standing near her?

14   A.  Everybody was at the front of the run when I came into the

15   building.                                                              02:57PM

16   Q.  Okay.  And how long were you in that particular run before

17   -- did you leave with the group then?

18   A.  Yes.  It was a matter of just a few -- maybe five minutes

19   and then they were done and we all exited the building.

20   Q.  When you got to that particular unit, were they -- were the        02:57PM

21   plaintiffs' attorneys speaking to their clients?

22   A.  When I came back in from my phone call?

23   Q.  Yes.

24   A.  Yes.

25   Q.  Okay.  Did either Ms. Eidenbach or the other plaintiffs'           02:57PM

 1   attorney relate to you that inmates were refusing to speak with

 2   them or anything like that?

 3   A.  No.  They were both talking to inmates at the time that I

 4   came in and walked down the run.

 5   Q.  Did she ever make -- either one of them ever make a request   02:57PM

 6   to you that you maybe pull inmates out of their -- to take them

 7   out of their cells and take them into a more private location

 8   for a meeting?

 9   A.  No.

10   Q.  If they had, would you have been able to accomplish that?   02:58PM

11   A.  Yes.

12   Q.  Okay.  What happened after you left the unit?

13   A.  At that point, the whole team went back up to complex admin

14   where we were staged to reconvene.  And at that time we had our

15   separate staging areas and they requested a phone call with   02:58PM

16   Judge Duncan.

17   Q.  In the 27 years that you have worked with the Department of

18   Corrections, what is your understanding with respect to

19   departmental philosophy regarding retaliation against inmates

20   who are filing lawsuits?   02:58PM

21   A.  We don't retaliate against inmates.

22   Q.  And why is that important?

23   A.  Because it's not tolerated.  Inmates have a right to file

24   lawsuits or grievances.  First of all, that's their right.  Our

25   stance is that, first of all, we try to resolve issues at the   02:59PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Diaz - Direct

```
 1    lowest level.  It's always been my understanding from the level
 2    of officer, from the time I was an officer, we always tried to
 3    resolve them.  And, you know, I promoted from officer through
 4    the ranks of sergeant, lieutenant, captain, associate deputy
 5    warden, deputy warden, warden, to my current rank.  And we have    02:59PM
 6    always tried to resolve the issues.  So we just don't
 7    retaliate.  That's not been something I have ever tolerated.
 8    Q.  And what is your understanding of departmental philosophy,
 9    maybe your philosophy, with respect to an inmate's right to
10    speak to their attorney confidentially?                            03:00PM
11    A.  That is their right.  Bottom line, that is their right.
12    Q.  And is that something that you think is an important aspect
13    of your job ensuring that the inmates that you are responsible
14    for the safety and security of are able to speak to their
15    attorneys privately?                                               03:00PM
16    A.  Yes.  I think that is part of my job, and I think that that
17    is part of our job as the Department.
18    Q.  Okay.  Nothing further, Your Honor?
19              THE COURT:  Thank you very much.
20              We're going to give the court reporter a 10-minute       03:00PM
21    break.  So what that means is that everybody will leave court.
22    You can leave there, get a drink of water, whatever you would
23    like to do.  We'll come back in 10 minutes.
24              THE WITNESS:  Thank you.
25              THE COURT:  Thank you.                                    03:00PM
```

1          (Recess from 3:00 p.m. until 3:14 p.m.)

2          THE COURT:  You may continue, Ms. Eidenbach.

3          MS. EIDENBACH:  Sorry to make you walk all the way up

4    there, but I have no questions.

5          THE WITNESS:  No problem.                           03:14PM

6          THE COURT:  If that small part was the worst thing

7    that happened today you're probably okay.  What's worse for you

8    is the fact you had to come here today.  I appreciate the

9    imposition and I'm sorry about that.

10          I have to say that because of the circumstances of the  03:14PM

11   Parsons settlement, things that the parties weren't able to

12   resolve come to me.  And I don't want to be uninformed or

13   ignorant about what I do.  So that means that I need to

14   sometimes impose upon people like you to come here, and the

15   reason for it is it's harder for me to go there.  I have gone.  03:15PM

16   You are probably aware of that.  I have gone to visit.  But

17   that's not the right way for me to do it because it isn't the

18   way we can have things on the record and have the opportunity

19   to have lawyers ask questions to do what we have done today.

