Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorney General
15 South 15th Avenue
Phoenix, Arizona 85007
Telephone: [602] 542-1645
Fax: [602] 542-3393
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Jacob B. Lee, Bar No. 030371
Kevin R. Hanger, Bar No. 027346
Timothy M. Ray, Bar No. 029191
Richard M. Valenti, Bar No. 031533
Jamie D. Guzman, Bar No. 022095
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  [480] 420-1600
Fax:  [480] 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
afletcher@strucklove.com
jlee@strucklove.com
khanger@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-DKD<br><br><br>**DEFENDANTS' POST-EVIDENTIARY HEARING BRIEF REGARDING PLAINTIFFS' TUCSON RETALIATION ALLEGATIONS**<br><br>**[REDACTED]** |

Defendants submit this Brief in connection with the November 8, 2017 evidentiary hearing on Plaintiffs' retaliation claims arising out of the Tucson Arizona State Prison Complex ("ASPC") compliance tours in November 2016.

Defendants incorporate by reference all witness testimony and exhibits offered by Defendants during the November 8, 2017 hearing, as well as the retaliation hearings to-date.

## I. INTRODUCTION

Plaintiffs' allegation of retaliation first arose during Plaintiffs' November 2, 2016 tour of ASPC-Tucson.  Plaintiffs demanded an emergency telephonic hearing with the Court to address accusations of improper conduct and retaliation.  Defendants argued then – and have maintained since – that the allegations were baseless speculation.  Since then, Plaintiffs have leveled additional retaliation allegations against Defendants, supported exclusively by hearsay and hearsay-upon-hearsay.  On November 8, 2017, Defendants conclusively proved that no retaliation occurred during the ASPC-Tucson tour.  Plaintiffs failed to adduce any evidence of retaliation, or even the threat of retaliation, and Defendants' witnesses explained what transpired that morning, which was a far cry from the outrageous conduct Plaintiffs alleged.

On July 25, 2017, the Court ordered "Defendants and Counsel for Defendants that that no actions be taken that harass, intimidate, or otherwise retaliate against the witnesses who have provided the Court information, … [which] includes actions which could reasonably be viewed as having a chilling effect on witness testimony by **utilizing group punishments**, or actions against other prisoners who could in turn blame or target the witnesses."  [Doc. 2209, at 4 (emphasis supplied)]  As the Court noted, this Order awards any inmate who communicates with Plaintiffs' counsel or the Court with a "gold pass;" immunizing them from discipline for an undefined period of time.  [07/21/2017 Hearing Tr. at 15:5-14]  Although the Order was undoubtedly well-intentioned when issued, it has engendered unintended consequences.  Not surprisingly, other inmates have caught wind of this "gold pass," and are attempting to take advantage of its perceived benefits.  As a

result, some inmates have been coerced to get them on "the list," putting some inmates in harm's way. In light of these recent revelations and the evidence presented to the Court by Defendants, Defendants respectfully request that the Court vacate its July 25, 2017 Order (Doc. 2209).

## II.   PLAINTIFFS FAILED TO ESTABLISH ANY RETALIATION

The November 8, 2017, evidentiary hearing was necessitated by Plaintiffs' counsels' insistence that Deputy Warden Jason Monson ["DW Monson"] intentionally and in bad-faith "obstructed" counsel from performing their monitoring duties. [*See* Doc. 1846, at 1:2-7]

During the ASPC-Tucson tour on November 2, 2016, Plaintiffs' counsel demanded a telephonic hearing with the Court to discuss Defendants' alleged interference with the monitoring tour. During the telephonic hearing on November 2, 2016, Plaintiffs' counsel told the Court that DW Monson "took pictures of the cells" while they interviewed inmates on Abel Run and "announced near the end of our visit that everyone on the run would be ticketed." [11/2/16 Hearing Tr. at 4] In addition, counsel claimed that DW Monson "announced that everyone on the run would be ticketed, and he again took pictures of all the runs." [*Id.*] Defendants' counsel informed the Court that DW Monson did not make those statements, or any statements intended to retaliate against the inmates, and that Ms. Eidenbach's allegations were based upon speculation and not on any evidence of actual retaliation. [11/2/16 Hearing Tr. at 6:23-7:10]

