Index to Defendants' Motion for Reconsideration of Court Order (Dkt. 2474)

Exhibit 1　REDACTED AND FILED UNDER SEAL
October 4, 2017 correspondence from David Fathi to Timothy Bojanowski regarding July 2017 CGAR reports and Defendants' monitoring methodology

Exhibit 2　REDACTED AND FILED UNDER SEAL
November 29, 2017 correspondence from Ashlee Hesman to David Fathi in response to November 13, 2017 correspondence regarding August 2017 CGARs and monitoring of certain performance measures

Exhibit 3　Declaration of Joseph V. Penn

# EXHIBIT 1

# (REDACTED)

LEGAL DEPARTMENT
NATIONAL PRISON PROJECT



AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202 393 4930
F/202 393 4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

October 4, 2017

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

   *Re:* *Parsons v. Ryan*

Dear Counsel:

   We write to address several issues regarding the July 2017 CGAR reports and Defendants' monitoring methodology.

**Using Partial Credit to Calculate Compliance**

   Defendants are using a partial credit methodology for multiple performance measures, which the Court ruled invalid on December 14, 2016. Specifically, Defendants are monitoring PMs 1, 2, and 4 using a partial credit calculation.[1]

**PM 1** (Each ASPC will maintain, at a minimum, one RN onsite 24/7, 7 days/week)

- Perryville– "No RN on night shift on 7/7, 7/20, or 7/21.  LPNs were present on those shifts" – monitor scored it as 28/31 or 90.32% compliance.  (ADCM1033094)
- Tucson – "No night shift RN noted on 7/28 or 7/29" – monitor scored it as 29/31 or 93.55% compliance.  (ADCM1033204)

**PM 2** (Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on call at all other times)

- Safford – "No provider onsite on 7/3, 7/17, 7/24, or 7/31" – monitor scored it as 27/31 or 87.10% compliance.  (ADCM1033162)

---

[1] Defendants moved to terminate monitoring of PM 1 and PM 2 at all ten Arizona State Prison Complexes, and PM 4 at Lewis, Perryville, and Tucson. Doc. 2251 at 3-4.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

- Winslow – "No Provider onsite on 7/5, 7/6, 7/7, 7/12, 7/13, 7/18, 7/19, 7/20, 7/21, 7/25, 7/26, 7/27" – monitor scored it as 18/31 or 58.06% compliance.  (ADCM1033239)

**PM 4** (Infirmary staffing will be maintained with a minimum staffing level of 2 RNs on duty in the infirmary at all times at Tucson & Florence infirmaries and a minimum of one RN on duty in the infirmary at all times at Perryville and Lewis infirmaries)

- Florence –there "was not 24/7 coverage by RNs on 7/25/17 and 7/27/17 night shifts" – monitor scored it as 29/31 or 93.55% compliance. (ADCM1032990)
- Tucson – "No second RN noted on 7/15/17 night shift" – monitor scored it as 30/31 or 96.77% compliance.  (ADCM1033204)[2]

This is especially problematic given the monitor who did these reviews at all ten institutions is Ms. Campbell, who testified in March 2017 that she was aware of the partial credit order:

> Q. … Are you aware of the Court's order about partial credit for performance measures?
> A. Yes.
> Q. And do you remember when you were told about that order?
> A. I believe it was last month for the -- I believe it was the infirmary questions, if I'm not mistaken.  But I'm not 100 percent positive on that.
> Q. Are you aware of other performance measures where you or the monitors are using a partial credit method of calculating compliance?
> A. *I do now on 23 and 24*.
> [. . .]
> Q. For what month have you started doing that older method of it's non-compliant if any days are missing?
> A. Starting with this month's audit for last month's data.
> Q. So the February 2017 CGARs would reflect --
> A. Yes.
> Q. -- a method that complies with the Court?

---

[2] It is unclear how to reconcile the findings on PM 1 and PM 4 for Tucson, where according to PM 1 there was no RN *at all* on site on 7/28 and 7/29, but on PM 4, 7/15 is listed as the only date without a second RN on duty.

2

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

> A. Yes.
> [. . .]
> Q. And have you changed your approach for this coming month review?
> A. Yes.
> Q. *Are there other performance measures that you use where you have been using partial credit that you can think of?*
> A. *No.*

[3/8/17 Tr. at 58:2-12; 59:4-10; 59:16-21 (emphasis added)][3]

**Please let us know by close of business on Friday, October 6 whether you will agree to abandon the use of "partial credit" methodology for PMs 1, 2, and 4 for all future CGARs in accordance with the Court's order.**

**PM 25** (A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency.)

The parties agreed upon the language for the methodology on July 28, 2017, including broadening the definition of basic life support or how to measure timeliness. Plaintiffs do not have access to the source documents (Serious Incident Reports) and ER report, to confirm if all applicable incidents were included.

