1   Kathleen E. Brody (Bar No. 026331)
    **ACLU FOUNDATION OF ARIZONA**
2   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
3   Telephone:  (602) 650-1854
    Email: kbrody@acluaz.org
4
    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
5   *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
    *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
6   *Desiree Licci, Joseph Hefner, Joshua Polson, and*
    *Charlotte Wells, on behalf of themselves and all others*
7   *similarly situated*

8   **[ADDITIONAL COUNSEL LISTED ON**
    **SIGNATURE PAGE]**

9   Sarah Kader (Bar No. 027147)
    Asim Dietrich (Bar No. 027927)
10  **ARIZONA CENTER FOR DISABILITY LAW**
    5025 East Washington Street, Suite 202
11  Phoenix, Arizona 85034
    Telephone:  (602) 274-6287
12  Email: skader@azdisabilitylaw.org
            adietrich@azdisabilitylaw.org
13
    *Attorneys for Plaintiff Arizona Center for Disability Law*
14
    **[ADDITIONAL COUNSEL LISTED ON**
15  **SIGNATURE PAGE]**

16                  UNITED STATES DISTRICT COURT

17                       DISTRICT OF ARIZONA

18  | Victor Parsons; Shawn Jensen; Stephen Swartz; | No. CV 12-00601-PHX-DKD |

18  Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-DKD
    Dustin Brislan; Sonia Rodriguez; Christina
19  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph     **PLAINTIFFS' REPONSE TO**
20  Hefner; Joshua Polson; and Charlotte Wells, on      **DEFENDANTS' POST-**
    behalf of themselves and all others similarly       **EVIDENTIARY HEARING**
21  situated; and Arizona Center for Disability Law,    **BRIEF REGARDING**
                                                        **PLAINTIFFS' TUCSON**
22                              Plaintiffs,             **RETALIATION**
                                                        **ALLEGATIONS [DOC. 2482]**
23             v.

    Charles Ryan, Director, Arizona Department of
24  Corrections; and Richard Pratt, Interim Division
    Director, Division of Health Services, Arizona
25  Department of Corrections, in their official
    capacities,
26
                                Defendants.

27

28

LEGAL137903905.1

1        The motive of custody staff is not relevant to the facts of what occurred during

2   Plaintiffs' November 2, 2016 tour of ASPC-Tucson, Rincon Unit (the "November Tour").

3   The facts as detailed by Plaintiffs in their previous briefing on the events remain largely

4   undisputed.  [Doc. 1819 at 2-4; Doc. 1897 at 2-5][1]  The testimony presented at the

5   evidentiary hearing held on November 8, 2017 ("Evidentiary Hearing") consisted of

6   largely irrelevant facts designed to distract from the relatively straightforward factual

7   record established by Plaintiffs, nearly all of which remains undisputed by Defendants and

8   their witnesses.

9        What Defendants fail to appreciate is that retaliation or intimidation—whether

10  perceived or actual—is of great importance in this case *because* it directly impacts and

11  interferes with Plaintiffs' counsel's ability to fulfill their duties under the Stipulation

12  (Doc. 1185).  Without the ability to candidly communicate with class members about their

13  medical, mental health, and dental care (collectively "health care") or their housing

14  conditions in isolation units, Plaintiffs cannot analyze the extent of Defendants'

15  compliance with the terms of the Stipulation.  Because of this, even the perception of

16  retaliation must be avoided.  [11/02/16 Tr. at 14:5-8 ("THE COURT: I won't abide any

17  kind of chill in the air that obstructs the disclosure of information in an attorney-client

18  context that is necessary for the enforcement of the Stipulation"); *see also* 7/21/17 Tr. at

19  28:16-17 ("THE COURT: [. . .] the allegations themselves raise enough of a specter that I

20  think it has a potential chilling effect"); 9/13/17 Tr. at 72:22-25 ("THE COURT: [. . .]

21  whether it was true or not, it still has the dangerous effect of chilling the willingness of

22  people to tell me the truth and so I have to guard against that.")]

