Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-DKD

**DECLARATION OF DR. TODD R. WILCOX, M.D., M.B.A.**

I, Todd Randall Wilcox, declare:

1. I have personal knowledge of the matters set forth herein. If called as a witness, I could and would testify competently to the facts stated herein, all of which are within my personal knowledge.

2. I have worked as a physician in jail and prison environments for more than 20 years. I am currently the Medical Director of the Salt Lake County Jail System. I am licensed to practice medicine in the States of Arizona and Utah, and am Board Certified in Urgent Care Medicine. I submitted my updated curriculum vitae on September 2, 2016. [Doc. 1670-1]

3. I was asked by Plaintiffs' counsel to review documents from the medical file of Walter Jordan, 078789, to offer my professional opinion regarding his medical care prior to his death on September 7, 2017 at the age of 67, while in the custody of the Arizona Department of Corrections (ADC). Prior to his death, Mr. Jordan was housed at ASPC-Florence, East Unit.

4. In addition to Mr. Jordan's medical record, which I reviewed electronically, I reviewed the Notice of Impending Death that Mr. Jordan sent to the Court and that was filed on the docket on August 29, 2017. [Doc. 2262] Mr. Jordan stated, "ADOC and Corizon delayed treating my cancer. Now because of there [sic] delay, I may be luckey [sic] to be alive for 30 days. The delayed treatment they gave me is causing memory loss, pain."

5. Sadly, Mr. Jordan's prediction was prescient, as he died on September 7, 2017 from invasive squamous cell cancer that had resulted in a very large (6 by 7 cm) open lesion on his head that invaded the underlying skull bone and caused the bone to die and ultimately become infected. Once the tumor breached the bone, it was inevitable that it would directly invade his brain. Mr. Jordan's case was unfortunate and horrific, and he suffered excruciating needless pain from cancer that was not appropriately managed in the months prior to his death.

6. The failures in treatment and care he experienced prior to his death are

illustrative of several systemic problems with the medical care provided by ADC and its contractor Corizon that I have observed in my reviews of hundreds of medical files of people in ADC's custody: (1) the limited pool of quality specialists willing to treat ADC prisoners; (2) a broken system of providing pain management, which may or may not be due to Corizon's limited formulary; and (3) a failure by nursing and provider staff to take basic preventive measures to reduce the likelihood of medical problems from developing into a catastrophic condition.

***Deficiencies in Mr. Jordan's Specialty Care***

7. The first systemic issue I identified in Mr. Jordan's care is a failure in specialty care and treatment. As I have noted in prior reports to the Court, ADC (and Corizon) are restricted by state law as to how much they can pay specialist contractors, and as a result this greatly limits the number of doctors that they can find in the community willing to accept ADC patients. [*See* Doc. 2103 at ¶¶ 51-53] I learned that Mr. Pratt recently testified about at least three separate incidents of Corizon not paying hospitals or specialists (for example, more than $1.2 million in a year's worth of unpaid bills in the case of the Gilbert/Florence Anthem Hospital). [8/8/17 Hearing Transcript at 93:19-103:5] Obviously, Corizon's failure to pay its bills does not do anything to increase the pool of quality community specialists willing to accept ADC patients. Therefore, it was sadly not surprising to discover that Mr. Jordan was sent for treatment at a dermatology clinic that did not practice its specialty within the standard of care.

8. Mr. Jordan had a history of skin cancer prior to 2017, and at the time of his death he had multiple skin cancers. Squamous cell carcinoma is generally easily managed when it is identified early and it has a greater than 90% cure rate. While the initial standard of care for uncomplicated skin cancers is to have the lesions or growths managed by a dermatologist, a serious case requires calling in oncologists and experienced surgeons who specialize in the area of anatomy that has to be treated. Mr. Jordan may well have survived had he been treated by a competent dermatologist and referred to an oncologist sooner when it was abundantly clear his cancer had progressed beyond the

scope of a dermatologist. Unfortunately, the dermatologist he saw was not competent, and by the time he saw an oncologist, his cancer had advanced and it was too late.

9. The records from the dermatology clinic did not document a comprehensive workup or treatment plan for him. The specialist's clinical notes are sparse and there is little detail. Also, one of the physicians who treated him at the dermatology clinic is not a Board-certified dermatologist.

