UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

No. **CV-12-00601-PHX-DKD**

Phoenix, Arizona
December 20, 2017
9:02 a.m.

BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(STATUS HEARING)

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CV-12-601-PHX-DKD – November 20, 2017

1

2                        **A P P E A R A N C E S**

3    For the Plaintiffs:

4            PRISON LAW OFFICE
             By:  **Corene Kendrick, Esq.**
5            1917 5th Street
             Berkeley, CA 94710
6
             ACLU – Washington DC
7            By:  **David C. Fathi, Esq.** (Telephonically)
             By:  **Amy Fettig, Esq.**  (Telephonically)
8            915 15th Street NW
             7th Floor
9            Washington, DC 20005

10           EIDENBACH LAW PC
             By:  **Kirstin T. Eidenbach, Esq.**
11           P.O. Box 91398
             Tucson, AZ 85752
12
             ARIZONA CENTER FOR DISABILITY LAW – Tucson, AZ
13           By:  **Maya S. Abela, Esq.**
             177 N. Church Avenue
14           Suite 800
             Tucson, AZ 85701
15
     For the Defendants:
16
             STRUCK LOVE BOJANOWSKI & ACEDO PLC
17           By:  **Daniel Stuck, Esq.**
             By:  **Rachel Love, Esq.**
18           By:  **Ashlee B. Hesman, Esq.**
             By:  **Richard Michael Valenti, Esq.**
19           3100 W. Ray Road
             Suite 300
20           Chandler, AZ 85226

21

22

23

24

25

1

2                              **I N D E X**

3   **WITNESS:**          **DIRECT**     **CROSS**      **REDIRECT**  **RECROSS**

4   RICHARD PRATT
    By the Court         125
5   By Ms. Kendrick                    130

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – November 20, 2017

1          (Proceedings begin at 9:02 a.m.)

2          THE CLERK:  Civil case number 12-601, Parsons, et al,

3    versus Ryan, et al, on for status hearing.

4          THE COURT:  Would counsel please announce?

5          MS. KENDRICK:  Yes.  Good morning, Your Honor, Corene      09:03:00

6    Kendrick from the Prison Law Office for the plaintiff class.

7          THE COURT:  Thank you.  Good morning.

8          MS. EIDENBACH:  Kirstin Eidenbach for the prisoner

9    plaintiff class.

10          THE COURT:  Thank you.  Good morning.                     09:03:10

11          MS. ABELA:  Good morning.  Maya Abela for the Arizona

12    Center for Disability Law.

13          THE COURT:  Thank you.  Good morning.

14          Anyone else on plaintiff's side?

15          MR. FATHI:  Good morning, Your Honor, David Fathi of      09:03:20

16    the ACLU National Prison Project for the plaintiff class.

17          THE COURT:  Thank you.  Good morning.

18          All right.  Defendants.

19          MR. STRUCK:  Good morning, Your Honor, Dan Struck,

20    Rachel Love, Ashlee Hesman, and Richard Valenti for the        09:03:37

21    defendants.

22          THE COURT:  Thank you.  Good morning.

23          MR. STRUCK:  Good morning.

24          MS. HESMAN:  Good morning.

25          MS. LOVE:  Good morning.                                  09:03:43

CV-12-601-PHX-DKD – November 20, 2017

1      THE COURT:  Well, I'm standing because in the most

2 literal sense I'm standing up for the inmates of the Arizona

3 Prison System.  It is my job to be the enforcement officer on

4 this Stipulation, which I have earnestly tried to do for months

5 expecting people to comply with my orders in good faith.      09:04:06

6      I read on the website from KJZZ this morning a memo

7 from Sara Neese at Corizon:

8      Hello, Dr. Watson.  Could you please cancel an

9      inmate's infectious disease consult.  There are

10     two.  We do not have a provider to send them to.      09:04:24

11     One was approved and has been sitting there for 42

12     days.  Another 30 days we get –– after 30 days we

13     get nailed for 1,000 bucks a day until they are

14     seen.  Also please look at my previous e-mail and

15     answer the other ATP/NMIs if you would.  We really      09:04:39

16     need them answered to do get our job done.  Thanks.

17     I appreciate it.

18     As I read this, there is no other way to read it than

19 an end run around the monitoring program, an end run around the

20 Stipulation.      09:04:55

21     The Stipulation has specifications with respect to

22 when inmates are supposed to be seen by outside providers.

23 They were scheduled for those providers, and the Arizona Prison

24 System decided that the right way to handle it was to cancel

25 the appointments and deny those people their healthcare.      09:05:07

CV-12-601-PHX-DKD – November 20, 2017

1      I have used words in this courtroom like

2  flabbergasted, stunned.  I've run out of words.  I've run out

3  of a way to communicate what is such an egregious departure

4  from honest representation in a case, from the defendants' side

5  of this case.                                              09:05:29

6      I don't know what is going on here.  If this is

7  entirely true.  This is certainly not something that has a

8  foundation laid in court.  But it looks to be like an e-mail

9  that was provided from Corizon staff person to another hired

10  Corizon doctor at the prison system.                       09:05:46

11      In addition, there are other e-mails in that story

12  which include what is just a flat-out statement, we need to get

13  around the Stipulation, here's how you do it.  And I saw the

14  Corizon comment that that was supposed to be read as, no, this

15  is how we comply.                                          09:06:05

16      But, you know, that's not consistent with what I've

17  seen otherwise, which is signs held up or posted in the offices

18  telling people what words need to go into the chart to make

19  sure that there's compliance.

20      Now I'm told -- in the past gave people the benefit of  09:06:21

21  the doubt when I was told that that was just to make sure that

22  we weren't making an error.  But one could have fairly read

23  that as being counseling on how to avoid the monitoring

24  program.

25      I have an agenda that was prepared earlier this week    09:06:34

1    of four pages, which was –– or three pages, which was

2    consistent with what I've been doing every single month for the

3    last months, where I have made an earnest and honest effort to

4    try to encourage compliance with the Stipulation.  And I have

5    done what I thought was a reasonable thing to do.  And that is,    09:06:58

6    point out deficiencies, ask for remediation programs from the

7    defendants, monitor the defendants' compliance with that, ask

8    honest and sincere questions about –– and really logical

9    questions about how the remedy was going to be met.  And I have

10   expected that in the background there would be the same kind of    09:07:19

11   honest and logical application.

12          What I now see is a window that undercuts my entire

13   agenda, undercuts my entire program, and that is, it's just a

14   game.  It's just a game to try to beat the judge and his

15   monitoring program.  It's just a game to try to beat the          09:07:37

16   State's monitoring program.

17          I am without words.  I don't know.  I cannot have

18   contemplated that anybody in a system –– the Corizon lawyers

19   have been coming to the courtroom, they've been listening to

20   this.  They certainly are aware of what's going on in their       09:08:00

21   shop.  They're aware of what's going on in my shop.  The two

22   don't work together, and they're not going to work together.

23          What's going to happen is I'm going to find out

24   exactly what's going on.  I'm going to get this doctor into

25   this courtroom and I'm going to hear her testimony.  I'm going    09:08:13

CV-12-601-PHX-DKD – November 20, 2017

1    to get this Sara Neese person in this courtroom, or if she's

2    outside of my jurisdiction I'll get her on the telephone.   I

3    will hear from these people.  I will get every single memo that

4    of this like.  And I am now changing the entire approach here.

5    It's not my agenda anymore, it's digging down deep to see how          09:08:31

6    deep this evil goes of trying to dissemble to the Court to see

7    if it's true.

8          Now I've said already that I don't know what's on my

9    iPad from the KJZZ website is something that's true or not.  It

10   could be all made up.  And if's it's made up I'm going to eat        09:08:47

11   all these words.

12         But over the time that I have been involved in this

13   case, there have been warning signs that this is not false.

14   There have been warning signs that come in the nature of the

15   memo that was posted on the wall that I've already seen.  There      09:08:59

16   have been warning signs of the testimony that I've had here

17   where I thought that the persons that were telling me the truth

18   were the inmates and the people that are lying through their

19   teeth were the people at the Department of Corrections.  And

20   that's not every single one of them.  There are decent and          09:09:13

21   honorable people on the correction side, and there are liars on

22   the prisoners' side.

23         But I tell you that as a fact finder in this case in

24   my role, the people that I have thought have lied to me have

25   not been the prisoners, they have been the people working for       09:09:24

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – November 20, 2017

1   the prison.  And I've laid that out for you.

2            And so the additional thing that I get is something I

3   can't work with because it's impermissible under the rules.  We

4   receive phone calls in chambers, my staff receives phone calls

5   in chambers from people who work for Corizon who say                     09:09:38

6   essentially, it is so much worse than you think.  And we cannot

7   do anything other than to say, if you would like to come

8   forward, we will have you in court any day to talk to us about

9   that.  Then they ask us, can you protect us?  And my staff is

10  told to instruct them, no, we cannot protect you.  I can't          09:09:55

11  guarantee what can happen.

12           And so some of those -- some of those people may have

13  told us something that would be relevant, but I really haven't

14  acted on it because it's not testimony.  It's just people

15  calling on the telephone.  I can't act upon it.                     09:10:10

16           But what it does is it adds to the filter of how I

17  evaluate what I see on a website from KJZZ that indicates that

18  a memo went from the contractor to the contractor's doctors

19  instructing them how to do an end run around my

20  Stipulation-monitoring responsibilities.  And it's just            09:10:35

21  disgusting.

22           And so we'll change how we'll do things.

23           The numbers here this morning, except for 35, look to

24  me like the performance measures are all in the realm of

25  compliance.  But the truth of it is -- I can't trust it all        09:10:55

1    until I get to the root of this and find out whether or not

2    it's just a game for the State, whether they've tried to figure

3    out a way to cover up what is non-compliance with the

4    Stipulation.

5           I had always been a little bit -- and I've told you          09:11:11

6    about this before -- concerned about the fact that the fox was

7    guarding the hen house.  I've told you also there were other

8    times that I thought that there was reason to believe that the

9    State had done what it was supposed to do because they were

10   reporting numbers to me that were chilling.  And so I thought     09:11:28

11   perhaps I can trust them.

12          I'm now concerned that I cannot trust those numbers

13   without further inquiry.  That's supported by the plaintiffs'

14   efforts in the Kendrick Affidavit, and the recent November 21

15   discovery conference where we worked through some of the errors   09:11:49

16   and discrepancies.  And now the plaintiffs have presented even

17   more of them.

18          The defendants have responded that they did not have

19   time to be in a position to respond to each of those.  From

20   past experience some of the responses to some of the arrows      09:12:05

21   that plaintiffs send may turn to fall short, they may be

22   mistaken or something.

23          But nevertheless, the plaintiffs are now doing what is

24   helpful to the Court.  They are scrutinizing the monitoring

25   program and the compilation of the CGAR data to see whether or    09:12:20

1    not it's valid.

2         The plaintiffs are making a stronger, stronger

3    argument, and were before today on my agenda for the purpose of

4    setting a time to allow us to delve more deeply into that.

5         I didn't have what looks like a smoking gun memo when          09:12:37

6    I did this agenda.  What I have now is nothing short of that, I

7    think.  And so I need to set a plan for us to move forward in

8    addressing this particular issue of whether or not there is a

9    corruption within the system that is depriving the Court of its

10   ability to perform its monitoring responsibilities in a fair       09:13:01

11   and appropriate way.

12        And we will get to the bottom of this.  We will

13   understand exactly what the nature is.  If it turns out that

14   this is a fallen short arrow, then I know that there are other

15   parts of it that still probably are right, and that is --          09:13:16

16   unless it's a complete fabrication.

17        We have Mr. Millar engaged as an expert to give us

18   advice to deal with what is manifest now in the memorandum --

19   another memorandum included in the KJZZ memo, and that is

20   Operation Backlog.  I've been telling you, and everybody except    09:13:38

21   for the defendants apparently, have been fighting this idea

22   that it's a staffing issue.  And it is identified here by

23   Corizon as a staffing issue, they don't have the providers

24   across the board, either inside where an individual doctor is

25   responsible for 5,000 potential patients and 20 people today,      09:13:54

1    and is told not to talk so much to her patients and not to

2    order so many procedures, and given specific examples.

3              So what I contemplate -- and I'll listen to the

4    parties in a moments about how they think this might better be

5    done if my idea is not a good idea.  But what I would          09:14:19

6    contemplate doing is setting a hearing date perhaps in

7    the -- we have already set for January, in the third week of

8    January I believe it is, for us to focus on this issue about

9    whether or not the monitoring program is so compromised that it

10   cannot be trusted, and whether we have to adopt some other     09:14:42

11   method to make sure that the Stipulation can be met in a fair

12   and honest and responsible way.

13             And what we would do at that hearing is have

14   the -- lay the foundation, if it exists, for what appears to be

15   in the press report, and then proceed from that and to call    09:15:02

16   witnesses and to identify people who will testify under oath

17   about what the reality is on the ground, a reality that is, as

18   suggested in the press report, gravely threatening to the

19   Court's ability to administer the Stipulation.

20             Turning now to plaintiffs for their response to what  09:15:21

21   I've said in these last 15 minutes.

22             MS. KENDRICK:  Your Honor, we share the Court's great

23   frustration, and we were likewise shocked to read the e-mails

24   that were in that report.

25             We would just note that the parties have already had  09:15:38

CV-12-601-PHX-DKD — November 20, 2017

1    more than five days of hearings about the broken methodology

2    system in place.  And plaintiffs asked the Court, after those

3    hearings in the Spring, that the Court appoint a Rule 706

4    expert with knowledge and experience in monitoring and

5    auditing.  I don't know if it would be a Price Waterhouse        09:16:00

6    Coopers type organization, but something like that.  Because it

7    has been shown clearly and repeatedly that the Department is

8    not capable of monitoring their contractor, that there are

9    cross interests going -- at play here that call into question

10   the reliability of the monitoring.                              09:16:18

11          And, Your Honor, while we are glad that you find it

12   useful that we go and have started doing these spot checks, I

13   can tell you that it's incredibly time consuming for my office.

14   Just to check three medical performance measures at three

15   institutions for the September CGARs, it involved going into    09:16:37

16   hundreds of prisoners' medical records.  It took several of the

17   staff in my office practically a week just to do that.

18          So that was just randomly selecting a couple of

19   measures at a couple of institutions.  And we uncovered

20   problems.  And as we noted, some of the problems went the other 09:16:59

21   way.  You know, we weren't just cherry picking problems where

22   suddenly they were out of compliance.  There were a couple

23   where I said, look, you guys said it was 90 percent, it was

24   actually 88 -- you know, it was still above the 85 percent.

25          For us the point is that you can't trust it.  We had     09:17:17

1   performance measures where –– this was supposedly the September

2   CGARs and they were looking at stuff that happened in July and

3   August.  And it troubles us greatly.  But we don't have the

4   resources to do that kind of monitoring.

5           And part of the reason we included the declaration of          09:17:34

6   my colleague, Alison Hardy, is because she works on another

7   case that Corizon is the contractor for the medical care, and

8   they are able to run these system-wide reports.

9           Now again, this doesn't address the fact that you

10  identified, which is garbage in, garbage out.  If you're being     09:17:51

11  told to cancel things or falsify things then, you know, if

12  you're running reports it's going to be reflected.  But at the

13  very least that gives you a more accurate picture when you're

14  looking at the entire system versus this Rube Goldberg system

15  that we have in place that is a legacy of the fact that they       09:18:08

16  were still using paper records when we settled the case.  And

17  so that's why we have the pull ten files method of finding

18  compliance.

19          It's not accurate.  It doesn't work.  And

20  unfortunately that wouldn't necessarily address the problem       09:18:24

21  that you've identified if the Corizon way is to tell providers

22  to cancel appointments or to not put things in the records.

23          But at the very least we would have an –– a more

24  accurate sense of what is being reflected in the records, and

25  we think that would be a good first start at trying to address    09:18:40

CV-12-601-PHX-DKD – November 20, 2017

1    some of these problems.

2        THE COURT:  Well, you have asked for the Rule 706

3    expert in the past but I was not there yet.  And one of the

4    reasons I wasn't there is you contracted to have this

5    monitoring system in house, that was the agreement that you          09:18:53

6    reached.  And it seemed to me that I needed to enforce that

7    agreement, to the extent that it could work, consistent with

8    the Stipulation.  And also it does implicate the Court's

9    ability to do its role, and that is to monitor the monitors, to

10   make sure that the performance measures are being met.  And so     09:19:13

11   I have been engaged in that process, a process that you all

12   selected.

13       If it becomes so corrupt, if it becomes so tainted

14   that it is not subject to being relied upon anymore, it so

15   undercuts the Stipulation that it is a component of the             09:19:31

16   Stipulation, would need to be modified.  And that modification

17   would be an independent auditor to go in and to review it.

18       I was anxious to see where the current allegations of

19   improper monitoring in your most recent affidavit led, because

20   the last time it was, I think, three quarters meritorious, a       09:20:01

21   quarter maybe not, just in rough terms.

22       But it seems that also you may be getting better at

23   this process of evaluating the monitoring, or worse, I don't

24   know.  But I wanted to see where this next one led.  And then

25   hadn't ruled out in my own mind the idea of proceeding to a        09:20:21

16

1   Rule 706 auditor as being a necessary component.

2          And so, I hear what you say, but I do think it's

3   necessary for me to go through this process.

4          With respect to your staffing limitations, I

5   understand that you may have some trepidation, because the          09:20:40

6   ability to be paid for these hours for your staff is probably

7   something that is a management decision that any law firm would

8   make about whether or not they run the risk of not being

9   compensated for devoting a lot of resources in a case.

10          And it is true that I have not resolved the issue of          09:21:02

11   the attorney's fees application that would give you perhaps

12   some comfort about where you stood with respect to these extra

13   efforts.

14          The order that I think that is on the docket now, at

15   least one that I believe I signed yesterday, doesn't          09:21:19

16   definitively answer it, but it provides, I think, some guidance

17   to you that I can augment here.  And that is that it is my

18   strong conviction that if your responsibility to assure

19   compliance with this Stipulation engenders these kinds of hours

20   to verify what is happening on the defendants' side of the          09:21:44

21   case, that is compensable under the Stipulation.

22          And understanding that those words, because I am a

23   trial court and not the Court of Appeals or the Supreme Court,

24   not the final answer on whether or not you can get those fees,

25   I understand that that is not yet money in the bank for you.          09:22:01

1        But nevertheless, my -- you should understand that at

2   least from the trial court's perspective that those hours that

3   you would devote to this process of double checking the

4   monitors would be compensable.

5        To the extent that I'm weighing whether or not it's          09:22:20

6   more efficient to have a Rule 706 expert versus the people in

7   your office, who may or may not be in a better position to do

8   that, I don't know, and maybe that's a decision for a different

9   day.  It may well be that the defendants would be more

10  comfortable having it done by an independent person rather than  09:22:42

11  having me vest entirely with assigning this additional

12  responsibility so to speak to the plaintiffs.

13       But, again, that is something that is in my thought

14  process.  I am thinking about it, the 706 expert for the

15  auditor.  And I think I have already said to both sides on the   09:23:03

16  record that one of the notions with respect to if there is any

17  sanction imposed for failure to comply, those dollars could be

18  used to pay for the expert to do exactly this, to confirm that

19  the numbers that we're relying on are accurate.

20       All right.

21       MS. KENDRICK:  Just --

22       THE COURT:  Go ahead.

23       MS. KENDRICK:  I'm sorry.  Just on the issue of the

24  hearing, I don't know if I really got to that.

25       We would welcome the chance to have Dr. Watson and          09:23:37

1   this other individual come and testify.  We would just ask that

2   prior to the hearing --

3          THE COURT:  I'm sorry, excuse me.

4          MS. KENDRICK:  Sorry.  That prior to the hearing that

5   we be allowed to get discovery so that we can find out if there          09:23:50

6   are other similar e-mails going out from Corizon to providers

7   and to medical staff making similar instructions.

8          THE COURT:  All right.  And I'm sorry to have

9   interrupted what you said.  I was handed a note that was an

10  urgent matter.                                                            09:24:08

11         So the blessing of having realtime court reporting is

12  that although I interrupted you and diverted my attention, I

13  can ask you to pause for a moment while I read what you just

14  said.

15         What I would anticipate is that you would do what          09:24:31

16  plaintiffs need to do in a case.  And this is a bit of a

17  different case because I'm not in the typical role of the

18  neutral judge, I'm the enforcer of the Stipulation.  And so I

19  turn to the respective parties to assist the Court in that job

20  when necessary.                                                           09:24:54

21         And one of the things that I would like the plaintiffs

22  to do, because of their familiarity with the prison system and

23  with the case, is to identify witnesses that they believe would

24  be the appropriate people, whether by a broad 30(b)(6) type

25  designation or individual names.                                         09:25:11

1          And then you can present those to the defendants and

2     see where they are, what the nature is with respect to what it

3     will require, whether the contract that the State has with

4     Corizon, if they're Corizon witnesses, whether that allows the

5     State to be able to commit to having their presence in court,          09:25:29

6     or whether if that's not the case whether we have to subpoena

7     them.  And if that's the case, then you let me know and then

8     I'll issue the subpoenas after I've heard from both sides about

9     whether or not it's appropriate to do so.

10         But I would like the plaintiffs to marshal the case,          09:25:44

11     to verify or not.  I can trust that perhaps the defendants will

12     be doing their bit in our adversary process to try to do what

13     they can to make sure that anything plaintiffs are presenting

14     is tested by cross-examination and tested by challenging

15     evidence.          09:26:03

16         But what I have here is certainly fair to describe as

17     a prima facie case that I would like the plaintiffs to follow

18     up on.  And that means developing the presentation for our

19     hearing in January and deciding what witnesses would be

20     appropriate.  If you need the Court's assistance in having          09:26:16

21     their appearance, then you let me know, we have a method for

22     doing that.

23         MS. KENDRICK:  Thank you.

24         THE COURT:  Mr. Struck.

25         MR. STRUCK:  Yes, Your Honor.          09:26:28

1        I haven't had the opportunity to review the article

2   that you came in very upset about.  I don't know who this

3   doctor is or -- I guess he's a former Corizon employee.  I

4   don't know --

5          THE COURT:  It's a woman.                          09:26:45

6          MR. STRUCK:  I don't know anything about -- I just

7   haven't read it.

8          THE COURT:  Okay.

9          MR. STRUCK:  But I will tell you this, I work very

10  closely with the ADC monitoring bureau.  They care very deeply   09:26:54

11  about what they do.  And they don't give Corizon free passes.

12  I haven't seen any evidence of that.  We haven't seen any

13  evidence of that during the course of this Stipulation period.

14         THE COURT:  Well, what may be happening then, giving

15  you the benefit of every doubt, is that under the nose of the   09:27:16

16  monitors the Corizon people are figuring out the way to do an

17  end run around the monitors.

18         I mean, just to put it in the record as it stands in

19  this unverified news report -- and Corizon has had an

20  opportunity to respond to this because their response is quoted   09:27:43

21  in the article as well.

22         I'm looking in the article to try to find the quote of

23  where the Corizon employee said "beat the monitor."

24         But again, this is -- certainly no foundation is laid

25  for this, but that's -- as I say, it's creating a prima facie   09:28:59

CV-12-601-PHX-DKD – November 20, 2017

1    case perhaps.  But we need to follow up on it because it is

2    something that is not inconsistent with what other red flags

3    have been blowing on the horizon in the wind.

4            But there were the words "beat the monitor."

5            And so that is something that the monitors themselves          09:29:23

6    need to be fully informed about, because if they are the police

7    officers, and they are people who they're supposed to be

8    monitoring, and the monitored individuals are in a cobble to

9    try to beat the monitors, the monitors need to know about that

10   as well.                                                                09:29:48

11           But -- and I also say this:  It's hard for me to think

12   that if there is this beat the monitoring program going on,

13   that it would be -- it would still call into question the

14   quality of the State's monitoring program if it didn't know

15   about it.  And -- because that would be the kind of thing you           09:30:12

16   would expect the monitors to be able to know about.

17           Just one moment.

18       (Discussion off the record between the Court and courtroom

19   deputy.)

20           THE COURT:  Give me a moment to look at the calendar.          09:30:36

21           The problem is the January hearing date is the 10th,

22   and that's probably too soon.

23           The potential of this issue, of the trustworthiness of

24   the reporting -- and when I say that it's specifically and

25   purposefully different words than monitoring, because the              09:32:00

1   reporting includes also what Corizon is putting into its charts

2   and putting into information that the monitors would have

3   access to and be evaluating.

4           The potential impact of this reporting issue is so

5   great that it can affect all sorts of other issues that are          09:32:21

6   pending, including, without limitation, the Court's order to

7   show cause proceedings, in addition the defendants' motions to

8   terminate certain measures from the Stipulation because of

9   records of compliance.  And so it makes sense to accord it a

10  fair and thorough hearing.                                           09:32:51

11          And I'm vexed by the calendar.  What we presently have

12  scheduled is we have the 10th of January, and then we have the

13  two days at the end of February, the 27th and 28th.

14          And I think that there are two options, one is to

15  include it on the 27th or 28th.  And the other option is to          09:33:45

16  pick sometime between the 10th and the 27th and the 28th to

17  address this particular issue of the credibility of the

18  reporting.

19          What's plaintiffs' position on those choices?

20          MS. KENDRICK:  Your Honor, we would propose doing it         09:34:04

21  in late January or early February, in between.  We anticipate

22  that there will be plenty on the regular status hearing

23  scheduled for the 10th, and then also on the 27th we're doing

24  the contempt order to show cause.

25          THE COURT:  Right.                                           09:34:20

1          Okay.  Mr. Struck, do you have a view?

2          MR. STRUCK:  Your Honor, I think later is probably

3    going to be more appropriate, considering what the Court is

4    wanting to look for.  I imagine there's going to be a

5    considerable amount of ESI searching for documentation to          09:34:37

6    determine whether or not this is just a anecdotal one-time

7    incident, whether there is any validity to it at all, or

8    whether it's more widespread as the Court is concerned about.

9    And that is not something that can be done overnight.

10          So our preference would be to push it to the 27th and          09:34:57

11   28th of February.

12          THE COURT:  If I do it at the end of January, given

13   the holidays between now and then, I really am just affording

14   two weeks for this document production, which is really

15   insufficient.  If I postpone it to the end of February, then I          09:36:23

16   am adding significantly to what is perhaps already an

17   overburdened calendar.

18          And so what I would think is the right thing to do is

19   to set it for perhaps Thursday or Friday, the 8th or 9th of

20   February.          09:36:49

21          Can you all look at your calendars and see if that

22   could work to do it one of those days?

23          MS. KENDRICK:  Both of those days would work for us,

24   Your Honor.

25          MR. STRUCK:  I'm available on the 9th.          09:37:07

1          THE COURT:  All right.  So at 9:00 a.m. on the 9th of

2     February we will have the hearing on the issue of the

3     credibility of the reporting.

4          I expect to be fully engaged and available on any

5     discovery issues that arise.  I want to hear about them, and I          09:37:26

6     want to hear about them at the soonest instant, so that we are

7     getting everything teed up in an appropriate way.

8          If you have issues and you cannot resolve it in the

9     meet and confer, get me on the phone.  Although I have some

10    out-of-state and out-of-country travel in January, there's a          09:37:43

11    telephone everywhere that I'll be.  And so I will be readily

12    available every single day seven days a week from now until

13    then if issues arise.

14         Okay.  All right.  So that means we can proceed to the

15    filing from the defendants of the October reporting for the          09:38:10

16    performance measures, is what I would propose to start with

17    this morning.

18         Let me ask this threshold question of the defendants.

19    It looked to us on the document that you filed that it was only

20    perhaps a scanned copy, which meant that it was a little bit          09:38:29

21    cumbersome for us to use, we couldn't scan it -- we couldn't

22    search it.  And if I'm wrong about that, my apologies.  But if

23    I'm right, could I ask you in the future that when you file it

24    that you do so consistent with our electronic filing manual,

25    and that is file a version that is in a scannable pdf or Word          09:38:48

1    so that we can take advantage of that feature in accessing the

2    document.

3           On the plaintiffs' side, have you had a chance to

4    digest the reporting yet?

5           MS. KENDRICK:  We've attempted to.  Again, you know,      09:39:04

6    we object to the fact that it was filed after close of business

7    the night before the hearing.

8           We also kind of experienced the same problem last

9    night and this morning trying to review and search for things

10   on a non-OCR document.                                            09:39:18

11          But I do believe that we're able to go forward.

12          THE COURT:  All right.  Well, what it essentially

13   includes is an overwhelming demonstration of compliance with

14   performance measures.  Is that fair to say?

15          MS. KENDRICK:  No.                                         09:39:39

16          THE COURT:  Okay.

17          MS. KENDRICK:  No.

18          THE COURT:  All right.

19          MS. KENDRICK:  I mean, there's -- again, I don't know

20   why they're doing this, but they've included performance          09:39:44

21   measures that you've never found them non-compliant for, and

22   then tout the fact that they're at 100 percent compliance,

23   which is fantastic, but --

24          THE COURT:  So again, perhaps I've been hobbled by the

25   fact that I'm rushing it too, that when it comes on the eve.  I    09:39:58

CV-12-601-PHX-DKD – November 20, 2017

1    was to bed last night when this happened, so I was up at 4:00

2    going through it this morning.  Or at least not when you filed

3    it, but when I received notice of it, I missed the chance to

4    take advantage of it last night.  So I saw that it came in but

5    already knew that I couldn't change my course of life.        09:40:21

6         So I was up at 4:00 looking at this morning.  So I

7    perhaps was mis -- misinformed by what you just pointed out,

8    and that is, it may look to me that it's overwhelming if you

9    include all the things that I've not been worried about.  Is

10   that essentially what you just said?

11        MS. KENDRICK:  Well, there's --

12        THE COURT:  It includes some things that I had not

13   been worried about before.  So if I look at it, it looks to me

14   like the problem areas are more outliers.  Is that what you're

15   saying?

