1            **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3                  _____

4

   **Victor Parsons, et al., on**   )
5  **behalf of themselves and all** )
   **others similarly situated;**   )
6  **and Arizona Center for**        )
   **Disability Law,**               )
7                                    )   No. **CV 12-00601-PHX-DKD**
            **Plaintiffs,**   )
8                                    )
       vs.                       )   Phoenix, Arizona
9                                    )   January 12, 2018
   **Charles Ryan, Director,**       )   2:04 p.m.
10 **Arizona Department of**          )
   **Corrections; and Richard**      )
11 **Pratt, Interim Division**        )
   **Director, Division of Health**  )
12 **Services, Arizona Department**   )
   **of Corrections, in their**      )
13 **Official capacities,**           )
                                    )
14           **Defendants.**       )
   _____ )
15

16

17  **BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

       **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
18
         **(*Telephonic Discovery Dispute*)**
19

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1                    <u>A P P E A R A N C E S</u>

2    **For the Plaintiffs:**

3         PRISON LAW OFFICE
          By:  **Corene Kendrick, Esq.**
4         1917 5th Street
          Berkeley, CA 94710
5
          ACLU - Washington DC
6         By:  **David C. Fathi, Esq.**
          915 15th Street NW
7         7th Floor
          Washington, DC 20005
8
          EIDENBACH LAW PC
9         By:  **Kirstin T. Eidenbach, Esq.**
          P.O. Box 91398
10        Tucson, AZ 85752

11        ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
          By:  **Maya S. Abela, Esq.**
12        177 N. Church Avenue
          Suite 800
13        Tucson, AZ 85701

14   For the Defendants:

15        STRUCK LOVE BOJANOWSKI & ACEDO PLC
          By: **Rachel Love, Esq.**
16        By: **Kevin Hanger, Esq.**
          3100 W. Ray Road
17        Suite 300
          Chandler, AZ 85226
18

19   Also Present:

20        Jennifer Finger, Corizon
          Mike Giardina, Paralegal, Struck Love Bojanowski &
21        Acedo

22

23

24

25

```
 1              P R O C E E D I N G S

 2          THE MAGISTRATE JUDGE CLERK:  Civil Case Number

 3  12-601, Parsons, et al., versus Ryan, et al., on for telephonic

 4  discovery dispute hearing.

 5          THE COURT:  Good afternoon.  Who is on the phone,        02:04PM

 6  please?

 7          MR. FATHI:  Good afternoon, Your Honor.  David Fathi

 8  from the ACLU National Prison Project for the plaintiff class.

 9          THE COURT:  Thank you.

10          MS. KENDRICK:  Good afternoon.  Corene Kendrick from     02:04PM

11  the Prison Law Office for the plaintiff class.

12          THE COURT:  Thank you.

13          MS. EIDENBACH:  Good afternoon, Your Honor.  This is

14  Kirsten Eidenbach for the prisoner plaintiff class.

15          THE COURT:  Thank you.                                   02:04PM

16          MS. ABELA:  Good afternoon.  Maya Abela for the

17  Arizona Center For Disability Law.

18          THE COURT:  Thank you.

19          MS. LOVE:  Your Honor, from defendants' side we have

20  Rachel Love and Kevin Hanger for defendants.  Also present for   02:05PM

21  complication purposes on the ESI issues is paralegal Mike

22  Giardina from our office.

23          THE COURT:  Thank you.  Is that everybody?

24          All right.  Thank you very much.  I have the letters

25  that have been submitted, and I thought I would turn to the      02:05PM
```

```
 1    more recent one, the January 11th letter of Struck, Love,
 2    Bojanowski, Acedo letterhead and jump down to the first place
 3    where my word search produces the word "impasse."  And I find
 4    the issue with respect to Dr. David Robertson and Jennifer
 5    Livingston.                                                         02:05PM
 6         Who of plaintiffs can tell me why these people should
 7    be included?
 8         MS. KENDRICK:  Yes, Your Honor.  This is Corene
 9    Kendrick.
10         As a threshold matter we think that a lot of these         02:05PM
11    disputes are rooted in a disagreement between the parties about
12    the scope of the hearing.  As you noticed in Mr. Hanger's
13    January 11th letter, it refers to Dr. Watson's statements.  But
14    our position is that the Court noted in its minute order and at
15    the hearing that the scope of the hearing is, quote, "regarding   02:06PM
16    the issue of credibility of monitoring," as the minute order
17    states.  So that's a threshold thing that I just want to put
18    out there as our position.
19         With regard to these two individuals, Dr. Robertson,
20    he measures Performance Measure 13, which is a performance        02:06PM
21    measure that, in the past, you have found defendants
22    substantially non-compliant.  They, in more recent reports,
23    including their filing today, are showing compliance with this
24    measure.  So to us, if they are in compliance that's great, but
25    this goes to the issue of whether or not the numbers are          02:07PM
```

1    accurate.

