UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

————————————

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

No. **CV-12-00601-PHX-DKD**

Phoenix, Arizona
January 18, 2018
9:37 a.m.


BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(STATUS HEARING)



Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CV-12-601-PHX-DKD – January 18, 2018

1

2                    **A P P E A R A N C E S**

3   For the Plaintiffs:

4          PRISON LAW OFFICE
           By:  **Corene Kendrick, Esq.**
5          1917 5th Street
           Berkeley, CA 94710
6
           ACLU – Washington DC
7          By:  **David C. Fathi, Esq.**
           915 15th Street NW
8          7th Floor
           Washington, DC 20005
9
           EIDENBACH LAW PC
10         By:  **Kirstin T. Eidenbach, Esq.**
           P.O. Box 91398
11         Tucson, AZ 85752

12         ARIZONA CENTER FOR DISABILITY LAW – PHOENIX, AZ
           By:  **Asim Dietrich, Esq.**
13         5025 East Washington Street
           Suite 202
14         Phoenix, AZ 85034

15   For the Defendants:

16         STRUCK LOVE BOJANOWSKI & ACEDO PLC
           By:  **Timothy James Bojanowski, Esq.**
17         By:  **Daniel Stuck, Esq.**
           By:  **Rachel Love, Esq.**
18         By:  **Ashlee B. Hesman, Esq.**
           By:  **Richard Michael Valenti, Esq.**
19         3100 W. Ray Road
           Suite 300
20         Chandler, AZ 85226

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2                               **I N D E X**

3

**DEFENSE WITNESS:**          **DIRECT**    **CROSS**    **REDIRECT**   **RECROSS**

KATHY CAMPBELL
By the Court                47
By Ms. Kendrick                          49
By the Court                                          51

JULI STOVER
By Mr. Struck               115
By the Court                             117
By Mr. Struck                                         123
By the Court                                                      128
By Ms. Kendrick                          130

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV-12-601-PHX-DKD – January 18, 2018

1        (Proceedings begin at 9:37 a.m.)

2            THE CLERK:  This is CV-12-601, Parsons, et al, v.

3    Ryan, et al.  On for status hearing.

4            THE COURT:  Would counsel please announce.

5            MR. FATHI:  Good morning, Your Honor.  David Fathi of        09:37:06

6    the ACLU National Prison Project for the plaintiff class.

7            THE COURT:  Thank you.  Good morning.

8            MS. KENDRICK:  Corene Kendrick from the Prison Law

9    Office for the plaintiff class.

10            THE COURT:  Thank you.                                      09:37:16

11            MS. EIDENBACH:  Good morning.  Kirstin Eidenbach for

12    the prisoner plaintiff class.  And behind me is Asim Dietrich

13    from the Arizona Center for Disability Law.

14            THE COURT:  Thank you.  Good morning.

15            MR. BOJANOWSKI:  Good morning, Your Honor.  Timothy        09:37:29

16    Bojanowski, Daniel Struck, Rachel Love, Ashlee Hesman and

17    Richard Valenti for the defendants.

18            THE COURT:  Thank you.

19            And anybody on the phone?

20            No?  All right.                                           09:37:42

21            THE CLERK:  Yes, Judge.

22            THE COURT:  Who's on the phone, please?

23            MS. STOVER:  Juli Stover with Corizon Health.

24            THE COURT:  I'm sorry?

25            MS. FINGER:  Jennifer Finger with Corizon Health, but     09:37:50

CV-12-601-PHX-DKD – January 18, 2018

1    we're not counsel of record.

2              THE COURT:  All right.  Thank you.

3              Let me address first the defendants' motion to limit

4    the scope of the February 9th evidentiary hearing regarding the

5    KJZZ article.                                          09:38:08

6              The defendants make a number of contentions in the

7    motion, some of which directed to allegations of improper Court

8    consideration of items not part of the evidentiary record.

9              To their credit in the motion they do point out that I

10   repeatedly said that what I was taking from the street and    09:38:32

11   bringing into the courtroom was not an evidentiary record, but

12   was a reason for me to explore whether there was anything

13   behind it.

14             I have not made any findings.  I have initiated a

15   discovery process to determine whether there is a plan in place  09:38:52

16   to beat the monitor.  This is not based upon a mere report

17   about someone saying that there was a beat the monitor.

18   There's a little bit more than that.  There are representations

19   in the KJZZ report of what looked to be internal communication

20   that addressed issues that could be interpreted that way.  I    09:39:18

21   mean, again, it's all open to what needs to come into court to

22   be tested here.

23             I will say that if I read the KJZZ report accurately

24   there is a response that defendants say that I did not cite,

25   but I certainly read.  The response was essentially that the    09:39:43

1  term "beat the monitor" was to be taken to mean, this is how we

2  are going to do better than the monitor requires.  Well, I've

3  never in my common understanding ever heard that kind of

4  phraseology used, so it strains believability.

5          But, again, I've made no finding about whether or not          09:40:03

6  there is an attempt to effect an end run around the Court's

7  monitoring program.

8          You should say -- or you should note that there are

9  appearances here.  And the appearances -- again, I can't

10  pretend that I haven't been presiding in a case for many years          09:40:30

11  now in which I receive information in ways that are not

12  traditional.  We visit the prison site and I stand in a room in

13  an infirmary with defense counsel and plaintiffs' counsel and I

14  talk to the people there.

15          And so the history of this case has a history where I          09:40:53

16  observe what's happening in the infirmary with respect to what

17  looks to me to be problems associated with compliance with the

18  Stipulation.  I ask someone who works there, it looks to me

19  like it's an inbox problem.  And that person says, yes, that's

20  what it is, it's the -- there's too much in the inbox and          09:41:13

21  there's not enough hours in the day to get through the inbox.

22  And then that person tells me that Corizon has clamped down on

23  overtime.

24          And meanwhile at the same time the State is telling me

25  it's not a staffing problem, it's not a manpower issue.  But it          09:41:29

CV-12-601-PHX-DKD – January 18, 2018

1    looks to me like it is.

2         And so I'm hearing on the scene, seeing on the scene

3    information that seems to be directly contrary to what the

4    defendants have been telling me.

5         Then I read a KJZZ report in which there is Operation    09:41:43

6    Backlog, which appears to be a memorandum --

7         And, again, I don't think the defendants have ever

8    said, these memoranda that were included in the report were not

9    true.  But we'll hear about that.  Again, they have to have

10   their day in court to be able to say whether that's true or    09:42:01

11   not.  And we'll have an evidentiary foundation about whether to

12   trust those things as being what they are, consistent with the

13   Rules of Evidence.

14        But I see a report where I've been told there's no

15   staffing problem, where I've observed a staffing problem, and    09:42:17

16   then the report includes a memorandum that says there's an

17   Operation Backlog to deal with the backlog, where they're

18   importuning everybody to try to jump in and to devote more

19   hours to be able to try to accomplish the tasks at hand.

20        And so I take all of this in in a way to try to make    09:42:35

21   sure that I'm fair to everybody.  So that we do comply with the

22   Rules of Evidence, I set a hearing, a hearing to determine

23   whether or not the information that I have been accumulating

24   over years presiding in this case.

25        And, you know, it's not as if I'm trying to put my    09:42:57

1    nose where it doesn't belong.  I'm putting my nose where you

2    all asked me to put it.  I mean, you asked for me to be the

3    person who would preside in this case.  So you consented to me.

4    So it's a little bit different than even any other kind of

5    situation where you get what you get by the random draw of what          09:43:20

6    used to be a little wheel box down in the clerk's office.

7          But you chose me.  And so I'm certain both of you,

8    since you both appealed, you both have maybe rued at times that

9    decision.  But nevertheless, you chose.

10         And you chose somebody who didn't just fall off the          09:43:42

11   turnip cart.  You know, I've been doing this, in this position,

12   for 16 years.  Appointed to two terms, Merit Selection

13   Committee evaluates me twice, makes no negative comment.  And,

14   you know, before that I was a partner in two firms and an

15   Assistant United States Attorney.          09:44:06

16         So it's as if over 30 years of practice I have learned

17   some things about how to look at a situation and try to make

18   intelligent decisions to help people accomplish what is our

19   common obligation, and that is to comply with the law.  And in

20   particular here to comply with the Stipulation, the agreement.          09:44:27

21         And what I have had over the course of my time

22   presiding in this role is, as plaintiffs -- defendants

23   accurately state, a judge who is upset.  The judge is upset

24   because I participated in a resolution of a case that I really

25   had full expectation that would not have me years out trying to          09:44:50

1    accomplish what is fundamental.

2         And what is fundamental here is compliance with the

3    Performance Measures.  And these Performance Measures –– and

4    you can look at them, and you see what they are, and that is,

5    this is not the luxury items, that we didn't get the condo that        09:45:07

6    had the sauna.  This is the issue about basic health care that

7    is supposed to be provided, that any reasonable, humane person

8    would think would be provided to people that you are guardians

9    for.

10        And the idea that you can look at these Measures and          09:45:30

11   see that so many years out there's an abject failure in so many

12   critical components of basic health care, anybody should be

13   upset who looks at this.  And anybody who is charged with the

14   responsibility of trying to fix it would be not only upset, but

15   very frustrated.                                                          09:45:50

16        Because I have tried as best I can to effectuate the

17   satisfaction of the Performance Measures.  And here we are in

18   January of 2018, and we look at the report that was submitted

19   last night, and a person simply has to shake their head and

20   wonder how it is that the State could continue to report these       09:46:12

21   failures, failures that all have associated with them in last

22   night's report remedial measures that generally involve a

23   greater commitment of educating people, or having a greater

24   number of supervisors look at the issue to make sure that it's

25   accomplished.                                                             09:46:38

CV-12-601-PHX-DKD - January 18, 2018

1        And one has to wonder, why in the world didn't this

2   happen two years ago?  And then one also has to wonder in the

3   context of Operation Backlog, where there appears to be a

4   ready -- a readily-apparent absence of sufficient number of

5   personnel to accomplish the task.  The task is just too big,      09:46:58

6   the number of people to accomplish it too little.  How can it

7   be that -- this statement that we're going to address

8   additional supervision and additional training or giving more

9   jobs to people who are already over strapped?

10       So a common sense reaction to what the State continues     09:47:20

11  to propose is, you are saying we are going to double down on

12  making sure that the people are getting the job done by telling

13  them they have to get the job done and making sure that we've

14  got other people looking over their shoulders to make sure that

15  they're getting it done.                                          09:47:38

16       In an over-strapped system, which is what I think we

17  may well have here, where there are just too many tasks given

18  to too few people, one has to wonder how a remedial measure

19  that involves even adding more tasks to people will accomplish

20  or have any reasonable hope of accomplishing that goal.           09:47:57

21       And so it is natural for one to be concerned where

22  there seems to be a disconnect between the logic of what the

23  problem is and the remedy, a logical turn to wonder, is there

24  reason to believe that people are not legitimately dealing with

25  the monitoring process?  The KJZZ article suggests that          09:48:22

UNITED STATES DISTRICT COURT

1  possibility.  And I have authorized and pursued a discovery

2  effort to find out whether that is true.

3       The defendants say that it's a witch hunt, a fishing

4  expedition.  But it's not.  What it is is I've been told by

5  people through news reports, I've been told -- I've          09:48:50

6  seen -- told by people who have said it to me in my presence,

7  in the presence of defense counsel and plaintiffs' counsel.

8  I've never acted on anything that anybody has ever said by

9  phoning in, because I've never learned anything substantively,

10  never anything substantively other than just a general sort of  09:49:11

11  qualitative statement which was an opinion.  Which as I can

12  assure you, something not tested by the Rules of Evidence and

13  being sworn under oath, I'm generally, unless it comes from a

14  lawyer, am loathe to accept it.  So I've never acted on

15  anything like that.                                          09:49:34

16       But my experience over time in this case has given me

17  enough reason to think that if people are saying there are

18  trout in this lake, before I bring the fleet in to fish for it,

19  I'm going to have some investigation to see whether there

20  really are some trout here.  And that's what we're involved in.  09:49:48

21  We're involved in this process where we've set a hearing, we've

22  required discovery to be produced to equip that hearing, so

23  that we can find out whether or not there is a reason to doubt

24  the credibility of the reporting system that is so important to

25  the Court's efforts to try to enforce this Stipulation.      09:50:09

1      Now, I read carefully and appreciate the onerous task

2  that is at hand.  I addressed it briefly in the status

3  conference last week on the telephone in which I heard from

4  defendants about how difficult the task was.  And I gave what I

5  think is a fair statement, and that is that it is a large task          09:50:38

6  because this is a large operation.

7      As I think I said, it's not a mom-and-pop operation,

8  it's a very large operation.  So when you undertake these kinds

9  of efforts you will find that it is a big job too, just like

10 everything associated with it is a big job.                             09:50:56

11     That all said, I am not insensitive to the idea that I

12 have representations from counsel that it is more than can be

13 humanly or productively accomplished in the time frame that I

14 have set.  And so I am open to discussing with you, both sides,

15 the possibility of granting you additional time to accomplish           09:51:23

16 the tasks at hand.

17     We had set a date of the 9th of February for this

18 evidentiary hearing.  We have -- I set that date because I

19 wanted to have it in advance of the dates that I had set for

20 the OSC hearing at the end of February and for our monthly             09:51:42

21 meeting on the 27th and 28th.

22     But I am willing to consider, after hearing from both

23 of you, the possibility of moving the 9th hearing to the 27th,

24 and make it the first subject that we would address in those

25 two days.  And when we conclude the evidentiary hearing, then           09:52:03

CV-12-601-PHX-DKD - January 18, 2018

1    move on to the OSC hearing.  And then to grant a 14-day

2    continuation of the discovery dates that I've set.

3           That purpose of granting that greater time is to allow

4    a more complete and diligent effort to make sure that the

5    discovery obligation that I find to be necessary here.  I'm          09:52:25

6    disinclined to limit it to the -- to what exactly has been

7    presented in the KJZZ article, because I think that it is

8    worthwhile, in light of my experience in this case, to make a

9    thorough inquiry to see whether or not there is compliance with

10   the monitoring program and the efforts to make honest               09:52:50

11   satisfaction of the obligations in the Stipulation rather than

12   just try to effect an end run, if that's possible.

13          And so that is my preliminary view, and I'll turn to

14   respective counsel to hear what you all have to say.

15          MS. KENDRICK:  Your Honor, we do not object to moving         09:53:17

16   it to the 27th.

17          MS. LOVE:  Your Honor, as to the issue of the hearing,

18   and to be more specific than perhaps we were in the briefing of

19   limiting the scope, we would reurge our request that the

20   hearing -- because of the onerous task and the cost involved,       09:53:39

21   which as we put in our briefing from last night ranges from

22   between -- over $163,000 to over $280,000 to complete this

23   between Corizon and ADC as to the e-discovery on its own.

24          What we've done in the past, specifically using the

25   example of the retaliation hearings that we had when you had        09:54:06

1    concerns about whether or not there was retaliation occurring

2    with the tours.  In that, going back to the history of the case

3    we -- the November of 2016 tours, the way that the parties

4    handled that is we came back and we briefed it.  And

5    Your Honor's concern was that you have to assess the                    09:54:25

6    credibility of the witnesses before we go down the road of

7    making a decision on your hand, because you wanted to see who

8    you were speaking to, what was more than just the paper that

9    you were --

10            THE COURT:  Can I interrupt for just a second?  And           09:54:37

11    maybe you can address the question that I raised a moment ago,

12    and that is, do you presently take the position that the

13    memorandum that is quoted in the KJZZ article is not authentic?

14            MS. LOVE:  Well, because we're doing the discovery

15    draws, we haven't come back to find whether or not those exist.        09:54:52

16    We just don't take a position on that yet.  We don't have any

17    information at this point to say that it's not in existence.

18            THE COURT:  Well, Mr. Struck seems to be leaning over

19    to --

20            MR. STRUCK:  No, I think -- to answer your question,           09:55:05

21    that we understand the memorandum is authentic, but what we

22    understand is there's a reasonable, rational explanation for it

23    that isn't the -- it doesn't cause you to reach the conclusion

24    that the Court apparently is concerned about, that is, they're

25    trying to do an end run around the monitors.                           09:55:23

1    So that's why we asked to maybe first limit the

2  hearing to the specific allegations at hand so you can make a

3  determination as to whether or not, you know what, I think

4  there is something to this, I want to see if there's more to

5  it.  Rather than simply jumping to the conclusion that this is          09:55:43

6  prima fascia evidence of a big problem, let's see if there's a

7  bigger problem.

8    So I guess maybe just defendants are requesting that,

9  you know, the Court pump the brakes a little bit on this.

10  Let's see if there is some traction to it.  And if you find          09:56:00

11  that there is, then we go to the extreme of doing the large ESI

12  pull and bringing in, you know, more witnesses to, you know,

13  explain to the Court how the monitoring system works, and that

14  it's not being compromised by Corizon or anybody else.

15    THE COURT:  Okay.  Well, overall here, in this case,          09:56:20

16  what I have seen is --

17    Well, let me back up and say:  There is -- even in the

18  best of worlds the motivations of people can sometimes be

19  adversely affected by self interests.  And one of the self

20  interests that I have been concerned about has been whether or          09:56:45

21  not the fox is a good guarder of the hen house.  And so this

22  has been an overall concern.

23    And it may well be that somebody could make the good

24  argument that this kind of examination of the process, to make

25  sure that the monitoring program, both the State's and the          09:57:04

1  contractor's, are competent, that this would be a normal kind

2  of process, a normal activity associated with assuring that the

3  Stipulation is complied with.

4        But I don't have just that underlay.  I have more.  I

5  have the memorandum that has a reasonable reading as to what          09:57:29

6  the focus is of the Corizon employee with respect to what is a

7  plainly posited situation where you have a person who has been

8  determined to need an outside consult, an inability to get it

9  in the time period that is required by the Stipulation, and the

10  decision typed out in that memorandum is that the way we deal        09:58:02

11  with that is we don't give the inmate the health care that the

12  provider has determined is necessary in this case.  What we do

13  to avoid -- and again -- not again.

14        I will point out that defendants misquote what is

15  stated in that memorandum, because the person writing the           09:58:20

16  memorandum doesn't understand the Stipulation -- or doesn't

17  understand the OSC penalty, and the defendants misquote it,

18  turning it into being a more accurate description, and that is

19  a sanction of a failure to comply rather than $1,000 a day,

20  which I think is what the memorandum says.  But in any event,       09:58:40

21  it shows a focus on something other than what is compliance.

22        And so I am going to go forward and not limit it in

23  any way as you suggest.  I'm going to go forward, give you this

24  additional time.  We'll do it on the 27th.  We'll give you an

25  additional 14 days on all of the deadlines.  And we will have a     09:59:02

1    full hearing, and we'll get this resolved one way or the other

2    at that point.

3          It may be that this is something that shows that it is

4    working fine.  If it shows contrary, then we will address that.

5    But at the very least I think it is appropriate, as we go          09:59:19

6    forward in this process, for the Court to be playing a role in

7    checking in on the veracity of the monitoring program.

8          So I cut you off, Miss Love, but you've heard that

9    I've decided.  But if there's anything you want to say in

10   addition for the record you may.                                   09:59:38

11         MS. LOVE:  And I understand Your Honor's rulings.  I

12   wanted to just for the record state the more concrete proposal

13   that we had as to the limitation, just so that the Court is

14   clear as to what we would request, as Mr. Struck said, a phased

15   type discovery versus doing the full-blown ESI that's so          10:00:00

16   burdensome and costly.

17         The proposal would be perhaps not as limited as just

18   in talking in general terms.  Because of the burdensome nature

19   of this, the proposal on the limitation like a phase one would

20   be because you would like to assess the credibility of           10:00:15

21   witnesses, we would have the witnesses come testify.

22         As to the ESI, we're not saying no ESI at all, what we

23   would propose is just a more limited ESI on the first phase to

24   look to see if the issues that you're concerned about are

25   in -- are in e-mails between either ADC or internally within      10:00:32

1    Corizon.  And search the e-mail boxes of those involved, which

2    was Miss Neese, Dr. Watson and a Dr. Stewart.  But go beyond

3    that.  We're not limiting -- we wouldn't say, only limit it to

4    those three people, because I understand, Your Honor, your

5    concern to be more broad based.                          10:00:49

6         We would request that there would be essentially a

7    first phase of the ESI, where we cut down the custodians, the

8    custodians that the parties have agreed on from Corizon, for

9    example, the regional office.  And then we look to the Eyman

10   Complex and we cull the e-mails, for example, from the clinical  10:01:04

11   coordinator who does the scheduling.  That's the person who

12   would be -- like Miss Neese, who would be doing e-mails saying

13   cancel this or don't cancel and why perhaps.

14        The Director of Operations, the Director of Nursing,

15   the Health Services Administrator, those are the people     10:01:19

16   that -- and the Director of Nursing, if I didn't say that,

17   those are people who would be corresponding about the issue.

18        So if we take it from the Eyman Complex, where

19   Miss Watson was from, we cull the regional folks that the

20   parties have agreed on as custodians, as the Associate Medical  10:01:35

21   Director, Director of Operations, Regional Director of Nursing,

22   Regional Medical Director.  And then also persons like from

23   ADC.

24        The parties have already agreed persons like

25   Dr. Taylor's e-mails could be searched for the 54 search terms  10:01:50

—— **CV-12-601-PHX-DKD – January 18, 2018** ——

1   we're looking for, Kathy Campbell, Richard Pratt.  So those

2   people at those levels, we could cull the universe down from

3   the -- what plaintiffs are demanding, which is over 60

4   custodians from Corizon, which we're still working on that

5   hopefully.                                                10:02:09

6          And then also as to ADC, we are doing our searches

7   right now, that is in process.  We have already a cull back of

8   almost 7,000 hits.  We're looking at the total 25 custodians

9   that we're going to be searching, an estimated 33,000 hits on

10  those 54 search terms.  And that's not even searching Richard  10:02:24

11  Pratt's e-mail.

12         And we know from our preliminary review at this point,

13  because there's so many hits, it's also an issue of the search

14  terms.  You know, we don't know what that universe will be.  So

15  there's reports coming back where perhaps "consult" is in page  10:02:38

16  1 and page 20.  You know, there's another search term which we

17  are working with plaintiffs' counsel to cull down.

18         So what we would propose as the first phase would, we

19  believe, satisfy the Court's concern as to whether there's

20  something going on other than these three persons involved who  10:02:57

21  were noted in the e-mails in the KJZZ article, but not going to

22  the full-blown ESI of almost 100 custodians.

23         THE COURT:  Miss Kendrick?

24         MS. KENDRICK:  First off, Your Honor, there appears to

25  be some confusion about the number of custodians and search    10:03:15

1   terms.  By my math there are 22 search terms that the parties

2   either agreed upon or that Your Honor ordered be included in

3   the search.

4          ADC has 24 custodians that we've agreed to, including

5   Dr. Robertson which you ordered.                              10:03:34

6          The parties have not agreed upon the custodians from

7   Corizon, that is still up in the air.  We have asked for people

8   from all ten institutions because Your Honor stated that you

9   wanted to dig down deep and see how deep the evil goes of

10  trying to dissemble to the Court.                             10:03:54

11         And this offer of limiting it to this institution,

12  another offer that we were given was to limit it to four

13  institutions that are the most problematic in terms of

14  performance with the Measures.  But the whole point of this is

15  to see also if people are beating the monitor.  So it's not    10:04:14

16  just the institutions that are performing poorly, we need to

17  look at the institutions that at least on paper are performing

18  well.

19         I would also note that we sent our request to

20  defendants a week early.  We asked for an immediate meet and   10:04:29

21  confer the first week of January, but they didn't respond for a

22  week.  We negotiated in good faith.  We had a status hearing

23  with you last Friday.  We have repeatedly limited the scope of

24  the search terms.  We spoke again with counsel for defendants

25  on Tuesday and limited the scope of the search terms.  So we    10:04:48

CV-12-601-PHX-DKD – January 18, 2018

1    thought at least with regard to the search terms we were done.

2         We also had agreed upon the list of custodians.  And

3    then last night at 8:45 defendants filed this motion appearing

4    to renege upon the agreements that they had made with us when

5    we were negotiating in good faith.                          10:05:07

6         And we would just like to note that this is a case of

7    huge magnitude.  This is not some pro se, pro per individual

8    prisoner doing a medical malpractice case.  This is a class

9    action of 34,000 prisoners and a subclass of several thousand.

10   It involves one of the largest state agencies that has a state  10:05:26

11   budget of over a billion dollars a year.  And the State is

12   paying Corizon over $145 million a year to provide health care.

13        So this is not just, you know, some small little

14   thing.  This is a big case.

15        And I don't know why the Attorney General of this      10:05:44

16   state has decided to outsource the case management and the

17   document production to a private litigation firm rather than

18   use the State's own employees and resources.  But we do not

19   think defendants should hide behind that policy choice or point

20   to the expense of doing the search as the reason to not provide  10:06:03

21   the information that the Court needs to assess whether or not

22   there is actual compliance with the Stipulation or if

23   something's going on.

24        With regard to Corizon, we asked for custodians by

25   classification, kind of by their titles.  And defendants came   10:06:19

UNITED STATES DISTRICT COURT

1    back and said, well, that would include 158 people.  So we

2    immediately agreed to exclude 68 assistant directors of nursing

3    and 22 admin assistants, who we had never even asked for admin

4    assistants.  That got us to approximately 70 custodians.

5         But we still said we need people from each institution   10:06:41

6    who is in charge of mental health.  Obviously there's some

7    prisons, like we know Winslow has no mental health staff, so

8    it's not going to be ten more.

9         And again, Corizon is a very large corporation.  The

10   Arizona taxpayers are paying them $12.06 a day per patient to   10:06:57

11   provide health care.  Yesterday's population, according to the

12   ADC website, was 33,446 prisoners.  Therefore, yesterday's

13   gross revenue for Corizon was $403,358.76.

14        So even if the expense of Corizon doing the search is

15   somewhere between 168 and $235,000, which we were told a week   10:07:24

16   ago it was going to cost $400,000, that's still less than half

17   of a day's gross income.  And our position is that this is the

18   cost of doing business.

19        Finally, Corizon also has capable counsel.  They are

20   represented by Fennemore Craig.  They are a large well-known    10:07:46

21   Phoenix law firm.  They have their own resources.  We're not

22   talking about some husband-and-wife law firm in a strip mall,

23   we're talking about a white-shoe corporate firm.  And, you

24   know, we're talking about a corporation that bills itself as

25   the foremost provider of health care operating in 22 states     10:08:04

1    with gross revenue of $1.5 billion a year.

2            So, yes, on first glance these numbers do seem big to

3    people who live in the real world, but we're talking about a

4    massive corporation and one of the largest agencies in the

5    state of Arizona.                                                 10:08:22

6            THE COURT:  With respect to the number of hits that

7    Miss Love has suggested may be afoot here, do the plaintiffs

8    have the capacity to work through all of the information that

9    would be produced?

10           MS. KENDRICK:  Yes.                                      10:08:36

11           THE COURT:  And with respect to the remaining issue of

12   identifying the Corizon custodians, you say you're at an

13   impasse there.  Where are those negotiations?

14           MS. KENDRICK:  We got a counterproposal yesterday mid

15   day from counsel for defendants about limiting the scope to 30  10:08:52

16   people from four institutions.  We have just now reviewed it

17   and we are staying by our position that we need individuals

18   from all ten institutions, as well as people from the regional

19   headquarters.

20           THE COURT:  Any additional word, Miss Love?             10:09:12

21           MS. LOVE:  Your Honor, just a couple comments.

22           First, Miss Kendrick's characterization of defendants

23   going back on the agreements that we've made thus far in the

24   ESI process is absolutely false and inaccurate.  I would hope

25   that the Court's experience with me specifically, who is        10:09:27

UNITED STATES DISTRICT COURT

**CV-12-601-PHX-DKD – January 18, 2018**

1    negotiating now these agreements, and counsel at the table next

2    to us, I don't go back on agreements.  And there's no part of

3    the pleading that goes back on any agreements.

4         We continue to negotiate on the Corizon custodians,

5    but that's a continued negotiation.  We have not gone back on                10:09:45

6    any agreements, we've merely asked the Court to limit the scope

7    of the hearing.

