**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **Victor Antonio Parsons,** | ) | |
| **et al.,** | ) | |
| | ) | No.  **CV 12-00601-PHX-DKD** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | February 7, 2018 |
| **Charles Ryan, et al.,** | ) | 4:30 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**


**TELEPHONIC STATUS HEARING**


Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                     **A P P E A R A N C E S**

2

**For the Plaintiffs:**
3        PRISON LAW OFFICE
         By:  **Corene T. Kendrick**, Esq.
4             **Donald Specter**, Esq.
         1917 5th Street
5        Berkeley, CA 94710

6        ACLU - Washington DC
         By:  **David C. Fathi**, Esq.
7        915 15th Street NW, 7th Floor
         Washington, DC 20005
8
         ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
9        By:  **Maya S. Abela**, Esq.
         177 N. Church Avenue, Suite 800
10       Tucson, AZ 85701

11

**For the Defendants:**
12       STRUCK LOVE BOJANOWSKI & ACEDO PLC
         By:  **Ashlee B. Hesman**, Esq.
13            **Daniel P. Struck**, Esq.
              **Jacob B. Lee**, Esq.
14            **Timothy J. Bojanowski**, Esq.
         3100 W. Ray Road, Suite 300
15       Chandler, AZ 85226

16

**Also Present:**
17
         Jennifer Finger, Corizon
18       Sarah Selzer, Law Clerk
         Dr. Nicole Taylor

19

20

21

22

23

24

25

                   UNITED STATES DISTRICT COURT

1               **P R O C E E D I N G S**

2          (Proceedings commenced at 4:30 p.m.)

3          THE CLERK:  Civil Case No. 12-601, Parsons, et al.,

4    versus Ryan, et al., on for a telephonic status hearing.

5          THE COURT:  Would counsel please announce.

6          MR. FATHI:  Good afternoon, Your Honor.  David Fathi

7    from the ACLU National Prison Project for the plaintiff class.

8          THE COURT:  Thank you.

9          MS. KENDRICK:  Good afternoon, Your Honor.  Corene

10   Kendrick and Don Specter from the Prison Law Office for the

11   plaintiff class.

12         THE COURT:  Thank you.

13         MS. ABELA:  Good afternoon.  Maya Abela for the

14   Arizona Center for Disability Law.

15         THE COURT:  Good afternoon.

16         MR. STRUCK:  And this is Dan Struck, Tim Bojanowski,

17   Jacob Lee, and Ashlee Hesman for the defendants.  And we have

18   Dr. Taylor, Dr. Nicole Taylor, on the line as well.

19         THE COURT:  Okay.  So that's everyone.

20         Well, thank you, everybody, for calling in so that we

21   can try to get a resolution of the issue that is currently

22   afoot with respect to Performance Measures 85 and 86.  We asked

23   for you all to assemble in this way and then asked further for

24   a common discussion of an exemplar because we saw things in the

25   data that suggested either that we didn't understand what the

1    monitor's application of the performance measure was, or in

2    some instances we really couldn't divine any reasonable

3    explanation of what we were seeing.

4          And so we spent a lot of time trying to figure this

5    out, and it seemed like the right thing to do was just to get

6    on the same page and let you know what the questions were that

7    we saw so that we could understand it and make an intelligent

8    decision about how to do it.

9          You know, as you all probably do, I imagine -- I don't

10   know -- I suspect it's a pretty common practice, and that is, I

11   like to prepare sort of twice for things.  I prepare in advance

12   because I have a number of things like you all do on any given

13   day, and then I like to have some period of time right before

14   the hearing so that I can have everything fresh in my mind.

15         Because of other obligations today, I'm not able to be

16   in that second position, and when I was earlier today

17   discussing with Ms. Brown and Ms. Selzer the issues, it

18   occurred to me that the right thing to do was to ask somebody

19   who would have the opportunity to have it immediately fresh in

20   their minds to present it.

21         And so what I'm going to do is ask Ms. Selzer to

22   explain to you the issues that have dogged us, and then once

23   you get an idea of what is troubling us, I'll give you -- both

24   sides a chance to either elucidate or explain where we are.

25         Ms. Selzer?

1          MS. SELZER:  Hi.  I don't know if the echo is just in

2     the courtroom.

3          So --

4          THE COURT:  Get used to it.

5          MS. SELZER:  Yeah, apparently.

6          So looking at 85 and 86 from Perryville from August,

7     the first question is:  Obviously, the way the stipulation is

8     written, some of the inmate records will overlap.  But in this

9     example, the second inmate in Perryville, whose ID number ends

10    with 463 for Performance Measure 85, the second record for 85,

11    has two dates, 5/23/17 and 6/13/17.

12         That inmate is -- the first record for 86, the 5/23/17

13    date is the same.  The next two dates don't match up with the

14    6/13/17.

15         So the first question is, what is the three dates for

16    86?  Presumably the first date is the discontinuation date, but

17    then the question is whether the next two dates -- and for all

18    of these records in the CGAR, it looks like the middle date,

19    the second date, is always the latest; and then the last date

20    is earlier.  But -- so sort of first, last, middle.

