Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Assistant Attorney General
15 South 15th Avenue
Phoenix, Arizona 85007
Telephone: (602) 542-1645
Fax: (602) 542-3393
Michael.Gottfried@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-DKD<br><br>**MOTION TO DISQUALIFY MAGISTRATE JUDGE DUNCAN FROM ALL FURTHER PROCEEDINGS**<br><br>(Oral Argument Requested) |

"An independent, fair and impartial judiciary is indispensable to our system of justice." *See* ABA Model Code of Judicial Conduct, Preamble (2007).  This tenet is so critical that a judge presiding over a case must avoid not only actual impropriety, but also the mere "appearance of impropriety."  *See* Code of Conduct for United States Judges, Canon 2; *see also Offutt v. United States*, 348 U.S. 11, 14 (1954) ("[J]ustice must satisfy the appearance of justice.").  The violation of either one "diminishes public confidence in the judiciary and injures our system of government under law," and requires

1   disqualification from a proceeding.  *See* 28 U.S.C. § 455; Judicial Code of Conduct,
2   Cannons 1 (commentary) & 3(C).

3         Pursuant to 28 U.S.C. § 455(a) and (b) and Fed. R. Civ. P. 73(b)(3), Defendants
4   Charles Ryan and Richard Pratt respectfully move the Court to disqualify Magistrate
5   Judge Duncan from all further proceedings in this matter.  Magistrate Judge Duncan has
6   acknowledged conduct that violates the Code of Conduct for United States Judges
7   ("Judicial Code of Conduct"), the ABA Model Code of Judicial Conduct ("ABA Model
8   Code"), and the Model Civil Jury Instructions.  His statements and other recent actions
9   call into serious question his ability to be fair and impartial in this case.  He has expressly
10  abandoned his role as a neutral arbiter.  He has pre-judged the evidence and veracity of
11  Defendants' witnesses.   He has relied on an unsubstantiated media report, internet
12  research, and previously undisclosed *ex parte* communications that deny Defendants the
13  right to have this matter adjudicated by a fair and impartial fact-finder.

14        The federal statute governing this Motion, 28 U.S.C. § 455(a) and (b)(1), mandates
15  that any magistrate "shall disqualify himself in any proceeding in which his impartiality
16  might reasonably be questioned [or] [w]here he has a personal bias or prejudice
17  concerning a party."  Here, Magistrate Judge Duncan's on-the-record disclosures and
18  other actions demonstrate he should disqualify himself to maintain the integrity and
19  fairness of future proceedings and to ensure the outcome of future proceedings is the
20  result of judicious decision-making and not grounded in animus or anger toward one
21  party.  *See United States v. S. Fla. Water Mgmt. Dist.*, 290 F. Supp. 2d 1356, 1358 (S.D.
22  Fla. 2003) (disqualifying district court judge for relying on newspaper coverage as
23  grounds for order to appoint special master).

24        Given the gravity of this evidence, either the Chief Judge (The Honorable Raner C.
25  Collins) or the Article III district court judge assigned to this case (The Honorable Diane
26  J. Humetewa) should decide this Motion to ensure a fair and objective resolution.

27
28

# I.      FACTUAL BACKGROUND

## A.      The Lawsuit, Stipulation, and Magistrate Judge Duncan's Role

In March 2012, Plaintiffs—13 inmates in the custody of ADC, and the Arizona Center for Disability Law—filed this class-action lawsuit in the United States District Court for the District of Arizona.  (Dkt. 1.)  The complaint alleged inadequate health care and unlawful conditions of confinement, in violation of the Eighth Amendment, and sought prospective relief.  (Id.)  The district court certified a Class and a Subclass in March 2013.  (Dkt. 372.)  Corizon, Inc. has been the private vendor providing healthcare to ADC inmates since March 2013.  (Dkt. 344.)

On the eve of trial, the parties entered into a settlement agreement ("Stipulation"), whereby ADC agreed to comply with 103 healthcare performance measures and nine maximum custody outcome measures, for a conditional period of time.  (Dkt. 1185, ¶¶ 8, 18; Dkt. 1185-1 at 8-15, 38-39.)  Magistrate Judge Duncan facilitated the settlement agreement and impartially assisted the parties with negotiations.   (Dkt. 1193.) The purpose of the Stipulation was to settle the case; Defendants denied all allegations in the complaint.  (Dkt. 1185, ¶¶ 4-5.)  There has never been a finding that Defendants violated any inmate's constitutional rights.

