**Index of Exhibits to Defendants' Motion to Disqualify Magistrate Judge Duncan
from all further Proceedings**

Exhibit 1    January 26, 2017 Transcript of Proceedings (excerpts) [Doc. 1959]

Exhibit 2    March 21, 2017 Transcript of Proceedings (excerpts) [Doc. 2070]

Exhibit 3    April 17, 2017 Transcript of Proceedings (excerpts) [Doc. 2038]

Exhibit 4    May 10, 2017 Transcript of Proceedings (excerpts) [Doc. 2071]

Exhibit 5    July 14, 2017 Transcript of Proceedings (excerpts) [Doc. 2208]

Exhibit 6    July 21, 2017 Transcript of Proceedings (excerpts) [Doc. 2223]

Exhibit 7    August 8, 2017 Transcript of Proceedings (excerpts) [Doc. 2244]

Exhibit 8    August 9, 2017 Transcript of Proceedings (excerpts) [Doc. 2243]

Exhibit 9    August 24, 2017 Transcript of Proceedings (excerpts) [Doc. 2313]

Exhibit 10   September 11, 2017 Transcript of Proceedings (excerpts) [Doc. 2329]

Exhibit 11   November 7, 2017 Transcript of Proceedings

Exhibit 12   November 8, 2017 Transcript of Proceedings (excerpts)

Exhibit 13   December 20, 2017 Transcript of Proceedings

Exhibit 14   January 18, 2018 Transcript of Proceedings

Exhibit 15   December 21, 2017 Jan Watson email chain

# Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

Victor Parsons, et al., on          )
behalf of themselves and all        )
others similarly situated;          )
and Arizona Center for              )
Disability Law,                     )
                                    )   No. **CV 12-00601-PHX-DKD**
            Plaintiffs,             )
                                    )
        vs.                         )   Phoenix, Arizona
                                    )   January 26, 2017
Charles Ryan, Director,             )   1:32 p.m.
Arizona Department of               )
Corrections; and Richard            )
Pratt, Interim Division             )
Director, Division of Health        )
Services, Arizona Department        )
of Corrections, in their            )
Official capacities,                )
                                    )
            Defendants.             )
                                    )

---

**BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*(Status Hearing)*
*(Amended)*

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

 1    raised.

 2            Couple of prefatory comments, first, apologies about

 3    my voice.  When we were last in court together I reported to

 4    you that I just returned from Europe and I may have brought

 5    back some kind of scourge there that has produced this                01:39PM

 6    protracted cough that has produced this hoarseness that I

 7    cannot deal with, meaning I cannot address it in a way to save

 8    you from that.  So I'm sorry about that.

 9            The second prefatory comment is I wish this could

10    somehow be a round table so it would be convenient for everyone       01:39PM

11    to be able to assert their points.  I realize that that's

12    probably not practically possible, but I will do my best to

13    turn to the respective parties and to give them an opportunity

14    to add anything they would like to add to the considerations

15    that they have already provided to me and what they have filed        01:39PM

16    with respect to their comments on the Monitoring Guide.

17            That said, I will, in the first instance, I think, let

18    you know what my preliminary view is and then naturally turn to

19    the side that would disagree with that.  So as it happens, my

20    preliminary view is probably 8 out of 10 times to agree with          01:39PM

21    what the plaintiffs have said, so I will be turning to the

22    defendants to tell me why it is that what they have said

23    doesn't seem to be or shouldn't be right.  So that's why I will

24    be proceeding that way, to give people a chance to talk and not

25    going the normal fashion of one after the other.  I will be           01:40PM

```
1    really focusing it.
2            I'm just reviewing my notes to make sure there are no
3    other prefatory comments that I wanted to make.
4            All right.  So then turning to plaintiffs' comments,
5    Document 1889, and this is the Plaintiffs' Comments Re: Revised    01:41PM
6    Monitoring Guides and Open Clinic.  And Paragraph 1 addresses
7    the status of the Monitoring Guide for the isolation sub-class
8    performance measures.  And it appears that the first issue is
9    what has been identified as I.A., and this is the consideration
10   of what to do about a week that has a state holiday in it.        01:41PM
11           It seems to me that the best way to proceed here is to
12   just make sure that the reporting period starts the day after a
13   state holiday or concludes the day before a state holiday
14   rather than excluding any week that has a state holiday in it.
15   And so I will turn to defendants as to why we can't go that       01:41PM
16   way.
17           Take your time.  That's all right.
18           (Discussion off the record between the parties and
19   attorneys.)
20           MS. LOVE:  Okay, Your Honor.  Thank you for allowing       01:46PM
21   us the time to discuss with our clients.  The impact on
22   operations that that would impose is that the monitoring week
23   runs from a Saturday to a Friday.  And it is already in
24   agreement as far as the monitoring is concerned that, for
25   instance, in the case of an emergency or something like that      01:46PM
```

# Exhibit 2

1                 UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3                 ───────────────────

4
Victor Parsons, et al., on      )
5  behalf of themselves and all   )
others similarly situated;       )
6  and Arizona Center for         )
Disability Law,                  )
7                                 )   No. CV 12-00601-PHX-DKD
             Plaintiff,           )
8                                 )
          vs.                     )   Phoenix, Arizona
9                                 )   March 21, 2017
Charles Ryan, Director,          )   8:01 a.m.
10  Arizona Department of          )
Corrections; and Richard         )
11  Pratt, Interim Division        )
Director, Division of Health     )
12  Services, Arizona Department   )
of Corrections, in their         )
13  Official capacities,           )
                                  )
14            Defendants.          )
                                  )
15  ─────────────────────────────

16

    BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE
17
        REPORTER'S TRANSCRIPT OF PROCEEDINGS-*REDACTED*
18
          (*Evidentiary Hearing re: Status - Resumed*)
19

20

21  Official Court Reporter:
    Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
    (602) 322-7256
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

———— March 21, 2017 - Status Hearing - Winland - Cross ————

```
 1    A.  I actually don't see that process.  I monitor the end

 2    result.

 3    Q.  Okay.  When you were working at Perryville and a doctor

 4    would write a prescription, who would carry it over to you?

 5            MR. BOJANOWSKI:  Your Honor, I don't know how his work    09:53AM

 6    at Perryville is relevant.

 7            THE COURT:  We're going to find out.  The objection is

 8    overruled.  We're going to find out.  We're going to let the

 9    plaintiffs' lawyer ask this witness every question that she

10    wants to ask.  If he doesn't know he has demonstrated he knows    09:53AM

11    how to say he doesn't know.  He doesn't need shepherding from

12    counsel in this education process.  So you can make your

13    objections but I'm telling you, and I think I have tried to

14    make this clear to you, I'm overruling virtually every one of

15    them.  And that's because I want to allow for more of a          09:53AM

16    discussion than an evidentiary record, and that's how we're

17    proceeding.

18            MS. KENDRICK:  Thank you.

19    BY MS. KENDRICK:

20    Q.  Who would bring the prescription to you when you were the    09:54AM

21    pharmacist?

22    A.  Typically nursing.

23    Q.  Okay.  And then you would just fill it and it would be

24    done, right?  I mean you would fill the prescription, the nurse

25    would take it, it would go away to the patient?                  09:54AM
```

# Exhibit 3

<pre>
 1                    UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF ARIZONA

 3                    _____

 4
     Victor Parsons, et al., on   )
 5   behalf of themselves and all )
     others similarly situated;   )
 6   and Arizona Center for       )
     Disability Law,              )
 7                                )   No. CV 12-00601-PHX-DKD
                    Plaintiff,    )
 8                                )
                 vs.              )   Phoenix, Arizona
 9                                )   April 17, 2017
     Charles Ryan, Director,      )   8:12 a.m.
10   Arizona Department of        )
     Corrections; and Richard     )
11   Pratt, Interim Division      )
     Director, Division of Health )
12   Services, Arizona Department )
     of Corrections, in their     )
13   Official capacities,         )
                                  )
14                  Defendants.   )
     _____ )
15

16

17   BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18             REPORTER'S TRANSCRIPT OF PROCEEDINGS

             (Status Hearing - Resumed)
19

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
</pre>

April 17, 2017 - Status Hearing Resumed - Dye - Cross

```
 1    Q.   Who reviews them?

 2    A.   One of the other administrators.  I don't know which one

 3    exactly.  Ms. Campbell or Headstream or somebody reviews the

 4    CAPs.

 5    Q.   Even the mental health ones?                              12:13PM

 6    A.   Yes.

 7    Q.   Have you ever been asked for your input on whether a CAP

 8    was adequate when it's your institution and you are the one who

 9    made the finding of non-compliance?

10    A.   Yeah, I get asked that.                                   12:14PM

11    Q.   Do you remember what it was about?

12    A.   Not exactly, like is training enough of an answer that

13    we're going to train.  I don't know.  I can't remember exactly.

14    I'm not asked that much.

15    Q.   Have you ever identified a root cause being not having    12:14PM

16    enough mental health staff?

17              MR. BOJANOWSKI:  Same objection.

18              THE COURT:  Overruled.

19              THE WITNESS:  No.  I have never thought that, no.

20    BY MS. KENDRICK:                                               12:14PM

21    Q.   Do you think Perryville has an adequate number of psych

22    associates?

23              MR. BOJANOWSKI:  Same objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  I mean, I can't -- because that's an    12:14PM
```

————April 17, 2017 - Status Hearing Resumed - Dye - Cross————

1   internal Corizon matter, I can't say.  I would need to know how

2   are they allocating their staff, do the staff work 10 hours,

3   eight hours, how is the allocation done.  So I would need to

4   know that before I had any opinion about staffing.

5   BY MS. KENDRICK:                                                    12:15PM

6   Q.  So you would need some sort of analysis or study before you

7   could form your opinion?

8           MR. BOJANOWSKI:  Same objection.

9           THE WITNESS:  Yeah.  I'm not involved in that end of

10  the staffing.  It's not my job.  I'm not aware of that.  That's  12:15PM

11  a Corizon decision.

12  BY MS. KENDRICK:

13  Q.  Do you know how many psychiatrist positions are in the

14  contract for Perryville?

15          MR. BOJANOWSKI:  Same objection.                          12:15PM

16          THE COURT:  Overruled.

17          THE WITNESS:  I can't remember exactly, no.

18  BY MS. KENDRICK:

19  Q.  Do you know if they are all filled currently?

20          MR. BOJANOWSKI:  Same objection.                          12:15PM

21          THE WITNESS:  I do not know.  I mean, I just audited

22  to see if psychiatry fulfilled their CGAR question.  But I

23  don't know that the numbers allotted are there.

24  BY MS. KENDRICK:

25  Q.  Do you have a practice of attending the monthly CQI         12:15PM

Exhibit 4

1      UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF ARIZONA

3      _____

4
Victor Parsons, et al., on      )
5 behalf of themselves and all   )
others similarly situated;       )
6 and Arizona Center for         )
Disability Law,                  )
7                                )   No. CV 12-00601-PHX-DKD
            Plaintiff,           )
8                                )
            vs.                  )   Phoenix, Arizona
9                                )   May 10, 2017
Charles Ryan, Director,          )   9:01 a.m.
10 Arizona Department of          )
Corrections; and Richard        )
11 Pratt, Interim Division       )
Director, Division of Health    )
12 Services, Arizona Department  )
of Corrections, in their        )
13 Official capacities,          )
                                 )
14            Defendants.        )
                                 )
15 _____

16

    BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE
17
        REPORTER'S TRANSCRIPT OF PROCEEDINGS
18
            (*Status Hearing-Resumed*)
19       (*Pages 682 through 886, inclusive.*)

20
Official Court Reporter:
21 Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
22 401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
23 (602) 322-7256

24 Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription
25

May 10, 2017 - Status Hearing Resumed - Pratt - Cross

1    Q.  How long does the position have to be vacant before they

2    have to start paying?

3    A.  I would have to review this again.  I thought it was 60

4    days.  I'm not sure.  I would have to look back at the contract

5    itself.  That's calculated by someone in my office.          11:11AM

6    Q.  Who is in charge of keeping track of this?

7    A.  I have a person in charge that handles all the financial

8    offsets and reviews the reports and the staffing and determines

9    what the offsets are.

10   Q.  I meant what is that person's name?                       11:11AM

11   A.  Amy Landry.

12   Q.  So if Corizon keeps the positions filled at 91 percent,

13   they don't have to pay any sort of fees, correct?

14   A.  Correct.

15   Q.  So they get to keep the difference between being paid by   11:11AM

16   the State to staff 100 percent and then what they actually have

17   staffed at 91 percent, correct?

18   A.  Correct.

19   Q.  So I want to look back at this staffing report document.

20   On the front page it shows that there's -- if you go down about  11:12AM

21   two-thirds of the way down under dental assistant there's

22   psychiatric director, and that's a .5 position?

23        MR. BOJANOWSKI:  Your Honor, I guess I'm going to

24   object.  I'm not sure what this has to do with methodology for

25   monitoring or the Monitoring Bureau or anything like that.     11:12AM

—— May 10, 2017 - Status Hearing Resumed - Pratt - Cross ——

1    THE COURT:  It has everything to do with the Court's

2  desire to get the stipulation effected.  Overruled.  That's why

3  we're having this hearing.  That's why Mr. Pratt is here so I

4  can better understand this process so that I can solve this

5  problem that is not getting solved by the State.                     11:12AM

6    Go ahead.

7    MS. KENDRICK:  Thank you.

8  BY MS. KENDRICK:

9  Q.  The psychiatric director position, is that a state-wide

10  position or is that at one institution?                             11:12AM

11  A.  That's a state-wide position, to my knowledge.

12  Q.  To your knowledge, how long has this position been vacant?

13  A.  I can't tell from this.

14  Q.  Okay.  And it also shows that according to the contract,

15  you are supposed to have 7.5 psychiatrists but Corizon only has     11:13AM

16  five?

17  A.  FTEs, yes.

18  Q.  And 19 psychologist positions but only 9.95 filled?

19  A.  Correct.

20  Q.  And do you know what a recreational therapist is?  That's       11:13AM

21  further down under mental health nurse.

22  A.  I can't give you a specific definition.

23  Q.  That's mental health staff, to your knowledge?

24  A.  Should be, yes.

25  Q.  And there's five of those positions in the contract and one     11:13AM

UNITED STATES DISTRICT COURT

# Exhibit 5

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3              _____

4

5    Victor Parsons, et al., on      )
     behalf of themselves and all     )
6    others similarly situated;       )
     and Arizona Center for           )
7    Disability Law,                  )
                                      )   No. CV 12-00601-PHX-DKD
8              Plaintiffs,            )
                                      )
9         vs.                         )   Phoenix, Arizona
                                      )   July 14, 2017
10   Charles Ryan, Director,          )   9:03 a.m.
     Arizona Department of            )
11   Corrections; and Richard        )
     Pratt, Interim Division          )
12   Director, Division of Health     )
     Services, Arizona Department     )
13   of Corrections, in their         )
     Official capacities,             )
14                                    )
               Defendants.            )
15   _____ )

16

17   BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19               (Evidentiary Hearing)

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    A.  I don't.  I usually -- the officers know me.  I usually

2    stay in the cell.  I have to ask one of the girls usually that

3    live in that pod if they would mind pushing me up.  And if they

4    do mind they will tell me so.

5    Q.  Okay.  So you are pretty much confined to your pod?          11:53AM

6    A.  Yes.

7    Q.  Because you don't have an aide?

8    A.  I'm confined pretty much to my cell.

9    Q.  To your cell?

10   A.  Uh-huh.                                                      11:53AM

11   Q.  Does your cell have a cooling unit in it?

12   A.  It does.

13   Q.  Is it an air conditioner or a swamp cooler?

14   A.  It's a swamp cooler.  And when it hits 100 degrees, it

15   stops, doesn't work.  It remains just humid like a swamp in      11:53AM

16   there.

17   Q.  Do you have a window in your unit that you could open?

18   A.  A couple years ago, they took all the lower run and they

19   welded our windows shut, so we can't open them.

20   Q.  So during count and other times where the yard is locked     11:54AM

21   down and your door is closed, you have no air coming in or out?

22   A.  No.  No, we don't.

23   Q.  And what does it feel like when you are inside your cell

24   when it's over 100 degrees?

25   A.  It feels like being trapped inside a bottle with a cork and  11:54AM

───── CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct ─────

1    I can hardly breathe.  But I do.  And my cellmate is a younger

2    woman and a couple weeks ago she collapsed and had a seizure in

3    the room.  And I was trapped by the desk, so I had to hit on

4    the wall with a cane to get the ladies next door to get one of

5    the officers.  And they had what they call an ICS.  That's an          11:54AM

6    emergency.  And they took her to complex medical.  So I was

7    really worried about her because she's been not feeling well.

8    Q.  Do you know how high the temperatures get in your cell?

9    Have you ever seen a reading?

10          MR. BOJANOWSKI:  Your Honor, I guess I'm going to                11:55AM

11   object.  I mean, this hearing is supposed to be about HNR boxes

12   and access.  Now we're talking about temperatures and welded

13   windows.

14          THE COURT:  These are extremely relevant with respect

15   to the patients or the inmates who are particularly susceptible        11:55AM

16   to heat intolerance, and I have been very interested in this

17   subject since I learned that the homes that these people are

18   placed in may be subject to, in effect, no cooling.  And, in

19   fact, I was going to -- I will overrule the objection and ask

20   my own questions.                                                      11:55AM

21          I would need to understand exactly how your cell is

22   cooled.  There is a vent into your cell from the evaporative

23   cooler that blows air in.  Is that correct?

24          THE WITNESS:  There's one vent high up towards the

25   ceiling over one of the bunks.                                         11:56AM

UNITED STATES DISTRICT COURT

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    today, but it severely limited our ability to present testimony

2    to this Court because people are too afraid.  And when you have

3    a diagnosis of cancer, the thought of your pain medication,

4    your chemotherapy, things that seem simple to you and I, like

5    ice cubes, the thought of those being discontinued, of your                  01:29PM

6    SNOs being pulled, was simply too significant of a risk for

7    these women to take for what they see as not necessarily an

8    immediate payoff.

9          And I wanted to bring that to the Court's attention

10   because we, unfortunately, don't have several witnesses here                  01:29PM

11   today who do have pertinent information that I think the Court

12   would like to hear because they are too afraid.

13         THE COURT:  Well, if it becomes known to me that there

14   is any retaliation I will certainly be interested in hearing

15   about it and acting upon it if it's warranted to do so.  I will               01:30PM

16   say that I am sensitive to the idea that this does happen

17   because not only what I just mentioned a moment ago with

18   respect to what has been told to me over the years by many

19   people who have been in custody and have appeared here for

20   settlement conferences, and I have heard what the consequence                 01:30PM

21   is for them even coming to court for a settlement conference.

22         And I will also say that just in terms of

23   observations, yesterday when we visited the Lewis yard and we

24   arrived somehow people knew that it was a group of people

25   looking into healthcare and the cacophony of voices                           01:30PM

─CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct─

```
 1    articulating dissatisfaction with the quality of the medical

 2    care as we arrived and walked through the yard to the medical

 3    unit was dramatic.  When we left the medical unit, virtually

 4    the same number of people were there, the voices were reduced

 5    to as best I could tell one.                                        01:30PM

 6           So it struck me that perhaps there had been something

 7    while we were inside the building communicated to the people in

 8    the yard you best not be expressing your views that way.  I

 9    don't know that.  That's just conjecture.  But in light of the

10    circumstances of my other experiences with what could happen in   01:31PM

11    light of what's in the prior history of this case not fully

12    developed, because the defendants did assert that they wanted

13    an opportunity to have of a chance to put on evidence, they

14    never followed through on that.  But I will say in fairness

15    that they did not have a day in court but plaintiffs had the      01:31PM

16    day in court and the plaintiffs made a case for what looked to

17    be, to reduce it to the simplest terms, people who talk to you,

18    the lawyers, were written up when they were -- for shirttail

19    violations.  That's what the people told you happened.

20           So it fits with this idea of retaliation, of              01:31PM

21    complaining.  I need to hear the complaints.  And so I'm

22    anxious to hear about them and so I'm equally anxious to make

23    sure that any effort to try to quell those complaints is itself

24    equally quelled.

25           MS. EIDENBACH:  Your Honor, I plan to stay in close        01:32PM
```

# Exhibit 6

1                UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3                  _____

4

5   Victor Parsons, et al., on      )
    behalf of themselves and all    )
    others similarly situated;      )
6   and Arizona Center for          )
    Disability Law,                 )
7                                    )   No. CV 12-00601-PHX-DKD
                    Plaintiffs,      )
8                                    )
                vs.                  )   Phoenix, Arizona
9                                    )   July 21, 2017
    Charles Ryan, Director,          )   3:24 p.m.
10  Arizona Department of            )
    Corrections; and Richard        )
11  Pratt, Interim Division          )
    Director, Division of Health     )
12  Services, Arizona Department     )
    of Corrections, in their         )
13  Official capacities,             )
                                     )
14                  Defendants.      )
    _____    )
15

16

17  BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19          (Emergency Telephonic Status Hearing)

20

21  Official Court Reporter:
    Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
    (602) 322-7256
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

```
 1              If you say that there's a good reason that you have to

 2     do it for prison safety, for a reason that is particularly

 3     compelling, I will listen to it.  But to tell me that it's the

 4     normal procedure when I made it clear to you that I didn't want

 5     any change in status for anybody who has communicated.  And I        03:41PM

 6     think I have to emphasize what is critical to me, and that is,

 7     we have a common interest, the plaintiffs, the Court, the

 8     defendants, in making sure that I get true information about

 9     what is going on.  I have given you every opportunity to

10     cross-examine, to ask for a hearing, to challenge any               03:42PM

11     allegations of retaliation.

12              And what I have to do is I have, at the end of that

13     process, to make sure that I have a client that exists in the

14     prison in which inmates feel completely safe in communicating

15     their views to the Court.  Their views may not be right.  Their    03:42PM

16     views may be wrong.  Their views may be lies.  But I have to

17     have the opportunity to hear what those views are.  You will

18     have the chance to cross-examine and to present contrary

19     evidence.  But I need to make sure there is nothing happening

20     in the process such that people have a fear that there will be     03:42PM

21     retaliation for what they have done.

22              And when you change their status with respect to a

23     rollup or taking their possessions, when you cannot demonstrate

24     to me that there's a good reason to do so, then I think that it

25     is fair to call it intimidating and chilling, and I can't even     03:43PM
```

UNITED STATES DISTRICT COURT

```
 1    address a number of issues.
 2            Let me make it clear.  You have told me that you used
 3    the roommate of the testifying witness in my case to address a
 4    problem that you had in the yard.  I am telling you you cannot
 5    do that.  You cannot use the roommate of someone who has          03:50PM
 6    testified, changing her situation to address some other
 7    problem.  The witness who testifies in my case, any change in
 8    circumstance that is not able to be supported by a compelling
 9    safety reason, probably, I'm not closing the door to hearing
10    other arguments, but what you have told me is not sufficient.     03:50PM
11    But people who testify in my court are off limits with respect
12    to your decision on the yard of how to deal with other problems
13    you have.  You cannot, and you will not, have that freedom
14    during the time that I am supervising this case because you
15    chill the opportunity that I have to get testimony.  That is my   03:51PM
16    ruling.
17            MS. LOVE:  Your Honor, for clarification, it is your
18    ruling that Ms. Shied will not be moved from Ms. Ashworth's
19    cell for the entirety of this stipulation which could continue
20    for years?  Is that your ruling?                                  03:51PM
21            THE COURT:  That is a preposterous argument because I
22    have made it very clear to you that we are talking about
23    temporal proximity such that a reasonable observer on the yard
24    could see a couple of things.  A woman came to my court and
25    testified on Friday.  On Wednesday, she suffered a major change   03:51PM
```

```
 1    in the circumstance of her confinement.  That close proximity
 2    is very suggestive of retaliation.  A month later, if there was
 3    a need to make an arrangement, and that it was usual on the
 4    yard for such rearrangements to occur, I would not have that
 5    problem.  And I think that any reasonable person would have          03:52PM
 6    come to that conclusion without what I view the preposterous
 7    statement that you just made.
 8            And so I will tell you that I will look at every
 9    single change that happens in close proximity to when someone
10    testifies in my court or when they talk to the plaintiffs.  As      03:52PM
11    time passes, and the greater time grows between the testimony
12    or the providing of the information, the burden that plaintiffs
13    would have to show that there is retaliation would become
14    greater; the presumption that retaliation had occurred would
15    become less.                                                        03:52PM
16            So I want to see what we can do to get immediately
17    this Ms. Ashworth returned to the status that she was in when
18    she left to come testify to my court.  If you want to change
19    circumstances after that, meaning in some period of time, that
20    will be something that I will be equally looking at closely,        03:53PM
21    the standard that I just articulated to you is the one that I
22    will apply.  But in this circumstance, I want her returned.  I
23    want the roommate returned.  I want her back in the situation
24    she was in when she testified to me.
25            MS. LOVE:  Your Honor, defendants need clarification        03:53PM
```

1    will be about what a changed circumstance is.  I'm asking you

2    to anticipate what my view will be, and that's a much easier

3    task to do.  Secondly, if I have to micro manage to make sure

4    that the stipulation is complied with, that's my job.  You gave

5    me that job.  And I can't do the job by being a flyover judge.    03:58PM

6    I learned that last week.  I learned that when I told Mr.

7    Bojanowski, that I had learned yet another thing that was the

8    opposite of what you had told me in court when I spoke to a

9    deputy warden.

10          And so I will micromanage.   I will be there in the       03:58PM

11   weeds dealing with this, especially in the area where it is the

12   conduit of information to the Court.  I can think of plenty of

13   areas where I will do everything in my power to not

14   micromanage.  But I cannot think of an area where it is more

15   imperative for me to micromanage than this.  I need to make      03:58PM

16   absolutely sure that all of the class members feel completely

17   safe, completely comfortable coming to testify to the Court.

18   And when they suffer, what they deem to be adverse actions as

19   confirmed by me in my view of them, then I believe there is a

20   chilling effect and I cannot permit that to happen.              03:59PM

21          So I will grant you the wish of the evidentiary

22   hearing.  I have always told you that I would give that to you

23   in every case, so I will hear full testimony.  But before we

24   get to that hearing, I want you to return to the status quo of

25   Ms. Ashworth, what she was in at the time when she testified.    03:59PM

```
 1    time to when somebody has testified in my court, that standard
 2    procedure can't happen because it would be viewed on the yard
 3    as, perhaps, an adverse consequence.  And it may be that in an
 4    individual circumstances my hypothetical doesn't play out.  But
 5    I am trying to communicate to you the message.  The message is        04:04PM
 6    that I have, just as you do, a number of different goals.  I
 7    have to prioritize those goals.  In my own view, there's hardly
 8    anything that has a higher priority than preserving this
 9    communication link.  So some other goals will suffer because of
10    my allegiance to this goal, and I believe it's necessary.            04:04PM
11         Ms. Love, I didn't give you an opportunity to respond
12    to Ms. Kendrick, so you can have the last word before we
13    conclude.  I meant Ms. Love.
14         MS. LOVE:  Your Honor, as to Ms. Kendrick's
15    characterization of what I have communicated to the Court            04:05PM
16    regarding at Perryville and standard operations, as I
17    specifically said earlier, it's standard operations at the
18    Perryville complex based upon that facility's operations.  As
19    to the allegation that nothing could have ever happened to her
20    property, Ms. Ashworth, while she was out at court, that holds       04:05PM
21    no weight.  Where she is on an open yard, we know that her
22    cellmate was back at the complex that day, who could have her
23    cell door open all day long and we can't monitor the comings
24    and goings of what happens in that cell.  So that argument by
25    Ms. Kendrick falls flat.                                            04:05PM
```

UNITED STATES DISTRICT COURT

```
1          As to the Court's ruling, it has now been expanded to
2    any inmate who submits any form of evidence as to any other
3    inmate's allegation, and as to Ms. Ashworth which I don't
4    recall off the top of my head, but it was four or five inmates
5    who submitted letters.  And it has now been expanded to any       04:06PM
6    inmate that the plaintiffs' counsel speaks to.  That is unduly
7    burdensome, unreasonable, and an order made without any actual
8    evidence of actual retaliation that has not been proven.  You
9    have been talking about appearance of, but there's no actual
10   evidence.  That is overbroad and overburdensome for us to now     04:06PM
11   have to monitor property, change in housing, and change in
12   cellmate for any inmate that the plaintiffs' counsel ever
13   speaks to.  That could be 33,000 people that Rachel Love has to
14   now monitor on a daily basis whether their housing has been
15   changed, where something happened to their property, and          04:06PM
16   whether they have a new cellmate.  That is absolutely unduly
17   burdensome, unreasonable, and not warranted by just allegations
18   without evidence.
19          THE COURT:  Ms. Love, your hyperbole is extreme and
20   unpersuasive.  There are 33,000 prisoners.  There are between 5   04:06PM
21   and 10 plaintiffs' lawyers.  If they started to talk to every
22   single one of them, which you know is not going to happen, and
23   you know over the course of this case that issue has arisen
24   just a couple of times.  So the specter that you raise about
25   33,000 people that you have to watch is, again, preposterous.     04:07PM
```

1    So the hyperbole does not advance the argument.

2            But what I want to make clear to you, that if you see

3    a case, a court filing from the plaintiffs that includes an

4    affidavit in it from an inmate in which they are telling me

5    something that I think is useful in the case, you need to be          04:07PM

6    mindful of whether or not that person has suffered any kind of

7    close in time proximal change in circumstance.  Now, I think as

8    a practical matter this is not going to be as grave as you

9    suggest.  And that's why I say that you have entered into a

10   hyperbolic argument.  It is this:  We haven't seen very many         04:07PM

11   affidavits over time.  We have seen some number of them but not

12   a great number.  We also understand that there is a dialogue

13   that does occur with respect to plaintiffs and their clients

14   when they visit, and that kind of conduct has, I think,

15   happened on a regular basis during prison visits, and only once      04:08PM

16   in the history of this case, have plaintiffs ever presented to

17   me that they believed that there was retaliation such that it

18   was brought to a level of attention of the Court.

19           There may be other instances, and if there have been

20   other instances and they haven't been reported to me, what I         04:08PM

21   hope is clear from you today, is that you are right.  This is

22   going to be work on your desk.  It's going to be work on my

23   desk.  Because I'm going to be watching this to make sure that

24   people who communicate with the plaintiffs, communicate with

25   the Court, do not feel that they are intimidated.  So there may      04:08PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    today, but it severely limited our ability to present testimony

2    to this Court because people are too afraid.  And when you have

3    a diagnosis of cancer, the thought of your pain medication,

4    your chemotherapy, things that seem simple to you and I, like

5    ice cubes, the thought of those being discontinued, of your          01:29PM

6    SNOs being pulled, was simply too significant of a risk for

7    these women to take for what they see as not necessarily an

8    immediate payoff.

9         And I wanted to bring that to the Court's attention

10   because we, unfortunately, don't have several witnesses here         01:29PM

11   today who do have pertinent information that I think the Court

12   would like to hear because they are too afraid.

13        THE COURT:  Well, if it becomes known to me that there

14   is any retaliation I will certainly be interested in hearing

15   about it and acting upon it if it's warranted to do so.  I will      01:30PM

16   say that I am sensitive to the idea that this does happen

17   because not only what I just mentioned a moment ago with

18   respect to what has been told to me over the years by many

19   people who have been in custody and have appeared here for

20   settlement conferences, and I have heard what the consequence       01:30PM

21   is for them even coming to court for a settlement conference.

22        And I will also say that just in terms of

23   observations, yesterday when we visited the Lewis yard and we

24   arrived somehow people knew that it was a group of people

25   looking into healthcare and the cacophony of voices                 01:30PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1  articulating dissatisfaction with the quality of the medical

2  care as we arrived and walked through the yard to the medical

3  unit was dramatic.  When we left the medical unit, virtually

4  the same number of people were there, the voices were reduced

5  to as best I could tell one.                                          01:30PM

6            So it struck me that perhaps there had been something

7  while we were inside the building communicated to the people in

8  the yard you best not be expressing your views that way.  I

9  don't know that.  That's just conjecture.  But in light of the

10 circumstances of my other experiences with what could happen in  01:31PM

11 light of what's in the prior history of this case not fully

12 developed, because the defendants did assert that they wanted

13 an opportunity to have of a chance to put on evidence, they

14 never followed through on that.  But I will say in fairness

15 that they did not have a day in court but plaintiffs had the    01:31PM

16 day in court and the plaintiffs made a case for what looked to

17 be, to reduce it to the simplest terms, people who talk to you,

18 the lawyers, were written up when they were -- for shirttail

19 violations.  That's what the people told you happened.

20           So it fits with this idea of retaliation, of           01:31PM

21 complaining.  I need to hear the complaints.  And so I'm

22 anxious to hear about them and so I'm equally anxious to make

23 sure that any effort to try to quell those complaints is itself

24 equally quelled.

25           MS. EIDENBACH:  Your Honor, I plan to stay in close    01:32PM

# Exhibit 7

```
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3                  _____

 4    Victor Parsons, et al., on      )
 5    behalf of themselves and all    )
      others similarly situated;      )
 6    and Arizona Center for          )
      Disability Law,                 )
 7                                     )   No. CV 12-00601-PHX-DKD
                   Plaintiffs,         )
 8                                     )
             vs.                       )   Phoenix, Arizona
 9                                     )   August 8, 2017
      Charles Ryan, Director,          )   9:03 a.m.
10    Arizona Department of            )
      Corrections; and Richard        )
11    Pratt, Interim Division         )
      Director, Division of Health     )
12    Services, Arizona Department     )
      of Corrections, in their        )
13    Official capacities,            )
                                       )
14                 Defendants.         )
      _____)
15

16

17        BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18             REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                     (Evidentiary Hearing)

20

21    Official Court Reporter:
      Laurie A. Adams, RMR, CRR
22    Sandra Day O'Connor U.S. Courthouse, Suite 312
      401 West Washington Street, Spc 43
23    Phoenix, Arizona 85003-2151
      (602) 322-7256
24
      Proceedings Reported by Stenographic Court Reporter
25    Transcript Prepared by Computer-Aided Transcription
```

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1    and towns and neighborhoods.

2            Prominent public service like you, Director Ryan, can

3    greatly influence whether we live in a society where there is

4    respect for the law, even laws with which you disagree.  The

5    tone of leadership matters on this, and whether you refer to a          09:09AM

6    court ruling when you address your troops as, quote,

7    preconceived, close quote, or as the recently convicted sheriff

8    in our county who thought that he could do as he wished

9    notwithstanding contrary orders of the Court or references to

10   so-called judges.                                                       09:09AM

11           All of this disrespect for the rule of law, something

12   I have never experienced of this kind or seen in nearly 30

13   years of being a lawyer or 16 years as a judge.  I worry where

14   this all leads.  I worry that it sends a message that we only

15   follow the laws that we think are right, or that we can choose          09:09AM

16   whether we wish to do what is necessary to follow the law.

17           This case is fundamentally about a failure of the

18   Department of Corrections to follow the law of this case.  For

19   years, your promise to provide the health care required by the

20   stipulation has failed.  This promise has not been met.  All of         09:10AM

21   my time in this case is focused on one thing:  Compliance with

22   the promise of health care in accordance with the stipulation.

23   Your comments in the context of this long-term failure to do

24   what the law requires with respect to providing health care to

25   your charges potentially thwarts my efforts to enforce the              09:10AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing

1   stipulation and potentially commits a broader ==assault against==
2   ==the rule of law.==  Imagine how you would feel if you directed
3   your wardens not to take a specific action but in communicating
4   that message your warden then also said to his or her staff
5   that the director's decision is preconceived, not based on the          09:10AM
6   full story, and you all are doing a great job.  That is how I
7   felt when I read your e-mail.  I then ordered that you provide
8   me with all written communication that was associated with
9   communicating my order prohibiting retaliation.  I saw there
10  statements of your staff which indicated to me that they                09:11AM
11  embraced the core value of my order, unimpaired by your mixed
12  message.  I hope that that's an accurate representation.

13         However, notwithstanding what is written, your e-mail
14  left me with a great concern that you did not fully embrace
15  your absolute obligation to follow to the letter and to the             09:11AM
16  spirit the rulings of this Court until they are reversed by me
17  or by the Court of Appeals or by the Supreme Court.  That is
18  what the rule of law requires, nothing less, nothing qualified,
19  nothing diluted by disparagement.

20         We can now proceed with any preliminary matters that             09:11AM
21  counsel need to raise before we hear the witnesses.  Anything
22  from the plaintiffs' side?

23         MR. SPECTER:  No, Your Honor.

24         THE COURT:  Mr. Struck?

25         MR. STRUCK:  Yes, Your Honor.  I would like to make a            09:11AM

CV 12-601 - August 8, 2017 - Evidentiary Hearing - Ryan - Cross

1  that a mistake or is there another planned video conference on

2  this topic?

3         THE WITNESS:  Judge Duncan, I'm not aware of another

4  video conference.

5         THE COURT:  Okay.  All right.  And then the last thing  09:58AM

6  that I will have to say is, get me out of this business of

7  micromanaging your operation.  And the simple pathway to doing

8  that is to make sure that when Mr. Struck or Mr. Bojanowski

9  stand up in court on a monthly basis they tell me the

10  performance measures are being met at 85 percent across the  09:59AM

11  board, we get there.  I'm out of your hair.  And what's more

12  important is that the health care promise that was made to the

13  inmates is being delivered, and that's what I'm here for.  And

14  I will be micromanaging until we get into that position but

15  there's an easy pathway out of it.  You have the complete  09:59AM

16  control to do it.  So I hope you do.  Thank you, sir.

17         THE WITNESS:  Judge, thank you for taking the time.

18  And I can assure you that we will comply with your orders to

19  the letter.  There was no intention to be disrespectful to the

20  Court.  I believe, with all due respect, I want you out of this  10:00AM

21  case as bad as everybody else.

22         THE COURT:  I don't have any doubt about that.

23         THE WITNESS:  So we will continue to stay after our

24  vendor to fulfill their requirements to perform.

25         THE COURT:  And I'm sure you have read the transcript  10:00AM

# Exhibit 8

CV-12-00601-PHX-DKD, August 9, 2017

1                UNITED STATES DISTRICT COURT                08:59:29

2                 FOR THE DISTRICT OF ARIZONA

3                      _____

4

5    Victor Antonio Parsons, et al., on  )                   08:59:29
     behalf of themselves and all others )
6    similarly situated; and Arizona     )
     Center for Disability Law,          )
7                                         )
                    Plaintiffs,           )   CV-12-00601-PHX-DKD
8                                         )
                    vs.                   )   Phoenix, Arizona
9                                         )
     Charles L. Ryan, et al., Director,  )   August 9, 2017
10   Arizona Department of Corrections;   )   9:01 A.M.           08:59:29
     and Richard Pratt, Interim Division )
11   Director, Division of Health         )
     Services, Arizona Department of      )
12   Corrections, in their Official       )
     capacities,                          )
13                                         )
                    Defendants.           )
14   _____)

15                                                            08:59:29

16   BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

17               TRANSCRIPT OF PROCEEDINGS

18         EVIDENTIARY HEARING AND STATUS HEARING

19

20                                                            08:59:29

21   Official Court Reporter:
     Elaine M. Cropper, RDR, CRR, CRC
22   Sandra Day O'Connor U.S. Courthouse
     401 West Washington Street, SPC 35
23   Phoenix, Arizona  85003-2150
     602.322.7245/(fax) 602.322.7253
24
     Proceedings Recorded by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription      08:59:29


                    United States District Court

1     MR. BOJANOWSKI:  Correct.                                    02:19:48

2     THE COURT:  And so then they presumably look at the

3  ones that are close to the expiration date of 60 days and the

4  leader of the conference call raises with the clinical

5  specialist at the facility the imminency of this deadline and   02:20:00

6  asks, "What are you doing about it?"

7     MR. BOJANOWSKI:  Correct.  And if they need help to

8  get somebody scheduled, then the help is provided.

9     THE COURT:  So my next question is:  Is there -- as

10  part of this 3:30 conference call -- any verification that     02:20:20

11  takes place on a realtime basis with respect to whether this

12  performance measure is being satisfied?

13     MR. BOJANOWSKI:  The way I understand it is that the

14  report shows the time frames that are at issue.  The people who

15  are seen fall off that report and are no longer in play so to   02:21:04

16  speak.  So as far as verifying whether they have been seen or

17  not, they are off the report if they have been seen.

18     THE COURT:  So the report that is before these

19  doctors every day at 3:30 includes some number of names, I

20  gather, for whom the next day will be the 60 days?             02:21:30

21     MR. BOJANOWSKI:  You're trying to get an idea of the

22  time frames.

23     THE COURT:  I'm trying to micromanage here.  I'm

24  trying to understand -- I'm serious.  I'm trying to understand

25  exactly how this is working so that I can see whether it's     02:22:02

United States District Court

140

1  likely to be efficacious or not, so I need to understand all of     02:22:05

2  the particular details about it and that is why I am asking all

3  of this.

4        MR. BOJANOWSKI:  No.  And I'm trying to understand

5  but I'm having a bit of a disconnect because I haven't seen the    02:22:15

6  report, so I'm having trouble visualizing in my mind what this

7  report looks like.

8        THE COURT:  Well, does the person you are talking to

9  know whether or not -- first of all, when did you start the

10 3:30 conference calls?  When did this process start.              02:22:30

11       MR. BOJANOWSKI:  About a week and a half ago?

12       THE COURT:  All right.  And in that week and a half,

13 you've obviously addressed this problem as we've described.

14       I am assuming that there have to be some number of

15 inmates for whom the time has passed because I know you fail      02:22:56

16 most of the time on this measure.  And so you would think that

17 even before you could get to the ones that are imminently

18 falling through the timetable, you would have to address this

19 backlog.  I guess I'm just trying to understand.  It just

20 doesn't --                                                        02:23:12

21       MS. ALMANZA:  Your Honor, what we've started is the

22 referral process.  Once the provider puts in the referral, it

23 goes into our system.  So we're looking at from the minute it's

24 been put in and the time frame of how long it takes to get

25 approval and then for -- from the time of approval until the      02:23:31

United States District Court

```
1        MR. BOJANOWSKI:  All right.  I have just wanted to           03:46:21
2   touch base with you as to that item which had not been
3   mentioned.
4        THE COURT:  No.  That's because I addressed it
5   yesterday.  There isn't any doubt about that.               03:46:28
6        MR. BOJANOWSKI:  No.  That's the only thing that was
7   on the list that was not mentioned.
8        THE COURT:  All right.  Thank you very much.
9        All right.  Well, thank you, all, very much for your
10  time yesterday and today.                                    03:46:38
11       You know, I used the word "micromanage" a bit ago and
12  that's because I really do want you all to understand that that
13  is not a poisoned word in this courtroom.  That is because,
14  unfortunately, you've left me with that responsibility and the
15  way you get me out of that business is to comply with the    03:46:57
16  performance measures and there will be no micromanaging.  But I
17  cannot do what I'm required to do, especially with respect to
18  the limitation that I just described without me getting into
19  the weeds on this and trying to understand as much as I can.
20       And so that means intelligent micro-designing --         03:47:12
21  micromanaging -- intelligent micro-designing -- I could use
22  that help maybe.
23       In any event, it does mean that I need to do that and
24  so I am not scared of that word and do think that for me to be
25  frightened of it is an abdication of my responsibility to do.  03:47:34
```

United States District Court

1    But if it remains frightening to anybody, I hope it remains          03:47:38

2    frightening to the defendants because the smart thing here is

3    to get me out of this, to meet the performance measures and to

4    have this thing be a conclusion in the past.

5              As the State considers how best to proceed, it needs       03:47:52

6    to understand that as you evaluate what the contract price is

7    in your negotiations, there is a healthy cost here that is

8    imposed by the presence in this case.  I see all of these

9    people in the courtroom.  And I think not only because the

10   lawyers billing, but the people not in their offices doing what     03:48:14

11   they are supposed to be doing.  And I don't like that and that

12   is a cost to everybody, but I can't sherk from imposing the

13   cost because of the responsibility that I have.

14             So what that means is the future holds much more of

15   this, much more expense, much more distraction from the primary     03:48:29

16   mission unless you can satisfy these performance measures

17   which, as I said to Director Ryan, seemed to me in the offing

18   of the settlement to be something that I really expected people

19   to straightforwardly be able to accomplish and they haven't

20   been able to do that.  So that's where we are.                      03:48:50

21             Thank you, all.

22             MR. SPECTER:  Thank you, Your Honor.

23             MR. BOJANOWSKI:  Thank you.

24        (Whereupon, these proceedings recessed at 3:48 p.m.)

25

United States District Court

Exhibit 9

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

Victor Antonio Parsons, et al,)
                        )
        Plaintiffs,    )      2:12-cv-00601-DKD
                        )
       vs.             )     Phoenix, Arizona
                        )     August 24, 2017
Charles L. Ryan, et al,    )       10:02 a.m.
                        )
        Defendants.    )
                        )

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC STATUS HEARING

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
1    pertains only to plaintiffs' notification filed with the Court

2    on July 20th as to inmates Oyenik and Ashworth, and does not

3    pertain to any of these other inmates.

4            THE COURT:  And then that's the -- the sum whole of

5    your objections?  Have you set forth everything you wanted to

6    say on those points?

7            MS. LOVE:  Yes.  Yes.

8            THE COURT:  Okay.

9            All right.  The defendants' objections are overruled,

10   and here's why.

11           I don't think that your fear of the snowball is

12   legitimate here because I'm not going to necessarily allow my

13   decision here to define how everything goes forward in the

14   future.  But here I have particular incidents that I have been

15   involved in, I've heard witness testimony already, I know the

16   nature of this -- of this issue in a way that affords me the

17   opportunity to be more engaged as -- as a judge to understand

18   it better.  And so if I'm on a fishing expedition as you are

19   certain of, I am less concerned about it when I know that these

20   are waters that I'm interested in.  And I am, as you know, very

21   interested in these waters.

22           I want to make sure that there is no sense of

23   retaliation.  And if it is, I want to identify it and bring it

24   out into the light so that everybody can see that this is how

25   the judge reacts if it is there.  If it's not there, then we
```

UNITED STATES DISTRICT COURT

# Exhibit 10

1        UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3                 _____

4

5   Victor Parsons, et al., on        )
    behalf of themselves and all      )
6   others similarly situated;        )
    and Arizona Center for            )
7   Disability Law,                   )
                                      )   No. **CV 12-00601-PHX-DKD**
8              Plaintiffs,            )
                                      )
9          vs.                        )   Phoenix, Arizona
                                      )   September 11, 2017
10  Charles Ryan, Director,           )   9:01 a.m.
    Arizona Department of             )
11  Corrections; and Richard         )
    Pratt, Interim Division           )
12  Director, Division of Health      )
    Services, Arizona Department      )
13  of Corrections, in their          )
    Official capacities,              )
14                                    )
               Defendants.            )
15  _____)

16

17    BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19          (*Evidentiary Hearing Re: Retaliation*)

20

21  Official Court Reporter:
    Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
    (602) 322-7256
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

CV 12-601 - September 11, 2017 - Evidentiary Hearing re:  Retaliation - Currier - Cross

1    A.  I didn't want them to talk about the retaliation issue in

2    front of the inmates to give them the impression that there was

3    any retaliation based on, you know, their testimony or being a

4    part of the lawsuit.

5    Q.  But what was the basis for saying, "It seems like we have a          09:59AM

6    problem"?  That implies that the problem already exists.

7    A.  You know, I don't remember why I wrote that, to be on

8    honest with you.  Just trying to cover all my bases.

9    Q.  If you go back to the third page of Exhibit 6, Lieutenant

10   Papworth responded to your e-mail on 7/28/17 at 8:26 a.m.                 10:00AM

11   Could you read Lieutenant Papworth's message?

12   A.  He says, "Donna Sheid has been placed in a jumpsuit until

13   August 11.  I'm not sure who authorized this.  There should be

14   a disciplinary sanction for inmate's due process.  We have

15   circumvented the disciplinary process here.  This may become an          10:00AM

16   issue in lieu of what's going on right now.  As a matter of

17   fact we have approximately 10 inmates in jumpsuits who may or

18   may not have even a ticket written before being sanctioned to a

19   jumpsuit."

20         MS. LOVE:  Your Honor, I'm going to object to the line            10:00AM

21   of questioning on Inmate Sheid when we are here on a

22   retaliation hearing as a result of plaintiff's notice of

23   retaliation regarding Inmates Ashworth and Oyenik.  Inmate

24   Sheid has never come to the Court and made any statements or

25   any averments or any opinions she believes she's been                    10:01AM

1   retaliated against.

2        THE COURT:  Thank you.  The objection is overruled.

3   We're learning about more for the process.  Thank you.

4   BY MS. KENDRICK:

5   Q.  I would note for the record Ms. Shied did provide with you     10:01AM

6   a written statement as an affiant.  What does it mean, Warden,

7   to be placed in a jumpsuit?

8   A.  Evidently, they were putting inmates who had some rule

9   violations in a jumpsuit.  I'm not sure why they were doing

10  that.                                                             10:01AM

11  Q.  Is there a policy about putting people in jumpsuits?

12  A.  No, there is not.

13  Q.  So what does this physically mean that you are in a

14  jumpsuit?

15  A.  It means that they put them in an orange jumpsuit versus      10:01AM

16  their regular clothes.

17  Q.  And regular clothes for women is an orange T-shirt and

18  orange pants?

19  A.  Yes.

20  Q.  Why would being placed in a jumpsuit be considered           10:01AM

21  punishment?

22  A.  I don't know.  I imagine they don't want to wear a

23  jumpsuit.  I wouldn't to wear a jumpsuit.  I would want to wear

24  my regular clothes.

25  Q.  Why would you not want to wear a jumpsuit?                   10:02AM

UNITED STATES DISTRICT COURT

Exhibit 11

1                    **UNITED STATES DISTRICT COURT**

2                   **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

   **Victor Parsons, et al., on**      )
5  **behalf of themselves and all**    )
   **others similarly situated;**      )
6  **and Arizona Center for**          )
   **Disability Law,**                 )
7                                      )  No. **CV 12-00601-PHX-DKD**
                   Plaintiffs,         )
8                                      )
            vs.                        )  Phoenix, Arizona
9                                      )  November 7, 2017
   **Charles Ryan, Director,**         )  9:03 a.m.
10 **Arizona Department of**           )
   **Corrections; and Richard**       )
11 **Pratt, Interim Division**         )
   **Director, Division of Health**   )
12 **Services, Arizona Department**   )
   **of Corrections, in their**       )
13 **Official capacities,**           )
                                       )
14                 Defendants.         )
   _____    )
15

16

17    **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

18           <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

                       (*Status Hearing*)
19

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1                      <u>A P P E A R A N C E S</u>

2    **For the Plaintiffs:**

3            PRISON LAW OFFICE
             By:  **Corene Kendrick, Esq.**
4            1917 5th Street
             Berkeley, CA 94710
5
             ACLU - Washington DC
6            By:  **David C. Fathi, Esq.**
             915 15th Street NW
7            7th Floor
             Washington, DC 20005
8
             EIDENBACH LAW PC
9            By:  **Kirstin T. Eidenbach, Esq.**
             P.O. Box 91398
10           Tucson, AZ 85752

11           ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
             By:  **Maya S. Abela, Esq.**
12           177 N. Church Avenue
             Suite 800
13           Tucson, AZ 85701

14   For the Defendants:

15           STRUCK LOVE BOJANOWSKI & ACEDO PLC
             By: **Timothy J. Bojanowski, Esq.**
16           By: **Rachel Love, Esq.**
             By: **Daniel Struck, Esq.**
17           By: **Richard Valente, Esq.**
             3100 W. Ray Road
18           Suite 300
             Chandler, AZ 85226
19

20

21

22

23

24

25

─── November 7, 2017 - CV 12-601 - Status Hearing ───

```
 1                  P R O C E E D I N G S

 2          THE MAGISTRATE JUDGE CLERK:  Civil Case Number 12-601,

 3     Parsons, et al., versus Ryan, et al., on for a status hearing.

 4          THE COURT:  Counsel, please announce.

 5          MR. FATHI:  Good morning, Your Honor.  David Fathi      09:03AM

 6     from the ACLU National Prison Project for the plaintiff class.

 7          THE COURT:  Thank you.  Good morning.

 8          MS. KENDRICK:  Good morning, Your Honor.  Corene

 9     Kendrick from the Prison Law Office for the plaintiff class.

10          THE COURT:  Thank you.  Good morning.                   09:03AM

11          MS. EIDENBACH:  Good morning.  Kirsten Eidenbach for

12     the prisoner plaintiff class, and behind me my co-counsel.

13     Maya Abela, from the Arizona Center for Disability Law.

14          THE COURT:  Thank you.  Good morning.

15          Anyone on the phone?  We have Mr. Millar, I think.      09:04AM

16          Good morning, Mr. Millar.  How are you.

17          MR. MILLAR:  Along with myself, Judge, I have Allison

18     Fishkind, who is from our legal team, and Lauren Keil who is

19     from our documents development department to support this call

20     as well.                                                     09:04AM

21          THE COURT:  Thank you.  Good morning, both of you, all

22     three of you.  Thank you very much.

23          Defendants?

24          MR. BOJANOWSKI:  Your Honor, Tim Bojanowski, Rachel

25     Love, Dan Struck, and Richard Valente.                       09:04AM
```

4

1          THE COURT:  Thank you.  Good morning, all.

2          Someone else was on the phone, I heard, too.  No, I

3   guess not.

4          Mr. Millar, thank you for calling in.  We need to

5   address a couple of things.  First, with respect to the                    09:04AM

6   settling of the Articles of Engagement with respect to the

7   standard terms and conditions, I know that you have heard from

8   my staff that there are issues associated with respect to what

9   I can fairly allow you to enter into because the normal kind of

10  contract that you would have with a normal entity provides for             09:05AM

11  you to have certain legal rights.  And I can't, in good

12  conscience, allow you to enter into an agreement where I know,

13  because you are contracting with the Court, who has absolute

14  immunity, that you don't have the opportunity to enforce those

15  rights.  But nevertheless, there are a couple of things that I             09:05AM

16  can say that can address those issues.

17          First, with respect to the matters that are going to

18  govern how the conduct of the project will be undertaken with

19  respect to the enforcement of my order that the defendants pay

20  for it, those provisions that respect to timing and invoicing,             09:05AM

21  those will be the guideline that I will use for enforcing my

22  order.  And so the expectation could be that you would have the

23  backing of the Court to make sure that those provisions are

24  satisfied.

25          Also, the confidentiality provisions with respect to               09:06AM

UNITED STATES DISTRICT COURT

─── November 7, 2017 - CV 12-601 - Status Hearing ───

1    protective orders, we're accustomed to doing that in this case

2    and so we do have a way to protect the confidential information

3    that is acquired during the project.  But also overall, with

4    respect to what would be, perhaps, Ms. Fishkind's concern, and

5    that is, how is my client going to be protected here, I think        09:06AM

6    it's reasonable for people to understand that the normal kind

7    of practices that you engage in that would reasonably cause you

8    to want to enter into these contractible provisions where you

9    worry that somebody is not going to comply with what needs to

10   happen, this is in the context where you are a court-appointed       09:07AM

11   expert and you are serving as an agent of the Court.  And so to

12   the extent, perhaps, there are some liability concerns that Ms.

13   Fishkind has with respect to potential indemnification, I think

14   if you encounter areas where you think you have a sensitivity

15   to that you can turn to the Court and get something even beyond       09:07AM

16   what I'm saying now, and that is that you are the agent of the

17   Court.  If there is something that is of particular concern

18   that you think is necessary to do or an action you need to take

19   that is necessary to complete your work, you can always contact

20   the Court and I will evaluate the circumstances of the request       09:07AM

21   and, if appropriate, make the necessary order, enter the

22   necessary order, that will become a specific order of the Court

23   that provides for the accomplishment of that task and then,

24   therefore, it is an order of the Court.

25            So I would think that you are complying with it and         09:08AM

─── **November 7, 2017 - CV 12-601 - Status Hearing** ───

1   then that would provide, I would imagine, any kind of

2   protection that you would want to have because it is your

3   service as an agent of the Court that is being undertaken.  And

4   if somebody has an issue with that, it would seem that that

5   would be on my doorstep, not yours.  But to the extent you have       09:08AM

6   concerns about that in particular areas you should feel free to

7   raise it.  And the general statement that I make here, that I

8   think that it is true that all of the actions being undertaken

9   pursuant to this project are as an agent of the Court so that

10  we can get the information that we need to be able to enforce        09:08AM

11  the stipulation.

12          So that was the one issue I knew that we needed to

13  address, and I will give you a chance, Ms. Fishkind and Mr.

14  Millar, if you want to address it further.  But just so you

15  know what the second issue is, the last time that we had a           09:09AM

16  telephonic hearing there were some issues raised by counsel

17  here with respect to definitional terms that were in the

18  engagement letter.  And you haven't, I don't think, been made

19  aware of those, Mr. Millar, so I will give counsel an

20  opportunity to do that in short order.                               09:09AM

21          But first we'll return to the issue about the terms

22  that unfortunately are your standard boilerplate, and

23  understandably so, but really don't have any application here.

24          Mr. Millar, Mr. Fishkind, anything you want to say

25  about that?                                                          09:09AM

─────────────── November 7, 2017 - CV 12-601 - Status Hearing ───────────────

1        MS. FISHKIND:  Judge, this is Allison Fishkind.

2        My one question is, actually, is it possible instead

3    of us entering into the engagement letter with the Court that

4    the Court would order that the defendant enter into the

5    engagement letter directly with us since we will be providing       09:10AM

6    the defendant with the services and then they will be paying us

7    because that's something contractually that I think would work

8    for both the Court and for the advisory board.

9        THE COURT:  I understand that that would be a solution

10   that would put you back into the normal pattern of how you          09:10AM

11   operate, but really, the difficulty here is that it's not that

12   you are working for the defendants.  You are working for me and

13   they are paying for it.  And so I'm uncomfortable with that

14   arrangement.  Also, I wonder, have you checked with other

15   entities that have been retained by courts to serve as experts      09:11AM

16   in this capacity?  Because I guess I know that there are -- I

17   know, from my own experience, that there are other

18   circumstances where courts have done this but I also know that

19   there are other circumstances where courts are in a position to

20   do things along the lines that you suggest.  But I have got         09:11AM

21   certain limitations both in the stipulation itself and in the

22   Prison Litigation Reform Act on how I can conduct my affairs

23   with respect to supervising this case that make it so that it's

24   not so easy to adopt that alternative that you suggest.

25       Are you really thinking that you cannot enter into              09:11AM

———November 7, 2017 - CV 12-601 - Status Hearing———

1   this arrangement without having that kind of proposal embraced?

2   Because I don't see a way that I can get there.

3        MS. FISHKIND:  So our biggest concern is third party

4   liability.  So we do the analysis and we do the work and we

5   make our recommendations and then something happens as a result   09:12AM

6   of those recommendations and the advisory board is viewed with

7   uncapped liability and without any form of indemnification for

8   that third party claim.  And so that's really where our biggest

9   concern is, and so it's not with the Court directly but it's

10  really for any third party complaints that come out of that.   09:12AM

11       THE COURT:  All right.  And I appreciate that.  But, I

12  mean, it's the old problem that no client likes to hear from

13  their lawyer, and that is there is nothing that I can do that

14  can stop you from being sued.  There are lots of things I can

15  do to stop you from being found to have liability, but there's   09:12AM

16  nothing I can do to stop you from being sued.  And that, I

17  think, is a cost of doing business with the Court.  There's

18  nothing I can do to protect you from being sued.

19       But there's a lot I can do to give you what I think is

20  a defense like mine, absolute, and that is any time you are   09:13AM

21  engaging in this project, and obviously, if your investigator

22  runs off the road and kills somebody, that's not what we're

23  talking about.  What we're talking about is somebody who thinks

24  that there's a change in job classification because of what has

25  happened as a result of your report and somehow they think you   09:13AM

1    are liable for that.  And so as tenuous -- I mean, maybe there

2    are less tenuous things that can be positive.  I just can't

3    think of one now.  But in that kind of circumstance, it would

4    seem to me that the engagement to do this analysis that results

5    in a report that causes the Court to do something is so full of      09:14AM

6    tiers of defenses, first of all, again, the activity itself is

7    the product of court-ordered action; secondly, you are not

8    going to be doing anything in this case with respect to what

9    happens on the ground regarding the employment or staffing of

10   people in the prison system.  That's not going to be an action      09:14AM

11   that you are going to cause to happen.  You are going to inform

12   me and I'm going to decide what to do.

13          So again, I just can't see where there is that there's

14   a reasonable fear that is beyond the fact that you could be

15   sued.  And you could be sued, and unfortunately, I can't do         09:14AM

16   anything about that.  But I surely think, as we analyze it as

17   lawyers, as trying to make a good judgment as best we can, it's

18   not great exposure.

19          MS. FISHKIND:  Okay.  And is the language that would

20   go in the order something along the lines of, you know, any --      09:15AM

21   what's contained in the scope and any deliverables that come

22   out of this scope are pursuant to a court order and, therefore,

23   are protected by the same levels or something along those

24   lines?

25          THE COURT:  Well, it is the order of the Court that          09:15AM

1    the advisory board undertake the analysis in the engagement

2    letter to provide information to the Court that would allow the

3    Court to make the most informed decisions it could make with

4    respect to the enforcement of the stipulation.  And that all of

5    the investigation, all of the research, all of the inquiries          09:15AM

6    made on behalf of the Court in -- as identified in the advisory

7    board's engagement letter are pursuant to the order of the

8    Court to do that.  And that it is as an agent of the Court that

9    is advisory board is engaging in this activity, and that in the

10   context of this court appointment as an agent of the Court, it        09:16AM

11   would be the -- it is the Court's view that the advisory board

12   is acting on behalf of the Court.  And it is further ordered

13   that if at any time the advisory board believes that it is

14   encountering an area of concern with respect to whether or not

15   it is acting at the order of the Court, and there is action           09:16AM

16   that it believes that is necessary for the achievement of the

17   purposes of the engagement, then they may bring that

18   information to the Court and the Court will specifically

19   identify that area of concern and make an appropriate order

20   which may include the direction that that activity go forward         09:16AM

21   as a specific direction of the Court.

22          Again, the overall context is one where this

23   engagement is being pursued as a purpose of the court and as an

24   order of the Court.  And so the agent of the Court should

25   expect that it would have the protection of the Court with            09:17AM

─────────── November 7, 2017 - CV 12-601 - Status Hearing ───────────

1    respect to activities that are engaged on its behalf that would

2    normally be the subject of judicial immunity.

3          If there are particular areas of concern, the Court

4    will address those so that it is clear to everyone that that is

5    the very clear understanding and expectation with respect to          09:17AM

6    anybody who is engaging in activities with the people who are

7    working for the advisory board and seeking to accomplish the

8    goals set forth in the engagement letter.

9          Does that order that I just entered on the record

10   provide the response, the explanation of the situation here          09:17AM

11   that addresses your last question, Ms. Fishkind?

12         MS. FISHKIND:  Yes.  I think that's very helpful.  I

13   will need to run this by our general counsel internally, but I

14   think I have the information I need and I think that that's

15   helpful and clear.  Thank you.                                        09:18AM

16         THE COURT:  All right.  Well, if you do think that you

17   need further clarification, again, this invitation to bring

18   that to the Court's attention is applicable now, from this

19   point forward, at any time.  And the way that you do that is

20   you contact the Court's judicial assistant, Ms. Armida Herrera,       09:18AM

21   and we will set a telephonic hearing that we will notice to

22   counsel and we'll address it on an emergent basis.  So I do not

23   want anything on this topic to be delayed because of the

24   Court's inattention to it.  And it's -- one of the ways that

25   you can make sure that the time frames are not -- are adhered         09:19AM

UNITED STATES DISTRICT COURT

───── **November 7, 2017 - CV 12-601 - Status Hearing** ─────

1   to is that if you do develop issues, let us know quickly and

2   we'll get it on the agenda that day if not the next.  Okay.

3   Thank you.

4       And then, shall I turn to you, Ms. Kendrick, first for

5   the issues that were raised on the telephonic hearing before        09:19AM

6   that Mr. Millar should be able to -- should hear about with

7   respect to definitional terms?

8       MS. KENDRICK:  Sure.  So, Mr. Millar, one question

9   that we had that we needed clarification for was that in your

10  engagement letter, you refer to advanced practice registered        09:19AM

11  nurses.  And we want to make sure that that term or the

12  provider term encompasses nurse practitioners and physician's

13  assistants.  Because within ADC and Corizon they use all three;

14  nurse practitioners, physician's assistants, and medical

15  doctors to be in the provider position.  And so we want to make     09:20AM

16  sure that they are part of your analysis.

17      MR. MILLAR:  It would be -- the intent would be to

18  include all of what we would term as physician extenders or

19  advance practitioners.

20      MS. KENDRICK:  Okay.  Thank you.  Also Mr. Fathi had a         09:20AM

21  question about the psychologists.

22      MR. FATHI:  Mr. Millar, this is an analogous issue on

23  the mental health side.  The stipulation in this case uses the

24  term mental health clinician.  And mental health clinician

25  includes both psychologists and psychology associates.  And the    09:20AM

————November 7, 2017 - CV 12-601 - Status Hearing————

1    Department of Corrections actually relies much more heavily on

2    psychology associates than on psychologists.  So, for example,

3    the staffing plan calls for a total of 19 psychologists and 52

4    psychology associates.  So we just want to make sure that when

5    you are looking at psychologists, that term includes psychology    09:21AM

6    associates.

7            MR. MILLAR:  Okay.  Yes.  And I think those would be

8    included under my earlier comment that we are anticipating

9    these are providers who would be at an M.D.-type level and

10   those additional providers one step down, which would include    09:21AM

11   psychology associates.

12           MR. FATHI:  Would it be possible to amend the letter

13   to make that explicit?

14           MR. MILLAR:  Absolutely.

15           MR. FATHI:  Great.  Thank you.    09:21AM

16           THE COURT:  Anything further from the plaintiffs'

17   side?

18           MS. KENDRICK:  No, sir.

19           THE COURT:  Mr. Bojanowski?  Mr. Struck?

20           MR. STRUCK:  No, Your Honor.    09:21AM

21           THE COURT:  Mr. Millar, Ms. Fishkind, the next step

22   here, so that you can get started on work, what do you feel

23   needs to happen next and what should we -- what can I do to

24   help us get to next?

25           MR. MILLAR:  One question, Judge, is we do have some    09:22AM

1    edits that we need to do but Allison and I would turn to you to

2    ask you what we need to do with our terms and conditions

3    section of the contract to make that fit our current need.

4            MS. FISHKIND:  Right.  So from my end, I will just

5    need to check internally with our general counsel, as I                09:22AM

6    mentioned, and then Lauren had assisted in culling out the

7    scope of services, so it was more in just a straight services

8    format.  And then I will just build in the confidentiality term

9    or is that something the Court pulls in?  I can just add that

10   for the services.                                                       09:22AM

11           THE COURT:  I think you can add that.  And so once you

12   get that sorted out on your end, send it over to us.  We'll

13   distribute it to counsel.  And then if it's acceptable, I will

14   make it an order of the Court and enter it on the docket.

15           MS. FISHKIND:  Okay.  Great.                                    09:23AM

16           THE COURT:  All right.  Anything else we need to raise

17   with Mr. Millar?  I see no -- okay.  Thank you all very much.

18   I appreciate the call-in.

19           MS. FISHKIND:  Great.  Thank you so much.

20           MR. MILLAR:  Thank you, Judge.                                  09:23AM

21           THE COURT:  Have a good day.

22           (Mr. Millar and Ms. Fishkind disconnected.)

23           THE COURT:  So now proceeding, I think we can use the

24   plaintiffs' agenda with the addendum of what the defendants

25   have filed with respect to their agenda items.  So then we'll         09:23AM

November 7, 2017 - CV 12-601 - Status Hearing

1    just work through.

2          Item 2, errors and improper monitoring methodology in

3    the July 2017 CGAR results, I have read everything that has

4    been submitted to the Court with respect to this except I did

5    not delve into the background documents that were attached.          09:24AM

6    But I have read the conclusions, and I have read some of the

7    reporting about it.

8          These, I mean, it seems to me that there are

9    sufficient number of errors identified that cause me to have

10   serious concern about the overall rectitude of this critical        09:24AM

11   component.  And I think I need to devote substantial energy and

12   court time to making sure that these issues are fully fleshed

13   out and they just are not simply he-said-she-said kinds of

14   things.  There is an answer.  And in some cases, the counsel

15   have come to the answer themselves, and then in other cases          09:24AM

16   they seem to still have disagreements.

17         But I think just so that people understand from my

18   overall perspective, this is the foundation of everything we

19   do, the information that we get.  It's always been troubling to

20   me that to a certain extent the information-gathering component      09:25AM

21   is vested with the party who would suffer if there are issues

22   raised with it.

23         Now, I have mentioned in the past that I have been

24   impressed with the fact that the defendants have come forward

25   with very self-damaging information.  They have revealed where      09:25AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1   they have failed to comply, and that that has given me some

2   comfort this past track record would indicate that maybe I can

3   trust it going forward.  I trust it's not, as I say,

4   necessarily an assumption of malicious intent.  It is, however,

5   just a problem that no one thinks it's a good idea to really    09:26AM

6   have people police themselves.  It's just there are biases.

7   There are inherent biases that people have.  And when you are

8   talking also about a very complex bureaucracy where people know

9   that adverse reporting can cause difficulty for higher-ups

10  there is a huge incentive to not give that adverse reporting    09:26AM

11  because, I mean, what flows flows downhill.  And so, I mean,

12  anybody just in common sense would think that this would be a

13  questionable way to do things.

14          And on the one hand, you could say that the State has

15  the desire to be an aggressive and appropriate monitor to make  09:27AM

16  sure that the contract is complied with.  But I have talked

17  about this before, and it is a reality of the case that if you

18  understand the crosscurrents here, you can see how it is that

19  there could be an alignment between the contractor and the

20  State with respect to being pleased with the fact that there    09:27AM

21  was not adverse information being reported.  And so that

22  pleasure serves everybody's interest who is capable or in

23  charge of doing it.

24          And when I say everybody, what I mean by that is the

25  contractor and the State.  If the contractor is saying         09:28AM

1    everything is fine and the State looks into it or doesn't look

2    into it they are happy with that because they want everything

3    to be fine.  But then if they look into it and they find things

4    aren't fine the State is troubled by that, too, because they

5    know that there will be a price to pay at the end of the day        09:28AM

6    because of that.  And it's either a price that's in my case or

7    it's a price with respect to what the contract will cost going

8    forward.  Because if you come back to the contractor and you

9    say you need to do these things, they will say the cost will be

10   higher and then at the end of the street here at Washington        09:28AM

11   there will be people who say we don't want the cost to be

12   higher.  So there is the potential for an unholy alliance that

13   is counter to the stipulation and counter to the people whose

14   interest the stipulation is designed to guard.

15        So this is a long way of expressing what I have                09:28AM

16   articulated before and want to be careful to say it, because I

17   think everyone should be aware of the fact that there are these

18   potential biases that can infect the reporting mechanism that

19   is the foundation of everything that we do here.

20        So what plaintiffs revealed to the Court last month in         09:29AM

21   issues that were raised with respect to concerns about

22   reporting accuracy as compounded by the reporting to the Court

23   this month in the letters that are the attachment that suggests

24   that there are things that are provably wrong and some things

25   about which there were unanswered questions, for instance, the      09:29AM

1   reporting that may have a reasonable explanation of how it is

2   that all of the time entries can be at precisely the start of

3   the hour which is not matched by any other provider, again,

4   raises concerns.  We have addressed these concerns before where

5   people thought for the State and the monitoring component of    09:30AM

6   the temperature logs where they put down temperatures that were

7   completely impossible or put down times that were completely

8   impossible and that if the culture is that somebody can

9   actually put pen to paper in a way to do that in that instance

10  it makes one thing, how far has that spread, that contagion.    09:30AM

11         So this leaves me with what I have said, and that is I

12  need to devote considerable energy to it.  It's a very serious

13  concern of mine.  I also know that at some point it may be that

14  we will need to engage in other 706 expert with respect to

15  evaluating the quality of the monitoring program to verify that  09:30AM

16  these biases haven't infected the process to verify that enough

17  attention is being devoted to it.

18         Now I'm going to turn to respective counsel so that we

19  can hear in court, on the record, what they want to say about

20  it, but in addition to the preamble I just gave about my        09:31AM

21  overall view of it, I do also want to address something that is

22  part of this.  And that is the motion for reconsideration on

23  the timeline for the order to show cause and the data that

24  would be necessarily to be provided by the defendants with

25  respect to the imposition of contempt sanctions for failure to  09:31AM

1    comply.

2            The defendants have asked for an extension of 30 days

3    from the requirements of January 5th and January 9th, or the

4    January 5th reporting date because they say that the real time

5    reporting obligation is one that is too burdensome, impossible    09:32AM

6    to accomplish in that short time frame for December.  They say

7    they could not, by January 5, produce the December data.  The

8    plaintiffs object to that motion for reconsideration.  They say

9    that the defendants have shown that they are able to do this.

10   They have done it in the past.  The Court has compelled it and    09:32AM

11   it has happened.

12           And I'm left with two minds on it.  One is I wonder if

13   one of the things that I have come to too late in the -- I mean

14   later than I would have liked, I'm coming to it but later than

15   I would have liked, and that is an appreciation that the         09:32AM

16   mechanism for alerting me about a problem in the prison

17   complexes with respect to complying with the terms of the

18   stipulation that require such a delay in time where we're

19   looking at data that's two months old and that we have -- we're

20   about to hear this morning a presentation about issues that      09:33AM

21   have a June -- I'm sorry -- November 6 sort of let's address it

22   as of today date when we know that the numbers that demonstrate

23   that that's necessary were known by or could have been known by

24   somebody two months before.

25           I have pushed, with my black box warning we discussed    09:33AM

1    last time, I have pushed more and more this idea of real time

2    reporting, because I think that it is wrong to think that the

3    triggering mechanism that has this two-month delay is also

4    appropriate to use with respect to when we have identified that

5    there's a problem and the Court is in its position to try to        09:33AM

6    effect a remediation.  Once the Court is in that position, I

7    don't think that I or the defendants should be bound by this

8    idea that we're okay with this process that works with -- that

9    means that there's delay.  And anybody who is familiar with the

10   Court record in this case will know that there are reasonable      09:34AM

11   reasons for the delay, that there is a collection period that

12   ends at the end of the month, the samples are drawn, and the

13   monitors do their work.  That takes time.  The monitors then

14   have a meet-and-confer, it seems, with the contractor, and it

15   works through in a process that necessarily involves delay and     09:34AM

16   then at the end of it we get that information finally in court.

17   That is part of a process that was designed to determine

18   whether the stipulation had been complied with.

19           Once we find that that information demonstrates that

20   the stipulation terms have not been met, the Court then --         09:34AM

21   well, the mediation process is undertaken and the Court has its

22   responsibility to try to effect remedial measures.  I don't

23   think that there is any reason, once there's been this alert,

24   the warning bell has gone off and there's been a finding of

25   failure to comply, that that same delay period should govern.      09:35AM

November 7, 2017 - CV 12-601 - Status Hearing

```
 1    I think at that point it's appropriate for me to say to the
 2    State, do what you need to do to make sure that what happened
 3    yesterday with respect to failure to meet into the stipulation
 4    with respect to every single one of your charges will not
 5    happen tomorrow and that we don't say we have this cushion          09:35AM
 6    period or time to reflect or reconsider on every single day on
 7    those measures you should be monitoring, how did we do the day
 8    before?  Because it is something that has been shown to fail to
 9    meet compliance with the stipulation.
10            As I say, I have come later to this than maybe I could     09:35AM
11    have earlier.  Maybe I should have identified this as something
12    and pushed harder on it and got us all, the State in
13    particular, into an understanding that that's how things would
14    go forward.  And I think I am moving toward that understanding,
15    nevertheless, that I have got issues there, too, because if I      09:36AM
16    do an end run around the monitoring program that the State has,
17    just so everybody, I mean, who may not understand this, and
18    it's none of the people ahead of the bar, but the people who
19    are doing the monitoring are state employees.  They are not
20    contractor's employees.  So they do have, I think -- and again,   09:36AM
21    they have been producing this information to me that I hope is
22    accurate and true.  For the contractor to be engaged in real
23    time reporting, which is who would be doing it, I think, raises
24    even more issues with respect to potential biases.  And it
25    doesn't have this safeguard measure of having the State, the      09:37AM
```

**November 7, 2017 - CV 12-601 - Status Hearing**

1    contractor, being the one looking after it.

2         And so if I push too much on real time then I run the

3    risk of doing an end run around the State's monitoring

4    capacity, and so I have to be sensitive to that.  And so these

5    conflicting views of mine have led me to a couple of                    09:37AM

6    preliminary views.  The first is that I may need to have some

7    help with respect to verification.  The second is, with respect

8    to the way that I have governed things so far, I am going to

9    grant the motion for reconsideration and allow for the

10   reporting date to be moved to the 5th of February, 2018, in            09:37AM

11   part because it is reporting of the December month.  And it's

12   not simply that December is an important holiday month for many

13   people, but it is also the end of the year and for people in

14   leave status in employment it sometimes is a time where there

15   are not people available to do the work.                               09:38AM

16        So there are practical issues that I think are

17   reasonably raised in the defendants' motion for reconsideration

18   and so I would be inclined to grant that and to give you that

19   additional time.  But I also do want to try to run a careful

20   balance as I go forward with respect to pushing this idea of           09:38AM

21   real time.  And maybe one of the mechanisms that the State can

22   contemplate is that if it wishes to avoid the responsibility of

23   having to have to pay for yet another expert to make sure that

24   the stipulation can be accomplished maybe there are things it

25   can do with respect to its own monitoring program to move it           09:39AM

1    over so that it can have some greater connection to real time

2    reporting.  Because we have just learned we're getting nowhere

3    with respect to these delays, and it just seems so

4    counterintuitive that you would continue to do what doesn't

5    work.  And that also if there are people on the floor who know          09:39AM

6    that if we had to get prescriptions to people within two days

7    and we decided to look at what happened with the people whose

8    prescriptions were written two days ago and then we find out

9    that this number of people didn't get them, well what do we do

10   tomorrow rather than putting it into a report that the Court          09:39AM

11   sees that says as of November 6th, this is what we're going to

12   do going forward when we get a report that says two months ago

13   we weren't doing so well.

14        All right.  My preliminary statement has ended.

15   Plaintiffs?                                                           09:40AM

16        MS. KENDRICK:  Yes, Your Honor.

17        First of all, we welcome the Court's considering the

18   possibility of a Rule 706 expert to assist upon the

19   methodology.  That is something that we actually asked the

20   Court for earlier this year when we did the briefing after the        09:40AM

21   series of hearings on the methodologies being used for

22   monitoring.  And so we just reiterate that request and hope

23   that the Court will consider it.

24        To the extent that the Court is inclined to postpone

25   until February 5th because of the holidays and the end of the         09:40AM

1    year, just two things.  First of all, as we pointed out, there

2    is no reason why the Department or Corizon have to wait until

3    the end of the month to start gathering real time data because

4    this is not a sampling.  This is all the entire universe.

5              THE COURT:  And I do appreciate that point.                09:41AM

6              MS. KENDRICK:  So that's our first point.  However, we

7    do understand that the Court wants to be solicitous of persons

8    who celebrate the holidays.  Then we would ask that in light of

9    the Court's interest in having the most current and up-to-date

10   data, that on February 5th defendants not only provide December    09:41AM

11   2017 data but that they also provide January 2018 data.  And

12   that way we think there's two purposes for that.  First of all,

13   it will be very current and up to date; but second of all, it

14   will give the Court two months worth of data so you will have

15   two data points and be able to look and see if they manage, if    09:41AM

16   things were really bad in December were they able to pull their

17   act together in January.

18             So to the extent the Court is inclined to grant

19   defendants' motion, we ask that you would include it so that

20   they have both December and January data.                          09:41AM

21             The final thing, just a final note that we want to

22   make, is we were very, very, very disturbed by the filing by

23   the Corizon vice president who said that they would not assist

24   the Department in gathering this data.  And we laid out both

25   the case law regarding third parties and their need to comply      09:42AM

—November 7, 2017 - CV 12-601 - Status Hearing—

1   with court orders but also the language of the contract between

2   Corizon and the state where it clearly states that Corizon must

3   provide all reports that the State requests of them.

4        And so again, we just want to emphasize and make clear

5   that that sort of game playing is very unacceptable and very          09:42AM

6   disturbing behavior and response by the State's vendor.

7        THE COURT:  Mr. Struck.

8        MR. STRUCK:  Yes, Your Honor.  Just a couple things.

9        First, the defendants agree with the Court that real

10  time reporting would help in figuring out where the problem          09:43AM

11  areas are and fixing them in an expedient manner.  The

12  defendants were also upset with the Corizon vice president's

13  statement that they couldn't do real time reporting and have

14  been in some serious discussions with their contractor,

15  Corizon, over the past couple of weeks and are endeavoring to        09:43AM

16  come up with a method to do real time reporting primarily

17  through a software system called Pentaho.  Apparently, it's

18  easier to do on some of these performance measures than it is

19  on others.

20       The contractor has committed to fashioning the               09:43AM

21  software in a manner in which they could do real time

22  reporting, and that is something that the defendants have been

23  pushing them on very strenuously certainly over the last two

24  weeks.  But this is something that's very important to the

25  director and Mr. Pratt, and we hope to have, and we're              09:44AM

UNITED STATES DISTRICT COURT

November 7, 2017 - CV 12-601 - Status Hearing

```
 1    insisting on, whether it be through a software system or in

 2    Corizon putting more bodies in the task, there be some real

 3    time reporting on these 11 performance measures at these

 4    facilities where they have been consistently failing.

 5            So the Court -- the defendants appreciate the Court's     09:44AM

 6    ruling with respect to the February reporting period, but we

 7    will be pushing our contractor to provide us with the real time

 8    numbers not only so we can accurately report to the Court but

 9    so we can locate and determine problem areas and try and fix

10    them much more expediently than it has been being done in the    09:45AM

11    past.  The defendants are frustrated as well as the Court with

12    respect to some of these.  And some of them we agree with the

13    Court.  It doesn't make sense why there has been consistent

14    failures in some of these.  And the director is committed to

15    making sure that the contractor satisfies the contract and,      09:45AM

16    more importantly, complies with the Court's October order with

17    respect to these reporting.

18            It will allow -- the additional time will allow for

19    the contractor to put into place some of the software changes

20    that need to be done.  That will be helpful.  But we're going    09:46AM

21    to continue to push them to do it much quicker than -- we would

22    like to see real time reporting by the dates in the October

23    10th order of the Court.  But it's something that we're in

24    discussions with the contractor about right now.

25            THE COURT:  Just a second.                               09:46AM
```

(Off the record discussion between the Court and his courtroom deputy.)

THE COURT: In February we meet later than normal, the 28th. And so what I would think would be a reasonable thing to do is to keep the February 5th date for December but say that the January data would have to be available to the Court and to the parties for the month of January on these measures in the possible contempt order by the day before our meeting on the 28th. It will give you a chance, both sides, to respond to that. 09:47AM 09:48AM

Ms. Kendrick.

MS. KENDRICK: So what would we be doing on February 5th?

THE COURT: On February 5th the data for December will be coming in. But I'm going to make sure, as you suggested, that the next time after that data comes in that we would meet together in our monthly status hearing, which would be February 28th, that we have both December and January. 09:48AM

MS. KENDRICK: That's fine, but we would ask that the Court set the date for submitting the January data a little sooner than the night before the hearing. 09:48AM

THE COURT: Oh. The January data you need -- a couple of days before seems reasonable, I guess. That's a Wednesday, is it?

MS. KENDRICK: We would ask for Friday, February 23rd, 09:48AM

─────────── **November 7, 2017 - CV 12-601 - Status Hearing** ───────────

1     Your Honor.

2            THE COURT:  Okay.  Defendants' position?

3            MR. STRUCK:  Your Honor, we appreciate the Court's

4     ruling because we were going to have to provide this data by

5     January 5th.  But we request that -- and we're hoping that                    09:49AM

6     we'll be able to get this data and that the software changes

7     will be successful -- but we would request -- I don't think it

8     would take more than a couple days for them to digest this

9     data.  We would suggest something more along the lines of

10    January -- or excuse me -- February 25th.                                       09:49AM

11           THE COURT:  Is that the Monday?

12           MS. KENDRICK:  That's a Sunday.

13           MR. STRUCK:  Then the 26th.

14           THE COURT:  All right.  We'll make it the 26th for the

15    January data.                                                                   09:49AM

16           Anything else on agenda Item 2 that you want to say?

17           MR. FATHI:  Yes, Your Honor.  As the Court pointed

18    out, the defendants acknowledge many of the mistakes we pointed

19    out but there are a few areas where there is a methodological

20    dispute that we need the Court to rule on.                                      09:50AM

21           THE COURT:  Do you want to point those out to me which

22    ones we need to work on right now?

23           MR. FATHI:  Yes, Your Honor.

24           MS. KENDRICK:  I'm sorry.  I'm recovering from

25    bronchitis.                                                                     09:50AM

1          THE COURT:  I'm sorry.  A lot of people, it seems,

2     have a long course of recovery with this.

3          MS. KENDRICK:  Yeah.  Thank you.

4          So the first area where we reached an impasse was with

5     Performance Measures 1, 2, and 4, and those are measures that          09:50AM

6     have to do with staffing being done on a daily basis and the

7     fact that defendants are awarding themselves partial credit for

8     that.

9          THE COURT:  Okay.  So the argument here is that the

10    defendants say that we take a look to see what number of times          09:50AM

11    in the given month that this has happened, and if it happens

12    half the time, we say that that's a 50 percent rate.  And your

13    position would be if it happens once that's not compliant.

14         All right.  And that's been the normal view of the

15    court with respect to its failure to respect this partial          09:51AM

16    credit idea.  And the difference that defendants say is

17    relevant here is because of the fact that this is a daily

18    requirement.  Is that right?  Who is on the defendants' side on

19    this?

20         MR. BOJANOWSKI:  That's correct, Your Honor.          09:51AM

21         THE COURT:  All right.  I'm unconvinced why that would

22    mean that we would treat it differently, Mr. Bojanowski.

23         MR. BOJANOWSKI:  Well, it has to do with what are we

24    measuring here is whether there's a person on site 24/7, seven

25    days a week.  So it's broken down by the number of days that a          09:52AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    person would be present.

2              THE COURT:  But that's not what the stipulation called

3    for.

4              Is that all you had to say about that?

5              MR. BOJANOWSKI:  Well, I think in our submission to          09:52AM

6    the Court, it explains what the methodology is.  And I guess

7    for purposes of this hearing, I was unsure how the Court wanted

8    to approach these issues, whether we were going to brief this

9    because all we have is a couple pieces of correspondence, and I

10   would suggest to the Court that perhaps we, because of the           09:52AM

11   Court's concerns, look at this in more detail if that's what

12   the Court would like to do.

13             So right now, what we've got is --

14             THE COURT:  Who is the lawyer in your office who is

15   the correspondent on these letters?                                  09:53AM

16             MR. BOJANOWSKI:  Ms. Fletcher.

17             THE COURT:  She's not here?

18             MR. BOJANOWSKI:  She is not.  And she has been the one

19   that was working with ADC and such to address the concerns

20   raised by the letter written by the plaintiffs.                      09:53AM

21             THE COURT:  Here's what I'd like to do.  What I'd like

22   to do is set a time for Ms. Fletcher and somebody on the

23   plaintiffs' -- it could be Mr. Fathi on the telephone if you

24   would like -- but I'd like to have a telephonic hearing if

25   that's what you would prefer.  But I'd like to sit down with         09:54AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    you and with her and go through these issues so that I can

2    singularly focus my attention on them in the series of

3    correspondence if you think that's -- among the ways for me to

4    get an understanding of some of the reporting issues that are

5    raised this is one tunnel into that place.  And if you think          09:54AM

6    that that's an efficient way for me to be engaged in it that,

7    to me, would be the right way to do it so I could have the

8    people who are most knowledgeable about the issue on both sides

9    within earshot of me as I try to understand where the truth

10   lies.                                                                  09:54AM

11              MR. STRUCK:  Your Honor, I think that's a good idea.

12   And we would like to have Mr. Pratt or Dr. Taylor involved

13   because they actually are the ones that are doing the

14   monitoring.  So they could maybe answer some of your questions.

15              THE COURT:  I have no objection to that.                    09:55AM

16              Mr. Fathi, you were about to say something.

17              MR. FATHI:  Your Honor, the parties' positions are

18   fully set forth in the correspondence.  We think the Court

19   should rule now.  This is a pure legal matter of what --

20              THE COURT:  Well, this one is, but the others aren't.       09:55AM

21   I mean, the others, to a certain extent you are saying one

22   thing; she's saying another.  Some of it looks like I can think

23   that I understand, but some of them I really can't because it

24   looks like two ships passing in the night a little bit.

25              MR. FATHI:  Your Honor, with all due respect, the next      09:55AM

UNITED STATES DISTRICT COURT

─────── November 7, 2017 - CV 12-601 - Status Hearing ───────

1   issue involving Performance Measure 77, it's a purely legal

2   question of what does 12 months mean and whether two contacts

3   that are more than a year apart were nevertheless within 12

4   months.  We don't think that requires additional discussion.

5              THE COURT:  I may be remembering the wrong one.  But          09:55AM

6   there seemed to be circumstances where you suggested things

7   like that where it was a matter of law but then it seemed like

8   Ms. Fletcher was saying on the other hand, no you are

9   misunderstanding this.

10             MR. FATHI:  Not on this one, Your Honor.                      09:56AM

11             THE COURT:  But there were others like that, weren't

12  there?

13             MR. FATHI:  I don't believe so, Your Honor.  Again,

14  there have been three letters now, the parties positions are

15  fully set forth.  We last wrote to the defendants about this on     09:56AM

16  October 24th.  They haven't responded.  Again, we think the

17  issues are ripe and the Court should rule today.  But

18  obviously, if the Court prefers to proceed differently, we'll

19  comply.

20             MR. BOJANOWSKI:  Your Honor, I don't want to see the        09:56AM

21  Court making rulings based on a couple of letters here.  I will

22  be honest with you.  I didn't write the letter.  I didn't have

23  the personal contact with the parties to be able to sit here

24  and argue the case with Mr. Fathi at this point.  I think it's

25  more efficient to have the people who are involved make some      09:56AM

November 7, 2017 - CV 12-601 - Status Hearing

1    kind of presentation to the Court telephonically to fully say

2    what do you mean by this or what do you mean by that.

3           So, I mean, you know, these letters are very recent

4    and it's best to proceed if the Court has these concerns with

5    the people who can best address it.                                    09:57AM

6           THE COURT:  That's what we'll do.  So I would ask that

7    the counsel who would be involved, I gather that's Ms. Fletcher

8    and anybody else on the defendants' side and Mr. Fathi or

9    anybody on your side, if you would, in the next two days get on

10   the phone with one another, figure out what time works, and     09:57AM

11   then contact Ms. Herrera and we'll do it as quickly as we can.

12   If your schedules are so crowded up on the week and you are not

13   offended by it, I'm perfectly happy to do it in an evening or a

14   Saturday or Sunday as well.  Because it's telephonic, I can

15   record it in other means without imposing upon court staff      09:58AM

16   necessarily.  But I am anxious to get to it quickly.

17          MR. FATHI:  Thank you, Your Honor.

18          THE COURT:  Are there other issues -- let me ask you

19   about this -- to include in this conversation that we're

20   contemplating that go to quality of data?                        09:58AM

21          MR. BOJANOWSKI:  If I may interject, Your Honor, Item

22   Number 3 on the agenda is, I think, the same topic.  This is

23   based upon a couple of letters that have been sent to defense

24   counsel, the most recent of which is November 2nd.  I just sent

25   that off to the client and Corizon to look into the matter.      09:58AM

34

1   This is the PM 66 --

2         THE COURT:  Right.

3         MR. BOJANOWSKI:  -- issue.  I think it's probably one

4   of those ones that would also be appropriate, because it is a

5   data source issue.                                          09:59AM

6         THE COURT:  That makes sense to me.  And I honestly

7   have nothing to respond at this time to this, because I have

8   not received data from the client nor Corizon with regard to

9   what is going on with this particular provider at the Florence

10  facility.                                                   09:59AM

11        MS. KENDRICK:  Your Honor, we would just note that we

12  first notified defendants on October 25th about the disturbing

13  pattern of this provider opening these encounters.  And so we

14  think that we could address it today.

15        Another thing is with regard to this issue about       09:59AM

16  needing Ms. Fletcher here to explain defendants' position, she

17  is a Phoenix-based attorney so we don't understand why she

18  couldn't come here this afternoon and we could just postpone

19  this matter until later in the day and come back to it.

20        THE COURT:  Well, I don't know.  As a practical        10:00AM

21  matter, I don't know what her schedule is.  I also am, as I

22  think you are, sensitive to how somebody would feel whose got a

23  bunch of things on their plate to suddenly getting a call you

24  need to be here to talk about all of these issues in a couple

25  of hours, I guess.  I also heard Mr. Bojanowski say that he    10:00AM

1    sent off an inquiry to his client about what could possibly be

2    the explanation here, and he hasn't heard back.  So he doesn't

3    know.  And so as we are here in court today, I agree it would

4    be nice to know, but I don't think there is much more I can do

5    by saying I'm going to hear this in the next week and I'm going          10:00AM

6    to be all over it and understanding what the explanation is.

7    And you know --

8        MS. KENDRICK:  No, I mean, it's just our continual

9    ongoing frustration with defendants' ongoing pattern of

10   continuing dragging things out, kicking cans down the road.             10:01AM

11   This was on the agenda we filed last Friday.  They received

12   these letters, some of them, two weeks ago.  So to

13   disingenuously say they just now sent it to their clients and

14   don't have any answer --

15       THE COURT:  He said he sent it on November 2nd.  So on             10:01AM

16   the one hand, I understand your frustration and in a certain

17   way -- I will let you know, Mr. Struck, I'm totally with the

18   plaintiffs with respect to your agenda item.  I think it's some

19   unbelievable form of chutzpah to be complaining about the

20   letters that the plaintiffs have sent you over time where                10:01AM

21   there's been a very plain demonstration.  You know, you can

22   complain that the plaintiffs don't respond to your letters or

23   that they say things that are frustrating to you but

24   fundamentally, we're only in this room because you have not

25   complied with the stipulation.  So everybody has thrown every          10:01AM

UNITED STATES DISTRICT COURT

November 7, 2017 - CV 12-601 - Status Hearing

```
 1    arrow they can to try to figure out how to get this.  We have
 2    been at this for a long time and getting nowhere.  So the
 3    plaintiffs have been writing you about this and you have the
 4    chutzpah to say they have been sending us too many letters.
 5    Well, solve the problem.  Meet the stipulation.  You won't get    10:02AM
 6    these letters.
 7          MR. STRUCK:  Your Honor, it has nothing to do with
 8    chutzpah, okay.  We are trying to come up with a reasonable way
 9    in which to resolve their questions and getting two and three
10    letters a day.  And it's -- the uptick has happened since         10:02AM
11    August.  They are continually sending letters and letters and
12    letters and filing motions and filing motions and filing
13    motions and then turning around complaining about defendants'
14    fees.  We think that they are entitled to answers to the
15    questions, but it needs to be done in a much more reasonable      10:02AM
16    way where, perhaps, we have, like we did with the document
17    production, once a month they provide us with information
18    regarding document production.
19          Right now, there are so many balls in the air, when
20    they come in here and say, oh, well we gave them this letter on   10:03AM
21    November 2nd.  We don't have a response.  They should be
22    responding right now.  Well, we're actually dealing with
23    probably 25 or 30 other requests that they are making.  I
24    understand the Court's frustration with respect to not
25    complying with some of the performance measures, but that is a    10:03AM
```

November 7, 2017 - CV 12-601 - Status Hearing

1    different issue than how do we proceed and get them the

2    information that they are entitled to in an expedient manner

3    instead of being peppered with letters and e-mails and motions.

4    That's all I'm asking.  It's not about chutzpah.  It's about

5    how do we do this.                                              10:03AM

6         THE COURT:  It is, because I have been around this

7    case long enough to know that there have been wholly

8    unresponsive misses sent over from the defendants to the

9    plaintiffs repeatedly, things that have astounded me.  You have

10   heard me berate your counsel in the case previously about       10:04AM

11   responsiveness, failures to respond.  And so the plaintiffs, I

12   don't think, honestly, are sitting around thing thinking how

13   they can send more letters just because the letter quotient is

14   ticking you off.  What they are doing is they are setting forth

15   in letters what they think they need to do under the terms of    10:04AM

16   the stipulation.  And they are the ones who are supposed to be

17   on this on a daily basis if it's not working.  And you are the

18   ones who need to be on it on a daily basis if it's not working

19   too.

20        And the availability of soldiers to be engaged in this      10:04AM

21   battle, I can just look at the fact that you have a law firm

22   that is larger than the plaintiffs' lawyers.  They have not

23   engaged the other lawyers who have been -- who have made

24   appearances on behalf of plaintiffs so it doesn't appear that

25   there is this secret Army that is also coming against you.  You  10:05AM

1   have essentially the people that you see in front of you in the

2   courtroom here today who are doing this work, and I have the

3   people on defendants' side who number four lawyers presently,

4   and I don't have the lawyer who is actually responsible for

5   much of this engagement.  But I also know that the State of         10:05AM

6   Arizona is represented by the largest law firm in the State of

7   Arizona.

8        So I know that it is somewhat incredulous to accept an

9   argument that you are being beaten to death by these four

10  lawyers over here who are simply sending you letters about        10:05AM

11  issues that they have.  If they want to send those letters and

12  they become abusive, you can talk to me about individual

13  letters just as both sides have done that in the past and I

14  have engaged in that.

15       But a wholesale list of saying the number is too many,     10:06AM

16  I don't think the number is too many.  If I could have full

17  time engagement of the plaintiffs' lawyers on this case, I

18  would be pleased about that.  I understand as a practical

19  reality that they have other cases.  But I also know that this

20  task that I have to try to deliver the promise of a stipulation   10:06AM

21  to the people for whom it matters, the inmates in the prison

22  system who are not getting the healthcare that was promised to

23  them, it can't be my full time job, but I wish it could.  And I

24  have told you I wish I could go live in the prison so that I

25  could understand this better because I'm just so frustrated       10:06AM

November 7, 2017 - CV 12-601 - Status Hearing

1   with getting everything months late and secondhand.  I want to

2   know whether or not what people are telling me is the truth

3   what's happening on the floor, and I'm frustrated I can't get

4   it.

5        So the next best thing that I have is the method of                10:07AM

6   the stipulation, and that is that the stipulation employs the

7   plaintiffs to do this.  And unfortunately, just as I can't

8   devote full time to it, they can't either, but I wish they

9   could.  I wish they could be on this more than they are.

10       And so I'm going to sit down with you all when you        10:07AM

11  tell me that you are available to do it, and I'm going to work

12  through these issues, but I'm not going to give any comfort or

13  support to your complaint that you think that you are getting

14  too many letters.

15       MR. STRUCK:  Again, Your Honor, it's not a complaint     10:07AM

16  with respect to the information they are asking for, it's a

17  request that it be done in a much more regimented fashion as

18  opposed to the shotgun approach that's occurring.

19       THE COURT:  Well, I'm going to leave it to them on how

20  best they need to identify issues, and I will leave it to you    10:08AM

21  to respond to them in a way that seems responsive.  Because

22  understand at the end of the day I'm going to look at the

23  letters.  I'm going to look at the response.  And if it's

24  unresolved, I'm going to decide on that individual issue.  I'm

25  not about creating a funnel that makes it necessarily easier    10:08AM

1    for you to do it because those funnels are further Procrustean

2    restrictions on me being nimble and plaintiffs being nimble in

3    trying to deal with what is a matter of life and death for a

4    lot of people.  And so I'm not interested in that.

5         Okay.  So the last question that I was asking Mr.                    10:08AM

6    Bojanowski said that should we also include Number 3 in the

7    discussion about Number 2.  Are there other issues now that you

8    know how I'm going to do this that the plaintiffs think should

9    also be included in that discussion on the agenda?

10        MS. KENDRICK:  Just a minute, Your Honor.                            10:09AM

11        THE COURT:  Surely.

12        MR. FATHI:  Nothing from our side, Your Honor.

13        THE COURT:  So does that take us to Number 4?

14        MR. BOJANOWSKI:  Yes, Your Honor.

15        THE COURT:  All right.  So do we have a remediation               10:09AM

16   proposal from the defendants?

17        MR. BOJANOWSKI:  Your Honor, the remediation plans are

18   part of the document.

19        THE COURT:  The graphs?

20        MR. BOJANOWSKI:  Monthly, on the graphs, yes.                        10:09AM

21        THE COURT:  So you have included this?

22        MR. BOJANOWSKI:  Those would be included.

23        THE COURT:  All right.

24        MR. FATHI:  Your Honor, just to note, we -- although

25   it was filed this morning, we have not yet been provided with           10:09AM

UNITED STATES DISTRICT COURT

**November 7, 2017 - CV 12-601 - Status Hearing**

1    that document.  We would appreciate that.

2         MR. BOJANOWSKI:  As I explained to Mr. Fathi, I had to

3    wait for them to arrive.  They have arrived.  I will provide

4    them to them so that they can have them as we go through.  I

5    have also got a copy for Your Honor and one for --           10:09AM

6         THE COURT:  I have mine, but you still haven't seen

7    yours?

8         MS. KENDRICK:  Well, it was filed.

9         THE COURT:  But have you read it yet?

10        MS. KENDRICK:  No, Your Honor, because as we were       10:10AM

11   leaving the hotel it was filed.  We haven't been able to read

12   it on our phones yet.

13        THE COURT:  Mr. Bojanowski has a hard copy?

14        MR. BOJANOWSKI:  I do.

15        THE COURT:  We're going to take a break as much time    10:10AM

16   now as you need to take a look at it.  It makes sense for

17   everybody to look at it first.  And so we'll take a break.  Let

18   me know when you are ready for me to come back into court.

19   Okay?

20        MS. KENDRICK:  Thank you.                               10:10AM

21        THE COURT:  Thank you.

22        (Recess from 10:10 a.m. until 10:38 a.m.)

23        THE COURT:  Thank you.  Please be seated.

24        Let me get my papers situated.  Just a moment, please.

25        First one we need to talk about is Performance Measure  10:38AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1   11.  And what we have is continued failure with respect to

2   Eyman worse than the previous month, and Lewis really not much

3   different.  And there are these plans that are set forth with

4   respect to how to address it, the supplemental corrective

5   action, which is the date of November 6th, 2017, that the         10:39AM

6   defendants proposed.

7          What portion of this document makes it on to the

8   record?  Is this all filed?  Are these graphs filed, Mr.

9   Bojanowski?

10          MR. BOJANOWSKI:  I'm sorry.                                 10:39AM

11          THE COURT:  I'm sorry.  Is this filed?

12          MR. BOJANOWSKI:  Yes.

13          THE COURT:  All right.  Thank you.

14          MR. BOJANOWSKI:  I have -- the copy I have for you is

15   a copy of the one we filed with the file number on it.            10:39AM

16          THE COURT:  No.  No.  That's fine.  I have the same

17   thing.  I just sometimes when I see the docket number at the

18   top it doesn't tell me whether there was some reason that it

19   would have been filed under seal or that this is a redacted

20   version.  In the past I have read all of this into the record    10:40AM

21   but if it's on the record, I don't need to do that, and

22   especially because I now know that everybody has had a chance

23   to read them.

24          So I guess the first thing that I should do then is

25   turn to the plaintiffs for their response.                       10:40AM

UNITED STATES DISTRICT COURT

─────────November 7, 2017 - CV 12-601 - Status Hearing─────────

1        MS. KENDRICK:  Yes, Your Honor.  As we noted in our

2   proposed agenda Number 6, last month the Court told defendants

3   that you wanted them to have, at this hearing, the person most

4   knowledgeable about the additional steps that had been taken

5   with regard to Performance Measure 11 given the fact that based        10:40AM

6   on the August numbers the remedial plans are not working.

7        So as an initial matter, we hope that defendants have

8   brought somebody who could answer some questions about why

9   Eyman and Lewis continue to be so substantially noncompliant

10  and it should be noted are also part of your order to show           10:41AM

11  cause.

12        THE COURT:  Okay.  So the question that is asked is

13  one that is drawn from the last hearing, the transcript at Page

14  85, you will have somebody available to explain to me what

15  steps have been taken to ascertain whether or not the remedial      10:41AM

16  measure identified at 2374-1 at Pages 4 and 5 for Performance

17  Measure 11 at Eyman, what steps were -- what steps were taken

18  to see whether or not it was providing results close in time to

19  the implementation date of September 15, 2017.  And if that

20  wasn't done, what possible reason for not doing it would exist?     10:42AM

21  Said the same thing with respect to Lewis as well.

22        What do we have?  Who can tell us about that?

23        MR. BOJANOWSKI:  Your Honor, there's been several

24  meetings with representatives from Corizon to work through and

25  identify the problems, part of which is to work to develop this     10:42AM

44

```
 1    action plan.  We also internally met with some ADC personnel
 2    and the monitors who actually monitor this measure to see if
 3    they had some insight on what the potential problem is.  And
 4    based upon those meetings, I have been told that the issues
 5    with regard to Performance Measure 11 at both facilities boils        10:42AM
 6    down to a documentation of the actual delivery of KOP meds to
 7    the patients.
 8              THE COURT:  Okay.  And I'm trying to understand how
 9    that's responsive to the question that I just reiterated from
10    the last time that we were in court, and that is, I wanted to        10:43AM
11    know what steps were -- because you told me the last time that
12    an implementation of a remedial measure was taken that was
13    imposed on the 15th of September.  And I wanted to know what
14    steps were taken close in time after the 15th of December to
15    figure out whether or not it was working.  And if somebody           10:43AM
16    didn't do that, why they didn't do that.
17              MR. BOJANOWSKI:  May I have a moment, Your Honor?
18              THE COURT:  Surely.
19              MR. BOJANOWSKI:  Your Honor, if I understand your
20    question correctly, you want to know what Corizon did?  I            10:45AM
21    mean --
22              THE COURT:  I want -- what I did is you told me when
23    we were in court in October that you had put in place on the
24    15th of September steps to address this failure to comply.
25              MR. BOJANOWSKI:  That would be the plan that's             10:45AM
```

UNITED STATES DISTRICT COURT

November 7, 2017 - CV 12-601 - Status Hearing

1    reflected in the non-bolded part.

2         THE COURT:  Right.  I understand.  So then my question

3    is, why are we hearing about this in October without an

4    understanding of what's happened between the time that this was

5    implemented and now?  Because the reporting data that I had        10:46AM

6    obviously didn't include -- didn't include the report for the

7    time period that involved implementation of the September 15th

8    measure.  With me so far?

9         MR. BOJANOWSKI:  Right.

10        THE COURT:  So my problem then was, I had you telling        10:46AM

11   me that we think we have put this in place, this measure on the

12   15th of September, but then I said, well, the real answer here

13   is because we, in October, can't be talking about it, because

14   you don't have the reporting for September.  But what I want to

15   know is what steps are being taken by people to make sure in        10:46AM

16   real time that this requirement in the performance measure is

17   being satisfied?

18        And so then we talked about it over a couple of pages

19   of the transcript.  I first identified the issue that I wanted.

20   I say, all right.  Quote, "All right.  So here's my proposed        10:47AM

21   method to address this.  In fact, I will give you both a chance

22   to comment on it before it becomes an actual order.  But what I

23   would like to hear at the next status conference is I would

24   like to hear what steps the defendants did to ascertain shortly

25   after the implementation of the September 15th plan to see        10:47AM

UNITED STATES DISTRICT COURT

 1    whether or not it was working.  And if they didn't take any

 2    steps to find out whether or not it was working in real time,

 3    why not?"

 4        And then I turned to counsel and counsel have their

 5    say.  And then I say, quote, "All right.  So what I'm                    10:47AM

 6    contemplating, Mr. Bojanowski, just so that you have it

 7    squarely up in front of you, is at our next status hearing you

 8    will have somebody available to explain to me what steps that

 9    were taken to ascertain whether or not the remedial method

10    identified in Document 2374-1 at Page 4 and 5 for Performance          10:48AM

11    Measure 11 at Eyman, what steps were taken to see whether or

12    not it was producing results close in time to the

13    implementation date of September 15, 2017.  And if that was not

14    done, what possible reason for not doing it would exist so that

15    I can better understand it," period, close quote.                      10:48AM

16        MR. BOJANOWSKI:  Your Honor, what we have done is we

17    have met with Corizon to try and develop a system to do some

18    real time reporting.  This is one of the ones that was

19    mentioned earlier that is not yet in place to do real time

20    reporting.  So this is one of the ones we're pushing to get          10:49AM

21    that up and going through some form of a Pentaho report as

22    mentioned before.  But at this time, this one is not in a real

23    time reporting status.

24        THE COURT:  Okay.

25        MR. BOJANOWSKI:  So it's still being, the computer               10:50AM

UNITED STATES DISTRICT COURT

**November 7, 2017 - CV 12-601 - Status Hearing**

1    program is still being worked on and developed to get software

2    that can actually track this in a real time basis.

3            MS. KENDRICK:  Your Honor, may I say something?

4            THE COURT:  Well, let me just say first, that doesn't

5    answer -- well, that answers a different question.  I feel like    10:50AM

6    I'm on _Jeopardy!_  Was real time reporting put in place?  That's

7    the question, and the answer just given, no.  But the question

8    that I had asked was, what steps were taken?  It sounds like I

9    can assume from what you have just said that the answer to that

10   question is none.  But then the second question that remained    10:50AM

11   was if not, why not?  Why wouldn't somebody do that?

12           And so I wanted to, I said, so that I could better

13   understand it, I wanted to know why the people who were tasked

14   with doing this didn't find out in real time whether or not it

15   was working, and if they didn't, why not?  And so then I said I    10:51AM

16   would like to have the person here to tell me the answer to

17   those questions.  I said it twice for you.  And then at the

18   end, at Line 11 of Page 86, Mr. Bojanowski -- I asked Mr.

19   Bojanowski, anything you want to say after I have gone through

20   it again?  And you say, quote, "No.  We'll have the information    10:51AM

21   to the Court," period, close quote.  And I say, "All right.

22   Good."

23           And so I'm here today wanting to hear from the person

24   who would answer the question that maybe you do know the answer

25   to also, and that is, why not?  Why wasn't this done?    10:51AM

1          MR. BOJANOWSKI:  It is being done, Your Honor.

2          THE COURT:  No, close in time.  Here we are in

3    November.  I wanted to know why it is when you were telling me

4    a new plan was put in place on September 15th, somebody wasn't

5    checking to see whether or not on September 17th, the two-day          10:52AM

6    requirement was now being met by this measure on the 15th.  And

7    instead, here I am on November 6th saying, well, we have looked

8    into it and we have a new plan.  But that really wasn't where I

9    was solely focused.  I was solely focused on trying to

10   understand why it was that somebody who had come up with a plan          10:52AM

11   wasn't immediately checking to see whether it worked.  It just

12   seemed so natural that that's what you do.  Irrigate the

13   fields, son.  All right, Dad.  So I have turned on the valve.

14   Did you check to see whether the fields got filled with water?

15   No.  Well, why not, young man?  You know, so nobody does that.          10:52AM

16   Nobody doesn't check to see whether or not it works.  And if

17   there was a reason as to why they didn't, I wanted to ask the

18   young man, why didn't you check the field?  And maybe he would

19   say because every time it had worked before.  I would say all

20   right.  That makes sense.  I'd buy that.  But if it's not          10:53AM

21   something had ever worked before I would have to hear another

22   explanation as to why the field wasn't checked when you turned

23   on the valve.  I don't think I'm saying crazy stuff.  So who

24   can we call?  Who can we hear from?

25          MR. BOJANOWSKI:  Do you want someone from Corizon,          10:53AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1   Your Honor, or someone from ADC?

2          THE COURT:  I want somebody to tell me why it was two

3   days after September 15th it wasn't checked to see whether or

4   not it was working, and if it wasn't checked, why not?  That's

5   what the assignment was.  And you said all right.  I will do          10:53AM

6   that.

7          MR. BOJANOWSKI:  It requires real time monitoring

8   which we are not set up to accomplish at this time.  And that's

9   what we're working toward is to get that real time monitoring

10  so, yes, when we turn the valve on we can see whether the water    10:54AM

11  is there or not.  And that's what we're working on, I mean,

12  from two sides.  We're pressuring Corizon to get that put into

13  place.  We are also looking internally from ADC's side from our

14  monitors to say, well, what are you seeing when you are going

15  out there?  So it's not that we're not doing anything in          10:54AM

16  checking.  We're checking to see what is happening in the field

17  to identify whether the plan is actually taking hold or not.

18  And when we determine that it's not we're looking at what is

19  the cause for this not happening.  And we think, at least from

20  ADC's side, we believe we have found a causative factor with      10:54AM

21  regard to why it is that they are missing this particular

22  measure.

23          And in speaking with Mr. Winland, who testified before

24  you, and he said, look, the medications are getting there.  We

25  know that.  The medications are going to the ICs.  We know        10:55AM

1    that.  The problem is we can't document the KOP medications

2    going to the individual inmates.

3         And so I said to Mr. Winland, Mr. Winland, what would

4    happen if they would properly document or document the KOP meds

5    going to the inmates?  He said this month would have reported          10:55AM

6    93 percent.  Now, we have tentatively done a spot check, real

7    time, of Lewis for the October number and we're coming up with

8    an 87 percent compliance rate for Lewis for the October

9    numbers.

10        So we're not sitting on our hands.  We see that the            10:55AM

11   plan is not working.  I'm trying to identify, well, wait a

12   minute, if that's not working it's got to be something else and

13   find out what that is and let's address that.  So that's the

14   water in the field.

15        THE COURT:  Okay.  Okay.                                       10:56AM

16        MR. BOJANOWSKI:  That's what I'm doing.  And so I

17   think I have identified the problem here in working with Mr.

18   Winland internally because he flat out said, you know, it's not

19   the DOT meds.  They are doing fine on those.  It's documenting

20   that card being handed to that inmate and it going into the        10:56AM

21   medical administration report.  That's what's reported to me.

22        So how do we fix that?  And that's the plan that we're

23   on the ground with the line nurse working on to say, okay, line

24   nurse at Eyman and Lewis going forward, this is what we want

25   you to do in order to make sure that it's documented in the        10:56AM

**November 7, 2017 - CV 12-601 - Status Hearing**

1   oMAR based upon the meds coming in and it shows up.  So I

2   understand the Court's frustration, but when we see these plans

3   in place we try to give them an opportunity, do they take hold

4   or don't they?  And if they are not taking hold, let's identify

5   that further, dig down deeper, perhaps, and look at other                10:57AM

6   things.  And that's what we did with this measure.  And like I

7   said to the Court, we did a spot check of Lewis the other day.

8   We've got a positive number there.  And as I indicated, you

9   know, according to Mr. Winland, he said that based upon his

10  review, if they would have just had the KOP meds documented       10:57AM

11  appropriately we would be sitting here with a 93 percent.

12          THE COURT:  So the follow-up question is, the Lewis

13  spot check that was put in place after you said you had gone

14  through the process and come up with this plan that was

15  supposed to solve the problem, that would suggest to me that      10:58AM

16  the plan was not in place as of November 6th.  It was actually

17  in place earlier.  So I'd like to know when was the date that

18  this plan that was enumerated here at Page 5 for -- that's for

19  Eyman -- but same one is applicable to Lewis a couple of pages

20  later, what date was that implemented?                            10:58AM

21          MR. BOJANOWSKI:  Page 5.

22          THE COURT:  So that's our court docket number.  It's

23  your Page 4, sorry.

24          MR. BOJANOWSKI:  Okay.  May I have a moment, Your

25  Honor?                                                            10:58AM

1          THE COURT:  Sure.  That's Performance Measure 11 with

2     respect to --

3          MR. BOJANOWSKI:  At Eyman.

4          THE COURT:  At Eyman.  It says Supplemental Corrective

5     Action Plan as of November 6, 2017.  As I read that, that makes          10:58AM

6     me think that's what we've done as of November 6th.  But

7     because you spot checked it before then, this makes me think it

8     was in place before then.  I want to know when it was in place.

9     Well, you didn't spot check Eyman.  You spot checked Lewis.

10    I'm sorry.          10:59AM

11         MR. BOJANOWSKI:  Yeah.  We did Lewis.

12         All right.  So the newest plan that you are looking at

13    is, according to the information I just got, is being put into

14    place now.

15         THE COURT:  So you did something else that we didn't          10:59AM

16    know about or was the -- or was nothing else done other than

17    the September 15th plan?

18         MR. BOJANOWSKI:  The old plan may have been taking

19    hold at Lewis is what's happening.  But we are, you know --

20         THE COURT:  But it sounds like your conversation          10:59AM

21    indicated that the old plan didn't include this component of

22    making sure the kept on person medications were documented when

23    they were dispensed.

24         MR. BOJANOWSKI:  Correct.

25         THE COURT:  So I'm really kind of still confused about          11:00AM

53

1    whether or not this spot check that you are reporting is after

2    the September 15th change or whether there was some interim

3    change in addition?

4            MR. BOJANOWSKI:  No.  I do need to clarify it was not

5    a spot check.  It was for the full month of October.  So we did          11:00AM

6    look at this.

7            THE COURT:  For Lewis you looked at October?

8            MR. BOJANOWSKI:  Correct.

9            THE COURT:  What you found is that October had -- was

10   meeting the stipulation's requirements.  And was that based             11:00AM

11   upon a plan that was the September 15th plan?

12           MR. BOJANOWSKI:  September 15th plan.

13           THE COURT:  So even without this KOP issue, again,

14   that doesn't seem to make sense because you are telling me that

15   it is saying it's compliant because of this.                            11:00AM

16           MR. BOJANOWSKI:  But it's at two different facilities.

17   So it may be working at Lewis but not working at Eyman.

18           THE COURT:  I see.  All right.

19           MR. BOJANOWSKI:  So we're talking about the Eyman

20   problem which is the one that we then looked at in more detail          11:01AM

21   to try and fix this immediately.

22           THE COURT:  Okay.  Anything you would like to say on

23   the plaintiffs' side?

24           MS. KENDRICK:  Oh, yes, Your Honor.

25           First of all, with all of those responses, Mr.                  11:01AM

UNITED STATES DISTRICT COURT

54

1    Bojanowski did not answer the question about why defendants

2    blew off the Court's order to provide somebody here.  It's nice

3    that he shared with us what Mr. Winland has to say but it would

4    have been helpful if Mr. Winland was there.  I would also note

5    the Court had ordered him to similarly provide people                11:01AM

6    knowledgeable similarly for Performance Measures 35, 46, 50,

7    and 51, so I certainly hope when we get to those measures those

8    people will be here.

9         The next thing is that the Court found defendants

10   noncompliant with Performance Measure 11 on May 20 of 2016.  We     11:01AM

11   are now a year -- more than a year and a half past that, and

12   it's beyond absurd that we have one remedial plan after

13   another.  Often times the excuse is that, trust us, everything

14   is being done.  We're just not writing it down, which, I'm

15   sorry, that does not count as credit.                               11:02AM

16        With regard to the KOP medications, our understanding

17   from the past is that the KOP medications are taken to

18   prisoners by custody staff at some prisons, so we don't know if

19   that might be part of it.  But we suggest that defendants and

20   Corizon explore who the individuals are who are handing out the    11:02AM

21   keep-on-person medications.

22        We also asked at the October hearing who these

23   inventory control nurses are, what level of staffing they are,

24   whether they are certified nursing assistants, LPNs, or

25   registered nurses.  Mr. Bojanowski last month could not answer     11:02AM

November 7, 2017 - CV 12-601 - Status Hearing

1    that question.  We would just note that according to their

2    September staffing report at Eyman they are only at 80 percent

3    staffing for certified nursing assistants and 91 percent

4    staffing for licensed practical nurses.

5           Finally, Mr. Bojanowski keeps saying that they don't                11:03AM

6    have real time data and they have no way of tracking this.  I

7    would just direct the Court's attention to the remedial plan at

8    the bottom of, I guess, which is Page 5 on the Court docket.

9    We don't have that stamp, but Page 4 in the corner, Number 9

10   states that the lead inventory control will run Pentaho reports        11:03AM

11   daily to conform compliance.

12          So if defendants are presenting this as the remedial

13   plan that has been put into place, we don't understand how you

14   can square Mr. Bojanowski's avowals here that they are

15   incapable of getting any real time data when they are telling          11:03AM

16   the Court in this filing that they are checking real time data.

17          THE COURT:  Mr. Bojanowski, is there any reason to

18   doubt that as of the 6th of November the operative date of this

19   remedial plan that these daily Pentaho reports will not produce

20   the information that we need?  I apologize for the double               11:04AM

21   negative there.  But is there any reason -- to restate it -- is

22   there any reason to think that the -- any reason for us to have

23   any doubt that the Pentaho reports will be able to, as of

24   today, provide this information?

25          MR. BOJANOWSKI:  I can't really answer to what the              11:04AM

1    scope of the Pentaho report is that they are running there.  As

2    far as --

3              THE COURT:  I'm sorry to interrupt.  It says as of the

4    6th of November, lead inventory control will run Pentaho

5    reports daily to confirm compliance.                        11:04AM

6              MR. BOJANOWSKI:  Right.

7              THE COURT:  So the question is, is that going to

8    happen today?

9              MR. BOJANOWSKI:  Yes.

10             THE COURT:  And will it work?                       11:05AM

11             MR. BOJANOWSKI:  As with any plan -- oh, you are

12   talking about will the report work?

13             THE COURT:  Yes, this Pentaho.  Will this happen

14   today?

15             MR. BOJANOWSKI:  Yes.                               11:05AM

16             THE COURT:  Will there be -- says a daily report.  Is

17   this going to happen today?

18             MR. BOJANOWSKI:  Well, I don't want to misrepresent

19   that it's going to happen today.

20             THE COURT:  You just did.  You already did.  Let me  11:05AM

21   make this clear to you, Mr. Bojanowski.  You misrepresented to

22   the Court because you told me that as of November 6, 2017,

23   daily reports to confirm compliance.  You then turned back and

24   you asked the Corizon counsel.  He -- I can't hear what he says

25   but it looks like he says, I don't know.  Then you come back to  11:05AM

1    me and say I can't misrepresent to the Court.  Well, you did.

2    You told me that it would work and you don't have any idea

3    whether it's going to work or not.  This has got to stop.  You

4    need to be in control of your client.  You need to be in

5    control of what your client's obligations are, and you cannot        11:06AM

6    tell me things that are represented as true.  Anybody would

7    read this and would think that as of November 6th, 2017, that

8    the following will happen:  Lead inventory control will run

9    Pentaho reports daily to confirm compliance.  So I asked a

10   simple question, is that going to happen today?  And you tell        11:06AM

11   me I don't know.  And I'm flabbergasted.

12           MR. BOJANOWSKI:  Your Honor, I'm flabbergasted, too,

13   because that was given to me by Corizon.  So I said, all right.

14   This is our plan starting today?  Fine.  That's our plan to

15   start today.  Now, this plan gets then distributed out to all        11:06AM

16   of the locations that are subject to that plan.  You are asking

17   me if a Pentaho report is being run today.  I cannot answer

18   that question.  That is the plan that it is to be run today.

19   Okay.  But I can't say to you, it is actually being run today.

20   And so I'm -- I don't want to misrepresent to the Court it is        11:07AM

21   actually happening.  The plan is being put into place today.

22   It may take a day or two for it to get going, but the plan is

23   to be put in place today.

24           So that is what I'm trying to communicate to the

25   Court.  Perhaps I'm not as eloquent as I should be.  But what        11:07AM

—————— **November 7, 2017 - CV 12-601 - Status Hearing** ——————

1    I'm trying to say is, look, the plan is going to be put in

2    place today.  Sometimes it takes some time for that actually

3    to, you know, start.  Somebody's got to push the button to

4    generate the report.  So I'm not trying to misrepresent to the

5    Court.                                                    11:07AM

6            MS. KENDRICK:  Well, that goes completely against what

7    you just said 10 minutes earlier about how they are making all

8    these reports and they have to design things.  And you put this

9    in a writing filed with the Court as a representation.  So it

10   is kind of troubling and hard for plaintiffs to believe that  11:07AM

11   Numbers 1 through 8 or 9B are happening on Performance Measure

12   11 if you sit here and say, yeah, we filed this at 8:00 this

13   morning but it could take a few days.  We could be here until

14   next week going through all of these if we have to parse every

15   single item and say, Mr. Bojanowski, is this really happening?  11:08AM

16           And I think that's the point.  It's not about being

17   eloquent or saying things.  It's just that you are filing

18   things with the Court that plaintiffs have no confidence in.

19   And your oral statements contradict what's written.  It

20   contradicts what's been said before.  And that's why we're left  11:08AM

21   with a giant mess.  That's why we're left writing you a lot of

22   letters because what are we supposed to do with this?

23           THE COURT:  Well, I know --

24           MS. KENDRICK:  I apologize, Your Honor.  I'm sorry.

25           THE COURT:  That's all right.  I just -- no, it's my  11:08AM

—November 7, 2017 - CV 12-601 - Status Hearing—

```
 1    turn.

 2            When I was a lawyer, I was always sensitive to the

 3    idea that I was representing somebody.  And I guess I don't

 4    understand how somebody turns away from the Court and talks to

 5    somebody else when the Court's addressing them.  I guess it's          11:09AM

 6    just a different world now, Mr. Bojanowski.  I know that when I

 7    was a lawyer, for me to turn aside when the Court was talking

 8    to me --

 9            MR. BOJANOWSKI:  I apologize, Your Honor.

10            THE COURT:  It was plain on the record.  Everybody          11:09AM

11    knew I was talking to you.  And I guess that's all part of it.

12    But I knew that when I was representing clients, that I

13    couldn't be the person who was the most knowledgeable because I

14    wasn't the client.  But I also knew it was my word.  It was not

15    the client who would be coming around again to that judge.  It          11:09AM

16    would be me.  And I was really careful and really sensitive to

17    the idea that everything I said I had run to the ground before

18    and that I was very careful about not overstating and also

19    making sure that I went back to my client and did everything

20    that I could do to verify that I had reduced the risk to as          11:10AM

21    close to zero as I possibly could that I was saying that

22    something that I didn't know was true.

23            And so I have raised this with you before, and I

24    understand and appreciate that this is an enormous task and

25    it's very difficult for a person to have the kind of command of          11:10AM
```

1    all of the facts.  But when you get into this trouble that we

2    have talked about before, and that is the one where you make a

3    statement to the Court and it turns out not to be true, that

4    maybe suggests that a method needs to be designed to make sure

5    that you don't get into that again.  And maybe that means that      11:11AM

6    too much responsibility is on someone's shoulders more than can

7    humanly be done by a single person, and that maybe there needs

8    to be a division of responsibility.  We have all, as lawyers,

9    seen that in our practices where we work on cases and we think

10   that the lawyer that we're working with could be doing a better     11:11AM

11   job if they would just allocate or divide up the

12   responsibility.

13            But in any event, the bottom line here is that the

14   frustration that Ms. Kendrick expresses is my frustration,

15   because I need to know, since I can't be the one making sure        11:11AM

16   and watching myself what's happening with respect to the

17   proposed method to fix this problem that requires these daily

18   reports, I can't know whether they are going to be generated or

19   not.  But I need to know that the person who is telling me it's

20   happening is on top of it and is checking and is putting the        11:12AM

21   stakes on the line of his or her personal reputation in a frank

22   way to the client letting them know that I have put my word out

23   on this, and that means that you have to be telling me

24   absolutely everything that is true.  And if it's not, and if

25   you find out that that's not the case, whether it's a               11:12AM

61

1   contractor, whether it's Corizon, whether it's ADC, doesn't

2   matter.  It's all your -- it's all the defendants' side.  And

3   you need to figure out a way in this mechanism of having a

4   contractor to make sure that your obligation as a lawyer is

5   being satisfied in this courtroom.  And I am respectful of the          11:12AM

6   efforts that counsel make in this case, but I also think that I

7   don't have to go very far to look for examples that demonstrate

8   to me that something is happening here that's not right,

9   something that I would never have ever contemplated when I was

10  a lawyer.          11:13AM

11          The idea that the transcript that I could -- that I

12  read to you, that was the order of the Court that I gave you

13  last month about what should be available to me here today,

14  made it clear that without leave of Court, you couldn't not

15  have somebody here explaining this to me who -- I mean, if I          11:13AM

16  needed the lawyer's explanation I would have said that.  But I

17  didn't.  I said I wanted to have the person here telling me why

18  they decided not to do this.  You are not the decider, I don't

19  think.  You are the lawyer.  And so I don't have anybody here.

20          And so that's a warning sign to me when there's an          11:13AM

21  order of the Court that's not complied with.  We have just

22  examined one here.  And that makes me think what else is going

23  on where we have issued orders and acted on reliance on that

24  and it's not occurred.

25          And so I describe what as I say an alien world to me.          11:14AM

—— November 7, 2017 - CV 12-601 - Status Hearing ——

```
 1   It's one I don't understand.  I'm going to hold on to my
 2   earlier world because that is how judges have been doing it
 3   since the country was founded.  And that, you know, I had a
 4   small glimpse of that for my years of practice.  And I think
 5   that it's not unreasonable to hold people to the standard that      11:14AM
 6   when they say something to the Court that they are, A, sure
 7   it's true; and B, just to make sure that it's true, they are
 8   going to check before they say it.  They are going to double
 9   check before they say it to the Court.  And if they are going
10   to give us something that's going to be implemented as of          11:14AM
11   November 6th, and they are not going to have a chance to say
12   whether it's going to be done daily or not, then they are going
13   to tell me that, saying we'll verify that this is being done on
14   a daily basis, not say to me that they will run reports daily
15   to confirm compliance.                                              11:15AM
16        So that's a long time talking about it.  I don't need
17   to hear any response further about it.
18        I'm going to, with respect to Performance Measure 11,
19   hope that the report from the spot check at one facility will
20   be produced in the final official report and hope that it's        11:15AM
21   also matched for the other failing performance measure.
22        But moving on, Performance Measure 12.  Plaintiffs.
23        MS. KENDRICK:  Yes, Your Honor.  We just note that
24   actually, the statement there talks about the fact that in
25   October Eyman was down one assistant director of nursing who        11:16AM
```

1   was out on leave and that she has since returned and that

2   another assistant director of nursing or ADON was hired and

3   will start work on November 15th.  And with the addition of

4   this ADON Eyman will have four of them.  Again, Eyman is a

5   facility with five units within it, so that means there's still    11:16AM

6   going to be one unit that doesn't have an assistant director of

7   nursing.  So it's unclear whatever that unit is who will be

8   checking compliance.

9          The other thing is that, again, our -- we only have

10  the September staffing report from defendants.  They haven't     11:16AM

11  provided the October one yet.  But it showed that at Eyman in

12  September there were five contracted assistant nursing

13  supervisor positions and only three were filled.  So we

14  certainly hope that this will improve, but first of all we

15  don't know what date this person returned, but we don't know if    11:17AM

16  October is going to be any better since it sounds like they

17  only had three people tasked with this.

18          THE COURT:  And to drill down on just a small point of

19  what you said, and that is the staffing report, I don't

20  remember exactly what I said last month, but this came up and    11:17AM

21  you raised the fact that you hadn't had the previous month's

22  staffing report.  And then I talked to defense counsel and they

23  said they would get that to you.  So you got that, I gather,

24  but you still, here we are on the 7th of November, and you

25  don't have October.  Why is that?    11:17AM

November 7, 2017 - CV 12-601 - Status Hearing

1      MR. BOJANOWSKI:  I don't have it.  It has not been

2  sent to me yet.

3      THE COURT:  I see.

4      MR. BOJANOWSKI:  As soon as I receive that report I

5  turn around and send it out.                          11:17AM

6      THE COURT:  When is the report generated?  Do you

7  know?  Can you see from the report when it is generated?  The

8  previous months, do they inform you about that?

9      MR. BOJANOWSKI:  It's usually about the 10th of the

10  month.  This month's hearing is a little ahead of the curve, so   11:18AM

11  to speak so --

12      MS. KENDRICK:  Well, Your Honor, there's no date on

13  the September one that they provided to us.  But I would just

14  note as we noted in our response to their motion for

15  reconsideration, ADC is not a passive vessel that just sits   11:18AM

16  helplessly waiting for Corizon to deign to send them reports.

17  It clearly states in the contract that Corizon has to provide

18  reports immediately to defendants upon request.  And so there's

19  no reason why ADC cannot request that their vendor provide them

20  these reports in a timely manner prior to the hearing so that   11:18AM

21  both the Court and plaintiffs' counsel have the most current

22  information.

23      So, you know, I understand and last month Ms. Rand

24  said the same thing as Mr. Bojanowski that they just wait and

25  see whenever Corizon might deign to send it to them.  But they   11:18AM

UNITED STATES DISTRICT COURT

November 7, 2017 - CV 12-601 - Status Hearing

```
1    are the master in this contract, and they do have the ability
2    to tell the person, or the company that they are paying over
3    $11 million a month, could you please get us a report within a
4    few days so the judge and plaintiffs' counsel have more current
5    information.                                                     11:19AM
6           THE COURT:  Okay.  Well, going forward, because it was
7    helpful to have these staffing reports, and again, trying to
8    reduce all the lags where I can, what we'll do is we'll order
9    that the State provide staffing reports for the previous month
10   at least 48 hours in advance of our monthly meeting if -- and   11:19AM
11   if the monthly meeting is not by the 15th of a given month, by
12   the 15th of that month, whichever is earlier, unless there's
13   some demonstrated cause and that cause can be set forth by the
14   defendants in a written notice of the Court which would seek
15   leave from that order.  But that would be helpful going         11:20AM
16   forward.
17          THE COURT:  Now, should I turn to the next performance
18   measure that is at issue, or are there others that appear to be
19   satisfactory that the plaintiffs would like to discuss?
20          MS. KENDRICK:  No, sir.                                  11:20AM
21          THE COURT:  What's the next one you would like to
22   address?
23          MS. KENDRICK:  Performance Measure 15.
24          THE COURT:  15.  Okay.
25          MS. KENDRICK:  Were you going to say something?          11:21AM
```

UNITED STATES DISTRICT COURT

66

1          THE COURT:  You can just let me catch up just a

2     second.  All right.

3               (Discussion off the record.)

4          THE COURT:  Yes.  Thank you.  Go ahead, Ms. Kendrick.

5          MS. KENDRICK:  Well, there's not much to say on                11:21AM

6     Performance Measure 15 because there's been no change in the

7     plan that was previously offered as the corrective action plan.

8     But you know, 58 percent compliance at Eyman, 63 percent at

9     Lewis is troubling again.  Also, just as a note, again, last

10    month we pointed out that the stipulation defines what a QHCP     11:21AM

11    is for purposes of this performance measure and it's not a

12    provider.  It's a qualified healthcare professional, which is

13    defined more broadly than what is a provider, which is a term

14    of art for a medical doctor, a nurse practitioner, or

15    physician's assistant.  And Mr. Bojanowski said that they would   11:22AM

16    make this change.

17              So again, I will reiterate and say the same thing I

18    said last month, which is if this Corrective Action Plan is

19    putting all of the burden on these providers to do this, then

20    that is a problem because, A, they don't have adequate numbers    11:22AM

21    of providers.  That's why Mr. Millar is going to be providing a

22    report to the Court.  But they're obviously not paying

23    attention to what the stipulation says and who could do this.

24         THE COURT:  And what is the method of turning the

25    corner on Performance Measure 15 at these facilities, Mr.         11:22AM

UNITED STATES DISTRICT COURT

1    Bojanowski?  Is there anything -- do you have any sense that

2    what you have talked about before, the October 6 correction

3    plan, is going to produce anything?

4           MR. BOJANOWSKI:  Well, we think it will be because we

5    are trending upward.  We went from a 36 percent to a 58                11:23AM

6    percent.  But I'm checking with Mr. Pratt right now about the

7    definition and how the monitors are actually looking at that

8    whether they are counting just providers or does it include

9    others as Ms. Kendrick has identified.  So if I may have a

10   moment.                                                                 11:23AM

11          THE COURT:  Surely.  Please.

12          MR. BOJANOWSKI:  We're going to double-check on this

13   one to see.  If this is one where, as Ms. Kendrick suggests,

14   only providers are being counted, then that's incorrect and we

15   would have to relook at this and see if, in fact, the monitors    11:23AM

16   are not counting the other professionals that can do the

17   counseling.

18          MS. KENDRICK:  I wasn't suggesting about the

19   monitoring.  My comment was with regards to the remedial plan

20   which is burdening -- appears to be burdening providers.  But      11:24AM

21   also note that this document at the top of Page 37, it says

22   that Corizon is developing a remedial plan that's going to be

23   effectuated on or before November 15th.

24          So today is the 7th, so to the extent there's any

25   update about the status of this plan, because also on the             11:24AM

1    previous page it says Corizon shall develop and implement a new

2    procedure for the administration of medication, and then on the

3    next page says that this will be developed and effectuated on

4    or before November 15th.  So that's eight days away.

5            MR. BOJANOWSKI:  Correct.                          11:24AM

6            THE COURT:  So do you have a sense about something

7    new, different?

8            MR. BOJANOWSKI:  No.  I think that's this plan.

9            THE COURT:  Okay.  All right.

10           The plaintiffs, in their agenda, have asked if you    11:25AM

11   could let them know about Performance Measure 19 with respect

12   to Eyman, Lewis, Perryville, Phoenix, and Tucson because that's

13   pending mediation and they would like to know before they go

14   into the mediation how things are looking with respect to

15   September.  Do you happen to have that handy?                 11:25AM

16           MR. BOJANOWSKI:  For what facilities?

17           THE COURT:  For Eyman, Lewis, Perryville, Phoenix, and

18   Tucson.

19           MR. BOJANOWSKI:  Eyman is at 72; Lewis, 51;

20   Perryville, 89.  I'm sorry.  What was the other one, Your     11:25AM

21   Honor?

22           THE COURT:  Phoenix and Tucson.

23           MR. BOJANOWSKI:  Phoenix, 90; Tucson, 88.

24           THE COURT:  Thank you.  Is the next performance

25   measure plaintiffs believe should be addressed 24?            11:26AM

UNITED STATES DISTRICT COURT

1        MS. KENDRICK:  Yes, sir.

2        THE COURT:  So we have a supplemental information that

3   the 63 compliance rate for Lewis is based in part because of

4   the, quote, "bag tags" which demonstrate checking emergency

5   medical response bags daily, and they were not changed, that          11:26AM

6   this resulted in the ADC monitors not giving credit for

7   compliance with PM 24.  Also in one instance the clavicle

8   splint was not replaced but the remainder of the emergency

9   response bag was compliant.

10       So you think that this is reflected just in September          11:26AM

11  but also this analysis reflects what happened in August as

12  well?

13       MR. BOJANOWSKI:  I'm checking, Your Honor.

14       THE COURT:  I'm just trying to decide if it's a

15  two-off.                                                            11:27AM

16       MR. BOJANOWSKI:  Same problem.

17       THE COURT:  Anything from plaintiffs on that?

18       MS. KENDRICK:  No, sir.

19       THE COURT:  All right.  Can you elucidate about

20  Performance Measure 27 with respect to Tucson where it says         11:27AM

21  currently under review by ADC monitoring program?

22       MR. BOJANOWSKI:  We are checking the attendance at the

23  CQI meeting, so we don't know at this time whether that's

24  everybody who is supposed to attend attended the meeting.  So

25  that one is still being reviewed.                                   11:28AM

1    THE COURT:  The problem is the minutes are missing

2  or --

3    MR. BOJANOWSKI:  No.  No.  No.  We're checking to see

4  who was there, because it's an interdisciplinary meeting and so

5  there has to be a person from each of the disciplines.  And so        11:28AM

6  we're checking to see if all of those people were present at

7  the meeting.  If they are then it's 100 percent.  If they are

8  not --

9    THE COURT:  Huh.  I guess --

10    MR. BOJANOWSKI:  Hold on, Your Honor.  I get              11:28AM

11  information on the fly here.  Ms. Campbell with our office did

12  confirm last night that it was fully attended, so it would be

13  reported as 100 percent.

14    THE COURT:  Okay.  I guess this is a kind of thing

15  that you sort of wonder when it was working through the process        11:28AM

16  that has so many steps, steps that I have expressed frustration

17  because they mean that I am talking November about September

18  and you just sort of wonder why it is that the monitoring steps

19  didn't address this early on, that if there is an issue with

20  respect to that meet-and-confer that occurs with Corizon how it        11:29AM

21  is that this wouldn't have been addressed and resolved earlier.

22  See my question there why I'm asking that?

23    MR. BOJANOWSKI:  Yes.  Sometimes when, well, like when

24  we get the preliminary results we'll have discussions with

25  Corizon and they then say, well, wait a minute, there was, like        11:29AM

1    in this instance, they may say, well, there was a person there

2    and this is who that person was.  And the monitor may not have

3    picked up on the fact that that person was the person who was

4    supposed to be there.

5            And so, you know, with different measures it really is    11:29AM

6    kind of we're working with a preliminary number here.  And so

7    because there's still factors that can come into play,

8    sometimes, like here, where the preliminary numbers I first got

9    them on the 2nd and then we're trying to gather the info and

10   confirm as best we can all of those numbers system-wide.  So in   11:30AM

11   this instance, unfortunately, there was an issue raised with

12   regard to who attended that meeting, and so we wanted to go

13   back and double check it and make sure.  And we did that and

14   apparently last night it was confirmed by Ms. Campbell that, in

15   fact, everybody attended who needed to attend.  So I didn't     11:30AM

16   want to put a report in that, you know.

17           THE COURT:  So when the CGARs are -- is there a time

18   that this chain of decision making, this revelation, will be

19   reported in the CGARs so that it's transparent so that

20   everybody can understand?  This is obviously an issue that's    11:30AM

21   been raised before with respect to whether or not the

22   meet-and-confer gets documented and if some things change is it

23   documented as to why it changed.  Is this kind of after the

24   report destination also documented someplace in the CGAR?

25           MR. BOJANOWSKI:  I will have to check that, Your       11:31AM

——— November 7, 2017 - CV 12-601 - Status Hearing ———

1    Honor.

2            THE COURT:  Mr. Pratt, if you don't mind, here's what

3    my question is.  You know, I say I want to go live in the

4    prison.  I kind of also want to go live and sleep in the

5    offices where the monitors are to watch what's going on because    11:31AM

6    I really am trying to understand this.  Because it just seems

7    to me there are two issues:  One is why wouldn't the process

8    earlier on catch and identify and correct, as you tell me it

9    did here, much earlier where there is an indication that Yuma

10   failed -- not Yuma, that -- forget it -- that this one complex    11:32AM

11   failed because it didn't have the right person there.  So that

12   raises a question in my mind.  Why wouldn't that be identified

13   earlier?

14           And then it raises the subsequent question, which is

15   if it gets corrected, is that in a way that's removed from the    11:32AM

16   monitoring process?  It sounds like it because it sounds like

17   it was after the lawyers got involved and they were inquiring.

18   I want to understand how that decision making is documented

19   because it's different than what the monitors had first

20   determined the people who were charged with this    11:32AM

21   responsibility, I don't want them to get the idea -- well,

22   there are all sorts of bad things I could think about

23   collateral effects.  But I guess I want to understand the

24   process better that how it is things are changed and if it is

25   changed, is it documented in a way that everybody can see how    11:33AM

1   it is that something that was originally reported as being not

2   compliant ends up being compliant?  Please.

3            MR. PRATT:  The 10th business day after the month

4   results are in -- these are all preliminary findings for

5   September.  So there is a potential that if Corizon notices          11:33AM

6   something and they say, wait a minute, we can go back at that

7   point.  So these September results are not official, Judge.

8            THE COURT:  I understand.

9            MR. PRATT:  But they will be after the 10th business

10  day, and that's when the final goes in.                              11:33AM

11           Now, if there are changes between these prelims then

12  that information is just entered into the official CGAR by the

13  15th, typically by the 15th, the 10th business day.

14           Now, if there's something that changes after the 15th

15  after these are official, nothing is changed in the CGAR itself      11:34AM

16  but there's an addendum added to that performance measure for

17  that month if it's prior history.  We don't take out old stuff

18  and put in new.  We'll add an addendum to that to show what

19  changes may have taken effect or what has taken place.

20           THE COURT:  So did I understand you to say that this        11:34AM

21  preliminary number, if changed, there isn't an addendum done or

22  there is?

23           MR. PRATT:  No.  There's no addendum done.  If we find

24  an error that we made then we will go in and correct that error

25  for the record, for the official final document.                    11:34AM

UNITED STATES DISTRICT COURT

74

1       THE COURT:  Well, but the meet-and-confer on September

2   has already happened between Corizon and the monitors, right?

3       MR. PRATT:  Corizon has received the September

4   information at this point.

5       THE COURT:  I'm using meet-and-confer as a lawyer kind    11:34AM

6   of term.

7       MR. PRATT:  Okay.

8       THE COURT:  But we heard testimony about what happens

9   is if the monitors see issues Corizon has a chance to see those

10  issues and to give feedback to the monitors to say, oh, you     11:35AM

11  have missed something here.  This one is compliant because of

12  this.

13      MR. PRATT:  Yes, sir.

14      THE COURT:  That's already happened with respect to

15  these.                                                          11:35AM

16      MR. PRATT:  That's the informal rebuttal.

17      THE COURT:  Right, the informal rebuttal.

18      MR. PRATT:  Yes.

19      THE COURT:  That already happened with respect to

20  this.  I'm wondering why the informal rebuttal didn't correct   11:35AM

21  something like this.

22      MR. PRATT:  It may not have taken place before the end

23  of the month.

24      THE COURT:  I see.  I understand.

25      MR. PRATT:  And the monitors will do their performance    11:35AM

November 7, 2017 - CV 12-601 - Status Hearing

1    measures at different times during the month, Your Honor.  So I

2    don't know when this one was completed.  And once they are

3    completed they are given to Corizon for review.

4            THE COURT:  Okay.  Thank you.

5            MR. PRATT:  Okay.                                              11:35AM

6            THE COURT:  Anything you wanted to add, Ms. Kendrick?

7            MS. KENDRICK:  Just a couple things with regard to

8    what Mr. Pratt said.  And we did the briefing on the monitoring

9    methodology.  We pointed out that there was this lack of a

10   paper trail when the rebuttal process, both the informal        11:36AM

11   rebuttal process at the institution level and the one that Ms.

12   Campbell testified about that happens in the first 10 days.

13   And so our understanding had been that there was going to be a

14   system where all changes made by people other than the monitor

15   would show up as an addendum and not that only after the 15th   11:36AM

16   day there would be an addendum made.  Because that means when

17   we're looking at the CGARs we have no idea of knowing what the

18   original preliminary number was unless it was shared with us at

19   court.  So that's kind of a global issue not really related to

20   these two performance measures.                                 11:36AM

21           Just an observation.  I'm not sure why defendants

22   chose not to include Performance Measures 27 and 29 in this

23   filing because you have never found them noncompliant with

24   those performance measures.  So, okay, this was useful what we

25   learned from Mr. Pratt.                                         11:37AM

━━ **November 7, 2017 - CV 12-601 - Status Hearing** ━━

1    THE COURT:  So you are looking a gift horse in the

2  mouth is what you are doing.

3    MS. KENDRICK:  Well, this was very illuminating but

4  somewhat off the tangent of looking at the noncompliant ones.

5    THE COURT:  Mr. Pratt, regarding the monitoring guide,   11:37AM

6  with respect to this issue of when changes are made, Ms.

7  Kendrick said that she thought there was an understanding that

8  if there were changes made anywhere in the process that that

9  would be documented.  And it sounds like that's not your

10  understanding of it.  And so I'm wondering, why wouldn't it   11:37AM

11  make sense that just like if you see a doctor and they chart

12  something and then the patient sees it and says that's not

13  right, the doctor doesn't go through and X out what was wrong,

14  they do an addendum and they say what I wrote before was wrong.

15  This is right so there's always a clear explanation of how data   11:37AM

16  is entered.  Why wouldn't that be a better way to do it?

17    MR. PRATT:  It may be, Your Honor.  But when we're

18  talking about the informal or the unofficial document, we're

19  not making a line-out and correction.  For instance, you have

20  got an incorrect inmate number.  We wouldn't go in and scratch   11:38AM

21  out the wrong number and put in the right number, we would

22  simply go in and put in the right number.

23    THE COURT:  What about the informal rebuttal.  If in

24  the informal rebuttal Corizon comes back with something and

25  says you had the wrong chart linked up with this inmate, so you   11:38AM

UNITED STATES DISTRICT COURT

1   were wrong in terms of your assessment that this was not in

2   compliance and that the monitor said, oh, you are right.  We

3   made that mistake.  That wouldn't be recorded, would it?

4           MR. PRATT:  If it was in the initial findings, in the

5   preliminary findings before the 15th, if we found our error we     11:38AM

6   would go in and simply correct the record at that point.  But

7   if it's, as I said, if it's in the official record after the

8   10th business day, then we would simply go in and make an

9   addendum showing all of the old information and any new

10  information as far as corrections or anything that was changed.    11:39AM

11          THE COURT:  So it sounds like I have sort of looked at

12  this issue in the past but never really made a decision about

13  it with respect to whether or not any interim changes in what

14  the monitors first found should be reflected in the CGAR

15  record.  Is that fair to say?                                      11:39AM

16          MR. PRATT:  That's my understanding, yes, sir.

17          THE COURT:  Thank you.

18          MS. KENDRICK:  Again, we would just reiterate that

19  it's very troubling that Defendant Pratt has basically admitted

20  here that there is no paper trail when these adjustments are       11:39AM

21  made from what we see when they are provided to us and to the

22  Court.

23          THE COURT:  Well, in the preliminary status we have

24  now made that crystal clear that there is no paper trail.  But

25  after they are no longer in preliminary status, after the 10th     11:40AM

78

1   business day of the month, then they all are reflected in an

2   addendum.  Whether that needs to be changed is, I think, now an

3   issue that's squared up in front of me.

4          MS. KENDRICK:  Yes.  And the testimony and the

5   briefing that we did in June about the monitoring methodology          11:40AM

6   pointed out that this informal rebuttal process seemed to only

7   go one way to win the benefits inured to Corizon versus Corizon

8   pointing out, oh, actually, you gave us credit for something

9   where we were actually noncompliant.  So it's a bit of a

10  one-way street as well.                                                 11:40AM

11         THE COURT:  Okay.  The next measure that plaintiffs

12  wanted to address is, please.

13         MS. KENDRICK:  Number 35, Your Honor.  We would just

14  note that your order to show cause that you issued last month

15  does cover Eyman, Florence, Lewis, and Tucson.  There appears          11:40AM

16  to be no change to the remedial plans despite the fact that

17  Eyman and -- Eyman at least looks to be noncompliant and

18  Florence, Eyman at 78 and Florence at 67.  And Your Honor had

19  ordered them to provide somebody who could come and provide

20  testimony to you about the additional steps taken to adjust the        11:41AM

21  remedial plans, and that was at Page 96 of the October hearing.

22  And it does not appear that we have a person here to provide

23  information nor is there any written addendum.

24         MR. BOJANOWSKI:  Your Honor, Mr. Pratt is here to

25  speak to 35 if there are questions.  But I can certainly say           11:41AM

1    that this performance measure is trending upward across the

2    board due to the significant changes in plans that have been

3    put into place.  We have now had two facilities come into

4    compliance that were previously out of compliance.  So

5    therefore, eight out of the 10 facilities are in compliance and          11:42AM

6    the remaining two are trending upwards.  The ADC has hired a

7    statewide transportation coordinator and has now implemented

8    DI-361 which sets forth procedures for transportation effective

9    October 31st, 2017.

10          So we believe that the plan that's put into place,              11:42AM

11   together with the transportation coordinator and the director's

12   instruction, are probably going to get this one into

13   compliance.  If the Court needs additional information Mr.

14   Pratt is available to speak to that.

15          THE COURT:  So in the past you have said that the             11:42AM

16   problem is largely one of coordination of what looks to be the

17   transportation side of things not so much of the healthcare,

18   not so much the people involved at Corizon, more so the

19   transportation people who would be making sure that this -- and

20   also the new custody control officers at the facilities.  And          11:43AM

21   so it sounds like what you are saying is what happened at the

22   end of October is specifically designed to address this

23   previously identified area of problem.  Is that fair?

24          MR. BOJANOWSKI:  That's fair.  The DI-361 is an inmate

25   medication transfer process specific to this.  So it's a              11:43AM

November 7, 2017 - CV 12-601 - Status Hearing

1    directive from the director's office laying out essentially a

2    procedure to be followed for these transportations.

3              THE COURT:  And don't you think it would be a good

4    idea for you to let us all have a copy of that so that we could

5    see it.                                                              11:44AM

6              MR. BOJANOWSKI:  It's available on line, I believe.

7    But if you want my copy --

8              THE COURT:  I just know that in other cases where you

9    are doing new remedial plans and this is the critical failure

10   component, you tell me, and it happens you don't tell me what    11:44AM

11   it is you are doing, it hamstrings me going forward to say,

12   well, you said you were going to do this on this day.  I would

13   like to know exactly what you are putting in place on the 31st

14   and so I would ask you to file that.

15             And then the next question I have is attendant to the   11:44AM

16   question that I asked last month with respect to this

17   performance measure as well, and that is since you have now

18   told me it's in place on the 31st of October, without sort of

19   beating a dead horse about why we didn't look at this earlier,

20   we're now on the 7th of November, what steps have you taken to    11:44AM

21   see if things are any better on the 1st, 2nd, 3rd, 4th, 5th,

22   and 6th of November?

23             MR. BOJANOWSKI:  Mr. Pratt is here to address the

24   questions.

25             THE COURT:  Thank you.                                   11:45AM

UNITED STATES DISTRICT COURT

1        MR. PRATT:  Your Honor, this is a collaboration

2  between Corizon and operations in doing this.  And what we have

3  set up is daily meetings with the wardens to get feedback from

4  Corizon and their staff exactly as to how this is working each

5  day.  And they are recognizing if there are failures, and there        11:45AM

6  have been a few failures at certain points, but they are

7  following it daily to see what has to be done to fix those

8  issues.  But they are meeting on a daily basis at each

9  facility.

10       THE COURT:  And how close is this analysis?  Are you        11:45AM

11  looking at every single one of the inmates who are transferred

12  on a given day to see whether or not they are meeting

13  Performance Measure 35?

14       MR. PRATT:  Yes, sir.

15       THE COURT:  So for the first six days of this month        11:45AM

16  it's true to say that somebody has looked at every single one

17  of the transfers and knows every single one that met it and

18  every single one that didn't meet it?

19       MR. PRATT:  Yes.

20       THE COURT:  And that's going to continue for how long?        11:46AM

21       MR. PRATT:  Until we get it right.

22       THE COURT:  All right.  Anything plaintiffs wanted to

23  add?

24       MS. KENDRICK:  Just an observation that it would have

25  been helpful if they amended this filing to add that        11:46AM

1    information and let us and the Court know about DI-361 because

2    we're not mind readers who are trolling the ADC website for

3    fun.  So we can't comment on this new instruction until we have

4    had a chance to look at it and review it.

5         THE COURT:  Right.  Well, you know, I can sort of cut     11:46AM

6    that down a little bit by saying that when we talked about the

7    graphs as being a method of trying to be the central place that

8    we could all turn to from month to month to see what was said

9    on month A and then we can look in month B to see what was said

10   in month A and have it all in front of us, what we have talked   11:47AM

11   about before is keeping everything here an adding it on.  And

12   it would seem to be natural as part of that that if you were

13   going to have a remedial plan that involved this directive that

14   was having specific procedures in place that were designed to

15   meet the demonstrated failure of this performance measure, you   11:47AM

16   would have included that.

17        So I guess this is another learning moment.  If you

18   are going to have parts of the plan that are addressing that

19   performance measure, put it in the graph so that we all have

20   it.  I mean, is there any good reason why we shouldn't do that,   11:47AM

21   Mr. Bojanowski?

22        MR. BOJANOWSKI:  Well, no good reason to include it.

23        THE COURT:  I'm sorry, no good reason to what?

24   Include or not include?

25        MR. BOJANOWSKI:  To not include it.  I would be more   11:47AM

1   than happy to include it.  I just received it.  It just became

2   effective on the 31st of October.  So I just received it and so

3   it's something that is --

4        THE COURT:  You received it this morning after you

5   filed the graph?                                                  11:48AM

6        MR. BOJANOWSKI:  I received it yesterday.

7        THE COURT:  All right.  So I guess I'm thinking to me

8   if I received this thing that's -- just so you know how I would

9   look at it, if I wanted to give everybody this graph thing in

10  35 and I receive this detailed plan about how we're going to     11:48AM

11  address what I have told the Court in the past is the big

12  problem here with these transportation issues, I would have

13  thought the most important thing for me to do is to get that

14  into the graph so that I can show the Court in concrete terms

15  what we have done.  And it just -- I'm saying going forward it    11:48AM

16  would be helpful to --

17       MR. BOJANOWSKI:  It's why I brought it with me today,

18  Your Honor, so if the Court wanted to look at it.  But it's a

19  policy.  It's not really a remedial plan.  It's a policy.  So

20  we'll certainly put it in with the plan and reference it.  And   11:49AM

21  I intend to do that.

22       THE COURT:  So which is it?  I have got -- I'm

23  standing because I have a problem with my back.

24       Which is it?  Is it a policy or is it a remedial plan?

25  I don't understand the distinction there, because I think you    11:49AM

UNITED STATES DISTRICT COURT

—November 7, 2017 - CV 12-601 - Status Hearing—

1    have told me that this thing on the 31st of October is the way

2    that we're going to solve this problem, and then you say, no,

3    it's not really a plan.  It's just a policy.  How do I -- don't

4    interrupt me -- how do I know the difference between the common

5    understanding that I embrace of what policy and implementation                11:49AM

6    plan, which is none, is operative in your head which somehow

7    they are different?

8            So let's stop now and understand, this directive, is

9    this part of the remedial plan that you are saying to the Court

10   is something I can rely on, or is this something other than                   11:49AM

11   that?

12           MR. BOJANOWSKI:  Mr. Pratt.

13           MR. PRATT:  Your Honor, the policy is memorialization

14   of the plan, and we have adapted that plan as our current

15   policy.                                                                        11:50AM

16           THE COURT:  All right.  So to say it again back to

17   you, you have seen the graphs and you see that there are these

18   bolded plans that are sometimes attached to the failing

19   remedial measures in which, for instance, let me see,

20   Supplemental Corrective Action Plan as of November 6, 2017, so                11:50AM

21   that was used as an introduction language to them, some

22   bulleted items about what was going to be done.

23           So is it fair for me to think that the policy that was

24   adopted on the 31st should be included within a supplemental

25   Corrective Action Plan as of the 31st of October 2017 with                    11:50AM

1    respect to Performance Measure 35 at this facility?

2            MR. PRATT:  Yes, sir, it should.

3            THE COURT:  All right.  Thank you.

4            MR. BOJANOWSKI:  It is on line and available now just

5    in case, but if the Court wants to look at this right now I'd        11:51AM

6    be more than happy.

7            THE COURT:  No, I think we have addressed it.  I am

8    just saying as part of us learning how best to use the graphs

9    this is the best way to do it.

10           MR. BOJANOWSKI:  Certainly.  And I apologize, Your        11:51AM

11   Honor.  I wish I would have included it already but I brought

12   it with me for the Court's perusal if it wanted to look at it.

13           THE COURT:  All right.  Thank you.

14           MS. KENDRICK:  Your Honor, can we go back to something

15   we were discussing just a little while ago about the rebuttals        11:51AM

16   and the addendum?

17           THE COURT:  Yes.

18           MS. KENDRICK:  At Docket 2068, which was defendants'

19   response filed May 22nd to our brief on the methodology, at

20   Page 17, Line 19, defendants write, quote, "Plaintiffs are        11:51AM

21   critical that the changes are made under the name of the

22   monitor who entered the original finding and show the entry

23   date of the original finding rather than the entry date of the

24   changed finding," citing to our filing Docket 2046 at 32.  They

25   go on, quote, "Defendants have adjusted this practice and are        11:52AM

1    now making the change in an addendum following the original

2    finding to clearly show that the information has been changed

3    following the original submission.  This change will be

4    reflected in the March 2017 CGAR report."

5           So it sounds from what Mr. Pratt said that this is not    11:52AM

6    true.

7           THE COURT:  It does sound that way.  Let me give the

8    defendants an opportunity to take a look, or do you know

9    already off the top of your head a response, Mr. Pratt?

10          MR. PRATT:  Your Honor, this is for the official        11:52AM

11   document not for the preliminary results.

12          THE COURT:  Okay.  Any reason to think that what you

13   said is beyond the official document?

14          MS. KENDRICK:  The citation to our filing was our

15   criticism about the fact that the individual monitors would do   11:53AM

16   their finding and submit it and then up at headquarters, Ms.

17   Campbell and other people would go back and change the finding

18   and it would look as if that monitor had made the change and

19   not headquarters.  And so their response was to say that there

20   would be a clearly indicated addendum.  So it has nothing to do  11:53AM

21   about within 10 business days or the like.  That was their

22   response to our concern that the people at ADC headquarters

23   were changing what the on-the-ground monitors were submitting.

24   And their response was that they had adjusted the practice so

25   that when changes are made an addendum following the original   11:53AM

1    finding to show that the information has been changed following

2    the original submission.

3         THE COURT:  Well, thank you for that citation.  I will

4    take a look at this issue again and issue an order with respect

5    to whether or not it is necessary for the application of the        11:53AM

6    stipulation to work effectively for these kinds of addenda to

7    be included within the record and any changes to be included in

8    a transparent way.  Thank you.

9         And then the next performance measure the plaintiffs

10   would like to address?                                              11:54AM

11        MS. KENDRICK:  So Performance Measure 40, actually,

12   Your Honor, this was in our proposed agenda at Number 7A, where

13   we had noted last month that we found it extremely troubling

14   that in August the Lewis institution that has more than 5000

15   prisoners had no urgent referrals to be audited.  And Mr.          11:54AM

16   Bojanowski had said that ADC was looking into it and would

17   possibly do a re-audit.  So we had first requested an update as

18   noted in the footnote, the comparably-sized institutions had

19   anywhere between 8 and 33 urgent provider referrals in the

20   month of August.                                                   11:55AM

21        And then according to this filing that defendants

22   provided, it shows that again for Performance Measure 40 at

23   Lewis, there were no urgent referrals made.  And so, again, we

24   hope that they have an update for us with regard to August and

25   an explanation as to September.                                    11:55AM

88

1          THE COURT:  Okay.

2          MR. BOJANOWSKI:  Your Honor, we did an investigation

3    on this, and we found that what was occurring is that because

4    of the open clinic concept inmates were immediately being seen

5    by a provider without a referral.  So what would end up                    11:56AM

6    happening is that the nurse was not documenting a urgent

7    referral.  When the inmate would show up and need urgent care

8    they would just take the inmate over to the provider and they

9    would be seen right away.  And so without that referral

10   documentation in the eOMIS, the monitor can't, you know, as a              11:56AM

11   source document, they need that referral.  And without the

12   referral documentation being present, it would appear as though

13   nothing was happening when, in fact, it was.

14          So what we're doing is re-instructing the nursing

15   staff at that facility not to do that so that if there's a                 11:56AM

16   person who is in need of an urgent referral, they need to make

17   the urgent referral into eOMIS and then have the inmate go over

18   to be seen.

19          THE COURT:  Forgive me if I'm missing something here.

20   But the performance measure, this is our urgent provider                   11:57AM

21   referrals being seen by a medical provider within 24 hours of

22   the referral.  And so what you have described is a possible

23   explanation of this, but it seems to me that it's hard for me

24   to understand why it is that the compliance team wouldn't see

25   in the medical record that somebody who came in in the open                11:57AM

November 7, 2017 - CV 12-601 - Status Hearing

1   clinic was then seen by a provider within 24 hours of that

2   time, why that wouldn't be satisfactory.  Are they looking for

3   just a referral order and then the date of that and looking no

4   farther?  Is that what's happening?

5           MR. BOJANOWSKI:  I will have Mr. Pratt address that          11:57AM

6   issue.

7           MR. PRATT:  Your Honor, it goes to the source document

8   and they do look for referrals.  And that's what they would

9   work off of.  And if the nurse doesn't document it as a

10  referral to a provider what that requires is two sets of          11:58AM

11  documentation.  First, the nurse has to refer it to the

12  provider and then that's closed out.  Then the provider has to

13  open up a new encounter to show that he's seeing the patient at

14  that time as opposed to one documentation where the nurse is

15  dealing with this and handing it off to the provider.  So it's          11:58AM

16  the source document that shows referrals that we work off of

17  then to work off the timing on those documents.

18          THE COURT:  Is there any possibility that Mr.

19  Bojanowski's description of how they are going to fix this will

20  create a disincentive for the intake nurses at open clinic to          11:58AM

21  make these immediate referrals in effect?

22          MR. PRATT:  Yes, Your Honor.  But it's the only way

23  we're going to be able to actually document it, which is the

24  way that it's done at the other facilities as well.  It's a

25  local educational thing for the Lewis staff to do it, so they          11:59AM

UNITED STATES DISTRICT COURT

1    are doing it consistently across the state.  I understand it

2    has a disincentive.  It's more work to have to document it and

3    turn around and reopen it and do it again.  But that's what

4    we're going to have to do.

5            THE COURT:  Maybe there's something that is right to          11:59AM

6    do with respect to the parties discussing the possibility of

7    modifying this performance measure so that it is asking a

8    different question that would satisfy the plaintiffs' concerns

9    about this that wouldn't obstruct with their concerns across

10   the board.  But this hasn't been a problem.  I don't know.  But     11:59AM

11   again, I just raise it as something to be concerned about where

12   we have at a very large facility we have people making

13   decisions about what they think is an emergent situation

14   causing them to act quickly, and we're saying oh, but our rules

15   say you can't do what seems like the really right and smart       11:59AM

16   thing to do here because it gets us into trouble when we report

17   this.

18           Any comment from the plaintiffs' side on this?

19           MS. KENDRICK:  Two points, Your Honor.  First of all,

20   we have been raising our concerns about the fact that using as     12:00PM

21   the source documents going off of the open clinics and the

22   people who only submitted an HNR and actually were seen impacts

23   the reliability of the source information for multiple

24   performance measures this is an illustration of it.

25           THE COURT:  Is it really, though?  Doesn't seem like       12:00PM

1    it's the HNR problem.  It seems like it's the independent

2    action of the intake nurse who is saying I happen to know that

3    the provider is over here.  I can get you over to the provider

4    right away.

5            MS. KENDRICK:  Right.  So it's only the people who                    12:00PM

6    have come in and seen the nurse that are then referred to the

7    provider so that if you are not seen by the nurse, you are not

8    referred to the provider.

9            THE COURT:  Right.

10           MS. KENDRICK:  That's the point.  So again, you know,              12:00PM

11   we had the testimony about the people who have been turned away

12   or the people who give up and leave, so they wouldn't be

13   included.  So again, that's kind of an underlying theme, as you

14   will, to it.

15           The other thing is Lewis has, I believe, eight                       12:01PM

16   separate units, eight clinics, and while it would be fantastic

17   if this is true that the providers are right there in the room

18   or at the clinic with the nurses and able to see a person so

19   quickly that we don't even have to check the box on the form,

20   there are staffing reports, again, that show yet again a month             12:01PM

21   where Lewis has no medical director.  There are only one of 2.5

22   staff physicians, and they have five nurse practitioners.  So

23   it's a little unclear with a total of six providers how they

24   are ensuring this amazing coverage of the clinics where

25   everybody is just getting instantaneously seen.  I certainly              12:01PM

1   hope that that is the case, but I'm a little suspicious of it,

2   of that representation as being why there's no documentation of

3   urgent referrals happening.  Because it just doesn't seem that

4   there's enough bodies of providers there to ensure this 100

5   percent coverage and immediate response.                        12:02PM

6        THE COURT:  It does seem unlikely.  All right.  Okay.

7   Thank you.

8        All right.  Let's take the break.  We'll be back at

9   1:15.  Thank you.

10       (Recess from 12:02 p.m. until 1:19 p.m.)               12:02PM

11       THE COURT:  In the noontime ruminations of which we

12   were just talking about with respect to the difficulty where

13   the intake nurse is not making a documentation of the referal

14   that happens on an expedited place in this one place, there was

15   an idea that emerged that maybe this is just not a stipulation  01:19PM

16   modification issue but more an eOMIS notification issue, that

17   it would seem that there would be something that if this had

18   happened it could be reflected in the medical record pretty

19   easily.  So I just raise that, again, trying to think broadly

20   about possible solutions.                                      01:20PM

21       So I think we're at 42.  And 42, according to what we

22   heard in October, is that Corizon would develop and effectuate

23   a new policy and procedure on or before November 1, 2017.  It

24   doesn't seem to be reflected in the graphs.  I guess I would

25   turn to hear what that new policy is.                          01:20PM

November 7, 2017 - CV 12-601 - Status Hearing

1           MR. BOJANOWSKI:  It's the plan that was put into place

2      that we reported on in October.

3           THE COURT:  Okay.  So it's the one that's --

4           MR. BOJANOWSKI:  It's the one --

5           THE COURT:  -- set forth there.                          01:21PM

6           MR. BOJANOWSKI:  Correct.

7           THE COURT:  Okay.  Thank you.  And then it became

8      operational on the 1st of November or --

9           MR. BOJANOWSKI:  Correct.  It is operational now.

10          THE COURT:  All right.  So is what was written in      01:21PM

11     October, did that turn out to be true, that it was on or before

12     November 1?  It was at November 1?  When exactly was it?

13          MR. BOJANOWSKI:  On November 1.

14          THE COURT:  Okay.  And what kind of oversight is

15     occurring with respect to the daily steps that are enumerated  01:22PM

16     in this plan to see that since it started on the 1st of

17     November that's actually happening?

18          MR. BOJANOWSKI:  Are you saying by ADC, Your Honor?

19          THE COURT:  Well, actually, in the paragraph on the

20     top of your Page 97, it looks to me like this is              01:22PM

21     responsibilities of Corizon people.  I just want to know, it

22     says, for example, at Number 3, on a daily basis, the appointed

23     employee shall utilize eOMIS to generate an appointment list

24     for that particular day; 4, on a daily basis an appointed

25     employee shall review the appointment list and confirm that all  01:23PM

November 7, 2017 - CV 12-601 - Status Hearing

1   follow-ups are set to occur timely.  I'm just wondering who is

2   binding to make sure these things are happening now after the

3   1st of November?

4           MR. BOJANOWSKI:  May I have a moment, Your Honor?

5           THE COURT:  Surely.                                    01:23PM

6           MR. BOJANOWSKI:  I don't have information on that at

7   this point, Your Honor.  We could check with some people at ADC

8   to see if somebody has checked on this yet.

9           THE COURT:  Well, I think that's a good idea.  Thank

10  you.                                                          01:23PM

11          Ms. Kendrick.

12          MS. KENDRICK:  Just, so you are not able to identify

13  who this quote appointed employee is that's doing the

14  monitoring?

15          MR. BOJANOWSKI:  No, I think the Court was asking       01:24PM

16  about --

17          THE COURT:  Well, no, I mean, that's a separate

18  question.  And that's a fair question.  Says, on a daily basis

19  an appointed employee shall review the appointment list.  Do we

20  know, is that a single person who is kind of in a supervisory   01:24PM

21  role, or is that somebody who is among new employees who is

22  just given this task?  So it's kind of ambiguous, so I think

23  this is a separate question if I can jump in on top of Ms.

24  Kendrick.

25          MR. BOJANOWSKI:  It would be a Corizon supervisory      01:24PM

UNITED STATES DISTRICT COURT

95

1    employee.

2         THE COURT:  Anything else?

3         MS. KENDRICK:  So yeah, the remedial plan that they

4    have talked about Eyman and Florence and them implementing on

5    November 1st, and last month, defendants were unable to say          01:24PM

6    when it would be implemented at Lewis and Perryville prisons,

7    and while Lewis just hit 85 percent and Perryville hit 90

8    percent in September, they were noncompliant before.  So we

9    just want to know whether it was November 1st as well for those

10   two institutions.                                                     01:25PM

11        THE COURT:  Do you know, Mr. Bojanowski?  Was this

12   plan also put in place there then?

13        MR. BOJANOWSKI:  That's my understanding, Your Honor.

14        THE COURT:  All right.

15        MS. KENDRICK:  The final thing, Your Honor, is we have          01:25PM

16   requested, and you had ordered, defendants to provide copies of

17   all policies and training materials that were created for

18   training the nursing staff.  And also Mr. Bojanowski was going

19   to provide an update on the status of the employee training.

20   So I just want to confirm everybody's been trained and when          01:25PM

21   they will produce the policies and training materials.

22        THE COURT:  Well, the last paragraph of the October

23   6th remediation plan says, additionally, prior to the effective

24   date, all Corizon providers shall be trained by site leadership

25   on the new policy and procedure.  So the two questions that are      01:25PM

UNITED STATES DISTRICT COURT

1    on the floor now are, first, did this happen by the effective

2    date; and second, when can the training materials that were

3    provided to the employees be provided to the plaintiffs

4    counsel?

5             MR. BOJANOWSKI:  That is my understanding.  As far as        01:26PM

6    the documents are concerned, may I have a moment, Your Honor?

7             THE COURT:  Surely.

8             MR. BOJANOWSKI:  Your Honor, we have made the request

9    for the documents from Corizon and have not yet received them.

10            THE COURT:  Would you follow up and file something        01:26PM

11   with the Court in seven days indicating they have been produced

12   to the plaintiffs or why they haven't been?

13            MR. BOJANOWSKI:  Yes, Your Honor.

14            THE COURT:  Thank you.  Anything further on 42?

15            MS. KENDRICK:  No, sir.        01:26PM

16            MR. BOJANOWSKI:  Your Honor, just for purposes of the

17   record, there are training materials on several other measures,

18   so the same response is going to apply.  We'll get all the

19   measures in one.  I think there's four, three or four, there's

20   four that have a training material document request.  And so I        01:27PM

21   think instead of talking about those individually, I will just

22   collectively say that's what we'll do.

23            THE COURT:  That amalgamation is happily accepted.  So

24   with respect to all the training materials that haven't been

25   produced yet, you will produce those to the plaintiffs within        01:27PM

1    seven days and/or file a notice with respect to any that

2    weren't so produced as to why.

3              Which performance measure would you like to turn to

4    next?

5              MS. KENDRICK:  46, Your Honor.                      01:28PM

6              THE COURT:  Okay.

7              MS. KENDRICK:  Oh.  Actually, Your Honor, to go back

8    to 45.

9              THE COURT:  All right.

10             MS. KENDRICK:  At Yuma, last month they were          01:28PM

11   noncompliant and Mr. Bojanowski said that ADC was investigating

12   the causes of noncompliance there in the remedial plan.  And so

13   I don't know if you guys got an answer on that.

14             THE COURT:  Do you have any update on what happened in

15   August in Yuma?                                               01:28PM

16             MR. BOJANOWSKI:  May I have a moment, Your Honor?

17             THE COURT:  Surely.

18             MR. BOJANOWSKI:  I simply don't have that information,

19   Your Honor, and I don't want to hazard a guess.

20             THE COURT:  Okay.  Would you please look into that   01:29PM

21   and provide a notice to the Court in seven days as to what was

22   the cause of the dropoff in August at Yuma with respect to

23   Performance Measure 45?

24             MR. BOJANOWSKI:  Yes, Your Honor.

25             THE COURT:  So we're now back to 46.                 01:29PM

98

1        MS. KENDRICK:  Yes, sir.

2        THE COURT:  And I see that the Corrective Action Plan

3    identified there, I guess the question that is always on my

4    mind today is what's going on with respect to making sure that

5    this is on a real time basis addressing this problem?  I gather          01:29PM

6    as of November 6th, the provider was reviewing the to do list

7    every day.  And so great, the review lists were reviewed, but

8    does that mean that what was on the to do list gets done?

9        MR. BOJANOWSKI:  I can't say what is happening

10   immediately.  What I can report to the Court is that our                  01:30PM

11   investigation of the issues at Florence indicated that this is

12   a problem of the medical providers charting in a timely basis.

13   One of the suggestions, and the suggestion that we made to fix

14   this, is to add a drop-down box in eOMIS so that there's not an

15   opportunity to improperly note the file.                                  01:30PM

16       So what the provider has to do is he has to report or

17   take action on a report when he sees an abnormal value and has

18   to put that in eOMIS.  And so the basic problem that we found

19   is that they are not adequately identifying the action that

20   they are taking with regard to an abnormal report.                       01:31PM

21       So in order to prevent that from occurring, the idea

22   would be in the notes section to add a drop-down box in eOMIS

23   which would then identify certain things that they could

24   essentially click on and say, all right, I have scheduled this

25   guy for an appointment, or I want to send him out for another            01:31PM

1    test or something along those lines so that the acted upon

2    portion is appropriately responded to instead of in the note

3    section the doctor says, I reviewed it.  So he reviews it but

4    he takes no action on it.  So it's not -- so the monitors are

5    finding noncompliance based upon the inadequacy of the notes.    01:32PM

6         We did find that the labs were reviewed but just

7    simply they are not documenting it appropriately.  And we're

8    trying to put things into the computer system to essentially

9    force that to happen.

10        THE COURT:  I gather what's happening in the other    01:32PM

11   facilities is that --

12        MR. BOJANOWSKI:  They are doing it correctly.

13        THE COURT:  Well, they are doing it correctly, but I'm

14   somewhat puzzled by understanding the suggested explanation of

15   what's gone wrong in Florence because it's not just the review    01:32PM

16   it's acting upon, and it would seem to me that the acting upon

17   would be pretty evident in the medical record.  You either had

18   it or you didn't.  You did or you didn't do it.  And so it's

19   just one of those things that doesn't seem like a drop box is

20   going to solve the problem.  But I have not obviously dealt on    01:33PM

21   a day-to-day basis with this performance measure and how its

22   possibly reviewed.  Maybe plaintiffs have greater insight on

23   this one.

24        MS. KENDRICK:  No, Your Honor.  Unfortunately, we

25   don't understand why they are unable to document what they are    01:33PM

1    ostensibly doing if they are doing it.  We certainly hope that

2    they will.

3           And I guess it's unclear from the filing whether this

4    is the cause of the problem at all of the institutions that are

5    noncompliant which, besides Eyman and Florence, I guess Lewis          01:33PM

6    is at 85.

7           THE COURT:  Tucson is --

8           MS. KENDRICK:  Tucson at 83 and Winslow at 80.  So

9    it's unclear whether that's the same cause for all of those

10   institutions as well.                                                  01:34PM

11          MR. BOJANOWSKI:  I can have Mr. Pratt.

12          THE COURT:  That would be helpful.

13          MR. BOJANOWSKI:  I don't want to hog the mic.

14          THE COURT:  Thank you.

15          MR. PRATT:  Hopefully I can help, Your Honor.              01:34PM

16          THE COURT:  Thank you.

17          MR. PRATT:  I was a provider at one time.  So I will

18   tell you there's two parts to this performance measure:  One is

19   reviewing; one is acting upon.  And there are many times when I

20   was a provider that I would see, for instance, an elevated             01:34PM

21   diabetic level on a patient, which may be the norm for that

22   patient and he's under current medication.  It seems while it's

23   controlled, it's still out of normal.  And I would never

24   personally document anything that said I'm not going to do

25   anything with this, I'm just going to watch it.  I would simply        01:34PM

101

1    do that.  I would review the note and wait for the next

2    scheduled appointment to follow this guy again.

3            So it wasn't my history or my habit to go in and

4    document an action taken on every abnormal lab.  That's

5    something that's required in this performance measure which we     01:35PM

6    agreed to in the stipulation, I understand.  But that's a

7    little bit difficult for some providers who didn't do that

8    historically and they have to go in and document an action

9    taken for everybody abnormal lab.

10           THE COURT:  So you wouldn't really document that you     01:35PM

11   were just going to watch it and see, you wouldn't -- abnormal

12   result recognized, but it may not be of significance but we'll

13   watch it and see.  You wouldn't document that normally?

14           MR. PRATT:  I wouldn't go to the extent of saying I'm

15   just going to watch this.     01:35PM

16           THE COURT:  So there would be nothing anybody could

17   look in your note and see if you had taken any action.  When

18   you had taken action you decided we're going to take no

19   objection.  So that's a purposeful thing, because you have told

20   me that you think right now we can just wait on this.     01:36PM

21           MR. PRATT:  Yes.  It would be my endorsement on the

22   lab that I actually reviewed it.  So I'm responsible for what's

23   in that lab.  But without going into great detail on, I mean,

24   if this patient was scheduled for routine follow-ups it is

25   something I would simply follow on a regular visit.     01:36PM

UNITED STATES DISTRICT COURT

**November 7, 2017 - CV 12-601 - Status Hearing**

1      THE COURT:  What would you think would be the right

2   method to try to bring these non-performing facilities into

3   compliance?

4      MR. PRATT:  Well, that's the eOMIS, the drop-down they

5   are talking about.                                          01:36PM

6      THE COURT:  What would the drop box action say?

7      MR. PRATT:  It's going to say action taken.

8      THE COURT:  So it will say you have to tell us what

9   the action is, and if it's, in fact, no action, I have decided

10   to take no action now.                                      01:36PM

11      MR. PRATT:  Yes, sir.

12      THE COURT:  I see.  Thank you.

13      MR. PRATT:  Uh-huh.

14      THE COURT:  Anything from plaintiffs additionally on

15   46?                                                         01:36PM

16      MS. KENDRICK:  Just, Your Honor, we would note that as

17   our expert Dr. Wilcox has pointed out before it's a basic tenet

18   of medical training that you do contemporaneous documentation

19   of the actions you are taking and the kind of theme is not

20   documented, not done.  And there's no way for a subsequent     01:37PM

21   provider to know what, if any, actions were taken.  So we think

22   this is a critically important performance measure and

23   certainly hope that having something that forces the provider

24   to document what action she or he is taking or if they are not

25   taking action why they are not taking action will improve.     01:37PM

1          THE COURT:  I gather that's why it's one of the

2   performance measures that was included in the stipulation.

3          MS. KENDRICK:  Yes, sir.

4          THE COURT:  Okay.  47, I gather.

5          MS. KENDRICK:  Yeah.  I see couple things.  First of          01:37PM

6   all, we are incredibly alarmed by the fact that it seems at

7   most -- many of the institutions, the performance has actually

8   gone down since this new system of having the providers print

9   out these communiques.  And defendants were going to provide an

10  update about this, including whether the facility health          01:38PM

11  administrators were clarified about the process, and they had

12  said they would provide exemplars.  And I actually brought some

13  exemplars of these communiques that were sent to me by a

14  prisoner.  I was wondering if I could share it with you.

15         MR. BOJANOWSKI:  I actually brought them as well.          01:38PM

16         MS. KENDRICK:  Maybe we should look at both of them.

17         THE COURT:  Take a look together and see if they are

18  the same.

19         MR. BOJANOWSKI:  Mine is just smaller print, so it's

20  okay.  So one box checked there and one box is checked there.          01:38PM

21  It's the same thing.

22         THE COURT:  It's like synchronized swimming.  Very

23  nice.  Thank you.

24         MS. KENDRICK:  So, Your Honor, what I provided you and

25  the clerks copies of is two examples of notifications that a          01:39PM

1    class member sent to my office recently.  The handwritten

2    questions that are written there were written by the class

3    member.  But, you know, this illustrates the point that I think

4    Ms. Eidenbach raised a couple months ago and that we have in

5    the past where there's not much information.  It just says, for          01:39PM

6    example, one of them it says normal results.  And as our client

7    wrote, what results are normal, question mark?  Because it

8    doesn't explain what it's referring to.

9          And then on the other one it just says you are going

10   to be seen and you are going to be reviewed, but again, it                01:40PM

11   doesn't tell him what's going to be discussed or when it would

12   be discussed.

13         So I think this kind of illustrates the concerns that

14   Ms. Eidenbach articulated either last month or two months ago

15   based on what she had been hearing from prisoners when she was           01:40PM

16   talking to them at Perryville.

17         THE COURT:  So this, these exemplars, the one provided

18   by the State is dated 9-15 and 9-19-2017.  And what we see is

19   an example of method that presumably was in place starting when

20   and where?  It's at Phoenix, right, Mr. Bojanowski, what you             01:40PM

21   gave?

22         MR. BOJANOWSKI:  I'm sorry, Your Honor.  I didn't

23   follow your question.

24         THE COURT:  You are talking about a document that was

25   for ASPC Phoenix Alhambra.                                               01:41PM

1    MR. BOJANOWSKI:  Correct.  And one for ASPC Yuma at

2    Cheyenne.

3         THE COURT:  Right.  And those are dated the 15th of

4    September and the 19th of September respectively?

5         MR. BOJANOWSKI:  Correct.                          01:41PM

6         THE COURT:  And when did this method of communication

7    go in place at those two facilities?

8         MR. BOJANOWSKI:  I don't have that information, Your

9    Honor.  Obviously assuming it was sometime prior to that.

10        THE COURT:  Well, I have got a couple of questions.  01:42PM

11   The first is wondering whether -- because I don't have the

12   answer -- so I am left wondering how much of September in these

13   facilities that are not meeting this compliance measure was

14   such a method of communication used?  And we really -- is it

15   fair to say we don't know?                              01:42PM

16        MR. BOJANOWSKI:  Well, I can report to you that in

17   September, between the 1st and 30th, there were 8,937 such

18   communiques that were sent.  So I can't report to you anything

19   about August, but in the 30 days of September that was the

20   total number of these such communiques that were sent.  01:43PM

21        THE COURT:  Okay.

22        MR. BOJANOWSKI:  Now, the measure is not looking at

23   this communique, though, okay.  So the measure is if an inmate

24   requests the diagnostic study within seven calendar days are

25   they provided that information?  So that request comes in  01:43PM

UNITED STATES DISTRICT COURT

1    through an HNR, okay.  What the communique is, is an attempt to

2    provide information to the inmates so they know, are the lab

3    results normal or abnormal?  And with that information, it cuts

4    down on the number of HNRs being submitted by inmates who are

5    wondering, well, I wonder what my lab test results were.          01:43PM

6          Now, the reason why there's not more information in

7    the communique is because for security purposes and protected

8    health information purposes, we don't put more information into

9    it.  In other words, if there is a patient who is being treated

10   for an STD or AIDS or Hep C or whatever it may be, they have no   01:44PM

11   way -- that inmate has no way of securing that document from

12   being obtained potentially by other inmates.  And per policy,

13   ADC policy, inmates are not provided their actual medical

14   records.  So this is a method by which we can at least give

15   them some information to help them out and then if they decide    01:44PM

16   to follow up and say, well, I want to talk to the doctor

17   anyway, they submit the HNR to get additional information.

18         But that's the nature of the communique and why that

19   was put into place.  And the information I have received is

20   yes, in fact, it has cut down on the number of HNRs by inmates    01:45PM

21   seeking just a lab test result.

22         THE COURT:  Ms. Kendrick.

23         MS. KENDRICK:  Well, if there's not many HNRs it's

24   unclear why they are incapable of answering them and achieving

25   compliance.                                                       01:45PM

1        THE COURT:  Hold on.  Are you saying we don't know

2   whether or not what facilities and when this communique was

3   started.  We know that 8,937 of them were issued in the month

4   of September.

5        MS. KENDRICK:  Well, actually, Your Honor, the                    01:45PM

6   commentary's a little different on each one.  But I think all

7   of them say eOMIS was upgraded in late June.  And then on the

8   Lewis one, which is at Page 123, its says at least there the

9   providers were trained on the change on how to do things on

10  August 9, 2017.                                                        01:46PM

11       So the month of August they achieved 43 percent when

12  theoretically three of the weeks they should have known to do

13  this.  And then in September it went down to 34 percent.  So I

14  don't know if that August 9th applies to everything but that's

15  one place that has a date.                                             01:46PM

16       But I guess the point being if Mr. Bojanowski keeps

17  saying the reason the numbers look bad is because there's just

18  a few number of HNRs that are submitted each month, and

19  therefore, if one is off they have a low compliance level, if

20  they have four or five HNRs a month asking for the results,            01:46PM

21  it's unclear why they are not capable of printing out the

22  response within seven days.

23       MR. BOJANOWSKI:  I have Mr. Pratt who can provide

24  additional information.

25       THE COURT:  Thank you.                                            01:46PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    MR. PRATT:  Your Honor, one of the difficulties with

2    this is the strict requirement that it must be a medical

3    provider communicating that information to the inmate when he

4    asks for it.  If the nurse were able to simply print the

5    results off on his lab results and hand them to him, that                01:47PM

6    commonsensically would meet the requirement.  But the

7    requirement is no, it can't come from a nurse.  It has to come

8    from a provider which is an additional step above trying to get

9    this to the inmate in a reasonable amount of time.

10       THE COURT:  So does that mean the communique can never       01:47PM

11   solve that problem?

12       MR. PRATT:  No.  The communique, if it's not signed by

13   a medical provider, does not meet the requirements in the

14   stipulation in the performance measure.  The requirement says

15   that it has to come from a medical provider.                              01:47PM

16       THE COURT:  So these exemplars do satisfy it?  No,

17   they don't?

18       MR. PRATT:  If you are telling me, sir, that --

19       THE COURT:  No.  I'm asking the question.  It's signed

20   by a reviewing practitioner.                                             01:47PM

21       MR. PRATT:  Electronic signature.

22       THE COURT:  Yes.

23       MR. PRATT:  If that's acceptable the nurse can simply

24   print that off.  That's what's in eOMIS right now.  The nurse

25   can simply print that off and send it to the person asking for          01:48PM

November 7, 2017 - CV 12-601 - Status Hearing

```
 1    those results.  If that were the case I think you would see an
 2    immediate uptick in this happening.
 3              MS. KENDRICK:  Your Honor.
 4              THE COURT:  Yeah.
 5              MS. KENDRICK:  If you look at Performance Measure 47    01:48PM
 6    for Eyman, the Corrective Action Plan, also the one for
 7    Florence, it talks about the fact that the corrective action
 8    plan is that the nurses will do the printing out and preparing
 9    the communique and that the only thing the provider has to do
10    is sign it.  So I don't understand why they are not already    01:48PM
11    doing that if that's what they told the Court at least a month
12    ago that's what they were going to do as the action plan at
13    Eyman and Florence.
14              THE COURT:  Okay.  The exemplars that have been given
15    to me, if they are given to the inmate and they have been    01:48PM
16    signed by the reviewing practitioner, would that satisfy the
17    performance measure in plaintiffs' view?
18              MS. KENDRICK:  Well, it doesn't say what test it is.
19              THE COURT:  No, I understand.
20              MS. KENDRICK:  Yeah.  I know this because there are    01:49PM
21    not that many providers.  Dr. Malachinski and Dr. Barkley are
22    providers so is Ms. Chudoff.  So they are signing it here.
23              THE COURT:  So what you are saying, then, so that I
24    can understand, is that you don't think these are sufficient
25    because they don't inform the inmate about what the test is and    01:49PM
```

1    about what the particular value is that's been --

2        MS. KENDRICK:  Correct.  That's our issue, not, you

3    know, it seems like the providers are signing it.  That has

4    never been before identified as the reason that because the

5    nurses can't print it out.  That's never been offered as the        01:49PM

6    reason for noncompliance and, in fact, that is actually the

7    Corrective Action Plan.

8        THE COURT:  So this whole mail idea that we've been

9    talking about for months really was a dead on arrival scene

10   from the start?                                                     01:49PM

11       MR. BOJANOWSKI:  That's the way they get to the

12   inmate.

13       THE COURT:  Well, but again, in terms of providing

14   results that provide the information that plaintiffs say that a

15   person should be entitled to have under this requirement, the       01:50PM

16   mail can never do that because it results in the inmate having

17   in his or her possession a document that security protocol says

18   they shouldn't have.

19       MR. BOJANOWSKI:  Well, the results are either normal

20   or abnormal.                                                        01:50PM

21       THE COURT:  Well, but what Ms. Kendrick is saying is

22   that's insufficient because it doesn't tell you what the test

23   was.  So somehow, this information is insufficient because

24   somebody who has had a battery of tests and they get this,

25   perhaps, a report that says your results were within acceptable     01:50PM

November 7, 2017 - CV 12-601 - Status Hearing

1    limits, no further action is needed, or maybe the other one is

2    checked, it could be a mixed bag.  I guess that's what your

3    issue is.

4         MS. KENDRICK:  Right.  I mean, it's just the language

5    of the performance measure.  So telling somebody that their            01:50PM

6    results are abnormal isn't communicating the results of the

7    study.  It's characterizing it but if somebody had blood tests

8    done --

9         THE COURT:  Right.  Right.  I understand.  So the

10   thing that I asked just a moment ago, this idea of doing it in        01:51PM

11   the mail is a dead letter, better thing to say, because it

12   couldn't be the method because you couldn't provide that

13   information.  So it had to be some kind of in person providing

14   of that information to the requesting inmate so that they could

15   see and understand what it was.  There was no idea that we           01:51PM

16   could ever communicate sufficient information in your mind to

17   satisfy this performance measure by doing it through the prison

18   mail.

19        MS. KENDRICK:  Well, I think this is actually first

20   time we have heard that they can't put information in there for     01:51PM

21   some ostensible security information.  It's protected health

22   information.  The protection belongs to the class member.  So

23   he or she is not getting something that's, you know, illicit.

24   It's their own personal health information that is being

25   communicated to them.  And Your Honor has been kind of floating    01:51PM

UNITED STATES DISTRICT COURT

1    the idea for months and months and we thought the most sensible

2    one was why don't you just print out the darn report and put it

3    in an envelope and send it to them which we agree would be the

4    easiest and simplest approach.  As far as I can recall this is

5    the first time --                                                  01:52PM

6              THE COURT:  It is the first time.

7              MS. KENDRICK:  -- first time I have heard them say,

8    oh, sorry, we can't give them any sort of substantive answer

9    which it would have been helpful if they said that, say, eight

10   months ago.  So if -- I guess that means at least in our          01:52PM

11   position they are never going to be able to comply with this if

12   they are not able to supply any substantive results other than

13   to say your results are abnormal.  Don't worry.  We'll see you

14   sometime.

15             THE COURT:  Well, the rule could be met by orally       01:52PM

16   informing someone you have this positive test or abnormal test

17   that shows that you have this.  And that would be just reading

18   what the report said.  What we have heard for the first time

19   here today is that apparently there's a prison regulation that

20   says that we can't provide that in the prison mail system to      01:53PM

21   our inmates because they will end up with it in their cells,

22   which kind of is surprising to me because I have a sense many

23   of the litigants in my cases have their medical records in

24   their cells.  So I'm surprised about that.

25             I also wonder about whether or not there's concerns on  01:53PM

─── November 7, 2017 - CV 12-601 - Status Hearing ───

1    their side about the transmissions through the mail system,

2    that's not so secure as they would like and they are concerned

3    about it for that reason.  But you are right, it's the first

4    time that we have ever heard about this and it does seem to get

5    in the way of what I had been floating before as what seemed          01:53PM

6    like a reasonable method.  Because I do think that the language

7    of the stipulation requires more than the information that's

8    provided here.

9          MS. KENDRICK:  And, I mean, we have seen countless

10   times handwritten communiques, which is how they used to do it      01:53PM

11   where they would say things like your cholesterol levels were

12   whatever over whatever.  We'll talk about it next time, where

13   they do give them some details and say this was your CT cell

14   count this was your cholesterol level.  It's apparently been

15   done in the past.  If there's this policy, this is kind of the      01:54PM

16   first news we have got about it.  And we think that if that's

17   the position they are taking then they are making this

18   performance measure a nullity.

19         THE COURT:  I think I recall you saying that the

20   California prison system sent the medical -- the laboratory          01:54PM

21   report to the inmate?

22         MS. KENDRICK:  Upon request.

23         THE COURT:  Okay.

24         MS. KENDRICK:  They don't do it automatically.

25         THE COURT:  But just as here, upon request.  But in            01:54PM

114

1    California if there's a request they send the actual report

2    says this is what happened on what day, what test was done, and

3    what the value was.

4         MS. KENDRICK:  That's my understanding, either the

5    actual report or kind of a little summary, handwritten or typed    01:54PM

6    up thing that explains it.

7         THE COURT:  Okay.  What about this?  Is there such a

8    regulation, Mr. Pratt?

9         MR. PRATT:  Yes.  There's a department order that

10   restricts inmates from getting copies of their medical records.    01:55PM

11   They can review medical records, take notes on their medical

12   records.  They are not allowed to have copies of their medical

13   records.

14        THE COURT:  So none of the prisoners have in their

15   cells any of their medical records?                                01:55PM

16        MR. PRATT:  No, sir, I can't say that because we will

17   issue medical records to their legal counsel or other parties

18   upon request.

19        THE COURT:  But is it contraband for them to have it

20   in their cells?                                                    01:55PM

21        MR. PRATT:  I don't know how it's considered by

22   operations.  I am not sure.

23        THE COURT:  Do you happen to know off the top of your

24   head what the regulation is?

25        MR. PRATT:  I don't but I can find out.                       01:55PM

1          MR. BOJANOWSKI:  It's DO-1104.

2          MS. EIDENBACH:  Your Honor, during the litigation Ms.

3    Fletcher sent a letter to us.  I can find it.  It may take a

4    little time because it was sometime back, basically saying that

5    because of the Parsons litigation, prisoners who were involved          01:55PM

6    in this litigation actively were permitted to have possession

7    of their medical records in their cells.  And, in fact, when

8    we -- when our clients had possession of their medical records

9    we made sure they also had a copy of the communication from Ms.

10   Fletcher so if a corrections officer was questioning them about          01:56PM

11   whether or not they were allowed to have a copy of that file

12   they could show the corrections officer a letter from their

13   attorney that gave them permission to have it.

14          So there are quite a few prisoners that do actually

15   have copies of large portions of their medical records pursuant          01:56PM

16   to an instruction given by defense counsel.

17          MR. BOJANOWSKI:  I think that was for named plaintiffs

18   only.

19          MS. EIDENBACH:  No, it was not.

20          THE COURT:  Whatever, it is what it is, but it doesn't          01:56PM

21   necessarily define the question here because it seems to me

22   that if somebody requests that they be provided with the

23   results of diagnostic studies that they should be able to have

24   them and assume the risks, if any, of having that information

25   in their cells with the understanding, I imagine, they have          01:57PM

—November 7, 2017 - CV 12-601 - Status Hearing—

1    that they know what their lives are like in their cells and who

2    or what circumstances could interfere with what would be their

3    ability to hold that information confidential.

4        So I think we are in a position where I'm not going to

5    be able to see how this communique that's been shown to me in          01:57PM

6    the exemplar should be counted as being -- satisfying the

7    measure here because it doesn't report the results of

8    diagnostic studies in the way that is, I think, a fair reading

9    of this performance measure.

10       MR. PRATT:  Your Honor, if it would suffice, again,              01:57PM

11   the common sense way to handle this performance measure, if it

12   were simple enough to have the lab results printed out of eOMIS

13   and handed to the inmates, as opposed to having a provider's

14   signature on those lab results after she prints it out and then

15   having to go ahead and send it to him, if what you have there        01:58PM

16   in an exemplar is you've got a lab report that's electronically

17   signed by a provider, and that is simply handed to him, if the

18   electronic signature would suffice it would save time and, I

19   think, cut to the quick on getting this information to the

20   inmate.                                                              01:58PM

21       THE COURT:  Well, follow-up question to that, how

22   would we then be able to document, where would be the

23   documentation point to know whether or not this information had

24   been communicated to the inmate?  Would it be charted by the

25   nurse who provided it?                                               01:58PM

117

1    MR. PRATT:  Absolutely.  It would not require handing

2    information off to a provider to sign off on a lab report and

3    then turning around and sending that to the inmate.  If the

4    electronic signature would work, the nurse could simply print

5    that out, hand it to the inmate, document that it was handed to        01:59PM

6    the inmate, and it's done.

7    THE COURT:  That seems very reasonable to me, Ms.

8    Kendrick.

9    MS. KENDRICK:  We don't have an issue with electronic

10   signatures.                                                            01:59PM

11   THE COURT:  Do you have an issue with anything he

12   said?

13   MS. KENDRICK:  No.  But what we're saying is it says

14   that a provider has to sign it, so if the signature is an

15   electronic signature, that's okay.  I don't think we're being         01:59PM

16   so literal meaning they have to sign off on it.

17   The other thing is the stipulation doesn't require

18   that the communication come in writing, you know, looking at

19   the monitoring guide, it says if the person sees a provider

20   within seven days and it's orally communicated, then that's           01:59PM

21   compliant.  So there's more than one way that they can achieve

22   compliance.  It doesn't have to be through the written

23   communiques.

24   THE COURT:  But the method that Mr. Pratt described is

25   also a way that would qualify for meeting the performance             02:00PM

UNITED STATES DISTRICT COURT

November 7, 2017 - CV 12-601 - Status Hearing

1    measure in plaintiffs' view.  Is that true?

2            MS. KENDRICK:  With regard to the requirement that

3    it's a provider communicating it.  Still doesn't address the

4    fact that there's no substantive information.

5            THE COURT:  No, no.  He just told me he would print          02:00PM

6    out the report.  The nurse would print out the report of the

7    diagnostic test and that will be provided to the inmate upon

8    request.

9            MR. FATHI:  May we have a minute, Your Honor?

10           THE COURT:  Of course.                                        02:00PM

11           Thank you, Mr. Pratt.  You can stand there or you can

12    take a chair.

13           MR. PRATT:  I have been sitting long enough.

14           THE COURT:  Fair enough.

15           MS. KENDRICK:  It's fine.                                      02:00PM

16           THE COURT:  Good.  All right.  Thank you.

17           MR. BOJANOWSKI:  May I have a moment, Your Honor?

18           THE COURT:  You may.

19           So, Mr. Pratt, one more question, to move to this kind

20    of approach, how much time do you think that will take?  To         02:01PM

21    move to this approach that you just described that plaintiffs

22    would say would be okay of providing the printouts when they

23    requested, when should we think that could be in place?

24           MR. PRATT:  I can let the monitoring bureau know if

25    they are reviewing these performance measures right now and         02:01PM

UNITED STATES DISTRICT COURT

—November 7, 2017 - CV 12-601 - Status Hearing—

1  they are looking at this one going back into the last month, if

2  they have already done that I will have them go back and

3  re-review it.

4          THE COURT:  Wait a minute.  Has this been happening?

5          MR. PRATT:  No.                                        02:01PM

6          THE COURT:  All right.  So that's the first step, make

7  it happen.

8          MR. PRATT:  I can make that effective tomorrow.

9          THE COURT:  Okay.  Why are you here just today if you

10  can do all this stuff tomorrow?  I wanted you here every day    02:01PM

11  doing this just tomorrow.

12          So what you are saying is what will happen, you will

13  send out a directive saying if an inmate requests to have the

14  result of diagnostic studies within seven calendar days of that

15  request it will be deemed -- you will take steps to provide    02:02PM

16  that those diagnostic study results will be printed out and

17  provided to the inmate within seven days of that request.  And

18  if you do that, that will be deemed to be compliant with

19  Performance Measure 47.

20          MR. PRATT:  Yes.  I will get that to the monitoring    02:02PM

21  bureau and I will also communicate that to Corizon to start

22  this immediately for any requests they have coming in.  They

23  don't have to worry about getting it to a provider.  They can

24  simply print the results out, hand them to the inmate, document

25  that, and we'll consider that compliance.                      02:02PM

1          THE COURT:  Well, that's great news.  Thank you.

2          MR. PRATT:  You're welcome.

3          THE COURT:  Did the plaintiffs want to have for their

4  mediation purposes Performance Measure 48 a report from Tucson?

5  I think I saw that.                                                02:03PM

6          MS. KENDRICK:  Yes, sir.

7          THE COURT:  Could you provide that, Mr. Bojanowski?

8          MR. BOJANOWSKI:  48, Tucson is 93 percent.

9          THE COURT:  Thank you.

10         MR. BOJANOWSKI:  You're welcome.                          02:03PM

11         THE COURT:  So with respect to 49, Ms. Kendrick.

12         MS. KENDRICK:  Well, Your Honor, I'm not quite sure --

13         THE COURT:  What to say?

14         MS. KENDRICK:  -- what to say because there's no

15  change in the action plan, which says that the new process was    02:03PM

16  going to be in place no later than November 15th.  So I suppose

17  we just need an update on what the status is of implementing

18  this new procedure.

19         THE COURT:  Okay.

20         MR. BOJANOWSKI:  I'm double-checking, Your Honor.          02:04PM

21         THE COURT:  Thank you.

22         MR. BOJANOWSKI:  To see if this is in place right now

23  or still not quite in place.

24         Your Honor, it's apparently in place right now.

25         THE COURT:  Do you know when it started?                  02:04PM

UNITED STATES DISTRICT COURT

1    MR. BOJANOWSKI:  I believe it was November 1st.

2    THE COURT:  And do you know whether there's any effort

3  to see whether or not it's working?

4    MR. BOJANOWSKI:  I have no information on that, Your

5  Honor.                                                          02:04PM

6    THE COURT:  Okay.

7    MR. BOJANOWSKI:  Let me ask Mr. Pratt.

8    THE COURT:  Thank you.

9    MR. BOJANOWSKI:  Your Honor, we have not done anything

10 specifically with regard to this measure.                       02:05PM

11   THE COURT:  All right.  It includes these internal

12 time steps requirements, for example, within 24 hours of the

13 output being entered.  So many things flow down the road

14 culminating in a 28-day check to see whether or not there is a

15 risk that there's going to be a violation here.                 02:05PM

16       I guess I would think that it would make sense to

17 check in on these interim dates, some of which since it started

18 on the 1st of November -- that's what you said, wasn't it, it

19 was the 1st of November?

20   MR. BOJANOWSKI:  Correct, Your Honor.                         02:06PM

21   THE COURT:  Since it started on the 1st of November we

22 have already passed some of these interim dates with respect to

23 requests that would have been -- or denials that would have

24 been made, I imagine.  And so you could see whether or not you

25 were on track or not, and I guess I would want to look at that. 02:06PM

November 7, 2017 - CV 12-601 - Status Hearing

1    Anything else on 49?

2         MS. KENDRICK:  Just you noted that there were quite a

3    few steps in this process that have time frames, but it doesn't

4    appear that Number 4, it says the request shall proceed through

5    the utilization management process.  And then utilization                  02:06PM

6    management will enter a determination.  There's no time frame

7    there, so I don't know if that's part of the plan to have a

8    time limitation for utilization management to process the

9    request.

10        MR. BOJANOWSKI:  It is my understanding there is not a       02:06PM

11   time limit on that.  Maybe it will be something we will look

12   at.

13        THE COURT:  As you read this you will think, well,

14   that could surely derail the train.  If that doesn't happen

15   nothing else happens, looks like, because that's what defines      02:07PM

16   the output occurring, right?  So I would look at that.  Thank

17   you.

18        So now we're to 50 and 51 and the notice regarding

19   Performance Measures 50 and 51 that includes the affidavit of

20   Greg Campbell raises all sorts of issues in my mind.  It's not     02:07PM

21   specifically tailored to issues that the Court previously

22   identified, urology and cardiology, but to the extent that the

23   issue is broader I have to deal with that issue if it is

24   broader.  But the issues include many things that I think are

25   some within my control, somewhat perhaps not within my control     02:08PM

UNITED STATES DISTRICT COURT

1    but are the subject of subject matters that could be made a

2    part of somebody's agenda, maybe even just the purpose of the

3    Court.  If we read here that there are medical providers who

4    choose not to see inmates because of a concern about adversity

5    on their practices, makes one think that you could overcome          02:08PM

6    that issue by coordinating and consolidating the necessary

7    specialty provider visits and maybe making an arrangement for

8    them to happen all on one day, or travel all on one day for a

9    number of patients just in one location.  There would be

10   perhaps people who would be willing to do that.                      02:09PM

11           Further expounding upon what is just sort of a gut

12   reaction to this, I mean, if it's true that the medical

13   community is not providing this service, I think that there are

14   associations, the Arizona Medical Association, for example, I

15   can't imagine that the doctor who is the elected head of that        02:09PM

16   group would be happy to hear that there was a medical need not

17   being met in the state because people were, perhaps, concerned

18   about issues associated with having inmates in their offices at

19   certain times.  I guess I just don't see that that's something

20   we're powerlessness to address.                                      02:09PM

21           The access limitation, again, I would want to drill

22   down more on that.  I would want to know how often does this

23   come up?  From my other cases, I think I have an understanding

24   that many prisoners are seen by many specialty practitioners

25   and that there doesn't seem to be across the state of Arizona        02:10PM

1    as far as I can tell the resistance to the AHCCCS rates because

2    many people are treated under AHCCCS.  But again, if that's the

3    fact I would like to know about it because I would like to be

4    able to consider whether or not there was something I needed to

5    do to make sure that that road block was not in the way of                      02:10PM

6    getting the necessary providers.

7            So those are my preliminary views to this affidavit

8    which culminate in a thought that, perhaps, the right thing

9    here is to have Mr. Campbell here in court so we can learn more

10   about my particular questions and what he represents he knows          02:10PM

11   about in broad strokes.  I mean, this is very broad and really

12   not very specific.  But the answer probably is in the

13   specifics, and I'd like to get to that as best I can.

14           So having made that preliminary statement about 50/51,

15   let me turn to plaintiffs for their reaction.                          02:11PM

16       MS. KENDRICK:  We're not quite sure if actually Mr.

17   Campbell would be the person who is most knowledgeable to talk

18   about this problem on a statewide basis because he is the

19   clinical coordinator just at one of prisons which actually is

20   not one of the prisons that you have found them substantially         02:11PM

21   noncompliant for Performance Measure 50 or 51.  So to the

22   extent there's numerous facilities, it seems it would make more

23   sense it would be somebody from regional headquarters who deals

24   with these things.

25           So, you know, the comment that there's some sort of            02:11PM

1    stigma about treating prisoners, Corizon is a corporation that

2    has contracts all across the country.  This cannot be the first

3    time that they have run into a situation where people in the

4    community or providers in the community may have some

5    hesitation about seeing prisoners.  But, you know, so I don't          02:11PM

6    necessarily think that's really a valid excuse.  They have

7    probably undoubtedly dealt with this elsewhere in the country.

8    So it seems like they could put their thinking caps on and

9    address it.

10          The other thing is that we had asked defendants for an          02:12PM

11   update on the telemedicine for specialty encounters, and we

12   were told that they were going to provide a detailed

13   declaration.  And so what we got was something that just talked

14   about negotiations and meetings that had happened since early

15   October 2017 which was troubling to us, because we have been          02:12PM

16   talking about this for months if not over a year.  And so there

17   was really no explanation as to what has happened in the

18   preceding 12 months.  Also to the extent that they have managed

19   to have some progress with the University of Arizona that would

20   be helpful to find out.  But we, again, think that the                02:12PM

21   telemedicine is an option.

22          And then finally, I think maybe it was a few months

23   ago I somewhat jokingly cited the supremacy clause to you when

24   you asked about this limitation on the payment rates.  But, you

25   know, on the other hand I'm serious, you know, that is                02:13PM

1    something that a federal court can do.  And if there is a state

2    law that is clearly, and the parties seem to agree, is a huge

3    barrier to providing care and achieving compliance, the Court

4    does and can have the power to waive that.

5            THE COURT:  Well, you may have mentioned it first, but      02:13PM

6    you didn't mention it last.  If you will look in last month's

7    transcript you will see that I actually mentioned it so it's

8    not something I'm unaware of.  The federal court, in its

9    responsibility to apply the Constitution of the United States

10   does turn, often times, to the supremacy clause in which the      02:13PM

11   founders established what the order of law would be.

12           The stipulation says that I can take such measures as

13   are permitted by law, but that certainly does not contemplate

14   that the State of Arizona could, through its legislative and

15   executive branch, pass a law that would obstruct the            02:14PM

16   enforcement of an action that was brought to vindicate a

17   federal constitutional right.

18           So I'm not, in the first instance, put off by that as

19   an obstacle because it is something that the federal courts

20   with respect find themselves necessarily to do from time to     02:14PM

21   time.  But obviously, too, because of the sensitivity in the

22   federal system, you do need to make sure that that is the only

23   alternative that you have to have available to effectuate the

24   difference.

25           I do think it makes sense to have the right person      02:14PM

1    here.  And if it's not Mr. Campbell, I'd like to hear from who

2    the right person is who can tell me what it is that is the

3    trouble in the landscape of obtaining specialty services in the

4    State of Arizona that's been cited here in a more particular

5    fashion:  How often are these issues that are generally raised          02:15PM

6    here a problem; how often is it the stigma; how often is it the

7    pay rate; how often is it the scheduling that, I guess, I think

8    it's true that many people, when they first contact a specialty

9    provider, they are told, well, Dr. So-and-so can see you in six

10   months.  Then you say, but, well, my doctor said that I need to         02:15PM

11   be seen sooner and that almost all my experience is when you

12   present that additional fact it does result in a way to get it

13   found.

14          But I will say this:  This is not -- any of this is

15   not rocket science stuff.  This is coordinating healthcare             02:15PM

16   benefits for people who you are responsible for every part of

17   their lives.  And so that means that it's not as if it's

18   undoable.  It's something that is completely doable if you

19   apply the right resources to it.

20          So I need to find out where that resource block is.            02:16PM

21   If it's a coordinating function within the state, then maybe

22   I'm back to figuring out who is better able to coordinate that

23   and figure out where that responsibility needs to be assigned.

24          All of these things are solvable problems, but they

25   are not solvable problems if you don't devote the resources.          02:16PM

128

 1          So what we'll do is, Mr. Bojanowski, you have heard

 2    what I would like to hear from a witness next week or if it's

 3    more than -- not next week, next month.  If it's more than one

 4    person, fine.  But in a couple of weeks, let the plaintiffs

 5    know whom you are contemplating calling and so that they can          02:17PM

 6    have input into that.  If there's an issue, bring it to me.

 7    But I would like to hear from somebody who can really flesh out

 8    what's in Mr. Campbell's affidavit so that I can understand

 9    these impediments and, therefore, have a better chance of

10    applying an educated remedy.                                         02:17PM

11          MS. KENDRICK:  Well, and we would just note that their

12    declaration they filed on October 25th from a person named Juli

13    Stover of Telehealth about telemedicine talked about the fact

14    they were still in discussions with University of Arizona and

15    also with the Arizona Oncology Network.  And we had asked           02:17PM

16    defendants in a letter dated October 31st that they either

17    provide Ms. Stover or they provide information about what the

18    status is of these negotiations, because we're hopeful that

19    that maybe that could address some of the problems with these

20    performance measures.                                               02:18PM

21          THE COURT:  The reason I hounded this telemedicine

22    idea is I was being told by the State this was -- I think the

23    phrase I used before was they are putting a lot of eggs in this

24    basket.  And I wanted to know where we were in the basket.  And

25    it seems like the Easter Bunny is never coming to my house.         02:18PM

UNITED STATES DISTRICT COURT

——— November 7, 2017 - CV 12-601 - Status Hearing ———

1    It's just always in an inchoate status.  And the reason I asked
2    for specific updates about it is that if you are not going to
3    be putting your eggs in this basket, I need to find another
4    basket.  And I had been encouraged by the previous
5    representations and now discouraged by the fact it remains in     02:18PM
6    inchoate status.
7         So I think it does make sense also for next month,
8    either to have available by phone or present in court, someone
9    who can tell us where we stand with respect to the telemedicine
10   and the University of Arizona.  Again, that's been cited as a     02:19PM
11   particular element and, again, it just seems we have not closed
12   the deal there.
13        Mr. Bojanowski, do you have some late-breaking news?
14        MR. BOJANOWSKI:  I'm just trying to confirm that I can
15   actually get the person who signed the declaration on the phone   02:19PM
16   to answer the Court's questions about the telemed, because I
17   agree, there's been inconsistent information which I have given
18   to the Court over a period of many months.  And I'm reporting
19   to you what they tell me, and then it turns out, you know, that
20   maybe that's not quite right.  So I want to get to the person     02:19PM
21   at Corizon who I understand to be the head of telemedicine
22   nationally and who can speak to telemedicine in Arizona.  That
23   was the person who signed that declaration, and so I was just
24   confirming with counsel for Corizon whether we could get that
25   person telephonically is what I was trying to do.                 02:20PM

UNITED STATES DISTRICT COURT

November 7, 2017 - CV 12-601 - Status Hearing

1          THE COURT:  All right.  Thank you.  No.  I appreciate

2     that.

3          Anything anybody else wishes to say regarding 50 and

4     51?  Okay.  Hearing none --

5          MS. KENDRICK:  Actually, just the additional                02:20PM

6     supplemental information for Performance Measure 50 that's

7     listed at Page 141, does that mean that it started as of

8     November 6th, or when did this process start?

9          MR. BOJANOWSKI:  It's my understanding, yes, that

10    started on that date.                                            02:20PM

11         THE COURT:  Again, this measure does include these

12    internal dates which would give somebody a ready opportunity to

13    see in real time whether or not you are on track to being able

14    to deliver the requirement in this performance measure.

15         52.  We have this November 6th supplemental               02:21PM

16    information.  And did that start on November 6th or when?  Do

17    we know?

18         MR. BOJANOWSKI:  Correct, Your Honor.

19         THE COURT:  All right.  Ms. Kendrick, anything you

20    wanted to add on it?                                             02:22PM

21         MS. KENDRICK:  No, Your Honor, just that your order to

22    show cause included for Florence for Performance Measure 52.

23    But given the fact that Eyman has plummeted from 41 percent in

24    the past two months to 24 percent in September, we think that

25    it should either be included or they should -- in that order to   02:22PM

1  show cause or that they need to provide the Court and

2  plaintiffs with real time information on February 5th.

3        THE COURT:  I will adopt that second proposal and say

4  that that will be included in the requirement for the February

5  5th report of December data.  And we'll see what is happening          02:22PM

6  if we don't get an improvement between now and then.  But it's

7  really no real optimism associated with that given that we have

8  gone from the 50s to the 40s now to the 20s in two successive

9  months.

10       54.  The supplemental correction plan as of November          02:23PM

11  6, 2017, is this also one that went into place on November 6th?

12       MR. BOJANOWSKI:  Correct, Your Honor.  I confirmed

13  with Corizon that all the -- over the break, I confirmed that

14  all of the supplemental plans are now in place that are

15  reflected in the document filed with the Court, just so that          02:23PM

16  there's clarity of the record.

17       THE COURT:  So when they see these corrective plans,

18  when the contractor sees them and they see that these deadlines

19  are required and they tell you that it's in place, do you have

20  every reason to think that they are actually going to do that?          02:24PM

21       MR. BOJANOWSKI:  Yes.

22       THE COURT:  Okay.

23       MR. BOJANOWSKI:  Yes, because we're going to be

24  checking on it.

25       THE COURT:  People aren't saying, well, I see this          02:24PM

1  aspirational goal you set here and it looks aspirational to us.

2  The tenor of the conversation is this is the order of the day.

3  This is what we have to do.

4      MR. BOJANOWSKI:  Right.  There's been numerous

5  conversations with regard to these plans whereby we are really

6  trying to get into some more detail.  As the Court can see

7  we're really getting very specific on what we think and what

8  they think is going to cure the problem.  I mean, I know that

9  in -- and this is kind of the purpose of having this kind of

10  document, is to get into some real specificity here.  So, yes,

11  that is -- this is what we are insisting be implemented.

12      THE COURT:  And I ask the question here because in the

13  past where we have seen such plans we have then come to

14  understand that they really weren't done.  But these are

15  specific and just wanted to make sure people understood that

16  the past wasn't a prologue of how we can treat these new ones

17  going forward.

18      MR. BOJANOWSKI:  Right.  That's why I want it in

19  writing and specific.

20      THE COURT:  Anything you wanted to say in addition on

21  54?

22      MS. KENDRICK:  Yes.  The supplemental information

23  refers to the fact that a chronic care nurse is going to be

24  running a Pentaho report and given we were told this morning

25  that Corizon is still in the process of doing all of the

—November 7, 2017 - CV 12-601 - Status Hearing—

1    programming to create these real time reports, I want to

2    confirm whether or not this real time report is actually

3    capable of being run as of today.

4              MR. BOJANOWSKI:  It is.

5              THE COURT:  Thank you.                           02:25PM

6              55.  We have our disease management guidelines

7    implemented for chronic diseases, and we have another very

8    detailed plan that is set to be in place November 6th.  Based

9    upon what you just said, we know that that's true now that it

10   is in place.  Was it in place in advance of the 6th or the     02:26PM

11   start date is the 6th for this one as well?

12             MR. BOJANOWSKI:  I believe the start date is the 6th,

13   Your Honor.

14             THE COURT:  Okay.  All right.  And Ms. Kendrick.

15             MS. KENDRICK:  No.  Nothing further.              02:26PM

16             THE COURT:  66, currently under review by ADC

17   monitoring bureau.  Is this something that we will take up when

18   we have the telephonic hearing?

19             MR. BOJANOWSKI:  We could, Your Honor.  By then we

20   should have some results.  Again, this was one of those ones    02:27PM

21   where we, in checking it here, we saw, you know, that there may

22   be some issues.  So it's being reviewed in some detail.

23             THE COURT:  Okay.  All right.  So what we'll do is

24   also address 66 at the time that we have the telephonic hearing

25   that was to address the --                                 02:27PM

1    MR. BOJANOWSKI:  If I get results prior to that I will

2    try and get a notice filed with the Court and over to

3    plaintiffs as well as with Item 27 at Tucson.

4         THE COURT:  Okay.  And how about 67.

5         MS. KENDRICK:  Your Honor, back to 66, I was hoping          02:27PM

6    that Mr. Bojanowski could actually explain what quote, unquote,

7    issues he means.  Because this is such a critical performance

8    measure.  They have been chronically noncompliant.  Your order

9    to show cause covers Florence, Lewis, and Tucson.  And as we

10   noted in that letter that we filed that's at Exhibit 4 with my    02:27PM

11   declaration, the profoundly disturbing discovery that the

12   provider at the Florence prison was opening up all of these

13   provider round encounters precisely on the hour raised some

14   major red flags to us about how any of the underlying

15   information could be used in 66.                                  02:28PM

16         So if he could explain what the issues are and then I

17   know he said that he had just sent that letter to Corizon

18   regarding that provider at Florence, but that, to us, calls

19   into question whether or not the past results, even though they

20   were pretty profoundly noncompliant at Florence, overinflated    02:28PM

21   the degree of compliance because she was somehow magically

22   opening 10, 12 encounter notes at the same precise moment and

23   counting those -- and those appear to be counted as the rounds

24   in compliance for 66.

25         THE COURT:  Since we first talked about this issue          02:29PM

UNITED STATES DISTRICT COURT

1   this morning, Mr. Bojanowski, have you learned anything more

2   about that?

3          MR. BOJANOWSKI:  I have not but Mr. Pratt has,

4   perhaps, some information he would provide to the Court.

5          THE COURT:  Good.                                    02:29PM

6          MR. PRATT:  With regards to the reporting on the hour,

7   I can tell you in general when a provider goes into eOMIS they

8   can go in and document their notes and leave the time that they

9   are actually opening their note as far as part of that

10  documentation to show when they are actually putting their      02:29PM

11  results in, or they can go in and say here's the time I did my

12  rounds and that's the time they were put in and then document

13  their note.  So there's no alarm system or anything that goes

14  off at 71 hours that says you have to put a note in so it opens

15  something up.  Nothing nefarious or anything like that is being  02:29PM

16  set up.  It's just a provider has that ability to go in and say

17  I did my rounds at 8:00 and they may do rounds on several

18  patients and go back and document after the fact.

19         THE COURT:  I still don't understand how that explains

20  why it shows up at the same time, though, on these successive    02:30PM

21  documentation episodes.

22         MR. PRATT:  Well, as a provider, if I go in and I

23  start my rounds at 8:00 and I see 10 patients and then I go

24  document on those 10 patients.

25         THE COURT:  You purposely put in then 8:00?            02:30PM

UNITED STATES DISTRICT COURT

1    MR. PRATT:  I can put in 8:00 for my rounds, yes, sir.

2    THE COURT:  Now knowing that information, does that

3    answer the question?

4    MS. KENDRICK:  No.  And that's actually more

5    disturbing, because our understanding with the eOMIS was that                02:30PM

6    when you open and start an entry, it starts at whatever time.

7    So, you know, with my attachment, I had for comparison the

8    nurse's entries which were more kind of normal, quote, unquote,

9    normal times.  It would say 1:26 and 53 seconds, that sort of

10   thing.  And so if the providers are able to go back and                       02:31PM

11   retroactively create a note saying that we saw this person at 5

12   but then as documented at length in that letter, closing the

13   encounters hours or days later, then we don't have that

14   computer proof of when things occurred.

15   And this is a critical performance measure and so that             02:31PM

16   doesn't actually make us feel any better to know that a

17   provider can go back and create an entry at a time hours or

18   days after the fact.  I mean, again, going back to kind of the

19   tenets of basic medical practice and documentation, you know,

20   documentation should occur contemporaneously and you shouldn't             02:31PM

21   be doing it preemptively or retroactively.  You should be doing

22   it at the time.  So that's our concern.

23   THE COURT:  Let me ask this question, Ms. Kendrick, to

24   help me understand this issue and your view of it.  Under the

25   old system before computers, I gather there would be a provider            02:32PM

───────── November 7, 2017 - CV 12-601 - Status Hearing ─────────

1   who would round on patients and then would return to his or her

2   desk and do the charting.  And that's what I -- when I have

3   been in hospitals, that's what I seem to see happening.  And

4   that all those people that you saw on that round, you would put

5   in a time of when you rounded, and you may be, as you are doing          02:32PM

6   it at your desk at 9 in the morning when you started at 8,

7   maybe some number of people would say I started this rounding

8   process at 8 so they would put in 8 for all of the people.  Is

9   that what you are saying is happening, Mr. Pratt?

10          MR. PRATT:  Yes, sir.  And the other way to document          02:32PM

11  that would be to go in and not adjust the time for the time you

12  did your rounds but to make a notation somewhere in the notes

13  to say this is a late entry.

14          THE COURT:  So for the other providers who don't have

15  this uniform zero, zero, zero, top of the hour zero, zero, zero          02:33PM

16  thing, the times that are reflected there, is that when they

17  opened up that eOMIS file to make the charting notes, or is

18  that when they put in a time as to when they say they did it?

19          MR. PRATT:  That would be the time as they said they

20  did it.                                                                   02:33PM

21          THE COURT:  So all of those times are not an automatic

22  feature of when the system was opened up?

23          MR. PRATT:  As I understand it, it defaults to the

24  current time when you are putting your information in unless

25  you choose to go in and say change that time, because here's          02:33PM

UNITED STATES DISTRICT COURT

138

1    when I actually did this.

2         THE COURT:  So it does automatically put it in.  It

3    defaults to it unless you purposely change it.  So we think

4    this provider with the zero, zero, zero, that person purposely

5    changed them to zero, zero, zero at the start of the shift?        02:33PM

6         MR. PRATT:  That's my understanding, yes.

7         THE COURT:  We have heard that Mr. Pratt will be

8    present when we meet again to talk about these issues that are

9    raised in the letter.  Percolate about it and see if there's

10   anything that remains unresolved or needs further inquiry about    02:34PM

11   whether or not it's being done appropriately.

12        MS. KENDRICK:  Well, the thing that -- I mean, one

13   other thing is, you know, we didn't search this out.  We

14   stumbled upon it when we were looking at a couple of prisoners'

15   medical records who had written us describing how they were       02:34PM

16   having some problems getting care.  It was literally just

17   looking at their medical chart and all the entries and this one

18   person in this one time would just pop out.  So it's very odd

19   because none of the other providers were doing this.  As you

20   can see the nurses don't do that for their infirmary rounds so    02:34PM

21   that's why it popped out at us.  And the fact that we have a

22   performance measure that says every 72 hours, and they can

23   retroactively go back and adjust the start times, to us does

24   raise some serious questions about the accuracy of the

25   underlying information that the monitor may be looking at.        02:35PM

November 7, 2017 - CV 12-601 - Status Hearing

1    THE COURT:  And in the old system, there wasn't any

2    kind of reliance on the equivalent of a time clock, I gather,

3    which you are saying that you maybe are comforted by in the new

4    system because the system, you thought, had been inputting

5    automatically a time that would be close in time to when the      02:35PM

6    care was actually provided.  But in the old system there wasn't

7    such a mechanism, right?

8    MS. KENDRICK:  Well, I don't know because this has

9    been -- I don't know if this is something they had did before

10   we settled the case.                                              02:35PM

11   THE COURT:  I'm talking about the old system before

12   computers.  You always had the person who was making the note,

13   signing the note, the requirement to have to trust that person

14   I guess.  So there came with the advent of computers what was,

15   perhaps, previously not ever applied to somebody who is a        02:36PM

16   medical professional, a time clock.

17   MS. KENDRICK:  Right.

18   THE COURT:  Like the guards have when they do rounds.

19   They have to put in a key or something.  So suddenly you have

20   that.  But here it seems like you can't count upon it, but it     02:36PM

21   doesn't necessarily mean something nefarious is going on.  It

22   just means somebody has acted in a way that lots of people

23   acted before computers were used.  I think it's a right thing

24   to raise, because it looks curious when you have this outlier.

25   And obviously, we -- when I say "we," the Court relies upon you   02:36PM

UNITED STATES DISTRICT COURT

—————November 7, 2017 - CV 12-601 - Status Hearing—————

1   to be sensitive to these things.  I sort of think about it in

2   the Harry Potter books there's this Mrs. Norris, this cat

3   that's wandering about the castle and sort of looking for

4   things that look out of the ordinary.  That's part of what I am

5   counting upon people to do in this case, both in the                02:36PM

6   plaintiffs' and defendants' side to make sure that we're

7   catching errors.  Thank you.

8          MR. PRATT:  The other thing I would add on this one,

9   Your Honor, is this is one of those you have to hit it 100

10  percent of the time in order for it to be considered compliant.   02:37PM

11  So in the overall view of when they look at 10 inmates'

12  records, which is required in the stipulation, if three of

13  those inmates missed one visit during the month they get a 70

14  percent.  Would there be in any objection to expanding that

15  beyond 10 to look at more than 10?  Because you can't hit an 85   02:37PM

16  percent when you are looking at 10 guys.  You are going to be

17  at 80 or 90.  And would there be an objection to going above

18  10?

19          THE COURT:  It's not a physical impossibility.

20          MR. PRATT:  No.                                            02:37PM

21          THE COURT:  To get to 100 percent.  It's just as a

22  practical issue you say it's harder here.  But the plaintiffs,

23  I think, are going to say this is an important performance

24  measure.  That's why we negotiated it this way.

25          MS. KENDRICK:  You took the words out of my mouth.        02:38PM

UNITED STATES DISTRICT COURT

November 7, 2017 - CV 12-601 - Status Hearing

```
 1                THE COURT:  Thank you, Mr. Pratt.  The answer is no.

 2                MR. PRATT:  Answer is no, we can't look at more than

 3     10?

 4                THE COURT:  Right.

 5                MR. PRATT:  Okay.                                      02:38PM

 6                THE COURT:  I'm assuming the answer is no.  I mean, I

 7     can't change -- you all can change it, but I can't change it.

 8                MS. KENDRICK:  We'll have to think about it.

 9                THE COURT:  Have a dialogue about it.

10                So are we at 72?                                       02:38PM

11                MR. BOJANOWSKI:  Correct, Your Honor.

12                MS. KENDRICK:  So what were the issues with 66 and 67?

13                THE COURT:  Oh, that's right, getting back to your

14     question.

15                MR. BOJANOWSKI:  I don't know exactly what the issues   02:38PM

16     are, to be honest with you.  I know that something was raised

17     with regard to how the monitoring was done, and so they are

18     looking at it.

19                THE COURT:  Next time that we talk, know the answer to

20     that question.                                                    02:39PM

21                MR. BOJANOWSKI:  Okay.

22                THE COURT:  Thank you.

23                Now to 72.  It seems to be an issue that we have

24     addressed already with respect to getting -- the only thing

25     that's hanging on 72 is just getting the training materials, I    02:39PM
```

UNITED STATES DISTRICT COURT

1    gather.  Is that right, Ms. Kendrick?

2          MS. KENDRICK:  At least that was one of them, yes.

3          THE COURT:  Anything else?

4          MS. KENDRICK:  No, sir.

5          THE COURT:  Okay.  And the next performance measure          02:39PM

6    you would like to address?

7          MR. FATHI:  Your Honor, on Performance Measures 85 and

8    86, I would point out that the parties still have not reached

9    agreement on the monitoring methodology.  We wrote to the

10   defendants about this on October 24th.  That's at Document      02:40PM

11   2426-1 at 14, and we haven't received a response.

12         MR. BOJANOWSKI:  What was the date of your letter,

13   David?

14         MR. FATHI:  October 24th.

15         THE COURT:  Do you remember what the issue was that       02:40PM

16   you were throwing back at the defendants on this?

17         MR. FATHI:  Yes, Your Honor.  The issue was that the

18   defendants sent a letter, and this was Ms. Fletcher's October

19   20th letter that said we agree with your proposed methodology

20   with a couple of exceptions.  But then the actual language they   02:40PM

21   attached was wildly different than our last proposal.  So the

22   text of the letter and the attachment just didn't go together

23   and we asked for clarification on October 24th, and we haven't

24   received a response.

25         THE COURT:  When could the plaintiffs expect a            02:41PM

November 7, 2017 - CV 12-601 - Status Hearing

```
 1    response?
 2            MR. BOJANOWSKI:  I would say within a week, 10 days at
 3    the most.  I know that Ms. Fletcher was working on a response,
 4    but I don't know what the status of it is specifically.  But I
 5    would say a week we should have a response.                      02:41PM
 6            THE COURT:  Does it make sense to put this on the
 7    agenda for the next telephonic conference?
 8            MR. FATHI:  If it is not resolved by then, yes, Your
 9    Honor.
10            THE COURT:  I'm just asking whether you think we        02:41PM
11    should let you continue to meet and confer to work out its way
12    on this in a week or 10 days or whether we should accelerate it
13    and have it addressed so that you get the response sooner and
14    then I have it before me when we next talk.  I don't know when
15    it is.  I'm hoping it's next week sometime.                     02:41PM
16            MR. FATHI:  Well, Your Honor, I'm a little bit
17    disappointed that it's already been two weeks and now we're
18    being told another week or 10 days.  It's not complicated.  But
19    we're happy to wait for a response and see if we can work it
20    out.                                                            02:42PM
21            THE COURT:  All right.  Thank you.
22            MR. FATHI:  And just a general comment, Your Honor, to
23    the extent that these numbers seem to show compliance, that's
24    obviously a very good thing with the proviso that these are
25    actual accurate and reliable numbers.  As we discussed earlier, 02:42PM
```

November 7, 2017 - CV 12-601 - Status Hearing

1    we found multiple errors in the July CGARs.  We are currently

2    reviewing the August CGARs and have similarly found multiple

3    errors there.  We haven't yet received the September CGARs, so

4    obviously we haven't reviewed those.  So we just have to append

5    a footnote to these numbers pending a review of the actual                   02:42PM

6    documents.

7            THE COURT:  Well, I mean, you are repeating what I

8    said, and that is, it's important that you look for these

9    anomalies and errors.  And I'm encouraged by the fact of what I

10   know that from the satisfaction that the truffle pigs feel when    02:43PM

11   they first found a truffle, all they want to do is find more

12   truffles.  So I know you will be looking.

13           MR. FATHI:  We will, Your Honor.

14           THE COURT:  Next one.

15           MR. FATHI:  Performance Measure 91.                                   02:43PM

16           THE COURT:  So we have a supplemental correction plan

17   to address the requirement that MH-5 prisoners who are actively

18   psychotic or actively suicidal being seen by a mental health

19   clinician or mental health provider daily.  And the report that

20   we have for Phoenix is at 73 percent.  And the defendants have    02:43PM

21   set forth a November 6th supplementation of a method to address

22   this problem.

23           Did this plan start on the 6th of November or before?

24           MR. BOJANOWSKI:  The plan has been put into place, but

25   I communicated to the plaintiffs this morning that a                          02:44PM

145

1    recalculation was done because we found a mistake in this, and

2    the actual result is 91 percent.  And Dr. Taylor is here to

3    explain the change in that if the Court so desires.

4            THE COURT:  Surely.  Go ahead, Dr. Taylor.  Near a

5    microphone, please.  Thank you.                          02:44PM

6            DR. TAYLOR:  When looking at that performance measure,

7    the two provider contacts had been missed on that.  And so the

8    73 percent was because two of the inmates were not audited with

9    looking at the provider contact.  So when the provider contact

10   was added in, the compliance went from 73 to 91.          02:45PM

11           THE COURT:  So a provider contact that satisfies the

12   requirement of the measure, meaning met the professional

13   requirement of the performance measure had seen those people

14   for some reason the auditors didn't include that as being a

15   required contact.  Is that what you are saying?           02:45PM

16           DR. TAYLOR:  Correct.  They got missed in that.

17           THE COURT:  Mr. Fathi.

18           MR. FATHI:  Were there any -- was there any change in

19   the files reviewed?

20           DR. TAYLOR:  No.  The same files were reviewed.    02:45PM

21           THE COURT:  So you went back and you -- what prompted

22   the recheck?

23           DR. TAYLOR:  I was re-reading the question over again

24   when I was sitting in my office and went, oh, my goodness.  The

25   provider contacts.                                        02:45PM

1      THE COURT:  So you just naturally know that provider

2  contacts would have necessarily happened so you thought that

3  they couldn't possibly have not happened and so you went back

4  and that was confirmed.  I'm putting words in your mouth.  I

5  don't mean to.  I'm just trying to understand how you                02:46PM

6  identified this error when you were looking at it.

7      DR. TAYLOR:  So I was just sitting in my office

8  thinking about what they could be doing differently and

9  realized that those got missed.  And, you know, with all the

10  auditing that we do and all the rechecking we do it was one of    02:46PM

11  those things that slipped my mind.  So I went back and looked

12  into the records and those two had provider contacts.

13      THE COURT:  Okay.  Thank you.

14      MR. FATHI:  One more question.  How many files were

15  reviewed?                                                          02:46PM

16      DR. TAYLOR:  All of the available files were reviewed,

17  so I believe there were 11.

18      THE COURT:  Thank you.

19      MR. FATHI:  Your Honor, I don't believe any fraction

20  of 11 will yield a percentage of 73.  But we'll recheck and if    02:46PM

21  there's anything to bring to the Court, we will.

22      THE COURT:  Is the 11 yielding the 91 or is the 73?

23      MR. FATHI:  What I'm saying, Your Honor, is I don't

24  think any fraction of 11 yields a percentage of 73.

25      And I don't --                                                02:47PM

1          THE COURT:  It seems to me that my question was stupid

2    now that I caught up to what you are saying and understanding

3    it.  That seems to be right, Dr. Taylor.

4          DR. TAYLOR:  Actually 8 divided by 11 --

5          MR. PRATT:  8 of 11 is 73 percent; 10 of 11 is 91          02:47PM

6    percent.

7          DR. TAYLOR:  I was saying the records I reviewed, it

8    was 8 out of 11, so those two provider contacts, and therefore

9    10 out of 11.

10         THE COURT:  Got it.  Well, thank you, Mr. Pratt.  You     02:47PM

11   have come to the rescue again but I have to note for the record

12   it was not because you are Richard Feynman and can do all this

13   in your head.  You did have a calculator at hand.  My rough

14   effort in my head totally missed this.  And so did Mr. Fathi's.

15         MR. FATHI:  Your Honor, I don't think we got an answer    02:48PM

16   to the question of when this plan went into effect.  I would

17   note that the Court had ordered that this remedial plan be

18   produced by October 25th and it was not produced until this

19   morning.  So we're interested to know whether it went into

20   effect by October 25th as required by the Court's order.        02:48PM

21         THE COURT:  Mr. Bojanowski.

22         MR. BOJANOWSKI:  The plan went into effect November

23   6th.

24         THE COURT:  November 6th.

25         MR. BOJANOWSKI:  As I had indicated before.               02:48PM

148

1          THE COURT:  Okay.  Mr. Fathi, the next measure you

2     would like to address?

3          MR. FATHI:  Still on 91.

4          THE COURT:  Yes, sir.

5          MR. FATHI:  Page 204 at the end of Paragraph 5, there          02:48PM

6     are a number of abbreviations.  Could we have those explained?

7          MR. BOJANOWSKI:  I cannot.  I will have to supplement

8     the record.

9          THE COURT:  Bet Dr. Taylor could.  Do you think these

10    are in-house Corizon abbreviations?          02:49PM

11         DR. TAYLOR:  Yeah.  Vice-president of behavioral

12    health, associate regional mental health director, I'm not

13    sure, I'm not sure, and then the facility health administrator.

14    But those are Corizon titles.

15         THE COURT:  So we still don't know for sure BHDT and          02:49PM

16    PRD?

17         DR. TAYLOR:  I don't know what those are.

18         THE COURT:  Would you figure that out and just

19    tomorrow let Mr. Fathi know what BHDT and PRD mean and confirm

20    that the other ones are right.          02:49PM

21         MR. FATHI:  Finally, Your Honor, there's references

22    here to an RN seeing the patient.  We have no objection to the

23    RN seeing the patient, but we want to make sure everyone is on

24    the same page that contact line RN does not satisfy the

25    performance measure.          02:50PM

UNITED STATES DISTRICT COURT

149

1          DR. TAYLOR:  Correct.  We have not ever counted an RN

2    contact for that performance measure.

3          MR. FATHI:  So what is the purpose of having the RN

4    see the patient?

5          DR. TAYLOR:  They round in that area four times a day,      02:50PM

6    I believe, as just part of their requirements for the

7    Department of Health Services.

8          MR. FATHI:  Okay.  Well, since --

9          THE COURT:  This is to conduct the watch.  Will assign

10   a licensed MH clinician RN to conduct the watch.  That's what     02:50PM

11   you are talking about Paragraph 7?

12         MR. FATHI:  Your Honor, in Paragraph 2B and again in

13   Paragraph 7 there's reference to the person, the patient being

14   seen by an RN.  And because this is a remedial plan for a

15   performance measure that is not satisfied by the patient being    02:51PM

16   seen by an RN.  I'm just not sure why that is in there.

17         DR. TAYLOR:  That is correct.  That needs to be

18   removed, the RN piece and provider needs to be put in instead.

19         THE COURT:  So to make sure we're all on the same page

20   on 2B, where it says, "A RN will see the inmate face-to-face.     02:51PM

21   If warranted RN will contact on-call psychological for a watch

22   order," you are saying, Dr. Taylor, that what change needs to

23   be made?

24         DR. TAYLOR:  Honestly, Your Honor, I actually haven't

25   seen those.  Those came out this morning.                         02:51PM

1          THE COURT:  Mr. Bojanowski, would you put it in front

2     of Dr. Taylor so she can see 2B?

3          DR. TAYLOR:  We're going to have to go through each of

4     those lines to make sure they have the right terms in there.

5     Because there is situations where they are not on a watch yet        02:52PM

6     and an RN would need to see them.  So that initial part may

7     still need to happen but I'm going to have to review the plan

8     and talk with them about changes that they make so that it's

9     completely accurate.

10          MR. BOJANOWSKI:  How about if we modify the plan and        02:52PM

11     get it to the plaintiffs and the Court within easily a week.

12          MR. FATHI:  Your Honor, I just want to raise this

13     global concern.  When this document is produced to us the

14     morning of the hearing without the relevant people having had a

15     chance to review, it's not terribly useful.  So it would be        02:52PM

16     helpful if this could be produced a little bit more in advance

17     than the morning of the hearing.

18          MR. BOJANOWSKI:  We strive to do that.  It's just that

19     we were on a compressed time frame for this particular hearing

20     because of the finalization of the preliminary numbers, getting        02:52PM

21     that out to Corizon, getting it investigated, getting a plan

22     put together, getting this document put together.  I would love

23     to get this to the plaintiffs well in advance and I'd love to

24     have a very specific review.  It's just this particular month

25     because this hearing is happening today, it was just        02:53PM

───── November 7, 2017 - CV 12-601 - Status Hearing ─────

 1   compressed.  And I apologize to the Court that sometimes

 2   mistakes arise when we work in that compressed time frame.  It

 3   just happened to be when it happened.  And so we'll get it

 4   corrected and get it off to the plaintiff so it's clear what

 5   the plan is.                                                    02:53PM

 6          THE COURT:  Okay.  Good.

 7          We're done with 91?

 8          MR. FATHI:  We are, Your Honor.

 9          THE COURT:  Let's take a 10-minute break.  Thank you.

10          (Recess from 2:53 p.m. until 3:09 p.m.)                  02:53PM

11          THE COURT:  Important question, we have a simple

12   answer, I think.  Mr. Pratt, when you were talking about the

13   Performance Measure 46 and the new drop-down menu that would

14   require that the action be noted, is that something that's

15   already in place or is it about to be in place?  Do you know    03:09PM

16   when it's going to -- what the date is for that?

17          MR. PRATT:  I don't know the date, Your Honor.  I'm

18   advised if it hasn't happened yet -- I think it has happened.

19   I'm not sure.

20          THE COURT:  Could you check and let us know?  I mean,    03:10PM

21   if you can find out easily by sending off an e-mail let us know

22   tomorrow.

23          MR. PRATT:  Absolutely.

24          THE COURT:  Thank you.

25          Next performance measure.                                03:10PM

─────── **November 7, 2017 - CV 12-601 - Status Hearing** ───────

1          MR. BOJANOWSKI:  Before we move on, Mr. Fathi had

2     asked the definitions of those.

3          THE COURT:  Oh, you found them.

4          MR. BOJANOWSKI:  I did.

5          THE COURT:  Please.                                    03:10PM

6          MR. BOJANOWSKI:  I thought I would report those now

7     instead of tomorrow.

8          THE COURT:  Of course.

9          MR. BOJANOWSKI:  Are you there?

10          MR. FATHI:  I am.                                      03:10PM

11          MR. BOJANOWSKI:  BHDT is behavioral health data

12     technician.  And PRD is psychiatric regional director.

13          THE COURT:  Thank you.

14          MR. FATHI:  Thank you.

15          THE COURT:  Mr. Fathi.                                 03:11PM

16          MR. FATHI:  Ms. Eidenbach has something.

17          THE COURT:  Thank you.

18          MS. EIDENBACH:  Your Honor, before we go on, I would

19     like to bring a matter to the Court's attention regarding

20     tomorrow's evidentiary hearing.  During the last session we   03:11PM

21     just received an additional production from the defendants of

22     documents that are responsive to our RFP regarding retaliation

23     last November in Tucson.  We have already completed and

24     de-duped the exhibit list.  Yesterday we received their

25     exhibits that contain two documents that had not been produced   03:11PM

1    to us before, Exhibit 46 and Exhibit 47.  While we're willing

2    to let these particular exhibits come in, we did want to bring

3    it to the Court's attention because last Monday, October 30th,

4    I e-mailed Mr. Struck because the majority of the production

5    that we received was strangely nonresponsive to the retaliation          03:12PM

6    situation.  In fact, most of the documents actually were dated

7    between June 2017 and September 2017.  And so I asked whether

8    his clients represented that the production was, in fact,

9    complete as produced on October 25th, 2017, and he told me that

10   it indeed was.                                                           03:12PM

11        So we have now received six additional documents.  The

12   two that we received today are perhaps the most responsive

13   because they relate to disciplinary actions that were taken

14   against two of the prisoners who were housed in House 3 at

15   Rincon Unit at the time that the retaliatory behavior occurred.         03:12PM

16        And so those are really the two most responsive

17   documents in the entire production and we just received them

18   while we were sitting in court today for the hearing that's due

19   tomorrow.  So we would like there to be no further productions,

20   you know.  We can't keep reviewing documents throughout the             03:13PM

21   evening and updating our exhibit list.

22        THE COURT:  Well, I don't think you want to say that.

23   I mean.

24        MS. EIDENBACH:  Well --

25        THE COURT:  You would like to have the production, but             03:13PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    you would also like to be able to argue to the Court this can't

2    be acceptable and how you are prejudiced by it and what remedy

3    you would like the Court to consider.  Shutting off the

4    information is probably not the right approach.

5         MS. EIDENBACH:  Right.  I mean, if there's going to be    03:13PM

6    a continued production, perhaps we need to reschedule the

7    hearing because we would need time to review those documents to

8    see if we need to call additional witnesses and how they relate

9    to the rest of the production.

10        THE COURT:  Because of the number of hearings that we    03:13PM

11   have set with respect to requiring steps being taken in advance

12   of that hearing, I cannot recall whether I set a particular

13   deadline for production of exhibits that would be used at the

14   retaliation evidentiary hearing.  Did I?

15        MS. EIDENBACH:  You did, Your Honor.  It was October    03:14PM

16   25th, which is the day -- I reviewed the documents that

17   defendants had produced by that day, and my e-mail on October

18   30th to Mr. Struck specifically asked whether the production

19   that had been made as of October 25th was complete and he

20   confirmed for me that it was complete.    03:14PM

21        THE COURT:  Mr. Struck is not here.  Ms. Love.

22        MS. LOVE:  Your Honor, I can't speak to the details of

23   what the source was for the additional production today.  I'm

24   happy to go make a phone call and see if I can get an answer

25   for you.    03:14PM

UNITED STATES DISTRICT COURT

1      THE COURT:  Do you know if Mr. Struck plans to be in

2  attendance tomorrow?

3      MS. LOVE:  Yes, he will be conducting the hearing

4  tomorrow.

5      THE COURT:  We'll be able to bring up the issue then.      03:14PM

6  Do you know if there are any other documents in the pipeline?

7      MS. LOVE:  I'm not aware of any.

8      THE COURT:  Well, we will reserve this until tomorrow

9  when we have Mr. Struck present.

10      MS. EIDENBACH:  Thank you, Your Honor.      03:15PM

11      THE COURT:  Mr. Fathi.

12      MR. FATHI:  Performance Measure 93, Your Honor, Page

13  211.

14      THE COURT:  I'm there.

15      MR. FATHI:  So the first question is, is this plan in      03:15PM

16  effect, and if so, when did it go into effect?

17      MR. BOJANOWSKI:  It is.  November 6th.

18      MR. FATHI:  And then Paragraph 4 describes action

19  taken by a mental health tech in Paragraph 5, action taken by a

20  mental health aide.  What is the difference, first, between      03:15PM

21  those two job classifications, and secondly, between the two

22  apparently quite similar tasks carried out by them.

23      MR. BOJANOWSKI:  They are the same.  We can change 8

24  to tech if you so desire.

25      MR. FATHI:  Well, Your Honor, if they are the same I'm      03:16PM

156

1   not sure why there's two different terms and two different

2   paragraphs that are, while similar, not identical.  Paragraph 4

3   talks about the MH tech taking brief notes on the printed MH

4   segregation visit search report, and Paragraph 5 talks about

5   the MH aide documenting the cell by cell checks in eOMIS.  So          03:16PM

6   those are two different things.

7           MR. BOJANOWSKI:  The problem is that we use the term

8   MH tech.  Corizon uses the term MH aide.  So it probably got

9   dropped in there.  It should be MH tech so there's no confusion

10  and we can make that change.                                           03:17PM

11          THE COURT:  Because everywhere else --

12          MR. BOJANOWSKI:  It's tech.

13          THE COURT:  At Number 5, MH-5 should be tech.

14          MR. BOJANOWSKI:  Correct.

15          MR. FATHI:  Your Honor, again, we would really like it         03:17PM

16  if this document could be accurate.

17          THE COURT:  No.  Totally understand that point,

18  obviously every time we identify issues like this it rings that

19  bell, beats that drum.

20          Go ahead, sir.                                                 03:17PM

21          MR. FATHI:  And then in Paragraph 6 it refers to an MH

22  lead.  What is an MH lead?  Is there one such person per

23  complex?  What are the requirement -- the minimum

24  qualifications for that position?

25          MR. BOJANOWSKI:  It's the mental health lead, and             03:17PM

November 7, 2017 - CV 12-601 - Status Hearing

```
1    there's one per complex.
2           MR. FATHI:  We have been told the mental health lead
3    is the mental health lead.  That's not terribly helpful.
4           MR. BOJANOWSKI:  Would you prefer "clinician" in there
5    Mr. Fathi?                                              03:18PM
6           THE COURT:  Dr. Taylor, what kind of person is this,
7    Dr. Taylor?
8           DR. TAYLOR:  The mental health lead is a mental health
9    clinician that's been assigned to oversee the site.  There's
10   one per complex, and they are a master's level clinician or a  03:18PM
11   psychologist.
12          THE COURT:  Thank you.
13          MR. FATHI:  So the mental health lead is always at
14   least -- always a mental health clinician?
15          DR. TAYLOR:  Correct.                            03:18PM
16          MR. FATHI:  Thank you.
17          THE COURT:  Before we go on, Ms. Fettig you said you
18   had done something with the records you received.  You said
19   they had already been something.  I didn't understand that
20   word.                                                   03:18PM
21          MS. EIDENBACH:  Are you talking to me?
22          THE COURT:  No, I am talking to you.  Yeah.  I said
23   Fettig.
24          MS. EIDENBACH:  That's okay.  I just wanted to make
25   sure I was reading your mind properly.                  03:19PM
```

UNITED STATES DISTRICT COURT

158

```
1          THE COURT:  I'm sorry about that.  I apologize.  I
2     realized as you stared at me why you were staring at me.
3          This word that you used is one that I didn't
4     recognize.  I noticed the court reporter didn't recognize it
5     either.
6          MS. EIDENBACH:  Okay.
7          THE COURT:  You said that you did something with the
8     records that you had received from the defendants preparatory
9     for tomorrow's hearing.  I didn't understand that word.
10         MS. EIDENBACH:  I apologize.  We de-duplicated our
11    exhibits.
12         THE COURT:  I think you said de-duped.
13         MS. EIDENBACH:  Apologize, yes, so we're not
14    submitting the same exhibits.  Each document is one exhibit.
15         THE COURT:  Thank you and I'm sorry for the lag on
16    both of those things.
17         Go ahead.
18         MR. FATHI:  Performance Measure 94.
19         THE COURT:  Thank you.
20         MR. FATHI:  Is this in effect, and if so, as of what
21    date?
22         MR. BOJANOWSKI:  As I indicated before, all of them in
23    this book are in effect as of November 6th.
24         MR. FATHI:  Okay.  Your Honor, a global comment about
25    Performance Measures 94, 95, and 97, as we have already pointed
```

03:19PM

03:19PM

03:19PM

03:19PM

03:19PM

03:20PM

UNITED STATES DISTRICT COURT

1   out, we found in the July CGARs the defendants are not

2   complying with the Court's July 13th order, Document 2185 at 2,

3   that they have to draw files of different individuals for each

4   of these performance measures and they can't use the same

5   individual files more than once.  We have since found that even          03:20PM

6   in the August CGARs they are still not complying with the

7   Court's orders.  So all of these findings for 94, 95, and 97

8   have, in fact, not been calculated in compliance with the

9   Court's order.

10            THE COURT:  So the August errors that you                     03:20PM

11   identified --

12            MR. FATHI:  I beg your pardon?

13            THE COURT:  The August errors that you identified?

14            MR. FATHI:  Both July and August.

15            THE COURT:  Both July and August.                             03:21PM

16            MR. FATHI:  And again, we have not received the

17   September CGARs.  We just don't know about them.

18            THE COURT:  When will you get the September CGARs?

19            MR. FATHI:  We historically have gotten them the

20   middle of the month, so that would be the middle of this month.        03:21PM

21   In recent months we're getting them later and later more toward

22   the end of the month.

23            THE COURT:  Let me know if the latest CGARs show the

24   same error.

25            MR. FATHI:  We will, Your Honor.                              03:21PM

November 7, 2017 - CV 12-601 - Status Hearing

1          THE COURT:  Thank you.

2          MR. BOJANOWSKI:  Dr. Taylor may be able to provide

3     some information on this.

4          THE COURT:  Go ahead.

5          DR. TAYLOR:  Your Honor, we had already conducted a          03:21PM

6     number of the audits by the time we received the July order.

7     And so those ones we unfortunately did not go back and relook

8     at to make sure there were not any duplicates in there.  One of

9     the duplicates was actually that under telepsych for 97, that

10    the individual was at one unit and then later moved to another          03:21PM

11    unit and was seen on a subsequent date.  And in our minds, that

12    wasn't something that fell under your order, but we removed

13    that individual and added another person because the

14    performance measure says 10 files per unit.  And so it was 10

15    files per unit for the 97, but we did remove that to do what          03:22PM

16    the plaintiffs had asked.

17          We have instituted a process that we have a formula

18    that checks the dates against themselves, because with human

19    error and the couple of errors, the four or five errors that

20    were found out of the 1,500 files that were reviewed, human          03:22PM

21    error, and so we have created a formula that will check those

22    dates against each other.

23          But just to add, the plaintiff suggested that those

24    were all in our favor, and actually one of the duplicates for,

25    I believe it was watch follow-ups, ended up it was a negative          03:22PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1   finding that was a duplicate.  We removed the negative finding

2   per their request, re-audited an additional person, and the

3   performance score went up.  So they aren't always in our favor.

4   Oftentimes they are not.

5            So I would be interested to see what August ones they          03:23PM

6   found, because we were working really hard to make sure we took

7   the human error element out to the best of our ability.

8            THE COURT:  Have the August findings been the product

9   of a letter or not?

10           MR. FATHI:  I'm sorry.                                          03:23PM

11           THE COURT:  Did you send a letter about the August

12   issue?

13           MR. FATHI:  Not yet, Your Honor.  It is in process.

14   But unfortunately, what Dr. Taylor says isn't true.  The

15   Court's order was July 13th.  The July CGARs were prepared at         03:23PM

16   the end of August.  The August CGARs were prepared at the end

17   of September.  So there's absolutely no excuse for the

18   noncompliance with the Court's order.  And we will certainly

19   notify the Court if the September CGARs show continued

20   noncompliance.                                                         03:24PM

21           THE COURT:  Okay.  Thank you.

22           MR. FATHI:  In Paragraph 3, there's a term mental

23   health lead, which we have just discussed, mental health lead

24   slash designee.  And that term recurs in Paragraph 4, Paragraph

25   5.  What does that mean?                                               03:24PM

UNITED STATES DISTRICT COURT

1          DR. TAYLOR:  So that's a situation where the mental

2     health lead might take a vacation, and then when they are gone

3     on vacation, while they are gone they designate another

4     clinician as the point of contact for that period of time where

5     they might have taken a day or two off.                        03:24PM

6          MR. FATHI:  So the designee would always be a mental

7     health clinician?

8          DR. TAYLOR:  That is correct.

9          MR. FATHI:  And there's no provision for a designee in

10    the plan for Performance 93, so does that mean it would not     03:24PM

11    occur with respect to Performance Measure 93?

12         DR. TAYLOR:  I'm sure that would occur for any

13    performance measure where somebody takes vacation or a sick day

14    and so, therefore, somebody else is placed into that position

15    to be the point of contact for that time.                      03:25PM

16         MR. FATHI:  Well, Your Honor, we, much like when

17    interpreting language in a contract, we assume that when

18    different terms are used a different meaning is intended.  So

19    what I'm trying to get to here is why, in Performance 93,

20    Measure 93, it's just mental health lead and in Performance     03:25PM

21    Measure 94 it's mental health lead slash designee.

22         THE COURT:  Take another look at this, Mr. Bojanowski,

23    to see whether or not this is highlighting an issue that since

24    somebody thought that it was important enough to be mentioned

25    in 94 should also be mentioned in 93, or whether there's some   03:25PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1    reason the two should be treated differently.

2           MR. BOJANOWSKI:  I will look at it and consistent with

3    Mr. Fathi's suggestion, we may add the designee status to 93 as

4    well.

5           THE COURT:  Okay.  Thank you.                          03:25PM

6           MR. FATHI:  And finally, Your Honor, in Paragraph 7,

7    it refers to an RN conducting the watch.  Again, I just want to

8    make sure that we all understand that that would be compliant

9    only on a weekend or holiday.  During the week contact by an RN

10   does not satisfy the performance measure.                     03:26PM

11          MR. BOJANOWSKI:  Right.  But the measure does include

12   weekends or holidays so I think that's the reference.

13          MR. FATHI:  Okay.

14          THE COURT:  All right.

15          MR. FATHI:  Nothing further, Your Honor.               03:26PM

16          THE COURT:  Okay.

17          MR. FATHI:  Oh, I beg your pardon.  On Performance

18   Measure 95, again, as we have set forth for the Court, we have

19   a dispute about the methodology that we recently learned the

20   defendants have been including in the sample for one facility  03:26PM

21   people who were removed from watch at a different facility.

22   So, for example, we found in the sample for Tucson for July of

23   2017 people who had been removed from watch at the Phoenix

24   facility.  So again, we will need the Court to resolve that

25   issue.                                                         03:27PM

1      THE COURT:  And it sounds as though the State has a

2  different position with respect to this performance measure for

3  transfer of inmates under a performance obligation than Dr.

4  Taylor said a minute ago, and that is that they addressed your

5  concern.  Sounds like it is still an issue.                    03:27PM

6      MR. FATHI:  It is an issue.  What they want is to have

7  it both ways.  So they include in the Tucson sample the person

8  who was taken off watch in Phoenix, but they don't verify that

9  the follow-up contacts that were due while they were still at

10  Phoenix occurred.  So our position is the record is either in    03:27PM

11  the sample or it's not in the sample.  You can't say it's in

12  the sample but we're not going to count the two, two out of the

13  three required contacts.

14      DR. TAYLOR:  So those individuals are actually also on

15  the Phoenix log, and they are in the random pull for could be    03:27PM

16  pulled for audit.  And those contacts would be audited at

17  Phoenix because as he very aptly pointed out in his letter, the

18  concern is whether the action is happening at the site that you

19  are reviewing.  And so we need to know is Tucson doing what

20  they need to do, and for Phoenix, we need to know are they      03:28PM

21  doing what they need to do.  And so they are on both logs for

22  potential review.

23      But to review a Tucson inmate for those contacts that

24  were done at Phoenix doesn't make sense.  As we have shown

25  them, they are on both logs and they are available for review.   03:28PM

UNITED STATES DISTRICT COURT

1    And we want to ensure that Tucson is not missing somebody who

2    transfers halfway through that three-week period and they end

3    up out on a yard without a contact.  I find that to be a very

4    important piece of this audit, because for me, that transfer is

5    a point of possible destabilization.  It's very important that          03:28PM

6    we are verifying that those watch contacts happen.  Absolutely.

7    And so that's why they have been included from day one.  They

8    have been part of the sample from day one.  And we have had

9    them on both complexes for being reviewed from day one to

10   ensure that those contacts happen no matter where they are at.          03:29PM

11           MR. FATHI:  Your Honor.

12           THE COURT:  Go ahead.

13           MR. FATHI:  Your Honor, the sample for Tucson should

14   consist of people who were removed from watch at Tucson.  The

15   way that we have dealt with this in every other performance              03:29PM

16   measure, if you draw -- if you randomly draw a record that

17   doesn't tell you what you need to know, you simply exclude that

18   record from the sample and you randomly draw another record

19   until the sample size is reached.  The defendants -- we have

20   suggested this.  The defendants have provided no reason why             03:29PM

21   that shouldn't be done with this performance measure just like

22   with every other.  But you can't simultaneously say we're going

23   to count this record in the sample but we're not going to look

24   at whether those first two contacts took place.  That just

25   doesn't make sense.  And again, there's no explanation why              03:30PM

1    those records can't just be excluded and another record

2    randomly drawn.

3          THE COURT:  Well, Dr. Taylor's point is a good one

4    with respect to inmate care, that you do want to make sure that

5    there's continuity when somebody is transferred from one          03:30PM

6    facility to another.

7          What you are objecting to is that if somebody's name

8    is drawn from Phoenix who has been transferred to Tucson, you

9    don't like the idea that they are looking to see whether or not

10   that person who has left Phoenix is still being counted on        03:30PM

11   whether Phoenix is doing the job or not.  Is that right?

12         MR. FATHI:  It's the reverse, Your Honor.  And as a

13   matter of patient care, obviously we completely agree nothing

14   we're seeing prevents them from providing that.

15         THE COURT:  I understand.                                    03:31PM

16         MR. FATHI:  About the sampling methodology.

17         THE COURT:  Help me fix my problem here.

18         MR. FATHI:  So our position is the sample for Tucson

19   should consist of people who were removed from watch at Tucson.

20   And if you are drawing a sample for Tucson, and you see, okay,    03:31PM

21   this person is at Tucson now but they were at Phoenix three

22   weeks ago and they were removed from watch at Phoenix, you just

23   exclude that record and draw another one so that you have got a

24   sample of people who were for Phoenix -- excuse me -- for

25   Tucson who were removed from watch at Tucson.                     03:31PM

**November 7, 2017 - CV 12-601 - Status Hearing**

1        THE COURT:  And the reason that you think this is

2    important is that if somebody is removed for watch in Tucson,

3    you want to know whether or not the Tucson people are on task

4    with respect to making sure that they meet this performance

5    measure.  If you allow Phoenix contacts to be counted that                03:31PM

6    doesn't answer the question about whether Tucson is doing it

7    right or not?

8        MR. FATHI:  Well, it's really a more fundamental

9    question, Your Honor.  Let me give a concrete example.

10        THE COURT:  Please.                                                  03:32PM

11        MR. FATHI:  Maybe that will help.  So you are drawing

12    the sample for Tucson and one of the records you draw is

13    someone who is now at Tucson but they were previously, let's

14    say they were transferred from Phoenix two weeks previously.

15    So they were taken off watch at Phoenix.  Their first required        03:32PM

16    contact between 22 and 72 hours should have happened at

17    Phoenix.  Their second required contact between seven and 10

18    days should have happened at Phoenix.

19        Our objection is that what the defendants are doing

20    now is they are not verifying that those contacts happened          03:32PM

21    because they are only looking at the contacts that were due at

22    Tucson, even though the person was taken off watch at Phoenix

23    and the first two contacts were due at Phoenix.  They just

24    don't look and see if those contacts occurred or not.  So the

25    simple solution is you just exclude that record and pick            03:33PM

UNITED STATES DISTRICT COURT

November 7, 2017 - CV 12-601 - Status Hearing

1    another one.

2          THE COURT:  Forgive me for going over it again.  But

3    what you just said sounded to me like the people who are

4    transferred to Tucson are evaluated in a way that if there was

5    a failure to comply with the performance measure in Phoenix we          03:33PM

6    would never know about it with respect to that inmate.

7          MR. FATHI:  Precisely, Your Honor.

8          DR. TAYLOR:  That's not actually true, because again,

9    they are on the Phoenix log for watch follow-ups and they are

10   in that same pool to be pulled for review for whether Phoenix          03:33PM

11   conducted the watch follow-ups as required.

12         So you would end up --

13         THE COURT:  We don't know whether or not.  The problem

14   is, let's use another analogy.  You are supposed to check four

15   things with this particular performance measure:  Did A, B, C,          03:33PM

16   and D happen.  And it sounds to me like your method, Dr.

17   Taylor, says we can satisfy this performance measure if we only

18   check C and D on this particular record, on this particular

19   inmate.  Is that a fair recitation?

20         MR. FATHI:  That's exactly right, Your Honor.  Just to          03:34PM

21   be clear, what Dr. Taylor is saying, Dr. Taylor is not saying

22   we're going to check this person's -- those first two contacts

23   when we audit Phoenix.  She's just saying they are in the pull

24   for Phoenix.  They have a chance of being randomly drawn for

25   Phoenix.  But unless that happens, A, B, C are not going to be          03:34PM

UNITED STATES DISTRICT COURT

**November 7, 2017 - CV 12-601 - Status Hearing**

1    checked for this person, and that's our objection.

2         THE COURT:  So my ruling would be if A, B, C and D,

3    the equivalent here, cannot be checked because somebody's been

4    transferred and that person would be pulled out of the sample

5    and an alternative person who was at the facility the entire          03:34PM

6    time, so A, B, C, D can be checked, can be evaluated for

7    compliance.

8         MR. FATHI:  Thank you, Your Honor.

9         DR. TAYLOR:  So removing those that have not been

10   removed from there is what you would like us to do?                   03:35PM

11        THE COURT:  Right.  You are only going to be looking

12   at people who have been there such that your evaluation can

13   determine whether or not all four of the requirements just

14   using that as an analogy were satisfied.  The problem with the

15   transferred inmates is that there is no check to see whether or       03:35PM

16   not A and B were done.

17        DR. TAYLOR:  And we can transition to that, but -- and

18   the concern, Your Honor, is the fact that we have been doing

19   this over two and-a-half years.  And this is the first time

20   this is brought up to the Court which then, in the plaintiffs'        03:35PM

21   mind, will say, well now that performance measure starts all

22   over again with auditing for the next two years for compliance

23   when we have been doing the same auditing the same way,

24   transparently, very clearly with them, no changes in any of

25   that, and it's just really challenging as a monitor to then be       03:35PM

UNITED STATES DISTRICT COURT

1    faced with okay, everything you have been doing I now have a

2    problem with it at two and-a-half years.  You need to change it

3    and start over again.

4           THE COURT:  Mr. Fathi, that response provided some

5    suggestion of facts that would cause -- or I should be                    03:36PM

6    considering any objection to any of the particular facts about

7    when you knew about this, et cetera.

8           MR. FATHI:  Your Honor, I am representing to you that

9    we did not know about this until we spot checked the July 2017

10   CGARs and found those examples of people who had been taken off          03:36PM

11   watch at Phoenix but were included in the Tucson sample.  There

12   has been nothing transparent about their monitoring.  There is

13   no hint in the performance measure in any of the successive

14   drafts of their monitor guide that they were including in the

15   sample for Institution A, people who had been taken off watch          03:36PM

16   at Institution B.  That's just not something that was ever made

17   known to us or that we ever could have known.

18          THE COURT:  Dr. Taylor, I don't want to put you in a

19   position where you have to be the person who feels like you are

20   obligated to respond to what may be legal arguments.  So I am          03:37PM

21   just saying to you I'm not expecting that of you but I

22   appreciate the information you have given.  I asked for a

23   counter view of sort of the facts.  The legal implications of

24   this is something that will be addressed when there is an

25   argument being made about whether or not the stipulation has          03:37PM

UNITED STATES DISTRICT COURT

November 7, 2017 - CV 12-601 - Status Hearing

1    been complied with.

2         I think the legal argument that you suggested which

3    you think is also in lay person's terms a fairness argument is

4    one that your lawyers will make.  So I don't think you need to

5    feel that you have to wage that right now.                03:37PM

6         But I just wanted to hear about whether or not Mr.

7    Fathi had known all along that this had been the way that had

8    been done and he has now told me he learned about it first in

9    July because of a spot check.

10        DR. TAYLOR:  And, Your Honor, that would be surprising   03:38PM

11   because we have had conversations about inmates being on both

12   logs at both facilities from day one.  And I had to prove to

13   him over and over again that those individuals were on both

14   logs because he was very frustrated if they would only be on

15   one log.  And so we showed him log after log where they were at   03:38PM

16   one facility and on that log for random pull and on the next

17   facility that they transferred to and on that log for the

18   random pull.  We have had multiple discussions about that to

19   ensure that they were being tracked through for all of that.

20   And so we have had that discussion.  So to say this is the    03:38PM

21   first time he's heard it, that's just not true.  We have had

22   multiple discussions about the logs.

23        MR. FATHI:  I'm afraid Dr. Taylor's memory is faulty.

24   But I think we should move on, Your Honor.

25        THE COURT:  Thank you.  Did you want to hear about 96    03:38PM

UNITED STATES DISTRICT COURT

———November 7, 2017 - CV 12-601 - Status Hearing———

1    at Tucson?

2              MR. FATHI:  Yes, please, Your Honor.

3              MR. BOJANOWSKI:  It's at 95 percent.

4              THE COURT:  Thank you.  And while you have got that in

5    front of you, how about Perryville for 98?                    03:39PM

6              MR. BOJANOWSKI:  98 percent.

7              THE COURT:  Thank you.  Mr. Fathi, were there other

8    performance measures that you wanted to address?

9              MR. FATHI:  No, Your Honor.  Thank you.

10             THE COURT:  All right.  Thank you.  I think the next    03:39PM

11   agenda item is Item 8, which is the mental health provider at

12   ASPC Tucson Santa Rita to provide medical care to class

13   members, an issue raised in the Kendrick declaration.  I'm

14   hoping there's an easy answer that this is somebody who decided

15   to get an additional shingle for their sign and it doesn't mean  03:40PM

16   that their mental health provider knowledge erased any previous

17   knowledge.  But it's a reasonable question to ask.

18             MR. BOJANOWSKI:  That's exactly what happened.  So he

19   was a medical nurse practitioner transitioned into mental

20   health.  I understand that there may have been some              03:40PM

21   documentation issues with his title in the eOMIS system.  I

22   also understand that that has been fixed as far as this

23   particular person is concerned.  And I think if there's still

24   some existing entries that may be medically related where it's

25   signed off as a mental health practitioner, it's my             03:41PM

1  understanding that he can do some kind of entry into eOMIS and

2  that auto fills into those boxes.  But that's my understanding

3  of what was going on here.

4       MS. KENDRICK:  I guess we had also asked to try to

5  figure out if Corizon was holding this person out as a

6  psychiatrist.

7       MR. BOJANOWSKI:  No.

8       MS. KENDRICK:  That's what his title said repeatedly,

9  whether they were counting him as a psychiatrist for the

10  purposes of the staffing reports at Tucson or where they were

11  counting him, because he's listed as a psychiatrist.  He's

12  providing medical care.  And he's not a mental health nurse

13  practitioner until apparently August when he finally got

14  certified for that.

15       MR. BOJANOWSKI:  All right.  So the title was -- that

16  was the mistake in eOMIS was his title.  But he was signing as

17  an NP.  So you look at his title said that, but then he's

18  signing off on the document as an NP.  That has been corrected.

19  He's not represented as a psychiatrist, not counted as a

20  psychiatrist because the roster that we received listed him as

21  a nurse practitioner.

22       MS. KENDRICK:  So I guess the roster you receive --

23  but I'm asking about the staffing reports.  That was our

24  question.

25       THE COURT:  It's a reasonable question, because we've

—————— November 7, 2017 - CV 12-601 - Status Hearing ——————

1  got somebody who is wearing two hats, and if they've got one

2  hat on that means they aren't serving in the other capacity so

3  they shouldn't be counted.

4           MR. BOJANOWSKI:  He's not counted in the staffing

5  report.                                                    03:42PM

6           THE COURT:  In which way?

7           MR. BOJANOWSKI:  Not as a psychiatrist.

8           THE COURT:  Okay.  Thank you.

9           Anything further about 8?

10          MS. KENDRICK:  Well, the other question was we also    03:43PM

11  noticed with one of the class members that is -- I believe

12  it's -- he was seen by the person whose title was the assistant

13  health services administrator on the nurse's line and it was

14  unclear because our understanding was these were admin

15  positions.                                                   03:43PM

16          THE COURT:  Could you restate the question, please?

17          MS. KENDRICK:  It's described in more specific detail

18  at Docket 2426-1, Page 58.  This was a gentleman who had a

19  detached retina for three months, and he submitted an HNR about

20  his eye and he was seen by somebody whose title was health      03:43PM

21  services administrator.  And so our question was that our

22  understanding was these HSAs, as they are known, are

23  administrative staff and why a health services administrator

24  was apparently running nurse's line on July 30th.

25          THE COURT:  And if this is the first -- this is not --  03:44PM

UNITED STATES DISTRICT COURT

1    I mean, that question is in the letter so it's not the first

2    that you have heard about this.

3              MS. KENDRICK:  Correct.

4              THE COURT:  Mr. Bojanowski.

5              MR. BOJANOWSKI:  We'll have to confirm whether the HSA    03:45PM

6    is an RN, Your Honor.  And again, I don't know specifically on

7    this particular provision what occurred here.  I might have a

8    redacted -- Mr. Pratt can add.

9              THE COURT:  Yes, sir.

10             MR. PRATT:  Your Honor, it's very possible, I don't    03:45PM

11   know the specifics on this, but I can look into it.  It's very

12   possible that the HSA is an RN, and it's not abnormal for an

13   HSA to fill in if there's an RN who is absent, to go in and do

14   a line and take care of business.  So I can verify on that.

15   That's my understanding.                                    03:46PM

16             THE COURT:  That's helpful.  Thank you.

17             So we'll hear, after Mr. Pratt has a chance to

18   investigate this, whether or not the person who signed off was

19   a person who is qualified to do it.  I think that these kinds

20   of little details that are suggested in the records are    03:46PM

21   appropriate.  It's really a way to make sure that there is a

22   careful attention from everybody's perspective to whether the

23   records are right.  And sometimes those of us who are at least

24   familiar with them are left to question things that look

25   anomalus to us, and this looks anomalus.  So if there's an    03:46PM

1    explanation, that's great.  We don't need to devote more time

2    to it.  I don't want to turn off this inquiry that may lead to

3    dead ends when there is a reasonable good faith basis to think

4    it is anomalus deserving of an explanation.

5            Is there anything else in 9 the plaintiffs wanted to          03:47PM

6    raise?

7            MS. KENDRICK:  Yes.  The last portion of it, Exhibit

8    7, again, this is another thing.  We're not looking for this

9    stuff, but when we're trying to decide whether we need to do

10   individual advocacy for somebody and we're reviewing their          03:47PM

11   medical records and we see disturbing things such as somebody

12   listed as a psychiatrist reviewing an EKG report, that raises a

13   lot of alarm bells.

14           And with this person it was about one of the

15   telemedicine providers and the individual -- our question was        03:47PM

16   simply the fact that, again, the eOMIS note referred to this

17   medical Dr., Dr. Awaal, A-W-A-A-L, who was seeing somebody for

18   chronic care and plaintiffs had clearly expressed our concern

19   at the August hearing about the fact that it was unclear

20   whether the people providing primary telemedicine care were         03:48PM

21   licensed by the State of Arizona to practice medicine.  Because

22   the exceptions that are within the Arizona Revised Statutes for

23   people who are not licensed are very narrow and involves

24   basically you can only do it for very discrete purposes like

25   people in the military or medical doctors that are with the         03:48PM

1    football team that's in town.

2             So we have checked the medical board licensing

3    website, and we could not find anybody who is an M.D. or a D.O.

4    by that name.  So that was our question again as of October

5    20th, was if this person, if they're licensed as a doctor in          03:48PM

6    Arizona.  Because we could not find any determination that he

7    or she was.  I'm not sure of the person's gender.

8             THE COURT:  All right.

9             MR. BOJANOWSKI:  Your Honor, we had done the

10   investigation on this particular individual that they                 03:49PM

11   identified, and he is licensed in Arizona as a nurse

12   practitioner.

13            THE COURT:  Thank you.

14            MR. BOJANOWSKI:  They apparently looked in the medical

15   board, and I don't know what they were looking at.  But we            03:49PM

16   confirmed that the individual performing those services was, in

17   fact, licensed.

18            THE COURT:  As I recall from the letter there was an

19   annotation that he was a medical doctor and that was why they

20   looked for an M.D. licensure.                                         03:49PM

21            MS. KENDRICK:  That is correct, Your Honor.  It stated

22   that he was a medical doctor.  If you look there is a printout

23   from the record, it's at Page 65 of the Docket 2146-1, and it

24   lists his name, staff member, and says title medical doctor.

25   So that's why we looked at the medical board's website.  That's      03:50PM

— November 7, 2017 - CV 12-601 - Status Hearing—

1   where you find medical doctors.

2           THE COURT:  Reasonable steps.

3           Okay.  Agenda Item 10.

4           MR. FATHI:  Your Honor, this is my letter of October

5   19th.  It's at Document 2426-1, Page 78.  And we asked for          03:50PM

6   various documents relating to a number of recent suicides that

7   have taken place in the Arizona Department of Corrections.  We

8   had not received any response until yesterday afternoon.  Then

9   we received a letter from the defendants saying that they have

10  produced the psychological autopsy for the second two people      03:51PM

11  listed here.  Unfortunately, that is not true.  Both my office

12  and the Prison Law Office have searched both by name and by the

13  docket number that the defendants provided and simply no such

14  document has been produced.

15          So we would ask that the Court order production of         03:51PM

16  these documents.

17          MR. BOJANOWSKI:  You are talking about the psych

18  autopsies?

19          MR. FATHI:  Yes.  My letter of October 19, 2017.  We

20  received a letter saying that two psych autopsies had been        03:51PM

21  produced, and that is not correct.

22          THE COURT:  All right.  That's simple enough.  Just

23  get those autopsies tonight when you go back to the office and

24  bring them in tomorrow.

25          MR. BOJANOWSKI:  Can I have a moment, Your Honor?          03:51PM

— November 7, 2017 - CV 12-601 - Status Hearing —

1      THE COURT:  Sure.

2      MR. BOJANOWSKI:  I guess Ms. Love has the information.

3      MS. LOVE:  I'm relaying information, but the

4  information that we have is during the transition with Ms. Rand

5  handling document production to our office we were informed by        03:52PM

6  Ms. Rand that she had, in fact, produced those documents and

7  cited Bates numbers.  If plaintiffs say they never received

8  them, obviously they are in the AG's database and we will

9  reproduce.

10     THE COURT:  Okay.  Thank you.                                     03:52PM

11     MR. FATHI:  And then the second half of this item is

12  my letter of October 23rd, Document 2426-1, at Page 81.  This

13  involves someone who died by suicide by hanging at the Tucson

14  Cimarron Unit earlier this year.  And in the psychological

15  autopsy which we did receive for this person, it said that the      03:52PM

16  resuscitation efforts after he was found showed that partial

17  rigor mortis had set in.  It also said that custody staff

18  reported checking on this person 31 minutes before he was found

19  dead and found him alive and normal and healthy.

20         We have consulted our medical expert, and that is a          03:53PM

21  medical impossibility.  Rigor mortis does not set in within 30

22  minutes of death.  And what this means is that the statements

23  by the custody officers that they had seen him alive and

24  healthy 31 minutes previously are false.  And this would not be

25  the first time, as we noted in the letter, that custody            03:53PM

1   officers have lied about checking on someone who subsequently

2   died by suicide.

3          So we simply asked in this letter to which we have not

4   yet received any response that defendants produce all documents

5   reflecting any investigation that was undertaken into these          03:54PM

6   false statements and any staff discipline that resulted or that

7   they confirm that no such investigation has occurred.

8          MR. BOJANOWSKI:  Your Honor, initially, the allegation

9   that there's some falsification going on here is totally

10  unfounded.  Further, in light of this letter, I asked our          03:54PM

11  medical expert whether rigor mortis can set in in the neck area

12  within 30 minutes, and he said absolutely.

13         So he said in addition to that, given the nature of

14  the injury by hanging and the finding that there were broken

15  bones in the neck, it would not surprise him that there would          03:54PM

16  be some difficulty in trying to intubate a particular patient

17  at that time.

18         So I am more than happy to provide medical evidence to

19  the Court with regard to what is clearly the plaintiffs' jail

20  expert going out on a limb here.  I even checked it in the          03:55PM

21  Medical Legal Investigation of Death text to see if rigor

22  mortis can set in within 30 minutes and even the Bible for

23  pathologists indicates that it can.

24         So I don't know, you know, about Mr. Wilcox's opinion,

25  but it clearly is not impossible.  And I have got the medical          03:55PM

1    testimony of our expert saying, oh, yes, it can happen.  And

2    given the physical nature of the injury it's not surprising

3    that somebody would have difficulty handling this patient.

4           As for the allegation that officers are lying, it's

5    unfounded and certainly not appreciated.  If he's got some kind                03:55PM

6    of evidence that somebody lied here, then pony it up to me.

7    I'd love to have a look at it because it didn't occur.

8           THE COURT:  Okay.

9           MS. LOVE:  Your Honor, if we could add to this as

10   well, this is an example of what defendants see as we are                      03:55PM

11   complying with the stipulation regarding production of

12   documents.  Allegations of officer misconduct are not

13   performance measures that are measured here.  So we're getting

14   into, while obviously it is always a concern if someone dies in

15   custody, we are getting off onto a road of plaintiffs                          03:56PM

16   interjecting into this lawsuit which we're looking at

17   compliance with performance measures of investigating and

18   litigating isolated incidents of things that they don't agree

19   with when they read the record.

20          So we have objections to continuing to provide                          03:56PM

21   document requests on individual isolated incidents of medical

22   care that they don't disagree with when we're not dealing with

23   what we're here to deal with, which is the stipulation and

24   compliance with performance measures versus now within this

25   lawsuit, on a systemwide delivery of care, plaintiffs are now                  03:56PM

1    litigating wrongs full death claims within here and that is not

2    appropriate.

3           THE COURT:  I think what the plaintiffs have asked

4    for, and they have already received with respect to this

5    inmate, are the medical records, the autopsy report and that      03:57PM

6    they are entitled to receive that.  What they have asked for in

7    addition is they wanted to know based upon their conclusion

8    that it appeared that this could not be physically possible.

9    They wanted to know whether or not any investigation had been

10   undertaken with respect to finding out whether the truth had      03:57PM

11   been told.

12          Mr. Bojanowski has satisfied himself that at least if

13   he were in charge he wouldn't undertake an investigation

14   because he believes that the supposition that rigor mortis is

15   inconsistent with this 31-minute examination, that -- so that's   03:57PM

16   the first question Mr. Fathi asked.  The second question Mr.

17   Fathi asked was whether any disciplinary action had been taken.

18   That answer, it sounds like, is no because you didn't think

19   there was any basis for it.

20          MR. BOJANOWSKI:  Correct.                                  03:58PM

21          THE COURT:  And third, Mr. Fathi asked if no

22   disciplinary action had been taken, why not.  Again, that

23   action has been provided here because you didn't think it was

24   warranted.  So I don't think, Ms. Love, we're getting into

25   areas that are turning this case into individual wrongful death   03:58PM

November 7, 2017 - CV 12-601 - Status Hearing

 1    cases.  What we're doing is encouraging the plaintiffs to ask

 2    questions where a reasonable person could ask this question.  I

 3    know when I have dealt with dead animals and dead people that I

 4    have encountered in my life I never saw rigor mortis within 30

 5    minutes but you now tell me that's possible.  So it's a        03:58PM

 6    reasonable thing for somebody to wonder about, to ask a

 7    question about in a context where there are these biases and

 8    incentives that are contrary to truth telling.  I have heard

 9    and seen had some of it in the witness box here.

10         So to ask these questions based upon that I have now,     03:58PM

11    I think, talked a bit about it to let you know that I don't

12    think asking the questions are inappropriate.  I think the

13    answers that you just gave in court here, Mr. Bojanowski, are

14    answers that can be -- could have been tendered in a written

15    response that would be a reasonable thing to happen in a case  03:59PM

16    like this that is looking at performance measures compliance

17    that require data and verified and truthful reporting.

18         So that's what I have to say about that one.  Next.

19         MR. FATHI:  Thank you, Your Honor.  May we just have a

20    clear -- I believe Mr. Bojanowski implied this -- but a clear  03:59PM

21    statement that there is no investigation of possible wrongdoing

22    by these officers?

23         THE COURT:  Do you know, Mr. Bojanowski?

24         MR. BOJANOWSKI:  Not that I'm aware of, Your Honor.

25    The investigation was complete and whatever records that were  03:59PM

UNITED STATES DISTRICT COURT

**November 7, 2017 - CV 12-601 - Status Hearing**

1   supposed to be submitted to the plaintiffs per the stipulation

2   have been submitted.

3          THE COURT:  Could you check with the ADC and see

4   whether or not there was an investigation of the recording of

5   this person whether they had been seen within 30 minutes of his      04:00PM

6   death occurring so we can close that out.

7          MR. FATHI:  Your Honor, we have received no such

8   documents so if they exist, we would like to receive them.

9          THE COURT:  You would like to see the documents.  But

10  Mr. Bojanowski is going to answer the first question, has there      04:00PM

11  been or is there an investigation based upon any concern about

12  the credibility of this report that he was documented alive 31

13  minutes in advance.

14         MR. FATHI:  Thank you, Your Honor.  I would simply add

15  that the psychological autopsy itself notes the finding of          04:00PM

16  rigor mortis and then states, quote, "These findings bring into

17  question the belief that he had been observed alive and healthy

18  by correctional staff 31 minutes prior to being discovered,"

19  end of quote.

20         The second issue with respect to this suicide is the          04:00PM

21  notes written by two different nurses who responded to the ICS

22  when the patient was found hanging.  And we attached the notes

23  and the notes are absolutely identical, verbatim down to the

24  same typographical and grammatical errors.  So it's apparent

25  that either one cut and pasted the other's note or both of them     04:01PM

185

1    cut and pasted from some other source.

2          So our first question is, is this conduct that is

3    considered acceptable in the Arizona Department of Corrections

4    by medical staff?

5          MR. BOJANOWSKI:  Unfortunately for Mr. Fathi, the          04:01PM

6    notes are not exactly the same.  The objective portion of the

7    note is the same, but the subjective portions and the other

8    portions are not.  We suspect, and I have not yet confirmed,

9    that the second entry, which was much later, they utilized the

10   same objective portion of the note.  It's my understanding that   04:01PM

11   that is done in medical documenting.  And then their own

12   individual subjective analysis is in there and those are

13   different.  And I can include that in my letter response to Mr.

14   Fathi.

15         THE COURT:  Thank you.                                       04:02PM

16         MR. FATHI:  Your Honor, I would simply note that

17   contrary to what Mr. Bojanowski just said, the subjective

18   portions are also identical.  They both read "ICS response."

19   So I think the answer to my question is that it is considered

20   acceptable for nurses to cut and paste each other's notes.  Is   04:02PM

21   that correct?

22         THE COURT:  Well, that's in some ways an unfair

23   question for counsel, because it's something that I think would

24   be a question of, perhaps, an expert witness could opine

25   whether that's acceptable procedure in the medical world.  I     04:02PM

UNITED STATES DISTRICT COURT

1    don't -- if there's some regulation that says or doesn't say

2    this, I suppose that that's something that Mr. Bojanowski would

3    have a handle on.  But I don't know.  I think that if you want

4    to suggest that there was something wrong about what was done

5    with respect to the reporting by the nurses in this incident          04:03PM

6    that would undercut the Court's reason to trust the validity of

7    other reporting, and I have engaged in some of that.  I have

8    asked questions of witnesses, of ADOC employees, specifically

9    designed to see whether there are issues that are present that

10   could implicate the true reporting mechanism in documents and         04:03PM

11   testimony that's come forward.  And I have uncovered that there

12   are such kinds of things, and this is not surprising to expect

13   in an institution.

14        But the inquiry that you have launched here about

15   whether or not repetition is, itself, an indication of              04:04PM

16   incredibility, on the one hand to the lay person it looks that

17   way; on the other hand, I don't know in the professional

18   community whether this is acceptable or not.  You have raised

19   the issue.  If you want to perfect the issue I suspect turning

20   to your expert in maybe an affidavit or something to that           04:04PM

21   extent is probably more appropriate than asking Mr. Bojanowski

22   about it.

23        MR. FATHI:  Well, Your Honor, my question was is this

24   acceptable in the Arizona Department of Corrections.  And we do

25   have the director of health services for the Arizona Department      04:04PM

─────────November 7, 2017 - CV 12-601 - Status Hearing─────────

1    of Corrections here.

2            THE COURT:  That's a fair point.  Mr. Pratt.

3            MR. BOJANOWSKI:  I think it would be more appropriate

4    for us to have a discussion concerning this and respond in

5    writing.                                                          04:04PM

6            MR. FATHI:  Mr. Pratt is here, Your Honor.  I don't

7    see --

8            THE COURT:  He also started to lean up and was leaning

9    into the conversation.  And so, Mr. Pratt, can you tell us?

10   Are you familiar with this record we're talking about, these   04:05PM

11   two records?

12           MR. PRATT:  I haven't seen the document, Your Honor.

13   But the question is regarding one person's information on

14   objective findings duplicating another's.

15           THE COURT:  Is that the fair question?                   04:05PM

16           MR. FATHI:  The question is whether it's acceptable

17   for one nurse to cut and paste the note of another nurse in

18   response to an ICS.

19           MR. PRATT:  In my opinion, yes, it is acceptable.  As

20   a provider, if I were to review someone else's notes rather    04:05PM

21   than re-create them, if I agreed with them, I could cut and

22   paste them into my own notes.

23           MR. FATHI:  Thank you.

24           MR. PRATT:  While I'm here.

25           THE COURT:  You are entitled.                            04:05PM

November 7, 2017 - CV 12-601 - Status Hearing

1          MR. PRATT:  The question came up regarding

2    documentation by a FHA, and that FHA is an RN.

3          THE COURT:  Thank you.  Okay.  Thank you.

4          Are we at 11?

5          MR. FATHI:  We are, Your Honor.                    04:06PM

6          THE COURT:  What do you have to say?

7          MR. FATHI:  All right.  Last month, Your Honor, we put

8    before the Court three letters requesting various documents to

9    which we had received no response.  And the Court, in light of

10   the transition of document production responsibilities,        04:06PM

11   essentially asked us to wait and see what we got from

12   defendants' counsel.

13         What we got was a letter that told us that they would

14   produce documents the week of October 23rd.  Unfortunately,

15   that did not happen.  As of the close of -- close of business   04:06PM

16   yesterday not a single document had been produced.  Documents

17   were produced yesterday evening, unfortunately not in a format

18   that we could open.  Additional documents have been produced

19   during this hearing today.  It's clear that it's still only a

20   tiny proportion of the documents that we have requested.        04:06PM

21         But the defendants' practice of producing things the

22   night before, the morning of, or even during the hearing is not

23   conducive to an accurate review of what's been produced and

24   what's still missing.  So what I would suggest is that the

25   Court encourage the defendants to make a more complete          04:07PM

UNITED STATES DISTRICT COURT

—November 7, 2017 - CV 12-601 - Status Hearing—

1    production, and to the extent there are remaining issues we can

2    discuss it when we speak with the Court by phone next week or

3    whenever that happens to be.

4         THE COURT:  Well, I think that should happen, and I

5    also think that if I set a deadline for discovery to be                04:07PM

6    produced that has been the subject of a discussion in court

7    where we have talked about the letters and that I have set

8    forth where we are and, as in this case, respective of the fact

9    there was this transition from Ms. Rand to the Struck firm,

10   that if it's true that I set a deadline then I think that              04:07PM

11   deadline can only not be complied with if there is a request to

12   the Court to extend the deadline.  So I would say that.  But

13   we'll look to hear when you have a chance to open up the

14   documents you receive when we next talk about this.

15        MR. FATHI:  Thank you, Your Honor.                                 04:08PM

16        THE COURT:  So make sure we keep it on the agenda for

17   next time, Number 11.

18        Number 12.

19        MR. FATHI:  Thank you, Your Honor.  The Court

20   suggested after the hearings about monitoring methodology, the         04:08PM

21   Court requested or suggested, rather, that it would make sense

22   to incorporate some of the things that Dr. Haney had said about

23   random sampling and how you take an unbiased sample, how you

24   make sure you are drawing the sample from an appropriate

25   source, how you exclude from the sample records that can't             04:08PM

November 7, 2017 - CV 12-601 - Status Hearing

1    possibly demonstrate noncompliance.  The Court suggested that

2    it would make sense to incorporate some of that into the

3    monitor guide.

4            And so we have proposed back in September, this is

5    Document 2426-1, starting on Page 106, we proposed some text to          04:09PM

6    the defendants that they could possibly include.

7            Their response was to include only two sentences from

8    what Dr. Haney has said.  And you could find those two

9    sentences in the monitor guide at 2291-1, Page 18.  We don't

10   think that the defendants have acted in compliance with the          04:09PM

11   Court's directive.

12           THE COURT:  So are you ready for me to rule on this?

13           MR. FATHI:  Yes, Your Honor.

14           THE COURT:  All right.  So I will get a written ruling

15   out unless the defendants say they need anything else to let me          04:09PM

16   know about it.

17           MR. BOJANOWSKI:  Well, Your Honor, I had taken the

18   suggested language that the plaintiffs had given to us and

19   submitted it to one of our experts to have a look, and they

20   said it wasn't accurate.  So that's why we are relying on the          04:10PM

21   language that we had submitted.  In fact -- well, that's what

22   we did.

23           THE COURT:  So you feel that you have more that you

24   want to say about this before I enter a ruling on whether -- I

25   mean, I have told you previously I was embrasive of Dr. Haney's          04:10PM

UNITED STATES DISTRICT COURT

--------November 7, 2017 - CV 12-601 - Status Hearing--------

1    language on this.  And if there is good reason that I was wrong

2    about that and you think it has not been fully set forth in the

3    correspondence let me know about that and I will give you a

4    chance to file one more thing.

5            MR. BOJANOWSKI:  I'd like that chance.                    04:10PM

6            MR. FATHI:  Your Honor, may we know the identity of

7    the expert who said that Dr. Haney was wrong?

8            THE COURT:  I don't know whether they will be inclined

9    to share that with you or not.

10           MR. BOJANOWSKI:  Not at this time, Your Honor.            04:10PM

11           THE COURT:  So you need how much time to be able to

12   get the filing in on this agenda item on, Mr. Bojanowski?  14

13   days okay?

14           MR. BOJANOWSKI:  Yes, Your Honor.

15           THE COURT:  Mr. Fathi, if you want to submit any         04:11PM

16   response to that you can have seven days.

17           MR. FATHI:  Thank you, Your Honor.

18           THE COURT:  The next agenda items are the fully

19   briefed matters awaiting decision of the court.  Number 1,

20   written order is in process.  We'll get that to you.  The       04:11PM

21   motion for reconsideration I have ruled on.  And the

22   termination issue is one I need to -- I told you I would take a

23   final look at it, and I will do that and get written order out

24   on 3.

25           So then what remains for me to say to plaintiffs, are    04:11PM

UNITED STATES DISTRICT COURT

—————November 7, 2017 - CV 12-601 - Status Hearing—————

1   there other issues you wanted to raise?  And after I heard from

2   plaintiffs, turned to them about their agenda item which I

3   think I have already addressed, but see if there are any other

4   issues or if they want to add more they can do so.  From

5   plaintiffs?                                                    04:12PM

6           MR. FATHI:  We have nothing further, Your Honor.

7           THE COURT:  Okay.

8           MR. BOJANOWSKI:  Nothing further, Your Honor.

9           THE COURT:  Okay.  All right.  So tomorrow, anything

10  we need to talk about right now?                               04:12PM

11          MR. BOJANOWSKI:  I didn't hear you.

12          THE COURT:  Anything about tomorrow we need to talk

13  about or can we just see everybody tomorrow?

14          MS. EIDENBACH:  I don't think there's anything in

15  addition to what I said earlier.                               04:12PM

16          THE COURT:  Thank you all.

17          (Proceeding concluded at 4:12 p.m.)

18

19

20

21

22

23

24

25

1

2

3

4

5                          C E R T I F I C A T E

6

7         I, LAURIE A. ADAMS, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15        DATED at Phoenix, Arizona, this 14th day of November,

16  2017.

17

18                          s/Laurie A. Adams

19                          _____
                            Laurie A. Adams, RMR, CRR

20

21

22

23

24

25

# Exhibit 12

1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ARIZONA

3    ————————————

4
     Victor Parsons, et al., on   )
5    behalf of themselves and all )
     others similarly situated;   )
6    and Arizona Center for       )
     Disability Law,              )
7                                 )   No. CV 12-00601-PHX-DKD
              Plaintiffs,         )
8                                 )
         vs.                      )   Phoenix, Arizona
9                                 )   November 8, 2017
     Charles Ryan, Director,      )   9:02 a.m.
10   Arizona Department of        )
     Corrections; and Richard     )
11   Pratt, Interim Division      )
     Director, Division of Health )
12   Services, Arizona Department )
     of Corrections, in their     )
13   Official capacities,         )
                                  )
14            Defendants.         )
     ———————————————————————————  )
15

16
       BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE
17
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
18
          (Evidentiary Hearing re: Tucson Retaliation)
19

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

1    MS. EIDENBACH:  There we go.

2  BY MS. EIDENBACH:

3  Q.  Where are you currently housed in the Arizona Department of

4  Corrections?

5  A.  Tucson Cimarron unit.                                    09:05AM

6  Q.  How long have you been in custody?

7  A.  For two and-a-half years.

8  Q.  How long have you been housed at Cimarron?

9  A.  For the last five months.

10  Q.  How are you doing today?                                09:05AM

11  A.  I'm fine.  How are you?

12  Q.  Good.  Thank you.

13        When were you transported here?

14  A.  This morning.

15  Q.  Around what time?                                       09:05AM

16  A.  About 5:00.

17  Q.  And did you get all of your medications this morning?

18  A.  Yes.

19  Q.  Do you have any concerns about testifying here today?

20  A.  No.                                                     09:05AM

21  Q.  Do you have any concerns about retaliation for testifying

22  here today?

23  A.  Yes.

24  Q.  What are those concerns?

25  A.  I'm concerned that they will plant something in my room and  09:05AM

1   try to criminally charge me with something.

2   Q.  And why are you afraid of that?

3   A.  Because it happens.

4   Q.  Has it happened to you in the past?

5   A.  No.  It has happened to other inmates.                    09:06AM

6           MR. STRUCK:  Objection, Your Honor.  Hearsay.  Move to

7   strike.

8           THE COURT:  Overruled.  It's not important.  Go ahead.

9           MS. EIDENBACH:  Thank you.

10  BY MS. EIDENBACH:                                             09:06AM

11  Q.  Why did you decide to testify today?

12  A.  Because it's right.

13  Q.  Why do you think that it's right?

14  A.  Because they did something wrong, and I decided that it

15  needs to be voiced.                                           09:06AM

16          THE COURT:  Just so that you understand, sir, the

17  objection that just was made, what I am doing is we don't have

18  a jury here today and so I'm not really concerned about some of

19  the objections that lawyers almost feel that they need to make

20  out of a part of instinct, because often times they are right  09:06AM

21  to make.

22          This objection, I'm trying to communicate to the

23  lawyers that they need to be careful when they make their

24  objections to understand that I'm not a jury, that I'm a judge,

25  and that sometimes objections are made that don't reflect sort  09:07AM

1    of the changed role.  And so when I say when there's an

2    objection and I overrule it, and I say it's not important, it's

3    me using kind of courtroom language that maybe you don't

4    understand that I should perhaps explain further, which I am

5    doing right now.  And that is when I say it's not important it          09:07AM

6    means that it's not what I'm going to be basing my decision on

7    because I understand the rules of evidence as well as the

8    lawyers do.  And I understand that what you have said about it

9    happening to other people is really part of the story that

10   animates what you are talking about.  But really, I want to be         09:07AM

11   most interested in what you, yourself, have experienced and

12   what you, yourself, are testifying about today.

13           And I'm trying to communicate to the lawyers that the

14   record here is one that is designed to inform my decision

15   making on an ongoing basis because we had allegations of             09:07AM

16   retaliation earlier and the defendants lawyers felt they didn't

17   have their chance to have their day in court on a particular

18   incident.  So we're giving them that day in court, and also as

19   part of that, in fairness, we're giving plaintiffs their day in

20   court.  That's why they have called you here today.  So I'm          09:08AM

21   going to hear what people have to say about it.

22           Thank you.  Go ahead.

23           MS. EIDENBACH:  Thank you, Your Honor.

24   BY MS. EIDENBACH:

25   Q.  Do you recall where you were housed on November 2nd, 2016?      09:08AM

UNITED STATES DISTRICT COURT

# Exhibit 13

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

————————————

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) |
| | ) No. **CV-12-00601-PHX-DKD** |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Phoenix, Arizona |
| | ) December 20, 2017 |
| Charles Ryan, Director, | ) 9:02 a.m. |
| Arizona Department of | ) |
| Corrections; and Richard | ) (Amended) |
| Pratt, Interim Division | ) |
| Director, Division of Health | ) |
| Services, Arizona Department | ) |
| of Corrections, in their | ) |
| official capacities, | ) |
| | ) |
| Defendants. | ) |
| ———————————————————— | ) |

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

(STATUS HEARING)

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

─────CV-12-601-PHX-DKD – December 20, 2017─────

1

2                    **A P P E A R A N C E S**

3   For the Plaintiffs:

4           PRISON LAW OFFICE
            By:  **Corene Kendrick, Esq.**
5           1917 5th Street
            Berkeley, CA 94710

6
            ACLU – Washington DC
7           By:  **David C. Fathi, Esq.** (Telephonically)
            By:  **Amy Fettig, Esq.**  (Telephonically)
8           915 15th Street NW
            7th Floor
9           Washington, DC 20005

10          EIDENBACH LAW PC
            By:  **Kirstin T. Eidenbach, Esq.**
11          P.O. Box 91398
            Tucson, AZ 85752

12
            ARIZONA CENTER FOR DISABILITY LAW – Tucson, AZ
13          By:  **Maya S. Abela, Esq.**
            177 N. Church Avenue
14          Suite 800
            Tucson, AZ 85701

15
    For the Defendants:

16
            STRUCK LOVE BOJANOWSKI & ACEDO PLC
17          By:  **Daniel Stuck, Esq.**
            By:  **Rachel Love, Esq.**
18          By:  **Ashlee B. Hesman, Esq.**
            By:  **Richard Michael Valenti, Esq.**
19          3100 W. Ray Road
            Suite 300
20          Chandler, AZ 85226

21

22

23

24

25

1

2                                **I N D E X**

3  **WITNESS:**            **DIRECT**     **CROSS**      **REDIRECT**  **RECROSS**

4  RICHARD PRATT
   By the Court         125
5  By Ms. Kendrick                    130

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

—— CV-12-601-PHX-DKD – December 20, 2017 ——

```
 1          (Proceedings begin at 9:02 a.m.)

 2          THE CLERK:  Civil case number 12-601, Parsons, et al,

 3    versus Ryan, et al, on for status hearing.

 4          THE COURT:  Would counsel please announce?

 5          MS. KENDRICK:  Yes.  Good morning, Your Honor, Corene     09:03:00

 6    Kendrick from the Prison Law Office for the plaintiff class.

 7          THE COURT:  Thank you.  Good morning.

 8          MS. EIDENBACH:  Kirstin Eidenbach for the prisoner

 9    plaintiff class.

10          THE COURT:  Thank you.  Good morning.                    09:03:10

11          MS. ABELA:  Good morning.  Maya Abela for the Arizona

12    Center for Disability Law.

13          THE COURT:  Thank you.  Good morning.

14          Anyone else on plaintiff's side?

15          MR. FATHI:  Good morning, Your Honor, David Fathi of     09:03:20

16    the ACLU National Prison Project for the plaintiff class.

17          THE COURT:  Thank you.  Good morning.

18          All right.  Defendants.

19          MR. STRUCK:  Good morning, Your Honor, Dan Struck,

20    Rachel Love, Ashlee Hesman, and Richard Valenti for the       09:03:37

21    defendants.

22          THE COURT:  Thank you.  Good morning.

23          MR. STRUCK:  Good morning.

24          MS. HESMAN:  Good morning.

25          MS. LOVE:  Good morning.                                 09:03:43
```

1        THE COURT:  Well, I'm standing because in the most

2   literal sense I'm standing up for the inmates of the Arizona

3   Prison System.  It is my job to be the enforcement officer on

4   this Stipulation, which I have earnestly tried to do for months

5   expecting people to comply with my orders in good faith.                    09:04:06

6        I read on the website from KJZZ this morning a memo

7   from Sara Neese at Corizon:

8             Hello, Dr. Watson.  Could you please cancel an

9             inmate's infectious disease consult.  There are

10            two.  We do not have a provider to send them to.           09:04:24

11            One was approved and has been sitting there for 42

12            days.  Another 30 days we get –– after 30 days we

13            get nailed for 1,000 bucks a day until they are

14            seen.  Also please look at my previous e-mail and

15            answer the other ATP/NMIs if you would.  We really        09:04:39

16            need them answered to do get our job done.  Thanks.

17            I appreciate it.

18            As I read this, there is no other way to read it than

19   an end run around the monitoring program, an end run around the

20   Stipulation.                                                        09:04:55

21            The Stipulation has specifications with respect to

22   when inmates are supposed to be seen by outside providers.

23   They were scheduled for those providers, and the Arizona Prison

24   System decided that the right way to handle it was to cancel

25   the appointments and deny those people their healthcare.           09:05:07

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1       I have used words in this courtroom like

2   flabbergasted, stunned.  I've run out of words.  I've run out

3   of a way to communicate what is such an egregious departure

4   from honest representation in a case, from the defendants'  side

5   of this case.                                                09:05:29

6       I don't know what is going on here.  If this is

7   entirely true.  This is certainly not something that has a

8   foundation laid in court.  But it looks to be like an e-mail

9   that was provided from Corizon staff person to another hired

10  Corizon doctor at the prison system.                         09:05:46

11      In addition, there are other e-mails in that story

12  which include what is just a flat-out statement, we need to get

13  around the Stipulation, here's how you do it.  And I saw the

14  Corizon comment that that was supposed to be read as, no, this

15  is how we comply.                                            09:06:05

16      But, you know, that's not consistent with what I've

17  seen otherwise, which is signs held up or posted in the offices

18  telling people what words need to go into the chart to make

19  sure that there's compliance.

20      Now I'm told -- in the past gave people the benefit of  09:06:21

21  the doubt when I was told that that was just to make sure that

22  we weren't making an error.  But one could have fairly read

23  that as being counseling on how to avoid the monitoring

24  program.

25      I have an agenda that was prepared earlier this week    09:06:34

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1   of four pages, which was -- or three pages, which was

2   consistent with what I've been doing every single month for the

3   last months, where I have made an earnest and honest effort to

4   try to encourage compliance with the Stipulation.  And I have

5   done what I thought was a reasonable thing to do.  And that is,   09:06:58

6   point out deficiencies, ask for remediation programs from the

7   defendants, monitor the defendants' compliance with that, ask

8   honest and sincere questions about -- and really logical

9   questions about how the remedy was going to be met.  And I have

10  expected that in the background there would be the same kind of   09:07:19

11  honest and logical application.

12          What I now see is a window that undercuts my entire

13  agenda, undercuts my entire program, and that is, it's just a

14  game.  It's just a game to try to beat the judge and his

15  monitoring program.  It's just a game to try to beat the         09:07:37

16  State's monitoring program.

17          I am without words.  I don't know.  I cannot have

18  contemplated that anybody in a system -- the Corizon lawyers

19  have been coming to the courtroom, they've been listening to

20  this.  They certainly are aware of what's going on in their      09:08:00

21  shop.  They're aware of what's going on in my shop.  The two

22  don't work together, and they're not going to work together.

23          What's going to happen is I'm going to find out

24  exactly what's going on.  I'm going to get this doctor into

25  this courtroom and I'm going to hear her testimony.  I'm going   09:08:13

1  to get this Sara Neese person in this courtroom, or if she's

2  outside of my jurisdiction I'll get her on the telephone.  I

3  will hear from these people.  I will get every single memo that

4  of this like.  And I am now changing the entire approach here.

5  It's not my agenda anymore, it's digging down deep to see how          09:08:31

6  deep this evil goes of trying to dissemble to the Court to see

7  if it's true.

8         Now I've said already that I don't know what's on my

9  iPad from the KJZZ website is something that's true or not.  It

10  could be all made up.  And if's it's made up I'm going to eat          09:08:47

11  all these words.

12         But over the time that I have been involved in this

13  case, there have been warning signs that this is not false.

14  There have been warning signs that come in the nature of the

15  memo that was posted on the wall that I've already seen.  There        09:08:59

16  have been warning signs of the testimony that I've had here

17  where I thought that the persons that were telling me the truth

18  were the inmates and the people that are lying through their

19  teeth were the people at the Department of Corrections.  And

20  that's not every single one of them.  There are decent and            09:09:13

21  honorable people on the correction side, and there are liars on

22  the prisoners' side.

23         But I tell you that as a fact finder in this case in

24  my role, the people that I have thought have lied to me have

25  not been the prisoners, they have been the people working for         09:09:24

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1    the prison.   And I've laid that out for you.

2            And so the additional thing that I get is something I

3    can't work with because it's impermissible under the rules.   We

4    receive phone calls in chambers, my staff receives phone calls

5    in chambers from people who work for Corizon who say                09:09:38

6    essentially, it is so much worse than you think.   And we cannot

7    do anything other than to say, if you would like to come

8    forward, we will have you in court any day to talk to us about

9    that.   Then they ask us, can you protect us?   And my staff is

10   told to instruct them, no, we cannot protect you.   I can't       09:09:55

11   guarantee what can happen.

12           And so some of those -- some of those people may have

13   told us something that would be relevant, but I really haven't

14   acted on it because it's not testimony.   It's just people

15   calling on the telephone.   I can't act upon it.                   09:10:10

16           But what it does is it adds to the filter of how I

17   evaluate what I see on a website from KJZZ that indicates that

18   a memo went from the contractor to the contractor's doctors

19   instructing them how to do an end run around my

20   Stipulation-monitoring responsibilities.   And it's just          09:10:35

21   disgusting.

22           And so we'll change how we'll do things.

23           The numbers here this morning, except for 35, look to

24   me like the performance measures are all in the realm of

25   compliance.   But the truth of it is -- I can't trust it all      09:10:55

—— CV-12-601-PHX-DKD — December 20, 2017 ——

1    until I get to the root of this and find out whether or not

2    it's just a game for the State, whether they've tried to figure

3    out a way to cover up what is non-compliance with the

4    Stipulation.

5         I had always been a little bit -- and I've told you          09:11:11

6    about this before -- concerned about the fact that the fox was

7    guarding the hen house.  I've told you also there were other

8    times that I thought that there was reason to believe that the

9    State had done what it was supposed to do because they were

10   reporting numbers to me that were chilling.  And so I thought     09:11:28

11   perhaps I can trust them.

12        I'm now concerned that I cannot trust those numbers

13   without further inquiry.  That's supported by the plaintiffs'

14   efforts in the Kendrick Affidavit, and the recent November 21

15   discovery conference where we worked through some of the errors   09:11:49

16   and discrepancies.  And now the plaintiffs have presented even

17   more of them.

18        The defendants have responded that they did not have

19   time to be in a position to respond to each of those.  From

20   past experience some of the responses to some of the arrows      09:12:05

21   that plaintiffs send may turn to fall short, they may be

22   mistaken or something.

23        But nevertheless, the plaintiffs are now doing what is

24   helpful to the Court.  They are scrutinizing the monitoring

25   program and the compilation of the CGAR data to see whether or   09:12:20

 1   not it's valid.

 2        The plaintiffs are making a stronger, stronger

 3   argument, and were before today on my agenda for the purpose of

 4   setting a time to allow us to delve more deeply into that.

 5        I didn't have what looks like a smoking gun memo when    09:12:37

 6   I did this agenda.  What I have now is nothing short of that, I

 7   think.  And so I need to set a plan for us to move forward in

 8   addressing this particular issue of whether or not there is a

 9   corruption within the system that is depriving the Court of its

10   ability to perform its monitoring responsibilities in a fair    09:13:01

11   and appropriate way.

12        And we will get to the bottom of this.  We will

13   understand exactly what the nature is.  If it turns out that

14   this is a fallen short arrow, then I know that there are other

15   parts of it that still probably are right, and that is --    09:13:16

16   unless it's a complete fabrication.

17        We have Mr. Millar engaged as an expert to give us

18   advice to deal with what is manifest now in the memorandum --

19   another memorandum included in the KJZZ memo, and that is

20   Operation Backlog.  I've been telling you, and everybody except    09:13:38

21   for the defendants apparently, have been fighting this idea

22   that it's a staffing issue.  And it is identified here by

23   Corizon as a staffing issue, they don't have the providers

24   across the board, either inside where an individual doctor is

25   responsible for 5,000 potential patients and 20 people today,    09:13:54

—— CV-12-601-PHX-DKD — December 20, 2017 ——

1    and is told not to talk so much to her patients and not to

2    order so many procedures, and given specific examples.

3              So what I contemplate -- and I'll listen to the

4    parties in a moments about how they think this might better be

5    done if my idea is not a good idea.  But what I would          09:14:19

6    contemplate doing is setting a hearing date perhaps in

7    the -- we have already set for January, in the third week of

8    January I believe it is, for us to focus on this issue about

9    whether or not the monitoring program is so compromised that it

10   cannot be trusted, and whether we have to adopt some other     09:14:42

11   method to make sure that the Stipulation can be met in a fair

12   and honest and responsible way.

13             And what we would do at that hearing is have

14   the -- lay the foundation, if it exists, for what appears to be

15   in the press report, and then proceed from that and to call    09:15:02

16   witnesses and to identify people who will testify under oath

17   about what the reality is on the ground, a reality that is, as

18   suggested in the press report, gravely threatening to the

19   Court's ability to administer the Stipulation.

20             Turning now to plaintiffs for their response to what 09:15:21

21   I've said in these last 15 minutes.

22             MS. KENDRICK:  Your Honor, we share the Court's great

23   frustration, and we were likewise shocked to read the e-mails

24   that were in that report.

25             We would just note that the parties have already had 09:15:38

CV-12-601-PHX-DKD – December 20, 2017

1    more than five days of hearings about the broken methodology

2    system in place.  And plaintiffs asked the Court, after those

3    hearings in the Spring, that the Court appoint a Rule 706

4    expert with knowledge and experience in monitoring and

5    auditing.  I don't know if it would be a Price Waterhouse          09:16:00

6    Coopers type organization, but something like that.  Because it

7    has been shown clearly and repeatedly that the Department is

8    not capable of monitoring their contractor, that there are

9    cross interests going -- at play here that call into question

10   the reliability of the monitoring.                                 09:16:18

11           And, Your Honor, while we are glad that you find it

12   useful that we go and have started doing these spot checks, I

13   can tell you that it's incredibly time consuming for my office.

14   Just to check three medical performance measures at three

15   institutions for the September CGARs, it involved going into      09:16:37

16   hundreds of prisoners' medical records.  It took several of the

17   staff in my office practically a week just to do that.

18           So that was just randomly selecting a couple of

19   measures at a couple of institutions.  And we uncovered

20   problems.  And as we noted, some of the problems went the other   09:16:59

21   way.  You know, we weren't just cherry picking problems where

22   suddenly they were out of compliance.  There were a couple

23   where I said, look, you guys said it was 90 percent, it was

24   actually 88 -- you know, it was still above the 85 percent.

25           For us the point is that you can't trust it.  We had      09:17:17

UNITED STATES DISTRICT COURT

1   performance measures where -- this was supposedly the September
2   CGARs and they were looking at stuff that happened in July and
3   August.  And it troubles us greatly.  But we don't have the
4   resources to do that kind of monitoring.
5           And part of the reason we included the declaration of       09:17:34
6   my colleague, Alison Hardy, is because she works on another
7   case that Corizon is the contractor for the medical care, and
8   they are able to run these system-wide reports.
9           Now again, this doesn't address the fact that you
10  identified, which is garbage in, garbage out.  If you're being     09:17:51
11  told to cancel things or falsify things then, you know, if
12  you're running reports it's going to be reflected.  But at the
13  very least that gives you a more accurate picture when you're
14  looking at the entire system versus this Rube Goldberg system
15  that we have in place that is a legacy of the fact that they       09:18:08
16  were still using paper records when we settled the case.  And
17  so that's why we have the pull ten files method of finding
18  compliance.
19          It's not accurate.  It doesn't work.  And
20  unfortunately that wouldn't necessarily address the problem        09:18:24
21  that you've identified if the Corizon way is to tell providers
22  to cancel appointments or to not put things in the records.
23          But at the very least we would have an -- a more
24  accurate sense of what is being reflected in the records, and
25  we think that would be a good first start at trying to address     09:18:40

1    some of these problems.

2        THE COURT:  Well, you have asked for the Rule 706

3    expert in the past but I was not there yet.  And one of the

4    reasons I wasn't there is you contracted to have this

5    monitoring system in house, that was the agreement that you      09:18:53

6    reached.  And it seemed to me that I needed to enforce that

7    agreement, to the extent that it could work, consistent with

8    the Stipulation.  And also it does implicate the Court's

9    ability to do its role, and that is to monitor the monitors, to

10   make sure that the performance measures are being met.  And so   09:19:13

11   I have been engaged in that process, a process that you all

12   selected.

13        If it becomes so corrupt, if it becomes so tainted

14   that it is not subject to being relied upon anymore, it so

15   undercuts the Stipulation that it is a component of the          09:19:31

16   Stipulation, would need to be modified.  And that modification

17   would be an independent auditor to go in and to review it.

18        I was anxious to see where the current allegations of

19   improper monitoring in your most recent affidavit led, because

20   the last time it was, I think, three quarters meritorious, a     09:20:01

21   quarter maybe not, just in rough terms.

22        But it seems that also you may be getting better at

23   this process of evaluating the monitoring, or worse, I don't

24   know.  But I wanted to see where this next one led.  And then

25   hadn't ruled out in my own mind the idea of proceeding to a      09:20:21

16

CV-12-601-PHX-DKD – December 20, 2017

1    Rule 706 auditor as being a necessary component.

2           And so, I hear what you say, but I do think it's

3    necessary for me to go through this process.

4           With respect to your staffing limitations, I

5    understand that you may have some trepidation, because the          09:20:40

6    ability to be paid for these hours for your staff is probably

7    something that is a management decision that any law firm would

8    make about whether or not they run the risk of not being

9    compensated for devoting a lot of resources in a case.

10          And it is true that I have not resolved the issue of          09:21:02

11   the attorney's fees application that would give you perhaps

12   some comfort about where you stood with respect to these extra

13   efforts.

14          The order that I think that is on the docket now, at

15   least one that I believe I signed yesterday, doesn't              09:21:19

16   definitively answer it, but it provides, I think, some guidance

17   to you that I can augment here.  And that is that it is my

18   strong conviction that if your responsibility to assure

19   compliance with this Stipulation engenders these kinds of hours

20   to verify what is happening on the defendants' side of the          09:21:44

21   case, that is compensable under the Stipulation.

22          And understanding that those words, because I am a

23   trial court and not the Court of Appeals or the Supreme Court,

24   not the final answer on whether or not you can get those fees,

25   I understand that that is not yet money in the bank for you.         09:22:01

UNITED STATES DISTRICT COURT

1         But nevertheless, my -- you should understand that at

2    least from the trial court's perspective that those hours that

3    you would devote to this process of double checking the

4    monitors would be compensable.

5         To the extent that I'm weighing whether or not it's          09:22:20

6    more efficient to have a Rule 706 expert versus the people in

7    your office, who may or may not be in a better position to do

8    that, I don't know, and maybe that's a decision for a different

9    day.  It may well be that the defendants would be more

10   comfortable having it done by an independent person rather than  09:22:42

11   having me vest entirely with assigning this additional

12   responsibility so to speak to the plaintiffs.

13        But, again, that is something that is in my thought

14   process.  I am thinking about it, the 706 expert for the

15   auditor.  And I think I have already said to both sides on the   09:23:03

16   record that one of the notions with respect to if there is any

17   sanction imposed for failure to comply, those dollars could be

18   used to pay for the expert to do exactly this, to confirm that

19   the numbers that we're relying on are accurate.

20        All right.

21        MS. KENDRICK:  Just --

22        THE COURT:  Go ahead.

23        MS. KENDRICK:  I'm sorry.  Just on the issue of the

24   hearing, I don't know if I really got to that.

25        We would welcome the chance to have Dr. Watson and         09:23:37

—CV-12-601-PHX-DKD – December 20, 2017—

1   this other individual come and testify.  We would just ask that

2   prior to the hearing --

3            THE COURT:  I'm sorry, excuse me.

4            MS. KENDRICK:  Sorry.  That prior to the hearing that

5   we be allowed to get discovery so that we can find out if there                09:23:50

6   are other similar e-mails going out from Corizon to providers

7   and to medical staff making similar instructions.

8            THE COURT:  All right.  And I'm sorry to have

9   interrupted what you said.  I was handed a note that was an

10  urgent matter.                                                                 09:24:08

11           So the blessing of having realtime court reporting is

12  that although I interrupted you and diverted my attention, I

13  can ask you to pause for a moment while I read what you just

14  said.

15           What I would anticipate is that you would do what              09:24:31

16  plaintiffs need to do in a case.  And this is a bit of a

17  different case because I'm not in the typical role of the

18  neutral judge, I'm the enforcer of the Stipulation.  And so I

19  turn to the respective parties to assist the Court in that job

20  when necessary.                                                                09:24:54

21           And one of the things that I would like the plaintiffs

22  to do, because of their familiarity with the prison system and

23  with the case, is to identify witnesses that they believe would

24  be the appropriate people, whether by a broad 30(b)(6) type

25  designation or individual names.                                              09:25:11

UNITED STATES DISTRICT COURT

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1     And then you can present those to the defendants and

2   see where they are, what the nature is with respect to what it

3   will require, whether the contract that the State has with

4   Corizon, if they're Corizon witnesses, whether that allows the

5   State to be able to commit to having their presence in court,        09:25:29

6   or whether if that's not the case whether we have to subpoena

7   them.  And if that's the case, then you let me know and then

8   I'll issue the subpoenas after I've heard from both sides about

9   whether or not it's appropriate to do so.

10    But I would like the plaintiffs to ==marshal the case==,      09:25:44

11  to verify or not.  I can trust that perhaps the defendants will

12  be doing their bit in our adversary process to try to do what

13  they can to make sure that anything plaintiffs are presenting

14  is tested by cross-examination and tested by challenging

15  evidence.                                                          09:26:03

16    But what I have here is certainly fair to describe as

17  a ==prima facie== case that I would like the plaintiffs to follow

18  up on.  And that means developing the presentation for our

19  hearing in January and deciding what witnesses would be

20  appropriate.  If you need the Court's assistance in having         09:26:16

21  their appearance, then you let me know, we have a method for

22  doing that.

23    MS. KENDRICK:  Thank you.

24    THE COURT:  Mr. Struck.

25    MR. STRUCK:  Yes, Your Honor.                                    09:26:28

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1        I haven't had the opportunity to review the article

2   that you came in very upset about.  I don't know who this

3   doctor is or -- I guess he's a former Corizon employee.  I

4   don't know --

5        THE COURT:  It's a woman.                       09:26:45

6        MR. STRUCK:  I don't know anything about -- I just

7   haven't read it.

8        THE COURT:  Okay.

9        MR. STRUCK:  But I will tell you this, I work very

10  closely with the ADC monitoring bureau.  They care very deeply  09:26:54

11  about what they do.  And they don't give Corizon free passes.

12  I haven't seen any evidence of that.  We haven't seen any

13  evidence of that during the course of this Stipulation period.

14       THE COURT:  Well, what may be happening then, giving

15  you the benefit of every doubt, is that under the nose of the   09:27:16

16  monitors the Corizon people are figuring out the way to do an

17  end run around the monitors.

18       I mean, just to put it in the record as it stands in

19  this unverified news report -- and Corizon has had an

20  opportunity to respond to this because their response is quoted  09:27:43

21  in the article as well.

22       I'm looking in the article to try to find the quote of

23  where the Corizon employee said "beat the monitor."

24       But again, this is -- certainly no foundation is laid

25  for this, but that's -- as I say, it's creating a prima facie    09:28:59

UNITED STATES DISTRICT COURT

1   case perhaps.  But we need to follow up on it because it is

2   something that is not inconsistent with what other red flags

3   have been blowing on the horizon in the wind.

4           But there were the words "beat the monitor."

5           And so that is something that the monitors themselves        09:29:23

6   need to be fully informed about, because if they are the police

7   officers, and they are people who they're supposed to be

8   monitoring, and the monitored individuals are in a cobble to

9   try to beat the monitors, the monitors need to know about that

10  as well.                                                            09:29:48

11          But -- and I also say this:  It's hard for me to think

12  that if there is this beat the monitoring program going on,

13  that it would be -- it would still call into question the

14  quality of the State's monitoring program if it didn't know

15  about it.  And -- because that would be the kind of thing you       09:30:12

16  would expect the monitors to be able to know about.

17          Just one moment.

18      (Discussion off the record between the Court and courtroom

19  deputy.)

20          THE COURT:  Give me a moment to look at the calendar.       09:30:36

21          The problem is the January hearing date is the 10th,

22  and that's probably too soon.

23          The potential of this issue, of the trustworthiness of

24  the reporting -- and when I say that it's specifically and

25  purposefully different words than monitoring, because the           09:32:00

22

1   reporting includes also what Corizon is putting into its charts

2   and putting into information that the monitors would have

3   access to and be evaluating.

4        The potential impact of this reporting issue is so

5   great that it can affect all sorts of other issues that are        09:32:21

6   pending, including, without limitation, the Court's order to

7   show cause proceedings, in addition the defendants' motions to

8   terminate certain measures from the Stipulation because of

9   records of compliance.  And so it makes sense to accord it a

10  fair and thorough hearing.                                         09:32:51

11       And I'm vexed by the calendar.  What we presently have

12  scheduled is we have the 10th of January, and then we have the

13  two days at the end of February, the 27th and 28th.

14       And I think that there are two options, one is to

15  include it on the 27th or 28th.  And the other option is to       09:33:45

16  pick sometime between the 10th and the 27th and the 28th to

17  address this particular issue of the credibility of the

18  reporting.

19       What's plaintiffs' position on those choices?

20       MS. KENDRICK:  Your Honor, we would propose doing it          09:34:04

21  in late January or early February, in between.  We anticipate

22  that there will be plenty on the regular status hearing

23  scheduled for the 10th, and then also on the 27th we're doing

24  the contempt order to show cause.

25       THE COURT:  Right.                                            09:34:20

1          Okay.  Mr. Struck, do you have a view?

2          MR. STRUCK:  Your Honor, I think later is probably

3    going to be more appropriate, considering what the Court is

4    wanting to look for.  I imagine there's going to be a

5    considerable amount of ESI searching for documentation to          09:34:37

6    determine whether or not this is just a anecdotal one-time

7    incident, whether there is any validity to it at all, or

8    whether it's more widespread as the Court is concerned about.

9    And that is not something that can be done overnight.

10         So our preference would be to push it to the 27th and       09:34:57

11   28th of February.

12         THE COURT:  If I do it at the end of January, given

13   the holidays between now and then, I really am just affording

14   two weeks for this document production, which is really

15   insufficient.  If I postpone it to the end of February, then I    09:36:23

16   am adding significantly to what is perhaps already an

17   overburdened calendar.

18         And so what I would think is the right thing to do is

19   to set it for perhaps Thursday or Friday, the 8th or 9th of

20   February.                                                          09:36:49

21         Can you all look at your calendars and see if that

22   could work to do it one of those days?

23         MS. KENDRICK:  Both of those days would work for us,

24   Your Honor.

25         MR. STRUCK:  I'm available on the 9th.                       09:37:07

24

1          THE COURT:  All right.  So at 9:00 a.m. on the 9th of

2    February we will have the hearing on the issue of the

3    credibility of the reporting.

4          I expect to be fully engaged and available on any

5    discovery issues that arise.  I want to hear about them, and I          09:37:26

6    want to hear about them at the soonest instant, so that we are

7    getting everything teed up in an appropriate way.

8          If you have issues and you cannot resolve it in the

9    meet and confer, get me on the phone.  Although I have some

10   out-of-state and out-of-country travel in January, there's a          09:37:43

11   telephone everywhere that I'll be.  And so I will be readily

12   available every single day seven days a week from now until

13   then if issues arise.

14         Okay.  All right.  So that means we can proceed to the

15   filing from the defendants of the October reporting for the          09:38:10

16   performance measures, is what I would propose to start with

17   this morning.

18         Let me ask this threshold question of the defendants.

19   It looked to us on the document that you filed that it was only

20   perhaps a scanned copy, which meant that it was a little bit          09:38:29

21   cumbersome for us to use, we couldn't scan it -- we couldn't

22   search it.  And if I'm wrong about that, my apologies.  But if

23   I'm right, could I ask you in the future that when you file it

24   that you do so consistent with our electronic filing manual,

25   and that is file a version that is in a scannable pdf or Word          09:38:48

─── CV-12-601-PHX-DKD ─ December 20, 2017 ───

1   so that we can take advantage of that feature in accessing the

2   document.

3            On the plaintiffs' side, have you had a chance to

4   digest the reporting yet?

5            MS. KENDRICK:  We've attempted to.  Again, you know,        09:39:04

6   we object to the fact that it was filed after close of business

7   the night before the hearing.

8            We also kind of experienced the same problem last

9   night and this morning trying to review and search for things

10  on a non-OCR document.                                              09:39:18

11           But I do believe that we're able to go forward.

12           THE COURT:  All right.  Well, what it essentially

13  includes is an overwhelming demonstration of compliance with

14  performance measures.  Is that fair to say?

15           MS. KENDRICK:  No.                                         09:39:39

16           THE COURT:  Okay.

17           MS. KENDRICK:  No.

18           THE COURT:  All right.

19           MS. KENDRICK:  I mean, there's -- again, I don't know

20  why they're doing this, but they've included performance          09:39:44

21  measures that you've never found them non-compliant for, and

22  then tout the fact that they're at 100 percent compliance,

23  which is fantastic, but --

24           THE COURT:  So again, perhaps I've been hobbled by the

25  fact that I'm rushing it too, that when it comes on the eve.  I    09:39:58

 1    was to bed last night when this happened, so I was up at 4:00

 2    going through it this morning.  Or at least not when you filed

 3    it, but when I received notice of it, I missed the chance to

 4    take advantage of it last night.  So I saw that it came in but

 5    already knew that I couldn't change my course of life.          09:40:21

 6          So I was up at 4:00 looking at this morning.  So I

 7    perhaps was mis -- misinformed by what you just pointed out,

 8    and that is, it may look to me that it's overwhelming if you

 9    include all the things that I've not been worried about.  Is

10    that essentially what you just said?

11          MS. KENDRICK:  Well, there's --

12          THE COURT:  It includes some things that I had not

13    been worried about before.  So if I look at it, it looks to me

14    like the problem areas are more outliers.  Is that what you're

15    saying?

16          I was looking for a way to address this in an

17    appropriate way rather than going through it and going through

18    each one that is meeting the performance level, because it

19    seems a little bit not worth doing in light of the fact that I

20    don't know whether I can trust the numbers.                     09:41:05

21          But maybe the right thing to do is to turn to

22    plaintiffs and ask whether you have a list of areas of concern

23    and use those as the destinations for our discussion at this

24    moment.

25          MS. KENDRICK:  Yes, Your Honor.  Most of our            09:41:17

1   questions, in fact, I think all of them, are around areas where

2   there's either continued non-compliance or there's a newer

3   remedial plan, and we have questions.

4        And we share your interest in not going to through the

5   Kabuki Theater of, you know, going through and reading plans          09:41:35

6   and not knowing when they're implemented.  So we're hoping that

7   we can streamline this as well.

8        THE COURT:  All right.

9        MS. KENDRICK:  So the first one was on Performance

10  Measure 11 at Eyman at page 4 of the Court filing.                    09:41:44

11       They again talk about in their December 15th update

12  plan, which is at page 6, that the non-compliance is due to

13  documentation problems.  And that their tracking this

14  information and preliminary data for November indicates that

15  all facilities are compliant.  And so we're just unclear what         09:42:18

16  this preliminary data is based upon.

17       THE COURT:  Mr. Struck, or who on defendants' side?

18       MR. STRUCK:  Yes, Your Honor.

19       This particular action plan was provided to us by

20  Corizon.  It's a Supplemental Corrective Action Plan with            09:42:38

21  respect to the Eyman facility, which was at 78 percent.

22       And I will tell you we had some -- when I spoke to

23  Corizon, the Corizon folks yesterday, there were some

24  preliminary numbers -- in conjuncture with the ADC monitoring,

25  there was -- there were some preliminary November numbers, not        09:43:03

—CV-12-601-PHX-DKD – December 20, 2017—

1    very many.  But on this particular Measure all ten facilities

2    met it.  Since we're talking about October numbers here.

3             THE COURT:  Right.

4             MR. STRUCK:  And so it's my understanding that they

5    are tracking this daily in order to try and finally reach          09:43:17

6    compliance with this particular Performance Measure.

7             And, of course, you know, pursuant to the Court's

8    order, if there aren't medications available, they're supposed

9    to go to Walgreens and get them.

10            It's something that is -- this is one of the original     09:43:41

11   performance measures that they were found to be non-compliant,

12   and it is subject to the Court's order that we're having a

13   hearing about the end of February.  It is on everyone's radar

14   screen, and it is on Corizon's radar screen.

15            So the fact that their preliminary numbers will show      09:44:04

16   that all of the facilities met compliance -- were compliant

17   with this is positive.

18            THE COURT:  All right.  I don't know that there's much

19   more to be said, because we are in the period where come the

20   end of February we'll know what the actual numbers were and       09:44:19

21   whether there will be a sanction.  So we're in this time period

22   where my words of remonstration are probably less effective

23   than the potential monetary threat that looms.

24            But, again, I have to drop the footnote that it all is

25   subject to confidence that we can trust the numbers.              09:44:39

CV-12-601-PHX-DKD – December 20, 2017

1              Anything else you want to say on this Measure,

2    Miss Kendrick?

3              MS. KENDRICK:  No, Your Honor.

4              THE COURT:  Okay.  The next one?

5              MS. KENDRICK:  Sorry, I'm having to scroll through                          09:44:48

6    this.

7              THE COURT:  That's fine.

8              MS. KENDRICK:  I don't have a hard copy.

9              THE COURT:  Take your time.

10             MR. STRUCK:  Your Honor, I have -- I have a hard copy,                      09:44:58

11   if it would make it easier for --

12             THE COURT:  Sure, please.

13             MR. STRUCK:  -- Miss Kendrick to scroll through.

14             THE COURT:  Sure.

15             MS. KENDRICK:  Unfortunately my notes are on the pdf.                       09:45:22

16             THE COURT:  And I understand that that may --

17             MS. KENDRICK:  I'm sorry.

18             THE COURT:  Don't apologize.  It's very difficult to

19   have everything in line when you get it just the eve of the

20   hearing.  So take your time.                                                         09:45:35

21             MS. KENDRICK:  So the next one was on Performance

22   Measure 15.  And this is about the medication refusals.

23             And for the past two hearings we have raised the fact

24   that the Corrective Action Plans kept referring to the fact

25   that people needed to be counseled by providers, and the Action                      09:45:50

```
 1   Plans were putting duties on providers.  And we had observed

 2   that the Stipulation defines QHCP as a qualified healthcare

 3   professional, so it doesn't have to be somebody at such a high

 4   level.

 5          And the past two months Mr. Bojanowski and the Corizon    09:46:09

 6   people said they would get back to us as to whether the

 7   Corrective Action Plan would be put on non-provider staff

 8   rather than burdening the very few doctors that they already

 9   have and nurse practitioners they have at the institutions.

10          THE COURT:  And you haven't heard back, is that what      09:46:29

11   you're saying?

12          MS. KENDRICK:  What's that?

13          THE COURT:  You haven't heard back about whether

14   that's happened?

15          MS. KENDRICK:  No, sir, not a word.                       09:46:34

16          THE COURT:  Do you know, Mr. Struck?

17          MR. STRUCK:  Well, I do know that I was informed that

18   the Director of Nursing is the one that's -- she's checking on

19   a daily basis to make sure that this is happening with respect

20   to --                                                            09:46:50

21          THE COURT:  But you don't know who is doing the

22   counseling?

23          MR. STRUCK:  I do not know who is doing the

24   counseling.

25          THE COURT:  Would you make a note and ask                 09:46:56
```

————— CV-12-601-PHX-DKD – December 20, 2017 —————

1    Mr. Bojanowski to let plaintiffs know whether or not it

2    is -- again, this is something that is principally in your

3    wheelhouse as to how to decide to do it.  But I think the

4    plaintiffs make a constructive comment, and that is, having

5    heard that it appears that you're thinking that maybe providers     09:47:15

6    needed to be the ones who were doing it, that that's not

7    necessarily so.

8              MR. STRUCK:  I can find out, Your Honor.

9              THE COURT:  All right.

10             MS. KENDRICK:  So the next one, Your Honor, is          09:47:24

11   Performance Measure 35.  And this is a Performance Measure that

12   the Court is quite familiar with about the transfer of

13   medications between the facilities.  And you've included it in

14   your order to show cause with regard to Eyman, Florence, Lewis

15   and Tucson.                                                       09:48:03

16             And unfortunately they continue to report

17   non-compliance.  Seventy-eight percent at Eyman.  Eighty-five

18   percent at Florence, so they're above.  And okay, actually, no,

19   Tucson is at 90, that's very good.

20             So I guess the question, they've included the new       09:48:34

21   system and the new policy, they cut and pasted it into the

22   Corrective Action Plan.  But I don't know if they have an

23   update on how this is working in terms of the daily tracking

24   and the ultimate reporting that's going to come to the Court in

25   February.                                                         09:48:56

——— CV-12-601-PHX-DKD – December 20, 2017 ———

1          THE COURT:  That was going to be my first question for

2     Mr. Struck.

3          Do you have any update on anything past October on

4     this one?

5          MR. STRUCK:  I do not have an update on anything past        09:49:04

6     October on this particular Performance Measure.  Other than to

7     say the -- I do have the name of the individual who the

8     Department of Corrections has hired -- or has assigned as

9     the -- to coordinate Corizon and ADC, and his name is Mark

10    Versluis, V-E-R-S-L-U-I-S.  I believe that he started in the     09:49:29

11    beginning of November.  And his job is to ensure coordination

12    between security, who are transferring the inmates from

13    facility to facility, and to make sure that the KOP and the

14    D.O.T. meds are transferred and provided to the inmate,

15    whether they have them when they arrive, make sure that they     09:50:00

16    get them.

17         But I don't have current status with respect to how

18    that's going.  I requested that information, but I was -- they

19    were unable to provide it to me.

20         MS. KENDRICK:  The other thing, Your Honor, is at page      09:50:17

21    79 of the filing, at docket 2506-1, for Lewis, they report no

22    score for the institution and say that it's in the rebuttal

23    process.

24         If you have an update on that one.

25         THE COURT:  There is no October reporting for 35 for        09:50:45

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    Lewis.  And it says it's -- as Miss Kendrick says, it's in the

2    rebuttal process.

3         Do you have an insight as to what the challenge was

4    there and where that stands?

5         MR. STRUCK:  I can tell you that the October Lewis          09:51:19

6    number, which is not listed on here, is 84 percent.  I don't

7    know what the -- where the rebuttal process stands, whether

8    that was what the issue was or whether that was upheld or not.

9         THE COURT:  So you have a piece of paper that tells

10   you that the October for Lewis was 84?  Is that what you just     09:51:34

11   said?

12        MR. STRUCK:  Yeah, it's my understanding that

13   the -- that that was the score that's being -- the preliminary

14   score that's being contested by Corizon.

15        THE COURT:  I see.                                          09:51:48

16        MS. KENDRICK:  So, Your Honor, actually I just

17   realized as soon as I said it that they produced the CGARs to

18   us last night, and so I looked and confirmed that it was at 84

19   percent, according to what they gave us.

20        However, we raised this last month and this came up in      09:52:03

21   the hearings, this whole issue of the rebuttals.  Mr. Pratt

22   represented last week that the rebuttal process is over by the

23   10th of the month.  It came out in the testimony that when

24   these rebuttals happened and things were changed, that they

25   were going to make an addendum.  That actually was an item on     09:52:22

 1   our agenda, item number 5.

 2        I am looking at what they produced us last night

 3   that's Bates stamped ADCM1045147 for Performance Measure 35 at

 4   Lewis, and there's no addendum or indication looking at the

 5   face of the CGAR what was changed to get this final number of         09:52:42

 6   84 percent that was given to us last night.

 7        THE COURT:  Thank you.

 8        It is true what Miss Kendrick just said that Mr. Pratt

 9   told us last month that if it was in the informal process there

10   was no documentation about that.  I expressed some concern          09:53:00

11   about that.  But then we were assured that if it was in the

12   formal process that there was documentation.

13        Is that only when there is a final decision that's

14   made that it's formally recorded, Mr. Pratt?  Or is this an

15   error that should have been reflected that actually a rebuttal      09:53:19

16   had been asserted?

17        MR. PRATT:  The results are -- there's not an addendum

18   until these results are considered final.  At that point IF

19   there's a change there would be an addendum placed in there.

20        THE COURT:  All right.  So now my understanding is a           09:53:35

21   little bit different.  Because I did think that what you said

22   is that things would have to be resolved by the 10th of the

23   month, and then after that it would be reported, and that any

24   challenge would have to be documented.  But here we are --

25        MR. STRUCK:  Your Honor, 84 percent is final.  I              09:53:56

1    just -- Mr. Pratt just informed me that the numbers that were

2    provided to Court and counsel with respect to the CGARs are

3    final numbers.  So 84 percent is final.

4         We -- this chart that we get is provided to us by

5    Corizon's attorneys.  So that's perhaps why it's not up to          09:54:15

6    date.  But it's my understanding that the 84 percent that is

7    reported on the CGARs, the October CGARs, is a final number.

8         So the appeal must have been denied by ADC.

9         MS. KENDRICK:  Well, I don't know --

10        THE COURT:  I need to understand what you just said,          09:54:40

11   Mr. Struck.

12        MR. STRUCK:  Okay.

13        THE COURT:  Did you say that document 2506, page 79,

14   was a document prepared by Corizon and given to you?

15        MR. STRUCK:  These documents are -- these graphs are          09:54:52

16   prepared by the Corizon attorneys.  And we go through it with

17   them and make changes on it.

18        Yesterday I met with them and the Corizon folks and we

19   added information to the -- some of the Corrective Action

20   Plans, because the plaintiffs and the Court have expressed a       09:55:13

21   frustration that some of these Corrective Action Plans in the

22   past -- the Corrective Action are provided by Corizon.

23        THE COURT:  I had no idea.  I had no idea that the --

24   that this work in progress that I've been working with

25   Mr. Bojanowski on on this reporting was something that's being     09:55:31

1    generated by the contractor who's supposed to be monitored.

2        MR. STRUCK:  It's provided to us in Word, and then we

3    do make changes to it.  We add to -- like, for example, there

4    was -- there's additions to -- when I found out some more

5    specific information with respect to the Corrective Action          09:55:48

6    Plan, we added to -- that information to that.

7        But in terms of these graphs, that's something that we

8    receive from Corizon.

9        But it -- and by way of explanation, that's probably

10   why the 84 isn't on there, but yet it is reflected in the CGAR      09:56:09

11   results that we provided to the Court and counsel.

12       THE COURT:  I cut you off, Miss Kendrick.

13       MS. KENDRICK:  So I get Mr. Struck seems very

14   confident that there must not have been any change in the

15   score.  But, again, there's really no clarity, because last        09:56:28

16   week -- or last month Mr. Pratt said that the addendums weren't

17   being made, while they said in a court filing that they were

18   going to start making addendums any time there was this formal

19   rebuttal process going on so that things could be seen.

20       So, again, it's very hard to take with any confidence          09:56:46

21   the trust us nothing's changed.  Because I'm looking at

22   something that's dated 11-29-17 done by a person who is one of

23   the monitors at the facility.  And as of December 15th,

24   according to them, it was still in the rebuttal process, so we

25   have no way of knowing what's been changed.                        09:57:09

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1        I certainly hope that Mr. Struck is correct and I can

2    take him at his word on this that nothing changed.  But it's,

3    again, troubling for us.

4        Also we're slightly concerned to learn that Corizon is

5    preparing the filings for the Court about how the Department is    09:57:26

6    going to ensure compliance with the performance measures.

7        MR. STRUCK:  Your Honor, the CGARs are prepared by

8    ADC.  And the CGARs that were provided to Court and counsel

9    have the 84 percent.

10       These documents are given to us in a draft form, but     09:57:43

11   we -- like I said we -- it's in a Word format, so we, you know,

12   we make sure that it has -- I've been in the courtroom where

13   the Court -- where the Judge has expressed displeasure with

14   some of this information being inaccurate, so I wanted to make

15   sure it was accurate.  So I met with the Corizon folks twice to    09:58:04

16   go through this stuff to make sure it was accurate and to add

17   information to provide the plaintiffs and the Court, additional

18   information with respect to some of these performance measures

19   that aren't -- that were not in compliance, to explain what

20   Corizon was doing to try and get it -- and ADC was insisting     09:58:23

21   they do to try and get in compliance.

22       THE COURT:  A couple of take aways here.  The first is

23   that I appreciate having the information now that, as I say, is

24   new information, and that is the provenance of these documents

25   that we're discussing right now.  So that's informative to me.    09:58:43

—CV-12-601-PHX-DKD – December 20, 2017—

1           The second take away is that it does augment what had

2     been my growing belief that it was appropriate that there

3     should be any -- that if there should be any change in the CGAR

4     data, either pursuant to the informal rebuttal process or the

5     formal rebuttal process, that that all should be logged          09:59:07

6     similarly to any way that a patient progress note is logged.

7     If the doctor records something that turns out not to be

8     accurate, they don't go in and erase the old one, they then put

9     at the bottom of the note, the previous statement is corrected

10    to reflect this.                                                  09:59:30

11          And so that kind of bread crumb trail that is so

12    intrinsic to proper auditing I think should be present in this

13    process as well.

14          Whether we -- exactly how that is put in place,

15    whether it should be in the Monitoring Manual or some            09:59:48

16    modification otherwise, an instruction of the Court, for

17    example, I am continuing to contemplate that and consider it,

18    thinking that it may be necessary.

19          Go ahead, Miss Kendrick.

20          MS. KENDRICK:  That's it on that measure.                  10:00:08

21          THE COURT:  You may go ahead then.

22          MS. KENDRICK:  So the next one was Performance Measure

23    39, which is about routine providers being seen -- provider

24    referrals being seen within 14 days.

25          At Florence, which is at page 92 of the filing, the       10:00:22

1    basis for non-compliance at the institution, I have read it

2    several times, and granted it was late at night, but I still

3    don't quite understand what the problem was.  And so hopefully

4    Mr. Struck or Mr. Pratt or somebody could explain.

5        THE COURT:  Which paragraph are you talking about that    10:00:44

6    you had trouble with?

7        MS. KENDRICK:  It's at the bottom of page 92.  It

8    says, basis for non-compliance.

9        THE COURT:  There was an issue experienced with the

10   manner in which routine provider referrals requiring an        10:00:53

11   appointment were being scheduled by one staff person at this

12   facility.  The staff member was miscalculated the 14 day time

13   clock starting on the day after the referral was made, rather

14   than on the same day it was made, leading to referrals being

15   addressed one day late.                                        10:01:14

16       MS. KENDRICK:  So I guess, is the point that you guys

17   are scheduling them to be exactly 14 days from the date of

18   referral?  Or why would being off one day be the cause of all

19   the problems?

20       MR. STRUCK:  It's my understanding that there was         10:01:37

21   somebody that was miscalculating it so these things were

22   occurring in 15 days, within 15 days, which obviously doesn't

23   meet the 14-day threshold.  That was one of the issues.

24       In addition, there had been -- prior to this there had

25   been a backlog at the facility that has been -- that's no      10:01:57

—CV-12-601-PHX-DKD – December 20, 2017—

1    longer in existence after the additional staff had been hired

2    in October.

3         So those were the two issues identified as to why

4    Florence was having trouble meeting the 85-percent threshold on

5    Performance Measure 39.                                          10:02:24

6         MS. KENDRICK:  What was the additional staff that was

7    hired in October?

8         MR. STRUCK:  Your Honor, I don't have the information

9    with respect to the additional staff at may fingertips.  I

10   thought it was in here somewhere, but I will find out at the   10:03:29

11   next break and let you know.

12        THE COURT:  Do you know when they were hired in

13   October?

14        MR. STRUCK:  It was my understanding that they were

15   hired in October.                                               10:03:37

16        THE COURT:  Do you know when they started?

17        MR. STRUCK:  Wait.  Well, I have -- it shows -- if you

18   look at the supplemental information, it looks like there were

19   two nurse practitioners hired on October 2nd, an additional

20   M.D. hired on October 5th.  If you look above --                10:03:53

21        THE COURT:  I see, I see.

22        MR. STRUCK:  Okay.  I think that is -- those are

23   the -- that's the additional staff that helped eliminate the

24   backlog.

25        MS. KENDRICK:  Is that additional or is it replacing      10:04:07

—CV-12-601-PHX-DKD – December 20, 2017—

1   vacant positions?

2           MR. STRUCK:  I'm sure it was replacing vacant

3   positions.

4           THE COURT:  And yet on October 9th, according to the

5   KJZZ story, there's a memo from Daniel Sego:                          10:04:27

6           Hi team.  As you all know we are currently

7       working towards catching up on our backlog of both

8       HNR and Chronic Care patients totaling

9       approximately 800.  We are in need of all available

10      provider staff to assist in, quote, Operation                      10:04:45

11      Backlog, close quote.  We have the availability and

12      need at both Florence and Eyman, and we encourage

13      you to let us know when -- where you would like to

14      work the overtime shifts and we will make the

15      arrangements.                                                      10:05:01

16          I greatly appreciate any and all time you are

17      willing to spend assisting us with our patient care

18      needs.  You will be compensated for your time.  And

19      who couldn't use a little extra cash around the

20      holidays?  Thank you in advance.  And I look                       10:05:14

21      forward to the response.

22          Best regards, Daniel Spencer Sego.

23          Facility Health Administrator.

24          Arizona State Prison Complex – Florence.

25          Do you have any data post October with respect to 39          10:05:42

1  at Florence?

2          MR. STRUCK:  I do not.

3          THE COURT:  And this issue is one that's also

4  implicated by the HNR Box Removal Program because it does

5  affect the number of days.                            10:06:12

6          All right.  Your next Measure?

7          MS. KENDRICK:  Yes, Your Honor, Performance Measure

8  42, which is about follow-up sick call encounters occurring

9  within the time frame specified by the medical provider.

10         So Eyman is at 35 percent this month, going down from   10:06:31

11  49 percent.  At the bottom of page 104 is the Corrective Action

12  Plan.  And I'm trying to look at my notes here.

13         Oh, so I guess it's midway on page 104, it's in

14  regular font, it's not bold.  It says that:

15         On or after December 15th Corizon compliance          10:07:03

16      monitor shall review an appropriate sample of

17      entries on the logs to evaluate and assess

18      compliance with the new policy and procedure.  Any

19      and all compliance deficiencies discovered during

20      this monitoring exercise shall be addressed by site    10:07:19

21      leadership in the form of providing additional

22      training to those providers associated with

23      deficiency findings.

24         So since this was supposed to be done, I don't know if

25  it's been done yet, if there's any update on what this review   10:07:32

————— CV-12-601-PHX-DKD – December 20, 2017 —————

1    by the compliance monitors have found.

2         THE COURT:  It will be interesting to see whether or

3    not the providers are actually able to schedule the follow-up

4    in light of the staffing issues that seem to be suggested both

5    with respect to the information that we have from the KJZZ          10:08:15

6    story and also from the reporting numbers here, just so

7    abjectly poor at 35 percent, 47 percent, 66 percent.

8         And I gather you don't have any real-time data in the

9    last five days.

10        MR. STRUCK:  I don't have any real-time data on that.          10:08:45

11        I was informed that one of the problems was that the

12   providers weren't consistent in ensuring that these follow-up

13   appointments were being scheduled.  So a CNA, a certified

14   nursing assistant, has been tasked with actually having that

15   job, to make sure that the order from the provider and -- is        10:09:05

16   taken and a follow-up is scheduled.

17        The Director of Nursing and the scheduler are looking

18   at this daily.  But I do not have any real-time information

19   with respect to how that's going.

20        MS. KENDRICK:  So I guess I would hope that they have          10:09:29

21   nursing staff to do the follow-ups.

22        I'm sorry, Your Honor, just to go back a couple pages,

23   I just realized this as we were flipping through.  There's no

24   data reported for Performance Measure 39 at Perryville.  It's

25   at page 96 of the filing.  I checked the CGAR that we got last       10:09:44

 1    night for this Performance Measure, and it shows 77 percent

 2    compliance with this measure.

 3            And again, if this was one that was in the rebuttal

 4    process, the CGAR that we were given, which is Bates stamped

 5    ADCM1045194, has no indication of any changes being made.          10:10:08

 6            Since it's 77 percent, we would also ask what the

 7    remedial plan is for Perryville for this measure.

 8            THE COURT:  The first question is whether Mr. Pratt

 9    knows whether this one is now concluded from the rebuttal

10    process and we can take the 77 number, or whether the rebuttal     10:10:29

11    process still seems to remain open.

12            Do you know?

13            MR. STRUCK:  The 77 percent number is a final number

14    that --

15            THE COURT:  All right.  And what would defendants          10:10:40

16    propose to do about correcting this problem and identifying its

17    cause?

18            MR. STRUCK:  You know, I am not sure what -- I did not

19    get a remedial plan from Corizon.  But in looking at PM 39, it

20    looked like Perryville was in compliance for --                   10:10:56

21            THE COURT:  They were, yeah.

22            MR. STRUCK:  -- six months in a row.  So I'm not sure.

23    I have to find out what the reason behind the falling from 94

24    percent to 77 percent was.  And I don't have that information.

25            MS. KENDRICK:  But we would note that, according to       10:11:26

—CV-12-601-PHX-DKD – December 20, 2017—

1   their November staffing report, which was filed -- we filed it

2   last night at docket 2509-1, on page 7 it shows that the

3   Medical Director position at Perryville is staffed at 80

4   percent, and the staff physician positions are at 80 percent

5   full-time equivalent.                                         10:11:43

6       So we would express a concern that it perhaps is

7   rooted in the fact that they're not at full staffing at the

8   physician and Medical Director level.

9       THE COURT:  That would be a reasonable conclusion.

10      All right.  Your next one?                                10:11:57

11      MS. KENDRICK:  So Performance Measure 42 at Lewis,

12  which is page 106 of their filing, they show 66 percent

13  compliance for the month.  The new Corrective Action Plan as of

14  last week says that the training is being done for nurses on

15  the requirements.  It also says that the Assistant Directors of  10:12:31

16  Nursing are pulling data related to this issue daily to send to

17  providers.

18      And then the final sentence is written in the passive

19  voice and says:  Further, the data is checked every night at

20  10:00 p.m. to prompt follow-up.                               10:12:48

21      And so our question would be, checked by whom?

22      THE COURT:  Do you have an answer to that question?

23      MR. STRUCK:  Yes.  It's my understanding it was the

24  Assistant Director of Nursing.  But I will get confirmation on

25  who is checking at 10:00 p.m.                                 10:13:11

1          THE COURT:  Give me just a moment.

2          MS. KENDRICK:  So the next one we have questions about

3   is Performance Measure 46 at Eyman, which is at page 118 of

4   this filing.  And they show 60 percent compliance.

5          And then on page 119 is the supplemental Corrective           10:14:03

6   Action Plan, which states that there's a backlog in having

7   providers review and act on diagnostic and pathology reports.

8   And then it says, providers were only reviewing their own

9   ordered diagnostic and pathology reports and were not also

10  reviewing the reports sought by other providers.                   10:14:29

11          The Corrective Action Plan states that on-duty

12  providers will be assigned to an individual yard at the

13  facility.  Providers are now responsible for reviewing all

14  diagnostic and pathology reports generated for the patients at

15  an assigned yard, including those requested by other providers.    10:14:45

16  This supplemental Corrective Action Plan was implemented in the

17  beginning of November 2017.

18          So a couple of questions or comments coming out of

19  this Corrective Action Plan.

20          First of all, our understanding was that providers        10:15:01

21  were assigned to an individual yard at the facility unless

22  there was a shortage of providers and then they had to go to

23  multiple yards.

24          The second observation is one that our consulting

25  expert, Dr. Wilcox, has shared with us before that the best       10:15:19

1    practice is that the provider who orders a report should be the

2    same person who reviews the report, because they know why they

3    ordered the report in the first place.

4         You know, obviously if that person is no longer

5    working there, then someone's going to have to review it.  But    10:15:34

6    I guess we just had some questions about why that is becoming

7    the practice and why it's not the situation where the person

8    who orders the report is reviewing the report.

9         THE COURT:  Mr. Pratt, do you have any observations

10   there?                                                            10:15:57

11       (Discussion held off the record.)

12         MR. PRATT:  Your Honor.

13         THE COURT:  Yes.

14         MR. PRATT:  It may not be the case where it's simply

15   the provider that ordered the report when it comes in.  In a      10:16:10

16   lot of cases you also have to consider the inmate movements

17   going from one facility or one yard to another when that report

18   does come in.  So it's not going to be the same provider that

19   is actually hands on with that inmate at the time.

20         THE COURT:  Okay.  Miss Kendrick, can I go back to 42       10:16:30

21   for a moment?

22         MS. KENDRICK:  Of course, Your Honor.

23         THE COURT:  Is my recollection correct that you

24   focused on Lewis and not on the other facilities, or did you

25   address the other facilities as well?                             10:16:45

1          MS. KENDRICK:  I think we looked at Eyman and Lewis.

2          THE COURT:  Did you?  All right.  Thank you.

3          Because I was going back to my notes from last month,

4     and I guess it looked to me like there had been a dialogue with

5     the Corizon people to make sure that the training was in place,          10:17:13

6     that this should have been reflected even in October.

7          No, that's not right, it's on November 1.  So November

8     1 was the new oversight.  Okay.  Never mind then.  Thank you.

9          You may go.

10          MS. KENDRICK:  So Performance Measure 46, again          10:17:39

11     reporting 65 percent compliance at Florence.  This Performance

12     Measure is part of your order to show cause at Eyman, Florence,

13     Perryville and Tucson, so we're concerned that the data is not

14     showing great improvement.

15          On the Lewis one, which is at page 121, the          10:18:03

16     supplemental information is referring to intake nurses and

17     communicating that people be seen upon their transport to the

18     Lewis facility before they are taken to their unit.  But it's a

19     little unclear how -- whether the source of the problem is

20     people that were coming from other prisons, or what the          10:18:30

21     situation was there.

22          THE COURT:  Do you have an answer on that?

23          MR. STRUCK:  Yeah, I think that -- it's my

24     understanding the issue is when inmates are transferred from

25     complex to complex, that at least at Lewis there had been          10:19:18

1  issues with respect to whether or not the providers at the

2  Lewis facility were -- knew that they needed to be reviewing a

3  diagnostic report or a pathology report that might have

4  occurred at a prior -- when they were at a prior facility.

5          And so I think that it's my understanding that               10:19:44

6  the -- this particular action plan by Corizon is to try and

7  ensure, to catch the patients that are being transferred to

8  make sure that this Performance Measure is being met.

9          THE COURT:  Do you have any more current data than

10  October?                                                            10:20:09

11          MR. STRUCK:  I do not.

12          THE COURT:  I guess that's puzzling to me why you

13  don't.  Because I guess if I were the defendant in this case

14  and I was sitting in the middle of December and I knew that

15  each one of these would cost me $1,000 if it wasn't happening    10:20:20

16  in December, and I had October data that suggested that I was

17  missing the boat here, and that this could be very costly for

18  me, I would really have my fingers on that pulse, I'd know

19  about it.

20          MR. STRUCK:  I'm not disagreeing with you, Your Honor.   10:20:36

21          THE COURT:  But you don't.  You don't --

22          MR. STRUCK:  Not -- on some of them I do.  On this one

23  I don't.  And I don't have the answer for you as to why I

24  don't.

25          THE COURT:  All right.                                      10:20:48

1          MS. KENDRICK:  Your Honor, just one other observation.

2     The CGARs that we got last night for Lewis, I was looking at

3     this Performance Measure trying to get some more information,

4     and observed that there seems to be a problem similar to one

5     that we identified in the letter that was attached to my          10:21:05

6     Declaration regarding the September CGARs, and that's the issue

7     of reviewing reports and actions for the month that's not being

8     reviewed.

9          So, for example, this is the October CGAR, it's Bates

10    number ADCM1045151, and it refers to a non-compliance file       10:21:22

11    where the results were received on September 20th and reviewed

12    September 26th.  And again, I'm not quite sure why that would

13    be included in the sample for an October performance review.

14         THE COURT:  I can't figure out a reason.

15         As you just listened to that description, Mr. Pratt,        10:21:52

16    do you have any idea why that would be so?

17         MR. PRATT:  I don't, Your Honor.

18         THE COURT:  All right.  Thank you.

19         MS. KENDRICK:  So on Performance Measure 46 for

20    Phoenix, which is a couple pages later, at page 123.  This        10:22:17

21    Performance Measure is about medical providers reviewing

22    diagnostic reports, but on this document on the basis for

23    non-compliance it states that the psychiatrist on staff did not

24    understand the process for reviewing diagnostic reports and

25    acting upon them.                                                 10:22:38

1          So it's a little unclear why we have psychiatrists

2    reviewing diagnostic reports, and how that's relevant to a

3    Performance Measure that's about medical procedures and

4    reports.

5          (Discussion off the record between defense counsel.)     10:23:23

6          MR. STRUCK:  Your Honor, I'm going to have to find out

7    some additional information to answer that question.

8          THE COURT:  And I gather Dr. Taylor or Mr. Pratt have

9    no ready response to it, on the face of it?

10          MR. STRUCK:  That's correct.                             10:23:47

11          THE COURT:  All right.

12          MS. KENDRICK:  So I wanted to go to Performance

13    Measure 47, which is at docket 2506-2, page 3.

14          Eyman is listed as 60 percent.  This is a Performance

15    Measure and institution that's included in your order to show  10:24:27

16    cause for contempt, along with multiple other facilities;

17    Florence, Lewis, Perryville, Phoenix and Tucson.  And this is

18    an issue which we've discussed ad nauseam for most of the year

19    about communicating the results of the test.

20          And at the bottom of page 3 the basis for              10:24:47

21    non-compliance says that there were, quote, issues previously

22    experienced in terms of how diagnostic results could be

23    communicated and delivered to an inmate upon request.

24          And the question is, what are the issues?  Because our

25    understanding was that this new process was put into place     10:25:08

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD – December 20, 2017—

1    several months ago for communicating diagnostic results to

2    inmates.

3            THE COURT:  So we have two questions here.  The first

4    one, the one you just raised, what is the modification?

5    Because it just says there's -- the diagnostic results, the RN        10:25:28

6    is now tasked with immediately providing the results to an

7    inmate.  We don't know how that's happening, what is the

8    method.

9            And the second is, it says it's being tracked on a

10   daily basis.  And at leads to the question, do we have                 10:25:42

11   real-time data on where we stand yesterday, for example?

12           MR. STRUCK:  The answer to question number two, I

13   don't have real-time data.

14           THE COURT:  Do you have any update at all after the

15   implementation of the program the third week of November?            10:25:58

16           MR. STRUCK:  I do not.

17           THE COURT:  All right.

18           MS. KENDRICK:  All right.  We would just observe that

19   Florence also looked problematic at 46 percent, Lewis at 52

20   percent, and Tucson at 75 percent.  So we hope that perhaps at        10:26:12

21   the January 10th hearing we might have a sneak peak of some of

22   the real-time data, as we had requested that the December

23   real-time data be provided at that hearing for those measures

24   that were included in your order, Your Honor.

25           THE COURT:  Right.  Well, it seems that if it's being         10:26:37

UNITED STATES DISTRICT COURT

1    tracked on a daily basis, that is as difficult as forwarding an

2    e-mail to let us know.  I mean, obviously I'm most interested

3    in compliance with the Stipulation and compliance as

4    expeditiously as possible.  And I'm limited by the delay in the

5    data that is a natural feature of the process.  But when that          10:27:01

6    natural feature of the process is addressed by daily tracking,

7    it is certainly much more useful for me to have that

8    information, and I would encourage it to be produced.

9           With respect to the first question, Mr. Struck, do you

10   know what is the new method that the RNs are using?                    10:27:24

11          MR. STRUCK:  I'm going to have to find out what

12   actually the RN is doing.

13          THE COURT:  I see.  I guess that seems to me a pretty

14   important component here, consistent with really the drill down

15   that I have engaged in on a monthly basis.  I mean, tasked with        10:27:40

16   immediately providing these results to an inmate, that could be

17   everything from immediately walking it over to the inmate in

18   his or her cell, to other methods that have been communicated

19   to me in the past, that apparently were not done, and that is

20   using the mailbox rule and immediately putting it in the inmate        10:28:09

21   mail.  But I've been told that that doesn't work for a number

22   of reasons.

23          So the bottom line of this comment is, I'm surprised

24   that we don't have an answer to both of these questions at this

25   moment at this time.                                                   10:28:26

1      MR. STRUCK:  Your Honor, I'm documenting these

2    questions.  I will get an answer to the Court and to the

3    plaintiffs.

4      THE COURT:  Right.  But that's not really helpful in

5    one way, because we have these monthly meetings to try to cut          10:28:37

6    as much time as we possibly can out of the delay process.

7    Because if I wait until the next -- to the next time that we

8    talk about it, I'm 30 days, usually, out from when we last

9    talked about it.  And it is anything but expeditious to do it

10   that way.                                                             10:29:00

11      And so I've been trying to drill down, trying to nail

12   people to firm commitments, as I told Mr. Bojanowski last month

13   using the metaphor of keeping feet to the fire.  I mean, that's

14   really what I try to do.  And if we don't get the answer right

15   at this moment, the feet grow cold.                                   10:29:17

16      MR. STRUCK:  My intention is that as soon as there's a

17   break, to send these questions out and try to get an answer

18   today.

19      THE COURT:  Okay.

20      MR. STRUCK:  And I apologize.  But I can't -- I mean,           10:29:28

21   I can anticipate what some of the questions are going to be.

22   And I did.  But I didn't -- I still -- I couldn't get an answer

23   for you, because I made an attempt.  Some of these questions I

24   just didn't anticipate, but I can get the answer.

25      And I understand the Court's desire to -- we're            10:29:44

1    talking about it now, you'd like to have the answer now.  But I

2    don't have the person from Florence that we're going to have to

3    ask this question here in the courtroom, so I can't answer it.

4            THE COURT:  All right.  Thank you.

5            We'll take a ten-minute break at this moment and then          10:30:01

6    we'll get back to it.  Thank you.

7        (Recess at 10:30 a.m., until 10:44 a.m.)

8            THE COURT:  A couple of things, the Court collecting

9    its thoughts during the break.  It makes sense, I think, for us

10   to set a deadline at the very start so that people can                 10:45:02

11   understand when the documents would need to be designated for

12   the February hearing on the reporting.

13           I just want to make sure that people do feel that they

14   have a deadline in place, so that they know at that deadline

15   who the plaintiffs believe the list of witnesses should be and        10:45:34

16   the document categories that the plaintiffs believe should be

17   produced for the hearing.

18           And it would seem to me that an appropriate deadline

19   for that would be maybe the end of the second week of January.

20           What do you think about that, Miss Kendrick?                   10:45:52

21           MS. KENDRICK:  So you're saying for production of

22   documents and --

23           THE COURT:  That would be the deadline for you to

24   designate the witnesses that you believe, so that you are

25   putting notice on anybody who has responsibility for those            10:46:04

CV-12-601-PHX-DKD – December 20, 2017

1   witnesses, by that date.  And then also you would be serving by

2   that date your requests for production of documents, so that

3   you would have enough time to allow for the responding parties

4   to collect those documents and for any issues to be resolved,

5   and also allow enough time for you to digest them.                    10:46:29

6          And then once that date happens, then it would seem to

7   me --

8          Unfortunately I don't have a calendar.  I do now.

9   Good.  2018.

10         MS. KENDRICK:  So, Your Honor, kind of working                 10:46:56

11   backwards from that date, the 9th, we agree that we would want

12   to give them the list of names.  But depending on what we --

13         THE COURT:  You need a deadline to have the response;

14   right.

15         MS. KENDRICK:  Right.  And we would also need to               10:47:12

16   potentially supplement who we were going to call based upon

17   what we get in the document production.

18         So working backwards what we would propose is that we

19   get our request to them no later than January 12th, which is

20   four weeks before the hearing.  They provide all responsive        10:47:27

21   information no later than the 26th.  And then Friday the 2nd,

22   one week before, would be the final day for any supplemental

23   witnesses based on reviewing documents.

24         THE COURT:  And defendants' view on that schedule?

25         MR. STRUCK:  Your Honor, I don't think that's                 10:47:49

```
1    going -- I mean, I haven't seen what their document request is,

2    but I suspect that there's going to be a significant amount of

3    ESI.  Probably, based on the Court's comments, it's going to

4    have to come from Corizon.  And I don't even know what kind of

5    document retention system they use, whether they -- you know,        10:48:05

6    how easy it's going to be to get it from them.  So I'm a little

7    concerned about that short fuse.

8            To agree on search terms, agree on -- I just think

9    we're going to need a little more time than that.

10           THE COURT:  Miss Kendrick, would it be possible to           10:48:20

11   push you all to the 5th of January as the date that you get

12   this -- these requests over to the defendants and to anybody

13   else?

14           MS. KENDRICK:  Yes, we could do that.

15           However, I would just note that we would like a firm         10:48:34

16   deadline for all discovery to be in, and for defendants to

17   produce it on a rolling basis rather than waiting until the

18   last piece of paper has arrived before producing anything to

19   us.

20           So 26th is the absolute deadline for them to produce         10:48:47

21   responsive documents, but that they start doing it sooner, then

22   we could do it on the 5th.

23           THE COURT:  All right.  So we'll set the 5th for the

24   date for the request for production and for the witness list

25   from plaintiffs to be produced.                                      10:49:04
```

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1          And then we'll set a response deadline of the 26th of

2    January.

3          And also the requirement that in good faith and with

4    good deliberate action, that the plaintiffs (sic) produce

5    documents on a rolling basis rather than accumulating them for          10:49:19

6    service on the date of the 22nd (sic).  If they become

7    available to counsel here sooner, then they should produce

8    those to plaintiffs so that they can have the time to digest

9    them.  That seems to be a fair accommodation of the respective

10   parties' positions on this issue.          10:49:40

11          MR. STRUCK:  And, Your Honor, I do want to point out,

12   I do want to mention, because Miss Kendrick is implying that we

13   don't do that, that we data dump them.  We don't do that.  When

14   we can, we produce on a rolling basis, there was really no need

15   for you to order that.  And it's -- I'm --          10:49:55

16          THE COURT:  I don't know, were you here last month

17   where I heard about -- it sounded to me, looked to me like it

18   was not a rolling basis, at least in one instance.  It may be

19   that overall you're doing exactly that.  But I'm not making it

20   up.          10:50:12

21          MR. STRUCK:  And understand that sometimes we can't,

22   we're not able to do it.  But when we can, we do,

23   because -- and we always offer to do that when we can.

24          THE COURT:  All right.  Good.

25          And I maybe wasn't clear, but with respect to the          10:50:25

UNITED STATES DISTRICT COURT

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1   status report with the graphs that's not in an OCR form that

2   we're using today, if you could refile that so we would have

3   this one --

4           MR. STRUCK:  We will, Your Honor.

5           THE COURT:  Okay.  Thank you.                    10:50:43

6           MR. STRUCK:  And do you -- do you have additional

7   things --

8           THE COURT:  No, go ahead.

9           MR. STRUCK:  I was going to say, during the break I

10  got some answers to some of the questions that have been asked   10:50:50

11  by the Court and counsel.

12          THE COURT:  All right.

13          MR. STRUCK:  Not all of them, but some of them.  I

14  only had a limited amount of time.

15          THE COURT:  Okay.                                 10:50:58

16          MR. STRUCK:  With respect to Performance Measure 15,

17  there was a question, I believe Miss Kendrick wanted to know

18  who was doing the counseling.  And that would be either an LPN

19  or an RN who is doing the counseling on Performance Measure 15.

20          With respect to Performance Measure 39, I wasn't fully   10:51:18

21  able to understand why Perryville dropped to 77.  And I'll get

22  to the bottom of that.  But I can tell you I was informed by

23  the FHA -- because I spoke to the FHA at Perryville on the

24  break, and was told that the preliminary numbers that had been

25  shared with the FHA show that they were at 92 percent in        10:51:49

1    November.  So that's gone up.

2          On Performance Measure 42, Miss Kendrick wanted to

3    know who at Lewis was checking daily at 10:00 p.m. to prompt a

4    follow-up.  And it's the FHA, Kelly Rogers, who's doing that.

5    And that's Performance Measure 42.                              10:52:23

6          THE COURT:  Thank you.

7          MR. STRUCK:  And on Performance Measure 47, I believe

8    it was Florence.  The question was, how is the RN communicating

9    the results of the diagnostic study to the inmate when the

10   inmate requests it.  And it's my understanding that they're     10:52:44

11   actually -- when the inmate request -- is requesting it, comes

12   in with the HNR requesting it, they immediately print off the

13   results and hand it to the inmate, the RN does.

14         THE COURT:  Okay.

15         MR. STRUCK:  And those -- the other questions I'll get    10:53:06

16   answers to, I think there were three other questions.

17         THE COURT:  Okay.

18         MS. KENDRICK:  Thank you.

19         THE COURT:  I interrupted Mr. Struck when we took the

20   break.  I don't know whether you had finished or whether we     10:53:20

21   were able to move forward with what you were saying.

22         MR. STRUCK:  I -- I don't remember what I was saying.

23         THE COURT:  All right.

24         MR. STRUCK:  It mustn't have been very important.

25         THE COURT:  All right.  Miss Kendrick?                    10:53:35

1          MS. KENDRICK:  So I think we were finishing up

2    Performance Measure 47.  I note that at page 12 of the filing

3    it shows that it's in the rebuttal process.  I reviewed the

4    CGAR that we got last night for Winslow, and it showed zero

5    percent for Performance Measure 47.                              10:53:54

6          THE COURT:  Do we know if that's a final number,

7    Mr. Pratt?

8          MR. PRATT:  Yes, Your Honor.

9          MR. STRUCK:  That is final.

10         MR. PRATT:  They were zero for one.                         10:54:10

11         MR. STRUCK:  There was only one inmate that fell under

12   this particular Performance Measure --

13         THE COURT:  And you didn't get that one right.

14         MR. STRUCK:  -- and they did not meet it.

15         MS. KENDRICK:  All right.  So Performance Measure 49        10:54:29

16   is the denials of requests for specialty service being

17   communicated to the patient.  And Tucson is showing 76 percent

18   at page 20.  The basis for non-compliance it states was due to

19   the departure and on boarding, I guess that means the training,

20   of a new clinical coordinator in mid October and turnover of    10:54:55

21   several providers.

22         And it states that two doctors have been hired.  I

23   just want to confirm that those are actually M.D.s or if

24   they're nurse practitioner providers, if Mr. Pratt or anybody

25   knows.                                                           10:55:15

————— CV-12-601-PHX-DKD – December 20, 2017 —————

1          MR. STRUCK:  I was told it was two new medical

2    doctors, but --

3          (Discussion off the record between defense counsel.)

4          MR. STRUCK:  Definitely one medical doctor.  We'll

5    check on -- make sure what the other provider is.                    10:55:42

6          MS. KENDRICK:  Okay.  Because the November report for

7    staffing that we filed at docket 2509-1, page 10, shows that of

8    the 3.5 staff physician positions, there's a .75 physician

9    filled in November.  The October report showed zero physicians.

10   So that appears that there's only three quarters of a M.D.         10:56:05

11   hired in November.

12         I also don't know if Mr. Pratt or anybody knows if

13   these are full-time M.D.s or if they are part-time, the ones

14   who have been hired.

15         THE COURT:  Do you happen to know, Mr. Pratt?                 10:56:25

16         MR. PRATT:  I do not.

17         THE COURT:  All right.  Well, the fact that we don't

18   know that what is said here is true, that Corizon has hired two

19   new M.D.s, when we have Corizon staff and Corizon lawyers in

20   the courtroom, we have ADOC staff and ADOC lawyers in the          10:56:48

21   courtroom, and we have a document that the lawyers from Corizon

22   produced --

23         MR. STRUCK:  If I may interrupt, it does say that the

24   second M.D. was hired in December 4th, so that wouldn't

25   necessarily show up on the November staffing report.               10:57:05

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1        THE COURT:  Well, it says who started December 4th.  I

2   don't know anybody who's hired on the 1st of December and

3   starts on the 4th.  Maybe that happens in some other world.

4   But again, it may be my bet that it was not a December -- maybe

5   it's only reported in the staffing report, that could be.                    10:57:24

6   You're right, that's possible.

7        Okay.  I just -- it's troubling to me that it's the

8   Corizon lawyers who are producing this document, not the

9   Corizon people who are the contractors, and not the ADOC staff

10  who are producing the document that we're using.                             10:57:44

11       So I'm worried that what I'm receiving is a lawyered

12  document rather than an actual depiction of what's going on on

13  the scene.  I'm not naive to think that things are never

14  lawyered.  But when I've got the lawyers in front of me in the

15  case, and they're honing over a document that's been generated  10:58:05

16  by lawyers for the contractor, very different interests

17  obviously in a long-time -- well, "long-time" perhaps not the

18  best word -- a broad responsibility to the case as the

19  signatories to the Stipulation, it would seem to me that it

20  would be a better practice for the documents to be developed    10:58:41

21  and not only merely evaluated or reviewed or modified by the

22  parties before the Court.

23       But that said.

24       All right.  Go ahead, Miss Kendrick.

25       MS. KENDRICK:  Well, our concern actually, Your Honor,    10:59:01

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    is that in the past Mr. Bojanowski refers to people as medical

2    doctors when they don't have M.D.s.  And so I just wanted to be

3    sure that this was actually accurate.

4              THE COURT:  Okay.

5              MS. KENDRICK:  So the next one was Performance Measure          10:59:16

6    50 at Florence, which is part of your order to show cause.  And

7    defendants are reporting 59 percent compliance.

8              And I don't know if there's any possibility that they

9    have more current or real-time data than the 59 percent in

10   October since they're collecting it in response to your order.          10:59:39

11             MR. STRUCK:  Your Honor, in answer to that question, I

12   do not have more current data with respect to Performance

13   Measure 50 at Florence.

14             I did obtain information yesterday from Corizon that

15   they have -- Corizon Nashville has contracted with Tenet            11:00:11

16   Healthcare to --

17             This is -- this particular Performance Measure is for

18   specialty diagnostic services, outside services.  And one of

19   the difficulties in meeting this Performance Measure at some of

20   these facilities was that -- you know, being able to identify       11:00:38

21   an outside provider who would actually treat this group of

22   patients in light of the challenges presented by that, in

23   addition to the AHCCCS rate issue.

24             But Tenet Healthcare, there is a contract with them.

25             And I believe that they did tell me they were            11:01:04

—CV-12-601-PHX-DKD – December 20, 2017—

1    negotiating with Banner Health as well for some of these

2    specialty services.

3         THE COURT:  The Tenet Healthcare sounds like it has

4    already been consummated as a contractor agreement?

5         MR. STRUCK:  That is what I was told yesterday.                    11:01:20

6         THE COURT:  Do we know whether it's in place?

7         MR. STRUCK:  I don't have -- I don't have the

8    contract.  I just know that they have -- I was told that a

9    contract is in place -- or has been signed.  I don't know what

10   the effective date of that contract is.                              11:01:34

11        THE COURT:  And these Tenet providers, where are they

12   located?

13        MR. STRUCK:  I believe it's the Tucson area.  But

14   there's more than one location.  It's kind of like Banner has

15   multiple locations around the state.                                 11:01:51

16        THE COURT:  Well, if this Performance Measure is not

17   showing a turnaround, we'll need to have much more detail about

18   the Tenet Healthcare.  Or maybe Mr. Millar's investigation will

19   also elucidate on this issue as well.

20        MS. KENDRICK:  So on their Supplemental Plan dated          11:02:13

21   December 15th, that's at page 25, they talk about the problem

22   in finding a specialist.  And it says that Corizon, quote, is

23   reaching out to additional specialty providers within Arizona

24   and those also residing in neighboring states.  This action

25   measure was implemented in mid November 2017.                       11:02:37

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1        It's unclear what does -- what neighboring states

2   means.  Is that referring to telemedicine, or are you guys

3   going to start taking people to Nevada and New Mexico?  Or

4   what --

5        MR. STRUCK:  I'm fairly certain that they're not going   11:02:53

6   to be transporting inmates to neighboring states.

7        And it's my understanding that that relates to

8   telemedicine.

9        THE COURT:  Any idea whether this reaching out in mid

10  November has produced any fruit yet?   11:03:18

11        MR. STRUCK:  Well, that's the Tenet contract

12  was -- that's one of the -- and it's my understanding that

13  there were additional contracts with -- Tenet is more of a

14  broad -- it's more than one specialty area that they will

15  provide.  And there are -- there are other specific contracts   11:03:39

16  relating to, you know, more specific providers I know that

17  were -- that I was told were also entered into contracts with.

18        I can get that information.  I requested that

19  information, I did not receive it.  But I can get that

20  information to the Court and counsel with respect to what   11:04:06

21  contracts have actually been entered since November on

22  that -- for that particular Performance Measure.

23        THE COURT:  Well, I mean, we will have to know more,

24  because the statement in the Corrective Action Plan is that the

25  corporate office was reaching out, and that this was   11:04:22

UNITED STATES DISTRICT COURT

1    implemented in November 2017.  And we're hearing about entered

2    into new contracts with.  And that has been orally put on the

3    record with respect to the consummated contract with Tenet and

4    the perhaps contemplated contract with Banner Health.

5             But we'll need to know exactly what the details are          11:04:44

6    here so that we can address the appropriateness of this

7    remedial measure and offer secondary measures if those are

8    necessary.

9             MS. KENDRICK:  Also, what is the status of Corizon's

10   contract with the Arizona Oncology Network?                           11:05:05

11            Yesterday we contacted your office, Mr. Struck, about

12   a patient with leukemia at Eyman who has a pending urgent

13   consult for oncology.  And the response from Corizon in his

14   medical record said that, quote, due to the transition process

15   from AON to MIHS there's been a large amount of patients that         11:05:28

16   are currently on a wait list, first come, first serve basis,

17   and we'll try to schedule him as soon as possible.

18            THE COURT:  The second acronym refers to?

19            MS. KENDRICK:  I'm not sure what MIHS means.

20            THE COURT:  I bet Mr. Pratt knows.

21            MS. KENDRICK:  If I may approach I can show you --

22            THE COURT:  I bet Mr. Pratt knows.

23            MR. PRATT:  Maricopa Integrated Health Services.

24            THE COURT:  So Corizon's no longer using them?

25            MR. STRUCK:  No, I think they are using -- I think           11:05:59

1    that --

2              THE COURT:  It's a transition away from AON to

3    Maricopa Integrated?

4              MR. STRUCK:  That's what I understood Miss Kendrick to

5    say.                                                              11:06:10

6              MS. KENDRICK:  May I approach, Your Honor?

7              THE COURT:  Yes.

8              Mr. Pratt, do you know anything about the details of

9    this wait list?

10             MR. PRATT:  I don't know the details on it,            11:06:57

11   Your Honor.  I do know that AON -- it was reported to me that

12   AON was --

13        (Court reporter interruption.)

14             THE COURT:  Louder, please.

15             MR. PRATT:  I'm sorry.  It's my understanding that AON 11:07:05

16   has declared or is declaring Chapter 11 bankruptcy, and

17   refusing to accept inmates as patients going forward, which

18   required Corizon to find another provider for their continuing

19   care.

20             THE COURT:  And so the notation on the document        11:07:30

21   provided by plaintiffs' counsel states, quote, there has been a

22   large amount of patients that are currently on a wait list,

23   close quote.

24             Do you know the number of patients roughly?

25             MR. PRATT:  I do not.                                  11:07:48

UNITED STATES DISTRICT COURT

1          THE COURT:  Do you know roughly how long the delay is

2    attendant to this dislocation arising out of the bankruptcy?

3          MR. PRATT:  No, sir, I do not have the details or

4    specifics on the delays.  All I know is that they will try to

5    schedule them as soon as possible through MIHS in the                   11:08:04

6    transition.

7          THE COURT:  Who in the State looks over such a thing

8    like this?  Who's responsible?  I mean, the Department of

9    Corrections is responsible for the lives of its inmates.  And

10   you've contracted with a contractor to provide medical                  11:08:24

11   services, and so that removes you sort of once removed from the

12   process.

13          And then there is a debacle that happens that is out

14   of the contractor's control, and that is a provider it used is

15   no longer able to see the patients.  And then there is word            11:08:51

16   that they're moving to another provider, but that there is a

17   large number of -- a large amount of patients that are

18   currently on a wait list that's a first come, first serve

19   basis.

20          And I wonder, when this happens, who in the State of            11:09:09

21   Arizona, among State of Arizona employees at the Department of

22   Corrections, takes responsibility for the fact that they need

23   to be riding herd on this situation where a large amount of

24   patients are having their oncology care delayed by

25   circumstances, to assure that the contractor who has apparently        11:09:34

1    dragged its feet with respect to getting the appropriate number

2    of providers -- and that's not something that is disputed by

3    the State because it insists on a particular number of

4    providers in its contract with the contractor and the

5    contractor has elected to pay a fine for many months rather          11:09:51

6    than hiring the appropriate number of providers.

7              So who -- is it your -- is it on your shoulders,

8    Mr. Pratt?  Who has trouble sleeping at night at the State

9    because the patients who have -- inmates who have cancer can't

10   get care because of the circumstances?  Is there anybody in the     11:10:12

11   State employ who worries about this?

12             MR. PRATT:  Your Honor, I worry about this.

13             THE COURT:  And yet you seem to know remarkably little

14   about it.

15             MR. PRATT:  I know as much as I've been provided the       11:10:21

16   same information.  And when I look into it, I discuss with

17   Corizon, and we tell them -- again, responsibility for the

18   care, I rely on Corizon to provide that care.  If there's been

19   a change in their -- their subcontractor who provides this, my

20   expectation is that they will do this as quickly as they             11:10:43

21   possibly can.

22             I don't know time frame wise on the delays on

23   transitioning that care over to the MIHS.  But I will deal with

24   specifications as they're brought to my attention.  I do not

25   know the number, Your Honor.  And I would be surprised if this       11:11:02

———CV-12-601-PHX-DKD — December 20, 2017———

1    number is a large number.  I don't know what that means.

2            THE COURT:  Well, I know that it doesn't mean a small

3    number.  And I know it doesn't mean -- well, actually it says

4    "a large amount."  So I know it doesn't mean a small amount.

5    And I know it doesn't mean an amount.  So the word "large" is        11:11:18

6    an adjective I'm familiar with.  And it typically means a lot.

7    And that the people are on a wait list, and that there's a

8    first come, first serve basis.

9            And I guess what really troubles me is that you're the

10   one in the State of Arizona who thinks about this, and you           11:11:38

11   don't know the answer to basic questions, such as, what is the

12   amount of patients exactly and how long is the wait list.

13           The buck stops someplace.  And it seems to me that I'm

14   in a position of having to have to always be looking over your

15   shoulder and saying, you know, you just can't pass the buck to       11:11:59

16   Corizon because at the end of the day you're responsible on

17   this.  And at the end of the day it's hard for me to imagine

18   how a person with responsibility is aware that the

19   contractor -- or the subcontractor that provides oncology

20   services -- and I don't know of anybody who's referred to an        11:12:20

21   oncology service who doesn't think that that is a matter of

22   immediate concern.  I mean, at least that's my experience in

23   the world.

24           And so, cancers grow, and they tend to grow I think in

25   some medical term that involves the idea of very quick cell         11:12:39

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    division, that's what cancers do.  And so time is usually of

2    the extreme essence.

3            And so, if you know the basic fact that there is this

4    contractor that's no longer providing this service, and they're

5    transitioning to another, and you don't know the number of          11:12:59

6    patients that are involved or what the implication is on a

7    timeline -- you know, what might be acceptable to Corizon may

8    not be acceptable to somebody who's on the hook in the

9    Stipulation in this case.

10           And so I guess it would seem that it would be in your       11:13:15

11   best interests, separately from the interests of the individual

12   inmates, to make sure that you are riding really close herd on

13   this.

14           MS. EIDENBACH:  Your Honor, if I may.  I'm also

15   wondering whether or not the Department has spoken to the          11:13:30

16   Bankruptcy Court.  Because if AON has declared Chapter 11,

17   there may be some way that the Court can order them to continue

18   providing care as part of the bankruptcy plan, so that there's

19   not this lapse in life-or-death situations.

20           So I'm wondering whether this has been brought to the      11:13:51

21   Bankruptcy Court's attention by the Department, whether they're

22   following the bankruptcy and trying to participate as a

23   creditor or vendor, just in terms of continuing to provide care

24   until the Department is able to make provisions otherwise.

25           THE COURT:  Well, your comment has certainly provided      11:14:08

1    information that might be useful on the defendants' side of the

2    case to explore that possibility.

3           MR. STRUCK:  Your Honor, this progress note or

4    whatever this is written by Marsha Ramirez is less than -- was

5    done about 46 hours ago.  We'll look into it.                    11:14:28

6           THE COURT:  Well, I mean --

7           MR. STRUCK:  I didn't see any -- I'm not aware of any

8    information with respect to a backlog, or how many inmates

9    we're talking about, or what the delay is.  So we can certainly

10   find out, and it might be something that we don't have to make   11:14:45

11   issue of.

12          THE COURT:  Well, raise the temporal issue, I'll ask

13   back:

14          Mr. Pratt, when did you learn about this bankruptcy?

15          MR. PRATT:  In the last couple of days.                   11:15:02

16          THE COURT:  Last three or four days?

17          MR. PRATT:  Yes.

18          THE COURT:  And how long has there been any

19   obstruction in the process that you've been aware of with

20   respect to AON seeing these inmates?                             11:15:10

21          MR. PRATT:  Just in the last couple of days when I was

22   made aware of it.

23          THE COURT:  All right.  Thank you.

24          MS. KENDRICK:  Just for the record, we did notify

25   Mr. Struck and his firm about this particular patient first on   11:15:19

1    November 15th, and then again yesterday, about the fact that he

2    is 25 years old, has chronic leukemia, and is experiencing a

3    serious lapse in getting the urgent care and treatment with

4    oncology.

5            So this was actually brought to ADC's attention more    11:15:38

6    than a month ago originally with regard to this particular

7    patient and the inability to get him urgent oncology care.

8            THE COURT:  In a prison system that's operating under,

9    quote, Operation Backlog, close quote, it's not surprising to

10   hear what you just said.                                       11:15:56

11           Miss Kendrick.

12           MS. KENDRICK:  Let me just scroll through, Your Honor.

13           So Performance Measure 52 is about specialty

14   consultation reports being reviewed and acted upon within seven

15   calendar days.                                                 11:16:30

16           The report for Eyman shows 35 percent compliance,

17   that's at page 43 of their report.

18           It also states that for the Corrective Action Plan as

19   of December 15th, which is at page 46, that this is now being

20   monitored on something called the Warden's Daily Tracker Sheet. 11:16:49

21   And the site medical directors have been tracking this for the

22   last three weeks.  So, again, if Corizon or ADC has any more

23   current information, that would be greatly appreciated.

24           MR. STRUCK:  I'm sorry, Your Honor what Performance

25   Measure are we looking at?                                     11:17:17

CV-12-601-PHX-DKD – December 20, 2017

1       THE COURT:  52, in particular on page 46 where it is

2   node that specialty consultation reports are now monitored on

3   the Warden's Daily Tracker Sheet.  And that this is being

4   captured since October 20th, 2017, on a daily basis by pulling

5   data directly from eOMIS for the last three weeks to ensure        11:17:34

6   timely action.

7       And so Miss Kendrick has asked the natural question,

8   what is this data that's been pulled in real time telling us

9   right now?

10      MR. STRUCK:  I will find out, Your Honor.                       11:17:48

11      MS. KENDRICK:  And we would note that Florence, which

12  is part of your order to show cause, Your Honor, is at 63

13  percent.

14      This particular measure, it states that the reason is

15  because of the backlog.  And it appears to be the same          11:18:11

16  Corrective Action Plan that we discussed earlier with the

17  providers being assigned to yards.  And we hope that there will

18  be more current data at the January 10th hearing.

19      MR. STRUCK:  Your Honor, it's -- in speaking with the

20  Facility Health Administrator at Florence yesterday, it's my       11:18:32

21  understanding that the backlog has been eliminated.  They've

22  been utilizing telemedicine lines, two to three telemedicine

23  lines per week to eliminate the backlog.

24      And that they -- but in terms of how that has affected

25  this particular measure, I don't have November preliminary         11:19:08

1     results.

2                THE COURT:  All right.

3                Miss Kendrick?

4                MS. KENDRICK:  We would also just note that their

5     reporting does show continued non-compliance with this measure    11:20:00

6     also at Tucson and Yuma.  And we hope that the daily tracking

7     will show some improvements in the next month's data.

8                On Performance Measure 54 for Eyman, which is also

9     part of your order to show cause, and that's regarding patients

10    who have chronic conditions being seen for chronic care          11:20:27

11    treatment as specified by the provider no less than every 180

12    days.

13               Again, from September to October they're showing a

14    dip, which is concerning, because we had been told, I believe

15    it was two months ago, that telemedicine was going to fix this   11:20:48

16    problem at Eyman in October, but instead it looks like it's

17    getting worse.

18               The remedial plan that's at page 56 states that they

19    are modifying the tracking in an attempt to forecast the needs

20    of inmates in the future to allow Corizon to better allocate     11:21:14

21    resources.

22               And I was hoping either Mr. Struck or Mr. Pratt or

23    somebody could unpack that and translate it into plain English

24    as to what this actually means and what those steps would be in

25    tracking.                                                        11:21:30

1    MR. STRUCK:  I don't have information with respect to

2  how the chronic care tracking has changed, but I can certainly

3  find out, unpack that for Miss Kendrick and let her know.

4    THE COURT:  Thank you.

5    MS. KENDRICK:  Okay.  And it also doesn't say when          11:21:51

6  that change took place, so when we could possibly see

7  improvements in the scores.

8    THE COURT:  Do you know the date of when Corizon

9  modified the chronic care tracking?

10    MR. STRUCK:  I do not.                                      11:22:09

11    THE COURT:  Okay.

12    MS. KENDRICK:  And then for the next page, for the

13  same Performance Measure 54 at Florence, it's showing a drop

14  from 82 percent to 67 percent.  And again, says that they are

15  using out-of-state providers to develop -- to deliver          11:22:27

16  telemedicine and see patients on-site, and that the backlog is

17  going to be eliminated.

18    And so again, with these out-of-state providers, it's

19  a little unclear with the sentence if they're just being seen

20  by telemedicine or if they're actually also being brought to    11:22:46

21  Arizona to see patients in the flesh.

22    THE COURT:  Do you know, Mr. Pratt, how this is

23  happening?  Is it just by telemedicine or are the out-of-state

24  providers coming here?

25    MR. PRATT:  The majority is telemedicine, but Corizon       11:23:05

CV-12-601-PHX-DKD – December 20, 2017

1   has brought in out-of-state providers to assist.

2           THE COURT:  All right.

3           MS. KENDRICK:  And I guess that's also the same

4   Corrective Action Plan it looks like for Performance Measure 55

5   at Eyman at page 64, which is showing 60 percent compliance.     11:23:45

6   So we hope to see improvement there.

7           And then Performance Measure 66, which is about

8   providers seeing patients a minimum of every 72 hours in the

9   infirmary.  Unfortunately it looks like Florence is still

10  non-compliant at page 67.  And Florence was one of the three    11:24:24

11  prisons you had included in your order to show cause.

12          It states that the problem is that providers are not

13  fully documenting their rounds.  Again, we raised this last

14  month about our concern about the fact that some of the

15  providers were opening and closing their entries into the eOMIS  11:24:44

16  system after the fact or in advance of the rounds.  And we are

17  very concerned about that sort of record keeping.  I mean, the

18  fact that they're still showing non-compliance at Florence is

19  significant, but the fact that the providers can manipulate the

20  system in that way is something that we find problematic.        11:25:10

21          Mr. Pratt stated that he thought this was regular

22  practice.  And defendants also submitted an affidavit from a

23  nurse saying that that is a common feature of electronic health

24  records.

25          We checked with our medical expert, Dr. Wilcox.  He      11:25:28

1    said that he is not familiar with electronic health record

2    systems that allow you to manipulate the time of an encounter,

3    that the time when it's documented is the time that it should

4    show up in the record.

5           So, again, we're just stating that for the record,          11:25:45

6    Your Honor, that we are concerned not only with the fact that

7    their reporting is showing non-compliance and continued

8    non-compliance, but we are now concerned about the underlying

9    accuracy of the records that are being kept by the providers at

10   the infirmaries.                                                    11:26:02

11          THE COURT:  The inpatient facility at Florence, how

12   many beds does it have?

13          MR. PRATT:  Fifty-seven.

14          THE COURT:  And what's the census usually?

15          MR. PRATT:  There typically 90 percent full.                 11:26:16

16          THE COURT:  As I discussed in the past, it is

17   surprising to me that this is a Performance Measure that's even

18   at issue, because it seems that people who are in the

19   stepped-up care of having to be inpatient at the facility, that

20   there wouldn't be something in the record that would document     11:26:43

21   that they had had a provider encounter, at least every 72

22   hours.  It was surprising.

23          And so the continued issues that we are here in

24   December, being told about additional education on November

25   29th, 2017, when this has such a chronic record of failure,        11:27:05

80

1    calls yet again into question the credibility of the effort to

2    try to address some of these problems.

3          I say that again for the record knowing that we are on

4    the cusp of seeing really what it is in true terms in terms of

5    every single person, but also maybe having a better                    11:27:28

6    understanding about the veracity of the record keeping.

7          All right.  Go ahead.

8          And maybe I should at this point mention too, I opened

9    with a comment that I have to completely change, and that is

10   where I said the words I think "overwhelming compliance," that         11:27:48

11   was a feature of me having started reading every word in

12   the -- in the defendants' submission of the charts and seeing

13   what looked to me to be progress on those charts that

14   were -- that I'd reached.  And then thumbing through the rest

15   and seeing what I thought to be a good collection of                   11:28:10

16   compliance.

17         I've since learned a couple of things.

18         One, that there are apparently included here some

19   numbers of things that I'm not concerned about that have always

20   been compliant so that they tend to make it look more rosier          11:28:26

21   than what I would be focused on.

22         Two, we have spent a lot of time talking about

23   continued egregious failures to comply.  So that undercuts the

24   idea of overwhelming compliance.

25         And third, of course, the issue that we've discussed           11:28:42

81

1    extensively this morning, and that is the concern about the

2    veracity of the reporting process.

3              But I just wanted to strike my previous comment.  It

4    is a reflection of having read only part of the document, and

5    the document that I had read perhaps was over inclusive with          11:28:57

6    respect to rosy performance measures that haven't been the

7    focus of my concern previously, and so I was clouded by them.

8              Thank you.

9              MS. KENDRICK:  So, Your Honor, I'm going to turn it

10   over to my colleague, Mr. Fathi, because that was all the            11:29:20

11   medical measures --

12             THE COURT:  Okay.

13             MS. KENDRICK:  -- that I wanted to talk about.

14             THE COURT:  Thank you.

15             Mr. Fathi.                                                  11:29:27

16             MR. FATHI:  Good morning, Your Honor.  And I apologize

17   that I'm not able to be present in person today.

18             THE COURT:  Thank you.

19             MR. FATHI:  The first measure I would like to discuss

20   is Performance Measure 81 at Tucson, this is at document 2506-2      11:29:38

21   at page 86.  And this is -- it's present here, but this is

22   really kind of a global question.  The remedial plan says --

23             By the way, this is the measure that requires MH-3A

24   prisoners who are prescribed psychotropic medications to be

25   seen a minimum of every 90 days by a mental health provider.        11:30:08

1         So the remedial plan says, this issue was caused by

2    one new mental health nurse who was not scheduling the

3    appointments within the strict time frames.  And it says the

4    remedy is that the nurse was given additional education.

5         And we've heard similar variations on this theme                11:30:27

6    throughout today, that someone wasn't properly trained, and the

7    remedy was to provide additional training.

8         These are obviously not new requirements, and so we

9    would think that existing staff would have been trained, and

10   that new staff coming on board would also have received          11:30:46

11   training.

12        So my question is, why do we keep seeing this problem

13   in staff who have apparently not received training in the

14   requirements of the Stipulation?

15        THE COURT:  Well, I don't know that we're going to          11:31:01

16   hear an answer from the defendants.  And I'll give them a

17   chance if they want to offer an answer.

18        I'll offer an answer, and that is, in a system that's

19   chronically understaffed you would expect that training would

20   be one of the things that would be compromised.  It's short      11:31:13

21   sighted obviously because it results in Performance Measure

22   issues.

23        But again, this may just be anecdote, but it's what

24   sticks in my mind, and that is Dr. Watson is quoted in the KJZZ

25   article as saying that she was scheduled for five days of        11:31:37

1    training, I think, and she had only two.

2            I think that when you are dealing with an emergent

3    situation one of the first things that falls off is training.

4    And you're right to say, Mr. Fathi, that it is a theme that we

5    hear and see a lot, that education appears to be a problem,                   11:31:51

6    training appears to be a problem, new staff members don't get

7    it right, old staff members don't get it right.

8            Overall you would think that over time, that having

9    worked on this so carefully all of us in this room together on

10   a monthly basis and sometimes more frequently than that, that         11:32:09

11   we would see that the ship kind of tightening up and that the

12   sails would be pulled tight and we'd be making good time.  It

13   does seem that we continue to be dogged by the same things over

14   and over again.

15           But, again, I didn't mean to cut off if there was a           11:32:24

16   response from the defendants to Mr. Fathi's particular

17   question.

18           MR. STRUCK:  I would like to respond, Your Honor.

19           Looking at MP 81 in Tucson, this has been compliant

20   since -- at least according to this graph since October of            11:32:36

21   2016.  This one -- this month is the first month that it was

22   non-compliant at 82 percent, barely non-compliant.  It's my

23   understanding that preliminary numbers on that show that they

24   were at 92 percent for the month of November.

25           This was one nurse who was scheduling things out three        11:32:54

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    months.  So these things were getting scheduled maybe at 91

2    days or 92 days.  And that's not a passing score.

3              It's not that things are falling through the cracks

4    when we're talking about this Performance Measure.  There's no

5    reason to conflate this particular issue to, oh, all of        11:33:17

6    these -- you know, we have all of these problems and they

7    continue to come up.

8              I mean, this is a human being.  I'm certain she was

9    told that she's supposed to do it at 90 days and she did it at

10   three months.  And that's where the mistake happened.        11:33:35

11             THE COURT:  And what you say is fair, Mr. Struck, if

12   it wasn't in the context that suggests that it isn't a one off.

13   That if we did this global search for the word "education" or

14   "training" we would see it over and over and over again.  And I

15   guess at some point you want to see no drop below the bench    11:33:55

16   mark, because you would think that mistakes made would be

17   mistakes corrected.  And we just see the same mistake in its

18   descriptive term being employed.

19             But I appreciate what you say.

20             Mr. Fathi.                                           11:34:14

21             MR. FATHI:  Thank you, Your Honor.

22             On performance measures 85 and 86, and both of these

23   concern MH-3D prisoners being seen after discontinuing

24   medication, I just wanted to remind the Court that there

25   remains a dispute between the parties about the monitoring     11:34:32

1    methodology for 85 and 86.

2          After the telephonic hearing on November 21st you

3    asked each side to e-mail you their proposed language for the

4    monitoring methodology.  So we are awaiting the Court's

5    decision on that issue.                                          11:34:51

6          THE COURT:  Right.  And I saw that, and will get an

7    order out.

8          MR. FATHI:  Thank you, Your Honor.

9          Performance Measure 86 at Tucson -- and this is

10   document 2506-2, page 93, there's no cause identified for the   11:35:04

11   non-compliance.  There's a corrective action, but we need to

12   know what caused the non-compliance in the first place.

13         MR. STRUCK:  And this particular Performance Measure

14   86, again, it's at Tucson for over a year has been compliant.

15   And for the month of October they were one percent below        11:35:36

16   compliant.

17         It's my understanding that a staff psychologist had

18   been scheduling something and that he'd done it incorrectly.

19   And so they -- Corizon decided that they would have the mental

20   health context be reassigned to one individual to make sure     11:35:59

21   that this is all being done consistently, and we don't continue

22   to have these issues with respect to, you know, somebody

23   scheduling something out 92 days or 93 days using the calendar

24   instead of the actual days.

25         MR. FATHI:  Your Honor, this is the second time we've      11:36:22

1    heard that response from Mr. Struck, and I have to say I don't

2    understand it.  Because while the requirements in the

3    Stipulation are stated in terms of 30 days, 60 days, 90 days,

4    the defendants early on asked to be able to use calendar

5    months, and the Court granted their motion at document 1673.          11:36:40

6           So if they're scheduling out three months that would

7    still be compliant.  So, again, I don't understand Mr. Struck's

8    explanation.

9           THE COURT:  Well, I think what he was saying that they

10   were just slightly beyond it.                                         11:36:55

11          Is that what you said?

12          MR. STRUCK:  Yeah, that's my understanding, yeah.

13          MR. FATHI:  I'm sorry, I thought he was saying they

14   were scheduling using calendar months rather than counting the

15   days and that's why they --                                          11:37:09

16          THE COURT:  I think he said that was by way of how

17   they got into that problem.  But maybe I misunderstood.

18          MR. STRUCK:  That's my understanding as to how the

19   problem occurred, where the scheduling actually was beyond the

20   90 days.                                                             11:37:20

21          MR. FATHI:  All right.  Well, let's move on.

22          Performance Measure 91, this is the measure that

23   requires MH-5 prisoners who are the most seriously mentally ill

24   people in the system, who are actively psychotic or actively

25   suicidal, to be seen by a mental health clinician or mental         11:37:41

1  health provider daily.  This applies at Phoenix, and this is at

2  2506-2, page 96.

3       This is identified on page 97 -- excuse me, on page 96

4  as Supplemental Corrective Action Plan as of November 6, 2017.

5  But on November 14th at document 2447-1, we were provided a          11:38:05

6  Supplemental Corrective Action Plan revised as of November

7  14th, which was substantially different from the one that's now

8  before us.  There were significant modifications made and

9  redlined.

10       So my question is, which Corrective Action Plan is in     11:38:29

11  effect, and what happened to the November 14 Corrective Action

12  Plan?

13       MR. STRUCK:  Okay.  I don't have an answer to his

14  question.  All I can say is it was in compliance in October.

15       THE COURT:  Well, it's a fair question.  He says that    11:38:46

16  you've recited the November 6, 2017 plan when there was a

17  supplement after that.  Was this a mistake to include within

18  document 2506-2 this vestigial November 6 plan, or is the

19  November 6 now rekindled in the supplemental plan the following

20  week no longer in action?                                     11:39:09

21       MR. STRUCK:  One moment, Your Honor.

22    (Discussion off the record between defense counsel.)

23       MR. STRUCK:  The November 14th update did not make it

24  onto this particular document.  So the November 14th is the

25  correct Corrective Action Plan.                               11:39:44

1          THE COURT:  Thank you.

2          MR. FATHI:  And just a couple of questions about

3   particular wording.  On page 97, paragraph 6 --

4          THE COURT:  But that's the old plan, isn't it?  That's

5   the old plan.  Or is that in the new plan as well?          11:40:04

6          MR. FATHI:  It is, Your Honor.  This text is

7   unchanged.

8          THE COURT:  Okay.  Thank you.  Thank you.

9          MR. FATHI:  All right.  In paragraph 6 it refers to,

10  verify any illness each innate -- and there seems to be a word    11:40:16

11  missing.  Innate what?

12         MR. STRUCK:  That each inmate on watch was seen?

13         MR. FATHI:  It says innate, I-N-N-A-T-E.  Is that an

14  error?

15         MR. STRUCK:  Inmate, not innate.  It's inmate.  That's    11:40:37

16  a typo.

17         THE COURT:  Thank you.

18         MR. FATHI:  Okay.  And then in paragraph 7 -- and this

19  is also -- this language is unchanged between the two versions.

20  It talks about a mental health clinician or RN conducting the    11:40:50

21  watch in a confidential -- excuse me -- conducting the watch in

22  a confidential setting.

23             I don't understand that.  Continuous -- or watches are

24  conducted by custody staff, they're not conducted by mental

25  health staff.  So I would just appreciate an explanation of      11:41:11

1    that.

2         (Discussion off the record between defense counsel.)

3              MR. STRUCK:  Yeah, the clinicians conduct the

4    confidential contact, the face-to-face contact.  The officers

5    are just doing -- conducting a watch.                    11:41:34

6              MR. FATHI:  But that's not what it says.  It says, the

7    clinician -- assign a licensed mental health clinician slash RN

8    to conduct the watch in a confidential setting.

9              So why is a clinician conducting the watch?

10             THE COURT:  It looks like that's a mistake.        11:41:51

11             MR. STRUCK:  After the word "watch" should be

12   "contact."

13             MR. FATHI:  Okay.  So that's an error?

14             MR. STRUCK:  It's a typo.

15             MR. FATHI:  Which is different from an error.  Okay.  11:42:07

16             THE COURT:  It's not, it's an error.

17             Go ahead.

18             MR. FATHI:  Next is Performance Measure 93 at Eyman.

19   This is page 103.  And this is mental health staff making

20   weekly rounds of all inmates 3 and above prisoners who are    11:42:27

21   housed in maximum custody.

22             Paragraphs 2, 3, 4 and 6 each refer to action by the

23   MH tech.  Paragraph 5 refers to action by the MH aide.  What's

24   the difference between those two positions and why are these

25   functions done by different positions?                   11:42:54

UNITED STATES DISTRICT COURT

90

1      (Discussion off the record between defense counsel.)

2           MR. STRUCK:  It's the same person.  I think this has

3   been addressed in prior hearings.  ADC uses the term "MH tech,"

4   Corizon uses the term "MH aide."  It's the same individual.

5   And I think that Mr. Fathi knows that.                    11:43:16

6           MR. FATHI:  I'm simply asking why this document that's

7   been produced to us uses the two different terms.

8           So you're telling me that, in fact, it's the same

9   person?

10          MR. STRUCK:  And you know it's the same person.     11:43:31

11  You're aware of the fact that it's the same person.

12          MR. FATHI:  Excuse me, Your Honor, we should be

13  addressing the Court rather than each other.

14          THE COURT:  Well, some amount of the exchange goes on.

15          And again, if you're telling us something that you    11:43:43

16  already know just to sort of highlight the errors -- I mean, it

17  would be better that if the MH tech is a synonym for the MH

18  aide, it would be preferable for any document that's filed with

19  the Court to pick one or the other, because it does create a

20  reasonable question for someone to wonder why, in this document  11:44:08

21  that was filed on the 19th of December, does it say in 1

22  through 4 "MH tech" and then in 5 say "MH aide."

23          I can't remember everything that's previously been

24  discussed.  I think people who submit things and file things

25  with the Court, if it has been previously identified as a    11:44:29

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD – December 20, 2017—

1    synonym that is simply a product of one usage preferred by the

2    contractor and the other usage preferred by the

3    contracting -- the contracted party -- I said that wrong -- by

4    the contractor and -- by Corizon and by the State, then it

5    would be helpful to not run into this three minutes, four                11:44:50

6    minutes that we spent talking about it by making sure that that

7    gets fixed in the future.

8          So Mr. Fathi's right to point it out.  And it's

9    helpful to the process, because it again is a further reminder

10   to everybody as we try to pull the lines tighter on our sails      11:45:06

11   that we've got to be careful.

12         Thank you.

13         MR. FATHI:  Okay.  Thank you, Your Honor.

14         On Performance Measures 94, 95 and 97, this is

15   actually an upcoming agenda item on plaintiffs' agenda, item       11:45:23

16   4A.  The Court issued an order about the monitoring methodology

17   for these three performance measures in July, and defendants

18   have not been complying with that order in subsequent months.

19         And so these scores have to be read in light of that

20   non-compliance with the Court's order.                             11:45:45

21         THE COURT:  All right.

22         MR. FATHI:  On specifically Performance Measure 94 at

23   Tucson, this is page 115, the Corrective Action Plan refers to

24   at the very bottom clinician -- a new clinician beginning

25   employment on August 14th.  And then it reads, quote, with the     11:46:10

1    change in clinicians, Corizon is fully staffed at Tucson, end

2    of quote.

3          However, the staffing report that was produced to us

4    just last night has the following numbers for mental health

5    staff at Tucson:  Psychiatrists 50 percent, psychologists 75    11:46:27

6    percent, mental health clerk is zero percent, mental health RN

7    50 percent, rec therapist zero percent, regional director zero

8    percent, clerk zero percent.  This is page -- or document

9    2509-1, page 10.

10          So I don't know how to reconcile this statement that    11:46:53

11    Corizon is fully staffed at Tucson with the data that I just

12    read into the record.

13          MR. STRUCK:  Okay.  A couple things, Your Honor.

14          First, the way this document was -- is presented to

15    plaintiffs and counsel -- this information I believe was in the    11:47:07

16    last -- in prior reports.

17          THE COURT:  You're right.  I mean, you're right about

18    that.  And it's also been at my insistence that it would

19    include the previous information.

20          But it's also right for Mr. Fathi to observe, we see    11:47:22

21    now in the October report a 96 percent, where we have a

22    previous track record, except for a couple of months, where

23    we're either below or on the cusp.  And so having been told

24    that they were fully staffed in August, and then having looked

25    at the most recent staffing numbers indicating that there is    11:47:45

1    missing staff members from what the contract calls for, he is

2    at the least perhaps inquiring about whether or not there is

3    any information that the state has that the more recent data

4    might reflect the pull down, or he's at least giving us a

5    presage of a fear he has that this 96 percent is based upon a          11:48:13

6    statement that they're at full levels.

7            And so he's not saying you were wrong to include it

8    here.  He's not saying that you necessarily had to -- I don't

9    think he's saying that you necessarily had to include the fact

10   that you're no longer at full staffing.  But he's observed          11:48:34

11   something that I think everybody would want to know, and that

12   is, we were told before that we were going to address the

13   problem with a Corrective Action Plan by making sure that we

14   were fully staffed, we're fully staffed, and now he's saying,

15   whoops, we're not, and he's worried about it.          11:48:49

16           MR. STRUCK:  And I didn't hear him say anything about

17   clinicians when he was reading off vacancies.

18           MR. FATHI:  Your Honor, under the Stipulation

19   psychologists are specifically -- or rather, clinician is

20   defined to include psychologists.  And I did read that          11:49:05

21   psychologists are currently at 75 percent.

22           On Performance Measure 94 at Winslow, this is page 116

23   of document 2506-2, this performance measure requires that all

24   prisoners who are on a suicide watch or mental health watch be

25   seen daily by a licensed mental health clinician or on weekends          11:49:30

CV-12-601-PHX-DKD – December 20, 2017

1     and holidays by a registered nurse.

2              However, according to the defendants' staffing plan

3     there has been no mental health staff at Winslow since May of

4     2016.

5              So my question is, how -- how can we explain these 100      11:49:48

6     percent compliance rates when there's no mental health staff at

7     the facility?

8              MR. STRUCK:  Two things, and Mr. Fathi has been

9     informed of this.

10             There's -- telepsych is used at that facility.  And      11:50:07

11    then as soon as -- it's my understanding as soon as somebody

12    goes on watch they're transferred away from Winslow to a

13    corridor facility.

14             THE COURT:  Does that answer your question, Mr. Fathi?

15             MR. FATHI:  It does not, Your Honor.      11:50:29

16             And I'm sorry if it's repetitive, but I need to keep

17    correcting Mr. Struck when he knows that I know this -- he

18    asserts that I know this or I have been told this, et cetera,

19    that is not correct.

20             The explanation that people are transferred as soon as      11:50:45

21    they go on watch, that doesn't explain a score of 100 percent.

22    That might explain a score of NA, not applicable, if there's no

23    one there to be seen daily by a licensed mental health

24    clinician.  But transferring them away as soon as they go on

25    watch does not explain a 100 percent compliance score.      11:51:07

95

 1          THE COURT:  Is that necessarily true, Mr. Fathi?  You

 2   couldn't have somebody seen who's on a watch at the destination

 3   facility on that day, and so you'd get the 100 percent

 4   compliance, the fact that they were transferred that day?  Or

 5   on the alternative, if they were transferred to another place          11:51:34

 6   and they were seen on that day, they were seen at the

 7   transferee place, wouldn't that be counted that way, or is

 8   that --

 9          MR. FATHI:  No, Your Honor.  Excuse me, Your Honor.

10          THE COURT:  Go ahead.                                           11:51:47

11          MR. FATHI:  No, Your Honor.  Because if they were seen

12   at -- if they weren't seen at all at Winslow, they shouldn't be

13   in the sample for Winslow.  If they were transferred to Tucson

14   and then seen in Tucson, then they can be in the Tucson sample.

15   But Winslow can't get credit for someone being seen at Tucson.         11:52:03

16          THE COURT:  I see.  That makes -- that makes a good

17   point.

18          Dr. Taylor, can you help us out here?

19          DR. TAYLOR:  Sure, Your Honor.

20          When they get -- when they go on watch at Winslow they          11:52:15

21   are seen when they are there.  Sometimes it's a day or two.

22   And we've provided to Mr. Fathi --

23          THE COURT:  By telemedicine -- by telepsych?

24          DR. TAYLOR:  Well --

25          THE COURT:  Because Mr. Fathi says there's nobody              11:52:27

1      there in Winslow who's qualified to do this on site.

2              DR. TAYLOR:  Correct.  So if the individual goes on

3      watch on a Sunday, that's going to be a registered nurse who

4      does that first contact.  Then when it starts on -- it's a week

5      day, it's Monday, it's Mr. Metz who does the telepsychology          11:52:41

6      contacts until the individual is transferred.  And so they have

7      that schedule, he does that daily until that individual is

8      transferred, which may be one day, it may be two days, it may

9      be three days.

10             But those contacts happen up there, and that's all           11:52:58

11     that is monitored.  We don't include anybody -- any contacts

12     that, you know, are from down in another facility and then

13     continue counting those days for Winslow.  It's just the

14     Winslow days that are counted.

15             THE COURT:  Anything else you wanted to say about            11:53:14

16     that, Mr. Fathi?

17             MR. FATHI:  Yes, Your Honor.  When Mr. Struck said

18     that as soon as someone goes on watch at Winslow they're

19     immediately transferred to another facility, I took

20     "immediately" to be within a couple of hours.  I didn't             11:53:27

21     realize, as Dr. Taylor has just testified, that "immediately"

22     might -- it might be a few days before the transfer.

23             Also, I would just point out that the most recent CGAR

24     shows eight cases sampled at Winslow for this Performance

25     Measure for the most recent month.  So clearly there are people     11:53:44

CV-12-601-PHX-DKD – December 20, 2017

1    who are -- who go on watch at Winslow and are staying on watch

2    for at least a few days so as to be included in the sample.

3              THE COURT:  All right.

4              MR. FATHI:  Performance Measure 95, I just want to

5    point out again that the Court has recently issued a ruling on    11:54:04

6    the methodology for this Performance Measure which is not

7    reflected in these data, so they have to be read with that in

8    mind.

9              THE COURT:  Understood.

10             MR. FATHI:  And I believe that is everything.          11:54:20

11             I believe Miss Kendrick had something to add about

12   this.

13             MS. KENDRICK:  Your Honor, the parties met and

14   conferred on November 28th with Judge Bade about the notice of

15   non-compliance that we had sent.  And there was some            11:54:43

16   disagreement about three of the measures.  But with all the

17   others defendants conceded that they were substantially

18   non-compliant.  And at the mediation they provided partial

19   remedial plans for some of the measures.  And Mr. Bojanowski

20   represented to us and to the Court that this filing today would  11:55:01

21   include updates on these performance measures as well, and it

22   appears that there's at least five of them where that was not

23   done and they were not included.

24             So we ask that when defendants file a supplemental OCR

25   searchable version that they also include the Performance       11:55:22

UNITED STATES DISTRICT COURT

——— CV-12-601-PHX-DKD – December 20, 2017 ———

1    Measure Remedial Plans that they had promised to provide us no

2    later than today.

3         THE COURT:  Do you want to set forth on the record

4    what those are again so that Mr. Struck knows?

5         MS. KENDRICK:  Sure.  So the first one was Performance        11:55:34

6    Measure 19 at Eyman, Lewis, Perryville, Phoenix and Tucson.

7    Defendants had provided just a flow chart for their remedial

8    plan.  They had promised to provide narration and words

9    describing what the remedial plan was.

10        They had also agreed to design a training program, and     11:55:55

11   that they were going to start training no later than the end of

12   December.

13        MR. STRUCK:  Your Honor, let me just interrupt.  I

14   don't know that it's appropriate to be discussing what happened

15   in the mediation.                                                11:56:10

16        THE COURT:  I don't think it is, but what she said is

17   that Mr. Bojanowski had said at the mediation that today, along

18   with the graphs, he would also include this additional

19   information.  If that's not true, then you can bring that up in

20   the settlement context.  But if it is true, it looks like it     11:56:28

21   might be an oversight or a feature of the fact that he's not

22   here and you are or something.

23        And so if -- why don't we do this:  Over the noon

24   break, you all again confer about whether or not this is

25   information that was supposed to be included today, get           11:56:48

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD – December 20, 2017—

1    Mr. Bojanowski's opinion if you can.  And then when we return

2    we'll take it up again.

3          MS. KENDRICK:  We notified defendants -- we were asked

4    and we sent a confirming letter on December 6th that

5    memorialized all of Mr. Bojanowski's agreements and his          11:57:02

6    representations.

7          THE COURT:  But, again, if they're taking a different

8    view now that's really something that's appropriately in front

9    of Judge Bade, I think, because I shouldn't be jumping in to

10   the settlement context.                                          11:57:16

11         But if it's just an oversight that he said he would do

12   this, and they don't disagree that they said they would do this

13   and they just haven't done it because it was an oversight, then

14   get it fixed.

15         But if they have a different view, that they said, no,    11:57:27

16   we never said we would do that, I'm not going to resolve that

17   dispute.

18         MS. KENDRICK:  Right.  Well, right now I didn't

19   realize that they were now disputing what they had previously

20   said --                                                          11:57:38

21         THE COURT:  Well, let's come back at 1:15, and over

22   that time you'll have had a chance to have an off-the-record

23   discussion about it that respects everybody's interests.

24         All right.  Thank you all.

25      (Recess at 11:57 a.m., until 1:17 p.m.)                       11:57:52

100

1      THE COURT:  Mr. Struck, were there more answers that

2  you wanted to provide?  Or if not, that's all right.

3      MR. STRUCK:  I believe this was in -- the question was

4  in response to Performance Measure 49 at Tucson.  There was a

5  question with respect to the -- I think reference to M.D.s.        13:18:19

6      THE COURT:  Yes.

7      MR. STRUCK:  We have -- I've got the names of the

8  providers and when they were employed.

9      THE COURT:  Okay.

10      MR. STRUCK:  I've got a Dr. DeGuzman, D-E capital        13:18:32

11  G-U-Z-M-A-N, who's and M.D. that was hired on 11-6-17.  Greg

12  Ladek, L-A-D-E-K, who's a DO hired on December 4th, 2017.

13  Steve Ellison is a nurse practitioner, start date 12-18-17.

14  And Julie Shute, that's S-H-U-T-E, who is also a nurse

15  practitioner, start date 12-4-17.                              13:19:12

16      THE COURT:  Thank you.

17      All right.  I'll turn then to the agenda that I have

18  crafted out of your agendas, and I'll work through these items

19  up until the place that Mr. Millar is ready to join us.  And if

20  at the end of working through the agenda that I have cobbled     13:19:36

21  together from yours, if you think that I've missed items or you

22  want to elaborate on some others, you can let me know at that

23  point.

24      But the next one that I would take a look at is the

25  notice that I need to make a finding with respect to            13:19:53

UNITED STATES DISTRICT COURT

1    Performance Measure 15 in Tucson.

2           I think that under the Stipulation it's non-compliant,

3    so I'll make that finding.  But there's no reason to take any

4    action in light of the recent performance at a level above the

5    benchmark for any further enforcement action at this time.  So     13:20:11

6    we'll continue to watch it, but hope that the current trend

7    continues to be locked in.

8           Next topic is the timing of document production.  I

9    think it really does cobble the whole operation to have the

10   graphs produced so close in time to the time that we join         13:20:33

11   another.  I made mistakes this morning because of that.  And I

12   just think it's much more efficient for us to have it so that

13   we can work through it in a more ordinary course.

14          And so what I would do is, understanding that January

15   is just an unusual circumstance with respect to that we have      13:20:52

16   that early meeting time, I would say that starting in February,

17   that whenever we meet on a Wednesday, that it has to be

18   filed -- or whenever we meet, that it has to be filed 48 hours

19   in advance of when we're scheduled to meet, so that everybody

20   has a chance to work through it in a deliberate way.              13:21:12

21          And then the next timing issue is the one that the

22   plaintiffs raised with respect to the current disagreement

23   between the parties on the scheduling of the prison tours.

24   There's been an objection to the document request, but also an

25   objection to the timing of the notice.                           13:21:36

1    The Stipulation is clear, it says that two weeks'

2 notice has to be provided.  But seems to me that it just

3 doesn't make sense for me to build within that a reasonable

4 production of the documents.

5    So when the plaintiffs provide their notice of the

6 intention to do a prison tour, they'll at the same time produce

7 their document request, and then the response will be a week

8 later.  So that defendants will have a week, and that will

9 leave a week for the plaintiffs to digest the documents and

10 prepare for the hearing.

11    That seems fair to me in light of the fact that I

12 don't think the documents are generally a surprise, the

13 category of them.  From what I've learned in the process when

14 you've involved me in this kind of dispute before, they are

15 subject matter documents that have been previously identified.

16 And so it would be an unusual case, I think, where there was

17 some kind of onerous burden on the defendants to have to turn

18 that request around --

19    MS. LOVE:  Your Honor, may we be heard on that matter?

20    THE COURT:  Everybody can be heard on that, surely.

21    Go ahead, Miss Love.

22    MS. LOVE:  Your Honor, with respect to the timing and

23 the Stipulation, the Stipulation at paragraph 32, which relates

24 to tours, provides that tours should be scheduled within at

25 least two weeks' advance notice.  However, the next to last

1    paragraph of -- I'm sorry, the next to last sentence of

2    paragraph 32 specifically addresses document production in

3    association with tours.  And it says that plaintiffs' counsel

4    and their experts shall be able to review healthcare records of

5    class members, et cetera, as well as documents that relate to          13:23:13

6    underlying basis for the CGAR reports.

7         But the next to last sentence says, during the tours.

8    There's no requirement in the Stipulation of advance production

9    of the documents.

10        As to the burden on operations, while it may be                   13:23:30

11   similar requests that are made at each time, we're still only

12   provided two weeks' notice of a tour and then one week to

13   produce.

14        No matter if we know what documents they generally

15   request, we're still only having two weeks' notice of where a          13:23:46

16   tour -- where a tour is going to occur.  It is a monumental

17   production by operations staff to gather the documents, which

18   are not -- they're asking for categories of documents that

19   relate to all inmates who, for instance, may have a specialty

20   consultation for the preceding 90 days.  We're not talking            13:24:04

21   about a week's worth of data.

22        That data has to be gathered by both Corizon folks and

23   ADC, and has to go through the process of coming to our office,

24   being reviewed so that we can make sure that the appropriate

25   documentation is being actually produced, and then provide it         13:24:19

1    for production.

2           All we're simply asking is, if they want to have

3    documents in their hands in time to review prior to going to

4    the tour in accordance with the normal document production

5    pursuant to Rule 34(b)(2), if it's a document request we should    13:24:35

6    be afforded 30 days to respond.  If they do not want them in

7    their hands to be able to review prior, then in accordance with

8    what the Stipulation requires we will have them on site.

9           THE COURT:  All right.  That sounds like a compelling

10   case to me to refute what I said.                                  13:24:54

11          MS. KENDRICK:  As an initial matter, Your Honor, we

12   have never run into this problem when the Attorney General's

13   Office was responding and providing the documents prior to the

14   tour.  It's only since the law firm has taken over that

15   suddenly they're not capable of doing it.                          13:25:09

16          Also, this tour was one in which we told them two

17   weeks before the date that we were going, but the majority of

18   the time we tell them three or even four weeks in advance of

19   tours.  So to say that we're not giving them enough time I just

20   think is not true.                                                 13:25:27

21          And again, the point of the requirement is so that we

22   can get as accurate a snapshot as possible about what's going

23   on at the prison, and not so they have the time to paint and

24   make it pretty and try to fix every problem before we get

25   there, as if suddenly there's nothing wrong with the prison.       13:25:46

CV-12-601-PHX-DKD – December 20, 2017

1    So the reason there's two weeks' notice is precisely for that

2    reason.

3            These document requests are not burdensome, most of

4    them are reports that Corizon can run using their Pentaho

5    software.  The problem we ran into in this situation was that        13:26:00

6    when I contacted them after I contacted the Court and talked to

7    Mr. Bojanowski and Mr. Valenti about it, I was told that they

8    were gathering the documents and there was just a couple of

9    things left that they wanted to check.  And so again I reminded

10   them of their responsibility to provide documents on a rolling     13:26:19

11   basis.

12           So we think, again, that this is not burdensome of a

13   request.  And in the majority of the time we are giving them

14   more than two weeks' notice and they do have time to respond.

15           THE COURT:  The problem I have is what Miss Love has       13:26:32

16   cited, and that is the Stipulation says that you're entitled to

17   review the documents at the prison.  And so you're asking for

18   them this advance, which is something that is beyond what the

19   Stipulation requires.

20           And she's saying that if you want to have them in          13:26:45

21   advance they'll give them to you but you're going to have to

22   give them 30 days' notice.  And that seems to be a matter of

23   grace that is hard for me to extract a further commitment from

24   because they don't have to even do that.

25           Is there any reason to think what I've said isn't          13:27:03

1    true?

2         (Discussion off the record between plaintiffs' counsel.)

3         MS. KENDRICK:  What Miss Eidenbach is reminding me is

4    the provision was a result of when the medical records were

5    paper documents, and that we needed to review them on-site          13:27:20

6    because we didn't have access to medical records.

7         THE COURT:  But you do review paper documents.  I

8    mean, I've been involved in disputes where I've been told about

9    boxes.  And so it's not -- if it were just medical records.

10   But you have access to the medical records yourself.                 13:27:35

11        MS. KENDRICK:  We don't have access to those reports,

12   sir.

13        THE COURT:  What reports?

14        MS. KENDRICK:  For example, the report that we asked

15   for of the pending specialty care appointments where                13:27:43

16   Utilization Management is either pending review or has approved

17   but it hasn't been scheduled.  We're not capable of creating or

18   getting those reports through our access to eOMIS.  That's

19   what's called a Pentaho report that Corizon creates.

20        THE COURT:  All right.  So what this is is a category          13:28:02

21   of documents that is exclusively electronic.  And you're saying

22   because of the Stipulations a recognition of the need to change

23   the practice with respect to document production once we move

24   to electronic records, that this would be included within that

25   transition and, therefore, a different time table should be         13:28:19

UNITED STATES DISTRICT COURT

1    contemplated because we were dealing with electronic records

2    and not paper records which had an intrinsic greater difficulty

3    to assemble to copy to produce.

4         MS. KENDRICK:  Right.  Right.  So we're asking them to

5    run different specialty reports or reports of people who have          13:28:36

6    been sent out to the hospital.  And the reason -- I mean, it's

7    not a secret why we're asking for these reports.  We use those

8    reports to identify class members who we will want to speak to

9    so we know who the people are that have outstanding pending

10   specialty consults that haven't been completed, or people that         13:28:53

11   have been sent out to the emergency room in the previous 90

12   days.

13        That's what we use the reports for.  It's not a

14   mystery or anything, it's to identify the class members that we

15   want to speak with while we're there.                                  13:29:06

16        And they're electronic reports that the Corizon

17   software program called Pentaho can create.

18        THE COURT:  All right.

19        MS. LOVE:  Your Honor, first of all, I don't see

20   where -- defendants don't see where there's any prejudice to          13:29:24

21   the plaintiffs for just not simply following the general Rules

22   of Civil Procedure for a document request to allow 30 days of

23   production.

24        In addition, you know, the statements that ADC goes

25   and paints and makes its prison pretty is, A, offensive, B,           13:29:38

1    incorrect, and C, has nothing to do with document production.

2             Number 3 on the list, they're not asking for one

3    report.  For the Tucson tour there are 15 categories of

4    documents asking for data back 90 days.  So to state that

5    they're just asking for one general report is not -- is not            13:29:58

6    correct based upon their own categories of documents that they

7    look for.

8             With respect to -- and I just did the quick math, so

9    this is all me doing it in my head, but as we were coming onto

10   the subject matter, with respect to document production made          13:30:19

11   prior to the Tucson, we produced either nearly or just over

12   1,000 pages of paper.  So we're not talking about one specific

13   report.

14            Finally, when the Stipulation was being negotiated,

15   defendant -- or plaintiffs knew that the electronic monitoring        13:30:38

16   system was coming on board.  So this isn't just exclusive and

17   constrained by the Stipulation to production during tours of

18   medical records.  Indeed the second -- I'm sorry, the last

19   sentence of paragraph 32 states that plaintiffs' counsel and

20   their experts shall be able to review any documents that              13:30:57

21   perform -- that form the basis of the MGAR reports and be able

22   to interview the ADC monitors who prepare those reports.

23            It says "review."  It doesn't say that we have to

24   produce those documents to plaintiffs' counsel prior.

25            That was, in defendants' mind, the whole concept of          13:31:15

CV-12-601-PHX-DKD – December 20, 2017

1   them doing tours, is that they could be on-site, they could

2   look at whatever documents they wanted to review.  We would

3   have them ready for them to review.  And then they could

4   interview ADC or Corizon staff with which they wanted to speak.

5          In sum, requesting that they provide 30 days' notice          13:31:31

6   in advance of a tour to provide documents when they're asking

7   for routinely 90 days worth of information not constrained to

8   just a report or two is appropriate.

9          THE COURT:  Well, what Miss Love is describing is

10  something different than what you described, Miss Kendrick, and   13:31:48

11  that is you said there was some kind of report about impending

12  scheduled appointments.  And what she's described is a look

13  back over 90 days of what was scheduled and what's happened.

14  And this does seem to be a larger class of documents than what

15  you described.                                                    13:32:05

16         MS. KENDRICK:  Well, we did request 15 separate

17  reports in the request.

18         And I don't understand about having to go back and

19  show -- it's not showing every specialty.  So what it is is,

20  for example, the specialty report, they run the report on       13:32:21

21  whatever day that they run it, and it shows all of the open

22  pending specialty reports that had been requested in the

23  preceding 90 days.  If the appointment had been completed, it

24  doesn't show up on the report.

25         So they're not creating like a daily list for us          13:32:36

─── CV-12-601-PHX-DKD – December 20, 2017 ───

1    of -- for the past 90 days each day this was who had a pending

2    report.  It's a snapshot of people whose requests have been

3    made in the previous 90 days, how many of them were still open

4    as of the day the report was run.

5         Medication expiration reports, I mean a lot of these          13:32:53

6    were just printouts of who -- where people are housed.  So one

7    request is the housing assignment logs for people who are

8    seriously mentally ill.  And it's just a roster that is printed

9    out.

10        So, yes, it looks like it's many pages long, but it's         13:33:08

11   the names of the people who are seriously mentally ill and

12   where they are housed so that we can go and find them and see

13   what sort of conditions they're in.

14        I think that it's clear with the Stipulation that 14

15   days is the notice that they need to be given.  These are          13:33:28

16   not -- we're not asking them to go through paper records and

17   create things for us.  We're asking for computer-generated

18   reports.

19        And, again, like I said earlier, when Miss Rand was

20   responsible for the document productions for the tours, we did     13:33:40

21   not have this problem or this objection.  So it's unclear what

22   has suddenly happened to cause this to become a problem.

23        THE COURT:  In this past experience with the obtaining

24   of these records, were they produced to you in electronic

25   format or in paper form?                                           13:33:59

1       MS. KENDRICK:  They were pdf's, they were electronic.

2       THE COURT:  Trying to craft a fair outcome under the

3   reality of the situation that is reflected in the Stipulation,

4   and that is the parties understood that there would be a change

5   in the migration to electronic records, and the eventual                13:34:41

6   occurrence of that development, and the idea that the Court

7   would be empowered to make a modification in how documents were

8   produced, it does seem to me to make sense to try to find a way

9   so that the plaintiffs can have in advance of when they arrive

10  on the scene to make their plan.                                         13:35:05

11      So I need to find a way so that they can get the

12  documents that they think are relevant close in time before

13  they arrive.  The Stipulation presently says that if you want

14  to look at them you have to give two weeks' notice.

15      So the defendants understood that they were entering      13:35:24

16  into a plan that would provide for two weeks' notice of

17  documents that the plaintiffs were entitled to look as, as the

18  defendants say, if they would look at them at the day of the

19  visit.  That contemplates that they were actual paper

20  documents, I think, and difficult to copy.  And they say, here          13:35:41

21  they are, look at them, that kind of thing.

22      But if they're produced in electronic format, that's a

23  whole different thing, much easier to do.  And so it seems like

24  it's reasonable to expect that the defendants would produce

25  that in advance.  The question is, how much in advance?  It             13:35:55

112

1    seems to me that it still does take time to assemble the

2    records.

3              So I'm going to do it this way:  If the plaintiffs

4    provide only the two weeks' notice of the documents that they

5    want to see, they're certainly entitled to see them at the site          13:36:10

6    of the visit.  But if those documents have been in the past and

7    are, therefore, reasonable to believe that they can be produced

8    in electronic format, in this pdf form, they'll have to produce

9    those pdf's no later than the start of business the day before

10   the tour.                                                                 13:36:30

11             If they want to see other documents that are not in

12   electronic form, then we'll go with the 30-day requirement if

13   you want to see them in advance.

14             But otherwise if they're in electronic form, and they

15   have been shown to be in electronic form, plaintiffs can still           13:36:42

16   do it within the two weeks, but the day for the compliance with

17   that will be not the day of the tour but the day before, no

18   later than the start of business the day before.

19             All right.  Turning now to Performance Measure 85 and

20   86 where you've asked for the Court's guidances on trying to             13:37:05

21   resolve the dispute that presently exists.  We ran into a

22   little bit of trouble there because we understand that

23   defendants' language is in an October 20th, 2017 letter, which

24   we couldn't find.

25             Does anybody here happen to have a handy cite to where        13:37:24

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    that might be in the record, the defendants' version of their

2    language that they would like in regard to Performance Measures

3    85 and 86?

4          MS. HESMAN:  Your Honor, we filed with that the Court

5    shortly after the November 21st telephonic hearing.  I don't          13:37:42

6    have the docket cite readily available, but --

7          THE COURT:  Would you mind e-mailing --

8          MS. HESMAN:  Sure.

9          THE COURT:  -- Miss Selzer and let her know where that

10   is, just so that we -- we had trouble finding it.          13:37:49

11         MS. HESMAN:  Okay, yeah, will do.

12         THE COURT:  Then with respect to Performance Measure

13   95, I see the plaintiffs' proposed language but, again, I don't

14   see if defendants have any objection to that.

15         Have you let us know whether you have an objection to          13:38:11

16   the defendants' (sic) language that they proposed for

17   Performance Measure 95?

18         MS. HESMAN:  No, Your Honor.  We've already reached an

19   agreement.  We agreed to plaintiffs' language.

20         THE COURT:  Okay.  Thank you.          13:38:22

21         Plaintiffs ask that we address the issue of the

22   re-audit of Performance Measures 1, 2, 4, 77 and 95.

23         What I'll say with respect to that is what I've said

24   in the past, if there's not a re-audit it can't be used in an

25   argument for removal from the Stipulation.  So the ball is kind          13:38:40

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    of in the court on the defendants' side on what they wish to do

2    with respect to that.

3              The next agenda item is that the plaintiffs have asked

4    if the State is in a position to give any update on the RFP for

5    the provider, the contractor for health care.                        13:39:04

6              MR. STRUCK:  Yes, Your Honor.

7              Your Honor, the RFP is still under review.  And that's

8    about all I can say.

9              THE COURT:  Okay.

10             MR. STRUCK:  And I know -- well, it's your agenda.          13:39:18

11             THE COURT:  No, go ahead.

12             MR. STRUCK:  But there were a couple of issues that

13   they --

14             THE COURT:  On that topic?

15             MR. STRUCK:  There's --                                     13:39:27

16             THE COURT:  Feel free.  Go ahead.

17             MR. STRUCK:  12A, B and C.  They wanted to know what

18   the sanctions were assessed against Corizon for the months of

19   September and October.  And under the new contract is -- the

20   cap is lifted starting this month, so -- I mean starting         13:39:44

21   November.  So in September and October it was 90,000 was the

22   maximum amount that they could be assessed.

23             THE COURT:  And you don't know what November is yet?

24             MR. STRUCK:  That's correct, I don't know what

25   November is yet.                                                      13:40:00

1          I do know -- I can say that if there wasn't a cap, the

2    October sanction would have been 320,000 and November sanction

3    would have been 245,000.

4          THE COURT:  And when does the November information

5    become available?                                                13:40:16

6          MR. PRATT:  Well, what's being audited in December, so

7    middle of January.

8          THE COURT:  All right.  Thank you.

9          MR. STRUCK:  And the third question they asked under

10   that subsection was the amount of money assessed by the State   13:40:34

11   against Corizon for failure to maintain staffing levels above

12   90 percent.

13         The month of September the total amount assessed

14   against Corizon was $58,497.22.  Of that amount $22,323.41 was

15   with respect to providers, because there's three different      13:41:00

16   categories.  There's key manager positions, there's provider

17   positions, and then there's everybody else, nonmanagement group

18   they call it.  So of the $58,497.22, $22,323.41 related to

19   providers.

20         For the month of October the total assessment against     13:41:22

21   Corizon was $60,660.03.  Of that amount -- for the providers,

22   that amount of the 60,000 amount was $6,875.99.

23         THE COURT:  Does that address plaintiffs' inquiry on

24   that subject?

25         MS. KENDRICK:  That answers the question, yes.             13:41:52

1          THE COURT:  Thank you.

2          There are pending motions to seal documents 2498 to

3   2501 and 2508, which will be granted consistent with the

4   Court's previous practice with respect to protecting individual

5   inmate's personal health information.                          13:42:11

6          The next topic on my agenda is to turn to yet again

7   this issue that continues to percolate, and that is the random

8   sampling issue.

9          It's not clear to me again where we are on this.  It's

10  because -- it seems as though part of the discussion is where  13:42:31

11  the randomization language would be present or not.  It seems

12  like I read that defendants say that we agree with it, with

13  plaintiffs' expert, but it then seems like the issue still

14  remains vital or alive in the parties' minds.

15         So it's not clear to me where it is.  So I need you     13:42:55

16  all to square it up for me to make sure that I understand

17  exactly what the issue is and what you need me to decide on

18  this random sampling issue.

19         MR. FATHI:  Your Honor, this is David Fathi.  Let me

20  try to give you a quick summary.                               13:43:10

21         The Court some months ago suggested that some language

22  based on Dr. Haney's Affidavit about random sampling be

23  included in the Monitor Guide.  We sent the defendants -- the

24  defendants asked us to provide some proposed language, we did.

25  They ended up including only two sentences of our proposed     13:43:31

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    language.  We expressed a view that that was insufficient.

2    There were a number of critical topics that simply weren't

3    covered.

4         At the last hearing the defendants asked for a chance

5    to file a brief.  They did so at document 2465.  We filed a          13:43:47

6    response at document 2469.

7         So those are the relevant documents for the Court to

8    review.  I think the matter is fully briefed and ready for

9    decision.

10        THE COURT:  All right.  I looked at that.  And again,          13:44:04

11   what -- I mean, if defendants are saying in the one hand they

12   don't object to the randomization, I guess I need to now hear,

13   what is it that the defendants object to in Dr. Haney's

14   Declaration that I embraced before?

15        MS. HESMAN:  Your Honor, first of all we object to          13:44:29

16   including the language in the Monitoring Guide, because it's

17   confusing.  The monitors aren't the ones who are actually doing

18   the random sampling.  So to advise them as to how to do

19   randomization is confusing.

20        Moreover, Dr. Haney's Declaration is extremely long          13:44:43

21   and convoluted.  Therefore, we attached a Declaration from our

22   own doctor with our filing that simplifies the language.  So to

23   the extent that the Court does desire that random sampling

24   language be included in the Monitoring Guide, that he uses that

25   simpler language.  Again, it's language that Dr. Haney also          13:45:02

1    agrees to.  It's the same language, it's just in a simpler

2    format.

3           But, again, our position is that no language should be

4    included in the Monitor Guide on randomization because the

5    monitors aren't the ones randomizing.                              13:45:17

6           THE COURT:  Right.  So I guess -- I mean, I do

7    understand and agree with that point, that it is not the

8    monitor's task to be doing the randomization.  But I also am

9    puzzled by your statement that you think that your expert -- if

10   I take it what you're saying essentially agrees with Haney's     13:45:36

11   Declaration, but you just think you say it plainer.

12          So I guess I should give Mr. Fathi a reply on that to

13   say why it is that they are still different.

14          MR. FATHI:  Your Honor, first of all, it's not correct

15   that the monitors don't do randomization.  In our filing at      13:45:54

16   2469 we cited testimony from the evidentiary hearings earlier

17   this year that monitors do sometimes do randomization.

18          Secondly, Dr. Haney --

19          THE COURT:  That's with the computer program -- that

20   was with the computer program that did it, is that what that     13:46:12

21   testimony was about?  Do you remember?

22          MR. FATHI:  Your Honor, the testimony I'm referring to

23   is Dennis Dye, who was a mental health monitor who was

24   testifying about, I believe, Performance Measure 74, in which

25   he testified that generally there's fewer than ten applicable    13:46:28

1    records per month, so he doesn't need -- they don't need to be

2    randomized.  But if there were more than ten then he would be

3    doing the one doing the randomization.

4              THE COURT:  Okay.

5              MR. FATHI:  But the more fundamental point,          13:46:43

6    Your Honor, is that Dr. Haney's Declaration covers many other

7    critical subjects other than just the mechanics of how you

8    randomize it.

9              It covers the need to -- when you make changes to the

10   results of the sampling, to document those changes in real      13:47:00

11   time.  It covers the entire process rather than just the narrow

12   mechanics of how do you do the randomization.

13             The defendants' expert said in his Declaration that

14   what Dr. Haney stated is correct.  There is absolutely no

15   objection, no disagreement from defendants' expert, except with 13:47:19

16   regard to I believe a single sentence about Performance Measure

17   39.  Defendants' expert didn't explain his objection, he just

18   said Dr. Haney's wrong without any elaboration.

19             Finally, Your Honor, we believe that if the Court

20   finds itself compelled to make a credibility determination      13:47:37

21   between the two experts, Dr. Haney has far, far more experience

22   in random sampling and research methods more generally than the

23   defendants' expert.

24             So for all of those reasons, particularly the fact

25   that neither the defendants' pleading at 2465 nor their expert  13:47:54

1    Declaration actually identify anything incorrect with what

2    Dr. Haney says, we believe that the language we propose should

3    be included in the Monitor Guide.

4         THE COURT:  Mr. Fathi, have you observed in the months

5    since we did talk about this and had testimony, have you had                    13:48:13

6    occasion to observe any circumstances where you thought that

7    there were randomization issues that were inconsistent with

8    what Dr. Haney had opined about?

9         MR. FATHI:  About the mechanics of randomization, no,

10   Your Honor.  But that's because those are invisible to us.  All                  13:48:35

11   we get are the CGARs.  And the CGARs say, these were the ten

12   records we pulled.  They contain absolutely no information

13   about the mechanics through which those records were selected.

14        So there could be massive problems with randomization

15   of the type that were discussed at the hearings, of the type                     13:48:53

16   that made the Court say there were great chasms of competence

17   in how the monitoring was being done, and we simply wouldn't

18   know about it.  And that's another reason why it's essential to

19   make sure that this guidance is provided.

20        Now about other aspects of the problem, yes, we have                        13:49:10

21   noticed difficulties.  One of the things that Dr. Haney says is

22   that it's critically important that when changes are made,

23   those changes be documented in real time, so that if

24   there's -- as the Court said earlier, I think a trail of bread

25   crumbs, an audit trail, so that the reader can see what was                      13:49:31

121

1   done.  And as we discussed earlier this morning, there's a

2   couple of examples that came up today where apparently that

3   wasn't done.

4           So we think this information is critically important.

5   The defendants haven't identified any reason not to include it.   13:49:44

6   And we think it should be included.

7           THE COURT:  Any last word from defendants?

8           MS. HESMAN:  Yes, Your Honor.

9           I agree with Mr. Fathi that our expert and Dr. Haney

10  can agree on general language regarding randomization.  It's   13:49:57

11  simply unnecessary to include over five pages in a Monitor

12  Guide.  The purpose of the Monitor Guide is to assist the

13  monitors.  It is very confusing and they don't need that

14  information.

15          I also don't know how including the randomization   13:50:12

16  language in the Monitor Guide answers Mr. Fathi's inquiries

17  about problems in the randomization process.  Including that in

18  the Guide is not going to answer that question for him.

19          I think that the simplified version that our expert

20  provided who, in fact, is a statistician, and Dr. Haney is not,   13:50:29

21  answers plaintiffs' concerns, answers any concerns that the

22  Court may have, and it's simple and direct and to the point.

23          THE COURT:  But when you say you don't have an

24  objection to Dr. Haney's five pages, other than the fact that

25  it sounds like you think that the five pages should not be   13:50:45

1    included in the Monitoring Guide, if they became an order of

2    the Court, then do you no longer have an objection to using

3    Dr. Haney's language of five pages?

4         MS. HESMAN:  Well, certainly, Your Honor, if you

5    ordered us to do it I would no longer have an objection to it.    13:50:58

6         The problem with Dr. Haney's methodology was with

7    respect to Performance Measure 39, and that's detailed in our

8    briefing.  That was the real issue that we had.  He dedicated

9    many of his pages to the analysis of Performance Measure 39.

10   But if he's just going to stick with the simplified version of   13:51:13

11   what randomization is then, no, we do not have an objection to

12   that.

13        Our overall objection that the monitors don't

14   randomize, so I don't understand what purpose this serves.

15        THE COURT:  All right.  Anything else you wanted to      13:51:26

16   say, Mr. Fathi, on this?

17        MR. FATHI:  Simply, again, Your Honor, it is incorrect

18   that the monitors don't randomize.  And again, Dr. Haney's

19   language is instructive on a number of critical steps in the

20   process that the hearings earlier this year showed is -- the     13:51:40

21   defendants are direly in need of.

22        THE COURT:  All right.  This was helpful for me.

23   Thank you very much.  I'll address it and get an order out.

24        Last time we talked about this suggestion that there

25   had been a uniform adoption of a policy with respect to pain      13:51:57

1    medications, and it was contemplated that we'd have testimony

2    from Mr. Pratt this month regarding the --

3         (Phone interruption.)

4         THE COURT:  -- discontinuation of the tramadol and the

5    gabapentin.  And so are we prepared to go forward with that?    13:52:23

6         MS. HESMAN:  We are, Your Honor.  If I could just say

7    some brief words before Mr. Pratt gives his testimony.

8         I spoke with various Corizon personnel yesterday about

9    this issue at length, specifically with Dr. Patel who is the

10   Regional Medical Director for Corizon.  And I have been advised    13:52:40

11   that there is no system-wide discontinuation of gabapentin or

12   the other pain medications, as plaintiffs allege.

13        As you may recall this issue stemmed from a document

14   request that plaintiffs sent to us for any and all documents

15   regarding the system-wide discontinuation of these medications.    13:52:57

16   That simply is inaccurate.  There is no system-wide

17   discontinuation.

18        Rather what has happened is that there has been an

19   uptick in abuse of these medications, specifically with inmates

20   cheeking the medication or hoarding the medication.  Therefore,    13:53:12

21   providers are scrutinizing the medical records a little more

22   closely before refilling or prescribing these pain medications.

23        So the Declaration submitted in support of their

24   agenda, Your Honor, where they detail these inmate letters that

25   they've received, I'm not saying they're invalid, but those are    13:53:30

—CV-12-601-PHX-DKD – December 20, 2017—

1    specific concerns that a specific provider had for a specific

2    inmate, and a determination was made whether or not to remove

3    that medication, re-prescribe that medication, or prescribe

4    that medication.

5            It's not a system-wide discontinuation.  And,                    13:53:46

6    therefore, there are no responsive documents to their request.

7            THE COURT:  All right.  So no documents, but we have

8    Mr. Pratt.  If you'd please step forward to the clerk to be

9    sworn.

10       (RICHARD PRATT, DEFENSE WITNESS, SWORN.)                             13:54:01

11           THE CLERK:  Thank you.

12           THE COURT:  Kindly, sir, have a seat.

13           MS. KENDRICK:  Your Honor, Mr. Fathi just sent a

14   message saying that the call got disconnected.  I think he may

15   have attempted to restart it.                                           13:54:20

16           THE COURT:  Give us just a second, we'll see what we

17   can do.

18           MS. KENDRICK:  Okay.  Thank you.

19       (Discussion held off the record.)

20           THE COURT:  Mr. Fathi, are you back?                            13:55:09

21           MR. FATHI:  I am, Your Honor.  My apologies.

22           THE COURT:  No, well, thank you.

23           Miss Kendrick, when you told us about Mr. Fathi's

24   absence, was that because he's the lead on the plaintiffs' side

25   on this issue?                                                          13:55:37

UNITED STATES DISTRICT COURT

125

—Richard Pratt – Direct Examination—

1          MS. KENDRICK:  No.

2          THE COURT:  I just wanted to know.

3          MS. KENDRICK:  But also, Miss Finger was using the

4    same call-in number too from Corizon, so we just wanted to make

5    sure everybody was back on.                                    13:55:46

6          THE COURT:  The only reason I asked that question is I

7    just wanted to know whether I needed to recapitulate what we

8    just heard with respect to the preamble from defense counsel

9    regarding what Mr. Pratt was going to be talking about.

10         I'm going to start with some questions, sir.           13:55:58

11                        DIRECT EXAMINATION

12   BY THE COURT:

13   Q.  This issue that was raised about the allegation of the

14   cessation of these two drugs, gabapentin and tramadol, when we

15   raised it, you then, I gather, looked into it?                13:56:08

16   A.  Yes.

17   Q.  And what did you do to look into it?

18   A.  I checked with Corizon.  I discussed the issues with them.

19   Have they put out anything that says we're going to

20   systematically get rid of these medications or -- and all the  13:56:22

21   answers I got were negative.

22   Q.  I see.  And when we heard from defense counsel that it was

23   in reaction to abuse of the drugs, is that something that comes

24   from the Corizon side or from the D.O.C. side?

25   A.  Both.                                                     13:56:40

UNITED STATES DISTRICT COURT

126

—Richard Pratt - Direct Examination—

```
 1    Q.  I see.  And had you heard about that before?

 2    A.  Yes, sir.  And that's -- that's historic.  That has been

 3    longstanding.  And it's not just ADC, it's across the country.

 4    Q.  And this uptick that defense counsel mentioned, is that

 5    what you had seen too?                                            13:56:56

 6    A.  I haven't seen an uptick.  Again, it's been pretty much

 7    historic.  And those are medications of high abuse potential,

 8    and they have great street value, I should say, on the yards.

 9    Q.  I understand pain management -- and both of these drugs are

10    pain management drugs; is that right?                             13:57:17

11    A.  Yes.

12    Q.  I understand pain management is a challenge in the prison

13    system because of the potential for abuse, and that the drugs

14    that are not so susceptible to abuse are not as effective in

15    dealing with pain oftentimes.  Is that fair to say?              13:57:29

16    A.  Not necessarily, Your Honor.  I don't know that they're

17    less effective.  A lot of times this is just based upon the

18    patient's desire for a specific drug.

19    Q.  All right.  And these are general questions.  I know that

20    you're not a doctor.  But I know that you have substantial       13:57:47

21    medical experience in the prison system and you're looking at

22    these issues, and so I do need to take advantage of the fact

23    that I have you here and can ask these questions.

24          But if it is a determination that these two drugs are

25    susceptible to abuse, do you have any idea about what the        13:58:06
```

—————Richard Pratt – Direct Examination—————

1   alternative drugs are that are available?

2   A.   There's a lot of different alternative drugs, Your Honor.

3        And by training I was licensed as a physician

4   assistant in the past, so I've got some knowledge there.

5        But there are a lot of different drugs to address pain          13:58:24

6   issues.  Some drugs will work for some people, some drugs --

7   that same drug may not work for another person.

8        A lot of times it's trial and error as to what is

9   successful in pain management.  And honestly, the only way that

10  you're able to judge that is based upon what the patient is          13:58:44

11  telling you.  It's subjective as far as what's considered pain

12  by the patient.

13  Q.   Well, I guess I'm a little bit troubled by the -- sort of

14  my lay person's logic application of this.  The lay person's

15  logic is that these two drugs were used because everybody           13:59:03

16  thought they were the best drugs to use.  And then it turns out

17  there's an abuse problem.  So that means you have to fall off

18  to what may not be -- what everybody viewed to be the best

19  drugs to use.

20       And so in the climate of what we see in Federal Court          13:59:18

21  where we see an uptick of our own with respect to individual

22  cases where people say they're no longer getting the pain

23  relief that they need, and they allege that it's part of a

24  systematic program, again, not part of the evidence in this

25  case, but something that I'm aware of from the docket of other      13:59:34

UNITED STATES DISTRICT COURT

─────── **Richard Pratt - Direct Examination** ───────

1   cases that are allegations in the courthouse.

2          And so if my logic is correct, I guess the question

3   is, who's looking at this on an individual basis to make sure

4   that individual inmates are receiving the appropriate pain

5   medication that they need to receive?                                    13:59:59

6   A.  Well, when -- as I'm sure you're aware, the whole pain

7   management and addiction issue has been gaining great notoriety

8   across the country, in particular with opioids.  And there's

9   been a focus to try to no longer throw out the major

10  painkiller, be it opioid or whatever it is, to try to come up          14:00:24

11  with alternative medications that may not be habit forming,

12  that may not be as dangerous for the overall patient care.

13         So there's been a push to adjust medications to

14  possibly less addictive, albeit -- and hopefully still as

15  effective.  But there's times when a patient will say, I'm            14:00:47

16  happy with what I'm getting, don't change it, where it may

17  actually be in the patient's best interests to change that to a

18  less addictive drug.

19  Q.  I'm left with the thought that this issue -- I mean, the

20  first question that I asked was whether or not there was a            14:01:14

21  broad policy to discontinue these medications, and the answer

22  first is, no, there's been no discontinuation, what there's

23  been is a decision to try to reduce the use of these medicines,

24  to explore alternatives because of the high abuse potential.

25         And again, I don't know where that leaves me with             14:01:35

UNITED STATES DISTRICT COURT

1  respect to the net number of people that are affected or what

2  the alternatives are.

3        But do you have a way of seeing in a quantitative

4  measure what the -- if somebody wanted to determine, well, we

5  are hearing from the lawyers that there's been no policy, but          14:01:58

6  one of the ways we could check that is we would say that in

7  December of '16 we had 100 units of this medicine being

8  dispensed and we look now at November of '17 and we see that

9  there are five.  And then that might inform us with respect to

10 whether or not there had been a dramatic change and maybe would        14:02:20

11 stimulate further inquiry, perhaps expert or otherwise.

12        Is there any such number that's available to you to

13 find about the number of dispensings of these medications?

14 A.  Yes.  We have a quarterly pharmacy and therapeutics meeting

15 where Corizon provides us with information on all drugs that            14:02:39

16 they've been prescribing.

17 Q.  I see.  And when was this last quarterly report?

18 A.  I believe it was last month.  I'd have to go back and look

19 for sure.

20 Q.  All right.  So that would be for the third quarter of '17,         14:02:55

21 you think?

22 A.  Yes.

23 Q.  So you could produce that to us and we could see what the

24 number of tramadol and gabapentin dispensings were in the third

25 quarter in the prison system and compare that to the previous          14:03:12

1    year, for example?

2    A.  Yes, sir.

3    Q.  Okay.  Can I ask you to make sure that happens?

4    A.  Of course.

5           THE COURT:  Okay.  All right.                    14:03:23

6           Any questions from plaintiffs' counsel?

7           MS. KENDRICK:  Just a couple, Your Honor.

8                         CROSS-EXAMINATION

9    BY MS. KENDRICK:

10   Q.  Mr. Pratt, you referred to the fact that the gabapentin and   14:03:30

11   the tramadol was being abused and cheeked by the people who

12   were taking it.  Are these medications direct observation

13   therapy or also known as watch swallow medications?

14   A.  Either or.

15   Q.  What does either or mean?                           14:03:47

16   A.  Could be -- it depends on how the provider orders it, KOP

17   or DOT.

18   Q.  So the providers prescribe tramadol as KOP?

19   A.  They can.

20   Q.  Do they?                                            14:04:00

21   A.  I don't know on a general basis.

22   Q.  So if medications were being abused, wouldn't the way to

23   eliminate the issue of passing the meds or cheeking the meds be

24   to observe them taking the medication?

25   A.  Easier said than done.  When you hand a pill to a patient   14:04:17

—— Richard Pratt - Cross-Examination ——

1   and the patient actually cheeks it, the only actual way that

2   you're going to verify for sure that that inmate has swallowed

3   that medication is to do a finger sweep of his mouth after the

4   medication has been delivered.

5   Q.  Is the general practice for DOT medication that the person          14:04:36

6   after they swallow the medication is asked to open their mouth

7   so that a custody officer or a nurse can see if they've cheeked

8   it?

9   A.  No.

10  Q.  That's not the practice in ADC?                                     14:04:48

11  A.  No, it's just observation by an officer.

12  Q.  Do you think that if that was the actual practice used that

13  that would reduce the number of cheekings or people not taking

14  their medications?

15  A.  I can't say that that would make a difference.                      14:05:02

16  Q.  Are you aware that other prison jurisdictions use that

17  approach to DOT medication administration?

18  A.  No, not particularly.

19  Q.  Okay.  So you didn't know that's how other prisons do it?

20  A.  Other systems --                                                    14:05:19

21  Q.  Yes.

22  A.  -- may have different rules as to, you know, how they

23  monitor direct order therapy.

24  Q.  So how -- you mentioned earlier that there's a national

25  trend of medications being abused and cheeked.  How are you            14:05:34

─────── **Richard Pratt - Cross-Examination** ───────

1    aware of that?

2    A.   No, I'm talking in particular about the opioid crisis that

3    we're going through at this point and the heightened level of

4    being careful regarding what medications are prescribed

5    for -- in the safety for the patient.                                    14:05:54

6    Q.   Is gabapentin an opioid?

7    A.   No.

8    Q.   And do you know when tramadol became a controlled

9    substance?

10   A.   I do not.                                                           14:06:03

11   Q.   But it wasn't a controlled substance in the past, are you

12   aware of that?

13   A.   I'm not aware of that, no.

14   Q.   And you mentioned that because of this opioid crisis, that

15   alternative drugs are being used.  What are the alternative       14:06:17

16   drugs that Corizon is using?

17   A.   There's a host of different medications that are available

18   for pain control.  I can't give you a list.

19   Q.   You can't even name one?

20   A.   No.                                                                 14:06:33

21   Q.   How about Effexor?

22   A.   I don't know.

23   Q.   How about Ibuprofen?

24   A.   I don't know.

25          As far as an alternative you're talking?              14:06:46

UNITED STATES DISTRICT COURT

—————— **Richard Pratt – Cross-Examination** ——————

1    Q.  Yes.

2    A.  Again, there's a host of medications that are allowed for

3    pain management.

4    Q.  But you're not aware of what Corizon is prescribing as an

5    alternative to gabapentin or tramadol?                      14:07:00

6    A.  Patient specific.  And that is the decision of the provider

7    that's treating that patient.

8    Q.  What does this quarterly report show that is being

9    prescribed?

10   A.  I will provide it to you and the Court.                 14:07:13

11          THE COURT:  It probably makes sense for us to see it

12   across the board, because then we'd be able to see maybe what

13   the increase in -- commiserate increase in medications that

14   might compare to the decrease of these other two drugs and we

15   might, therefore, be able to, knowing the class of drugs, make  14:07:33

16   some kind of rough assessment about what the substitute drugs

17   would be.

18          But if we needed to find out in particular from the

19   person most knowledgeable, who would that be?  Who is the one

20   who's most knowledgeable about making a decision, we've got    14:07:50

21   this issue with these two drugs, we're seeking to try to clamp

22   down as I think you said on them, and here are the possible

23   alternatives, who would be providing that information to the

24   providers who would need to know that?

25          THE WITNESS:  Dr. Patel, who is the medical manager    14:08:08

UNITED STATES DISTRICT COURT

──────── **Richard Pratt – Cross-Examination** ────────

1    for Corizon.

2              THE COURT:  Okay.  Thank you.

3              Anything further from plaintiffs?

4              MS. KENDRICK:  Yes.

5    BY MS. KENDRICK:                                          14:08:17

6    Q.  Do you know what is listed in the Corizon formulary as pain

7    management medication?

8    A.  Not off the top, no.

9    Q.  Is that something that you could obtain or request from

10   Corizon?                                                  14:08:28

11   A.  Absolutely.

12   Q.  Okay.

13             THE COURT:  Can you provide that also to us?

14             THE WITNESS:  Sure.

15             THE COURT:  Thank you.                          14:08:37

16             MS. KENDRICK:  I have nothing further.

17             THE COURT:  All right.  Anything defendants wanted to

18   say?

19             MS. HESMAN:  Nothing, Your Honor.  Thank you.

20             THE COURT:  Okay.  Mr. Pratt, thank you.       14:08:45

21             THE WITNESS:  You're welcome.

22             MS. KENDRICK:  Your Honor?

23             THE COURT:  Yes.

24             MS. KENDRICK:  I did want to say something in response

25   to what Miss Hesman said.                                14:08:51

—CV-12-601-PHX-DKD – December 20, 2017—

1          THE COURT:  Yes.

2          MS. KENDRICK:  So we requested documents related to

3   the discontinuation of medication.  We did not request

4   documents regarding a systematic policy.  So the fact that

5   there's no written policy that says discontinuing medication          14:09:06

6   doesn't mean that there could not be relevant documents.

7          For example, as detailed in the Declaration of Megan

8   Lynch at docket 2497, we received reports from class members

9   that said they had been given grievance responses or shown

10   e-mails that said that all prisoners were to be taken off these          14:09:27

11   drugs.

12          So again, we just would like to ask that they make

13   sure that they are searching correctly for documents rather

14   than just saying, do you have any documents about a systemic

15   policy or a written policy to do this, that they're actually          14:09:41

16   looking at the underlying substance of what we're trying to get

17   at here.

18          We understand that there probably is no written policy

19   that's on Corizon letterhead that says we're going to

20   discontinue these medications.  However, given the statically          14:09:55

21   significant amount of intake our office has received in the

22   past 11 months about this issue, we do believe that there

23   perhaps is some sort of documentation out there about the

24   practice that is going on, even if it's not pursuant to a

25   formal written policy.          14:10:13

1          THE COURT:  And you don't happen to have your

2    interrogatory question?

3          MS. HESMAN:  I do, Your Honor.  I can read it.

4          THE COURT:  Can you?

5          MS. HESMAN:  Any documents relating to the system-wide          14:10:21

6    and/or institution-wide discontinuation of gabapentin or

7    tramadol.

8          So what I'm hearing from Miss Kendrick is that we're

9    supposed to be mind readers and interpret that to mean

10   something more than what she's requested.  If she wanted          14:10:34

11   something else they should have phrased it differently.

12         THE COURT:  That's why I asked the question, because I

13   don't expect any lawyer should expect the other side's lawyer

14   to be the mind reader.  You need to ask the question that you

15   want answered.  And the question that I heard from          14:10:46

16   Miss Kendrick is a different question than the one she asked.

17         MS. KENDRICK:  We'll be happy to rephrase our request.

18         THE COURT:  That's what I think you need to do.

19         All right.  Thank you.

20         Other than the Procure Arizona issue that we'd raised          14:11:15

21   with Mr. Millar, I think all of the -- as I read it, all of the

22   other agenda items are captured within the change in course

23   that I adopted this morning with respect to looking into the

24   collection of records and reporting.

25         And so I think that I have addressed the issues that          14:11:39

```
 1   were on the agenda items that were submitted that touched upon

 2   those already by the course that we're going to take.  But

 3   we're now at that point where I'll turn to each side to address

 4   issues that they think that I have failed to raise.

 5          MR. FATHI:  Your Honor, this is David Fathi.          14:12:01

 6          There remain --

 7          THE COURT:  Oh, there was one -- I'm sorry, I've just

 8   been handed a note that I did miss one that was on my agenda.

 9   And I'm sorry about that.

10          Before you go on, Mr. Fathi, let me just finish my     14:12:12

11   list for sure.

12          MR. FATHI:  Of course.

13          THE COURT:  And that is the agenda item of the

14   isolation subclass.

15          What I have here is an issue that I thought that I     14:12:23

16   could get to a place where the parties could agree, and that I

17   kind of jumped over some steps to get to there, thinking that

18   if I got to that place it wouldn't be afoul for me to have

19   jumped those steps.

20          But then where I am right now, it looks to me like     14:12:45

21   with respect to this isolation subclass issue, that I do have a

22   disagreement.  And I have a proposed order -- which is what I

23   asked for, so there's no foul, this was what was presented to

24   me.  But I now have a proposed order that is a subject of

25   contention.                                                  14:13:08
```

1          And so then I have to go back to see -- if I'm not in

2     the position of presiding over a happy agreement, I have to be

3     the decision-maker on it.  And that means that the steps to get

4     to that place need to be respected.

5          And the steps that I think that I'm missing are that I        14:13:24

6     don't have a motion to do what plaintiffs asked me to do in

7     their proposed language, other than the one that is rather

8     stale now.

9          Because I understand from what I have read, but is not

10    really part of the evidentiary record in the case, that there    14:13:47

11    have been changed circumstances that directly affect this

12    issue.  For example, this adoption I think of a plan that's in

13    place where the armbands are used to clock like marathon

14    runners when they run past certain mile points, about when

15    people are out of the cell or where they are.  If that's a        14:14:06

16    circumstance, that affects how I address this issue.  But

17    there's nothing in the evidentiary record that I have.

18         And so I'm thinking that with respect to the subclass

19    issue I need to have a renewed motion from plaintiffs.  And

20    then I need to set an evidentiary hearing to give you all a       14:14:22

21    chance to tell me what the facts are so that I can make a

22    reasonable decision on how to resolve this dispute that you

23    presently have.  I don't think there's any possibility that we

24    could schedule it before March, but I think that that's the way

25    I need to go.                                                     14:14:39

───── CV-12-601-PHX-DKD – December 20, 2017 ─────

1    I'll turn now to respective counsel to opine on what

2  I've just said.

3    MR. FATHI:  Your Honor, this is David Fathi.

4  Miss Fettig has just joined us.  I don't know if she heard

5  everything the Court said from the beginning.  But if she has        14:14:54

6  questions I'm sure she will pose them.

7    THE COURT:  Well, let's ask Miss Fettig whether she

8  heard what I said or not.

9    MS. FETTIG:  Good afternoon, Your Honor.

10    I heard part of it, but I may not have gotten the full      14:15:06

11  thing.  I came in when you were discussing armbands.  And I

12  confess I'm not sure what you're talking about.  You may have

13  some information that I do not.

14    THE COURT:  Go ahead.

15    MS. FETTIG:  Yes.  No, I'm not sure what you're            14:15:24

16  talking about in terms of the armband.  You may -- there has

17  been discussion about monitoring the new -- the close custody

18  units using electronic monitoring.  But the most recent

19  information we have regarding that is that it is still in

20  progress because of purchasing problems with the State.  So       14:15:45

21  that has yet to be implemented.

22    If there's a separate armband issue, I'm not aware of

23  it.  Certainly electronic monitoring is a nice idea, but I

24  don't think it has yet been realized in the ADC.

25    THE COURT:  All right.

——CV-12-601-PHX-DKD – December 20, 2017——

1           MS. FETTIG:  So in terms of a renewed motion, the

2     question I would have for Your Honor is, much of the original

3     motion is about inaccurate methodology for the initial two

4     years plus of monitoring for many of the max custody measures.

5     That situation has not changed because it is historical fact.          14:16:24

6     And so --

7           THE COURT:  But what's happening on the

8     ground -- what's happening right now with -- I mean, do we have

9     the same issue, do we have the same circumstances, the same

10    ambiguity about who's going where, when, and who's writing it          14:16:38

11    down about what's happening?

12          MS. FETTIG:  Well, Your Honor, as you know we've been

13    working on the Monitoring Guide.  New monitoring methodology

14    was put in place.

15          Now, plaintiffs have recently filed a notice of             14:16:52

16    non-compliance with the defendants, but the defendants have not

17    yet responded.  I believe that is due on December 29th.  That

18    notice raises some issues that are similar and some that are

19    different from the original motion.

20          For example, the original motion addressed the fact          14:17:10

21    that there was nonrandom selection of weeks.  That had changed.

22    But that was a year and a half of nonrandom selections in the

23    methodology historically for the max custody conformance

24    measures.  The fact that there was inaccurate nonrandom

25    monitoring for the first two years isn't going to change.  The          14:17:33

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1    issue the plaintiffs brought forward was that, you know, to

2    some degree we needed to restart the monitoring of the max

3    custody measures because they were so compromised that they

4    could not be fixed.  And that was part of the original motion.

5            Those arguments remain the same, although going          14:17:58

6    forward some of the methodology has improved because of the

7    Monitoring Guide.

8            THE COURT:  So the notice of non-compliance, which the

9    defendants will respond to at the end of the month, won't

10   provide much more additional information in the record, I       14:18:17

11   gather, to help me understand this issue.  So it seems like I

12   do need to hear from you all about what the current situation

13   is as you see it that is the basis for your feeling of

14   non-compliance.  Is that fair?

15           MS. FETTIG:  Well, Your Honor, the basis for the        14:18:40

16   non-compliance during the first two years of monitoring remains

17   the same as it was in the motion that we originally filed.

18   That's a historical fact.

19           Going forward there are some new issues that have

20   arisen that are part of our new notice of non-compliance.  And  14:18:54

21   part of that arises from the Monitoring Guide, a question of

22   how that monitoring is being done, how are the cell hours being

23   counted, especially for the SMI population.  And that will be

24   addressed by defendants on the 29th, I don't want to argue that

25   in court now.                                                    14:19:17

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1          But the original motion remains the same in terms of

2     those methodological errors that we flagged.  Our concern is

3     that we want the monitoring going forward for the adequate

4     period of time to be accurate.  Those first two plus years were

5     fatally compromised, and that isn't going to change.          14:19:44

6          THE COURT:  All right.  But the proposed order would

7     be addressing both a correction of the past record that you'd

8     submitted as well as going forward; is that true?

9          MS. FETTIG:  Your Honor, I'm not quite clear that I

10    understand you.                                               14:20:05

11         THE COURT:  Okay.

12         MS. FETTIG:  The proposed order was meant to address

13    the flaws that we -- that were identified during the first two

14    years and then going forward.  So some of the issues remain a

15    problem because they have not yet been decided.  Some, like I   14:20:18

16    mentioned, the random selection of weeks that got corrected

17    after the first two plus years.

18         So the order that we crafted, the new order that you

19    asked us submit, and we did submit, that is crafted to address

20    issues going forward.  So that is current.                   14:20:39

21         THE COURT:  Okay.  And then what happens -- if I adopt

22    that order, the next question I have to ask, what happens to

23    what you've spent a lot of time talking about, and that is the

24    historical problems?

25         MS. FETTIG:  Yes.  Well, we would -- what we would    14:20:57

CV-12-601-PHX-DKD – December 20, 2017

1    like the Court to address are the old issues of methodology

2    that made the findings of compliance not compliant.  So we've

3    got a period of time expressed in the motion to enforce the

4    Stipulation for the max custody measures that -- in which the

5    defendants claimed they were compliant and our findings upon      14:21:21

6    analysis of the methodology and the actual -- and the actual

7    documents, our argument is that they were not complying with

8    the terms of the Stipulation.

9          So we would ask the Court to rule on the plaintiffs'

10   position that those -- that first, you know, two years is        14:21:39

11   actually not compliant.

12         THE COURT:  All right.  So, my discussion with you

13   right now has told me that I do think that it was wrong -- or

14   it is now in retrospect wrong for me to have done things the

15   way that I did, because it's created all of these ambiguities,   14:22:00

16   and to make sure that the issues are properly joined.

17         What I'll do is I'll take a look at the

18   Government's -- the State's response at the end of the month,

19   and your reply, and then I'll take all of that information

20   together with the information that I have in the documents that  14:22:17

21   have already been filed, and see if I'm right, that I do think

22   that I still need an additional motion.  And if I do need any

23   additional evidentiary evidence -- evidentiary hearing or

24   taking of evidence, and I'll let you know all about that after

25   I see the reply.                                                 14:22:38

—CV-12-601-PHX-DKD – December 20, 2017—

1          MS. FETTIG:  Thank you, Your Honor.  We appreciate

2     that.

3          And if the Court has any questions, certainly at the

4     next status hearing we can address those so that we're all on

5     the same page.                                                    14:22:50

6          THE COURT:  All right.  Thank you very much.

7          MS. LOVE:  Your Honor, if I may, I'm not sure in this

8     discussion what we're speaking of of looking at a reply.  I

9     think there may be some confusion in that the new notice of

10    substantial non-compliance that Miss Fettig referred to, I     14:23:04

11    think she just maybe made a mistake in terminology when she

12    said it was filed.  That is indeed a letter to defendants of a

13    notice of substantial non-compliance pursuant to paragraphs 30

14    and 31 of the Stipulation, which starts a new mediation

15    process.                                                          14:23:23

16         So that's not going to give you anymore information in

17    the record.

18         THE COURT:  I see.  I see.  All right.

19         MS. LOVE:  What defendants' concern is, and I think

20    that we share that with the Court, is that based upon the      14:23:32

21    motion that defendants also believe is stale in many respects,

22    because since October of 2016, and even before we have come to

23    a Monitoring Guide that was put into place as agreements were

24    made or guidance was provided by the Court, and is in effect,

25    if you look at the new proposed order versus the stale motion,  14:23:54

1  defendants are also unclear as to the marrying of both, as to

2  what is really still at issue.

3        THE COURT:  Well, let me ask this:  If it's embarking

4  upon the mediation process under this new Notice of

5  Non-Compliance, is that a venue that I should, without being          14:24:19

6  too much of an imposition on Judge Bade, to give a chance to

7  run its course so that seeing if it could maybe capture all of

8  these issues, or is that unworkable or unreasonable to think

9  about?

10        Miss Fettig?                                                     14:24:42

11        MS. FETTIG:  Your Honor, the new Notice of

12  Non-Compliance -- and I apologize if I made the Court think

13  that that was an actual pleading.  Indeed, we are at the early

14  stages in the non-compliance findings.

15        For that the issues, some of them overlap and some of            14:25:01

16  them are new.  What plaintiffs would say in this situation is

17  that the original motion to enforce the Stipulation for the max

18  custody measures, we do need a ruling regarding the issues

19  methodology and otherwise that were brought forward in that

20  motion so that both parties have an understanding of, you know,       14:25:24

21  where we go from here.

22        For example, you know, we -- even though defendants

23  for the moment no longer non-randomly select weeks for

24  monitoring, we need a ruling from the Court on that issue so

25  that there's no backsliding.  You know, that's just a clear          14:25:43

─── CV-12-601-PHX-DKD - December 20, 2017 ───

1    example where, if we don't get a ruling from the Court -- you

2    know, everything is a moving target in this case, from -- on

3    the monthly monitoring.

4         So we would certainly appreciate an initial ruling.

5         THE COURT:  All right.  I gather there's no                    14:26:03

6    impropriety in the court seeing the Notice of Non-Compliance

7    and the response, because that does not intrude upon the

8    mediation process, as those are just triggering actions before

9    the mediation occurs.

10        If that's true what I've just said -- and it may not           14:26:27

11   be true and you all may tell me it's not true.  But if that is

12   true, is it all right for me to see the notice from plaintiffs

13   and the response from the defendants, and let me see those so

14   that I can decide whether I think that there's action I can

15   take with the existing motion, or whether I do think that I        14:26:46

16   need additional evidentiary information with respect to

17   addressing the proposed form of order?

18        MS. FETTIG:  Your Honor, plaintiffs do not have a

19   problem with providing that information to you.

20        MS. LOVE:  Your Honor, defendants agree with               14:27:03

21   Miss Fettig.  We would only ask that because this is still

22   pursuant to the Stipulation going through the mediation

23   process, that rather that it be filed on the public document

24   that we provide it to your chambers via e-mail.

25        THE COURT:  I have no objection to that.  So if you           14:27:18

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD — December 20, 2017—

1    would at the end of the month, on the 29th, and sometime

2    between now and then, Miss Fettig, if you'd submit what you've

3    provided to the defendants, I'll take a look at that and let

4    you know what I need or what I can do with respect to the

5    existing issue that's before me.                                    14:27:34

6            Thank you.

7            MS. FETTIG:  Thank you, Your Honor.

8            THE COURT:  All right.  Mr. Fathi, that is the end of

9    my list.  You can start up again, please.

10           MR. FATHI:  Thank you, Your Honor.                           14:27:43

11           There remain some issues under item 4, first beginning

12   with item 4A, which this involves the Court's order for

13   Performance Measures 94, 95 and 97.

14           The defendants have to select the required number of

15   files from different individuals rather than counting the same       14:28:05

16   person's file more than once in the same month.

17           Now the Court issued its order on July 13th at

18   document 2185, and since then for the next three months of

19   CGARs the defendants have failed to comply with the Court's

20   order, and each month have continued to count the same              14:28:24

21   individual's file more than once for a given Performance

22   Measure.

23           We think that's a problem, and we would like assurance

24   that defendants will comply with the Court's order going

25   forward.                                                            14:28:39

1          THE COURT:  And the defendants essentially respond

2     that they say it's de minimis; is that right?

3          MS. HESMAN:  That's correct, Your Honor.

4          MR. FATHI:  Well --

5          MS. HESMAN:  Our response is at docket 2489.  I'd          14:28:54

6     specifically like to direct the Court to page 3 where we

7     outline the total number of files that were reviewed for all

8     Performance Measures 94, 95 and 97.

9          140 -- with respect to the August numbers, 140 files

10    were reviewed for Performance Measure 94.  Of those files two     14:29:13

11    duplicate entries were found.  That's an error rate of 1.4

12    percent.  More importantly, neither Florence or Yuma where the

13    duplicates existed fell below 100 percent compliance.

14         For Performance Measure 95, 140 files were reviewed.

15    Four duplicate entries were found.  That's an error rate of 2.8   14:29:29

16    percent.  Florence maintained 90-percent compliance rate.

17    Lewis maintained a 95-percent compliance rate.  Phoenix and

18    Tucson maintained 100-percent compliance rate.

19         With respect to Performance Measure 97, 364 files were

20    reviewed.  Four duplicates were found.  That's an error rate of   14:29:46

21    1.1 percent.  Phoenix's score went from 96 percent to 94

22    percent.

23         Your Honor, we're talking about human error.

24    Plaintiffs have constantly tried to present this as an

25    intentional defiance of the Court order, and that's simply not    14:30:02

149

1    the case.  These are human errors.  They're going to happen.

2    And we're talking about error rates of less than two percent

3    where compliance remains compliant.  None of these measures

4    dropped to non-compliance.

5          So as we stated in our motion, this is much to do          14:30:17

6    about nothing, Your Honor.

7          MR. FATHI:  Your Honor, as for the defendants'

8    representations that there were only X errors that accounted

9    for only Y percent of the cases, and that none of the measures

10   changed from complaint to non-compliant, there are no           14:30:31

11   declarations here.  The defendants admit that they haven't

12   provided the underlying documents so we can verify what they're

13   claiming.  All that we have, as usual, is the unsupported

14   assertions of counsel which are not evidence.

15         And more importantly, there's never been any              14:30:47

16   explanation as to why, after the Court's order, for three

17   consecutive months defendants weren't complying with that

18   order.

19         They do provide an explanation for September, but that

20   explanation is not reassuring because they admit that the error 14:31:03

21   was corrected only after we filed our notice with the Court.

22         There's no explanation for the other two months where

23   we found in July four cases, in August nine cases.  And I

24   emphasize again, that was just spot checking, because as

25   Miss Kendrick said earlier this morning, we don't have the      14:31:24

UNITED STATES DISTRICT COURT

1    resources to check every Performance Measure at every

2    institution every month.

3         But whether in a given month on a given Measure the

4    defendants' errors are numerous enough and egregious enough to

5    change from compliance to non-compliance isn't the only          14:31:40

6    question.  The fundamental question is whether these CGAR

7    reports, the documents on which we all rely, the foundation of

8    this entire compliance monitor and enterprise are accurate,

9    whether we can rely that what we read in the CGARs is true and

10   accurate.  And we have shown over and over again, month after    14:32:01

11   month, that you can't rely on the CGARs for being accurate.

12        What we want is simply that at long last the

13   defendants commit that they will comply with the Court's order

14   of July 13th on how to do the monitoring on these three

15   Performance Measures.                                            14:32:22

16        THE COURT:  Well, what you said just, Mr. Fathi, is a

17   good articulation of the reason why I omitted this agenda item

18   from my list, because I believe that it was captured or

19   subsumed within the greater topic of the reporting issues about

20   whether or not we could trust the CGARs.                         14:32:39

21        What will happen with respect to the marshalling of

22   the potential case, whether it exists or not, that is suggested

23   by my comments at the start today, will largely control and

24   perhaps swamp or not this particular issue.  But it seemed to

25   me, because it potentially could, this one, be swamped, it       14:33:01

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    didn't make a lot of sense to focus on it right now.

2           If it turns out that the plaintiffs think it is one of

3    their leading points, their lead stories, so to speak, then you

4    can marshal those facts and present it in a way where we'll

5    take it up in greater detail with respect to the hearing that          14:33:19

6    we've scheduled.

7           But for now, for today, I'm not going to address this

8    one anymore.

9           MR. FATHI:  Thank you, Your Honor.

10          THE COURT:  Your next one?                                       14:33:31

11          MR. FATHI:  Well, the next one is 4D, and this is a

12   little bit different, although certainly if the Court wants to

13   defer this one too, we will comply with the Court's direction.

14          And this involves Performance Measure 77 and the

15   requirement that treatment plans be updated every 12 months.           14:33:51

16   The Court has ruled on what every 12 months means.  It means no

17   less frequently than every calendar year.  But eight days after

18   the Court ruled, the defendants continued -- reasserted their

19   position that even if more than one year has elapsed between

20   the reviews, the file can still be compliant.                          14:34:17

21          And this is concerning because it may well make the

22   difference -- this incorrect counting in disregard of the

23   Court's order may well make the difference between compliance

24   and non-compliance.

25          So here again, we simply ask that the defendants               14:34:32

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD — December 20, 2017

1    commit to obey the Court's order regarding monitoring

2    methodology for Performance Measure 77.

3            THE COURT:  Well, I addressed this when I said what

4    happened regarding the agenda item that included this one and

5    the others regarding the plaintiffs' request for a re-audit.          14:34:51

6    And that is, at the time that the defendants seek to leave the

7    Stipulation with respect to Performance Measures that are

8    subject to a challenge based upon a failure to comply with the

9    Court's instructed methodology, the Court will at that point be

10   able to evaluate whether or not in fairness and in substance it   14:35:11

11   is appropriate to think that the errors were significant enough

12   to remove the -- to remove the compliance record and to not

13   give the defendants credit for those months.

14           The things that I had previously thought that I would

15   be thinking about would be whether or not there was a recent       14:35:33

16   strong history of compliance, in which case then I would think

17   that it probably would mean that it wasn't such an important

18   factor to turn the decision on.  But if there -- if it was

19   marginal, then I would think differently about it.

20           But again, it may be swamped by a greater issue            14:35:51

21   of -- and again, that's why I'll hold off for now for those

22   reasons on this one as well.

23           MR. FATHI:  Thank you, Your Honor.

24           Our only additional concern is that this measure may

25   well be non-compliant at one or more institutions under the        14:36:07

UNITED STATES DISTRICT COURT

————— CV-12-601-PHX-DKD – December 20, 2017 —————

1   correct monitoring methodology, and defendants' use of the

2   incorrect monitoring methodology will conceal that, and

3   therefore create an impression of compliance where, in fact,

4   none is warranted.

5          And that's why we think this needs to be addressed          14:36:26

6   sooner than the time at which the defendants seek to terminate

7   monitoring.

8          But obviously we'll comply with the Court's directive

9   on how to address this.

10          THE COURT:  Thank you.          14:36:38

11          MS. HESMAN:  Your Honor, if I may --

12          THE COURT:  Yes.

13          MS. HESMAN:  -- just very briefly.  I think I can

14   alleviate a lot of Mr. Fathi's concerns.

15          We are applying the Court's methodology to this          14:36:46

16   Measure.  After the November 21st hearing, the first batch of

17   CGARs that were reviewed were the October CGARs, and they were

18   reviewed pursuant to the Court's order.

19          So there's been no defiance, we're complying with the

20   Court's order.          14:37:01

21          THE COURT:  Good to hear.  Thank you.

22          Is that it from plaintiffs' side?

23          MS. KENDRICK:  Your Honor, just one thing.

24          THE COURT:  Yes.

25          MS. KENDRICK:  I wanted to go back to our request for          14:37:07

─── **CV-12-601-PHX-DKD – December 20, 2017** ───

1   the documents -- document request number 62.

2          Miss Hesman only read part of the request into the

3   record, and so for the record I would like to relay what we

4   actually asked for in full.  And it's also at docket 2503-1 at

5   page 31.                                                    14:37:28

6          Our request number 62 reads in full:  Any documents

7   relating to the system-wide and/or institution-wide

8   discontinuation of gabapentin, parenthesis, Neurontin, close

9   parenthesis, or tramadol as pain medications, comma, including

10  instructions or directives given to prescribing providers,   14:37:46

11  comma, and protocols for tapering patients off the medication.

12         That was the complete, full request, and the last two

13  clauses were not read into the record before.  So I just wanted

14  to make a record of that.

15         THE COURT:  Your record is made.  But as I listened to  14:38:04

16  it, it does sound like a different question than the one you

17  asked today.

18         MS. KENDRICK:  Nevertheless, we will revise our

19  request to make it quite clear to them what we are seeking.

20         THE COURT:  Thank you.                                14:38:16

21         Anything else from plaintiffs' side?

22         MS. KENDRICK:  No, sir.

23         THE COURT:  Okay.

24         MR. FATHI:  If I may, Your Honor, agenda item 8, this

25  involves the defendants' failure to provide a number of        14:38:25

CV-12-601-PHX-DKD – December 20, 2017

1    documents that we've requested.  Many of these requests date

2    from July of this year, and here we are nearing the end of

3    December.  So we would appreciate some alacrity on the part of

4    defendants and an order by the Court setting a deadline for

5    production.                                                          14:38:47

6         THE COURT:  And are these issues that were addressed

7    at the November 21 hearing or not?

8         MR. FATHI:  They are, Your Honor.  And then

9    subsequently there has been some correspondence.  If you will

10   give me a moment to find the reference in the record.               14:39:00

11        Our letter of December 14th at document 2502-1,

12   starting at page 30, these are the requests that remain

13   outstanding.  We've already dealt with number 62, which is the

14   Neurontin/tramadol issue, but there are others where, again,

15   five months after making these requests we have still not          14:39:32

16   received the documents.  And we have not yet received a

17   response to this December 14th letter.

18        So we would appreciate, given the many months that

19   have elapsed, the imposition of a deadline to either produce

20   the documents or state that after a diligent inquiry none          14:39:51

21   exist.

22        THE COURT:  So the December 14th letter restates

23   everything that you're asking for in agenda item 8?

24        MR. FATHI:  That's correct, Your Honor.  It restates

25   the requests that remain outstanding.  We have resolved some       14:40:09

UNITED STATES DISTRICT COURT

1    since the November 21st telephonic hearing.

2         THE COURT:  So what you'd like me to do is to inquire

3    of the defendants as to when they would be able to respond to

4    your November 14th letter at the very least; is that right?

5         MR. FATHI:  Yes, Your Honor.  And respond not only by      14:40:25

6    saying, we'll look into it, but respond with either production

7    or a definitive answer, again, given the many months that have

8    elapsed since these requests were made.

9         MS. LOVE:  Your Honor, the letter that Mr. Fathi

10   speaks of, it's a December 14th letter that was received by     14:40:41

11   defense counsel less than one week ago.

12        It -- to be fair to all parties, since our firm took

13   over document production, we've all been working diligently

14   together to get all remaining outstanding issues resolved.

15   We're down to -- as to request for production numbers, we're    14:40:58

16   down to literally plaintiffs taking issue with us over

17   eight -- we're down to eight RFPs, a couple of which we have

18   responded to them, with respect to request number 18 and 19,

19   that we are making additional inquiries into whether there's

20   additional documents to produce, and we're doing that.  Others  14:41:18

21   we may just be at an impasse.

22        I think that it requires, again, where we are facing

23   these broad-based requests for production, that we can't be

24   mind readers as to what they want.  And we need to do a meet

25   and confer among counsel if we can't come to a resolution.      14:41:36

1          But asking for a deadline to respond when we've

2    received a letter less than a week ago is inappropriate.

3          Again, we're back to the situation where plaintiffs

4    make, you know, repeated -- sometimes we get multiple letters

5    or requests a week, where if we were in a litigation          14:41:56

6    stage -- essentially we are still in discovery.  This case was

7    settled, but we continue with discovery.

8          We should be afforded the protocol of Rule of Civil

9    Procedure 34(b)(2) where we get 30 days to respond to this.

10   When we can respond earlier, we certainly will, and we continue   14:42:16

11   to roll out.

12         But I don't believe that this is a matter that

13   requires, you know, painting defendants in a bad light when

14   we've worked down to eight RFPs that are at issue and we've

15   received a letter less than a week ago.                       14:42:33

16         THE COURT:  All right.  So what we'll do is --

17         MR. FATHI:  Your Honor.

18         THE COURT:  Go ahead, Mr. Fathi.

19         MR. FATHI:  May I respond briefly?

20         First of all, I'm glad to hear defendants agree that   14:42:39

21   the Federal Rules of Civil Procedure continue to apply to this

22   case, because they've taken the contrary position previously.

23         Second, as I said, many of these requests were served

24   in July.  There's nothing new in here, they have had them for

25   five months, so the idea that we're somehow giving them six   14:42:55

1    days to respond is just not correct.

2          THE COURT:  All right.  Well, what we'll do is, on

3    the -- no later than the 29th of December the defendants will

4    produce what documents they have that are responsive, or enter

5    objections in a responsive letter to the plaintiffs.          14:43:11

6          You then can have your meet and confer on those

7    remaining issues.  And then if you can't resolve it, call me on

8    the telephone and we'll address those issues of the eight that

9    remain.

10         Okay.                                                  14:43:26

11         MR. FATHI:  Thank you, Your Honor.

12         THE COURT:  Defendants' turn on agenda items.

13         MR. STRUCK:  Your Honor, really the -- I think the

14   only thing that we mentioned was the -- and it's something that

15   we just haven't been able to clear with Mr. Millar.  The Court  14:43:39

16   has ordered payment for Mr. Millar within a certain time frame,

17   and there's -- it necessarily requires that his organization go

18   through Procure Arizona.  They just need to update their

19   information, and they're not -- for whatever reason that hasn't

20   happened.  So they were paid, but it was going outside --       14:44:01

21         THE COURT:  All right.  So we'll talk about that with

22   him, do you think makes sense --

23         MR. STRUCK:  Yeah, that's fine.

24         THE COURT:  -- when he calls in?

25         All right.  So he's scheduled to do that at 3:00.  So    14:44:12

1    we'll take a break until 3:00 when he calls in.

2            Thank you very much.

3        (Recess at 2:44 p.m., until 3:01 p.m.)

4            THE COURT:  Thank you.

5            Please be seated.

6            And, Mr. Millar, you're on the phone, I gather.  Thank

7    you very much for calling in.

8            MR. MILLAR:  Yes, we are.  Thank you.

9            THE COURT:  All right.  We have on the screen here the

10   Advisory Board slide to start.  So the WebEx is working          15:01:27

11   apparently.

12           What we'll do is ask you to go forward, and when you

13   finish there were just couple of things that we needed to

14   raise, one from me, one from defense counsel, and maybe

15   something from plaintiffs.  But we'll ask you to go first.        15:01:42

16           MR. MILLAR:  We will do that.

17           Judge, we do have the option to possibly bring -- I

18   can bring myself up on the webcam, we could try that to see if

19   it would be helpful.  I don't know if the audio on the phone

20   will directly sync with it, and sometimes it's distracting.      15:01:59

21   But I'll defer to your input on whether you'd like to try that

22   and see if it works, or just go with our presentation and our

23   conference call.

24           THE COURT:  Well, I'll tell you that right now there a

25   difficulty with the audio, and it may be because you're on a     15:02:13

——CV-12-601-PHX-DKD – December 20, 2017——

1    speaker phone.  But there are these -- they're not full

2    cutouts.

3              But am I only one having trouble hearing?

4              MR. STRUCK:  We're having difficulty.

5              THE COURT:  It is hard for us to hear.                    15:02:26

6              And I think that if you got closer to the speaker

7    phone microphone or used a nonspeaker phone, we'd probably be

8    able to hear.  But it is hard to hear you right now.

9              So if you want to try using the feature that would use

10   the WebEx and let us see if it works better, although I'm a      15:02:40

11   little frightened that maybe it won't, because already we're

12   having trouble.

13             MR. MILLAR:  Actually I think it will make it worse.

14   Is this better now?

15             THE COURT:  Yes, much better.                           15:02:54

16             MR. MILLAR:  Okay.  I will work directly from a

17   headset.  I had the headset off just in case I was going to go

18   on video.  But let's work directly from headsets.

19             I've got two other team members on the phone that I

20   will introduce, I'll ask them if they have the ability to put    15:03:08

21   headset on, that they do the same.  And hopefully we'll

22   eliminate that speaker phone issue.

23             THE COURT:  Great.

24             MR. MILLAR:  Very good.

25             Rene, if you'll go ahead and advance.                   15:03:24

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – December 20, 2017

1        So as we outlined our intent for this call, what we

2   refer to this as within our company is a welcome call, that we

3   seek to introduce our team, outline what we believe the

4   overview of the engagement will be, or the objectives, to make

5   sure as we start out we're on the same page.  So before we          15:03:49

6   start spending time and effort going down a road, that we know

7   that all parties are in agreement with the direction we're

8   going.

9        And then at this point where we're kicking off we have

10  some logistical and scheduling elements to talk through, and       15:04:02

11  then look at the next steps as we move forward with this

12  project.

13        And I think, Judge, you indicated there are a couple

14  of additional agenda items that you would like to include at

15  the end.  I think some of them are housekeeping in nature,          15:04:15

16  others we'll address as they come up.

17        Does that sound like an appropriate agenda to start

18  with?

19        THE COURT:  Yes, perfect.  Thank you.

20        MR. MILLAR:  Okay.  So if we move to the next slide           15:04:28

21  you'll see photographs of our team there.  Three are of us that

22  will be working with you on this engagement.

23        My name is Braxton Millar.  You'll hear me introduce

24  myself as BJ most often.  I'm a vice president with th

25  value-based care consulting practice at the Advisory Board.          15:04:47

UNITED STATES DISTRICT COURT

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1  And so our practice works with all types of provider-based

2  consulting endeavors, a lot with physician groups, a lot with

3  population health management.  And we do deal specifically with

4  physician compensation, recruitment, and retention.

5         Not in my current role at Advisory Board, but in my    15:05:12

6  prior 25 years of consulting, I do have a substantial

7  background in correctional healthcare consulting, and have

8  worked in Arizona, Utah and California.

9         What I'll do is I'll also allow my two teammates to

10  introduce themselves.  Mr. David Long first, and then Miss Rene  15:05:32

11  Sobolewski.

12         David.

13         MR. LONG:  Yes.  Hi, I'm David Long.  I'm a control

14  consultant with the Advisory Board team.  Much of my practice

15  focuses around physician alignment as well as population health  15:05:46

16  management and staffing, which will translate well to figuring

17  out the best staffing for this engagement.

18         So I'm looking forward to working with everyone.

19         THE COURT:  Mr. Long, what's your background?

20         MR. LONG:  So I've been with the Advisory Board for   15:06:04

21  about five years.  Prior to that did JD and MBA programs.

22  Worked with the Mississippi Attorney General's Office.  I did

23  my JD at the University of Mississippi.  I worked with some

24  consumer protection as well as Medicaid.  Worked there, and

25  then focused on healthcare law during law school, and then   15:06:32

UNITED STATES DISTRICT COURT

1   focused on healthcare MBA.

2          And so my major full-time work post grad school has

3   been with the Advisory Board for about four years.

4          THE COURT:  Thank you, sir.

5          MS. SOBOLEWSKI:  And hello, this is Rene Sobolewski.      15:06:46

6   I'm a consultant on our value-based care team.  And my practice

7   has been most of the time, like David, in physician alignment,

8   population health management.  Also a good bit of experience

9   with evaluating physician employment agreements and benefits

10  packages and providing fair market value opinions.            15:07:01

11         So we're really looking forward to providing you

12  insights with our analysis of the situation.

13         THE COURT:  Thank you.

14         MR. MILLAR:  Rene is also -- she's a graduate of

15  Vanderbilt University.  And just as a unique aside, she was the  15:07:14

16  captain of their golf team.  So she's actually our wringer

17  whenever we go on golfing events.

18         THE COURT:  That's good to know.

19         MR. MILLAR:  Rene, you can go ahead and move forward.

20         Judge, let me ask you this question:  Are there any in  15:07:33

21  the courtroom that you believe we should introduce -- or we

22  should be aware of who is there?

23         THE COURT:  Well, I think we have all of the counsel

24  present.  And with respect to the defendants, there's the

25  person who is a defendant in the case who is actually present  15:07:55

CV-12-601-PHX-DKD – December 20, 2017

1    who is the overseer of the provision of the State's medical

2    care in the prison system.  We also have present in the

3    courtroom the person who is the chief of the psychological

4    psychiatric services that are provided.

5         I think that -- I don't know whether it's a handy way          15:08:21

6    for you to meet these people and to understand who they are and

7    link names with faces to have us do it by telephone.  But I'm

8    certainly open to when you're in the District of Arizona -- and

9    I think they will be open too -- to facilitating an opportunity

10   for you to meet and to understand who contact people are.          15:08:44

11        As you learn about this and embark on the project, I

12   gather part of what someone does in your business is you

13   learn -- learn and identify who the contact people are with

14   respect to getting information.  And that's probably the first

15   question that you ask everybody that you meet.                     15:09:03

16        The lawyers are certainly a good place to start here,

17   and they'll lead you to other people.  But to the extent that

18   you think that it would be helpful for you to have a further

19   introduction or greeting, and if there's anything I can do to

20   facilitate that when you appreciate the need for it, let me       15:09:20

21   know.

22        MR. MILLAR:  I will do that.  I think just knowing the

23   description you've given of the groups in the court is helpful

24   for us.  And I think as you proposed, then when we are there

25   physically in the court we'll be able to do some of that          15:09:35

UNITED STATES DISTRICT COURT

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    face-to-face, which will be more meaningful than I think taking

2    up the time on the call to do that today.

3            So with that being said, I think we're good at this

4    point to move forward.

5            THE COURT:  Okay.                                      15:09:49

6            MR. MILLAR:  This next slide is one that is an

7    overview of our engagement.  The top portion of this is

8    language that we've pulled directly from the engagement letter

9    which is our contract with the courts and the Arizona

10   Department of Corrections.                                     15:10:06

11           And so the goal is to provide for the courts an

12   assessment of and recommendations for provider staffing and

13   retention within the Arizona Department of Corrections with

14   regard to their healthcare services.

15           The objective of that is to understand how to better   15:10:21

16   and more consistently and timely provide care to the prisoners

17   by maintaining the staffing and retaining the care providers.

18           If we drop down to the bottom, then we've broken it

19   out into answers that we believe are the -- those that we are

20   working towards, answers to the following questions.           15:10:49

21           First one is to understand what the current strategy

22   and process for healthcare staffing and retention at the ten

23   ADC facilities is, and why to this point they have struggled or

24   have lacked success in filling or retaining their budgeted

25   positions.                                                     15:11:10

—CV-12-601-PHX-DKD — December 20, 2017—

1          The second then is what is the current market for

2    healthcare provider supply and demand within eight specified

3    markets.  In our prior calls we've identified that the ten

4    facilities fall within what we would define as eight markets.

5          And then understanding how profiling these markets can

6    inform either the challenges or obstacles that may or may not

7    exist to staffing, hiring, and retention within the different

8    market areas.

9          So the first question is focused on the ADC's

10   approach.

11         The second one looking at market characteristics or

12   factors that would be influencing it.

13         And then third, the result of these two analytic or

14   data-gathering exercises is, how will these findings produce a

15   final report from us where we can outline recommendations for

16   immediate next steps and even long-term strategy for

17   successfully hiring and retaining at the proposed budgeted

18   staffing levels.

19         Let me pause there and see, Judge, if there is a

20   common understanding that this is what you have engaged us to

21   pursue.

22         THE COURT:  I think that's consistent with what we've

23   talked about.

24         MR. MILLAR:  Okay.  I think at this point we'd ask if

25   there are any concerns or questions from either of the two

15:11:26

15:11:46

15:12:02

15:12:24

15:12:40

1   parties or counsel, if they're in agreement that that's also

2   what -- that that outlines what our prior conversations have

3   been.

4           THE COURT:  Plaintiffs have any observations?

5           MS. KENDRICK:  No, Your Honor.  We think that what          15:12:52

6   Mr. Millar presented does match with what we've talked about in

7   the past.

8           THE COURT:  Thank you.

9           Mr. Struck?

10          MR. STRUCK:  No, Your Honor.                                 15:13:00

11          MR. MILLAR:  Okay.  Very good.

12          Then as we take the next level, we've broken down the

13  scope of this engagement into three identifiable work streams.

14          The first of those work streams are the market

15  profiles and compensation benchmarks.  This is where we will      15:13:19

16  use the data tools and benchmarking data sets that we have at

17  our disposal, along with some teleconference interviews and

18  others with providers within each of these markets to

19  understand what the supply, demand and requisite hiring

20  characteristics are within the eight Arizona markets.  That      15:13:48

21  will be one that we will do mostly on our own direction.  There

22  will not be much data that we're asking from you all for to

23  support this work stream.

24          And in fact, our teams, as soon as we received the

25  first payment about a week ago, began pulling these elements      15:14:08

1    together, pulling the ZIP codes and other.  So that will be

2    some of the first information we'll bring forward for feedback

3    and vetting with the group.

4         The second work stream then, or Work Stream II, are

5    the facilities profiles and baselines.  This will be where the          15:14:31

6    bulk of our data request items will be directed, where we are

7    looking for the current, what I would call, the 28 team

8    proposed budgets for staff positions at the different levels.

9         We'll also then be looking for information about the

10   employment and payroll nature of who is employed, what               15:14:53

11   positions are vacant, what some of the turnover has been.  So

12   there will be a more detailed request for that information.

13   Which allows us then to look at each of the facilities, not

14   only geographically, but from the different modalities of care.

15   So we'll look at the physicians, we'll look at the behavioral        15:15:14

16   health folks, we'll look at the midlevel providers that are

17   supporting both of those.

18        It appears from our initial review of data during the

19   early conversations we've had, that there will be different

20   issues in different markets.  And so we will strive to identify      15:15:31

21   those, to be able to detail them from an analytic standpoint as

22   well as from an anecdotal standpoint.

23        Also part of this will be a series of interviews via

24   teleconference, or face-to-face if scheduling allows for it,

25   with some of these providers, both who are currently employed       15:15:55

1   and providing care at the ADC facilities and those that have

2   been there and no longer are there, to be able to inform beyond

3   the analytics some of the working conditions, working

4   requirements and job expectations, so that we can have a full

5   360-degree look at the elements that are impacting the ability          15:16:17

6   to hire and retain within the facilities.

7         The final work stream, Work Stream III, in our

8   consulting language it is our final deliverable.  In our mind

9   it will take the form of a written report and probably a

10  PowerPoint slide that work hand in hand, that begins then to           15:16:40

11  take the comparisons of the markets in each of the facilities,

12  and then begins to identify the -- or to describe the

13  identified constraints or issues, either from a market

14  perspective or from the ADC's hiring strategy perspective, of

15  the causes for the struggles to hire and maintain at the              15:17:10

16  budgeted staffing levels.  We will then work towards what our

17  recommendations would be for remedying that.

18        This is where you get kind of the full insight from

19  our experience not only in correctional healthcare but in

20  healthcare staffing as a whole, to understand what current            15:17:31

21  methodologies, current strategies are for hiring and retaining,

22  what the obstacles would be and our recommendations for

23  overcoming those.

24        Those at this point could span everything from job

25  descriptions to job requirements to salaries and benefits or          15:17:51

170

1    different type of retention or staffing elements.

2           Let me pause there and ask if there's any questions

3    regarding the details flushed out here a little bit more around

4    these three work streams.

5           THE COURT:  I have no questions.                          15:18:11

6           Plaintiffs' counsel?

7           MS. KENDRICK:  No, sir.

8           THE COURT:  Mr. Struck?

9           MR. STRUCK:  No, Your Honor.

10          THE COURT:  No questions here.                             15:18:15

11          MR. MILLAR:  Okay.  We've been provided by the Court

12   your monthly ongoing scheduled times that this case is in

13   court.

14          What we are proposing is that we would have at least

15   interim project updates during each one of those scheduled      15:18:33

16   times, where we would give a current project status to let you

17   know if there are any obstacles or impediments we've had in

18   obtaining data or scheduling or anything else that would impact

19   the progress.  We would also have discussions and resolutions

20   of any of those hurdles.                                         15:18:55

21          We would also look to be very transparent in vetting

22   and providing data-received feedback on.  This is not something

23   that we intend to work in a black box and bring a final product

24   forward.  And so our intent would be to have materials prepared

25   ahead of each of these project updates so that they could be     15:19:18

—— CV-12-601-PHX-DKD – December 20, 2017 ——

1    reviewed in advance, and counsels and others can come to the

2    update calls or meetings with specific questions or concerns

3    around findings and around the process we've gone through.

4         This will allow us then to vet all of those materials

5    as we work towards that final recommendation, with the intent      15:19:43

6    being that there really is -- there are no huge surprises as we

7    get to the end, because we would have worked with these updates

8    as we go forward on those.

9         The one thing we would reserve -- go ahead.

10         THE COURT:  No, we'll make time for these                    15:20:05

11    presentations during our monthly meetings.  And I do appreciate

12    your providing the materials in advance so that we can have a

13    chance to digest them before we do meet together.

14         MR. MILLAR:  And that will be very important, because

15    we will want to make the most use of that time.  And so I will    15:20:23

16    hold my team accountable to having those out in advance.

17         What we would look to the Court to understand is how

18    far in advance would be appropriate for that?  We oftentimes

19    shoot for five working days or a calendar week.  If that is

20    acceptable to the Court, we would work toward that, or if it      15:20:46

21    needs to be longer or shorter.

22         THE COURT:  No, we would be very appreciative of that

23    five days.

24         MR. MILLAR:  Okay.  The turnaround on the first one,

25    as we get to the scheduling we'll talk about this as well, we     15:20:59

1    may be a little bit tighter than that on the January 10th --

2         THE COURT:  Understood.

3         MR. MILLAR:  -- just because of the holidays.

4         But, again, it helps to know that we're accountable to

5    you for that, because that keeps us accountable internally as          15:21:13

6    well.

7         THE COURT:  Understood.

8         MR. MILLAR:  There may be an occasion where we need to

9    have -- I mean, we will have contact with certain folks to

10   follow up, to do data collection, et cetera.  I think because         15:21:26

11   of the monthly schedule with the Court I don't anticipate that

12   we would need any special scheduling with you, Judge, with the

13   Court, but if that comes up we will work through Sarah and

14   others, with your folks, to make sure that we make you aware of

15   any additional access that we would need.                              15:21:50

16        THE COURT:  Of course.  And that's part of the

17   understanding that I've made plain to you, you should expect us

18   to help when we're needed to do so.

19        MR. MILLAR:  Very good.

20        And if we move to the next slide, this is now putting           15:22:03

21   the components of those three work streams on a timeline to

22   look at the milestones that we're pushing towards.

23        So we're looking in January at initiating the market

24   analysis and the interviews, and in February continuing those

25   elements with analysis and interviews.                                15:22:23

1      As we reach the March time frame, we would expect that

2  we're coming very close to having some of our initial findings.

3  What we would not have at that point would be resolutions or

4  others.  But we would start to bring forward those elements so

5  that in the March and April time frame we would seek to vet and          15:22:42

6  validate the analysis.

7      The intent for doing that before we move right into

8  our recommended solutions or strategies around that is we want

9  to make sure that all parties involved agree that the data that

10  we have analyzed and the information that's come forward                 15:23:01

11  appropriately describes and fits all of the different

12  marketplaces.

13      Then in the May time frame we would look to preview

14  and finalize our recommendations, with a final report sometime

15  in that May to June –– to mid-June time frame.                          15:23:19

16      So I think our engagement letter originally assumed a

17  five- to six-month work stream on this.  Again, our teams will

18  move as expeditiously as we can, with a commitment to you,

19  Judge, that no later than mid June that we are presenting

20  final –– a final report to your group.                                  15:23:43

21      THE COURT:  Okay.

22      MR. MILLAR:  All right.  If we move to our next slide,

23  these are the dates we've received from the Court regarding the

24  times you have scheduled.  So today is the 20th, we're speaking

25  with you today.                                                         15:24:00

——CV-12-601-PHX-DKD – December 20, 2017——

1          On January 10th, what we've listed here is our

2    availability to know when it would most appropriately align

3    with the Court's scheduled for those days.

4          So we would anticipate no less than 30 minutes,

5    probably no more than one hour for the update at that point in          15:24:17

6    time.

7          Judge, initially when we spoke with Sarah and others

8    last week, I thought that the January time frame would be an

9    appropriate time for us to be there physically on-site, to be

10   able to introduce the team and some of our initial findings.  I          15:24:32

11   believe at this point with the short turnaround that it would

12   be better use of my team's time to make that a virtual call

13   again in January, and plan during that February timeframe to be

14   there with the team, because we will have some more substantial

15   findings.  We would also potentially align some interviews and          15:24:54

16   other things around those two dates, so that we could actually

17   spend some more time with the Court with some more substantial

18   findings from our work to date.

19         Let me just ask at this point if you believe that that

20   proposal would meet the Court's needs.          15:25:15

21         THE COURT:  Well, certainly.  And we'll coordinate any

22   particular requirements of your availability during those

23   times.

24         I do need to apprise you though that earlier this

25   morning I set an additional hearing date, that while it may not          15:25:29

1    be a place where you would want to make a presentation, it may

2    be a place and time where you could learn information that may

3    be relevant to your inquiry.

4            This additional --

5            MR. MILLAR:  Okay.                                        15:25:47

6            THE COURT:  -- hearing was set for the 9th of February

7    at 9:00 a.m.  And it's an evidentiary hearing in which I have

8    tasked the parties to follow up on a news story that was

9    published -- or broadcast this morning on the public radio

10   station, the national public radio affiliate in Phoenix, in     15:26:07

11   which there was a report of a former physician who was

12   contracted with a temporary agency, and then that led to her

13   employment in the prison system.  And then she decided to talk

14   apparently with the news reporter and shared some of her

15   concerns about working there.                                    15:26:36

16           The reason that I suggest that it might be relevant to

17   your inquiry is that you have told me, and the parties have

18   told me too, that -- and it's part of your second stream, and

19   that is an inquiry into work conditions, so to speak.

20           And so it is possible, without knowing what this will    15:26:54

21   lead to -- because as I say, it is just a news report and it's

22   not part of the evidentiary record in the case.  But I have

23   asked the counsel to move forward in a way that would allow us

24   to have on the 9th of February a full evidentiary hearing, if

25   appropriate, in which evidence may well be developed regarding   15:27:17

```
 1   issues that are of particular interest to you under the second

 2   stream.

 3            To that end also I will tell you that I've asked

 4   Miss Selzer to forward the link of the story, which is not only

 5   apparently in a broadcast form, audio form, but also there is a      15:27:35

 6   written form of the story that's being prepared.

 7            So this may be helpful information or it may not to

 8   you.  But I think you should know about it.  And you should

 9   also know about the fact that we've scheduled this hearing in

10   Phoenix on the 9th of February.                                      15:27:53

11            MR. MILLAR:  I think that will be very germane to what

12   we are doing.  And I think it's actually -- it's a really good

13   interim to the six-week spread we had between the currently

14   scheduled January and February pieces.

15            So I'll make sure my team has that on our calendar.         15:28:10

16   And we've got to schedule details around that, I think at a

17   bear minimum we would like someone from our term to at least

18   participate via call.  But at this point I actually think it

19   might be strong enough that we might have somebody there

20   physically for that hearing, and schedule some of our other          15:28:28

21   research in the marketplace around that --

22            THE COURT:  Well --

23            MR. MILLAR:  -- as well so that --

24            THE COURT:  -- understand that you and your team are

25   welcome any time that we are in court on this matter.  And you       15:28:37
```

1    can be here by physical presence or by telephone, whichever you

2    prefer.

3            MR. MILLAR:  We appreciate that.  And we will likely

4    take advantage of both modalities as needs be.

5            So I believe then that being the case, the other --          15:28:57

6            If you can go back to the dates just for a moment,

7    Rene.

8            The other dates then follow fairly well in sequence.

9    Our availability at this point is quite wide open.  And I think

10   as we get further in we'll understand how much time we would be    15:29:11

11   requesting within those scheduled dates.  Although we have the

12   dates held on our calendars now, we will schedule several

13   months out in advance the timing that we want for that.  But

14   we'll not go to that level today.

15           THE COURT:  Fair enough.                                    15:29:29

16           MR. MILLAR:  Okay.  Moving forward then, when we look

17   at logistics and scheduling, there are two primary elements.

18   And, Judge, you referenced one of these already.  As we're

19   looking at these, we are looking for some data request items

20   that will be mostly pertinent to the Arizona Department of         15:29:48

21   Corrections and their contractor with regard to their staff and

22   their payroll, et cetera.

23           Along with those data elements will be the facility

24   interviews.  The one question that we're asking just to make

25   sure that we are within the rights and guidelines of the Court,    15:30:09

CV-12-601-PHX-DKD — December 20, 2017

1   is in identifying who those folks are, are there protocols or

2   authorizations or any restrictions that we should be aware of

3   as we go to request this data and/or hold these interviews?  If

4   it's the type of situation where these either need to be

5   documented by being recorded, or if there needs to be                15:30:32

6   representation present at these.

7          THE COURT:  Well, my view would be that in your

8   inquiries that you are undertaking, that you should in the

9   first instance look for the way that is the most efficient for

10  you.  If issues are raised that you think that interfere with     15:30:52

11  that efficiency, or obstruct in any way your effort to obtain

12  information that you need, either from the

13  defendant -- defendants in my case, the individuals in the

14  State of Arizona Department of Corrections and/or their

15  contractor and agent of the defendants in my case, then you      15:31:12

16  need to let me know and I'll address those.

17         But my hope is that everybody will be amenable to the

18  idea that you need to find the most efficient way to get this

19  information.  And that does not mean that I'm going to say at

20  the get go you have to record it or you have to have others      15:31:30

21  present.

22         If it's not interfering with your role to have others

23  present, I'm not going to say that that can't occur.  But if

24  you find that it's interfering with your role or it's a

25  scheduling problem -- I mean, I'm not interested in hearing      15:31:43

CV-12-601-PHX-DKD – December 20, 2017

1    about the fact that you weren't able to get your work done

2    because others said they wanted to be there and they had some

3    other engagement.

4          But you just let me know if you run into individual

5    issues, and we will address those with everybody on the record          15:31:57

6    and make sure that you have the guidance that you need.

7          MR. MILLAR:  Okay.  And I think we can very easily do

8    that.  We'll move forward with the understanding that we can

9    accommodate requests as long as they're not interfering or

10   delaying our process in moving our analysis forward.                     15:32:16

11         What we will do then is we will prepare a data request

12   document.  Before we come off this call we'll hopefully have

13   identified who the appropriate person will be to send that to.

14   And then we would like to schedule a follow-up phone call with

15   them to talk through on a line-by-line basis so there's clarity         15:32:39

16   of what we're asking for.

17         Our normal operating procedure is to establish an FTP,

18   a security FTP site through a document storage corridor that's

19   called Box, so that these can be uploaded electronically.  If

20   they exist in electronic format, that would be our preferred           15:33:01

21   methodology, so that we're not having to rekey or reenter them

22   and running the risks of data entry errors.  If they only exist

23   in hard copy, then we would take scanned or imaged copies of

24   those, or even I guess mailed hard copies if that's what we

25   come down.                                                              15:33:23

UNITED STATES DISTRICT COURT

1          At this point I believe the Court's been able to

2     provide either scanned images for actual electronic files in

3     Excel or Word for doing that.

4          THE COURT:  Well, I don't know -- I don't know what

5     the limitations would be with the particular recipients.  But          15:33:37

6     again, I'm hopeful that they'll be able to do it in a way that

7     is consistent with how you have found the marketplace generally

8     does produce this information to you.

9          With respect to the written request, I will in a

10    moment identify a representative from each of the sides in the          15:33:53

11    case.  Because I think for the written requests those should

12    be, whether they're addressed to one side or the other, they

13    should be copied to the other side, because there's no

14    encumbrance to simply providing that information to everybody

15    in the case so that all sides --          15:34:14

16         MR. MILLAR:  Okay.

17         THE COURT:  -- know what questions you're asking.

18         With respect to going beyond that, where you find

19    perhaps individuals that you want to talk to, it seems to me

20    that it might make sense to see how it works for you, in terms          15:34:29

21    of whether or not you are finding that it's efficient to have

22    really complete reign to talk to individuals, or whether it's

23    possible to do it in a way such that you do give people the

24    opportunity to be present if they wish at a time that is

25    convenient for you.          15:34:55

1          I don't want to prejudge that, because I don't know

2     how difficult it would be, and I may have to weigh the various

3     costs and benefits of different approaches.  But with respect

4     to the written inquiries, I think that doesn't have any cost,

5     it's all potential benefit in that somebody who is not the          15:35:10

6     target of the inquiry could perhaps send you some response

7     saying, you've asked this question, maybe should you also ask

8     this question, kind of thing.

9          MR. MILLAR:  Okay.

10         THE COURT:  And so that would seem to make sense to          15:35:24

11    me, unless you have some objections to doing it that way?

12         MR. MILLAR:  No, I think we can make that work.

13         And if I'm understanding what you've just described,

14    what I would anticipate is that we would have a primary contact

15    at the Court and one for each of the counsels, plaintiffs and          15:35:38

16    defendants.  And when we send these requests, we would send

17    them to those three principal contacts, which then would have

18    responsibility for disseminating them appropriately to the

19    parties.

20         THE COURT:  I think that makes sense.          15:35:53

21         MR. MILLAR:  Is that a correct understanding?

22         THE COURT:  Yes.

23         And on the plaintiffs' side who should that be?

24         MS. KENDRICK:  I'm sorry, Your Honor, it could be me,

25    Corene Kendrick.          15:36:03

1           THE COURT:  Okay.  So Corene Kendrick, one of the

2     plaintiffs' counsel.  And we'll make sure that you have her

3     contact information.

4           And on the defendants' side?

5           MR. STRUCK:  To me, Dan Struck.                        15:36:11

6           THE COURT:  All right.  Dan Struck on the defendants'

7     side.  And, again, we'll make sure that you have the contact

8     information.

9           And with respect to the Court, always what you can do

10    is contact Miss Selzer.                                      15:36:20

11          MR. MILLAR:  Correct.  And I think she's identified

12    one other person that we would contact both of them so that

13    they would have coverage for each other as well.

14          THE COURT:  Is that Miss Brown?

15          MS. BROWN:  Yes.                                       15:36:36

16          THE COURT:  The additional one -- I didn't want to

17    volunteer her without having spoken with her personally about

18    it.  But I do think it makes sense for her to be in the loop as

19    well.  And that is Miss Jody brown.

20          MR. MILLAR:  Okay.  Well, as we initiate this, we'll    15:36:47

21    at least communicate with -- any of our written requests with

22    those four individuals, with the assumption that then the

23    information will get appropriately distributed.

24          And then we will keep you informed, Judge, if for some

25    reason that process is creating difficulty in us moving        15:37:03

183

1   forward, delays in the process, if we need something else.  But

2   at this point we will assume that those communication contacts

3   will be sufficient for what we need.

4          THE COURT:  And I think you can expect that when you

5   contact Mr. Struck or Miss Kendrick, and that you've -- provide    15:37:18

6   the information, you should expect them to be giving you -- if

7   it's a targeted information to their side of the case, I think

8   you should expect them to be giving you a guiding hand, and

9   also helping you as much as they can.  Because they understand

10  that that is the -- a key efficiency component of making sure     15:37:42

11  that you can accomplish your task in a way that is most

12  expeditious and as most economically efficient as well.

13         MR. MILLAR:  That will be very helpful.  So we will

14  move forward with that expectation.

15         Moving forward then, this is just a description of        15:38:06

16  some of the components that will be included in our data

17  request.  Our team is finalizing the details around that today

18  and tomorrow.  Our intent is that by week end we will send this

19  out.  We do know that we are coming into the holidays, and so

20  as part of this written -- of the sending of this data request,   15:38:32

21  there will be the request to work towards scheduling in

22  early -- as early in January as possible the follow-up call for

23  these items.

24         But as I described earlier, we'll be looking for the

25  most current budgeted staffing levels by provider type, by       15:38:54

—**CV-12-601-PHX-DKD – December 20, 2017**—

1    facility.  We'll be looking for the existing provider roster or

2    the payroll record, who has been employed, who is in seat now,

3    how long have they been there, et cetera.

4            We'll also be looking for written job descriptions for

5    all of the different levels so that we can make sure as we do                15:39:17

6    the market profiling that we are doing an apples-to-apples

7    comparison, or where we are not that we can make appropriate

8    adjustments between the national benchmarks we're using for

9    providers and the job descriptions within a correctional

10   setting.                                                                      15:39:35

11           I do understand that oftentimes the requirements of a

12   physician or a midlevel provider are different.  And I want to

13   make sure that we -- we're able to identify that and to adjust

14   accordingly as we do our comparisons.

15           We'll also be looking for examples of the contract           15:39:53

16   agreements.  This will likely entail the agreement between the

17   State and their contractor, as well as between their contractor

18   and its employees.  So it will be two levels of elements that

19   we're looking at there.

20           And then descriptions of the compensation benefits          15:40:13

21   packages.

22           We will then work towards gathering information on the

23   retention and turnover.  We will have to see if the agent of

24   the State or the State itself has reports that are sufficient

25   for us to work from.  If they are not, we may be requesting        15:40:33

1    actual payroll information so that we can calculate the

2    retention and turnover appropriately.

3         But we'll work with the thought that we might have

4    reports that may provide sufficient data for us.  If it does

5    not, we will have to look towards raw data to be able to run          15:40:55

6    that analysis ourself.

7         And then we do reserve the right as we get into this

8    that there may be some additional detail that are needed or

9    some other data sets that haven't been anticipated.  But our

10   intent is to be comprehensive up front, but not ask for -- not       15:41:13

11   burden the ADC or its contractor with superfluous data

12   requests.  So we'll try to ask appropriately.  And that's why

13   we want to have the call to make sure there's clarity around

14   the description of the elements that we are looking for.

15        Let me pause there and see if specifically from the              15:41:36

16   defendants' side if they have any concerns or questions

17   regarding this data request process.

18        THE COURT:  Mr. Struck?

19        MR. STRUCK:  No.  I think he understands that much of

20   this data that he's looking for is not coming directly from           15:41:48

21   ADC, it's actually coming from Corizon, which I don't have

22   direct access, I have hoops that I have to jump through to get

23   it myself.  So I think he understands that.

24        MR. MILLAR:  Absolutely understand that.  And we'll be

25   looking for your help.  And you will have our support to              15:42:06

1    facilitate getting that data.

2            MS. KENDRICK:  Your Honor.

3            THE COURT:  Yes.

4            Excuse me, Mr. Millar.  Miss Kendrick wanted to say

5    something.                                                  15:42:20

6            MR. MILLAR:  Yes.

7            MS. KENDRICK:  Just one idea I had while Mr. Millar

8    was talking, and also based on what Mr. Struck just said,

9    whether the Court and Mr. Millar would think it would be useful

10   to have Corizon designate an individual to be the point person,   15:42:29

11   much like Mr. Struck and I are the point people too.

12           THE COURT:  It may make sense, but I'll let them work

13   that out.  That may well be a good idea.  And that kind of was

14   what I had envisioned, that as -- as Mr. Millar and his team

15   work deeper into this issue, they would find the right vein of    15:42:49

16   the mine to mine.  And that that would be the person that would

17   be likely to be the contact.

18           And I would be hopeful that there would be a

19   relationship that would be established that could make for this

20   efficient transfer of information.                          15:43:07

21           MR. MILLAR:  The one request, Judge, that I would make

22   is that when we provide this data request this week, if

23   defendants can review that with the Corizon contractor so that

24   they can inform their questions.  And for when we schedule the

25   follow-up data call, if that Corizon representative could be on    15:43:29

1   that call as well.  So that we don't have the issue of asking

2   questions that can't be answered, if they would be a part of

3   that conversation.

4           THE COURT:  That would seem to make sense to me.

5           MR. STRUCK:  I think that's fine.                     15:43:45

6           MR. MILLAR:  Okay.  Thank you.

7           So at that point then if we look at the immediate next

8   steps that we're looking to achieve between now and the

9   beginning of January, I think we've identified, at least from a

10  logistics standpoint, who we would work with to submit our data  15:44:06

11  requests.  We have those contacts at the Court for the

12  scheduling.

13          And we have now successfully tested or video

14  conferencing capability.  And so, Judge, that does allow us to

15  use our standard operating procedures for remote presentations  15:44:21

16  and discussions.

17          I would stop at this point and just ask if the slides

18  have been presented in a way that have been readable and

19  accessible on the equipment that's being used in the court.

20          THE COURT:  We are definitely within the range of work  15:44:39

21  built with a little bit of tweaking.  We can move the projector

22  back a little bit and make the image a little bit bigger.  We

23  have, as you say in the third goal here, successfully

24  demonstrated that this can work.

25          MR. MILLAR:  Good.  Good.                             15:44:56

1          And then I think we are close on confirming times for

2    our updates and we'll work on interim means as we move forward.

3          So as I look as objectives of this call and our

4    immediate next steps, I think, Judge, I have achieved

5    everything that I hoped to have from this call to get my team     15:45:14

6    up and moving in producing the materials that you have

7    requested from us.

8          At this point I think I would pause and allow you to

9    then address some of the items that you indicated at the

10   beginning that were a couple of follow ups or additional agenda   15:45:29

11   components.

12         THE COURT:  Thank you.  I was able to address the item

13   that was on my agenda already.

14         Mr. Struck has the issue about the method that is

15   necessary for you to be registered within the State procurement  15:45:42

16   system.  Have you heard about that issue before, Mr. Millar?

17   Do you know whether you're on the way to trying to resolve

18   that, or do you need --

19         MR. MILLAR:  No, we have -- I may need to hear some

20   more about it.  We have been trying through our finance          15:45:58

21   department to get registered through the Arizona payment or

22   procurement site.  There was a series of e-mails that went

23   through today.  Our team has had trouble either obtaining or

24   knowing the right login passwords and elements are.  But I

25   believe that there was an e-mail chain that went through today    15:46:19

1    that we're continuing to make efforts to get that handled.

2           But at this point I believe we are still not

3    registered, but I think we are receiving information we need to

4    become registered.

5           THE COURT:  All right.  Mr. Struck, if it continues to      15:46:35

6    be a problem, whom should Mr. Millar contact about it to try to

7    see what he needs to do further to become registered?

8           MR. STRUCK:  Well, there's a woman by the name of

9    Amy Landry at the Department of Corrections, that I think we

10   provided him with her phone number.                                15:46:55

11          THE COURT:  Okay.  So you have Miss Landry's phone

12   number and name, Mr. Millar?  She's the person, if you continue

13   to have trouble, give her a call at the Department of

14   Corrections Mr. Struck says.

15          MR. MILLAR:  Yes.  I am checking on that to see.            15:47:09

16          MR. STRUCK:  I can make sure that he has the correct

17   line, but I thought I saw an e-mail where her number was

18   provided to him.  But we can send it again.

19          THE COURT:  Okay.  Thank you.

20          MR. MILLAR:  I believe it has been provided.  I'm not       15:47:23

21   sure if we knew that's who we were going to connect directly

22   with.  The e-mail stream I have here came from Elaine

23   Percevecz.

24          MR. STRUCK:  Percevecz.

25          MR. MILLAR:  And she's with your group.  So if there's      15:47:40

— CV-12-601-PHX-DKD – December 20, 2017 —

1    some additional follow-up, we would do that.

2          And I'll just let the Court know that I'm working

3    through our internal iterations on this side as well.  I am not

4    the person that does this, and I'm working down through our

5    accounting department as well.                                    15:48:00

6          But it is a known issue, and I commit to the Court

7    that we'll continue on this until it is resolved in one of the

8    two offered methodologies for submitting and being paid for the

9    invoices.

10          I do appreciate -- and I'm not sure exactly how the     15:48:14

11    State facilitated this, but even without that registration we

12    did receive the payment on the first invoice just from the

13    engagement letter which allowed us to start this.  And so just

14    acknowledgement that we appreciate whatever efforts were put

15    forward to not allow this process to languish just as we        15:48:34

16    figured out the details of the procurement and payment process.

17          THE COURT:  And I will add my appreciation as well.

18    Thank you.

19          Miss Kendrick, anything you wanted to say?

20          MS. KENDRICK:  No, sir.  We're looking forward to        15:48:50

21    seeing what Mr. Millar comes up with.

22          THE COURT:  And anything further, Mr. Struck?

23          MR. STRUCK:  No, Your Honor.

24          THE COURT:  Well, Mr. Millar, thank you very much.

25          MR. MILLAR:  We appreciate the opportunity to serve      15:49:02

CV-12-601-PHX-DKD – December 20, 2017

```
 1   the Court in this process, and look forward to this work with
 2   you over the next several months.
 3              THE COURT:  Thank you.
 4              And Miss Sobolewski's name has come up on our screen
 5   now, which will help us pronounce the name properly.          15:49:15
 6              Now you'll be very busy, so I can't say that I can
 7   commend to you the golf courses near Casa Grande which are near
 8   the Florence Prison, but some people in Arizona find those to
 9   be worthy golf courses.  But again, I fear that we've given you
10   a lot of work and so there may not be a lot of time for that.  15:49:39
11              MS. SOBOLEWSKI:  Well, I hope I can find some time
12   maybe on a weekend in between.  Sounds good to me.  Thank you
13   very much.
14              THE COURT:  Well, indeed Arizona, at some point it was
15   the place that had the highest per capita number of golf holes. 15:49:53
16   Hard to believe.  Maybe it's not the case anymore.  But if you
17   fly into Phoenix, you do have the sense that virtually every
18   square mile has a golf course.
19              Thank you all very much.  Appreciate your time this
20   afternoon, and we'll be in touch.                             15:50:09
21              MR. MILLAR:  Thank you.  Good afternoon.  Bye.
22              THE COURT:  So I have one loose end that I wanted to
23   tie up, and that is, Mr. Pratt said that he could get us the
24   additional information regarding the formulary and the
25   documents regarding the different dispensing rates.           15:50:28
```

UNITED STATES DISTRICT COURT

1           I didn't come up with a date.  Would the last day of

2     December be possible?

3           MR. PRATT:  I'm hopeful, yes.  I've already requested

4     it.

5           THE COURT:  Let Mr. Struck know if it's not so that he        15:50:43

6     can let everybody know if there's a problem so that we can stay

7     on top of that.

8           Anything further from plaintiffs?

9           MS. KENDRICK:  No, Your Honor.  Thank you.

10          THE COURT:  Mr. Struck?        15:50:52

11          MR. STRUCK:  No, Your Honor.

12          THE COURT:  Thank you all for your time today.  I

13    really appreciate it.

14       (Proceedings concluded at 3:50 p.m.)

15

16                              -oOo-

17

18

19

20

21

22

23

24

25

————CV-12-601-PHX-DKD – December 20, 2017————

1

2

3

4                  C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 21st day of December,

15  2017.

16

17

18

                              s/Candy L. Potter_____
19                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25

# Exhibit 14

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

No. **CV-12-00601-PHX-DKD**

Phoenix, Arizona
January 18, 2018
9:37 a.m.

_____

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(STATUS HEARING)

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                    **A P P E A R A N C E S**

3    For the Plaintiffs:

4            PRISON LAW OFFICE
             By:  **Corene Kendrick, Esq.**
5            1917 5th Street
             Berkeley, CA 94710

6
             ACLU – Washington DC
7            By:  **David C. Fathi, Esq.**
             915 15th Street NW
8            7th Floor
             Washington, DC 20005

9
             EIDENBACH LAW PC
10           By:  **Kirstin T. Eidenbach, Esq.**
             P.O. Box 91398
11           Tucson, AZ 85752

12           ARIZONA CENTER FOR DISABILITY LAW – PHOENIX, AZ
             By:  **Asim Dietrich, Esq.**
13           5025 East Washington Street
             Suite 202
14           Phoenix, AZ 85034

15   For the Defendants:

16           STRUCK LOVE BOJANOWSKI & ACEDO PLC
             By:  **Timothy James Bojanowski, Esq.**
17           By:  **Daniel Stuck, Esq.**
             By:  **Rachel Love, Esq.**
18           By:  **Ashlee B. Hesman, Esq.**
             By:  **Richard Michael Valenti, Esq.**
19           3100 W. Ray Road
             Suite 300
20           Chandler, AZ 85226

21

22

23

24

25

CV-12-601-PHX-DKD – January 18, 2018

1

2                                I N D E X

3

DEFENSE WITNESS:          DIRECT    CROSS    REDIRECT   RECROSS

4

KATHY CAMPBELL
5   By the Court            47
    By Ms. Kendrick                   49
6   By the Court                               51

7   JULI STOVER
    By Mr. Struck           115
8   By the Court                     117
    By Mr. Struck                             123
9   By the Court                                        128
    By Ms. Kendrick                  130

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV-12-601-PHX-DKD – January 18, 2018

```
 1         (Proceedings begin at 9:37 a.m.)

 2         THE CLERK:  This is CV-12-601, Parsons, et al, v.

 3  Ryan, et al.  On for status hearing.

 4         THE COURT:  Would counsel please announce.

 5         MR. FATHI:  Good morning, Your Honor.  David Fathi of      09:37:06

 6  the ACLU National Prison Project for the plaintiff class.

 7         THE COURT:  Thank you.  Good morning.

 8         MS. KENDRICK:  Corene Kendrick from the Prison Law

 9  Office for the plaintiff class.

10         THE COURT:  Thank you.                                    09:37:16

11         MS. EIDENBACH:  Good morning.  Kirstin Eidenbach for

12  the prisoner plaintiff class.  And behind me is Asim Dietrich

13  from the Arizona Center for Disability Law.

14         THE COURT:  Thank you.  Good morning.

15         MR. BOJANOWSKI:  Good morning, Your Honor.  Timothy       09:37:29

16  Bojanowski, Daniel Struck, Rachel Love, Ashlee Hesman and

17  Richard Valenti for the defendants.

18         THE COURT:  Thank you.

19         And anybody on the phone?

20         No?  All right.                                           09:37:42

21         THE CLERK:  Yes, Judge.

22         THE COURT:  Who's on the phone, please?

23         MS. STOVER:  Juli Stover with Corizon Health.

24         THE COURT:  I'm sorry?

25         MS. FINGER:  Jennifer Finger with Corizon Health, but    09:37:50
```

1    we're not counsel of record.

2           THE COURT:  All right.  Thank you.

3           Let me address first the defendants' motion to limit

4    the scope of the February 9th evidentiary hearing regarding the

5    KJZZ article.                                                          09:38:08

6           The defendants make a number of contentions in the

7    motion, some of which directed to allegations of improper Court

8    consideration of items not part of the evidentiary record.

9           To their credit in the motion they do point out that I

10   repeatedly said that what I was taking from the street and        09:38:32

11   bringing into the courtroom was not an evidentiary record, but

12   was a reason for me to explore whether there was anything

13   behind it.

14          I have not made any findings.  I have initiated a

15   discovery process to determine whether there is a plan in place  09:38:52

16   to beat the monitor.  This is not based upon a mere report

17   about someone saying that there was a beat the monitor.

18   There's a little bit more than that.  There are representations

19   in the KJZZ report of what looked to be internal communication

20   that addressed issues that could be interpreted that way.  I     09:39:18

21   mean, again, it's all open to what needs to come into court to

22   be tested here.

23          I will say that if I read the KJZZ report accurately

24   there is a response that defendants say that I did not cite,

25   but I certainly read.  The response was essentially that the     09:39:43

1    term "beat the monitor" was to be taken to mean, this is how we

2    are going to do better than the monitor requires.  Well, I've

3    never in my common understanding ever heard that kind of

4    phraseology used, so it strains believability.

5            But, again, I've made no finding about whether or not            09:40:03

6    there is an attempt to effect an end run around the Court's

7    monitoring program.

8            You should say -- or you should note that there are

9    appearances here.  And the appearances -- again, I can't

10   pretend that I haven't been presiding in a case for many years          09:40:30

11   now in which I receive information in ways that are not

12   traditional.  We visit the prison site and I stand in a room in

13   an infirmary with defense counsel and plaintiffs' counsel and I

14   talk to the people there.

15           And so the history of this case has a history where I           09:40:53

16   observe what's happening in the infirmary with respect to what

17   looks to me to be problems associated with compliance with the

18   Stipulation.  I ask someone who works there, it looks to me

19   like it's an inbox problem.  And that person says, yes, that's

20   what it is, it's the -- there's too much in the inbox and              09:41:13

21   there's not enough hours in the day to get through the inbox.

22   And then that person tells me that Corizon has clamped down on

23   overtime.

24           And meanwhile at the same time the State is telling me

25   it's not a staffing problem, it's not a manpower issue.  But it        09:41:29

1  looks to me like it is.

2          And so I'm hearing on the scene, seeing on the scene

3  information that seems to be directly contrary to what the

4  defendants have been telling me.

5          Then I read a KJZZ report in which there is Operation    09:41:43

6  Backlog, which appears to be a memorandum --

7          And, again, I don't think the defendants have ever

8  said, these memoranda that were included in the report were not

9  true.  But we'll hear about that.  Again, they have to have

10  their day in court to be able to say whether that's true or    09:42:01

11  not.  And we'll have an evidentiary foundation about whether to

12  trust those things as being what they are, consistent with the

13  Rules of Evidence.

14          But I see a report where I've been told there's no

15  staffing problem, where I've observed a staffing problem, and    09:42:17

16  then the report includes a memorandum that says there's an

17  Operation Backlog to deal with the backlog, where they're

18  importuning everybody to try to jump in and to devote more

19  hours to be able to try to accomplish the tasks at hand.

20          And so I take all of this in in a way to try to make    09:42:35

21  sure that I'm fair to everybody.  So that we do comply with the

22  Rules of Evidence, I set a hearing, a hearing to determine

23  whether or not the information that I have been accumulating

24  over years presiding in this case.

25          And, you know, it's not as if I'm trying to put my    09:42:57

1   nose where it doesn't belong.  I'm putting my nose where you

2   all asked me to put it.  I mean, you asked for me to be the

3   person who would preside in this case.  So you consented to me.

4   So it's a little bit different than even any other kind of

5   situation where you get what you get by the random draw of what        09:43:20

6   used to be a little wheel box down in the clerk's office.

7           But you chose me.  And so I'm certain both of you,

8   since you both appealed, you both have maybe rued at times that

9   decision.  But nevertheless, you chose.

10          And you chose somebody who didn't just fall off the         09:43:42

11  turnip cart.  You know, I've been doing this, in this position,

12  for 16 years.  Appointed to two terms, Merit Selection

13  Committee evaluates me twice, makes no negative comment.  And,

14  you know, before that I was a partner in two firms and an

15  Assistant United States Attorney.                                      09:44:06

16          So it's as if over 30 years of practice I have learned

17  some things about how to look at a situation and try to make

18  intelligent decisions to help people accomplish what is our

19  common obligation, and that is to comply with the law.  And in

20  particular here to comply with the Stipulation, the agreement.        09:44:27

21          And what I have had over the course of my time

22  presiding in this role is, as plaintiffs -- defendants

23  accurately state, a judge who is upset.  The judge is upset

24  because I participated in a resolution of a case that I really

25  had full expectation that would not have me years out trying to       09:44:50

1    accomplish what is fundamental.

2           And what is fundamental here is compliance with the

3    Performance Measures.  And these Performance Measures -- and

4    you can look at them, and you see what they are, and that is,

5    this is not the luxury items, that we didn't get the condo that          09:45:07

6    had the sauna.  This is the issue about basic health care that

7    is supposed to be provided, that any reasonable, humane person

8    would think would be provided to people that you are guardians

9    for.

10           And the idea that you can look at these Measures and           09:45:30

11   see that so many years out there's an abject failure in so many

12   critical components of basic health care, anybody should be

13   upset who looks at this.  And anybody who is charged with the

14   responsibility of trying to fix it would be not only upset, but

15   very frustrated.                                                        09:45:50

16           Because I have tried as best I can to effectuate the

17   satisfaction of the Performance Measures.  And here we are in

18   January of 2018, and we look at the report that was submitted

19   last night, and a person simply has to shake their head and

20   wonder how it is that the State could continue to report these          09:46:12

21   failures, failures that all have associated with them in last

22   night's report remedial measures that generally involve a

23   greater commitment of educating people, or having a greater

24   number of supervisors look at the issue to make sure that it's

25   accomplished.                                                           09:46:38

1        And one has to wonder, why in the world didn't this

2    happen two years ago?  And then one also has to wonder in the

3    context of Operation Backlog, where there appears to be a

4    ready -- a readily-apparent absence of sufficient number of

5    personnel to accomplish the task.  The task is just too big,          09:46:58

6    the number of people to accomplish it too little.  How can it

7    be that -- this statement that we're going to address

8    additional supervision and additional training or giving more

9    jobs to people who are already over strapped?

10        So a common sense reaction to what the State continues      09:47:20

11   to propose is, you are saying we are going to double down on

12   making sure that the people are getting the job done by telling

13   them they have to get the job done and making sure that we've

14   got other people looking over their shoulders to make sure that

15   they're getting it done.                                              09:47:38

16        In an over-strapped system, which is what I think we

17   may well have here, where there are just too many tasks given

18   to too few people, one has to wonder how a remedial measure

19   that involves even adding more tasks to people will accomplish

20   or have any reasonable hope of accomplishing that goal.               09:47:57

21        And so it is natural for one to be concerned where

22   there seems to be a disconnect between the logic of what the

23   problem is and the remedy, a logical turn to wonder, is there

24   reason to believe that people are not legitimately dealing with

25   the monitoring process?  The KJZZ article suggests that             09:48:22

CV-12-601-PHX-DKD – January 18, 2018

1   possibility.  And I have authorized and pursued a discovery

2   effort to find out whether that is true.

3        The defendants say that it's a witch hunt, a fishing

4   expedition.  But it's not.  What it is is I've been told by

5   people through news reports, I've been told -- I've                  09:48:50

6   seen -- told by people who have said it to me in my presence,

7   in the presence of defense counsel and plaintiffs' counsel.

8   I've never acted on anything that anybody has ever said by

9   phoning in, because I've never learned anything substantively,

10  never anything substantively other than just a general sort of     09:49:11

11  qualitative statement which was an opinion.  Which as I can

12  assure you, something not tested by the Rules of Evidence and

13  being sworn under oath, I'm generally, unless it comes from a

14  lawyer, am loathe to accept it.  So I've never acted on

15  anything like that.                                                  09:49:34

16       But my experience over time in this case has given me

17  enough reason to think that if people are saying there are

18  trout in this lake, before I bring the fleet in to fish for it,

19  I'm going to have some investigation to see whether there

20  really are some trout here.  And that's what we're involved in.     09:49:48

21  We're involved in this process where we've set a hearing, we've

22  required discovery to be produced to equip that hearing, so

23  that we can find out whether or not there is a reason to doubt

24  the credibility of the reporting system that is so important to

25  the Court's efforts to try to enforce this Stipulation.             09:50:09

12

1      Now, I read carefully and appreciate the onerous task

2   that is at hand.  I addressed it briefly in the status

3   conference last week on the telephone in which I heard from

4   defendants about how difficult the task was.  And I gave what I

5   think is a fair statement, and that is that it is a large task     09:50:38

6   because this is a large operation.

7      As I think I said, it's not a mom-and-pop operation,

8   it's a very large operation.  So when you undertake these kinds

9   of efforts you will find that it is a big job too, just like

10   everything associated with it is a big job.                       09:50:56

11      That all said, I am not insensitive to the idea that I

12   have representations from counsel that it is more than can be

13   humanly or productively accomplished in the time frame that I

14   have set.  And so I am open to discussing with you, both sides,

15   the possibility of granting you additional time to accomplish     09:51:23

16   the tasks at hand.

17      We had set a date of the 9th of February for this

18   evidentiary hearing.  We have –- I set that date because I

19   wanted to have it in advance of the dates that I had set for

20   the OSC hearing at the end of February and for our monthly        09:51:42

21   meeting on the 27th and 28th.

22      But I am willing to consider, after hearing from both

23   of you, the possibility of moving the 9th hearing to the 27th,

24   and make it the first subject that we would address in those

25   two days.  And when we conclude the evidentiary hearing, then     09:52:03

1    move on to the OSC hearing.  And then to grant a 14-day

2    continuation of the discovery dates that I've set.

3            That purpose of granting that greater time is to allow

4    a more complete and diligent effort to make sure that the

5    discovery obligation that I find to be necessary here.  I'm          09:52:25

6    disinclined to limit it to the -- to what exactly has been

7    presented in the KJZZ article, because I think that it is

8    worthwhile, in light of my experience in this case, to make a

9    thorough inquiry to see whether or not there is compliance with

10   the monitoring program and the efforts to make honest              09:52:50

11   satisfaction of the obligations in the Stipulation rather than

12   just try to effect an end run, if that's possible.

13           And so that is my preliminary view, and I'll turn to

14   respective counsel to hear what you all have to say.

15           MS. KENDRICK:  Your Honor, we do not object to moving        09:53:17

16   it to the 27th.

17           MS. LOVE:  Your Honor, as to the issue of the hearing,

18   and to be more specific than perhaps we were in the briefing of

19   limiting the scope, we would reurge our request that the

20   hearing -- because of the onerous task and the cost involved,       09:53:39

21   which as we put in our briefing from last night ranges from

22   between -- over $163,000 to over $280,000 to complete this

23   between Corizon and ADC as to the e-discovery on its own.

24           What we've done in the past, specifically using the

25   example of the retaliation hearings that we had when you had       09:54:06

1  concerns about whether or not there was retaliation occurring

2  with the tours.  In that, going back to the history of the case

3  we -- the November of 2016 tours, the way that the parties

4  handled that is we came back and we briefed it.  And

5  Your Honor's concern was that you have to assess the                09:54:25

6  credibility of the witnesses before we go down the road of

7  making a decision on your hand, because you wanted to see who

8  you were speaking to, what was more than just the paper that

9  you were --

10         THE COURT:  Can I interrupt for just a second?  And       09:54:37

11  maybe you can address the question that I raised a moment ago,

12  and that is, do you presently take the position that the

13  memorandum that is quoted in the KJZZ article is not authentic?

14         MS. LOVE:  Well, because we're doing the discovery

15  draws, we haven't come back to find whether or not those exist.   09:54:52

16  We just don't take a position on that yet.  We don't have any

17  information at this point to say that it's not in existence.

18         THE COURT:  Well, Mr. Struck seems to be leaning over

19  to --

20         MR. STRUCK:  No, I think -- to answer your question,       09:55:05

21  that we understand the memorandum is authentic, but what we

22  understand is there's a reasonable, rational explanation for it

23  that isn't the -- it doesn't cause you to reach the conclusion

24  that the Court apparently is concerned about, that is, they're

25  trying to do an end run around the monitors.                      09:55:23

CV-12-601-PHX-DKD – January 18, 2018

1        So that's why we asked to maybe first limit the

2   hearing to the specific allegations at hand so you can make a

3   determination as to whether or not, you know what, I think

4   there is something to this, I want to see if there's more to

5   it.  Rather than simply jumping to the conclusion that this is          09:55:43

6   prima fascia evidence of a big problem, let's see if there's a

7   bigger problem.

8        So I guess maybe just defendants are requesting that,

9   you know, the Court pump the brakes a little bit on this.

10  Let's see if there is some traction to it.  And if you find          09:56:00

11  that there is, then we go to the extreme of doing the large ESI

12  pull and bringing in, you know, more witnesses to, you know,

13  explain to the Court how the monitoring system works, and that

14  it's not being compromised by Corizon or anybody else.

15       THE COURT:  Okay.  Well, overall here, in this case,          09:56:20

16  what I have seen is --

17       Well, let me back up and say:  There is -- even in the

18  best of worlds the motivations of people can sometimes be

19  adversely affected by self interests.  And one of the self

20  interests that I have been concerned about has been whether or          09:56:45

21  not the fox is a good guarder of the hen house.  And so this

22  has been an overall concern.

23       And it may well be that somebody could make the good

24  argument that this kind of examination of the process, to make

25  sure that the monitoring program, both the State's and the          09:57:04

UNITED STATES DISTRICT COURT

1    contractor's, are competent, that this would be a normal kind

2    of process, a normal activity associated with assuring that the

3    Stipulation is complied with.

4         But I don't have just that underlay.  I have more.  I

5    have the memorandum that has a reasonable reading as to what          09:57:29

6    the focus is of the Corizon employee with respect to what is a

7    plainly posited situation where you have a person who has been

8    determined to need an outside consult, an inability to get it

9    in the time period that is required by the Stipulation, and the

10   decision typed out in that memorandum is that the way we deal        09:58:02

11   with that is we don't give the inmate the health care that the

12   provider has determined is necessary in this case.  What we do

13   to avoid -- and again -- not again.

14        I will point out that defendants misquote what is

15   stated in that memorandum, because the person writing the            09:58:20

16   memorandum doesn't understand the Stipulation -- or doesn't

17   understand the OSC penalty, and the defendants misquote it,

18   turning it into being a more accurate description, and that is

19   a sanction of a failure to comply rather than $1,000 a day,

20   which I think is what the memorandum says.  But in any event,        09:58:40

21   it shows a focus on something other than what is compliance.

22        And so I am going to go forward and not limit it in

23   any way as you suggest.  I'm going to go forward, give you this

24   additional time.  We'll do it on the 27th.  We'll give you an

25   additional 14 days on all of the deadlines.  And we will have a      09:59:02

CV-12-601-PHX-DKD – January 18, 2018

1    full hearing, and we'll get this resolved one way or the other

2    at that point.

3             It may be that this is something that shows that it is

4    working fine.  If it shows contrary, then we will address that.

5    But at the very least I think it is appropriate, as we go                    09:59:19

6    forward in this process, for the Court to be playing a role in

7    checking in on the veracity of the monitoring program.

8             So I cut you off, Miss Love, but you've heard that

9    I've decided.  But if there's anything you want to say in

10   addition for the record you may.                                            09:59:38

11            MS. LOVE:  And I understand Your Honor's rulings.  I

12   wanted to just for the record state the more concrete proposal

13   that we had as to the limitation, just so that the Court is

14   clear as to what we would request, as Mr. Struck said, a phased

15   type discovery versus doing the full-blown ESI that's so                    10:00:00

16   burdensome and costly.

17            The proposal would be perhaps not as limited as just

18   in talking in general terms.  Because of the burdensome nature

19   of this, the proposal on the limitation like a phase one would

20   be because you would like to assess the credibility of                      10:00:15

21   witnesses, we would have the witnesses come testify.

22            As to the ESI, we're not saying no ESI at all, what we

23   would propose is just a more limited ESI on the first phase to

24   look to see if the issues that you're concerned about are

25   in -- are in e-mails between either ADC or internally within                10:00:32

1    Corizon.  And search the e-mail boxes of those involved, which

2    was Miss Neese, Dr. Watson and a Dr. Stewart.  But go beyond

3    that.  We're not limiting -- we wouldn't say, only limit it to

4    those three people, because I understand, Your Honor, your

5    concern to be more broad based.                                    10:00:49

6         We would request that there would be essentially a

7    first phase of the ESI, where we cut down the custodians, the

8    custodians that the parties have agreed on from Corizon, for

9    example, the regional office.  And then we look to the Eyman

10   Complex and we cull the e-mails, for example, from the clinical   10:01:04

11   coordinator who does the scheduling.  That's the person who

12   would be -- like Miss Neese, who would be doing e-mails saying

13   cancel this or don't cancel and why perhaps.

14        The Director of Operations, the Director of Nursing,

15   the Health Services Administrator, those are the people          10:01:19

16   that -- and the Director of Nursing, if I didn't say that,

17   those are people who would be corresponding about the issue.

18        So if we take it from the Eyman Complex, where

19   Miss Watson was from, we cull the regional folks that the

20   parties have agreed on as custodians, as the Associate Medical   10:01:35

21   Director, Director of Operations, Regional Director of Nursing,

22   Regional Medical Director.  And then also persons like from

23   ADC.

24        The parties have already agreed persons like

25   Dr. Taylor's e-mails could be searched for the 54 search terms   10:01:50

1   we're looking for, Kathy Campbell, Richard Pratt.  So those

2   people at those levels, we could cull the universe down from

3   the -- what plaintiffs are demanding, which is over 60

4   custodians from Corizon, which we're still working on that

5   hopefully.                                              10:02:09

6         And then also as to ADC, we are doing our searches

7   right now, that is in process.  We have already a cull back of

8   almost 7,000 hits.  We're looking at the total 25 custodians

9   that we're going to be searching, an estimated 33,000 hits on

10  those 54 search terms.  And that's not even searching Richard  10:02:24

11  Pratt's e-mail.

12        And we know from our preliminary review at this point,

13  because there's so many hits, it's also an issue of the search

14  terms.  You know, we don't know what that universe will be.  So

15  there's reports coming back where perhaps "consult" is in page  10:02:38

16  1 and page 20.  You know, there's another search term which we

17  are working with plaintiffs' counsel to cull down.

18        So what we would propose as the first phase would, we

19  believe, satisfy the Court's concern as to whether there's

20  something going on other than these three persons involved who  10:02:57

21  were noted in the e-mails in the KJZZ article, but not going to

22  the full-blown ESI of almost 100 custodians.

23        THE COURT:  Miss Kendrick?

24        MS. KENDRICK:  First off, Your Honor, there appears to

25  be some confusion about the number of custodians and search    10:03:15

1    terms.  By my math there are 22 search terms that the parties

2    either agreed upon or that Your Honor ordered be included in

3    the search.

4          ADC has 24 custodians that we've agreed to, including

5    Dr. Robertson which you ordered.                          10:03:34

6          The parties have not agreed upon the custodians from

7    Corizon, that is still up in the air.  We have asked for people

8    from all ten institutions because Your Honor stated that you

9    wanted to dig down deep and see how deep the evil goes of

10   trying to dissemble to the Court.                          10:03:54

11         And this offer of limiting it to this institution,

12   another offer that we were given was to limit it to four

13   institutions that are the most problematic in terms of

14   performance with the Measures.  But the whole point of this is

15   to see also if people are beating the monitor.  So it's not    10:04:14

16   just the institutions that are performing poorly, we need to

17   look at the institutions that at least on paper are performing

18   well.

19         I would also note that we sent our request to

20   defendants a week early.  We asked for an immediate meet and    10:04:29

21   confer the first week of January, but they didn't respond for a

22   week.  We negotiated in good faith.  We had a status hearing

23   with you last Friday.  We have repeatedly limited the scope of

24   the search terms.  We spoke again with counsel for defendants

25   on Tuesday and limited the scope of the search terms.  So we    10:04:48

CV-12-601-PHX-DKD – January 18, 2018

1    thought at least with regard to the search terms we were done.

2         We also had agreed upon the list of custodians.  And

3    then last night at 8:45 defendants filed this motion appearing

4    to renege upon the agreements that they had made with us when

5    we were negotiating in good faith.                          10:05:07

6         And we would just like to note that this is a case of

7    huge magnitude.  This is not some pro se, pro per individual

8    prisoner doing a medical malpractice case.  This is a class

9    action of 34,000 prisoners and a subclass of several thousand.

10   It involves one of the largest state agencies that has a state  10:05:26

11   budget of over a billion dollars a year.  And the State is

12   paying Corizon over $145 million a year to provide health care.

13        So this is not just, you know, some small little

14   thing.  This is a big case.

15        And I don't know why the Attorney General of this       10:05:44

16   state has decided to outsource the case management and the

17   document production to a private litigation firm rather than

18   use the State's own employees and resources.  But we do not

19   think defendants should hide behind that policy choice or point

20   to the expense of doing the search as the reason to not provide  10:06:03

21   the information that the Court needs to assess whether or not

22   there is actual compliance with the Stipulation or if

23   something's going on.

24        With regard to Corizon, we asked for custodians by

25   classification, kind of by their titles.  And defendants came  10:06:19

UNITED STATES DISTRICT COURT

1    back and said, well, that would include 158 people.  So we

2    immediately agreed to exclude 68 assistant directors of nursing

3    and 22 admin assistants, who we had never even asked for admin

4    assistants.  That got us to approximately 70 custodians.

5         But we still said we need people from each institution   10:06:41

6    who is in charge of mental health.  Obviously there's some

7    prisons, like we know Winslow has no mental health staff, so

8    it's not going to be ten more.

9         And again, Corizon is a very large corporation.  The

10   Arizona taxpayers are paying them $12.06 a day per patient to   10:06:57

11   provide health care.  Yesterday's population, according to the

12   ADC website, was 33,446 prisoners.  Therefore, yesterday's

13   gross revenue for Corizon was $403,358.76.

14        So even if the expense of Corizon doing the search is

15   somewhere between 168 and $235,000, which we were told a week   10:07:24

16   ago it was going to cost $400,000, that's still less than half

17   of a day's gross income.  And our position is that this is the

18   cost of doing business.

19        Finally, Corizon also has capable counsel.  They are

20   represented by Fennemore Craig.  They are a large well-known   10:07:46

21   Phoenix law firm.  They have their own resources.  We're not

22   talking about some husband-and-wife law firm in a strip mall,

23   we're talking about a white-shoe corporate firm.  And, you

24   know, we're talking about a corporation that bills itself as

25   the foremost provider of health care operating in 22 states   10:08:04

1    with gross revenue of $1.5 billion a year.

2            So, yes, on first glance these numbers do seem big to

3    people who live in the real world, but we're talking about a

4    massive corporation and one of the largest agencies in the

5    state of Arizona.                                              10:08:22

6            THE COURT:  With respect to the number of hits that

7    Miss Love has suggested may be afoot here, do the plaintiffs

8    have the capacity to work through all of the information that

9    would be produced?

10            MS. KENDRICK:  Yes.                                    10:08:36

11            THE COURT:  And with respect to the remaining issue of

12    identifying the Corizon custodians, you say you're at an

13    impasse there.  Where are those negotiations?

14            MS. KENDRICK:  We got a counterproposal yesterday mid

15    day from counsel for defendants about limiting the scope to 30  10:08:52

16    people from four institutions.  We have just now reviewed it

17    and we are staying by our position that we need individuals

18    from all ten institutions, as well as people from the regional

19    headquarters.

20            THE COURT:  Any additional word, Miss Love?            10:09:12

21            MS. LOVE:  Your Honor, just a couple comments.

22            First, Miss Kendrick's characterization of defendants

23    going back on the agreements that we've made thus far in the

24    ESI process is absolutely false and inaccurate.  I would hope  

25    that the Court's experience with me specifically, who is       10:09:27

1    negotiating now these agreements, and counsel at the table next

2    to us, I don't go back on agreements.  And there's no part of

3    the pleading that goes back on any agreements.

4         We continue to negotiate on the Corizon custodians,

5    but that's a continued negotiation.  We have not gone back on    10:09:45

6    any agreements, we've merely asked the Court to limit the scope

7    of the hearing.

8         Secondly, the citation that was made by plaintiffs'

9    counsel as to budgets of the State, as to essentially where is

10   Fennemore Craig located, how many attorneys do they have, how    10:10:01

11   many attorneys does this firm have, in the world of litigation

12   and the Rules of Federal Civil Procedure, it's not governed by

13   whether or not a party can afford to do something.  The Rules

14   of Civil Procedure apply here.  Rule 26 applies.

15        And as to discovery, that's the argument we're making.    10:10:18

16   It's not about whether somebody can afford it.  Is it

17   expensive?  Yes.  Can you afford it?  So what if you can afford

18   it.  Anybody maybe can afford something, that doesn't mean that

19   it's still not an expenditure that needs to happen, that it's

20   unnecessary.    10:10:33

21        So our arguments are not a crying and whining about

22   how much things cost just because we want to cry and whine

23   about it, it's about the applicability of Rule 26 to these

24   proceedings and discovery, and what are the bounds of

25   discovery.    10:10:47

1        That is why we made the proposal that I just set

2    forth today, to not limit the e-discovery to three persons,

3    but to look still on a broader scale and see if we need to go

4    further.

5        And just a note as to the Eyman Complex and going          10:11:00

6    further than that with our proposal on the ESI, the Eyman

7    Complex is a very large complex.  It is a complex that is

8    subject to Performance Measures that the Court is concerned

9    about.  It is reasonable to believe that if there are any

10   internal communications, whether it's within ADC, between      10:11:21

11   Corizon and ADC, or internally with Corizon, that if there is a

12   beat-the-system action at play, why would Eyman, which is

13   serving a very large population and doing a lot of medical

14   care, be circumscribed out of that?

15       It makes -- it's reasonable to believe if there's          10:11:37

16   those kinds of e-mails, Eyman is going to be included, because

17   if we're going to beat the system, why wouldn't you be trying

18   to beat it at a facility that may be problematic in some

19   Performance Measures.

20       Finally, the -- again, the negotiation on defendants'       10:11:51

21   side as to trying to limit the Corizon custodians down to

22   perhaps picking four, we suggested four complexes.  There was

23   no design other than it was the Eyman Complex, the Florence

24   Complex, Lewis Complex and Tucson, where there is high

25   populations there, medical care has been objected to and       10:12:13

1    challenged by plaintiffs' counsel.  So that's why those were

2    picked.

3           We offered that plaintiffs may pick four other

4    facilities if they'd like.  But, again, we're trying to cull

5    the universe and not go down a road of unnecessary and                10:12:28

6    burdensome discovery that exceeds the scope of the Stipulation,

7    the scope of the hearing, and do a phase.  You know, if four of

8    those facilities, if there's a beat-the-system plan in place,

9    it's reasonable to believe that you're going to get ESI hits at

10   those four locations.                                                 10:12:51

11          If it comes back that the judge and the Court is

12   concerned that there's something that has popped up at Florence

13   or Lewis that leads you to believe that the other six

14   facilities not contemplated by a first phase of discovery may

15   also be at issue, then that can be addressed.                         10:13:04

16          Again, it is not a conspiracy to try to hide evidence

17   or anything else, it is about the Rules of Civil Procedure.

18   It's about the relevant scope of the proceedings and trying to

19   do it in a phase that is not going to unnecessarily burden

20   defendants and go on a fishing expedition that doesn't need to        10:13:23

21   be gone on.  It's a phase-type process.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          Miss Kendrick, this last point that Miss Love makes

25   about focusing on Eyman, Florence, Lewis and Tucson seems to be       10:13:33

1    reasonable, that if you were going to find evidence of

2    problems, that by focusing on the places that have the greatest

3    number of and sickest number of inmates would produce that.

4            Why is that not a reasonable first shot?

5            MS. KENDRICK:  That's not a reasonable first shot for          10:13:56

6    several reasons, Your Honor.

7            First of all, it does not include Perryville, which is

8    the only female facility, and has been found substantially

9    non-compliant on multiple Performance Measures.  And you have

10   personally heard testimony from people housed at Perryville.          10:14:09

11           Also, Phoenix prison is a small prison, but it's a

12   critical prison because it's the inpatient mental health unit.

13   So there are a lot of very seriously mentally ill people.  The

14   most profoundly mentally ill people are housed at Phoenix.

15           The Yuma prison is also very large.  It has                    10:14:28

16   approximately 4,000 people at it.  And it has been found

17   substantially non-compliant by the Court on numerous

18   Performance Measures.

19           And, again, I would go back to my point with regard to

20   the other three institutions, the more remote ones that are           10:14:42

21   referred to as noncorridor facilities, because they do not

22   house people with serious physical or mental illnesses, that --

23   first of all, you have found them non-compliant on some

24   Measures, but also to the extent they are reporting compliance,

25   we need to kick the tires and test those numbers and see if it        10:15:01

1    really is accurate.

2           THE COURT:  All right.  So the two institutions that

3    you first identified, Perryville and Phoenix, had unique

4    characteristics that would raise the question about whether or

5    not excluding them could potentially blind me to an area of          10:15:23

6    inquiry that would be useful, the fact that Perryville is women

7    and that Phoenix has the mentally ill population.

8           Yuma, having a number of –– a great number of

9    prisoners, but prisoners in categories similar, I gather, to

10   Eyman, Florence, Lewis and Tucson would seem to be captured.        10:15:45

11          So it seems like a reasonable approach here would be

12   to add Phoenix and Perryville, but not include Yuma and the

13   other out of corridor, so that you would have those six and not

14   ten, and not the four that the defendants advocate.

15          Last word on that?                                           10:16:05

16          MS. KENDRICK:  Yes, Your Honor.

17          The Yuma prison, because of how far away it is and how

18   remote it is, has struggled mightily with staffing.  That's

19   something that we had discovered a few months ago.  We talked

20   about the fact that they in the Corrective Action Plans           10:16:18

21   referred to the fact that they had not had a psychiatrist there

22   for over a year.  Due to its remote nature they struggle with

23   finding specialty care for people, having to bring them into

24   Phoenix or Tucson.

25          So we would think that there are problems at the Yuma      10:16:33

29

1   facility just based on its geographical distance.  And it is

2   considered a, quote, corridor facility, so it does house people

3   with serious chronic medical conditions and people who are

4   seriously mentally ill.

5          THE COURT:  All right.  I'm going to include Yuma.  So     10:16:51

6   it's now going to be the seven, not ten.  But otherwise the

7   scope will be as previously defined.

8          If you find that you continue to have issues with

9   respect to the custodians, get on the phone with me straight

10  away.  And I don't want -- I've given you a big bump of         10:17:06

11  additional time here, I want you all to be able to use it

12  constructively.  I don't want you to be waiting on me making a

13  decision.  So if you've got issues, let me know straight away.

14         MS. KENDRICK:  Yes, sir, we will do that.

15         THE COURT:  The November --                              10:17:27

16         MS. KENDRICK:  Your Honor --

17         THE COURT:  Yes.

18         MS. KENDRICK:  -- just for clarification.  So that

19  we're not expected to file a responsive brief?

20         THE COURT:  You are not.                                 10:17:33

21         MS. KENDRICK:  The motion is denied?

22         THE COURT:  The Court finds that a response is

23  unnecessary.  This is directed to the Court's view, it's not as

24  if I'm trying to adjudicate a dispute between the plaintiffs

25  and the defendants.  This is something that I initiated, and so  10:17:44

UNITED STATES DISTRICT COURT

1    the defendants brought those issues up to me.  I've addressed

2    them now, I don't need to hear anything further from the

3    plaintiffs.  I'd like you to spend your time working on getting

4    this issue presented and resolved so that one way or the other

5    we know where the truth lies.                              10:18:02

6             I think it is worth doing, for the reasons that I've

7    articulated.  I think that the proportionality is not

8    unreasonable.  It seems to me that we have enough of a reason,

9    just in common sense, but also if I were to start over again

10   maybe I would even do this in the first instance to make sure  10:18:24

11   that I was paying more careful attention to the monitoring

12   program, and this is the way to do it.

13            I've worked through this, explaining to the defendants

14   over and over again that the best way for them to save money in

15   this case is to get the court out of it.  And the best way to   10:18:41

16   get the court out of it is to satisfy the Stipulation.  And for

17   whatever reason, notwithstanding my three-tiered approach, I

18   think I called it three-front approach, and these monthly,

19   sometimes more frequent gatherings, where I do what I can, I

20   haven't been able to get the results that I hoped to            10:19:09

21   accomplish.

22            Maybe part of that is my lack of understanding exactly

23   how the system is working.  And so this discovery effort has

24   perhaps collateral benefits of helping me understand better

25   about the process.                                             10:19:28

1          I don't -- and I told the Director this, I don't want

2    to be in the position of managing the health care at his

3    prisons, but the only way that I can make informed decisions

4    and good decisions is to be informed.  And simply that has to

5    happen.                                                          10:19:48

6          All right.  So I would propose to turn next to the

7    November report from the defendants.  Last night there was a

8    filing, which I have read.  But I didn't see any explanation of

9    why there was this second filing.  I see that there's a

10   difference on the Performance Measure that is initially         10:20:09

11   addressed.

12         But I would ask first defendants to explain what it is

13   that was different about what was filed last night.

14         MR. BOJANOWSKI:  Your Honor, there were some

15   additional -- some additional information, updated information  10:20:20

16   on the Measures.  And I wanted to make sure everything was

17   complete, and then cull out anything that was extra due to

18   complaints by plaintiffs' counsel at the last hearing, from

19   what I understand.

20         THE COURT:  Okay.  Well, without knowing what the         10:20:37

21   specifics are about the differences, I can't really say for

22   sure what I'm about to say, so I'll say it generally.  It is

23   usually helpful when you file something that you would expect

24   people to read, to tell people when you file something that is

25   supplanting that, how it is that the supplanted version is      10:21:03

```
 1    different.  Because then it means that we don't have to -- I
 2    mean, you put me in a difficult position.  You asked me to read
 3    and digest something, and then you give me something else that
 4    doesn't tell me what I should throw up from before or what I
 5    should be looking for.  And that's not helpful.              10:21:22
 6            I'll curse you with my metaphors, they're going to get
 7    worse probably, like that one, which doesn't ring very
 8    pleasant.  But again, maybe that's something I can do to try to
 9    steel you on to resolving this in-house rather than turning to
10    me.                                                         10:21:49
11            So with that admonition about going forward, does it
12    make sense to -- we did this last month, Miss Kendrick, we
13    allowed you to sort of steer the boat here on what we addressed
14    because of things that you wanted to say, rather than me going
15    through and having Mr. Bojanowski tell us about the ones that 10:22:11
16    don't need to be talked about.
17            MS. KENDRICK:  We can do that, Your Honor.
18            THE COURT:  Okay.
19            MS. KENDRICK:  I think it might be flipping between
20    the two filings though.                                     10:22:23
21            THE COURT:  Well, all right.  Then that's the time for
22    the defendants to tell us which one is the right one.
23            MR. BOJANOWSKI:  Your Honor, the most recent filing is
24    the correct filing.
25            THE COURT:  Okay.                                   10:22:35
```

UNITED STATES DISTRICT COURT

33

— CV-12-601-PHX-DKD – January 18, 2018 —

1          MR. BOJANOWSKI:  So, you know, it is to supplant the

2     prior filing in its entirety.

3          THE COURT:  Okay.

4          MR. BOJANOWSKI:  So if we're going to discuss these

5     things, the most current data and the most current reports and          10:22:44

6     such are contained in that -- in that filing that occurred last

7     night.

8          THE COURT:  Okay.

9          MR. BOJANOWSKI:  So, you know, we're willing to speak

10     about these, but there's generally -- generally these -- these          10:22:56

11     reports contain the information that we have.  So I don't know

12     if --

13          Well, I'll let Miss Kendrick go forward, but I just

14     wanted --

15          THE COURT:  Right.  I mean, her statement's a          10:23:12

16     reasonable one, and that is, the flipping back and forth is

17     because she did as I say happened would happen, and that is

18     people did read what you filed, and then we get another one on

19     the eve the night before.  And so people are prepared to

20     address what you did file.  And so if she has a little bit of a          10:23:30

21     going back and forth, we have to be mindful that that's not her

22     fault.

23          MS. KENDRICK:  Your Honor, just one other thing with

24     regard to what was filed last night.  It does not include any

25     of the Performance Measures that were in our pending motion to          10:23:45

UNITED STATES DISTRICT COURT

1    enforce.  What was filed on the 12th actually did include the

2    scores for one of the Performance Measures.  So at least in

3    that regard it didn't carry over to what was filed last night.

4    So I will have to actually jump back and forth.

5              THE COURT:  Fair enough.                              10:24:03

6              MS. KENDRICK:  And I'm also going to have to ask

7    Mr. Bojanowski or somebody to provide us those scores for the

8    Measures that are in our pending motion.

9              THE COURT:  All right.

10             MS. KENDRICK:  So the first one is actually           10:24:12

11   Performance Measure 19, which was in -- is in our motion.  It

12   was not -- it was included in the filing -- it was not included

13   in the filing last week.  And no plan has been submitted for

14   Performance Measure 19.

15             The scores for recent months, as the Court can see in  10:24:40

16   our motion, which is at docket 2520, is that the Lewis prison

17   has been substantially non-compliant every month for the

18   past -- at least the past year.  And Eyman has equally been

19   substantially non-compliant since January.  The Phoenix

20   facility is fluctuating.                                       10:25:04

21             And so again, you know, we believe that while the

22   Court has not made a formal finding yet because the motion is

23   pending, there is a clear record of substantial non-compliance.

24   Defendants have conceded it meets the definition of substantial

25   non-compliance.                                                10:25:22

1          So we would request that they provide a plan or some

2    sort of information to us about what they're doing to address

3    the substantial non-compliance at Eyman, Lewis and Phoenix

4    prisons.

5          THE COURT:  Well, I need to make the finding, but I            10:25:36

6    can ask Mr. Bojanowski whether he's prepared to say anything

7    about where we stand on 19.

8          MR. BOJANOWSKI:  As far as the pending motion is

9    concerned, I do not have any information with regard to

10   Remedial Action Plans, for the obvious reason that there's been   10:25:49

11   no finding.  I can report what the preliminary numbers are for

12   anything that the plaintiffs want to know, and am willing and

13   prepared to do that.

14         So -- but I can't -- I can't talk about Remedial

15   Action Plans that have not yet been developed.  And so I'm not    10:26:08

16   in a position to do that, and that's because we still have to

17   respond to their motion, and then the Court still has to make

18   the finding, at which point it would trigger the obligation

19   obviously to prepare those plans.

20         So if the question is that -- it's Performance Measure       10:26:24

21   19, at -- which facilities?  I think it was Lewis.  But was

22   there additional ones?

23         MS. KENDRICK:  Eyman, Lewis, Perryville, Phoenix and

24   Tucson.

25         MR. BOJANOWSKI:  All right.  19, Eyman is 86 percent.        10:26:41

1    Lewis 65 percent.

2          Did you say Perryville?

3          MS. KENDRICK:  Yes, I did.

4          MR. BOJANOWSKI:  Perryville is 92 percent.

5          MS. KENDRICK:  Phoenix.                                    10:26:55

6          MR. BOJANOWSKI:  Phoenix is 83 percent.

7          MS. KENDRICK:  And Tucson.

8          MR. BOJANOWSKI:  I'm sorry, Tucson is 88 percent.

9          MS. KENDRICK:  Your Honor, we would ask that just in

10   the future going forward that defendants include the           10:27:09

11   Performance Measures in the pending motion with the scores so

12   that we know that in advance.

13         And also, we would just observe that it's very

14   troubling that defendants have conceded that they are

15   substantially non-compliant, their scores continue to show     10:27:26

16   substantial non-compliance, and there's a pending motion, and

17   they apparently are not being proactive in taking the steps to

18   identify the root causes of the substantial non-compliance or

19   developing a plan.  We think that they don't need to wait until

20   the Court issues a formal finding if they've conceded          10:27:45

21   substantial non-compliance and the scores continue month after

22   month to reflect that.

23         MR. BOJANOWSKI:  Your Honor --

24         THE COURT:  In fairness that's not what Mr. Bojanowski

25   said.  He said that he didn't have in his head the knowledge.   10:27:57

1    It may well be that the State is on top of this and doing it, I

2    don't know.  But in fairness, what he said, he didn't know at

3    this moment.

4         So in terms of the agenda items on a lawyer's to-do

5    list at a hearing, it's reasonable for him to think that the          10:28:14

6    ones that are subject of the motion would be perhaps not ones

7    that he would have to be prepared to give that information

8    about.

9         MR. BOJANOWSKI:  Your Honor, I can represent to the

10   Court that we are undertaking an analysis of the root cause          10:28:27

11   problems with regard to these non-compliant findings and

12   working with Corizon to identify those.  So it's not accurate

13   to say that we're just sitting on our hands here.  We are

14   actually undertaking that kind of review, because the sooner we

15   can get these into compliance, obviously the less that we have       10:28:47

16   to do here.  And so that is actually occurring.

17        And so we -- but a Remedial Action Plan has not yet

18   been developed with regard to the pending motion, that's all

19   I'm saying.

20        THE COURT:  And that makes sense.  All right.                   10:29:05

21        MS. KENDRICK:  Okay.  Well, under the terms of the

22   contract between Corizon and ADC a Corrective Action Plan is

23   required after three months of substantial non-compliance, so

24   there should be something out there for it.

25        So, the next point involves Perryville at Performance           10:29:20

1    Measure 39.  And in their filing last week, which is docket

2    2535-1 at page 60, they stated that the Perryville facility was

3    in the rebuttal process for the month of October showing 77

4    percent, and that it would be updated when the numbers are

5    finalized.  And then what they filed last night at page 69 says      10:29:45

6    the same thing.

7         And so we're trying to find out whether the 77 percent

8    for October is accurate and final or if we're still pending a

9    change in the number.

10        MR. BOJANOWSKI:  The 77 percent is accurate for the            10:30:02

11   month.  The rebuttal was rejected.

12        MS. KENDRICK:  And the next one would be Performance

13   Measure 40 at Eyman, which is at page 72 of what they filed

14   last night.  The -- this is about referrals, urgent referrals,

15   being seen by a provider within 24 hours.                          10:30:40

16        The Corrective Action Plan is included for the fact

17   that it went from 92 percent to 50 percent, but it does not

18   identify the underlying cause as to why the providers were not

19   seeing patients within the required time frames.

20        MR. BOJANOWSKI:  I do not have that information,              10:31:01

21   Your Honor.

22        MS. KENDRICK:  So the next one is Performance Measure

23   42, which is only in the last night's filing.

24        And we would just observe that the scores across the

25   board for Eyman, Florence and Lewis are still abysmally low.       10:31:40

UNITED STATES DISTRICT COURT

39

1    And our concern is that this Corrective Action Plan does not

2    appear to be working.  And the update that was offered as of

3    January 8th, for example, if you look at page 78 for Florence,

4    it says that they're going to continue with their current plan.

5    But our concern is that at at least three facilities the                    10:32:03

6    current plan doesn't seem to be working, and whether or not

7    they might be doing a supplemental Corrective Action Plan.

8            THE COURT:  In light of this low performance, have you

9    been engaged in real-time analysis so that we have a better

10   idea of where things stand now?                                            10:32:24

11           MR. BOJANOWSKI:  May I have a moment, Your Honor?

12           THE COURT:  Surely.

13       (Discussion off the record between defense counsel.)

14           MR. STRUCK:  Your Honor, I did want to mention that

15   Mr. Pratt is ill with the flu, and that's why he's not here                10:32:52

16   today.

17           THE COURT:  I'm very sympathetic to that, as you can

18   imagine.  I'm proud to report that I don't think anybody in my

19   court staff contracted the flu when I had it.  I wore a mask

20   for a week after the onset of symptoms, which is what the CDC              10:33:09

21   says you're supposed to do.  And so I commiserate with him and

22   all the people who have the flu.

23           I have been wondering about what happens when this

24   virus that seems to be very contagious gets loose in a prison

25   system.  I feel for those people.                                          10:33:26

1          Go ahead.

2          MR. BOJANOWSKI:  The information I have is, no,

3    there's no real-time reporting on this Measure.  But I'd like

4    to be able to follow up, if I could, as to the Remedial Action

5    Plan.                                                         10:33:48

6          MS. KENDRICK:  So, Your Honor, the next Performance

7    Measure that we wanted to talk about is Performance Measure 44

8    at Eyman.  This is at page 81 of last night's filing.

9          And this is a Performance Measure that is part of the

10   Court's Order to Show Cause and for which defendants should be  10:34:05

11   tracking real-time data.  The December data the Court had

12   ordered should be provided by February 5th, so we're eagerly

13   awaiting that.

14         But, our concern is twofold.  First of all, compliance

15   in one month at Eyman went from 89 percent to 20 percent, which 10:34:23

16   was dramatic.  But the basis that was given for the

17   non-compliance is, quote, Corizon was informed that the Court

18   changed the monitoring process for this Performance Measure

19   resulting in non-compliance, close quote.

20         And we're concerned about that for a couple reasons.      10:34:44

21   Because the last time the Court, according to our records,

22   ruled on Performance Measure 44, which is the Measure about

23   having hospital discharge recommendations reviewed and acted

24   upon within 24 hours, was in December 2016 when the Court

25   issued an order at docket 1831 that said that this is a         10:35:06

1    two-part test, it's not just a timeliness of did they look at

2    it, but did they actually do something.

3           So we don't understand why Corizon or ADC is taking

4    the position that the Court has changed the monitoring process,

5    because the Court ordered it 13 months ago.                                    10:35:26

6           And if you turn a page to the Lewis institution, which

7    also scored 58 percent -- so this is at page 83 of last night's

8    filing -- the basis of non-compliance states, quote, on

9    November 28th, 2017, the D.O.C. compliance monitor met with the

10   FHA for this facility and notified her that the auditing method   10:35:51

11   was changing.  This Performance Measure now also includes

12   generic discharge recommendations such as, quote, do not drive

13   or operate heavy machinery while on this medication, close

14   quote.  This Performance Measure dropped out of compliance

15   because these generic recommendations were not included prior     10:36:10

16   to November 28th, 2017.

17          So we're quite perplexed by this, because we were not

18   aware that the Court issued any sort of order that says generic

19   discharge recommendations need to be included.

20          And moreover, what is written for Eyman and Lewis          10:36:28

21   appear to indicate that defendants or somebody has made changes

22   to the Monitoring Guide, and we were not made aware of these

23   changes before they apparently were made.

24          THE COURT:  The explanation just doesn't seem to make

25   sense, Mr. Bojanowski.                                            10:36:54

CV-12-601-PHX-DKD – January 18, 2018

1          MR. BOJANOWSKI:  It's not a matter of a change in the

2    Monitoring Guide.  I think what was happening was, the

3    discharge recommendations that were specific to the patient as

4    far as, you know, medication administration or something of

5    that nature, were being reviewed and signed off on.          10:37:08

6          There are -- typically when you are discharged from

7    the hospital there's maybe a sheet or two sheets of

8    generic -- a generic list of things that address, you know,

9    what you're supposed to do, not supposed to do.

10         So what ended up happening was, the doctor would sign   10:37:31

11   off on the specific recommendation, but was not signing off on

12   the generic recommendations.  So counting -- basically the

13   interpretation was, well, you have to sign off on all

14   recommendations in order to get credit for this particular

15   Measure.                                                       10:37:57

16         So that's -- that's really what has occurred here.

17         If the Court is going to say, well, you know, those

18   generic things, like operating heavy equipment, that's not

19   really what the Measure is seeking to address, and it's the

20   more specific recommendation, like follow-up care with regard  10:38:12

21   to this, that, or the other thing.

22         So that's, I think, what the shift was in the analysis

23   by the monitors in monitoring this.  They were no longer going

24   to count the doctor signing off on a specific recommendation as

25   opposed to those generic pages of stuff that you get from the  10:38:32

UNITED STATES DISTRICT COURT

1  hospital that basically lists everything that could conceivably

2  go wrong with you on discharge.

3          THE COURT:  Can you explain to me how this signoff is

4  bifurcated between general and specific?  How does that process

5  work?                                                          10:38:53

6          MR. BOJANOWSKI:  I can't explain that to you.

7          THE COURT:  It just doesn't -- the whole thing doesn't

8  make sense to me.  It doesn't make sense because I don't

9  understand how you can have a signoff on the specific but not

10  the general.                                                  10:39:02

11          I mean, certainly when we've talked about this in the

12  past we've talked about it in the context where the hospital

13  says, this person needs to have this kind of care when they

14  return to your care back to the prison, and we've focused on

15  that.                                                         10:39:20

16          If there is now this idea that these general

17  obligations are also not being signed off, you wonder, well,

18  how is it that there's a signoff that happens on one part but

19  not the other part.  And then you also wonder, why is it that

20  we don't see it across the board at all of the institutions   10:39:38

21  where this is new analysis.

22          So the whole thing just doesn't make any sense to me.

23          I gather nobody's in the courtroom who has any

24  on-the-floor experience with what this is?

25          MR. BOJANOWSKI:  I'm trying to run that down right now  10:39:58

CV-12-601-PHX-DKD – January 18, 2018

1  to see if we can't bring some light to this.

2        It was my understanding that there's these forms

3  that -- these general forms that are just -- I don't know if

4  you've seen them before but, you know, I go to my doctor,

5  and he gives me this --                                    10:40:17

6        THE COURT:  No, I -- yeah, when you leave the hospital

7  they give you a piece of paper and it says what you should be

8  doing.  But I gather when you're in custody there's a different

9  thing, because they don't give you the piece of paper, they

10  communicate it to the provider in the facility, in the prison,  10:40:28

11  telling what needs to be done.

12        And that's been the falloff here, where there have

13  been issues where the doctor at the ED or at the hospital has

14  said, this needs to be done.  And this Performance Measure is

15  designed to make sure that either it is done, or if it's not   10:40:47

16  done it's addressed specifically as to why it wasn't done.

17        MS. KENDRICK:  Your Honor, just a couple of things.  I

18  am confused by Mr. Bojanowski's reference to some sort of

19  bifurcated discharge --

20        THE COURT:  I used the word "bifurcated."           10:41:04

21        MS. KENDRICK:  Okay.  Because I look at all the

22  medical records, and generally the discharge recommendations

23  are at the very end, and it says, treatment recommendations,

24  number one, number two, number three, number four.  They're all

25  right there, you know.                                     10:41:18

UNITED STATES DISTRICT COURT

1          And so our view would be, if that's listed as the

2     recommendations, that's what's reviewed and acted upon.

3          And it's perplexing to us that there's this change in

4     methodology of monitoring that apparently has gone into effect

5     at two institutions.  If they're changing the way they're          10:41:36

6     monitoring, they need to write that down.  And, therefore, they

7     need to write that down in the Guide and tell us.

8          You observed that, you know, a similar drop off was

9     not seen at the Florence prison.  And also we have the Winslow

10     prison that's subject to the pending motion.  And so it's          10:41:54

11     unclear, since this explanation appears in two places, whether

12     this is something that's changed system-wide or just at these

13     two institutions.

14          And finally, I would just note that what it states as

15     the basis for non-compliance for Eyman is inaccurate.  The          10:42:10

16     Court did not change the monitoring performance for this -- the

17     monitoring process for this Performance Measure.

18          THE COURT:  I don't believe I did in the timeline

19     that's suggested there.  We did discuss it, as you -- what your

20     recitation is is consistent with my recollection.  But I have          10:42:27

21     no recollection of after that time period discussing it with

22     respect to saying, well, here's a different view.

23          I mean, it seems like I've been on the consistent

24     theme throughout as far back as when you described in 2016.  So

25     I'm as puzzled as you are.          10:42:47

1          And so I noticed that some people were talking to you,

2     Mr. Bojanowski.  Were you able to garner any additional

3     information?

4          MR. BOJANOWSKI:  I think so.  I have Miss Campbell

5     here, who is one of the representatives of the ADC that is in          10:42:59

6     the monitoring bureau.  And maybe she can explain what

7     is -- what this is.

8          THE COURT:  Surely.

9          Miss Campbell, if you'd step up to a microphone.

10         MS. KENDRICK:  Can we have her sworn?          10:43:16

11         THE COURT:  Pardon me?

12         MS. KENDRICK:  Can we have her sworn?

13         THE COURT:  Miss Campbell, would you please step

14    forward to the clerk of the court to be sworn?

15         How about this:  Please raise your right hand.          10:43:36

16         Do you swear or affirm that the statements that you're

17    about to make in court are the truth and nothing but the truth?

18         MS. CAMPBELL:  I do.

19         THE COURT:  Thank you.

20         Please have a seat on the witness stand.          10:43:43

21         I'm borrowing Judge Snow's clerk and she is -- because

22    my clerk is covering for another clerk who is ill.  And

23    Judge Snow's clerk is a perfectionist, and so even though she

24    knows the oath like the back of her hand, she wanted to use the

25    one that I use in my courtroom because different judges use          10:44:01

─────── **Kathy Campbell – Direct Examination** ───────

1    different oaths.  And I know that that's what was going on.

2         So rather than have her look for the oath on the

3    clerk's desk in front of her, I went ahead and did it.  I'm

4    authorized under the statute to administer oaths.

5                      DIRECT EXAMINATION

6    BY THE COURT:

7    Q.  Please.

8    A.  The difference is, there is a generic one that is printed

9    out by nursing usually.  And it just gives information --

10   Q.  Nursing who?  Nursing at the --                          10:44:26

11   A.  The nursing staff at the hospital.

12   Q.  Okay.

13   A.  Typically like if you have a cold it will say, you know,

14   drink fluids, get plenty of rest.

15        And the other one is actually discharge instructions     10:44:36

16   written by the provider.

17   Q.  I see.  And was there a change in how you approached this

18   with respect to evaluating compliance with this Performance

19   Measure?

20   A.  The interpretation by some of the monitors were the fact  10:44:49

21   that they should have been looking at those generic ones by

22   nursing and not just the provider ones.  So they were looking

23   at both of them instead of just the ones written by the

24   providers.

25   Q.  And when did that happen?                                 10:45:02

UNITED STATES DISTRICT COURT

Kathy Campbell – Direct Examination

1    A.  I don't recall the exact time frame.

2          THE COURT:  Any questions from plaintiffs?

3          MS. KENDRICK:  No.

4          THE COURT:  Anything you want to say?

5          MR. BOJANOWSKI:  Nothing, Your Honor.  Thank you.    10:45:17

6    BY THE COURT:

7    Q.  So the nursing requirements, is it fair to say that they

8    are boilerplate, so to speak, that they apply in every person

9    who's transported, and that the ones that come from someone

10   other than the nursing staff are the ones particular to that    10:45:38

11   patient, or is that not fair to say?

12   A.  That's fair.  The ones by the provider are patient specific

13   versus those by nursing are just general.

14   Q.  All right.  And just to make sure that I didn't use a term

15   that I have a common understanding of and you may not,    10:45:52

16   "boilerplate" for me is language that is used in every

17   discharge circumstance.  You would find that same language in

18   every discharge from a nurse.  Is that what you understand it

19   to mean?

20   A.  Yes.    10:46:08

21   Q.  Okay.  So there's no difference with respect to an

22   individual patient in the nursing discharge, but differences

23   with respect to the -- what the provider -- someone other than

24   a nurse has indicated, those would be different for each

25   patient?    10:46:25

UNITED STATES DISTRICT COURT

49

─────── Kathy Campbell – Cross-Examination ───────

1    A.  Correct.

2           THE COURT:  Did I engender any additional questions?

3           MS. KENDRICK:  Well, it made me think of something.

4                        CROSS-EXAMINATION

5    BY MS. KENDRICK:

6    Q.  So, Miss Campbell, you said that some of the monitors were

7    changing how they interpreted it.  Was it just the ones at

8    Eyman and Lewis, or were there other institutions?

9    A.  I don't recall as far as my sites.  I do the five northern

10   regions now.  So I don't recall which ones were doing          10:46:48

11   which -- how they were measuring each one at each site.

12   Q.  So you do -- you measure 44 at the northern sites?

13   A.  I monitor the audit of the compliance monitors that do that

14   at five sites.

15   Q.  So it's the individual institutional monitors that monitor   10:47:07

16   Performance Measure 44?

17   A.  Correct.

18   Q.  Okay.  And do you know if the change by the Eyman and Lewis

19   monitors was made in writing?

20   A.  I don't recall if it was or not.  They were -- they're two   10:47:21

21   of our newer compliance monitors.

22   Q.  And do you know why they changed how they were approaching

23   the monitoring?

24   A.  As far as -- I don't understand your question.

25   Q.  Why did they decide that they were going to include generic  10:47:35

UNITED STATES DISTRICT COURT

Kathy Campbell – Cross-Examination

1    measures?

2    A.  I don't know -- I don't recall offhand.

3    Q.  And are the site monitors allowed to change how they

4    interpret and monitor the Measures?

5    A.  No, we actually had a discussion about it, the fact that                10:47:49

6    they were including both of them instead of just the provider

7    orders.

8    Q.  So how is it being monitored now at the ten institutions?

9    Is it uniform, do you know?

10   A.  I believe it is now, yes, by looking at the provider                    10:48:05

11   orders --

12   Q.  So --

13   A.  -- and not the generic discharge instructions that nursing

14   prints out.

15           And not all hospitals have the generic nursing                     10:48:15

16   discharge instructions.  They're more instructions than they

17   are orders.  And I think that's where the miscommunication was.

18   Q.  Do you know what type of training these two new monitors

19   got for the Monitoring Guide?

20   A.  I provided training to both of them, and had them shadow                10:48:32

21   another monitor too as well.

22   Q.  And you gave them a Monitoring Guide as part of the

23   training?

24   A.  Yes.

25   Q.  And to your knowledge has the written instructions for                  10:48:46

─────── Kathy Campbell – Redirect Examination ───────

1  Performance Measure 44 changed?

2  A.  No.

3          MS. KENDRICK:  Thank you.

4                 REDIRECT EXAMINATION

5  BY THE COURT:

6  Q.  Miss Campbell, when did you take responsibility for

7  supervising the monitoring of the northern facilities?

8  A.  I don't recall the exact time frame.

9  Q.  Ballpark.

10  A.  In the last maybe seven months.                    10:49:09

11  Q.  Okay.

12  A.  Six or seven months.

13  Q.  All right.  And you said that this issue came up and you

14  discussed it.  Did that discussion happen after you or someone

15  saw that these numbers were out of compliance or did it happen  10:49:25

16  before?

17  A.  It happened after I was doing some of the post auditing

18  that I kind of review their findings and go back and review

19  some of the information that they included in their audit.

20          THE COURT:  Okay.  Anything else, counsel?          10:49:41

21          Miss Campbell, thank you very much.

22          MS. KENDRICK:  Your Honor, I guess we're still a

23  little confused about where things stand with this, because the

24  Corrective Action Plan from Corizon is that they've educated

25  the providers and the nurses that they are supposed to abide by  10:50:09

1     this new interpretation of the monitoring.

2           So, again, we just want to make the point that if

3     changes are made in how things are monitored, it should be

4     written down and reflected in the Guides.

5           THE COURT:  Well --                                    10:50:29

6           MS. KENDRICK:  And that it should be uniform at all

7     ten institutions versus idiosyncratic approaches by individuals

8     from different institutions.

9           THE COURT:  Well, let me just state what I think I've

10    just learned.                                                 10:50:46

11          At the docket at 2540, page 83, in the blue appended

12    page -- pagination provided by the clerk's ECF system, the

13    Corrective Action Plan for this Performance Measure is, quote,

14    on November 28th, 2017, the FHA verbally told every provider

15    about the inclusion of general discharge recommendations in    10:51:12

16    this Performance Measure.  On January 3rd, 2018, the FHA and

17    the site Medical Director formally trained every provider

18    during a provider meeting.  Compliance is expected for December

19    2017, close quote.

20          At the very least this Corrective Action Plan is         10:51:32

21    incomplete because it doesn't address whether or not the

22    inclusion of the generic discharge recommendation in this

23    Performance Measure is something to be part of the appropriate

24    monitoring program or not.  We just heard that the State has

25    decided that it should not be -- that the generic should not    10:52:01

1    be.

2         But the problem that I'm left with, and the reason

3    that counsel observes that there still is a state of being

4    perplexed, is because we're left fundamentally with the concern

5    that when we dig a little bit deeper we find something that we          10:52:27

6    really think we should have been told rather plainly and we

7    weren't.  And something also that maybe should have been

8    apparent to counsel for defendants as to a potential issue,

9    that didn't result in a self awareness of that.

10         And so it is, again, a reason to be concerned about           10:52:53

11   whether or not this mechanism that is at the very threshold of

12   making sure this whole process works, and that is the

13   monitoring program, whether it's firing on all eight cylinders

14   and it is doing everything it should.

15         So I take this additional time to talk about this           10:53:14

16   because it raises an issue that really shouldn't be an issue,

17   and that is, we really should be clear this far into it about

18   what it means to comply with this Performance Measure or not.

19   And if there were issues raised about it, it shouldn't have

20   been presented by two new employees who coded something that          10:53:35

21   they thought made sense that apparently doesn't seem to make

22   sense.

23         But, again, it just seems -- if this kind of thing is

24   happening here, you have to think there must be a -- so many

25   incidents of this which are fundamental distractions, whether         10:53:55

1    it's new employees that are not getting it.  And so that means

2    we have to have meetings and talk about it and wrestle with it,

3    and then you get a judge talking about it for five minutes on

4    court time where everybody is trying to focus on what really

5    needs to be addressed.  And we find ourselves always looking at          10:54:12

6    these kinds of details that should just be done.

7          So, go ahead.

8          MS. KENDRICK:  We're actually ready to move on to

9    another Performance Measure.

10          THE COURT:  Yes.          10:54:30

11          MS. KENDRICK:  So the next one we wanted to talk about

12    is Performance Measure 47, which the Court is abundantly

13    familiar with this Performance Measure which requires providers

14    communicate results of diagnostic studies to inmates upon

15    request and within seven days.          10:54:48

16          And the Court's Order to Show Cause includes this

17    Performance Measure at Eyman, Florence, Lewis, Perryville,

18    Phoenix and Tucson.  And we are certainly looking forward to

19    seeing the real-time data for December on February 5th, because

20    according to docket 2540-1 at page 98, Eyman is at 61 percent.          10:55:07

21          And granted, it says the policy change was made in mid

22    November that allows nurses to provide these communications,

23    but we were surprised to see that it didn't reflect it really

24    in the scores for these institutions.  Eyman was at 61, Lewis

25    was at 74, Tucson was at 67, and Yuma was at 72.          10:55:36

1      THE COURT:  Anything you'd like to add,

2   Mr. Bojanowski?

3      MR. BOJANOWSKI:  Well, Your Honor, I think the reason

4   why we have these graphs is to show the progression over time

5   and the effectiveness of the Corrective Action Plan.  And what          10:55:52

6   plaintiffs fail to show is that at Florence you've got an

7   increase from 26 percent up to 88 percent on this Plan.  You've

8   got Lewis from 34 percent up to 74 percent.

9      So it's really something to where we need to look at

10   this, and we look at those trends when we're trying to                  10:56:17

11   determine the efficacy of the plan.

12      Tucson unfortunately dropped off.  I don't have

13   specifics on that one.

14      But the plan seems to be working.  As Miss Kendrick

15   indicated, the change in mid November allowing nursing staff to         10:56:36

16   communicate these we believe is going to have a significant

17   impact on those scores.

18      MS. KENDRICK:  Your Honor, I would just also observe

19   one thing that we've been told over the months about this

20   Performance Measure and the reason the scores are so low is             10:56:55

21   because there's such a small sample size that, you know, these

22   days maybe it's just two or three people in the entire month

23   requested.  So then if there's just one that's off it looks

24   terrible.

25      And since we don't have the actual November CGARs yet,              10:57:11

1    I can't tell you how many records were reviewed.  But what I

2    can tell you is at the Eyman facility in the month of October

3    they were found non-compliant when they reviewed 40 files.  And

4    at Lewis in October they reviewed 23 files.

5           So I don't think that necessarily is a valid                    10:57:29

6    explanation as to why there's substantial non-compliance going

7    on.  It's not just because there's such a small sample size.

8           And again, we just hope that they are keeping this

9    real-time data as the Court ordered, and that we will see

10   improvements in December.                                              10:57:51

11          THE COURT:  I think it's also fair to say that this is

12   a basic Performance Measure.  If some provider thought it was

13   necessary to have a diagnostic study, diagnostic studies that

14   we see here have pretty substantial barriers to accessibility

15   because of bankruptcy and other sort of things, that if          10:58:06

16   somebody thought it was important enough to have that study, it

17   surely seems that somebody ought to be communicating to the

18   request of the patient, who's obviously concerned about the

19   results, within seven calendar days.

20          So Mr. Bojanowski cites a trend.  But then you just            10:58:25

21   can't ignore the fact that this basic fundamental idea has just

22   been less than 50 percent in so many places for so, so long.

23   And so you see a jump, you know, of 30 that takes you close to

24   compliance, and you think, oh, my goodness, we've gone from 50

25   to 80.  But then you look back on the previous year and you see        10:58:54

```
 1    you've been hovering in the place below 50 for a long, long

 2    time.

 3            So there are a lot of people adversely affected by

 4    this Performance Measure.

 5            Why don't we take a ten-minute break at this moment.     10:59:06

 6    We'll come back at 11:10.

 7            Thank you.

 8        (Recess at 10:59 a.m., until 11:18 a.m.)

 9        THE COURT:  I'm a little bit delayed in getting back

10    to you because I've been wrestling in my head, playing back     11:18:59

11    over what we were discussing with Miss Campbell about

12    Performance Measure 44, because I'm still left with some

13    confusion about where we stand.

14            Miss Campbell, what is the current view?  Is the

15    current view that there has to be this separate signoff, or is  11:19:20

16    the signoff of the specific discharge instructions, is that

17    sufficient?

18            MS. CAMPBELL:  The specific discharge instructions by

19    the provider.

20            THE COURT:  Okay.  So why is it then that the rebuttal   11:19:34

21    process -- and maybe I could ask you to come forward so that

22    you could respond in a microphone so the record could capture

23    it.

24            Why is it that the rebuttal process didn't address

25    this?                                                           11:19:51
```

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1      MR. BOJANOWSKI:  Corizon didn't file a rebuttal on

2  this.

3      THE COURT:  I see.  So Corizon never raised it as an

4  issue?

5      MS. CAMPBELL:  Correct.                                    11:20:05

6      THE COURT:  Okay.  So there's -- so if there's an

7  absence of performance compliance on a Performance Measure,

8  it's not surprising sometimes when Corizon just doesn't say

9  anything at all about it?

10      MR. BOJANOWSKI:  That would be correct, Your Honor.       11:20:21

11      I mean, we're recording preliminary numbers here.  I'm

12  unaware of a claim for --

13      THE COURT:  Okay.

14      MR. BOJANOWSKI:  -- on this at this point.  But --

15      THE COURT:  No, I understand.  I understand.  It just     11:20:37

16  seemed like to me that this was one that would have been

17  readily apparent, that you would address it.

18      Thank you, Miss Campbell.

19      The next question that I have is, Mr. Bojanowski, do

20  you have any idea where the suggestion that is set forth in the  11:20:56

21  basis -- let me get back to this.

22      This is on docket 2541, page 81.  The basis of

23  non-compliance, Corizon was informed that the Court changed the

24  monitoring process for this Performance Measure resulting in

25  non-compliance.                                                11:21:40

1          Do you have –– that's for Eyman.  Do you have any idea

2     where that came from?

3          MR. BOJANOWSKI:  Specifically, no.  Generally, from

4     Corizon.  I'd have to follow up on that.  Maybe that was the

5     understanding of the person who was providing the information.          11:21:57

6          THE COURT:  All right.  Thank you.

7          Miss Kendrick, you may continue.

8          MS. KENDRICK:  Sure.  So moving along, we wanted to

9     talk about Performance Measure 49 at Tucson.  This is at page

10    119 of docket 2540-1.  And this is a Performance Measure where          11:22:13

11    the patients need to be told of a denial of a request for

12    specialty services within 30 days of the denial by utilization

13    management.  And Tucson continues to be substantially

14    non-compliant with this Measure.

15         But what is confusing to us is, on the next page, 120,          11:22:41

16    the Corrective Action Plan for this Performance Measure is that

17    each site Medical Director will have their own medical

18    assistant to assist with management of daily duties concerning

19    timeliness of taking action.  This procedure will assist with

20    other Measures where provider timeliness is an issue.  This          11:23:01

21    procedure is currently being implemented at facilities

22    system-wide with a projected completion date in early February.

23         And we're a little confused about how getting a

24    personal assistant or medical assistant for the medical

25    directors is going to address the fact that the providers are          11:23:20

1    unable to meet with the individuals and tell them about the

2    non-compliance.

3            And our concern is that the non-compliance at Tucson,

4    as shown in the staffing reports that have been filed, both

5    with the Court and then provided, show that there's been                    11:23:41

6    continued and ongoing vacancies at Tucson.  Only 1.75 of 3.5

7    staff physician positions at Tucson are filled.

8            So we would just note for the record that we think

9    that probably part of the failure here is rooted in the fact

10   that they don't have these physician positions filled.                      11:24:10

11           And to the extent Mr. Bojanowski or anybody could

12   explain why this Corrective Action Plan is going to address

13   this issue, it would be helpful.

14           THE COURT:  How will this assistant make this more

15   likely to be compliant?                                                     11:24:28

16           MR. BOJANOWSKI:  Your Honor, I think it's scheduling

17   of appointments and making sure that contact is made with

18   individual patients.  And so instead of having the general CNA

19   who is there, or scheduler who is there, this person would be a

20   person who would specifically assist this doctor or provider              11:24:48

21   with making sure that they're getting appointments set, seeing

22   the people when they need to see them, and then making sure

23   that the timeliness of the interaction is in accordance with

24   what's required.

25           This is a statement that it's my understanding will                 11:25:09

1    affect this Measure as well as perhaps some other Measures that

2    deal with provider timeliness and contact with patients.

3            THE COURT:  So is it the medical director who

4    communicates this information or the provider?  Who usually

5    communicates this information?                                    11:25:33

6            MR. BOJANOWSKI:  To the patient?

7            THE COURT:  Yeah.

8            MR. BOJANOWSKI:  It would be the provider.  But the

9    medical director is a provider.

10           THE COURT:  Okay.  But one of many; right?              11:25:42

11           MR. BOJANOWSKI:  Well, yes.  There are other providers

12   there, yes.

13           THE COURT:  Again, I'm just trying to understand.

14           MR. BOJANOWSKI:  Yes.

15           THE COURT:  Because it doesn't seem like it's a          11:25:52

16   perfect fit for the problem at hand.

17           MS. KENDRICK:  Your Honor, we would also note that

18   according to their December staffing report, only 4.0 of ten

19   FTEs for the medical director position are filled state-wide.

20   There's no medical director at Douglas, Florence, Phoenix,        11:26:09

21   Safford or Winslow.  The one at Lewis is listed as a 0.2 FTE,

22   and the one at Perryville is listed as a 0.8 FTE.

23           So that also kind of adds to our confusion about

24   creating a position to be the assistant to a site medical

25   director when that position is not filled.  And site medical      11:26:32

1    director, our understanding tends to be a more administrative

2    position, and they're not just another line provider in the

3    yard clinic.

4          THE COURT:  Very reasonable observation.

5          Go ahead.                                                    11:26:58

6          MS. KENDRICK:  So Performance Measure 50 at

7    Florence -- I'm sorry, I have things --

8          THE COURT:  That's all right.

9          Are urgent consultations and urgent specialty

10   diagnostic services being scheduled and completed within 30    11:27:14

11   calendar days for the consultation being requested by the

12   provider.

13         MS. KENDRICK:  Yes.  And Florence is at page 121.

14   Florence is one of the institutions that was in your Order to

15   Show Cause.  And they report 52 percent.  And this Measure --  11:27:27

16   there's a lot of troubling things in here.

17         First of all, we noted with regard to the proposed

18   remedial plan from November 6th, that this work flow plan that

19   they had, which is detailed at pages 122 to 123 of the filing,

20   seemed to be pushing things pretty close to the wire.  These   11:27:58

21   consults have to be scheduled and completed within 30 days, but

22   the process, as articulated at the top of page 123, was that it

23   would not be until day 25 in the process that the clinical

24   coordinator would escalate one of these issues to the vice

25   president.                                                      11:28:19

1    And we observed at the time that that seemed like it

2  was cutting it close and maybe they should escalate it to the

3  regional office a little sooner than five days before the

4  deadline.

5    It does appear that it's not working at Florence.

6  Other institutions did show improvement; for example,

7  Perryville.

8    The other thing that was concerning to us is at the

9  bottom of page 123, which is the basis for non-compliance as of

10  January 8th.  And we heard last month about the lack of

11  oncology services because Arizona Oncology Network had

12  reportedly filed for bankruptcy.  But defendants are now

13  reporting other specialties, including urology, neurology, and

14  gastroenterology.

15    And so we would like to basically get an update on

16  where things stand with the specialty services, including

17  finding a new oncology provider, but then also these other

18  specialists and the potential use of telemedicine.

19    THE COURT:  Can you provide some detail here,

20  Mr. Bojanowski, please?

21    MR. BOJANOWSKI:  Your Honor, to address the first

22  point made by Miss Kendrick, yes, we agree that the timelines

23  are a little too close.  We have been discussing adjusting

24  those timelines.  It hasn't been formalized as of yet so it

25  wasn't included in this plan.  But that is currently what is

11:28:29

11:28:48

11:29:11

11:29:29

11:29:47

1   being undertaken is to try and get those timelines adjusted so

2   that we meet the Performance Measure instead of having it

3   within three or five days of the deadline.

4          With regard to specialty consult providers, Corizon

5   entered into a new contract on December 27th with Ironwood      11:30:09

6   Physicians Associates to take care of the oncology needs that

7   AON was providing to the specified facilities that were under

8   contract.

9          So we moved as quickly as possible to get under a new

10  contract so that there would not be an interruption of service.  11:30:35

11  But as a result of the fact that AON declared bankruptcy and

12  gave Corizon a week's notice, obviously those patients that

13  were scheduled there had to then be put back into the pipeline

14  to get the services from the new contractor.

15         As far as the other services are concerned, it's my      11:30:53

16  understanding that the -- that Corizon is entering into

17  provider contracts or agreements with individual doctors, as

18  opposed to like the group -- like Ironwood Physicians

19  Associates type of thing, to try and build a bigger base of

20  availability.  So they're undertaking that process and working  11:31:26

21  with some of the ADC personnel to identify some doctors that we

22  can get plugged in on an as-needed basis to fill these gaps.

23         So that's pretty much the information that I have at

24  this point.  And maybe Mr. Struck's got some additional

25  information.                                                    11:31:50

CV-12-601-PHX-DKD – January 18, 2018

1        MR. STRUCK:  With respect to the -- there was -- I

2   think at the hearing last month there was a concern about a

3   list of folks who were scheduled to be seen by the AON group.

4   They have all been scheduled.

5        And the facilities affected by the loss -- or the                    11:32:09

6   bankruptcy of that, and now Ironwood has now taken over, are

7   Eyman, Florence, Perryville and Tucson.  All of those folks

8   have been scheduled with various providers, some through

9   Ironwood, some through Maricopa County Integrated Health

10  Services, and some through Virginia Piper.                                 11:32:31

11       So there isn't anybody who isn't scheduled to see an

12  oncologist that -- they're no longer being affected by the loss

13  of that contract as a result of the bankruptcy.

14       THE COURT:  Does your information include the time of

15  when they'll be seen?                                                      11:32:50

16       MR. STRUCK:  It does.  And I can -- I just received

17  this, I can provide it to the Court and counsel.

18       THE COURT:  Can you give me what the -- the ones that

19  are before you, what's the one that's farthest into the future?

20       MR. STRUCK:  Okay.  Let's see.  Most of them are           11:33:05

21  January.  There's one dated February 22nd, looks like the one

22  that's the furthest out.  But some of them have already

23  occurred.  Some of them occurred in December.  Some have

24  already occurred that occurred in January.  Almost all of them

25  are in January.  There's only one, two, three, four out of this   11:33:35

1    list that I have that are actually scheduled for February.  The

2    rest have either occurred already or are in January.

3                THE COURT:  Thank you.

4                And in the three other specialty care areas, do you

5    know whether those people are facing a backlog presently or          11:33:57

6    what the status is?

7                MR. STRUCK:  I don't know the answer to that question,

8    but I can find out at the lunch break --

9                THE COURT:  Okay.

10               MR. STRUCK:  -- and report back to you.                   11:34:07

11               THE COURT:  Thank you.  Thank you.

12               Miss Kendrick?

13               MS. KENDRICK:  I would just first want to know how

14   many patients are on that list that are affected that are now

15   scheduled but haven't been seen yet.                                 11:34:18

16               THE COURT:  Well, Mr. Struck said he could provide you

17   with the list, so that will answer that question.

18               MS. KENDRICK:  Sorry.  I thought he had a list in

19   front of him.

20               THE COURT:  He does.  He said he could provide you --    11:34:29

21   I thought I heard him say that he could provide --

22               MR. STRUCK:  Yeah, I'll -- I will provide them with a

23   list.  It might take me a couple minutes to figure out who

24   hasn't yet been seen.  But I have all the dates here.

25               THE COURT:  Okay.                                        11:34:44

67

—— CV-12-601-PHX-DKD – January 18, 2018 ——

1        MR. STRUCK:  If the Court would like me to do that, or

2   I can just provide them the list.

3        THE COURT:  I think the list is all right.

4        MS. KENDRICK:  Yeah.

5        MR. STRUCK:  Okay.  All right.                                11:34:53

6        THE COURT:  Thank you.

7        MS. KENDRICK:  So we would just observe that, you

8   know, February 22nd when we're talking about oncology is still

9   quite a ways out, especially if these people were in the midst

10  of treatment and haven't been seen since December 1st when AON    11:35:06

11  went bankrupt.

12        So on that note, we have been trying to do some

13  research into that.  And as you might recall at the last

14  hearing, Miss Eidenbach searched the Bankruptcy Court's docket

15  and was looking at it, and we checked again, looking for the      11:35:26

16  name Arizona Oncology on the bankruptcy docket for Arizona

17  Bankruptcy Court.  The most recent bankruptcy we could find

18  using those two words, not even the word "Network," was 2014.

19        So we're a little confused about that.

20        Also in our research we discovered there's actually          11:35:44

21  two entities called Arizona Oncology Network.  There's one that

22  appeared to be a small medical practice with two doctors, and

23  then there's another network called Arizona Oncology Network

24  which is across the state as part of the United States Oncology

25  Network and is owned and operated by the McKesson Corporation.    11:36:04

Case 2:12-cv-00601-ROS   Document 2641-1   Filed 02/23/18   Page 513 of 634

68

CV-12-601-PHX-DKD – January 18, 2018

1        And so to the extent counsel can tell us which Arizona

2   Oncology Network they were using, we could possibly try to

3   figure out what happened, and how they had a contract with just

4   one provider and that provider giving them one week's notice

5   threw everything into a tailspin.                          11:36:24

6        THE COURT:  Well, the first question is one that we

7   can easily redirect and ask if anybody in the courtroom happens

8   to know which entity it was, this McKesson subsidiary or this

9   other two-person operation.

10       (Discussion off the record between defense counsel.)   11:36:41

11       MR. BOJANOWSKI:  It was the United States Oncology

12  Group.

13       THE COURT:  Okay.  All right.  That's not one of the

14  ones you mentioned?

15       MS. KENDRICK:  No, that is the one.  It's just a       11:36:56

16  little surprising, because McKesson is a multibillion dollar

17  S&P 500 corporation based in actually San Francisco.  So it's a

18  little alarming that this network went bankrupt, given the

19  breadth of services that it offers across the state to

20  nonprisoners.                                               11:37:14

21       THE COURT:  I'm not begrudging your effort to inquire

22  into the underlying facts associated with what has been

23  represented, and that is a bankruptcy.  That's perfectly fine,

24  you can do that.

25       But what I guess -- what I think is more important to   11:37:25

1    focus on is just the thin margin that seems to be operating at

2    every level here.  And that is that on the best day we don't

3    seem to meet our goals, and so when bad things happen, when

4    bumps happen in the road, as you say, it completely upsets

5    everything and creates this really catastrophic situation where    11:37:43

6    people who need emergent care aren't getting it.

7            You would like to think that there was some kind of

8    mechanism in place where they would be ready set to be able to

9    move into that standby position.  But the general sense I have,

10   and it is always because of just reading these Performance    11:38:01

11   Measures where you would think that basic things would be done,

12   and they're not done, and then it's explained to me that

13   they're devoting more people to try to tell them what they're

14   supposed to do, and then have people supervising it.

15           It does leave one with the impression that everything    11:38:16

16   is operating on sort of a barebones operation, that if on any

17   given day something unforeseen happens that the whole thing has

18   cast asunder.

19           Now I have heard that people have been rescheduled,

20   and so you'll take a look at the list.  And again, I think it    11:38:34

21   is part of the Stipulation to be concerned about -- about this.

22   And so it's a relevant inquiry.  But the overall impression is

23   one that adds to the Court's concerns with respect to whether

24   or not the whole thing is just too flimsy.

25           MS. KENDRICK:  The other Measure, Performance 50 at    11:39:08

1   Tucson, this was included on the filing on the 12th, docket

2   2535-1.  It's at page 112.  It's not included in last night's

3   filing.

4           But what was filed on the 12th showed that it was at

5   76 percent at Tucson.  And the note stated that this was being        11:39:31

6   formally rebutted because the score resulted from a charting

7   error.  An outside referral or diagnostic service was

8   originally requested, but that request was canceled.  However,

9   the cancellation was not indicated in the record.  After the

10  rebuttal process, this Performance Measure should be in                11:39:54

11  compliance.  For these reasons, the existing Corrective Action

12  Plan will be utilized.  Corizon will reevaluate the need for a

13  supplemental plan based on the results of the rebuttal.

14          And so I guess our first question is, if it's at 76

15  percent, was there one file or multiple files that had a              11:40:13

16  charting error?  Because it seems that if it was just one it

17  wouldn't suddenly get the compliance level to go from 76

18  percent to 85 percent.

19          And I say that because it's not just a handful of

20  files reviewed.  In October for Tucson for this Performance           11:40:31

21  Measure the monitors measured 43 files.  So assuming it's

22  roughly comparable month to month, it doesn't seem that going

23  from -- switching one from non-compliant to compliant would

24  make it go from 76 to 85 percent.

25          So that is our first observation and concern, is that          11:40:52

 1    while this says an outside referral, that it was more than one

 2    referral that was canceled.

 3          And we are concerned about the fact that a referral

 4    request was being canceled in light of what Dr. Watson alleged

 5    in the KJZZ story about -- and the e-mails instructing her to        11:41:10

 6    cancel requests for specialty care because they were going to

 7    get nailed with a hundred bucks -- a thousand bucks fine.

 8          So, again, this Corrective Action Plan for Performance

 9    Measure 50, which was included and then was taken out in last

10    night's filing, raises a multitude of questions and concerns        11:41:32

11    for us.

12          THE COURT:  Well, you asked a general question and

13    specific questions.  I'll ask Mr. Bojanowski if he has at hand

14    any responses to that.

15          MR. BOJANOWSKI:  Well, I don't have any specific             11:41:45

16    responses.  But the reason it was removed is because at the

17    last hearing plaintiffs were complaining about the addition of

18    Performance Measures which there was no finding by the Court of

19    substantial non-compliance.

20          This was one of those findings where the Court has not        11:41:59

21    ruled that it is substantially non-compliant, and that's why it

22    was removed.  So there's not some nefarious thing going on

23    here, as the plaintiffs would like you to believe, it was

24    simply because I wanted to remove all this extraneous material

25    that the plaintiffs were complaining about from this document.      11:42:17

1    And that was one of the Measures where the Court has never made

2    a finding of substantial non-compliance.  That's why it was

3    removed.

4         MS. KENDRICK:  Let's be clear, when plaintiffs were

5    raising that point, it was with regard to Performance Measures        11:42:30

6    for which there had never been a notice or a motion or a

7    finding, things showing 100 percent compliance at Douglas with

8    Performance Measure 19, things like that.

9         This Performance Measure is part of the motion to

10   enforce that is pending with the Court.  And we had requested      11:42:48

11   that defendants provide the scores and the Corrective Action

12   Plan for those Performance Measures within our motion that was

13   filed on January 4th.

14        THE COURT:  And do you have any more current

15   information on this Performance Measure?                           11:43:05

16        MR. BOJANOWSKI:  Aside from the score, I do not.

17        MS. KENDRICK:  Is the score still 76 percent?

18        MR. BOJANOWSKI:  It is.

19        THE COURT:  And I don't think Mr. Bojanowski has any

20   of the specifics that you asked about, so I don't see how we       11:43:33

21   can get more on that here now.

22        MS. KENDRICK:  Well, hopefully we will get the CGARs

23   and we can take a look at the files that were reviewed for this

24   Performance Measure.

25        So the next one that I wanted to just raise again is          11:43:53

1    Performance Measure 51 at Florence.  Florence, along with Eyman

2    and Tucson for this Measure, which is routine specialty

3    consults are scheduled and completed within 60 days, are part

4    of the Court's Order to Show Cause.

5            Non-compliance is shown again for Florence, and the                11:44:13

6    basis for the non-compliance for routine consults is the same

7    as what was listed that we discussed before for Performance

8    Measure 50.

9            But I guess what is of some concern or confusion to us

10   is that it appears that with this Performance Measure other                11:44:34

11   institutions, for example, Eyman and Perryville and Tucson,

12   have gotten it together and pulled it above 85 percent.

13           And so it's a little unclear to us if there is really

14   a state-wide shortage, how come Florence isn't able to perform

15   at the same level that the other institutions have been able                11:44:59

16   to?

17           MR. BOJANOWSKI:  I can't speak to that, Your Honor.  I

18   don't know the specifics as to why Florence dropped from a 96

19   percent last month to an 82 percent.  The reasoning given to me

20   by Corizon was there was some issues with regard to the                     11:45:14

21   providers, similar to what we had with the previous Measure 50.

22   Because it's essentially the same Measure just under a

23   different timeframe.

24           THE COURT:  Okay.

25           MR. BOJANOWSKI:  And I would note Florence was one of              11:45:36

```
 1   the facilities that was subject to the AON bankruptcy

 2   situation, so that may have had an impact on that.

 3              THE COURT:  Okay.

 4              MS. KENDRICK:  So the next one that we want to talk

 5   about is Performance Measure 52 at Eyman.                        11:46:08

 6              And this Performance Measure continues to be

 7   substantially non-compliant, and went from 35 percent to 36

 8   percent.  And then on page 136 of last night's filing they

 9   state that the reason for the non-compliance was that the two

10   new providers were unfamiliar with the eOMIS system.            11:46:36

11              We certainly hope that that would address the issue.

12   But, again, we're concerned that, given the chronic

13   non-compliance, that there needs to be some sort of

14   supplemental Corrective Action Plan beyond showing providers

15   how to use eOMIS.                                               11:46:57

16              THE COURT:  You just wouldn't expect it to happen

17   where you would put people in a position where their services

18   are critically needed and they don't understand the environment

19   that they're working in.

20              Again, we don't know what the circumstances are of   11:47:16

21   this particular case.  And we will hear from Dr. Watson about

22   whether or not what she said out of court is something that can

23   withstand the test of the adversary process in court with

24   respect to her saying how her training was truncated.

25              But, again, a logical conclusion would be if you have 11:47:36
```

CV–12–601–PHX–DKD – January 18, 2018

1    a great amount of turnover, if you have a great amount of

2    moving one people over –– one person over to do another job,

3    the other people who's covering for that person who's been

4    moved need training, and if there's not time to be trained

5    because it's an emergent situation with respect to the moving,    11:47:52

6    it really does become sort of a Whac-A-Mole game where people

7    are left not able to clear their field of the moles just

8    because there aren't enough people to do that.

9          But go ahead.

10         MS. KENDRICK:  And the Florence institution has    11:48:10

11   improved, but it's still below compliance at 79 percent, and

12   was part of your Order to Show Cause.  And so we hope that the

13   real-time tracking of all of the incidents in December will

14   reflect improvement.

15         The next one is Performance Measure 54 at Eyman, which    11:48:30

16   is about patients with chronic diseases being seen as specified

17   no less than every 180 days.

18         And on page 144 of last night's filing the basis for

19   non-compliance is that there was a backlog of patients.  And as

20   of January 4th there is no longer a backlog because the    11:48:54

21   institution utilized, quote, additional resources in November

22   2017.  And it states that these resources, quote, included a

23   combination of providers from other facilities and those from

24   this facility who worked extra days.  Providers will continue

25   to utilize these additional resources as necessary moving    11:49:15

UNITED STATES DISTRICT COURT

CV–12–601–PHX–DKD – January 18, 2018

1    forward so as to maintain a zero backlog, close quote.

2         And our concern is that pulling people from one prison

3    to another to help on a backlog and having people work overtime

4    is not a sustainable approach to ensuring sustained compliance

5    with the Stipulation.                                          11:49:37

6         And we've talked about that before, about the -- and

7    the concern that we have is that, you know, in November 2017

8    they pulled providers from other institutions to come help out

9    at Eyman.  What does that mean for other institutions a month

10   later?  You know, are you going to see a ripple effect around   11:49:57

11   the system?

12        THE COURT:  Well, what you say makes logical sense in

13   general.  We'll see whether or not in the specifics of this

14   prison system it's true or not, because Mr. Millar will help

15   with that.                                                      11:50:12

16        MS. KENDRICK:  And I believe also Eyman is part of

17   your OSC as well.

18        So the next Measure I want to talk about is

19   Performance Measure 66, which is about provider rounds

20   occurring every 72 hours in the infirmaries.                   11:50:45

21        And Florence, Lewis and Tucson were part of the Order

22   to Show Cause.  And we're glad to see that this month they did

23   show improvement above compliance levels at the three

24   institutions.  We, however, reiterate the concern that we

25   raised a few months ago about the fact that these provider      11:51:12

1    encounter notes apparently are being opened in eOMIS in such a

2    way that they're always precisely on the hour.

3            We plan to possibly use our expert at the evidentiary

4    hearing to talk about his opinion of this type of record

5    keeping, because we have consulted with him, and he states he's        11:51:34

6    not aware of electronic health record systems where you can go

7    back and manipulate and open a note at a certain time.

8            And so while we certainly hope that this is reflective

9    of reality, and I understand that they started a rule of seeing

10   them every 48 hours, we do have some concerns about the actual        11:51:51

11   accuracy of the underlying information that is placed in the

12   patient's medical record.

13           THE COURT:  As Ronald Reagan said, trust but verify.

14           MS. KENDRICK:  And finally, we have Performance

15   Measure 67 for Florence, Perryville and Tucson in our pending          11:52:19

16   motion.  And we would just request that counsel provide those

17   numbers for us.

18           THE COURT:  Do you have that, Mr. Bojanowski?

19           MR. BOJANOWSKI:  I do.

20           You said 67, Corene?                                           11:52:32

21           THE COURT:  Yes.

22           MS. KENDRICK:  Yes.

23           MR. BOJANOWSKI:  For what facilities?

24           MS. KENDRICK:  Florence, Perryville and Tucson.

25           MR. BOJANOWSKI:  Florence is at 90 percent.                    11:52:40

1    Perryville is at 90 percent.  And Tucson is at 90 percent.

2            MS. KENDRICK:  Thank you.

3            MR. FATHI:  Your Honor, I will be taking over for

4    Miss Kendrick.

5            As Miss Kendrick said, there were a number of                11:52:58

6    Performance Measures that the defendants have been reporting on

7    monthly through December of 2017 which were then deleted from

8    the chart that was filed last Friday at document 2535-1.  And

9    then there were some Performance Measures that were in that

10   chart filed last Friday but disappeared from the chart that was   11:53:18

11   filed last night.

12           So -- and these deleted Performance Measures include

13   those where the Court has made a finding of non-compliance, and

14   also some additional Performance Measures where there is

15   current non-compliance and a remedial plan in place.                11:53:33

16           So, among other things, I'm going to be asking about

17   that.

18           First is Performance Measure 81 at Lewis and Tucson.

19   These were both found non-compliant in the Court's order

20   document 1709.  Tucson was also non-compliant last month, but     11:53:54

21   they are absent from last night's filing.

22           So we would ask, number one, that they be included

23   going forward.

24           And secondly, we'd ask for current numbers.

25           MR. BOJANOWSKI:  Your Honor, I'm looking at document       11:54:14

1   1709, Performance Measure 81 is not included as a finding of

2   the Court.  I would be more than happy to give the numbers, if

3   counsel so desires.

4          THE COURT:  I think he probably would like those

5   numbers.                                                    11:54:30

6          MR. FATHI:  I would.  Thank you, Your Honor.

7          MR. BOJANOWSKI:  For what facilities?

8          MR. FATHI:  For Lewis and Tucson.

9          MR. BOJANOWSKI:  Lewis would be 97 percent.  And

10  Tucson would be 93 percent.                                 11:54:38

11         THE COURT:  Thank you.

12         MR. FATHI:  Your Honor, we will obviously correct what

13  appears to be an erroneous statement that I made.

14         With Performance Measures 85 and 86, we would just

15  point out that there remains a pending dispute over the correct  11:54:56

16  monitoring methodology for those Performance Measures.

17         THE COURT:  Understood.

18         MR. FATHI:  Performance Measure 86 at Tucson was

19  non-compliant last month.  That is document 2506-2 at page 93.

20  There was a Performance Measure -- excuse me, a Corrective    11:55:29

21  Action Plan in place, but it's omitted from this month's

22  report.  So we would like that number, please.

23         MR. BOJANOWSKI:  Your Honor, we would note that that

24  Measure has not been found by the Court as being substantially

25  non-compliant under any of its orders.                      11:55:50

1           That would be Performance Measure 86, Mr. Fathi?

2           MR. FATHI:  At Tucson.

3           MR. BOJANOWSKI:  At Tucson.

4           MR. FATHI:  Which was non-compliant last month, and as

5   I said there was a Corrective Action Plan in place.            11:56:00

6           MR. BOJANOWSKI:  Fortunately it is compliant this

7   month at 86 percent.

8           MR. FATHI:  I'm sorry, what?

9           MR. BOJANOWSKI:  Eighty-six percent.

10          MR. FATHI:  Thank you.                                  11:56:08

11          THE COURT:  Thank you.

12          MR. FATHI:  Next is Performance Measure 91, which in

13  last night's filing is at document 2540-1, page 171.  And this

14  is Performance Measure 91 at Phoenix.

15          This involves prisoners who are classified MH-5 who     11:56:42

16  are actively psychotic or actively suicidal being seen by a

17  mental health clinician or a mental health provider daily.

18  These are the most seriously mentally ill people in the entire

19  system.

20          The current month's compliance rate is 60 percent.  It 11:57:01

21  has been non-compliant for five of the last seven months, and

22  so that is by itself cause for serious concern.

23          But also there are a number of errors in the

24  Corrective Action Plan that we discussed at last month's

25  hearing, which defendants admitted were errors.  And those     11:57:23

—— CV-12-601-PHX-DKD – January 18, 2018 ——

1    errors have unfortunately not been corrected this month.

2           That discussion was in the December 20th transcript at

3    pages 86 to 89.

4           First of all, this contains, again on page 171, a

5    Corrective Action Plan dated November 6th, 2017.  The          11:57:45

6    defendants confirmed at last month's hearing that that plan was

7    subsequently withdrawn and replaced by one dated November 14th,

8    and that that was the operative plan.  Mr. Struck said, quote,

9    the November 14th update did not make it into this particular

10   document, so the November 14th is the correct Corrective Action  11:58:07

11   Plan.

12          But here again, we still have the November 6 plan, no

13   sign of the November 14th plan, which is the correct one.  So

14   we'd like to know why that is.

15          MR. BOJANOWSKI:  I don't know.  I simply have no          11:58:25

16   information on that.  As you know I was not here last time, and

17   frankly I didn't go back and check the transcript.  But I can

18   certainly take care of that.

19          I mean, this document is primarily my responsibility,

20   so I apologize to the Court that that was not included.  But    11:58:45

21   certainly I can make note of Mr. Fathi's complaint here and see

22   that I include that additional language in in my next report.

23          THE COURT:  Thank you.

24          MR. FATHI:  And another error that we discussed last

25   month that has -- that remains uncorrected, in paragraph 7 on   11:59:09

—— CV-12-601-PHX-DKD – January 18, 2018 ——

1  page 172, it says, quote, the MH lead will assign a licensed MH

2  clinician slash RN to conduct the watch in a confidential

3  setting, end quote.

4      We discussed this last month.  The defendants

5  acknowledged that the clinician or the RN doesn't conduct the      11:59:34

6  watch, that's done by security staff, and that that was an

7  error, and yet this error remains uncorrected and.  Again, we'd

8  like to know why.

9      THE COURT:  Well, Mr. Bojanowski will take a look at

10  that and he'll let you know.                                       11:59:51

11      MR. BOJANOWSKI:  I'm sorry, Your Honor, I was trying

12  to get clarification --

13      THE COURT:  Go ahead.  No, what I said is -- were you

14  able to hear what Mr. Fathi was saying?

15      MR. BOJANOWSKI:  Yeah, it's apparently maybe a typo or      12:00:03

16  something like that that he's concerned about.  And, you

17  know --

18      THE COURT:  We just need to make sure that we get it

19  right.  And so --

20      MR. BOJANOWSKI:  I can certainly --                           12:00:12

21      THE COURT:  Okay.

22      MR. BOJANOWSKI:  -- go back and look at it.  I mean,

23  if there are these kinds of issues that are there, I mean, if

24  Mr. Fathi wants to send me an e-mail and say, hey, would you

25  correct this, as opposed to sitting in court and spending time    12:00:24

 1  going through this, I mean, that would probably be more

 2  efficient.

 3          THE COURT:  Right.  I agree.  But it's a little bit

 4  hard for him to do that when it comes across a transom at 8:00

 5  o'clock at night the day before the hearing.                    12:00:40

 6          MR. FATHI:  And more fundamentally, Your Honor, these

 7  specific errors were discussed at the hearing last month.  The

 8  defendants agreed they were errors, said they would correct

 9  them, and then they didn't.

10          THE COURT:  Okay.  Well, good of you to follow up on   12:00:52

11  it.

12          It's the noon hour, we'll break.  We have --

13          MR. FATHI:  Your Honor, if I may, I have one more

14  question about this one.  May we just finish that?

15          THE COURT:  Surely.                                    12:01:01

16          MR. FATHI:  And then there's a new -- what appears to

17  be a new error in paragraph 6.

18          THE COURT:  Which -- on what page?

19          MR. FATHI:  I'm sorry, page 172 --

20          THE COURT:  Thank you.

21          MR. FATHI:  -- of paragraph 6.

22          THE COURT:  Okay.

23          MR. FATHI:  Quote, the MH lead slash designee will

24  review and verify in eOMIS each inmate on watch contact was

25  seen in a confidential setting.                                12:01:19

84

1          What is an inmate on watch contact?

2          THE COURT:  Sounds like there's a missing word there.

3    Take a look and see if it needs to be amended, Mr. Bojanowski,

4    and let Mr. Fathi know.

5          MR. FATHI:  Your Honor, I must say --                        12:01:33

6          MR. BOJANOWSKI:  I'll go back and look -- I'll go back

7    and look at the transcript and address each of Mr. Fathi's

8    concerns.

9          THE COURT:  Okay.  Thank you.

10          So we have Mr. Millar scheduled for 1:30.  So I would        12:01:42

11    suggest that we come back at 1:30 and we take him up then.  And

12    we'll take a lunch break then between now and then, give people

13    a chance to do what they need in terms of filling in some of

14    the blanks that we've identified the last couple of hours.

15          Thank you.                                                   12:02:01

16      (Recess at 12:02 p.m., until 1:33 p.m.)

17          THE COURT:  Mr. Millar, you're on the phone?

18          MR. MILLAR:  Good afternoon, Judge.

19          THE COURT:  Good afternoon, sir.

20          I think before we turn it over to you to give you the        13:33:22

21    floor for the update, we should tell you that in the morning

22    session that we rescheduled something that I told you about

23    last time that we talked.  And that is a hearing where we were

24    going to consider issues associated with the monitoring

25    program, and some of those issues could touch upon staffing.      13:33:44

1    And so the 9th of February had been a time I think
2  that you had identified as when you would be in attendance.
3  But we have rescheduled that now until the end of the month, on
4  the 26th, I believe.  I don't have it in front of me.  To the
5  26th of February.  And we've granted additional time for the     13:34:05
6  discovery that will be necessary for that hearing.
7    I just wanted to give you that heads up and mention it
8  now at the outset so I didn't forget.
9    MR. STRUCK:  Your Honor, I think it's the 27th.
10    THE COURT:  It's the 27th.  Thank you.              13:34:19
11    MR. MILLAR:  I appreciate that.
12    THE COURT:  The 27th is the rescheduled date.
13    All right, sir, you may proceed.
14    MR. MILLAR:  I think one follow-up question I would
15  have is that we were scheduled to give an update on this         13:34:30
16  project on the 27th as well.  With your change in itineraries,
17  will that still allow the 30 minutes or so to give our update
18  during that same time?
19    THE COURT:  Yes, sir.  Yes, we'll make sure.
20    MR. MILLAR:  Very good.                              13:34:47
21    Very good.  Just to validate, you are seeing the
22  slides in the courtroom; is that correct, Judge?
23    THE COURT:  We are, as well as a dialogue box off to
24  the right that's obscuring part of the slide.  I don't know
25  whether you intend for us to see that.                           13:35:01

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1      MR. MILLAR:  I think that may be one that you need to

2  shrink on your side.  There should be a small arrow that will

3  allow you to close that on your end.

4      THE COURT:  Got it.

5      We just did.  Thank you.                              13:35:13

6      MR. MILLAR:  Okay.  Very good.

7      Fairly straightforward agenda.  We'll give you project

8  and status update using our driver diagram.  We'll go over the

9  project work streams in a single page.

10     And then the main areas we'd look to focus on is an      13:35:30

11 update on the data request of items and status.  And then we

12 have initiated our market profiles, want to talk through what

13 we have there and confirm a modification that we would like to

14 make from what was proposed in the original engagement letter.

15 And then we would go over next steps.                       13:35:52

16     Is there anything else that anyone in the court

17 believes should be added in addition to the items listed here?

18     THE COURT:  Counsel?

19     MS. KENDRICK:  No, sir.

20     MR. STRUCK:  Your Honor, the only issue that -- it's   13:36:04

21 actually been raised by Corizon.  They've started to produce

22 documentation to the Advisory Board, but they raised concerns

23 about the confidentiality of some of the information that has

24 been asked for.

25     I am assuming that the Advisory Board, as the Court's  13:36:19

UNITED STATES DISTRICT COURT

1    expert, falls under the purview of the protective order, but I

2    wanted to confirm that and make sure that that's the Court's

3    view as well.

4         THE COURT:  Well, that is my view.  And I think it's

5    consistent with what we've heard from Mr. Millar before.  But    13:36:36

6    let me ask him that question directly.

7         Do you understand the issue that Mr. Struck on behalf

8    of the defendants have raised, with respect to an issue that

9    Corizon has raised, of concern that they wish to be assured

10   that the protective order that can be applied in this case, if   13:36:52

11   it is implied on these items of information that are provided

12   to you, that you would treat them in accord with that

13   protective order.

14        MR. MILLAR:  I do understand.  And it does not vary

15   greatly from other issues we have to deal with for HIPAA         13:37:09

16   compliance with some of our other health care vendors and with

17   similar type engagements.

18        And so I think the information that they're sensitive

19   to is around compensation and other elements.  My team works

20   very carefully to make sure that anything that's presented       13:37:26

21   publicly is blinded or vetted prior, to ensure that we don't

22   violate any of those protections that are in place.

23        THE COURT:  Very well.

24        Then there's no other comment from this side.  So go

25   ahead, sir.                                                      13:37:43

CV-12-601-PHX-DKD – January 18, 2018

1           MR. MILLAR:  Okay.  I can move forward.

2           Again, this is the driver diagram tool that we refer

3     to.  This is a look of the entire project.

4           Is this large enough in the court's screen to read --

5           THE COURT:  Yes, everybody can see it because they        13:37:58

6     have it on the screen, but also they have it on the monitors in

7     front of them.  So I think everybody can make it out.

8           Is that not true, Mr. Bojanowski?

9           MR. BOJANOWSKI:  I have bad eyes, Your Honor.

10          MR. STRUCK:  It's right here.

11          MR. BOJANOWSKI:  Yeah, but even with my glasses --

12    that's okay.

13          MR. MILLAR:  Okay.  If it would be helpful, we could

14    ensure that the printed copies are provided in the future if

15    that's needed.  But please let us know if that would be --       13:38:22

16          THE COURT:  If that's handy, that probably for the

17    future would be helpful.  It just so happens that the

18    transmission that results in the image on our screens in front

19    of us, both I think at counsel table, judging from

20    Mr. Bojanowski's squinting, and from the one that I see here,    13:38:39

21    it looks like it does get fuzzy a little bit.  And so if we

22    could have in advance the hard copies that might be handy.

23          Or did you find a way to make it sharper?  The

24    plaintiffs have tinkered.

25          No.  Okay.                                                 13:38:53

CV-12-601-PHX-DKD – January 18, 2018

1          All right.  Go ahead, sir.

2          MR. MILLAR:  We will do that next time.

3          The other thing, because we are planning to be on-site

4    in February, is we will at least be able to see what the output

5    is on your end to see if there's anything we can do to improve        13:39:06

6    the projection process when we're not on-site.

7          THE COURT:  Okay.

8          MR. MILLAR:  So as we look at the four main areas that

9    we're working on, project initiation, and then the three

10   primary work streams, we have completed much if not all of that       13:39:21

11   first section.

12         The one item that is still in green under project

13   initiation is development of the project management driver

14   diagram.  You are seeing the output of that.  And if there are

15   no substantive changes that come out of our conversation today,       13:39:37

16   then we will have completed that initiation component of the

17   engagement.

18         The three then below are our primary work streams.

19   Those are all in a green status now as we are early on in going

20   through the analysis of the data that we have access to and the       13:39:55

21   gathering of the data for your facilities.

22         So at this point in time we do not see any concerns

23   with that.  As we get to our slide later where we talk more

24   specifically of the data requests and collection, we'll have

25   some specifics to talk around that.                                   13:40:14

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1          But at this point all black are green, would mean that

2    we're in a good place and on track with our current work plan.

3          I'll pause there and ask if there are any questions,

4    even to just orient to this page.

5          THE COURT:  Any questions?                          13:40:30

6          I see none.

7          MR. MILLAR:  Okay.  Good.

8          Then moving on.  Again, this engagement scope breaks

9    down into three work streams.  We are focused right now on

10   Work Stream No. I and Work Stream No. II.                 13:40:46

11         The market profiles and compensation benchmarks, those

12   are elements that we are producing based on resources that we

13   have and don't have any dependencies on the data that we're

14   gathering from your teams.

15         Work Stream No. II is the facility profiles and        13:41:04

16   baselines, and that is where we are working on the data request

17   at this point in time, and aligning those facilities with our

18   market-based definitions.

19         These two as they near completion will lead into

20   Work Stream III.  So we put that up as reference.          13:41:23

21         And then the next slide gives you the timeline

22   perspective on where we are.

23         So at the very beginning in January, initiating those

24   elements with this current call today.

25         As we look towards the February time frame, with the   13:41:39

CV-12-601-PHX-DKD – January 18, 2018

1   information we've received at the beginning of this call, we

2   will be there on the 27th.  I anticipate that we'll be -- I'll

3   bring myself and both of my team members at that point in time

4   for both the hearing and then to give our update at that point.

5          Assuming that we will continue to get the information,     13:42:01

6   we do have a portion of that from Corizon, with the rest of

7   those we'll also have some initial looks at the facility

8   analysis that we can begin vetting and getting some direction

9   or feedback there.

10          We will also in that interim be able then to produce     13:42:18

11   the interview request lists for those, and we'll be able to

12   give an update on that process as well.

13          Any questions regarding our timeline currently?

14          THE COURT:  I see none.

15          MR. MILLAR:  Okay.  Then we'll move forward.     13:42:39

16          I'm going to turn this over to Rene Sobolewski of my

17   team, who is heading up our data gathering and analytics

18   process, and let her give the update on the data requests.

19          MS. SOBOLEWSKI:  Sure.  Thanks, BJ.

20          So we had sent out the data requests a couple of weeks     13:42:58

21   ago and had a phone call with many of the parties to discuss

22   some of the line items in this, and talk about the process for

23   data gathering.  We use a folder system called Box, which is a

24   secure site.

25          So far I've received some e-mail from -- documents     13:43:14

UNITED STATES DISTRICT COURT

1    from Corizon on benefits packages, as well as staffing from

2    2015 to 2017.

3         The one ask I'd make is that we get some of these

4    files in Excel format or Word so they're electronic and we're

5    able to manipulate.  This way we are not, you know, entering          13:43:36

6    data which is increasing the likelihood of entering incorrect

7    data.  We want to make sure that this is as accurate as

8    possible.  And it will also increase the speed of our

9    deliverable if we're able to get them in electronic format.

10        Is that something that you all think that you can          13:43:53

11   accommodate?

12        THE COURT:  Well, let me ask if anybody here in the

13   courtroom knows on the defendants' side whether that's

14   something that's possible.

15        MR. STRUCK:  I'll have to check with the -- Corizon on     13:44:02

16   that.  Because the lion's share of the information is coming

17   from them.

18        THE COURT:  Do you have a contact that you can address

19   this question to, Miss Sobolewski, at Corizon?  So that you

20   feel that there's somebody when you have a question about this    13:44:19

21   kind of thing, and that is the mechanism for the transfer of

22   information, that there's somebody that you can -- it seems

23   like that would be a helpful thing and that people wouldn't

24   object to that in the first instance, rather than having you

25   pose the question in an environment where there's not likely to   13:44:36

CV-12-601-PHX-DKD — January 18, 2018

1    be somebody who can answer the question.

2         MS. SOBOLEWSKI:  Absolutely.  I will reach back out to

3    the person who sent me the data.  I just wanted to make it

4    clear to anybody in the room that might be part of the data

5    request.                                                    13:44:50

6         But, yes, we will handle that.  And it's not something

7    that we had mentioned in the past, so just something to think

8    about going forward.

9         THE COURT:  Okay.

10        MS. SOBOLEWSKI:  I --                                  13:44:57

11        THE COURT:  And as always, if you run into difficulty,

12   just feel free to communicate with the Court staff and we can

13   get everybody on the phone together and I can address it.

14        MS. SOBOLEWSKI:  Great.  Will do.

15        Other than a few of the documents from Corizon I        13:45:10

16   haven't received anything else yet.  But we did set a deadline

17   of middle of next week, so we are still expecting to receive

18   data.  We will make sure that we're following up with all

19   parties.

20        I think that everybody has received the invitation to   13:45:25

21   that website I talked about, Box.  And I think so far I've

22   heard no difficulties.  So anybody has difficulties, feel free

23   to reach out.  But we can always set up another phone call to

24   work through that and make sure that we have, like you said,

25   the secure transfer of files and making sure everything is    13:45:41

—— CV-12-601-PHX-DKD – January 18, 2018 ——

1    confidential.

2            THE COURT:  Okay.

3            MR. MILLAR:  Very good.

4            Moving forward, I'm also going to have Rene speak

5    about this.  She has taken on the task of organizing from an          13:45:59

6    analysis standpoint the regions.  This is the part where we're

7    slightly different.

8            As we went to look at the counties as the main grouper

9    for these facilities and how we would look at the markets, we

10   recognized that there were seven counties that the State              13:46:19

11   facilities resided in, not eight.  And want to just confirm

12   with the Court that this grouping would be acceptable for

13   everyone going forward for our comparison.

14           THE COURT:  I see no objection.  Let me see if any of

15   the counsel have any.                                                 13:46:36

16           I don't think there's any objection to the regrouping.

17           MS. SOBOLEWSKI:  Great.  And that's really -- BJ

18   summarized it well.  That's really what we're looking to

19   confirm today so we can move ahead, taking a county-level

20   approach to benchmarking.  Obviously our benchmarks will be at        13:46:54

21   more of a geographic region perspective.  So like the southwest

22   United States from a compensation benchmark perspective.

23           But for the most part this is how we plan to show your

24   market profiles for disposition demands and some of the other

25   types of data elements that we'll be looking at.                      13:47:09

UNITED STATES DISTRICT COURT

1          So as long as these groupings feel correct and

2     reasonable, then we will move forward this way.

3          THE COURT:  Doesn't seem to be anything inappropriate

4     about these groupings from my perspective.  And, again,

5     whatever grouping mechanism that you find is most useful for          13:47:25

6     you in analyzing the data, and also that recognizes the

7     features that are associated with the fact that Maricopa

8     County, that it's the fourth largest county in the country, I

9     think, in terms of land mass.  So it's an enormous area.

10          MR. MILLAR:  And so as we get closer to finalizing          13:47:48

11     this, we will ask that question internally, of whether or not

12     we need to subdivide Maricopa or any of the other areas based

13     on what we're seeing.

14          We are also working from the assumption that Corizon

15     is dealing with each of these facilities on an individual          13:48:06

16     basis, and that they have not grouped them by any type of

17     region or regional grouping or facility grouping.

18          Is that a correct assumption as far as anyone in the

19     court is aware of?

20          THE COURT:  They're checking now.  Let's see if we can          13:48:22

21     get an answer.

22          MR. MILLAR:  Thank you.

23        (Discussion off the record between defense counsel.)

24          MR. STRUCK:  Your Honor, can I get some clarification

25     from Mr. Millar on exactly what they're looking for with          13:48:38

1    respect to what Corizon is doing?

2         MR. MILLAR:  Yeah.  What we're asking is if, for

3    example, we ask for staffing or payroll or other things, would

4    they have grouped the three facilities in Maricopa County under

5    a single entity, or would they show them as the three separate                    13:48:55

6    facilities?  So for business purposes, have they grouped these

7    facilities in some way that might differ from what we're

8    proposing for the markets.

9         MR. STRUCK:  Your Honor, we'll find out the answer to

10   that question and let Mr. Millar know.                                             13:49:15

11        THE COURT:  All right.  I think that, again, this is

12   another area where that communication person at Corizon could

13   answer these kinds of categorical questions on how data is

14   handled.

15        There may be cleavages that could develop as you study         13:49:30

16   the markets that are independent, I think, of how they're

17   treated though by the contractor or by the State, just because

18   markets necessarily won't reflect how people could decide to

19   organize things within their own house.  But in any event,

20   that's something not surprising to you, I'm sure.                                  13:49:51

21        MR. MILLAR:  So just for clarification sake, do we

22   have the latitude to reach out to those that are sending us the

23   information directly from Corizon for questions?

24        The reason I ask is, we have not been in verbal

25   communication with them.  We spoke with counsels early on about         13:50:08

97

1    the data request and offered to be available for follow-up

2    questions.

3            But to this point -- Rene, correct me if I'm wrong --

4    we have not been in phone conversations with any of the Corizon

5    staff.  Is that correct?                                          13:50:25

6            MS. SOBOLEWSKI:  That's my understanding.  I have just

7    received e-mails from them over the past day or two.  But

8    that's the extent of the conversations.

9            THE COURT:  Well, let me tell you what my perspective

10   is.  I've got a defendant in the case who's contracted much of   13:50:38

11   the operations that are at issue in my case.  And so this agent

12   of the State is someone that I can reach through to the

13   State -- through the State.

14           And what I'm trying to do is to identify an efficient

15   way for you all to get these kinds of questions answered.         13:50:56

16   They're questions about how best to get information, how you

17   categorize information, what method works best for you.  You

18   tell us it would be better if it was in Excel or Word, you'd

19   like to be able to talk to someone who is the one who would

20   actually be sending that.                                         13:51:16

21           I think it would make sense for you to have a contact

22   person at Corizon to do that.  And I think it would be in the

23   defendants' interests also to have that happen.  But I'm not

24   going to cut off the opportunity for the defendants' lawyers to

25   be involved in the process.  Though I think that there could      13:51:31

UNITED STATES DISTRICT COURT

1    well be a place in time where people would be comfortable with

2    the information exchange where they would understand it's not

3    at sort of a lawyer level, it's just about how information is

4    kept.

5              And so I do want and would work to make sure that we        13:51:46

6    would have in place a mechanism so that if you did have these

7    kinds of questions, two of which you've identified today --

8    about whether or not there's an internal structure on how

9    Corizon organizes its classification of this information, and

10   also the way that the information is -- has been provided to      13:52:07

11   you, whether it could be provided in Excel or Word -- it would

12   seem to me that those kind of questions, it just makes sense

13   for you to have somebody at Corizon that you can call and ask

14   that.

15             If that works, I think that's the best possible         13:52:20

16   scenario.  If the lawyers feel that they need to be on the

17   line, then the simple thing is that the lawyers for the State

18   just get advised as to when that phone call is going to happen

19   and they're on the phone.

20             But I do think there needs to be this kind of           13:52:33

21   information exchanged.  So I would ask Mr. Struck to take care

22   to make sure that that's put in place.

23             MR. STRUCK:  We will do so.

24             THE COURT:  All right.  Thank you.

25             MR. MILLAR:  Thank you very much.  I think that will     13:52:44

CV-12-601-PHX-DKD – January 18, 2018

1    facilitate the process.

2           What we'd like is that when we reach out to the

3    Corizon folks, if they'd had some instruction or information

4    from the State, that they are able to speak with us, just so

5    that they have some assurance of who we are.  And if we need to     13:52:59

6    provide the names of those that they would be contacting so

7    that they can validate who they are speaking with, we'd be glad

8    to do that as well.

9           THE COURT:  Okay.  Good.

10          MR. MILLAR:  Good.  I think we can move on then, Rene.     13:53:12

11          So just as a final step or wrap up here, we would look

12   at what the immediate next steps are between now and the end of

13   February when we'll be there for our next update, receive and

14   validate the outstanding data.

15          I think having this ability to communicate directly     13:53:32

16   with some of the Corizon folks on the technical questions will

17   help ensure that we get what we need when we need to move that

18   forward.

19          Once we have received the bulk of that information we

20   will be able to generate our interview request list.  This is     13:53:46

21   something that we spoke about on the data request call and I

22   believe on our update a month ago.

23          But we will look at this from kind of a randomized or

24   statistical level.  There won't be large populations to deal

25   from, but we'll be looking based on our market profiles of what     13:54:04

CV-12-601-PHX-DKD – January 18, 2018

1    level of care provider at each of the locations we would like

2    to speak with.  And at some of those sites that may have higher

3    turnover or retention rates, that we might request more of

4    a -- an interview of those prior employees.  I'm just

5    anticipating that some of those we may not be able to contact,          13:54:30

6    depending on if they've left the area or not.

7            That also then being said, the third element was our

8    anticipation of when we would be on-site.  With the change in

9    the hearing to the 27th we'll be able to consolidate that into

10   one trip into Arizona in February.  And we'll look to be there        13:54:48

11   then for pretty much the bulk of that day to participate in the

12   hearing and then to give our update.

13           THE COURT:  All right.  Anything else from counsel?

14           MS. KENDRICK:  No.

15           MR. STRUCK:  No, Your Honor.                                    13:55:07

16           THE COURT:  All right.  Mr. Millar, thank you very

17   much for calling in and for providing us this update.  I'm

18   anxious to have you all get the information that you are

19   looking forward to receiving next week so that you can get

20   started and get your hands into the meat of this problem.              13:55:24

21           Thank you very much.

22           MR. MILLAR:  Thank you, Judge.

23           And we'll commit to have some real information to

24   digest and process the next time we meet.

25           THE COURT:  All right.  Thank you kindly.  Bye-bye.            13:55:38

1     MR. MILLAR:  Bye.

2     THE COURT:  So, Mr. Fathi, before we return to where

3  you were on the Performance Measures, I just wanted to check in

4  to see whether there was anything Mr. Struck or Mr. Bojanowski

5  wanted to provide after the noon break that he hadn't been able          13:55:55

6  to give you informally.

7     (Discussion off the record between defense counsel.)

8     MR. BOJANOWSKI:  We're still waiting on the

9  information, Your Honor.

10     THE COURT:  Okay.  All right.                                          13:56:07

11     Mr. Fathi, you may continue.

12     MR. FATHI:  Thank you, Your Honor.

13     First I'd like to provide some information about the

14  erroneous statement I made before the break that there was an

15  order finding non-compliance with Performance Measure 81 at          13:56:22

16  Lewis and Tucson.

17     Document number 1663 is our motion to find those

18  Measures -- that Measure at those facilities non-compliant.  At

19  the time we filed the motion Lewis had been non-compliant for

20  ten consecutive months, Tucson for seven consecutive months.  I          13:56:44

21  don't think there would be any dispute that under the

22  definition the Court has now adopted, that constitutes

23  non-compliance.

24     But Mr. Bojanowski is correct, that whether it was an

25  oversight or whatever the cause, the order does not reflect a          13:56:59

1    finding of non-compliance.  So that was incorrect and I

2    apologize.

3              THE COURT:  Thank you very much for setting that

4    record straight.

5              MR. FATHI:  All right.  Okay.  Next is Performance          13:57:10

6    Measure 91 at the Winslow facility.  And this is the Measure

7    that requires patients who are on suicide watch to be seen

8    daily by a licensed mental health clinician or on weekends or

9    holidays by a registered nurse.

10             In their January 12th filing the defendants did          13:57:43

11   include results from Performance Measure 94 at Winslow, but

12   then they deleted them from their later filing last night.

13             But if you look at document 2535-1 at page 182, that

14   is the chart for Performance Measure 94 at Winslow.  And you'll

15   see that it reflects a score of 100 percent every month from          13:58:07

16   February through November of 2017.

17             But there are currently no mental health staff at

18   Winslow, and there have been no mental health staff at Winslow

19   since May of 2016.  So we'd like to know how it is that they're

20   complying with this requirement that the patient be seen daily          13:58:31

21   by a licensed mental health clinician.

22             THE COURT:  Dr. Taylor, did you address this before

23   once?  I think that's my recollection.  Could you refresh

24   everyone's recollection?

25             DR. TAYLOR:  Yes.  They have a provider -- I'm sorry,          13:58:47

CV-12-601-PHX-DKD – January 18, 2018

1    a clinician who does telepsychiatry there -- telepsychology

2    there.  If they happen to stay during a day of the week, he

3    will do that contact.  But otherwise if they transfer out,

4    which they fairly often do pretty quickly, and it's a weekend,

5    then it's done by the RN.                                      13:59:07

6         MR. FATHI:  Your Honor, I should have added that we

7    looked at the last few months, and in July of 2017 four files

8    were counted as compliant with Measure 94 at Winslow.  In

9    August it was 11.  In September it was 10.

10        And most of these people were actually there on week    13:59:31

11   days, and so the Performance Measure required that they be seen

12   by a licensed clinician.  So I understand their response to be

13   that in that case they are seen via telepsychology or

14   psychiatry.

15        And has that been the case -- how long has that been     13:59:50

16   the case, I guess, is my next question.

17        THE COURT:  Dr. Taylor, can you answer that question?

18        DR. TAYLOR:  I'm not positive as to when that started.

19   But whenever the coverage is needed, it's covered that way,

20   currently.                                                     14:00:05

21        THE COURT:  So do you have a recollection as to when

22   it was last that there was an on-site provider who was

23   qualified to provide these services at Winslow?

24        DR. TAYLOR:  I'm not sure.

25        THE COURT:  Let's just try to find the answer to this    14:00:22

UNITED STATES DISTRICT COURT

—— CV-12-601-PHX-DKD – January 18, 2018 ——

1    question.

2         DR. TAYLOR:  Six months, maybe.  I can't remember how

3    long it's been.  But they have --

4         THE COURT:  And jumping ahead to the telemedicine

5    issue, Mr. Bojanowski, Mr. Struck, is this also a subject          14:00:31

6    matter that the person that we're going to hear from on

7    telemedicine could also address?

8         MR. STRUCK:  No.  Miss Stover, isn't -- can't address

9    telepsychiatry.

10        THE COURT:  Okay.  All right.  That comes up not only          14:00:49

11   in this question, but also comes up with respect to whether

12   it's occurring in a confidential setting.  Because there's been

13   a suggestion that's not been explored about whether or not the

14   telemedicine apparatus affords for a confidential setting or

15   not.                                                               14:01:07

16        But it sounds like the person that you were going to

17   have us hear from on telemedicine generally can't talk about it

18   in this context.

19        MR. STRUCK:  That's correct.

20        THE COURT:  All right.  Go ahead.                             14:01:19

21        MR. FATHI:  Your Honor, just on the timing, according

22   to the staffing reports, which we have been filing with the

23   Court, there has been no mental health staff at Winslow since

24   May of 2016.

25        So my question is, has it been during that entire            14:01:30

UNITED STATES DISTRICT COURT

1    period that telepsych has been used?

2         THE COURT:  I gather if there's been compliance found,

3    that what -- taking that in combination with what Dr. Taylor

4    just said, that it must necessarily have been by telemedicine

5    if they were not transferred out of Winslow.                    14:01:50

6         Is that true, Dr. Taylor?

7         DR. TAYLOR:  That is correct.

8         MR. FATHI:  Your Honor, may I approach?

9         THE COURT:  Yes.

10        Thank you.                                                  14:02:07

11        MR. FATHI:  Do you need an extra?

12        THE COURT:  If you could.

13        MR. FATHI:  Your Honor, I've handed up a document that

14   has been produced to us by the defendants in this case, Bates

15   stamped ADCM1043042 through 056.  And it's titled, Corizon     14:02:27

16   Health Biweekly Meeting, Director's Office, October 5th, 2017.

17        And if you look at page -- the page that ends in 54,

18   you'll see a chart showing that there was no telepsychiatry at

19   Winslow from June through September of 2017.  And if you look

20   at the page ending in 056, it shows that there was also no     14:02:57

21   telepsychology at Winslow through June -- from June through

22   September of 2017.

23        And yet, as I mentioned a moment ago, this Measure was

24   found compliant at Winslow all four of those months at a 100

25   percent level with people who were there on watch during the    14:03:23

UNITED STATES DISTRICT COURT

```
 1   week.
 2           So I don't understand how to square what Dr. Taylor
 3   told us about the use of telepsych with this document that
 4   shows there was no telepsych during those four months.
 5           THE COURT:  Well, let's give Dr. Taylor a moment to     14:03:40
 6   digest what you've just said and look at the document that
 7   you've presented and see if she has a response.
 8       (Discussion off the record between defense counsel.)
 9           MR. STRUCK:  Judge, just very quickly, it would be
10   more appropriate for us to have some sort of advance notice    14:04:15
11   when counsel's going to be springing this on us.  We were asked
12   this morning by your clerk whether or not there were any
13   exhibits, and both parties said no.
14           This is -- you know, this is the first time that we
15   knew this was even going to be an issue.  We could be far more  14:04:31
16   prepared and not waste the Court's time with this if we
17   could -- it's not even on our agenda either.
18           So I guess we just would rather, for more efficiency,
19   to have some sort of notice if there's going to be issues like
20   this that come up.  Because clearly this isn't something that   14:04:48
21   was spontaneous, Mr. Fathi obviously had planned this issue.
22           So a little advance notice would make it a lot more
23   efficient for everybody.
24           THE COURT:  Well, I'm sympathetic to the idea of what
25   you just described about providing notice, because the Court    14:05:06
```

—— CV-12-601-PHX-DKD – January 18, 2018 ——

1    wrestles with this sub-issue about errors in the monitoring

2    program.  And we've taken them up on an ad hoc basis, visited

3    them when they've been included within a particular discussion

4    of a Performance Measure.

5            So this is one such subject where counsel and the          14:05:25

6    Court read a document and observe certain things about it and

7    see perhaps internal inconsistencies and want to raise

8    questions at the moment.  So that has happened and that is

9    normal with our method of operating.

10           It is also true to say that if there have been times       14:05:44

11   where plaintiffs have identified what they think are errors in

12   the reporting, and it turns out that when you look you find

13   that maybe those errors are not true.  And so those kinds of

14   things could be removed from court if the dialogue would occur

15   in advance.                                                        14:06:03

16           And so I'm caught in the position of agreeing with

17   what you say, but also not wanting to cut it off.

18           I do think it makes sense to allow for there to be a

19   deliberate consideration at this point.  So I would ask that we

20   just stop the discussion of it at this point, and instead ask     14:06:19

21   the defendants to provide a response that they file with the

22   Court and provide to the plaintiffs in 14 days' time,

23   addressing the questions that Mr. Fathi has identified in this

24   document.

25           MR. STRUCK:  Thank you, Your Honor.                        14:06:37

UNITED STATES DISTRICT COURT

1        MR. FATHI:  Thank you, Your Honor.

2        And so that the record is complete, I would move the

3   admission of this document.

4        THE COURT:  Well, it is received for the purposes of

5   allowing it to be a part of the record.  That will have to be                14:06:48

6   sealed though, because it's subject to the protective order.

7        I don't know whether it really makes a lot of sense to

8   have it become an exhibit here, because obviously if the issues

9   do pan out, there will be, I gather, some future opportunity

10  for the Court to visit the veracity of this.                                  14:07:08

11       So I'm not sure whether it makes a lot of sense to

12  have it here as an exhibit.  But be that as it may.

13       MR. FATHI:  Thank you, Your Honor.

14       On a quick perusal I don't see any personally

15  identifying information.  I don't think there's any reason for                14:07:22

16  it to be under seal.

17       But I simply suggest that it be in the record so that

18  when the defendants file their response everyone knows what

19  it's referring to.

20       MR. BOJANOWSKI:  It's identified by Bates number.                        14:07:38

21       THE COURT:  Well, the problem is we've got steps then.

22  You have to mark it for identification.  I have to give this

23  very copy and Mr. Bojanowski an opportunity -- or Mr. Struck to

24  take a look at it to make sure that the one that's a part of

25  the record is indeed the one that's been handed out to                       14:07:51

1    everybody.  It just doesn't seem to make sense.

2         So I'm going to deny your motion.  Say, talk to one

3    another about this maybe as well -- maybe in between now and

4    when the defendants file their response.  Maybe they've got a

5    ready response and you'll be satisfied with it.  If you're not,    14:08:08

6    then they'll file the formal response.  And I would ask that at

7    that time that the defendants file a copy of the document that

8    they were considering so that everybody knows what it is.

9         MR. FATHI:  Thank you, Your Honor.

10        THE COURT:  Thank you.                                         14:08:22

11        MR. FATHI:  As I said before the break, there

12   were -- there are some Performance Measures at some facilities

13   that have been the subject of a finding of non-compliance that

14   are not reflected in the defendants' latest filing last night.

15   One of them is Performance Measure 97 at Phoenix.  That was       14:08:45

16   found non-compliant on October 11th, 2017, document 2403.

17        So we would ask for the current figures for that

18   Performance Measure.

19        MR. BOJANOWSKI:  Your Honor, that is correct.

20   Performance Measure 97 at Phoenix was taken up by the Court,       14:09:09

21   but it had ruled that the Court would hold the remediation plan

22   in abeyance.  That's why I didn't -- I didn't file it.  But I'd

23   be more than happy to give the numbers for both that Measure

24   and Measure 98 at Douglas, which had the same language.

25        97 at Phoenix is 100 percent.  And 98 at the Douglas          14:09:30

1    facility is 100 percent.

2            THE COURT:  Okay.  Thank you.

3            MR. FATHI:  Finally, Your Honor, Performance Measure

4    98 at Phoenix, this was included in defendants' previous

5    filing, 2535-1 at page 189, showing non-compliance in November      14:10:08

6    of 2017 and a Corrective Action Plan.  But then it was deleted

7    from last night's filing.

8            So, again, in light of the fact that there was a

9    finding of non-compliance and a Corrective Action Plan, we

10   would ask that it be included in next month's filing.              14:10:33

11           THE COURT:  And do you want to hear about what it is

12   for November for 98 for Phoenix as well?

13           MR. FATHI:  Well, I know what it was, Your Honor,

14   because it was included in last Friday's filing --

15           THE COURT:  Okay.

16           MR. FATHI:  -- but then deleted from last night's

17   filing.

18           THE COURT:  All right.

19           MR. BOJANOWSKI:  Well, Your Honor, I don't think

20   there's been a finding --                                          14:10:52

21           MR. FATHI:  There hasn't been a finding, Your Honor.

22           MR. BOJANOWSKI:  -- on 98 for Phoenix.

23           THE COURT:  Well, what we've been able to do is get,

24   through the willingness of the defendants to provide the

25   information, whenever you have an inquiry -- wherever you have      14:11:04

1  a desire to know, they've been able to provide that information

2  to you.  And so far, obviously, we've been able to hear that

3  they've all been in compliance.

4          So I think that the current mechanism that we have is

5  working satisfactorily well with respect to giving you this          14:11:23

6  information.

7          MR. FATHI:  Well, the reason for my request,

8  Your Honor, is, again, there is a Corrective Action Plan in

9  place currently.  And as we know, these Corrective Action Plans

10 evolve, sometimes they learn that the -- what they initially       14:11:36

11 thought was the problem, wasn't the problem.

12         So we would simply like to see what this Corrective

13 Action Plan looks like next month.  That's the reason for the

14 request.

15         THE COURT:  Well, you'll be able to get it because       14:11:48

16 you're going to ask the question and you'll be told.

17         MR. FATHI:  I'm sorry, Your Honor?

18         THE COURT:  You'll be able to find out because you'll

19 ask the question and you'll be told.

20         MR. FATHI:  Okay.  Thank you, Your Honor.               14:11:57

21         THE COURT:  Okay.

22         MR. FATHI:  I believe that's everything.

23         Thank you.

24         THE COURT:  Okay.  Going back to the telemedicine, did

25 you want to make the presentation on telemedicine with that       14:12:07

1    person that you had introduced, did you want to do that today?

2              MR. STRUCK:  Yes, Your Honor.  She's in Nashville and

3    is available by phone.  I think we need to have her call in.

4    She was -- she started on the phone with us early in the

5    morning, but it didn't look like we were going to get to it.                    14:12:24

6              But she needs to -- if the Court wants to hear from

7    her, need to hear from her by 4:00 o'clock, otherwise she has

8    to leave.  So now might be an appropriate time to go ahead and

9    do that.

10             THE COURT:  Yeah.  Do we have the contact information               14:12:39

11   that we need to do that?

12             MR. STRUCK:  If we can have ten minutes we can get her

13   on the phone.

14             THE COURT:  Okay.  All right.  We'll take a break for

15   ten minutes and we'll be back as soon as she's on the line.                    14:12:53

16             MR. STRUCK:  Okay.  Thank you.

17             THE COURT:  Thank you.

18        (Recess at 2:12 p.m., until 2:24 p.m.)

19             THE COURT:  Miss Stover, we have you on the phone?

20             MS. STOVER:  Yes, sir.                                               14:25:02

21             THE COURT:  Thank you very much for standing by today.

22   I'm sorry that we weren't able to get to you sooner, and I'm

23   sorry if we're keeping you later into your day.

24             Before Mr. Struck or Mr. Bojanowski do what they would

25   like to do in terms of presentation, I want to explain to you                  14:25:16

1    why it is that you're here.

2           For months I've been hearing about how remedial plans,

3    steps to try to accomplish the requirements of the Stipulation,

4    were going to be supported by telemedicine.

5           And I've heard different times about different                14:25:39

6    particulars.  I've heard about contract negotiations almost

7    being completed, or being completed with the University of

8    Arizona.  I've heard about telemedicine with providers that are

9    working for Corizon in other states that are on the telephone.

10           And I've heard a lot about this such that, as I've          14:26:00

11    described it in the past, it has been that the defendants in

12    this case have put a lot of their eggs in this basket.  And I

13    never really felt that I understood exactly what the basket was

14    about.  And I needed to understand what the basket was about

15    because I have to evaluate whether or not we're on the right       14:26:19

16    path to try to accomplish the satisfaction of the Performance

17    Measures through this modality, through the modality of

18    telemedicine.

19           So I wanted to understand once and for all from sort

20    of the horse's mouth where it was that this stood, what was       14:26:37

21    being done.  Is the University of Arizona in it or not?

22    Is -- what amount of care is being provided through this

23    service?  How readily is it available?  Sort of the nuts and

24    bolts of it, so that I could have a better understanding of

25    whether it is something that I should trust that's going to        14:26:54

1    work.

2            And that's a preamble to help you understand why it is

3    that I wanted to hear from somebody like you.

4            And I don't know whether you had in mind a

5    presentation by way of examination on the defendants' side, or    14:27:08

6    how you thought you would proceed with this witness.

7            MR. STRUCK:  Your Honor, I'll just ask her some

8    questions.

9            I will say at the outset, the information that will be

10   provided isn't going to be all that enlightening, I'm afraid,     14:27:25

11   just so you know.  But Miss Stover is the Vice President of

12   Telehealth for Corizon, and she's the individual who has been

13   identified by Corizon as the best person to talk about the

14   overall -- she oversees the telehealth in 22 states.

15           THE COURT:  Can I ask why it is we're hearing from a      14:27:49

16   person who's not going to be all that enlightening?

17           MR. STRUCK:  Well, because that is the individual that

18   we were directed to by Corizon.

19           Now, when I say "enlightening," I mean more in terms

20   of the University of Arizona contract doesn't really appear to    14:28:07

21   me to have moved beyond where it was reported to you last Fall.

22   So Miss Stover can testify about what's going on with that and

23   what it currently encompasses and where the status of that is.

24           But with respect to -- like, for example,

25   telepsychiatry, she's not able to testify about the nuts and      14:28:31

─Juli Stover – Direct Examination─

1    bolts about what happens in Arizona.  I've been told that

2    Dr. Calcote, who I think you have heard from in this courtroom

3    in the past, will be the one that can tell you about

4    telepsychiatry and how it's utilized in the Arizona facilities,

5    which I know you're interested in and the plaintiffs are                    14:28:56

6    interested in as well.

7           But I'm -- I just wanted to kind of lay that out at

8    the beginning, just so you know it's the scope of what we will

9    expect to hear from Miss Stover.

10          THE COURT:  All right.  Go ahead.                                    14:29:15

11                        DIRECT EXAMINATION

12   BY MR. STRUCK:

13   Q.  All right.  Would you state your name, please?

14   A.  Juli Stover.

15   Q.  And what is your current occupation?                                    14:29:21

16   A.  Vice President of Telehealth and Innovative Services for

17   Corizon.

18   Q.  And how long have you been --

19          MR. FATHI:  Excuse me.  Pardon the interruption.

20          Could we have Miss Stover sworn, please?                            14:29:31

21          THE COURT:  Oh, surely.

22          Miss Stover, we're going to administer the oath as if

23   you were a witness in court.  We'll do it telephonically, but

24   it will have the same import as if you were here in court.

25          So I would ask you to please raise your right hand.                 14:29:45

─────Juli Stover – Direct Examination─────

1          And upon your solemn oath or affirmation, do you swear

2    or affirm that the information you're about to provide in your

3    testimony is the truth and nothing but the truth?

4          MS. STOVER:  I do.

5          THE COURT:  Thank you.                                   14:29:57

6    BY MR. STRUCK:

7    Q.  By –– and you say you're employed by Corizon?

8    A.  Correct.

9    Q.  Okay.  And how long have you been so employed?

10   A.  Six months.                                                 14:30:08

11   Q.  All right.  What are your duties?

12   A.  So I oversee the strategic development of telehealth from a

13   broad perspective for the organization as a whole, for the

14   development of that strategy and the execution thereof.

15   Q.  Okay.  And in terms of that job, what are you responsible   14:30:27

16   for in terms of geographic region?

17   A.  As you stated previously, 22 states, and where we hold

18   contracts within.

19   Q.  Okay.  And that includes Arizona?

20   A.  It does.                                                    14:30:44

21   Q.  Okay.  There has been information that has been provided to

22   the Court and plaintiffs' counsel with respect to a contract

23   with the University of Arizona Telemedicine Program.

24          Can you please tell us, is there a current contract?

25   A.  There is.                                                   14:31:03

117

—Juli Stover – Cross-Examination—

1   Q.   And what does that contract entail?

2   A.   So basically with the University of Arizona's Telemedicine

3   Program, what you do is you sign up to be part of that program.

4   And then once you become part of that telemedicine network or

5   that Telemedicine Program, if you will, then you work with them     14:31:22

6   to identify the services that you have a need for.

7           So today the services that are being received from the

8   University of Arizona are for infectious disease.

9   Q.   Do you -- can you tell us what -- whether that covers all

10   of the Arizona facilities?  Or what does that entail?            14:31:43

11   A.   I can't specifically, because that contract was before my

12   time.  But it's my understanding that it does.

13          Whether -- now let's say this, whether each facility

14   is taking advantage of that contract is a different story.  And

15   I can't speak to that.  But it's my understanding that each      14:32:05

16   facility could if they wanted to.

17                          CROSS-EXAMINATION

18   BY THE COURT:

19   Q.   So is it fair to say, Miss Stover, that you have no idea

20   whether or not this infectious disease telemedicine has been     14:32:15

21   employed or not?

22   A.   No, I know for a fact that it is taking place.  No, it

23   absolutely is taking place today.

24   Q.   How many times has it been used since the contract has been

25   put in place?                                                    14:32:30

UNITED STATES DISTRICT COURT

118

—Juli Stover - Cross-Examination—

1   A.  So the numbers that I receive don't specifically tell me

2   that.  Again, that would have to be -- that would have to come

3   from somebody within the Arizona contract there.  The numbers

4   that I receive are -- on a monthly basis are numbers in total.

5   They don't report to me specifically what they're for.  They          14:32:46

6   just report to me the total volume.

7   Q.  Total volume of what?

8   A.  Of everything.

9   Q.  What is everything?

10  A.  Of everything.  Of every telehealth encounter that takes          14:32:54

11  place within the Arizona contract.  It's not broken out for me

12  specifically what those encounters are for.  I just receive a

13  total lump sum number for every telehealth encounter by

14  contract by month.

15  Q.  By contract by month.                                             14:33:12

16          So you know that there have been contacts with the

17  University of Arizona infectious disease telemarketing (sic)

18  service based upon monthly data reports that you receive every

19  month telling you that that's happened every month?  Is that

20  what you're saying, or did I misunderstand?                           14:33:31

21  A.  So -- no.  So I know that the consults are taking place

22  with the University of Arizona because I am in conversation

23  with the University of Arizona.  And I know that the site -- at

24  least some of the sites are utilizing that service.  And -- but

25  as far as specifically looking at the numbers to be able to           14:33:49

UNITED STATES DISTRICT COURT

— Juli Stover – Cross-Examination —

1  tell which ones are infectious disease consults and which ones

2  are not, the reports that I receive do not tell me that.

3  Q.  So you know that it's happening.  So that could mean that

4  it's happened once in a given month.  But you don't know

5  whether it's happened more than once.  Is that fair?          14:34:07

6  A.  Well, based on what I just said to you, you would assume

7  that.  However, no, I know that to not be the case because I've

8  received more communication than just what one consult would

9  present.

10  Q.  And so how many do you think are occurring?               14:34:24

11  A.  I mean, I can -- you want me to guess?  It would be a

12  guess.  But, I mean, I could throw a number out if that's what

13  you want.  But I really have nothing to base it on.

14  Q.  Well, tell me your guess and tell me why you think your

15  guess should be trusted.                                      14:34:42

16  A.  I wouldn't trust my guess because, again, I have nothing to

17  base it on.

18  Q.  All right.  That's fair.

19       So then with the University of Arizona infectious

20  disease component here, we really don't know how many of the   14:34:58

21  eggs in the basket are ones that are being used.  We know that

22  it is singularly just this infectious disease component.

23       But I gather you also know about other

24  telemarketing -- telemarketing -- telemedicine programs and

25  other services that are provided, is that true, by other       14:35:17

UNITED STATES DISTRICT COURT

120

——Juli Stover – Cross-Examination——

1    entities?

2    A.  Absolutely.

3    Q.  All right.

4    A.  Absolutely.

5    Q.  So can you give me an overview of exactly what the lay of          14:35:26

6    the land is in Arizona with respect to the number of inmates

7    who are getting the benefit of telemedicine?

8    A.  Sure.  On average -- I mean, I would venture to say that

9    the infectious disease services from the University of Arizona

10   are a very, very small percentage of the activity that takes          14:35:47

11   place on a monthly basis there.  I mean, they routinely see

12   well over -- over 3,000 telehealth consults in a month within

13   the state.

14        And the way that those are characterized is either

15   through telepsychiatry, which you mentioned Dr. Calcote.  So          14:36:04

16   that's a team of, you know, mental health providers of varying

17   degree, if you will, that provide those services.

18        And then also it's categorized into chronic care.  So

19   for our chronic care clinics -- which that lumps everything in.

20   So that's every other subspecialty from a health perspective,        14:36:27

21   from a medical perspective outside of mental health.

22        And so those are kind of the ways that the categories

23   come to me.  And those -- and all of those services that are

24   provided are -- it comes to them in many ways, like either

25   physicians that are providers that are employed by Corizon or,       14:36:46

─Juli Stover – Cross-Examination─

1   you know -- or independent contractors.

2   Q.  So to make sure that I've understood, you've said that

3   there are 3,000 telemarketing -- forgive me -- 3,000

4   telemedicine --

5   A.  You're fine.

6   Q.  -- telemedicine encounters per month in the Arizona system;

7   is that correct?

8   A.  Well, I'm just looking back here over the past six months,

9   and it's actually well over 3,000.  In the month of August it

10  was actually 4,057 based on the report that I received.          14:37:18

11  Q.  And what are the more current months that you have?

12  A.  3648, 3379.

13  Q.  Can you tell me what months those are?  The 3648 is for

14  which month?

15  A.  Yes.  3648 was September.  3379 was October.                 14:37:39

16          And I have not received -- I don't see November, but I

17  haven't received December's yet.

18  Q.  And can you help me understand how you define a

19  telemedicine encounter?  What does that mean?

20  A.  Any time the care is delivered from a physician that is      14:38:03

21  virtual.  So that can be -- that could mean from one facility

22  to the other.

23          So let me just kind of give you a scenario.  So let's

24  say that one primary care physician at one facility has the

25  capacity to provide coverage to another facility.  They are in  14:38:20

122

—— Juli Stover – Cross-Examination ——

1  Arizona.  So this physician may be employed by Corizon, and

2  they may be, you know, physically located at one of the

3  facilities, and they may have the capacity in their day or in

4  their schedule to provide some gap coverage or help fill in for

5  some physician to, you know, help eliminate backlog or whatever      14:38:42

6  the case may be at another facility.  And so they may do that.

7  They may cross cover one another.

8         Or it can be a physician that's completely out of

9  state, 100-percent virtual, and they are contracted for a

10  certain number of hours on a monthly basis that they dedicate      14:38:57

11  to the contract.

12  Q.  And how is the system coordinated such that where there is

13  a need for the service and the provider, how are they linked

14  together?

15  A.  So I can tell you generally what I know.  So, again, if you      14:39:16

16  get into kind of the specifics of the day-to-day operations too

17  much there, I'm not going to know a lot of probably the

18  questions that you have, I'm not going to know a lot of the

19  answers.

20         But from what I understand there specifically in      14:39:32

21  Arizona, is that there are two different individuals that

22  manage the schedules; one for health -- one for telehealth and

23  one for telepsychiatry.  And those individuals are aware of the

24  providers that are available to them.  The sites communicate

25  the need to these individuals, and then they are responsible      14:39:54

─────── Juli Stover - Redirect Examination ───────

1    for coordinating the schedules of those providers.

2            THE COURT:  Okay.  Thank you.

3            Go ahead, Mr. Struck.

4                    REDIRECT EXAMINATION

5    BY MR. STRUCK:

6    Q.  Just to clarify, Miss Stover, is it -- I understood you to

7    say that with respect to the University of Arizona Telemedicine

8    Program, specifically the infectious disease, that you get some

9    sort of a report that is indicative of the number of times that

10   that service is utilized on a monthly basis?                    14:40:26

11   A.  It does not specifically give me the infectious disease

12   numbers.  The report that I get, the infectious disease

13   consults are lumped into the chronic care category.

14            I only get it in two categories.  I get it in

15   telepsychiatry and chronic care.  Infectious disease is part of  14:40:43

16   that chronic care category.

17   Q.  Okay.  So that's -- in terms of these reports then, you get

18   a chronic -- report with respect to chronic care and a report

19   with respect to telepsych on a monthly basis with respect to

20   the care that's provided over -- virtual care, either by        14:40:59

21   telephone or video, in Arizona?

22   A.  None of these would be via telephone.  This would all be

23   via the telehealth equipment.

24   Q.  Okay.  Do you have specific knowledge with respect to how

25   the telehealth equipment is utilized, where it's located in the 14:41:16

—— Juli Stover – Redirect Examination ——

1    facilities, that type of thing?

2    A.  I mean, I can tell you how to use it, but I have no idea

3    where it would be located within the facility.

4    Q.  Okay.  With respect to negotiations with the University of

5    Arizona, it was our understanding that Corizon had been                  14:41:38

6    negotiating with the University of Arizona Telemedicine

7    Department to expand beyond the infectious disease.

8             Can you tell us what the status of that is?

9    A.  Yes.  So it's my understanding that they're going through a

10   leadership transition at this time, and that's why they have            14:41:56

11   been delaying us just a little bit.  We've tried to schedule a

12   couple of different meetings here through the holiday season

13   and the first part of this year.

14            And Dr. Amy Waer is transitioning out as the leader of

15   that program, and Dr. Po, who ironically enough is the                   14:42:16

16   infectious disease physician, is transitioning in as the

17   leader.

18            And so they have asked us to hold off on meeting until

19   Dr. Po can assume his responsibilities.  So we're in a little

20   bit of a holding pattern waiting for them to do that.                    14:42:32

21            Prior to that what I had done -- or what I had

22   provided to them was, you know, we -- we refer to the patients

23   that leave the facilities for outside care as an out-count, so

24   if you don't mind I'll use that terminology.

25            So what I had done is we had signed a nondisclosure            14:42:52

─────── Juli Stover - Redirect Examination ───────

1   agreement with the University for me to be able to provide them

2   the data on out-count, so that they could evaluate the needs

3   that we had specific to certain specialties.  And then in turn

4   the conversation that we are hoping to have with them is for

5   them to come back to us, and then tell us, based on that        14:43:15

6   out-count data, what specialties they might have the ability

7   and capacity to provide back to us.

8           And so that is information that I have provided to

9   them.

10          But then, of course, in the meantime, you know, we've   14:43:29

11  also signed a letter of intent just in good faith saying that

12  we're -- you know, that we're continuing these discussions.

13          So that's the progress that we've made.

14  Q.  Are there specific specialty areas in which Corizon is

15  looking to utilize the University Telemedicine Program beyond   14:43:44

16  infectious disease?

17  A.  Yes, there are many.  But that doesn't mean that the

18  University is willing and able to provide them.

19          But, yeah, I mean, there's a lot.  I mean, basically

20  any subspecialty you can think of, I'm certain there would be a 14:44:03

21  need for.  Some of the top ones were orthopedic, cardiology,

22  just to name a few.

23  Q.  Okay.  Other than the -- these ongoing negotiations with

24  the University of Arizona, what other efforts have you made

25  with respect to trying to increase the Telemedicine Program     14:44:25

—— Juli Stover - Redirect Examination ——

1   within the Arizona system?

2   A.  So in the beginning we had also -- and I say "in the

3   beginning," meaning kind of my beginning.  So forgive me for

4   that.

5          But kind of in the beginning one of -- a couple of the          14:44:43

6   different organizations that I had reached out to was Dignity

7   Health.  As you're probably aware they have a presence there in

8   the market.  As well as Mayo.  I was familiar with both of

9   these organizations just from past experiences, and so knowing

10  that they were utilizing telehealth within their own health          14:45:00

11  systems, as well as providing services to others, I reached out

12  to them to explore their interest.

13         Both of them said they did not have the ability -- the

14  capacity to help us at this time.  So we moved on from that.

15         And I think I've heard folks mention Banner before.          14:45:20

16  And I think it's just kind of worth mentioning that Banner and

17  the University are aligned now.  So in some respects those are

18  kind of one and the same.  But I had attempted to also reach

19  out to them.  And that just kind of led to the University

20  conversations.          14:45:35

21         We had also reached out to some purely remote, so

22  completely virtual services.  There's a couple of

23  organizations.  One in particular is located in Colorado.  And

24  we were told they currently do not have Arizona state

25  licensure.  So, of course, that would cause a pretty          14:45:57

—— Juli Stover - Redirect Examination ——

1    significant delay in them being able to provide services, and

2    we were trying to move, you know, at a pace that was faster

3    than that.

4          We were also in conversations with a group called

5    Virtual Medical Staff, which is based out of Atlanta, Georgia.          14:46:09

6    Those conversations are still ongoing.

7          And then as I heard you guys mention earlier, any time

8    we approach a new physician contract with a group like -- well

9    previously, you know, it was Arizona Oncology Network, but now

10   it's Ironwood Physicians, any time we approach a physician          14:46:31

11   and/or a group such as that, we will also ask them if they are

12   willing to explore telehealth services as well.

13         And so now that those agreements have been solidified

14   with Ironwood and then -- you know, I know they're looking to

15   seek other relationships -- we would explore that as well.  But          14:46:54

16   we have not done that yet, as those agreements are pretty new.

17   Q.  With respect to the University of Arizona negotiations,

18   have they told you when they will be -- their leadership will

19   be in place and ready to continue the negotiations to expand

20   that -- those services?          14:47:15

21   A.  They have not notified us yet.

22   Q.  Okay.  Is there anything else that you can tell us with

23   respect to Corizon's efforts to obtain additional telemedicine

24   services in the Arizona Department of Corrections system?

25   A.  Sure.  I mean, I guess -- you know, I would offer that          14:47:35

1    there are -- there are things that we are considering or

2    exploring from a broader perspective for Corizon as a whole.

3            And one example that I would present to you is a

4    relationship that we are exploring with a company called

5    MyWoundDoctor.  They are a remote wound care offering.  And we          14:47:53

6    are piloting a program with them in our contracts within the

7    state of Kansas.  And assuming that that goes well, and we

8    think that that is a viable solution, you know, to move forward

9    on, we would -- you know, we would be considering moving

10   something like that into our other contracts, and Arizona being       14:48:18

11   one of those.

12           So, you know, that -- those type of things are my

13   responsibility, is to explore opportunities such as that, you

14   know, other solutions.

15           And so that's just -- that's one right now that                14:48:30

16   happens to be going on.  But my hope would be that there would

17   be others.

18   Q.  Is there anything else that you can add?

19   A.  Not that I can think of.

20                        CROSS-EXAMINATION

21   BY THE COURT:

22   Q.  Miss Stover, before I ask the plaintiffs if they have any

23   questions that they would like to ask you, I wanted to follow

24   up on an answer that you gave me, and that is providing me with

25   the number of telemedicine encounters that occurred in August,        14:48:56

——————— **Juli Stover – Recross-Examination** ———————

1    September and October of 2017.

2            I'm wondering if for comparison purposes you happen to

3    have in front of you the previous year, those same months in

4    2016, so that I can understand whether or not over the course

5    of a year the telemedicine component had increased, stayed the          14:49:14

6    same, or decreased.

7    A.  I am happy to say that I do have those numbers.  Let's see

8    here.  So what did I give you first, August; is that correct?

9    Q.  Yes.

10   A.  Okay.  So August of 2016 was 1576 consults, 1,576, in               14:49:29

11   contrast to 4,057 in August of this year.

12           September of 2016 was 1,317, in contrast to 3,648 in

13   2017.

14           And then October of 2016 was 1,477, in contrast to

15   3,379.                                                                   14:50:12

16   Q.  Thank you.

17           So these are increases of about 100 percent.  Why, do

18   you think?

19   A.  Oh, gosh, unfortunately I'm not going to have much

20   historical perspective on that to speak to it.  I mean, I can           14:50:26

21   speak generically just from an industry perspective what I have

22   seen over time, and it would be purely guesses.  I'm afraid,

23   you know, I wouldn't have much context there for you.

24   Q.  What did you do before six months ago?

25   A.  I actually worked for a telehealth vendor.  And prior to            14:50:49

————Juli Stover – Cross-Examination————

 1    that I was with a very large health system based out of

 2    Nashville.

 3    Q.  And a telehealth vendor is the kind of person that you

 4    described, such as the Colorado entity, or some other -- the

 5    wound care place, is that what it is?                    14:51:07

 6    A.  We actually owned and manufactured our own equipment.

 7    Q.  Oh, I see.

 8    A.  And implemented telehealth programs nationally.

 9         THE COURT:  I see.

10         All right.  Let me give plaintiffs' counsel an        14:51:20

11    opportunity to ask any questions they'd like to ask.

12         MS. STOVER:  Okay.

13                    CROSS-EXAMINATION

14    BY MS. KENDRICK:

15    Q.  Hi, Miss Stover.  My name is Corene Kendrick, and I'm one   14:51:26

16    of the attorneys for the plaintiffs.

17         You said that as part of the process with the

18    University of Arizona is that step one is you sign up to be

19    part of the telemedicine network, and then step two is you

20    identify the needs.  And I was hoping you could speak to where   14:51:42

21    you are in the needs assessment stage.

22    A.  So let me just say that I was not part of that process in

23    the beginning, so that is the way that I understand it.  The

24    agreement was executed long before my arrival here.  But that's

25    the way that it has been explained to me.                  14:52:01

131

─── Juli Stover – Cross-Examination ───

1              And then I think, as I shared a few minutes ago, I

2   have provided -- originally we signed a nondisclosure

3   agreement.  I provided the out-count data to the University.

4   They have reviewed it.  And then the conversation that we're

5   hoping to have is around their availability to provide some of          14:52:18

6   those services.

7   Q.  And I think when Mr. Struck asked you what specialties were

8   you trying to get, you said, basically a lot, and then you said

9   cardio and didn't list any others.

10             So I was wondering if you remember any other                  14:52:34

11  specialties that Corizon is seeking to use the University of

12  Arizona for.

13  A.  I believe what I said actually was orthopedic and

14  cardiology.  But, yes, there are many others.  Basically any

15  service -- any specialty you can think of, I mean, they're         14:52:52

16  going to have a need for.  So it can be anything -- oncology,

17  which I know you guys know, because we've talked about oncology

18  a lot today.

19             So, you know, if Ironwood Physicians is not able to

20  provide that, possibly that's something we could explore           14:53:08

21  through the University if they had those services available.

22             But I mean, patients leave our facility for

23  everything.  So there's everything on there from, you know,

24  urology to nephrology to neurology to pulmonology, dermatology,

25  endocrinology, rheumatology.  I mean, every ology you can think    14:53:30

—Juli Stover – Cross-Examination—

1    of is going to be on there.  And I would -- we would welcome

2    services in anything that they're able to provide.

3    Q.  And I didn't hear that you actually practice medicine or

4    anything, but I'm curious, how would you do oncology via

5    telemedicine if somebody needs radiation therapy or                14:53:48

6    chemotherapy?

7    A.  Well, clearly you can't administer radiation or chemo via

8    telehealth.  But with anything, just as orthopedics or general

9    surgery or any other subspecialty line service, there's a

10   tremendous amount of pre and post-op procedural work that could    14:54:06

11   be done.

12        So the goal here is to reduce the transport of these

13   patients as much as we possibly can.  Procedures clearly can't

14   be done via telehealth -- or at least, you know, most invasive

15   procedures, if you will, can't be done via telehealth.  And so    14:54:25

16   the goal in many of these services lines would be to eliminate,

17   you know, preprocedural and/or postprocedural transports.

18        So if there's any type of pre or post-op, if it's

19   general surgery, orthopedics, or anything like that, and pre

20   and post evaluations can be done via telehealth as well.  All     14:54:44

21   of those are -- all of those are transports out for one reason

22   or another.

23   Q.  Okay.  And are you aware of the Arizona State law that caps

24   the reimbursement rate for specialists to be no higher than

25   what Medicaid rates are?                                          14:54:59

133

Juli Stover – Cross-Examination

1  A.  Unfortunate I'm very well aware.

2  Q.  And has this law been identified as a barrier to providing

3  telehealth services by some of these entities that you've

4  contacted?

5  A.  Absolutely 100 percent.                                    14:55:15

6  Q.  And you said earlier when Mr. Struck was asking you

7  questions that we weren't -- you didn't know if every

8  institution was using the infectious disease telehealth

9  service.

10         Do you know who would know the answer to that          14:55:33

11  question?

12  A.  Yes.  The folks there on-site within the contract.  So

13  maybe possibly one of the chief medical officers and/or the

14  recently-appointed telehealth coordinator would be able -- she

15  may not know that information immediately offhand, but she     14:55:52

16  would be able to access it from the different sites.

17  Q.  Okay.  And those numbers that you were giving Judge Duncan

18  where you were comparing August 2016 and August 2017, was that

19  the total number of telehealth encounters?

20  A.  That was everything.  That was total psychiatry and total  14:56:15

21  health together.

22  Q.  And telepsychiatry and telepsychology take up approximately

23  70 percent, would you say, of the telehealth encounters?  Do

24  you have that breakdown?

25  A.  I would have to do the math, but I don't think it's 70     14:56:30

UNITED STATES DISTRICT COURT

—Juli Stover – Cross-Examination—

 1   percent.  The telepsychiatry and telepsychology for the

 2   purposes of this report that I'm referring to are lumped

 3   together just as basically mental health care.

 4         I mean, I can give you the breakdown if you would like

 5   to know what this report states for one versus the other.                    14:56:48

 6         THE COURT:  Rather than imposing a math test on you

 7   for the 70 percent, why don't you go ahead and just give us the

 8   real numbers.

 9         MS. STOVER:  Okay.  So for August –– let's see here.

10   For August the mental health number was 2732, and the chronic    14:57:05

11   care number was 1201.

12         Oh, wait a minute, hold on.  I'm sorry.  That's not

13   the right number.  Hold on.  Let's see here.

14         The mental health number was 2856, I'm sorry.  And the

15   chronic care number was 1201.                                    14:57:31

16         Let's see, for September we're looking at, for mental

17   health 2547, and for chronic care 1101.

18         And then for October for mental health we're looking

19   at 2107, and chronic care 1272.

20   BY MS. KENDRICK:                                                  14:58:03

21   Q.  Why is there so much more telepsych?

22   A.  Because the need is greater.

23   Q.  And are the telepsych providers, are anyone other than

24   psychologists or psychiatrists used to do telemed –– telepsych?

25   A.  I'm sorry, you'd have to ask Dr. Calcote that question.       14:58:22

135

1    I'm not familiar with who all their providers are they're

2    utilizing.

3    Q.  Okay.  And would he be the one who knows where the mental

4    health providers are located?

5    A.  Absolutely.                                                  14:58:35

6    Q.  And you said that mental health is higher because the need

7    is greater.  What do you mean by "the need is greater"?  Is it

8    harder to hire mental health staff or there's more mentally ill

9    people?

10   A.  The patient population demands it.                          14:58:51

11   Q.  Okay.  And you talked about how all the -- you said

12   something that like -- I wrote down that you said the

13   subspecialties, other than infectious disease, come under

14   telehealth for chronic care.  Is that correct?  Did I get that

15   right?                                                          14:59:08

16   A.  Correct.  Yes, absolutely.

17   Q.  But isn't chronic care what is just the normal kind of

18   maintenance every three months, every six months check in with

19   somebody who has a chronic condition?

20   A.  So your visits to a chronic care clinic are dependent on    14:59:24

21   what your condition is.  And so you would go based on what the

22   maintenance of that particular condition requires.

23   Q.  Right.

24   A.  And so you may go into the chronic care clinic and be seen

25   for two or three different things.  I mean, you might have      14:59:48

──────── Juli Stover – Cross-Examination ────────

1   multiple, you know, different issues that you're being seen

2   for.  And you may be seen for them all at one time.

3   Q.  Right.

4        And so my understanding is when this is done in person

5   at the institution, the medical provider who is seeing them is          15:00:02

6   generally an internist or general family medicine specialist,

7   because you may be seeing somebody who has both asthma and a

8   heart murmur, but it's not that a cardiologist is doing chronic

9   care appointments.  Is that correct?

10  A.  Well, so unless they -- unless they are requesting a               15:00:20

11  specialist to participate in that visit, because it requires a

12  higher level of care, like we discussed Dr. Po from the

13  University for infectious disease.

14  Q.  Right.

15       So I guess I just am trying to make clear that these             15:00:38

16  telehealth chronic care encounters that you're referring to are

17  kind of the more generic maintenance chronic care appointment

18  that you would have, say, on the prison yard with the prison

19  doctor.  It's not that you're seeing a cardiologist or a

20  pulmonologist.                                                         15:00:56

21  A.  It absolutely could be that you're seeing a cardiologist or

22  pulmonologist.

23       All of these numbers are lumped together.  This could

24  be exactly what I described to you, where it could be one

25  internist covering another -- one internist at one facility           15:01:10

UNITED STATES DISTRICT COURT

1  covering another facility for as you described it kind of

2  routine visits, or it could be a specialist seeing them for a

3  particular condition.

4  Q.  So you said these are other Corizon employees that are

5  doing these encounters?                                    15:01:29

6  A.  Some of them are.

7  Q.  So --

8  A.  Some of them are.  Not all of them.

9  Q.  How many cardiologists work for Corizon?

10 A.  I'm not -- I don't oversee the physicians, so I'm not    15:01:39

11 the one -- I'm not the appropriate person to answer that

12 question.

13 Q.  Okay.  And you said that everything comes to you lumped

14 together.  Do you know who would possibly have the data broken

15 out by specialty under the telehealth?                      15:01:57

16 A.  Yes.  The person that we spoke about just a few minutes

17 ago, either the regional medical directors or the individual

18 that has recently been identified over telehealth for the

19 contract.

20 Q.  And when you are trying to find providers, are you provided 15:02:18

21 data on the number of people at each institution that have

22 specific medical conditions where they would need specialists?

23 So, for example, how many people have HIV, or how many people

24 have cancer, or how many people are on dialysis?

25 A.  No.  The data that I utilize is the out-count data that I  15:02:40

—Juli Stover – Cross-Examination—

1    spoke about a few minutes ago.

2    Q.  Yeah.  And I wanted to ask you, why is out-count data for

3    specialties confidential information?

4          MR. STRUCK:  Foundation.

5          THE COURT:  What is the reason for asking that,          15:02:57

6    Miss Kendrick?  Why do you think that's the case?

7          MS. KENDRICK:  Because she said that it was provided

8    confidentially to the University of Arizona.  And I just don't

9    understand why numbers would be confidential.

10         THE COURT:  I see.  I understand your question now.      15:03:09

11         Go ahead.

12         MS. STOVER:  I guess I'd have to defer to my legal

13    counsel to answer that question.  It's not my call to make.

14         THE COURT:  So when you disclosed this information on

15    what your needs were that you were looking for somebody to     15:03:24

16    provide those services, somebody told you that -- that that had

17    to be confidentially provided, is that fair to say?

18         MS. STOVER:  Yes.

19         THE COURT:  Okay.

20    BY MS. KENDRICK:

21    Q.  And was that people at the University of Arizona or your

22    own attorneys?

23    A.  No, my legal counsel.

24    Q.  Okay.  And you mentioned --

25    A.  Yes.  Go ahead.                                           15:03:50

Juli Stover – Cross-Examination

1    Q.  No, go ahead, ma'am.

2    A.  That's okay.

3    Q.  You mentioned a virtual telemed services company in

4    Colorado.  I don't think I caught the name of that company.

5    What was it?                                                    15:04:03

6    A.  CarePoint.

7    Q.  CarePoint.  Okay.

8         And I just want to make sure I understood you

9    correctly.  You were talking about another entity, and it

10   sounded like you said MyWoundDoctor; is that correct?          15:04:16

11   A.  That's correct.

12   Q.  Okay.  Just a minute, ma'am, I'm looking at my notes.

13   A.  Okay.

14      (Discussion off the record between plaintiffs' counsel.)

15        MS. KENDRICK:  I have nothing further, sir.              15:04:45

16        THE COURT:  Thank you.

17        Any follow-up from you, Mr. Struck?

18        MR. STRUCK:  No, Your Honor.

19        THE COURT:  I wonder, it makes sense, I think, in

20   light of what we've heard here today, to maybe drill down a    15:04:59

21   little bit more on this subject in particular, because it seems

22   like many of these out calls are in the area of the

23   telepsychiatry or telepsychology services.  And it sounds as

24   though we need to hear from a person, perhaps this Dr. Calcote

25   again, about the nature of the services that are provided and  15:05:24

UNITED STATES DISTRICT COURT

1    where things stand with respect to how that system is working.

2             I will add as a footnote that it would be helpful if

3    that person could also address some of the topics that are

4    associated with the particular difficulties of functionality of

5    telemedicine in the mental health arena with respect to issues          15:05:47

6    that are specified in the Stipulation, and that is that there

7    be a confidential setting, whether or not there is a means for

8    that confidential setting.

9             I don't know whether plaintiffs have been privy to any

10   of these encounters and they can avow about whether or not              15:06:05

11   there is an issue there, or whether they have conducted a

12   simulation with the equipment that is used to do it.

13            We know from -- everyone in this room knows from

14   personal experience that there are certain difficulties with

15   telemedicine -- telecommunications that -- some of the cues of          15:06:32

16   understanding people that are present when you're in person are

17   lost in the electronic means, and that sometimes people

18   compensate for that by speaking louder, that's a natural

19   feature.  And if you speak louder, one wonders how a

20   confidential setting continues to be possible.                          15:06:47

21            I don't know whether plaintiffs, as I say, have looked

22   at a mockup to see how this situation can exist where there is

23   a telemedicine employed, and whether it does allow for a

24   confidential setting.  It would seem to me that maybe one could

25   have a simulation or a mockup to see whether or not that can            15:07:10

CV-12-601-PHX-DKD – January 18, 2018

1    work, whether it's possible to use -- I understand there's a

2    rolling cart kind of thing.  And I don't know exactly what the

3    amplification is of the voices on both sides, whether somebody

4    has to speak very loudly to be heard, or whether everybody can

5    hear what's being said whether there are headphones or not.          15:07:31

6            I don't know the answer to those questions, and I

7    think that maybe it makes sense to arrange at a subsequent

8    hearing date to have Dr. Calcote, or someone else who is

9    knowledgeable about this who can answer these questions, but

10   also the other questions that Miss Stover wasn't able to answer   15:07:45

11   about the specifics of what happens in Arizona.

12           And I think I would ask plaintiffs and defendants to

13   confer about that and to put that on the agenda for a

14   subsequent hearing.  And if there are issues associated with it

15   and you think it needs to be heard at a separate time or some     15:08:04

16   other means, or whether you think the Court needs to visit and

17   to see how it's done, you can let me know about that as well.

18           But let me hear your thoughts about my observations

19   here on this, Mr. Fathi, Miss Kendrick.

20           MS. KENDRICK:  Yes, Your Honor.                            15:08:19

21           So your presumption was correct, we do not know how

22   it's operating, unfortunately.  So we agree that it would be

23   incredibly helpful to have Dr. Calcote come to explain it, and

24   also to perhaps have some sort of simulation of it.

25           I think that, you know, you raise an excellent point,      15:08:34

UNITED STATES DISTRICT COURT

1    and probably in future tours we will request to see it

2    demonstrated so we can observe.  It may be that the Court may

3    want to have Corizon wheel it in and link to somebody in one of

4    the prisons and see if it can be done.  I don't know.  I mean,

5    it's a black hole for us as well.                                    15:08:52

6        I would just also ask that this telehealth coordinator

7    that Miss Stover referred to several times, who apparently is

8    in the Arizona area, as well as Dr. Calcote, be available to

9    answer questions, and hopefully provide some of the drilldown

10   data about the needs assessments in terms of specialties and      15:09:13

11   the -- what they call the out-count.

12       THE COURT:  It sounds as though this person, this

13   newly-appointed person, could well be a person who could assist

14   the Court in its understanding of how this all works.  I'll

15   leave to you all to confer with one another to see who the best   15:09:32

16   possible witnesses are.

17       If you can get a resolution on that and how to present

18   it to the Court, we'll go forward.  If you run into issues and

19   you need me to address them in the meantime, just get on the

20   phone together and we'll figure that out.                          15:09:48

21       Anything else you wanted to say, Mr. Struck?

22       MR. STRUCK:  No, Your Honor.

23       I did want to point out though that this issue -- this

24   isn't a new issue.  And plaintiffs have been aware of the

25   telehealth and telemedicine for quite some time and had           15:10:02

1  opportunities -- numerous opportunities during their tours to

2  see how it works, see where they take place, and investigate

3  the confidentiality and those types of things.

4       So it isn't something that the defendants have been

5  hiding at all, and they have had that opportunity.  And I        15:10:24

6  imagine in future tours they'll probably want to undertake

7  that.

8       MS. KENDRICK:  There's only so many things we can do

9  in the eight hours that we're at an institution, sir.  So it

10  was -- I did not mean to imply in any way that something was    15:10:39

11  being hidden.  It's just we have not raised this point before.

12       But you raise a very good suggestion, and we will

13  attempt to do so on future tours.

14       THE COURT:  Miss Stover, thank you very much for your

15  time this afternoon.  Appreciate it.                            15:10:54

16       MS. STOVER:  Absolutely.

17       THE COURT:  I wonder if it makes sense to --

18       Do you need to take a break?

19       COURT REPORTER:  No.

20       THE COURT:  Okay.  I wonder if it makes sense to turn      15:11:04

21  next to the discovery issues that are presently involved in

22  your discussions about how best to frame and address issues

23  that have been raised by plaintiffs with respect to identified

24  areas, in their view, where the monitoring was erroneous.

25       And we had, I think, a first report of this, if I'm        15:11:34

CV-12-601-PHX-DKD – January 18, 2018

1    remembering correctly September, and then there was a follow-up

2    on October data, I think.  I may be a month off in each case.

3    But it was essentially plaintiffs saying that they had done a

4    drilldown on some records that they had sampled, and they found

5    documents that -- or they found a suggestion that what was                    15:11:55

6    reported was not accurate.

7            There was a response from the defendants in some cases

8    where the defendants said that the plaintiffs' points of error

9    were not well taken.

10           And the issue has continued, I think, as I read what        15:12:09

11   you've submitted to me, to be to a place of an impasse, where

12   it looks like the defendants are saying, if you're going to

13   complain about what we did because you've done research and

14   you've found out that what we did was wrong, tell us what it is

15   that we did wrong and we'll look into it.                           15:12:31

16           And as I understand it, it seems like plaintiffs are

17   saying, no, we don't have to do that.

18           And if I'm understanding that issue as I just

19   presented it, that doesn't make a lot of sense to me.  Because

20   the complainer, I think, needs to say what the basis is for the    15:12:42

21   complaint.

22           But I open this topic and trust that you all will

23   educate me on how best I can involve myself in it.

24           MS. KENDRICK:  Well, so the two months that we had

25   previously raised was August 2017 CGARs and September 2017         15:12:59

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1    CGARs.  And the issue is not that we didn't provide

2    information.  When we sent the letter regarding the September

3    mistakes, which was filed last month at docket 2502-1 at page

4    4, we listed the details.  We explained, some of the mistakes

5    were actually apparent on the face of the CGARs themselves.                    15:13:25

6    For example, the September reviews looking at consult reports

7    from previous months.

8            So in those situations we don't think that we need to

9    provide back a copy of the actual CGAR when it's on the face of

10   the CGAR.                                                                       15:13:46

11           We did provide extensive detail.  The letter goes on

12   for 16 pages and gives the dates of things received.  And so we

13   think that to require us to go back into eOMIS and print out

14   the specific page or screen that shows what is written down in

15   our letter is an unreasonable demand, when defendants have                      15:14:12

16   access to eOMIS as well and have 30 odd monitors in their

17   monitoring bureau.

18           THE COURT:  Is that what this is about, you're saying

19   that on page 17 of August 18th, this particular CGAR there's

20   this error, and they're saying that they want you to print that                 15:14:36

21   out?  Really, that's really what the issue is?

22           MS. KENDRICK:  So the response which is attached as

23   Exhibit 1 to the Declaration that was filed last week, it's

24   docket 2531, we were asked -- it's at page 4 of docket 2531-1.

25   And defendants' counsel writes, in order to understand                          15:15:03

CV-12-601-PHX-DKD – January 18, 2018

1    plaintiffs' position, please provide us with each and every

2    document that supports the errors alleged by plaintiffs in

3    their December 11, 2017 correspondence.  Until we receive that

4    information, we are unable to respond to your correspondence.

5         That December 11th letter was filed with the Court          15:15:21

6    before the December 20th hearing, it's at docket 2502-1.  It's

7    16 pages.  It's Exhibit 1.  And we do go institution by

8    institution giving the dates and what the mistake is for every

9    single person.

10        So, for example, Performance Measure 52 at Eyman, we        15:15:45

11   noted that three files had been marked as compliant but

12   actually were not applicable and should not have been reviewed

13   because the review of the report was not in September 2017.

14   And on the face of the CGAR it said, report received 8-17,

15   reviewed 8-17.  Report reviewed -- received 8-10, reviewed       15:16:12

16   8-11.

17        And then we also, for example, went on -- this is at

18   page 14 on the docket of this filing, where again we refer to

19   reports that were received in October, reports received in

20   July, that were marked actually as non-compliant.  And our      15:16:32

21   response was, these aren't applicable because these are

22   different months than September.

23        So, again, we don't think we need to provide the

24   sheets of paper that are in eOMIS that reflect this for each

25   and every one.                                                   15:16:49

1       THE COURT:  Moreover, haven't you identified every

2  document that would be necessary for someone to understand what

3  your argument is?

4       MS. KENDRICK:  Yes, sir.

5       And also another example is Performance Measure 77,          15:16:57

6  which this is at page 19 of the docket 2502-1, again, we list

7  entries that were marked as compliant, but just looking at the

8  dates listed on the face of the CGAR, they were out of

9  compliance.

10      So if you just look at the September CGAR for               15:17:20

11 Performance Measure 77 for four different prisons, we listed

12 the ADC number of the prisoner and the dates that were listed

13 on the CGAR form and said, on its face this is not compliant

14 based on what you've put in the CGARs.

15      THE COURT:  Okay.  And I'll give defendants a chance        15:17:38

16 to respond to you.

17      But let me also put on the table a broader question,

18 and that is:  How best for me to adjudicate this process that

19 you've undertaken so that there's a definitive determination.

20 Last time we talked about it I really had hoped that it would   15:17:57

21 be teed up so that I could best understand where it was that

22 there was a different view and then I'd have to decide who's

23 right, who's wrong, and that that would educate the system as

24 to understanding what was required for reporting, and also give

25 me a heads up about the number of errors that are occurring.    15:18:16

CV-12-601-PHX-DKD – January 18, 2018

1    So it was, I thought, a useful inquiry.

2         But it's difficult for me to do it efficiently, first

3    when it's not teed up, but also to worry about the fact that

4    each time we talk about this and it gets bumped down the road,

5    I'm now talking about August in January.  And so the delay just          15:18:35

6    becomes much worse.  I don't know whether I'm focusing on the

7    present issues.

8         I don't know whether plaintiffs are engaged in a

9    continuing rolling process here.  If you are, it probably makes

10   sense for us to focus on the more current ones because of the             15:18:50

11   limited resources that we all have.  But I don't know the

12   answer to that question.

13        MS. KENDRICK:  Right.  So just a couple thoughts in

14   response.

15        First, to the question about whether we're doing it on               15:19:02

16   a rolling basis, we are spot checking some of the October CGARs

17   that we got a few weeks ago.  We haven't actually received the

18   November CGARs, so we can't do anything with those yet.

19        But, Your Honor, I think this actually illustrates

20   again our position that there needs to be an independent                  15:19:20

21   monitor -- or expert.  Because otherwise we're just going to be

22   in this endless death spiral where we say they're non-compliant

23   and then they come back and say, no, we're not.  And then we go

24   round and around and around and there's never any resolution.

25        And what we want is we want accurate data that we can               15:19:40

CV-12-601-PHX-DKD – January 18, 2018

1   trust that's monitored competently.

2           And I am an attorney, I am not an auditor.  And my

3   office is not Price Waterhouse Cooper, so we are not equipped

4   to take on doing this other check.

5           And what this exchange has illustrated is, it doesn't      15:19:56

6   matter what we find because the response is going to be, no,

7   you're wrong plaintiffs.  And it's a tit for tat, or as I

8   called it, a death spiral.

9           So we think that, again, this illustrates the need

10  that we've articulated in the briefing that's fully briefed     15:20:11

11  since we had those hearings in the early Summer about the

12  methodology, that the Court needs to consider appointing a

13  Rule 706 expert on monitoring, because this is not sustainable.

14          THE COURT:  Well, I have considered it and I have

15  mentioned it and put it on sort of one of the things that I'm   15:20:31

16  thinking about as being necessary in the case.

17          But I also think in fairness I have to know that there

18  is a real problem.  And so at some point I'm going to have to

19  make a finding.

20          So I guess the answer that you've provided to me tells   15:20:45

21  me that I need to get to a step where we have this issue joined

22  in the two months that you presented it to me.

23          And so the way to do that is, I'll turn now to

24  defendants and see why it is that you need to have actual

25  pieces of paper, when it sounds to me like, at least in the     15:21:02

UNITED STATES DISTRICT COURT

1  examples that have been cited by Miss Kendrick, that you have

2  all the information you need to know what their accusation is

3  about the error, and so that I can then hear what your view is,

4  see what their view is, and decide, was there an error.  And

5  then if I see a number of errors, that informs my decision

6  about whether a 706 expert is necessary to augment the

7  monitoring process.

8        MS. HESMAN:  Thank you, Your Honor.

9        Just to give you some historical context and

10 background, this issue began in July when we received a letter

11 from plaintiffs' counsel detailing numerous what they call

12 errors from the July CGARs.  We went back and forth among

13 counsel exchanging correspondence.  They said things were

14 non-compliant, we said they are actually compliant and here is

15 why.  We went back and forth.

16       Most of what they thought was non-compliant was

17 actually compliant.  So we reran the numbers.

18       And as you may recall from the last hearing, I

19 presented you with those percentages.  It may no difference.

20 It made no difference in July.  It made no difference in

21 August.

22       THE COURT:  But, again, what I would focus on is on

23 the errors, not whether or not it was a mistake that didn't

24 affect the compliance.

25       I guess what they've -- they've taken a sample, and

15:21:20

15:21:32

15:21:48

15:22:01

15:22:11

1    they are contending that they found errors that would cause one

2    to question whether everything else was valid.

3            MS. HESMAN:  I understand that that's what they're

4    saying.  Most of their errors were not actually errors, they

5    were looking at the wrong screen or section in eOMIS.          15:22:27

6            THE COURT:  All right.  So that was July; right?

7            MS. HESMAN:  That was what?

8            THE COURT:  That was July.  That was a July episode.

9            MS. HESMAN:  That was both in July and August.

10           THE COURT:  So August the same thing, most of the      15:22:37

11   errors were because of looking at a wrong screen.

12           Anything about that?

13           MS. HESMAN:  It was a combination.

14           THE COURT:  Hold on just a second.

15           Anything -- is that true?                              15:22:45

16           MR. FATHI:  Your Honor, I can address August.  In --

17   one moment.

18           We pointed out a number of errors in the August 2017

19   CGARs specifically relating to Performance Measures 94, 95 and

20   97.  The defendants conceded that those were errors.  But they  15:23:06

21   claimed that they had reaudited those Performance Measures and

22   that the reaudited results didn't make any difference, didn't

23   change any findings of the compliance to non-compliance.  And

24   this is in document 2489.

25           But they didn't provide the reaudited CGARs so that    15:23:27

CV-12-601-PHX-DKD – January 18, 2018

1  plaintiffs and the Court could verify the statement they made

2  that this didn't change anything.

3          So one of the things we need is for them to provide

4  those reaudited CGARs so that we can actually verify that it

5  didn't shift compliance to non-compliance.                    15:23:44

6          But going to your first point, Your Honor, there were

7  a number of errors -- I don't have the document in front of me,

8  document 2489.  There were a number of errors that they did not

9  dispute, they conceded were errors.  Their rejoinder was, yes,

10 but it didn't change compliance to non-compliance.             15:24:03

11         But, again, they still haven't provided the reaudited

12 CGARs so we can verify that.

13         THE COURT:  All right.  So folks have made efforts to

14 inquire into July and August and September.  And what I have, I

15 imagine in my mind, is a possible table in which we have        15:24:18

16 plaintiffs' allegations where they tell the defendants there

17 were errors.  Then we have the defendants' response.  In some

18 of those cases it sounds like the defendants say the plaintiffs

19 were wrong, we were right.

20         I'm not interested in whether it changes compliance or  15:24:35

21 not.  I'm interested in whether it's -- this window into the

22 quality of the monitoring program is telling me to be

23 concerned.

24         And so the way that I'd like to do that is I'd like

25 you all to set forth the accusations that you made, tell me     15:24:51

1   where you concede your error on the accusation of error, if it

2   turns out that you're convinced that the defendants got it

3   right and that your accusation was wrong.  And then if there is

4   still after the defendants' response your view that you have it

5   right, then I have two views, the issue is joined, I can in my          15:25:12

6   third column make a decision, who is right, who is wrong.

7          At the end of this process I will look at July, August

8   and September, and I will see whether or not there are

9   sufficient numbers to cause me to think that I should seriously

10  take steps forward as advocated by plaintiffs with respect to          15:25:30

11  doing something different on the monitoring side to make sure

12  that it's competent.

13         I'll give each side a chance now to tell me why this

14  is a bad idea.

15         MR. FATHI:  Your Honor, our primary concern is just             15:25:47

16  the tremendous amount of work that's going to be.  We're happy

17  to do it if it's useful to the Court.

18         THE COURT:  Haven't you already done your side of the

19  work though?

20         MR. FATHI:  We have, Your Honor.                                15:26:00

21         THE COURT:  All right.  So -- and the defendants have

22  done some amount of the work already, I think they've

23  responded.  There are some -- you say the latest letter says we

24  want to know -- we want to have the piece of paper that you

25  think is evidence of this error.                                       15:26:12

1          MR. FATHI:  Correct.

2          THE COURT:  But it seems to me if you tell them what

3   that document is, that's enough, they can go look themselves.

4   And so you're saying its on its face telling us this, go look

5   you'll see it on its face.                                   15:26:24

6          If you say that enough times and you're not right, or

7   it turns out that you're not on the right screen, then we're

8   not going to go down the road you're advocating.

9          But I don't see any other way for me to decide this,

10  other than to have the issue joined and to have me make an     15:26:37

11  informed decision.

12         MR. FATHI:  Your Honor, just to be clear, what we have

13  provided in the September letter that Miss Kendrick was

14  discussing a little bit ago is the dates of the encounters.

15  And our position is that if we provide the date of the         15:26:54

16  encounter, the defendants can go look at it in eOMIS just as

17  easily as we can.

18         THE COURT:  Wait a minute.  So you're saying that

19  there's a problem on the date of the encounter, but you're not

20  telling them exactly what it is that you saw that's wrong?     15:27:07

21         MR. FATHI:  I think Miss Kendrick can probably give a

22  concrete example.

23         MS. KENDRICK:  So, for example, among the files –– and

24  this illustrates the point that it's not just about, it doesn't

25  matter because it's still compliant.  This one Performance     15:27:21

1    Measure we identified nine files that they marked as

2    non-compliant, but were actually not applicable.

3            And so, for example, prisoner blank, report received

4    8-10, reviewed 8-21, not applicable to September.  Parenthesis,

5    would have been non-compliant if reviewed in August CGARs.  And        15:27:45

6    it goes on like that, with the date of the report received, the

7    date the review was done, and what happened.

8            And so we have given all of the dates of these reports

9    that were reviewed or seen.  For example, at the Lewis prison

10   on this Measure about specialty reports, Performance Measure        15:28:06

11   52, we note at page 15 of docket 2502-1, number 2, ortho report

12   received 9-13, reviewed 9-19.  Plan of Action, enter hand

13   surgery consult when dictated copy is available.  And then we

14   wrote, no indication that the follow-up consult request was

15   made.        15:28:35

16           So it's in the record that you can go and see the

17   orthopedics report that was received on 9-13 and click the date

18   that it was reviewed, and see the exact same thing that we saw.

19   Otherwise we're going to have to go back and print out the

20   screen for every single one of these encounters that's on the        15:28:52

21   eOMIS system.

22           THE COURT:  How many are there?

23           MS. KENDRICK:  Well, for Eyman there were nine.  For

24   Lewis we reviewed 71 files.  For Tucson it was 60 separate

25   files we reviewed.        15:29:11

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1          So it's quite a few.

2          THE COURT:  And how many of these files did you find

3    errors?  Are those the gross number of errors or the gross

4    number of files you pulled to review?

5          MS. KENDRICK:  Well, so, for example --                    15:29:23

6          MS. HESMAN:  I believe the letter has 160 allegations

7    of errors.

8          MS. KENDRICK:  Right.  So, for example, Eyman for

9    Performance Measure 48, which is about the denial of specialty

10   services, the September 2017 CGAR reported a compliance rate of   15:29:38

11   40 out of 41 compliant, or 98 percent.  However, 30 entries

12   were marked as compliant that were not applicable for the month

13   of September 2017 and should not have been included in the CGAR

14   report.  And then we list all 30 of them that were not

15   applicable to the month of September, with the ADC number --      15:30:02

16         THE COURT:  On that one, on that example, why would

17   defendants need anything more?

18         MS. HESMAN:  I don't think we need anything more when

19   we're talking about if they think something's not applicable

20   and we believe something is applicable.                           15:30:20

21         What we're talking about is instances, which is 80 to

22   90 percent of what's contained in that letter, where they say a

23   consult wasn't ordered, and we pull up -- ADC monitors pull up

24   eOMIS and says, it's right here.  What screen are you looking

25   at where you don't think that it was ordered, or medication      15:30:36

CV-12-601-PHX-DKD – January 18, 2018

1    wasn't given, or hospital discharge recommendations weren't

2    implemented?

3           All of these things that when ADC monitors take time

4    out of their day to go re-review 160 files from a letter that

5    we received, and it's right there in front of us.                    15:30:46

6           What we're simply asking is, they've obviously done

7    the work, Your Honor, they've put together a letter with 160

8    allegations of inmates that were marked -- that were

9    incorrectly marked compliant, so show us the work, what screen

10   are you looking at?                                                   15:31:01

11          I think this would be beneficial to both sides.

12   Perhaps they just don't understand eOMIS, and we can say, no,

13   you're supposed to be looking at this screen.  And then perhaps

14   in October and November the letters will be culled down because

15   they'll understand the appropriate place to look for.                15:31:13

16          But it's of no use for them to spin their wheels and

17   then for us to spin our wheels and we don't know whether we're

18   looking at the same thing.

19          I also don't know who's undertaking this review, is it

20   law students, law clerks, Miss Kendrick herself?  I mean, we         15:31:24

21   certainly have access to eOMIS, but we rely on medical

22   professionals to review the medical records and tell us where

23   things are.

24          I think there's a disconnect, and we're simply asking

25   for the support for their allegations.  I think it would be          15:31:38

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1   beneficial to both of us.

2          THE COURT:  All right.  Here's what going to happen:

3   You're going to take three hours.  You lawyers are going to

4   take three hours, and you're going to go to the same eOMIS

5   terminal, and you're going to sit down, and the plaintiffs are          15:31:50

6   going to say, these are the ones that we think are wrong in

7   this three hours.

8          And as far as you get in three hours, you then will

9   sit side by side and work through those.  And at the end of

10  that process you can report to me about what happened.  And if          15:32:02

11  there are two ships passing in the dark, then we're going to

12  get that fixed.

13         But it sounds like, to take you from your word, that's

14  what you think is happening on the defendants' side.  And

15  the -- if I can say that -- to a drilldown to try to give a           15:32:20

16  chance to see if there is some obvious mistake that's going on,

17  the best way to do that is to have you sit side by side and to

18  work through these accusations.  So if there's a wrong screen

19  kind of thing, you'll see about it.

20         And after three hours it seems like it's a reasonable          15:32:38

21  period of time that people would get a sense about whether this

22  is a avenue worth going down.

23         MS. KENDRICK:  Yeah, we would just -- I encourage the

24  Court -- I know you review everything before the hearings, but

25  if you take a look at our December 11th letter that's filed at          15:32:54

UNITED STATES DISTRICT COURT

1    docket 2502-1, you can see the examples and the amount of

2    detail that we included in the allegations.  We don't just say

3    something didn't happen.  We searched.

4           And there's examples where people come back, you know,

5    with serious instructions from the hospital, and it looks like          15:33:17

6    it takes, you know, instead of 24 hours to take the action of,

7    for example, requesting the follow-up, ten days later the

8    follow-up consult is submitted.  And so we say that's

9    non-compliant, because it says reviewed and acted upon within

10   24 hours.                                                               15:33:38

11          So, yes, we are looking at a screen.  We may see that

12   ultimately whatever was requested was done, but it wasn't done

13   pursuant to the Performance Measures.

14          But we're happy to do it either telephonically or in

15   person, that kind of conference, and going through eOMIS               15:33:54

16   simultaneously.

17          THE COURT:  You're located in San Francisco,

18   Miss Kendrick; is that right?

19          MS. KENDRICK:  We're in Berkeley, sir.

20          THE COURT:  Berkeley.  All right.                               15:34:04

21          MS. KENDRICK:  Telephonically would probably be

22   easier.

23          Or Miss Eidenbach can do it in person as well in

24   Arizona.  The problem is Miss Eidenbach was not part of the

25   team who reviewed these records.  But she knows how to use            15:34:27

160

1   eOMIS.

2           And it was -- to answer the question, the people who

3   did the reviews for the December 11th letter, I did the bulk of

4   it.  And Rita Lomio, who is another attorney of record, did a

5   lot of it.  And then one of our litigation assistants who's          15:34:45

6   worked on the case for two years and has an eOMIS login and

7   knows how to use eOMIS also worked on it.

8           I would also just note for the Court that we did go

9   and counted up the amount of hours it took for us to do that,

10  attorney and paralegal time, and to do those three Measures to    15:35:06

11  review, three Measures at three institutions, approximately 180

12  records, it took over 40 hours of attorney and paralegal time.

13          So I just want to emphasize again what I said last

14  month, that it's an incredible amount of work and resource

15  drain on my office to do this.  We recognize that it's             15:35:26

16  critically important for us to make the case for you that there

17  are these errors in monitoring, but I just want to highlight

18  that there are these limitations.

19          THE COURT:  All right.  What I'm about to propose is

20  based upon the fact that I have two sides telling me that their    15:35:42

21  system is not as -- well, I have plaintiffs saying the system

22  has errors that they found, and I really think I hear

23  defendants say that the overwhelming number of them are -- look

24  to be looking at wrong screen kind of things.

25          So I'm going to find out whether it's true.  And the       15:36:05

CV-12-601-PHX-DKD – January 18, 2018

1    way I'm going to do that is, I'm going to ask you two to

2    coordinate your schedules with mine.  I want to be there for

3    the three hours.  We'll do it in Phoenix sometime,

4    Miss Kendrick, when you happen to be here otherwise.

5         Get those three hours from me, find an eOMIS terminal        15:36:18

6    that I can show up, wherever that is, at the AG's office, or in

7    your counsel's office, wherever it is, and the three of us will

8    sit down and you will show me what you think are the errors,

9    and then I'll look at the screen and see whether or not those

10   should be counted or errors or not.                             15:36:33

11        That will at least give me a greater hands-on

12   understanding of the system that I will have to adjudicate as I

13   decide whether or not there are enough errors here to warrant

14   further -- a different method of monitoring.

15        Let's take a ten-minute break, give the court reporter     15:36:48

16   a break.  Thank you.

17      (Recess at 3:36 p.m., until 3:49 p.m.)

18        THE COURT:  I wondered if it was worth me inquiring

19   about whether or not in the breaks and all you've had a chance

20   to discuss the Winslow telepsychology issue that Mr. Fathi      15:49:11

21   raised such that if it has a ready answer I'd rather save you

22   the trouble of having to do briefing on it as we talked about.

23   I thought I would at least ask whether you thought now you had

24   a ready answer or you still needed more time.

25        MR. STRUCK:  I don't have a ready answer.  But we          15:49:30

CV-12-601-PHX-DKD – January 18, 2018

1   could get a ready answer and confer with Mr. Fathi and then

2   determine whether or not -- he can decide whether or not, you

3   know, he would like the Court to deal with the issue, or maybe

4   it will answer his question.

5           THE COURT:  Okay.  So then to make sure that that          15:49:46

6   happens in an ordered process, so you all will meet and confer

7   in the next week about this.  If it turns out that there still

8   is an issue that the Court needs to address, then seven days

9   from -- well, next Friday, defendants will file a response to

10  what was put forth on the record from Mr. Fathi today.  And     15:50:04

11  then five days after that the plaintiffs can respond.

12          How is that?

13          MR. STRUCK:  That's fine.

14          Also, Judge, over the break we conferred with respect

15  to the issue that we were just discussing.  And Miss Kendrick    15:50:17

16  had the idea that perhaps we do this three-hour review on

17  February 9th, when the Court already had some time set aside.

18  We could do it at the ADC monitoring bureau, which is very

19  close to the courthouse.  And we could go through the

20  allegations in the December 11th letter with a bank of          15:50:33

21  computers so we can all see how the monitors -- you can see how

22  the monitors are reviewing things, and we can show where we

23  think that they made mistakes.  And if they're correct then you

24  can see that.

25          But we think -- we think that's probably a good idea     15:50:53

1    to do it, since we all had that time set aside.  Miss Kendrick

2    had already purchased her plane tickets to come out here

3    anyway.

4            THE COURT:  All right.  We'll do that.

5            And let me get back to -- or let's have a conversation      15:51:07

6    perhaps through my staff about what time of day works better in

7    light of everybody's schedules in terms of what I'm doing as

8    well.

9            Does that make sense?

10           MS. KENDRICK:  Yes, sir.                                     15:51:16

11           MR. STRUCK:  Yes.

12           THE COURT:  All right.  Thank you.

13           So since I've opened the issue of discovery, I

14    understand there are some other discovery issues that are

15    present.  Maybe now is the time to talk about those.  I think      15:51:25

16    those are on the plaintiffs' side.

17           MR. FATHI:  Yes, Your Honor.

18           This is not -- perhaps not exactly a discovery issue,

19    but it has to do with the monitoring which we've been

20    discussing.  And this is item 4c on the plaintiffs' agenda.        15:51:37

21           The last version -- most recent version of the

22    Monitor Guide that we've received from the defendants is dated

23    October 20th.  And since that time the Court has invalidated

24    the defendants' previous monitoring methodology for Performance

25    Measures 1, 2, 4, 77 and 95.  Those rulings were back in          15:52:00

CV-12-601-PHX-DKD – January 18, 2018

1    November, November 7th and November 21st.

2            But the defendants still haven't produced a new -- an

3    updated Monitor Guide reflecting the Court's ruling.  So we

4    think it's important, both so the monitors are apprised of the

5    Court's rulings on how they have to monitor these Measures, and    15:52:27

6    so the parties have a common understanding of what's happening,

7    that the defendants produce a new Monitor Guide that reflects

8    those rulings.

9            THE COURT:  So what you'd like to have in the first

10   instance is the language that they would be posing in the    15:52:41

11   Monitoring Guide so that you can take a look at it, or do you

12   just want a Monitoring Guide with their language?

13           MR. FATHI:  Well, Your Honor, we've already reached

14   agreement on the language for Performance Measure 95.  They

15   just sent language on the remaining Performance Measures on    15:52:52

16   Tuesday night.  And I apologize, I was at a conference

17   yesterday, I haven't had a chance to look at it.

18           But, yes, once we reach agreement, we would like them

19   to promptly produce a new Monitor Guide, and make sure it's

20   distributed to the monitors.    15:53:09

21           THE COURT:  Is there any issue with that?

22           MS. HESMAN:  No, Your Honor.  If I just may correct

23   something that Mr. Fathi said that was incorrect.

24           I actually sent him language on Friday, January 12th,

25   for Performance Measures 1, 2, 4 and 77.  Like he says, we've    15:53:19

1    already agreed on 95.

2           He responded that same day and asked us for a new

3    version of the Monitoring Guide.  I responded on Tuesday

4    saying, are you approving our language for 1, 2, 4 and 77?  If

5    you approve, certainly I'll provide that to you.  And I                15:53:39

6    received no response.

7           So this notion that we've refused to provide a Monitor

8    Guide is simply inaccurate.  I'm waiting for him to approve the

9    language.

10          MR. FATHI:  Your Honor, I don't think I said they'd         15:53:48

11   refused to provide the Monitor Guide.

12          And on Tuesday night's -- in Tuesday night's e-mail

13   Miss Hesman did produce some modified language from her

14   previous proposal for Performance Measure 77.

15          I don't think this back and forth is important.  What       15:54:02

16   we want is that there be a new Monitor Guide produced promptly.

17   We will --

18          THE COURT:  But isn't the back and forth stopping the

19   prompt production of the Monitoring Guide?  Because until you

20   get it all sorted out, they don't want to issue it --             15:54:13

21          MR. FATHI:  I'm sorry, I meant this back and forth

22   now, Your Honor --

23          THE COURT:  Oh, oh.

24          MR. FATHI:  -- about who said what.

25          THE COURT:  Oh, okay.                                       15:54:20

CV-12-601-PHX-DKD – January 18, 2018

1          MR. FATHI:  We will respond to Miss Hesman's e-mail.

2          THE COURT:  All right.  So we don't need to talk about

3     it further at this moment, it seems.

4          MR. FATHI:  Correct.

5          THE COURT:  Other discovery issues?                    15:54:28

6          MR. FATHI:  Yes, Your Honor.

7          Item 5, we -- there are some outstanding discovery

8     requests.  Exhibits 2 and 3 to the Declaration of

9     Miss Kendrick.

10         Exhibit 2 at document 2531-1 is my January 4th letter    15:54:48

11    to the defendants regarding these outstanding requests.  We

12    have received no response.  We would appreciate one.

13         MS. LOVE:  Your Honor, we are down to -- just so you

14    know, when we took over document production issue in November,

15    and have attorneys working diligently, just specifically       15:55:12

16    working on document production, we have drilled down

17    outstanding issues that plaintiffs had -- from about 14 to 16,

18    we're down now to four.

19         Mr. Fathi followed up asking if we have any additional

20    information to supplement on four.  We're down to four.  We're  15:55:28

21    in that process.  We are supplementing it.  I don't think that

22    we need a court order to respond.  We are doing that.

23         But this is the same situation where we were at last

24    month where the parties continue to work together.  If

25    Mr. Fathi is dissatisfied with either what he's getting, then   15:55:44

```
 1   we need to have a meet and confer versus just this
 2   identification to the Court every month of what the date of
 3   their letter is.
 4           I mean, we continue to work on this.  There's really
 5   nothing for the Court to solve at this point.                      15:55:55
 6           THE COURT:  All right.
 7           MR. FATHI:  Your Honor, I do think that -- one of
 8   these document requests was originally made in August.  We
 9   still have received nothing.  We are judicious about what we
10   bring to the Court.  But I think --                                15:56:10
11           THE COURT:  And what's the subject of this August
12   request?
13           MR. FATHI:  Yes, Your Honor.  This had to do with a
14   situation where a physician, the medical director at the
15   Phoenix facility, refused to accept for transfer a couple of      15:56:21
16   prisoners based on deficient CGAR scores.
17           And there was -- there were e-mails from Dr. Taylor,
18   there was an e-mail from Mr. Pratt saying -- and, again, I'm
19   paraphrasing -- serious consideration must be given to
20   continued employment of this individual.                          15:56:43
21           And so our document request was simply for any
22   follow-up documents that showed any corrective action taken
23   with this individual.  And again, five, six months later we
24   have received nothing.
25           THE COURT:  Miss Love, is this within your four issues    15:57:01
```

168

1    that remain or something that you hadn't been focusing on?

2              MS. LOVE:  I'm sorry?

3              THE COURT:  Is this among the four issues that you say

4    remain to be addressed, or is this something you had not been

5    focused on?                                                    15:57:13

6              MS. LOVE:  No, this is one of the -- this is one of

7    the document requests.

8              ADC is not in possession of documents responsive to

9    the request.  We are following up with Corizon to see if they

10   have any documents that are responsive, and they are searching  15:57:24

11   to see if there is.  If there are any, we will certainly turn

12   it over.

13             But, again, I think that this is an issue where, if we

14   need to talk through these issues, the time would be for

15   Mr. Fathi to say, hey, can we have a phone call and talk        15:57:36

16   through these things, more versus bringing it to this venue,

17   when what we're supposed to be doing is having a confer session

18   before, versus being -- bringing it up every month.

19             THE COURT:  Okay.  Well, let me just, for the sake of

20   drilling down -- so that I can do what I promised to do when I  15:57:52

21   took this job, and that is not just turn a deaf ear to when

22   people were having discovery disputes, to actually be the judge

23   and listen to them.  When was the last time that there was a

24   discussion about this issue between counsel?

25             MS. LOVE:  There have been letters back and forth.    15:58:09

CV-12-601-PHX-DKD – January 18, 2018

1   ADC has responded that there's no responsive -- we don't have

2   any responsive documents.  We have advised them in a letter

3   form that we're following up with Corizon to see if they have

4   any documents responsive.  If so, then we will supplement.

5          It's a normal discovery process that if there are                    15:58:25

6   additional documents that are out there, we will certainly

7   supplement.

8          THE COURT:  All right.  And that letter where you said

9   that you'd turned to Corizon to ask them to see if they had

10  any, when was that?                                                          15:58:36

11         MS. LOVE:  That was --

12      (Discussion off the record between defense counsel.)

13         MS. LOVE:  -- December 29th.

14         THE COURT:  Okay.  Well, it seems to me that it is

15  appropriate to not be raising that here.                                     15:58:56

16         To offer my observation, that if you get a response

17  from counsel on the 29th of December, and you haven't heard

18  anything back by the 18th of January, what you should do is

19  send over an e-mail saying, you told us you would get this on

20  the 29th, when should we expect to be able to hear an answer?                15:59:13

21  And that would be the appropriate thing to do.

22         MR. FATHI:  That's fine, Your Honor.

23         I do want to make clear that there are other discovery

24  requests in this letter, and we have received no response.

25         THE COURT:  You brought this one up, though.  And so                  15:59:28

UNITED STATES DISTRICT COURT

1   I drill downed and looked into it, and you don't win on this

2   one.

3           MR. FATHI:  Thank you.

4           THE COURT:  All right.  Any other discovery issues?

5       (Discussion off the record between plaintiffs' counsel.)          15:59:38

6           MS. KENDRICK:  So another request that's outstanding,

7   Your Honor, is the one that has been numbered document request

8   62, and that involved our request for documents regarding the

9   discontinuation of pain medication.

10          THE COURT:  Right.  Well, we have the production that      15:59:56

11  the defendants filed, about the tramadol and the gabapentin.

12  Is that what we're talking about?

13          MS. KENDRICK:  Correct, Your Honor.

14          So that filing contradicts what counsel for defendants

15  asserted both in court and in correspondence saying that no      16:00:11

16  such policy existed.  Because what they filed showed that it

17  was as a result of something that was a state-wide directive

18  handed down by the governor himself.  And in the filings that

19  was included in the Declaration, there's reference to

20  directives being given to providers and that sort of thing.      16:00:34

21          And so we think that there are documents that are

22  responsive.

23          We're frankly kind of confused by the fact that last

24  month we were told by counsel for defendants and Mr. Pratt that

25  the reason these medications were no longer being prescribed     16:00:51

CV-12-601-PHX-DKD – January 18, 2018

1   for people was because there was this uptick in abuse of the

2   drugs.  And then Mr. Moyers from Corizon files this Declaration

3   where he says the reason why is because Governor Ducey said

4   that the State will not pay for more than seven days of opioid

5   medication.                                                    16:01:13

6           Holding aside whether or not the Governor, and given

7   his background, necessarily is a person who should be making

8   these prescribing decisions, the fact remains that it does

9   appear that there was some sort of system-wide policy.

10          Mr. Moyer states that as a result of Governor Ducey's  16:01:30

11  order, that they worked with the providers -- worked with

12  providers to ensure the medications are appropriately

13  prescribed.

14          And so to us this does actually seem to indicate that

15  there are responsive documents.                                16:01:44

16          You know, this information they provided was what you

17  had requested with the data.  The data that they provided

18  raised a lot of questions to us as well because it showed a

19  sharp decrease in these two medications, and then said there

20  was an increase in overall pain meds being prescribed.  But    16:02:01

21  then they include all of these psychotropic medications, like

22  Cymbalta and Effexor and Elavil in there, which are primarily

23  prescribed for mental health purposes.  As our expert,

24  Dr. Wilcox, pointed out, that's an off-label use to use them to

25  treat pain.                                                    16:02:21

1      So given what was filed, it to us indicates that there

2  are responsive documents out there.  And so this is something

3  that we had been hearing about, as laid out in the Declaration

4  of Megan Lynch from my office, where she analyzed the mail and

5  what had been filed on the docket with the court by class          16:02:42

6  members.

7      And so we've been trying to get more information about

8  this.  This is a useful start in terms of showing we now know

9  the true reason why it happened, it was pursuant to the

10  governor's order.                                                   16:02:54

11      But it also indicates to us that this request, as you

12  had asked a few months ago that we make some sort of case as to

13  why we were asking for it, that there are documents and that we

14  are entitled to get them.

15      THE COURT:  Well, I think the defendants have produced        16:03:11

16  what I had a commitment from Mr. Pratt to obtain.  And so that

17  is satisfied.

18      Those documents, as I review them though, raise a

19  number of other questions.  And you say that you want discovery

20  on those questions.  Have you promulgated that -- have you          16:03:29

21  served interrogatories or discovery --

22      MS. KENDRICK:  Yes.

23      THE COURT:  -- document requests?

24      MS. KENDRICK:  I'm sorry to interrupt, Your Honor.

25      Yes, sir, we have.  After the December -- so on the            16:03:40

UNITED STATES DISTRICT COURT

1    15th of every month we promulgate our monthly document request.

2         So after the last hearing where you advised us that

3    the language that was originally used in request 62 could have

4    been read to mean we were just requesting a copy of the policy,

5    we revised that language appropriately, and provided it to          16:03:58

6    defendants on the 16th of this month, Tuesday, because of the

7    federal holiday on Monday, the 15th.

8         THE COURT:  All right.  So you've done the next step.

9    It doesn't seem like it's ripe for me to address anything

10   further on this as a discovery dispute because they haven't       16:04:16

11   responded yet.  Is that right?

12        MS. KENDRICK:  We just -- I guess we just want to make

13   clear that, holding that aside, we are concerned by the fact

14   that we were told for months that, first of all, there were no

15   documents, there was no policy, and now it appears that there     16:04:31

16   are documents and there was a policy.

17        THE COURT:  Well, again, the discussion that we had in

18   court about this was about a policy, I think, of discontinuing

19   these drugs.  And so we see that it's not true that they've

20   been discontinued, because some number of inmates still get       16:04:57

21   them.

22        What we've learned is that there is a policy from the

23   governor's office with respect to the opiates that has resulted

24   in a direct effect.  We read in the Affidavit that the State

25   provided that with respect to the gabapentin that there is this   16:05:14

CV-12-601-PHX-DKD – January 18, 2018

1   abuse issue that is raised.

2        And then I will say this about the attached

3   information, it's somewhat unintelligible to a lay person in

4   terms of understanding exactly what it means.  There are terms

5   that are used in some of the tables that are not defined or        16:05:37

6   they're apparently potentially inconsistent with respect to

7   what the meanings are across these documents.

8        So I think further discovery is warranted.  I also

9   think -- you mentioned your expert, it's appropriate for the

10  expect -- plaintiffs' expert to opine about what this means     16:06:00

11  with respect to the impact for the prison population to

12  discontinue these two classes of medications, and whether or

13  not there is reason to believe that it's causing harm in a way

14  that would be recognized as being contrary to the Stipulation.

15       And so I think that this discovery stage is             16:06:23

16  appropriate.  I think I invite you to further brief this and to

17  have an Affidavit of your expert, or if we need to have a

18  hearing about it, to give an opportunity for the respective

19  sides to be heard about it.  But I don't think this is the end

20  of the issue.                                                 16:06:42

21       MS. KENDRICK:  Correct.  We agree that it is not the

22  end of the issue.

23       And I actually forwarded those findings to Dr. Wilcox

24  when they were filed because, like you, I couldn't make head or

25  tails out of them.  And he did send me some written comments,   16:06:54

1   primarily about the formulary.

2            He also made the observation that the chart showing

3   that there's been an increase in pain medication doesn't really

4   mean anything if it's including all the mental health

5   medications that are prescribed for mental health issues.          16:07:10

6            His observation to him –– that he offered was that he

7   found that the formulary for pain medication, the scientific

8   word for it was weird.  Because he says they have minimally

9   effective, if even at all, medication such as Tylenol 3, and

10  then they have morphine.  And he says, they're missing          16:07:33

11  formulary options for what I consider medium strength pain

12  medication.

13           So, you know, obviously that's just something he

14  e-mailed me quick and dirty.  But we are in the process of

15  trying to gather that sort of information and get a little more   16:07:48

16  detail and handle on what exactly is going on with this.

17           THE COURT:  Okay.  All right.

18           Anything that defendants' side want to say on this

19  point?  I didn't give you a chance.

20           MS. HESMAN:  No, Your Honor.  You covered exactly what   16:08:02

21  I was going to say.  Miss Kendrick said that I made

22  misrepresentations at the last hearing.  That is absolutely

23  false.  What I said at the last hearing, just as you

24  reiterated, is there hasn't been a policy of discontinuation.

25  And, in fact, it says that in paragraph 12 of the Declaration.   16:08:16

CV-12-601-PHX-DKD – January 18, 2018

1           And the governor's order is not a policy, it was

2   strictly instructive to Corizon, which the Declaration makes

3   clear.  So I just wanted to correct that statement.

4           So, no, nothing else from us.

5           THE COURT:  So Corizon doesn't have to follow that?        16:08:28

6           MS. HESMAN:  Corizon doesn't have a policy based on

7   the governor's order.  Their discovery request asked for

8   policies of discontinuation.  And what Miss Kendrick had said

9   was that there are now documents responsive to that request,

10  and that's not true because there has not been a policy of       16:08:44

11  discontinuation.  These medications are still prescribed.

12          THE COURT:  I don't have the Affidavit in front of me,

13  but the Affidavit, as I recall, seemed to represent that

14  Corizon felt they were being told what to do in the state of

15  Arizona.                                                          16:09:01

16          MS. KENDRICK:  Well, the Affidavit at paragraph 6 of

17  docket 2539-1 says, quote, as a result of the governor's

18  October 24th, 2016 Executive Order, Corizon undertook a review

19  of narcotic prescriptions in ADC and revised its practice for

20  prescribing and renewing these medications.  So --               16:09:16

21          MS. HESMAN:  That's not --

22          MS. KENDRICK:  So we can get pedantic about whether

23  practice equals policy, or practice for prescribing and

24  renewing is the same thing as discontinuation, and

25  discontinuation means something different.                       16:09:32

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – January 18, 2018

1       The idea is that the rates of prescribing these

2  medications dropped dramatically and quickly.

3       And our concern, based upon our expert looking at

4  some of these medical records, was first of all, despite the

5  fact that the governor's decree gives an exception to the                16:09:45

6  seven-day rule for children with cancer who rely upon the State

7  for their health care, there's no language about adults.  And

8  finding people with cancer who are not being provided

9  appropriate pain management is of great concern to us and to

10  our expert.                                                              16:10:05

11      And so, again, whether we want to use the magic word

12  "policy" or "practice," I think the overall concept is, the

13  governor issued a directive, Corizon changed its practice and

14  told its providers to not prescribe and renew these medications

15  at the rate they previously were.                                        16:10:23

16      If we want to pull out dictionaries -- I mean, I think

17  that we need to look at the spirit of the request, the spirit

18  of what our people are reporting versus getting into an

19  analysis of whether a policy equals a practice or not.

20      THE COURT:  Well, I mean, you just don't have the              16:10:41

21  cited example -- or not cited, the cited authority of the

22  governor's declaration, but you also have the numerical

23  diminution in the -- dramatic numerical diminution in the

24  number of these drugs that are being provided.  So that seems

25  to create a reason to think that they are linked.  But in any       16:10:57

1    event.

2          Okay.  That was, I think, the last discovery issue you

3    had, or there's another one?

4          MR. FATHI:  Your Honor, I don't think this is a

5    discovery issue, so the next item is our request for an update          16:11:17

6    from defendants regarding the following contractual issues,

7    item 8 on our agenda.

8          First, the status of their request for proposals and

9    negotiations with bidders for a five-year contract to provide

10   health care services to begin in March 2018.                           16:11:34

11         THE COURT:  Mr. Struck?

12         MR. STRUCK:  Yes.  With respect to 8a, the status is

13   the same.  The RFP is still under review.

14         THE COURT:  So under the current contract, the

15   extensions that have been used, if a new contract is not              16:11:51

16   reached, either with Corizon or with a different provider,

17   there could, I gather, be extensions because we're operating

18   under an extension?  Is that fair to say?

19         MR. STRUCK:  I believe that is fair to say,

20   Your Honor.                                                            16:12:10

21         THE COURT:  Okay.  So the fact that the March 2018

22   date is looming is not necessarily an indication that there

23   will be a decision made by that time with respect to the

24   inquiry that plaintiff asked, and that is about the five-year

25   contract.                                                              16:12:23

1      MR. STRUCK:  I think that's -- I think that's true,

2   that not necessarily.  But I'm not privy to any of that

3   information.

4      THE COURT:  Okay.  All right.  Fair enough.

5      And then on the fine issue, that second part?                    16:12:33

6      MR. BOJANOWSKI:  Your Honor, the fines for November

7   2017 have not yet been calculated.  So I don't know -- I don't

8   know -- I have no response to that.  I know that it was 90,000

9   for October.  But those -- that has not yet been calculated.

10     I do have the fine for staffing levels for November,          16:13:02

11  and that was $74,613.36.

12     MR. FATHI:  Could we have that again?

13     MR. BOJANOWSKI:  $74,613.36.

14     MR. FATHI:  And any idea when we will have the

15  November fine for violations of the Stipulation?                   16:13:26

16     MR. BOJANOWSKI:  I've been told that it will probably

17  come in at the end of this month.

18     THE COURT:  So you'll let us all know, plaintiffs know

19  when that happens.

20     Thank you.                                                      16:13:40

21     MR. FATHI:  And then finally is the issue of

22  defendants' failure to timely reimburse plaintiffs' monitoring

23  fees and expenses as required by the Stipulation.  The

24  Stipulation requires payment within 30 days of submission of

25  the invoice.                                                       16:13:58

CV-12-601-PHX-DKD – January 18, 2018

```
1              Under the Stipulation payment was due on January 3rd,

2    and we have still not received it.  So we would like an order

3    that the defendants provide payment immediately and --

4              THE COURT:  Is this unusual?  Is this late pay

5    unusual?                                                        16:14:16

6              MR. FATHI:  It's not the first time, Your Honor, let

7    me put it that way.

8              THE COURT:  All right.  And when it happens, do you

9    call them up and say, what's going on?

10             MR. FATHI:  We e-mail them, Your Honor, as we did in   16:14:23

11   this case.  The e-mails are attached as Exhibit 11.

12             THE COURT:  I didn't read those.  I'm sorry.

13             And what did you say -- what did they say in response?

14             MR. FATHI:  They said -- let me quote directly.

15             MR. BOJANOWSKI:  Your Honor, I could shortcut this.    16:14:39

16             THE COURT:  Sure, please.  Go ahead.  No, let's make

17   it longer if we can.

18             MR. BOJANOWSKI:  What occurred here was, in the

19   transition between our firm and the Attorney General's Office

20   as to the responsibility to address the letters, there          16:14:56

21   was -- the responsibility was falling with the Attorney General

22   to do the analysis.  The Attorney General thought the

23   responsibility had moved over to us.

24             So once we found out from Mr. Fathi's e-mail what was

25   going on, I contacted Miss Rand, and she expedited the          16:15:16
```

UNITED STATES DISTRICT COURT

1   authorization for the payment.  It has been submitted.  It's on

2   the fast-track.  And so it should be paid forthwith.

3           THE COURT:  All right.  So this is just a one off

4   because of the transition between the responsible entities?

5           MR. BOJANOWSKI:  I believe that to be the case.          16:15:34

6           And it's my understanding that our office going

7   forward will be taking the responsibility for the analysis of

8   the bill and then the submission to the State for payment.

9           THE COURT:  Okay.

10          MR. FATHI:  As I said, Your Honor, this is not the       16:15:51

11  first time.  We hope it will be the last.

12          THE COURT:  All right.  Thank you.

13          Anything else, Mr. Fathi, from your side?

14     (Discussion off the record between plaintiffs' counsel.)

15          MR. FATHI:  Nothing, Your Honor.  Thank you.             16:16:05

16          THE COURT:  Defendants' side?

17          MR. STRUCK:  No, Your Honor.

18          THE COURT:  All right.  First of all -- or last of

19  all, I thank the court reporter and the clerk of the court that

20  has stood in today.  We needed to address absences.  And so     16:16:20

21  they sacrificed their work schedules, and I'm thankful for

22  that.

23          Secondly, I'll ask my law clerk, and perhaps

24  Miss Brown if she wants to participate too, to be involved in

25  the planning process for the 9th.  So communicate with them     16:16:42

UNITED STATES DISTRICT COURT

1    about what timing seems to make sense, and how best to do it

2    and where and all of that, and we'll follow up appropriately.

3            Thank you all very much.

4        (Proceedings concluded at 4:16 p.m.)

5

6                            -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV-12-601-PHX-DKD – January 18, 2018

1

2

3

4                       C E R T I F I C A T E

5

6           I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9           I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 25th day of January,

15   2018.

16

17

18
                              s/Candy L. Potter_____
19                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25

# Exhibit 15

# M Gmail

**Jan Watson**

## Re: Updated Story Online
1 message

**Jan Watson**
To: Jimmy Jenkins

Thu, Dec 21, 2017 at 2:20 PM

I know, a friend said it was like a Lifetime movie, we just need the abusive husband!

On Thu, Dec 21, 2017 at 1:51 PM, Jimmy Jenkins                        wrote:
Awesome I'm serious - this is like a once-in-a-life-time soap box moment - go off!


Jimmy Jenkins
Senior Field Correspondent
KJZZ | NPR | Phoenix, Arizona


On Thu, Dec 21, 2017 at 1:47 PM, Jan Watson                        wrote:
I did speak to to Corene this morning and started writing down things for her. I will include my previous
experience when the state was in charge

On Thu, Dec 21, 2017 at 1:43 PM, Jimmy Jenkins                  wrote:
Well once we have this hearing - the judge will more than likely appoint an independent monitor - that monitor
will more than likely find different results than what corizon is reporting and all of this is going on while the state
is taking requests for proposals for the next 5 year contract. So no - i doubt it will revert back to the state - but I
think it is possible that another company will take over.

I don't know if you've spoken to Corene yet but my advice would be for you to start writing down things you
want the judge to know and think about. He is very eager to hear from you and I think will listen to anything you
want to tell him. So as to your thoughts about private run health care - I would start by writing them down
because you're going to have the opportunity to speak directly to the person in charge of all of this.

Remember how you told me about your time working in the prisons (or jails) when it was state run? Maybe you
could give him some examples of how things changed since you've seen both sides.



Jimmy Jenkins
Senior Field Correspondent
KJZZ | NPR | Phoenix, Arizona


On Thu, Dec 21, 2017 at 1:37 PM, Jan Watson                        wrote:
Thanks. I read the shorter version yesterday. Can anyone ask the question why they don't return control of
healthcare back to the state? This didn't become a problem until the state privatized medical care.

On Dec 21, 2017 1:19 PM, "Jimmy Jenkins"                  wrote:
http://kjzz.org/content/583172/federal-judge-calls-hearing-after-kjzz-report-arizona-prison-health-care

Jimmy Jenkins
Senior Field Correspondent
KJZZ | NPR | Phoenix, Arizona

JW001119

**M** Gmail

**Jan Watson**

## Here It Is!
1 message

**Jimmy Jenkins**
To: Jan Watson

Tue, Dec 19, 2017 at 3:51 PM

http://kjzz.org/content/572976/inside-chaos-arizona-prison-health-care#two

We did it! Sorry this took so long. Thank you again for coming to me with your story Jan. This has been the most powerful thing I've ever been a part of and I'm honored that you shared your account with me.

Jimmy

Jimmy Jenkins
Senior Field Correspondent
KJZZ | NPR | Phoenix, Arizona

JW001123



Jan Watson <span>▮▮▮▮▮▮▮▮▮▮</span>

## Re: Follow Up Question
1 message

**Jimmy Jenkins** ▮▮▮▮▮▮▮                                      Mon, Dec 4, 2017 at 1:43 PM
To: Jan Watson ▮▮▮▮▮▮▮

I asked the same question both at the state and local level and both tried to explain it as something about how they can't take individual stories from outside the scope of the case. I don't know if that means it's because you didn't work there anymore? They go out an interview and get testimony from current employees - we see those in court quite a bit. So I'm not sure - but they have told me they can submit a "public account" that they think addresses the Parsons case - which is where the press comes in.

I am not sure why they didnt return your calls - that's just rude!


Jimmy Jenkins
Senior Field Correspondent
KJZZ | NPR | Phoenix, Arizona
▮▮▮▮▮▮▮▮▮▮

On Mon, Dec 4, 2017 at 1:10 PM, Jan Watson ▮▮▮▮▮▮▮▮▮▮ wrote:
  So if the attorneys are going to use this information, why didn't they return my calls?

  On Mon, Dec 4, 2017 at 1:02 PM, Jimmy Jenkins ▮▮▮▮▮▮▮ wrote:
    Got it - thanks again. I just reached out with a follow up to Corizon Health and the Department of Corrections with a detailed list of allegations for them to respond to. I will let you know what they say. Your story is still running Thursday. As soon as it publishes the attorneys for the plaintiffs in Parsons are going to enter it into the court docket so the judge will see it!


    Jimmy Jenkins
    Senior Field Correspondent
    KJZZ | NPR | Phoenix, Arizona
    ▮▮▮▮▮▮▮▮▮▮

    On Mon, Dec 4, 2017 at 12:57 PM, Jan Watson ▮▮▮▮▮▮▮▮▮▮ wrote:
      I do not remember her title, but yes she is one of the people responsible for acquiring data submitted to the court as part of the monitoring process from ;the Parsons v Ryan settlement.

      On Mon, Dec 4, 2017 at 12:25 PM, Jimmy Jenkins ▮▮▮▮▮▮▮ wrote:
        Hi Jan,

        When you said you were at a Provider meeting and a woman told the group "Let me tell you how to beat the monitor" - do you remember who she was or what her position was? Did she work for Corizon?

        And when she said "monitor" - did you take that to mean "the court ordered monitoring process resulting from the Parsons v Ryan settlement" ?

        Thank you!

        Jimmy

JW001141



**Jan Watson** █████████████████

## Re:
1 message

**Jimmy Jenkins** ██████████████████          Mon, Oct 30, 2017 at 5:09 PM
To: Jan Watson ██████████████████

Hi Jan - thanks for sending this along - please forward anything else that shows the shortage of providers and the denial of specialist care.

I'm putting a script together and my editor said we can publish this week.

If you would do me the favor of withholding your story from any other news outlets until I publish, I can promise you that this will be a fantastic presentation that I think will bring about real change. Your quotes that we got on tape are really fantastic.

Can you tell me where you went to medical and what your various licenses are - where you can practice medicine etc.

Please look for any other denials of materials, resources etc.

Can you also see if there is anywhere they speak of "The Corizon Way" that you mentioned?

Thank you Jan - I'm so honored that you came to me with this information - we are going to do good things.

Jimmy


Jimmy Jenkins
Senior Field Correspondent
KJZZ | NPR | Phoenix, Arizona
███████████████████

On Fri, Oct 27, 2017 at 1:46 PM, Jan Watson ██████████████████ wrote:
I didn't cancel the consult.  Someone else did and left a comment that he would be sent when they found a Physical medicine specialist.

JW001169

M Gmail

Jan Watson

## Request For Response
1 message

**Jimmy Jenkins -**
To: Jan Watson

Tue, Dec 12, 2017 at 12:34 PM

Hi Jan!

I think we have them on the ropes. Through a response from their attorneys, Corizon basically confirmed most of your allegations. They pushed back in a few areas that I would like you to respond to. Your responses are for me and my editor and we could possibly use them in our response to Corizon when we ask more questions:

**1. Original Allegation Sent to Corizon:** "Jan claims she repeatedly was asked by Corizon Health officials to cancel referrals for specialty care for things like infectious disease consults because there were no providers available. She said the company asked her to cancel these referrals so it could avoid fines."

**Interpretation of Allegation 1 by Fennemore Craig:** "Dr. Watson alleges Corizon asked her to cancel referrals for specialty care because no providers were allegedly available. She further alleges Corizon told her to cancel to avoid fines.

**Corizon Response to interpretation of Allegation 1 from Fennemore Craig:** "Corizon reviewed relevant documents from the time period in which Dr. Watkins served as a provider. From July 1, 2017 through the end of September, 2017, eighteen appointments were canceled, and of those, twelve of them were cancelled by the specialty physicians' offices themselves and not by Corizon or its providers. Of the remaining six, records indicate (i) one was sent to an emergency room; (ii) one physician refused to see the patient at all, necessitating rescheduling the appointment with another provider; (iii) two patients had off-site visits cancelled in September but were, in turn, followed by onsite providers in consultation with a Corizon infectious disease consultant; and (iv) two patients were fed by security when they were to appear for their appointments fasted, necessitating having to reschedule those visits.

JAN RESPONSE: ( I am going to ask them why they think the 12 appointments were cancelled by the specialists. But can you you tell me whether you think this is an accurate breakdown? Obviously we have the email you saved that shows part of this response is untrue) :

**2. Original Allegation Sent to Corizon:** "Jan claims that she frequently ran out of Morphine for cancer patients and would have to send employees to Walgreens to fill prescriptions while waiting on PharmaCorr to supply the facility."

**Interpretation of Allegation by Fennemore Craig:** "Dr. Watson alleges she frequently ran out of morphine for cancer patients and would have to send Corizon employees to Walgreens to fill prescriptions while waiting on PharmaCorr to supply the requested medication."

**Corizon Response to interpretation of Allegation from Fennemore Craig:** "During the time period from June 2017 through October 2017, backup morphine prescriptions were only filled at Walgreens a total of nine times, which is a fairly limited amount for a five-month period. In addition, Dr. Watson omits the fact that she was not current with her prescription renewals, which contributed to the very problem about which she complained."

**KJZZ Response:** ( I am going to ask them "What is a normal amount of times to run out of morphine?" Can you respond to this point as well as the prescription renewals? In our interview you told me the nurses sometimes would not request refills at the right time, sometimes a little early - and this would affect the delivery of those meds - is that

JW001170