## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

————————————————

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their Official capacities, | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |

No. **CV-12-00601-PHX-DKD**

Phoenix, Arizona
February 27, 2018
9:11 a.m.

**BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

### EVIDENTIARY HEARING
#### Day 1
(Pages 1 through 234, inclusive)

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CV-12-601-PHX-DKD – February 27, 2018

1

2                    **A P P E A R A N C E S**

3    For the Plaintiffs:
            PRISON LAW OFFICE
4            By:  **Donald Specter, Esq.**
            By:  **Corene Kendrick, Esq.**
5            1917 5th Street
            Berkeley, CA 94710
6
            ACLU – Washington DC
7            By:  **David C. Fathi, Esq.**
            915 15th Street NW
8            7th Floor
            Washington, DC 20005
9
            EIDENBACH LAW PC
10           By:  **Kirstin T. Eidenbach, Esq.**
            P.O. Box 91398
11           Tucson, AZ 85752
12           PERKINS COIE
            By:  **Daniel Clayton Barr**, Esq.
13           P.O. Box 400
            Phoenix, AZ 85001
14
            ARIZONA CENTER FOR DISABILITY LAW – Tucson, AZ
15           By:  **Maya S. Abela, Esq.**
            177 N. Church Avenue
16           Suite 800
            Tucson, AZ 85701
17
     For the Defendants:
18           STRUCK LOVE BOJANOWSKI & ACEDO PLC
            By:  **Timothy J. Bojanowski, Esq.**
19           By:  **Rachel Love, Esq.**
            By:  **Daniel Struck, Esq.**
20           By:  **Ashlee B. Hesman**, Esq.
            3100 W. Ray Road
21           Suite 300
            Chandler, AZ 85226
22

23

24

25

CV-12-601-PHX-DKD – February 27, 2018

1

2                          **I N D E X**

3   <u>WITNESS:</u>          <u>DIRECT</u>    <u>CROSS</u>      <u>REDIRECT</u>   <u>RECROSS</u>

4   JANICE WATSON
    By Mr. Fathi         16

5
    Presentation by Mr. Millar    99

6
    JANICE WATSON
7   By Mr. Fathi         114
    By the Court                   132
8   By Mr. Struck                  135

9

10                    **INDEX OF EXHIBITS**

11  <u>EXHIBIT</u>                              <u>IDENT</u>    <u>RECEIVED</u>

12  1        6-29-17 email from
             J. Watson to M. Johnson        33       34
13
    3        9-18-17 email from
14           S. Neese to J. Watson          22       24

15  4        6-14-17 email from
             T. Espinoza to J. Watson       29       32
16
    6        9-18-17 email from
17           J. Watson to B. White          129      130

18  10       9-19-17 email from
             S. Neese to J. Watson          218      220
19
    11       9-16-17 email from
20           J. Watson to M. Johnson
             and R. Stewart                 43       47
21
    12       B. Medical Records             91       93
22
    13       9-13-17 email from
23           S. Neese to J. Watson          25       26

24  14       H. Medical Records             60       67

25  15       L. Medical Records             75       83

UNITED STATES DISTRICT COURT

1

2                         **INDEX OF EXHIBITS**

3    <u>**EXHIBIT**</u>                                      <u>**IDENT**</u>    <u>**RECEIVED**</u>

4    16        O. Medical Records                    67      75

5    17        R. Medical Records                    98      123

6    18        S. Medical Records                    83      91

7    20        10-9-17 email from
              D. Sego to multiple recipients         38      39
8
     168       12-22-17 email from
9              K. Padron to K. Campbell              93      95

10   308       J. Watson Application for
              Corizon Affiliation                   137     144
11
     309       CV93-10100
12             Masters v. Watson                     145

13   310       CV94-06004
              Galindo v. Watson                      145
14
     311       CV91-12492
15             Prato v. Samaritan Health             146

16   312       84CV10599
              Sapp v. Watson                         149
17
     314       Az Board of Medical Examiners
18             Application by Jan Watson             154

19   315       Az Board of Medical Examiners
              Preliminary Questionnaire
20             by Jan Watson                         151

21   316       Az Board of Medical Examiners
              Renewal of Licence by
22             Jan Watson                            157

23   318       Az Board of Medical Examiners
              correspondence issued to
24             Jan Watson                            159

25

1

2                           **INDEX OF EXHIBITS**

3   **EXHIBIT**                                    **IDENT**   **RECEIVED**

4   323     CV2010-000199
            Watson v. Phoenician Medical          166

5
    324     11-24-06 letter from Banner
6           Desert to Jan Watson                  165

7   325     10-27-08 Phoenix Health Plan
            Credentialing Application
8           by Jan Watson                         169

9   367     9-13-17 email from
            S. Neese to J. Watson                 205         207

10
    415     9-11-17 email from
11          S. Neese to J. Watson                 24          25

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings begin at 9:11 a.m.)

2           THE CLERK:  Civil case number 12-601, Parsons, et al,

3   versus Ryan, et al, on for an evidentiary hearing.

4           THE COURT:  Would counsel please announce?

5           MR. FATHI:  Good morning, Your Honor, David Fathi of       09:12:09

6   the ACLU National Prison Project for the plaintiff class.

7           THE COURT:  Thank you.  Good morning.

8           MS. KENDRICK:  Good morning, Your Honor, Corene

9   Kendrick from the Prison Law Office for the plaintiff class.

10          THE COURT:  Good morning.                                  09:12:20

11          MR. SPECTER:  Donald Specter, Prison Law Office for

12  plaintiffs.

13          THE COURT:  Thank you.  Good morning.

14          MS. EIDENBACH:  Good morning, Your Honor, Kirsten

15  Eidenbach for the prisoner plaintiff class, along with Dan Barr   09:12:31

16  for the prisoner plaintiff class from Perkins Coie, and Maya

17  Abela from the Arizona Center for Disability Law.

18          THE COURT:  Thank you.  Good morning all.

19          MR. STRUCK:  Good morning, Your Honor, Dan Struck,

20  Ashlee Hesman, Tim Bojanowski, and Rachel Love for the           09:12:45

21  defendants.

22          THE COURT:  Thank you.  Good morning.

23          MR. STRUCK:  Good morning.

24          And, Your Honor, before we begin there were a couple

25  preliminary issues, that I -- if you have --                     09:12:55

─── CV-12-601-PHX-DKD – February 27, 2018 ───

1          THE COURT:  All right.  Go ahead.

2          MR. STRUCK:  After the date for this hearing of set, I

3     had a case in New Mexico where the judge set a pretrial

4     conference ordering my personal appearance.  I filed a motion

5     to excuse myself, and all the judge would do was allow me to      09:13:10

6     appear telephonically.

7          So at about 10:25 I need to be excused for about --

8     I've been told ten minutes, for the pretrial conference.  If

9     that's okay.

10          THE COURT:  And your co-counsel will be able to cover       09:13:27

11     for you, I'm sure.

12          MR. STRUCK:  Yes.  But I believe --

13          THE COURT:  Meaning here in this courtroom.

14          MR. STRUCK:  Yes.  It would probably -- it would be

15     our request that we -- if possible, we take a break at that      09:13:36

16     time, because I think Miss Watson will be on the stand, and she

17     is -- I'm doing the cross-examination of her.  So it would be

18     our preference to take a break at that time, if possible.

19          THE COURT:  And this is at 10:00 a.m.?

20          MR. STRUCK:  10:25.                                         09:13:52

21          THE COURT:  I'm sorry.  10:25.

22          MR. STRUCK:  Yes.

23          THE COURT:  All right.  I think we'll be able to

24     accommodate that.

25          MR. STRUCK:  Okay.  The other issue is, as the Court        09:13:59

 1   is aware, the defendants filed a motion to disqualify on

 2   Friday.  We would like to request that Your Honor refer that

 3   motion to the chief judge or another judge to decide the

 4   motion.  I think it's -- we believe it's in your inherent

 5   authority to do that.  It would certainly eliminate any                09:14:25

 6   question of partiality, and I think, at least in my client's

 7   view, fundamental fairness would require that -- that you do

 8   that.  Obviously it's in your discretion to do that, but we

 9   make that request.

10        THE COURT:  All right.  Well, you're right, it is            09:14:45

11   within the discretion, and there are numerous matters that need

12   to be considered in deciding whether or not that's an

13   appropriate step to take.

14        And for the reason that I said in the order yesterday

15   morning, I'll defer any consideration of the motion to              09:15:00

16   disqualify after full briefing so that I have all of the

17   information that the parties can provide to me with respect to

18   that issue.

19        And as I said, it's not necessary for me to consider

20   it now because of the factors that I explained in the order         09:15:12

21   yesterday.

22        Thank you.

23        MR. STRUCK:  Thank you.

24        THE COURT:  Now, I told you all, I think a couple of

25   times, that I was deferential to what I have loosely called the     09:15:23

CV-12-601-PHX-DKD – February 27, 2018

1    order of service about how we would handle these two days, and

2    that I want you to understand that I remain committed to the

3    idea of doing what makes the most sense, both with respect to

4    efficiency and not necessarily following some traditional

5    method of doing things.                                      09:15:48

6           And so I wanted to, at the very start from my agenda,

7    talk to you all about how you thought, in light of witnesses

8    and exhibits that you contemplated with respect to the matters

9    set for today's hearing, which is, in summary, the soundness of

10   the monitoring system, how we should best proceed.           09:16:07

11          And so if there are witnesses that are available at

12   particular times, as -- or counsel available at particular

13   times, I am amenable to that.

14          So I wanted to give you this moment, this forum now to

15   tell me what, if any, thoughts you had, either you had agreed  09:16:24

16   together how you thought best to proceed or you had individual

17   ideas about how to proceed.

18          Plaintiffs?

19          MS. KENDRICK:  Your Honor, plaintiffs had only listed

20   two witnesses for the evidentiary hearing, the first being    09:16:35

21   Dr. Jan Watson.  She is here in the courtroom, so we plan to

22   begin with her, as soon as we're done with these preliminaries.

23          We also are calling our expert Dr. Todd Wilcox.  He

24   would be appearing telephonically.  So what we had told him was

25   to be prepared to be available approximately 1:30 or 2:00      09:16:55

─── CV-12-601-PHX-DKD – February 27, 2018 ───

1   o'clock.  And he's available the entire afternoon, so I can

2   keep him posted as we go along.

3          But our view was we would finish with Dr. Watson.  I

4   understand that Mr. Millar is doing a presentation after lunch.

5   And so depending upon whether or not we're finished with          09:17:14

6   Dr. Watson, we would then want to contact Dr. Wilcox and have

7   him testify telephonically.

8          THE COURT:  Okay.  All right.

9          Anything on defendants' side?

10         MR. STRUCK:  Yes, Your Honor.                                09:17:25

11         We have several witnesses.  And I must say, I don't

12  believe we're going to finish with this particular issue today.

13  We have Mr. Pratt, we have Dr. Taylor, Vanessa Headstream, Lisa

14  McNeal, and Kathy -- Kathy Campbell.  We have Carson

15  McWilliams.  We have Sara Neese and Dr. Stewart.                   09:17:51

16         And we also have Dr. Khan, who is an expert, who I

17  wanted to make everyone aware is in the courtroom right now.

18  We -- I just learned that he was in the courtroom.  And he is

19  going to be testifying about some of the issues that might come

20  up today.                                                          09:18:13

21         I don't see how we're going to possibly get through

22  that list of witnesses.  But we'll try.  The people that are

23  less available, we'll try and put them first.  And obviously

24  the ADC folks, we can get them here just about any time.

25         THE COURT:  All right.  Fair enough.                        09:18:30

1          And are the parties invoking the rule?

2          MS. KENDRICK:  Yes, sir, we're invoking the rule.

3          And also we were not aware that Mr. McWilliams was

4   testifying.  I don't believe he was on your disclosure list.

5          MR. STRUCK:  I'm sorry, Your Honor, he's testifying          09:18:42

6   tomorrow.  I misspoke.

7          Dr. Khan is an expert.  And the cases go both ways

8   with respect to whether or not an expert is allowed in the

9   courtroom.  I think that his testimony will be more beneficial

10  to the Court if he's allowed to hear particularly what          09:18:57

11  Dr. Watson and Dr. Wilcox have to say when they testify.

12         We have no idea what Dr. Wilcox is going to be

13  testifying to.  Obviously we've done no discovery.  He was just

14  listed as a witness.  So the first time that any of us have any

15  idea what he's going to be talking about will be when he's          09:19:15

16  testifying.  So we couldn't really prepare Dr. Khan with

17  respect to what Dr. Wilcox is going to say.

18         So we request that the Court allow Dr. Khan to sit in

19  and listen to the testimony in order to provide the Court with

20  the most effective testimony, the most helpful testimony to you          09:19:33

21  when he's up on the stand.

22         THE COURT:  What was Dr. Khan's role with respect to

23  Dr. Watson when Dr. Watson was a contracted doctor?

24         MS. LOVE:  Your Honor, Dr. Khan has been retained by

25  Corizon to offer opinions that are directly related to the          09:19:52

1     hearing today, and to Dr. Watson.

2          What he's done is he's done a review of Corizon's

3     utilization management process that is directly related to how

4     outside consults are requested and processed, the rebuttal

5     process, the appeal process.                                    09:20:11

6          And so what he is prepared to testify is, he has

7     reviewed outside specialty consults that Dr. Watson during her

8     time working at the Eyman Complex submitted.  He's prepared to

9     offer opinions as to how not only the Corizon process worked --

10    which we know that you're very interested in how do those       09:20:29

11    outside consults get approved, how do they get processed -- but

12    what was Dr. Watson's role in her individual cases of asking

13    for outside consults.

14         So he's not only going to testify just to the baseline

15    of what is the utilization management review process within     09:20:44

16    Corizon, how does that affect specialty consults, but what was

17    Dr. Watson's role in all -- in doing that as well.

18         So he is also going to address specific allegations

19    that Dr. Watson has made as to certain inmates and requests

20    that were in her view apparently not processed correctly.       09:21:05

21         He has also taken a look and will offer opinions as to

22    whether Corizon's response from the utilization management team

23    was appropriate and what steps she did or did not take.

24         So that is why we request that she -- that Dr. Khan be

25    able to hear not only the testimony of Dr. Wilcox today, but    09:21:23

1    also Dr. Watson.

2            MS. KENDRICK:  Your Honor, we object --

3            THE COURT:  Hold on just a second, I need to finish

4    with Miss Love.

5            MS. KENDRICK:  I apologize.                         09:21:35

6            The question that I asked was whether or not he had

7    anything to do with her when she was employed.

8            MS. LOVE:  No, Your Honor.  Dr. Khan was only recently

9    retained by Corizon to look at these issues in preparation for

10   today's hearing.                                            09:21:49

11           THE COURT:  All right.

12           MS. LOVE:  He had no contact.

13           THE COURT:  I needed to know the answer to that

14   question.

15           All right.  Go ahead.                               09:21:50

16           MS. KENDRICK:  We object for several reasons.

17           First of all, Miss -- Dr. Khan is an outside expert.

18   He's not employed by Corizon.  He's not a party to this.

19           Our expert, Dr. Wilcox, is not listening in to

20   Dr. Watson's testimony.  We proactively followed the rule    09:22:03

21   ourselves.  So, therefore, we believe that defendants should

22   feel -- follow the rule too.

23           Also, Miss Love makes reference to studies that he

24   apparently did of all of the medical cases that Dr. Watson

25   oversaw.  And if he's already done the study, then there's no  09:22:21

1    reason for him to be here and listen to the testimony.

2         Finally, to the extent he did any sort of written

3    study or written report about his analysis of Dr. Watson's

4    requests for medical care for our clients, that has not been

5    produced to us pursuant to the rules surrounding expert          09:22:39

6    witnesses.

7         THE COURT:  Well, the difficulty that we have in

8    following the standard protocol with respect to expert

9    witnesses is the timeline that I've imposed upon everybody.

10   And I have to weigh whether or not it makes sense for me to try  09:22:52

11   to get to information in a way that reflects the fact that we

12   are in an accelerated timeline and it's not always ideal.  I

13   think that it makes sense for me to try to have the issues

14   focused.

15        In real-time, over the next 48 hours, we'll all be         09:23:10

16   taking in a good deal of information and evaluating it.  And I

17   think it makes sense for us to have the benefit of having

18   everybody engaged in that conversation, and allow the lawyers

19   and the Court to observe about whether or not it appears that

20   things are what is the general reason for invoking the rule      09:23:28

21   against allowing witnesses to hear what other witnesses have

22   said, and that is that they're changing their testimony or

23   they're getting some unfair advantage.  I don't think that's as

24   likely to be the case here.

25        So I'm going to open it up with respect to your            09:23:43

1    witness as well.  If you'd like to have your witness available

2    by telephone, you said the proactive stuff, if you'd like to do

3    that, you may.  But I will not invoke the rule with respect to

4    Dr. Khan.

5            MS. KENDRICK:  Okay.  We ask that all other witnesses      09:23:56

6    be excluded pursuant to the rule.

7            THE COURT:  Well, we'll consider those on a

8    case-by-case basis, but it would be -- this ruling is just

9    limited to Dr. Khan for the reasons I've just discussed.

10           All right.  You may call your first witness.              09:24:09

11           MR. FATHI:  Yes, Your Honor.

12           Just to be clear, will the other witnesses be leaving

13   the room, the courtroom?

14           THE COURT:  Are there other witnesses present?

15           MS. LOVE:  Yes.  And they're leaving the room right       09:24:20

16   now.

17           THE COURT:  Thank you.

18           MR. FATHI:  Your Honor, plaintiffs call Dr. Jan

19   Watson.

20           THE COURT:  Dr. Watson, will you please step forward      09:24:27

21   to the well of the court here before the clerk so that she may

22   administer the oath.

23           THE CLERK:  Please raise your right hand.

24      (JAN WATSON, PLAINTIFF WITNESS, SWORN.)

25           THE CLERK:  Thank you.                                    09:24:45

1              If you'll please step around to the witness stand.

2              THE COURT:  Good morning, Doctor.

3              You'll find that the microphone is not attached to the

4     desk there, so if you can even drag it closer to you so that

5     the arm of it will be close to your mouth, it will help          09:25:03

6     everybody, in particular the court reporter, hear what you have

7     to say.

8              THE WITNESS:  Thank you.

9              THE COURT:  Thank you, ma'am.

10             You may proceed.                                         09:25:10

11                          DIRECT EXAMINATION

12    BY MR. FATHI:

13    Q.  Good morning, Dr. Watson.

14    A.  Good morning.

15    Q.  Do you have the binders of exhibits there with you?          09:25:14

16    A.  Are these the brown --

17             MR. FATHI:  May I approach, Your Honor?

18             THE COURT:  You may.

19         (Discussion held off the record.)

20    BY MR. FATHI:

21    Q.  Would you please state your full name?

22    A.  Jan Denise Watson.

23    Q.  And, Dr. Watson, in what city do you live?

24    A.  Phoenix.

25    Q.  How long have you lived in Phoenix?                          09:25:56

1    A.   Thirty years.

2    Q.   And what is your profession?

3    A.   I'm a physician.

4    Q.   Are you currently licensed to practice medicine in Arizona?

5    A.   Yes.                                                          09:26:09

6    Q.   How long have you been licensed to practice medicine in

7    Arizona?

8    A.   Thirty years.

9    Q.   Continuously?

10   A.   There was a break when I moved to California.  And          09:26:16

11   then -- I was there for about a year.  And then when I returned

12   I got my Arizona license again.

13   Q.   Okay.  Dr. Watson, if you could either speak up or maybe

14   move the mic a little closer, I think that would be helpful.

15   A.   Okay.  Is that it -- better?                                 09:26:41

16   Q.   Better.  Thank you.

17        Have you been licensed to practice medicine in states

18   other than Arizona?

19   A.   Yes.

20   Q.   What states are those?                                      09:26:49

21   A.   Colorado, California, and Texas.

22   Q.   Are you still licensed in those states?

23   A.   No.

24   Q.   And why not?

25   A.   I just let them expire because I wasn't going back.         09:27:00

**Jan Watson – Direct Examination**

1  Q.  Were you in good standing in those states when you let your

2  licenses lapse?

3  A.  Yes.

4  Q.  Where did you graduate from medical school?

5  A.  Baylor College of Medicine in Houston.                    09:27:14

6  Q.  And what year was that?

7  A.  1977.

8  Q.  Did you do a residency?

9  A.  Yes.  I did a residency in OB/GYN in Denver, Colorado.

10 Q.  At what institution?                                       09:27:30

11 A.  University of Colorado Health Sciences Center.

12 Q.  Are you board certified?

13 A.  Yes.  I'm board certified in OB/GYN and clinical genetics.

14 Q.  And are both of those board certifications current?

15 A.  Yes.                                                       09:27:47

16 Q.  Could you briefly summarize for the Court your medical

17 career?  Where have you worked?  What kind of practices have

18 you held?

19 A.  After I finished my genetics fellowship in London, England,

20 I returned to the University of Colorado where I was faculty    09:28:01

21 for several years.  And then I moved to Phoenix and practiced

22 high risk obstetrics in a private perinatology office.

23      And I have worked at Maricopa County Medical Center in

24 the division of perinatology, and at St. Joseph's Hospital in

25 perinatology.                                                  09:28:34

UNITED STATES DISTRICT COURT

─── **Jan Watson – Direct Examination** ───

1        And I now do locums tenens work, which is just fill-in

2   temporarily.

3   Q.  Are you currently working as a physician?

4   A.  Yes.

5   Q.  In what sort of setting?                                    09:28:45

6   A.  I am working in a senior care home two days a week every

7   other week.

8   Q.  Have you ever been qualified as an expert to testify in

9   court?

10  A.  Yes, I have.  It was a long time ago.  I was the expert    09:29:00

11  witness in a paternity case.

12  Q.  And where was that?

13  A.  That was in Denver.

14  Q.  Before last year have you ever provided medical care in a

15  prison?                                                        09:29:16

16  A.  Yes.  When I was working at Maricopa County we were

17  responsible for providing the OB/GYN care at Perryville, so I

18  would go out there periodically.

19  Q.  And what time period was that, approximately?

20  A.  It was between 2005 and 2009.                              09:29:34

21        MR. FATHI:  Your Honor, I tender Dr. Watson as an

22  expert in the provision of medical care as a treating

23  physician.

24        THE COURT:  Any objection?

25        MR. STRUCK:  Yes, Your Honor.  I believe she's           09:29:49

UNITED STATES DISTRICT COURT

Jan Watson - Direct Examination

1  provided foundation to testify with respect to OB/GYN and the

2  genetics specialty areas, but I don't believe that she has

3  provided sufficient foundation to be able to testify as a -- an

4  expert in general medicine, or even the provision of general

5  medical care within a prison setting.                              09:30:08

6       THE COURT:  I can't tell for now where the testimony

7  is going to lead, and so I'll reserve ruling on that objection

8  until I hear more testimony.

9  BY MR. FATHI:

10  Q.  Dr. Watson, have you ever worked as a primary care            09:30:19

11  physician?

12  A.  Yes.  When I started doing locum tenens work I was

13  contacted by an internal medicine office in Fort Mojave, and

14  they needed someone immediately.  And I agreed to go cover that

15  office.                                                           09:30:46

16       At first I was concerned, since I was OB/GYN, but then

17  when I thought about it, what I did in high risk obstetrics was

18  provide medical care for pregnant woman who had bad medical

19  conditions.  So now I was just going to take care of people who

20  weren't pregnant who had the same bad medical conditions that     09:31:11

21  I'd been treating for over 20 years.

22  Q.  Thank you.

23       At some point in 2017 did you provide medical care to

24  patients in the Arizona Department of Corrections?

25  A.  Yes.  Starting in May of 2017 until October of 2017 I         09:31:28

UNITED STATES DISTRICT COURT

1    worked in the Eyman Complex.

2    Q.  And how did it come about that you worked in the Arizona

3    Department of Corrections?

4    A.  The way I obtained my locum tenens jobs are, I receive

5    multiple e-mails or calls from different locum tenens companies    09:31:53

6    when they have opportunities available in Arizona and they ask

7    me if I'm willing to fill in.

8    Q.  And is there a particular company through which you got

9    this position in the Department of Corrections?

10   A.  In this case it was Onyx M.D.                                  09:32:12

11   Q.  And what kind of company is Onyx M.D.?

12   A.  It's a locum tenens -- which is a temporary company.  It's

13   one of the many locum tenens companies out there.

14   Q.  So they connect doctors with places who need doctors on a

15   temporary basis; is that correct?                                 09:32:32

16   A.  Yes.

17   Q.  And when you were working in the Department of Corrections,

18   were you working as a primary care physician?

19   A.  Yes.

20   Q.  Now, at some point when you were working in the Department    09:32:41

21   of Corrections, did you become aware of the Parsons versus Ryan

22   case?

23   A.  Yes, I did.

24   Q.  And how did you -- how did you learn of the case?

25   A.  Actually when I went in for orientation they mentioned        09:32:56

1    CGARs, and they told me that that was -- well, they told all of

2    us there that those were goals that had been set that Corizon

3    had to follow because of that case.  So they were being

4    monitored for these things.

5    Q.  So at some point you became aware that the provision of          09:33:30

6    medical care in the prison system was being monitored?

7    A.  Yes.

8    Q.  And at some point did you become aware that there was a

9    potential for monetary fines if things were not done in a

10   timely manner?                                                       09:33:47

11   A.  Yes, I did.  I received some e-mails about that.

12   Q.  Who is Sara Neese?

13   A.  Sara Neese was one of the clinical coordinators.

14   Q.  At which facility?

15   A.  Eyman.                                                           09:34:03

16   Q.  And what did she do as a clinical coordinator?

17   A.  When we write for a referral to a specialist, the clinical

18   coordinators then pass that information on to the utilization

19   management physicians.  And if the referral is approved, the

20   clinical coordinator then sets up the appointment.                  09:34:32

21   Q.  Dr. Watson, would you turn to Exhibit 3, please?

22          MR. FATHI:  For the record I should make clear this is

23   Plaintiffs' Exhibit 3.

24          THE COURT:  And it's been marked for identification as

25   Plaintiffs' Exhibit 3.  Has it already been admitted in some        09:35:03

Jan Watson – Direct Examination

```
 1   other context?

 2          MR. FATHI:  It has not yet been admitted.

 3          THE COURT:  All right.  Thank you.

 4   BY MR. FATHI:

 5   Q.  Do you have it, Dr. Watson?                          09:35:11

 6   A.  Yes.

 7   Q.  Showing you Plaintiffs' Exhibit 3, a document Bates stamped

 8   JW460, this appears to be a September 18th, 2017 e-mail from

 9   Sara Neese to you.

10          Did you receive this e-mail, Dr. Watson?          09:35:28

11   A.  Yes.

12   Q.  On or about --

13   A.  Yes.

14   Q.  On or about September 18th?

15   A.  Yes.                                                 09:35:35

16   Q.  Could you please read aloud the text of the e-mail?

17   A.  Hello, Dr. Watson.  Could you please cancel the infectious

18   disease consults.  There are two.  We do not have a provider to

19   send him to.  One was approved and has been sitting there for

20   42 days.  After 30 days we get nailed for a thousand bucks a    09:35:57

21   day until they are seen.

22   Q.  Okay.  You can stop there.  Thank you, Doctor.

23          MR. FATHI:  Your Honor, I move the admission of

24   Plaintiffs' Exhibit 3.

25          THE COURT:  Is there any objection?               09:36:13
```

─────── **Jan Watson – Direct Examination** ───────

1          MR. STRUCK:  No objection, Your Honor.

2          THE COURT:  It will be received.

3      (Exhibit No. 3 admitted into evidence.)

4  BY MR. FATHI:

5  Q.  Dr. Watson, I'd now like you to look at Defendants'          09:36:19

6  Exhibit 415.

7          And please let me know if you can't quickly find it.

8  A.  Okay.

9  Q.  Do you have it, Doctor?

10  A.  Yes.          09:36:53

11  Q.  Let's wait for Judge Duncan.

12          THE COURT:  Thank you.  I appreciate that.

13          Thank you.  I'm ready.

14  BY MR. FATHI:

15  Q.  Dr. Watson, showing you Defendants' Exhibit 415, a document          09:37:08

16  Bates stamped Corizon 73685.  This is a September 11th, 2017

17  e-mail from Sara Neese to you.

18          Did you receive this e-mail, Dr. Watson?

19  A.  Yes.

20  Q.  Without reading the patient's name or number, would you          09:37:26

21  please read this e-mail aloud?

22  A.  Hello, Dr. Watson.  You had put in a consult request for

23  inmate.  It was for a cardiology consult to be scheduled in

24  November.  Could I ask you to cancel that request and put it in

25  at a later date closer to November, as we only have a 60-day          09:37:51

**Jan Watson - Direct Examination**

1    window to get it processed and scheduled.  If it's past that

2    time frame we get fined $1,000 per day for just that one

3    consult.

4            MR. FATHI:  Your Honor, I move the admission of

5    Defendants' Exhibit 415.                                    09:38:12

6            THE COURT:  Any objection?

7            MR. STRUCK:  No, Your Honor.

8            THE COURT:  It will be received.

9        (Exhibit No. 415 admitted into evidence.)

10   BY MR. FATHI:                                               09:38:17

11   Q.  Dr. Watson, I'd like you next to please look at Plaintiffs'

12   Exhibit 13.

13   A.  Okay.

14   Q.  Dr. Watson, showing you what's been marked Plaintiffs'

15   Exhibit 13, a document Bates stamped Corizon 24638, a September  09:38:59

16   13th, 2017 e-mail from Sara Neese to you.

17           Did you receive this e-mail?

18   A.  Yes.

19   Q.  Now, the first line, the first line of the body of the

20   e-mail that begins, ATP, colon, would you please read that   09:39:22

21   aloud, again omitting the name of the patient.

22   A.  Please cancel infectious disease consults as we do not

23   currently have a provider for that.  Also accept cardiology

24   ATP.

25           MR. FATHI:  Your Honor, I move the admission of      09:39:48

─── **Jan Watson – Direct Examination** ───

1   Plaintiffs' Exhibit 13.

2          THE COURT:  Any objection?

3          MR. STRUCK:  No objection, Your Honor.

4          THE COURT:  It will be received.

5      (Exhibit No. 13 admitted into evidence.)                    09:39:52

6   BY MR. FATHI:

7   Q.  Dr. Watson, you testified that you worked at ADC for

8   between five and six months; is that right?

9   A.  Correct.

10  Q.  And was that all pursuant to one contract or agreement with   09:40:02

11  Onyx, or was there more than one?

12  A.  My initial contract was to work there for three months, and

13  that ended in August.  I agreed to extend the contract for

14  another three months, which would have been to mid December.

15  But in September I requested to end that second contract early.   09:40:29

16  Q.  Okay.  We'll get to that in a little bit.  But right now I

17  just want to make clear that -- or I want to make sure I

18  clearly understand your testimony, that you had an initial

19  three-month contract and then a second three-month contract.

20  Is that right?                                                    09:40:51

21  A.  Correct.

22  Q.  Thank you.

23          I believe you testified you worked at the Eyman

24  Complex; is that right?

25  A.  Yes.                                                          09:41:00

**Jan Watson - Direct Examination**

1   Q.  And were you assigned to a particular unit within the Eyman

2   Complex?

3   A.  I was assigned mainly at Cook, but occasionally filled in

4   at some of the other units.

5   Q.  And why would you occasionally fill in at other units?       09:41:13

6   A.  They would be short providers.

7   Q.  How many prisoners are there in the Cook unit?

8   A.  Approximately 1500.

9   Q.  And how would you characterize the patients that you saw at

10  Cook unit?                                                       09:41:33

11  A.  Many of them had multiple medical problems, were on a long

12  list of medications, and they were just complicated.

13  Q.  When you say "multiple medical problems," could you give

14  some examples?

15  A.  Heart disease, diabetes, and hypertension, all in one       09:41:52

16  person.  And they -- many of them were not well controlled,

17  especially the diabetics.

18  Q.  Who was your supervisor when you worked at -- in the

19  Arizona Department of Corrections?

20  A.  Initially I don't think I really had one.  But eventually    09:42:15

21  Dr. Rodney Stewart was appointed to be Medical Director for the

22  Eyman Complex.

23  Q.  Approximately when did Dr. Stewart become your supervisor,

24  was it during your first contract or your second contract?

25  When --                                                          09:42:38

**Jan Watson - Direct Examination**

1  A.  The first contract.  I would say probably maybe a month

2  after I arrived, or sooner.

3  Q.  And Dr. Stewart was your direct supervisor until you left

4  ADC?

5  A.  Yes.                                                    09:42:54

6  Q.  Did Dr. Stewart ever speak with you about becoming a

7  Corizon employee?

8  A.  Yes.  He frequently asked me to come on permanently.

9  Q.  And what was your response?

10 A.  I kept saying, we need to have a long talk.             09:43:11

11       But eventually I did contact Bob Manche, I don't know

12 what his title was, to talk to him about a permanent position.

13 Q.  When you had these conversations with Dr. Stewart about you

14 possibly becoming a Corizon employee, did he approach you, did

15 you approach him, or did it happen both ways?             09:43:42

16 A.  I think he approached me.  I don't -- I don't actually

17 remember how that conversation was initiated.

18 Q.  Did Dr. Stewart express a wish or a desire that you become

19 a Corizon employee?

20 A.  Yes, he did, because he said I was his lifeline down at   09:44:06

21 Cook.

22 Q.  What was your schedule when you were working at ADC?

23 A.  I worked Wednesday, Thursday and Fridays 8:00 to 5:00.

24 Q.  Now, after you started working in ADC, at some point were

25 you provided either an ADC or a Corizon e-mail address to use?  09:44:27

1  A.  Yes, but it took about a month for me to get my computer

2  logons and my e-mail.

3  Q.  Why did it take so long?

4  A.  I don't know.  Whoever in IT was supposed to issue those,

5  just took a long time.                                          09:44:53

6  Q.  Well, how did you function during that period when you were

7  working in ADC but didn't have either an ADC or a Corizon

8  e-mail address?

9  A.  I had to log on as one of -- as one of the nurse

10  practitioners.                                                 09:45:11

11  Q.  Okay.  I'm not talking right now about logging on, I'm

12  talking just about e-mail.  How -- what did you do for e-mail?

13  A.  Oh, my e-mails, we used my personal Gmail account.

14  Q.  Dr. Watson, would you look at Plaintiffs' Exhibit 4,

15  please.  And would you please turn to the page that's marked   09:45:38

16  exhibit 004.3.

17  A.  Okay.

18  Q.  Do you have it?

19  A.  Yes.

20  Q.  This is an e-mail dated June 14th, 2017, from Terri         09:46:07

21  Espinoza to you apparently at your Gmail account.

22          Who is Terri Espinoza?

23  A.  She's the administrative assistant at Eyman.

24  Q.  Will you please read the body of the e-mail at the top of

25  this page?                                                     09:46:29

─── **Jan Watson – Direct Examination** ───

1   A.  Oh, yeah, your e-mail account should be created shortly.

2   Your address will be jan.watson@corizonhealth.com.

3   Q.  So this e-mail is dated June 14th, 2017.  Is that

4   approximately when you finally got a Corizon e-mail account?

5   A.  Yes.                                                         09:46:49

6   Q.  Now let's talk about computer access.

7           What is eOMIS, Dr. Watson?

8   A.  EOMIS is the electronic medical record that is used in the

9   prison system.

