# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

———————————

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>          Plaintiffs,<br><br>    vs.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their Official capacities,<br><br>          Defendants.<br>——————————————————— | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. **CV-12-00601-PHX-DKD**

Phoenix, Arizona
March 14, 2018
9:07 a.m.


**BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**EVIDENTIARY HEARING/ORDER TO SHOW CAUSE**</u>
**Day 3**
(Pages 461 through 684, inclusive)


Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                      **A P P E A R A N C E S**

3   For the Plaintiffs:
             PRISON LAW OFFICE
4            By:  **Corene Kendrick, Esq.**
             1917 5th Street
5            Berkeley, CA 94710

6            ACLU – Washington DC
             By:  **David C. Fathi, Esq.**
7            915 15th Street NW
             7th Floor
8            Washington, DC 20005

9            EIDENBACH LAW PC
             By:  **Kirstin T. Eidenbach, Esq.**
10           P.O. Box 91398
             Tucson, AZ 85752
11
             ARIZONA CENTER FOR DISABILITY LAW – Phoenix, AZ
12           By:  **Maya Stock Abela, Esq.**
             5025 East Washington Street
13           Suite 202
             Phoenix, AZ 85034
14
     For the Defendants:
15           STRUCK LOVE BOJANOWSKI & ACEDO PLC
             By:  **Rachel Love, Esq.**
16           By:  **Jamie Dennise Guzman, Esq.**
             By:  **Timothy Michael Ray, Esq.**
17           By:  **Ashlee B. Hesman, Esq.**
             3100 W. Ray Road
18           Suite 300
             Chandler, AZ 85226
19

20

21

22

23

24

25

1

2                              **I N D E X**

3   **WITNESS:**            **DIRECT**    **CROSS**      **REDIRECT**  **RECROSS**

4   RODNEY STEWART
    By Ms. Love          483

5

6   Report by Mr. Millar            628

7   RODNEY STEWART
    By Ms. Love          651

8

9

10

11                       **INDEX OF EXHIBITS**

12  **EXHIBIT**                              **IDENT**   **RECEIVED**

13  14       H. medical records            623

14  15       L. medical records            657

15  16       O. medical records            613

16  17       R. medical records            667

17  18       S. medical records            652

18  338      9-10-17 email from
             Glen Babich to Rodney Stewart   604

19
    363      9-5-17 email from Mary Marino
20           to Rodney Stewart               588       592

21  397      9-9-17 email from Daniel Sego
             regarding Operation Backlog     675

22
    645      eOMIS records for D.O.          598       601
23

24

25

1        (Proceedings begin at 9:07 a.m.)

2            THE CLERK:  Civil case number 12-601, Parsons, et al,

3   versus Ryan, et al, on for status hearing.

4            THE COURT:  Would counsel please announce.

5            MR. FATHI:  Good morning, Your Honor, David Fathi of          09:07:34

6   the ACLU National Prison Project for the plaintiff class.

7            THE COURT:  Thank you.  Good morning.

8            MS. KENDRICK:  Good morning, Your Honor, Corene

9   Kendrick from the Prison Law Office for the plaintiff class.

10           THE COURT:  Thank you.  Good morning.                         09:07:46

11           MS. EIDENBACH:  Good morning.  Kirsten Eidenbach for

12  the plaintiff case.  And behind me is Maya Abela from the

13  Arizona Center for Disability Law.

14           THE COURT:  Welcome and good morning.

15           MS. LOVE:  Your Honor, good morning.  For defendants,        09:07:54

16  Rachel Love, Jamie Guzman, Timothy Ray, and appearing later

17  today will be Ashlee Hesman.

18           THE COURT:  All right.  Thank you very much.

19           I told you all last time -- well, actually -- yeah, I

20  told you all last time that I was perfectly happy with you all       09:08:05

21  setting the agenda for the three days that we have this month,

22  and you have done that and I appreciate it.  But I'm going to

23  interject just a moment so that I can at the very start take

24  just a couple of minutes to explain to you something that I

25  think that the parties are entitled to know, and that is what        09:08:24

1    the judge's perspective is presently.

2           I have from the bench said before that there are times

3    where there are no words, and I haven't provided to you the

4    kind of understanding that I think people are entitled to have,

5    and that is, what is the judge thinking about?                        09:08:46

6           Oftentimes the court is limited in certain kinds of

7    cases because there is so much going on that we address

8    individual issues in orders.  And the parties present those to

9    the court and the court issues its ruling.  And it's

10   appropriately very narrowly tailored to what that instant case      09:09:07

11   and controversy is.

12          But in a case that has an omnibus characteristic to

13   it, as this does, and that is a major involvement in a great

14   activity of the State, I think it's also fair for the parties

15   to have an understanding of what the judge's perspective is,       09:09:28

16   even if it's not definitive at that moment, an understanding of

17   what the preliminary view is so that they can anticipate not

18   only their responses to the judge's position, but also

19   anticipate conduct in the future if it turns out that that

20   preliminary view is one that is likely to become effective in      09:09:50

21   the application in individual orders.

22          And this discussion this morning is animated from my

23   perspective of what we will see this afternoon from Mr. Millar.

24   He provided to all of the parties and to the Court in advance

25   his preliminary numbers with respect to staffing issues that       09:10:15

1   are presently -- well, not presently, but staffing issues that

2   are present, but also historical.

3        And in particular it looks, from my read of it, that

4   what is revealed for 2017 is consistent with what I had

5   intimated was the motivation for wanting to find out from the        09:10:41

6   expert about staffing, and that is, my preliminary

7   understanding, an understanding that I don't think was

8   particularly erudite or novel or anything but obvious, and that

9   is that it was a staffing problem.  That we were not getting

10  the health care that was required by the stipulation because        09:11:04

11  there weren't enough people to provide it.

12       Now the stipulation prohibits me from ordering the

13  State to build new prisons or to hire a particular kind or

14  number of staff.  But I have explained to you in the past that

15  I believed that that limitation on staff did not apply if the        09:11:22

16  State itself had already agreed.

17       And the State has throughout this process, as part of

18  its remediation measures, talked to me about staff issues and

19  talked to me about frustrations associated with trying to fill

20  up those positions.                                                   09:11:40

21       And so I think if the State has decided it needs to

22  have ten people to do this, and for an entire year it has had

23  five, and it hasn't been able to get five, or for many months

24  it has had zero when it said it should have people in that

25  position, that's the State deciding to do it, telling me that        09:11:56

1    they're anxious to do it, and we have to figure out a way to

2    get there.

3            I don't know whether that's ultimately going to be the

4    order of the Court.  But I think people need to know what my

5    perspective is when I read the report that Mr. Millar has          09:12:10

6    provided to us in advance, and will show on the record here

7    today in his presentation.

8            It is preliminary, of course, but it looks like we're

9    on the road to affirm what has been obvious, and that is, it is

10   a staffing issue.                                                  09:12:27

11           That's important for the defendants to know about,

12   because I understand that they're currently in negotiations for

13   a contract to renew for the contractor.

14           It's also important for the State as it addresses its

15   budgetary issues in the legislature.  They need to know that      09:12:42

16   there is down the road here the possibility that the judge in

17   the case will order that this happen.

18           Now, there are limitations that the State has imposed,

19   perhaps on itself, that affect how it is able to procure health

20   care.  And I've heard about a couple of them on the record        09:13:05

21   here.

22           I've heard about the legislature having deemed that

23   outside providers can only be paid at AHCCCS levels.  And I've

24   heard it suggested that that is a complication with respect to

25   obtaining those services.                                         09:13:22

CV-12-601-PHX-DKD – March 14, 2018

1        I've heard also about the fact that rural areas --

2    prison areas in rural areas are difficult to staff and that

3    maybe there needs to be a premium on what's paid.  I don't know

4    whether that's going to pan out or not.

5        But those are decisions that are made by contractors          09:13:36

6    and are made by the State of Arizona under state law.

7        We are in Federal Court, and there is Article VI,

8    Clause 2, the Supremacy Clause.  What that means is in this

9    country from its founding we embraced the idea that most of the

10   decisions should be made by the states.  And that was            09:13:58

11   appropriate under a federal system.  And the Federal Court is

12   very respectful of that in every case it can be.

13       But if there is a conflict between the Constitution

14   and laws of the United States and the state law, the supreme

15   law of the land is the federal law, as established by our        09:14:14

16   common founding agreement, and that is the Constitution, and in

17   particular Article VI and Clause 2.

18       Now, there have been some suggestions that perhaps

19   it's inappropriate for this Court to exercise that authority

20   because of my role in the case, because of the kind of judicial  09:14:35

21   officer I am.  I am a federal United States magistrate judge.

22   I am not appointed under Article III of the Constitution, so I

23   do not enjoy the Article III protections of life tenure or the

24   protection against salary diminution.

25       That provision of Article III of life tenure and the         09:14:55

1   salary protection was designed to protect the judicial power of

2   the United States and is not addressed to concerns about

3   whether or not it is over exercised.  It is addressed as to

4   whether it is under exercised, because I don't enjoy those

5   protections.                                                    09:15:14

6           That said, this case is unique in another aspect.

7   Whereas the Supreme Court has said that the magistrate judges

8   not enjoying these protections can never preside in a felony

9   criminal case, because the framers were most concerned about

10  individual liberty.  And so they were concerned that the sole   09:15:33

11  reason for the judiciary to have power, and that is the Article

12  III protections vis-a-vis the political system, needed to be

13  perfected and honored absolutely in the felony criminal cases.

14  And so that's why I cannot preside in a felony criminal case.

15          But the Supreme Court has repeatedly said that it is    09:15:54

16  perfectly appropriate for the judicial power of the United

17  States to be fully exercised by a United States magistrate

18  judge if the parties consent.  And the parties have consented

19  in this case.  And they -- you chose to have me preside in the

20  case, understanding that I was not an Article III judge.  And   09:16:11

21  you gave me that power to exercise the judicial power of the

22  United States subject to the limitation that I ultimately

23  derive all of my power through Article III judges, whether it

24  is by way of appeal to an Article III judge sitting on the

25  Ninth Circuit or the United States Supreme Court, or whether it 09:16:28

1   is under the statutory provision that provides for the plenary

2   power to flow through the district judges of the District of

3   Arizona.

4           But, with respect to any suggestion that I am

5   operating outside of my authority because I am a magistrate          09:16:41

6   judge, that I think is not recognized by law and is not

7   appropriate here.

8           And also, if there's any disquiet associated with it,

9   it seems to me that that would be addressed by the fact that

10  the parties, fully understanding whom they had before them,         09:17:00

11  consented to have me be the judge.

12          Usually the judge in Federal Court is a random

13  selection, you get who you get.  But here you had the

14  opportunity to choose.  And so the idea that somehow it's

15  inappropriate for this judge to exercise the judicial power of       09:17:17

16  the United States as fully recognized by the Supreme Court

17  because it's offensive because you were thrust upon this

18  person, doesn't I think apply here, because you chose me.

19          And you chose me after we knew one another.  And we

20  knew one another because you asked me to be -- well, I think I       09:17:34

21  was randomly selected -- I don't actually honestly as I sit

22  here right now recall how it is.

23          But in any event, it is true to say you knew me.  We

24  worked for days together in a settlement context where I was

25  the mediator.                                                        09:17:51

1      I will say this, that I was the mediator impressed

2  with a couple of things.  One, mostly how the lawyers on both

3  sides were working hard to advance their client's interests,

4  and mostly were producing the settlement themselves.  There

5  were some times where I think I helped.  I brought things to          09:18:06

6  the table.  And certainly I was actively engaged.  There's no

7  doubt that anybody would say that I was actively engaged.

8      So you had a full opportunity to see who and what I

9  was about my views of the settlement.

10      And if you want to talk about bias, boy, I did have a        09:18:24

11  bias, and that was in favor of settlement.  I think every side

12  will say that you knew that I was in favor of settlement.  I

13  thought it was a good idea.  I thought there are a lot of

14  reasons that settlement makes sense.

15      First of all, it reduced the uncertainty of the case,        09:18:37

16  because you were agreeing to something that was definitive

17  rather than going on to trial and not knowing what would happen

18  there.  And so you could know the sure thing, and you could

19  also shut it down.  Meaning, you could close out the

20  uncertainty and get a firm understanding of what the future        09:18:54

21  would hold for both sides.

22      Both sides gave up things, both sides gave up big

23  things.  And you did so in exchange for the sure thing of

24  knowing what you were getting.

25      You also had a role in it.  And that's what happens         09:19:08

1    when you go to settlement and you settle the case.  You're not

2    turning it over to some well-intentioned group of people from

3    the community, you're not turning it over to a judge.  You're

4    saying, we are defining what we are going to do based upon the

5    settlement.                                                09:19:25

6         And so that personal participation of the State of

7    Arizona and the plaintiffs class here, to me was a big reason

8    for a bias in favor of settlement.  They were personally

9    involved, the people for whom this was the most important

10   matter, the parties.  And so I, again, was embracive of that    09:19:38

11   whole idea.

12        I also at the end of the process was thankful, that I

13   thought that it would produce the resolution that the

14   plaintiffs' class saw with respect to health care that they

15   thought that they weren't receiving.  And it also was          09:19:56

16   beneficial to the State of Arizona, because it would be

17   something that they could budget for, anticipate and

18   understand, that was completely different than what could

19   happen at trial, where you could have, for either side, either

20   an enormous win or an enormous loss, or something in the        09:20:11

21   middle.

22        But in any event, the settlement was something that

23   wasn't contingent upon sort of that roulette wheel of

24   understanding what would happen -- or not understanding what

25   would happen and have a trial result.                          09:20:24

1          A trial result that ultimately would go on too,

2     because you all know the path to the Court of Appeals, and you

3     probably know the path to the Supreme Court.  And so that would

4     mean years and years.  And what that years and years would mean

5     would be not only uncertainty for both sides, the plaintiffs'     09:20:42

6     class and their concern about health care -- health care that

7     has a human life component to it.  People live and die on

8     health care.  And so getting that health care sooner rather

9     than later was a good idea with the settlement.

10          But also the prospect of ongoing litigation means     09:21:00

11     every time you file a paper in this court, and in the Court of

12     Appeals or the Supreme Court, there's an enormous amount of

13     money associated with that that is unrelated to the health care

14     issue that was the reason for the case.  It's the attorney's

15     fees that go on and on and on.     09:21:16

16          And so my idea again was, this is wonderful, the

17     parties have agreed to a settlement.  And I at that moment

18     believed that there would be little role for any judge, whether

19     it was going to be the enforcement judge, that I anticipated

20     that it would be, and that would the presiding district judge,     09:21:33

21     but then the parties decided that they wanted me to be the

22     enforcement judge, and the district judge agreed.  And so I was

23     then that judge.

24          I wasn't chagrined or disappointed or thinking, oh, my

25     goodness, this is work for me that I should not look forward     09:21:48

1  to, because I didn't really think there would be work.  Because

2  I had worked with the parties, and I really thought that we

3  were at a place where everybody understood what the

4  contract -- the stipulation was, what the obligations were,

5  they had entered into it in good faith, and I well anticipated          09:22:04

6  that we would not be where we are.  And that is three years

7  since then this March where I have devoted an enormous amount

8  of money of yours to this project trying to accomplish what I

9  thought was going to be done.

10        I can't understand or note the full reasons of why we          09:22:23

11 are where we are.  But at some point I shake my head and say,

12 why are we here?  Why has this just not been done?

13        And at some level it is pretty -- there's a part of it

14 that just seems the sort of scratch-your-head simpleton kind of

15 thing that you would be able to explain to a second grader, and          09:22:46

16 the second greater would scratch his or her head too.

17        You would say, there's a Performance Measure that says

18 that people in our custody, if we move them from one prison to

19 another, which we need to do, that's part of our job, but they

20 have health care issues, and so we need to move their          09:23:02

21 medications with them on the day that they're moved, so that

22 they have received -- they receive on the day of their

23 movement, as they did the day before, and as hopefully the next

24 day in their new facility, their medication.

25        Now that shouldn't be so hard, because we move people          09:23:19

1   intelligently.  Obviously when you move people from one

2   facility to another you look, as the custodian of these people,

3   at some basic issues.  Are we doing a dangerous thing?  Are we

4   putting them in a yard where there's somebody who would want to

5   fight?  And so we are aware of those things, we pay attention        09:23:38

6   to that.

7          And so it doesn't seem it's so hard to say also at the

8   same time, we need to make sure that, just as we are caring

9   about the health and safety of these individuals on our yard

10  with respect to whether they get along together, but also          09:23:52

11  whether they have their package of medicines with them at that

12  time.  So it doesn't seem so hard.

13         And you could also say to the second grader, you know,

14  why is this important?  And the second grader would probably

15  get the first answer.  And that is, because health care is        09:24:05

16  important.  People need to have their medicine.  If they've

17  been getting medicine for months in their old facility and they

18  move them to a new one, they need to get their medicine that

19  day too.  So the second grader would get that answer.

20         But the second answer is, why it's important, is           09:24:21

21  because the State of Arizona promised to do it, and understood

22  that is promised to do it.  And it promised to do it for every

23  single person.  And we had a measure that would tell me if they

24  weren't doing it.  And the last report that was tendered by the

25  defendants show that we're still not doing it for every single    09:24:40

1   person.  We're actually failing on the Performance Measure in a

2   number of the facilities.

3           And so, again, it's a scratch your head kind of

4   moment.  How could this possibly be after three years that we

5   are still there?                                              09:24:58

6           And so I have imposed with this Performance Measure

7   the possibility -- or I've told you that I'm wanting to hear

8   from you as to why I should not impose a dramatic measure to

9   try to fix this, a $1,000 penalty for every single one that you

10  don't do it.                                                  09:25:16

11          It's a scratch the head kind of thing that makes me

12  think when I told you that there were no words, that you needed

13  to hear words.  That I just don't understand how this can be

14  remotely possible.

15          The last thing that I wanted to address is the        09:25:31

16  suggestion that what is defined by the State's role here is

17  manifestly bad.  I have seen in the State's papers that they

18  think that I've declared that the Department of Corrections

19  people have lied through their teeth.

20          I have sat here and done the best I can on an          09:25:56

21  impossible task, and that is to be a truth finder.  Meaning, I

22  can't know, there's no way anybody can know whether somebody is

23  actually lying or not.  But here in court every single day in

24  every courtroom in this courthouse, where there's proceedings

25  where we have a fact finder involved, we are asking that fact  09:26:19

1    finder to do that impossible task as best he or she can.  And

2    that is, is that person telling the truth?

3            And through the adversary process, through

4    cross-examination and direct examination, we routinely are

5    asked to do that impossible task, and must come to a                09:26:35

6    conclusion.

7            I have come to the conclusion that people who have

8    worn the uniform of the Department of Corrections have sat here

9    and lied to me.

10           But I also will tell you that there are people that I       09:26:46

11   have been incredibly impressed with.  There are people who are

12   absolutely dedicated public servants who are trying to do the

13   best they can to meet the needs of the stipulation.  And I have

14   come to hear that in testimony from people who are high up in

15   the Department of Corrections, who I have believed and honestly     09:27:04

16   think they are telling me the truth, and I have been impressed

17   with that.  And I embrace that.

18           And I also have come to see it in some of the

19   notebooks that you have given to me.  That's not evidence yet,

20   and maybe it won't come into evidence.  But I will tell you, I      09:27:20

21   learn more, and I don't take action as I've told you based upon

22   anything that isn't in evidence.  But you have tendered to me a

23   great number of documents, and I have tried to devote attention

24   to them.  And what I have seen is e-mail traffic where it looks

25   to me like if it comes into evidence it is evidence of people       09:27:37

1    in the monitoring program who are doing the exact right thing,

2    they are saying, we're holding you to the stipulation here.

3    This is not something you can do.

4         Now I see other things that suggest that it's maybe

5    not that way.  And I don't know.  And it will be tested by the          09:27:53

6    adversary system here in court when things come into evidence.

7         But I want you to know that there is a sense that I

8    have that there are people who are dedicated to solving this

9    problem.  But I also at the end of the day, three years, know

10   we haven't solved the problem.  And that is, that we are not          09:28:12

11   meeting the promise that was made in that settlement conference

12   where when I left I was at equipoise.

13        I really believed that both sides had been earnest in

14   working to accomplish a settlement that would be in their

15   respective best interests and be in the best interests of the          09:28:31

16   State of Arizona and be in the best interests for everybody

17   concerned.  And I had a true state of equipoise, I had

18   confidence and faith in both sides.

19        Since then I have come to be disappointed.  I think

20   both sides will tell me that they -- that if you would -- at          09:28:48

21   the end of the case, at the end of the day, both sides will

22   tell me that they believe that there are times that I have been

23   disappointed in both sides in what they have done in this case.

24        And so the equipoise that I started with has been

25   affected by conduct that I have seen in the case.  And so some          09:29:06

1    of that conduct is more directly and appropriately attributed

2    to the defendants in the case, because ultimately it was the

3    promise to meet the stipulation that is not being met that is

4    at your door.  It is your responsibility.

5            And so if I'm disappointed in plaintiffs, it's that          09:29:26

6    they are not banging on that door loud enough and pointing out

7    where the key is.  Now they've done a lot of that work for me,

8    and appropriately so under the stipulation.  And I'm thankful

9    for it.  But they have also heard me express disappointment

10   about how it is that the banging is not loud enough, or maybe       09:29:51

11   the keyhole that we're looking for is the wrong one, or we have

12   the wrong key.

13           But that ultimately that responsibility on complying

14   with the stipulation lies at the defendants' door, and so it is

15   appropriate that you should get the brunt of my -- of my           09:30:06

16   departure from equipoise based upon what has happened over

17   these last three years.

18           So I've taken longer than I thought I would.  But that

19   is what I needed to say so that people could have it in their

20   minds, understanding not that I've made final decisions, but       09:30:25

21   you should have an understanding of how I may well view what is

22   my next course of action.  And people in the State are entitled

23   to know that.

24           Thank you all.

25           Miss Love, I understand you have a witness you'd like       09:30:41

1    to call.

2         MS. LOVE:  Yes, Your Honor.  Defendants call

3    Dr. Rodney Stewart.

4         THE COURT:  Dr. Stewart, if you'd kindly step forward

5    to the center of the courtroom so that the clerk could          09:30:50

6    administer the oath to you.

7         MS. KENDRICK:  Your Honor, before we start with

8    Dr. Stewart, just a few housekeeping things.

9         THE COURT:  Okay.

10        Dr. Stewart, if you don't mind, have a seat there.         09:30:59

11        MS. KENDRICK:  Sorry.

12        THE COURT:  I jumped the gun apparently.

13        Yes, Miss Kendrick.

14        MS. KENDRICK:  Yeah, so before we started the hearing

15   this morning we were told by Miss Love that Dr. Stewart's       09:31:06

16   testimony will probably take most of the day.  And we are

17   concerned about that just in the fact that this was scheduled

18   to be a regular status hearing, and we have numerous items on

19   the agenda.  And there are certain things that we believe are

20   critical to be addressed today in court.  I can tell you what   09:31:25

21   we think they are, and then I, of course, defer to you about

22   how you might want to schedule the day.

23        But among that is, plaintiffs filed a motion to

24   enforce the stipulation on January 4th at docket 2520.  The

25   Court has not yet ruled on that.  But in light of your recent   09:31:42

1    order clarifying the definition of substantial non-compliance,

2    we would like to have the Court make an order with regard to

3    that motion.

4         We also would like to address a few things that play

5    into the upcoming hearings in a couple weeks.                    09:31:58

6         One is defendants' failure to include 420 instances of

7    non-compliance in their December court filings regarding

8    contempt that we were able to locate in our document review.

9         Another is the issue of defendants' and Corizon's

10   privilege logs, which number over 500 pages long and include     09:32:20

11   correspondence that does not implicate attorneys.

12        We also were hoping for an update on the RFP and the

13   fines assessed against Corizon, especially in light of what you

14   have just said with the contract negotiations going on.

15        And finally, there are some documents that we think         09:32:37

16   are needed for the upcoming hearings.  One of defendants'

17   exhibits refer to a root cause analysis that Corizon did with

18   regard to the Performance Measures in your contempt order.  And

19   we have asked defendants for that document because we feel that

20   it would be very important to present as evidence and to         09:32:58

21   question witnesses about.

22        And we also have not been provided the February 2018

23   staffing reports as required by your order that they be

24   produced at least 48 hours before every court hearing.

25        Thank you.                                                   09:33:14

CV-12-601-PHX-DKD – March 14, 2018

```
1         THE COURT:  All right.  Well, before we give the
2    defendants an opportunity to respond to those, I think I can
3    say this:  First, I gave the plaintiffs an opportunity to
4    present as much as they wanted to in the first instance, and
5    then I only imposed limitations with respect to Dr. Watson          09:33:31
6    after people told me that they were comfortable with
7    limitations.
8         Miss Love has told us that she thinks that this will
9    take most of the day.  I am, of course, as you know, very
10   sensitive to efficient use of time.  And so if it's productive,    09:33:44
11   and I'm not uncomfortable with how things are going, I'm not
12   going to restrict this instance here.
13        That said, a couple of things.
14        One, I'm sure we know we have a couple of carve outs
15   today.  We know Dr. Millar, if he can clear the weather            09:33:59
16   issues -- Mr. Millar, when he gets here, we'll make that carve
17   out.  So we know that's going to happen.
18        Two, I'm hopeful that there will be time to be able to
19   get to the many items that are on the agenda.  And I'm
20   oftentimes happily surprised that we do get through our work       09:34:16
21   and we are able to do that.
22        So if it turns out that we get through it, then we
23   don't have an issue, we don't have to talk about it more.  If
24   it turns out that we run into the end of the day and we are
25   blocked out, I have told you with respect to these discovery       09:34:29
```

─ **Rodney Stewart – Direct Examination** ─

1    issues that I'm readily available by telephone otherwise to

2    address them separately, and so we will do that.  And so we

3    will get to those.

4          With respect to the ruling you want, that doesn't have

5    to happen here.  That's the kind of thing I can do and am          09:34:42

6    actually working on.  And so I think we'll be okay.  But if

7    not, you know how to reach me, and we can do it.

8          Anything else preliminarily wise?

9          MS. KENDRICK:  No, sir.  Thank you.

10         THE COURT:  All right.  Doctor, if you'd restart          09:34:56

11   again, please.

12         THE CLERK:  Please raise your right hand.

13      (RODNEY STEWART, DEFENSE WITNESS, SWORN.)

14         THE CLERK:  Thank you.  Please have a seat.

15         THE COURT:  On the witness stand, sir, please.          09:35:20

16         The microphone is not welded there to the table, so if

17   you'd move it closer to you.  I don't know why it gets pushed,

18   but you can move it even closer to you so you won't have to

19   reach over.

20         Thank you.          09:35:46

21         You may proceed.

22                  DIRECT EXAMINATION

23   BY MS. LOVE:

24   Q.  Will you please state your full name the record?

25   A.  Rodney Allen Stewart, M.D.          09:35:50

Rodney Stewart – Direct Examination

1   Q.   Dr. Stewart, who is your employer?

2   A.   Corizon Health.

3   Q.   How long have you been employed by Corizon?

4   A.   Since December 2015.

5   Q.   What is your current title?                          09:36:03

6   A.   I'm the Site Medical Director.  Everybody keeps saying

7   psych, but it's Site, S-I-T-E, Medical Director at Eyman

8   Prison.  And I'm the Interim Site Medical Director at Florence.

9   Q.   How long have you held the position of Site Medical

10  Director for the Eyman Complex?                           09:36:24

11  A.   Since about June of 2017, May or June 2017.

12  Q.   And how long have you held the position as Interim Site

13  Director for the Florence Complex?

14  A.   That would be like July or August of 2017.

15  Q.   You started with Corizon in 2015?                    09:36:41

16  A.   Um-hum.

17  Q.   And that's a yes?

18  A.   Yes.

19  Q.   From 2015 until you became Site Director for Eyman Complex,

20  what did you do for Corizon?                              09:36:54

21  A.   I was the -- between 2015 and 2017?

22  Q.   Yes.

23  A.   I was the IPC infirmary physician.

24  Q.   At Florence?

25  A.   At Florence, yes.                                    09:37:08

UNITED STATES DISTRICT COURT

485

Rodney Stewart - Direct Examination

1   Q.  And you're currently licensed to practice medicine in the

2   state of Arizona?

3   A.  Yes, I am.

4   Q.  Where did you go to medical school?

5   A.  At the University -- well, it's called the University of          09:37:15

6   Toledo now.  It was the Medical College of Ohio, in Toledo,

7   Ohio.

8   Q.  When did you graduate?

9   A.  1992.

10  Q.  Okay.                                                             09:37:28

11  A.  From medical school, yeah.

12  Q.  Since 1992 can you give us a snapshot of your career in

13  medicine?  What type of medicine have you practiced, what have

14  you done?

15  A.  So started out with a little bit of -- interestingly             09:37:38

16  enough, of thinking I was going to go into OB/GYN, but

17  eventually didn't, and went into internal medicine.  I spent

18  actually four years in residency, and that includes a

19  transitional year.  And then got out, worked in Ohio as a --

20  kind of like a covering physician in a hospital, Mount Carmel       09:38:04

21  Hospital in Ohio, in Columbus, Ohio.

22          And then I got married and moved here to Arizona.

23  Started out in a company called IPC, InPatient Consultants.

24  And basically was a hospitalist from that point on covering

25  most of the hospitals.  At that time we were the only           09:38:25

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    hospitalist company, so we were covering most of the hospitals

2    in the greater Phoenix area.

3            And left that in 2004 or '5, and went to another

4    company or group, which was a combination of two entities,

5    Alliance Hospitalists and the Associated Internists of                09:38:49

6    Ahwatukee.  And basically covering -- still covering hospitals

7    for a short time, then I went to an LTAC, which is a long-term

8    acute care hospital.  And was the -- eventually became the CMO

9    of that hospital.

10   Q.  What does a CMO mean?                                              09:39:11

11   A.  Chief medical officer.

12           And that -- eventually that changed to different

13   statuses, because that facility eventually ended, because of

14   poor management.  But after that, then I primary covered

15   skilled nursing facilities for the same group until I came to        09:39:35

16   work at the prison.

17   Q.  Do you consider to this day yourself to be a hospitalist?

18   A.  Absolutely.

19   Q.  Tell us -- if you can, explain for us, what does it mean to

20   be a hospitalist?                                                     09:39:47

21   A.  Hospitalist came about back when I started, it really

22   wasn't an entity.  Skyrocketing costs of health care and

23   managed care basically created this thing.  Managed care was

24   basically doling out money to primary care doctors and their

25   offices and saying, hey, this is your amount of money you get,        09:40:15

Rodney Stewart – Direct Examination

1    use it efficiently.

2         Those primary care doctors in the past would admit

3    their patients to the hospitals and then have to leave their

4    office practice and go see those patients.  That was terribly

5    inefficient and costly.  And the people who were losing out       09:40:33

6    were the primary care doctors who weren't receiving enough

7    financial compensation.

8         So someone said, hey, you know, why not put a doctor

9    in the hospital all the time, that's all they do.  The primary

10   care doctor gives up his care of the patient when they're in      09:40:52

11   the hospital.  They give a report to the doctor and say, this

12   is the problem.  The doctor in the hospital fixes the problem,

13   sends the patient back to the primary care for continuity of

14   care, and gives a report back to the primary care, and it just

15   continues.                                                         09:41:11

16        And that was -- that turned out to be great for

17   managed care.  Managed care could manage the hospitalists,

18   rather than trying to manage the office practice.  You just

19   manage the hospitalists, the hospitalists basically helped

20   shorten that period to the best of its ability, to shorten that   09:41:27

21   period of hospitalization, decrease the costs.

22   Q.  Could you describe, when you work in the private sector as

23   a hospitalist, what was your typical day like?

24   A.  Oh, you start in the ICU, see patient after patient after

25   patient.  And you step down.  So you see an ICU patient -- you     09:41:44

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

```
1    see all your ICU patients, then you see your telemetry med
2    patients, your surgical patients.  And then toward the end of
3    the day you see -- you might go see the OB/GYN consults or the
4    patients you're about to discharge.
5    Q.  On average when you were working in the private sector as a    09:42:04
6    hospitalist, how many patients would you see a day?
7    A.  Twenty to 30, on average.  At the end there, there was a
8    period where I was seeing like 50, which is crazy, crazy,
9    nearly impossible.  But I did that for a short time.
10   Q.  Did you primarily work at any certain hospitals in the        09:42:20
11   Valley here when you were working in the private sector?
12   A.  I worked at -- I worked at all -- we had privileges at
13   pretty much all of them when I was in IPC.  And when I was
14   worked with Associated Internists of Ahwatukee, it was Chandler
15   Regional Medical Center primarily.                                09:42:42
16         But I've been at all the hospitals.
17   Q.  And in 2015 you start your employment with Corizon?
18   A.  Um-hum.
19   Q.  That's a yes?
20   A.  Yes.  Sorry.                                                  09:42:52
21   Q.  I say that because the court reporter has to take
22   everything down.
23   A.  I understand.
24   Q.  And um-hums look like could be an uh-huh or huh-uh.
25         THE COURT:  The other thing too, Doctor, is it's           09:42:59
```

Rodney Stewart – Direct Examination

1    completely unnatural to do this, but we have to maintain a

2    rigidity of not talking when somebody else is talking.

3                    THE WITNESS:  Yes, sir.

4                    THE COURT:  You just did it.

5                    THE WITNESS:  I just did it, yes.

6                    THE COURT:  And that's how unnatural it is.  It's

7    something that even the lawyers who are supposed to be really

8    good about it, we break the rule too.

9                    So periodically my job is to try to make it easier for

10   the court reporter.  And that is, although she's amazing and          09:43:25

11   probably could get five people talking at once, that's really

12   unfair.  So try to just think of a mental image of pausing for

13   a second when Miss Love finishes her question, and then that

14   will allow us to respect the court reporter.

15                   Thank you.                                             09:43:43

16                   THE WITNESS:  Yes, sir.  Thank you.

17   BY MS. LOVE:

18   Q.  Describe your duties for us when you were working as a

19   provider at the Florence Complex, for the time period of the

20   2015 to 2017.                                                         09:43:53

21   A.  I come in in the morning, see patients in the infirmary.

22   We had three units there, and we still do.  And basically would

23   round on those patients all day, whatever time that took.  And

24   then pretty much the second part of your day was to put the

25   notes in the eOMIS system, to make sure we had the -- our           09:44:16

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1   encounter recorded.

2   Q.  And was this a full-time position from 2015 to 2017?

3   A.  Yes, it was.

4   Q.  Did you see patients exclusively in the infirmary or did

5   you also see patients from the living units?                    09:44:35

6   A.  Not exclusively.  Mostly from the infirmary, but wherever

7   there was a need, I'd go.

