**EXHIBIT 2**

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Victor Parsons, et al., on    )
behalf of themselves and all  )
others similarly situated;    )
and Arizona Center for        )
Disability Law,               )
                              )  No. **CV-12-00601-PHX-DKD**
          Plaintiffs,         )
                              )
     vs.                      )  Phoenix, Arizona
                              )  February 28, 2018
**Charles Ryan, Director,**       )  9:06 a.m.
**Arizona Department of**         )
**Corrections; and Richard**      )
**Pratt, Interim Division**       )
**Director, Division of Health**  )
**Services, Arizona Department**  )
**of Corrections, in their**      )
**Official capacities,**          )
                              )
          Defendants.         )
_____ )


     BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

          REPORTER'S TRANSCRIPT OF PROCEEDINGS

         EVIDENTIARY HEARING/ORDER TO SHOW CAUSE
                        Day 2
           (Pages 235 through 460, inclusive)


Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CV-12-601-PHX-DKD - February 28, 2018

1

2                              **A P P E A R A N C E S**

3    For the Plaintiffs:
             PRISON LAW OFFICE
4            By:  **Donald Specter, Esq.**
             By:  **Corene Kendrick, Esq.**
5            1917 5th Street
             Berkeley, CA 94710
6
             ACLU - Washington DC
7            By:  **David C. Fathi, Esq.**
             915 15th Street NW
8            7th Floor
             Washington, DC 20005
9
             EIDENBACH LAW PC
10           By:  **Kirstin T. Eidenbach, Esq.**
             P.O. Box 91398
11           Tucson, AZ 85752

12           ARIZONA CENTER FOR DISABILITY LAW - Phoenix, AZ
             By:  **Asim Dietrich, Esq.**
13           5025 East Washington Street
             Suite 202
14           Phoenix, AZ 85034

15   For the Defendants:
             STRUCK LOVE BOJANOWSKI & ACEDO PLC
16           By:  **Timothy J. Bojanowski, Esq.**
             By:  **Rachel Love, Esq.**
17           By:  **Daniel Struck, Esq.**
             By:  **Richard Michael Valenti,** Esq.
18           3100 W. Ray Road
             Suite 300
19           Chandler, AZ 85226

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2                              **I N D E X**

3    **WITNESS:**            **DIRECT**    **CROSS**      **REDIRECT**   **RECROSS**

4    JANICE WATSON
     By the Court                         247
5    By Mr. Struck                        252
     By Mr. Fathi                                        271
6
     WILLIAM UPTON
7    By Ms. Eidenbach      293

8    DAVID ROBERTSON
     By Ms. Kendrick       320
9

10

11                       **INDEX OF EXHIBITS**

12   **EXHIBIT**                                         **IDENT**   **RECEIVED**

13   5        Medical Records of W. Upton       405      477

14   18       S. Medical Records               277

15   30       Mortality Review for JG          335      371

16   31       Mortality Review for JU          353      371

17   32       Mortality Review for JA          346      371

18   33       Mortality Review for KB          343      371

19   34       Mortality Review for RD          347      371

20   35       Mortality Review for MT          349      371

21   36       Mortality Review for AA          354      371

22   37       Mortality Review for ED          356      371

23   38       Mortality Review for RA          368      371

24   39       Mortality Review for HM          368      371

25   40       Mortality Review for WS          359      371

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD - February 28, 2018

1

2                         **INDEX OF EXHIBITS**

3    **EXHIBIT**                                    **IDENT**    **RECEIVED**

| EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|
| 41 | Mortality Review for CM | 369 | 371 |
| 42 | Mortality Review for VC | 370 | 371 |
| 43 | Mortality Review for EM | 359 | 371 |
| 44 | Mortality Review for EC | 370 | 371 |
| 45 | Mortality Review for JP | 363 | 371 |
| 46 | Mortality Review for DP | 365 | 371 |
| 47 | Mortality Review for GG | 357 | 371 |
| 76 | 12-20-17 email from P. O'Neal to V. Headstream | 373 | 447 |
| 84 | 7-27-17 email from M. Bedoya to B. McMullen | 376 | 446 |
| 85 | 7-27-17 email from K. Padron to D. Robertson | 382 | 446 |
| 95 | 12-7-17 email from R. Patel to D. Robertson | 387 | 446 |
| 112 | 7-13-17 email from V. Headstream to D. Robertson | 404 | 447 |
| 113 | 7-27-17 email from Headstream to Robertson | 408 | 447 |
| 114 | 11-10-17 email from Ellison to Headstream | 411 | 447 |
| 151 | 10-18-17 email from L. Cole to D. Robertson | 414 | |
| 152 | 7-13-17 email from R. Pratt to Headstream | 419 | 448 |
| 154 | 8-7-17 email from M. Bedoya to D. Robertson | 420 | 448 |

CV-12-601-PHX-DKD - February 28, 2018

1

2                           **INDEX OF EXHIBITS**

3    <u>EXHIBIT</u>                                    <u>IDENT</u>    <u>RECEIVED</u>

4    155        8-8-17 email from
                D. Robertson to FallHowe           426      448
5
     157        8-28-17 email from
6               D. Robertson to B. Schmid          432      448

7    158        9-5-17 email from
                D. Robertson to V. Headstream      440      448
8
     159        9-5-17 email from
9               B. McMullen to D. Robertson        440      449

10   160        9-5-17 email from
                R. FallHowe to D. Robertson        441      449
11
     180        8-25-17 email from
12              Y Serrato to K. Barcklay           391      446

13   181        9-13-17 email from
                S. Rucker to L. Otero-Ponzio       395      446
14
     190        8-18-17 email from
15              G. Campbell to L. Johnson          399      447

16   333        Onyx documents relating to
                Jan Watson                         272
17
     466        12-4-17 email from
18              J. Watson to J. Jenkins            262      287

19   467        11-21-17 email from
                J. Watson to J. Jenkins            261      268
20
     469        12-19-17 email from
21              J. Watson to J. Jenkins            267      289

22   470        12-19-17 email from
                J. Watson to J. Jenkins            268      289
23
     473        12-1-17 email from
24              J. Watson to J. Jenkins            262      287

25

CV-12-601-PHX-DKD - February 28, 2018

1

2                          INDEX OF EXHIBITS

3    EXHIBIT                                  IDENT    RECEIVED

4    475      10-26-17 email from
              J. Watson to J. Jenkins         253      286
5
     477      12-12-17 email from
6             J. Watson to J. Jenkins         265

7    478      12-12-17 email from
              J. Watson to J. Jenkins         264
8
     479      12-21-17 email from
9             J. Watson to J. Jenkins         268      289

10   480      12-21-17 email from
              J. Watson to J. Jenkins         269      289
11
     481      10-31-17 email from
12            J. Watson to J. Jenkins         260      286

13   485      1-23-18 email from
              J. Jenkins to J. Watson                  290
14
     486      12-18-17 email from
15            J. Jenkins to J. Watson                  289

16

17

18

19

20

21

22

23

24

25

1     (Proceedings begin at 9:06 a.m.)

2          THE CLERK:  Civil case number 12-601, Parsons, et al,

3     versus Ryan, et al, on for continuation of evidentiary hearing,

4     order to show cause hearing, and status hearing.

5          THE COURT:  Counsel, please announce.                    09:07:17

6          MR. FATHI:  Good morning, Your Honor, David Fathi of

7     the ACLU National Prison Project for the plaintiff class.

8          THE COURT:  Thank you.

9          MS. KENDRICK:  Good morning, Your Honor, Corene

10    Kendrick from the Prison Law Office for the plaintiff class.    09:07:29

11         THE COURT:  Thank you.

12         MR. SPECTER:  Good morning.  Donald Specter, Prison

13    Law Office, plaintiffs.

14         THE COURT:  Thank you.

15         MS. EIDENBACH:  Good morning, Your Honor, Kirsten        09:07:37

16    Eidenbach for the prisoner plaintiff class.  And behind me is

17    Asim Dietrich from the Arizona Center for Disability Law.

18         THE COURT:  Thank you.  Good morning.

19         MR. STRUCK:  Good morning, Your Honor.  Dan Struck,

20    Rachel Love, Tim Bojanowski, and Richard Valenti for          09:07:49

21    defendants.

22         THE COURT:  Thank you very much.

23         Good morning all.

24         A couple of things that I wanted to raise --

25         And you can stay there if you'd like, Mr. Struck,         09:07:57

CV-12-601-PHX-DKD - February 28, 2018

```
 1    because it won't take long, I don't think, before we return to

 2    Dr. Watson's testimony.

 3            The reason I wanted to address them now is because I

 4    think both counsel may wish to have the benefit of what I'm

 5    going to ask about before you proceed.                            09:08:13

 6            But as I say, you can stand there if you wish,

 7    Mr. Struck.  It may also be just as convenient for you to sit

 8    down.

 9            Dr. Watson, if you could make your way back to the

10    stand, if you don't mind.  Thank you.                            09:08:30

11            A couple of things that I wanted to address were

12    related to some of the testimony yesterday.  And because it,

13    again, may affect what the lawyers want to ask about, I do want

14    to go first.

15            But I'm not going to evade the time that I promised     09:08:46

16    you yesterday.

17            So the first issue was, you testified yesterday that

18    you made a contact to the Court, and that you were given a

19    lawyer's name.

20            And I just wanted to let everyone know that we had no    09:09:02

21    knowledge that you had contacted the Court.  I checked with my

22    staff, and so we didn't -- we receive a number of calls,

23    voicemails and letters.

24            The way that we respond to the letters is, because of

25    the nature of letters, transparent to the lawyers, we respond    09:09:22
```

UNITED STATES DISTRICT COURT

1  by telling people that we cannot communicate with them except

2  in court, which means on the record in this room, or through

3  court filings.  And that we return the letters to them with a

4  letter indicating that.  And that letter, the Court's letter,

5  and the letter that was sent to the Court, is provided to both        09:09:44

6  parties.

7        With respect to telephone calls, again, the

8  instruction that has been followed in my chambers, my

9  instruction, is that we tell people that we cannot talk to them

10  except in court or through court filings.                            09:10:00

11        Sometimes people ask us for particular names of the

12  lawyers.  If they ask for particular names of the lawyers, if

13  they say, who are the plaintiffs' lawyers or who are the

14  defendants' lawyers, that is not contrary to my instruction

15  that that information may be given.  It's a matter of the            09:10:16

16  public docket.  A public docket is not as easily accessible to

17  everyone, not withstanding the progress we've made with respect

18  to having things available on the internet.

19        With respect to family members of the plaintiff class

20  members, we receive a fair number, I think, of phone calls          09:10:33

21  about that, the instruction has been that if they want to talk

22  to the Court they're told the same thing, the Court cannot have

23  contact with someone unless it's through a filing or in open

24  court.  But then we do provide the name, because it's a family

25  member of a class member, if they ask for -- I don't know           09:10:53

CV-12-601-PHX-DKD - February 28, 2018

1    whether it's if they ask, but I think my staff has been

2    providing the name of Miss Eidenbach in Tucson, because I

3    believe you're in Arizona.

4           And so that was the reason that your name has been

5    given in particular when we don't give everybody's name.  But          09:11:06

6    if we receive a phone call from a family member of a plaintiff

7    class member who wants to talk about the case, we say, if you

8    have any questions you can talk to your relative's lawyer.  And

9    so we give that lawyer's name.

10          So that is how we deal with that subject.          09:11:22

11          The second matter is one that addresses the

12   examination yesterday where I paused and asked the court

13   reporter to read back the question.  It was because I had an

14   objection raised by the plaintiff to the question.  But I was,

15   as you may recall yesterday, focused instead on whether or not          09:11:46

16   it was a fair and understandable question.

17          And if you recall, I said on the record and I also,

18   you could see in court, read the question to myself.  I

19   actually read it several times, maybe three times.  And at the

20   end of reading it three times I decided it was a fair question.          09:12:07

21          In retrospect, that probably wasn't a fair test,

22   because the question had been posed to you originally,

23   Dr. Watson, and then objected to, then it was reread by the

24   court reporter.  And that is not the same test that I employed.

25   The same test I employed was reading it myself on the screen          09:12:29

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD - February 28, 2018

1    three times, and at which time I decided it was a fair

2    question.

3              The reason that I think that it may not have been a

4    fair question is because it created a conflict between

5    earlier -- the answer there created a conflict, as I perceived    09:12:45

6    it.  And that may not be your view.

7              I'm not trying to put words in your mouth, at any

8    point.  In fact, I really am interested in what the purpose of

9    my original question was, and that is your state of mind, how

10   you took the comment of "beat the monitor," what you took that    09:13:00

11   to mean.  I wanted to understand what that meant, as I

12   explained yesterday.

13             I had heard different views about it, a view that I've

14   expressed on the record that was my reaction, but also a view

15   that I had seen in a news report indicating what other people's   09:13:17

16   reaction could have been to that.  And I explained it to you in

17   my analogy to the Olympics, I think, if you remember that.

18             And so, I had asked that question trying to understand

19   your state of mind, and then I had an answer.

20             And then Mr. Struck in his examination used the         09:13:38

21   question that caused me to pause, and that I allowed to be

22   answered.

23             As I look at the two answers, it looks to me that

24   there might be a conflict between them.  I don't know whether

25   you think there's a conflict.  That's what really matters.  It    09:13:53

1    matters what you think and not what I think.

2         But I wanted to pose the two questions to you again by

3    way of showing you what the unofficial transcript is.  And I'm

4    going to show it to the lawyers too so if they have an

5    objection that the unofficial transcript -- meaning unofficial          09:14:13

6    is that it hasn't been certified by the court reporter yet.

7    And so that means that it's a product of what I've seen here on

8    the screen.  Usually it's right on but, again, it's not

9    official yet.

10        And so what I'm going to do is I'm going to show you              09:14:27

11   the answer that you gave in the morning, show you the answer in

12   the afternoon.  And I've highlighted where I see a conflict.

13   But it doesn't mean you necessarily see a conflict.  I'm not

14   trying to suggest an answer one way or the other.  I'm just

15   trying to resolve what is my reaction of a very important issue         09:14:45

16   in the case for me, and that is whether or not somebody is

17   trying to beat the monitor in a good way or a bad way.

18        And so what I have here, and I'm handing to you, is

19   the first page which has the Court's question.  And I have

20   words highlighted -- well, the Court -- actually I'll let you           09:15:07

21   see.  The lawyer's will see what's highlighted, it's the same

22   thing for them.

23        That's the Court's question.

24        Here's Mr. Struck's question.

25        And if I could ask the clerk of the court to                      09:15:21

---

Jan Watson - Cross-Examination

1    distribute these two versions.

2           And while they're doing that, you can read those and

3    think about an answer.

4           And so what I would --

5           MR. FATHI:  Your Honor, I beg your pardon, I don't        09:16:01

6    think either of us have a complete set.  May we have a moment?

7           THE COURT:  Sorry.  You may have all received the only

8    one.

9       (Discussion held off the record.)

10          MR. FATHI:  Thank you, Your Honor.                        09:16:35

11      (JAN WATSON, PLAINTIFF WITNESS, PREVIOUSLY SWORN.)

12                        CROSS-EXAMINATION

13   BY THE COURT:

14   Q.  Does -- what I propose to do is to simply ask you,

15   Dr. Watson, you testified that there was a meeting at the pizza  09:16:41

16   restaurant at which the words "beat the monitor" were used.  Is

17   that fair?

18   A.  It was a different meeting but, yes.

19   Q.  That was not the meeting.  I'm sorry, I --

20   A.  It was at a different meeting.                               09:16:57

21   Q.  Okay.  Which meeting was it?  So we're clear?

22   A.  This was a separate --

23   Q.  Can you move the microphone closer?

24   A.  This was a separate provider meeting in late September or

25   early October where we first went over dietary orders, and then  09:17:12

---

Jan Watson - Cross-Examination

```
 1    we discussed the documentation.

 2            And I took it at the time when she said, let me tell

 3    you how to beat the monitor, was to show us when we're writing

 4    in the chart things that we could say that she could then count

 5    and submit.  And so -- for the monitoring.                        09:17:47

 6            So I took it as evading, as I agreed to in the

 7    morning, how to -- well, basically how to cheat, you know.  So

 8    if we said certain things a certain way, she could count

 9    those -- that.  But if we didn't say them in that manner, they

10    wouldn't be counted.                                              09:18:14

11            So it wasn't that what we had written in the chart was

12    inappropriate or inadequate, it's the way in which we might

13    write something that she couldn't count.

14            Did that make sense?

15            Did I take what she said in a good or a bad way?  I       09:18:39

16    took it as a bad way.

17    Q.  Okay.  And again, who was this who said that?

18    A.  That was McNeal.

19    Q.  And did you ever hear her ever say anything like this at

20    any other time?                                                   09:18:52

21    A.  No, that was the first and last time I ever saw her,

22    period.

23    Q.  And had you ever heard anybody else say anything along the

24    lines of "beat the monitor"?

25    A.  No.
```

Jan Watson - Cross-Examination

1  Q.  All right.  Thank you.

2       Then the last area that I wanted to inquire about was

3  the patient that you described yesterday who had the coronary

4  issue and had been to the -- had been examined by the

5  cardiologist and they had prepared a report, and then                09:19:21

6  Dr. Stewart had interaction not only with you, but also with

7  the patient, and then documented that.

8       What I didn't understand was whether or not you had a

9  time after Dr. Stewart spoke with this patient to talk to the

10 patient about what I was taking to mean sort of -- and maybe         09:19:42

11 this is wrong, it was kind of a do not resuscitate conversation

12 that you have with a patient where you say, we're at that

13 place.

14      And I just wondered whether you had that conversation

15 or whether you thought Dr. Stewart had that conversation, or am     09:19:58

16 I missing the boat here entirely?

17 A.  Okay.  So when he was discharged from the hospital and

18 arrived back at prison, I wasn't there.  It was -- so it would

19 have had to have been a Monday or Tuesday.

20      So Dr. Stewart saw him when he came back from the               09:20:14

21 hospital and had the discussion with the patient that there was

22 nothing more that could be done.  So that if he had chest pain

23 again, they weren't going to do anything.

24      When I returned on Wednesday -- either that provider

25 meeting was that Wednesday or Thursday, that's when Dr. Stewart      09:20:38

Jan Watson - Cross-Examination

1    told me what had happened, and that he had had a heart attack,

2    and that if he came in with chest pain, just to let him die

3    because we couldn't do anything.

4         Then the following day I told the CNA to have that

5    inmate brought up to the unit so that I could talk with him and    09:21:02

6    make sure he understood what was going on, and those were his

7    wishes.

8         And before he got there -- the patient returned, I

9    read the hospital records.  And what was written in the

10   hospital records was different.  It didn't say none of the    09:21:26

11   coronary arteries were bypassable, it said one of them wasn't,

12   another one may be.

13        And I showed that to the patient, and he said that was

14   different than what he had been told.

15   Q.  By whom?    09:21:48

16   A.  By Dr. Stewart.

17        And the patient then told me that the cardiologist had

18   told him in the hospital that he wanted to see him back in two

19   weeks.

20        So that's what I was going to do, because that -- if    09:22:01

21   the cardiologist wanted to see him back, the cardiologist

22   should be the one to make the call.

23        THE COURT:  All right.  Those are my questions.

24        Mr. Struck, you may continue.

25        Thank you.    09:22:15

Jan Watson - Cross-Examination

```
 1            MR. STRUCK:  Your Honor, we only received my question.
 2   We don't have her answer with respect to the question regarding
 3   Miss McNeal's statement.
 4            THE COURT:  Forgive me.  That's on the next page.  And
 5   what happened is, the program allows you to print only in six     09:22:32
 6   point font.
 7            And so the answer to your question is something that I
 8   can find in just a second, if you'll give me a moment.
 9            Actually I'm not as fast at this as I wished.  I have
10   what you want back at my desk.  Excuse me just a moment.          09:23:29
11        (Recess at 9:23 a.m., until 9:26 a.m.)
12            THE COURT:  Thank you.  My apologies.
13            Can you see it at the top?  It's very small print.  I
14   can tell you what the word is.  The witness answered, correct.
15            MR. STRUCK:  Good morning, Dr. Watson.                   09:28:06
16            THE WITNESS:  Good morning.
17            MR. FATHI:  Excuse me, Your Honor.  Before
18   examination resumes we would like to invoke the rule excluding
19   witnesses.
20            THE COURT:  Are there witnesses who were excluded        09:28:13
21   yesterday who are present now?
22            MR. FATHI:  I don't know, Your Honor.  I see some new
23   faces.
24            MR. STRUCK:  I don't think so, Your Honor.
25            THE COURT:  All right.  Thank you.                       09:28:21
```

Jan Watson - Cross-Examination

1          MR. FATHI:  Thank you.

2          MR. STRUCK:  And just to be clear, this is -- we're

3    considering this two different hearings.  And so there's a

4    witness for the order to show cause hearing in the courtroom,

5    but he's not a witness in this particular hearing.                    09:28:39

6          THE COURT:  Seems like a fair distinction.

7          MR. STRUCK:  Okay.

8                       CROSS-EXAMINATION

9    BY MR. STRUCK:

10   Q.  Dr. Watson, I wanted to follow up on what Judge Duncan just     09:28:47

11   asked you with respect to the beat the monitor statement that

12   you testified about yesterday that you heard from Miss McNeal.

13         Is it a fair interpretation, in your opinion, of

14   Miss McNeal's statement in that she may very well have been

15   trying to instruct the Corizon providers in how to               09:29:33

16   appropriately document the care that you were providing to the

17   patients in order to ensure that you all got credit for that

18   with respect to the monitoring of the Performance Measures?

19         MR. FATHI:  Objection, Your Honor, calls for

20   speculation.  Dr. Watson doesn't know what was in Miss McNeal's     09:29:58

21   head.

22         THE COURT:  Just a moment.

23         Overruled.

24         THE WITNESS:  My interpretation of what she said was

25   not that.                                                           09:30:40

Jan Watson - Cross-Examination

1    BY MR. STRUCK:

2    Q.  I understand.  And I think you just said that to the Court.

3         My question is:  Wouldn't you agree, Dr. Watson, that

4    another interpretation could be what I suggested, that

5    Miss McNeal was trying to ensure that you got credit for        09:30:59

6    appropriate care by documenting things in a way that would

7    allow her to score it accurately for the -- so you would get

8    credit for the performance measure?

9    A.  No.  And that's where I gave in yesterday.  I can only

10   respond to how I interpreted it.  Someone else may have taken   09:31:22

11   it differently.

12   Q.  Okay.  So you agree that someone else might have taken it

13   the way I have suggested to you, but that's not the way you

14   interpreted it.  Is that fair?

15   A.  Right.  I have no idea what other people thought.           09:31:40

16   Q.  Okay.

17        MR. STRUCK:  And, Your Honor, just so you're aware,

18   the exhibits that we're using do not have confidential patient

19   information on them, so we're going to make an attempt to do it

20   electronically, and hopefully that will speed the process up a  09:32:08

21   little bit.

22        THE COURT:  Thank you.

23   BY MR. STRUCK:

24   Q.  I'm going to refer you, Dr. Watson to Exhibit 475.  And it

25   should pop up on your screen right in front of you.             09:32:21

Jan Watson - Cross-Examination

```
 1              Are you able to see it?  We'll try and make it a
 2    little bigger for you.
 3    A.   Okay.  Yes.
 4    Q.   Okay.  And this is an e-mail between you and the reporter
 5    after you had contacted him about your experience working with    09:32:46
 6    Corizon; correct?
 7    A.   Sort of.
 8    Q.   Okay.
 9    A.   Can I say what my contact -- what I actually asked him?
10    Q.   Certainly.                                                    09:33:05
11    A.   I asked him if he knew who I should contact to talk to them
12    about my experiences.
13    Q.   So --
14    A.   Because I had not been successful in finding someone up to
15    that point.  But I figured he knew.                               09:33:24
16    Q.   All right.  So your intent initially was --
17              And I'm sorry, I don't know why that's flashing.
18    We're trying to figure that out.
19              Your original intent was to contact this reporter to
20    find out who you should contact to report your experiences        09:33:40
21    working with Corizon; right?
22    A.   Correct.
23    Q.   Okay.  Now, this particular e-mail was dated October 26th,
24    2017; is that right?
25    A.   Yes.                                                         09:33:57
```

Jan Watson - Cross-Examination

```
 1          MS. KENDRICK:  Excuse me.  What exhibit number is this
 2    again?  It's not labeled on the screen.
 3          MR. STRUCK:  It's labeled up at the top.  It's Exhibit
 4    475.
 5          MS. KENDRICK:  Thank you, sir.                          09:34:07
 6    BY MR. STRUCK:
 7    Q.  So, in this particular e-mail it appears that you had
 8    already contacted him at least as of October 25th, 2017.  Do
 9    you see that?
10          He says, I'm on the road back to Phoenix from          09:34:54
11    reporting in Tucson and just got your note.
12    A.  Correct.
13    Q.  Did you e-mail him, is that how you initially contacted
14    him?
15    A.  Yes.                                                     09:35:04
16    Q.  Okay.  And your original e-mail was something to the effect
17    of, I'm -- I want -- can you tell me who I should contact?
18    A.  Who to contact.
19    Q.  Okay.  And that original e-mail, do you know what day it
20    was that you sent it?                                        09:35:19
21    A.  No.  Maybe the 25th or the day before.
22    Q.  Okay.  Right around that same time frame.
23          And you had left your employ with Corizon on October
24    12th?
25    A.  Yes.                                                     09:35:40
```

UNITED STATES DISTRICT COURT

1  Q.  And you were supposed to work another -- until the end of

2  the month?

3  A.  Until the 20th.

4  Q.  Until the 20th?

5      But you were asked by Corizon to leave early?                    09:35:50

6  A.  On the 12th.

7  Q.  Okay.  Was that a surprise to you?

8  A.  Yes.  Why not just wait the last three days?

9      Actually -- actually back in -- whenever I had that

10 meeting with Babich and Stewart, which was before Labor Day,        09:36:07

11 that Friday, I asked them then if they would like me to leave

12 that day right then or at the end of the day.  I asked multiple

13 times.  And they said no, that they wanted to basically turn me

14 into a Corizon type doc.  So I was supposed to talk with

15 Dr. Stewart weekly to find out if I had changed the way I          09:36:47

16 practiced.

17     So I could have left in September if they would have

18 let me.

19 Q.  I see.  So -- but were you surprised -- I mean, how did you

20 find out that October 12th was going to be your last day, what     09:37:07

21 was your --

22 A.  The administrator called me on that day and said he needed

23 to meet with me.  So I figured when I got the telephone call

24 that that's what it was for.

25 Q.  Okay.  And who was that administrator?                          09:37:23

UNITED STATES DISTRICT COURT

1   A.  Sego.

2   Q.  Daniel Sego?

3         And you met with Daniel Sego on the 12th and he told

4   you what?

5   A.  That they wanted me to -- that to be my last day.  That I          09:37:37

6   wasn't a bad physician, but I didn't do things the way Corizon

7   usually did it.  And we had a long discussion about all of the

8   problems I saw.  And he did tell me that the problems I told

9   him about other providers had also mentioned.  And so these

10  were not new things.                                                   09:38:09

11        And I left.  That was it.

12  Q.  Were you upset?

13  A.  No.  I told you, I had asked them to let me go back in

14  September, but they didn't, they wanted to work on me some

15  more.  And so I had to complete my 30 days.                           09:38:26

16        I would have loved to have left back on September --

17  in September.

18  Q.  And so at some point between the 12th and either October

19  24th or 25th, you had decided that you wanted to report to

20  somebody what your experience was working with Corizon?               09:38:50

21  A.  No.  As I stated yesterday, I actually first contacted the

22  ACLU while I was still there, and they wouldn't talk to me.

23        So the second time I called the ACLU it was after I

24  finished my assignment there.

25  Q.  All right.  So when was the first time you contacted the          09:39:16

Jan Watson - Cross-Examination

1    ACLU?

2    A.  I'm not quite sure of the date.  But I was still there.

3    And I thought that that's why there was confusion about me

4    being a Corizon employee.  Because I kept explaining I was a

5    locums doctor at Corizon.                                       09:39:36

6         So I waited until I was no longer at Corizon to try to

7    remove that confusion.

8    Q.  And you remember whether the first time you contacted them

9    was in the month of October?

10   A.  No.  I think it was in September.                           09:39:53

11   Q.  All right.  And did you contact them via e-mail?

12   A.  No, telephone.

13   Q.  What -- who did you call, do you remember?

14   A.  The Phoenix ACLU office.

15   Q.  Okay.                                                       09:40:12

16   A.  I guess it was Phoenix.  I looked it up -- I found the

17   telephone number on line and called.

18   Q.  So you --

19   A.  I may actually have that -- I just can't remember that

20   person's name.                                                  09:40:22

21        Whoever I spoke with was an attorney, and he said he

22   would send my contact information to the attorneys involved in

23   the case, and they would get back to me.  And no one did.

24   Q.  And that was some time in September.

25        When did you contact the Court's chambers?                 09:40:47

UNITED STATES DISTRICT COURT

```
 1   A.  Okay.  Sometime in October.  Because I called the ACLU

 2   again and no one called me back, so then I called the Court and

 3   I was given -- Kristen, Kirsten?  I was given her name in

 4   Tucson.  And I left two messages there.  And she did not

 5   contact me.                                                     09:41:26

 6          And then I had read articles.  And so I pulled up

 7   articles again and I found Jimmy's name and I sent him an

 8   e-mail.

 9   Q.  When you contacted the Court, what did you say?

10   A.  I said I had -- I wanted to talk to someone about things    09:41:46

11   that I had experienced in Eyman, but I needed to know who I

12   should call.

13   Q.  Did you identify yourself as a former employee?

14   A.  No.

15   Q.  So you just --                                              09:42:07

16   A.  Because I never considered -- I was never a Corizon

17   employee.

18   Q.  Let me ask the question differently.

19          Did you identify yourself as somebody who had worked

20   in the health care delivery in Eyman when you contacted the     09:42:18

21   court?

22   A.  I assume I did.  I don't remember exactly what I said.

23   Q.  Okay.

24   A.  But anyway, that's how I got her number.

25   Q.  So sometime after October 25th you -- did you meet with the 09:42:33
```

Jan Watson - Cross-Examination

 1  reporter?

 2  A.  Yes.

 3  Q.  At what time, do you remember?  What day?  Approximately.

 4  A.  I don't know.

 5  Q.  Let me show you -- take a look at Exhibit 481.          09:43:07

 6          And it should come up on your screen, so don't --

 7          This is an e-mail dated October 31st, 2017.

 8  A.  Okay.

 9  Q.  And you say, you went to Baylor, that you're licensed in

10  Arizona.  You only do locum tenens work now.  That you've never  09:43:42

11  seen the Corizon way written anywhere.  And you say, don't

12  forget to Photoshop the picture.

13          Had you already met with the reporter before October

14  31st, 2017?

15  A.  Yes.                                                   09:44:02

16  Q.  Okay.  What did you mean by "don't forget to Photoshop the

17  picture"?

18  A.  I didn't know he was going to take a photograph of me.  And

19  I thought it was horrible.  I let him take one picture.  And he

20  said he thought it was fine.  I thought it was horrible.  And  09:44:18

21  he said he could Photoshop it.  So I told him to do that.  And

22  I also sent him a better one, a professionally-done photograph.

23  Q.  And it was your understanding that the information that you

24  provided will be a fantastic presentation that will bring about

25  real change.  Is that what the reporter stated to you in this  09:44:51

UNITED STATES DISTRICT COURT

Jan Watson - Cross-Examination

1  e-mail?

2  A.  It's gone.  So if that's what he said -- okay.  It's back.

3  It's gone.

4  Q.  Hang on.

5  A.  I can tell you what I wanted to accomplish, since mine          09:45:06

6  keeps coming and going.

7          MR. STRUCK:  Your Honor, may I approach?  I have the

8  hard copies.

9          THE COURT:  Thank you.

10          Half your time it's gone, Mr. Struck.  I say that only   09:45:20

11  because the story about the Photoshop is amusing and endearing,

12  but it doesn't seem to be relevant to anything.  So keep in

13  mind we're on a tight schedule here.

14          THE WITNESS:  Okay.

15  BY MR. STRUCK:                                                    09:45:46

16  Q.  And the reporter told you that you and he are going to do

17  good things?  Do you see that at the bottom of the page?  It's

18  Exhibit 481.

19  A.  Okay.  Yes.  Okay.  Okay.

20  Q.  Would take a look at the next exhibit?  It's 467.  It's the   09:46:08

21  next one in your stack.

22  A.  All right.

23  Q.  Do you have it?

24  A.  Yes.

25  Q.  Okay.  This is dated November 21st, 2017.  And at the top     09:46:26

1   you see the reporter states that there will be an article with

2   an audio of you being narrated -- or of you talking narrated by

3   me.  You sound great.  Don't worry.

4          Was there a recording?  Did he record you saying

5   something?                                                      09:46:58

6   A.  Yes.  The interview was recorded.

7   Q.  Next is Exhibit 473.  And this is an e-mail where you sent

8   him a photograph of yourself that you would rather have used.

9   Is that right?

10  A.  Correct.                                                    09:47:34

11  Q.  And there's a picture of you on that exhibit.

12         Were you excited about going public with this story?

13  A.  No.  That had not been my plan.

14  Q.  Okay.  Go to Exhibit 466.  And these are a series of

15  e-mails between you and the reporter dated December 4th, 2017.  09:48:20

16  And you see in the middle of the page at 1:02 p.m. the

17  reporter -- you're asking the reporter about what's going to

18  happen with the story.  And the reporter states, as soon as it

19  publishes the attorneys for the plaintiffs and Parsons are

20  going to enter it into the court docket so the judge will see   09:48:47

21  it.

