1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3                  _____

4

  Victor Parsons, et al., on    )
5 behalf of themselves and all  )
  others similarly situated;    )
6 and Arizona Center for        )
  Disability Law,               )
7                               )    No. CV 12-00601-PHX-DKD
              Plaintiffs,       )
8                               )
         vs.                    )    Phoenix, Arizona
9                               )    March 19, 2018
  Charles Ryan, Director,       )    9:18 a.m.
10 Arizona Department of         )
  Corrections; and Richard     )
11 Pratt, Interim Division       )
  Director, Division of Health )
12 Services, Arizona Department )
  of Corrections, in their     )
13 Official capacities,         )
                               )
14            Defendants.       )
  _____ )
15

16

17    BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

        REPORTER'S TRANSCRIPT OF PROCEEDINGS
18
                (*Telephonic Status Hearing*)
19

20

21 Official Court Reporter:
  Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
  401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
  (602) 322-7256
24
  Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1                    A P P E A R A N C E S

2    For the Plaintiffs:

3              PRISON LAW OFFICE
               By:  Donald Specter, Esq.
4              By:  Corene Kendrick, Esq.
               1917 5th Street
5              Berkeley, CA 94710

6              ACLU - Washington DC
               By:  David C. Fathi, Esq.
7              915 15th Street NW
               7th Floor
8              Washington, DC 20005

9              EIDENBACH LAW PC
               By:  Kirstin T. Eidenbach, Esq.
10             P.O. Box 91398
               Tucson, AZ 85752

11
               ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
12             By:  Maya S. Abela, Esq.
               177 N. Church Avenue
13             Suite 800
               Tucson, AZ 85701

14
     For the Defendants:

15
               STRUCK LOVE BOJANOWSKI & ACEDO PLC
16             By: Timothy J. Bojanowski, Esq.
               By: Rachel Love, Esq.
17             By: Timothy M. Ray, Esq.
               By: Jacob B. Lee, Esq.
18             By: Jamie D. Guzman, Esq.
               3100 W. Ray Road
19             Suite 300
               Chandler, AZ 85226

20
     ALSO PRESENT:
21             Richard Pratt
               Nicole Taylor
22             Jennifer Finger

23

24

25

1                    P R O C E E D I N G S

2           THE COURT:  Please be seated.  Please call the case.

3           THE MAGISTRATE JUDGE CLERK:  Case Number CV 12-00601,

4   Parsons, et al., versus Ryan, et al., set before the Court for

5   a telephonic status hearing.                                    09:18AM

6           THE COURT:  Who is on the telephone, please?

7           MR. FATHI:  Good morning, Your Honor.  David Fathi of

8   the ACLU National Prison Project for the plaintiff class.

9           THE COURT:  Thank you.  Good morning.

10          MS. KENDRICK:  Good morning, Your Honor.  Don Specter    09:18AM

11  and Corene Kendrick from the Prison Law Office for the

12  plaintiff class.

13          THE COURT:  Thank you.

14          MS. EIDENBACH:  Good morning, Your Honor.  This is

15  Kirsten Eidenbach for the prisoner plaintiff class.             09:18AM

16          THE COURT:  Thank you.

17          MS. ABELA:  Maya Abela for the Arizona Center for

18  Disability Law.

19          THE COURT:  Thank you.

20          MR. BOJANOWSKI:  Good morning, Your Honor.  Tim         09:19AM

21  Bojanowski, Rachel Love, Jacob Lee, Jamie Guzman, Tim Ray,

22  Richard Pratt, and Nicole Taylor for defendants.

23          THE COURT:  Is that it?  Anybody else?

24          All right.  Thank you all very much.

25          It's 9:20, so I know that I have to apologize.  In       09:19AM

```
1    setting the matter for this morning, there was the
2    understanding I knew that it was not a scheduled court date for
3    my normal clerk of court, so we have been very lucky to have
4    another deputy clerk to come here as well.  But it just was, I
5    understand, not as familiar terrain for him with respect to          09:19AM
6    making the transition from the phone call.  You all were
7    present when you were supposed to be.  We just couldn't bring
8    you into the courtroom.
9         I think that it is a difficult situation because the
10   many different courtrooms here have different procedures for         09:20AM
11   how things work.  In my particular courtroom, the way that we
12   have worked it out with the technology people is, I think, a
13   sui generis arrangement that makes it so that the sound is
14   better here than in other places.  There was a recent change
15   and we were able to keep it so that the sound was better.  But       09:20AM
16   unfortunately, that means that it requires special experience
17   in doing it.  And no reason to think that anybody who was just
18   stepping in as they graciously agreed to do didn't know how to
19   do that.
20        So I may not fully understand exactly what happened,            09:20AM
21   but that's my understanding of it.  And I give you that by way
22   of explanation because I know I have taken 20 minutes of your
23   time and I apologize about that.
24        The first thing before we get to the agenda of these
25   emergency items that we had to bump off from the last time, I        09:20AM
```

