UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

——————————

| | |
|---|---|
| Victor Parsons, et al., on ) | |
| behalf of themselves and all ) | |
| others similarly situated; ) | |
| and Arizona Center for ) | |
| Disability Law, ) | |
| ) | No. CV 12-00601-PHX-DKD |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Phoenix, Arizona |
| ) | March 26, 2018 |
| Charles Ryan, Director, ) | 9:10 a.m. |
| Arizona Department of ) | |
| Corrections; and Richard ) | |
| Pratt, Interim Division ) | |
| Director, Division of Health ) | |
| Services, Arizona Department ) | |
| of Corrections, in their ) | |
| Official capacities, ) | |
| ) | |
| Defendants. ) | |
| ——————————————————— ) | |

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

_(*Evidentiary Hearing/Order to Show Cause*)
Day 4
(*Pages 685 through 910, inclusive.*)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

 1                    A P P E A R A N C E S

 2   For the Plaintiffs:

 3            PRISON LAW OFFICE
              By:  Corene Kendrick, Esq.
 4            1917 5th Street
              Berkeley, CA 94710
 5
              ACLU - Washington DC
 6            By:  David C. Fathi, Esq.
              915 15th Street NW
 7            7th Floor
              Washington, DC 20005
 8
              EIDENBACH LAW PC
 9            By:  Kirstin T. Eidenbach, Esq.
              P.O. Box 91398
10            Tucson, AZ 85752

11            ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
              By:  Maya S. Abela, Esq.
12            177 N. Church Avenue
              Suite 800
13            Tucson, AZ 85701

14   For the Defendants:

15            STRUCK LOVE BOJANOWSKI & ACEDO PLC
              By: Timothy J. Bojanowski, Esq.
16            By: Rachel Love, Esq.
              By: Daniel Struck, Esq.
17            3100 W. Ray Road
              Suite 300
18            Chandler, AZ 85226

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS:                DIRECT    CROSS     REDIRECT   RECROSS
     DAVID ROBERTSON
3    By Mr. Bojanowski                 689                  737
     By Ms. Kendrick                             712
4
     RICHARD PRATT
5    By Mr. Bojanowski        742
     By Ms. Kendrick                   863
6

7                      INDEX OF EXHIBITS

8    EXHIBIT                                          RECEIVED
     6        1-31-18 Agenda for meeting with Corizon
9             and Operations                          859
     7        Sanction Letter Dated 11-5-14           771
10   9        Sanction Letter Dated 1-21-15           771
     10       Sanction Letter Dated 2-10-15           771
11   11       Sanction Letter Dated 7-17-15
     12-40    Sanction Letters                        775
12   79-95    Sanction Letters                        789
     96       Letter Dated 3/22/18 re:  Controlled
13            Substance Audits                        859
     97       Letter Dated 3/22/18 re:  Real-Time
14            Reporting Demand for Performance        859
     98       ADC Director's Office Memorandum 10-31-17  859
15   99       Solicitation No. ADOC12-00001105        771
     101      Order to Show Cause Dated 10-10-17      771
16   103      Sanction Tracking 2004 through 2017
     201      Contract Amendment Number 10            789
17   202      Contract Amendment Number 11            789
     204      Contract Amendment Number 13            789
18   205      Contract Amendment Number 14            789

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE MAGISTRATE JUDGE CLERK:  On the record in CV |
| 3 | 12-601, Parsons, et al. versus Ryan, et al., before the Court |
| 4 | for continuation of evidentiary and order to show cause |
| 5 | hearings. |
| 6 | Counsel, please state your appearances. |
| 7 | MR. FATHI:  Good morning, Your Honor.  David Fathi of |
| 8 | the ACLU National Prison Project for the plaintiff class. |
| 9 | THE COURT:  Thank you.  Good morning. |
| 10 | MS. KENDRICK:  Good morning, Your Honor.  Corene |
| 11 | Kendrick from the Prison Law Office for the plaintiff class. |
| 12 | THE COURT:  Thank you.  Good morning. |
| 13 | MS. EIDENBACH:  Good morning, Your Honor.  Kirsten |
| 14 | Eidenbach for the prisoner plaintiff class.  Behind me is Maya |
| 15 | Abela for the Arizona Center for Disability Law. |
| 16 | THE COURT:  Thank you.  Good morning. |
| 17 | MR. BOJANOWSKI:  Tim Bojanowski, Dan Struck and Rachel |
| 18 | Love for defendants. |
| 19 | THE COURT:  We have a witness on the telephone. |
| 20 | Before we turn to that, is there anything we need to address |
| 21 | preliminarily before we -- |
| 22 | MR. FATHI:  We're ready, Your Honor. |
| 23 | THE COURT:  Who is on the telephone, please? |
| 24 | MS. FINGER:  Jennifer Finger from Corizon, although |
| 25 | I'm not a witness. |

09:11AM
09:11AM
09:11AM
09:11AM
09:12AM

1          THE COURT:  Okay.  I misunderstood.

2          So with respect to the witness, we will have a live

3     witness in person.  Can we call that witness?

4          MR. BOJANOWSKI:  Your Honor, this would be the

5     continuation of Dr. Robertson, which I believe the plaintiffs          09:12AM

6     had finished up with him.

7          THE COURT:  Remember, I had left to you the

8     scheduling, so I hadn't been informed about whether we were

9     proceeding with Dr. Robertson straight away.  I didn't presume

10    to say it was Dr. Robertson.  I had heard there was someone on          09:12AM

11    the phone.  I thought you all made an accommodation to his

12    schedule.

13         Doctor, if you would kindly return to the witness

14    stand, the oath that you took before continues to apply.  If

15    you would like to be refreshed, we can do that but I think you          09:12AM

16    may not need that.

17         THE WITNESS:  Thank you.

18                    DAVID ROBERTSON,

19    called as a witness herein, having been previously duly sworn,

20    was examined and testified further as follows:          09:12AM

21                    CROSS-EXAMINATION

22    BY MR. BOJANOWSKI:

23    Q.  Good morning, Dr. Robertson.

24    A.  Good morning, sir.

25    Q.  When we had left off last time one of the things that we          09:13AM

————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross————

1   were talking about in some detail were these mortality reviews.

2   Do you recall that testimony?

3   A.  Yes, sir.

4   Q.  And I think that you had indicated in some way that the

5   purpose of the mortality review is to improve the quality of          09:13AM

6   care, medical care, that is rendered to the inmate population

7   by Corizon.  Is that correct?

8   A.  Yes, sir.

9   Q.  And the mortality reviews are set up in a fashion where

10  it's basically a committee that reviews a particular case.  Is       09:14AM

11  that accurate?

12  A.  Yes, sir.

13  Q.  So a case would come into the door, it would be a death and

14  that death would then be investigated by the team.  Is that

15  correct?                                                              09:14AM

16  A.  Well, one person will prepare a report to the team and then

17  present the case to the team.

18  Q.  Okay.

19         MR. BOJANOWSKI:  May I approach, the witness?

20         THE COURT:  You may.                                          09:14AM

21  BY MR. BOJANOWSKI:

22  Q.  So if I understand your testimony correctly, what you are

23  saying is the report or review comes into the office, one

24  person does the preliminary workup, so to speak, and then a

25  team meets and reviews that workup.  Is that accurate?               09:14AM

-----3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross-----

1    A.   Yes, sir.

2    Q.   All right.  And so when you are working up a file, you had

3    indicated previously that you look at it in some detail.  Is

4    that right?

5    A.   Yes, sir.                                                          09:15AM

6    Q.   And what you are looking for are mistakes, problems, those

7    kinds of things, is that right?

8    A.   Yes, sir.

9    Q.   And the reason why you are doing that is because you want

10   to find where a mistake has occurred so you can identify that    09:15AM

11   to correct it.  Is that right?

12   A.   Yes, sir.  We're following standard of care.

13   Q.   Okay.  And so once you find a mistake, you then -- do you

14   then prepare the report with all the mistakes in it and then

15   bring it to the team, so to speak?                               09:15AM

16   A.   Nothing is hidden.

17   Q.   Okay.  And who sits on the team that reviews the report?

18   A.   There's several people that are on that team myself,

19   Dr. Rowe, Corizon's chief medical officer, and we'll have some

20   of the monitoring board and now they are including their         09:15AM

21   continuous quality improvement person for Corizon.

22   Q.   Okay.  And why are they including that person now?

23   A.   Well, in the course of doing a review we might identify

24   there's a process that's not working and/or where there might

25   be a glitch in one individual process.                           09:16AM

1   Q.  Well, what do you mean by a process?  I don't think I

2   understand what you are talking about.

3   A.  Say, for example, someone needs to go to see a specialist

4   right away and that didn't happen for, say, 30 or 60 days, you

5   know, say a consult is ordered urgently and they have 30 days        09:16AM

6   to perform the consult but sometimes you need to get them in

7   there sooner, they didn't order it emergently, and it will take

8   that full 30 days when it should be expedited more quickly.

9   Q.  So do you then create recommendations to fix the process,

10  to streamline it, or is there some consensus that's reached to      09:16AM

11  say, well, this was a process issue and, you know, we're going

12  to find a solution to that process issue?

13  A.  Of course.

14  Q.  Okay.  And so once that solution is developed is it

15  developed by that team or is it just turned over to Corizon and     09:17AM

16  say fix this process?

17  A.  We make recommendations.

18  Q.  Okay.  So, collectively, the team makes recommendations to

19  the Corizon representatives that are present and then it's up

20  to them to implement that.                                          09:17AM

21  A.  Yes, sir.

22  Q.  And in your experience, how receptive is Corizon to address

23  various process issues or problems that arise in your

24  experience in dealing with them?

25  A.  I think it's been a mixed response from Corizon, especially     09:17AM

-------3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross-------

1    in regards to expediting consults.

2    Q.  So that's a problem area?

3    A.  Yes.

4    Q.  Okay.  And are you still working on a solution for that?

5    A.  Yes.                                                        09:17AM

6    Q.  Have you made recommendations?

7    A.  Yes.

8    Q.  And what kind of recommendations have you made?

9    A.  To improve communication between the provider and the

10   utilization management, all the team involved in getting an    09:18AM

11   appointment made, you know, you've got several steps along the

12   way, and we're working on addressing that issue by having a

13   weekly meeting on problem cases or cases that need urgent

14   attention and we go through these cases individually on

15   Wednesdays afternoon.                                          09:18AM

16   Q.  And this is something you testified to the last time you

17   were on the witness stand, was this new weekly meeting that's

18   been put into place to address these problems?

19   A.  It's not that new now.

20   Q.  Well --                                                    09:18AM

21   A.  It's a new process recently.

22   Q.  All right.

23        Now, are the recommendations to fix process problems

24   and all of that, is that actually put onto the mortality review

25   report or not?                                                 09:18AM

1    A.  I couldn't be sure.  I believe so.

2    Q.  Okay.  Are there other items that have been raised during

3    the course of the mortality reviews that you have raised to

4    Corizon that they are working to fix to make the delivery of

5    health care better for the inmate population aside from this          09:19AM

6    process thing we just talked about?

7    A.  We stress that there needs to be a sense of urgency on some

8    of these cases and on getting the backlogs done, and Corizon

9    has been working on that.

10   Q.  And how have they done as far as getting backlogs relieved?     09:19AM

11   A.  I couldn't give you specific numbers, but I do know they

12   are working on it.

13   Q.  Okay.  Now your experience in working with the monitoring

14   bureau, one of the job duties I think you talked about last

15   time briefly was that you would contact Corizon with regard to      09:20AM

16   specific cases that were brought to your attention.  Is that

17   accurate?

18   A.  Yes, sir.

19   Q.  And those cases are brought to your attention in a variety

20   of ways, is that right?                                              09:20AM

21   A.  Yes, sir.

22   Q.  And sometimes somebody from the field will call you and ask

23   you some questions, is that right?

24   A.  Yes, sir.

25   Q.  You are considered to be the subject matter expert for the      09:20AM

1    monitoring bureau.  I've heard that term before.

2    A.  It's a role shared by myself and Dr. Rowe.

3    Q.  And what is that role?  What are the duties within that

4    role that you perform for the monitoring bureau?

5    A.  Oh, boy.  We do the mortality reviews, we fly cover in       09:21AM

6    cases that need attention to be bumped up to a higher level.

7    Q.  What do you mean by that?

8    A.  Well, for example, if we get a letter from a family and

9    there's been no movement on it I will contact my peer over at

10   Corizon, say what's going on here and we need to have something  09:21AM

11   happen, now, and oftentimes they will take care of it

12   immediately, if not --

13   Q.  Have you found that to be the case when you have made those

14   types of calls?

15   A.  Yes, especially recently.                                    09:21AM

16   Q.  Do you then track what happens once you make the call?  In

17   other words, you have access to eOMIS, do you not?

18   A.  Yes, sir.

19   Q.  So you are able to track what goes on with regard to a

20   particular patient's care, right?                                09:21AM

21   A.  Yes, sir.

22   Q.  And so when you make a phone call over to Corizon and say I

23   believe this person needs Medicare, you are able to see whether

24   that care is actually delivered, is that right?

25   A.  Yes, sir.                                                    09:22AM

1   Q.  Do you keep any kind of record or note or memo or anything

2   like that that would track that kind of response and delivery

3   of care?

4   A.  I don't track specifically but I will assign it to the

5   monitor in the field.                                          09:22AM

6   Q.  Okay.

7           So as an example, if there is a particular patient who

8   is -- their family contacts you by way of a telephone call or

9   letter, you then contact Corizon, you tell them we need some

10  attention here, and then you send some kind of notification to  09:22AM

11  the monitor in the field.  Which one would that be?  Would that

12  be the ADC monitor?

13  A.  Yes.

14  Q.  Okay.  You are aware that Corizon has got their own

15  monitors and compliance staff, are you not?                    09:22AM

16  A.  Yes, sir.

17  Q.  So you don't contact that staff.  You contact the ADC

18  staff.

19  A.  Yes, sir.

20  Q.  And what is it that you do with the monitor in the field    09:22AM

21  when you contact them with regard to one of these special

22  cases?

23  A.  I will send them an e-mail or I will call them and say, you

24  know, track this one, this one's on radar, follow this one up,

25  and let me know.  And if it doesn't get done in a timely        09:23AM

-------3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross-------

1   manner, say if it's hung up in scheduling, for example, I'll

2   get a call and say this one needs to be taken care of, I'll

3   call them back, I'll call my peer in Corizon.  And recently,

4   with the current -- well, the current former R.M.D., Regional

5   Medical Director, we are able to get really quick responses.  I   09:23AM

6   mean that day.  I was very pleased.

7   Q.  Good.

8          And so the monitor in the field not only is doing the

9   regular monitoring duties but when you contact them and put

10  somebody on the radar they are to follow up with that patient   09:23AM

11  and track that patient to make sure that patient gets whatever

12  care it is that is recommended to occur.  Is that correct?

13  A.  They are often the ones to let me know of the case.

14  Q.  Okay.

15         And so in addition to families contacting you and   09:24AM

16  sending letters and phone calls, you get contact from monitors

17  in the field, is that right?

18  A.  Yes, sir.

19  Q.  And how is that contact initiated?

20  A.  Usually by e-mail or a phone call.   09:24AM

21  Q.  And what is the nature of the contact?  In other words, are

22  they just identifying a person who needs care?

23  A.  Yes.

24  Q.  Okay.  And how is it that the monitor may have seen this

25  person?   09:24AM

1    A.   The monitors are very familiar with the population.

2    Q.   And why do you say that?

3    A.   Because they are in it all the time.

4    Q.   And when you say familiar with the population, what do you

5    mean by that?                                              09:24AM

6    A.   For example, they are on the unit.   They go on the unit.

7    Q.   So they actually see the care being delivered?

8    A.   They are in the unit.   I'm not sure how closely they

9    monitor encounters or anything like that but often times they

10   will be on the unit just doing their surveys.              09:25AM

11   Q.   Are you saying that they are familiar with individual cases

12   and individual patients?

13   A.   Yes, sir.

14   Q.   They would know them by name?

15   A.   Yes, sir.                                              09:25AM

16   Q.   And so if they have a particular patient that is at a high

17   acuity, they may keep an eye on that patient as an extra set of

18   eyes for ADC to monitor what's going on in the field.   Is that

19   right?

20   A.   Yes, sir.                                              09:25AM

21   Q.   And if they see a problem, then they are going to contact

22   you with regard to that problem and then you are going to

23   contact Corizon to get something done?

24   A.   Yes, sir.   They might also contact Vanessa Headstream or

25   Kathy Campbell and they will bring it to me.               09:25AM

1  Q.  Okay.  So Vanessa Headstream and Kathy Campbell are

2  in-house monitors at the office, the home office, so to speak?

3  A.  Yes.

4  Q.  And they would then bring the case to you.

5  A.  Yes.                                                    09:26AM

6  Q.  All right.  And then you would do your same follow-up with

7  regard to that case and make sure that care is delivered, is

8  that right?

9  A.  Yes, sir.

10  Q.  Do you take an opportunity to go into the field and meet   09:26AM

11  with treating physicians, nursing staff, monitors, et cetera?

12  Do you actually get out of the home office and go to a facility

13  and observe what's going on?

14  A.  Yes, sir.

15  Q.  And how often do you do that?                            09:26AM

16  A.  Every six months.

17  Q.  Okay.  Do you pick a facility and go to it, or --

18  A.  It's a general canvass.  When I do transgender interviews,

19  I see the transgender inmates on a six-month schedule, so I'm

20  canvassing the state pretty much every six months.  If I go on  09:27AM

21  a unit to see a transgender inmate, I will drop into the

22  medical, you know, say hi, I'll introduce myself, talk to

23  people, how are you doing, what's going on, and they are all

24  pretty well -- you know, they are nice folks.

25  Q.  Do you observe care being delivered?                    09:27AM

1    A.   Sometimes.   Uh-huh.

2    Q.   Do you have conversations with providers and nursing staff

3    to determine whether they are providing adequate care?

4    A.   I don't grill them on that.   I give them my card and I tell

5    them if there's anything I can do to help you with any cases          09:27AM

6    please let me know.

7    Q.   So what you are doing is you are communicating with the

8    staff to say, look, I'm here to assist you in whatever you need

9    to make sure care is delivered?

10   A.   Yes, sir.                                                         09:27AM

11   Q.   So it works both ways.   In other words, they can contact

12   you -- Corizon staff can contact you as well with regard to

13   issues they may have.   Is that right?

14   A.   And I make sure to keep that confidential.

15   Q.   Okay.                                                             09:28AM

16        What types of things would they contact you about as

17   far as health care -- well, strike that.

18        They contact you on a regular basis or not?

19   A.   It's irregular

20   Q.   Okay.                                                             09:28AM

21        You were asked at the last hearing about NCCHC

22   accreditation.   Are you familiar with that?

23   A.   Yes, sir.

24   Q.   What is that?

25   A.   It's an -- I don't want to say it's a governing body.   It's      09:28AM

1    an organization of the, you know, corrections health care

2    folks.

3    Q.  Is it a national organization?

4    A.  Yes, sir.

5    Q.  Is it recognized as an organization that sets a standard, a    09:28AM

6    certain level of standards in the corrections industry for the

7    delivery of health care?

8    A.  Yes, sir.

9    Q.  And how does it -- how do they go about determining

10   accreditation?  Are you familiar with that?    09:29AM

11   A.  I believe they go inspect the sites and look at records.

12   Q.  They perform an audit?

13   A.  Yes.

14   Q.  And that audit covers all aspects of health care at the

15   facility?    09:29AM

16   A.  I wouldn't be able to say if it was all aspects.

17   Q.  Have you participated in such an audit?

18   A.  No, I haven't.

19   Q.  Have you seen such an audit, the results of such an audit?

20   A.  Yes.    09:29AM

21   Q.  And in your review of those results does it touch on

22   various aspects of the delivery of health care, such as access

23   to care and chronic care treatments and those types of things?

24   A.  I'm really not qualified to speak to that.  I'm

25   uncomfortable about that.    09:29AM

———————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross———————

1   Q.  Do you know if the facilities in Arizona are NCCHC

2   accredited?

3   A.  I believe they all are.

4   Q.  All of them are, is that right?

5   A.  Yes, sir.                                                    09:30AM

6   Q.  Are you familiar with other states' correctional facilities

7   whether they have reached accreditation or not, or are you just

8   familiar with Arizona?

9   A.  Just Arizona.

10  Q.  And then the accreditation is not permanent.  It's          09:30AM

11  temporary.  You have to go through an audit every so many years

12  to maintain your accreditation.  Is that right?

13  A.  Yes, sir.

14  Q.  And Arizona has -- all of their facilities have attained

15  that accreditation and have continued with that accreditation   09:30AM

16  to this very day?

17  A.  Yes, sir.

18  Q.  Okay.

19          Have you actually -- I think you testified to this,

20  but I -- I can't recall exactly, but I believe you said that    09:31AM

21  you had provided care in the facilities prior to the

22  privatization of the system.  Is that right?

23  A.  Yes, sir.

24  Q.  How would you describe the inmate population as a patient

25  class, so to speak?                                             09:31AM

—————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross—————

1   A.   Oh, boy.   The inmate population -- this is a very unique

2   population.

3   Q.   What do you mean?

4   A.   Well, inmates aren't known for taking good care of

5   themselves to begin with, so you have a lot of pathologies          09:31AM

6   coming in that are becoming more and more advanced before they

7   present.   Also, when you are dealing with inmates, and we

8   learned this in medical school, every encounter, the patient

9   comes for something and you are there to give something, you

10  are supposed to negotiate.   And what happens in the prison is      09:31AM

11  often times you have manipulative people coming in who will,

12  say, for example, present with some radiculopathy symptoms,

13  which are totally subjective, and we have all been fooled by

14  them.   They come in and say, oh, I have got this pain, give you

15  all the signs, they'll give you a beautiful examination for,        09:32AM

16  say, a lumbar radiculopathy, and you'll say, oh, my goodness,

17  this is a lumbar radiculopathy, they do everything.   So you

18  will prescribe a medication for them and then that afternoon

19  you will see them playing shortstop.

20          You know, you're gamed.   It happens to everyone in         09:32AM

21  corrections.   You get gamed.   And once you get your experience

22  and you get a sixth sense of figuring out who is gaming you,

23  and, you know, how to read what are pain signs, what is

24  legitimate pain, and when do I need to really intervene or when

25  I'm being gamed?                                                    09:32AM

———3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross———

1          Now I'm not saying all patients are like that, and

2     most patients that come in are appreciative of the health care

3     we deliver, because it's not the Mayo and this is a difficult

4     situation and the conditions are hard.  So it's its own career,

5     its own specialty, it's going to end up eventually being a                    09:33AM

6     specialty.

7     Q.  So do you believe it takes a special kind of person to be a

8     provider in a prison setting?

9     A.  Without a doubt.

10    Q.  What do you mean?                                                          09:33AM

11    A.  You have to have the acumen, you have to have a filter to

12    perceive what's legitimate, what isn't, you know, and most

13    times things are legitimate but every now and then a little

14    alarm will go off and say I'm being gamed.  When I was first

15    working in the Tucson complex, my nurse supervisor would come                 09:33AM

16    in at the end of the day with a stack of charts and just drop

17    them on my desk and say, "No."  And she would turn around and

18    walk out.  And I would say, "Why?"  She would say, "You are

19    being gamed."  Turned out she was right.  Because I was new.

20    The more experience you get the more you realize when you are                 09:34AM

21    being gamed.

22          And it's not something that is -- that causes a

23    resentment towards your population or anything like that.  You

24    are there to deliver the care to the patient, but you are not

25    there to be taken advantage of.  And once you realize that and                09:34AM

1    you get a reputation and get some credibility on the yard, then

2    you can proceed, you know, and deliver more care more

3    effectively.

4    Q.  You had mentioned something about the acuity level of the

5    patients coming into the system.  What did you mean by they          09:34AM

6    have physical difficulties that may be beyond what the normal

7    population outside a prison facility would experience?

8    A.  I would say the biggest issue that we have is poorly

9    managed diabetes coming in.  They just don't take good care of

10   themselves, you know.  And when you are progressing in the           09:35AM

11   diabetic spectrum you really have to be aware of your A1C, and

12   they wouldn't even know what it is because they have never

13   sought care.  So they present in a -- say they will go into

14   keto acidosis, which is a diabetic coma, and that will be the

15   first time they knew they had diabetes, you know.  And so            09:35AM

16   there's lots of cases like that that come in.

17          Or a patient will not present.  They will have had a

18   skin cancer or something like that on the outside.  They won't

19   think anything of it.  They come in, they don't think anything

20   of it, they present, you say, oh, my goodness.  It would be a        09:35AM

21   lot easier to handle if you could intervene early but they are

22   presenting late.

23   Q.  So how does that affect the delivery of care?  Does it make

24   more difficult?

25   A.  Oh, without a doubt, yes, sir.                                   09:36AM

—————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross—————

1    Q.   Okay.

2              THE COURT:   How many inmates have poorly-controlled

3    diabetes, what percentage, would you say?

4              THE WITNESS:   I couldn't -- right now I couldn't give

5    you a number.  I really couldn't.  But I do know that the staff    09:36AM

6    is very aggressive on it, they are doing their insulin lines

7    twice a day and also doing a lot of education, which is really

8    the best tool you have for treating diabetes, is education.

9              THE COURT:   Do you know how many have diabetes

10   diagnoses as opposed to poorly-man managed diabetes?              09:37AM

11             THE WITNESS:   Couldn't give you a number, sir.

12             THE COURT:   Thank you.

13   BY MR. BOJANOWSKI:

14   Q.   Do you know how many staff people there are at Corizon

15   delivering care on average?                                       09:37AM

16   A.   800.  Something.  I'm not specific.

17   Q.   In your experience in dealing with them, do they care about

18   their patients?

19   A.   Yes.

20   Q.   Do they want to provide good quality health care?            09:37AM

21   A.   Yes.

22   Q.   You had talked a little bit about the telemedicine program

23   that exists in the State of Arizona.  Do you remember that?

24   A.   Yes, sir.

25   Q.   And telemedicine, you said, is an extremely effective tool   09:38AM

—————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross—————

1   to be used for the delivery of certain types of care.  Is that

2   right?

3   A.  Yes, sir.

4   Q.  What kind of care was that again?

5   A.  I am a proponent of telemedicine.  Telemedicine is one of          09:38AM

6   the cost effective tools we have to lower cost, increase

7   efficiencies in the prison population.  This has been proven

8   time and time again.  The Texas prison system in the numbers I

9   have -- I think it was 1998 -- saved over $600,000 in

10  transportation costs alone.  And it's very important that we         09:38AM

11  get a telemedicine program running.

12  Q.  And from your testimony last time I take it you are a big

13  proponent of telemedicine and you think it ought to be fully

14  implemented here in Arizona.

15  A.  It was.                                                           09:38AM

16  Q.  Okay.

17  A.  Prior to privatization.

18  Q.  So privatization changed the delivery of telemedicine

19  within the ADC system.

20  A.  Yes, sir.                                                         09:39AM

21  Q.  And you have worked to try and get that up and running

22  again with Corizon, correct?

23  A.  Yes, sir.

24  Q.  And have you -- you had developed a checklist or some 10

25  items or something like that, I think you mentioned, that you        09:39AM

—————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross—————

1    wanted to get to Corizon?

2    A.   When I was -- I got out of medical school when I was 50 and

3    I was working at Maricopa Integrated Health Systems.  I did a

4    year of surgery.  And during a break year, a gap year in my

5    residency, they allowed me to do a study into telemedicine and          09:39AM

6    the use of technology to increase efficiencies and reduce

7    costs, and I reviewed electronic health records for the system

8    and I also tried to get an effective telemedicine program

9    running.  I became involved with the Arizona Telemedicine

10   Program, which is the premier system in the country, and I did          09:40AM

11   a lot of -- I wrote a little white paper and I have a summation

12   that is what you need to get a telemedicine program running.

13   Q.   Have you sent that to Corizon?

14   A.   Yes, sir.

15   Q.   When did you send that?                                            09:40AM

16   A.   Last week.  And they are very grateful.

17   Q.   Are you willing to work with Corizon to get an effective

18   telemedicine program up and running if they so ask you?

19   A.   I will make suggestions but I will not direct.

20   Q.   Okay.  So it will be up to them to actually implement it           09:40AM

21   and get it put into place because it's going to be their

22   system.

23   A.   Yes, sir.

24   Q.   Okay.

25   A.   But to speak to telemedicine again, you can get any type of        09:40AM

─────3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross─────

1   health care delivery through telemedicine.  For example, you

2   can do cardiology where they will take the stethoscope and

3   actually put it on the heart of the patient and the

4   cardiologist puts on headphones.  It can be reported into the

5   electronic record.  You can do colposcopy.  I mean, it's that          09:41AM

6   exact.

7   Q.  What's that?

8   A.  Gynecological examination.

9   Q.  How about wound care?

10  A.  Without a doubt.                                                   09:41AM

11  Q.  How would they go about doing that?

12  A.  The wound specialist will see the wound, and the cameras

13  that they have on these telemedicine carts, the resolution can

14  go to the follicle on some of them.  It's quite amazing.  And

15  they take a picture and they say "do this" and they do it.            09:41AM

16  Q.  How about a remote pen-type camera?

17  A.  There's many different types of camera.  I helped develop a

18  camera for a company here in Phoenix years ago, about a decade

19  ago, and it was a burn camera specifically used for burns

20  because it had a built-in black light.                                09:41AM

21  Q.  Okay.  And so as far as telemedicine is concerned, from

22  your experience, anyway, it can be used in just about every

23  circumstance to deliver health care?

24  A.  Yes, sir.

25  Q.  And you certainly would recommend that such a program be          09:42AM

———————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross———————

1   implemented by Corizon?

2   A.   I have been waving this banner for a long time.

3   Q.   That's what you said last time?

4   A.   Yeah.

5   Q.   Okay.                                                    09:42AM

6           Are you engaged at all in supervising the monitors in

7   the field?

8   A.   No.

9   Q.   Do you supervise anybody?

10  A.   No.                                                      09:42AM

11          MR. BOJANOWSKI:   May I approach the witness, Your

12  Honor?

13          THE COURT:   You may.

14  BY MR. BOJANOWSKI:

15  Q.   Dr. Robertson, I have handed you what has been previously   09:44AM

16  marked as Exhibit 101, and I'm going to represent to you that

17  this is a filing by this Court, Docket Number 2373, dated

18  October 10, 2017.  Do you see that at the top of the page?

19  A.   Yes, sir.

20  Q.   Have you ever seen this before?                         09:44AM

21  A.   No.

22  Q.   Have you ever read it?

23  A.   No.

24  Q.   Has anyone notified you of the content of this document?

25  A.   We have had discussions.                                09:44AM

-------3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross-------

1   Q.   Okay.  You haven't been involved in assuring compliance by

2   Director Ryan and Mr. Pratt with regard to this order, have

3   you?

4   A.   That is not in my scope.

5   Q.   You have not been involved in writing any letters to            09:44AM

6   Corizon with regard to the compliance with this Court order,

7   have you?

8   A.   No, sir.

9   Q.   You are not involved with meetings at Corizon to craft any

10  remedial plans to be utilized in addressing what is set forth       09:45AM

11  in this order?

12  A.   No, sir.

13  Q.   You are not a named defendant in this case, are you?

14  A.   No, sir.

15  Q.   You were never served a copy of this order?                    09:45AM

16  A.   No, sir.

17  Q.   You didn't have any input into identifying a list of

18  instances of non-compliance with this order, is that right?

19  A.   No, sir.

20  Q.   You didn't direct any person to violate this order, did        09:45AM

21  you?

22  A.   No, sir.

23  Q.   You didn't direct any person to ignore this order?

24  A.   No, sir.

25  Q.   Have you been involved in any meetings to create new           09:46AM

1   policies and procedures to attain compliance with the order?

2   A.  No, sir.

3   Q.  You don't have any personal knowledge of any actions taken

4   by Mr. Ryan or Mr. Pratt with regard to the implementation or

5   compliance with the order?                                      09:47AM

6   A.  No, I don't.

7           MR. BOJANOWSKI:  May I have a moment, Your Honor?

8           THE COURT:  You may.

9           MR. BOJANOWSKI:  Nothing further, Your Honor.

10          THE COURT:  Thank you.                                  09:48AM

11          Plaintiff have further questions for this witness?

12          MS. KENDRICK:  Yes, sir.

13                      REDIRECT EXAMINATION

14  BY MS. KENDRICK:

15  Q.  Good morning.                                               09:48AM

16  A.  Good morning.

17  Q.  Thank you for coming back.

18  A.  Sure.

19  Q.  So you testified that with the mortality reviews that the

20  CQI person from Corizon is now involved.  Who is that person?   09:48AM

21  A.  I'm not sure.  They usually listen in.

22  Q.  So they call in.

23  A.  Yes.  This is a new assignment --

24  Q.  Okay.

25  A.  -- in just the last few weeks.                              09:49AM

—————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Cross—————

1    Q.  Do they not identify themselves by name?

2    A.  They do but I don't write it down.

3    Q.  Is it one person or several people?

4    A.  It's one person from what I understand.

5    Q.  And in the last few weeks has it been the same person each    09:49AM

6    time or is it a different person?