20          So I realize it's an imposition.  I want to say thank  03:15PM

21   you.  Have a good rest of the day.

22          THE WITNESS:  Thank you.

23          MR. STRUCK:  Your Honor, the last witness of the day,

24   Warden Alfred Ramos.

25          THE COURT:  Thank you.                             03:15PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Ramos - Direct

 1          Good afternoon.  Please step forward to the clerk of

 2    the court to be sworn.

 3               (The witness was sworn.)

 4               THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

 5               THE COURT:  You may proceed.                          03:16PM

 6               MR. STRUCK:  Thank you, Your Honor.

 7                         ALFRED RAMOS,

 8    a witness herein, having been first duly sworn by the clerk to

 9    speak the truth and nothing but the truth, was examined and

10    testified as follows:

11                      DIRECT EXAMINATION

12    BY MR. STRUCK:

13    Q.  Good afternoon, Warden.  Would you state your name, please?

14    A.  Alfred David Ramos.

15    Q.  And by whom are you employed?                               03:16PM

16    A.  I am employed by the Arizona Department of Corrections.

17    Q.  And how long have you worked for the Arizona Department of

18    Corrections?

19    A.  March of 2004.

20    Q.  What capacity are you currently working for them?  What is  03:16PM

21    your job title?

22    A.  I am the warden of the Arizona State Prison complex in

23    Tucson.

24    Q.  And how long have you been the warden there?

25    A.  Going on three years in February.                          03:16PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Ramos - Direct

1    Q.  Okay.  Did you have corrections experience before being

2    employed by the Arizona Department of Corrections?

3    A.  Yes, sir.

4    Q.  And where were you -- where did you work?

5    A.  I started in corrections in September of 1973 at the state          03:17PM

6    penitentiary in Walla Walla, Washington.  And I worked there

7    until retiring in 2003.

8    Q.  What position did you start at in Walla Walla?

9    A.  I was a correctional officer.

10   Q.  And when you left the employ of the -- is it the Washington         03:17PM

11   Department of Corrections?  That was your employer?

12   A.  Yes.

13   Q.  When you left their employ, what was your position?

14   A.  I was superintendent of the Pine Lodge Release Facility

15   just outside of Airway Heights, Washington.                            03:17PM

16   Q.  Now, do they have -- do they designate jobs up there, or

17   people up there as wardens, or what's the equivalent of a

18   superintendent here in Arizona?

19   A.  It would be a warden.

20   Q.  And how long were you a superintendent at a Washington             03:18PM

21   facility?

22   A.  I became superintendent in 2001 and retired in 2003.

23   Q.  We had -- the plaintiffs have had an expert in this case

24   that was from the state of Washington.  Do you know -- are you

25   familiar with him?                                                     03:18PM

1  A.  Yes, Eldon Vail.  He was my secretary from the Washington

2  State Department of Corrections.

3         THE COURT:  Could you spell the name for the court

4  reporter?

5         THE WITNESS:  Mr. Vail or my name?                      03:18PM

6         THE COURT:  Vail.

7         THE WITNESS:  V-A-I-L.

8         THE COURT:  Thank you.

9  BY MR. STRUCK:

10 Q.  So what are your duties as warden of the Tucson facility?  03:18PM

11 A.  Well, my responsibility is the management of the -- it's a

12 5,000-bed facility with approximately 1200 and a half employees

13 and managing the day-to-day care of the inmates, providing them

14 fundamental services.

15 Q.  Do you have, as warden with a lot of years in corrections  03:19PM

16 experience, let's see, that's about --

17 A.  44.

18 Q.  44 years in corrections.  Do you have a philosophy with

19 respect to how you operate or run or manage that Tucson

20 facility?                                                       03:19PM

21 A.  First and foremost, it's our responsibility to keep people

22 safe.  It's our responsibility to provide services to them that

23 are mandated by not only our own requirements and our own

24 policies but also by the law.  We are responsible for

25 fundamental services of making sure that they are fed, they are  03:19PM

1    fed properly, kept safe, making sure that they are provided

2    fundamental constitutionally mandated medical services.  We're

3    responsible for providing them education.  We're responsible

4    for keeping, for all intents and purposes, people out of harm's

5    way and providing them the opportunity to change.                    03:20PM

6    Q.  And how do you accomplish getting that philosophy through

7    to your staff at the Tucson facility?