During the November 2, 2016 hearing, the Court stated "that the application of these infractions across everybody who's participating in these interviews can reasonably be seen to chill the environment for full disclosure. And so I cannot allow that to continue." [*Id.* at 15:6-9] The Court also stated that it would "not tolerate any kind of retaliation for conversations or meetings or speaking with plaintiffs' counsel" and that a "broad brush ticketing to everybody on the line who is showing up for an interview" was not permissible. [*Id.* at 12-13, 17] It ordered the parties to work together and give notice to the inmates that there will be no retaliation. [*Id.* at 12, 14-15]

Plaintiffs' counsel subsequently filed a Motion for Contempt and Further Remedial Measures (Doc. 1819, Motion for Contempt), arguing that DW Monson "intentionally" and in "bad faith" "obstructed Plaintiffs' counsel from performing their Court-ordered monitoring responsibilities" during the November tour by "threaten[ing] disciplinary sanctions against all class members who had just been interviewed and those who were about to be approached for an interview by their own lawyers." [Doc. 1819 at 5:5-28; 6:26; 7:5-7; 8:10] Among other relief, the Motion for Contempt asked the Court to "rescind all disciplinary actions taken against prisoners on Plaintiffs' November 1-2, 2016, tour of the Tucson prison complex." [*Id.* at 11] Plaintiffs' Motion for Contempt was supported only by the Declaration of Kirstin Eidenbach [Doc. 1820, Declaration of Kirstin T. Eidenbach in Support of Plaintiff's Motion for Contempt and Further Remedial Orders ["Eidenbach Decl."], at ¶ 6] But, there is no evidence that any of the Tucson inmates were "ticketed" during or after the tour, or that the inmates themselves actually believed they were retaliated against.

On January 14, 2017, Defendants responded to the Motion for Contempt with six separate declarations, two from defense attorneys also present at the Tucson tour (Mark Bracken and Ashley Zuerlein), and four declarations from ASPC-Tucson staff, including DW Monson and Warden Ramos. [Docs. 1846-1, 1846-2, 1846-3, 1846-4, 1846-5, and 1846-7] Defendants argued that there was no retaliation during the tours and that Plaintiffs did not accurately depict what occurred in the Rincon Unit. Plaintiffs' Reply was supported for the first time, by only two inmate declarations, Inmates Brian Creswell and Ronald Miller.[1] [Doc. 1897-1]

There was no further discussion of Plaintiffs' Motion or the allegations of retaliation at the Tucson tour until the August 2017 Status Hearing, when the Court acknowledged that it could not make credibility determinations and resolve factual disputes based on "battling affidavits." [08/09/2017 Hearing Tr. at 62:12-63:2] The Court

---

[1] Ronald Miller did not testify at the November 8, 2017 hearing.

1   noted that those determinations can only be made by invoking "the mechanism that we

2   use in court and that is examination and cross-examination[.]" [*Id.*]

3        Based upon the testimony and evidence introduced in the November 8, 2017

4   hearing, it is clear that Plaintiffs failed to introduce any competent evidence that (1) ADC

5   staff retaliated against inmates for speaking to Plaintiffs' counsel during the Tucson tours,

6   or (2) that ADC staff otherwise interfered with Plaintiffs' rights to reasonable access

7   under the Stipulation.

8        **A.        There is no evidence that ADC staff retaliated against any inmates**
9        **during or after the November 1-2, 2016 tours at ASPC-Tucson.**

10       Inmates have a First Amendment right to pursue civil rights litigation, *Rhodes v.*

11  *Robinson*, 408 F.3d 559, 567 (9th Cir. 2005), and prison officials may not retaliate against

12  an inmate for exercising those rights. *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir.

13  1995). But to establish that Defendants retaliated against inmate class members, Plaintiffs

14  must prove Defendants or ADC staff **actually took adverse action** against the inmates

15  because they were engaging in protected conduct. *Rhodes*, 408 F.3d at 567-68; *see also*

16  *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claims require an inmate to

17  show that (1) the prison official acted in retaliation for the exercise of a constitutionally

18  protected right, and (2) the action "advanced no legitimate penological interest").[2] Thus,

19  Plaintiffs must prove the existence of an adverse action and a "causal connection between

20  the adverse action and the protected conduct." *Watison v. Carter*, 668 F.3d 1108, 1114

21  (9th Cir. 2012). Mere speculation that a defendant acted out of retaliation is not enough.