- Douglas – two incidents, no ADC number listed, but rather listed the SIR log numbers. (ADCM1032909)
- Eyman – no applicable incidents. (ADCM1032947)
- Florence – three incidents, ADC numbers are listed. (ADCM103300)
- Lewis – one incident, ADC number is listed. (ADCM1033053)
- Perryville – three incidents, ADC numbers are listed. (ADCM1033105)
- Phoenix – one incident, no ADC number listed. (ADCM1033145)
- Safford – no applicable incidents. (ADCM1033170)
- Tucson – one incident, ADC number is listed. (ADCM1033216)
- Winslow – no applicable incidents. (ADCM1033248)
- Yuma – no applicable incidents. (ADCM1033284)

---

[3] Ms. Campbell used the "partial credit" method on PMs 1, 2, and 4 one week prior to testifying and three weeks after testifying. See, e.g. ADCM841996 (Florence January 2017 CGAR, entered 2/28/17); ADCM865777 (Eyman February 2017, entered 3/31/17)

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**Please let us know by close of business on Friday, October 6, whether Defendants will agree to provide Plaintiffs the underlying source documents for PM 25 in future monthly document productions.** *See* **Stipulation ¶ 29 (Plaintiffs' counsel shall have reasonable access to documents necessary to properly evaluate whether Defendants are complying with the performance measures).**

**PM 60** (All female inmates ages 21 to 65 will be offered a Pap smear at the inmate's initial intake physical examination, and every 36 months thereafter unless more frequent screening is clinically recommended.)

The Perryville monitor reviewed 10 files for the other intake PMs: PMs 33, 34, and 62, but for PM 60 inexplicably has "not applicable" listed. (ADCM1033125). If there were at least ten files to review for the other intake measures, it is unclear why they were not also reviewed for PM 60.

**Please let us know by close of business Friday, October 6 if the ten intake files reviewed for PMs 33, 34, and 62 will also be reviewed for compliance with PM 60.**

**Performance Measures that Require a Provider "Act Upon" a Report**

Performance Measure 44 requires that "Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours." On December 14, 2016, the Court ruled that performance measure 44 "shall only permit compliance if the inmate received the prescribed treatment, or if there is a documented reason explaining why the prescribed treatment was rejected." Doc. 1831 at 2.[4]

---

[4] PM 44 is not the only measure that includes both a requirement that a report be reviewed and acted upon in a certain time frame. PM 46 requires, "A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison" and PM 52 requires "Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report." We did not spot-check the monitoring of these two performance measures at other institutions, but in light of our spot-check of PM 44 at three institutions, we are concerned that similar methodological failings may be occurring.

We conducted a spot-check of the July 2017 CGARs for Lewis, Perryville, and Safford for PM 44 and found the following records were erroneously counted as compliant when there is no documentation that the provider took any action upon reviewing the hospital recommendations, or when there is no documentation that the person returned from offsite in the month of July. We emphasize that we did not check all of the records marked as compliant at any other institutions:

**Lewis**:

The monitor listed the institution as 100% compliant with 16 files reviewed. (ADCM1033058). However, there was a record that appeared to be noncompliant, and 3 files that appear to be inapplicable. Therefore the correct calculation would be 12/13 compliant, or 92%.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

▇▇▇▇▇: He returned on 7/26/17, and the report was reviewed by the provider on 7/27/17, but no action was documented by the provider.

▇▇▇▇▇: It does not appear that he returned from an off-site hospitalization or emergency room visit during the month of July.

▇▇▇▇▇: He returned from off-site appointments four times in the month of July, but none of them were for hospitalizations or emergency room transports. 7/3/17 – return from "chemo dry run"; 7/18/17 – return from ophthalmology; 7/25/17 – return from chemotherapy; 7/27/17 – return from CT scan.

▇▇▇▇▇: He returned from off-site appointments three times in July, but none of them were hospitalizations or emergency room transports. 7/1/17 – return from radiation treatment; 7/5/17 – return from radiation treatment; 7/16 – return from endocrinology consult.

**Perryville**:

The monitor listed the institution as 93.33% compliant with 14 out of 15 records compliant. (ADCM1033111). However there were 5 records marked as compliant that appeared noncompliant, and one file listed that was either incorrect or not applicable, because it lists a male prisoner. Accordingly, the compliance rate should have been 8 out of 14, or 57%.