23       The Court's protective Order that protects class members from retaliation and

24  intimidation sufficiently addresses the concerns Plaintiffs raised in their briefing about the

25  November 2016 tour.  [Doc. 2209]  It gives class members the assurance they will suffer

26  no negative consequences for speaking to class counsel or to the Court.  [*Id*. at 4 (". . . no

27

28       [1]  All page citations in this brief refer to the PACER page number.

LEGAL137903905.1

1   actions [shall] be taken that harass, intimidate, or otherwise retaliate against the witnesses

2   who have provided the Court information, either via oral testimony or written

3   statements. . .")]  The Court should leave this protective Order in place, unaltered.

4
                                        **ARGUMENT**
5
6   **I.    DEFENDANTS RELY ON THE WRONG STANDARD AND BURDEN OF
            PROOF**

7           Defendants argued in their brief and at the Evidentiary Hearing that Plaintiffs have

8   not proven that intentional retaliation occurred during the November Tour, and therefore

9   the Court's protective Order should not stand.  Those arguments fail, however, because

10  they apply the wrong legal standard to Defendants' conduct and they ignore that

11  Defendants have the burden of proof.

12          If Defendants seek vacatur of the protective Order, then it is Defendants who have

13  the burden of showing good cause why the order should be vacated.  *See* LRCiv 7.2(g) (a

14  party seeking reconsideration of a court order must make "a showing of manifest error or

15  a showing of new facts or legal authority that could not have been brought to [the Court's]

16  attention earlier with reasonable diligence").  Defendants fail to carry the burden.

17          Defendants also cite inapplicable cases that are related to the burden of proof

18  required for a prisoner to recover money damages when alleging retaliatory actions taken

19  by prison staff.  [*See* Doc. 2482 at 5-8, 13-14]  Defendants recite "legitimate penological

20  interests" throughout their brief as a mantra that somehow forecloses a determination that

21  Defendants' behavior was perceived by reasonable persons to be retaliatory.  [Doc. 2482

22  at 5, 8, and 13]  However, "prison officials may not defeat a retaliation claim on summary

23  judgment simply by articulating a general justification for a neutral process, when there is

24  a genuine issue of material fact as to whether the action was taken in retaliation for the

25  exercise of a constitutional right."  *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003).

26  Furthermore, Defendants argue that there can be no finding of retaliation unless the

27  disciplinary actions actually occurred.  Again, this ignores well-established Ninth Circuit

28  precedent.  *See Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (rejecting prison

1  officials' argument that "the repeated but ultimately unsuccessful attempts to transfer

2  inmate Jones are not a retaliatory as a matter of law because the transfers never took

3  place" as "a retaliation claim may assert an injury no more tangible than a chilling effect

4  on First Amendment rights"); *see also Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997)

5  (same).

6        If a reasonable person could interpret Defendants' behavior to be intimidation or

7  retaliation, the risk that class members will be unwilling to talk with class counsel

8  becomes too great.  This is the proper test here, as the Court noted: whether Defendants'

9  actions "could reasonably be seen to chill [attorney-client] communication" and therefore

10  should be considered "improper interference with the enforcement of the Stipulation."

11  [Doc. 1734 at 1; *see also* 11/02/16 Tr. at 20:7-11 ("there's going to be nothing that makes

12  people think that participating in this process of discussing their current status of issues

13  relevant to this Stipulation with their counsel will subject them to any kind of treatment

14  that would cause them to think that they should chill what they're saying"); 7/21/17 Tr. at

15  28:12-17 ("I am fearful that what has been presented to me has a chilling effect.  And it

16  may well be that the defendants believe that the evidence that support each of these

17  allegations may fall short. But it is also true that the allegations themselves raise enough

18  of a specter that I think it has a potential chilling effect.")]  Defendants' behavior during

19  the November Tours frustrated and interfered with Plaintiffs basic abilities to conduct the

20  tour and with their reasonable access to class members.[2]

21

22

23

24

25

26  ─────────────────
   [2] It should be noted that the protections for class members set out in the Court's
27  protective Order are not, as Defendants hyperbolically state, that Defendants must avoid
   any changes or disciplinary action for cooperating prisoners for the duration and entire
28  lifetime of the Stipulation.  [*See* Doc. 2482 at 18]  As usual, this is an unhelpful
   exaggeration and willful misstatement of the Court's clear instructions.