10. When the dermatology clinic did decide to intervene, the notes indicate that they did office-based electrodesiccation—they electrically fried the tissue. While this is a treatment for squamous cell carcinoma, it is indicated for only small, superficial, well-defined lesions located in noncritical sites of the body. Mr. Jordan's largest cancer on his scalp was more than 2 inches by 2 inches, and did not qualify for electrodesiccation on any of these criteria. The scalp skin and the skull bone are absolutely precious anatomical structures that must be preserved at all costs. As such, the treatment he received from the dermatology clinic was not what he needed.

11. Given the number, size, and aggressiveness of Mr. Jordan's growths, the specialist should have called in an oncologist. Unfortunately, valuable time was wasted by the dermatology clinic attempting to perform procedures inadequate to address the skin cancer, repeatedly (and painfully) attempting to excise large growths from Mr. Jordan's body. The attempted electrodesiccation procedure when it was contraindicated made him much worse, and burning a hole in his skull bone could cause the surrounding bone to die and become at risk of infection.

12. After several trips to the dermatology clinic failed to address the cancerous growths on his head, on June 6, 2017, Mr. Jordan was seen by a Corizon provider who documented a 6 cm by 7 cm ulcerated lesion on his scalp (among others), and indicated that she was requesting an "urgent oncology consult for radiation of frontal SCC lesion" be approved by Corizon Utilization Management. On July 8, 2017, the prison provider submitted an urgent request to Utilization Management that radiation therapy be approved and started. She wrote (all capital letters are in the original):

> PT [Patient] NEEDS URGENT BRACHYTHERAPY FOR VERY LARGE OPEN INVASIVE SQUAMOUS CELL CARCINOMA OF THE R FRONTAL TEMPORAL SCALP. BIOPSY POSITIVE FOR INVASIVE, MODERATELY TO WELL DIFFERENTIATED SCC. PAIN IS SEVERE. WOUND IS ENLARGING RAPIDLY IN DEPTH.
>
> PT HAS SEEN NO IMPROVEMENT OR HEALING FROM THE EXCISION DONE BY DERMATOLOGY. EXCISION SITE IS DRAINING CLEAR FLUID, YELLOW AND BROWN ADHERENT SLOUGH; EXQUISITELY PAINFUL. WILL NEED TREATMENT AND F/U WITH RAD ONCOLOGY WEEKLY.
>
> THIS NEEDS EMERGENT TREATMENT. HE IS NOT SAFE AND IS AT VERY HIGH RISK FOR OSTEOMYELITIS OF THE SKULL OR MRSA CELLULITIS. THE WOUND IS HORRIFIC. PT IS EXPOSED TO THE ENVIRONMENT (DUST, DIRT, HEAT, FLIES), DIRTY HOUSING AND SHOWER FACILITIES (OLD EVAP COOLERS, DORM STYLE HOUSING AND BATHING).
>
> I CANNOT STRESS HOW IMPORTANT IT IS THAT WE TAKE SOME TYPE OF IMMEDIATE ACTION.

13. Mr. Jordan finally started radiation therapy on July 21, 2017. However, by the time Mr. Jordan began radiation, the squamous cell cancer had penetrated his skull, and reached the parenchyma of his brain. The most common way for squamous cell carcinoma to spread is via the lymph nodes. It almost never invades bone unless there is damage to the tissue and bone from incomplete attempts of managing the tumor. It is difficult to fathom how a squamous cell carcinoma could grow so large and deep that it breached the skull and reached the brain, if the treating provider and the specialist dermatologist is vigilant and practicing within the standard of care.

14. Mr. Jordan was ultimately hospitalized on August 28, 2017, a day before his Notice of Impending Death arrived at the courthouse. According to his hospital records, he suffered a seizure while being transported from the radiation oncologist's office to the prison, and he was taken to the Emergency Department. The combination of the invasive tumor touching his brain lobe, and the radiation of his head that was necessary to treat the cancer, resulted in seizure activity. Review of his hospital records demonstrates the

extensive bony destruction of his skull as a result of the invasive nature of the cancer and the inappropriate treatment he received from the dermatologist office.