16        I was looking for a way to address this in an

17   appropriate way rather than going through it and going through

18   each one that is meeting the performance level, because it

19   seems a little bit not worth doing in light of the fact that I

20   don't know whether I can trust the numbers.                   09:41:05

21        But maybe the right thing to do is to turn to

22   plaintiffs and ask whether you have a list of areas of concern

23   and use those as the destinations for our discussion at this

24   moment.

25        MS. KENDRICK:  Yes, Your Honor.  Most of our          09:41:17

UNITED STATES DISTRICT COURT

1   questions, in fact, I think all of them, are around areas where

2   there's either continued non-compliance or there's a newer

3   remedial plan, and we have questions.

4        And we share your interest in not going to through the

5   Kabuki Theater of, you know, going through and reading plans    09:41:35

6   and not knowing when they're implemented.  So we're hoping that

7   we can streamline this as well.

8        THE COURT:  All right.

9        MS. KENDRICK:  So the first one was on Performance

10   Measure 11 at Eyman at page 4 of the Court filing.    09:41:44

11        They again talk about in their December 15th update

12   plan, which is at page 6, that the non-compliance is due to

13   documentation problems.  And that their tracking this

14   information and preliminary data for November indicates that

15   all facilities are compliant.  And so we're just unclear what    09:42:18

16   this preliminary data is based upon.

17        THE COURT:  Mr. Struck, or who on defendants' side?

18        MR. STRUCK:  Yes, Your Honor.

19        This particular action plan was provided to us by

20   Corizon.  It's a Supplemental Corrective Action Plan with    09:42:38

21   respect to the Eyman facility, which was at 78 percent.

22        And I will tell you we had some -- when I spoke to

23   Corizon, the Corizon folks yesterday, there were some

24   preliminary numbers -- in conjuncture with the ADC monitoring,

25   there was -- there were some preliminary November numbers, not    09:43:03

1    very many.  But on this particular Measure all ten facilities

2    met it.  Since we're talking about October numbers here.

3                THE COURT:  Right.

4                MR. STRUCK:  And so it's my understanding that they

5    are tracking this daily in order to try and finally reach          09:43:17

6    compliance with this particular Performance Measure.

7                And, of course, you know, pursuant to the Court's

8    order, if there aren't medications available, they're supposed

9    to go to Walgreens and get them.

10               It's something that is -- this is one of the original   09:43:41

11   performance measures that they were found to be non-compliant,

12   and it is subject to the Court's order that we're having a

13   hearing about the end of February.  It is on everyone's radar

14   screen, and it is on Corizon's radar screen.

15               So the fact that their preliminary numbers will show    09:44:04

16   that all of the facilities met compliance -- were compliant

17   with this is positive.

18               THE COURT:  All right.  I don't know that there's much

19   more to be said, because we are in the period where come the

20   end of February we'll know what the actual numbers were and        09:44:19

21   whether there will be a sanction.  So we're in this time period

22   where my words of remonstration are probably less effective

23   than the potential monetary threat that looms.

24               But, again, I have to drop the footnote that it all is

25   subject to confidence that we can trust the numbers.               09:44:39

——CV-12-601-PHX-DKD – November 20, 2017——

1          Anything else you want to say on this Measure,

2   Miss Kendrick?

3          MS. KENDRICK:  No, Your Honor.

4          THE COURT:  Okay.  The next one?

5          MS. KENDRICK:  Sorry, I'm having to scroll through          09:44:48

6   this.

7          THE COURT:  That's fine.

8          MS. KENDRICK:  I don't have a hard copy.

9          THE COURT:  Take your time.

10          MR. STRUCK:  Your Honor, I have -- I have a hard copy,     09:44:58

11   if it would make it easier for --

12          THE COURT:  Sure, please.

13          MR. STRUCK:  -- Miss Kendrick to scroll through.

14          THE COURT:  Sure.

15          MS. KENDRICK:  Unfortunately my notes are on the pdf.      09:45:22

16          THE COURT:  And I understand that that may --

17          MS. KENDRICK:  I'm sorry.

18          THE COURT:  Don't apologize.  It's very difficult to

19   have everything in line when you get it just the eve of the

20   hearing.  So take your time.                                     09:45:35

21          MS. KENDRICK:  So the next one was on Performance

22   Measure 15.  And this is about the medication refusals.

23          And for the past two hearings we have raised the fact

24   that the Corrective Action Plans kept referring to the fact

25   that people needed to be counseled by providers, and the Action  09:45:50

1    Plans were putting duties on providers.  And we had observed

2    that the Stipulation defines QHCP as a qualified healthcare

3    professional, so it doesn't have to be somebody at such a high

4    level.

5            And the past two months Mr. Bojanowski and the Corizon      09:46:09

6    people said they would get back to us as to whether the

7    Corrective Action Plan would be put on non-provider staff

8    rather than burdening the very few doctors that they already

9    have and nurse practitioners they have at the institutions.

10           THE COURT:  And you haven't heard back, is that what      09:46:29

11   you're saying?

12           MS. KENDRICK:  What's that?

13           THE COURT:  You haven't heard back about whether

14   that's happened?

15           MS. KENDRICK:  No, sir, not a word.      09:46:34

16           THE COURT:  Do you know, Mr. Struck?

17           MR. STRUCK:  Well, I do know that I was informed that

18   the Director of Nursing is the one that's -- she's checking on

19   a daily basis to make sure that this is happening with respect

20   to --      09:46:50

21           THE COURT:  But you don't know who is doing the

22   counseling?

23           MR. STRUCK:  I do not know who is doing the

24   counseling.

25           THE COURT:  Would you make a note and ask      09:46:56

1   Mr. Bojanowski to let plaintiffs know whether or not it

2   is -- again, this is something that is principally in your

3   wheelhouse as to how to decide to do it.  But I think the

4   plaintiffs make a constructive comment, and that is, having

5   heard that it appears that you're thinking that maybe providers          09:47:15

6   needed to be the ones who were doing it, that that's not

7   necessarily so.

8           MR. STRUCK:  I can find out, Your Honor.

9           THE COURT:  All right.

10          MS. KENDRICK:  So the next one, Your Honor, is          09:47:24

11   Performance Measure 35.  And this is a Performance Measure that

12   the Court is quite familiar with about the transfer of

13   medications between the facilities.  And you've included it in

14   your order to show cause with regard to Eyman, Florence, Lewis

15   and Tucson.          09:48:03

16          And unfortunately they continue to report

17   non-compliance.  Seventy-eight percent at Eyman.  Eighty-five

18   percent at Florence, so they're above.  And okay, actually, no,

19   Tucson is at 90, that's very good.

20          So I guess the question, they've included the new          09:48:34

21   system and the new policy, they cut and pasted it into the

22   Corrective Action Plan.  But I don't know if they have an

23   update on how this is working in terms of the daily tracking

24   and the ultimate reporting that's going to come to the Court in

25   February.          09:48:56

1          THE COURT:  That was going to be my first question for

2     Mr. Struck.

3          Do you have any update on anything past October on

4     this one?

5          MR. STRUCK:  I do not have an update on anything past          09:49:04

6     October on this particular Performance Measure.  Other than to

7     say the -- I do have the name of the individual who the

8     Department of Corrections has hired -- or has assigned as

9     the -- to coordinate Corizon and ADC, and his name is Mark

10    Versluis, V-E-R-S-L-U-I-S.  I believe that he started in the          09:49:29

11    beginning of November.  And his job is to ensure coordination

12    between security, who are transferring the inmates from

13    facility to facility, and to make sure that the KOP and the

14    D.O.T. meds are transferred and provided to the inmate,

15    whether they have them when they arrive, make sure that they          09:50:00

16    get them.

17         But I don't have current status with respect to how

18    that's going.  I requested that information, but I was -- they

19    were unable to provide it to me.

20         MS. KENDRICK:  The other thing, Your Honor, is at page          09:50:17

21    79 of the filing, at docket 2506-1, for Lewis, they report no

22    score for the institution and say that it's in the rebuttal

23    process.

24         If you have an update on that one.

25         THE COURT:  There is no October reporting for 35 for          09:50:45

1    Lewis.  And it says it's -- as Miss Kendrick says, it's in the

2    rebuttal process.

3         Do you have an insight as to what the challenge was

4    there and where that stands?

5         MR. STRUCK:  I can tell you that the October Lewis        09:51:19

6    number, which is not listed on here, is 84 percent.  I don't

7    know what the -- where the rebuttal process stands, whether

8    that was what the issue was or whether that was upheld or not.

9         THE COURT:  So you have a piece of paper that tells

10   you that the October for Lewis was 84?  Is that what you just   09:51:34

11   said?

12        MR. STRUCK:  Yeah, it's my understanding that

13   the -- that that was the score that's being -- the preliminary

14   score that's being contested by Corizon.

15        THE COURT:  I see.                                        09:51:48

16        MS. KENDRICK:  So, Your Honor, actually I just

17   realized as soon as I said it that they produced the CGARs to

18   us last night, and so I looked and confirmed that it was at 84

19   percent, according to what they gave us.

20        However, we raised this last month and this came up in    09:52:03

21   the hearings, this whole issue of the rebuttals.  Mr. Pratt

22   represented last week that the rebuttal process is over by the

23   10th of the month.  It came out in the testimony that when

24   these rebuttals happened and things were changed, that they

25   were going to make an addendum.  That actually was an item on   09:52:22

1    our agenda, item number 5.

2         I am looking at what they produced us last night

3    that's Bates stamped ADCM1045147 for Performance Measure 35 at

4    Lewis, and there's no addendum or indication looking at the

5    face of the CGAR what was changed to get this final number of          09:52:42

6    84 percent that was given to us last night.

7         THE COURT:  Thank you.

8         It is true what Miss Kendrick just said that Mr. Pratt

9    told us last month that if it was in the informal process there

10   was no documentation about that.  I expressed some concern         09:53:00

11   about that.  But then we were assured that if it was in the

12   formal process that there was documentation.

13        Is that only when there is a final decision that's

14   made that it's formally recorded, Mr. Pratt?  Or is this an

15   error that should have been reflected that actually a rebuttal      09:53:19

16   had been asserted?

17        MR. PRATT:  The results are -- there's not an addendum

18   until these results are considered final.  At that point IF

19   there's a change there would be an addendum placed in there.

20        THE COURT:  All right.  So now my understanding is a         09:53:35

21   little bit different.  Because I did think that what you said

22   is that things would have to be resolved by the 10th of the

23   month, and then after that it would be reported, and that any

24   challenge would have to be documented.  But here we are --

25        MR. STRUCK:  Your Honor, 84 percent is final.  I         09:53:56

CV-12-601-PHX-DKD – November 20, 2017

1    just -- Mr. Pratt just informed me that the numbers that were

2    provided to Court and counsel with respect to the CGARs are

3    final numbers.  So 84 percent is final.

4         We -- this chart that we get is provided to us by

5    Corizon's attorneys.  So that's perhaps why it's not up to          09:54:15

6    date.  But it's my understanding that the 84 percent that is

7    reported on the CGARs, the October CGARs, is a final number.

8         So the appeal must have been denied by ADC.

9         MS. KENDRICK:  Well, I don't know --

10        THE COURT:  I need to understand what you just said,          09:54:40

11   Mr. Struck.

12        MR. STRUCK:  Okay.

13        THE COURT:  Did you say that document 2506, page 79,

14   was a document prepared by Corizon and given to you?

15        MR. STRUCK:  These documents are -- these graphs are          09:54:52

16   prepared by the Corizon attorneys.  And we go through it with

17   them and make changes on it.

18        Yesterday I met with them and the Corizon folks and we

19   added information to the -- some of the Corrective Action

20   Plans, because the plaintiffs and the Court have expressed a       09:55:13

21   frustration that some of these Corrective Action Plans in the

22   past -- the Corrective Action are provided by Corizon.

23        THE COURT:  I had no idea.  I had no idea that the --

24   that this work in progress that I've been working with

25   Mr. Bojanowski on on this reporting was something that's being     09:55:31

1    generated by the contractor who's supposed to be monitored.

2         MR. STRUCK:  It's provided to us in Word, and then we

3    do make changes to it.  We add to -- like, for example, there

4    was -- there's additions to -- when I found out some more

5    specific information with respect to the Corrective Action            09:55:48

6    Plan, we added to -- that information to that.

7         But in terms of these graphs, that's something that we

8    receive from Corizon.

9         But it -- and by way of explanation, that's probably

10   why the 84 isn't on there, but yet it is reflected in the CGAR        09:56:09

11   results that we provided to the Court and counsel.

12        THE COURT:  I cut you off, Miss Kendrick.

13        MS. KENDRICK:  So I get Mr. Struck seems very

14   confident that there must not have been any change in the

15   score.  But, again, there's really no clarity, because last          09:56:28

16   week -- or last month Mr. Pratt said that the addendums weren't

17   being made, while they said in a court filing that they were

18   going to start making addendums any time there was this formal

19   rebuttal process going on so that things could be seen.

20        So, again, it's very hard to take with any confidence          09:56:46

21   the trust us nothing's changed.  Because I'm looking at

22   something that's dated 11-29-17 done by a person who is one of

23   the monitors at the facility.  And as of December 15th,

24   according to them, it was still in the rebuttal process, so we

25   have no way of knowing what's been changed.                         09:57:09

1          I certainly hope that Mr. Struck is correct and I can

2    take him at his word on this that nothing changed.  But it's,

3    again, troubling for us.

4          Also we're slightly concerned to learn that Corizon is

5    preparing the filings for the Court about how the Department is          09:57:26

6    going to ensure compliance with the performance measures.

7          MR. STRUCK:  Your Honor, the CGARs are prepared by

8    ADC.  And the CGARs that were provided to Court and counsel

9    have the 84 percent.

10          These documents are given to us in a draft form, but          09:57:43

11    we -- like I said we -- it's in a Word format, so we, you know,

12    we make sure that it has -- I've been in the courtroom where

13    the Court -- where the Judge has expressed displeasure with

14    some of this information being inaccurate, so I wanted to make

15    sure it was accurate.  So I met with the Corizon folks twice to          09:58:04

16    go through this stuff to make sure it was accurate and to add

17    information to provide the plaintiffs and the Court, additional

18    information with respect to some of these performance measures

19    that aren't -- that were not in compliance, to explain what

20    Corizon was doing to try and get it -- and ADC was insisting          09:58:23

21    they do to try and get in compliance.

22          THE COURT:  A couple of take aways here.  The first is

23    that I appreciate having the information now that, as I say, is

24    new information, and that is the provenance of these documents

25    that we're discussing right now.  So that's informative to me.          09:58:43

1    The second take away is that it does augment what had

2  been my growing belief that it was appropriate that there

3  should be any -- that if there should be any change in the CGAR

4  data, either pursuant to the informal rebuttal process or the

5  formal rebuttal process, that that all should be logged          09:59:07

6  similarly to any way that a patient progress note is logged.

7  If the doctor records something that turns out not to be

8  accurate, they don't go in and erase the old one, they then put

9  at the bottom of the note, the previous statement is corrected

10 to reflect this.                                                 09:59:30

11    And so that kind of bread crumb trail that is so

12 intrinsic to proper auditing I think should be present in this

13 process as well.

14    Whether we -- exactly how that is put in place,

15 whether it should be in the Monitoring Manual or some            09:59:48

16 modification otherwise, an instruction of the Court, for

17 example, I am continuing to contemplate that and consider it,

18 thinking that it may be necessary.

19    Go ahead, Miss Kendrick.

20    MS. KENDRICK:  That's it on that measure.                     10:00:08

21    THE COURT:  You may go ahead then.

22    MS. KENDRICK:  So the next one was Performance Measure

23 39, which is about routine providers being seen -- provider

24 referrals being seen within 14 days.

25    At Florence, which is at page 92 of the filing, the           10:00:22

CV-12-601-PHX-DKD – November 20, 2017

1    basis for non-compliance at the institution, I have read it

2    several times, and granted it was late at night, but I still

3    don't quite understand what the problem was.  And so hopefully

4    Mr. Struck or Mr. Pratt or somebody could explain.

5           THE COURT:  Which paragraph are you talking about that          10:00:44

6    you had trouble with?

7           MS. KENDRICK:  It's at the bottom of page 92.  It

8    says, basis for non-compliance.

9           THE COURT:  There was an issue experienced with the

10   manner in which routine provider referrals requiring an          10:00:53

11   appointment were being scheduled by one staff person at this

12   facility.  The staff member was miscalculated the 14 day time

13   clock starting on the day after the referral was made, rather

14   than on the same day it was made, leading to referrals being

15   addressed one day late.          10:01:14

16          MS. KENDRICK:  So I guess, is the point that you guys

17   are scheduling them to be exactly 14 days from the date of

18   referral?  Or why would being off one day be the cause of all

19   the problems?

20          MR. STRUCK:  It's my understanding that there was          10:01:37

21   somebody that was miscalculating it so these things were

22   occurring in 15 days, within 15 days, which obviously doesn't

23   meet the 14-day threshold.  That was one of the issues.

24          In addition, there had been -- prior to this there had

25   been a backlog at the facility that has been -- that's no          10:01:57

1    longer in existence after the additional staff had been hired

2    in October.

3          So those were the two issues identified as to why

4    Florence was having trouble meeting the 85-percent threshold on

5    Performance Measure 39.                                        10:02:24

6          MS. KENDRICK:  What was the additional staff that was

7    hired in October?

8          MR. STRUCK:  Your Honor, I don't have the information

9    with respect to the additional staff at may fingertips.  I

10   thought it was in here somewhere, but I will find out at the   10:03:29

11   next break and let you know.

12         THE COURT:  Do you know when they were hired in

13   October?

14         MR. STRUCK:  It was my understanding that they were

15   hired in October.                                              10:03:37

16         THE COURT:  Do you know when they started?

17         MR. STRUCK:  Wait.  Well, I have -- it shows -- if you

18   look at the supplemental information, it looks like there were

19   two nurse practitioners hired on October 2nd, an additional

20   M.D. hired on October 5th.  If you look above --               10:03:53

21         THE COURT:  I see, I see.

22         MR. STRUCK:  Okay.  I think that is -- those are

23   the -- that's the additional staff that helped eliminate the

24   backlog.

25         MS. KENDRICK:  Is that additional or is it replacing     10:04:07

1    vacant positions?

2         MR. STRUCK:  I'm sure it was replacing vacant

3    positions.

4         THE COURT:  And yet on October 9th, according to the

5    KJZZ story, there's a memo from Daniel Sego:                    10:04:27

6         Hi team.  As you all know we are currently

7         working towards catching up on our backlog of both

8         HNR and Chronic Care patients totaling

9         approximately 800.  We are in need of all available

10        provider staff to assist in, quote, Operation          10:04:45

11        Backlog, close quote.  We have the availability and

12        need at both Florence and Eyman, and we encourage

13        you to let us know when -- where you would like to

14        work the overtime shifts and we will make the

15        arrangements.                                           10:05:01

16        I greatly appreciate any and all time you are

17        willing to spend assisting us with our patient care

18        needs.  You will be compensated for your time.  And

19        who couldn't use a little extra cash around the

20        holidays?  Thank you in advance.  And I look           10:05:14

21        forward to the response.

22        Best regards, Daniel Spencer Sego.

23        Facility Health Administrator.

24        Arizona State Prison Complex - Florence.

25        Do you have any data post October with respect to 39    10:05:42

 1   at Florence?

 2          MR. STRUCK:  I do not.

 3          THE COURT:  And this issue is one that's also

 4   implicated by the HNR Box Removal Program because it does

 5   affect the number of days.                                    10:06:12

 6          All right.  Your next Measure?

 7          MS. KENDRICK:  Yes, Your Honor, Performance Measure

 8   42, which is about follow-up sick call encounters occurring

 9   within the time frame specified by the medical provider.

10          So Eyman is at 35 percent this month, going down from  10:06:31

11   49 percent.  At the bottom of page 104 is the Corrective Action

12   Plan.  And I'm trying to look at my notes here.

13          Oh, so I guess it's midway on page 104, it's in

14   regular font, it's not bold.  It says that:

15          On or after December 15th Corizon compliance          10:07:03

16       monitor shall review an appropriate sample of

17       entries on the logs to evaluate and assess

18       compliance with the new policy and procedure.  Any

19       and all compliance deficiencies discovered during

20       this monitoring exercise shall be addressed by site      10:07:19

21       leadership in the form of providing additional

22       training to those providers associated with

23       deficiency findings.

24          So since this was supposed to be done, I don't know if

25   it's been done yet, if there's any update on what this review  10:07:32

UNITED STATES DISTRICT COURT

1    by the compliance monitors have found.

2              THE COURT:  It will be interesting to see whether or

3    not the providers are actually able to schedule the follow-up

4    in light of the staffing issues that seem to be suggested both

5    with respect to the information that we have from the KJZZ          10:08:15

6    story and also from the reporting numbers here, just so

7    abjectly poor at 35 percent, 47 percent, 66 percent.

8              And I gather you don't have any real-time data in the

9    last five days.

10             MR. STRUCK:  I don't have any real-time data on that.     10:08:45

11             I was informed that one of the problems was that the

12   providers weren't consistent in ensuring that these follow-up

13   appointments were being scheduled.  So a CNA, a certified

14   nursing assistant, has been tasked with actually having that

15   job, to make sure that the order from the provider and -- is       10:09:05

16   taken and a follow-up is scheduled.

17             The Director of Nursing and the scheduler are looking

18   at this daily.  But I do not have any real-time information

19   with respect to how that's going.

20             MS. KENDRICK:  So I guess I would hope that they have     10:09:29

21   nursing staff to do the follow-ups.

22             I'm sorry, Your Honor, just to go back a couple pages,

23   I just realized this as we were flipping through.  There's no

24   data reported for Performance Measure 39 at Perryville.  It's

25   at page 96 of the filing.  I checked the CGAR that we got last     10:09:44

**CV-12-601-PHX-DKD – November 20, 2017**

1    night for this Performance Measure, and it shows 77 percent

2    compliance with this measure.

3              And again, if this was one that was in the rebuttal

4    process, the CGAR that we were given, which is Bates stamped

5    ADCM1045194, has no indication of any changes being made.          10:10:08

6              Since it's 77 percent, we would also ask what the

7    remedial plan is for Perryville for this measure.

8              THE COURT:  The first question is whether Mr. Pratt

9    knows whether this one is now concluded from the rebuttal

10   process and we can take the 77 number, or whether the rebuttal   10:10:29

11   process still seems to remain open.

12             Do you know?

13             MR. STRUCK:  The 77 percent number is a final number

14   that --

15             THE COURT:  All right.  And what would defendants       10:10:40

16   propose to do about correcting this problem and identifying its

17   cause?

18             MR. STRUCK:  You know, I am not sure what -- I did not

19   get a remedial plan from Corizon.  But in looking at PM 39, it

20   looked like Perryville was in compliance for --                   10:10:56

21             THE COURT:  They were, yeah.

22             MR. STRUCK:  -- six months in a row.  So I'm not sure.

23   I have to find out what the reason behind the falling from 94

24   percent to 77 percent was.  And I don't have that information.

25             MS. KENDRICK:  But we would note that, according to     10:11:26

1    their November staffing report, which was filed -- we filed it

2    last night at docket 2509-1, on page 7 it shows that the

3    Medical Director position at Perryville is staffed at 80

4    percent, and the staff physician positions are at 80 percent

5    full-time equivalent.                                        10:11:43

6           So we would express a concern that it perhaps is

7    rooted in the fact that they're not at full staffing at the

8    physician and Medical Director level.

9           THE COURT:  That would be a reasonable conclusion.

10          All right.  Your next one?                             10:11:57

11          MS. KENDRICK:  So Performance Measure 42 at Lewis,

12   which is page 106 of their filing, they show 66 percent

13   compliance for the month.  The new Corrective Action Plan as of

14   last week says that the training is being done for nurses on

15   the requirements.  It also says that the Assistant Directors of  10:12:31

16   Nursing are pulling data related to this issue daily to send to

17   providers.

18          And then the final sentence is written in the passive

19   voice and says:  Further, the data is checked every night at

20   10:00 p.m. to prompt follow-up.                              10:12:48

21          And so our question would be, checked by whom?

22          THE COURT:  Do you have an answer to that question?

23          MR. STRUCK:  Yes.  It's my understanding it was the

24   Assistant Director of Nursing.  But I will get confirmation on

25   who is checking at 10:00 p.m.                                10:13:11

1          THE COURT:  Give me just a moment.

2          MS. KENDRICK:  So the next one we have questions about

3     is Performance Measure 46 at Eyman, which is at page 118 of

4     this filing.  And they show 60 percent compliance.

5          And then on page 119 is the supplemental Corrective     10:14:03

6     Action Plan, which states that there's a backlog in having

7     providers review and act on diagnostic and pathology reports.

8     And then it says, providers were only reviewing their own

9     ordered diagnostic and pathology reports and were not also

10    reviewing the reports sought by other providers.            10:14:29

11         The Corrective Action Plan states that on-duty

12    providers will be assigned to an individual yard at the

13    facility.  Providers are now responsible for reviewing all

14    diagnostic and pathology reports generated for the patients at

15    an assigned yard, including those requested by other providers. 10:14:45

16    This supplemental Corrective Action Plan was implemented in the

17    beginning of November 2017.

18         So a couple of questions or comments coming out of

19    this Corrective Action Plan.

20         First of all, our understanding was that providers     10:15:01

21    were assigned to an individual yard at the facility unless

22    there was a shortage of providers and then they had to go to

23    multiple yards.

24         The second observation is one that our consulting

25    expert, Dr. Wilcox, has shared with us before that the best   10:15:19

─── CV-12-601-PHX-DKD ─ November 20, 2017 ───

1   practice is that the provider who orders a report should be the

2   same person who reviews the report, because they know why they

3   ordered the report in the first place.

4        You know, obviously if that person is no longer

5   working there, then someone's going to have to review it.  But        10:15:34

6   I guess we just had some questions about why that is becoming

7   the practice and why it's not the situation where the person

8   who orders the report is reviewing the report.

9        THE COURT:  Mr. Pratt, do you have any observations

10  there?                                                                10:15:57

11      (Discussion held off the record.)

12        MR. PRATT:  Your Honor.

13        THE COURT:  Yes.

14        MR. PRATT:  It may not be the case where it's simply

15  the provider that ordered the report when it comes in.  In a        10:16:10

16  lot of cases you also have to consider the inmate movements

17  going from one facility or one yard to another when that report

18  does come in.  So it's not going to be the same provider that

19  is actually hands on with that inmate at the time.

20        THE COURT:  Okay.  Miss Kendrick, can I go back to 42        10:16:30

21  for a moment?

22        MS. KENDRICK:  Of course, Your Honor.

23        THE COURT:  Is my recollection correct that you

24  focused on Lewis and not on the other facilities, or did you

25  address the other facilities as well?                                10:16:45

1          MS. KENDRICK:  I think we looked at Eyman and Lewis.

2          THE COURT:  Did you?  All right.  Thank you.

3          Because I was going back to my notes from last month,

4     and I guess it looked to me like there had been a dialogue with

5     the Corizon people to make sure that the training was in place,          10:17:13

6     that this should have been reflected even in October.

7          No, that's not right, it's on November 1.  So November

8     1 was the new oversight.  Okay.  Never mind then.  Thank you.

9          You may go.

10         MS. KENDRICK:  So Performance Measure 46, again          10:17:39

11    reporting 65 percent compliance at Florence.  This Performance

12    Measure is part of your order to show cause at Eyman, Florence,

13    Perryville and Tucson, so we're concerned that the data is not

14    showing great improvement.

15         On the Lewis one, which is at page 121, the          10:18:03

16    supplemental information is referring to intake nurses and

17    communicating that people be seen upon their transport to the

18    Lewis facility before they are taken to their unit.  But it's a

19    little unclear how -- whether the source of the problem is

20    people that were coming from other prisons, or what the          10:18:30

21    situation was there.

22         THE COURT:  Do you have an answer on that?

23         MR. STRUCK:  Yeah, I think that -- it's my

24    understanding the issue is when inmates are transferred from

25    complex to complex, that at least at Lewis there had been          10:19:18

1   issues with respect to whether or not the providers at the

2   Lewis facility were -- knew that they needed to be reviewing a

3   diagnostic report or a pathology report that might have

4   occurred at a prior -- when they were at a prior facility.

5          And so I think that it's my understanding that       10:19:44

6   the -- this particular action plan by Corizon is to try and

7   ensure, to catch the patients that are being transferred to

8   make sure that this Performance Measure is being met.

9          THE COURT:  Do you have any more current data than

10  October?                                                    10:20:09

11         MR. STRUCK:  I do not.

12         THE COURT:  I guess that's puzzling to me why you

13  don't.  Because I guess if I were the defendant in this case

14  and I was sitting in the middle of December and I knew that

15  each one of these would cost me $1,000 if it wasn't happening  10:20:20

16  in December, and I had October data that suggested that I was

17  missing the boat here, and that this could be very costly for

18  me, I would really have my fingers on that pulse, I'd know

19  about it.

20         MR. STRUCK:  I'm not disagreeing with you, Your Honor.  10:20:36

21         THE COURT:  But you don't.  You don't --

22         MR. STRUCK:  Not -- on some of them I do.  On this one

23  I don't.  And I don't have the answer for you as to why I

24  don't.

25         THE COURT:  All right.                               10:20:48

CV-12-601-PHX-DKD – November 20, 2017

1      MS. KENDRICK:  Your Honor, just one other observation.

2  The CGARs that we got last night for Lewis, I was looking at

3  this Performance Measure trying to get some more information,

4  and observed that there seems to be a problem similar to one

5  that we identified in the letter that was attached to my      10:21:05

6  Declaration regarding the September CGARs, and that's the issue

7  of reviewing reports and actions for the month that's not being

8  reviewed.