2         Dr. Robertson is somebody who you may not be familiar

3    with or his name, but if you look at the org charts for the

4    Department of Corrections Monitoring Bureau he is the

5    counterpart to Dr. Nicole Taylor.  He is the doctor who                    02:07PM

6    monitors and is the consultant on medical care the same way she

7    is for mental health care.  So for that reason, we think that

8    Dr. Robertson should be included in the group of custodians.

9         THE COURT:  Go ahead.

10        MS. KENDRICK:  So with regard to Ms. Livingston,                        02:07PM

11   according to defendants she monitors performance measures

12   related to grievance appeals, Performance Measure 26.  And this

13   is a measure for which they have shown compliance and has not

14   had a finding of non-compliance.  However, we think she needs

15   to be included not only because there are showings of                       02:07PM

16   compliance but because the Department, when Corizon took over,

17   revamped their exhaustion and grievance policy for healthcare

18   related issues and so all healthcare grievances are considered

19   exhausted when they go to a facility health administrator,

20   which is a Corizon employee, and they provide an answer.                    02:08PM

21   Nobody from ADC now gives what you would consider a director

22   level response.

23        So therefore, Ms. Livingston appears to be the only

24   person who works for the Department of Corrections who actually

25   looks at grievances.  And we think that is another important                02:08PM

UNITED STATES DISTRICT COURT

1    reason to include her.

2            THE COURT:  And who of defendants can respond to

3    these?

4            MS. LOVE:  Your Honor, this is Rachel Love for

5    defendants.                                                    02:08PM

6            I agree with Ms. Kendrick that at the root of our

7    discovery disputes regarding search terms, which I will note

8    that hopefully the Court looks favorably on we have made

9    tremendous progress.  We are down to our last issues.  We have

10   made tremendous progress on agreement.  We do, at the outset, I   02:09PM

11   think, disagree on what the scope of the hearing, the February

12   evidentiary hearing, is going to be.  Our understanding based

13   upon the statements made during the last hearing that the

14   Court's concerned with the KJZZ article is the issue of some

15   sort of beat the monitor system and as specifically related to   02:09PM

16   Dr. Watson's statements about backlogs and specialty consults

17   and cancellations of specialty consults, not the entirety of

18   ADC's monitoring of hundreds of performance measures.  There's

19   no way just in common sense terms we could ever even address

20   that in a one-day hearing to begin with.                          02:09PM

21           So we see the scope of the hearing to describe what

22   the Court had issue with, which was Dr. Watson's statements

23   about cancellation of speciality consults.  So that is at the

24   root.  So then capsuling off of that --

25           THE COURT:  Let me go ahead and interrupt just for a      02:09PM

1   moment to clarify that issue before you continue.

2         I will say this, that I agree that it is not so

3   limited as to Dr. Watson and the issues that were directly

4   raised by potential witnesses or potential evidence in the KJZZ

5   article.  I do believe, as you describe it as a beat the    02:10PM

6   monitor inquiry, that is what this is about.  It's not just

7   limited to these particular person -- this particular person or

8   these interchanges that were reported in the KJZZ story.  It's

9   broader than that.  It's about whether or not there is a beat

10   the monitor system.  It's not a wholesale evaluation of the    02:10PM

11   monitoring program.  It's whether or not we need to find out if

12   there is a beat the monitoring operation afoot.

13         And so it's not as narrow as you say, Ms. Love.  It's

14   perhaps not as broad as one could think if you were evaluating

15   the entire monitoring system.  We're looking to see if there is    02:10PM

16   something wrong with the system with respect to how people are

17   approaching it.  I hope that provides additional clarification.

18         Go ahead.

19         MS. LOVE:  Okay.  So as to Dr. Robertson, we'll just

20   make our record then based upon what the Court just stated but    02:11PM

21   we'll just make the record as to our understanding of the scope

22   of the hearing and then that Dr. Robertson, in only monitoring

23   Performance Measure Number 13 regarding psychotropic medication

24   renewals, that he should not be subject to the custodians.

25         As to Ms. Livingston, I think even based upon the    02:11PM

1  broader scope, and it's defendants' position at the hearing,

2  this is an ADC person responsible for inmate grievances.  So

3  what it seems that we're looking for is, you know, is there a

4  beat the monitor intent or activity within -- with Corizon at

5  play and an inmate grievance appeal person isn't going to yield          02:11PM

6  that kind of information where you are looking to see if

7  there's discussions internally, whether within Corizon or

8  between Corizon and ADC as to beat the system.  That would not

9  be information that an inmate would be privy to, and so we

10  don't see how that would reveal any relevant information as to          02:12PM

11  internal communications between ADC and Corizon either

12  internally separately or in conjunction with each other.  This

13  is only measuring of a performance measure as to health care

14  grievances submitted by inmates.

15          THE COURT:  And at present, that is not something that          02:12PM

16  is before me as is Performance Measure 13, which is something

17  that is in acute focus and that is related to Dr. David

18  Robertson.  And so I'm inclined to agree with Ms. Love with

19  respect to Jennifer Livingston, that certainly, based upon what

20  we know right now, that is beyond the scope of what I should be          02:12PM

21  inquiring into.  But I will give you the last word, Ms.