8         Secondly, the citation that was made by plaintiffs'

9    counsel as to budgets of the State, as to essentially where is

10   Fennemore Craig located, how many attorneys do they have, how          10:10:01

11   many attorneys does this firm have, in the world of litigation

12   and the Rules of Federal Civil Procedure, it's not governed by

13   whether or not a party can afford to do something.  The Rules

14   of Civil Procedure apply here.  Rule 26 applies.

15        And as to discovery, that's the argument we're making.            10:10:18

16   It's not about whether somebody can afford it.  Is it

17   expensive?  Yes.  Can you afford it?  So what if you can afford

18   it.  Anybody maybe can afford something, that doesn't mean that

19   it's still not an expenditure that needs to happen, that it's

20   unnecessary.                                                           10:10:33

21        So our arguments are not a crying and whining about

22   how much things cost just because we want to cry and whine

23   about it, it's about the applicability of Rule 26 to these

24   proceedings and discovery, and what are the bounds of

25   discovery.                                                             10:10:47

1    That is why we made the proposal that I just set

2  forth today, to not limit the e-discovery to three persons,

3  but to look still on a broader scale and see if we need to go

4  further.

5    And just a note as to the Eyman Complex and going                10:11:00

6  further than that with our proposal on the ESI, the Eyman

7  Complex is a very large complex.  It is a complex that is

8  subject to Performance Measures that the Court is concerned

9  about.  It is reasonable to believe that if there are any

10  internal communications, whether it's within ADC, between        10:11:21

11  Corizon and ADC, or internally with Corizon, that if there is a

12  beat-the-system action at play, why would Eyman, which is

13  serving a very large population and doing a lot of medical

14  care, be circumscribed out of that?

15    It makes -- it's reasonable to believe if there's            10:11:37

16  those kinds of e-mails, Eyman is going to be included, because

17  if we're going to beat the system, why wouldn't you be trying

18  to beat it at a facility that may be problematic in some

19  Performance Measures.

20    Finally, the -- again, the negotiation on defendants'        10:11:51

21  side as to trying to limit the Corizon custodians down to

22  perhaps picking four, we suggested four complexes.  There was

23  no design other than it was the Eyman Complex, the Florence

24  Complex, Lewis Complex and Tucson, where there is high

25  populations there, medical care has been objected to and        10:12:13

1    challenged by plaintiffs' counsel.  So that's why those were

2    picked.

3         We offered that plaintiffs may pick four other

4    facilities if they'd like.  But, again, we're trying to cull

5    the universe and not go down a road of unnecessary and                    10:12:28

6    burdensome discovery that exceeds the scope of the Stipulation,

7    the scope of the hearing, and do a phase.  You know, if four of

8    those facilities, if there's a beat-the-system plan in place,

9    it's reasonable to believe that you're going to get ESI hits at

10   those four locations.                                                     10:12:51

11        If it comes back that the judge and the Court is

12   concerned that there's something that has popped up at Florence

13   or Lewis that leads you to believe that the other six

14   facilities not contemplated by a first phase of discovery may

15   also be at issue, then that can be addressed.                            10:13:04

16        Again, it is not a conspiracy to try to hide evidence

17   or anything else, it is about the Rules of Civil Procedure.

18   It's about the relevant scope of the proceedings and trying to

19   do it in a phase that is not going to unnecessarily burden

20   defendants and go on a fishing expedition that doesn't need to           10:13:23

21   be gone on.  It's a phase-type process.

22        Thank you, Your Honor.

23        THE COURT:  Thank you.

24        Miss Kendrick, this last point that Miss Love makes

25   about focusing on Eyman, Florence, Lewis and Tucson seems to be          10:13:33

1    reasonable, that if you were going to find evidence of

2    problems, that by focusing on the places that have the greatest

3    number of and sickest number of inmates would produce that.

4            Why is that not a reasonable first shot?

5            MS. KENDRICK:  That's not a reasonable first shot for     10:13:56

6    several reasons, Your Honor.

7            First of all, it does not include Perryville, which is

8    the only female facility, and has been found substantially

9    non-compliant on multiple Performance Measures.  And you have

10   personally heard testimony from people housed at Perryville.    10:14:09

11           Also, Phoenix prison is a small prison, but it's a

12   critical prison because it's the inpatient mental health unit.

13   So there are a lot of very seriously mentally ill people.  The

14   most profoundly mentally ill people are housed at Phoenix.

15           The Yuma prison is also very large.  It has             10:14:28

16   approximately 4,000 people at it.  And it has been found

17   substantially non-compliant by the Court on numerous

18   Performance Measures.

19           And, again, I would go back to my point with regard to

20   the other three institutions, the more remote ones that are    10:14:42

21   referred to as noncorridor facilities, because they do not

22   house people with serious physical or mental illnesses, that --

23   first of all, you have found them non-compliant on some

24   Measures, but also to the extent they are reporting compliance,

25   we need to kick the tires and test those numbers and see if it  10:15:01

CV-12-601-PHX-DKD – January 18, 2018

1    really is accurate.

2         THE COURT:  All right.  So the two institutions that

3    you first identified, Perryville and Phoenix, had unique

4    characteristics that would raise the question about whether or

5    not excluding them could potentially blind me to an area of          10:15:23

6    inquiry that would be useful, the fact that Perryville is women

7    and that Phoenix has the mentally ill population.

8         Yuma, having a number of -- a great number of

9    prisoners, but prisoners in categories similar, I gather, to

10   Eyman, Florence, Lewis and Tucson would seem to be captured.        10:15:45

11        So it seems like a reasonable approach here would be

12   to add Phoenix and Perryville, but not include Yuma and the

13   other out of corridor, so that you would have those six and not

14   ten, and not the four that the defendants advocate.

15        Last word on that?                                             10:16:05

16        MS. KENDRICK:  Yes, Your Honor.

17        The Yuma prison, because of how far away it is and how

18   remote it is, has struggled mightily with staffing.  That's

19   something that we had discovered a few months ago.  We talked

20   about the fact that they in the Corrective Action Plans            10:16:18

21   referred to the fact that they had not had a psychiatrist there

22   for over a year.  Due to its remote nature they struggle with

23   finding specialty care for people, having to bring them into

24   Phoenix or Tucson.

25        So we would think that there are problems at the Yuma         10:16:33

CV-12-601-PHX-DKD – January 18, 2018

```
 1   facility just based on its geographical distance.  And it is
 2   considered a, quote, corridor facility, so it does house people
 3   with serious chronic medical conditions and people who are
 4   seriously mentally ill.
 5              THE COURT:  All right.  I'm going to include Yuma.  So   10:16:51
 6   it's now going to be the seven, not ten.  But otherwise the
 7   scope will be as previously defined.
 8              If you find that you continue to have issues with
 9   respect to the custodians, get on the phone with me straight
10   away.  And I don't want -- I've given you a big bump of           10:17:06
11   additional time here, I want you all to be able to use it
12   constructively.  I don't want you to be waiting on me making a
13   decision.  So if you've got issues, let me know straight away.
14              MS. KENDRICK:  Yes, sir, we will do that.
15              THE COURT:  The November --                            10:17:27
16              MS. KENDRICK:  Your Honor --
17              THE COURT:  Yes.
18              MS. KENDRICK:  -- just for clarification.  So that
19   we're not expected to file a responsive brief?
20              THE COURT:  You are not.                               10:17:33
21              MS. KENDRICK:  The motion is denied?
22              THE COURT:  The Court finds that a response is
23   unnecessary.  This is directed to the Court's view, it's not as
24   if I'm trying to adjudicate a dispute between the plaintiffs
25   and the defendants.  This is something that I initiated, and so   10:17:44
```

1   the defendants brought those issues up to me.  I've addressed

2   them now, I don't need to hear anything further from the

3   plaintiffs.  I'd like you to spend your time working on getting

4   this issue presented and resolved so that one way or the other

5   we know where the truth lies.                                    10:18:02

6          I think it is worth doing, for the reasons that I've

7   articulated.  I think that the proportionality is not

8   unreasonable.  It seems to me that we have enough of a reason,

9   just in common sense, but also if I were to start over again

10  maybe I would even do this in the first instance to make sure   10:18:24

11  that I was paying more careful attention to the monitoring

12  program, and this is the way to do it.

13         I've worked through this, explaining to the defendants

14  over and over again that the best way for them to save money in

15  this case is to get the court out of it.  And the best way to   10:18:41

16  get the court out of it is to satisfy the Stipulation.  And for

17  whatever reason, notwithstanding my three-tiered approach, I

18  think I called it three-front approach, and these monthly,

19  sometimes more frequent gatherings, where I do what I can, I

20  haven't been able to get the results that I hoped to            10:19:09

21  accomplish.

22         Maybe part of that is my lack of understanding exactly

23  how the system is working.  And so this discovery effort has

24  perhaps collateral benefits of helping me understand better

25  about the process.                                              10:19:28

1          I don't -- and I told the Director this, I don't want

2    to be in the position of managing the health care at his

3    prisons, but the only way that I can make informed decisions

4    and good decisions is to be informed.  And simply that has to

5    happen.                                                          10:19:48

6          All right.  So I would propose to turn next to the

7    November report from the defendants.  Last night there was a

8    filing, which I have read.  But I didn't see any explanation of

9    why there was this second filing.  I see that there's a

10   difference on the Performance Measure that is initially         10:20:09

11   addressed.

12         But I would ask first defendants to explain what it is

13   that was different about what was filed last night.

14         MR. BOJANOWSKI:  Your Honor, there were some

15   additional -- some additional information, updated information  10:20:20

16   on the Measures.  And I wanted to make sure everything was

17   complete, and then cull out anything that was extra due to

18   complaints by plaintiffs' counsel at the last hearing, from

19   what I understand.

20         THE COURT:  Okay.  Well, without knowing what the          10:20:37

21   specifics are about the differences, I can't really say for

22   sure what I'm about to say, so I'll say it generally.  It is

23   usually helpful when you file something that you would expect

24   people to read, to tell people when you file something that is

25   supplanting that, how it is that the supplanted version is      10:21:03

—— **CV-12-601-PHX-DKD – January 18, 2018** ——

1   different.  Because then it means that we don't have to -- I

2   mean, you put me in a difficult position.  You asked me to read

3   and digest something, and then you give me something else that

4   doesn't tell me what I should throw up from before or what I

5   should be looking for.  And that's not helpful.                    10:21:22

6          I'll curse you with my metaphors, they're going to get

7   worse probably, like that one, which doesn't ring very

8   pleasant.  But again, maybe that's something I can do to try to

9   steel you on to resolving this in-house rather than turning to

10  me.                                                                10:21:49

11         So with that admonition about going forward, does it

12  make sense to -- we did this last month, Miss Kendrick, we

13  allowed you to sort of steer the boat here on what we addressed

14  because of things that you wanted to say, rather than me going

15  through and having Mr. Bojanowski tell us about the ones that     10:22:11

16  don't need to be talked about.

17         MS. KENDRICK:  We can do that, Your Honor.

18         THE COURT:  Okay.

19         MS. KENDRICK:  I think it might be flipping between

20  the two filings though.                                           10:22:23

21         THE COURT:  Well, all right.  Then that's the time for

22  the defendants to tell us which one is the right one.

23         MR. BOJANOWSKI:  Your Honor, the most recent filing is

24  the correct filing.

25         THE COURT:  Okay.                                          10:22:35

CV-12-601-PHX-DKD – January 18, 2018

1     MR. BOJANOWSKI:  So, you know, it is to supplant the

2 prior filing in its entirety.

3     THE COURT:  Okay.

4     MR. BOJANOWSKI:  So if we're going to discuss these

5 things, the most current data and the most current reports and          10:22:44

6 such are contained in that -- in that filing that occurred last

7 night.

8     THE COURT:  Okay.

9     MR. BOJANOWSKI:  So, you know, we're willing to speak

10 about these, but there's generally -- generally these -- these          10:22:56

11 reports contain the information that we have.  So I don't know

12 if --

13     Well, I'll let Miss Kendrick go forward, but I just

14 wanted --

15     THE COURT:  Right.  I mean, her statement's a          10:23:12

16 reasonable one, and that is, the flipping back and forth is

17 because she did as I say happened would happen, and that is

18 people did read what you filed, and then we get another one on

19 the eve the night before.  And so people are prepared to

20 address what you did file.  And so if she has a little bit of a          10:23:30

21 going back and forth, we have to be mindful that that's not her

22 fault.

23     MS. KENDRICK:  Your Honor, just one other thing with

24 regard to what was filed last night.  It does not include any

25 of the Performance Measures that were in our pending motion to          10:23:45

CV-12-601-PHX-DKD – January 18, 2018

1   enforce.  What was filed on the 12th actually did include the

2   scores for one of the Performance Measures.  So at least in

3   that regard it didn't carry over to what was filed last night.

4   So I will have to actually jump back and forth.

5          THE COURT:  Fair enough.                          10:24:03

6          MS. KENDRICK:  And I'm also going to have to ask

7   Mr. Bojanowski or somebody to provide us those scores for the

8   Measures that are in our pending motion.

9          THE COURT:  All right.

10         MS. KENDRICK:  So the first one is actually            10:24:12

11  Performance Measure 19, which was in -- is in our motion.  It

12  was not -- it was included in the filing -- it was not included

13  in the filing last week.  And no plan has been submitted for

14  Performance Measure 19.

15         The scores for recent months, as the Court can see in   10:24:40

16  our motion, which is at docket 2520, is that the Lewis prison

17  has been substantially non-compliant every month for the

18  past -- at least the past year.  And Eyman has equally been

19  substantially non-compliant since January.  The Phoenix

20  facility is fluctuating.                                   10:25:04

21         And so again, you know, we believe that while the

22  Court has not made a formal finding yet because the motion is

23  pending, there is a clear record of substantial non-compliance.

24  Defendants have conceded it meets the definition of substantial

25  non-compliance.                                            10:25:22

1    So we would request that they provide a plan or some

2  sort of information to us about what they're doing to address

3  the substantial non-compliance at Eyman, Lewis and Phoenix

4  prisons.

5    THE COURT:  Well, I need to make the finding, but I          10:25:36

6  can ask Mr. Bojanowski whether he's prepared to say anything

7  about where we stand on 19.

8    MR. BOJANOWSKI:  As far as the pending motion is

9  concerned, I do not have any information with regard to

10  Remedial Action Plans, for the obvious reason that there's been    10:25:49

11  no finding.  I can report what the preliminary numbers are for

12  anything that the plaintiffs want to know, and am willing and

13  prepared to do that.

14    So -- but I can't -- I can't talk about Remedial

15  Action Plans that have not yet been developed.  And so I'm not    10:26:08

16  in a position to do that, and that's because we still have to

17  respond to their motion, and then the Court still has to make

18  the finding, at which point it would trigger the obligation

19  obviously to prepare those plans.

20    So if the question is that -- it's Performance Measure    10:26:24

21  19, at -- which facilities?  I think it was Lewis.  But was

22  there additional ones?

23    MS. KENDRICK:  Eyman, Lewis, Perryville, Phoenix and

24  Tucson.

25    MR. BOJANOWSKI:  All right.  19, Eyman is 86 percent.    10:26:41

```
 1    Lewis 65 percent.
 2              Did you say Perryville?
 3              MS. KENDRICK:  Yes, I did.
 4              MR. BOJANOWSKI:  Perryville is 92 percent.
 5              MS. KENDRICK:  Phoenix.                              10:26:55
 6              MR. BOJANOWSKI:  Phoenix is 83 percent.
 7              MS. KENDRICK:  And Tucson.
 8              MR. BOJANOWSKI:  I'm sorry, Tucson is 88 percent.
 9              MS. KENDRICK:  Your Honor, we would ask that just in
10    the future going forward that defendants include the          10:27:09
11    Performance Measures in the pending motion with the scores so
12    that we know that in advance.
13              And also, we would just observe that it's very
14    troubling that defendants have conceded that they are
15    substantially non-compliant, their scores continue to show    10:27:26
16    substantial non-compliance, and there's a pending motion, and
17    they apparently are not being proactive in taking the steps to
18    identify the root causes of the substantial non-compliance or
19    developing a plan.  We think that they don't need to wait until
20    the Court issues a formal finding if they've conceded          10:27:45
21    substantial non-compliance and the scores continue month after
22    month to reflect that.
23              MR. BOJANOWSKI:  Your Honor --
24              THE COURT:  In fairness that's not what Mr. Bojanowski
25    said.  He said that he didn't have in his head the knowledge.  10:27:57
```

1    It may well be that the State is on top of this and doing it, I

2    don't know.  But in fairness, what he said, he didn't know at

3    this moment.

4         So in terms of the agenda items on a lawyer's to-do

5    list at a hearing, it's reasonable for him to think that the          10:28:14

6    ones that are subject of the motion would be perhaps not ones

7    that he would have to be prepared to give that information

8    about.

9         MR. BOJANOWSKI:  Your Honor, I can represent to the

10   Court that we are undertaking an analysis of the root cause          10:28:27

11   problems with regard to these non-compliant findings and

12   working with Corizon to identify those.  So it's not accurate

13   to say that we're just sitting on our hands here.  We are

14   actually undertaking that kind of review, because the sooner we

15   can get these into compliance, obviously the less that we have       10:28:47

16   to do here.  And so that is actually occurring.

17        And so we -- but a Remedial Action Plan has not yet

18   been developed with regard to the pending motion, that's all

19   I'm saying.

20        THE COURT:  And that makes sense.  All right.                    10:29:05

21        MS. KENDRICK:  Okay.  Well, under the terms of the

22   contract between Corizon and ADC a Corrective Action Plan is

23   required after three months of substantial non-compliance, so

24   there should be something out there for it.

25        So, the next point involves Perryville at Performance           10:29:20

1    Measure 39.  And in their filing last week, which is docket

2    2535-1 at page 60, they stated that the Perryville facility was

3    in the rebuttal process for the month of October showing 77

4    percent, and that it would be updated when the numbers are

5    finalized.  And then what they filed last night at page 69 says          10:29:45

6    the same thing.

7            And so we're trying to find out whether the 77 percent

8    for October is accurate and final or if we're still pending a

9    change in the number.

10           MR. BOJANOWSKI:  The 77 percent is accurate for the          10:30:02

11   month.  The rebuttal was rejected.

12           MS. KENDRICK:  And the next one would be Performance

13   Measure 40 at Eyman, which is at page 72 of what they filed

14   last night.  The -- this is about referrals, urgent referrals,

15   being seen by a provider within 24 hours.          10:30:40

16           The Corrective Action Plan is included for the fact

17   that it went from 92 percent to 50 percent, but it does not

18   identify the underlying cause as to why the providers were not

19   seeing patients within the required time frames.

20           MR. BOJANOWSKI:  I do not have that information,          10:31:01

21   Your Honor.

22           MS. KENDRICK:  So the next one is Performance Measure

23   42, which is only in the last night's filing.

24           And we would just observe that the scores across the

25   board for Eyman, Florence and Lewis are still abysmally low.          10:31:40

CV-12-601-PHX-DKD – January 18, 2018

1   And our concern is that this Corrective Action Plan does not

2   appear to be working.  And the update that was offered as of

3   January 8th, for example, if you look at page 78 for Florence,

4   it says that they're going to continue with their current plan.

5   But our concern is that at at least three facilities the        10:32:03

6   current plan doesn't seem to be working, and whether or not

7   they might be doing a supplemental Corrective Action Plan.

8        THE COURT:  In light of this low performance, have you

9   been engaged in real-time analysis so that we have a better

10  idea of where things stand now?                                 10:32:24

11       MR. BOJANOWSKI:  May I have a moment, Your Honor?

12       THE COURT:  Surely.

13   (Discussion off the record between defense counsel.)

14       MR. STRUCK:  Your Honor, I did want to mention that

15  Mr. Pratt is ill with the flu, and that's why he's not here     10:32:52

16  today.

17       THE COURT:  I'm very sympathetic to that, as you can

18  imagine.  I'm proud to report that I don't think anybody in my

19  court staff contracted the flu when I had it.  I wore a mask

20  for a week after the onset of symptoms, which is what the CDC    10:33:09

21  says you're supposed to do.  And so I commiserate with him and

22  all the people who have the flu.

23        I have been wondering about what happens when this

24  virus that seems to be very contagious gets loose in a prison

25  system.  I feel for those people.                               10:33:26

1        Go ahead.

2        MR. BOJANOWSKI:  The information I have is, no,

3   there's no real-time reporting on this Measure.  But I'd like

4   to be able to follow up, if I could, as to the Remedial Action

5   Plan.                                                         10:33:48

6        MS. KENDRICK:  So, Your Honor, the next Performance

7   Measure that we wanted to talk about is Performance Measure 44

8   at Eyman.  This is at page 81 of last night's filing.

9        And this is a Performance Measure that is part of the

10  Court's Order to Show Cause and for which defendants should be  10:34:05

11  tracking real-time data.  The December data the Court had

12  ordered should be provided by February 5th, so we're eagerly

13  awaiting that.

14        But, our concern is twofold.  First of all, compliance

15  in one month at Eyman went from 89 percent to 20 percent, which  10:34:23

16  was dramatic.  But the basis that was given for the

17  non-compliance is, quote, Corizon was informed that the Court

18  changed the monitoring process for this Performance Measure

19  resulting in non-compliance, close quote.

20        And we're concerned about that for a couple reasons.    10:34:44

21  Because the last time the Court, according to our records,

22  ruled on Performance Measure 44, which is the Measure about

23  having hospital discharge recommendations reviewed and acted

24  upon within 24 hours, was in December 2016 when the Court

25  issued an order at docket 1831 that said that this is a        10:35:06

1    two-part test, it's not just a timeliness of did they look at

2    it, but did they actually do something.

3            So we don't understand why Corizon or ADC is taking

4    the position that the Court has changed the monitoring process,

5    because the Court ordered it 13 months ago.                    10:35:26

6            And if you turn a page to the Lewis institution, which

7    also scored 58 percent -- so this is at page 83 of last night's

8    filing -- the basis of non-compliance states, quote, on

9    November 28th, 2017, the D.O.C. compliance monitor met with the

10   FHA for this facility and notified her that the auditing method  10:35:51

11   was changing.  This Performance Measure now also includes

12   generic discharge recommendations such as, quote, do not drive

13   or operate heavy machinery while on this medication, close

14   quote.  This Performance Measure dropped out of compliance

15   because these generic recommendations were not included prior    10:36:10

16   to November 28th, 2017.

17           So we're quite perplexed by this, because we were not

18   aware that the Court issued any sort of order that says generic

19   discharge recommendations need to be included.

20           And moreover, what is written for Eyman and Lewis        10:36:28

21   appear to indicate that defendants or somebody has made changes

22   to the Monitoring Guide, and we were not made aware of these

23   changes before they apparently were made.

24           THE COURT:  The explanation just doesn't seem to make

25   sense, Mr. Bojanowski.                                          10:36:54

CV-12-601-PHX-DKD – January 18, 2018

1          MR. BOJANOWSKI:  It's not a matter of a change in the

2    Monitoring Guide.  I think what was happening was, the

3    discharge recommendations that were specific to the patient as

4    far as, you know, medication administration or something of

5    that nature, were being reviewed and signed off on.                    10:37:08

6          There are -- typically when you are discharged from

7    the hospital there's maybe a sheet or two sheets of

8    generic -- a generic list of things that address, you know,

9    what you're supposed to do, not supposed to do.

10         So what ended up happening was, the doctor would sign       10:37:31

11    off on the specific recommendation, but was not signing off on

12    the generic recommendations.  So counting -- basically the

13    interpretation was, well, you have to sign off on all

14    recommendations in order to get credit for this particular

15    Measure.                                                               10:37:57

16         So that's -- that's really what has occurred here.

17         If the Court is going to say, well, you know, those

18    generic things, like operating heavy equipment, that's not

19    really what the Measure is seeking to address, and it's the

20    more specific recommendation, like follow-up care with regard      10:38:12

21    to this, that, or the other thing.

22         So that's, I think, what the shift was in the analysis

23    by the monitors in monitoring this.  They were no longer going

24    to count the doctor signing off on a specific recommendation as

25    opposed to those generic pages of stuff that you get from the      10:38:32

1    hospital that basically lists everything that could conceivably

2    go wrong with you on discharge.

3           THE COURT:  Can you explain to me how this signoff is

4    bifurcated between general and specific?  How does that process

5    work?                                                              10:38:53

6           MR. BOJANOWSKI:  I can't explain that to you.

7           THE COURT:  It just doesn't -- the whole thing doesn't

8    make sense to me.  It doesn't make sense because I don't

9    understand how you can have a signoff on the specific but not

10   the general.                                                       10:39:02

11          I mean, certainly when we've talked about this in the

12   past we've talked about it in the context where the hospital

13   says, this person needs to have this kind of care when they

14   return to your care back to the prison, and we've focused on

15   that.                                                              10:39:20

16          If there is now this idea that these general

17   obligations are also not being signed off, you wonder, well,

18   how is it that there's a signoff that happens on one part but

19   not the other part.  And then you also wonder, why is it that

20   we don't see it across the board at all of the institutions       10:39:38

21   where this is new analysis.

22          So the whole thing just doesn't make any sense to me.

23          I gather nobody's in the courtroom who has any

24   on-the-floor experience with what this is?

25          MR. BOJANOWSKI:  I'm trying to run that down right now      10:39:58

1    to see if we can't bring some light to this.

2            It was my understanding that there's these forms

3    that -- these general forms that are just -- I don't know if

4    you've seen them before but, you know, I go to my doctor,

5    and he gives me this --                                    10:40:17

6        THE COURT:  No, I -- yeah, when you leave the hospital

7    they give you a piece of paper and it says what you should be

8    doing.  But I gather when you're in custody there's a different

9    thing, because they don't give you the piece of paper, they

10   communicate it to the provider in the facility, in the prison,   10:40:28

11   telling what needs to be done.

12           And that's been the falloff here, where there have

13   been issues where the doctor at the ED or at the hospital has

14   said, this needs to be done.  And this Performance Measure is

15   designed to make sure that either it is done, or if it's not    10:40:47

16   done it's addressed specifically as to why it wasn't done.

17       MS. KENDRICK:  Your Honor, just a couple of things.  I

18   am confused by Mr. Bojanowski's reference to some sort of

19   bifurcated discharge --

20       THE COURT:  I used the word "bifurcated."              10:41:04

21       MS. KENDRICK:  Okay.  Because I look at all the

22   medical records, and generally the discharge recommendations

23   are at the very end, and it says, treatment recommendations,

24   number one, number two, number three, number four.  They're all

25   right there, you know.                                     10:41:18

CV-12-601-PHX-DKD – January 18, 2018

1          And so our view would be, if that's listed as the

2     recommendations, that's what's reviewed and acted upon.

3          And it's perplexing to us that there's this change in

4     methodology of monitoring that apparently has gone into effect

5     at two institutions.  If they're changing the way they're          10:41:36

6     monitoring, they need to write that down.  And, therefore, they

7     need to write that down in the Guide and tell us.

8          You observed that, you know, a similar drop off was

9     not seen at the Florence prison.  And also we have the Winslow

10    prison that's subject to the pending motion.  And so it's        10:41:54

11    unclear, since this explanation appears in two places, whether

12    this is something that's changed system-wide or just at these

13    two institutions.

14         And finally, I would just note that what it states as

15    the basis for non-compliance for Eyman is inaccurate.  The       10:42:10

16    Court did not change the monitoring performance for this -- the

17    monitoring process for this Performance Measure.

18         THE COURT:  I don't believe I did in the timeline

19    that's suggested there.  We did discuss it, as you -- what your

20    recitation is is consistent with my recollection.  But I have    10:42:27

21    no recollection of after that time period discussing it with

22    respect to saying, well, here's a different view.

23         I mean, it seems like I've been on the consistent

24    theme throughout as far back as when you described in 2016.  So

25    I'm as puzzled as you are.                                       10:42:47

1        And so I noticed that some people were talking to you,

2    Mr. Bojanowski.  Were you able to garner any additional

3    information?

4        MR. BOJANOWSKI:  I think so.  I have Miss Campbell

5    here, who is one of the representatives of the ADC that is in        10:42:59

6    the monitoring bureau.  And maybe she can explain what

7    is -- what this is.

8        THE COURT:  Surely.

9        Miss Campbell, if you'd step up to a microphone.

10        MS. KENDRICK:  Can we have her sworn?        10:43:16

11        THE COURT:  Pardon me?

12        MS. KENDRICK:  Can we have her sworn?

13        THE COURT:  Miss Campbell, would you please step

14    forward to the clerk of the court to be sworn?