21         So the first question is, what are those three dates

22    and how come they don't completely overlap with the dates in

23    85?

24         THE COURT:  And before we go forward, let me ask this

25    question:  If we use the last three digits of the inmate

1   numbers in this discussion, those, I gather, are not unique

2   such that then we wouldn't have to seal the balance of this

3   transcript.  Is that right?

4           MS. HESMAN:  That's correct, Your Honor.  This is

5   Ashlee Hesman.

6           THE COURT:  All right.  Thank you.  Go ahead.

7           Go ahead, Sarah.  Either continue, or do you want to

8   hear the answer?  It maybe makes sense to see if people have a

9   response to what you said so far.

10          MS. SELZER:  I agree.

11          MS. HESMAN:  So this is Ashlee Hesman, and I have

12  Dr. Nicole Taylor here with me.  And she can offer you an

13  explanation as to that question.

14          THE COURT:  Okay.

15          DR. TAYLOR:  And, Your Honor, I think it's a little

16  challenging when you guys are trying to read it out of the CGAR

17  where things kind of mash up.

18          But the first part of the CGAR, what we've put in is

19  the headers so that you'll know kind of what those dates are

20  supposed to line up with.  But it is very challenging to read

21  in that -- and we've not figured out a way to have it line up

22  in columns like we keep it.

23          So when you're looking at 85, for the second inmate at

24  Perryville, the first date is correct.  That's the date that

25  her medications were discontinued, which is 5/23.  And then the

1    second date is the date that she was followed up by psychiatry

2    for her meds DC contact.  And so that is required to be done no

3    later than 30 days.

4         So that answers 85.  Does that part make sense with

5    those two dates?

6         MS. SELZER:  Yes.

7         DR. TAYLOR:  Okay.  So the way the performance measure

8    is written is that we have to use those same inmates for 86 as

9    long as they've been in that status for at least 90 days and

10   they've had -- at least needing to have two contacts.

11        So she ends up being the first inmate that was used in

12   the next performance measure, number 86, and they have asked --

13   the plaintiffs asked that we indicate what that DC date is so

14   that they know what it is, so that's why that date is repeated.

15   And so the 5/23 date is the DC date so you can see where her

16   start date is.

17        In the past, we only used to report the most recent

18   date, which -- of contact, which for her was 8/21.  The

19   plaintiffs have asked that we give the prior contact date in

20   there, so that date is the second date that you see.

21        So for a clinician, she was seen by a clinician on

22   8/21 and also seen prior to that on 5/31.  Those are her two

23   clinician contacts after her meds were DC'd.  But they're in

24   the flip order because that -- over history, we were only

25   keeping the one date; and then we were asked to add the other

1    date, and so it ends up being, oh, okay, we'll add another

2    column.

3            So when we're reading them, they make sense to us, but

4    when you're looking in I think the CGAR, it's a little more

5    challenging.

6            THE COURT:  Okay.

7            MS. SELZER:  So then what's the difference between

8    what happened on 5/31 and what happened on 6/13?

9            DR. TAYLOR:  6/13 is the psychiatric contact that's

10   required.  So after the meds are DC'd, psychiatry has to have a

11   contact within 30 days of that DC date.  But then mental

12   health, the clinicians, they need to have a contact every -- no

13   more than every 90 days after that DC date.

14           So 85 is just about psychiatry doing what they need to

15   do, and 86 is about the psychology department doing what they

16   need to do.  But they both have the same start date.

17           MS. SELZER:  Okay.

18           MR. FATHI:  Your Honor, this is David Fathi.  May I

19   ask a question before we move on?

20           THE COURT:  Of course.  Of course.

21           MR. FATHI:  Everything that Dr. Taylor has said so far

22   is consistent with our understanding.  One question I have,

23   though, is why the first patient under number 85, whose

24   number -- prisoner number ends in 828, was not in the sample

25   for number 86.

1          DR. TAYLOR:  So that individual was reviewed and had

2     only one contact after the DC date, and per your request, was

3     excluded because there isn't two contacts after the DC date.

4     And so she was excluded and replaced with the next person in

5     line, which would be down further because the line is just

6     brought up.  And so the person underneath her becomes the first

7     person for that question.

8          THE COURT:  Dr. Taylor, why shouldn't that record be a

9     noncompliant record then?

10          DR. TAYLOR:  She was seen -- she's been -- she was

11     DC'd more than 90 days and she got her contact in compliance,

12     but she only had one contact.  And per your order for the every

13     X, we had to only use records that were either noncompliant,

14     which she wasn't with one contact, or had two contacts, and she

15     had only had the one contact so far when we audited.  She

16     hadn't yet had the second one, but she was compliant on the

17     first; and per your order, we had to exclude anybody who fell

18     into that category.

19          MR. FATHI:  Your Honor, that is not what the Court has

20     ordered, and I think we have a problem here in that it seems

21     that the defendants are selectively including people if they're

22     compliant but not if they're not.