After executing the Stipulation, the parties agreed to allow Magistrate Judge Duncan to conduct all further proceedings in the case. (Dkt. 1194.) The parties agreed to this reassignment "because his constructive participation in the settlement negotiations has provided him with a unique ability to effectuate the parties' intent in any future proceedings." (Dkt. 1194.) For the Stipulation, Magistrate Judge Duncan would be responsible for ruling on motions to enforce it and resolving disputes that arose during the monitoring/compliance phase. (Dkt. 1185, ¶¶ 31, 35.)   Ultimately, Magistrate Judge Duncan "retain[s] the power to enforce this Stipulation through all remedies provided by law," subject to several exceptions.  (Id., ¶ 36.)  While the parties chose Magistrate Judge Duncan to enforce the Stipulation, Defendants did so based on the assumption he would continue to be a fair and impartial arbiter like he had been during settlement negotiations.

**B.**     **The Monitoring and Compliance Phase of the Litigation**

Magistrate Judge Duncan approved the Stipulation on February 25, 2015 (Dkt. 1458), and monitoring/compliance began in March 2015.  With respect to the healthcare performance measures, ADC contract monitors review monthly a random sample of medical records applicable to a particular measure and determine whether those records reflect care in compliance with the measure's requirements.  (Dkt. 1185-1 at 17-36; Dkt. 1842-3, ¶¶ 17-21.)  ADC then reports those compliance levels (of those random samples) to Plaintiffs' counsel and Magistrate Judge Duncan. For each performance measure at each complex, the Stipulation requires 75% compliance in the first 12 months; 80% compliance in the second 12 months, and 85% compliance thereafter. (Dkt. 1185, ¶¶ 10.a.)

As the monitoring phase progressed, Defendants were in compliance with the majority of performance measures, but not compliant with some.  (Dkt. 1583, 1709, 2030, 2403.)  Magistrate Judge Duncan made his frustration known on the record.  (See, e.g., Dkt. 1691 at 5 ["the compliance failure is substantial at best and abject at worst"]; Dkt. 1622 at 4 [noting his "disappointment" in Defendants' remedial plan); id. at 5 [noting Defendants' plan includes statements "ranging from the absurd"].)  He issued orders purportedly aimed at enforcing the Stipulation.  (See, e.g., Dkt. 1754, 1917.)

**C.**     **Magistrate Judge Duncan's Frustration Turns Into Bias and Prejudice Against Defendants.**

Magistrate Judge Duncan's tone and demeanor changed in 2017.  His earlier frustration, and even anger, over Defendants' instances of non-compliance with certain performance measures escalated to hostility, confrontation, personal animus, and bias and prejudice, devoid of impartiality.  For example:

- Magistrate Judge Duncan declared that his "preliminary view" of the issues "is probably 8 out of 10 times to agree with what the plaintiffs have said," (Ex. 1, R.T. 1/26/17, at 7:17-8:1), and that he would "micromanage" ADC until the "promise that was made to the inmates is being delivered, and

that's what I'm here for" (Ex. 6, R.T. 7/21/17, at 25:10-20; Ex. 7, R.T. 8/08/17 at 38:5-16; Ex. 8, R.T. 8/9/17 at 139:23-140:3; 180:11-181:20). (See also Ex. 11, R.T. 11/7/17, at 38:19-39:1 [stating it was his "task … to try to deliver the promise of a stipulation to the people for whom it matters, the inmates in the prison system who are not getting the healthcare that was promised to them, it can't be my full time job, but I wish it could. And I have told you I wish I could go live in the prison so that I could understand this better because I'm just so frustrated with getting everything months late and secondhand."].)

- Magistrate Judge Duncan told Defendants that he was "overruling virtually every one of" their objections to testimony without any evidentiary basis and was "on a fishing expedition" into whatever he is interested in. (Ex. 2, R.T. 3/21/17, at 64:7-17; Ex. 9, R.T. 8/24/17, at 7:18-20; see also Ex. 3, R.T. 4/17/17, at 556:15-557:23; Ex. 4, R.T. 5/10/17, at 759:19-760:6; Ex. 5, R.T. 7/14/17, at 109:23-110:25; Ex. 10, R.T. 9/11/17, at 48:9-49:3; Ex. 12, R.T. 11/8/17, at 7:21-9:22.)

- Magistrate Judge Duncan told Defendants that he "wish[ed]" Plaintiffs had more "soldiers" to "engage[]" Defendants "in this battle."  (Ex. 11, R.T. 11/7/17, at 37:20-39:9 ["And the availability of soldiers to be engaged in this  battle … If I could have full time engagement of the plaintiffs' lawyers on this case, I would be pleased about that. … And unfortunately, just as I can't devote full time to it, they can't either, but I wish they could. I wish they could be on this more than they are."].)