10  Q.  And you -- I understand you access eOMIS with a computer?    09:47:06

11  A.  Yes.

12  Q.  And you need a logon and a password to access eOMIS?

13  A.  Yes.

14  Q.  And is that where as a provider you would both learn

15  information about your patients and enter information about     09:47:22

16  your patients?

17  A.  Yes.

18  Q.  As a provider did you need access to eOMIS to treat your

19  patients?

20  A.  Yes.  That was the only way we could make a note.           09:47:33

21  Q.  When you began working at ADC, were you immediately given

22  access to eOMIS?

23  A.  No.  I --

24  Q.  About -- I'm sorry.  Go ahead.

25  A.  That's what -- I would have to log on as someone else.      09:47:47

─── **Jan Watson – Direct Examination** ───

1  Q.  So tell us how that -- how that would work.

2  A.  One of the nurse practitioners gave me her login

3  information.  So every patient I saw was entered into the

4  system under her name.

5  Q.  And who instructed you to do that?                    09:48:06

6  A.  Well, it was the Facility Health Administrator.

7  Q.  And what is that person's name?

8  A.  Maureen Johnson.

9  Q.  So at what point did you -- did you eventually get your own

10  login for eOMIS?                                          09:48:29

11  A.  Yes.

12  Q.  And approximately when was that?

13  A.  About the same time I got my e-mail address, so in June.

14  Q.  Okay.  Will you please look back at Exhibit 4, and look at

15  the bottom of the same page, exhibit 004.3.               09:48:45

16        Are you there?

17  A.  Oh, yes.

18  Q.  This is another June 14th, 2017 e-mail from Terri Espinoza

19  to your personal Gmail account.

20        Did you receive this e-mail, Doctor?               09:49:04

21  A.  Yes.

22  Q.  Would you please read the text of the e-mail, starting at

23  the bottom of this page and continuing on to the following

24  page.

25  A.  Good morning.  Finally got your logon info.  It is as     09:49:15

—Jan Watson – Direct Examination—

1   follows.  And then it gives my computer logon, my user name,

2   JWatson.  What is PW?  Anyway.  Summer 2017, exclamation point,

3   password.

4   Q.  And is the next --

5   A.  EOMIS logon is -- JWatson is my user I.D., and the password      09:49:47

6   is eOMIS 123.

7   Q.  Okay.  So was it on or about June 14th that you finally

8   received access to eOMIS?

9   A.  Yes.

10         MR. FATHI:  Your Honor, I move the admission of             09:50:04

11  Plaintiffs' Exhibit 4.

12         MR. STRUCK:  No objection.

13         THE COURT:  Any objection?

14         It will be received.

15     (Exhibit No. 4 admitted into evidence.)                        09:50:12

16  BY MR. FATHI:

17  Q.  Dr. Watson, when you started working at ADC, were you

18  provided any training?

19  A.  Yes.  I had two days of orientation at Corizon in their

20  Tempe offices.  And then I received two days of orientation        09:50:29

21  from D.O.C. actually on the Eyman Complex.

22  Q.  What's your understanding of how much training you were

23  supposed to be providing?

24  A.  The D.O.C. training was supposed to be five days.

25  Q.  And how did you learn that it was supposed to be five days?     09:50:52

**Jan Watson – Direct Examination**

1    A.  When I checked in to get my information from Terri Espinoza

2    the first day, she gave me the D.O.C. training schedule.

3    Q.  And from that you learned that you were supposed to have

4    five days of training?

5    A.  Yes.                                                        09:51:12

6    Q.  Did you receive five days of training before you started

7    seeing patients?

8    A.  No.

9    Q.  Did you ever receive a total of five days of training

10   throughout your time at ADC?                                   09:51:22

11   A.  No.

12   Q.  Did you ever express concern about not receiving the

13   required training?

14   A.  Yes, I did point out that I hadn't completed the D.O.C.

15   training.                                                      09:51:34

16   Q.  Would you please turn to Plaintiffs' Exhibit 1, Dr. Watson.

17          Dr. Watson, Plaintiffs' Exhibit 1 is a June 29th, 2017

18   e-mail from you to Maureen Johnson.

19          Did you send this e-mail, Dr. Watson?

20   A.  Yes, I did.                                                09:52:03

21   Q.  Who is Maureen Johnson?

22   A.  She's the FHA, the Facility Health Administrator.

23   Q.  Is that for the Eyman Complex?

24   A.  Yes.

25   Q.  And would you please read the text of your e-mail?         09:52:13

—— Jan Watson – Direct Examination ——

1  A.  At some point I need to complete D.O.C. training.  Would it

2  be possible to one day per -- oh, I left out a word -- one day

3  per week until I complete the last three sessions, that way I

4  wouldn't miss a complete week at Cook.

5  Q.  And I believe your testimony is that you were never -- you                09:52:38

6  never completed the last three sessions.

7  A.  No, I was too busy.

8          MR. FATHI:  Okay.  Your Honor, I move the admission of

9  plaintiffs' Exhibit 1.

10         THE COURT:  Any objection?                                            09:52:52

11         MR. STRUCK:  No objection.

12         THE COURT:  Received.

13     (Exhibit No. 1 admitted into evidence.)

14 BY MR. FATHI:

15 Q.  Dr. Watson, how much patients would you see in a typical                 09:52:55

16 day at ADC?

17         Excuse me, let me modify that.  How many patients

18 would you be scheduled to see in a typical day?

19 A.  Twenty.

20 Q.  Was that pretty constant, most days you would be scheduled               09:53:06

21 to see 20 patients?

22 A.  Yes.

23 Q.  And how many hours -- you testified that you worked from

24 8:00 to 5:00.  How many of those nine hours were actually

25 available for patient care?                                                  09:53:21

—— **Jan Watson - Direct Examination** ——

1  A.  Eight.  For an hour every day we were scheduled to be on a

2  telephone conference to discuss all the patients who had been

3  admitted throughout the Arizona complex, all of them, but

4  typically we were so busy we even would work through that hour.

5  Q.  Doctor, you said "the Arizona complex."  Did you mean the        09:53:54

6  Eyman Complex?

7  A.  No.  I was trying to think of another -- it was all of the

8  providers in Arizona.  So all of the Arizona facilities.

9  Q.  Okay.  So you were scheduled to have a one-hour meeting

10 every day, but you sometimes worked through it, is that your         09:54:12

11 testimony?

12 A.  Yes.  Since it was a telephone conference, many of us would

13 just mute the conference and still be seeing patients.

14 Q.  Okay.  If we assumed that you had eight hours a day to see

15 patients, and I divide eight hours by 20 patients, I come up         09:54:34

16 with 24 minutes per patient.  Does that sound right?

17 A.  Yes.

18      THE COURT:  Did you have lunch or go to the bathroom

19 or take a break during the day?

20      THE WITNESS:  You ran to the bathroom.  I ate lunch           09:54:47

21 during the telephone conference.  And you just keep plugging

22 along.

23      THE COURT:  All right.  Thank you.

24 BY MR. FATHI:

25 Q.  Did you have enough time to adequately take care of 20           09:54:57

**Jan Watson - Direct Examination**

1   patients every day?

2   A.  No.

3   Q.  And why is that?

4   A.  Well, not only do you have those patients, many of whom

5   were complicated patients, you have a nurse who is running a     09:55:11

6   line, that means the nurse is seeing patients.  She frequently

7   has questions about some of the patients she is seeing.  Then

8   you have emergency situations where inmates get sick, what I

9   refer to as inmate down situations where they are brought to

10  the unit, sometimes having seizures or chest pain, lacerations   09:55:38

11  that came in, you then had to sew up.  All of those types of

12  situations were not on your list.

13  Q.  So is everything you've just described on top of the 20

14  patients you were scheduled to see every day?

15  A.  Yes.                                                         09:56:02

16  Q.  Would you ever get called to go to another unit during the

17  course of your work day?

18  A.  Yes.  If there was a problem on another unit and there were

19  no providers, I would get called from other units.

20  Sometimes -- most of the time I could handle those over the      09:56:21

21  phone, but I can remember one case where the inmate had chest

22  pain so I had to leave Cook and go to Meadows.

23  Q.  And Meadows is a different unit of the Eyman Complex?

24  A.  Yes.

25  Q.  Dr. Watson, what is an ICS?                                  09:56:38

UNITED STATES DISTRICT COURT

**Jan Watson - Direct Examination**

1    A.   Emergency situation.  So either an inmate is unconscious or

2    some -- something bad has happened.  And a guard and a nurse

3    are supposed to run out and initially evaluate that inmate and

4    bring him back up to the unit for evaluation.

5    Q.   And would you, as the physician on duty, be expected to          09:57:13

6    evaluate that patient?

7    A.   Yes.  Once they reach the unit, yes.

8    Q.   About how often would an ICS happen while you worked at

9    Eyman?

10   A.   At least -- at least once a week, and sometimes I might          09:57:28

11   have two to three a day.

12   Q.   And how did that affect your ability to see the 20 patients

13   you were scheduled to see?

14   A.   I would be tied up with the emergency, and so the other

15   inmates would just have to sit there and wait until I finished.      09:57:48

16   There were times I just -- I just told them, it's not possible

17   for me to see everybody, and so they would have to take some of

18   those inmates back.

19   Q.   Dr. Watson, did you ever hear of something called Operation

20   Backlog?                                                             09:58:15

21   A.   Yes, I did.

22   Q.   And what is or what was Operation Backlog?

23   A.   It was a push to get all of the chronic care visits and

24   health need -- needs requests that had not been seen, they

25   needed to be done to get caught up.                                  09:58:42

**Jan Watson - Direct Examination**

1    Q.  Doctor, would you turn to Plaintiffs' Exhibit 20, please?

2    A.  Okay.

3    Q.  Let's wait for Judge Duncan.

4         Showing you Plaintiffs' Exhibit 20, an e-mail from

5    Daniel Sego, S-E-G-O, to you and a number of other people          09:59:15

6    titled Operation Backlog, dated October 9th, 2017, Bates

7    stamped -- indicated -- labeled as Exhibit 20.

8         Dr. Watson, did you receive this e-mail on or about

9    October 9th, 2017?

10   A.  Yes.                                                            09:59:38

11   Q.  And will you please read the text of the e-mail?

12   A.  As you -- Hi, team.  As you all know, we are currently

13   working towards catching up on our backlog of both HNR and

14   chronic care patients totaling approximately 800.  We are in

15   need of all available provider staff to assist in Operation       10:00:00

16   Backlog.  We have the availability and need at both Florence

17   and Eyman, and we encourage you to let us know where you would

18   like to work the overtime shifts and we will make the

19   arrangements.

20   Q.  You can stop there.  Thank you, Doctor.                        10:00:20

21        Did you volunteer for Operation Backlog?

22   A.  No.

23   Q.  And why not?

24   A.  I -- since I was not a regular Corizon employee, if I

25   worked any days other than the ones that I had been scheduled      10:00:37

**Jan Watson – Direct Examination**

1   for, I had to get approval through the locums company, because

2   that's officially who I worked for, and they covered my

3   malpractice, so they need to know what days I'm working.

4           MR. FATHI:  Your Honor, I move the admission of

5   Plaintiffs' Exhibit 20.                              10:01:00

6           THE COURT:  Any objection?

7           MR. STRUCK:  No objection.

8           THE COURT:  Received.

9       (Exhibit No. 20 admitted into evidence.)

10  BY MR. FATHI:                                        10:01:06

11  Q.  Dr. Watson, did you ever, during your time at the Arizona

12  Department of Corrections, become aware of problems getting

13  medications for patients?

14  A.  Oh, yes.

15  Q.  When did you first become aware of that problem?     10:01:15

16  A.  Oh, probably within the first few weeks of working there.

17  Q.  And can you describe the contours of that problem?

18  Describe what the -- what you saw as a problem with getting

19  medications.

20  A.  Well, first of all, one of the big problems is the fact   10:01:36

21  that the pharmacy is actually located in another state, so when

22  you need medications it takes a minimum of two days to get

23  them.  If you write an order near the end of the week it's

24  going to be more than two days before you get them.

25          So you don't necessarily get medications in a timely   10:02:03

—— **Jan Watson – Direct Examination** ——

1    fashion from the pharmacy.

2         I also had problems with several inmates complaining

3    that their KOP, or keep on person medications, were being

4    withheld from them by the nurses, one in particular.

5         And the other problem that we had with medication          10:02:32

6    delivery was, if we had written orders that the medication

7    could be refilled, if the nurse didn't submit the refill order

8    exactly 21 days after the previous prescription, the pharmacy

9    would not fill the prescription, and so the medication would

10   not be sent.                                                    10:03:02

11   Q.  So are you saying that if the refill was submitted 22 days

12   before or 20 days before it would not be filled?

13   A.  Yes.

14   Q.  And why is that?

15   A.  That was just their rule.                                   10:03:15

16   Q.  Whose rule?

17        THE COURT:  Did you ever understand the explanation of

18   that rule?

19        THE WITNESS:  There was no explanation.  No, I didn't

20   understand why they did that.                                   10:03:24

21        THE COURT:  And more than once this happened where if

22   there wasn't the fill on the exact day required, that resulted

23   in the fill request not being satisfied.

24        THE WITNESS:  Yes.

25        THE COURT:  How often did this happen?                     10:03:37

─Jan Watson – Direct Examination─

1          THE WITNESS:  All I can say is frequently.

2          The way I would find out that there was a problem is

3     the inmates would have to come and tell me that they didn't get

4     their medication.  Then I'd have to go to the computer and see

5     that they should have.  And then I go to the pharmacy tech or

6     the nurse and they said, it should have been refilled but it

7     wasn't.

8          THE COURT:  Can I explore precisely your personal

9     understanding of what you just testified about, and that is,

10    that if the request did not come in for a refill on the 21st

11    day that it was rejected.  Was that something that inmates told

12    you or something that the Corizon staff --

13         THE WITNESS:  No, the pharmacy tech told me.

14         THE COURT:  The pharmacy tech.

15         And is it the pharmacy tech who has made the untimely

16    request or is it the pharmacy tech who is saying, this is why

17    we didn't fill it because somebody didn't ask for it on the

18    21st day?

19         THE WITNESS:  The nurse is the one who submits the

20    refill.  The pharmacy tech there on-site is the one who told me

21    multiple times that that was the PharmaCor policy, if it

22    didn't -- if they did not receive that refill request from the

23    nurse on day 21, the medication was not sent.

24         THE COURT:  Thank you.

25         And let me follow up, just while I have you here, one

10:03:56

10:04:18

10:04:32

10:04:45

10:05:12

UNITED STATES DISTRICT COURT

1  of the things that I wondered about before.  And that is, when

2  you said that all of the prescriptions had to be filled from an

3  out-of-state pharmacy.  I've heard other people in the case

4  talk about the fact that there were some prescription

5  medications that were located on-site, and the ones that were          10:05:25

6  not usually filled were the ones that were out of state.  Can

7  you explain that?

8         THE WITNESS:  The ones that are located on-site we had

9  in small number.  We did have like maybe five cards of certain

10  antibiotics.  So you would run out of those very quickly, like          10:05:49

11  during flu season or if you had a big episode of bronchitis.

12         So, yes, you have a small stock there of certain

13  medications, but if you run out of those you then have to get

14  it restocked from the main pharmacy in Oklahoma.

15         THE COURT:  Thank you.          10:06:17

16         MR. STRUCK:  Your Honor, I would object to the answer

17  to the prior question.  It called for hearsay.  There's an

18  unidentified pharmacy tech that was identified as making a

19  statement.  Defendants' move to strike that answer.

20         THE COURT:  Overruled.  You'll have the opportunity to          10:06:34

21  cross-examine.

22  BY MR. FATHI:

23  Q.  Dr. Watson, you've mentioned a number of problems with

24  medications.  Did you ever bring any of these problems to the

25  attention of your supervisor, Dr. Stewart, or anyone else?          10:06:46

1    A.  Yes.

2    Q.  Will you turn to Plaintiffs' Exhibit 11, please?

3            Dr. Watson, showing you Plaintiffs' Exhibit 11, a

4    September 16th, 2017 e-mail from you to Maureen Johnson and

5    Rodney Stewart.                                              10:07:20

6            Did you send this e-mail?

7    A.  Yes, I did.

8    Q.  Would you please read aloud the first paragraph.

9    A.  It has become an ongoing problem at Cook that patients do

10   not receive their medications.  Sometimes it is due to Lisa    10:07:33

11   withholding medications, other times it is because PharmaCor is

12   not sending the medications in a timely fashion.  Sometimes

13   renewals aren't entered because the person who does that is

14   overwhelmed by the volume.  And there are probably other

15   reasons I have not yet identified.                            10:07:57

16   Q.  Thank you.

17           Did you ever receive a response to this e-mail?

18   A.  No.

19   Q.  Let me go through a couple of the things that you say in

20   this e-mail.                                                  10:08:09

21           First you say, quote, sometimes it is due to Lisa

22   withholding medications, end of quote.

23           What does that mean?

24   A.  Lisa is one of the nurses who I had multiple inmates

25   complain about were not giving them their KOPs.  And so I would  10:08:24

**Jan Watson – Direct Examination**

1    have to then go to the medication room and ask her to find the

2    medications, then she would give them to the inmates.

3    Q.  And what is the -- what is Lisa's last name?

4    A.  Sedlar.

5    Q.  All right.  Was she still working there at the time you          10:08:44

6    left ADC?

7    A.  Yes.

8    Q.  And what are some of the medications that she would

9    withhold?

10   A.  Oh, gosh, I can't remember.  I can't remember the specific       10:08:54

11   medications, but it wouldn't be narcotics because those can't

12   be KOP.  Oh, some of them were antihypertensive medications.

13   Q.  And --

14   A.  I can't remember exactly what the other ones were.

15   Q.  And about how many times did this happen with Miss Sedlar,       10:09:23

16   to your knowledge?

17   A.  Oh, it happened more than five times.  A lot of my visits

18   were from inmates regarding their KOP medications.

19   Q.  And would you personally speak to Miss Sedlar about this?

20   A.  I would go in there and ask her to find these -- the KOP         10:09:47

21   drugs.  And then I reported her to the director of nurses --

22   Director of Nursing I think at least twice.

23   Q.  And to your knowledge did anything ever come of those

24   reports?

25   A.  No.                                                             10:10:11

**Jan Watson - Direct Examination**

1   Q.  Are you aware of any other staff who withheld medications?

2   A.  Yes.  We had another nurse who refused to give an inmate

3   his insulin.

4   Q.  Can you tell us about that incident?

5   A.  I didn't actually see him, but I was standing in the                10:10:27

6   medication room when a guard brought up this inmate who did not

7   hear the call to come up and have his insulin, so he wanted him

8   to get his insulin then.  And Denise refused to give him his

9   insulin, she said it was too late.

10          And when I confronted her about that, I said, are you         10:10:54

11  really not going to give him his insulin?  And she said, no,

12  we're all adults here, they need to learn to be responsible.

13          And I said, what you're doing is dangerous.  And she

14  turned around and went off to do whatever she had to do.

15  Q.  And what is Denise's last name?                                   10:11:21

16  A.  Egan.

17  Q.  Did you ever report Miss Egan or take any other action

18  in --

19  A.  I reported her to the Director of Nursing.

20  Q.  And to your knowledge did anything ever come of that            10:11:32

21  report?

22  A.  I'm not sure.  The director said he would talk to her.

23          She remained there for several weeks and then I didn't

24  see her anymore.  And so I don't know if she was transferred

25  somewhere else or if she left Corizon.                               10:11:50

1   Q.  And then going back to Exhibit 11, your e-mail, you write,

2   quote, other times it is because PharmaCor is not sending the

3   medications in a timely fashion, end of quote.

4           What is PharmaCor?

5   A.  PharmaCor is like the sister of Corizon.  It's the          10:12:11

6   pharmacy, but it's owned by Corizon.  And it is in Oklahoma.

7   And so when we write an order, it goes to PharmaCor and then

8   they send the medications to us.

9           So even though stock medications that we keep in our

10  local units in a limited basis, you have to make sure you       10:12:45

11  reorder those before you get low, otherwise it's going to take

12  days for you to get your stock refilled.

13  Q.  Were there -- did this happen with just one medication or

14  did it happen with a number of different medications?

15  A.  No, it happened with a lot.  There was no specific          10:13:07

16  medication.

17          The one medication where it was more of a problem

18  would be if it was a narcotic, such as morphine, which happened

19  a few times.  You would then -- for some reason they thought

20  that that required a different method of dealing with.  So I     10:13:32

21  would have to write a prescription for them to go to Walgreens

22  to get the morphine for the patients if we were about to run

23  out.

24  Q.  And how many times did that happen, approximately?

25  A.  I can remember probably -- maybe three, three or four.       10:13:52

────── Jan Watson – Direct Examination ──────

1    Q.  And what is morphine used to treat?

2    A.  It's for pain relief.

3          And we don't have many inmates on morphine.  I did

4    have two -- two for a while, and then one of them died.

5          MR. FATHI:  Your Honor, I move the addition of                10:14:22

6    Plaintiffs' Exhibit 11.

7          THE COURT:  Any objection?

8          MR. STRUCK:  No objection.

9          THE COURT:  11 will be received.

10        (Exhibit No. 11 admitted into evidence.)                       10:14:31

11   BY MR. FATHI:

12   Q.  Dr. Watson, did you ever have occasion to refer or attempt

13   to refer a patient to a specialist?

14   A.  Yes, I frequently wrote referrals.

15   Q.  Give us some examples of medical conditions that might          10:14:42

16   require a specialist referral.

17   A.  I had a lot of people who needed to see the cardiologist

18   because of heart problems.  Orthopedic referrals.  They would

19   break bones playing sports.  You had neurology consults for

20   people with multiple neurological diseases, for which some of      10:15:13

21   them did not have a specific diagnosis.  There are a lot of

22   them with seizures.  And the HIV patients needed -- should have

23   been seen by infectious disease.

24   Q.  So if you needed to refer a patient to a specialist, say

25   one of the specialists you've just mentioned, what was the         10:15:37

**Jan Watson – Direct Examination**

1   process that you would go through?

2   A.  I enter information regarding that particular inmate into a

3   consult request form in eOMIS, the HMR, then that information

4   is sent to the -- one of the Utilization Management physicians,

5   and they will either approve it or not.                          10:16:06

6   Q.  Okay.  Let's walk through the process.

7          But first, Doctor, you said in eOMIS the HMR, did you

8   mean EMR?

9   A.  Yeah, EHR is electronic health record.

10  Q.  Okay.  But you were referring to the medical record?        10:16:25

11  A.  Yes.

12  Q.  Okay.  Thank you.

13         So were you, as the provider who was seeking a

14  referral to a neurologist or a cardiologist, were you able to

15  communicate directly with Utilization Management?               10:16:39

16  A.  No.

17  Q.  Who did you communicate with?

18  A.  Once I put it into the computer, the clinical coordinator

19  then transmits that information to the Utilization Management

20  physicians.                                                     10:16:57

21  Q.  Were you, as the ordering provider, copied on or otherwise

22  kept apprised of the communications between the clinical

23  coordinator and Utilization Management?

24  A.  No.

25  Q.  So --                                                       10:17:13

─────── **Jan Watson - Direct Examination** ───────

1   A.  It wasn't until they got a response and entered it into

2   eOMIS would I know what had transpired between them and

3   Utilization Management.

4   Q.  So until the answer came, the communications between the

5   clinical coordinator and Utilization Management was unknown to    10:17:31

6   you?

7   A.  Yes.

8          THE COURT:  And help me understand the purpose for the

9   clinical coordinator.  Was that to make sure that the right

10  management -- Utilization Management physician received it?  So   10:17:42

11  the clinical coordinator was deciding, this is a neurology

12  problem, it should go to the neurological specialist?  I don't

13  mean to suggest an answer to you, I'm just trying to understand

14  and explain to you what my confusion is.

15         THE WITNESS:  When we actually write the consult, we        10:18:00

16  say if it's a cardiology or a neurology.  So that part was not

17  their decision.

18         They served as -- they just took the information we

19  put in the computer, then put that in a different system to

20  transmit that information to Utilization Management.  The         10:18:26

21  Utilization Management, for the longest time I didn't

22  understand, those doctors did not have access to eOMIS, so they

23  were not seeing what I wrote.  And they were not seeing the

24  rest of the patient's medical record, they were only getting

25  the information that the clinical coordinator sent.               10:18:55

────── **Jan Watson – Direct Examination** ──────

1          Then if a referral was approved, the clinical

2    coordinator would then schedule an appointment with the

3    specialist.

4          THE COURT:  So the clinical coordinator is framing the

5    question for the Utilization Management.  So that you have said      10:19:14

6    there should be a referral, the clinical coordinator has access

7    to the medical record and your request.  The clinical

8    coordinator then presumably looks at your request, and if that

9    person wishes at the medical record, and then formulates a

10   request that is then sent on to the utilization manager; is       10:19:31

11   that correct.

12         THE WITNESS:  Yes.

13         THE COURT:  And then utilization manager responds

14   directly to the coordinator and copies to you, or just responds

15   solely to the coordinator who then informs you?      10:19:42

16         THE WITNESS:  Responds to the coordinator, and the

17   coordinator puts a note in eOMIS, either asking us for more

18   information or gives us an ATP, alternate treatment plan.

19         THE COURT:  I'm sorry to interrupt.

20         It's 10:22.  Mr. Struck, is this the time period that      10:20:02

21   you'd like your 15-minute break to commence?

22         MR. STRUCK:  We can go for five more minutes, if

23   that's okay.

24         THE COURT:  All right.  Fair enough.

25         Go ahead.      10:20:15

**Jan Watson - Direct Examination**

1    BY MR. FATHI:

2    Q.  Dr. Watson, when you were requesting a specialist consult,

3    did you know the identity of the Utilization Management people?

4    A.  Did I know --

5    Q.  Did you know, yes, who these people were who were deciding        10:20:24

6    on your consult?

7    A.  No.

8    Q.  Where are the Utilization Management people located?

9    A.  I don't know.  I know where one is.

10   Q.  And where was that one?                                          10:20:38

11   A.  Well, I -- I looked one up, and she was either in a small

12   town in Wisconsin or Minnesota.

13   Q.  Are the Utilization Management people licensed to practice

14   medicine in Arizona?

15   A.  I don't know.                                                    10:20:55

16   Q.  Do the Utilization Management people ever see the patient?

17   A.  No.

18   Q.  Now, when you submit a consult, what are the possible

19   outcomes?  What are the different answers you can get?

20   A.  I could either get -- as I mentioned, they might request        10:21:12

21   more information about that particular patient before making a

22   decision.  They can either approve it, or they can give an

23   alternate treatment plan, which is basically they would not

24   approve the consult, and here's what we think you should do

25   instead.                                                            10:21:49

**Jan Watson - Direct Examination**

1   Q.  So were those the only three possible outcomes?

2   A.  As far as I know.

3   Q.  Were those the only three outcomes that you ever got for

4   any of your consults?

5   A.  Yes.                                                    10:21:59

6   Q.  So if we see NMI in the record, what does that mean?

7   A.  Need more information.

8   Q.  And if your consult request comes back NMI, what does that

9   mean for you as the provider?

10  A.  Whoever did the review needs to let me know what          10:22:15

11  information that they want, and then I have to submit that.

12  Q.  So you as the provider ordering the consult need to provide

13  the additional information?

14  A.  Correct.

15  Q.  Okay.  And then you mentioned an alternate treatment plan.  10:22:30

16  And you said, I think, that essentially means that your consult

17  is -- your consult request is being denied; is that correct?

18  A.  Correct.

19  Q.  Okay.  If there's an ATP -- if you make a consult request

20  and there's an ATP, does that mean that that consult request is  10:23:01

21  considered resolved?

22  A.  The way you resolve it is the provider on-site either

23  accepts the ATP, or if you don't accept it you can submit more

24  information to be reviewed.  And that information would be in

25  support why you think the ATP is inappropriate.               10:23:33

UNITED STATES DISTRICT COURT

Jan Watson – Direct Examination

1        THE COURT:  Dr. Watson, you heard about the need for

2   us to recess for 15 minutes.  We're going to do that now.  You

3   can leave the witness stand and refresh yourself if you'd like,

4   but in 15 minutes we'll all be back.

5        Thank you all.                                          10:23:52

6        (Recess at 10:23 a.m., until 10:45 a.m.)

7        THE COURT:  Dr. Watson, you can return to the witness

8   stand if you would, please.

9        I know that Mr. Struck's not here, and I know what

10  he's probably otherwise doing, but I can't help that.  I was    10:45:19

11  respectful of the jury trial -- I assumed it was a jury trial

12  with a pretrial conference in New Mexico.  But I've also got a

13  bunch of people here interested, so we've got to progress.

14        You may continue.

15        MR. FATHI:  Thank you, Your Honor.                       10:45:32

16        And because we've had some new people join us, I just

17  do want to make sure that all witnesses are -- remain outside

18  the courtroom.

19        THE COURT:  Can you confirm that, Miss Love?  Any

20  witnesses subject to the rule present in the courtroom?          10:45:43

21        MR. BOJANOWSKI:  No, Your Honor.

22        THE COURT:  Thank you, Mr. Bojanowski.

23        You may continue.

24        MR. FATHI:  Thank you, Your Honor.

25  BY MR. FATHI:                                                  10:45:53

**Jan Watson - Direct Examination**

1  Q.  Dr. Watson, I'd like to just revisit a couple of things you

2  testified about before the break.

3          Early on you said that you worked at ADC under two

4  contracts.  And the second one would have gone from -- I think

5  you said three-month contract and it would have gone, the          10:46:09

6  second one, from August to December.  That would have been four

7  months.  Did you mean to say August to November or was it

8  really August to December?

9  A.  No, I think it was December, so I guess it was longer.  I

10  think it was mid December it was supposed to end.          10:46:26

11  Q.  Okay.

12          We talked about the clinical coordinator.  What are

13  the job requirements for a clinical coordinator?  Does the

14  person have to be a registered nurse?

15  A.  I don't know what their qualifications are.          10:46:43

16  Q.  The clinical coordinator at Eyman while you were there was

17  Sara Neese; is that right?

18  A.  Correct.

19  Q.  Is Miss Neese a registered nurse?

20  A.  Not that I know of.          10:46:55

21          There were two -- well, when I first arrived, Matilda

22  Smith was the clinical coordinator, and she is a LPN.  Then

23  Martha Ramirez and Sara Neese became the clinical coordinators

24  later.

25  Q.  And do you know their licensure status?          10:47:25

UNITED STATES DISTRICT COURT

**Jan Watson - Direct Examination**

1   A.   No.

2   Q.   We talked about your requests for outside referrals, and I

3   think you said that there were three possible outcomes:   NMI,

4   meaning need more information; ATP, alternative treatment plan;

5   or it's approved.                                                          10:47:49

6          In the records I've also seen canceled.   Is that a

7   fourth possible outcome?

8   A.   Well, yes, they have done that sometimes.   But I -- if --

9   it happened to me on several occasions when I did not accept an

10  ATP, and submitted more information, including documentation of   10:48:24

11  why I felt the request was appropriate.   And so that can't go

12  on forever, and so eventually it was just canceled.

13  Q.   So I want to make sure I understand your testimony.

14         These were cases where your request came back and the

15  decision was alternate treatment plan, you disagreed with the   10:48:59

16  alternate treatment plan, and then the consult was canceled.

17         Do I have that right?

18  A.   Yes.   That would be the last -- if you don't accept the

19  alternate treatment plan, the cycle just can't continue to go

20  on and on and on.   So the consult could then just be canceled.   10:49:20

21  Q.   And if in the case of a consult requested by you, who would

22  be the person to cancel it?

23  A.   Well, the situation I can think of, one of the clinical

24  coordinators had to have just canceled it.

25  Q.   Do you remember which one?                                   10:49:49

**Jan Watson – Direct Examination**

1  A.  Oh, another thing that happened in some instances, since I

2  only worked three days a week, sometimes other providers would

3  accept an ATP on a case when I wasn't there.

4  Q.  So you had requested the consult, it came back with an ATP,

5  and rather than wait for you to either accept the ATP or not,          10:50:19

6  another provider would accept it?

7  A.  Yes.

8  Q.  But in those cases in which your requests were canceled,

9  you don't recall who did that?

10  A.  I do remember in one case, and I cannot remember the          10:50:38

11  patient's name.  At least in one case Dr. Stewart canceled it.

12       In another instance one of the clinical coordinators

13  had to have canceled it.  My name was there, but I didn't

14  cancel it.

15  Q.  Okay.  Well, we're going to look at some examples shortly,          10:51:06

16  and maybe you'll be able to point out examples of consults

17  being canceled.

18       I want to make sure that we all understand what an

19  alternate treatment plan is, because it sounds like you

20  requested a neurology consult, and the alternate treatment plan          10:51:24

21  is, we're going to send this person not to a neurologist, but

22  to some other kind of specialist.

23       Is that what an alternate treatment plan is?

24  A.  No.  An alternate treatment plan was something that they

25  said the provider on-site could do.          10:51:42

**Jan Watson – Direct Examination**

1   Q.  So -- and who was the provider on-site at the Cook unit?

2   A.  Me.  It would be me.

3   Q.  So let me see if I'm understanding you.  You're saying that

4   if you would order a consult, and it came back alternate

5   treatment plan, that meant essentially your consult was denied          10:52:02

6   and you, Dr. Watson, are going to have to manage this patient?

7   A.  Right.  And they would give me suggestions as to what I

8   could do --

9   Q.  Okay.

10  A.  -- for treatment.                                                    10:52:16

11         THE COURT:  And this is based upon a medical opinion

12  from people who have received what the LPN coordinator has

13  submitted to them, at best, and not based upon any access to

14  the medical record?

15         THE WITNESS:  Correct.                                            10:52:31

16         THE COURT:  Thank you.

17  BY MR. FATHI:

18  Q.  Dr. Watson, are you familiar with a program or process

19  called CARES?

20  A.  I have heard of the system, yes.                                     10:52:40

21  Q.  And what is it?

22  A.  That is the computer system -- well, the software that the

23  clinical coordinator uses to communicate with the Utilization

24  Management people.

25  Q.  And is CARES a part of eOMIS or is it separate?                      10:53:02

**Jan Watson - Direct Examination**

1  A.  I must admit I don't know how CARES fits into the whole

2  thing.

3  Q.  Did you, as the provider ordering the consult or requesting

4  the consult, did you have access to CARES?

5  A.  No.                                                          10:53:20

6  Q.  Did it ever happen that you would request a consult and

7  that request would be -- would be denied?

8  A.  Oh, yes.

9  Q.  And about how often would that happen, maybe as a

10  percentage of the consults that you would request?            10:53:39

11  A.  Oh, it probably happened over 50 percent of the time.

12  Q.  And did the frequency of rejections change over the course

13  of your time at ADC, or was it pretty constant throughout the

14  time you were there?

15  A.  No.  My first three months there, it wasn't bad at all.  I  10:53:56

16  don't know what percentage of my consults were approved, but it

17  wasn't bad.

18        But when I returned near the end of August to start

19  the second contract, there was a noticeable difference in how

20  frequently the consults were denied or received ATP.  I even   10:54:27

21  said something to one of the nurse practitioners.  We all

22  noticed that things changed a lot.