8   Q.  On average when you were working as a provider at the

9   Florence Complex, the 2015 to 2017 range, how many patients

10  would you see a day?                                             09:44:57

11  A.  2015 to 2017?  There was a period where we had really

12  adequate providers, and so it was pretty much -- two of us

13  split the 60-bed unit.  Three buildings, 60 -- about 60 beds.

14  And so about 30 patients.  Those patients did not have to be

15  rounded on every day, so it made it easy, you could split up 15  09:45:31

16  and 15 alternating.

17         So somewhere between 15 and 30, I guess would be

18  the number.

19  Q.  In your capacity as a provider at Florence, were you

20  responsible for seeking where necessary outside specialty       09:45:43

21  consults for your patients?

22  A.  Yes.

23  Q.  What about any responsibility for ordering and renewing

24  medications?

25  A.  Yes, we -- I'm sorry.                                        09:45:56

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1   Q.  Were you supervised -- was there a chain of command that

2   you reported to within the Corizon system when you were a

3   provider at Florence?

4   A.  Yes.  Immediately over me was the Site Medical Director,

5   and then above that level was the Regional Medical Director.          09:46:13

6   Q.  Did you, as a provider, supervise any Corizon staff?

7   A.  I wouldn't say supervised.  I assisted nurse practitioner

8   providers.

9   Q.  Any other staff that you assisted or supervised?

10  A.  All of the nursing staff and CNA staff.                            09:46:35

11  Q.  Now in July of 2017 -- do I have the month right?  July of

12  2017 you become the Site Medical Director for the Eyman

13  Complex?

14  A.  May or June.  It was more like May or June.

15  Q.  So if we say Summer of 2017 that would be fair?                    09:46:54

16  A.  That would be good, yes.

17  Q.  When you became the Site Director for the Eyman Complex,

18  was that considered a promotion?

19  A.  Yes.

20  Q.  In what way?                                                       09:47:06

21  A.  More pay, more responsibility.

22  Q.  Geographically, where is the Eyman Complex located in

23  relation to the Florence Complex?

24  A.  It's about ten minutes down the road.

25  Q.  And when you became the Site Director for the Eyman                09:47:32

Rodney Stewart – Direct Examination

1    Complex, what were the increased responsibilities that you

2    received?

3    A.  Well, the Site Medical Director has to supervise all of the

4    provider staff.  Then there's a lot of paperwork that goes with

5    that job, in doing mortality reviews, reviewing deaths, new          09:47:56

6    admissions to the prison, reviewing any problems that anybody

7    has, you have to go over that and either discipline or not

8    discipline someone.  Meetings, lots and lots of meetings.

9    Q.  As Site Director, has this been a full-time position for

10   you?                                                                 09:48:31

11   A.  Yes.

12   Q.  Continually from 2017 to the present?

13   A.  Yes.

14   Q.  In your capacity as Site Director at Eyman, is this

15   exclusively an administrative position for you, or do you also       09:48:43

16   provide direct patient care?

17   A.  I do direct patient care, it was a requirement of my taking

18   that position.

19   Q.  When you say it was a requirement of you taking the

20   position, what do you mean?                                          09:48:58

21   A.  The FHA at that time was a friend of mine, and she asked me

22   to come over multiple times.  And I told her, I'm happy in the

23   infirmary, I don't want to go.  But they had a really -- they

24   had a huge need for a Site Medical Director.  And I said,

25   listen, I'm a hospitalist, I take care of patients.  So I'm not      09:49:20

 1   going to go over there and do just a bunch of administrative

 2   paperwork.  So that would be a requirement.  And she basically

 3   guaranteed me that I would get to see patients.

 4   Q.  So is it fair to say that a requirement personally of yours

 5   to become the Site Medical Director is that you wanted to          09:49:37

 6   continue to provide direct patient care?

 7   A.  Absolutely.

 8   Q.  And you mentioned FHA.  What does FHA stand for?

 9   A.  The Facility Health Administrator.  It was Miss Johnson at

10   that time.                                                        09:49:49

11   Q.  As the Site Director at Eyman, who do you supervise?

12   A.  Essentially everyone.  But my primary concern is the

13   providers, make sure that they deliver the healthcare they're

14   supposed to deliver.

15   Q.  Now as Site Director, let's talk about the chain of command  09:50:12

16   of who do you report to, as Site Director at Eyman?

17   A.  To the AFHA, the Associated Health Facility Administrator,

18   the FHA, and the -- my direct report is the Regional Medical

19   Director.

20   Q.  Let's talk about the Eyman Complex.  The Eyman complex, are  09:50:35

21   you aware of what the average inmate population is at the

22   complex?

23   A.  Yes.

24   Q.  What is that?

25   A.  It's usually around 5,000 inmates at Eyman.                   09:50:47

Rodney Stewart – Direct Examination

```
 1   Q.  How many living units are there at the Eyman Complex?

 2   A.  There are five prison yards, but each yard has dozens

 3   of -- let's see.  About seven per yard, seven living units per

 4   yard, seven or eight.  It changes every now and then.

 5   Q.  Now let's talk about the yards.                              09:51:12

 6           So at the Eyman Complex there's five separate yards;

 7   correct?

 8   A.  Um-hum.  Yes.

 9   Q.  That's a yes?

10   A.  Yes.                                                         09:51:20

11   Q.  So just to get a visual picture, each yard is its own

12   separate standing facility, so to speak.

13   A.  Yes.

14   Q.  Does each yard have a medical unit?

15   A.  Yes.                                                         09:51:35

16   Q.  So five yards, five medical units?

17   A.  Yes.

18   Q.  How are each of the medical units staffed, as far as

19   medical personnel?

20   A.  There are -- there are actually multiple entities.  You     09:51:47

21   have your CNA staff, your one provider, sometimes two, either

22   be it telemetry or either I'll go be another -- additional

23   provider for that yard, depending where we are as far as the

24   census on that day.  There are two nurses usually dispensing

25   medication, one nurse covering the ER, and there's a HNR nurse  09:52:22
```

Rodney Stewart - Direct Examination

1    which sees inmates.  There's a CNA that covers the providers,

2    there's usually one CNA per provider.  And then you've got your

3    support staff.  You know, radiology if they're there, you've

4    got the whole division of psych.

5            Who else is there?  Your pharm techs.  You've got your           09:52:52

6    people who help manage the medications and renewals and things

7    like that.

8            THE COURT:  Can I interrupt for just a second?

9            When you said "the ER," what did you mean by that?

10           THE WITNESS:  There's -- each medical unit has a                09:53:09

11   treatment room.  So when there's an ICS, someone gets beat up

12   really bad or something, that's the first place they go.

13           THE COURT:  Okay.  I've been there, and I just didn't

14   see something that looked like an ER.  I saw a treatment room,

15   but it didn't look like an emergency room.                             09:53:23

16           But you could just call it that, that's what it's

17   called?

18           THE WITNESS:  Yeah, that's what --

19           THE COURT:  Okay.  Thank you.

20   BY MS. LOVE:

21   Q.  Now how does it work presently as Site Director that you're

22   involved in direct patient care?  Are you assigned -- do you

23   assign yourself to a particular yard, does it vary day to day?

24   How does that work presently?

25   A.  Depends on where the need is.  And depends on who -- you           09:53:45

1    know, mostly what I do is educate.  So when I go someplace I

2    have some sort of plan to educate the provider there.  I

3    supervise the provider, watch where they might be falling

4    short, and try and interject and try and teach them about

5    efficiency and teach them about the particular medicine that          09:54:08

6    they're attempting to practice.

7            And that's primarily what I do.

8    Q.  Do you sit in with the providers as the providers are

9    seeing patients to facilitate this education process?

10   A.  Absolutely.                                                        09:54:28

11   Q.  And currently you're also Interim Director at Florence;

12   correct?

13   A.  Yes.

14   Q.  So are you also presently going over to the Florence

15   Complex as well and doing the same as what you just told us,          09:54:38

16   where you're participating in direct patient care with the

17   providers?

18   A.  Yes.  But the Site Medical Director at Florence also has to

19   see patients in the IPC.  So I'm seeing my old patients still

20   at the IPC.                                                           09:54:55

21   Q.  Based upon our history, all of us in the room, when I say

22   counsel and the judge here, we often use the term chronic care

23   patient.  What does -- is that a term that you utilize?

24   A.  Yes.

25   Q.  What does that mean, chronic care patients?                       09:55:15

Rodney Stewart – Direct Examination

1   A.  Patients who have longstanding medical illness or medical

2   problems get put into a category of chronic care so that they

3   are on a scheduled contact with the provider based on the

4   disease process that they have.

5           So there's an assigned number of months that a                09:55:43

6   particular disease gets seen.  And, you know, these patients

7   come up on your list for chronic care and you deal with them on

8   that time schedule.

9   Q.  What kind of diseases or medical conditions would fall into

10  the chronic care category?                                             09:56:05

11  A.  All long-standing disorders.  So all heart conditions,

12  hypertension, diabetes, COPD, emphysema, hepatitis C which is

13  huge, all chronic liver disease, cancer -- all cancers.  Pretty

14  much anything that you're going to have for a longstanding

15  period you're going to -- hematologic disorders that are          09:56:31

16  longstanding, renal failure.

17  Q.  Of the approximate 5,000 inmate population at the Eyman

18  Complex, do you know approximately how many inmates are

19  considered to be chronic care patients?

20  A.  At Eyman, probably about 2700 or so, something around that    09:56:50

21  number.

22  Q.  2700 out of the 5,000?

23  A.  Correct.

24          THE COURT:  Is that unusual?

25          THE WITNESS:  No.                                         09:57:02

UNITED STATES DISTRICT COURT

1          THE COURT:  So that's pretty standard with aging

2   prison --

3          THE WITNESS:  I'm surprised it's not higher.

4          THE COURT:  So more than half of the people have

5   chronic health care problems?                                    09:57:11

6          THE WITNESS:  Well, here's the thing, is that

7   hepatitis C is a chronic care condition.

8          THE COURT:  I see.  And it's very prevalent.

9          THE WITNESS:  Very prevalent.  I'm surprised it's not

10  higher.                                                          09:57:21

11         THE COURT:  Just that so I can understand that, what's

12  the rough number of the number of people of the 5,000 you think

13  are hep C?

14         THE WITNESS:  I would -- I can only guess.

15         THE COURT:  Yeah.                                         09:57:36

16         THE WITNESS:  But I would -- probably about -- of

17  5,000, probably 80 percent.

18         THE COURT:  Eighty?

19         THE WITNESS:  Eighty percent.

20         THE COURT:  Well, that produces a number much higher      09:57:43

21  than your --

22         THE WITNESS:  Yes.

23         THE COURT:  -- 2700 though, sir.

24         THE WITNESS:  That's why I said I thought it would be

25  higher than that.                                                09:57:49

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1          THE COURT:  Oh, I see.

2          THE WITNESS:  But I've seen that number, 2700.

3          THE COURT:  Okay.  Thank you.

4    BY MS. LOVE:

5    Q.  Based on your experience in the private sector and now in       09:57:54

6    the corrections environment, do you see the chronic care

7    patient case load to be significantly higher in the corrections

8    environment versus the private sector?

9    A.  I'm sorry, can you repeat that?

10   Q.  Well, we talked about the -- approximately 2700 inmates out      09:58:12

11   of 5,000 have -- are designated as chronic care patients.

12   Based upon your experience in the corrections field -- medicine

13   field and private, do you find that unique to corrections?

14   A.  Yes.  Yes.

15   Q.  What do you attribute that to?                                    09:58:32

16   A.  Obviously the standard community doesn't have a hepatitis

17   C, for lack of a better term, epidemic as the prisons do.

18   Hepatitis C is pretty -- pretty prevalent and it leads to a lot

19   of bad disease.  So you get a lot of cirrhosis and a lot of

20   liver disease, a lot of liver cancer.  So that's different.          09:59:00

21          And cancer are in general in prisons is off the chart,

22   it's unbelievable.  And we don't have an answer for that.  And

23   I actually talked once a couple times about maybe someone ought

24   to do a study, because the prevalence of cancer is way higher

25   in the community.  And the disease -- the cancers that you see        09:59:27

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    are different.  You see -- the rare don't become rare anymore,

2    the rare cancers that you see.  It's really different.

3            And you see it in a different age population, a lot

4    younger, it shifts to a lot younger population.

5    Q.  Based upon what you've told us about the unique nature of          09:59:46

6    the chronic care patients in the prison environment, does that,

7    to you as a Medical Director and someone who provides direct

8    patient care, pose unique challenges to you in the delivery of

9    care to the inmate population?

10   A.  It definitely does.                                               10:00:05

11   Q.  In what way?

12   A.  Well, it makes delivery of care difficult, very difficult.

13   You know, many of the medical problems become complex, and you

14   see a cross of multiple medical problems that are unique to I

15   think in prison.  You know, we have a -- many of our providers        10:00:25

16   are nurse practitioners, and some of them pretty inexperienced.

17   And so we spend a lot of time trying to educate.  I mean, we

18   educate each other, but we spend a lot of time trying to

19   educate ourselves about the things that we're seeing that are

20   coming up that we don't see very often.                               10:00:49

21           You know, blue star carcinoma, never seen that.  I've

22   been practicing over 20 years.  But I saw it in prison.

23           So it's difficult.

24   Q.  Can you give us examples of the unique disease processes

25   that you see as common in the corrections medicine environment        10:01:06

─── Rodney Stewart - Direct Examination ───

1    that you may not necessarily see as prevalent in the private

2    sector?

3    A.  Again, you know, it's the age groups that we're finding

4    really, really severe disease.  It's the population -- you

5    know, many of these guys come in from homeless environments,          10:01:28

6    they're abusers of things that no one would ever think about

7    putting in their body.

8           We see infections that are off the chart, just

9    unbelievable infections.

10           Pneumonia that is -- it really outranks                        10:01:46

11   community-acquired pneumonias.

12           If you talk about MRSA, MRSA is not all that uncommon

13   in the hospitals -- or in the community, you find it mostly in

14   the hospitals.  But MRSA infections, these guys can get MRSA

15   infections walking across the yard.  It's very common in their        10:02:09

16   environment.

17           So it's just different and unique, difficult to --

18   Q.  I want to go back and talk a little bit more about the

19   medical units, the five medical units at the Eyman Complex.

20           You talked about the staffing generally on each yard.         10:02:29

21   And as to the medical units, do you have X-ray ability at

22   the -- at the medical units on the yards?

23   A.  On most of them, not all of them.

24   Q.  EKG ability?

25   A.  On every one.                                                     10:02:48

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1  Q.  Can you do minor surgeries?  The providers, can they do

2  minor surgeries?

3  A.  Yes.

4  Q.  What would you consider to be a minor surgery that a

5  provider on the Eyman -- any of the Eyman yards could do?

6  A.  Mostly what we do is wound closure.  But we have to create

7  wounds sometimes to debride infections.  Abscesses, remove

8  sebaceous cysts, biopsies.  That's pretty much it.

9  Q.  What about situations where an inmate may have a broken

10  bone, do the providers on the yard have the ability to

11  immobilize or cast or splint?

12  A.  Uncomplicated ones.  Complicated fractures go to the

13  hospital.  Uncomplicated fractures, we can do casting and

14  splints.

15  Q.  And you have those supplies there on the units at the Eyman

16  yard?

17  A.  Yes, we do.

18  Q.  What about pharmacy?  How does it work at the Eyman Complex

19  as to the delivery of medications to the inmates?  Is there a

20  pharmacy on-site?  How does that work?

21  A.  Yeah, every unit has a pharmacy.  The meds -- those meds

22  are delivered by nursing staff.  I'm not that involved with

23  that side of it.  But there are -- there's pharm techs, they

24  prepare the medicines.  And the medicines are delivered,

25  depending on the yard -- like if it's an open yard, the

10:02:57

10:03:23

10:03:41

10:03:56

10:04:18

Rodney Stewart – Direct Examination

1   nurses -- there's lines that form.  And unless they're -- if

2   they're DOT medicines, the nurses hand out the medicines to

3   inmates in those lines.  And we have KOP medicines, which they

4   can keep on their person and they take it themselves.  And then

5   in the yards that aren't open, like Browning and SMU, those        10:04:41

6   units, the meds are taken out to the cells.  So they have a med

7   pass and they take the meds out to the cells.

8   Q.  What does the -- what does the acronym DOT mean?

9   A.  I'm not exactly sure the letters, but it means that those

10  meds are required to be given -- to be seen put in the mouth      10:05:03

11  and then seen swallowed.

12  Q.  Presently, as you sit here today --

13  A.  Yes.

14  Q.  -- do you have a provider assigned to all five yards at the

15  Eyman Complex?                                                     10:05:19

16  A.  Yes, I do.

17  Q.  And does the provider -- does a provider have to be an M.D.

18  or a D.O.?  How does that work?

19  A.  They can be an M.D., D.O. or an NP.

20  Q.  Taking the time period of the Summer of 2017 until now, has   10:05:32

21  it always been the case that you have had a provider assigned

22  to each one of the Eyman five yards?

23  A.  We had a provider assigned since mid 2017 until now at each

24  yard.  We haven't always had a provider on those yards.  There

25  were -- there were something like three or four -- we always       10:05:56

Rodney Stewart – Direct Examination

1  had like one deficit.  But after I got there we pretty much

2  filled those spots.

3  Q.  And when you say after you got there you pretty much filled

4  those spots, is that because you jumped into also the role of

5  provider or because you were able to increase staffing?          10:06:16

6  A.  I was able to increase staffing because there were people

7  who wanted to go with me.  I could pull two more, but it would

8  leave Florence in a lurch.  People wanted to go with me when I

9  moved.

10 Q.  And presently are the providers at all five yards at Eyman   10:06:31

11 Complex, do they work a set schedule, is it five days a week,

12 is three days a week?  How does that work?

13 A.  Most of them work four tens.

14 Q.  And what happens as far as provider coverage on the other

15 three days of the week for those yards?                          10:06:48

16 A.  On the week -- we have an on-call.  And so there will be a

17 provider on call always 24-7.  There's -- holidays, weekends,

18 every single day someone has to be on call and they have to be

19 responsive.

20 Q.  And are all five yards staffed with nursing personnel 24     10:07:05

21 hours a day?

22 A.  There's nursing there always.

23 Q.  Seven days a week?

24 A.  Seven days a week.

25 Q.  When you were down providers during your time as medical     10:07:15

UNITED STATES DISTRICT COURT

1    director at Eyman, how did you accomplish coverage for all five

2    yards?

3    A.   I was the gap filler.  So we had -- it was very difficult.

4    So catching up with chronic cares was nearly impossible then.

5    We were -- we were really struggling.  But as far as, you know,                10:07:47

6    HNRs, new patients and that kind of thing, I would go and fill

7    in the gaps where there wasn't a provider.  Or if there was an

8    increased number of patients or HNRs, I would go help a

9    provider cover.

10   Q.   Presently where you're fully staffed with five providers at               10:08:06

11   Eyman, what do you do if a provider is out for vacation or sick

12   time, how do you provide coverage?

13   A.   Again, I cover that space.

14   Q.   In addition to the staffing of each of the five yards at

15   Eyman, are there additional Corizon support staff that serve                   10:08:26

16   the entire complex at large?

17   A.   There -- we have telemetry medicine that helps to see some

18   of the chronic cares.  We have people who help fill in on the

19   weekends to help chronic care backlog, so that we can catch up.

20        We put a plan in place -- because we are required by                      10:08:53

21   the PMs to stay caught up on our chronic cares.  So we put a

22   plan in place to do that.  And so lots of people from all over

23   came in, those who had licenses to practice in the state of

24   Arizona came from all over to help with our backlog.  We're

25   caught up.                                                                      10:09:16

Rodney Stewart – Direct Examination

1    Q.  Dr. Stewart, as Medical Director, are you aware of the

2    Parsons versus Ryan lawsuit?

3    A.  I'm aware of it, yes.

4    Q.  And you're aware that there was a settlement?

5    A.  Yes.                                                          10:09:27

6    Q.  And a stipulation?

7    A.  Yes.

8    Q.  And the stipulation requires the Arizona Department of

9    Corrections to follow certain health care Performance Measures.

10   Are you aware of that?                                           10:09:40

11   A.  Yes.

12   Q.  And are you also aware that obviously to seek compliance

13   with the stipulation there's a monitoring process?

14   A.  Yes.

15   Q.  And are you aware that Arizona Department of Corrections     10:09:49

16   has a Monitoring Bureau that measures compliance with the

17   Performance Measures?

18   A.  Yes.

19   Q.  You, as Medical Director, do you take any role in the

20   monitoring or reporting of health care Performance Measures out  10:10:01

21   of the Eyman Complex?

22   A.  Yes.  We have to stay on top of the Performance Measures or

23   else I don't know who to yell at.

24          So basically if I'm going to task my providers with

25   staying caught up, I have to know what they're behind in.  So    10:10:22

Rodney Stewart - Direct Examination

1    we pretty much stay on top of what -- we have a report that

2    comes out called Pentaho that we look at, we can see who's

3    behind and who's not.  And then I can go to them, usually

4    directly, and say, hey, this is where we are, these people have

5    to be seen today, let's make sure these people get seen today.      10:10:44

6    If they need help, I stay and I help them see those patients.

7    Q.  How often do you look at the Pentaho report?

8    A.  Daily.

9    Q.  And what kind of information does the Pentaho report

10   specifically provide to you that you're concerned about as         10:10:59

11   Medical Director?

12   A.  Just from my standpoint, my biggest concerns are labs and

13   consults.  So PM 46 and PM 52, we have to make sure the

14   providers stay on top of those.  So we've been working really

15   hard on those two particulars.  That comes up at every staff        10:11:22

16   meeting, every single time, where are we with those, and how

17   are we improving those?

18   Q.  And based upon your understanding of Performance Measures

19   46 and 52, are there time requirements associated with those

20   Performance Measures?                                               10:11:38

21   A.  Yes, there are.

22   Q.  Are you aware specifically of what those time periods are?

23   A.  I believe they're five -- my number is five that I keep in

24   my head.  So for both of them, I think one is seven and the

25   other one is five.  For labs, I think it's five days and           10:11:51

Rodney Stewart – Direct Examination

1    consults are seven days.  And I couldn't tell you if it's

2    business days or just straight days.

3             But I just keep that number five in my head.  And

4    that's where I hold them to, which is -- I know I won't get in

5    trouble from that standpoint, from consults or labs, if I can          10:12:08

6    make sure that my providers get their labs seen and reviewed,

7    and get their consults reviewed in that five-day period.

8    Q.  And when you say you won't be in trouble, what do you mean?

9    What kind of trouble would you be concerned about?

10   A.  Well, failing.  We don't want to fail the Performance              10:12:26

11   Measures.  And that's the -- you know, unfortunately

12   Performance Measures have been failed.  There's not a -- you

13   know, there's not -- you know, the skies don't open up and bad

14   things happen.  You know, it's not really like that.  It's

15   about our own personal success.  And so that's why I try               10:12:51

16   encouraging the providers, that, hey, this is our house, these

17   are our patients.  These patients need to be treated

18   appropriately.  But you can't treat them appropriately if you

19   don't know what their labs are.  If you don't know what the

20   consultant say on the consult, how are you going to treat them?        10:13:14

21            So this is fair.  See your patients, review your

22   consults so that you can progress with the management of those

23   patients.  So that's -- that's mostly what our provider

24   meetings -- primarily what I say in the provider meetings, how

25   are you going to treat somebody if you don't know what's going         10:13:33

1    on?

2    Q.  If in your daily review of a Pentaho report you see

3    information or timelines that are causing you a concern, how do

4    you convey that information to your providers?  And then after

5    that, what do you expect of them?                                  10:13:48

6    A.  I expect -- I can tell you what I expect, that it gets

7    taken care of that day.  Most of the time I start with a phone

8    call.  If they're hesitant, then I go see them on that day and

9    try to convey to them, on their busy schedule -- because they

10   are very busy, there's no question about that.  But try to        10:14:12

11   convey to them the importance of doing this.

12        And one of the things I like to say to them, because

13   it's going from nurses -- most of our providers are nurse

14   practitioners, and going from nursing to nurse provider, which

15   is more like a doctor than a nurse, I try to convey to them       10:14:27

16   that you don't punch a clock.  There's -- I really don't -- I

17   really don't want them thinking in terms of time.  Hey, you

18   know, I get done at 4:00 o'clock, or I get done at 7:00

19   o'clock.  That doesn't matter.

20        And so at the meetings I really emphasize that, hey,         10:14:44

21   it's about the job, it's not about the time.  So I have them

22   think in terms of that.  And whenever I hear that excuse, you

23   know, it's getting close to the end of the day, I understand

24   that, but our PMs aren't done.  So we need to figure out a plan

25   to get these either done by the time that you want to go home,    10:15:03

1    or we're not going home that day until those are done.

2            So I'm not like a task master or anything, I just -- I

3    want to emphasize to them that, you know, when you practice

4    medicine, people get sick at all times, bad things happen right

5    in the middle of your day.  Oh, shucks it's too bad.  People       10:15:26

6    come to your ERs and ICS and they're going to interrupt your

7    schedule.  Those things happen, and it's going to prolong your

8    day.  But that's what we do.  That's what you signed up for.

9    Q.  And what do you do if your providers do not meet your

10   expectations with respect to timeliness and adherence to the      10:15:43

11   Performance Measures 46 and 52 related to labs and consults?

12   A.  You know, I got a really good group of people who respond.

13   So fortunately I haven't had to go to the employment folder and

14   say -- put anything in there.  But they do know that if it

15   continues to happen, then we have to put something in their       10:16:07

16   folder, which ultimately could lead -- if it's ongoing,

17   ongoing, with no rhyme or reason, then we might have to

18   terminate them, we might have to separate our relationship.

19           But for those -- for PMs we haven't had to do that.

20   They're really responsive.  They hate when Dr. Stewart gives a    10:16:31

21   lecture.  And I do, I give a lecture, and I wear your ears out

22   primarily.

23   Q.  Do you, in your capacity as Medical Director, have any

24   regular -- regularly timed face-to-face group meetings with

25   your provider staff?                                              10:16:49

Rodney Stewart – Direct Examination

1   A.   Every other week we have a provider meeting.  And every

2   other Wednesday when I'm not -- this is Wednesday.  They

3   actually have a provider meeting today that I can't be at.  So

4   it's every other Wednesday when I don't have something else

5   that supersedes.                                        10:17:04

6   Q.   What happens at the provider meetings?

7   A.   We always start with announcements, things that are going

8   on, that are -- you know, e-mails that have come through,

9   things that we have to pay attention to.  Usually the FHA will

10  give a talk about those things.  And then after that we talk   10:17:23

11  about the thing that we always have to talk about, the PMs.

12  That's about a 30-minute talk, usually a little bit more

13  sometimes, on what they're doing or not doing, how can they do

14  it better?  And then after that we have an education period,

15  training period.                                        10:17:46

16  Q.   Who attends the meetings, if anyone, besides you and your

17  five providers?

18  A.   The FHA, AFHA.  When we had directors, we -- they would go

19  to the meeting.  And then anybody who -- like the coordinators,

20  our clinical coordinators who manage consults and things, if    10:18:11

21  they have issues that come up, they come.  If someone from

22  dietary has an issue about the way we're doing the dietary

23  orders, they will come and give us a talk about how to do it

24  better or right.

25  Q.   Do any ADC personnel from the Monitoring Bureau ever attend  10:18:27

UNITED STATES DISTRICT COURT

1   your bimonthly provider meetings?

2   A.  Not all of them, but many of them, yes.  Especially when

3   there are PM issues.  You know, obviously if you repeatedly

4   fail on a PM, there's something you're not doing right.  So we

5   have to figure out how to do it correctly.  What is it we're          10:18:48

6   missing?  What blank on the eOMIS page are we not filling in?

7           And they also have statistics about who is, you know,

8   failing over and over and over again, what particular provider.

9   So it gives me information on how to -- who to address and how

10  to approach the problem.                                              10:19:15

11  Q.  Do you find the attendance of ADC Monitoring Bureau staff

12  at your provider meetings to be a positive experience in your

13  view or a negative, challenging?  How would you categorize it?

14  A.  To have monitoring people?

15  Q.  Yes.                                                              10:19:32

16  A.  It's positive.  It's -- that's how we -- that's how we know

17  what to do.  There's nobody more informed about the PMs than

18  the monitors.  And, you know, they tell us, as supervisors,

19  hey, you know, this person's not cutting it, they're not doing

20  what they need to do.  And they tell us how they're failing.         10:19:53

21  And it's like, you know, this person really hates to write in

22  this section of the eOMIS, they don't fill out this part

23  continuously, or they leave this blank continuously.  If we

24  don't know that, then we can't address it.  So who would know

25  better than the monitors do?                                         10:20:19

Rodney Stewart – Direct Examination

1    Q.  Would it be fair to characterize this type of education

2    that the monitor may give as assisting Corizon staff in putting

3    the information to document the care that was actually provided

4    in the right place so that the Performance Measure can be

5    assessed and then either determined whether to be in compliance          10:20:41

6    or not?

7             MR. FATHI:  Objection, leading.

8             THE COURT:  Overruled.

9    BY MS. LOVE:

10   Q.  You can go ahead.                                                      10:20:50

11   A.  Yes.  Again, if you don't know where you're failing -- I

12   mean, to say the PM is failing, that's one thing.  But if you

13   don't know how you're failing it, how do you correct that?  I

14   mean, if someone says, hey, you know what, you're not getting

15   your consults done, and I go to the provider and I say, hey,              10:21:11

16   you're not getting your consults done, they go, yes, I am.

17   Well, the PM says -- the monitors say you're failing.  But they

18   don't tell me how they're failing, I'm going to get this

19   argument with the provider.  They're saying, yes, I'm filling

20   out this thing every single time.                                         10:21:28

21             It's not that they're filling it out -- I mean, when I

22   first -- for instance, when I first got to -- in 2015 when I

23   first got there, EMR, okay, EMR, I can do that.  Type, fill it

24   in.  Well, when I write a history and physical, I like to keep

25   my history and physical together, all of it, all of it compact           10:21:49

514

1   in one place where you can see everything.  It helps, when

2   somebody looks at it they don't have to go searching

3   everywhere.  But eOMIS isn't structured like that.

4           The monitors, when they look at eOMIS, they say, okay,

5   subjective filled in, objective filled in, assessment filled      10:22:11

6   in, education, you know, plan.  They look at those sections.

7   Well, all of mine was in subjective.  I had everything,

8   history, physical, everything was all in there, my assessment,

9   education, what I discussed with the patient, all in that one

10  section.  But I kept failing.                                      10:22:31

11          I'm like, hey, all the information is here.  But the

12  monitors go, oh, yeah, now I see it.  But that's not how we do

13  it.  We only look in -- we look at the subjective, is that

14  filled in, objective, is it filled in, are those blanks filled?

15  The information may be there.                                      10:22:49

16          So my providers tell me they're doing it, but they're

17  not putting information in the right places.

18          The monitors can tell us, hey, this is what MP so and

19  so is doing.  So I can go to the MP and I say, hey, don't do it

20  that way, do it this way.  Okay.  Make sure you do it -- or       10:23:06

21  they're doing it, but they're doing it late, they're missing it

22  by this amount of time.  Okay.  Don't do it -- like when you

23  see the patient, write your note.  Don't wait whatever hours

24  you're waiting and then write the note.

25          They're doing it, but they're not getting credit for      10:23:22

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1      it.  So that's the problem.

2      Q.  Based upon your experience working for Corizon from 2015 to

3      the present, both in your capacity as a provider at Florence

4      and now as Site Medical Director, have you found the

5      Performance Measures such as 46 and 52 to be positive in the          10:23:40

6      advancement of delivery of care to the inmates, or a hurdle?

7      A.  No, that's -- those -- that's a -- it's worked out

8      fantastically, honestly.  I think they're not a hurdle.  Again,

9      you know, as I said earlier, if you don't know what's going on

10     with your patient, you can't take care of the patient.  If you          10:24:05

11     don't know what's going on in a timely way with your patient,

12     you can't take care of your patient.  They could be dead before

13     you get to them.

14          So knowing the labs is extremely important.  You

15     ordered it, you ordered it with a purpose, and now you're just          10:24:20

16     going to forget about it?  No.  Review your labs, get the

17     answers that you asked for, and then take care of the problem,

18     if there is a problem.

19          You ordered the consult, don't you want to know what

20     the consultant said?  Don't you want to know if there's a          10:24:35

21     diagnosis of cancer now in your patient?  You should go and

22     review that.  And then maybe have a discussion with the

23     care -- with the outside caregiver that -- we encourage that.

24     We push that.  They're not a hurdle, they're actually very

25     important things to do in the care of the patient.          10:24:52

Rodney Stewart – Direct Examination

1            So it's -- it really is more about that than it is

2    breaking the PM or getting through the PM or satisfying the

3    court order.  It really is about taking care of the person.

4    Q.  Since you became Site Medical Director at Eyman, did you

5    have the opportunity to work with a Dr. Janice Watson?                10:25:13

6    A.  Yes.

7    Q.  When you became Site Medical Director at Eyman, was

8    Dr. Watson already working at the Eyman Complex?

9    A.  She was.

10   Q.  And as you became the Medical Director then, did you              10:25:26

11   directly supervise Dr. Watson?

12   A.  Yes.

13   Q.  Do you know whether or not -- well, first let me stop

14   there.

15           Do you know -- well, is Dr. Watson still working at          10:25:40

16   Eyman?

17   A.  No.

18   Q.  Do you know when her assignment to Eyman ended?

19   A.  In about October 2017 -- October or November 2017.

20   Q.  When she was working at the Eyman Complex, do you know           10:25:57

21   whether or not she was an employee of Corizon?

22   A.  She was a locums.

23   Q.  What does that mean, a locum?

24   A.  She had a -- she didn't have -- she wasn't directly

25   employed by Corizon, she had a contract with another company.       10:26:12

517

—— Rodney Stewart - Direct Examination ——

1   And that company supplied -- supplies employees to short --

2   areas where there are shortages.

3   Q.  And are you aware that KJZZ has reported a story in which

4   KJZZ interviewed Dr. Watson?

5   A.  Yes.                                                      10:26:39

6   Q.  And have you read that article?

7   A.  Yes.

8   Q.  Let me back up here.

9           And you're aware that in the KJZZ story there are

10  allegations made by Dr. Watson as to criticisms regarding the   10:26:54

11  delivery of care by Corizon at the Eyman Complex?

12  A.  Yes.

13  Q.  Had you ever worked with Dr. Watson in any other capacity

14  before your interaction with her at the Eyman Complex?