22         Is that what that says?

23  A.  Yes.

24  Q.  Okay.  And that was your understanding that the -- one of

25  the purposes of providing this information to the reporter so   09:48:58

Jan Watson - Cross-Examination

```
 1   he could report on it was so the Court would see it?

 2              MR. FATHI:  Objection, Your Honor, misstates her

 3   testimony.

 4              THE WITNESS:  No.

 5              THE COURT:  Overruled.                              09:49:07

 6              THE WITNESS:  No.  I was trying to get the information

 7   to the attorneys.

 8   BY MR. STRUCK:

 9   Q.  So the attorneys could bring it to the Court's attention?

10   A.  So the attorneys could do whatever they thought was best to  09:49:24

11   try to get things changed.

12              I was hoping that they would see that the monitors

13   don't work.

14   Q.  Okay.  Dr. Watson, isn't it true that you knew as of

15   December that this article -- the intention of the article was  09:49:48

16   to get that information in front of the Court so the Judge

17   would see it and maybe change would happen?

18              MR. FATHI:  Objection.

19              MR. STRUCK:  Wasn't that your intent?

20              THE COURT:  I'm sorry?                              09:50:04

21              MR. FATHI:  Objection, Your Honor, it calls for

22   speculation as to the intention of other people.

23              THE COURT:  I think the intention of the article is

24   not necessarily referring to somebody else, it may be referring

25   to the witness.  So the objection is overruled.               09:50:29
```

UNITED STATES DISTRICT COURT

1          THE WITNESS:  My intent has always been to get the

2     information to the attorneys, because I knew they were involved

3     with the monitoring.

4     BY MR. STRUCK:

5     Q.  Exhibit 478.  It's a December 12th e-mail from you to the          09:50:59

6     reporter.  And you say, I stated that I was asked to cancel

7     referrals to infectious disease specialists for HIV patients

8     because according to Sara Neese Corizon did not have a

9     contracted infectious disease specialist.

10          Do you see that?                                                 09:51:32

11    A.  Yes.

12    Q.  And then why didn't you tell the reporter that you had

13    received an e-mail from Miss Neese the next day telling you

14    that Corizon did have an inside -- in-house infectious disease

15    specialist?                                                            09:51:44

16    A.  The e-mail that I was referring to, I did not get that

17    e-mail the next day.

18          There was more than one canceled contract -- I mean,

19    there was more than one request to cancel a contract -- a

20    referral.                                                              09:52:06

21    Q.  We looked at the e-mail yesterday, it was dated September

22    19th, 2017, which was the day after.  You actually -- if you

23    recall, you had sent an e-mail that morning asking her, well,

24    if I can't refer him to an outside infectious disease

25    specialist, what am I supposed to do?  And her response was            09:52:25

1    that there is an inside Corizon infectious disease specialist

2    that you could --

3    A.   And I also stated that I never found out who an inside

4    infectious disease specialist was at Corizon.

5    Q.   And I understand that.                                              09:52:41

6         My question to you is:  Why didn't you tell the

7    reporter that you had been told by Sara Neese that there was an

8    infectious disease specialist in-house that you could utilize

9    to assist you in providing care for HIV patients?

10   A.   Because it was never used.                                          09:53:00

11   Q.   Exhibit 477.  This is a December 12th e-mail exchange

12   between you and the reporter.  And he's asking you about the

13   statement about the patient with the chest pain.  And he asks

14   you -- he says, they, Corizon, denies -- they said he denies

15   making that statement, but it's your word against his, so we           09:53:47

16   can still publish it.

17        And you state -- I'm sorry, yeah.  And you state in

18   the next e-mail exchange, he didn't say to let Mr. -- die if he

19   came in with chest pain.  There was nothing that could be done

20   so keep him comfortable and let him die.                                09:54:06

21        So he didn't say --

22   A.   Wait a minute.

23   Q.   -- let him die if he came in with chest pain.  Isn't that

24   what you told the reporter?  It's right at the top.

25   A.   He didn't say to let him -- yeah, I was asking the reporter       09:54:21

Jan Watson - Cross-Examination

1    what he denied saying.  Did he deny saying this?

2          You're not following the conversation.

3    Q.  No.  It looks like you say, he didn't say to let Mr. Blank

4    die if he came in with chest pain.  There was nothing that

5    could be done so keep him comfortable and let him die.         09:54:52

6          So are you telling the reporter he didn't say --

7    A.  No.

8    Q.  -- to let him die if he came in with chest pain, but he did

9    say there was nothing that could be done, so keep him

10   comfortable and let him die.                                   09:55:04

11   A.  I was asking him, the reporter, if what Stewart denies

12   saying he didn't -- he told me to tell -- to let the

13   patient die.

14         Does that make sense?

15         THE COURT:  So what you're saying is that there's a      09:55:25

16   missing question mark after the end of the first sentence?

17   Is that what you're saying, that you were asking a question

18   there?

19         THE WITNESS:  Yes.  I wanted to know if that's what he

20   had denied saying.                                             09:55:35

21   BY MR. STRUCK:

22   Q.  Well then, what's the meaning of the second sentence,

23   Dr. Watson?  In the second sentence you say, there was nothing

24   that could be done, so keep him comfortable and let him die.

25   A.  That's still a part of -- are these the things that he     09:55:49

UNITED STATES DISTRICT COURT

1    denied saying.

2    Q.  Okay.  Well, let me ask it a different way.

3          Are you saying now that Dr. Stewart said that there

4    was nothing that could be done so keep him comfortable and let

5    him die?  Is that what Dr. Stewart said?                    09:56:03

6    A.  Yes.

7    Q.  Okay.

8    A.  What Dr. Stewart said was, if the patient comes in with

9    chest pain, keep him comfortable and let him die.  Am I giving

10   it verbatim?  No.  His coronary arteries are not bypassable,  09:56:23

11   there's nothing that can be done.

12   Q.  Okay.  And that's a paraphrase of what your recollection

13   was that Dr. Stewart said; is that fair?

14   A.  Yeah, the sentences may be out of order a little bit.

15   Q.  And the next exhibit is Exhibit 469 --                  09:56:43

16          Your Honor, how much more time do I have?

17          THE COURT:  Two minutes.

18   BY MR. STRUCK:

19   Q.  Exhibit 469.

20   A.  469?                                                    09:57:09

21   Q.  It's not the next one, it's the one after.  I'm skipping

22   because I'm short on time.

23          469.  Do you have it?

24   A.  Yes.

25   Q.  And the reporter tells you, we did it, exclamation point. 09:57:26

1  Sorry this took so long.  Thank you for coming with me with

2  your story, Jan.  This has been the most powerful thing I've

3  ever been a part of and I'm honored that you shared your

4  account with me.

5         And your response is, I just read it.  You and I may          09:57:41

6  need to hire someone for protection, exclamation point.

7  Corizon definitely won't like this.  This should get a response

8  from someone.

9         Was that -- did you type that?

10  A.  Yes.                                                            09:57:54

11  Q.  Were you pretty happy with the article?

12  A.  I thought it was a good article.

13  Q.  And then --

14  A.  It did get a response.

15  Q.  And then on Exhibit 470, Mr. Jenkins puts you in touch with     09:58:13

16  Corene Kendrick, one of the lawyers for the plaintiffs; is that

17  right?

18  A.  Correct.

19  Q.  And Exhibit 479, this is an e-mail exchange between you and

20  Jimmy Jenkins.  This is dated December 21st, 2017, the day         09:58:46

21  after a hearing that we had in court.

22         Mr. Jenkins tells you -- it says to start writing

23  things down.  He says, the judge is very eager to hear from you

24  and will listen to anything you want to tell him.

25         Is that what he told you?  Is that your understanding       09:59:08

Jan Watson - Cross-Examination

1    of what he's trying to express to you here?

2    A.   I haven't seen that yet.

3    Q.   Let's go to Exhibit 480, since I'm running out of time

4    here.

5    A.   480?                                                    09:59:34

6    Q.   Yes.  It's another e-mail between you and the reporter.

7    And the reporter states, awesome.  I'm serious, this is like a

8    once-in-a-lifetime soapbox moment, go off, explanation point.

9           And your response was, I know, a friend said it's like

10   a lifetime movie, we just need the abusive husband.           09:59:56

11          Is that your response?

12   A.   Yes.

13   Q.   The -- ultimately your hope is that you coming forward with

14   this article would catch the attention of the judge in this

15   case and do something about what you perceive to be problems;   10:00:32

16   isn't that true?

17   A.   Ultimately my goal was to change the quality of care in the

18   prisons.

19   Q.   Did you meet with Mr. Fathi this morning or last night, or

20   any of the plaintiffs' attorneys to prepare for today?         10:00:47

21   A.   No.

22   Q.   Talk to him?

23   A.   This morning I talked to him.

24   Q.   Okay.  Did you talk about what your testimony is going to

25   be?                                                            10:00:55

Jan Watson - Cross-Examination

1    A.  No.  He let me know he was going to ask me some more

2    questions.

3            MR. STRUCK:  Your Honor, defendants move for the

4    admission of Exhibits 469, 477, 478, 466, 473, 467, 481 and

5    475, they're these e-mails that we just went through.        10:01:19

6            THE COURT:  Any objection?

7            MR. FATHI:  Your Honor, without -- I would need to

8    look at them individually.  I believe they are all hearsay, not

9    subject to an exception.

10           But if I may make a suggestion, perhaps we could         10:01:30

11   finish with Dr. Watson, let her go, and then we could discuss

12   the exhibits.

13           THE COURT:  Agreed.  We'll defer the ruling.

14           MR. STRUCK:  That's fine.

15           THE COURT:  Thank you, Mr. Struck.                       10:01:42

16           MR. STRUCK:  And I will say, they're not being offered

17   to prove the truth of the matter asserted, and they are subject

18   to 803(3).

19           THE COURT:  Thank you.

20           Mr. Fathi, any redirect?                                 10:01:52

21           MR. FATHI:  Yes, Your Honor.

22           THE COURT:  And you're going to work within the time

23   limit that you gave me yesterday as well?

24           MR. FATHI:  I will, Your Honor.

25           THE COURT:  Thank you.                                   10:02:01

UNITED STATES DISTRICT COURT

1              REDIRECT EXAMINATION

2   BY MR. FATHI:

3   Q.  Good morning, Dr. Watson.

4   A.  Good morning.

5   Q.  Mr. Struck asked you yesterday about malpractice lawsuits          10:02:06

6   in which you were named as a defendant.  Do you remember that

7   testimony?

8   A.  Yes.

9   Q.  You practiced -- or you have in the past practiced

10  obstetrics; correct?                                                   10:02:20

11  A.  Correct.

12  Q.  Have you at any time in the course of your medical career

13  had to purchase malpractice insurance?

14  A.  Numerous times.

15  Q.  In your experience, compared to the medical profession as a        10:02:29

16  whole, are physicians who practice obstetrics more likely to

17  get sued, less likely to get sued, or is the likelihood about

18  the same as other doctors?

19            MR. STRUCK:  Your Honor --

20            THE COURT:  I'm sorry.                                       10:02:43

21            MR. STRUCK:  The objection is leading.  These are

22  leading questions.

23            THE COURT:  Sustained.

24  BY MR. FATHI:

25  Q.  Mr. Struck asked you about your disclosure to Corizon and         10:02:51

Jan Watson - Redirect Examination

1    to Onyx of past lawsuits in which you have been named as a

2    defendant.  Do you remember that discussion?

3    A.  Yes.

4    Q.  And there was discussion about whether you had disclosed

5    other cases in addition to the Masters case.  Do you remember          10:03:07

6    that discussion?

7    A.  Yes.

8    Q.  Will you please look at exhibit -- Defendants' 333.

9    A.  Is that this pile?

10         MR. FATHI:  May I approach, Your Honor?                          10:03:29

11         THE COURT:  You may.

12     (Discussion held off the record.)

13   BY MR. FATHI:

14   Q.  Dr. Watson, Defendants' Exhibit 333 has been labeled by

15   defendants, documents provided by Onyx M.D. in response to             10:03:56

16   Subpoena Duces Tecum relating to Jan Watson.

17         Would you please turn to page 12.

18         Now, this appears to be a letter pertaining to Prator

19   versus Phoenix Perinatal Associates, a lawsuit in which you

20   were named as a defendant but then dismissed.  Is that correct?        10:04:27

21   A.  Correct.

22   Q.  Would you please look at page 118, please.

23         Do you see a little bit above the middle of the page

24   the name of Beverly White?

25   A.  Yes.                                                               10:04:59

UNITED STATES DISTRICT COURT

Jan Watson - Redirect Examination

1   Q.   And who is Beverly White?

2   A.   Beverly White was my contact at Onyx.

3   Q.   And would you read what is written next to the first three

4   lines that are written next to Miss White's name?

5   A.   The first three -- she -- where it starts with -- this is          10:05:15

6   little.

7   Q.   It is very small type.

8   A.   She's a locum provider familiar with the process.

9   Q.   I'm sorry, the one -- the line -- if you go to the right of

10  Beverly, the line that begins, no background issues.                    10:05:35

11  A.   Middle of the page.  Oh, okay got it.

12        No background issues.  Two malpractice cases.  One

13  case dismissed.  One case settled for 100,000.  Active DEA,

14  DOT, DEA, BLS, State CS --

15  Q.   That's fine, Doctor.  Thank you.                                    10:06:09

16        Doctor, in your 40 years of medical practice, have you

17  ever been found liable in a malpractice lawsuit?

18        MR. STRUCK:  Leading.

19        THE COURT:  Overruled.

20        MR. STRUCK:  Foundation.                                          10:06:21

21        THE COURT:  Overruled.

22        THE WITNESS:  No.

23  BY MR. FATHI:

24  Q.   You talked about your work at a place called Concentric.

25  Do I have that right?                                                    10:06:30

1   A.   Concentra.

2   Q.   What kind of practice was that?

3   A.   Concentra is mainly occupational medicine and you do some

4   urgent care.

5   Q.   And I believe you testified yesterday that at Concentra you          10:06:42

6   would see up to 40 patients a day; is that correct?

7   A.   Sometimes, 30 to 40.

8   Q.   How would you compare the acuity of the patients you saw at

9   Concentra to the acuity of the patients you saw in the Arizona

10  Department of Corrections?                                                 10:07:00

11  A.   Totally different.  We do not manage chronic care patients

12  at Concentra, I'm taking care of acute injuries.  And those

13  that are follow-up patients, we are dealing specifically with

14  that particular injury.  Patients who have multiple medical

15  problems that are not well controlled, I then have to refer       10:07:30

16  them back to their primary care physician to handle that.

17         I am handling a limited problem in those patients

18  there.

19  Q.   Dr. Watson, are you familiar with the term "provider line"?

20  A.   Oh, yes.                                                             10:07:48

21  Q.   What does that term mean?

22  A.   "Provider line" is when the inmates come into the medical

23  unit and they are to see a provider, whether it's a nurse

24  practitioner or a physician.

25  Q.   So when you were working at ADC, would you be part of       10:08:02

Jan Watson - Redirect Examination

1    provider line?

2    A.  Right.

3    Q.  That's how you would see patients?

4    A.  Yes.

5    Q.  Did it ever happen that provider line was interrupted or          10:08:09

6    shut down because of an ICS?

7            MR. STRUCK:  Your Honor, this is outside the scope.

8            THE COURT:  Overruled.

9            THE WITNESS:  Okay.  So my provider line got

10   interrupted if there was an ICS, because I'd then have to go          10:08:26

11   take care of that emergency.

12           Another problem that interrupts the flow is if the

13   yard is on lockdown, because the inmates can't be brought up to

14   be seen.

15           So those are the common things that stop the provider        10:08:48

16   line.

17   BY MR. FATHI:

18   Q.  You talked about refills of prescriptions, and how if the

19   refill wasn't submitted exactly 21 days before it ran out it

20   wouldn't be processed.                                               10:09:03

21           Do you remember that testimony?

22   A.  Yes.

23   Q.  And I want to make sure I correctly understand.  You were

24   talking about refills, not about renewals; is that right?

25   A.  Correct.                                                         10:09:12

Jan Watson - Redirect Examination

1   Q.   What's the difference?

2   A.   My understanding is a refill is a medication that we have

3   already written.  And like I said, we can write for 120 days.

4   So, you know, several months.  But they only are sent to the

5   inmate one month at a time.                                    10:09:37

6         So the nurse has to submit the refill to the pharmacy

7   at day 21 so that they can then send the next month's supply.

8   Q.   In your practice outside of the prison context, have you

9   ever encountered a rule or a requirement similar, that refills

10  had to be submitted exactly 21 days in advance?                10:10:05

11  A.   No.

12  Q.   Mr. Struck asked you about the patient with coronary artery

13  disease about whom you testified that Dr. Stewart said, keep

14  him comfortable and let him die.  Do you recall that?

15  A.   Yes.                                                      10:10:23

16  Q.   And Mr. Struck asked if you reported Dr. Stewart's

17  statement to Corizon or ADC.  Do you remember that testimony?

18  A.   Yes.

19  Q.   Did you tell anyone about Dr. Stewart's statement that you

20  should keep this patient comfortable and let him die?          10:10:39

21  A.   I did tell people about the statement.  I didn't report him

22  to his superiors.  That was different.

23  Q.   Who did you tell about the statement?

24  A.   The first person I told was Norma Sestiaga, the CNA.  I

25  told her why I needed her to have him come up and see me the    10:11:00

UNITED STATES DISTRICT COURT

1    next day.  And I also informed her it was very important,

2    because if he came in with chest pain, chances are it was going

3    to be the two of us who would be there with him.

4    Q.  And how long after Dr. Stewart's statement to you did you

5    tell Norma about --                                              10:11:21

6    A.  That was the next morning.

7    Q.  Okay.  Would you please look at Plaintiffs' Exhibit 18.

8         And will you please turn to page 119, using the page

9    numbers at the bottom right-hand corner.

10        Are you there, Doctor?                                      10:12:03

11   A.  Yes.

12   Q.  Now, this is the patient that we discussed yesterday who

13   has cerebral palsy; is that correct?

14   A.  Correct.

15   Q.  And there's a note -- this page, page 119 is a note dated   10:12:10

16   October 26, 2017; correct?

17   A.  Correct.

18   Q.  And yesterday Mr. Struck drew your attention to the line

19   under P that reads, inmate received a set of deluxe forearm

20   crutches.                                                         10:12:32

21        Do you remember that discussion?

22   A.  Yes.

23   Q.  Could you please read aloud the note under S?

24   A.  Under S?

25   Q.  Yes.                                                         10:12:43

Jan Watson - Redirect Examination

```
 1   A.  An interpreter services -- no.

 2          Okay.  Inmate to HU -- health unit -- to pick up

 3   medical supplies requested by provider on January 5th, 2017.

 4   Q.  So according to this note, about nine-and-a-half months

 5   elapsed between when the crutches were requested by a provider      10:13:08

 6   and when the crutches were given to the patient; is that

 7   correct?

 8   A.  Correct.

 9   Q.  Let's go back to Exhibit 333, please.

10          THE COURT:  Close, Mr. Fathi?                                10:13:23

11          MR. FATHI:  I'm sorry?

12          THE COURT:  Are you getting close to being done?

13          MR. FATHI:  I'm very close, Your Honor.

14          THE COURT:  Thank you.

15   BY MR. FATHI:                                                       10:13:31

16   Q.  And would you please turn to page 185.

17          And about a third of the way down the page there's a

18   note that reads -- that begins, talked with provider.  Will you

19   please read that aloud until the end of the quotation marks.

20   A.  Talked with -- talked with the provider at the facility.       10:13:55

21          Where it says Rodney Smith?

22   Q.  Yes.  Begin with, talked with provider, please.

23          May I approach?

24   A.  Talked with the provider, the facility director, Sensur

25   Sergio.                                                            10:14:26
```

1          Am I in the right place?

2   Q.  Yes.

3   A.  And Dr. Rodney Smith, Medical Director, called her in

4   yesterday at 2:45 p.m. for a meeting.

5          Oh, I got it.                                                    10:14:39

6          And they let her go at 3:30 p.m.  She stated

7   that -- she stated that they told her that she was not a bad

8   doctor or anything, she just was not following the Corizon way

9   of doing things.

10  Q.  Thank you.                                                          10:14:57

11         MR. STRUCK:  Your Honor, move to strike.  That's

12  multiple layers of hearsay that she just read.

13         THE COURT:  Where did the document come from?

14         MR. FATHI:  These are documents that were produced in

15  response to defendants' subpoena to Onyx, the agency through   10:15:08

16  which Dr. Watson worked at the prison.

17         THE COURT:  And how is it not hearsay?

18         MR. FATHI:  I'm going to ask her a question about it,

19  Your Honor.

20         THE COURT:  Okay.  Go ahead.                                     10:15:19

21  BY MR. FATHI:

22  Q.  Dr. Watson, does this -- is this an accurate account of the

23  meeting that you described with Mr. Sego and with Dr. Stewart?

24         MR. STRUCK:  Objection, leading and lack of

25  foundation.                                                             10:15:33

Jan Watson - Redirect Examination

 1          THE COURT:  Overruled.

 2          THE WITNESS:  Yes.  This was a note from -- that

 3  Betty -- Beverly White wrote when I called her to tell her what

 4  happened.

 5          MR. STRUCK:  And hearsay.                                   10:15:48

 6          THE COURT:  Okay.  Hold on.  We've got multiple layers

 7  of hearsay here we have to work through.

 8          Exactly, you want to get in the statement about the

 9  Corizon way.

10          MR. FATHI:  Your Honor, I'm not going to move to admit    10:16:01

11  the exhibit.  I'm simply asking Dr. Stewart -- excuse me,

12  Dr. Watson if this is an accurate account of the meeting.  And

13  I believe the answer is yes.

14          THE COURT:  But here's the thing:  We have an

15  out-of-court statement, if she's testifying about what somebody   10:16:17

16  else told her.  I need to find a hearsay exception to what this

17  other person told her if she's going to testify about it in

18  court.

19          MR. FATHI:  Your Honor, the hearsay exception for what

20  Dr. Stewart and Mr. Sego said to her is that it is an admission   10:16:29

21  of --

22          THE COURT:  Aren't we talking about the Onyx person

23  now?

24          MR. FATHI:  No, Your Honor, this is not a statement by

25  the Onyx person, this is -- I'm simply asking --                  10:16:39

—————— Jan Watson - Redirect Examination ——————

```
 1              And again, I'm not seeking to admit this statement,

 2      Your Honor.

 3              THE COURT:  Right.

 4              MR. FATHI:  I'm simply asking Dr. Watson if this is an

 5      accurate account of the meeting.                              10:16:49

 6              THE COURT:  Well, that means that you're asking her to

 7      affirm an out-of-court statement which is, again, something

 8      that is not permitted unless we can find a hearsay exception.

 9              Now you've told me that what the statement is is being

10      made by not the person I thought that it was, an Onyx person,  10:17:04

11      it is a statement by whom?

12              MR. FATHI:  The underlying statements to her are

13      statements by Dr. Stewart and Mr. Sego, both of whom were

14      Corizon employees.  And, therefore, it's an admission by an

15      agent of the defendants.                                      10:17:21

16              THE COURT:  Mr. Struck?

17              MR. STRUCK:  Yes, but the statement in this document

18      is by Miss Smith, an Onyx employee, who is relating something

19      that she says was told to her by these two individuals.  So

20      that's the hearsay that he can't overcome.                    10:17:36

21              THE COURT:  What is the exhibit number, please?

22              MR. FATHI:  It's Exhibit No. 333, page 185.

23              I can ask the question a different way if you'd like.

24              THE COURT:  All right.  Fair enough.

25      BY MR. FATHI:                                                 10:17:58
```

Jan Watson - Redirect Examination

1   Q.  Miss -- excuse me, Dr. Watson, at the meeting in -- on

2   October 12th with Mr. Sego and Dr. Stewart, was there any

3   mention of "the Corizon way"?

4   A.  Yes.  Doctor -- Daniel Sego said I wasn't a bad doctor, but

5   I wasn't doing things the way Corizon does.  And so they wanted   10:18:22

6   me to leave that day.

7        Since I officially work for Onyx, I then had to call

8   my contact at Onyx to let them know that my last day had been

9   October 12th, not October 20th, as it was supposed to be in the

10  contract.                                                          10:18:52

11        MR. FATHI:  Thank you, Dr. Watson.

12        May I have a moment with co-counsel?

13        THE COURT:  You may.

14   (Discussion off the record between plaintiffs' counsel.)

15        MR. FATHI:  Nothing further.                                 10:18:59

16        Thank you very much, Dr. Watson.

17        THE COURT:  Dr. Watson, thank you very much.

18  Especially thank you because we imposed, I think, greater than

19  what you said told perhaps, which is oftentimes a fact, that

20  that does happen in court.  So it is something that we should      10:19:14

21  apologize for, but it is a reality that's necessary sometimes

22  for the fact-finding purposes.  We can't always predict how

23  long things will take.

24        And so I appreciate the time that you came in here

25  today and yesterday.                                               10:19:29

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD – February 28, 2018—

1       THE WITNESS:  Thank you.

2       THE COURT:  So, counsel, we need to address when we

3  resume this hearing.

4       I note that we have a monthly status hearing scheduled

5  for next month on March.                                    10:19:48

6       MS. KENDRICK:  Your Honor.

7       THE COURT:  Yes.

8       MS. KENDRICK:  So we did confer with counsel --

9       THE COURT:  You did.

10       MS. KENDRICK:  -- for defendants about this.  And the   10:19:58

11  only date -- dates in March that Mr. Struck and the necessary

12  witnesses we're calling would be available would be either

13  March 12th, March 26th and March 27th.

14       MR. STRUCK:  March 12th, March 26th and March 27th.

15  But we do have Dr. Stewart is not available on the 26th and   10:20:19

16  27th.  So March 12th would be a better day.

17       THE COURT:  Hold on just a second.

18    (Discussion held off the record.)

19       THE COURT:  It's not me this time, it's the technical

20  device.                                                      10:21:41

21    (Discussion held off the record.)

22       THE COURT:  And when you talk about rescheduling for

23  the 12th, did you anticipate that you believed that we'd be

24  able to accomplish the task on that day?  Or do you think we

25  needed more time?                                            10:22:18

—CV-12-601-PHX-DKD - February 28, 2018—

1           MS. KENDRICK:  Your Honor, we only have one

2   witness -- additional witness that we're calling, Dr. Wilcox.

3           THE COURT:  All right.

4           MR. STRUCK:  It will be a challenge to do it in one

5   day.                                                    10:22:29

6       (Discussion held off the record.)

7           THE COURT:  The one thing I didn't ask about was

8   whether or not when you selected the 12th whether that meant

9   that you also thought t hat you were in a position to be able

10  to continue into the 13th, preparatory to our meeting on the   10:23:25

11  14th.  Is that possible?

12          MS. KENDRICK:  Plaintiffs' counsel are, yes.

13          MR. STRUCK:  Your Honor, that's not possible

14  for -- I'm actually going to be out of town the rest of the

15  week.                                                   10:23:41

16          THE COURT:  All right.

17          MR. STRUCK:  And other counsel are going to handle the

18  status conference.

19          THE COURT:  Okay.  So we'll schedule it for the 12th.

20  And we will hope to be able to get it all done.  If we don't,   10:23:47

21  we'll see where we stand at that point and what needs to be

22  done.

23          So we'll go on the 12th with the resumption this of

24  this hearing, and then conclude on the 12th.  And then we'll

25  take up the case on the 14th again for our normal monthly    10:24:01

1    meeting.

2            Any comment to that?

3            MS. KENDRICK:  No.  That sounds fine.

4            THE COURT:  Mr. Struck?

5            MR. STRUCK:  No, Your Honor.                        10:24:13

6            THE COURT:  All right.  So it's my rudeness that I

7    didn't recognize the fact that we'd been working here and we

8    need to take a break, so we'll take a 15-minute break now.

9            Thank you.

10       (Recess at 10:24 a.m., until 10:43 a.m.)                10:24:31

11           THE COURT:  Thank you.  Please be seated.

12           Before we turn to Mr. Upton, do we need to address the

13   evidentiary deferred ruling?  Have you all had a chance to take

14   a look at that?

15           MR. FATHI:  Your Honor, if we could just take them one  10:43:59

16   at a time I think we can probably resolve it quickly.

17           THE COURT:  All right.  Go ahead.

18           Do you have the numbered list?  Do you want to work

19   through it and Mr. Struck can concur or not whether he has the

20   list right?  Who should lead this march?                   10:44:13

21           MR. STRUCK:  I can go ahead and state the exhibit.

22           The first one is 475.

23           THE COURT:  Is there an objection?

24           MR. FATHI:  One moment, Your Honor.

25           THE COURT:  Thank you.                             10:44:27

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD - February 28, 2018—

1        MR. FATHI:  No objection.

2        THE COURT:  475 is received.

3     (Exhibit No. 475 admitted into evidence.)

4        MR. STRUCK:  467.

5        THE COURT:  Is there an objection?                    10:44:41

6        MR. FATHI:  Sorry, Your Honor, just one moment.

7        THE COURT:  That's all right.

8        MR. FATHI:  No objection.

9        THE COURT:  475 will be received.

10        MR. STRUCK:  481.                                      10:45:24

11        MR. FATHI:  I believe the last one was 460 --

12        MR. STRUCK:  467.

13        MR. FATHI:  Okay.  I believe you said something

14   different.

15        THE COURT:  You're right, I did.                       10:45:37

16        467 is received, correcting here I erroneously said

17   475.

18     (Exhibit No. 467 admitted into evidence.)

19        THE COURT:  So now which one are we on?

20        MR. STRUCK:  481, Your Honor.                          10:45:48

21        THE COURT:  481.

22        MR. FATHI:  No objection.

23        THE COURT:  481 is admitted.

24     (Exhibit No. 481 admitted into evidence.)

25        MR. STRUCK:  473.                                      10:46:06

CV-12-601-PHX-DKD - February 28, 2018

1        THE COURT:   473.  Any objection?

2        MR. FATHI:  No objection.

3        THE COURT:   475 is received.

4        MR. STRUCK:  I'm sorry, 473.

5        THE COURT:  I'm sorry, 473.  I'm focused on 475          10:46:35

6   because Mr. Struck used that exhibit before.  I apologize.

7        473 is admitted.

8     (Exhibit No. 473 admitted into evidence.)

9        MR. STRUCK:  466.

10       THE COURT:   466, any objection?                          10:46:45

11       MR. FATHI:  No objection.

12       THE COURT:   466 is admitted.

13    (Exhibit No. 466 admitted into evidence.)

14       MR. STRUCK:  478.

15       THE COURT:   478, any objection?                          10:47:06

16       MR. FATHI:  I'm sorry, Your Honor, 478 has several

17  components.

18       Are you moving it in its entirety?

19       MR. STRUCK:  Just a moment, Your Honor.

20       I was moving it in its entirety, yes.                     10:48:01

21       MR. FATHI:  Well, Your Honor, on 478, there is a

22  lengthy quotation of Corizon's counsel's response to

23  Dr. Watson's allegations.  We would object to the admission of

24  those statements for their truth.

25       THE COURT:  The objection is sustained.                   10:48:21

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD - February 28, 2018

1    I overruled hearsay objections previously with respect

2  to documents that would perhaps be subject to the hearsay rule,

3  but in those cases the evidentiary foundation laid by the

4  examining lawyer demonstrated that there were factors of

5  reliability and foundation that were reflected by the witness's    10:48:39

6  testimony, and I don't have that here.  So that's why the

7  ruling is different.

8    MR. STRUCK:  Your Honor, we request then that we move

9  to admit 478 with those portions -- objectionable portions

10 redacted.    10:48:57

11    THE COURT:  Let's focus on the part that you want to

12 admit.  Are you talking about then the top half of the page

13 before the bolded print?  Or where are you exactly?

14    MR. STRUCK:  Yes, Your Honor.  And I believe

15 that -- yeah, I'm at the top of the page about half way down,    10:49:10

16 and I believe there are -- there is a -- in bold there are

17 three allegations by Corizon --

18    THE COURT:  Why don't you do this with respect to this

19 exhibit:  Redact it, submit it to the plaintiffs, and we'll

20 take it up when they've had a chance to look at exactly what    10:49:38

21 you seek to admit.

22    MR. STRUCK:  Will do.

23    Exhibit 486.

24    THE COURT:  486, any objection?

25    MR. FATHI:  No objection, Your Honor.    10:49:49

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD - February 28, 2018

1      THE COURT:  486 is received.

2    (Exhibit No. 486 admitted into evidence.)

3      MR. STRUCK:  469.

4      THE COURT:  Any objection to 469?

5      MR. FATHI:  No objection, Your Honor.                    10:50:05

6      THE COURT:  469 will be received.

7    (Exhibit No. 469 admitted into evidence.)

8      MR. STRUCK:  470.

9      THE COURT:  Any objection to 470?

10     MR. FATHI:  No objection, Your Honor.                    10:50:23

11     THE COURT:  470 is received.

12   (Exhibit No. 470 admitted into evidence.)

13     MR. STRUCK:  479.

14     THE COURT:  Any objection to 479?

15     MR. FATHI:  No objection, Your Honor.                    10:50:40

16     THE COURT:  479 is received.

17   (Exhibit No. 479 admitted into evidence.)

18     MR. STRUCK:  480.

19     THE COURT:  480, any objection?

20     MR. FATHI:  No objection.                                10:50:58

21     THE COURT:  And 480 is received.

22   (Exhibit No. 480 admitted into evidence.)

23     MR. STRUCK:  And the last is 485.

24     THE COURT:  485, any objection?

25     MR. FATHI:  No objection, Your Honor.  But there is in   10:51:30

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD - February 28, 2018

1   this exhibit, as well as in one of the previous exhibits, a

2   personal phone number.  So we would ask that those be redacted.

3          MR. STRUCK:  And they will.  We will do that.

4          THE COURT:  All right.  Subject to that correction,

5   this 485 will be admitted.                                    10:52:23

6       (Exhibit No. 485 admitted into evidence.)

7          THE COURT:  All right.  And I understand the agreement

8   yesterday was to do Mr. Upton at the first instance here; is

9   that correct?

10         MS. KENDRICK:  Yes, Your Honor, but while we're        10:52:35

11  talking about exhibits, there's just a couple things that we

12  want to make a record of for the Court.

13         THE COURT:  Okay.

14         MS. KENDRICK:  First of all, plaintiffs still have not

15  received a privilege log from either defendants or Corizon for 10:52:46

16  the documents that were supposed to be completed production by

17  the 13th of the month.

18         So we still need to get the privilege log.  And also,

19  you know, reserve the right to recall any witnesses in light of

20  what we find in the privilege log, or in the documents that    10:53:04

21  were produced to us late by Corizon, which we are still in the

22  process of reviewing.

23         The other item I would just want to raise for the

24  Court is that today at 9:02 a.m. we were given these 75

25  exhibits from defendants for today's hearing on the OSC and the 10:53:25

─── CV-12-601-PHX-DKD - February 28, 2018 ───

1  contempt.  We have endeavored to go through them as quickly as

2  possible, since we received them about an hour ago.