1    did want to address something that I have been working on, and

2    just because it's been fresh in my mind and it's been ready to

3    rule for a long time, I do think I need to address it.  And

4    this is the attorney's fees issue, the plaintiffs' motion for

5    attorney's fees.                                                    09:21AM

6          The defendants had taken an argument that I just don't

7    see any support for, and that is that the amount is not able to

8    be used as plaintiffs suggest, and that is to get to a

9    multiplier effect because of special circumstances.  There's

10   clear Ninth Circuit authority, quite old even, that says that    09:21AM

11   that's not true.  So I have been trying to figure out why it is

12   that defendants have made this argument, but I can now come to

13   the firm conclusion that it's an untenable argument so I'm

14   going to reject it.

15         That doesn't mean that plaintiffs get everything they      09:21AM

16   want, though, because the plaintiffs' motion has a complication

17   as well.  In reviewing the calculation that the plaintiffs have

18   submitted in which they say that they are entitled to the most

19   recent rate for the several years of time because defendants

20   did not engage in the attempts to negotiate a fee award, that    09:22AM

21   goes into the difficult area where the -- I mean, it's true the

22   sort of base rate we have to start with is the rate that the

23   AO, the Administrative Office of the U.S. Courts, under the

24   Prisoner Litigation Reform Act, the interaction of those two

25   rates, we do have to pay attention to that.  But that rate       09:22AM

1    changes over time, and so defendants -- plaintiffs, rather, are

2    saying that they get the most current rate.  And Mr. Specter's

3    affidavit at Document 2278 at Paragraph 10 states that there

4    was an attempt to negotiate with defendants for fees that

5    occurred from October 2015 to December 2016 but it was                    09:22AM

6    unsuccessful.  But there's no explanation as to why plaintiffs

7    waited until they had incurred 15 months of fees or what

8    happened between January 2017 when the fees through December

9    2016 were presumably known and September 2017 when the fee

10   application was filed.                                                     09:23AM

11          So it appears to me that the delay is the plaintiffs'

12   own doing and that they are not entitled to retrospective

13   application of the higher rate.  So I would expect then, unless

14   maybe because it's your affidavit, Mr. Specter, and since you

15   are on the phone you can tell me why I'm wrong here, but it                09:23AM

16   would seem to me that you would need to submit fiscal year

17   summaries and evidence supporting what hourly rate the Judicial

18   Conference established during those physical years and I will

19   use that rate.  But I will not use the most current rate going

20   back through that entire period.                                          09:23AM

21          Someone on plaintiffs' side, and then I will give

22   defendants a chance to say anything they would like to say.

23          MR. SPECTER:  Hello, Your Honor.  This is Donald

24   Specter.

25          We would be happy to submit a declaration with the                 09:24AM

1    relevant rates and the new calculations.

2          THE COURT:  Okay.  Great.  Anything defendants want to

3    say in response to what I say?

4          MR. BOJANOWSKI:  Nothing else, Your Honor.  We'll have

5    a look at what Mr. Specter submits and then take action if we    09:24AM

6    feel it necessary based upon that.

7          THE COURT:  Okay.  Thank you very much.

8          So now turning to the emergency items that we had to

9    put off, that's going to be -- you are going to speak first,

10   Ms. Eidenbach?  I'm sorry, not Ms. Eidenbach, Ms. Kendrick.    09:24AM

11         MS. KENDRICK:  Actually, Mr. Specter is going to speak

12   first.

13         THE COURT:  Go ahead.

14         MR. SPECTER:  Well, Your Honor, on the issue of the

15   scheduling of the witnesses, as we set forth in the memo that    09:24AM

16   we submitted on Friday afternoon, we believe that since the OSC

17   re:  Contempt has been pending since June of last year and then

18   October was when you finally issued -- you issued the OSC that

19   is operative at the moment, that it's better to take care of

20   one issue at a time.  And we believe since the contempt    09:25AM

21   proceeding is the most important issue, we are hoping that we

22   could have the witnesses on the contempt proceeding proceed

23   next week and leave the KJZZ witnesses for a future date to be

24   set by you according to your calendar.

25         THE COURT:  Okay.  Who would like to speak to that on    09:25AM

1    the defendants' side?