7    A.  I would not be able to address that.  Sorry.

8    Q.  That's okay.

9           And I believe last time you were here, you testified

10   that you don't necessarily track or follow up on the    09:49AM

11   recommendations made by the mortality review committee,

12   correct?

13   A.  No, I don't.

14   Q.  And Mr. Bojanowski asked you about some of the results of

15   these reviews, and you said that one of the focuses is    09:49AM

16   improving communication between the providers and utilization

17   management?

18   A.  Yes, I did.

19   Q.  And how are you going to evaluate or quantify improved

20   communication?    09:50AM

21   A.  Well, we're having our meeting on Wednesdays now and that's

22   really -- it's been very effective.

23   Q.  But these are at the higher level.  I'm saying how would

24   you evaluate improvement between the line providers in

25   utilization management?  Would it be higher rates of approval,    09:50AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1    fewer MMIs, that sort of thing?

2    A.  That sort of thing, yes.

3    Q.  Are you tracking the rate of need-more-information

4    responses or ATP responses?

5    A.  I would have to refer you to the reports that are coming          09:50AM

6    in.  They do a tally on those.

7    Q.  Who is they?

8    A.  Our monitoring board, I believe.

9    Q.  They track the rate of --

10   A.  ATPs.                                                             09:50AM

11   Q.  And the rate of need-more-information responses?

12   A.  I don't know if they are using need more information

13   anymore.

14   Q.  So Corizon is not using that anymore?

15   A.  Not to my knowledge.                                             09:50AM

16   Q.  When did they stop using that?

17   A.  I wouldn't be able to say.

18   Q.  Was it --

19   A.  I made strong recommendations that that stop.

20   Q.  Right.                                                           09:51AM

21   A.  And I believe they are asking -- they are just saying that

22   it's -- they are not meeting medical -- what's the term?

23   There's a term they are using.  Does not meet medical --

24   Q.  Necessity?

25   A.  Criteria.  Medical necessity.                                    09:51AM

1    Q.  So instead of coming back with need more information they

2    are coming back with the alternate treatment plan?

3    A.  Well, they do an alternate treatment plan and they can't

4    say you may resubmit.

5    Q.  Has it been in the past month that they stopped issuing        09:51AM

6    NMIs or how -- how --

7    A.  I'm sorry.  I can't speak to that.

8            THE COURT:  Do you remember when you first became of

9    aware?

10           THE WITNESS:  Not using NMI?                                09:51AM

11           THE COURT:  Yeah.

12           THE WITNESS:  It was about three months ago I noticed

13   I wasn't seeing them anymore.

14   BY MR. KENDRICK:

15   Q.  And you talked about this new process of the Wednesday         09:52AM

16   afternoon meetings.

17   A.  Yes, ma'am.

18   Q.  And approximately when did those begin?

19   A.  I want to say about three months ago.

20   Q.  And that's a telephonic conference?                            09:52AM

21   A.  Yes, ma'am.

22   Q.  And you said that an issue that has been raised in these

23   Wednesday meetings is getting backlogs reduced?

24   A.  And to follow important cases.

25   Q.  And where are the backlogs currently?                          09:52AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1  A.  They are moving through scheduling and being seen.

2  Q.  No.  I meant are there specific institutions at which

3  backlogs are a problem?

4  A.  I couldn't address that specific question.

5  Q.  Do you get a report or any sort of statistics each week          09:53AM

6  about what the backlogs are at each institution?

7  A.  No, I don't.

8  Q.  So you guys speak about it generally?

9  A.  I'm sorry?

10  Q.  You speak about it -- the idea of a backlog generally, not      09:53AM

11  specifically like Tucson has this many, Eyman has this many?

12  A.  Right.  Well, that -- we ask Corizon -- let me be clear.

13  I'm not involved in going to Corizon saying take care of these

14  backlogs.  That's not in my scope.

15  Q.  Uh-huh.                                                         09:53AM

16  A.  I'm involved in dealing with the cases that come in front

17  of me.  Now, I see a lot of cases that get added on to this

18  list that we have on our Wednesday conference call and I pay

19  attention to what's going on with them.  During the week I

20  might even call the site medical director, the regional medical   09:53AM

21  director, and ask them how is this going, how is this

22  progressing?  They will give me a report on the spot or send me

23  an e-mail by the end of the business day.  And they are being

24  much more responsive that way with the cases that I'm

25  following.                                                         09:54AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1    Q.  Right.

2            But in terms of the backlogs -- having backlogs as a

3    problem, are we talking about backlogs for chronic care

4    appointments with providers or provider line referrals?  What

5    types of backlogs are these?                                    09:54AM

6    A.  I'm sorry.  I can't speak to those as far as the backlogs

7    of chronic cares or anything like that.  I'm following the high

8    acuity cases.

9    Q.  So you can't say today what the backlogs are at various

10   institutions?                                                   09:54AM

11   A.  No.

12   Q.  Okay.

13           And it's the case that not all of the facility

14   monitors have medical training, is that correct?

15   A.  Not to my knowledge.                                        09:54AM

16   Q.  Does Mark Haldane have medical training?

17   A.  He has an extensive amount of experience.

18   Q.  As an auditor and as an attorney?

19   A.  Yes, and as an attorney.

20   Q.  But no medical training?                                    09:54AM

21   A.  Unknown.  I couldn't address it.

22   Q.  Okay.

23           THE COURT:  Ms. Kendrick, can I interrupt for a

24   second?

25           MS. KENDRICK:  Yes.                                     09:55AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1            THE COURT:  Are you done with the subject of the

2     Wednesday meeting?

3            MS. KENDRICK:  I was but --

4            THE COURT:  Dr. Robertson, I'd like to follow up just

5     because it's something we talked about last time.  When you      09:55AM

6     were here I learned some things about it.  I learned in

7     particular that I shouldn't schedule things on Wednesdays

8     because it means it interferes with the meeting.  And you

9     attend every week, is that right?

10           THE WITNESS:  Yes, sir.                                    09:55AM

11           THE COURT:  And the meeting is always at the same

12    time?

13           THE WITNESS:  Two o'clock.

14           THE COURT:  And it runs how long?

15           THE WITNESS:  Till it's done.                             09:55AM

16           THE COURT:  And usually that's how long?

17           THE WITNESS:  About an hour and half.

18           THE COURT:  Who sets the agenda?

19           THE WITNESS:  The agenda is the list.

20           THE COURT:  Who makes up the list?                        09:55AM

21           THE WITNESS:  Everyone does.  We all can put people --

22    I've put many patients on the list.

23           THE COURT:  And is there a time before the meeting is

24    called when the list is assembled so that people can see who

25    the names are on the list or do the people first learn who is    09:55AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1    on one another's lists and does Corizon learn who is on the

2    list at the meeting?

3            THE WITNESS:  Corizon makes the list through their UM

4    and it's sent out the morning or the evening prior to.

5            THE COURT:  So what happens is you identify in advance    09:56AM

6    who should be on the list.

7            THE WITNESS:  Yes.  I will say, for example, let's add

8    this patient to the list when I am talking to the RMD and he

9    will call UM and the patient will be put on the list.

10           THE COURT:  So you can cause a patient that you're    09:56AM

11   focused on, who is on the radar, to be on the list.

12           THE WITNESS:  Yes, sir.

13           THE COURT:  And everybody else who is in the meeting

14   can do the same thing?

15           THE WITNESS:  Yes, sir.    09:56AM

16           THE COURT:  How many people again is that?

17           THE WITNESS:  Oh, it's quite a collection.  There's

18   myself and Vanessa and Kathy Campbell and Dr. Rowe, sometimes

19   Mr. Pratt.  And that's just on our side.  And then there's the

20   Corizon team as well.  It's a free-form meeting.  I mean, we --    09:56AM

21   these are cases that need to be dealt with and everyone knows

22   it and everyone wants to get the job done.

23           THE COURT:  So everybody who participates in the

24   meeting can contribute these names, they do so in advance,

25   Corizon puts together the total list for --    09:57AM

―――――――3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect―――――――

1            THE WITNESS:  Excuse me.  I will submit a new name

2     during the meeting.

3            THE COURT:  So there's also the possibility for names

4     to come up during the meeting, but focusing for just a moment

5     on the list that's put together by Corizon in advance of the          09:57AM

6     meeting, for the meeting, about how many people's names are on

7     the list?

8            THE WITNESS:  It varies because as they are satisfied

9     they are deleted.  I think we're about 15, 20 right now.

10            THE COURT:  So each one of these meetings that goes          09:57AM

11     roughly an hour and half --

12            THE WITNESS:  Uh-huh.

13            THE COURT:  -- has the capacity to or addresses 15 to

14     20 inmates.

15            THE WITNESS:  Yes, sir.                                       09:57AM

16            THE COURT:  Is there ever a time when there are too

17     many people brought to the list, you think?

18            THE WITNESS:  No.

19            THE COURT:  So there's never a need to have somebody

20     be bumped from the list because of an ability to get to them.        09:58AM

21            THE WITNESS:  No.  And what usually takes the time is

22     we're looking at the medical record as it goes along.  As the

23     meeting is going on people are looking at the record and UM is

24     checking their system.  We have an issue right now with eOMIS

25     not reflecting what is actually the status of a consult of, you      09:58AM

1    know, any type of special need.  It will be taken care of on

2    the Corizon side but it's not being entered in the chart, and

3    that's a serious issue that we bring up all the time and so

4    we're addressing that, you know, every week.

5              THE COURT:  Let me step back again to get a better         09:58AM

6    sense of the overall scope of things.  This particular -- this

7    Wednesday meeting is addressed for inmates at all ADC-operated

8    facilities?

9              THE WITNESS:  State wide.

10             THE COURT:  State wide.                                    09:59AM

11        So all of -- the pool of possible prisoners are all of

12   those prisoners who are in custody who have medical issues.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  I guess it just occurs to me that there

15   has to be a component of this that is a natural component of       09:59AM

16   what you medical people do that are triage.  You have to decide

17   who the priority is and focus on those.  It just can't possibly

18   be all the people who aren't getting the care that you think

19   need to have.  These are the ones, I guess, that are really,

20   really significant cases with respect to not getting the care      09:59AM

21   they need.  Is that fair to say?

22             THE WITNESS:  No.

23             THE COURT:  No.

24             THE WITNESS:  What it is is these are the cases that

25   are proving to be difficult to treat in that -- for example, we    09:59AM

1    have a patient with torticollis, which is a spasming of the

2    neck and shoulder muscles and coming to a care plan for him and

3    getting him into the plan, which ended up being Botox

4    injections, took a while, but it was nothing that could be

5    dealt with on the local level.  It had to come up.                10:00AM

6         These are cases that we follow.  Cancers that aren't

7    being seen on a timely manner.  I have a relationship with the

8    University of Arizona Cancer Center.  They will call me.  I go

9    over there.  I send them flowers.  Thank you.  Because they

10   bring patients to us that aren't being seen or miss an           10:00AM

11   appointment or need to be seen for surgery or something like

12   that, and I'll put them on the list and we'll expedite their

13   care.

14        The list is fluid in that there are no exclusionary

15   criteria, but we do end up with the serious cases.               10:00AM

16        THE COURT:  And that's, I guess, part of the focus of

17   my question, because you know that many more than the number of

18   people that you see in this weekly meeting are not getting the

19   care that's required by the stipulation.

20        THE WITNESS:  Uh-huh.                                       10:00AM

21        THE COURT:  That's a fact.

22        THE WITNESS:  Right.

23        THE COURT:  So there are some number of people like

24   you told me last time you think that there's really -- there's

25   no good reason that they haven't received the outside            10:01AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1   consultant and this is -- and sometimes this meeting is to get

2   somebody's attention to get it done and to short circuit what

3   is a delay or something to figure out why this one hasn't been

4   addressed.

5          So that's why I said those seem to be like the really     10:01AM

6   horrible situations that were just -- somebody whose cancer is

7   self-evident I think you said last time and we don't need to

8   have more delay, we just need to get to this.

9          THE WITNESS:  Uh-huh.

10         THE COURT:  So they get addressed in the committee,       10:01AM

11  but I know because of the report from the monitoring process

12  that there are many more than just these people who aren't

13  getting the care but they are not the subject of the committee.

14  So the committee addresses the really awful ones.  I'm worried

15  about just the awful ones or the ones who are simply entitled   10:01AM

16  to get the care under the stipulation.  Who is looking after

17  them?

18         THE WITNESS:  That would be -- I couldn't speak to

19  that.  I could speak to the fact that if someone is really sick

20  they can get on the list.  The chronic cares, for example, I    10:02AM

21  don't know what the pulmonology or cardiology backlog is to go

22  see, but I know that if someone's pacemaker is failing they

23  will be seen.

24         Did that answer your question?

25         THE COURT:  I appreciate that.  Thank you.                10:02AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1        Go ahead.

2            MS. KENDRICK:  Thank you.

3    BY MR. KENDRICK:

4    Q.  So are you saying that only 20 patients out of 34,000 are

5    serious or critical medical needs right now?                    10:02AM

6    A.  That are in the process, say, of oncology or significant

7    surgery or something that needs follow-up that we have had

8    problems getting done.

9    Q.  And these are the ones that have been elevated to your

10   attention either via a monitor learning about it or contact    10:02AM

11   from a family member, correct?

12   A.  And I have seen Corizon put people on the list.

13   Q.  Okay.

14   A.  We need to follow this one, it's not getting taken care of

15   properly.                                                        10:02AM

16   Q.  And should it have to take the medical director of the

17   Department of Corrections and the western medical director of

18   Corizon to get this sort of treatment for patients as a routine

19   matter?

20   A.  If that's what it takes.                                     10:03AM

21   Q.  But shouldn't it not have to take family members contacting

22   ADC in order for people to get the medical care that they need?

23   A.  I can't speak to that.  I'm sorry.

24            THE COURT:  Could you say that if the system were

25   working closer to an ideal you wouldn't need a committee like   10:03AM

1  this; it would happen just as a matter of course, I gather.  Is

2  that right?

3         THE WITNESS:  Yes.

4         THE COURT:  They would get the care they need.

5         THE WITNESS:  Yes.                              10:03AM

6  BY MS. KENDRICK:

7  Q.  Okay.  And you said these meetings are approximately 90

8  minutes?

9  A.  Yes.  They can run up to an hour and a half.

10 Q.  And 15 to 20 patients?                            10:03AM

11 A.  Uh-huh.

12 Q.  So 20 patients in 90 minutes, is that less than five

13 minutes per patient?

14 A.  Well, what we're doing is we know the patients by the time

15 they come to committee and we'll say, for example, this patient 10:03AM

16 with torticollis, what's the status of his neurology

17 appointment, when is he going to get his Botox, you know, and

18 it will only take a couple seconds to deal with it.  The cases

19 that need more attention get the attention that they need.

20 Q.  And you stated that you visit the facilities every six    10:04AM

21 months as part of the project working with the people who are

22 transgendered?

23 A.  About that yes.

24 Q.  Do all 10 of the state complexes have people who are

25 transgendered housed in them?                         10:04AM

1    A.   They move.  The primary ones are in the corridor

2    facilities, you know, Tucson, Florence, Eyman, Lewis, but

3    sometimes we'll have them in private prisons like Kingman.  Or

4    there might be one in Yuma or -- you know, they get scattered

5    around.  But the majority are in the corridor.                    10:04AM

6    Q.   Do you remember the last time you went to the Perryville

7    prison?

8    A.   It's been a while.

9    Q.   Over a year?

10   A.   I would say so, yes.                                          10:04AM

11   Q.   And you said when you go, you introduce yourself and talk

12   to the medical staff?

13   A.   Yes, whoever I see.

14   Q.   Give them your card, tell them they can contact you.

15           And you also testified that you have received contact    10:05AM

16   from some Corizon line staff over the years?

17   A.   Yes, ma'am.

18   Q.   And what sort of complaints did they share with you?

19   A.   Delays in care.

20   Q.   Delays in nursing care or specialty care?                    10:05AM

21   A.   Specialty care.  I'm sorry.

22   Q.   And do you speak just with the providers or do you speak

23   with the nursing staff and mental health staff, too?

24   A.   It's mostly with the providers.

25   Q.   Have you received complaints about not enough staff working  10:05AM

1  at the institutions?

2  A.   No.

3  Q.   Have you received any complaints from providers or others

4  saying that their work load is overwhelming?

5  A.   That's a common complaint.                                    10:05AM

6  Q.   From providers?

7  A.   Every provider.

8  Q.   And what would it take so that their workloads would not be

9  so overwhelming?

10 A.   I wouldn't be able to address that management question.  I    10:06AM

11 know that there is a shortage of physicians everywhere.

12 Q.   And Mr. Bojanowski asked you about NCCHC accreditation and

13 you testified that all 10 institutions are accredited?

14 A.   I believe so.

15 Q.   Does that include the Eyman facility?                         10:06AM

16 A.   I believe so.  I could be wrong.

17 Q.   Okay.  Well, are you aware that in 2012 when the RFP went

18 out for privatization Eyman was not accredited and that was one

19 of the requirements of the RFP for Eyman to get accreditation?

20 A.   No, I know nothing of the RFP.                                10:06AM

21 Q.   Were you aware that Eyman for a very long period of time

22 was not accredited?

23 A.   I know that Eyman was in bad shape?

24 Q.   Okay.  But you believe that Eyman is now accredited?

25 A.   I believe so.                                                 10:07AM

1    Q.   On what basis?

2    A.   Because it would come across -- it would be a common

3    knowledge.

4    Q.   Do you remember receiving announcement that Eyman had

5    finally received accreditation?                                    10:07AM

6    A.   No.

7    Q.   So as you sit here today you cannot state that you know for

8    sure that Eyman is now accredited?

9    A.   I could be wrong.

10   Q.   Okay.  Are you aware that in many states where facilities   10:07AM

11   are accredited by NCCHC courts have found their medical care to

12   be unconstitutional?

13   A.   No.

14        Wait.  I'm sorry.  California.  Big one.

15   Q.   You talked a bit about how the inmate population is unique  10:07AM

16   from a provider point of view because sometimes you have people

17   gaming the system or trying to get something that they don't

18   really need?

19   A.   Yes.

20   Q.   And patients in the community can game providers, right?    10:07AM

21   A.   Yes.

22   Q.   And were the patients in those mortality reviews that we

23   went through gaming the system?

24   A.   No.

25   Q.   And I believe you also said that the more experience you    10:08AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1    get in being a provider in a prison setting the more you learn

2    those skills of seeing things when they come up, right?

3    A.  Yes, ma'am.

4    Q.  Okay.  And I believe last month you had testified that many

5    of the providers are relatively new and pretty fresh out of          10:08AM

6    school.  Is that correct?

7    A.  Yes.

8    Q.  Okay.

9            THE COURT:  Turnover, I gather, is a problem generally

10   with providers.  Is that true?                                        10:08AM

11           THE WITNESS:  Yes, sir.

12           THE COURT:  So if you visit and have a successful

13   opportunity to meet some of the providers, there's a good shot

14   the next time you visit you won't see a familiar face.

15           THE WITNESS:  There will be a different provider.             10:08AM

16           THE COURT:  Thank you.

17           THE WITNESS:  But I know some of the long-term

18   providers.

19           THE COURT:  So there are a few who hang on.

20           THE WITNESS:  Yes, sir.  Uh-huh.                              10:09AM

21   BY MS. KENDRICK:

22   Q.  I think you had said something earlier about the current

23   slash former regional medical director.  Who is that?

24   A.  Dr. Patel.

25   Q.  Why did you say former?                                           10:09AM

1  A.  I believe he's moving on to another position with the

2  Indian reservation, Indian Health Service.

3  Q.  Do you know when he's leaving or when he left?

4  A.  I couldn't speak to exactly when.  He said he was going to

5  stick around and help as much as he could.                      10:09AM

6  Q.  Until --

7  A.  Until he does go.

8  Q.  Was he -- were you in contact with him last week?

9  A.  No.  I didn't get a chance to talk to him last week.

10  Q.  So do you know if he's already left?                        10:09AM

11  A.  Unknown.

12  Q.  Do you know who Corizon is going to bring in as the new

13  regional medical director?

14  A.  Dr. Adele, I believe.

15  Q.  And how long was Dr. Adele the regional medical director    10:09AM

16  approximately?

17  A.  I want to say about six, eight months.

18  Q.  And before him it was Dr. Babich?

19  A.  Yes.

20  Q.  Babich.                                                     10:10AM

21       And you said one of the biggest issues with chronic

22  care is poorly-managed diabetes?

23  A.  Yes.

24  Q.  Are you familiar with the ADC diet fed to the general

25  population?                                                     10:10AM

─3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect─

1    A.   Yes.

2    Q.   And do you think that that is appropriate for people with

3    diabetes?

4    A.   My opinion on the diet in the DOC is that it's not a very

5    good diet.                                                              10:10AM

6    Q.   And is there a special diabetic diet?

7    A.   Yes.

8    Q.   And do you know how many --

9    A.   Wait.  I'm sorry.  It's a heart-healthy diet.

10   Q.   It's a heart-healthy diet.                                         10:10AM

11          And you said that they do insulin lines two times a

12   day?

13   A.   Yes, ma'am.

14   Q.   What about individuals who require insulin three times a

15   day?  What do they do?                                                  10:10AM

16   A.   Unknown.

17   Q.   Do you know if patients are allowed to have insulin pumps

18   when they are incarcerated?

19   A.   Yes; if they come in with it.

20   Q.   If they come in with one they are allowed to keep it?             10:11AM

21   A.   Uh-huh.

22   Q.   Are any patients with diabetes allowed to get an insulin

23   pump if they didn't have it when they came in but they

24   developed diabetes?

25   A.   Unknown.                                                           10:11AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1  Q.  Have you ever heard of any patients with diabetes getting

2  an insulin pump?

3  A.  No, I haven't.

4  Q.  And are those insulin lines every 12 hours?

5  A.  They are -- I'm not sure if they are every 12 hours but I       10:11AM

6  believe they are morning and evening.

7  Q.  And do you know roughly the amount of time between the

8  insulin line and the meals?

9  A.  No, I couldn't speak to that.

10          THE COURT:  Can I follow up?                                  10:11AM

11          Do you know whether the morning and evening

12  appointments are before the dining times or after?

13          THE WITNESS:  Usually it's before.

14          THE COURT:  So the morning one I think I heard

15  testimony it sounds like it's before.                                10:11AM

16          THE WITNESS:  Yes.

17          THE COURT:  But the one in the evening --

18          THE WITNESS:  Is often times after.

19          THE COURT:  After.  Thank you.

20          THE WITNESS:  But there's different types of insulin.        10:12AM

21  There's slow acting and there's long acting, there's rapid

22  onset, and there's, you know, the slow onset.  You know,

23  there's different types of insulin you use for different

24  situations.

25          THE COURT:  Okay.                                            10:12AM

1    BY MS. KENDRICK:

2    Q.  And you testified that since you were here last month you

3    provided your white paper on telemedicine to Corizon?

4    A.  It's, just a little four-page annotated...

5    Q.  Who did you send it to?                                    10:12AM

6    A.  I sent it to Lynn Cole and Mr. Ward and I believe they

7    forwarded it around their network.

8    Q.  Did you do that of your own accord or did somebody tell you

9    to do that?

10   A.  Of my own accord.  I'm Mr. Telemedicine.                   10:12AM

11   Q.  Apparently.

12           THE COURT:  But it was the first time you sent your

13   white paper, right?

14           THE WITNESS:  I have delivered it a couple of times.

15           THE COURT:  To Corizon?                                10:12AM

16           THE WITNESS:  Yes.

17           THE COURT:  And you first wrote it when?

18           THE WITNESS:  10 years ago.  Something like that.

19           THE COURT:  Do you have a rough idea about when you

20   previously provided it to Corizon?                            10:13AM

21           THE WITNESS:  Year ago, two years ago.

22           THE COURT:  So a year ago or two years ago you first

23   provided it to Corizon and that didn't change anything with the

24   equipment coming out of the corner at that point, I gather.

25           THE WITNESS:  No.                                     10:13AM

————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect————

1          THE COURT:  And in the last year did you ever take any

2    action between the time a year or two ago when you sent the

3    white paper?

4          THE WITNESS:  Uh-huh.

5          THE COURT:  Did you take any other action to try to          10:13AM

6    encourage or reencourage telemedicine with Corizon?

7          THE WITNESS:  I have introduced Corizon management

8    personally in meetings to the Arizona telemedicine program

9    management.

10         THE COURT:  When was that?                                    10:13AM

11         THE WITNESS:  Last summer.

12         THE COURT:  Last summer.  And was that your own idea?

13         THE WITNESS:  Yeah, last summer.

14         THE COURT:  Was that your own idea?

15         THE WITNESS:  Yes.                                            10:13AM

16         THE COURT:  Nobody at the Department of Corrections or

17    anybody associated with them came to you and said we need to

18    get back on the telemedicine wagon?

19         THE WITNESS:  I say it and they encourage it.

20         THE COURT:  Okay.  But I'm asking when you took this          10:14AM

21    action in the summer, last summer, was that your own idea or

22    did somebody come to you and say it's time to reengage on

23    telemedicine?

24         THE WITNESS:  It was my idea.

25         THE COURT:  So there had been no contact from anybody         10:14AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

 1   saying to you let's reengage this.

 2          THE WITNESS:  This has been a disappointment.

 3          THE COURT:  The answer to my question is -- do you

 4   remember the question?

 5          THE WITNESS:  No.                                    10:14AM

 6          THE COURT:  There has been no contact from anybody in

 7   the last year about let's reengage -- to you let's reengage

 8   with telemedicine.

 9          THE WITNESS:  No.

10          THE COURT:  And you are the telemedicine guy.        10:14AM

11          THE WITNESS:  Yes.

12          THE COURT:  Thank you.

13   BY MS. KENDRICK:

14   Q.  And since you testified last month, has anybody asked you

15   to restart the process of engaging with the Arizona          10:14AM

16   telemedicine program or the University of Arizona?

17   A.  I have been asked but I have declined.

18   Q.  Who asked you?

19   A.  Dr. Patel.

20   Q.  And why did you decline?                                10:14AM

21   A.  I have lost my credibility.

22   Q.  With whom?

23   A.  The Arizona telemedicine program.  When you bring people in

24   twice and they make promises about utilization of their program

25   and you free up provider times to accept patients and they get  10:15AM

1   no patients, they lose money, and so, you know, I'm not going

2   to say please lose money a third time.  So I said if you want

3   to get it going it's up to you.  I will support, I will

4   suggest, I will do whatever I can to advocate, you know.  I

5   have called the people over at the ATP and said please give          10:15AM

6   them another try, you know, but I don't know if I have any

7   credibility.

8   Q.  And do you know if anybody at Corizon has followed up with

9   the University of Arizona?

10  A.  I believe Dr. Patel met with them.                               10:15AM

11  Q.  And you testified that Dr. Patel is leaving now?

12  A.  Yes.

13  Q.  And Mr. Bojanowski showed you the Court's contempt order

14  from October and you said that you had never seen it or read it

15  before?                                                              10:16AM

16  A.  I might have seen it and read it.  This stuff goes over my

17  head.

18  Q.  So nobody has asked you to assist in ensuring that the

19  department is compliant with the Court's order?

20  A.  No.                                                              10:16AM

21  Q.  Okay.  I have nothing further.

22  A.  If that means get them to get these done, I have been told

23  to do what you can, but as far as do this because the Court

24  order says so, I'm not instructed under that -- under those

25  terms.  It's like tell me something that makes sense to me,         10:16AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1    which is like let's get these consults done.

2    Q.  Okay.  So nothing in terms of ensuring compliance with

3    those specific performance measures at those specific

4    institutions.

5    A.  No, ma'am.                                           10:16AM

6    Q.  Okay.  Thank you.

7           MR. KENDRICK:  I have nothing further, Your Honor.

8           THE COURT:  Mr. Bojanowski, were there any questions

9    that were engendered by my questions that you'd like to ask?

10          MR. BOJANOWSKI:  Yes, Your Honor.                  10:17AM

11          THE COURT:  You may.

12                        RECROSS-EXAMINATION

13   BY MR. BOJANOWSKI:

14   Q.  The Court had inquired of you with regard to these weekly

15   meetings and had asked you about the number of patients that   10:17AM

16   are considered each week.  Do you recall that testimony?

17   A.  Yes, sir.

18   Q.  One of the issues that you address with a particular

19   patient would be a process issue, correct?

20   A.  Yes, sir.                                             10:17AM

21   Q.  And these process issues that are raised and dealt with at

22   these weekly meetings would apply to the inmate population as a

23   whole, would they not?

24   A.  I believe so.

25   Q.  And so --                                             10:17AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Robertson-Redirect

1    A.   Yes.

2    Q.   And so one of the purposes and one of the things that's

3    accomplished at these meetings is to fix a process problem so

4    that inmates on the whole who are subject to the stipulation

5    receive the health care they are supposed to require whether          10:17AM

6    they are a bad case, an average case or a simple case, right?

7    A.   These meetings are used to identify problems in the

8    process.

9    Q.   Right.  And that applies to the entire population, not just

10   this particular patient.  I mean, you are focused on that            10:18AM

11   patient certainly, but you deal with these process problems to

12   address the entire population to raise the level of care on the

13   whole.

14   A.   Correct.

15   Q.   Okay.  And these kinds of committees that are used to           10:18AM

16   address specific bad cases, those exist in other health care

17   systems, do they not?

18   A.   Yes, they do.

19   Q.   So this isn't unusual for this system to have such a

20   meeting or a committee or whatever to address bad cases because     10:18AM

21   that's something that's done at a hospital system, for

22   instance.

23   A.   I couldn't speak as an expert on that, but yes.

24   Q.   Okay.

25           Now, you had talked something about a shortage of           10:19AM

1   positions.

2   A.  Yes, sir.

3   Q.  Do you remember that?

4        Okay.  Is that a shortage in filling vacancies of

5   positions?  Is that what you meant by that or --                    10:19AM

6   A.  There's a shortage of health care providers all over the

7   country in every strata of the population.  Corrections has

8   really taken a hit.

9   Q.  So when you are talking about a shortage of positions it's

10  just a shortage of available providers to deal with everybody,      10:19AM

11  be they on an Indian reservation or be they in a prison or at a

12  community hospital or a rural setting.  It's just a shortage of

13  doctors.

14  A.  That will do this type of work, yes.

15  Q.  A shortage of doctors to do corrections work?                   10:20AM

16  A.  Yes.

17  Q.  And why do you think that is?

18  A.  It's hard work.  It's an isolated -- it's usually in an

19  isolated location.  It's usually in conditions that are

20  difficult to work in.  You are dealing with -- you don't know       10:20AM

21  if that's a murderer across from you or what, he's just another

22  guy in orange.  It's hard work.  And I admire those people that

23  do it, you know.  They get up and they drive 60 miles one way

24  to pass out insulin on time, and, you know, it's pretty

25  thankless.  And they show up every day and they deserve all the     10:20AM

1    support we can give them.

2    Q.   Okay.

3         MR. BOJANOWSKI:  May I have a moment, Your Honor?

4         THE COURT:  You may.

5         MR. BOJANOWSKI:  Nothing further, Your Honor.                10:21AM

6         THE COURT:  Thank you very much.

7         Dr. Robertson, thank you very much for your

8    assistance.

9         THE WITNESS:  I appreciate it.

10        THE COURT:  Let's take a 10-minute break.  We'll be          10:21AM

11   back at 10:30.

12        Thank you.

13        (Recess from 10:21 a.m. until 10:35 a.m.)

14        THE COURT:  Thank you.

15        And who is next, please?                                     10:35AM

16        MR. BOJANOWSKI:  I think we're still in the

17   plaintiffs' case.  Dr. Robertson was called by the plaintiffs.

18        THE COURT:  Again, normally I know what the order is.

19   I deferred to you all.  That's why I say when I see you look at

20   me you think I'm going to call the shots I said to you you all    10:36AM

21   can have the freedom to coordinate what the various

22   availabilities and scheduling is.  So I need to turn back to

23   you and ask that question:  Who's next?