8    A.  Well, actually, it started day one as soon as I was

9    assigned to Tucson.  My philosophy has to do with relationships

10   with people and how do we address relationships with people.         03:20PM

11   One of my favorite authors is John Maxwell, and he wrote a

12   little book called Relationships 101; that I spend a lot of

13   time talking with our staff about respect, making sure that we

14   respect people to the level that they deserve and even when

15   they don't have it coming; about reciprocating relationships,        03:21PM

16   making sure that people understand that we have to provide

17   services to people, and sometimes we take on the idea that, you

18   know, that it should be fair, always fair, to the best of our

19   abilities.  Life's not fair, but there are things that we can

20   do to make sure we level the board for them.  We talk about          03:21PM

21   trust.

22          Now, in our business it's a little bit different when

23   it comes to trust, because many of our clientele have not

24   exhibited a great deal of trust in their lives or in the

25   community or even since they have been incarcerated.  So but we      03:21PM

1    do trust but verify.  So if an individual says I want to go to

2    school, you know, we provide them the opportunity to go to

3    school.  There are a lot of things that come into consideration

4    when you are dealing with relationships.  Mutual experience.

5    We're going to be there for the men.  We're going to be there        03:22PM

6    for the staff.  We're going to be there for the men who are

7    incarcerated as well.  They can be traumatized.  They can go

8    through some pretty terrible times themselves and we have to

9    provide and we have to be there for them.

10         That's my philosophy when it comes to relationships.          03:22PM

11   And to be honest with you it covers day-to-day life even in the

12   community with our relationships with others.

13   Q.  Now, the reason why we're here today is regarding a tour

14   that took place November 2nd of last year.  Did you have any

15   responsibility with respect to that tour?                           03:22PM

16   A.  It was my responsibility to manage the logistics of the

17   tour along with my Tucson the DWOPs, deputy wardens of

18   operations, to manage where people were going to go, who are

19   they going to be with; to make sure that people got where they

20   needed to be, and to do it in a way that people were safe and       03:23PM

21   in a safe environment.

22   Q.  And how did you go about accomplishing that for the tour

23   that took place in November of 2016?

24   A.  Well, if I recall correctly, it was a large tour.  It was

25   one of the larger ones that we have experienced.  And so there      03:23PM

1    was conversations with the attorneys for, you know, Parsons,

2    and there was conversations with our RODs who would go with who

3    to make sure that people were going to their right area.  Some

4    people wanted to go to particular units; others wanted to go to

5    other units.                                                          03:23PM

6           And in this case, we had three groups, I believe, that

7    day, three separate vans that went to separate areas on the

8    first day, the three separate areas of the complex.

9    Q.  And it was your job to accommodate of what the plaintiffs'

10   attorneys wanted to do with respect to touring at your           03:24PM

11   facility?

12   A.  Yes.

13   Q.  And what was your goal regarding that particular tour?

14   What did you hope you would accomplish?

15   A.  Well, first and foremost, to allow individuals to have a     03:24PM

16   conversation with the attorneys.  I wanted to make sure that

17   that was open to the inmates and to anybody who wanted to have

18   a conversation with the attorneys, not just the Parsons

19   attorneys but also our attorneys were there and people were

20   asking a lot of questions.  I know there were inmates asking     03:24PM

21   who is that, what are they doing, can I talk to them.  And, of

22   course, every step of the way we tried to be as -- you know,

23   allowed them to talk with individuals.  There was one

24   individual that I believe we even allowed them, you know,

25   access to the big yard and there was like 100 inmates out in     03:25PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Ramos - Direct

 1   the yard.  And we, of course, put additional staff on the yard

 2   to make sure that there were no problems and to give them

 3   access.

 4   Q.  Your goal was to accommodate their requests and desire to

 5   speak to their clients?                                          03:25PM

 6   A.  And cooperate.

 7   Q.  Now, you weren't with the tour group that went to Rincon on

 8   November 2nd, were you?

 9   A.  No.

10   Q.  Where were you that day?                                     03:25PM

11   A.  I was -- I believe I was with another group.  I may have

12   been over with the Manzanita group, if I'm not mistaken.