22  *See Wood v. Yordy*, 753 F.3d 899, 904-05 (9th Cir. 2014) (affirming grant of summary

23  judgment where no evidence that defendants knew about plaintiff's prior lawsuit, or that

24  defendants' disparaging remarks were made in reference to prior lawsuit); *see also*

25  *McCollum v. Cal. Dep't of Corr. & Rehab.,* 647 F.3d 870, 882 (9th Cir. 2011) (specific

26  evidence of retaliation required). Here, there is no evidence that Defendants took any

27       [2] Plaintiffs must also prove that the adverse action "chilled the inmate's exercise of
    his First Amendment rights," and that the adverse action "did not reasonably advance a
28  legitimate correctional goal." *Rhodes*, 408 F.3d at 567-68.

"adverse action" against any inmates, let alone that they took adverse action because the inmates communicated with Plaintiffs' counsel during the tours.

Based on representation of Plaintiffs' counsel made during the November 2, 21016 hearing, the Court understood that inmates were actually being ticketed for Departmental Order ("DO") 704 violations (cell/dress code compliance). Indeed, the Court stated that "the application of these infractions across everybody who's participating in these interviews can reasonably be seen to chill the environment for full disclosure." [*Id.* at 15:6-9] The Court also posited "broad brush ticketing to everybody on the line who is showing up for an interview" was not permissible. [*Id.* at 12-13, 17] It is undisputed, however, that none of the inmates in HU3 were disciplined for DO 704 violations on November 2, 2016.

According to hearing testimony from COII Robles, the floor officer working on HU3 on November 2, 2016, no inmates received disciplinary reports for DO 704 violations. Indeed, COII Robles advised inmates of potential DO 704 violations, resulting in the inmates coming into compliance with DO 704. [*Id.* at 155:1-156:9] As a result, he did not need to issue any disciplinary reports. In addition, DW Monson confirmed that no disciplinary tickets were written for Housing Unit on November 2, 2016. [11/08/2017 Hearing Tr. at 83:22-84:8; 110:4-10; Exhibit 45, at 1]

Moreover, Inmate Creswell testified that he was not disciplined for speaking to Plaintiffs' counsel on November 2, 2016, and that he did not believe there was any loss of recreation time linked to that visit. [November 8, 2017 Hearing Transcript, at 29:15-17; 38:9-18] The only thing DW Monson said to him was to "put his shirt on." [*Id.* at 28:21-29:2] He also admitted he had no personal knowledge regarding whether other inmates received tickets for DO 704 violations (cell/dress code compliance) during the November 2, 2016 tour. [November 8, 2017 Hearing Transcript, at 41:23-42:15]

According to Inmate Creswell, the corrections officers generally do not write tickets or place inmates on report for DO 704 violations. [November 8, 2017 Hearing Transcript, at 10:15-11:6] Instead, they simply direct the inmates to fix 704 violations,

and the inmates typically comply with those directions without issue, which is exactly what occurred here. [*Id.*] [see also *Id.* at 155:22-25]    In sum, the undisputed evidence establishes that no inmate at ASPC-Tucson, suffered any "adverse action" for speaking to Plaintiffs' counsel during the ASPC-Tucson tour.  Accordingly, Defendants request that the Court find that there was no retaliation against inmates during the ASPC-Tucson tour on November 2, 2016.

Next, while Inmate Creswell's testimony establishes that he was not ticketed for DO 704 violations and DW Monson's testimony establishes the same for the rest of the inmates in the unit, Inmate Creswell additionally argues that he was strip searched in March 2017 in retaliation for talking to Plaintiffs' counsel during the November 2016 tour. However, this incident occurred **four** months after the November 2016 monitoring tour. [November 8, 2017 Hearing Transcript, at 29:18-33:2]   Moreover, there is no evidence that ADC staff stripped searched Inmate Creswell **because** he spoke to Plaintiffs' counsel and submitted a declaration to the Court in January 2017.  Rather, the undisputed evidence establishes that DW Monson – who participated in the ICS and sent Inmate Creswell to CDU to be strip searched when he refused to submit to the metal detector – had no idea that Inmate Creswell submitted a declaration in support of Plaintiffs' retaliation allegations.  [November 8, 2017 Hearing Transcript, at 84:9-85:16; 122:24-123:19]

Deputy Warden Monson also testified that ADC Policy and Post Orders require that inmates be strip searched in a separate, private area if they cannot clear a metal detector:

> If they can't clear the scanner, then that's your indicator that there's some sort of suspicion.  Again, Rincon is a close custody yard.  You want to make sure that nobody has either cell phones or weapons.  So if you can't clear the scanner then, and multiple times, then we have to strip search you just so we can make sure you don't have anything that could harm another inmate or staff.