▇▇▇▇▇: She returned from major surgery at the hospital the evening of 7/7/17. PA Rodriguez entered an "infirmary admission" for her upon her return, but there is no indication that he saw her, but rather it appears to be a pre-emptive

5

entry authorizing admission, as he wrote she was "being released back to Perryville long after I have left for the day." A nursing note entered as "verbal/telephone orders" notes that PA ▮▮▮ ordered medications for the patient, but she had not yet returned from the hospital. Accordingly, he could not be "acting upon" a hospital report, because she had not yet returned. She was not seen by a provider until 7/10/17, the following Monday. See Exs. 1-3.

▮▮▮: She returned from a procedure performed at the hospital on 7/26/17. Dr. ▮▮▮ entered an "infirmary admission" for her with orders for medication, but similar to the patient listed above, this was done prior to her return from the hospital or his review of the hospital report. See Ex. 4. From the record it does not appear he saw her or reviewed the report until 7/28/17.

▮▮▮: She returned from the emergency room on 7/10/17 after an act of self-harm (cutting her wrists). There is no record that the discharge report was reviewed by the medical provider, other than a note stating that her KOP medications were going to be changed to DOT, and she was being placed on mental health watch.

▮▮▮: Listed as compliant at Perryville, but this is a male who was housed at Phoenix and Florence in July.

▮▮▮: She returned from the emergency room on 7/21/17 after attempting suicide by hanging. There is no record that the discharge report was reviewed by the medical provider upon her return. She was placed on mental health watch upon her return.

▮▮▮: She returned from the hospital on 7/17/17 after an act of self-harm (lacerations to her arms). The progress note from the nurse reads, "CWA staff does not know where hospital d/c paperwork is at this time. On-call provider contacted for pain med orders." See Ex. 5.

**Safford:**

The CGAR lists 100% compliance with 2 records reviewed. (ADCM1033175). However, one of the records appears to be noncompliant, which would make the institution 50% compliant.

▮▮▮: On 7/31/17 he saw the RN on his return from the emergency room, where he was taken for back pain and loss of sensation to his lower extremities. According to the nursing note, the ER had recommended that he meet with the provider to discuss an MRI. The nurse wrote she was sending

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

him back on the yard with no medication orders or special needs.  See Ex. 6.  PA ▓▓▓▓▓ did not see the patient or submit a request for a MRI until August 4.  Accordingly, the Medical Provider's review and action was outside the timeframes.  A registered nurse encounter should not be counted.

**Please let us know by close of business on Friday, October 6 whether you will agree to re-check the July 2017 CGAR results for PM 44 at all institutions and correct the compliance figures accordingly.**

**Multiple Errors in CGARs at Eyman and Tucson**

Our spot-check of the July 2017 CGARs for Eyman and Tucson revealed a number of errors.  All of the following records were erroneously counted as compliant when they should have been counted as noncompliant:

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

| *Eyman PM #77*[5] | | | |
|---|---|---|---|
| **ADC No.** | **MH Category** | **Most Recent Treatment Plan Update** | **Second Most Recent Treatment Plan Update** |
| ▓▓▓ | 3B | 7/12/17 | 7/11/16 |
| ▓▓▓ | 3A | 7/31/17 | 3/15/17 |
| ▓▓▓ | 3B | 10/10/16 | 9/16/15 |

| *Tucson PM #77* | | | |
|---|---|---|---|
| **ADC No.** | **MH Category** | **Most Recent Treatment Plan Update** | **Second Most Recent Treatment Plan Update** |
| ▓▓▓ | 3B | 3/13/17 | 3/2/16 |
| ▓▓▓ | 3B | 7/11/17 | 7/7/16 |

---

[5] PM 77 requires that "Mental health treatment plans shall be updated a minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12 months for all other MH-3 prisoners."

| *Tucson PM #80[6]* | | |
|---|---|---|
| **ADC No.** | **Most Recent Date Seen by MH Clinician** | **Second Most Recent Date Seen By MH Clinician** |
| ▮ | 7/30/17 | 6/23/17 |
| ▮ | 7/25/17 | 5/26/17 |
| ▮ | 7/27/17 | 6/26/17 |

| *Tucson PM #81[7]* | | |
|---|---|---|
| **ADC No.** | **Most Recent Date Seen by MH Provider** | **Second Most Recent Date Seen By MH Provider** |
| ▮ | 5/15/17 | 2/14/17 |

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

*See* Exhibit 7.  We emphasize that we have not checked all institutions and performance measures.  The fact that a spot-check of a few PMs at two institutions revealed so many errors -- all in Defendants' favor -- is troubling and casts serious doubt on the reliability of the CGARs.