**II.    DEFENDANTS FAILED TO REBUT THE FACTS SHOWING THAT PRISON STAFF'S ACTIONS CREATED A CHILLING EFFECT AND THREAT OF RETALIATION AGAINST CLASS MEMBERS WHO SPOKE TO THEIR ATTORNEYS**

Defendants ignore and cannot rebut the avowals by class counsel and a testifying class member as to what they personally observed occurring on the runs in Housing Unit 3 on November 2, 2016.  Defendants also entirely ignore the direct testimony by *every* testifying class member that has provided information to the Court that he or she is fearful of retaliation and that each have had to have that fear assuaged before agreeing to testify.

Mr. Creswell stated both in his Declaration and in his testimony that he believed the officers and senior ADC staff on the run that day were there to intimidate him out of talking to class counsel.  [Doc. 1897-1, Ex. 1 at ¶¶ 11-13; *see also* 11/8/17 Tr. at 13:25-14:3, 14:23-15:8]   Although Mr. Creswell did not receive a disciplinary ticket for his Department Order 704 noncompliance on November 2, 2017, that has no bearing on the undisputed fact that threats that were made within earshot of the prisoners housed in Housing Unit 3, Abel and Charlie runs.  The threats to take away recreation and to write everyone up chilled class members' willingness to speak with their attorneys—in both Mr. Creswell's experience and in the experience of class counsel.  [11/8/17 Tr. at 25:12-20; *see also* Doc. 1820 at ¶¶ 6, 11-12 (hereinafter "Eidenbach Decl.")]   Sgt. Krages' testimony indicated that there was in fact an intention to discipline people for 704 violations, as he testified that he gave a direct order to Officer Robles to walk the runs and ticket prisoners who were out of 704 compliance.  [11/8/17 Tr. at 142:4-6, 16-18]   Although these disciplinary tickets ultimately were not issued, *the threat to issue the tickets was real*, and it chilled class members from providing information to counsel.  *See Gomez*, *supra*, 255 F.3d at 1127.

The Court also has heard from several class members about their experiences with Defendants' provision of health care and the conditions they experience in maximum custody.  As noted above, all of these witnesses testified that they feared retaliation for coming to court to testify.  Mr. Creswell testified that he feared retaliation in response to

his testimony but that he felt like "they did something wrong, and I decided that it needs to be voiced." [11/8/17 Tr. at 7:21-8:15]  Mr. Blocksom testified that he feared retaliation but nevertheless testified because of his multiple medical issues, stating that "we are being subjected a process … that is more criminal than anything any of us in that system have ever done.  And it just infuriates me that they get away with doing what they are doing under the guise of healthcare." [7/14/17 Tr. at 36:24-38:13]  Mr. Oyenik testified that he too feared retaliation.  [*Id.* at 85:24-86:23]  Ms. Keys testified that she feared retaliation, and in fact, had had all of her property "rolled up" before coming to Court to testify, a procedure which is contrary to policy when a prisoner is gone less than 24 hours.  [*Id*. at 104:5-106:19]  Ms. Ashworth testified that she feared retaliation and that she had been "rolled up" prior to being transported to the courthouse to testify.  [*Id.* 174:16-175:5]  Ms. Ashworth further testified that her decision to testify despite fears of retaliation was based on her conviction that "[this] doesn't happen again to somebody else."  [*Id.* at 213:8]

In addition, Defendants again attempt to characterize the live testimony and avowal by counsel and the subsequent declarations sworn under oath filed in support of the Contempt Motion as "baseless speculation."  [Doc. 2482 at 2, 3]  Direct testimony, either by way of live testimony or declaration, is not unsubstantiated speculation.  As the Court directly admonished Defendants during the telephonic hearing held minutes after the events on November 2, 2016 that testimony by percipient witnesses, or avowals by counsel on the record, was "not speculation." [11/2/16 Tr. at 7:3-9]  Yet Defendants persist in this characterization of the direct observations made by class counsel.