15. Mr. Jordan died on September 7, 2017 after his daughter agreed to no heroic measures.

***Inadequate Pain Management by Corizon***

16. The second systemic problem I identified with Mr. Jordan's treatment was inadequate pain control. While the limited selection and quality of specialists is most likely a reflection of policy choices made by the State of Arizona, and Corizon's historic failure to pay its bills, and thus out of the control of the providers treating Mr. Jordan at the prison, the providers profoundly failed at appropriately managing the excruciating pain Mr. Jordan experienced as a result of the cancer and these painful electrodessiccation and curettage procedures, and the resultant very painful dressing changes.

17. The medical record clearly documents the patient's extreme pain throughout the last few months of his life. The medical record also documents Corizon provided him only Tylenol with Codeine dosed twice per day. Tylenol with Codeine is simply not an appropriate pain medication for cancer pain for multiple reasons. First of all, the Tylenol in the combination drug limits the amount of codeine you can give the patient because of associated Tylenol toxicity. In addition, it is well known that the metabolism and efficacy of codeine is highly variable in patients due to genetic issues that impact its metabolism. Many healthcare systems have removed codeine from their formulary for lack of efficacy. In addition, the appropriate dosing schedule of Tylenol with codeine is every 4 to 6 hours. The prison dosed it twice per day which, even if the medication were slightly effective, provided only intermittent pain relief for this patient. This pain management style with intermittent pain relief from a short-half-life medication is just wrong. It is actually the opposite of how cancer pain should be managed. Appropriate management of chronic severe cancer pain should be accomplished using long-half-life opiates of adequate strength to ameliorate the pain. All of the prescribers in the AZ DOC system should know this since it is one of the core teachings of basic pain management. Their choice to use

Tylenol with codeine is willful ignorance of the lack of efficacy for their patients in favor of adhering to an unreasonable formulary and institutional pressures.

18. Most patients with end stage cancer experience severe pain and it is one of the fundamental duties of physicians to address this pain at the end of life. There are many other medications that are low-cost generic medications that would be appropriate and presumably on formulary. Given the many options for adequate pain management, there is no excuse for therapeutic nihilism (undertreatment) of cancer pain that appears to be the norm in the Arizona prison health care system.

***Failure to Take Appropriate Preventive Measures***

19. The third systemic problem I identified in Mr. Jordan's care is that prison health care staff failed to take appropriate and basic preventive measures to reduce his likelihood of developing skin cancers in the first place. On April 1, 2016, the provider issued Mr. Jordan a special needs order ("SNO") valid for one year for sunscreen. However, on June 6, 2016, Mr. Jordan filed a HNR stating "I received some SPF-50 sunscreen lotion that the doctor had ordered for me on 4-1-16. I would like to know if I can get a refill on it? And if so, how soon?" The response by the registered nurse, dated the next day stated "SPF 50 Non-Formulary – (Denied). Store have SPF-30 available for purchase." This denial is medically inappropriate. The SNO for SPF-50 is a medically necessary treatment for Mr. Jordan as part of his cancer management. For a nurse to deny the sunscreen, is overruling and countermanding a provider's order for care, and exceeds the scope of that nurse's decisionmaking capability and licensure.

20. On April 27, 2016, Mr. Jordan also was issued SNO good for one year, issuing him a wide-brimmed straw hat. Based on my experience with ADC and other prison systems, a patient is issued a paper SNO when he or she is issued any sort of durable medical equipment (i.e. a cane, wheelchair), or for special dispensation (i.e. a lay-in, sunglasses, extra toilet paper, extra ice). Prisoners must have a copy of the valid SNO with them at all times, so custody staff can confirm they are authorized to have the item in their possession. This SNO expired on April 27, 2017 and I could find no indication in

his medical file that it was re-authorized. Assuming the straw hat was still in decent condition after a years' worth of use, and still provided sun protection, he technically was not authorized to possess it after April 27, 2017 without a valid SNO, and was subject to confiscation at any time as a result.

21. I was surprised that these April 2016 SNOs did not also authorize long-sleeved clothing, as this is of critical importance for reducing the likelihood of additional cancers. Mr. Jordan finally was issued a SNO for a long sleeved shirt on September 15, 2016, but in my review of his file I could find no record of a subsequent order for long-sleeved clothing in 2017.