9      So, for example, this is the October CGAR, it's Bates

10  number ADCM1045151, and it refers to a non-compliance file      10:21:22

11  where the results were received on September 20th and reviewed

12  September 26th.  And again, I'm not quite sure why that would

13  be included in the sample for an October performance review.

14      THE COURT:  I can't figure out a reason.

15      As you just listened to that description, Mr. Pratt,      10:21:52

16  do you have any idea why that would be so?

17      MR. PRATT:  I don't, Your Honor.

18      THE COURT:  All right.  Thank you.

19      MS. KENDRICK:  So on Performance Measure 46 for

20  Phoenix, which is a couple pages later, at page 123.  This      10:22:17

21  Performance Measure is about medical providers reviewing

22  diagnostic reports, but on this document on the basis for

23  non-compliance it states that the psychiatrist on staff did not

24  understand the process for reviewing diagnostic reports and

25  acting upon them.      10:22:38

1          So it's a little unclear why we have psychiatrists

2     reviewing diagnostic reports, and how that's relevant to a

3     Performance Measure that's about medical procedures and

4     reports.

5          (Discussion off the record between defense counsel.)          10:23:23

6          MR. STRUCK:  Your Honor, I'm going to have to find out

7     some additional information to answer that question.

8          THE COURT:  And I gather Dr. Taylor or Mr. Pratt have

9     no ready response to it, on the face of it?

10         MR. STRUCK:  That's correct.          10:23:47

11         THE COURT:  All right.

12         MS. KENDRICK:  So I wanted to go to Performance

13    Measure 47, which is at docket 2506-2, page 3.

14         Eyman is listed as 60 percent.  This is a Performance

15    Measure and institution that's included in your order to show          10:24:27

16    cause for contempt, along with multiple other facilities;

17    Florence, Lewis, Perryville, Phoenix and Tucson.  And this is

18    an issue which we've discussed ad nauseam for most of the year

19    about communicating the results of the test.

20         And at the bottom of page 3 the basis for          10:24:47

21    non-compliance says that there were, quote, issues previously

22    experienced in terms of how diagnostic results could be

23    communicated and delivered to an inmate upon request.

24         And the question is, what are the issues?  Because our

25    understanding was that this new process was put into place          10:25:08

1   several months ago for communicating diagnostic results to

2   inmates.

3           THE COURT:  So we have two questions here.  The first

4   one, the one you just raised, what is the modification?

5   Because it just says there's -- the diagnostic results, the RN    10:25:28

6   is now tasked with immediately providing the results to an

7   inmate.  We don't know how that's happening, what is the

8   method.

9           And the second is, it says it's being tracked on a

10  daily basis.  And at leads to the question, do we have          10:25:42

11  real-time data on where we stand yesterday, for example?

12          MR. STRUCK:  The answer to question number two, I

13  don't have real-time data.

14          THE COURT:  Do you have any update at all after the

15  implementation of the program the third week of November?       10:25:58

16          MR. STRUCK:  I do not.

17          THE COURT:  All right.

18          MS. KENDRICK:  All right.  We would just observe that

19  Florence also looked problematic at 46 percent, Lewis at 52

20  percent, and Tucson at 75 percent.  So we hope that perhaps at   10:26:12

21  the January 10th hearing we might have a sneak peak of some of

22  the real-time data, as we had requested that the December

23  real-time data be provided at that hearing for those measures

24  that were included in your order, Your Honor.

25          THE COURT:  Right.  Well, it seems that if it's being    10:26:37

CV-12-601-PHX-DKD – November 20, 2017

```
 1  tracked on a daily basis, that is as difficult as forwarding an

 2  e-mail to let us know.  I mean, obviously I'm most interested

 3  in compliance with the Stipulation and compliance as

 4  expeditiously as possible.  And I'm limited by the delay in the

 5  data that is a natural feature of the process.  But when that      10:27:01

 6  natural feature of the process is addressed by daily tracking,

 7  it is certainly much more useful for me to have that

 8  information, and I would encourage it to be produced.

 9          With respect to the first question, Mr. Struck, do you

10  know what is the new method that the RNs are using?              10:27:24

11          MR. STRUCK:  I'm going to have to find out what

12  actually the RN is doing.

13          THE COURT:  I see.  I guess that seems to me a pretty

14  important component here, consistent with really the drill down

15  that I have engaged in on a monthly basis.  I mean, tasked with   10:27:40

16  immediately providing these results to an inmate, that could be

17  everything from immediately walking it over to the inmate in

18  his or her cell, to other methods that have been communicated

19  to me in the past, that apparently were not done, and that is

20  using the mailbox rule and immediately putting it in the inmate   10:28:09

21  mail.  But I've been told that that doesn't work for a number

22  of reasons.

23          So the bottom line of this comment is, I'm surprised

24  that we don't have an answer to both of these questions at this

25  moment at this time.                                            10:28:26
```

1        MR. STRUCK:  Your Honor, I'm documenting these

2   questions.  I will get an answer to the Court and to the

3   plaintiffs.

4        THE COURT:  Right.  But that's not really helpful in

5   one way, because we have these monthly meetings to try to cut          10:28:37

6   as much time as we possibly can out of the delay process.

7   Because if I wait until the next -- to the next time that we

8   talk about it, I'm 30 days, usually, out from when we last

9   talked about it.  And it is anything but expeditious to do it

10  that way.                                                             10:29:00

11       And so I've been trying to drill down, trying to nail

12  people to firm commitments, as I told Mr. Bojanowski last month

13  using the metaphor of keeping feet to the fire.  I mean, that's

14  really what I try to do.  And if we don't get the answer right

15  at this moment, the feet grow cold.                                   10:29:17

16       MR. STRUCK:  My intention is that as soon as there's a

17  break, to send these questions out and try to get an answer

18  today.

19       THE COURT:  Okay.

20       MR. STRUCK:  And I apologize.  But I can't -- I mean,           10:29:28

21  I can anticipate what some of the questions are going to be.

22  And I did.  But I didn't -- I still -- I couldn't get an answer

23  for you, because I made an attempt.  Some of these questions I

24  just didn't anticipate, but I can get the answer.

25       And I understand the Court's desire to -- we're                  10:29:44

1   talking about it now, you'd like to have the answer now.  But I

2   don't have the person from Florence that we're going to have to

3   ask this question here in the courtroom, so I can't answer it.

4         THE COURT:  All right.  Thank you.

5         We'll take a ten-minute break at this moment and then      10:30:01

6   we'll get back to it.  Thank you.

7      (Recess at 10:30 a.m., until 10:44 a.m.)

8         THE COURT:  A couple of things, the Court collecting

9   its thoughts during the break.  It makes sense, I think, for us

10  to set a deadline at the very start so that people can            10:45:02

11  understand when the documents would need to be designated for

12  the February hearing on the reporting.

13        I just want to make sure that people do feel that they

14  have a deadline in place, so that they know at that deadline

15  who the plaintiffs believe the list of witnesses should be and   10:45:34

16  the document categories that the plaintiffs believe should be

17  produced for the hearing.

18        And it would seem to me that an appropriate deadline

19  for that would be maybe the end of the second week of January.

20        What do you think about that, Miss Kendrick?              10:45:52

21        MS. KENDRICK:  So you're saying for production of

22  documents and --

23        THE COURT:  That would be the deadline for you to

24  designate the witnesses that you believe, so that you are

25  putting notice on anybody who has responsibility for those       10:46:04

UNITED STATES DISTRICT COURT

1    witnesses, by that date.  And then also you would be serving by

2    that date your requests for production of documents, so that

3    you would have enough time to allow for the responding parties

4    to collect those documents and for any issues to be resolved,

5    and also allow enough time for you to digest them.                    10:46:29

6          And then once that date happens, then it would seem to

7    me --

8          Unfortunately I don't have a calendar.  I do now.

9    Good.  2018.

10         MS. KENDRICK:  So, Your Honor, kind of working                  10:46:56

11   backwards from that date, the 9th, we agree that we would want

12   to give them the list of names.  But depending on what we --

13         THE COURT:  You need a deadline to have the response;

14   right.

15         MS. KENDRICK:  Right.  And we would also need to                10:47:12

16   potentially supplement who we were going to call based upon

17   what we get in the document production.

18         So working backwards what we would propose is that we

19   get our request to them no later than January 12th, which is

20   four weeks before the hearing.  They provide all responsive          10:47:27

21   information no later than the 26th.  And then Friday the 2nd,

22   one week before, would be the final day for any supplemental

23   witnesses based on reviewing documents.

24         THE COURT:  And defendants' view on that schedule?

25         MR. STRUCK:  Your Honor, I don't think that's                   10:47:49

—CV-12-601-PHX-DKD – November 20, 2017—

1    going -- I mean, I haven't seen what their document request is,

2    but I suspect that there's going to be a significant amount of

3    ESI.  Probably, based on the Court's comments, it's going to

4    have to come from Corizon.  And I don't even know what kind of

5    document retention system they use, whether they -- you know,        10:48:05

6    how easy it's going to be to get it from them.  So I'm a little

7    concerned about that short fuse.

8         To agree on search terms, agree on -- I just think

9    we're going to need a little more time than that.

10        THE COURT:  Miss Kendrick, would it be possible to          10:48:20

11   push you all to the 5th of January as the date that you get

12   this -- these requests over to the defendants and to anybody

13   else?

14        MS. KENDRICK:  Yes, we could do that.

15        However, I would just note that we would like a firm        10:48:34

16   deadline for all discovery to be in, and for defendants to

17   produce it on a rolling basis rather than waiting until the

18   last piece of paper has arrived before producing anything to

19   us.

20        So 26th is the absolute deadline for them to produce        10:48:47

21   responsive documents, but that they start doing it sooner, then

22   we could do it on the 5th.

23        THE COURT:  All right.  So we'll set the 5th for the

24   date for the request for production and for the witness list

25   from plaintiffs to be produced.                                  10:49:04

UNITED STATES DISTRICT COURT

1          And then we'll set a response deadline of the 26th of

2     January.

3          And also the requirement that in good faith and with

4     good deliberate action, that the plaintiffs (sic) produce

5     documents on a rolling basis rather than accumulating them for          10:49:19

6     service on the date of the 22nd (sic).  If they become

7     available to counsel here sooner, then they should produce

8     those to plaintiffs so that they can have the time to digest

9     them.  That seems to be a fair accommodation of the respective

10    parties' positions on this issue.          10:49:40

11          MR. STRUCK:  And, Your Honor, I do want to point out,

12    I do want to mention, because Miss Kendrick is implying that we

13    don't do that, that we data dump them.  We don't do that.  When

14    we can, we produce on a rolling basis, there was really no need

15    for you to order that.  And it's -- I'm --          10:49:55

16          THE COURT:  I don't know, were you here last month

17    where I heard about -- it sounded to me, looked to me like it

18    was not a rolling basis, at least in one instance.  It may be

19    that overall you're doing exactly that.  But I'm not making it

20    up.          10:50:12

21          MR. STRUCK:  And understand that sometimes we can't,

22    we're not able to do it.  But when we can, we do,

23    because -- and we always offer to do that when we can.

24          THE COURT:  All right.  Good.

25          And I maybe wasn't clear, but with respect to the          10:50:25

—CV-12-601-PHX-DKD – November 20, 2017—

1   status report with the graphs that's not in an OCR form that

2   we're using today, if you could refile that so we would have

3   this one --

4           MR. STRUCK:  We will, Your Honor.

5           THE COURT:  Okay.  Thank you.                    10:50:43

6           MR. STRUCK:  And do you -- do you have additional

7   things --

8           THE COURT:  No, go ahead.

9           MR. STRUCK:  I was going to say, during the break I

10  got some answers to some of the questions that have been asked  10:50:50

11  by the Court and counsel.

12          THE COURT:  All right.

13          MR. STRUCK:  Not all of them, but some of them.  I

14  only had a limited amount of time.

15          THE COURT:  Okay.                                10:50:58

16          MR. STRUCK:  With respect to Performance Measure 15,

17  there was a question, I believe Miss Kendrick wanted to know

18  who was doing the counseling.  And that would be either an LPN

19  or an RN who is doing the counseling on Performance Measure 15.

20          With respect to Performance Measure 39, I wasn't fully  10:51:18

21  able to understand why Perryville dropped to 77.  And I'll get

22  to the bottom of that.  But I can tell you I was informed by

23  the FHA -- because I spoke to the FHA at Perryville on the

24  break, and was told that the preliminary numbers that had been

25  shared with the FHA show that they were at 92 percent in      10:51:49

1    November.  So that's gone up.

2          On Performance Measure 42, Miss Kendrick wanted to

3    know who at Lewis was checking daily at 10:00 p.m. to prompt a

4    follow-up.  And it's the FHA, Kelly Rogers, who's doing that.

5    And that's Performance Measure 42.                              10:52:23

6          THE COURT:  Thank you.

7          MR. STRUCK:  And on Performance Measure 47, I believe

8    it was Florence.  The question was, how is the RN communicating

9    the results of the diagnostic study to the inmate when the

10   inmate requests it.  And it's my understanding that they're     10:52:44

11   actually -- when the inmate request -- is requesting it, comes

12   in with the HNR requesting it, they immediately print off the

13   results and hand it to the inmate, the RN does.

14         THE COURT:  Okay.

15         MR. STRUCK:  And those -- the other questions I'll get    10:53:06

16   answers to, I think there were three other questions.

17         THE COURT:  Okay.

18         MS. KENDRICK:  Thank you.

19         THE COURT:  I interrupted Mr. Struck when we took the

20   break.  I don't know whether you had finished or whether we     10:53:20

21   were able to move forward with what you were saying.

22         MR. STRUCK:  I -- I don't remember what I was saying.

23         THE COURT:  All right.

24         MR. STRUCK:  It mustn't have been very important.

25         THE COURT:  All right.  Miss Kendrick?                    10:53:35

1          MS. KENDRICK:  So I think we were finishing up

2     Performance Measure 47.  I note that at page 12 of the filing

3     it shows that it's in the rebuttal process.  I reviewed the

4     CGAR that we got last night for Winslow, and it showed zero

5     percent for Performance Measure 47.                              10:53:54

6          THE COURT:  Do we know if that's a final number,

7     Mr. Pratt?

8          MR. PRATT:  Yes, Your Honor.

9          MR. STRUCK:  That is final.

10          MR. PRATT:  They were zero for one.                         10:54:10

11          MR. STRUCK:  There was only one inmate that fell under

12     this particular Performance Measure --

13          THE COURT:  And you didn't get that one right.

14          MR. STRUCK:  -- and they did not meet it.

15          MS. KENDRICK:  All right.  So Performance Measure 49       10:54:29

16     is the denials of requests for specialty service being

17     communicated to the patient.  And Tucson is showing 76 percent

18     at page 20.  The basis for non-compliance it states was due to

19     the departure and on boarding, I guess that means the training,

20     of a new clinical coordinator in mid October and turnover of    10:54:55

21     several providers.

22          And it states that two doctors have been hired.  I

23     just want to confirm that those are actually M.D.s or if

24     they're nurse practitioner providers, if Mr. Pratt or anybody

25     knows.                                                          10:55:15

—CV-12-601-PHX-DKD – November 20, 2017—

1          MR. STRUCK:  I was told it was two new medical

2    doctors, but --

3          (Discussion off the record between defense counsel.)

4          MR. STRUCK:  Definitely one medical doctor.  We'll

5    check on -- make sure what the other provider is.                    10:55:42

6          MS. KENDRICK:  Okay.  Because the November report for

7    staffing that we filed at docket 2509-1, page 10, shows that of

8    the 3.5 staff physician positions, there's a .75 physician

9    filled in November.  The October report showed zero physicians.

10   So that appears that there's only three quarters of a M.D.        10:56:05

11   hired in November.

12         I also don't know if Mr. Pratt or anybody knows if

13   these are full-time M.D.s or if they are part-time, the ones

14   who have been hired.

15         THE COURT:  Do you happen to know, Mr. Pratt?               10:56:25

16         MR. PRATT:  I do not.

17         THE COURT:  All right.  Well, the fact that we don't

18   know that what is said here is true, that Corizon has hired two

19   new M.D.s, when we have Corizon staff and Corizon lawyers in

20   the courtroom, we have ADOC staff and ADOC lawyers in the        10:56:48

21   courtroom, and we have a document that the lawyers from Corizon

22   produced --

23         MR. STRUCK:  If I may interrupt, it does say that the

24   second M.D. was hired in December 4th, so that wouldn't

25   necessarily show up on the November staffing report.             10:57:05

UNITED STATES DISTRICT COURT

——— CV-12-601-PHX-DKD – November 20, 2017 ———

1      THE COURT:  Well, it says who started December 4th.  I
2  don't know anybody who's hired on the 1st of December and
3  starts on the 4th.  Maybe that happens in some other world.
4  But again, it may be my bet that it was not a December -- maybe
5  it's only reported in the staffing report, that could be.          10:57:24
6  You're right, that's possible.
7      Okay.  I just -- it's troubling to me that it's the
8  Corizon lawyers who are producing this document, not the
9  Corizon people who are the contractors, and not the ADOC staff
10 who are producing the document that we're using.                    10:57:44
11     So I'm worried that what I'm receiving is a lawyered
12 document rather than an actual depiction of what's going on on
13 the scene.  I'm not naive to think that things are never
14 lawyered.  But when I've got the lawyers in front of me in the
15 case, and they're honing over a document that's been generated     10:58:05
16 by lawyers for the contractor, very different interests
17 obviously in a long-time -- well, "long-time" perhaps not the
18 best word -- a broad responsibility to the case as the
19 signatories to the Stipulation, it would seem to me that it
20 would be a better practice for the documents to be developed       10:58:41
21 and not only merely evaluated or reviewed or modified by the
22 parties before the Court.
23     But that said.
24     All right.  Go ahead, Miss Kendrick.
25     MS. KENDRICK:  Well, our concern actually, Your Honor,         10:59:01

UNITED STATES DISTRICT COURT

1   is that in the past Mr. Bojanowski refers to people as medical

2   doctors when they don't have M.D.s.  And so I just wanted to be

3   sure that this was actually accurate.

4           THE COURT:  Okay.

5           MS. KENDRICK:  So the next one was Performance Measure    10:59:16

6   50 at Florence, which is part of your order to show cause.  And

7   defendants are reporting 59 percent compliance.

8           And I don't know if there's any possibility that they

9   have more current or real-time data than the 59 percent in

10  October since they're collecting it in response to your order.    10:59:39

11          MR. STRUCK:  Your Honor, in answer to that question, I

12  do not have more current data with respect to Performance

13  Measure 50 at Florence.

14          I did obtain information yesterday from Corizon that

15  they have -- Corizon Nashville has contracted with Tenet         11:00:11

16  Healthcare to --

17          This is -- this particular Performance Measure is for

18  specialty diagnostic services, outside services.  And one of

19  the difficulties in meeting this Performance Measure at some of

20  these facilities was that -- you know, being able to identify    11:00:38

21  an outside provider who would actually treat this group of

22  patients in light of the challenges presented by that, in

23  addition to the AHCCCS rate issue.

24          But Tenet Healthcare, there is a contract with them.

25          And I believe that they did tell me they were           11:01:04

1    negotiating with Banner Health as well for some of these

2    specialty services.

3            THE COURT:  The Tenet Healthcare sounds like it has

4    already been consummated as a contractor agreement?

5            MR. STRUCK:  That is what I was told yesterday.                    11:01:20

6            THE COURT:  Do we know whether it's in place?

7            MR. STRUCK:  I don't have -- I don't have the

8    contract.  I just know that they have -- I was told that a

9    contract is in place -- or has been signed.  I don't know what

10   the effective date of that contract is.                                   11:01:34

11           THE COURT:  And these Tenet providers, where are they

12   located?

13           MR. STRUCK:  I believe it's the Tucson area.  But

14   there's more than one location.  It's kind of like Banner has

15   multiple locations around the state.                                      11:01:51

16           THE COURT:  Well, if this Performance Measure is not

17   showing a turnaround, we'll need to have much more detail about

18   the Tenet Healthcare.  Or maybe Mr. Millar's investigation will

19   also elucidate on this issue as well.

20           MS. KENDRICK:  So on their Supplemental Plan dated              11:02:13

21   December 15th, that's at page 25, they talk about the problem

22   in finding a specialist.  And it says that Corizon, quote, is

23   reaching out to additional specialty providers within Arizona

24   and those also residing in neighboring states.  This action

25   measure was implemented in mid November 2017.                            11:02:37

1           It's unclear what does -- what neighboring states

2    means.  Is that referring to telemedicine, or are you guys

3    going to start taking people to Nevada and New Mexico?  Or

4    what --

5           MR. STRUCK:  I'm fairly certain that they're not going    11:02:53

6    to be transporting inmates to neighboring states.

7           And it's my understanding that that relates to

8    telemedicine.

9           THE COURT:  Any idea whether this reaching out in mid

10   November has produced any fruit yet?                            11:03:18

11          MR. STRUCK:  Well, that's the Tenet contract

12   was -- that's one of the -- and it's my understanding that

13   there were additional contracts with -- Tenet is more of a

14   broad -- it's more than one specialty area that they will

15   provide.  And there are -- there are other specific contracts   11:03:39

16   relating to, you know, more specific providers I know that

17   were -- that I was told were also entered into contracts with.

18          I can get that information.  I requested that

19   information, I did not receive it.  But I can get that

20   information to the Court and counsel with respect to what       11:04:06

21   contracts have actually been entered since November on

22   that -- for that particular Performance Measure.

23          THE COURT:  Well, I mean, we will have to know more,

24   because the statement in the Corrective Action Plan is that the

25   corporate office was reaching out, and that this was            11:04:22

1    implemented in November 2017.  And we're hearing about entered

2    into new contracts with.  And that has been orally put on the

3    record with respect to the consummated contract with Tenet and

4    the perhaps contemplated contract with Banner Health.

5              But we'll need to know exactly what the details are          11:04:44

6    here so that we can address the appropriateness of this

7    remedial measure and offer secondary measures if those are

8    necessary.

9              MS. KENDRICK:  Also, what is the status of Corizon's

10   contract with the Arizona Oncology Network?                            11:05:05

11             Yesterday we contacted your office, Mr. Struck, about

12   a patient with leukemia at Eyman who has a pending urgent

13   consult for oncology.  And the response from Corizon in his

14   medical record said that, quote, due to the transition process

15   from AON to MIHS there's been a large amount of patients that          11:05:28

16   are currently on a wait list, first come, first serve basis,

17   and we'll try to schedule him as soon as possible.

18             THE COURT:  The second acronym refers to?

19             MS. KENDRICK:  I'm not sure what MIHS means.

20             THE COURT:  I bet Mr. Pratt knows.

21             MS. KENDRICK:  If I may approach I can show you --

22             THE COURT:  I bet Mr. Pratt knows.

23             MR. PRATT:  Maricopa Integrated Health Services.

24             THE COURT:  So Corizon's no longer using them?

25             MR. STRUCK:  No, I think they are using -- I think          11:05:59

—CV-12-601-PHX-DKD – November 20, 2017—

1   that --

2           THE COURT:  It's a transition away from AON to

3   Maricopa Integrated?

4           MR. STRUCK:  That's what I understood Miss Kendrick to

5   say.                                                          11:06:10

6           MS. KENDRICK:  May I approach, Your Honor?

7           THE COURT:  Yes.

8           Mr. Pratt, do you know anything about the details of

9   this wait list?

10          MR. PRATT:  I don't know the details on it,           11:06:57

11  Your Honor.  I do know that AON -- it was reported to me that

12  AON was --

13      (Court reporter interruption.)

14          THE COURT:  Louder, please.

15          MR. PRATT:  I'm sorry.  It's my understanding that AON  11:07:05

16  has declared or is declaring Chapter 11 bankruptcy, and

17  refusing to accept inmates as patients going forward, which

18  required Corizon to find another provider for their continuing

19  care.

20          THE COURT:  And so the notation on the document        11:07:30

21  provided by plaintiffs' counsel states, quote, there has been a

22  large amount of patients that are currently on a wait list,

23  close quote.

24          Do you know the number of patients roughly?

25          MR. PRATT:  I do not.                                  11:07:48

```
1          THE COURT:  Do you know roughly how long the delay is

2    attendant to this dislocation arising out of the bankruptcy?

3          MR. PRATT:  No, sir, I do not have the details or

4    specifics on the delays.  All I know is that they will try to

5    schedule them as soon as possible through MIHS in the                    11:08:04

6    transition.

7          THE COURT:  Who in the State looks over such a thing

8    like this?  Who's responsible?  I mean, the Department of

9    Corrections is responsible for the lives of its inmates.  And

10   you've contracted with a contractor to provide medical                   11:08:24

11   services, and so that removes you sort of once removed from the

12   process.

13         And then there is a debacle that happens that is out

14   of the contractor's control, and that is a provider it used is

15   no longer able to see the patients.  And then there is word            11:08:51

16   that they're moving to another provider, but that there is a

17   large number of -- a large amount of patients that are

18   currently on a wait list that's a first come, first serve

19   basis.

20         And I wonder, when this happens, who in the State of             11:09:09

21   Arizona, among State of Arizona employees at the Department of

22   Corrections, takes responsibility for the fact that they need

23   to be riding herd on this situation where a large amount of

24   patients are having their oncology care delayed by

25   circumstances, to assure that the contractor who has apparently       11:09:34
```

—CV-12-601-PHX-DKD – November 20, 2017—

1    dragged its feet with respect to getting the appropriate number

2    of providers -- and that's not something that is disputed by

3    the State because it insists on a particular number of

4    providers in its contract with the contractor and the

5    contractor has elected to pay a fine for many months rather          11:09:51

6    than hiring the appropriate number of providers.

7              So who -- is it your -- is it on your shoulders,

8    Mr. Pratt?  Who has trouble sleeping at night at the State

9    because the patients who have -- inmates who have cancer can't

10   get care because of the circumstances?  Is there anybody in the     11:10:12

11   State employ who worries about this?

12             MR. PRATT:  Your Honor, I worry about this.

13             THE COURT:  And yet you seem to know remarkably little

14   about it.

15             MR. PRATT:  I know as much as I've been provided the       11:10:21

16   same information.  And when I look into it, I discuss with

17   Corizon, and we tell them -- again, responsibility for the

18   care, I rely on Corizon to provide that care.  If there's been

19   a change in their -- their subcontractor who provides this, my

20   expectation is that they will do this as quickly as they             11:10:43

21   possibly can.

22             I don't know time frame wise on the delays on

23   transitioning that care over to the MIHS.  But I will deal with

24   specifications as they're brought to my attention.  I do not

25   know the number, Your Honor.  And I would be surprised if this       11:11:02

CV-12-601-PHX-DKD – November 20, 2017

1    number is a large number.  I don't know what that means.

2           THE COURT:  Well, I know that it doesn't mean a small

3    number.  And I know it doesn't mean -- well, actually it says

4    "a large amount."  So I know it doesn't mean a small amount.

5    And I know it doesn't mean an amount.  So the word "large" is      11:11:18

6    an adjective I'm familiar with.  And it typically means a lot.

7    And that the people are on a wait list, and that there's a

8    first come, first serve basis.

9           And I guess what really troubles me is that you're the

10   one in the State of Arizona who thinks about this, and you        11:11:38

11   don't know the answer to basic questions, such as, what is the

12   amount of patients exactly and how long is the wait list.

13          The buck stops someplace.  And it seems to me that I'm

14   in a position of having to have to always be looking over your

15   shoulder and saying, you know, you just can't pass the buck to    11:11:59

16   Corizon because at the end of the day you're responsible on

17   this.  And at the end of the day it's hard for me to imagine

18   how a person with responsibility is aware that the

19   contractor -- or the subcontractor that provides oncology

20   services -- and I don't know of anybody who's referred to an      11:12:20

21   oncology service who doesn't think that that is a matter of

22   immediate concern.  I mean, at least that's my experience in

23   the world.

24          And so, cancers grow, and they tend to grow I think in

25   some medical term that involves the idea of very quick cell       11:12:39

CV-12-601-PHX-DKD – November 20, 2017

1   division, that's what cancers do.  And so time is usually of

2   the extreme essence.

3        And so, if you know the basic fact that there is this

4   contractor that's no longer providing this service, and they're

5   transitioning to another, and you don't know the number of                11:12:59

6   patients that are involved or what the implication is on a

7   timeline -- you know, what might be acceptable to Corizon may

8   not be acceptable to somebody who's on the hook in the

9   Stipulation in this case.

10       And so I guess it would seem that it would be in your        11:13:15

11  best interests, separately from the interests of the individual

12  inmates, to make sure that you are riding really close herd on

13  this.

14       MS. EIDENBACH:  Your Honor, if I may.  I'm also

15  wondering whether or not the Department has spoken to the        11:13:30

16  Bankruptcy Court.  Because if AON has declared Chapter 11,

17  there may be some way that the Court can order them to continue

18  providing care as part of the bankruptcy plan, so that there's

19  not this lapse in life-or-death situations.

20       So I'm wondering whether this has been brought to the       11:13:51

21  Bankruptcy Court's attention by the Department, whether they're

22  following the bankruptcy and trying to participate as a

23  creditor or vendor, just in terms of continuing to provide care

24  until the Department is able to make provisions otherwise.

25       THE COURT:  Well, your comment has certainly provided       11:14:08

1   information that might be useful on the defendants' side of the

2   case to explore that possibility.

3          MR. STRUCK:  Your Honor, this progress note or

4   whatever this is written by Marsha Ramirez is less than -- was

5   done about 46 hours ago.  We'll look into it.                    11:14:28

6          THE COURT:  Well, I mean --

7          MR. STRUCK:  I didn't see any -- I'm not aware of any

8   information with respect to a backlog, or how many inmates

9   we're talking about, or what the delay is.  So we can certainly

10  find out, and it might be something that we don't have to make  11:14:45

11  issue of.