22  Kendrick.

23          MS. KENDRICK:  Yes, Your Honor.  Thank you.

24          So we would just note that something that we have been

25  told from time to time by class members is that they think that          02:13PM

things in their medical records are falsified and that, you

know, one thing we hear about a lot is that prisoners will

write us and say they didn't get their medication, for example,

and then we look in eOMIS and write them back and say it looks

like according to eOMIS you got your medication on these days.     02:13PM

And we tell them if that's not the case you need to file a

grievance about it.  So, for example, we don't know if there

may have been grievances filed about this issue.  We don't know

if Ms. Livingston may have reviewed some grievances in doing

her monitoring of Performance Measure 26 and whether or not      02:13PM

that generated anything to her superiors or to others saying I

received this information.  It was contained within a

grievance.  So that's the other reason why we think that it

would, perhaps, produce relevant information for the purposes

of the hearing.                                                    02:13PM

          THE COURT:  All right.  I will deny the request with

respect to Ms. Livingston without prejudice to revisiting it

if additional information becomes available that would suggest

that it is worth the resources to be invested.  Also.  It is

rather afield from what we're focusing on in respect to this     02:14PM

hearing.

          Then the next issue appears to be the attorney

communications and the impasse with respect to the e-mails that

are directed to someone who is in the "to" line as the counsel.

Just a moment, please.  I'm reading to transcript to see         02:14PM

whether or not it was clear enough. I hope that I was, to say

that I am saying that I agree with plaintiffs' point with

respect to Dr. David Robertson but disagreeing with the

plaintiffs' point with respect to Jennifer Livingston.

So it seems to me that if the communication is

directed to an attorney in the first instance that that's an

easy case. It seems also to me that if the communication is

directed in the first instance to an attorney and others that

creates an issue for the lawyers to have to review the document

to see whether or not it's an attorney/client privileged

document because it's black letter that simply throwing the

lawyer's name in the "to" list doesn't satisfy the

attorney/client privilege if it is treated as something that is

otherwise not an attorney/client privileged communication.

So I will turn to defendants first to explain why it

is that that rule shouldn't apply here.

MS. LOVE: Well, Your Honor, if it's anybody within

ADC who is addressing an e-mail to us on -- related to the

Parsons case, whether or not there's other e-mails from -- I'm

sorry -- other persons on that e-mail also from ADC that are

ADC employees within our CC list that could include multiple

people, that doesn't take it outside of the attorney/client

privilege situation. Because we are, you know, it's official

capacity lawsuits against the two individuals but it is against

then the agency. So whether there are multiple people on an

1    e-mail when we work closely with ADCs people as an agency on an

2    everyday basis, I believe that would fall within the

3    attorney/client privilege and/or work product privilege because

4    they are communicating with us on a daily basis regarding this

5    case.                                                                    02:16PM

6          THE COURT:  No.  If somebody among the ADC employees

7    sends an e-mail to an attorney, as I said, that is an easy

8    case.  That's one of your potential -- your clients reaching

9    out to you for attorney/client advice.

10         But if it is -- I mean, it's, again, it's very clear      02:17PM

11   the law that if someone is engaging in normal activities of an

12   enterprise, in this case, a prison, and they send off an e-mail

13   to a number of people similarly engaged in that enterprise

14   simply including a lawyer among the recipient list doesn't mean

15   that whole document becomes privileged.  What it means is that   02:17PM

16   the lawyer would then have to look at the document to see

17   whether or not it satisfies the elements of an attorney/client

18   privileged communication.  If it's an originating document,

19   it's not work product.  If it's responsive it's possible that

20   it could be work product.  But in any event, a lawyer is going   02:17PM

21   to have to look at that to see whether or not it's

22   attorney/client privileged.

23         Is that clear?

24         MS. LOVE:  Okay.  Yes.

25         THE COURT:  Then, this looks like the next issue is or     02:18PM

1    I skipped over, I guess, search order.  Forgive me for doing

2    that.  The search order issue, that is one that still is at an

3    impasse.  How significant is this?  Is this something you will

4    address, Ms. Kendrick, the timing issue?  You asked for them to

5    be addressed in a certain order so that you would have, I          02:18PM

6    gather, more time to address the documents for witnesses or

7    custodians whom you thought would be more likely to have

8    information.  Is that what this is about?

9          MR. FATHI:  This is David Fathi, Your Honor.

10         Yes.  That's exactly what it's about.  And to answer       02:18PM

11   the Court's question, the importance of this depends on how

12   long this production takes.  We have asked the defendant how

13   long it's going to take, which they have said they don't know

14   and I'm sure that's an honest answer.  Mr. Hanger's letter from

15   yesterday said that it's an onerous task and that production      02:19PM

16   will be on a rolling basis.  So we have prioritized the

17   custodians that we care about most and asked that they be

18   searched first so that we can receive those e-mails first and

19   have more time to review them.  And we set forth the order we

20   requested in our January 7th order, January 7th letter, excuse    02:19PM

21   me.