15        How about this:  Please raise your right hand.        10:43:36

16        Do you swear or affirm that the statements that you're

17    about to make in court are the truth and nothing but the truth?

18        MS. CAMPBELL:  I do.

19        THE COURT:  Thank you.

20        Please have a seat on the witness stand.        10:43:43

21        I'm borrowing Judge Snow's clerk and she is -- because

22    my clerk is covering for another clerk who is ill.  And

23    Judge Snow's clerk is a perfectionist, and so even though she

24    knows the oath like the back of her hand, she wanted to use the

25    one that I use in my courtroom because different judges use        10:44:01

─────── **Kathy Campbell – Direct Examination** ───────

1    different oaths.  And I know that that's what was going on.

2         So rather than have her look for the oath on the

3    clerk's desk in front of her, I went ahead and did it.  I'm

4    authorized under the statute to administer oaths.

5                      DIRECT EXAMINATION

6    BY THE COURT:

7    Q.  Please.

8    A.  The difference is, there is a generic one that is printed

9    out by nursing usually.  And it just gives information --

10   Q.  Nursing who?  Nursing at the --                          10:44:26

11   A.  The nursing staff at the hospital.

12   Q.  Okay.

13   A.  Typically like if you have a cold it will say, you know,

14   drink fluids, get plenty of rest.

15        And the other one is actually discharge instructions    10:44:36

16   written by the provider.

17   Q.  I see.  And was there a change in how you approached this

18   with respect to evaluating compliance with this Performance

19   Measure?

20   A.  The interpretation by some of the monitors were the fact  10:44:49

21   that they should have been looking at those generic ones by

22   nursing and not just the provider ones.  So they were looking

23   at both of them instead of just the ones written by the

24   providers.

25   Q.  And when did that happen?                                10:45:02

UNITED STATES DISTRICT COURT

1    A.  I don't recall the exact time frame.

2            THE COURT:  Any questions from plaintiffs?

3            MS. KENDRICK:  No.

4            THE COURT:  Anything you want to say?

5            MR. BOJANOWSKI:  Nothing, Your Honor.  Thank you.    10:45:17

6    BY THE COURT:

7    Q.  So the nursing requirements, is it fair to say that they

8    are boilerplate, so to speak, that they apply in every person

9    who's transported, and that the ones that come from someone

10   other than the nursing staff are the ones particular to that    10:45:38

11   patient, or is that not fair to say?

12   A.  That's fair.  The ones by the provider are patient specific

13   versus those by nursing are just general.

14   Q.  All right.  And just to make sure that I didn't use a term

15   that I have a common understanding of and you may not,    10:45:52

16   "boilerplate" for me is language that is used in every

17   discharge circumstance.  You would find that same language in

18   every discharge from a nurse.  Is that what you understand it

19   to mean?

20   A.  Yes.    10:46:08

21   Q.  Okay.  So there's no difference with respect to an

22   individual patient in the nursing discharge, but differences

23   with respect to the -- what the provider -- someone other than

24   a nurse has indicated, those would be different for each

25   patient?    10:46:25

A.  Correct.

    THE COURT:  Did I engender any additional questions?

    MS. KENDRICK:  Well, it made me think of something.

CROSS-EXAMINATION

BY MS. KENDRICK:

Q.  So, Miss Campbell, you said that some of the monitors were changing how they interpreted it.  Was it just the ones at Eyman and Lewis, or were there other institutions?

A.  I don't recall as far as my sites.  I do the five northern regions now.  So I don't recall which ones were doing which -- how they were measuring each one at each site.    10:46:48

Q.  So you do -- you measure 44 at the northern sites?

A.  I monitor the audit of the compliance monitors that do that at five sites.

Q.  So it's the individual institutional monitors that monitor Performance Measure 44?    10:47:07

A.  Correct.

Q.  Okay.  And do you know if the change by the Eyman and Lewis monitors was made in writing?

A.  I don't recall if it was or not.  They were -- they're two of our newer compliance monitors.    10:47:21

Q.  And do you know why they changed how they were approaching the monitoring?

A.  As far as -- I don't understand your question.

Q.  Why did they decide that they were going to include generic    10:47:35

**Kathy Campbell – Cross-Examination**

1    measures?

2    A.  I don't know -- I don't recall offhand.

3    Q.  And are the site monitors allowed to change how they

4    interpret and monitor the Measures?

5    A.  No, we actually had a discussion about it, the fact that          10:47:49

6    they were including both of them instead of just the provider

7    orders.

8    Q.  So how is it being monitored now at the ten institutions?

9    Is it uniform, do you know?

10   A.  I believe it is now, yes, by looking at the provider          10:48:05

11   orders --

12   Q.  So --

13   A.  -- and not the generic discharge instructions that nursing

14   prints out.

15        And not all hospitals have the generic nursing          10:48:15

16   discharge instructions.  They're more instructions than they

17   are orders.  And I think that's where the miscommunication was.

18   Q.  Do you know what type of training these two new monitors

19   got for the Monitoring Guide?

20   A.  I provided training to both of them, and had them shadow          10:48:32

21   another monitor too as well.

22   Q.  And you gave them a Monitoring Guide as part of the

23   training?

24   A.  Yes.

25   Q.  And to your knowledge has the written instructions for          10:48:46

─── Kathy Campbell – Redirect Examination ───

1    Performance Measure 44 changed?

2    A.  No.

3           MS. KENDRICK:  Thank you.

4                        REDIRECT EXAMINATION

5    BY THE COURT:

6    Q.  Miss Campbell, when did you take responsibility for

7    supervising the monitoring of the northern facilities?

8    A.  I don't recall the exact time frame.

9    Q.  Ballpark.

10   A.  In the last maybe seven months.                    10:49:09

11   Q.  Okay.

12   A.  Six or seven months.

13   Q.  All right.  And you said that this issue came up and you

14   discussed it.  Did that discussion happen after you or someone

15   saw that these numbers were out of compliance or did it happen  10:49:25

16   before?

17   A.  It happened after I was doing some of the post auditing

18   that I kind of review their findings and go back and review

19   some of the information that they included in their audit.

20          THE COURT:  Okay.  Anything else, counsel?          10:49:41

21          Miss Campbell, thank you very much.

22          MS. KENDRICK:  Your Honor, I guess we're still a

23   little confused about where things stand with this, because the

24   Corrective Action Plan from Corizon is that they've educated

25   the providers and the nurses that they are supposed to abide by  10:50:09

1    this new interpretation of the monitoring.

2          So, again, we just want to make the point that if

3    changes are made in how things are monitored, it should be

4    written down and reflected in the Guides.

5          THE COURT:  Well --                                     10:50:29

6          MS. KENDRICK:  And that it should be uniform at all

7    ten institutions versus idiosyncratic approaches by individuals

8    from different institutions.

9          THE COURT:  Well, let me just state what I think I've

10   just learned.                                                 10:50:46

11         At the docket at 2540, page 83, in the blue appended

12   page -- pagination provided by the clerk's ECF system, the

13   Corrective Action Plan for this Performance Measure is, quote,

14   on November 28th, 2017, the FHA verbally told every provider

15   about the inclusion of general discharge recommendations in    10:51:12

16   this Performance Measure.  On January 3rd, 2018, the FHA and

17   the site Medical Director formally trained every provider

18   during a provider meeting.  Compliance is expected for December

19   2017, close quote.

20         At the very least this Corrective Action Plan is         10:51:32

21   incomplete because it doesn't address whether or not the

22   inclusion of the generic discharge recommendation in this

23   Performance Measure is something to be part of the appropriate

24   monitoring program or not.  We just heard that the State has

25   decided that it should not be -- that the generic should not    10:52:01

CV-12-601-PHX-DKD – January 18, 2018

1    be.

2            But the problem that I'm left with, and the reason

3    that counsel observes that there still is a state of being

4    perplexed, is because we're left fundamentally with the concern

5    that when we dig a little bit deeper we find something that we          10:52:27

6    really think we should have been told rather plainly and we

7    weren't.  And something also that maybe should have been

8    apparent to counsel for defendants as to a potential issue,

9    that didn't result in a self awareness of that.

10           And so it is, again, a reason to be concerned about          10:52:53

11   whether or not this mechanism that is at the very threshold of

12   making sure this whole process works, and that is the

13   monitoring program, whether it's firing on all eight cylinders

14   and it is doing everything it should.

15           So I take this additional time to talk about this          10:53:14

16   because it raises an issue that really shouldn't be an issue,

17   and that is, we really should be clear this far into it about

18   what it means to comply with this Performance Measure or not.

19   And if there were issues raised about it, it shouldn't have

20   been presented by two new employees who coded something that          10:53:35

21   they thought made sense that apparently doesn't seem to make

22   sense.

23           But, again, it just seems -- if this kind of thing is

24   happening here, you have to think there must be a -- so many

25   incidents of this which are fundamental distractions, whether          10:53:55

UNITED STATES DISTRICT COURT

1    it's new employees that are not getting it.  And so that means

2    we have to have meetings and talk about it and wrestle with it,

3    and then you get a judge talking about it for five minutes on

4    court time where everybody is trying to focus on what really

5    needs to be addressed.  And we find ourselves always looking at        10:54:12

6    these kinds of details that should just be done.

7          So, go ahead.

8          MS. KENDRICK:  We're actually ready to move on to

9    another Performance Measure.

10         THE COURT:  Yes.                                                  10:54:30

11         MS. KENDRICK:  So the next one we wanted to talk about

12   is Performance Measure 47, which the Court is abundantly

13   familiar with this Performance Measure which requires providers

14   communicate results of diagnostic studies to inmates upon

15   request and within seven days.                                         10:54:48

16         And the Court's Order to Show Cause includes this

17   Performance Measure at Eyman, Florence, Lewis, Perryville,

18   Phoenix and Tucson.  And we are certainly looking forward to

19   seeing the real-time data for December on February 5th, because

20   according to docket 2540-1 at page 98, Eyman is at 61 percent.         10:55:07

21         And granted, it says the policy change was made in mid

22   November that allows nurses to provide these communications,

23   but we were surprised to see that it didn't reflect it really

24   in the scores for these institutions.  Eyman was at 61, Lewis

25   was at 74, Tucson was at 67, and Yuma was at 72.                       10:55:36

CV-12-601-PHX-DKD – January 18, 2018

1          THE COURT:  Anything you'd like to add,

2     Mr. Bojanowski?

3          MR. BOJANOWSKI:  Well, Your Honor, I think the reason

4     why we have these graphs is to show the progression over time

5     and the effectiveness of the Corrective Action Plan.  And what     10:55:52

6     plaintiffs fail to show is that at Florence you've got an

7     increase from 26 percent up to 88 percent on this Plan.  You've

8     got Lewis from 34 percent up to 74 percent.

9          So it's really something to where we need to look at

10    this, and we look at those trends when we're trying to           10:56:17

11    determine the efficacy of the plan.

12         Tucson unfortunately dropped off.  I don't have

13    specifics on that one.

14         But the plan seems to be working.  As Miss Kendrick

15    indicated, the change in mid November allowing nursing staff to  10:56:36

16    communicate these we believe is going to have a significant

17    impact on those scores.

18         MS. KENDRICK:  Your Honor, I would just also observe

19    one thing that we've been told over the months about this

20    Performance Measure and the reason the scores are so low is      10:56:55

21    because there's such a small sample size that, you know, these

22    days maybe it's just two or three people in the entire month

23    requested.  So then if there's just one that's off it looks

24    terrible.

25         And since we don't have the actual November CGARs yet,      10:57:11

1    I can't tell you how many records were reviewed.  But what I

2    can tell you is at the Eyman facility in the month of October

3    they were found non-compliant when they reviewed 40 files.  And

4    at Lewis in October they reviewed 23 files.

5         So I don't think that necessarily is a valid                    10:57:29

6    explanation as to why there's substantial non-compliance going

7    on.  It's not just because there's such a small sample size.

8         And again, we just hope that they are keeping this

9    real-time data as the Court ordered, and that we will see

10   improvements in December.                                            10:57:51

11        THE COURT:  I think it's also fair to say that this is

12   a basic Performance Measure.  If some provider thought it was

13   necessary to have a diagnostic study, diagnostic studies that

14   we see here have pretty substantial barriers to accessibility

15   because of bankruptcy and other sort of things, that if         10:58:06

16   somebody thought it was important enough to have that study, it

17   surely seems that somebody ought to be communicating to the

18   request of the patient, who's obviously concerned about the

19   results, within seven calendar days.

20        So Mr. Bojanowski cites a trend.  But then you just       10:58:25

21   can't ignore the fact that this basic fundamental idea has just

22   been less than 50 percent in so many places for so, so long.

23   And so you see a jump, you know, of 30 that takes you close to

24   compliance, and you think, oh, my goodness, we've gone from 50

25   to 80.  But then you look back on the previous year and you see  10:58:54

1    you've been hovering in the place below 50 for a long, long

2    time.

3          So there are a lot of people adversely affected by

4    this Performance Measure.

5          Why don't we take a ten-minute break at this moment.    10:59:06

6    We'll come back at 11:10.

7          Thank you.

8       (Recess at 10:59 a.m., until 11:18 a.m.)

9          THE COURT:  I'm a little bit delayed in getting back

10   to you because I've been wrestling in my head, playing back    11:18:59

11   over what we were discussing with Miss Campbell about

12   Performance Measure 44, because I'm still left with some

13   confusion about where we stand.

14         Miss Campbell, what is the current view?  Is the

15   current view that there has to be this separate signoff, or is    11:19:20

16   the signoff of the specific discharge instructions, is that

17   sufficient?

18         MS. CAMPBELL:  The specific discharge instructions by

19   the provider.

20         THE COURT:  Okay.  So why is it then that the rebuttal    11:19:34

21   process -- and maybe I could ask you to come forward so that

22   you could respond in a microphone so the record could capture

23   it.

24         Why is it that the rebuttal process didn't address

25   this?                                                           11:19:51

1     MR. BOJANOWSKI:  Corizon didn't file a rebuttal on

2  this.

3     THE COURT:  I see.  So Corizon never raised it as an

4  issue?

5     MS. CAMPBELL:  Correct.                          11:20:05

6     THE COURT:  Okay.  So there's -- so if there's an

7  absence of performance compliance on a Performance Measure,

8  it's not surprising sometimes when Corizon just doesn't say

9  anything at all about it?

10     MR. BOJANOWSKI:  That would be correct, Your Honor.   11:20:21

11     I mean, we're recording preliminary numbers here.  I'm

12  unaware of a claim for --

13     THE COURT:  Okay.

14     MR. BOJANOWSKI:  -- on this at this point.  But --

15     THE COURT:  No, I understand.  I understand.  It just  11:20:37

16  seemed like to me that this was one that would have been

17  readily apparent, that you would address it.

18     Thank you, Miss Campbell.

19     The next question that I have is, Mr. Bojanowski, do

20  you have any idea where the suggestion that is set forth in the  11:20:56

21  basis -- let me get back to this.

22     This is on docket 2541, page 81.  The basis of

23  non-compliance, Corizon was informed that the Court changed the

24  monitoring process for this Performance Measure resulting in

25  non-compliance.                                   11:21:40

1          Do you have -- that's for Eyman.  Do you have any idea

2     where that came from?

3          MR. BOJANOWSKI:  Specifically, no.  Generally, from

4     Corizon.  I'd have to follow up on that.  Maybe that was the

5     understanding of the person who was providing the information.        11:21:57

6          THE COURT:  All right.  Thank you.

7          Miss Kendrick, you may continue.

8          MS. KENDRICK:  Sure.  So moving along, we wanted to

9     talk about Performance Measure 49 at Tucson.  This is at page

10    119 of docket 2540-1.  And this is a Performance Measure where        11:22:13

11    the patients need to be told of a denial of a request for

12    specialty services within 30 days of the denial by utilization

13    management.  And Tucson continues to be substantially

14    non-compliant with this Measure.

15         But what is confusing to us is, on the next page, 120,          11:22:41

16    the Corrective Action Plan for this Performance Measure is that

17    each site Medical Director will have their own medical

18    assistant to assist with management of daily duties concerning

19    timeliness of taking action.  This procedure will assist with

20    other Measures where provider timeliness is an issue.  This          11:23:01

21    procedure is currently being implemented at facilities

22    system-wide with a projected completion date in early February.

23         And we're a little confused about how getting a

24    personal assistant or medical assistant for the medical

25    directors is going to address the fact that the providers are        11:23:20

1   unable to meet with the individuals and tell them about the

2   non-compliance.

3         And our concern is that the non-compliance at Tucson,

4   as shown in the staffing reports that have been filed, both

5   with the Court and then provided, show that there's been          11:23:41

6   continued and ongoing vacancies at Tucson.  Only 1.75 of 3.5

7   staff physician positions at Tucson are filled.

8         So we would just note for the record that we think

9   that probably part of the failure here is rooted in the fact

10  that they don't have these physician positions filled.          11:24:10

11        And to the extent Mr. Bojanowski or anybody could

12  explain why this Corrective Action Plan is going to address

13  this issue, it would be helpful.

14        THE COURT:  How will this assistant make this more

15  likely to be compliant?                                          11:24:28

16        MR. BOJANOWSKI:  Your Honor, I think it's scheduling

17  of appointments and making sure that contact is made with

18  individual patients.  And so instead of having the general CNA

19  who is there, or scheduler who is there, this person would be a

20  person who would specifically assist this doctor or provider     11:24:48

21  with making sure that they're getting appointments set, seeing

22  the people when they need to see them, and then making sure

23  that the timeliness of the interaction is in accordance with

24  what's required.

25        This is a statement that it's my understanding will       11:25:09

 1   affect this Measure as well as perhaps some other Measures that

 2   deal with provider timeliness and contact with patients.

 3         THE COURT:  So is it the medical director who

 4   communicates this information or the provider?  Who usually

 5   communicates this information?                                    11:25:33

 6         MR. BOJANOWSKI:  To the patient?

 7         THE COURT:  Yeah.

 8         MR. BOJANOWSKI:  It would be the provider.  But the

 9   medical director is a provider.

10         THE COURT:  Okay.  But one of many; right?               11:25:42

11         MR. BOJANOWSKI:  Well, yes.  There are other providers

12   there, yes.

13         THE COURT:  Again, I'm just trying to understand.

14         MR. BOJANOWSKI:  Yes.

15         THE COURT:  Because it doesn't seem like it's a          11:25:52

16   perfect fit for the problem at hand.

17         MS. KENDRICK:  Your Honor, we would also note that

18   according to their December staffing report, only 4.0 of ten

19   FTEs for the medical director position are filled state-wide.

20   There's no medical director at Douglas, Florence, Phoenix,       11:26:09

21   Safford or Winslow.  The one at Lewis is listed as a 0.2 FTE,

22   and the one at Perryville is listed as a 0.8 FTE.

23         So that also kind of adds to our confusion about

24   creating a position to be the assistant to a site medical

25   director when that position is not filled.  And site medical     11:26:32

1    director, our understanding tends to be a more administrative

2    position, and they're not just another line provider in the

3    yard clinic.

4         THE COURT:  Very reasonable observation.

5         Go ahead.                                              11:26:58

6         MS. KENDRICK:  So Performance Measure 50 at

7    Florence -- I'm sorry, I have things --

8         THE COURT:  That's all right.

9         Are urgent consultations and urgent specialty

10   diagnostic services being scheduled and completed within 30    11:27:14

11   calendar days for the consultation being requested by the

12   provider.

13        MS. KENDRICK:  Yes.  And Florence is at page 121.

14   Florence is one of the institutions that was in your Order to

15   Show Cause.  And they report 52 percent.  And this Measure --  11:27:27

16   there's a lot of troubling things in here.

17        First of all, we noted with regard to the proposed

18   remedial plan from November 6th, that this work flow plan that

19   they had, which is detailed at pages 122 to 123 of the filing,

20   seemed to be pushing things pretty close to the wire.  These   11:27:58

21   consults have to be scheduled and completed within 30 days, but

22   the process, as articulated at the top of page 123, was that it

23   would not be until day 25 in the process that the clinical

24   coordinator would escalate one of these issues to the vice

25   president.                                                    11:28:19

1    And we observed at the time that that seemed like it

2  was cutting it close and maybe they should escalate it to the

3  regional office a little sooner than five days before the

4  deadline.

5    It does appear that it's not working at Florence.     11:28:29

6  Other institutions did show improvement; for example,

7  Perryville.

8    The other thing that was concerning to us is at the

9  bottom of page 123, which is the basis for non-compliance as of

10  January 8th.  And we heard last month about the lack of     11:28:48

11  oncology services because Arizona Oncology Network had

12  reportedly filed for bankruptcy.  But defendants are now

13  reporting other specialties, including urology, neurology, and

14  gastroenterology.

15    And so we would like to basically get an update on     11:29:11

16  where things stand with the specialty services, including

17  finding a new oncology provider, but then also these other

18  specialists and the potential use of telemedicine.

19    THE COURT:  Can you provide some detail here,

20  Mr. Bojanowski, please?     11:29:29

21    MR. BOJANOWSKI:  Your Honor, to address the first

22  point made by Miss Kendrick, yes, we agree that the timelines

23  are a little too close.  We have been discussing adjusting

24  those timelines.  It hasn't been formalized as of yet so it

25  wasn't included in this plan.  But that is currently what is     11:29:47

1  being undertaken is to try and get those timelines adjusted so

2  that we meet the Performance Measure instead of having it

3  within three or five days of the deadline.

4          With regard to specialty consult providers, Corizon

5  entered into a new contract on December 27th with Ironwood          11:30:09

6  Physicians Associates to take care of the oncology needs that

7  AON was providing to the specified facilities that were under

8  contract.

9          So we moved as quickly as possible to get under a new

10  contract so that there would not be an interruption of service.    11:30:35

11  But as a result of the fact that AON declared bankruptcy and

12  gave Corizon a week's notice, obviously those patients that

13  were scheduled there had to then be put back into the pipeline

14  to get the services from the new contractor.

15          As far as the other services are concerned, it's my        11:30:53

16  understanding that the -- that Corizon is entering into

17  provider contracts or agreements with individual doctors, as

18  opposed to like the group -- like Ironwood Physicians

19  Associates type of thing, to try and build a bigger base of

20  availability.  So they're undertaking that process and working    11:31:26

21  with some of the ADC personnel to identify some doctors that we

22  can get plugged in on an as-needed basis to fill these gaps.

23          So that's pretty much the information that I have at

24  this point.  And maybe Mr. Struck's got some additional

25  information.                                                        11:31:50

1    MR. STRUCK:  With respect to the -- there was -- I

2  think at the hearing last month there was a concern about a

3  list of folks who were scheduled to be seen by the AON group.

4  They have all been scheduled.

5    And the facilities affected by the loss -- or the                      11:32:09

6  bankruptcy of that, and now Ironwood has now taken over, are

7  Eyman, Florence, Perryville and Tucson.  All of those folks

8  have been scheduled with various providers, some through

9  Ironwood, some through Maricopa County Integrated Health

10  Services, and some through Virginia Piper.                              11:32:31

11    So there isn't anybody who isn't scheduled to see an

12  oncologist that -- they're no longer being affected by the loss

13  of that contract as a result of the bankruptcy.

14    THE COURT:  Does your information include the time of

15  when they'll be seen?                                                   11:32:50

16    MR. STRUCK:  It does.  And I can -- I just received

17  this, I can provide it to the Court and counsel.

18    THE COURT:  Can you give me what the -- the ones that

19  are before you, what's the one that's farthest into the future?

20    MR. STRUCK:  Okay.  Let's see.  Most of them are          11:33:05

21  January.  There's one dated February 22nd, looks like the one

22  that's the furthest out.  But some of them have already

23  occurred.  Some of them occurred in December.  Some have

24  already occurred that occurred in January.  Almost all of them

25  are in January.  There's only one, two, three, four out of this        11:33:35

```
 1    list that I have that are actually scheduled for February.  The

 2    rest have either occurred already or are in January.

 3              THE COURT:  Thank you.

 4              And in the three other specialty care areas, do you

 5    know whether those people are facing a backlog presently or        11:33:57

 6    what the status is?

 7              MR. STRUCK:  I don't know the answer to that question,

 8    but I can find out at the lunch break --

 9              THE COURT:  Okay.

10              MR. STRUCK:  -- and report back to you.                   11:34:07

11              THE COURT:  Thank you.  Thank you.

12              Miss Kendrick?

13              MS. KENDRICK:  I would just first want to know how

14    many patients are on that list that are affected that are now

15    scheduled but haven't been seen yet.                               11:34:18

16              THE COURT:  Well, Mr. Struck said he could provide you

17    with the list, so that will answer that question.

18              MS. KENDRICK:  Sorry.  I thought he had a list in

19    front of him.

20              THE COURT:  He does.  He said he could provide you --    11:34:29

21    I thought I heard him say that he could provide --

22              MR. STRUCK:  Yeah, I'll -- I will provide them with a

23    list.  It might take me a couple minutes to figure out who

24    hasn't yet been seen.  But I have all the dates here.

25              THE COURT:  Okay.                                        11:34:44
```

1    MR. STRUCK:  If the Court would like me to do that, or

2  I can just provide them the list.

3    THE COURT:  I think the list is all right.

4    MS. KENDRICK:  Yeah.

5    MR. STRUCK:  Okay.  All right.                    11:34:53

6    THE COURT:  Thank you.

7    MS. KENDRICK:  So we would just observe that, you

8  know, February 22nd when we're talking about oncology is still

9  quite a ways out, especially if these people were in the midst

10  of treatment and haven't been seen since December 1st when AON    11:35:06

11  went bankrupt.

12    So on that note, we have been trying to do some

13  research into that.  And as you might recall at the last

14  hearing, Miss Eidenbach searched the Bankruptcy Court's docket

15  and was looking at it, and we checked again, looking for the    11:35:26

16  name Arizona Oncology on the bankruptcy docket for Arizona

17  Bankruptcy Court.  The most recent bankruptcy we could find

18  using those two words, not even the word "Network," was 2014.

19    So we're a little confused about that.

20    Also in our research we discovered there's actually    11:35:44

21  two entities called Arizona Oncology Network.  There's one that

22  appeared to be a small medical practice with two doctors, and

23  then there's another network called Arizona Oncology Network

24  which is across the state as part of the United States Oncology

25  Network and is owned and operated by the McKesson Corporation.    11:36:04

1          And so to the extent counsel can tell us which Arizona

2     Oncology Network they were using, we could possibly try to

3     figure out what happened, and how they had a contract with just

4     one provider and that provider giving them one week's notice

5     threw everything into a tailspin.                                    11:36:24

6          THE COURT:  Well, the first question is one that we

7     can easily redirect and ask if anybody in the courtroom happens

8     to know which entity it was, this McKesson subsidiary or this

9     other two-person operation.

10         (Discussion off the record between defense counsel.)          11:36:41

11         MR. BOJANOWSKI:  It was the United States Oncology

12     Group.

13         THE COURT:  Okay.  All right.  That's not one of the

14     ones you mentioned?

15         MS. KENDRICK:  No, that is the one.  It's just a             11:36:56

16     little surprising, because McKesson is a multibillion dollar

17     S&P 500 corporation based in actually San Francisco.  So it's a

18     little alarming that this network went bankrupt, given the

19     breadth of services that it offers across the state to

20     nonprisoners.                                                      11:37:14

21         THE COURT:  I'm not begrudging your effort to inquire

22     into the underlying facts associated with what has been

23     represented, and that is a bankruptcy.  That's perfectly fine,

24     you can do that.

25          But what I guess -- what I think is more important to       11:37:25

1    focus on is just the thin margin that seems to be operating at

2    every level here.  And that is that on the best day we don't

3    seem to meet our goals, and so when bad things happen, when

4    bumps happen in the road, as you say, it completely upsets

5    everything and creates this really catastrophic situation where          11:37:43

6    people who need emergent care aren't getting it.

7            You would like to think that there was some kind of

8    mechanism in place where they would be ready set to be able to

9    move into that standby position.  But the general sense I have,

10   and it is always because of just reading these Performance               11:38:01

11   Measures where you would think that basic things would be done,

12   and they're not done, and then it's explained to me that

13   they're devoting more people to try to tell them what they're

14   supposed to do, and then have people supervising it.