23          So, for example, the person who -- Ms. 463, who

24     discontinued on 5/23/17, she had -- this shows she had two

25     contacts, 5/31 and 8/21, so she's included.

1          If you look up to number 85, the very first patient,

2    Ms. 828, she was -- she discontinued meds on 4/13, so actually

3    earlier than the other patient.  But she's excluded --

4          DR. TAYLOR:  Correct.

5          MR. FATHI:  -- from the sample for number 86.

6          And again, it -- the inclusion or exclusion needs to

7    be -- needs to be based on simply how long they have been in

8    this status.  It can't be based on the very outcome that you're

9    looking for.  You can't say, well, this person was seen twice,

10   so we're going to put her in the sample; and this person was

11   only seen once, so we're going to exclude her from the sample.

12         DR. TAYLOR:  Mr. Fathi, you've literally argued that

13   we can't use people who have only had one contact but are

14   compliant, and you have argued successfully to the Court that

15   we cannot include those individuals because that's not in every

16   X.

17         So she wasn't -- the first one wasn't seen every 90

18   days because she'd only been seen once.  It was in compliance,

19   and in the past we were using those, and you said we can't use

20   them.  Only -- we can only use them if they're noncompliant.

21   She was compliant with her 90-day contact.  She had not yet had

22   her second 90-day contact, and you said we couldn't use those.

23         MR. FATHI:  That's not correct, Your Honor.  I'm

24   looking at our proposed language for Performance Measure 96.

25   This is at Document 2368-1, pages 35 and 36.  And I will read

1   it into the record if the Court would like, but I will just

2   summarize.  It does not require that anyone who does not have

3   two contacts is excluded from the sample.  It doesn't say that

4   at all.

5          And, again, you can't -- you can't look at how the

6   record comes out on the measure and then decide whether or not

7   it's included or excluded from the sample.

8          THE COURT:  And I gather, Dr. Taylor, you can't -- and

9   this is -- and I would totally understand if you weren't

10  prepared to do it at this moment, but maybe your counsel are.

11  I don't know.

12         But whether you believe that the citation to the

13  record that Mr. Fathi has just given is the one that you're

14  relying on in saying that they've argued the other position or

15  whether there's something someplace else where you think

16  they've argued the other position.

17         MS. HESMAN:  Your Honor, this is Ashlee Hesman.  I

18  don't know if Mr. Fathi misspoke, but he said he was reading

19  the language from Performance Measure 96.

20         THE COURT:  He did say 96.

21         MR. FATHI:  I beg your pardon, Your Honor.  I meant to

22  say 86.

23         THE COURT:  86, okay.  So --

24         MS. HESMAN:  Your Honor, I think --

25         THE COURT:  Go ahead.

1          MS. HESMAN:  I'm sorry.

2          I think the issue is that they -- this file did not

3    meet the requirements for 86.  It met the requirements for 85,

4    but the every X order -- and I apologize, I don't have the

5    docket citation in front of me, but your order that requires

6    things to be done every X amount of days requires that more

7    than one contact be available to review.  Otherwise, we cannot

8    determine if something has been done every 90 days.

9          THE COURT:  But I don't think that order was limited

10   to this context of the couplet of 85 and 86, or the 86

11   situation, which may well be different.

12         MS. HESMAN:  I agree that it wasn't limited to these

13   two measures, Your Honor, but it was global as far as the

14   measures that -- any measure that was subject to this every X

15   day language, and both of these measures have that language

16   here.  And that is exactly what Mr. Fathi has argued, that we

17   cannot use files that do not meet the criteria for every X

18   days.  It simply doesn't for 86.

19         That doesn't mean it's noncompliant with 85.  It's

20   certainly compliant -- or, excuse me, with 85 --

21         THE COURT:  86.

22         MS. HESMAN:  It's compliant with 85.  It just doesn't

23   meet the criteria for 86 to be looked at.  That's why the files

24   were placed with something that can be monitored.

25         THE COURT:  Well, I think that it's fair to say that

1   Mr. Fathi's never argued that the X number of days order would

2   apply to 85 and 86.  If he did, you can point that out to me

3   someplace in the record.

4          What he's at least arguing now and what seems to make

5   sense to me is that order doesn't make sense in this context

6   because it does remove from consideration orders -- sorry,

7   inmates who would -- who would be the ones that you'd want to

8   be identifying as not meeting the performance measure.

9          That's how it sounds to me.

10          MS. HESMAN:  Your Honor, your order on every X days,

11   if I may -- this is Ashlee Hesman -- doesn't say that it's

12   limited to any performance measure.

13          THE COURT:  Right.  Well, luckily, the good thing

14   about orders is we can fix them when they're errant.  So I'll

15   take a look at that.

16          MS. KENDRICK:  Excuse me, Your Honor.  This is Corene

17   Kendrick from the Prison Law Office.

18          And I just want to comment here that it appears that

19   the defendants are taking very different approaches to how they

20   interpret this type of measure and whether it's a mental health

21   measure or a medical measure, because they have long agreed and

22   it's memorialized in the language of the monitoring guide that

23   they look at everything that is due in a given month, not just

24   what has happened.