- Magistrate Judge Duncan scolded Defendants' counsel merely for seeking a solution to the number of complaint letters Plaintiffs' counsel send on a daily basis—"you have the chutzpah to say they have been sending us too many letters"—and calling it an "incredulous" request. (Ex. 11, R.T. 11/7/17, 35:17-36:6, 38:8-14; see also id. at 37:9-11 ["You have heard me

5

berate your counsel in this case previously about responsiveness, failures to respond."].)

- Magistrate Judge Duncan deferred to extra-judicial sources in resolving evidentiary issues. (See Ex. 5, R.T. 7/14/17, at 127:3-128:24 [in determining disputed allegations of retaliation, he considered "what has been told to me over the years by many people who have been in custody and have appeared here for settlement conferences."]; Ex. 11, R.T. 11/7/17, at 183:1-9 [contrary to Defendants' expert's opinion, he opined: "I know when I have dealt with dead animals and dead people that I have encountered in my life I never saw rigor mortis within 30 minutes but you now tell me that's possible."].)

The breadth and depth of Magistrate Judge Duncan's relinquishment of his impartiality and his hostility toward Defendants were palpable during at least two status hearings.

### July 21, 2017 Status Hearing

At a July 21, 2017 emergency telephonic hearing to address an allegation of retaliation against an inmate,[1] Magistrate Judge Duncan referred to the inmate as his "client" for whom he had an obligation to ensure their voice is heard:

> And what I have to do is I have, at the end of that process, <u>to make sure that I have a client that exists in the prison</u> in which inmates feel completely safe in communicating their views to the Court. Their views may not be right. Their views may be wrong. Their views may be lies. But I have to have the opportunity to hear what those views are.

(Ex. 6, R.T. 7/21/17, at 14:12-17, emphasis added.) The inmate class is represented by counsel and it is their job to speak and stand for the inmates, not the judge presiding over

---

[1] This inmate alleged that, when she left her cell to attend a court hearing, ADC staff "rolled up" her property. (Dkt. 2423.) This was standard operating procedure; when an inmate leaves the facility for a court hearing, staff remove and safeguard their property from other inmates. (Id.) The inmate further alleged that, a few days after her testimony, ADC replaced her cell mate with another inmate. (Id.) ADC made that cell reassignment, however, to accommodate a housing issue involving the new cell mate (she was pregnant and needed a lower bunk). (Id.)

1   contested proceedings. While refusing to give Defendants an opportunity to present

2   evidence refuting the inmate's claim, Magistrate Judge Duncan ordered that inmates "who

3   testify in my court are off limits with respect to your decision on the yard of how to deal

4   with other problems you have." (Id. at 20:2-16.) When Defendants' counsel asked for

5   clarification as to whether ADC was prohibited from making housing decisions with

6   respect to the particular inmate involved for the duration of the Stipulation, Magistrate

7   Judge Duncan retorted:  "That is a preposterous argument . . . ."  (Id. at 20:17-21:7.)

8   When Defendants' counsel tried to explain that the ramifications of his order—which

9   extended to any inmate whom Plaintiffs' counsel talked to (up to 33,000 inmates)—was

10  unduly burdensome on ADC operations, particularly since the source allegation had not

11  even been proven, Magistrate Judge Duncan shouted back: "Ms. Love, your hyperbole is

12  extreme and unpersuasive. … [and] preposterous."  (Id. at 29:14-31:1.)

13                                  **December 20, 2017 Status Hearing**

14          On December 19, 2017, KJZZ published a story, titled:  *On the Inside: The Chaos*

15  *of Arizona Prison Health Care*.  The article was based on allegations by a former temp-

16  agency OB-GYN who worked with Corizon (Jan Watson) at ASPC-Eyman for about

17  5 months.  According to the article, Dr. Watson claimed that: she experienced delays in

18  treating chronic care inmate patients; she prescribed pain medication that would often run

19  out; Corizon often denied her patient specialty referrals; and Corizon would ask her to

20  cancel authorized specialty referrals. *See*  http://kjzz.org/content/572976/inside-chaos-

21  arizona-prison-health-care.