23  Q.  And do you know why?

24  A.  No.

25  Q.  Now, let's say you request a consult and it's approved and  10:54:49

UNITED STATES DISTRICT COURT

1    it's scheduled and it happens.  Is there a report from the

2    outside consultant that is generated?

3    A.  Yes.

4    Q.  And is that report supposed to be entered into eOMIS so

5    that the prison health staff have access to it?                    10:55:09

6    A.  Yes.  The reports initially are sent to the clinical

7    coordinators, and the clinical coordinators are responsible for

8    getting that consult report into eOMIS so that the providers

9    have access.

10   Q.  So the consult report would not be sent directly to you as    10:55:31

11   the ordering provider?

12   A.  No.

13   Q.  Were you ever aware of delays in getting the consultant

14   reports into eOMIS?

15   A.  Yes.  And it was not that infrequent.  And occasionally the    10:55:46

16   delay was up to three months after the consult before it ever

17   got into eOMIS.

18   Q.  And does that pose any problems for patient care if there's

19   been an outside consult and the consult report isn't entered

20   into eOMIS for three months?                                       10:56:11

21   A.  Yes.  In several cases I needed to have that information,

22   and I eventually just called the specialist's office and asked

23   them to fax me the results directly.  And they would always

24   say, well, we already sent that information to the clinical

25   coordinator.  And I would have to let them know, but I don't       10:56:38

**Jan Watson – Direct Examination**

1    have access to it yet.  And so then they would fax it directly

2    to my unit.

3    Q.  We're now going to talk about some examples of consults

4    that you requested and what happened with them.

5          Do you recall a consult that you requested for an          10:56:56

6    audiologist?

7    A.  Oh, yeah, that was -- that was one of my funny ones.

8    Q.  Can you tell us about it?

9    A.  Yes.  I made an audiology referral because the patient's

10   hearing aid was broken, and it was sent back to me with an ATP    10:57:17

11   that the provider on-site should take a look at the hearing

12   aid.  We all know I can't fix a hearing aid, so that was a

13   waste of my time to have to resubmit that consult request

14   stating that, he turns on the hearing aid, puts it in and it

15   doesn't do anything.  That should have just been approved.  Who  10:57:50

16   can fix the hearing aid at Cook?  None of us can.

17   Q.  Doctor, would you turn to Plaintiffs' Exhibit 14, please?

18         Doctor, these are -- Plaintiffs' Exhibit 14 is three

19   pages marked EVHG 1 through 3.  What are these documents?

20   A.  These are consultation requests on a particular patient.    10:58:35

21   Q.  And would this -- would these documents be part of the

22   patient's medical record?

23   A.  Yes.

24   Q.  And are those records kept in the ordinary course of

25   business of the prison healthcare operation?                     10:58:56

1   A.  Yes.

2   Q.  Are you familiar with the patient to whom these records

3   pertain?

4   A.  Yes, I am.

5   Q.  Are you familiar with the patient's medical condition          10:59:04

6   that's described here?

7   A.  Yes.

8   Q.  And what is that medical condition?

9   A.  He fractured his hand.

10  Q.  Tell us what happened with this patient.                       10:59:13

11  A.  He fell, and it was a week after the fall his hand was

12  still swollen and sore, so he came in to see me and I ordered

13  X-rays.  And he had fractured his fifth metacarpal.

14  Q.  So in lay person's terms he had a broken hand?

15  A.  Yes, broken hand.                                              10:59:44

16  Q.  If you turn to page 2, the document titled Condensed

17  Consultation Report, this is dated, request date 9-28-17.  And

18  it appears that you are requesting an orthopedics consult on

19  urgent priority.

20       Am I reading that correctly?                                  11:00:05

21  A.  Correct.

22  Q.  Would you please read under Procedure Requested Comments,

23  the first line and the final line?

24  A.  32-year-old male fell approximately one-and-a-half weeks

25  ago and hit his left hand.  Then there's the X-ray results.       11:00:24

**Jan Watson – Direct Examination**

1  And I said, needs to see ortho ASAP.

2  Q.  Okay.  Would you now turn to page 3.

3        And the second entry from the top -- or the third

4  entry from the top, rather, dated 10-11-17, and it says, need

5  more information.                                          11:00:50

6        What does that mean?

7  A.  The consult was returned to me, and the Utilization

8  Management physician wanted to know how angulated the displaced

9  bone was.  So I had the radiologist who had read the X-ray

10  measure it and submit a second report with the angulation    11:01:22

11  included.

12        (Mr. Struck entered at 11:01 a.m.)

13  BY MR. FATHI:

14  Q.  And what does the angulation mean?

15  A.  So how many degrees the bone was off from where it should  11:01:33

16  be.

17  Q.  Okay.  Would you turn to page 1, please.

18        This is a document titled Consultation Request Action.

19        Can you read the final -- the text of the final line

20  under Action Taken Comments?                               11:02:02

21  A.  On exam the hand is obviously fractured, the displaced bone

22  is easily palpable.

23  Q.  And who wrote that?

24  A.  I did.

25  Q.  And why did you have occasion to write that?           11:02:15

1    A.  Well, after we had the radiologist measure the angulation,

2    the Utilization physician didn't accept that because it was the

3    same X-ray and wanted a new X-ray taken.  So I did make the

4    comment that you could see the bone sticking up.  That's why I

5    made that comment.                                                   11:02:47

6    Q.  So what eventually happened with this patient's broken

7    hand?

8    A.  Well, I ordered another X-ray.  And then my time was up.

9    But it does say on this consultation request what happened.

10   October 19th, an alternate treatment plan was accepted.  And so   11:03:07

11   since it was an alternate treatment plan, he never got -- he

12   was never sent to the orthopedic surgeon.

13           MR. STRUCK:  Objection, Your Honor, foundation.

14           THE COURT:  Yeah.  The objection is one based on

15   foundation.  And that is, we don't know how you know what you    11:03:32

16   just said.

17           If you could first point out to us whether or not

18   there was an alternative treatment plan.  I can't see on this

19   exhibit where that is.  Can you just tell me?

20           THE WITNESS:  Okay.  So at the bottom of page 2 it      11:03:48

21   says, October 19th alternative treatment accepted.  Reason, see

22   comments by -- flip the page -- staff, Rodney Stewart.

23           So that was the last entry that was made on this

24   consult request, and that occurred on October 19th.

25           THE COURT:  Okay.  But you don't know what the actual    11:04:21

Jan Watson - Direct Examination

1    alternative treatment plan was.

2            THE WITNESS:  No.

3            THE COURT:  Okay.  And then the other question that I

4    have is, the reason for the orthopedic consult, what -- why

5    were you seeking that?  What would be the need for that?          11:04:35

6            THE WITNESS:  To set the bone correctly so that it

7    wouldn't -- it was a displaced fracture, it wasn't like the

8    bone was still in line and there was a crack.  The bone was

9    fractured and it was sticking up.

10           THE COURT:  Okay.  And the orthopedic specialist would   11:04:53

11   have to set it, because that's not something that a provider

12   can do like you?

13           THE WITNESS:  Right.  And it had already been a week.

14           THE COURT:  I see.

15           And then, even though the original X-ray radiologist's    11:05:06

16   report had said "with minimal angulation," even with minimal

17   angulation when you received that information do you still

18   think that needs to be set?

19           THE WITNESS:  Yes, because I could -- you could see

20   it.                                                              11:05:22

21           THE COURT:  I see.  So what I'm understanding from

22   what you're saying is that if you have a fracture where there's

23   a crack but everything is still in line, you don't need to have

24   it reset, but if you have an angulation, even if a minimal

25   angulation exists in your opinion, then you think that does      11:05:35

**Jan Watson - Direct Examination**

1    need to be set.

2         THE WITNESS:  Yes.  I should not be able to see your

3    bone sticking out.

4         THE COURT:  I didn't want to put words in your mouth.

5    I mean, if anything I said was not true, tell me that.                11:05:44

6         THE WITNESS:  No, no, correct.

7         And the other problem I had was, even if it had been

8    one that was not displaced, I did not have the proper equipment

9    to splint his hand.

10         THE COURT:  Is that always the case at the unit, that        11:06:04

11    there's no ability to splint a hand?

12         THE WITNESS:  I didn't have a splint.

13         THE COURT:  Could you have obtained one?  I guess --

14         THE WITNESS:  I'm trying to think if -- if we called

15    other units to see if they had a splint.  I can't remember.        11:06:21

16    But I didn't have one.

17         THE COURT:  I see.  Okay.  All right.  Thank you very

18    much.

19         The objection is overruled.

20         You may continue.                                             11:06:32

21         MR. FATHI:  Thank you.

22    BY MR. FATHI:

23    Q.  Doctor, looking at this record, it appears that you wrote

24    on September 28th that this patient fell approximately

25    one-and-a-half weeks ago.  So can we assume he fell about the      11:06:47

—**Jan Watson - Direct Examination**—

1   middle of September?

2   A.  Yes.

3   Q.  And then the date that the alternative treatment plan was

4   accepted was October 19th.  Is that -- am I reading that

5   correctly?                                                    11:07:02

6   A.  Correct.

7   Q.  Does it have any affect on prospects for a full recovery

8   that kind of delay in treating the kind of fracture that you've

9   described?

10      MR. STRUCK:  Your Honor, foundation.  She's not an        11:07:15

11  orthopedic doctor.  She hasn't laid any foundation at all with

12  respect to being able to testify regarding anything other than

13  obstetrics and the clinical genetics.

14      MR. FATHI:  Your Honor --

15      THE COURT:  Hold it just a second.                        11:07:29

16      She is a primary care provider that the State allowed

17  to provide care to the inmates in the facility.  And she has

18  testified that she's presented with a fractured hand, something

19  that happens from sports injuries and otherwise, and so I

20  imagine she's got good experience.                            11:07:45

21      But the objection is overruled if for no reason this

22  is somebody that the State thought should be competent

23  providing for medical care for its inmates.

24      You may answer.

25      THE WITNESS:  The concern was the longer you wait to      11:07:57

```
 1    properly set a broken bone, it will start to heal.  And once it

 2    starts the healing, the only way you can then reset it properly

 3    is to break it again.  So you try to get it fixed as fast as

 4    can -- as you can.

 5            MR. FATHI:  Thank you.                                    11:08:24

 6            Your Honor, I'd move the admission of Plaintiffs'

 7    Exhibit 14?

 8            THE COURT:  Any objection?

 9            MR. STRUCK:  No objection, Your Honor.

10            THE COURT:  14 will be received.                          11:08:32

11        (Exhibit No. 14 admitted into evidence.)

12    BY MR. FATHI:

13    Q.  Dr. Watson, will you please next look at Plaintiffs'

14    Exhibit 16?

15            Doctor, Plaintiffs' Exhibit 16 is a number of pages       11:08:52

16    numbered EVHG 24 through 56.

17            Can you tell us collectively what these documents are?

18    A.  These are notes from a hospital admission on a patient who

19    was hospitalized following seizures.

20    Q.  Okay.  Let me ask a different question.                       11:09:25

21            Would these documents be part of the patient's medical

22    record in eOMIS?

23    A.  Yes.

24    Q.  Are you familiar with this patient, Doctor?

25    A.  Yes.                                                          11:09:35
```

Jan Watson - Direct Examination

1  Q.  Are you familiar with the patient's medical condition that

2  is discussed in these documents?

3  A.  Yes.

4  Q.  And what is that medical condition?

5  A.  He has seizures that we could not control.                11:09:43

6  Q.  Now it's my understanding that sometimes seizures can be

7  controlled with medication; is that right?

8  A.  Correct.

9  Q.  Were this patient's seizures controlled with medication?

10 A.  No.  Even though we had him on three or four different     11:09:57

11 anticonvulsants, he still would have a lot of seizures.

12 Q.  Okay.  Would you turn to page 30, please, looking at the

13 numbers in the lower right-hand corner.

14         What is this document, page 30?

15 A.  This is a Consultation Request Action.                     11:10:23

16 Q.  I'm sorry, Doctor, I'm not sure you're looking at page 30.

17 I'm looking at Florence Hospital at Anthem.

18 A.  Uh-oh.

19         THE COURT:  Is it starts with the initials

20 EVG -- EVHG.                                                   11:10:46

21         THE WITNESS:  I was looking at the wrong 30.  Sorry.

22         MR. FATHI:  Quite all right.

23         THE WITNESS:  Okay.

24         MR. FATHI:  Do you have it now, Doctor?

25         THE COURT:  Go ahead and assist --                    11:10:55

UNITED STATES DISTRICT COURT

**Jan Watson - Direct Examination**

1          THE WITNESS:  I got it.  I got it.

2    BY MR. FATHI:

3    Q.  Thank you, Doctor.

4          This document says in the upper right-hand corner

5    Florence Hospital at Anthem; correct?                    11:11:04

6    A.  Okay.

7    Q.  So what is this document?

8    A.  This is a progress note from his hospital admission.

9    Q.  And what is the date -- what does it say under Arrival Date

10   in the upper left-hand corner?                           11:11:14

11   A.  August 8th, 2017.

12   Q.  Under Presentation, would you read the first two-and-a-half

13   lines, please?

14   A.  Transition care -- transition of care, patient was not

15   received from another setting of care.  Presenting complaint,   11:11:32

16   patient states he had 14 seizures today and he has body ache

17   and a headache.  EMS states the patient had 14 seizures today

18   and a total of ten milligrams of Valium today.

19   Q.  And the next sentence also, please.

20   A.  The injury or illness occurred in a prison in a cell.   11:11:57

21   Q.  Okay.  So this is a hospital visit that occurred on

22   October -- excuse me, August 8th; correct?

23   A.  Correct.

24   Q.  Will you next turn to page 43, please.

25   A.  Okay.                                                 11:12:21

UNITED STATES DISTRICT COURT

**Jan Watson - Direct Examination**

1   Q.  And what is this document?

2   A.  This is a consultation request for neurology on this inmate

3   after he had returned to the prison.

4   Q.  And you wrote it as priority urgent; correct?

5   A.  Yes.                                                          11:12:46

6   Q.  And you were the provider who wrote this consult, is that

7   right, this consult request?

8   A.  Yes.

9   Q.  And -- go ahead.

10  A.  This -- this patient had been presented at our daily         11:12:59

11  conference of all the providers in Arizona when we discuss

12  anyone who had been admitted to the hospital.  And it had been

13  agreed upon in that conference that he should have further

14  neurological evaluation.  One, to make sure that his seizure

15  activity was due to real epilepsy or what the problem was,       11:13:26

16  since we could not control them.

17  Q.  And what happened with this consult that you wrote on

18  August 9th?

19  A.  Alternative treatment plan.

20  Q.  Okay.  Would you next turn to page 47, please.               11:13:51

21        And what is this document?

22  A.  Another consultation request dated August 19th for an

23  urgent neurology consult.

24  Q.  And this is for the same patient; correct?

25  A.  This is for the same patient.                                11:14:22

Jan Watson – Direct Examination

```
 1   Q.  But this is written by someone other than you; correct?
 2   A.  Right.  One of the nurse practitioners, Maureen Gay, wrote
 3   this one.
 4   Q.  About half way down the page the box with a lot of text in
 5   it, there's a line that begins, consultation as discussed.  Can    11:14:42
 6   you find that?
 7   A.  Yes.
 8   Q.  Could you read those two sentences, please?
 9   A.  Consultation as discussed submitted for EEG but ATP'd
10   August 16th, 2017, asking for more information about lab            11:15:03
11   results and EEG findings.  Discussed patient and treatment plan
12   with other medical directors, regional director, with on-site
13   medical director August 16th.  All agreed for further work-up
14   was required and submitted but consultation ATP'd.
15   Q.  Okay.  So what happened with this consultation -- this         11:15:36
16   request at page 47?
17   A.  This one -- this one was ATP'd as well.
18   Q.  Okay.  Would you next turn to page 50, please.
19          And what is this document?
20   A.  This is another consultation request on the same patient      11:16:06
21   dated October 2nd.
22   Q.  So this is the third urgent neurology consult that we've
23   seen?
24   A.  Yes.
25   Q.  And this was written by you?                                   11:16:20
```

 1    A.  Yes.

 2    Q.  In the first paragraph under Procedure Requested there's a

 3    sentence beginning "two weeks ago."  Would you read that,

 4    please?

 5    A.  Oh, two weeks ago he sustained a large eye contusion when      11:16:34

 6    he fell and hit his face during a seizure.  He is at risk for

 7    sustaining a more severe head injury if his seizures are not

 8    better controlled.

 9    Q.  And what happened with this consult request?

10    A.  ATP.                                                           11:17:02

11            THE COURT:  Did you write this?

12            THE WITNESS:  Yes.

13            THE COURT:  What I'm referring to is on EVHG0050.

14            THE WITNESS:  Yes.

15            THE COURT:  And then in the block below what we've         11:17:27

16    been talking about it states, when request was made previously

17    it was stated that since he had a normal EEG in May a neurology

18    consult was not needed.  And then the next paragraph seems to

19    suggest that maybe it's drawn from an article, because it

20    states, the epilepsies and seizures, colon, hope through         11:17:44

21    research from the National Institute of Health, National

22    Institute of Neurological Disorders and Stroke.  And then what

23    follows is a narrative paragraph that starts "some people."

24            Can you explain what the epilepsies and seizure

25    reference is to and what this next paragraph came from?         11:18:04

73

**Jan Watson - Direct Examination**

1          THE WITNESS:  Since his previous neurology consults

2    had been ATP'd, I did a literature search and pulled articles

3    as to why -- to support the fact that he still needed a

4    neurology consult, even though he had had an EEG that was

5    normal several months ago.                                          11:18:27

6          So I was trying to gather supporting data

7    through -- by doing a literature search.  And so that was one

8    of the references I submitted to them.

9          THE COURT:  Thank you.

10   BY MR. FATHI:                                                        11:18:42

11   Q.  Dr. Watson, did you ever discuss with Dr. Stewart sending

12   this patient out for a neurology consult?

13   A.  Yes.  He actually came over and we both sat with the

14   patient.  And Dr. Stewart told him that sometimes we couldn't

15   control seizures.  And I said that we had one of the best       11:19:04

16   neurological institutes in the country down the road, so why

17   don't we send him there?  And Dr. Stewart told him it cost too

18   much.

19   Q.  To your knowledge was this patient ever sent out for a

20   neurology consult?                                                  11:19:26

21   A.  No.

22   Q.  Was anything done for his seizure disorder?

23          MR. STRUCK:  Foundation, Your Honor.

24          THE COURT:  You'll have to restrict your answer to

25   what personal knowledge you have, which I gather is when you    11:19:38

——— **Jan Watson - Direct Examination** ———

1    were treating him.

2         THE WITNESS:  Right.

3         I added one more anticonvulsant that he had not yet

4    taken.  And then I was gone.

5    BY MR. FATHI:                                              11:19:55

6    Q.  Did you ever -- did Dr. Stewart ever say anything about

7    getting a helmet for this patient?

8    A.  Oh, during that little mini conference we had he did say,

9    order a helmet so that we could protect his head.  And in eOMIS

10   where we order durable medical equipment, there are no helmets,  11:20:26

11   so I couldn't order one.  I went to the CNA and asked her if

12   she knew how to order a helmet, and she said she didn't, but

13   she'd check with someone else.

14        So he did not have a helmet when I left.  I don't know

15   if he ever received one.                                   11:20:49

16   Q.  And --

17        THE COURT:  How long was it after you had the bedside

18   conference -- or I guess maybe "bedside" is the wrong word.

19   But when you and Dr. Stewart met with this inmate, and the

20   suggestion was made to have the helmet, how long after that did  11:21:04

21   you leave?

22        THE WITNESS:  Okay.  About two weeks.

23        THE COURT:  Thank you.

24   BY MR. FATHI:

25   Q.  Would you turn to page 55, Doctor?                     11:21:14

**Jan Watson – Direct Examination**

1          And what is this document?

2    A.  This is an HNR, a Health Needs Request, from this inmate,

3    and he's asking for a seizure helmet.

4    Q.  Can you read what it says under Plan of Action at the

5    bottom of the page?                                          11:21:46

6    A.  To CNA for helmet.

7          MR. FATHI:  Your Honor, I move the admission of

8    Plaintiffs' Exhibit 16.

9          THE COURT:  Any objection?

10         MR. STRUCK:  No objection, Your Honor.                 11:21:59

11         THE COURT:  16 will be received.

12      (Exhibit No. 16 admitted into evidence.)

13   BY MR. FATHI:

14   Q.  Doctor, would you please look at Plaintiffs' Exhibit 15.

15         And same question, Doctor.  Collectively what are       11:22:31

16   these documents?

17   A.  Did you say 50?

18   Q.  15.  I'm sorry, one five.  15.

19         THE COURT:  I heard 50 also.

20         THE WITNESS:  Oh, good.                                11:22:47

21         MR. FATHI:  I beg your pardon.

22         THE WITNESS:  Okay.

23   BY MR. FATHI:

24   Q.  Just to move things along, Doctor, would these documents be

25   part of a patient's medical record in eOMIS?                 11:23:11

─Jan Watson – Direct Examination─

1    A.   Yes.

2    Q.   Are you familiar with this patient?

3    A.   Oh, yes.

4    Q.   Are you familiar with the patient's medical condition

5    that's described here?                                    11:23:22

6    A.   Yes.

7    Q.   And what is that medical condition?

8    A.   HIV.

9    Q.   Will you turn to page 11, please?

10            What is this document?                           11:23:34

11   A.   It's a Consultation Request.

12   Q.   Completed by you?

13   A.   Completed by me in August.

14   Q.   And what kind of consultation are you requesting?

15   A.   Infectious disease.                                  11:23:53

16   Q.   And with urgent priority; correct?

17   A.   Yes.

18   Q.   Would you read what is written under Procedure Requested

19   Comments?

20   A.   53-year-old male with HIV for approximately eight years.   11:24:06

21   He is currently taking three antiviral medications.  He has not

22   been seen by the infectious disease since he arrived here in

23   2015.  His medications have not been changed since his arrival.

24   Q.   Now why did you believe that this patient needed an urgent

25   consult for infectious disease?                          11:24:31

UNITED STATES DISTRICT COURT

**Jan Watson - Direct Examination**

1   A.  Well, urgent means 30 days.  And he had not had his

2   medications adjusted.  And I was not qualified to adjust his

3   HIV medications.

4   Q.  Did it concern you that he had not been seen by infectious

5   disease and his medications hadn't been changed since 2015?        11:25:00

6   A.  Yes.  We were told during orientation that the infectious

7   disease specialists were the ones who managed the HIV patients.

8           And might I point your attention to one of the lab

9   results?

10  Q.  Please.                                                        11:25:26

11  A.  Okay.  So still on page 11, it does say under HIV-1, RNA,

12  ultra/PCR 4710 high.

13          He had the HIV virus detectable.  And the goal of

14  treatment is to get it to be very low or nondetectable.

15  Q.  So it was this laboratory test that suggested to you a need   11:26:02

16  for an infectious disease consult?

17  A.  As well.  Even if it had been low, I still would have

18  wanted the infectious disease specialist to see this patient.

19  Q.  And the date of this consult is August --

20  A.  4th.                                                           11:26:22

21  Q.  -- 4th, this consult request; correct?

22  A.  Yes.

23  Q.  Would you turn to page 10, please.

24          This appears to be a Consultation Request Action on

25  the August 4th consult request that we just looked at; is that    11:26:38

—— **Jan Watson – Direct Examination** ——

1    right?

2    A.  Yes, it is.

3    Q.  And what action was taken on this consult request?

4    A.  On September 18th it says canceled.

5    Q.  And who canceled it?                                    11:26:57

6    A.  Rodney Stewart.

7    Q.  Now why was there a six-week gap between submission of the

8    request and its cancellation by Dr. Stewart?

9    A.  I don't know.

10   Q.  Could you please read what it says under Action Taken    11:27:15

11   Comments?

12   A.  Will be following HIV patients on-site and consult with

13   Corizon ID consultant.

14   Q.  And presumably "ID" stands for infectious disease?

15   A.  Infectious disease.                                     11:27:33

16   Q.  So what does that mean to you, the sentence you just read?

17   A.  Well, first, that following the HIV patients on-site would

18   be the provider on-site, which would be me.  And I was supposed

19   to follow that patient with the ID consultant, whoever that

20   was.                                                        11:27:59

21   Q.  Do you feel comfortable managing HIV disease on your own?

22   A.  No.

23   Q.  Would you turn to page 16, please?

24          THE COURT:  May I ask a question?

25          As you read this, am I right to read it as well that  11:28:13

Jan Watson - Direct Examination

1   you're saying that you need to consult with an ID specialist

2   for this HIV patient.  And then you're being told that you are

3   to follow this ID patient and consult with the ID specialist in

4   the same message where you're being told, no, you can't do

5   that.                                                              11:28:35

6          THE WITNESS:  Right.  That's why I said I have no idea

7   who the Corizon ID consultant is.  And if we have a Corizon

8   infectious disease consultant, why doesn't that person see this

9   patient?

10         THE COURT:  So there are some cases where the             11:28:53

11  consultants that you refer to are people who are consultants

12  who are employed by Corizon, they're not outside providers.  In

13  some other cases; is that right?

14         THE WITNESS:  The only situation I know where we have

15  had patients with certain medical conditions that were managed   11:29:09

16  by Corizon were the hepatitis C patients.  There was a

17  hepatitis C committee somewhere who reviewed all of their lab

18  results, and then that committee made recommendations as to who

19  would be treated and with what.

20         THE COURT:  I see.  This form that we've seen             11:29:41

21  repeatedly this morning, the Condensed Consultation Request, is

22  that used both for a Corizon doctor referral and also for an

23  outside referral, or just for one or the other?  Do you

24  understand the question?

25         THE WITNESS:  It could be used for outpatient -- out      11:29:57

———— **Jan Watson – Direct Examination** ————

1    of site, or -- let me see, off site and in site.  But when you

2    would check if this was an off-site consult or if it was an

3    on-site consult.

4          For instance, on-site consults were to optometry or

5    dentistry.  But for physical therapy, cardiology, and all of          11:30:30

6    those types of things, including infectious disease, those were

7    off-site consults.

8          THE COURT:  So with this HIV patient, you had

9    initiated a process seeking an outside consult; correct?

10         You need to answer so we can hear.                              11:30:49

11         THE WITNESS:  Oh, I'm sorry, yes.

12         THE COURT:  It's normal conversation.  But

13   unfortunately the record we make requires the microphones to

14   hear it.

15         And then you're told in response that there's a               11:30:58

16   Corizon internal consultant who can provide this information.

17   That's correct?

18         THE WITNESS:  Correct.

19         THE COURT:  But you're not told who that person is?

20         THE WITNESS:  Correct.                                         11:31:10

21         THE COURT:  And at the time did you know that any such

22   person existed?

23         THE WITNESS:  I did get an e-mail from Sara saying

24   that Dr. Stewart would tell me who that infectious disease

25   consultant was.                                                      11:31:22

UNITED STATES DISTRICT COURT

Jan Watson – Direct Examination

1          THE COURT:  Did that ever happen?

2          THE WITNESS:  No.

3          THE COURT:  Thank you.

4    BY MR. FATHI:

5    Q.  Would you turn to page 16, please.                    11:31:34

6          And what is this, Dr. Watson?

7    A.  This is another consultation request on the same patient.

8    Q.  Also for infectious disease?

9    A.  Infectious disease.

10         And this one's dated August 6th, 2017.              11:32:04

11   Q.  And who wrote this request?

12   A.  Christine.  I don't know how to say her last name.

13   Boryczka.

14         MR. FATHI:  For the record, that's B-O-R-Y-C-Z-K-A.

15   BY MR. FATHI:

16   Q.  Do you know who this person is, Doctor?

17   A.  Yes.  She is one of the physicians that did the

18   telemedicine chronic care visits.

19   Q.  And would you read what it says under Subjective Notes?

20   A.  53-year-old male with known HIV with normal CD4 count, but   11:32:38

21   detectable viral load.  Will request ID consultation.

22   Q.  And when it says "detectable viral load," is that what you

23   were discussing earlier?

24   A.  Correct.

25   Q.  That the goal of successful HIV management is to have       11:32:59

UNITED STATES DISTRICT COURT

Jan Watson - Direct Examination

```
 1    undetectable viral load; correct?
 2    A.  Correct.
 3    Q.  And would you turn to page 17, please.
 4            And what is this document?
 5    A.  This is a Consultation Request Action.              11:33:18
 6    Q.  And it appears that this pertains to the August 6th request
 7    that we just looked at; is that right?
 8    A.  Yes.
 9    Q.  And what action was taken on that request?
10    A.  The consult was canceled.                           11:33:33
11    Q.  And on what date?
12    A.  September 18th.
13    Q.  By whom?
14    A.  Rodney Stewart.
15    Q.  Will you read what it says under Action Taken Comments?  11:33:44
16    A.  HIV patients will be followed on-site and Corizon ID
17    consultant will be consulted for issues.
18    Q.  To your knowledge was this patient ever seen by an ID
19    consultant?
20    A.  As far as I know, no, he wasn't.                    11:34:08
21            MR. FATHI:  Your Honor, I move the admission of
22    Plaintiffs' Exhibit 15.
23            THE COURT:  Any objection?
24            MR. STRUCK:  No objection, Your Honor.
25            THE COURT:  This exhibit will be received.      11:34:16
```

**Jan Watson – Direct Examination**

1        (Exhibit No. 15 admitted into evidence.)

2        THE COURT:  Mr. Fathi, before you continue, could you

3    help me understand the difference between EVHG 10 Consultation

4    Request Action with an action date of 9-18-2017, and EVHG0017,

5    Consultation Request Action with action date 9-18-2017.        11:34:33

6        MR. FATHI:  10 is a cancellation of the August 4th

7    request by Dr. Watson.  17 is the cancellation of the August

8    6th request by Dr. Boryczka.

9        THE COURT:  Thank you kindly.

10   BY MR. FATHI:                                                  11:34:56

11   Q.  All right.  Will you please turn to Plaintiffs' Exhibit 18,

12   please.

13        Doctor, would these documents be part of the patient's

14   medical record in eOMIS?

15   A.  Yes.                                                       11:35:27

16   Q.  And are you familiar with this patient?

17   A.  Yes.

18   Q.  Are you familiar with the medical condition that this

19   patient had that is described here?

20   A.  Yes.                                                       11:35:36

21   Q.  And what is that condition?

22   A.  He has cerebral palsy.

23   Q.  And how did that -- what about his cerebral palsy led you

24   to request a consult for him?

25   A.  He has severe spasticity in his lower limbs, and that      11:35:48

UNITED STATES DISTRICT COURT

**Jan Watson - Direct Examination**

1    causes his feet to be turned inward.  And so when he walks he's

2    almost walking on the top of his foot.  He uses crutches to

3    help keep his balance, but his crutches are old and they're no

4    longer fitting together well, the screws are loose.  And so

5    he's very, very unstable when he walks.                          11:36:21

6         And so I was concerned about his gait and wanted him

7    to be seen by a physical medicine and rehabilitation doctor to

8    evaluate him for braces and to develop a treatment plan to try

9    and decrease his spasticity to see if we could get his feet

10   into a more normal position.                                     11:36:53

11        And he also needed new crutches.

12   Q.  When you say braces, what -- what are braces?

13   A.  Metal supports basically that will straighten his feet and

14   legs and give him more support so he's not walking on top of

15   his foot almost.                                                 11:37:17

16   Q.  Okay.  Would you turn to page 108, please.

17        And what is this document, Doctor?

18   A.  It's a consultation request for physical medicine and

19   rehabilitation.

20   Q.  And urgent priority?                                         11:37:41

21   A.  Urgent.

22   Q.  Dated July --

23   A.  July 14th.

24   Q.  Will you please read what's written under Procedures

25   Requested Comments?                                              11:37:53

**Jan Watson – Direct Examination**

1  A.  21-year-old with cerebral palsy.  He has spasticity of the

2  lower legs.  Oh, is the worst.  But he also has spasticity in

3  the elbows.  He should be in braces to give his lower limbs

4  more stability.  He also should get PT, physical therapy, to

5  aid in decreasing spasticity.  He has difficulty with                    11:38:19

6  ambulation, even while using crutches.  He has significant risk

7  for falling.  I need physical medicine to evaluate for the

8  correct type of braces and recommended therapy program for the

9  spasticity.

10  Q.  And this is a consult request that you wrote; correct?          11:38:41

11  A.  Correct.

12  Q.  Would you turn to page 111, please.

13         And what is this document?

14  A.  Another consultation request dated August 22nd.  And this

15  one is for physical medicine and rehabilitation as well on the      11:39:05

16  same patient.

17  Q.  Also urgent priority?

18  A.  Urgent.

19  Q.  And also written by you?

20  A.  Yes.  And I should have proofread it before I --                11:39:16

21  Q.  And so this is the second request for this consult for this

22  patient?

23  A.  Yes.

24  Q.  Would you now turn to page 115, please.

25         And what is this?                                            11:39:38

**Jan Watson - Direct Examination**

1  A.  Another consultation request dated September 9th on the

2  same patient.

3  Q.  Same kind of consult requested?

4  A.  It's -- right.  It's physical medicine and rehabilitation.

5  And it too is urgent.                                        11:39:53

6  Q.  Would you please read the two final paragraphs under

7  Procedure Requested Comments?

8  A.  Starting with the "we have tried for four months"?

9  Q.  Yes, please.

10  A.  To get him new forearm crutches with no success.  Please   11:40:07

11  have the physical medicine and rehabilitation doctor order

12  them.  Apparently whoever orders crutches does not know where

13  to get forearm crutches.  Eric has now fallen several times.

14  He hasn't hurt himself yet.

15  Q.  All right.  Will you now please turn to page 117.         11:40:30

16          And what is this document?

17  A.  This is another consultation request.

18  Q.  For the same patient for the same kind of consultation?

19  A.  Yes.  It's another physical medicine and rehabilitation

20  consult dated September 30th.                                11:40:58

21  Q.  And written by you; correct?

22  A.  Yes.

23  Q.  Would you please read the first paragraph.

24  A.  This is the third request for this 21-year-old with

25  cerebral palsy to be sent for a physical medicine and        11:41:15

**Jan Watson - Direct Examination**

rehabilitation referral.  On the two previous occasions he was

sent to USA Sports Therapy.  He has spasticity of the lower

legs and ankles, but he also has spasticity in the elbows.  He

has now fallen several times.  He hasn't hurt himself yet.

Q.  And you write that he was sent to USA Sports Therapy.

What's the significance of that?                                        11:41:43

A.  I requested physical medicine and rehabilitation, and they

sent him to a physical therapy facility the first time.  I had

then told -- explained to the clinical coordinators the

difference between physical therapy and physical medicine and     11:42:10

rehabilitation.  And after that explanation they still sent him

back to physical therapy.

        And when I did run into the clinical coordinator who

had done that, she said she had called that place and they had

a physical medicine doctor on-site.  I looked them up on the      11:42:35

internet, they do not have physical medicine doctor on-site.

Q.  So physical therapy and physical medicine are not the same

thing; correct?

A.  Correct.

Q.  Could you explain the difference?                              11:42:50

A.  Physical medicine and rehabilitation are physicians who

specialize in patients who have complex disorders that have

caused their disability.  Those doctors then evaluate those

patients and develop a whole program for that particular

patient to be rehabilitated.  They are not physical therapists.   11:43:18

**Jan Watson – Direct Examination**

1  They are the ones who design the program for the therapists to

2  follow.

3          The doctor also is the one who determines what type of

4  braces would be appropriate for the particular condition.