15  A.  No.                                                       10:27:12

16  Q.  Do you know how long she had worked at the Eyman Complex

17  before you became the Site Medical Director?

18  A.  I don't really know how long she was there.

19  Q.  When you came on as director, was Dr. Watson, to your

20  recollection, assigned to a particular yard?                  10:27:30

21  A.  She was.

22  Q.  Which yard?

23  A.  Cook Unit.

24  Q.  Do you know how many inmates, approximately, are housed on

25  the Cook Unit?  If you know.                                  10:27:40

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1   A.  I could guess.  Somewhere around 1,000.

2   Q.  Do you know what the custody level of the inmates are at

3   the Cook Unit?

4   A.  They're midlevel.  You know, they're not -- they're not 4

5   or 4s.  They're usually around 2, 3 -- 2 or 3 security level,    10:27:58

6   the inmates.

7   Q.  And the Cook Unit has its own medical unit?

8   A.  Yes, it does.

9   Q.  Is there any uniqueness to the staffing or the operations

10  of the Cook yard medical unit versus the other four yards at    10:28:14

11  Eyman?

12  A.  There is not.

13        Well, let me take that back.  The SMU, which is a

14  closed unit, works differently than an open yard.  And

15  Browning, which housed the death row inmates at that time, is   10:28:31

16  different obviously for security than that open yard.  So those

17  two places are different.

18        But Meadows and Rynning Unit are pretty much the same.

19  Q.  Okay.  So Cook, Meadows and Rynning, those are all

20  considered to be what we term as, quote, unquote, an open yard? 10:28:48

21  A.  Yes.

22  Q.  And does that mean that the inmates can walk to the medical

23  unit versus being escorted?

24  A.  Yes.

25        THE COURT:  Miss Love, it's 10:30, would it be all        10:29:03

UNITED STATES DISTRICT COURT

1   right for us to take our ten-minute break?

2           MS. LOVE:  Absolutely.

3           THE COURT:  Okay.  Thank you.

4           Doctor, what we're going to do is take a ten-minute

5   break.  You can leave and come back to your spot before we          10:29:12

6   start.

7           THE WITNESS:  Okay.  Thank you.

8           THE COURT:  Thank you, sir.

9       (Recess at 10:29 a.m., until 10:45 a.m.)

10          THE COURT:  Please.                                         10:45:34

11          MS. LOVE:  Thank you, Your Honor.

12  BY MS. LOVE:

13  Q.  Dr. Stewart, when we left off before the break we were

14  talking about the fact that when you came on as

15  director -- Medical Director at Eyman, Dr. Watson was already      10:45:52

16  working at Eyman; correct?

17  A.  Yes.

18  Q.  And assigned to the Cook Unit?

19  A.  Yes.

20  Q.  Do you know how many days a week Dr. Watson worked at the      10:46:00

21  Cook Unit?

22  A.  Three days a week.

23  Q.  What -- what happened with respect to coverage as to a

24  provider at the Cook Unit on the other four days of the week?

25  A.  If there was a patient census that had to be seen, then I      10:46:22

─── Rodney Stewart – Direct Examination ───

1    saw those patients.

2    Q.  During the time period you supervised Dr. Watson, was there

3    ever a time, to your recollection, where Dr. Watson was the

4    only provider available at the Eyman Complex to serve all five

5    yards?                                                          10:46:44

6    A.  Not to my recollection.

7    Q.  As a provider assigned to the Cook Unit, what were

8    Dr. Watson's duties, as you required them to be, when you were

9    Site Director supervising her?

10   A.  Her primarily was to take care of her yard.               10:47:00

11            I think this is a little close.

12            Primarily it was to take care of her yard, see her

13   HNRs, complete her chronic care visits, and then do the reviews

14   that were required, the consults and review her labs, that

15   any -- you would do in any practice.                           10:47:21

16   Q.  Were you aware or provided information as to Dr. Watson's

17   experience or background in medicine?

18   A.  Not until recently.  So she was an OB/GYN, that I knew.

19   She was proud of that.  And that was the only thing I knew

20   until recently.                                                10:47:45

21   Q.  And what did you learn recently?

22   A.  In the article it said something about her doing some

23   internal medicine stuff and some primary care stuff.  So she

24   apparently has primary care experience.

25   Q.  As to her OB/GYN experience, is that something that you    10:48:05

1    learned shortly after becoming Medical Director and supervising

2    her?

3    A.  Yes.

4    Q.  And how did it come about that you learned that

5    information?                                                    10:48:15

6    A.  She told me.

7    Q.  Did that cause you any particular concern as to her

8    competency to deliver medical care to the male inmates on the

9    Cook yard?

10   A.  It didn't, because we all went to medical school.  You      10:48:29

11   know, as I told you before, I thought about going into OB/GYN.

12   But it's a procedure-oriented business, you know, it's surgery

13   and things like that.  And I was a procedure-oriented person.

14   But the thing that I enjoyed most was putting in lines in

15   central catheters, and -- but all the internal medicine guys     10:48:54

16   were doing it, so I went that way.

17        Women have medical problems too, they have internal

18   medicine problems, primary care problems.  And many of the

19   OB/GYNs are primary care practitioners.

20        So that didn't bother me that she was an OB/GYN            10:49:17

21   doctor.

22   Q.  I want to take the time period now when we're speaking

23   about duties of the providers at the Eyman yard, and I want to

24   take -- focus on the time period where Dr. Watson worked at

25   Eyman.                                                           10:49:31

Rodney Stewart - Direct Examination

1          So you recall that she ended her assignment at the

2     Eyman Complex in October of 2017; is that correct?

3     A.  Yes, as far as I can recall.

4     Q.  Okay.  So let's take the time period of Summer, when you

5     come on as Site Medical Director, Summer 2017 to October 2017,          10:49:46

6     when Dr. Watson is there.  I want to talk to you about the

7     duties and expectations you had as to providers.

8          Now first of all, I want to talk to you about, did

9     you, during that time period, Summer through Fall of 2017, have

10    an expectation as to how many patients your providers on          10:50:10

11    the -- at the Eyman Complex saw per day?

12    A.  Yes.  And that's strictly mathematics basically, there's so

13    many patients, especially when it comes to chronic cares.  And

14    so each -- in order for us to stay on top of our Measures, we

15    have to see a certain number a day.  So we -- the number's 20.          10:50:32

16          We lowered that number for the Browning Unit and SMU

17    to 15 because of security restraints that kept security from

18    bringing the inmates actually to the provider.  And so we

19    lowered that number to 15.

20          But for an open yard it's 20 patients.          10:50:54

21    Q.  And within the 20 patients a day seen by providers on the

22    open yards, what category of patients are the providers seeing?

23    I mean, are they seeing, for instance, all chronic care

24    patients on one day, the next day they're seeing walk-ins?  How

25    does work?          10:51:16

1    A.  It's a mixture every day.  At this point they have a

2    minimum of four inmates that are chronic care.  So they see

3    four chronic cares, and all the rest as HNRs or walk-ins.  Or

4    the HNRs or like the emergency patients.

5    Q.  Does it typically take -- does a provider typically spend          10:51:33

6    more time with a chronic care patient than a walk-in or an HNR?

7    A.  It -- that's a difficult question to answer.

8         If you have a COPD or a diabetic, you know, with an

9    infection all at the -- you know, comes in, you're going to

10   spend a lot of time with that person.  So that person, it's           10:52:00

11   just a walk-in, but you're going to spend chronic care time

12   with them, probably longer.

13        Chronic cares are pretty succinct.  They're almost the

14   same time for every patient, pretty much, because you list

15   their problems, they're right there in front of you, you have         10:52:18

16   to address each problem, and that's pretty much the visit.

17        So those -- for the average walk-in, the average knee,

18   I hurt my knee kind of guy, yeah, chronic cares are longer.

19   But when you got a complex medical -- complex medical problems,

20   it could be the same amount of time.                                  10:52:35

21   Q.  Would it be fair to say that a provider at the Eyman

22   Complex assigned to a yard is, for laymen's terms, I guess, to

23   categorize it, practicing internal medicine?

24   A.  Yes.  Yes.  Definitely at Cook Unit.  There's a lot of

25   medical problems there, adult medical problems.  And that's           10:53:00

1    what internists do.

2    Q.  When you say especially at Cook Unit, what do you mean?

3    A.  There's a lot of illness at Cook.  The Cook Unit is

4    complex.  You know, you have the whole gamut of age.  You have

5    an aging population there.  A ton of cardiac conditions.  A          10:53:19

6    great -- you know, they have an open yard, so these older

7    fellows are trying to exercise, go out and play basketball and

8    soccer and things, and they're injuring themselves.  And you

9    got injuries and people who have complex medical problems, lung

10   disorders and heart disorders.                                       10:53:40

11          So you have to -- it's -- Cook is -- Cook and Meadows

12   both are -- they're tough yards to work on.

13   Q.  Your expectation that the provider see approximately 20

14   patients a day, do you know if that expectation is different

15   than or unique compared to the private sector as to how many        10:54:01

16   patients an internal medicine physician would see?

17   A.  It's actually easier than private sector.

18   Q.  How so?

19   A.  Private sector, they're on ten- to 15-minute periods.  It's

20   super managed care.  And so -- and their populations                10:54:22

21   are -- tend to be pretty large.  And so they're required to see

22   quite a few patients per day.

23          And their pay depends on it.  You know, I mean, they

24   get paid -- in a lot of -- in a lot of companies they're paid

25   per -- on what they see and not how much time they spend with       10:54:45

1    them or how much time they spend at the job.

2         So, you know, in prison you're not paid per patient,

3    you don't -- I don't get 100 bucks to see this guy.  I

4    just -- I get paid to be there for that time period.  So it's

5    different.                                                    10:55:08

6         THE COURT:  A doctor gets paid 100 bucks to see this

7    guy.  From my EOBs they usually get $27, it seems.  And it

8    makes me think that, how is this possible to get time?

9         Because obviously one of the dilemmas I think in the

10   whole process is that medical care -- and I'm not a doctor, but  10:55:23

11   just the observation -- and I want to ask you this question:

12   One of the observations I have is that time really seems to be

13   what is oftentimes necessary.  And there is in the private

14   sector no compensation for that, it seems, other than this very

15   base amount, and also for procedures.                         10:55:39

16        And so the thing that oftentimes really matters the

17   most in the private world, it would seem, is the one that's

18   disincentivized, and that is time.

19        Is that a fair generalization, or is it just too

20   general to even go down that road?                            10:55:53

21        THE WITNESS:  No, it is fair.  But -- so remember I'm

22   from a hospitalist background.

23        THE COURT:  Right.

24        THE WITNESS:  As a hospitalist you get paid for

25   admission and you get paid for the discharge.  You don't get   10:56:02

—— Rodney Stewart - Direct Examination ——

1    paid for the stuff in between.

2              THE COURT:  So the more time it takes, the less money

3    the institution makes.

4              THE WITNESS:  Right.  And also myself, because I'm

5    spending -- if I have an admission on day one, a discharge on        10:56:13

6    day two, now I can go -- my patient population decreases, I can

7    take another admission and do the same thing.

8              If I have an admission on day one and a discharge on

9    day 20, I'm spending 20 days with that one person, and I can't

10   admit because of his presence.                                       10:56:33

11             THE COURT:  I understand.

12             Doctor, while I have you, with respect to Miss Love,

13   this afternoon we're going to take a time to hear from one of

14   the Court's experts.  And he has given a presentation in

15   advance to us that raised a concern that we had that you can         10:56:49

16   address.

17             And that is, with respect to what kind of care you

18   take regarding the full disclosure of your names.  From cases

19   that we see, oftentimes the people who bring cases who are

20   inmates only know first names.  And that made they think that       10:57:04

21   maybe the ID badges that you wear have just first names and not

22   your whole name.

23             And the reason I'm asking this question is the

24   information that the expert has provided has the full name of

25   provider.  And I don't know whether, for instance, when you         10:57:16

1    wear your ID when you're seeing a patient, does it show your

2    full name?

3              THE WITNESS:  I got my I.D.

4              THE COURT:  We've got Exhibit 1 here.

5              Okay.  So for everybody who is a provider, the full          10:57:31

6    name is there?

7              THE WITNESS:  On the badge?

8              THE COURT:  Yes.

9              THE WITNESS:  I'm different.  I like to wear a white

10   coat.  My white coat has my name right across the top.          10:57:42

11             THE COURT:  But is it true that all the providers have

12   to have a badge displayed?

13             THE WITNESS:  You can't get on the yard without a

14   badge.

15             THE COURT:  So the last names are not secret?          10:57:51

16             THE WITNESS:  No.

17             THE COURT:  Okay.  Thank you, Doctor.

18             I'm sorry to interrupt.

19             Please go ahead.

20   BY MS. LOVE:                                                        10:57:57

21   Q.  Do you provide, as Medical Director, education and training

22   to your providers on how to accomplish seeing 20 patients in

23   one day?

24   A.  Yes.  I use -- for me, in particular, I use my -- I carry a

25   cellphone.  They're not allowed to carry cellphones, but they          10:58:19

Rodney Stewart – Direct Examination

1    have clocks.  But I take my cellphone out and I show them, hey,

2    you know -- I go to my time lapse and I say, hey, you click 15

3    minutes.  Okay?  And I put it there.  Get an alarm in 15

4    minutes.

5            Now that doesn't mean that the visit's got to be 15      10:58:38

6    minutes exactly.  But when it rings, you know, I don't even

7    stop talking to the patient.  I hear it ring and I just push it

8    to shut it off.  But in my head I know that I am pretty close

9    to being in my 20-minute period, 20, 25 minutes to finish with

10   that inmate.                                                     10:58:59

11           So I tie up loose ends, spend time tying up loose

12   ends, and making sure that -- at the end you say, hey, these

13   are the things that we addressed, and this is how I'm going to

14   take care of these issues.  You may still have some outstanding

15   issues.  If you do, then we bring you back.  If they're real    10:59:15

16   important, we bring you back tomorrow.  If they're not that

17   important, maybe we'll see you next week and do the same thing.

18           It's the same as in any primary care office, you

19   accomplish what you can in the time period that you're allowed.

20   Q.  In addition to seeing 20 on average patients a day, what    10:59:30

21   are the other duties that providers at the Eyman yard must

22   accomplish?

23   A.  They're the overseers of the ER, the treatment room in

24   which an ICS could come in.  So they have to stop doing what

25   they're doing.  If somebody comes in bleeding, somebody comes   10:59:55

Rodney Stewart – Direct Examination

1   in clutching their chest, someone can't breath, for whatever

2   reason, they have to stop what they're doing, they must go see

3   that patient.

4   Q.  What does the acronym ICS stand for, if you know?

5   A.  Something control systems.  It's a D.O.C. term.  It would          11:00:09

6   be like a code blue for in a hospital.  You know, something

7   that needs emergent attention.

8          And ICS doesn't always mean medical, it could be a

9   security issue or anything else.

10  Q.  When there's a medical ICS, is it a situation where the          11:00:28

11  inmate is always brought to the provider, or are there

12  circumstances where a provider will respond basically on scene

13  to the inmate?

14  A.  It depends.  If they're doing -- if the nurses respond

15  first, if they're doing CPR in the field, then my expectation          11:00:47

16  as the SMD is that you get up, you go out there, and you

17  assist.

18          And a lot of times I'll hear it on the radio, and so

19  wherever I am, I'll go to that yard and assist.

20          That's my expectation.  If they can't bring it to you,          11:01:05

21  then as a provider you go out there and assist.

22          The nurses generally respond to those and take care of

23  the inmates as they see fit.  So if the inmate is stable, they

24  bring it back, they do the initial assessment, and then they go

25  tell the provider, hey, this is what we have.          11:01:25

UNITED STATES DISTRICT COURT

─── Rodney Stewart – Direct Examination ───

1    Q.  So we've got -- I'm going to start listing as we go, the

2    categories.

3            We've got, see 20 patients a day.

4    A.  Um-hum.

5    Q.  We've got respond to ICS where needed.                    11:01:34

6            What other duties do -- are expected of providers at

7    the Eyman complex?

8    A.  They have -- they have their reviews that they have to do.

9    We kind of prefer that they try and get those done in the

10   morning when they first show up so that -- if you review your   11:01:47

11   labs and your consults, then you know how to treat the patient

12   later on when you see them, if you're going to see them that

13   day.  There are -- there's an education meeting every single

14   day that we try to educate them, from a real-time, real case

15   standpoint.  So we present our admissions to the hospital.  So  11:02:08

16   if someone is sick enough to go to a hospital, we have a

17   report, we report, and then we discuss the case.  Why did that

18   patient go to the hospital?  What were the circumstances?

19   Could we have prevented that patient from going to the

20   hospital?  Was there something we could have did two days ago   11:02:26

21   that could have stopped that patient from getting that sick?

22   Those kinds of things.

23           So that's once a day.

24           And two things that really stop the provider from

25   seeing patients are the lockdown times, when they have count at  11:02:40

——— Rodney Stewart – Direct Examination ———

1   11:00 and o'clock at 4:00 o'clock.

2   Q.  The daily meetings that you have, are those meetings at a

3   set time?

4   A.  At 11:00 o'clock every day.

5   Q.  How long do the meetings last?                          11:02:55

6   A.  About 30 minutes.

7   Q.  Do you require that the providers physically attend the

8   meeting, or do they attend by phone?  How does that work?

9   A.  It's a phone conference every day.

10  Q.  And that is where you go over information related to      11:03:06

11  admissions of patients that are happening; is that correct?

12  A.  Yes.

13  Q.  Anything else that is discussed in the daily meetings?

14  A.  If there is -- if we're having a particular problem, let's

15  say there's a security issue, that will be discussed.  If the 11:03:24

16  computers go down, that will be discussed.  We try to figure

17  out a solution for that, what to do if we don't have -- if we

18  have to go back to paper and pencil.

19         Pretty much troubleshoot, that's pretty much what we

20  do.  It's education.  And then whatever else anybody else wants 11:03:43

21  to discuss or present.

22  Q.  Do you have any expectation for your providers as to how

23  they organize their day in order to accomplish the tasks that

24  they are required to do, including the patient care, ICS if

25  happening, reviewing their labs and consults, their daily      11:04:03

Rodney Stewart – Direct Examination

1    meetings?

2    A.  So we –– I tell them, start doing your reviews.  You're not

3    going to get them all done.  Do your reviews, your 46 and your

4    52.  Then start seeing patients –– after about an hour or so of

5    review, start seeing patients.  Try and see those in 20-minute          11:04:18

6    increments.

7            At 11:00 o'clock be on the phone call.  11:30, do

8    reviews.  Because you're not going to have patients there

9    between 11:30 and 12:00 o'clock because of the count time.

10   Once count is over, start seeing patients.  Be aggressively          11:04:38

11   seeing patients.  Get as many as you done –– in that time

12   period as you can, until 4:00 o'clock, which is another count

13   time.

14           After 4:00 o'clock –– or after 5:00 o'clock –– count

15   is an hour, so during that 4:00 to 5:00 o'clock period, again          11:04:51

16   they have another period to do their reviews, 46 and 52.  Make

17   sure you get those out of the way, they're completed for the

18   day.  If we can get them all done, great.  But if you can't

19   get –– if you can't get them all done, make sure you get day

20   three –– those are at day three, day four, and definitely if          11:05:09

21   they're at day five.

22   Q.  And operationally, what happens during count time?  Is it a

23   situation where the providers cannot see patients during count

24   time?

25   A.  You can get patients.  It's difficult.  But if you          11:05:25

UNITED STATES DISTRICT COURT

—— Rodney Stewart - Direct Examination ——

1    absolutely need to see someone, they're compliant.  They will

2    help us try and get those patients out.  But it's very

3    difficult because it's a security measure.  You need to know

4    that all the inmates are in the facility.  So that's an

5    important thing.                                              11:05:43

6    Q.  So is it a situation where inmate movement stops during the

7    count time?

8    A.  All inmate stops -- all inmate movement stops.

9    Q.  What if -- currently the medical units run where an inmate

10   may show up with an HNR and present it to be seen that day;     11:05:59

11   correct?

12   A.  Yes.

13   Q.  What if an inmate is at the medical unit waiting for his

14   turn and it's count time, does the inmate have to go back to

15   his unit and then return?  How does that work?                 11:06:15

16   A.  No, he can -- they can take him out of count.  He's

17   counted, but he's count in the medical unit.  So they

18   just -- they have to stay there the entire hour though.  So if

19   it was a ten-minute problem, they're staying there the whole

20   hour until count is over.                                      11:06:31

21   Q.  You spoke about in your daily meetings you talk about any

22   issues that might come up such as security issues.  Are there

23   security issues that regularly come up that impact the delivery

24   of care to inmates?

25   A.  Absolutely.  Especially at SMU or Browning, there's always  11:06:54

1    something happening.  You're assigned so many officers, but if

2    those officers have to break away to take care of something,

3    you stop -- you can't see patients.  They won't bring any

4    patients to you.

5           And because of the security level of those                11:07:11

6    patients -- especially at Browning, if the security level is

7    really high, they may not be allowed to have other inmates in

8    the area or the vicinity of that particular inmate.  So he

9    comes alone.  And so you can't go -- you know, see this patient

10   and then see the next.  What happens, they have -- you see that  11:07:29

11   patient, then they have to take that patient all the way back,

12   and then start getting -- start back on your line, start the

13   next patient again.  So it just depends on the security level

14   of the patient.

15   Q.  I believe you also mentioned -- please correct me if I am    11:07:44

16   incorrect, but I believe you testified that another issue you

17   may discuss in your daily meetings is if eOMIS goes down you

18   have to return to pencil and paper.

19   A.  Yes.

20   Q.  What did you mean by that?                                   11:07:59

21   A.  Well, if eOMIS goes down, you can't write -- you can't

22   input your notes in the computer.  But you can still see

23   patients.  I mean, we have PMs -- we have Measures.  So you can

24   still see patients, but you can write the full note on a piece

25   of paper and hang on to it until eOMIS is back up and running,   11:08:18

1    and then you have to spend time inputting that information.

2            THE COURT:  How often does this happen that eOMIS

3    falls?

4            THE WITNESS:  It's not on a regularity, so it's hard

5    to say.  But it's happened recently.  We've had some problems        11:08:34

6    recently.  But it can -- it can happen -- I think last year it

7    probably happened maybe four times or something like that.

8            THE COURT:  Those outages, how long do they usually

9    last?

10           THE WITNESS:  Some of them last year, I think, went        11:08:51

11   all day.

12           THE COURT:  Thank you.

13   BY MS. LOVE:

14   Q.  If a provider is not able to see the on average 20 patients

15   per day, taking the time period of Summer to Fall of 2017, did        11:09:04

16   you have an expectation that a particular provider report to

17   you and let you know, hey, Dr. Stewart, I wasn't able to get to

18   all of my patients today because of X, Y, Z?

19   A.  Yes, that's a requirement.  I require them to call me if

20   they're not going to be able to see their entire line.  One, it        11:09:24

21   gives me an opportunity to go help them.  Or two, I can -- we

22   can set -- assess the acuity of those inmates and see if they

23   absolutely need to be seen today, or is it something we can

24   reschedule -- we can coordinate with the people who coordinate

25   those lines, the CNA, the AFHA, who help coordinate those        11:09:45

Rodney Stewart – Direct Examination

1   lines, nursing, staffing and all that kind of stuff.

2   Q.  Talk to me, Dr. Stewart, if you will, about your management

3   style as a medical director.  What is Dr. Stewart's management

4   style as far as interaction with your providers?  Are you

5   someone who wants to be e-mailed reports?  Do you want a phone        11:10:03

6   call?  Are you available by phone?  How do you interact with

7   your providers daily?

8   A.  I hate e-mails.  I need to talk and see them.  If I can't

9   see them, at least talk to them.  So most of the time I manage

10  them by phone or physically present.                                 11:10:25

11          I'm an educator, that's first and foremost.  So I

12  spend a lot of time teaching, a lot of time teaching, and not

13  just my providers, nursing staff too, as to what we need and

14  what -- what are you looking at?  Why is this important?  Why

15  do we have to do these things?  Why do we have to get an EKG         11:10:48

16  when somebody says they have chest pain?  We spend a lot of

17  time educating, tons of time educating.

18  Q.  One of the duties and requirements of your providers is to

19  review specialty consults; correct?

20  A.  Yes.                                                             11:11:04

21  Q.  Is it the responsibility of a provider at Eyman to request

22  a specialty consult?

23  A.  Yes.

24  Q.  So there's not -- it's not a situation where there's one

25  person who's in charge of all specialty consults requesting         11:11:14

Rodney Stewart – Direct Examination

1    them for the entire complex?

2    A.   No, it has to be the provider, because it's a medical

3    issue.  It has to be a medical person, a medically-trained

4    person to request a consult.

5    Q.   And does Corizon provide a set procedure whereby a provider    11:11:29

6    will request approval for an outside specialty consult?

7    A.   I didn't get your question.

8    Q.   Does Corizon provide a specific procedure where providers

9    have to go through certain steps to request an outside

10   specialty consult?                                                 11:11:52

11   A.   Yes.  In eOMIS there's a consult request page.  You request

12   it on the page.  You try to be as thorough as you can as far as

13   information goes.  And that gets submitted in eOMIS to the

14   clinical coordinator.  Clinical coordinator then pushes it up

15   the chain to the UM management team.  And Utilization            11:12:09

16   Management then decides whether that is something that should

17   be done or should not be done based on the clinical necessity.

18   Q.   I want to back up a little bit and ask you, Dr. Stewart,

19   why would there be a need to send a patient to an outside

20   specialty consult?  In general terms.                            11:12:33

21   A.   Generally, they require a skill beyond our abilities in the

22   facility.

23   Q.   And when we say "outside specialty consult" is it fair to

24   say you're referring -- or requesting a referral to a specialty

25   physician in the private sector?                                 11:12:52

UNITED STATES DISTRICT COURT

─── Rodney Stewart – Direct Examination ───

1    A.  Yes.

2    Q.  Based upon your experience from 2015 to the present, have

3    you found there to be any particular challenges in facilitating

4    outside specialty consults?

5    A.  Yes.  In 2015 it was difficult as a primary care provider.        11:13:13

6    And maybe it was because I was newer then and didn't exactly

7    understand.  Again, that's where monitors help you too with

8    information.  This is important information, this is an

9    important -- to include in your consult.  And the regional

10   medical directors also helped us with trying to get information     11:13:46

11   into the consult appropriately so that when somebody reads it

12   they go, okay, yeah, I can see how that is important and needs

13   to be done.  Or, you know, there's another way to do this, do

14   it this way.

15          So in 2015 I struggled with consults, as everybody did     11:14:04

16   probably.  But I got better in 2016.  And it's not a problem

17   for me personally, as it would be, say, for my MP providers

18   right now in 2017 or 2018.  It's a learning process to

19   understand what needs to go in those consults that will get you

20   the result that you want.                                          11:14:30

21          And sometimes what you want isn't correct.  People are

22   fallible.  What you're asking for, you think -- in your mind

23   you see this picture, yeah, I'll get this and this is what will

24   make this patient better.  But maybe it's not.  And they'll see

25   it in UM.  And they'll tell you no.  And first you kind of get    11:14:49

539

─── **Rodney Stewart – Direct Examination** ───

1   a little upset and say, hey, why are you telling me no?  But if

2   you think about it, it might be the right thing to do.  So it

3   might be something to consider.

4         Fortunately -- you know, sometimes you're going to

5   disagree, and there's an appeal process.  So it doesn't always      11:15:09

6   have to be no.  Or we don't really deny it, we say ATP,

7   alternative treatment process.

8   Q.  Have you personally encountered any particular challenges

9   with respect to locating outside specialty consultants in the

10  community that are willing to see the inmate population?           11:15:35

11  A.  Yes.  Some are and some aren't.  There are challenges,

12  because -- I mean, think about it.  If you have a practice and

13  your practice is some general, let's say ENT.  ENTs see all

14  race, all ages, all -- male and female.  But if you're -- if

15  you have a bunch of orange with chains walking into your office   11:16:08

16  doors, it might affect your clinic.  It might affect the amount

17  of people who want to come to your clinic.  And so some people

18  say no.  Some people say no to inmate -- an inmate population.

19        We have to -- it takes time to find people who are

20  willing to do that, to have inmates come in.                      11:16:32

21        Many of our -- like in the IPC, many of our patients

22  are on stretchers because they're so sick, they have to go on

23  stretchers.  Well, even in the regular community, if you're in

24  a skilled nursing facility and someone is on a stretcher, a lot

25  of doctors will say, no, I don't want stretchers coming into my   11:16:50

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    office practice.  Because they come in on a stretcher, they go

2    out on a stretcher, and it gives an appearance that you're

3    sending patients out on a stretcher from your practice.  It's

4    just appearances.

5           And so some people just say, I don't want that.  I                11:17:04

6    just don't want really sick people in my office.

7    Q.  Have you ever personally had to take any action where

8    you're making phone calls or talking to persons in the

9    community to try to find outside consultants willing to see

10   patients?                                                                 11:17:19

11   A.  Yes.  But not everybody has the ability that I do, because

12   I started in the community.  And so many of our patients go to

13   Mesa, Tempe and Chandler, and so I know a lot of physicians

14   there.  So, you know, I can -- I can pull out my phone and I

15   can make a phone call and say, hey, will you be willing to do     11:17:37

16   this.

17          But it's not like that across the board, you know.  It

18   makes it very difficult.  It's difficult sometimes to get

19   consults.

20   Q.  I want to now have you walk us through the process of how a   11:17:48

21   provider makes a specialty consult.  You talked to us in

22   general terms about using the computer system; eOMIS, CARES.

23   But take us through step by step.  If you've seen a patient,

24   you believe that, for instance, the inmate needs a cardiac

25   consult.  You as the provider, what is your next step?  What      11:18:09

Rodney Stewart - Direct Examination

1  are you doing and how?

2  A.  If it's just a consult, and the patient is stable, that's

3  pretty easy.  I just -- from that standpoint if it's -- if it's

4  cardiology, I can call the cardiologist and say, first of all,

5  does this patient need to come to your office?  And I can take

6  a picture of his EKG and text it to the physician directly.

7  And he can text me back and say, yeah, that's important or

8  that's not important.

9       If it's -- if it's not a stable patient, I always take

10  a picture of the EKG and I send it to the physician that I use.

11  And he tells me, yes, that's -- we got to get this patient

12  going.  He usually meets the patient -- he tells me the

13  hospital he wants the patient to go to, and he meets the

14  patient there in the emergency department.

15       And then the next thing I do is text the hospitalist

16  for that hospital, and he also meets the patient in the

17  emergency department.

18  Q.  Take me through -- is that a unique circumstance related to

19  cardiology and your connections in the community, or is that

20  across the board?

21  A.  All of us are required to, for an emergency that we're

22  sending out, to contact the emergency doctor and talk to them.

23  Because I know this physician and he has a really good

24  relationship with Florence and Eyman, I can do that with that

25  cardiologist.  There aren't a whole lot of cardiologists going

1    to get up at 2:00 in the morning and meet the patient.  He

2    will.

3              So, yeah, that particular part of it is unique to

4    Florence and Eyman.  But everyone is required to contact the ER

5    doctor to let them know what's coming.                          11:20:16

6    Q.  Let's take an example of a provider who needs -- who, for

7    instance, would like for a patient to have an orthopedic

8    consult.  Is there a process, a set process by which the

9    provider needs to provide information to some other division or

10   team in Corizon in order to obtain authorization for an outside  11:20:40

11   consult?

12   A.  Yes.  There's a section in the -- in eOMIS on the page for

13   consults where you have to be pretty thorough about your

14   reasoning for getting a consult.

15             And again, you know, many of the people who work for   11:21:00

16   me are new providers, and they don't always know what to

17   put -- they don't have a lot of experience that will tell them,

18   hey, you know, you always need to put whatever, you know, the

19   respiratory rate or something.  You always need to put that in

20   for this consult if you want a pulmonologist.  You always need   11:21:24

21   this.  So they don't know that.

22             And it just comes with experience.  So sometimes their

23   consults will get rejected because they didn't have adequate

24   information.

25   Q.  Okay.  So does the provider have to type out in the         11:21:38

1    computer system a request, I would like -- I may be simplifying

2    this.  I would like an orthopedic consult for this patient

3    because X, Y, Z.

4    A.  It's more like this:  I have a 70-year-old white male, past

5    medical history, diabetes, hypertension, COPD, who present with     11:21:58

6    a fall who is now complaining of right hip pain with ecchymosis

7    or bruising around the site, you know, et cetera, et cetera.

8    Describe the level of pain.  X-rays show this.  We are

9    requesting approval for this consult for hip repair or fracture

10   repair or whatever.                                                 11:22:25

11   Q.  And that is typed into a portion of the Corizon computer

12   system?

13   A.  Correct.

14   Q.  Where does that request go?  Who does it go to?

15   A.  It goes to the clinical coordinator first.  The clinical       11:22:36

16   coordinator is then -- actually improve it by putting the

17   actual -- say the hip X-ray report in there, or if you got a

18   CT scan, or if there was a old CT scan or previous X-ray, they

19   put it in there.  If there were -- if there's a nursing report

20   that's pertinent, or if there was a previous consult, or if        11:22:57

21   someone else saw the patient in regards to a similar thing,

22   they'll put that in there.

23        So they actually add information that helps you.  And

24   then they send it to the UM Team.

25   Q.  Would it be fair to say then that there is a narrative         11:23:11

Rodney Stewart – Direct Examination

1  statement outlining the basis for the need for the consult, and

2  then additional medical evidence in the form of pertinent

3  records or labs or studies that then also go with the request?

4  A.  Yes.

5  Q.  Who decides what medical evidence, so to speak, in the form        11:23:32

6  of whether it's labs, X-ray reports, et cetera, goes with the

7  consult request?

8  A.  The provider.

9        THE COURT:  How?  How do you do that?  How does the

10  clinical coordinator get that information?                            11:23:49

11        THE WITNESS:  At the end of your narrative you put,

12  please add X-rays, please add previous patient visits, you

13  know, whatever.  Whatever you want, you put in there.  You put

14  it at the bottom.

15        THE COURT:  I see.  And does the clinical coordinator         11:24:04

16  then augment that with his or her own additions that he or she

17  may see fit, or is it limited solely to what the provider

18  indicates should be included?

19        THE WITNESS:  Only if they call you.  So they'll say,

20  okay, I couldn't find the X-ray, would this be okay?  Or, you      11:24:19

21  know, you didn't order a chest X-ray, do you want one now?  And

22  then I'll put that in.  You know, I mean --

23        THE COURT:  Okay.  And this first request that goes

24  from the provider to the clinical coordinator that has this

25  information you say at the bottom, is that in eOMIS?               11:24:41

Rodney Stewart - Direct Examination

1      THE WITNESS:  Yes.

2      THE COURT:  So we will see if we look at eOMIS on

3  every one of the outside referrals the provider's indication of

4  what material that provider wants to be included in the report

5  that the clinical coordinator -- the request that the clinical          11:24:53

6  coordinator prepares for the separate system.  And that request

7  that he or she is preparing, the clinical coordinator, again,

8  what's that called?  Do you know what I'm talking about?