3        But again, we may need to reserve the right to recall

4  any of defendant' witnesses for cross-examination in light of

5  what is in the late-produced documents.                    10:53:44

6        THE COURT:  I see.  I understood everything that you

7  said.

8        With respect to the privilege log, where do we stand

9  on that?

10       MS. LOVE:  Your Honor, prior to this hearing David     10:53:52

11 Fathi and I had discussions via e-mail that obviously due to

12 the onerous production that we were diligently to get out, that

13 we were still working on the privilege log, could not get that

14 done before the hearing.  We endeavor to get that done in the

15 next ten to 14 days.                                        10:54:11

16       And we did agree that if there were any issues that

17 required recall of witnesses and continued evidentiary hearing,

18 we're fine with that.

19       THE COURT:  So at the very worst it's 14 days from

20 today?                                                      10:54:22

21       MS. LOVE:  Yes, Your Honor.

22       MS. KENDRICK:  Your Honor, in light of the fact that

23 we're resuming the hearing in less than 14 days, we would ask

24 that it be produced in seven days.

25       THE COURT:  Thank you.  I appreciate that.            10:54:30

1          We do have this problem that we have this next

2     hearing, and so I think I'm going to have to impose that

3     requirement.

4          So by the close of business next week that's when the

5     privilege log has to be produced.                              10:54:46

6          MS. KENDRICK:  What day next week, sir?

7          THE COURT:  Close of business last day.

8          MS. KENDRICK:  So Friday?

9          THE COURT:  Friday, yes.

10         MS. KENDRICK:  Thank you.

11         THE COURT:  All right.  Ready to call Mr. Upton in?

12         MS. EIDENBACH:  Yes, Your Honor, we are ready.

13         THE COURT:  Where is he?

14         MS. EIDENBACH:  He is right back there with the

15    marshals.                                                      10:55:07

16         THE COURT:  Okay.  Thank you.

17         So do you know how to let them know that we're ready?

18         Okay.  Thank you.

19         Mr. Upton, we have a couple of stairs here.  I don't

20    know whether you feel comfortable making your way up to them.  10:55:51

21    Do you think you can?

22         THE WITNESS:  I can.

23         THE COURT:  Thank you.  Have a seat.

24         THE WITNESS:  Thank you.

25         THE CLERK:  Can you please raise your right hand?         10:56:08

UNITED STATES DISTRICT COURT

─────────── **William Upton - Direct Examination** ───────────

1          THE WITNESS:  Pardon.

2          THE CLERK:  Can you please raise your right hand?

3      (WILLIAM UPTON, PLAINTIFF WITNESS, SWORN.)

4          THE CLERK:  Thank you.

5          THE COURT:  Mr. Upton, before we start, can I lean     10:56:24

6   across and move the microphone closer to you there?

7          THE WITNESS:  Okay.  Thank you.

8          THE COURT:  Thank you.

9          Miss Eidenbach, you may proceed.

10          MS. EIDENBACH:  Your Honor, before we begin, may I    10:56:36

11   approach and pour Mr. Upton a glass of water?  He's just

12   finished a chemotherapy round and I want to make sure --

13          THE COURT:  Surely.

14          And while you're doing that, I'll also say, sir, you

15   probably, because of your experience in life, have learned one  10:56:49

16   of the lessons that's known to everybody in this courtroom, and

17   that is, we rarely get to things when we say we're going to get

18   to things.  And so that meant that you had to wait, and I'm

19   sorry about that.

20          THE WITNESS:  Thank you.                               10:57:05

21                      DIRECT EXAMINATION

22   BY MS. EIDENBACH:

23   Q.  Are you good?

24   A.  Yes.

25   Q.  Good morning.                                            10:57:26

William Upton - Direct Examination

| | |
|---|---|
| 1 | A.  Good morning. |
| 2 | Q.  Can you please state your name for the record? |
| 3 | A.  William Larry Upton. |
| 4 | Q.  Will you spell your last name for us? |
| 5 | A.  U-P-T-O-N. |

10:57:37

6  Q.  And are you currently incarcerated in the state of Arizona?

7  A.  Yes.

8  Q.  What is your number assigned to you by the Arizona

9  Department of Corrections?

10 A.  128149.

10:57:50

11 Q.  How long have you been in custody?

12 A.  A little over 20 years.

13 Q.  And where are you currently housed?

14 A.  South Unit.

15 Q.  Where is that located?

10:58:05

16 A.  It's in the Florence Complex.

17 Q.  And is that in Florence, Arizona?

18 A.  Yes.

19 Q.  How are you doing today?

20 A.  I'm doing a little better.

10:58:19

21 Q.  Good.

22       And what time did you arrive here at the courthouse,

23 do you know?

24 A.  Pardon?

25 Q.  What time did you arrive here this morning?

10:58:32

William Upton - Direct Examination

```
1   A.  I believe it was 8:30.  No, it was 7:30.

2   Q.  Okay.  Did you get all of your medications this morning?

3   A.  Yes.

4   Q.  Did you eat breakfast prior to coming here this morning?

5   A.  No, I did not.  I don't like to eat before I go on a day    10:58:53

6   trip.

7   Q.  Were you offered breakfast though?

8   A.  Yes.

9   Q.  Did any of your property get removed before you were

10  transported here --                                             10:59:06

11  A.  No.

12  Q.  -- from your cell?

13  A.  No, just my KOP.

14  Q.  So you brought your KOP medications with you?

15  A.  Right.                                                      10:59:14

16  Q.  Okay.  And how did you bring those with you?

17  A.  I hand carried them.  They're out in the van.

18  Q.  And do you know whether you'll be eating lunch before you

19  go back?

20  A.  Yes.                                                        10:59:34

21  Q.  You will?  Okay.  Great.

22          Do you have any concerns about testifying today?

23  A.  No.  I'll just be glad when it's over.

24  Q.  Well then, we'll get going.

25          Mr. Upton, do you have any current medical conditions?  10:59:45
```

UNITED STATES DISTRICT COURT

William Upton - Direct Examination

1    A.   Yes.  I have cancer.

2    Q.   Do you know what kind of cancer?

3    A.   It's been diagnosed as small cell B lymphoma.

4    Q.   And when were you diagnosed with small cell B lymphoma?

5    A.   In November of 2015.                                11:00:19

6    Q.   And we'll come back more specifically to your cancer in a

7    moment.

8            Do you have any other medical diagnoses?

9    A.   I have anemia.

10   Q.   I'm sorry, could you repeat that?                   11:00:36

11   A.   Anemia.

12   Q.   Okay.  And anything beyond your anemia?

13   A.   Pardon?

14   Q.   Do you have any other medical conditions?

15   A.   No, just a disabled hand from broken bones.         11:00:49

16   Q.   And when did you have broken bones?

17   A.   August 2016.

18   Q.   Are you hard of hearing?

19   A.   Yes.

20   Q.   Okay.  I just want to say that so that as we progress   11:01:11

21   through the hearing everybody is aware of that and we make sure

22   you hear what our questions are.

23   A.   Good.  Thank you.

24   Q.   So if at any point you cannot hear me or understand me,

25   please let me know, and do the same with the other people who   11:01:24

William Upton - Direct Examination

1   will be questioning you.

2   A.   Okay.

3   Q.   Okay?

4        You mentioned that you had a broken arm or hand that

5   occurred?  Do you know which part of your arm or hand was                11:01:40

6   broken?

7   A.   It was a double fracture in the forearm wrist area.

8   Q.   And how did that happen?

9   A.   I fell at work at Arizona Correctional Industries.

10  Q.   And when you sustained the injury, did you receive                  11:02:02

11  treatment for it?

12  A.   Only X-rays and five sessions of physical therapy.

13  Q.   Were you examined?

14  A.   Pardon?

15  Q.   Were you examined by a provider or a nurse?                         11:02:21

16  A.   No.

17          THE COURT:  Miss Eidenbach, can I interrupt for just a

18  moment?

19          MS. EIDENBACH:  Of course.

20          THE COURT:  I want to address, sir, the Department of            11:02:34

21  Corrections officers who are here with you today.  I notice

22  that they're standing here.  I just wanted to invite them, if

23  it's permissible under their rules, to sit.  The U.S. Marshals,

24  the deputy U.S. Marshals who are in the courtroom when we have

25  in-custody defendants, do routinely sit.                                11:02:50

─── **William Upton - Direct Examination** ───

1      So if you'd like to sit in the jury box right there,

2  if that's permissible under your rules, feel welcome to do so.

3  But do whatever you'd like to do.

4      Thank you.

5      CORRECTIONS OFFICER:  Thank you.  Appreciate it.          11:03:02

6  BY MS. EIDENBACH:

7  Q.  Okay.  So you just testified that you did not receive an

8  examination at the time that you sustained the fracture to your

9  wrist.

10  A.  No, only X-rays.                                          11:03:14

11  Q.  Did you receive the results of the X-rays?

12  A.  Did I see them?

13  Q.  Did you receive them?  Did anybody tell you what they were?

14  A.  Only the follow-up X-rays three weeks after the break.

15  Q.  Go ahead.                                                 11:03:36

16  A.  They said they weren't -- that it wasn't healing properly.

17  Q.  Okay.  At the time of the initial set of X-rays, did you

18  get a splint or a cast, anything of that sort?

19  A.  They gave -- they put what they call a sugar-tong splint.

20  Q.  Can you describe for us what that looks like?             11:03:59

21  A.  It wraps around the elbow and goes down to the hand.

22  Q.  And did it immobilize your fracture, your arm?

23  A.  Yeah.  The splint self hardened.

24  Q.  Okay.  And how long did you wear the splint?

25  A.  Two months.                                               11:04:24

UNITED STATES DISTRICT COURT

─────William Upton - Direct Examination─────

1    Q.   Was it comfortable or uncomfortable?

2    A.   Very uncomfortable.

3    Q.   Did you let anybody know how uncomfortable it was?

4    A.   Yes.

5    Q.   Who?                                                      11:04:36

6    A.   I let the Nurse Practitioner Denehy know.  And I asked for

7    a cast.

8    Q.   And what was the response that you got?

9    A.   He denied approving a cast.

10   Q.   Okay.                                                     11:04:56

11   A.   And he's the one that told me to take the splint off after

12   two months.

13   Q.   You mentioned that you received five physical therapy

14   sessions for your wrist?

15   A.   Yes, between February and April.                          11:05:08

16   Q.   Did you find those helpful?

17   A.   Slightly.

18   Q.   Okay.  After you fractured your wrist and had it set in the

19   splint, were you in pain?

20   A.   Severe pain.                                              11:05:29

21   Q.   And how long would you say that pain lasted?

22   A.   Four months.

23   Q.   Did you report how much pain you were in to anybody?

24   A.   Yes.  And I even cried in front of the nurses.

25   Q.   And what was the response that you got?                   11:05:43

UNITED STATES DISTRICT COURT

William Upton - Direct Examination

1   A.  They prescribed me Ibuprofen or Motrin.

2   Q.  And that was it?

3   A.  Yes.

4   Q.  Okay.  Now you mentioned earlier a set of follow-up X-rays

5   that occurred later; is that correct?                          11:05:58

6   A.  Right.

7   Q.  Okay.  When you had the follow-up X-rays, you mentioned

8   that you were told the bone wasn't healing correctly.  Who told

9   you that?

10  A.  Nurse Practitioner Denehy.                                  11:06:12

11  Q.  And were you made aware of any additional treatment that

12  was going to be ordered as a result of the follow-up X-rays?

13  A.  He said that he would make an appointment with an

14  orthopedic surgeon.

15  Q.  Did you ever see an orthopedic surgeon?                     11:06:37

16  A.  No.

17  Q.  So it's now been a little while since you sustained the

18  fracture.  Do you have any lasting effects as a result of the

19  fracture?

20  A.  I have nerve damage in my hand.  My hand is partially numb, 11:06:51

21  and I can't make a fist.

22  Q.  Do you still experience pain beyond the numbness?

23  A.  There's not much pain.

24  Q.  So it's just numb?

25       (Court reporter interruption.)

—————William Upton - Direct Examination—————

1        MS. EIDENBACH:  I'll reask.

2        THE COURT:  Thank you.

3   BY MS. EIDENBACH:

4   Q.  So at this point your arm is just numb?

5   A.  My hand.  Yeah, there's nerve damage.                    11:07:30

6   Q.  Thank you.

7        Now I'd like to turn back to your cancer diagnosis.

8        You told us that you were diagnosed specifically with

9   small cell B lymphoma in November of 2015; is that right?

10  A.  Right.                                                   11:07:51

11  Q.  Okay.  At that time did you see an oncologist?

12  A.  Yes.  The first doctor diagnosed me with multiple myeloma,

13  that's what he thought it was.  It was a doctor in South Unit

14  in September 2015.

15       And he -- he referred me -- he came to that conclusion   11:08:11

16  after reviewing lab results of a blood sample.  And he referred

17  me to an oncologist.

18  Q.  And did you see the oncologist?

19  A.  Yeah, it was Dr. Rakkar at the Palo Verde Medical Center.

20  Q.  Okay.  And when you saw Dr. Rakkar, what kind of treatment  11:08:34

21  were you -- did he discuss with you?

22  A.  The first consult I had with him he ordered a bone marrow

23  biopsy.

24  Q.  And did you get a bone marrow biopsy?

25  A.  Yes, I did.                                              11:08:55

William Upton - Direct Examination

1    Q.  And did you receive the results of that bone marrow biopsy?

2    A.  Yeah.  That's when he diagnosed small cell B lymphoma.

3    That was in November of 2015.

4    Q.  Were you made aware of a treatment plan that resulted from

5    the results of the bone marrow biopsy?                              11:09:10

6    A.  I believe so.  I don't clearly remember, but he talked

7    about eight weekly treatments using a drug called Rituxan.

8    Q.  Did you receive those eight weekly treatments?

9    A.  Yes, starting in December of 2015.  And they ended in

10   February of 2016.                                                   11:09:44

11   Q.  And when you talk about a weekly treatment, what did that

12   entail?  What was it like for you?

13   A.  Well, the first treatment was supposed to be a six-hour

14   dose infusion by I.V., but they had to abort half of it because

15   of the adverse reactions I suffered.                               11:10:09

16   Q.  What symptoms did you experience as a result of the first

17   treatment that you received?

18   A.  I experienced chills, fever, rigors, tremors, nausea,

19   diarrhea, and joint pain.

20   Q.  Did you experience these same symptoms on the later           11:10:30

21   treatments?

22   A.  Yes, I did.  The first -- the next series of treatments, I

23   experienced those symptoms the first two treatments.

24   Q.  But the rest of the eight weekly treatments you didn't

25   experience the same symptoms; is that right?                       11:10:48

UNITED STATES DISTRICT COURT

1    A.   No, the rest -- the rest of the treatments I didn't.

2    Q.   So you received all eight of the treatments ordered for

3    that first session of chemotherapy?

4    A.   Right.

5    Q.   And did these treatments have an affect on you?                    11:11:02

6    A.   They did for about two months.

7    Q.   And what was that effect?

8    A.   My appetite returned, some of my strength returned.

9    Q.   So you felt a little better?

10   A.   I felt a little better.                                           11:11:24

11   Q.   You said that you felt better for about two months, which

12   puts us at about April 2016.  Does that sound right to you?

13   A.   Yeah, my symptoms started coming back by May of 2016 -- or

14   April of 2016.

15   Q.   And what were those symptoms?  How did you feel?                   11:11:45

16   A.   I felt sickly, loss of appetite, sickliness, and fatigue.

17   Q.   Did you report these symptoms to anyone?

18   A.   Yes, to the oncologist when he had a follow-up consult in

19   May.

20   Q.   And were you made aware of a treatment plan that he wanted         11:12:09

21   to implement as a result of your symptoms?

22   A.   Not in May.  He told me that he would see me again in three

23   months.

24   Q.   Did you see him again in three months?

25   A.   In September.                                                      11:12:28

UNITED STATES DISTRICT COURT

─────William Upton - Direct Examination─────

1   Q.  And what happened at the three-month follow-up in

2   September?

3   A.  He told me on September 22nd that he would have me back for

4   another series of treatments.  And on September 26th he had me

5   brought back.  His nurse put an I.V. in, she went out to talk                11:12:53

6   to Dr. Rakkar, and came back about 20 minutes later and said

7   Corizon had not approved the treatments, and she pulled the

8   I.V. out and we came back.

9   Q.  So you did not receive a treatment that day?

10  A.  No.                                                                        11:13:19

11  Q.  After the trip to the oncologist where you did not receive

12  a treatment, did you continue to experience your symptoms?

13  A.  Yes.  Progressively worse.

14  Q.  Tell us how they were getting worse.

15  A.  I became -- by 2017 I became extremely weak.  And I was            11:13:41

16  losing weight.  I had loss of appetite.  I had to force myself

17  to eat.

18  Q.  Did you report these increased symptoms to anyone?

19  A.  Yes.

20  Q.  Who?  Who did you report them to?                                     11:14:02

21  A.  The reported it to the medical through HNRs.  And I also

22  filed a number of grievances.

23  Q.  And did you get treatment for the -- either the cancer or

24  the increase in your symptoms at that time?

25  A.  No.  It was over one year before I received any more            11:14:32

UNITED STATES DISTRICT COURT

1    treatments.

2    Q.  When did you receive your next treatment?

3    A.  April and May of 2017.

4    Q.  So just to make sure we're on the right page here in terms

5    of dates, the last treatment that you had received had been in          11:14:53

6    April of 2016; is that right?

7    A.  Right.

8    Q.  And then you didn't --

9    A.  2016; right.  Yeah.  No, no, it was 2017.

10   Q.  I'm sorry.  Actually your last treatment was February of           11:15:11

11   2016, and your symptoms returned in April of 2016.  Is that

12   right?  That's what you testified earlier.

13   A.  Let's see.

14   Q.  Take your time.

15   A.  Yeah, 2016.  My first series was over in February of 2016.          11:15:28

16   And I didn't receive the next series until 2017.

17   Q.  Correct.  Okay.  Good.

18   A.  In April and May.

19   Q.  And when you began treatment again in 2017, what kind of

20   treatment did you receive?                                             11:15:55

21   A.  I received the same drug, Rituxan, four weekly treatments.

22   Q.  And did you experience side effects as a result of that

23   chemotherapy session?

24   A.  Yes.  The first two treatments I experienced the same side

25   effects that I did in the first -- in the eight-week treatment.        11:16:13

306

William Upton - Direct Examination

1  Q.  And what about the last two treatments?

2  A.  No, I didn't experience side effects.

3  Q.  When you had completed this course of chemotherapy, did you

4  feel better again?

5  A.  Yes, I did.                                              11:16:33

6  Q.  And how long did you feel better for?

7  A.  About six weeks.

8  Q.  And when you started to not feel good again, what symptoms

9  did you experience?

10  A.  Loss of appetite, sickliness, extreme fatigue.           11:16:48

11  Q.  Did you report this to anyone?

12  A.  Pardon?

13  Q.  Did you report this to anyone, how were feeling?

14  A.  Yes.

15  Q.  Who?                                                     11:17:03

16  A.  I reported it -- I reported it to quite a few medical

17  staff.  I filed my grievances.

18  Q.  Were the medical staff responsive to your reports?

19  A.  No, they didn't -- they didn't -- they kept denying

20  approval of any further treatments.                         11:17:32

21  Q.  Did you receive any treatment specifically for the symptoms

22  themselves to help you just feel better?

23  A.  No.

24  Q.  So you --

25  A.  They did sometimes get -- the nurse practitioner sometimes  11:17:45

─── **William Upton - Direct Examination** ───

1    gave me ALA if I was too weak.  And they prescribed me naproxen

2    for pain, but I didn't have that much pain.  And they did give

3    me special diet.

4    Q.  So when your symptoms started returning and you had

5    reported it to medical staff, did you see an oncologist again?          11:18:31

6    A.  Yes.

7    Q.  Do you remember when?

8    A.  I believe it was -- I believe it was in August of 2017

9    they -- a nurse practitioner named Grafton referred me to

10   another oncologist named Dr. Goldfarb.                                   11:19:10

11   Q.  So in August the referral was made.  When did you actually

12   see Dr. Goldfarb?

13   A.  I believe it was in August --

14   Q.  Okay.

15   A.  -- the first time.                                                   11:19:24

16   Q.  And was there a second time that you saw Dr. Goldfarb?

17   A.  Yes, I saw him -- I had another consult with him

18   in -- let's see, did I say August?  Maybe it was -- I had a

19   consult with him in September.

20   Q.  Okay.  So it was later in the Fall of 2017?                          11:19:47

21   A.  Right.

22   Q.  Okay.  And during your second consult with Dr. Goldfarb --

23   A.  No, no, it was November.

24   Q.  Okay.  The second consult was in November?

25   A.  Right.                                                               11:20:03

William Upton - Direct Examination

```
 1   Q.  Okay.  Good.

 2         And so at that appointment did you receive any test

 3   results or a treatment plan?

 4   A.  Dr. Goldfarb looked at the lab results of a blood sample,

 5   and he said that my blood proteins were out of control.  He was    11:20:22

 6   visibly alarmed.  He said that he needed to get a bone marrow

 7   biopsy right away, and I needed to start treatments

 8   immediately.

 9         And when he made his report to South Unit medical, he

10   issued a medical emergency.                                          11:20:45

11   Q.  Did you start treatment at that time?

12   A.  No.

13   Q.  And were you transported back to South Unit the same day?

14   A.  Yes.

15   Q.  When you arrived back at South Unit, did you go to the          11:21:00

16   medical unit before returning to your house?

17   A.  Yes.  I went through what they call doctors line and saw

18   Nurse Practitioner Igwe.

19   Q.  And what happened when you met with Nurse Practitioner

20   Igwe?                                                                11:21:19

21   A.  She laid the -- Dr. Goldfarb's report in front of me and

22   changed "medical emergency" to "urgent."  And I protested and I

23   said, what about the emergency?  And she said, I'm restricted.

24   Q.  You mentioned that Dr. Goldfarb ordered a bone biopsy for

25   you.                                                                11:21:47
```

1    A.   Yes.   The bone marrow biopsy was done the day before

2    Thanksgiving.

3    Q.   Okay.   So you did receive it?

4    A.   Pardon?

5    Q.   You did receive it?                                      11:21:57

6    A.   Yes.

7    Q.   And did you receive the results?

8    A.   I believe the results were available December 12th, but

9    every time I would talk to the Nurse Practitioner Igwe, for

10   three weeks after that she said she couldn't do anything until  11:22:21

11   the results were available.   And I told her that I knew the

12   results had already -- were already available I believe

13   December 12th.   But she didn't -- she said she didn't have

14   them.

15   Q.   So your bone marrow biopsy was the day before Thanksgiving.  11:22:44

16   A.   Right.

17   Q.   How were you feeling at that point?

18   A.   Right after Thanksgiving I began having serious nose

19   bleeds, and they had to send me to the ER at Florence Hospital

20   because I had a nose bleed for two days.   They sent me on      11:23:08

21   Saturday, November 25th.

22   Q.   And once you were at the emergency room were they able to

23   stop the bleeding?

24   A.   The ER doctor was unable to stop the bleeding.   And

25   unbeknownst to me he stuffed some gauze up my nose, but he      11:23:28

1   said -- he said he just put some medication up my nose, so I

2   didn't know the gauze was up there.

3   Q.  And did the bleeding stop when the medication was put in

4   your nose?

5   A.  No.  It stopped on the following Monday.                    11:23:54

6   Q.  So once you had the medication put in your nose, were you

7   returned to the prison yard?

8   A.  Yes.  He put a nose clip on my nose, and I had to lay in

9   the ER for about two hours.  And then he told me to leave the

10  clip on until -- until midnight.                                11:24:17

11  Q.  And did you do that?

12  A.  Yes.

13  Q.  And when you removed the clip, was the bleeding stopped?

14  A.  The bleeding didn't stop until Monday.

15  Q.  Monday.  Okay.                                              11:24:31

16        And when you returned from the ER, did you stop by the

17  medical unit?

18  A.  Yes.  They had to check vitals.

19  Q.  And --

20  A.  We got back late, so we went through the Central Health     11:24:46

21  Unit.

22  Q.  Okay.  And did you receive any follow-up with the medical

23  staff at the prison about your nose bleed?

24  A.  No.  But I put in emergency HNRs because I continued to

25  have nose bleeds.  And I told the nurse practitioner I needed   11:25:09

William Upton - Direct Examination

1    to see -- and I told the nurses I needed to see an ENT

2    specialist.

3    Q.  Did you go to medical the Monday after your return to see

4    medical about your nose bleed?

5    A.  Yes, I believe so.                                              11:25:32

6    Q.  And what happened at that time?

7    A.  Nothing.

8    Q.  Were you seen?

9    A.  Pardon?

10   Q.  Were you seen?                                                  11:25:44

11   A.  Yes.

12   Q.  By whom?

13   A.  I don't remember.

14   Q.  Okay.  But it was a nurse or a nurse practitioner?

15   A.  Right.                                                          11:25:52

16   Q.  How many nose bleeds have you had since your first one?

17   A.  Probably half a dozen.

18   Q.  And how long do they last?

19   A.  They last anywhere from a few hours to a day.

20   Q.  Now, after your visit to the emergency room for your           11:26:13

21   initial nose bleed, how were you feeling?

22   A.  I became very sick.

23   Q.  In what way?

24   A.  I became very sick throughout most of December.

25   Q.  What were your symptoms?                                        11:26:33

UNITED STATES DISTRICT COURT

William Upton - Direct Examination

1   A.  My throat became severely infected and I had great

2   difficulty breathing.  I had to sleep sitting up.

3   Q.  Did you report these symptoms to the medical staff at the

4   prison?

5   A.  Yes.                                                    11:26:52

6   Q.  And what was their response?

7   A.  I believe it was after two weeks they prescribed -- I told

8   them I -- I lost my voice for over two weeks, and they

9   prescribed some antibiotic for my throat.

10  Q.  And after the antibiotic was prescribed, did you get the   11:27:11

11  medication?

12  A.  About a week later.

13  Q.  And you took it?

14  A.  Yes.

15  Q.  Did it help?                                             11:27:20

16  A.  Yes.

17  Q.  Did you see any other medical provider about your throat

18  infection or your nose bleeds after your visit to the emergency

19  room?

20  A.  I didn't see -- I don't think I saw a nurse practitioner.   11:27:35

21  And when I did see her about a nose bleed, she didn't do

22  anything.

23  Q.  Were you ever sent to an EMT?

24  A.  One month after the first nose bleed they sent me to an

25  ENT, and she -- the first thing she did was look up my nose and   11:27:57

1   found that gauze that had been up there for one month.

2   Q.  And when she found that gauze, did she remove it?

3   A.  She pulled it out, and then she cauterized my right

4   nostril.

5   Q.  Had anybody at the Department of Corrections ever looked in    11:28:17

6   your nose?

7   A.  Pardon?

8   Q.  Had anybody at -- in the prison medical unit ever looked up

9   your nose?

10  A.  Nurse Igwe did.                                               11:28:30

11  Q.  While the gauze was in there?

12  A.  Uh-huh.

13  Q.  Okay.  And didn't see it?

14  A.  They didn't see it.

15          No, I think it was Nurse Ship.  She looked up there      11:28:41

16  but she didn't see it.

17  Q.  And with the gauze removed and the antibiotics, did your

18  throat clear up?

19  A.  Yes.

20  Q.  And did your voice come back?                                 11:28:52

21  A.  Yes.

22  Q.  Which is helpful, because you're here today.

23          So during the time that you were sick, were you

24  receiving any chemotherapy or treatment for your cancer?

25  A.  No.                                                           11:29:08

UNITED STATES DISTRICT COURT

314

William Upton - Direct Examination

1   Q.   When did you next see Dr. Goldfarb?

2   A.   My next consult was in January of this year.  And it was a

3   different oncologist, Dr. Monique Chang.

4   Q.   And when you saw Dr. Chang, did she start you on treatment

5   again?                                                          11:29:38

6   A.   She reviewed my medical history and she said she needed to

7   get some PET scans.

8   Q.   Did you get a PET scan?

9   A.   Yes.

10  Q.   Did you receive the results of the PET scan?            11:29:55

11  A.   Dr. Chang said it -- my spleen was enlarged and I had a

12  nodule on my left lung.

13  Q.   And did she discuss with you any further testing that might

14  be necessary because of those results?

15  A.   Yes.  She discussed what she called a four cycle and four    11:30:21

16  treatment plan.  And that began this month.

17  Q.   February of 2018?

18  A.   Yes.

19  Q.   So the first treatment, can you tell us what you received?

20  A.   I believe that was February 6th.                         11:30:47

21  Q.   And what -- was it an infusion or an injection?

22  A.   It was an injection in the back of my right arm.  And the

23  nurse -- I asked her what she injected me with, and she said a

24  combination of Rituxan and Velcade.

25  Q.   Okay.  And then tell us about your third treatment.     11:31:10

William Upton - Direct Examination

1    A.   The second treatment was, I believe it was just Velcade.

2          And the third treatment, before I arrived I had had

3    problems bleeding through the nose and through the anus, and

4    when I told the nurse about it, she went to talk to Dr. Chang,

5    and decided to abort the treatment because of the bleeding.          11:31:49

6    And that was February 9th.

7    Q.   Did you receive that treatment subsequently?

8    A.   I believe they doubled up on the last treatment, which was

9    February 12th.  I believe that -- because -- because I received

10   a four-hour infusion of Rituxan, plus she gave me an injection    11:32:21

11   of Velcade in my stomach area.

12   Q.   You mentioned that prior to the third treatment that you

13   were experiencing anal bleeding and also nose bleeding again.

14          In terms the nose bleeding, was it the same amount

15   of blood you were used to seeing or more blood?                    11:32:48

16   A.   About the same amount.

17   Q.   And what about the anal bleeding?

18   A.   I assume that that was a result of the treatment I had

19   received, because along with it I suffered constipation.

20   Q.   Did you receive any treatment for those symptoms that you    11:33:09

21   were experiencing?

22   A.   No.

23   Q.   But you did report them to medical staff at the prison?

24   A.   Yes.

25   Q.   And after you reported them, did the prison staff follow up   11:33:20

UNITED STATES DISTRICT COURT

──── **William Upton - Direct Examination** ────

1   to make sure that the bleeding had stopped?

2   A.  No.

3   Q.  So as far as you know you've now completed this most recent

4   session of chemotherapy; is that right?

5   A.  Right.                                                              11:33:42

6   Q.  And how are you feeling?

7   A.  I'm feeling better.

8   Q.  Good.

9          Now, throughout your testimony we've talked about

10  several spans -- significant spans of time where you didn't       11:33:56

11  receive chemotherapy, the most prolonged being between February

12  2016 and April of 2017.

13         And tell us about the impact of that lap -- that delay

14  in treatment in terms of how you felt.

15  A.  Well, I think those treatments were too few and far           11:34:18

16  between, and especially when I went for treatment, without it,

17  over a year.  I became progressively more sickly and extremely

18  weak, so weak I could barely walk to the chow hall for meals.

19         And so -- and also I think it made the next series of

20  treatments cause more adverse reactions.  The adverse reactions   11:34:59

21  were more severe, I think, because of that delay.

22  Q.  Now, you mentioned that you sometimes were almost too weak

23  to make it to chow to eat.  Did you report this difficulty to

24  ADC staff?

25  A.  Yes, I did.  And Nurse Practitioner Igwe finally in           11:35:23

─────────── **William Upton - Direct Examination** ───────────

1  February she issued a three-month lay in.

2  Q.  And that's February of 2018?

3  A.  Right.

4         MS. EIDENBACH:  Your Honor, that's all that I have at

5  this point.                                                    11:35:52

6         Mr. Upton, thank you so much.

7         THE COURT:  Mr. Upton, the lawyers -- the lawyer for

8  the defendants will have an opportunity to ask questions now.

9         Are you doing okay?  Do you need to take a drink or

10  are you all right?                                            11:36:06

11         THE WITNESS:  I'm doing okay.  I'll take a drink of

12  water.  I'm just a little chilled.

13         MS. EIDENBACH:  Do you need a refill, Mr. Upton?  I

14  can come fill your water before I sit down.

15         Do you need more water?                                11:36:15

16         THE WITNESS:  No, I'm good.  Thank you.

17         MS. EIDENBACH:  Okay.  Great.

18         MS. LOVE:  Your Honor, defendants have no questions.

19         THE COURT:  All right.  Thank you.

20         Mr. Upton, thank you very much for coming in today    11:36:51

21  pursuant to the Court's requirement.  I appreciate that.  And

22  I'm sorry again for the delay that was associated with --

23         THE WITNESS:  Thank you for having me as a witness,

24  Your Honor.

25         THE COURT:  Thank you, sir.                            11:37:03

UNITED STATES DISTRICT COURT

```
 1          And be careful going down.  Take your time and hold on
 2   to the banister there.
 3          THE WITNESS:  Okay.
 4          THE COURT:  So now the schedule would call for us to
 5   turn to the order to show cause portion of what we had            11:37:41
 6   scheduled, and we can do that taking advantage of these 20
 7   minutes, or I can propose an alternative of us taking our hour
 8   lunch break now and coming back at a time if it works for
 9   everybody's schedule a little bit earlier than the 1:00 o'clock
10   hour.                                                             11:38:01
11          I'll ask you all what your thoughts are.
12          MR. FATHI:  Your Honor, plaintiffs would prefer to
13   break now.
14          THE COURT:  And defendants?
15          MR. STRUCK:  That's fine with us.                          11:38:08
16          THE COURT:  All right.  Let me check with the court
17   reporter and court staff.
18          All right.  So let's do this, let's take an hour
19   break, we'll come back at a quarter to 1:00, and resume at that
20   point.                                                           11:38:22
21          MR. STRUCK:  And I do want to mention one thing.  It
22   was our understanding that this witness was called by
23   plaintiffs in the order to show cause hearing.
24          THE COURT:  You're right.  I mean, that's exactly fair
25   to say.  So if I was loose in the language in what I said we     11:38:34
```

─── **CV-12-601-PHX-DKD - February 28, 2018** ───

1    were doing.  This is exactly -- as my text only minute order

2    indicated, it was of some interest to me on both subjects.  But

3    it was called primarily for the purpose of the order to show

4    cause hearing.

5            All right.  Thank you all.                                    11:38:53

6        (Recess at 11:38 a.m., until 12:48 p.m.)