2            MS. LOVE:  Your Honor, this is Rachel Love for

3    defendants.

4            We respectfully disagree with Mr. Specter.  We believe

5    that both issues are paramount and should continue on the dual        09:26AM

6    track that we have been doing so far.  We do have Dr. Khan, an

7    out-of-state witness who has already due to fly in Sunday so he

8    can testify on Monday.  Yes, we do disagree also with

9    plaintiffs' papers calling this a morass of an exercise when it

10   is the Court that decided that it was very important to not         09:26AM

11   only look at and evaluate the allegations made by Dr. Watson

12   but to look at the monitoring process in general to see if

13   there was a beat the monitor system or some sort of beat the

14   monitor play at hand.

15           We do believe based on the number of witnesses that          09:26AM

16   the defendants do, with the due process rights, have the

17   responsibility and the opportunity and the need to respond to

18   that it will likely take probably three more days of

19   evidentiary hearing to get through the witnesses.

20           THE COURT:  Well, that actually makes it easy for me.       09:27AM

21   I am going to find three more days to get to the witnesses.

22   I'm going to get to the OSC.  We have already bumped it too

23   much so I'm going to grant plaintiffs' request.  We'll focus on

24   the OSC in the first instance.

25           MR. SPECTER:  Thank you, Your Honor.                          09:27AM

1    THE COURT:  Timing-wise, I have to check here with

2    people on where we stand just to make sure that there aren't

3    other issues associated with witnesses.  Stand by for just a

4    second.

5    What's the complication of -- I mean, I guess in my     09:27AM

6    own life, if I'm scheduled to do something, I'm supposed to fly

7    in to do something, often times I'm really relieved it's

8    getting bumped because it means I can get to what I'm doing

9    other than somebody else's agenda.  Is there some reason that

10   that is not reasonable here or there's some reason this        09:28AM

11   particular witness who is scheduled to fly in on the

12   defendants' side is something I should be listening more

13   carefully to just to make sure?  Ms. Love?

14   MS. LOVE:  Your Honor, it's just the fact of the, you

15   know, the substantial amount of preparation to get the doctor   09:28AM

16   ready and then also, you know, changes monetarily for flights,

17   changes in tickets.  But this is a witness that does need to,

18   as we stated before in arguing whether or not he could be

19   present in the courtroom during the evidentiary hearing, it is

20   a witness who does need to listen to Dr. Wilcox's opinions,      09:28AM

21   which plaintiff needs to put on first because they needed to

22   reschedule him and then needs to listen to Sarah Neese.  So

23   it's not a witness who scheduling-wise would be something we

24   could take out of order anyway.  So we would need him to

25   testify on the day after witnesses go first where Wilcox and    09:29AM

1    Sarah Neese go first.

2         THE COURT:  I will say this, that my introduction,

3    that's probably the wrong word, but the word I mean to say is

4    wading deeper into what I learned with respect to the witnesses

5    that are associated with these monitoring issues.  I have          09:29AM

6    learned a considerable amount; just by way of example, the idea

7    that the computer can be down when you have medical records

8    that are only on a computer for an entire day and there's no

9    fail over, I mean, I don't know whether that's the standard of

10   care.  I can't imagine it.  But again, I'm ignorant about that      09:29AM

11   but it raises enormous questions for me.

12        So I think that it is appropriate to make sure that

13   this process continues in a way where I am exploring it

14   consistent with what I have seen before, and that is this is a

15   mine worth mining.  There's a vein here that at each turn, the      09:30AM

16   witness that the defendants call that provides enormous

17   information to me about how the system works or doesn't work,

18   issues associated with -- plainly directly related to why it is

19   that, perhaps, performance measures haven't been met.

20        So I think that this has been very useful.  I think          09:30AM

21   I'm going to need you all to sit down and figure out what the

22   calendar can be and where we can get more days and we'll have

23   to get those days.  And we'll have to get it soon.  But in any

24   event, we'll focus on the OSC first.

25        The next issue.                                               09:31AM

1          MS. KENDRICK:  Yes, Your Honor.  This is Corene

2     Kendrick.  Last Wednesday we had highlighted a few of the

3     issues on our proposed agenda that we felt were critical to try

4     to get to on Wednesday, and so if the Court likes --

5          THE COURT:  That's what I'm talking about.  I think          09:31AM

6     you mentioned that -- you had mentioned, in particular,

7     privilege log issues, discovery production.  Those are the

8     kinds of things I'm talking about, I think.