24        MS. KENDRICK:  Your Honor, we're done, although we

25   reserve the right to call anybody for rebuttal.                   10:36AM

```
1              THE COURT:  All right.  So you're resting for now.

2    Have you given the heads-up to defendants about that?  You all

3    need to talk.

4              MS. KENDRICK:  Yeah.  No.  We did --

5              THE COURT:  Okay.  All right.                            10:36AM

6              MR. BOJANOWSKI:  We have scheduled witnesses --

7              THE COURT:  So you all are doing what I counted on you

8    to do.  It's not as if you --

9              MR. BOJANOWSKI:  I wasn't sure if they were going to

10   call somebody else or not.                                        10:36AM

11             THE COURT:  I see.

12             Well, again, make sure you know what one another are

13   planning so that people don't have to have this moment where

14   you are wondering what's going on, because there's no reason

15   for it.  We should give everybody the courtesy of knowing       10:36AM

16   what's coming up.

17             MS. KENDRICK:  We provided our witness list, sir.

18             THE COURT:  But again, a little conversation right

19   before wouldn't be a bad idea so we're clear we're done for

20   now, that means your next time is your witness.  That's what I   10:37AM

21   would like to hear about.

22             Go ahead, Mr. Bojanowski.

23             MR. BOJANOWSKI:  Thank you, Your Honor.  We'd call

24   Richard Pratt.

25             THE COURT:  Mr. Pratt, please return to the well of    10:37AM
```

1    the court for the administration of the oath.

2          (The witness was sworn.)

3          THE COURT:  Thank you, sir.

4                       RICHARD PRATT,

5    called as a witness herein, having been first duly sworn, was

6    examined and testified as follows:

7                     DIRECT EXAMINATION

8    BY MR. BOJANOWSKI:

9    Q.  Please state your name for the record.

10   A.  Richard Pratt.                                          10:38AM

11   Q.  Mr. Pratt, what is your position with ADC?

12   A.  Assistant Director, Health Services Contract Monitoring

13   Bureau.

14   Q.  You've testified here before, is that correct?

15   A.  Several times, yes, sir.                                10:38AM

16   Q.  And I'm not going to get into your background because I

17   think the Court is well aware of what it is, as well as your

18   job duties and position with the department, and I'm not going

19   to repeat all of that testimony which I don't think is needed

20   because we all know who you are.                            10:38AM

21   A.  Thank you.

22   Q.  All right.

23          So, Mr. Pratt, you are a named defendant in this case.

24   Is that -- you understand that?

25   A.  I do.                                                   10:38AM

1    Q.  And you were sued in your official capacity?

2    A.  That's my understanding, yes.

3            MR. BOJANOWSKI:  May I approach the witness?

4            THE COURT:  Yeah.

5            MR. BOJANOWSKI:  Help with the exhibits here.          10:38AM

6            THE COURT:  As reluctantly as it would be to admit

7    this, Mr. Pratt, you can make yourself at home.

8            THE WITNESS:  Thank you, sir.

9    BY MR. BOJANOWSKI:

10   Q.  Mr. Pratt, you have in front of you defendants' Exhibit    10:39AM

11   101.  Would you have a look at that document for a moment,

12   please.

13   A.  Okay.

14   Q.  Do you recognize that document?

15   A.  I do.                                                      10:40AM

16   Q.  What is it?

17   A.  The notice of contempt.

18   Q.  It's a court order?

19   A.  Yes.

20   Q.  And it describes certain measures that the Court is seeking 10:40AM

21   to have compliance with as part of this hearing; is that your

22   understanding?

23   A.  Correct.

24   Q.  And what measures would those be?

25   A.  11 performance measures.                                  10:40AM

1  Q.  And they are listed in the order?

2  A.  They are.

3  Q.  And if you go to Page 4 of the order, at the bottom, the

4  last sentence, could you read that into the record?

5  A.  Page 4 --                                                    10:41AM

6          MR. BOJANOWSKI:  May I approach the witness?

7          THE COURT:  You may.

8          THE WITNESS:  Next to the last sentence.

9          If the Court finds clear and convincing evidence that

10  defendants have failed to take all reasonable steps to comply   10:41AM

11  with this order, the Court shall impose civil contempt

12  sanctions on defendants.

13  BY MR. BOJANOWSKI:

14  Q.  And this is an order which was issued to the defendants in

15  the Parsons versus Ryan case.                                   10:41AM

16  A.  My understanding, correct.  Yes.

17  Q.  And the named defendants in that case are?

18  A.  Charles Ryan and myself.

19  Q.  And you said that you were sued in your official capacity?

20  A.  Yes.                                                        10:42AM

21  Q.  Is Corizon or any Corizon employee a defendant in this

22  case?

23  A.  No.

24  Q.  And so this order requires you and Mr. Ryan to take all

25  reasonable steps to comply with the order, is that right?      10:42AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   A.  Yes.

2   Q.  And so you were provided this order on what day

3   approximately?

4   A.  The order's dated October 10, 2017, so either that day or

5   shortly thereafter.                                          10:42AM

6   Q.  Once you received the order, did you undertake an effort to

7   exercise all reasonable steps within your power to comply with

8   the order?

9   A.  Yes.

10  Q.  You didn't ignore the order, did you?                    10:43AM

11  A.  Absolutely not.

12  Q.  You didn't instruct staff to ignore the order, did you?

13  A.  Absolutely not.

14  Q.  You didn't instruct Corizon to ignore the order?

15  A.  Absolutely not.                                          10:43AM

16  Q.  In fact, you notified Corizon of the order?

17  A.  Yes.  And Corizon, of course, was aware of the order

18  because they are in court with us as well.

19  Q.  All right.

20         Now, Corizon, what is the relationship between Corizon  10:44AM

21  and the ADC?

22  A.  Corizon is our contracted medical health care vendor.  We

23  rely on them strictly to provide all the health care in the

24  Department of Corrections.  They are not what I would actually

25  consider an agent.  We don't do the hiring and firing for     10:44AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Corizon.  We rely on them to do all of that.  We don't dictate

2    that.  We don't dictate care.  We rely on Corizon to provide

3    constitutional care to the inmate population.

4    Q.  ADC does not direct the day-to-day means and methods of

5    medical treatment to individual patients?                          10:44AM

6    A.  Correct.

7    Q.  And you said you can't hire or fire Corizon employees or

8    staff?

9    A.  No, we can't hire or fire.  We do have the ability to

10   restrict access if we have a staff member from Corizon that we    10:45AM

11   feel we do not want to be with our inmate population.  We can

12   restrict their access and not allow them on the premises.  But

13   we don't hire or fire.

14   Q.  Would you go to Exhibit 99, please.

15   A.  Okay.                                                          10:45AM

16          MR. BOJANOWSKI:  May I approach the witness, Your

17   Honor?

18          THE COURT:  You may.

19   BY MR. BOJANOWSKI:

20   Q.  Do you see Exhibit 99 in front of you?  It's marked with a    10:46AM

21   Bates number ADC 014114.

22          Do you see that?

23   A.  Yes.

24   Q.  And there's a second page to that document, Bates numbered

25   ADC 014136.  Do you see that?                                     10:46AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    A.   Yes.

2    Q.   On the first page of that document -- do you know what this

3    document is?

4    A.   It looks like part of the contract with Corizon.

5    Q.   Would you look at paragraph 2.4 on document 014114?          10:46AM

6    A.   Okay.

7    Q.   Does that describe the relationship of the parties?

8    A.   Yes.

9    Q.   Would you read into the record what the relationship of the

10   parties is pursuant to the contract which was entered into       10:46AM

11   between Corizon and the department?

12   A.   The contractor under this contract is an independent

13   contractor, period.  Neither party to this contract shall be

14   deemed to be the employee or agent of the other party in the

15   contract.  To the contract.  I'm sorry.                          10:47AM

16   Q.   Would you go to the next page, that being Page 14136, and

17   look at paragraph 1.31.

18        Do you see that?

19   A.   I do.

20   Q.   Is that another page out of the contract that exists         10:47AM

21   between Corizon and the Arizona Department of Corrections?

22   A.   Yes.

23   Q.   Would you read -- does this describe the independent

24   contractor status of Corizon?

25        MS. KENDRICK:  Objection.  Calls for a legal                 10:47AM

1   conclusion.

2           THE COURT:  Sustained.

3   BY MR. BOJANOWSKI:

4   Q.  Would you look at paragraph 1.31.

5   A.  Yes.                                                    10:48AM

6   Q.  What is that titled?

7   A.  Independent Status of the Contractor.

8   Q.  Paragraph 1.31.  Would you read that one into the record?

9   A.  1.31.1.  The contractor is an independent contractor and

10  will not under any circumstances be considered an employee,   10:48AM

11  servant, or agent of the department, nor will the employees,

12  servants or the agents of the contractor be considered

13  employees of the department.

14          1.31.2.  Personnel actions of employees on the

15  contractor's payroll shall be the contractor's responsibility. 10:48AM

16  The contractor shall comply with the applicable government

17  regulations related to the employment compensation and payment

18  of personnel.

19          1.31.3.  The department will not be responsible in any

20  way for the damage or loss caused by fire, theft, accident, or  10:48AM

21  otherwise to the contractor's stored supplies, materials,

22  equipment, or his employees' personal property stored on

23  department property.

24  Q.  Thank you.

25          Is Exhibit 99 a true and accurate copy of portions of  10:49AM

1  the contract which exists between Corizon and the Arizona

2  Department of Corrections with regard to the provision of

3  health care services to the inmate population?

4  A.  I believe so.  Yes.

5  Q.  Is this a record which is regularly kept in the business of   10:49AM

6  the department?

7  A.  Yes, it is.

8  Q.  When dealing with Corizon, in regard to the provision of

9  health care to the inmate population, do you have to deal with

10  Corizon within the parameters of the contractual requirements   10:50AM

11  and terms that you have entered into with Corizon?

12  A.  Yes.  That's correct.

13        THE COURT:  Mr. Bojanowski, I'm not clear the

14  relevancy of this testimony, these questions.  Can you give me

15  a heads up so I focus on the right thing?   10:50AM

16        MR. BOJANOWSKI:  Your Honor, this goes to the

17  relationship between the parties, how you go about taking

18  reasonable actions with regard to compliance to the Court's

19  order.

20        We have to deal with Corizon as a contractor, not as   10:50AM

21  an employee or agent of ADC, and so we have to work within the

22  parameters of the contract which provide certain sanctionable

23  events, certain incentives, certain mandated obligations that

24  we would then move forward in dealing with Corizon with regard

25  to the enforcement of the Court's order.   10:51AM

1      THE COURT:  Are you essentially saying if the Court

2  orders you to do X and you have a contract with your contractor

3  that says we're not permitted to do X you have no ability to

4  comply with the Court's order to do X?

5      MR. BOJANOWSKI:  That's not what I'm saying.                    10:51AM

6      THE COURT:  I just want to make sure.

7      MR. BOJANOWSKI:  I'm saying we have to work within the

8  parameters of the contract when we start taking actions with

9  regard to the Court's order.  It's incumbent upon us to

10  exercise contract obligations and actions that are available to  10:51AM

11  us to gain that compliance.  So if we can work under the terms

12  of our contract to gain that compliance that's a legitimate

13  avenue of relief.

14      THE COURT:  But it's not exclusive.

15      MR. BOJANOWSKI:  It would not be exclusive.                    10:52AM

16      THE COURT:  Thank you.

17      MR. KENDRICK:  Your Honor, we --

18      THE COURT:  But I have -- is there an objection?

19      MS. KENDRICK:  Yes, we do object to this line of

20  relevance.  I mean, this Court has ruled several times on this   10:52AM

21  argument.  The first time was actually in 2012 on the order

22  denying defendant's motion to dismiss where the Court relied

23  upon West v. Atkins and the Arizona Revised Statute

24  31-201.01(D) that requires the director of corrections provide

25  medical and mental health care for prisoners and they cannot    10:52AM

1      contract this away.

2              So we think this entire line of questioning is, A,

3      calling for legal conclusions from somebody who is not an

4      attorney or a judge and also is not relevant to the matter at

5      hand.                                                              10:52AM

6              THE COURT:  Before I address the objection, the reason

7      that I asked the question of Mr. Bojanowski is essentially the

8      same because it looked to me like you were headed down a road

9      that would seem inconsistent with what I previously said was

10     the case, and that is that if you chose to have a contractor    10:53AM

11     who was not delivering the services that were necessary under

12     the stipulation you couldn't hide behind the fact that the

13     contractor hadn't done it because it wasn't the contractor's

14     obligation, it was your obligation, and so I thought I had made

15     that very clear.                                                 10:53AM

16             And so when you gave me the first answer to my

17     question it sounded as though -- well, let me put it this way:

18     The two answers that I think I perceived sounded to me to be in

19     conflict because it still seems, notwithstanding what you say,

20     that you are thinking that there is an argument here that can    10:53AM

21     be successfully made that somehow if you have certain

22     structures in the contract with Corizon that that ties your

23     hands with respect to what you could do to comply with not only

24     the Court's order to show cause but also to comply with the

25     stipulation itself.                                              10:53AM

1          If you have chosen to contract with a contractor that

2   is not meeting the stipulation, I'm not going to address that

3   in the context of the limitations of the contract between the

4   provider Corizon and the State; I'm going to only address it in

5   the contract that is the one relevant to me, and that is the          10:54AM

6   stipulation, and the stipulation parties are the plaintiffs and

7   the defendants in this case, and if there's a failure to comply

8   with the stipulation, it must rest upon the shoulders of the

9   defendants in this case.

10          It has been a very clear point of mine that there          10:54AM

11   are -- that the State is not, nor should it think it is, and I

12   have made this clear, bound by what is the circumstance of that

13   contract on a real-time basis, that if they find that they are

14   unable to achieve the stipulation's goals under the terms of

15   the contract that is no excuse for failure to comply with the          10:54AM

16   stipulation.  Because it's not Corizon's obligation, it's the

17   State's obligation, and if you are currently in a position that

18   your contractor that you chose is not delivering the services

19   that meet the stipulation you need to figure out, as I have

20   said over and over and over again, something to do to address          10:55AM

21   that.

22          So if that's the road you are going down, you are not

23   going to go down that road successfully here because you have

24   already lost that argument, so we're clear.

25          MR. BOJANOWSKI:  I understand, Your Honor.          10:55AM

1        THE COURT:  Okay.  You are on a different road.

2        MR. BOJANOWSKI:  I'm laying down context as to the

3   relationship of the parties so that you and everyone else has a

4   clear understanding when we're doing something --

5        THE COURT:  But are you going down a different road?    10:55AM

6   Are you going down the same road that I said is closed?

7        MR. BOJANOWSKI:  No.

8        THE COURT:  What's that no mean?

9        MR. BOJANOWSKI:  No.

10        THE COURT:  Are you going down a different road or are   10:55AM

11   you down that same road?

12        MR. BOJANOWSKI:  I'm going down a different road.

13        THE COURT:  Okay.  Go ahead.

14        MR. BOJANOWSKI:  I thought I --

15        THE COURT:  The road is washed out.  The road I just    10:55AM

16   articulated to you is gone.

17        MR. BOJANOWSKI:  Right.  I understand the Court has

18   already ruled along those lines.

19        THE COURT:  Right.  So don't try to develop through

20   this witness some kind of --                                 10:56AM

21        MR. BOJANOWSKI:  This has to do with --

22        THE COURT:  That's not what we should be spending time

23   on.  That's not going to help you.

24        MR. BOJANOWSKI:  I understand.  This has to do with

25   contractual remedies.                                        10:56AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1          THE COURT:  Okay.

2          MR. BOJANOWSKI:  And so I wanted to lay some

3    foundation as to the relationship of the parties for

4    contractual remedies.

5          THE COURT:  It still sounds dangerously close to the      10:56AM

6    same road, but --

7          MR. BOJANOWSKI:  I understand.

8          THE COURT:  -- I'll let you go on a little more.

9          MR. BOJANOWSKI:  Thank you, Your Honor.  I appreciate

10   that latitude.  And rest assured I will continue down the road   10:56AM

11   that I think I have delineated here.

12   BY MR. BOJANOWSKI:

13   Q.  So my next question is, does the contract have penalty

14   provisions within it to make sure that ADC can compel

15   compliance with the terms of the contract even though they are   10:56AM

16   designated as an independent contractor?

17   A.  Yes.  The contract contains sanctions, the contract

18   contains staffing offsets, so there are a number of avenues

19   that we can go down as far as holding the contractor

20   responsible and accountable for shortcomings.                    10:57AM

21   Q.  All right.  There are monetary sanctions, and that's what

22   we're talking about when I say penalties.  Those are monetary

23   penalties that can be assessed under the contract with the

24   contractor?

25   A.  Correct.                                                     10:57AM

1  Q.  Okay.  Have you utilized those sanctions at all in trying

2  to compel compliance with the terms of the contract?

3  A.  We have utilized the sanctions as laid out in the contract

4  and ever since the beginning of the contract, yes.

5  Q.  All right.  And so what kind of sanctions are available to  10:57AM

6  you under the contract?

7  A.  Currently --

8       THE COURT:  Sorry.  Everybody in Phoenix is -- we live

9  in a beautiful city with orange blossoms and everything

10  blooming, but I think the coughing in the courtroom is mine and  10:57AM

11  others.  We just -- we've had too much of a good thing.  I'm

12  sorry.  I apologize.

13       THE WITNESS:  Can I get you some water?

14       THE COURT:  No.  I've got a glass.  Thank you.  Sorry

15  to interrupt.  10:58AM

16       THE WITNESS:  The question again, Tim?

17  THE ATTORNEY:

18  Q.  We were talking about sanctions and all I wanted to do

19  was -- we kind of established what the relationship of the

20  parties is.  We know that as a contractor you have a contract  10:58AM

21  and under that contract there are various sanctions that are

22  available, and my next question is, you had talked about

23  staffing offsets and you talked about something else.  I'm

24  wondering what are those types of sanctions that we're talking

25  about that have been utilized to compel compliance with the  10:58AM

1    terms of the contract?

2    A.   When we originally started this contract we had 43

3    performance measures, and sanctions were spelled out and dealt

4    with on a quarterly basis on an average across the state as far

5    as sanctionable issues.  We have developed over time to the          10:59AM

6    most recent contract amendment, which I believe was contract

7    amendment Number 10, where we are now assessing a $5,000 offset

8    against Corizon's income for any performance measure that fails

9    during a monitored month and extends the stipulation an

10   additional month going forward.                                      10:59AM

11            So we do have some teeth in the contract at that

12   point.

13            In addition to that, effective last November -- we at

14   one point had a cap on those sanctions and that cap was removed

15   effective November of '17.                                           10:59AM

16            MR. BOJANOWSKI:  May I have a moment, Your Honor?

17            THE COURT:  You may.

18            MR. BOJANOWSKI:  May I approach?

19            THE COURT:  You may.

20            (A discussion was had off the record between counsel.)      11:01AM

21   BY MR. BOJANOWSKI:

22   Q.   Would you go to Plaintiffs' 201, please?

23   A.   201?

24   Q.   Yes, sir.

25   A.   Okay.                                                           11:01AM

1  Q.  Okay.  You had mentioned contract Amendment Number 10 in

2  your answer here just a minute ago.  Is that what you have in

3  front of you?

4  A.  Yes.

5  Q.  And this is an amendment to the contract which was                11:01AM

6  negotiated between the Department and Corizon to effect a

7  change with regard to the sanction structure.  Is that right?

8  A.  Correct.

9  Q.  Prior to this particular contract amendment, what was the

10 sanction structure for violation of the -- excuse me -- for not  11:02AM

11 attaining performance under a performance measure?

12 A.  There was a $5,000 assessment, but it did have a cap on it

13 of $90,000 per month.

14 Q.  So if I understand your testify correctly, what you are

15 saying is that they could violate a number of the performance   11:02AM

16 measures but they were capped out as far as a penalty at

17 $90,000?

18 A.  Correct.

19 Q.  Now, how was it that that particular sanction was

20 calculated before the amendment occurred?  How would you go     11:03AM

21 about calculating it?

22 A.  I'm not quite sure I understand.

23 Q.  Well, how about --

24 A.  The methodology to figure out what the sanction would have

25 been?                                                           11:03AM

1    Q.  Yes, sir.

2    A.  Again, in accordance with the rules of the stipulation as

3    we understand them, any performance measure that failed during

4    the monitored month that because of that failure would have

5    extended the date that it would have fallen off the radar from        11:03AM

6    the stipulation over the last rolling 24-month period, if it

7    would have extended that period then there was a $5,000

8    assessment for that penalty.

9    Q.  All right.  And before that, there was a different system

10   in place when the contract was first entered into before the        11:03AM

11   stipulation?

12   A.  Yes.

13   Q.  Why don't you go to Defendants' Exhibit 7.

14   A.  Okay.

15   Q.  Do you see what that is?                                          11:04AM

16   A.  Yes.

17   Q.  What is it?

18   A.  This is a sanction letter that was sent by our procurement

19   office to Corizon dated November 5, 2014.

20   Q.  That was before the stipulation was entered into?               11:04AM

21   A.  Correct.

22   Q.  And in this particular --

23          MS. KENDRICK:  Your Honor, that misstates the

24   evidence.  The stipulation was entered into before November

25   5th, 2014.  The Court ruled on it in February 2015.                 11:04AM

1    THE COURT:  Sustained.

2  BY MR. BOJANOWSKI:

3  Q.  So this letter was an assessment of sanctions against

4  Corizon?

5  A.  Yes.                                                    11:05AM

6  Q.  What is the assessment?

7  A.  The assessment was $140,000.

8  Q.  How was that calculated?

9  A.  There were 40 performance measures which were considered

10  noncompliant and each was assessed at $3,500.              11:05AM

11  Q.  And so how would then the payment of $140,000 occur?

12  A.  Not a payment but an offset to monies going to Corizon.

13  Q.  Okay.

14    Now, you had mentioned something about staffing

15  offsets earlier.  What are those?                          11:05AM

16  A.  In accordance with the contract, there's certain staffing

17  levels that have to be maintained by the vendor and in the

18  event that they are not maintained, again, in accordance with

19  the contract, there are offsets that we also take in addition

20  to the sanctions on a monthly basis.                       11:06AM

21  Q.  Is there a staffing pattern which is part of the contract?

22  A.  Yes.

23  Q.  And the staffing pattern sets out a number of positions?

24  A.  Yes, it does.

25  Q.  Is it set up in FTEs or is it just set up in positions with 11:06AM

1   a number next to it?

2   A.   It's set up in hours worked by physician positions.

3   Q.   So if they meet the number of hours worked by position they

4   are in compliance.   If they fall below that number of hours

5   worked then they are subject to this staffing offset?                11:06AM

6   A.   The staffing offsets that are currently in place, the

7   positions are grouped and counted in aggregate as far as hours

8   go.

9   Q.   What do you mean?

10   A.   There are three separate groups that are worked under the      11:07AM

11   staffing offset.   There is a key management group, which is

12   your site medical directors, your regional leadership, folks

13   along that line.   There is another group which is basically all

14   other staff separate of a third group, which is a provider

15   group.   And those -- again, those hours are considered in        11:07AM

16   aggregate at each facility in computing the staffing offsets.

17          The key management group is set up only to be assessed

18   after a vacancy of 120 days by a physician.   The other two

19   groups are broken out and to be considered in real time but

20   based upon a 90 percent threshold of staffing hours being        11:08AM

21   worked.

22          It's kind of confusing, but that's the gist.

23   Q.   How long have the staffing offsets been in place?

24   A.   Since the beginning.

25   Q.   What's the purpose of the staffing offset penalty?          11:08AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    A.   To hold the vendor accountable for requirements in the

2    contract that they signed.

3    Q.   Well, I take it that you're trying to fill vacancies that

4    exist in the staffing plan.  Is that the purpose?

5    A.   Yes; unfilled staff in accordance with the contract and the          11:08AM

6    agreement that the vendor came into with us.

7    Q.   So if I understand how it works, there's a particular

8    staffing plan which is in place under the contract, there are

9    requirements to meet the number of hours with a 90 percent

10   threshold to attain that staffing level, so to speak, and that          11:09AM

11   if they don't meet that level there is the economic sanction

12   that's imposed to boost that level up?

13   A.   Correct.  And the shortage of the hours is based against

14   Corizon as an offset.

15   Q.   Has the Department ever not assessed that particular               11:09AM

16   penalty if, in fact, it existed?

17   A.   No.

18   Q.   All right.

19          Do you know what the amount of that penalty is?

20   A.   Since the beginning of the contract, and you are talking           11:09AM

21   staffing offsets?

22   Q.   Yes, sir.

23   A.   I believe it is right at 3.8 million.

24   Q.   And that's total?

25   A.   Correct.                                                          11:10AM

1    Q.   In your experience has Corizon undertaken an effort to fill

2    vacancies?

3    A.   Yes.

4    Q.   And what type of efforts do they undertake to fill

5    vacancies?                                                          11:10AM

6    A.   They have gone through different sets of recruiting

7    efforts.   They have done hiring job fairs.   They have gone

8    locally to colleges.   They have done a lot of advertising, a

9    lot of marketing.   Some of my staff have gotten some of their

10   marketing just by virtue of being licensed and receiving        11:10AM

11   information from Corizon as to opportunities for work.

12           They have people in their central offices that work on

13   a national basis to try to attract staff, and they also have

14   some folks working locally in attempt to attract staff.   They

15   also work with local agencies, temporary hiring staff, and if     11:11AM

16   staff do work out well I know Corizon will also attempt to hire

17   those staff directly as opposed to going through a separate

18   agency for that.

19   Q.   Do you know of any type of incentives or bonuses, signing

20   bonuses, anything like that, that are being offered?             11:11AM

21   A.   There have been a number of different options that Corizon

22   has used in the past.   I'm not totally aware of all of them.   I

23   know they do have signing bonuses.   They have referral bonuses.

24   They have bonuses for longevity.   There's a number of options

25   that they have used.   They have also, I believe, used           11:12AM

—————— 3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross ——————

1    educational payment, that kind of thing, as far as some

2    incentives.

3    Q.  What do you mean by educational payment?

4    A.  Offsetting -- you are getting a new grad coming out of

5    school and those expenses are pretty high and it's attractive          11:12AM

6    if someone will offer to offset part of those expenses.

7    Q.  What's been your experience as far as trending is concerned

8    with regard to staffing up the vacancies that exist within the

9    system?

10   A.  Typically, Corizon has operated overall in anywhere from 88        11:12AM

11   to 90 percent of staffing that we -- that is required by the

12   contract.

13   Q.  Have you done anything to try and -- aside from sanctioning

14   them, have you done anything else on top of that to try and

15   move them along in filling vacancies?                                  11:13AM

16   A.  We push and push and push.

17   Q.  What do you mean by that?

18   A.  We talk.  We communicate.  We demand that Corizon actually

19   fill empty positions.  We can't -- again, we can't hire them

20   ourselves but we continue to address the issue that they are          11:13AM

21   not 100 percent staffed according to the current contract and

22   we want that shortage to be -- that gap to be filled.

23   Q.  Do you send letters to that effect?

24   A.  We send letters, we -- the basic place that these

25   conversations take place is in meetings that we have with             11:13AM

1  Director Ryan on a bi-weekly basis where Corizon leadership and

2  myself sit down with the director and we will talk about

3  staffing and staffing levels and where exactly Corizon is in

4  that effort.  And so we recognize it and discuss it at least

5  every two weeks.                                          11:14AM

6  Q.  Returning to Exhibit 7 is this a true and accurate copy of

7  the letter that went out to Corizon concerning the sanction?

8  A.  I believe so, yes.

9  Q.  Is this a record that's regularly kept in the business of

10 the Department?                                           11:14AM

11 A.  Yes.

12 Q.  Let's move to Exhibit Number 9.

13 A.  Okay.

14 Q.  This appears to be a letter dated January 21st, 2015.  Do

15 you see that?                                             11:15AM

16 A.  Yes, I do.

17 Q.  And in this particular letter there's a sanction as well.

18 A.  Yes.

19 Q.  And although the letter is dated the 21st of 2015, it

20 appears as though this was for findings made October 31st,   11:15AM

21 2014?

22 A.  This is for the quarter of July 2014 through September 30

23 of 2014.  Yes.

24 Q.  Go to Page 2 of the exhibit.  Do you see that letter there?

25 A.  Yes.                                                  11:16AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Q.  And that's a letter to Mr. Jansen dated October 31, 2014?

2    A.  Yes.

3    Q.  And does that list out, then, the performance measures and

4    sanctions that were assessed in January of 2015?

5    A.  Yes.                                                        11:16AM

6    Q.  If you go to Page 11 of the exhibit, this is a letter from

7    Corizon to you.  Do you see that it's dated November 19, 2014?

8    A.  Yes.

9    Q.  And who is this from?

10   A.  Cindy Black.                                                11:17AM

11   Q.  And she was?

12   A.  The vice-president of operations, the interim at that time.

13   Q.  So the first letter went to Mr. Jansen and then this letter

14   is being responded to by Ms. Black?

15   A.  Correct.                                                    11:17AM

16   Q.  And in this letter, she proposes a suspension or temporary

17   suspension of sanctions.  Do you see that?

18   A.  Yes.

19   Q.  You responded to this letter on Page 12 of the exhibit.

20   Did you agree to a suspension of sanctions?                     11:18AM

21   A.  Absolutely not.

22   Q.  Page 12 of the exhibit is an e-mail you sent to Ms. Black

23   and it details out your position with regard to the sanctions.

24   Do you see that?

25   A.  Yes.                                                        11:18AM

1    Q.  And in this letter, are you seeking to compel Corizon to

2    meet the CGAR performance measures set out in the stipulation?

3    A.  Yes.

4    Q.  And the way you do that through the contract is through an

5    assessment of the sanctions?                                      11:18AM

6    A.  That's correct.

7    Q.  And how much in total was the sanctions for this particular

8    period?

9    A.  This one was 136,500.

10   Q.  Now, in your response to Ms. Black you also indicate that   11:19AM

11   the Department is willing to work with Corizon to try and

12   address these issues.  Do you see that?  About three-quarters

13   of the way down beginning with "I hope".

14   A.  Yes.

15   Q.  Is that something that you engender as far as working with  11:19AM

16   Corizon to resolve issues and problems with regard to

17   performance measure compliance?

18   A.  This is part of the overall communications that needs to

19   take place.  So it's not just a memo that says here's a

20   sanction and that's it.  There needs to be communication and   11:20AM

21   understanding as to why those sanctions take place, and we do

22   want to work in a collaborative manner with Corizon to make

23   sure everybody is on the same page.

24   Q.  And as a result of the Court's order set out in Exhibit

25   101, you utilized that process to try and address those 11      11:20AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   issues or performance measures that were in that particular

2   order as well?

3   A.  Correct.

4   Q.  So you worked with Corizon, number one, to identify the

5   problem, right?                                              11:20AM

6   A.  Yes.

7   Q.  And then seek a solution to the problem?

8   A.  That's correct.  Identify, investigate, break it down, take

9   a look at it, see if there's any fail point in the process, is

10  it a people process, is it an issue, where is the problem, and  11:21AM

11  try to solve it.

12  Q.  And you did that for each of the 11 measures that the Court

13  set out in its order identified in Exhibit 101?

14  A.  Yes.

15  Q.  And you don't only -- and you not only do that for the     11:21AM

16  Court's order but you do that for all of them, right?

17  A.  For any failed performance measure, yes.

18  Q.  All right.

19          So you specifically concentrated on the Court's order

20  but you had a continuing obligation to address all of the other 11:21AM

21  measures as well?

22  A.  Yes.  This has been an ongoing and the process has been

23  enhanced and adjusted through time to try to make the

24  communications better.

25          Initially, again, as far as the ability to hold       11:21AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Corizon accountable for this and try to figure out where these

2    failed points are.  Any failed performance measure that is

3    taking place in a monitored month Corizon goes out -- initially

4    went out on their own and met with their folks in the field

5    after they received a preliminary results and then they would          11:22AM

6    go through and do a fact-finding and get responses or they

7    would tell their staff this one's out of line and here's what

8    you need to do to fix it.

9         That process has evolved over time to also include

10   members of the monitoring bureau to be involved in those                11:22AM

11   meetings, and as recently as early this year to involve legal

12   staff to be involved in those conversations as well, which

13   gives you a better education on what the treatment -- what the

14   caps are -- not the caps but the -- the -- yeah, the action

15   plans are, and to be able to represent that better in court.            11:23AM

16        So it's a process where in addition to that my staff,

17   my leadership from the central office, also is now going out to

18   meet with Corizon and all the other staff to work through the

19   process and figure out where the failed points are, what

20   happened that month and what needs to be done to fix it.                11:23AM

21   Q.  How many total performance measures are evaluated each

22   month by the monitoring bureau?

23   A.  849.

24   Q.  Would you go to Exhibit 10, please.

25   A.  Okay.                                                               11:24AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Q.   What is Exhibit 10?

2    A.   It's a letter from my procurement office dated February 10,

3    2015, sanction against Corizon.

4    Q.   And what was the total amount of sanction for this

5    particular period?                                              11:24AM

6    A.   136,500.

7    Q.   If you go to Exhibit 10, Page 2, do you see that?

8    A.   Yes.

9    Q.   This is a letter to Ms. Black?

10   A.   Yes.                                                       11:25AM

11   Q.   And it's from you?

12   A.   Yes.

13   Q.   You have various performance measures here, and I'm

14   wondering about the required threshold and actual threshold

15   numbers that are in there.                                      11:25AM

16   A.   Early on in the process we set up different thresholds for

17   different performance measures, again, based on a quarterly

18   basis, and some were at 90 percent, some were at 93 percent,

19   some were at 95 percent.  This all changed with the

20   stipulation.  But --                                           11:25AM

21   Q.   So these were thresholds that existed before the

22   stipulation?