13   Q.  Okay.  And when did you first hear about some sort of a

14   problem that had been reported with respect to the tour that

15   occurred at the Housing Unit 3 in Rincon?                        03:26PM

16   A.  Not until the next day after lunch.  There was a

17   conversation that took place, and it was the first time that I

18   had personally heard any allegations that were being made and

19   that was the next day.  It was about like probably 1, 1:30.

20   Q.  How do you feel about being accused of retaliatory conduct   03:26PM

21   at your facility?

22   A.  Well, how do I feel or what do I think?

23   Q.  Well, let me ask you first, what do you think?

24   A.  Well, I think that sometimes people's perceptions about

25   what occurs is not really what happens.  And so sometimes       03:26PM

1    people make decisions based upon what their, either their

2    judgment or their, you know, information that they attempt to

3    interpret in a specific way.  And sometimes that's not always

4    the case.  Because in our work, we really do have to manage

5    perceptions and not -- there are times when things are not as          03:27PM

6    they seem that they are.

7           And how do I feel about it?  You know, after 44 years

8    I have learned to accept that not everybody's the same.  And I

9    don't want everybody to be the same.  I thank God that not

10   everybody is like me, you know.  So I believe people have to be        03:27PM

11   allowed to grow, to learn, to interpret information and that's

12   what I think occurred this day.  And if one of my employees

13   would ever think about retaliation against an inmate, they

14   would have a personal conversation with me and there would be

15   some type of discipline taken against that employee.  We just          03:28PM

16   don't do that.

17   Q.  You feel very strongly about that?

18   A.  Absolutely.  Absolutely I do.  As a matter of fact, the

19   next day we had a conversation with our staff and the

20   communications that came out at that time was we are always            03:28PM

21   managing the way people think about us.  And it may not always

22   be the case, but we still have to manage ourselves.

23          So since then, since January of -- let's see.  This

24   took place November, we have published to all of our staff in

25   each one of our units, there is a memo on each board that              03:28PM

1    notifies them that we will not allow any type of retaliation

2    against any inmate who wishes to talk to an attorney or talk to

3    their attorney.  And at the Rincon unit, we have one that is,

4    especially there, for this, for not only the staff but for the

5    inmates also because we have to manage their perceptions as          03:29PM

6    well on whether or not they can feel, you know, that they can

7    go to their attorney and talk to them at any time.  And we have

8    done that, I think I can honestly say, five times since that

9    occurrence.

10        MR. STRUCK:  Your Honor, I don't have any more                  03:29PM

11   questions.

12        THE COURT:  Thank you.  Now there will be a chance for

13   the plaintiffs' attorney to ask a question.  But before she

14   does that, I wanted to follow up just on what you were talking

15   about.  The memorandum generally for Tucson in the particular       03:29PM

16   memorandum for Rincon, were those your idea to put up those

17   memoranda.

18        THE WITNESS:  That was in conversation with my

19   supervisor, my SROD, and in the conversation with him, he was

20   very, very clear about the fact that we needed to manage this       03:30PM

21   situation, we had to get out in front of it to make sure that

22   people understood it was just unacceptable.  And whether or not

23   people believe that it happened or not, if they think that it

24   happened, then to them it happened.  So we wanted to make sure

25   that that was not the case with our staff.  They cannot behave      03:30PM

 1    in that manner even if it's not true.  I don't want people

 2    thinking they can behave in a manner that could cause us harm

 3    and we still have to deal with 5,000 inmates.  So if there is a

 4    perception among 5,000 inmates, that's not a good perception

 5    for them to have.                                          03:30PM

 6         THE COURT:  Thank you.  Let me just interject and say,

 7    Mr. Struck, do you have copies of these two memoranda?

 8         MR. STRUCK:  I think we have submitted them to the

 9    Court, Your Honor.

10         THE COURT:  Okay.                                     03:31PM

11         MR. STRUCK:  And I will double check on the docket

12    number on that and get back to you.

13         THE COURT:  Thank you kindly.

14         Ms. Eidenbach.

15         MS. EIDENBACH:  I have no questions but I may have the  03:31PM

16    memoranda in my exhibits.  So if I can just review the exhibit

17    list for a moment, I might be able to -- I will confer with you

18    first to make sure they are the right ones.  They are the ones

19    you produced to us.