[*Id.* at 85:17-86:10]   In other words, Inmate Creswell's strip search was conducted in accordance with ADC policy and served a legitimate penological interest – weapon and contraband control.

Finally, there is no causal connection between Inmate Creswell speaking to Plaintiffs' counsel in November 2016 or submitting a declaration to the Court in January 2017 and being subjected to a strip search.  Indeed, the Court explained to the inmate the difficulty connecting the two events – especially considering Inmate Creswell's admitted significant disciplinary history for intentionally disobeying staff orders.  As the Court noted:

> [W]hen I listen to what you say, it seems to me kind of hard to link a November 2nd incident to something that happened in March.  Even though you think that it's out of the ordinary, my general understanding of the world is November to March is a long period of time.  And the idea that this has been burning in somebody's mind to be able to do that at that moment when there probably are lots of opportunities between November and March for people who are in charge of your life to make your life more difficult.  And so it's only in March, five months after.

[November 8, 2017 Hearing Transcript, at 84:9-85:16; 122:24-123:19]

Because Plaintiffs cannot causally connect the strip search to talking to Plaintiffs' counsel in November 2016 and furthermore cannot combat the legitimate penological interest in strip searching the inmate who admits refusing to clear a metal detector, Inmate Creswell cannot establish actual retaliation.

> **B.    Plaintiffs have no credible evidence that ADC staff's conduct on November 2, 2016, chilled the inmates' participation in this lawsuit.**

In addition to allegations that ADC staff "retaliated" against inmates for speaking to Plaintiffs' counsel, Plaintiffs' counsel argued that ADC staff "inhibited and disrupted [their] ability to effectively communicate with [inmates] about the quality and nature of the medical, mental health, and dental care that they're receiving."  [November 2, 2016 Transcript, at 4:22-5:1]  As highlighted below, there is no evidence that any of the inmates felt threatened or intimidated, or that Defendants inhibited counsels' ability to speak with their clients.

**1. There is no evidence that inmates terminated interviews, or rebuffed Plaintiffs' counsel because they feared retaliation.**

Plaintiffs failed to produce evidence that ADC's conduct on November 2, 2016, caused inmates to rebuff Plaintiffs' counsel in fear of retaliation.  Specifically, the two inmate declarations Plaintiffs submitted with their Reply do not evidence fear of retaliation.  First, Inmate Miller's declaration merely states that he was "uncomfortable" having a conversation with Ms. Janespar-Ross while corrections staff were within earshot. [Doc. 1897-1, at 9]  This is not "direct evidence" that Inmate Miller believed ADC staff would retaliate against him for speaking with Plaintiffs' counsel.[3]  Because Inmate Miller did not testify at the evidentiary hearing, the Court can only speculate to why Inmate Miller felt "uncomfortable" discussing his concerns with Ms. Janespar-Ross.  Speculation cannot establish actual retaliation, or even the specter of retaliation.

Second, Inmate Creswell claimed in his declaration that he did not feel he "had privacy to talk with the attorney about his healthcare needs."  [Doc. 1897-1, at 3]  He further explained that he and Ms. Eidenbach ended their conversation for lack of privacy, not fear of retaliation.  [*Id.* at 4]  At the evidentiary hearing, Inmate Creswell again confirmed that he **was not** intimidated or threatened by ADC staff and that he actually wanted to continue his conversation with Plaintiffs' counsel:

> Q.  What was your interpretation of the events that occurred in your run that day?
>
> A.  Well, while it was happening, I told you they were trying to intimidate us for us not to talk to you.  And I voiced that,that they were trying to get me not to talk to you.  But I still wanted to talk to you.
>
> Q.  Okay.  And why did you feel that they were trying to intimidate you?
>
> A.  Because I have never seen any of that occur before, ever. I have never seen them, especially those officers in the runs, yelling about 704

---

[3] Importantly, there is no evidence that Ms. Janespar-Ross or anyone else asked ADC staff to move away so she and Inmate Miller could continue the conversation in private, or asked for the inmate to be moved to a confidential setting to continue the interview.  In fact, at any time Ms. Janespar-Ross could have requested a private room or area to continue the conversation privately and ADC would have obliged her request.  [*Id.* at 178:3-19; 184:5-11]

compliance.  And how they were crowded up behind you when you were trying to talk to me, I could tell what they were doing.