**Please let us know by close of business on Friday, October 6 whether you will agree to re-check the July 2017 CGAR results for PM 77, 80, and 81 at all institutions and correct the compliance figures accordingly.**

**PM 85 and 86[8]**

Thank you for your September 25, 2017 email attaching your proposed Monitor Guide language for PM 85 and 86.[9]  As you know, the Court has set

---

[6] PM 80 requires that "MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician."

[7] PM 81 requires that "MH-3A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider."

[8] PM 85 requires that "MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications."  PM 86 requires that "MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication."

[9] The Court had ordered that this proposal be provided to Plaintiffs no later than September 15, 2017.  See Doc. 2317 at 2.

8

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

forth the sampling methodology that is to be followed with these PMs, based upon the uncontradicted declaration of Dr. Haney:

> With respect to Performance Measures 85 and 86, there really wasn't a similar substantive objection that I could ferret out to the plaintiffs' proposed language. And so I would adopt the plaintiffs' language. And that is, with 85, that the monitor selects a random sample of 10 records from all MH-3D prisoners at a given unit. If any of them discontinued medications less than 30 days previously, that record is excluded from the sample and another record is randomly drawn. See Document 2048, Paragraph 12.
>
> Once these -- once there are 10 records of MH-3D prisoners that have discontinued medications more than 30 days ago, those records are assessed to determine whether the patient was seen within 30 days of discontinuing medications.
>
> And then with respect to Performance Measure 86, the final sample of 10 records used for Performance Measure 85 is the starting point for evaluating compliance with Performance Measure 86. If any of these prisoners discontinued medications less than 90 days previously, that record is excluded from the sample and another record is randomly drawn. Once there are 10 records of MH-3D prisoners who have discontinued medications more than 90 days ago, those records are assessed to determine whether the patient was seen within 90 days of discontinuing medications.

*See* Doc. 2160 at 4.  We have modified your proposed language so that it is consistent with the Court's order. Additional modifications have been made to ensure that the Monitor Guide is consistent with the requirements of the Stipulation, and to ensure consistency between PMs 85 and 86. Our proposal is attached as Exhibit 8; please let us know if you agree.

9

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**PM 95[10]**

It appears that the monitors are inappropriately including in the sample for one institution patients who were removed from suicide watch at a different institution. For example, patients ███ and ███ were both included in the July 2017 sample for PM 95 for Tucson. *See* ADCM 1033195. However, both were actually removed from suicide watch at Phoenix. While both of these patients were included in the Tucson sample, the monitor inexplicably counted the first required follow-up as "N/A" for each, even though that contact was required to occur in July of 2017.

The purpose of drawing a sample from a given institution is to assess Defendants' compliance with the performance measure *at that institution*. Please confirm that you will henceforth exclude from the sample for PM 95 any patients who were removed from suicide watch at a different institution, and will randomly draw replacement records until the required sample size is reached.

**PM 94, 95, and 97[11]**

It appears that monitors are continuing to include the same individual's record in a given sample for these PMs more than once. *See* Exhibit 9. Indeed, at Lewis, the monitor counted the same patient's June 27-July 3 suicide watch twice for PM 94. *See* ADCM 1033031. The monitor similarly counted the same patient's June 13, 2017 removal from suicide watch twice for PM 95. *See* ADCM 1033032.

---

[10] PM 95 requires that "Only licensed mental health staff may remove a prisoner from a suicide or mental health watch. Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch."

[11] PM 94 requires that "All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse." PM 97 requires that "A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider."

This is inconsistent with the Court's order of July 13, 2017.  *See* Doc. 2185 at 2 ("Argument is heard regarding Performance Measures 94, 95 and 97. IT IS ORDERED Defendants must draw individuals as previously ordered").

**Please let us know by close of business on Friday, October 6 whether you will agree to recalculate the July 2017 CGAR results for PM 94, 95, and 97 at all institutions in compliance with the Court's order, and correct the compliance figures accordingly.**

**PM 98 and 99**

PM 98 is listed in the CGARs as "Are mental health HNRs being responded to within the timeframes set forth in the current Mental Health Technical Manual (MHTM), rev. 4/18/14, Chapter 2, Section 5.0?"  PM 99 is listed as "Are peer reviews being conducted as set forth in the current MHTM? (rev. 4/18/14), Chapter 1, Section 3.0?"

As discussed at the September 12 hearing, the inclusion of the word "current" in each of these PMs is incorrect; that word occurs neither in the Stipulation nor in the Monitor Guide.  Please confirm that you will delete this word from the CGARs and from any other statement of the requirements of PM 98 and 99.

We look forward to your response.

Very truly yours,

David C. Fathi

Cc:     All counsel

AMERICAN CIVIL LIBERTIES UNION FOUNDATION