Ms. Eidenbach avowed to the Court at the November 8, 2017 hearing that her "statement still stands as it was represented on the record at the emergency hearing on November 2 [2016] and at my declaration." [11/8/17 Tr. at 204:13-15]  Ms. Eidenbach's observations at the November Tour were those of a witness to the events in question.  She personally saw not only the behavior of Defendants but she then also witnessed the consequences of those actions.  Specifically, she saw and heard DW Monson give

1   instructions to his officers to issue broad-brush disciplinary tickets. [Doc. 1820 at ¶ 6]

2   She then was told by the class member with whom she was speaking, Mr. Creswell, that

3   he felt officers were trying to intimidate him out of talking with her, and then watched as

4   multiple other class members housed in that run turned their backs to her, refusing to

5   speak to her. [*Id*. at ¶¶ 11-12; 11/8/17 Tr. at 14:23-15:8]

6       Ms. Eidenbach's testimony that she observed DW Monson issue a directive to

7   officers to ticket 704 violators on both Abel and Charlie runs remains unrefuted and

8   unchallenged.    She re-confirmed the contents of her declaration at the Evidentiary

9   Hearing. [11/8/17 Tr. at 204:8-16]

10

11  **III.   DEFENDANTS' WITNESSES OFFERED CONTRADICTORY AND SELF-
         SERVING TESTIMONY REGARDING THE EVENTS AT ISSUE**

12      Defendants' witnesses presented conflicting accounts of what happened during the

13  November Tours, contradicting one another's, and at times their own, testimony. Their

14  memories also failed them at crucial times, and even high level administrators at ADC

15  evidenced little to no awareness of the seriousness of their behavior.    Defendants'

16  witnesses would clearly remember information that painted their actions in a rosy hue but

17  moments later would have little-to-no memory of less flattering instances. For example,

18  DW Monson could remember the specifics of Plaintiffs' 2015 tour of Rincon Unit, down

19  to sensory details such as the appearance of the floor and the smell of the unit (11/8/17 Tr.

20  at 92:23-25), but when pressed to remember whether he was on the run taking pictures at

21  the same time as class counsel were conducting interviews, he couldn't remember. [*Id*. at

22  102:13-103:5]

23      There also were repeated instances in which Defendants' witnesses contradicted

24  themselves. DW Monson asserted that he never told his officers to address 704 violations

25  on the run where legal interviews were taking place. [11/8/17 Tr. at 74:10-75:5] But

26  Ms. Zuerlin testified to the contrary, and told the Court that she heard DW Monson speak

27  to the officers about 704 violations in the middle of the run, between where she was

28  standing at the entrance to the run and the attorneys conducting interviews at the other end

1   of the run, meaning the conversation was clearly within earshot of the class members

2   housed on that run—as it occurred right in front of their cells.  [*Id.* at 172:7-25][3]

3       Officer Robles testified that he filled out and turned in to his supervisor his

4   worksheets detailing the warnings he issued for 704 violations on November 2, 2016, yet

5   his supervisor, Sgt. Krages testified to the contrary that no 704 worksheets existed for

6   November 2, 2016.  [*Id.* at 157:2-11, 144:17-19, respectively]  Sgt. Krages testified that

7   he had given a direct order to Officer Robles to issue disciplinary tickets.  [*Id.* at 142:16-

8   18]  When the Court questioned Officer Robles about his initial testimony that he was not

9   given an instruction either way as to whether to issue disciplinary tickets, Officer Robles

10  then changed his testimony and said he could not remember what he had been told.  [*Id.* at

11  161:20-162:14]

12      Combined, the disorganized, contradictory, and questionably truthful testimony of

13  Defendants' witnesses paints a picture of disrespect for the Stipulation and its

14  requirements.  Instead of taking their duties under the Stipulation seriously, Defendants

15  regarded the tour days as "just another day at work," (11/8/17 Tr. at 109:19-20)—a

16  statement that embodies the flippant and haphazard approach Defendants take to

17  compliance with the Stipulation.