***Mr. Jordan's Care is Emblematic of Systemic Dysfunction in Medical Care Delivery***

22. Mr. Jordan's experience in medical care was sadly predictable because ADC's specialty care, pain management, and preventive care systems continue to be dysfunctional.

23. The amount that specialists are paid to provide care to prisoners is capped by state law, and Defendant Pratt admits that on multiple occasions, Corizon failed to pay specialists and subcontractors. The completely foreseeable result of not paying specialists, or paying them very little, is that there is an ever-shrinking pool of specialists willing to see prisoners, and the quality of those willing specialists can be lower, as was the case here.

24. One of my recommendations to the Court in June of this year to address Defendants' chronic substantial noncompliance with performance measures related to specialty care was "to enlist the State's publicly-funded medical schools and their affiliated practice groups to provide their expertise and assistance, including delivery of specialty care, to persons who are wards of the State." [Doc. 2103 at ¶ 52] I am disappointed to learn Defendants reported that Corizon is struggling to engage the University of Arizona in a telemedicine program to provide specialty care. [9/12/17 Hearing Transcript at 187:3-192:14; Doc. 2398-1 at ¶ 5] I cannot fathom that the University of Arizona – which offers high-quality specialty medical care – would not be

interested in a telemedicine program if the money for the clinical visits and the technology in use were up to community standards.

25. With regard to pain management, in addition to Mr. Jordan's case, I reviewed the record of a young man with testicular cancer that had metastasized to many of his other internal organs, leaving him at Stage IV cancer. At the time of his orchiectomy, in early May he was prescribed only ibuprofen and Tylenol with Codeine for his pain. According to his medical records, he was not prescribed morphine until late July 2017.

26. I also reviewed the medical record of a patient paralyzed from the chest down housed in the Tucson infirmary, who is suffering from severe pain, in part as a result a poorly managed decubitus pressure sore. The infirmary provider appropriately made a nonformulary request for Gabapentin, but Corizon's Utilization Management rejected the request, stating that, "Corizon's preferred medication for neuropathic pain is venlafaxine XR 37.5 mg daily." Venlaxafine is also known by its brand name, Effexor, and is a psychotropic medication used to treat depression.

27. I have also been informed by Plaintiffs' counsel that over the course of 2017 they have been notified by numerous class members who state that certain pain medications, including Tramadol and the non-opioid Gabapentin, were abruptly cut off by Corizon with no step-down weaning, and on occasion, without the provider first meeting with and evaluating the patient. I cannot emphasize enough how irresponsible it is for a prescribing provider to abruptly discontinue pain medications without a tapering-down schedule. These class members report that they are having effective pain management medications replaced with less effective medication including psychotropic medications such as Effexor, or over-the-counter treatment such as ibuprofen or alpha lypoic acid.

28. There have been some studies that have found that Effexor has some benefit for treating pain, but it is far less effective than standard mainline therapy for neuropathic pain. Effexor also does not have an indication from the U.S. Food and Drug

Administration for the treatment of neuropathic pain, which means Corizon is using it off-label to treat pain. Additionally, some patients are unable to tolerate the side effects of the psychotropic medication. Attached as Exhibit 1 is a summary of a recent study of the use of Effexor for neuropathic pain, in which the authors concluded

> We found little compelling evidence to support the use of venlafaxine in neuropathic pain. While there was some third tier evidence of benefit, this arose from studies that had methodological limitations and considerable risk of bias. Placebo effects were notably strong in several studies. Given that effective drug treatments for neuropathic pain are in current use, there is no evidence to revise prescribing guidelines to promote the use of venlafaxine in neuropathic pain.

29. Finally, the failure to provide basic and simple preventive measures is a problem that I have described in past reports. I also have documented the tendency of nursing staff to act outside of their scope of practice, such as the nurse did here in overriding the provider's special needs order for SPF 50 sunblock to prevent skin cancer.

Executed December 15, 2017, in Salt Lake City, Utah.

Todd Randall Wilcox, M.D., M.B.A

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com
rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Victoria Lopez (Ill. 6275388)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
afettig@aclu.org
vlopez@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.L.L.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone: (520) 477-1475
Email: kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email: jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org
mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Kevin R. Hanger
Timothy M. Ray
Richard M. Valenti
Jamie D. Guzman
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
khanger@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com

*Attorneys for Defendants*

s/ D. Freouf

137939248.1