12         THE COURT:  Well, raise the temporal issue, I'll ask

13  back:

14         Mr. Pratt, when did you learn about this bankruptcy?

15         MR. PRATT:  In the last couple of days.              11:15:02

16         THE COURT:  Last three or four days?

17         MR. PRATT:  Yes.

18         THE COURT:  And how long has there been any

19  obstruction in the process that you've been aware of with

20  respect to AON seeing these inmates?                         11:15:10

21         MR. PRATT:  Just in the last couple of days when I was

22  made aware of it.

23         THE COURT:  All right.  Thank you.

24         MS. KENDRICK:  Just for the record, we did notify

25  Mr. Struck and his firm about this particular patient first on  11:15:19

1    November 15th, and then again yesterday, about the fact that he

2    is 25 years old, has chronic leukemia, and is experiencing a

3    serious lapse in getting the urgent care and treatment with

4    oncology.

5           So this was actually brought to ADC's attention more    11:15:38

6    than a month ago originally with regard to this particular

7    patient and the inability to get him urgent oncology care.

8           THE COURT:  In a prison system that's operating under,

9    quote, Operation Backlog, close quote, it's not surprising to

10   hear what you just said.    11:15:56

11          Miss Kendrick.

12          MS. KENDRICK:  Let me just scroll through, Your Honor.

13          So Performance Measure 52 is about specialty

14   consultation reports being reviewed and acted upon within seven

15   calendar days.    11:16:30

16          The report for Eyman shows 35 percent compliance,

17   that's at page 43 of their report.

18          It also states that for the Corrective Action Plan as

19   of December 15th, which is at page 46, that this is now being

20   monitored on something called the Warden's Daily Tracker Sheet.    11:16:49

21   And the site medical directors have been tracking this for the

22   last three weeks.  So, again, if Corizon or ADC has any more

23   current information, that would be greatly appreciated.

24          MR. STRUCK:  I'm sorry, Your Honor what Performance

25   Measure are we looking at?    11:17:17

1          THE COURT:  52, in particular on page 46 where it is

2    node that specialty consultation reports are now monitored on

3    the Warden's Daily Tracker Sheet.  And that this is being

4    captured since October 20th, 2017, on a daily basis by pulling

5    data directly from eOMIS for the last three weeks to ensure                    11:17:34

6    timely action.

7          And so Miss Kendrick has asked the natural question,

8    what is this data that's been pulled in real time telling us

9    right now?

10          MR. STRUCK:  I will find out, Your Honor.                              11:17:48

11          MS. KENDRICK:  And we would note that Florence, which

12    is part of your order to show cause, Your Honor, is at 63

13    percent.

14          This particular measure, it states that the reason is

15    because of the backlog.  And it appears to be the same                        11:18:11

16    Corrective Action Plan that we discussed earlier with the

17    providers being assigned to yards.  And we hope that there will

18    be more current data at the January 10th hearing.

19          MR. STRUCK:  Your Honor, it's -- in speaking with the

20    Facility Health Administrator at Florence yesterday, it's my                  11:18:32

21    understanding that the backlog has been eliminated.  They've

22    been utilizing telemedicine lines, two to three telemedicine

23    lines per week to eliminate the backlog.

24          And that they -- but in terms of how that has affected

25    this particular measure, I don't have November preliminary                    11:19:08

1    results.

2            THE COURT:  All right.

3            Miss Kendrick?

4            MS. KENDRICK:  We would also just note that their

5    reporting does show continued non-compliance with this measure          11:20:00

6    also at Tucson and Yuma.  And we hope that the daily tracking

7    will show some improvements in the next month's data.

8            On Performance Measure 54 for Eyman, which is also

9    part of your order to show cause, and that's regarding patients

10   who have chronic conditions being seen for chronic care                 11:20:27

11   treatment as specified by the provider no less than every 180

12   days.

13           Again, from September to October they're showing a

14   dip, which is concerning, because we had been told, I believe

15   it was two months ago, that telemedicine was going to fix this          11:20:48

16   problem at Eyman in October, but instead it looks like it's

17   getting worse.

18           The remedial plan that's at page 56 states that they

19   are modifying the tracking in an attempt to forecast the needs

20   of inmates in the future to allow Corizon to better allocate            11:21:14

21   resources.

22           And I was hoping either Mr. Struck or Mr. Pratt or

23   somebody could unpack that and translate it into plain English

24   as to what this actually means and what those steps would be in

25   tracking.                                                               11:21:30

1          MR. STRUCK:  I don't have information with respect to

2    how the chronic care tracking has changed, but I can certainly

3    find out, unpack that for Miss Kendrick and let her know.

4          THE COURT:  Thank you.

5          MS. KENDRICK:  Okay.  And it also doesn't say when          11:21:51

6    that change took place, so when we could possibly see

7    improvements in the scores.

8          THE COURT:  Do you know the date of when Corizon

9    modified the chronic care tracking?

10          MR. STRUCK:  I do not.          11:22:09

11          THE COURT:  Okay.

12          MS. KENDRICK:  And then for the next page, for the

13    same Performance Measure 54 at Florence, it's showing a drop

14    from 82 percent to 67 percent.  And again, says that they are

15    using out-of-state providers to develop -- to deliver          11:22:27

16    telemedicine and see patients on-site, and that the backlog is

17    going to be eliminated.

18          And so again, with these out-of-state providers, it's

19    a little unclear with the sentence if they're just being seen

20    by telemedicine or if they're actually also being brought to          11:22:46

21    Arizona to see patients in the flesh.

22          THE COURT:  Do you know, Mr. Pratt, how this is

23    happening?  Is it just by telemedicine or are the out-of-state

24    providers coming here?

25          MR. PRATT:  The majority is telemedicine, but Corizon          11:23:05

1    has brought in out-of-state providers to assist.

2              THE COURT:  All right.

3              MS. KENDRICK:  And I guess that's also the same

4    Corrective Action Plan it looks like for Performance Measure 55

5    at Eyman at page 64, which is showing 60 percent compliance.      11:23:45

6    So we hope to see improvement there.

7              And then Performance Measure 66, which is about

8    providers seeing patients a minimum of every 72 hours in the

9    infirmary.  Unfortunately it looks like Florence is still

10   non-compliant at page 67.  And Florence was one of the three     11:24:24

11   prisons you had included in your order to show cause.

12             It states that the problem is that providers are not

13   fully documenting their rounds.  Again, we raised this last

14   month about our concern about the fact that some of the

15   providers were opening and closing their entries into the eOMIS  11:24:44

16   system after the fact or in advance of the rounds.  And we are

17   very concerned about that sort of record keeping.  I mean, the

18   fact that they're still showing non-compliance at Florence is

19   significant, but the fact that the providers can manipulate the

20   system in that way is something that we find problematic.        11:25:10

21             Mr. Pratt stated that he thought this was regular

22   practice.  And defendants also submitted an affidavit from a

23   nurse saying that that is a common feature of electronic health

24   records.

25             We checked with our medical expert, Dr. Wilcox.  He    11:25:28

1   said that he is not familiar with electronic health record

2   systems that allow you to manipulate the time of an encounter,

3   that the time when it's documented is the time that it should

4   show up in the record.

5          So, again, we're just stating that for the record,     11:25:45

6   Your Honor, that we are concerned not only with the fact that

7   their reporting is showing non-compliance and continued

8   non-compliance, but we are now concerned about the underlying

9   accuracy of the records that are being kept by the providers at

10  the infirmaries.                                              11:26:02

11         THE COURT:  The inpatient facility at Florence, how

12  many beds does it have?

13         MR. PRATT:  Fifty-seven.

14         THE COURT:  And what's the census usually?

15         MR. PRATT:  There typically 90 percent full.          11:26:16

16         THE COURT:  As I discussed in the past, it is

17  surprising to me that this is a Performance Measure that's even

18  at issue, because it seems that people who are in the

19  stepped-up care of having to be inpatient at the facility, that

20  there wouldn't be something in the record that would document   11:26:43

21  that they had had a provider encounter, at least every 72

22  hours.  It was surprising.

23         And so the continued issues that we are here in

24  December, being told about additional education on November

25  29th, 2017, when this has such a chronic record of failure,    11:27:05

1   calls yet again into question the credibility of the effort to

2   try to address some of these problems.

3          I say that again for the record knowing that we are on

4   the cusp of seeing really what it is in true terms in terms of

5   every single person, but also maybe having a better                    11:27:28

6   understanding about the veracity of the record keeping.

7          All right.  Go ahead.

8          And maybe I should at this point mention too, I opened

9   with a comment that I have to completely change, and that is

10  where I said the words I think "overwhelming compliance," that        11:27:48

11  was a feature of me having started reading every word in

12  the -- in the defendants' submission of the charts and seeing

13  what looked to me to be progress on those charts that

14  were -- that I'd reached.  And then thumbing through the rest

15  and seeing what I thought to be a good collection of            11:28:10

16  compliance.

17         I've since learned a couple of things.

18         One, that there are apparently included here some

19  numbers of things that I'm not concerned about that have always

20  been compliant so that they tend to make it look more rosier         11:28:26

21  than what I would be focused on.

22         Two, we have spent a lot of time talking about

23  continued egregious failures to comply.  So that undercuts the

24  idea of overwhelming compliance.

25         And third, of course, the issue that we've discussed         11:28:42

CV-12-601-PHX-DKD – November 20, 2017

1    extensively this morning, and that is the concern about the

2    veracity of the reporting process.

3            But I just wanted to strike my previous comment.  It

4    is a reflection of having read only part of the document, and

5    the document that I had read perhaps was over inclusive with          11:28:57

6    respect to rosy performance measures that haven't been the

7    focus of my concern previously, and so I was clouded by them.

8            Thank you.

9            MS. KENDRICK:  So, Your Honor, I'm going to turn it

10   over to my colleague, Mr. Fathi, because that was all the          11:29:20

11   medical measures --

12           THE COURT:  Okay.

13           MS. KENDRICK:  -- that I wanted to talk about.

14           THE COURT:  Thank you.

15           Mr. Fathi.                                                    11:29:27

16           MR. FATHI:  Good morning, Your Honor.  And I apologize

17   that I'm not able to be present in person today.

18           THE COURT:  Thank you.

19           MR. FATHI:  The first measure I would like to discuss

20   is Performance Measure 81 at Tucson, this is at document 2506-2     11:29:38

21   at page 86.  And this is -- it's present here, but this is

22   really kind of a global question.  The remedial plan says --

23           By the way, this is the measure that requires MH-3A

24   prisoners who are prescribed psychotropic medications to be

25   seen a minimum of every 90 days by a mental health provider.         11:30:08

──── CV-12-601-PHX-DKD – November 20, 2017 ────

1      So the remedial plan says, this issue was caused by

2  one new mental health nurse who was not scheduling the

3  appointments within the strict time frames.  And it says the

4  remedy is that the nurse was given additional education.

5      And we've heard similar variations on this theme                      11:30:27

6  throughout today, that someone wasn't properly trained, and the

7  remedy was to provide additional training.

8      These are obviously not new requirements, and so we

9  would think that existing staff would have been trained, and

10  that new staff coming on board would also have received          11:30:46

11  training.

12      So my question is, why do we keep seeing this problem

13  in staff who have apparently not received training in the

14  requirements of the Stipulation?

15      THE COURT:  Well, I don't know that we're going to        11:31:01

16  hear an answer from the defendants.  And I'll give them a

17  chance if they want to offer an answer.

18      I'll offer an answer, and that is, in a system that's

19  chronically understaffed you would expect that training would

20  be one of the things that would be compromised.  It's short          11:31:13

21  sighted obviously because it results in Performance Measure

22  issues.

23      But again, this may just be anecdote, but it's what

24  sticks in my mind, and that is Dr. Watson is quoted in the KJZZ

25  article as saying that she was scheduled for five days of          11:31:37

1   training, I think, and she had only two.

2         I think that when you are dealing with an emergent

3   situation one of the first things that falls off is training.

4   And you're right to say, Mr. Fathi, that it is a theme that we

5   hear and see a lot, that education appears to be a problem,                11:31:51

6   training appears to be a problem, new staff members don't get

7   it right, old staff members don't get it right.

8         Overall you would think that over time, that having

9   worked on this so carefully all of us in this room together on

10  a monthly basis and sometimes more frequently than that, that      11:32:09

11  we would see that the ship kind of tightening up and that the

12  sails would be pulled tight and we'd be making good time.  It

13  does seem that we continue to be dogged by the same things over

14  and over again.

15        But, again, I didn't mean to cut off if there was a        11:32:24

16  response from the defendants to Mr. Fathi's particular

17  question.

18        MR. STRUCK:  I would like to respond, Your Honor.

19        Looking at MP 81 in Tucson, this has been compliant

20  since -- at least according to this graph since October of     11:32:36

21  2016.  This one -- this month is the first month that it was

22  non-compliant at 82 percent, barely non-compliant.  It's my

23  understanding that preliminary numbers on that show that they

24  were at 92 percent for the month of November.

25        This was one nurse who was scheduling things out three    11:32:54

1    months.  So these things were getting scheduled maybe at 91

2    days or 92 days.  And that's not a passing score.

3         It's not that things are falling through the cracks

4    when we're talking about this Performance Measure.  There's no

5    reason to conflate this particular issue to, oh, all of          11:33:17

6    these -- you know, we have all of these problems and they

7    continue to come up.

8         I mean, this is a human being.  I'm certain she was

9    told that she's supposed to do it at 90 days and she did it at

10   three months.  And that's where the mistake happened.          11:33:35

11        THE COURT:  And what you say is fair, Mr. Struck, if

12   it wasn't in the context that suggests that it isn't a one off.

13   That if we did this global search for the word "education" or

14   "training" we would see it over and over and over again.  And I

15   guess at some point you want to see no drop below the bench     11:33:55

16   mark, because you would think that mistakes made would be

17   mistakes corrected.  And we just see the same mistake in its

18   descriptive term being employed.

19        But I appreciate what you say.

20        Mr. Fathi.                                                 11:34:14

21        MR. FATHI:  Thank you, Your Honor.

22        On performance measures 85 and 86, and both of these

23   concern MH-3D prisoners being seen after discontinuing

24   medication, I just wanted to remind the Court that there

25   remains a dispute between the parties about the monitoring      11:34:32

1   methodology for 85 and 86.

2           After the telephonic hearing on November 21st you

3   asked each side to e-mail you their proposed language for the

4   monitoring methodology.  So we are awaiting the Court's

5   decision on that issue.                                    11:34:51

6           THE COURT:  Right.  And I saw that, and will get an

7   order out.

8           MR. FATHI:  Thank you, Your Honor.

9           Performance Measure 86 at Tucson -- and this is

10  document 2506-2, page 93, there's no cause identified for the  11:35:04

11  non-compliance.  There's a corrective action, but we need to

12  know what caused the non-compliance in the first place.

13          MR. STRUCK:  And this particular Performance Measure

14  86, again, it's at Tucson for over a year has been compliant.

15  And for the month of October they were one percent below     11:35:36

16  compliant.

17          It's my understanding that a staff psychologist had

18  been scheduling something and that he'd done it incorrectly.

19  And so they -- Corizon decided that they would have the mental

20  health context be reassigned to one individual to make sure   11:35:59

21  that this is all being done consistently, and we don't continue

22  to have these issues with respect to, you know, somebody

23  scheduling something out 92 days or 93 days using the calendar

24  instead of the actual days.

25          MR. FATHI:  Your Honor, this is the second time we've  11:36:22

1   heard that response from Mr. Struck, and I have to say I don't

2   understand it.  Because while the requirements in the

3   Stipulation are stated in terms of 30 days, 60 days, 90 days,

4   the defendants early on asked to be able to use calendar

5   months, and the Court granted their motion at document 1673.          11:36:40

6          So if they're scheduling out three months that would

7   still be compliant.  So, again, I don't understand Mr. Struck's

8   explanation.

9          THE COURT:  Well, I think what he was saying that they

10  were just slightly beyond it.                                         11:36:55

11         Is that what you said?

12         MR. STRUCK:  Yeah, that's my understanding, yeah.

13         MR. FATHI:  I'm sorry, I thought he was saying they

14  were scheduling using calendar months rather than counting the

15  days and that's why they --                                          11:37:09

16         THE COURT:  I think he said that was by way of how

17  they got into that problem.  But maybe I misunderstood.

18         MR. STRUCK:  That's my understanding as to how the

19  problem occurred, where the scheduling actually was beyond the

20  90 days.                                                             11:37:20

21         MR. FATHI:  All right.  Well, let's move on.

22         Performance Measure 91, this is the measure that

23  requires MH-5 prisoners who are the most seriously mentally ill

24  people in the system, who are actively psychotic or actively

25  suicidal, to be seen by a mental health clinician or mental          11:37:41

1    health provider daily.  This applies at Phoenix, and this is at

2    2506-2, page 96.

3            This is identified on page 97 -- excuse me, on page 96

4    as Supplemental Corrective Action Plan as of November 6, 2017.

5    But on November 14th at document 2447-1, we were provided a          11:38:05

6    Supplemental Corrective Action Plan revised as of November

7    14th, which was substantially different from the one that's now

8    before us.  There were significant modifications made and

9    redlined.

10            So my question is, which Corrective Action Plan is in     11:38:29

11   effect, and what happened to the November 14 Corrective Action

12   Plan?

13            MR. STRUCK:  Okay.  I don't have an answer to his

14   question.  All I can say is it was in compliance in October.

15            THE COURT:  Well, it's a fair question.  He says that      11:38:46

16   you've recited the November 6, 2017 plan when there was a

17   supplement after that.  Was this a mistake to include within

18   document 2506-2 this vestigial November 6 plan, or is the

19   November 6 now rekindled in the supplemental plan the following

20   week no longer in action?                                           11:39:09

21            MR. STRUCK:  One moment, Your Honor.

22         (Discussion off the record between defense counsel.)

23            MR. STRUCK:  The November 14th update did not make it

24   onto this particular document.  So the November 14th is the

25   correct Corrective Action Plan.                                     11:39:44

—CV-12-601-PHX-DKD – November 20, 2017—

1          THE COURT:  Thank you.

2          MR. FATHI:  And just a couple of questions about

3     particular wording.  On page 97, paragraph 6 --

4          THE COURT:  But that's the old plan, isn't it?  That's

5     the old plan.  Or is that in the new plan as well?          11:40:04

6          MR. FATHI:  It is, Your Honor.  This text is

7     unchanged.

8          THE COURT:  Okay.  Thank you.  Thank you.

9          MR. FATHI:  All right.  In paragraph 6 it refers to,

10    verify any illness each innate -- and there seems to be a word   11:40:16

11    missing.  Innate what?

12          MR. STRUCK:  That each inmate on watch was seen?

13          MR. FATHI:  It says innate, I-N-N-A-T-E.  Is that an

14    error?

15          MR. STRUCK:  Inmate, not innate.  It's inmate.  That's   11:40:37

16    a typo.

17          THE COURT:  Thank you.

18          MR. FATHI:  Okay.  And then in paragraph 7 -- and this

19    is also -- this language is unchanged between the two versions.

20    It talks about a mental health clinician or RN conducting the   11:40:50

21    watch in a confidential -- excuse me -- conducting the watch in

22    a confidential setting.

23          I don't understand that.  Continuous -- or watches are

24    conducted by custody staff, they're not conducted by mental

25    health staff.  So I would just appreciate an explanation of   11:41:11

1    that.

2         (Discussion off the record between defense counsel.)

3              MR. STRUCK:  Yeah, the clinicians conduct the

4    confidential contact, the face-to-face contact.  The officers

5    are just doing -- conducting a watch.                          11:41:34

6              MR. FATHI:  But that's not what it says.  It says, the

7    clinician -- assign a licensed mental health clinician slash RN

8    to conduct the watch in a confidential setting.

9              So why is a clinician conducting the watch?

10             THE COURT:  It looks like that's a mistake.          11:41:51

11             MR. STRUCK:  After the word "watch" should be

12    "contact."

13             MR. FATHI:  Okay.  So that's an error?

14             MR. STRUCK:  It's a typo.

15             MR. FATHI:  Which is different from an error.  Okay.  11:42:07

16             THE COURT:  It's not, it's an error.

17             Go ahead.

18             MR. FATHI:  Next is Performance Measure 93 at Eyman.

19    This is page 103.  And this is mental health staff making

20    weekly rounds of all inmates 3 and above prisoners who are     11:42:27

21    housed in maximum custody.

22             Paragraphs 2, 3, 4 and 6 each refer to action by the

23    MH tech.  Paragraph 5 refers to action by the MH aide.  What's

24    the difference between those two positions and why are these

25    functions done by different positions?                        11:42:54

1          (Discussion off the record between defense counsel.)

2          MR. STRUCK:  It's the same person.  I think this has

3     been addressed in prior hearings.  ADC uses the term "MH tech,"

4     Corizon uses the term "MH aide."  It's the same individual.

5     And I think that Mr. Fathi knows that.                          11:43:16

6          MR. FATHI:  I'm simply asking why this document that's

7     been produced to us uses the two different terms.

8          So you're telling me that, in fact, it's the same

9     person?

10         MR. STRUCK:  And you know it's the same person.            11:43:31

11    You're aware of the fact that it's the same person.

12         MR. FATHI:  Excuse me, Your Honor, we should be

13    addressing the Court rather than each other.

14         THE COURT:  Well, some amount of the exchange goes on.

15         And again, if you're telling us something that you        11:43:43

16    already know just to sort of highlight the errors -- I mean, it

17    would be better that if the MH tech is a synonym for the MH

18    aide, it would be preferable for any document that's filed with

19    the Court to pick one or the other, because it does create a

20    reasonable question for someone to wonder why, in this document 11:44:08

21    that was filed on the 19th of December, does it say in 1

22    through 4 "MH tech" and then in 5 say "MH aide."

23         I can't remember everything that's previously been

24    discussed.  I think people who submit things and file things

25    with the Court, if it has been previously identified as a       11:44:29

1    synonym that is simply a product of one usage preferred by the

2    contractor and the other usage preferred by the

3    contracting -- the contracted party -- I said that wrong -- by

4    the contractor and -- by Corizon and by the State, then it

5    would be helpful to not run into this three minutes, four          11:44:50

6    minutes that we spent talking about it by making sure that that

7    gets fixed in the future.

8         So Mr. Fathi's right to point it out.  And it's

9    helpful to the process, because it again is a further reminder

10   to everybody as we try to pull the lines tighter on our sails     11:45:06

11   that we've got to be careful.

12        Thank you.

13        MR. FATHI:  Okay.  Thank you, Your Honor.

14        On Performance Measures 94, 95 and 97, this is

15   actually an upcoming agenda item on plaintiffs' agenda, item      11:45:23

16   4A.  The Court issued an order about the monitoring methodology

17   for these three performance measures in July, and defendants

18   have not been complying with that order in subsequent months.

19        And so these scores have to be read in light of that

20   non-compliance with the Court's order.                            11:45:45

21        THE COURT:  All right.

22        MR. FATHI:  On specifically Performance Measure 94 at

23   Tucson, this is page 115, the Corrective Action Plan refers to

24   at the very bottom clinician -- a new clinician beginning

25   employment on August 14th.  And then it reads, quote, with the    11:46:10

1   change in clinicians, Corizon is fully staffed at Tucson, end

2   of quote.

3          However, the staffing report that was produced to us

4   just last night has the following numbers for mental health

5   staff at Tucson:  Psychiatrists 50 percent, psychologists 75      11:46:27

6   percent, mental health clerk is zero percent, mental health RN

7   50 percent, rec therapist zero percent, regional director zero

8   percent, clerk zero percent.  This is page -- or document

9   2509-1, page 10.

10         So I don't know how to reconcile this statement that       11:46:53

11  Corizon is fully staffed at Tucson with the data that I just

12  read into the record.

13         MR. STRUCK:  Okay.  A couple things, Your Honor.

14         First, the way this document was -- is presented to

15  plaintiffs and counsel -- this information I believe was in the   11:47:07

16  last -- in prior reports.

17         THE COURT:  You're right.  I mean, you're right about

18  that.  And it's also been at my insistence that it would

19  include the previous information.

20         But it's also right for Mr. Fathi to observe, we see       11:47:22

21  now in the October report a 96 percent, where we have a

22  previous track record, except for a couple of months, where

23  we're either below or on the cusp.  And so having been told

24  that they were fully staffed in August, and then having looked

25  at the most recent staffing numbers indicating that there is     11:47:45

1    missing staff members from what the contract calls for, he is

2    at the least perhaps inquiring about whether or not there is

3    any information that the state has that the more recent data

4    might reflect the pull down, or he's at least giving us a

5    presage of a fear he has that this 96 percent is based upon a          11:48:13

6    statement that they're at full levels.

7            And so he's not saying you were wrong to include it

8    here.  He's not saying that you necessarily had to -- I don't

9    think he's saying that you necessarily had to include the fact

10   that you're no longer at full staffing.  But he's observed          11:48:34

11   something that I think everybody would want to know, and that

12   is, we were told before that we were going to address the

13   problem with a Corrective Action Plan by making sure that we

14   were fully staffed, we're fully staffed, and now he's saying,

15   whoops, we're not, and he's worried about it.          11:48:49

16           MR. STRUCK:  And I didn't hear him say anything about

17   clinicians when he was reading off vacancies.

18           MR. FATHI:  Your Honor, under the Stipulation

19   psychologists are specifically -- or rather, clinician is

20   defined to include psychologists.  And I did read that          11:49:05

21   psychologists are currently at 75 percent.

22           On Performance Measure 94 at Winslow, this is page 116

23   of document 2506-2, this performance measure requires that all

24   prisoners who are on a suicide watch or mental health watch be

25   seen daily by a licensed mental health clinician or on weekends          11:49:30

1    and holidays by a registered nurse.

2            However, according to the defendants' staffing plan

3    there has been no mental health staff at Winslow since May of

4    2016.

5            So my question is, how -- how can we explain these 100      11:49:48

6    percent compliance rates when there's no mental health staff at

7    the facility?

8            MR. STRUCK:  Two things, and Mr. Fathi has been

9    informed of this.

10            There's -- telepsych is used at that facility.  And       11:50:07

11    then as soon as -- it's my understanding as soon as somebody

12    goes on watch they're transferred away from Winslow to a

13    corridor facility.

14            THE COURT:  Does that answer your question, Mr. Fathi?

15            MR. FATHI:  It does not, Your Honor.                       11:50:29

16            And I'm sorry if it's repetitive, but I need to keep

17    correcting Mr. Struck when he knows that I know this -- he

18    asserts that I know this or I have been told this, et cetera,

19    that is not correct.

20            The explanation that people are transferred as soon as    11:50:45

21    they go on watch, that doesn't explain a score of 100 percent.

22    That might explain a score of NA, not applicable, if there's no

23    one there to be seen daily by a licensed mental health

24    clinician.  But transferring them away as soon as they go on

25    watch does not explain a 100 percent compliance score.           11:51:07

1    THE COURT:  Is that necessarily true, Mr. Fathi?  You

2   couldn't have somebody seen who's on a watch at the destination

3   facility on that day, and so you'd get the 100 percent

4   compliance, the fact that they were transferred that day?  Or

5   on the alternative, if they were transferred to another place      11:51:34

6   and they were seen on that day, they were seen at the

7   transferee place, wouldn't that be counted that way, or is

8   that --

9        MR. FATHI:  No, Your Honor.  Excuse me, Your Honor.

10        THE COURT:  Go ahead.                                          11:51:47

11        MR. FATHI:  No, Your Honor.  Because if they were seen

12   at -- if they weren't seen at all at Winslow, they shouldn't be

13   in the sample for Winslow.  If they were transferred to Tucson

14   and then seen in Tucson, then they can be in the Tucson sample.

15   But Winslow can't get credit for someone being seen at Tucson.     11:52:03

16        THE COURT:  I see.  That makes -- that makes a good

17   point.

18        Dr. Taylor, can you help us out here?

19        DR. TAYLOR:  Sure, Your Honor.

20        When they get -- when they go on watch at Winslow they         11:52:15

21   are seen when they are there.  Sometimes it's a day or two.

22   And we've provided to Mr. Fathi --

23        THE COURT:  By telemedicine -- by telepsych?

24        DR. TAYLOR:  Well --

25        THE COURT:  Because Mr. Fathi says there's nobody             11:52:27

1    there in Winslow who's qualified to do this on site.

2            DR. TAYLOR:  Correct.  So if the individual goes on

3    watch on a Sunday, that's going to be a registered nurse who

4    does that first contact.  Then when it starts on -- it's a week

5    day, it's Monday, it's Mr. Metz who does the telepsychology        11:52:41

6    contacts until the individual is transferred.  And so they have

7    that schedule, he does that daily until that individual is

8    transferred, which may be one day, it may be two days, it may

9    be three days.

10           But those contacts happen up there, and that's all        11:52:58

11   that is monitored.  We don't include anybody -- any contacts

12   that, you know, are from down in another facility and then

13   continue counting those days for Winslow.  It's just the

14   Winslow days that are counted.

15           THE COURT:  Anything else you wanted to say about         11:53:14

16   that, Mr. Fathi?

17           MR. FATHI:  Yes, Your Honor.  When Mr. Struck said

18   that as soon as someone goes on watch at Winslow they're

19   immediately transferred to another facility, I took

20   "immediately" to be within a couple of hours.  I didn't          11:53:27

21   realize, as Dr. Taylor has just testified, that "immediately"

22   might -- it might be a few days before the transfer.

23           Also, I would just point out that the most recent CGAR

24   shows eight cases sampled at Winslow for this Performance

25   Measure for the most recent month.  So clearly there are people  11:53:44

1    who are -- who go on watch at Winslow and are staying on watch

2    for at least a few days so as to be included in the sample.

3                THE COURT:  All right.

4                MR. FATHI:  Performance Measure 95, I just want to

5    point out again that the Court has recently issued a ruling on          11:54:04

6    the methodology for this Performance Measure which is not

7    reflected in these data, so they have to be read with that in

8    mind.