22         The defendants have articulated absolutely no reason

23   in Mr. Hanger's letter or anywhere else why they can't conduct

24   the search in the order that we have requested.  When we talked

25   yesterday Mr. Hanger actually said that the search order is       02:19PM

1    inconsequential, but for some reason, the defendants have

2    declined to search in the order that we have requested.

3            THE COURT:  Well, they offered a reason in the letter

4    that essentially was they want to do it their way, not your

5    way.  That's a reason, certainly.  Mr. Hanger, do you want to          02:20PM

6    add anything more to that?

7            MS. LOVE:  Your Honor, this is Rachel Love.  I can

8    address that.

9            THE COURT:  Thank you.

10           MS. LOVE:  What needs to be considered here is that          02:20PM

11   from both our side and the Corizon side, as soon as, you know,

12   as soon as this order came out and we -- and Ms. Kendrick sent

13   over the search terms, which we appreciate she got it to us

14   even earlier than you had ordered so we could get going on

15   this.  But this has been a constant day-to-day dialogue with          02:20PM

16   ADC and then Corizon on its own with their people as to how to

17   manage this task.  It's not we want to do it our way because we

18   want to do it our way, it's a matter of efficiency.

19           And what we have been able to determine and what we

20   can do is from the ADC side, the collections, everyone has          02:20PM

21   already agreed that Richard Pratt is going to do his own

22   collection because of the monumental -- basically it's an IT

23   nightmare to lump him in with others.

24           Once we have agreed on search terms, ADC can then run

25   the bulk with the other 24 custodians to get all the search          02:21PM

terms in there and we can get it out to a vendor.  Just as an

example of the magnitude of what we're talking about, we did

run a small sample of four custodians which would be people

that would have a bulk of the information to include Dr.

Taylor, Kathy Campbell, Ms. Headstream.  And on that only

running the undisputed search terms, we have that initial back

out to the vendor.  We may get it back today.  It's more likely

we would get it back on Tuesday.  We came up with 7,000 hits.

That's not 7,000 pages.  That's 7,000 hits.  And that's even

through the de-duplication process.  Neither ADC nor our firm

has the capability in house to do this and with Corizon they

are going to have to be using a vendor, which is common in this

ESI world.  But to dictate that we have to do it in a certain

order when we are, and we're committed to rolling this

production, actually slows down the process.  We're going to

have to a multitude of attorneys in our office and paralegals

basically doing nothing but reviewing these documents.  And

we're looking at a 25 custodian pull where we have a sample

right now of 7,000 hits on four custodians.

So it's not that we're trying to be difficult.  We're

actually trying to be the most efficient that we can because

we're going to have simultaneous people reviewing batches which

doesn't necessarily mean that through the de-duplication

process that we're going to say, okay, here's Nicole Taylor's

e-mails.  There's going to be a lot of cc's so something that

1   gets a hit on Dr. Taylor, could possibly be three or four other

2   custodians can get a hit on that, too.  So we're not doing that

3   to be difficult.  We're doing that to be the most efficient we

4   can to do these things on a rolling basis.

5           THE COURT:  All right.  Anything else you would like                    02:23PM

6   to say on this, Mr. Fathi?

7           MR. FATHI:  Well, again, Your Honor, I have

8   heard about how many -- we have heard about how many hits they

9   generated.  We haven't heard anything about why they can't

10  produce the data in the order that we have requested.  And             02:23PM

11  again if this is going to take 24 hours then it doesn't matter

12  but the defendants have not been able to tell us when this is

13  going to be accomplished.  And so it is important to us that

14  the custodians who are, we think, are the most important and

15  most likely to have relevant information be searched first so             02:23PM

16  that we can have a reasonable amount of time before the hearing

17  to review the documents that are produced.

18          THE COURT:  All right.

19          MS. LOVE:  And, Your Honor, if I may, this is probably

20  a good time for me to also --                                          02:23PM

21          THE COURT:  Hold on just a second, Ms. Love.  I need

22  to ask you just a favor.  What happens often times when people

23  speak on the telephone in a court proceeding is we forget that

24  there's somebody here who is a court reporter.  And so we're

25  reminded by that when we're in court, but when we're on the             02:24PM

telephone we forget.  So what that means is we tend to do what

all lawyers do, the occupational disease, we fall into this

rapid pace of speaking.  So if you would please slow down.

Thank you.

MS. LOVE:  Your Honor, I apologize.  I'm always
02:24PM

chastised for my fast speaking.

THE COURT:  I'm not surprised.  So am I.

MS. LOVE:  I just wanted to give an example for some

additional information that we received from Corizon as to the

magnitude of what we're talking about.  And this also plays
02:24PM

into whether or not it's even possible to have a hearing on the

stated data February 9th.  The preliminary numbers even from

the Corizon side is that even running test searches, they are

getting, for that time period that at issue, they so far have

over -- looks like over 250,000 hits for their custodians.  And
02:25PM

again, that's not pages, that's a hit.