15           It does leave one with the impression that everything          11:38:16

16   is operating on sort of a barebones operation, that if on any

17   given day something unforeseen happens that the whole thing has

18   cast asunder.

19           Now I have heard that people have been rescheduled,

20   and so you'll take a look at the list.  And again, I think it          11:38:34

21   is part of the Stipulation to be concerned about -- about this.

22   And so it's a relevant inquiry.  But the overall impression is

23   one that adds to the Court's concerns with respect to whether

24   or not the whole thing is just too flimsy.

25           MS. KENDRICK:  The other Measure, Performance 50 at            11:39:08

1    Tucson, this was included on the filing on the 12th, docket

2    2535-1.  It's at page 112.  It's not included in last night's

3    filing.

4            But what was filed on the 12th showed that it was at

5    76 percent at Tucson.  And the note stated that this was being          11:39:31

6    formally rebutted because the score resulted from a charting

7    error.  An outside referral or diagnostic service was

8    originally requested, but that request was canceled.  However,

9    the cancellation was not indicated in the record.  After the

10   rebuttal process, this Performance Measure should be in                 11:39:54

11   compliance.  For these reasons, the existing Corrective Action

12   Plan will be utilized.  Corizon will reevaluate the need for a

13   supplemental plan based on the results of the rebuttal.

14           And so I guess our first question is, if it's at 76

15   percent, was there one file or multiple files that had a               11:40:13

16   charting error?  Because it seems that if it was just one it

17   wouldn't suddenly get the compliance level to go from 76

18   percent to 85 percent.

19           And I say that because it's not just a handful of

20   files reviewed.  In October for Tucson for this Performance            11:40:31

21   Measure the monitors measured 43 files.  So assuming it's

22   roughly comparable month to month, it doesn't seem that going

23   from -- switching one from non-compliant to compliant would

24   make it go from 76 to 85 percent.

25           So that is our first observation and concern, is that          11:40:52

1    while this says an outside referral, that it was more than one

2    referral that was canceled.

3         And we are concerned about the fact that a referral

4    request was being canceled in light of what Dr. Watson alleged

5    in the KJZZ story about -- and the e-mails instructing her to     11:41:10

6    cancel requests for specialty care because they were going to

7    get nailed with a hundred bucks -- a thousand bucks fine.

8         So, again, this Corrective Action Plan for Performance

9    Measure 50, which was included and then was taken out in last

10   night's filing, raises a multitude of questions and concerns     11:41:32

11   for us.

12        THE COURT:  Well, you asked a general question and

13   specific questions.  I'll ask Mr. Bojanowski if he has at hand

14   any responses to that.

15        MR. BOJANOWSKI:  Well, I don't have any specific            11:41:45

16   responses.  But the reason it was removed is because at the

17   last hearing plaintiffs were complaining about the addition of

18   Performance Measures which there was no finding by the Court of

19   substantial non-compliance.

20        This was one of those findings where the Court has not      11:41:59

21   ruled that it is substantially non-compliant, and that's why it

22   was removed.  So there's not some nefarious thing going on

23   here, as the plaintiffs would like you to believe, it was

24   simply because I wanted to remove all this extraneous material

25   that the plaintiffs were complaining about from this document.   11:42:17

1   And that was one of the Measures where the Court has never made

2   a finding of substantial non-compliance.  That's why it was

3   removed.

4        MS. KENDRICK:  Let's be clear, when plaintiffs were

5   raising that point, it was with regard to Performance Measures   11:42:30

6   for which there had never been a notice or a motion or a

7   finding, things showing 100 percent compliance at Douglas with

8   Performance Measure 19, things like that.

9        This Performance Measure is part of the motion to

10  enforce that is pending with the Court.  And we had requested   11:42:48

11  that defendants provide the scores and the Corrective Action

12  Plan for those Performance Measures within our motion that was

13  filed on January 4th.

14       THE COURT:  And do you have any more current

15  information on this Performance Measure?   11:43:05

16       MR. BOJANOWSKI:  Aside from the score, I do not.

17       MS. KENDRICK:  Is the score still 76 percent?

18       MR. BOJANOWSKI:  It is.

19       THE COURT:  And I don't think Mr. Bojanowski has any

20  of the specifics that you asked about, so I don't see how we   11:43:33

21  can get more on that here now.

22       MS. KENDRICK:  Well, hopefully we will get the CGARs

23  and we can take a look at the files that were reviewed for this

24  Performance Measure.

25       So the next one that I wanted to just raise again is   11:43:53

1  Performance Measure 51 at Florence.  Florence, along with Eyman

2  and Tucson for this Measure, which is routine specialty

3  consults are scheduled and completed within 60 days, are part

4  of the Court's Order to Show Cause.

5          Non-compliance is shown again for Florence, and the        11:44:13

6  basis for the non-compliance for routine consults is the same

7  as what was listed that we discussed before for Performance

8  Measure 50.

9          But I guess what is of some concern or confusion to us

10 is that it appears that with this Performance Measure other     11:44:34

11 institutions, for example, Eyman and Perryville and Tucson,

12 have gotten it together and pulled it above 85 percent.

13         And so it's a little unclear to us if there is really

14 a state-wide shortage, how come Florence isn't able to perform

15 at the same level that the other institutions have been able   11:44:59

16 to?

17         MR. BOJANOWSKI:  I can't speak to that, Your Honor.  I

18 don't know the specifics as to why Florence dropped from a 96

19 percent last month to an 82 percent.  The reasoning given to me

20 by Corizon was there was some issues with regard to the        11:45:14

21 providers, similar to what we had with the previous Measure 50.

22 Because it's essentially the same Measure just under a

23 different timeframe.

24         THE COURT:  Okay.

25         MR. BOJANOWSKI:  And I would note Florence was one of    11:45:36

CV-12-601-PHX-DKD – January 18, 2018

1    the facilities that was subject to the AON bankruptcy

2    situation, so that may have had an impact on that.

3           THE COURT:  Okay.

4           MS. KENDRICK:  So the next one that we want to talk

5    about is Performance Measure 52 at Eyman.                      11:46:08

6           And this Performance Measure continues to be

7    substantially non-compliant, and went from 35 percent to 36

8    percent.  And then on page 136 of last night's filing they

9    state that the reason for the non-compliance was that the two

10   new providers were unfamiliar with the eOMIS system.           11:46:36

11          We certainly hope that that would address the issue.

12   But, again, we're concerned that, given the chronic

13   non-compliance, that there needs to be some sort of

14   supplemental Corrective Action Plan beyond showing providers

15   how to use eOMIS.                                              11:46:57

16          THE COURT:  You just wouldn't expect it to happen

17   where you would put people in a position where their services

18   are critically needed and they don't understand the environment

19   that they're working in.

20          Again, we don't know what the circumstances are of      11:47:16

21   this particular case.  And we will hear from Dr. Watson about

22   whether or not what she said out of court is something that can

23   withstand the test of the adversary process in court with

24   respect to her saying how her training was truncated.

25          But, again, a logical conclusion would be if you have    11:47:36

CV-12-601-PHX-DKD – January 18, 2018

1    a great amount of turnover, if you have a great amount of

2    moving one people over -- one person over to do another job,

3    the other people who's covering for that person who's been

4    moved need training, and if there's not time to be trained

5    because it's an emergent situation with respect to the moving,          11:47:52

6    it really does become sort of a Whac-A-Mole game where people

7    are left not able to clear their field of the moles just

8    because there aren't enough people to do that.

9              But go ahead.

10             MS. KENDRICK:  And the Florence institution has          11:48:10

11   improved, but it's still below compliance at 79 percent, and

12   was part of your Order to Show Cause.  And so we hope that the

13   real-time tracking of all of the incidents in December will

14   reflect improvement.

15             The next one is Performance Measure 54 at Eyman, which   11:48:30

16   is about patients with chronic diseases being seen as specified

17   no less than every 180 days.

18             And on page 144 of last night's filing the basis for

19   non-compliance is that there was a backlog of patients.  And as

20   of January 4th there is no longer a backlog because the          11:48:54

21   institution utilized, quote, additional resources in November

22   2017.  And it states that these resources, quote, included a

23   combination of providers from other facilities and those from

24   this facility who worked extra days.  Providers will continue

25   to utilize these additional resources as necessary moving          11:49:15

1   forward so as to maintain a zero backlog, close quote.

2        And our concern is that pulling people from one prison

3   to another to help on a backlog and having people work overtime

4   is not a sustainable approach to ensuring sustained compliance

5   with the Stipulation.                                          11:49:37

6        And we've talked about that before, about the -- and

7   the concern that we have is that, you know, in November 2017

8   they pulled providers from other institutions to come help out

9   at Eyman.  What does that mean for other institutions a month

10  later?  You know, are you going to see a ripple effect around   11:49:57

11  the system?

12       THE COURT:  Well, what you say makes logical sense in

13  general.  We'll see whether or not in the specifics of this

14  prison system it's true or not, because Mr. Millar will help

15  with that.                                                     11:50:12

16       MS. KENDRICK:  And I believe also Eyman is part of

17  your OSC as well.

18       So the next Measure I want to talk about is

19  Performance Measure 66, which is about provider rounds

20  occurring every 72 hours in the infirmaries.                   11:50:45

21       And Florence, Lewis and Tucson were part of the Order

22  to Show Cause.  And we're glad to see that this month they did

23  show improvement above compliance levels at the three

24  institutions.  We, however, reiterate the concern that we

25  raised a few months ago about the fact that these provider     11:51:12

UNITED STATES DISTRICT COURT

1   encounter notes apparently are being opened in eOMIS in such a

2   way that they're always precisely on the hour.

3          We plan to possibly use our expert at the evidentiary

4   hearing to talk about his opinion of this type of record

5   keeping, because we have consulted with him, and he states he's     11:51:34

6   not aware of electronic health record systems where you can go

7   back and manipulate and open a note at a certain time.

8          And so while we certainly hope that this is reflective

9   of reality, and I understand that they started a rule of seeing

10  them every 48 hours, we do have some concerns about the actual     11:51:51

11  accuracy of the underlying information that is placed in the

12  patient's medical record.

13         THE COURT:  As Ronald Reagan said, trust but verify.

14         MS. KENDRICK:  And finally, we have Performance

15  Measure 67 for Florence, Perryville and Tucson in our pending     11:52:19

16  motion.  And we would just request that counsel provide those

17  numbers for us.

18         THE COURT:  Do you have that, Mr. Bojanowski?

19         MR. BOJANOWSKI:  I do.

20         You said 67, Corene?                                        11:52:32

21         THE COURT:  Yes.

22         MS. KENDRICK:  Yes.

23         MR. BOJANOWSKI:  For what facilities?

24         MS. KENDRICK:  Florence, Perryville and Tucson.

25         MR. BOJANOWSKI:  Florence is at 90 percent.                 11:52:40

1    Perryville is at 90 percent.  And Tucson is at 90 percent.

2         MS. KENDRICK:  Thank you.

3         MR. FATHI:  Your Honor, I will be taking over for

4    Miss Kendrick.

5         As Miss Kendrick said, there were a number of                    11:52:58

6    Performance Measures that the defendants have been reporting on

7    monthly through December of 2017 which were then deleted from

8    the chart that was filed last Friday at document 2535-1.  And

9    then there were some Performance Measures that were in that

10   chart filed last Friday but disappeared from the chart that was    11:53:18

11   filed last night.

12        So -- and these deleted Performance Measures include

13   those where the Court has made a finding of non-compliance, and

14   also some additional Performance Measures where there is

15   current non-compliance and a remedial plan in place.               11:53:33

16        So, among other things, I'm going to be asking about

17   that.

18        First is Performance Measure 81 at Lewis and Tucson.

19   These were both found non-compliant in the Court's order

20   document 1709.  Tucson was also non-compliant last month, but     11:53:54

21   they are absent from last night's filing.

22        So we would ask, number one, that they be included

23   going forward.

24        And secondly, we'd ask for current numbers.

25        MR. BOJANOWSKI:  Your Honor, I'm looking at document          11:54:14

```
 1    1709, Performance Measure 81 is not included as a finding of

 2    the Court.  I would be more than happy to give the numbers, if

 3    counsel so desires.

 4            THE COURT:  I think he probably would like those

 5    numbers.                                                     11:54:30

 6            MR. FATHI:  I would.  Thank you, Your Honor.

 7            MR. BOJANOWSKI:  For what facilities?

 8            MR. FATHI:  For Lewis and Tucson.

 9            MR. BOJANOWSKI:  Lewis would be 97 percent.  And

10    Tucson would be 93 percent.                                  11:54:38

11            THE COURT:  Thank you.

12            MR. FATHI:  Your Honor, we will obviously correct what

13    appears to be an erroneous statement that I made.

14            With Performance Measures 85 and 86, we would just

15    point out that there remains a pending dispute over the correct  11:54:56

16    monitoring methodology for those Performance Measures.

17            THE COURT:  Understood.

18            MR. FATHI:  Performance Measure 86 at Tucson was

19    non-compliant last month.  That is document 2506-2 at page 93.

20    There was a Performance Measure -- excuse me, a Corrective     11:55:29

21    Action Plan in place, but it's omitted from this month's

22    report.  So we would like that number, please.

23            MR. BOJANOWSKI:  Your Honor, we would note that that

24    Measure has not been found by the Court as being substantially

25    non-compliant under any of its orders.                        11:55:50
```

1          That would be Performance Measure 86, Mr. Fathi?

2          MR. FATHI:  At Tucson.

3          MR. BOJANOWSKI:  At Tucson.

4          MR. FATHI:  Which was non-compliant last month, and as

5  I said there was a Corrective Action Plan in place.                    11:56:00

6          MR. BOJANOWSKI:  Fortunately it is compliant this

7  month at 86 percent.

8          MR. FATHI:  I'm sorry, what?

9          MR. BOJANOWSKI:  Eighty-six percent.

10         MR. FATHI:  Thank you.                                          11:56:08

11         THE COURT:  Thank you.

12         MR. FATHI:  Next is Performance Measure 91, which in

13  last night's filing is at document 2540-1, page 171.  And this

14  is Performance Measure 91 at Phoenix.

15         This involves prisoners who are classified MH-5 who             11:56:42

16  are actively psychotic or actively suicidal being seen by a

17  mental health clinician or a mental health provider daily.

18  These are the most seriously mentally ill people in the entire

19  system.

20         The current month's compliance rate is 60 percent.  It         11:57:01

21  has been non-compliant for five of the last seven months, and

22  so that is by itself cause for serious concern.

23         But also there are a number of errors in the

24  Corrective Action Plan that we discussed at last month's

25  hearing, which defendants admitted were errors.  And those            11:57:23

—— CV-12-601-PHX-DKD – January 18, 2018 ——

1    errors have unfortunately not been corrected this month.

2         That discussion was in the December 20th transcript at

3    pages 86 to 89.

4         First of all, this contains, again on page 171, a

5    Corrective Action Plan dated November 6th, 2017.  The                11:57:45

6    defendants confirmed at last month's hearing that that plan was

7    subsequently withdrawn and replaced by one dated November 14th,

8    and that that was the operative plan.  Mr. Struck said, quote,

9    the November 14th update did not make it into this particular

10   document, so the November 14th is the correct Corrective Action    11:58:07

11   Plan.

12        But here again, we still have the November 6 plan, no

13   sign of the November 14th plan, which is the correct one.  So

14   we'd like to know why that is.

15        MR. BOJANOWSKI:  I don't know.  I simply have no              11:58:25

16   information on that.  As you know I was not here last time, and

17   frankly I didn't go back and check the transcript.  But I can

18   certainly take care of that.

19        I mean, this document is primarily my responsibility,

20   so I apologize to the Court that that was not included.  But       11:58:45

21   certainly I can make note of Mr. Fathi's complaint here and see

22   that I include that additional language in in my next report.

23        THE COURT:  Thank you.

24        MR. FATHI:  And another error that we discussed last

25   month that has –– that remains uncorrected, in paragraph 7 on      11:59:09

1  page 172, it says, quote, the MH lead will assign a licensed MH

2  clinician slash RN to conduct the watch in a confidential

3  setting, end quote.

4      We discussed this last month.  The defendants

5  acknowledged that the clinician or the RN doesn't conduct the       11:59:34

6  watch, that's done by security staff, and that that was an

7  error, and yet this error remains uncorrected and.  Again, we'd

8  like to know why.

9      THE COURT:  Well, Mr. Bojanowski will take a look at

10 that and he'll let you know.                                       11:59:51

11     MR. BOJANOWSKI:  I'm sorry, Your Honor, I was trying

12 to get clarification --

13     THE COURT:  Go ahead.  No, what I said is -- were you

14 able to hear what Mr. Fathi was saying?

15     MR. BOJANOWSKI:  Yeah, it's apparently maybe a typo or       12:00:03

16 something like that that he's concerned about.  And, you

17 know --

18     THE COURT:  We just need to make sure that we get it

19 right.  And so --

20     MR. BOJANOWSKI:  I can certainly --                           12:00:12

21     THE COURT:  Okay.

22     MR. BOJANOWSKI:  -- go back and look at it.  I mean,

23 if there are these kinds of issues that are there, I mean, if

24 Mr. Fathi wants to send me an e-mail and say, hey, would you

25 correct this, as opposed to sitting in court and spending time    12:00:24

1  going through this, I mean, that would probably be more

2  efficient.

3          THE COURT:  Right.  I agree.  But it's a little bit

4  hard for him to do that when it comes across a transom at 8:00

5  o'clock at night the day before the hearing.                    12:00:40

6          MR. FATHI:  And more fundamentally, Your Honor, these

7  specific errors were discussed at the hearing last month.  The

8  defendants agreed they were errors, said they would correct

9  them, and then they didn't.

10          THE COURT:  Okay.  Well, good of you to follow up on   12:00:52

11  it.

12          It's the noon hour, we'll break.  We have --

13          MR. FATHI:  Your Honor, if I may, I have one more

14  question about this one.  May we just finish that?

15          THE COURT:  Surely.                                     12:01:01

16          MR. FATHI:  And then there's a new -- what appears to

17  be a new error in paragraph 6.

18          THE COURT:  Which -- on what page?

19          MR. FATHI:  I'm sorry, page 172 --

20          THE COURT:  Thank you.

21          MR. FATHI:  -- of paragraph 6.

22          THE COURT:  Okay.

23          MR. FATHI:  Quote, the MH lead slash designee will

24  review and verify in eOMIS each inmate on watch contact was

25  seen in a confidential setting.                                 12:01:19

1        What is an inmate on watch contact?

2        THE COURT:  Sounds like there's a missing word there.

3   Take a look and see if it needs to be amended, Mr. Bojanowski,

4   and let Mr. Fathi know.

5        MR. FATHI:  Your Honor, I must say --                    12:01:33

6        MR. BOJANOWSKI:  I'll go back and look -- I'll go back

7   and look at the transcript and address each of Mr. Fathi's

8   concerns.

9        THE COURT:  Okay.  Thank you.

10       So we have Mr. Millar scheduled for 1:30.  So I would      12:01:42

11  suggest that we come back at 1:30 and we take him up then.  And

12  we'll take a lunch break then between now and then, give people

13  a chance to do what they need in terms of filling in some of

14  the blanks that we've identified the last couple of hours.

15       Thank you.                                                12:02:01

16    (Recess at 12:02 p.m., until 1:33 p.m.)

17       THE COURT:  Mr. Millar, you're on the phone?

18       MR. MILLAR:  Good afternoon, Judge.

19       THE COURT:  Good afternoon, sir.

20       I think before we turn it over to you to give you the     13:33:22

21  floor for the update, we should tell you that in the morning

22  session that we rescheduled something that I told you about

23  last time that we talked.  And that is a hearing where we were

24  going to consider issues associated with the monitoring

25  program, and some of those issues could touch upon staffing.   13:33:44

1    And so the 9th of February had been a time I think

2  that you had identified as when you would be in attendance.

3  But we have rescheduled that now until the end of the month, on

4  the 26th, I believe.  I don't have it in front of me.  To the

5  26th of February.  And we've granted additional time for the        13:34:05

6  discovery that will be necessary for that hearing.

7    I just wanted to give you that heads up and mention it

8  now at the outset so I didn't forget.

9    MR. STRUCK:  Your Honor, I think it's the 27th.

10    THE COURT:  It's the 27th.  Thank you.                            13:34:19

11    MR. MILLAR:  I appreciate that.

12    THE COURT:  The 27th is the rescheduled date.

13    All right, sir, you may proceed.

14    MR. MILLAR:  I think one follow-up question I would

15  have is that we were scheduled to give an update on this           13:34:30

16  project on the 27th as well.  With your change in itineraries,

17  will that still allow the 30 minutes or so to give our update

18  during that same time?

19    THE COURT:  Yes, sir.  Yes, we'll make sure.

20    MR. MILLAR:  Very good.                                           13:34:47

21    Very good.  Just to validate, you are seeing the

22  slides in the courtroom; is that correct, Judge?

23    THE COURT:  We are, as well as a dialogue box off to

24  the right that's obscuring part of the slide.  I don't know

25  whether you intend for us to see that.                             13:35:01

1    MR. MILLAR:  I think that may be one that you need to

2  shrink on your side.  There should be a small arrow that will

3  allow you to close that on your end.

4    THE COURT:  Got it.

5    We just did.  Thank you.                              13:35:13

6    MR. MILLAR:  Okay.  Very good.

7    Fairly straightforward agenda.  We'll give you project

8  and status update using our driver diagram.  We'll go over the

9  project work streams in a single page.

10   And then the main areas we'd look to focus on is an       13:35:30

11 update on the data request of items and status.  And then we

12 have initiated our market profiles, want to talk through what

13 we have there and confirm a modification that we would like to

14 make from what was proposed in the original engagement letter.

15 And then we would go over next steps.                       13:35:52

16   Is there anything else that anyone in the court

17 believes should be added in addition to the items listed here?

18   THE COURT:  Counsel?

19   MS. KENDRICK:  No, sir.

20   MR. STRUCK:  Your Honor, the only issue that -- it's     13:36:04

21 actually been raised by Corizon.  They've started to produce

22 documentation to the Advisory Board, but they raised concerns

23 about the confidentiality of some of the information that has

24 been asked for.

25   I am assuming that the Advisory Board, as the Court's    13:36:19

1   expert, falls under the purview of the protective order, but I

2   wanted to confirm that and make sure that that's the Court's

3   view as well.

4           THE COURT:  Well, that is my view.  And I think it's

5   consistent with what we've heard from Mr. Millar before.  But          13:36:36

6   let me ask him that question directly.

7           Do you understand the issue that Mr. Struck on behalf

8   of the defendants have raised, with respect to an issue that

9   Corizon has raised, of concern that they wish to be assured

10  that the protective order that can be applied in this case, if         13:36:52

11  it is implied on these items of information that are provided

12  to you, that you would treat them in accord with that

13  protective order.

14          MR. MILLAR:  I do understand.  And it does not vary

15  greatly from other issues we have to deal with for HIPAA              13:37:09

16  compliance with some of our other health care vendors and with

17  similar type engagements.

18          And so I think the information that they're sensitive

19  to is around compensation and other elements.  My team works

20  very carefully to make sure that anything that's presented           13:37:26

21  publicly is blinded or vetted prior, to ensure that we don't

22  violate any of those protections that are in place.

23          THE COURT:  Very well.

24          Then there's no other comment from this side.  So go

25  ahead, sir.                                                          13:37:43

1          MR. MILLAR:  Okay.  I can move forward.

2          Again, this is the driver diagram tool that we refer

3     to.  This is a look of the entire project.

4          Is this large enough in the court's screen to read --

5          THE COURT:  Yes, everybody can see it because they                    13:37:58

6     have it on the screen, but also they have it on the monitors in

7     front of them.  So I think everybody can make it out.

8          Is that not true, Mr. Bojanowski?

9          MR. BOJANOWSKI:  I have bad eyes, Your Honor.

10         MR. STRUCK:  It's right here.

11         MR. BOJANOWSKI:  Yeah, but even with my glasses --

12    that's okay.

13         MR. MILLAR:  Okay.  If it would be helpful, we could

14    ensure that the printed copies are provided in the future if

15    that's needed.  But please let us know if that would be --                 13:38:22

16         THE COURT:  If that's handy, that probably for the

17    future would be helpful.  It just so happens that the

18    transmission that results in the image on our screens in front

19    of us, both I think at counsel table, judging from

20    Mr. Bojanowski's squinting, and from the one that I see here,             13:38:39

21    it looks like it does get fuzzy a little bit.  And so if we

22    could have in advance the hard copies that might be handy.

23         Or did you find a way to make it sharper?  The

24    plaintiffs have tinkered.

25         No.  Okay.                                                            13:38:53

1          All right.  Go ahead, sir.

2          MR. MILLAR:  We will do that next time.

3          The other thing, because we are planning to be on-site

4     in February, is we will at least be able to see what the output

5     is on your end to see if there's anything we can do to improve          13:39:06

6     the projection process when we're not on-site.

7          THE COURT:  Okay.

8          MR. MILLAR:  So as we look at the four main areas that

9     we're working on, project initiation, and then the three

10    primary work streams, we have completed much if not all of that          13:39:21

11    first section.

12         The one item that is still in green under project

13    initiation is development of the project management driver

14    diagram.  You are seeing the output of that.  And if there are

15    no substantive changes that come out of our conversation today,          13:39:37

16    then we will have completed that initiation component of the

17    engagement.

18         The three then below are our primary work streams.

19    Those are all in a green status now as we are early on in going

20    through the analysis of the data that we have access to and the          13:39:55

21    gathering of the data for your facilities.

22         So at this point in time we do not see any concerns

23    with that.  As we get to our slide later where we talk more

24    specifically of the data requests and collection, we'll have

25    some specifics to talk around that.          13:40:14

1          But at this point all black are green, would mean that

2    we're in a good place and on track with our current work plan.

3          I'll pause there and ask if there are any questions,

4    even to just orient to this page.

5          THE COURT:  Any questions?                            13:40:30

6          I see none.

7          MR. MILLAR:  Okay.  Good.

8          Then moving on.  Again, this engagement scope breaks

9    down into three work streams.  We are focused right now on

10   Work Stream No. I and Work Stream No. II.                    13:40:46

11         The market profiles and compensation benchmarks, those

12   are elements that we are producing based on resources that we

13   have and don't have any dependencies on the data that we're

14   gathering from your teams.

15         Work Stream No. II is the facility profiles and         13:41:04

16   baselines, and that is where we are working on the data request

17   at this point in time, and aligning those facilities with our

18   market-based definitions.

19         These two as they near completion will lead into

20   Work Stream III.  So we put that up as reference.            13:41:23

21         And then the next slide gives you the timeline

22   perspective on where we are.

23         So at the very beginning in January, initiating those

24   elements with this current call today.

25         As we look towards the February time frame, with the   13:41:39

1  information we've received at the beginning of this call, we

2  will be there on the 27th.  I anticipate that we'll be -- I'll

3  bring myself and both of my team members at that point in time

4  for both the hearing and then to give our update at that point.

5       Assuming that we will continue to get the information,     13:42:01

6  we do have a portion of that from Corizon, with the rest of

7  those we'll also have some initial looks at the facility

8  analysis that we can begin vetting and getting some direction

9  or feedback there.

10       We will also in that interim be able then to produce      13:42:18

11  the interview request lists for those, and we'll be able to

12  give an update on that process as well.

13       Any questions regarding our timeline currently?

14       THE COURT:  I see none.

15       MR. MILLAR:  Okay.  Then we'll move forward.             13:42:39

16       I'm going to turn this over to Rene Sobolewski of my

17  team, who is heading up our data gathering and analytics

18  process, and let her give the update on the data requests.

19       MS. SOBOLEWSKI:  Sure.  Thanks, BJ.

20       So we had sent out the data requests a couple of weeks   13:42:58

21  ago and had a phone call with many of the parties to discuss

22  some of the line items in this, and talk about the process for

23  data gathering.  We use a folder system called Box, which is a

24  secure site.

25       So far I've received some e-mail from -- documents       13:43:14

1    from Corizon on benefits packages, as well as staffing from

2    2015 to 2017.

3             The one ask I'd make is that we get some of these

4    files in Excel format or Word so they're electronic and we're

5    able to manipulate.  This way we are not, you know, entering          13:43:36

6    data which is increasing the likelihood of entering incorrect

7    data.  We want to make sure that this is as accurate as

8    possible.  And it will also increase the speed of our

9    deliverable if we're able to get them in electronic format.