25          So, for example, Performance Measure 54 requires that

1    chronic care patients be seen every X number of days as

2    determined by the provider, no more than every 180 days.  And

3    they look at the encounters that are due in a given month, not

4    just the ones where they have the two encounters to do the

5    measurements.

6              So I just want to point that out to Your Honor, that

7    they are monitoring -- or the monitoring guide says that they

8    will monitor the medical measures in the same method that we

9    have been arguing for this performance measure here,

10   Performance Measure 86.

11             MR. FATHI:  And just to be clear, Your Honor -- this

12   is David Fathi.

13             You -- I hope it's obvious that you cannot look and

14   see how the file does on the measure before you decide whether

15   it's in the sample or not.  And that's exactly what the

16   defendants are doing here.

17             MS. HESMAN:  That's incorrect --

18             MR. FATHI:  The determination -- may I -- may I

19   finish?

20             THE COURT:  Yes, you may.

21             You'll have your chance, Ms. Hesman.

22             Go ahead, Mr. Fathi.

23             MR. FATHI:  The determination -- thank you, Your

24   Honor.

25             The determination of whether the file is in the sample

1   or not has to be made before you look at, in this case, whether

2   the contacts occurred or not.  So both parties agree that to be

3   included in the sample for Performance Measure 86, the person

4   has to have been in an MH-3D for 90 days or more.  Both parties

5   agree.

6          So that's what determines if the file is in the sample

7   or not.  You can't look and see how many contacts the person

8   actually had and then decide whether the file is in the sample

9   or not.  That's just entirely backward and is going to grossly

10  inflate the compliance figures.

11         THE COURT:  Ms. Hesman?

12         MS. HESMAN:  Yes, Your Honor.  I just want to say

13  something very quickly, and then I'm going to hand it over to

14  Dr. Taylor for her comments.

15         Despite what Mr. Fathi said, we don't look at the file

16  to see if it's compliant with 85 before we determine if it's

17  going to be used for 86.  We cannot use the file for 86 because

18  it simply doesn't meet the measure's criteria.  It is not -- we

19  cannot possibly monitor it, because she has not had more than

20  one contact within 90 days, which is what 86 requires.

21         So to say that we look at the file to first determine

22  whether or not they're compliant to see if we want to use them

23  is completely inaccurate.  We cannot use it to monitor 86

24  because it doesn't meet the criteria, and we replace it with a

25  file that can easily be noncompliant.  We don't replace it with

a compliant file.  We simply replace it with a file that can be
measured and that does meet that measure's criteria.

And I think Dr. Taylor had a few additional things to
say.

DR. TAYLOR:  And I apologize.  I have a cold.

Your Honor, to be honest, we're struggling a bit with
the fact that we read your orders and we read them to the
letter, and we apply them exactly as you ask us to.  And what
your order said was any measure that had every X had to have
the two contacts or you couldn't use it unless the one contact
was noncompliant.

And so we applied that across the board per your order
and per the plaintiffs' argument.  And so what we ended up with
is the fact that we only include records that are noncompliant
if they have one contact, and we exclude compliant ones that
are -- that only have the one contact.

I argued in court to you that that was wrong, that
wouldn't give you an accurate reflection, because if I'm only
including people who are noncompliant and I'm excluding all of
the people who were compliant just because they've only had one
contact, that's the wrong thing to do.

That argument was overruled, and your order was very
clear about this.  So we changed what we were doing, because we
weren't doing that, and we changed what we were doing to get in
line with the order.  And then to now have us months down the

1    road be told by the plaintiffs that what we changed to, we're

2    doing the wrong thing, to go back to exactly what we were doing

3    before.

4           And I'm at a loss, because honestly, we're really

5    trying to do exactly what you ask us to do, and you've said

6    every X applies in this situation.  And we said, okay, but that

7    seems like not what we want to do because we're going to be

8    excluding compliant files and only including the noncompliant

9    files, which is exactly what happened.

10          If you look at Perryville, it's a great example.  The

11   only one that's in there with one contact is the one individual

12   who was noncompliant with her one contact.  So she was

13   included.  And everybody who was compliant with their one

14   contact was excluded per the plaintiffs' argument.

15          MR. STRUCK:  Your Honor, this is Dan --

16          MR. FATHI:  Your Honor, let --

17          MR. STRUCK:  This is Dan Struck.

18          I would like to go back -- have an opportunity to go

19   back to the actual transcript and the pleadings, because what

20   Mr. Fathi is saying is absolutely incorrect.  That is exactly

21   what they argued at that hearing.  And we would like an

22   opportunity to present that, because it's -- this isn't the

23   first time this has happened where they argue one thing and

24   then turn around later and say, oh, wait a minute.  That's not

25   what we meant.  We argued the other.

1          And it's putting the ADC monitoring bureau in a very

2    difficult position because these kinds of things keep

3    happening.