22          On December 20, 2017, the parties attended a regularly scheduled status hearing.

23  After counsel announced their appearances, Magistrate Judge Duncan—clearly upset,

24  standing, and waving and pointing to his iPad—yelled at Defendants' counsel, during the

25  course of which he made statements acknowledging conduct that constitutes violations of

26  the Judicial Code of Conduct, the ABA Model Code, and the Model Civil Jury

27  Instructions:

28

1
2
3
         THE COURT: Well, I'm standing because in the most literal sense <u>I'm standing up for the inmates of the Arizona Prison System</u>. It is my job to be the enforcement officer on this Stipulation, which I have earnestly tried to do for months expecting people to comply with my orders in good faith.

4
         <u>I read on the website from KJZZ this morning</u> a memo from Sara Neese at Corizon …

5

6
(Ex. 13, R.T. 12/20/17, at 5:1-7, 8:8-9, emphasis added.)  He proceeded to read that memo

7
(from the Corizon employee to Dr. Watson), which asked the doctor to cancel two

8
infectious disease consults, one because Corizon did not have a provider scheduled for the

9
inmate.  He then summarily declared the KJZZ story to be a "smoking gun memo," called

10
ADC "evil," and—with no evidentiary basis whatsoever—accused Defendants' counsel of

11
being dishonest:

12
         <u>As I read this</u>, there is no other way to read it than an end run around the monitoring program, an end run around the Stipulation.

13

14
                …

15
16
         I have used words in this courtroom like flabbergasted, stunned. I've run out of words. <u>I've run out of a way to communicate what is such an egregious departure from honest representation in a case, from the defendants' side of this case</u>.

17
                …

18
19
20
         What I now see is a window that undercuts my entire agenda, undercuts my entire program, and that is, it's just a game. It's just a game to try to beat the judge and his monitoring program.  It's just a game to try to beat the State's monitoring program.

21
22
23
         I am without words. I don't know. I cannot have contemplated that anybody in a system -- the Corizon lawyers have been coming to the courtroom, they've been listening to this. They certainly are aware of what's going on in their shop. They're aware of what's going on in my shop. The two don't work together, and they're not going to work together.

24
25
26
27
28
         What's going to happen is I'm going to find out exactly what's going on. I'm going to get this doctor into this courtroom and I'm going to hear her testimony. I'm going to get this Sara Neese person in this courtroom, or if she's outside of my jurisdiction I'll get her on the telephone. I will hear from these people. I will get every single memo that of this like. <u>And I am now changing the entire approach here. It's not my agenda anymore, it's digging down deep to see how</u>

deep this evil goes of trying to dissemble to the Court to see if it's true.

(Id. at 5:18-20, 6:1-5, 7:12-8:7, 11:5-11, emphasis added.)

Magistrate Judge Duncan then accused ADC employee witnesses of lying to him:

> But over the time that I have been involved in this case, there have been warning signs that this is not false. There have been warning signs that come in the nature of the memo that was posted on the wall that I've already seen.   There have been warning signs of the testimony that I've had here where I thought that the persons that were telling me the truth were the inmates <u>and the people that are lying through their teeth were the people at the Department of Corrections</u>. And that's not every single one of them. There are decent and honorable people on the correction side, and there are liars on the prisoners' side.

> <u>But I tell you that as a fact finder in this case in my role, the people that I have thought have lied to me have not been the prisoners, they have been the people working for the prison</u>.  And I've laid that out for you.

(Id. at 8:12-9:1, emphasis added.)

Magistrate Judge Duncan then disclosed that he had received *ex parte* communications from potential fact witnesses (unnamed Corizon employees), and that those communications had influenced his enforcement of the Stipulation:

> And so the additional thing that I get is something I can't work with because it's impermissible under the rules. <u>We receive phone calls in chambers, my staff receives phone calls in chambers from people who work for Corizon who say essentially, it is so much worse than you think</u>. And we cannot do anything other than to say, if you would like to come forward, we will have you in court any day to talk to us about that.  Then they ask us, can you protect us?  And my staff is told to instruct them, no, we cannot protect you. I can't guarantee what can happen.

> And so some of those -- some of those people may have told us something that would be relevant, but I really haven't acted on it because it's not testimony. It's just people calling on the telephone.  I can't act upon it.

> <u>But what it does is it adds to the filter of how I evaluate what I see on a website from KJZZ that indicates that a memo went from the contractor to the contractor's doctors instructing them how to do an end run around my Stipulation-monitoring responsibilities.  And it's just disgusting.</u>

(Id. at 9:2-21, emphasis added.)