5          So if you're admitted to a rehabilitation hospital,    11:43:45

6  you have a doctor who specializes in that in charge of your

7  overall care.

8  Q.  Would you turn to page 116, please.

9          THE COURT:  Before you do that, Doctor, can I

10  interrupt?                                                   11:44:00

11          With respect to the reference to USA Sports Therapy, I

12  appreciate that you made the inquiry and saw that the website

13  didn't list a medical doctor with physical medicine on it.  But

14  I'm trying to understand where your information came that he

15  had been to USA Sports Therapy.  Did the inmate tell you that?  11:44:18

16          THE WITNESS:  Oh.

17          THE COURT:  Do you remember?

18          THE WITNESS:  No, I found it.  Because his first

19  consult had been approved.  So I got a report back from USA

20  Sports Therapy telling me what they did.  And they did some   11:44:39

21  exercises.  I can't remember exactly what they did.  And said

22  that he might benefit from something more.

23          So I got a consult request.  That's how I knew he

24  ended up in physical therapy and not physical medicine.

25          THE COURT:  So you were able to tell from the report   11:45:01

**Jan Watson - Direct Examination**

1    that it was physical therapy, not physical medicine?

2            THE WITNESS:  Correct.

3            THE COURT:  Thank you.

4            You may continue.

5    BY MR. FATHI:                                              11:45:10

6    Q.  Would you turn to page 116, please.

7            Now, this appears to be a Consultation Request Action

8    pertaining to the September 30th physical medical rehab request

9    that we just discussed; is that right?

10   A.  Correct.                                               11:45:28

11   Q.  And what action was taken with regard to that request?

12   A.  It was canceled.

13   Q.  And who does it say canceled the request?

14   A.  It says I did.

15   Q.  Did you cancel this request?                           11:45:41

16   A.  No.

17   Q.  Is it possible for one person to log into eOMIS under

18   another person's login credentials?

19           MR. STRUCK:  Foundation.

20           THE COURT:  Overruled.                             11:45:54

21           THE WITNESS:  Somehow -- I learned after seeing this,

22   somehow they -- the appointments obviously can be canceled even

23   if the provider is not the one who canceled it.

24           And there is a note here under action -- at the

25   bottom, Action Taken Comments, it says, will resubmit consult   11:46:22

Jan Watson – Direct Examination

1   as soon as we find a physical medicine and rehabilitation

2   specialist.  I would never say I would resubmit a consult "when

3   we," I would say "when I."

4           So that comment was written by someone else.

5   BY MR. FATHI:                                                11:46:48

6   Q.  And I believe you testified earlier that when you first

7   began work at ADC and you didn't have your own login for eOMIS,

8   you were told to use someone else's login to access eOMIS; is

9   that right?

10  A.  Correct.                                                 11:47:04

11          THE COURT:  Is there any way to look at this document,

12  EVHG0116, that you can surmise who might have inputted this

13  information?

14          THE WITNESS:  I can't tell who the individual was.

15  But I think --                                              11:47:19

16          MR. STRUCK:  Your Honor, foundation.

17          THE COURT:  Overruled.

18          Go ahead.

19          THE WITNESS:  I think it was one of the clinical

20  coordinators, because they put in comments.                 11:47:25

21          THE COURT:  All right.  But there's no way here --

22          THE WITNESS:  That I can tell who, which one.

23          THE COURT:  You can't tell for sure?

24          THE WITNESS:  Right.

25          THE COURT:  Okay.  That's what I was trying to find  11:47:33

1  out, and that's why I overruled the objection.  Because my

2  question was designed to see whether or not you could really

3  know for sure, and I really only want to know what you know for

4  sure.

5        Thank you.                                          11:47:46

6  BY MR. FATHI:

7  Q.  To your knowledge, Doctor, did this patient ever receive a

8  physical medical rehab consult?

9  A.  No.

10        MR. FATHI:  Your Honor, I move the admission of        11:47:58

11  Plaintiffs' Exhibit 18.

12        THE COURT:  Any objection?

13        MR. STRUCK:  No objection.

14        THE COURT:  18 is received.

15    (Exhibit No. 18 admitted into evidence.)                 11:48:04

16  BY MR. FATHI:

17  Q.  Will you next turn to plaintiff's Exhibit 12, please.

18        Dr. Watson, what are these documents that make up

19  Plaintiffs' Exhibit 12?

20  A.  This is a consultation request dated August 4th for       11:48:31

21  radiation oncology, and it is urgent.

22  Q.  And this request was done by you; correct?

23  A.  Yes.

24  Q.  Are you familiar with this patient?

25  A.  Yes.                                                    11:48:50

Jan Watson – Direct Examination

1    Q.  How old is this patient?

2    A.  He is 77.

3    Q.  Could you please read what's written under Procedure

4    Requested Comments?

5    A.  He had chemotherapy and radiation following diagnosis of          11:49:02

6    invasive bladder cancer last year.  He was to follow up with

7    the radiation oncologist in August and the urologist in June.

8    He is not sure if he saw the urologist in June.  He denies pain

9    and hematuria.  He had a CT December 2016 that showed possible

10   nodules in his chest.  The oncologist recommended that the CT     11:49:31

11   be repeated in July, and that has not been done.  The radiation

12   oncologist taking care of him is Kurt Wharton at Palo Verde

13   Cancer Center.

14   Q.  Thank you.

15       What happened with this consultation request?            11:49:52

16       I think if you turn to page 24333 you can tell.

17   A.  Okay.

18            THE COURT:  That's the next page over.

19            THE WITNESS:  Right.

20       So on August 18th it was -- there was an ATP.          11:50:09

21   BY MR. FATHI:

22   Q.  And who entered the ATP?

23   A.  Sara Neese.

24   Q.  And she's the clinical coordinator; correct?

25   A.  Correct.                                                  11:50:26

**Jan Watson - Direct Examination**

1    Q.  Now if you turn back to the first page of this document,

2    24332, there's a handwritten note in the upper right-hand

3    corner.  Can you read what that says?

4    A.  Oh, final ATP, please accept.

5    Q.  What do you understand that to mean?                    11:50:48

6    A.  That someone wants me to go into eOMIS and accept this ATP.

7    Q.  Do you know whose handwriting that is?

8    A.  No, I don't.

9    Q.  To your knowledge did this patient ever receive the

10   radiation oncology consult that you requested?             11:51:11

11   A.  No.

12          MR. FATHI:  Your Honor, I move the admission of

13   Plaintiffs' Exhibit 12.

14          THE COURT:  Any objection?

15          MR. STRUCK:  No objection, Your Honor.              11:51:21

16          THE COURT:  12 will be received.

17       (Exhibit No. 12 admitted into evidence.)

18   BY MR. FATHI:

19   Q.  Would you next look at Plaintiffs' Exhibit 168, please.

20   A.  Did you say --                                         11:51:31

21          THE COURT:  168.

22          THE WITNESS:  Okay.

23   BY MR. FATHI:

24   Q.  Just one moment.

25          All right.  On Plaintiffs' Exhibit 168, would you   11:52:20

—— Jan Watson – Direct Examination ——

1   please turn to the second page, Exhibit 168.2.

2           And this exhibit consists of a series of e-mails.

3           My first question is, is this the same patient that we

4   have just been discussing?

5   A.   Yes.                                                      11:52:47

6   Q.   All right.  On page 168.2, about half way down the page

7   where it says "Richard," would you read that, please?

8   A.   Did you say where it says "Richard"?

9   Q.   Richard, yes.

10  A.   Okay.  Richard, we received Judge Viola who wanted to make   11:53:03

11  sure this inmate -- to make sure this inmate that will be

12  arriving shortly to Alhambra.  The judge didn't want him

13  falling through the cracks.  Sounds like he is a sick inmate.

14  Please see information below.

15  Q.   Thank you.                                                11:53:28

16          And then would you turn to page 168.1.

17          And at the bottom of the page there's a note dated

18  7-19.  Will you read that, please?

19  A.   7-19?  Oh, Intake Alhambra.  I think that the judge would

20  not be happy with his medical care.                           11:53:57

21          MR. FATHI:  Your Honor, I move the admission of

22  Plaintiffs' Exhibit 168.

23          THE COURT:  Any objection?

24          MR. STRUCK:  No objection.

25          THE COURT:  168 is received.                          11:54:06

UNITED STATES DISTRICT COURT

**Jan Watson – Direct Examination**

1         (Exhibit No. 168 admitted into evidence.)

2    BY MR. FATHI:

3    Q.  Doctor, you've been practicing medicine for about 40 years?

4    A.  Oh, gosh.  Yes.

5         THE COURT:  For an esteemed period of time, maybe                11:54:29

6    that's an euphemism you could use.

7    BY MR. FATHI:

8    Q.  And I assume in that time you have had -- you've made

9    efforts to get your patients to see specialists when you

10   thought it was necessary; is that right?                              11:54:45

11   A.  Yes.

12   Q.  How would you compare the ease of getting your patients to

13   see specialists in the Arizona Department of Corrections with

14   getting to see your -- getting your patients to see specialists

15   in other settings where you've practiced?                            11:55:00

16        MR. STRUCK:  Objection, Your Honor, foundation.  What

17   areas is he discussing?  I mean, she hasn't testified about

18   anything other than -- about working in her field of specialty.

19        THE COURT:  Thank you.  One second, please.

20        Overruled.                                                       11:55:26

21        THE WITNESS:  It's -- it's a major hassle to try to

22   get a consult in -- through D.O.C.  And it's a lot less

23   complicated in the outside world to get a consult.

24        MR. FATHI:  Thank you.

25        THE WITNESS:  It is.                                             11:55:54

```
 1   BY MR. FATHI:
 2   Q.  Dr. Watson, at any point while you were working with the
 3   Arizona Department of Corrections did you hear the phrase "beat
 4   the monitor"?
 5   A.  Yes, I did.                                               11:56:05
 6   Q.  Could you tell the Court the circumstances under which
 7   you've heard that phrase?
 8   A.  During a provider meeting, one of the individuals
 9   responsible for gathering data to be submitted regarding the
10   monitoring was there to discuss with the providers things that  11:56:26
11   we needed to document.  And she just said, I'll show you what
12   you need to do to beat the monitors.
13   Q.  And who was that person?
14   A.  All I remembered was her last name was McNeal and her
15   office was in Browning.                                       11:56:49
16   Q.  And what was her position?
17   A.  I don't know.  I don't remember.
18           THE COURT:  Who did she work for?
19           THE WITNESS:  D.O.C.
20           THE COURT:  Corizon or D.O.C.?                        11:57:01
21           THE WITNESS:  D.O.C.
22           THE COURT:  All right.  Thank you.
23           THE WITNESS:  As far as I could tell.
24   BY MR. FATHI:
25   Q.  Was she a monitor working for D.O.C.?                     11:57:07
```

1    A.  Yes.

2    Q.  Approximately when did this occur?

3    A.  It was near the end of September or the beginning of

4    October.

5    Q.  Of 2017?                                              11:57:22

6    A.  Of 2017.

7    Q.  Was this person's name Lisa McNeal?

8    A.  It could have been.  I do remember the last name, but I

9    didn't remember the first name.

10   Q.  Okay.  Was anyone else present besides yourself and    11:57:34

11   Miss McNeal?

12   A.  Yes.  All of the providers.  Do you want me to list all of

13   the providers there?

14   Q.  All of the providers state-wide or just from Eyman?

15   A.  Oh, just all of the Eyman providers.                   11:57:51

16   Q.  Okay.  If you can remember some names that would be

17   helpful.

18   A.  Stewart, Johnson, Weigel, Gay, Maureen Johnson, who was

19   still the FHA at that time.

20   Q.  And again, "FHA" is Facility Health Administrator?      11:58:11

21   A.  Correct.

22   Q.  Anyone else?

23   A.  That's all I -- Matilda Smith might have been there.  I

24   can't remember if she had left by then or not.

25   Q.  Okay.  Thank you.                                      11:58:26

─── **Jan Watson - Direct Examination** ───

1      Doctor, will you turn to Plaintiffs' Exhibit 17,

2  please.

3      THE COURT:  Mr. Fathi, do you see what the time is?

4      MR. FATHI:  I do, Your Honor.  I think I have

5  approximately 15 minutes left.  But if we need to break                11:58:51

6  that's --

7      THE COURT:  I think it makes sense, because what we've

8  done is during the last break we tried to accomplish some

9  adoption of -- amendment of our calendar here today to try to

10  make sure that we can get as much as we possibly can.  And I           11:59:09

11  understand that it's agreeable to everyone that we break for

12  just an hour and come back at 1:00.  And so if we work into

13  that, that's not really fair.  And so I think it makes sense

14  because people may have made plans based upon that.

15      So, Doctor, if it's okay with you we'll break now at            11:59:25

16  1:00 -- I'm sorry, break now at 1:00.

17      But at 1:00 we'll actually hear something different.

18  And if it's all right with you, that will not take very long,

19  maybe a half hour.  And then we'll resume your testimony at

20  that time.  Isn't all right?                                       11:59:41

21      THE WITNESS:  Okay.

22      THE COURT:  Anything else anybody needs to raise?

23      MR. STRUCK:  No, Your Honor.

24      THE COURT:  Okay.  Thank you all.

25      (Recess at 11:59 a.m., until 1:02 p.m.)                        11:59:49

CV-12-601-PHX-DKD – February 27, 2018

1          THE COURT:  Thank you very much.  Please be seated.

2          So after many opportunities to speak with you and your

3   team, Mr. Millar, on the telephone, it's really very grand to

4   have you here in the courtroom and to finally be able to meet

5   you in person.  As the Court's expert, you came through a          13:02:50

6   vetting process that directed us to you and led us to believe

7   that you were the right person to retain for this task.

8          But I have to say at the very start I want to

9   apologize for the fact that you have had to sort of be a little

10  bit like we all have been, somewhat, and that is the tail on     13:03:09

11  the kite on a windy day sort of having to have to be flexible

12  and to move things around.  And I appreciate that.  It's no

13  diminution intended upon the important role that you play here,

14  but it's just simply the fact that over time as the Court has

15  made increasing efforts to try to bring about enforcement of     13:03:29

16  the stipulation, I find myself in a three-front battle

17  presently.

18          The three fronts, one of which is your role, and that

19  is to be the Court's expert to try to identify what the issues

20  are with respect to the staffing issues associated with          13:03:46

21  obtaining the medical care that the stipulation requires.

22          The second front is what I started with, and that was

23  the Court's role in looking over what the numbers were

24  reporting, and then making what became routinized monthly

25  inquiries about where it was that we presently stood, why it     13:04:09

UNITED STATES DISTRICT COURT

1    was when we were missing the mark, and what we could expect.

2    And then trying to draw those links and trying to maintain

3    enforcement by making sure that there was somebody who was

4    paying attention and grading the paper, so to speak, and

5    saying, well, if we failed here today what are we doing to make          13:04:29

6    sure we get an A next time.

7            And the then the third front is the order to show

8    cause hearing as to why the defendants shouldn't be sanctioned

9    for failing to comply.

10           At least in very strong ways two of those fronts, and          13:04:43

11   to a certain extent as well your front, requires upon the

12   validity of the monitoring system.  And so that's what we've

13   devoted the time to hear this morning, and what we'll continue

14   to devote time to.  Because if it turns out that we have

15   reasons to be concerned about that, that undercuts, as I say,          13:05:05

16   the three fronts in real ways.

17           We need to know whether the information that we're

18   getting is accurate, and we need to know whether we can rely

19   upon it.  And we also need to know about what might need to be

20   done to try to improve it.  Because obviously it's become now          13:05:22

21   the watch word of everybody, you can't evaluate how you're

22   doing unless you know what is -- the results are.  And we need

23   to know what the results are.  Because just trying to decide

24   what to do and what sounds like a good idea may not make sense

25   if it doesn't link up with results, or if the results are             13:05:42

CV-12-601-PHX-DKD – February 27, 2018

1    telling us to look in the wrong areas.  And we need to have

2    valid data.

3          And so that's why you all were graciously asked to try

4    to change the schedule a little bit.  And I very much do

5    appreciate that.                                          13:05:57

6          So I'll turn it over to you now, sir.

7          MR. MILLAR:  Thank you.

8          I think if I just present from here then I can be

9    heard on the mics.  Will that work, Judge?

10         THE COURT:  Yes.                                    13:06:10

11         MR. MILLAR:  Appreciate being here.  It's nice to be

12   here in person.  It is informative for some of the analysis

13   that we're doing, for some of the nuances.

14         We'll work today to work on a truncated schedule.

15         This is the first of what I would call three areas.  13:06:23

16   So today in our agenda what we're looking to do is give a brief

17   project status update, give a overview of the market profile.

18   So when we're thinking of this quandary or this analysis that

19   we're doing, we want to see what the physician supply or

20   provider supply looks like surrounding each of the state      13:06:42

21   facilities, and then we'll compare it to the actual staffing

22   that's been in place.  And then we'll talk about the next

23   steps.

24         And so we'll move through this more rapidly to try to

25   do it on a 30-minute timeframe.                           13:06:55

CV-12-601-PHX-DKD – February 27, 2018

1      As we look at this, this driver diagram is our

2  one-page view of the work that we're doing.

3      As you look at it you would read this by saying

4  anything that black are steps that have been completed.

5  Anything that has a green dot is in process and on target.          13:07:09

6  Anything if it were yellow or red would be at risk or behind

7  schedule.

8      So at this point in time we've completed about 40

9  percent of that work.  Much of that was up front with data

10  collection.  We have gotten, I think, almost all of the data      13:07:23

11  that we've asked for.  And the Corizon contacts have been very

12  readily available to us as we've worked to clarify different

13  data points.

14      THE COURT:  Good.

15      MR. MILLAR:  So we're moving very well on that front.          13:07:37

16      If we look at the project from a time perspective,

17  starting in January, we're here in the end of February time

18  frame where we're looking at the market and facility analysis.

19  We'll then move into March and April where we'll move onto the

20  second and third phases of this.                                   13:07:52

21      So if you think of the phases, phase one is the

22  markets, phase two are the facilities, phase three is when we

23  truly compare those together.

24      The reason we do those in that phased approach, in

25  that stage of approach, is we want to make sure that we all       13:08:06

CV-12-601-PHX-DKD – February 27, 2018

1   have some consensus and agreement around what the market and

2   its definition is and what some of the reporting of the

3   utilization at the facilities will be.

4          And so I anticipate that next month as we come forward

5   with that we'll get the materials out ahead of time so we can          13:08:21

6   get the feedback from the Court and from the counsels on that

7   information before we go to the third and final stage to

8   compare them and to draft our recommendations.

9          So when we talk about a market profile analysis, what

10  we've done here you can see in this map, we've highlighted the          13:08:39

11  ten different facilities and grouped them by county or by HRR,

12  hospital referral region.  And we'll define what that is in the

13  next slide.

14         What we're looking at here then is that the ten

15  facilities fall into these five different hospital referral          13:08:57

16  regions.  The reason that we do that is because that is the

17  basis of the benchmarking material or the supply, demand and

18  compensation material that we work with from usable databases.

19         So to understand what an HRR is, what they do is they

20  look at the level of care provided within an area.  They use a          13:09:24

21  rule of thumb where they look for one hospital in the area that

22  performs major cardiovascular procedures and neurosurgery.

23  Those are kind of seminal healthcare encounters.  And where

24  those occur, they feel justified in building these HRRs.

25         And so they look to create geographic contiguity.  A          13:09:47

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – February 27, 2018

1    minimum population size of 120,000 people.  And then they use

2    something called a high localization index where they're

3    looking at some of the geography and the distances involved.

4         That being said, we actually have three HRRs in

5    Arizona; Phoenix, Mesa, Tucson and Sun City.  And you can see          13:10:09

6    them highlighted there on the map.

7         The Phoenix one is a little bit more expansive.  They

8    use that to capture some of those areas using that high

9    localization connection.

10         Any questions or clarifications needed there?                     13:10:24

11         But this is our base unit of comparison.

12         As we move forward then the next thing that we needed

13    to do in our analysis, the data bases that we use break down

14    physicians and nonphysician providers to a specialty level.

15    And so where those specialties don't crosswalk identically to          13:10:45

16    the correctional healthcare setting, what we've done is we have

17    grouped them into specialty categories.  And then we will use

18    these in combination and in averages as we go forward with our

19    analysis.

20         So we've used primary care, which includes primary                13:11:02

21    care providers such as family practitioners and internal

22    medicine, emergency medicine, and OB/GYN.  And so those

23    specialties have been grouped together.

24         We take all advance practitioners, which would be

25    nurse practitioners, physician assistants and the like, into a         13:11:17

1    category.

2          Behavioral health providers include psychiatry,

3    psychology and social services, so licensed social workers.

4          And then we've also picked an other medical specialty

5    category.  This was one that we added as we got into this to       13:11:33

6    look at as we look for opportunities or other recommendations.

7    And so we've pulled cardiovascular, gastroenterology,

8    hospitalists, PMnR, and then several other specialties.

9          It was actually interesting today to hear in the

10   testimony some of these specialties being called out as having    13:11:53

11   some need within the correctional environment.  And so it will

12   help inform how we would use the numbers that we look at here.

13         So we don't anticipate that these would have been part

14   of the medical staff at the facilities now, but we'd look at

15   those as potential options.                                       13:12:10

16         So for the current supply what we do is there's a

17   physician head count that's estimated or created in each area,

18   and it's assigned to a market-based -- that's a sign based on

19   the primary market address.  So there may be doctors that

20   practice in more than one location, but they have a primary       13:12:25

21   practice.  And so that's the designation there.

22         The needs are calculated on physicians per 100,000.

23   That is the ratio that's used nationally to draw these

24   comparisons.

25         And then the health referral regions then provide that      13:12:42

1    comparative number of whether you are high or low to generate

2    what we would call a gap or a surplus in the supply.

3         And what we have done to highlight the supply gap,

4    we've used a three-color scale; red, yellow and green.  Any one

5    of these counties that we're comparing to the HRRs that has a          13:13:05

6    gap greater than 75 percent will be colored in red.  Anything

7    that has a gap of 25 to 50 percent will be colored in yellow.

8    And anything with a gap less than 25 percent would be in green.

9         THE COURT:  So at this level your inquiry would be

10   relevant to a nonprison population, you just would find out          13:13:26

11   whether there are providers available for general care, even

12   before you get to the question about whether or not it would be

13   further affected by the special circumstance that the patients

14   were coming from a prison.

15        MR. MILLAR:  Correct.                                          13:13:47

16        MS. KENDRICK:  Your Honor, I have a question.

17        THE COURT:  Yes.

18        MS. KENDRICK:  The gap scale it says 25 to 50 percent

19   for yellow.  Should that be 25 to 75 percent?

20        MR. MILLAR:  Yes, I think it actually should be.              13:13:58

21        Is that an -- that's just an error on the slide.

22        THE COURT:  Thank you, Miss Kendrick.

23        MR. MILLAR:  Thank you.

24        You may note that we don't drive the green gap all the

25   way down to zero.  One of those reasons is because as you look       13:14:10

1   at national numbers, nationally if you look at the number of

2   providers per 100,000, Massachusetts is the state that has the

3   highest number with about 446 providers per 100,000.

4   Mississippi falls at the very bottom with 186 providers per

5   100,000.                                                          13:14:36

6          The state of Arizona is ranked number 31st out of the

7   states, with 236 providers per 100,000.

8          To put that in perspective, that's in the same range

9   as California and New Mexico and Texas.  It's actually better

10  than some of your states to the north in Nevada, Utah, Idaho    13:14:55

11  and Wyoming.

12         And just to put it in perspective, Arizona falls about

13  in the middle.

14         Now, there are questions, this is ongoing debate in

15  healthcare in general, what does that really mean?  What does a  13:15:10

16  supply shortage mean?  Because we have technology that

17  influences, with telemedicine and other pieces.  But what it is

18  is it's the measure that we have to run with as our baseline.

19         So the first slice that we took was to look at all of

20  these areas rolled up together as a whole.  You can see the      13:15:30

21  primary care supply, almost 7300 within the state, with a gap

22  of almost 1600 required.  But on a percentage basis that gap

23  falls in the green area of -- at 22 percent.

24         In fact, across all of these you will see that as a

25  state the numbers are in the green.                              13:15:52

1          Now we then took the next step down to drill into

2     that, because I think to roll it up at that level can be

3     deceptive.  It doesn't draw out challenges by locations that

4     may be in a more rural setting or other instances.

5          But as we look at it as a whole, this is about where          13:16:10

6     we fell.  And you can see that the lowest gap is in the

7     advanced practicing providers, so the nonphysician providers,

8     which is what we see industry wide where the primary care gap

9     is being filled is with those numbers.

10          On the right-hand side you can see here just the          13:16:27

11     median compensation totals.  This is information that just

12     highlights some of the summary around the detail that we have

13     underlying this, that as we go to the third leg of our analysis

14     and we look at the supply and any shortages, we'll then start

15     looking at the compensation to see how it compares to the          13:16:48

16     current Corizon provider contracts.

17          Questions here from anyone?

18          Okay.  As we move then what I'd like to do is take a

19     look at each of these five areas to see how they reside.

20          Maricopa County, which houses three of the facilities,          13:17:08

21     actually is in a very good stance.  Provider supply should not

22     pose a significant threat or impediment within these areas

23     because of what we're looking at.  In fact, you can see

24     advanced practitioners and some of the other medical

25     specialties that actually have a surplus for this area.          13:17:28

CV-12-601-PHX-DKD – February 27, 2018

1   They're large numbers.  But it's something to consider for

2   here.

3          And so as then we go into the different facilities to

4   look at them, we would anticipate that any issues in any of

5   those three facilities may be less related to supply and more          13:17:46

6   related to something else.  And so it will inform our analysis

7   moving forward.

8          Pima County is a very similar story.  This will be

9   your second largest metropolitan area in the state.  No surplus

10  in any of these.  But you do have in all four of the primary          13:18:04

11  categories what we would consider a green ranking for what

12  we're looking at in those areas.

13         Where we start to see some challenges is when we move

14  out to some of the more rural or outlying counties.

15         You'll see in your Yuma County for your Yuma facility          13:18:22

16  we have gap levels in the red zone for all of these, and some

17  of these fairly significant.  The behavioral health here is a

18  300 plus percent gap, where only 24 behavioral health providers

19  are identified in that area, with a need for close to 100 --

20  105 of those.  So a gap of 80.          13:18:46

21         So these will be areas that we'll be looking at

22  specifically to look at challenges and strategies for

23  addressing that.

24         Pinal County, with two of your facilities, one area in

25  yellow, three in red.  The unique element here is they are          13:19:01

CV-12-601-PHX-DKD – February 27, 2018

1    better in the primary care area than others.  So our

2    supposition or our assumption is, Judge, is that when we come

3    forward with recommendations they'll be specific to each of the

4    areas, because we're seeing already characteristics that differ

5    between them.                                                    13:19:22

6          Navajo County sits in the yellow zone for all of those

7    areas.  And advanced practitioners and behavioral health,

8    actually pretty close to the green area.  Some of what we're

9    looking at here are some small numbers issues.  Whereas you've

10   got thousands of providers in the Maricopa and Pima counties,   13:19:42

11   these you have hundreds.  So the shortages are something that

12   although they would rank in the yellow or red status,

13   addressing them actually becomes a small numbers problem.  And

14   we think it will lend itself to some unique solutions that we

15   should be able to bring forward.                                 13:20:05

16         Finally with Graham County, again, advanced

17   practitioners, pretty strong in this area with almost even

18   supply comparison.  But with some areas red in behavioral

19   health and medical specialties.

20         And then finally Cochise, with your Douglas facility,      13:20:20

21   again, three in the red and one in the green.  And again at

22   that advanced practitioners area.

23         If we then break out and look at the state then

24   instead of as a whole but by these constituent parts and rank

25   them red, yellow or green, this is what we now see.  Out of the  13:20:42

UNITED STATES DISTRICT COURT

1    ten facility areas, we have four of them that fall in what we

2    would call a green supply gap ranking.  We have two of them

3    that fall in yellow, and four of them that fall in red.

4            And so in our minds what this does is it informs an

5    approach for how we go forward that will require leveraging,          13:21:03

6    that the supplier access that you have in the two major

7    metropolitan areas, find solutions to serve those outlying

8    areas in one way or another.  Hoping to look for something

9    that's other than just a back of the napkin dollar solution

10   that says you can solve everything by throwing more money at      13:21:24

11   it, but also looking at what options are that we've seen from

12   the work that we've done.

13           THE COURT:  And just my gut reaction to what you say

14   is maybe that would include things such as incentives to get

15   the metropolitan area providers to decide to want to be in the    13:21:39

16   rural areas for some time, or maybe looking at whether or not

17   prisoners who are in the rural areas can be housed in places

18   closer, those kinds of things.

19           MR. MILLAR:  Yes, those kind of things.  And that's

20   actually for many rural health systems, like acute care          13:21:53

21   hospitals, they have real difficulty in getting specialists and

22   coverage for certain things.  And they almost create a circuit

23   type staff that services them.

24           And so we're trying to look broadly to all of health

25   care for solutions that could be applicable for the               13:22:10

CV-12-601-PHX-DKD – February 27, 2018

1    correctional setting and how that might work.

2         So if we think of our engagement scope, we originally

3    broke it down into three work streams that I've talked to.  We

4    are working to complete work stream one and moving into work

5    stream two.  Our intent when we are back in March for our                13:22:29

6    update is that we would have the initial facility profiles to

7    then bring up and to look through at this point.

8         As I stated before, we'll work to get that information

9    out several days ahead so that the members of the court have a

10   chance to review that and bring any questions or concerns,              13:22:44

11   because we believe that's where they will have a higher

12   interest of making sure our calculations from payroll and data

13   that we've received align with or match, or we can explain any

14   misalignment with any of the reports that have been coming into

15   the Court.  And then work towards our final deliverable.                13:23:01

16        That being said, our immediate next steps are to

17   continue our work with our Corizon contract with the payroll

18   data and to conduct our compensation benchmarking and our FTE

19   calculations.  So what we're actually doing is we are taking

20   payroll data, the hours that have been paid out, to calculate          13:23:21

21   an FTE number.  We're not relying on just a reported FTE count.

22        From that we'll also then generated interview lists of

23   areas that we would like to speak with current or former health

24   care providers to get some insight into things that are going

25   on.  And then we'll continue our analysis.                             13:23:42

CV-12-601-PHX-DKD – February 27, 2018

1       And we're scheduled then to be back with the Court on

2   March 14th.

3       THE COURT:  Okay.  Any questions, counsel?

4       MS. KENDRICK:  No.  This sounds great.  Thank you.

5       MR. STRUCK:  No, Your Honor.                                    13:23:51

6       THE COURT:  Thank you very much.  Thank you all.

7       Dr. Watson, if you'll kindly return to the witness

8   stand.

9       I'm sure it occurs to you that you're still under

10  oath.  Thank you.                                                  13:24:09

11      MS. KENDRICK:  Your Honor, just a housekeeping matter.

12  The defendants' expert, Dr. Khan is here from out of state.

13  And we had proposed that since he's here today that we would be

14  willing to have him go after Dr. Watson, if --

15      THE COURT:  That's acceptable to me.                           13:24:26

16      MS. KENDRICK:  -- if there's time.

17      MR. STRUCK:  Yeah, Your Honor, we discussed it, and I

18  informed Miss Kendrick that that isn't the order of

19  witnesses that we wanted to --

20      THE COURT:  Oh, you don't want to have that?                   13:24:35

21      MR. STRUCK:  Right.

22      THE COURT:  I see.  So what would be the alternative

23  then?

24      MR. STRUCK:  Well, the alternative would be that they

25  call Dr. Wilcox, as they discussed, and we'd just bring         13:24:42

─── **Jan Watson - Direct Examination** ───

1    Dr. Khan back whenever this thing is rescheduled, because we're

2    probably not going to finish today.

3             MS. KENDRICK:  We just figured since Dr. Khan is

4    physically here and Dr. Wilcox is by phone, that it might be

5    easier to do the person who's here.                    13:24:58

6             THE COURT:  Well, let's say this:  Dr. Khan has been

7    presented as a witness.  It's possible that the plaintiffs can

8    call him in their case, so to speak.  If they want to do that,

9    I'm not going to interfere with it, if you think it makes more

10   sense to do that.  So it will be your call.            13:25:16

11                      DIRECT EXAMINATION

12   BY MR. FATHI:

13   Q.  Hello again, Dr. Watson.

14   A.  Hi.

15   Q.  Will you please now turn to Plaintiffs' Exhibit 17.   13:25:31

16   A.  Okay.

17   Q.  These are pages labeled EVHG 57 through 100.

18             Would this be part of this patient's medical record in

19   eOMIS?

20   A.  Yes, it is.                                        13:26:01

21   Q.  And are you familiar with this patient?

22   A.  Yes.

23   Q.  Are you familiar with the patient's medical condition that

24   is described here?

25   A.  Yes.                                               13:26:09

**Jan Watson - Direct Examination**

1    Q.  And what is that condition?

2    A.  He had heart disease and presented -- he had other

3    problems, diabetes.  But he presented with chest pain and

4    eventually was transferred to a hospital where it was confirmed

5    that he had a heart attack.  And he was there for about five          13:26:30

6    days and then came back --

7    Q.  Okay.

8    A.  -- to Eyman.

9    Q.  Doctor, you're, again, a little faint.

10   A.  I forgot.  I got to move over.                                     13:26:44

11   Q.  Thank you.

12   A.  Okay.

13   Q.  All right.  Would you turn to pages 69 to 70, please.

14   Again using the numbers in the lower right-hand corner.

15   A.  Okay.                                                             13:27:00

16   Q.  What is this document?

17   A.  This is a consultation during his admission to the hospital

18   when he had his heart attack.

19   Q.  So this patient was admitted to Mountain Vista Medical

20   Center on August 25th, 2017; is that right?                          13:27:23

21   A.  Correct.

22   Q.  And is that the incident that you were speaking of before

23   we looked at the exhibit?

24   A.  Yes.

25   Q.  Can you tell us a little bit more about how this                  13:27:33

— Jan Watson - Direct Examination —

1   hospitalization came about?

2   A.   He presented to the unit on Cook complaining of chest pain.

3   I evaluated him.  He had an abnormal EKG.  His lungs sounded

4   like he had fluid.  He had bronchi and he was wheezing.  And I

5   wanted to send him to the hospital for observation.          13:28:01

6          And we have to call the Medical Director now to get

7   approval for an ambulance to be called to transport the

8   patients.  So I called Dr. Stewart, told him about the patient,

9   and that I definitely needed a chest X-ray because I thought he

10  had -- may have fluid in his lungs.  And I needed to send him   13:28:32

11  out, because it was like 2:00 o'clock in the afternoon and the

12  X-ray tech would leave.

13         So he said don't send him.  They tried to catch the

14  X-ray tech.  And I e-mailed Dr. Stewart a copy of the chest

15  X-ray -- not the chest X-ray, the EKG and waited to hear from   13:28:58

16  him if I had permission to send the patient to the hospital.

17         We could not get the X-ray tech, he had already left.

18         So then around 4:00 or 4:30 I had not heard anything

19  back yet, and I called Dr. Stewart and asked him what he wanted

20  me to do with this patient.  He was comfortable now.  I said,   13:29:28

21  do you want me to just send him back to his housing unit?  And

22  he said, well, yeah, I guess you can do that.  And tell him to

23  come back.