9      So the stage here, as I understand from previous

10  testimony, from what you're just told me, is that the provider          11:25:13

11  indicates that he or she would like an outside referral and

12  issues an order to that effect.  And then at the bottom says,

13  when you submit this to the utilization review people, I want

14  this included, this additional information.

15      I understand that the clinical coordinator then takes          11:25:29

16  that order from you and puts it into a separate system --

17      THE WITNESS:  No, it goes in the same system.

18      THE COURT:  Same -- eOMIS is.

19      THE WITNESS:  Is scanned in.  All the information is

20  scanned in.          11:25:41

21      So it's actually at the top -- so you write the

22  narrative, and then right underneath that you put what you want

23  to be added.  And then underneath that they'll scan in the

24  X-ray report or whatever, it will be all scanned in.

25      THE COURT:  So in eOMIS somebody could see whether or          11:25:54

1    not the provider had indicated that he or she wanted additional

2    information, whether that additional information had been

3    included in the eOMIS order.

4          And then as I understand it the next step, though, is

5    that there is a preparation of a document that goes to                    11:26:12

6    management review.  Because management review does not have

7    access to eOMIS.

8          THE WITNESS:  That's correct.

9          THE COURT:  So this next step has to, I think,

10   necessarily include the documentation that you said would be at           11:26:26

11   the bottom; right?

12         THE WITNESS:  Yes, it does.

13         THE COURT:  Okay.  So this next step, that form that's

14   prepared is in a separate system.  And that system is called

15   again, what, do you remember or do you know?                              11:26:41

16         THE WITNESS:  It's probably CARES.

17         THE COURT:  CARES.  Okay.

18         So if it's CARES, that CARES form that's going to

19   management review that includes this information, do you know

20   what that form -- that request is called?                                 11:26:52

21         THE WITNESS:  No.

22         THE COURT:  Okay.  All right.  Thank you.

23         Thank you.

24   BY MS. LOVE:

25   Q.  In the Summer and Fall of 2017, do you know who the                   11:26:57

Rodney Stewart – Direct Examination

1    clinical coordinator or coordinators were for the Eyman

2    Complex?

3    A.  Yes.

4    Q.  Who?

5    A.  Neese -- Sara Neese and Martha -- what is her name,          11:27:07

6    Velasquez?  I'm not sure what her last name is.  I call her

7    Martha.

8    Q.  Do you know whether both or either of the clinical

9    coordinators during that time period had any medical education

10   or training?                                                     11:27:24

11   A.  Yeah, I believe Sara is an LPN, I believe.  I'm not -- I

12   think Martha -- this is at Eyman only.  Florence, there's

13   another gentleman who has a nursing background.  But I believe

14   Sara might be an LPN or she might be a CNA, I'm not sure.

15   Q.  Now does the -- specifically focusing on Eyman, does the    11:27:46

16   clinical coordinator have discretion to add to the consult

17   request, as far as narrative information or reports, or delete

18   from?

19   A.  Only if they talked to the physician.

20          You really need -- and if you're going to put            11:28:11

21   information in there, you really need a medical background at a

22   provider level.

23   Q.  Does the clinical coordinator have any decision-making

24   power within the consult request process of, hey, we're not

25   forwarding this on to the management team, or yes, we are?      11:28:30

Rodney Stewart – Direct Examination

1   A.  No, they do not.

2   Q.  Would it be fair to say that the clinical coordinator is a

3   facilitator between the provider making the request and

4   gathering the medical evidence and providing that information

5   to the management team?                                        11:28:47

6   A.  That's exactly what they are.

7   Q.  Is it a Utilization Management team, is that --

8   A.  UM, Utilization Management; right.

9   Q.  And then does the clinical coordinator then play a role in

10  facilitation of information that may be received from the      11:29:00

11  Utilization Management, to get that information back to the

12  provider as to what is the response to the request?

13  A.  Yes.  It goes to the same steps out, it comes the same

14  steps back.  So it comes back to the clinical coordinator, and

15  then the clinical coordinator makes sure that information gets  11:29:17

16  disseminated to the providers.

17  Q.  Are there timelines associated with response time?  And in

18  that I mean, the outside consult request is made, gets to the

19  Utilization Management team.  Is there a certain time period

20  that the UM team responds back?                                11:29:36

21  A.  It's usually right away.  You know, we're all under a time

22  constraint.  So it's usually right away.

23  Q.  When you say "right away," are you talking 30 seconds,

24  three days?

25  A.  Same day.  Usually the information is -- it's supposed to   11:29:48

1   be input the same day, so that when our -- when we have

2   results, we actually have results.  So the provider actually

3   has results.

4   Q.  And then when the results are back from the Utilization

5   Management team, how -- what is the time constraints, if any,      11:30:08

6   for the provider to review the results and take any action, if

7   necessary?

8   A.  Technically you should be doing it right away.  With the

9   amount of work that our providers are doing, we're happy

10  with -- if we can get it within the PM time frame.  So our goal   11:30:29

11  is to make sure that they at least do it within the PM time

12  frame, the PM constraint time frame, which my number is five,

13  five days.

14  Q.  How is the provider notified that the UM team has responded

15  to the request?                                                   11:30:47

16  A.  They get an e-mail.  There's an e-mail response.

17          So the way it works is, if you had two screens, you'd

18  have eOMIS open, and you'd have -- you have your e-mail open.

19  And your e-mail will pop up and it will say, hey, there's

20  something here waiting for you, make sure you have eOMIS open.    11:31:06

21  And you click on it, and then the consult will show up -- that

22  particular consult will show up on the eOMIS screen and then

23  you deal with it.

24  Q.  Who does the e-mail come from?  Is it coming from a

25  specific person, is it coming from a database?                    11:31:18

1    A.  From the clinical coordinators.

2    Q.  Does the provider have the ability to access the computer

3    system to check up and see, has the UM team responded before,

4    so to speak, getting an e-mail from the clinical coordinator?

5           Let me ask it a better way.                              11:31:46

6           If I, Rachel Love, am I provider, and I know that a

7    consult was sent to the UM team 48 hours ago, but I haven't

8    received an e-mail from the clinical coordinator saying, hey,

9    the UM team has responded, can I independently go into the

10   system and say, I want to look with my own eyes to see what is  11:32:05

11   the status of my consult and have they responded?

12   A.  Yes.  So most of the time you'll be notified or you will

13   find out that your inmate left the facility.  So once you know

14   that, then you can say, okay, so someone's going to respond.

15   That person's going to come back with a yellow envelope.  The   11:32:28

16   envelope goes to the clinical coordinator.  And it has whatever

17   the outside consultant wants done or thinks needs to be done.

18   And that will be scanned into eOMIS.

19   Q.  So you're talking though here about the results of what

20   the -- the results of the consult.                             11:32:50

21   A.  Yes.

22   Q.  I'm talking about if I have a patient, I, Rachel, am a

23   provider, and I have a patient and I sent out a request to the

24   UM team saying I want -- I'm requesting a consult for outside

25   specialty care.  And it's, for instance, been 48 hours and I    11:33:04

1    haven't heard back from Sara Neese with that e-mail saying

2    Utilization Management team says ATP -- can I go in and check

3    myself and follow it myself?

4    A.  Yes.  You can go in eOMIS, and you look and you can see if

5    it's been scheduled or not.                                    11:33:21

6          So the next thing will happen after I put a request

7    in, is either it's going to be scheduled or there's going to be

8    an ATP.  So if it says scheduled, then your inmate is going

9    out.  If it says ATP, then you have to deal with that and

10   review that.                                                  11:33:38

11         Once the inmate is scheduled then though, they come

12   back.  Again, you can follow whether or not they've returned

13   and whether the clinical coordinator has scanned in that

14   information.  That's when it's time for you to review it.

15         And that will also go back into your -- that will go    11:33:53

16   back into your e-mail.

17   Q.  Do you know who -- do you know what the make-up of the

18   Utilization Management team is?

19   A.  Not really.

20   Q.  Do you have direct access by perhaps telephone call?  If   11:34:07

21   you wanted to call up the Utilization Management team and

22   discuss something with them, can you do that?

23   A.  No.

24   Q.  Do you know whether or not the Utilization Management team

25   has access to the entire eOMIS medical file on the patient?    11:34:21

Rodney Stewart – Direct Examination

1   A.  I don't believe they do.

2   Q.  When the Utilization Management team responds, what are the

3   categories of responses that one may get after submitting an

4   outside specialty consult?

5   A.  You can get a -- it could be successful, in which you won't    11:34:42

6   really get a response, it will just go to the coordinator and

7   they'll schedule.

8   Q.  So that's a yes?

9   A.  That's a yes.

10  Q.  Okay.                                                           11:34:54

11  A.  Or you can get an NMI, which is needs more information, and

12  they'll explain what information they're looking for.

13          Or you get an ATP, which is alternative treatment

14  plan.  Then you can read what the alternative treatment plan is

15  and see if you agree with that.  And then do it, do that         11:35:08

16  instead.

17  Q.  Let's take these one by one.

18          So if, in essence, you get a yes, I request -- I --

19  Dr. Stewart requests an orthopedic consult, UM team decides

20  it's appropriate, it's granted, then that -- did I understand    11:35:25

21  you correctly that that just goes directly to the coordinator

22  who then schedules?

23  A.  Correct.

24  Q.  Do you receive some sort of notification saying, yes, we're

25  going to put this person on the schedule and get them out?  How  11:35:38

—— Rodney Stewart – Direct Examination ——

1    do you know if it's, quote, unquote, granted?

2    A.  You don't get an e-mail in regards to that.  But you can

3    check and see if your patient's been scheduled.

4         If you have -- if you've ordered a consult and you are

5    of some concern about whether that's getting done, you're          11:35:52

6    checking it.  Most of the time you're checking it way more

7    frequent than you probably need to.  And it really is annoying,

8    from my perspective when I'm doing it, to the coordinators,

9    because if I see it's not scheduled, I call the coordinator and

10   I go, why not?  Why is it not scheduled yet?  Call somebody, do   11:36:10

11   something, get it scheduled.  So I'm really pushy about that.

12        And some of my other providers are too.  And I try to

13   make -- the ones who are not, I try to push them to make them

14   responsible.  So I say, hey, why isn't that scheduled yet?  Who

15   did you call?  You haven't called anybody?  Then you should       11:36:30

16   call somebody today.

17   Q.  So is it fair to say if a consult has not been scheduled,

18   then there's two other things that may be going on, either you

19   received an NMI from the Utilization Management team or an ATP?

20   A.  Correct.                                                       11:36:45

21   Q.  Is there ever just a flat-out no denial?

22   A.  No, we don't deny, we offer alternatives.

23   Q.  Is that different in your experience, the lack of a, quote,

24   unquote, just no, flat no denial, is that unique to Corizon

25   versus the private sector in your experience?                     11:37:05

1   A.  Well, some insurance companies will tell you that this

2   isn't appropriate and what we usually do it is this.  Some do,

3   some don't.  So it is a little different.

4          Every time you ask for something from Corizon they're

5   going to tell you -- they're going to essentially say, this is          11:37:20

6   not appropriate.  This is what you should be doing.  This is

7   better -- this is better utilization.  This is safer for the

8   patient, say.  Or, you know, this is -- this is appropriate for

9   the disease process you're talking about.

10  Q.  Let's go now to the -- we have the yes category, getting          11:37:41

11  scheduled.  We have number two, the NMI.

12          If a provider receives an NMI, which I understand to

13  be needs more information, what is the provider expected to do

14  next?

15  A.  Send that information.          11:37:56

16          So you can add it to the information you already put

17  in that section and you can resubmit it with that -- with

18  additional information requested.  So it's pretty simple.

19  Q.  In your experience what kinds of -- what kinds of

20  information would the Utilization Management team ask for?  Are          11:38:09

21  they asking for, quote, unquote, the evidence, like we need

22  more studies, we need more labs, or narratives?  How does that

23  work?

24  A.  Let's say you -- you're requesting something regarding a

25  neuro, a neuro consult, a neurology consult, and you did your          11:38:26

1    physical exam without the neuro exam, well, they would say,

2    well, we need a neuro exam.

3          But even more specifically, let's say you say patient

4    needs a CT scan because they have ataxia.  They'll say,

5    evidence not met because you didn't demonstrate -- in your exam          11:38:47

6    you didn't document the need -- the evidence of ataxia.  So you

7    have to actually write down the focus exam that you did in your

8    notes or some other part of the exam that shows ataxia and then

9    they would proceed.

10   Q.  So if there's an NMI, additional information is submitted,          11:39:09

11   then you're going wait then for the Utilization Management team

12   to come back and say, yes, another NMI, or an ATP?

13   A.  That's correct.

14   Q.  If you receive an ATP from the Utilization Management team,

15   what do you do as a provider?          11:39:32

16   A.  First thing is to read it.  If you agree, then you should

17   accept it and do what they've asked you to do.  And it may

18   surprise you that, hey, this is actually more appropriate.

19   Sometimes it doesn't and you don't agree with it.  And if you

20   don't agree, based on your experience, based on your education,          11:39:57

21   you can appeal it, you can appeal it to the Regional Medical

22   Director.

23   Q.  Tell me about the appeal process and how that works.

24   A.  So there are several levels of appeal.  You can appeal to

25   the Regional Medical Director.  The Regional Medical Director          11:40:15

Rodney Stewart – Direct Examination

 1    will uphold the ATP or they will overturn it.  If they -- if

 2    they don't overturn it, they uphold it, it goes to another

 3    level.  And usually that next level, it usually stops but it

 4    doesn't have to there.  There's a committee above even that

 5    level that will reexamine it again and then decide whether or          11:40:37

 6    not it should stop or not.

 7    Q.  Are you aware of what the makeup is of the panel or the

 8    committee?

 9    A.  I honestly do not.

10    Q.  In the appeal process, do you know whether or not the panel        11:40:50

11    for the appeal process has access to the patient's entire

12    medical record?

13    A.  Yes, they do.

14    Q.  In the appeal process, you, as the provider or the Medical

15    Director, are you able to make a telephone call and actually          11:41:10

16    speak to a person on the panel or appear at the committee or

17    the panel and discuss person to person?

18    A.  Not -- not to the committee.  But in the first levels we're

19    actually -- it's always a good idea.  You're appealing to the

20    Regional Medical Director, it's a good idea to call the               11:41:31

21    Regional Medical Director and say, hey, this is what I'm

22    looking at, this is my situation.  And a lot of times they'll

23    tell you, you got to look at it a different way, what you're

24    thinking is not correct.  Especially with NPs, who often time

25    need guidance, the M.D.s, who are regional medical directors,        11:41:48

Rodney Stewart - Direct Examination

1  can help direct them, their thought process, into a more inline

2  direction, that more appropriate testing and more appropriate

3  requests.

4  Q.  Have you yourself availed yourself of the opportunity to

5  appeal an ATP?                                                    11:42:09

6  A.  Boy, yes.  A couple of times.  A couple of times.

7        And even -- the one time that I did, I was -- I was

8  for most of the process upset about it.  And that ended up

9  into -- it led to a conference.  Not the committee, but it

10 actually led to a conference between the oncologist and a       11:42:39

11 Corizon oncologist who we used for -- to coordinate things, to

12 run things by.  And that ultimately led to an idea sharing and

13 to a good picture of where that inmate was with his cancer.

14 And then some -- and then some appropriate therapy was started

15 because of that.                                                 11:43:10

16 Q.  So you have had success through the appeal process?

17 A.  Yes.

18 Q.  Do you expect your providers to also utilize the appeal

19 process if they disagree with an ATP?

20 A.  Absolutely.  It's okay to disagree.  Not everybody is       11:43:27

21 correct, they're not -- because you don't have the full picture

22 of the circumstances of that inmate's condition, it makes it

23 difficult.  So you should get an opportunity to describe that

24 circumstance.

25 Q.  Is it your expectation that your providers that you oversee  11:43:49

Rodney Stewart – Direct Examination

1  act as advocate for their patient?

2  A.  Yes.

3  Q.  And appeal where necessary?

4  A.  Absolutely.

5  Q.  If a provider gets an ATP back -- which that stands for            11:43:59

6  alternative treatment plan; is that correct?

7  A.  Yes.

8  Q.  And disagrees with it, are the only two choices, I just got

9  to disagree and do it, or appeal, or is there any other

10  avenues?                                                              11:44:20

11  A.  There are other avenues.  If you disagree with that, one,

12  you can try the alternative treatment plan.  It's always good

13  to try the alternative treatment plan, because it's not going

14  to hurt your patient.  It's always good to do that.

15        THE COURT:  Is that always true?  I mean, that strikes         11:44:37

16  me as a little broad.

17        So if the alternative plan is based on errant

18  information because, as you say, people are fallible and it

19  makes a mistake.  So you said it is always safe to do the

20  alternative treatment plan.  What if the alternative treatment       11:44:51

21  plan involves a delay of two months where everybody after the

22  fact would say that delay was wrong, then that treatment plan

23  was not safe.  Fair?

24        THE WITNESS:  No, it doesn't have to be a delay.

25        THE COURT:  I'm positing a hypothetical where the              11:45:05

1   alternative treatment plan is -- the referral is for an

2   immediate consult with an oncology expert, and the people come

3   back from the management team and they say, no, we want

4   additional laboratory findings, we want additional time to see

5   if this course runs satisfactorily.  So they say, do it for two        11:45:22

6   more months.

7          If it turns out that that was a mistake, then that

8   delay was not neutral.  So your statement that it's always safe

9   to do that is a little broad, isn't it?

10          THE WITNESS:  What you're saying is true.  But you can        11:45:37

11   always do two things.  So you can resubmit that ATP and talk to

12   your Regional Medical Director to see if you can get it

13   expedited while you're doing the alternative treatment plan.

14   So you can do two things at once.

15          It's not -- it's not real cut and dry.  It's                    11:45:52

16   complicated.  It's complex.  But you can do two things at once.

17   And you can say, hey, I'm going -- you talk to your Regional

18   Medical Director or your Site Medical Director and you say,

19   hey, I'm going to do the alternative treatment plan, but really

20   we shouldn't be making sure all our ducks are in a row for this        11:46:08

21   next process?

22          THE COURT:  What we've heard -- and I don't -- I'm not

23   trying to be unfair to you, because you didn't hear it all --

24   maybe you did, maybe you have had a chance to understand what

25   was -- the previous testimony was.  But we heard not just from        11:46:24

Rodney Stewart – Direct Examination

1   Dr. Watson, but we heard from other people who are doing the --

2   in particular we had a good deal of testimony about postmortem

3   exams and the self critical analysis that goes on.  And that

4   self critical analysis highlighted a number of times where it

5   appeared that things that were associated with -- perhaps could          11:46:45

6   be associated certainly, and that was my hypothetical with

7   alternative treatment plans, could be actions that were

8   associated with an adverse outcome.

9            And so I was only just pointing out that I thought it

10  was a little broad to say that it was never a problem to give          11:47:01

11  the ATP a shot first, because it could be that it was wrong,

12  and that it could be that it would, at least in my

13  hypothetical, engender delay that could be exactly what is the

14  most dangerous thing.

15           THE WITNESS:  Yes, sir, that could happen.                    11:47:15

16           THE COURT:  Thank you.

17  BY MS. LOVE:

18  Q.  If you as a provider receive an ATP back, but in the

19  interim between the consult going out to the Utilization

20  Management team and the ATP coming back there's a change in          11:47:26

21  circumstances as to the patient's medical condition, and an

22  increase or change in symptoms, an increase in the severity of

23  the condition, do you -- are you socked into trying that

24  alternative treatment plan, or can you go back and just

25  re-request another consult?                                          11:47:45

Rodney Stewart – Direct Examination

1   A.  In a lot of those cases we just send them to the hospital.

2   If they're that -- if they're that ill where time is a problem,

3   you send them to the hospital.

4   Q.  During the Summer and Fall of 2017, did you, in your view,

5   experience any uptick in the number of ATPs and NMIs coming                     11:48:05

6   back from the Utilization Management team?

7   A.  What time period?

8   Q.  Summer through Fall of 2017.

9   A.  There were quite a few.  There was -- we were in -- we had

10  a lot of new providers during that time period.  And it                         11:48:25

11  was -- there was a lot of changes in the way we were doing

12  things, especially in the Fall just toward the end of the year

13  with adding CARES so that we could actually see what was going

14  on in CARES.  It made it difficult.

15          So it was a learning process, a learning curve there.                   11:48:45

16          THE COURT:  I'm sorry, why do you think there was a

17  learning curve, a learning process?  Why did there need to be

18  learning that caused this difficulty, do you think?

19          THE WITNESS:  Well, okay.  So, one, you have to learn

20  how to get into CARES, what is important in CARES, what your                    11:49:04

21  role is in it.  And then we did have a lot of people thinking

22  that CARES -- once they switched to it, you actually still have

23  to do the eOMIS part.  So they -- a lot of people were doing

24  the CARES, but they didn't go back to eOMIS and do that part.

25          So it's education.  It's with anything new, takes a                     11:49:22

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    little time.

2           THE COURT:  All right.  Thank you.

3    BY MS. LOVE:

4    Q.  Was a change in the entire Utilization Management process

5    as to who was deciding the specialty consult decisions during          11:49:31

6    that time period?

7    A.  Ask your question again.  I'm sorry.

8    Q.  Was there any change in the -- to your knowledge, from the

9    Corizon side, any change in the UM process as to who on the

10   UM team was deciding the specialty consult decisions?                   11:49:50

11   A.  Yeah.  Earlier in 2017 -- in 2016 the regional medical

12   directors and the CMO made the decisions regarding consults,

13   whether they were approved or not.

14          The Utilization Management became more a -- more a

15   separate entity without contacts with the providers themselves         11:50:17

16   to make those decisions.

17   Q.  You spoke of a learning curve with your providers utilizing

18   a system, the CARES system, the eOMIS system.  Did you take a

19   role in providing education or training to your providers to

20   address the learning curve?                                            11:50:36

21   A.  I did after I learned it.  I mean, it was a learning curve

22   for everybody, including me.  So once I learned it, we -- I

23   tried my best to help those.

24          But what we mostly did was we sent the coordinators to

25   the providers.  And I would -- but the coordinators would go           11:50:52

──── Rodney Stewart – Direct Examination ────

1    and talk to the provider and say, do it this way, do it this

2    way, add this, don't do that.  Because they don't see this

3    part.

4    Q.  And you've spoken to us about the -- you have talked about

5    your five day -- for you your five day period of time for your          11:51:10

6    providers to be looking at -- reviewing their specialty

7    consults.  And when you say reviewing your specialty consults,

8    are you talking about reviewing the result or the answers from

9    the Utilization Management team?

10   A.  Both.  Either the patient went out for the consult and came         11:51:25

11   back, or the ATPs or NMIs.

12   Q.  How does a provider operations wise know what they need to

13   review?  I mean, is there a chart that lists, okay, in this

14   five day period of time you better be looking at these ten?  Or

15   is it on a case-by-case basis, is there a piece of paper on a            11:51:47

16   desk?  How did that work?

17   A.  There's two ways.  You can go -- in eOMIS there's a reviews

18   section and you can review consults.  It will say review

19   consults.  You click on it, you put your name in there, and all

20   the consults that you have to review will show up.  So you can           11:52:02

21   do it that way.

22        Or you don't -- you don't put your name in it, you put

23   your yard in it, which is what we prefer.  Because sometimes

24   someone else wrote the consult but the inmate ended up in your

25   yard and so you don't know that they're there.  So we actually          11:52:17

Rodney Stewart – Direct Examination

1    prefer that they put the yard name in and then all the consults

2    for that yard, your population, will show up.  And then you can

3    just review those there.

4          What we do on a daily basis though is for the PMs, PM

5    52 comes up, all the consults that need to be done show up and          11:52:34

6    we send them to each individual person on the yard -- each

7    provider at each yard.

8    Q.  And as those are coming up for Performance Measure 52, is

9    it a list of, these are the deadlines for the ones that must be

10   completed today or else you're out of compliance?                       11:52:49

11   A.  They come in color coded.  So red, you messed up and missed

12   your five day.  There's yellow, tomorrow will be the five day.

13   And then there's -- I forget the other two colors, but they're

14   color coded by day.

15   Q.  When the provider is reviewing the consults in the computer         11:53:06

16   system, is there something that they physically like have to

17   check a box or something that says, I have reviewed, I accept

18   the ATP, or I have reviewed, I do not accept and appeal?  How

19   does that work?

20   A.  Yes, that's part of the review.  When you review it, you            11:53:23

21   state -- at the bottom you state what you're going to do.

22          So if the consult comes back and says -- the provider

23   wants, you know, an X-ray, some blood work, you know, for

24   presurgical evaluation, then you write down at the bottom, I

25   will be ordering this X-ray, this blood work for presurgical            11:53:47

1    evaluation.  And then you click and it's recorded.  You click

2    twice actually and then it's recorded.

3    Q.  If a specialty consult is granted by the UM team, and you

4    spoke to us about how it then goes to the coordinator's

5    schedule.  Is it Sara Neese, the clinical coordinator, or is it          11:54:07

6    a different coordinator?  Who is it?

7    A.  They work together.  We've -- we've lost personnel, so now

8    it's primarily Martha.  And I'm blanking on the other

9    coordinator's name.  But there's two of them.  David Ellison.

10   That's it.                                                               11:54:34

11        So those two primarily are doing it.

12   Q.  Once an outside specialty consult is sent to the

13   coordinator and is scheduled, are there circumstances in which

14   a consult would then be canceled by a provider?

15   A.  By a provider?  Sure.                                                11:54:51

16        If -- let's say I -- I'm trying to think.  I'm trying

17   to think -- I mean, I can think -- let's say there's a

18   circumstance where an inmate is ill, and from all -- let's say,

19   okay, a patient has a bowel obstruction, or the X-ray comes

20   back bowel obstruction versus ileus, and you want to send them          11:55:24

21   to a surgeon.  And you show the X-ray, it shows dilated loops

22   of bowel, everything fits.  Bowel obstruction or ileus.

23        Well, ileuses will resolve, bowel obstructions often

24   do not.  So let's say the patient -- you send all the stuff,

25   the X-rays are seen by the UM team, and they say, yeah, we             11:55:45

Rodney Stewart - Direct Examination

1    agree, that's definitely a distended bowel and it's got -- it

2    looks like an ileus, send them to the surgeon.  Comes back, you

3    get -- the patient gets scheduled, the patient is on the

4    schedule, and then the ileus resolves.  The guy goes to the

5    bathroom, his belly pain goes away, he's doing better.  The        11:56:01

6    bowel preps that you gave him worked.

7          Then you cancel it.  So you would just go cancel the

8    consult.

9    Q.  So in that situation the issue or the need for the original

10   consult has resolved such that no need anymore for a consult,     11:56:17

11   we can cancel?

12   A.  That's correct.

13   Q.  Any other reasons, based upon your experience, that a

14   provider may cancel an outside specialty consult once it's

15   granted?                                                          11:56:33

16   A.  A lot of times they will discuss their consult -- they

17   write the consult, a lot of the NPs do this, they write the

18   consult, and then I come later on a teaching day and I'm

19   saying, hey, we're doing these things or whatever, and they'll

20   say, hey, you know, I had a patient just like that the other     11:56:50

21   day I wrote a consult for this.  I go, no, that's not

22   what -- that test will not show you anything.  This test is

23   what you need to do.  Cancel that test, order this test.

24          So if I'm -- if I'm fortunate enough to intervene,

25   then I can tell them to change that so they'll get a more         11:57:06

UNITED STATES DISTRICT COURT

—— Rodney Stewart – Direct Examination ——

1   appropriate response.

2   Q.  If there's -- if you see a situation like that where you

3   believe that the consult order wasn't appropriate, needed

4   different a test, do you need to go back to the utilization

5   team and redo the process to get another consult?                11:57:23

6   A.  If you're going to order something new, you have to go

7   through the Utilization Management, yeah.

8   Q.  In your experience have there been outside specialty

9   consults that are granted and scheduled, later become canceled

10  because there's not an outsider provider available to see the    11:57:39

11  patient?

12  A.  We don't -- it's not really canceled.  If there's a need,

13  there's a need.  So if they can't go to Phoenix and find

14  somebody, we have to send them to Tucson to find somebody.  If

15  there's a need, there's a need.                                   11:57:55

16       But we don't really cancel the consult.  We might

17  cancel where they're going, because the inmate's -- you know,

18  no one's willing to provide that service.  But we'll keep

19  looking until we find somebody that can provide that service.

20  Q.  Under your direction as Medical Director at Eyman, are you    11:58:11

21  aware of any Corizon medical personnel at any level ever

22  cancelling an outside specialty consult to avoid a finding of

23  non-compliance on timelines?

24  A.  No.

25  Q.  Same question with respect to cancellation of an outside      11:58:30

1    specialty consult to avoid fines that may be potentially at

2    issue in this lawsuit.

3    A.  No.  We don't think about -- that doesn't even come up in

4    discussions.  Money or whatever, that's not -- affects us -- it

5    doesn't really affect us at all.  All we're trying to do is get          11:58:50

6    the work done.

7           Again, we cancel them because either there's no need,

8    or we find somebody until -- we keep looking until we find

9    somebody.

10   Q.  Now if there's a situation where a Corizon employee did              11:59:01

11   cancel an outside specialty consult to avoid a fine that may be

12   imposed by the Court in this action, or to save a finding of

13   non-compliance for a Performance Measure, is that something

14   that would be acceptable to you?

15   A.  No.  They would be fired probably.                                   11:59:20

16          THE COURT:  Miss Love, is this a good time to take the

17   noon break?

18          MS. LOVE:  Perfect time.

19          THE COURT:  All right.  Doctor, what we're going to do

20   is break for lunch.  We'll come back at 1:15.  And if you'd            11:59:30

21   kindly be where you are now at 1:15, that would be helpful.

22          THE WITNESS:  Okay.

23          THE COURT:  Thank you, sir.

24          Thank you all.

25          (Recess at 11:59 a.m., until 1:16 p.m.)                            11:59:40

1          THE COURT:  Thank you very much.  Thank you, Doctor.

2          Please be seated.

3          You may continue.

4          MS. LOVE:  Thank you, Your Honor.

5          MR. FATHI:  Excuse me, Your Honor, before we resume,          13:17:12

6    could we just get a time check on approximately how much longer

7    Miss Love --

8          THE COURT:  Are you able to give us that kind of heads

9    up, Miss Love?

10         MS. LOVE:  It's probably -- I'm probably a little over          13:17:28

11   half way over.

12         THE COURT:  Okay.  All right.  Thank you.

13   BY MS. LOVE:

14   Q.  Dr. Stewart, as for your providers at the Eyman Complex,

15   are they responsible for prescribing medications to inmates?          13:17:41

16   A.  Yes.

17   Q.  And as to medication refills, once a medication has

18   originally been prescribed, also are providers responsible for

19   the refill process?

20   A.  Yes.          13:17:58

21   Q.  In what way?

22   A.  The -- we have a person who basically keeps a check on the

23   refills that are coming up for renewal, and she presents each

24   provider with a list of those renewals, and they have to renew

25   those medications.          13:18:15

─ **Rodney Stewart – Direct Examination** ─

1    Q.  How is the list distributed?

2    A.  Generally at the provider meetings, the list is given to

3    them, on the weeks that we do have provider meetings.  It's

4    given weekly.  So on Wednesdays when we don't have a provider

5    meeting, Nurse King takes them directly to the providers, and          13:18:32

6    then they fill it out while she's standing there, and then they

7    give it back to her.

8    Q.  So is it fair to say that the provider is responsible for

9    signing off on a prescription refill in order for it to go

10   through the process to actually get refilled?                          13:18:47

11   A.  Right, right.

12   Q.  Is the list that the providers are given regarding

13   medication refills, do those show, similar to the list on the

14   consults where you said that they were color coded like in the

15   red?                                                                   13:19:00

16   A.  No, it's just a inmate name, medication he's on, the date

17   it's going to lapse.  And all you have to do is basically

18   write, yes, I want to renew that, no, I don't.

19   Q.  Is there a certain time period that's dictated for refills?

20   For instance, if a prescription is a 30-day prescription, is it       13:19:17

21   a situation by day 21 the provider better reorder or there

22   could be an issue in continuation of medications?

23   A.  Yeah, it's a good idea to be considering that a week ahead

24   of time.

25          But we're trying to do the thinking for them by having        13:19:30

Rodney Stewart – Direct Examination

1    that person review the medicines and distribute that list.

2    Q.  When you say have the person do the thinking for them, who

3    do you mean?

4    A.  The Nurse King who basically goes through all the renewals

5    and decides -- you know, all the renewals for Cook for this          13:19:46

6    week, we need to renew these medicines, and she takes that list

7    to them and gets them renewed.

8    Q.  Are you aware that in the KJZZ story Dr. Watson in her

9    interview was critical of Corizon for making runs to nearby

10   Walgreens to fill medication prescriptions?                          13:20:05

11   A.  Yes.

12   Q.  Do you consider -- well, first of all, let's talk about,

13   does that occur in your experience?

14   A.  Yes.

15   Q.  Under what circumstances?                                        13:20:13

16   A.  Whenever a medication is not available, the inmate still

17   needs the medicine, so we go to Walgreens and pick it up.

18   Q.  Do you consider it to be a -- are you yourself critical of

19   Corizon for employing a methodology whereby Corizon goes out to

20   Walgreens to fill prescriptions?                                     13:20:34

21   A.  No.

22   Q.  Why not?

23   A.  Because the inmate still needs the medication.  Despite

24   whatever circumstance occurs where the medication is not

25   available, you should pick the medication up and make sure the       13:20:44

Rodney Stewart – Direct Examination

1    inmate gets the medication.

2    Q.  Would you consider the methodology to go get prescriptions

3    at Walgreens to be essentially a stopgap between just delaying

4    medications all together from being provided to the inmate or

5    an interim solution?                                        13:21:01

6    A.  Yeah, so the -- the process for obtaining medications is

7    that you -- any medication, you write the order for the

8    medication.  The pharmacy, PharmaCor, which distributes the

9    medication, is not in the same state.  So that order goes to

10   PharmaCor, then PharmaCor sends medication, I believe it's    13:21:25

11   FedEx or something, I don't know how they get it here, but it

12   gets here -- takes two days.  Unless there's a weekend, so if

13   you order medication on Friday, you're going to have a two-day

14   weekend plus two days for delivery, because they don't deliver

15   medicine.                                                    13:21:42

16          So the most that you could have where an inmate could

17   miss medication is five days.  So what we do is we are allowed

18   to write five days worth of prescriptions to fill that five-day

19   gap for transportation -- transport.  It's just another way of

20   getting medication.                                          13:22:00

21   Q.  So the prescriptions that Corizon obtains from Walgreens

22   are limited to a five-day supply?