7            THE COURT:  Thank you, please be seated.

8            MR. FATHI:  Your Honor, may we discuss scheduling the

9    continued hearing?

10           THE COURT:  Yes.                                              12:48:37

11           MR. FATHI:  After we talked about March 12th,

12   plaintiffs realized that that actually does not work for three

13   of us.  So we talked to defendants, and they have graciously

14   agreed to do it on March 26th and 27th, if the Court could give

15   us either or both of those days.                                     12:48:53

16           And I apologize, I know the Court already moved

17   something in reliance on the 12th.

18           THE COURT:  Well, and it's further complicated beyond

19   that, because on the latter dates in March I'm presently

20   scheduled to be on criminal duty.  And I don't know whether        12:49:05

21   there's somebody else to cover that duty on such late notice.

22   So that's difficult.

23           I can explore that possibility and then get back to

24   you all, and see whether or not we can adopt those dates or

25   whether we'll have to look for another date.                        12:49:27

David Robertson - Direct Examination

```
 1          MR. FATHI:  Thank you, Your Honor.  And apologies for
 2    the confusion.
 3          MR. STRUCK:  And the one other issue is, if we do end
 4    up with those dates on the 26th and 27th, Dr. Stewart, who we
 5    need to have testify, the plaintiffs have agreed, if the Court     12:49:40
 6    is amenable, to have him testify on the 14th, which is the
 7    regularly scheduled date for the status conference.
 8          THE COURT:  And that's acceptable to me.
 9          I'll get back to you as soon as I can on this.
10          Miss Kendrick.                                               12:49:55
11          MS. KENDRICK:  Thank you, sir.
12          Plaintiffs call Dr. David Robertson.
13          THE COURT:  Would you please step forward to the clerk
14    of the court to be sworn.
15          THE CLERK:  Please raise your right hand.                    12:50:09
16       (DAVID ROBERTSON, PLAINTIFF WITNESS, SWORN.)
17          THE CLERK:  Thank you.  Please have a seat.
18                    DIRECT EXAMINATION
19    BY MS. KENDRICK:
20    Q.  Hello.  Good afternoon.                                        12:50:30
21    A.  Hi.
22    Q.  How are you doing?
23    A.  A little nervous.
24          THE COURT:  Sir, you can pull the microphone -- it's
25    not attached to the desk -- closer, it will help everybody.       12:50:35
```

David Robertson - Direct Examination

```
 1              THE WITNESS:  I can throw my voice really well, too.

 2              THE COURT:  Thank you very much.

 3  BY MS. KENDRICK:

 4  Q.  Could you please state your name for the record?

 5  A.  David Robertson.                                          12:50:45

 6  Q.  And with whom are you employed?

 7  A.  I'm employed by the State of Arizona, Department of

 8  Corrections.

 9  Q.  And what is your job title, sir?

10  A.  I am a physician monitor.  I'm on the Monitoring Board.    12:50:55

11  Q.  And to whom do you report?

12  A.  I report to Richard Pratt.

13  Q.  And does anybody report to you?

14  A.  People don't report to me directly in my position.  I

15  accept information from people in the field and respond.       12:51:11

16  Q.  Okay.  And can we take a step back and talk about your

17  background.

18              Where did you get your medical training?

19  A.  I did my medical training at the Arizona School of

20  Osteopathy at Midwestern University.  I graduated in 2005.     12:51:25

21  Q.  Okay.

22  A.  And I did three years of burn and trauma at Maricopa

23  Medical Center.  And I did a year psychiatry at the Queens

24  Medical Center in Honolulu.

25  Q.  And did you complete --                                    12:51:41
```

David Robertson - Direct Examination

```
 1   A.   I never completed residency.

 2   Q.   And are you board certified in any specialties?

 3   A.   No, ma'am.

 4   Q.   Okay.  Are you licensed by NCCHC?

 5   A.   No.                                                   12:51:50

 6   Q.   Okay.  And when did you start working for the Arizona

 7   Department of Corrections?

 8   A.   October of 2009.

 9   Q.   And there's a pitcher of water there.

10   A.   Oh, thanks.                                           12:52:01

11   Q.   And when you were hired by D.O.C. in October of 2009, for

12   what position was that?

13   A.   I was a staff position at the Tucson Complex.

14   Q.   And then when did you become the physician monitor for the

15   monitoring program?                                       12:52:18

16   A.   When they privatized.

17   Q.   So that would be July 2012?

18   A.   '13?

19   Q.   '13?

20   A.   Yeah.                                                 12:52:28

21   Q.   Since the privatization.

22   A.   Yeah, since -- yeah, since the initial privatization.

23   Q.   So you were a monitor when Wexford still had the contract?

24   A.   Yes.

25   Q.   What is your job description?                         12:52:38
```

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    A.  Oh, I have multiple duties, as assigned.

2         I am on the Monitoring Board, of course.  And my

3    principal purpose for being on the Monitoring Board is I do

4    more at reviews.  I am involved in the audit process for one of

5    the Performance Measures.  I am also involved in the          12:53:01

6    Transgender Committee for the Department of Corrections.  And

7    kind a catchall.  You know, when people have an issue, a

8    medical issue, they can bring it to me and I'll try to solve

9    it.

10   Q.  And you said when people have an issue, is that when other  12:53:16

11   monitors encounter problems?

12   A.  Well, when a monitor encounters something that they think

13   is a problem, they can bring it to my attention, I'll respond.

14   Q.  Are you a member of the Hepatitis C Treatment Committee?

15   A.  Oh, Yes, I am.  That's another role.                      12:53:35

16   Q.  And do you have any role in terms of telemedicine or

17   electronic health records, anything like that?

18   A.  No, I don't.  I'm a strong advocate for telemedicine.  I've

19   worked with the Arizona telemedicine program before in trying

20   to get a system working.  But mostly it's in advocacy role.   12:53:57

21   Q.  Do you have a written job description?

22   A.  No.  Do I?  I just --

23   Q.  Okay.  And since you're here today, can we assume that

24   you're familiar with the case of Parsons v. Ryan?

25   A.  Yes, I am.                                                 12:54:18

David Robertson - Direct Examination

1   Q.   Okay.

2   A.   Somewhat.

3   Q.   And are you aware that the stipulation has certain health

4   care Performance Measures?

5   A.   Yes.                                                          12:54:26

6   Q.   And I'm not going to quiz you about, you know, which

7   one --

8   A.   Thanks.

9   Q.   But I just do want to talk about a few of the Performance

10  Measures.                                                          12:54:37

11          And are you aware that there is a Performance Measure,

12  I'll represent to you that it's number 5, that says that

13  medical records need to be accurate, maintained, complete and

14  scanned within two business days?

15  A.   I'm not familiar with the specific Performance Measures.     12:54:50

16  Q.   But are you familiar with the concept --

17  A.   I know that they do have to --

18  Q.   Are you familiar with the concept that medical records need

19  to be accurate, complete?

20  A.   Yes, ma'am.                                                   12:55:01

21  Q.   And why is that important?

22  A.   Because it determines the course of patient care.  It's a

23  medical legal document.

24  Q.   And there's another Performance Measure, it's number 8,

25  that requires that nurses use nursing protocols or what are      12:55:12

David Robertson - Direct Examination

1   called NETS?

2   A.   NETS, yes, ma'am.

3   Q.   For sick call.

4   A.   Um-hum.

5   Q.   What does NETS stand for?                          12:55:19

6   A.   Nursing encounter something.  It's a protocol for different

7   presenting complaints, like abdomen, lungs, heart.  You know,

8   they can do the NET and know that all the bases are covered.

9   Q.   And this is important because it serves as sort of a

10  checklist for the nursing staff when a patient comes to make   12:55:39

11  sure they --

12  A.   It's a appropriate call; right.

13  Q.   Okay.  Are you aware of Performance Measure 39, which

14  requires that referrals to a provider from the nursing line be

15  seen within 14 days?                                    12:55:55

16  A.   Yes, I am.

17  Q.   And why is this an important --

18  A.   Well, a nurse feels a provider needs to see a patient, the

19  patient should be seen by the provider.  Nurses are not

20  providers, they can't order.  And nurses are also great for   12:56:06

21  triaging.  And when a nurse triages a patient to a provider, it

22  usually is worthwhile.

23  Q.   Okay.  My colleague just handed me a note stating that you

24  are starting to talk when I'm still asking the questions.  So I

25  would just ask if you just wait until I finish, because we have   12:56:25

UNITED STATES DISTRICT COURT

—David Robertson - Direct Examination—

1  a court reporter, and she can only take one person down at a

2  time.

3          And also, your attorneys may want to object to a

4  question that I'm asking.  So --

5  A.  Sure.                                                12:56:35

6          THE COURT:  You just did it.

7          THE WITNESS:  Did it again.

8  BY MS. KENDRICK:

9  Q.  Okay.  We can try.

10 A.  You interviewed me before, didn't you?              12:56:43

11 Q.  Yes, sir, I deposed you in 2013.

12         Are you familiar with the requirement that referrals

13 from nursing line that are urgent need to be seen within 24

14 hours and emergency ones be seen immediately?

15 A.  Yes.                                                 12:56:59

16 Q.  And that's for the same reason, nurses aren't providers?

17 A.  Yes.

18 Q.  Are you aware of a measure -- Performance Measure 46 that

19 diagnostic reports need to be reviewed and acted upon by a

20 provider within five calendar days?                     12:57:16

21 A.  Yes.

22 Q.  And why is that important?

23 A.  Continuity of care.

24 Q.  And there's also some Performance Measures that have been

25 at issue here in the court quite a lot, and those are involving  12:57:31

David Robertson - Direct Examination

1   specialty care.  They're Performance Measures measures 50, 51

2   and 52.  And they require respectively that urgent requests be

3   seen within 30 days, routine within 60 days, and that the

4   specialty reports be reviewed within seven days.

5          Are you aware of those Performance Measures?          12:57:50

6   A.  Yes.

7   Q.  And, again, why are those important measures to include?

8   A.  Again, this is for continuity of care.

9   Q.  Okay.  And when you were a physician at Tucson, did you see

10  chronic care patients?                                      12:58:04

11  A.  Yes.

12  Q.  And you know there's a Performance Measures 54 that

13  requires that chronic care patients be seen as specified and no

14  less than 180 days?

15  A.  Yes.                                                    12:58:16

16  Q.  Okay.  You had said you aren't licensed by NCCHC, but are

17  you familiar with many of the NCCHC standards?

18  A.  Yes.

19  Q.  And do these Performance Measures mirror many of the NCCHC

20  standards?                                                  12:58:34

21  A.  Yes.

22  Q.  Okay.  And I'd asked you about the provider referrals from

23  nurse's line within 39 days -- I mean -- Performance Measures

24  39, that they be seen within 14 days.

25         Are you aware that in the Fall of 2016 Corizon         12:58:47

UNITED STATES DISTRICT COURT

─────David Robertson - Direct Examination─────

1    submitted a Corrective Action Plan for Performance Measure 39

2    that said patients would have to be seen multiple times by a

3    nurse before they could be referred to a provider?

4    A.  I'm not aware of that.

5    Q.  Are you aware of that ever happening at Perryville or any          12:59:02

6    other prison?

7    A.  I'm not aware of that.

8    Q.  Would you find that to be problematic?

9           MR. BOJANOWSKI:  Note an objection.

10          THE COURT:  What is the objection?                              12:59:13

11          MR. BOJANOWSKI:  The objection is he says he's not

12   aware of that situation.

13          THE COURT:  It's a separate question though.  Is there

14   an objection to this subsequent question?

15          MR. BOJANOWSKI:  Yes.  There's no foundation.  He's            12:59:20

16   not aware.

17          THE COURT:  The question was, would you find that to

18   be problematic?  Meaning, if such a thing did exist, would you

19   find that to be problematic?

20          MR. BOJANOWSKI:  Same objection, asking for an                 12:59:39

21   opinion.

22          THE COURT:  Overruled.

23          THE WITNESS:  Not necessarily.

24   BY MS. KENDRICK:

25   Q.  Why do you say not necessarily?                                   12:59:49

─── David Robertson - Direct Examination ───

1   A.  Everybody's different.

2   Q.  But I'm asking if there was a policy.  So it's not looking

3   at everybody being different, but just an across the board

4   policy that a person had to be seen multiple times on nursing

5   line before the nurse was allowed to make a referral to the          13:00:06

6   provider.

7           MR. BOJANOWSKI:  Same objection.

8           THE COURT:  Overruled.

9           THE WITNESS:  I don't see where there's a problem.

10  BY MS. KENDRICK:                                                    13:00:16

11  Q.  You don't -- okay.

12          So you mentioned one of the things you do is mortality

13  reviews.  Can you kind of walk us through, what are the steps

14  involved in doing a mortality review?

15  A.  Oh, boy.  Whenever an inmate expires, there's a process to      13:00:28

16  review the case as thoroughly as possible by as many people as

17  possible.

18          There's a first mortality review, which is done by the

19  site provider.  And that needs to be done within 48 hours, I

20  believe.  I could be wrong on that.  But it has to be done        13:00:50

21  pretty quick.

22  Q.  Okay.

23  A.  And then there's a second mortality review that's done

24  on-site that confirms the first mortality review.  And that's

25  done when the autopsy comes in.  Because everyone in our          13:01:04

David Robertson - Direct Examination

1    facility has to have an autopsy, whenever there's a death in

2    the department.

3           And then there's a third and final mortality review,

4    which all the records are compiled, brought over to our office,

5    and we do a thorough review of the chart and the flows and what          13:01:21

6    happened.  And then we have a meeting with all the people

7    involved; Corizon, and the Department.  And we discuss the case

8    and we see where things went wrong or where things went right,

9    and we make recommendations or not.

10          And then we submit that up the chain to the director          13:01:42

11   through Mr. Pratt.

12   Q.  Okay.  And you said the first review is done by the site

13   provider.  Who does the second review?

14   A.  It's usually the same provider.

15   Q.  It's not the Facility Medical Director?          13:01:55

16   A.  Well, it's usually the Facility Medical Director that does

17   the first one.

18   Q.  Oh, okay.  When you said "site provider," I thought you

19   meant like the person in the clinic who did the treating.

20   A.  No.  As long as it gets done, you know, someone reviews it,          13:02:09

21   it's usually the site Medical Director.

22   Q.  And then you said the third review goes to ADC

23   headquarters.  And you do the review?

24   A.  Yes, ma'am.

25   Q.  Does anybody else do the reviews?          13:02:22

David Robertson - Direct Examination

1    A.  Yes, ma'am.

2    Q.  Who is that?

3    A.  Well, Dr. Rowe.  He's another one of our physicians at the

4    Department of Corrections.  He's our elder statesman.  And he

5    will do reviews, I will do reviews.                              13:02:36

6         But the important thing is that the entire review and

7    all the supporting documentation is reviewed in a committee

8    meeting.  And these can sometimes take two hours.

9    Q.  And how frequently does this committee meet?

10   A.  It meets sometimes twice a week.                             13:02:49

11   Q.  So as a final level review is completed, then the committee

12   comes together?

13   A.  For example, I finish the final review, we have -- we call

14   a meeting, because there's a ten-day window that has to be

15   satisfied.  And we have the meeting with myself, Dr. Rowe, you   13:03:11

16   know, Medical Director of Corizon, a few of our understanding

17   staff.  And now we're starting to include CQIs.

18   Q.  So you had said you look at the medical records, you get

19   the autopsy report of the medical examiner.

20        Do you look at things like lab results or pharmacy         13:03:33

21   records?

22   A.  Everything.

23   Q.  Everything.

24        And so then the next step for you when you're doing

25   your stage is, do you analyze the care that is documented that  13:03:41

———— David Robertson - Direct Examination ————

1    was provided?

2    A.   Whether it was appropriate, yes, ma'am.

3    Q.   And then you draw conclusions?

4    A.   Based on the record.

5    Q.   And then you make recommendations to Corizon and to ADC as          13:03:53

6    appropriate?

7    A.   Yes, ma'am.

8    Q.   Okay.  Who trained you how to do mortality reviews?

9    A.   Dr. Rowe.

10   Q.   And you said Dr. Rowe is the elder statesman of ADC?                13:04:02

11   A.   Yes, ma'am.

12   Q.   Is he also employed by the Monitoring Bureau?

13   A.   Yes, ma'am.

14   Q.   In a similar position to yours?

15   A.   Yes, ma'am.                                                         13:04:14

16   Q.   Okay.  And he's also a doctor, as are you?

17   A.   Yes.

18   Q.   And do you review the reports that he writes?

19   A.   We all review the reports.  We all get a copy, and we all

20   go through them.                                                        13:04:29

21   Q.   And do you believe that Dr. Rowe does a good job on his

22   reviews and has solid conclusions?

23   A.   He's far more thorough than I.

24   Q.   Is there any rhyme or reason as to how the reviews are

25   divided between the two of you?                                         13:04:46

UNITED STATES DISTRICT COURT

1    A.   No.  It usually comes from -- I'll walk into my office and

2    the medical records librarian will just have given me another

3    case.

4    Q.   So it's just as they come in --

5    A.   Yes, ma'am.                                                    13:05:00

6    Q.   -- they're assigned to either one of you?

7    A.   And depending on each other's workload.

8    Q.   Does he also review any of the Performance Measures or do

9    anything like that?

10           You have to say yes or no, so the reporter gets            13:05:11

11   your --

12   A.   Oh.  No, ma'am.

13   Q.   And you said you meet with the Corizon officials and you

14   have to do this within ten days.  If you have recommendations

15   or, you know, suggestions for Corrective Action Plans, is there    13:05:24

16   any sort of follow-up to that, to make sure that those changes

17   and recommendations were implemented?

18   A.   We pass them on.  And I don't follow through on that, I'm

19   sorry.  I just -- I don't -- I say this needs to be taken care

20   of if there's an issue, this needs to be looked at.  And we        13:05:46

21   pass it on, and usually it's taken care of.

22   Q.   And so you've been doing these mortality reviews for a few

23   years since they privatized; right?

24   A.   Yes, ma'am.

25   Q.   Have you ever done any sort of trend analysis of the          13:06:00

David Robertson - Direct Examination

1    mortality reviews to review any systemic problems?

2    A.  No.

3    Q.  Have you ever thought to yourself, I'm noticing trends in

4    my reviews, or I'm making the same recommendations over and

5    over?                                                          13:06:17

6    A.  No.

7    Q.  You have never --

8    A.  I have discussed with our statistician mortality, and he

9    seems to have it pretty well analyzed.

10   Q.  What does he analyze?                                      13:06:31

11   A.  I couldn't address specifically what he goes into, because

12   I'm not a statistician at all.  But he -- I think he reviews

13   causes of death, whether or not a death was avoidable or -- you

14   know, what we submit.

15   Q.  So who is the statistician, what's his name?              13:06:50

16   A.  Oh, shoot.  I'm having a senior moment.  Jason.

17   Q.  Is it Jason Reese?

18   A.  Yes.

19   Q.  And has Jason ever given you any sort of report or analysis

20   about the mortality trends?                                   13:07:09

21   A.  He sends them out, and I -- honestly I don't look at them.

22   Q.  He sends out some sort of report?

23   A.  Yes.

24   Q.  Is that annually or monthly?

25   A.  It's a monthly report.  I don't open it up.  I can't read  13:07:21

David Robertson - Direct Examination

1  Excel very well.

2  Q.  So it's just columns and numbers, it's not like a

3  written --

4  A.  Right.

5  Q.  You sound like my boss, he can't stand spreadsheets.      13:07:32

6         MR. SPECTER:  I object.

7  BY MS. KENDRICK:

8  Q.  So I've put some of exhibits on the table in front of you

9  Dr. Robertson, and I'd like you to take a look.  We'll start

10  with Exhibit 30, which I believe is the first one there.      13:07:49

11         And what is this document?

12  A.  This is the Mortality Review for --

13  Q.  Don't, don't.

14  A.  I'm sorry.  What did I do?

15  Q.  I realized as you started talking, we'd just like to ask   13:08:07

16  that we try not to say the inmate's names or numbers to the

17  extent possible.

18  A.  I'm sorry.  This is a Mortality Review.

19  Q.  Okay.

20         THE COURT:  You may continue.                           13:08:30

21  BY MS. KENDRICK:

22  Q.  Did you prepare this Mortality Review, Dr. Robertson?

23  A.  Yes.

24  Q.  And if you flip to page 4, which at the bottom is that your

25  signature and the date, 9-18-17?                               13:08:47

UNITED STATES DISTRICT COURT

1    A.   Yes.

2    Q.   Okay.  If you can go back to page 1, could you tell us the

3    age of this patient and his primary cause of death?

4    A.   He was a 48-year-old male who died from complications of

5    metastatic cancer.                                                    13:09:09

6    Q.   Okay.  And if you could just turn to page 2.

7           On the top of page 2 it states, could the patient's

8    death have been prevented or delayed by more timely

9    intervention?

10          And which box did you check?                                   13:09:29

11   A.   Yes.

12   Q.   And the next section under Contributing Cause Analysis,

13   could you read the boxes that you checked in that section?

14   A.   Failure to recognize symptoms or signs, delay in access to

15   care, failure of provider-to-provider communication, failure to      13:09:50

16   supervise midlevel care, failure to follow clinical guidelines,

17   failure to follow up or identify abnormal test results, failure

18   of the provider to assume responsibility for the patient, and a

19   medical prescribing issue.

20   Q.   And then if you go two lines below that it states, is it         13:10:12

21   likely that the patient's death was caused by or affected in a

22   negative manner by health care personnel?

23          And which box did you check?

24   A.   Yes.

25   Q.   And then the next page it appears to be more of a narrative      13:10:23

David Robertson - Direct Examination

1    where you can describe the contributing factors by either

2    nursing, pharmacy, mental health, dental, staff.

3           What did you write under nursing?

4    A.   The nursing failed to assume responsibility for the patient

5    on many occasions.  On many occasions the patient's written and        13:10:44

6    verbal requests for help were not addressed properly.  His

7    obvious need was essentially ignored.

8    Q.   And what did you write under Lessons Learned?

9    A.   Nothing.

10   Q.   Okay.  And then if you go to the next page, it states,           13:11:03

11   Discussion and Recommendations.

12          And could you read the first three paragraphs?

13   A.   Problems identified in this review cover almost all

14   processes involved in delivering care to an inmate.

15          Poor communication and documentation are present            13:11:28

16   throughout the record.  Increased time and effort was needed to

17   ascertain communications via e-mail and telephone, and poor

18   communication (sic) in the record does not give an adequate

19   picture of the situation, even when it was grave.

20          Utilization Management was a major contributor to the       13:11:43

21   delays in care.  The chart shows many delays due to scheduling

22   and UM roadblocks, such as demanding a biopsy for an obvious

23   metastatic neoplastic process, before the patient could be

24   referred to the appropriate specialist for procedure.  It

25   remains a systemic problem.                                       13:12:04

David Robertson - Direct Examination

```
 1   Q.  Do you remember writing this report in September?

 2   A.  Yes, ma'am.

 3   Q.  And do you remember meeting about it with the other --

 4   A.  Yes, ma'am.

 5   Q.  And what changes to policy or practice did Corizon make as        13:12:15

 6   a result of this report?

 7   A.  They -- from the result of this report they became more

 8   flexible in their utilization process.  That being that the

 9   site medical director could override UM.

10   Q.  Do you know if that's a written policy?                           13:12:38

11   A.  No, I don't.

12   Q.  Do you know if that's been communicated to all ten site

13   medical directors?

14   A.  No, I don't.

15        I was referring to the Regional Medical Director not            13:12:57

16   the Site Medical Director.

17   Q.  Oh, I'm sorry.  I apologize.  So the Regional Medical

18   Director.

19        And I see below your signature is Glen Babich, M.D.

20        Is he the Regional Medical Director?                            13:13:13

21   A.  He was at the time.

22   Q.  Who is now?

23   A.  Dr. Patel, Rob Patel.

24   Q.  And then -- so these first four pages look like that's the

25   end of the form, but then there's additional pages appended          13:13:26
```

—David Robertson - Direct Examination—

```
 1    that are notes.
 2            Are these notes that you prepared?
 3    A.  Yes, ma'am.
 4    Q.  And why -- why did you attach these extra nine pages?
 5    A.  In order to establish a timeline.                        13:13:39
 6    Q.  Okay.  And I notice that there are areas -- and this
 7    printout is black and white, but it looks like they've been
 8    highlighted throughout these nine pages.
 9            Did you do that highlighting?
10    A.  No.                                                      13:13:55
11    Q.  Do you know who might have done the highlighting on it?
12    A.  No idea.
13    Q.  Okay.  And if you look half way down on the first page of
14    your notes, are these notes that you cut and paste from the
15    medical record, or are you just typing them in?             13:14:14
16    A.  I transcribed.
17    Q.  Okay.  And on May 9th, 2017, which is half way down the
18    page, what was this patient's weight?
19    A.  He weighed 182 pounds.
20    Q.  Okay.  And if you turn to the next page, which is the    13:14:29
21    Exhibit No. 30.6, on May 15th what his weight?  It's half way
22    down again.
23    A.  175.
24    Q.  And if you go to the next page, page 7 of the exhibit,
25    there's an entry on 6-7-17.  Could you tell us -- read into the  13:15:00
```

David Robertson - Direct Examination

1   record what it states?

2   A.   6-7 -- Nurse Practitioner Higgins, noncontact encounter.

3   Spoke to radiologist who reported ominous findings on CT.

4   Called M. Smith, clinical coordinator, and notified of orders

5   being entered for urgent oncology consult.                          13:15:25

6        Consult request for Heme/Onc.  Was referred to UM Team

7   for review on 6-9.

8   Q.   Okay.  And if you go down to the notation that says 6-17.

9   It says, nursing, colon, ICS for back spams --

10  A.   Yes.                                                           13:15:54

11  Q.   -- shaking, pain.  Sent back to house.

12       What does "sent back to house" mean?

13  A.   That means he was sent back to his unit -- his housing.

14  Q.   Would that indicate that the person was sent back to their

15  housing unit without being seen by a provider?                     13:16:05

16  A.   Yes.

17  Q.   And then the next entry says, 6-22-17, Watson, M.D.

18       Does that mean that Dr. Watson --

19  A.   Yes.

20  Q.   Okay.  And what is his weight on 6-22-17?                      13:16:18

21  A.   170.

22  Q.   And could you read what it says underneath there under

23  Consult Request?

24  A.   Consult Request, Heme/Oncology, urgent.  6-22 referred to

25  UM Team for review.  6-23 alternative treatment recommended,       13:16:42

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1   medical necessity not demonstrated.  Recommend tissue diagnosis

2   prior to referral to oncology.  7-11 alternative treatment

3   recommended, medical necessity not demonstrated.  Recommended

4   obtaining a tissue diagnosis prior to referral to oncology.

5   And 7-18, alternative treatment was accepted.                      13:17:06

6   Q.  So previously on page 4 under the recommendations you had

7   written that there was a, quote, roadblock, such as demanding a

8   biopsy for an obvious metastatic neoplastic process.

9        Are you referring to this paragraph that you just

10  read?                                                              13:17:25

11  A.  Yes.

12  Q.  Okay.  And then if you turn to page 8 of the exhibit, it's

13  labeled as page 4 of your document.

14       I notice that there are five entries with Nursing

15  between 7-3 and 7-12.  Is that correct?                            13:17:49

16  A.  Yes.

17  Q.  And until 7-12 it says, sent back to house or sent back?

18  A.  Yes.

19  Q.  And then on 7-12 it appears that he saw Dr. Watson again.

20       And could you write -- could you read what she wrote?        13:18:10

21  A.  He continues to have abdominal pain and now has nausea and

22  vomiting.  He has not been able to eat.  He states he can't

23  take it anymore.  He is known to have a ten-centimeter

24  subdiaphragmatic mass around the aorta and IVC, that's inferior

25  vena cava, with mets to the lung.  We are awaiting approval for   13:18:32

David Robertson - Direct Examination

1    him to get a tissue diagnosis by an interventional radiologist

2    before he can be sent to an oncologist.

3           Objective note says, pale, visibly in pain and holding

4    his abdomen.

5           Plan, try to get him transferred to IPC for                    13:18:47

6    intravenous.

7           Education, he's been told about the concern that the

8    mass is cancer and needs to go to radiology as soon as possible

9    for diagnosis.

10   Q.  Okay.  And if you could turn to page 10, which is page 6 of   13:18:57

11   your attachment.  And --

12          Actually, could you turn back one page?

13          So this was written on 7-31-17 by Dr. Stewart;

14   correct?

15   A.  Yes.                                                              13:19:26

16   Q.  So at the top of page 10, what does Dr. Stewart write?

17   A.  Where are we?

18   Q.  At the top of page 10.

19   A.  Top of page 10.

20   Q.  The first two lines.                                              13:19:40

21   A.  Patient will be transferred to the Florence infirmary as

22   soon as bed is available.  Weight is 141.

23   Q.  Okay.  And if you go to page 11, the next page, at the

24   middle.

25          What happened on 8-1 at 1445?                                  13:19:59

1   A.  Where are we?

2         On 8-1, nursing -- oh.  IPC admission, cachectic, no

3   complaints of pain.

4   Q.  What does cachectic that mean?

5   A.  Cachectic is wasted.  His body is being consumed.          13:20:24

6   Q.  Wasting, is that associated with cancer?

7   A.  Yes.

8   Q.  Okay.  And if you could turn to page 13 of the exhibit,

9   what does the last line say?

10  A.  8-11-17, expired in hospital.                               13:20:42

11  Q.  Thank you.

12        Next I'd like you to turn to Exhibit 33.

13        You can just put that back in there.

14        And this is another Mortality Review that you

15  completed?                                                      13:21:22

16  A.  Yes, ma'am.

17  Q.  And what was the age and primary cause of death of this

18  patient?

19  A.  This is a 36-year-old male who had hypertensive

20  cardiovascular disease with a ruptured aortic dissection with   13:21:40

21  hemopericardium and cardiomegaly.

22  Q.  What is an aortic dissection?

23  A.  The aorta -- an aortic aneurysm, you have a balloon like a

24  balloon on a tire.  And there's three main levels of the wall

25  in an aorta.  And the dissection is when there's a leak in      13:22:01

David Robertson - Direct Examination

1    between the layers and they can't contain the pressure.  And if

2    it ruptures, it's usually fatal.

3    Q.  And if you could turn to page 2 of the review.

4          And under the question, could the patient's death have

5    been prevented or delayed by more timely intervention?  You          13:22:33

6    checked the box undetermined?

7    A.  This is undetermined.

8    Q.  Okay.  And under Contributing Cause Analysis, you checked

9    failure to recognize symptoms or signs, delays in access to

10   care, and patient nonadherence?                                      13:22:47

11   A.  Yes.

12   Q.  Okay.  And it appears you answered yes to the question, is

13   it likely that the patient's death was caused by or affected in

14   a negative manner by health care personnel?

15   A.  Yes.                                                             13:23:02

16   Q.  Okay.  And then on page 3, what did you write under Lessons

17   Learned?

18   A.  None.

19   Q.  And then under General Critique on page 3, what boxes did

20   you check?                                                          13:23:16

21   A.  Diagnosis not timely, diagnosis was inaccurate, treatment

22   was not timely, and treatment was inappropriate.

23   Q.  And if you turn to page 4, could you read what you wrote

24   starting with the words, of concern?

25   A.  Of concern are the actions of nursing prior to his send        13:23:36

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    out.  First of all, it is felt that nursing should have taken

2    blood pressure in bilateral arms, or all extremities.  However,

3    this would not have changed the outcome, and the nursing NET is

4    being reviewed for updating.

5         It is recommended that an immediate over read of an                13:23:56

6    EKG on cases of chest pain that does not resolve be performed.

7         In cases within ambiguous but concerning

8    symptomatology, the index of suspicion should be elevated.

9    Also, direct communication with providers needs to occur in

10   cases that present for the same concerning symptoms repeatedly         13:24:16

11   over a 24-hour period.

12   Q.  So I want to ask you about that last sentence that you

13   wrote there.  You didn't attach, you know, notes like you did

14   with the previous one we went through.

15        Did you write that because you saw that the patient             13:24:33

16   had presented to nursing line repeatedly for the same symptoms?

17   A.  Yes.  It's in the summary.

18   Q.  Okay.  Yes, it is.  Thank you.

19        And you also had marked on page 2 that patient

20   nonadherence was a factor in this.  And why did you mark that?       13:24:50

21   Do you remember?

22   A.  I'm reading.

23        I couldn't address that question without having the

24   record in front of me.

25   Q.  So you don't remember why you thought the patient --            13:25:23

David Robertson - Direct Examination

1    A.   No.

2    Q.   Okay.

3    A.   I'm thinking it might have been because he wasn't taking

4    blood pressure medication.

5    Q.   Okay.  If we could just go to another exhibit, it's number          13:25:32

6    32.  Do you have it?

7    A.   Yes, ma'am.

8    Q.   And this is another Mortality Review that you did for the

9    committee?

10   A.   Yes, ma'am.                                                          13:25:58

11   Q.   And what is the age and primary cause of death of this

12   class member?

13   A.   This was a 66-year-old male who died from metastatic

14   carcinoma.

15   Q.   Okay.                                                                13:26:10

16   A.   And he had a history of malignant melanoma.

17   Q.   And on page 2 you checked two boxes under Contributing

18   Cause Analysis.  Which ones were those?

19   A.   Delay in access to care, and failure to follow clinical

20   guidelines.                                                              13:26:28

21   Q.   When it says "failure to follow clinical guidelines," is

22   that referring to providers or nursing staff?

23   A.   Could be both.

24   Q.   And on page 3 of the exhibit, what did you write under

25   Lessons Learned?                                                        13:26:42

David Robertson - Direct Examination

1    A.   None.

2    Q.   And then under General Critique it appears you checked the

3    boxes for treatment not timely, treatment inappropriate, and

4    level of care inappropriate for the severity of the illness?

5    A.   Yes.  But the death was unavoidable.                          13:26:58

6    Q.   And the final page, which is page 6, you have some

7    Discussion and Recommendations.

8         Could you read your discussion into the record,

9    please?

10   A.   There was a delay in care when a CT scan was ordered on       13:27:18

11   December 19th, 2016, and was given an alternative treatment

12   plan.  This was outside the standard of care.

13        Although the patient -- although the patient was known

14   to have a diagnosed advanced metastatic disease, and he was

15   complaining of severe pain, enough to warrant sending to          13:27:35

16   emergency room on several occasions, he continued to be housed

17   on Meadows yard for over a month and received inadequate

18   analgesia for his end stage cancer pain.