9          MS. KENDRICK:  Yes, sir.  So this is Docket 2680.  We

10    don't necessarily have to go in order, but one of the first          09:31AM

11    items is that we have requested what was called a root cause

12    analysis that Corizon did in response to the Court's order to

13    show cause.  We have asked defendants for it because it was

14    referred to in one of their proposed exhibits for the OSC

15    hearing.  And to date, we have not been provided this document          09:32AM

16    which we believe we would need for cross-examination of

17    Defendant Pratt and Defendant Ryan.

18          THE COURT:  All right.  And who would like to speak on

19    this issue on the defendants' side, please?

20          MR. BOJANOWSKI:  Your Honor, I think that what they          09:32AM

21    are talking about are there's a series of charts, and I don't

22    have them in front of me, to be honest with you, that identify

23    in a graphic form the structure that's used in analyzing the

24    particular performance measure.  And there's one for each one

25    of the measures that's subject to the Court order, and that's          09:32AM

1    been disclosed to the plaintiffs already.  If you would like, I

2    can give them the Bates range after this hearing is done so

3    they can focus in on those.  I don't, unfortunately, have that

4    in front of me right now, but I can provide that Bates range to

5    them.                                                          09:33AM

6            THE COURT:  Ms. Kendrick, why do you think that this

7    root cause analysis hasn't been produced?

8            MR. SPECTER:  Your Honor, this is Don Specter again.

9    The root cause analysis was referred to in defendants' Exhibit

10   33 of 34 for the contempt proceeding.  And it was a letter from  09:33AM

11   the chairman of Corizon, Mr. Goldberg, who said that they were

12   doing a root cause analysis.  And that was in the fall of this

13   year.  And so it appears to us that this is not just charts.

14   It's some explanation of why things have gone so wrong.

15           So that's why we think that we haven't gotten it.  And  09:33AM

16   we would like an explanation from Corizon or Mr. Bojanowski of

17   what Mr. Goldberg was referring to in that letter that he wrote

18   to Mr. Ryan.

19           MR. BOJANOWSKI:  I think it was those charts that I

20   have just mentioned.                                           09:34AM

21           THE COURT:  So, Mr. Bojanowski, you feel comfortable

22   saying to me that there is no such thing as this root cause

23   analysis as generally described by Mr. Specter other than the

24   charts that you just mentioned?

25           MR. BOJANOWSKI:  Well, I want to go back and renew      09:34AM

| | |
|---|---|
| 1 | again, Your Honor, I want to make sure I am getting what is |
| 2 | described in this letter.  I believe that that's what has been |
| 3 | produced, but I certainly am going to go back and have a look |
| 4 | at it and make sure that they've got it in a timely fashion. |
| 5 | THE COURT:  Okay. |
| 6 | MR. BOJANOWSKI:  I don't recall being in the document |
| 7 | production anything that was titled root cause analysis. |
| 8 | MS. KENDRICK:  The phrase is used in defendants' |
| 9 | Exhibit 33 for the February 28th OSC hearing.  So that's where |
| 10 | the phrase came from. |
| 11 | MR. BOJANOWSKI:  That's a letter by the Chairman of |
| 12 | the Board from Corizon? |
| 13 | MR. SPECTER:  Yes. |
| 14 | MS. KENDRICK:  Yes. |
| 15 | MR. BOJANOWSKI:  Okay.  Well, let me have a look at |
| 16 | that again then and follow up. |
| 17 | THE COURT:  All right.  Do exactly that, and then have |
| 18 | a meet-and-confer based upon what you have found out with the |
| 19 | plaintiffs.  And if you still believe that this issue is |
| 20 | outstanding, we will take it up at the very first moment of |
| 21 | next week's hearing. |
| 22 | MR. SPECTER:  Thank you, Your Honor. |
| 23 | THE COURT:  Next? |
| 24 | MS. KENDRICK:  Thank you, sir. |
| 25 | MR. SPECTER:  One moment, Your Honor.  In light of the |

09:34AM

09:35AM

09:35AM

09:35AM

09:35AM

1  fact that this is going to be possible evidence at the hearing,

2  could we have a time limit for Mr. Bojanowski to get back to

3  us?

4  THE COURT:  That seems reasonable.  Can you do this by

5  close of business on Wednesday, Mr. Bojanowski?          09:36AM

6  MR. BOJANOWSKI:  I believe so, Your Honor.

7  THE COURT:  Thank you.

8  MS. KENDRICK:  So, Your Honor, the next item we wanted

9  to talk about is Docket 2680, Number 6.  And that is the issue

10 of the privilege logs that defendants and Corizon provided to   09:36AM

11 us.