23   A.   Yes.

24   Q.   Okay.

25   A.   And, for instance, Performance Measure Number 1 indicated  11:25AM

1   in the letter, we were holding Corizon to a 93 percent

2   threshold on that and they attained a 70 percent score.  So it

3   was one of those $3,500 charges.

4   Q.  Okay.

5   A.  And to be clear, the letter is from me to Cindy Black.        11:26AM

6   This is a letter allowing them time to rebut or come back with

7   concerns or issues or questions that they have about it before

8   it goes to our procurement office, and that letter from

9   procurement is the second letter that's in here.

10  Q.  Would you go to -- well, is this Exhibit 10 a true and       11:26AM

11  accurate copy of the letter sent to Ms. Black?

12  A.  To my knowledge, yes.

13  Q.  Is it a record that's regularly kept in the business of the

14  Department?

15  A.  Yes.                                                          11:27AM

16          THE COURT:  And I gather at some point you are going

17  to move to introduce these?

18          MR. BOJANOWSKI:  I was hoping to.

19          THE COURT:  Had there been objections to any of the

20  ones we have previously heard?                                    11:27AM

21          MS. KENDRICK:  No.

22          THE COURT:  The previous ones that you've shown for --

23  that were marked for identification will be admitted, no

24  objection having been entered.

25          MS. KENDRICK:  Which ones those are?                      11:27AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

```
 1              MR. BOJANOWSKI:  Do you want to do it as we go, Your

 2      Honor, or --

 3              THE COURT:  Well, the -- it seems the foundation for

 4      the hearsay exception was rather weak, I believe so, so if

 5      there was going to be an objection I wanted to take it up.  If    11:28AM

 6      there wasn't an objection it seems efficient to handle it at

 7      the moment.  That's all.  And so far everything that's been

 8      mentioned as a possible exhibit is not objectionable to the

 9      plaintiffs.

10              Is that right?                                            11:28AM

11              MS. KENDRICK:  Correct.

12              THE COURT:  Those will be received.

13              MS. LOVE:  And, Your Honor, for the record, I was

14      keeping track.  It's Exhibits 101, 99, 7, 9 and 10.

15              THE COURT:  Does that conform to the plaintiffs' list?    11:28AM

16      Is that all right with the plaintiffs?

17              MS. KENDRICK:  Also Plaintiffs' Exhibit 201 that you

18      used Amendment 10 of the contract.

19              MR. BOJANOWSKI:  I didn't lay a foundation for that at

20      this point yet.                                                   11:28AM

21              MS. KENDRICK:  It's our exhibit.  We don't object.

22              THE COURT:  You can stipulate to that?

23              MR. BOJANOWSKI:  I would stipulate to 201 and the

24      latest exhibits.

25              THE COURT:  All right.  Plaintiffs' 201 and the          11:28AM
```

 1    exhibits Ms. Love mentioned will be admitted.

 2          Thank you.

 3          MR. BOJANOWSKI:  Would you want me to address the

 4    admission as we go?

 5          THE COURT:  Feel free to turn to plaintiffs' table and    11:29AM

 6    ask if they have any objection.  If not, it will be considered

 7    a stipulation and it will be received.

 8          MR. BOJANOWSKI:  I can do that before I lay a

 9    foundation, then?

10          THE COURT:  Yeah.                                          11:29AM

11          MR. BOJANOWSKI:  Is that acceptable?

12          THE COURT:  Yeah.  If you stipulate it will come in.

13          MR. BOJANOWSKI:  I will do that, then.  I mean, maybe

14    we could do some of that over the lunch hour.

15          THE COURT:  Certainly.                                     11:29AM

16          MR. BOJANOWSKI:  Maybe.

17    BY MR. BOJANOWSKI:

18    Q.  I believe I was at Exhibit 11 at this point.  Exhibit 11 is

19    another sanction letter?

20    A.  Yes.                                                         11:29AM

21    Q.  Behind Exhibit 11 at Page 2 through 3 do you see that

22    that's a letter to Ms. Black from you?

23    A.  Yes.

24    Q.  And this sets out another set of sanctions for 10

25    performance measures.  Do you see that?                          11:30AM

1    A.   Yes.

2    Q.   And it also describes some rebuttals that had been set

3    forth at the bottom of Page 2?

4    A.   Correct.

5    Q.   Can you tell me why there were only 10 performance                11:30AM

6    measures that were sanctioned for this particular month?  Do

7    you know?

8    A.   I can't say for sure with looking at this unless this was

9    the point in time when we went -- when we switched from

10   quarterly to monthly assessments.                                      11:31AM

11           MR. BOJANOWSKI:  Your Honor, the parties will

12   stipulate to the admission of Exhibit 11.

13           THE COURT:  11 will be received.  Thank you.

14   BY MR. BOJANOWSKI:

15   Q.   Go to Exhibit Number 12.                                          11:32AM

16   A.   All right.

17   Q.   This is another sanction letter, I take it, dated September

18   23rd, 2015?

19   A.   Correct.

20   Q.   And the amount of the sanction is?                                11:32AM

21   A.   38,500.

22   Q.   And the backup documentation for that setoff is set out in

23   Pages 2, 3, and 4 of that exhibit?

24   A.   Yes.

25   Q.   So these sanctions that are assessed -- I mean, if you look       11:32AM

1    at Page 4 of the exhibit there's apparently a process that

2    takes place when a sanction is assessed.  Do you see -- do you

3    know what that process is?

4    A.  Yes.  It's what I was describing previously.  Initially I

5    will send the VPO a letter --                          11:33AM

6    Q.  The what?

7    A.  The vice-president of operations --

8    Q.  Okay.

9    A.  -- a letter indicating this is what the sanctions will be

10   and allow them a time frame to get back to me with any concerns   11:33AM

11   or disagreements and we can meet and confer on them.

12   Q.  When you say get back to you with any concerns, was that a

13   process whereby they could object and put forth perhaps some

14   evidence or something that would change your mind, so to speak,

15   on the level of sanction?                              11:33AM

16   A.  Yes.

17   Q.  So there was kind of an appeal time period for lack of a

18   better word?

19   A.  For lack of a better word, yes, that's correct.

20   Q.  Okay.  And it looks as though it's seven days for a        11:33AM

21   response?

22   A.  Seven calendar days.  Yes.

23   Q.  Throughout your experience with Corizon did they ever

24   challenge a sanction that was levied?

25   A.  With the exception of Cindy Black asking to withhold or   11:34AM

1    kind of hold off on sanctions, no.

2    Q.  And as you said, that would be an offset, right?

3    A.  Correct.

4        MR. BOJANOWSKI:  Your Honor, may we have a quick

5    conference.                                              11:34AM

6        THE COURT:  You may.

7        (A discussion was had off the record between counsel.)

8        MR. BOJANOWSKI:  Your Honor, in an effort to move

9    things along, the parties will stipulate to the admission of

10   Exhibits 12 through 40.                                  11:34AM

11       THE COURT:  All right.  They will be received.  Thank

12   you.

13   BY MR. BOJANOWSKI:

14   Q.  So I'm going to try and run through a bunch of these

15   letters a little quicker since they have been stipulated to. 11:35AM

16       So I'm going to address Exhibit 13.

17       And why don't you pull out 14, and 15 while you are at

18   it.

19   A.  All right.

20   Q.  So Exhibit Number 13 would be a sanction letter where ADC 11:36AM

21   sanctioned Corizon $45,500?

22   A.  December 3rd, 2015.  Correct.

23   Q.  That would be 13 performance measures that were not met?

24   A.  Yes.

25   Q.  And Exhibit 14 is the letter to Ms. Black laying out the 11:36AM

1   performance measures not being met for the quarter October 1st

2   through December 31st, 2015?

3   A.  Correct.  Eight performance measures.

4   Q.  And then the Exhibit 15 would be the actual sanction letter

5   assessing $28,000 in sanctions?                                    11:36AM

6   A.  Correct.

7   Q.  We'll go to Exhibit 16.

8   A.  Okay.

9   Q.  This is a letter dated May 27, 2016?

10  A.  Yes.                                                            11:37AM

11  Q.  And this is from you?

12  A.  Yes.

13  Q.  And so this is the letter where sanctions were changed from

14  a quarterly basis to a monthly basis.  Is that what this letter

15  did?                                                               11:37AM

16  A.  That's correct.

17  Q.  And this is another letter to Ms. Cindy Black, is that

18  right?

19  A.  Yes.

20  Q.  So would you go to Plaintiffs' Exhibit 201.                     11:37AM

21  A.  Yes.

22          MR. BOJANOWSKI:  May I have a moment, Your Honor?

23          THE COURT:  Yes, you may.

24  BY MR. BOJANOWSKI:

25  Q.  And so contract amendment Number 10 was a change whereby        11:39AM

1  the Department moved from the quarterly sanction to the monthly

2  sanction as we had said?

3  A.  Correct.

4  Q.  Why was that done?

5  A.  This was done in relationship to both the stipulation and          11:39AM

6  the fact that we were extending beyond the third year of the

7  contract for one more additional year with Corizon.

8  Q.  And so did you increase the level of sanction that was

9  going to be assessed?

10  A.  Yes.  This is where we broke it out at $5,000 per          11:39AM

11  performance measure.

12  Q.  And then you put the cap in there as well?

13  A.  Correct.

14  Q.  So if you look at Exhibit 201.3, do you see that?

15  A.  Yes.          11:40AM

16  Q.  At Paragraph 6.

17  A.  Yes.

18  Q.  Is that the change that we are taking about?

19  A.  The change to $5,000, yes, with the cap.

20  Q.  Okay.  How many performance measures were being evaluated          11:40AM

21  for purposes of determining the sanctionable amount?

22  A.  I believe it was 112.

23  Q.  Okay.

24  A.  Well, I -- correction on that.  I believe it's 103 more

25  than likely, without the maximum custody performance measures.          11:40AM

1    I'd have to look to make sure, Tim.  It's either 103 or 112.

2    Q.  As far as paragraph 7 is concerned, was that as well an

3    amendment to the contract?

4    A.  It was.

5    Q.  And what was paragraph 7 for?                                11:41AM

6    A.  The requirement to add additional staffing to Corizon.

7    Q.  And paragraph 9?

8    A.  Yes.

9    Q.  That, then, identifies what?

10   A.  The staffing expectations at each facility.                 11:41AM

11   Q.  Okay.

12          So if we go to Plaintiffs' Exhibit 201.5 --

13   A.  Yes.

14   Q.  -- what is that?

15   A.  This is the state-wide rollup for the contract that Corizon 11:41AM

16   entered into.

17   Q.  What's that mean?

18   A.  The number of people in each position on a state-wide

19   basis.

20   Q.  So when this says current contract FTEs, what's an FTE?      11:41AM

21   A.  Full time equivalent.

22   Q.  And then it lists key management positions, provider

23   positions, non-management positions.  Do you see that?

24   A.  Yes.

25   Q.  And we had talked about earlier in your testimony the       11:42AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   staffing offsets.  Do you recall that?

2   A.  Yes.

3   Q.  Is the staffing offsets part of this Attachment A

4   identified in Exhibit 201.5?

5   A.  I'm not sure I understand the question.                    11:42AM

6   Q.  Do you use 201.5 in calculating staffing offsets?

7   A.  Yes.

8   Q.  Okay.

9          MR. BOJANOWSKI:  May I have a moment, Your Honor?

10         THE COURT:  You may.                                    11:42AM

11  BY MR. BOJANOWSKI:

12  Q.  So the modification to the contract gave you more of a

13  hammer, so to speak, to compel compliance with performance

14  measures?

15  A.  Yes.                                                       11:43AM

16  Q.  And that was the intention ADC had when it entered into

17  this amendment, was to try and give it a little more economic

18  incentive for Corizon to comply with the performance measures?

19  A.  Correct.

20         MS. KENDRICK:  Your Honor, objection.  I have tried to  11:43AM

21  be very patient but the leading questions have been extreme.

22         THE COURT:  Sustained.

23         MR. BOJANOWSKI:  One of my problems.

24  BY MR. BOJANOWSKI:

25  Q.  What was the purpose of having this modification to the    11:44AM

1  contract and its impact on performance measures?

2  A.  Basically, three pieces to this.  One was staffing, one was

3  sanctions, and again, this spelled out fairly clearly what our

4  expectations were going forward, and it extended the contract

5  by a year.                                                                11:44AM

6  Q.  What expectations did you have going forward?

7  A.  Expectations that staffing will be met in accordance with

8  the contract.

9  Q.  Any other expectations?  Any expectations with regard to

10  compliance with performance measures?                                    11:44AM

11  A.  Continuous expectation.  That doesn't change.  Actually, on

12  either staffing or performance it's continuous.

13  Q.  Was that communicated to Corizon at the time this contract

14  amendment was being negotiated?

15  A.  Not just at that time, but all the time.  Yes.                       11:45AM

16  Q.  Do you recall what was said?

17  A.  Not specifically, no.

18  Q.  Do you know generally?

19  A.  In general, get the job done.  Yes.

20  Q.  Has that been the focus of ADC with regard to performance            11:45AM

21  by Corizon?

22  A.  Yes.

23  Q.  Now, this particular Exhibit, 16 has on it on Page 8.

24        MS. KENDRICK:  Objection.  Where are you,

25  Mr. Bojanowski?                                                          11:45AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1          MR. BOJANOWSKI:  Exhibit Number 16.

2          MS. KENDRICK:  Oh.

3   BY MR. BOJANOWSKI:

4   Q.  Let's start -- Page 1 through 7 looks like a chart.  Can

5   you tell us what that is?                                    11:45AM

6   A.  List of performance measures.

7   Q.  Is this -- where does this list of performance measures

8   come from?

9   A.  Stipulation.

10  Q.  Then on Page 8 and 9 there's another chart or graph.  Do  11:46AM

11  you see that?

12  A.  I do.

13  Q.  And what does that depict?

14  A.  This depicts 125 incidents of failure on specific

15  performance measures at specific sites.                      11:46AM

16  Q.  All right.

17          Now, how is the chart set up?

18  A.  This only indicates failed performance measures, and it's

19  the performance measures listed on the left, the facilities

20  across the top, showing, for instance, Performance Measure   11:46AM

21  Number 5 was failed at three facilities, Performance Measure 6

22  was failed at four facilities.

23          And it also rolls them up at the bottom.  For

24  instance, Douglas failed only one performance measure out of

25  this group, whereas Eyman failed 22 of them.                 11:47AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1              And then in the bottom right corner it shows a roll-up

2    of the total number of failed performance measures that we

3    determined was 125 for that month.

4    Q.  Now, is that 125 total the failed performance measures out

5    of the 849 total?                                              11:47AM

6    A.  Correct.

7    Q.  Performance measures that exist in the system each month?

8    A.  Correct.

9    Q.  And so from this letter going forward, then, you would

10   calculate the total number of misses at the facility and you  11:47AM

11   would sanction them that 125 total in the right hand corner?

12   A.  Correct.

13   Q.  And what's the sanction amount for this month?

14   A.  The sanction amount was calculated to be a potential of

15   $625,000.  However, there was a cap of $90,000.  So that was   11:48AM

16   the sanction amount.

17   Q.  So the sanction amount for this letter was 90,000?

18   A.  Correct.

19              And again, this is not just performance measures that

20   failed.  This is performance measures that failed and extended  11:48AM

21   the stipulation.

22   Q.  And where does that come from?

23   A.  From the contract itself.  It's stated at the top of Page

24   8.

25   Q.  If you would go back to Exhibit 201, go to 201.17.          11:49AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   A.  Okay.

2   Q.  What is that?

3   A.  This is a breakout from Corizon as to daily costs on

4   several categories.

5   Q.  That was part of this amendment?                    11:50AM

6   A.  Yes.

7   Q.  Then Exhibit 201, 19 through 22, what is that?

8   A.  These are the performance measures that Corizon is being

9   held accountable for.

10  Q.  If you go to Exhibit 17.                             11:51AM

11  A.  Okay.

12  Q.  What is Exhibit 17 at Page 1?

13  A.  Letter from our procurement officer to the CEO of Corizon

14  dated June 13 indicating the sanction for that month.

15  Q.  Was this the sanction that was calculated in Exhibit 16? 11:52AM

16  A.  Yes.

17  Q.  And again, this was -- the same procedure was used when it

18  was changed to a monthly basis, that you would simply withhold

19  money from Corizon for that month?

20  A.  Correct.                                             11:52AM

21  Q.  In the amount of $90,000?

22  A.  Correct.

23  Q.  Would you go to Exhibit 18, please.

24  A.  All right.

25  Q.  What is this?                                        11:53AM

-3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross-

1    A.  A letter from me to Cindy Black dated June 16 for

2    contractually sanction the month of April 2016.

3    Q.  And again, Page 8 is the chart where you figure out the

4    number of sanctionable events?

5    A.  Correct.                                                    11:53AM

6    Q.  And how many total sanctionable events were set out in this

7    particular letter?

8    A.  113.

9    Q.  How does that compare with the previous month?

10   A.  I think the previous month was 125, if I recall, so it's   11:54AM

11   down.

12   Q.  Exhibit 19, what is this?

13   A.  Sanction letter for the contractual month of April, 2016.

14   This is from our procurement office.

15   Q.  And this is just setting forth to Corizon the amount that   11:54AM

16   will be withheld because they have already exceeded the appeal

17   time?

18   A.  Correct.

19   Q.  Okay.  Exhibit 20.

20   A.  Okay.                                                       11:55AM

21   Q.  What is this?

22   A.  Letter dated July 25 for contractual sanctionable amount

23   for the month of May 2016 from me to Cindy Black.

24   Q.  Now, this letter has some additional language in it with

25   regard to seeking compliance with Corizon.  Do you see that?   11:55AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    A.  Yes.

2    Q.  And you see in the third paragraph that it refers to

3    Director Ryan having a discussion with the CEO of Corizon, is

4    that right?

5    A.  Yes.                                                          11:55AM

6    Q.  Were you a participant in that particular conversation?

7    A.  I'm not sure if I was in that particular one but I have

8    been part of many of those, yes.

9    Q.  What is indicated by Corizon with regard to its

10   relationship with ADC concerning compliance with the             11:56AM

11   stipulation?

12   A.  I'm not sure I understand.

13   Q.  What is Corizon committing to do?

14   A.  Oh.  Corizon had indicated to the director -- it's not

15   indicated in this letter but this is a memorialization of that   11:56AM

16   conversation that Corizon is indicating their commitment to

17   achieving full compliance with the stipulation.  It goes on to

18   say that ADC is a top priority for Corizon.  There's a

19   commitment to adding significant additional resources in an

20   effort to obtain full compliance with the stipulation.           11:56AM

21          And as we indicated, ADC has heard these promises

22   before from Mr. Witty and from his predecessor, and once again,

23   from him, "Actions speak louder than words.  Results speak

24   louder than actions."

25   Q.  So this letter is kind of a snippet of communications that   11:57AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   ADC has with Corizon seeking compliance with the stipulation

2   terms?

3   A.   That's correct.

4   Q.   So it's not merely an issue of sanctions under the contract

5   but there's additional pressure that's brought to bear to make          11:57AM

6   sure that we get compliance with the stipulation?

7            MS. KENDRICK:  Objection.  Leading.

8            THE COURT:  Sustained.

9   BY MR. BOJANOWSKI:

10  Q.   Do you have phone conferences or participate in meetings          11:57AM

11  with Corizon leadership?

12  A.   Corizon leadership meets with the director and myself every

13  two weeks and we discuss issues such as this that are on our

14  agenda, including staffing, performance and what our

15  expectations are, and we will continue, as always, to hold them       11:57AM

16  accountable to our expectations in this contract.

17  Q.   And what are your expectations in this contract that you

18  are seeking to hold them to?

19  A.   Staffing and performance to meet the thresholds that are

20  required in the stipulation.                                           11:58AM

21  Q.   And this letter, as early as July of 2016, does that --

22  well, what does it indicate as far as your efforts are

23  concerned?

24  A.   It's just -- it's another in a series of things that we do

25  to hold Corizon's feet to the fire, for lack of a better term.        11:58AM

1   This was the third month in a row that we saw continued

2   failure, and it's not enough simply to say, okay, here's

3   another month, just go on with business as usual.  This ramps

4   it up and puts additional emphasis on it.

5   Q.  Okay.                                                          11:58AM

6          Would you go to the bottom of Exhibit 20, and read the

7   last sentence into the record.

8   A.  The first page?

9   Q.  Yes, sir.

10  A.  Time is certainly of the essence.  In the absence of        11:59AM

11  immediate and significant improvement in performance, Corizon

12  will relegate ADC to operating the inmate health care system

13  under judicial monitoring for many years to come.  ADC remains

14  committed to working with the Corizon to achieve full

15  compliance with the stipulation, but at the end of the day it    11:59AM

16  is Corizon and Corizon alone which is providing inmate health

17  care and which is responsible for performance and results.

18  Q.  Did you receive a response to this particular

19  correspondence from Corizon?

20  A.  I don't know specifically on this.  I'm sure we discussed     11:59AM

21  it verbally.  I'm not sure if there's anything in writing to

22  come back from them.  There more than likely is.

23  Q.  And again, another assessment -- there was another

24  assessment here?

25  A.  Yes.                                                          11:59AM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   Q.  How much?

2   A.  $90,000.  That's the cap.

3        THE COURT:  Mr. Bojanowski, we'll have to pause here.

4   We'll come back at 1:15.

5        MR. BOJANOWSKI:  Very good, Your Honor.                    12:00PM

6        THE COURT:  Thank you.

7        Thank you, Mr. Pratt.

8        THE WITNESS:  You're welcome.

9        (Recess from 12:00 p.m. until 1:21 p.m.)

10       MR. BOJANOWSKI:  Are you ready?                           01:21PM

11       THE COURT:  Yes, please.

12       MR. BOJANOWSKI:  Your Honor, before we get started, we

13  conferred with plaintiffs' counsel and could perhaps streamline

14  our process a bit here today.  Instead of going through each of

15  these letters, the sanction letters, what we have agreed to is   01:21PM

16  that the parties will stipulate to the admission of additional

17  Exhibit Numbers 79 through 95 of defendants' exhibits and

18  plaintiffs' 201 through 205.

19       In addition to that, I have presented to the Court

20  what will be now marked as Exhibit 103, which is -- I think you  01:21PM

21  have a copy there on your desk.  It is titled Sanction

22  Tracking, 2004 through 2017, which is essentially a summary of

23  the data contained in the letters.

24       So instead of going through each of the letters and

25  extracting the data the hard way, it is our position to utilize  01:22PM

1    this Exhibit 103 and the testimony of Mr. Pratt as well as the

2    stipulation with regard to the sanction letters to proceed so

3    we don't have to go through each one of those exhibits.

4            THE COURT:  Thank you very much.  Pursuant to the

5    stipulation, all of those exhibits will be received into          01:22PM

6    evidence.

7            MR. BOJANOWSKI:  Thank you.

8            MS. KENDRICK:  And defendants' Exhibit 103 that they

9    did pursuant to Rule 10.06 of the Federal Rules of Evidence, we

10   would need to reserve the right to check this against the        01:22PM

11   original documents, the numbers and the --

12           THE COURT:  If that's the case, that specification as

13   it being a demonstrative exhibit will be respected.

14           Thank you.

15           MS. KENDRICK:  Okay.                                     01:22PM

16           And I guess in light of that, Mr. Bojanowski, in terms

17   of a time check, how much longer do you think you'll be?

18           MR. BOJANOWSKI:  Well, I honestly don't know.  I'm

19   sorry.

20           MS. KENDRICK:  We need to finish tomorrow.               01:23PM

21           MR. BOJANOWSKI:  Of course, this does cut down on

22   the amount of time needed since we are not having to go through

23   them.

24           THE COURT:  All right.  Thank you.

25           MR. BOJANOWSKI:  So for me to estimate, I just don't     01:23PM

1    know.

2            MR. FATHI:  Your Honor, just our concern is that we

3    finish this proceeding tomorrow, and the defendants have two

4    more witnesses after Mr. Pratt so we just want to make sure

5    that we are able to finally conclude this hearing tomorrow.          01:23PM

6            THE COURT:  Thank you very much.  Please continue.

7            MR. BOJANOWSKI:  Thank you, Your Honor.

8    BY MR. BOJANOWSKI:

9    Q.  Mr. Pratt, would you turn to Exhibit 30?

10   A.  Okay.                                                            01:24PM

11   Q.  Exhibit 30 is one of our sanction letters again, but it

12   also has some additional information in it.  Do you see that?

13   A.  Yes.

14   Q.  This letter is dated October -- what's the date of the

15   letter?                                                              01:24PM

16   A.  October 18, 2017.

17   Q.  And is this something you had sent?

18   A.  Yes.

19   Q.  Would you look at the fourth paragraph in the letter?

20   A.  Yes.                                                             01:24PM

21   Q.  And this -- what are you -- what are you saying to Corizon

22   at this point?

23   A.  Well, I'm telling them this is continued evidence of

24   unsatisfactory performance and this is unacceptable, Corizon is

25   expected to meet unsatisfactory levels of performance on every      01:24PM

1    performance measure, all 849 of them, and I attached the court

2    document 2373, which was consideration of civil contempt

3    charges as another reminder to further reinforce our continuing

4    demand that Corizon improve their performance not just for the

5    performance measures in the document but for every measure that     01:25PM

6    is not currently in compliance.

7    Q.  The order -- is this the first time you attached the

8    Court's order that is the subject of this hearing and gave it

9    to Corizon?

10   A.  Yes.                                                            01:25PM

11   Q.  And again, you are demanding performance of Corizon to

12   comply with the Court's order?

13   A.  Correct.

14   Q.  Would you go to Exhibit Number 31, please?

15   A.  Okay.                                                           01:25PM

16   Q.  What is Exhibit Number 31?

17   A.  This is a letter to Jeffrey Goldberg, Daniel Slipkovitch

18   and Kenneth Paulus, who are the operating committee on the

19   Board of Directors from Corizon, from the director and myself

20   dated October 25, 2017.                                             01:26PM

21   Q.  What's the purpose of this letter?

22   A.  Demand for performance.

23   Q.  Would you go to Page 2 of the letter?

24   A.  Yes.

25   Q.  Is this where you are making the demand, in the 7th             01:26PM

1  paragraph?

2  A.  Yes.

3  Q.  What exactly did you demand of Corizon as far as their

4  performance to comply with the Court's order?

5  A.  We are demanding that issues be -- or thresholds be met and    01:26PM

6  that Corizon put together some real-time reporting to try to

7  address these situations.

8  Q.  Look at the 7th paragraph on Page 2.  Are there some type

9  of -- was there some type of demand with regard to staffing?

10  A.  Yes.                                                           01:27PM

11  Q.  What was that?

12  A.  We advised Corizon, as far as staffing, that to do what it

13  takes, including but not limited to flying in health care

14  personnel from other states to fill vacant positions.

15  Q.  And how about your demand of Mr. Maldonado?  What was        01:27PM

16  demanded of him?

17  A.  Was to put into place real-time reporting activities so we

18  could better try to track results without going in

19  retrospective.

20  Q.  Okay.                                                         01:28PM

21         This letter also detailed out other obligations of

22  Corizon pursuant to the contract?  On Page 3?

23  A.  Yes.  That's correct.

24  Q.  Were you making a demand concerning these obligations of

25  the contract?                                                     01:28PM

1    A.   Yes.   I mean, we have demanded service all along but this

2    is evidence of ramping up those demands in another format in

3    just a written letter to Corizon.

4    Q.   And this was in direct response to this Court's order?

5    A.   It was.                                                          01:29PM

6    Q.   On the last page, Page 4, in the last paragraph, do you

7    clearly set forth your demand for compliance?

8    A.   Yes.   It's very clear.

9    Q.   What did you say?

10   A.   To be clear, we demand that Corizon immediately take all       01:29PM

11   reasonable steps to comply with the subject performance

12   measures as well as all other performance measures set forth in

13   the Court's order.   These steps include but are not limited to

14   flying in Corizon health care personnel from other states to

15   fill vacant positions and implementing the daily real-time         01:29PM

16   monitoring data program advocated by Mr. Maldonado just last

17   week.   Corizon's failure or refusal to take these additional

18   steps exposes Mr. Pratt and I to civil contempt sanctions.   If

19   the Court ultimately imposes any sanctions against us, Corizon

20   will be contractually responsible for our comprehensive            01:29PM

21   indemnification pursuant to Paragraph 4 of Contract Amendment

22   Number 10.   This letter constitutes our formal demand for full

23   indemnification pursuant to this contract amendment.

24   Q.   So again you are exercising some contractual remedies that

25   you are seeking to get them to comply with so that they fulfill     01:30PM

1   the obligation set forth in the Court order?

2   A.   That's correct.

3   Q.   Did you receive a response to this letter?

4   A.   We did receive a response.  I'm not sure if that's another

5   --                                                                    01:30PM

6   Q.   Would you look at Exhibit 33?

7   A.   Okay.  I have it.

8   Q.   Was this the response you received?

9   A.   Yes.

10  Q.   Did Corizon agree to work on full compliance with the          01:30PM

11  Court's order?

12  A.   They did.

13  Q.   And that's your expectation?

14  A.   It is.

15  Q.   And so were there to be actions taken with regard to           01:31PM

16  compliance with this Court's order?

17  A.   Yes.  Corizon is committing to take whatever actions are

18  necessary to move this contract forward --

19  Q.   All right.

20  A.   -- to become -- to get into compliance.                        01:31PM

21  Q.   Would you look at Page 1 of Exhibit 33?

22  A.   Okay.

23  Q.   There's a paragraph with the number 2 in front of it.  Do

24  you see that?

25  A.   Yes.                                                           01:31PM

1   Q.  And what does that say?

2   A.  It says Corizon will take all reasonable steps to

3   substantially comply with the stipulation, including working

4   collaboratively to address the root causes of noncompliance

5   with the 11 performance measures included in the Court's order.  01:32PM

6   While Corizon certainly has the leading role in this effort,

7   even Charles Barkley needed KJ to get him the ball.

8   Q.  All right.  Did you understand the analogy?

9   A.  I did.

10  Q.  And what did it mean to you?                               01:32PM

11          MS. KENDRICK:  Objection.  Relevance.

12          THE COURT:  Overruled.

13          THE WITNESS:  It means that it's a collaboration and

14  they are going to have to work together with us in our demands

15  to accomplish these goals.                                     01:32PM

16  BY MR. BOJANOWSKI:

17  Q.  Well, aside from making demands, were you going to

18  implement any measures to be taken by the Department in

19  assisting Corizon in reaching compliance with regard to these

20  11 measures?                                                   01:32PM

21  A.  Well, as far as compliance goes, there's a whole host of

22  things that we do and we have done but in particular since the

23  order where we are continually holding them accountable and we

24  ramped up those efforts.  As part of that Dr. Robertson had

25  mentioned a weekly meeting that he has.  That's one effort that  01:33PM

1    we added to this process to focus on certain people that are on

2    the radar that need to be taken care of.  We have regular

3    weekly meetings that my staff has held with Corizon for

4    sometime.

5            But as related to again the NOC, we ramped that up and      01:33PM

6    we added more participants to that meeting as far as

7    communications goes so everybody can be on the same page and

8    hear the same thing at the same time.  Those are also weekly

9    meetings on Wednesdays.  I have meetings with the director and

10   Corizon leadership every other week where we sit and, as I have    01:34PM

11   mentioned, we go through performance measures, we go through

12   staffing, we go through our demands on holding them accountable

13   to meet the requirements of the stipulation.

14           Again, since the NOC, we have -- we required from a

15   staffing standpoint that they fill out additional paperwork for    01:34PM

16   us so we can see exactly what the efforts are in them obtaining

17   personnel at which sites, and we ask for specifics on that.

18   That's only been a couple weeks ago when we started that.

19           Corizon has meetings with our regional operations

20   staff every other week where the security staff will also meet     01:34PM

21   with Corizon to discuss what efforts need to be made to pass

22   some of these performance measures or if there's any stumbling

23   blocks so we can be collaborative in making sure that they are

24   taken care of.  If operation staff see any issues or concerns

25   that they have with Corizon at that point, this is the place       01:35PM

1    they bring it up with their leadership.

2            There's the monthly meetings that are held by Corizon

3    where they go out to the facilities and talk about Corrective

4    Action Plans for any and every performance measure that misses

5    the mark.  Since the NOC those have been ramped up.  We have          01:35PM

6    included -- as I mentioned before, we have included my staff in

7    those meetings.  We have also included legal staff in those

8    meetings.