20         But I don't have any questions for the witness.       03:31PM

21         THE COURT:  Thank you.  While she's looking for that I

22    need to say a couple of things, because it's not always the

23    opportunity that I have to talk to a complex's warden.  And I

24    understand that I interpose the district court for the United

25    States of America into your workday in a way that is here very  03:32PM

1    obstructive to what you would like to be doing.  You have got

2    plenty of things in your in-box.  So I know it means you have

3    had to travel here and you have to devote attention to this.  I

4    feel that I should explain to you a couple of things, some of

5    which I think you and I are in 100 percent agreement in light        03:32PM

6    of what you said about perceptions, how important perceptions

7    are in the world.  Sometimes perceptions don't match up with

8    the reality but sometimes it doesn't matter what the reality is

9    because the perception can become more controlling.

10          And so I am sure you are familiar enough with Parsons.        03:32PM

11   It must come across your desk pretty regularly, so you

12   understand what the circumstance is here that more than two

13   years ago the parties reached a settlement of a lawsuit.  I

14   happen to have been the judge drawn to be the mediator in the

15   settlement, and at the conclusion of the settlement, the             03:33PM

16   parties decided that they would like to see if I could be the

17   presiding judge in the case.  And so that is ultimately my role

18   now.  I am the presiding judge with the following

19   responsibility:  To effectuate the settlement, to make sure

20   that the promises that were reached by the two parties, that         03:33PM

21   they would be satisfied.  And if it turns out that the parties

22   can't work it out themselves, then the stipulation, the

23   settlement, says that's where I come into play.

24          And when I have that role, I am sensitive to the fact

25   that I don't know your job as well as you, and I don't really        03:33PM

 1    want to make things worse.  And one of the ways that I can

 2    reduce error is for me to learn about the circumstances of

 3    what's going on in the yard as best I can.  And sometimes that

 4    means I should go to the yard, and I have done that.  I have

 5    said to the lawyers, they may think I'm joking, but I really                    03:34PM

 6    wish this were possible that I could go live there for a while

 7    because I think that -- I know I have a sense when I go there I

 8    change everything and I don't really know what it's like.  I

 9    don't know which way that cuts, actually, because I think that

10    my perception could be adversely affected.                                      03:34PM

11          Just to give you an example when I visit one yard and

12    I walk onto the yard and I develop a sense people understand

13    who I am.  I hear lots of shouts about things relevant to the

14    case.  I go into a building.  I come out.  The people are still

15    on the yard but they are all of a sudden completely quiet.  So  03:34PM

16    that creates a perception that may not be true, that maybe

17    somebody told them don't yell out things to the judge.  But I

18    don't know whether that's true or not, but you can imagine it

19    ends up somewhat with a perception, and that perception

20    probably could be best addressed if I lived there for a while,  03:35PM

21    if I worked there, if I could be in that role.  But I can't.

22          The next best thing is to visit, which I do.  Another

23    best thing is to summon you all to come here to talk.  And I do

24    that somewhat reluctantly because I don't want to pull you out

25    of your job, but I also know that maybe at the end of the day   03:35PM

1    it's better for me to be informed by hearing from you and your

2    colleagues in the setting that I have to hear.  I can't talk to

3    you, really, in a way about matters that are substantive to the

4    case without having all the lawyers present.  And although in

5    tours sometimes I do talk, and that's okay, because both the          03:35PM

6    lawyers are present, but there are also sometimes that what

7    we're addressing should be addressed formally in court on the

8    record and where there's an opportunity for the lawyers to ask

9    questions pursuant to the rules of the court.  So that's why it

10   happens that it's sometimes necessary.                                03:36PM

11        The second thing that I have to say really does focus

12   on this perception issue.  When the specter, I use the word

13   "specter" as sort of this -- as a ghost of what may or may not

14   be true, but the specter of retaliation.  If the specter of

15   retaliation comes up I have to be very sensitive to it, because       03:36PM

16   not only do I get information from having testimony in Court

17   and from doing the tours, the stipulation really requires that

18   we put a lot of responsibility in the effectuation of the

19   settlement, on the plaintiffs being educated as well and being

20   educated about what their clients are saying.  So there is            03:36PM

21   recognized in the stipulation modalities for the plaintiffs to

22   have conversations with their lawyers.