Q.  Okay.  And yet you still wanted to talk to me?

*A.  Yes.*

[November 8, 2017, Hearing Transcript, at 15:21-16:10 (emphasis supplied)]  In short, there is no evidence that Inmate Creswell feared retaliation for talking to Plaintiffs' counsel.

Here, Plaintiffs' only "evidence" of inmates' alleged fear of retaliation is not based on facts or testimony, but on Plaintiffs' counsels' argument and interpretation of the events. Neither inmate feared retaliation for talking to Plaintiffs' counsel.  Rather, it appears they preferred a more private setting in which to talk to counsel.  And, neither Plaintiffs' counsel nor the inmates requested such accommodation from staff – a request that would have been accommodated if requested.  Because there is no credible evidence that any of the inmates at ASPC-Tucson ever feared or believed that ADC staff was going to retaliate against them for speaking to Plaintiffs' counsel, this Court should find that Plaintiffs have failed to prove actual retaliation.

### 2.  There is no credible evidence that inmates were threatened or intimidated because DW Monson was taking pictures.

It is undisputed that Deputy Warden Monson took pictures of inmates' cells during the tour on November 2, 2016.  Outside of argument by Plaintiffs' counsel, however, there is no evidence that inmates actually observed Deputy Warden Monson taking photos of their cells, or that his actions engendered fear of retaliation.

During the evidentiary hearing, Inmate Creswell testified that he **was not** aware that Deputy Warden Monson was taking pictures with his phone. [November 8, 2017, Evidentiary Hearing, at 23:25-24:5]  In fact, Inmate Creswell only learned about the photographs was from a copy of Monson's Declaration (Doc. 1846-2) that he received from Plaintiffs' counsel months after the tour.  [*Id.* at 7-14]  Accordingly, there is no evidence that Inmate Creswell was threatened or intimidated because DW Monson took pictures of DO 704 compliance issues during the tour.

9

Next, Inmate Miller's declaration claims that he observed DW Monson taking a photo of another inmates' identification card. [Doc. 1897-1, at 9, ¶ 5]  However, there is no evidence that he was threatened and/or intimidated by DW Monson, or otherwise retaliated against for talking to Plaintiffs' counsel.  He merely stated that he found the behavior odd because he had not observed it before.  [Miller Decl., at ¶ 5]  This does not constitute actual retaliation or even the fear of retaliation – especially where the picture taking was not directed at Inmate Miller.

Finally, DW Monson's actions in taking pictures of maintenance needs, inmate identification replacement needs, or DO 704 compliance issues was not retaliatory, as DW Monson testified in detail that taking pictures of issues encountered when he tours his units is normal operations:

> If I'm touring and I see issues with sanitation or 704… I will take pictures from the door, from the window of the door.  I won't even go into the cell, take a picture from the window of the door.  And then at the end of that tour I will print out those pictures, and I will write on those pictures what 704 compliance it is and I will send it to all the supervisors.  I won't even tell them what house it is.  And I will say, these areas are out of 704 compliance.  Because my intent is then the supervisors will have to check all the areas and get all those areas up to the standard.

> If I send a picture, this is Cell 1A-1 they will just go to 1A-1.  But I want them to look everywhere and in that quest to look everywhere they are probably going to find more issues and they can address it.  So that's my standard practice.

[11/08/2017 Hearing Tr. at 54:1-18]  Moreover, Lieutenant Krages, who was a sergeant under Deputy Warden Monson on November 2, 2016, confirmed that he had previously received photographs that DW Monson took when touring other housing units.  [*Id.* at 141:24-142:1]  CO II Robles confirmed the same.  As it was DW Monson's standard practice to take photographs of Rule 704 violations when he toured the housing units, inmates should not have been surprised or threatened by his actions.