18

19  ## IV.    THE PROTECTIVE ORDER DOES NOT CREATE AN UNNECESSARY RISK TO CLASS MEMBERS

20      Defendants' final Hail Mary assertion that the Court's protective Order created

21  unnecessary risk for class members who provide information to the Court or class counsel

22  is absurd and strains credulity.  [Doc. 2482 at 15-18]  Their newfound concern about the

23  well-being of class members is disingenuous at best.

24      Defendants base this sweeping characterization on a single instance where a

25  prisoner who was subjected to multiple searches and disciplinary tickets attempted to

26  pressure Ms. Ashworth to lie to Plaintiffs' counsel and the Court and say that this prisoner

---

[3] It should be noted that Ms. Zuerlin is a Member of the State Bar of Arizona, and therefore an officer of the court, who testified under oath.  [11/8/17 Tr. at 168:14-18]

provided information about her medical care and somehow was protected by the protective Order.  Ms. Ashworth refused to lie to counsel or the Court and thus was threatened by this other prisoner, and she and her roommate were transferred to a different unit.  Defendants responded to this security threat according to their policy and handled the situation.  The story ends there.[4]

Moreover, Plaintiffs' counsel have had quite the opposite experience with the protective Order.  On the whole, since the Court issued it, class counsel have found it an effective tool to encourage and increase communication between class counsel and their clients.  When class members are assured that they will not be subject to retaliation from Defendants, and that if they do experience it, their complaints will not be ignored, they have been far more willing to candidly discuss the subject matters covered by the Stipulation.  The protective Order is an important tool for Plaintiffs' counsel to curb the chilling effect of retaliation and to encourage class members to report lapses in health care or inhumane conditions of confinement in isolation.

As such, for the reasons set forth above, in the Court's protective Order, and Plaintiffs' other recent filings regarding the order (Docs. 2363 and 2455), the Court's Order should stand.

Dated:  December 13, 2017                 **EIDENBACH LAW, P.L.L.C.**

By:  s/ Kirstin T. Eidenbach
    Kirstin T. Eidenbach (Bar No. 027341)
    P. O. Box 91398
    Tucson, Arizona 85752
    Telephone:  (520) 477-1475
    Email:   kirstin@eidenbachlaw.com

---

[4] Ms. Keys, the other witness from Perryville, has reported no such extortion attempts.  Neither have Mr. Blocksom, Mr. Oyenik, or Mr. Creswell.

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    kbrody@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com
          rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Victoria Lopez (Ill. 6275388)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@aclu.org
          afettig@aclu.org
          vlopez@aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

1
2

**ARIZONA CENTER FOR DISABILITY LAW**

3

By:   s/ Maya Abela

4

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)

5

5025 East Washington Street, Suite 202
Phoenix, Arizona 85034

6

Telephone:  (602) 274-6287
Email:    skader@azdisabilitylaw.org

7

adietrich@azdisabilitylaw.org

8

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)

9

Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)

10

**ARIZONA CENTER FOR DISABILITY LAW**

11

177 North Church Avenue, Suite 800
Tucson, Arizona 85701

12

Telephone:  (520) 327-9547
Email:

13

rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org

14

jross@azdisabilitylaw.org
mabela@azdisabilitylaw.org

15

*Attorneys for Arizona Center for Disability Law*

16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Jacob B. Lee
Kevin R. Hanger
Timothy M. Ray
Richard M. Valenti
Jamie D. Guzman
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
afletcher@strucklove.com
jlee@strucklove.com
khanger@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com

*Attorneys for Defendants*

s/ D. Freouf