9                THE COURT:  Understood.

10               MR. FATHI:  And I believe that is everything.               11:54:20

11               I believe Miss Kendrick had something to add about

12   this.

13               MS. KENDRICK:  Your Honor, the parties met and

14   conferred on November 28th with Judge Bade about the notice of

15   non-compliance that we had sent.  And there was some             11:54:43

16   disagreement about three of the measures.  But with all the

17   others defendants conceded that they were substantially

18   non-compliant.  And at the mediation they provided partial

19   remedial plans for some of the measures.  And Mr. Bojanowski

20   represented to us and to the Court that this filing today would    11:55:01

21   include updates on these performance measures as well, and it

22   appears that there's at least five of them where that was not

23   done and they were not included.

24               So we ask that when defendants file a supplemental OCR

25   searchable version that they also include the Performance         11:55:22

1    Measure Remedial Plans that they had promised to provide us no

2    later than today.

3            THE COURT:  Do you want to set forth on the record

4    what those are again so that Mr. Struck knows?

5            MS. KENDRICK:  Sure.  So the first one was Performance    11:55:34

6    Measure 19 at Eyman, Lewis, Perryville, Phoenix and Tucson.

7    Defendants had provided just a flow chart for their remedial

8    plan.  They had promised to provide narration and words

9    describing what the remedial plan was.

10           They had also agreed to design a training program, and    11:55:55

11   that they were going to start training no later than the end of

12   December.

13           MR. STRUCK:  Your Honor, let me just interrupt.  I

14   don't know that it's appropriate to be discussing what happened

15   in the mediation.                                                  11:56:10

16           THE COURT:  I don't think it is, but what she said is

17   that Mr. Bojanowski had said at the mediation that today, along

18   with the graphs, he would also include this additional

19   information.  If that's not true, then you can bring that up in

20   the settlement context.  But if it is true, it looks like it      11:56:28

21   might be an oversight or a feature of the fact that he's not

22   here and you are or something.

23           And so if -- why don't we do this:  Over the noon

24   break, you all again confer about whether or not this is

25   information that was supposed to be included today, get           11:56:48

—CV-12-601-PHX-DKD – November 20, 2017—

1   Mr. Bojanowski's opinion if you can.  And then when we return

2   we'll take it up again.

3           MS. KENDRICK:  We notified defendants -- we were asked

4   and we sent a confirming letter on December 6th that

5   memorialized all of Mr. Bojanowski's agreements and his          11:57:02

6   representations.

7           THE COURT:  But, again, if they're taking a different

8   view now that's really something that's appropriately in front

9   of Judge Bade, I think, because I shouldn't be jumping in to

10  the settlement context.                                          11:57:16

11          But if it's just an oversight that he said he would do

12  this, and they don't disagree that they said they would do this

13  and they just haven't done it because it was an oversight, then

14  get it fixed.

15          But if they have a different view, that they said, no,   11:57:27

16  we never said we would do that, I'm not going to resolve that

17  dispute.

18          MS. KENDRICK:  Right.  Well, right now I didn't

19  realize that they were now disputing what they had previously

20  said --                                                          11:57:38

21          THE COURT:  Well, let's come back at 1:15, and over

22  that time you'll have had a chance to have an off-the-record

23  discussion about it that respects everybody's interests.

24          All right.  Thank you all.

25      (Recess at 11:57 a.m., until 1:17 p.m.)                      11:57:52

```
 1              THE COURT:  Mr. Struck, were there more answers that

 2    you wanted to provide?  Or if not, that's all right.

 3              MR. STRUCK:  I believe this was in -- the question was

 4    in response to Performance Measure 49 at Tucson.  There was a

 5    question with respect to the -- I think reference to M.D.s.          13:18:19

 6              THE COURT:  Yes.

 7              MR. STRUCK:  We have -- I've got the names of the

 8    providers and when they were employed.

 9              THE COURT:  Okay.

10              MR. STRUCK:  I've got a Dr. DeGuzman, D-E capital         13:18:32

11    G-U-Z-M-A-N, who's and M.D. that was hired on 11-6-17.  Greg

12    Ladek, L-A-D-E-K, who's a DO hired on December 4th, 2017.

13    Steve Ellison is a nurse practitioner, start date 12-18-17.

14    And Julie Shute, that's S-H-U-T-E, who is also a nurse

15    practitioner, start date 12-4-17.                                  13:19:12

16              THE COURT:  Thank you.

17              All right.  I'll turn then to the agenda that I have

18    crafted out of your agendas, and I'll work through these items

19    up until the place that Mr. Millar is ready to join us.  And if

20    at the end of working through the agenda that I have cobbled       13:19:36

21    together from yours, if you think that I've missed items or you

22    want to elaborate on some others, you can let me know at that

23    point.

24              But the next one that I would take a look at is the

25    notice that I need to make a finding with respect to               13:19:53
```

1    Performance Measure 15 in Tucson.

2            I think that under the Stipulation it's non-compliant,

3    so I'll make that finding.  But there's no reason to take any

4    action in light of the recent performance at a level above the

5    benchmark for any further enforcement action at this time.  So    13:20:11

6    we'll continue to watch it, but hope that the current trend

7    continues to be locked in.

8            Next topic is the timing of document production.  I

9    think it really does cobble the whole operation to have the

10   graphs produced so close in time to the time that we join    13:20:33

11   another.  I made mistakes this morning because of that.  And I

12   just think it's much more efficient for us to have it so that

13   we can work through it in a more ordinary course.

14           And so what I would do is, understanding that January

15   is just an unusual circumstance with respect to that we have    13:20:52

16   that early meeting time, I would say that starting in February,

17   that whenever we meet on a Wednesday, that it has to be

18   filed -- or whenever we meet, that it has to be filed 48 hours

19   in advance of when we're scheduled to meet, so that everybody

20   has a chance to work through it in a deliberate way.    13:21:12

21           And then the next timing issue is the one that the

22   plaintiffs raised with respect to the current disagreement

23   between the parties on the scheduling of the prison tours.

24   There's been an objection to the document request, but also an

25   objection to the timing of the notice.    13:21:36

——— **CV-12-601-PHX-DKD – November 20, 2017** ———

1      The Stipulation is clear, it says that two weeks'

2  notice has to be provided.  But seems to me that it just

3  doesn't make sense for me to build within that a reasonable

4  production of the documents.

5      So when the plaintiffs provide their notice of the                    13:21:49

6  intention to do a prison tour, they'll at the same time produce

7  their document request, and then the response will be a week

8  later.  So that defendants will have a week, and that will

9  leave a week for the plaintiffs to digest the documents and

10  prepare for the hearing.                                                  13:22:12

11      That seems fair to me in light of the fact that I

12  don't think the documents are generally a surprise, the

13  category of them.  From what I've learned in the process when

14  you've involved me in this kind of dispute before, they are

15  subject matter documents that have been previously identified.          13:22:27

16  And so it would be an unusual case, I think, where there was

17  some kind of onerous burden on the defendants to have to turn

18  that request around --

19      MS. LOVE:  Your Honor, may we be heard on that matter?

20      THE COURT:  Everybody can be heard on that, surely.               13:22:43

21      Go ahead, Miss Love.

22      MS. LOVE:  Your Honor, with respect to the timing and

23  the Stipulation, the Stipulation at paragraph 32, which relates

24  to tours, provides that tours should be scheduled within at

25  least two weeks' advance notice.  However, the next to last          13:22:54

—CV-12-601-PHX-DKD – November 20, 2017—

1      paragraph of –- I'm sorry, the next to last sentence of

2      paragraph 32 specifically addresses document production in

3      association with tours.  And it says that plaintiffs' counsel

4      and their experts shall be able to review healthcare records of

5      class members, et cetera, as well as documents that relate to          13:23:13

6      underlying basis for the CGAR reports.

7              But the next to last sentence says, during the tours.

8      There's no requirement in the Stipulation of advance production

9      of the documents.

10             As to the burden on operations, while it may be             13:23:30

11     similar requests that are made at each time, we're still only

12     provided two weeks' notice of a tour and then one week to

13     produce.

14             No matter if we know what documents they generally

15     request, we're still only having two weeks' notice of where a       13:23:46

16     tour –- where a tour is going to occur.  It is a monumental

17     production by operations staff to gather the documents, which

18     are not –- they're asking for categories of documents that

19     relate to all inmates who, for instance, may have a specialty

20     consultation for the preceding 90 days.  We're not talking          13:24:04

21     about a week's worth of data.

22             That data has to be gathered by both Corizon folks and

23     ADC, and has to go through the process of coming to our office,

24     being reviewed so that we can make sure that the appropriate

25     documentation is being actually produced, and then provide it       13:24:19

CV-12-601-PHX-DKD – November 20, 2017

1    for production.

2          All we're simply asking is, if they want to have

3    documents in their hands in time to review prior to going to

4    the tour in accordance with the normal document production

5    pursuant to Rule 34(b)(2), if it's a document request we should     13:24:35

6    be afforded 30 days to respond.  If they do not want them in

7    their hands to be able to review prior, then in accordance with

8    what the Stipulation requires we will have them on site.

9          THE COURT:  All right.  That sounds like a compelling

10   case to me to refute what I said.                                   13:24:54

11         MS. KENDRICK:  As an initial matter, Your Honor, we

12   have never run into this problem when the Attorney General's

13   Office was responding and providing the documents prior to the

14   tour.  It's only since the law firm has taken over that

15   suddenly they're not capable of doing it.                          13:25:09

16         Also, this tour was one in which we told them two

17   weeks before the date that we were going, but the majority of

18   the time we tell them three or even four weeks in advance of

19   tours.  So to say that we're not giving them enough time I just

20   think is not true.                                                 13:25:27

21         And again, the point of the requirement is so that we

22   can get as accurate a snapshot as possible about what's going

23   on at the prison, and not so they have the time to paint and

24   make it pretty and try to fix every problem before we get

25   there, as if suddenly there's nothing wrong with the prison.      13:25:46

1   So the reason there's two weeks' notice is precisely for that

2   reason.

3          These document requests are not burdensome, most of

4   them are reports that Corizon can run using their Pentaho

5   software.  The problem we ran into in this situation was that          13:26:00

6   when I contacted them after I contacted the Court and talked to

7   Mr. Bojanowski and Mr. Valenti about it, I was told that they

8   were gathering the documents and there was just a couple of

9   things left that they wanted to check.  And so again I reminded

10   them of their responsibility to provide documents on a rolling          13:26:19

11   basis.

12          So we think, again, that this is not burdensome of a

13   request.  And in the majority of the time we are giving them

14   more than two weeks' notice and they do have time to respond.

15          THE COURT:  The problem I have is what Miss Love has          13:26:32

16   cited, and that is the Stipulation says that you're entitled to

17   review the documents at the prison.  And so you're asking for

18   them this advance, which is something that is beyond what the

19   Stipulation requires.

20          And she's saying that if you want to have them in          13:26:45

21   advance they'll give them to you but you're going to have to

22   give them 30 days' notice.  And that seems to be a matter of

23   grace that is hard for me to extract a further commitment from

24   because they don't have to even do that.

25          Is there any reason to think what I've said isn't          13:27:03

1    true?

2        (Discussion off the record between plaintiffs' counsel.)

3        MS. KENDRICK:  What Miss Eidenbach is reminding me is

4    the provision was a result of when the medical records were

5    paper documents, and that we needed to review them on-site          13:27:20

6    because we didn't have access to medical records.

7        THE COURT:  But you do review paper documents.  I

8    mean, I've been involved in disputes where I've been told about

9    boxes.  And so it's not -- if it were just medical records.

10   But you have access to the medical records yourself.               13:27:35

11       MS. KENDRICK:  We don't have access to those reports,

12   sir.

13       THE COURT:  What reports?

14       MS. KENDRICK:  For example, the report that we asked

15   for of the pending specialty care appointments where              13:27:43

16   Utilization Management is either pending review or has approved

17   but it hasn't been scheduled.  We're not capable of creating or

18   getting those reports through our access to eOMIS.  That's

19   what's called a Pentaho report that Corizon creates.

20       THE COURT:  All right.  So what this is is a category         13:28:02

21   of documents that is exclusively electronic.  And you're saying

22   because of the Stipulations a recognition of the need to change

23   the practice with respect to document production once we move

24   to electronic records, that this would be included within that

25   transition and, therefore, a different time table should be       13:28:19

1    contemplated because we were dealing with electronic records

2    and not paper records which had an intrinsic greater difficulty

3    to assemble to copy to produce.

4         MS. KENDRICK:  Right.  Right.  So we're asking them to

5    run different specialty reports or reports of people who have          13:28:36

6    been sent out to the hospital.  And the reason -- I mean, it's

7    not a secret why we're asking for these reports.  We use those

8    reports to identify class members who we will want to speak to

9    so we know who the people are that have outstanding pending

10   specialty consults that haven't been completed, or people that        13:28:53

11   have been sent out to the emergency room in the previous 90

12   days.

13        That's what we use the reports for.  It's not a

14   mystery or anything, it's to identify the class members that we

15   want to speak with while we're there.                                  13:29:06

16        And they're electronic reports that the Corizon

17   software program called Pentaho can create.

18        THE COURT:  All right.

19        MS. LOVE:  Your Honor, first of all, I don't see

20   where -- defendants don't see where there's any prejudice to          13:29:24

21   the plaintiffs for just not simply following the general Rules

22   of Civil Procedure for a document request to allow 30 days of

23   production.

24        In addition, you know, the statements that ADC goes

25   and paints and makes its prison pretty is, A, offensive, B,           13:29:38

1    incorrect, and C, has nothing to do with document production.

2           Number 3 on the list, they're not asking for one

3    report.  For the Tucson tour there are 15 categories of

4    documents asking for data back 90 days.  So to state that

5    they're just asking for one general report is not -- is not          13:29:58

6    correct based upon their own categories of documents that they

7    look for.

8           With respect to -- and I just did the quick math, so

9    this is all me doing it in my head, but as we were coming onto

10   the subject matter, with respect to document production made       13:30:19

11   prior to the Tucson, we produced either nearly or just over

12   1,000 pages of paper.  So we're not talking about one specific

13   report.

14          Finally, when the Stipulation was being negotiated,

15   defendant -- or plaintiffs knew that the electronic monitoring      13:30:38

16   system was coming on board.  So this isn't just exclusive and

17   constrained by the Stipulation to production during tours of

18   medical records.  Indeed the second -- I'm sorry, the last

19   sentence of paragraph 32 states that plaintiffs' counsel and

20   their experts shall be able to review any documents that            13:30:57

21   perform -- that form the basis of the MGAR reports and be able

22   to interview the ADC monitors who prepare those reports.

23          It says "review."  It doesn't say that we have to

24   produce those documents to plaintiffs' counsel prior.

25          That was, in defendants' mind, the whole concept of          13:31:15

1  them doing tours, is that they could be on-site, they could

2  look at whatever documents they wanted to review.  We would

3  have them ready for them to review.  And then they could

4  interview ADC or Corizon staff with which they wanted to speak.

5      In sum, requesting that they provide 30 days' notice                   13:31:31

6  in advance of a tour to provide documents when they're asking

7  for routinely 90 days worth of information not constrained to

8  just a report or two is appropriate.

9      THE COURT:  Well, what Miss Love is describing is

10  something different than what you described, Miss Kendrick, and   13:31:48

11  that is you said there was some kind of report about impending

12  scheduled appointments.  And what she's described is a look

13  back over 90 days of what was scheduled and what's happened.

14  And this does seem to be a larger class of documents than what

15  you described.                                                            13:32:05

16      MS. KENDRICK:  Well, we did request 15 separate

17  reports in the request.

18      And I don't understand about having to go back and

19  show -- it's not showing every specialty.  So what it is is,

20  for example, the specialty report, they run the report on        13:32:21

21  whatever day that they run it, and it shows all of the open

22  pending specialty reports that had been requested in the

23  preceding 90 days.  If the appointment had been completed, it

24  doesn't show up on the report.

25      So they're not creating like a daily list for us            13:32:36

—CV-12-601-PHX-DKD – November 20, 2017—

1    of -- for the past 90 days each day this was who had a pending

2    report.  It's a snapshot of people whose requests have been

3    made in the previous 90 days, how many of them were still open

4    as of the day the report was run.

5              Medication expiration reports, I mean a lot of these        13:32:53

6    were just printouts of who -- where people are housed.  So one

7    request is the housing assignment logs for people who are

8    seriously mentally ill.  And it's just a roster that is printed

9    out.

10             So, yes, it looks like it's many pages long, but it's       13:33:08

11   the names of the people who are seriously mentally ill and

12   where they are housed so that we can go and find them and see

13   what sort of conditions they're in.

14             I think that it's clear with the Stipulation that 14

15   days is the notice that they need to be given.  These are          13:33:28

16   not -- we're not asking them to go through paper records and

17   create things for us.  We're asking for computer-generated

18   reports.

19             And, again, like I said earlier, when Miss Rand was

20   responsible for the document productions for the tours, we did     13:33:40

21   not have this problem or this objection.  So it's unclear what

22   has suddenly happened to cause this to become a problem.

23             THE COURT:  In this past experience with the obtaining

24   of these records, were they produced to you in electronic

25   format or in paper form?                                          13:33:59

UNITED STATES DISTRICT COURT

1           MS. KENDRICK:  They were pdf's, they were electronic.

2           THE COURT:  Trying to craft a fair outcome under the

3    reality of the situation that is reflected in the Stipulation,

4    and that is the parties understood that there would be a change

5    in the migration to electronic records, and the eventual          13:34:41

6    occurrence of that development, and the idea that the Court

7    would be empowered to make a modification in how documents were

8    produced, it does seem to me to make sense to try to find a way

9    so that the plaintiffs can have in advance of when they arrive

10   on the scene to make their plan.                                   13:35:05

11          So I need to find a way so that they can get the

12   documents that they think are relevant close in time before

13   they arrive.  The Stipulation presently says that if you want

14   to look at them you have to give two weeks' notice.

15          So the defendants understood that they were entering       13:35:24

16   into a plan that would provide for two weeks' notice of

17   documents that the plaintiffs were entitled to look as, as the

18   defendants say, if they would look at them at the day of the

19   visit.  That contemplates that they were actual paper

20   documents, I think, and difficult to copy.  And they say, here    13:35:41

21   they are, look at them, that kind of thing.

22          But if they're produced in electronic format, that's a

23   whole different thing, much easier to do.  And so it seems like

24   it's reasonable to expect that the defendants would produce

25   that in advance.  The question is, how much in advance?  It       13:35:55

—CV-12-601-PHX-DKD – November 20, 2017—

1    seems to me that it still does take time to assemble the

2    records.

3              So I'm going to do it this way:  If the plaintiffs

4    provide only the two weeks' notice of the documents that they

5    want to see, they're certainly entitled to see them at the site      13:36:10

6    of the visit.  But if those documents have been in the past and

7    are, therefore, reasonable to believe that they can be produced

8    in electronic format, in this pdf form, they'll have to produce

9    those pdf's no later than the start of business the day before

10   the tour.                                                             13:36:30

11             If they want to see other documents that are not in

12   electronic form, then we'll go with the 30-day requirement if

13   you want to see them in advance.

14             But otherwise if they're in electronic form, and they

15   have been shown to be in electronic form, plaintiffs can still       13:36:42

16   do it within the two weeks, but the day for the compliance with

17   that will be not the day of the tour but the day before, no

18   later than the start of business the day before.

19             All right.  Turning now to Performance Measure 85 and

20   86 where you've asked for the Court's guidances on trying to         13:37:05

21   resolve the dispute that presently exists.  We ran into a

22   little bit of trouble there because we understand that

23   defendants' language is in an October 20th, 2017 letter, which

24   we couldn't find.

25             Does anybody here happen to have a handy cite to where     13:37:24

1    that might be in the record, the defendants' version of their

2    language that they would like in regard to Performance Measures

3    85 and 86?

4        MS. HESMAN:  Your Honor, we filed with that the Court

5    shortly after the November 21st telephonic hearing.  I don't          13:37:42

6    have the docket cite readily available, but --

7        THE COURT:  Would you mind e-mailing --

8        MS. HESMAN:  Sure.

9        THE COURT:  -- Miss Selzer and let her know where that

10   is, just so that we -- we had trouble finding it.                     13:37:49

11       MS. HESMAN:  Okay, yeah, will do.

12       THE COURT:  Then with respect to Performance Measure

13   95, I see the plaintiffs' proposed language but, again, I don't

14   see if defendants have any objection to that.

15       Have you let us know whether you have an objection to           13:38:11

16   the defendants' (sic) language that they proposed for

17   Performance Measure 95?

18       MS. HESMAN:  No, Your Honor.  We've already reached an

19   agreement.  We agreed to plaintiffs' language.

20       THE COURT:  Okay.  Thank you.                                     13:38:22

21       Plaintiffs ask that we address the issue of the

22   re-audit of Performance Measures 1, 2, 4, 77 and 95.

23       What I'll say with respect to that is what I've said

24   in the past, if there's not a re-audit it can't be used in an

25   argument for removal from the Stipulation.  So the ball is kind       13:38:40

1   of in the court on the defendants' side on what they wish to do

2   with respect to that.

3          The next agenda item is that the plaintiffs have asked

4   if the State is in a position to give any update on the RFP for

5   the provider, the contractor for health care.                    13:39:04

6          MR. STRUCK:  Yes, Your Honor.

7          Your Honor, the RFP is still under review.  And that's

8   about all I can say.

9          THE COURT:  Okay.

10          MR. STRUCK:  And I know -- well, it's your agenda.        13:39:18

11          THE COURT:  No, go ahead.

12          MR. STRUCK:  But there were a couple of issues that

13   they --

14          THE COURT:  On that topic?

15          MR. STRUCK:  There's --                                   13:39:27

16          THE COURT:  Feel free.  Go ahead.

17          MR. STRUCK:  12A, B and C.  They wanted to know what

18   the sanctions were assessed against Corizon for the months of

19   September and October.  And under the new contract is -- the

20   cap is lifted starting this month, so -- I mean starting        13:39:44

21   November.  So in September and October it was 90,000 was the

22   maximum amount that they could be assessed.

23          THE COURT:  And you don't know what November is yet?

24          MR. STRUCK:  That's correct, I don't know what

25   November is yet.                                                 13:40:00

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – November 20, 2017

1      I do know -- I can say that if there wasn't a cap, the

2  October sanction would have been 320,000 and November sanction

3  would have been 245,000.

4      THE COURT:  And when does the November information

5  become available?                                          13:40:16

6      MR. PRATT:  Well, what's being audited in December, so

7  middle of January.

8      THE COURT:  All right.  Thank you.

9      MR. STRUCK:  And the third question they asked under

10  that subsection was the amount of money assessed by the State  13:40:34

11  against Corizon for failure to maintain staffing levels above

12  90 percent.

13      The month of September the total amount assessed

14  against Corizon was $58,497.22.  Of that amount $22,323.41 was

15  with respect to providers, because there's three different   13:41:00

16  categories.  There's key manager positions, there's provider

17  positions, and then there's everybody else, nonmanagement group

18  they call it.  So of the $58,497.22, $22,323.41 related to

19  providers.

20      For the month of October the total assessment against   13:41:22

21  Corizon was $60,660.03.  Of that amount -- for the providers,

22  that amount of the 60,000 amount was $6,875.99.

23      THE COURT:  Does that address plaintiffs' inquiry on

24  that subject?

25      MS. KENDRICK:  That answers the question, yes.          13:41:52

CV-12-601-PHX-DKD – November 20, 2017

1          THE COURT:  Thank you.

2          There are pending motions to seal documents 2498 to

3    2501 and 2508, which will be granted consistent with the

4    Court's previous practice with respect to protecting individual

5    inmate's personal health information.                    13:42:11

6          The next topic on my agenda is to turn to yet again

7    this issue that continues to percolate, and that is the random

8    sampling issue.

9          It's not clear to me again where we are on this.  It's

10   because -- it seems as though part of the discussion is where   13:42:31

11   the randomization language would be present or not.  It seems

12   like I read that defendants say that we agree with it, with

13   plaintiffs' expert, but it then seems like the issue still

14   remains vital or alive in the parties' minds.

15         So it's not clear to me where it is.  So I need you   13:42:55

16   all to square it up for me to make sure that I understand

17   exactly what the issue is and what you need me to decide on

18   this random sampling issue.

19         MR. FATHI:  Your Honor, this is David Fathi.  Let me

20   try to give you a quick summary.                          13:43:10

21         The Court some months ago suggested that some language

22   based on Dr. Haney's Affidavit about random sampling be

23   included in the Monitor Guide.  We sent the defendants -- the

24   defendants asked us to provide some proposed language, we did.

25   They ended up including only two sentences of our proposed   13:43:31

CV-12-601-PHX-DKD – November 20, 2017

1    language.  We expressed a view that that was insufficient.

2    There were a number of critical topics that simply weren't

3    covered.

4            At the last hearing the defendants asked for a chance

5    to file a brief.  They did so at document 2465.  We filed a          13:43:47

6    response at document 2469.

7            So those are the relevant documents for the Court to

8    review.  I think the matter is fully briefed and ready for

9    decision.

10           THE COURT:  All right.  I looked at that.  And again,        13:44:04

11   what -- I mean, if defendants are saying in the one hand they

12   don't object to the randomization, I guess I need to now hear,

13   what is it that the defendants object to in Dr. Haney's

14   Declaration that I embraced before?

15           MS. HESMAN:  Your Honor, first of all we object to          13:44:29

16   including the language in the Monitoring Guide, because it's

17   confusing.  The monitors aren't the ones who are actually doing

18   the random sampling.  So to advise them as to how to do

19   randomization is confusing.

20           Moreover, Dr. Haney's Declaration is extremely long         13:44:43

21   and convoluted.  Therefore, we attached a Declaration from our

22   own doctor with our filing that simplifies the language.  So to

23   the extent that the Court does desire that random sampling

24   language be included in the Monitoring Guide, that he uses that

25   simpler language.  Again, it's language that Dr. Haney also          13:45:02

UNITED STATES DISTRICT COURT

1    agrees to.  It's the same language, it's just in a simpler

2    format.

3         But, again, our position is that no language should be

4    included in the Monitor Guide on randomization because the

5    monitors aren't the ones randomizing.                          13:45:17

6         THE COURT:  Right.  So I guess -- I mean, I do

7    understand and agree with that point, that it is not the

8    monitor's task to be doing the randomization.  But I also am

9    puzzled by your statement that you think that your expert -- if

10   I take it what you're saying essentially agrees with Haney's    13:45:36

11   Declaration, but you just think you say it plainer.

12        So I guess I should give Mr. Fathi a reply on that to

13   say why it is that they are still different.

14        MR. FATHI:  Your Honor, first of all, it's not correct

15   that the monitors don't do randomization.  In our filing at     13:45:54

16   2469 we cited testimony from the evidentiary hearings earlier

17   this year that monitors do sometimes do randomization.

18        Secondly, Dr. Haney --

19        THE COURT:  That's with the computer program -- that

20   was with the computer program that did it, is that what that    13:46:12

21   testimony was about?  Do you remember?

22        MR. FATHI:  Your Honor, the testimony I'm referring to

23   is Dennis Dye, who was a mental health monitor who was

24   testifying about, I believe, Performance Measure 74, in which

25   he testified that generally there's fewer than ten applicable   13:46:28

CV-12-601-PHX-DKD – November 20, 2017

```
 1    records per month, so he doesn't need -- they don't need to be
 2    randomized.  But if there were more than ten then he would be
 3    doing the one doing the randomization.
 4         THE COURT:  Okay.
 5         MR. FATHI:  But the more fundamental point,          13:46:43
 6    Your Honor, is that Dr. Haney's Declaration covers many other
 7    critical subjects other than just the mechanics of how you
 8    randomize it.
 9         It covers the need to -- when you make changes to the
10    results of the sampling, to document those changes in real      13:47:00
11    time.  It covers the entire process rather than just the narrow
12    mechanics of how do you do the randomization.
13         The defendants' expert said in his Declaration that
14    what Dr. Haney stated is correct.  There is absolutely no
15    objection, no disagreement from defendants' expert, except with 13:47:19
16    regard to I believe a single sentence about Performance Measure
17    39.  Defendants' expert didn't explain his objection, he just
18    said Dr. Haney's wrong without any elaboration.
19         Finally, Your Honor, we believe that if the Court
20    finds itself compelled to make a credibility determination      13:47:37
21    between the two experts, Dr. Haney has far, far more experience
22    in random sampling and research methods more generally than the
23    defendants' expert.
24         So for all of those reasons, particularly the fact
25    that neither the defendants' pleading at 2465 nor their expert  13:47:54
```

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – November 20, 2017

1   Declaration actually identify anything incorrect with what

2   Dr. Haney says, we believe that the language we propose should

3   be included in the Monitor Guide.

4        THE COURT:  Mr. Fathi, have you observed in the months

5   since we did talk about this and had testimony, have you had          13:48:13

6   occasion to observe any circumstances where you thought that

7   there were randomization issues that were inconsistent with

8   what Dr. Haney had opined about?

9        MR. FATHI:  About the mechanics of randomization, no,

10  Your Honor.  But that's because those are invisible to us.  All      13:48:35

11  we get are the CGARs.  And the CGARs say, these were the ten

12  records we pulled.  They contain absolutely no information

13  about the mechanics through which those records were selected.

14       So there could be massive problems with randomization

15  of the type that were discussed at the hearings, of the type         13:48:53

16  that made the Court say there were great chasms of competence

17  in how the monitoring was being done, and we simply wouldn't

18  know about it.  And that's another reason why it's essential to

19  make sure that this guidance is provided.

20       Now about other aspects of the problem, yes, we have            13:49:10

21  noticed difficulties.  One of the things that Dr. Haney says is

22  that it's critically important that when changes are made,

23  those changes be documented in real time, so that if

24  there's -- as the Court said earlier, I think a trail of bread

25  crumbs, an audit trail, so that the reader can see what was          13:49:31

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – November 20, 2017

1    done.  And as we discussed earlier this morning, there's a

2    couple of examples that came up today where apparently that

3    wasn't done.