Corizon estimates that they are going to have to have

at least 60 people doing the review to be able to accomplish

the feat of reviewing, you know, of culling out for any

privileged and completing the production.  And I'm looking here
02:25PM

from my notes that an optimistic time for review would assume

approximately 40 days.  And that's doing a rolling basis.

So I just wanted to just add that into the mix that I

think that we really need to consider because of the magnitude

of what we're talking about here in the production, no matter
02:25PM

```
1    what the search on order is, no matter what the search terms
2    are, is that we are looking at optimistic, with people working,
3    so many time keepers working and persons committed to this job
4    from both Corizon's side and our firm's side of at least 40
5    days out.                                                      02:26PM
6         THE COURT:  Well, this is not a mom and pop operation
7    that you are running.  This is the State of Arizona
8    Correctional Department.  So it's a big deal.  I get that.  And
9    an effort to look into it is going to produce a big deal.
10   We've got two days, a two-day hearing, and we've got the       02:26PM
11   possibility to do -- what I'm saying is we have the possibility
12   to not just be limited on what is before us on the schedule.
13   We can find more time.  But we are going to get as into this as
14   we possibly can with what we have scheduled.  So that's just
15   where we are.                                                  02:26PM
16        I think it was reasonable for the plaintiffs to
17   suggest a method of timing that would have been what they
18   thought was sufficient, but I also think it's also reasonable
19   for the defendants to have the power within their own shop to
20   decide what is reasonable.  If it could have been accommodated  02:27PM
21   then I will trust that plaintiffs -- defendants would have done
22   that but you have given me reason to believe that you have
23   found that it would be more obstructive to the process that you
24   are trying to pursue here.  So I am not going to impose an
25   order requirement on the production of the custodians' records. 02:27PM
```

1        Then moving to the next impasse issue.  Just a moment.

2   Lost my page.

3        MS. LOVE:  Your Honor, may I clarify, was that

4   ordering to go with plaintiffs' search order or allowing

5   defendants to control the search order?                    02:27PM

6        THE COURT:  It allows the defendants to control the

7   search order.  Thank you for asking for clarification.  That's

8   always important to do if you don't understand what I have

9   said.

10       MS. LOVE:  Thank you, Your Honor.                      02:28PM

11       MS. KENDRICK:  Your Honor, this is Corene Kendrick.

12  Ms. Love mentioned the custodian issue with Corizon, and I

13  don't know if the Court wants to talk about that next or stick

14  to the requests for ADC.  But we did respond to that in my

15  letter that's dated January 11th.  We got a breakdown of the   02:28PM

16  categories of employees, and they had said that they estimated

17  158 custodians but then when we got the breakdown, as you can

18  see on Page 3 of my letter, they had included administrative

19  assistants, 22 of them, which we had not requested.  So we said

20  we don't need that.  And they also noted that the assistant      02:28PM

21  director of nursing category would account for 68 individuals.

22  So in my letter, we offered to remove that entire category of

23  custodians as well.  So that would take it down from 158 would

24  cut it more than half taking out 90 of the custodians.

25       So I just wanted to note for the Court that that is      02:29PM

1    the offer that we had made to defendants and Corizon.

2         THE COURT:  And I gather there's no doubt that people

3    are going to take you up on that, so that's -- and I did read

4    that in your letter so that is good.

5         So then are we then to the issues of the search terms?  02:29PM

6    Is that the next remaining issue?

7         MR. FATHI:  Yes, Your Honor.

8         THE COURT:  Okay.

9         MS. KENDRICK:  Well, actually no.  I'm sorry.  I don't

10   mean to contradict my co-counsel.  On the issue of the        02:29PM

11   custodians we had just asked that they confirm that the four

12   individuals who either are former or current employees of

13   Corizon who we requested by name, Dr. Watson, Sarah Neese, Lynn

14   Cole, and Dr. Babich, were included.  And then we also had

15   questions about the category of employee who is basically the  02:30PM

16   person who is in charge of mental healthcare at each of the 10

17   institutions.  So I don't know if those are questions that Ms.

18   Love or Corizon counsel who are on the phone could answer for

19   us.

20        THE COURT:  I didn't see that in your letter, though,    02:30PM

21   Ms. Kendrick.

22        MS. KENDRICK:  It's at the bottom of Page 3, sir.

23        THE COURT:  Thank you.  Let me get there.

24        MR. FATHI:  And just to be clear, Your Honor, this

25   pertains to Corizon, not to ADC.                              02:30PM

1    THE COURT:  So this is reference the paragraph which

2    begins, "We had requested all persons who were employed as

3    permanent or acting regional mental health directors"?

4        MS. KENDRICK:  Yes, sir.

5        THE COURT:  Does anybody know whether we do have an          02:30PM

6    impasse on that right now?  You were saying you were seeking

7    clarification.  So that would suggest to me that we don't know

8    whether we have an impasse or not.

9        MS. LOVE:  Your Honor, this is Rachel Love.  I'm sorry

10   that I do not have an answer on this particular issue at this     02:31PM

11   moment.  But we can certainly get back with Ms. Kendrick to see

12   whether or not Corizon has any objection to this request.