10            Is that something that you all think that you can          13:43:53

11   accommodate?

12            THE COURT:  Well, let me ask if anybody here in the

13   courtroom knows on the defendants' side whether that's

14   something that's possible.

15            MR. STRUCK:  I'll have to check with the -- Corizon on    13:44:02

16   that.  Because the lion's share of the information is coming

17   from them.

18            THE COURT:  Do you have a contact that you can address

19   this question to, Miss Sobolewski, at Corizon?  So that you

20   feel that there's somebody when you have a question about this     13:44:19

21   kind of thing, and that is the mechanism for the transfer of

22   information, that there's somebody that you can -- it seems

23   like that would be a helpful thing and that people wouldn't

24   object to that in the first instance, rather than having you

25   pose the question in an environment where there's not likely to   13:44:36

1   be somebody who can answer the question.

2        MS. SOBOLEWSKI:  Absolutely.  I will reach back out to

3   the person who sent me the data.  I just wanted to make it

4   clear to anybody in the room that might be part of the data

5   request.                                                      13:44:50

6        But, yes, we will handle that.  And it's not something

7   that we had mentioned in the past, so just something to think

8   about going forward.

9        THE COURT:  Okay.

10       MS. SOBOLEWSKI:  I --                                    13:44:57

11       THE COURT:  And as always, if you run into difficulty,

12  just feel free to communicate with the Court staff and we can

13  get everybody on the phone together and I can address it.

14       MS. SOBOLEWSKI:  Great.  Will do.

15       Other than a few of the documents from Corizon I        13:45:10

16  haven't received anything else yet.  But we did set a deadline

17  of middle of next week, so we are still expecting to receive

18  data.  We will make sure that we're following up with all

19  parties.

20       I think that everybody has received the invitation to   13:45:25

21  that website I talked about, Box.  And I think so far I've

22  heard no difficulties.  So anybody has difficulties, feel free

23  to reach out.  But we can always set up another phone call to

24  work through that and make sure that we have, like you said,

25  the secure transfer of files and making sure everything is    13:45:41

CV-12-601-PHX-DKD – January 18, 2018

1   confidential.

2           THE COURT:  Okay.

3           MR. MILLAR:  Very good.

4           Moving forward, I'm also going to have Rene speak

5   about this.  She has taken on the task of organizing from an          13:45:59

6   analysis standpoint the regions.  This is the part where we're

7   slightly different.

8           As we went to look at the counties as the main grouper

9   for these facilities and how we would look at the markets, we

10  recognized that there were seven counties that the State          13:46:19

11  facilities resided in, not eight.  And want to just confirm

12  with the Court that this grouping would be acceptable for

13  everyone going forward for our comparison.

14          THE COURT:  I see no objection.  Let me see if any of

15  the counsel have any.          13:46:36

16          I don't think there's any objection to the regrouping.

17          MS. SOBOLEWSKI:  Great.  And that's really -- BJ

18  summarized it well.  That's really what we're looking to

19  confirm today so we can move ahead, taking a county-level

20  approach to benchmarking.  Obviously our benchmarks will be at          13:46:54

21  more of a geographic region perspective.  So like the southwest

22  United States from a compensation benchmark perspective.

23          But for the most part this is how we plan to show your

24  market profiles for disposition demands and some of the other

25  types of data elements that we'll be looking at.          13:47:09

1              So as long as these groupings feel correct and

2     reasonable, then we will move forward this way.

3              THE COURT:  Doesn't seem to be anything inappropriate

4     about these groupings from my perspective.  And, again,

5     whatever grouping mechanism that you find is most useful for          13:47:25

6     you in analyzing the data, and also that recognizes the

7     features that are associated with the fact that Maricopa

8     County, that it's the fourth largest county in the country, I

9     think, in terms of land mass.  So it's an enormous area.

10             MR. MILLAR:  And so as we get closer to finalizing          13:47:48

11    this, we will ask that question internally, of whether or not

12    we need to subdivide Maricopa or any of the other areas based

13    on what we're seeing.

14             We are also working from the assumption that Corizon

15    is dealing with each of these facilities on an individual          13:48:06

16    basis, and that they have not grouped them by any type of

17    region or regional grouping or facility grouping.

18             Is that a correct assumption as far as anyone in the

19    court is aware of?

20             THE COURT:  They're checking now.  Let's see if we can     13:48:22

21    get an answer.

22             MR. MILLAR:  Thank you.

23         (Discussion off the record between defense counsel.)

24             MR. STRUCK:  Your Honor, can I get some clarification

25    from Mr. Millar on exactly what they're looking for with           13:48:38

CV-12-601-PHX-DKD – January 18, 2018

1   respect to what Corizon is doing?

2           MR. MILLAR:  Yeah.  What we're asking is if, for

3   example, we ask for staffing or payroll or other things, would

4   they have grouped the three facilities in Maricopa County under

5   a single entity, or would they show them as the three separate          13:48:55

6   facilities?  So for business purposes, have they grouped these

7   facilities in some way that might differ from what we're

8   proposing for the markets.

9           MR. STRUCK:  Your Honor, we'll find out the answer to

10  that question and let Mr. Millar know.                                   13:49:15

11          THE COURT:  All right.  I think that, again, this is

12  another area where that communication person at Corizon could

13  answer these kinds of categorical questions on how data is

14  handled.

15          There may be cleavages that could develop as you study         13:49:30

16  the markets that are independent, I think, of how they're

17  treated though by the contractor or by the State, just because

18  markets necessarily won't reflect how people could decide to

19  organize things within their own house.  But in any event,

20  that's something not surprising to you, I'm sure.                       13:49:51

21          MR. MILLAR:  So just for clarification sake, do we

22  have the latitude to reach out to those that are sending us the

23  information directly from Corizon for questions?

24          The reason I ask is, we have not been in verbal

25  communication with them.  We spoke with counsels early on about        13:50:08

CV-12-601-PHX-DKD - January 18, 2018

1    the data request and offered to be available for follow-up

2    questions.

3            But to this point -- Rene, correct me if I'm wrong --

4    we have not been in phone conversations with any of the Corizon

5    staff.  Is that correct?                                    13:50:25

6            MS. SOBOLEWSKI:  That's my understanding.  I have just

7    received e-mails from them over the past day or two.  But

8    that's the extent of the conversations.

9            THE COURT:  Well, let me tell you what my perspective

10   is.  I've got a defendant in the case who's contracted much of  13:50:38

11   the operations that are at issue in my case.  And so this agent

12   of the State is someone that I can reach through to the

13   State -- through the State.

14           And what I'm trying to do is to identify an efficient

15   way for you all to get these kinds of questions answered.     13:50:56

16   They're questions about how best to get information, how you

17   categorize information, what method works best for you.  You

18   tell us it would be better if it was in Excel or Word, you'd

19   like to be able to talk to someone who is the one who would

20   actually be sending that.                                    13:51:16

21           I think it would make sense for you to have a contact

22   person at Corizon to do that.  And I think it would be in the

23   defendants' interests also to have that happen.  But I'm not

24   going to cut off the opportunity for the defendants' lawyers to

25   be involved in the process.  Though I think that there could   13:51:31

1    well be a place in time where people would be comfortable with

2    the information exchange where they would understand it's not

3    at sort of a lawyer level, it's just about how information is

4    kept.

5           And so I do want and would work to make sure that we          13:51:46

6    would have in place a mechanism so that if you did have these

7    kinds of questions, two of which you've identified today --

8    about whether or not there's an internal structure on how

9    Corizon organizes its classification of this information, and

10   also the way that the information is -- has been provided to       13:52:07

11   you, whether it could be provided in Excel or Word -- it would

12   seem to me that those kind of questions, it just makes sense

13   for you to have somebody at Corizon that you can call and ask

14   that.

15          If that works, I think that's the best possible             13:52:20

16   scenario.  If the lawyers feel that they need to be on the

17   line, then the simple thing is that the lawyers for the State

18   just get advised as to when that phone call is going to happen

19   and they're on the phone.

20          But I do think there needs to be this kind of               13:52:33

21   information exchanged.  So I would ask Mr. Struck to take care

22   to make sure that that's put in place.

23          MR. STRUCK:  We will do so.

24          THE COURT:  All right.  Thank you.

25          MR. MILLAR:  Thank you very much.  I think that will        13:52:44

1    facilitate the process.

2            What we'd like is that when we reach out to the

3    Corizon folks, if they'd had some instruction or information

4    from the State, that they are able to speak with us, just so

5    that they have some assurance of who we are.  And if we need to    13:52:59

6    provide the names of those that they would be contacting so

7    that they can validate who they are speaking with, we'd be glad

8    to do that as well.

9            THE COURT:  Okay.  Good.

10           MR. MILLAR:  Good.  I think we can move on then, Rene.    13:53:12

11           So just as a final step or wrap up here, we would look

12   at what the immediate next steps are between now and the end of

13   February when we'll be there for our next update, receive and

14   validate the outstanding data.

15           I think having this ability to communicate directly    13:53:32

16   with some of the Corizon folks on the technical questions will

17   help ensure that we get what we need when we need to move that

18   forward.

19           Once we have received the bulk of that information we

20   will be able to generate our interview request list.  This is    13:53:46

21   something that we spoke about on the data request call and I

22   believe on our update a month ago.

23           But we will look at this from kind of a randomized or

24   statistical level.  There won't be large populations to deal

25   from, but we'll be looking based on our market profiles of what    13:54:04

CV-12-601-PHX-DKD – January 18, 2018

1    level of care provider at each of the locations we would like

2    to speak with.  And at some of those sites that may have higher

3    turnover or retention rates, that we might request more of

4    a -- an interview of those prior employees.  I'm just

5    anticipating that some of those we may not be able to contact,                13:54:30

6    depending on if they've left the area or not.

7         That also then being said, the third element was our

8    anticipation of when we would be on-site.  With the change in

9    the hearing to the 27th we'll be able to consolidate that into

10   one trip into Arizona in February.  And we'll look to be there               13:54:48

11   then for pretty much the bulk of that day to participate in the

12   hearing and then to give our update.

13        THE COURT:  All right.  Anything else from counsel?

14        MS. KENDRICK:  No.

15        MR. STRUCK:  No, Your Honor.                                            13:55:07

16        THE COURT:  All right.  Mr. Millar, thank you very

17   much for calling in and for providing us this update.  I'm

18   anxious to have you all get the information that you are

19   looking forward to receiving next week so that you can get

20   started and get your hands into the meat of this problem.                    13:55:24

21        Thank you very much.

22        MR. MILLAR:  Thank you, Judge.

23        And we'll commit to have some real information to

24   digest and process the next time we meet.

25        THE COURT:  All right.  Thank you kindly.  Bye-bye.                     13:55:38

CV-12-601-PHX-DKD – January 18, 2018

```
 1          MR. MILLAR:  Bye.

 2          THE COURT:  So, Mr. Fathi, before we return to where

 3    you were on the Performance Measures, I just wanted to check in

 4    to see whether there was anything Mr. Struck or Mr. Bojanowski

 5    wanted to provide after the noon break that he hadn't been able     13:55:55

 6    to give you informally.

 7          (Discussion off the record between defense counsel.)

 8          MR. BOJANOWSKI:  We're still waiting on the

 9    information, Your Honor.

10          THE COURT:  Okay.  All right.                                  13:56:07

11          Mr. Fathi, you may continue.

12          MR. FATHI:  Thank you, Your Honor.

13          First I'd like to provide some information about the

14    erroneous statement I made before the break that there was an

15    order finding non-compliance with Performance Measure 81 at         13:56:22

16    Lewis and Tucson.

17          Document number 1663 is our motion to find those

18    Measures -- that Measure at those facilities non-compliant.  At

19    the time we filed the motion Lewis had been non-compliant for

20    ten consecutive months, Tucson for seven consecutive months.  I     13:56:44

21    don't think there would be any dispute that under the

22    definition the Court has now adopted, that constitutes

23    non-compliance.

24          But Mr. Bojanowski is correct, that whether it was an

25    oversight or whatever the cause, the order does not reflect a       13:56:59
```

CV-12-601-PHX-DKD – January 18, 2018

1    finding of non-compliance.  So that was incorrect and I

2    apologize.

3           THE COURT:  Thank you very much for setting that

4    record straight.

5           MR. FATHI:  All right.  Okay.  Next is Performance        13:57:10

6    Measure 91 at the Winslow facility.  And this is the Measure

7    that requires patients who are on suicide watch to be seen

8    daily by a licensed mental health clinician or on weekends or

9    holidays by a registered nurse.

10          In their January 12th filing the defendants did          13:57:43

11   include results from Performance Measure 94 at Winslow, but

12   then they deleted them from their later filing last night.

13          But if you look at document 2535-1 at page 182, that

14   is the chart for Performance Measure 94 at Winslow.  And you'll

15   see that it reflects a score of 100 percent every month from   13:58:07

16   February through November of 2017.

17          But there are currently no mental health staff at

18   Winslow, and there have been no mental health staff at Winslow

19   since May of 2016.  So we'd like to know how it is that they're

20   complying with this requirement that the patient be seen daily 13:58:31

21   by a licensed mental health clinician.

22          THE COURT:  Dr. Taylor, did you address this before

23   once?  I think that's my recollection.  Could you refresh

24   everyone's recollection?

25          DR. TAYLOR:  Yes.  They have a provider -- I'm sorry,    13:58:47

CV-12-601-PHX-DKD – January 18, 2018

 1   a clinician who does telepsychiatry there -- telepsychology

 2   there.  If they happen to stay during a day of the week, he

 3   will do that contact.  But otherwise if they transfer out,

 4   which they fairly often do pretty quickly, and it's a weekend,

 5   then it's done by the RN.                               13:59:07

 6          MR. FATHI:  Your Honor, I should have added that we

 7   looked at the last few months, and in July of 2017 four files

 8   were counted as compliant with Measure 94 at Winslow.  In

 9   August it was 11.  In September it was 10.

10          And most of these people were actually there on week    13:59:31

11   days, and so the Performance Measure required that they be seen

12   by a licensed clinician.  So I understand their response to be

13   that in that case they are seen via telepsychology or

14   psychiatry.

15          And has that been the case -- how long has that been    13:59:50

16   the case, I guess, is my next question.

17          THE COURT:  Dr. Taylor, can you answer that question?

18          DR. TAYLOR:  I'm not positive as to when that started.

19   But whenever the coverage is needed, it's covered that way,

20   currently.                                              14:00:05

21          THE COURT:  So do you have a recollection as to when

22   it was last that there was an on-site provider who was

23   qualified to provide these services at Winslow?

24          DR. TAYLOR:  I'm not sure.

25          THE COURT:  Let's just try to find the answer to this   14:00:22

UNITED STATES DISTRICT COURT

1    question.

2         DR. TAYLOR:  Six months, maybe.  I can't remember how

3    long it's been.  But they have --

4         THE COURT:  And jumping ahead to the telemedicine

5    issue, Mr. Bojanowski, Mr. Struck, is this also a subject        14:00:31

6    matter that the person that we're going to hear from on

7    telemedicine could also address?

8         MR. STRUCK:  No.  Miss Stover, isn't -- can't address

9    telepsychiatry.

10         THE COURT:  Okay.  All right.  That comes up not only    14:00:49

11    in this question, but also comes up with respect to whether

12    it's occurring in a confidential setting.  Because there's been

13    a suggestion that's not been explored about whether or not the

14    telemedicine apparatus affords for a confidential setting or

15    not.                                                            14:01:07

16         But it sounds like the person that you were going to

17    have us hear from on telemedicine generally can't talk about it

18    in this context.

19         MR. STRUCK:  That's correct.

20         THE COURT:  All right.  Go ahead.                         14:01:19

21         MR. FATHI:  Your Honor, just on the timing, according

22    to the staffing reports, which we have been filing with the

23    Court, there has been no mental health staff at Winslow since

24    May of 2016.

25         So my question is, has it been during that entire        14:01:30

1   period that telepsych has been used?

2          THE COURT:  I gather if there's been compliance found,

3   that what -- taking that in combination with what Dr. Taylor

4   just said, that it must necessarily have been by telemedicine

5   if they were not transferred out of Winslow.                    14:01:50

6          Is that true, Dr. Taylor?

7          DR. TAYLOR:  That is correct.

8          MR. FATHI:  Your Honor, may I approach?

9          THE COURT:  Yes.

10         Thank you.                                                14:02:07

11         MR. FATHI:  Do you need an extra?

12         THE COURT:  If you could.

13         MR. FATHI:  Your Honor, I've handed up a document that

14   has been produced to us by the defendants in this case, Bates

15   stamped ADCM1043042 through 056.  And it's titled, Corizon      14:02:27

16   Health Biweekly Meeting, Director's Office, October 5th, 2017.

17         And if you look at page -- the page that ends in 54,

18   you'll see a chart showing that there was no telepsychiatry at

19   Winslow from June through September of 2017.  And if you look

20   at the page ending in 056, it shows that there was also no      14:02:57

21   telepsychology at Winslow through June -- from June through

22   September of 2017.

23         And yet, as I mentioned a moment ago, this Measure was

24   found compliant at Winslow all four of those months at a 100

25   percent level with people who were there on watch during the    14:03:23

CV-12-601-PHX-DKD – January 18, 2018

1    week.

2           So I don't understand how to square what Dr. Taylor

3    told us about the use of telepsych with this document that

4    shows there was no telepsych during those four months.

5           THE COURT:  Well, let's give Dr. Taylor a moment to          14:03:40

6    digest what you've just said and look at the document that

7    you've presented and see if she has a response.

8       (Discussion off the record between defense counsel.)

9           MR. STRUCK:  Judge, just very quickly, it would be

10   more appropriate for us to have some sort of advance notice        14:04:15

11   when counsel's going to be springing this on us.  We were asked

12   this morning by your clerk whether or not there were any

13   exhibits, and both parties said no.

14          This is -- you know, this is the first time that we

15   knew this was even going to be an issue.  We could be far more      14:04:31

16   prepared and not waste the Court's time with this if we

17   could -- it's not even on our agenda either.

18          So I guess we just would rather, for more efficiency,

19   to have some sort of notice if there's going to be issues like

20   this that come up.  Because clearly this isn't something that       14:04:48

21   was spontaneous, Mr. Fathi obviously had planned this issue.

22          So a little advance notice would make it a lot more

23   efficient for everybody.

24          THE COURT:  Well, I'm sympathetic to the idea of what

25   you just described about providing notice, because the Court       14:05:06

UNITED STATES DISTRICT COURT

1   wrestles with this sub-issue about errors in the monitoring

2   program.  And we've taken them up on an ad hoc basis, visited

3   them when they've been included within a particular discussion

4   of a Performance Measure.

5         So this is one such subject where counsel and the              14:05:25

6   Court read a document and observe certain things about it and

7   see perhaps internal inconsistencies and want to raise

8   questions at the moment.  So that has happened and that is

9   normal with our method of operating.

10         It is also true to say that if there have been times          14:05:44

11   where plaintiffs have identified what they think are errors in

12   the reporting, and it turns out that when you look you find

13   that maybe those errors are not true.  And so those kinds of

14   things could be removed from court if the dialogue would occur

15   in advance.                                                          14:06:03

16         And so I'm caught in the position of agreeing with

17   what you say, but also not wanting to cut it off.

18         I do think it makes sense to allow for there to be a

19   deliberate consideration at this point.  So I would ask that we

20   just stop the discussion of it at this point, and instead ask       14:06:19

21   the defendants to provide a response that they file with the

22   Court and provide to the plaintiffs in 14 days' time,

23   addressing the questions that Mr. Fathi has identified in this

24   document.

25         MR. STRUCK:  Thank you, Your Honor.                           14:06:37

—CV-12-601-PHX-DKD – January 18, 2018—

1          MR. FATHI:  Thank you, Your Honor.

2          And so that the record is complete, I would move the

3     admission of this document.

4          THE COURT:  Well, it is received for the purposes of

5     allowing it to be a part of the record.  That will have to be          14:06:48

6     sealed though, because it's subject to the protective order.

7          I don't know whether it really makes a lot of sense to

8     have it become an exhibit here, because obviously if the issues

9     do pan out, there will be, I gather, some future opportunity

10    for the Court to visit the veracity of this.          14:07:08

11         So I'm not sure whether it makes a lot of sense to

12    have it here as an exhibit.  But be that as it may.

13         MR. FATHI:  Thank you, Your Honor.

14         On a quick perusal I don't see any personally

15    identifying information.  I don't think there's any reason for          14:07:22

16    it to be under seal.

17         But I simply suggest that it be in the record so that

18    when the defendants file their response everyone knows what

19    it's referring to.

20         MR. BOJANOWSKI:  It's identified by Bates number.          14:07:38

21         THE COURT:  Well, the problem is we've got steps then.

22    You have to mark it for identification.  I have to give this

23    very copy and Mr. Bojanowski an opportunity -- or Mr. Struck to

24    take a look at it to make sure that the one that's a part of

25    the record is indeed the one that's been handed out to          14:07:51

CV-12-601-PHX-DKD – January 18, 2018

1   everybody.  It just doesn't seem to make sense.

2         So I'm going to deny your motion.  Say, talk to one

3   another about this maybe as well -- maybe in between now and

4   when the defendants file their response.  Maybe they've got a

5   ready response and you'll be satisfied with it.  If you're not,          14:08:08

6   then they'll file the formal response.  And I would ask that at

7   that time that the defendants file a copy of the document that

8   they were considering so that everybody knows what it is.

9         MR. FATHI:  Thank you, Your Honor.

10        THE COURT:  Thank you.                                             14:08:22

11        MR. FATHI:  As I said before the break, there

12   were -- there are some Performance Measures at some facilities

13   that have been the subject of a finding of non-compliance that

14   are not reflected in the defendants' latest filing last night.

15   One of them is Performance Measure 97 at Phoenix.  That was           14:08:45

16   found non-compliant on October 11th, 2017, document 2403.

17        So we would ask for the current figures for that

18   Performance Measure.

19        MR. BOJANOWSKI:  Your Honor, that is correct.

20   Performance Measure 97 at Phoenix was taken up by the Court,         14:09:09

21   but it had ruled that the Court would hold the remediation plan

22   in abeyance.  That's why I didn't -- I didn't file it.  But I'd

23   be more than happy to give the numbers for both that Measure

24   and Measure 98 at Douglas, which had the same language.

25        97 at Phoenix is 100 percent.  And 98 at the Douglas           14:09:30

UNITED STATES DISTRICT COURT

─── CV-12-601-PHX-DKD – January 18, 2018 ───

1    facility is 100 percent.

2              THE COURT:  Okay.  Thank you.

3              MR. FATHI:  Finally, Your Honor, Performance Measure

4    98 at Phoenix, this was included in defendants' previous

5    filing, 2535-1 at page 189, showing non-compliance in November          14:10:08

6    of 2017 and a Corrective Action Plan.  But then it was deleted

7    from last night's filing.

8              So, again, in light of the fact that there was a

9    finding of non-compliance and a Corrective Action Plan, we

10   would ask that it be included in next month's filing.                    14:10:33

11             THE COURT:  And do you want to hear about what it is

12   for November for 98 for Phoenix as well?

13             MR. FATHI:  Well, I know what it was, Your Honor,

14   because it was included in last Friday's filing --

15             THE COURT:  Okay.

16             MR. FATHI:  -- but then deleted from last night's

17   filing.

18             THE COURT:  All right.

19             MR. BOJANOWSKI:  Well, Your Honor, I don't think

20   there's been a finding --                                               14:10:52

21             MR. FATHI:  There hasn't been a finding, Your Honor.

22             MR. BOJANOWSKI:  -- on 98 for Phoenix.

23             THE COURT:  Well, what we've been able to do is get,

24   through the willingness of the defendants to provide the

25   information, whenever you have an inquiry -- wherever you have           14:11:04

1  a desire to know, they've been able to provide that information

2  to you.  And so far, obviously, we've been able to hear that

3  they've all been in compliance.

4       So I think that the current mechanism that we have is

5  working satisfactorily well with respect to giving you this    14:11:23

6  information.

7       MR. FATHI:  Well, the reason for my request,

8  Your Honor, is, again, there is a Corrective Action Plan in

9  place currently.  And as we know, these Corrective Action Plans

10  evolve, sometimes they learn that the -- what they initially    14:11:36

11  thought was the problem, wasn't the problem.

12       So we would simply like to see what this Corrective

13  Action Plan looks like next month.  That's the reason for the

14  request.

15       THE COURT:  Well, you'll be able to get it because    14:11:48

16  you're going to ask the question and you'll be told.

17       MR. FATHI:  I'm sorry, Your Honor?

18       THE COURT:  You'll be able to find out because you'll

19  ask the question and you'll be told.

20       MR. FATHI:  Okay.  Thank you, Your Honor.    14:11:57

21       THE COURT:  Okay.

22       MR. FATHI:  I believe that's everything.

23       Thank you.

24       THE COURT:  Okay.  Going back to the telemedicine, did

25  you want to make the presentation on telemedicine with that    14:12:07

1    person that you had introduced, did you want to do that today?

2            MR. STRUCK:  Yes, Your Honor.  She's in Nashville and

3    is available by phone.  I think we need to have her call in.

4    She was -- she started on the phone with us early in the

5    morning, but it didn't look like we were going to get to it.          14:12:24

6            But she needs to -- if the Court wants to hear from

7    her, need to hear from her by 4:00 o'clock, otherwise she has

8    to leave.  So now might be an appropriate time to go ahead and

9    do that.

10           THE COURT:  Yeah.  Do we have the contact information          14:12:39

11   that we need to do that?

12           MR. STRUCK:  If we can have ten minutes we can get her

13   on the phone.

14           THE COURT:  Okay.  All right.  We'll take a break for

15   ten minutes and we'll be back as soon as she's on the line.           14:12:53

16           MR. STRUCK:  Okay.  Thank you.

17           THE COURT:  Thank you.

18       (Recess at 2:12 p.m., until 2:24 p.m.)

19           THE COURT:  Miss Stover, we have you on the phone?

20           MS. STOVER:  Yes, sir.                                         14:25:02

21           THE COURT:  Thank you very much for standing by today.

22   I'm sorry that we weren't able to get to you sooner, and I'm

23   sorry if we're keeping you later into your day.

24           Before Mr. Struck or Mr. Bojanowski do what they would

25   like to do in terms of presentation, I want to explain to you         14:25:16

CV-12-601-PHX-DKD – January 18, 2018

1   why it is that you're here.

2          For months I've been hearing about how remedial plans,

3   steps to try to accomplish the requirements of the Stipulation,

4   were going to be supported by telemedicine.

5          And I've heard different times about different          14:25:39

6   particulars.  I've heard about contract negotiations almost

7   being completed, or being completed with the University of

8   Arizona.  I've heard about telemedicine with providers that are

9   working for Corizon in other states that are on the telephone.

10          And I've heard a lot about this such that, as I've          14:26:00

11   described it in the past, it has been that the defendants in

12   this case have put a lot of their eggs in this basket.  And I

13   never really felt that I understood exactly what the basket was

14   about.  And I needed to understand what the basket was about

15   because I have to evaluate whether or not we're on the right          14:26:19

16   path to try to accomplish the satisfaction of the Performance

17   Measures through this modality, through the modality of

18   telemedicine.

19          So I wanted to understand once and for all from sort

20   of the horse's mouth where it was that this stood, what was          14:26:37

21   being done.  Is the University of Arizona in it or not?

22   Is -- what amount of care is being provided through this

23   service?  How readily is it available?  Sort of the nuts and

24   bolts of it, so that I could have a better understanding of

25   whether it is something that I should trust that's going to          14:26:54

```
 1   work.

 2          And that's a preamble to help you understand why it is

 3   that I wanted to hear from somebody like you.

 4          And I don't know whether you had in mind a

 5   presentation by way of examination on the defendants' side, or     14:27:08

 6   how you thought you would proceed with this witness.

 7          MR. STRUCK:  Your Honor, I'll just ask her some

 8   questions.

 9          I will say at the outset, the information that will be

10   provided isn't going to be all that enlightening, I'm afraid,      14:27:25

11   just so you know.  But Miss Stover is the Vice President of

12   Telehealth for Corizon, and she's the individual who has been

13   identified by Corizon as the best person to talk about the

14   overall -- she oversees the telehealth in 22 states.

15          THE COURT:  Can I ask why it is we're hearing from a        14:27:49

16   person who's not going to be all that enlightening?

17          MR. STRUCK:  Well, because that is the individual that

18   we were directed to by Corizon.

19          Now, when I say "enlightening," I mean more in terms

20   of the University of Arizona contract doesn't really appear to     14:28:07

21   me to have moved beyond where it was reported to you last Fall.

22   So Miss Stover can testify about what's going on with that and

23   what it currently encompasses and where the status of that is.

24          But with respect to -- like, for example,

25   telepsychiatry, she's not able to testify about the nuts and       14:28:31
```

—Juli Stover - Direct Examination—

1    bolts about what happens in Arizona.  I've been told that

2    Dr. Calcote, who I think you have heard from in this courtroom

3    in the past, will be the one that can tell you about

4    telepsychiatry and how it's utilized in the Arizona facilities,

5    which I know you're interested in and the plaintiffs are            14:28:56

6    interested in as well.