4          And I remember Dr. Taylor arguing the -- exactly what

5    she just said, and it was overruled.  They're following your

6    order to a T.  They're following the request, the demands of

7    the plaintiff to a T, and now all of a sudden they're told, oh,

8    no, no.  That's not what we wanted.

9          And that's just not accurate.

10         MR. FATHI:  Your Honor, let me say it one -- try to

11   say it one more time, if I may.

12         Ms. 828 discontinued medications on April 13th.

13   Ms. 463 discontinued medications on May 23rd.  Only Ms. 463 is

14   included in the sample for 86.  And we've been told now

15   repeatedly that that was because she had two contacts.

16         Now, Ms. 828, who discontinued medications earlier,

17   was not included in the sample for Performance Measure 86.  I

18   don't know how to say it any more clearly.  You can't look at

19   the outcome, how many contacts the person actually had, before

20   you decide if they're in the sample or not.

21         THE COURT:  Well, Mr. Struck, I will give you the

22   opportunity to make every citation to the record that you would

23   like and present the transcripts to the Court so that you can

24   make an argument, if there is one to be made, that someone has

25   made an argument directly counter to the exact point that they

1    made before.

2            But I will say this also:  that it is the Court's view

3    that this is not a simple device we are trying to manipulate.

4    This is not a pencil.  This is a very complicated, hundred-plus

5    stipulation with performance measures across many different

6    subject matters, taking an enormous amount of the Department of

7    Corrections' resources, the lawyers' resources, the Court's

8    resources, because it from the get-go was never a simple

9    process.  It was complicated in its origin.  It was complicated

10   in its litigation.  It was complicated in its settlement.

11           And so the fact that we find ourselves having to have

12   to wrestle with subjects more often than we would like if it

13   were simple is a reality that we have to deal with.  And the

14   reality commands that we take a careful look each time that

15   issues are presented and that we don't try to wed ourselves to

16   a belief, oh, I just wish it were simpler.

17           It may not be simple, and it may be that we need to

18   reexamine, and if appropriate, rework.  And that's just where

19   we are with a complicated process.

20           And so what I'll do is we'll give everybody an

21   opportunity to submit what they would like to submit and then

22   an opportunity to respond to what the other side's submitted.

23   So there will be a supplement if a party wishes, and then seven

24   days after that, a response.

25           And then we'll take a look at all of those things.

1   I'll take a look, too, at what the Court has done and heard

2   before, and we'll get this resolved.  If other question are

3   raised, I'll bring those up with you.  But this one is one that

4   requires this kind of careful attention.

5           Were there any other questions before we left this

6   subject, Ms. Selzer, that you wanted to raise?

7           MS. SELZER:  Actually, yes.

8           The more basic question about how the records are

9   pulled implicates the monitoring guide, because when records

10  don't apply for 85, then more need to get pulled for 86.

11          And I'm wondering -- they all have discontinuation

12  dates from different months, and I'm wondering if someone can

13  explain how the records are pulled that even get into the

14  review, based on -- whether it's based on discontinuation date

15  or something.  I know it's random and that there's this random

16  pull, but the discontinuation months are all over the place.

17          THE COURT:  It raises a question in our mind how it

18  can be that when you are taking a particular month survey, why

19  you get these dates all across the board.  And maybe there's a

20  simple answer; and if there is, please, somebody have it.

21          MR. FATHI:  Your Honor, this is David Fathi.

22          This was actually addressed in your order at

23  Document 2551.  This was one of the two disputed issues about

24  Performance Measures 85 and 86, was how you draw the sample.

25  And your order adopted plaintiffs' language, which is that a

1    random sample of all MH-3D patients at the facility or at the
2    unit be drawn.
3         So you will get people who discontinued medications in
4    different months.
5         THE COURT:  Okay.  Thank you.
6         Ms. Selzer, anything else?
7         MS. SELZER:  I don't think so.  Thanks.
8         THE COURT:  Okay.
9         All right.  So how much time do you all need to
10   assemble what you'd like to present in your supplement on 85
11   and 86, Counsel?
12        MR. STRUCK:  We should probably -- oh, go ahead,
13   Corene.
14        MS. KENDRICK:  It was actually asked -- I mean, I
15   think we can -- defendants can probably get it put together in
16   a week.
17        THE COURT:  Okay.  And is that a timetable that works
18   for plaintiffs as well?
19        MR. FATHI:  Well, Your Honor, I don't know that we
20   have anything to say until we see what the defendants are going
21   to say.
22        THE COURT:  That's fine.  You can do that -- do it in
23   that order, if you'd like, as well.
24        So in seven days we'll hear from the defendants, and
25   then in seven days we'll hear from the plaintiffs if they have

1    anything to say in response.  But don't do anything that goes

2    beyond responding to what the defendants did because that

3    doesn't give them an opportunity to respond.  So you're going

4    to have to respond to what they said rather than trying to

5    bolster up arguments that you waive by not presenting them in

6    writing.