1    Relying solely on the uncorroborated hearsay allegations in the KJZZ article and
2    the *ex parte* communications he and his staff had received over the phone in chambers,
3    Magistrate Judge Duncan summarily declared that he now doubted the veracity of the
4    entire evidentiary record of compliance over the past two years, stating:  "I'm now
5    concerned that I cannot trust those numbers without further inquiry." (Ex. 13, R.T.
6    12/20/17, at 10:12-13.)  He stated that he would re-evaluate the entire record, commenting
7    that Plaintiffs were making a "stronger, stronger argument" of non-compliance in light of
8    the KJZZ article, which he claimed was "prima facie" evidence of Defendants'
9    dishonesty, characterizing the monitoring reports as "complete fabrication." (Id. at 10:13-
10   11:16, 19:17.)  Magistrate Judge Duncan then instructed Plaintiffs' counsel "to marshal
11   the case" and present evidence to substantiate them.  (Id. at 19:10-22, 20:14-21:17.)

12       To emphasize that he was abandoning his role as a neutral arbiter, Magistrate Judge
13   Duncan proclaimed:  "I'm not in the typical role of the neutral judge, I'm the enforcer of
14   the Stipulation." (Ex. 13, R.T. 12/20/17, at 18:17-18.)  He ordered an evidentiary hearing
15   for February 27, 2018.  (Dkt. 2559.)

16       At the January 18, 2018 Status Hearing, Magistrate Judge Duncan again
17   acknowledged that the KJZZ story was unsubstantiated, and that he set the hearing based
18   on allegations "tak[en] from the street."  (Ex. 14, R.T. 1/18/18, at 5:9-13.)  He also
19   confirmed that the KJZZ story called into question the veracity of the evidentiary record
20   of Defendants' compliance, and that he would be actively "playing a role in checking on
21   the veracity of the monitoring program." (Id. at 17:6-7.)

22   **II.   MAGISTRATE   JUDGE   DUNCAN'S   DISQUALIFICATION   IS
     NECESSARY BECAUSE OF HIS BIAS AGAINST DEFENDANTS.**

23

24       "A judge shall avoid impropriety and the appearance of impropriety." ABA Model
25   Code, Canon 2.  The appearance of impropriety exists if "the conduct would create in
     reasonable minds a perception that the judge's ability to carry out judicial responsibilities
26   with integrity, impartiality and competence is impaired." *Caperton v. A.T. Massey Coal*
27   *Co., Inc.*, 556 U.S. 868, 888 (2009) (quoting ABA Model Code, Canon 2A); *see also*

28

Judicial Code of Conduct, Canon 2A commentary ("An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired.").  Under both the ABA Model Code and the Judicial Code of Conduct, a judge must disqualify himself if his "impartiality might reasonably be questioned." *See* Judicial Code of Conduct, Canon 3(C); ABA Model Code, Canon 2, Rule 2.11.

Section 455 incorporates these ethical codes.  *See United States v. Baca*, 610 F. Supp. 2d 1203, 1212 (E.D. Cal. 2009).  Under § 455(a), a magistrate judge "must recuse himself whenever his impartiality might reasonably be questioned." *Liteky v. United States*, 510 U.S. 540, 548 (1994) (internal quotation omitted).  This is an objective standard that turns on the *appearance* of impartiality rather than its actual existence. *Davis v. Xerox*, 811 F.2d 1293, 1295 (9th Cir. 1987); *see also United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008) (test for recusal is "an objective test based on public perception.").  The adjudication of an improper appearance of impartiality involves ascertaining "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Preston v. United States*, 923 F.2d 731, 734 (9th Cir. 1991).

Section 455(b) "covers situations in which an *actual* conflict of interest exists, even if there is no appearance of one." *Herrington v. Sonoma County*, 834 F.2d 1488, 1502 (9th Cir. 1987). "[A]ctual bias is a per se ground for disqualification." *Id.*  "Frequently, an overlap will occur—an act will appear to create [an apparent] conflict and will fall within the per se rule." *Davis*, 811 F.2d at 1295.  Thus, § 455(b) provides "concrete examples where the *appearance* of partiality suffices to establish a ground for recusal under § 455(a) even absent actual bias." *Preston*, 923 F.2d at 734 (emphasis added). Among those disqualifying situations are proceedings where the magistrate judge has "a personal bias or prejudice concerning a party" or is "acting as a lawyer in the proceeding." *See* 28 U.S.C. §§ 455(b)(1), -(b)(5)(ii); *see also* Judicial Code of Conduct, Canon

11

1    3(C)(1)(a), -(d)(ii).

2        Magistrate Judge Duncan has violated § 455 and these codes of conduct and, unless

3    he recuses himself, he must be disqualified from all further proceedings.