24         And I said, well, did you look at his EKG?  And he

25  hadn't.                                                        13:29:47

1    So then he looked at the EKG and said, oh, he has

2  acute coronary syndrome.  And then we called for an ambulance

3  to transport him to the hospital.

4    That was a long story to tell you how he ended up in

5  the hospital.                                          13:30:07

6    And that happened on a Friday.  So I did not see him

7  again until Wednesday.  So he had -- he was back in the unit.

8  Q.  Let me just interrupt you there, Doctor.  I just want to

9  make sure that we're keeping track of time.

10    So according to this document it looks like the     13:30:26

11  patient was hospitalized on August 25th.  Is that consistent

12  with your --

13  A.  Right.  If that was a Friday, yes.

14  Q.  Okay.  And then at some point the following week the

15  patient was back at Eyman?                             13:30:40

16  A.  Yes.

17  Q.  Okay.

18  A.  And I'll be quiet.

19  Q.  At some point after the patient's return to the prison from

20  the hospital, did you have a conversation with Dr. Stewart    13:30:50

21  about this patient?

22  A.  Yes.  So I came back on Wednesday, and either Thursday or

23  Friday we had a provider's meeting.  And at that provider's

24  meeting I was told that the patient actually did have a heart

25  attack, and that if he came back to the unit with chest pain,   13:31:14

UNITED STATES DISTRICT COURT

**Jan Watson - Direct Examination**

1  that I was to just keep him comfortable and let him die because

2  none of his arteries were bypassable.

3  Q.  Excuse me, who said that?

4  A.  Dr. Stewart.

5  Q.  Were other people present when he said that?                13:31:35

6  A.  Yes.

7  Q.  Who else was present?

8  A.  Maureen Gay, Natasha (sic) Wiegel -- Weigel, and Betty -- I

9  forgot Betty's last name, the third nurse practitioner.  They

10 were all there.                                                 13:31:59

11        Dr. Stewart had requested that we have a provider's

12 meeting at this little pizza place, so we were all there when

13 he told me that he had had a heart attack.

14 Q.  And I want you to remember as precisely as you can what he

15 said you should do if the patient again presented to the       13:32:19

16 medical unit with chest pains.

17 A.  To keep him comfortable and let him die.

18 Q.  And what did Dr. Stewart say about the patient's arteries?

19 A.  That they were not bypassable.  And he also told me that he

20 had already had that talk with the patient.                     13:32:42

21 Q.  Okay.  Would you turn to page 93, please.

22        And what is this document, Dr. Watson?

23 A.  This is a progress note from the clinic dated August 29th.

24 Q.  Okay.  And if you look at the following page, can you tell

25 who wrote this progress note?                                   13:33:20

**Jan Watson – Direct Examination**

1   A.  Dr. Stewart.

2   Q.  And could you read on the second to last sentence under the

3   subjective category.

4   A.  The second -- there was an extensive discussion -- there?

5   Q.  No, the second sentence from the bottom of -- in the                    13:33:41

6   subjective.  The patient is made aware.

7   A.  Oh, starting up there -- wait a minute.  I've got the

8   subjective.

9   Q.  Okay.  It's the third line from the bottom in the

10  subjective box.  The patient --                                             13:34:02

11  A.  Oh, okay.  Yes.

12          The patient is made aware that there is no further

13  treatment for the remaining coronary disease.  He is educated

14  on what to do if chest pain starts.

15  Q.  So this is a note written by Dr. Stewart on August 29th,                13:34:17

16  2017; correct?

17  A.  Correct.

18  Q.  Now, after you had this conversation with Dr. Stewart about

19  this patient, did you review the notes from the patient's

20  recent hospitalization?                                                     13:34:34

21  A.  The next day I came in and I told the CNA to have the

22  patient come in to see me.  Because if I was supposed to stand

23  there and watch him die, that that was a talk I need to have

24  with him.

25          Just a second.                                                      13:35:08

**Jan Watson – Direct Examination**

1              So when -- before he came in --

2   Q.   Dr. Watson, if you need them, there are tissues behind the

3   watcher pitcher.

4   A.   I'm going to get it together.

5              So before I had to talk to him I reviewed his hospital          13:35:24

6   records.

7   Q.   Okay.  Would you turn back to page 70, please.

8   A.   Back to 70?

9   Q.   Page 70, yes.

10  A.   Okay.                                                                 13:35:56

11  Q.   Are these the hospital records that you reviewed?

12  A.   Yes.

13  Q.   Would you read what it says on page 70 under Assessment and

14  Plan, please.

15  A.   This is a 67-year-old gentleman, status post non-ST              13:36:09

16  elevation myocardial infarction.  I have reviewed his cardiac

17  catheterization films.  I do not believe his LAD has a

18  bypassable area as there is disease throughout the entire

19  vessel and would not benefit from bypass.  He does have disease

20  in his circumflex, which could be bypassable however.  His         13:36:40

21  right coronary disease is diffusely diseased and could not be

22  bypassable.  I therefore believe that surgical

23  revascularization would not give him a longevity benefit.  I

24  discussed this with Dr. Kumar.  I told him that I believe that

25  medical therapy or a combination of stenting and medical         13:37:09

**Jan Watson – Direct Examination**

1   therapy would be best served for him as his LAD is so diffusely

2   deceased that surgical intervention would not be beneficial.  I

3   also discussed this with the patient.  He understands and is in

4   agreement.

5   Q.  What does LAD stand for?                                    13:37:37

6   A.  Left anterior descending.  It's one of the coronary

7   arteries.

8   Q.  Okay.  Is the circumflex also a coronary artery?

9   A.  Yes.

10  Q.  So this doctor is saying that the circumflex coronary        13:37:50

11  artery could be bypassable; correct?

12  A.  Correct.

13  Q.  Is this doctor's note from the hospital consistent with the

14  note by Dr. Stewart that we just read?

15  A.  No.                                                          13:38:04

16  Q.  What did you do after you had reviewed this hospitalization

17  report?

18  A.  Well, then the patient came in, and I showed him this note

19  and we discussed it.  And he said this is what -- not what he

20  had been told.  And so the two of us came up with a different    13:38:24

21  plan.

22         Prior to me seeing him, nitroglycerin had been ordered

23  for him to take if he had chest pain, but it was not ordered

24  for it to be KOP, keep on person.  So if he had chest pain he

25  would then have to make it up to the medical unit to get his     13:38:47

UNITED STATES DISTRICT COURT

Jan Watson – Direct Examination

1    nitroglycerin.

2           I ordered it to be KOP, but it would take two days to

3    get that from Oklahoma.  So I let the nurse know, and she said

4    she would give me the stock nitroglycerin.  So we gave that to

5    him and instructed him on how to take the nitroglycerin, and to          13:39:12

6    start immediately after he received -- if he started having

7    chest pain.  And he keeps it around his neck on a lanyard.

8           And he said that the cardiologist had told him that he

9    wanted to see him back in his office in two weeks.  And so I

10   made a consult for him to go back to the cardiologist.                   13:39:39

11   Q.  Okay.  And what happened with that consult?

12   A.  I don't know.

13   Q.  That's okay.

14          Would you turn to page 97, please.

15          And pages 97 and 98, what is this document?                       13:39:52

16   A.  This is -- this is a clinic note.

17   Q.  Written by you?

18   A.  Written by me, yes.

19   Q.  And does this note document the treatment plan for this

20   patient that you've just described?                                      13:40:19

21   A.  Yes.  It tells you about, we taught him how to use

22   nitroglycerin.  And I gave it to him.

23          And I put in my note the assessment that I had found

24   from the hospital notes about his coronary arteries and what

25   his options were.                                                        13:40:43

UNITED STATES DISTRICT COURT

1   Q.  That the circumflex may be bypassable?

2   A.  Right.

3   Q.  Okay.  Was this patient still alive at the time you left

4   ADC?

5   A.  Yes.                                                      13:40:54

6          MR. FATHI:  Your Honor, I move the admission of

7   Plaintiffs' Exhibit 17.

8          THE COURT:  Any objection?

9          MR. STRUCK:  No objection.

10         THE COURT:  17 is received.                            13:40:59

11      (Exhibit No. 17 admitted into evidence.)

12  BY MR. FATHI:

13  Q.  Dr. Watson, at some point after you initiated this

14  treatment plan for this patient, did you have a meeting with

15  Dr. Stewart?                                                  13:41:12

16  A.  After I change -- no.

17  Q.  At some point after you had a discussion with Dr. Stewart

18  about this patient, did you have a meeting with Dr. Stewart?

19  A.  Oh, not specifically about this patient.  However, at the

20  same provider meeting where I was told about this patient's    13:41:30

21  status, we were also told that we couldn't give narcotics to

22  anyone unless they had cancer.

23  Q.  Excuse me, Doctor.  I think we may be talking about two

24  different meetings.  So let's back up.

25          At some point did you have a meeting with Dr. Stewart  13:41:57

**Jan Watson - Direct Examination**

1    and Dr. Babich?

2    A.  Oh, yes, I'm working up to it.  I was taking too long.

3    Q.  When was the meeting with Dr. Stewart and Dr. Babich?

4    A.  It was the day after -- yeah, it must have been the day

5    after we had the provider meeting where he told me about the      13:42:23

6    patient and his chest pain and let him die.

7    Q.  And who is Dr. Babich?

8    A.  Dr. Babich is the Area Medical Director.  So he's above

9    Stewart.

10   Q.  So he was Dr. Stewart's boss?                                  13:42:39

11   A.  Yes.

12   Q.  So this was a meeting of you and Dr. Stewart and

13   Dr. Babich.  Was anyone else present?

14   A.  No.

15   Q.  And what did Dr. Stewart say at that meeting?                  13:42:48

16   A.  Okay.  Well, can I give just a little preface?

17        At the provider meeting the day before, because of all

18   the problems, I had said I need to have a talk about whether I

19   can stay here.  And the day -- the next day is when he and

20   Babich showed up.                                                 13:43:17

21        And at that time they told me that I ordered too many

22   narcotics, I ordered too much durable medical equipment, like

23   splints and braces.  What else?  Oh, I spent too much time

24   talking with the patients.  If I spent less time with the

25   patient I would have more time to do my computer work, like       13:43:46

**Jan Watson – Direct Examination**

1   checking the labs and the ATPs and all these other things.

2          Those were the big ones.

3   Q.  Did Dr. Stewart at this meeting say anything about the

4   number of referrals that you made, specialty referrals?

5   A.  Something came up about my referrals.  I can't remember          13:44:08

6   exactly what they said, but I did -- I do remember I said,

7   well, yes, I do make referrals knowing that more than likely

8   they're not going to be approved.

9   Q.  And why did you make referrals even if you thought they

10  weren't going to be approved?                                       13:44:34

11  A.  One, I thought it would be documentation of what would be

12  normally considered appropriate medical care.  And there was

13  always a possibility they could surprise me and approve it.

14  Q.  At this meeting with Dr. Stewart and Dr. Babich, was the

15  phrase "the Corizon way" used?                                      13:44:57

16  A.  Yes.  That was the first time I was told I do not do things

17  the Corizon way.

18  Q.  Who told you that?

19  A.  Dr. Babich.

20  Q.  And did he elaborate on what the Corizon way was?               13:45:08

21  A.  I needed to spend less time with the patients, catch up on

22  all of my computer work and the paperwork.  The medications for

23  pain were to be the Corizon-approved medications for pain,

24  which were the antiseizure medications and some of the

25  antipsychotics that they used.  And to stop ordering so many        13:45:39

**Jan Watson – Direct Examination**

1   splints.

2   Q.  Now at this meeting was it Dr. Stewart who used the phrase

3   "the Corizon way," Dr. Babich, or did they both use that

4   phrase?

5   A.  It was Dr. Babich.  Dr. Stewart didn't say a whole lot.          13:45:58

6   Q.  At some point during your time at ADC were you told to

7   discontinue all narcotics except for patients with cancer?

8   A.  Yes.  That was the day before.

9   Q.  The day before the meeting with Dr. Stewart and Dr. Babich?

10  A.  Yes.                                                             13:46:18

11  Q.  And who told you that?

12  A.  Dr. Stewart.

13  Q.  Did he give any explanation?

14  A.  No, they just didn't want narcotics written anymore.

15  Q.  Is there any medical reason why narcotics should be             13:46:30

16  discontinued for all patients except those with cancer?

17  A.  No.

18          MR. STRUCK:  Lacks foundation.

19          THE COURT:  Overruled.

20          You may answer.                                             13:46:43

21          THE WITNESS:  Okay.

22          No, there isn't.

23  BY MR. FATHI:

24  Q.  At some point were you told that patients over 50 years of

25  age couldn't receive Ibuprofen?                                     13:46:49

**Jan Watson – Direct Examination**

1   A.  Yes, at that same meeting.

2   Q.  So also by Dr. Stewart?

3   A.  Yes.

4   Q.  Did Dr. Stewart give you any reason for this rule?

5   A.  He said there were risks.  And I asked him to let me -- to    13:47:01

6   give me the study that he was quoting from.  I knew there are

7   multiple studies out there that the use of NSAIDs -- use NSAIDs

8   in caution in elderly patients.  But it doesn't say there's an

9   absolute contraindication.

10        I'm elderly and I'm hypertensive and I take Ibuprofen    13:47:28

11  every day and I'm fine.

12        So it's a matter of you keeping that in mind that some

13  elderly patients may have problems with it, but it doesn't mean

14  that you can't use it at all.

15  Q.  Doctor, you used a term that I want to make sure the court    13:47:49

16  reporter got.  Was it NSAIDs?

17  A.  Yes, it's NSAIDs, N-S-A-I-D-S.  Nonsteroidal

18  anti-inflammatory drugs.

19  Q.  Thank you.

20        At some point were you told not to write prescriptions    13:48:04

21  for medications that had to be taken three times a day?

22  A.  Yes, I was.

23  Q.  And when was that?

24  A.  Oh, that was probably back in July.

25  Q.  And who told you that?    13:48:23

UNITED STATES DISTRICT COURT

**Jan Watson - Direct Examination**

1    A.  Dr. Stewart.

2    Q.  And did he give any reason for that rule?

3    A.  Well, the problem arose because I had a few people with

4    different problems who I had ordered Tylenol No. 3.  And

5    Codeine is the mildest -- or weakest narcotics we give.  And I          13:48:46

6    had ordered it three times a day.  They are p.r.n., which is as

7    needed.

8         But since they only had a nurse available from

9    basically like 8:00 to 6:00, when -- if we order a medication

10   to be given three times a day, they do it at like 8:00 o'clock,        13:49:10

11   noon, and 2:00 or 3:00.  So that is too close together.

12        And a nurse had brought this to my attention.  And I

13   said, notify the Director of Nursing, because that's a staffing

14   issue.  They should have nurses there over a long enough period

15   that you space those drugs out.  You don't give it three times        13:49:39

16   a day in a total of eight hours.

17        So that all got back to Dr. Stewart.  And so rather

18   than hire more nurses, Dr. Stewart told me not to give

19   medications that had to be given three times a day.

20   Q.  Dr. Watson, at some point did you decide that you didn't          13:50:06

21   want to work at ADC anymore?

22   A.  Yes.

23   Q.  And why did you come to that decision?

24   A.  Well, at the meeting where you couldn't write narcotics,

25   they told me, and I didn't have Ibuprofen even as an option           13:50:27

UNITED STATES DISTRICT COURT

**Jan Watson - Direct Examination**

anymore, and when I told him I needed to talk to somebody about

whether I could be there, because he was tying my hands when it

comes to practicing medicine, I had decided then I needed to

go, because it was not going to work.

Q.  And when you said "he," do you mean Dr. Stewart?                    13:50:51

A.  Dr. Stewart.

Q.  Okay.  Did you send an e-mail to Onyx stating that you

wanted to stop working at ADC?

A.  Yes.  I actually called my contact at Onyx and I told her

she needed to get me out of there ASAP.  And they told me that    13:51:07

I had to give at least 30 days' notice.  And they asked me to

send them something in writing as to why I wanted to leave.

Q.  Doctor, would you turn to Plaintiffs' Exhibit 6, please.

        What is this document?

A.  This is an e-mail I sent to Beverly White who was my         13:51:38

contact at Onyx.

Q.  And it's dated September 18th.  Did you send it on or about

that date?

A.  Yes.

Q.  Would you read the text of the e-mail, please?              13:51:51

A.  Due to my concerns about the number of patients to be seen,

the complexity of those patients, and the amount of time

Corizon medical directors feel it is appropriate to be spent

seeing those patients, I would like to end my current

assignment.  The medical directors also stated I order too much   13:52:11

Jan Watson – Direct Examination

```
 1   durable medical equipment and too many narcotics.  The only

 2   narcotic I order is Tylenol with codeine, and only to patients

 3   who have documented causes for their pain.

 4          If Onyx is agreeable, my 30 days' notice will start

 5   today.  Thank you for giving me the opportunity to work in          13:52:36

 6   Eyman prison.  I have enjoyed delivering the best possible care

 7   I could to the inmates.

 8          MR. FATHI:  Your Honor, I move the admission of

 9   Plaintiffs' Exhibit 6.

10          THE COURT:  Any objection?                                    13:52:50

11          MR. STRUCK:  No objection.

12          THE COURT:  It will be received.

13       (Exhibit No. 6 admitted into evidence.)

14   BY MR. FATHI:

15   Q.  So, Doctor, you wrote on September 18th that your 30 days'      13:52:55

16   notice would start on that day.  So that would have meant that

17   you would have worked until about October 18th; is that

18   correct?

19   A.  Correct.

20   Q.  Did you actually work until October 18th?                       13:53:07

21   A.  No.  They revised my contract and I was supposed to work

22   until October 20th, because -- but on October 12th I was called

23   in to the facility administrator's office and told that they

24   wanted that day to be my last day, the 12th instead of the

25   20th.                                                               13:53:35
```

**Jan Watson – Direct Examination**

1   Q.   12th of October?

2   A.   Yes.

3   Q.   And who was the Facility Health Administrator at that

4   point?

5   A.   Daniel Sego, Sego.                                          13:53:40

6   Q.   So he told you that that would be your last day?

7   A.   Yes.

8   Q.   Dr. Watson, who is Jimmy Jenkins?

9   A.   Oh, he's a reporter at KJZZ that I contacted, because I was

10  having difficulty trying to get someone that I could talk to to  13:54:02

11  tell them about the care that was occurring.

12  Q.   And Mr. Jenkins did a story that aired on KJZZ about your

13  experiences; correct?

14  A.   Correct.

15  Q.   Did you receive any payment or compensation of any kind for  13:54:23

16  talking with Mr. Jenkins?

17  A.   No.

18  Q.   Now, at some point the defendants in this case served a

19  subpoena on you asking you to produce a number of documents; is

20  that right?                                                      13:54:37

21  A.   Correct.

22  Q.   And did you produce documents?

23  A.   Yes.

24  Q.   And about how much time did you spend gathering and

25  producing those documents?                                      13:54:45

1  A.  Oh, probably two to three hours at least.

2  Q.  Did you receive any compensation for the time that you

3  spent gathering the documents that defendants subpoenaed from

4  you?

5  A.  No.                                                    13:54:57

6  Q.  Except for the $40 witness fee, are you receiving any

7  compensation for your testimony here today?

8  A.  No.

9  Q.  Has it been kind of a hassle since you came forward and

10 told your story?                                           13:55:11

11 A.  It's beyond a hassle.  But -- it's been kind of

12 nerve-racking because you can't get it out of your mind.  But I

13 started it, so I've got to finish it.

14 Q.  So why did you decide to come forward?

15 A.  I don't know why it's bothering me so today.           13:55:31

16        Because he told me to let him die, that patient die.

17 I couldn't get that out of my mind.

18        MR. FATHI:  May I have a moment, Your Honor?

19        THE COURT:  You may.

20    (Discussion off the record between plaintiffs' counsel.)  13:56:01

21        MR. FATHI:  Nothing further, Your Honor.

22        Thank you very much, Dr. Watson.

23                    CROSS-EXAMINATION

24 BY THE COURT:

25 Q.  Dr. Watson, Mr. Struck will have an opportunity to ask you  13:56:15

Jan Watson – Cross-Examination

1  questions next.  But before he does that I want to follow up on

2  the one thing that you testified about that Mr. Fathi asked you

3  about.  And that was the meeting where the phrase "beat the

4  monitor" was used.

5  A.  Yes.                                                          13:56:29

6  Q.  Do you remember that?

7  A.  Yes.

8  Q.  And I wondered, when you heard those words, what was the

9  effect on you?  What -- did it have any effect on your state of

10 mind?  How did you take those words?                             13:56:39

11 A.  I was in disbelief.  I couldn't believe that even if you

12 felt that way you said that publically.  If you wanted to help

13 us beat the monitors, at least say, let me show you what types

14 of things I am looking for in the charts that I can use, or

15 something like that.                                             13:57:08

16       I was surprised that someone would say that

17 publically.

18       It was also not what I wanted to hear.  I wanted to

19 hear, what can we do to improve the care?  Not what -- not what

20 we could do to beat the monitors.                               13:57:33

21 Q.  The word "beat," the verb, has many meanings.  The

22 Norwegians beat the Canadians in the Olympic championships.  So

23 you could say, let's beat the monitor because let's make sure

24 we get the gold medal and not the silver.  Let's make sure we

25 beat what the monitor's expectations are.                       13:57:59

UNITED STATES DISTRICT COURT

Jan Watson – Cross-Examination

1   A.  How can -- I'm trying to think of a nice way to say it.

2   Well, how -- basically cheat on the monitoring system.

3   Q.  Well, but do you understand my question.  Let me just try

4   to explain it a little bit more.

5   A.  How can we fudge the data?                           13:58:23

6   Q.  No, no, no.

7        I'm just wondering -- all of this arose because of a

8   news report that I read.  And then there was a subsequent news

9   report where essentially some people were saying, no, when

10  this -- if these words were used, "beat the monitor," it was   13:58:36

11  meant to convey the message, let's try to do better than the

12  monitor expects.  Let's try to make sure that we get the gold

13  medal, that instead of being at 22 percent compliance we're at

14  100 compliance.  That's what we mean by "beat the monitor."

15       Is that possible that that was what was being said?     13:58:55

16  A.  That's not how I took it at all.

17  Q.  Why is that?  Why didn't you take it that way?

18  A.  Because after that that was said, then she started telling

19  us little things we could do in our -- on the charts that she

20  could then count toward the monitoring.                    13:59:15

21  Q.  And so did you think she was giving you sort of tricks and

22  tips to try to evade the monitoring, is that what you're

23  saying?

24  A.  Yes.

25  Q.  And why do you think it was that and not just, let's make   13:59:27

UNITED STATES DISTRICT COURT

1  sure that you're documenting what will give us a legitimate

2  reason to think that we're complying?

3  A.  I can't give you the exact words on what she said about

4  these little things we could do, but she -- she said, well, if

5  you do so and so, then I can count that.                    13:59:48

6       So that was the way I took it, these are things that

7  you can do on the chart to make it -- to make our data look

8  better.

9  Q.  Even though the data necessarily shouldn't show it that

10 way, in your professional opinion.  Is that what you're saying?  14:00:07

11 A.  Correct.

12       THE COURT:  Any further questions from my questioning,

13 Mr. Fathi?

14       MR. FATHI:  No, Your Honor.

15       THE COURT:  Mr. Struck, you may proceed.              14:00:16

16       MR. STRUCK:  Your Honor, can we take five minutes?

17       THE COURT:  You may.

18       Doctor, do you need a drink of water or anything?

19       THE WITNESS:  I'll take a drink.

20    (Discussion held off the record.)                        14:00:44

21                    CROSS-EXAMINATION

22 BY MR. STRUCK:

23 Q.  Good afternoon, Miss Watson.

24       MR. FATHI:  Excuse me, Your Honor.  Excuse me.  We let

25 it go the first time.  Could she please be addressed as       14:03:01

1    Dr. Watson?

2              MR. STRUCK:  I just did --

3              THE COURT:  I'm really surprised that you would do

4    that, Mr. Struck.

5              MR. STRUCK:  I just did --

6              THE COURT:  We've been very careful about the titles

7    of all of your physicians.  And sometimes I've overdone it,

8    because Mr. Pratt had to correct me and say that when I called

9    him doctor it wasn't right.

10             But I think we do and should do that.                      14:03:18

11             MR. STRUCK:  Perhaps you didn't hear me because

12   Mr. Fathi was interrupting, but I corrected myself before he

13   said anything.  I said, excuse me, Dr. Watson.

14             THE COURT:  Ah, thank you.  Thank you very much.

15   BY MR. STRUCK:                                                       14:03:32

16   Q.  We've never met before, have we?

17   A.  No.

18   Q.  No.

19             Have you met with plaintiffs' counsel before?

20   A.  Yes.                                                            14:03:43

21   Q.  Okay.  When did you meet with them?

22   A.  Yesterday.

23   Q.  All right.  Was that the first time you ever met with them?

24   A.  Yes.

25   Q.  And how much time did you spend with them?                      14:03:49

1  A.  A couple hours, three hours?

2  Q.  A couple hours?

3  A.  Three.

4  Q.  Okay.  Three hours.

5        And you -- what were you talking about?                    14:04:03

6  A.  Oh, they told me what today would be like, what to expect,

7  what they thought the order would be like, and to tell the

8  truth.  And then they asked me some sample questions to try to

9  get me comfortable with being on -- in the courtroom.

10  Q.  And you had -- you communicated before with Miss Kendrick   14:04:32

11  who's sitting at counsel table over here; correct?

12  A.  Yes.

13  Q.  When did you start communicating with her?

14  A.  After the first news story was published.  When was that?

15  The beginning of November?                                     14:04:54

16  Q.  Okay.  If you would, Dr. Watson, there's a stack of

17  exhibits in front of you.  If you wouldn't mind, please, taking

18  a look at Exhibit 308.

19  A.  I've got --

20        THE COURT:  You can help, Mr. Struck, if that would be    14:05:21

21  assistive.

22        MR. STRUCK:  Sure.

23        Your Honor, maybe I can get her another copy of it.

24        THE COURT:  Sure.

25  BY MR. STRUCK:                                                 14:06:02

**Jan Watson – Cross–Examination**

1   Q.   Do you recognize that document?

2   A.   Yes.

3   Q.   What is it?

4   A.   It's a Corizon application.

5   Q.   Okay.  And whose application is it?                    14:06:10

6   A.   Mine.

7   Q.   Is that your handwriting on 308?

8   A.   No.

9   Q.   That's not your handwriting?

10  A.   No.                                                    14:06:21

11  Q.   Did somebody fill out your application for you?

12  A.   Yes.

13  Q.   Who filled it out for you?

14  A.   Someone in credentialing.

15  Q.   Okay.  And why don't you tell me what the process is, how   14:06:30

16  this -- how the someone in credentialing filled out your

17  application to Corizon.

18  A.   If I've worked for a locums company before, they already

19  have a lot -- they have a lot of my information already there.

20  So when they send me a new credentialing form for a different   14:06:52

21  facility, they will pre-fill as much of the application as they

22  can, and then I fill out the rest.

23  Q.   Okay.  So you filled out some of this application and then

24  somebody in credentialing filled out the remainder?

25  A.   Correct.                                               14:07:20

1    Q.  All right.  Why don't you turn to -- it's on the top, it's

2    page 308.004.

3    A.  Okay.

4    Q.  Do you see that?

5    A.  Uh-huh.                                                        14:07:31

6    Q.  Is that your signature at the bottom?

7    A.  Yes.

8    Q.  And you see it says in subsection A that you're

9    representing and warranting to Corizon Health that the

10   information put forth on the application for Corizon Health      14:07:51

11   Affiliation form is true, correct and complete in all material

12   aspects?

13   A.  Yes.

14   Q.  Do you see that?

15   A.  Yes.                                                          14:08:02

16   Q.  Did you read that before you signed it?

17   A.  Yes.

18   Q.  Did you have a chance to review this particular application

19   to make sure everything was accurate?

20   A.  As far as I could tell.                                      14:08:10

21   Q.  You have no reason to believe that you didn't review the

22   application before you signed it; true?

23   A.  Right.

24   Q.  Okay.

25   A.  Correct.                                                      14:08:32

1   Q.  And if there was something that the credentialing person

2   had maybe put in there that wasn't right, you would have fixed

3   that; correct?

4   A.  If I caught it.

5   Q.  So why don't you tell me with respect to the Exhibit 308,   14:08:42

6   which portions did you fill out and which portions did they

7   fill out?

8   A.  The handwritten part would not be me, because the part that

9   I complete, I complete on the computer, so it's all going to be

10   typed.   14:09:06

11   Q.  Okay.  It looks like -- take a look, if you would, please,

12   at like say Section V.  Do you see that where it says Insurance

13   Information?

14        It's on -- I'm sorry, it's on page 2 of the document.

15   A.  Yes.   14:09:24

16   Q.  Okay.  Do you see that section?

17   A.  Yes.

18   Q.  And you'll see there's boxes; yes, no, and NA.  Do you see

19   that?

20   A.  Yes.   14:09:31

21   Q.  It appears that those boxes were filled out by someone with

22   a computer.

23   A.  Right.

24   Q.  Would you agree?

25        So that would have been you that filled those out;   14:09:38

1   right?

2   A.  Yes.

3   Q.  Okay.  Let me refer you to Section VI, and it asks, have

4   any disciplinary actions ever been taken for the following?

5   This includes past and pending actions for voluntary          14:10:09

6   withdrawal, relinquished licenses, non-renewal, reduction,

7   limitation, required supervision, placement on probation,

8   denial, revocation, suspension, investigation, or subject to

9   monetary fines or any other disciplinary action.

10          And it asks you about any professional license in any   14:10:27

11   state or jurisdiction.

12          And you put what?

13   A.  No.

14   Q.  DEA/CDS registration.

15          And what did you put?                                   14:10:39

16   A.  No.

17   Q.  If you look at Section X, you provided a narrative.

18          Do you see that?

19   A.  Yes.

20   Q.  Okay.  And that narrative was something you typed in;      14:11:01

21   correct?

22   A.  Correct.

23   Q.  And why don't you tell us what that narrative is.  It talks

24   about something that occurred in 2012.

25   A.  It's about I didn't get permanent privileges at Casa Grande  14:11:13

**Jan Watson – Cross-Examination**

1     Hospital because of a bad outcome.

2     Q.  Okay.  And you told Corizon that.  And you also attached

3     something with respect to claims information.

4            Do you see that?

5     A.  Okay.                                                        14:11:33

6     Q.  On the next page, page 5, regarding a patient.

7     A.  Yes.

8     Q.  And a failure to make a diagnosis of ectopic pregnancy.  Is

9     that what that case was about?

10    A.  Yes.                                                         14:11:50

11    Q.  And that was a lawsuit?

12    A.  Yes.

13    Q.  And you understood that Corizon was asking you about -- to

14    include all information with respect to lawsuits that had been

15    filed against you?                                              14:12:05

16    A.  Right.

17            And I said yes under -- where it says, have any

18    lawsuit -- malpractice suits been filed.

19    Q.  And that's why you included the --

20    A.  Right.                                                      14:12:19

21    Q.  -- claims information?

22    A.  It says, have any professional liability suits ever been

23    filed against you?  And I said yes.

24    Q.  Okay.  And you identified this one lawsuit right here;

25    correct?                                                        14:12:32

Jan Watson - Cross-Examination

1    A.   Right.

2            And as far as the Casa Grande privileges in Section VI

3    -- no, not VI.  Hold on.  There's another section.

4            One of these sections said something about hospital

5    privileges.  Oh, yes, Section VI.  It says, under clinical          14:12:57

6    privileges, rights on the staff of any facility.  I checked

7    yes.  And that's why I submitted the information about

8    permanent privileges in Casa Grande.

9            MR. STRUCK:  Your Honor, defendants move to admit

10   Exhibit 308.                                                        14:13:19

11           THE COURT:  Any objection?

12           MR. FATHI:  Yes, Your Honor.  It's hearsay, not

13   subject to any exception.

14           THE COURT:  Where did it come from?

15           MR. STRUCK:  It's the Corizon application that she          14:13:26

16   just testified that she filled out a portion of it, reviewed it

17   and made sure it was accurate.

18           THE COURT:  Ma'am, have you had an opportunity to

19   review this document such that you feel you can answer a

20   question about whether or not you believe it is in the form        14:13:39

21   when you prepared it and signed it?

22           THE WITNESS:  Yes.

23           THE COURT:  And do you think it is an accurate

24   reflection of what you signed and dated on the date of this

25   document?                                                          14:13:52

Jan Watson – Cross-Examination

1          THE WITNESS:  Yes.

2          THE COURT:  Do you have any reason to doubt its

3    authenticity?

4          THE WITNESS:  No.

5          THE COURT:  It will be received.                    14:13:58

6      (Exhibit No. 308 admitted into evidence.)

7          MR. STRUCK:  Thank you.

8    BY MR. STRUCK:

9    Q.  Now isn't it true, Doctor, that this isn't the

10   lawsuit -- the one lawsuit you identified on your application   14:14:10

11   isn't the only time you've ever been sued; isn't that true?

12   A.  I was dropped from the other cases.  And so I -- when I

13   submitted the information to Onyx -- this Corizon application

14   was sent to me by Onyx, then I send it back to Onyx.  So Onyx

15   actually has even more information, because Onyx is the        14:14:38

16   one -- is the company under which my malpractice coverage is.

17          So they have a letter from the University of Colorado

18   where four suits were filed initially with my name attached, as

19   well as a lot of other people.  And so there is a letter that

20   states, from the University of Colorado, that there was never a  14:15:03

21   suit settled in my name at the University of Colorado.

22          And they also have the information about being dropped

23   from some other cases.

24   Q.  Okay.

25   A.  So I gave them the information about the suit that was      14:15:22

─────── **Jan Watson – Cross-Examination** ───────

1    settled.

2    Q.  And no other suit was ever settled, is that your testimony?

3    A.  Yes.

4    Q.  Okay.  Why don't you take a look at Exhibit 309.

5        Do you have it?                                    14:15:53

6    A.  Yes.

7    Q.  Okay.  And this was a lawsuit that was filed against you

8    here in Arizona.  Do you see that you are the defendant?

9    A.  That's the same lawsuit that --

10   Q.  Okay.                                              14:16:06

11   A.  -- that was in the application.  See, the name is the same.

12   Q.  Let me -- it's my mistake.  Take a look at Exhibit 310.

13   A.  Yes.

14   Q.  Okay.  You were sued here in Arizona in a lawsuit filed in

15   1994; isn't that true?                                 14:16:45

16   A.  Yes.  And I was dropped.

17   Q.  And your testimony is you were dropped from that lawsuit?

18   A.  Yes.

19   Q.  And what's the basis for your belief that you were dropped

20   from the lawsuit?                                      14:16:56

21   A.  I never heard --

22        MR. FATHI:  Objection, Your Honor.  I really don't see

23   the relevance of a lawsuit filed 22 years ago for her testimony

24   about what happened last year.

25        THE COURT:  Overruled.                            14:17:06

Jan Watson – Cross-Examination

1          THE WITNESS:  I never heard any more.

2    BY MR. STRUCK:

3    Q.  You never heard any more about it?

4    A.  No.

5    Q.  Okay.  So when you were asked about lawsuits in your          14:17:13

6    application, you didn't think that you needed to put in there

7    all the lawsuits that have been filed against you, whether they

8    were dropped or settled or proceeded to judgment?  You

9    just -- you just only included the one lawsuit?