23   A.  That's correct.

24   Q.  Are you aware that the KJZZ story and the interview of

25   Dr. Watson, she alleged a difficulty getting morphine          13:22:14

1   medications for cancer patients on her yard?

2   A.  I did -- I did read that.

3   Q.  In your experience has there been that difficulty that

4   Dr. Watson addressed in the story about getting morphine for

5   cancer patients on the Cook yard?                    13:22:34

6   A.  As long as you follow policy and procedure, there should

7   not be a reason for a lapse in medications.

8            One, recognize that the patient needs medication.

9            Number two, is order that medication in a timely way.

10            Number three, if you didn't order it, let's say you   13:22:55

11   made a mistake or you were sick that day and you didn't order

12   it in a timely way, make sure that you write scripts for five

13   days, and then make sure you contact the people who are in

14   charge -- the AFHA primarily, or the D.O.N., make sure you get

15   those scripts to those people, and they will make sure your   13:23:17

16   medication gets picked up and the patient gets the medication.

17            It's not that difficult.

18   Q.  If there is a situation where a medication needs to be

19   ordered from Walgreens for that five-day interim period, is

20   that something that you expect the providers to alert you to   13:23:30

21   and it goes through you, or they can directly coordinate with

22   the -- who is it that processes that?

23   A.  The AFHA or the D.O.N.  But sometimes the provider picks it

24   up, sometimes the nurses pick it up.  But the nurses can't

25   write the scripts, so the nurses have to notify the provider.   13:23:47

1    So the provider should always know and write the scripts.

2    Q.  As Medical Director, are you advised whether or not -- on a

3    daily, weekly, monthly basis whether Walgreens prescriptions

4    are required to fill gaps in delivery of medications to

5    inmates?                                                        13:24:11

6    A.  I'm not always notified.

7    Q.  I want to turn now and talk to you about your specific

8    experiences with Dr. Watson when she worked at Eyman under your

9    supervision.

10          Now you obviously supervised Dr. Watson; correct?        13:24:26

11   A.  Yes.

12   Q.  Did Dr. Watson then directly supervise any medical

13   personnel?

14   A.  She instructed the people who worked around -- who helped

15   provide her support.                                            13:24:38

16   Q.  What would be considered her team as far as medical

17   personnel working in the medical unit at Cook?

18   A.  All of the nursing staff and the CNA that works with her.

19   Q.  During the course of working with Dr. Watson in the Summer

20   and Fall of 2017, did you come to have any concerns regarding   13:24:53

21   her performance?

22   A.  In the Summer of 2017?

23   Q.  Summer through the Fall.

24   A.  Oh.  Yes.  She -- there again, we have numbers that we have

25   to maintain, and so that became quite a problem.  We have 20    13:25:10

───── Rodney Stewart – Direct Examination ─────

1    patients to see, she would see eight or ten or 11.  So the

2    phone calls were coming almost daily, I didn't get to see my

3    number of my patients this time.  And she'd have excuses and

4    ICS's.  So sometimes it was okay, it was appropriate.  I'd say,

5    okay, we just got to make arrangements.  But a lot of times,          13:25:33

6    no, it was because she was spending way too much time with the

7    inmates on nonmedical issues.

8           MR. FATHI:  Objection, Your Honor, hearsay, move to

9    strike.

10          THE COURT:  Overruled.                                         13:25:45

11   BY MS. LOVE:

12   Q.  You said that there were some circumstances where her

13   ability to see an average of 20 patients a day was justified.

14   What kind of circumstances were those?

15   A.  Well, if she had multiple ICS's and/or had cases where she       13:25:58

16   had to actually do like a surgical procedure to debride a wound

17   or something like that, it takes a lot of time sometimes to do

18   those.  So that would make it okay.

19          If there are things that come up that were medically

20   necessary that would interrupt her schedule, that would be           13:26:17

21   perfectly fine.

22   Q.  Did you ever have a face-to-face talk with Dr. Watson

23   regarding your concerns on her ability to see 20 patients a

24   day?

25   A.  Multiple times.                                                   13:26:29

---

**Rodney Stewart – Direct Examination**

1    Q.  Do you remember how many times?

2    A.  No, I can't remember how many.  Multiple.  It came up

3    almost every time I saw her.

4         But it came up for a lot of providers during that

5    Summer period at the meetings, we were very concerned about the        13:26:45

6    number of inmates that were being seen.  And most providers

7    were able to step up their performance on that.

8    Q.  Did you -- in speaking to Dr. Watson about her patient case

9    load on a daily basis, did you provide her any instruction or

10   training on how to, in your view, better address the issue?        13:27:07

11   A.  Yes.  Again, I gave her my standard lecture on timing, pull

12   out my cellphone.  I say, this is what I do, click the button.

13   We go based on number of minutes.  When the bell rings, you got

14   to wrap it up.  And if there's other -- if there's outstanding

15   issues, if they're critical, then deal with them as soon as you        13:27:31

16   can, next day if you have to.  Or call me, maybe I need to come

17   and deal with it myself.  Or if they're not critical, then

18   schedule it for the next week, the following week when you have

19   the space in your schedule.

20   Q.  Did you ever tell Dr. Watson that she talked to patients        13:27:48

21   too much?

22   A.  I don't recall ever saying that, but we did -- I think

23   Dr. Babich and I had a discussion with her and we told her that

24   we need to make her -- make it more of a purposeful interaction

25   with the inmates.  So find out what their issues are, deal with        13:28:13

UNITED STATES DISTRICT COURT

1     those issues.

2          Because essentially what she's doing is cheating the

3     next guy.  So when -- if you spend a bunch of time on talking

4     about things and trying to figure out things and you're really

5     not solving the problems, you're hurting the guy you're with,          13:28:31

6     plus you're stealing time away from the next guy.

7          So there's only so many hours in a day.

8     Q.  Who is Mr. Babich?

9     A.  Dr. Babich.

10    Q.  Dr. Babich, I'm sorry.          13:28:44

11    A.  He was the Regional Medical Director then.

12    Q.  So he was your direct report?

13    A.  Um-hum.

14    Q.  That's a yes?

15    A.  Yes.  Sorry.          13:28:49

16    Q.  Do you know how many face-to-face talks that Dr. Babich had

17    with Dr. Watson regarding the issue of seeing enough patients

18    per day?

19    A.  I believe he only met with her once with me.  I don't

20    recall him meeting with her a second time, but I'm not 100          13:29:04

21    percent sure about that.

22    Q.  In the course of providing Dr. Watson training or education

23    on how to better see more patients per day, did you ever sit in

24    on her examinations of patients so that you could give her like

25    real life examples of how she could better manage time or          13:29:20

Rodney Stewart – Direct Examination

1   address inmate concerns?

2   A.  Yes.  I sat with all my providers.

3   Q.  And what did you find based upon sitting in on her

4   examinations or interactions with patients?

5   A.  Actually when I was there it wasn't that -- that great of          13:29:35

6   an issue.  She didn't spend a whole lot of time, because I

7   would be interjecting in regards to the medical part, that hey,

8   you know, this is an interesting finding, you know, this -- you

9   know, this is the direction we go with this.  But -- and there

10  wasn't a time issue when I was there.                                   13:29:59

11         But when I'm not there, things change.  And so we get

12  reported from the CNA, her assistant, the CNA assistant, the

13  nurses, hey, she's doing it again.

14         MR. FATHI:  Objection, Your Honor, hearsay, move to

15  strike.                                                                 13:30:19

16         THE COURT:  Here's the thing, Mr. Fathi, I totally

17  understand the reason for the hearsay rule.  And I also

18  appreciate the fact that I'm dealing with a witness who has a

19  state of mind issue about a particular witness in the case.

20  And he's informing me about his state of mind.  So that would          13:30:35

21  be a basis to overrule the objection, and that's what I'm

22  taking it for.  But I'm not taking it for the truth of the

23  matter asserted.

24         Thank you.

25         MR. FATHI:  Thank you, Your Honor.                              13:30:46

Rodney Stewart – Direct Examination

1   BY MS. LOVE:

2   Q.  In relation to your concerns regarding Dr. Watson's ability

3   to see on average 20 patients a day, did you ever review

4   medical records to see what she was charting or documenting

5   during her examinations of the patients?                        13:31:05

6   A.  I did not really look at the medical records for her.

7   There were other people who reviewed her medical records.  The

8   AFHA primarily reviewed her medical records, and then would

9   bring the complaints to me, and then I would just go discuss it

10  with her.                                                       13:31:26

11  Q.  In the course of your supervision of Dr. Watson through the

12  Summer and Fall of 2007 (sic), did you have concerns regarding

13  her treatment of other personnel?

14  A.  Yes.

15  Q.  What were your concerns?                                    13:31:41

16  A.  In general when I spoke to Dr. Watson I did not have a

17  problem with her.  But, whenever the coordinators -- clinical

18  coordinators came around her, she was extremely rude, even in

19  my presence.  So it was -- she was condescending and

20  disrespectful, even though I personally -- and that's why I     13:32:13

21  went with the coordinators on one occasion, because I -- myself

22  and the AFHA sent the clinical coordinators with purpose to

23  assist her to improve her time to better her situation.  And

24  she took it as a -- I don't know what she took it as.  I can't

25  say.  But she -- she was offended by it and acted out in a way  13:32:33

UNITED STATES DISTRICT COURT

─────────── Rodney Stewart – Direct Examination ───────────

1   that was inappropriate.

2   Q.  When you say she acted out in a way that was inappropriate,

3   is this something that you yourself witnessed?

4   A.  The manner in which she talked to them, I don't have time

5   for you right now, I did witness that.  But the hand incident I      13:32:58

6   did not witness.

7   Q.  What is the hand incident?

8   A.  Where they went to ask -- to tell her, hey, we need -- and

9   she put her hand in their face and said, no, not right now.

10  Q.  Who is "they"?                                                    13:33:13

11  A.  The coordinator, Martha and Sara.

12  Q.  And is this something that Martha and Sara reported

13  directly to you?

14  A.  Yes.

15  Q.  And did you have a specific conversation with Dr. Watson         13:33:25

16  about the hand incident?

17  A.  About the rudeness in general with Dr. Babich, that's when

18  we went to meet with her in regards to that.

19       MR. FATHI:  Objection, Your Honor.  Out of an

20  abundance of caution I do want to object to consideration of        13:33:37

21  the hand -- the statement regarding the hand incident for its

22  truth.

23       THE COURT:  What I've heard so far is that it sounds

24  like somebody was saying something to her and she held up her

25  hand to say no, right now.                                          13:33:52

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1          Is that what you're saying, or is it beyond that?

2          THE WITNESS:  She put her hand in her face like that.

3  (Indicating.)

4          There used to be a thing where people would say, talk

5  to the hand, you know, that kind of thing, it was like that.          13:34:04

6          THE COURT:  Okay.  So what you've described here using

7  your hands is that somebody put out their hand and put it in

8  the face of the other person.  And it looked to me like you

9  were self -- demonstrating to yourself about five inches from

10  the hand-to-face distance.  Is that what you meant to do?          13:34:23

11          THE WITNESS:  Yes.  But, again, I wasn't witness to

12  it.

13          THE COURT:  All right.  That's my next question.  But

14  you actually didn't see that?

15          THE WITNESS:  Correct.          13:34:32

16          THE COURT:  That's what you just heard about it?

17          THE WITNESS:  Yes.

18          THE COURT:  So is there really any reason to fight

19  about this, Mr. Fathi, it's not --

20          MR. FATHI:  Well, my objection is to considering that          13:34:40

21  for the truth, because it's hearsay not subject to --

22          THE COURT:  Well, again, he didn't see it.  And so I'm

23  not somebody who understands -- or fails to understand that the

24  telephone game exists not among kids but among the real world

25  as well, and that is when people don't see it with their own          13:34:59

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    eyes you sometimes should take it with less weight.  And even

2    if they see it with their eyes, the studies show that

3    eyewitness testimony is the weakest.

4         So in any event, we don't have the person here in

5    court who's saying anything about it.  So it's again, in the          13:35:14

6    abundance of caution you say, but I'm going to allow the

7    questioning to go on just because it's mostly about the state

8    of mind of this individual who is testifying about somebody who

9    he supervised and why he thought he or she was doing things

10   inappropriate.                                                       13:35:30

11        I don't know whether it happened.  And until I hear

12   somebody here who testifies that said it happened, I'm not

13   going to know or think that it happened.  But I know that this

14   guy thinks that it happened.  And that's the state of mind, and

15   that's all I'm taking it for.                                        13:35:44

16        Thank you.

17        MR. FATHI:  Thank you, Your Honor.

18   BY MS. LOVE:

19   Q.  Dr. Stewart --

20        THE COURT:  And forgive me, sir, I was colloquial in           13:35:48

21   an inappropriate way when referring to you as "this guy."

22   That's not appropriate for me to do.

23        But the reason I did it that way is because

24   I'm -- we're torn in court.  We try to follow the rules and use

25   precise words that match the rules.  And those rules make sense     13:36:06

UNITED STATES DISTRICT COURT

1    a lot of times in particular when we have to be really careful

2    because we're dealing with evidence that's coming in that's

3    being considered by people who haven't been sort of around the

4    block.  Jurors, for example.

5        And they think if they hear something, that if                    13:36:22

6    somebody says it's true -- and we have a hearsay rule that has

7    developed over time for good reason, that we really want the

8    people who actually heard or said it, we actually want the

9    person who said it or saw it present in the witness stand

10   testifying about it.  Those are all good reasons.                       13:36:39

11       But for the people who have been around the block,

12   there are safeguards, so to speak, that exist, and that is, we

13   can compartmentalize.  And that's exactly what I did here, I

14   compartmentalized the information, because it is -- to me

15   you're telling me about how you were reacting based upon what          13:36:55

16   you believed to be true.

17       I don't know whether it's true or not.  And maybe I'm

18   too strong in saying you believed it was true.  But it sounds

19   like that's what you believed, that it was true.

20       And so as I moved away from the strict structure of            13:37:08

21   the rule and spoke in a formal kind of way, I moved to what is

22   kind of embracive of a spirit I was trying to communicate to

23   Mr. Fathi, and that is that this is relatively free of having

24   to have to be concerned from the strict structure of the rule,

25   it is a looser kind of arrangement.  I moved to a looser            13:37:28

Rodney Stewart – Direct Examination

1   language that was, I think, disrespectful.  And I'm sorry about

2   that.

3            THE WITNESS:  No offense taken, Your Honor.  It's not

4   a problem.

5   BY MS. LOVE:                                                    13:37:37

6   Q.  Dr. Stewart, based upon your discussions with Dr. Watson

7   regarding accusations of treatment of other personnel and your

8   contact with the clinical coordinators, do you think that there

9   was a resulting impact on the ability of the clinical

10  coordinators to work with Dr. Watson to accomplish timely       13:38:02

11  reviews of outside specialty consults?

12  A.  Yes.  The clinical coordinators wouldn't go see her after

13  that.

14  Q.  And if they wouldn't go see her after that, does that cause

15  a problem, in your opinion?                                     13:38:26

16  A.  It does.  Their purpose was to go and educate her on how to

17  appropriately amend her consults so that they would get -- get

18  attention.  And if they couldn't teach her how to do it -- I

19  mean, granted, she's the M.D., and she has the information that

20  she needs to put in there, but they have an idea of how that    13:38:47

21  information should go in that report.  And unfortunately they

22  weren't able to do that, they weren't able to even get that

23  information to her.  And I actually went and attempted to try

24  and get that information to her, but it was not -- it wasn't

25  received.                                                       13:39:18

Rodney Stewart – Direct Examination

1  Q.  Can you explain specifically what you mean by that the

2  statement that you went to her.  Do you mean Dr. Watson?

3  A.  Um-hum.  Yes.

4  Q.  And tell us about that conversation that you had with

5  Dr. Watson.                                                    13:39:31

6  A.  Again, it was myself and Dr. Babich trying to teach her

7  Corizon policy and Corizon methodology, how that -- how it

8  works, what things you need to do in order to get your consults

9  appreciated, and have them attended to, to get the result that

10 you need.                                                      13:39:54

11      And that meeting appeared to be -- appeared to be

12 received.  She was -- was, yes, okay, I understand.  I asked

13 her multiple times, do you understand what we're trying to tell

14 you and teach you here?  She said, yes, yes, I understand.

15      But then following that we still ended up with same        13:40:21

16 results, same problems.

17 Q.  At any conversations that you had with Dr. Watson in which

18 you discuss any concerns you had regarding her performance, did

19 you ever use the term with her -- or counsel her to do things,

20 the, quote, unquote, Corizon way?                              13:40:39

21 A.  Yes.  Yes.  That's Corizon policy methods.  Corizon and

22 D.O.C. policy for that matter, because Corizon policy is based

23 on the D.O.C. policy.

24 Q.  And what did you mean specifically by the term, quote,

25 unquote, the Corizon way, in what context?                     13:40:56

─────── Rodney Stewart - Direct Examination ───────

1    A.   In regard to her consults, to apply -- basically to insert

2    the information in an appropriate way, first.   Then when you

3    receive an NMI or ATP, which is the Corizon method -- the

4    Corizon method, to respond to them appropriately.   To actually

5    answer the NMI.   Actually either elevate the ATP or to -- or to          13:41:22

6    accept the ATP.   It's those -- it's the standard of care in the

7    Corizon company.

8    Q.   So then do I understand you correctly that you -- over the

9    course of your supervision of Dr. Watson, that you had concerns

10   regarding her performance in relation to how she did her                  13:41:49

11   specialty consults?

12   A.   Yes.

13   Q.   What were your concerns?

14   A.   Well, in certain cases she -- the NMI would come back to

15   her, needs more information.   What information?   They say it            13:42:07

16   right there on the return form.   I need this, this and this.   I

17   mean, it's exactly that.   But she would refuse to give that

18   information, which was very basic, and could be returned in a

19   timely way.

20           She would go out and do research.   Which is not a bad           13:42:33

21   thing.   But then she would answer none of the questions that

22   were asked in the NMI, just give other information that was

23   maybe not even necessarily related to what they were asking

24   for.   They just needed this basic information.   Hey, you didn't

25   do this exam, so do -- give me this exam information.                     13:42:56

UNITED STATES DISTRICT COURT

─── Rodney Stewart - Direct Examination ───

1          Well, she would go out and try and find reasons why

2     that exam wasn't important and then put that in there.  And

3     basically ended up in a tit for tat, you know, issue with the

4     UM people.

5          So they would respond to the consult with another NMI        13:43:20

6     saying, hey, that's all well and good what you put in there,

7     but this is what we're asking for.  And again she would say,

8     that's not -- it's not important.  Well, it's important to them

9     because they can't do your consult until you get the

10    information.                                                       13:43:40

11         So now there's a delay in time.

12    Q.  Was there ever a situation where you sat down with her with

13    specific consult requests and the response by the UM team and

14    said, Dr. Watson, let's sit down with these and go through

15    together, and here's my concerns about how you are using the      13:43:58

16    system?

17    A.  We did not.  The problem was kind of escalated at that

18    point, so I ended up doing those consults myself.  And

19    the -- her -- her -- although she stated that she was in

20    compliance, and that she would be in compliance with what we      13:44:21

21    were asking at the meeting that Babich and I had with her, she

22    was not.  So it became difficult.

23         So this was -- this was getting closer to October.

24    And so we had already pretty much said, you know, she's a

25    locums and we're not going to renew her contract.                 13:44:35

Rodney Stewart - Direct Examination

1   Q.  What do you mean that -- by saying that you did the

2   consults yourself?

3   A.  For instance, if there was an ATP, I just accepted the ATP

4   and closed out that consult, because the ATP was appropriate.

5   If there was NMI, I sent the NMI information back, and then          13:44:53

6   eventually closed those consults out.

7   Q.  During your course of supervision of Dr. Watson, did you

8   ever come to have a concern regarding her backlog on seeing

9   specifically chronic care patients?

10  A.  I mean, there was a problem, but the problem was               13:45:15

11  system-wide with all the providers at Eyman.  Eyman had a huge

12  backlog of chronic care patients.  So it wasn't really specific

13  to her, but her performance was not helping that situation.

14        She was a three-day worker, three days a week only.

15  She did not assist on the weekends, as everybody else was.  And   13:45:37

16  then she wasn't able during her -- like I said, she was only

17  seeing about eight patients a day, it was hard for her to keep

18  up on chronic care.

19  Q.  In front of you, Doctor, you have a stack of folders that

20  are marked with numbers.  And those are exhibits that I may       13:45:58

21  show you and ask you to talk about.

22        In that stack -- and they're numbered -- could you see

23  if in front of you is Exhibit No. 363?

24        And this is Defendants' Exhibit 363?

25        THE COURT:  Thank you.                                      13:46:20

Rodney Stewart - Direct Examination

1           MS. LOVE:  And I'm pausing to allow counsel an

2    opportunity to get the exhibit in front of him as well.

3           Ready?

4           MR. FATHI:  Yes.  Thank you.

5    BY MS. LOVE:                                                  13:46:45

6    Q.  Dr. Stewart, do you recognize the document that is

7    contained in Exhibit No. 363 before you?

8    A.  I have seen this before.

9    Q.  Can you tell us what this document is?

10   A.  Basically this is -- this is an e-mail, and it shows      13:47:02

11   the --

12   Q.  First let me stop you right there and I'll just make this

13   quicker.

14          Is the document in front of you an e-mail addressed to

15   you, Dr. Rodney Stewart?                                      13:47:16

16   A.  Yes.

17   Q.  And is it an e-mail from Mary Marino?

18   A.  Yes.

19   Q.  Who is Mary Marino?

20   A.  She's our chronic care coordinator.                      13:47:25

21   Q.  And the subject matter of this e-mail is chronic care

22   backlog; is that correct?

23   A.  Yes.

24   Q.  What is the e-mail dated -- dated as sent?

25   A.  9-5-2017.                                                 13:47:41

Rodney Stewart – Direct Examination

1    Q.  And is this an e-mail that you received from Mary Marino in

2    the normal course of your duties as the Site Medical Director

3    at the Eyman Complex?

4    A.  Yes.

5    Q.  Do you -- if I can direct you to the first part of the text    13:47:53

6    of the e-mail, it says, as of first thing this morning here are

7    the numbers.  And underneath that lists numbers for Browning,

8    Cook, Meadows, Rynning and SMU I.  Do you see that?

9    A.  Yes.

10   Q.  Are those all yards at the Eyman complex?    13:48:15

11   A.  Yes.

12   Q.  And does it list numbers for chronic care backlog for each

13   of those yards?

14   A.  Yes.

15   Q.  Can you tell us, according to this e-mail that you received    13:48:24

16   from Mary Marino, what the backlog was for Browning?

17   A.  The total was 126.

18   Q.  What about the backlog for Cook?

19   A.  Total for Cook was 347.

20   Q.  What was the backlog for Meadows?    13:48:41

21   A.  69.

22   Q.  What about Rynning?

23   A.  45.

24   Q.  And what about SMU I?

25   A.  99.    13:48:50

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1  Q.  Do you have any knowledge as to why the backlog for chronic

2  care patients at the Cook Unit of 347 was more than double of

3  any of the other units -- I'm sorry, yards at the Eyman

4  Complex?

5  A.  I think this is -- I don't want to say obvious, but it is.    13:49:10

6  You know, the provider there, one, is there three days a week,

7  and then only seeing eight patients on the days that she is

8  there, it makes it difficult to catch up on your backlog.

9       I did go over and help, but I can't -- I can't see,

10  you know, hundreds of patients a day to try and fix this.  So  13:49:38

11  she was not very efficient in her time.

12  Q.  Were the other units at Eyman back in September of 2017

13  running providers on more than three days a week, as compared

14  to Cook?

15  A.  Yes.                                                         13:49:59

16  Q.  But you were filling in at Cook; is that correct?

17  A.  That's correct.

18  Q.  In the third paragraph of the text of this e-mail, the

19  first sentence says, the Agnes machine is currently at

20  Browning.                                                       13:50:13

21       What does that mean, if you know?

22  A.  I've not heard it referred to as Agnes machine, but I

23  believe that's the telemetry machine, telemetry for chronic

24  care.

25  Q.  Thank you.                                                  13:50:28

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1          MS. LOVE:  Defendants move to admit.

2          THE COURT:  Any objection?

3          MR. FATHI:  No objection, Your Honor.

4          THE COURT:  363 is received.

5     (Exhibit No. 363 admitted into evidence.)                13:50:36

6  BY MS. LOVE:

7  Q.  With respect to Dr. Watson's performance in Summer and Fall

8  of 2017, did you have any concerns regarding whether or not she

9  had a backlog on medication refills?

10 A.  The same person who does -- I think at the time -- I think   13:50:51

11 the same person was doing the renewals.  I think Mary was doing

12 the renewals at that time as opposed to King.

13          But yes, you know, every -- every time that the

14 numbers get really close and we're getting to the point where

15 we're going to fail, they come to me directly and try to        13:51:19

16 help -- try to get some help into implementing some sort of

17 plan to get those things taken care of.

18 Q.  And to be fair, were providers on other yards at Eyman also

19 having difficulty with backlog in medication refills?

20 A.  Yes, absolutely.                                            13:51:43

21 Q.  Would you -- was Dr. Watson any worse in that category of

22 backlog than others, or was she consistent with the others?

23 A.  In regards to medication refills, she was -- when she was

24 at the provider meetings, she's the same as everybody else.  At

25 the provider meeting you get handed your paper, you do your     13:52:03

1    renewals, you hand it back the same time.  Everybody is the

2    same.  It's not like she tried to refuse or do anything like

3    that.  She was exactly the same.

4         It was on the weeks where there was no provider

5    meeting, no supervision, that it became a problem.  It was          13:52:17

6    cutting into her time almost -- almost like, you know, she

7    really felt that she needed every second to try and just do the

8    job that was there and didn't want any extra involvement.

9    Q.  In supervising Dr. Watson, did you ever have a concern with

10   regards to her performance in the ordering of medical supplies    13:52:43

11   for inmates?

12   A.  Yes.

13   Q.  What were your concerns?

14   A.  She was very liberal with ordering inmate nonstock items

15   and equipment that weren't necessary.                             13:53:00

16   Q.  Do you base your concern on any specific examples?

17   A.  There were -- I mean, for every patient that had an injury

18   or had some kind of fall or injury or problem, she would

19   order -- she would order ice for the inmate, which is not

20   usually a problem.  But when you order it for a whole year,       13:53:21

21   that's a problem.

22   Q.  Why is ordering ice for an inmate for an entire year a

23   problem, in your opinion?

24   A.  One, it's a -- D.O.C.'s concerned about having ice on the

25   yard.  So they're our client, and so we have to pay attention     13:53:35

—— Rodney Stewart – Direct Examination ——

1   to that.

2          Number two, is that for an inflammatory process, an

3   injury, who needs ice beyond three days?  A whole year is not

4   serving that purpose, it's serving some other purpose.

5   Q.  Do you know what D.O.C.'s concern was with respect to ice          13:53:57

6   on the yard for inmates?

7   A.  I'm not exactly sure, but the -- what we do find is that in

8   prison you have to be consistent and fair.  And if one inmate

9   has -- orders something to drink or has milk, let's say, and

10  their milk is always cold because they always have ice and the          13:54:20

11  other inmates don't, it becomes a problem.

12          So consistency and fairness is one of the issues, I'm

13  sure.  But beyond that I'm not sure.

14  Q.  Do you recall how it came to your attention that ice was

15  being prescribed or ordered inappropriately, in your view?          13:54:39

16  A.  The orders always come back, especially when they're not

17  appropriate, come back and go, why is this person doing this?

18  I'll get asked that by the AFHA.

19          So when I find out then I go ask the person involved,

20  why are you writing ice like that?  If I don't get an answer          13:55:01

21  that's appropriate -- you know, I mean, they could state the

22  disorder, hey, yeah, this person has ligament tear.  Okay.  But

23  for a year?  Shouldn't you be looking more at getting that

24  ligament, if it's that bad, repaired as opposed to just writing

25  ice for a year?          13:55:23

Rodney Stewart – Direct Examination

1  Q.  Do you recall whether or not you ever told Dr. Watson that

2  she could no longer write orders or scripts for insoles or

3  medical shoes?

4  A.  No.  I approve those every day.

5  Q.  Did you ever have a concern regarding Dr. Watson's ordering          13:55:36

6  of --

7  A.  Yes.

8  Q.  -- medical shoes?

9  A.  Yeah.  Because I approve them every day, but I will not

10  approve something without a diagnosis.  That's how I practice          13:55:46

11  medicine.  The medicine that we practice at Corizon and our

12  practice there at Eyman in Florence is evidence based.

13       So you first come to the diagnosis.  Once you have the

14  diagnosis, then you can make a plan regarding that diagnosis.

15  And medical shoes would fall in line with treatment just like          13:56:04

16  anything else.  Without a diagnosis, I won't give you anything.

17  So write the diagnosis on the paper, if you know what it is.

18  If you have no diagnosis, then you're just -- you're

19  supplying -- you become a supplier essentially.

20  Q.  Are medical shoes something that is valued or a commodity          13:56:21

21  within the inmate population, in your experience, your personal

22  experience?

23  A.  It very much is.

24  Q.  In what way?

25  A.  New shoes, brand new shoes.  In that inmate population,          13:56:31

Rodney Stewart – Direct Examination

1   again, those things can be traded, they can be, you know,

2   basically moved around.  They're a commodity.

3   Q.  So was it your concern that -- not the concern that

4   Dr. Watson was ordering medical shoes, but that there was no

5   diagnosis to support the order?                              13:56:55

6   A.  She didn't -- at least didn't -- there may have been one,

7   but she didn't -- she didn't communicate it to me.  And the

8   forms are the way they communicate it to me.  I read the form,

9   there's no diagnosis, you can't get your shoes, or ice, or

10  anything else.                                               13:57:11

11  Q.  Do you recall whether or not you ever had a specific

12  discussion with Dr. Watson regarding your concerns over her

13  ordering of medical shoes?

14  A.  I made that expressly clear in our provider meetings on

15  multiple occasions.  If you don't put the diagnosis down, you  13:57:24

16  can't get what you need, even if you really need it.  If you

17  don't have a diagnosis, you're not going to get it.  So I made

18  that very clear in the provider meetings.

19  Q.  Did you ever come to have a concern regarding Dr. Watson's

20  ordering of foot baths or foot soaks for the inmates?         13:57:43

21  A.  Yes.  I would not have a problem with that if it were

22  for -- if there was an infectious issue, but it was because

23  they got a callous, that's not appropriate.  It's not an

24  appropriate treatment for -- I mean, we do that at home, you

25  soak your foot for that.  But to utilize -- first, the         13:58:09

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    treatment room, and nursing -- nursing time for a foot soak,

2    it's -- I'm not being -- I'm not trying to be flippant, but

3    it's not the Sheraton, it's prison.

4    Q.  So this is not a situation where a foot soak or a foot bath

5    happens back in the inmate's cell, it's taking resources away          13:58:33

6    from the medical unit?

7    A.  Right, exactly.  She was doing it in the medical unit.

8    Q.  Do you recall whether or not you ever told doctor --

9         First all, let me ask you this:  Do you recall whether

10   or not there was ever a time during Dr. Watson's assignment to         13:58:47

11   the Cook Unit that you asked her to come on permanently?

12   A.  I did.  We were -- we had a deficit of providers, and it

13   appeared that she was providing care -- inmates -- she got

14   along with the inmates famously.  I mean, they appreciated her

15   attention and all of those things.  And for good reason,              13:59:13

16   because they were getting a lot of the things that other

17   providers would say no to.

18        That -- despite that, there were other things that she

19   did well.  Her -- she did surgical procedures well, although

20   she -- there was a problem with some of that too.  But she            13:59:33

21   was -- she was a very attentive provider.

22        So, yes, early on, in the early -- in the early

23   Summer, that time period when we had a major deficit of

24   providers, I wanted to try and keep that group cohesive, and

25   try and increase her days too so that we could catch up on that       14:00:03

─────── **Rodney Stewart – Direct Examination** ───────

1    backlog.  But that didn't work out.

2    Q.  You said that there was -- I believe you said that there

3    was a concern regarding surgical procedures that she did do?

4    What did you mean by that?

5    A.  Her -- she did the procedures well.  But it's a prison.          14:00:18

6    When you do surgical procedures, there are blades, needles,

7    hardware that are setting in the trays.  And she would leave

8    them for the nurses to clean up.  Which is something that you

9    see in the community practice, the nurses will come right

10   behind you and take the utensils off the table or whatever.          14:00:39

11   And it doesn't matter if the patient is sitting in the room, it

12   doesn't matter, you just walk away and start writing your note

13   for the procedure.

14          But you can't to that in prison.  Every item has to be

15   accounted for.  If they're dangerous items then you put people      14:00:55

16   at risk.  So when you leave your -- the blade there, you leave

17   the scissors there, you leave the needles there, it becomes a

18   big problem.  And D.O.C. had a problem with that.

19   Q.  Doctor, there is a folder in front of you marked Exhibit

20   No. 645.  If you could take a look at that for me.                   14:01:13

21          And this is defendants' Exhibit 645.

22          Counsel, do you have it?

23          MR. FATHI:  Yes, thank you.

24   BY MS. LOVE:

25   Q.  Dr. Stewart, if you could take a look at Exhibit 645 and        14:01:51

1   tell me if you recognize this document.

2   A.  Honestly I have not seen this one.

3   Q.  If you could take a moment to need -- whatever time you

4   need to read it, and then I will ask you some questions.  Just

5   let me know when you're finished.                          14:02:10

6   A.  I'm finished.

7   Q.  I'd like to direct your attention to the bottom half of

8   page 1 of Exhibit 645.

9          Would you agree with me that this is an e-mail

10  communication?                                            14:02:31

11  A.  Yes.

12  Q.  And the bottom half of the Exhibit 645, is this an e-mail

13  communication from Dr. Babich to Daniel Sego?