19   Q.   If we could go to another exhibit, it's 34.

20        And this is another Mortality Review that you did?           13:28:14

21   A.   Yes, ma'am.

22   Q.   On August 2nd, 2017, is the --

23   A.   Yes, ma'am.

24   Q.   Is that your handwriting under Date of Review?

25   A.   I believe so.                                                 13:28:26

1   Q.   Okay.  And if you could go to the third page of your

2   report, what did you list as a contributing factor under

3   Nursing?

4   A.   Substandard documentation.

5   Q.   And what did you write under Lessons Learned?          13:28:43

6   A.   Substandard documentation, which would have not changed the

7   outcome of this situation -- in this situation, is a necessary

8   part of the medical legal record.

9   Q.   And that's for the reasons we talked about earlier, why

10  it's necessary to have full documentation?                  13:28:59

11  A.   Yes, ma'am.

12  Q.   Okay.  And then on the last page there's two lines in

13  handwriting.  Is that your handwriting?

14  A.   Yes.

15  Q.   And what did you write?                                13:29:10

16  A.   Poor, very poor documentation must be addressed.  No note

17  of any kind on date of death.

18  Q.   And do you remember this particular Mortality Review?

19  A.   Very much.

20  Q.   And did Corizon change any policies or practices as a   13:29:23

21  result of your review and your recommendations?

22  A.   As of August last year, the documentation has improved.

23  There has been efforts made by Corizon management to improve

24  documentation.

25        They've also improved their treatment of pain.        13:29:42

David Robertson - Direct Examination

1    Analgesia I've found is starting to be more appropriate for the

2    need.  That being, you know, morphine is given on the yards if

3    it's needed.  And nursing notes are much more thorough.

4    Q.  That's good.

5    A.  Yeah, I'm happy with it.  Progress is being made.          13:29:59

6    Q.  Could you turn to Exhibit 35, please?

7            And again, your name is listed as the one who did the

8    review for the committee?

9    A.  That would be me.

10   Q.  Okay.  And what was the age and cause of death of this      13:30:22

11   patient?

12   A.  This was a 42-year-old male who expired from complication

13   of splenic thrombosis with infarction.  He had a gross and

14   microscopic infarction rupture of the subcapsular splenic

15   hematoma.                                                       13:30:45

16   Q.  So is this -- to translate this into English for those of

17   us who don't have medical training, is this a ruptured spleen?

18   A.  It's a ruptured spleen.

19   Q.  If we could turn to the second page.

20           You marked yes to the question, could the patient's    13:31:05

21   death have been prevented or delayed by more timely

22   intervention; correct?

23   A.  Correct.

24   Q.  And you checked seven boxes under Contributing Cause

25   Analysis?                                                       13:31:17

David Robertson - Direct Examination

1  A.  Yes, ma'am.

2  Q.  Okay.  And those were failure to recognize symptoms or

3  signs, delay in access to care, medication delivery issue,

4  failure to follow clinical guidelines, failure to follow up

5  slash identify abnormal test results, failure of provider to      13:31:32

6  assume responsibility for patient, and failure to communicate

7  effectively with patient.

8  A.  Yes.

9  Q.  And then the next line says, was the cause of death the

10  result of a preexisting medical condition?  And you checked no.   13:31:44

11  A.  No.  And that's correct.

12  Q.  And then it says, is it likely that the patient's death was

13  caused by or affected in a negative manner by health care

14  personnel?  And what box did you check?

15  A.  Yes.                                                          13:31:58

16  Q.  Okay.  And then you have a narrative on page 3 under

17  Contributing Factors.

18        Could you tell us what the factors were that you

19  identified?

20  A.  I'm trying to recall this case.                              13:32:10

21        Very poor documentation in eOMIS.  An unsigned

22  narrative summary found in Mortality Review.  States two 18

23  gauge IVs were placed with fluid resuscitation begun prior to

24  sending out.  This is not recorded.

25        Ambiguity -- under Pharmacy I wrote, ambiguity in         13:32:33

David Robertson - Direct Examination

1   prescription order led to unknown amounts of Warfarin ordered

2   or given.  If -- it is ordered daily, but checked boxes show

3   b.i.d. or twice daily dosing.

4           In the conclusions I wrote, issues with documentation

5   and ordering of medication have been addressed.                13:32:54

6   Q.  And do you remember how those issues with documentation and

7   ordering of medication were addressed?

8   A.  I'd have to do research on this one.

9   Q.  Okay.  This was -- according to the first page of your

10  report, this happened at Lewis-Buckley unit?                   13:33:10

11  A.  Yes, ma'am.

12  Q.  Okay.  And then on the page 4 under Discussion and

13  Recommendations, what does your last paragraph say?

14  A.  There is also mention in the narrative summary -- that's of

15  the previous Mortality Review -- of incorrect communication    13:33:40

16  between nursing staff and EMS, which is the emergency medical

17  service.  It appears that security reported the case to be a

18  drug overdose, which confounded the situation.

19  Q.  Okay.  And this report has three pages attached to it that

20  are typed up as an addendum.  And there's initials on the front 13:34:03

21  that looks like a DR 7 -18-17.  Is that you?

22  A.  Yes.

23  Q.  Okay.  So you have a narrative summary here with headers

24  called, what happened, what usually happens, what is supposed

25  to happen, why did it happen, and Corrective Action Plan.      13:34:25

David Robertson - Direct Examination

1              Is this something that you shared with the Corizon

2    staff?

3    A.  I didn't write this.

4    Q.  You didn't write this?

5    A.  No.                                                         13:34:40

6    Q.  Do you know who wrote it?

7    A.  Unknown.

8    Q.  Do you know why you put your initials on it?

9    A.  That's -- I didn't sign this, these two pages.

10   Q.  So you're thinking you did the addendum with the --        13:34:59

11   A.  I did the addendum here.  But the narrative summary -- I

12   would have to research this.

13   Q.  Okay.

14   A.  I could have written it.

15   Q.  So under the Corrective Action Plan on page 7, it states   13:35:18

16   that security staff --

17              MR. BOJANOWSKI:  Note an objection, it's hearsay,

18   Your Honor.  This witness indicated that he did not author

19   this.

20              THE COURT:  He said he could have.                   13:35:43

21              THE WITNESS:  I could have.

22              THE COURT:  Overruled.

23   BY MS. KENDRICK:

24   Q.  So if this -- if this is attached to the Mortality Review,

25   it's part of the final report; correct?  An addendum is part   13:35:55

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    of --

2    A.  Yes.

3    Q.  -- of the report?

4        Okay.  So under Corrective Action Plan it states that,

5    number one, security staff should be educated to provide          13:36:07

6    medical's provisional diagnosis to EMS, rather than the ICS

7    initiating complaint, as this would enable EMS to gauge their

8    response better.

9        And number two, hub nursing staff need simulation

10   training for emergent resuscitation situations.                    13:36:25

11       Are you aware of nursing staff at Lewis receiving

12   simulation training on emergent resuscitation situations after

13   you finished this report on July 18th, 2017?

14   A.  Unknown.

15       What puzzled me is, I don't write Corrective Action           13:36:44

16   Plans.  I would not have written this.

17   Q.  Okay.  But it's in the --

18   A.  It's attached, but it's not signed.

19   Q.  Right.  It's attached, and it's in the same font as the

20   page that you said you wrote.  So -- okay.                         13:37:01

21       Let's turn to Exhibit 31.  And this is another report

22   that you wrote for the Committee?

23   A.  Yes.

24   Q.  And if you could turn to page 3 under Contributing Factors

25   under Nursing, what did you write?                                 13:37:33

David Robertson - Direct Examination

1    A.  No documentation between IPC, which is the inpatient care

2    unit, and the SHU, which is special health unit, nursing.  No

3    documentation of abdominal wound assessment or care.  No

4    documentation of bowel movement in a post surgical patient.

5    Q.  What was your Lessen Learned?                          13:37:56

6    A.  Documentation is very poor, must be addressed.

7    Q.  All right.  And could you turn to Exhibit 36.

8           And this one was written by Dr. Rowe for the Committee

9    on November 16th, 2017; correct?

10   A.  Yes.                                                   13:38:25

11   Q.  And you stated earlier that you're part of the committee

12   that reviews the reports.  Even if you don't write it, if

13   Dr. Rowe writes it --

14   A.  I read it.

15   Q.  You read it.  Okay.                                    13:38:37

16          Could you go down to Case Summary in the second

17   paragraph on -- that begins with, on 9-24-17?

18          MR. BOJANOWSKI:  Note an objection, hearsay.

19          MS. KENDRICK:  He just stated that --

20          THE COURT:  Hold on just a second, please.  I'm not  13:38:53

21   finding -- could you cite me the page again, please?

22          MS. KENDRICK:  Yes, sir, it's page 1, Case Summary,

23   the bottom box, the second paragraph, on 9-24-17.

24          Did you find it?

25          THE COURT:  I did find it.                          13:39:18

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1          And this document was produced by the State?

2          MS. KENDRICK:  Yes, in the normal course of business.

3          THE COURT:  Overruled.

4          THE WITNESS:  On 9-24-17, the first ICS was initiated

5    after the patient complained of sharp pain in his throat that          13:39:31

6    traveled to his stomach and caused him to, quote, pass out, end

7    coat.  When seen by the LPN, the patient related that these

8    symptoms have been occurring for three months.  Record further

9    shows that the patient stated that me gets dizzy and nauseous

10   and slid onto floor with these symptoms.  Vitals included 160          13:39:53

11   over 84, temperature was 97.9, and his pulse was 84.

12   Musculoskeletal NET was utilized in the assessments and Mylanta

13   was given.  Care was then deferred to RN.  Record does not show

14   that the HCP was notified of the patient's complaints.

15   Q.  Okay.  Thank you.                                                  13:40:18

16          And on page 2, this is Dr. Rowe's report for ADC, and

17   he has checked off, under Contributing Cause Analysis, the

18   boxes that say failure to recognize symptoms or signs, and

19   delay in access to care.  And then on the next line he writes

20   the word, "nurse" in the box that says, failure of nurse to          13:40:44

21   provider communication, and failure to follow clinical

22   guidelines.  And he handwrites, inappropriate NET selection.

23          Is that correct?

24   A.  Yes.

25   Q.  Okay.  And on page 3, what did he assess was a contributing        13:40:58

David Robertson - Direct Examination

1    factor by nursing staff?

2    A.   Inadequate clinical documentation, and failure to contact

3    HCP.

4    Q.   And "HCP" means health care provider?

5    A.   Yes, ma'am.                                                13:41:17

6    Q.   And that's a term of art that refers to a physician, a

7    physician assistant, or nurse practitioner?

8    A.   Yes, ma'am.

9    Q.   Okay.  If you turn to Exhibit 37, the next one there.

10        And, again, this was a Mortality Review Report            13:41:54

11   prepared by Dr. Rowe for the Committee and the State of

12   Arizona?

13   A.   Um-hum.

14   Q.   And the age and primary cause of death for this patient?

15   A.   This was a 43-year-old male who expired from staph aureus  13:42:08

16   sepsis and atherosclerotic cardiovascular, diabetes mellitus,

17   hypertension, and obesity.

18   Q.   Okay.  And Dr. Rowe writes a long narrative here under Case

19   Summary.

20        Are you familiar with this case?                          13:42:34

21   A.   I'd have to study it.

22   Q.   Okay.  Why don't we just move ahead.

23        Could you turn to page 3?

24        And Dr. Rowe has marked yes to the question, could the

25   patient's death have been prevented or delayed by more timely   13:43:02

David Robertson - Direct Examination

1   intervention?

2   A.  Yes.

3   Q.  And failure to recognize symptoms or signs, and failure of

4   provider-to-provider communication?

5   A.  Yes.                                                          13:43:17

6   Q.  And he also marked yes for, is it likely that the patient's

7   death was caused by or affected in a negative manner by health

8   care personnel?

9   A.  Yes.

10  Q.  And then if you turn to page 5 of the exhibit.  Under        13:43:25

11  Discussion and Recommendations, what did Dr. Rowe write?

12  A.  Contractor to remind their health staff of NCCHC standards

13  relating to timely referrals to the health care practitioner of

14  offenders presenting to nursing more than one occasion with the

15  same complaints.                                                 13:43:51

16  Q.  Okay.  Could you turn to Exhibit 47?  I think it's the last

17  one in that red well in front of you.

18       And that's another Mortality Review prepared for ADC

19  by Dr. Rowe?

20  A.  Yes, ma'am.                                                  13:44:26

21  Q.  And he has written November 21st, 2017?

22  A.  Yes, ma'am.

23  Q.  Okay.  And the age and the primary cause of death are?

24  A.  This was a 63-year-old male who had exsanguinating

25  hemorrhage secondary to ruptured esophageal varices.            13:44:46

David Robertson - Direct Examination

1    Q.  So what does exsanguinating hemorrhage mean in laymen's

2    terms?

3    A.  He had cirrhosis that caused back pressure in his

4    esophagus, the vessels in his esophagus ruptured.  And it's

5    very difficult to stop that bleeding, and he bled out.          13:45:06

6    Q.  Okay.  He bled to death?

7    A.  Um-hum.

8    Q.  And if you turn to page 4 of this Review, under

9    Contributing Factors, what did Dr. Rowe write under Nursing?

10   A.  Nursing staff did not communicate with HCP effectively     13:45:27

11   regarding vomiting of blood by the patient.

12   Q.  And on the previous page, page 3, at the top, Dr. Rowe

13   checked the box yes in answer to the question of, could the

14   patient's death have been prevented or delayed by more timely

15   intervention?                                                   13:45:54

16   A.  Yes.

17   Q.  And he marked off under Contributing Causes, failure to

18   recognize symptoms or signs, delay in access to care, failure

19   of provider-to-provider communication, and failure to

20   communicate effectively with patient?                          13:46:08

21   A.  Yes.

22   Q.  And he marked yes for the question, is it likely that the

23   patient's death was caused by or affected in a negative manner

24   by health care personnel?

25   A.  Yes.                                                        13:46:17

—————David Robertson - Direct Examination—————

1  Q.  And under Discussion on page 5, Discussion and

2  Recommendations, what was Dr. Rowe's first recommendation?

3  A.  Nursing staff must be encouraged to be aggressive with

4  their communication with the health care practitioner when

5  confronted by unstable or suspicious clinical findings.        13:46:35

6  Q.  Okay.  Would you turn to Exhibit 43.

7          And this is a Mortality Review Report that was done by

8  Dr. Rowe for the Committee on June 23rd, 2017?

9  A.  Yes.

10  Q.  For a 60-year-old male who died from complications of     13:47:09

11  metastatic colorectal carcinoma?

12  A.  Yes.

13  Q.  If you could turn to page 5 of Dr. Rowe's report.

14          What did he write under Discussion and Recommendations

15  to Corizon?                                                   13:47:21

16  A.  LPN's training in timely contact of HCP in cases where

17  patient's condition is deteriorating.  Nursing staff to follow

18  established policies of Corizon Health when evaluating an

19  unstable patient.

20  Q.  Could you turn to Exhibit 40.                             13:47:38

21          This is another Review written by Dr. Rowe for the

22  Committee?

23  A.  Yes.

24  Q.  And November 28th, 2017, is the date of the Review?

25  A.  Yes.                                                      13:48:08

David Robertson - Direct Examination

1    Q.   And typed on this report it says, Primary Cause of Death,

2    complications of arteriosclerotic cardiovascular disease.

3    A.   Yes.

4    Q.   But what did Dr. Rowe write underneath?

5    A.   That the history and clinical findings not consistent with      13:48:26

6    arteriosclerotic disease.  No internal exam was performed.

7    Q.   Okay.

8    A.   This was a very spirited discussion, because the

9    patient -- the medical examiner stated that it was

10   complications of cardiovascular disease, but it didn't show      13:48:46

11   that.

12          We look at everything.  We look at everything and

13   we're critical.  And we pull out the warts and put them in

14   writing, and put it out there.

15          And we found that we all disagreed with the medical      13:49:02

16   examiner's findings in this case.

17   Q.   So what did the Committee think that the cause of death

18   was?

19   A.   Unknown.  We couldn't figure out it out because we didn't

20   do an internal exam.      13:49:16

21   Q.   So the medical examiner doesn't always do an internal exam?

22   A.   They usually don't do an internal exam.

23   Q.   Okay.  Could you turn to page 2, which is a typed

24   narrative.  And what does the last sentence on page 2 say?

25   A.   Of note, between 6-21-15 and 5-31-17, no documentation of      13:49:31

David Robertson - Direct Examination

```
 1    INR monitoring found.

 2    Q.  What's INR stand for?

 3    A.  International normalized ratio.

 4    Q.  And does that refer to people who are on blood thinners?

 5    A.  Yes, ma'am.                                                    13:49:53

 6    Q.  And why is it important to check their INR levels?

 7    A.  People that are on anticoagulation need to have an INR

 8    value between two values.  INR must be checked if you're on a

 9    blood thinner.

10    Q.  And how frequently must INR be checked, weekly or daily?       13:50:05

11    A.  It can be pushed out to monthly.  But when you're -- when

12    you're establishing protocol for a patient and getting their

13    levels right, you know, depending on what medication you're

14    using, you should do it weekly.

15    Q.  So at 23-and-a-half month gap is inappropriate?               13:50:19

16    A.  Yes.

17         THE COURT:  Do you know whether this note is here

18    because this patient was on an anticoagulant?

19         THE WITNESS:  Again, Your Honor, I'd have to look at

20    the chart.                                                        13:50:31

21         THE COURT:  Thank you.

22    BY MS. KENDRICK:

23    Q.  On page 3 of the exhibit, Dr. Rowe has marked the box yes

24    to the question, could the patient's death have been prevented

25    or delayed by more timely intervention?                          13:50:42
```

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    A.  It could have been prevented or delayed.

2    Q.  Okay.  And he checked four of the boxes that are kind of

3    prewritten for contributing cause; failure to recognize

4    symptoms or signs, delay in access to care.  And then the one

5    that says failure to follow clinical guidelines, he wrote, not      13:50:58

6    monitoring Warfarin.

7         So that's referring to the INR levels; correct?

8    A.  Yes.

9    Q.  And then he marked the box that says, failure of provider

10   to assume responsibility for patient, and wrote in parenthesis,    13:51:10

11   INR.

12   A.  Yes.

13   Q.  Okay.  And could you turn to page 4 of the exhibit under

14   the Contributing Factors by nursing staff?

15        What did he write?                                            13:51:31

16   A.  No EKG performed per chest pain guidelines.

17        No SPO2 documented.  SPO2 is oxygen saturation.

18        And HCP not contacted in a timely manner.

19   Q.  And then under Discussion slash Recommendations, it appears

20   that Dr. Rowe wrote four recommendations.                          13:51:52

21        Do you remember this discussion and these

22   recommendations in this case?

23   A.  Yes.

24   Q.  And what were the four recommendations?

25   A.  One, utilize the appropriate clinical guidelines in            13:52:02

David Robertson - Direct Examination

1    assessing a patient's condition.

2        Two, nursing staff to report unstable clinical

3    findings in a timely manner to the HCP.

4        Three, equipment pertaining to patient care must be

5    maintained in operative condition, the EKG machine.          13:52:18

6        Four, accurate documentation of clinical history and

7    physical findings, no oxygen saturation documented.

8    Q.  Okay.  Let's turn to Exhibit 45.

9        And this is a Mortality Review that Dr. Rowe did for

10   the Committee and for ADC on June 28th, 2017, for a 53-year-old  13:52:56

11   man whose primary cause of death was hypertensive

12   cardiovascular disease; correct?

13   A.  Correct.

14   Q.  And if you turn to page 2, the box "undetermined" was

15   marked to the question, could the patient's death have been   13:53:16

16   prevented or delayed by more timely intervention.

17       What did Dr. Rowe write underneath that box?

18   A.  No intake medical evaluation by HCP was done.

19   Q.  And then under Contributing Cause Analysis he checked the

20   box that says delay in access to care; correct?              13:53:38

21   A.  Yes.

22   Q.  And then he modified one of the boxes and checked it and

23   wrote, failure of nurse-to-provider communication.  And then he

24   wrote, no documentation that HCP was called; correct?

25   A.  Yes.                                                      13:53:54

David Robertson - Direct Examination

1   Q.  And on page 3 under Nursing, he wrote, quote, no

2   documentation found as to whether nursing staff contacted the

3   HCP after the patient was admitted to the unit.

4   A.  Yes.

5   Q.  And then on page 4, what did Dr. Rowe write under                    13:54:14

6   Discussion and Recommendations?

7   A.  This patient was not seen or evaluated by the health care

8   practitioner from the time that he returned to custody until

9   his demise.  It is, therefore, unclear whether this patient's

10  death could have been prevented.  The proper intake evaluation    13:54:35

11  was not completed according to policy.

12  Q.  Now, do you -- do you know, Dr. Robertson, when you're

13  meeting with the Corizon officials and they're kind of the

14  regional people and you're going over these things, do they go

15  back to the providers or the nursing staff and provide them       13:54:55

16  copy of the final Mortality Reviews?

17  A.  I believe they do.

18  Q.  Okay.

19  A.  See, again, this is everything we can find.  This is all of

20  the fault.  And we -- when we do these things, it is in the       13:55:08

21  spirit of collegiality for improving care.

22          And, you know, corrections is not the Mayo.  And we

23  have to work with people that are often, you know, fresh out of

24  school.  And so you have to develop a nurturing atmosphere.

25          And when we find -- when we have these findings,          13:55:30

David Robertson - Direct Examination

1    especially serious findings, the individuals are counseled.

2    Sometimes they're shown the door, you know, if they're

3    extremely incompetent.

4         But the point of the final Mortality Review is to find

5    the problems that we're outlining.  We can make a big old list.    13:55:49

6    But we address them openly with Corizon.  And progress is being

7    made.

8    Q.  Okay.  I'm glad to hear that.

9         And I'm glad to hear that they do something with it,

10   because if it just went into a black hole, that would be very    13:56:04

11   problematic.

12   A.  We're holding their feet to the fire.

13        And we're also improving our processes as we go.

14   We've changed this form, and we're also going to start

15   including CQIs so the Continuous Quality Improvement people are    13:56:17

16   in the room at the time we do the findings.

17   Q.  Very good.

18        Could you turn to Exhibit 46, please.

19        And this is a Mortality Review that Dr. Rowe prepared

20   dated 6-12-17 for a 63-year-old male?                             13:56:40

21   A.  Yes.

22   Q.  Unknown cause of death, and secondary cause of death

23   written as COPD?

24   A.  Yes.

25   Q.  And on page 3, under Contributing Cause Analysis, Dr. Rowe    13:56:55

1    marked the box that says, failure to recognize symptoms or

2    signs; correct?

3    A.   Correct.

4    Q.   And then he modified one of the entries to say, failure of

5    nurse-to-provider communication?                                    13:57:13

6    A.   Yes.

7    Q.   And then if you turn to page 5, he wrote under Discussion

8    Recommendations, nursing to call HCP when patient presents with

9    atypical symptoms.

10   A.   Yes.                                                           13:57:31

11   Q.   And this particular Review was out of the Winslow prison,

12   according to page 1?

13   A.   Yes.

14   Q.   Do you know if the Winslow prison has had problems having

15   provider positions staffed?                                        13:57:48

16   A.   Unknown.

17           MS. KENDRICK:  Okay.  I would like to move into the

18   record Exhibits 30 through 47.  These are the 12 Mortality

19   Reviews -- sorry, 13 Mortality Reviews that we walked through,

20   plus four additional ones that were written by Dr. Rowe.           13:58:31

21           THE COURT:  Any objection?

22           MR. BOJANOWSKI:  I'm reviewing to see if that's -- is

23   that a complete, 30 through 37 --

24           MS. KENDRICK:  We went through all of the --

25           THE COURT:  Subject to a reservation that if what          13:58:52

1  Miss Kendrick said isn't true, assuming that she is seeking the

2  admission of only the exhibits that were marked for

3  identification that she addressed with this witness, assuming

4  that that is the list, subject to your ability to modify your

5  objection if it turns out that's not the list, what is the          13:59:06

6  defendants' position?

7          MR. BOJANOWSKI:  There's no objection, I just thought

8  that there were a few within that range that were not

9  discussed.

10         MS. KENDRICK:  They were not.  They were Exhibits 39,     13:59:15

11  41, 42 and 44.

12         MR. BOJANOWSKI:  38.

13         MS. KENDRICK:  39.

14         THE COURT:  Are you --

15         MR. BOJANOWSKI:  I did not know that 38 was discussed.   13:59:37

16         MS. KENDRICK:  I'm sorry.  And 38, yes, you're

17  correct.

18         THE COURT:  Is what, I'm sorry?

19         MS. KENDRICK:  So Exhibits 38, 39, 41, 42 and 44 were

20  not discussed with the witness, but are also mortality reviews    13:59:55

21  that were prepared by Dr. Rowe in the normal course of business

22  for the Arizona Department of Corrections.

23         THE COURT:  I see.  It was confusing what you said

24  before, because I didn't know whether you were referring to the

25  reviews were conducted by Dr. Rowe that this doctor did testify   14:00:09

David Robertson - Direct Examination

1   about, as opposed to what is now these other exhibits, which

2   were ones that were not addressed by this witness, but are also

3   being sought to be placed on the record.

4       And so we have a couple of -- at least three

5   categories here, I guess.                                    14:00:27

6       What's the State's position?

7       MR. BOJANOWSKI:  We'll object to the ones that have

8   not been testified to.

9       MS. KENDRICK:  Okay.  Let's turn to Exhibit 38 then.

10  BY MS. KENDRICK:                                             14:00:43

11  Q.  And this is a Mortality Review Report that was prepared by

12  Dr. Rowe dated 8-7-17; correct?

13  A.  Correct.

14  Q.  Okay.  And if you turn to page 5 under Discussion and

15  Recommendations, Dr. Rowe wrote, quote, staff to be reminded to  14:01:07

16  timely and accurately document care provided; correct?

17  A.  Yes.

18  Q.  All right.  Let's turn to Exhibit 39.

19      MR. BOJANOWSKI:  I'm sorry, I didn't hear an answer.

20      THE WITNESS:  Yes.                                       14:01:29

21      MR. BOJANOWSKI:  Thank you.

22      THE COURT:  There was an answer on the record, it

23  just didn't make it all the way to half of the courtroom.

24  BY MS. KENDRICK:

25  Q.  And Exhibit 39 is a report done by Dr. Rowe on 4-19-17?   14:01:42

David Robertson - Direct Examination

1    A.  Correct.

2    Q.  And on page 4 under Nursing, he wrote inadequate

3    documentation on 3-23-17 of the event surrounding the patient's

4    death.  No documentation of pronouncement of death found.

5    A.  Yes.                                                        14:02:07

6    Q.  And then under Discussion slash Recommendations he wrote,

7    quote, health staff to be reminded of the necessity of accurate

8    and complete documentation of care provided to offenders, close

9    quote.  Correct?

10   A.  Correct.                                                    14:02:20

11   Q.  All right.  Let's go to Exhibit 41.

12   A.  In this case, you know, when -- this is a 77-year-old man

13   who died from hypertensive cardiovascular disease.  Again, this

14   is not something to be punitive to the nurses, this is

15   something to educate them.  It's an opportunity for growth.     14:02:37

16   And so it's -- I don't want it to seem like we're being

17   punitive here.  You know, the staff needs to be reminded, and

18   they get reminded.

19   Q.  And are you aware the concept in health care, not

20   documented, not done?                                          14:02:54

21   A.  Very much.

22   Q.  Would you turn to Exhibit 41, please.

23          And this is another review done by Dr. Rowe on

24   10-25-17?

25   A.  Correct.                                                    14:03:15

David Robertson - Direct Examination

1  Q.  And on page 4 under Discussion Recommendations he writes,

2  quote, all efforts should -- omitting the word "be" -- should

3  be made to obtain documentation for end-of-life care on all

4  patients admitted to the IPC, close quote.  Correct?

5  A.  Correct.                                                        14:03:35

6  Q.  All right.  Let's turn to Exhibit 42.

7         This is a review completed by Dr. Rowe on December

8  5th, 2017; correct?

9  A.  Correct.

10  Q.  And on page 4 under Discussion slash Recommendations, he     14:03:48

11  writes, quote, documentation lacking as to who pronounced

12  death, close quote.  Correct?

13  A.  Correct.

14  Q.  All right.  I think the final one is Exhibit 44.

15         And this is another report done by Dr. Rowe on          14:04:16

16  4-24-17; correct?

17  A.  Correct.

18  Q.  And on page 3 under Contributing Cause Analysis, he's

19  marked the box, delay in access to care.  And then he writes,

20  chronic longer than recommended intervals; correct?           14:04:34

21  A.  Correct.

22  Q.  And then if you turn to page 5 under Discussion slash

23  Recommendations, one of his recommendations is, quote, nursing

24  staff will be reminded to accurately and fully document care

25  that is provided to the inmate patients.  Correct?            14:04:48

David Robertson - Direct Examination

1    A.  Correct.

2           MS. KENDRICK:  Your Honor, I move to -- ask that we

3    move Exhibits 30 to 47 into evidence.

4           THE COURT:  Any objection?

5           MR. BOJANOWSKI:  No objection.                    14:05:01

6           THE COURT:  These exhibits will be received.

7      (Exhibit Nos. 30 through 47 admitted into evidence.)

8    BY MS. KENDRICK:

9    Q.  So, Dr. Robertson, before we went through these 17

10   Mortality Reviews, you said that you hadn't been able to   14:05:13

11   identify any sort of systemic problems or trends that arise in

12   the Mortality Reviews.

13          Having now gone through 17 of them at once, are there

14   any trends that perhaps one could identify from these reviews?

15   A.  Communication.                                        14:05:34

16   Q.  Communication.

17          And that's communication from nurses to providers?

18   A.  Written and spoken, amongst the health care staff.

19   Q.  And that would include failure to properly document the

20   medical care provided?                                    14:05:48

21   A.  Correct.

22   Q.  Because as we just said a few minutes ago, not documented,

23   not done.

24   A.  Well, that's correct.

25   Q.  Yeah.  And the failure -- was there a failure of nursing   14:05:54

David Robertson - Direct Examination

1  staff to notify providers when the patients were appearing on

2  nurse's line multiple times for the same problems?  Would you

3  say that was a trend in these 17 reviews?

4  A.  No.

5  Q.  Okay.  How about nurses practicing outside their scope of          14:06:11

6  practice?

7  A.  No.

8  Q.  What about failure to provide appropriate palliative care

9  and pain management?

10  A.  Isolated instances, yes.                                           14:06:23

11         MS. KENDRICK:  Okay.  Your Honor --

12         THE COURT:  Yes.

13         MS. KENDRICK:  I don't know if the court reporter

14  needs a break, but this is actually a good breaking point for

15  me.                                                                    14:06:39

16         THE COURT:  We'll ask.

17         The reason I was more accommodating in the morning is

18  that even though we start at 9:00, she starts earlier.  And

19  when we started at quarter to 1:00, I think she started when we

20  started.                                                               14:06:53

21         So if you divide the time between now and when we

22  normally conclude and try to give a break in the middle, would

23  mean we would be breaking about 2:45.

24         We'll ask the court reporter if that's okay.

25         All right.                                                      14:07:07

——David Robertson - Direct Examination——

```
 1   BY MS. KENDRICK:

 2   Q.  All right.  Dr. Robertson, there's a couple boxes behind

 3   you.  There's -- with exhibits.  Could you --

 4         THE COURT:  You can approach to assist.

 5         THE WITNESS:  Please.                          14:07:21

 6      (Discussion held off the record.)

 7   BY MS. KENDRICK:

 8   Q.  So for the record I asked you to pull out Exhibit 76.

 9         We're not going to go through the whole thing, don't

10   worry.                                               14:08:00

11   A.  Thanks.

12   Q.  So, I'm showing you a document that is a very long

13   spreadsheet that is attached to an e-mail sent on December

14   20th, 2017, from Peggy O'Neill to Kathleen Campbell.

15         Do you know these two people?                  14:08:17

16   A.  Yes.

17   Q.  And the subject line is, no shows for review; correct?

18   A.  Yes.

19   Q.  Okay.  Now if you turn the page to page 2, all the way

20   through page 85, the column that is second from the far right  14:08:39

21   under appointment status, does it appear to say "canceled" over

22   and over to you?

23   A.  Yes.

24   Q.  What is a no show?

25   A.  I wouldn't -- I'm uncomfortable speculating on this.  I   14:08:56
```

David Robertson - Direct Examination

1    believe it's no show to clinic.

2    Q.  Okay.

3    A.  But I have nothing to do with the spreadsheets.

4    Q.  Sure.  But -- so, for example, if you could turn to page

5    what's been marked as page 48.  It should say 076.48.      14:09:14

6              THE COURT:  Thank you.

7              THE WITNESS:  Got it.

8    BY MS. KENDRICK:

9    Q.  Are you on that page?

10   A.  Yes, ma'am.                                            14:09:35

11   Q.  So you see on that column -- on that page, the second from

12   the right column, it alternates between saying "canceled" and

13   "no show"; correct?

14   A.  Correct.

15   Q.  So is it fair to surmise that "canceled" and "no show" have  14:09:49

16   two different meanings for the Arizona Department of

17   Corrections?

18   A.  I can't speculate --

19             MR. BOJANOWSKI:  Objection.

20             THE WITNESS:  -- to the meaning of these.  I really    14:10:02

21   can't.

22   BY MS. KENDRICK:

23   Q.  Okay.  You testified that you used to work as a provider on

24   provider lines?

25   A.  Yes.                                                         14:10:08

David Robertson - Direct Examination

```
 1   Q.  And would the lines get shut down from time to time, like a
 2   lockdown or something like that?
 3   A.  Yes.
 4   Q.  And so if you had people that were waiting to be seen and
 5   had to be sent back to their house because of a lockdown, would      14:10:19
 6   you make some sort of notation in the record that it was
 7   canceled?
 8   A.  No.
 9   Q.  What would you put in the record?
10   A.  I wouldn't let them go.                                          14:10:28
11   Q.  You wouldn't let them go?
12   A.  Now, remember, I worked under the ADOC, and when I ran a
13   clinic in my yard and there was a lockdown, they sat in that
14   waiting room until the lockdown was done.
15   Q.  What if at the yard was locked down at 7:00 a.m. and            14:10:45
16   provider line wasn't starting until 9:00?
17   A.  I would call the deputy warden and have them get me my
18   patients.
19   Q.  Do you know if that's the practice of the Corizon
20   providers?                                                           14:10:59
21   A.  Unknown.
22   Q.  Have you, in your experience looking at medical records,
23   seen entries for canceled?
24   A.  No.
25   Q.  You've never seen an entry in a medical record saying          14:11:06
```

UNITED STATES DISTRICT COURT

376

David Robertson - Direct Examination

1  canceled?