12 THE COURT:  Go ahead.

13 MS. KENDRICK:  So defendants produced 500 pages of

14 privilege logs, and we reviewed the logs and in many cases they

15 are claiming attorney/client privilege for communications in    09:36AM

16 which the -- neither the sender nor the recipient appears to be

17 counsel of record.  And our position was that the Court had

18 made it clear at the January 12th telephonic hearing that it's

19 clear under the law that, you know, just including or cc'ing an

20 attorney isn't enough to make it privileged.  And so in some of  09:37AM

21 the cases an attorney appears to be listed on the CC line, but

22 in other cases there's no attorney copied at all.  And it's an

23 exchange between Corizon staff, like a facility health

24 administrator and a regional operations director.  So we don't

25 understand how these documents could be designated as           09:37AM

```
 1    privileged.

 2            MS. LOVE:  Your Honor, this is Rachel Love.

 3            As to this issue regarding privilege log, this is an

 4    issue that is obviously a discovery issue that needs to go

 5    through the meet-and-confer process, too.  So we would request

 6    that we be able to do that to, perhaps, cull down any issues

 7    there might be and that the parties need that meet-and-confer

 8    and discuss this first amongst themselves before going to the

 9    Court on this issue.

10            THE COURT:  Here's what I want you to do, Ms.

11    Kendrick, identify 10 examples from the privilege log where you

12    think it's an impermissibly broad application of the

13    attorney/client privilege or the work product immunity and send

14    those over today, by the close of business today, to the

15    defendants.  The defendants will take a look at your 10

16    examples and respond by the close of business tomorrow.  If by

17    the close of business Wednesday you are unable to resolve this

18    issue, then by close of business Wednesday I want those 10

19    examples sent over to me for in-camera review.

20            MS. KENDRICK:  Yes, sir.

21            THE COURT:  Thank you.

22            MS. KENDRICK:  The next item that we had flagged is

23    listed as Item Number 9 on our agenda, and that was a request

24    for an update from the defendants about the status of their

25    request for proposals and negotiations for the five-year
```

09:37AM

09:38AM

09:38AM

09:38AM

09:38AM

09:38AM

 1    contract as well as the amount of money that's been assessed

 2    against Corizon as fines in November and December for failure

 3    to maintain staffing levels and for violations of the

 4    stipulation.

 5            THE COURT:  Mr. Bojanowski, can you provide an update     09:39AM

 6    on those things?

 7            MR. BOJANOWSKI:  Yes, Your Honor.  The contract is

 8    still in negotiation, so I don't have really much else to say

 9    about that.  As far as the amount of money assessed against

10    Corizon for performance measures, I'm going to have Mr. Pratt,   09:39AM

11    if it's all right with everybody, maybe indicate for the record

12    what those numbers are.

13            THE COURT:  Of course.

14            MR. BOJANOWSKI:  So it would be the amount of money

15    assessed against Corizon for violations of the performance       09:39AM

16    measures.

17            MR. PRATT:  For November 2017 it was $200,000.  For

18    December it was $210,000.

19            MR. BOJANOWSKI:  And January is not yet complete.

20            MR. PRATT:  January, the prelims on January are           09:40AM

21    $175,000.

22            MR. BOJANOWSKI:  As far as the money assessed for

23    staffing level issues for November, December, and January.

24            MR. PRATT:  Total staffing offsets for November were

25    $74,613.36; December 2017 was $83,055.37; and we had a January    09:40AM

1    prelim, but it's still under audit, so I can't really give an

2    official number on that.

3              THE COURT:  Thank you.

4              MS. KENDRICK:  Thank you.

5              So, Your Honor, another issue that we had flagged          09:41AM

6    Wednesday for priority discussion is listed at Number 3 of our

7    agenda, and that is defendants' failure to include instances of

8    noncompliance with the order to show cause in their February

9    5th and February 14th filings that reported December 2017

10   noncompliance.  Plaintiff submitted a declaration that's filed     09:41AM

11   at Docket 2633 that listed at least 420 other instances of

12   noncompliance that we identified in their internal documents

13   and tracking reports, which was supported by 77 exhibits to my

14   declaration, including numerous printouts from patients'

15   medical records confirming that defendants were substantially     09:41AM

16   noncompliant yet inexplicably had not listed them in their

17   filings to the Court.