9            So again, it's communication, it's opening this thing

10   up so we can be collaborative and come up with ways to address       01:35PM

11   these issues when they are not being compliant:  Is it, again,

12   a process, is it a person, to try to find weak points in the

13   system to get them addressed and get them addressed immediately

14   as opposed to waiting in retrospect to try to go back and

15   recreate scenarios.                                                   01:36PM

16   Q.  Exhibit 33, in the letter from Mr. Goldberg he references

17   root causes of noncompliance.  Do you see that?

18   A.  Yes.

19   Q.  Do you know what that means?

20   A.  That's a breakdown on a process to go back and review the        01:36PM

21   process that Corizon has been taking, look at every step in

22   that process to try to address, again, failed points, areas

23   where things may be not taking place correctly, and these are

24   root cause analyses for a process but that process may have a

25   different root cause breakdown at each facility.                     01:37PM

1          So this is the ability to go in and look at the

2     process, break it down, and track it and see if it's not

3     working, if they are still failing to try to figure out where

4     exactly it's failing and why and address it.

5     Q.   Okay.  Exhibit 34.                                          01:37PM

6     A.   Okay.

7     Q.   Is this a response letter that was sent with regard to

8     Mr. Goldberg's letter?

9     A.   Yes.

10    Q.   Do you again make a demand for performance in this letter?  01:37PM

11    A.   Yes.

12    Q.   And what was the demand that was made?

13    A.   We demanded specifics on how many medical providers are

14    going to be flying in, when we may expect them to arrive, and

15    to let them know that we will try to assist them in identifying 01:38PM

16    problems and correcting them as soon as possible.

17    Q.   Was the demand for immediate compliance?

18    A.   Yes.

19    Q.   Would you go to Exhibit Number 96.

20          Well, back to 94 for just a second, this letter --       01:39PM

21    excuse me -- 34.  Exhibit 34 was a letter sent in response to

22    Mr. Goldberg.  Again, that was a letter that was sent seeking

23    compliance with the Court 's order and action taken by you to

24    get them to comply with the Court's order?

25    A.   Exactly.                                                    01:39PM

---3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross---

1    Q.  Okay.

2            Let's go to 96.

3    A.  Okay.

4    Q.  What is this letter?

5    A.  This is a letter March 22, 2018 to Mr. Maldonado.        01:39PM

6    Q.  And what are you seeking to do with this letter?

7    A.  I am seeking additional work be done on Corizon's part to

8    address some issues and concerns that we had about quarterly

9    audits being completed by their pharmacy.

10   Q.  This has a summary on Page 3.  What is this?            01:40PM

11   A.  This is a summary from Corizon about the audits that they

12   had done.

13   Q.  Who is doing the audits?

14   A.  PharmaCor staff, which is a subcontractor for Corizon.

15   Q.  So there's some form of auditing that's going on internally  01:40PM

16   within Corizon?

17   A.  Correct.

18   Q.  And why do they do that?

19   A.  It's just as a matter of course of business.  They will

20   perform self audits as well but we were concerned about the    01:40PM

21   quality of those audits.

22   Q.  Okay.  And so that's the purpose of the letter?

23   A.  Yes, is to demand a repeat audit on some of these.

24   Q.  Would you go to Exhibit 97?

25           What is that?                                        01:41PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    A.   A separate letter dated March 22nd to Mr. Maldonado.

2    Q.   And what are you trying to do with this letter?

3    A.   With this letter I'm trying to reinforce and again make

4    demand that Corizon get the job done when it comes to this

5    real-time reporting.  Another real-time report is due to the          01:41PM

6    Court in April.

7    Q.   Is this a demand that's specific to the Court's order?

8    A.   It is.

9    Q.   And you are seeking to have Corizon comply with the Court's

10   order?                                                               01:42PM

11   A.   Exactly.  Yes.

12           MR. BOJANOWSKI:  May I approach the witness, Your

13   Honor.

14           THE COURT:  I'm sorry.  I didn't hear.  Forgive me.

15   Please.  Yes.                                                        01:42PM

16   BY MR. BOJANOWSKI:

17   Q.   I have handed you a document which is identified as

18   Defendants' Exhibit 103.  Do you have that?

19   A.   I do.

20   Q.   What is this?                                                   01:43PM

21   A.   This is a tracking sheet that I put together several years

22   ago to keep track monthly of sanctions.

23   Q.   And is this essentially a summary chart of all the letters

24   that we were going through, what I call the sanction letters?

25   A.   It is.                                                          01:43PM

1   Q.  So let's examine the chart somewhat and get some

2   explanations on some of the categories that are in here.

3        On the left column, obviously, you have the date,

4   right?

5   A.  Correct.                                            01:43PM

6   Q.  And then in the top portion of the document on the left

7   side it's broken down by quarter.  Why is that?

8   A.  When we initially started this, as I testified before, we

9   are doing this -- we are applying sanctions on a quarterly

10  basis.                                                   01:44PM

11  Q.  All right.

12       And then the performance measure threshold goal, what

13  is that?

14  A.  Again, when we initially started the thresholds that we had

15  established were 75 percent for compliance.  They moved in the  01:44PM

16  second quarter to 75, 78 and 80 percent depending upon the

17  different performance measures, and those continued to ramp up

18  through quarter seven when our expectation was 90, 93, and 95

19  percent.

20  Q.  And then the sanctional performance measures, not in   01:45PM

21  compliance?

22  A.  I was listing the number of performance measures that were

23  being sanctioned that were not in compliance.

24  Q.  And then sanctions per occurrence is the rate?

25  A.  Yes.  It's the rate per sanction.                    01:45PM

1    Q.   And then on the last column that's the total?

2    A.   Correct.

3    Q.   Okay.

4         Now, if you go about two-thirds down, it says begin

5    monthly 5,000 per performance measure that extends the          01:45PM

6    stipulation agreement.  Do you see that?

7    A.   I do.

8    Q.   We had had some testimony earlier about contract amendment

9    Number 10.  Is that when that occurred?

10   A.   Yes.                                                        01:45PM

11   Q.   And so this is now the monthly sanctions situation?

12   A.   Correct.

13   Q.   And then the total sanctionable performance measures not in

14   compliance, it's the 113 number that is the number used for the

15   sanction amount, so it would be in the first column, April      01:46PM

16   16th.  Do you see it?

17   A.   Yes.  That would mean that 113 of the total 166 performance

18   measures that were not in compliance actually extended the

19   stipulation agreement.

20   Q.   And that then triggered the sanction?                      01:46PM

21   A.   Correct.

22   Q.   All right.  So over time, though, that number has reduced?

23   A.   It showed a fairly consistent and steady reduction until

24   March of 17 when the threshold went from 80 to 85 percent.

25   Q.   What happened then?                                        01:47PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    A.  Well, then you saw another ramp in the noncompliance

2    because the threshold again was raised 5 percent.

3    Q.  And then did it come back down?

4    A.  It did.

5    Q.  When did that happen?                                    01:47PM

6    A.  It came down through the next several months.  It continues

7    on to Page 2.  Page 1 is our fiscal year sanctions for 2014

8    through 2017.  I started a separate sheet for fiscal year 2018.

9          THE COURT:  When you say you started a separate sheet,

10   you are talking about 103, is that right, or the base document   01:47PM

11   that became 103?

12         THE WITNESS:  Correct.

13         THE COURT:  Which is it, please?

14         THE WITNESS:  I created this.

15         THE COURT:  Okay.                                      01:47PM

16         THE WITNESS:  So I just created a separate sheet to

17   start tracking.

18         THE COURT:  When you are holding up "this" that's

19   something different than 103.

20         THE WITNESS:  No.  My understand -- this is 103.       01:47PM

21         THE COURT:  Right.

22   BY MR. BOJANOWSKI:

23   Q.  He's talking -- are you talking about Page 2?

24   A.  Yes.

25   Q.  Okay.  So we have three pages, right?                    01:48PM

1   A.  Correct.

2   Q.  And in the second page you started to include the 2018

3   data?

4   A.  That's correct.

5   Q.  So before you only needed one sheet but adding the 2018      01:48PM

6   data rolled it over to a second page?

7   A.  Yes.  My font kept getting smaller and I didn't want to go

8   to legal.

9   Q.  Okay.

10              THE COURT:  But this sanction-tracking document is    01:48PM

11  something that you started yourself?

12              THE WITNESS:  Yes, sir.

13              THE COURT:  And when?

14              THE WITNESS:  At the very beginning when we started

15  this whole process.                                             01:48PM

16              THE COURT:  At the time when the stipulation was

17  entered.

18              THE WITNESS:  Prior to the stipulation.

19              THE COURT:  Okay.  Thank you.

20  BY MR. BOJANOWSKI:                                              01:48PM

21  Q.  The beginning date is 3-14 -- excuse me -- 3-4-13 through

22  6-30-13.  Is that right?

23  A.  That's correct.  This is when Corizon actually took over

24  the contract and started performing.

25              THE COURT:  So you have been doing this since 3-4-13.  01:49PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1        THE WITNESS:  Yes, sir.

2        THE COURT:  Thank you.

3  BY MR. BOJANOWSKI:

4  Q.  And so if we go to Page 2 we start at the top at July 17th

5  and we start to see now a reduction in the sanctionable        01:49PM

6  measures.  Do you see that?

7  A.  I do.

8  Q.  Do you know why that started to occur?

9  A.  I believe it has a direct effect of us holding Corizon

10 accountable to the performance measures.        01:49PM

11 Q.  One of the things that changed was the lifting of the cap

12 off of the sanctions.  Do you recall that?

13 A.  Yes, very well.

14 Q.  Do you know when that occurred?

15 A.  November of 2017.        01:49PM

16 Q.  All right.

17        Would you go to Exhibit 205.

18 A.  Plaintiffs' Exhibit 205?

19 Q.  Yes.  Plaintiffs' Exhibit 205.  I'm sorry.

20 A.  Okay.        01:50PM

21 Q.  All right.  Do you recognize this document?

22 A.  Yes.

23 Q.  What is it?

24 A.  This is Contract Amendment Number 14.

25 Q.  And were you involved in this particular contract        01:50PM

1    amendment?

2    A.   I was.

3    Q.   What was your involvement?

4    A.   We were discussing what was -- what would be required in

5    moving forward with the current contract as it existed.  It          01:50PM

6    talks about what's required by Corizon and it talks about the

7    cap being removed and what our expectations are of Corizon

8    going forward.

9    Q.   So the cap was removed starting in November?

10   A.   Correct.                                                        01:51PM

11   Q.   And on our tracker sheet, Exhibit 103, defendants, November

12   17th, how many performance measures were non-compliant?

13   A.   Total non-compliant and performance measures were 65.  Of

14   those 65, 40 extended the stipulation, which was subject to a

15   $5,000 fine.                                                         01:51PM

16   Q.   And the total amount of fine levied against Corizon in

17   November?

18   A.   200,000.

19        If you will notice, starting at the top of Page 2 it

20   shows the number -- under sanctionable performance measures not     01:51PM

21   in compliance it shows the number of performance measures that

22   extended the stipulation out of the number of total performance

23   measures for that month that were out of compliance out of the

24   entire 849.

25   Q.   So let's use July 17.  68 of 97 of 849.  Explain for me        01:52PM

 1   what each of those numbers is, because now I think I'm

 2   confused.

 3   A.   Out of the total 849 performance measures, 97 were out of

 4   compliance, which means they did not meet the threshold,

 5   period, out of overall, state wide.  Out of those 97, 68 -- the   01:52PM

 6   failure on 68 of those -- 97, actually -- extended the

 7   stipulation by one or more month.

 8   Q.   And so that, then, is the ones that extend the stipulation

 9   that are subject to the $5,000 penalty?

10   A.   That's correct.                                              01:53PM

11   Q.   The contract amendment did not reduce the amount of the per

12   noncompliant penalty?

13   A.   No, it did not.

14   Q.   Was this contract amendment part of your efforts to both

15   comply with the Court order and to deal with overall            01:53PM

16   noncompliance?

17   A.   Yes.

18           MS. KENDRICK:  Objection.  Leading.  And the amendment

19   was entered into over a month before the Court's order so it

20   could not have been in response to the Court's order of October  01:53PM

21   10th, 2017.

22           THE COURT:  Sustained.

23   BY MR. BOJANOWSKI:

24   Q.   Were you aware that the Court was going to issue some kind

25   of contempt citation well before the contract amendment was      01:53PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   entered into?

2   A.  Yes.  We were --

3           MS. KENDRICK:  Objection.  Leading.

4           THE COURT:  Hold it.

5           Overruled.                                          01:54PM

6           THE WITNESS:  We were well aware as is evidenced by

7   our status update hearings on the displeasure of the court

8   regarding these performance measures.  So we were being

9   proactive in going at this and moving forward without waiting

10  for an official notice.                                      01:54PM

11  BY MR. BOJANOWSKI:

12  Q.  And so as a result of the court communicating the idea of a

13  contempt sanction well before it actually issued the order, you

14  were taking action months before the October order was even

15  issued?                                                      01:54PM

16          MS. KENDRICK:  Objection.  Leading.

17          THE COURT:  It is leading but in the context it's a

18  fair question.  Overruled.

19          THE WITNESS:  That's absolutely correct.  Yes.

20  BY MR. BOJANOWSKI:                                           01:54PM

21  Q.  As a result of this Court's action, did you seek solutions

22  based on amending the contract to further force compliance by

23  Corizon?

24  A.  There were discussions in advance of the order and we tried

25  to come up with different methods to further enforce and demand  01:55PM

1    of Corizon that these performance measures be met.  Removal of

2    the caps was a key component to that again and it's just our

3    expectation that these things happen but by putting this into

4    an amendment it memorialized it and things became effective and

5    it appears to have made a difference.                         01:55PM

6    Q.   When you say it's made a difference what do you mean?

7    A.   Well, if you look at the performance measures that are

8    sanctionable, you will see that that number has been going down

9    month after month after month.

10   Q.   What is it at right now?                                 01:56PM

11   A.   The most recent findings were 50 of the 849 performance

12   measures were out of compliance, which meant that actually 94

13   percent of the overall performance measures were in compliance,

14   but of those 50, which is an all-time low, 35 of those 50

15   extended the stipulation as a result of failure.  And that     01:56PM

16   number is also at an all-time low.

17   Q.   What was the sanctionable amount, then, in January 2018?

18   A.   175,000.

19   Q.   Do you believe that the contract sanctions that have been

20   implemented and revised have led to a greater compliance rate  01:56PM

21   by Corizon?

22   A.   Absolutely.  This is part and parcel to efforts that we

23   made to put more teeth into the contract and hold them

24   accountable.

25   Q.   In addition to sanctions, Contract Amendment Number 14 has 01:57PM

1  also got incentives.  Do you see that?

2  A.  Yes.

3  Q.  And were the incentives a part of what was being discussed

4  as a plan to get more compliance?

5  A.  Yes.                                                    01:57PM

6  Q.  And relate to the Court how it was that the incentives came

7  to be and how those incentives are used to help gain compliance

8  with the stipulation and the Court's order.

9  A.  There's a carrot and there's a stick.  The sanctions

10  themselves are the stick.  The ability for Corizon to earn     01:57PM

11  incentives by maintaining compliance and actually attaining

12  compliance where it had not been before with other performance

13  measures is the carrot.

14       It was necessary for us to take moves to do whatever

15  possible to move forward in compliance, and this was a         01:58PM

16  significant effort on the Department to do that.  And again,

17  this has obviously shown positive results because the numbers

18  of noncompliance are coming down each and every month.

19  Q.  When you talk about significant efforts to enter into this

20  particular contract amendment who was involved in actually     01:58PM

21  getting this put together?

22  A.  The director, myself, folks from our budget team, folks

23  from our procurement team.

24  Q.  Was the legislature at all involved?

25  A.  The legislature has to approve any budgetary issues.  This  01:59PM

 1    is something that needs to be covered in budgetary issues going

 2    forward.  But we put a cap on this incentive.  Based upon our

 3    budget at that time it was the maximum that we could go to try

 4    to move Corizon forward.

 5          THE COURT:  And the limitation and the maximum you          01:59PM

 6    could go was because you did not feel you could return to the

 7    legislature and seek additional appropriation or you didn't

 8    have the internal budget?  I'm just giving you -- not -- I'm

 9    not trying to suggest answers.  I'm just trying to explain to

10    you why I am sitting here wondering what it is that was the      01:59PM

11    limitation.

12          THE WITNESS:  We would have to go back to the

13    legislature for some sort of a special session to try to

14    increase our budget, and we were able to find a cap of 3.5

15    million to deliver towards this process.                         02:00PM

16          THE COURT:  So just that I understand, you say that

17    you found within the Department of Corrections budget already

18    these additional monies that you could use for the carrot?

19          THE WITNESS:  Correct.

20    BY MR. BOJANOWSKI:                                               02:00PM

21    Q.  Now, you had mentioned before that in addition to the

22    sanctions, the contract amendments and the incentives, that you

23    have now participated in numerous meetings to gain compliance

24    with the stipulation as well as the Court's order, and you had

25    ticked off a number of those.  I would like to perhaps talk      02:01PM

1    about some of those meetings in more detail.

2            So you say you have weekly meetings or bi-weekly

3    meetings?

4    A.   Both.  I have weekly meetings, my administrative staff and

5    Corizon's administrative staff.                                   02:01PM

6    Q.   With who?

7    A.   Pardon?

8    Q.   With who?

9    A.   With Mr. Maldonado, Lynn Cole, myself, Kathy Campbell,

10   Vanessa Headstream, several miscellaneous players, just to       02:01PM

11   discuss current topics, issues, questions, concerns.  These

12   meetings have been taking place for -- on a regular basis since

13   probably last September, October, but we have ramped them up,

14   as I said, to include participation from additional staff.

15           Because we felt it in everybody's interest for the       02:02PM

16   monitors to hear what was happening at that meeting, for the

17   health administrators to hear what was going on in those

18   meetings, the directors of nursing to hear what was going on in

19   those meetings, again everyone getting the same message,

20   hearing the same things at the same time.  If questions arise     02:02PM

21   regarding how a performance measure is done or what the

22   problems may be at a certain facility, they are raised at that

23   meeting with everyone present so we don't have to worry about

24   communication.

25           Communication is a huge piece of our ability to hold      02:02PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Corizon accountable and it's a huge piece of Corizon's ability

2    to hold what our demands are.  So we have increased that level

3    of communication.  We have those weekly meetings.  It's --

4    Q.  So at those weekly meetings you are actually talking about

5    specific measures?                                          02:03PM

6    A.  Yes.  We'll talk about specific measures.  We'll talk about

7    anything and everything.  If anyone has anything to add to an

8    agenda, we will add it and we will cover it, but there are also

9    things as similar to what Dr. Robertson was talking about in

10   the meetings which follow these meetings.  Nothing is barred,  02:03PM

11   it's open, and even if it hasn't been brought up previously it

12   could be brought up on the phone call.

13   Q.  Have you discussed the items that are contained in the

14   Court's order, those performance measures?

15   A.  We do, absolutely.  Yes.                               02:03PM

16   Q.  Is that another one of the actions that you have taken to

17   get some compliance with regard to that order?

18   A.  Yes, ramping up on those meetings.  Again, the meetings

19   themselves were taking place, but as a result of the NOC rising

20   the level of that fire is a key component.                 02:04PM

21   Q.  Do the wardens and the FHAs and other custody staff

22   participate in those weekly meeting?

23   A.  Wardens also have meetings.  And again, this is

24   communication.  There's meetings taking place all the time, in

25   addition to phone calls and e-mails and discussions, and my   02:04PM

1    going over to Corizon, Corizon coming over to see me, the

2    communication is constant.  Yes.  The wardens meet with the

3    FHAs and the monitors at a minimum once a week to discuss any

4    issues that are going on at each facility.

5    Q.  You mentioned bi-weekly meetings.  What are those?          02:04PM

6    A.  They are bi-weekly meetings, my one-on-one with the

7    director.  I have a one-on-one meeting with the director every

8    week where I --

9    Q.  What's the purpose of that?

10   A.  Just to keep him up to date and keep him on notice.  If    02:05PM

11   there's anything special I want to talk to him about, we have

12   set aside time to do that.

13   Q.  Have you specifically talked about the Court's order and

14   how to comply with it?

15   A.  Every week.                                                 02:05PM

16   Q.  Was the contract amendment one of the things that you had

17   talked about at the bi-weekly meeting or was that something

18   that happened outside of that?

19   A.  Both in and outside of that meeting.  But you mentioned the

20   bi-weekly.  Again, that's where Corizon comes over and we sit   02:05PM

21   with Corizon leadership and myself sit with the director and/or

22   possibly the deputy director.

23   Q.  What kind of topics do you discuss?

24   A.  Staffing, performance, and basically the consistent message

25   that is TCB, take care of business.                             02:05PM

1   Q.  Do you try and work up solutions to issues and problems?

2   A.  Of course we do.  It's a collaborative effort and if

3   there's something that is blocking Corizon's ability to get the

4   job done we need to know about it, and that's part of those

5   discussions.                                                    02:06PM

6   Q.  Have you seen results as that have come from these meetings

7   that have helped with compliance?

8   A.  I can say yes in particular probably more so since last

9   fall.  We have seen a ramp-up in Corizon's response to our

10  demands.                                                        02:06PM

11  Q.  What do you mean by that?

12  A.  Well, we have seen more of a sense of urgency and we have

13  seen a different direction from Corizon in addressing these

14  problems.

15  Q.  What do you mean by correction?                             02:06PM

16  A.  Corizon in the past was more top down directive to its

17  staff.  Corizon has taken -- with the leadership change Corizon

18  has taken some different steps in the way that they approach

19  the problems in the State of Arizona, and I think that's shown

20  some very positive results.                                     02:07PM

21  Q.  What are the differences?

22  A.  One of the things they started doing was exit interviews

23  with staff to find out what's going wrong, why can't we retain

24  these staff.  They have also instituted an issue of anybody

25  that puts in a notice they need to have a very special          02:07PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    one-on-one meeting with those staff to find out is it something

2    Corizon did or is it just something in the course of your life

3    where you decide that you are going to be leaving Corizon or

4    what can they do to retain you.

5    Q.  So there's this new push for retention of staff?                   02:07PM

6    A.  Absolutely.

7    Q.  And they are doing it by way of exit interviews and this

8    special one-on-one to identify what might be a problem?

9    A.  Yes.  I'm not sure what it's called but I know it's been

10   taking place.                                                          02:08PM

11   Q.  Has it resulted in increased retention?

12   A.  The retention numbers, and I don't have specifics on

13   retention numbers, but I know back last September, I think, the

14   retention was -- the turnover, I should say, was close to three

15   percent, and as of February the turnover is around one percent.       02:08PM

16   So that's a significant decrease in staff turnover, which

17   again, without turnover you're maintaining consistency in your

18   staff, you are not spending as much time training or

19   restraining staff, and you have got staff that are more

20   comfortable in that environment.  So I think it's producing           02:09PM

21   some positive results.

22   Q.  Are there other examples of items that have arisen in these

23   meetings that have resulted in action that Corizon is taking

24   with regard to its performance?

25   A.  I'm not sure I understand the question.                           02:09PM

1   Q.  Well, at the meetings are you talking about specific

2   solutions to specific problems concerning a specific

3   performance measure?

4   A.  It can get into specifics but it also can be as broad as

5   looking at the process, examining the process and trying to          02:09PM

6   figure out, again, fail points in a process, what's happening

7   at each facility.  Fail points in the processes may be entirely

8   different from facility to facility.  Where a performance

9   measure may fail at Eyman, it may be as a result of a staff

10  member who is new and just didn't get it at that point,              02:10PM

11  required education.

12          It may -- again, it may be -- at a-n-o-t-h-e-r

13  facility it may be as a result of physical structure or are

14  they going through a lot of security problems at that prison

15  which has resulted in some delays in what's supposed to be          02:10PM

16  happening and documented on a daily basis.

17          So there may be different fail points at different

18  facilities.  By and large, the processes remain the same,

19  however.  It's just to identify different fail points.

20  Q.  Okay.  You mentioned monthly meetings.  What are those?         02:10PM

21  A.  These are the meetings where Corizon has gone out in

22  increasing numbers and again being ramped up going to each

23  facility to identify not just the NOC performance measures

24  but -- those in particular, but to look at any performance

25  measure that has failed based on preliminary results that the       02:11PM

1    monitoring bureau sends to Corizon leadership each month.

2           They have gone out and -- again, a change in direction

3    from initially being Corizon walking out and telling the people

4    in the field here's what you are doing wrong and here's how you

5    are going to fix it, as opposed to looking at a more bottom up,    02:11PM

6    getting response from the folks in the field to hear what their

7    suggestions are, what they feel, and they have added the

8    monitoring bureau to those meetings to hear from the monitoring

9    bureau as well what's your thoughts on how to fix this, how do

10   you think in the field we can do this better?                      02:11PM

11          That's the collaboration that we're requiring and

12   that's the improved communication that we've got going with the

13   new leadership at Corizon.  I think the fact that we have got

14   possibly a good mix of leadership at this point that we have

15   not seen in the past.                                              02:12PM

16          This is my fifth VPO in this contract.  A lot of

17   turnover in that position.  We have not been successful.  And

18   if we're not being successful things need to change.  I'm

19   hopeful.  I am anticipating that we will continue to see the

20   positive momentum continue that we have seen over the past        02:12PM

21   several months with this leadership.

22   Q.  So you speak of new leadership and working from the bottom

23   up.  Who is the new vice-president of operations?

24   A.  Mr. Maldonado.

25   Q.  And Mr. Maldonado, has he worked with you to restructure      02:12PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    the top down to a bottom up kind of a philosophy?

2    A.   The bottom up philosophy is coming basically from Corizon

3    leadership, but that's in response, again, to us saying things

4    have to change.  We have heard the same thing over and over and

5    over.  You can't keep coming in with new leadership and telling      02:13PM

6    us the same stuff and us expecting different results.  And

7    it's -- as we explained in some of the letters, basically, talk

8    is cheap, show me.

9    Q.   So you feel that as a result of your putting pressure on

10   Corizon to comply they have come in with a new team and a new        02:13PM

11   direction to approach these problems?

12   A.   Yes.

13   Q.   Do you feel the new direction is having an effect?

14   A.   I do.

15   Q.   Is it having a positive effect?                                  02:13PM

16   A.   It is having a possible effect as a result --

17   Q.   Better compliance?

18   A.   Better compliance, yes.

19   Q.   Now, in addition to the meetings and the letters, do you

20   communicate with Corizon by e-mail and telephone with regard to      02:14PM

21   compliance issues?

22   A.   Every day.

23   Q.   And could you give us types of issues you are addressing

24   with Corizon on the basis of telephone and e-mail?

25   A.   A lot of times telephone and e-mail correspondence will         02:14PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    come as a result from a problem that's brought to my attention

2    by either my monitoring staff or by advocates in the field to

3    tell me this inmate appears to be having a problem, this has

4    been reported, please check it out, we need to get responses to

5    that.   That's where I turn that over to my staff and Corizon to      02:15PM

6    address those issues and make sure that business is taking

7    place.

8    Q.   Is that a compliance issue or a quality of care issue?

9    A.   It a quality of care issue.   Health care is not just about

10   the stipulation.   It's not just about passing these measures.      02:15PM

11   It's about patient care.

12   Q.   Are you concerned about patient care?

13   A.   Absolutely.

14   Q.   And so are you taking actions to better the patient care?

15   A.   Yes, daily.                                                     02:15PM

16   Q.   And that's part of what you do on a daily basis on top of

17   meeting what the Court's requirements are and the stipulation's

18   requirements are you are actually going in and trying to do

19   things to better the quality of care?

20   A.   That's correct.                                                 02:16PM

21              MS. KENDRICK:   Objection.   Leading.

22              THE COURT:   Hold it just a second.

23              Sustained.

24   BY MR. BOJANOWSKI:

25   Q.   So what kinds of things do you do to better quality of         02:16PM

1   care?

2   A.  Again, any issues, anything that we see that's lacking in

3   care.  Or if it's a performance measure, great, we'll deal with

4   it from a performance measure standpoint.  But it's patient

5   care, overall patient care.  It may have something that's not          02:16PM

6   related to a specific performance measure but if there's

7   something that needs to happen for a patient we get in touch

8   with Corizon, we hold them to taking care of business, doing

9   what's required to take care of the patients.  It's

10  constitutionally-mandated health care.                                 02:16PM

11  Q.  Do you receive contact from families?

12  A.  Yes.

13  Q.  Do you follow up on that contact?

14  A.  Absolutely.  And I don't mind getting calls from families

15  or advocates.  If I find out about a problem, we can address it        02:16PM

16  and take care of it.  I don't care what the source is.

17  Q.  Is there a particular program in effect that is identified

18  as being a program that families can take advantage of?

19  A.  Not that I'm aware of.  We used to have a program called

20  Friends and Family but that was when we were self op, and at           02:17PM

21  this point what we like to do is have -- first and foremost,

22  let the customer -- because the customers are not just the

23  inmates, the customers are the public and our operations staff

24  and our vendor as well.  We prefer to have the vendor speak

25  directly with whoever has a concern or a complaint and then we        02:17PM

1    follow up to make sure that is addressed appropriately.

2    Q.   Have you ever received a communication from the director

3    with regard to a particular patient's care?

4    A.   Sure.  He gets notified, as I do, when there are complaints

5    or concerns from the public, and he will rely on me to take          02:18PM

6    care of business on my end but he also does the same thing and

7    he will correspond with Corizon directly and say give me an

8    answer, tell me what's going on.

9    Q.   All right.

10          Do you have some familiarity with the Corizon staff          02:18PM

11   training that involves CGAR training?

12   A.   Generally, yes.

13   Q.   Okay.  Would you look at Exhibit 41?

14   A.   Okay.

15   Q.   Is it your understanding that Corizon is undertaking a          02:19PM

16   training program of its staff to train them on CGAR compliance?

17   A.   Yes.

18   Q.   Is Exhibit Number 41 an example of one of those training

19   sessions?

20   A.   It is.  This is an example that I believe was undertaken,       02:19PM

21   again, with new management as around last September, October.

22   Q.   Was this type of training arising as a result of the

23   Court's contempt order?

24   A.   In my opinion, yes.

25   Q.   Was this something you discussed with Mr. Maldonado and his     02:20PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   staff to utilize and implement such that staff in the field

2   could be educated as to compliance issues?

3   A.   Not the specific methodology but the actual purpose of

4   doing this most definitely.  Because we would hear about

5   educating staff, educating staff, educating staff.  We would          02:20PM

6   hear that over and over and we would say you must be doing

7   something wrong or it's not the same staff that you are

8   educating over and over.  This is a methodology to be

9   consistent in getting that message across to Corizon staff.

10  Q.   Well, is CGAR compliance a topic that would normally arise       02:21PM

11  in a, say, nurse's educational training in school?

12  A.   In school?

13  Q.   Yes.

14  A.   No.

15  Q.   Do the staff that come on with Corizon, are they already        02:21PM

16  trained in CGAR compliance to your knowledge?

17  A.   No.

18  Q.   So what was the purpose of implementing CGAR training with

19  Corizon staff at the facility level?

20  A.   This is an additional layer of training that's going to be      02:21PM

21  required for them to meet the measures to be able to show

22  exactly what has to be documented and why and the methodology

23  for that documentation and why it's expected.  It's all part of

24  the stipulation agreement which you are not going to find

25  anywhere else.                                                        02:22PM

1    Q.  And does it include providers and administrative staff as

2    well?

3    A.  Yes.

4    Q.  And was this as a result of the court's order this type of

5    training was implemented?                                        02:22PM

6    A.  I believe it was, yes.  Again, another effort to ramp up

7    the care that is taking place and solidify the methodology so

8    it's consistent.

9    Q.  Okay.  Would you look at Exhibit 42, please.

10            Do you know what that is?                                02:23PM

11   A.  Yes.

12   Q.  What is it?

13   A.  Corizon, as a method of educating staff and showing them

14   what to do, came up with a system where they do put pieces of

15   education and they post this education throughout the           02:23PM

16   facilities.  They do this -- every two weeks they change up the

17   methods, change up the message, change up the performance

18   measure, change up -- they even change up the look of the

19   educational piece so it doesn't look the same to every staff

20   that see it all the time.                                        02:23PM

21            And they will post this in lockers, they will post

22   this -- hate to say they will post it in bathrooms.  They will

23   post it anywhere for staff to see this, and again, more efforts

24   toward educating staff, letting them know what the expectations

25   are and taking care of business.                                 02:24PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   Q.  Now, is Exhibit number 42 specifically referencing a

2   particular CGAR measure?

3   A.  Yes.  Performance Measure 46.

4   Q.  And what is it instructing the person to do?

5   A.  It's step by step.  I mean, it's spelling it out.  It's          02:24PM

6   very simple, very plain what to do.  Perform eOMIS, search for

7   reviews, select normal or abnormal.  It's a methodology, tells

8   them how to do what they are supposed to do to document

9   performance measures.

10  Q.  Let's look at Exhibit 43.                                        02:24PM

11  A.  Okay.

12  Q.  And again, is this one of these postings that you are

13  talking about?