23        If they feel that there's an adverse consequence to

24   having that conversation, or if they come to court and they

25   feel that there's an adverse consequence to talking to the           03:37PM

11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation - Ramos - Direct

1    judge in court, many people will choose not to talk.  They will

2    feel that it's not a risk they want to take.  And so when the

3    specter of retaliation comes up it feeds into that fear and can

4    chill the conversation that I need to have happen.

5           There was an accusation of retaliation in Tucson on          03:37PM

6    the 2nd of November.  There have been other accusations of

7    retaliation.  And I have said many times what I'm about to say

8    now, and that is that the perception is sometimes as dangerous

9    as the reality.  So what that means is that if I have allowed

10   for a situation where the perception can exist, it does as much   03:37PM

11   damage as the reality.  And so it leaves me with a puzzle

12   because I have got two competing worthy goals.  One is what we

13   have in this case on the 2nd of November where there was an

14   allegation that the fact that people were subject or that

15   they -- it's unclear whether or not they were told they would    03:38PM

16   be subject to discipline for offenses that happened and were

17   noticed on the day that the tour happened.  And so there is an

18   accusation of that.  It may -- it is beyond dispute that you

19   are entitled, and should be entitled, unobstructed by anybody

20   else without a good reason of effectuating the enforcement of    03:38PM

21   rules like 704.  That's your job.  That's what you need to do.

22   Nobody should be getting in the way of that unless there's a

23   good reason.

24          Well, is there a good reason.  The countervailing

25   other worthy goal that I have is making sure that the             03:39PM

1    information flow runs freely, unencumbered by any fear of

2    retaliation, understanding that even if there isn't

3    retaliation, if there's a perception of it, that's as

4    dangerous.  So we have these two worthy goals.  Often times in

5    life we run into competing goals.  We have to make a decision.          03:39PM

6              I'm in the position of being a decisionmaker about

7    this.  So what that has meant is that I have said the worthy

8    goal of enforcing the rules and the worthy goal of making sure

9    the information exchange happens, I have to weigh and I have to

10   balance, and I have made a decision that the balance of making        03:39PM

11   sure that information is exchanged means that close in time to

12   when there would be a desire to enforce such regulations that

13   are not critical to health and safety, for instance, shirt

14   tails out, that type of thing, you don't get to do disciplinary

15   action for that close in time.  So I have to make that               03:40PM

16   judgment, a judgment that interferes with your professional

17   judgment about enforcing the rule, but I have to think about

18   these two things really critically and I have to balance them.

19             So I wanted to take the opportunity to explain this to

20   you so that you understood that I didn't have you here or            03:40PM

21   create a situation where the defendants chose to have you here

22   gratuitously.  Because I understand there's an imposition on

23   your professional life and your professional time, and I am

24   sensitive to that and always will be.

25             I don't know whether my comments engendered the need       03:40PM

1    for any further comments.

2              MR. STRUCK:  No, Your Honor.

3              MS. EIDENBACH:  No, Your Honor.

4              THE COURT:  Thank you, sir.  Have a safe drive back.

5              MS. EIDENBACH:  Your Honor, we do have a copy of at        03:40PM

6    least one of the memos, and it's marked for exhibit so I will

7    just distribute it.

8              THE COURT:  Thank you.  Do we need a foundation for it

9    as to which one it is?

10             MS. EIDENBACH:  It's been filed on the record.           03:40PM

11             THE COURT:  All right.  Thank you.

12             MS. EIDENBACH:  It's the last page.

13             THE COURT:  So attached to Warden Ramos's declaration

14   is a memorandum from him, I don't see that it's dated,

15   regarding Parsons v. Ryan prison tours.                           03:41PM

16             MR. STRUCK:  Your Honor, there's another one.  There's

17   actually two memoranda and one of them is Exhibit 1 to his

18   declaration and the other is Exhibit 2.

19             THE COURT:  Got it.  Thank you very, very much.

20             MR. STRUCK:  And these were attached to the             03:41PM

21   defendants' response to the plaintiffs' motion.  We filed it on

22   January 4, 2017.

23             THE COURT:  Thank you.

24             MR. STRUCK:  And that concludes the witness

25   presentation.                                                     03:42PM

1          THE COURT:  Okay.

2          MR. STRUCK:  We probably would like the opportunity to

3    brief whatever issues still need to be briefed.