Looking at the totality of the circumstances that day in regards to picture taking, it cannot reasonably be concluded that DW Monson was intent on catching inmates out of compliance with DO 704.  Rather, DW Monson also took several photographs of issues relating to matters other than DO 704 that required staff attention and promptly emailed

them. These included, among other things, issues related to the needed repair of the sit-up bench on the rec yard, inoperable cell door locks, visitation, notary, and phone issues, as well as requests for good time. [Exhibits 32, 33, 35, 42]   DW Monson also took eight photos of potential DO 704 violations.  [Exhibit 36] The photos of DO 704 compliance issues purposely omitted the cell number and locations.  [*Id.*]  DW Monson does this so his staff checks the entire unit for compliance, instead of addressing one location. [11/08/2017 Hearing Tr. at 54:1-18; 71:12-19; 98:1-11] He also utilizes the photographs as a teaching tool for his staff so that they understand specifically what his expectations regarding compliance.  [*Id.*]

In sum, DW Monson's supervisory duties continue during monitoring tours. He noted DO 704 compliance issues and recorded the issues on his phone to facilitate follow-up by his staff.  No inmates were ticketed for the DO 704 compliance issues he found. Moreover, DW Monson's pictures/emails addressed a variety of other supervisory issues to include maintenance items and inmate request follow-up.  The pictures were taken for legitimate penological reasons and were not the result of retaliatory conduct.  Plaintiffs cannot prove otherwise.

### 3.  There is no credible evidence that DW Monson "announced" that inmates would be ticketed for Rule 704 violations.

Plaintiffs allege that DW Monson, or ADC staff, proclaimed that everyone on Able and Charlie runs in HU3 were going to receive tickets for DO 704 violations.   This allegation was disputed by the testimony of DW Monson, Lt. Krages, COII Robles, Tara Diaz and Ashley Zuerlein [11/08/2017 Hearing Tr. at 82:19-83:7Indeed, DW Monson denies that he even uses the term "ticket" to refer to issuing disciplinary reports.  [*Id.* at 83:8-9] [*Id.* at 131:23; 155:14-21; 173:20-22]

Inmate Creswell specifically claimed he overheard DW Monson telling corrections officers to "ticket everyone" while standing near the entrance to Charlie Run. That scenario is unlikely.  Lt. Krages testified that the first time he spoke with DW Monson at the entrance to Charlie Run, their conversation was just above a whisper.  [11/08/2017

Hearing Tr. at 131:23-132:1]  COII Robles testified that the second conversation between DW Monson, COII Robles and Lt. Krages was "just low, between, you know, between us there." [*Id.* at 155:5-13]  In addition, these quiet conversations were a considerable distance from Inmate Creswell's cell. He was locked in cell 3C-6 behind a closed door when he allegedly overheard DW Monson's conversation. [*Id.* at 10:2-3; 11:17-21]  Cell 3C-6 is the second to last cell on Charlie run, approximately 60 feet from the entrance where the conversation between Lt. Krages and SW Monson took place. [*Id.* at 131:6-14]  And Inmate Creswell was locked inside his cell, where he claims he was having trouble even hearing Ms. Eidenbach. [Doc. 1897-1, at 3]  In short, Inmate Creswell's credibility is called into question as to what he claims he heard about inmates being ticketed.

In sum, Plaintiffs lack credible evidence to establish that DW Monson "announced" that all the inmates would be ticketed for DO 704 compliance. Moreover, there is no evidence that inmates feared retaliation; the only inmate testimony presented actually proves that Inmate Creswell did not fear retaliation.  With no evidence that any ADC staff took or threatened adverse action, or that inmates were threatened with adverse action such that their desire to speak to Plaintiffs' counsel was chilled, Plaintiffs cannot prove actual retaliation.

### 4. The Court's July 25, 2017 Order [doc. 2209] should be vacated because there is no evidence of actual retaliation at ASPC-Tucson.

Plaintiffs' have a right to bring constitutional claims and not be retaliated against for doing so.  But it is equally well-established that inmates are not immunized from the normal operations and rules merely because they engaged in protected activity. *Peterson v. Shanks*, 149 F. 3d 1140, 1144 [10th Cir. 1998].  Indeed, the incentives created by granting inmates that type of immunity would stymie prison administration.  Because federal courts are ill equipped to deal with such problems of prison administration, , the Supreme Court has repeatedly held that courts must defer to prison officials' reasonable decisions in prison administration. *See Lewis v. Casey*, 518 U.S. 343, 387 [1996]; *Turner v. Safley*, 482 U.S. 78, 84–85 [1987]; *Rizzo v. Dawson*, 778 F.2d 527, 532 [9th Cir. 1985].