4         So we think this information is critically important.

5    The defendants haven't identified any reason not to include it.          13:49:44

6    And we think it should be included.

7         THE COURT:  Any last word from defendants?

8         MS. HESMAN:  Yes, Your Honor.

9         I agree with Mr. Fathi that our expert and Dr. Haney

10   can agree on general language regarding randomization.  It's          13:49:57

11   simply unnecessary to include over five pages in a Monitor

12   Guide.  The purpose of the Monitor Guide is to assist the

13   monitors.  It is very confusing and they don't need that

14   information.

15        I also don't know how including the randomization          13:50:12

16   language in the Monitor Guide answers Mr. Fathi's inquiries

17   about problems in the randomization process.  Including that in

18   the Guide is not going to answer that question for him.

19        I think that the simplified version that our expert

20   provided who, in fact, is a statistician, and Dr. Haney is not,          13:50:29

21   answers plaintiffs' concerns, answers any concerns that the

22   Court may have, and it's simple and direct and to the point.

23        THE COURT:  But when you say you don't have an

24   objection to Dr. Haney's five pages, other than the fact that

25   it sounds like you think that the five pages should not be          13:50:45

CV-12-601-PHX-DKD – November 20, 2017

1    included in the Monitoring Guide, if they became an order of

2    the Court, then do you no longer have an objection to using

3    Dr. Haney's language of five pages?

4         MS. HESMAN:  Well, certainly, Your Honor, if you

5    ordered us to do it I would no longer have an objection to it.      13:50:58

6         The problem with Dr. Haney's methodology was with

7    respect to Performance Measure 39, and that's detailed in our

8    briefing.  That was the real issue that we had.  He dedicated

9    many of his pages to the analysis of Performance Measure 39.

10   But if he's just going to stick with the simplified version of    13:51:13

11   what randomization is then, no, we do not have an objection to

12   that.

13        Our overall objection that the monitors don't

14   randomize, so I don't understand what purpose this serves.

15        THE COURT:  All right.  Anything else you wanted to         13:51:26

16   say, Mr. Fathi, on this?

17        MR. FATHI:  Simply, again, Your Honor, it is incorrect

18   that the monitors don't randomize.  And again, Dr. Haney's

19   language is instructive on a number of critical steps in the

20   process that the hearings earlier this year showed is -- the     13:51:40

21   defendants are direly in need of.

22        THE COURT:  All right.  This was helpful for me.

23   Thank you very much.  I'll address it and get an order out.

24        Last time we talked about this suggestion that there

25   had been a uniform adoption of a policy with respect to pain     13:51:57

CV-12-601-PHX-DKD – November 20, 2017

1    medications, and it was contemplated that we'd have testimony

2    from Mr. Pratt this month regarding the --

3        (Phone interruption.)

4        THE COURT:  -- discontinuation of the tramadol and the

5    gabapentin.  And so are we prepared to go forward with that?          13:52:23

6        MS. HESMAN:  We are, Your Honor.  If I could just say

7    some brief words before Mr. Pratt gives his testimony.

8        I spoke with various Corizon personnel yesterday about

9    this issue at length, specifically with Dr. Patel who is the

10   Regional Medical Director for Corizon.  And I have been advised       13:52:40

11   that there is no system-wide discontinuation of gabapentin or

12   the other pain medications, as plaintiffs allege.

13       As you may recall this issue stemmed from a document

14   request that plaintiffs sent to us for any and all documents

15   regarding the system-wide discontinuation of these medications.      13:52:57

16   That simply is inaccurate.  There is no system-wide

17   discontinuation.

18       Rather what has happened is that there has been an

19   uptick in abuse of these medications, specifically with inmates

20   cheeking the medication or hoarding the medication.  Therefore,      13:53:12

21   providers are scrutinizing the medical records a little more

22   closely before refilling or prescribing these pain medications.

23       So the Declaration submitted in support of their

24   agenda, Your Honor, where they detail these inmate letters that

25   they've received, I'm not saying they're invalid, but those are      13:53:30

CV-12-601-PHX-DKD – November 20, 2017

1   specific concerns that a specific provider had for a specific

2   inmate, and a determination was made whether or not to remove

3   that medication, re-prescribe that medication, or prescribe

4   that medication.

5          It's not a system-wide discontinuation.  And,                    13:53:46

6   therefore, there are no responsive documents to their request.

7          THE COURT:  All right.  So no documents, but we have

8   Mr. Pratt.  If you'd please step forward to the clerk to be

9   sworn.

10      (RICHARD PRATT, DEFENSE WITNESS, SWORN.)                              13:54:01

11          THE CLERK:  Thank you.

12          THE COURT:  Kindly, sir, have a seat.

13          MS. KENDRICK:  Your Honor, Mr. Fathi just sent a

14   message saying that the call got disconnected.  I think he may

15   have attempted to restart it.                                           13:54:20

16          THE COURT:  Give us just a second, we'll see what we

17   can do.

18          MS. KENDRICK:  Okay.  Thank you.

19      (Discussion held off the record.)

20          THE COURT:  Mr. Fathi, are you back?                             13:55:09

21          MR. FATHI:  I am, Your Honor.  My apologies.

22          THE COURT:  No, well, thank you.

23          Miss Kendrick, when you told us about Mr. Fathi's

24   absence, was that because he's the lead on the plaintiffs' side

25   on this issue?                                                          13:55:37

UNITED STATES DISTRICT COURT

— Richard Pratt – Direct Examination —

1         MS. KENDRICK:  No.

2         THE COURT:  I just wanted to know.

3         MS. KENDRICK:  But also, Miss Finger was using the

4    same call-in number too from Corizon, so we just wanted to make

5    sure everybody was back on.                                    13:55:46

6         THE COURT:  The only reason I asked that question is I

7    just wanted to know whether I needed to recapitulate what we

8    just heard with respect to the preamble from defense counsel

9    regarding what Mr. Pratt was going to be talking about.

10        I'm going to start with some questions, sir.            13:55:58

11                        DIRECT EXAMINATION

12   BY THE COURT:

13   Q.  This issue that was raised about the allegation of the

14   cessation of these two drugs, gabapentin and tramadol, when we

15   raised it, you then, I gather, looked into it?               13:56:08

16   A.  Yes.

17   Q.  And what did you do to look into it?

18   A.  I checked with Corizon.  I discussed the issues with them.

19   Have they put out anything that says we're going to

20   systematically get rid of these medications or -- and all the  13:56:22

21   answers I got were negative.

22   Q.  I see.  And when we heard from defense counsel that it was

23   in reaction to abuse of the drugs, is that something that comes

24   from the Corizon side or from the D.O.C. side?

25   A.  Both.                                                      13:56:40

─── Richard Pratt - Direct Examination ───

1    Q.  I see.  And had you heard about that before?

2    A.  Yes, sir.  And that's -- that's historic.  That has been

3    longstanding.  And it's not just ADC, it's across the country.

4    Q.  And this uptick that defense counsel mentioned, is that

5    what you had seen too?                                          13:56:56

6    A.  I haven't seen an uptick.  Again, it's been pretty much

7    historic.  And those are medications of high abuse potential,

8    and they have great street value, I should say, on the yards.

9    Q.  I understand pain management -- and both of these drugs are

10   pain management drugs; is that right?                           13:57:17

11   A.  Yes.

12   Q.  I understand pain management is a challenge in the prison

13   system because of the potential for abuse, and that the drugs

14   that are not so susceptible to abuse are not as effective in

15   dealing with pain oftentimes.  Is that fair to say?            13:57:29

16   A.  Not necessarily, Your Honor.  I don't know that they're

17   less effective.  A lot of times this is just based upon the

18   patient's desire for a specific drug.

19   Q.  All right.  And these are general questions.  I know that

20   you're not a doctor.  But I know that you have substantial      13:57:47

21   medical experience in the prison system and you're looking at

22   these issues, and so I do need to take advantage of the fact

23   that I have you here and can ask these questions.

24        But if it is a determination that these two drugs are

25   susceptible to abuse, do you have any idea about what the       13:58:06

UNITED STATES DISTRICT COURT

1   alternative drugs are that are available?

2   A.   There's a lot of different alternative drugs, Your Honor.

3         And by training I was licensed as a physician

4   assistant in the past, so I've got some knowledge there.

5         But there are a lot of different drugs to address pain          13:58:24

6   issues.  Some drugs will work for some people, some drugs --

7   that same drug may not work for another person.

8         A lot of times it's trial and error as to what is

9   successful in pain management.  And honestly, the only way that

10  you're able to judge that is based upon what the patient is          13:58:44

11  telling you.  It's subjective as far as what's considered pain

12  by the patient.

13  Q.   Well, I guess I'm a little bit troubled by the -- sort of

14  my lay person's logic application of this.  The lay person's

15  logic is that these two drugs were used because everybody          13:59:03

16  thought they were the best drugs to use.  And then it turns out

17  there's an abuse problem.  So that means you have to fall off

18  to what may not be -- what everybody viewed to be the best

19  drugs to use.

20        And so in the climate of what we see in Federal Court          13:59:18

21  where we see an uptick of our own with respect to individual

22  cases where people say they're no longer getting the pain

23  relief that they need, and they allege that it's part of a

24  systematic program, again, not part of the evidence in this

25  case, but something that I'm aware of from the docket of other          13:59:34

---

**Richard Pratt - Direct Examination**

1    cases that are allegations in the courthouse.

2            And so if my logic is correct, I guess the question

3    is, who's looking at this on an individual basis to make sure

4    that individual inmates are receiving the appropriate pain

5    medication that they need to receive?                          13:59:59

6    A.  Well, when -- as I'm sure you're aware, the whole pain

7    management and addiction issue has been gaining great notoriety

8    across the country, in particular with opioids.  And there's

9    been a focus to try to no longer throw out the major

10   painkiller, be it opioid or whatever it is, to try to come up   14:00:24

11   with alternative medications that may not be habit forming,

12   that may not be as dangerous for the overall patient care.

13           So there's been a push to adjust medications to

14   possibly less addictive, albeit -- and hopefully still as

15   effective.  But there's times when a patient will say, I'm      14:00:47

16   happy with what I'm getting, don't change it, where it may

17   actually be in the patient's best interests to change that to a

18   less addictive drug.

19   Q.  I'm left with the thought that this issue -- I mean, the

20   first question that I asked was whether or not there was a      14:01:14

21   broad policy to discontinue these medications, and the answer

22   first is, no, there's been no discontinuation, what there's

23   been is a decision to try to reduce the use of these medicines,

24   to explore alternatives because of the high abuse potential.

25           And again, I don't know where that leaves me with       14:01:35

UNITED STATES DISTRICT COURT

1    respect to the net number of people that are affected or what

2    the alternatives are.

3            But do you have a way of seeing in a quantitative

4    measure what the -- if somebody wanted to determine, well, we

5    are hearing from the lawyers that there's been no policy, but          14:01:58

6    one of the ways we could check that is we would say that in

7    December of '16 we had 100 units of this medicine being

8    dispensed and we look now at November of '17 and we see that

9    there are five.  And then that might inform us with respect to

10   whether or not there had been a dramatic change and maybe would        14:02:20

11   stimulate further inquiry, perhaps expert or otherwise.

12           Is there any such number that's available to you to

13   find about the number of dispensings of these medications?

14   A.  Yes.  We have a quarterly pharmacy and therapeutics meeting

15   where Corizon provides us with information on all drugs that           14:02:39

16   they've been prescribing.

17   Q.  I see.  And when was this last quarterly report?

18   A.  I believe it was last month.  I'd have to go back and look

19   for sure.

20   Q.  All right.  So that would be for the third quarter of '17,         14:02:55

21   you think?

22   A.  Yes.

23   Q.  So you could produce that to us and we could see what the

24   number of tramadol and gabapentin dispensings were in the third

25   quarter in the prison system and compare that to the previous         14:03:12

Richard Pratt – Cross-Examination

 1   year, for example?

 2   A.  Yes, sir.

 3   Q.  Okay.  Can I ask you to make sure that happens?

 4   A.  Of course.

 5         THE COURT:  Okay.  All right.                        14:03:23

 6         Any questions from plaintiffs' counsel?

 7         MS. KENDRICK:  Just a couple, Your Honor.

 8                   CROSS-EXAMINATION

 9   BY MS. KENDRICK:

10   Q.  Mr. Pratt, you referred to the fact that the gabapentin and   14:03:30

11   the tramadol was being abused and cheeked by the people who

12   were taking it.  Are these medications direct observation

13   therapy or also known as watch swallow medications?

14   A.  Either or.

15   Q.  What does either or mean?                               14:03:47

16   A.  Could be -- it depends on how the provider orders it, KOP

17   or DOT.

18   Q.  So the providers prescribe tramadol as KOP?

19   A.  They can.

20   Q.  Do they?                                               14:04:00

21   A.  I don't know on a general basis.

22   Q.  So if medications were being abused, wouldn't the way to

23   eliminate the issue of passing the meds or cheeking the meds be

24   to observe them taking the medication?

25   A.  Easier said than done.  When you hand a pill to a patient   14:04:17

1    and the patient actually cheeks it, the only actual way that

2    you're going to verify for sure that that inmate has swallowed

3    that medication is to do a finger sweep of his mouth after the

4    medication has been delivered.

5    Q.  Is the general practice for DOT medication that the person          14:04:36

6    after they swallow the medication is asked to open their mouth

7    so that a custody officer or a nurse can see if they've cheeked

8    it?

9    A.  No.

10   Q.  That's not the practice in ADC?                                     14:04:48

11   A.  No, it's just observation by an officer.

12   Q.  Do you think that if that was the actual practice used that

13   that would reduce the number of cheekings or people not taking

14   their medications?

15   A.  I can't say that that would make a difference.                      14:05:02

16   Q.  Are you aware that other prison jurisdictions use that

17   approach to DOT medication administration?

18   A.  No, not particularly.

19   Q.  Okay.  So you didn't know that's how other prisons do it?

20   A.  Other systems --                                                    14:05:19

21   Q.  Yes.

22   A.  -- may have different rules as to, you know, how they

23   monitor direct order therapy.

24   Q.  So how -- you mentioned earlier that there's a national

25   trend of medications being abused and cheeked.  How are you             14:05:34

Richard Pratt – Cross-Examination

1  aware of that?

2  A.   No, I'm talking in particular about the opioid crisis that

3  we're going through at this point and the heightened level of

4  being careful regarding what medications are prescribed

5  for -- in the safety for the patient.                    14:05:54

6  Q.   Is gabapentin an opioid?

7  A.   No.

8  Q.   And do you know when tramadol became a controlled

9  substance?

10 A.   I do not.                                           14:06:03

11 Q.   But it wasn't a controlled substance in the past, are you

12 aware of that?

13 A.   I'm not aware of that, no.

14 Q.   And you mentioned that because of this opioid crisis, that

15 alternative drugs are being used.  What are the alternative  14:06:17

16 drugs that Corizon is using?

17 A.   There's a host of different medications that are available

18 for pain control.  I can't give you a list.

19 Q.   You can't even name one?

20 A.   No.                                                 14:06:33

21 Q.   How about Effexor?

22 A.   I don't know.

23 Q.   How about Ibuprofen?

24 A.   I don't know.

25          As far as an alternative you're talking?       14:06:46

UNITED STATES DISTRICT COURT

─────── **Richard Pratt – Cross-Examination** ───────

1    Q.  Yes.

2    A.  Again, there's a host of medications that are allowed for

3    pain management.

4    Q.  But you're not aware of what Corizon is prescribing as an

5    alternative to gabapentin or tramadol?                          14:07:00

6    A.  Patient specific.  And that is the decision of the provider

7    that's treating that patient.

8    Q.  What does this quarterly report show that is being

9    prescribed?

10   A.  I will provide it to you and the Court.                     14:07:13

11          THE COURT:  It probably makes sense for us to see it

12   across the board, because then we'd be able to see maybe what

13   the increase in -- commiserate increase in medications that

14   might compare to the decrease of these other two drugs and we

15   might, therefore, be able to, knowing the class of drugs, make  14:07:33

16   some kind of rough assessment about what the substitute drugs

17   would be.

18          But if we needed to find out in particular from the

19   person most knowledgeable, who would that be?  Who is the one

20   who's most knowledgeable about making a decision, we've got     14:07:50

21   this issue with these two drugs, we're seeking to try to clamp

22   down as I think you said on them, and here are the possible

23   alternatives, who would be providing that information to the

24   providers who would need to know that?

25          THE WITNESS:  Dr. Patel, who is the medical manager      14:08:08

UNITED STATES DISTRICT COURT

─────── **Richard Pratt – Cross-Examination** ───────

1   for Corizon.

2          THE COURT:  Okay.  Thank you.

3          Anything further from plaintiffs?

4          MS. KENDRICK:  Yes.

5   BY MS. KENDRICK:                                          14:08:17

6   Q.  Do you know what is listed in the Corizon formulary as pain

7   management medication?

8   A.  Not off the top, no.

9   Q.  Is that something that you could obtain or request from

10  Corizon?                                                  14:08:28

11  A.  Absolutely.

12  Q.  Okay.

13         THE COURT:  Can you provide that also to us?

14         THE WITNESS:  Sure.

15         THE COURT:  Thank you.                             14:08:37

16         MS. KENDRICK:  I have nothing further.

17         THE COURT:  All right.  Anything defendants wanted to

18  say?

19         MS. HESMAN:  Nothing, Your Honor.  Thank you.

20         THE COURT:  Okay.  Mr. Pratt, thank you.           14:08:45

21         THE WITNESS:  You're welcome.

22         MS. KENDRICK:  Your Honor?

23         THE COURT:  Yes.

24         MS. KENDRICK:  I did want to say something in response

25  to what Miss Hesman said.                                 14:08:51

1          THE COURT:  Yes.

2          MS. KENDRICK:  So we requested documents related to

3     the discontinuation of medication.  We did not request

4     documents regarding a systematic policy.  So the fact that

5     there's no written policy that says discontinuing medication          14:09:06

6     doesn't mean that there could not be relevant documents.

7          For example, as detailed in the Declaration of Megan

8     Lynch at docket 2497, we received reports from class members

9     that said they had been given grievance responses or shown

10    e-mails that said that all prisoners were to be taken off these          14:09:27

11    drugs.

12          So again, we just would like to ask that they make

13    sure that they are searching correctly for documents rather

14    than just saying, do you have any documents about a systemic

15    policy or a written policy to do this, that they're actually          14:09:41

16    looking at the underlying substance of what we're trying to get

17    at here.

18          We understand that there probably is no written policy

19    that's on Corizon letterhead that says we're going to

20    discontinue these medications.  However, given the statically          14:09:55

21    significant amount of intake our office has received in the

22    past 11 months about this issue, we do believe that there

23    perhaps is some sort of documentation out there about the

24    practice that is going on, even if it's not pursuant to a

25    formal written policy.          14:10:13

CV-12-601-PHX-DKD – December 20, 2017

 1            THE COURT:  And you don't happen to have your

 2    interrogatory question?

 3            MS. HESMAN:  I do, Your Honor.  I can read it.

 4            THE COURT:  Can you?

 5            MS. HESMAN:  Any documents relating to the system-wide    14:10:21

 6    and/or institution-wide discontinuation of gabapentin or

 7    tramadol.

 8            So what I'm hearing from Miss Kendrick is that we're

 9    supposed to be mind readers and interpret that to mean

10    something more than what she's requested.  If she wanted    14:10:34

11    something else they should have phrased it differently.

12            THE COURT:  That's why I asked the question, because I

13    don't expect any lawyer should expect the other side's lawyer

14    to be the mind reader.  You need to ask the question that you

15    want answered.  And the question that I heard from    14:10:46

16    Miss Kendrick is a different question than the one she asked.

17            MS. KENDRICK:  We'll be happy to rephrase our request.

18            THE COURT:  That's what I think you need to do.

19            All right.  Thank you.

20            Other than the Procure Arizona issue that we'd raised    14:11:15

21    with Mr. Millar, I think all of the -- as I read it, all of the

22    other agenda items are captured within the change in course

23    that I adopted this morning with respect to looking into the

24    collection of records and reporting.

25            And so I think that I have addressed the issues that    14:11:39

CV-12-601-PHX-DKD – December 20, 2017

1    were on the agenda items that were submitted that touched upon

2    those already by the course that we're going to take.  But

3    we're now at that point where I'll turn to each side to address

4    issues that they think that I have failed to raise.

5            MR. FATHI:  Your Honor, this is David Fathi.                14:12:01

6            There remain --

7            THE COURT:  Oh, there was one -- I'm sorry, I've just

8    been handed a note that I did miss one that was on my agenda.

9    And I'm sorry about that.

10           Before you go on, Mr. Fathi, let me just finish my      14:12:12

11   list for sure.

12           MR. FATHI:  Of course.

13           THE COURT:  And that is the agenda item of the

14   isolation subclass.

15           What I have here is an issue that I thought that I     14:12:23

16   could get to a place where the parties could agree, and that I

17   kind of jumped over some steps to get to there, thinking that

18   if I got to that place it wouldn't be afoul for me to have

19   jumped those steps.

20           But then where I am right now, it looks to me like     14:12:45

21   with respect to this isolation subclass issue, that I do have a

22   disagreement.  And I have a proposed order -- which is what I

23   asked for, so there's no foul, this was what was presented to

24   me.  But I now have a proposed order that is a subject of

25   contention.                                                     14:13:08

CV-12-601-PHX-DKD – December 20, 2017

1      And so then I have to go back to see -- if I'm not in

2   the position of presiding over a happy agreement, I have to be

3   the decision-maker on it.  And that means that the steps to get

4   to that place need to be respected.

5      And the steps that I think that I'm missing are that I      14:13:24

6   don't have a motion to do what plaintiffs asked me to do in

7   their proposed language, other than the one that is rather

8   stale now.

9      Because I understand from what I have read, but is not

10  really part of the evidentiary record in the case, that there     14:13:47

11  have been changed circumstances that directly affect this

12  issue.  For example, this adoption I think of a plan that's in

13  place where the armbands are used to clock like marathon

14  runners when they run past certain mile points, about when

15  people are out of the cell or where they are.  If that's a      14:14:06

16  circumstance, that affects how I address this issue.  But

17  there's nothing in the evidentiary record that I have.

18     And so I'm thinking that with respect to the subclass

19  issue I need to have a renewed motion from plaintiffs.  And

20  then I need to set an evidentiary hearing to give you all a     14:14:22

21  chance to tell me what the facts are so that I can make a

22  reasonable decision on how to resolve this dispute that you

23  presently have.  I don't think there's any possibility that we

24  could schedule it before March, but I think that that's the way

25  I need to go.                                                   14:14:39

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1      I'll turn now to respective counsel to opine on what

2   I've just said.

3          MR. FATHI:  Your Honor, this is David Fathi.

4   Miss Fettig has just joined us.  I don't know if she heard

5   everything the Court said from the beginning.  But if she has        14:14:54

6   questions I'm sure she will pose them.

7          THE COURT:  Well, let's ask Miss Fettig whether she

8   heard what I said or not.

9          MS. FETTIG:  Good afternoon, Your Honor.

10     I heard part of it, but I may not have gotten the full        14:15:06

11  thing.  I came in when you were discussing armbands.  And I

12  confess I'm not sure what you're talking about.  You may have

13  some information that I do not.

14         THE COURT:  Go ahead.

15         MS. FETTIG:  Yes.  No, I'm not sure what you're        14:15:24

16  talking about in terms of the armband.  You may -- there has

17  been discussion about monitoring the new -- the close custody

18  units using electronic monitoring.  But the most recent

19  information we have regarding that is that it is still in

20  progress because of purchasing problems with the State.  So        14:15:45

21  that has yet to be implemented.

22     If there's a separate armband issue, I'm not aware of

23  it.  Certainly electronic monitoring is a nice idea, but I

24  don't think it has yet been realized in the ADC.

25         THE COURT:  All right.

1    MS. FETTIG:  So in terms of a renewed motion, the

2    question I would have for Your Honor is, much of the original

3    motion is about inaccurate methodology for the initial two

4    years plus of monitoring for many of the max custody measures.

5    That situation has not changed because it is historical fact.          14:16:24

6    And so --

7         THE COURT:  But what's happening on the

8    ground -- what's happening right now with -- I mean, do we have

9    the same issue, do we have the same circumstances, the same

10   ambiguity about who's going where, when, and who's writing it          14:16:38

11   down about what's happening?

12        MS. FETTIG:  Well, Your Honor, as you know we've been

13   working on the Monitoring Guide.  New monitoring methodology

14   was put in place.

15        Now, plaintiffs have recently filed a notice of               14:16:52

16   non-compliance with the defendants, but the defendants have not

17   yet responded.  I believe that is due on December 29th.  That

18   notice raises some issues that are similar and some that are

19   different from the original motion.

20        For example, the original motion addressed the fact           14:17:10

21   that there was nonrandom selection of weeks.  That had changed.

22   But that was a year and a half of nonrandom selections in the

23   methodology historically for the max custody conformance

24   measures.  The fact that there was inaccurate nonrandom

25   monitoring for the first two years isn't going to change.  The     14:17:33

UNITED STATES DISTRICT COURT

1    issue the plaintiffs brought forward was that, you know, to

2    some degree we needed to restart the monitoring of the max

3    custody measures because they were so compromised that they

4    could not be fixed.  And that was part of the original motion.

5            Those arguments remain the same, although going          14:17:58

6    forward some of the methodology has improved because of the

7    Monitoring Guide.

8            THE COURT:  So the notice of non-compliance, which the

9    defendants will respond to at the end of the month, won't

10   provide much more additional information in the record, I        14:18:17

11   gather, to help me understand this issue.  So it seems like I

12   do need to hear from you all about what the current situation

13   is as you see it that is the basis for your feeling of

14   non-compliance.  Is that fair?

15           MS. FETTIG:  Well, Your Honor, the basis for the         14:18:40

16   non-compliance during the first two years of monitoring remains

17   the same as it was in the motion that we originally filed.

18   That's a historical fact.

19           Going forward there are some new issues that have

20   arisen that are part of our new notice of non-compliance.  And   14:18:54

21   part of that arises from the Monitoring Guide, a question of

22   how that monitoring is being done, how are the cell hours being

23   counted, especially for the SMI population.  And that will be

24   addressed by defendants on the 29th, I don't want to argue that

25   in court now.                                                    14:19:17

1          But the original motion remains the same in terms of

2     those methodological errors that we flagged.  Our concern is

3     that we want the monitoring going forward for the adequate

4     period of time to be accurate.  Those first two plus years were

5     fatally compromised, and that isn't going to change.          14:19:44

6          THE COURT:  All right.  But the proposed order would

7     be addressing both a correction of the past record that you'd

8     submitted as well as going forward; is that true?

9          MS. FETTIG:  Your Honor, I'm not quite clear that I

10    understand you.                                              14:20:05

11         THE COURT:  Okay.

12         MS. FETTIG:  The proposed order was meant to address

13    the flaws that we -- that were identified during the first two

14    years and then going forward.  So some of the issues remain a

15    problem because they have not yet been decided.  Some, like I  14:20:18

16    mentioned, the random selection of weeks that got corrected

17    after the first two plus years.

18         So the order that we crafted, the new order that you

19    asked us submit, and we did submit, that is crafted to address

20    issues going forward.  So that is current.                   14:20:39

21         THE COURT:  Okay.  And then what happens -- if I adopt

22    that order, the next question I have to ask, what happens to

23    what you've spent a lot of time talking about, and that is the

24    historical problems?

25         MS. FETTIG:  Yes.  Well, we would -- what we would     14:20:57

CV-12-601-PHX-DKD – December 20, 2017

1   like the Court to address are the old issues of methodology

2   that made the findings of compliance not compliant.  So we've

3   got a period of time expressed in the motion to enforce the

4   Stipulation for the max custody measures that -- in which the

5   defendants claimed they were compliant and our findings upon        14:21:21

6   analysis of the methodology and the actual -- and the actual

7   documents, our argument is that they were not complying with

8   the terms of the Stipulation.

9        So we would ask the Court to rule on the plaintiffs'

10   position that those -- that first, you know, two years is        14:21:39

11   actually not compliant.

12        THE COURT:  All right.  So, my discussion with you

13   right now has told me that I do think that it was wrong -- or

14   it is now in retrospect wrong for me to have done things the

15   way that I did, because it's created all of these ambiguities,    14:22:00

16   and to make sure that the issues are properly joined.

17        What I'll do is I'll take a look at the

18   Government's -- the State's response at the end of the month,

19   and your reply, and then I'll take all of that information

20   together with the information that I have in the documents that    14:22:17

21   have already been filed, and see if I'm right, that I do think

22   that I still need an additional motion.  And if I do need any

23   additional evidentiary evidence -- evidentiary hearing or

24   taking of evidence, and I'll let you know all about that after

25   I see the reply.                                                   14:22:38

CV-12-601-PHX-DKD – December 20, 2017

1    MS. FETTIG:  Thank you, Your Honor.  We appreciate

2    that.

3    And if the Court has any questions, certainly at the

4    next status hearing we can address those so that we're all on

5    the same page.                                        14:22:50

6    THE COURT:  All right.  Thank you very much.

7    MS. LOVE:  Your Honor, if I may, I'm not sure in this

8    discussion what we're speaking of of looking at a reply.  I

9    think there may be some confusion in that the new notice of

10   substantial non-compliance that Miss Fettig referred to, I    14:23:04

11   think she just maybe made a mistake in terminology when she

12   said it was filed.  That is indeed a letter to defendants of a

13   notice of substantial non-compliance pursuant to paragraphs 30

14   and 31 of the Stipulation, which starts a new mediation

15   process.                                             14:23:23

16   So that's not going to give you anymore information in

17   the record.