13       THE COURT:  All right.

14       MS. LOVE:  I apologize.  We're seeing the letters

15   late.  I apologize I missed that.                                 02:31PM

16       THE COURT:  It would seem to me that what plaintiff is

17   asking for is reasonable including the four individuals that

18   are referenced on Page 4.  But if you do find that you are at

19   an impasse get back on the phone and we'll take it up at that

20   point.                                                           02:31PM

21       Now we're to the terms that there are impasse about

22   backlog and whether it be tied to the word "operation" or not.

23   Tell me why the backlog can't be or shouldn't be somewhat

24   limited?  Somebody on the plaintiffs' side.

25       MS. KENDRICK:  Yes, Your Honor.  So the reason we           02:32PM

```
1   think that the word "backlog" doesn't need to be tied to the
2   word "operation" or any other word is to the extent that we are
3   being reassured regularly in court hearings by people from ADC
4   and Corizon that everything is fine, and that the CGARs are
5   improving, we don't think that the word in and of itself will        02:32PM
6   generate many hits.  However, if the word "backlog" is somehow
7   going to generate thousands of hits, that is of importance to
8   us and to the reason why on the one hand we're being told
9   things are fine and things are improving, yet there's thousands
10  of e-mails talking about backlogs.                                   02:32PM
11          THE COURT:  Who on defendants' side, please?
12          MS. LOVE:  Your Honor, this is Rachel Love.  And
13  yesterday when we used the word "operation" that was during our
14  meet-and-confer so there was a lot of brainstorming as to what
15  that could entail of what terms could be attached to "backlog."      02:33PM
16  We would merely request that the word "backlog" could be tied
17  to a list of things that are relevant to the hearing.  I mean,
18  in my mind, I thought backlog and it could be with a tag of and
19  backlog and specialty backlog and consult backlog and
20  additional terms that backlog by itself is just one word that's      02:33PM
21  not attached to a category of information that the Court will
22  be examining during the hearing.
23          THE COURT:  And those words that you just mentioned,
24  Ms. Love, are not words that are otherwise being searched, is
25  that right?                                                          02:33PM
```

1          MS. LOVE:  Well, things like "specialty" and

2     "consult," they are also in other phrases.  What we have been

3     trying to do is it's just how my brain works, I keep thinking

4     of how you do like a Westlaw search.  So instead of just

5     searching one word, you know, we have been searching words in          02:34PM

6     consultation with another or in the same stream like within

7     five words or "and" or "or" so you are picking up phrases

8     versus just a word.

9          THE COURT:  But on the other hand, the issue has been

10    one of we have been dogged by this backlog issue.  We have been          02:34PM

11    dogged by things that are backing up that don't get done.  So

12    I'm going to grant the plaintiffs' request that the term

13    "backlog" be included without any kind of conjunction.

14         The "cancer" and "cancel" issue seems to me that it

15    has been sufficiently raised here in this matter that we should          02:34PM

16    be wanting to capture both of these items.  And so I'm inclined

17    to favor the plaintiffs' view on that one but I will give you a

18    chance to talk me out of that, Ms. Love.

19         MS. LOVE:  The issue on that was that it would, in our

20    view, go broader than what we believed to be the scope of the          02:35PM

21    hearing, which is the cancellation of consult and specialty

22    care because it would pick up -- "cancel" would pick up other

23    terms like "cancer."  But that would also be if there's a

24    cancellation issue, if we're talking about cancellations, if

25    there's a cancellation of some sort of specialty care, a          02:35PM

1    consult, oncology, et cetera, that's going to be picked up in

2    doing it by the term of "cancel" with the L on it versus the

3    asterisk.

4         THE COURT:  So did you just say there is not an

5    impasse on this or did I misunderstand?                          02:35PM

6         MS. LOVE:  No.  Defendants position that it is still

7    too broad.

8         THE COURT:  So I disagree.

9         Then the next issue is the alternative, the phrase or

10   the sentence, the paragraph that begins, "You requested that    02:36PM

11   although alternative treatment plan," I see the plaintiffs

12   agreed to make it more limited.  It seems like that issue is

13   not an impasse, or is there still an impasse, Ms. Kendrick?

14        MS. KENDRICK:  That's our offer.  We, since my January

15   11th letter before Mr. Hanger's, they didn't respond as to      02:36PM

16   whether or not they accepted that proposal.  But we're willing

17   to do that.

18        THE COURT:  What do you think, Ms. Love?

19        MS. LOVE:  Your Honor, we were able to consult today

20   with all -- with everybody who needs to be consulted, and Ms.   02:36PM

21   Kendrick's offer last night of doing it the alternate treatment

22   plan, for example, or ATP within 5 of utilization management,

23   that was their offer in about the middle of Page 2 of their

24   January 11th letter, we will go ahead and do that as they

25   request.                                                        02:37PM

1          THE COURT:  Okay.  So then what other issues are at

2     impasse that I have not addressed rather than me trying to pick

3     them out?