7         But I'm -- I just wanted to kind of lay that out at

8    the beginning, just so you know it's the scope of what we will

9    expect to hear from Miss Stover.

10             THE COURT:  All right.  Go ahead.                          14:29:15

11                         DIRECT EXAMINATION

12   BY MR. STRUCK:

13   Q.  All right.  Would you state your name, please?

14   A.  Juli Stover.

15   Q.  And what is your current occupation?                            14:29:21

16   A.  Vice President of Telehealth and Innovative Services for

17   Corizon.

18   Q.  And how long have you been --

19             MR. FATHI:  Excuse me.  Pardon the interruption.

20             Could we have Miss Stover sworn, please?                   14:29:31

21             THE COURT:  Oh, surely.

22         Miss Stover, we're going to administer the oath as if

23   you were a witness in court.  We'll do it telephonically, but

24   it will have the same import as if you were here in court.

25             So I would ask you to please raise your right hand.        14:29:45

_Juli Stover - Direct Examination_

1        And upon your solemn oath or affirmation, do you swear

2  or affirm that the information you're about to provide in your

3  testimony is the truth and nothing but the truth?

4        MS. STOVER:  I do.

5        THE COURT:  Thank you.                                    14:29:57

6  BY MR. STRUCK:

7  Q.  By -- and you say you're employed by Corizon?

8  A.  Correct.

9  Q.  Okay.  And how long have you been so employed?

10 A.  Six months.                                                 14:30:08

11 Q.  All right.  What are your duties?

12 A.  So I oversee the strategic development of telehealth from a

13 broad perspective for the organization as a whole, for the

14 development of that strategy and the execution thereof.

15 Q.  Okay.  And in terms of that job, what are you responsible    14:30:27

16 for in terms of geographic region?

17 A.  As you stated previously, 22 states, and where we hold

18 contracts within.

19 Q.  Okay.  And that includes Arizona?

20 A.  It does.                                                     14:30:44

21 Q.  Okay.  There has been information that has been provided to

22 the Court and plaintiffs' counsel with respect to a contract

23 with the University of Arizona Telemedicine Program.

24        Can you please tell us, is there a current contract?

25 A.  There is.                                                    14:31:03

1    Q.  And what does that contract entail?

2    A.  So basically with the University of Arizona's Telemedicine

3    Program, what you do is you sign up to be part of that program.

4    And then once you become part of that telemedicine network or

5    that Telemedicine Program, if you will, then you work with them      14:31:22

6    to identify the services that you have a need for.

7            So today the services that are being received from the

8    University of Arizona are for infectious disease.

9    Q.  Do you -- can you tell us what -- whether that covers all

10   of the Arizona facilities?  Or what does that entail?              14:31:43

11   A.  I can't specifically, because that contract was before my

12   time.  But it's my understanding that it does.

13           Whether -- now let's say this, whether each facility

14   is taking advantage of that contract is a different story.  And

15   I can't speak to that.  But it's my understanding that each        14:32:05

16   facility could if they wanted to.

17                        CROSS-EXAMINATION

18   BY THE COURT:

19   Q.  So is it fair to say, Miss Stover, that you have no idea

20   whether or not this infectious disease telemedicine has been       14:32:15

21   employed or not?

22   A.  No, I know for a fact that it is taking place.  No, it

23   absolutely is taking place today.

24   Q.  How many times has it been used since the contract has been

25   put in place?                                                      14:32:30

UNITED STATES DISTRICT COURT

**Juli Stover - Cross-Examination**

1    A.  So the numbers that I receive don't specifically tell me

2    that.  Again, that would have to be -- that would have to come

3    from somebody within the Arizona contract there.  The numbers

4    that I receive are -- on a monthly basis are numbers in total.

5    They don't report to me specifically what they're for.  They          14:32:46

6    just report to me the total volume.

7    Q.  Total volume of what?

8    A.  Of everything.

9    Q.  What is everything?

10   A.  Of everything.  Of every telehealth encounter that takes          14:32:54

11   place within the Arizona contract.  It's not broken out for me

12   specifically what those encounters are for.  I just receive a

13   total lump sum number for every telehealth encounter by

14   contract by month.

15   Q.  By contract by month.                                             14:33:12

16         So you know that there have been contacts with the

17   University of Arizona infectious disease telemarketing (sic)

18   service based upon monthly data reports that you receive every

19   month telling you that that's happened every month?  Is that

20   what you're saying, or did I misunderstand?                           14:33:31

21   A.  So -- no.  So I know that the consults are taking place

22   with the University of Arizona because I am in conversation

23   with the University of Arizona.  And I know that the site -- at

24   least some of the sites are utilizing that service.  And -- but

25   as far as specifically looking at the numbers to be able to           14:33:49

**Juli Stover - Cross-Examination**

1   tell which ones are infectious disease consults and which ones

2   are not, the reports that I receive do not tell me that.

3   Q.  So you know that it's happening.  So that could mean that

4   it's happened once in a given month.  But you don't know

5   whether it's happened more than once.  Is that fair?                14:34:07

6   A.  Well, based on what I just said to you, you would assume

7   that.  However, no, I know that to not be the case because I've

8   received more communication than just what one consult would

9   present.

10  Q.  And so how many do you think are occurring?                     14:34:24

11  A.  I mean, I can -- you want me to guess?  It would be a

12  guess.  But, I mean, I could throw a number out if that's what

13  you want.  But I really have nothing to base it on.

14  Q.  Well, tell me your guess and tell me why you think your

15  guess should be trusted.                                           14:34:42

16  A.  I wouldn't trust my guess because, again, I have nothing to

17  base it on.

18  Q.  All right.  That's fair.

19          So then with the University of Arizona infectious

20  disease component here, we really don't know how many of the      14:34:58

21  eggs in the basket are ones that are being used.  We know that

22  it is singularly just this infectious disease component.

23          But I gather you also know about other

24  telemarketing -- telemarketing -- telemedicine programs and

25  other services that are provided, is that true, by other           14:35:17

─────── **Juli Stover - Cross-Examination** ───────

1    entities?

2    A.   Absolutely.

3    Q.   All right.

4    A.   Absolutely.

5    Q.   So can you give me an overview of exactly what the lay of          14:35:26

6    the land is in Arizona with respect to the number of inmates

7    who are getting the benefit of telemedicine?

8    A.   Sure.  On average -- I mean, I would venture to say that

9    the infectious disease services from the University of Arizona

10   are a very, very small percentage of the activity that takes          14:35:47

11   place on a monthly basis there.  I mean, they routinely see

12   well over -- over 3,000 telehealth consults in a month within

13   the state.

14        And the way that those are characterized is either

15   through telepsychiatry, which you mentioned Dr. Calcote.  So          14:36:04

16   that's a team of, you know, mental health providers of varying

17   degree, if you will, that provide those services.

18        And then also it's categorized into chronic care.  So

19   for our chronic care clinics -- which that lumps everything in.

20   So that's every other subspecialty from a health perspective,        14:36:27

21   from a medical perspective outside of mental health.

22        And so those are kind of the ways that the categories

23   come to me.  And those -- and all of those services that are

24   provided are -- it comes to them in many ways, like either

25   physicians that are providers that are employed by Corizon or,       14:36:46

Juli Stover – Cross-Examination

1   you know -- or independent contractors.

2   Q.  So to make sure that I've understood, you've said that

3   there are 3,000 telemarketing -- forgive me -- 3,000

4   telemedicine --

5   A.  You're fine.

6   Q.  -- telemedicine encounters per month in the Arizona system;

7   is that correct?

8   A.  Well, I'm just looking back here over the past six months,

9   and it's actually well over 3,000.  In the month of August it

10  was actually 4,057 based on the report that I received.       14:37:18

11  Q.  And what are the more current months that you have?

12  A.  3648, 3379.

13  Q.  Can you tell me what months those are?  The 3648 is for

14  which month?

15  A.  Yes.  3648 was September.  3379 was October.              14:37:39

16         And I have not received -- I don't see November, but I

17  haven't received December's yet.

18  Q.  And can you help me understand how you define a

19  telemedicine encounter?  What does that mean?

20  A.  Any time the care is delivered from a physician that is    14:38:03

21  virtual.  So that can be -- that could mean from one facility

22  to the other.

23         So let me just kind of give you a scenario.  So let's

24  say that one primary care physician at one facility has the

25  capacity to provide coverage to another facility.  They are in  14:38:20

UNITED STATES DISTRICT COURT

Juli Stover – Cross-Examination

1    Arizona.  So this physician may be employed by Corizon, and

2    they may be, you know, physically located at one of the

3    facilities, and they may have the capacity in their day or in

4    their schedule to provide some gap coverage or help fill in for

5    some physician to, you know, help eliminate backlog or whatever          14:38:42

6    the case may be at another facility.  And so they may do that.

7    They may cross cover one another.

8          Or it can be a physician that's completely out of

9    state, 100-percent virtual, and they are contracted for a

10   certain number of hours on a monthly basis that they dedicate          14:38:57

11   to the contract.

12   Q.  And how is the system coordinated such that where there is

13   a need for the service and the provider, how are they linked

14   together?

15   A.  So I can tell you generally what I know.  So, again, if you         14:39:16

16   get into kind of the specifics of the day-to-day operations too

17   much there, I'm not going to know a lot of probably the

18   questions that you have, I'm not going to know a lot of the

19   answers.

20         But from what I understand there specifically in             14:39:32

21   Arizona, is that there are two different individuals that

22   manage the schedules; one for health -- one for telehealth and

23   one for telepsychiatry.  And those individuals are aware of the

24   providers that are available to them.  The sites communicate

25   the need to these individuals, and then they are responsible         14:39:54

—— Juli Stover – Redirect Examination ——

1    for coordinating the schedules of those providers.

2            THE COURT:  Okay.  Thank you.

3            Go ahead, Mr. Struck.

4                    REDIRECT EXAMINATION

5    BY MR. STRUCK:

6    Q.  Just to clarify, Miss Stover, is it -- I understood you to

7    say that with respect to the University of Arizona Telemedicine

8    Program, specifically the infectious disease, that you get some

9    sort of a report that is indicative of the number of times that

10   that service is utilized on a monthly basis?          14:40:26

11   A.  It does not specifically give me the infectious disease

12   numbers.  The report that I get, the infectious disease

13   consults are lumped into the chronic care category.

14            I only get it in two categories.  I get it in

15   telepsychiatry and chronic care.  Infectious disease is part of   14:40:43

16   that chronic care category.

17   Q.  Okay.  So that's -- in terms of these reports then, you get

18   a chronic -- report with respect to chronic care and a report

19   with respect to telepsych on a monthly basis with respect to

20   the care that's provided over -- virtual care, either by        14:40:59

21   telephone or video, in Arizona?

22   A.  None of these would be via telephone.  This would all be

23   via the telehealth equipment.

24   Q.  Okay.  Do you have specific knowledge with respect to how

25   the telehealth equipment is utilized, where it's located in the   14:41:16

Juli Stover - Redirect Examination

1    facilities, that type of thing?

2    A.  I mean, I can tell you how to use it, but I have no idea

3    where it would be located within the facility.

4    Q.  Okay.  With respect to negotiations with the University of

5    Arizona, it was our understanding that Corizon had been                    14:41:38

6    negotiating with the University of Arizona Telemedicine

7    Department to expand beyond the infectious disease.

8             Can you tell us what the status of that is?

9    A.  Yes.  So it's my understanding that they're going through a

10   leadership transition at this time, and that's why they have                14:41:56

11   been delaying us just a little bit.  We've tried to schedule a

12   couple of different meetings here through the holiday season

13   and the first part of this year.

14            And Dr. Amy Waer is transitioning out as the leader of

15   that program, and Dr. Po, who ironically enough is the                      14:42:16

16   infectious disease physician, is transitioning in as the

17   leader.

18            And so they have asked us to hold off on meeting until

19   Dr. Po can assume his responsibilities.  So we're in a little

20   bit of a holding pattern waiting for them to do that.                       14:42:32

21            Prior to that what I had done -- or what I had

22   provided to them was, you know, we -- we refer to the patients

23   that leave the facilities for outside care as an out-count, so

24   if you don't mind I'll use that terminology.

25            So what I had done is we had signed a nondisclosure               14:42:52

UNITED STATES DISTRICT COURT

1   agreement with the University for me to be able to provide them

2   the data on out-count, so that they could evaluate the needs

3   that we had specific to certain specialties.  And then in turn

4   the conversation that we are hoping to have with them is for

5   them to come back to us, and then tell us, based on that          14:43:15

6   out-count data, what specialties they might have the ability

7   and capacity to provide back to us.

8         And so that is information that I have provided to

9   them.

10        But then, of course, in the meantime, you know, we've     14:43:29

11  also signed a letter of intent just in good faith saying that

12  we're -- you know, that we're continuing these discussions.

13        So that's the progress that we've made.

14  Q.  Are there specific specialty areas in which Corizon is

15  looking to utilize the University Telemedicine Program beyond    14:43:44

16  infectious disease?

17  A.  Yes, there are many.  But that doesn't mean that the

18  University is willing and able to provide them.

19        But, yeah, I mean, there's a lot.  I mean, basically

20  any subspecialty you can think of, I'm certain there would be a   14:44:03

21  need for.  Some of the top ones were orthopedic, cardiology,

22  just to name a few.

23  Q.  Okay.  Other than the -- these ongoing negotiations with

24  the University of Arizona, what other efforts have you made

25  with respect to trying to increase the Telemedicine Program      14:44:25

1   within the Arizona system?

2   A.  So in the beginning we had also -- and I say "in the

3   beginning," meaning kind of my beginning.  So forgive me for

4   that.

5         But kind of in the beginning one of -- a couple of the     14:44:43

6   different organizations that I had reached out to was Dignity

7   Health.  As you're probably aware they have a presence there in

8   the market.  As well as Mayo.  I was familiar with both of

9   these organizations just from past experiences, and so knowing

10  that they were utilizing telehealth within their own health     14:45:00

11  systems, as well as providing services to others, I reached out

12  to them to explore their interest.

13        Both of them said they did not have the ability -- the

14  capacity to help us at this time.  So we moved on from that.

15        And I think I've heard folks mention Banner before.       14:45:20

16  And I think it's just kind of worth mentioning that Banner and

17  the University are aligned now.  So in some respects those are

18  kind of one and the same.  But I had attempted to also reach

19  out to them.  And that just kind of led to the University

20  conversations.                                                  14:45:35

21        We had also reached out to some purely remote, so

22  completely virtual services.  There's a couple of

23  organizations.  One in particular is located in Colorado.  And

24  we were told they currently do not have Arizona state

25  licensure.  So, of course, that would cause a pretty            14:45:57

1   significant delay in them being able to provide services, and

2   we were trying to move, you know, at a pace that was faster

3   than that.

4       We were also in conversations with a group called

5   Virtual Medical Staff, which is based out of Atlanta, Georgia.          14:46:09

6   Those conversations are still ongoing.

7       And then as I heard you guys mention earlier, any time

8   we approach a new physician contract with a group like -- well

9   previously, you know, it was Arizona Oncology Network, but now

10  it's Ironwood Physicians, any time we approach a physician          14:46:31

11  and/or a group such as that, we will also ask them if they are

12  willing to explore telehealth services as well.

13      And so now that those agreements have been solidified

14  with Ironwood and then -- you know, I know they're looking to

15  seek other relationships -- we would explore that as well.  But          14:46:54

16  we have not done that yet, as those agreements are pretty new.

17  Q.  With respect to the University of Arizona negotiations,

18  have they told you when they will be -- their leadership will

19  be in place and ready to continue the negotiations to expand

20  that -- those services?          14:47:15

21  A.  They have not notified us yet.

22  Q.  Okay.  Is there anything else that you can tell us with

23  respect to Corizon's efforts to obtain additional telemedicine

24  services in the Arizona Department of Corrections system?

25  A.  Sure.  I mean, I guess -- you know, I would offer that          14:47:35

1    there are -- there are things that we are considering or

2    exploring from a broader perspective for Corizon as a whole.

3         And one example that I would present to you is a

4    relationship that we are exploring with a company called

5    MyWoundDoctor.  They are a remote wound care offering.  And we    14:47:53

6    are piloting a program with them in our contracts within the

7    state of Kansas.  And assuming that that goes well, and we

8    think that that is a viable solution, you know, to move forward

9    on, we would -- you know, we would be considering moving

10   something like that into our other contracts, and Arizona being    14:48:18

11   one of those.

12        So, you know, that -- those type of things are my

13   responsibility, is to explore opportunities such as that, you

14   know, other solutions.

15        And so that's just -- that's one right now that             14:48:30

16   happens to be going on.  But my hope would be that there would

17   be others.

18   Q.  Is there anything else that you can add?

19   A.  Not that I can think of.

20                      CROSS-EXAMINATION

21   BY THE COURT:

22   Q.  Miss Stover, before I ask the plaintiffs if they have any

23   questions that they would like to ask you, I wanted to follow

24   up on an answer that you gave me, and that is providing me with

25   the number of telemedicine encounters that occurred in August,    14:48:56

1   September and October of 2017.

2          I'm wondering if for comparison purposes you happen to

3   have in front of you the previous year, those same months in

4   2016, so that I can understand whether or not over the course

5   of a year the telemedicine component had increased, stayed the                14:49:14

6   same, or decreased.

7   A.  I am happy to say that I do have those numbers.  Let's see

8   here.  So what did I give you first, August; is that correct?

9   Q.  Yes.

10  A.  Okay.  So August of 2016 was 1576 consults, 1,576, in                      14:49:29

11  contrast to 4,057 in August of this year.

12          September of 2016 was 1,317, in contrast to 3,648 in

13  2017.

14          And then October of 2016 was 1,477, in contrast to

15  3,379.                                                                         14:50:12

16  Q.  Thank you.

17          So these are increases of about 100 percent.  Why, do

18  you think?

19  A.  Oh, gosh, unfortunately I'm not going to have much

20  historical perspective on that to speak to it.  I mean, I can                  14:50:26

21  speak generically just from an industry perspective what I have

22  seen over time, and it would be purely guesses.  I'm afraid,

23  you know, I wouldn't have much context there for you.

24  Q.  What did you do before six months ago?

25  A.  I actually worked for a telehealth vendor.  And prior to                   14:50:49

**Juli Stover – Cross-Examination**

1    that I was with a very large health system based out of

2    Nashville.

3    Q.  And a telehealth vendor is the kind of person that you

4    described, such as the Colorado entity, or some other -- the

5    wound care place, is that what it is?                          14:51:07

6    A.  We actually owned and manufactured our own equipment.

7    Q.  Oh, I see.

8    A.  And implemented telehealth programs nationally.

9            THE COURT:  I see.

10           All right.  Let me give plaintiffs' counsel an        14:51:20

11   opportunity to ask any questions they'd like to ask.

12           MS. STOVER:  Okay.

13                       CROSS-EXAMINATION

14   BY MS. KENDRICK:

15   Q.  Hi, Miss Stover.  My name is Corene Kendrick, and I'm one 14:51:26

16   of the attorneys for the plaintiffs.

17           You said that as part of the process with the

18   University of Arizona is that step one is you sign up to be

19   part of the telemedicine network, and then step two is you

20   identify the needs.  And I was hoping you could speak to where 14:51:42

21   you are in the needs assessment stage.

22   A.  So let me just say that I was not part of that process in

23   the beginning, so that is the way that I understand it.  The

24   agreement was executed long before my arrival here.  But that's

25   the way that it has been explained to me.                      14:52:01

**Juli Stover – Cross-Examination**

1          And then I think, as I shared a few minutes ago, I

2    have provided -- originally we signed a nondisclosure

3    agreement.  I provided the out-count data to the University.

4    They have reviewed it.  And then the conversation that we're

5    hoping to have is around their availability to provide some of          14:52:18

6    those services.

7    Q.  And I think when Mr. Struck asked you what specialties were

8    you trying to get, you said, basically a lot, and then you said

9    cardio and didn't list any others.

10          So I was wondering if you remember any other          14:52:34

11    specialties that Corizon is seeking to use the University of

12    Arizona for.

13    A.  I believe what I said actually was orthopedic and

14    cardiology.  But, yes, there are many others.  Basically any

15    service -- any specialty you can think of, I mean, they're          14:52:52

16    going to have a need for.  So it can be anything -- oncology,

17    which I know you guys know, because we've talked about oncology

18    a lot today.

19          So, you know, if Ironwood Physicians is not able to

20    provide that, possibly that's something we could explore          14:53:08

21    through the University if they had those services available.

22          But I mean, patients leave our facility for

23    everything.  So there's everything on there from, you know,

24    urology to nephrology to neurology to pulmonology, dermatology,

25    endocrinology, rheumatology.  I mean, every ology you can think          14:53:30

— Juli Stover - Cross-Examination —

1    of is going to be on there.  And I would -- we would welcome

2    services in anything that they're able to provide.

3    Q.  And I didn't hear that you actually practice medicine or

4    anything, but I'm curious, how would you do oncology via

5    telemedicine if somebody needs radiation therapy or                14:53:48

6    chemotherapy?

7    A.  Well, clearly you can't administer radiation or chemo via

8    telehealth.  But with anything, just as orthopedics or general

9    surgery or any other subspecialty line service, there's a

10   tremendous amount of pre and post-op procedural work that could   14:54:06

11   be done.

12         So the goal here is to reduce the transport of these

13   patients as much as we possibly can.  Procedures clearly can't

14   be done via telehealth -- or at least, you know, most invasive

15   procedures, if you will, can't be done via telehealth.  And so   14:54:25

16   the goal in many of these services lines would be to eliminate,

17   you know, preprocedural and/or postprocedural transports.

18         So if there's any type of pre or post-op, if it's

19   general surgery, orthopedics, or anything like that, and pre

20   and post evaluations can be done via telehealth as well.  All    14:54:44

21   of those are -- all of those are transports out for one reason

22   or another.

23   Q.  Okay.  And are you aware of the Arizona State law that caps

24   the reimbursement rate for specialists to be no higher than

25   what Medicaid rates are?                                          14:54:59

UNITED STATES DISTRICT COURT

**Juli Stover – Cross-Examination**

1  A.  Unfortunate I'm very well aware.

2  Q.  And has this law been identified as a barrier to providing

3  telehealth services by some of these entities that you've

4  contacted?

5  A.  Absolutely 100 percent.                                    14:55:15

6  Q.  And you said earlier when Mr. Struck was asking you

7  questions that we weren't -- you didn't know if every

8  institution was using the infectious disease telehealth

9  service.

10         Do you know who would know the answer to that          14:55:33

11  question?

12  A.  Yes.  The folks there on-site within the contract.  So

13  maybe possibly one of the chief medical officers and/or the

14  recently-appointed telehealth coordinator would be able -- she

15  may not know that information immediately offhand, but she     14:55:52

16  would be able to access it from the different sites.

17  Q.  Okay.  And those numbers that you were giving Judge Duncan

18  where you were comparing August 2016 and August 2017, was that

19  the total number of telehealth encounters?

20  A.  That was everything.  That was total psychiatry and total  14:56:15

21  health together.

22  Q.  And telepsychiatry and telepsychology take up approximately

23  70 percent, would you say, of the telehealth encounters?  Do

24  you have that breakdown?

25  A.  I would have to do the math, but I don't think it's 70     14:56:30

Juli Stover – Cross-Examination

1    percent.  The telepsychiatry and telepsychology for the

2    purposes of this report that I'm referring to are lumped

3    together just as basically mental health care.

4         I mean, I can give you the breakdown if you would like

5    to know what this report states for one versus the other.                   14:56:48

6         THE COURT:  Rather than imposing a math test on you

7    for the 70 percent, why don't you go ahead and just give us the

8    real numbers.

9         MS. STOVER:  Okay.  So for August -- let's see here.

10   For August the mental health number was 2732, and the chronic      14:57:05

11   care number was 1201.

12        Oh, wait a minute, hold on.  I'm sorry.  That's not

13   the right number.  Hold on.  Let's see here.

14        The mental health number was 2856, I'm sorry.  And the

15   chronic care number was 1201.                                               14:57:31

16        Let's see, for September we're looking at, for mental

17   health 2547, and for chronic care 1101.

18        And then for October for mental health we're looking

19   at 2107, and chronic care 1272.

20   BY MS. KENDRICK:                                                            14:58:03

21   Q.  Why is there so much more telepsych?

22   A.  Because the need is greater.

23   Q.  And are the telepsych providers, are anyone other than

24   psychologists or psychiatrists used to do telemed -- telepsych?

25   A.  I'm sorry, you'd have to ask Dr. Calcote that question.                 14:58:22

Juli Stover - Cross-Examination

```
 1    I'm not familiar with who all their providers are they're
 2    utilizing.
 3    Q.  Okay.  And would he be the one who knows where the mental
 4    health providers are located?
 5    A.  Absolutely.                                              14:58:35
 6    Q.  And you said that mental health is higher because the need
 7    is greater.  What do you mean by "the need is greater"?  Is it
 8    harder to hire mental health staff or there's more mentally ill
 9    people?
10    A.  The patient population demands it.                       14:58:51
11    Q.  Okay.  And you talked about how all the -- you said
12    something that like -- I wrote down that you said the
13    subspecialties, other than infectious disease, come under
14    telehealth for chronic care.  Is that correct?  Did I get that
15    right?                                                       14:59:08
16    A.  Correct.  Yes, absolutely.
17    Q.  But isn't chronic care what is just the normal kind of
18    maintenance every three months, every six months check in with
19    somebody who has a chronic condition?
20    A.  So your visits to a chronic care clinic are dependent on 14:59:24
21    what your condition is.  And so you would go based on what the
22    maintenance of that particular condition requires.
23    Q.  Right.
24    A.  And so you may go into the chronic care clinic and be seen
25    for two or three different things.  I mean, you might have     14:59:48
```

UNITED STATES DISTRICT COURT

1   multiple, you know, different issues that you're being seen

2   for.  And you may be seen for them all at one time.

3   Q.  Right.

4        And so my understanding is when this is done in person

5   at the institution, the medical provider who is seeing them is          15:00:02

6   generally an internist or general family medicine specialist,

7   because you may be seeing somebody who has both asthma and a

8   heart murmur, but it's not that a cardiologist is doing chronic

9   care appointments.  Is that correct?

10  A.  Well, so unless they -- unless they are requesting a                15:00:20

11  specialist to participate in that visit, because it requires a

12  higher level of care, like we discussed Dr. Po from the

13  University for infectious disease.

14  Q.  Right.

15       So I guess I just am trying to make clear that these               15:00:38

16  telehealth chronic care encounters that you're referring to are

17  kind of the more generic maintenance chronic care appointment

18  that you would have, say, on the prison yard with the prison

19  doctor.  It's not that you're seeing a cardiologist or a

20  pulmonologist.                                                          15:00:56

21  A.  It absolutely could be that you're seeing a cardiologist or

22  pulmonologist.

23       All of these numbers are lumped together.  This could

24  be exactly what I described to you, where it could be one

25  internist covering another -- one internist at one facility             15:01:10

UNITED STATES DISTRICT COURT

1    covering another facility for as you described it kind of

2    routine visits, or it could be a specialist seeing them for a

3    particular condition.

4    Q.  So you said these are other Corizon employees that are

5    doing these encounters?                                          15:01:29

6    A.  Some of them are.

7    Q.  So --

8    A.  Some of them are.  Not all of them.

9    Q.  How many cardiologists work for Corizon?

10   A.  I'm not -- I don't oversee the physicians, so I'm not       15:01:39

11   the one -- I'm not the appropriate person to answer that

12   question.