7            MR. FATHI:  Okay.

8            THE COURT:  If you feel that you're comfortable

9    sitting on the record here today, that's fine.  But if you want

10   to say something that bolsters your argument and is not

11   responsive to defendants' argument, you better do that in seven

12   days as well.

13           MR. FATHI:  Okay.  So just to be clear, the dates are

14   February 14th and then February 21st?

15           THE COURT:  Yep.

16           MR. FATHI:  And on reflection, Your Honor, we may

17   decide to submit something on the --

18           THE COURT:  All right.  And that's up to you.  That's

19   fine.

20           MR. FATHI:  Thank you.

21           THE COURT:  That's fine.

22           Then the next issue that we raised --

23           MS. SELZER:  Judge?

24           THE COURT:  I'm sorry.  Go ahead.

25           MS. SELZER:  It's Sarah.  I have one more question --

```
1              THE COURT:  Oh, go ahead, please.

2              MS. SELZER:  -- about 86.

3              The performance measure requires that these prisoners

4    are seen a minimum of every 90 days for a minimum of six

5    months.  And I'm wondering if we can get some clarification,

6    because for 86, we have two dates within the first several

7    months after discontinuation but that are marked "yes" for --

8    "Y" for compliant.  But it's not six months after the

9    discontinuation date.

10             So I was wondering if we could get clarification about

11   how that is calculated.

12             DR. TAYLOR:  This is Dr. Taylor.

13             Just to sort of explain, these individuals cannot be

14   changed from an MH-3D for the first six months after their

15   medications are discontinued.  They have to remain as a 3D.  So

16   while they remain as a 3D, they're on the log for the potential

17   pull.

18             And so they may have contacts for seven months, eight

19   months, nine months.  It's until they're no longer an MH-3D.

20   But it -- those contacts have to happen no more than every 90

21   days apart, however long they're a 3D.

22             THE COURT:  I'm not sure I understand that.  Could you

23   say it again?  I'm sorry.

24             DR. TAYLOR:  Sure.  The inmate -- once the medications

25   are discontinued, the inmate has to remain an MH-3D for six
```

1    months.

2              THE COURT:  Okay.

3              DR. TAYLOR:  The individual cannot be changed to an

4    MH-2 or an MH-3E.

5              THE COURT:  Okay.

6              DR. TAYLOR:  So they remain on the log for a minimum

7    of six months.  Some may stay on longer, but they have to be on

8    for at least six months.

9              And so these are the dates that they've been seen in

10   that time, but because we have to exclude people who have been

11   taken off meds less than 90 days prior, you end up only looking

12   at inmates who are in the back half of that 90 -- of that six

13   months, because the first 90 days we wouldn't be looking at any

14   of those individuals because they are excluded per the

15   plaintiffs' request from that pool because they've only been an

16   MH-3D for 89 days or less.

17             But at six months, they can be lowered to an MH-2 or

18   an MH-3E, depending on what's clinically appropriate.

19             THE COURT:  And, Ms. Selzer, does that answer your

20   question?

21             MS. SELZER:  I think so.

22             THE COURT:  Okay.  I must confess that even upon your

23   gracious second explanation, I'm not sure that I followed it.

24   But luckily, I've got the transcript, and I'll have a chance to

25   do some homework and study it when I'm not on the phone.

1              Okay.  Does that close out 85 and 86 for now?

2              MS. SELZER:  For now.

3              MR. FATHI:  Your Honor, with the caveat that -- or

4    with the understanding that we can raise additional issues in

5    our written filing.  I'm happy to do that.  There is one

6    additional --

7              THE COURT:  Yes, you can supplement -- as long as you

8    do it in the seven-day first blow, then you can raise whatever

9    you want that's pertinent to this issue --

10             MR. FATHI:  Thank you, Your Honor.

11             THE COURT:  -- 85 and 86.

12             The next issue is one that we presaged in the email,

13   and that is an update on the missing performance data for

14   Performance Measure 54.

15             Do we have an update on where that is?

16             MR. LEE:  Yes, Your Honor.  This is Jacob Lee.

17             As you know, the Performance Measure 54 is looking at

18   whether the chronic disease inmates are seen according to the

19   inmate treatment plan specified by the provider but no more

20   than every 180 days unless the provider's documented a reason

21   why a longer period is appropriate.

22             The difficulty in doing a report that gives real-time

23   tracking data for this particular performance measure is that

24   when the provider puts in a diagnosis or a condition for an

25   inmate, it almost gives the provider an opportunity to check a

1   box marking that condition as chronic.  And so the report that

2   would be pulled is looking first and foremost at whether that

3   box is checked.

4          The problem is that the stipulation defines a chronic

5   disease as one of 19 either diseases or categories of diseases,

6   but a provider's able to mark any condition as chronic in

7   eOMIS.  So we did kind of a test pull this morning after seeing

8   the Court's email and, you know, understanding that this --

9   that we were going to be discussing this today, and as of

10  December 31st of 2017, for Eyman alone, there were 5,561

11  conditions that had been checked as chronic by the providers.