4        **A.    Magistrate Judge Duncan's Acknowledged Reliance on a Media Story
              and Internet Research Violates the Codes of Judicial Conduct.**

5

6        Rule 2.9(C) of the Model Code of Judicial Conduct forbids judges from conducting

7    their own personal research into the issues before them: a judge "[can]not investigate facts

8    in a matter independently, and shall consider only the evidence presented and any facts

9    that may properly be judicially noticed." ABA Model Code, Canon 2, Rule 2.9(C); *see*

10   *also* Judicial Code of Conduct, Canon 2A commentary (judge prohibited from engaging in

11   "harmful" conduct).  Magistrate Judge Duncan engaged in this prohibited conduct when

12   he *sua sponte* researched and read the KJZZ article outside the court proceedings.  He

13   then acted on this improperly obtained out-of-court information and issued rulings based

14   upon it to Defendants' detriment. *See* ABA Comm. on Ethics & Prof'l Responsibility,

15   Formal Op. 478 (Dec. 8, 2017) (addressing independent factual research by judges via the

16   internet).  And without any substantiation and refusing Defendants an opportunity to

17   refute the hearsay allegations in the KJZZ article, Magistrate Judge Duncan angrily

18   proclaimed he was "standing up for the inmates of the Arizona Prison System"; accused

19   Defendants' counsel of dishonest representation; declared that he was changing his

20   "agenda" to "see how deep the evil goes"; called ADC employees/witnesses liars; and

21   discredited all prior evidence of Defendants' compliance with the Stipulation.

22       At the very least, Magistrate Judge Duncan's impartiality might reasonably be

23   questioned, and unless he recuses himself, he should be disqualified from presiding over

24   future proceedings.

25       **B.    Magistrate Judge Duncan's Statements Demonstrate He Has
              Abandoned His Duty to Be a Fair and Impartial Fact-Finder.**

26       The Manual of Model Civil Jury Instructions 3.2 instructs jurors to limit their

27   findings to "only the evidence received in the case" and expressly prohibits them from

28   communicating or conducting research on the internet, and from reading, watching, or

12

listening to "any news or media accounts or commentary about the case or anything to do with it."  The instruction further explains that the purpose of the prohibition is to protect the parties' rights to due process because "research or investigation outside the courtroom," and "any information through improper communications," are not under oath and could result in a verdict improperly "influenced by inaccurate, incomplete or misleading information." *Id.* The Manual of Model Criminal Jury Instructions 7.2 provides substantially the same instruction, likewise explaining: "The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address."

Magistrate Judge Duncan—the fact-finder in this matter—acknowledged that he read the KJZZ article on-line, and based on what he read, he concluded Defendants were not telling the truth about their reported compliance. Indeed, if a juror had done what Magistrate Judge Duncan has done, a mistrial would be declared or, at the very least, that juror would be removed from the jury.  Failure to comply with the basic duty of a fact-finder—to be open-minded and not reach any conclusions until both sides have an opportunity to present their case—demonstrates to a reasonable observer of these proceedings that Magistrate Judge Duncan's independence and impartiality have been compromised.

Furthermore, the record demonstrates Magistrate Judge Duncan abdicated his role as a "neutral judge," proclaiming that he was "standing up for the inmates of the Arizona Prison System," and declaring that he had "a client that exists in the prison."  He also pre-judged the veracity of witnesses when he stated he would defer to Plaintiffs' arguments "8 out of 10 times" and that he is inclined to deny "virtually every one" of Defendants' objections." Just as professional ethics rules prohibit a lawyer from serving as both advocate and witness in the same case to protect against appearances that could bring "distrust on the legal profession," *United States v. Birdman*, 602 F.2d 547, 554 & n. 23 (3d Cir. 1979), § 455(b)(5)(ii) disqualifies a magistrate judge for "acting as a lawyer in the proceeding" to protect "the integrity and independence of the judiciary." *See* Judicial

Code of Conduct Canon 1.  Magistrate Judge Duncan's statements are not protected by purported efforts to enforce the Stipulation.  *See Jacobsen v. Filler*, 790 F.2d 1362, 1364-65 (9th Cir. 1986) (rejecting pro se inmate's argument that court had the duty to advise him, explaining "courts generally do not intervene to save litigants from their choice of counsel, even when the lawyer loses the case . . . . [I]t is not for the trial court to inject itself into the adversary process on behalf of once class of litigant."); *see also In re Cement Antitrust Litig.*, 688 F.2d 1297, 1310 (9th Cir. 1982) (stating "the appearance of impropriety is similar whether the interest is in a named party or a class member, class members should be viewed as parties for purposes of recusal under the statute."); *In re Cement & Concrete Antitrust Litig.*, 515 F. Supp. 1076, 1079 (D. Ariz. 1981) (holding "where it counts, class members and parties are identical" for the purposes of determining financial conflict under § 455(b)(4)).