10   A.  I included the one settled one.          14:17:33

11          But as I stated, all of this was submitted to Onyx,

12   and Onyx has the rest of the information.

13   Q.  Okay.  So you're saying you submitted to Onyx the

14   information with respect to the lawsuit on Exhibit 310?

15   A.  No.  Because I actually don't have any more information          14:17:54

16   about this.  And I forgot all about this.

17   Q.  Okay.  So you forgot about that one.

18          Take a look at Exhibit 311.

19          Do you see that?

20   A.  Yes.          14:18:21

21   Q.  That's another lawsuit filed against you here in Arizona?

22   A.  Yes.

23   Q.  Okay.  You did not include that in Section X of your

24   application either, did you?

25   A.  It is with the rest of the documents from -- at Onyx, with          14:18:33

1   the malpractice insurance.  I was dropped.  They sued everybody

2   in the practice.

3   Q.  Okay.  And you say you were dropped from this lawsuit so

4   you didn't feel that you needed to include it?

5   A.  It is -- I gave that to Onyx credentialing because the          14:18:55

6   malpractice insurance carrier needs it.

7           Now, I don't know why just those two things are

8   attached to the Corizon application.  But remember, I send the

9   Corizon application not to Corizon, I send it to Onyx.  So

10  that's where everything is.  So this Corizon application does      14:19:28

11  not stand alone.  I don't send it directly to Corizon.

12          So if you want the other information, you need to get

13  the other information out of the Onyx files.

14  Q.  And we did issue a subpoena to Onyx, Dr. Watson, and

15  there's no information in the Onyx files with respect to any of    14:19:56

16  these lawsuits.

17  A.  It was --

18          MR. FATHI:  Objection, Your Honor.

19          THE COURT:  Hold on just a second.

20          What is the objection?                                      14:20:03

21          MR. FATHI:  Counsel is testifying.

22          THE COURT:  Well, he's making a statement.

23          And you can ask the question about, if it's true that

24  they didn't receive anything back from Onyx.

25          What's your question?                                       14:20:13

**Jan Watson — Cross-Examination**

```
 1    BY MR. STRUCK:
 2    Q.  My question is, is isn't it true that you did not provide
 3    Onyx with information with respect to any lawsuit other than
 4    the lawsuit that's listed on the --
 5    A.  That's not true.
 6    Q.  -- Corizon application?
 7    A.  That's not true.
 8    Q.  So what did you provide to Onyx?
 9    A.  I have a letter from the University of Colorado about no
10    lawsuits being settled in my name.  And I have a letter where I      14:20:38
11    was dropped from the Mary -- from another case.  And that's the
12    information I had.
13    Q.  And you say you provided those two letters to Onyx?
14    A.  Yes.
15    Q.  Okay.  And so if Onyx submitted all the documentation with       14:21:01
16    respect to you, Dr. Watson, in response to a subpoena, those
17    letters should be in there; correct?
18    A.  Yes.
19    Q.  Okay.  And I'm sorry, did you say you included some
20    information that you sent to Onyx about this lawsuit in 1991         14:21:27
21    that's in Exhibit 311?  You provided that information to Onyx?
22    A.  Yes.
23    Q.  Okay.  And I'm sorry, you said you sent a letter regarding
24    the Colorado lawsuit.  And did you send a letter with respect
25    to this particular lawsuit as well?                                 14:21:57
```

Jan Watson - Cross-Examination

1   A.  Yes.  I have a letter -- would you like me to get you one?

2   Q.  No, I'm just asking you:  Did you provide them a letter

3   with respect to this lawsuit that was filed in 2011 here in

4   Maricopa County against you for malpractice?

5   A.  Oh, in Maricopa?                                              14:22:16

6   Q.  Yes, ma'am.

7   A.  No, because I don't have anything from that case.

8   Q.  Okay.

9   A.  I checked.

10  Q.  Do you even remember that lawsuit?                            14:22:24

11  A.  No.

12  Q.  Would you take a look at Exhibit 312?

13          Do you have it there in front of you?

14  A.  Yes.

15  Q.  Okay.  This is a lawsuit that was filed against you in       14:22:56

16  Colorado with respect to medical malpractice.  Is that right?

17  A.  Yes.

18  Q.  Is this the one that you were talking about where you said

19  you sent a letter to Onyx, that you were dropped from this

20  lawsuit?                                                         14:23:18

21  A.  This is one of the ones from Colorado that's included in

22  the letter from the University of Colorado that states no suits

23  were ever settled in my name.  There are four from the

24  University.

25  Q.  All right.  Now, let's -- if you wouldn't mind taking a      14:23:38

UNITED STATES DISTRICT COURT

1   look the Exhibit 312.  I think earlier you testified that there

2   were multiple defendants in that case in Colorado.

3   A.  Yes.

4   Q.  Okay.  I only see you listed, Dr. Watson.

5   A.  I think there was somebody else.  Because if it's the case          14:23:58

6   I remember, I didn't even actually do the surgery.  I was the

7   senior resident there assisting the intern.

8   Q.  Okay.  Do you remember what kind of surgery this was with

9   respect to?

10  A.  This was a tubal ligation, a failed tubal ligation.                  14:24:24

11  Q.  Yes.

12  A.  Yeah.  They do fail.  It's a part -- we tell the patient

13  that prior to the time we tie her tubes.

14  Q.  And you state -- were you working for the University of

15  Colorado at that time?                                                   14:24:47

16  A.  Yes, I was a fourth-year resident.

17  Q.  Okay.  At St. Luke's Hospital?

18  A.  Yes.  I was the chief.

19  Q.  And you say there were three other lawsuits in Colorado

20  when you were there besides this one?                                    14:25:00

21  A.  Yes.

22       Would you like to know what I remember about them?

23  Q.  No, that's okay.

24       Now, on Section VI of your application you checked yes

25  with respect to disciplinary actions.  And you mentioned the            14:25:29

─── **Jan Watson – Cross-Examination** ───

1   2012 denial of privileges at Casa Grande Medical Center;

2   correct?

3   A.  Correct.

4        MR. FATHI:  Excuse me.  Could we have an exhibit

5   number?                                              14:25:46

6        MR. STRUCK:  I'm sorry, it's Exhibit 308.

7        MR. FATHI:  Thank you.

8   BY MR. STRUCK:

9   Q.  If you would, please, take a look at Exhibit 315, Doctor.

10       Are you there?                                  14:26:20

11  A.  Um-hum.

12  Q.  Okay.  Can you tell me what this is?

13  A.  An application -- an application for something.

14  Q.  Okay.  Why don't you turn to page 3 and look at the bottom.

15  A.  What?                                            14:26:38

16  Q.  Page 3, if you wouldn't mind taking a look at page 3 and

17  look at the bottom of the page.

18  A.  All right.

19  Q.  Is that your signature?

20  A.  Yes.                                             14:26:53

21  Q.  And it looks like it says received from BOMEX July 18th,

22  1996.  Do you see that stamp, right next to your signature?

23  A.  Yes.

24  Q.  What's BOMEX?

25  A.  Board of Medical Examiners.                      14:27:04

**Jan Watson – Cross-Examination**

1    Q.  Okay.  Is this your handwriting, Doctor?

2    A.  Yes.

3    Q.  All right.  If you look at the top, about a third of the

4    way down on page 3, it says, has any formal disciplinary or

5    rehabilitation action including reprimand, censure, probation,      14:27:22

6    restriction, limitation, suspension, or revocation been taken

7    against your license in any state?

8            What did you check?

9    A.  I don't know.  I haven't found it yet.

10   Q.  It's about a third of the way down on page 3.              14:27:38

11           And you'll see there's something that's blacked out

12   right below it.

13           THE COURT:  Above it.  I think.

14           THE WITNESS:  Have you ever been convicted of Medicare

15   fraud.  Is it below there?                                    14:27:52

16   BY MR. STRUCK:

17   Q.  It is -- do you see where it says --

18   A.  Oh, any formal --

19   Q.  Disciplinary or rehabilitation action.

20   A.  Okay.                                                    14:28:07

21   Q.  Do you see that?

22   A.  Yes.

23   Q.  And you checked yes.

24   A.  Uh-huh.

25           I have no idea.                                      14:28:16

UNITED STATES DISTRICT COURT

1  Q.  You don't know what that's for?

2  A.  That's way back in July of 1996.

3  Q.  Okay.  But it's fair to say you didn't include whatever

4  that was --

5  A.  Because I don't even know what I was talking about there.     14:28:26

6  Q.  Okay.

7  A.  1996.  I have to try to figure out where I was.

8        THE COURT:  Just so the record is clear, Mr. Struck,

9  my comment, where I tried to correct you, was a mistake too.  I

10  wasn't correctly appreciating where you were.  So when I used     14:28:42

11  the preposition I used the wrong one.  So just so the record is

12  clear I wasn't accurately setting forth the directions either.

13        MR. STRUCK:  That's fine.

14  BY MR. STRUCK:

15  Q.  So you can't even say what you checked yes for with respect     14:28:54

16  to this question --

17  A.  No.

18  Q.  -- regarding formal disciplinary rehabilitation action,

19  including reprimand, censure, probation, restriction,

20  limitation, suspension or revocation?     14:29:05

21  A.  No, I must have -- the only thing I can think of in 1996 I

22  must have checked the wrong box.

23  Q.  And it looks like something's been redacted right below it.

24  Do you see that by the -- that black mark?

25  A.  Yeah.  Who did that?     14:29:22

1   Q.  Well, presumably the Board of Medical Examiners.

2   A.  I have no idea.

3   Q.  So you don't know what that says underneath that black box?

4   A.  No.

5   Q.  All right.  But it's fair to say you didn't include that                    14:29:36

6   information in the application that you provided to Corizon;

7   true?

8   A.  No.  As far as I can remember I didn't have any actions

9   back in 1996.

10  Q.  So when you checked "yes" back in '96 when you were             14:29:58

11  submitting this application to the Board of Medical

12  Examiners -- or this questionnaire, that was a mistake?

13  A.  I don't -- I don't remember anything.  So I actually need

14  to see the line that has been redacted, because hopefully that

15  line tells you what that's all about.  Because I don't know.        14:30:25

16  Q.  Now you do see also at the bottom of page 3 where your

17  signature is, you signed under penalty of perjury that all of

18  your answers and statements were true and correct.

19  A.  Yes.

20  Q.  Yeah.                                                           14:30:42

21          If you would, please, Doctor, take a look at Exhibit

22  314.

23  A.  Okay.

24  Q.  You got it?

25          Exhibit 314, can you identify what that is, please?        14:31:22

UNITED STATES DISTRICT COURT

—— Jan Watson – Cross-Examination ——

1    A.   It's an application for a license.

2    Q.   A license to practice medicine with the Arizona Board of

3    Medical Examiners; is that right?

4    A.   Right.

5    Q.   If you would, please, take a look at the top of page 3.          14:31:39

6    A.   Uh-huh.

7    Q.   First let me ask you to turn to the last page of the

8    document on page 4.

9              Is that your signature, Dr. Watson?

10   A.   Yes.                                                             14:31:56

11   Q.   And that's a notarized signature?

12   A.   Yes.

13   Q.   And attested that all the information in this document was

14   true and accurate to the best of your ability?

15   A.   Yes.                                                             14:32:12

16   Q.   Okay.  Why don't you refer to number 9 at the top of page

17   3.

18   A.   Right.

19   Q.   Have you ever had a medical license revoked, suspended,

20   limited, restricted, placed on probation, voluntarily               14:32:24

21   surrendered or canceled during an investigation or in lieu of

22   disciplinary action, entered into a consent agreement or

23   stipulation?

24             What was your answer?

25   A.   I know what it is.                                              14:32:36

Jan Watson — Cross-Examination

1    Q.  Did you answer yes?

2    A.  Yes.

3          When I left Arizona and moved to California, while I

4    was in California I forgot to pay my license fee.  So my

5    Arizona license was revoked.  That was under one number.  And          14:32:55

6    when I came back from California I had to get a new Arizona

7    license.

8    Q.  Okay.  So you're saying that --

9    A.  That's what it is.

10   Q.  What year did you leave for California?          14:33:09

11   A.  Is that what -- I must have left in '95 and returned in

12   '96.  That's why I have two different Arizona licenses.

13   Q.  So it's your testimony that you -- your license was

14   suspended because you didn't pay --

15   A.  I forgot while I was in California to pay my license in          14:33:46

16   Arizona.  And I had to reapply.

17   Q.  All right.  And you didn't include any of that in your

18   application to Corizon that you submitted to Onyx; correct?

19   A.  Obviously no.  I forgot all about that.

20   Q.  Well, you did testify earlier today that your license --          14:34:10

21   when Mr. Fathi was asking you questions, you testified that

22   your license was suspended for a period of time when you went

23   to California.  Do you remember that?

24   A.  No, I didn't.

25          MR. FATHI:  Objection, Your Honor, that misstates her          14:34:22

UNITED STATES DISTRICT COURT

Jan Watson – Cross-Examination

```
1    testimony.

2              THE WITNESS:  I did not say that.

3              THE COURT:  The record will show.

4              You don't need to answer that question.

5    BY MR. STRUCK:                                              14:34:29

6    Q.  Didn't you say, when Mr. Fathi was asking you about your

7    work history, that your license had been suspended for a period

8    of time when you went to California to work?

9              MR. FATHI:  Objection, Your Honor, it misstates her

10   testimony.                                                  14:34:42

11             THE COURT:  It's not worth the candle.  We'll figure

12   it out later.

13             The objection is sustained.

14   BY MR. STRUCK:

15   Q.  Would you take a look at Exhibit 316?                   14:35:30

16             Are you there?  I'll wait for you.

17             MR. STRUCK:  May I approach?

18             THE COURT:  Yes, you may.

19             THE WITNESS:  Okay.

20   BY MR. STRUCK:                                              14:36:12

21   Q.  Do you see at the bottom, is that your signature?

22   A.  Yes.

23   Q.  And the question asks you, during the last registration

24   period has there been any denial, restriction, suspension, or

25   loss/revocation of your DEA or State prescription permit?     14:36:28
```

UNITED STATES DISTRICT COURT

1          And then your answer is yes.

2          Is that true?

3    A.  It would really be nice to be able to see what's under

4    redacted, so that I know what this is.

5          I don't remember anything about my DEA.  Did I forget        14:36:52

6    to pay my DEA when I was in California?  I don't remember

7    anything going wrong with my DEA.

8    Q.  Is that your handwriting on Exhibit 316?

9    A.  Yes.

10   Q.  And you marked yes on that box, number 2; correct?            14:37:18

11   A.  Yes.

12         So give me some time.  It took me a long time to

13   remember about my Arizona license.

14         I do not know what the problem was.

15   Q.  Okay.  So --                                                   14:37:36

16         THE COURT:  Do you have a DEA license now?

17         THE WITNESS:  Yes.

18   BY MR. STRUCK:

19   Q.  And when you filled out your application to Corizon that

20   you provided to Onyx, it asks you whether or not there had been    14:37:47

21   any disciplinary action with respect to the DEA or CDS

22   registration, you answered no.  Is that true?

23   A.  As far as I remember, even at this very moment, I have not

24   had a problem with my DEA.  So, I don't know what this is.  It

25   may take me some time to remember.  It too is in this period       14:38:16

1   when I forgot about my Arizona license.

2   Q.  Would you take a look at Exhibit 318, please.

3   A.  Oh, here's another.  Okay.

4   Q.  Exhibit 318 is two pages.  It looks like a letter from you

5   to Mark Speicher at the --                                    14:39:46

6          THE COURT:  Speicher.

7   BY MR. STRUCK:

8   Q.  Speicher at the Arizona Board of Medical Examiners.

9   A.  Right.

10  Q.  Is that right?                                            14:39:54

11  A.  Right.

12  Q.  Is that your signature?

13  A.  Yes.

14  Q.  Okay.  And so you notified the Board in January you didn't

15  want to renew your license and that's why you didn't pay the  14:40:02

16  fee.  Do you see that?

17  A.  Yes.

18  Q.  Okay.  Why don't you turn to the next page.

19  A.  Okay.

20  Q.  And this is a letter from the Board of Medical Examiners to  14:40:11

21  you dated May 8th, 1995.  Do you see that?

22  A.  Yes.

23  Q.  And why don't you look down to that third full paragraph.

24  It says, since you have an ongoing investigation with the

25  Board, your license cannot expire until the review of this    14:40:35

1   matter is completed.  Your license is now suspended in Arizona.

2   A.  Okay.

3   Q.  What was the ongoing investigation that was being conducted

4   by BOMEX in 1995?

5   A.  I don't know.                                                    14:40:51

6   Q.  You don't know?  You have no recollection of that?

7   A.  No.

8   Q.  And you didn't include any of that information in your

9   application to Corizon either, did you?

10  A.  I couldn't include it if I don't remember it.                    14:41:04

11  Q.  Now in your application that we looked at before, which is

12  Exhibit 308, on subsection 6 --

13  A.  Oh, what year was that?  Going back.

14  Q.  Going back to Exhibit 318, it's May 8th, 1995, was the date

15  of the letter from BOMEX.                                            14:41:47

16  A.  Okay.  That would have -- the only thing I could think of

17  was that that was while we were still settling that malpractice

18  case that I settled.  That's the only thing I can think of.

19  Because that case occurred in 1994-ish.

20  Q.  Okay.  So there was an investigation that was ongoing with       14:42:16

21  respect to the incident that occurred that resulted in the

22  lawsuit in Maricopa County?

23  A.  That's the only thing I can think of.  Those dates are

24  about the same.

25  Q.  Okay.                                                            14:42:37

**Jan Watson – Cross–Examination**

1    A.  So perhaps they're referring to, we were waiting for that

2    case to be settled.

3    Q.  Do you know what occurred or what ultimately happened as a

4    result of the BOMEX investigation with respect to your

5    treatment?                                                    14:42:53

6    A.  Nothing.

7    Q.  Nothing happened?

8    A.  No.

9    Q.  You never got a letter or anything like that from BOMEX?

10   A.  No.                                                       14:42:59

11   Q.  Take a look at 308, Doctor, on page 3 of that document.

12          MR. FATHI:  I'm sorry, which number?

13          THE COURT:  308.

14          MR. STRUCK:  308, page 3.

15   BY MR. STRUCK:                                                14:44:13

16   Q.  Do you see where it asks you if you have ever been

17   terminated.  Do you see that?  And you said no.

18   A.  Okay.

19   Q.  And that's your -- you typed in that no; correct?

20   A.  Right.                                                    14:44:33

21   Q.  All right.  That's not true, is it?

22   A.  I remembered one now.

23   Q.  You actually have been terminated before, haven't you?

24   A.  Yes.  I remember one.

25   Q.  All right.  So this information that you submitted to      14:44:44

**Jan Watson – Cross-Examination**

1    Corizon was incorrect?

2    A.  Okay.

3    Q.  Why don't you tell us, when were you terminated?

4    A.  '90 -- was it 2010?

5    Q.  Who terminated you, do you recall?                    14:45:12

6    A.  I was at Desert Perinatology.

7    Q.  Yes.  Phoenician Medical Center dba Desert Perinatology.

8    A.  Yes.

9    Q.  And you were terminated from your contract; is that right?

10   A.  Yes.                                                   14:45:37

11   Q.  Why were you terminated from your contract, do you

12   remember?

13   A.  Yes.  They were going to close the practice because the

14   perinatologist there could not get admitting privileges to

15   Desert Samaritan.  And they -- I -- they thought my getting    14:45:53

16   privileges could help him get his privileges.  But when I

17   obtained my privileges, it didn't help him.  And so they used

18   me as an excuse as to why he couldn't get his privileges, and

19   so they fired me.  And then a few weeks later they closed the

20   practice.                                                  14:46:24

21   Q.  Okay.  Were you hired by Phoenix Medical Center in the

22   capacity of a maternal-fetal medicine physician?

23   A.  Phoenix Medical Center?

24   Q.  Yes, ma'am.

25   A.  You mean Phoenician or Phoenix Medical?               14:46:41

UNITED STATES DISTRICT COURT

**Jan Watson – Cross-Examination**

1    Q.  Phoenician Medical Center, Inc., dba Desert Perinatology.

2    A.  They wanted -- they wanted me -- they hired me because of

3    my genetics certifications.  I'm a reproductive geneticist.  So

4    I could do thinks the perinatologist could not.

5    Q.  You didn't hold yourself out as a maternal-fetal medicine          14:47:14

6    physician?

7    A.  No, I did not.  And if you look at my curriculum vitae, it

8    does not say that.  It says I am board certified in clinical

9    genetics.

10   Q.  You actually sued Phoenician Medical Center, didn't you?          14:47:30

11   A.  Yes.  Because instead of coming to talk to me about what

12   was happening in the practice, I just received a letter one day

13   from their attorney.  And so I then got an attorney.

14   Q.  And isn't it true the reason they terminated you, Doctor,

15   was because you held yourself out as a maternal-fetal                  14:48:01

16   medicine --

17   A.  That was the --

18   Q.  -- specialist?

19   A.  That was the excuse they used.  But no, I didn't.  As I

20   stated, my curriculum vitae and all of my certifications, they        14:48:12

21   had -- say genetics and OB/GYN.

22   Q.  Isn't it true that when you were working for them you tried

23   to get credentials at Banner Desert Medical Center as a

24   maternal-fetal medicine specialist?

25   A.  No, it is not.                                                     14:48:38

Jan Watson – Cross-Examination

1          The way the applications for OB/GYN privileges are

2     made, under OB/GYN you get your c-sections and all that.  And

3     then there are certain special procedures that are listed

4     separately under perinatology.  And those procedures are

5     targeted ultrasounds, amniocentesis and chorionic villus                14:49:03

6     sampling, which I do as a reproductive geneticist.

7          And in order for me to check that I needed -- wanted

8     those privileges as well, I had to check perinatology.  Those

9     were your options.

10          So once I met with the chairman of the OB/GYN                       14:49:24

11     department and the perinatologist at Desert Sam and explained I

12     just needed those privileges, they said, oh, okay.  Then they

13     sent a letter to me giving me my privileges with those special

14     privileges included.

15          That has happened every time I apply for privileges at             14:49:48

16     Maricopa County and St. Joseph's.  That's the way it's done.

17     Q.  Okay.  But isn't it true, Dr. Watson, that Banner Desert

18     Medical Center refused to give you maternal-fetal medicine

19     privileges that you requested --

20          MR. FATHI:  Objection.                                             14:50:09

21          MR. STRUCK:  -- in 2008?

22          THE COURT:  I'm sorry, what's the objection?

23          MR. FATHI:  The objection is relevance.  We're now

24     going on one hour of things that have nothing to do with her

25     work at the Arizona Department of Corrections.                          14:50:17

UNITED STATES DISTRICT COURT

Jan Watson – Cross-Examination

1          THE COURT:  Overruled.

2          Do you remember the question, Doctor?

3          THE WITNESS:  Yes.

4          They granted privileges in OB/GYN with special

5   privileges in a separate letter to include ultrasound,          14:50:30

6   amniocentesis and chorionic villus sampling.

7   BY MR. STRUCK:

8   Q.  Would you take a look at Exhibit 324, please?

9          THE COURT:  Maybe in a different notebook, is it?

10         Oh, you don't have a notebook.          14:50:57

11         MR. STRUCK:  Your Honor, may I approach?

12         THE COURT:  Please.

13  BY MR. STRUCK:

14  Q.  Do you see it?

15  A.  Yes.          14:51:16

16  Q.  Okay.  Exhibit 324 is a letter from Banner Desert Medical

17  Center to you; correct?

18  A.  Yes.

19  Q.  And it states under subsection 1, you have requested

20  maternal-fetal medicine privileges.  At this time you are not          14:51:26

21  board certified in maternal-fetal medicine and unable to

22  receive such certification within the required time period

23  based on the OB/GYN department policies and procedures with

24  Banner Medical.

25         Is that correct?          14:51:44

UNITED STATES DISTRICT COURT

**Jan Watson – Cross-Examination**

1   A.  Right.

2   Q.  All right.

3   A.  And what I said was, what they -- what they did do was

4   grant me privileges in OB/GYN and those sections under

5   perinatology that I had requested.  And that is in a separate        14:52:02

6   letter.

7   Q.  But the reason why you were terminated by Phoenician

8   Medical Center Incorporated dba Desert Perinatology is because

9   you held yourself out a maternal-fetal specialist and you did

10  not get that privilege.  Isn't that true?                           14:52:22

11  A.  No, it is not.

12  Q.  Take another look at Exhibit 323, please.

13      And the first page of that is your complaint against

14  Phoenician Medical Center Incorporated; correct?

15  A.  Yes.                                                            14:53:07

16  Q.  And if you turn to page 4 of that exhibit, that is the

17  answer that was filed by Phoenician Medical Center dba Desert

18  Perinatology.  Do you see that?  Page 4 of that exhibit.

19  A.  Right.

20  Q.  And if you turn to page 9 of the answer, it states that in      14:53:28

21  the answer, defendants did not breach the contract as the

22  plaintiff was subject to immediate termination pursuant to

23  paragraph 8(c) of Exhibit 1 as plaintiff did not have Board

24  certification in the subspecialty of maternal-fetal medicine as

25  required by Exhibit 1.                                              14:53:53

1          Do you see that?

2   A.  Yes.

3   Q.  And that was -- that was the answer of the complaint that

4   you filed against your former employer?

5   A.  That was the excuse they used.  How -- the reason I said          14:54:04

6   what I said was, you said that I was promoting or held myself

7   up to be maternal-fetal medicine.  No, I did not.  I am a

8   reproductive geneticist.  I am board certified in clinical

9   genetics.  They knew that when they hired me.  That's what they

10  wanted.  I can do things that the perinatologist they had hired     14:54:33

11  could not.  They knew that, but they needed a reason to explain

12  some of the problems he was having with getting his hospital

13  privileges.  I became the scapegoat.

14  Q.  Okay.  Why don't you take a look at -- again at -- continue

15  on on Exhibit 323.  Look at page 24 of Exhibit 323.                  14:55:11

16  A.  24?

17  Q.  Yeah, page 24.

18  A.  Okay.

19  Q.  All right.  And that is the employment agreement that is

20  signed by you on page 30 of this document, signed on August         14:55:37

21  13th, 2008; correct?

22  A.  Yes.

23  Q.  All right.  And if you look at -- and it's on page 25 of

24  Exhibit 323.

25          It states, physician will sign whatever Directorship,        14:55:53

**Jan Watson – Cross-Examination**

1   Insurance or other contract Company deems necessary which are

2   ethical, legal and moral to enter into in her capacity of one

3   of the maternal-fetal medicine physicians.

4         Do you see that?

5   A.  Yes.                                                          14:56:09

6   Q.  And that's your employment agreement that you had with

7   them.

8   A.  Yes.

9   Q.  All right.  And the fact of the matter is, you were

10  terminated by them and you did not include that in your         14:56:15

11  application to Corizon; correct?

12        MR. FATHI:  Objection, Your Honor, this has been asked

13  and answered.

14        THE COURT:  Overruled.

15        THE WITNESS:  Right, I had forgotten about them.          14:56:29

16        MR. STRUCK:  Okay.

17        THE COURT:  At a good breaking point we'll take --

18        MR. STRUCK:  Yes.

19        THE COURT:  -- a ten-minute break.  Is this a good

20  point?                                                          14:56:41

21        MR. STRUCK:  We can do that now.

22        THE COURT:  Dr. Watson, we need to give our court

23  reporter a chance to take a break.  She's been working even

24  during the pauses.  When we all get a chance to take a breath

25  and she never gets such a chance.                               14:56:50

Jan Watson – Cross-Examination

1          We'll come back at 3:10.

2          THE WITNESS:  Okay.

3      (Recess at 2:56 p.m., until 3:11 p.m.)

4          THE COURT:  Thank you.  Please be seated.

5          Except Dr. Watson, if you would kindly return to the          15:11:12

6  witness stand.

7  BY MR. STRUCK:

8  Q.  Dr. Watson, could you take a look at Exhibit 325, please?

9          This looks to be an Initial Credentialing Application

10 to Phoenix Health Plan/Community Connection Abrazo Advantage     15:11:50

11 Health Plan, Incorporated.  Is that correct?

12 A.  Yes.

13 Q.  And this is your application; isn't that true?

14 A.  Yes.

15 Q.  And if you look on page 7 of this document, that's your      15:12:00

16 signature dated October 27th, 2008; correct?

17 A.  Page where?

18 Q.  7.

19 A.  Yes.

20 Q.  All right.  If you look at page 5, please.                   15:12:18

21          Question number 2, have you ever settled a malpractice

22 lawsuit and/or had a judgment rendered against you in a

23 malpractice lawsuit?

24          And you checked no.

25 A.  That was a mistake.                                          15:12:37

UNITED STATES DISTRICT COURT

Jan Watson – Cross-Examination

1   Q.  That is a mistake, isn't it?

2   A.  Yeah.

3   Q.  Okay.  So when you checked no in 2008, you actually had

4   settled a lawsuit.

5   A.  Yes.                                                          15:12:47

6   Q.  And do you see on page 7 it says that you understand that

7   falsification of any part of this application and/or

8   documentation included with this application may be grounds for

9   denial of credentialing?  Do you see that?

10  A.  Yes.                                                          15:13:11

11  Q.  Okay.  So when you --

12  A.  Now, would you like to hear something about this piece of

13  paper that you didn't ask me?

14          THE COURT:  Doctor --

15          THE WITNESS:  Whoops, I'm not --                          15:13:20

16          Would you like to hear something about this that you

17  didn't ask me?

18          MR. STRUCK:  Okay.

19          THE WITNESS:  You didn't ask me is this my

20  handwriting.                                                      15:13:30

21  BY MR. STRUCK:

22  Q.  Okay.  So did somebody else fill this out for you,

23  Dr. Watson?

24  A.  Yes.  And neither one of us caught that.

25  Q.  But you had a chance to review this documentation before     15:13:40

UNITED STATES DISTRICT COURT

1    you signed it, didn't you?

2    A.  Right.  And I just said, neither one of us caught that.

3    Q.  Who was it that filled it out for you?

4    A.  I don't know, whoever does credentialing.

5           You see on page 1 where it says Jan Watson, you can          15:14:01

6    tell I don't write my name that way.  So someone was helping me

7    out and filled out the paperwork, and we both missed the

8    mistake.

9    Q.  Okay.  And go down to number 9.  Have you ever been denied

10   membership and/or been subject to probation, reprimand,          15:14:21

11   sanction or disciplinary action or notified in writing you're

12   being investigated as a possible subject of a criminal

13   disciplinary action by any health care organization, e.g.,

14   hospital, HMO, PPO, IPA, professional group or society,

15   licensing board, certification board or any other national,          15:14:39

16   state or local organization?

17          And no has been checked.

18   A.  Okay.

19   Q.  Do you see that?

20   A.  Yes.          15:14:48

21   Q.  Okay.  Well, that's not accurate either, is it?

22   A.  No.

23   Q.  Because BOMEX was conducting an investigation on you with

24   respect to that first lawsuit you were telling us about;

25   correct?          15:15:01

Jan Watson - Cross-Examination

1   A.  Right.

2   Q.  All right.  So is that -- you missed that too when you

3   filled this out?

4   A.  Yes.

5   Q.  Or when you signed it?                          15:15:07

6   A.  Yes.

7   Q.  Now you testified earlier today that you contacted a KJZZ

8   reporter to tell him about your experience working at the

9   prison facility as a locums tenens for Corizon; is that right?

10  A.  As a locum tenens, yes.                          15:15:42

11  Q.  You made that contact.

12  A.  Yes.

13  Q.  And why did you contact that particular journalist?

14  A.  I had tried to contact the ACLU, and I couldn't.  And I had

15  seen articles written by him, so I -- and I knew he knew how to  15:16:04

16  contact them.  So I sent him an e-mail and asked him if he knew

17  who I should contact to tell them about my experiences at

18  Eyman.

19  Q.  And that was the beginning of several back and forth e-mail

20  correspondence with this particular journalist; is that right?  15:16:34

21  A.  Correct.

22  Q.  Okay.  And you provided him with some e-mails that you

23  had -- now had you saved e-mails when you left Corizon?  How

24  did you happen to have them?

25  A.  It was a screen shot, because I was concerned if in certain  15:16:54

1   cases there ever became a problem, it was going to be a

2   potential problem for me if there was ever a lawsuit with those

3   cases.

4   Q.  Okay.  I see.  So is that true with anything you took a

5   screen shot of, was something that you were concerned that          15:17:20

6   perhaps it might some day become a lawsuit?

7   A.  Come back and be a problem for me, yes.

8   Q.  And did you take screen shots of anything other than things

9   that you believed might come back and turn into a lawsuit or

10  some sort of --                                                      15:17:36

11  A.  A problem for me?  No.

12  Q.  Okay.  So that was your criteria, only the things that you

13  thought might come back to cause problems for you, maybe a

14  lawsuit, maybe disciplinary action, were the things that you

15  made screen shots of; right?                                         15:17:50

16  A.  Correct.

17  Q.  Okay.  Now, as a result of the back and forth e-mails with

18  this journalist, you were actually interviewed, I believe on

19  camera or -- there was a recorded interview of you by him as

20  well; correct?                                                       15:18:12

21  A.  Correct.

22  Q.  All right.  Was that filmed?

23  A.  No.

24  Q.  No?

25          Photographs were taken?                                      15:18:18

1    A.  One.

2    Q.  Okay.  And as a result of that there was ultimately an

3    article that was written by this journalist, and it was, I

4    guess, put online by KJZZ.

5    A.  Correct.                                                       15:18:44

6    Q.  Is that right?

7            You were pretty happy about that?

8    A.  I wasn't happy or unhappy.

9    Q.  You weren't pretty excited about it?

10   A.  No.                                                            15:18:58

11   Q.  Now, in -- I think during your first stint with Corizon,

12   the first three months, you were interested in continuing with

13   Corizon in its employ; is that right?  For a period of time.

14   A.  I was agreeable to doing three days a week ongoing.

15   Q.  Okay.  And wouldn't you say it wasn't until late August,    15:19:31

16   early September meeting that you had with Dr. Stewart -- and

17   who was the other gentleman?

18   A.  Babich.

19   Q.  Glen Babich.  That you -- that's when you decided that you

20   didn't want to re-up or continue with Corizon; is that right?   15:19:50

21   A.  Actually it was the day before that meeting.

22   Q.  The day before that meeting.  Okay.

23           And it's your testimony that at that meeting you were

24   told not to write any narcotic prescriptions except for inmates

25   with cancer?  Is that your testimony?                           15:20:15

Jan Watson – Cross-Examination

1   A.   Yes.

2   Q.   Is that what you told the journalist?

3   A.   I guess so.

4   Q.   Okay.  Well --

5   A.   Oh, I thought of a situation where you could.  You could          15:20:28

6   write it for three days for an acute injury, but it couldn't be

7   tramadol or Oxycodone or something like that.  So that left you

8   with Tylenol 3 for an acute situation for three days.

9   Q.   Isn't it true that when they met with you, they told you

10  that you were just simply writing too many prescriptions for          15:21:01

11  narcotics?  Isn't that true?

12          MR. FATHI:  Objection.  Can we have clarification on

13  who this is and which meeting?

14          THE COURT:  Sustained.

15  BY MR. STRUCK:                                                        15:21:12

16  Q.   When you met with Dr. Stewart and Glen -- I'm sorry, what

17  was his name again?