14  A.  Yes.

15  Q.  And who is Daniel Sego, if you know?                   14:02:48

16  A.  He -- currently he's the Facility Health Administrator at

17  Florence, but at this time we had lost our Facility Health

18  Administrator at Eyman, so he was doing double duty at Florence

19  and Eyman.  So he was the Facility Health Administrator at the

20  time.                                                     14:03:10

21  Q.  Are you cc'd on this e-mail communication between

22  Dr. Babich and Mr. Sego?

23  A.  Yes.

24  Q.  And is it dated October 5th of 2017?

25  A.  Yes.                                                  14:03:19

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    Q.  Is this an e-mail that you would have received in the

2    normal course of your duties as Site Medical Director for the

3    Eyman Complex?

4    A.  Yes.

5    Q.  If you look at the second to the last paragraph of text on          14:03:27

6    this page 1 of Exhibit 645, do you see where it says, we are

7    having issues with Dr. Watson being insubordinate, rude to

8    staff, and now leaving sharps and laceration trays unaccounted

9    for?

10   A.  Yes.                                                                 14:03:53

11   Q.  And is this the situation that you were previously

12   referring to in your testimony where you had a concern with her

13   leaving out sharps in the medical unit?

14   A.  Yes.

15   Q.  The e-mail goes on to say that, Dr. Stewart feels, and I            14:04:02

16   agree, it would be best to allow her to sever her contract

17   early.  She does have some outstanding labs, X-rays, et cetera.

18   A.  Yes.

19   Q.  In this e-mail, this is Dr. Babich reporting what you feel.

20   Is that a correct assessment of what you felt with regards to          14:04:22

21   Dr. Watson, that it would be best to allow her to sever her

22   contract early?

23   A.  Yes.

24   Q.  And why was that your feeling?

25   A.  The main reason was the rude behavior.  She never, ever            14:04:35

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    wanted to be disrespected in her office, why would she

2    disrespect someone else?  So that was -- that was the -- that

3    was the biggest problem, it was that last final tiff with the

4    coordinators, who only were there trying to help.  So that

5    bothered me quite a bit.                                    14:05:06

6          And then, you know, it's obviously -- when you leave

7    laceration trays open with an inmate present, that's -- that

8    puts everyone at risk, it puts the COs, it puts the nurses, the

9    CNA -- everybody who is anywhere around that situation could

10   get hurt.  And so that's -- and that's going to fall back on    14:05:27

11   everyone else.

12         So that kind of behavior -- it's almost common sense,

13   you've just got to know where you are, it's prison.

14         MS. LOVE:  Defendants move to admit Exhibit 645.

15         THE COURT:  Any objection?                             14:05:43

16         MR. FATHI:  Objections, Your Honor, the doctor

17   testified that he hasn't seen it before and it is hearsay not

18   subject to any exception.

19         THE COURT:  He said that he received a copy of the one

20   at the bottom, so the one at the bottom doesn't seem to be     14:05:53

21   subject to that objection.  The one at the top seems like it

22   could be.

23         So the Court will receive the bottom and grant in part

24   and deny in part the objection.

25         MR. FATHI:  Your Honor, are you receiving it for the     14:06:09

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    truth?  Because it is --

2         THE WITNESS:  The bottom part is, he says that we are

3    having issues with Dr. Watson being insubordinate, rude to

4    staff, and now leaving sharps and laceration trays unaccounted

5    for.  That is something that Dr. Stewart doesn't have any          14:06:23

6    knowledge about.

7         Dr. Stewart then says -- feels -- it is reported that

8    Dr. Stewart feels, and I agree, it would be best to allow her

9    to sever -- it says "severe," but sever her contract early.

10   She does have some outstanding late X-rays, et cetera.            14:06:41

11        So what we have here is what we've heard from the

12   witness, and that is he agrees with this latter part, but he

13   doesn't have any ability to testify about the parts.

14        MR. FATHI:  Right.  And the second part is hearsay,

15   not subject to any exception.  So we object to the admission of   14:06:58

16   that statement.

17        THE COURT:  He said that it was what he -- with

18   respect to the foundation of this -- for the application of the

19   hearsay exception, there is an incomplete testimony or record

20   to support that, so the objection is sustained.                   14:07:22

21        MR. FATHI:  Thank you, Your Honor.

22     (Exhibit No. 645 admitted into evidence.)

23   BY MS. LOVE:

24   Q.  Dr. Stewart, in your supervision of Dr. Watson, did you

25   have concerns regarding the appropriateness of her medication    14:07:45

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    orders in any respect?

2    A.  In regards to her -- her prescribing medication?

3    Q.  Well, did you ever come to have any concern that Dr. Watson

4    was inappropriately prescribing any categories of medications

5    to inmates?                                                    14:08:12

6    A.  She did have an excessive amount of narcotic use and

7    gabapentin use as well.

8    Q.  And what -- did you look at anything to determine -- or to

9    arrive at that conclusion, that she was prescribing narcotics

10   and gabapentin at an inappropriate rate?                       14:08:39

11   A.  Well, yes, we did -- those things get tracked.  The

12   appropriateness of -- you know, of a narcotic compared to the

13   injury or to -- and also the duration of time, how long the

14   need for that narcotic is, all those things are tracked.  So we

15   match those, the diagnosis and the narcotic.  If it appears    14:09:04

16   that any one provider is providing a lot of narcotics -- I

17   mean, we're pretty much required to track narcotics, because

18   it's a DEA thing.  But if any of that appears to be

19   inappropriate, then I'm informed of it and then I have a talk

20   with the provider.                                             14:09:29

21   Q.  Were you ever informed by any Corizon staff that there was

22   a concern over the rate of Dr. Watson's prescription of

23   gabapentin?

24   A.  Yes.  My AFHA always kept me informed if that comes up.

25   And so there was of not just -- not just gabapentin, but of    14:09:46

UNITED STATES DISTRICT COURT

604

—— Rodney Stewart – Direct Examination ——

1    narcotic use.

2    Q.  Do you know whether or not you ever received information

3    from Dr. Babich as to concerns that Dr. Watson was prescribing

4    excessive gabapentin on the Cook yard?

5    A.  Yes.  Gabapentin has to be approved by the Regional Medical        14:10:07

6    Director, and so he saw it firsthand and asked us to cut back.

7    Q.  Doctor, if you could look for the folder in front of you

8    that is marked number 338.

9         Take whatever time you need to review Exhibit No. 338,

10   and then let me know when you're ready for some questions.        14:10:59

11   A.  I'm ready.

12   Q.  Dr. Stewart, is Exhibit No. 338, which is comprised of two

13   pages, an e-mail communication that you received from

14   Dr. Babich on September 9th, 2017 (sic), in your capacity as

15   Site Medical Director for the Eyman Complex?        14:12:06

16   A.  Yes.

17   Q.  And what is the subject matter of this e-mail

18   communication?

19   A.  This was generated at a time when we were trying to

20   significantly reduce the amount of gabapentin on prison yards        14:12:21

21   at Eyman.  Especially at Eyman, but really at Eyman and

22   Florence.  The problem was a -- really a high level of abuse of

23   that particular drug.  It became a commodity at the prison.

24        THE COURT:  Can I ask a question about that?  I'm

25   sorry to interrupt.  I should have maybe let you finish.        14:12:45

UNITED STATES DISTRICT COURT

─── Rodney Stewart - Direct Examination ───

1          But it just was something you said earlier about where
2     you didn't know the meaning of the acronym of those words about
3     observing it.  What about that?  Couldn't you completely reduce
4     the -- is this the kind of drug that is a kept on person drug
5     sometimes, or is it a drug that you could monitor it every          14:13:03
6     single time to make sure that it actually went down the gullet
7     and would never go down and be, what we use in the outside
8     world, diverted?
9          THE WITNESS:  We do try.  For those who do get it,
10    they are monitored.  But even they attempt to divert it.  We        14:13:19
11    can catch them sometimes, but we can't catch them all the time.
12    They can cheek it better than anybody.
13          THE COURT:  How is that possible?  I'm sorry to be
14    incredulous.  But how is that -- the doctor says ah, sticks a
15    tongue depressor in your mouth, looks around.  Where do you         14:13:34
16    hide it?
17          THE WITNESS:  There was an inmate on SMU who had
18    a -- created a pouch in his cheek by cutting --
19          THE COURT:  I gather that's an inmate.  So the
20    pouching is probably -- is this rampant pouching?                   14:13:51
21          I'm sorry to be incredulous.
22          THE WITNESS:  No, it isn't.  But it does show the
23    creativity at which they do find ways.
24          So just by a mouth inspection -- you know, when the
25    nurses are giving out their medications they're on one side of     14:14:09

UNITED STATES DISTRICT COURT

1   a window, inmate's on the other.  So they don't stick anything

2   in their mouth or anything.  They just ask them -- they ask

3   them to swallow.  They watch the swallow, the deglutition

4   motion, and then they ask them to open their mouth, lift up

5   their tongue.  And that's pretty much all you can really do          14:14:27

6   without sticking your fingers in there.

7        THE COURT:  Why the window?  Why is a window

8   necessary?

9        THE WITNESS:  They're in the pharmacy.  There's a boat

10  load of medications in there.  You have to --                       14:14:36

11       THE COURT:  I see.  So the prescription is handed out

12  from the pharmacy.

13       But I gather -- and the reason I'm asking about this

14  is, I've not heard any testimony about it, but because I'm

15  always learning about this, I ask myself questions in my head        14:14:48

16  to try to understand when there are obstacles that are

17  presented, and I try I to think, well, if I was trying to solve

18  that problem, could I solve the problem, and how big of deal

19  would it be to solve the problem?

20       And I guess as I think about this one, if we have an           14:15:07

21  issue about whether or not people are getting the drug or not,

22  that we're worried it's being diverted -- and I totally

23  appreciate that that is a real danger -- that it seems like it

24  would be possible to say that for this particular drug what

25  we'll do is we'll say that the line should be outside the           14:15:23

UNITED STATES DISTRICT COURT

───── Rodney Stewart – Direct Examination ─────

1   window, and the person will have the pill, for those people who

2   are getting that particular drug, they'll show the same kind of

3   identification, but they will also use the tongue depressor to

4   make sure that it goes down.

5        Because what you've described to me in a context where        14:15:34

6   I imagine there are inmates who need to have medications that

7   will be diverted, is a situation where they will be diverted,

8   because there's no way to check.  So it doesn't sound like a

9   great solution, just to me.

10       THE WITNESS:  I agree, yes.                                   14:15:51

11       THE COURT:  I'm sorry.  Do you need the court reporter

12   to read back the middle?  It was wrong for me to interrupt the

13   middle.

14       MS. LOVE:  Fine.

15       THE COURT:  Could you go back to his answer before I

16   interrupted, so that he can retain --

17       Maybe you can already, I can't honestly, Doctor, where

18   you were when we interrupted.  But the court reporter will tell

19   you what you said before I asked my question.

20   (Record read from page 604, lines 17 to 23.)                     14:16:39

21       THE COURT:  Was that the end or --

22       THE WITNESS:  No.

23       So what I was saying is that Dr. Babich was monitoring

24   this particular drug closely, and it had to be approved by him

25   before he could give it.  And in all cases of providers, the    14:16:53

Rodney Stewart – Direct Examination

1    number of -- the amount of gabapentin went down, except for

2    her, it went up.  And so he was very concerned about that.  And

3    it looked like that she was actually writing the same diagnosis

4    for everyone.

5            And so this sudden new number of seizure cases                 14:17:13

6    concerned him, and he want us to look into it.

7            Again, you know, gabapentin is a drug that is used in

8    conjunction with other seizure medications, except many of

9    these inmates were only on gabapentin.  It's not used as a sole

10   agent for a seizure disorder.                                          14:17:45

11           So that was the concerning -- that was a concerning

12   issue.

13   BY MS. LOVE:

14   Q.  Were you aware of what the same diagnosis it was that was

15   being found in the prescriptions issued by Dr. Watson with           14:18:00

16   regards to gabapentin?

17   A.  I'm sorry, one more time.

18   Q.  Yeah, let me ask that again.

19           If you know, what was the -- well, you testified

20   earlier -- just a few moments ago about the matter was looked       14:18:14

21   into and it appeared that Dr. Watson was -- there was an

22   increase in her prescriptions of gabapentin, and it was for the

23   same diagnosis.

24           Do you know what that same diagnosis was?

25   A.  Seizure disorder.                                                  14:18:29

UNITED STATES DISTRICT COURT

1    Q.   How did you know that?

2    A.   That's what -- when you write for a drug that's restricted,

3    that's a non-formulary drug, you have to write the reason you

4    want it at the bottom.  And so she would write "seizure" every

5    time.                                                              14:18:45

6    Q.   And did you go back and do a -- you yourself do a review of

7    Dr. Watson's prescriptions for gabapentin to see that the

8    consistent diagnosis was for seizure?

9    A.   I did not.  But the sheer numbers were not likely.  None of

10   those -- I shouldn't say "none."                                   14:19:04

11        There were a few inmates who were actually having

12   seizure that she would write it for.  But the primary diagnosis

13   on many of those cases was lumbago, back pain.

14        And so I actually found it at Cook, and I could

15   see -- I didn't go back and review her, but I could see on       14:19:23

16   those charts where I had to have those long conversations on

17   many of those patients about their gabapentin, because she

18   would write it, I would come on a subsequent day and go, you're

19   on gabapentin.  When was your last seizure?  I didn't have a

20   seizure.  But they'd have back pain diagnosis.  And I'd have to   14:19:44

21   have this long conversation with them that I'm getting rid of

22   your gabapentin, we're either going to wean it off or stop it,

23   because it's not indicated for what you're using it for.

24   Q.   I believe you testified earlier that the regional director

25   had to approve each prescription of gabapentin; is that          14:20:00

1    correct?

2    A.  Yes.

3    Q.  So was it based upon an individual assessment of the

4    patient and whether gabapentin was appropriate for that

5    particular patient?                                         14:20:12

6    A.  Yes.

7    Q.  Do you know why it was that Corizon was trying to reduce

8    the number of prescriptions of gabapentin?  If you know.

9    A.  The primary reason was abuse.  Gabapentin was being used as

10   a adjunct to heroin use, or sniffed -- solely sniffed.  After   14:20:31

11   it had been crushed it's sniffed to alter their mentation.  So

12   to get high with.

13   Q.  How did you know -- or what is your basis for testifying

14   that inmates would sniff gabapentin, crush and sniff?

15   A.  Inmates.  Inmates tell you that.                        14:20:59

16   Q.  And they've told you that personally?

17   A.  Oh, yes.

18        MR. FATHI:  Objection, Your Honor, hearsay.

19        THE COURT:  Sustained.

20   BY MS. LOVE:                                                14:21:07

21   Q.  You also testified that gabapentin can be used as an

22   adjunct to heroin.  What do you mean by that?

23   A.  It accentuates the high that they get from heroin.  Again,

24   that's -- that use -- that use has been described by D.O.C.

25   staff and by inmates.                                       14:21:38

Rodney Stewart – Direct Examination

1           MR. FATHI:  Same objection, Your Honor, hearsay.

2           THE COURT:  Overruled.

3    BY MS. LOVE:

4    Q.  You testified that there was particular efforts to reduce

5    the prescription rate of gabapentin at Eyman and Florence.  Do          14:21:52

6    you have knowledge as to why that was a focus on Eyman and

7    Florence?

8    A.  There was a study done, I can't quote the study, but that

9    Dr. Babich reviewed, and a lot of senior -- senior Corizon

10   staff also reviewed at that time, that basically went over the          14:22:17

11   use of gabapentin.  And Eyman -- I think in particular Eyman

12   Meadows Unit had like the highest in the country, one of the

13   highest in the country.  And they couldn't figure out a reason

14   for that.  And it was surmised that it was the abuse potential

15   for it.                                                                  14:22:52

16          MR. FATHI:  Objection, Your Honor, two levels of

17   hearsay.

18          THE COURT:  It's just wildly broad and untied to

19   anything that is really helpful for the Court, I must say.

20   I've really tried to corral my comments here with respect to            14:23:04

21   directing for efficiency, because I want to give you the

22   opportunity, Miss Love, to try to, in fairness, develop a

23   record that does reflect the state of mind of this witness.

24          But really, we're not going to be able to decide what

25   the panorama is of gabapentin prescription here with this               14:23:21

Rodney Stewart – Direct Examination

1   witness here today.  So I don't see that this is really worth

2   the candle.

3   BY MS. LOVE:

4   Q.  Dr. Stewart, did you ever tell Dr. Watson that she cannot

5   prescribe narcotics to inmates on the Cook Unit except for          14:23:34

6   cancer patients?

7   A.  No, I did not.

8   Q.  Did you ever tell Dr. Watson that she cannot prescribe

9   Ibuprofen to inmates over the age of 50?

10  A.  I told her to reduce the amount of prescribing of NSAIDs to      14:23:47

11  inmates over 50.

12  Q.  Why was that?  Why did you tell her that?

13  A.  Because of the cardiac risk involved.

14  Q.  What is the cardiac risk involved?

15  A.  There's a fourfold increase in the use of NSAIDs increasing      14:24:01

16  the risk of coronary disease.

17  Q.  Dr. Stewart, are you aware that the KJZZ story reported

18  that the -- or the interview of Dr. Watson reported in the KJZZ

19  story criticized denial of a neurology consult for an inmate

20  who had a seizure disorder?                                          14:24:44

21  A.  Yes.

22  Q.  And I'm going to ask you some questions about that and show

23  you some records, but we need to be careful that we do not say

24  the inmate's name.

25  A.  Correct.                                                         14:24:56

1    Q.   Okay.  All right.  So when you read the KJZZ story

2    regarding the criticisms regarding the consult for the inmate

3    who had a seizure disorder, did you know which inmate

4    Dr. Watson was referencing?

5    A.   Immediately.                                           14:25:14

6    Q.   And how did you know immediately who that inmate was?

7    A.   Because I've taken care of that inmate myself.

8    Q.   And did you agree or disagree with Dr. Watson's criticism

9    regarding denial of a neurology consult for this particular

10   inmate?                                                     14:25:35

11   A.   I disagree.

12   Q.   Why?

13   A.   Because it's -- it was unfounded.  Her -- what she was

14   saying was not happening had already happened.  She was asking

15   for a neurology consult.  Well, he had previously seen a       14:25:49

16   neurologist.  She was asking for an MRI, he had an MRI.  She

17   was asking for an EEG, he had already had an EEG.

18         So those things actually did not identify a seizure

19   focus.

20   Q.   If you could take a look for me at Exhibit No. -- this is  14:26:06

21   Plaintiffs' Exhibit No. 16.  Should be in a folder in front of

22   you.  And I believe it's already admitted into evidence.

23        (Discussion off the record between counsel.)

24   BY MS. LOVE:

25   Q.   Dr. Stewart, I will represent to you that by agreement of  14:26:44

 1    counsel, the excerpts of that particular inmate's medical

 2    records have already been admitted into evidence.

 3            I want to ask you a couple of questions about this

 4    particular inmate's records and the consult process.

 5            If you could turn for me -- if you look at the bottom      14:27:09

 6    of the pages you'll see a stamp, it's the bottom right, that

 7    says "exhibit," and it will say 016 and then a decimal point

 8    and numbers after that.

 9            Do you see that?

10    A.  Yes, I do.                                                    14:27:24

11    Q.  If you can turn to 016.20, I'll have some questions for

12    you.

13    A.  That's a blank page.

14            THE COURT:  You can assist, Miss Love, if you wish.

15            THE WITNESS:  Okay.  Sorry.                               14:27:52

16    BY MS. LOVE:

17    Q.  Turning to page 20 of Exhibit No. 16, do you recognize,

18    based upon your duties as Site Medical Director at Eyman, what

19    this form is that says Condensed Consultation Request?

20    A.  Yes.                                                         14:28:20

21    Q.  What is this form?

22    A.  A request for a consult.

23    Q.  And is this the paperwork that you spoke about earlier

24    today that the provider would fill out in order to make a

25    request to the UM team for a consultation?                       14:28:31

Rodney Stewart – Direct Examination

1    A.  Yes.

2    Q.  And this appears to be, please correct me if I'm reading

3    this wrong, but a consult request dated August 9th of 2017, and

4    requested by staff member Jan Watson; is that correct?

5            In the first box.                                      14:28:55

6    A.  Yes.

7    Q.  Can you tell, based upon this Consultation Request, what

8    kind of consult she was requesting?

9    A.  Service type was a neurology.  It says, procedure

10   requested, but it's just a neurology consult.                 14:29:09

11   Q.  Do you see the box two boxes down that says -- it's

12   entitled Subjective Notes?

13   A.  Yes.

14   Q.  In the process of a provider making a request for a

15   consult, is the subjective note something that the provider is 14:29:20

16   typing in to this particular form or a screen, or that copy and

17   pasted?  How does that work?

18   A.  The part that she would put in is typed in.  Anything

19   additional that's already documented somewhere will

20   get -- would get copied and pasted in.                        14:29:38

21   Q.  So would it be the normal course that the subjective notes

22   portion of this consult request is typed in by the provider?

23   A.  Yes.

24   Q.  And the subjective notes portion reads:  He had multiple

25   seizures yesterday and was sent to the hospital.  Prior to the 14:29:53

1   seizures he just felt tired and he laid down to rest.  The next

2   thing he remembers is being awakened by people standing around

3   him.  Today his muscles hurt all over.  He first had seizures

4   at age ten.  He's been treated for grand mal seizures since.

5           Did I read that correctly?                              14:30:14

6   A.  Yes.

7   Q.  In your opinion as Medical Director of Eyman, is this

8   sufficient information to justify making a neurology

9   consultation request?

10  A.  No.                                                          14:30:27

11  Q.  Why not?

12  A.  It lacks a neuro exam.  The age of the patient is not

13  stated clearly.  The description of the seizure is not here.

14  You could basically say the same thing about anybody who just

15  fell.  It's just not -- it's incomplete.                        14:30:56

16  Q.  And can you tell as you turn the pages in this record

17  whether or not Dr. Watson's consultation request was granted by

18  the UM team, whether it was ATP'd or NMI'd?

19  A.  It looks like this one above says status alternative

20  treatment accepted.  So she -- I'm assuming she got an ATP for   14:31:23

21  this.

22  Q.  If you turn now to same Exhibit 16 page 23, so it's labeled

23  16.23 at the bottom.

24          Do you recognize what this page is, this Consultation

25  Request Action?                                                  14:31:48

─── Rodney Stewart - Direct Examination ───

 1   A.  Yes.

 2   Q.  What is this?

 3   A.  This is the return -- when you submit a consult, the

 4   information -- what you're going to get comes back, it comes

 5   either ATP or NMI, this is what comes back.                      14:32:02

 6   Q.  And is the ATP indicated on this page?

 7   A.  Yes, in the bottom little space.

 8   Q.  What does it say?

 9   A.  It says:  ATP, inmate was noted to have a normal EEG in

10   April.  There's no documentation that his medication levels are  14:32:18

11   therapeutic.  Recommend checking these now.

12   Q.  Do you know whether or not this ATP was accepted by

13   Dr. Watson?

14   A.  I really can't recall whether it was or not.

15   Q.  Do you recall whether or not you had any discussion with     14:32:39

16   Dr. Watson specifically regarding this patient and the ATP for

17   her neurology consult?

18   A.  Yes.

19   Q.  Tell us about that.

20   A.  Again, this is a patient that I had also had the experience   14:32:54

21   of seeing him, even in the ICS when he was coming up with

22   seizure -- active seizure right in front of me.  And I tried to

23   explain to her that this is not standard what would be

24   considered seizure.

25          He had all the right movements.  And it was very scary    14:33:19

Rodney Stewart – Direct Examination

1   to watch him move.  But one of the things with seizures --

2   there's a couple things.

3          One, you can't interrupt a seizure.  They will -- you

4   get in the way they will beat you up.  Okay?

5          Number two is, there's a postictal period after a          14:33:35

6   seizure.

7          And these two things were absent in this inmate.  You

8   could stick your hand out and stop his hand -- he would do

9   this.  (Indicating.)  His hands jerking back and forth.  But

10  could you stick your hand out and he would stop one, if you'd   14:33:51

11  stop one, and he'd keep doing the other.  And if you stop the

12  other one, he'd stop and he'd keep doing the other.

13         And these are indications of someone who is having

14  pseudoseizures, not real seizures.  And so I tried to explain

15  that to her.                                                    14:34:06

16  Q.  What is a pseudoseizure?

17  A.  It's -- there are -- there are several types.

18         One, they're just fake seizures, okay, where the

19  inmate is -- or in my case inmate.  But where the patients are

20  actually attempting to get something.  When there's a           14:34:29

21  -- sometimes they're psychological when there's a need, some

22  kind of gain, even if it's a psychological gain, comfort,

23  attention, whatever.  Sometimes we see that behavior in

24  patients with mental illness.

25         Sometimes they present as real, as is say a conversion    14:35:01

619

Rodney Stewart – Direct Examination

1    reaction, when someone loses their ability to move their legs

2    because of some psychological trauma or something.

3         So they do appear as real, but nonetheless, when you

4    have a true psychomotor site in your brain that causes you to

5    have seizure, you can't -- you're going to have a postical          14:35:24

6    period.

7    Q.  If you can turn to page 31 of Exhibit No. 16.

8         Page 31, is that a Consultation Request by Dr. Watson

9    dated October 2nd, 2017?

10   A.  I'm sorry, what was that date again?                            14:35:57

11   Q.  October 2nd, 2017.

12        And I'm looking at the date at the top left.

13   A.  Yes, it was.

14   Q.  And can you tell from this Consultation Request what kind

15   of consult in October of 2017 Dr. Watson was requesting?           14:36:07

16   A.  This is -- it looks like the service type was neurology.  I

17   imagine it's a neurology consult.  But this is the Request

18   Action.

19        So this -- this is actually the -- the information

20   that we put back in in regards to the ATP.  So basically we        14:36:39

21   accepted this ATP.

22   Q.  So is the action taken comments box at the bottom, is that

23   the acceptance of the ATP?

24   A.  Yes.

25        We basically were recognizing that the inmate was             14:36:59

Rodney Stewart – Direct Examination

1    having pseudoseizure, and that a neurology consult was not

2    necessary.

3    Q.  And was that ATP accepted by you, Dr. Stewart?

4    A.  Yes.

5    Q.  And where can we find that?  Where is that so indicated on          14:37:10

6    this document?

7    A.  In the third box down, action date 10-19-2017, staff member

8    Stewart, Rodney accepted the ATP.

9    Q.  Next page at page 32 of Exhibit 16, do you recognize what

10   this document is?                                                      14:37:34

11   A.  This is a -- this is an HNR request.

12   Q.  And is that an HNR request something that is filled out by

13   the patient?

14   A.  In the patient's handwriting, yes.

15   Q.  And is it fair to say that this HNR for this particular            14:37:54

16   patient requests a seizure helmet?

17   A.  Yes.

18   Q.  Do you know whether or not this particular patient has been

19   provided with a seizure helmet?

20   A.  Yes.                                                               14:38:09

21   Q.  What is a seizure helmet?

22   A.  It's a rubber padding.  Basically it's just rubber padding

23   that has a chin strap, it holds around the ear, with a rubber

24   pad that goes around the ear, basically to protect their skull.

25   Q.  Do you have personal knowledge whether or not presently           14:38:26

UNITED STATES DISTRICT COURT

—**Rodney Stewart – Direct Examination**—

1  this inmate does have a seizure helmet?

2  A.  Yes, he does.

3  Q.  And do you believe that that is -- was an appropriate order

4  for a medical supply to this particular inmate based upon even

5  the records of pseudoseizure?                                    14:38:43

6  A.  Yes.

7  Q.  Why?

8  A.  Because he banged his head a lot.  Just to protect his

9  skull.  It's not, you know, the end all of things.  It's not a

10 football helmet, but even a football helmet can't protect you   14:38:56

11 from concussion.  But it does give him some degree of

12 protection.

13 Q.  Are you aware in reading the KJZZ story that, per the

14 interview of Dr. Watson, she was critical of Corizon's

15 UM team's denial of an orthopedic consult for a particular      14:39:19

16 inmate who had suffered a fracture of the hand?

17 A.  Yes.

18 Q.  Do you have personal knowledge of that particular inmate's

19 case with respect to the fracture of the hand and the consult

20 request?                                                         14:39:35

21 A.  Yes, I had to complete that consult.

22 Q.  Do you know whether or not an orthopedic consult was, in

23 fact, granted or ATP'd or NMI'd by the UM team?

24 A.  It was all of those things.  It was ordered, NMI'd, and

25 then ultimately ATP'd.                                           14:40:00

Rodney Stewart – Direct Examination

1    Q.  If I can direct your attention to the folder in front of

2    you that will be marked number 14.

3             THE COURT:  Miss Love, just to give you a heads up, at

4    2:45 we're going to take a 15-minute break so that Mr. Millar

5    and Miss Sobolewski can set up for their presentation, which          14:40:23

6    will start at 3:00.

7             What that means, Doctor, is we're going to have to

8    impose an interruption on you, because the lawyers and the

9    Court have previously arranged for an out-of-town presentation

10   to be made.  Those people have arrived here.  And we said that         14:40:39

11   we would set it up at a particular time.

12            So what we're going to do is we'll probably devote

13   about -- well, it's going to be at least an hour perhaps,

14   starting at 3:00 o'clock until 4:00.

15            What that means is that we'll be able to return to            14:40:55

16   you, but there's going to be a delay.  I know that that's an

17   imposition.

18            I will say this to you, you've told me about a meeting

19   that you missed, at least one, that I want you at.  And I'm

20   sorry about that.  I've only last time learned that by                14:41:08

21   scheduling these things on a Wednesday we are oftentimes

22   running into such a meeting.  And I don't take that lightly,

23   and regret that I couldn't have made a different arrangement.

24            But as you can imagine, because your job is big, this

25   job is big too, and so we have a lot of balls to juggle.  And         14:41:25

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    that's the way we have to just do it.

2          So I just wanted to give Miss Love a heads up that now

3    in three minutes we're going to break for 15 minutes.

4    BY MS. LOVE:

5    Q.  Dr. Stewart, if you can please look at Exhibit No. 14         14:41:35

6    that's in front of you.

7          MS. LOVE:  And counsel, I believe this is already

8    admitted into evidence.

9          MR. FATHI:  Yes.

10   BY MS. LOVE:                                                       14:41:43

11   Q.  If you look at page 2, coded as 14.2, do you recognize this

12   record to be a Consultation Request for the particular inmate

13   that had the hand fracture that Dr. Watson spoke of in the KJZZ

14   story?

15   A.  Yes.                                                          14:42:05

16   Q.  And is this a consultation -- orthopedic consultation that

17   was requested by Dr. Watson?

18   A.  Yes.

19   Q.  In the subjective notes section it says, he fell, hitting

20   his left hand.  X-ray results are, colon, the following X-ray    14:42:20

21   results were processed on 9-25-2017, 11:00 p.m.  Slightly

22   displaced fracture distal fifth metacarpal shaft with minimal

23   angulation, fifth metacarpal fracture.

24          Do you see that?

25   A.  Yes.                                                          14:42:39

Rodney Stewart – Direct Examination

1   Q.  In your opinion as Site Medical Director of Eyman, was that

2   enough information or sufficient information to justify

3   requesting an orthopedic consult for this particular patient?

4   A.  I only hesitate because this part of it is an appropriate

5   thing to do.  You can submit this.  You have a 32 -- you have a          14:43:04

6   procedure request, 32-year-old male, approximately

7   one-and-a-half weeks.  Struck his hand.  There's probably a lot

8   more you could add to that.  You have the X-ray results, which

9   is primarily -- in any ortho thing that's the primary thing to

10  have.                                                                    14:43:25

11       And then you could submit this as is.  And a lot of

12  providers would not be aware that there still is more

13  information that you could have added.  Nonetheless, when she

14  submitted it, it did come back asking for more information.

15  Q.  And this is something you're personally aware of, that an            14:43:46

16  NMI was generated as a result?

17  A.  I -- yes.  I attended to it actually.  Eventually I had to

18  attend to it myself.

19  Q.  How did you attend to it yourself and why?

20  A.  Because it basically asked a simple question, what was the           14:43:58

21  degree of angulation or displacement of the fracture?

22       As you can be -- you know, small bones, especially

23  small bones of the hand, say this is the small bone, it's just

24  a stick, say any stick.  So you got a stick and you fracture

25  it.  If you fracture it like that, the pieces are well              14:44:21

UNITED STATES DISTRICT COURT

1    approximated, that bone will heal all by itself, you don't have

2    to do anything.  The greater the degree of displacement the

3    more likely are you're going to need to do something about

4    that.  Because as you can imagine, this thing sticking out

5    through your skin displaced completely at 90 degrees is going          14:44:39

6    to give you some problem and you're going to need a surgeon.

7    But if it's only just a minimal displacement, you just restrict

8    movement of the hand and that bone will form a callous and it

9    will heal all by itself.

10            So what the UM team needed to know was, what was the          14:44:55

11   degree?  It says minimal angulation, but how much?  Minimum to

12   one radiologist might be different than another.  But you can

13   measure the degree, so that's what they were asking for.

14   Q.  And were you personally involved in stepping in and

15   providing that information to the UM team?                             14:45:12

16   A.  Yes, because she would not.  And I could not figure that

17   out for the life of me why she just didn't write two sentences.

18   I don't even understand that.

19   Q.  Was it a situation where she just didn't do it, she refused

20   to do it?                                                              14:45:28

21   A.  It was -- in her opinion it was broken, so go fix it.  That

22   was her opinion.  It was broken, so go fix it.

23   Q.  Did you direct her to provide a response to the NMI?

24   A.  Yes.  And she did not.

25   Q.  So you stepped in and did that?                                    14:45:44

—— Rodney Stewart – Direct Examination ——

1    A.  Yes.

2    Q.  And what information did you provide to the UM team?

3    A.  It was not -- as again the X-ray says, it was minimally

4    angulated.  But it doesn't give you any numbers.  So I had to

5    contact the radiology people and ask them to send that                14:45:59

6    information back to us, the exact -- measure it and then send

7    that information back to us.

8           And once we got it, the -- our coordinator sent it on

9    to the UM team, and they came back with an ATP.

10   Q.  What was the ATP?                                                  14:46:16

11   A.  Basically the angulation did not meet standards for a

12   orthopedic consult.

13   Q.  Do you know whether or not the patient's hand was

14   immobilized in any way?

15   A.  Yes, it was immobilized.  And I believe Dr. Watson                 14:46:29

16   immobilized it, I'm not exactly sure.  I did not do it, but I

17   believe she did it.  Immobilized the hand even prior to the

18   consult -- returning of the consult.  And that inmate healed

19   just fine.

20   Q.  Did providers on the Eyman unit have the supplies necessary        14:46:44

21   to cast, if necessary?