2  A.  No, not that I can recall right now.

3  Q.  Okay.  And when you used to run provider line and a patient

4  didn't show up, what was that referred to?

5  A.  A no show.                                                    14:11:24

6  Q.  And under the rules you're supposed to get a refusal form

7  signed or some sort of figuring out why the guy is not there;

8  correct?

9  A.  I would send an officer to get the patient.

10  Q.  And --                                                       14:11:35

11  A.  And they would sign the refusal.

12  Q.  So he would either come and show, or he would sign the

13  refusal and it would be a --

14  A.  Or he would -- if the patient showed and wanted to leave,

15  he could sign the paper.  If he didn't show, someone went to    14:11:49

16  his bed and told him to come.  If he refused at that point,

17  they would fill out the paper.

18  Q.  Okay.

19  A.  Again, this was before Corizon.

20  Q.  Okay.  So if you saw, for example, page 48, where there's a  14:12:02

21  combination of the terms "canceled" and "no show," would you

22  reading that consider that to refer to two different events or

23  those words can be used interchangeably?

24  A.  I have no idea.  I can't speak to this.  I'm sorry.

25  Q.  Okay.  So behind you there's Exhibit 84.                     14:12:25

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    A.  And you're going to find it?

2    Q.  And actually grab 85 and 88 while you're at it.

3    A.  I have them.

4    Q.  Okay.  We can start with 84.

5         This is an e-mail dated August 10, 2017, from somebody          14:12:58

6    who works for Corizon named Stacy Deguara at Tucson, Assistant

7    Facility Health Administrator.  And it appears at 8:02 a.m. on

8    August 10th she sent this e-mail to a bunch of people, and

9    you're listed under the cc line; correct?

10   A.  Yes, ma'am.                                                       14:13:25

11   Q.  Okay.  And the subject for this e-mail is forward, colon,

12   weekly update, dash, follow up on PTs, dash, Tucson.

13        Is this a regular e-mail that is circulated at the

14   Tucson facility?

15   A.  Yes.  It was.                                                     14:13:46

16   Q.  It was.  You're using the past tense.  So when was --

17   A.  I'm not aware of this process continuing right now.

18   Q.  What was --

19   A.  It's evolved.  This was -- I'm sorry.

20   Q.  No, so tell us about the process.                                14:14:00

21   A.  The process was to make sure the patients that were high

22   acuity that needed care got the care.  It was a checklist of

23   patients in the complex that needed oncology, or any other type

24   of procedure, that wasn't -- that was not getting through.

25        And so this is an update.  They would meet, and they            14:14:17

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    would go down the list to make sure everything was up to date

2    and everybody was aware and they were all on the same page.

3              And this has evolved into a meeting that we have on

4    Wednesdays at 2:00 o'clock with Corizon.

5    Q.   State-wide meeting?                                        14:14:33

6    A.   System-wide, yes.

7    Q.   Okay.  But at the time this was just for Tucson?

8    A.   Just for Tucson.

9    Q.   And this was in August.

10             Were you aware of this weekly process being done at    14:14:41

11   any of the other institutions?

12   A.   No, I wasn't aware it was going on in any other

13   institutions.

14   Q.   Okay.  And you had mentioned earlier that one of your roles

15   is that the monitors can contact you when they're worried or    14:14:55

16   concerned about medical care, or they need your analysis of the

17   care that the person's getting?

18   A.   Yes.

19   Q.   So is this an example of how you would get involved into

20   individual patient care sometimes?                              14:15:07

21   A.   Yes.  I believe this was initiated by Corizon to make sure

22   that these patients were seen.

23   Q.   Okay.  And if you turn to the second page, about half way

24   down there's an entry for a patient who the last two numbers of

25   his ADC number are 37.  Do you see that?                        14:15:32

──────── David Robertson - Direct Examination ────────

1    A.  Yes, ma'am.

2    Q.  Okay.  And it's written, quote, this is what the latest

3    consult info says in eOMIS dated 7-28-17.

4          Third request.

5          Recurrent mantle cell lymphoma with axilla and neck          14:15:49

6    nodes, post splenectomy in May 2016, splenic rupture, lymphoma.

7    Currently under treatment by Dr. Persky.  Needs to return to

8    oncology for chemotherapy dose adjustment.  Oncology will not

9    adjust his dose unless he has appointment with them.  Needs a

10   monthly visit with oncology.                                      14:16:14

11   A.  Yes.

12   Q.  And then under the O note the provider writes, multiple

13   requests by oncologist for inmate to return 2/2.

14   A.  That's secondary to.

15   Q.  Secondary to, needing chemo dose adjustment.  See oncology    14:16:29

16   consults, initiated 5-2-17.  Chemotherapy was approved.  He

17   began chemo on May 10th.  He had subsequent appointments on his

18   chemo plan.  He went to his June appointment.  Had an

19   appointment and transportation scheduled for July 10th, but he

20   never got to go.  Appointment was no longer in the system.  New   14:16:48

21   consult initiated July 11th.  Was ATP'd.  I did not accept the

22   ATP.  When I resubmitted it, it was sent to UM review, and then

23   a few days later was no longer in the system.  His consult

24   initiation date should remain 5-2-17.

25          And then underneath that it states, Dr. FallHowe          14:17:09

David Robertson - Direct Examination

1    wrote, I will need to get involved.  Inmate was given a NMI by

2    the UM Team.

3              What's an NMI?

4    A.  Need more information.

5    Q.  And who is Dr. FallHowe?                          14:17:25

6    A.  Dr. FallHowe is the western director, I believe, for

7    Corizon.

8    Q.  So why would she need to get involved if the UM Team gave a

9    need more information?

10   A.  She needed to get involved because this is a consult that   14:17:38

11   needed to be approved.

12   Q.  So she has the power to override UM?

13   A.  She had to get involved.  I didn't know if she was

14   overriding UM or not, or if she was calling UM, because they're

15   in-house.                                             14:17:57

16   Q.  Okay.  And then on the next page, page 3 of the exhibit,

17   the last patient who's listed, again, it says -- Dr. FallHowe

18   wrote, I need to get involved in review because the requests

19   were ATP'd.

20             So you guys were having to get the western regional   14:18:17

21   director of Corizon involved to get the specialty care for

22   these patients?

23   A.  I was speaking to her almost daily.

24   Q.  Why?

25   A.  Because these consults were languishing.          14:18:29

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

```
 1   Q.  Why were they languishing?

 2   A.  I don't know.  I don't care.  They needed to be done.

 3   Q.  Right.

 4        THE COURT:  So when you say you don't care, you're

 5   saying you don't --                                              14:18:44

 6        THE WITNESS:  I don't care why they were --

 7        THE COURT:  You don't care about the why --

 8        THE WITNESS:  I care that they get done.

 9        THE COURT:  -- you care about the fact.

10        THE WITNESS:  Absolutely.                                   14:18:50

11        THE COURT:  I understand, because you think the why is

12   not your problem.

13        THE WITNESS:  No.  And we were -- we brought this up

14   to Corizon on multiple occasions that these patients weren't

15   being seen.  And we felt -- I felt personally that Utilization   14:19:00

16   Management was being arbitrary.  And she and her team decided

17   to have meetings on every one of these cancer patients in the

18   Tucson complex.  And I would call her every day, and sometimes

19   we'd have a conference call.  And I expressed my very strong

20   displeasure with how this was working, because lives were       14:19:31

21   involved.

22        And so what was the outcome of this were these

23   meetings we were having.  Everything was out in the open.  We

24   had the meeting, and -- or they had the meeting, and each case

25   was discussed, and FallHowe would weigh in.                     14:19:48
```

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1   BY MS. KENDRICK:

2   Q.  Right.  And this was in --

3   A.  August.

4   Q.  -- August.

5          Were you doing this with the cancer patients at the          14:19:59

6   other prisons, Eyman or Florence or Perryville, anywhere else?

7   A.  Yes.  And Tucson was particularly problematic.

8   Q.  Do you have any idea why Tucson was particularly

9   problematic?

10  A.  Unknown.                                                        14:20:11

11  Q.  And you stated earlier, I don't care why they weren't

12  getting approved.  And I understand, as the Judge clarified,

13  that you meant along the lines you didn't want to hear the

14  excuses.

15  A.  There are none.                                                 14:20:25

16  Q.  What -- were any excuses or explanations provided to you as

17  to the reasons for the delay?

18  A.  No.

19  Q.  Could you turn to page 85 -- Exhibit 85?

20  A.  This --                                                         14:20:50

21          May I speak, Your Honor?

22          THE COURT:  Yes.

23          THE WITNESS:  This process has gone state-wide, it's

24  evolved, and become more applicable system-wide in that we have

25  a meeting every Monday -- or every Wednesday at 2:00 o'clock       14:21:00

David Robertson - Direct Examination

1   with Corizon, and we discuss these cases with UM directly now.

2   BY MS. KENDRICK:

3   Q.  And is it limited to just cancer patients?

4   A.  No, it's limited to patients that are hiccupped, you know,

5   they just don't seem to be moving.                              14:21:16

6          And so when we have a patient that's not being seen or

7   there's an issue with a UM refusal or ATP or something like

8   that, we can bring it up in this meeting.  It's pretty free

9   wheeling.

10          And there's no real criteria for bringing a case        14:21:32

11   forward.  If you have a case and you want to bring it forward.

12   I bring cases forward every week that bubble up to me.  And

13   I'll review the chart and say, well, this patient needs to be

14   seen, and this ATP is unreasonable.  Instead of getting the CT

15   go ahead and go do the biopsy.  I mean, if it smells like -- if  14:21:50

16   it walks like a duck and quacks like a duck, move forward on

17   oncology.  And they say, okay, because they don't have access

18   to the chart.

19          THE COURT:  Miss Kendrick, are you going to follow up

20   about questions related to when it became implemented          14:22:03

21   state-wide and other aspects of it?

22          MS. KENDRICK:  You just asked it.

23          THE COURT:  All right.  When did it become implemented

24   state-wide?

25          THE WITNESS:  A few months ago.                          14:22:12

UNITED STATES DISTRICT COURT

1          THE COURT:  Are we thinking December or November or

2  January?

3          THE WITNESS:  I'm not sure specifically.  I'm thinking

4  November, somewhere around there.

5          THE COURT:  All right.  One of these -- you missed                    14:22:26

6  together, I gather.

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.  And it's every Wednesday at what

9  time?

10         THE WITNESS:  2:00 o'clock.                                           14:22:35

11         THE COURT:  And who all calls in?

12         THE WITNESS:  We have Dr. Rowe, we have myself, we

13  have our nursing supervisors, Vanessa and Kathy Campbell --

14  Vanessa Headstream.  Mr. Pratt will sit in often if he has

15  time.  Dr. Patel.  And their UM Team, I'm not sure of their                  14:22:54

16  last names.  But their UM Team is there, and they look things

17  up as we address them and tell us where we are in the process.

18         And then that's all logged and we get a spreadsheet

19  each week.

20  BY MS. KENDRICK:                                                            14:23:11

21  Q.  You get a spreadsheet of all the patients?

22  A.  Yes, that are in our cue.

23  Q.  So it's kind of like the agenda for the meeting, like here

24  are the patients we're going to discuss, so be prepared to

25  discuss them?                                                               14:23:23

David Robertson - Direct Examination

1    A.  Yes.  And then we bring new patients forward.

2    Q.  And does anybody take notes, are there any minutes from

3    these meetings?

4    A.  They're applied to the spreadsheet.

5    Q.  Okay.                                                      14:23:34

6    A.  There's an update on each one.

7    Q.  And are you aware that my office and Miss Eidenbach and the

8    ACLU National Prison Project from time to time notify the

9    attorneys for the State about individual class members who

10   contact our offices reporting serious medical needs or mental   14:23:50

11   health needs, and we, as part of our ethical obligation, share

12   that information with the attorneys for the defendants?

13   A.  Yes.

14   Q.  So you sometimes see those letters that we send?

15   A.  Yes.                                                       14:24:04

16   Q.  Are those patients included in these weekly Wednesday

17   meetings?

18   A.  Yes.

19   Q.  All of them?  As far as you know.

20   A.  As far as I know.                                         14:24:13

21   Q.  Okay.  Thank you.  That was very helpful explanation.

22          Can we look at Exhibit 85, if you have it in front of

23   you?

24          And this is an e-mail from Karen Padron.  And she

25   works for the Department as a monitor?                        14:24:36

1    A.  Yes, ma'am.

2    Q.  At what institution?

3    A.  I think she's at Perryville.

4    Q.  Okay.  Could you read what she wrote you in this e-mail

5    that's dated July 28th, 2017?                              14:24:54

6    A.  Hello, Dr. Robertson.

7         I'm working on PM 5052 and ran across this consult

8    that was canceled by the regional medical director and wondered

9    if you were aware and that nothing has been pursued since 4-20.

10   Routine neuro consult was ordered by provider 4-4, second   14:25:12

11   request, for Alzheimer's/dementia evaluation due to decline.

12   Canceled by the clinical coordinator on 4-20 with a note that,

13   canceled per directive from Dr. Urdaneta.

14        There have not been any further medical assessments

15   since.                                                      14:25:30

16        Read his 3-23 chronic care appointment subjective

17   notes.

18        Thought you might want to be aware that this inmate

19   appears not to be getting an evaluation he needs in order to be

20   appropriately treated.                                      14:25:42

21   Q.  So would this be kind of a good example of the sort of

22   notifications you get from the monitors --

23   A.  Yes.

24   Q.  -- about -- okay.

25        And it states that he's had multiple requests for       14:25:51

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    neuro consults for Alzheimer's and dementia canceled by the

2    regional medical director and the clinical coordinator.

3         Is this -- is that sort of cancellation of specialty

4    requests something that you've encountered in the past?

5    A.  Yes.                                                    14:26:12

6    Q.  How frequently?

7    A.  I wouldn't be able to say.

8         You know, I get a letter like this, and what I do is I

9    review the chart, and if I think it's appropriate to bring up

10   with Corizon leadership, I'll call my peers.  I just call my   14:26:25

11   peers.  And I'll call Karen and just let her know.

12   Q.  But in terms of seeing a note about a request made by a

13   provider being canceled by someone else, would you say you see

14   that maybe once a week, once a month, twice a month in the

15   records?                                                     14:26:46

16   A.  Monthly maybe.

17   Q.  Okay.

18   A.  Maybe.

19   Q.  All right.  I think it's behind you, if you could grab

20   Exhibit 95.                                                  14:27:04

21   A.  I have it.

22   Q.  And this is an e-mail that was sent on December 27th from

23   Robert Patel at Corizon to a number of people, including you

24   and Dr. Rowe; correct?

25   A.  Yes.                                                     14:27:36

David Robertson - Direct Examination

1    Q.   Do you remember this case?

2    A.   Yes.

3    Q.   Do you know if he's -- this class member has seen a

4    urologist yet?

5    A.   He has had the cryoablation and the biopsy done, and he is      14:27:56

6    scheduled for follow-up.

7         This was one of the cases on our weekly call.

8    Q.   Right.

9    A.   And the issue that we have right now is that he's due to be

10   released.  And so how do we do appropriate continuity of care?      14:28:15

11   And so the appointments have been made.  They're working with

12   AHCCCS to get him on AHCCCS.  And he will be seen.

13   Q.   Did his biopsy come back as cancer?

14   A.   Yes.

15   Q.   Has he started any sort of oncology or hematology, to your      14:28:32

16   knowledge?

17   A.   At this point I believe he is scheduled for it.

18   Q.   Okay.

19   A.   This is where it's working.

20   Q.   Okay.  If you turn to the second page at the top, this is      14:28:45

21   earlier in the e-mail chain, it's dated December 7th.  And it's

22   sent to Dr. Patel at Corizon from somebody named Dennis

23   Randles, who's the facility health administrator at Winslow;

24   correct?

25   A.   Yes.      14:29:06

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1   Q.  And he starts his e-mail saying, Dr. Patel, I need your

2   help and intervention.  The inmate -- I'm not saying his

3   name -- has an ostomy and came to us almost two years ago with

4   it.  Over the course of time he has been diagnosed with a

5   kidney mass which is believed to be cancerous.                    14:29:23

6           Right?

7   A.  Right.

8   Q.  And then the next paragraph says, I have reviewed this case

9   and I really don't want to see us have this case as another

10  headline.  As the facility health administrator, I have to       14:29:35

11  express grave concerns that we may be viewed as not, all caps,

12  doing what is expeditious or right, all caps, in this regard.

13  Bottom line for me is that, unless there is compelling evidence

14  to the contrary, I just feel that we have not and are not doing

15  the right thing in this case.                                     14:29:54

16          And then he closes by saying, I ask you to you please

17  stop, reevaluate this case, and help to set it on the right

18  path.

19          Correct?

20  A.  Correct.                                                      14:30:04

21  Q.  And then on page 3 is -- it appears to be a copy, cut and

22  pasted from eOMIS of the inmate consultation request screen.

23  A.  Yes.

24  Q.  And it appears since May 18th, 2017, that there were eight

25  separate urology consults submitted between May 4th and          14:30:32

---

David Robertson - Direct Examination

1   December 1st, 2017; correct?

2   A.  Correct.

3   Q.  And of those urology consults, two were urgent; correct?

4   A.  Correct.

5   Q.  And it also appears that since May 18th -- since the May          14:30:45

6   18th request there were four that received alternative

7   treatment; correct?

8   A.  Correct.

9   Q.  Three that were canceled.

10  A.  Correct.                                                          14:31:02

11  Q.  And one that says, sent to UM.

12  A.  Correct.

13  Q.  Do you know why these routine consults were receiving --

14  and urgent were receiving alternative treatments?

15  A.  Unknown.                                                          14:31:15

16  Q.  Did Corizon ever provide any sort of explanation?

17  A.  Usually when there's an alternative treatment plan, it says

18  medical criteria not met.  And what happens is it starts --

19  cases that are important, like this case is important, they

20  start -- it starts building momentum, it comes to me, the FHA        14:31:34

21  writes a letter and, you know, we get upper management

22  involved.

23         And in this case what happened is Dr. Patel was very

24  expeditious and got this through.

25  Q.  And do you have any contact with the people at Corizon who        14:31:52

---

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1   do the Utilization Management reviews?

2   A.  We do -- we have the meeting on Wednesday and they're

3   present in the meeting.

4   Q.  The people that work at Corizon that do the reviews?

5   A.  I believe so.  Or their clerks or somebody -- it's their          14:32:08

6   UM Team, they're in the call.  And, you know, we discuss cases

7   like this.

8          Oftentimes this cut and paste is not current and they

9   have to bring it up to date.

10  Q.  Well, this cut and paste has the last request submitted as       14:32:36

11  December 1st --

12  A.  It's sent to UM.  So he's already had surgery.

13  Q.  Right.  But the e-mail was -- the e-mail was sent December

14  7.  So I think at the time the e-mail was sent --

15  A.  Right.                                                           14:32:51

16  Q.  -- would it be fair to say this is a current cut and paste

17  from the screen?

18  A.  That would be current.

19  Q.  Okay.  Thank you.

20         And could you look behind you for Exhibits 180 and            14:33:01

21  181?

22  A.  I have them.

23  Q.  Okay.  So this is -- Exhibit 180 is a Corizon e-mail

24  between two people, one named Yolanda Serrato, who on page 2 of

25  the exhibit is listed as the clinical coordinator for ASPC Yuma     14:33:48

─────David Robertson - Direct Examination─────

1    and somebody named Karen Barcklay.

2             Is Dr. Barcklay the provider at Yuma?

3    A.  Yes.

4    Q.  Okay.  So on August 25th Miss Serrato writes to

5    Dr. Barcklay --                                          14:34:11

6             MR. BOJANOWSKI:  Note an objection, this is hearsay.

7             MS. KENDRICK:  I'm not admitting it for the substance,

8    I want his opinion on this.

9             MR. BOJANOWSKI:  I think you were going to read into

10   the record what it says.  This document is hearsay.        14:34:22

11            MS. KENDRICK:  It was provided by your agent, Corizon.

12            MR. BOJANOWSKI:  It doesn't change the character of

13   the document, the document is hearsay.

14            THE COURT:  Let's try to ask some foundational

15   questions to see whether or not there's some basis for some   14:34:36

16   exception to apply.

17   BY MS. KENDRICK:

18   Q.  You talked earlier about NMIs; right?

19   A.  Yes.

20   Q.  And on the middle of the first page it states, I think they   14:34:45

21   have to show --

22            MR. BOJANOWSKI:  Same objection.  She's reading into

23   the record --

24            THE COURT:  Let her finish the question.

25            MR. BOJANOWSKI:  Your Honor, she's reading into the    14:35:00

─────────── David Robertson - Direct Examination ───────────

```
 1   record the content of the document.
 2           THE COURT:  It's not as if there's somebody whose bell
 3   you can't unring.
 4           MR. BOJANOWSKI:  I'm sorry, Your Honor.
 5           THE COURT:  It's not as if there's somebody here who's      14:35:07
 6   listening whose bell you can't unring.  I know how to do that.
 7   I'm trying to figure out whether or not there's a basis for
 8   this document to come in, so we'll have these preliminary
 9   questions and you'll have a chance to make your argument as to
10   what you've heard as to whether or not you think hearsay        14:35:21
11   applies, and then we'll hear whether or not there's perhaps an
12   exception that applies.
13   BY MS. KENDRICK:
14   Q.  So in this -- the doctor writes, I think they have to show
15   these MNI reports -- but I believe it's NMI reports -- to the   14:35:38
16   Courts and it affects our fines, smiley -- frowny face.
17           Are you aware of need more information reports being
18   record to the Court?
19           MR. BOJANOWSKI:  Same objection.
20           THE WITNESS:  No, I'm not.                               14:35:52
21   BY MS. KENDRICK:
22   Q.  Do you have any idea what she might be referring to there?
23   A.  No.
24           MR. BOJANOWSKI:  Same objection.
25           THE COURT:  And this document, Exhibit 180.1 --          14:36:00
```

David Robertson - Direct Examination

```
 1            MS. KENDRICK:  Yes.
 2            THE COURT:  -- was produced by the defendants in this
 3    case.
 4            MS. KENDRICK:  No, it was produced by defendants'
 5    agent, Corizon.  And this is an exception to the hearsay rule     14:36:10
 6    because it's an admission by an agent of a party opponent.
 7            THE COURT:  So the pathway of this document though
 8    didn't come from the State, it was pursuant to a subpoena to
 9    Corizon directly?
10            MS. KENDRICK:  No, it's part of the document             14:36:26
11    production --
12            THE COURT:  So it came from --
13            MS. KENDRICK:  It came from your court order to
14    Corizon and ADC.
15            THE COURT:  Right.  So what I'm trying to establish is   14:36:33
16    that this document came from the defendant in this case, and it
17    is a document of the defendants' contractor.
18            MS. KENDRICK:  Correct, Your Honor.
19            It was forwarded to us by Mr. Bojanowski's assistant,
20    Elaine, the link to this document.                               14:36:48
21            THE COURT:  The objection is overruled.
22    BY MS. KENDRICK:
23    Q.  And towards the bottom of the page Dr. Barcklay writes --
24    do you see this -- do you want me to cancel it with a notation
25    that we will resubmit when the dictated reports are available?   14:37:04
```

David Robertson - Direct Examination

 1   A.  I see.

 2   Q.  Are you aware of a practice of specialty requests being

 3   canceled and resubmitted?

 4           MR. BOJANOWSKI:  Same objection.

 5           THE COURT:  Overruled.                          14:37:15

 6           THE WITNESS:  No, I'm not.

 7           Sometimes they want more information, but I'm not

 8   aware of any of this.  I don't understand the context.

 9   BY MS. KENDRICK:

10   Q.  Okay.  And you have Exhibit 181 in front of you?      14:37:28

11   A.  Yes, ma'am.

12   Q.  Okay.  And this is, again, an e-mail provided by Corizon in

13   response to the Court's order.

14           MR. BOJANOWSKI:  Same objection to the questions

15   concerning the document.                                 14:37:45

16           THE COURT:  A continuing objection will be granted,

17   and we'll hear what the question is before we rule.

18   BY MS. KENDRICK:

19   Q.  Well, it's written --

20           THE COURT:  No, what's the question?  I'm sorry.  14:37:55

21   BY MS. KENDRICK:

22   Q.  So the question is, you stated that you're not aware of

23   providers discontinuing consults?

24   A.  Correct.

25   Q.  Okay.  But it states here, if it is not necessary I can   14:38:08

David Robertson - Direct Examination

1    just have the provider discontinue the consults so that I'm not

2    cited for being delinquent and not addressing within a timely

3    manner.  Correct?

4              MR. BOJANOWSKI:  Same objection.

5              THE COURT:  Overruled.                           14:38:22

6              THE WITNESS:  That's what the document says.  I don't

7    know anything about this practice.

8    BY MS. KENDRICK:

9    Q.  Right.  But as somebody who works for the Monitoring Bureau

10   and monitors Corizon's adherence to the contract, is it        14:38:31

11   concerning to you that at two separate institutions there are

12   medical staff and clinical coordinators discussing

13   discontinuing consults so that they are not cited for being

14   delinquent?

15             MR. BOJANOWSKI:  Same objection.                  14:38:47

16             THE WITNESS:  Could you repeat the question?  I'm not

17   aware of this process, this practice.

18   BY MS. KENDRICK:

19   Q.  Okay.  So we've just brought two apparent examples of this

20   process to your attention.                                  14:38:56

21   A.  Um-hum.

22   Q.  And as a monitor, who clearly cares about patient care, as

23   you've expressed for the past hour or so, does it concern you

24   to learn that ADC's contractor at two separate institutions

25   health care staff and clinical coordinators are discussing    14:39:10

David Robertson - Direct Examination

1  discontinuing consult requests so that they, quote, am not

2  cited for being delinquent?

3         MR. BOJANOWSKI:  Both foundation and hearsay,

4  Your Honor.

5         THE COURT:  The objections is overruled, but subject          14:39:22

6  to the modification of the question.

7         If what is posited in this information from these

8  e-mails is true, then you can answer the question.  Assume for

9  the fact of the question that these things are true.  Would

10  that trouble you?                                                    14:39:39

11         THE WITNESS:  I would have to know the context.  It's

12  like if you're going to -- if they're going to ATP or NMI a

13  consult, you should just keep the consult moving forward.

14         MS. KENDRICK:  Right.

15         THE COURT:  Well, here the question that's posited is          14:40:00

16  that there is expressed in the e-mail -- and, again, I don't

17  know whether or not it's true.  And maybe there will be some

18  other witness who will maybe tell me whether it's true or

19  exactly what it means.

20         But as I read the e-mail on 181.1, it says, I could           14:40:14

21  just have the provider discontinue -- is that what we --

22         MS. KENDRICK:  D.C. stands for discontinue.

23         THE COURT:  -- discontinue the consult so that I'm not

24  cited for delinquent and not addressing within a timely manner.

25         THE WITNESS:  I would have an issue with that.                 14:40:35

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    BY MS. KENDRICK:

2    Q.  You do or do not?

3    A.  I would, yes.

4    Q.  Yeah.  Because it doesn't appear that it's based on some

5    sort of change in medical condition, like the patients are                14:40:47

6    somehow better; correct?

7    A.  Correct.

8    Q.  And the only reason provided for possibly discontinuing the

9    consults is so that they are not cited for being delinquent;

10   correct?                                                                   14:41:01

11           MR. BOJANOWSKI:  Same objection.

12           THE COURT:  Overruled.

13           THE WITNESS:  I'm not the monitor, but -- and I don't

14   understand most of the monitoring.  But personally that would

15   cause concern.                                                            14:41:13

16   BY MS. KENDRICK:

17   Q.  Right.  But there's nothing here that says, we're going to

18   discontinue the consults because these two individuals are

19   feeling great and they're healthy now; correct?

20           MR. BOJANOWSKI:  Same objection.                                  14:41:23

21           THE COURT:  You're getting close, Miss Kendrick.  I'll

22   overrule it.  But he's given you the best answer I think that

23   he can.

24           MS. KENDRICK:  Okay.

25           THE WITNESS:  I mean, it's a dermatology follow-up.               14:41:41

UNITED STATES DISTRICT COURT

—David Robertson - Direct Examination—

1    BY MS. KENDRICK:

2    Q.  Could you grab Exhibit 190, please?

3         THE COURT:  And when I said you're getting close, just

4    so you understand what I meant, you're getting close to having

5    the objection sustained, because I do think that the form of          14:41:55

6    the modification of the question, in fairness, you reach a

7    point at which we have to keep in mind what the witness has

8    already testified about, which limits, I think, the scope of

9    what you can push him on.

10        And so when I say that you're getting close, what I          14:42:10

11   think is at that point Mr. Bojanowski is making a good point.

12        MS. KENDRICK:  Thank you, sir.

13   BY MS. KENDRICK:

14   Q.  All right.  So Exhibit 190 is, again, an e-mail produced by

15   Corizon in response to the Court's order.  And it's between two          14:42:33

16   people named Greg Campbell and Erica Johnson.

17        And Greg Campbell's signature block says that he works

18   at the Phoenix Alhambra Complex; correct?

19   A.  Correct.

20   Q.  And he's writing about an inmate.  And he states that he's          14:42:49

21   trying to, quote, figure out how I missed the audiology

22   consult.  And he says, it's because the provider didn't

23   actually create the eOMIS encounter until mid July.  However,

24   because he used an entry date of 6-22-17, when he actually saw

25   the inmate, the consult he wrote in the encounter generated          14:43:15

─────David Robertson - Direct Examination─────

1   with a date of 6-22-17.  But in reality, he didn't write the

2   consult until 7-10-17.

3           Do you see that?

4   A.  Yes.

5   Q.  Are you aware that the health care staff at Corizon are          14:43:31

6   able to go into eOMIS and change and manipulate the dates of

7   requests to an earlier date?

8   A.  I know that it's possible to do that.

9   Q.  How do you know that?

10  A.  Through examples brought to my attention.                       14:43:47

11  Q.  Tell me about those examples.

12  A.  I don't have them with me.

13  Q.  How many of them do you remember?

14  A.  I wouldn't be able to speak to that.

15  Q.  And why were they brought to your attention?                    14:44:00

16  A.  For cases like this where a consult is postdated or a note

17  is postdated.

18  Q.  And why would -- why would postdating an entry be

19  problematic or brought to your attention in the first place?

20  A.  It's sometimes CYA.                                             14:44:22

21          THE COURT:  It's essentially not honest; right?

22          THE WITNESS:  Well, sometimes you can do late entries,

23  which is completely legitimate.

24          THE COURT:  But you're supposed to document that it's

25  a late entry.                                                       14:44:37

1        THE WITNESS:  You're supposed to document that it's a

2   late entry.

3        THE COURT:  But if you don't disclose that you've

4   documented a late entry, it's a dishonest statement --

5        THE WITNESS:  Yes.

6        THE COURT:  -- to say that you've done something on a

7   day --

8        THE WITNESS:  Yes.

9        THE COURT:  -- when you didn't.

10       You're talking over me.                              14:44:44

11       THE WITNESS:  I'm sorry.

12       THE COURT:  But it's a dishonest entry if you say

13   something that isn't true; is that correct?

14       THE WITNESS:  Correct.

15       THE COURT:  Thank you.                               14:44:51

16   BY MS. KENDRICK:

17   Q.  And then in response -- this Miss Johnson writes back in

18   response, LOL, it is okay, I canceled the consult and the

19   provider will reevaluate him and resubmit if necessary.

20       And are you aware of practices of cancel -- providers   14:45:09

21   cancelling a request and then resubmitting?

22       MR. BOJANOWSKI:  Same objection.

23       THE COURT:  Overruled.

24       THE WITNESS:  I don't know who Gregory Campbell is.

25       THE COURT:  No, this is not related to this e-mail.    14:45:22

David Robertson - Direct Examination

1  She read it to you to set a context.  We're not going to be

2  able to know from you, I don't think, about this.  But she's

3  asked a more general question.

4  BY MS. KENDRICK:

5  Q.  Are you aware of a practice where providers -- where they          14:45:35

6  cancel consults and the providers have to reevaluate and

7  resubmit?

8  A.  No.

9          THE COURT:  It's a quarter 'till.  Would that be an

10  appropriate time to take a break?          14:46:00

11          MS. KENDRICK:  Yes.

12          THE COURT:  With you, Miss Kendrick?

13          Sir, we're going to take a 15-minute break now.  Feel

14  free to leave the witness stand, but if you'll kindly come back

15  at 3:00 o'clock.          14:46:11

16          THE WITNESS:  Sure.

17          THE COURT:  Thank you.

18      (Recess at 2:46 p.m., until 3:12 p.m.)

19          THE COURT:  Please everybody be seated.

20          Before we continue, two matters I need to address.          15:12:38

21          One, the reason that I was so delayed is that I was

22  working to see if I could seek the good graces of one of my

23  colleagues.  And I have multiple colleagues.  We've cobbled

24  together the possibility so that now, Monday, Tuesday, the 25th

25  and 26th of March -- those are the correct dates; right?          15:12:58

─────David Robertson - Direct Examination─────

1          MS. KENDRICK:  It was the 26th and 27th.

2          MR. STRUCK:  I think it was the 26th and 27th, but I

3    have to look.

4          THE COURT:  Let's take a look at that, please.

5          MR. STRUCK:  It's -- March 26 is a Monday.          15:13:17

6          THE COURT:  Right.

7          MR. STRUCK:  And Tuesday the 27th.

8          THE COURT:  So I misstated the dates, but we are in

9    agreement that it's Monday and Tuesday.

10          MR. FATHI:  Correct.                              15:13:28

11          MR. STRUCK:  Correct.

12          THE COURT:  All right.  So we'll schedule that for a

13   continuation of both it looks like, I'm afraid, what we started

14   yesterday and what we have started today.  So that's what we'll

15   do.                                                     15:13:41

16          Again, the order of service, we can talk about that if

17   there are issues, but otherwise I will leave it to you as to

18   what works better with your witnesses.