18             THE COURT:  And we need a response on that.

19             MR. LEE:  Yes, Your Honor.  This is Jacob Lee.

20             Just as sort of a preliminary matter, in reviewing Ms.   09:42AM

21   Kendrick's declaration and the exhibits attached to it, she

22   makes a lot of reference throughout the declaration to daily

23   trackers, performance measure logs, rosters of compliance,

24   performance measure rosters.  These appear to all be, I guess,

25   labels for the most part, except for maybe daily trackers, that    09:42AM

1    plaintiffs have applied to these documents.  But the documents

2    themselves, in many instances, contain no information as far as

3    what these documents are used for, what the source of the

4    information was, how often they are generated, who created

5    them.  There's no context given on any of these documents.  And   09:42AM

6    many of them are simply lists of inmate names and numbers.

7         And so there's really no way to tell on the basis of

8    these documents whether these inmates that are listed actually

9    should be included on the list of noncompliance that we have

10   been ordered produce to the Court.                                09:43AM

11        And really, as another threshold matter, this whole

12   exercise sort of demonstrates the difficulties inherent in

13   providing true real time data to the Court regarding compliance

14   with the measures subject to the order to show cause.  It's not

15   as simple as just running a report.  We provided some            09:43AM

16   additional explanation to the Court in our motion for

17   reconsideration that was filed on February 23rd of the Document

18   2640, that it's not a matter simply running a report in a

19   Pentaho.  It requires comparison of the resulting reports with

20   medical records, with the healthcare or the Monitoring Bureau's  09:43AM

21   audit results.  And there's just a lot more that goes into it.

22   It's a long, painstakingly difficult process.

23        But kind of going back to this declaration, there

24   seems to be a lot of assumptions in here.  And, in fact, in

25   Footnote 8 on, I believe it was, Page 37 of the declaration,     09:44AM

1    Ms. Kendrick acknowledges that on some of these daily trackers

2    that refer to backlogs they don't characterize the backlog as

3    noncompliance with the particular performance measure, yet that

4    seems to be the entire basis of this declaration, is that

5    plaintiffs' counsel has these backlog reports, these daily          09:44AM

6    trackers, these rosters of compliance, whatever you want to

7    call them.  And they are assuming if the name appears on one of

8    those trackers it should be on the list of noncompliance for

9    the month when, again, there's no context in these lists to

10   explain why the names are on the lists, what they are used for,    09:44AM

11   how often they are generated, what the source of the

12   information was that would allow the Court, us, anybody, to

13   make a determination that the inmates included on this list are

14   true instances of noncompliance.

15        I can give you a real good example with regard to             09:45AM

16   Performance Measure 54 at Eyman.  This is starting in Paragraph

17   17 of Ms. Kendrick's declaration.  She mentions a December 11,

18   2017 daily tracker that shows a backlog of 301 chronic care

19   patients.  But that number is already down significantly from

20   562 on the quote, unquote, daily tracker for December 5th,         09:45AM

21   2017.

22        She says there's a chronic care backlog report

23   attached to the daily trackers that lists 243 names.  There's

24   157 inmates on the backlog report that are not on the court

25   filings.  But this backlog report is just a list of names.         09:45AM

1    There's no indication on it that it's intended to constitute

2    instances of noncompliance as is recognized in that footnote

3    later on in regard to a different backlog report.  And none of

4    these numbers match up.  The daily tracker says in the notes

5    that there's 301 backlogs but then lists out numbers by unit      09:46AM

6    which add up to 299.  And the backlog report that's attached to

7    the tracker only contains 243 names.

8            So there's just a whole lot of assumptions going into

9    this declaration as to what inmates are actually instances of

10   noncompliance.  There hasn't been any --                          09:46AM

11           THE COURT:  I'm sorry to interrupt.  This real good

12   example, using your words, this is the first that plaintiffs

13   have heard about it?  I can't remember.  Was it in your

14   response that you filed at the end of February?

15           MR. LEE:  I'm sorry.  What was your question?            09:46AM

16           THE COURT:  What I asked is when you were giving us

17   what you described as a real good example of how it is that

18   this assertion in plaintiffs' numbers is not right, is this the

19   first that they have heard about it, or was it included in your

20   response you said that you filed at the 21st, I think, of        09:47AM

21   February?

22           MR. LEE:  No.  This is, I would assume, I mean, this

23   is the first of this particular information has been brought to

24   light because, again, if this is considered a discovery issue

25   there's no meet-and-confer on this.  We didn't get an            09:47AM

1    opportunity to respond before the declaration was filed

2    accusing us of not including these instances of noncompliance.