14  A.  Yes, it is.

15  Q.  Looks a little different from the previous one?                  02:25PM

16  A.  Yes.  Again, the thought process by Corizon, and I totally

17  agree, is that if all these notices look the same they wouldn't

18  get any attention and that's why they are changed up, and they

19  are adjusted every couple of weeks.  These have been coming out

20  steadily since last September and updated at all the               02:25PM

21  facilities.

22  Q.  And again, it's addressing a particular CGAR measure?

23  A.  This one is Performance Measure 47.

24  Q.  And what does this Performance Measure 47 involve?

25  A.  Our medical providers communicating the results of the          02:25PM

1    diagnostic studies to the inmate upon request and within seven

2    days of the date of the request.

3    Q.  And does it give steps to follow?

4    A.  Step by step.  Yes.  Again, these are things that need to

5    be taught by Corizon that are not part of nursing school.  This    02:26PM

6    is the things that are required for specific performance

7    measures.

8    Q.  And are these postings one of the things that you were

9    working with Corizon to accomplish to get compliance with the

10   Court's order?                                                      02:26PM

11   A.  We did not specifically tell Corizon -- we did not direct

12   them to do this but we directed them to address the education

13   issue.  This was their response to that in our demands to take

14   care of that.

15   Q.  Okay.  And after you had seen these, did you approve?           02:26PM

16   A.  Absolutely.

17   Q.  And if you look at Exhibit --

18          THE COURT:  And again, I understand the distribution

19   of these postings was on the hallways and the bathrooms, or

20   were there formal classes, were they --                            02:27PM

21          THE WITNESS:  No, not formal classes, Your Honor.

22   Again, these are postings.  These are on bulletin boards.

23   These are put in places where staff will see them.  It kind of

24   goes to the mind set of the staff to be aware of these issues.

25   They are reminders.                                                 02:27PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1        THE COURT:  I see.  Thank you.

2   BY MR. BOJANOWSKI:

3   Q.  So there are several exhibits here, if you would just pull

4   out Exhibits 44 through 50.

5   A.  Okay.                                                    02:27PM

6   Q.  What does 44 deal with?

7   A.  Heat intolerance.

8   Q.  Is that part of the stipulation?

9   A.  It is part of the -- yes, it is part of the stipulation.

10  Q.  Okay.  And again, this is an educational posting for what  02:28PM

11  to do in a heat intolerant situation?

12  A.  It is.

13  Q.  And what is Number 45?

14  A.  Health needs request process.

15  Q.  Is that the HNR process?                                 02:28PM

16  A.  Yes, it is.

17  Q.  Number 46.

18  A.  Late entry documentation.

19  Q.  And what is that for?

20  A.  That is, again, educational for staff.  If they cannot    02:28PM

21  document in real time what they are doing, this is instructions

22  on how to document it in eOMIS.

23  Q.  And 47?

24  A.  Administration of medication.

25  Q.  48?                                                      02:29PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   A.  New reference materials.

2   Q.  What is 48 talking about?  Do you know?

3   A.  48 is referring to the breakdown of -- I don't want to say

4   breakdown -- the review that Corizon undertook as far as the

5   process of some of these performance measures and where they      02:29PM

6   may be breaking down.

7   Q.  49?

8   A.  Medications provided timely.

9   Q.  And then 50?

10  A.  Reviewing consultation reports.                               02:30PM

11  Q.  Is that tied to a particular CGAR measure?

12  A.  Performance Measure 52.

13  Q.  And this gives you the steps as to how to gain compliance?

14  A.  Correct.

15  Q.  And 51.                                                       02:31PM

16  A.  Return from off site.

17  Q.  Is that tied to a specific performance measure?

18  A.  Performance Measure 44.

19  Q.  Would you go to Exhibit Number 52.

20  A.  Okay.                                                         02:31PM

21  Q.  Do you know what Exhibit 52 is?

22  A.  Yes.  This is an example of one of the reviews that Corizon

23  went through, this one for Performance Measure Number 11.

24  Q.  And when you say review, what do you mean by that?

25  A.  Process review.                                               02:32PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   Q.  Does this set out the process involved in PM 11?

2   A.  Yes.  This one is specific to PM 11.  It takes the process

3   from start to finish and identifies people that are active in

4   the process on the left-hand side, inmates, providers, nurses,

5   infection control leads and leadership, and it's just a diagram   02:32PM

6   that shows step by step what happens in this process and who is

7   involved at what point.

8   Q.  Does it establish like a work flow?  Is that what it shows?

9   A.  It is exactly -- it's a work flow process, yes.

10  Q.  And --                                                        02:32PM

11  A.  This is a visual process.  Corizon put these visuals out in

12  two different methods, one being in this type of a diagram and

13  another in a step-by-step process that goes for each one of

14  these performance measures.

15  Q.  If you look at Exhibit 52, Page 2, what is that?             02:33PM

16  A.  This is -- as opposed to the diagram, this is the written

17  out step-by-step process.

18  Q.  Were these prepared as a result of the Court's order?

19  A.  Yes.

20  Q.  And what is the purpose?                                      02:33PM

21          MS. KENDRICK:  Objection, Your Honor.  The document is

22  dated September 14, 2017, which is a month before the Court's

23  order.

24          THE COURT:  Also, just the Court needs to observe

25  there's been no foundation laid for the answer so the answer     02:33PM

1    will be stricken and the objection will be sustained.

2           You can try to address the foundational issue if you

3    would like, Mr. Bojanowski.  I don't know how he knows whether

4    this was part of Corizon's plan or not based upon an order.

5           MR. BOJANOWSKI:  All right.                              02:33PM

6    BY MR. BOJANOWSKI:

7    Q.  Did you have knowledge that these were being prepared by

8    Corizon?

9    A.  Yes.  And we again had talked with Corizon about methods to

10   address --                                                      02:34PM

11          THE COURT:  I'm sorry to interrupt, Mr. Pratt, but I

12   thought I heard you say before you had no conversation with

13   Corizon about the method of their educational components.  You

14   had said you need to increase the education and then I thought

15   you said before that you didn't -- with the postings, they came  02:34PM

16   up with that on their own.  This looks like a posting not --

17   not -- it's not a posting.  It looks like another method.  So I

18   just want to be clear.  Did I misunderstand about the postings

19   first, so the question there is, did Corizon come up with the

20   posting idea on their own or did you suggest that?              02:34PM

21          THE WITNESS:  On their own.

22          THE COURT:  And with respect to Exhibit 52, do you

23   know whether or not Corizon came up with that on their own or

24   you suggested that?

25          THE WITNESS:  We suggested this.                         02:34PM

1          THE COURT:  Okay.  Thank you.

2     BY MR. BOJANOWSKI:

3     Q.  So as the suggestion to develop this kind of process

4     analysis that occurred prior to the Court's order?

5     A.  It did occur prior to the Court's order.  Again, we were          02:35PM

6     dissatisfied with results and whether the Court order came out

7     or not we would have wanted this to happen again, but with the

8     Court's order this is something -- there was more pressure,

9     more sense of urgency placed on getting this -- getting it done

10    now.  That's the reason that this was -- that this came about.          02:35PM

11    Q.  As I asked you before, you knew that the Court was

12    considering contempt sanctions well before October, sometime in

13    June and July?

14    A.  Correct.

15    Q.  And so as a result of knowing that, did you then work with          02:35PM

16    Corizon to develop an analysis of the process of each of the

17    measures involved in the Court's order?

18    A.  Yes.

19          And again, we sat down with Corizon in their offices

20    and we went through iterations of this.  Corizon started the          02:36PM

21    process.  We worked with them in looking at the process to see

22    if there were questions, concerns on our part, if it made

23    sense.  This was -- this is no easy thing to lay this out and

24    try to find failed points on it.  But again, this is a direct

25    result of us holding Corizon accountable to get the job done.          02:36PM

1    Q.  Did representatives from the ADC actually participate in

2    the preparation of these documents?

3    A.  We participated in process flows with Corizon, yes.

4    Q.  Did you personally do that?

5    A.  Yes.                                                        02:36PM

6    Q.  And the process flows that are set out in the next group of

7    exhibits, those were not only for the Court's order but also

8    addressed some other problem performance measures?

9           MS. KENDRICK:  Objection.  Leading.

10          THE COURT:  Sustained.                                   02:37PM

11   BY MR. BOJANOWSKI:

12   Q.  Did the process diagrams that were prepared include

13   performance measures that were not included in the Court's

14   order?

15          MS. KENDRICK:  Objection.  Leading.                      02:37PM

16   A.  I'm not sure --

17          THE COURT:  You will have to wait.

18          What's the objection?

19          MS. KENDRICK:  Leading.

20          THE COURT:  Overruled.  The question was did the         02:37PM

21   process diagrams that were prepared include performance

22   measures that were not included in the Court's order?

23          THE WITNESS:  I will have to look at the ones that are

24   in the documents to make sure.

25   BY MR. BOJANOWSKI:                                              02:37PM

1   Q.  Why don't you go ahead and look at Exhibits 52 through 74.

2           THE COURT:  Why don't we take -- we're five minutes

3   away from the afternoon break.  Why don't we take the afternoon

4   break.  Give Mr. Pratt time to look through those documents.

5           MR. BOJANOWSKI:  Yes, Your Honor.                          02:38PM

6           THE COURT:  We'll come back in 15 minutes.  Thank you.

7           MR. BOJANOWSKI:  Thank you, Your Honor.

8           (Recess from 2:38 p.m. until 2:56 p.m.)

9           MS. KENDRICK:  Your Honor, just a time check.  During

10  the break Mr. Bojanowski and I spoke about these Exhibits 52    02:56PM

11  through 74, which are these process diagrams for noncompliant

12  performance measures.  Plaintiffs will agree to stipulate to

13  them so that we don't have to go through each one and have them

14  read out loud or explained in the interest of expediting the

15  process.  We just would note that some of these are very         02:56PM

16  difficult to read.  Mr. Bojanowski said that he will provide

17  cleaner electronic copies, because some of them are very

18  difficult to read.

19          THE COURT:  Okay.  And I appreciate all of that and I

20  will assure you, as perhaps you have come to understand, I will  02:56PM

21  read all of these.

22          MS. KENDRICK:  Yes.  And we're very -- just to say

23  this, we're very concerned that at the rate we're going we're

24  not going to complete with Director Ryan's testimony, finish

25  the OSC by close of business tomorrow.  That's why we're trying  02:57PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    to move things along.

2            THE COURT:  Thank you very much.

3            MR. BOJANOWSKI:  Your Honor, what we'll do with regard

4    to this set of exhibits is I will have somebody on my staff

5    produce an electronic version that you can use to expand,        02:57PM

6    because apparently what happened here is these are copies which

7    were scanned in and then they lose the resolution if you start

8    going through them, difficult to read, and if you pull them up

9    electronically you fare no better.

10           So we'll resubmit this set of exhibits electronically     02:57PM

11   to the Court if that's --

12           THE COURT:  That's perfect.

13           MR. BOJANOWSKI:  So you can blow it up as big as you

14   want and be able to read it.

15           THE COURT:  Thank you.                                    02:57PM

16   BY MR. BOJANOWSKI:

17   Q.  So, Mr. Pratt, I think I left you with the question as to

18   whether there were more of these visual work flows and

19   descriptions than were contained in the Court's order.

20   A.  Yes.                                                          02:58PM

21   Q.  And you have -- okay.

22           Have you reviewed the set of Exhibits 52 through 74 to

23   determine whether there are extra work flow sheets as part of

24   this set of exhibits?

25   A.  I didn't go through every one but I did see there are         02:58PM

1    several that are not included in the NOC.

2    Q.  And all of the -- are all of the performance measures

3    identified in the Court's order, are those contained within

4    this set of exhibits?

5    A.  Yes, they are.                                          02:58PM

6    Q.  All right.

7            And just briefly, as a description of these work

8    flows, are they fairly self-explanatory as to how you read it?

9    A.  To my mind they are self-explanatory.  I have seen them

10   before and I have worked with them before but it's just a basic   02:59PM

11   process flow.

12           Again, on the left-hand side it shows the players, if

13   you will, that are involved in different parts of the process

14   flow and it just shows if this, then what?  And it just moves

15   the process through to completion.                         02:59PM

16           Each one of the categories on the left basically shows

17   what's called a swim lane, which it shows that person's full

18   exposure to this performance measure.

19   Q.  So on the left, on like Exhibit 52, if we look at that, the

20   top has inmate as one of the people and then it goes to    02:59PM

21   provider, and then all of the blocks within the provider lane

22   moving left to right are the providers' responsibilities and

23   below that there's -- those are their responsibilities, et

24   cetera, right?

25   A.  Correct.                                                03:00PM

1   Q.   Okay.

2           Now, how are these used in attaining performance?

3   A.   These are educational.

4   Q.   Okay.

5           Now, do these then identify the fail points that you          03:00PM

6   had talked about earlier?  You are saying you are trying to

7   identify a fail point.  Do these assist in that process?

8   A.   It identifies potential fail points, yes.

9   Q.   And have you used these flows, these work flow sheets and

10  descriptions, to increase the compliance with regard to those     03:00PM

11  measures that the Court has ordered compliance upon?

12  A.   Corizon uses these, yes.

13  Q.   Have you seen that these have affected compliance in a

14  positive fashion?

15  A.   Obviously.                                                     03:00PM

16  Q.   Okay.

17          Are these used at a site-specific level?

18  A.   Yes, these are used at sites, and Corizon also will use

19  them in their -- if they have meetings in their central office.

20  Q.   You had talked earlier about different sites having           03:01PM

21  different fail points?

22  A.   Correct.

23  Q.   Is that what you are finding is occurring with regard to

24  overall compliance?

25  A.   It depends on the performance measure and on the fail         03:01PM

1    point.  Again, it can be a fail point with lack of staff at a

2    certain position for a day at a facility that wasn't covered,

3    may have been a break point.  It may be something that happened

4    in operations one day to break down that process.

5            So there are different fail points.  The process --      03:02PM

6    again, the process is pretty sound in the way that they are

7    laid out.  It does describe the process in its entirety, where

8    there may be breakdowns in that process.  Could be different at

9    each facility.

10   Q.  So going forward, ADC and Corizon will work collaboratively   03:02PM

11   with these methodologies and work flows to continue to identify

12   the problems and fix them?

13           MS. KENDRICK:  Objection.  Leading.

14           THE COURT:  Sustained.

15   BY MR. BOJANOWSKI:                                                03:03PM

16   Q.  How are you going to use these work flows going forward?

17   A.  What we anticipate is that Corizon specifically is going to

18   be continuing to identify any break points or fail points in

19   this process, and as they go through the meetings with our

20   staff on a monthly basis we will also be able to identify fail   03:03PM

21   points that we recognize.

22   Q.  Do you know if Corizon is undertaking any other items to

23   try and seek compliance?  Do you know if they are working on

24   any other things?

25   A.  Corizon has plans at this point to hire five additional       03:03PM

—————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross—————

1  compliance monitors, if you will, to work on their side.  Those

2  positions have not yet been established and it may be some time

3  yet before that happens, but I just recently had that

4  conversation with Mr. Maldonado.

5  Q.  Have you heard of something called pocket guides?                03:04PM

6  A.  I heard about that last week.

7       MS. KENDRICK:  Objection.  Hearsay.

8       THE COURT:  Can't ask much more about that unless we

9  get past that hearsay objection.

10 BY MR. BOJANOWSKI:                                                   03:04PM

11 Q.  Are you involved in developing pocket guides with Corizon

12 to be distributed to staff?

13 A.  I am not.

14 Q.  All right.  Have you had a meeting with Corizon to develop

15 or discuss pocket guides being distributed to staff to help      03:04PM

16 continue with compliance?

17 A.  Not pocket guides specifically, no.

18 Q.  Is there anything else that ADC is going to do to increase

19 compliance?

20 A.  Short of sanctions, staffing offsets, continuous demands,      03:05PM

21 meetings, phone calls, e-mails, day-to-day business, no.

22 That's -- we're doing everything I think we can.

23 Q.  What about the structure of the Health Services monitoring

24 bureau?  Is that going to change at all?

25 A.  I did make one change to the Bureau itself by moving one      03:05PM

1    position from a clerical position into a separate liaison type

2    position to include or to increase communication with Corizon

3    and with as a direct liaison between my field monitors and

4    myself.

5    Q.  What's the purpose of this position?                      03:06PM

6    A.  More communication, clearer communication, clearer

7    communication going both ways.  Both to my office and out of my

8    office back to the field.

9    Q.  What kind of things -- you talk of communication.  What

10   kind of things are involved in that?                          03:06PM

11   A.  If a monitor has a question on a performance measure about

12   is this -- how do you read this, what do you think in this case

13   should possibly happen, that may be a scenario that not only

14   that monitor has that question but other monitors may have that

15   question but have never asked.                                03:06PM

16        So it's my ability to funnel those questions through a

17   liaison to bring those to my attention for review with my

18   senior staff to come up with an answer to the question and then

19   to get that response back out to the entire field in case there

20   are additional questions out there from other monitors.       03:07PM

21   Q.  So this is a newly-created position?

22   A.  It is.

23   Q.  And is this being done in response to the Court's order?

24   A.  It is.

25   Q.  Would you turn to Exhibit 6, please?  Defendants' Exhibit  03:07PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    6.

2    A.   Okay.

3    Q.   Do you know what this is?

4    A.   These are notes that I made for myself for talking points

5    during a meeting on January 31st with Corizon, my leadership,     03:07PM

6    and our operations leadership with Director Ryan.

7    Q.   Is this one of the bi-weekly meetings or weekly meetings?

8    A.   This is a separate meeting altogether.  This is not

9    included in any one of those.  This is an example of a separate

10   meeting where we sat down to talk about ways to get the job       03:08PM

11   done.

12   Q.   And is this something that was done in response to the

13   Court's order?

14   A.   Yes.

15   Q.   Is this a regularly scheduled meeting or something that is    03:08PM

16   done on an ad hoc basis?

17   A.   This was purely ad hoc.

18   Q.   Do you anticipate participating in such ad hoc meetings

19   going forward to take care of issues that arise as a result of

20   the Court's order?                                                03:08PM

21   A.   As necessary, in addition to regularly scheduled we will

22   always have an ad hoc meeting if necessary.

23           THE COURT:  I have to ask -- I'm sorry.  I have to ask

24   Mr. Pratt.  You say it's in response to my order.  You knew the

25   order was not focused on some time and period after January       03:09PM

1    31st, right?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  You knew we were looking at December.

4              THE WITNESS:  Yes, sir.

5              THE COURT:  And yet this is coming a month after that.    03:09PM

6    So I guess I wonder, the natural question I have is, why is

7    this not something that existed in advance of when you knew

8    that the potential serious implications of the sanctions

9    would -- the events that would be relevant to that would occur

10   in December and not in January?                                    03:09PM

11             THE WITNESS:  This is just an additional meeting.  If

12   we're seeing that things are still not happening correctly,

13   this is just another step in the process to add to what we have

14   done up to that point.

15             THE COURT:  I gather there's no such document like       03:10PM

16   Exhibit 6 of a meeting that occurred in response to my order in

17   advance of December.

18             THE WITNESS:  Not that I'm aware of, Your Honor.

19             THE COURT:  Thank you.

20             THE WITNESS:  You're welcome.                            03:10PM

21   BY MR. BOJANOWSKI:

22   Q.  Did you have such ad hoc meetings prior to December?

23   A.  We will have ad hoc meetings.  This one was on a larger

24   scale because it involved our operation staff, Director Ryan,

25   myself, and Corizon leadership.                                    03:10PM

1   Q.  Okay.

2            In addition to the weekly, bi-weekly and monthly

3   meetings did you have ad hoc meetings prior to December 2017

4   that dealt with the Court's order?

5   A.  Not that I recall specifically dealing with the order          03:11PM

6   itself as far as ad hoc goes.

7   Q.  Would you go to Exhibit 98, please.

8   A.  Okay.

9   Q.  Do you know what this is?

10  A.  Yes.                                                            03:11PM

11  Q.  What is it?

12  A.  This is DI, Director's Instruction, 361, which was --

13  Q.  I'm sorry.  What does this deal with?

14  A.  I'm sorry?

15  Q.  What does it deal with?                                        03:11PM

16  A.  This deals with Performance Measure 35, medication transfer

17  process.

18  Q.  Did you have input into putting this together?

19  A.  Yes.

20  Q.  What did you do to help put it together?                       03:12PM

21  A.  Met with operations staff and Corizon staff to discuss

22  clarification on this director's instruction.  A director's

23  instruction is something that can be implemented very quickly

24  without going through an actual department order and making

25  changes in it.  This is spelling out methodology for adherence     03:12PM

1    to Performance Measure 35.  This became part of the action plan

2    in trying to correct the performance for Performance Measure

3    35.

4              THE COURT:  Explain to me, Mr. Pratt, why it is the

5    director is doing this one when you have testified earlier that    03:13PM

6    the actual methodologies of solving the problems is something

7    that is a Corizon responsibility primarily.

8              THE WITNESS:  This also involves operations, Your

9    Honor.

10             THE COURT:  So it's because it crosses between          03:13PM

11   transportation of the inmates from one facility to another and

12   the medical component it is necessarily in your view, something

13   that needs to come from the director as opposed to just

14   Corizon.

15             THE WITNESS:  Absolutely.  Yes.                         03:13PM

16             THE COURT:  And I wondered, one of the things that --

17   I mean, this -- as you know, this performance measure has been

18   very frustrating for me because it seems to me like I have

19   explained it before and you have heard it.  I don't think you

20   are not sympathetic to what I've said.  In fact, I have to say    03:13PM

21   as I listen to you express your frustration with Corizon

22   oftentimes the words you are using are the same words that I

23   used to you, meaning to the defendants' side of this case, and

24   I think the echo probably has been -- I'm guessing -- something

25   you have also noticed.                                           03:14PM

1        But, in any event, it occurs to me that with this

2    particular performance measure that has dogged me in terms of

3    trying to effectuate compliance, now having you tell me what I

4    did think was the answer, and that was that it was a hybrid,

5    that it was something that had components both with respect to          03:14PM

6    Corizon responsibilities, because they have the medications in

7    their pharmacy before the distribution to the inmates at their

8    former yard and also would have it in the future yard, so

9    there's the Corizon component, but there is also the ADOC

10   component of the actual transportation with which Corizon has          03:14PM

11   nothing really to do with.

12        One of the things that comes to mind as I see this

13   document is it does seem to be not a hybrid in nature, it seems

14   to be unilateral, and so it doesn't seem like maybe it

15   addresses what is the problem, and that is that it is a hybrid          03:15PM

16   problem.  It doesn't have a sense of a collaborative component

17   to it because it does in certain parts, as I read it quickly

18   here, reach out and direct Corizon to do certain things, which

19   seems a little bit odd because I thought you said it's not

20   really what you did.                                                    03:15PM

21        So it seems to have a workability challenge to it in

22   terms of the context.

23        And I raise that by way of a comment as I get to this

24   point and not really a question.  I just want you to know that

25   that's how I look at these sort of things and maybe it's              03:15PM

1    helpful for the lawyers, and maybe not for you necessarily, but

2    I just again felt compelled to say it because I'm trying to

3    vent what my thinking is so that people like you who are the

4    most knowledgeable about the operations can let me know if I

5    have come to an improper conclusion.                              03:16PM

6         But that's just one of the things that I observed

7    through this process that leads me to come to worry that

8    something that is addressing a hybrid problem appears to not be

9    itself a collaborative document.

10        You need not respond, sir.  Thank you.                       03:16PM

11        THE WITNESS:  Thank you.

12   BY MR. BOJANOWSKI:

13   Q.  So to get to the Court's inquiry, was there collaboration

14   with Corizon to address the PM 35 issues that have a risk?

15   A.  Yes.  There was a great deal of collaboration with Corizon  03:16PM

16   on this going back as far as June, July, August.

17   Q.  What do you mean by collaboration?

18   A.  Getting together with Corizon's nursing management, getting

19   together with our operations staff, trying to -- again, to find

20   fail points in this process as to where it was breaking down.    03:16PM

21        Operations plays a great role in this with advance

22   notification of inmates who they're moving, how many are they

23   moving, at what time of the day are they moving, and the

24   requirement that -- the term is to roll them up, to get them

25   ready to go for a transport, operations has to follow certain    03:17PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    rules and regs in our policies that say that, for instance,

2    keep-on-person medications should go with the inmate during a

3    trip.

4            Well, there are times when an inmate may be rolled up

5    or prepared to go and his medications are rolled up in his          03:17PM

6    property.  That is not something that Corizon has the ability

7    to take care of on the front end.  They have to take care of it

8    on the back end.

9            So there's issues as far as operations actually

10   following our own rules.  It's not just Corizon.  This is a        03:17PM

11   true partnership in this one that does require everybody

12   working very closely.  There's a lot of moving parts in this

13   performance measure.

14   Q.  As far as the medical side of it, what kind of issues arose

15   with regard to the medical side of PM 35 that had to be            03:18PM

16   addressed?

17   A.  On the medical side, it's making sure that the inmates have

18   the actual medications before they go.  You may get a very

19   short notice that an inmate is moving from point A to point B.

20   The inmate may not have those medications and he may not have      03:18PM

21   required or requested those medications, although they are

22   prescribed for him, and you don't come to find that out until

23   that inmate is leaving and then you have to make arrangements

24   to make sure that they are waiting for him at the receiving

25   end.                                                               03:19PM

1          There are things such as as needed medications that

2     may be prescribed for an inmate, an inhaler, for instance, that

3     the inmate may not have used for six months and not requested

4     for six months but it is again on his medication list, and so

5     he may not have it and he may not have requested it but it's          03:19PM

6     required that when he moves that that either goes with him or

7     is at the receiving end when he gets there.

8     Q.   Would you look at Exhibit 78?

9     A.   Okay.

10    Q.   Do you recognize that document?                                   03:19PM

11    A.   This is one of a number of spreadsheets and documents that

12    Corizon and our operations staff worked on to break down this

13    process and see where all the fail points may be.

14    Q.   And this process of developing this particular process and

15    the DI 361, that was done as a result of the Court's order?           03:20PM

16    A.   This was done prior to the Court's order.  This was not

17    something specifically for the Court's order but -- I mean, we

18    recognized early on that this is a failed process.  They were

19    not achieving results that we wanted them to, and again,

20    recognizing the Court's frustration in this, not just the             03:20PM

21    Court's frustration, our frustration in making this work.  This

22    was a collaborative efforts with Corizon and our staff.

23          THE COURT:  When was 78 prepared?

24          THE WITNESS:  I'm not sure, Your Honor.  I would

25    imagine this took place sometime last summer.                         03:21PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1          THE COURT:  Thank you.

2          And did Corizon prepare it or did ADOC prepare it?

3          THE WITNESS:  Both.

4          THE COURT:  Okay.  Thank you.

5          But I gather because you don't know when it was          03:21PM

6   prepared you were not involved in the preparation of it.

7          THE WITNESS:  I was aware of it being prepared but I

8   was not personally involved in the preparation of it.

9          THE COURT:  Thank you.

10  BY MR. BOJANOWSKI:          03:21PM

11  Q.  Would you refer to Exhibit 100, please.

12  A.  Okay.

13  Q.  Do you know what this document is?

14  A.  Yes.

15  Q.  What is it?          03:22PM

16  A.  This is a document that -- it shows Corizon's efforts and

17  results on obtaining outside consultants.

18  Q.  Had you worked with Corizon to increase the number of

19  outside consultants available for use?

20  A.  If you mean worked with them, we have demanded of them to          03:22PM

21  increase numbers where they were apparently not adequate.  Yes.

22  Q.  When did you start doing that?

23  A.  That's been an ongoing process for years.

24  Q.  Is there now a different approach to it or is the approach

25  the same?          03:23PM

─────── 3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross ───────

1   A.   To my knowledge, the approach is basically the same.   I

2   have not -- until recently, I had not seen this type of

3   documentation showing me where they were at in the process at

4   each facility, showing me efforts that were going specifically

5   to attract outside consultants.                            03:23PM

6   Q.   What's your understanding at this point what those efforts

7   are?

8   A.   As represented in the spreadsheet.   It tells me places they

9   have gone and are refused to -- you know, folks just are not

10  interested in serving the inmate population or efforts they    03:23PM

11  have got going on right now at different facilities to try to

12  find somebody to deal with consults.

13          THE COURT:   But you said you have just recently seen

14  this kind of document.   So that means in the last month or so?

15          THE WITNESS:   In the last two weeks.                03:24PM

16          THE COURT:   But you have never seen anything like this

17  before.

18          THE WITNESS:   Not laid out like this, no, sir.

19          THE COURT:   Thank you.

20  BY MR. BOJANOWSKI:                                          03:24PM

21  Q.   Have you been provided any kind of information in a status

22  or meeting indicating what efforts were being undertaken?

23  A.   Yes.   These are typically conversations that we have with

24  our bi-weekly one-on-one with the director and Corizon

25  leadership.                                                 03:24PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Q.   Is that one of the issues that is discussed at the

2    bi-weekly meetings is the availability of specialty consult

3    resources and obtaining new ones?

4    A.   Yes.

5    Q.   Can you go to Exhibit 102.                                    03:24PM

6    A.   Okay.

7    Q.   Do you know what that is?

8    A.   Yes.

9    Q.   Did you prepare this document?

10   A.   Yes.                                                          03:25PM

11   Q.   What is it?

12   A.   This is part of my regular CGAR tracking, and it's a

13   spreadsheet that shows overall compliance since March of 2015

14   on the performance measures.

15   Q.   Does this take into account the 849 performance measures    03:25PM

16   system-wide?

17   A.   It does.

18   Q.   And system-wide, in January of 2018, what is the compliance

19   rate by Corizon system-wide of all performance measures?

20   A.   94.11 percent.                                               03:25PM

21   Q.   Is that a good percentage rate?

22   A.   I personally think that's an excellent percentage rate.

23   Not to take away from the fact that there are some performance

24   measures that are still not performing, historically have not

25   performed, overall I think this is -- it says a lot very         03:26PM

1    positive, in particular with the way it's been trending, and to

2    show, you know, almost 95 percent compliance is an excellent

3    score in my opinion.

4    Q.   When you look at this particular document, what was the

5    compliance rate in September 2017?                              03:26PM

6    A.   89.05 percent.

7    Q.   And in October?

8    A.   90.93 percent.

9    Q.   And in November?

10   A.   93.4 percent.                                              03:26PM

11   Q.   And in December?

12   A.   92.93 percent.

13   Q.   So since September of 2017 you have been trending upward on

14   your overall compliance?

15   A.   Yes.  I'm not sure if I actually read those correctly but  03:27PM

16   it has been trending upward.

17          THE COURT:  I gather 91 percent performance measure is

18   little consolation for the inmate who is dead because that

19   individual performance measure that failed him or her was well

20   below the requirement of the stipulation.  Is that fair to say, 03:27PM

21   Mr. Pratt?

22          THE WITNESS:  Your Honor, I'm not sure if that's fair

23   to say.  If there's --

24          THE COURT:  I'm not focused on any of the compliance.

25   I'm just wondering.  You haven't triggered my enforcement       03:27PM

1    mechanism.  So the idea that you overall have done well is what

2    we all expected when we settled the case.  We thought we would

3    be there.  The only ones that are the focus of my order to show

4    cause are the ones where you have abjectly failed to comply.

5    That's fair, isn't it?                                        03:28PM

6             THE WITNESS:  If there was a specific performance

7    measure that failed and that directly resulted in the inmate's

8    death, absolutely, I agree with you.

9             THE COURT:  Thank you, sir.

10            I'm just trying to cut you off, Mr. Bojanowski.      03:28PM

11   That's getting nowhere with me, that overall argument.  That's

12   not what we're here about.

13            MR. BOJANOWSKI:  I understand, Your Honor.  I'm trying

14   to give a --

15            THE COURT:  If the country is doing great overall     03:28PM

16   that's marvelous, I'm happy, but if there are parts of the

17   country where nobody is getting any food or there's no

18   electricity for months and months and months, that's not a

19   great thing for those people in that situation.

20            MR. BOJANOWSKI:  I understand, Your Honor.            03:28PM

21   BY MR. BOJANOWSKI:

22   Q.  Would you look at Exhibit 101?

23   A.  Plaintiffs' exhibit?

24   Q.  Defendants'.

25   A.  On the bottom of the pile.  I've got it.                  03:29PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Q.  And this is the Court's order?

2    A.  Yes.

3    Q.  Do you know what the CGAR compliance rate was for

4    Performance Measure 11 at the Eyman facility in December?

5    A.  I don't have that with me.                                03:29PM

6    Q.  Is there something that would help you?

7    A.  A CGAR spreadsheet, yes.

8           MR. BOJANOWSKI:  May I approach the witness, Your

9    Honor?

10          THE COURT:  You may.                                   03:29PM

11          MR. BOJANOWSKI:  Sorry.  May I approach?

12          THE COURT:  You may.

13   BY MR. BOJANOWSKI

14   Q.  I have given you a document which I hope refreshes your

15   recollection as to the results.  Did you prepare this document?  03:30PM

16   A.  I did.

17   Q.  And so for Performance Measure Number 11 at the Eyman

18   facility, do you know what the December compliance rate was?