4          THE COURT:  All right.  So we need to create a

5    mechanism so that you can have the opportunity to respond one          03:42PM

6    to the other, I gather.  Should we have simultaneous briefing

7    schedules or what would you suggest?

8          MS. EIDENBACH:  Your Honor, our position is that this

9    has already been fully briefed for quite some time.  So we

10   we're not really sure what issues need further briefing.                03:42PM

11         THE COURT:  Here's what I will do.  I will give the

12   defendants an opportunity to file anything they would like to

13   file when they say in a moment when they can do it.  I will

14   give you an opportunity to file any response.

15         MS. EIDENBACH:  Thank you.                                        03:42PM

16         THE COURT:  Is that all right?

17         MR. STRUCK:  That's fine.

18         THE COURT:  When would you like the deadline?

19         MR. STRUCK:  If we could have at least 14 days, Your

20   Honor, that would be appreciated.                                       03:43PM

21         THE COURT:  Well, I set yesterday a number of 14-day

22   deadlines.

23         MR. STRUCK:  Well, maybe 21 days.

24         THE COURT:  I think maybe that's the right thing to

25   do.  So 21 days and then 14 days after that for any response if        03:43PM

1   you wish.  If you want to waive the response, feel free to file

2   a notice to that effect.

3          MS. EIDENBACH:  Thank you.

4          THE COURT:  And if there is a need after you have

5   taken a look at anything to tailor any relief you have          03:43PM

6   previously asked for to specify what relief you would like to

7   see, also note that.

8          MS. EIDENBACH:  Okay.  There is one other issue that

9   I'd like to address with the Court, which is the defendants had

10  previously represented that I was an essential witness because  03:43PM

11  I was a percipient witness to the events on November 2nd and

12  then chose not to call me.  So I just wanted to let the Court

13  know that my statement still stands as it was represented on

14  the record at the emergency hearing on November 2nd and at my

15  declaration.  But if you have any particular questions for me   03:44PM

16  I'm happy to answer them.

17         THE COURT:  Thank you.  I do not.

18         MR. STRUCK:  Your Honor, we did, I think, when this

19  was first scheduled we did have Ms. Eidenbach listed as a

20  witness.  They strenuously objected to it, and based upon that  03:44PM

21  objection and other -- taking a look at the evidence we decided

22  that we didn't need to call her as a witness.

23         THE COURT:  Okay.  Yesterday we talked about the

24  possibility of you all conferring in scheduling the next time

25  that we needed to address the discovery issues that were in the 03:44PM

205

**─────11-8-17 - CV 12-601 - Evidentiary Hearing re: Tucson Retaliation─────**

1    letters attached to the Kendrick declaration.  I wondered if

2    you had a chance to do that yet or no.

3            MR. STRUCK:  I believe there's a call being

4    coordinated, maybe even as we speak.

5            THE COURT:  Okay.  All right.  I was just asking since        03:44PM

6    we had maybe a number of potential participants present we

7    could take advantage of that.  But obviously if not, we won't.

8            Anything further we need to address now?

9            MS. EIDENBACH:  No, Your Honor.

10           MR. STRUCK:  No, Your Honor.                                  03:45PM

11           THE COURT:  Thank you kindly.  Thank you all.

12           I appreciate at the very least something that is often

13   times lost in this process.  You all are very punctual.  I

14   appreciate that.  I think court staff appreciates that as well.

15   It just makes the whole thing work better.  I wanted to note       03:45PM

16   it, and thank you.

17           (Proceeding concluded at 3:45 p.m.)

18

19

20

21

22

23

24

25

1

2

3

4

5

6                          C E R T I F I C A T E

7

8           I, LAURIE A. ADAMS, do hereby certify that I am duly

9    appointed and qualified to act as Official Court Reporter for

10   the United States District Court for the District of Arizona.

11          I FURTHER CERTIFY that the foregoing pages constitute

12   a full, true, and accurate transcript of all of that portion of

13   the proceedings contained herein, had in the above-entitled

14   cause on the date specified therein, and that said transcript

15   was prepared under my direction and control.

16          DATED at Phoenix, Arizona, this 15th day of November,

17   2017.

18

19                               s/Laurie A. Adams

20                               _____

                                 Laurie A. Adams, RMR, CRR

21

22

23

24

25