With respect to retaliation claims, Courts have required inmates claiming retaliation to make the five requisite showings: [1] a state actor took some adverse action against an inmate [2] because of [3] that prisoner's protected conduct, and that such action [4] chilled the inmate's exercise of his First Amendment rights, and [5] the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 568 [9th Cir. 2005].[4]

As Defendants established in their recent brief regarding retaliation allegation out of ASPC-Perryville (Doc. 2423), inmates must present actual evidence of retaliation. This includes proving the existence of an "adverse action against the inmate" that "did not reasonably advance a legitimate correctional goal."   There is no evidence of actual retaliation, or even the threat or specter of retaliation, from the November 2016 tour at ASPC-Tucson. Therefore, this Court should vacate its July 25, 2017 Order that is predicated upon a premature finding of perceived retaliation without proof of actual retaliation which is required in order to issue injunctive relief.

The injunctive relief ordered by the Court on July 25, 2017 Order [Doc. 2209], goes far beyond the actual protections afforded under the law and eschews the important principles cited above.  Indeed, the July 25, 2017 Order prohibits any action against an inmate – within an undefined temporal proximity to participation in this case that the inmate could subjectively perceive as retaliatory. This requirement is patently unworkable; it requires ADC staff to guess as to what a particular inmate might think is retaliatory, and constitutes prohibited micromanagement of prison operations.  Moreover, it effectively immunizes any inmate who volunteers to participate in this litigation, which

---

[4] Moreover, "[c]ase law dictates that such claims must be examined 'with skepticism and particular care[,]'" because "[r]etaliation claims by prisoners 'are prone to abuse.'" *Greening v. Klemme*, CV-12-06000-JLQ, 2014 WL 3640813, at *5 (E.D. Wash. July 22, 2014) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), and *Graham v. Henderson*; 89 F.3d 75, 79 (2d Cir. 1996)).

can have many unforeseen effects.  In the absence of proof of actual retaliation, and considering its overbreadth, this Court should vacate its July 25, 2017 Order.

**III.    THE COURT'S INJUNCTIVE ORDER JEOPARDIZED INMATES ASHWORTH AND SCHEID AND COMPROMISES MANY MORE**

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.   CONCLUSION**

Defendants respectfully request the Court find that Plaintiffs' claims of retaliation arising out of the November 2016 Tucson Complex tour are without merit and vacate its July 25, 2017 Order [Doc. 2209] providing the class with injunctive relief for unproven claims.

DATED this 30th day of November 2017.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/Daniel P. Struck
    Daniel P. Struck
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    Ashlee B. Fletcher
    Jacob B. Lee
    Kevin R. Hanger
    Timothy M. Ray
    Richard M. Valenti
    Jamie D. Guzman
    3100 West Ray Road, Suite 300
    Chandler, Arizona  85226

    Arizona Attorney General Mark Brnovich
    Office of the Attorney General
    Michael E. Gottfried
    Lucy M. Rand
    Assistant Attorneys General
    15 South 15th Avenue
    Phoenix, Arizona 85007

    *Attorneys for Defendants*

1

**CERTIFICATE OF SERVICE**

2

     I hereby certify that on November 30, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

3

4

Alison Hardy:             ahardy@prisonlaw.com

5

Amelia M. Gerlicher:     agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

6

7

Amy B. Fettig:          afettig@npp-aclu.org

8

Asim Dietrich:          adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

9

Caroline N. Mitchell:     cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

10

11

Corene T. Kendrick:     ckendrick@prisonlaw.com; edegraff@prisonlaw.com

12

Daniel Clayton Barr:     DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

13

David Cyrus Fathi:     dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

14

Donald Specter:        dspecter@prisonlaw.com

15

Jessica Pari Jansepar Ross:   jross@azdisabilitylaw.org

16

John Howard Gray:     jhgray@perkinscoie.com; slawson@perkinscoie.com

17

John Laurens Wilkes:     jlwilkes@jonesday.com, dkkerr@jonesday.com

18

Jose de Jesus Rico:     jrico@azdisabilitylaw.org

19

Kathleen E. Brody:     kbrody@acluaz.org

20

Kirstin T. Eidenbach:     kirstin@eidenbachlaw.com

21

Maya Abela           mabela@azdisabilitylaw.org

22

Rose Daly-Rooney:     rdalyrooney@azdisabilitylaw.org

23

Sara Norman:         snorman@prisonlaw.com

24

Sarah Eve Kader:     skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org

25

Rita K. Lomio:         rlomio@prisonlaw.com

26

Victoria Lopez:        vlopez@aclu.org

27

28

1

2

        I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

3

        N/A

4

                                        /s/Daniel P. Struck

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28