18   THE COURT:  I see.  I see.  All right.

19   MS. LOVE:  What defendants' concern is, and I think

20   that we share that with the Court, is that based upon the     14:23:32

21   motion that defendants also believe is stale in many respects,

22   because since October of 2016, and even before we have come to

23   a Monitoring Guide that was put into place as agreements were

24   made or guidance was provided by the Court, and is in effect,

25   if you look at the new proposed order versus the stale motion, 14:23:54

1    defendants are also unclear as to the marrying of both, as to

2    what is really still at issue.

3             THE COURT:  Well, let me ask this:  If it's embarking

4    upon the mediation process under this new Notice of

5    Non-Compliance, is that a venue that I should, without being          14:24:19

6    too much of an imposition on Judge Bade, to give a chance to

7    run its course so that seeing if it could maybe capture all of

8    these issues, or is that unworkable or unreasonable to think

9    about?

10            Miss Fettig?                                                  14:24:42

11            MS. FETTIG:  Your Honor, the new Notice of

12   Non-Compliance -- and I apologize if I made the Court think

13   that that was an actual pleading.  Indeed, we are at the early

14   stages in the non-compliance findings.

15            For that the issues, some of them overlap and some of        14:25:01

16   them are new.  What plaintiffs would say in this situation is

17   that the original motion to enforce the Stipulation for the max

18   custody measures, we do need a ruling regarding the issues

19   methodology and otherwise that were brought forward in that

20   motion so that both parties have an understanding of, you know,       14:25:24

21   where we go from here.

22            For example, you know, we -- even though defendants

23   for the moment no longer non-randomly select weeks for

24   monitoring, we need a ruling from the Court on that issue so

25   that there's no backsliding.  You know, that's just a clear          14:25:43

—————— CV-12-601-PHX-DKD – December 20, 2017 ——————

1   example where, if we don't get a ruling from the Court -- you

2   know, everything is a moving target in this case, from -- on

3   the monthly monitoring.

4           So we would certainly appreciate an initial ruling.

5           THE COURT:  All right.  I gather there's no                    14:26:03

6   impropriety in the court seeing the Notice of Non-Compliance

7   and the response, because that does not intrude upon the

8   mediation process, as those are just triggering actions before

9   the mediation occurs.

10          If that's true what I've just said -- and it may not         14:26:27

11  be true and you all may tell me it's not true.  But if that is

12  true, is it all right for me to see the notice from plaintiffs

13  and the response from the defendants, and let me see those so

14  that I can decide whether I think that there's action I can

15  take with the existing motion, or whether I do think that I     14:26:46

16  need additional evidentiary information with respect to

17  addressing the proposed form of order?

18          MS. FETTIG:  Your Honor, plaintiffs do not have a

19  problem with providing that information to you.

20          MS. LOVE:  Your Honor, defendants agree with               14:27:03

21  Miss Fettig.  We would only ask that because this is still

22  pursuant to the Stipulation going through the mediation

23  process, that rather that it be filed on the public document

24  that we provide it to your chambers via e-mail.

25          THE COURT:  I have no objection to that.  So if you       14:27:18

CV-12-601-PHX-DKD – December 20, 2017

1   would at the end of the month, on the 29th, and sometime

2   between now and then, Miss Fettig, if you'd submit what you've

3   provided to the defendants, I'll take a look at that and let

4   you know what I need or what I can do with respect to the

5   existing issue that's before me.                          14:27:34

6          Thank you.

7          MS. FETTIG:  Thank you, Your Honor.

8          THE COURT:  All right.  Mr. Fathi, that is the end of

9   my list.  You can start up again, please.

10         MR. FATHI:  Thank you, Your Honor.                  14:27:43

11         There remain some issues under item 4, first beginning

12   with item 4A, which this involves the Court's order for

13   Performance Measures 94, 95 and 97.

14         The defendants have to select the required number of

15   files from different individuals rather than counting the same   14:28:05

16   person's file more than once in the same month.

17         Now the Court issued its order on July 13th at

18   document 2185, and since then for the next three months of

19   CGARs the defendants have failed to comply with the Court's

20   order, and each month have continued to count the same       14:28:24

21   individual's file more than once for a given Performance

22   Measure.

23         We think that's a problem, and we would like assurance

24   that defendants will comply with the Court's order going

25   forward.                                                    14:28:39

UNITED STATES DISTRICT COURT

1           THE COURT:  And the defendants essentially respond

2      that they say it's de minimis; is that right?

3           MS. HESMAN:  That's correct, Your Honor.

4           MR. FATHI:  Well --

5           MS. HESMAN:  Our response is at docket 2489.  I'd          14:28:54

6      specifically like to direct the Court to page 3 where we

7      outline the total number of files that were reviewed for all

8      Performance Measures 94, 95 and 97.

9           140 -- with respect to the August numbers, 140 files

10     were reviewed for Performance Measure 94.  Of those files two   14:29:13

11     duplicate entries were found.  That's an error rate of 1.4

12     percent.  More importantly, neither Florence or Yuma where the

13     duplicates existed fell below 100 percent compliance.

14          For Performance Measure 95, 140 files were reviewed.

15     Four duplicate entries were found.  That's an error rate of 2.8  14:29:29

16     percent.  Florence maintained 90-percent compliance rate.

17     Lewis maintained a 95-percent compliance rate.  Phoenix and

18     Tucson maintained 100-percent compliance rate.

19          With respect to Performance Measure 97, 364 files were

20     reviewed.  Four duplicates were found.  That's an error rate of  14:29:46

21     1.1 percent.  Phoenix's score went from 96 percent to 94

22     percent.

23          Your Honor, we're talking about human error.

24     Plaintiffs have constantly tried to present this as an

25     intentional defiance of the Court order, and that's simply not   14:30:02

—CV-12-601-PHX-DKD – December 20, 2017—

```
 1    the case.  These are human errors.  They're going to happen.
 2    And we're talking about error rates of less than two percent
 3    where compliance remains compliant.  None of these measures
 4    dropped to non-compliance.
 5           So as we stated in our motion, this is much to do          14:30:17
 6    about nothing, Your Honor.
 7           MR. FATHI:  Your Honor, as for the defendants'
 8    representations that there were only X errors that accounted
 9    for only Y percent of the cases, and that none of the measures
10    changed from complaint to non-compliant, there are no          14:30:31
11    declarations here.  The defendants admit that they haven't
12    provided the underlying documents so we can verify what they're
13    claiming.  All that we have, as usual, is the unsupported
14    assertions of counsel which are not evidence.
15           And more importantly, there's never been any            14:30:47
16    explanation as to why, after the Court's order, for three
17    consecutive months defendants weren't complying with that
18    order.
19           They do provide an explanation for September, but that
20    explanation is not reassuring because they admit that the error   14:31:03
21    was corrected only after we filed our notice with the Court.
22           There's no explanation for the other two months where
23    we found in July four cases, in August nine cases.  And I
24    emphasize again, that was just spot checking, because as
25    Miss Kendrick said earlier this morning, we don't have the      14:31:24
```

UNITED STATES DISTRICT COURT

1   resources to check every Performance Measure at every

2   institution every month.

3          But whether in a given month on a given Measure the

4   defendants' errors are numerous enough and egregious enough to

5   change from compliance to non-compliance isn't the only                    14:31:40

6   question.  The fundamental question is whether these CGAR

7   reports, the documents on which we all rely, the foundation of

8   this entire compliance monitor and enterprise are accurate,

9   whether we can rely that what we read in the CGARs is true and

10  accurate.  And we have shown over and over again, month after    14:32:01

11  month, that you can't rely on the CGARs for being accurate.

12         What we want is simply that at long last the

13  defendants commit that they will comply with the Court's order

14  of July 13th on how to do the monitoring on these three

15  Performance Measures.                                                        14:32:22

16         THE COURT:  Well, what you said just, Mr. Fathi, is a

17  good articulation of the reason why I omitted this agenda item

18  from my list, because I believe that it was captured or

19  subsumed within the greater topic of the reporting issues about

20  whether or not we could trust the CGARs.                                     14:32:39

21         What will happen with respect to the marshalling of

22  the potential case, whether it exists or not, that is suggested

23  by my comments at the start today, will largely control and

24  perhaps swamp or not this particular issue.  But it seemed to

25  me, because it potentially could, this one, be swamped, it                   14:33:01

1    didn't make a lot of sense to focus on it right now.

2         If it turns out that the plaintiffs think it is one of

3    their leading points, their lead stories, so to speak, then you

4    can marshal those facts and present it in a way where we'll

5    take it up in greater detail with respect to the hearing that    14:33:19

6    we've scheduled.

7         But for now, for today, I'm not going to address this

8    one anymore.

9         MR. FATHI:  Thank you, Your Honor.

10        THE COURT:  Your next one?                                    14:33:31

11        MR. FATHI:  Well, the next one is 4D, and this is a

12   little bit different, although certainly if the Court wants to

13   defer this one too, we will comply with the Court's direction.

14        And this involves Performance Measure 77 and the

15   requirement that treatment plans be updated every 12 months.     14:33:51

16   The Court has ruled on what every 12 months means.  It means no

17   less frequently than every calendar year.  But eight days after

18   the Court ruled, the defendants continued -- reasserted their

19   position that even if more than one year has elapsed between

20   the reviews, the file can still be compliant.                    14:34:17

21        And this is concerning because it may well make the

22   difference -- this incorrect counting in disregard of the

23   Court's order may well make the difference between compliance

24   and non-compliance.

25        So here again, we simply ask that the defendants            14:34:32

1    commit to obey the Court's order regarding monitoring

2    methodology for Performance Measure 77.

3            THE COURT:  Well, I addressed this when I said what

4    happened regarding the agenda item that included this one and

5    the others regarding the plaintiffs' request for a re-audit.          14:34:51

6    And that is, at the time that the defendants seek to leave the

7    Stipulation with respect to Performance Measures that are

8    subject to a challenge based upon a failure to comply with the

9    Court's instructed methodology, the Court will at that point be

10   able to evaluate whether or not in fairness and in substance it    14:35:11

11   is appropriate to think that the errors were significant enough

12   to remove the -- to remove the compliance record and to not

13   give the defendants credit for those months.

14            The things that I had previously thought that I would

15   be thinking about would be whether or not there was a recent        14:35:33

16   strong history of compliance, in which case then I would think

17   that it probably would mean that it wasn't such an important

18   factor to turn the decision on.  But if there -- if it was

19   marginal, then I would think differently about it.

20            But again, it may be swamped by a greater issue            14:35:51

21   of -- and again, that's why I'll hold off for now for those

22   reasons on this one as well.

23            MR. FATHI:  Thank you, Your Honor.

24            Our only additional concern is that this measure may

25   well be non-compliant at one or more institutions under the         14:36:07

─── CV-12-601-PHX-DKD – December 20, 2017 ───

1  correct monitoring methodology, and defendants' use of the

2  incorrect monitoring methodology will conceal that, and

3  therefore create an impression of compliance where, in fact,

4  none is warranted.

5           And that's why we think this needs to be addressed          14:36:26

6  sooner than the time at which the defendants seek to terminate

7  monitoring.

8           But obviously we'll comply with the Court's directive

9  on how to address this.

10          THE COURT:  Thank you.                                      14:36:38

11          MS. HESMAN:  Your Honor, if I may --

12          THE COURT:  Yes.

13          MS. HESMAN:  -- just very briefly.  I think I can

14  alleviate a lot of Mr. Fathi's concerns.

15          We are applying the Court's methodology to this             14:36:46

16  Measure.  After the November 21st hearing, the first batch of

17  CGARs that were reviewed were the October CGARs, and they were

18  reviewed pursuant to the Court's order.

19          So there's been no defiance, we're complying with the

20  Court's order.                                                      14:37:01

21          THE COURT:  Good to hear.  Thank you.

22          Is that it from plaintiffs' side?

23          MS. KENDRICK:  Your Honor, just one thing.

24          THE COURT:  Yes.

25          MS. KENDRICK:  I wanted to go back to our request for       14:37:07

1    the documents -- document request number 62.

2         Miss Hesman only read part of the request into the

3    record, and so for the record I would like to relay what we

4    actually asked for in full.  And it's also at docket 2503-1 at

5    page 31.                                                        14:37:28

6         Our request number 62 reads in full:  Any documents

7    relating to the system-wide and/or institution-wide

8    discontinuation of gabapentin, parenthesis, Neurontin, close

9    parenthesis, or tramadol as pain medications, comma, including

10   instructions or directives given to prescribing providers,      14:37:46

11   comma, and protocols for tapering patients off the medication.

12        That was the complete, full request, and the last two

13   clauses were not read into the record before.  So I just wanted

14   to make a record of that.

15        THE COURT:  Your record is made.  But as I listened to     14:38:04

16   it, it does sound like a different question than the one you

17   asked today.

18        MS. KENDRICK:  Nevertheless, we will revise our

19   request to make it quite clear to them what we are seeking.

20        THE COURT:  Thank you.                                     14:38:16

21        Anything else from plaintiffs' side?

22        MS. KENDRICK:  No, sir.

23        THE COURT:  Okay.

24        MR. FATHI:  If I may, Your Honor, agenda item 8, this

25   involves the defendants' failure to provide a number of         14:38:25

1  documents that we've requested.  Many of these requests date

2  from July of this year, and here we are nearing the end of

3  December.  So we would appreciate some alacrity on the part of

4  defendants and an order by the Court setting a deadline for

5  production.                                                    14:38:47

6       THE COURT:  And are these issues that were addressed

7  at the November 21 hearing or not?

8       MR. FATHI:  They are, Your Honor.  And then

9  subsequently there has been some correspondence.  If you will

10  give me a moment to find the reference in the record.          14:39:00

11       Our letter of December 14th at document 2502-1,

12  starting at page 30, these are the requests that remain

13  outstanding.  We've already dealt with number 62, which is the

14  Neurontin/tramadol issue, but there are others where, again,

15  five months after making these requests we have still not      14:39:32

16  received the documents.  And we have not yet received a

17  response to this December 14th letter.

18       So we would appreciate, given the many months that

19  have elapsed, the imposition of a deadline to either produce

20  the documents or state that after a diligent inquiry none      14:39:51

21  exist.

22       THE COURT:  So the December 14th letter restates

23  everything that you're asking for in agenda item 8?

24       MR. FATHI:  That's correct, Your Honor.  It restates

25  the requests that remain outstanding.  We have resolved some   14:40:09

CV-12-601-PHX-DKD – December 20, 2017

1    since the November 21st telephonic hearing.

2            THE COURT:  So what you'd like me to do is to inquire

3    of the defendants as to when they would be able to respond to

4    your November 14th letter at the very least; is that right?

5            MR. FATHI:  Yes, Your Honor.  And respond not only by                14:40:25

6    saying, we'll look into it, but respond with either production

7    or a definitive answer, again, given the many months that have

8    elapsed since these requests were made.

9            MS. LOVE:  Your Honor, the letter that Mr. Fathi

10   speaks of, it's a December 14th letter that was received by               14:40:41

11   defense counsel less than one week ago.

12           It -- to be fair to all parties, since our firm took

13   over document production, we've all been working diligently

14   together to get all remaining outstanding issues resolved.

15   We're down to -- as to request for production numbers, we're             14:40:58

16   down to literally plaintiffs taking issue with us over

17   eight -- we're down to eight RFPs, a couple of which we have

18   responded to them, with respect to request number 18 and 19,

19   that we are making additional inquiries into whether there's

20   additional documents to produce, and we're doing that.  Others          14:41:18

21   we may just be at an impasse.

22           I think that it requires, again, where we are facing

23   these broad-based requests for production, that we can't be

24   mind readers as to what they want.  And we need to do a meet

25   and confer among counsel if we can't come to a resolution.              14:41:36

1        But asking for a deadline to respond when we've

2   received a letter less than a week ago is inappropriate.

3        Again, we're back to the situation where plaintiffs

4   make, you know, repeated -- sometimes we get multiple letters

5   or requests a week, where if we were in a litigation          14:41:56

6   stage -- essentially we are still in discovery.  This case was

7   settled, but we continue with discovery.

8        We should be afforded the protocol of Rule of Civil

9   Procedure 34(b)(2) where we get 30 days to respond to this.

10  When we can respond earlier, we certainly will, and we continue  14:42:16

11  to roll out.

12       But I don't believe that this is a matter that

13  requires, you know, painting defendants in a bad light when

14  we've worked down to eight RFPs that are at issue and we've

15  received a letter less than a week ago.                        14:42:33

16       THE COURT:  All right.  So what we'll do is --

17       MR. FATHI:  Your Honor.

18       THE COURT:  Go ahead, Mr. Fathi.

19       MR. FATHI:  May I respond briefly?

20       First of all, I'm glad to hear defendants agree that  14:42:39

21  the Federal Rules of Civil Procedure continue to apply to this

22  case, because they've taken the contrary position previously.

23       Second, as I said, many of these requests were served

24  in July.  There's nothing new in here, they have had them for

25  five months, so the idea that we're somehow giving them six    14:42:55

——CV-12-601-PHX-DKD – December 20, 2017——

1    days to respond is just not correct.

2            THE COURT:  All right.  Well, what we'll do is, on

3    the -- no later than the 29th of December the defendants will

4    produce what documents they have that are responsive, or enter

5    objections in a responsive letter to the plaintiffs.                    14:43:11

6            You then can have your meet and confer on those

7    remaining issues.  And then if you can't resolve it, call me on

8    the telephone and we'll address those issues of the eight that

9    remain.

10           Okay.                                                           14:43:26

11           MR. FATHI:  Thank you, Your Honor.

12           THE COURT:  Defendants' turn on agenda items.

13           MR. STRUCK:  Your Honor, really the -- I think the

14   only thing that we mentioned was the -- and it's something that

15   we just haven't been able to clear with Mr. Millar.  The Court    14:43:39

16   has ordered payment for Mr. Millar within a certain time frame,

17   and there's -- it necessarily requires that his organization go

18   through Procure Arizona.  They just need to update their

19   information, and they're not -- for whatever reason that hasn't

20   happened.  So they were paid, but it was going outside --            14:44:01

21           THE COURT:  All right.  So we'll talk about that with

22   him, do you think makes sense --

23           MR. STRUCK:  Yeah, that's fine.

24           THE COURT:  -- when he calls in?

25           All right.  So he's scheduled to do that at 3:00.  So    14:44:12

1    we'll take a break until 3:00 when he calls in.

2            Thank you very much.

3        (Recess at 2:44 p.m., until 3:01 p.m.)

4            THE COURT:  Thank you.

5            Please be seated.

6            And, Mr. Millar, you're on the phone, I gather.  Thank

7    you very much for calling in.

8            MR. MILLAR:  Yes, we are.  Thank you.

9            THE COURT:  All right.  We have on the screen here the

10   Advisory Board slide to start.  So the WebEx is working                    15:01:27

11   apparently.

12           What we'll do is ask you to go forward, and when you

13   finish there were just couple of things that we needed to

14   raise, one from me, one from defense counsel, and maybe

15   something from plaintiffs.  But we'll ask you to go first.                 15:01:42

16           MR. MILLAR:  We will do that.

17           Judge, we do have the option to possibly bring –- I

18   can bring myself up on the webcam, we could try that to see if

19   it would be helpful.  I don't know if the audio on the phone

20   will directly sync with it, and sometimes it's distracting.               15:01:59

21   But I'll defer to your input on whether you'd like to try that

22   and see if it works, or just go with our presentation and our

23   conference call.

24           THE COURT:  Well, I'll tell you that right now there a

25   difficulty with the audio, and it may be because you're on a              15:02:13

 1    speaker phone.  But there are these -- they're not full

 2    cutouts.

 3              But am I only one having trouble hearing?

 4              MR. STRUCK:  We're having difficulty.

 5              THE COURT:  It is hard for us to hear.                    15:02:26

 6              And I think that if you got closer to the speaker

 7    phone microphone or used a nonspeaker phone, we'd probably be

 8    able to hear.  But it is hard to hear you right now.

 9              So if you want to try using the feature that would use

10    the WebEx and let us see if it works better, although I'm a      15:02:40

11    little frightened that maybe it won't, because already we're

12    having trouble.

13              MR. MILLAR:  Actually I think it will make it worse.

14    Is this better now?

15              THE COURT:  Yes, much better.                           15:02:54

16              MR. MILLAR:  Okay.  I will work directly from a

17    headset.  I had the headset off just in case I was going to go

18    on video.  But let's work directly from headsets.

19              I've got two other team members on the phone that I

20    will introduce, I'll ask them if they have the ability to put    15:03:08

21    headset on, that they do the same.  And hopefully we'll

22    eliminate that speaker phone issue.

23              THE COURT:  Great.

24              MR. MILLAR:  Very good.

25              Rene, if you'll go ahead and advance.                   15:03:24

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1          So as we outlined our intent for this call, what we

2   refer to this as within our company is a welcome call, that we

3   seek to introduce our team, outline what we believe the

4   overview of the engagement will be, or the objectives, to make

5   sure as we start out we're on the same page.  So before we          15:03:49

6   start spending time and effort going down a road, that we know

7   that all parties are in agreement with the direction we're

8   going.

9          And then at this point where we're kicking off we have

10  some logistical and scheduling elements to talk through, and      15:04:02

11  then look at the next steps as we move forward with this

12  project.

13         And I think, Judge, you indicated there are a couple

14  of additional agenda items that you would like to include at

15  the end.  I think some of them are housekeeping in nature,       15:04:15

16  others we'll address as they come up.

17         Does that sound like an appropriate agenda to start

18  with?

19             THE COURT:  Yes, perfect.  Thank you.

20             MR. MILLAR:  Okay.  So if we move to the next slide      15:04:28

21  you'll see photographs of our team there.  Three are of us that

22  will be working with you on this engagement.

23         My name is Braxton Millar.  You'll hear me introduce

24  myself as BJ most often.  I'm a vice president with th

25  value-based care consulting practice at the Advisory Board.       15:04:47

1   And so our practice works with all types of provider-based

2   consulting endeavors, a lot with physician groups, a lot with

3   population health management.  And we do deal specifically with

4   physician compensation, recruitment, and retention.

5           Not in my current role at Advisory Board, but in my          15:05:12

6   prior 25 years of consulting, I do have a substantial

7   background in correctional healthcare consulting, and have

8   worked in Arizona, Utah and California.

9           What I'll do is I'll also allow my two teammates to

10  introduce themselves.  Mr. David Long first, and then Miss Rene  15:05:32

11  Sobolewski.

12          David.

13          MR. LONG:  Yes.  Hi, I'm David Long.  I'm a control

14  consultant with the Advisory Board team.  Much of my practice

15  focuses around physician alignment as well as population health 15:05:46

16  management and staffing, which will translate well to figuring

17  out the best staffing for this engagement.

18          So I'm looking forward to working with everyone.

19          THE COURT:  Mr. Long, what's your background?

20          MR. LONG:  So I've been with the Advisory Board for      15:06:04

21  about five years.  Prior to that did JD and MBA programs.

22  Worked with the Mississippi Attorney General's Office.  I did

23  my JD at the University of Mississippi.  I worked with some

24  consumer protection as well as Medicaid.  Worked there, and

25  then focused on healthcare law during law school, and then      15:06:32

CV-12-601-PHX-DKD – December 20, 2017

1    focused on healthcare MBA.

2             And so my major full-time work post grad school has

3    been with the Advisory Board for about four years.

4             THE COURT:  Thank you, sir.

5             MS. SOBOLEWSKI:  And hello, this is Rene Sobolewski.      15:06:46

6    I'm a consultant on our value-based care team.  And my practice

7    has been most of the time, like David, in physician alignment,

8    population health management.  Also a good bit of experience

9    with evaluating physician employment agreements and benefits

10   packages and providing fair market value opinions.               15:07:01

11            So we're really looking forward to providing you

12   insights with our analysis of the situation.

13            THE COURT:  Thank you.

14            MR. MILLAR:  Rene is also -- she's a graduate of

15   Vanderbilt University.  And just as a unique aside, she was the  15:07:14

16   captain of their golf team.  So she's actually our wringer

17   whenever we go on golfing events.

18            THE COURT:  That's good to know.

19            MR. MILLAR:  Rene, you can go ahead and move forward.

20            Judge, let me ask you this question:  Are there any in  15:07:33

21   the courtroom that you believe we should introduce -- or we

22   should be aware of who is there?

23            THE COURT:  Well, I think we have all of the counsel

24   present.  And with respect to the defendants, there's the

25   person who is a defendant in the case who is actually present    15:07:55

1    who is the overseer of the provision of the State's medical

2    care in the prison system.  We also have present in the

3    courtroom the person who is the chief of the psychological

4    psychiatric services that are provided.

5            I think that -- I don't know whether it's a handy way          15:08:21

6    for you to meet these people and to understand who they are and

7    link names with faces to have us do it by telephone.  But I'm

8    certainly open to when you're in the District of Arizona -- and

9    I think they will be open too -- to facilitating an opportunity

10   for you to meet and to understand who contact people are.          15:08:44

11           As you learn about this and embark on the project, I

12   gather part of what someone does in your business is you

13   learn -- learn and identify who the contact people are with

14   respect to getting information.  And that's probably the first

15   question that you ask everybody that you meet.          15:09:03

16           The lawyers are certainly a good place to start here,

17   and they'll lead you to other people.  But to the extent that

18   you think that it would be helpful for you to have a further

19   introduction or greeting, and if there's anything I can do to

20   facilitate that when you appreciate the need for it, let me          15:09:20

21   know.

22           MR. MILLAR:  I will do that.  I think just knowing the

23   description you've given of the groups in the court is helpful

24   for us.  And I think as you proposed, then when we are there

25   physically in the court we'll be able to do some of that          15:09:35

1    face-to-face, which will be more meaningful than I think taking

2    up the time on the call to do that today.

3          So with that being said, I think we're good at this

4    point to move forward.

5          THE COURT:  Okay.                                    15:09:49

6          MR. MILLAR:  This next slide is one that is an

7    overview of our engagement.  The top portion of this is

8    language that we've pulled directly from the engagement letter

9    which is our contract with the courts and the Arizona

10   Department of Corrections.                                  15:10:06

11         And so the goal is to provide for the courts an

12   assessment of and recommendations for provider staffing and

13   retention within the Arizona Department of Corrections with

14   regard to their healthcare services.

15         The objective of that is to understand how to better   15:10:21

16   and more consistently and timely provide care to the prisoners

17   by maintaining the staffing and retaining the care providers.

18         If we drop down to the bottom, then we've broken it

19   out into answers that we believe are the -- those that we are

20   working towards, answers to the following questions.         15:10:49

21         First one is to understand what the current strategy

22   and process for healthcare staffing and retention at the ten

23   ADC facilities is, and why to this point they have struggled or

24   have lacked success in filling or retaining their budgeted

25   positions.                                                  15:11:10

CV-12-601-PHX-DKD – December 20, 2017

1      The second then is what is the current market for

2   healthcare provider supply and demand within eight specified

3   markets.  In our prior calls we've identified that the ten

4   facilities fall within what we would define as eight markets.

5      And then understanding how profiling these markets can      15:11:26

6   inform either the challenges or obstacles that may or may not

7   exist to staffing, hiring, and retention within the different

8   market areas.

9      So the first question is focused on the ADC's

10   approach.                                                      15:11:46

11      The second one looking at market characteristics or

12   factors that would be influencing it.

13      And then third, the result of these two analytic or

14   data-gathering exercises is, how will these findings produce a

15   final report from us where we can outline recommendations for   15:12:02

16   immediate next steps and even long-term strategy for

17   successfully hiring and retaining at the proposed budgeted

18   staffing levels.

19      Let me pause there and see, Judge, if there is a

20   common understanding that this is what you have engaged us to   15:12:24

21   pursue.

22      THE COURT:  I think that's consistent with what we've

23   talked about.

24      MR. MILLAR:  Okay.  I think at this point we'd ask if

25   there are any concerns or questions from either of the two      15:12:40

CV-12-601-PHX-DKD – December 20, 2017

1    parties or counsel, if they're in agreement that that's also

2    what -- that that outlines what our prior conversations have

3    been.

4              THE COURT:  Plaintiffs have any observations?

5              MS. KENDRICK:  No, Your Honor.  We think that what          15:12:52

6    Mr. Millar presented does match with what we've talked about in

7    the past.

8              THE COURT:  Thank you.

9              Mr. Struck?

10             MR. STRUCK:  No, Your Honor.                                15:13:00

11             MR. MILLAR:  Okay.  Very good.

12             Then as we take the next level, we've broken down the

13   scope of this engagement into three identifiable work streams.

14             The first of those work streams are the market

15   profiles and compensation benchmarks.  This is where we will         15:13:19

16   use the data tools and benchmarking data sets that we have at

17   our disposal, along with some teleconference interviews and

18   others with providers within each of these markets to

19   understand what the supply, demand and requisite hiring

20   characteristics are within the eight Arizona markets.  That          15:13:48

21   will be one that we will do mostly on our own direction.  There

22   will not be much data that we're asking from you all for to

23   support this work stream.

24             And in fact, our teams, as soon as we received the

25   first payment about a week ago, began pulling these elements         15:14:08

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1   together, pulling the ZIP codes and other.  So that will be

2   some of the first information we'll bring forward for feedback

3   and vetting with the group.

4         The second work stream then, or Work Stream II, are

5   the facilities profiles and baselines.  This will be where the          15:14:31

6   bulk of our data request items will be directed, where we are

7   looking for the current, what I would call, the 28 team

8   proposed budgets for staff positions at the different levels.

9         We'll also then be looking for information about the

10  employment and payroll nature of who is employed, what          15:14:53

11  positions are vacant, what some of the turnover has been.  So

12  there will be a more detailed request for that information.

13  Which allows us then to look at each of the facilities, not

14  only geographically, but from the different modalities of care.

15  So we'll look at the physicians, we'll look at the behavioral          15:15:14

16  health folks, we'll look at the midlevel providers that are

17  supporting both of those.