4          MS. KENDRICK:  So one other thing is -- I don't think

5     we are at an impasse -- we have made an offer to narrow the        02:37PM

6     search terms for infectious disease and for oncology and have

7     them within a certain range of words.  So that's at the bottom

8     of Page 2, top of Page 3 of my letter.  The only other one

9     where we're at an impasse is we requested the search term

10    "Judge Duncan."                                                    02:37PM

11         THE COURT:  Do you really think anybody knows the

12    judge's name out there?

13         MR. FATHI:  You would be surprised, Your Honor.

14         THE COURT:  Ms. Love, plaintiffs have asked for this.

15    Why do you think that that's not a good idea?                      02:37PM

16         MS. LOVE:  For the first two, as to "infectious

17    disease" and "oncology," we're thankful to plaintiffs that they

18    did reconsider on that and have narrowed it down.  At this

19    point -- and I'm reading from the bottom of Page 2 of Ms.

20    Kendrick's letter to the top of Page 3, our only question and     02:38PM

21    our position at this point is that their inclusion of

22    "infectious disease" within 20 of cancel asterisk, or, and the

23    words new, search, and seek, or terminate, we are okay with the

24    word "terminate" but we would object to the words "new,"

25    "search" "or seek," because this is -- we don't see how that      02:38PM

1    falls into the category of looking at, you know, basically the

2    allegations of beat the system or cancellations.  Because

3    what's going to happen is any time there's like a new person

4    with an infectious disease or they are seeking care that's

5    going to bring up any -- we see that as it's going to bring up          02:38PM

6    any multitude of just e-mails that are talking about this

7    person needs a -- we need to seek care for the person, that's

8    not going into the cancellation or doing something that is a

9    detriment to an inmate's care.

10         MS. KENDRICK:  Your Honor, we disagree because one of          02:39PM

11   the key points is the fact that Dr. Watson alleged that she was

12   instructed to cancel requests for specialty consults because

13   there was no outside provider.  We learned at the December 20th

14   hearing that the cancer oncology specialist that Corizon used

15   was terminating the contract because they reportedly were          02:39PM

16   declaring bankruptcy.  So we think that words such as "new" or

17   "search" or "seek" are important because we anticipate there

18   probably is some discussion about saying we need to find a new

19   oncology specialist, or we are searching for a new infectious

20   disease provider.  And that goes squarely back to what she          02:40PM

21   alleged and to the scope of the hearing.

22         THE COURT:  And is there some way to limit that

23   Boolean search so that we get the words within proximity so we

24   can address the concern Ms. Love has while it's still

25   respecting what I think is a good argument that you make, Ms.          02:40PM

1    Kendrick, for you to track and capture what you just described?

2              MS. KENDRICK:  We could make it closer.  We could make

3    it within 10.

4              THE COURT:  Wouldn't five be enough, wouldn't you

5    think?                                                          02:40PM

6              MS. KENDRICK:  Five would probably work too.

7              THE COURT:  Let's do that.  Let's do that.

8              And the idea of including "The Court" seems to me that

9    that could be a possible shorthand that somebody might use so

10   we'll go ahead and allow for that to be included.               02:41PM

11             MS. LOVE:  Your Honor, if I could just make our record

12   on that as to including the term "Judge Duncan."

13             THE COURT:  Yeah.

14             MS. LOVE:  We did, for example, we did a test case of

15   one of the custodians for ADC, and it returned 174 separate     02:41PM

16   hits on Judge Duncan.  There is, you know, the monitors will

17   report what the Court has ordered so that's why we would

18   request that if the Court is going to allow the term "Judge

19   Duncan" that it be also in conjunction with some other search

20   term relevant to this because there will be e-mails and         02:41PM

21   numerous e-mails that are going to report on what findings from

22   the Court, you know, Judge Duncan ordered a remedial and we

23   need to look at a remedial measure.

24             So first of all, we believe it's just a fishing

25   expedition to request we search for the words "Judge Duncan"    02:41PM

1    but more importantly it needs to be tied to other search terms

2    that plaintiffs have already agreed to pare down as to

3    categories of care and the issues at play not just Judge Duncan

4    in general.

5           THE COURT:  Ms. Kendrick, why don't you pick five                02:42PM

6    additional words that you think would hone it in so that you

7    are getting exactly what you want.  It seems like that's a

8    reasonable scope of universe to be able to define what you are

9    looking for that would be modified, not just the name of the

10   court but also with these other issues that are the ones they     02:42PM

11   are focusing at would likely seem to me to be in the same

12   communication.  So if you could propose some additional terms

13   to make as conjunctive with the "Judge Duncan" term.