13   Q.  Okay.  And you said that everything comes to you lumped

14   together.  Do you know who would possibly have the data broken

15   out by specialty under the telehealth?                          15:01:57

16   A.  Yes.  The person that we spoke about just a few minutes

17   ago, either the regional medical directors or the individual

18   that has recently been identified over telehealth for the

19   contract.

20   Q.  And when you are trying to find providers, are you provided 15:02:18

21   data on the number of people at each institution that have

22   specific medical conditions where they would need specialists?

23   So, for example, how many people have HIV, or how many people

24   have cancer, or how many people are on dialysis?

25   A.  No.  The data that I utilize is the out-count data that I   15:02:40

— **Juli Stover – Cross-Examination** —

 1   spoke about a few minutes ago.

 2   Q.  Yeah.  And I wanted to ask you, why is out-count data for

 3   specialties confidential information?

 4          MR. STRUCK:  Foundation.

 5          THE COURT:  What is the reason for asking that,        15:02:57

 6   Miss Kendrick?  Why do you think that's the case?

 7          MS. KENDRICK:  Because she said that it was provided

 8   confidentially to the University of Arizona.  And I just don't

 9   understand why numbers would be confidential.

10          THE COURT:  I see.  I understand your question now.    15:03:09

11          Go ahead.

12          MS. STOVER:  I guess I'd have to defer to my legal

13   counsel to answer that question.  It's not my call to make.

14          THE COURT:  So when you disclosed this information on

15   what your needs were that you were looking for somebody to     15:03:24

16   provide those services, somebody told you that -- that that had

17   to be confidentially provided, is that fair to say?

18          MS. STOVER:  Yes.

19          THE COURT:  Okay.

20   BY MS. KENDRICK:

21   Q.  And was that people at the University of Arizona or your

22   own attorneys?

23   A.  No, my legal counsel.

24   Q.  Okay.  And you mentioned --

25   A.  Yes.  Go ahead.                                            15:03:50

—Juli Stover – Cross-Examination—

1    Q.  No, go ahead, ma'am.

2    A.  That's okay.

3    Q.  You mentioned a virtual telemed services company in

4    Colorado.  I don't think I caught the name of that company.

5    What was it?                                                    15:04:03

6    A.  CarePoint.

7    Q.  CarePoint.  Okay.

8         And I just want to make sure I understood you

9    correctly.  You were talking about another entity, and it

10   sounded like you said MyWoundDoctor; is that correct?          15:04:16

11   A.  That's correct.

12   Q.  Okay.  Just a minute, ma'am, I'm looking at my notes.

13   A.  Okay.

14      (Discussion off the record between plaintiffs' counsel.)

15         MS. KENDRICK:  I have nothing further, sir.              15:04:45

16         THE COURT:  Thank you.

17         Any follow-up from you, Mr. Struck?

18         MR. STRUCK:  No, Your Honor.

19         THE COURT:  I wonder, it makes sense, I think, in

20   light of what we've heard here today, to maybe drill down a    15:04:59

21   little bit more on this subject in particular, because it seems

22   like many of these out calls are in the area of the

23   telepsychiatry or telepsychology services.  And it sounds as

24   though we need to hear from a person, perhaps this Dr. Calcote

25   again, about the nature of the services that are provided and   15:05:24

CV-12-601-PHX-DKD – January 18, 2018

1    where things stand with respect to how that system is working.

2         I will add as a footnote that it would be helpful if

3    that person could also address some of the topics that are

4    associated with the particular difficulties of functionality of

5    telemedicine in the mental health arena with respect to issues        15:05:47

6    that are specified in the Stipulation, and that is that there

7    be a confidential setting, whether or not there is a means for

8    that confidential setting.

9         I don't know whether plaintiffs have been privy to any

10   of these encounters and they can avow about whether or not          15:06:05

11   there is an issue there, or whether they have conducted a

12   simulation with the equipment that is used to do it.

13        We know from -- everyone in this room knows from

14   personal experience that there are certain difficulties with

15   telemedicine -- telecommunications that -- some of the cues of       15:06:32

16   understanding people that are present when you're in person are

17   lost in the electronic means, and that sometimes people

18   compensate for that by speaking louder, that's a natural

19   feature.  And if you speak louder, one wonders how a

20   confidential setting continues to be possible.                       15:06:47

21        I don't know whether plaintiffs, as I say, have looked

22   at a mockup to see how this situation can exist where there is

23   a telemedicine employed, and whether it does allow for a

24   confidential setting.  It would seem to me that maybe one could

25   have a simulation or a mockup to see whether or not that can         15:07:10

1    work, whether it's possible to use -- I understand there's a

2    rolling cart kind of thing.  And I don't know exactly what the

3    amplification is of the voices on both sides, whether somebody

4    has to speak very loudly to be heard, or whether everybody can

5    hear what's being said whether there are headphones or not.          15:07:31

6           I don't know the answer to those questions, and I

7    think that maybe it makes sense to arrange at a subsequent

8    hearing date to have Dr. Calcote, or someone else who is

9    knowledgeable about this who can answer these questions, but

10   also the other questions that Miss Stover wasn't able to answer     15:07:45

11   about the specifics of what happens in Arizona.

12          And I think I would ask plaintiffs and defendants to

13   confer about that and to put that on the agenda for a

14   subsequent hearing.  And if there are issues associated with it

15   and you think it needs to be heard at a separate time or some       15:08:04

16   other means, or whether you think the Court needs to visit and

17   to see how it's done, you can let me know about that as well.

18          But let me hear your thoughts about my observations

19   here on this, Mr. Fathi, Miss Kendrick.

20          MS. KENDRICK:  Yes, Your Honor.                              15:08:19

21          So your presumption was correct, we do not know how

22   it's operating, unfortunately.  So we agree that it would be

23   incredibly helpful to have Dr. Calcote come to explain it, and

24   also to perhaps have some sort of simulation of it.

25          I think that, you know, you raise an excellent point,        15:08:34

1    and probably in future tours we will request to see it

2    demonstrated so we can observe.  It may be that the Court may

3    want to have Corizon wheel it in and link to somebody in one of

4    the prisons and see if it can be done.  I don't know.  I mean,

5    it's a black hole for us as well.                        15:08:52

6             I would just also ask that this telehealth coordinator

7    that Miss Stover referred to several times, who apparently is

8    in the Arizona area, as well as Dr. Calcote, be available to

9    answer questions, and hopefully provide some of the drilldown

10   data about the needs assessments in terms of specialties and  15:09:13

11   the -- what they call the out-count.

12            THE COURT:  It sounds as though this person, this

13   newly-appointed person, could well be a person who could assist

14   the Court in its understanding of how this all works.  I'll

15   leave to you all to confer with one another to see who the best 15:09:32

16   possible witnesses are.

17            If you can get a resolution on that and how to present

18   it to the Court, we'll go forward.  If you run into issues and

19   you need me to address them in the meantime, just get on the

20   phone together and we'll figure that out.                15:09:48

21            Anything else you wanted to say, Mr. Struck?

22            MR. STRUCK:  No, Your Honor.

23            I did want to point out though that this issue -- this

24   isn't a new issue.  And plaintiffs have been aware of the

25   telehealth and telemedicine for quite some time and had     15:10:02

1    opportunities -- numerous opportunities during their tours to

2    see how it works, see where they take place, and investigate

3    the confidentiality and those types of things.

4         So it isn't something that the defendants have been

5    hiding at all, and they have had that opportunity.  And I          15:10:24

6    imagine in future tours they'll probably want to undertake

7    that.

8         MS. KENDRICK:  There's only so many things we can do

9    in the eight hours that we're at an institution, sir.  So it

10   was -- I did not mean to imply in any way that something was     15:10:39

11   being hidden.  It's just we have not raised this point before.

12        But you raise a very good suggestion, and we will

13   attempt to do so on future tours.

14        THE COURT:  Miss Stover, thank you very much for your

15   time this afternoon.  Appreciate it.                              15:10:54

16        MS. STOVER:  Absolutely.

17        THE COURT:  I wonder if it makes sense to --

18        Do you need to take a break?

19        COURT REPORTER:  No.

20        THE COURT:  Okay.  I wonder if it makes sense to turn       15:11:04

21   next to the discovery issues that are presently involved in

22   your discussions about how best to frame and address issues

23   that have been raised by plaintiffs with respect to identified

24   areas, in their view, where the monitoring was erroneous.

25        And we had, I think, a first report of this, if I'm         15:11:34

1    remembering correctly September, and then there was a follow-up

2    on October data, I think.  I may be a month off in each case.

3    But it was essentially plaintiffs saying that they had done a

4    drilldown on some records that they had sampled, and they found

5    documents that -- or they found a suggestion that what was          15:11:55

6    reported was not accurate.

7          There was a response from the defendants in some cases

8    where the defendants said that the plaintiffs' points of error

9    were not well taken.

10         And the issue has continued, I think, as I read what          15:12:09

11   you've submitted to me, to be to a place of an impasse, where

12   it looks like the defendants are saying, if you're going to

13   complain about what we did because you've done research and

14   you've found out that what we did was wrong, tell us what it is

15   that we did wrong and we'll look into it.                           15:12:31

16         And as I understand it, it seems like plaintiffs are

17   saying, no, we don't have to do that.

18         And if I'm understanding that issue as I just

19   presented it, that doesn't make a lot of sense to me.  Because

20   the complainer, I think, needs to say what the basis is for the    15:12:42

21   complaint.

22         But I open this topic and trust that you all will

23   educate me on how best I can involve myself in it.

24         MS. KENDRICK:  Well, so the two months that we had

25   previously raised was August 2017 CGARs and September 2017          15:12:59

CV-12-601-PHX-DKD - January 18, 2018

1   CGARs.  And the issue is not that we didn't provide

2   information.  When we sent the letter regarding the September

3   mistakes, which was filed last month at docket 2502-1 at page

4   4, we listed the details.  We explained, some of the mistakes

5   were actually apparent on the face of the CGARs themselves.        15:13:25

6   For example, the September reviews looking at consult reports

7   from previous months.

8           So in those situations we don't think that we need to

9   provide back a copy of the actual CGAR when it's on the face of

10  the CGAR.                                                          15:13:46

11          We did provide extensive detail.  The letter goes on

12  for 16 pages and gives the dates of things received.  And so we

13  think that to require us to go back into eOMIS and print out

14  the specific page or screen that shows what is written down in

15  our letter is an unreasonable demand, when defendants have         15:14:12

16  access to eOMIS as well and have 30 odd monitors in their

17  monitoring bureau.

18          THE COURT:  Is that what this is about, you're saying

19  that on page 17 of August 18th, this particular CGAR there's

20  this error, and they're saying that they want you to print that   15:14:36

21  out?  Really, that's really what the issue is?

22          MS. KENDRICK:  So the response which is attached as

23  Exhibit 1 to the Declaration that was filed last week, it's

24  docket 2531, we were asked -- it's at page 4 of docket 2531-1.

25  And defendants' counsel writes, in order to understand            15:15:03

1    plaintiffs' position, please provide us with each and every

2    document that supports the errors alleged by plaintiffs in

3    their December 11, 2017 correspondence.  Until we receive that

4    information, we are unable to respond to your correspondence.

5              That December 11th letter was filed with the Court          15:15:21

6    before the December 20th hearing, it's at docket 2502-1.  It's

7    16 pages.  It's Exhibit 1.  And we do go institution by

8    institution giving the dates and what the mistake is for every

9    single person.

10             So, for example, Performance Measure 52 at Eyman, we         15:15:45

11   noted that three files had been marked as compliant but

12   actually were not applicable and should not have been reviewed

13   because the review of the report was not in September 2017.

14   And on the face of the CGAR it said, report received 8-17,

15   reviewed 8-17.  Report reviewed -- received 8-10, reviewed          15:16:12

16   8-11.

17             And then we also, for example, went on -- this is at

18   page 14 on the docket of this filing, where again we refer to

19   reports that were received in October, reports received in

20   July, that were marked actually as non-compliant.  And our         15:16:32

21   response was, these aren't applicable because these are

22   different months than September.

23             So, again, we don't think we need to provide the

24   sheets of paper that are in eOMIS that reflect this for each

25   and every one.                                                     15:16:49

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1        THE COURT:  Moreover, haven't you identified every

2   document that would be necessary for someone to understand what

3   your argument is?

4        MS. KENDRICK:  Yes, sir.

5        And also another example is Performance Measure 77,          15:16:57

6   which this is at page 19 of the docket 2502-1, again, we list

7   entries that were marked as compliant, but just looking at the

8   dates listed on the face of the CGAR, they were out of

9   compliance.

10       So if you just look at the September CGAR for              15:17:20

11  Performance Measure 77 for four different prisons, we listed

12  the ADC number of the prisoner and the dates that were listed

13  on the CGAR form and said, on its face this is not compliant

14  based on what you've put in the CGARs.

15       THE COURT:  Okay.  And I'll give defendants a chance      15:17:38

16  to respond to you.

17       But let me also put on the table a broader question,

18  and that is:  How best for me to adjudicate this process that

19  you've undertaken so that there's a definitive determination.

20  Last time we talked about it I really had hoped that it would   15:17:57

21  be teed up so that I could best understand where it was that

22  there was a different view and then I'd have to decide who's

23  right, who's wrong, and that that would educate the system as

24  to understanding what was required for reporting, and also give

25  me a heads up about the number of errors that are occurring.    15:18:16

CV-12-601-PHX-DKD – January 18, 2018

1   So it was, I thought, a useful inquiry.

2          But it's difficult for me to do it efficiently, first

3   when it's not teed up, but also to worry about the fact that

4   each time we talk about this and it gets bumped down the road,

5   I'm now talking about August in January.  And so the delay just          15:18:35

6   becomes much worse.  I don't know whether I'm focusing on the

7   present issues.

8          I don't know whether plaintiffs are engaged in a

9   continuing rolling process here.  If you are, it probably makes

10  sense for us to focus on the more current ones because of the          15:18:50

11  limited resources that we all have.  But I don't know the

12  answer to that question.

13          MS. KENDRICK:  Right.  So just a couple thoughts in

14  response.

15          First, to the question about whether we're doing it on          15:19:02

16  a rolling basis, we are spot checking some of the October CGARs

17  that we got a few weeks ago.  We haven't actually received the

18  November CGARs, so we can't do anything with those yet.

19          But, Your Honor, I think this actually illustrates

20  again our position that there needs to be an independent          15:19:20

21  monitor -- or expert.  Because otherwise we're just going to be

22  in this endless death spiral where we say they're non-compliant

23  and then they come back and say, no, we're not.  And then we go

24  round and around and around and there's never any resolution.

25          And what we want is we want accurate data that we can          15:19:40

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1    trust that's monitored competently.

2           And I am an attorney, I am not an auditor.  And my

3    office is not Price Waterhouse Cooper, so we are not equipped

4    to take on doing this other check.

5           And what this exchange has illustrated is, it doesn't          15:19:56

6    matter what we find because the response is going to be, no,

7    you're wrong plaintiffs.  And it's a tit for tat, or as I

8    called it, a death spiral.

9           So we think that, again, this illustrates the need

10   that we've articulated in the briefing that's fully briefed          15:20:11

11   since we had those hearings in the early Summer about the

12   methodology, that the Court needs to consider appointing a

13   Rule 706 expert on monitoring, because this is not sustainable.

14          THE COURT:  Well, I have considered it and I have

15   mentioned it and put it on sort of one of the things that I'm          15:20:31

16   thinking about as being necessary in the case.

17          But I also think in fairness I have to know that there

18   is a real problem.  And so at some point I'm going to have to

19   make a finding.

20          So I guess the answer that you've provided to me tells          15:20:45

21   me that I need to get to a step where we have this issue joined

22   in the two months that you presented it to me.

23          And so the way to do that is, I'll turn now to

24   defendants and see why it is that you need to have actual

25   pieces of paper, when it sounds to me like, at least in the          15:21:02

CV-12-601-PHX-DKD – January 18, 2018

1   examples that have been cited by Miss Kendrick, that you have

2   all the information you need to know what their accusation is

3   about the error, and so that I can then hear what your view is,

4   see what their view is, and decide, was there an error.  And

5   then if I see a number of errors, that informs my decision          15:21:20

6   about whether a 706 expert is necessary to augment the

7   monitoring process.

8           MS. HESMAN:  Thank you, Your Honor.

9           Just to give you some historical context and

10  background, this issue began in July when we received a letter     15:21:32

11  from plaintiffs' counsel detailing numerous what they call

12  errors from the July CGARs.  We went back and forth among

13  counsel exchanging correspondence.  They said things were

14  non-compliant, we said they are actually compliant and here is

15  why.  We went back and forth.                                       15:21:48

16          Most of what they thought was non-compliant was

17  actually compliant.  So we reran the numbers.

18          And as you may recall from the last hearing, I

19  presented you with those percentages.  It may no difference.

20  It made no difference in July.  It made no difference in            15:22:01

21  August.

22          THE COURT:  But, again, what I would focus on is on

23  the errors, not whether or not it was a mistake that didn't

24  affect the compliance.

25          I guess what they've -- they've taken a sample, and         15:22:11

UNITED STATES DISTRICT COURT

1    they are contending that they found errors that would cause one

2    to question whether everything else was valid.

3           MS. HESMAN:  I understand that that's what they're

4    saying.  Most of their errors were not actually errors, they

5    were looking at the wrong screen or section in eOMIS.                15:22:27

6           THE COURT:  All right.  So that was July; right?

7           MS. HESMAN:  That was what?

8           THE COURT:  That was July.  That was a July episode.

9           MS. HESMAN:  That was both in July and August.

10          THE COURT:  So August the same thing, most of the            15:22:37

11   errors were because of looking at a wrong screen.

12          Anything about that?

13          MS. HESMAN:  It was a combination.

14          THE COURT:  Hold on just a second.

15          Anything -- is that true?                                     15:22:45

16          MR. FATHI:  Your Honor, I can address August.  In --

17   one moment.

18          We pointed out a number of errors in the August 2017

19   CGARs specifically relating to Performance Measures 94, 95 and

20   97.  The defendants conceded that those were errors.  But they      15:23:06

21   claimed that they had reaudited those Performance Measures and

22   that the reaudited results didn't make any difference, didn't

23   change any findings of the compliance to non-compliance.  And

24   this is in document 2489.

25          But they didn't provide the reaudited CGARs so that          15:23:27

1   plaintiffs and the Court could verify the statement they made

2   that this didn't change anything.

3           So one of the things we need is for them to provide

4   those reaudited CGARs so that we can actually verify that it

5   didn't shift compliance to non-compliance.                    15:23:44

6           But going to your first point, Your Honor, there were

7   a number of errors -- I don't have the document in front of me,

8   document 2489.  There were a number of errors that they did not

9   dispute, they conceded were errors.  Their rejoinder was, yes,

10  but it didn't change compliance to non-compliance.             15:24:03

11          But, again, they still haven't provided the reaudited

12  CGARs so we can verify that.

13          THE COURT:  All right.  So folks have made efforts to

14  inquire into July and August and September.  And what I have, I

15  imagine in my mind, is a possible table in which we have        15:24:18

16  plaintiffs' allegations where they tell the defendants there

17  were errors.  Then we have the defendants' response.  In some

18  of those cases it sounds like the defendants say the plaintiffs

19  were wrong, we were right.

20          I'm not interested in whether it changes compliance or  15:24:35

21  not.  I'm interested in whether it's -- this window into the

22  quality of the monitoring program is telling me to be

23  concerned.

24          And so the way that I'd like to do that is I'd like

25  you all to set forth the accusations that you made, tell me     15:24:51

CV-12-601-PHX-DKD – January 18, 2018

1   where you concede your error on the accusation of error, if it

2   turns out that you're convinced that the defendants got it

3   right and that your accusation was wrong.  And then if there is

4   still after the defendants' response your view that you have it

5   right, then I have two views, the issue is joined, I can in my      15:25:12

6   third column make a decision, who is right, who is wrong.

7        At the end of this process I will look at July, August

8   and September, and I will see whether or not there are

9   sufficient numbers to cause me to think that I should seriously

10  take steps forward as advocated by plaintiffs with respect to      15:25:30

11  doing something different on the monitoring side to make sure

12  that it's competent.

13       I'll give each side a chance now to tell me why this

14  is a bad idea.

15       MR. FATHI:  Your Honor, our primary concern is just           15:25:47

16  the tremendous amount of work that's going to be.  We're happy

17  to do it if it's useful to the Court.

18       THE COURT:  Haven't you already done your side of the

19  work though?

20       MR. FATHI:  We have, Your Honor.                              15:26:00

21       THE COURT:  All right.  So -- and the defendants have

22  done some amount of the work already, I think they've

23  responded.  There are some -- you say the latest letter says we

24  want to know -- we want to have the piece of paper that you

25  think is evidence of this error.                                   15:26:12

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1              MR. FATHI:  Correct.

2              THE COURT:  But it seems to me if you tell them what

3       that document is, that's enough, they can go look themselves.

4       And so you're saying its on its face telling us this, go look

5       you'll see it on its face.                                    15:26:24

6              If you say that enough times and you're not right, or

7       it turns out that you're not on the right screen, then we're

8       not going to go down the road you're advocating.

9              But I don't see any other way for me to decide this,

10      other than to have the issue joined and to have me make an    15:26:37

11      informed decision.

12             MR. FATHI:  Your Honor, just to be clear, what we have

13      provided in the September letter that Miss Kendrick was

14      discussing a little bit ago is the dates of the encounters.

15      And our position is that if we provide the date of the        15:26:54

16      encounter, the defendants can go look at it in eOMIS just as

17      easily as we can.

18             THE COURT:  Wait a minute.  So you're saying that

19      there's a problem on the date of the encounter, but you're not

20      telling them exactly what it is that you saw that's wrong?     15:27:07

21             MR. FATHI:  I think Miss Kendrick can probably give a

22      concrete example.

23             MS. KENDRICK:  So, for example, among the files -- and

24      this illustrates the point that it's not just about, it doesn't

25      matter because it's still compliant.  This one Performance     15:27:21

—— **CV-12-601-PHX-DKD – January 18, 2018** ——

1    Measure we identified nine files that they marked as

2    non-compliant, but were actually not applicable.

3            And so, for example, prisoner blank, report received

4    8-10, reviewed 8-21, not applicable to September.  Parenthesis,

5    would have been non-compliant if reviewed in August CGARs.  And          15:27:45

6    it goes on like that, with the date of the report received, the

7    date the review was done, and what happened.

8            And so we have given all of the dates of these reports

9    that were reviewed or seen.  For example, at the Lewis prison

10   on this Measure about specialty reports, Performance Measure          15:28:06

11   52, we note at page 15 of docket 2502-1, number 2, ortho report

12   received 9-13, reviewed 9-19.  Plan of Action, enter hand

13   surgery consult when dictated copy is available.  And then we

14   wrote, no indication that the follow-up consult request was

15   made.                                                                 15:28:35

16           So it's in the record that you can go and see the

17   orthopedics report that was received on 9-13 and click the date

18   that it was reviewed, and see the exact same thing that we saw.

19   Otherwise we're going to have to go back and print out the

20   screen for every single one of these encounters that's on the          15:28:52

21   eOMIS system.

22           THE COURT:  How many are there?

23           MS. KENDRICK:  Well, for Eyman there were nine.  For

24   Lewis we reviewed 71 files.  For Tucson it was 60 separate

25   files we reviewed.                                                    15:29:11

1           So it's quite a few.

2           THE COURT:  And how many of these files did you find

3    errors?  Are those the gross number of errors or the gross

4    number of files you pulled to review?

5           MS. KENDRICK:  Well, so, for example --                    15:29:23

6           MS. HESMAN:  I believe the letter has 160 allegations

7    of errors.

8           MS. KENDRICK:  Right.  So, for example, Eyman for

9    Performance Measure 48, which is about the denial of specialty

10   services, the September 2017 CGAR reported a compliance rate of   15:29:38

11   40 out of 41 compliant, or 98 percent.  However, 30 entries

12   were marked as compliant that were not applicable for the month

13   of September 2017 and should not have been included in the CGAR

14   report.  And then we list all 30 of them that were not

15   applicable to the month of September, with the ADC number --      15:30:02

16          THE COURT:  On that one, on that example, why would

17   defendants need anything more?

18          MS. HESMAN:  I don't think we need anything more when

19   we're talking about if they think something's not applicable

20   and we believe something is applicable.                          15:30:20

21          What we're talking about is instances, which is 80 to

22   90 percent of what's contained in that letter, where they say a

23   consult wasn't ordered, and we pull up -- ADC monitors pull up

24   eOMIS and says, it's right here.  What screen are you looking

25   at where you don't think that it was ordered, or medication      15:30:36

1    wasn't given, or hospital discharge recommendations weren't

2    implemented?

3           All of these things that when ADC monitors take time

4    out of their day to go re-review 160 files from a letter that

5    we received, and it's right there in front of us.          15:30:46

6           What we're simply asking is, they've obviously done

7    the work, Your Honor, they've put together a letter with 160

8    allegations of inmates that were marked -- that were

9    incorrectly marked compliant, so show us the work, what screen

10   are you looking at?                                         15:31:01

11          I think this would be beneficial to both sides.

12   Perhaps they just don't understand eOMIS, and we can say, no,

13   you're supposed to be looking at this screen.  And then perhaps

14   in October and November the letters will be culled down because

15   they'll understand the appropriate place to look for.       15:31:13

16          But it's of no use for them to spin their wheels and

17   then for us to spin our wheels and we don't know whether we're

18   looking at the same thing.

19          I also don't know who's undertaking this review, is it

20   law students, law clerks, Miss Kendrick herself?  I mean, we   15:31:24

21   certainly have access to eOMIS, but we rely on medical

22   professionals to review the medical records and tell us where

23   things are.

24          I think there's a disconnect, and we're simply asking

25   for the support for their allegations.  I think it would be   15:31:38

─── **CV-12-601-PHX-DKD – January 18, 2018** ───

1    beneficial to both of us.

2         THE COURT:  All right.  Here's what going to happen:

3    You're going to take three hours.  You lawyers are going to

4    take three hours, and you're going to go to the same eOMIS

5    terminal, and you're going to sit down, and the plaintiffs are          15:31:50

6    going to say, these are the ones that we think are wrong in

7    this three hours.

8         And as far as you get in three hours, you then will

9    sit side by side and work through those.  And at the end of

10   that process you can report to me about what happened.  And if         15:32:02

11   there are two ships passing in the dark, then we're going to

12   get that fixed.

13        But it sounds like, to take you from your word, that's

14   what you think is happening on the defendants' side.  And

15   the -- if I can say that -- to a drilldown to try to give a            15:32:20

16   chance to see if there is some obvious mistake that's going on,

17   the best way to do that is to have you sit side by side and to

18   work through these accusations.  So if there's a wrong screen

19   kind of thing, you'll see about it.

20        And after three hours it seems like it's a reasonable            15:32:38

21   period of time that people would get a sense about whether this

22   is a avenue worth going down.

23        MS. KENDRICK:  Yeah, we would just -- I encourage the

24   Court -- I know you review everything before the hearings, but

25   if you take a look at our December 11th letter that's filed at         15:32:54

1  docket 2502-1, you can see the examples and the amount of

2  detail that we included in the allegations.  We don't just say

3  something didn't happen.  We searched.

4      And there's examples where people come back, you know,

5  with serious instructions from the hospital, and it looks like   15:33:17

6  it takes, you know, instead of 24 hours to take the action of,

7  for example, requesting the follow-up, ten days later the

8  follow-up consult is submitted.  And so we say that's

9  non-compliant, because it says reviewed and acted upon within

10  24 hours.                                                        15:33:38

11      So, yes, we are looking at a screen.  We may see that

12  ultimately whatever was requested was done, but it wasn't done

13  pursuant to the Performance Measures.

14      But we're happy to do it either telephonically or in

15  person, that kind of conference, and going through eOMIS        15:33:54

16  simultaneously.

17      THE COURT:  You're located in San Francisco,

18  Miss Kendrick; is that right?

19      MS. KENDRICK:  We're in Berkeley, sir.

20      THE COURT:  Berkeley.  All right.                            15:34:04

21      MS. KENDRICK:  Telephonically would probably be

22  easier.