12         THE COURT:  And I gather there's no easy way to add a

13  filter that reduces it to just the pertinent chronic

14  conditions?

15         MR. LEE:  Exactly.  Not without going through and

16  reviewing that one by one.  And when you pull that list, you

17  look at it, these are conditions that are going way beyond what

18  is specified in the stipulation.  They include things like

19  diarrhea, allergies, psoriasis, flat feet; you know, things

20  that aren't necessarily chronic conditions and certainly

21  they're not covered by chronic diseases as defined in the

22  stipulation.

23         THE COURT:  All right.  So now that we've found this

24  out, how do we fix this problem to make sure that we can ensure

25  compliance?

1          MR. LEE:  Well, there is some culling down that can be

2     done.  For example, off that list, when you pull out just the

3     people who haven't been seen or it's been more than 180 days,

4     that reduces the list down to 281.  If you further pull out

5     people who have never actually had a note entered as a chronic

6     care encounter -- because, again, on the assumption that those

7     aren't actual chronic conditions, you're down to 128.

8          But at that point, the only way to provide real-time

9     tracking data is to go through and review each of those files

10     every day that comes up on that report manually one by one to

11     look at, one, whether it's actually a chronic condition as

12     covered by the stipulation; and, two, if there's an order by

13     the provider in there specifying that more than 180 days is

14     appropriate.

15          And unfortunately, with the way the system is set up,

16     there's no way to cull it down any more than that.  Each of

17     those files is going to have to be looked at every day, which

18     obviously is time consuming and not possible given the number

19     of hours in a day and the number of records that would have to

20     be reviewed.

21          MS. KENDRICK:  Your Honor, this is Corene Kendrick.

22     May I respond?

23          THE COURT:  You may.

24          MS. KENDRICK:  So I would just like to note that in

25     the documents that were produced to us last Friday, included

some reports that were the daily reports for Eyman and Florence

prison regarding their day-to-day compliance with various

performance measures at an order to show cause.

Among what they gave us was for the date of

December 13th, 2017, a report that was the Eyman chronic care

report that showed the chronic care backlog for that day of 192

patients.  And the chronic care backlog is a specific term of

art because it refers to a specific type of encounter that

is -- that occurs for the providers.

So they provided -- or they had included in that

production a list of the names of the people who were on the

chronic care backlog.  It showed that it had gone down by 25

from the day prior.  And that document is at Bates No.

ABCM 1229409 through 9415.

The report that they included -- that was included in

their production for December 18th was the Eyman chronic care

Performance Measure 54 daily report, and it showed a chronic

care backlog at Eyman of 110 people needing to be seen for

their chronic care appointments.  And that was down by 12 from

the date prior.  And that is at Bates No. ABCM 1229197 through

9200.

So we think that there are these reports.  I have been

looking at medical records for years in this case, and I have

never seen a provider list diarrhea as a chronic condition.

Chronic conditions are terms of art.  If you look at the

1    chronic care report that they produced in this document

2    production, it refers to conditions that we all agree are

3    chronic care such as HIV, hepatitis C, diabetes, hypertension,

4    high blood pressure, and the like.  It does not include

5    diarrhea.  It doesn't include flat feet.

6          So it's very curious to us that somehow in the month

7    of December, the individuals at the Eyman institution were able

8    to create and generate what they call their daily report

9    showing compliance or lack thereof with Performance Measure 54,

10   but now defendants are somehow not able to compile 31 days of

11   those daily reports to create a list of names of all cases

12   where they were substantially noncompliant.

13         THE COURT:  Mr. Lee?

14         MR. LEE:  Well, I don't have the particular reports

15   that she is referring to in front of me, and I haven't looked

16   at them.  But, I mean, it kind of goes to the point that each

17   one of those -- I mean, we're still talking about over a

18   hundred every day, and this is out of one unit for Eyman.

19   Those are going to have to be reviewed manually in order to

20   determine, at the very least, whether there's an order in there

21   from the provider specifying more than 180 days is appropriate.

22         And the reference that I was making to the conditions

23   that aren't specified in the stipulation, that was on data

24   provided by Corizon.  We did a pull this morning.  Again, I

25   haven't looked at the specific documents Ms. Kendrick was

1    referencing, but either way, the point is is that a manual

2    review is going to have to be done of over a hundred records

3    every day in order to provide that real-time tracking data.

4            THE COURT:  Well --

5            MS. KENDRICK:  Your Honor, they don't have to do a

6    manual inspection of every single file because they generate

7    this chronic care backlog list.  They do it at other

8    institutions, and it's generated as a result of the providers

9    putting in that the person needs to be seen no later than a

10   certain date for the chronic care appointment.

11           So, again, this is what's used as the source document

12   for monitoring Performance Measure 54.  So, again, I don't

13   understand why they are able to generate these lists that show

14   the chronic care backlog as designated by the provider and

15   using the tickler system of the computer that says it's past

16   due, that they now have to go into every single file to see --

17   to double-check if it's past due.  The reports that they are

18   using are from the Pentaho system.  That pulls directly out of

19   eOMIS.