### C.   Magistrate Judge Duncan Improperly Relied on *Ex Parte* Communications in Making His Rulings.

Judges are prohibited from "*ex parte* communications or any 'communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers.'"  *United States v. Sierra Pac. Indus., Inc.*, 862 F.3d 1157, 1173-74 (9th Cir. 2017) (quoting Judicial Code of Conduct, Cannon 3A(4)).  They "[can]not initiate, permit, or consider *ex parte* communications."  ABA Model Code, Canon 2, Rule 2.9(A).  Magistrate Judge Duncan stated that he entertained *ex parte* communications—from potential fact witnesses—and considered those communications in ruling on issues, in violation of the Judicial Code of Conduct and the ABA Model Code.  Like the KJZZ article, Magistrate Judge Duncan stated that these communications contributed to his anger and actions and served as a "filter" for his assessment of the case.  *See El Fenix de Puerto Rico, Inc. v. M/Y "Johanny", Aurelio Varona-Perez*, 954 F. Supp. 23, 26 (D.P.R. 1996) (disqualification for apparent bias where judge may have received *ex parte* comments that affected judge's weighing of witness credibility even though the judge denied actual bias, but noting that disqualification would have been *required* if the judge

1   actually received "ex parte information regarding evidentiary facts (namely the credibility
2   of witnesses)").

3       Magistrate Judge Duncan has further stated he has resolved disputed allegations of
4   retaliation based upon his prior settlement judge experience in inmate lawsuits against
5   ADC, due to "what has been told to me over the years by many people who have been in
6   custody and have appeared here for settlement conferences."  *See* ABA Model Code,
7   Canon 2, Rule 2.9(C); Model Civil Jury Instructions 3.2.

8       He has further acknowledged that he based an evidentiary ruling rejecting
9   Defendants' *expert's* opinion on the medical principles of rigor mortis solely upon his
10  personal life experience rather than the actual medical evidence before him.  *See* ABA
11  Model Code, Canon 2, Rule 2.9(C); Model Civil Jury Instructions 3.2.

12      In a factually analogous case, the Southern District of Florida's chief judge
13  disqualified a district court judge (who had presided over a complex case since its
14  inception in 1988, and retained jurisdiction to enforce a consent decree entered after
15  settlement in 1992), finding  apparent bias under § 455(a) because he participated in *ex*
16  *parte* communications with several media outlets concerning issues relating to an order he
17  made appointing a special master to assist him in enforcing the consent decree.  *S. Fla.*
18  *Water Mgmt. Dist.*, 290 F. Supp. 2d at 1358.  The court found that the judge's references
19  to newspaper coverage of proposed legislation and evidence of his *ex parte*
20  communications with newspaper reporters who quoted him were sufficient cause for
21  disqualification because a "disinterested observer fully informed of the facts would
22  entertain a significant doubt as to the judge's impartiality." *Id.* at 1360-61.

23      Like the district court judge in that case, Magistrate Judge Duncan should be
24  disqualified for conducting internet research on the KJZZ website, and then relying on it,
25  other *ex parte* communications, and personal experiences to issue rulings to Defendants'
26  detriment, all in violation of the Judicial Code of Conduct, the ABA Model Code, and the
27  Model Civil Jury Instructions.  He was required to follow these codes of conduct and
28  avoid the appearance of impropriety.

### D.    At a Minimum, There is an Appearance of Impropriety.

Whether actual or apparent, the bias that saturates this record requires Magistrate Judge Duncan's disqualification.  Indeed, the mere appearance of impropriety is sufficient grounds for disqualification under the law.  The overwhelming evidence presented here— his consideration of the KJZZ article; his reliance on *ex parte* communications; his pronounced abdication of his role as a neutral arbiter; and all of his other statements recounted above—demonstrate that a reasonable person could at least conclude that Magistrate Judge Duncan's impartiality is irreparably compromised. The evidentiary record demonstrates that his comments reveal much more than mere anger at or frustration with Defendants. It reveals a longstanding history of hostility toward Defendants, concluding they are "liars," and accusing them of "lying through their teeth," and plotting an "evil" plan to deceive him.  The appearance of impropriety is buttressed by the circumstances surrounding the KJZZ article.