18  A.   Babich.

19  Q.   Glen Babich, isn't it true that what they told you was that

20  you were simply writing too many prescriptions for narcotics?        15:21:26

21  A.   At that meeting.

22  Q.   Yes.

23  A.   It was a different meeting where Dr. Stewart told me not to

24  write.

25  Q.   Okay.  So the meeting with Babich and Dr. Stewart, they         15:21:35

Jan Watson – Cross-Examination

1   told you not to write so many, but then there was a subsequent

2   meeting with Dr. Stewart?

3   A.  The meeting the day before was a provider meeting in the

4   pizza restaurant.  That is where we were all told not to write

5   narcotics except for cancer patients.  It was me and the nurse        15:21:59

6   practitioners.  That's the same meeting where he told us not to

7   write prescriptions for NSAIDs for patients 50 years or older.

8   And that is the same meeting where he told me to let the

9   patient die.

10          That all occurred the day before Babich and Stewart         15:22:26

11  came and met with me.

12          So my decision to leave was based on things that were

13  said at that provider's meeting.

14  Q.  Okay.  So at that provider's meeting, that occurred in the

15  pizza restaurant in Florence?                                        15:22:45

16  A.  Yes.

17  Q.  Okay.  And all those things you say Dr. Stewart told you in

18  that meeting?

19  A.  Yes.

20  Q.  All right.  And then the next day you met with Dr. Stewart       15:22:52

21  and Mr. Babich separately; correct?

22  A.  Correct.

23  Q.  All right.  But at that meeting you weren't told to stop

24  writing -- stop writing narcotics with the exception of cancer

25  patients, you were told that you were writing too many.              15:23:08

1    A.  Yes.

2    Q.  All right.  Did you at that point try and clarify whether

3    or not you could write narcotics prescriptions for anybody

4    besides cancer patients?

5    A.  No.                                                              15:23:24

6    Q.  Why not?

7    A.  Because I didn't think it was worth prolonging that

8    conversation.  That wasn't the only problem they had with me.

9    Q.  Okay.  So you didn't -- you didn't clarify whether or not

10   you could write narcotics prescriptions for anyone other than    15:23:51

11   cancer patients at that meeting; true?

12   A.  Correct.

13   Q.  All right.  And the reason why you didn't is because there

14   were other issues that they had with you that they addressed --

15   A.  Right.                                                          15:24:03

16   Q.  -- Mr. Babich and Dr. Stewart addressed with you at that

17   meeting.

18   A.  Right.  And I had already decided I was leaving.

19   Q.  And didn't they also tell you that you were writing too

20   many orders for medical shoes?                                     15:24:14

21   A.  Yes.  I got all of that, included that I was writing -- I

22   was ordering too much durable medical equipment, I included all

23   of that.

24   Q.  But didn't they specifically address with you that inmates

25   were coming to you because they liked the medical shoes, and      15:24:34

**Jan Watson – Cross-Examination**

1    you were writing too many prescriptions for those?

2    A.   Actually I don't remember the medical shoes.  I remember

3    them complaining about knee braces.  And he told me how they

4    don't work anyway.  Not knowing that I was sitting there with

5    one on.                                                          15:24:52

6         And some of -- what else?  Right, his big thing was

7    the knee braces, and that I should just use ACE bandages.

8         So I don't remember him separating out medical shoes.

9    Q.   Do you remember Mr. Babich and Dr. Stewart asking you to

10   not order so many foot baths for patients who had calluses on  15:25:17

11   their feet?

12   A.   No.

13   Q.   Do you remember them saying anything to you about you

14   overprescribing galapentin?

15   A.   No.                                                        15:25:37

16   Q.   Excuse me, gabapentin.

17   A.   No.

18         THE COURT:  Same answer.

19   BY MR. STRUCK:

20   Q.   You don't remember them asking you to cut back on narcotic 15:25:49

21   orders for patients who were complaining of subjective signs of

22   neuropathy?

23   A.   No.

24   Q.   Did you ever prescribe gabapentin?

25   A.   Yes.                                                       15:26:10

—— Jan Watson - Cross-Examination ——

1   Q.  Do you know what it is?

2   A.  No.  Would you like to tell me?

3   Q.  I'm asking you, do you know what gabapentin is?

4   A.  Yes, I know what it is.

5   Q.  What is it?                                                    15:26:21

6   A.  It's a seizure medication.

7   Q.  And you were only prescribing it for seizures?

8   A.  No.  It also is indicated for postherpetic neuralgia and

9   diabetic peripheral neuropathy.

10  Q.  Are you aware of the fact that gabapentin is a problem in     15:26:44

11  terms of being abused by inmates throughout the United States?

12  A.  It is abused by Americans period, not inmates.  But that is

13  because some provider wrote for it in the first place.

14  Q.  Okay.  And you would agree that it is -- you need to be

15  careful before prescribing gabapentin to a patient,              15:27:24

16  particularly one that might have a history of drug abuse,

17  because of the possibility that they might actually be seeking

18  drugs?

19  A.  Yes.  Inmates are not the only patients who seek drugs.  So

20  I am accustomed to that behavior.                                15:27:45

21  Q.  Okay.  So that's a good practice as a physician, to be very

22  careful and mindful about what you're prescribing a narcotic

23  such as gabapentin --

24  A.  Gabapentin is not a narcotic.

25  Q.  A drug that can be abused like gabapentin when someone is     15:28:00

1   coming to you with complaints of pain.

2   A.  Yes.

3   Q.  Okay.

4   A.  And actually I am someone who has not liked this whole

5   trend in medicine where they are prescribing gabapentin for a          15:28:16

6   lot of so-called nerve pain.  It's a very bad trend in

7   medicine.

8   Q.  Why is that?

9   A.  Because it -- all pain is due to nerves.  Gabapentin should

10  be limited -- and its indications are limited to where there is        15:28:36

11  intrinsic nerve damage.  And this whole practice of giving it

12  to people who have sciatica, that's nerve impingement, that's

13  not intrinsic nerve damage.  I personally don't do it.  I write

14  gabapentin for seizures, and I do use it for herpetic -- post

15  herpetic neuralgia, and I will use it for diabetic neuropathy.         15:29:11

16  Those indications have good data to back them up.  All of this

17  other -- these other uses, there is not good supporting data

18  for that and I don't do it.

19  Q.  Okay.  And in your opinion that's good medical practice?

20  That's the standard of care?                                           15:29:34

21  A.  I wouldn't say it's the standard of care, because so many

22  people are doing something else.  That is what I do.

23  Q.  Okay.  And in your opinion that is what is the appropriate

24  treatment for -- that would be the appropriate treatment just

25  for people who have those particular conditions?                       15:29:52

1    A.   Right.

2    Q.   Okay.

3    A.   I personally have continued gabapentin in some patients who

4    have been started on it by other providers, but we then try to

5    get them off of it.                                                    15:30:06

6    Q.   Okay.  One of the other things when you met with Glen

7    Babich and Dr. Stewart that they talked to you about was -- and

8    you testified about earlier, trying to see 20 patients per day.

9    Do you remember?  That was one the things they came to you

10   about that they wanted you to try and see 20 patients per day.        15:30:29

11           MR. FATHI:  Objection, that misstates her testimony.

12           THE COURT:  Do you remember the testimony about the 20

13   patients per day?

14           THE WITNESS:  Right.  That's how many patients were

15   scheduled.                                                            15:30:40

16           THE COURT:  The question I think is whether they also

17   asked you at one of these -- I don't know whether you were

18   specific.  But the question is whether you were asked about

19   whether you were seeing a sufficient number of patients,

20   whether it's 20 or not.                                               15:30:50

21           But, Mr. Struck, I'm just trying to amplify the

22   question.  But I should allow you to do that.

23           So I'll sustain the objection.  You can --

24           THE WITNESS:  Okay.  The way it came up was at the

25   meeting --                                                            15:31:01

UNITED STATES DISTRICT COURT

Jan Watson – Cross-Examination

1          THE COURT:  Are you okay with the question as it's

2     sort of posed right now?

3          Okay.  Go ahead, ma'am.  I'm sorry.

4          THE WITNESS:  At the meeting we were discussing that I

5     brought up that I cannot see that many patients and keep up          15:31:14

6     with all of the paperwork, computer work that is needed.  And

7     Dr. Babich said if I spent less time with the patients I should

8     be able to see the 20 patients in five hours, and then I would

9     have three hours per day to do all of that other stuff.

10    BY MR. STRUCK:                                                        15:31:42

11    Q.  Your documentation, your -- the one-hour meeting that you

12    had to do, those things?

13    A.  Yes.

14    Q.  Okay.  Now, you were -- you were seeing about eight to ten

15    patients -- you were averaging about eight to ten patients a          15:31:57

16    day; isn't that true?

17    A.  No, that is not true.

18    Q.  All right.  How many patients were you seeing a day?

19    A.  I probably saw -- most days I saw the 20.  There were days

20    that I didn't -- I remember one day walking out the door and a        15:32:17

21    correctional officer told me I saw 27 that day.

22    Q.  Okay.  What would you say you averaged in a day, if you had

23    to estimate?

24    A.  Seventeen, 18.

25    Q.  All right.                                                        15:32:35

UNITED STATES DISTRICT COURT

Jan Watson – Cross-Examination

1   A.  I don't know.

2           No, 20.

3   Q.  Okay.  So you were seeing 20 patients a day?

4   A.  At least.

5   Q.  All right.  But -- I want to make sure I understand your          15:32:50

6   testimony.  When you met with Mr. Babich and Dr. Stewart you

7   were saying 20 is too many?

8   A.  Yes.  Twenty is too many if we are to be able to do all of

9   the paperwork and documentation.  So I didn't get all of that

10  done.  A lot of work that could be done in the computer I had        15:33:14

11  to do when I was at home on a day not scheduled to actually be

12  at Cook.

13  Q.  Were you counseled with respect to your documentation not

14  being in order?

15  A.  No.                                                              15:33:35

16  Q.  Or not sufficient?

17  A.  No.

18  Q.  No?

19  A.  They told me that I was not up on my ATPs and things like

20  that.  So that's why I was doing as much as I could on the days      15:33:50

21  when I wasn't actually there from home.

22  Q.  Okay.  Let's talk a little bit about ATPs and NMIs, which

23  is need more information; correct?

24  A.  Yes.

25  Q.  Okay.  And that is something that when you scheduled a           15:34:05

**Jan Watson – Cross-Examination**

1   consult, sometimes you would get the response back from

2   Utilization Management that they needed more information to be

3   able to determine whether or not it was appropriate to send

4   this person -- this patient to whatever consult you wanted to

5   send them to.                                                    15:34:22

6   A.  Correct.

7   Q.  Correct?

8        All right.  And so you understand it was important to

9   provide that information as quickly as possible to the

10  Utilization Management group so that a determination could be   15:34:32

11  made and this person could be scheduled for an outside consult;

12  right?

13  A.  Right.

14  Q.  All right.  And isn't it true that you weren't -- or you

15  were counseled because you weren't providing that information   15:34:47

16  on a timely basis?

17  A.  No, I wasn't counseled.  They let me know that it was -- I

18  was behind.  And like I said, once I was able to log in from

19  home I could do some of that from home.  And so I was doing it

20  on days that I wasn't there.                                     15:35:11

21  Q.  And when -- I'm sorry.  When were you able to log in from

22  home?

23  A.  That was probably two or three months after I arrived.

24       The first time I asked if I could log in from home I

25  was told no.  And I thought -- because I had heard the nurse    15:35:28

**Jan Watson – Cross-Examination**

1    practitioner say she went home at night and did some of her

2    notes.  So I thought that when Terri told me that I couldn't do

3    it, it because I was a locums doc.  And then, oh, a month or so

4    later I asked again, and then they gave me the information on

5    how to log in from home.                                    15:35:56

6          So I started catching up then, but that was months

7    into my assignment.

8    Q.  And you started in --

9    A.  May.

10   Q.  -- May?  So sometime in July you were --              15:36:09

11   A.  At least, if not later.

12   Q.  Okay.  So then was it your testimony that after July of

13   2017 it wasn't a problem for you anymore to be able to timely

14   provide more information or timely get your -- do the ATPs?

15   A.  That is not what I said.  I said I started catching up.  15:36:36

16   And I -- I was better at getting that information in, but I was

17   still behind.

18         And finally they didn't schedule patients for me a day

19   and they gave me a full day to just sit down and complete the

20   ATPs.                                                       15:37:07

21   Q.  Okay.  When was that?

22   A.  September.

23   Q.  Can you, I guess in more detail, tell us what an ATP is?

24   A.  It's an alternate treatment plan.  So it can be anything.

25   Like I told you for the man's hearing aid, they told me to look  15:37:29

Jan Watson – Cross-Examination

1   at the hearing aid.

2          I had someone who I wanted an ear, nose and throat

3   consult for.  He had swollen turbinates, the tissue in your

4   nose, so he had difficulty breathing, and his nose had been

5   broken.  And I wanted an ENT consult.  The ATP came back that I          15:37:48

6   should get a pulse oximetry measurement on him to document that

7   he was having difficulty breathing.  Well, anybody knows

8   if -- if you can't breathe through your nose, you can breathe

9   through your mouth, so that does not affect your O2 saturation.

10         So we -- you just never know what you're going to get          15:38:18

11  back.

12  Q.  For example, the patient that had the prior history of

13  bladder cancer that you wanted to send to the oncologist, their

14  request was that you send him first to a neurologist; is that

15  right?          15:38:40

16  A.  Something like that.

17         But all of that -- first of all, that patient -- I

18  received an e-mail from the Director of Nursing that I needed

19  to see him immediately because of his situation about being

20  treated for bladder cancer.  And his daughter had contacted          15:38:55

21  them.  They get -- they sent me what records he had from his

22  outside providers, so I made those consults based on what he

23  was receiving outside.  And I had been specifically requested

24  to do that.  So we made an emergency visit for this man and

25  then they didn't approve him.          15:39:22

Jan Watson – Cross-Examination

```
 1   Q.  Okay.  You had been specifically requested to do that by

 2   whom?

 3   A.  The Director of Nursing sent me an e-mail that -- to see

 4   this patient immediately.  He had been contacted by that

 5   inmate's daughter.  And these were all of the things that          15:39:41

 6   needed to be done.

 7            So we brought him in.  We booted somebody else,

 8   brought him in.  I wrote all of those consults, and they

 9   weren't followed.  And I was doing it because I was requested

10   to do so.                                                          15:40:00

11   Q.  You were requested to see the patient; right?

12   A.  I was requested to do -- to follow up with his care.

13            You see, I made all of those referrals to the doctors

14   he was seeing as an outpatient.  That's why I put those names

15   there.                                                             15:40:24

16   Q.  Okay.  But the Director of Nursing didn't tell you to do

17   that, the Director of Nursing told you to see this patient and

18   come up with a treatment plan at that point; isn't that right?

19   A.  That's not the way I remember it, but let's go with it.

20   Q.  I'm sorry.                                                     15:40:38

21   A.  I don't remember it that way, no.

22   Q.  Okay.  Well, I'm not understanding how you remember it

23   then.  Why don't you explain?

24            The Director of Nursing told you --

25   A.  I just --                                                      15:40:47
```

UNITED STATES DISTRICT COURT

**Jan Watson – Cross-Examination**

1  Q.  -- that you needed to see this patient and get him to

2  specialist --

3  A.  And they gave me the information about who was taking care

4  of him, what had been done.  And so I wrote referrals for all

5  of the follow-up visits and care that he was supposed to get as

6  an outpatient.  So that's what I did.

7  Q.  Were you also counseled regarding not writing outside

8  specialty consults for things that you should be able to handle

9  in-house?

10 A.  No.

11 Q.  No?  That didn't ever happened?

12 A.  No.

13 Q.  Okay.  You testified earlier today about the patient that

14 you had with the fractured hand.  Do you remember that?

15 A.  Yes.

16 Q.  Okay.  And you put out for a specialty consult for someone

17 to see -- for an orthopedic doctor to see this man; correct?

18 A.  Correct.

19 Q.  And you were asked by Utilization Management for -- to

20 describe the displacement; right?

21 A.  She wanted it measured.  She wanted to know the angle of

22 the displacement.

23 Q.  What was the angle of displacement?

24 A.  I don't remember.  But we had the radiologist measure it.

25 Then she was not satisfied with the radiologist making that

15:41:03

15:41:33

15:41:46

15:42:01

15:42:17

**Jan Watson – Cross–Examination**

1    measurement on that X-ray, so I ordered another X-ray so that

2    we would have a new one that the radiologist could measure,

3    that we would then send to her.

4    Q.  Okay.  Now, you're aware of how insurance companies work,

5    medical insurance companies; right?                          15:42:38

6    A.  Yes.

7    Q.  Okay.  And through your years of experience you've had to

8    probably deal with insurance companies and their approvals of

9    care above and beyond the normal amount.  Say if you had a

10   patient that needed surgery, you have to get approval.        15:42:57

11   A.  Yes.

12   Q.  Okay.  And that's pretty standard in the industry these

13   days, isn't it?

14   A.  Yes.

15   Q.  Okay.  And one of the reasons is it helps keep costs of    15:43:05

16   health care down; right?

17   A.  That's what they say.

18   Q.  Okay.  Well, if there are more conservative measures that

19   can be done to treat a particular illness or ailment, doesn't

20   it make sense to give that a try first before you go to the    15:43:24

21   extreme?

22           MR. FATHI:  Objection, Your Honor, argumentative.

23           THE COURT:  Overruled.

24           THE WITNESS:  Yes.  But that isn't always what they

25   do.                                                            15:43:38

**Jan Watson – Cross–Examination**

1    BY MR. STRUCK:

2    Q.  Okay.  Well, for example, if somebody say has a fractured

3    hand, it makes more sense to get an X-ray before you do an MRI;

4    right?

5    A.  Right.  Which is what I did.                                    15:43:48

6    Q.  Right.  Because an X-ray is less expensive than an MRI and

7    might provide you with the information that you need in order

8    to make an appropriate diagnosis and a treatment plan; correct?

9    A.  Correct.

10   Q.  All right.  Now, with respect to the patient that you had    15:44:04

11   with the broken hand, you testified earlier that you had no

12   splints in which to splint this patient's hand.

13   A.  Right.  We should -- I should have splinted above and below

14   where the fracture was.

15   Q.  Did you look in your cabinets to see if there were splints?  15:44:25

16   A.  Yes, I did.

17   Q.  Did you check with Dr. Stewart to ask where there might be

18   splints somewhere?

19   A.  I don't think I checked with him.  But the first thing we

20   did was go to the treatment room and look in the cabinets.       15:44:39

21   Q.  Did you do anything beyond looking in the treatment room

22   for splints?

23   A.  We looked back in the other supply room as well.

24   Q.  Did you contact --

25   A.  Did I ask somebody?  Yes, I did.                              15:44:51

UNITED STATES DISTRICT COURT

**Jan Watson – Cross-Examination**

1   Q.  Who did you ask?

2   A.  I went to Norma, my trustee CNA, who had been there for

3   years and knows everything.

4   Q.  Okay.  And Norma couldn't get a splint for you?

5   A.  No.                                                         15:45:06

6   Q.  Did anybody check --

7   A.  If Norma doesn't know, I'm lost.

8   Q.  Did anybody ever check any other medical units that are out

9   at Eyman or Florence for splints?

10  A.  I don't remember if she called other units.  I know I also   15:45:18

11  asked correctional officers.  I asked her.

12         Did I call Stewart on that?  No, I didn't.

13  Q.  So going back to the 20 patients per day, not all the

14  patients you were seeing had multiple problems; true?

15  A.  Correct.                                                    15:46:11

16  Q.  And some of them you could treat relatively quickly; right?

17  A.  Right.

18  Q.  Prior to -- I think you testified this morning that before

19  coming to work at the Cook unit in Eyman you -- the only other

20  prison experience was providing -- when you were at Maricopa     15:46:51

21  Medical Center, you would sometimes provide health care to

22  female inmates from Perryville; is that right?

23  A.  At Perryville.

24  Q.  So you actually went to Perryville to provide the care?

25  A.  Yes, at Perryville.                                         15:47:08

Jan Watson - Cross-Examination

1   Q.  And how long was -- what was that period of time in which

2   you went to Perryville to provide -- was this -- were you

3   providing OB/GYN care?

4   A.  Yes.

5   Q.  Okay.  And how long -- what was that period of time?      15:47:21

6   A.  I think it was between 2005 and 2009.

7   Q.  Okay.

8   A.  Somewhere around there.

9   Q.  How often would you go out to Perryville on these specialty

10  visits, consult visits?                                       15:47:36

11  A.  I don't know.

12         It wasn't a specialty visit, it was -- it was their

13  OB/GYN clinic.

14  Q.  Okay.

15  A.  So they received all of their prenatal care and all of     15:47:44

16  their GYN exams there.  The only time we saw them at the County

17  was when they were in labor if they needed surgery.

18  Q.  So between 2005 and 2009, on average how often, say, in a

19  month would you go out to Perryville for a OB/GYN clinic?

20  A.  I wouldn't go multiple times during the month.  We rotated.  15:48:11

21  So I don't know how many times.  I wouldn't even go every

22  month.

23  Q.  How many times a year would you go out there for a clinic?

24  A.  I don't know, two, three.  I don't know.

25  Q.  Two or three times a year?  Okay.                          15:48:28

UNITED STATES DISTRICT COURT

**Jan Watson – Cross-Examination**

1          And you would spend -- would you spend the whole day

2    out there?

3    A.  Yes.

4    Q.  And that was over the course of about, what, four years?

5    A.  Yes.                                                          15:48:40

6    Q.  So --

7    A.  Three years or so, whatever.  Yeah.

8    Q.  Okay.  So maybe eight to ten times you went out to

9    Perryville?

10   A.  Yeah.  No more.                                               15:48:50

11   Q.  Other than that did you have any experience providing

12   health care to inmates or detainees in a correctional or

13   detention setting?

14   A.  No.

15   Q.  Prior to coming to the Cook unit in Eyman to provide health   15:49:08

16   care, did you have any other practice that you would describe

17   as, say, high volume?  Something you would see a lot of

18   patients.

19   A.  Yes.  I have done occupational patients for Concentra,

20   that's high volume.                                               15:49:28

21   Q.  When was that?

22   A.  The last time I was at Concentra?  May -- April.  I was at

23   Concentra right before I came down to the prison.

24   Q.  How long were you there?

25   A.  I was never a full-time person.                               15:49:48

194

**Jan Watson – Cross-Examination**

1    Q.  I understand.

2    A.  It was a locums thing.  I've been at Concentra off and on

3    since -- I don't know, six years.

4    Q.  So during your experience with Concentra, you would go down

5    there -- you'd work there a couple two or three times a week?        15:50:18

6    A.  Well, it just depends on what they needed.  I was generally

7    a p.r.n. doc, so it's what shifts they needed.

8    Q.  And p.r.n. is an as needed?

9    A.  Yeah.  I was a p.r.n. and a locums.  So you just fill in

10   shifts.  There's nothing consistent.                                15:50:38

11   Q.  Okay.  What was the longest shift that you would fill in

12   when you worked with Concentra?

13   A.  You might arrive there at 8:00 and not finish until 6:00.

14   Q.  All right.  And how many patients would you see in that

15   high-volume practice between 8:00 and 6:00?                         15:50:59

16   A.  Oh, you could see 40 patients.

17   Q.  Okay.

18   A.  Yes.  It just -- it depends on which clinic you're at.

19   Q.  All right.  When you were meeting with the journalist for

20   KJZZ, did you tell him that you were the only doctor for 5,000      15:51:37

21   inmates at the Eyman Complex?

22   A.  There were days when I was the only one there.

23   Q.  But you weren't the only physician for the Eyman Complex;

24   isn't that true?

25   A.  It was just certain days.  There was -- I wasn't saying         15:51:54

1  that it was a prolonged period of time.  There were days I was

2  the only provider there, yes.

3  Q.  How many days?

4  A.  Oh, I don't know.  I don't know, five.

5  Q.  In what month did this -- do you remember what month it          15:52:20

6  was -- these occasions occurred when you were the only

7  provider?

8  A.  Yeah, when I first started.

9  Q.  So back in May?

10  A.  That's how I got pulled out of training.  That's why I          15:52:32

11  didn't get to complete my D.O.C. training.

12  Q.  And that was -- so that was in May when you say you were

13  the only provider?

14  A.  Yeah.

15  Q.  Okay.  Because there was -- there were other                    15:52:44

16  providers -- there was a provider on every yard for the Eyman

17  Complex, say, in August of 2017, wasn't there?

18  A.  August?  I don't know.

19  Q.  Natalya Weigel, do you remember her, nurse practitioner?

20  A.  Yes.                                                            15:53:04

21  Q.  Maureen Gay.  Do you remember Maureen Gay?

22  A.  Yes.

23  Q.  Betty Hahn, H-A-H-N?

24  A.  Um-hum.

25  Q.  That's a yes?                                                   15:53:16

1   A.  Yes.

2   Q.  Robert Parker?

3   A.  Oh, yeah.  But they got rid of him not long after that.  So

4   we were short again.

5   Q.  And Dr. Stewart was there in August of 2017?            15:53:29

6   A.  Yeah, but he wasn't really seeing patients.  He wasn't

7   really assigned to a yard, because he was still covering IPC,

8   which is kind of like the hospital part.

9         But yes, officially we were full staffed then, but we

10  weren't in May, according to Maureen.                       15:53:56

11  Q.  Do you remember Dr. Rowley?

12  A.  No, I never saw him.

13  Q.  You never asked Dr. Rowley for a consult on a patient?

14  A.  No, I didn't.  I saw Dr. Rowley's name.  He saw a patient I

15  think when I wasn't there.                                  15:54:25

16  Q.  Okay.  So if there was a Dr. Rowley that worked there, you

17  just didn't ever see him?

18  A.  Right.

19  Q.  Okay.  You testified earlier today that you were always on

20  the Cook yard.  I think you said that you had to go to        15:54:52

21  Meadows -- the Meadows unit one time because a patient had

22  chest pain; is that right?

23  A.  Right.

24  Q.  Is that the only time you had to go leave to treat somebody

25  at another unit?                                            15:55:11

Jan Watson - Cross-Examination

1    A.  As far as I can remember.

2    Q.  Okay.

3    A.  When I did go to other units, most of the time it was

4    scheduled.

5    Q.  You testified this morning with respect to problems getting    15:55:25

6    medications, and you talked about PharmaCor and how it worked.

7    Do you remember that?

8    A.  Yes.

9    Q.  You testified that -- correct me if I'm wrong, but it's my

10   recollection you testified that if you wrote -- to renew a       15:55:49

11   prescription at 22 days or 20 days, either one, it was denied;

12   is that right?

13   A.  That was my understanding.  It had to be day 21.

14   Q.  Okay.  Now, wouldn't you agree, Doctor, that it makes sense

15   if there's a rule that prohibits the renewal of a prescription,   15:56:11

16   say, 22 days out, or 23 days out, or 40 days out, that there's

17   a time frame that's appropriate in which you shouldn't be

18   renewing a prescription medication?  Wouldn't you agree?

19   A.  Let me clarify --

20   Q.  Okay.                                                         15:56:35

21   A.  -- how this works.

22        I would write a prescription, and the longest period

23   of time we could write one I think was for 120 days.  So the

24   nurses would be responsible for calling in or submitting the

25   refills on those medications.  Because they're only going to     15:56:58

UNITED STATES DISTRICT COURT

1   receive I think 30 -- a 30-day supply.

2        So it's not that I needed to write a prescription on

3   day 21.  The nurse needs to submit the refill on day 21.  If it

4   was written before that time -- I will say if it was written

5   before that time the prescription was not sent.                    15:57:31

6   Q.  So if it was written, say, 22 days, it wasn't going to be

7   sent?

8   A.  That's my understanding.  But that could be wrong.  If it

9   wasn't -- if it wasn't day 21, it didn't get sent.  Now, I

10  could be wrong about day 22.                                        15:57:51

11  Q.  All right.  And might you also be wrong that if the

12  prescription wasn't sent until day 20 that it wasn't filled,

13  might be you be wrong about that?

14  A.  No.  That is definitely clear.

15       The pharmacy tech explained to me, if it was there           15:58:07

16  before day 21 it did not get filled.  That I know is exactly

17  what she said.

18  Q.  And I'm sorry, perhaps I wasn't clear.  But if it was -- if

19  it was written or requested to be filled at, say, 20 or 19 or

20  18 days before the medication was going to run out, that          15:58:30

21  medication was still filled; true?

22  A.  No.

23  Q.  Okay.  So that's -- and that's what the pharmacy tech

24  explained to you?

25  A.  Yes.                                                          15:58:42

**Jan Watson – Cross-Examination**

1   Q.  And who was that pharmacy tech?

2   A.  At that time the pharmacy tech on Cook was Julia Owens.

3   Q.  Did you –– so Julia –– Miss Owens told you that if the

4   prescription was written within 21 days, it's not going to get

5   filled?                                                        15:59:04

6   A.  Not written.  If the nurse submitted the refill prior to 21

7   days, the medication would not be sent.

8   Q.  Okay.  And I'm asking you about on the other side of 21

9   days, like 20, 19, 18.

10  A.  Right.  That's before 21.                                  15:59:28

11          So from one day after the prescription was filled up

12  to day 20, any of those 20 days if the nurse submitted the

13  refill on any of those 20 days, it would not be refilled.

14  Q.  Okay.  Now, you testified this morning with respect to an

15  e-mail that mentioned –– I think it went out on October 9th,   16:00:15

16  2017, that mentioned seeking assistance from health care

17  providers to help reduce a backlog.  Do you remember that?

18  A.  Yes.

19  Q.  Okay.  And that was one of the ones you took a screen shot

20  of and provided to the reporter; right?                        16:00:34

21  A.  Yes.

22  Q.  Okay.  And was that one that you believed would somehow

23  come back to get you in trouble?

24  A.  I thought that documented the fact that I was not the only

25  person who got behind, and that we must be short providers.    16:00:52

1    You do not get that far behind without this being a more

2    chronic problem.  So that was my documentation that it wasn't

3    just me.

4    Q.  I see.  And what was your understanding of the term

5    "backlog," what did that mean?  To the individual --        16:01:19

6    A.  They had not been seen -- the chronic cares had not been

7    seen -- depending on what your disease process is, you're

8    supposed to be seen every three months or every six months or

9    once a year.  So included in those chronic care patients are

10   going to be people who should have been seen three, six months  16:01:41

11   or a year sooner and hadn't been seen.

12         The HNR requests were -- how fast were we supposed to

13   get those in?  I think we were supposed to get those seen

14   within two weeks, or 30 days.  I don't remember what the time

15   limit was on the HNR requests.                              16:02:05

16   Q.  Okay.  Might the individuals on the backlog include people

17   who were coming up on, say, their 180 days to be seen?  Maybe

18   they missed an appointment, but they were coming up on their

19   180 days and so that's why they were on the backlog list?

20         MR. FATHI:  Objection, calls for speculation.        16:02:28

21         THE COURT:  Overruled.

22         THE WITNESS:  I don't know.

23         MR. STRUCK:  Okay.

24         THE WITNESS:  You would have to ask Daniel Sego.

25         MR. STRUCK:  All right.                               16:02:36

UNITED STATES DISTRICT COURT

1          THE WITNESS:  He said, we are 800 behind.

2     BY MR. STRUCK:

3     Q.  And 800 would be for the Florence, Eyman -- both Florence

4     and Eyman facilities?

5     A.  Yes.                                              16:02:47

6     Q.  Okay.  And would you agree it's a good thing to try and

7     make sure that if there is somebody who needs to be seen, that

8     providers are called in to help to try and get that done,

9     rather than just let them wait and create a backlog and create

10    people who really are late with respect to their treatment?  16:03:09

11    A.  That's a good thing.  But it's even better if you don't

12    ever let it back up in the first place.

13    Q.  Okay.  You testified, I think this afternoon, regarding a

14    meeting that you attended where Lisa McNeal spoke.  Do you

15    remember that?                                        16:03:48

16    A.  Yes.

17    Q.  And Lisa McNeal is -- was one of ADC's monitors; right?

18    A.  Yes.

19    Q.  And she was the Eyman monitor, wasn't she?

20    A.  Yes.                                              16:03:58

21    Q.  Okay.  And Lisa McNeal had -- you had lots of conversations

22    with Lisa McNeal, didn't you?

23    A.  No.

24    Q.  You never spoke to Lisa McNeal other than that one time?

25    A.  I didn't speak to her then.                       16:04:10

1   Q.  Okay.  So she never tried to counsel you with respect to

2   your documentation being inappropriate or your documentation

3   not being sufficient?

4   A.  No.

5   Q.  Never?                                                           16:04:23

6   A.  No.  That's the first time I had ever seen her, that's why

7   I couldn't even remember what her first name was.

8   Q.  Isn't it true the purpose of that meeting was for

9   Miss McNeal to try and help the Corizon providers provide the

10  appropriate documentation in the records so they could get      16:04:36

11  credit for the care that they were providing their patients?

12  Isn't that true?

13          MR. FATHI:  Objection, calls for speculation.

14          THE COURT:  Overruled.

15          THE WITNESS:  She was there to tell us about           16:04:50

16  documentation that she would accept.

17  BY MR. STRUCK:

18  Q.  Okay.  So if there was documentation -- insufficient

19  documentation as far as Miss McNeal was concerned in the record

20  regarding treatment say that you were providing, she was trying  16:05:07

21  to tell you how to provide the appropriate documentation so

22  Corizon would get credit for the care that you were providing

23  the patients; correct?  Isn't that true?

24          MR. FATHI:  Objection, Your Honor.  She doesn't know

25  what Miss McNeal's intention was.                               16:05:28

Jan Watson – Cross-Examination

1          THE COURT:  Well, I'm going to overrule that

2    objection.

3          But the question is --

4          THE WITNESS:  The way --

5          THE COURT:  Hold just a second, ma'am.                16:05:39

6          So, ma'am, I've read the question, because when I

7    first heard it, to my ear it was difficult for me to

8    understand.  But I've read it now, and I think that what I

9    thought was the other reason that I was concerned about the

10   question that it was difficult to understand is not so valid,    16:06:48

11   because as I read it it does seem clearer to me.

12         So I'm going to ask the court reporter to read the

13   question back to you.

14         THE WITNESS:  Okay.

15      (Record read from page 202, line 18 to 23.)             16:07:25

16         THE WITNESS:  Correct.

17   BY MR. STRUCK:

18   Q.  Were you ever counseled by Dr. Stewart or anybody else at

19   Corizon regarding being disrespectful to staff?

20   A.  No.                                                    16:08:25

21   Q.  I'm sorry?

22   A.  No.

23   Q.  No?

24         So you were never counseled about putting your hand

25   in, say, Sara Neese's face?                               16:08:32

UNITED STATES DISTRICT COURT

**Jan Watson – Cross-Examination**

1    A.  No.

2    Q.  Asked not to do that?

3    A.  No, because I never did that.

4    Q.  Okay.

5    A.  I didn't put my hand in anybody's face.                    16:08:41

6    Q.  You didn't get along with Sara Neese, did you?

7    A.  Sara Neese and I really didn't have that much contact.

8    Q.  You didn't have any contact with her?

9    A.  I said we did not have much contact with Sara.  I actually

10   saw her physically one time.  The day they didn't schedule      16:09:13

11   patients for me and allowed me to do my ATPs, they sent me over

12   to the administration office to do that.  That was the first

13   and only time I had ever actually seen Sara.