22   A.  Yeah.  There's a series of cabinets above the sinks in

23   every treatment room, and those cabinets contain casting

24   materials and splints and slings.  And there's additional

25   material -- not all the units have it, but there's a locked           14:47:06

UNITED STATES DISTRICT COURT

──────── Mr. Millar's Presentation ────────

```
 1    cabinet also in the treatment room that has additional

 2    materials for that.

 3              MS. LOVE:  Thank you.

 4              THE COURT:  So we'll take the break.  We will return

 5    at 3:00 o'clock, or whenever Mr. Millar and Miss Sobolewski are    14:47:16

 6    ready, whichever is later.

 7              Thank you, sir.

 8       (Recess at 2:47 p.m., until 3:03 p.m.)

 9       (Discussion held off the record.)

10              THE COURT:  The floor is yours, sir.                      15:03:49

11              MR. MILLAR:  All right.  Thank you.

12              We are -- we're glad to be back.  We were here just a

13    little over two weeks ago.

14              Today the time we have to spend we'll work to be

15    expeditious on it.  But this truly will set the foundation for     15:04:45

16    the balance of the work that we're going to do.

17              And so today what we're really asking is for the

18    participants here to make sure that we've got sufficient

19    feedback on the data elements and the assumptions that we've

20    made around using them.  Because as we go forward now then to      15:05:00

21    reproduce this profiling analysis across all ten of the

22    facilities, and through both medical and behavioral health

23    providers, we want to make sure that we're doing it

24    appropriately.

25              THE COURT:  And thank you very much for providing the    15:05:15
```

UNITED STATES DISTRICT COURT

1    material in advance to everyone so that the lawyers and the

2    Court would be able to be prepared.

3             MR. MILLAR:  And we'll continue to try to do that.

4             THE COURT:  Thank you.

5             MR. MILLAR:  So if we look at what we've outlined          15:05:25

6    today, we'll go very quickly, just on the project status of the

7    parts of where are working.

8             And then we've used Perryville as the sample to do the

9    profiling on their medical staff.  We'll talk through the

10   elements that we have there, what we assumed with the data,       15:05:39

11   what the graphs and the different analytical tools look like

12   that we're starting to utilize to just pressure test what we

13   are assuming, to make sure that's correct, and then we'll refer

14   to our next steps of where we'll go from there.

15            THE COURT:  Very well.                                    15:05:56

16            MR. MILLAR:  So we're near the midpoint of the

17   engagement as we anticipate it.  We're reporting our

18   intermediate findings, looking towards what the assumptions are

19   in the data and what the interview requirements will be as we

20   continue to move forward.                                         15:06:13

21            I've actually asked my team to hold off in making

22   recommendations on those that we want to interview, because we

23   want to make sure that we're intentional of who we're looking

24   at based on the data that we're working on.  And so those will

25   be coming out in the near future.  But we have not made those     15:06:27

1    yet.

2         We're still working primarily in the Work Stream II

3    area.  We've done the market profiling that we looked at the

4    last month.  This is our beginnings on the facilities' profile

5    and baselines.                                        15:06:42

6         So as we think about this, we are deriving this

7    analysis from raw payroll data.  The data that we're looking

8    with is for calendar year 2017, so January 1st through December

9    31st.  It includes the provider's name, a job title, salary

10   types, hours worked by week, et cetera.               15:06:59

11        We are also using then the Corizon monthly budgeted

12   hours report.  These were pulled from a set of six months of

13   reports that we received from January 17th to June 17th.  As

14   we've tested that data, the budgeted numbers, the contracted

15   numbers for FTEs are consistent across all six of those months  15:07:20

16   and all of the facility locations.

17        And so the one question that we're asking here is for

18   confirmation from the Court and from the parties involved, is

19   are those budgeting numbers, can we assume that those are

20   correct, even though we have not pulled that from 12 months of  15:07:38

21   reports?

22             THE COURT:  Okay.

23             MR. MILLAR:  So hearing no objection --

24             THE COURT:  No, no objection.

25             MR. MILLAR:  -- we'll assume that those are correct.  15:07:50

UNITED STATES DISTRICT COURT

─────── Mr. Millar's Presentation ───────

1          THE COURT:  And by the way, the lawyers should feel

2    free to interject at any point.  Don't wait for Mr. Millar or

3    for me to recognize you, because I do think this is a helpful

4    process to be able to engage in real-time.  So please.

5          MR. MILLAR:  Yes, we would hope for that.  We'll take          15:08:05

6    questions and clarification or concerns so that we can make

7    sure we have a clear understanding.

8          MS. KENDRICK:  I actually have a clarifying question.

9          The budgeted hours report, is that the same thing as

10   the staffing reports that they produce every month?          15:08:17

11         I can show you an example of one.  I just want to

12   see --

13         MR. MILLAR:  Yeah, if you can show me the example,

14   then I can confirm.

15         Yes, that is the report that we are working from.          15:08:38

16         THE COURT:  Okay.

17         MR. MILLAR:  Essentially it's an 11-page pdf file that

18   we've worked from.

19         MS. KENDRICK:  Well, I guess, do you not have the last

20   six months reports?  Because they have been filed with the          15:08:55

21   Court over the months.  So they're publically available.

22         MR. MILLAR:  I don't think we've received them.  If

23   those would be put in our box folder, we could use those and

24   complete the set for that.

25         THE COURT:  Can you kindly, Miss Kendrick, direct          15:09:09

1   Mr. Millar in an e-mail that you copy to everybody that shows

2   where it is that he could see, so that he can get a handle on

3   how it is -- he's using a source that is directed through

4   Corizon.  But if there is this other source as well that

5   exists, his handle of it may not be as -- well, we have a          15:09:27

6   better handle on it because we're used to dealing with the

7   docket.

8          MR. MILLAR:  Yes.

9          THE COURT:  That's where we are.

10          So giving him that guidance I think would be helpful.       15:09:36

11   Thank you.

12          MS. KENDRICK:  Yes, sir.

13          MR. MILLAR:  Thank you.

14          Additional lists that we're working from, Corizon has

15   provided us with employed provider lists.  This included who       15:09:47

16   their provider are, the positions they're in, et cetera, as

17   well as a W-2 compensation list.

18          What we're using this for is within the payroll data

19   file, we're using this to reconcile and test totals in the data

20   to make sure that we have processed it correctly, that we're       15:10:04

21   not -- we haven't made any errors in the calculations.  And so

22   we're looking at exceptions and cross matching on those.

23          It's just one of the ways that we ensure that the raw

24   file we're working with matches to the reports that the Court

25   has been seeing as well.  And if there's any discrepancy, that     15:10:23

UNITED STATES DISTRICT COURT

 1    we could call attention to that.

 2              THE COURT:  Thank you.

 3              MR. MILLAR:  Okay.  One of the things that we need to

 4    do with this data, because of the way that our engagement is

 5    described, is we need to group some of the titles or some of        15:10:36

 6    the staffing titles.  They're not the same on every single

 7    report that we work with, every set of data.

 8              And so for the medical staff groupings we created

 9    three categories; one called medical director, one physician,

10    and then nonphysician practitioner, or NPP.                         15:10:56

11              The payroll job titles that have been included in each

12    of those are listed here; so Medical Director, Regional Medical

13    Director, and Associate Medical Director.

14              And then budgeted staff job titles, there is a Medical

15    Director title there.  And so when we're working with the          15:11:13

16    different data sets that have each of the different titles in

17    them, this is what we're using to group them into the one

18    element that you'll see on our reports called Medical Director.

19              We've done the same with physician, that's staff

20    physician and hospitalist, or staff physician on the budgeted      15:11:29

21    staff job title.

22              And then the nonphysician practitioners are the nurse

23    practitioners, physician assistants, and midlevel

24    practitioners.

25              And on the budgeted staff job titles, it's the nurse     15:11:41

1    practitioners.

2             And so I'll stop here at this point, and with the

3    medical staff groupings, I want to ask the counsels if this

4    makes sense going forward.

5             MS. KENDRICK:  Yes, it does.                    15:11:59

6             MS. LOVE:  Yes.

7             MR. MILLAR:  Okay.  Behavioral health staff grouping

8    we've done as well.  The director -- the BH, standing for

9    behavioral health, is the regional psychiatric director,

10   associate regional mental health director, and the VP of    15:12:13

11   behavioral health services.

12            On the budgeted staff titles we see an MH director

13   Ph.D. and a psychiatric director job title that has been

14   categorized there.

15            In the middle category we use BH, or behavioral health  15:12:27

16   provider.  We do provider instead of physician because we're

17   including psychiatrists and psychologists, acknowledging that

18   the psychiatrists have scripting privileges, psychologists do

19   not.  And the budget staff titles match that as well.

20            The behavioral health midlevels are the nurse      15:12:48

21   practitioners, physician assistants, and MH midlevels.

22            And then ask the same question, if this grouping makes

23   sense.

24            MR. FATHI:  If I could just have a moment to see if

25   there's anything missing?                                15:13:02

1          THE COURT:  Of course.  Surely.

2      (Discussion held off the record.)

3          MR. FATHI:  The only job category that I don't see

4    here that perhaps should be included is psych techs, who do

5    some of the contacts with people on watch, for example, or          15:13:35

6    people with mental illness who are in high security settings.

7          So if you made a deliberate decision to exclude them,

8    obviously that's fine, but I just wanted to ask about them.

9          MR. MILLAR:  Let me explain our rationale behind that,

10   and then we'll take direct from the Court on how you'd like to       15:13:55

11   proceed.

12         In both the medical area and the mental health or

13   behavioral health area, we did exclude anything that were tech

14   identified, such as medical assistants, medical technicians,

15   radiology technicians, and then the psych techs.                     15:14:08

16         Part of the reason for doing that is we do not have

17   national benchmarks to compare that staffing against.  We do

18   though have that payroll information in the table -- in the

19   data sets that we have.  We would have the capability of

20   showing what the FTE level staffing is for the tech, and even        15:14:26

21   or the nursing levels.  We just don't have the market profiles

22   to work against for them.

23         And so from the perspective of our team, if that

24   information would be meaningful, in light of the lack of bench

25   marks, but just to see it in the same type of analysis that          15:14:46

1   we're doing with the physician and nonphysician providers, that

2   could be included.

3        But that was the rationale for excluding the technical

4   job titles.

5        MR. FATHI:  That certainly makes sense to me.  And as          15:15:01

6   I said, I just wanted to make sure it had been a deliberate

7   decision rather than an overlooking.  So that's fine with

8   plaintiffs.

9        MR. MILLAR:  And I think --

10        THE COURT:  Hold on just a second.          15:15:21

11        Are you still considering that?

12        MS. LOVE:  Yes.

13     (Discussion held off the record.)

14        MS. LOVE:  That's fine.

15        THE COURT:  Okay.  Thank you.          15:15:58

16        MR. MILLAR:   Thank you.

17        Our biggest concern was that there might be a title

18   that we had not recognized --

19        THE COURT:  Right.

20        MR. MILLAR: -- that should be included, and we did not          15:16:05

21   want to underestimate the hours worked.

22        Several assumptions then that we've made.

23        There is a series of -- Rene, help me here -- maybe 20

24   plus salary codes or pay codes, because we're working with raw

25   payroll data.  So we worked directly with the representatives          15:16:21

─────────── Mr. Millar's Presentation ───────────

1    at Corizon to understand how the differential pay is accounted

2    for in this setting.  And so per their instructions, anything

3    indicated as a level one pay code -- and there's probably six

4    or eight of those -- so salary level one, contractor level one,

5    et cetera, represented the actual hours.  And so when we're          15:16:43

6    doing our full-time equivalent, or FTE calculations, we're

7    doing it based on that number alone.  Otherwise we would be

8    double counting the hours.

9          And so -- and then number two, the weekly FTE

10   calculations that we are doing include productive working time      15:17:05

11   only.  We have excluded PTO, paid time off, paid sick time,

12   training, and offsite admin time.  This is an area that we need

13   to make sure we have clarification.

14         We have run this analysis with those times included,

15   and with them not included.  There's a marginal difference in       15:17:25

16   having them in there.  But we were making the assumption that

17   the budgets that we were looking at were staffed or worked

18   FTEs, not full.

19         And we look for clarification from the Court here that

20   that is a correct assumption.                                        15:17:43

21         THE COURT:  It's all right with me.

22         MS. KENDRICK:  May I say something actually?

23         THE COURT:  Yes.

24         MS. KENDRICK:  So it's come up in past status hearings

25   when we've looked at these monthly staffing reviews, and we're      15:17:52

─────── **Mr. Millar's Presentation** ───────

1    comparing them to the Corrective Action Plans, that the

2    Corrective Action Plans sometimes had said, you know, one

3    provider was on extended PTO, and that's why, you know, we

4    weren't compliance with this Performance Measure.

5           I can't right know remember precisely which one, I          15:18:07

6    think it was Yuma perhaps.

7           But in any event, when we were talking about that

8    Corrective Action Plan, I do remember looking at the staffing

9    report, and it showed 1.0 of 1.0 FTEs filled, even though this

10   person had been on long-term PTO.                                  15:18:24

11          So I'm not sure if maybe they do it differently on the

12   weekly reports, but the monthly reports, it -- we discussed

13   that a few months ago and came to the realization that they

14   were counting them as FTEs when people were on extended PTOs.

15          If the Court likes during a break or tomorrow or           15:18:43

16   something, we could find that --

17          THE COURT:  No, you're right.  And I remember that.

18   And it's important, because oftentimes we're talking about one

19   position.  So it's not as if when there is a PTO there's any

20   coverage at all.                                                   15:18:58

21          MS. KENDRICK:  Correct.

22          THE COURT:  So what you do think we should do about

23   that?

24          MR. MILLAR:  My recommendation would be is that we

25   start with the productive working time as our baseline.  What I   15:19:07

1   would have my team do as well, not doing the full analysis with

2   the paid time off included, but at least a high level analysis,

3   that when we're looking at the different facilities we could at

4   least comment on what the impact of either short-term or

5   long-term PTO within the facilities are.                  15:19:27

6        So what I would ask is that we could run with the

7   assumption that our base analysis will be done on productive

8   work time, but that we would run at least a visual to pressure

9   test what the PTO impact would be.

10       THE COURT:  And it may well be that what we find in   15:19:43

11  the front end will suggest we don't even need to look at the

12  second end, because the front end will answer the question

13  overall, maybe.  I don't know.

14       MR. MILLAR:  Possibly.

15       THE COURT:  All right.  Is that all right with you,   15:19:53

16  Miss Kendrick?

17       MS. KENDRICK:  Well, I guess my concern is --

18       THE COURT:  What he's going to do is -- I'm sorry to

19  cut off you, but it sounds like what he's going to do, he's

20  aware of the issue, and if it turns out that we have down the   15:20:04

21  road a reason to think that this issue is going to be a serious

22  threat to the data, we can dig down deeper.  But we're at least

23  going to at the start take a look at what we know that we can

24  get more accessibly, and get a sense about whether it will tell

25  us that we're at risk of relying on improper data.          15:20:21

1          Is that a fair way to put it, Mr. Millar?  Or no, did

2   I miss it?

3          MR. MILLAR:  I believe so.  All I would augment is

4   that I think what I'm recommending is that we would actually

5   allow you to be able to look at both.  But we would drive the          15:20:35

6   primary analysis just from productive time.

7          THE COURT:  So we would -- it would be available for

8   us, everybody to see, but your conclusions would be based not

9   on it, but on the non-PTO.  Is that right?

10          MR. MILLAR:  Right.  Unless we did find, as we did the          15:20:52

11   other ten facilities, that the PTO was significant.  With

12   Perryville it did not create a large difference.

13          THE COURT:  Okay.

14          MR. MILLAR:  And so I would like to base our

15   analysis -- and if, for example, I'm going to run eight or nine          15:21:06

16   different analytical views on a facility, I would like to do

17   that first on the productive work time.  I don't want to run

18   the same eight or nine with the paid time off included.  But I

19   would propose running one analysis overall with paid time off

20   to just see what the significance might be site to site.          15:21:25

21          THE COURT:  Anything else you wanted to say,

22   Miss Kendrick?

23          MS. KENDRICK:  Yes.  I guess my concern, what I'm

24   trying to articulate, is that whether or not these reports are

25   actually accurately reflecting productive working time only.          15:21:39

─── Mr. Millar's Presentation ───

1    Because if you look at the monthly staffing reports, it would

2    appear that there was 1.0 FTE productive working time.

3         So I guess my question to Mr. Millar would be, do you

4    guys have a way to like reconcile that with payroll or other

5    things to figure out --                                    15:21:58

6         MR. MILLAR:  What I can clarify is that we are not

7    using the reports for the worked FTE data calculations.  We are

8    only pulling the contracted budgeted numbers from that report.

9    We are generating the worked FTEs directly from payroll files.

10        MS. KENDRICK:  Okay.  Thank you.                       15:22:16

11        MR. MILLAR:  So using that level on pay code restricts

12   it just to actual paid work time, and excludes the PTO paid

13   sick and training.  So it is a raw data calculation.

14        MS. KENDRICK:  Thank you.

15        MR. MILLAR:  Okay.  On this third element, we have      15:22:34

16   identified at least seven what we're calling non-Corizon

17   providers.  We believe they are locum tenens providers.  They

18   are included in the payroll data.  And I believe we've

19   confirmed that with our contacts at Corizon, that that is the

20   way they're paid.  Three physicians, one physician assistant,   15:22:54

21   two nurse practitioners, and one midlevel.

22        We've been able to crosswalk that to the W-2 lists and

23   the Corizon employed list.

24        There are some exceptions as well where it looks like

25   there have been contracted employees that have become employed,  15:23:09

1    so they are paid under both elements.

2          We don't believe that it's a material issue, but we

3    are tracking to that.  And if any of the counsels are aware of

4    problems that we should be aware of, we would entertain their

5    comments at this point.                                          15:23:27

6          THE COURT:  I don't hear any comments.  Thank you.

7          MR. MILLAR:  Okay.  Very good.

8          What you're seeing here is our first view of the

9    staffing levels at the Perryville facility.  This is done on a

10   weekly view.  So along the bottom you just see weeks 1 through   15:23:45

11   53 for the year 2017.  This is done in a stacked bar chart

12   format.  So the dark color at the very bottom are the director

13   hours worked.  And these are done in FTE equivalents.  And so

14   we are assuming a 40-hour per week full-time equivalent.

15         And so against the number -- the hours paid in           15:24:10

16   payroll, this has been put in here.

17         So for Perryville overall, their staffing for the year

18   of 2017 would be at 8.5 medical FTEs per week.

19         THE COURT:  I'm sorry to interrupt.

20         So the hours in payroll mean those are actual hours       15:24:28

21   worked.  It's not what the budget is.  Somebody was there doing

22   the job and paid for that.  Or no?

23         MR. MILLAR:  I can't confirm that they were there

24   doing the job, but they were paid to be there to do the job.

25         THE COURT:  Okay.                                         15:24:42

1           MR. MILLAR:  So from a W-2 income tax reporting

2   standpoint, they were paid for those hours worked.

3           THE COURT:  Okay.  Thank you.

4           MR. MILLAR:  The grey bar in the middle are the

5   physician hours.  And then the nonphysician providers are at        15:24:55

6   the top.

7           One of the reasons that we want to look at this in a

8   stacked bar format is, we understand that in some cases if

9   there are shortages of physician providers they can be covered

10  by nonphysician providers.  And we just want to see where         15:25:09

11  that's falling.

12          So if you look throughout the year in Perryville there

13  was not -- there wasn't a single week during the year that they

14  reached the 8.5 FTE level for this medical staff.

15          And so that was one of the things that we were testing   15:25:25

16  against as we begin to look at the situation and to look at the

17  trending over the year.

18          THE COURT:  Mr. Millar, for you and your team, I'll

19  just say this, that this morning I made some observations at

20  the very start of the hearing based upon my preliminary view of  15:25:40

21  this very graph.  And I didn't make any final decisions, but I

22  just gave some views about how it had animated my thinking.

23  And I'll make sure that when the transcript becomes available

24  that we give that to you, because it's relevant to what you're

25  doing.                                                            15:26:00

1          MR. MILLAR:  Thank you.  That would be helpful.

2          What we've then done is we've broken down each of

3    these categories on their own to then look at them as well.

4          For Perryville what we've identified is during 2017

5    there were two different employees that filled the Medical          15:26:12

6    Director role.  And you can see here, I think this might have

7    been one that was referenced earlier, that there was either a

8    time of PTO or a time of someone being not in position, a

9    25-week period, from the 10th to the 37th week, that there was

10   not a medical director staffed at Perryville.                       15:26:33

11         In the beginning of the year their weekly staffing was

12   at or above that .8 FTE range, and so fairly consistent

13   staffing.

14         And we get towards the end of the year they did have a

15   person there, but not working the full budgeted hours.             15:26:48

16         And so this is the type of view that we will take of

17   this data as we move forward to see what the different impacts

18   are and to help inform our observations and recommendations for

19   the site specifically and for the D.O.C. system overall.

20         Any questions on this one?                                    15:27:12

21         THE COURT:  No.

22         MR. MILLAR:  Okay.  This then is the physician

23   staffing.  Perryville had four unique physician employees that

24   were paid to be there over this time.  The budget for the

25   physicians is 2.5 FTEs per week.  Generally speaking that was       15:27:32

——— Mr. Millar's Presentation ———

1    not met at any time during the year.

2          There were two primary -- two physicians that worked

3    primarily at that point.  There were just two that filled in in

4    the 8th and 9th week and then the 51st week.

5          And so what we do see is some consistency in the                15:27:53

6    staffing here, which is something we're looking towards.

7          One of the other things we will do with our analysis

8    as we do this for all ten of the facilities, is we will look to

9    see what percentage of cross coverage is being provided by any

10   individual provider, to be able to give some feedback and        15:28:10

11   recommendations on that regard.

12         And then this final would be the nonphysician

13   practitioners, or NPPs.  There were nine of those that worked

14   at Perryville throughout the year.

15         And you can see this is one where the staffing           15:28:27

16   actually was near or exceeded the budgeted 5.0 FTEs throughout

17   the year.

18         I think this is a meaningful view, because even though

19   when we started out with all of them together, you could see

20   that Perryville did not meet the 8.5 budgeted hours.  This is     15:28:42

21   one area where they're at least being successful in meeting

22   that need.

23         So what we will look towards is some of the things

24   that they're doing in that area of staffing to see if they

25   would be applicable to the others.                               15:28:57

UNITED STATES DISTRICT COURT

1          THE COURT:  It is a good observation, because we have

2     Performance Measures that run across many facilities.  And the

3     same entity is running them all.  And when we see compliance in

4     one area and failures in others, we think, well, it can't be a

5     mystery in what works, so why don't we see that?                    15:29:15

6          So I think it's good to be what you've just declared

7     as being something you're open to looking to.

8          MR. MILLAR:  And we'll look to compare that on an

9     operational basis.  We'll also do that to compare from our

10    benchmarks.                                                          15:29:31

11         If you'll recall from last month, there are some areas

12    where there is much greater supply of these midlevel or

13    non-physicican providers in a marketplace.  And that may be --

14         THE COURT:  I see.

15         MR. MILLAR:  That may be an essential factor as well.          15:29:38

16    So we'll trying to look at that from two or three different

17    dimensions, operationally, from a recruitment and retention,

18    and market supply demand element as well.

19         THE COURT:  Thank you.

20         MR. MILLAR:  Any questions from the counsels on this?          15:29:53

21         MS. KENDRICK:  No.

22         MS. LOVE:  No.

23         MR. MILLAR:  Okay.  Very good then.

24         Then I think what we have then is we have agreement

25    that this method of looking at the data, the assumptions we         15:30:03

1   have made hold true.

2           And so our next steps at this point will be to now

3   apply this to all of the medical staff providers throughout the

4   other nine facilities, and all of the behavioral health

5   staffing through the ten facilities.  We'll complete that          15:30:17

6   analysis, and then begin our draft of looking at the staffing

7   profiles.

8           And so I believe when we're back here in April we will

9   probably need more time than we've had on these first two go

10  rounds, because we'll highlight all of the systems as a whole,    15:30:34

11  and then probably identify the top ones that we think we need

12  to dig into with the most level of detail, or are the most

13  representative on either end of the spectrum, a facility that's

14  doing very, very well in all or one of the categories, or those

15  that are struggling.                                               15:30:52

16          And so I don't know that we'll intend to go through

17  all ten of them while we're with the Court.  We will work to

18  get that out even more ahead of time, so that the Court and the

19  counsels will have the chance to look at those to have specific

20  questions, and we'll be ready to dig into those as we go          15:31:08

21  forward.

22          Based on the work we'll do over the next three or four

23  weeks as well, that will inform where we believe some

24  significant interview opportunities will come.  And again,

25  looking for best practices or known challenges to be able to      15:31:22

1    inform those.

2            And then I believe we're scheduled to be back at the

3    court on the April 11th timeframe.

4            THE COURT:  Just let us know how much time that you

5    believe that you need.  Because we cut you short last time, and          15:31:36

6    we don't want to be doing that.  And so this is a big priority.

7    So you let us know how much time you think you need, and we'll

8    take what steps we need to make sure that we get all of the

9    work done that we need to get done.

10           MR. MILLAR:  I will do that.  How far ahead would you          15:31:52

11   need to know that?

12           THE COURT:  If you could let -- I understand that you

13   coordinate logistical matters with Miss Selzer in e-mails that

14   are circulated to people.  The soonest you can let us know, the

15   better.  Because what the alternative is, if it turns out that          15:32:08

16   we have so much on our agenda that we need to look to find

17   another day, the sooner we get a heads up about that the

18   better.

19           I'm sorry it's not a specific answer.

20           MR. MILLAR:  That's okay.          15:32:20

21           I could tell that at this time that I would ask for 90

22   minutes.  And if we needed more than that we would let you know

23   as soon as we knew that was possible.  But I believe we will

24   have sufficient material and discussion to go through that I

25   would anticipate 90 minutes.          15:32:33

**Mr. Millar's Presentation**

1            THE COURT:  All right.  Thank you.

2            MR. MILLAR:  Okay.  Thank you very much.

3            THE COURT:  Anything else from anybody?

4            MS. LOVE:  No.  Thank you.

5            THE COURT:  Thank you all very much, and have safe          15:32:39

6      travels home.

7            MR. MILLAR:  Thank you.

8            THE COURT:  So, Miss Love, thank you.  We can

9      continue.

10           MS. KENDRICK:  Your Honor, just again on the time          15:32:49

11     check.  At the beginning of the day there were some issues that

12     I raised.

13           THE COURT:  Right.  Again, I'm sorry, I'm in the

14     cutoff mode.

15           I've been thinking about that.  And obviously I have          15:33:03

16     found what has happened today to be productive.  So I'm not

17     going to look to be trying to make it shorter than it needs to

18     be because of what we have to do otherwise.

19           Those issues that you raised are important.  I've been

20     taking a look at my calendar to see what we could do in an          15:33:17

21     alternative by way of having you all perhaps appear

22     telephonically and to address these issues.

23           It looks to me like that I've got a couple of near

24     term -- or near time availabilities.  I know that your

25     counsels' calendars are unlikely to be as free as mine happens          15:33:32

1   to be, because things can disappear from a court and it goes

2   away.  But as I look at my calendar -- and my judicial

3   assistant is luckily listening to me, I trust -- it looks to me

4   like I could do it any time Monday.  I don't know whether that

5   happens to work with anybody.                                   15:33:50

6          Phone's not ringing yet.

7          MS. KENDRICK:  That works for plaintiffs' counsel.

8          MS. LOVE:  I'm firing my phone back up.

9          THE COURT:  Okay.  The lawyers can keep their phones

10  on.                                                             15:34:07

11      (Discussion held off the record.)

12          MS. LOVE:  Yes, Monday works.

13          THE COURT:  All right.  Now the next question is for

14  you all, since I'm available the entire day, you get to pick

15  when you want it to be.                                         15:34:38

16          MS. LOVE:  I have no constraints.

17          MS. KENDRICK:  No constraints, so whatever the Court

18  prefers.

19          THE COURT:  I'm the judge, I have to make all the

20  decisions?                                                      15:34:49

21          Would you rather have it earlier in the day or later

22  in the day?

23          MS. KENDRICK:  We would rather have it earlier in the

24  day, sir, because some --

25          THE COURT:  More time.                                  15:34:57

CV-12-601-PHX-DKD – March 14, 2018

1        Okay.  So let's set it for 9:00.  Is that all right?

2   Or is that a problem?

3        MS. KENDRICK:  That works for us.

4        THE COURT:  Okay.  What we're going to do is we'll do

5   it telephonically.  So arrange for a call in.  We will be on          15:35:06

6   the record, but it won't be -- it will be electronically

7   recorded, in one of our alternative ways.

8        So that will be -- if you place the call at 9:00,

9   we'll take it up and we'll finish when we finish.  All right?

10       MS. KENDRICK:  Thank you.                                         15:35:25

11       THE COURT:  Thank you.

12       Miss Love.

13       Oh, the clerk makes a good point.  Just so that

14  everybody remembers, we're back -- well, everybody else is

15  changed.  We stay the same, we never change.  But when people        15:35:37

16  switch in other places, when they go from -- to daylight

17  savings time, as the Pacific Coast and the East Coast have,

18  that means that your times are different than what you've been

19  expecting.

20       So we don't change.  It makes it very easy for us.              15:35:53

21  We're simpletons here in Arizona.  Do the math.

22       MS. KENDRICK:  It's easy for us in California when

23  you're on the same time as us.

24       THE COURT:  Well, they say the reason we don't do it

25  is because since so many of us spend our summers in California,      15:36:04

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1     it would be handy if it would just be the same time.  So that's

2     what we do.

3            Doctor, I appreciate your indulgence here.  I'm sorry.

4     It is just -- it's one of our occupational diseases.  We are

5     never able to do what we promise to do on a time table.  And                    15:36:22

6     that's mostly because life is that way.  Life is unpredictable.

7            And we're interested in something here that's more

8     important than the clock.  We're actually interested in getting

9     to the truth of the matter.  And so we subordinate what is a

10    normal courtesy to people, and that is, we say we're going to            15:36:39

11    do it at that time, but oftentimes we can't because we're

12    engaged in something that actually has a big priority.

13           I know it's inconvenient.  I appreciate it.  Thank

14    you.

15           Miss Love.                                                             15:36:51

16                        DIRECT EXAMINATION

17    BY MS. LOVE:

18    Q.  Dr. Stewart, in reviewing the KJZZ story and interview of

19    Dr. Watson, did you read about criticism she had over denial of

20    a consult for rehabilitation and physical medicine for a              15:37:07

21    particular inmate patient?

22    A.  Yes, I read that.

23    Q.  Do you have any personal knowledge of the particular inmate

24    that she spoke of, of that inmate's situation?

25    A.  I do not.                                                                  15:37:25

Rodney Stewart – Direct Examination

1   Q.  Have you reviewed any of the records of the particular

2   inmate at issue?

3   A.  I did read about it, yes.

4   Q.  If you could turn for me to the folder in front of you

5   that's marked as Exhibit No. 18, which is already in evidence.          15:37:36

6           And if you -- again, the coding at the bottom of the

7   exhibits tells us the number.  But if you could turn to page 7,

8   so it's 18.7 in Exhibit No. 18.

9           And looking at page 7 of Exhibit No. 18, are you aware

10  of what this document is?                                                15:38:10

11  A.  A special needs order form.

12  Q.  And for this particular inmate, did Dr. Watson request or

13  order forearm crutches for the particular inmate?

14  A.  Yes, she did.

15  Q.  And is it indicated on this record whether or not the               15:38:28

16  inmate already had crutches and this was an order for a

17  replacement pair, or how do you understand that?

18  A.  Down where it says "medical property to be returned by

19  clinic," it says, current crutches are worn making them

20  unstable.                                                               15:38:46

21          So he had a pair of crutches and these would be

22  replacements.

23  Q.  If you turn to the next page, which is page 8 of Exhibit

24  No. 18.

25          Do you recognize this to be a consultation request?           15:38:57

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1   A.  Yes.

2   Q.  Is this a consultation request made by Dr. Watson?

3   A.  Yes.

4   Q.  Was the request made on July 14th of 2017?

5   A.  Yes.                                                    15:39:14

6   Q.  Can you tell from this consultation request what kind of

7   outside specialty consultation that Dr. Watson was requesting?

8   A.  Service type is physical medical -- physical medicine and

9   rehab consult.

10  Q.  And in the procedure requested comments, can you read that   15:39:29

11  to yourself for a moment?  And then I'll ask you a question.

12  A.  Okay.

13  Q.  And in the box marked procedure requested comments, is this

14  information that the provider would him or herself put into the

15  outside specialty consult request?                            15:40:18

16  A.  Yes.

17  Q.  And reviewing this, do you have an understanding of what

18  Dr. Watson was requesting as far as a specialty consult and

19  why?

20  A.  Not really.  The -- this previous document, the special   15:40:30

21  needs request made by Dr. Watson, is asking for crutches.  This

22  one she is -- she notes that possibly braces might be a

23  possibility, and also notes the crutches.  And then she

24  describes some of the spasticity, which is appropriate.  She

25  describes him, and she doesn't put in here exactly her exam.   15:41:06

1          So it's incomplete.

2          She does make a point, says he's at significant risk

3    for falling.  That's an important thing to put in your note, it

4    elevates the level of a need.

5          But I'm not exactly sure what she's -- really what          15:41:30

6    she's asking for.  Does she want the crutches or does she want

7    the braces?  And either way she's asking for a physical

8    medicine rehab consult.  That would be inappropriate.

9          So had I seen this beforehand, I would have intervened

10   and said go to physical therapy.          15:41:49

11   Q.  Why would you have intervened and said go to physical

12   therapy?

13   A.  Because they're the ones who measure and look at gait,

14   monitor the gait, and decide whether or not an inmate -- or in

15   my case inmate, or any patient would benefit from such a thing          15:42:03

16   as a brace or even the crutches.

17   Q.  What is the difference between physical therapy and

18   physical medicine?

19   A.  Physical medicine is actually an M.D. physician who does a

20   lot of what physical therapy does, but they're really not          15:42:22

21   physical therapists.  That's not what -- they can do what they

22   do and they can write orders in regards to that, but their

23   primary mission is to manage complex medical cases.  They're

24   internists like me who have subsequent training in the realm

25   of, you know, rehabilitation.          15:42:45

1          So what she's asking for actually isn't exactly what

2    she should be asking for.  To get a physical medicine consult,

3    you really are admitting somebody to a hospital, physical

4    medicine, to a hospital that they do physical medicine in, a

5    rehab hospital, or into a regular hospital that has a physical          15:43:08

6    rehab center.  And that's where those guys work.  They don't

7    really like have an office practice that -- as far I know they

8    don't really have an office practice that does that kind of

9    thing.

10   Q.  So had you seen this consultation request for physical              15:43:24

11   medicine and rehabilitation, and the information that

12   Dr. Watson provided, would you believe that that was an

13   appropriate referral or a request for physical medicine?