19          And if counsel, I only really need one from each side,

20   could approach for just a moment, please.                15:13:55

21      (Discussion held at sidebar off the record.)

22          THE COURT:  Thank you, sir.

23          You may continue.

24   BY MS. KENDRICK:

25   Q.  Okay.  Dr. Robertson, could you look behind you for     15:14:33

David Robertson - Direct Examination

1    Exhibits 112, 113 and 114.

2    A.  I have them.

3    Q.  And we can start with Exhibit 112.

4         This is an e-mail from Vanessa Headstream to you dated

5    July 13th, 2017?                                        15:15:14

6    A.  Correct.

7    Q.  And this particular class member testified earlier today,

8    Mr. Upton, so unlike with the other class members we can freely

9    use his name when we're discussing his case.

10        Are you familiar with Mr. Upton's medical condition     15:15:32

11   and his treatment?

12   A.  Yes.

13   Q.  And why is that?

14   A.  Because I knew -- he's been on radar.

15   Q.  He's been on your radar?  Okay.                       15:15:45

16        And you previously said that you guys started doing

17   the state-wide meetings around November for all the

18   institutions, and previously it was Tucson; right?

19   A.  Correct.

20   Q.  He's housed at Florence South, but you would still get   15:15:59

21   involved with other people, not just only Tucson; correct?

22   A.  Correct.

23   Q.  Okay.  I just wanted to make that clear.

24        And in her e-mail to you, Miss Headstream writes that

25   his referral for oncology had been ATP'd for, quote, medical   15:16:20

1   necessity not demonstrated, even though the inmate underwent a

2   four-week course of Rituxan and showed improvement in symptoms.

3   The oncologist recommended continuing Rituxan every other

4   month.  The 5-22-17 C slash S --

5   A.  Consult.                                                    15:16:44

6   Q.  -- consult was ATP'd, resubmitted on 6-15-17, ATP'd, more

7   info submitted 7-10-17 with a provider line note that the

8   inmate is becoming more frail and worse each day.

9        Do you remember being aware of Mr. Upton before you

10  received this e-mail from Miss Headstream in July?              15:17:01

11  A.  No.

12  Q.  Were you aware that my office had sent multiple letters

13  regarding Mr. Upton's medical care to the attorneys for the

14  defendants?

15  A.  I've been made aware of them.                               15:17:15

16  Q.  Okay.  But at the time in July you weren't aware of that?

17  A.  No.

18  Q.  Okay.  And you stated that after you took a look -- or

19  after you get these sorts of e-mails you take a look at their

20  medical record; correct?                                        15:17:32

21  A.  Correct.

22  Q.  So I previously pulled out for you what the defendants had

23  marked as their Exhibit 5 for today's hearing.  That's

24  Mr. Upton's -- it's documents from Mr. Upton's medical record,

25  according to defendants.                                        15:17:47

David Robertson - Direct Examination

1          THE COURT:  And also, Doctor, it's a natural habit in

2    conversation for people to -- especially busy people, they want

3    to give the answer when they know where the question's going.

4    And it's an unnatural process here in court where we do the

5    opposite where we pause and stop.  And you were doing great,          15:18:19

6    but just keep it in mind.  Thank you.

7          THE WITNESS:  I will try to remember that.

8          THE COURT:  Thank you.

9    BY MS. KENDRICK:

10   Q.  If you could turn to page 78 of his record.  The numbers          15:18:35

11   are in the upper right-hand corner.

12   A.  Yes.

13   Q.  And are you familiar with this type of form or document?

14   Have you ever seen something that looks like this before?

15   A.  I believe this is an internal document.                          15:18:57

16   Q.  And internal to Corizon?

17   A.  Yes.

18   Q.  And is it -- are you aware of something called the CARES

19   computer system?

20   A.  Yes.                                                             15:19:09

21   Q.  Do you have access to CARES?

22   A.  No.

23   Q.  What is your understanding, if any, as to what CARES is?

24   A.  CARES is a tracking system for consults.

25   Q.  That is used internally at Corizon?                              15:19:20

David Robertson - Direct Examination

1   A.   Yes.

2   Q.   But ADC monitors do not have access to it?

3   A.   I believe that some of the monitors have access to it.

4   Q.   You do not?

5   A.   No.                                                    15:19:31

6   Q.   Do you know if Dr. Rowe has access to it?

7   A.   No, he doesn't.

8   Q.   He does not.  Okay.

9        So do you remember looking at Mr. Upton's medical

10  record after you received this e-mail on July 13th?        15:19:45

11  A.   Yes.

12  Q.   And did -- if you look at the last four entries on the

13  bottom of page 78, starting from the bottom, it's dated May

14  25th, and it says, ATP, medical necessity not demonstrated.

15       So that would correspond to what Miss Headstream was   15:20:07

16  referring to, correct, where she said the 5-22-17 consult was

17  ATP'd?

18  A.   Yes.

19  Q.   Okay.  And then it was resubmitted on 6-15, according to

20  Miss Headstream.  But if you look up a little bit, it appears 15:20:25

21  there's an entry about half way, right by the middle, where it

22  says, June 27th, G. Babich.

23       Do you see that?

24       THE COURT:  You may approach if you wish.

25       THE WITNESS:  Yes.                                      15:20:52

UNITED STATES DISTRICT COURT

———David Robertson - Direct Examination———

1   BY MS. KENDRICK:

2   Q.  Okay.  You do see it?

3   A.  No.

4       (Discussion held off the record.)

5           THE WITNESS:  Okay.  Got it.  Thank you.                    15:21:01

6   BY MS. KENDRICK:

7   Q.  And so this states that on June 27th, again, Corizon was

8   needing more information about this patient?

9   A.  Correct.

10  Q.  Okay.  And sorry, I'm kind of making you look at two things    15:21:14

11  at once.  If you could look back at the plaintiffs' exhibits,

12  the next one, 113.  But keep those records right there.

13          And this is a subsequent e-mail from Miss Headstream

14  dated July 27th to you.

15  A.  Yes.                                                           15:21:49

16  Q.  And again she's writing you about Mr. Upton.

17  A.  Yes.

18  Q.  And she says, Dr. Robertson, will you review the consult

19  and responses on the ATPs for this 74-year-old inmate diagnosed

20  with lymphoma.  He has previously been under review due to       15:22:04

21  delays in treatment.

22          Do you remember looking at his record a second time?

23  A.  Yes.

24  Q.  If you could flip a few pages in Exhibit 5 to page 88.

25  A.  I have it.                                                     15:22:32

1    Q.  Okay.  And the dates run in reverse chronological order

2    from the top to the bottom.

3    A.  Correct.

4    Q.  So if you go to the one that's second from the bottom, it's

5    dated August 17th, 1:52.  And it says Corizon Health slash S      15:22:44

6    Stacy?

7    A.  Correct.

8    Q.  NMI.  Can you clarify why a new oncology provider is

9    needed?  Is it for a second opinion or is the previous

10   oncologist no longer available and no longer contracted?  Thank  15:23:03

11   you.

12            And then if you go up two more entries, there's

13   another entry dated August 30th, 2017, at 5:02 p.m.

14            Do you see that?

15   A.  Yes.                                                          15:23:20

16   Q.  And it says, received NMI requesting why a new oncology

17   treatment center is needed.

18            And the second paragraph says, if consult for new

19   treatment center is not going to be approved, can you please

20   suggest slash recommend treatment for this patient's B cell      15:23:40

21   lymphoma?  Previous ATPs for on-site surveillance does not

22   appear to be a feasible option in this increasingly frail

23   appearing patient who is complaining of increasing weakness and

24   has never been treated completely for his B cell lymphoma.

25            At this point, by August 30th, were you raising         15:24:04

David Robertson - Direct Examination

1  Mr. Upton's case in those weekly calls, do you remember?

2  A.  I don't remember.  I remember making some very strongly

3  worded phone calls.

4  Q.  To whom?

5  A.  Dr. Babich.                                          15:24:18

6  Q.  And Dr. Babich was the regional medical director at the

7  time?

8  A.  Yes.

9  Q.  Okay.

10       THE COURT:  And at the time did Dr. Babich have the    15:24:42

11  capacity to overrule the Corizon medical management?

12       THE WITNESS:  I believe he did.

13  BY MS. KENDRICK:

14  Q.  And you said before you don't know who these Utilization

15  Management people actually are?                         15:24:57

16  A.  No, I've never met them.

17  Q.  Do you know if they're licensed to practice medicine in

18  Arizona?

19  A.  I believe they are licensed to practice in Arizona.

20  Q.  Have you ever asked anybody from Corizon who the        15:25:09

21  Utilization Management people are?

22  A.  There was an oncology physician named Dr. Kozerawski, I

23  believe he's still on service.

24  Q.  And do you know where Dr. Kozerawski is located?

25  A.  I think he's in Tennessee.                           15:25:32

UNITED STATES DISTRICT COURT

—David Robertson - Direct Examination—

1  Q.  Do you know if he's licensed to practice medicine in

2  Arizona?

3  A.  Yes, he is.

4  Q.  Okay.  Then if you could turn to what's Exhibit 114 in

5  plaintiffs' pile.                                          15:25:49

6         These are -- these are, again, e-mails regarding

7  Mr. Upton; correct?

8  A.  Yes.

9  Q.  So if you turn to the second page of the exhibit, it's an

10  e-mail from Miss Headstream dated November 9th, at 4:22 p.m.,   15:26:20

11  addressed to Daniel Sego of Corizon, and you and Dr. Rowe and

12  Dr. Babich are among the people copied on Miss Headstream's

13  e-mail.

14         Do you see that?

15  A.  Yes.                                                   15:26:39

16  Q.  And she writes, Mr. Sego, a consult for lymph node biopsy

17  was approved 9-22-17 per CARES.  A chest CT was completed

18  10-12-17, with the report received and reviewed 10-24-17.  The

19  CT report was not sent to radiology for scheduling the biopsy

20  until 11-3-17, also per CARES.  Will you look into the cause of   15:27:01

21  the delay and advise of your findings?

22         Were you aware that there was this delay still in

23  November?

24  A.  I was aware that there were delays in the case.

25  Q.  Okay.  And on the first page at the top, Mr. Ellison, who   15:27:17

1  is listed as the clinical coordinator for Florence Complex

2  states, quote, we have the biopsy scheduled for Tuesday, the

3  14th of November, and his oncology appointment scheduled for

4  November 15th.

5      Do you know if those appointments -- specialty       15:27:44

6  appointments happened?

7  A.  I believe they did.  I know they did, but I couldn't give

8  you the exact date.  I do know it was too close for the biopsy

9  report to be given to the oncologist.  And the oncologist

10  needed the biopsy report to make a recommendation for         15:28:01

11  treatment.

12  Q.  Okay.  And if you could look back at Exhibit 5 and go to

13  page 143.

14  A.  Got it.

15  Q.  Okay.  And this is a Corizon CARES form for a specialty    15:28:32

16  request for Mr. Upton?

17  A.  Correct.

18  Q.  And half way down on the front page it says, Service

19  Category, radiology, CT scans.

20      Do you see that?                                      15:28:56

21  A.  Yes.

22  Q.  Okay.  And do you see at the top, the very top line at the

23  very top of the page, it says, Status, accepted ATP?

24  A.  Yes.

25  Q.  And so it appears from looking at this that a CT scan was  15:29:09

David Robertson - Direct Examination

1    requested for him, and he received an alternate treatment plan.

2    A.  I believe so.  I don't know this form.

3    Q.  Okay.  Well, if you start at the bottom of the first page

4    and work your way up, there's an entry dated November 14th at

5    12:32 p.m. by somebody who says D. Calliham, requesting a CT          15:29:41

6    scan of the chest, is the request.

7    A.  Um-hum.

8    Q.  And 18 minutes later, at 12:50 on November 14th, there's an

9    ATP saying, medical necessity not yet demonstrated.

10   A.  Correct.                                                          15:30:09

11   Q.  And then if you go up two entries there's an entry November

12   16th, 2017, at 10:08 a.m., put in by S. Neese.  And she writes,

13   new orders from oncology came in today, need CT scan now, now

14   emergent order per Arizona Oncology Network.

15          Do you see that?                                              15:30:34

16   A.  Yes, ma'am.

17   Q.  And then three hours and four minutes later, at 1:12 p.m.,

18   they have changed it to a biopsy; correct?

19   A.  Correct.

20   Q.  Okay.  Are you still following Mr. Upton's care?                 15:30:46

21   A.  Yes.

22   Q.  All right.  I'm done asking you questions about that

23   exhibit.

24          If you could look at the exhibits behind you and grab

25   the one that starts with 150.                                        15:31:28

UNITED STATES DISTRICT COURT

1          So we're actually going to start with 151.

2          And this is an e-mail chain.  At the top it has a

3    patient's name at Florence East.  And the top date is October

4    18th, 2017.  Correct?

5    A.  Correct.                                              15:32:35

6    Q.  And if you go back to the bottom of page 2 going back in

7    the e-mail chain, at the bottom of page 2 is an e-mail from you

8    to multiple Corizon people, including Dr. Babich and Roland

9    Maldonado, and Mr. Pratt, other monitors, Dr. Rowe, and

10   Dr. FallHowe from Corizon; correct?                       15:33:05

11   A.  Correct.

12   Q.  It was October 3rd?

13   A.  Um-hum.

14   Q.  And you state at the top -- you address it to Dr. Babich,

15   and you say this, patient needs your immediate attention to    15:33:19

16   expedite his procedures and consultations.  This is cancer and

17   there have been serious delays care along with constriction of

18   care algorithm by UM.

19          And you list some pertinent facts in the record.  One

20   is, quote, weight loss of 44 pounds since June 19th from 246 to  15:33:38

21   202 pounds.  You describe other problems.

22          And then you write in all caps, also pain is not being

23   treated.

24          And you go on to note that there were several ATPs,

25   and that the results of an emergency CT scan done in July 18th   15:34:01

1    was not scanned into his medical record until September 18th

2    and not reviewed until September 29th.   Correct?

3    A.   Right.

4    Q.   And then on page 4 of the exhibit you close out your e-mail

5    to Dr. Babich, after cutting and pasting more notes, and you          15:34:26

6    state to Dr. Babich, quote, as stated above, this is cancer.

7    We are frustrated at delays in care from UM and site personnel.

8    Please assure this group in writing today that this case will

9    be given highest priority and that any pain will be treated.

10   A.   Correct.                                                          15:34:48

11        I have one amendment.   I should have put, until proven

12   otherwise.

13   Q.   Pain is --

14   A.   This is cancer until proven otherwise.

15   Q.   Okay.                                                             15:34:57

16        But then if go to page 2, a little bit from the top,

17   you again send an e-mail saying -- on October 17th to these

18   same people, and you write, quote, I have been asking since

19   Friday.   And you have "Friday" in all caps.

20        Were you -- what were you asking for, do you remember?           15:35:20

21   A.   Movement on the case and pain control.

22   Q.   So two weeks later they still hadn't moved on the case or

23   provided pain control?

24   A.   I would have to see the chart to get the exact dates.   But

25   I was very upset about this case.                                      15:35:35

David Robertson - Direct Examination

1  Q.  Okay.  And then on the first page of the exhibit, still on

2  October 17th, at 10:22 p.m. you write to Miss Cole.

3          Who is Miss Cole?

4  A.  Lynn Cole.

5  Q.  Who is she?                                            15:36:02

6  A.  She's operations manager.

7  Q.  For Corizon?

8  A.  For Corizon.

9  Q.  And you write at the beginning, quote, the last CT done in

10 July took until September to load.  It had ominous findings.   15:36:13

11 The scan taken on Wednesday 10-11 has taken too far long to

12 post.  It is still not posted this evening after a written

13 request sent this morning.

14         And then at the end of it you state, I apologize,

15 Miss Cole, if I didn't make myself clear.  There is a very real  15:36:34

16 possibility that urology may need to be present and involved in

17 any procedures performed by colorectal.  Coordination may be

18 needed that is beyond that which can be performed on-site based

19 on recent performance.

20         In my opinion it is probable that the patient will    15:36:52

21 need to be hospitalized for a determination and initiation of

22 care plan.  As stated before, time is of the essence.

23         So, I want to ask you about something you said here,

24 about coordination may be needed that is beyond what can be

25 performed on-site.  This --                                 15:37:11

1  A.  Based on recent performance.

2  Q.  Right.

3         So this patient sounds as -- very serious condition

4  and very complicated.

5  A.  For me I was very concerned because of the findings in the          15:37:23

6  CT scan.  I was concerned for cancer.  It turned out to be a

7  phlegmon, which is a communication between the bladder and the

8  bowel, that is found in some chronic bowel conditions.  It was

9  not cancer.

10        But because of the weight loss, because of the pain,          15:37:44

11 and because of previous cases the pain wasn't managed and

12 cancer wasn't treated, I was pretty reactionary towards this

13 case.

14 Q.  And as it appears you well should have been.

15        And it is still a serious condition to have the          15:38:02

16 bladder attached to the bowel; correct?

17 A.  With the communication between the bowel and bladder.

18 Q.  Yes.  Because that could lead to infection and sepsis and

19 death.  So while it's not cancer, it is still a serious

20 condition?          15:38:20

21 A.  Yes, ma'am.

22 Q.  Okay.  So but what I wanted to ask about is, you're

23 referring to coordination that could be performed on-site.

24 Were you implying that there was going to be urological or

25 colorectal procedures performed on-site?  Or what does that          15:38:33

David Robertson - Direct Examination

1    sentence -- what are you referring to in that sentence?

2    A.   It refers to there will be double surgeries.  Urology will

3    have to be in the room after colorectal is done to do what they

4    can do.  Phlegmon socks in the whole pelvis, and it's a pretty

5    drawn-out procedure.  They usually don't declare themselves        15:38:57

6    real easily as where your boundaries are, because it all

7    becomes just this amorphous mass.

8            And so when they do these types of surgeries they

9    usually have both specialties in the room.  You know,

10   colorectal will call surgery, and when he's getting ready to       15:39:15

11   finish his job, and then -- or urology will come in and close.

12   Q.   So I guess I just want to make clear what you're referring

13   to, because there was no idea that they were going to be

14   performing urological or colorectal surgery on-site at the

15   prison; correct?                                                   15:39:36

16   A.   No, of course not.  But it's trying to find, urology is

17   over here, and colorectal is over here, and urology has this

18   date and colorectal has this date.  And we couldn't even get a

19   CT out of them.

20           And so it was like, I think -- I was leaning towards       15:39:48

21   admitting the patient in order that you have the two

22   specialties in the same house talking together about what

23   they're going to do on the case at the same time.

24   Q.   Rather than relying upon --

25   A.   Oh, we'll call him first, and then we'll wait 30 days and     15:40:04

David Robertson - Direct Examination

1    call him.  You know, it just stretches out.  And before you

2    know it there's significant delays.

3    Q.  Right.  So you were referring more to the inability of

4    Corizon to coordinate specialty care in a thoughtful and

5    meaningful manner?                                          15:40:22

6    A.  They eventually did.

7            MS. KENDRICK:  Your Honor looks like you're about to

8    ask a question.

9            THE COURT:  No, I wasn't.  Thank you though.

10   BY MS. KENDRICK:                                            15:40:36

11   Q.  All right.  Could you look at Exhibit 152?

12           And this e-mail was produced to us by defendants

13   without a to line on it.  But it's from Richard Pratt.  So it

14   may or may not be that you received this e-mail on July 13th

15   regarding this particular patient.                          15:41:14

16           But I don't know, do you remember?

17   A.  No.

18   Q.  Okay.  I just want to ask you about something that

19   Mr. Pratt writes in his e-mail.  And apparently Mr. Pratt

20   writes, quote, the inmate is Interstate Compact and approvals 15:41:33

21   for specialty care would need to come from his owning state,

22   parenthesis, at their expense, close parenthesis, end quote.

23           Are you familiar with how specialty care for

24   Interstate Compact prisoners is handled?

25   A.  It's handled on a case-by-case basis.  But usually it's  15:41:54

420

David Robertson - Direct Examination

1   that the -- in an Interstate Compact, that we have the inmate,

2   and if he needs specialty care, he's owned by the other state.

3   We're just taking him and holding him.

4   Q.  So are they considered outside the Corizon Utilization

5   Management?                                                    15:42:17

6        So, for example, if -- I don't think it even says what

7   state this gentleman is from.  So let's say he's from South

8   Dakota.  If he's from South Dakota, would he use the

9   South Dakota corrections protocol to get specialty care

10  approved?                                                     15:42:32

11  A.  I don't know how all that works.  I know that the sending

12  state that owns him, quote, owns.

13  Q.  Yeah, that's probably --

14  A.  They're responsible for his costs.

15  Q.  Okay.  Let's call them sending.  I think "own" is an      15:42:45

16  unfortunate verb choice, 13th Amendment.

17        So you don't know how that's handled though?

18  A.  No.

19  Q.  Do you know who might know how specialty care for

20  Interstate Compact prisoners is handle?                       15:43:04

21  A.  I would refer the question to Mr. Pratt.

22  Q.  Mr. Pratt.  Okay.

23        And if you have it in front of you, could you flip to

24  Exhibit 154.

25  A.  I have it.                                                15:43:25

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

```
 1   Q.  Okay.  And if you turn to the second page, about one third

 2   of the way up the top there's an e-mail dated August 7th from

 3   Marlena Bedoya addressed to you and copying other people in the

 4   Monitoring Bureau.

 5   A.  Yes.                                                        15:43:51

 6   Q.  Do you see that?

 7        And it says that she's the monitor at Tucson?

 8   A.  Yes.

 9   Q.  And she opens her e-mail to you with, hi, Dr. Robertson.  I

10   think I found another cancer.  I came across this chart while    15:44:02

11   auditing and saw his cancer diagnosis, went into the latest

12   consult and found these comments.  I just don't understand why

13   they continue to state, quote, need more info, close quote, if

14   he has ongoing cancer.

15        And then underneath she lists -- she cuts and pastes       15:44:19

16   an entry showing an 8-2-17 request, urgent, hematology

17   oncology, to which the response is, need more information.

18   Correct?

19   A.  Correct.

20   Q.  And you responded to Miss Bedoya also on August 7th.  And   15:44:33

21   what was your response?

22   A.  Multiple myeloma, need more information is not ATP.  Time

23   is not reset for the consult approval/schedule.

24   Q.  So what do you mean by time is not reset for consult

25   approval slash schedule?                                        15:44:55
```

David Robertson - Direct Examination

1    A.   There is -- they have a certain window once the consult is

2    submitted for the consult to be done.  If it's an urgent

3    consult they have 30 days.

4         This is another example of the fine work that these

5    monitors are doing.  You know, I've heard disparaging remarks          15:45:13

6    towards the monitors.  And I won't hear it.  The monitor team

7    is a bunch of dedicated professionals who have one goal in

8    mind, and that's to ensure care.  And Marlena Bedoya is one of

9    the best.

10   Q.   So -- we're very happy to hear that.  But my question was         15:45:32

11   about your statement, quote, time is not reset for consult

12   approval slash schedule, and what you meant by stating that.

13        Is Corizon using the ATPs to stop the time frame

14   requirements so that they appear to be in compliance with the

15   30-day time frames?                                                    15:45:55

16        What do you mean by reset -- time is not reset?

17   A.   For a resubmission on the ATP, then they would have another

18   30 days, I believe.  Time is not reset.  The consult is urgent,

19   and the patient had multiple myeloma.

20        And at that point we were having a discussion about           15:46:16

21   need more information as an ATP.  And it was decided that this

22   is not a criteria for ATP.  And the -- they have to get the

23   patient in.

24   Q.   Right.  You said something about time is reset when the

25   consult request is resubmitted.                                       15:46:38

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    A.  I believe so.  I'm not sure the criteria in the monitoring

2    manual, where it is today.  But at that point I was concerned

3    that it would be reset.

4    Q.  So if they're resubmitting the request, does that mean that

5    the previous request was canceled or ATP'd?                          15:46:56

6    A.  I'm not sure how those criteria work.  I was just covering

7    that base.  I did not want delays.

8    Q.  You were discovering that they were resetting the clock?

9    A.  I didn't know.  I just wanted to make sure that it was on

10   the table, that an ATP -- or a need more information is not an       15:47:10

11   ATP, and that they needed to do their work and get the proper

12   information to their UM.

13   Q.  Okay.

14         THE COURT:  Because of your response here in the

15   e-mail, where you say that time is not reset, that would            15:47:24

16   suggest that there are people who are saying -- or assuming

17   that time can be reset.  Right?

18         THE WITNESS:  I didn't want that in play.

19         THE COURT:  But my question is, people thought that

20   time could be reset by some method.                                  15:47:42

21         THE WITNESS:  I'm not sure at that time.  I might have

22   heard it, that might have been what triggered that statement,

23   you know.

24         But as far as my position was, is that the ATP was

25   unacceptable.  You know, need more information is not an ATP.       15:47:55

David Robertson - Direct Examination

1    An alternative treatment plan is an alternative treatment plan,

2    instead of doing this, do this.  We need more information to

3    make our mind up on whether we're going to approve this consult

4    is not an ATP.

5            THE COURT:  Who would have the power to reset?            15:48:12

6            THE WITNESS:  Reset the clock?

7            THE COURT:  Yes.

8            THE WITNESS:  Unknown.

9    BY MS. KENDRICK:

10   Q.  And these need more information requests, the NMIs, do you   15:48:23

11   feel like at some point in August you were seeing more of

12   these?  Or why --

13   A.  Yes, at that time I believe we were.

14   Q.  And was that kind of a recent development in the Summer, or

15   when did you kind of notice that uptick?                          15:48:37

16   A.  They'd gone to a UM process and, you know, we're getting

17   all these ATPs and NMIs, you know, and trying to figure out

18   what was going on with this new process.  And what was

19   happening was, it ended up being delays, you know.  And we were

20   just trying to get these patients seen.                           15:49:01

21   Q.  And you referred to a new process.  Is that a new process

22   at Corizon for processing the request?

23   A.  I'm not sure exactly when this was initiated, but they

24   had -- when they began, they had a UM process that was handled

25   by their regional medical directors.  And then it was taken      15:49:24

David Robertson - Direct Examination

1    over, became centralized.

2    Q.  In Tennessee?

3    A.  In Tennessee.

4         And at that point we were -- they were submitting

5    all -- I'm not sure exactly how it all worked.            15:49:39

6    Q.  Right.  But tell us your understanding.

7    A.  My understanding was that they would go to the UM

8    committee, and UM would make a determination of what was on the

9    form.  And then they would say, well, we need more information

10   to make up our mind.                                      15:49:57

11        THE COURT:  Is that a change that happened roughly

12   around the Summer of 2017?

13        THE WITNESS:  Yes, sir.  I believe so.

14        THE COURT:  And in the previous practice when the

15   regional medical director would make the decision, do you know  15:50:08

16   how those requests were submitted to the regional medical

17   director?

18        THE WITNESS:  Same form.

19        THE COURT:  And do you know whether or not the

20   regional medical directors had access to the medical records of  15:50:21

21   the inmate in question.

22        THE WITNESS:  Yes, they did.

23        THE COURT:  And do you know whether or not the

24   management team in Tennessee has access to the medical records?

25        THE WITNESS:  No, they don't.                        15:50:33

David Robertson - Direct Examination

BY MS. KENDRICK:

Q.   And have you ever asked why the people in Tennessee don't
have access to the medical records?

A.   Yes, I have.  And there was a letter from Dr. FallHowe in
the exhibits explaining why.

Q.   And would that be Exhibit 155?

A.   Let me look.

        Here it is.

Q.   And this is dated August 8th regarding the same patient at
Tucson.  And it's from Dr. FallHowe at Corizon addressed to
you; correct?

A.   Correct.

Q.   And she writes, Dr. Robertson, the UM process was developed
to emulate the national insurance reviews using Milliman and
Interqual.  Just as the insurance companies do not review the
EHR, the UM Department only applies the national guidelines to
the information provided.  If the information is not available
for it to meet criteria, then the NMI step was developed to
prompt the provider to send the information that is needed for
it to meet criteria.

        So, she refers to the fact that insurance companies do
not review EHRs.  I'm curious, given your experience as a
physician, is that your experience outside of the correctional
environment that --

A.   Yes.  Yes, it is.

UNITED STATES DISTRICT COURT

─────David Robertson - Direct Examination─────

1  Q.  Okay.

2  A.  Sorry for interrupting.

3         THE COURT:  May I ask a question about the flow of

4  information?

5         Another witness has testified that the care                    15:52:20

6  coordinators who prepare these forms that are submitted to the

7  management team provide the information that the management --

8         What's the best way to call it?  Management team is

9  not right.  What would you call it?  It's been abbreviated as

10 UM.                                                                    15:52:41

11        THE WITNESS:  Utilization Management.

12        THE COURT:  That's right.  Okay.  All right.

13        So it's these -- so far you understand what I've said

14 to be correct, that there are these care coordinators who

15 prepare the form that's submitted to the UM.                          15:52:54

16        THE WITNESS:  Correct.

17        THE COURT:  All right.  And that person takes the

18 information -- the care coordinator takes the information from

19 the provider who has charted a request for an outside referral

20 for some kind of care that would be subject to the UM review;        15:53:10

21 is that right?

22        THE WITNESS:  That's correct.

23        THE COURT:  And then we know from what you said that

24 the UM Team doesn't have access to the medical records, so they

25 only have access to what the care coordinator has provided to        15:53:26

1    the UM people; is that correct?

2              THE WITNESS:  That's my understanding.

3              THE COURT:  All right.  And we learned that in the

4    general case of at least one witness, that the care

5    coordinators were LPNs, and -- but -- and I'm not saying that's          15:53:42

6    bad.  But what I'm concerned about is they are LPNs who are not

7    under the supervision of the provider, because the provider, we

8    learned, was not receiving a copy of what was given to the

9    UM Team.

10             And if I've misstated, you all can object.          15:54:04

11             But do you understand what I just said to be the

12   situation?

13             THE WITNESS:  I understand what you're saying.  I've

14   never really been clear on how it all works.  You know, I know

15   that there's a document that goes to UM, UM makes -- and they          15:54:17

16   enter it into eOMIS on the status, and then it comes back and

17   they're supposed to update eOMIS.  It doesn't always reflect

18   that.

19             THE COURT:  And again, if I'm going into an area that

20   you're not comfortable talking about -- but because of your          15:54:37

21   medical experience I think you might be.  But if you're not

22   comfortable, tell me that.

23             And we've heard questions comparing what happened

24   here, with what happens in private care outside -- meaning

25   outside of the prison context.  And you said that it's not          15:54:51

David Robertson - Direct Examination

1    unusual for this kind of medical management to take place.

2          The difference that I'm wondering about is, if I go to

3    my doctor and my doctor, as they frequently do, will have to

4    make a case to the medical managers at the insurance company as

5    to why the care should be provided.  That case is being made by          15:55:11

6    the lieutenant of the medical doctor, who might be, as I've

7    described, an LPN, or might be an RN, or might be someone above

8    that, below the doctor, but somebody in the doctor's office,

9    and the doctor seems to be involved in that process, at least

10   the direct supervisor of that person.                                    15:55:31

11         And this sounds to me like a different model than the

12   one I just described that happens in the private world.  Is

13   that true?

14         THE WITNESS:  It's close, I believe.  I'm not

15   real -- I'm not real good addressing the Corizon processes,             15:55:46

16   because they're always evolving.

17         THE COURT:  Well, if you were the provider for a

18   patient -- and let me just give this hypothetical example, just

19   a hypothetical -- and that you said we need this kind of care

20   because I've decided that care needs to be done.  And then some         15:56:07

21   person whom you were not supervising was preparing that report

22   and deciding what information would be reported to the

23   management team, the management team that is aligned in

24   economic interest, the care coordinator -- they all work for

25   the same person, so it's not as if it's going to an insurance          15:56:27

—————David Robertson - Direct Examination—————

1  company from a doctor who doesn't work for the insurance

2  company.  It's the insurance company person sending the

3  information to the insurance company person.

4          Is that fair?

5          THE WITNESS:  That's fair.                      15:56:38

6          THE COURT:  All right.  And so the hypothetical is

7  that this person who's sending the information is an LPN who's

8  been licensed for two months.  Would that cause you some

9  concern?

10         THE WITNESS:  If that is, in fact, what was happening.  15:56:51

11         THE COURT:  Okay.

12         THE WITNESS:  And there was supposed to be safeguards,

13  you know, pick up the phone and call.

14         THE COURT:  Who should pick up the phone?

15         THE WITNESS:  The provider if there's an issue with an  15:57:04

16  ATP or a need more information, or you needed an override, you

17  picked up the phone and called your regional manager.

18         THE COURT:  Right.  And the problem here too is we

19  have the alignment of interest.  The provider also worked for

20  the insurance company who works for the management team.  So   15:57:17

21  it's not like the private model where you have an advocate for

22  the patient.

23         THE WITNESS:  Well, the doctor's role is an advocate.

24         THE COURT:  Pardon me?

25         THE WITNESS:  The doctor's role is to be an advocate.   15:57:25

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1        THE COURT:  Indeed.  But in the reality of the world,

2   they probably notice whose name is on the paycheck.  Is that

3   fair?

4        THE WITNESS:  I don't know if that's fair in

5   corrections.                                                    15:57:38

6        THE COURT:  Okay.  All right.  But -- thank you.

7        THE WITNESS:  We're not doing it for the money.

8        THE COURT:  I'm sorry?

9        THE WITNESS:  We're not doing it for the money.

10        THE COURT:  I appreciate that.  Neither am I.          15:57:48

11   BY MS. KENDRICK:

12   Q.  And back to Exhibit 155.  Dr. FallHowe had sent you that

13   response.

14        If you could go to the bottom of the page.  What was

15   she responding to?  What had you written to her?              15:58:06

16   A.  I said that a need more information is not an ATP.  EOMIS

17   is unavailable to UM.  The delays we are seeing in oncology are

18   unacceptable.

19   Q.  Well, actually you said eOMIS is available to UM.

20   A.  If they wanted it to be.  They work for the same company.  15:58:25

21   Q.  So you don't know who made the decision that the people

22   doing Utilization Management review would not have eOMIS

23   access?

24   A.  I don't know who made that decision.

25   Q.  But the old system when it was the medical -- site medical  15:58:41

David Robertson - Direct Examination

1   director or the regional medical director making the decision,

2   he or she had access to eOMIS?