3          MS. KENDRICK:  Your Honor, that's not true.  We had a

4    telephonic conference with you after they failed to file

5    anything for Performance Measure 54 at Eyman.  And at that time    09:47AM

6    I mentioned these daily tracking reports when they said they

7    had just bothered to run a report that morning.  So it is not

8    true that they have not learned about their own documents that

9    I brought to their attention over a month and a half ago.

10         And furthermore, what Mr. Lee said is shocking that    09:48AM

11   they can't track their noncompliance and that these are their

12   own documents and they are accusing us of mischaracterizing

13   them, and they state that they cannot explain or authenticate

14   their own documents that are attached to e-mails sent by their

15   own employees saying that this is the daily tracking for    09:48AM

16   compliance with the order to show cause.

17         If we have somehow inaccurately characterized their

18   own documents then defendants need to file declarations under

19   oath explaining what these documents are.  Mr. Lee also ignores

20   the fact that I have 77 exhibits attached to my declaration    09:48AM

21   including numerous printouts from patients' medical records

22   that show, on their face, that this patient is noncompliant

23   with whatever performance measure it is.  So if they feel that

24   we are somehow mischaracterizing their own documents that they

25   authenticated and that they produced to us with Bates numbers    09:48AM

1    on it, then they need to file a declaration under oath

2    explaining what these documents are and why things don't match

3    up and why they are not capable of tracking noncompliance

4    pursuant to the Court's order.

5            THE COURT:  Well, I'm not sure that I will adopt all       09:49AM

6    of your words, Ms. Kendrick.  But I will tell you that as I

7    heard what Mr. Lee say, the same thought came into my head, and

8    that is that he generally described the difficulty, the

9    burdensomeness of these real time reports.  I find that very

10   difficult to accept three years into a process.  If you have a    09:49AM

11   three-year failure to deliver the performance measures, I have

12   been repeatedly banging the drum about how real time is what's

13   necessary, especially as we loom on the possibility of

14   significant financial costs associated with doing this.  I

15   don't understand why it is that you wouldn't figure out that      09:49AM

16   you needed to have real time data that was easily accessible.

17           So even if Mr. Lee is right, that the plaintiffs have

18   missed the mark and the real good examples, et cetera, et

19   cetera, that argument is pretty much entirely undercut in my

20   view by the admission that we don't really have a handy way to    09:50AM

21   find out what's happening in real time.  Well, my goodness, why

22   not?  Because you are about to pay a lot of money for not doing

23   this.

24           So I don't know.  To me, I cannot, at this moment, put

25   everything in front of me on the record while I sit on the        09:50AM

1     bench and figure out whether or not what plaintiff says is true

2     and what the defendant says is true.  But I will do that at a

3     time when I can, because that was the whole idea also

4     associated with my effort that was frustrated by my medical

5     appointment that meant I couldn't attend to take a look at what     09:51AM

6     the two sides were saying and being what I'm supposed to do,

7     and that is, make the decision who is right and who is wrong.

8              So with respect to this, if you do believe, Mr. Lee,

9     that there's been some failure on the meet and confer to

10    exhaust every opportunity that you have to say you say it's X,     09:51AM

11    Ms. Kendrick; I say it's Y, and here's why I say it's Y, you

12    need to sit down and make sure you have exhausted that.  If you

13    don't think you have, then have that conversation so that you

14    both can walk away from it saying, yeah, we did exhaust our

15    meet-and-confer obligation and then the next step is we go to     09:51AM

16    the judge and the judge decides.  That's what I do.

17             So on this issue, make sure you have exhausted the

18    meet-and-confer and then if you have, then call me up on the

19    phone like we do with discovery disputes and I will take that

20    up at that moment and initiate my process.     09:52AM

21             MS. KENDRICK:  Your Honor, I'm sorry, but this is not

22    something that we consider a run-of-the-mill discovery dispute.

23             THE COURT:  No.  I understand.  This is -- I

24    understand the nature and the different in kind here with this.

25    I know what this issue is about because it raises the     09:52AM

1  possibility of additional issues that should have been

2  reported.  But Mr. Lee has said that he thinks that you have

3  missed the mark on some.  I want you all to make sure that you

4  have squared that out.  Again, I'm not going anywhere this

5  week.  I'm here.  If you can't get this resolved, I will expect   09:52AM

6  to hear from you after close of business Wednesday and we'll

7  look at it.  And I will look at it in a way that is consistent

8  with the practice that I have tried to move to, and that is

9  getting deep into the details and making sure.

10          MS. KENDRICK:  Your Honor.                               09:52AM

11          THE COURT:  Go ahead.

12          MS. KENDRICK:  Your Honor, I apologize.  I did not

13  mean to interrupt you there.