19   A.  88 percent.

20   Q.  Is that in compliance?                                    03:30PM

21   A.  Yes.

22   Q.  And how about the Lewis facility?

23   A.  In December?

24   Q.  Yes, sir.

25   A.  94 percent.                                               03:30PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1  Q.  And is that in compliance?

2  A.  Yes.

3  Q.  And how about January?

4  A.  Eyman?

5  Q.  For Eyman.                                          03:30PM

6  A.  Eyman, January, 96 percent.

7  Q.  And for Lewis, January?

8  A.  90 percent.

9  Q.  Performance Measure 35, the one that we just got done

10 talking about, at Eyman for December what was it?       03:31PM

11 A.  74 percent.

12 Q.  And January?

13        MS. KENDRICK:  Objection, Your Honor.  We have not

14 been provided the January CGARs yet so we don't have any way to

15 check the basis of what appears to be a Rule 1006 exhibit.  03:31PM

16        THE COURT:  That seems like a very valid objection.

17        MR. BOJANOWSKI:  I thought our results were already

18 provided to the plaintiffs.

19        THE COURT:  Is that correct or not?  I don't know.

20        MS. KENDRICK:  Ms. Eidenbach is going to check.  I  03:31PM

21 don't have a record of January data.

22        THE COURT:  It may have been reported as part of the

23 OSC component, not of the monthly reporting component.  That's

24 possible.

25        MR. BOJANOWSKI:  It may have been in one of our status  03:32PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

```
 1    reports that we provide monthly to the report.  If there's an
 2    objection to January numbers, I can just work with December
 3    numbers.
 4              THE COURT:  Fair enough.
 5              MR. BOJANOWSKI:  How's that?                          03:32PM
 6              THE COURT:  Thank you.
 7    BY MR. BOJANOWSKI:
 8    Q.  So back to 35 at Eyman for December?
 9    A.  74 percent.
10    Q.  And for Florence?                                          03:32PM
11    A.  86 percent.
12    Q.  Lewis?
13    A.  84 percent.
14    Q.  Tucson?
15    A.  91 percent.                                                03:32PM
16    Q.  Performance Measure Number 39 at Lewis?
17    A.  94 percent.
18    Q.  Performance Measure 44 at Eyman?
19    A.  11 percent.
20    Q.  Performance Measure 46 at Eyman?                           03:32PM
21    A.  84 percent.
22    Q.  Florence?
23    A.  89 percent.
24    Q.  Perryville?
25    A.  89 percent.                                                03:32PM
```

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   Q.   Tucson?

2   A.   91 percent.

3   Q.   Performance Measure 47 at Eyman?

4   A.   54 percent.

5   Q.   Florence?                                              03:33PM

6   A.   96 percent.

7   Q.   Lewis?

8   A.   53 percent.

9   Q.   Phoenix?

10  A.   50 percent.                                            03:33PM

11  Q.   Perryville?

12  A.   100 percent.

13  Q.   Tucson?

14  A.   89 percent.

15  Q.   Performance Measure Number 50 at Florence?            03:33PM

16  A.   60 percent.

17  Q.   51 at Eyman?

18  A.   90 percent.

19  Q.   Florence?

20  A.   80 percent.                                            03:33PM

21  Q.   Tucson?

22  A.   91 percent.

23  Q.   52 at Florence?

24  A.   65 percent.

25  Q.   Performance Measure 54 at Eyman?                      03:33PM

-3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross-

1   A.   60 percent.

2   Q.   And 66 at Florence?

3   A.   90 percent.

4   Q.   Lewis?

5   A.   100 percent.                                          03:34PM

6   Q.   And Tucson?

7   A.   90 percent.

8   Q.   Do you continue to work to get those compliance numbers

9   that we just read that failed increased?

10  A.   Of course.                                           03:34PM

11  Q.   We had some earlier testimony concerning telemedicine.   Are

12  you familiar with telemedicine efforts that are involved here

13  in Arizona with Corizon?

14  A.   Yes.

15  Q.   Can you add anything -- well, you were here to listen to   03:35PM

16  Dr. Robertson's testimony, correct?

17  A.   Correct.

18  Q.   All right.   Have you done anything yourself to assist

19  Corizon with regard to increasing its telemedicine efforts?

20  A.   Not to assist, but to demand that efforts be made to      03:35PM

21  utilize telemedicine to the best extent they can.

22  Q.   Have there been results that are acceptable to you at this

23  point in time?

24  A.   No.

25  Q.   Are you continuing to demand performance of telemedicine?  03:35PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    A.  Yes.

2    Q.  Do you believe that utilizing telemedicine will increase

3    your compliance overall and with regard to the Court's contempt

4    order?

5    A.  Yes.                                                          03:36PM

6    Q.  What is your focus as far as the Court's contempt order is

7    concerned?

8    A.  The focus is to move these performance measures into

9    compliance.

10   Q.  Do you believe you have done everything you can reasonably   03:36PM

11   do at this point to move them into compliance?

12   A.  We have done everything that I feel I'm capable of at this

13   point.  Are there more things that can possibly be done?  Sure.

14   I'm not ruling out anything going forward.  But to this point,

15   I feel that we definitely have been holding Corizon's feet to    03:36PM

16   the fire.

17          MR. BOJANOWSKI:  May I have a moment, Your Honor?

18          THE COURT:  You may.

19          MR. BOJANOWSKI:  No further questions at this time,

20   Your Honor.                                                       03:37PM

21          THE COURT:  Thank you very much.

22          Plaintiffs will now have an opportunity.

23          MR. BOJANOWSKI:  Your Honor, I do want to move for the

24   admission of several exhibits.  I should probably do that

25   before I sit down.                                                03:37PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1            THE COURT:  Surely.  Please.

2            MR. BOJANOWSKI:  If that's okay with defense counsel.

3            THE COURT:  Plaintiffs' counsel.

4            MR. BOJANOWSKI:  Or plaintiffs' counsel.  It's okay

5    with me.                                                        03:37PM

6            THE COURT:  I assumed you would have your stipulation

7    in your pocket, but...

8            MR. BOJANOWSKI:  We would move to admit Exhibit -- do

9    you want to do them one by one or just -- it's 96, 97, 98.

10   Those were letters to Corizon.                                  03:38PM

11           MS. KENDRICK:  We stipulate.

12           MR. FATHI:  98 was actually the director's office --

13           MR. BOJANOWSKI:  I'm sorry.  That was the 361.

14           MS. KENDRICK:  Yes.  No objection.

15           THE COURT:  They will be received.  Thank you.         03:38PM

16   98?  Has that been addressed?

17           MS. KENDRICK:  Yes.

18           THE COURT:  So 98 is received as well.  Thank you.

19           MR. BOJANOWSKI:  Exhibit 6.

20           MS. KENDRICK:  Just one question.  It's four pages and 03:38PM

21   it appears that pages 1 and 2 and pages 3 and 4 are very

22   similar.  It's unclear if these were separate documents or the

23   same thing.

24           No objection.

25           THE COURT:  It will be received.                       03:39PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1          MR. BOJANOWSKI:  Exhibit 103, I think, is

2    conditionally agreed to based upon --

3          THE COURT:  Right.  The previous limitation.

4          MR. BOJANOWSKI:  Right.

5          THE COURT:  And plaintiffs can raise issues with it,          03:39PM

6    but until we hear such issues --

7          MS. KENDRICK:  Defendants' Exhibit 103, our objection

8    to it is it includes information from the January CGARs, which

9    we appear to have not been provided.

10          THE COURT:  Right.  That objection is not one that I          03:39PM

11    previously addressed but I did -- if it wasn't explicit it

12    should have been that I won't consider the January numbers,

13    unless we are assured that you have had a chance to look at

14    them in advance, and it looks to me like you are still looking

15    into that.                                                          03:39PM

16          No, you're not or do you know?  I --

17          MS. KENDRICK:  We could find no record that defendants

18    provided us the January CGARs yet.

19          THE COURT:  Well, then there's two solutions:  One for

20    me not to look at the January numbers or between now and          03:39PM

21    tomorrow morning for you to give the plaintiffs January

22    numbers.

23          MS. KENDRICK:  And the Court.

24          THE COURT:  True enough.  Thank you.

25          MR. BOJANOWSKI:  Exhibit 100.                                 03:40PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1           MS. KENDRICK:  Objection on the basis of hearsay.

2           THE COURT:  Hold it.

3           MS. KENDRICK:  Foundation.

4           THE COURT:  Any response to those objections?

5           MR. BOJANOWSKI:  Your Honor, the witness testified      03:40PM

6    that this is a reflection of the ongoing efforts by Corizon to

7    fill positions.

8           THE COURT:  I was there for the foundation.  The

9    foundation objection is sustained.

10          MR. BOJANOWSKI:  All right.                              03:40PM

11          Exhibit Number 102.  This is a graph that was prepared

12   by the witness.

13          MS. KENDRICK:  Objection on foundation.  And

14   relevance.

15          THE COURT:  The foundation objection is overruled.      03:41PM

16   The relevance objection is overruled.  You heard the Court's

17   comments about it.

18          MR. BOJANOWSKI:  Did I say Exhibit 78?

19          THE COURT:  I don't know.

20          MR. BOJANOWSKI:  I don't believe I did, Exhibit 78,     03:41PM

21   which is the work flow for PM 35.

22          THE COURT:  Is there an objection to 78?

23          MS. KENDRICK:  I think that's another one where we

24   need a more legible --

25          THE COURT:  This is the --                              03:41PM

1          MR. KENDRICK:  Yeah.

2          THE COURT:  That's -- it's legible -- it's illegible

3    to -- you think the print is too small?  I didn't even try to

4    read it.  You're right.  It's illegible.  So other than the

5    legibility, you don't know.  So we'll hold off on that until          03:41PM

6    you provide a more legible copy and then we'll hear from

7    plaintiffs on whether they object.

8          MR. BOJANOWSKI:  We'll include that in --

9          THE COURT:  Okay.

10         MR. BOJANOWSKI:  -- our electronic thing --          03:42PM

11         THE COURT:  Great.

12         MR. BOJANOWSKI:  -- so everybody can blow them up.

13         THE COURT:  We'll hold that one in abeyance.

14         MR. BOJANOWSKI:  41 through 51.  Those are the

15    training postings and training materials.          03:42PM

16         MS. KENDRICK:  I believe we may have previously --

17         THE COURT:  I think those were stipulated.

18         MR. BOJANOWSKI:  Were they?

19         THE COURT:  Yes.

20         MR. BOJANOWSKI:  Okay.  I'm sorry.          03:42PM

21         I believe that's everything.

22         THE COURT:  You can clean it up without prejudice to

23    you raising it first thing in the morning.  If you take a look

24    and see that there were omissions you can raise them again.

25         MR. BOJANOWSKI:  Yes.          03:42PM

1    THE COURT:  Thank you for the efficiency on those.

2              CROSS-EXAMINATION

BY MS. KENDRICK:

4    Q.  How are you, Mr. Pratt?

5    A.  I'm good.                                          03:42PM

6    Q.  Do you need a break?

7    A.  No, I'm good.

8    Q.  So just one thing.  Throughout your testimony you kept

9    talking about an NOC.  Are you -- is that what you use to refer

10   to the order to show cause?                            03:43PM

11   A.  Yes.

12   Q.  You described some bi-weekly meetings that you have with

13   Director Ryan and Corizon.  When did you start having those

14   meetings?

15   A.  Maybe six months ago, possibly longer.             03:43PM

16   Q.  And does Director Ryan always attend them?

17   A.  Yes.

18   Q.  And do you always attend them?

19   A.  Yes.

20   Q.  Assuming you are not sick or --                    03:43PM

21   A.  Correct.

22   Q.  And who from Corizon comes?

23   A.  The VPO, and possibly Lynn Cole, possibly other staff

24   members if necessary.

25   Q.  Who is Lynn Cole?                                  03:43PM

1   A.   Lynn Cole is Mr. Maldonado's assistant.

2   Q.   What is her title?

3   A.   I'm not sure the exact title.

4   Q.   Okay.  At the beginning of your testimony you said

5   something about how you don't hire or fire Corizon staff but          03:44PM

6   you can restrict them from ADC policy.  How many Corizon staff

7   have been restricted from ADC policy?  I mean ADC property.

8   A.   I don't have a number.  I know if there is a suspicion of

9   improper behavior then the staff member will be restricted from

10  coming on site while an investigation takes place.  This can be      03:44PM

11  done either by myself or can be done by the warden at the

12  facility.

13  Q.   How frequently does that happen?  Monthly, every other

14  month?

15  A.   Maybe once or twice a year.                                      03:44PM

16  Q.   And could you look for Defendants' Exhibit 12 over there?

17  A.   Okay.  Yes.

18  Q.   And this is a sanctions letter that ADC sent to the CEO of

19  Corizon on September 23rd, 2015, and it talks about the

20  sanctions from April 1st to June 30, 2015 and it attaches a          03:45PM

21  letter that you sent that I believe we walked through with

22  Mr. Bojanowski.

23  A.   Exhibit 12.

24  Q.   Yes.  Does this look familiar?

25  A.   That's not what I --                                            03:45PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1           MS. KENDRICK:  May I approach?

2           THE COURT:  You may.

3     BY MS. KENDRICK:

4     Q.  Now we've got Defendants' Exhibit 12 or no?

5     A.  Yes.                                                    03:46PM

6     Q.  Excellent.

7     A.  And the question again?  I'm sorry.

8     Q.  This is a letter ADC sent on September 23rd, 2015 about

9     sanctions from April 1st to June 30, 2015?

10    A.  Correct.                                                03:46PM

11    Q.  And attached is a three-page letter that you had sent

12    earlier about detailing the noncompliance?

13    A.  Correct.

14    Q.  Okay.  And would it be fair to say that at the time you

15    sent that letter you were not satisfied with Corizon's       03:47PM

16    performance?

17    A.  Yes.

18    Q.  Can you look for Defendants' Exhibit 18?

19    A.  Okay.

20    Q.  And this is a letter dated June 16, 2016, to Ms. Cindy   03:47PM

21    Black, vice-president of operations, from you?

22    A.  Yes.

23    Q.  And on Page 9 it states that there were 113 items that were

24    noncompliant and but for the cap it would have been $565,000 in

25    fines.  Is that correct?                                    03:47PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    A.   That's correct.

2    Q.   Would it be fair to say that when you sent this letter on

3    June 16th you were not satisfied with Corizon's performance?

4    A.   Of course.

5    Q.   Would you find Defendants' Exhibit 87?                      03:48PM

6    A.   Okay.

7    Q.   And this is another sanctions letter, subject line April

8    2017 contract sanctions, sent on June 14th, 2017 to Rhonda

9    Almanza, vice-president of operations, from yourself?

10   A.   That's correct.                                            03:48PM

11   Q.   And on Page 3 you state that without current contractual

12   limitations the monthly assessment for March 20, 2017 but is

13   that a typo?  Should it have said April?

14   A.   Yes, it should have.

15   Q.   Could have been calculated to be 74 times 5,000 equals      03:49PM

16   $370,000?

17   A.   Correct.

18   Q.   And on Page 1 of this letter in your second paragraph you

19   note that this is the 14th consecutive month that Corizon's

20   lack of compliance with the stipulated agreement has resulted    03:49PM

21   in a $90,000 sanction.

22   A.   That's correct.

23   Q.   Do you remember in June of 2017, June 14, the Court issued

24   it first order to show cause regarding contempt?

25   A.   Not specifically but I'm sure I was here.                   03:49PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Q.  You were here.  And the Court issued it?

2    A.  Yes.

3    Q.  Okay.  I will represent to you that it was on June 14,

4    2017.

5    A.  I will accept that.                                    03:50PM

6    Q.  Would it be fair to say that on June 14, 2017 you were not

7    satisfied with Corizon's performance?

8    A.  Yes.

9    Q.  And clearly you are familiar with the order to show cause

10   from October.                                              03:50PM

11   A.  Yes, ma'am.

12   Q.  And again, would it be fair to say that you were not

13   satisfied with Corizon's performance in October of 2017?

14   A.  With regard to those performance measures, correct.

15   Q.  What about for the performance measures for which they have  03:50PM

16   been found substantially noncompliant but were not part of the

17   order?

18   A.  Agreed.  Not satisfied with those either.

19   Q.  Okay.  Could you turn to Plaintiffs' Exhibit 201?  This is

20   the contract amendment number 10.                          03:50PM

21   A.  Okay.

22   Q.  And this contract at paragraph 1 says that the terms of the

23   contract was extended from March 4, 2016 to March 3rd, 2017,

24   correct?

25   A.  Correct.                                               03:51PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Q.   Could you look at Page 3?

2    A.   Okay.

3    Q.   On paragraph 8.

4    A.   Yes.

5    Q.   And it says that the contract is adjusting the per diem          03:51PM

6    from $11.20 to $11.60 with an estimated annual fiscal impact of

7    $5.2 million.  Correct?

8    A.   Correct.

9    Q.   And at subparagraph B it says that this increase in the per

10   diem rate is retroactive to March 4, 2015?                            03:51PM

11   A.   Yes.

12   Q.   And what is the date of this amendment?

13   A.   May 11, 2015.

14   Q.   Okay.  So ADC agreed to increase what you were paying

15   Corizon even at the same time you were not satisfied with their       03:52PM

16   performance?

17   A.   Yes.

18   Q.   Why?

19   A.   It's the cost of doing business.

20   Q.   Had Corizon threatened to walk away from the contract if         03:52PM

21   they didn't get an increase in the per diem?

22   A.   No.

23   Q.   Could you turn to Plaintiffs' Exhibit 202.

24   A.   Okay.

25   Q.   This is a contract Amendment Number 11 dated June 30, 2016.      03:52PM

—————3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross—————

1    A.  Correct.

2    Q.  And at Paragraph 2 it states that the Department's plan is

3    to increase the inmate health care per diem from $11.60 to

4    $12.06 retroactive to March 4th, 2016, correct?

5    A.  Correct.                                                    03:53PM

6    Q.  And at Paragraph 1 it also states that the contract is now

7    extended from March 2017 to March 2018?

8          Paragraph 3.  I apologize?

9    A.  Yes.

10   Q.  And again ADC agreed to increase what it was paying Corizon  03:53PM

11   at the same time you state that you were not satisfied with

12   their performance?

13   A.  Yes.

14   Q.  And again why this time did you agree to the increase?

15   A.  Again, cost of doing business and --                        03:53PM

16   Q.  And had Corizon threatened to exit the contract if you did

17   not give them this increase?

18   A.  No.

19   Q.  If we can go to Plaintiffs' Exhibit 204.

20   A.  Okay.                                                       03:54PM

21   Q.  And this is Amendment Number 13 dated June 29, 2017.

22   Correct?

23   A.  Correct.

24   Q.  And paragraph 1 extends the term of the contract from March

25   4, 2018 to June 30th, 2018?                                     03:54PM

1   A.  Correct.

2   Q.  And at Paragraph 2 it states that ADC is going to increase

3   the per diem rate from $12.06 to $12.54 retroactive to March

4   4th, 2017?

5   A.  Correct.                                                    03:55PM

6   Q.  And again this was entered into just two weeks after the

7   Court's first contempt order?

8   A.  Correct.

9   Q.  When you testified you were not satisfied with their

10  performance?                                                   03:55PM

11  A.  Correct.

12  Q.  So Corizon started, if you look at these, getting paid

13  $11.20 per day per prisoner, correct?

14  A.  Yes.

15  Q.  And then in March 2015 it went to $11.60 per day?          03:55PM

16  A.  I believe so, yes.

17  Q.  And then March 2015 it went to 11.60 and then March 2016 it

18  went to 12.06?

19  A.  Yes.

20  Q.  And March 2017 it went to 12.54?                           03:55PM

21  A.  Yes.

22  Q.  So that's three separate raises in three years?

23  A.  Yes.

24  Q.  Are there any plans to increase the per diem as to March

25  2018?                                                          03:56PM

1   A.   No.

2   Q.   And so the difference between $12.54 and $11.20 is $1.34,

3   correct?

4   A.   Okay.  I will accept that.

5   Q.   If you want to do the math...                                03:56PM

6         But that is 12 percent of the original $11.20?  I will

7   represent that to you.

8   A.   Okay.

9   Q.   Do you think that Corizon's performance in the past three

10  years deserved a 12 percent raise over that time?                03:56PM

11  A.   I can't comment specifically as to whether or not what type

12  of an increase is deserved based strictly on performance.  I

13  know there's costs associated with providing care and costs

14  associated with providing staffing that we require, and that's

15  the reason for some of these increases.                          03:56PM

16  Q.   Okay.  So what was the increase in staffing for Amendment

17  13?  Does it indicate the change?

18  A.   Which exhibit is 13?

19  Q.   Exhibit 204.

20  A.   There was no staff attached to that one.                    03:57PM

21  Q.   Okay.  So there's no indication from looking at the

22  amendment to the contract that this money was actually supposed

23  to go to hire more staff?

24  A.   Not this one, no.

25  Q.   And you said you had no comment about whether the 12         03:57PM

1   percent was deserved, but you are under oath and so what is

2   your opinion of giving them a 12 percent raise over three years

3   if you are not satisfied with their performance?

4           MR. BOJANOWSKI:  Note an objection.

5           THE COURT:  I'm sorry.  What's the objection?                03:58PM

6           MR. BOJANOWSKI:  Relevance.  His opinion as to whether

7   they deserve a raise or not.  He testified that these increases

8   resulted from staff increases and cost of doing business

9   increases, so his opinion as to whether they deserved to be

10  compensated for costs of doing business I don't think is        03:58PM

11  relevant to the proceeding at all as to compliance with the

12  Court's order.

13          THE COURT:  Thank you.  Overruled.

14  BY MS. KENDRICK:

15  Q.  You can answer.                                             03:58PM

16  A.  So the question is do I personally feel that they should

17  get an increase?

18  Q.  Correct.

19  A.  Yes.  There's reasons that they should receive an increase,

20  and again, those have to do with costs of doing business, which 03:58PM

21  may be regardless of performance.

22  Q.  But we just noted that the increase is not stated that it

23  has to go for any given purpose, correct?

24  A.  That's correct.

25  Q.  So you don't know that it's actually going to the cost of   03:59PM

1    doing business.  That's just your assumption?

2    A.   That's my assumption, yes.

3    Q.   Could you look to Defendants' Exhibit 103.  This is the

4    sanctions -- defendants' exhibit, sanctions tracking.

5    A.   This one --                                                  03:59PM

6            MS. KENDRICK:   May I approach?

7            THE COURT:   You may.

8    BY MS. KENDRICK:

9    Q.   So if you go to Page 2 on the chart, it shows that the

10   sanctions that were assessed for physical years 2014 to 2017     04:00PM

11   were $2,000,071?

12   A.   2,071,000.

13   Q.   Thank you.

14           For fiscal year 2018 to date 945,000?

15   A.   Correct.                                                     04:00PM

16   Q.   And you said you maintained this chart so you had a total

17   of 3,016,000 --

18   A.   Yes.

19   Q.   -- in sanctions over the four years?

20   A.   Through January of 18.                                       04:00PM

21   Q.   Okay.

22           And can you turn to Page 3, which is labeled FY 2018

23   incentives?

24   A.   Yes.

25   Q.   And how much has ADC paid in bonuses and incentives in the   04:01PM

1  first four months of these new incentives?

2  A.  2,550,000.

3  Q.  So the net difference between the 3 million in sanctions

4  over four years and the 2.5 million paid in bonuses in four

5  months -- I will represent to you I did the math -- is a net          04:01PM

6  charge or sanction of $466,000?

7  A.  Yes.

8  Q.  And how many prisoners are there approximately in custody?

9  A.  35,000.

10  Q.  35,000.  So you would multiply that times the $12.54 to        04:01PM

11  figure out what would be charged for one day of health care?

12  A.  Correct.

13  Q.  Are you aware that $12.54 times 35,000 is about $450,000?

14  A.  Again, I will take your word for it.

15  Q.  So the total amount in sanctions over the four years has       04:02PM

16  worked out to be the equivalent of what Corizon grosses in one

17  day?

18  A.  If that's the math, yes.

19  Q.  Okay.

20          And could you turn to Exhibit 205?  It's Amendment 14.      04:03PM

21  A.  Okay.

22  Q.  And at Paragraph 2 it refers to the fact that Corizon is

23  eligible for a 100,000-per-month incentive from October 1st to

24  June 30, 2018 for each month at or above 90 percent statewide

25  compliance rate?                                                    04:03PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    A.   Yes.

2    Q.   So on what was marked as Defendants' Exhibit 103, Page 3,

3    this incentive-tracking chart that you made?

4    A.   Yes.

5    Q.   Is that the third column where it says overall score                    04:04PM

6    incentive?

7    A.   Yes.

8    Q.   How come it changed to 250,000 in November from 100,000

9    bonus in October?

10   A.   The rates for each percentage above 90 percent for October             04:04PM

11   and November were 75,000.  The rate changed in December through

12   February to be 100,000.

13   Q.   Oh.  So you are referring to Paragraph 3 of the amendment

14   that refers to the supplemental statewide compliance rate

15   initiative?                                                                 04:05PM

16   A.   Correct.

17   Q.   And in that one, according to this chart, for each full

18   percentage point above 90 percent statewide compliance rate in

19   October and November they could get $75,000 for each percentage

20   point, December 1 to February 28 100,000, and March 1 to June              04:05PM

21   30, 125,000?

22   A.   Correct.

23   Q.   So that's the third column here?  Is that what that's

24   referring to?

25   A.   Yes.  The overall score is, again, for instance, for                   04:05PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    October of '17, 90.93 percent was achieved.  That earned

2    $100,000.  November, 92.34 percent, so that was $100,000, plus

3    $150,000 for the additional 91 and 92 percent thresholds.

4    Q.  And you calculate this by averaging all 849 performance

5    measures across the state to get this overall statewide          04:06PM

6    number?

7    A.  No, it wasn't an average.  It was the actual performance

8    measures achieved.

9    Q.  So what defendants marked as Exhibit 102, this thing title

10   CGAR results summary, I think you testified that you created     04:06PM

11   this chart?

12   A.  Yes.  It was created by one of my staff.

13   Q.  Okay.  So is it averaging the CGAR scores or what is this a

14   percentage of?

15   A.  That is a percentage of the 849 performance measures that    04:06PM

16   achieved the threshold required for compliance.

17   Q.  Okay.

18   A.  So, for instance, the last column on the right shows that

19   94.1 percent of the 849 were in compliance.

20   Q.  And do you count N/As as 100 percent when making this        04:07PM

21   chart?

22   A.  No.

23   Q.  And does this include results that have been calculated

24   with methodologies that the Court has ruled invalid?

25   A.  Yes.                                                         04:07PM

1   Q.  And you testified in May 2017 that no measures have been

2   recalculated pursuant to the Court's orders or the agreements

3   other than some mental health measures at Winslow?

4   A.  My understanding, yes.

5   Q.  To your knowledge, have any of the performance measures          04:07PM

6   been retroactively recalculated in accordance with the Court's

7   order since you testified in May 2017?

8   A.  No.

9   Q.  And then back to Exhibit 205, Amendment 14.

10  A.  Yes.                                                             04:08PM

11  Q.  On Page 2 of Paragraph 4 there's another type of incentive

12  for Corizon, and it's called a CGAR compliance incentive?

13  A.  Compliance improvement incentive.

14  Q.  And how do you determine that a performance measure that

15  was noncompliant is now compliant?                                  04:08PM

16  A.  Based on the rules of the stipulation.  If a performance

17  measure in the last rolling 24 months had missed more than six,

18  or three in the last 18 months, that is technically out of

19  compliance per my measurements and then any that are brought

20  back into compliance after being out of compliance for that         04:08PM

21  rolling 24-month period going forward would have earned the

22  incentive of $35,000.

23  Q.  Are you aware that the Court recently issued an order

24  clarifying the definitions of compliance and noncompliance

25  after the parties submitted a joint request for clarification?      04:09PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    A.  Yes.

2    Q.  So are you using the Court's current order to calculate

3    this or are you using the language of the stipulation?

4    A.  I'm using the language of the stipulation, which is more

5    than six, or three in the last 18 months.                    04:09PM

6    Q.  Okay.

7           Then continuing on Amendment 14 at Paragraph 6, it

8    states that the maximum amount of incentives shall not

9    cumulatively exceed $3.5 million?

10   A.  Yes.                                                      04:09PM

11   Q.  And you have already paid more than $2.5 million in

12   incentives in the first four months?

13   A.  Yes.

14   Q.  Do you anticipate maxing out the 3.5 million in the next

15   few months?                                                  04:10PM

16   A.  I do.

17   Q.  So what is going to be the carrot for Corizon once the 3.5

18   million is paid?

19           You testified earlier that this shows that the

20   amendment was the carrot and the stick?                      04:10PM

21   A.  Yes.

22   Q.  So the carrot will be completely consumed within a couple

23   months when you hit the 3.5 million.  So how are you going to

24   incentivize Corizon to comply with the contract?

25   A.  I don't feel any further incentive is necessary at this   04:10PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    point.

2            THE COURT:  Why is that?  Because if the bunny has

3    eaten the carrot and knows there's no more carrot coming the

4    bunny is not going to hop to the carrot.  So I'm sort of having

5    trouble with the logic there.  You want to have the carrot       04:10PM

6    always there, don't you?

7            THE WITNESS:  Not necessarily, Your Honor, because

8    there are limitations on that carrot.  The budget is not -- we

9    came up with what we felt was adequate and appropriate, which

10   was 3.5 out of our budget.  We have to go to the legislature     04:11PM

11   again for any additional carrots that we feel would be

12   appropriate, and honestly, the continuing contract to me is

13   that carrot.

14           THE COURT:  So if you could think about it, though,

15   and you say, just for sake of simplification, we can only        04:11PM

16   afford a hundred dollar carrot and if we feed the hundred

17   dollar carrot to the bunny the bunny is not going to be

18   potentially incentivized anymore, but if we say in the contract

19   we will only have a hundred dollar carrot but we can only

20   allocate that carrot on a more restrictive basis, for instance,  04:11PM

21   divided over time, the most we can possibly give you is this

22   carrot so we hold in reserve some amount of carrot.  In

23   retrospect, could that have been a way you could have dealt

24   with that to preserve the bunny's carrot?

25           THE WITNESS:  Yes, Your Honor.  Quite possibly, yes.     04:12PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1  BY MS. KENDRICK:

2  Q.  Does Amendment 14 say these three types of incentives that

3  are spelled out at Paragraphs 2, 3, and 4 need to be earmarked

4  or allocated for something specific?

5  A.  I'm not sure I understand the question.                    04:12PM

6  Q.  So this bonus money that you are giving to Corizon, does it

7  say anywhere that they need to use this bonus money for

8  anything specific?

9  A.  No, it does not.

10 Q.  So, for example, it doesn't say that they need to hire more  04:12PM

11 doctors with this bonus money?

12 A.  Correct.

13 Q.  Or psychiatrists?

14 A.  Correct.

15 Q.  Or increase the number of prisoners treated for hepatitis    04:12PM

16 C?

17 A.  Correct.

18 Q.  Or pay for specialty care?

19 A.  As I stated, there's no requirements associated with this.

20 Q.  Could you flip back to Exhibit 201, which is Amendment       04:12PM

21 Number 10.

22 A.  Okay.

23 Q.  If you could, go to Page 3 in Paragraph 6.

24 A.  Yes.

25 Q.  And the last sentence says, quote, the total cumulative      04:13PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    sanctions in any month shall not exceed $90,000, close quote?

2    A.   Yes.

3    Q.   This is the cap we've been talking about a lot?

4    A.   Pardon?

5    Q.   This is the cap that we've been discussing a lot?          04:13PM

6    A.   Yes, ma'am.

7    Q.   Why did ADC agree to this cap?

8    A.   There's no simple answer for that.  There would have to be

9    limitations on what sanctions can be applied and we felt this

10   was reasonable at that time.                                    04:13PM

11   Q.   But prior to this amendment you had the system where it was

12   quarterly and it was $3,500, right, for the sanctions?

13   A.   Yes.

14   Q.   And there was no cap at that time, correct?

15   A.   Correct.                                                   04:14PM

16   Q.   So why did ADC agree to a cap if there had not been one

17   before?

18   A.   It was a business decision by the Department.

19   Q.   Was that decision made by you?

20   A.   I was part of that decision, yes.                          04:14PM

21   Q.   And why did you make that decision?

22   A.   It was felt that that was an appropriate business decision.

23   Q.   On what basis?

24   A.   I can't answer that.

25   Q.   Well, what does appropriate business decision mean?        04:14PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   A.  In my mind, this was reasonable.