18        It appears from our initial review of data during the

19  early conversations we've had, that there will be different

20  issues in different markets.  And so we will strive to identify          15:15:31

21  those, to be able to detail them from an analytic standpoint as

22  well as from an anecdotal standpoint.

23        Also part of this will be a series of interviews via

24  teleconference, or face-to-face if scheduling allows for it,

25  with some of these providers, both who are currently employed          15:15:55

1    and providing care at the ADC facilities and those that have

2    been there and no longer are there, to be able to inform beyond

3    the analytics some of the working conditions, working

4    requirements and job expectations, so that we can have a full

5    360-degree look at the elements that are impacting the ability          15:16:17

6    to hire and retain within the facilities.

7         The final work stream, Work Stream III, in our

8    consulting language it is our final deliverable.  In our mind

9    it will take the form of a written report and probably a

10   PowerPoint slide that work hand in hand, that begins then to          15:16:40

11   take the comparisons of the markets in each of the facilities,

12   and then begins to identify the -- or to describe the

13   identified constraints or issues, either from a market

14   perspective or from the ADC's hiring strategy perspective, of

15   the causes for the struggles to hire and maintain at the                15:17:10

16   budgeted staffing levels.  We will then work towards what our

17   recommendations would be for remedying that.

18        This is where you get kind of the full insight from

19   our experience not only in correctional healthcare but in

20   healthcare staffing as a whole, to understand what current             15:17:31

21   methodologies, current strategies are for hiring and retaining,

22   what the obstacles would be and our recommendations for

23   overcoming those.

24        Those at this point could span everything from job

25   descriptions to job requirements to salaries and benefits or          15:17:51

1    different type of retention or staffing elements.

2         Let me pause there and ask if there's any questions

3    regarding the details flushed out here a little bit more around

4    these three work streams.

5         THE COURT:  I have no questions.                    15:18:11

6         Plaintiffs' counsel?

7         MS. KENDRICK:  No, sir.

8         THE COURT:  Mr. Struck?

9         MR. STRUCK:  No, Your Honor.

10         THE COURT:  No questions here.                     15:18:15

11         MR. MILLAR:  Okay.  We've been provided by the Court

12    your monthly ongoing scheduled times that this case is in

13    court.

14         What we are proposing is that we would have at least

15    interim project updates during each one of those scheduled    15:18:33

16    times, where we would give a current project status to let you

17    know if there are any obstacles or impediments we've had in

18    obtaining data or scheduling or anything else that would impact

19    the progress.  We would also have discussions and resolutions

20    of any of those hurdles.                                15:18:55

21         We would also look to be very transparent in vetting

22    and providing data-received feedback on.  This is not something

23    that we intend to work in a black box and bring a final product

24    forward.  And so our intent would be to have materials prepared

25    ahead of each of these project updates so that they could be    15:19:18

1   reviewed in advance, and counsels and others can come to the

2   update calls or meetings with specific questions or concerns

3   around findings and around the process we've gone through.

4           This will allow us then to vet all of those materials

5   as we work towards that final recommendation, with the intent          15:19:43

6   being that there really is -- there are no huge surprises as we

7   get to the end, because we would have worked with these updates

8   as we go forward on those.

9           The one thing we would reserve -- go ahead.

10          THE COURT:  No, we'll make time for these                        15:20:05

11  presentations during our monthly meetings.  And I do appreciate

12  your providing the materials in advance so that we can have a

13  chance to digest them before we do meet together.

14          MR. MILLAR:  And that will be very important, because

15  we will want to make the most use of that time.  And so I will        15:20:23

16  hold my team accountable to having those out in advance.

17          What we would look to the Court to understand is how

18  far in advance would be appropriate for that?  We oftentimes

19  shoot for five working days or a calendar week.  If that is

20  acceptable to the Court, we would work toward that, or if it          15:20:46

21  needs to be longer or shorter.

22          THE COURT:  No, we would be very appreciative of that

23  five days.

24          MR. MILLAR:  Okay.  The turnaround on the first one,

25  as we get to the scheduling we'll talk about this as well, we         15:20:59

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1    may be a little bit tighter than that on the January 10th --

2            THE COURT:  Understood.

3            MR. MILLAR:  -- just because of the holidays.

4            But, again, it helps to know that we're accountable to

5    you for that, because that keeps us accountable internally as        15:21:13

6    well.

7            THE COURT:  Understood.

8            MR. MILLAR:  There may be an occasion where we need to

9    have -- I mean, we will have contact with certain folks to

10   follow up, to do data collection, et cetera.  I think because       15:21:26

11   of the monthly schedule with the Court I don't anticipate that

12   we would need any special scheduling with you, Judge, with the

13   Court, but if that comes up we will work through Sarah and

14   others, with your folks, to make sure that we make you aware of

15   any additional access that we would need.                          15:21:50

16           THE COURT:  Of course.  And that's part of the

17   understanding that I've made plain to you, you should expect us

18   to help when we're needed to do so.

19           MR. MILLAR:  Very good.

20           And if we move to the next slide, this is now putting       15:22:03

21   the components of those three work streams on a timeline to

22   look at the milestones that we're pushing towards.

23           So we're looking in January at initiating the market

24   analysis and the interviews, and in February continuing those

25   elements with analysis and interviews.                             15:22:23

1          As we reach the March time frame, we would expect that

2     we're coming very close to having some of our initial findings.

3     What we would not have at that point would be resolutions or

4     others.  But we would start to bring forward those elements so

5     that in the March and April time frame we would seek to vet and     15:22:42

6     validate the analysis.

7          The intent for doing that before we move right into

8     our recommended solutions or strategies around that is we want

9     to make sure that all parties involved agree that the data that

10    we have analyzed and the information that's come forward          15:23:01

11    appropriately describes and fits all of the different

12    marketplaces.

13         Then in the May time frame we would look to preview

14    and finalize our recommendations, with a final report sometime

15    in that May to June -- to mid-June time frame.                    15:23:19

16         So I think our engagement letter originally assumed a

17    five- to six-month work stream on this.  Again, our teams will

18    move as expeditiously as we can, with a commitment to you,

19    Judge, that no later than mid June that we are presenting

20    final -- a final report to your group.                           15:23:43

21         THE COURT:  Okay.

22         MR. MILLAR:  All right.  If we move to our next slide,

23    these are the dates we've received from the Court regarding the

24    times you have scheduled.  So today is the 20th, we're speaking

25    with you today.                                                   15:24:00

1          On January 10th, what we've listed here is our

2     availability to know when it would most appropriately align

3     with the Court's scheduled for those days.

4          So we would anticipate no less than 30 minutes,

5     probably no more than one hour for the update at that point in          15:24:17

6     time.

7          Judge, initially when we spoke with Sarah and others

8     last week, I thought that the January time frame would be an

9     appropriate time for us to be there physically on-site, to be

10    able to introduce the team and some of our initial findings.  I          15:24:32

11    believe at this point with the short turnaround that it would

12    be better use of my team's time to make that a virtual call

13    again in January, and plan during that February timeframe to be

14    there with the team, because we will have some more substantial

15    findings.  We would also potentially align some interviews and          15:24:54

16    other things around those two dates, so that we could actually

17    spend some more time with the Court with some more substantial

18    findings from our work to date.

19          Let me just ask at this point if you believe that that

20    proposal would meet the Court's needs.          15:25:15

21          THE COURT:  Well, certainly.  And we'll coordinate any

22    particular requirements of your availability during those

23    times.

24          I do need to apprise you though that earlier this

25    morning I set an additional hearing date, that while it may not          15:25:29

CV-12-601-PHX-DKD – December 20, 2017

1    be a place where you would want to make a presentation, it may

2    be a place and time where you could learn information that may

3    be relevant to your inquiry.

4         This additional --

5         MR. MILLAR:  Okay.                                    15:25:47

6         THE COURT:  -- hearing was set for the 9th of February

7    at 9:00 a.m.  And it's an evidentiary hearing in which I have

8    tasked the parties to follow up on a news story that was

9    published -- or broadcast this morning on the public radio

10   station, the national public radio affiliate in Phoenix, in    15:26:07

11   which there was a report of a former physician who was

12   contracted with a temporary agency, and then that led to her

13   employment in the prison system.  And then she decided to talk

14   apparently with the news reporter and shared some of her

15   concerns about working there.                                15:26:36

16        The reason that I suggest that it might be relevant to

17   your inquiry is that you have told me, and the parties have

18   told me too, that -- and it's part of your second stream, and

19   that is an inquiry into work conditions, so to speak.

20        And so it is possible, without knowing what this will    15:26:54

21   lead to -- because as I say, it is just a news report and it's

22   not part of the evidentiary record in the case.  But I have

23   asked the counsel to move forward in a way that would allow us

24   to have on the 9th of February a full evidentiary hearing, if

25   appropriate, in which evidence may well be developed regarding  15:27:17

UNITED STATES DISTRICT COURT

1   issues that are of particular interest to you under the second

2   stream.

3           To that end also I will tell you that I've asked

4   Miss Selzer to forward the link of the story, which is not only

5   apparently in a broadcast form, audio form, but also there is a          15:27:35

6   written form of the story that's being prepared.

7           So this may be helpful information or it may not to

8   you.  But I think you should know about it.  And you should

9   also know about the fact that we've scheduled this hearing in

10  Phoenix on the 9th of February.                                          15:27:53

11          MR. MILLAR:  I think that will be very germane to what

12  we are doing.  And I think it's actually -- it's a really good

13  interim to the six-week spread we had between the currently

14  scheduled January and February pieces.

15          So I'll make sure my team has that on our calendar.             15:28:10

16  And we've got to schedule details around that, I think at a

17  bear minimum we would like someone from our term to at least

18  participate via call.  But at this point I actually think it

19  might be strong enough that we might have somebody there

20  physically for that hearing, and schedule some of our other               15:28:28

21  research in the marketplace around that --

22          THE COURT:  Well --

23          MR. MILLAR:  -- as well so that --

24          THE COURT:  -- understand that you and your team are

25  welcome any time that we are in court on this matter.  And you            15:28:37

CV-12-601-PHX-DKD – December 20, 2017

```
 1    can be here by physical presence or by telephone, whichever you

 2    prefer.

 3            MR. MILLAR:  We appreciate that.  And we will likely

 4    take advantage of both modalities as needs be.

 5            So I believe then that being the case, the other --    15:28:57

 6            If you can go back to the dates just for a moment,

 7    Rene.

 8            The other dates then follow fairly well in sequence.

 9    Our availability at this point is quite wide open.  And I think

10    as we get further in we'll understand how much time we would be  15:29:11

11    requesting within those scheduled dates.  Although we have the

12    dates held on our calendars now, we will schedule several

13    months out in advance the timing that we want for that.  But

14    we'll not go to that level today.

15            THE COURT:  Fair enough.                                 15:29:29

16            MR. MILLAR:  Okay.  Moving forward then, when we look

17    at logistics and scheduling, there are two primary elements.

18    And, Judge, you referenced one of these already.  As we're

19    looking at these, we are looking for some data request items

20    that will be mostly pertinent to the Arizona Department of       15:29:48

21    Corrections and their contractor with regard to their staff and

22    their payroll, et cetera.

23            Along with those data elements will be the facility

24    interviews.  The one question that we're asking just to make

25    sure that we are within the rights and guidelines of the Court,  15:30:09
```

1    is in identifying who those folks are, are there protocols or

2    authorizations or any restrictions that we should be aware of

3    as we go to request this data and/or hold these interviews?  If

4    it's the type of situation where these either need to be

5    documented by being recorded, or if there needs to be          15:30:32

6    representation present at these.

7            THE COURT:  Well, my view would be that in your

8    inquiries that you are undertaking, that you should in the

9    first instance look for the way that is the most efficient for

10   you.  If issues are raised that you think that interfere with   15:30:52

11   that efficiency, or obstruct in any way your effort to obtain

12   information that you need, either from the

13   defendant -- defendants in my case, the individuals in the

14   State of Arizona Department of Corrections and/or their

15   contractor and agent of the defendants in my case, then you     15:31:12

16   need to let me know and I'll address those.

17           But my hope is that everybody will be amenable to the

18   idea that you need to find the most efficient way to get this

19   information.  And that does not mean that I'm going to say at

20   the get go you have to record it or you have to have others     15:31:30

21   present.

22           If it's not interfering with your role to have others

23   present, I'm not going to say that that can't occur.  But if

24   you find that it's interfering with your role or it's a

25   scheduling problem -- I mean, I'm not interested in hearing     15:31:43

1    about the fact that you weren't able to get your work done

2    because others said they wanted to be there and they had some

3    other engagement.

4         But you just let me know if you run into individual

5    issues, and we will address those with everybody on the record    15:31:57

6    and make sure that you have the guidance that you need.

7         MR. MILLAR:  Okay.  And I think we can very easily do

8    that.  We'll move forward with the understanding that we can

9    accommodate requests as long as they're not interfering or

10   delaying our process in moving our analysis forward.             15:32:16

11        What we will do then is we will prepare a data request

12   document.  Before we come off this call we'll hopefully have

13   identified who the appropriate person will be to send that to.

14   And then we would like to schedule a follow-up phone call with

15   them to talk through on a line-by-line basis so there's clarity   15:32:39

16   of what we're asking for.

17        Our normal operating procedure is to establish an FTP,

18   a security FTP site through a document storage corridor that's

19   called Box, so that these can be uploaded electronically.  If

20   they exist in electronic format, that would be our preferred     15:33:01

21   methodology, so that we're not having to rekey or reenter them

22   and running the risks of data entry errors.  If they only exist

23   in hard copy, then we would take scanned or imaged copies of

24   those, or even I guess mailed hard copies if that's what we

25   come down.                                                       15:33:23

———— CV-12-601-PHX-DKD — December 20, 2017 ————

1        At this point I believe the Court's been able to

2   provide either scanned images for actual electronic files in

3   Excel or Word for doing that.

4        THE COURT:  Well, I don't know -- I don't know what

5   the limitations would be with the particular recipients.  But          15:33:37

6   again, I'm hopeful that they'll be able to do it in a way that

7   is consistent with how you have found the marketplace generally

8   does produce this information to you.

9        With respect to the written request, I will in a

10  moment identify a representative from each of the sides in the          15:33:53

11  case.  Because I think for the written requests those should

12  be, whether they're addressed to one side or the other, they

13  should be copied to the other side, because there's no

14  encumbrance to simply providing that information to everybody

15  in the case so that all sides --                                       15:34:14

16       MR. MILLAR:  Okay.

17       THE COURT:  -- know what questions you're asking.

18       With respect to going beyond that, where you find

19  perhaps individuals that you want to talk to, it seems to me

20  that it might make sense to see how it works for you, in terms          15:34:29

21  of whether or not you are finding that it's efficient to have

22  really complete reign to talk to individuals, or whether it's

23  possible to do it in a way such that you do give people the

24  opportunity to be present if they wish at a time that is

25  convenient for you.                                                     15:34:55

1          I don't want to prejudge that, because I don't know

2     how difficult it would be, and I may have to weigh the various

3     costs and benefits of different approaches.  But with respect

4     to the written inquiries, I think that doesn't have any cost,

5     it's all potential benefit in that somebody who is not the          15:35:10

6     target of the inquiry could perhaps send you some response

7     saying, you've asked this question, maybe should you also ask

8     this question, kind of thing.

9          MR. MILLAR:  Okay.

10         THE COURT:  And so that would seem to make sense to          15:35:24

11    me, unless you have some objections to doing it that way?

12         MR. MILLAR:  No, I think we can make that work.

13         And if I'm understanding what you've just described,

14    what I would anticipate is that we would have a primary contact

15    at the Court and one for each of the counsels, plaintiffs and          15:35:38

16    defendants.  And when we send these requests, we would send

17    them to those three principal contacts, which then would have

18    responsibility for disseminating them appropriately to the

19    parties.

20         THE COURT:  I think that makes sense.          15:35:53

21         MR. MILLAR:  Is that a correct understanding?

22         THE COURT:  Yes.

23         And on the plaintiffs' side who should that be?

24         MS. KENDRICK:  I'm sorry, Your Honor, it could be me,

25    Corene Kendrick.          15:36:03

CV-12-601-PHX-DKD – December 20, 2017

1          THE COURT:  Okay.  So Corene Kendrick, one of the

2     plaintiffs' counsel.  And we'll make sure that you have her

3     contact information.

4          And on the defendants' side?

5          MR. STRUCK:  To me, Dan Struck.                          15:36:11

6          THE COURT:  All right.  Dan Struck on the defendants'

7     side.  And, again, we'll make sure that you have the contact

8     information.

9          And with respect to the Court, always what you can do

10    is contact Miss Selzer.                                       15:36:20

11         MR. MILLAR:  Correct.  And I think she's identified

12    one other person that we would contact both of them so that

13    they would have coverage for each other as well.

14         THE COURT:  Is that Miss Brown?

15         MS. BROWN:  Yes.                                         15:36:36

16         THE COURT:  The additional one -- I didn't want to

17    volunteer her without having spoken with her personally about

18    it.  But I do think it makes sense for her to be in the loop as

19    well.  And that is Miss Jody brown.

20         MR. MILLAR:  Okay.  Well, as we initiate this, we'll    15:36:47

21    at least communicate with -- any of our written requests with

22    those four individuals, with the assumption that then the

23    information will get appropriately distributed.

24         And then we will keep you informed, Judge, if for some

25    reason that process is creating difficulty in us moving       15:37:03

CV-12-601-PHX-DKD – December 20, 2017

1   forward, delays in the process, if we need something else.  But

2   at this point we will assume that those communication contacts

3   will be sufficient for what we need.

4        THE COURT:  And I think you can expect that when you

5   contact Mr. Struck or Miss Kendrick, and that you've -- provide          15:37:18

6   the information, you should expect them to be giving you -- if

7   it's a targeted information to their side of the case, I think

8   you should expect them to be giving you a guiding hand, and

9   also helping you as much as they can.  Because they understand

10  that that is the -- a key efficiency component of making sure           15:37:42

11  that you can accomplish your task in a way that is most

12  expeditious and as most economically efficient as well.

13       MR. MILLAR:  That will be very helpful.  So we will

14  move forward with that expectation.

15       Moving forward then, this is just a description of            15:38:06

16  some of the components that will be included in our data

17  request.  Our team is finalizing the details around that today

18  and tomorrow.  Our intent is that by week end we will send this

19  out.  We do know that we are coming into the holidays, and so

20  as part of this written -- of the sending of this data request,        15:38:32

21  there will be the request to work towards scheduling in

22  early -- as early in January as possible the follow-up call for

23  these items.

24       But as I described earlier, we'll be looking for the

25  most current budgeted staffing levels by provider type, by             15:38:54

1    facility.  We'll be looking for the existing provider roster or

2    the payroll record, who has been employed, who is in seat now,

3    how long have they been there, et cetera.

4         We'll also be looking for written job descriptions for

5    all of the different levels so that we can make sure as we do                15:39:17

6    the market profiling that we are doing an apples-to-apples

7    comparison, or where we are not that we can make appropriate

8    adjustments between the national benchmarks we're using for

9    providers and the job descriptions within a correctional

10   setting.                                                                      15:39:35

11        I do understand that oftentimes the requirements of a

12   physician or a midlevel provider are different.  And I want to

13   make sure that we -- we're able to identify that and to adjust

14   accordingly as we do our comparisons.

15        We'll also be looking for examples of the contract                       15:39:53

16   agreements.  This will likely entail the agreement between the

17   State and their contractor, as well as between their contractor

18   and its employees.  So it will be two levels of elements that

19   we're looking at there.

20        And then descriptions of the compensation benefits                       15:40:13

21   packages.

22        We will then work towards gathering information on the

23   retention and turnover.  We will have to see if the agent of

24   the State or the State itself has reports that are sufficient

25   for us to work from.  If they are not, we may be requesting                   15:40:33

CV-12-601-PHX-DKD – December 20, 2017

1    actual payroll information so that we can calculate the

2    retention and turnover appropriately.

3           But we'll work with the thought that we might have

4    reports that may provide sufficient data for us.  If it does

5    not, we will have to look towards raw data to be able to run          15:40:55

6    that analysis ourself.

7           And then we do reserve the right as we get into this

8    that there may be some additional detail that are needed or

9    some other data sets that haven't been anticipated.  But our

10   intent is to be comprehensive up front, but not ask for -- not        15:41:13

11   burden the ADC or its contractor with superfluous data

12   requests.  So we'll try to ask appropriately.  And that's why

13   we want to have the call to make sure there's clarity around

14   the description of the elements that we are looking for.

15          Let me pause there and see if specifically from the             15:41:36

16   defendants' side if they have any concerns or questions

17   regarding this data request process.

18          THE COURT:  Mr. Struck?

19          MR. STRUCK:  No.  I think he understands that much of

20   this data that he's looking for is not coming directly from           15:41:48

21   ADC, it's actually coming from Corizon, which I don't have

22   direct access, I have hoops that I have to jump through to get

23   it myself.  So I think he understands that.

24          MR. MILLAR:  Absolutely understand that.  And we'll be

25   looking for your help.  And you will have our support to             15:42:06

CV-12-601-PHX-DKD – December 20, 2017

1    facilitate getting that data.

2            MS. KENDRICK:  Your Honor.

3            THE COURT:  Yes.

4            Excuse me, Mr. Millar.  Miss Kendrick wanted to say

5    something.                                                          15:42:20

6            MR. MILLAR:  Yes.

7            MS. KENDRICK:  Just one idea I had while Mr. Millar

8    was talking, and also based on what Mr. Struck just said,

9    whether the Court and Mr. Millar would think it would be useful

10   to have Corizon designate an individual to be the point person,   15:42:29

11   much like Mr. Struck and I are the point people too.

12           THE COURT:  It may make sense, but I'll let them work

13   that out.  That may well be a good idea.  And that kind of was

14   what I had envisioned, that as -- as Mr. Millar and his team

15   work deeper into this issue, they would find the right vein of   15:42:49

16   the mine to mine.  And that that would be the person that would

17   be likely to be the contact.

18           And I would be hopeful that there would be a

19   relationship that would be established that could make for this

20   efficient transfer of information.                                15:43:07

21           MR. MILLAR:  The one request, Judge, that I would make

22   is that when we provide this data request this week, if

23   defendants can review that with the Corizon contractor so that

24   they can inform their questions.  And for when we schedule the

25   follow-up data call, if that Corizon representative could be on   15:43:29

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1    that call as well.  So that we don't have the issue of asking

2    questions that can't be answered, if they would be a part of

3    that conversation.

4         THE COURT:  That would seem to make sense to me.

5         MR. STRUCK:  I think that's fine.                    15:43:45

6         MR. MILLAR:  Okay.  Thank you.

7         So at that point then if we look at the immediate next

8    steps that we're looking to achieve between now and the

9    beginning of January, I think we've identified, at least from a

10   logistics standpoint, who we would work with to submit our data    15:44:06

11   requests.  We have those contacts at the Court for the

12   scheduling.

13        And we have now successfully tested or video

14   conferencing capability.  And so, Judge, that does allow us to

15   use our standard operating procedures for remote presentations    15:44:21

16   and discussions.

17        I would stop at this point and just ask if the slides

18   have been presented in a way that have been readable and

19   accessible on the equipment that's being used in the court.

20        THE COURT:  We are definitely within the range of work    15:44:39

21   built with a little bit of tweaking.  We can move the projector

22   back a little bit and make the image a little bit bigger.  We

23   have, as you say in the third goal here, successfully

24   demonstrated that this can work.

25        MR. MILLAR:  Good.  Good.                            15:44:56

1        And then I think we are close on confirming times for

2   our updates and we'll work on interim means as we move forward.

3        So as I look as objectives of this call and our

4   immediate next steps, I think, Judge, I have achieved

5   everything that I hoped to have from this call to get my team        15:45:14

6   up and moving in producing the materials that you have

7   requested from us.

8        At this point I think I would pause and allow you to

9   then address some of the items that you indicated at the

10  beginning that were a couple of follow ups or additional agenda        15:45:29

11  components.

12        THE COURT:  Thank you.  I was able to address the item

13  that was on my agenda already.

14        Mr. Struck has the issue about the method that is

15  necessary for you to be registered within the State procurement        15:45:42

16  system.  Have you heard about that issue before, Mr. Millar?

17  Do you know whether you're on the way to trying to resolve

18  that, or do you need --

19        MR. MILLAR:  No, we have -- I may need to hear some

20  more about it.  We have been trying through our finance        15:45:58

21  department to get registered through the Arizona payment or

22  procurement site.  There was a series of e-mails that went

23  through today.  Our team has had trouble either obtaining or

24  knowing the right login passwords and elements are.  But I

25  believe that there was an e-mail chain that went through today        15:46:19

CV-12-601-PHX-DKD – December 20, 2017

```
 1    that we're continuing to make efforts to get that handled.

 2            But at this point I believe we are still not

 3    registered, but I think we are receiving information we need to

 4    become registered.

 5            THE COURT:  All right.  Mr. Struck, if it continues to      15:46:35

 6    be a problem, whom should Mr. Millar contact about it to try to

 7    see what he needs to do further to become registered?

 8            MR. STRUCK:  Well, there's a woman by the name of

 9    Amy Landry at the Department of Corrections, that I think we

10    provided him with her phone number.                                15:46:55

11            THE COURT:  Okay.  So you have Miss Landry's phone

12    number and name, Mr. Millar?  She's the person, if you continue

13    to have trouble, give her a call at the Department of

14    Corrections Mr. Struck says.

15            MR. MILLAR:  Yes.  I am checking on that to see.           15:47:09

16            MR. STRUCK:  I can make sure that he has the correct

17    line, but I thought I saw an e-mail where her number was

18    provided to him.  But we can send it again.

19            THE COURT:  Okay.  Thank you.

20            MR. MILLAR:  I believe it has been provided.  I'm not      15:47:23

21    sure if we knew that's who we were going to connect directly

22    with.  The e-mail stream I have here came from Elaine

23    Percevecz.

24            MR. STRUCK:  Percevecz.

25            MR. MILLAR:  And she's with your group.  So if there's     15:47:40
```

─── CV-12-601-PHX-DKD ─ December 20, 2017 ───

1    some additional follow-up, we would do that.

2         And I'll just let the Court know that I'm working

3    through our internal iterations on this side as well.  I am not

4    the person that does this, and I'm working down through our

5    accounting department as well.                                   15:48:00

6         But it is a known issue, and I commit to the Court

7    that we'll continue on this until it is resolved in one of the

8    two offered methodologies for submitting and being paid for the

9    invoices.

10        I do appreciate -- and I'm not sure exactly how the        15:48:14

11   State facilitated this, but even without that registration we

12   did receive the payment on the first invoice just from the

13   engagement letter which allowed us to start this.  And so just

14   acknowledgement that we appreciate whatever efforts were put

15   forward to not allow this process to languish just as we         15:48:34

16   figured out the details of the procurement and payment process.

17        THE COURT:  And I will add my appreciation as well.

18   Thank you.

19        Miss Kendrick, anything you wanted to say?

20        MS. KENDRICK:  No, sir.  We're looking forward to           15:48:50

21   seeing what Mr. Millar comes up with.

22        THE COURT:  And anything further, Mr. Struck?

23        MR. STRUCK:  No, Your Honor.

24        THE COURT:  Well, Mr. Millar, thank you very much.

25        MR. MILLAR:  We appreciate the opportunity to serve         15:49:02

CV-12-601-PHX-DKD – December 20, 2017

1    the Court in this process, and look forward to this work with

2    you over the next several months.

3            THE COURT:  Thank you.

4            And Miss Sobolewski's name has come up on our screen

5    now, which will help us pronounce the name properly.                    15:49:15

6            Now you'll be very busy, so I can't say that I can

7    commend to you the golf courses near Casa Grande which are near

8    the Florence Prison, but some people in Arizona find those to

9    be worthy golf courses.  But again, I fear that we've given you

10   a lot of work and so there may not be a lot of time for that.          15:49:39

11           MS. SOBOLEWSKI:  Well, I hope I can find some time

12   maybe on a weekend in between.  Sounds good to me.  Thank you

13   very much.

14           THE COURT:  Well, indeed Arizona, at some point it was

15   the place that had the highest per capita number of golf holes.        15:49:53

16   Hard to believe.  Maybe it's not the case anymore.  But if you

17   fly into Phoenix, you do have the sense that virtually every

18   square mile has a golf course.

19           Thank you all very much.  Appreciate your time this

20   afternoon, and we'll be in touch.                                      15:50:09

21           MR. MILLAR:  Thank you.  Good afternoon.  Bye.

22           THE COURT:  So I have one loose end that I wanted to

23   tie up, and that is, Mr. Pratt said that he could get us the

24   additional information regarding the formulary and the

25   documents regarding the different dispensing rates.                    15:50:28

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1          I didn't come up with a date.  Would the last day of

2   December be possible?

3          MR. PRATT:  I'm hopeful, yes.  I've already requested

4   it.

5          THE COURT:  Let Mr. Struck know if it's not so that he          15:50:43

6   can let everybody know if there's a problem so that we can stay

7   on top of that.

8          Anything further from plaintiffs?

9          MS. KENDRICK:  No, Your Honor.  Thank you.

10          THE COURT:  Mr. Struck?          15:50:52

11          MR. STRUCK:  No, Your Honor.

12          THE COURT:  Thank you all for your time today.  I

13   really appreciate it.

14       (Proceedings concluded at 3:50 p.m.)

15

16                         -oOo-

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

           I, CANDY L. POTTER, do hereby certify that I am duly
appointed and qualified to act as Official Court Reporter for
the United States District Court for the District of Arizona.

           I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion of
the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control.

           DATED at Phoenix, Arizona, this 21st day of December,
2017.


                              s/Candy L. Potter_____
                              Candy L. Potter, RMR, CRR

UNITED STATES DISTRICT COURT