14          MR. FATHI:  Your Honor, I beg your pardon.  This is

15   David Fathi.  Could I respond?                                    02:42PM

16          THE COURT:  Of course.

17          MR. FATHI:  We had initially asked to search for the

18   term "federal court" and the defendants objected that that

19   would generate too many hits.  And so we changed that to "Judge

20   Duncan."  If it generated 173 hits, that is a very small number   02:43PM

21   compared to these other terms.  This is probably the most

22   efficient search term in the entire list because, number one,

23   it's not going to generate very many hits.  Defendants have

24   agreed to search for the term "non-compliance" and "Judge

25   Duncan" will certainly generate far fewer hits than              02:43PM

1    "non-compliance."  But every single hit it does generate will

2    be directly relevant to this case.  And the defendants have

3    articulated no reason why the term shouldn't be included.

4         The difficulty with trying to pair it with something

5    else is we don't know what other words people are going to use.    02:43PM

6    So, for example, the e-mail to Dr. Watson from Sarah Neese that

7    was quoted in the KJZZ story, she said, "After 30 days we get

8    nailed for 1,000 bucks a day until they are seen."  We wouldn't

9    have thought to search for "nailed" but that was the term that

10   we used.  So "Judge Duncan" is going to generate a small number    02:44PM

11   of hits.  All of them are going to be relevant to this case and

12   so we believe that the marginal burden of including that term

13   is truly negotiable.

14         THE COURT:  Ms. Love, go ahead.

15         MS. LOVE:  I'm sorry.  The 174 example was for one           02:44PM

16   custodian.  And we're not talking -- we're talking only ADC

17   people.  But that comes out to, if you want to just take an

18   average times 25 custodians over 4,300 hits.  What Mr. Fathi

19   seems to be doing discovery on is the entirety of the case,

20   just anybody who says the word "Judge Duncan" in an e-mail not     02:44PM

21   constrained to this particular hearing.

22         So on the burdensome side of, you know, it takes a bit

23   of time, and I am not -- I am being a little sarcastic -- to

24   review 4,000, what could be on the small side of 4,350 e-mails,

25   that's just a hit, that's not pages, to look to see what the       02:45PM

1    nature of the e-mail is.  And as to the case in its entirety,

2    we believe that that's overbroad to the scope of the hearing

3    and not relevant.

4         MR. FATHI:  Your Honor, they don't want the Court to

5    see these e-mails that contain the term "Judge Duncan."  That's          02:45PM

6    the real source of their objection.  This is a trivial number

7    of hits, and they are all going to be relevant to this case.

8    They should be produced.

9         MS. LOVE:  And, Your Honor, I take issue and I think

10   that that is a very inappropriate personal attack without any           02:45PM

11   basis that Mr. Fathi is making accusations to the nature of

12   what could be in e-mails when I am counsel and officer of the

13   court making an objection under the rules as to relevancy.  And

14   the personal attacks are entirely inappropriate.

15        MR. FATHI:  It wasn't a personal attack in any way,                 02:46PM

16   shape, or form.  It was stating the only conceivable objection

17   to searching for a term that is going to generate nothing but

18   relevant hits.

19        THE COURT:  Well, I mean, it's not the only

20   conceivable because Ms. Love has articulated a conceivable              02:46PM

21   argument, and that is that it would be too burdensome.  But in

22   any event, what I'm going to do is the plaintiffs have decided

23   that this term "Judge Duncan" is going to be the shorthand that

24   they think will capture messages that are associated with

25   trying to inform the Court of a subject of whether there's a            02:46PM

```
 1    beat the monitor system in place, IM in certain respects of the

 2    picture of the monitor.  So I will allow the term "Judge

 3    Duncan" to be used.

 4            Anything else?

 5            MS. KENDRICK:  No, sir, not from plaintiffs.                02:46PM

 6            THE COURT:  Defendants?

 7            MS. KENDRICK:  I guess we would just request that

 8    counsel for defendants and Corizon counsel get back to us very

 9    quickly about our response and our offer on the custodians and

10    clarify the question about the mental health staff so that we     02:47PM

11    can figure out if we're hitting another impasse and have to

12    schedule a call with you on Tuesday.

13            THE COURT:  Ms. Love, is there a time you could get

14    back with Ms. Kendrick on this?

15            MS. LOVE:  Unfortunately, with the time frame with        02:47PM

16    corporate counsel in Nashville, we won't be able to get back

17    today but we can do that on Tuesday.

18            THE COURT:  Thank you very much.  Good afternoon,

19    everybody.

20            MR. FATHI:  Thank you, Your Honor.                        02:47PM

21            THE COURT:  Bye-bye.

22            (Proceeding concluded at 2:47 p.m.)

23

24

25
```

```
1
2
3                        C E R T I F I C A T E
4
5           I, LAURIE A. ADAMS, do hereby certify that I am duly
6    appointed and qualified to act as Official Court Reporter for
7    the United States District Court for the District of Arizona.
8           I FURTHER CERTIFY that the foregoing pages constitute
9    a full, true, and accurate transcript of all of that portion of
10   the proceedings contained herein, had in the above-entitled
11   cause on the date specified therein, and that said transcript
12   was prepared under my direction and control.
13          DATED at Phoenix, Arizona, this 19th day of January,
14   2018.
15
16                              s/Laurie A. Adams
17                              _____
                                Laurie A. Adams, RMR, CRR
18
19
20
21
22
23
24
25
```