23      Or Miss Eidenbach can do it in person as well in

24  Arizona.  The problem is Miss Eidenbach was not part of the

25  team who reviewed these records.  But she knows how to use      15:34:27

CV-12-601-PHX-DKD – January 18, 2018

1    eOMIS.

2         And it was -- to answer the question, the people who

3    did the reviews for the December 11th letter, I did the bulk of

4    it.  And Rita Lomio, who is another attorney of record, did a

5    lot of it.  And then one of our litigation assistants who's        15:34:45

6    worked on the case for two years and has an eOMIS login and

7    knows how to use eOMIS also worked on it.

8         I would also just note for the Court that we did go

9    and counted up the amount of hours it took for us to do that,

10   attorney and paralegal time, and to do those three Measures to    15:35:06

11   review, three Measures at three institutions, approximately 180

12   records, it took over 40 hours of attorney and paralegal time.

13        So I just want to emphasize again what I said last

14   month, that it's an incredible amount of work and resource

15   drain on my office to do this.  We recognize that it's           15:35:26

16   critically important for us to make the case for you that there

17   are these errors in monitoring, but I just want to highlight

18   that there are these limitations.

19        THE COURT:  All right.  What I'm about to propose is

20   based upon the fact that I have two sides telling me that their   15:35:42

21   system is not as -- well, I have plaintiffs saying the system

22   has errors that they found, and I really think I hear

23   defendants say that the overwhelming number of them are -- look

24   to be looking at wrong screen kind of things.

25        So I'm going to find out whether it's true.  And the         15:36:05

1   way I'm going to do that is, I'm going to ask you two to

2   coordinate your schedules with mine.  I want to be there for

3   the three hours.  We'll do it in Phoenix sometime,

4   Miss Kendrick, when you happen to be here otherwise.

5          Get those three hours from me, find an eOMIS terminal      15:36:18

6   that I can show up, wherever that is, at the AG's office, or in

7   your counsel's office, wherever it is, and the three of us will

8   sit down and you will show me what you think are the errors,

9   and then I'll look at the screen and see whether or not those

10  should be counted or errors or not.                             15:36:33

11         That will at least give me a greater hands-on

12  understanding of the system that I will have to adjudicate as I

13  decide whether or not there are enough errors here to warrant

14  further -- a different method of monitoring.

15         Let's take a ten-minute break, give the court reporter    15:36:48

16  a break.  Thank you.

17     (Recess at 3:36 p.m., until 3:49 p.m.)

18         THE COURT:  I wondered if it was worth me inquiring

19  about whether or not in the breaks and all you've had a chance

20  to discuss the Winslow telepsychology issue that Mr. Fathi      15:49:11

21  raised such that if it has a ready answer I'd rather save you

22  the trouble of having to do briefing on it as we talked about.

23  I thought I would at least ask whether you thought now you had

24  a ready answer or you still needed more time.

25         MR. STRUCK:  I don't have a ready answer.  But we         15:49:30

1    could get a ready answer and confer with Mr. Fathi and then

2    determine whether or not -- he can decide whether or not, you

3    know, he would like the Court to deal with the issue, or maybe

4    it will answer his question.

5             THE COURT:  Okay.  So then to make sure that that          15:49:46

6    happens in an ordered process, so you all will meet and confer

7    in the next week about this.  If it turns out that there still

8    is an issue that the Court needs to address, then seven days

9    from -- well, next Friday, defendants will file a response to

10   what was put forth on the record from Mr. Fathi today.  And     15:50:04

11   then five days after that the plaintiffs can respond.

12            How is that?

13            MR. STRUCK:  That's fine.

14            Also, Judge, over the break we conferred with respect

15   to the issue that we were just discussing.  And Miss Kendrick    15:50:17

16   had the idea that perhaps we do this three-hour review on

17   February 9th, when the Court already had some time set aside.

18   We could do it at the ADC monitoring bureau, which is very

19   close to the courthouse.  And we could go through the

20   allegations in the December 11th letter with a bank of          15:50:33

21   computers so we can all see how the monitors -- you can see how

22   the monitors are reviewing things, and we can show where we

23   think that they made mistakes.  And if they're correct then you

24   can see that.

25            But we think -- we think that's probably a good idea     15:50:53

1   to do it, since we all had that time set aside.  Miss Kendrick

2   had already purchased her plane tickets to come out here

3   anyway.

4           THE COURT:  All right.  We'll do that.

5           And let me get back to -- or let's have a conversation    15:51:07

6   perhaps through my staff about what time of day works better in

7   light of everybody's schedules in terms of what I'm doing as

8   well.

9           Does that make sense?

10          MS. KENDRICK:  Yes, sir.                                   15:51:16

11          MR. STRUCK:  Yes.

12          THE COURT:  All right.  Thank you.

13          So since I've opened the issue of discovery, I

14   understand there are some other discovery issues that are

15   present.  Maybe now is the time to talk about those.  I think   15:51:25

16   those are on the plaintiffs' side.

17          MR. FATHI:  Yes, Your Honor.

18          This is not -- perhaps not exactly a discovery issue,

19   but it has to do with the monitoring which we've been

20   discussing.  And this is item 4c on the plaintiffs' agenda.     15:51:37

21          The last version -- most recent version of the

22   Monitor Guide that we've received from the defendants is dated

23   October 20th.  And since that time the Court has invalidated

24   the defendants' previous monitoring methodology for Performance

25   Measures 1, 2, 4, 77 and 95.  Those rulings were back in        15:52:00

1    November, November 7th and November 21st.

2         But the defendants still haven't produced a new -- an

3    updated Monitor Guide reflecting the Court's ruling.  So we

4    think it's important, both so the monitors are apprised of the

5    Court's rulings on how they have to monitor these Measures, and          15:52:27

6    so the parties have a common understanding of what's happening,

7    that the defendants produce a new Monitor Guide that reflects

8    those rulings.

9         THE COURT:  So what you'd like to have in the first

10   instance is the language that they would be posing in the          15:52:41

11   Monitoring Guide so that you can take a look at it, or do you

12   just want a Monitoring Guide with their language?

13        MR. FATHI:  Well, Your Honor, we've already reached

14   agreement on the language for Performance Measure 95.  They

15   just sent language on the remaining Performance Measures on          15:52:52

16   Tuesday night.  And I apologize, I was at a conference

17   yesterday, I haven't had a chance to look at it.

18        But, yes, once we reach agreement, we would like them

19   to promptly produce a new Monitor Guide, and make sure it's

20   distributed to the monitors.          15:53:09

21        THE COURT:  Is there any issue with that?

22        MS. HESMAN:  No, Your Honor.  If I just may correct

23   something that Mr. Fathi said that was incorrect.

24        I actually sent him language on Friday, January 12th,

25   for Performance Measures 1, 2, 4 and 77.  Like he says, we've          15:53:19

— CV-12-601-PHX-DKD – January 18, 2018 —

1   already agreed on 95.

2           He responded that same day and asked us for a new

3   version of the Monitoring Guide.  I responded on Tuesday

4   saying, are you approving our language for 1, 2, 4 and 77?  If

5   you approve, certainly I'll provide that to you.  And I          15:53:39

6   received no response.

7           So this notion that we've refused to provide a Monitor

8   Guide is simply inaccurate.  I'm waiting for him to approve the

9   language.

10          MR. FATHI:  Your Honor, I don't think I said they'd     15:53:48

11  refused to provide the Monitor Guide.

12          And on Tuesday night's -- in Tuesday night's e-mail

13  Miss Hesman did produce some modified language from her

14  previous proposal for Performance Measure 77.

15          I don't think this back and forth is important.  What   15:54:02

16  we want is that there be a new Monitor Guide produced promptly.

17  We will --

18          THE COURT:  But isn't the back and forth stopping the

19  prompt production of the Monitoring Guide?  Because until you

20  get it all sorted out, they don't want to issue it --            15:54:13

21          MR. FATHI:  I'm sorry, I meant this back and forth

22  now, Your Honor --

23          THE COURT:  Oh, oh.

24          MR. FATHI:  -- about who said what.

25          THE COURT:  Oh, okay.                                    15:54:20

 1           MR. FATHI:  We will respond to Miss Hesman's e-mail.

 2           THE COURT:  All right.  So we don't need to talk about

 3    it further at this moment, it seems.

 4           MR. FATHI:  Correct.

 5           THE COURT:  Other discovery issues?                    15:54:28

 6           MR. FATHI:  Yes, Your Honor.

 7           Item 5, we -- there are some outstanding discovery

 8    requests.  Exhibits 2 and 3 to the Declaration of

 9    Miss Kendrick.

10           Exhibit 2 at document 2531-1 is my January 4th letter   15:54:48

11    to the defendants regarding these outstanding requests.  We

12    have received no response.  We would appreciate one.

13           MS. LOVE:  Your Honor, we are down to -- just so you

14    know, when we took over document production issue in November,

15    and have attorneys working diligently, just specifically        15:55:12

16    working on document production, we have drilled down

17    outstanding issues that plaintiffs had -- from about 14 to 16,

18    we're down now to four.

19           Mr. Fathi followed up asking if we have any additional

20    information to supplement on four.  We're down to four.  We're  15:55:28

21    in that process.  We are supplementing it.  I don't think that

22    we need a court order to respond.  We are doing that.

23           But this is the same situation where we were at last

24    month where the parties continue to work together.  If

25    Mr. Fathi is dissatisfied with either what he's getting, then   15:55:44

1   we need to have a meet and confer versus just this

2   identification to the Court every month of what the date of

3   their letter is.

4         I mean, we continue to work on this.  There's really

5   nothing for the Court to solve at this point.          15:55:55

6         THE COURT:  All right.

7         MR. FATHI:  Your Honor, I do think that -- one of

8   these document requests was originally made in August.  We

9   still have received nothing.  We are judicious about what we

10  bring to the Court.  But I think --                   15:56:10

11        THE COURT:  And what's the subject of this August

12  request?

13        MR. FATHI:  Yes, Your Honor.  This had to do with a

14  situation where a physician, the medical director at the

15  Phoenix facility, refused to accept for transfer a couple of  15:56:21

16  prisoners based on deficient CGAR scores.

17        And there was -- there were e-mails from Dr. Taylor,

18  there was an e-mail from Mr. Pratt saying -- and, again, I'm

19  paraphrasing -- serious consideration must be given to

20  continued employment of this individual.              15:56:43

21        And so our document request was simply for any

22  follow-up documents that showed any corrective action taken

23  with this individual.  And again, five, six months later we

24  have received nothing.

25        THE COURT:  Miss Love, is this within your four issues  15:57:01

CV-12-601-PHX-DKD – January 18, 2018

1    that remain or something that you hadn't been focusing on?

2          MS. LOVE:  I'm sorry?

3          THE COURT:  Is this among the four issues that you say

4    remain to be addressed, or is this something you had not been

5    focused on?                                          15:57:13

6          MS. LOVE:  No, this is one of the -- this is one of

7    the document requests.

8          ADC is not in possession of documents responsive to

9    the request.  We are following up with Corizon to see if they

10   have any documents that are responsive, and they are searching  15:57:24

11   to see if there is.  If there are any, we will certainly turn

12   it over.

13         But, again, I think that this is an issue where, if we

14   need to talk through these issues, the time would be for

15   Mr. Fathi to say, hey, can we have a phone call and talk      15:57:36

16   through these things, more versus bringing it to this venue,

17   when what we're supposed to be doing is having a confer session

18   before, versus being -- bringing it up every month.

19         THE COURT:  Okay.  Well, let me just, for the sake of

20   drilling down -- so that I can do what I promised to do when I  15:57:52

21   took this job, and that is not just turn a deaf ear to when

22   people were having discovery disputes, to actually be the judge

23   and listen to them.  When was the last time that there was a

24   discussion about this issue between counsel?

25         MS. LOVE:  There have been letters back and forth.    15:58:09

UNITED STATES DISTRICT COURT

1    ADC has responded that there's no responsive -- we don't have

2    any responsive documents.  We have advised them in a letter

3    form that we're following up with Corizon to see if they have

4    any documents responsive.  If so, then we will supplement.

5         It's a normal discovery process that if there are                    15:58:25

6    additional documents that are out there, we will certainly

7    supplement.

8         THE COURT:  All right.  And that letter where you said

9    that you'd turned to Corizon to ask them to see if they had

10   any, when was that?                                                        15:58:36

11        MS. LOVE:  That was --

12      (Discussion off the record between defense counsel.)

13        MS. LOVE:  -- December 29th.

14        THE COURT:  Okay.  Well, it seems to me that it is

15   appropriate to not be raising that here.                                   15:58:56

16        To offer my observation, that if you get a response

17   from counsel on the 29th of December, and you haven't heard

18   anything back by the 18th of January, what you should do is

19   send over an e-mail saying, you told us you would get this on

20   the 29th, when should we expect to be able to hear an answer?             15:59:13

21   And that would be the appropriate thing to do.

22        MR. FATHI:  That's fine, Your Honor.

23        I do want to make clear that there are other discovery

24   requests in this letter, and we have received no response.

25        THE COURT:  You brought this one up, though.  And so                  15:59:28

1   I drill downed and looked into it, and you don't win on this

2   one.

3        MR. FATHI:  Thank you.

4        THE COURT:  All right.  Any other discovery issues?

5   (Discussion off the record between plaintiffs' counsel.)    15:59:38

6        MS. KENDRICK:  So another request that's outstanding,

7   Your Honor, is the one that has been numbered document request

8   62, and that involved our request for documents regarding the

9   discontinuation of pain medication.

10       THE COURT:  Right.  Well, we have the production that    15:59:56

11  the defendants filed, about the tramadol and the gabapentin.

12  Is that what we're talking about?

13       MS. KENDRICK:  Correct, Your Honor.

14       So that filing contradicts what counsel for defendants

15  asserted both in court and in correspondence saying that no    16:00:11

16  such policy existed.  Because what they filed showed that it

17  was as a result of something that was a state-wide directive

18  handed down by the governor himself.  And in the filings that

19  was included in the Declaration, there's reference to

20  directives being given to providers and that sort of thing.   16:00:34

21       And so we think that there are documents that are

22  responsive.

23       We're frankly kind of confused by the fact that last

24  month we were told by counsel for defendants and Mr. Pratt that

25  the reason these medications were no longer being prescribed   16:00:51

1    for people was because there was this uptick in abuse of the

2    drugs.  And then Mr. Moyers from Corizon files this Declaration

3    where he says the reason why is because Governor Ducey said

4    that the State will not pay for more than seven days of opioid

5    medication.                                                    16:01:13

6          Holding aside whether or not the Governor, and given

7    his background, necessarily is a person who should be making

8    these prescribing decisions, the fact remains that it does

9    appear that there was some sort of system-wide policy.

10         Mr. Moyer states that as a result of Governor Ducey's    16:01:30

11    order, that they worked with the providers -- worked with

12    providers to ensure the medications are appropriately

13    prescribed.

14         And so to us this does actually seem to indicate that

15    there are responsive documents.                               16:01:44

16         You know, this information they provided was what you

17    had requested with the data.  The data that they provided

18    raised a lot of questions to us as well because it showed a

19    sharp decrease in these two medications, and then said there

20    was an increase in overall pain meds being prescribed.  But   16:02:01

21    then they include all of these psychotropic medications, like

22    Cymbalta and Effexor and Elavil in there, which are primarily

23    prescribed for mental health purposes.  As our expert,

24    Dr. Wilcox, pointed out, that's an off-label use to use them to

25    treat pain.                                                   16:02:21

1        So given what was filed, it to us indicates that there

2   are responsive documents out there.  And so this is something

3   that we had been hearing about, as laid out in the Declaration

4   of Megan Lynch from my office, where she analyzed the mail and

5   what had been filed on the docket with the court by class          16:02:42

6   members.

7        And so we've been trying to get more information about

8   this.  This is a useful start in terms of showing we now know

9   the true reason why it happened, it was pursuant to the

10  governor's order.                                                   16:02:54

11       But it also indicates to us that this request, as you

12  had asked a few months ago that we make some sort of case as to

13  why we were asking for it, that there are documents and that we

14  are entitled to get them.

15       THE COURT:  Well, I think the defendants have produced         16:03:11

16  what I had a commitment from Mr. Pratt to obtain.  And so that

17  is satisfied.

18       Those documents, as I review them though, raise a

19  number of other questions.  And you say that you want discovery

20  on those questions.  Have you promulgated that -- have you          16:03:29

21  served interrogatories or discovery --

22       MS. KENDRICK:  Yes.

23       THE COURT:  -- document requests?

24       MS. KENDRICK:  I'm sorry to interrupt, Your Honor.

25       Yes, sir, we have.  After the December -- so on the           16:03:40

1   15th of every month we promulgate our monthly document request.

2       So after the last hearing where you advised us that

3   the language that was originally used in request 62 could have

4   been read to mean we were just requesting a copy of the policy,

5   we revised that language appropriately, and provided it to        16:03:58

6   defendants on the 16th of this month, Tuesday, because of the

7   federal holiday on Monday, the 15th.

8       THE COURT:  All right.  So you've done the next step.

9   It doesn't seem like it's ripe for me to address anything

10  further on this as a discovery dispute because they haven't       16:04:16

11  responded yet.  Is that right?

12      MS. KENDRICK:  We just -- I guess we just want to make

13  clear that, holding that aside, we are concerned by the fact

14  that we were told for months that, first of all, there were no

15  documents, there was no policy, and now it appears that there     16:04:31

16  are documents and there was a policy.

17      THE COURT:  Well, again, the discussion that we had in

18  court about this was about a policy, I think, of discontinuing

19  these drugs.  And so we see that it's not true that they've

20  been discontinued, because some number of inmates still get       16:04:57

21  them.

22      What we've learned is that there is a policy from the

23  governor's office with respect to the opiates that has resulted

24  in a direct effect.  We read in the Affidavit that the State

25  provided that with respect to the gabapentin that there is this   16:05:14

UNITED STATES DISTRICT COURT

1   abuse issue that is raised.

2          And then I will say this about the attached

3   information, it's somewhat unintelligible to a lay person in

4   terms of understanding exactly what it means.  There are terms

5   that are used in some of the tables that are not defined or            16:05:37

6   they're apparently potentially inconsistent with respect to

7   what the meanings are across these documents.

8          So I think further discovery is warranted.  I also

9   think -- you mentioned your expert, it's appropriate for the

10  expect -- plaintiffs' expert to opine about what this means            16:06:00

11  with respect to the impact for the prison population to

12  discontinue these two classes of medications, and whether or

13  not there is reason to believe that it's causing harm in a way

14  that would be recognized as being contrary to the Stipulation.

15         And so I think that this discovery stage is               16:06:23

16  appropriate.  I think I invite you to further brief this and to

17  have an Affidavit of your expert, or if we need to have a

18  hearing about it, to give an opportunity for the respective

19  sides to be heard about it.  But I don't think this is the end

20  of the issue.                                                    16:06:42

21         MS. KENDRICK:  Correct.  We agree that it is not the

22  end of the issue.

23         And I actually forwarded those findings to Dr. Wilcox

24  when they were filed because, like you, I couldn't make head or

25  tails out of them.  And he did send me some written comments,          16:06:54

UNITED STATES DISTRICT COURT

1    primarily about the formulary.

2          He also made the observation that the chart showing

3    that there's been an increase in pain medication doesn't really

4    mean anything if it's including all the mental health

5    medications that are prescribed for mental health issues.        16:07:10

6          His observation to him –– that he offered was that he

7    found that the formulary for pain medication, the scientific

8    word for it was weird.  Because he says they have minimally

9    effective, if even at all, medication such as Tylenol 3, and

10   then they have morphine.  And he says, they're missing         16:07:33

11   formulary options for what I consider medium strength pain

12   medication.

13         So, you know, obviously that's just something he

14   e-mailed me quick and dirty.  But we are in the process of

15   trying to gather that sort of information and get a little more 16:07:48

16   detail and handle on what exactly is going on with this.

17         THE COURT:  Okay.  All right.

18         Anything that defendants' side want to say on this

19   point?  I didn't give you a chance.

20         MS. HESMAN:  No, Your Honor.  You covered exactly what   16:08:02

21   I was going to say.  Miss Kendrick said that I made

22   misrepresentations at the last hearing.  That is absolutely

23   false.  What I said at the last hearing, just as you

24   reiterated, is there hasn't been a policy of discontinuation.

25   And, in fact, it says that in paragraph 12 of the Declaration.  16:08:16

CV-12-601-PHX-DKD – January 18, 2018

1          And the governor's order is not a policy, it was

2    strictly instructive to Corizon, which the Declaration makes

3    clear.  So I just wanted to correct that statement.

4          So, no, nothing else from us.

5          THE COURT:  So Corizon doesn't have to follow that?                16:08:28

6          MS. HESMAN:  Corizon doesn't have a policy based on

7    the governor's order.  Their discovery request asked for

8    policies of discontinuation.  And what Miss Kendrick had said

9    was that there are now documents responsive to that request,

10   and that's not true because there has not been a policy of                16:08:44

11   discontinuation.  These medications are still prescribed.

12         THE COURT:  I don't have the Affidavit in front of me,

13   but the Affidavit, as I recall, seemed to represent that

14   Corizon felt they were being told what to do in the state of

15   Arizona.                                                                  16:09:01

16         MS. KENDRICK:  Well, the Affidavit at paragraph 6 of

17   docket 2539-1 says, quote, as a result of the governor's

18   October 24th, 2016 Executive Order, Corizon undertook a review

19   of narcotic prescriptions in ADC and revised its practice for

20   prescribing and renewing these medications.  So --                       16:09:16

21         MS. HESMAN:  That's not --

22         MS. KENDRICK:  So we can get pedantic about whether

23   practice equals policy, or practice for prescribing and

24   renewing is the same thing as discontinuation, and

25   discontinuation means something different.                               16:09:32

CV-12-601-PHX-DKD – January 18, 2018

1          The idea is that the rates of prescribing these

2     medications dropped dramatically and quickly.

3          And our concern, based upon our expert looking at

4     some of these medical records, was first of all, despite the

5     fact that the governor's decree gives an exception to the          16:09:45

6     seven-day rule for children with cancer who rely upon the State

7     for their health care, there's no language about adults.  And

8     finding people with cancer who are not being provided

9     appropriate pain management is of great concern to us and to

10    our expert.          16:10:05

11         And so, again, whether we want to use the magic word

12    "policy" or "practice," I think the overall concept is, the

13    governor issued a directive, Corizon changed its practice and

14    told its providers to not prescribe and renew these medications

15    at the rate they previously were.          16:10:23

16         If we want to pull out dictionaries -- I mean, I think

17    that we need to look at the spirit of the request, the spirit

18    of what our people are reporting versus getting into an

19    analysis of whether a policy equals a practice or not.

20         THE COURT:  Well, I mean, you just don't have the          16:10:41

21    cited example -- or not cited, the cited authority of the

22    governor's declaration, but you also have the numerical

23    diminution in the -- dramatic numerical diminution in the

24    number of these drugs that are being provided.  So that seems

25    to create a reason to think that they are linked.  But in any          16:10:57

1    event.

2           Okay.  That was, I think, the last discovery issue you

3    had, or there's another one?

4           MR. FATHI:  Your Honor, I don't think this is a

5    discovery issue, so the next item is our request for an update          16:11:17

6    from defendants regarding the following contractual issues,

7    item 8 on our agenda.

8           First, the status of their request for proposals and

9    negotiations with bidders for a five-year contract to provide

10   health care services to begin in March 2018.                            16:11:34

11          THE COURT:  Mr. Struck?

12          MR. STRUCK:  Yes.  With respect to 8a, the status is

13   the same.  The RFP is still under review.

14          THE COURT:  So under the current contract, the

15   extensions that have been used, if a new contract is not                16:11:51

16   reached, either with Corizon or with a different provider,

17   there could, I gather, be extensions because we're operating

18   under an extension?  Is that fair to say?

19          MR. STRUCK:  I believe that is fair to say,

20   Your Honor.                                                             16:12:10

21          THE COURT:  Okay.  So the fact that the March 2018

22   date is looming is not necessarily an indication that there

23   will be a decision made by that time with respect to the

24   inquiry that plaintiff asked, and that is about the five-year

25   contract.                                                              16:12:23

1      MR. STRUCK:  I think that's –– I think that's true,

2   that not necessarily.  But I'm not privy to any of that

3   information.

4      THE COURT:  Okay.  All right.  Fair enough.

5      And then on the fine issue, that second part?                16:12:33

6      MR. BOJANOWSKI:  Your Honor, the fines for November

7   2017 have not yet been calculated.  So I don't know –– I don't

8   know –– I have no response to that.  I know that it was 90,000

9   for October.  But those –– that has not yet been calculated.

10      I do have the fine for staffing levels for November,       16:13:02

11   and that was $74,613.36.

12      MR. FATHI:  Could we have that again?

13      MR. BOJANOWSKI:  $74,613.36.

14      MR. FATHI:  And any idea when we will have the

15   November fine for violations of the Stipulation?              16:13:26

16      MR. BOJANOWSKI:  I've been told that it will probably

17   come in at the end of this month.

18      THE COURT:  So you'll let us all know, plaintiffs know

19   when that happens.

20      Thank you.                                                  16:13:40

21      MR. FATHI:  And then finally is the issue of

22   defendants' failure to timely reimburse plaintiffs' monitoring

23   fees and expenses as required by the Stipulation.  The

24   Stipulation requires payment within 30 days of submission of

25   the invoice.                                                  16:13:58

1          Under the Stipulation payment was due on January 3rd,

2    and we have still not received it.  So we would like an order

3    that the defendants provide payment immediately and --

4          THE COURT:  Is this unusual?  Is this late pay

5    unusual?                                                          16:14:16

6          MR. FATHI:  It's not the first time, Your Honor, let

7    me put it that way.

8          THE COURT:  All right.  And when it happens, do you

9    call them up and say, what's going on?

10          MR. FATHI:  We e-mail them, Your Honor, as we did in     16:14:23

11    this case.  The e-mails are attached as Exhibit 11.

12          THE COURT:  I didn't read those.  I'm sorry.

13          And what did you say -- what did they say in response?

14          MR. FATHI:  They said -- let me quote directly.

15          MR. BOJANOWSKI:  Your Honor, I could shortcut this.      16:14:39

16          THE COURT:  Sure, please.  Go ahead.  No, let's make

17    it longer if we can.

18          MR. BOJANOWSKI:  What occurred here was, in the

19    transition between our firm and the Attorney General's Office

20    as to the responsibility to address the letters, there         16:14:56

21    was -- the responsibility was falling with the Attorney General

22    to do the analysis.  The Attorney General thought the

23    responsibility had moved over to us.

24          So once we found out from Mr. Fathi's e-mail what was

25    going on, I contacted Miss Rand, and she expedited the          16:15:16

1   authorization for the payment.  It has been submitted.  It's on

2   the fast-track.  And so it should be paid forthwith.

3          THE COURT:  All right.  So this is just a one off

4   because of the transition between the responsible entities?

5          MR. BOJANOWSKI:  I believe that to be the case.          16:15:34

6          And it's my understanding that our office going

7   forward will be taking the responsibility for the analysis of

8   the bill and then the submission to the State for payment.

9          THE COURT:  Okay.

10          MR. FATHI:  As I said, Your Honor, this is not the          16:15:51

11   first time.  We hope it will be the last.

12          THE COURT:  All right.  Thank you.

13          Anything else, Mr. Fathi, from your side?

14      (Discussion off the record between plaintiffs' counsel.)

15          MR. FATHI:  Nothing, Your Honor.  Thank you.          16:16:05

16          THE COURT:  Defendants' side?

17          MR. STRUCK:  No, Your Honor.

18          THE COURT:  All right.  First of all -- or last of

19   all, I thank the court reporter and the clerk of the court that

20   has stood in today.  We needed to address absences.  And so          16:16:20

21   they sacrificed their work schedules, and I'm thankful for

22   that.

23          Secondly, I'll ask my law clerk, and perhaps

24   Miss Brown if she wants to participate too, to be involved in

25   the planning process for the 9th.  So communicate with them          16:16:42

CV-12-601-PHX-DKD – January 18, 2018

1    about what timing seems to make sense, and how best to do it

2    and where and all of that, and we'll follow up appropriately.

3            Thank you all very much.

4        (Proceedings concluded at 4:16 p.m.)

5

6                        -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 25th day of January,

15   2018.

16

17

18

19                          s/Candy L. Potter_____
                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25