20           THE COURT:  Well, I understand, Ms. Kendrick, that

21   you're going to be there Friday at the eOMIS review; right?  Is

22   that correct?

23           MS. KENDRICK:  Yes, sir, but I -- again, we discussed

24   this before.  I don't have access to create and generate --

25           THE COURT:  No, I know.  I know.  But I also thought

1   if Mr. Lee was going to be there, there could be an opportunity

2   for you maybe to educate him on the way that you see is a

3   pathway to reduce the burden that he's explained.  And so I

4   think that I'd like you to be prepared to do that on Friday,

5   and if necessary -- and it seems to me that the stipulation

6   requires this -- this work.

7           But I also think it's worth talking about.  If

8   Ms. Kendrick believes that from her experience, it's not as

9   burdensome as Mr. Lee is saying, maybe there's a pathway that

10  she sees that you don't see, and at the least, we can talk

11  about that on Friday.

12          MS. KENDRICK:  Well, and also, to finally note, Your

13  Honor, that I don't understand why they waited until yesterday

14  to run this report because they've had since January 1st to

15  start compiling this data for the filing.

16          THE COURT:  Well, a reasonable question.

17          MR. BOJANOWSKI:  Your Honor, this is Tim Bojanowski.

18          THE COURT:  Yes, sir?

19          MR. BOJANOWSKI:  May I suggest that we set up a

20  conference call with Ms. Kendrick tomorrow to talk about these

21  issues?  And we can then get a look at the reports that she's

22  talking about and try and get this identified and resolved

23  prior to Friday.  I know that you're going to be over at the

24  monitoring bureau on Friday, and I'm going -- I'm trying to

25  keep that as clean a process as possible.  So --

1          THE COURT:  So are you suggesting a conference call as

2   a meet-and-confer among counsel or a conference call with the

3   Court like we're doing now?

4          MR. BOJANOWSKI:  No.  Among counsel, Your Honor.

5   Because this is something to where Corene can give us specific

6   Bates numbers and say, here, look at this report, and this is

7   how I interpret it.

8          And then that way, you know, maybe we can have a

9   representative from the monitoring bureau on there as well so

10  that -- and some Corizon folks as well so that we can kind of

11  work through this issue so that we can get accurate information

12  to the Court.  That's what we want to do, and I'm certainly

13  willing to get that arranged and work through that.

14         THE COURT:  Well, whether it happens tomorrow or some

15  other day, that makes sense to me.  That's exactly what I was

16  talking about in just thinking that we could take advantage of

17  the convenience of having people together on Friday, but I also

18  don't disagree that it makes sense to have it separately.

19         Is that something that would be workable for you

20  sometime, Ms. Kendrick?

21         MS. KENDRICK:  Yeah, I can work with Mr. Bojanowski.

22  And I don't necessarily want that to eat into the time that the

23  Court has set aside regarding the September CGARs.

24         THE COURT:  All right.  Fair enough.  Fair enough.

25  Okay.  Thank you.

1          The next question is one that was raised by an email

2     to the Court and to all counsel from Mr. Fathi regarding a

3     former Corizon employee.  And it seemed to me as I read the

4     email that it was suggesting to the -- that the Court take some

5     steps here.

6          I really don't see any steps for the Court to take.  I

7     don't think there's any basis for me to consider the issue.  I

8     mean, in sort of stark terms, there's no case in controversy

9     before me.  There's somebody who's been -- who's approached

10    plaintiffs' counsel, asked for counsel.  These kinds of

11    questions are questions that counsel deal with all the time.

12    And whether one is complying with one's ethical obligations or

13    not, it's something that a lawyer has to ask herself all the

14    time, and that's, indeed, some reason why there's such a thing

15    as ethics council, where you can seek to get advice.

16         But the Court is limited by Article III to addressing

17    issues that are joined in before me, and that is usually where

18    somebody is trying to advance an evidentiary presentation and

19    there's an objection.  That's where these issues sometimes

20    arise before a Court.

21         But before that happens, I just don't see any role for

22    the Court to properly take here.  So I'm going to stick to my

23    limited role as defined by Article III and wait for a case in

24    controversy before me.

25         Anything else anybody wants to say before we conclude?

1           (Call dropped.)

2           THE CLERK:  Did we lose everybody?  Is anyone still on

3   the line?

4           MS. SELZER:  Hello?

5           I think they got dropped.

6           THE CLERK:  But it says we're still on here, so I

7   don't know what happened.

8           MS. SELZER:  We're still dialed in?

9           THE CLERK:  Yeah.

10          MS. SELZER:  Maybe they can still hear him if they're

11  all on it together.

12          THE CLERK:  Wow.

13          MS. SELZER:  Do you want me to call them?

14          THE CLERK:  Yes, please.

15          (Proceedings concluded at 5:19 p.m.)

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3         I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7         I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12        DATED at Phoenix, Arizona, this 9th day of February,

13   2018.

14

15

16                       s/Jennifer A. Pancratz_____  _____ ____

17                       Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25