Before publishing the article, the reporter boasted that the article would "bring about real change" (Ex. 15, JW001169) and that, given his relationship with Plaintiffs' counsel, they planned on "enter[ing] it into the court docket so the judge will see it!" (Ex. 15, JW001141).  On December 12, 2017, a week before publishing, he boasted, "I think we have them on the ropes." (Ex. 15, JW001170.)  Not coincidentally, he published the story on December 19, the day before the already-scheduled Status Hearing and, just as he had hoped, Magistrate Judge Duncan read it and allowed it to influence his decision-making.  The reporter attended the December 20 Status Hearing.  (Ex. 15, JW001123.) The next day, he claimed credit for Magistrate Judge Duncan's outburst (recounting it in detail in another story),[2] and urged Dr. Watson to bring up any other issues she had at the ordered evidentiary hearing and even suggested some topics for her testimony. (Ex. 15,

---

[2] That story was titled: *Federal Judge Calls For Hearing After KJZZ Report on Arizona Prison Health Care*.  *See* https://kjzz.org/content/583172/federal-judge-calls-hearing-after-kjzz-report-arizona-prison-health-care.  The story noted that Magistrate Judge Duncan "furiously addressed the courtroom," it quoted much of what Magistrate Judge Duncan said, and noted he was "[w]aiving his iPad and pointing to" the December 20 KJZZ story.  *Id*.

JW001119.)  They then joked that the evidentiary hearing and the role the KJZZ article played was "like a once-in-a-life-time soap box moment," and they "just need the abusive husband!"  (Id.)

These emails reveal that even the media readily saw Magistrate Judge Duncan's animosity toward and bias and prejudice against Defendants and (successfully) sought to exploit it.  *See* Judicial Code of Conduct, Canon 2(B) ("A judge should … no[t] convey or permit others to convey the impression that they are in a special position to influence the judge."); ABA Model Code, Canon 2, Rule 2.4(C) ("A judge shall not convey or permit others to convey the impression that any person or organization is in a position to influence the judge."); *see id*., comment ("Confidence in the judiciary is eroded if judicial decision making is perceived to be subject to inappropriate outside influences.").

To protect and uphold the independence and integrity of the justice system, this matter should be reassigned to an Article III judge or magistrate judge who has not pre-judged the evidence, witnesses, or Defendants, and who can avoid outside influences such as the media from influencing their decision-making.

**III.   CONCLUSION**

Magistrate Judge Duncan's own statements demonstrate that he is no longer fair and impartial and that he has allowed out-of-court sources of information, which Defendants have not had an opportunity to test or challenge, influence his decisions and rulings.   Under these unusual circumstances, unless Magistrate Judge Duncan recuses himself, he should be disqualified.

DATED this 23rd day of February 2018.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/Daniel P. Struck
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
3100 West Ray Road, Suite 300
Chandler, Arizona  85226

Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried
Assistant Attorneys General
15 South 15th Avenue
Phoenix, Arizona 85007

*Attorneys for Defendants*

18

1

**CERTIFICATE OF SERVICE**

2

     I hereby certify that on February 23, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

3

4

Alison Hardy:           ahardy@prisonlaw.com

5

Amelia M. Gerlicher:    agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

6

7

Amy B. Fettig:         afettig@npp-aclu.org

8

Asim Dietrich:         adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

9

Caroline N. Mitchell:    cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

10

11

Corene T. Kendrick:    ckendrick@prisonlaw.com; edegraff@prisonlaw.com

12

Daniel Clayton Barr:    DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

13

David Cyrus Fathi:     dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

14

Donald Specter:       dspecter@prisonlaw.com

15

Jessica Pari Jansepar Ross:   jross@azdisabilitylaw.org

16

John Howard Gray:     jhgray@perkinscoie.com; slawson@perkinscoie.com

17

John Laurens Wilkes:    jlwilkes@jonesday.com, dkkerr@jonesday.com

18

Jose de Jesus Rico:     jrico@azdisabilitylaw.org

19

Kathleen E. Brody:     kbrody@acluaz.org

20

Kirstin T. Eidenbach:    kirstin@eidenbachlaw.com

21

Maya Abela           mabela@azdisabilitylaw.org

22

Rose Daly-Rooney:     rdalyrooney@azdisabilitylaw.org

23

Sara Norman:         snorman@prisonlaw.com

24

Sarah Eve Kader:      skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org

25

Rita K. Lomio:         rlomio@prisonlaw.com

26

Victoria Lopez:        vlopez@aclu.org

27

28

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Daniel P. Struck