14        And I don't have a problem with Sara.  I actually

15   thought she was the most pleasant one of the clinical          16:09:40

16   coordinators.

17   Q.  Okay.

18   A.  I liked Sara.

19   Q.  You only saw her one time, you say --

20   A.  I talked to her on the phone.                              16:09:52

21   Q.  You talked to her on the phone.  You had a lot of

22   communication -- e-mail communication with her as well?

23   A.  Yes.

24   Q.  And a lot of the communication you had with her was Sara

25   trying to get you to get your ATPs done; right?               16:10:04

**Jan Watson – Cross-Examination**

1    A.   Correct.

2    Q.   And that was something that happened several times --

3    A.   Yes.

4    Q.   -- right?

5         And I think you testified earlier about the importance    16:10:15

6    of doing -- getting the ATPs done as quickly as possible;

7    right?

8    A.   Right.   When you have the time.

9    Q.   Please take a look at Exhibit 367.

10        Do you see that?                                           16:11:28

11   A.   Yes.

12   Q.   Okay.   I think you may have even testified about this

13   earlier today.

14        This is an e-mail from Sara Neese to you regarding

15   compiling a list of things for you to complete.  Do you see    16:11:42

16   that?

17   A.   Yes.

18   Q.   Okay.  And it has some ATPs, and a need more information

19   that she wanted you to complete; correct?

20   A.   Correct.                                                   16:11:59

21   Q.   What is an RUQ?

22   A.   Right upper quadrant ultrasound.

23   Q.   Okay.  And she's asking you to complete that for one of

24   your patients; is that right?

25   A.   Yes.                                                       16:12:19

1  Q.  Okay.  And at the bottom of the e-mail she asks you to

2  respect your work -- she says, I respect your work and the time

3  and effort you put into your job, and I ask that you please

4  respect the time and effort that Martha and I put into ours to

5  get your requests completed on time.                      16:12:40

6       If you would like me to come over and assist in any

7  way, I'm more than happy to.

8       Thank you, Sara Neese.

9       Is that what that says?

10 A.  Yes.                                                  16:12:49

11       MR. STRUCK:  Okay.  I move for the admission of the

12 Exhibit 367.

13       THE COURT:  Any objection?

14       MR. FATHI:  Your Honor, it's already admitted as

15 Plaintiffs' Exhibit 13.                                   16:12:59

16       THE COURT:  367 is deemed admitted.

17       MR. STRUCK:  Let me take a look for a second.4.

18       THE COURT:  You want to make sure it's the same?

19       MR. STRUCK:  Of course it's the one on the bottom.

20       Your Honor, Exhibit 367 has some additional pages that 16:14:00

21 Exhibit 13 doesn't have.

22       THE COURT:  367, would you take a look at that,

23 Mr. Fathi, and see if there's any objection?

24       MR. FATHI:  Yes, Your Honor.  No objection to the

25 admission of 367.                                         16:14:18

1          THE COURT:  367 will be admitted as well.

2      (Exhibit No. 367 admitted into evidence.)

3          THE COURT:  If you would just pause for a moment and

4  not say anything for the record.

5      (Discussion held off the record.)

6          THE COURT:  The real driver of this train is the court

7  reporter.  And so when the judge inadvertently stops the

8  real-time reporting, and I need to turn to the court reporter

9  to do it, I had to impose this delay on you all.  And I'm

10 sorry, but it was pilot error on my part.                    16:16:46

11         MR. STRUCK:  That's okay.

12 BY MR. STRUCK:

13 Q.  So still looking at Exhibit 367, Doctor?

14 A.  Okay.

15 Q.  All right.  And 367, this is one of the examples of one of  16:17:04

16 the reminders that you would get to do -- that you needed to do

17 something like an ATP or an NMI; is that correct?

18 A.  Correct.

19 Q.  And can you tell us, what are the two pages -- the second

20 and third page of 367, what is that?                         16:17:24

21 A.  If I order a abdominal ultrasound on a patient with

22 hepatitis C, they then want us to go fill in all of this

23 information on this form to submit -- I'm not sure who it goes

24 to -- before they'll schedule an ultrasound.

25 Q.  And that was one of the issues on the e-mail that was sent  16:17:55

1    to you by Miss Neese, was that she wanted you to fill out that

2    form for one of your patients?

3    A.  Yes.

4    Q.  And that she would come over and help you if you needed

5    help; right?                                                    16:18:13

6    A.  Yes.

7    Q.  Okay.  Did you ever ask for her to come over and help you

8    with any of this -- these --

9    A.  No.  I had told them that when I am there it was not a good

10   time for them to come over, because I was so busy seeing        16:18:25

11   patients I didn't have time for them to explain.  So if they

12   would either call me when I'm at home on computer and explain

13   things to me, or if they would not schedule patients for me, if

14   they would set some time aside during the day where I didn't

15   have patients back to back, then come over.                     16:18:51

16   Q.  Okay.  Did you ever talk to any of them on the phone to

17   explain things to you when you were at home, as you just

18   described?

19   A.  They didn't want to do that.  So Stewart finally set aside

20   time where I didn't have to see patients, and they came over.   16:19:14

21   They did not want to do it with me being at home and them

22   talking me through it over the phone.

23   Q.  Okay.  And that "they" is Dr. Stewart?

24   A.  No, Martha Ramirez, the other clinical coordinator, she's

25   the one that said no.                                           16:19:33

**Jan Watson – Cross-Examination**

1   Q.  Did you ever ask Sara to come and help you?

2   A.  No, it was always Martha.  That's -- like I said, I didn't

3   run into Sara until later.  This was a Martha problem.

4   Q.  You testified earlier today with respect to having to get

5   morphine from Walgreens.  Do you remember that?          16:20:12

6   A.  Yes.

7   Q.  And I think you said that happened three times; is that

8   right?

9   A.  As far as I can remember.  It could be more.

10  Q.  Okay.  Did you know that during your tenure at Eyman, that  16:20:26

11  they only had to go to Walgreens nine times to refill

12  medications?  Does that sound about right?

13  A.  Okay.

14  Q.  No more than that?

15  A.  Okay.                                                  16:20:46

16  Q.  Does that sound about right to you?

17  A.  I just said three was all I could remember.  So you

18  admitted to more.

19  Q.  Okay.  So nine times they had to go to Walgreens to fill

20  the medication that they didn't have, that they needed for  16:20:59

21  their patients.

22  A.  Right.

23  Q.  And do you believe that's excessive?

24  A.  I didn't say that.

25  Q.  Okay.                                                  16:21:07

**Jan Watson – Cross-Examination**

1  A.  I was using that morphine problem as an example of a

2  continuing problem we have when your pharmacy is not right

3  there in town.  By having a pharmacy in another state it

4  creates multiple problems with getting medications.

5  Q.  But if you only had -- if Corizon only had to go to                16:21:31

6  Walgreens nine times during the period of time you were working

7  there, that doesn't sound like a big problem.

8  A.  That was one drug.  I said -- I used that as an example of

9  one of the problems by having a pharmacy in another state.

10 Q.  That -- actually nine times represents any time Corizon had   16:21:54

11 to go to Walgreens.

12        MR. FATHI:  Objection, Your Honor, counsel is

13 testifying.

14        THE COURT:  It sounds that way.

15        Sustained.                                                       16:22:07

16 BY MR. STRUCK:

17 Q.  Wouldn't you agree that that is the appropriate thing to do

18 if medication is needed, to have somebody go over to the local

19 Walgreens to get it?

20 A.  Yes.  But we shouldn't have to go to Walgreens.  We need to   16:22:33

21 have an on-site pharmacy.  I keep saying, I used it as one

22 example of medication problems.

23 Q.  Okay.  Did you ever complain to Dr. Stewart about the

24 problems with getting medication?

25 A.  Yes, I sent him an e-mail.                                          16:23:21

Jan Watson – Cross-Examination

1   Q.  With respect to the inmate that we were talking about

2   earlier with the broken hand, do you know what -- you don't

3   know what his outcome was, do you?

4   A.  No, I left.

5   Q.  You were gone by then; right?                          16:24:48

6   A.  Yes.

7   Q.  All right.  Would you take a look at Exhibit 16?  It's

8   admitted in evidence.

9          This is the patient with the seizures?

10  A.  Yes.                                                   16:26:08

11  Q.  Do you remember that testimony?

12  A.  Yes.

13  Q.  And if you take a look at the last page, 56, this form is

14  the Inmate Consultation Request that's a screen shot from -- is

15  that a screen shot from eOMIS?                             16:27:18

16  A.  Yes.

17  Q.  And this shows the dates on which there was a consultation

18  requested and what the priority was, what the service type is,

19  and the request status.  Do you see that?

20  A.  Yes.                                                   16:27:42

21  Q.  Okay.  And in this particular case on October 2nd, 2017, it

22  says alternative treatment accepted.  Do you see that?

23  A.  Yes.

24  Q.  Okay.  Do you know what that alternative treatment was?

25  A.  No.                                                    16:28:01

—— Jan Watson – Cross-Examination ——

1   Q.  No?

2   A.  Do we have it here?

3   Q.  This was plaintiffs' exhibit.

4        Is this the complete medical record of this patient?

5   A.  I found one note on page 51 dated October 19th that says      16:28:52

6   alternative treatment accepted.  Then it says reason, see

7   comments.  And I don't have the comments.

8        And whatever the alternative treatment was, it is

9   accepted by Dr. Stewart on the 19th.

10  Q.  And that says October 19th.                                   16:29:18

11  A.  Yes, on October --

12       THE COURT:  Doctor, before you read more, can you pull

13  your microphone closer?

14       THE WITNESS:  Oh, I'm sorry.

15       On October 11th there is a note that alternative           16:29:30

16  treatment was recommended.  And on the 11th as well I

17  submitted -- it looks like I submitted more information.

18       And this is on page 52?

19  BY MR. STRUCK:

20  Q.  Yes.                                                          16:30:04

21       And that was on October 11th.  And then on October

22  19th it looks like Dr. Stewart accepted your alternative

23  treatment that you recommended on the 11th.  Is that right?

24  A.  I can't recommend alternative treatment.  The utilization

25  doctors do it.  They make the ATP recommendations, and I either   16:30:19

—— Jan Watson – Cross–Examination ——

1    accept it or dispute it.

2    Q.   Does it show here whether you disputed it?

3    A.   Well, on October 11th I submitted more information.

4         What he accepted on October 19th, I don't know, I

5    wasn't there.                                                    16:30:43

6    Q.   You were gone, I think, what, on -- was it the 12th?

7    A.   12th.

8    Q.   Okay.  Do you know if that particular patient received a

9    helmet to protect his head?

10   A.   On the health needs request that was made -- oh, am I in   16:31:23

11   the right place?

12        16, wasn't it?

13   Q.   Yes.

14   A.   He submitted a health needs request on October 30th stating

15   that he needed a helmet.  So he didn't have one by October       16:31:52

16   30th.

17   Q.   And you weren't there so you don't know if he got one.

18   A.   Correct.

19   Q.   Let me refer you to Exhibit 18 that's in evidence.  This is

20   the patient with cerebral palsy?                                 16:33:00

21   A.   Yes.

22   Q.   And if you would, turn please to -- it's the last page of

23   Exhibit 18.

24        Are you there?

25   A.   Yes.                                                        16:33:29

Jan Watson – Cross-Examination

1   Q.  Do you see, it shows that he received -- he went to the

2   physical medical rehab that was scheduled -- or requested on

3   July 14th and on August 22nd.  Do you see that?

4   A.  Yes.

5   Q.  Is that where you say he went to the wrong --                    16:33:53

6   A.  They sent him to physical therapy.

7   Q.  Do you see on October 4th, 2016, there was -- sent to the

8   physical therapy -- physical therapy therapeutic exercises, and

9   that the consult was completed.  Do you see that?

10  A.  Yes.                                                             16:34:18

11  Q.  That was actually the correct physical therapy that you

12  were talking about, isn't it?

13         MR. FATHI:  Objection, Your Honor.  This was before

14  her time.  She has no knowledge.

15         THE COURT:  Is that true, Mr. Struck?                         16:34:29

16         MR. STRUCK:  You know what, I'm sorry, Your Honor, I'm

17  looking at the wrong year, it's the 16th.

18         THE WITNESS:  Right.  I did see the report from that.

19  And it was, once again, USA Physical Therapy that's in his

20  record.  He did not see physical medicine and rehabilitation.       16:34:50

21  BY MR. STRUCK:

22  Q.  If you would turn, please, to page 120 of Exhibit 18.  And

23  that's dated 11-26, it says 2117.  Is it fair to say that

24  that's 2017, that date?

25  A.  October 26?                                                      16:35:22

───── Jan Watson – Cross-Examination ─────

```
 1   Q.  I'm sorry.  It says 11-26, it says 2117.

 2   A.  I'm on the wrong page.

 3           MR. FATHI:  I'm sorry, could we have a page number?  I

 4   think I'm on the wrong --

 5           THE COURT:  Everybody's a little off page here again,    16:35:35

 6   Mr. Struck.

 7   BY MR. STRUCK:

 8   Q.  I'm sorry.  It's Exhibit No. 18, page 20, or EVHG0120.

 9   A.  Okay.  120.  And at the top does it say clinical orders?

10   Q.  Yes.                                                         16:35:54

11   A.  Okay.  And it says encounter date October 26, 2017?

12   Q.  Well --

13           THE COURT:  Mr. Struck, why don't you approach,

14   please --

15           MR. STRUCK:  Certainly.                                  16:36:05

16           THE COURT:  -- the witness and point out, and then

17   once you're done that return to Mr. Fathi and show him what

18   you've shown the witness.

19       (Discussion held off the record.)

20           MR. FATHI:  May I approach, Your Honor?                  16:36:27

21           THE COURT:  You may.

22           THE WITNESS:  His page is all messed up.  I'm sorry.

23       (Discussion held off the record.)

24           THE WITNESS:  And yours is the only one that's like

25   that.                                                           16:36:52
```

─────────── **Jan Watson – Cross-Examination** ───────────

1   BY MR. STRUCK:

2   Q.  Well, let me ask you about your document, as I just saw it.

3   It's a clinical order dated 10-26-2017?

4   A.  Correct.

5   Q.  Okay.  And that shows that a pair of deluxe forearm          16:37:06

6   crutches was ordered; is that right?

7   A.  Yes.

8   Q.  Okay.  And those were the crutches that you were

9   prescribing for this patient; correct?

10  A.  Yes.  But they had been ordered months ago.                  16:37:22

11  Q.  Okay.  But it looks like the patient got them.

12  A.  Do we know that he received them?  This says the order.

13  Q.  Yes.  This is the clinical order for those crutches.

14          Your testimony was that nobody knew -- earlier today,

15  nobody knew how to order them, and that was where your           16:37:47

16  testimony ended.

17  A.  No, no, no.  I said -- and it will be on here -- we have

18  been trying for four months.  So they had been ordered more

19  than once starting four months ago, but no one has been able to

20  find them.                                                       16:38:08

21  Q.  Okay.  And -- but this order shows that somebody found them

22  and ordered them on 10-26-2017.

23  A.  No.

24  Q.  What does that show?

25  A.  It shows that they ordered them for at least the third       16:38:21

Jan Watson - Cross-Examination

1    time.  Those forearm crutches were first ordered by Maureen

2    Gay, the nurse practitioner.  Then several months after she

3    ordered them, I ordered them.  And the fact that they got

4    ordered again in October 26th, I would assume that he still had

5    not received those forearm crutches.                          16:38:48

6    Q.  Okay.  Earlier today -- can you take a look, please, as

7    Exhibit 18, page 19?

8         MR. STRUCK:  Your Honor, may I approach and make sure

9    we're looking at the same thing?

10        THE COURT:  You may.                                      16:40:03

11      (Discussion held off the record.)

12   BY MR. STRUCK:

13   Q.  Page 19 of Exhibit 18, do you see where it says

14   under -- it's a SOAP note; is that right?

15   A.  Yes.                                                       16:40:36

16   Q.  Okay.  And it says, notes, inmate received a set of deluxe

17   forearm crutches.  Do you see that?

18   A.  Yes.

19   Q.  Okay.  And that would indicate to you, wouldn't it, that

20   this inmate received the crutches?                             16:40:54

21   A.  That he finally got them.

22   Q.  Okay.

23        THE COURT:  Can you tell what date he received them

24   from this?

25        THE WITNESS:  Well, it looks -- this is on the 26th.      16:41:05

UNITED STATES DISTRICT COURT

Jan Watson – Cross-Examination

1    And it says --

2              THE COURT:  It says 26, 2018, but it looks like the

3    date they're approved to.  It says crutches until --

4              THE WITNESS:  Right.  Here, 10-26-17, the CNA states

5    that the crutches were given to the inmate.                    16:41:29

6              THE COURT:  Okay.  Thank you.

7    BY MR. STRUCK:

8    Q.  Would you take a look at -- earlier today, do you remember

9    your testimony regarding the HIV infectious disease specialist

10   that you were trying to send -- you were trying to send the HIV   16:42:20

11   patient to an outside specialty provider, an infectious disease

12   specialist.  Do you remember that?

13   A.  Yes.

14   Q.  Okay.  And Mr. Fathi asked you about an e-mail -- about an

15   e-mail that was sent to you by Sara Neese that talked about it   16:42:38

16   costing Corizon a thousand bucks because we don't have an

17   infectious disease specialist, outside specialty consult.  Do

18   you remember that?

19   A.  Yes.

20   Q.  Okay.  What he didn't show you was the next -- the e-mail   16:42:58

21   that you sent the next morning.  You sent an e-mail the next

22   morning to Sara Neese, didn't you?

23   A.  Okay.  Well, show it to me.

24   Q.  All right.  Why don't you take a look at Exhibit 10,

25   Plaintiffs' Exhibit 10.                                        16:43:17

UNITED STATES DISTRICT COURT

**Jan Watson − Cross−Examination**

1   A.   Okay.

2   Q.   And is that -- do you see that there's an e-mail there

3   dated September 19th, 2017, from you to Sara Neese --

4   A.   Yes.

5   Q.   -- at 7:43 a.m.  Do you see that?                    16:44:00

6   A.   Yes.

7   Q.   Okay.  And you state -- and this was the next day after

8   Sara Neese had told you to cancel that specialty appointment.

9   Do you remember that?

10  A.   Okay.                                                16:44:13

11  Q.   Well, we can look at that if you want.  We were talking

12  about --

13  A.   Okay.  Okay.

14  Q.   And so the next day -- the next morning you sent an e-mail

15  to Sara saying, if you don't have an infectious disease        16:44:22

16  specialist to see patients with HIV, to whom should they be

17  referred?

18        That was your question to her, wasn't it?

19  A.   Yes.

20  Q.   And her answer was, per Dr. Stewart we have a Corizon     16:44:32

21  infectious disease provider that we can consult.  And I will

22  ask Dr. Stewart to let you know where to contact them.

23  A.   Okay.

24  Q.   Was that the response?

25  A.   Yes.                                                 16:44:47

**Jan Watson – Cross-Examination**

1   Q.  Okay.  So Sara Neese was telling you that you could refer

2   the HIV patient -- or you could contact the Corizon infectious

3   disease specialist to assist you in providing care to the

4   inmate with HIV.

5   A.  Yes.                                                         16:45:07

6        MR. STRUCK:  Okay.  Your Honor, move to admit Exhibit

7   10.

8        THE COURT:  Any objection?

9        I thought it was received, but I could be wrong.

10       MR. FATHI:  I'm sorry?                                      16:45:13

11       THE COURT:  Any objection?

12       MR. FATHI:  No, Your Honor.

13       THE COURT:  All right.  Thank you.

14       It will be received.

15      (Exhibit No. 10 admitted into evidence.)                    16:45:22

16   BY MR. STRUCK:

17   Q.  And this was on September 19th, 2017.  Did you -- did you

18   ask Dr. Stewart or contact Dr. Stewart with respect to who --

19   how you can contact the Corizon infectious disease provider?

20   A.  I didn't call him.  Sara said she would tell him to tell me 16:45:46

21   who it was.  And he never told me that we had anybody.

22   Q.  Okay.  Did you -- other than this e-mail, did you ever

23   follow up with Sara or Dr. Stewart or anybody else with respect

24   to how you could contact this Corizon infectious disease

25   provider?                                                       16:46:07

**Jan Watson – Cross-Examination**

1    A.  Not that I remember.

2    Q.  Okay.  Did you provide this e-mail to the reporter who was

3    writing the story about Corizon and only included the e-mail on

4    September 18th in his article?

5    A.  This particular one that you just read?                          16:46:31

6    Q.  Yes, ma'am.

7    A.  No.

8    Q.  Okay.

9    A.  I don't think so.

10   Q.  Look at Exhibit 17, please, Doctor.                              16:46:38

11        These are the records of the patient who had the

12   cardiac issue that you testified about earlier.

13        I'm sorry, I'll wait for you to find it.

14   A.  I think its label fell off.

15        MR. STRUCK:  Let me try and help her out.                       16:47:59

16        THE COURT:  Please.

17     (Discussion held off the record.)

18   BY MR. STRUCK:

19   Q.  Okay.  And this particular patient when he was

20   at -- actually did receive -- if you will turn to 37 up at the       16:48:54

21   top, Exhibit 17, page 37.

22        Are you there?

23   A.  I am --

24   Q.  And I'm looking at --

25        THE COURT:  She's not there.                                    16:49:20

UNITED STATES DISTRICT COURT

1          THE WITNESS:  I have a 57.

2          THE COURT:  Hold on.  37 -- right there, the lower

3    part.

4          THE WITNESS:  They're real dark.

5          Okay.  Got you.                                    16:49:39

6    BY MR. STRUCK:

7    Q.  All right.  And do you see there's the SOAP note written

8    there under subjective?

9    A.  Yes.

10   Q.  It states that he underwent a heart catheter with stenting. 16:49:53

11         Do you see that?

12   A.  Yes.

13   Q.  Okay.  And so that was treatment that he received as a

14   result of his heart condition; correct?

15   A.  Yes.                                                  16:50:10

16   Q.  All right.  And is it your testimony that there was

17   additional surgery that could have been performed with respect

18   to this patient's heart condition?

19   A.  That is not what we -- I said.

20   Q.  Okay.                                                 16:50:36

21   A.  If you find the page where the consultation while he was in

22   the hospital is written.

23   Q.  Yes.

24   A.  Whatever page that is.  Just a sec.

25         Okay.  Page 14.                                     16:50:59

1   Q.   Right.

2   A.   It states there that Dr. Stein felt that he would benefit

3   from medical therapy or a combination of stenting and medical

4   therapy.

5   Q.   And it says, I believe that surgical revascularization          16:51:23

6   would not give him a longevity benefit.

7          Do you see that?

8   A.   Yes, I read that this morning.

9   Q.   Okay.  And he didn't believe that his LAD was bypassable --

10  was a bypassable area as there is disease throughout the entire    16:51:44

11  vessel, and he would not benefit from bypass.

12         Do you see that?

13  A.   Yes.  And do you see where it says the circumflex could be

14  bypassable?

15  Q.   Who wrote the SOAP note on page 37, which physician?          16:52:28

16  A.   Dr. Stewart.

17  Q.   Okay.  And was this SOAP note written after you said that

18  he told you to -- I think you said just let him die?

19  A.   This was before.  This was his discussion with the patient

20  about there was nothing to be done.                                16:53:01

21  Q.   Okay.  And then after that is when you say that Dr. Stewart

22  told you to just let him die?

23  A.   Yes.

24  Q.   All right.  And did you report that to anybody, besides the

25  reporter?                                                          16:53:16

1    A.  No.

2    Q.  No?

3            Why didn't you?

4    A.  Who was I going to report it to?

5    Q.  The Medical Board, somebody higher up at Corizon.  You say        16:53:25

6    it really -- it bothered you so much that it caused you to

7    quit.

8            MR. FATHI:  Is there a question here?

9            THE COURT:  I think there is -- do you understand the

10   question?                                                            16:53:40

11           THE WITNESS:  I thought about reporting it to the

12   Medical Board, but I didn't.

13   BY MR. STRUCK:

14   Q.  You didn't.

15   A.  At that point I thought I would report him to the people          16:53:48

16   who were monitoring the care.  The medical care in the prisons

17   was already being monitored.  I thought they should know.

18   Q.  Did you report that?

19   A.  I tried.

20   Q.  How?                                                              16:54:04

21   A.  I called the ACLU office.

22   Q.  Okay.  Did you report it to ADC?

23   A.  No.

24   Q.  Did you send an e-mail to anybody saying, hey, this is

25   going on at ADC?  How about the monitor at the site, did you          16:54:18

**Jan Watson – Cross-Examination**

1    report it to them?

2    A.  No.

3    Q.  Okay.  So you tried calling the ACLU, and you didn't

4    get -- they wouldn't speak with you?

5    A.  Right, because they thought I was a Corizon employee.        16:54:33

6    Q.  Who did you speak with?

7    A.  I don't remember the name of the attorney who answered the

8    phone, but he said they could not speak with -- the attorneys

9    involved in the case could not speak with me.

10   Q.  So the only one you reported it to was -- after you'd left   16:54:53

11   the employ with Corizon, you reported it to the KJZZ reporter.

12   That was the first person you reported it to?

13   A.  I actually tried again to contact the ACLU, and they would

14   not return my calls.  I then called doctor -- doctor --

15   Judge Duncan's office, and they gave me the name of another      16:55:24

16   attorney.  And I called her office twice and she would not call

17   me back.  And that's when I contacted Jimmy to ask him if he

18   knew how I could get in contact with someone.

19        I did not contact anyone above Stewart at Corizon

20   while I was there because I did not believe anything would be    16:55:51

21   done.

22   Q.  Why didn't you contact them after you left?

23   A.  I didn't think anything would be done.

24   Q.  Why didn't you contact anybody at ADC?

25   A.  I didn't think anything would be done.                       16:56:05

1   Q.  Why would you think that?

2   A.  All of this substandard care had been going on for some

3   time, and they had not done anything about it then, so why

4   would I have any confidence that they would do something about

5   this?                                                              16:56:30

6   Q.  What did you report to ADC that you believed was

7   substandard?  Give me one example.

8          MR. FATHI:  Objection, Your Honor, argumentative.

9          THE COURT:  Ma'am, the question is a fair question.

10  The tone is objected to, but the question is a fair one.  And   16:56:43

11  it is, what did you do to report to ADC that you believed was

12  substandard?  Give me one example.

13         THE WITNESS:  I didn't report anything in particular

14  to ADC.  They -- the correctional officers see what's going on.

15  The warden knew about me trying to do some pain management with  16:57:12

16  just medical ice, and I was told I couldn't renew medical ice

17  anymore.

18         So to me the things that go -- were going on there

19  were known.

20  BY MR. STRUCK:                                                    16:57:36

21  Q.  Medical ice, and you said that somebody knew about you

22  trying to do pain management?

23  A.  With ice, yeah.

24  Q.  With ice.

25         That's it?  Is there any other examples besides the       16:57:49

1    ice?

2    A.  I could sit here until next week and list all of the things

3    that they do on a regular basis there that were just

4    substandard.  To me it is known about these things.  And so I

5    saw no advantage to reporting to them stuff they already knew.        16:58:15

6            Now, one of the nurse practitioners who was very

7    uncomfortable with things, she was going to report things to

8    higher ups at Corizon.  And I told her, I'm concerned Corizon

9    already knows and will not do anything about it.  I am going to

10   report them to the ACLU.  And that's what I tried to do.              16:58:41

11           But I had to go through the reporter to finally get to

12   the ACLU.

13   Q.  You didn't have to go to the reporter, you could have gone

14   to somebody at Corizon and said, hey, this doctor just said

15   just let him die.                                                     16:59:00

16           MR. FATHI:  Objection, Your Honor, counsel is

17   testifying, and it's argumentative.

18   BY MR. STRUCK:

19   Q.  Could you have?

20           THE COURT:  It's been asked and answered.                     16:59:07

21           Sustained.

22   BY MR. STRUCK:

23   Q.  You have an ethical obligation, don't you, as a doctor to

24   make sure that patients receive the care that you believe is

25   appropriate; right?                                                   16:59:17

1    A.  And that's why I did something totally different than what

2    he told me to do.  I would not stand there and let a patient

3    die.  So if he wanted him to die, he was going to have to come

4    down there and do it.

5    Q.  And you gave this patient nitroglycerin?                    16:59:33

6    A.  Yes.

7    Q.  And do you know whether or not he had an allergy to

8    nitrates?

9    A.  He didn't say that he had an allergy.

10   Q.  Okay.  Did you look back in his records to see if he had an  16:59:45

11   allergy to nitrates?

12   A.  Yes.  And he already had nitroglycerin ordered, it just

13   wasn't KOP.

14   Q.  But it's fair to say, you could have contacted somebody at

15   ADC about this; right?                                          17:00:03

16          MR. FATHI:  Your Honor, this has been asked and

17   answered a number of times.

18          THE COURT:  Last time, Mr. Struck.

19   BY MR. STRUCK:

20   Q.  You could have done that; right?                            17:00:12

21   A.  I could have, but I didn't because I didn't think they

22   would act upon the information.

23   Q.  Because of the ice issue?

24          THE COURT:  No, Mr. Struck, that's an unfair question

25   and it's beyond the bounds of the grace that I gave you.        17:00:23

Jan Watson – Cross-Examination

```
 1              You don't need to answer that question.
 2    BY MR. STRUCK:
 3    Q.  Let me ask it this way:  Give me some basis, besides what
 4    you testified about the ice, that led you to believe that you
 5    couldn't contact anybody at ADC about a patient that you          17:00:42
 6    thought there was viable treatment for but Dr. Stewart told you
 7    to let him die.
 8              MR. FATHI:  Objection, asked and answered.
 9              THE COURT:  Sustained.
10              Mr. Struck, what amount of time do you believe you      17:01:05
11    have remaining for your examination?
12              MR. STRUCK:  I probably have another half hour.
13              THE COURT:  Dr. Watson, the time has come when it is
14    appropriate for the Court to conclude its business for the day.
15    The imposition of that is on witnesses who are subpoenaed to      17:01:27
16    the court need to return to the court the next time that the
17    Court can do that.
18              And I am now going to talk with the lawyers about
19    that, and to see what is possible, then will talk with you
20    about what's possible with your schedule.                         17:01:45
21              THE WITNESS:  Okay.
22              THE COURT:  Now, Mr. Struck, if you need a half hour
23    more, I need to then ask the plaintiffs what they need for any
24    possible redirect.
25              MR. FATHI:  Your Honor, at this point I think I have     17:01:56
```

UNITED STATES DISTRICT COURT

1    no more than ten minutes of redirect.

2         THE COURT:  All right.  So the options are to do it

3    first thing tomorrow morning or to set it for another day.

4         Let me first inquire of the witness whether she has an

5    availability tomorrow morning at 9:00.                          17:02:11

6         THE WITNESS:  I have a short period of time.

7         THE COURT:  So if we had you gone by 10:00 o'clock

8    you'd be okay?

9         THE WITNESS:  Yes.

10        THE COURT:  So that's what we will do, ma'am.  I will    17:02:25

11   ask you to come back tomorrow morning at 9:00, and we will have

12   you out of here by 10:00, because the lawyers have told me that

13   the collective amount of time they need is ten minutes plus a

14   half hour.  And if I have any questions, I won't go beyond ten

15   minutes.                                                        17:02:45

16        So we'll make sure that you're done by 10:00 o'clock.

17        Thank you very much.

18        THE WITNESS:  Okay.

19        THE COURT:  You may step down from the witness stand

20   and leave the courthouse this afternoon as you wish.           17:02:52

21        So a couple of things then to address before we

22   conclude today.

23        Because we don't know exactly -- well, I'm going to

24   allow you all to deliberate and meet and confer, if necessary,

25   about the remaining testimony that needs to be taken on the    17:03:16

1    foundation of the monitoring program, and we will address that

2    tomorrow morning after we conclude with Dr. Watson.

3         There are a couple of things that I hope can be fixed

4    overnight.  And that is, I've asked you repeatedly when

5    exhibits are available to have -- well, have an additional set          17:03:42

6    available for court staff.  And that is for the -- for the

7    Court's law clerk and for the staff attorney who is assisting

8    the Court in the case.  That's because it's important for

9    people who are involved in the case itself to be as readily

10   engaged with what's happening at the moment.                           17:04:03

11        And I have been informed that no such set was made for

12   today's exhibits.  That is contrary to what I've asked about.

13        Mr. Fathi is giving me an expression as if they've --

14   that maybe it's under a desk someplace here and we just didn't

15   notice where it is.                                                    17:04:22

16        MR. FATHI:  Your Honor, I'm informed that each folder

17   has three copies.  So it was our understanding that was what

18   the Court wanted.

19        THE COURT:  Actually what's handy is what you've done

20   for me, and that is you've provided for me a separate set.  So         17:04:33

21   it would be very handy to have a separate set for the staff

22   attorneys.

23        And, Mr. Struck, I don't know whether there's any

24   explanation you have that's similar to that or different.

25        MR. STRUCK:  I don't know the explanation.  I recall             17:04:47

1    the Court's request on that.

2          One thing I think that might streamline the process,

3    we can do these exhibits electronically, but the plaintiffs

4    objected because they were fearful of somebody in the gallery

5    seeing the name of one of the patients on --                    17:05:06

6          THE COURT:  Right.  And the issue was raised how to

7    keep it off the screens that are at counsel table.  And that's

8    a problem, it is approximate, and it is an issue.  So it's a

9    legitimate concern.  It's one that is -- when I'm weighing all

10   the factors, the fact that we have dealt with paper for so     17:05:23

11   long, and also the Court's experience is often times the paper

12   just works a lot easier, in any event.

13         So we'll go ahead with paper for now for that reason.

14         So, unless there's anything else that needs to be

15   raised now, we'll take up Dr. Watson at 9:00 a.m., conclude    17:05:38

16   with her no later than 10:00.  And then at 10:00 we'll start

17   the order to show cause where the defendants are to show cause

18   why the contempt sanction of the October -- the October 10th,

19   2017, should not be imposed in this case.

20         Anything further from plaintiffs?                         17:05:58

21         MR. FATHI:  Yes, Your Honor.  Simply that Mr. Upton,

22   whose presence you ordered from the Florence prison, will be

23   coming tomorrow.  And so we would ask that he could go on

24   immediately after Dr. Watson, if that's possible.

25         THE COURT:  All right.  Any objection to that,            17:06:13

CV-12-601-PHX-DKD – February 27, 2018

1    Mr. Struck?

2            MR. STRUCK:  No, Your Honor.

3            THE COURT:  Okay.  Anything from the defendants?

4            MR. STRUCK:  No, Your Honor.

5            THE COURT:  All right.  Thank you all.                    17:06:19

6            And I appreciate everybody in this room's

7    concentration today through a very long proceeding, and the

8    fact that we asked you to give up some of the normal breaks so

9    that we could get through it all.

10           Thank you.                                                17:06:30

11       (Proceedings concluded at 5:06 p.m.)

12

13                            -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

CV-12-601-PHX-DKD – February 27, 2018

1

2

3

4                        C E R T I F I C A T E

5

6           I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9           I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 28th day of February,

15   2018.

16

17

18

19                          s/Candy L. Potter_____
                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25