14   A.  It was not.  This patient needed physical therapy,

15   occupational therapy.                                                    15:43:39

16   Q.  And turning to page 9 of Exhibit No. 18, can you tell us

17   what this document is?

18   A.  This is a consultation report that we would usually see

19   coming from a -- from a consultant.  It looks like it was PT

20   for this inmate, a Cook inmate.                                          15:44:02

21   Q.  Does this indicate to you that Corizon did, in fact, send

22   this particular patient out for a consultation with physical

23   therapy?

24   A.  Yes, it does.

25   Q.  And turning to page 19 of Exhibit No. 18.                           15:44:17

Rodney Stewart – Direct Examination

1   A.  What was that?

2   Q.  I'm sorry, page 19.  So coded as 18.19 at the bottom right.

3          Are you able to tell from this particular page of

4   Exhibit No. 18 whether indeed this particular patient did

5   receive new forearm crutches as requested by Dr. Watson?        15:44:50

6   A.  Yes.  In the plan portion of this note it says, inmate

7   received set of deluxe forearm crutches.

8   Q.  In reviewing the KJZZ story and interview of Dr. Watson,

9   did you also read that Dr. Watson was critical over a

10  cancellation for a patient who had HIV, where she requested     15:45:21

11  referral to infectious disease?

12  A.  I did note that also.

13  Q.  Have you reviewed medical records associated with that

14  particular patient?

15  A.  I have.  And I actually discussed that with the current     15:45:39

16  provider at that facility.

17         Apparently Dr. Watson had an inmate that was on triple

18  therapy HIV medication, and there was some

19  concern -- reasonable concern that the patient wasn't getting

20  better.  The CD4 count was still -- which is a white blood cell  15:46:07

21  count, it was really low.  It's the white blood cells that are

22  attacked by the virus.  And the viral load was really high.

23         And so she had reasonable concern about that.  And

24  that is appropriate.

25         The treatment for HIV now is very -- is very good.       15:46:28

—— Rodney Stewart – Direct Examination ——

1    It's really good for HIV now.

2         And so Dr. Watson requested an HIV consult –– or

3    basically an HIV consult from an infectious disease doctor,

4    which is not really done a lot anymore.  It's done.  There are

5    clinics for HIV where the infectious disease doctors run those           15:46:57

6    clinics.  But because the medications are so good, essentially

7    once you place those patients on the antiviral medications they

8    become effectively cured, just about.  Okay.  They continue to

9    have the virus, but the load is –– usually goes to

10   nondetectable levels.                                                    15:47:26

11        That doesn't work for everyone.  So sometimes you have

12   to change the medications.

13        Our policy generally is to have an inmate on

14   medications.  If that medication does not appear to be working,

15   you really have to think it through.                                    15:47:44

16        One, the patient isn't taking the medication, and so

17   you would change the medication regimen so that the patient is

18   watch swallow.  If you put them on a period of watch swallow,

19   then you would then consider maybe changing their regimen if

20   those medications aren't effective.                                     15:48:09

21        So it's not a very difficult thing to do, and you

22   don't really need infectious disease to do that.

23   Q.  Can I turn your attention to folder number 15 in front of

24   you.  Which is plaintiffs' Exhibit No. 15 already admitted in

25   evidence.  And if you could look at page 1 of Exhibit No. 15.          15:48:26

Rodney Stewart – Direct Examination

1            Do you recognize this to be the -- a consultation

2    request by Dr. Watson dated August 4th of 2017 in which she

3    requested a cardiology consult for this particular inmate?

4    A.  I'm sorry, what day was that again?

5    Q.  This was a request dated -- I'm looking at the top left        15:48:59

6    three lines down -- August 4th of 2017?

7    A.  August 4th.  Yes.

8    Q.  And can you tell from this consultation request what kind

9    of outside consultation she's requesting for this particular

10   inmate?                                                          15:49:16

11   A.  The service type is cardiology, a cardiology consult, it

12   appears.

13   Q.  Now looking at the subjective notes section -- and if you

14   want to take time to read that to yourself.

15           First, I should ask you, have you seen the excerpts of   15:49:31

16   medical records contained in Exhibit No. 15 before today?

17   A.  I -- let me think.  I don't recall seeing them before.

18   Q.  Well, if you could take a look at the subjective notes box,

19   read that to yourself.

20           And then my question for you is going to be:  Based      15:50:09

21   upon the information provided by Dr. Watson in the subjective

22   notes portion, do you believe that that is appropriate

23   information to justify a referral for cardiology?

24   A.  Just on the subjective notes or the procedure request

25   comments as well?                                               15:50:31

—Rodney Stewart – Direct Examination—

1   Q.  Both, whichever you deem important to review.

2   A.  Okay.  So it appears to be mixed up.  The subjective notes

3   don't apply.  If this is strictly a cardiology consult, what

4   she describes at up top is good for a cardiology consult.  But

5   in the middle it looks like she's trying to discuss infectious        15:51:50

6   disease.  And all the labs at the bottom also suggest that she

7   was interested in infectious disease.

8        So I'm confused about it, actually.  I'm not exactly

9   sure what she was after.

10  Q.  Do you under Dr. Watson's allegation in the interview with        15:52:09

11  KJZZ, that she was critical of Corizon cancelling an infectious

12  disease consultation?

13  A.  Yes.

14  Q.  Based upon the information that you read in the procedure

15  requested comments and/or the subjective notes, is that              15:52:26

16  sufficient information, in your opinion, to justify a

17  consultation for infectious disease?

18        MR. FATHI:  Objection, Your Honor.  This is a

19  consultation request for cardiology.

20        THE COURT:  Well, hasn't the testimony been that it is        15:52:44

21  to this witness ambiguous?

22        MR. FATHI:  Your Honor, there is another -- there is a

23  request for infectious disease consult elsewhere in this file,

24  but this is a request for cardiology.  So I don't understand

25  why the question is, is this sufficient information for an           15:53:02

Rodney Stewart – Direct Examination

1    infectious disease consult?

2          THE COURT:  Doctor, do you think that this is a

3    request for an infectious disease consultation or a cardiology

4    consultation?

5          THE WITNESS:  Is a boggled request for a cardiologist.    15:53:19

6          THE COURT:  I guess the answer then is you don't know

7    which it is; is that right?  Is that fair to say?

8          THE WITNESS:  Well, the request type at the top says

9    it's cardiology.

10          THE COURT:  Okay.                                         15:53:31

11          THE WITNESS:  But they talk about infectious disease,

12    so I'm not exactly sure.  I'm not exactly sure.

13          There is one on page 15.8 of a infectious disease

14    consult.

15          THE COURT:  Okay.  You can ask another question or you    15:53:45

16    can ask this question.  I'll overrule the objection.

17    BY MS. LOVE:

18    Q.  Well, based upon -- that same question, based upon the

19    information provided in the subjective notes and signs and

20    symptoms box as to HIV history and treatment, do you believe    15:54:07

21    that that's sufficient information to justify an outside

22    consult for infectious disease?

23    A.  Not in the way that our practice -- the way our practice

24    practices.

25          Primarily -- unless there's a really significant          15:54:26

1  complication with HIV -- if it's just medication management, we

2  don't -- we don't consult.  We have a consultant that we -- if

3  we have some, you know, real confusion about, we can contact

4  people.  For me, some work for Corizon or consult with Corizon.

5  And I have, like I said before, community infectious disease        15:54:53

6  people.

7           So as her supervisor, if she had actually came to me I

8  could have straightened this out.

9           But this inmate says he's currently taking three

10  antiviral medications, not been seen by infectious disease        15:55:08

11  since he arrived here in 2015.  But he's been managed since

12  that time.  His medications have not been changed.  And that's

13  one -- that's a good thing, that's not a bad thing, that his

14  medications have not been changed, as long as he's responding

15  to those medications.                                             15:55:25

16           If you look down the -- these labs -- at the CD4

17  count -- CD4 count -- it says, T helper, CD4, 17.2, it's low.

18  That white cell count is low, and that is -- that's not a good

19  thing.

20           The HIV viral load, which is back on the other page,     15:55:48

21  says ultraquant -- or the RNA ultra is 4710.  That's high.

22  That's also a bad thing.

23           This inmate, again, as I said before, either one of

24  two things, either they're not taking the medication, or the

25  medication doesn't work, in which case the standard of care is    15:56:09

Rodney Stewart – Direct Examination

1   just to change to another three-drug regimen.  It's really not

2   that difficult.  There are a number of three-drug regimens

3   available.  They come in packages.  So you don't have to pick,

4   you know, I need this drug or that drug or this drug, they come

5   as a group.  So it's not that difficult.                          15:56:27

6   Q.  In the Summer of 2017, did Corizon have an infectious

7   disease person within the system with whom your providers could

8   consult with if needed for HIV treatment and management?

9   A.  Yes, they did.

10  Q.  So would there be a need, if there was someone in-house, so   15:56:48

11  to speak, for Corizon, that a provider could consult with to

12  actually send the person out to an outside consultant?

13  A.  There's no need.

14  Q.  And in these modern times of now -- well, 2017 and 2018, is

15  it your experience that internal medicine physicians or primary   15:57:10

16  care physicians can manage the care of an HIV patient?

17  A.  Yes, they can.

18  Q.  Do you have any information as to the current medical

19  status or condition of this particular patient?

20  A.  This particular patient continues to have a very low CD4      15:57:35

21  count, and a very high -- it's actually higher now, I think,

22  viral load.

23          And after discussions with the provider, I found this

24  inmate is actually not taking their medications.  So they're

25  non-compliant.                                                    15:57:59

1    Q.  Do you recall whether or not Dr. Watson ever consulted with

2    you regarding a concern that a referral for infection disease

3    for this particular patient, or any patient with HIV, had been

4    canceled because there was somebody within the Corizon system

5    who could consult instead of sending outside?                    15:58:19

6    A.  If she was told that?

7    Q.  No.  Do you recall whether or not she had a discussion with

8    you about this subject?

9    A.  Yes.

10   Q.  What you recall?                                              15:58:30

11   A.  Basically that she didn't need an infectious disease

12   consult.  This is the same thing that the consult said, that it

13   wasn't necessary.  We don't do -- we don't have a need for the

14   infectious disease consult.

15            Truth be told, if -- actually if you consulted         15:58:48

16   infectious disease, there aren't any places for -- for us to

17   send in the Phoenix area, that I know for sure, because that's

18   the community I practice in.  But infectious disease doctors

19   these days are hospitalist doctors, they practice in the

20   hospital.  So I think maybe -- maybe one doctor maybe half time  15:59:07

21   does office, maybe.  I don't know if she does it anymore.

22            But primarily they see really sick patients and give

23   their recommendations, and then the primary cares take over

24   following those recommendations once they leave the hospital.

25            So there aren't really, really a lot of options to      15:59:30

1   have inmates see infectious disease.  There's really no need.

2   If they get that sick, they're in the hospital, we send them to

3   the hospital.

4   Q.  In reading the KJZZ story and interview of Dr. Watson, did

5   you read about allegations that she made against you                    15:59:50

6   personally, that with respect to a cardiac patient on the Cook

7   Unit, that you instructed her to keep the patient comfortable

8   and let him die?

9   A.  I did.

10  Q.  What was your reaction to that allegation?                          16:00:04

11  A.  I was upset, personally.  There were -- when that came out,

12  I got so many phone calls from friends, going, Stewart, that

13  doesn't sound like you.  And it isn't me.

14      One, I never said, let somebody die.  Even if I were

15  going to say that, I wouldn't even say it like that.                    16:00:33

16      We allow inmates to pass not infrequently, inmates or

17  patients in the community.  It's the same everywhere.  Patients

18  who have chronic terminal illness often request to die and

19  pass.  Patients who have been told there is no other treatment

20  for you are often allowed to pass.                                      16:01:02

21      It is a horrible thing to let someone -- that's what

22  we fight for.  That's why I run across the yards and from

23  prison to prison, so that doesn't happen.  And it's upsetting

24  when it does happen, that inmates do die.  But oftentimes we

25  know in advance that there is an illness that we cannot treat.          16:01:31

1          In this case that wasn't completely the way it was.

2     This inmate had a heart attack, went to the hospital.  Had had

3     previous heart attacks and had previous heart surgery.  And

4     that inmate had had essentially all the bypass options done.

5          This is something I'm familiar with, because it                    16:02:01

6     happened to my father.  My father had all the bypass options,

7     no more bypass options, on your next MI things might not be

8     good.  So I understood this.

9          And this gentleman also had -- not only was that the

10    opinion of the surgeon, it was the opinion of the cardiologist.          16:02:23

11    And both of those entities made a recommendation for medical

12    management.  Medical management means we give medications,

13    which we do for every cardiac case.  So they get a beta

14    blocker, an ACE inhibitor.  And if they need symptomatic

15    relief, sometimes they get nitrates.  If they require oxygen,           16:02:45

16    they get oxygen.  If they need other supportive care, we give

17    that.

18         So that's medical management.  We make them

19    comfortable.  We try and stave off any potential obstruction.

20         Sometimes they get -- we don't really use like                     16:03:06

21    Coumadin, anticoagulation, but they get aspirin.  So we try and

22    decrease their ability to produce clots, that are what cardio

23    myo infarctions are.

24         So that inmate was getting all of those things, and so

25    when she poses a question, what do we do next?  Ask the                  16:03:23

1    cardiologist.  He's already done it.  Ask the cardiovascular

2    surgeon.  He's already done it.  The patient came back from the

3    hospital with all of those things already in place.  I'm not

4    clear as to what your confusion is.

5    Q.  Do you remember whether or not you had --                    16:03:43

6          Well, first let me start here.

7          The particular patient that we're speaking of, is this

8    a patient that was known to you prior to the inmate going to

9    the hospital when he was under Dr. Watson's care?

10   A.  I didn't know about him until he went to the hospital.  All  16:04:00

11   the hospital admissions go through me, so...

12   Q.  Do you recall after the patient returned back to the

13   complex whether or not you met with Dr. Watson and had a

14   conversation with her as to how this particular patient's care

15   would be managed going forward?                                  16:04:21

16   A.  We did.  We did meet.  And I explained it to the patient

17   and to her.

18   Q.  Were you all three in the same meeting?

19   A.  Yes.

20         And still, you know, I get -- you know, the stuff         16:04:33

21   that's in the article makes no sense.  After I -- you know, I

22   was speaking plain English, that this patient's care from this

23   point on will require medical management.  These are the

24   medicines you're on.  There will be no more heart bypasses, and

25   most likely no more heart catheterizations or that kind of      16:04:54

Rodney Stewart – Direct Examination

1    thing.  Medical management is what your specialists have

2    recommended for you.

3    Q.  And when you say there will be no more bypasses, is that a

4    decision that you made?

5    A.  No, that's a decision that the vascular surgeon made.  The      16:05:10

6    cardiothoracic surgeon decided that at that time.

7    Q.  And was that a cardiothoracic surgeon that was consulted

8    regarding this particular patient's care while he was in the

9    hospital?

10   A.  Right.  We didn't consult him.  The patient went into the       16:05:27

11   hospital emergently and they consulted a cardiovascular surgeon

12   to see if something could be done.

13   Q.  Do you know whether or not while hospitalized this

14   particular patient had heart catheterization?

15   A.  It's either during the hospitalization or a short time           16:05:44

16   after, the patient did undergo a heart cath and had one stent

17   placed.

18   Q.  Was the patient also placed upon a medication management

19   protocol?

20   A.  Yes.  The standard medications, beta blocker, ACE                16:05:58

21   inhibitor, aspirin, I believe.  I can't -- it might be in the

22   record, if I can look.

23           This is the wrong record.  This is the other patient's

24   record.

25   Q.  If you turn to folder number 17 in front of you that's          16:06:39

Rodney Stewart – Direct Examination

1    already admitted into evidence, and take a look at Exhibit No.

2    17, Plaintiffs' Exhibit 17.

3            Please review and let us know if you believe those are

4    excerpts of the medical record for the particular cardiac

5    patient referred to in the KJZZ story.                                16:06:56

6    A.  It is.

7    Q.  And prior to today and your testimony right now, have you

8    reviewed excerpts of this particular patient's medical record

9    with regard to his cardiac condition and treatment?

10   A.  I have.                                                           16:07:15

11           So I see some potassium --

12   Q.  And can you tell us please at the bottom right which page

13   you're looking at at Exhibit 17?

14   A.  17.33.  This is on -- when was the hospitalization?  Let's

15   see.  Let me just get organized here, make sure the dates are       16:08:16

16   right.

17           This is 8-25, so that would be right.

18           So the medications listed there are some magnesium,

19   potassium.  And those are only just if he was checked in the

20   hospital, if those were low they would replace them.                16:09:03

21           Metoprolol, which is a beta blocker.  Those would have

22   been the new drugs that were added to him.

23           I'm looking for his old med list, because that would

24   also continue.  But I don't see that.

25   Q.  Well, if I could turn your attention to Exhibit 17, pages       16:09:35

—— Rodney Stewart – Direct Examination ——

1   37 and 38.

2   A.   37 and 38.   Yes.

3   Q.   In looking at pages 37 and 38, can you tell me whether or

4   not this is a health services encounter that is signed --

5   electronically signed or indicated to have been done by you,        16:09:59

6   Dr. Stewart?

7   A.   This is -- yes, it is me.  You can always tell because I

8   write in all caps, which I apologize.

9   Q.   And at page 38 of Exhibit No. 17, do you see where it says

10  providers signature and it says your name underneath?              16:10:23

11  A.   Yes, I see that.

12  Q.   But there is no actual physical signature; correct?

13  A.   Correct.

14  Q.   Is that something that is usually there would be a

15  signature there, a hand signature by you if you had done this       16:10:34

16  encounter?

17  A.   No.   These are EMR notes, so there's -- it's electronic.

18  There's no signature.

19  Q.   Looking at page -- flipping back one page looking at page

20  37, in the notes section, I believe you just stated that you        16:10:48

21  believe that that would be you because you always write in all

22  caps.

23  A.   Yes.

24  Q.   Do you have any reason to believe that the notes section

25  was written by anyone else other than you?                          16:11:00

─── Rodney Stewart – Direct Examination ───

1    A.  No.

2    Q.  And you do recall sitting -- or sitting with and meeting

3    with this patient to discuss his offsite visit to the

4    hospital?

5    A.  Yes.                                                    16:11:12

6    Q.  And the encounter date shown on the top left, am I correct

7    in reading that the encounter date was August 29th of 2017?

8    A.  Yes.

9    Q.  And about half way down, five lines down, the last

10   paragraph in the notes section, in the middle it reads, he    16:11:32

11   underwent a heart cath with stenting.  Unfortunately most of

12   the disease was not amenable to treatment.

13       Is that your recollection of this particular patient's

14   procedures that he had while out at the hospital, the heart

15   cath with stenting?                                          16:11:55

16   A.  Yes.

17   Q.  It goes on to read a couple lines down that there was

18   extensive discussion and education on natural progression of

19   coronary artery disease.  The patient is made aware that

20   there's no further treatment for the remaining coronary       16:12:12

21   disease.  He is educated on what to do if chest pain starts.

22       Is that your recollection of the subject matter that

23   you discussed with this particular patient during the meeting?

24   A.  Yes.

25   Q.  And Dr. Watson was also there?                           16:12:23

UNITED STATES DISTRICT COURT

1    A.  Yes.

2    Q.  Do you remember what you educated this patient to do if he

3    had chest pain?

4    A.  Basically the same as all chest pains.  This gentleman is

5    on an open yard, so they -- at any time there's chest pain,          16:12:44

6    even if you're 20 years old, you have chest pain, they usually

7    call an ICS and the patients are brought to medical.

8    Q.  Do you know whether or not this inmate had a DNR or a do

9    not resuscitate order?

10   A.  Yes, I do remember.                                              16:13:03

11   Q.  What is the answer to that?

12   A.  The answer to that is that you can't have a DNR on an open

13   yard, it's not allowed.  It can't be comfort care.  Even if you

14   want to you, you can't have it on open yard.

15   Q.  So if this particular patient had a DNR, he would not have       16:13:21

16   been housed at the Cook Unit?

17   A.  He would not, he would in IPC.

18   Q.  And if this patient had presented with chest pain, would

19   you, or would you have expected any provider working on that

20   yard to respond and provide medical treatment to this               16:13:37

21   particular?

22   A.  100 percent.

23   Q.  And you yourself would have done that?

24   A.  Absolutely, 100 percent.

25   Q.  Would you have left him to die?                                  16:13:45

Rodney Stewart – Direct Examination

1    A.  No, I wouldn't have done that.

2    Q.  Do you know what this particular patient's medical

3    condition is currently?

4    A.  It's the same.  He's the same.  He's taking his

5    medications.  I have not heard of any ICS's in regards to him.          16:14:07

6    I've seen him once, but I was sharing the encounter.  Someone

7    else was actually seeing him, I was overseeing.  And he's doing

8    reasonably well.

9    Q.  Are you aware that Dr. Watson alleges that because of

10   her --                                                                   16:14:36

11             Let me start over.  Strike that, please.

12             Are you aware that Dr. Watson alleges that she

13   provided that this particular patient would have nitroglycerin

14   available to him to wear on a lanyard around his neck?

15   A.  I wasn't aware about wearing it around the neck, but I was    16:14:58

16   aware in the article it says that she made sure he got

17   nitroglycerin.

18   Q.  Were you aware, apart from reading the article, that

19   Dr. Watson alleged that she had made nitroglycerin available to

20   this particular --                                                       16:15:15

21   A.  There is an order for nitroglycerin in the chart.

22   Q.  If you turn to page 7 of Exhibit No. 17?

23   A.  Sorry, what was that again, number?

24   Q.  Exhibit No. 17, page 7.

25   A.  7.  Okay.                                                            16:15:36

UNITED STATES DISTRICT COURT

---

**Rodney Stewart – Direct Examination**

1        Okay.

2  Q.  Do you know whether or not this particular page of Exhibit

3  No. 17 is from the Mountain Vista Medical Center?

4  A.  I do know that, because Ralph Dsilva's name is all over

5  that particular page.  And he is our hospitalist that we use      16:16:00

6  when we send patients to Mountain Vista.

7  Q.  Does this page of this particular inmate's medical file

8  indicate that he has any allergies?

9  A.  Yes, he does.  He has several allergies.  He has an allergy

10  to nitrates.                                                     16:16:21

11  Q.  Does it cause you concern as a physician that Dr. Watson

12  would provide this particular inmate with nitroglycerin if he

13  has a nitrate allergy?

14  A.  It does cause concern.

15  Q.  Why?                                                         16:16:36

16  A.  Because he could die from his allergy with anaphylaxis.

17  Q.  At page 8 of Exhibit No. 17, switching to the next page, is

18  this also a medical record generated by the Mountain Vista

19  Medical Center?

20  A.  Yes, it is.                                                  16:16:56

21  Q.  And on this page do you see whether or not allergies

22  suffered by this particular patient are indicated?

23  A.  Yes, it's part of the history and physical, allergies are

24  listed, which includes nitrates which cause swelling in his

25  throat.  Latex also, which also causes a rash.                  16:17:14

---

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1    Q.  Directing your attention to page 9 of Exhibit No. 17, would

2    you agree with me that's a continuation from page 8 of a

3    medical history and physical generated by the Mountain Vista

4    Medical Center?

5    A.  Yes, it is.                                                        16:17:36

6    Q.  And the admission date for this patient was August 25th of

7    2017; is that correct?  As indicated on the top of page 8 of

8    Exhibit 17.

9    A.  That's correct.

10   Q.  Directing your attention now to page 9 of Exhibit 17, a         16:17:50

11   little more than half way down, do you see the section that

12   says Assessment and Plan?

13   A.  Yes, I do.

14   Q.  And under subsection 1 of Assessment and Plan, if you go

15   four lines down towards the end of that line it states, no         16:18:07

16   nitroglycerin since the patient is allergic to nitrates.

17            Do you see that?

18   A.  I do see that.

19   Q.  Based upon these three indications in the Mountain Vista

20   Medical records that this patient indeed allergic to nitrates,      16:18:21

21   and even says no nitroglycerin since the patient is allergic to

22   nitrates, does that cause you concern that Dr. Watson indeed

23   provided this inmate with nitroglycerin?

24   A.  She obviously did not read that.

25   Q.  Do you know whether or not Dr. Watson would have had these      16:18:37

UNITED STATES DISTRICT COURT

Rodney Stewart – Direct Examination

1   Mountain Vista Medical Center records available to her in eOMIS

2   there at the Cook Unit?

3   A.  Her -- I can't say that for sure.  Her notes indicated that

4   she read the recommendations of the cardiovascular surgeon, and

5   she read the notes -- or the recommendations for the                    16:19:04

6   cardiologist.  So I'm -- I can't say for sure, but it appears

7   that she read at least part of the chart, because she copied

8   down what the recommendations from the cardiovascular surgeon

9   and the cardiologist.

10  Q.  Would you, Dr. Stewart, have provided this particular           16:19:22

11  inmate with nitroglycerin based upon the history of nitrate

12  allergy in the medical records?

13  A.  No, I would not.

14  Q.  If you can turn for me to Defendants' Exhibit No. 397.

15          Could you take a moment and whatever time you need to      16:20:21

16  read through Exhibit No. 397.  And once you've had that

17  opportunity, please let me know.

18  A.  Okay.

19  Q.  Dr. Stewart, do you recognize this e-mail communication to

20  be an e-mail from Daniel Sego, dated October 9th of 2017, sent   16:20:58

21  to a number of persons, including you, Dr. Rodney Stewart?

22  A.  Yes.

23  Q.  And the subject matter of this e-mail is Operation Backlog;

24  is that correct?

25  A.  That's correct.                                               16:21:14

Rodney Stewart – Direct Examination

1    Q.  Is this a -- an e-mail communication that you received from

2    Daniel Sego in the normal course of your duties as Site

3    Director at the Eyman Complex?

4    A.  Do I routinely receive e-mails from Daniel Sego?

5    Q.  Yes.                                                        16:21:33

6    A.  He was our acting FHA, yes.

7    Q.  Do you recall as you sit here today receiving this

8    particular e-mail from Mr. Sego?

9    A.  Yes.

10   Q.  And if you -- after the greeting that says, hi team,        16:21:40

11   reading this e-mail, it says, as you all know, we are currently

12   working towards catching up on our backlog of both HNR and

13   chronic care patients totaling approximately 800.  We are in

14   need of all available provider staff to assist in, quote,

15   Operation Backlog, end quote.                                   16:22:01

16            Do you see that?

17   A.  Yes.

18   Q.  Do you know what that term means, in quotes, Operation

19   Backlog?

20   A.  It was just a plan to try and catch up on chronic care.     16:22:10

21   Q.  I'm sorry?

22   A.  It was a plan to catch up on chronic care.  Sometimes they

23   refer to it as a blitz, to do a blitz.

24   Q.  And this was in response to a backlog of what?

25   A.  Chronic care -- chronic cares that haven't been seen that   16:22:27

1    were getting behind, that we need to do catch up on.  Chronic

2    care visits.

3    Q.  And it states that there are patients totaling

4    approximately 800.  Do you see that?

5    A.  I see that.                                            16:22:43

6    Q.  Do you know whether or not this 800 patients is across

7    different complexes, different yards?  Do you recall?

8    A.  I believe he was referring to both yards -- to both

9    prisons, Eyman and Florence together.  I'm not 100 percent

10   sure.                                                      16:23:02

11   Q.  Did you participate in the blitz or quote, unquote,

12   Operation Backlog?

13   A.  I can't remember if I participated in this blitz, but there

14   have been several, in order to catch up on backlogs.  I did

15   participate in some of them.                               16:23:19

16   Q.  And the some that you did participate in, what was done to

17   address the backlog?

18   A.  Essentially bring in providers who could see those

19   patients, give each one a list to do on a Saturday or Sunday.

20   And basically we stayed in Florence over the weekend, and     16:23:43

21   basically saw patients on the weekend.

22   Q.  Were providers brought in from different complexes?

23   A.  Yes.

24   Q.  Were providers --

25   A.  From all over the state.                               16:23:56

Rodney Stewart – Direct Examination

1    Q.  From all over the state?

2    A.  Yes.

3    Q.  Were providers brought in, to your knowledge, from out of

4    state?

5    A.  I believe so.  There were a few.                          16:24:04

6    Q.  Do you know how long in October of 2017 it took to catch up

7    on this particular Operation Backlog?

8    A.  I think to -- on this particular blitz or all the blitzes

9    to catch up on totally?

10   Q.  Let's first start with this particular one.               16:24:29

11   A.  I mean, we worked that weekend.  So I don't know how much

12   of the -- how much catch up we did.  I'm not privy to the

13   numbers.  But it was very effective.  All the blitzes were very

14   effective.

15   Q.  Do you know what over time period these blitzes that you    16:24:43

16   speak of occurred?  Was it like a six-month process, a

17   two-month process, a week process?

18   A.  It was actually started -- they started having blitzes

19   before I even got to Eyman, in May or June or whenever that

20   was.  I think there were some blitzes before I got there.  And  16:25:06

21   they occurred -- they occurred randomly throughout the Summer

22   and the Fall as well.  So there were quite a few.

23   Q.  Do you have any recollection as to -- well, first of all,

24   let me ask this:  Has the backlog -- as we sit here today, has

25   the backlog been addressed?                                    16:25:26

UNITED STATES DISTRICT COURT

1    A.  Yes, it has.

2    Q.  And do you know when that was accomplished?

3    A.  I want to say January, but I'm not completely sure, January

4    2018.

5    Q.  Have you ever been counseled, directed, instructed on how            16:25:42

6    to, quote, unquote, beat the monitor, beat an ADC medical

7    monitor?

8    A.  No, I have not.  And I don't see how you can beat the

9    monitor.

10   Q.  Have you ever heard that term used within the Corizon              16:26:00

11   organization of, quote, unquote, beat the monitor?

12   A.  No.

13   Q.  Have you ever directed any of your medical personnel that

14   you supervise or interact with on how to, quote, unquote, beat

15   the medical monitor?                                                  16:26:17

16   A.  No.

17   Q.  And you said that you don't even -- I believe you just

18   testified that you don't know how you would beat the monitor.

19   What do you mean by that?

20   A.  They're an independent monitoring system.  Okay.                  16:26:26

21         So we write notes.  And I can only speak in regards to

22   what we do as providers.  We write notes.  They read the notes.

23   Either it has what it needs in the note or it doesn't.  Either

24   you saw the patient on the time that you were required to see

25   them or you didn't.  There's no -- there's no way to fudge that       16:26:48

Rodney Stewart – Direct Examination

1    or change it, or make it any way -- there's nothing that you

2    can do to do that.

3    Q.  Have you ever been told by anyone within the ADC

4    organization how to, quote, unquote, beat the monitor so that

5    your compliance levels on Performance Measures show passing?        16:27:08

6    A.  I've never been told how to beat a monitor.  No one's even

7    talked about anything like that.

8    Q.  Have you yourself ever forged any medical records in order

9    to accomplish making compliance on a Performance Measure?

10   A.  Forged a document?  No.        16:27:37

11   Q.  Add information that wasn't true?

12   A.  No.

13   Q.  Have you known of anybody within Corizon who has done

14   something like that?

15   A.  Not to my knowledge.        16:27:49

16   Q.  Have you ever instructed anybody to do so?

17   A.  Never.

18   Q.  Have you ever received any instruction from anybody within

19   the Corizon organization to do so?

20   A.  No.        16:27:59

21   Q.  Have you ever received any instruction from anybody within

22   the ADC system to do so?

23   A.  No.

24   Q.  Have you ever canceled a specialty consult to avoid missing

25   a time requirement prescribed by a health care Performance        16:28:11

UNITED STATES DISTRICT COURT

─── **Rodney Stewart – Direct Examination** ───

1    Measure?

2    A.  No.

3    Q.  Have you ever canceled a specialty -- outside specialty

4    consult to save Corizon money?

5    A.  No.                                                    16:28:21

6    Q.  Have you ever deprived any inmates of medications in order

7    to save Corizon money?

8    A.  No.

9    Q.  Have you ever instructed Dr. Watson or any other Corizon

10   employee to let an inmate die?                              16:28:30

11   A.  No.

12          MS. LOVE:  Thank you.

13          I have no further questions.

14          THE COURT:  Thank you.

15          Doctor, the bad news is you're not done.  But we're   16:28:37

16   going to work with you on what works for your schedule.

17          I need to turn first to the plaintiffs' lawyers and

18   see how much time they believe they need, and then we'll talk

19   about when the possible time is that we can do that.  And we'll

20   explore with you what works for your schedule.              16:28:53

21          MR. FATHI:  Your Honor, given the extensive direct

22   examination, I would estimate two to three hours of cross.

23          THE COURT:  All right.  And I tell you, what we ought

24   to do is, I'll let you all come up with what the right time is

25   to fit that in, keeping in mind that you should be liberal in  16:29:19

1    contacting me –– the worst I can do is say I'm not available.

2    But if you find a time that will work, even if it's separate

3    from what we previously have scheduled, if it works for people

4    who happen to be here, or you feel you want to do it in a way

5    that is acceptable to counsel, but not traditional,                    16:29:39

6    telephonically, that's all right with me as well.

7           I have had a good time with the doctor here just a

8    couple of feet away from me.  Normally you like to have the

9    person in the room with you.  But if it turns out that it's

10   telephonic or it's just by video conference, that would work as   16:29:56

11   well, because of the great amount of time we've had together.

12          I leave that all open to you.  It is your call.  If

13   you can agree.  If you can't agree, we'll do it the tradition

14   way, you just let me know when works for the three of you.

15   Hopefully at a time not on a Wednesday when you have this          16:30:13

16   important meeting.  And we'll continue with what is fair.

17          And that is, since you have been examined by the

18   counsel for the State, you need to be cross-examined by counsel

19   for the plaintiffs, and any redirect from the counsel for the

20   State.  It's just necessary out of fairness, at the very least.   16:30:28

21          So that's what we'll do.  We conclude for today.

22          Miss Kendrick, you look disappointed.

23          MS. KENDRICK:  No.  I'm calculating how fast I can get

24   to the airport.

25          THE COURT:  But we have accommodated the issues that     16:30:46

1    you've raised earlier for Monday, so we'll be on the telephone

2    Monday.

3            Anything we need to address before we conclude for the

4    day?

5            MS. LOVE:  Not from defendants, Your Honor.                    16:30:56

6            MR. FATHI:  Nothing from plaintiffs, Your Honor.

7            THE COURT:  Thank you.  Thank you all very much.

8            Thank you, Doctor.

9        (Proceedings concluded at 4:31 p.m.)

10

11                                    -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                          C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 15th day of March,

15  2018.

16

17

18                              s/Candy L. Potter_____
19                              Candy L. Potter, RMR, CRR

20

21

22

23

24

25