3   A.   Yes.

4   Q.   Okay.  Could you turn to Exhibit 157?

5   A.   I have it.                                                    15:59:19

6   Q.   Okay.  And this is a series of e-mails regarding the

7   patient at Tucson Unit.  And if you go to page 3, the first

8   full entry at the top is an e-mail sent by Miss Headstream on

9   August 25th to multiple people, and you and Dr. FallHowe are

10  copied on it; correct?                                            15:59:52

11  A.   Correct.

12  Q.   And Miss Headstream writes, Mr. Schmid, who this is

13  addressed to.

14          And who is Mr. Schmid?

15  A.   He's the Facility Health Administrator for Tucson.           16:00:03

16  Q.   Okay.  Quote, this urgent, all caps, bolded, consult

17  request was submitted 5-15-17, bolded, as recommended by

18  Dr. FallHowe.  Will you look into why no action has been taken

19  to have the patient scheduled for evaluation with ID and

20  started on treatment.  What, quote, specific lab test, close     16:00:22

21  quote, are needed prior to his ID appointment?  Lab tests HIV

22  related were ordered and completed 5-8-17 and 5-22-17.  Any

23  other lab tests related to the completion of this consult

24  should be completed without further delay.

25          Do you remember looking at this gentlemen's medical      16:00:41

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    record?

2    A.  Yes.

3    Q.  And if you flip to page 2, about a third of the way down,

4    you sent an e-mail on Monday, August 28th, to everybody.  And

5    you write, quote, Dr. Po has telemedicine appointments          16:00:57

6    available, use it, exclamation mark, Dr. DR.

7           Who is Dr. Po?

8    A.  Dr. Po is the infectious disease specialist for the

9    University of Arizona Telemedicine Program.

10   Q.  And he provides infectious disease services?              16:01:17

11   A.  Yes, he does.

12   Q.  And we've been hearing from others that the infectious

13   disease, at some point Corizon was -- Corizon officials were

14   saying that they would do the infectious disease consults

15   on-site.  Are you aware of that response from Corizon?        16:01:36

16   A.  I heard of it.

17   Q.  And we also were told in previous testimony that Corizon

18   had represented that they had a infectious disease specialist

19   who worked for the company and was available on-site in

20   Arizona.                                                       16:01:58

21          Were you ever told this?

22   A.  I heard of it.

23   Q.  Do you know who this individual was or is?

24   A.  No.

25   Q.  Did you ask?                                               16:02:05

—— David Robertson - Direct Examination ——

1   A.  I could have asked and been told something but, you know,

2   when the consults kept piling up for infectious disease and the

3   Arizona Telemedicine Program had Dr. Po, who is experienced in

4   corrections using telemedicine.

5          And a little history, the Arizona Telemedicine Program      16:02:25

6   was developed with the Arizona State Prison system in mind.

7   And there's a great network that was utilized quite heavily

8   prior to privatization.

9   Q.  And did you use this network when you were a practicing

10  physician?                                                        16:02:45

11  A.  Yes.

12  Q.  And do you remember what specialties you had available to

13  you as a provider?

14  A.  Pretty much everything.

15  Q.  And was it through the University of Arizona?                 16:02:54

16  A.  Yes.

17  Q.  So "pretty much everything," do you mean things like

18  cardiology or --

19  A.  Cardiology, pulmonology, infectious disease.  You name it,

20  they can provide it.  Surgery.                                    16:03:09

21  Q.  And what sort of telemedicine specialties are currently

22  available to the people in the prisons now?

23  A.  I have no idea.

24          THE COURT:  You said you were a big advocate of it.

25          THE WITNESS:  Yes.                                        16:03:25

David Robertson - Direct Examination

1        THE COURT:  Do you have any opinion at all as to why

2   it hasn't exploded in use?

3        THE WITNESS:  Inside our system?

4        THE COURT:  Yes.

5        THE WITNESS:  I could talk a lot about it.                    16:03:34

6        To make it brief as possible, in order for this

7   paradigm to be implemented on top of the system, you must have

8   open declaration of support by all management frequently to all

9   staff.  There has to be an active program of utilization with a

10  champion within the system specifically for the advancement of  16:04:01

11  telemedicine.  Consults and all that kind of stuff, ATP can

12  handle, they can do, they're really quite amazing.

13       And in this case we -- Dr. FallHowe and I had gone to

14  the Arizona Telemedicine Program to set up, you know, frequent

15  visits utilizing Dr. Po.  They were reluctant to offer any more  16:04:26

16  services because when they have a -- when you have a

17  telemedicine clinic, you're taking a doctor's time.  And if you

18  schedule him up for a morning for -- say Dr. Po was scheduling

19  corrections for a morning a week, and he'd have no

20  appointments, so it withered, you know.  Interest was lost,      16:04:51

21  machines were shut off and shoved in a corner.  And the program

22  didn't advance.

23       And from my understanding this is where we're at today

24  with telemedicine.

25       Psych services are -- the greatest provider of psych        16:05:08

UNITED STATES DISTRICT COURT

David Robertson - Direct Examination

1    services in Northern Arizona uses telemedicine exclusively.

2          MS. KENDRICK:  Do you have more questions?

3          THE COURT:  Well, you have left me with some questions

4    about that.  I really don't really feel that I understand why

5    it is that this great idea gets pushed to the corner.          16:05:26

6          THE WITNESS:  It's very frustrating.

7    BY MS. KENDRICK:

8    Q.  You stated earlier that you were seeing backlogs of

9    infectious disease consults piling up, but then you just stated

10   that Dr. Po would be scheduled for a morning a week for          16:05:43

11   corrections and nobody would be scheduled.

12   A.  And he offers -- he would schedule his time for it.  Pima

13   County Jail, they have an active Telemedicine Program.  There's

14   Native Americans -- they have telemedicine sites all over the

15   state.                                                           16:05:59

16          And, you know, unless there are -- these criteria are

17   met, programs will whither.

18          And he was -- he still sees patients via telemedicine,

19   you know, but they're not from D.O.C.

20   Q.  I guess my question is the disconnect, because on the one    16:06:15

21   hand you've stated and we have seen in reports that there's,

22   you know, infectious disease consults that are overdue and

23   pending and unable to find specialists, and then by the same

24   token you say Dr. Po sets aside a morning -- or used to set

25   aside a morning a week for corrections, and nobody would be      16:06:36

 1    there.

 2          So I don't know -- do you have an opinion why those

 3    two pieces didn't fit together and resolve the backlog if he

 4    had set aside a morning a week for corrections?

 5    A.  I just outlined it.                                    16:06:50

 6    Q.  I'm sorry?

 7    A.  I outlined it.  Unless there is open declaration of support

 8    by the highest levels of management frequently to all levels of

 9    staff, along with a champion in the system to promote and

10    advance the use of telemedicine, the program will wither.    16:07:07

11    Q.  Okay.

12          THE COURT:  It sounds like it would solve many of the

13    problems that have been an issue in the case.  And, in fact,

14    the defendants' lawyers have repeatedly talked to me about it

15    to and I've made inquiries about it.                       16:07:18

16          But I'm still trying to understand why the impediment

17    would exist.  Is it a cost -- does it cost money to retain

18    Dr. Po in a way that somebody might think is inappropriate?

19          THE WITNESS:  I can't answer that.

20          THE COURT:  Is that a possible reason?              16:07:34

21          THE WITNESS:  I just know it works.  I don't --

22          THE COURT:  If you could give me your list -- I mean,

23    you've told me what the problem is, they're not doing it.  But

24    you're also somebody who is an advocate for the system, so I

25    imagine you've had some thoughts in your head about what would  16:07:52

1    it take, what argument do I have to counter, or what

2    presentation do I have to make to get people to think this is a

3    good idea?  So if people are against it, what are the reasons

4    that they are against it?  I need to know that in order to

5    counter it.  And if people aren't listening, you've said who          16:08:06

6    the people are to listen, but what can you do to make the voice

7    louder?

8            On the negative side, are there reasons you can help

9    me understand why people would say we don't want to go down

10   that road?                                                           16:08:20

11           THE WITNESS:  I don't know the motivations, you know,

12   if they're financial, or logistic, or what.  I just know that

13   it is -- it truly is a viable solution to a lot of problems.

14           THE COURT:  So on the practical side, your experience

15   is that you can have an inmate who's incarcerated receive            16:08:42

16   valuable care through telemedicine.  And I gather sometimes

17   that's telephonically and sometimes it's video as well; is that

18   right?

19           THE WITNESS:  The stations that were in the Department

20   of Corrections are full telemedicine units.                         16:08:57

21           THE COURT:  So with video as well?

22           THE WITNESS:  Video.  They have -- they have amazing

23   stethoscopes.  They can do otoscope, they can do

24   ophthalmoscope.  You know, there's different techniques that

25   would eliminate the need to send patients out for retinal           16:09:15

1    exams, things like that.  That are truly cost effective.

2            THE COURT:  Okay.  So as opposed to court, where I

3    frequently see that our television systems don't work so well,

4    you've got the opposite.  You say as a practical matter it

5    works great.  So we know that we can check that off as a                    16:09:36

6    problem of any argument, because I could hear judges saying, we

7    don't want to do more of the TV stuff because it doesn't work

8    often enough.

9            But you say that's something to check off the list,

10   that's fine; right?                                                          16:09:45

11           THE WITNESS:  That's my understanding.

12           THE COURT:  Okay.  So that's one idea I could think of

13   why people would think that it shouldn't be done.

14           Are there other logistical issues that you can

15   describe?                                                                    16:09:56

16           THE WITNESS:  You'd have to ask Corizon.  When I do

17   advocate -- I've been to the Arizona Telemedicine twice with

18   Corizon management, and was told that we're going to get this

19   rolling, and it just stops.

20           THE COURT:  Okay.  Thank you.                                        16:10:14

21   BY MS. KENDRICK:

22   Q.  So do you have an opinion, is the problem Corizon or ADC or

23   is it both?

24   A.  It's not ADC.

25           MR. BOJANOWSKI:  Note an objection, foundation.                      16:10:23

David Robertson - Direct Examination

1          THE COURT:  Overruled.

2    BY MS. KENDRICK:

3    Q.  It's Corizon?  Is that a yes?

4    A.  That's their business.

5    Q.  Could you flip to the Exhibit 158.                    16:10:31

6    A.  I have it.

7    Q.  Okay.  And this is regarding the same person that we were

8    just talking about, the HIV.

9          And this e-mail was produced to us this way without

10   the from line on it.  But do you remember sending this e-mail?  16:11:05

11   A.  Yes.

12   Q.  And you wrote in all caps, patient diagnosed with HIV on

13   5-11-17.  Urgent infectious disease consult written on 5-15-17.

14   No consult as of this date.  Most importantly, this patient has

15   not begun any therapy, followed by five exclamation points.    16:11:30

16   Correct?

17   A.  Correct.

18   Q.  Would you turn to 159?  And also 160 while you're --

19   A.  I have it.

20   Q.  Okay.  So this is another e-mail regarding the same        16:11:58

21   individual.  Exhibit 158, the previous one you sent was

22   September 5th.

23         And then on this e-mail about two thirds of the way

24   down, somebody named Brenda McMullen is writing you,

25   Miss Headstream and Miss Dumkreiger about this person.  It says 16:12:22

David Robertson - Direct Examination

1  that he was seen on -- seen by infectious disease on September

2  20th.  He was recommended and prescribed to start certain

3  medication.

4       And then she writes, it does not appear that this was

5  done prior to release on 9-25-17.  Quote, I don't see where he          16:12:40

6  was seen by a provider prior to release or the recommendations

7  were reviewed by Corizon.

8       And she subsequently wrote you later in the day, it

9  appears, and said, would it be out of line to advise Corizon to

10  send the report to the inmate with a prescription for this          16:13:03

11  medication that should have started before he left on the 25th?

12  The report was available to the provider to review on the 20th.

13       And subsequently at the very top on September 27th it

14  says, Corizon will get his meds to him.

15       Do you know if he got his meds?          16:13:21

16  A.  I was told in telephone conversations that he would get his

17  meds.  And they explained that to Brenda McMullen, who was a

18  monitor, another fantastic, caring, professional nurse who, you

19  know, found this and bird dogged it like a pit bull.  It was

20  amazing.          16:13:47

21       And I understand that he did get his meds, and that he

22  understood the importance of getting to a primary care provider

23  to continue his care.

24  Q.  Very good.

25       So if you could look at Exhibit 160.  I think this is          16:13:56

 1    building off of some of the remarks that you just made to

 2    Judge Duncan.

 3           And this is, again, an e-mail chain, looks like a

 4    separate one regarding the same individual.  And the second

 5    entry is Dr. FallHowe from Corizon writes you on September 5th.   16:14:17

 6    And she says, Dr. Po's team represented to Corizon that they

 7    had ten slots for correction each month.  If they have changed

 8    their stance, then we will need to identify another provider

 9    who can see the patient.

10           And you wrote in response, reduction due to                  16:14:37

11    underutilization.  They are willing to expand ID and add on

12    other specialties once demand is expressed in ID.

13           Did you, subsequent to sending this e-mail on

14    September 5th explaining that it was your understanding that

15    they were willing to expand ID, meet with anybody from ADC or     16:14:55

16    Corizon about this issue of the telemedicine?

17    A.  This is after we met with them, Dr. FallHowe and I went and

18    met with the Arizona Telemedicine Program.

19    Q.  Do you remember approximately when you and Dr. FallHowe

20    went to meet with them?                                           16:15:15

21    A.  Early September.

22    Q.  So this --

23    A.  This is in response.  And they had ten slots for

24    corrections each month.  I'm sorry, I have been referencing a

25    week.  But they had one for corrections each month.  And they     16:15:27

1    were underutilized.  So Dr. Po was wasting his time waiting for

2    a consult to come in.

3    Q.  So when you and Dr. FallHowe went and met with the people

4    at the University of Arizona about expanding infectious

5    disease, what was the outcome?  Was that going to start being          16:15:47

6    used more?

7    A.  That's what I was told.

8    Q.  Do you -- have you had any follow-up meetings with Dr. Po

9    or Dr. FallHowe about this?

10   A.  No.                                                               16:15:59

11   Q.  Do you have any information if they are using Dr. Po's ten

12   slots per month now?

13   A.  No, they're not.

14   Q.  They're not?

15   A.  No.                                                               16:16:06

16   Q.  So how you are people who have HIV being seen by infectious

17   disease?

18   A.  I don't know.

19   Q.  Do you think that they should be getting seen by Dr. Po?

20   A.  Oftentimes HIV, if it's stable, and the viral load is            16:16:20

21   suppressed, you don't need to go see a specialist, your primary

22   care provider can manage the case.

23        Oftentimes though over time the virus will develop a

24   resistance to the certain drug regimen.  That drug regimen has

25   to be thrown out and you have to start over again.  There are        16:16:39

David Robertson - Direct Examination

1    lab studies that can be done that will tell you what that

2    strain of HIV is sensitive to, and you implement that.

3           It's a lot to ask a nurse practitioner.

4    Q.  And are you aware, under Arizona law are nurse

5    practitioners supposed to operate under the supervision of a      16:17:02

6    physician?

7    A.  I don't believe they have to.

8    Q.  Okay.  So their work is not reviewed by a physician

9    pursuant to state law or anything like that?

10   A.  Nurse practitioners don't, but physician assistants do.      16:17:15

11   Q.  Are you aware of any vacancies in providers at the Eyman

12   Complex this Summer?

13   A.  It's my understanding it's a chronic problem.

14   Q.  At Eyman?

15   A.  Yes.                                                          16:17:45

16   Q.  What about at Florence or Tucson?

17   A.  I wouldn't be able to address those specifically.

18   I'd -- that's staffing.  I don't do staffing.

19   Q.  How do you know that it's a chronic problem at Eyman?

20   A.  Just -- I go around to the complexes.  I talk to people.     16:17:57

21   And they'll say they're short.

22   Q.  How frequently do you go around?

23   A.  I go to every complex usually twice a year.

24   Q.  And who do you speak with?

25   A.  Well, I go on the -- under the -- doing my transgender        16:18:13

1    work.  You know, I see the transgender inmates.  And when I'm

2    on a yard and I see a transgender inmate and I do my interview

3    with them, I'll walk around, go into medical, see what's

4    happening.  They know me.  Sometimes I'll take chocolate.  It

5    works.                                                        16:18:37

6    Q.  Always a good strategy.

7         Do you provide medical care to the transgender

8    inmates?

9    A.  No, I'm just following them.  I'm tracking them.

10        MS. KENDRICK:  Oh, I see.                                16:18:47

11        I have nothing further at this moment, Your Honor.

12        THE COURT:  Okay.

13    (Discussion off the record between plaintiffs' counsel.)

14        MS. KENDRICK:  Oh, yeah that would be helpful.  I need

15   to enter some exhibits.                                       16:19:02

16        And if Mr. Bojanowski needs a few minutes, I'll just

17   give you the numbers and you can work through them.

18        MR. BOJANOWSKI:  Yes, if we can address them as

19   Mr. Fathi and Mr. Struck did earlier, so I can kind of look and

20   see which one is which.                                       16:19:21

21        So if you just want to start with whatever one you

22   wart to start with.

23        MS. KENDRICK:  Sure.  Exhibit 48.  84, I'm sorry.  84.

24        MR. BOJANOWSKI:  No objection, Your Honor.

25        THE COURT:  84 is received.                              16:20:04

CV-12-601-PHX-DKD - February 28, 2018

1        (Exhibit No. 84 admitted into evidence.)

2            MS. KENDRICK:  Exhibit 85.

3            MR. BOJANOWSKI:  No objection, Your Honor.

4            THE COURT:  85 is received.

5        (Exhibit No. 85 admitted into evidence.)                16:20:14

6            MS. KENDRICK:  Exhibit 95.

7            MR. BOJANOWSKI:  No objection, Your Honor.

8            THE COURT:  That's 95; is that correct?

9            MR. BOJANOWSKI:  Yes.  95, no objection.

10           THE COURT:  95 is received.  Thank you.         16:21:08

11       (Exhibit No. 95 admitted into evidence.)

12           MS. KENDRICK:  180.

13           MR. BOJANOWSKI:  Did you say 180?

14           MS. KENDRICK:  Yes.  I'm sorry.

15           MR. BOJANOWSKI:  Objection, hearsay, Your Honor.   16:21:24

16           THE COURT:  And the hearsay objection is overruled

17  because the Court is not going to consider the truth of the

18  matter that was at issue when the exhibit was tendered.

19           It will be admitted.

20       (Exhibit No. 180 admitted into evidence.)         16:21:37

21           MS. KENDRICK:  181.

22           MR. BOJANOWSKI:  Objection hearsay, Your Honor.

23           THE COURT:  Same ruling.

24       (Exhibit No. 181 admitted into evidence.)

25           MS. KENDRICK:  190.                            16:21:44

CV-12-601-PHX-DKD - February 28, 2018

1     MR. BOJANOWSKI:  Objection hearsay, Your Honor.

2     THE COURT:  Overruled.

3  (Exhibit No. 190 admitted into evidence.)

4     MS. KENDRICK:  76.

5     MR. BOJANOWSKI:  No objection, Your Honor.          16:22:23

6     THE COURT:  76 is received.

7  (Exhibit No. 76 admitted into evidence.)

8     MS. KENDRICK:  Defendants' Exhibit 5.

9     MR. BOJANOWSKI:  No objection, Your Honor.

10    THE COURT:  5 is received.                          16:22:30

11  (Exhibit No. 5 admitted into evidence.)

12    MS. KENDRICK:  Exhibit 112.

13    MR. BOJANOWSKI:  No objection, Your Honor.

14    THE COURT:  112 is received.

15  (Exhibit No. 112 admitted into evidence.)            16:22:51

16    MS. KENDRICK:  113.

17    MR. BOJANOWSKI:  No objection, Your Honor.

18    THE COURT:  113 is received.

19  (Exhibit No. 113 admitted into evidence.)

20    MS. KENDRICK:  114.                                 16:22:55

21    MR. BOJANOWSKI:  No objection, Your Honor.

22    THE COURT:  114 is received.

23  (Exhibit No. 114 admitted into evidence.)

24    MS. KENDRICK:  152.

25    MR. BOJANOWSKI:  No objection.                      16:23:06

```
 1              MS. KENDRICK:  154.

 2              THE COURT:  152 is admitted.

 3         (Exhibit No. 152 admitted into evidence.)

 4              MS. KENDRICK:  I apologize.

 5              THE COURT:  That's all right.                    16:23:28

 6              MR. BOJANOWSKI:  No objection, Your Honor.

 7              MS. KENDRICK:  155.

 8              THE COURT:  And 154, is that where --

 9              MR. BOJANOWSKI:  154, no objection.

10              THE COURT:  Yes, 154 is admitted.               16:23:40

11         (Exhibit No. 154 admitted into evidence.)

12              THE COURT:  Now we're on 155.

13              MR. BOJANOWSKI:  155, no objection, Your Honor.

14              THE COURT:  155 is admitted.

15         (Exhibit No. 155 admitted into evidence.)           16:23:50

16              MS. KENDRICK:  157.

17              MR. BOJANOWSKI:  No objection, Your Honor.

18              THE COURT:  157 is admitted.

19         (Exhibit No. 157 admitted into evidence.)

20              MS. KENDRICK:  158.                             16:23:55

21              MR. BOJANOWSKI:  No objection, Your Honor.

22              THE COURT:  158 is admitted.

23         (Exhibit No. 158 admitted into evidence.)

24              MS. KENDRICK:  159.

25              MR. BOJANOWSKI:  No objection.                  16:24:07
```

UNITED STATES DISTRICT COURT

—— CV-12-601-PHX-DKD - February 28, 2018 ——

```
 1              THE COURT:  159 is admitted.
 2         (Exhibit No. 159 admitted into evidence.)
 3              MS. KENDRICK:  160.
 4              MR. BOJANOWSKI:  No objection, Your Honor.
 5              THE COURT:  160 is admitted.                    16:24:12
 6         (Exhibit No. 160 admitted into evidence.)
 7              MR. FATHI:  Your Honor, I don't believe we got a clear
 8    statement that 190 was admitted.  You overruled the objection,
 9    but I don't think --
10              THE COURT:  It is admitted.                     16:24:31
11              To overrule the objection means it comes in.  But it's
12    good to be careful.
13              MS. KENDRICK:  And 151 and Defendants' 5 came in as
14    well?
15              THE COURT:  Yes.                                16:24:45
16              All right.  Mr. Bojanowski, do you have examination
17    for this witness?
18              MR. BOJANOWSKI:  I do, but I doubt that I'd be able to
19    complete it.
20              THE COURT:  All right.
21              MR. BOJANOWSKI:  And I don't know that I would want to
22    split it up over a month.
23              THE COURT:  All right.  Fair enough.
24              Then I'll ask a question or two, and then we'll be
25    done with you today.  But we'll have to have you back again.    16:25:10
```

CV-12-601-PHX-DKD - February 28, 2018

1    You look joyful about that.

2           THE WITNESS:  Thank you.

3           THE COURT:  You said when you were asked about whether

4    or not the mortality information -- or the information process

5    that you were involved in, and the reports that you received          16:25:28

6    back, and then also you were asked in sort of summation after

7    you were examined about a number of these different reports,

8    whether there were any trends or any lessons learned.  And you

9    used the word communication; is that right?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  So communication is the what.  And that's

12   an important thing to know when you're trying to solve a

13   problem.  But maybe even more important is knowing the why.

14   And I wonder what your thoughts are about why.  Why is it that

15   communication's a problem?                                            16:26:05

16          THE WITNESS:  This is an extremely complex system that

17   have a lot of different people working in different levels

18   doing different jobs.  And we all have to speak and share our

19   information in a manner that is understood.

20          For example, UM versus the clerk that enters it,           16:26:23

21   versus the doctor.  You know, these all have to be communicated

22   effectively and processed quickly.

23          Communication is putting it in writing.

24          Now, we made a lot of comments about poor

25   communication in the medical record, and that's true.  Was it      16:26:42

1    the cause of death?  No.  But it was -- it was a finding.

2         And in order to have effective communication, we must

3    be completely cash register honest with ourselves about what

4    we're seeing.  And the mortality review process is that,

5    because everything is put on the table.                              16:27:07

6         THE COURT:  And I understand what you said.  But I

7    also -- I think it's probably fair to take from what you said

8    that -- whether it's related to the cause of death or not, the

9    reason that you were pointing it out was you had a situation

10   where the worst thing happened to somebody who could happen in    16:27:23

11   your care, and that is they died.  And some of them died at the

12   end of life.

13        But the reason where -- the most of the records you

14   were talked about, there were problems associated with the end

15   of that life, and you identified communication as being a          16:27:34

16   problem.

17        THE WITNESS:  Yes, sir.

18        THE COURT:  And I imagine that that just doesn't cut

19   across to mortality, it also cuts across to adverse morbidity

20   as well.                                                           16:27:45

21        And so let me tell you what -- I mean, I have visited

22   the prisons, and I have been paying a lot of attention to this.

23   And one of the things that I know, is apparent to me when I

24   visit, is what I've described as the inbox problem.  And that

25   is, there's too much in the inbox and not enough staff time to     16:28:03

CV-12-601-PHX-DKD - February 28, 2018

```
 1   be able to address the inbox.

 2           Which would suggest that one of the reasons that

 3   people aren't able to communicate is they just don't have time.

 4   It's like the fire department is there putting a fire out, and

 5   they're supposed to do a thorough report about the fire, but        16:28:20

 6   while they're finishing up wrapping up their hoses they get

 7   called to another fire, and then get called to another fire,

 8   and then they get called to another fire.  So the communication

 9   falls off.

10           Is that something that you've observed as well?           16:28:31

11           THE WITNESS:  Oh, absolutely.  I agree with that

12   completely.

13           THE COURT:  Then let me ask -- or say one final thing.

14   You told me that you had a lot of respect for the people who

15   are involved in the process and that you'd heard bad things       16:28:48

16   about them.  Some of the things that you probably have heard

17   bad things about have come from this -- from this courtroom,

18   and even have come from me.

19           And I was heartened to hear what you said about how

20   things are getting better.                                        16:29:06

21           I also will tell you honestly that I was sad that we

22   had scheduled this on a day for this committee phone call that

23   you talk about where you would normally be in the room.

24   Because from what I heard from you, I want you in that room.

25   And I'm sad that our -- to the extent that our normal meetings    16:29:22
```

1   here in court are on Wednesdays, that those may be adversely

2   affecting --

3            THE WITNESS:  No.

4            THE COURT:  Not you, but Mr. Pratt is here.

5            THE WITNESS:  There are others.  I mean, the business          16:29:36

6   continues.

7            THE COURT:  And so I understand that there's an

8   imposition to this.  And I understand that you say things are

9   working.

10           But I think I also have to say to you that I have          16:29:46

11  heard a lot about things that haven't worked and that aren't

12  looking like they're working right now, and haven't worked for

13  a long time.

14           And so I want you to appreciate that I don't draw you

15  in here without a real purpose to it.  And I don't draw          16:30:02

16  everybody in without a real purpose to it.  Because I think, as

17  I've heard from you -- and I'll tell you this is just my

18  observation, and it's not just you, it's heard from others,

19  that there are good spirited people who want to do the right

20  thing here.  And what I heard today from you about State          16:30:20

21  monitors who are over the issue of supervising the contractor,

22  it sounds to me like what needs to happen.

23           But I have also talked about, with you, some of the

24  factors that are present in the situation on the yard that

25  interfere with the ability for that really to play out in a way          16:30:40

─── **CV-12-601-PHX-DKD – February 28, 2018** ───

1    that should work.  And if it had worked, we wouldn't be here.

2    Because I'm here only because every month I get a report.  We

3    were supposed to get the one today about December 2017.  And

4    for years I've been getting reports that we haven't met the

5    mark in places where the mark has been met at some of the          16:30:58

6    facilities.  And so that would make me think people know how to

7    do it, why aren't they doing it?  And then we see other

8    facilities where they're missing the mark by far.

9           So my continued engagement in this is, I think, while

10   as I've expressed, it's an imposition on you and your people,      16:31:17

11   and things are said that maybe make people think that they're

12   not being appreciated, it's part of the job that the parties

13   asked me to do in this case.  And I have to do it.  And in

14   order to it I have to ask hard questions.

15           THE WITNESS:  Yes.

16           THE COURT:  And sometimes I have to square those hard

17   questions up against facts that are -- that are part of my

18   effort to try to understand the overall environment.

19           And so sometimes I have to paint with a broad brush,

20   because I can't just I can't just stencil it with a fine point,    16:31:49

21   because I'm learning too.

22           So thank you for listening to that.

23           We'll have you back at a time that the lawyers will

24   talk about and when it will be.  But I appreciate your time

25   here today.                                                         16:32:03

1        THE WITNESS:  I'm glad to be of service.

2        THE COURT:  Thank you, sir.

3        So we have obviously an agenda, at least on my agenda

4    is two pages that remain for today.  But as I look at it, it

5    seems to me that the activity that we're engaged in, both with        16:32:20

6    respect to the OSC and with respect to the foundation of the

7    monitoring system, is critically important to all of those

8    other components.

9        And so I do not feel that any of those ride

10   necessarily on -- or are interfered with by conducting and        16:32:35

11   having given what we did the higher priority to the activities

12   of these two days.

13       I think we will need at some point to visit about the

14   agenda for the dates that we've selected in March and try to

15   make a good plan to try to accommodate everything that we have        16:32:56

16   to do.  I would ask the lawyers to do that in the first

17   instance.  And then feel free to get me engaged or to get the

18   staff attorneys engaged at whichever you think is useful with

19   respect to trying to come up with a time table of how we can

20   best proceed.        16:33:14

21       But other than that, unless there's something that is

22   emergent at this point, I would say that we should conclude at

23   this moment for today.

24       MR. FATHI:  One more thing, Your Honor.

25       Since -- in light of the fact that we are continuing        16:33:25

CV-12-601-PHX-DKD - February 28, 2018

 1   the hearing to essentially a month from now, the defendants

 2   have produced their lists of non-compliant instances for

 3   December.  They've produced some of them for January.  We would

 4   ask that they also produce February in advance of the next

 5   hearing which will take place at the end of March.                 16:33:46

 6           THE COURT:  The end of March hearing?

 7           MR. FATHI:  Yes, Your Honor.

 8           THE COURT:  Is that possible?

 9           MR. BOJANOWSKI:  You're talking about the real-time --

10           MR. FATHI:  Yes.                                            16:33:57

11           MR. BOJANOWSKI:  -- report?

12           MR. FATHI:  The number and list of non-compliant --

13           THE COURT:  The going forward basis of the month to

14   month.

15           MR. FATHI:  Yes, Your Honor.  Just so that we have the      16:34:04

16   most up to date numbers available when we --

17           THE COURT:  It does seem to be relevant to what we're

18   considering, because obviously if it's favorable for defendants

19   they're going to be wanting to assert that.  And if it's not

20   favorable for defendants, you'll be wanting it.                    16:34:17

21           But either way, it is in the first interests better

22   for us to have the most current information, even while we are

23   vetting the veracity of that information.

24           MR. BOJANOWSKI:  The February -- the February numbers

25   won't be available by the end of March.                           16:34:36

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD - February 28, 2018

1          MR. FATHI:  I'm sorry, Your Honor, I'm not talking

2    about the CGARs, I'm talking about the Performance Measures in

3    facilities that are subject to the order to show cause.

4          THE COURT:  That's what I took you to mean, yes.

5          MR. BOJANOWSKI:  I don't know the answer to that            16:34:59

6    question, Your Honor.  I have to kind of speak with the Corizon

7    representatives to find out if that's possible.  Because it

8    is -- it's a large undertaking to do that.  And so --

9          THE COURT:  All right.  Do this then, check with the

10   Corizon people, then talk to the plaintiffs' counsel, and then    16:35:21

11   give me a call on Monday and let me know what your respective

12   arguments are on that.

13         Is that enough time?

14         MR. BOJANOWSKI:  That will be enough --

15         THE COURT:  Yes, Miss Kendrick.                             16:35:34

16         MS. KENDRICK:  I'm actually out of town on Monday.

17         THE COURT:  That's all right.

18         MS. KENDRICK:  Never mind.

19         THE COURT:  Well, no, what day would work for you,

20   Miss Kendrick?                                                    16:35:42

21         MS. KENDRICK:  Tuesday.

22         THE COURT:  Would that work, to set the deadline for

23   you all to give me a call?  If you need to.

24         MR. BOJANOWSKI:  I believe so, Your Honor.

25         We'll make sure it's attended.                             16:35:49

UNITED STATES DISTRICT COURT

1    THE COURT:  So if this is an issue -- we've heard what

2  the request is from the plaintiffs.  I've told you why I think

3  it makes sense.  But if it turns out that it's -- for some

4  reason it doesn't make sense or is impossible, you'll give me a

5  call on Tuesday and we'll talk about it.                    16:36:04

6    And so what we'll -- just to make sure, I need you all

7  to coordinate the three days that we have in March and figure

8  out what you think is the best plan.  That's the March 14th

9  day, as well as the two days that I mistook before, 25, 26.  Is

10 that right?                                                 16:36:27

11    MR. FATHI:  26th and 27th.

12    THE COURT:  26th and 27th.

13    So, again, we have a normal practice of what we do on

14 the date that we'd already selected for March 14th, but it may

15 make sense to do something differently.  I just want you all to 16:36:37

16 be thinking about that, because you're the ones who are making

17 the presentation here, and you've got to consider witnesses.  I

18 have three days in that month, and I want you to take the best

19 advantage of them as you can.  And I'm not going to set any

20 rule about how to do it.                                    16:36:52

21    MR. FATHI:  We'll do so, Your Honor.

22    THE COURT:  Anything you wanted to say Mr. Bojanowski,

23 or Mr. Struck or Ms. Love?

24    MR. STRUCK:  No, Your Honor.

25    MR. BOJANOWSKI:  No, Your Honor.                         16:36:59

1          MS. LOVE:  No, Your Honor.

2          THE COURT:  All right.  Thank you all very much.

3      (Proceedings concluded at 4:37 p.m.)

4

5                          -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV-12-601-PHX-DKD - February 28, 2018

1

2

3

4                     C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 1st day of March,

15   2018.

16

17

18

                                s/Candy L. Potter_____
19                              Candy L. Potter, RMR, CRR

20

21

22

23

24

25

UNITED STATES DISTRICT COURT