14          I really don't think that any sort of meet-and-confer

15  is going to have any sort of meaningful or substantive         09:53AM

16  progress, and so we would request that you order Mr. Lee and

17  the defendants to respond to our filing, which they have had

18  now several weeks to review, and submit a declaration under

19  oath explaining how we have missed the mark.  Because there's

20  really not much from plaintiffs' side for us to discuss.  We    09:53AM

21  believe the defendants' documents speak for themselves and that

22  the medical records that we pulled up exhaustively show the

23  noncompliance.

24          So in our opinion, there's really nothing to discuss.

25  We would rather just have them respond and explain how these    09:53AM

1   documents that are in their own possession and created by their

2   own employees somehow are not accurate and don't reflect their

3   instances of noncompliance in real time.

4          This is not a discovery dispute.  Defendants are

5   providing incomplete and inaccurate information to the Court.      09:53AM

6   We brought that to the Court's attention, and we would like

7   defendants to respond.

8          MR. LEE:  Your Honor, if I may, this is Jacob Lee.

9   Plaintiffs did bring this to the Court's attention without

10  giving us an opportunity to respond first.  As Ms. Kendrick       09:54AM

11  noted, she's got 77 exhibits to her declaration.  Some of these

12  exhibits are hundreds of pages long including names and inmates

13  for over 400 inmates.  There's no way we could review all that

14  and have a meaningful discussion with plaintiffs about it by

15  Wednesday, by the end of this week, or even a couple of weeks.     09:54AM

16  It's too big of a burden.

17         THE COURT:  Mr. Lee, could you stop there for a

18  moment?  I just want to read what you just said because I

19  wasn't able to hear it all.  Just stop for a moment.

20         Mr. Lee, there's no meaningful opportunity for you to       09:55AM

21  do it by Wednesday.  What you will do instead, by close of

22  business Friday you will file a formal response as Ms. Kendrick

23  asks.

24         MR. LEE:  Your Honor, even by Friday there's not time

25  to review all of these medical records to conduct the necessary    09:55AM

```
 1    investigation as far as all of these documents.  Again,
 2    plaintiffs' counsel got these documents, made assumptions about
 3    what they were looking at, and filed their declaration with the
 4    Court.  We're going to need time to go through and confirm what
 5    each one of these documents are.  We need to review all of          09:55AM
 6    these medical records for the inmates that they say were truly
 7    noncompliant.  It's not possible to do all of that and file a
 8    response by the close of business on Friday.  It's too much to
 9    do, too much review, too many people to talk to.
10         MS. KENDRICK:  Your Honor, we filed that 27 days ago           09:55AM
11    on February 23rd.
12         THE COURT:  I agree, Mr. Lee.  These are your
13    documents.  File it Friday close of business.
14         Next matter.
15         MS. KENDRICK:  That was all of the urgent items we             09:56AM
16    had, Your Honor.  If there's anything else Your Honor wants to
17    cover, that's fine.  Otherwise, we have addressed what we
18    needed to cover last Wednesday.
19         THE COURT:  Anything on the defendants' side?
20         MR. BOJANOWSKI:  Nothing from the defendants, Your             09:56AM
21    Honor.
22         THE COURT:  What I need you to do are a couple of
23    things in addition.  I mentioned it already, but I want to make
24    sure that you do put this on your agenda.  We're going to need
25    more dates.  We're not going to be able to rely on a single        09:56AM
```

1    monthly date.  I would also like to see if there's something we

2    can do to deal with the fact that Mr. Pratt has this meeting on

3    Wednesday that we're pulling him out of that's an important

4    meeting, whether the meeting can be moved on your end to a

5    different day other than Wednesday because we've got these days    09:56AM

6    blocked out for the monthly status conference on Wednesdays.

7    But if that meeting can't be changed, I'm open to doing

8    something that doesn't pull Mr. Pratt off line.  So look at

9    that.

10           Secondly, it is warming in Arizona.  Ms. Rand was in    09:57AM

11   charge of the temperature logs before.  That was a disaster.  I

12   want to make sure that people are paying attention to it so

13   that I'm not being told that it's 185 degrees or that it's 42

14   degrees or they are just blank sheets.  Somebody needs to be

15   focusing on this because this is a real issue.  And I just    09:57AM

16   think that in March, as it's now going to be 90, that may

17   portend that we'll be getting to warmer weather sooner, so be

18   thinking about that.

19           Thank you all very much.  I appreciate your time this

20   morning.  Again, I apologize for the delay at the start.    09:57AM

21   Bye-bye.

22           (Proceeding concluded at 9:57 a.m.)

23

24

25

1

2

3

4

5                          C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 20th day of March,

16   2018.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25