2   Q.  You thought it was reasonable to charge $90,000 a month

3   maximum for noncompliance even if they were noncompliant with

4   849 of the 849 measures?

5   A.  That was my response.  Yes.                                    04:15PM

6   Q.  Okay.  In the grand scheme of how much the State pays

7   Corizon, do you think $90,000 a month is going to hurt them

8   financially?

9   A.  You are asking for a personal opinion?

10  Q.  Yeah.                                                          04:15PM

11  A.  It's a small percentage.

12  Q.  Who made the final decision on this cap?  Was it you or

13  Director Ryan?

14  A.  The final decision would be Director Ryan.

15  Q.  And you provided input about this cap, I believe you just    04:15PM

16  said?

17  A.  I did.

18  Q.  And did you recommend the cap or did you oppose the cap?

19  A.  There were conversations about the cap, pros and cons, and

20  ultimately I agreed to accept this.                               04:15PM

21  Q.  Could you turn to what's been marked as Plaintiffs' Exhibit

22  206, I believe.  It might be behind you.

23          MR. BOJANOWSKI:  Corene, what was the exhibit number?

24          MS. KENDRICK:  206.

25          May I approach, Your Honor?                               04:16PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1          THE COURT:  You may.

2          MS. KENDRICK:  It's a brand new binder.

3          THE COURT:  Thank you.

4          This one here.  Thank you very much.

5          MS. KENDRICK:  Does Your Honor have it?          04:16PM

6          THE COURT:  Yes, I do.  Thank you.  I'm sorry.

7   BY MS. KENDRICK:

8   Q.   This is an e-mail dated October 11, 2017 from Mr. Struck to

9   Sarah Selzer and many other people?

10  A.   Yes.          04:17PM

11  Q.   Could you read what the e-mail says?

12  A.   Sarah, at the hearing in September Judge Duncan wanted to

13  know the effect of the $90,000 sanctions cap had on the amount

14  of sanctions that could have been imposed on Corizon had there

15  been no cap in place in the contract.  From March 2016 when the          04:17PM

16  $90,000 cap was put in place to June 2017 Corizon paid a total

17  of 1,440,000 in sanctions for not meeting performance measure

18  thresholds.  If no cap had been in place, the amount of

19  sanctions would have been 7,350,000, a difference of 5,910,000.

20  Q.   Thank you.          04:17PM

21          Could you look at Defendants' Exhibit 193?  It's one

22  of the sanction letters.

23  A.   Okay.

24  Q.   So this is a letter dated September 18, 2017 addressed to

25  Mr. Maldonado regarding July 2017 contract sanctions?          04:18PM

———3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross———

1    A.   Yes.

2    Q.   And in the second paragraph, you note that this is the 17th

3    consecutive month that Corizon's lack of compliance with the

4    stipulated agreement has resulted in the $90,000 sanction?

5    A.   Yes.                                                      04:18PM

6    Q.   And then on Page 3 -- well, Page 2, there's one of your

7    charts that shows 68 performance measures and then on Page 3 it

8    says 68 times 5,000 equals $340,000, correct?

9    A.   Correct.

10   Q.   And the sentence here says the monthly assessment for May   04:19PM

11   2017.  Is that a typo?  Because this is referring to July.

12   A.   Yes.

13   Q.   Okay.

14        I want you to take a look at another sanctions letter.

15   It's Defendants' Exhibit 30.                                  04:19PM

16        THE COURT:  That's the second such typo that we have

17   seen.  Is that because what's happening in the word processing

18   world is you are using a previous month and so you're just not

19   catching that?

20        THE WITNESS:  That's my mistake, Your Honor, and yes,    04:19PM

21   it is a boilerplate that I have to fill in each month.  Yes.

22        30?

23   BY MS. KENDRICK:

24   Q.   Yes.

25   A.   Okay.                                                    04:19PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Q.  And this is an October 18, 2017 letter sent to

2    vice-president of operations Roland Maldonado regarding August

3    2017 sanctions?

4    A.  Yes.

5    Q.  And you noted that in the second paragraph this is the 18th   04:20PM

6    consecutive month that lack of compliance resulted in a $90,000

7    sanction?

8    A.  Yes.

9    Q.  And on Page 3 the underlined text, Paragraph 2, you noted

10   that without the contractual limitations the assessment would   04:20PM

11   have been 71 times $5,000 equals $355,000?

12   A.  Yes.

13   Q.  Could you turn to Defendants' Exhibit 35, which is another

14   sanctions letter.

15   A.  Okay.   04:20PM

16   Q.  And this is a letter dated November 22, 2017 addressed to

17   Mr. Maldonado regarding September 2017 contract sanctions?

18   A.  Yes.

19   Q.  And in the second paragraph you note this is the 19th

20   consecutive month that there's been a $90,000 sanction?   04:21PM

21   A.  Yes.

22   Q.  And on Page 3, the underlying text, you note that without

23   the current contractual limitations the monthly assessment for

24   September 2017 could have been 64 times $5,000, which equals

25   $320,000, correct?   04:21PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   A.   Correct.

2   Q.   And can you turn to Defendants' Exhibit 36, please.

3   A.   Okay.

4   Q.   And this is dated December 15 of 2015, again addressed to

5   Mr. Maldonado, October 2017 contract sanctions?                    04:22PM

6   A.   Yes.

7   Q.   And the second paragraph notes this is the 20th consecutive

8   month that lack of compliance resulted in a $90,000 sanction?

9   A.   Correct.

10  Q.   And if you turn to Page 3 in the underlying text, it notes   04:22PM

11  that without the contractual limitations the fine could have

12  been calculated to be 49 times 5,000 equals 245,000?

13  A.   Correct.

14  Q.   So if we add up July of 340,000, August of 355,000,

15  September of 320,000 and October of 245,000, that's another      04:22PM

16  $1,260,000 in those four months they could have been sanctioned

17  but for the cap?

18  A.   I'll take your word for it.

19  Q.   But each month they were only charged $90,000, is that

20  correct?                                                         04:23PM

21  A.   That's correct.

22  Q.   Or $360,000 for the four months?

23       90 times 4 is 360?

24  A.   Yes.

25  Q.   Okay.                                                       04:23PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1           So Mr. Struck's e-mail that we looked at earlier

2    reported that it was 7,350,000 through June of 2017 and then we

3    have four more months here where it's 1,260,000.  So we're

4    getting to $8,610,000.

5           I represent that you to but if you want to do the math    04:23PM

6    that's fine?

7    A.  I will accept your math.

8    Q.  But 20 months at 90,000 is $1.8 million?

9    A.  Correct.

10   Q.  So that's roughly $6.8 million that ADC left on the table    04:24PM

11   with Corizon?

12   A.  Left on the table.

13   Q.  That's taxpayer money that was foregone that was not offset

14   that Corizon kept because of this cap?

15   A.  That's money that was not offset.  that's correct.           04:24PM

16   Q.  Are you aware of any efforts by ADC or the State of Arizona

17   to claw back the $6.8 million?

18           MR. BOJANOWSKI:  Note an objection.

19           THE COURT:  What's the objection?  I'm sorry.

20           MR. BOJANOWSKI:  Its relevance.  There was never any      04:24PM

21   testimony about a clawback.

22           THE COURT:  Overruled.

23           THE WITNESS:  What do you mean clawback?

24           THE COURT:  We all know the contract doesn't have a

25   provision for that.                                              04:24PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1      MS. KENDRICK:  I don't know actually if the contract

2  has a provision for clawback.

3      THE COURT:  We know there's a limitation.  The

4  contract has a limitation and they acted in compliance with the

5  limitation.  Isn't that what we all heard, Ms. Kendrick?  What      04:25PM

6  I have just said is true?  So the idea there would be a

7  clawback would be extracontractual.  So again, I think it's a

8  little bit of a posturing question.

9      MR. KENDRICK:  Okay.

10  BY MR. KENDRICK:                                                    04:25PM

11  Q.  When the cap was lifted, in Amendment 14, was that at the

12  behest of the governor's office or was that ADC's decision to

13  do that?

14  A.  ADC's decision.

15  Q.  Is there any reason why the cap couldn't have been lifted      04:25PM

16  18 months earlier?

17  A.  The contract had been set up.

18  Q.  Between the time that Amendment 10 set the cap and you kept

19  sending these letters every month saying this is the 12th

20  month, the 13th month, were there any discussions about lifting   04:25PM

21  the cap?

22  A.  Not at that time.  No.  It was based on the contract in

23  place that was enforced at that time, and we would have had to

24  go in and renegotiate a new contract.

25  Q.  Would you look at Amendment 10 again, Exhibit 201.             04:26PM

1    A.   Okay.

2    Q.   And on the second page, the second paragraph, that starts

3    with -- that says, "In addition, Corizon agrees to indemnify

4    ADC for claims asserted under Paragraphs 30 and 31 under the

5    stipulated agreement in Parsons v. Ryan"?                    04:26PM

6    A.   Yes.

7    Q.   Is that what you and Director Ryan are citing to in those

8    letters saying that the State was going to seek money from

9    Corizon to pay any contempt fines?

10   A.   I'm not an attorney but that's my understanding, yes.    04:27PM

11   Q.   Okay.  And if you go down five lines, it states, "ADC

12   intends to utilize the resources of the Arizona Attorney

13   General's Office, parens, AG, close parens, to work

14   collaboratively with Corizon in responding to any claims of

15   substantial noncompliance with Paragraph 30 of the stipulation  04:27PM

16   and Corizon will not be responsible for indemnifying ADC for

17   work performed by the AG.  The parties agree that Corizon will

18   only be responsible for any and all costs and attorney's fees

19   incurred by ADC in defending claims in front of the District

20   Judge pursuant to the last sentence of Paragraph 13 of the     04:27PM

21   stipulation involving substantial noncompliance with the health

22   care performance measures that arise from Corizon's acts or

23   omissions during the time period July 15 through contract

24   termination."

25          So does this mean that Corizon reimburses ADC for the   04:28PM

1    money paid to Mr. Struck's firm?

2              MR. BOJANOWSKI:  Foundation and relevance.

3              THE COURT:  The foundation objection is sustained.

4    You need to try to see if you can lay a foundation for this

5    witness.                                                          04:28PM

6    BY MR. KENDRICK:

7    Q.  Do you know if ADC and the State of Arizona pays for the

8    money from Mr. Struck's firm or is it Corizon that reimburses?

9              MR. BOJANOWSKI:  Same objection.

10             THE COURT:  Overruled.                                  04:28PM

11             THE WITNESS:  My understanding is it's Corizon that

12   pays for that.  And just to -- I don't want to correct you but

13   you said Paragraph 13.  It's Paragraph 31.

14   BY MS. KENDRICK:

15   Q.  Oh.  Thank you.                                               04:29PM

16             And do you know does Corizon reimburse ADC for the

17   $250,000 a year in monitoring fees that the Department pays to

18   plaintiffs' counsel?

19   A.  Not to my knowledge, no.

20   Q.  And if the Court awards additional fees to plaintiffs'        04:29PM

21   counsel will Corizon reimburse ADC that money?

22             MR. BOJANOWSKI:  Foundation.  Relevance.

23             THE COURT:  Sustained.

24   BY MS. KENDRICK:

25   Q.  Do you know if they will?                                     04:29PM

1   A.   I don't know.

2   Q.   Okay.  Could you turn to Defendants' Exhibit 31, please?

3   A.   Okay.

4   Q.   And this is the letter that you and Mr. Ryan send to

5   Corizon on October 25, 2017?                                    04:29PM

6   A.   Yes.

7   Q.   Why is the letter addressed to the Board of Directors of

8   Corizon instead of their CEO?

9   A.   This was a board that was acting -- the CEO was no longer

10  with them and this was the parties that were acting in his      04:30PM

11  place.

12  Q.   Okay.  And I believe earlier on Page 4, the last two

13  sentences, you read into the record about whether that if the

14  Court ultimately imposes sanctions against defendants Corizon

15  will be responsible for the penalties.  Are you aware that      04:30PM

16  Director Ryan recently testified at a legislative budget

17  committee saying he expects Corizon to pay the fees?

18          MR. BOJANOWSKI:  Objection.  Foundation.  Relevance.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes.                                      04:30PM

21  BY MS. KENDRICK:

22  Q.   Has Corizon to date refused to agree to pay any

23  court-ordered fines for contempt?

24  A.   Not to my knowledge.

25  Q.   They have agreed to pay it?                                04:31PM

1   A.   I don't know that there's been agreement or disagreement.

2   Q.   And then on Page 2 of your letter, the first large

3   paragraph, the third sentence, you state that we demand that

4   Corizon immediately take all reasonable steps to comply with

5   the order to show cause?                                          04:31PM

6   A.   Yes.

7   Q.   And you demanded that they fly in health care staff from

8   out of state to fill these vacant positions?

9   A.   Yes.

10  Q.  So you felt that additional staff were needed to          04:31PM

11  substantially comply with the Court's order?

12  A.   It was felt that additional staff were required to fill a

13  current gap, yes.

14  Q.   To comply with the Court's order?

15  A.   Yes.                                                        04:31PM

16  Q.   What types of positions were most lacking?

17  A.   That could have been any and all positions.  It could have

18  been nurses, providers, psychiatrists, anybody.

19  Q.   Were there specific institutions that were lacking?

20  A.   It varies month to month as to which facilities are        04:32PM

21  lacking.  Yes.

22  Q.   After you sent this letter did Corizon fly in staff from

23  other parts of the country?

24  A.   Corizon did bring in staff from other parts of the country.

25  Q.   How many?                                                   04:32PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   A.  I don't know.  I don't have a specific answer to that.  I

2   know they did bring in staff from outside or from their

3   regional offices or central offices to assist.

4   Q.  Do you know what type of staff?  Doctors, nurses,

5   psychiatrists?                                              04:32PM

6   A.  I'm aware specifically of a contingency of nurses, but

7   other than that I can't tell you specifically.

8   Q.  How many nurses, approximately, can you estimate were

9   brought in?

10  A.  It would be a pure guess and I would probably say a dozen.  04:33PM

11  Q.  Do you remember roughly when they arrived?

12  A.  No, not specifically.  I'm sorry.

13  Q.  Do you remember any other category, like nurse

14  practitioners or physicians, anything like that?

15  A.  From time to time there will be physicians that may come in  04:33PM

16  to assist.

17  Q.  Did you demand that they provide you updates on the staff

18  that they were flying in?

19  A.  We got updates again in our bi-weekly meetings with

20  Director Ryan.                                              04:33PM

21  Q.  So you were given some sort of written report or oral

22  statement saying this week we brought X numbers of nurses or

23  doctors?

24  A.  Typically, oral statement, yes.

25  Q.  Did you take notes of this or in any other way track?     04:34PM

1    A.   There's no meetings for these -- no minutes for these

2    meetings and I may have taken some notes here or there but

3    nothing that I retained specifically for that purpose.

4    Q.   This was pretty critical, right?  This request in getting

5    more staff in, it was critical?                                    04:34PM

6    A.   Yes.

7    Q.   Yeah.  Okay.  But you didn't keep a record of who and when

8    they were coming in?

9    A.   No.  Again, in conversation, this is an ongoing thing and

10   it may take place at more than the director's meeting,            04:34PM

11   actually.  We would have meetings and conversations all the

12   time on this.

13   Q.   Okay.

14        And the other step that you specifically asked that

15   they take is something that was called a real-time monitoring     04:34PM

16   data program?

17   A.   Yes.

18   Q.   And what was this designed to accomplish?

19   A.   To give more immediate feedback on performance measures

20   that were not up to speed and to see if we could get a quicker    04:35PM

21   handle on the fail points and hopefully get things addressed

22   before the -- before midnight on the day of issues that came

23   up.

24   Q.   And the last two sentences of the paragraph on the bottom

25   of Page 2 states that the very next day after a meeting with      04:35PM

1    Mr. Maldonado, quote, Mr. Maldonado informed us on October 20,

2    2017 that Corizon will not implement any daily real-time

3    monitoring data program.  This is unacceptable and contrary to

4    a multitude of promises and other representations that Corizon

5    has made to ADC and the State of Arizona over many years.          04:35PM

6            What were those promises you were referring to?

7    A.  My interpretation was that we would have actual real-time

8    reports that we would be using for our ability to track on a

9    daily basis, and Mr. Maldonado's interpretation of that was

10   that they would be utilizing real-time information as part of    04:36PM

11   their process in trying to find fail points.

12   Q.  And who made these past promises?  It says these promises

13   and other representations that Corizon has made, but who

14   specifically do you remember?

15   A.  Mr. Maldonado.                                                04:36PM

16   Q.  You say over many years.  So were there other people before

17   Mr. Maldonado?

18   A.  We did not talk about real-time reporting over years.  This

19   was a recent --

20   Q.  I'm just reading what you wrote on the letter.               04:36PM

21   A.  I'm telling you this was a recent concern and the real-time

22   reporting was fairly fresh at that point.

23   Q.  Okay.  Did they implement the real-time reporting program?

24   A.  Yes.  They started implementing real-time reports for

25   several performance measures and they put a lot of them into a    04:37PM

 1   developmental process trying to come up with satisfactory

 2   reports to meet the demand.

 3   Q.  And when did they do this?

 4   A.  This started late in the fall.

 5            MS. KENDRICK:  Excuse me for a minute.                    04:37PM

 6            May I approach, Your Honor?

 7            THE COURT:  Yes, you may.

 8            MS. KENDRICK:  Your Honor, I'm showing the witness

 9   what was filed at Docket 2704.  Unfortunately, I only have two

10   copies of it.                                                     04:38PM

11            THE COURT:  That's all right.

12            MS. KENDRICK:  If you can pull it up --

13            THE COURT:  Yes.

14            Thank you.

15   BY MS. KENDRICK:                                                  04:38PM

16   Q.  Could you turn to what is labeled at the top as Page 3 of

17   18?

18   A.  Yes.

19   Q.  And do you see at the bottom of the page around line 24

20   where there's a header number B?                                 04:38PM

21   A.  Yes.

22   Q.  What does the first sentence say after header number B?

23   A.  Defendants cannot provide true, automated, accurate

24   real-time reporting data within the deadlines imposed by the

25   Court.                                                           04:38PM

1    Q.  And what does the first sentence say?

2    A.  Automated true, quote, real time, end quote, reporting data

3    is not feasible under the current Health Services contract

4    structure and stipulation.

5    Q.  So why did you say that they have implemented real-time          04:39PM

6    monitoring programs when your counsel is telling the Court the

7    opposite?

8    A.  For some performance measures they were able to come up

9    with this information.

10   Q.  Which performance measures?                                      04:39PM

11   A.  I don't know specifically.

12   Q.  This is pretty important, right?

13   A.  Yes.

14   Q.  Are you requesting updates as to which performance measures

15   they are tracking?                                                   04:39PM

16   A.  Yes, we did.

17   Q.  So you just don't remember?

18   A.  Not off the top of my head, no.

19   Q.  Do you have it written down somewhere which performance

20   measures it would be?                                                04:39PM

21   A.  It may be in documentation I have got somewhere, but again,

22   this was an ongoing process.

23   Q.  And could you turn to Page 14?

24   A.  Okay.

25   Q.  Actually, it's Page 15.  It's underneath the big chart.         04:40PM

1    A.   I'm there.

2    Q.   Yeah.   What does the first text say underneath that chart?

3    A.   These instances were not identified by HSCMB during its

4    monitoring of the performance measures subject to the OSC as

5    HSCMB does not review every eligible file for every performance      04:40PM

6    measure but performs a spot check by auditing randomly selected

7    files for each performance measure pursuant to the procedures

8    outlined in the HSCMB, blank.

9    Q.   But hadn't the Court's order to show cause required

10   defendants to report every instance of noncompliance?                04:40PM

11   A.   Yes.

12   Q.   So more than a spot check would be necessary to ensure the

13   accuracy of the information provided to the Court in response

14   to the OSC?

15   A.   If we can provide that information, absolutely.                  04:41PM

16   Q.   But only a spot check was done, according to that?

17           MR. BOJANOWSKI:   Note an objection, Your Honor.   I

18   think that -- do you have the rest of this document, Corene?

19   Does it go for -- this is Page 15 of 18.   Do you have 16, 17,

20   18?                                                                   04:41PM

21           MS. KENDRICK:   I printed it out at the hotel, so...

22           THE COURT:   What's your objection?

23           MR. BOJANOWSKI:   The provision you are asking him to

24   comment on is not complete and I don't have it.

25           THE COURT:   The objection is overruled.                     04:41PM

1        THE WITNESS:  What you are telling me, Ms. Kendrick,

2    is that these items that were listed, specifically Performance

3    Measure 46 at Eyman, Florence, 39 at Lewis, 46 at Tucson, and

4    51 at Tucson, were not showing in the real-time reporting, and

5    I can't --                                                       04:42PM

6        MS. KENDRICK:  I'm showing the --

7        THE COURT:  Let's pause for a moment so counsel can

8    try to see if we can make an efficient step here.

9        Go ahead.  Take your time.

10       Thank you, Mr. Pratt.                                        04:42PM

11       THE WITNESS:  Sure.

12       MR. BOJANOWSKI:  Your Honor, I think that this witness

13   is entitled to read the entire document as well as the

14   attachments in order to answer counsel's question, because

15   it's -- there's a context to it and I'm -- I think in fairness  04:43PM

16   to the witness he should have the document in front of him so

17   he can analyze it and then respond.

18       THE COURT:  You may approach, yes.  Looks like that's

19   happening.

20       MS. KENDRICK:  I printed out --                             04:43PM

21       THE COURT:  What Ms. Kendrick just said is something

22   about she printed it up at the hotel so she's now providing it

23   to the witness so he has the complete document.  Is that what

24   you are saying?

25       MR. BOJANOWSKI:  It does not have the declarations and     04:43PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    attachments, though.

2            THE COURT:  We can ask the witness whether it's a

3    document he's familiar with.

4            Are you thinking, Ms. Kendrick, that Mr. Pratt has

5    already seen this document before or no?                    04:44PM

6            MR. BOJANOWSKI:  Maybe we should find that out as a

7    foundational issue.

8            THE COURT:  I don't object to that question.

9    BY MS. KENDRICK:

10   Q.  Have you seen this document before?                     04:44PM

11   A.  No.

12           THE COURT:  How long is it?  How many pages is it,

13   please?

14           MS. KENDRICK:  18 pages.

15           THE COURT:  It's probably not fair to make him go    04:44PM

16   through that now, especially because it looks like he's going

17   to be joining us tomorrow morning, so maybe we can make it some

18   homework with all due respect, Mr. Pratt.

19           Are there other questions you can proceed to and we'll

20   hold this one?                                              04:44PM

21           MS. KENDRICK:  Okay.

22   BY MS. KENDRICK:

23   Q.  Are you aware that you signed a declaration in support of

24   this brief?

25   A.  Yes.                                                    04:45PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    Q.  Are you familiar with your declaration?

2    A.  Yes.

3    Q.  Okay.  We might ask that you take a look at your

4    declaration.

5            THE COURT:  Do you have that for him?            04:45PM

6            MS. KENDRICK:  I do.

7            It's on the Court Docket as Docket 2704-2.

8    BY MR. KENDRICK:

9    Q.  I'm not going to ask you any questions.  I'm giving it to

10   you for the homework.                                    04:45PM

11   A.  I'm familiar with this yes.

12   Q.  Okay.  So I will move on from that.

13           So back to the Defendants' Exhibit 31, on Page 4, the

14   first full paragraph, it states that Corizon's most recent

15   former CEO, Karey Witty, represented to us that Mr. Maldonado  04:46PM

16   would have unfettered authority to implement remedial measures

17   upon his transfer to Arizona.

18           Do you know when Mr. Maldonado transferred to Arizona?

19   A.  Approximately last September.

20   Q.  And I believe you said he was the fifth VP of operations?  04:46PM

21   A.  That's correct.

22   Q.  And I believe you had testified earlier that you were

23   optimistic and thought he would succeed where the other VPs of

24   operation had not?

25   A.  I'm hopeful, yes.                                    04:47PM

1    Q.   What's the basis for that?

2    A.   The improvement that we have seen since his arrival.

3    Q.   Okay.

4         And you said this was the fifth VP of operations.  How

5    many regional medical directors has Corizon had since the          04:47PM

6    contract went into effect?

7    A.   I don't know how many.

8    Q.   More than three?

9    A.   Yes.

10   Q.   More than five?                                               04:47PM

11   A.   I don't know.

12   Q.   How many regional mental health directors have they had?

13   A.   I don't know.

14   Q.   More than two?

15   A.   I don't know.                                                 04:47PM

16   Q.   Okay.

17        And you testified earlier about the efforts that

18   Corizon had taken to fill vacancies.  You listed what I noted

19   was recruiting at job fairs, local colleges, advertising in

20   marketing, national recruiting, locum agencies, and signing       04:48PM

21   bonuses and loan repayment offers?

22   A.   Yes.

23   Q.   How about raising salaries across the salary scale?  Have

24   they done that?

25   A.   I don't have any update on that, no.                         04:48PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1   Q.  So you can't say for sure that they have raised salaries or

2   attempted to raise salaries?

3   A.  I don't know that they have specifically raised salaries.

4   They may have spot-raised salaries in some cases to retain

5   staff, but as far as overall, raising of salaries across the          04:48PM

6   board, I don't know.

7   Q.  And do they pay market rates for the health care staff?

8   A.  I'm not quite sure what the market rate will be.  I know we

9   have an expert that's going to be providing information on

10  staffing, so I will wait to hear what that has to say.               04:48PM

11  Q.  And I believe you also testified that on average they are

12  operating at between 88 and 90 percent staffing?

13  A.  Yes.

14  Q.  Could that be because there's no sanctions if the staffing

15  is above 90 percent but below 100 percent?                           04:49PM

16  A.  I can't say.

17  Q.  It's possible?

18  A.  Anything is possible.

19          MR. BOJANOWSKI:  Note an objection.

20          THE COURT:  I'm sorry.  Did somebody say something          04:49PM

21  other than the witness?

22          MR. BOJANOWSKI:  That's speculation, Your Honor,

23  asking if something is a possibility.

24          THE COURT:  I think the objection came after the

25  question.  Overruled.                                                04:49PM

1              I mean after the answer.

2              Thank you.

3              MR. BOJANOWSKI:  I wasn't quick enough.

4    BY MS. KENDRICK:

5    Q.  Could you find Defendants' Exhibit 9?                        04:50PM

6    A.  Okay.

7    Q.  Page 11.

8    A.  Yes.

9    Q.  And that's a letter Cindy Black sent you on November 19,

10   2014?                                                            04:50PM

11   A.  Correct.

12   Q.  And this is the letter where she proposed a temporary

13   suspension of the sanctions?

14   A.  Yes.

15   Q.  And she says, quote, we identified significant disparities   04:51PM

16   in the MGAR results for the third quarter, which suggested a

17   re-audit to address the disparities.

18              Was a re-audit done?

19   A.  We spot-checked some of their concerns.

20   Q.  And what did the spot check find?                            04:51PM

21   A.  There would be no change in the sanctions.

22   Q.  What were the disparities that she recognized?

23   A.  I don't recall specifically.

24   Q.  Could you turn to Exhibit 33?

25              This is the letter from plaintiff Goldberg to you and  04:51PM

1  Mr. Ryan.

2  A.  Okay.

3  Q.  And in the second paragraph, he refers to somebody named

4  Dr. Owen Murray.  He says, quote, your retained correctional

5  health expert recently was very complimentary of the care                04:52PM

6  Corizon is providing and opined that the care Corizon is

7  providing exceeds the care he has seen in other states.

8          Have you ever seen any documents or anything in

9  writing from Dr. Murray that states this opinion?

10 A.  I have not.                                                           04:52PM

11 Q.  Do you know if there are any documents or any writings from

12 Dr. Murray that states this opinion?

13 A.  I would have to rely on my legal counsel.

14 Q.  Would you want to see something that has an opinion on the

15 quality of the health care?                                              04:52PM

16 A.  It would be good information to have.

17 Q.  Were you aware that Dr. Owen Murray is ADC's retained

18 correctional health care expert?

19 A.  Yes.

20 Q.  Has he ever provided you any sort of written report?                 04:53PM

21 A.  Not directly, no.

22 Q.  Has he provided the Department any written report?

23 A.  Not to me that I'm aware of.  I would -- again, I have to

24 go back through my legal counsel who retained him.

25          THE COURT:  Is it -- I should tell you that I don't             04:53PM

3-26-2018-CV 12-601-Evidentiary Hearing-Day 4-Pratt-Cross

1    understand what a retained correctional health care expert is.

2    I have never heard this name Dr. Owen Murray before.  Is it

3    going to be important for me to know who he is?

4              MS. KENDRICK:  Dr. Murray is from the University of

5    Texas Medical Board.  He's involved with the health care at the        04:53PM

6    Texas prison system.

7              THE COURT:  Has he been involved in this case?  Should

8    I know who he is?

9              MS. KENDRICK:  I know who he is from our litigation in

10   California.                                                            04:54PM

11             THE COURT:  But he's not somebody who has been --

12             MS. KENDRICK:  He's never been disclosed to us as an

13   expert.

14             THE COURT:  So what role does he play in the

15   Department of Corrections?                                             04:54PM

16             THE WITNESS:  My legal counsel --

17             THE COURT:  He's retained by the legal counsel?

18             THE WITNESS:  Yes.

19             THE COURT:  I'm sorry.  Forgive me.  I thought he was

20   the Department of Corrections medical expert.  I didn't                04:54PM

21   understand.

22             THE WITNESS:  Thank you.

23             THE COURT:  Forgive me.

24             MR. BOJANOWSKI:  Your Honor, he's a consulting expert.

25             THE COURT:  For counsel.  I read this not to mean            04:54PM

1    that.  I read this to mean he was employed by ADC and I didn't

2    understand.  I'm sorry.

3              MS. KENDRICK:  As did I.  Thank you.

4              THE COURT:  That's not an area the Court should

5    inquire into, and so I had read this and seen that you are no      04:54PM

6    doubt aware that Dr. Owen Murray is your retained correctional

7    expert, and so I guess I had taken that to mean in the letter

8    to Director Ryan that it meant that ADC had retained him and

9    not counsel.  That's why I asked a question.  But now that I

10   realize it was counsel that did it, I am stepping back, as I      04:54PM

11   should.

12             THE WITNESS:  Understood.

13   BY MS. KENDRICK:

14   Q.  And this is the letter where he said that they were

15   prepared with detailed analyses of the root cause of             04:55PM

16   noncompliance, and then you and Mr. Bojanowski walked us

17   through those charts that were at Exhibits 52 to 74?

18   A.  Yes.

19   Q.  So to your understanding that is what the, quote, root

20   cause analysis is, is those documents?                           04:55PM

21   A.  Yes.

22   Q.  And I believe you testified that when you were doing a root

23   cause analysis the causes differ for each institution why they

24   are noncompliant?

25   A.  The fail points could differ.                                04:55PM

1  Q.  The fail points?

2  A.  At each institution, yes.

3  Q.  So these analyses that were done and that are at Exhibits

4  52 to 74, are they broken down by institution or are they just

5  state wide?                                                         04:55PM

6  A.  The process is the process.  The process should be the same

7  regardless of the facility but the fail point at each facility

8  can be a different point in that process.

9  Q.  Is there any documents that spell out what the fail points

10  are for any specific institution in specific performance           04:56PM

11  measure?

12  A.  No.  No, not that I have.

13  Q.  Would the closest approximation be the documents that the

14  defendants file with the Court for the status hearings that go

15  through the noncompliant performance measures?                     04:56PM

16  A.  The Corrective Action Plans?

17  Q.  Correct.

18  A.  Yes.

19  Q.  So you would consider that, to the extent where any of the

20  fail points are identified, that's where they would be?           04:56PM

21  A.  The fail points should be identified in the updates.  Yes.

22         THE COURT:  Would this be a good point to stop?

23         MS. KENDRICK:  Sure.

24         THE COURT:  Mr. Pratt, thank you for your energy and

25  attention this afternoon.  I appreciate it.  We'll ask you to     04:56PM

1    join us again tomorrow morning at 9 when we resume.

2            Is that the plan, counsel?

3            MR. STRUCK:  Your Honor, Director Ryan is only

4    available tomorrow morning.  We will take him out of order.

5            THE COURT:  Somebody else is going to intercede.                04:57PM

6            THE WITNESS:  I know that person.  Yes.

7            THE COURT:  So what we'll do, sir, is we'll take up

8    Director Ryan at 9.  Is that what you are saying, Mr. Struck?

9            MR. STRUCK:  Yes, Your Honor.

10            THE COURT:  Thank you very much.                                04:57PM

11            We are at recess until tomorrow.

12            (Proceeding recessed at 4:57 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                        C E R T I F I C A T E

6

7            I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10           I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15           DATED at Phoenix, Arizona, this 27th day of March,

16   2018.

17

18                              s/Laurie A. Adams
                                _____
19                              Laurie A. Adams, RMR, CRR

20

21

22

23

24

25