1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3                _____

4

   Victor Parsons, et al., on   )
5  behalf of themselves and all )
   others similarly situated;    )
6  and Arizona Center for        )
   Disability Law,               )
7                                )   No. CV 12-00601-PHX-DKD
            Plaintiffs,          )
8                                )
        vs.                      )   Phoenix, Arizona
9                                )   March 27, 2017
   Charles Ryan, Director,       )   9:02 a.m.
10 Arizona Department of         )
   Corrections; and Richard      )
11 Pratt, Interim Division       )
   Director, Division of Health  )
12 Services, Arizona Department  )
   of Corrections, in their      )
13 Official capacities,          )
                                 )
14          Defendants.          )
   _____)
15

16

     BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE
17
            REPORTER'S TRANSCRIPT OF PROCEEDINGS
18
          (*Evidentiary Hearing/Order to Show Cause*)
19                    Day 5
            (*Pages 911 through 1119, inclusive.*)
20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1                      A P P E A R A N C E S

2    For the Plaintiffs:

3              PRISON LAW OFFICE
               By:  Corene Kendrick, Esq.
4              1917 5th Street
               Berkeley, CA 94710
5
               ACLU - Washington DC
6              By:  David C. Fathi, Esq.
               915 15th Street NW
7              7th Floor
               Washington, DC 20005
8
               EIDENBACH LAW PC
9              By:  Kirstin T. Eidenbach, Esq.
               P.O. Box 91398
10             Tucson, AZ 85752

11             ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
               By:  Maya S. Abela, Esq.
12             177 N. Church Avenue
               Suite 800
13             Tucson, AZ 85701

14   For the Defendants:

15             STRUCK LOVE BOJANOWSKI & ACEDO PLC
               By: Timothy J. Bojanowski, Esq.
16             By: Rachel Love, Esq.
               By: Daniel Struck, Esq.
17             By: Richard Valenti, Esq.
               3100 W. Ray Road
18             Suite 300
               Chandler, AZ 85226
19

20

21

22

23

24

25

1                          I N D E X

2   WITNESS:                DIRECT    CROSS    REDIRECT   RECROSS
    CHARLES L. RYAN
3   By Mr. Struck           915                1022
    By Mr. Fathi                      955
4
    RICHARD PRATT
5   By Ms. Kendrick (Resumed)         1054
6   CARSON MCWILLIAMS
    By Ms. Love             1077

7

8

9

10

11                     INDEX OF EXHIBITS

12  EXHIBIT                                        RECEIVED

13  1         Inmate Medication Transfer Memorandum
              Dated 8-4-17                         1089
14  2         ADOC Director's Office Memorandum
              Dated 10-31-17 re:  Inmate Medication
15            Transfer Process                     1103
    3         Sticker Template KOP                 1099
16  4         Sticker Template DOT                 1099
    206       E-Mail dated October 11, 2017 from
17            Mr. Struck to Sarah Selzer and others 1075

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2          THE MAGISTRATE JUDGE CLERK:  Civil Case Number 12-601,

3    Parsons et al. versus Ryan et al., on for continuation of

4    evidentiary and order to show cause hearings.

5          THE COURT:  Good morning.  May I have counsel's          09:04AM

6    appearances for the record, please.

7          MR. FATHI:  Your Honor, David Fathi of the ACLU

8    National Prison Project for the plaintiff class.

9          THE COURT:  Thank you.  Good morning.

10          MS. KENDRICK:  Good morning, Your Honor.  Corene         09:05AM

11    Kendrick from the Prison Law Office for the plaintiff class.

12          THE COURT:  Good morning.

13          MS. EIDENBACH:  Good morning, Your Honor.  Kirsten

14    Eidenbach for the prisoner plaintiff class.  Behind me is Maya

15    Abela from the Arizona Center for Disability Law.              09:05AM

16          THE COURT:  Thank you.  Good morning.

17          MR. STRUCK:  Good morning, Your Honor.  Dan Struck,

18    Rachel Love, Tim Bojanowski, and Richard Valenti for

19    defendants.

20          THE COURT:  Good morning, everyone.  Are we ready to     09:05AM

21    proceed directly with Director Ryan, or is there anything we

22    need to take up in the first instance?

23          MR. STRUCK:  We're ready, Your Honor.

24          THE COURT:  Director Ryan, if you would kindly step up

25    to the clerk and be sworn.                                    09:05AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5

1          (The witness was sworn.)

2          THE MAGISTRATE JUDGE CLERK:  Thank you.  Please have a

3    seat.

4          THE COURT:  Good morning.  Welcome back.

5          THE WITNESS:  Good morning.                          09:05AM

6          THE COURT:  Thank you.

7          The microphone is not attached there.  Most witnesses

8    find if they just move it closer on the platform there that it

9    is handier, and it means the court reporter can hear you.

10         Thank you.  You may be seated.                       09:06AM

11         MR. STRUCK:  Thank you, Your Honor.

12                        CHARLES L. RYAN,

13   called as a witness herein, having been first duly sworn, was

14   examined and testified as follows:

15                     DIRECT EXAMINATION

16   BY MR. STRUCK:

17   Q.  Good morning, Director.

18   A.  Good morning.

19   Q.  Would you state your name, please?

20   A.  Charles L. Ryan.                                       09:06AM

21   Q.  And what is your occupation?

22   A.  I'm the Director of the Arizona Department of Corrections.

23   Q.  And how long have you been in that position?

24   A.  This is my 10th year serving as the Director.

25   Q.  How long have you been with the Arizona Department of     09:06AM

1   Corrections?

2   A.   I began my career with the Arizona Corrections in 1977 and

3   worked and promoted through various positions from program

4   officer, classification officer.  I was responsible for design,

5   staffing and activation of the prison's Deputy Warden, Warden,          09:07AM

6   Senior Warden, Deputy Director, Interim Director.  Then I

7   retired the summer of 2003 and I returned to the Department in

8   January of 2009 as the Director.

9   Q.   Who is your boss?

10  A.   Governor Ducey.                                                      09:07AM

11  Q.   Now, one of the things that -- what are some of your

12  responsibilities with respect to budgeting for the Department

13  of Corrections?

14  A.   I'm responsible for overseeing of the operational budget of

15  the Department and being party to the preparation from fiscal          09:07AM

16  year to fiscal year for the continuation of that budget and/or

17  the submission of decision packages to expand that budget.

18  Q.   What is the current budget, the total budget for the

19  Department?

20  A.   The operating budget for FY 18 is a little under $1.2             09:08AM

21  billion.

22  Q.   Obviously, the reason why we're here is the Parsons versus

23  Ryan stipulation, who's ultimately responsible for the delivery

24  of constitutionally-adequate health care to the roughly 35,000

25  inmates in the Arizona Department of Corrections system.               09:08AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1    A.   The Department of Corrections is ultimately responsible.

2    Q.   And you are the head?

3    A.   And as the Director, I am ultimately responsible.

4    Q.   Now, we all know that the health care is currently being

5    provided by third-party vendor Corizon.  How did that come                09:08AM

6    about?

7    A.   The Arizona Legislature in the fall of 2008 made a decision

8    that legislation would be introduced in the 2009 session to

9    migrate from self-operated health care to privilege-tied health

10   care, so when I returned to the Department that's what I was             09:09AM

11   going to inherit, and that decision had already been made.

12   Q.   Prior to that had Arizona Department of Corrections ever

13   utilized a private vendor to provide its overall health care?

14   A.   Not overall health care.  The Department had been a

15   self-operating health care provider system.                              09:09AM

16   Q.   And so with respect to having to inherited this legislative

17   decision with respect to the privatization of health care, what

18   kind of challenges or what did the Department have to do with

19   respect to putting a vendor in place?

20   A.   There were a number of challenges because the way the               09:10AM

21   legislation was written it was predicated on the fiscal year

22   2008 allocation with a maximum allocation of $137 million.

23   Therefore, an RFP had to be developed and eventually was put on

24   the street, if you will, and responsive vendors submitted

25   proposals.  We evaluated those proposals in 2009.                        09:10AM

1           And the requirement simply was that whoever was to be

2    awarded had to do so at a rate less than what the allocation

3    required.  We did a comparison to what our actual expenditures

4    had been as self-op and we came to the conclusion, because of

5    the approximate 122 to 124 million dollars that the self-op          09:11AM

6    expenditure had experienced, that the proposals were

7    significantly higher, although under the threshold of $137

8    million.

9           Given the fiduciary responsibility that I oversaw for

10   the Department, we went back across the street to the                 09:12AM

11   legislature, told them that these proposals were nonresponsive,

12   and therefore, the statute was modified and changed and in

13   essence what was given consideration through that revision was

14   the best qualified was also within that allocation.

15          Three vendors -- excuse me.  Three vendors then ended          09:12AM

16   up submitting responsive proposals, that was Wexford, Corizon,

17   and Centurion, and we evaluated those proposals and we ended up

18   making an award to Wexford.  And that took effect July 1st of

19   FY 11.

20          Anyway, one of the challenges was that they had to             09:12AM

21   identify as an organization where they were going to obtain the

22   health care staff from.  In the negotiations with them, it was

23   required that they accept and hire the currently employed

24   health care staff from the Department of Corrections, and as I

25   recall, almost without exception, they hired those employees.         09:13AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1          That contract continued for about eight months, at

2    which time Wexford basically communicated to the Department

3    that they wanted out of the contract.  We came to terms with

4    them.  We went back to the State Procurement Officer and the

5    Assistant Attorney General that oversaw procurement for the          09:13AM

6    Department and were authorized through a competition

7    impracticable to only reapproach the two remaining vendors who

8    had submitted proposals, one being Corizon and the other

9    Centurion.

10         We evaluated their proposals, asked them to resubmit,          09:14AM

11   either confirm or modify their proposals.  They both did so.

12   Centurion provided a one-page recommendation which, in essence,

13   was the same as what they previously submitted.  We determined

14   that was not responsive and so the award through the

15   competition impractical was made to Corizon.                         09:14AM

16   Q.  And what was the total contract amount?  And if you have --

17   I know you have some notes.

18   A.  The original total contract amount was $125.3 million.

19   Q.  How many FTEs did that cover?

20   A.  At that time, the original was 759.8 employee positions.          09:15AM

21   Q.  And has that increased overtime?

22   A.  It did.  It increased by another 165 positions that brought

23   their staffing number up to 925.0 positions, and that

24   represented a contract amount of $148.8 million, which is the

25   current amount to date.                                              09:15AM

1          Additionally, Corizon at their own expense brought on

2   an additional 79 positions so that their staffing at the time

3   is 1,004 positions.

4   Q.  That's up from 2013 759 positions?

5   A.  That is correct.  Yes, it is.                              09:16AM

6   Q.  And has the -- how has the inmate population -- has it gone

7   up at all since March of 2013 to today?

8   A.  The population had gone up for a period of time but the

9   Department's population has levelled off during the previous 18

10  months.  The Department's population reached its all-time       09:16AM

11  historical high during the month of June 2016 and we surpassed

12  43,000 inmates.  We started fiscal year 17 at 42,902.  We ended

13  that fiscal year at 42,200.  Today the count is less than

14  42,000.  It's under 41,800.

15  Q.  To be clear, does that 41 -- roughly 41,000 number include  09:17AM

16  inmates who are in private facilities?

17  A.  It does.

18  Q.  And those inmates aren't covered by -- they aren't provided

19  health care by Corizon, is that correct?

20  A.  That is correct.  They are not.                             09:17AM

21  Q.  Do you know what the number is with respect to -- and I'm

22  sorry I am putting you on the spot.  Do you know roughly what

23  the number is currently with respect to the inmates that are

24  housed in state facilities that are covered by the Corizon

25  contract?                                                       09:17AM

1   A.   It's over 35,000.

2   Q.   And that population, is that roughly about the same between

3   2013 and today with respect to the inmates that are being

4   covered by the Corizon contract?

5   A.   It's about the same and there has been some variance.          09:18AM

6   Q.   Now with respect to contracting with Corizon in March of

7   2017, have you had challenges with respect to the fact that you

8   are not -- it's not a self-operated medical care delivery

9   system since March of 2017?  I know that's a very open-ended

10  question.                                                          09:19AM

11  A.   I think you're making reference to the wrong year.

12  Q.   I'm sorry.  March of 2013.

13  A.   Thank you.

14  Q.   And can you tell us what -- just generally, what kind of

15  challenges that the Department faces with respect to running     09:19AM

16  from what you were doing in, I guess, February of 2000 -- or I

17  guess prior to Wexford coming on board, the self-operated

18  health care delivery system as opposed to dealing with a

19  third-party vendor providing health care?  What -- just

20  generally, what kind of challenges as Director do you face?      09:19AM

21  A.   Well, many of the challenges that we faced certainly was

22  being able to obtain outside consultant providers, outside

23  hospitalization, locations.  If those inmates required outside

24  treatment and in-patient care in a hospital setting, we have

25  had contract arrangements with hospitals in Tucson.  Years ago   09:20AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1   it was with St. Mary's.  Then it was with the University

2   Physicians Hospital, which was being operated by the University

3   of Arizona, the Tempe St. Luke's Hospital.  We have had inmates

4   that have had to have been housed in the Maricopa Medical

5   Center.  And all of those arrangements, if you will, have come          09:20AM

6   and gone by the wayside.  So that certainly has always been a

7   challenge if we have to refer people to outside consultants.

8   Q.  And with respect to trying to replace those outside

9   consultants, is that something that the Department relies on

10  Corizon to do?                                                          09:21AM

11  A.  Yes, it is.

12          And we are, frankly, dependent upon them to do that.

13  We have taken it to the point at the request of Corizon to

14  expand the inpatient component bed space in the prisons, and we

15  have expanded them from, I think, 107 IPC beds to upwards of            09:21AM

16  144.

17          In terms of inmates being referred to outside

18  consultants and/or hospitals, one of the major challenges is

19  that we have to provide the security staff of two officers per

20  offender to oversee and supervise that inmate who is assigned           09:22AM

21  to a hospital setting, being mindful of when they are in a

22  hospital setting they are not in a secure ward.  So we have to

23  identify officer positions, we move them from the prisons and

24  have them accompany the inmate to that hospital, and then they

25  have to be relieved after every eight hours by another team of          09:22AM

1    two.

2          That represents a major challenge to the Department

3    particularly given our vacancy rates, and the purpose of the

4    IPC beds was to have those inmates return from the hospital

5    setting as soon as possible so that they could be placed in          09:23AM

6    an IPC setting at a prison where those IPC beds would be

7    located.

8    Q.  When you refer to vacancy rates, vacancy rates for what

9    positions are you talking about?

10   A.  Correctional officers.  The Department has authorized 6,655   09:23AM

11   CO positions, and the vacancy rate -- and the vacancies of

12   those CO positions this week is 918, or approximately 13.8

13   percent.

14   Q.  And has that been a continuous challenge for the

15   Department?                                                        09:23AM

16   A.  It has been a continuous challenge for the Department for a

17   number of years, although we have, if you will, weaned, in

18   other words, eliminated, all the wasteful steps in recruiting

19   and attracting staff and we reduced it from 120 days down to

20   28, and that is sustainable.  The issue of retention is the       09:24AM

21   challenge.

22          And in terms of salaries and what we pay the

23   corrections officers, we are no longer competitive and have

24   not been -- they have not seen a pay package increase for 12

25   years.  So we lose a lot of corrections officers positions and    09:24AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1   we lose them within the first four-year period of time.

2   Q.  Basically, the officers are using The Department of

3   Corrections as a stepping stone into different areas of law

4   enforcement?

5   A.  It might either be to a different area of law enforcement    09:24AM

6   or it may be into another corrections system, or correctional

7   agency, primarily because of compensation.  The survey that we

8   have done of our corrections officers as a break-through

9   project and obtaining from them as the voice of the customer

10  why they were leaving, primarily it has been because of         09:25AM

11  compensation.

12          When they have been queried in terms of what would

13  help keep you here and that would -- their answer was and is an

14  increase in compensation.

15          So we are not competitive when we look at the other 18   09:25AM

16  detention or corrections agencies within the State of Arizona.

17  We're in the bottom third.  In the western United States we're

18  also in the bottom third.

19  Q.  And what have you done to try and bridge the gap between

20  what the corrections officers are being paid now at the         09:25AM

21  department and what you think would make it competitive and

22  allow you to retain more corrections officers?

23  A.  The strategy that I employed in FY 17 was to use some of

24  the vacancies savings, monies which is generated by vacancy

25  open positions, to give those officers a retention bonus of     09:26AM

1    $1,500 at the end of FY 17.  We also use these vacancy savings

2    dollars to provide a merit increase for those employees who

3    were eligible for performance pay increases as well.

4         I intend to take a very similar strategy relative to

5    merit pay this year.  We had modified the evaluation period for    09:26AM

6    the employees to end at the end of February, that we take the

7    month of March to evaluate them, and then with those vacancy

8    savings dollars in the final quarter of the year we make our

9    decision in terms of the funding that is available for merit

10   pay consideration based on their performance evaluation.          09:27AM

11   Q.  Now, the reason why you are here today is with respect to

12   the Court's order of October 10, 2017 regarding 11 performance

13   measures at specific facilities.  You are aware of that order?

14   A.  Yes, I am.

15   Q.  Now, have you had challenges with respect to utilizing a      09:27AM

16   third-party provider and having to comply with the stipulation

17   that was entered into, the settlement agreement entered into in

18   Parsons versus Ryan that was approved by the Court in, I

19   believe, October or February of 2015?

20   A.  Yes.  We certainly have had challenges with achieving         09:27AM

21   performance measure compliance from our vendor, and that has

22   been something that we have strived to overcome.  And we put

23   forth, I believe, considerable effort in trying to have the

24   vendor achieve compliance and fulfill that.  The order from

25   Magistrate Duncan on October the 10th is very explicit and very   09:28AM

 1   clear.

 2           THE COURT:  Director Ryan, it would be wrong for me to

 3   refer to you as something other than your title.  It's wrong

 4   for you to refer to me as something other than my title.  The

 5   title "Magistrate" no longer exists in the federal system.          09:28AM

 6   Congress changed it in 1990.  They created the position of

 7   Magistrate Judge.  So you can refer to me as a Magistrate

 8   Judge, you can refer to me as a Judge, but you can't refer to

 9   me as a Magistrate because Magistrate no longer exists.  It's

10   simply an adjective now that modifies judge.                        09:29AM

11           It would be similar -- you have military exposure, I

12   know, and so you would imagine what would happen if you

13   referred to the Lieutenant Colonel as the Lieutenant.  That's

14   what you have just done to me.

15           So if you would, kindly, in the future, follow what        09:29AM

16   Congress has prescribed in 1990.

17           Thank you, sir.

18           THE WITNESS:  Magistrate Judge Duncan, I apologize

19   and I stand corrected.

20           THE COURT:  No reason to apologize.  They used to          09:29AM

21   say -- grandmothers used to say, "I don't care what you call

22   me; just don't call me late for dinner."  Sometimes titles

23   don't matter, but actually sometimes titles do matter, because

24   Congress actually wanted to aggrandize the role, they wanted to

25   change the role.  So there was a previous position that the        09:29AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1    magistrates performed, and they changed that position, gave

2    them the opportunity for them to serve as judges, as I am in

3    this case.  Previously, that wasn't possible under the

4    commissioner system and under the magistrate system.

5           And so the changing of the title reflects that changed   09:29AM

6    role, and if we respect what Congress has done we have to also

7    use that title because they entered into serious discussions

8    about what should the appropriate title be.  Whereas in the

9    United States there still exists magistrates, the City of

10   Phoenix has magistrates and other municipalities have          09:30AM

11   magistrates, but they are not magistrate judges, they are

12   magistrates.  So it would be appropriate to call them

13   magistrates still.  It's just not appropriate here.

14          But thank you very much.  No apologies necessary.

15   Thank you, sir.                                                09:30AM

16          THE WITNESS:  Okay.  Thank you.

17   BY MR. STRUCK:

18   Q.  And you have a stack of exhibits in front of you there,

19   Director.  Let me -- if you wouldn't mind pulling out Exhibit

20   201, which is probably closer to on the bottom.                09:30AM

21          Do you have it?

22          THE COURT:  You may assist, Mr. Struck.

23          THE WITNESS:  Yes, I do.

24   BY MR. STRUCK:

25   Q.  And there was some testimony yesterday from Mr. Pratt      09:31AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1    regarding 201.  What is Exhibit 201?

2    A.   Exhibit 201 is Amendment Number 10, a contract amendment to

3    the contract that we have with Corizon.

4    Q.   And it looks to be dated May 11, 2015.  Is that right?

5    A.   That is correct.                                        09:31AM

6    Q.   Okay.  What's the background, if you recall, with respect

7    to the purpose behind Amendment 10?

8    A.   The purpose of Amendment 10, in part, was an amendment so

9    that we could exercise a year for -- a renewal option for a

10   one-year period from March 4th of 2016 to March 3rd, 2017.  It  09:31AM

11   also had the potential year five renewal for Corizon to

12   exercise its second annual renewal option for contract year 5

13   if ADC requested a 4.0 CPI increase to its annual budget

14   request for contract years 4 and 5, and if the State

15   Legislature authorized the 4 percent CPI increase for contract  09:32AM

16   year 4 this would extend the contract until March 3rd, 2018.

17   Q.   Okay.

18        One of the things that Ms. Kendrick asked Mr. Pratt

19   yesterday was with respect to an increase, and if you see, if

20   you look at the first page, it talks about a CPI increase.    09:32AM

21   What is that?

22   A.   Consumer price increase based on the medical rates for, if

23   you will, a metropolitan area, and I believe in this case it

24   was based on that rate for Phoenix.  The vendor asked for that

25   type of a CPI and indicated that if that was not approved then  09:33AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1  they could go ahead and serve notice to the Department of

2  Corrections for 180 days that it would intend to cancel the

3  contract.

4  Q.  There was also some additional provisions in this

5  modification as well.  If you look at Page 3 of 4, the bottom          09:33AM

6  of the page, it says Exhibit 201.3.

7          Are you there?

8  A.  Yes, I am.

9  Q.  Under Subsection 6, there's a section called Contract

10  Sanctions.  What was the purpose behind this change?          09:34AM

11  A.  The purpose was to ensure better performance with the

12  performance measures for years three and four, and it was

13  effective on March 4th.  The contract sanctions for performance

14  measures were changed from 43 performance measures quarterly at

15  a state-wide level to approximately 100 measures evaluated          09:34AM

16  monthly at each complex.

17          The sanction amount that Corizon agreed to was for

18  $5,000 per performance measure, with a maximum on a monthly

19  basis to be sanctioned for $90,000.

20  Q.  And what was the purpose -- if this modification came about          09:35AM

21  shortly after or right around the time that the Parsons versus

22  Ryan stipulation -- strike that.

23          This modification changed the sanctions from 43

24  performance measures to 100 performance measures being

25  evaluated.  Do you know why that was?          09:35AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1    A.  Well, I believe it moved them from 43 measures which were

2    being sanctioned on a quarterly basis to 100 measures being

3    performed or evaluated on a monthly basis, and frankly, I would

4    defer to Richard Pratt for further detailed explanation.

5    Q.  Okay.  That's fine.                                        09:35AM

6          And under Subsection 7 there was also additional

7    staffing added?

8    A.  Yes.  There are five positions listed there, and basically,

9    Corizon indicated that they needed those five positions and

10   that they would bear the cost and there would be no cost to the  09:36AM

11   State.

12   Q.  And under Subsection 8 there's a little more detail with

13   respect to the CPI adjustment.  Do you see that?

14   A.  Yes, I do.

15   Q.  And so this was something that was specified in the         09:36AM

16   original contract with respect to Corizon's ability to ask for

17   a CPI adjustment?

18   A.  Yes.

19   Q.  Now if you look at -- I'm sorry.  Go back to page 201.1.

20         Under Subsection 4, you see that there's an              09:37AM

21   indemnification provision amending Amendment Number 10.  Why

22   was that put in?

23   A.  The indemnification language is inserted there so that if

24   there were any claims filed against the Department because of

25   shortcomings on the part of Corizon that the cost associated   09:37AM

 1   with such as court costs or attorney fees would have to be

 2   borne by Corizon and not the State of Arizona or the Department

 3   of Corrections.

 4   Q.  And if you look at the Page 201.2, the second paragraph, it

 5   looks like it specifically addresses Parsons versus Ryan.  Do          09:37AM

 6   you see that?

 7            It's the second paragraph on the second page of

 8   Exhibit 201.

 9   A.  Yes, I see that.

10   Q.  And what was the thought process behind making Corizon               09:38AM

11   responsible for indemnifying the Department with respect to

12   shortcomings regarding providing health care under the Parsons

13   versus Ryan stipulation?

14   A.   The Department -- excuse me.  Corizon was the entity or

15   organization for the delivery of health care to the inmate             09:38AM

16   population.  The Department's role was that of a monitor and a

17   monitoring bureau was overseeing Corizon in terms of its

18   accountability in the delivery of health care to the inmate

19   population.

20   Q.  And was there any kind of thought process regarding                 09:39AM

21   Corizon -- Corizon, I guess, skin in the game with respect to

22   providing health care that met the performance measures set

23   forth in the stipulation under Parsons versus Ryan?

24   A.   Corizon was looking for, if you will, support for a CPI and

25   the Department was looking for performance in compliance with          09:39AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1   the stipulated agreement, so, if you will, the skin in the game

2   was, for them, if you do not deliver and do not fulfill the

3   performance measures there will be a consequence through a

4   sanction process.

5   Q.  So this was another form of sanction in addition to the          09:39AM

6   sanctions set forth in Section 6 of the contract?

7   A.  Yes.

8   Q.  Thank you.

9           Now, in June of 2017 the Court issued an order with

10  respect to these 11 performance measures at a few of the          09:40AM

11  facilities, having been substantially non-compliant, and

12  indicating that the Court may issue monetary sanctions.

13          Do you recall that?  And this was in June of 2017?

14  A.  Yes.

15  Q.  Okay.                                                          09:40AM

16          With respect to that, what efforts did you make, the

17  Department make, regarding trying to get Corizon to comply with

18  the stipulation?

19  A.  We continue to meet with Corizon on a bi-weekly basis

20  demanding and insisting upon their performance.  The             09:41AM

21  forewarning from the Court was quite clear in terms of having

22  to achieve 100 percent compliance 100 percent of the time with

23  those performance measures.

24  Q.  Let me correct you.  That didn't come about until October

25  10 of 2017.                                                       09:41AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1    A.   That's correct.

2    Q.   The order to show cause is why you are here today but in

3    June the Court indicated that it may issue monetary sanctions.

4         THE COURT:  Excuse me.  You're testifying.

5         MR. STRUCK:  I'm sorry, Your Honor.  I apologize.          09:41AM

6         THE COURT:  Thank you.

7    BY MR. STRUCK:

8    Q.   Why don't you refer to Exhibit 205.

9    A.   Okay.

10   Q.   And what is Exhibit 205?                                   09:42AM

11   A.   It is Amendment Number 14 to the contract with Corizon.

12   It's dated September 6, 2017.

13   Q.   And what was the purpose behind Amendment Number 14?

14   A.   The purpose of this amendment was the result of

15   conversations with Corizon leadership to try and negotiate     09:42AM

16   better performance on the part of Corizon, and it not only made

17   available to Corizon the possibility of a compliance rate

18   incentive based on improved performance, it also had the

19   objective of eliminating the sanction cap which had been set at

20   $90,000.                                                       09:43AM

21        We initiated this and came to terms on this in

22   September of 2017 to encourage prompt, if you will, reward for

23   a relatively short period of time to the end of the contract

24   with Corizon to improve their performance.

25        So there was a combination of incentives based on        09:44AM

1   improved performance and then there were also increased

2   sanctions for not performing.

3   Q.  You just testified that one of the things that the

4   Department was trying to do was to increase performance by

5   Corizon.  Was there anything specifically or different things      09:44AM

6   that prompted this discussion with Corizon leadership to come

7   up with some sort of amendment that would help encourage

8   Corizon to do a better job performing under the contract?

9   A.  Again, I would refer to the Court had been -- the Court had

10  forewarned months earlier that improved performance was           09:44AM

11  expected or there, in fact, might be sanctions imposed.  So

12  when we sat down and negotiated with Corizon, basically, they

13  were making a proposal to receive some incentives and they were

14  accepting of the cap being removed if they did not perform,

15  frankly, what it proved to be -- turned out to be over several    09:45AM

16  months was improved performance on their part.

17  Q.  And how do you know that they improved performance?

18  A.  By looking at the CGAR summary that showed marked

19  improvement month after month.

20          When I look at the issue of documenting it and            09:46AM

21  tracking their performance and knowing that we had initially

22  entered into a stipulated agreement in October of 2014 and the

23  Court acknowledged that and accepted that in February of 2015,

24  we saw marked improvement in March of 2015 and they had

25  improved scores and they were finally able to start hitting the   09:46AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1    mark of the 75, the 80, and the 85 percent.  From a period of

2    time in 2015 to as recently as in January of 2018, their

3    performance had improved to the point of 94 percent.

4            MR. FATHI:  Excuse me, Your Honor.  We object and move

5    to strike on the grounds that the January data have not been          09:47AM

6    provided to us.

7            THE COURT:  You will have the opportunity to

8    cross-examine.

9    BY MR. STRUCK:

10   Q.  So between September 6, 2017 and January, this January,          09:47AM

11   have you -- has Corizon improved their performance with respect

12   to meeting the performance measures on the stipulation?

13   A.  Yes, they have.

14   Q.  And you say in January it was 94 percent of --

15           THE COURT:  Mr. Struck, I have reconsidered my ruling.       09:47AM

16   It's not fair for you to ask about January when the plaintiffs

17   don't know what January is, so I will sustain the objection.  I

18   kind of had assumed maybe overnight you would be providing

19   those January numbers to the plaintiff.

20           MR. STRUCK:  We don't have that, Your Honor.                  09:48AM

21           THE COURT:  You don't have them and you are asking

22   about them.

23           MR. STRUCK:  There's preliminary numbers.

24           THE COURT:  That 's not fair.  Let's not do that.

25   Thank you.                                                           09:48AM

——————3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct——————

1          MR. STRUCK:  All right.

2     BY MR. STRUCK:

3     Q.  In December, do you know what Corizon's performance was

4     with respect to the total number of performance measures that

5     are measured at the facilities that Corizon provides health          09:48AM

6     care at?

7     A.  The December 2017 percentages were almost 93 percent

8     compliant.

9     Q.  Okay.  Thank you.

10          Now, did you have any -- was the hope -- one of the          09:48AM

11     hopes with respect to Amendment 14 have anything to do with the

12     11 performance measures that the Court was concerned about and

13     had issued a warning a few months earlier?

14          In other words, was the hope that Corizon would get

15     serious and comply with those, meet the 85 percent threshold on          09:49AM

16     those particular performance measures at the facilities that

17     were affected?

18          MR. FATHI:  Objection, Your Honor.  Amendment Number

19     14 is more than one month earlier than the Court's October 10th

20     order that set forth the 11 specific performance measures.          09:49AM

21          MR. STRUCK:  I'm sorry, Your Honor.  I was referring

22     to your June order.

23          THE COURT:  I see.  All right.  Overruled.

24          THE WITNESS:  Would you please repeat your question?

25     BY MR. STRUCK:          09:49AM

1    Q.  Certainly.

2            Was part of the thought process behind Amendment

3    Number 14, did it have anything to do with the Court's concerns

4    back in June with respect to those 11 performance measures that

5    we're here about today, getting Corizon to --                    09:50AM

6    A.  Yes, it did.  We were wanting them to improve the

7    performance relative to all the measures that had been

8    identified as either non-compliant and or deficient.

9    Q.  Now, this Amendment Number 14 in Exhibit 205 caps the

10   incentives at $3.5 million.  It's on Page 2 of Subsection 6.     09:50AM

11           Do you see that?

12   A.  Yes, I do.

13   Q.  Where did you find that money?

14   A.  The $3.5 million came from within the Department's budget

15   by identifying either from the contingency and/or we identified  09:51AM

16   some of the funds from vacancy savings.

17   Q.  And the vacancy savings that you have previously testified,

18   that was some of the money that you were using to try and

19   incentivize to keep corrections officers from leaving?

20   A.  Yes.                                                         09:51AM

21   Q.  So essentially you were taking that money to incentivize

22   Corizon to perform under the stipulation?

23   A.  We were trying to utilize the funds within the Department's

24   appropriation to pay for -- to identify and pay for that

25   incentive.                                                       09:52AM

1    Q.  On October 10 of 2017, this Court issued an order to show

2    cause with respect to those 11 performance measures at the four

3    facilities that are affected.  Were you aware of that?

4    A.  Yes.

5    Q.  And when did you find out about it?                          09:52AM

6    A.  Very shortly after the Court entered its order.

7    Q.  And what did you do about that order?

8    A.  We sat down with Corizon and had a very frank conversation

9    with them in terms of that requirement.  Specifically, we sat

10   down with the Arizona senior VP, Roland Maldonado, and advised   09:52AM

11   him this was the expectation and requirement of the Court and

12   Corizon had to fulfill that to the letter.  We had what I

13   thought was a very productive conversation and meeting in my

14   office with Richard Pratt and some other staff, Mr. Maldonado

15   and his deputy, in terms of, if you will, a real-time tracking   09:53AM

16   requirement as far as they pertain to those 11 performance

17   measures.  Mr. Maldonado indicated and was very cooperative

18   about wanting to do that and said that he would be able to

19   implement that real-time tracking instrument, I think he said,

20   by October 23rd.  So we concluded our business and anticipated   09:54AM

21   that we would be moving forward so that, if you will, the

22   real-time tracking and reporting would be able to be fulfilled.

23   Q.  Why don't you take a look at Exhibit 31.

24   A.  Yes.

25   Q.  Have it?                                                     09:55AM

———————3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct———————

1    A.   I do.

2    Q.   What is Exhibit 31?

3    A.   Exhibit 31 is an October 25, 2017 letter that is

4    co-authored by myself and Richard Pratt and it is addressed to

5    the Corizon leadership.  It is a letter that explained to them          09:55AM

6    clearly, as you know, on October 10th, United States District

7    Court Magistrate Judge David Duncan issued an order requiring

8    defendants in the Parsons case to comply with the following

9    performance measures or face sanctions pursuant to the Court's

10   civil contempt authority.  The 11 performance measures are             09:55AM

11   listed.

12        Then when I refer to Page 2 of that exhibit, the next

13   to last paragraph on the page, the Court found that these

14   performance measures at these prisons to be substantially

15   non-compliant with the stipulation almost one year ago and they       09:56AM

16   are still non-compliant.  Corizon's failure to substantially

17   comply with these measures now has exposed Mr. Pratt and I to

18   civil contempt sanctions and we demand that Corizon take all

19   reasonable steps to substantially comply with these measures in

20   the Court's order, included, but not limited to, flying Corizon       09:56AM

21   health care personnel from other states to fill vacant

22   positions.

23        It goes on in implementing the daily real-time

24   monitoring data program advocated by Corizon Senior

25   Vice-President of Operations Roland Maldonado at our meeting on       09:56AM

1    October 19th.  In the course of doing so Corizon also must

2    immediately ensure that not only these measure thresholds are

3    met but that each and every inmate who is affected by these

4    performance measures at the subject prisons receive the medical

5    care that Corizon is contractually obligated to provide.                    09:57AM

6          And it goes on.

7          With or without your knowledge and consent,

8    Mr. Maldonado personally advocated for the immediate

9    implementation of a daily real-time monitoring data program.

10   At our meeting last week he specifically included in his          09:57AM

11   written agenda a, quote, patient care slash CGAR improvement

12   plan with a description of a daily tracker and installation

13   plan of recommended sample forms stating daily tracking

14   starting October 23rd.

15         We reached an agreement with Mr. Maldonado at the          09:57AM

16   meeting and understood that Corizon's daily real-time reporting

17   would begin as promised on October 23rd.  However, the very

18   next day after the meeting, after apparently discussing his

19   representations with you, referring to, I believe, Mr.

20   Goldberg, Mr. Maldonado informed us on October 20, 2017 that          09:58AM

21   Corizon will not implement any daily real-time monitoring data

22   program.

23         This is unacceptable and contrary to a multitude of

24   promises and other representations that Corizon has made to ADC

25   and the State of Arizona over many years.                                  09:58AM

1    Q.   Okay.

2         And then on the next page, I think it talks about some

3    of the representations that have been made by Corizon officials

4    to you folks over the years.  Ultimately, what was your

5    expectation and demand when sending this letter?                09:58AM

6    A.   That they comply as had been stated and promised by Roland

7    Maldonado, and the last paragraph on the last page so states to

8    be clear:  We demand that Corizon immediately take all

9    reasonable steps to comply with the subject performance

10   measures, and the letter constitutes our formal demand for full  09:59AM

11   indemnification pursuant to this contract agreement.

12   Q.   Did you do anything besides send a letter to try and get

13   Corizon to comply with respect to the October 10th, 2017 order

14   from this Court?

15   A.   We continued to meet with Corizon and reminded them of      09:59AM

16   their contractual obligations to perform, and we thought that

17   they understood that, meaning specifically Mr. Maldonado.  It

18   was followed a few days later by a letter from Mr. Goldberg,

19   which is another exhibit.

20   Q.   Why don't you take a look at Exhibit 33.                    10:00AM

21   A.   I have it.

22   Q.   Is that the letter that you are referring to?

23   A.   Yes, it is.

24   Q.   And it appears -- and this is in evidence, Your Honor.

25        At the bottom of the page it appears Mr. Goldberg is        10:00AM

| | |
|---|---|
| 1 | backing off on Mr. Maldonado's promise for real-time reporting. |
| 2 | Is that the gist of this letter? |
| 3 | A.  Yes, it was the gist of the letter, that he was indicating |
| 4 | that Corizon would not be providing what Mr. Maldonado had |
| 5 | committed to previously. |
| 6 | Q.  And it looks like he's explaining that there is some sort |
| 7 | of misunderstanding as to what Mr. Maldonado was promising to |
| 8 | deliver, if you look at the top of Page 2. |
| 9 | MR. FATHI:  Objection, Your Honor.  Leading. |
| 10 | THE COURT:  Sustained. |
| 11 | BY MR. STRUCK: |
| 12 | Q.  Look at the top of Page 2, please. |
| 13 | THE COURT:  I'm sorry? |
| 14 | MR. STRUCK:  I'm referring the witness to the top of |
| 15 | Page 2. |
| 16 | THE COURT:  That's simply what you did.  You weren't |
| 17 | suggesting the answer? |
| 18 | MR. STRUCK:  No.  It's in the top -- |
| 19 | THE COURT:  It looks like he's explaining that there |
| 20 | is some sort of misunderstanding as to what Mr. Maldonado is |
| 21 | promising to deliver if you look at the top of Page 2.  That |
| 22 | looks to me like a leading question. |
| 23 | MR. STRUCK:  After you sustained the objection I asked |
| 24 | the witness to take a look at the top of Page 2. |
| 25 | THE COURT:  Yes. |

Timestamps in right margin:
- Line 5: 10:01AM
- Line 10: 10:01AM
- Line 15: 10:01AM
- Line 20: 10:02AM
- Line 25: 10:02AM

1            Then, Mr. Fathi, the record doesn't reflect what your

2     further statement was.  You said no, it was in --

3            MR. FATHI:  I made no further statement after the

4     objection.

5            THE COURT:  Let's re-try, then.                    10:02AM

6            MR. STRUCK:  I'm sorry.  I understood your ruling and

7     I'm trying to move on --

8            THE COURT:  I'm sorry.

9            MR. STRUCK:  -- and have the Director testify about

10    what's on the top of Page 2.                              10:02AM

11    BY MR. STRUCK:

12    Q.  If you refer to the top of Page 2, what is it that -- I

13    guess Mr. Goldman, who is the Chairman of the Board of

14    Directors, what is he stating here with respect to

15    Mr. Maldonado's promise to deliver a real-time tracking    10:02AM

16    system?

17    A.  He goes on to say, "I believe Rolly promptly corrected this

18    misunderstanding in a phone call to you the day after your

19    letter.  To avoid further confusion, we refer to this program

20    as, quote, 'Rolly's real-time system improvement tracking,'"  10:03AM

21    unquote.

22            Needless to say, as I read the rest of this letter

23    there's emphasis being given on the part of Mr. Goldberg that

24    clearly tells me that they would not comply with this

25    requirement, and he emphasized we might, as a last resort,   10:03AM

1  consider altering Rolly's real-time system improvement tracking

2  to serve this purpose.

3          So we were not accepting of this letter because

4  clearly it was conveying resistance and great reluctance on the

5  part of Corizon, and we followed up this letter with another         10:04AM

6  one a couple of days later.

7  Q.  Take a look at Exhibit 34.

8          This is in evidence as Defendants' Exhibit 34.

9          Can you tell us what Exhibit 34 is?

10  A.  Exhibit 34 is a letter dated November the 8th to              10:04AM

11  Mr. Goldberg and others indicating that we were in receipt of

12  his November 6th letter confirming Corizon's refusal to

13  immediately implement a manual system for real-time reporting

14  of the failing performance measures subject to the October

15  10th, 2017 Court order.  We went on to make it very, very          10:05AM

16  clear, we believe, and this is a letter co-authored by myself

17  and Richard Pratt, in terms of what our expectation was.

18  Q.  Why were you sending it to the operating committee of the

19  Board of Directors?  Why not the CEO?

20  A.  I believe Mr. Goldberg at the time was, if you will,          10:05AM

21  double-hatted.  He was not only the chairman.  I think he was

22  the interim CEO as well.  Corizon has gone through a number of

23  CEOs and they had not yet appointed another permanent CEO so I

24  think Mr. Goldberg was serving a dual function.

25  Q.  And besides demanding the real-time reporting in the second   10:06AM

1    paragraph here, what else are you asking Corizon to do?

2    A.  As we had done previously on multiple occasions, given the

3    vacant staffing positions which had been moving around the 10

4    percent vacancy for a number of months, we wanted Corizon to

5    fly in from whatever contracts they had elsewhere in the United    10:07AM

6    States personnel and providers to fill that void.

7    Q.  And were you demanding that?

8    A.  Yes, we were.

9    Q.  How many days after the letter from Mr. Goldberg did you

10   send this letter?    10:07AM

11   A.  Mr. Golberg's letter of November 6th was followed by this

12   letter from us on November the 8th.

13   Q.  Since November 8th, has Corizon got a CEO put in place?

14   A.  Yes.  CEO No. 7 is Steve Rector, and we have found him to

15   be much more responsive.  He has given direction relative to    10:08AM

16   the performance measures that -- particularly those the Court

17   is requiring to be 100 percent.  He has given direction to the

18   Corizon leadership and certainly the senior VP here in Arizona

19   to be as responsive as possible to try and fulfill those

20   measures.    10:08AM

21          I have conversations with this CEO almost on a weekly

22   basis in addition to the bi-weekly meetings with the Arizona

23   VP, Mr. Maldonado, and his team.

24          We have also had further meetings with the Corizon

25   team, to include the FHAs, the DONs, Mr. Pratt's monitoring    10:09AM

1    team, the wardens, and the deputy wardens, to emphasize the

2    significance of the Court's order and the expectation of

3    ensuring the performance measures are being achieved.  We have

4    seen marked improvement in the communication and the approach

5    to problem-solving relative to those performance measures.          10:10AM

6    They are not perfect but they have made significant strides,

7    and as recently as the December of 2017 have all but achieved

8    93 percent compliance with the CGARs.

9    Q.  Have you met personally with Mr. Dichter (sic), the CEO?

10   A.  Mr. Rector.  I certainly have.  I have met with him I          10:10AM

11   believe three to four times face to face.  The first meeting I

12   encountered him actually was an introduction to each other at

13   the American Corrections Association and Directors Conference

14   at the mid winter in January in Florida, and our first

15   one-on-one conversation we specifically discussed the Court's     10:11AM

16   order of October the 10th.

17   Q.  In subsequent discussions you have had with him have you

18   talked about this order?

19   A.  Absolutely.  Certainly have.  And it's a topic that is

20   discussed on a weekly basis.  It's the same topic that I have     10:11AM

21   every other week with Mr. Maldonado and his staff and two

22   topics that are always discussed without exception are

23   performance measures and staffing.

24   Q.  Show you what's been marked as Defense Exhibit 37.  You

25   should have that in front of you.                                 10:12AM

1          And what is this?

2    A.   Exhibit 37 is a January 10th, 2018 letter addressed to

3    Mr. Maldonado co-signed by myself and Richard Pratt.  It is

4    reference:  Performance.  And it states, "As previously

5    discussed on October the 10th, United States Court Magistrate          10:13AM

6    Judge David Duncan issued an order requiring defendants in the

7    Parsons case to comply with the following performance measures

8    or face sanctions pursuant to the Court's civil contempt

9    authority."

10          It goes on to list the 11 measures subject to the          10:13AM

11   order as follows.

12          And on the bottom of Page 2, in order to follow the

13   compliance of these measures Corizon developed a daily tracking

14   system to determine which measures were not in compliance.  The

15   initial results based upon reporting for the calendar month of          10:13AM

16   December 2017 are as follows, and then there's a listing of

17   those measures, and it indicates a grand total of 2,481, which

18   I believe refers to incidents.

19          "To be clear, and as you well know, the Court has

20   demanded 100 percent compliance with these measures at the          10:14AM

21   listed facilities.  Anything short of 100 percent will be

22   considered by Magistrate Judge Duncan as eligible for

23   imposition of a $1,000 sanction.  Figures above represent a

24   potential sanction of $2.4 million.

25          "As we and ADC previously notified Corizon, if the          10:14AM

1    Court ultimately imposes sanctions against us Corizon will be

2    contractually responsible for comprehensive indemnification

3    pursuant to Paragraph 4 of Contract Amendment Number 10."

4    Q.   Do you know, Director, do you have personal knowledge as to

5    whether or not Corizon has been able -- actually been able to          10:14AM

6    develop a real-time tracker for all of these performance

7    measures?

8    A.   I don't know with specific detail if they have fully

9    achieved that.   I think they have with some.   I would defer to

10   Richard Pratt.                                                          10:15AM

11   Q.   Do you know where this 2481 number came from?

12   A.   I believe the number was identified and self-reported by

13   Corizon and verified by Richard Pratt and his staff.

14   Q.   And if you wouldn't mind taking a look at Exhibit 39,

15   defendants' Exhibit 39.                                                 10:15AM

16           And what is Exhibit 39?

17   A.   It is a February 7, 2018 letter addressed to Roland

18   Maldonado reference performance.   It is a co-signed letter from

19   myself and Richard Pratt and I believe it is a clarification

20   letter to our letter dated January 10 regarding performance            10:16AM

21   measures on review by the Court.

22   Q.   Okay.   And if you turn to Page 3, it looks like there's

23   some numbers there.

24   A.   And then states that number has now been recalculated

25   consistent with the Court's order as follows, and it lists the         10:16AM

1  performance measures and the grand total is 668.

2  Q.  Do you know why there was a -- do you have personal

3  knowledge as to why there was a difference between the January

4  10 letter and this February 7 letter, the difference in the

5  numbers?                                                    10:17AM

6  A.  Personally, I do not.  I would defer to Richard Pratt.

7  Q.  And the purpose of this letter was to?

8  A.  To provide clarification.

9  Q.  And that clarification being the number?

10 A.  Yes.                                                    10:17AM

11 Q.  Now, you have testified already about the letters that you

12 sent Corizon and meeting with the CEO in these bi-weekly

13 meetings.  Are you personally involved in these bi-weekly

14 meetings with the Corizon?

15 A.  Most of the time, yes.                                  10:17AM

16 Q.  How many -- what percentage of the meetings since October

17 have you been personally involved do you think?

18 A.  Probably 95 percent of them.

19 Q.  And is the October 10th order, is that a topic of

20 conversation at all of these meetings?                      10:18AM

21 A.  Yes, it is.

22 Q.  And what is your expectation with respect to the October

23 10th order?

24 A.  Compliance.

25 Q.  Now, one of the things that you have mentioned earlier in  10:18AM

1    the order referred to 100 percent compliance.  Is that

2    something that was in the stipulation?

3           MR. FATHI:  Objection, Your Honor.  Calls for a legal

4    conclusion.

5           THE COURT:  It's a subject of significant legal issue    10:18AM

6    in this case that's pending before the Court of Appeals

7    presently so I don't understand how a record developed here

8    with Mr. Ryan is of any use with respect to the OSC.  I have my

9    view as to what is going to be until I get further instruction

10   from the Court of Appeals that would cause me to do something    10:19AM

11   differently.  What Director Ryan would say would have no effect

12   on that because I have already made that legal decision.  You

13   have already challenged it.  So I don't see how this is useful

14   of your time.

15          MR. STRUCK:  If I may ask another question?    10:19AM

16          THE COURT:  Surely.

17   BY MR. STRUCK:

18   Q.  With respect to the stipulation, were you involved in the

19   negotiation of the stipulation?

20   A.  Yes, I was.    10:19AM

21   Q.  And what was your understanding when you negotiated a

22   stipulation with respect to the level of the performance

23   measures that needed to be met in order to comply?

24          MR. FATHI:  Objection, Your Honor.  One party's

25   post-hoc statement about what his intention was is absolutely    10:19AM

—————3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct—————

1    irrelevant.

2              THE COURT:  Sustained.  Water under the bridge.

3              MR. STRUCK:  Let me ask one more question.

4              THE COURT:  You may.

5    BY MR. STRUCK:                                                    10:19AM

6    Q.  If, in fact, the stipulation had -- if one of the

7    provisions of the stipulation required 100 percent performance

8    with a performance measure, would you have entered into that

9    stipulation?

10             MR. FATHI:  Objection, Your Honor.                      10:20AM

11             THE COURT:  Sustained.  The objection is sustained.

12   It's the same question.

13             MR. STRUCK:  May I submit an offer of proof, Your

14   Honor, through the question?

15             THE COURT:  Again, I don't see the utility of that.     10:20AM

16   The issue is presently before the Court of Appeals and you will

17   have to ask them to reopen the record, not me.

18             MR. STRUCK:  All right.

19             THE COURT:  Mr. Struck, is this a good time to take

20   the morning break?                                               10:20AM

21             Mr. Pratt, we take a break in the morning mostly for

22   the court reporter.  She works every second.  We're like cross

23   country skiers.  We can kick and glide.  She's doing something

24   every single moment.

25             We'll come back in 15 minutes.                         10:21AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1          MR. STRUCK:  It is Director Ryan.

2          THE COURT:  Did I say Mr. Ryan?

3          MR. STRUCK:  You said Director Pratt.

4          THE COURT:  We're both imperfect.  We know that.  So

5   stipulated.  Thank you, sir.                                    10:21AM

6          (Recess from 10:21 a.m. to 10:40 a.m.)

7          MR. STRUCK:  Before I resume I wanted to alert the

8   Court that we did receive the January numbers this morning and

9   they have been filed.  I have informed plaintiffs' counsel.

10          THE COURT:  But they haven't had a chance to look at   10:40AM

11   them, obviously.

12          MR. STRUCK:  I'm sure they have not.

13          THE COURT:  Thank you.

14          MR. STRUCK:  All right.

15   BY MR. STRUCK:                                                 10:40AM

16   Q.  Director, I wanted to ask you specifically about

17   Performance Measure 35.  Did the Department have involvement in

18   coming up with some sort of a plan to assist in reaching

19   compliance for Performance Measure 35?

20   A.  Yes, the Department did.  PM 35 relevant to the transfer of 10:41AM

21   medications with the inmate when moving from one location to

22   another involves an operational activity between prison

23   operations, personnel, and health care staff as well.  So there

24   has to be good collaboration and communication, advance

25   notification relative to the relocation of that offender.      10:41AM

1      We transfer hundreds of inmates throughout the state

2  each week to various locations so it is imperative that there

3  be good coordination.  Myself, Richard Pratt, Roland Maldonado,

4  Carson McWilliams, the regional directors, the wardens, the

5  FHAs, the DONs, several months ago collaborated and had a          10:42AM

6  state-wide meeting relative to the development and planning and

7  collaboration of this process.  The minute details of that

8  process I would defer to Carson McWilliams and Richard Pratt to

9  explain that, but it was essential that this operational

10  activity be well-coordinated between the Department and          10:43AM

11  Corizon.

12  Q.  And was that something that you directed?

13  A.  I facilitated it and was party to that, certainly the

14  initial, and then subsequently signed the Director's

15  instruction after it was fully developed.                         10:43AM

16  Q.  I just want to go over one more time and make sure.  You

17  have testified with respect to the measures that you took

18  regarding the Court's requirement and the stipulation's

19  requirement that the Department comply and ensure that its

20  third-party health care provider comply with the 11 performance   10:43AM

21  measures that are at issue here today.

22      You have testified about the letters that were sent.

23  Just so I'm not restating what your testimony is, could you

24  just go ahead and testify with respect to the other things that

25  you did?                                                          10:44AM

1   A.   We have met with Corizon on a bi-weekly basis.  I have

2   conferred with the CEO on a regular and/or weekly basis.  I

3   have met with Richard Pratt on a weekly basis.

4           And oftentimes, more often, certainly, I meet with,

5   have met with Carson McWilliams, the RODs, we conduct wardens'    10:44AM

6   meetings.  This is a topic of discussion on a regular basis and

7   we take a problem-solving approach relative to what is expected

8   in attendance at those wardens' meetings.  They are required to

9   meet on a daily basis with the health administrator from that

10  respective prison complex to problem solve.                      10:45AM

11          And they conduct those meetings operationally in the

12  afternoon of each day.  They had been conducting them much

13  earlier in the day, the morning, and it made a lot more sense

14  operationally to be conducting those sessions in the afternoon

15  so that they understood what had occurred or what had not        10:45AM

16  occurred during the day.  That was a requirement relative to

17  the measures and I think that's greatly improved the approach

18  that's being taken.  And again, I would defer to either Richard

19  Pratt or Carson, who can testify in certainly much greater

20  detail.                                                          10:46AM

21  Q.   Has it just been since June of 2017 when the Court

22  indicated that financial sanctions might be forthcoming that

23  you have been pushing Corizon with respect to complying with

24  this contract?

25  A.   No, it has not been just since June.  I have been heavily   10:46AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Direct

1   involved as the Director since the inception of privatized

2   health care over the last all but 10 years, and the delivery of

3   health care is an incredibly important function to the inmate

4   population and I pay attention and have paid attention for the

5   delivery of health care certainly throughout my career, but          10:47AM

6   most certainly since I returned almost 10 years ago as the

7   Director.

8   Q.  On October 10 the court ordered, "If the Court finds clear

9   and convincing evidence that the defendants have failed to take

10  all reasonable steps to comply with this order, the Court shall      10:47AM

11  impose civil contempt sanctions on defendants."

12          You have read that order, haven't you?

13  A.  Yes, I have.

14  Q.  And you understood what the Court meant?

15  A.  Yes, I do and I did.                                             10:47AM

16  Q.  Do you believe that you took all reasonable steps to comply

17  with the Court's order?

18  A.  Yes, I do.

19  Q.  Thank you.

20          THE COURT:  Thank you.                                       10:47AM

21          Any cross-examination?

22          MR. FATHI:  Yes, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. FATHI:

25  Q.  Good morning, Director Ryan.                                     10:48AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1    A.   Good morning.

2    Q.   Now, you were the legal custodian of all persons who were

3    incarcerated in ADC, correct?

4    A.   Yes.

5    Q.   And you have a constitutional obligation to provide                10:48AM

6    adequate medical and mental health care to those in your

7    custody who need it, correct?

8    A.   Yes.

9    Q.   And this lawsuit involves, among other things, the

10   provision of medical and mental health care in Arizona prisons,        10:48AM

11   correct?

12   A.   I'm sorry.  I --

13   Q.   This lawsuit involves the provision of medical and mental

14   health care in Arizona prisons?

15   A.   Yes.                                                               10:48AM

16   Q.   And the name of this lawsuit is Parsons versus Ryan?

17   A.   And Pratt.

18   Q.   Fair enough.

19        And you are the Ryan in Parson versus Ryan and Pratt,

20   correct?                                                               10:49AM

21   A.   Yes.

22   Q.   Now when this case settled in October of 2014 you put your

23   signature on the settlement agreement, which we also call the

24   stipulation, didn't you?

25   A.   Yes.                                                              10:49AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1   Q.  And obviously, when you did that you knew that health care

2   was being provided by a third party private corporation, right?

3   A.  Yes.

4   Q.  And by signing the stipulation, you promised to comply with

5   its requirements, including all of the performance measures          10:49AM

6   that are part of the stipulation?

7   A.  Yes.

8   Q.  And that's a promise you take seriously, isn't it?

9   A.  Yes.

10  Q.  Now, you know that we have regular hearings here in court         10:49AM

11  in this case, correct?

12  A.  Yes.

13  Q.  We have a standing monthly hearing and some months, like

14  this month, we have more than one hearing in a month?

15  A.  Yes.                                                              10:49AM

16  Q.  And you are notified in advance of when these hearings are

17  going to take place?

18  A.  Yes.

19  Q.  But before today, since the stipulation was approved in

20  February of 2015, you have only come to court once.                  10:50AM

21          MR. STRUCK:  Objection, Your Honor.  Relevance.

22          THE COURT:  What's the objection?

23          MR. STRUCK:  Relevance.

24          THE COURT:  Overruled.

25          THE WITNESS:  Repeat your question.                          10:50AM

1   BY MR. FATHI:

2   Q.   Before today, since the stipulation was approved by Judge

3   Duncan in February of 2015, you have only come to court once?

4   A.   Yes.

5   Q.   And that was last August when Judge Duncan ordered you to          10:50AM

6   appear?

7   A.   Yes.

8   Q.   Do you rely on Mr. Pratt to make sure that ADC is in

9   compliance with the stipulation?

10  A.   Yes, I do.                                                          10:50AM

11  Q.   Is he the person with primary responsibility for ensuring

12  compliance?

13  A.   He is, and he shares in that responsibility to some extent

14  with Carson McWilliams.

15  Q.   But talking about the health care provision to the                  10:51AM

16  stipulation, is it fair to say that Mr. Pratt is the person

17  with primary responsibility for ensuring compliance with those

18  provisions?

19  A.   Yes.

20  Q.   That's his job?                                                     10:51AM

21  A.   Yes.

22  Q.   Now, we talked about a state law that requires ADC to

23  contract with a private company to provide health care services

24  to people in your custody.

25  A.   Yes.                                                                10:51AM

1   Q.  And the current contract is with Corizon Health.

2   A.  Yes.

3   Q.  And the Corizon contract took effect in March of 2013.

4   A.  Yes.

5   Q.  And the original contract was for a period of three years        10:51AM

6   from March 2013 to March 2016.

7   A.  Yes.

8   Q.  And the number of FTEs in Corizon's original staffing

9   pattern when it first assumed the contract was actually smaller

10  than the number of FTEs when the State provided health care,        10:52AM

11  correct?

12  A.  I don't recall specifically.

13  Q.  You don't know.

14  A.  I would defer to Mr. Pratt.  I do not recall specifically.

15  Q.  Would you look at Exhibit, 201 please.                          10:52AM

16          This is a document that you discussed earlier dated

17  May 11, 2015 entitled Amendment Number 10, correct?

18  A.  Yes.

19  Q.  And you are familiar with this document?

20  A.  Yes.                                                           10:52AM

21  Q.  And by this document you extended the original three-year

22  contract with Corizon for an additional year to March of 2017,

23  correct?

24  A.  Yes.  The statutory provision that had been passed by the

25  legislature made available a three-year contract and the           10:53AM

1    potential of two one-year extensions.

2    Q.  So the contract was extended for an additional year to

3    2017.

4    A.  Yes.

5    Q.  As of the date of this renewal, May 11, 2015 were you          10:53AM

6    satisfied with Corizon's performance in providing health care

7    to ADC prisoners?

8    A.  Not completely.

9    Q.  Would you please turn to Page 3 of Exhibit 201.

10          In paragraph 8 you gave Corizon a raise from 11.20 to     10:53AM

11   11.60 per prisoner per day, correct?

12   A.  It was a CPI adjustment from $11.20 to $11.60.

13   Q.  So Corizon formerly got $11.20.  By this amendment they got

14   $11.60.

15   A.  Yes.                                                          10:54AM

16   Q.  And that was at an annual fiscal impact of $5.2 million.

17   A.  Yes.

18   Q.  And this increase was retroactive to March 4, 2015,

19   correct?

20   A.  Yes.                                                          10:54AM

21   Q.  Would you turn to paragraph -- Page 2, the final paragraph

22   above Section 5 titled Mediation.

23          This is the indemnification provision that you

24   discussed earlier, correct?

25          MR. STRUCK:  I'm sorry, Your Honor.  It's actually --      10:55AM

1  the indemnification is on Page 1 of the document, Paragraph 4.

2          MR. FATHI:  I'm sorry.  It begins on Page 1.  It

3  continues on to Page 2.

4  BY MR. FATHI:

5  Q.  Director Ryan, please take your time.  Let me know when you    10:55AM

6  are ready to answer questions about that.

7  A.  I have read it.

8  Q.  Pursuant to this provision, is Corizon indemnifying ADC for

9  the money ADC pays to Mr. Struck's law firm in this case?

10  A.  Yes.                                                            10:56AM

11  Q.  For 100 percent of that money?

12  A.  Yes.

13  Q.  How much is Corizon indemnified so far for Mr. Struck's law

14  firm?

15          MR. STRUCK:  Foundation, Your Honor, and relevance.       10:56AM

16          THE COURT:  Foundation objection is sustained.

17  Relevance is overruled.

18  BY MR. FATHI:

19  Q.  Director Ryan, do you know approximately how much Corizon

20  has reimbursed ADC for the payments that ADC has made to          10:56AM

21  Mr. Struck's law firm?

22  A.  Not off the top of my head, no.

23  Q.  You have no idea?

24  A.  I'm sure it's considerable.  But I do not have a specific

25  number.                                                           10:56AM

1   Q.  Pursuant to this provision, does Corizon indemnify ADC for

2   the payments that ADC makes to plaintiffs' counsel for

3   attorney's fees?

4           MR. STRUCK:  Foundation, Your Honor.

5           THE COURT:  The foundation objection is sustained.          10:56AM

6   BY MR. FATHI:

7   Q.  Director Ryan, do you know if -- under the stipulation, ADC

8   pays plaintiffs' counsel in this case up to $250,000 per year

9   for monitoring, correct?

10  A.  Yes.                                                            10:57AM

11  Q.  And the stipulation also provides that under certain

12  circumstances the Court can award plaintiffs' counsel

13  additional attorney's fees, correct?

14  A.  I believe so.

15  Q.  So my first question is, does Corizon reimburse ADC for the    10:57AM

16  up to $250,000 per year ADC pays to plaintiffs' counsel?

17          MR. STRUCK:  Foundation.

18          THE COURT:  Overruled.

19          THE WITNESS:  Ask your question again.

20  BY MR. FATHI:                                                      10:57AM

21  Q.  Does Corizon reimburse ADC for the $250,000 a year that ADC

22  pays to plaintiffs' counsel under the stipulation?

23  A.  I think so.

24  Q.  And is that 100 percent or some lesser percentage?

25          MR. STRUCK:  Foundation, Your Honor.                       10:58AM

1          THE COURT:  Overruled.

2          THE WITNESS:  I think so.

3   BY MR. FATHI:

4   Q.  You think it's 100 percent?

5   A.  I think it's 100 percent.                          10:58AM

6   Q.  And if the Court were to award plaintiffs' counsel

7   additional attorney's fees under the stipulation in addition to

8   that $250,000 a year, does Corizon reimburse ADC for that

9   amount?

10          MR. STRUCK:  Foundation.                        10:58AM

11          THE COURT:  The foundation objection is overruled.

12          MR. STRUCK:  And relevance.

13          THE COURT:  The relevance objection is overruled.

14          MR. STRUCK:  Also speculation, Your Honor.

15          THE COURT:  Sustained.                          10:58AM

16   BY MR. FATHI:

17   Q.  Director Ryan, you are aware that there's currently an

18   application for attorney's fees for plaintiffs' counsel pending

19   before this Court?

20   A.  I'm assuming so.                                   10:58AM

21   Q.  Have you had any discussions with Corizon about who is

22   going to pay that money if the Court grants that application

23   for attorney's fees?

24   A.  No, I haven't.

25   Q.  Still with Exhibit 201, would you please look at Paragraph  10:59AM

1    6 on Page 3 titled Contract Sanctions?

2          Are you there?

3    A.  Yes.

4    Q.  So this paragraph provides for sanctions to be imposed on

5    Corizon for failure to comply with performance measures under        10:59AM

6    the stipulation?

7    A.  Yes.

8    Q.  Would you please read aloud the -- on the fifth line the

9    sentence that begins, "The sanctions are assessed as follows."

10   A.  "The sanctions are assessed as follows:  For each          10:59AM

11   performance measure at each complex beginning the month of

12   March, 2016, if Corizon's lack of performance results in an

13   extension of the original time frame specified in the Parsons

14   v. Ryan et al. stipulation, Corizon will be assessed $5,000

15   for" --          11:00AM

16   Q.  That's fine.  Thank you.

17          I think you testified that this amendment was entered

18   into shortly after the stipulation went into effect.  Did I

19   hear that right?

20   A.  I believe I testified to that.          11:00AM

21   Q.  Okay.  But this amendment actually goes into effect or this

22   sanctions provision goes into effect March of 2016, which is

23   more than a year after the stipulation went into effect,

24   correct?

25   A.  Yes.          11:00AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1    Q.   Now, prior to Amendment 10 there have been no cap on the

2    sanctions that were payable by Corizon for non-compliance.

3    A.   I think that's correct.

4    Q.   Now, under Amendment 10, if Corizon was noncompliant on

5    three performance measures at six complexes, for a total of 18    11:01AM

6    instances of non-compliance that would result in a sanction of

7    $90,000, correct?

8    A.   Yes.

9    Q.   So once Corizon had incurred $90,000 in sanctions for 18

10   instances of non-compliance in a single month, there would be    11:01AM

11   no additional sanction for that month even if it was

12   non-compliant on all performance measures at all facilities,

13   correct?

14   A.   Correct.

15   Q.   The sanction would be the same.                              11:01AM

16   A.   Correct.

17   Q.   And that $90,000 monthly cap on sanctions remained in force

18   until the compliance results for November of 2017, which were

19   reported in January of this year, correct?

20   A.   Yes.                                                         11:01AM

21   Q.   Now, Mr. Pratt told us yesterday that you made the final

22   decision to agree to this $90,000 cap.  Is that correct?

23   A.   Yes.

24   Q.   Why did you agree to a cap on sanctions of $90,000 per

25   month?                                                           11:02AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1   A.  It was a negotiation with the vendor.

2   Q.  Now, we saw a moment ago at the bottom of Page 3 of Exhibit

3   201 that at the time you agreed to the $90,000 cap Corizon was

4   getting paid $11.60 per day per prisoner, correct?

5   A.  Yes.                                                        11:02AM

6   Q.  And just a little further down the page from that it refers

7   to a state average daily population of 35,159.  Do you see

8   that?

9   A.  Yes.

10  Q.  I will represent to you that 35,159 times $11.60 equals     11:02AM

11  $407,854.  Does that sound about right?

12  A.  Yes.

13  Q.  I have a calculator.  Would you like to check?

14  A.  I will accept that.

15  Q.  All right.                                                  11:03AM

16          So from its contract with ADC Corizon was at this time

17  grossing more than $407,000 every single day.

18  A.  Okay.

19  Q.  Correct?

20  A.  Correct.                                                    11:03AM

21  Q.  So $90,000 is less than one-quarter of what Corizon was

22  making from the contract in a single day.

23  A.  Yes.

24  Q.  In light of that figure, did you think that capping

25  sanctions at a maximum of $90,000 per month was a smart         11:03AM

1   business decision?

2           MR. STRUCK:  Objection, Your Honor.  Relevance.

3           THE COURT:  Overruled.

4           THE WITNESS:  Yes, I do.

5   BY MR. FATHI:                                              11:03AM

6   Q.  Did you think that a monthly sanction of less than

7   one-quarter of what Corizon makes in a single day was likely to

8   have a significant effect on Corizon's behavior?

9           MR. STRUCK:  Objection, Your Honor.  Foundation.  He's

10  talking about what they make but he's talking about gross      11:04AM

11  income.  It's not what they make.

12          MR. FATHI:  I'm happy to rephrase the question.

13          THE COURT:  Rephrase the question.

14  BY MR. FATHI:

15  Q.  Did you think that a monthly sanction of less than         11:04AM

16  one-quarter of what Corizon grosses in a single day was likely

17  to have a significant effect on Corizon's behavior?

18  A.  What was the second part of your question?  Significant

19  what.

20  Q.  A significant effect on Corizon's behavior.               11:04AM

21  A.  It was part of the negotiation process and there was a

22  $90,000 maximum sanction that was in effect, and they would be

23  required to provide an action plan in response to those

24  deficient measures, but that was all part of the negotiation

25  process.                                                      11:05AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1  Q.  Did you think that a monthly sanction of less than

2  one-quarter of what Corizon grosses in a single day was likely

3  to have a significant effect on Corizon's behavior?

4          MR. STRUCK:  Objection, Your Honor.  Relevance,

5  foundation, and speculation.                                    11:05AM

6          THE COURT:  All three overruled.

7          THE WITNESS:  Yes.

8  BY MR. FATHI:

9  Q.  Would you turn to Defendants' Exhibit 18, please.  Please

10 let me know when you are there.                                 11:05AM

11 A.  It's not here.

12         MR. FATHI:  May I approach, Your Honor?

13         THE COURT:  You may.

14 BY MR. FATHI:

15 Q.  Are you there, Director Ryan?                               11:06AM

16 A.  Yes.

17 Q.  This is a letter dated June 16, 2016, dealing with

18 sanctions for April of 2016.  Would you turn to Page 9, please?

19 A.  Yes.

20 Q.  This letter is signed by Richard Pratt and cc'd to you.    11:07AM

21 Have you seen this letter before?

22 A.  Probably.  I don't recall when.

23 Q.  Given that you are listed as a cc, do you have any reason

24 to believe that you did not receive this letter?

25 A.  No, I do not.                                               11:07AM

1  Q.  On Page 9, Mr. Pratt states that there were 113 separate

2  performance measures that were non-compliant, and with a fine

3  of $5,000 each that would add up to a sanction of $565,000.  Do

4  you see that?

5  A.  Yes.                                                          11:07AM

6  Q.  But because of the cap that you negotiated it was capped at

7  90,000, correct?

8          MR. STRUCK:  Relevance and cumulative.  We have

9  already gone over this testimony with Mr. Pratt.

10         THE COURT:  Both are overruled.                           11:08AM

11         THE WITNESS:  Repeat your question.

12 BY MR. FATHI:

13 Q.  The presumptive sanction based on 113 instances of

14 non-compliance at $5,000 apiece would have been $565,000,

15 correct?                                                          11:08AM

16 A.  Yes.

17 Q.  But because of the cap that you negotiated the actual

18 sanction imposed was $90,000.

19 A.  Yes.

20 Q.  Would it be fair to say that on June 16, 2016, the date of   11:08AM

21 this letter, you were not satisfied with Corizon's performance?

22 A.  Yes.

23 Q.  If you turn to Exhibit 202, please.

24         Director Ryan, Exhibit 202 is a document dated June

25 30, 2016 entitled Amendment Number 11.  Correct?                 11:09AM

1    A.  Yes.

2    Q.  So this document is dated two weeks after the letter we

3    just looked at when you weren't satisfied with Corizon's

4    performance.

5    A.  Yes.                                                        11:09AM

6    Q.  And in this amendment you extended Corizon's contract for

7    an additional year from March 2017 to March 2018, correct?

8            MR. STRUCK:  Objection.  Relevance.

9            THE COURT:  Overruled.

10           THE WITNESS:  Yes.                                      11:09AM

11   BY MR. FATHI:

12   Q.  And you gave Corizon a 4 percent raise, correct?

13   A.  A 4 percent CPI increase was requested and approved by the

14   legislature.

15   Q.  So you gave Corizon a 4 percent increase on what they were  11:09AM

16   paid under this contract.

17   A.  Yes.

18   Q.  And, once again, the raise was retroactive to March of

19   2016.

20   A.  Yes.                                                        11:10AM

21   Q.  Would you look at Exhibit 20, please?

22   A.  Which one?

23   Q.  20.

24           Director Ryan, Exhibit 20 is a July 25, 2016 letter

25   from Richard Pratt to Cindy Black.  Correct?                    11:10AM

1    A.  Yes.

2    Q.  So this letter was written about three or four weeks after

3    you extended Corizon's contract for the second time and gave

4    them a raise for the second time.

5    A.  It was written after they were approved for a CPI.        11:11AM

6    Q.  It was written after the contract was extended for an

7    additional year, correct, about three to four weeks after that?

8    A.  Yes.

9    Q.  And about three to four weeks after Corizon received the

10   4 percent increase in what they were paid.                    11:11AM

11   A.  Yes.

12   Q.  Would you turn to Page 9, please.

13         Are you there?

14   A.  Yes.

15   Q.  You were copied on this letter, correct?                  11:11AM

16   A.  Yes.

17   Q.  Have you seen this letter before?

18   A.  Probably.

19   Q.  So this letter deals with the sanctions imposed on Corizon

20   for May of 2016.  Correct?                                    11:11AM

21   A.  Yes.

22   Q.  And on Page 9, Mr. Pratt writes that 121 measures were

23   non-compliant, which would have resulted in a fine of $605,000,

24   correct?

25         MR. STRUCK:  402, 403.  Objection.                      11:12AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1      THE COURT:  You are going to have to -- I don't see

2   how this is -- you said 402 and 403.  I don't see how those

3   apply here.

4      MR. STRUCK:  Relevance.  And this is cumulative from

5   the testimony that we already heard about yesterday.          11:12AM

6      THE COURT:  I thought you were saying something

7   different because you had been using different words before.

8      MR. STRUCK:  I thought I would try 402, 403.

9      THE COURT:  We don't have a jury here so we're not

10  hiding anything from them.  So I was just curious about that.   11:12AM

11      And you should understand that the plaintiffs have an

12  opportunity to inquire about whether or not the Department of

13  Corrections people who are defendants in this case have taken

14  all reasonable steps, and he is tracking through what seems to

15  be a reasonable inquiry on that approach.  That's why every     11:12AM

16  single one of your objections has been overruled.  So this

17  objection now is the same as the objections you have made

18  previously.  You are entitled to make each and every one of

19  those objections but just so you understand I'm unlikely to

20  sustain any of them.                                            11:13AM

21      MR. STRUCK:  I understand, Your Honor, and the reason

22  why I'm objecting to relevance is because of the date on this

23  is far before any issues with respect to the order to show

24  cause.

25      THE COURT:  I never wanted to get into the situation     11:13AM

UNITED STATES DISTRICT COURT

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1    where I have to have an order to show cause so it's an ultimate

2    dramatic sanction, and if we had been in a position where

3    reasonable steps had been taken we would imagine that we would

4    have had corrections that would have addressed the failure to

5    comply with the stipulation.                                    11:13AM

6            And so this is, to me, inquiring with respect to the

7    Director about the track record that led us down the road that

8    has me contemplating this very serious sanction, so that is a

9    road that would be populated by whether reasonable actions were

10   taken or not.                                                   11:13AM

11           The date that you asked me to focus on when I

12   postponed the consideration of it allowed me to focus on a

13   particular time period of whether or not you had taken all

14   reasonable steps as defendants with the order to show cause.

15   That's fair.  But it also seems fair to me that the context of  11:14AM

16   the case, one that you have also made presentations about in

17   your direct examination of this witness and other witnesses on

18   the order to show cause, have also gone beyond the date and the

19   time period from my initial declaration in the summer of last.

20   To October of last.                                             11:14AM

21           So I think what's good for the goose is good for the

22   gander.  The objections are overruled.

23   BY MR. FATHI:

24   Q.  Would you like me to repeat the question, Director Ryan?

25   A.  Yes.                                                        11:14AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1   Q.  On Page 9 of Exhibit 20 Mr. Pratt writes that in May of
2   2016 121 measures were non-compliant, which would have resulted
3   at $5,000 apiece in a fine of $605,000, correct?
4   A.  Yes.
5   Q.  But because of the cap you negotiated the actual fine was          11:15AM
6   only $90,000.
7   A.  Yes.
8   Q.  Would you turn back to Page 1, please?
9           Please read aloud the fourth paragraph, beginning
10  "Corizon must demonstrate".                                            11:15AM
11  A.  "Corizon must demonstrate immediate improvement in the
12  performance measure scores ADC will not tolerate the
13  perpetuation of the status quo."
14  Q.  Did Corizon demonstrate immediate improvement after this
15  July 25th, 2016 letter?                                                11:15AM
16  A.  I don't recall.
17  Q.  You don't recall?
18  A.  I don't recall.
19  Q.  In the same paragraph, would you please read the third
20  sentence beginning "Corizon cannot continue".                         11:15AM
21  A.  "Corizon cannot continue to conduct business as usual with
22  the attitude that paying a sanction of $90,000 each month is
23  simply the acceptable cost of doing business."
24  Q.  Next, would you please read the first two sentences of the
25  fifth paragraph.                                                       11:16AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1    A.   "Time is certainly of the essence in the absence of

2    immediate and significant improvement in performance.  Corizon

3    will relegate ADC to operating the inmate health care system

4    under judicial monitoring for many years to come."

5    Q.   Did Corizon demonstrate immediate and significant                11:16AM

6    improvement in performance after this July 25, 2016 letter?

7    A.   I think I would have to look at subsequent monthly letters

8    to answer that question.  I don't recall.

9    Q.   Would you next turn to Exhibit 204, please.

10           Exhibit 204 is a document entitled Amendment 13 and          11:17AM

11   dated June 29, 2017.  Correct?

12   A.   Yes.

13   Q.   And in this document, in this amendment, you extended

14   Corizon's contract a third time to June 30, 2018?

15   A.   Yes.                                                             11:17AM

16   Q.   And you gave Corizon a raise for the third time.

17   A.   Corizon received a 4 percent consumer price index increase.

18   Q.   Corizon started to be paid 4 percent more under the

19   contract.

20   A.   Yes.                                                             11:17AM

21   Q.   And once again the raise was retroactive to March 4th,

22   2017.

23   A.   The CPI was retroactive to March 4 of 2017.

24   Q.   Would you turn to Exhibit 205, please.

25           MR. FATHI:  May I approach, Your Honor?                       11:18AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

```
1              THE COURT:  You may.

2              THE WITNESS:  I don't find it up here.

3              THE COURT:  Assistance is on its way.

4              THE WITNESS:  I'd stand corrected.  Here it is.  I

5    found it.                                                    11:19AM

6    BY MR. FATHI:

7    Q.  Director Ryan, Exhibit 205 is a document entitled Amendment

8    Number 14 dated September 6, 2017.  Correct?

9    A.  Yes.

10   Q.  And you testified on direct examination that this amendment  11:19AM

11   removed the caps on the sanctions and also provided for some

12   incentive payments, correct?

13   A.  Yes.

14   Q.  Would you now look at Exhibit 103, please.

15             THE COURT:  This is Mr. Pratt's summary.              11:20AM

16             MR. FATHI:  It's Mr. Pratt's summary.  Yes.  I believe

17   it's defendants'.

18             THE COURT:  Okay.

19   BY MR. FATHI:

20   Q.  Do you have it, Director Ryan?                             11:20AM

21             THE COURT:  Go ahead and see if you can help find it.

22             THE WITNESS:  I think this is it.  It says -- it's

23   entitled Sanctionable PMs at the top?

24             MR. FATHI:  May I approach, Your Honor?

25             THE COURT:  You may.  Please.                        11:20AM
```

1        MS. EIDENBACH:  Your Honor, may I approach?

2        THE COURT:  You may as well.  It takes a village.

3        MR. FATHI:  Your Honor, if defendants have an extra

4   copy could they perhaps come to the rescue and provide it to

5   the witness?                                            11:21AM

6        THE COURT:  Do you all happen to have an extra copy of

7   Mr. Pratt's summary.

8        If you can find it we can also make copies.  Mine's

9   been annotated so it wouldn't be helpful.

10        We have one for the witness here that we can present.   11:22AM

11   It's been placed before the Director as what's been marked and

12   admitted into evidence as Demonstrative Exhibit 103 subject to

13   the reservations that will be heard once the plaintiffs take a

14   look at the January numbers.

15        MR. FATHI:  Thank you, Your Honor.                 11:22AM

16   BY MR. FATHI:

17   Q.  Director Ryan, have you seen this document before?

18   A.  No.

19   Q.  This was -- Mr. Pratt testified yesterday that this is a

20   document that he prepared to track the sanctions that were     11:22AM

21   imposed and then, more recently, the incentives that were

22   awarded to Corizon under the contract.

23        Would you turn to Page 2, please, and you will see

24   down the left-hand column there are various months.

25        Do you see that?                                  11:23AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1   A.   Yes.

2   Q.   And the extreme right-hand column is labeled Total

3   Sanctions Applied.  Do you see that?

4   A.   Yes.

5   Q.   How much in sanctions was imposed in October of 2017?      11:23AM

6   A.   90,000.

7   Q.   November '17?

8   A.   200,000.

9   Q.   December '17?

10   A.   210,000.      11:23AM

11   Q.   And January '18.

12   A.   175,000.

13   Q.   So that adds up for those four months to $675,000.

14   Correct?

15          MR. STRUCK:  Your Honor, I think that math is      11:24AM

16   incorrect.

17          THE COURT:  Double check, please.

18          MR. STRUCK:  585,000.

19          MR. FATHI:  No.  It's 675,000.

20          MR. STRUCK:  Your Honor, for November, December, and      11:24AM

21   January.

22          MR. FATHI:  And October.

23          MR. STRUCK:  I'm sorry.

24   BY MR. FATHI

25   Q.   So that adds up to 675,000, correct?      11:24AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1    A.  I will accept that number.  I don't have a calculator.

2    Q.  Would you like to borrow mine?

3    A.  No.

4    Q.  Would you next turn to Page 3, please?

5           And this page provides month by month the total     11:25AM

6    incentives applied.

7           Do you see that?

8    A.  Yes.

9    Q.  What was the amount of incentives in October of '17?

10   A.  485,000.                                                11:25AM

11   Q.  November '17?

12   A.  635,000.

13   Q.  December '17?

14   A.  545,000.

15   Q.  January '18?                                           11:25AM

16   A.  885,000.

17   Q.  And here the math is helpful we've already done for us.

18   That adds up to $2,550,000, correct?

19   A.  Yes.

20   Q.  So in those four months, October '17 through January '18, a  11:25AM

21   total of $675,000 in sanctions were imposed and a total of

22   $2,550,000 in incentives were awarded, correct?

23   A.  Yes.

24   Q.  Does that strike you as a smart business decision?

25           MR. STRUCK:  Objection, Your Honor.  That's        11:26AM

1    argumentative.

2           THE COURT:  Overruled.

3           THE WITNESS:  It was a negotiated business decision.

4    BY MR. FATHI:

5    Q.  Does it strike you as a smart business decision?            11:26AM

6    A.  It was.

7    Q.  Now there's no requirement, is there, that Corizon spend

8    this incentive money in any particular way?

9    A.  I don't know that I can answer that question.

10   Q.  Well, can you show me in Exhibit 205 where it requires      11:26AM

11   Corizon to spend the incentive money it gets in any particular

12   way?

13   A.  I don't see anything in Amendment 14 that requires that.

14   Q.  So Corizon doesn't have to spend this money on providing

15   health care?                                                    11:27AM

16   A.  I don't know that that is -- that to be the case.

17   Q.  Are you aware of any requirement in the contract or any of

18   the amendments that constrains Corizon's ability in any way in

19   terms of what it does with this incentive money?

20   A.  Not that I'm aware of.                                      11:27AM

21   Q.  So Corizon can just keep the money, right?

22   A.  Yes.

23   Q.  Doesn't have to spend it on health care.

24   A.  It may not require them to spend it on health care.

25   Q.  Would you turn to Exhibit 31, please.                       11:28AM

1           Exhibit 31 is the October 25, 2017 letter from you and

2    Mr. Pratt to the Corizon Board of Directors, and on pages 1 and

3    2 you list the 11 performance measures that are the subject of

4    the October 2017 order to show cause, correct?

5    A.  Yes.                                                              11:29AM

6    Q.  Would you please read aloud the first sentence of the next

7    paragraph, beginning, "The Court found".

8    A.  "The Court found these performance measures at these

9    prisons to be substantially non-compliant with a stipulation

10   almost one year ago and they are still non-compliant."          11:29AM

11   Q.  Would you turn to Page 4, please.

12          Would you please read aloud the first two sentences of

13   the final paragraph.

14   A.  "To be clear, we demand that Corizon immediately take all

15   reasonable steps to comply with the subject performance         11:29AM

16   measures as well as all other performance measures set forth in

17   the Court's order.  These steps include but are not limited to

18   flying in Corizon health care personnel from other states to

19   fill vacant positions and implementing the daily real-time

20   monitoring data program advocated by Mr. Maldonado just last    11:30AM

21   week."

22   Q.  At any time -- excuse me.

23          You demanded that Corizon fly in additional health

24   care from other states because you believed that additional

25   health care personnel were needed to achieve compliance with    11:30AM

1    the performance measures in the order to show cause.

2    A.  I believe that flying in personnel was necessary for them

3    to fill the equivalent of the positions that they were

4    authorized to fill but had not.

5    Q.  You believed that flying in additional health care                11:30AM

6    personnel was necessary to achieve compliance with the

7    performance measures set forth in the OSC, correct?

8    A.  I believe it certainly would have been helpful and moved

9    them in that direction.

10   Q.  At any time between October 25 and today did Corizon fly in  11:31AM

11   health care personnel from other states?

12   A.  I believe they have but I would defer to Richard Pratt.

13   Q.  How many?

14   A.  I would defer to Richard Pratt.  I don't know how many.

15   Q.  What positions were they?                                         11:31AM

16          MR. STRUCK:  Your Honor, foundation.

17          MR. FATHI:  Your Honor if he doesn't know he can

18   obviously say that.

19          THE COURT:  Do you know, Director Pratt -- I'm

20   sorry.  Director Ryan, do you know?                                   11:31AM

21          THE WITNESS:  I do not know.

22          THE COURT:  Thank you.

23   BY MR. FATHI:

24   Q.  So you don't know how many health care staff Corizon

25   brought in.                                                          11:31AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

```
 1    A.   No, I don't.

 2    Q.   You don't know what positions they were.

 3    A.   I would defer to Richard Pratt to answer that.

 4    Q.   You don't know?

 5    A.   No, I don't.                                    11:32AM

 6    Q.   Do you know at what complexes they were deployed?

 7              MR. STRUCK:  Foundation.

 8              THE COURT:  It's says do you know.  Overruled.

 9              THE WITNESS:  No, I don't.

10    BY MR. FATHI:                                        11:32AM

11    Q.   Do you know when they arrived?

12    A.   No, I don't.

13    Q.   Do you know how long they stayed?

14    A.   No, I don't.

15    Q.   Do you know if they are still here?            11:32AM

16    A.   No, I don't.

17    Q.   This was pretty important to you, wasn't it?

18    A.   Yes.

19    Q.   You demanded it?

20    A.   Yes.                                            11:32AM

21    Q.   Would you please read the penultimate sentence of the final

22    paragraph?

23    A.   You said read the first sentence?

24    Q.   The penultimate sentence, the second to last sentence, of

25    the final paragraph.                                11:33AM
```

1   A.  "If the Court ultimately imposes any sanctions against us,

2   Corizon will be contractually responsible for comprehensive

3   indemnification pursuant to Paragraph Number 4 of contract

4   Amendment Number 10."

5   Q.  So you are saying here that if the Court imposes contempt      11:33AM

6   sanctions Corizon has to pay them.

7   A.  Yes.

8   Q.  And so if that were to happen, no matter how large the

9   sanction was that Judge Duncan imposed, it wouldn't cost ADC a

10  dime, correct?                                                    11:33AM

11          MR. STRUCK:  Objection, Your Honor.  Speculation and

12  foundation.

13          THE COURT:  Why don't you rephrase the question.

14  BY MR. FATHI

15  Q.  If Corizon were to, as you request, indemnify ADC for         11:33AM

16  contempt sanctions, then any contempt sanctions imposed by

17  Judge Duncan on ADC would not cost ADC anything.

18          MR. STRUCK:  Same objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  That is correct, in accordance with         11:34AM

21  Amendment Number 10.

22  BY MR. FATHI:

23  Q.  Has Corizon agreed to pay any contempt sanctions that may

24  be imposed against you and Mr. Pratt?

25  A.  They have not indicated one way or the other.                 11:34AM

1  Q.  So they have not agreed?

2  A.  They have not indicated one way or the other.

3  Q.  You do not have an agreement from Corizon that they will

4  indemnify you for any sanctions that may be imposed by the

5  Court.                                                          11:34AM

6         MR. STRUCK:  Objection, Your Honor.  Foundation.

7  Calls for a legal conclusion.  We have already talked about --

8         THE COURT:  And I think there's been testimony that he

9  understands the agreement in Amendment 10 to provide for

10  exactly that.  So you're saying he doesn't have an agreement?  11:34AM

11         MR. FATHI:  I'm sorry.

12  BY MR. FATHI:

13  Q.  Putting aside Amendment 10, has anyone from Corizon, since

14  you wrote this letter on October 25, said to you that Corizon

15  will indemnify ADC for part or all of any contempt sanctions   11:35AM

16  that may be assessed?

17  A.  Not so far.

18  Q.  Would you turn to Exhibit 33, please.

19         This is the November 6, 2017 letter to you from Jeff

20  Goldberg that we discussed or you discussed on direct          11:35AM

21  examination.

22         In the last paragraph on the first page, about five

23  lines up from the bottom, would you please read aloud the

24  sentence beginning "We are prepared".

25  A.  "We are prepared with detailed analyses of the root causes 11:35AM

1  of non-compliance and are eager to work together with your team

2  on the ground to address them.  We have substantial actions

3  under way that we are excited to convey.  I hope you will

4  promptly ask your team to engage with us in these efforts."

5  Q.  That's fine.                                              11:36AM

6       Did you ever request that Corizon provide you with

7  these detailed analyses of the root causes of non-compliance?

8  A.  I would defer to Richard Pratt.  They certainly have not

9  been provided to me to date.

10 Q.  Would you turn to Exhibit 34, please.                     11:36AM

11      And this is your -- excuse me.

12      Mr. Struck asked you about it so it may already be on

13 the table.

14      Exhibit 34 is the letter from you and Mr. Pratt dated

15 November 18 to the Corizon Health Board of Directors.  On Page 11:37AM

16 1 in the first paragraph, about seven lines up from the bottom,

17 could you please read aloud the sentence beginning "We have

18 serious concerns".

19 A.  "We have serious concerns whether Pentaho can be used

20 effectively for daily reporting on many of these performance    11:38AM

21 measures and the time required for Corizon to experiment

22 whether it can be so used is a luxury that we do not have."

23 Q.  Director Ryan, what is Pentaho?

24 A.  It is, my understanding, an automated program that Corizon

25 uses to try and report data.  And I would also defer to Richard 11:38AM

1   Pratt to respond to that in greater detail.

2   Q.  You spoke about the new CEO of Corizon.  Is his name Steve

3   Rector?

4   A.  Yes.

5   Q.  You referred to him as CEO Number 7, correct?                    11:38AM

6   A.  Yes.

7   Q.  Because he's the 7th CEO that Corizon has had since they

8   have had the contract with ADC.

9   A.  Yes.

10  Q.  And you believe that CEO Number 7 will succeed where CEO       11:39AM

11  Numbers 1 through 6 have failed.

12  A.  That's the expectation.

13  Q.  But you believe that CEO Number 7 will succeed in achieving

14  compliance where CEOs 1 through 6 have failed.

15  A.  I have found Mr. Rector to be quite responsive and            11:39AM

16  progressive.

17  Q.  Now, you testified that Mr. Rector has -- the phrase he

18  used was given direction to various people.  Do you remember

19  that testimony?

20  A.  Yes.                                                          11:39AM

21  Q.  How do you know that?

22  A.  Because he's conveyed it personally.

23  Q.  So who are the people -- who are some of the categories of

24  people he's given direction to?

25  A.  Certainly to Corizon people, leadership in his               11:39AM

1  headquarters, and certainly to Mr. Maldonado and his team here

2  in Arizona.

3  Q.   Okay.  So how do you know that Mr. Rector has given

4  direction to people in Corizon headquarters?

5  A.   Because he's told me that verbally.                    11:40AM

6  Q.   So you haven't seen anything in writing that Mr. Rector has

7  sent to people in Corizon headquarters?

8  A.   No, I haven't.

9  Q.   So your only source of information is that Mr. Rector tells

10  you so?                                                     11:40AM

11  A.   Yes.

12  Q.   And how do you know that Mr. Rector has given direction to

13  Mr. Maldonado?

14  A.   He's told me that.  I have met with Mr. Maldonado and

15  Mr. Rector together and I have heard that firsthand.        11:40AM

16  Q.   Have you seen any communications in writing between -- in

17  which Mr. Rector gives direction to Mr. Maldonado?

18  A.   Not that I recall.

19  Q.   Now, you testified, I believe, that in December of 2017

20  Corizon had achieved 93 percent compliance.  Is that right?  11:41AM

21  A.   Yes.

22  Q.   How was that figure calculated?

23  A.   It is, I believe, calculated by the number of compliant

24  performance measures in relationship to those that are, if you

25  will, non-compliant, and so if there's 849 performance measures  11:41AM

 1   and they are, if you will, 93 percent compliant, take the

 2   percentage 93 times 849 and that will give you the number of

 3   performance measures that are compliant.

 4   Q.  And who performed that calculation?

 5   A.  That is information that is compiled by Richard Pratt and          11:41AM

 6   his team of monitors.

 7   Q.  So who is the individual who performed the calculation that

 8   you just described and came up with 93 percent?

 9          MR. STRUCK:  Foundation.

10          THE COURT:  Overruled.                                         11:42AM

11          THE WITNESS:  I don't know specifically.  It might be

12   Richard Pratt or it might be one of his staff whose first name

13   is Jason.

14   BY MR. FATHI:

15   Q.  But it wasn't you?                                                11:42AM

16   A.  No.

17   Q.  Now, in performing that calculation, how are performance

18   measures that were not applicable at a given facility in that

19   month counted?  Were they counted as compliant?

20          MR. STRUCK:  Foundation.                                       11:42AM

21          THE COURT:  Sustained.

22   BY MR. FATHI

23   Q.  Director Ryan, do you know in performing the calculation

24   that you just described how performance measures that are not

25   applicable at a given facility in that month are counted?            11:42AM

1   A.  No, I don't.

2   Q.  Do you know if in performing that calculation it includes

3   scores that were calculated using methodologies that the Court

4   has ruled are invalid?

5   A.  It's my understanding there may be two performance measures   11:43AM

6   that the Court was in disagreement with the methodology.

7   Q.  Well, my question is, for those performance measures that

8   were calculated using a methodology that the Court has since

9   ruled is invalid are those scores included in this average?

10          MR. STRUCK:  Foundation.                                 11:43AM

11          THE COURT:  Sustained.

12   BY MR. FATHI

13   Q.  Do you know one way or the other?

14   A.  I don't know specifically.

15   Q.  Thank you.                                                   11:43AM

16          Would you turn to Exhibit 35, please.

17          Director Ryan, Exhibit 35 is a November 22, 2017

18   letter from Richard Pratt to Roland Maldonado on which you are

19   listed as a CC.  Have you seen this letter before?

20   A.  I have.                                                      11:44AM

21   Q.  On Page 1 would you please read aloud the second sentence

22   of the second paragraph?

23   A.  "This is the 19th consecutive month that Corizon's lack of

24   compliance with the stipulated agreement has resulted in a

25   $90,000 sanction."                                              11:45AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1    Q.  Would you now read aloud the first sentence of the fourth

2    paragraph.

3    A.  "Unsatisfactory performance on several performance measures

4    continues to be unacceptable."

5    Q.  Do you agree with Mr. Pratt that unsatisfactory performance    11:45AM

6    on several performance measures continues to be unacceptable?

7    A.  Yes.

8    Q.  Would you turn to Exhibit 36, please.

9          Exhibit 36 is a December 17, 2017 letter from Richard

10   Pratt to Roland Maldonado, and if you turn to Page 3 --    11:46AM

11          THE COURT:  You may have misstated the date.

12          MR. FATHI:  Perhaps, Your Honor.

13          THE COURT:  You said December 17.  I think it's

14   December 15.

15          MR. FATHI:  It is December 15, 2017.  My apologies.    11:46AM

16   BY MR. FATHI:

17   Q.  And if you turn to Page 3, Director Ryan, you are listed as

18   a CC.  Do you see that?

19   A.  Yes.

20   Q.  Have you seen this letter before?    11:46AM

21   A.  Yes.

22   Q.  Would you please read aloud the second sentence of the

23   second paragraph.

24   A.  "This is the 20th consecutive month that Corizon's lack of

25   compliance with the stipulated agreement has resulted in a    11:46AM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1    $90,000 sanction."

2    Q.  Is it acceptable to you that for 20 consecutive months

3    Corizon compliance with the stipulation resulted in the maximum

4    sanction available?

5    A.  No.                                                    11:47AM

6    Q.  Would you turn to Exhibit 97, please, Defendants' Exhibit

7    97.

8            Director Ryan, Exhibit 97 is a letter from you and

9    Mr. Pratt to Roland Maldonado, correct?

10   A.  Yes.                                                   11:47AM

11   Q.  And it's dated March 22, 2018.  In other words, last

12   Thursday.  Correct?

13   A.  Yes.

14   Q.  And the subject line is, quote, "Real-Time reporting

15   required by the Court demand for performance."             11:47AM

16   A.  Yes.

17   Q.  And this letter discusses the Court's requirement that ADC

18   report its compliance with the 11 performance measures that are

19   the subject of the order to show cause.

20   A.  Yes.                                                   11:48AM

21   Q.  On Page 1, would you please read aloud the final sentence

22   of the second paragraph?

23   A.  "The process to complete these reports has been developed

24   by Corizon and adjusted over the past several months in order

25   to result in a quality report to be shared with the Court."  11:48AM

1  Q.  Please describe the process that is used to complete these

2  reports.

3  A.  I defer to Richard Pratt to do that.

4  Q.  Do you -- are you able to describe the process?

5  A.  Not specifically, no.                                   11:48AM

6  Q.  What adjustments have been made to this process over the

7  past several months?

8          MR. STRUCK:  Foundation.

9          THE COURT:  Sustained.

10         THE WITNESS:  I would defer to Richard Pratt.        11:48AM

11         THE COURT:  Don't answer the question.  The objection

12  was sustained.

13  BY MR. FATHI:

14  Q.  Director Ryan, do you know what adjustments have been made

15  to this process over the past several months?              11:49AM

16  A.  No.

17         THE COURT:  It may seem silly to you, sir, but your

18  lawyer made an objection.  I sustained it.  So we should at

19  least honor the courtesy that he won on that and not give him

20  what he was hoping to stop and not give an answer that he    11:49AM

21  thought was impermissible because there was not a foundation

22  for it.

23  BY MR. FATHI:

24  Q.  Is it Mr. Pratt's job to know these things?

25  A.  Yes.                                                    11:49AM

1    BY MR. FATHI:

2    Q.  Would you turn to page 3 of Exhibit 97, please, and would

3    you please read aloud the second paragraph.

4    A.  "Corizon is now compiling numbers for the February 2018

5    real-time report.  While the difficulty in the process to          11:49AM

6    determine these results is understood, it is nonetheless

7    paramount that significant improvement is shown with the next

8    report.  That final report will be due no later than April 4,

9    2018."

10   Q.  Director Ryan, why is it paramount that significant           11:50AM

11   improvement is shown with the next report?

12   A.  It's paramount because of what the Court is considering

13   relative to being held in contempt, and therefore, if the

14   real-time reporting is to be made available then we have an

15   expectation that Corizon will deliver.                            11:50AM

16   Q.  What were the problems with the previous reports such that

17   significant improvement is necessary?

18   A.  I don't know.

19   Q.  You signed this letter, correct?

20   A.  I did.                                                        11:50AM

21   Q.  But you don't know the answer to that question?

22   A.  This letter was co-authored by myself and Richard Pratt and

23   I'm relying on his input relative to that topic.

24   Q.  So you don't know the answer to that question.

25   A.  No.                                                           11:51AM

1    Q.   It's Mr. Pratt's job to know that?

2    A.   Yes.

3    Q.   All right.

4           Finally, on Page 3 would you please read aloud the

5    fourth paragraph.  It's only one sentence.                    11:51AM

6    A.   "Please provide a detailed synopsis of efforts taken over

7    the last five months to document Corizon's commitment to comply

8    with the subject performance measures and to fill vacant

9    positions on your rosters."

10   Q.   Since you sent this letter on March 22 have you received   11:51AM

11   the detailed synopsis that you requested?

12   A.   No.

13   Q.   Why did you wait for more than five months after the

14   Court's order to show cause to demand this detailed synopsis?

15   A.   We have been meeting and demanding of Corizon on a regular  11:51AM

16   basis for information relative to compliance with performance

17   measures.

18   Q.   But this is the first time that you have set forth a

19   written demand for a detailed synopsis, correct?

20   A.   We have asked repeatedly of Corizon for the details, so    11:52AM

21   yes, this is the first time that a demand has, in fact, been

22   made in writing.

23   Q.   And my question is, why did you wait more than five months

24   after the Court's order to show cause to issue that written

25   demand for detailed synopsis?                                  11:52AM

1  A.  We had seen some improvement in the hiring of the positions

2  that have been vacant and it was our determination at this time

3  to provide such a demand.

4  Q.  Which positions that were vacant have now been filled?

5  A.  I would have to defer to Richard Pratt.  I do not know.          11:53AM

6  Q.  Now, you testified about -- when Mr. Struck was questioning

7  you you testified about the difficulties, the challenges

8  involved in getting patients seen outside hospitals and by

9  outside providers.  Do you remember that testimony?

10 A.  I do.  And so I guess my question is, are you referring in     11:53AM

11 the context of when it was self-op or since it's been Corizon?

12 Q.  I'm going to ask about since it's been Corizon.

13 A.  Pardon me?

14 Q.  My questions will be about since it's been Corizon.

15      Are you aware of Corizon's failure to pay Florence           11:54AM

16 Anthem Hospital more than $1 million that it owed them?

17 A.  I think I have had some awareness from Richard Pratt that

18 there's been delays in payment.  I cannot tell you the specific

19 amount.

20 Q.  So you weren't aware that Corizon had failed to pay            11:54AM

21 Florence Anthem Hospital more than $1 million that it was owed?

22 A.  I'm not aware of the dollar amount.

23 Q.  Were you aware that Florence Anthem Hospital said it would

24 not take patients from ADC until Corizon paid up?

25      MR. STRUCK:  Objection, Your Honor.  Counsel is              11:54AM

1    testifying.

2           THE COURT:  He's saying were you aware.  He's asking

3    the witness whether he knows and the witness can answer that

4    question without Mr. Fathi testifying.

5           Have you heard anything about this before?                11:55AM

6           THE WITNESS:  I don't believe I have.

7           THE COURT:  All right.

8    BY MR. FATHI:

9    Q.  Are you aware of any other instances in which Corizon

10   didn't pay its bills -- didn't timely pay its bills to outside   11:55AM

11   hospitals or providers?

12   A.  I don't recall any other times.

13   Q.  I think you testified that the contracts with Tempe St.

14   Luke's and University of Arizona went by the wayside.  Do you

15   remember that testimony?                                         11:55AM

16   A.  Yes.

17   Q.  Why did the contract with Tempe St. Luke's go by the

18   wayside?

19   A.  My recollection was because of not maintaining a census

20   that was suitable to the hospital.  I don't remember the         11:55AM

21   specific bed capacity.  I do know that the Department had

22   provided the security staffing for that entire ward but I

23   believe it went by the wayside because there was not a stable

24   inmate census being maintained.

25   Q.  And whose decision was it to terminate the contract?  Was    11:56AM

1  that ADCs or Tempe St. Luke's?

2  A.  It was at the behest of Tempe St. Luke's.

3  Q.  Why did the contract with University of Arizona go by the

4  wayside?

5  A.  Similar concerns, maintaining a census, and I think at the        11:56AM

6  time the University Physician Hospital was not enthralled with

7  the idea of inmates being brought to that hospital.

8  Q.  So it's your testimony that the University of Arizona

9  Hospital simply did not want to treat ADC patients?

10  A.  I don't believe they wanted the detention ward to be            11:56AM

11  occupied, and I -- in my recollection, I think they had

12  different designs for use of that space.

13  Q.  And that would be reflected in written correspondence

14  between ADC and University of Arizona?

15  A.  I don't recall if there was written correspondence.  There      11:57AM

16  certainly would have been verbal conversations with the U of A

17  staff.

18  Q.  And between U of A staff and who on ADC's side?

19  A.  It probably would have been Richard Pratt, and it may have

20  also involved Carson McWilliams.                                    11:57AM

21  Q.  Were you involved in those conversations?

22  A.  I may have been involved in some of those conversations.

23  Q.  And whose was the decision to terminate that contract,

24  University of Arizona or ADC?

25  A.  It would have been the University.                              11:57AM

1   Q.  Now, you also testified that one of the challenges of

2   taking patients out is the large number of CO positions that

3   ADC has vacant, correct?

4   A.  Yes.

5   Q.  I think you testified the vacancy rate was 13.8 percent?        11:58AM

6   A.  I believe so.

7   Q.  Now, that vacancy rate isn't Corizon's fault, right?

8   A.  No.

9   Q.  Corizon has no control over how many COs there are.

10  A.  Correct.                                                        11:58AM

11  Q.  So the lack of COs to take people to outside appointments

12  isn't Corizon's responsibility.

13          MR. STRUCK:  Objection, Your Honor.  That misstates

14  his earlier testimony.

15          THE COURT:  So the lack of the COs to take people to        11:58AM

16  outside appointments isn't Corizon's responsibility.  The

17  objection is overruled.

18          THE WITNESS:  The responsibility of providing

19  correctional officer supervision for those inmates who have to

20  be taken out for consults and/or to emergency rooms is the         11:59AM

21  responsibility of the Department.

22  BY MR. FATHI:

23  Q.  And if there aren't enough COs to take people to outside

24  appointments, there's nothing that Corizon can do about that.

25  A.  If there are outside appointments that inmates have to be       11:59AM

————3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross————

1    taken to, the Department, through the use of overtime, and as

2    necessary of collapsing security posts, has to make available

3    the corrections staff to take the inmate out.

4    Q.   But it sometimes happens, doesn't it, that there's an

5    outside appointment scheduled and the patient isn't able to go          11:59AM

6    to his or her appointment because there aren't COs to do the

7    escort?  That happens, doesn't it?

8    A.   That may happen on occasion.

9    Q.   You are not aware of that ever happening?

10   A.   It's probably happened.                                            11:59AM

11   Q.   And if that happens, there's nothing Corizon can do about

12   that, correct?

13   A.   Correct.

14            THE COURT:  Mr. Fathi, it's noon.

15            Director Ryan, I've not been privy to the discussions          12:00PM

16   among your lawyer and the other lawyers about what your

17   availability was.  I was told that we needed to hear you this

18   morning, and I don't know whether or not it's contemplated that

19   you would be back after the noon hour.  So I need to turn to

20   the lawyers now and see what is the plan.                               12:00PM

21            MR. STRUCK:  I'd have to -- I'd like a chance to

22   confer with Director Ryan on that issue.

23            THE COURT:  You can have a private conversation with

24   him.  You can walk up to him and I will step away so you can do

25   that.                                                                   12:00PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1        (Off-the-record discussion.)

2            MR. STRUCK:  Okay, Your Honor.

3            THE COURT:  Mr. Struck, what are your thoughts?

4            MR. STRUCK:  He can come back at 1:00.  I don't know

5   how much time Mr. Fathi has left on cross-examination.                    12:01PM

6            THE COURT:  How much do you think, Mr. Fathi?

7            MR. FATHI:  I think perhaps 15 or 20 minutes.

8            THE COURT:  How much for redirect?

9            MR. STRUCK:  Probably something similar.

10           THE COURT:  Okay.                                                  12:01PM

11           All right.  So we'll come back at 1:15.  That affords

12   the opportunity to everybody to have time to --

13           MR. FATHI:  Your Honor, given that Mr. Pratt is in the

14   middle of cross-examination could he please be admonished not

15   to discuss his testimony with anyone?                                     12:01PM

16           THE WITNESS:  It's Mr. Ryan, not Mr. Pratt.

17           THE COURT:  That's my fault and it's not in

18   retribution on anything.  I didn't -- it was a complete

19   accident.

20           MR. FATHI:  I'm sorry.  1:15, Your Honor?                         12:01PM

21           THE COURT:  Yes.  1:15.

22           (Recess from 12:02 p.m. until 1:17 p.m.)

23           THE COURT:  Thank you very much.  Please be seated.

24           Mr. Fathi, you may continue.

25   BY MR. FATHI:                                                             01:17PM

1   Q.  Good afternoon, Director Ryan.

2   A.  Good afternoon.

3   Q.  Let me just follow up on a couple of topics that came up

4   before the lunch break.  When did the Tempe St. Luke's

5   contract, when was that terminated?                              01:18PM

6   A.  Three or four years ago.  I don't remember the specific

7   year.

8   Q.  And the University of Arizona contract, when was that

9   terminated?

10  A.  I think that was terminated on -- when Wexford was the       01:18PM

11  provider.  So that may have been 2012.

12  Q.  Now we talked about Amendment 14, which authorizes

13  incentive payments to Corizon of up to $3.5 million, correct?

14  A.  Yes.

15  Q.  Does all the money to pay for those incentive payments come  01:18PM

16  from savings that result from vacant CO positions?

17  A.  Not all of it.  Some of it may come from other line item

18  funds within the Department's appropriation.

19  Q.  Well, of the 2.5 million incentive payments that have been

20  paid out so far, where did that money come from?                01:19PM

21  A.  Came from either vacancy savings or other line item funding

22  within the Department's budget.

23  Q.  What other line items?

24  A.  Could be from some other operating funds.  It could also be

25  from the contingency fund.                                       01:19PM

1   Q.  Of the 2.5 million, what proportion or percentage came from

2   savings that resulted from vacant CO positions?

3   A.  I don't know.

4   Q.  Who would know the answer to that?

5   A.  Maybe somebody that works in the administrative division     01:19PM

6   that oversees the agency's budget for me.

7   Q.  But you don't know the answer to that?

8   A.  The name of the individual?

9   Q.  No.  I'm sorry.  You don't know how much of the 2.5 million

10  in incentive payments that have been paid out so far, how much   01:19PM

11  of that money came from savings that resulted from vacant CO

12  positions?

13  A.  That's correct.

14  Q.  Would you turn to Exhibit 31, please?

15          Director Ryan, I'm just using this exhibit for the       01:20PM

16  list that appears on Pages 1 and 2 for the 11 performance

17  measures that are subject to the Order to Show Cause.  Do you

18  see that?

19  A.  Yes.

20  Q.  So Performance Measures 50 and 51 refer to, or involve,      01:20PM

21  consultations with outside providers, correct?

22  A.  Yes.

23  Q.  And would you agree that one of the challenges in getting

24  outside providers to agree to care for ADC prisoners is the

25  fact that there's a state law capping reimbursement for those    01:21PM

1  providers at the AHCCCS rates?

2  A.  Yes.

3  Q.  Since the Court's Order to Show Cause in October 2017, have

4  you submitted a written proposal to the legislature asking it

5  to repeal that law?                                        01:21PM

6  A.  No.

7  Q.  Since the Court's October Order to Show Cause have you

8  submitted a written proposal to the legislature asking it to

9  repeal the law that requires that ADC contract with a private

10  provider for health care?                                 01:21PM

11  A.  No.

12  Q.  Since the Court's October Order to Show Cause, have you

13  submitted a written proposal to the legislature asking it to

14  allow you to hire additional health care staff to supplement

15  those provided by Corizon?                                01:22PM

16  A.  No.

17  Q.  Since the October order to show cause have you asked

18  Corizon to increase compensation for its health care staff?

19  A.  I don't recall that we have asked Corizon to increase its

20  compensation for its health care staff, but there have been   01:22PM

21  conversations with Corizon about them offering an increase in

22  salaries to those prospective providers or employers.

23  Q.  But you haven't requested that Corizon do that?

24  A.  No.

25  Q.  Since the October Order to Show Cause have you asked       01:23PM

1   Corizon to increase the number of health care staff it

2   provides?

3   A.   No.  We have asked Corizon to fill the positions that they

4   are currently authorized, and that includes whatever the number

5   was that I read earlier, the 925 plus the additional 79          01:23PM

6   positions that they opted to bring on board.  The bottom line

7   is we have asked them, you need to fill the 1004 positions.

8   Q.  Have you asked Corizon to increase the number of positions

9   beyond that 1004?

10  A.  Under the current contract, no.                              01:23PM

11  Q.  Since the Court's October Order to Show Cause, have you

12  asked Corizon to increase its use of telemedicine?

13  A.  We have had conversations with Corizon about expanding and

14  utilizing telemedicine services.  So we have had that

15  discussion.                                                      01:24PM

16  Q.  Have you ever submitted, since the Court's October Order to

17  Show Cause, have you submitted anything in writing asking

18  Corizon to increase its use of telemedicine?

19  A.  I don't know that we have submitted anything in writing to

20  them, but I know it has been a topic, certainly, in the         01:24PM

21  bi-weekly meetings that we have with Corizon.

22  Q.  But to the best of your knowledge and recollection, you

23  have not submitted anything in writing to Corizon asking it to

24  increase its use of telemedicine since the October OSC?

25  A.  I don't think so, but I would also defer to Richard Pratt.   01:24PM

1  Q.  Since the October OSC, have you asked Corizon to stop

2  relying on an out-of-state pharmacy to provide medication for

3  prisoners?

4  A.  We have not asked Corizon to stop using the out-of-state

5  pharmacy; however, we have asked them to increase the clinical          01:25PM

6  pharmaceuticals that are on site in Arizona so that that could

7  mitigate any issues related to medications being made available

8  when the inmates were transferred from one location to the

9  other.  And by chance, if, in fact, Performance Measure 35

10  acknowledges that inmate X moved from Point A to Point B and he        01:25PM

11  either threw away his KOPs or the DOT was not there upon

12  arrival, the idea of expanding the clinical stock would be that

13  specific medication may be awaiting him there so it could be

14  administered to him before he is assigned to the unit or put in

15  a transitory unit until he arrives at his permanent location.          01:26PM

16  Q.  So since the October OSC, have you asked Corizon in writing

17  to increase the clinical stock that's on site at the ADC

18  facilities?

19  A.  I don't recall if we have asked in writing.  I certainly

20  have asked verbally of both the Arizona VP and also as recently        01:26PM

21  as last week in my conversation with Mr. Rector, asked him to

22  increase the clinical stock of those pharmaceuticals.  And I

23  believe some of that is in process.  We did have a discussion

24  about why don't you consider relocating that pharmaceutical

25  company or arrange for a different pharmaceutical company here          01:27PM

1    in Arizona.

2    Q.  But I believe your testimony is that since the October OSC

3    you have not asked Corizon to stop using an out-of-state

4    pharmacy to provide medication to ADC prisoners?

5    A.  We have not asked them to stop using it.                    01:27PM

6    Q.  Since the October OSC, have you submitted a written

7    proposal to the legislature to increase compensation for

8    custody staff?

9    A.  For custody staff?

10   Q.  Yes.                                                        01:27PM

11   A.  I have submitted a decision package for a few years in a

12   row to the governor's budget office, and that is the Office of

13   Strategic Planning and Budgeting, and we have had extensive

14   discussions about the issue of compensation for the

15   correctional service series and the employees in the            01:28PM

16   Department.  And we have conducted, if you will, breakthrough

17   projects to show that we have relatively high turnover and

18   large numbers of vacancies, and we have been able to

19   demonstrate that compensation is an issue.

20          The decision package was not able to go forward and      01:28PM

21   nor was it for any other state agency this session.  The focus

22   in terms of compensation this session has been on education.

23   Q.  When was the last time you submitted a decision packet

24   requesting an increase in compensation for ADC custody staff?

25   A.  For the last three years in a row, three fiscal years, I     01:29PM

1  have done that.

2  Q.  Right.  My question is when was the most recent time that

3  you did that?

4  A.  The most recent time was in the September submission,

5  September 2017 submission.                                    01:29PM

6  Q.  So since the October OSC, have you submitted any written

7  requests to the legislature to increase compensation for

8  custody staff?

9  A.  No.

10  Q.  Have you informed Mr. Pratt that if compliance with the   01:29PM

11  stipulation does not improve he may face disciplinary action?

12  A.  No.

13  Q.  Have you informed any ADC employee that if compliance with

14  the stipulation does not improve he or she may face

15  disciplinary action?                                          01:30PM

16  A.  No.

17  Q.  You have the power to terminate the contract with Corizon,

18  correct?

19  A.  I have the authority to give them 180 days notice to advise

20  them that we may be considering terminating that contract if   01:30PM

21  performance does not improve.

22  Q.  But you haven't given that notice, have you?

23  A.  No.

24  Q.  The ADC health care contract is currently up for renewal,

25  correct?                                                      01:31PM

1    A.   The contract with Corizon is due to terminate at the end of

2    the current fiscal year, June 30th.  There is an RFP process

3    underway.  I am precluded by state law from discussing that

4    because it's an active procurement.

5    Q.   Well, we'll get into that in a minute.  But first, what is        01:31PM

6    the term of the new contract?  How many years would it be?

7    A.   The RFP proposal would be for an initial five-year period

8    of time.

9    Q.   So from July 1, 2018, through June 30th of 2023, is that

10   right?                                                                01:31PM

11   A.   The initial five-year period of time, I believe that's

12   correct.

13   Q.   Did Corizon bid on this contract?

14   A.   Yes.

15   Q.   How many other companies bid on the contract?                    01:32PM

16   A.   One other company.

17   Q.   And what is the current procedural status of the selection

18   process?

19   A.   Again, because it is an active procurement, I am precluded

20   by state law from discussing this any further.                       01:32PM

21            MR. FATHI:  Your Honor, this is critically important

22   testimony.  We would ask that you either direct Director Ryan

23   to answer, and if there's a confidentiality issue, we close the

24   courtroom and seal the transcript.

25            THE COURT:  Mr. Struck.                                      01:32PM

1       MR. STRUCK:  Your Honor, he's precluded by state law

2  from discussing it.  If this is an issue that he was going to

3  be questioned about, clearly he was expecting to do so.  This

4  is something he should have brought to the Court prior to this

5  moment to allow us to fully brief this.  This isn't something  01:33PM

6  that the Court should have to decide on the fly.

7       THE COURT:  Well, I'm not going to wade into it

8  precipitously or, as you say, on the fly, because it is an

9  issue that has been raised routinely in our monthly status

10  meetings where the plaintiff has requested an update and the  01:33PM

11  State has given an update but always present in that

12  conversation has been the idea of what the director has just

13  mentioned, and that is that there are proscriptions.  I have

14  never explored exactly what the proscriptions are.  I'm not

15  going to do that now.  So I'm not going to require the director  01:33PM

16  to answer any further questions beyond what he thinks he needs

17  to answer at this point.

18       If it is critical, and I'm not clear that it is in

19  terms of with respect to going forward because I'm dealing with

20  the current issue, which is whether or not sanctions should be  01:33PM

21  imposed for December and who the new contractor is, it doesn't

22  seem to be all that particularly germane.  Tell me why that's

23  wrong, Mr. Fathi.

24       MR. FATHI:  Well, Your Honor, the ultimate question

25  before the Court is whether the defendants have taken all  01:34PM

1   reasonable steps to achieve compliance with the stipulation.

2   If, in fact, they are currently considering renewing Corizon's

3   contract despite Corizon's failure to achieve compliance for

4   more than three years, that is highly relevant to the question.

5        THE COURT:  It would be pursuant to a different                    01:34PM

6   contract or different RFP, presumably, and it's one that would

7   take effect in the next fiscal year as I have now just heard

8   for potentially five years.  So I don't think that it is true

9   all that you say, so I will stand by what I have previously

10  said.  Thank you.                                                        01:34PM

11       MR. FATHI:  Thank you, Your Honor.  I would just add

12  that, obviously, the Supremacy Clause provides that the Court's

13  ruling -- the Court is not bound by state procurement law.

14       THE COURT:  As you have heard me before, I'm a

15  respectful applier of the Supremacy Clause.  Comity requires            01:34PM

16  that we do so in this federal system.  So again, I'm not going

17  to do something on the fly at this moment.

18       MR. FATHI:  May I just ask my two remaining questions?

19       THE COURT:  Surely.

20       MR. FATHI:  Thank you.                                             01:35PM

21  BY MR. FATHI:

22  Q.  Director Ryan, as we sit here today, is it possible that

23  Corizon could be offered another contract by ADC?

24       MR. STRUCK:  Objection, Your Honor.

25       THE COURT:  That's a ridiculous question.  I don't                 01:35PM

1    even need to hear what the objection is.

2            MR. FATHI:  I'm sorry, Your Honor.  I just wanted the

3    refusal to answer on the record.

4            THE COURT:  We're intelligent people, Mr. Fathi.  We

5    know that there are two people who have bid on the contract.          01:35PM

6    It is certainly possible that the procurement officers might,

7    in their best judgment, make a decision on that.  So it's

8    possible.  And he said he can't answer any more questions.  So

9    the question -- no.

10           MR. FATHI:  May I have a moment, Your Honor?               01:35PM

11           THE COURT:  You may.

12           MR. FATHI:  Nothing further.  Thank you, Director

13   Ryan.

14           THE COURT:  Before we proceed to the redirect

15   examination from your lawyer, I need to ask my question,         01:35PM

16   because it might engender an additional question from either

17   Mr. Fathi or Mr. Struck.  So it seems to be a fair time for me

18   to go forward with my question.  And it is this:  You talked

19   today about Amendment 10 and Mr. Fathi, through his

20   cross-examination, presented the numbers with respect to the    01:36PM

21   dollar amounts both under the sanction provision and the

22   incentive provision.

23           The way that I have wrapped my mind around that is

24   similar to what Mr. Pratt described it as yesterday, the carrot

25   and the stick.  So it seemed like Amendment 10 provided for a    01:36PM

1  carrot and a stick.  And I gather that's a characterization

2  that you can relate to, because is it a fair way to describe it

3  generally, the incentive and the sanction provision?

4          MR. STRUCK:  I'm sorry, Your Honor.  I believe you are

5  referring to Amendment 14.                                      01:36PM

6          THE COURT:  Yes.  You are exactly right.  Changing

7  what I said to Amendment 14, it says right here Amendment 14.

8  I'm sorry.  I just didn't read it.

9          But is that fair, the carrot and the stick idea with

10  the incentive and the sanction?                                01:36PM

11          THE WITNESS:  Your Honor, yes.

12          THE COURT:  And so the reason that that came up

13  yesterday, and the reason it came up today, both from the

14  plaintiffs' counsel and from your counsel, is that the

15  defendants suggest that this is an example of a step that was  01:37PM

16  taken to try to obtain compliance with the stipulation and that

17  I should consider it, that it was a reasonable step.  And Mr.

18  Fathi today tried to walk through an argument that it wasn't a

19  reasonable step because the carrot was so golden that it

20  swamped the stick; that what we ended up with was a situation   01:37PM

21  where, if I wrote the numbers down correctly, that the sanction

22  was $675,000 in other words, the stick; whereas the carrot was

23  2,550,000.  So what you are left with, if -- I used the bunny

24  rabbit yesterday -- but if you are left with the pony, or the

25  burro, what you are left is the burro, as smart as all of us   01:38PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1  know they are, and they are pretty wily, they would figure out

2  pretty quickly that they are doing well there, that the stick

3  is not a problem because the carrot they are getting completely

4  swamps it.  Mr. Fathi said to you that doesn't seem like a very

5  good business decision, and you stuck by it.  You said that it        01:38PM

6  was.

7             And I guess I wanted to understand why it is you think

8  that in light of the fact that it looks like there's no stick

9  when the carrot is so golden.

10            THE WITNESS:  Well, Your Honor, there's $3.5 million       01:38PM

11  potentially on the table as, if you will, the carrot.  And as

12  you just enumerated, 2,550,000 of it has been obligated and, in

13  fact, I think it's actually a little more if you take into

14  consideration the possibility for the January 2018 information

15  which I know that Mr. Fathi alluded to in terms of the            01:39PM

16  sanctions.  The sanctions are continuing to decline.

17            THE COURT:  But there will never be a situation where

18  the sanction will be meaningful, because the carrot here will

19  be satisfied, and they will get the full amount of the carrot

20  and the sanction can never swamp the carrot.                      01:39PM

21            THE WITNESS:  Your Honor, that is correct; however,

22  that was the negotiated business decision that we made to try

23  and compel and encourage Corizon to achieve much better

24  performance.

25            THE COURT:  I guess the question I have is, logically,    01:40PM

1    it seemed to me that at the time when the compliance rate for

2    the stipulation was overall around 90 percent, that it was

3    self-evident that if you rewarded somebody for compliance,

4    where the number is 91 percent, I mean, there's no doubt that

5    there's been major satisfaction of the performance measures,    01:40PM

6    but those have never been the focus of what we've been doing

7    here.  What has been the focus are the ones that have dogged

8    the State and the Court with respect to critically significant

9    health care measures that there have been abject failure with.

10            So we have been focused on those whereas I kind of    01:40PM

11   would have expected the State to be focused also on those

12   rather than to say we're going to enter into an incentive

13   reward program that is going to reward you for the victories

14   you have already accomplished and we're agreeing you have

15   accomplished those because you get money for those.    01:41PM

16           And I think that's essentially what happened here,

17   where they get an enormous amount of money for things that

18   never really were at issue for me and you did this after a time

19   where I told you I was focused on particular measures and that

20   I was going to impose potentially sanctions for those    01:41PM

21   particular measures.  And so your lawyers have said to me,

22   well, one of the reasonable steps that you took was this:  It

23   doesn't look like a reasonable step to me because it seems to

24   be rewarding for things that were not at issue in my case.  Do

25   you see where I'm going here, or you understand my analysis, at    01:41PM

1   least?  I understand you said it was a negotiated position.

2   And I appreciate that, that there are circumstances that are

3   present at a given time.  But I need to hear the subsequent

4   answer as to why that looked like a good idea at the time and

5   if it even doesn't look like a good idea now, why you are           01:41PM

6   sticking by it.  Because in retrospect it doesn't look like it

7   was a good idea to me, but I'm just trying to understand fully

8   what the State's thought was here.

9        THE WITNESS:  Your Honor, I maintain it was, and still

10  is, a good idea.  We took the cap off the sanctions.  And         01:42PM

11  certainly what is going to occur between now and the end of the

12  fiscal year, they are -- Corizon is going to probably benefit

13  from the rest of the incentive money, but then that is going to

14  probably be exhausted, I'm guessing, within a couple of months

15  based on their performance.  There is no more incentive money     01:42PM

16  coming to them.  They will be compelled to perform, to continue

17  to reduce the number of performance measures that are

18  non-compliant, and it is at $5,000 apiece.  And if I recall,

19  the January number, or the January sanction which I know has

20  been shared, that amount is 175.  And it's probably in a couple   01:43PM

21  of months, maybe February, maybe through March's numbers, that

22  they will have benefitted from all of the incentive dollars

23  that are available, and then there are no more incentive

24  dollars throughout the rest of the contract for the fiscal

25  year.  And I am not going to identify or look for any other       01:43PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1    funding within the Department's current budget.  We're all but

2    about to enter the fourth quarter of this fiscal year.  And

3    frankly, all funds have been fully committed for all of the

4    various needs, operational needs in the Department for the rest

5    of the fiscal year.                                              01:44PM

6         And we're also awaiting the outcome of the legislative

7    process and what the FY 19 budget will bear, because as agency

8    directors, we're still waiting.  I think we have done the best

9    we can do with the strategy that we have taken.  And had we

10   considered greater amounts of the sanction, and I acknowledge   01:44PM

11   that Mr. Fathi used his math to say, okay, it's $400,000 a

12   month and your sanction is -- or 400,000 a day and 90,000 a

13   month, so it's 25 percent.  To consider sanctioning them, for

14   the sake of discussion, a full monthly amount, that would

15   result, I believe, in that contractor saying we want out of     01:45PM

16   this contract and we're giving you 180 days notice because we

17   will not negotiate or agree to a sanction that high.

18        So the approach that was taken, whether you or

19   plaintiffs agree or disagree, that, from our vantage point, was

20   a stick-and-carrot approach that we believe has demonstrated     01:45PM

21   that they, in fact, can achieve better performance, and they

22   have, from month to month.  And I understand they acknowledge

23   the issues that you are weighing, but I believe we have made a

24   concerted effort to try and achieve the performance

25   requirements that you have wanted.                              01:46PM

1    THE COURT:  And I appreciate what you say, because one

2  of the things you said in particular is true and not so true.

3  And that is, I haven't come to -- it's clear that Mr. Fathi,

4  he's an advocate here.  He's supposed to do that.  But I

5  haven't decided yet.  But I'm just trying to understand.  And          01:46PM

6  what I'm trying to understand is me applying what is my ability

7  to think through a problem.  And one of the times or things you

8  should do when you try to think through a problem is ask people

9  who have thought through the problem and whose job it is to

10  think through the problem.  So I appreciate your answer.  It          01:46PM

11  helps me to understand what the thought process is that was

12  employed.

13    I now need to turn to Mr. Fathi to see whether my

14  question engendered any further question from the plaintiffs.

15    MR. FATHI:  Just one, Your Honor.                                   01:46PM

16  BY MR. FATHI:

17  Q.  Director Ryan, are you aware at all of any discussions, any

18  discussions at all, of providing additional incentive money

19  beyond the 3.5 million that was made available under Amendment

20  14?                                                                   01:47PM

21  A.  Am I aware?

22  Q.  Are you aware of any discussions of that possibility?

23  A.  The only discussion that I had occurred last week with Mr.

24  Rector, who asked me was there any additional incentive funds

25  available, and I told him no.                                        01:47PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1  Q.  That is the only discussion of that topic that you are

2  aware of?

3  A.  That I'm aware of?

4  Q.  Yes.

5  A.  He alluded to it the week prior and said he was not looking    01:47PM

6  for a response from me the week prior.  He asked me to give it

7  consideration, and we had a conversation telephonically last

8  week and I gave him that answer.

9  Q.  So as you sit here today, you are confident that there will

10 be no additional funding made available for incentive payments    01:48PM

11 beyond the 3.5 million provided for in Amendment 14?

12 A.  That is correct.

13 Q.  Thank you, Director Ryan.  One moment, if I may.

14        You mentioned the FY 19 budget request.  What was the

15 amount requested in that request for the health care contract?     01:48PM

16 A.  The discussion with OSPB --

17        THE COURT:  Could you tell me what that is?

18        THE WITNESS:  Office of Strategic Planning and Budget,

19 which is the governor's budget office.

20        THE COURT:  Thank you.                                       01:48PM

21        THE WITNESS:  There was a discussion with OSPB, and we

22 are waiting to find out what will be negotiated between the

23 Joint Legislative Budget Committee and the governor's budget

24 office.  There is a $30 million placeholder, and that's what

25 I'm aware of to this point in time.                                01:49PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross

1    THE COURT:  And the placeholder, does that mean that's

2  an additional amount over the current fiscal year, or what is

3  that $30 million amount?  What does that mean, the placeholder?

4    THE WITNESS:  Your Honor, at this point in time, the

5  placeholder is for $30 million in addition to what the current    01:49PM

6  appropriated amount is for health care, which is $148.8

7  million.

8    THE COURT:  So if this placeholder is effectuated, the

9  new budget would be $178 million for health care.  Is that

10  correct?                                                          01:49PM

11    THE WITNESS:  Your Honor, if it's effectuated, yes.

12    THE COURT:  I see.  You say that in a way that

13  suggests that you asked for something you know you probably

14  won't receive but you asked for something hoping you will

15  receive something.  Is that fair?                                 01:50PM

16    THE WITNESS:  Your Honor, for the same reasons --

17    THE COURT:  You don't want to talk any more about

18  that.

19    THE WITNESS:  I do not want to talk any more.

20    THE COURT:  Fair enough.  Thank you.                           01:50PM

21  BY MR. FATHI:

22  Q.  Does the budget request you submitted in September for

23  fiscal year 19 include any funding for the kind of incentives

24  set forth in Amendment 14?

25  A.  Mr. Fathi, it's a $30 million placeholder.  And again, I do   01:50PM

—3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Cross—

1    not wish to discuss or allude to an active procurement.  So I

2    respectfully decline to answer your question.

3            THE COURT:  And so we'll stop there, but there's one

4    more thing.  I just wanted to check in.  I was wanting to speak

5    to what I know because I read the newspaper.  And I know that                   01:50PM

6    it is true that we are in the season when state agency heads

7    are involved in these discussions.  And so there was a hearing

8    a couple of weeks ago where I opened with my statement, and

9    this is when I most recently mentioned the Supremacy Clause,

10   and the idea that it was possible that there could come out of           01:51PM

11   this courtroom an order that would require the State to spend

12   more than it thought it needed to.  And because of that

13   potential, I did not know that I would be in that situation,

14   but I thought, and I said, and if you haven't read the

15   transcript I am simply commending it to you to take a look at           01:51PM

16   that first couple of minutes of that hearing so that you could

17   see that as you talk to the legislature that there are reasons

18   to think perhaps that a placeholder is wise because we don't

19   know what my decision will be.

20           But I thought it was fair to alert you to alert the                   01:51PM

21   State that it was potential, that there was a potentiality that

22   there would be a requirement that more be spent on health care

23   in the State of Arizona than people had been sitting at the

24   table thinking about because there was an external force that

25   could compel them to spend that money.  And I just wanted to              01:52PM

1  make sure you had a chance to look because you weren't present

2  that day.  And I'm not saying you should have been, but luckily

3  we have transcripts and you can see what it is.  I am just

4  commending that to you.

5          THE WITNESS:  And, Your Honor, I have read that.          01:52PM

6          THE COURT:  Thank you, sir.

7          Thank you.  Mr. Struck, you may continue with your

8  redirect examination.

9          MR. STRUCK:  Thank you, Your Honor.  I just have a few

10  questions, Your Honor.          01:53PM

11          THE COURT:  Thank you.

12                    REDIRECT EXAMINATION

13  BY MR. STRUCK:

14  Q.  This morning, Mr. Fathi was asking you regarding your

15  knowledge as to what Corizon pays and what ADC pays with          01:53PM

16  respect to legal bills, whether it be bills from my office or,

17  if the Court so orders, plaintiffs' bills.  And I think he also

18  asked you about the $250,000 requirements in the stipulation.

19          Do you know who pays those bills or what percentage,

20  or do you know anything about that?          01:53PM

21  A.  The $250,000, as I recall, is spelled out in the stipulated

22  agreement.  Specifically in terms of what is paid either to

23  your firm or to plaintiffs specifically, I do not know.

24  Q.  Okay.  Let me refer you to Exhibit 201, which is Amendment

25  10.  And I wanted to ask you, Mr. Fathi asked you this morning          01:54PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1   questions about -- I think he called it giving Corizon a raise.

2   And I think you referred to it as CPI.  Can you explain to us

3   why Corizon was given a CPI increase, the Amendment Number 10,

4   in May of 2015?

5   A.   I go back to the legislative change that occurred when the          01:55PM

6   decision was made to privatize health care.  And the statute

7   spoke to a three-year and two one-year options to extend for a

8   potential of up to five years.  This amendment specifically

9   speaks about Year 4 and Year 5, and a consumer price index

10  could be given consideration based on the average medical CPI          01:56PM

11  for the metropolitan Phoenix area as specified by a contract

12  increase.

13          So we made a business decision to pursue a 4 percent

14  CPI to extend that contract for at least one additional year.

15  We subsequently did that another time that carried it to the           01:56PM

16  full five years.  And then lastly, we amended the current

17  contract, which otherwise would have ended March 3rd or March

18  4th of 2018 so it would sync up with the start of Fiscal Year

19  19.

20          Because this contract came about and Wexford walked           01:57PM

21  away after eight months, and they had given us notice in

22  November or December, we had a 90-day transition from one

23  vendor to the other, that made their contract effective on

24  March 3rd or 4th, which does not sync up with the start of a

25  fiscal year.  So extending the current contract by an                  01:57PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1    additional four months, frankly, allows us, in the budgetary

2    process, to operate with one watch instead of with two.

3    Q.  And I know that we discussed it earlier this morning, but

4    in addition, under Amendment 10, Corizon also agreed to an

5    indemnification provision with respect to its contract?      01:57PM

6    A.  It certainly did.

7    Q.  And so that was something that was bargained for in

8    exchange for the 4 percent CPI?

9    A.  Yes.

10            MR. FATHI:  Objection, Your Honor.  Leading.        01:58PM

11            THE COURT:  We've already had the answer.  I believe

12   we had the answer.  It's too late.

13   BY MR. STRUCK:

14   Q.  Director, what would have happened if you didn't extend

15   this contract to the health care for the 34 -- 35, roughly   01:58PM

16   35,000 inmates in the Arizona Department of Corrections system

17   that Corizon was providing health care for?

18   A.  If we didn't extend then there would have been, if you

19   will, a 180-day notice to go ahead and seek a replacement

20   vendor.  Now, relatively speaking, in my knowledge and        01:58PM

21   experience in corrections, there are very few privatized health

22   care providers who can deliver health care to populations of

23   this size.  And the three that I'm aware of, and there may be a

24   fourth, but it's certainly Wexford, Centurion, and Corizon.

25   And oftentimes one may replace another in other contracts, in  01:59PM

1   other states, throughout the United States.  In retrospect, had

2   I been asked in what we have experienced, my advice to the

3   legislature, had we been asked, would have been a three plus

4   one plus one is not a good idea.  If you are going to do this,

5   then do it for at least a minimum of five years.  And I relate          02:00PM

6   that to some of the private prison contracts that we have

7   operated with.  And we have had some good success with the

8   private prison operators, and we only contract with them in

9   Arizona for medium and minimum custody, not the higher custody

10  levels.                                                                 02:00PM

11          And one example of a terrible experience with a

12  private prison was the private prison riot that occurred two

13  summers ago in Kingman, and those inmates rioted literally for

14  three days; January 1st, 2nd, and 4th, and destroyed much of

15  that prison.  And we had to move inmates temporarily, if you            02:00PM

16  will, nor nine months to other locations.  And then that

17  contractor, MTC, had to make the State whole and replenish and

18  replace and rebuild that prison.  And we terminated that

19  relationship contractually with that vendor.

20          So relatively speaking, there's not a lot of private           02:01PM

21  health care providers.  So if we are going to continue with

22  privatized health care, then I believe those contracts need to

23  be for a minimum of a five-year period of time.

24  Q.  If you would have let that contract, the three-year

25  contract expire without renewing it, what about going back to          02:01PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

 1   self-operation?  Could you have done that?

 2   A.   Realistically, I don't think returning to self-operations

 3   is a possibility simply because of the costs associated with

 4   the provider salaries that they demand.  The State does not pay

 5   health care staff what the privates do, and then if you think        02:02PM

 6   about it in terms of the employer-related expenditures on top

 7   of the salary, I don't believe for a second that the State of

 8   Arizona will be in a position to afford returning to

 9   self-operations.

10        THE COURT:  That's a choice, isn't it?  The State             02:02PM

11   could choose to do that?  There's no constitutional

12   prohibition.  There's no -- it's a fiscal matter, simply we

13   would need to find the revenue to do it.  Is that right?

14        THE WITNESS:  Your Honor, that's exactly right.

15        THE COURT:  Okay.  Thank you.                                 02:02PM

16   BY MR. STRUCK:

17   Q.   And if I understood you correctly, did you say Corizon pays

18   more money than the State would pay health care providers?

19   A.   Oh, yes, they are.

20   Q.   Why don't you take a look at Exhibit 103.  Mr. Fathi asked     02:03PM

21   you about that this morning.  Do you have it, Director?

22   A.   Yes.

23   Q.   This is the sanction tracking exhibit that Mr. Fathi asked

24   you about this morning.  And if you look at Page 1 -- excuse

25   me -- if you look at Page 3 of Exhibit 103, incentive tracking,     02:04PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1   it shows up in July of 2017 that Corizon was about 88 percent

2   compliant with all of the CGARs.  Is that right?  Do you see

3   that number?

4   A.  I do.

5   Q.  And it shows, since July of 2017, a steady increase in         02:05PM

6   compliance with the overall -- Corizon's overall compliance

7   with the CGARs.  Is that right?

8   A.  It does.

9   Q.  When you entered into Amendment 14, what was your goal with

10  respect to Corizon compliance?                                    02:05PM

11  A.  The goal was to fully more than satisfy the requirements

12  and the percentages greater than 85 percent to get it as high

13  as possible in terms of compliance.

14  Q.  And what percent do you want Corizon to be operating at?

15  A.  Well, in terms --                                             02:06PM

16  Q.  In terms of compliance?

17  A.  In terms of compliance?

18  Q.  Yes.

19  A.  We wanted them to certainly remain well above the 85

20  percent, and certainly given the requirements of the Court's      02:06PM

21  order relative to the 11 performance measures, those need to

22  approach 100 percent.

23  Q.  And when you are talking about the 85 percent, are you

24  talking about the 85 percent compliance within the stipulation?

25  A.  Yes, I am.                                                    02:06PM

1  Q.  In terms of overall compliance with the 849 different

2  performance measures that are measured, what was your goal with

3  respect to overall compliance with those 849 measures?  What

4  percentage --

5  A.  At or above 85 percent.                                    02:07PM

6  Q.  How about when you are looking at -- this is measuring the

7  849 measures, and it looks like in December -- let me look at

8  the percentage.  It looks like in December, if you look at Page

9  3, it's almost 93 percent.  Do you see that?

10 A.  Yeah.  That is correct.  And I testified to that earlier   02:07PM

11 today.

12 Q.  What percentage do you want Corizon to be operating at?

13 A.  As close to 100 percent as they could possibly get.

14 Q.  That's what the contract requires, right?

15 A.  Yes.                                                        02:08PM

16 Q.  Once the $3.5 million carrot is extinguished do the

17 sanctions go on?

18 A.  Yes.

19 Q.  In terms of the increase that Corizon has shown with

20 respect to the overall performance under the 849 performance    02:08PM

21 measures, do you believe that that incentive was money well

22 spent?

23 A.  I do.

24 Q.  Mr. Fathi asked you this morning why you didn't come to

25 every hearing.  What do you do in order to keep track of what    02:09PM

1  goes on here in the courtroom?

2  A.   That's a fair question.  I receive a briefing from Richard

3  Pratt and other staff members who come to this courtroom.  I

4  have regular briefings with you and other outside counsel.  I

5  have almost daily conversations with my general counsel.  I                     02:09PM

6  devote a considerable amount of time to staying abreast of this

7  litigation and have been since its very beginning.

8          I know that Mr. Fathi acknowledged, and I confirmed,

9  that I was here in August when I was summoned by the Court.  I

10  erred in my answer, because I also participated telephonically     02:10PM

11  on the, I believe, the July 21st, 2017, emergency telephonic

12  hearing last summer.  I identified myself as on the call and I

13  listened to what had transpired.

14          But I stay, I think I stay abreast and I have regular

15  conversations with Richard Pratt, the general counsel, the                     02:10PM

16  outside counsel, and other monitoring staff employed in the

17  monitoring bureau, such as Dr. Taylor.  I have, again, regular

18  conversations and interactions with Corizon's VP, Mr.

19  Maldonado, Lynn Cole, weekly conversations with the CEO.

20  Q.   You also, in response to one of the Court's questions, you     02:11PM

21  mentioned that you read a recent transcript, a transcript of a

22  recent hearing.  Do you review transcripts?

23  A.   I do.  And the two most recent transcripts that I have read

24  end-to-end was the one on the 14th and the one on the 19th of

25  this month.                                                                     02:11PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1    Q.  Mr. Fathi, this afternoon, asked you whether or not you

2    have ever asked the legislature to repeal the law regarding

3    AHCCCS rates and your response was you hadn't.  Can you explain

4    your answer?

5    A.  The AHCCCS rate is spelled out statutorily, and the process       02:12PM

6    for getting any statutory changes is, frankly, very extensive

7    and very formalized.  And as part of the executive branch of

8    government, if we want any consideration for a change in a

9    statute, we certainly can elevate it, write it up, have a

10   discussion with the governor's office legislative liaison.          02:13PM

11         But the bottom line decision in terms of executive

12   branch agencies moving changes to statutes, that is the process

13   that we go through.  And it is the governor's legislative

14   liaison's decision and certainly that of the executive to

15   finalize what will and will not be allowed to go forward as far     02:13PM

16   as statutory changes.  There was no request to change the

17   AHCCCS rates.

18   Q.  He also asked you whether or not you have, since October

19   10th of 2017, requested that the legislature repeal the law

20   requiring privatization of health care and you responded that       02:13PM

21   you hadn't.  Can you explain that answer?

22   A.  Again, the statutory change that resulted in the

23   privatization of health care, we would go through the same

24   process that I briefly just described through the governor's

25   office.  And again, it is not believed, it is not our               02:14PM

1  estimation, that it would be less expensive to return to

2  self-operations.  We, in fact, believe it would be more

3  expensive.

4          THE COURT:  But it might also be a provision of care

5  that could save the state ultimately money if it provided the          02:14PM

6  health care that was required.  As I understood your testimony

7  earlier, it seemed at the time the move to privatization was

8  made that you were expressing -- maybe I misperceived this --

9  but I thought you were expressing some frustration with what

10  looked to be the idea that they were asking the Department of          02:15PM

11  Corrections to hire a contractor at roughly the same number of

12  dollars that the State had been doing it itself, and that would

13  necessarily not reflect the fact that a private contractor

14  would have to do what is the great -- respect the great model

15  of our country, and that is, have an ability to make money          02:15PM

16  doing it.

17          So the idea that you would be paying the same amount

18  of money to a private contractor that you were doing it

19  yourself would not respect the fact that there would have to be

20  some profit component of that.  And was I reading your          02:15PM

21  frustration about that point right?

22          THE WITNESS:  Your Honor, no, I don't think --

23          THE COURT:  Okay.  Then the second question is:  Is my

24  observation right or wrong that there is a problem if you move

25  from roughly the same number of dollars that you are doing it          02:15PM

1   in-house to doing it out-house, would you necessarily not be --

2   I mean, I buy a shirt at Brooks Brothers and they mark it up

3   100 percent.  I don't know what Corizon marks it up in order to

4   make the profit.  But presumably they are not in this just for

5   laughs.  They are in it to make money, so they've got to make          02:16PM

6   the money.  There's going to be the counterargument that, well,

7   we are much more efficient than the State.  I don't know that

8   there's proof of that because I have seen lots of things that

9   are inefficient in this case, and I never was watching what the

10  State was doing so I'm not there necessarily.                          02:16PM

11          But, again, the basic point looked like the State

12  moved from a system where it was paying X number of dollars.

13  It then moved to a privatization where X number of dollars but

14  that X had to include something that wasn't there before but

15  that was the profit component.                                         02:16PM

16          Is that correct, my observation there?

17          THE WITNESS:  Your Honor, I think that's fair.  They

18  are certainly in business to make a profit.  That said, health

19  care continues to be a very expensive proposition throughout

20  this country, both in the free world and in the corrections           02:17PM

21  environment.  They are not in it to lose money.  They are in it

22  to make a profit.

23          THE COURT:  Thank you.

24  BY MR. STRUCK:

25  Q.  And I think as you testified earlier, you discussed it a          02:17PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1  little bit this morning, the amount of money earmarked for

2  health care in the Arizona Department of Corrections system has

3  increased since the inception of the privatization.  Is that

4  accurate?

5          MR. FATHI:  Objection, Your Honor.  Leading.                    02:17PM

6          THE COURT:  Sustained.

7  BY MR. STRUCK:

8  Q.  Has it remained the same?  How has it changed with respect

9  to the total amount of money that the State spends on health

10  care?                                                                   02:17PM

11  A.  At the time that we were considering privatized health

12  care, it was based on the fiscal year 2008 allocation for

13  health care per the legislature, and the allocation was $137

14  million.  And I went through a competitive process, and we also

15  ended up comparing what the Department of Corrections had been    02:18PM

16  expending on health care prior to the advent of privatized

17  health care.  And my recollection was that our actuals had been

18  somewhere between 122, 124, $125 million.  The original

19  proposals from the respective vendors, there were three of

20  them, and it was Corizon, Wexford, and Centurion.  And whatever   02:18PM

21  they were submitting it was supposed to be less than -- or less

22  than the allocation of $137 million.

23          Two of the three came in with proposals of numbers

24  that were hovering near the 137 million, 136, 137.  The third

25  vendor, their number was off the charts.  It was 150 something.  02:19PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1    Given the fiduciary responsibility, we went back across the

2    street to the legislature and said, look, they are proposing

3    numbers that are 10 or 12 million dollars more than us.

4         So there was a change in statute that basically said

5    words to the effect, best offer.  When they resubmitted          02:19PM

6    Centurion came back with basically the same number.  Corizon

7    and Wexford were a million dollars apart.  And when we actually

8    went ahead and awarded, made a decision, we awarded it based on

9    an objective evaluation to Wexford.  And I have already

10   described in earlier testimony that they started with 759.8 of   02:20PM

11   the Department's health care staff that they indicated that

12   they would employ.  And the dollar amount of that award was

13   about 125.3 million.  Then as time has gone on, through various

14   amendments, they have increased, some as a result of a scope

15   change on our part such as the issue of KOP and DOT, requiring   02:21PM

16   staff to deliver the DOT and do a watch swallow.  Anyway, they

17   have increased by an additional 165 positions and that took the

18   contract up to, this past fiscal year, to 148.8.  During this

19   several-year window Corizon went ahead and brought on, at their

20   own expense, an additional 79 positions that has brought their  02:21PM

21   operational and authorized staff number up to 1004.

22        The issue for us has been, you have continued to hover

23   at 8, 9, 10 percent vacant, and we want you to fill all those

24   positions and see what impact that has on performance.  I hope

25   that answers your question.                                      02:22PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1    Q.  It does.

2              Mr. Fathi also asked you whether or not the

3    Department, and I think, if I understood his question, whether

4    the Department had decided whether the ADC would hire their own

5    health care staff to assist in the provision of health care.          02:22PM

6    Is that something you can even do?

7              MR. FATHI:  Objection, Your Honor.  It does misstate

8    the question.

9              THE COURT:  How would you say that it's an unfair

10   question, Mr. Fathi?  He's asking, Mr. Fathi has suggested,          02:22PM

11   which I think you did, that one of the things that was not done

12   was the State deciding to hire its own health care people.  And

13   Mr. Struck has said is that something you can do?  And we'll

14   hear whether the director thinks he can or not.  How is that

15   unfair?                                                              02:22PM

16             MR. FATHI:  The question I asked, Your Honor, was did

17   Director Ryan approach the legislature and ask for additional

18   health care staff in addition to those provided by Corizon.

19             THE COURT:  Will you accept that amendment, Mr.

20   Struck?                                                              02:23PM

21             MR. STRUCK:  I wrote down his question accurately, I

22   thought.  I don't remember him saying exactly that.  But if

23   that was his question, then I have another question.  I

24   completely misunderstood what Mr. Fathi was asking.

25             THE COURT:  Okay.                                          02:23PM

1   BY MR. STRUCK:

2   Q.   So apparently Mr. Fathi asked you this afternoon whether

3   since October 10th of 2017 whether you have gone to the

4   legislature and asked the legislature for, I guess, additional

5   FTEs for Corizon to provide health care within the Arizona          02:23PM

6   Department of Corrections system and you said you hadn't done

7   that.

8            Why isn't that something you have done?

9   A.   Because under the current contract, if you will, knowing

10  that they have operational and actual positions of 1004, we        02:24PM

11  wanted to see and want to see if they can perform and deliver

12  sufficiently with that staffing.  I don't know that throwing

13  staff at this is the solution.  They have never, and for that

14  matter, nor have Wexford, they have never filled up all their

15  positions.  We would like to see that accomplished first.          02:24PM

16           But I have not gone to the legislature.  And even if I

17  were to consider that, it still would have to go through the

18  Office of Strategic Planning and Budget and receive that

19  support.

20  Q.   And I believe you told Mr. Fathi this afternoon that you       02:25PM

21  have asked Corizon to increase the clinical stock at the

22  facility.  Can you explain that, please?

23  A.   Yes.  I will give it a shot.

24           Basically, Corizon's approach, if you will, is a

25  just-in-time approach in delivering pharmaceuticals.  And it's      02:25PM

1   a pharmaceutical company that's situated in the Midwest and

2   they make deliveries.  They fly in the medication two or three

3   times a week.  I think it makes as much sense to have an

4   increase, or a greater amount of the clinical pharmaceuticals

5   on hand at the various prisons, at least a fundamental                02:26PM

6   inventory, because they ought to have the ability to understand

7   what are the most regularly prescribed pharmaceuticals that the

8   inmate population needs or consumes.

9            As I said earlier, I believe, to Mr. Fathi, I have had

10  a conversation with Mr. Maldonado and Mr. Rector in the very         02:26PM

11  recent days or past couple of weeks and said, why don't you

12  relocate or why don't you consider relocating a pharmacy here

13  in Arizona so if there is a delivery issue, it's already

14  situated here and it would be quicker and more expedient to

15  send transportation teams or Corizon staff to that                   02:27PM

16  pharmaceutical to retrieve whatever that medication is and

17  deliver it same day to those institutions.  Basically, they

18  either have committed to or are looking at increasing the

19  clinical stock, but they are not willing at this point in time

20  to entertain relocating a pharmacy.                                  02:27PM

21            MR. FATHI:  Excuse me, Your Honor.  Could we get a

22  time check?  I believe this has been well over 15 or 20

23  minutes.

24            THE COURT:  Where do you stand, Mr. Struck?

25            MR. STRUCK:  I have one more question.                     02:28PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1    THE COURT:  Great.  Thank you.

2    BY MR. STRUCK:

3    Q.  Mr. Fathi asked you why you hadn't, I guess, disciplined

4    Mr. Pratt or anybody else at ADC with respect to Corizon's

5    failure to comply with the Court's October 10th, 2017 order          02:28PM

6    regarding those 11 performance measures.  And why have you not

7    done that?

8    A.  Mr. Pratt is the assistant director that oversees the

9    monitoring bureau, and he has the responsibility of a

10   monitoring team that is dispersed and situated at each prison.       02:28PM

11   The shortcomings in terms of satisfying the performance

12   measures frankly does not rest with Mr. Pratt, and I do not

13   believe it is for the lack of effort on his part.

14        The one thing I will say about the performance and the

15   performance measures, their performance is improving and it has      02:29PM

16   improved considerably.  And when you look at those percentages

17   of compliance that are well above 90 percent, that, from my

18   vantage point, is the overall big picture that we're trying to

19   ensure that they are fulfilling, as high as they can, the

20   performance measures.  100 percent would be a perfect world.         02:29PM

21   But I don't know that 100 percent is realistic in terms of

22   achievement.  I'm not aware of any corrections system that

23   achieves that type of threshold.  That's not to say we should

24   not continue to strive for that, but that's a pretty lofty

25   goal.  I don't know that perfection is achieved.                     02:30PM

1    Q.  Thank you.

2            THE COURT:  I have to say the last word on that.  You

3    didn't ask me to enforce a stipulation that had the goal of

4    trying to accomplish an overall pretty good picture.  You asked

5    me to get involved where you failed to meet the stipulation          02:30PM

6    with respect to certain triggering points, and those have been

7    the ones I focused on.  I haven't focused on overall.  And each

8    one of those performance measures was important to the parties

9    in the negotiation.  So it could have been that you could have

10   arrived at a stipulation that said we're going to evaluate this     02:31PM

11   by an overall compliance level.  That's not what you did.  What

12   you did is you turned over to me a stipulation that said I

13   should look at individual performance measures and see whether

14   or not there had been a meeting of the benchmark with respect

15   to those performance measures.  And where you failed to meet        02:31PM

16   the benchmark is where I have been involved.  That's is the

17   only place I have been involved because that's where you asked

18   me to be involved.  And you said if we can't get it done

19   ourselves you need to tell us how to get it done.  And that's

20   what I have spent an enormous amount of energy and resources to     02:31PM

21   try to do, because it's an important task.

22            Now, it's fair, I think, to recognize the good

23   accomplishments.  And I have always wanted to do that as well

24   because as I think you have read the transcript, I really did

25   at the time that we all sat down together in the negotiations       02:31PM

1  for the settlement.  I really did think that it would work and

2  I thought that there was good faith efforts on everybody's side

3  to get to a place where we would not be where we have been now,

4  where we are.  This is not what I envisioned at all.  But the

5  performance measures that were individually negotiated are          02:32PM

6  individually important.

7          So to say that we have an overall accomplishment at 90

8  percent and somehow that excuses the fact we're at 20 percent

9  at others that are as important as individual ones for the

10  plaintiffs and the defendants in the case in the negotiation.      02:32PM

11  You all didn't come up with a document that said we have an

12  overall approval rate.  There's no amalgamation of all of the

13  performance measures that is a measure of success or not.  It's

14  success on the individual performance measures.  And as I have

15  used those two words before, abject failure continues to be a      02:32PM

16  characteristic of this case with respect to certain performance

17  measures.  And you have written about that in ways that I have

18  learned.  Actually, I would have liked to have known about

19  this.  I didn't know.  Your lawyers never let me know that you

20  were doing this with Corizon in a way as aggressively as you       02:33PM

21  were.  In fact, sometimes it was the opposite.  I was being

22  told things that would suggest that you weren't being as

23  aggressive and I was puzzled.  I didn't understand why that

24  was.  I now have a greater window through the exhibits here to

25  see what was going on in the back.                                 02:33PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1    Now I have to tell you, I'm not sure where that leaves

2    me, because it looked a little bit a day late and a dollar

3    short.  I don't know that yet.  I looked at the timetable of

4    the efforts when you said you were on notice in July of last

5    year about where I was maybe heading here, and then it turned        02:33PM

6    out that we moved to a situation where it was more

7    formalistically employed such that we have the October order.

8    And it seems like the October order, which your lawyers

9    challenged all the time with respect to my ability to do it,

10   but I heard from, sounded like, Mr. Pratt and maybe from you,        02:34PM

11   that that was exactly what you needed with respect to Corizon

12   to get somebody's attention to do it differently here.  And I

13   don't know whether that's the situation.  But I will tell you

14   that's one of my observations of what I have heard today.

15   So I have to leave you with the final word that is one       02:34PM

16   that I'm just compelled to offer, and that is, I am grateful

17   for the efforts that have produced compliance with the

18   performance measures.  But as you, I think, can appreciate,

19   some of the performance measures that we have not been able to

20   achieve anywhere near compliance with the performance measures       02:34PM

21   in a system where it's sometimes inexplicable to me because one

22   institution accomplishes and others don't.  And it would

23   suggest to me you would know how to do it.  But again, there

24   are certain aspects of this, too, that you today, and I must

25   thank you for this, where you continue to educate me.  As I          02:35PM

1  told you the last time we were this close together that I

2  really did appreciate it because I really didn't want to be

3  making things worse.  And I think that to the extent that you

4  share with me what your observations are and I listen to those,

5  I think it reduces the danger that in applying the power that        02:35PM

6  you all have given me in this case that I will make a serious

7  misstep.  The more I know the less likely that is.

8          So I have to end with this word again, one that I have

9  offered before.  Thank you very much.

10         All right.  So we need to then talk about how we           02:35PM

11 return to Mr. Pratt.  But we also need to -- you can go about

12 your business.  Forgive me for not saying that more formally.

13 People usually run as soon as they get the chance.

14         We need to talk about the remaining limited amount of

15 time that we have here today, because there are at least a half    02:35PM

16 hour of things that I need to address in terms of sort of

17 matters that are a concern for me with respect to going

18 forward.  So what I would like to do is talk to you all about

19 what everybody's view is of the agenda that we think we need to

20 accomplish today so we can get a sense about what kinds of         02:36PM

21 things are on that agenda.  Plaintiffs.

22         MS. KENDRICK:  Yes, Your Honor.  We foresee only about

23 15 minutes additional cross-examination of Mr. Pratt, so then

24 whatever redirect that Mr. Bojanowski might have.

25         THE COURT:  Let's ask that question right now.  How        02:36PM

1   much do you think?

2           MR. BOJANOWSKI:  I would say maybe 40 minutes, maybe

3   more.  I just don't know.  There were a lot of topics that were

4   brought up, and Director Ryan had deferred some of his

5   information over to Mr. Pratt and I was thinking of, perhaps,          02:36PM

6   covering some of that.

7           MS. KENDRICK:  You can't cover that on redirect.

8           MR. BOJANOWSKI:  I think it would depend upon the

9   question that was asked and whether you asked about it in --

10          THE COURT:  I must ask Ms. Kendrick not to have             02:37PM

11  conversations back and forth with counsel.  That's one of the

12  rules --

13          MS. KENDRICK:  Apologize.

14          THE COURT -- we respect in court.  We talk through the

15  Court.                                                              02:37PM

16          MR. BOJANOWSKI:  So obviously it's a rough estimate,

17  Your Honor.  There were a lot of topics that were brought up

18  that may need to be explained, and I certainly don't want to --

19          THE COURT:  All right.  So I have a sense about that.

20          Ms. Kendrick, the next plaintiffs' item that you have       02:37PM

21  on your agenda today.

22          MS. KENDRICK:  The only thing that was on our agenda,

23  sir, was that we close out this hearing on the Orders to Show

24  Cause so the Court can consider all the evidence and make its

25  decision about ordering fines.  We need to close this out.  We      02:37PM

1    need to get on.  This is of paramount importance to the Court

2    and it's of paramount importance to our clients that they are

3    receiving the health care that they need with these critical

4    performance measures that are in your order.  And we have

5    delayed it for now over several months, and we need to put it          02:38PM

6    to bed and close it out.

7              THE COURT:  Okay.  And then on the defendants' agenda?

8              MS. LOVE:  Your Honor, we still have Carson McWilliams

9    who is set to testify today due to his availability on

10   Performance Measure 9.  I anticipate his testimony will take           02:38PM

11   probably an hour to an hour and a half on direct because of

12   Performance Measure 35, I'm sorry, is of paramount importance

13   to this Court.

14             But on a larger issue, there has been no delay by

15   these defendants in these proceedings.                                 02:38PM

16             THE COURT:  Well, hold it there.  Forgive me.  I think

17   I just saw a pleading where you admitted that you missed the

18   boat on 38 out of 50 of the matters that should have been set

19   for the OSC.  That's not a delay?

20             MS. LOVE:  I'm sorry?                                        02:38PM

21             THE COURT:  Plaintiffs point out that you didn't

22   capture all of the ones you should have captured.  So I said to

23   you, you need to respond.  You need to tell me by close of

24   business last Friday.  And in that pleading, not pleading, it's

25   a response, in that response you told me that you got it wrong        02:39PM

1   38 out of 58 of the times.  Is that right?  That didn't cause a

2   delay?  If you had timely told the Court and plaintiffs what I

3   required you to tell me, and that was for December, in a timely

4   way, what numbers of the actual individual cases of failure to

5   provide the services, if you had told me that in a timely way          02:39PM

6   we would not have caused delay.

7        So I have to cut you short and be rather umbrageous

8   about the fact you are suggesting to me you have brought no

9   delay to the table here where you haven't done something of

10  critical importance and your lawyer told me that they couldn't        02:39PM

11  do it.  So I didn't accept that argument last week, and you did

12  it, and then you told me that, oh, by the way, we did it

13  poorly.

14       So I need you to go back.  And that's one of the

15  things on my agenda.  I need you to go back and do it right            02:40PM

16  next time and review all of your work because I asked you to do

17  this much earlier and you didn't do it.  You told me you

18  couldn't do it and then when I tell you to do it, you do it

19  poorly.  So I guess I'm a really a little bit put off by the

20  idea that you haven't caused some delay here in this process          02:40PM

21  with respect to the OSC when the fundamental starting point was

22  tell me the exact number of cases in December where you failed

23  to provide the services that were required for the inmates in

24  the Arizona corrections system.

25           MS. LOVE:  Your Honor, we have made a record on many         02:40PM

1  occasions.  And I understand that, and the defendants

2  understand, that you disagree with our position and so does

3  plaintiffs.  But we have apprised the Court from the beginning

4  of the paramount and substantial difficulty in doing real-time

5  reporting, that it's not a computer system that does it.  It          02:40PM

6  requires people that are humans to try to report real time,

7  real-time reporting of incidents that are not necessarily

8  things that you can capture in real time.

9        As to my statement that we have not delayed these

10  proceedings, I am specifically referring to the process by          02:41PM

11  which we are presenting witnesses and scheduling witnesses to

12  testify.

13        THE COURT:  I missed those words in your statement,

14  those caveats.  I missed those.  They weren't there, were they?

15  You made the broad statement you had caused no delay, and I'm      02:41PM

16  saying to you that you misstepped in a big way on the first

17  step here, and that is to tell me exactly the number of times

18  that you failed to comply in December.

19        And so you didn't come forth and tell me.  The

20  plaintiffs had to come forth and give an exhaustive               02:41PM

21  presentation of where you had under-included by -- what was it,

22  500?

23        MS. KENDRICK:  420, sir.

24        THE COURT:  420.  So you went and you said your team

25  said we can't do that and I found that unacceptable.  And then    02:41PM

1  you came back and said, well, we have taken a look at what the

2  plaintiffs have done and we found out that actually we were

3  wrong in a great number of cases.  And so that was very

4  troubling to me, and it also has potentially caused a

5  distraction and a delay.                                    02:42PM

6        So when you used those broad words saying you had done

7  nothing to delay here, I'm not accepting the idea that you did

8  what you were supposed to do in this case on the Order to Show

9  Cause.  With respect to witnesses and delay, I have appreciated

10  and I have given you wide latitude, both sides, on what you    02:42PM

11  have presented, and I have tried to allow you that freedom and

12  flexibility so that we could be efficient and not involve

13  delay.

14        But on the overall topic of delay, I am very

15  disappointed in what you have done, and you have not made your  02:42PM

16  case any better when I have asked you to go back and do your

17  homework to make sure that what the -- you came back -- your

18  lawyer came back at me pretty strongly and said plaintiffs had

19  done it wrong and they had not given you complete information.

20  And instead of finding out that you were right, we found out   02:43PM

21  that you were wrong even more.  So I'm sorry.  I can't accept

22  that.

23        MS. LOVE:  I disagree that the pleadings show that

24  there was a substantial number of, within plaintiffs' 420

25  examples, where we went back and had people look at actual    02:43PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Ryan-Redirect

1   medical records, there were some instances where there may have

2   been underreporting or mistakes made by humans.  There was

3   nowhere near 420.

4          And additionally, plaintiffs' counsel did not provide

5   medical record evidence of their 420 examples.  If I remember       02:43PM

6   correctly, it was approximately 50 and we did a review.

7          THE COURT:  And of those 50, how many were faulty?

8   38?

9          MS. KENDRICK:  Your Honor --

10          MS. LOVE:  I believe it was 38.                              02:43PM

11          THE COURT:  Ms. Kendrick, can you correct me if I'm

12   wrong about my recollection?

13          MS. KENDRICK:  It is 38, sir.  But I just want to kind

14   of focus everybody's eye back on the ball about the OSC hearing

15   and trying to set, perhaps, time limits on finishing up with      02:43PM

16   Mr. Pratt and with Mr. McWilliams and closing out the hearing.

17   To the extent Ms. Love wants to have some sort of oral argument

18   about the briefing, we can do that but I would rather do that

19   after we complete and have all witness testimony on the record.

20          THE COURT:  Your opinion is accepted, Ms. Kendrick,        02:44PM

21   but I have to deal with what I have to deal with.  And I would

22   prefer if you would allow me the latitude to run my courtroom

23   as I choose.

24          MS. KENDRICK:  I apologize, sir.  Thank you.

25          THE COURT:  So we've got two witnesses that will           02:44PM

1    consume the time that we have today.  That means that one of

2    the items on my agenda is one I have to turn to instantly, and

3    that is I had asked you to look for additional time so the

4    other matters I know that I have to get to.

5         I have to give the defendants an opportunity to have      02:44PM

6    their day in court on this.  And so I cannot say that it is

7    wrong to allow you to have the time to complete Mr. Pratt and

8    the time to have your additional witness as well.  So I need to

9    now turn to the idea of, if I take 15 minutes for my -- well, I

10   may not need -- part of what I just addressed was in my agenda.  02:45PM

11   So I have concluded that.

12        I need to find time as quickly as I can to conclude

13   the witnesses on the Order to Show Cause.  I am unavailable the

14   remainder of this week.  The possibility exists to either do it

15   on a number of early morning hours, we could do it between 8    02:45PM

16   and 9 on any given day in this week and next.  We could do it

17   between 5 and 6 on any given day.  I can run this courtroom

18   myself.  I don't need to turn to court staff.  I don't know

19   whether or not I actually need to have the court reporter

20   because I can also use electronic devices to record.  I don't   02:46PM

21   know whether or not the court reporter would be amenable to

22   extra hours.

23        But I agree with what Ms. Kendrick says.  We need to

24   do this straight away.  And it's difficult in a court like

25   ours, one of the busiest in the country, to find these hours in  02:46PM

1    the courtroom.

2           So what I will do is I will take a 15-minute break now

3    and I would ask you all to take some time in those 15 minutes

4    to talk between the two tables there and hear what I have --

5    and consider what I have said about the possibility of trying      02:46PM

6    to fit this in.  I have a bench trial next week Monday,

7    Tuesday, Wednesday, Thursday.  Is that correct?  We start at 9

8    each of those days and we run to 5 each of those trial days.  I

9    could run the courtroom between 8 and 9 and after 5 on each of

10   those days and then on Friday what do we have?                     02:46PM

11          THE MAGISTRATE JUDGE CLERK:  Armida says we have April

12   5th from 9 to 11 and April -- we have April 5th from 9 to 11

13   and then on April 10th the settlement conference at 1:30 went

14   away.

15          THE COURT:  So there is a 1:30 opening on the 10th,        02:47PM

16   did you say?  The 10th of April from 1:30 you could have and

17   also this period of time between 9:30.

18          THE MAGISTRATE JUDGE CLERK:  Between 9 and 11 on April

19   5th.

20          THE COURT:  April 5th.  So in addition to what I have      02:47PM

21   said, those are the other times we could turn to for the

22   completion of the OSC.  So we'll let you all talk about this

23   and come back and talk about scheduling.

24          Thank you.

25          (Recess from 2:47 p.m. until 3:05 p.m.)                    03:05PM

1    THE COURT:  Thank you.  Please be seated.

2        In the first instance, let me address my most recent

3    comments.  I reconsidered what the transcript said and what was

4    said.  And I may have cut you off, Ms. Love, before you were

5    getting to the point that would have qualified as you say it.     03:06PM

6    The problem is you stepped on a live wire for me.  You saw.  So

7    the truth of it is, it shouldn't have been directed at you.  It

8    was directed the arguments that Mr. Lee made.  He's not present

9    in the courtroom, and so consequently you got the brunt of it.

10   So that was a misdirected blow, and I shouldn't have done it.    03:06PM

11       So the point is one that's real for me, and that is

12   everything I said substantively about it is right, and I still

13   do believe was right.  This was really an affront to me that

14   this basic kind of thing couldn't be done.  And I understand

15   you still have the position that the real time is complicated.   03:06PM

16   To me, I thought I gave you plenty of notice and it seemed to

17   me that this was something that could be done.  And it looked

18   to me like the plaintiffs had done it when they don't even have

19   full access to the medical records and they had done it in a

20   credible way.  And I was really unsettled with the idea there    03:07PM

21   was an attack on what plaintiffs had done and that it hadn't

22   produced in the end.

23       But all of that said, it was wrongly directed to the

24   comment that you made.  I used it as -- well, I didn't use it.

25   I think the right way to say it is exactly you stepped into      03:07PM

1   what was a live wire to me about delay and I apologize for

2   that.

3          MS. LOVE:  Thank you, Your Honor.

4          MS. KENDRICK:  Your Honor, during the break we

5   attempted to talk about how we were proceeding next.  And          03:07PM

6   plaintiffs were under the impression that we would finish the

7   cross-examination of Mr. Pratt because I was in the middle of

8   cross-examining him when we ended for the day.  In fact, I was

9   in the middle of questioning him about an exhibit.  I wasn't at

10  any sort of closing point.  And that's based partly on the fact     03:07PM

11  that defendants have represented that they were calling their

12  witnesses --

13         THE COURT:  Can I ask you to do two things?  One, step

14  closer to the microphone; two, speak a little more slowly.  You

15  and I have the same disease so I'm a good person to observe it.    03:08PM

16         MS. KENDRICK:  And I apologize to the court reporter.

17         So we would like to finish the cross-examination of

18  Mr. Pratt.  I told you before that I think I have about 15 or

19  20 minutes left.  I was in the middle of cross-examining him on

20  an exhibit.  Defendants have announced that they are calling       03:08PM

21  Mr. McWilliams even though I have not finished my cross and we

22  haven't done the redirect.  And I am out-of-state counsel.  It

23  is a waste of my resources to come back to finish 15 minutes --

24         THE COURT:  My general predilection is we would return

25  to what we were doing at the time that the director interceded    03:08PM

1   as an accommodation to his schedule.  So my sense would be that

2   we are going to go back to Mr. Pratt.  I want to give the

3   defendants an opportunity to tell me why that shouldn't be so

4   that's my predilection.  So I'm cutting you off because you

5   have got the upside so far.     03:08PM

6         Go ahead.

7         MR. STRUCK:  Yes, Your Honor.  It's our preference

8   that we call Mr. McWilliams for a couple reasons.  One is it

9   dovetails nicely with what the director was testifying about

10   with respect to Performance Measure 35 because Mr. McWilliams   03:09PM

11   is going to be able to fill in a lot of holes in the director's

12   testimony with respect to that.

13         Our preference would be that if we reconvene, say, on

14   April 10th, which kind of makes sense since April 11th is a

15   regular scheduled status hearing, that we would -- if we   03:09PM

16   complete Mr. McWilliams today, which I think we very well may

17   do that, I don't know, and then she can continue with Mr.

18   Pratt.  But I would like to have Mr. Pratt come back primarily

19   because of your concerns with respect --

20         THE COURT:  You will have the chance, maybe, for that   03:09PM

21   redirect.  We'll go ahead and let Ms. Kendrick finish.  We'll

22   go back to what we were doing at the time we took the director.

23         MR. STRUCK:  That's fine.  I wanted to be able to

24   provide the Court with some better information with respect to

25   this real-time reporting issue that you are obviously --   03:10PM

1    THE COURT:  Well, I needed to know the names of all

2  the people who didn't get the services in December, and that

3  just didn't seem like something that would be impossible to do.

4    MR. STRUCK:  And I understand that.  And that's why we

5  thought I was thinking it might be better to have Mr. Pratt          03:10PM

6  come back on April 10th or whenever it is we reconvene.

7    THE COURT:  Thank you.

8    You may continue.  Mr. Pratt, would you kindly come

9  back to the witness stand?  Thank you, sir.

10    THE WITNESS:  Still under oath?                                    03:10PM

11    THE COURT:  No, the oath is -- we don't do that

12  anymore.  You are so old school here you know the rules.

13    No.  You are still under oath.  Thank you.

14                        RICHARD PRATT,

15  called as a witness herein, having been previously duly sworn,

16  was examined and testified further as follows:

17                     CROSS-EXAMINATION

18  BY MS. KENDRICK:

19  Q.  Welcome back.

20  A.  Thank you.                                                      03:10PM

21  Q.  Could you pull out defendants' Exhibit 33?  They are to

22  your left.

23  A.  Okay.

24    THE COURT:  It's a good thing you went back to 33.

25  BY MS. KENDRICK:                                                    03:11PM

1   Q.  So when we left off we were on Page 2 of Exhibit 33.

2   A.  All right.

3   Q.  And this is the letter that was sent on November 6, 2017,

4   by Mr. Goldberg, the chairman of the Corizon board, to you and

5   Mr. Pratt in response to that letter that the two of you had          03:11PM

6   sent previously on October 25th.

7        What was your response when you saw this letter?  Do

8   you remember?

9   A.  To me it just sounded like a routine response.  Nothing

10  special about it.                                                      03:12PM

11  Q.  How about the fact on the second page, in the second line,

12  Mr. Goldberg writes, "Any contrary understanding you have is

13  another product of the frustration factory."  And then he, two

14  lines later, he refers to Mr. Maldonado's proposal for

15  real-time system as a, quote, "Rolly's real-time system              03:12PM

16  improvement tracking system."

17       Did that seem a little flippant to you?

18  A.  Frankly, yes.

19  Q.  Did it make you feel that he was not taking the contempt

20  seriously?                                                            03:12PM

21       MR. BOJANOWSKI:  Note an objection.  That's asking

22  this witness to testify about what's in the mind of the person

23  who wrote the letter.

24       THE COURT:  No, she asked the witness what it made him

25  feel.  Overruled.                                                     03:13PM

1    MR. BOJANOWSKI:  What this witness felt?

2    THE COURT:  I think that's what the question was:  Did

3  it make you feel that he was not taking the contempt seriously?

4  Overruled.

5    THE WITNESS:  No.  The bottom line is I don't -- I was    03:13PM

6  not familiar enough with Mr. Goldberg at that point to know

7  where he was coming from with this.  I didn't know if this was

8  routine for him in his method of communication or if -- I had

9  nothing to judge this against.

10  BY MS. KENDRICK:    03:13PM

11  Q.  Okay.  And then as you go further in the second paragraph,

12  about five lines from the end, he says, quote, "If we cannot

13  fully comply with court-ordered December failure reporter using

14  the Pentaho system we might, as a last resort," with those four

15  words bold and italics, "consider altering Rolly's real time    03:14PM

16  system improvement tracking to serve this purpose."

17    Did he or somebody else explain what the Pentaho

18  system was going to do?

19  A.  Did who explain?

20  Q.  Mr. Goldberg or anybody else from Corizon?    03:14PM

21  A.  No, Mr. Goldberg didn't.  And, you know, I have come to

22  understand the Pentaho system well enough to have a general

23  idea of what it can and cannot do.

24  Q.  So let's turn to Exhibit 34.

25  A.  All right.    03:14PM

1  Q.  And this is the letter that you and Mr. Ryan sent in

2  response to Mr. Goldberg on November 8th, correct?

3  A.  Correct.

4  Q.  And about seven lines from the bottom of the first

5  paragraph you write, quote, "We have serious concerns whether          03:15PM

6  Pentaho can be used effectively for daily reporting on many of

7  these performance measures and the time required for Corizon to

8  experiment whether it can be so used is a luxury that we do not

9  have," close quote.

10          Describe your serious concerns with Pentaho.          03:15PM

11  A.  Pentaho is a standalone computer program that will go into

12  the eOMIS, the electronic health record, and it can pull

13  certain pieces of information out of that.  It can pull, for

14  instance, dates that things happen.  It can pull numbers of

15  encounters.  But as far as the ability to go in and derive          03:15PM

16  anything that has any subjectivity in it or any freestanding

17  text or anything along those lines, the program will not

18  recognize that.  And a lot of these performance measures have a

19  subjective component to them, so Pentaho is really limited in

20  the ability to pull out answers to that.          03:16PM

21  Q.  Is another concern the fact that Pentaho also depends on

22  how staff input information?  So, for example, if a nurse has

23  different ways she could make a record of checking on a patient

24  in an infirmary, Pentaho may or may not pull it out?

25  A.  Again depending upon -- yes, you are correct.  And it          03:16PM

1  depends on where that information is entered into eOMIS.  It

2  may be entered in several different areas and it may be a

3  footnote to some subjective note.

4              So when Pentaho may not recognize that as an encounter

5  to follow one of these performance measures that information          03:17PM

6  may well be in eOMIS but you have to look at each individual

7  file to see if that information is there.  Pentaho will not

8  automatically be able to pull that out.

9  Q.  So as an example, Performance Measure 66, which is about

10  the provider rounds in the infirmaries.                               03:17PM

11  A.  Yes.

12  Q.  If you ran a Pentaho report to extract all the entries

13  where the provider had entered provider-infirmary round, it

14  would pull them out, correct?

15  A.  If that's specifically what was used as a source, that's           03:17PM

16  correct.

17  Q.  But if the provider saw somebody and she, for whatever

18  reason, coded it as provider followup, it wouldn't come out

19  with that Pentaho report, correct?

20  A.  Not unless it was required in the Pentaho report.  Not             03:17PM

21  unless that was one of the parameters that was used to pull the

22  information.

23  Q.  To create the report?

24  A.  Correct.

25  Q.  Okay.  Thank you.                                                  03:18PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1       What were your other concerns with Pentaho?

2  A.  That's the basic concern with Pentaho, and the Department

3  does not have the ability to run Pentaho reports.  We rely on

4  Corizon to run these reports for us.

5  Q.  Have you ever asked to have the ability for the department      03:18PM

6  monitors to run Pentaho reports?

7  A.  We have asked for that ability, and I have never been given

8  that ability to run those reports on my own.

9  Q.  Did Corizon give you an explanation why they were not

10  giving you that access?                                            03:18PM

11  A.  The ability to obtain reports is part of our contract with

12  Corizon.  We can ask for any ad hoc as you, you know, report

13  that you want.  So these are considered ad hoc reports.  So

14  rather than giving us access to Pentaho -- and honestly, I

15  don't know that I would know what to do with Pentaho, because      03:18PM

16  again, it's a standalone program that belongs to Corizon.  I

17  would have to be educated on how to use it, what to use it for.

18  There's a whole host of things that could possibly go wrong.

19  And I rely on Corizon to be able to provide me with information

20  that I'm asking for.                                               03:19PM

21  Q.  Does the Department own the electronic records and the

22  information contained therein?

23  A.  The records, yes.

24  Q.  So if Corizon were to exercise its 180-day notice, or if a

25  different company were selected for the next contract, you         03:19PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1  would still keep that information that's contained within

2  eOMIS?

3  A.  That's correct.

4  Q.  I want to turn to the next sentence after that one in

5  Exhibit 34.  You write, quote, "As a result, we insist that          03:19PM

6  Corizon utilize additional employees at these facilities to

7  assist with the daily monitoring of these measures."

8           So you believe that additional Corizon staff was

9  necessary to monitor and do the daily reports for the Court?

10 A.  That would be correct, yes.                                       03:20PM

11 Q.  And who was doing this monitoring for the real time reports

12 from Corizon?

13 A.  Corizon had set up staff to undertake this project, J.T.

14 Scalise was a major part of that project in trying to determine

15 what parameters would be used for Pentaho to pull this              03:20PM

16 information out of eOMIS.

17 Q.  Did they assign individual court compliance employees to

18 each institution to oversee the real time data collection?

19 A.  Not to my knowledge.

20 Q.  How many people did the data collection and the monitoring     03:20PM

21 for the Courts report?

22 A.  I don't know an exact number, but I know that Corizon

23 brought additional staff in, and they may be -- I may be

24 talking three or four people.

25 Q.  On top of Mr. Scalise?                                           03:21PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1    A.   Correct.

2    Q.   Does Chris Tucker still work for Corizon?

3    A.   No, ma'am.

4    Q.   Is there somebody in his position now?

5    A.   I'm not sure who is maintaining that aspect of the          03:21PM

6    contract, but J.T. Scalise is the one that oversees this

7    reporting.

8    Q.   Do they have any court monitors or court compliance people

9    still working at Corizon?

10   A.   I'm not sure who exactly is assigned to that at this point   03:21PM

11   other than Mr. Scalise.

12   Q.   And those people that they brought -- Mr. Scalise brought

13   in, you said it was two or three, they were from headquarters

14   of Corizon in Tennessee?

15   A.   I'm not sure where they came from.                           03:21PM

16   Q.   But they don't normally work in Arizona?

17   A.   Correct.

18   Q.   Okay.  And then the next paragraph you write, "Moreover, we

19   want to know how many medical providers Corizon will be flying

20   to Arizona to ensure compliance with this order and when we may  03:22PM

21   expect then them to arrive in Arizona."

22        Can we interpret that sentence to mean that as of

23   November 8th, 2017, no medical providers had flown to Arizona

24   to help?

25   A.   No, I can't assume that.  But I'm asking at this point,      03:22PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1     we're asking for more.  I don't know if it had happened prior

2     to that or not.  I know subsequent to this, I know Corizon did

3     actually fly in a couple of medical providers and nurse

4     practitioners.

5     Q.  So you don't interpret the phrase, the conditional verb,          03:22PM

6     when we may expect them to arrive in Arizona, to imply that

7     they have not yet arrived in Arizona?

8     A.  No.

9     Q.  Okay.  On Page 2 of Exhibit 34, the second paragraph, it

10    states, quote, "Finally, your deputy general counsel informed        03:23PM

11    us via e-mail numerous times yesterday of Corizon's reluctance

12    and/or refusal to make its employees available to appear and

13    testify at hearings before Judge Duncan due to, quote,

14    'concerns about Corizon employees being subject to questioning

15    in court when we are not a party and do not have representation     03:23PM

16    at counsel table,'" close quote, close quote.

17         You go on to state that you demand that Corizon,

18    quote, "Immediately further reflect upon and retract its

19    position."  Did Corizon retract their position on not making

20    employees available to testify?                                     03:23PM

21    A.  Not to me, no.

22    Q.  And then you state, quote, "We expect Corizon's Senior Vice

23    President of Arizona Operations, Roland Maldonado, and

24    Associate Vice President of Arizona Operations, Lynn Cole, to

25    arrange their respective schedules, collaborate with ADC's          03:24PM

1    legal counsel, and voluntarily make themselves available to

2    attend all hearings go forward."

3          And then you close out that says, "In the absence of

4    Corizon's full cooperation, ADC will have no recourse but to

5    subpoena Corizon personnel to appear and testify at further          03:24PM

6    hearings."

7          Are Roland Maldonado and Lynn Cole here today?

8    A.   Yes.

9    Q.   Were they here yesterday?

10   A.   Yes.                                                             03:24PM

11   Q.   Did Corizon refuse to provide Mr. Maldonado as a witness to

12   testify at this contempt hearing?

13   A.   Not that I am aware of, no.

14   Q.   Did you and Mr. Ryan ever receive a written response to

15   this letter?                                                         03:24PM

16   A.   I don't think so.  I don't know.

17   Q.   Okay.  Could you next turn to Exhibit 96, please?

18   A.   Okay.

19   Q.   And this is a letter that you sent to Mr. Maldonado on

20   March 22nd, 2018, last Thursday?                                     03:25PM

21   A.   Correct.

22   Q.   And the subject line is Corizon controlled substance

23   audits?

24   A.   Yes.

25   Q.   And I have from my notes that you testified yesterday that      03:25PM

1   you sent this letter because you were concerned about the

2   quality of the audits that were done?

3   A.   Yes.

4   Q.   Were you concerned about the result of the audit or how the

5   audit was actually done?  Do you understand my question?          03:25PM

6   A.   Yes, I do.

7   Q.   Okay.

8   A.   If you give me just one second to read their -- the results

9   of their audit.

10  Q.   Take your time, sir.                                          03:26PM

11  A.   This is based upon the results that they came up with.

12  Q.   And you testified that you wanted to have them re-audit.

13  Did you want them to re-audit those same units that were done,

14  those seven units at five complexes or different units at

15  different complexes?                                               03:27PM

16  A.   Statewide.

17  Q.   Statewide.  And what was your concern with the results?

18  A.   They were showing substandard results from their own audit.

19  Q.   And why is an audit of controlled substances important?

20  A.   Pharmacy rules, regulations.  This is medication.  It's      03:27PM

21  important.

22  Q.   And does federal law from the Drug Enforcement Agency also

23  have an impact on the maintenance of controlled substances?

24  A.   I'm not familiar with the federal laws.  I rely on my

25  pharmacy monitor to keep me informed on these things.             03:28PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1    Q.  And that's Martin Winland?

2    A.  Mr. Winland, that's correct.

3    Q.  And he's expressed concern to you about the audit results?

4    A.  Yes.

5    Q.  Let's turn to Exhibit 97.                                    03:28PM

6    A.  Bear with me.  I'm still looking.

7         MS. KENDRICK:  May I approach, sir?

8         THE COURT:  You may.  Please.

9         THE WITNESS:  Okay.

10   BY MS. KENDRICK:                                                  03:30PM

11   Q.  And that's a March 22nd, 2018 letter from you and Mr. Ryan

12   to Mr. Maldonado?

13   A.  Correct.

14   Q.  And the subject line is real-time reporting required by the

15   Court demand for performance?                                    03:30PM

16   A.  Correct.

17   Q.  And the last sentence of the second paragraph says, quote,

18   "The process to complete these reports has been developed by

19   Corizon and adjusted over the past several months in order to

20   result in a quality report to be shared with the Court."         03:30PM

21        What is the process that you are referring to?

22   A.  The process is it goes back to Pentaho being able to pull

23   this information out of eOMIS and present us with a set of

24   files to be reviewed.

25   Q.  So was Corizon using Pentaho to extract the data for the     03:30PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1    reports to the Court?

2    A.   Yes.

3    Q.   What were the adjustments that were made over the past

4    several months?

5    A.   As we have gone through the reports and we have looked at          03:31PM

6    them, changes and enhancements to what areas were looked at in

7    Pentaho have been adjusted.  As you said, if a nurse reports

8    something in one area and it's the wrong area, it may be

9    necessary to go back into the reporting again and use a

10   different source to pull those of those areas as far as the          03:31PM

11   reporting goes.  So it's just to -- these are enhancements that

12   are made to improve the quality of the information you are

13   getting to try to make sure that you are getting the best

14   possible source document that you can.

15   Q.   So the last exhibit we looked at, Exhibit 38, the November          03:31PM

16   8th letter, you stated in it that we have serious concerns

17   about Pentaho.  You described some of those concerns to us, and

18   then in March 22nd, a few months later, it's talking about the

19   reports and Pentaho being used.

20           So I'm curious what happened between November 8th when          03:32PM

21   you stated that there were serious concerns with Pentaho to

22   Corizon going ahead and using Pentaho anyway.  How did that

23   happen?

24   A.   The concerns are still there.  The concerns have not

25   changed.  It's the, again, the changes in the way that the          03:32PM

1    information is being pulled.  I'm still not satisfied that all

2    the information that we're getting in the real time reports is

3    pristine simply due to the fact that there is subjective

4    information that's required in these performance measures that

5    Pentaho cannot pull.                                          03:32PM

6    Q.   Okay.  And so between November 8th and when defendants had

7    to report that data for December was February 5th, we were in

8    court a few times, correct?

9    A.   Correct.

10   Q.   And did you ever express to plaintiffs or to the Court that  03:33PM

11   you were concerned about the Pentaho reports that Corizon was

12   using to track the real time December data?

13             MR. BOJANOWSKI:  Relevance.

14             THE COURT:  Overruled.

15             THE WITNESS:  Not to my knowledge.               03:33PM

16   BY MS. KENDRICK:

17   Q.   And then if you turn to Page 3 of Exhibit 97, in the second

18   paragraph you state, quote, "Corizon is now compiling numbers

19   for the February 2018 real time report.  While the difficulty

20   in the process to determine these results is understood, it is  03:33PM

21   nonetheless paramount that significant improvement is shown

22   with the next report.  That final report will be due no later

23   than April 4th, 2018."

24             What are they improving from?

25   A.   Trying to improve on the quality of the information that's  03:34PM

1    in the report.

2    Q.  And did you or your counsel notify the Court of the

3    problems with the previous reports?

4            MR. BOJANOWSKI:  Relevance.

5            THE COURT:  Overruled.                                03:34PM

6            THE WITNESS:  Not to my knowledge.

7    BY MS. KENDRICK:

8    Q.  Then in the next paragraph on Page 3, you reference the

9    correspondence going back as far as October 25th, 2017, and the

10   demand to take all reasonable steps including, but not limited   03:34PM

11   to, quote, "flying in Corizon health care personnel from other

12   states to not only fill vacant positions but also to implement

13   this daily real-time reporting effort."

14           At the time you wrote the letter last Thursday, did

15   you know how many people had been flown in by that point to    03:35PM

16   deliver health care or monitor?

17   A.  Not a specific number, no.

18   Q.  And I believe I asked you yesterday if you knew how many

19   and what type of staff have flown in.  Were you able to

20   remember that information overnight by any chance?             03:35PM

21   A.  No.  My memory never got better overnight.  I still don't

22   have specific numbers.  I have asked Corizon to provide that to

23   me.  I have not received a total number, dates, or specifics on

24   that.

25   Q.  Okay.  And then the penultimate paragraph says, quote,    03:35PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1    "Please provide a detailed synopsis of efforts taken over the

2    last five months to document Corizon's commitment to comply

3    with the subject performance measures and to fill vacant

4    positions on your rosters," close quote.

5          Have you received a synopsis in response?                    03:35PM

6    A.  No, I have not.  I asked to have that by yesterday, again,

7    understanding very short notice but I wanted it prior to court.

8    And I sent followup e-mail today to track that and find out

9    where that response is, and it's being worked on.

10   Q.  Given the short notice, why did you wait until March 22nd    03:36PM

11   to ask for information that you needed for a March 26th

12   hearing?

13   A.  I asked for it to memorialize the information so I would

14   have it fresh for court.

15   Q.  Mr. Ryan testified earlier that Corizon pays its providers   03:36PM

16   more than the State did.  Is that your opinion as well?

17   A.  Yes.

18   Q.  What is the differential?

19   A.  It varies by position.  But one of the issues with state

20   employees, and I think the director alluded to this, was the     03:36PM

21   retirement benefits and everything that go with that salary.

22   So in the end, I think it's more money, much more money that

23   Corizon is paying its staff than we had paid in the past.

24   Q.  You mean for salary?

25   A.  Yes.                                                         03:37PM

1   Q.   Okay.  But does Corizon have a pension for life like state

2   employees get?

3   A.   I don't know.

4   Q.   So there's more benefits for state employees than for

5   Corizon employees?                                          03:37PM

6   A.   I know what the state benefits are.  I'm not sure what

7   Corizon's benefits are for their staff.

8   Q.   And I just want to make sure, the per diem increases that

9   we talked about yesterday, have you asked Corizon specifically

10  to use that money to increase salaries for health care staff?   03:37PM

11  A.   Specifically, no.

12  Q.   Have you asked them to use that money to create more

13  positions?

14  A.   Specifically, again, no.

15  Q.   Have you asked them to put it for any sort of specific use?   03:38PM

16  A.   No.

17  Q.   And the three letters that we went through that you and Mr.

18  Pratt sent on October 25th, November 8th and March 22nd,

19  Exhibits 31, 34, and 97, you don't ask them anywhere in there

20  to raise salaries.  Correct?                                03:38PM

21  A.   Myself and Director Ryan on that correspondence.  No, we

22  did not.

23  Q.   And in those letters, did you demand that Corizon make

24  greater use of the University of Arizona telemedicine program

25  to comply with the Court's order?                           03:38PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1    A.   I don't believe that's mentioned.

2    Q.   And you were here last month and then yesterday when Dr.

3    Robertson testified about the telemedicine program?

4    A.   Yes.

5    Q.   Yes.  And he testified last month that the services are          03:39PM

6    available through the University of Arizona, but in his

7    opinion, Corizon is not availing themselves of those services.

8    Correct?

9    A.   That's what he said, yes.

10   Q.   Do you share that opinion?                                        03:39PM

11   A.   Yes, I do.

12   Q.   And is it fair to say that telemedicine would be an

13   important component of providing required health care to the

14   people who are in ADC's custody?

15   A.   I think telemedicine is a very important adjunct to              03:39PM

16   services.  Absolutely, yes.

17   Q.   Because in part you wouldn't have the need of correctional

18   officers in a van to drive everybody 50 miles to see a

19   specialist?

20   A.   Part of it, yes.                                                  03:39PM

21   Q.   And since Dr. Robertson testified last month, have you

22   requested that he or anybody else who works for you focus on

23   ensuring that Corizon expands their use of the Arizona

24   telemedicine program?

25   A.   I have spoken with Dr. Robertson on numerous occasions and       03:40PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1  I know he has continuing discussions with Corizon, Corizon

2  medical leadership, to increase the use of telemedicine, yes.

3          THE COURT:  I'm sorry to interrupt, Ms. Kendrick.

4          You heard him say yesterday that nobody last year had

5  contacted him about that, though.  Did your conversations take          03:40PM

6  place with him sometime other than last year?  Remember I asked

7  him whether any time last year anybody contacted him about

8  ramping up the telemedicine program and he said no.  You don't

9  remember me asking that question?

10          THE WITNESS:  Are you talking about me asking him          03:40PM

11  about that?

12          THE COURT:  Right.  You said you spoke to him many

13  times.

14          THE WITNESS:  I have, yes, sir.

15          THE COURT:  Last year?          03:40PM

16          THE WITNESS:  Last year, this year, yes.  It's part of

17  routine conversations that we have.

18          THE COURT:  So I guess maybe I should understand the

19  nature of the conversations.  You weren't directing him to ramp

20  up the program.  It was just more conversation of you both          03:40PM

21  lamenting that Corizon hadn't pursued it, that type of thing?

22          THE WITNESS:  No, sir.  It's conversations with him

23  and we talk about the lack of telemedicine use that we have

24  seen in our opinions.  And for him -- and he goes forward to

25  his counterparts in Corizon and also talks about that and says          03:41PM

1    we need to ramp these things up.

2            THE COURT:  Thank you.  I'm sorry to interrupt.

3            THE WITNESS:  I'm sorry.  But my opinion of whether or

4    not we have had those conversations is probably different than

5    what you may have heard yesterday.                         03:41PM

6            THE COURT:  In what way?

7            THE WITNESS:  If you are thinking Dr. Robertson said

8    nope, we're not talking about that, that is not the case.

9            THE COURT:  I think the impression that I took from

10   his response was that there was no one who was pushing him to   03:41PM

11   reengage on telemedicine last year.

12           THE WITNESS:  That's not my opinion at all, because I

13   have had those conversations with him.

14           THE COURT:  Okay.  Thank you.

15           THE WITNESS:  You're welcome.                       03:42PM

16   BY MS. KENDRICK:

17   Q.  So my specific question was since he testified on February

18   28th, and you have heard what he testified to, did you direct

19   him to work with Corizon and work with the Arizona telemedicine

20   program to get it implemented and back to what it was when the  03:42PM

21   Department was self-operating health care services?

22   A.  No, not specifically.  Again, we had those conversations

23   about telemedicine and increasing the use of it and he

24   continues to have those conversations, to my knowledge, with

25   Corizon.                                                    03:42PM

1  Q.  Can you describe all the steps you have taken since the

2  Court issued its Order to Show Cause to secure specialty care

3  providers adequate for the need of the people in ADC's custody?

4  A.  I rely on Corizon to find those specialty providers.  I

5  get -- and recently I just had a list of specialty providers

6  that they have contacted in the past and their efforts to

7  attract more.  They track this on a regular basis, and I'm

8  getting report now of all their efforts.  So it's not incumbent

9  upon me to find those contracted providers for them.  It's

10 incumbent upon them, and I expect that they do that and I

11 expect that they do whatever they need to to attract the

12 necessary people.

13 Q.  Since the October order, have you contacted or reached out

14 to anybody from the University of Arizona or the Arizona

15 telemedicine program?

16 A.  Not directly, no.

17 Q.  And Director Ryan previously talked about the Tempe St.

18 Luke's and the University Hospital, outside hospital contracts?

19 A.  Yes.

20 Q.  And I believe he used the expression that they fell by the

21 wayside.  Have you made any efforts to reopen discussions with

22 either hospital to, again, provide specialty services and

23 hospitalization for patients?

24 A.  I know conversation has been had with Florence Hospital

25 regarding the potential of opening up services there.  But

03:43PM

03:43PM

03:43PM

03:44PM

03:44PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1    nothing has come of that at this point.

2    Q.  You said Florence Hospital?

3    A.  Yes.

4    Q.  Is that Florence Anthem?

5    A.  Yes.                                                    03:44PM

6    Q.  What about Tempe St. Luke's?

7    A.  No.

8    Q.  What about University Hospital?

9    A.  No.

10          MS. KENDRICK:  Your Honor, just one housekeeping     03:44PM

11   thing.  I need to move plaintiffs' Exhibit 206 into evidence.

12   It was used yesterday with Mr. Pratt, and I did not ask to move

13   it in.

14          THE COURT:  Any objection to 206?

15          MR. BOJANOWSKI:  May I have a moment?                03:45PM

16          THE COURT:  Of course.  That's --

17          MS. KENDRICK:  Plaintiffs' exhibit.

18          THE COURT:  Thank you.

19          MR. STRUCK:  Your Honor, this is my e-mail to the

20   Court.  I just don't think it's an appropriate exhibit.       03:46PM

21          THE COURT:  Why?

22          MR. STRUCK:  Well, I guess it contains hearsay, I

23   suppose.

24          THE COURT:  That's an unusual argument to make.

25          MR. STRUCK:  Well, it's also unusual to have           03:46PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-Pratt-Cross

1   correspondence from defense counsel or plaintiffs' counsel as

2   an exhibit.

3          THE COURT:  Not subject to any privilege, any kind of

4   exception.  It's a communication with the Court.  Why shouldn't

5   it be something that's part of the record?  I think the          03:46PM

6   presumption is if you send something to the Court it can become

7   part of the record.  The objection is overruled.

8          You can call your next witness out of order if you

9   like or do the redirect of Mr. Pratt, whichever you prefer.

10         MS. KENDRICK:  Your Honor, are you going to admit        03:47PM

11  Exhibit --

12         THE COURT:  Yes.  The objection is overruled.  It will

13  be received.

14         MS. KENDRICK:  Thank you.

15         MS. LOVE:  Your Honor, defendants call Division           03:47PM

16  Director Carson McWilliams.

17         THE COURT:  You are spared for the day, Mr. Pratt.

18  Thank you very much.

19         MS. LOVE:  Your Honor, he's coming in the courtroom.

20         THE COURT:  Thank you very much for your patience,        03:48PM

21  sir.  I oftentimes am so very pleased that when people have

22  been put charitably on ice in that outer room that they are

23  still there when we look for them.  It's a demonstration to

24  people's willingness to understand what we do here is time

25  consuming and full of delay and frustration but is important    03:48PM

-------3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct-------

1    and necessary.  So I thank you for your patience, sir.

2         You may step forward to the well of the court to be

3    right before the clerk so she may administer the oath.

4         (The witness was sworn.)

5         THE MAGISTRATE CLERK:  Thank you.  Please have a seat.   03:48PM

6                    CARSON MCWILLIAMS,

7    called as a witness herein, having been duly sworn, was

8    examined and testified as follows:

9                    DIRECT EXAMINATION

10   BY MS. LOVE:

11   Q.  Will you please state your name for the record?

12   A.  My name is Carson McWilliams.

13   Q.  Who is your employer?

14   A.  The Arizona Department of Corrections.

15   Q.  What is your current title?                                03:49PM

16   A.  I'm the Division Director in charge of prison operations.

17   Q.  And Division Director McWilliams, you have testified here

18   in court in the *Parsons versus Ryan* case previously, is that

19   correct?

20   A.  Yes, I have.                                               03:49PM

21   Q.  And what -- remind us please, quickly, what is your chain

22   of command?

23   A.  I report to the director, Mr. Ryan.

24   Q.  And are there others that directly report to you?

25   A.  Yes.  I have regional directors, four of those; I also have   03:49PM

1   10 wardens that report to me through the regional directors;

2   and then about 48 deputy wardens.

3   Q.   The 10 wardens that report to you, are those wardens of

4   state-run prison complexes in the state of Arizona?

5   A.   Yes, they are.                                              03:50PM

6   Q.   And those are complexes that are subject to the stipulation

7   in this case?

8   A.   That is correct.

9   Q.   You also mentioned that there are four regional directors?

10  A.   Yes, there are.                                             03:50PM

11  Q.   And how many regional directors supervise the state-run

12  complexes?

13  A.   Two.

14  Q.   And those two regional directors are who?

15  A.   Ernie Trujillo covers the northern region, and Joe Profiri 03:50PM

16  the southern region.

17  Q.   If you could turn to Exhibit 101, which is in the stack in

18  front of you.  Take a look at that for us if you could.

19  A.   Yes.

20  Q.   Do you recognize the document that is contained in          03:50PM

21  Defendants' Exhibit 101, which is already admitted into

22  evidence?

23  A.   Yes, I do.

24  Q.   What do you understand this document to be?

25  A.   It is a court order that addresses some performance          03:51PM

1    measures, I think 11 to be exact, that we are to comply with

2    the order in this document.

3    Q.  And do you see at the top of Page 1 of Exhibit Number 101

4    that there's a stamp at the top that says filed 10-10 of '17?

5    A.  Yes, I do.                                                    03:51PM

6    Q.  Did you receive a copy of this order in your capacity as

7    division director close in time to the filing date of October

8    10th of 2017?

9    A.  Yes, I did.

10   Q.  Is this an order that you personally had discussions with    03:51PM

11   Director Charles Ryan about?

12   A.  Yes, I did.

13   Q.  Did you also have discussions with Richard Pratt?

14   A.  Yes, I did.

15   Q.  And do you know who Richard Pratt is?                         03:52PM

16   A.  Yes, I do.

17   Q.  And is he -- are you aware that he is also a defendant in

18   this litigation?

19   A.  Yes, I am.

20   Q.  If you could turn to Page 4 of Exhibit Number 101.  And I     03:52PM

21   want to refer you to the last sentence on Page 4.

22   A.  Yes.

23   Q.  The last sentence of Page 4 reads, "If the Court finds

24   clear and convincing evidence that defendants have failed to

25   take all reasonable steps to comply with this order, the Court   03:52PM

1  shall impose civil contempt sanctions upon" -- or I'm sorry --

2  "civil contempt sanctions on defendants."

3          Did I read that correctly?

4  A.  Yes, you did.

5  Q.  And when you received a copy of this order on or about          03:52PM

6  October 10th of 2017, were you aware of the import of this last

7  sentence of the Court's order?

8  A.  Yes, I was.

9  Q.  In your capacity as division director, did you receive any

10 instruction or orders from either defendants to take any action   03:53PM

11 on the operations side of the functioning of the Arizona

12 Department of Corrections' 10 state-run complexes to comply

13 with this order?

14 A.  Yes, I did.

15 Q.  In what respect?                                                03:53PM

16 A.  The main focus was about PM 35 because we had already been

17 working on a project with that.  But there was discussion about

18 the entire order and all of the measures.

19 Q.  In your capacity as a division director and supervising the

20 two regional operations directors that oversee the 10 state-run   03:53PM

21 complexes as well as the 10 wardens of those state-run

22 complexes, did you ever direct anyone under your supervision to

23 take action to violate this court order?

24 A.  No, I did not.

25 Q.  Or to ignore this court order?                                 03:54PM

—————3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct—————

1    A.  No, I did not.

2    Q.  In your capacity as division director, did anybody in the

3    Arizona Department of Corrections' organization instruct you to

4    disobey this court order?

5    A.  No.                                                              03:54PM

6    Q.  Or in any respect ignore this court order?

7    A.  No.

8    Q.  You referred to Performance Measure 35.  Can you tell us

9    what your understanding of Performance Measure 35 is?

10   A.  It's basically about the transportation of inmates that        03:54PM

11   have prescribed medications to them and ensuring those

12   medications are transported with them, and that they receive

13   the dose on time of the next dose of whatever that dose would

14   be.  So that would be in the same day that the transport

15   happened.                                                           03:54PM

16   Q.  Is it your understanding that the Court's October 10th,

17   2017 order specifically pertained to Performance Measure 35?

18   A.  Yes, I did.

19   Q.  And do you know how many complexes were at issue in the

20   Court's October 2017 order as to Performance Measure 35?          03:55PM

21   A.  I believe there was four.  All the complexes have the

22   transportation order, but there was four main ones.

23   Q.  I believe, and please correct me if I'm wrong, a few

24   minutes ago in your testimony with reference to Performance

25   Measure 35, you mentioned that you started a process in the        03:55PM

1  summer prior to the Court's October order.

2  A.  Yes, we did.

3  Q.  Please tell us what was the catalyst that started a process

4  pertaining to Performance Measure 35 in the summer of 2017?

5  A.  Well, I believe it was in about the middle of the summer,          03:55PM

6  there was a conversation that Mr. Pratt had with Director Ryan.

7  He immediately called me on the phone and talked to me about

8  maybe some things that we could do to improve the compliance

9  with transportation of the medications.  So we set up a meeting

10 with transportation sergeants that we had with -- we met with          03:56PM

11 them first, operations staff, and then a small committee was

12 formed that Mr. Pratt facilitated.  And we discussed some ways

13 that we could do things that might enhance that compliance.

14 Q.  Do you remember who -- what the makeup was of that

15 committee that you speak of?                                           03:56PM

16 A.  I wasn't on the committee, but I believe it was some key

17 transportation sergeants that had a lot of experience and had

18 some knowledge of things; it was Mr. Pratt; I believe there was

19 someone from Corizon staff on it; and maybe a couple other

20 people from either Corizon or Mr. Pratt's office.                      03:57PM

21 Q.  Did you receive any reports from the committee as to their

22 activities or the information that they were gathering and

23 assessing?

24 A.  Yes.  We met with those same sergeants a couple of times,

25 and they would give us feedback on some things.  And there were        03:57PM

1    some plans made to modify some of our transport practices.

2    Q.  Do you recall what the challenges or concerns that were

3    being looked into by the committee in the summer of 2017

4    related to the medication transfer issue?

5    A.  Well, there's several of them.  Probably the first one            03:57PM

6    would be the volume of transports.  It's extremely high.

7    Another one would be the process itself of -- there was

8    multiple medications that were involved in this, and some of

9    them were KOP and some of them were DOT.  And some of the

10   medications, either the inmate had quit using those or they           03:58PM

11   had -- sometimes the inmates had traded them off on the yard.

12   There was a lot of little issues with it that came into play as

13   we looked into these things.

14   Q.  When you speak of the volume of transports, do you have

15   knowledge of, on a broad scale, how many intra-facility               03:58PM

16   transports are completed by the Arizona Department of

17   Corrections on an annual basis?

18   A.  On an annual basis it's around 30,000.

19   Q.  And do you have a sense of what the statistics are

20   presently as to how many statewide intra-facility transports         03:58PM

21   take place on a weekly basis?

22   A.  On a weekly it's a little over 600.

23            THE COURT:  Can I ask a question, Ms. Love, just so

24   that I'm not missing something?  Is the 30,000 number

25   reflecting only people who go from one facility to another and       03:59PM

1    exclusive of people who are arriving or are leaving DOC

2    custody?

3            THE WITNESS:  That number would be transfers inside

4    our system from one complex to another.  It wouldn't account

5    for inside a complex or Alhambra transports.                      03:59PM

6            THE COURT:  So just to make sure I understood, I'm

7    wanting to make sure this number, the 30,000 number, is only

8    for people who are going on the place they leave, DOC custody,

9    to the place they arrive, DOC custody.  It's not people who are

10   leaving DOC custody and going outside of DOC custody and it's   03:59PM

11   not people who are coming from outside DOC custody and going

12   into DOC custody.

13           THE WITNESS:  No.  It's just the movement from complex

14   to complex that they are already incarcerated.  It's that group

15   of inmates.                                                      04:00PM

16           THE COURT:  So these are people who are being -- is

17   the right word being transferred to another complex?

18           THE WITNESS:  Yes.

19           THE COURT:  Okay.

20   BY MS. LOVE:                                                     04:00PM

21   Q.  And what is the reason or reasons that inmates may be

22   transported from one state-run complex to another?

23   A.  Well, there's a lot of reasons.  Some of them are based on

24   classification and behavior.  Some of them are based on their

25   own requests of, like, for protection or something along those  04:00PM

1   lines that we have to move people to alt placement to try them

2   in another facility.  Some of them are balancing out just the

3   system itself to ensure that we keep racial parity and things

4   like that on yards.  Some of it could be for some type of

5   special programming.  And then some of it is just based on the        04:01PM

6   classification changes themselves.

7   Q.  So as an inmate's custody level may change, for instance,

8   an inmate may be close custody and is downgraded to medium

9   custody, that may require a complex change?

10  A.  Yes.  In most cases it would.  It wouldn't always, but it        04:01PM

11  would in most cases.

12  Q.  You also mentioned that you, in the summer of 2017 -- and

13  when I say "you," I mean you and the committee -- looking at

14  the issue of, you said, KOPs and DOTs.  Can you explain for us

15  what you meant by that?                                              04:01PM

16  A.  Well, there was some issues with medication that either

17  expires or inmates traded away.  The KOP meds, because once an

18  inmate receives those, it's not like we track it every day to

19  make sure they are using the medication.  So some drugs are

20  very popular on the yards.  Sometimes medications are sold or       04:02PM

21  bartered or traded, you know.  So they are used in different

22  ways than maybe what they are prescribed to use.

23          And then some of the medications, too, we found they

24  were doing prescriptions for things like medicated shampoo for

25  dandruff or lip balm, there were things like that that were         04:02PM

1   actually getting recorded as a prescription.  So we had some

2   discussion about why we would do that when it's

3   over-the-counter type medication.  Another example would be

4   aspirin.

5   Q.  So am I understanding your explanation to be a concern          04:02PM

6   about what, as you are looking at this medication transport

7   issue, what kind of medications may go with the inmate on

8   person and does that pose as security risk?

9   A.  No, not necessarily a security risk.  But it was just

10  making sure verifying, first of all, that they had the             04:03PM

11  medication they were supposed to have.  That was part of that

12  issue.  Because before we modified some things, we wouldn't

13  have known -- medication would have been, you know, accounted

14  for when they did the inventory.  But it wouldn't be done in a

15  way where you would go through a list of medication to ensure       04:03PM

16  that all the medications they have been prescribed for

17  keep-on-person are there.

18  Q.  So you are looking at, then, if I'm understanding your

19  testimony correctly, a process by which you would look to see

20  how do we look and see what medications have been prescribed to     04:03PM

21  this particular inmate, do they have them in their possession

22  when they are leaving, and are they still going to have them in

23  their possession when they are arriving at their new complex?

24  A.  Yes.  That's the process we developed so we could tell

25  that, even if it's expired or not.  Because if it's expired        04:04PM

1   that medication is removed from the inmate's possession.

2   Q.  Why isn't expired medication removed from an inmate's

3   possession?

4   A.  Because it's expired.  It's not a medication that you

5   should be using if it has an expiration date on it.          04:04PM

6   Q.  Was there a change in the summer of 2017 as to physically

7   how and where the medications were transported when an inmate

8   was transported, for instance, were they -- were medications

9   loaded into a certain part of the van and then delivered to the

10  receiving complex?  Did they go with the inmate?  How did that   04:04PM

11  work prior?

12  A.  Normally if you had a lot of prescriptions, a lot of

13  keep-on-person ones, the bulk of that would go into your

14  property inventory.  You would keep a small amount of that

15  which would be for the use on that transport.  If you had to    04:05PM

16  take that medication you were able to carry that with you.  But

17  the bulk of the medication would be put into your property.

18  Q.  Division Director McWilliams, if you could take a look at

19  Exhibit Number 1, which should be in that stack in front of

20  you.                                                          04:05PM

21  A.  Yes.

22  Q.  Do you recognize the document that is contained in

23  defendants' Exhibit Number 1?

24  A.  Yes, I do.

25  Q.  What is it?                                               04:05PM

1    A.   This was a memo that came out from a meeting that was held

2    as a result of how we started doing the meetings with the

3    sergeants, and then Richard did some meetings with them.  And

4    then there was a big meeting with all the State and this

5    meeting was a result of that that outlined a process to                    04:06PM

6    transfer medication with the inmate.

7    Q.   And was this process for inmate medication transfers

8    directly related to Performance Measure 35 at issue in this

9    case?

10   A.   Yes, it was.                                                          04:06PM

11   Q.   Is this a memorandum that you reviewed and approved as

12   division director prior to it being sent from the Northern

13   Region Operations Director Ernie Trujillo and Southern Region

14   Operations Director Joe Profiri before it was sent to the

15   wardens?                                                                   04:06PM

16   A.   Yes, it is.

17   Q.   Was this a memorandum that was approved by you, generated

18   and approved for delivery to the wardens in the normal course

19   of operations of the Arizona Department of Corrections?

20   A.   Yes, it was.                                                          04:06PM

21   Q.   And at your direction?

22   A.   Yes.

23            MS. LOVE:  Defendants move to admit.

24            THE COURT:  Any objection?

25            MS. EIDENBACH:  No objection, Your Honor.                         04:06PM

1    THE COURT:  It is received.

2    BY MS. LOVE:

3    Q.  In this memorandum it appears on Page 1 that there is a

4    process that is outlined for departure.  Do you see that?

5    A.  Yes, I do.                                              04:07PM

6    Q.  And can you explain for us what the implementation of this

7    memorandum on August 4th of 2017, what the departure process

8    was for the medication transfers?

9    A.  Kind of a basic part of it was first of all, you had to

10   verify that they were being transferred.  That's done on a 71   04:07PM

11   screen on the AIMS computer.  Then there's an order that's put

12   out where the KOP medication, first you have to give the

13   officers the direction of who is going to be rolled up.  A

14   rollup is a prison term for doing an inventory on an inmate.

15         Then when they did the inventory they would give the     04:08PM

16   inmate a plastic big.  They would put the keep-on-person

17   medication in the plastic bag.  The inmate would be instructed

18   to keep possession of the bag.  Then when they went to the

19   central intake area for departure then that's when it would be

20   verified by the nursing staff or the Corizon staff.           04:08PM

21   Q.  Let me stop you there.  As the inmate's property is rolled

22   up for transport, does the property but for the plastic bag

23   with the medications go to a different location?

24   A.  No.  It all goes to the same location.  It's all

25   transported on the same bus, van.                             04:08PM

1   Q.  But the medications the inmate is given, or the inmate's

2   medications are put in a bag that is carried by the inmate

3   himself?

4   A.  Yes, it is.

5           THE COURT:  Only the keep-on-person medication, right?   04:08PM

6           THE WITNESS:  Right.  The DOT medications are a

7   separate issue.  But yes.  Yes.

8   BY MS. LOVE:

9   Q.  So let's do it this way.  Let's talk about the departure

10  process for the KOP medications and then we'll talk separately   04:09PM

11  about the DOT.

12  A.  Then when they got to the intake, central intake, then the

13  medical staff would verify that they did have those

14  keep-on-person medications with them and the inmate would still

15  keep possession of them.  They would actually verify it,   04:09PM

16  though, through their list of medications that were prescribed.

17          And then once that was done, they did a medical

18  transfer sheet that where they listed everything on that so

19  when it arrived they could verify it on the other end.

20  Q.  Are you aware of what would happen from the Corizon side if   04:09PM

21  an inmate goes with his plastic bag, hypothetically, and

22  there's one KOP medication in there, is the Corizon person, to

23  your knowledge, looking to see, well, should this inmate have,

24  based on their medical records, have two different kinds of KOP

25  medications and where is that second?   04:10PM

1  A.  Yes.  Because they have a list of whatever the medications

2  are.  So they are verifying that the medications that they have

3  on their person are the same ones that they have been

4  prescribed that would be in that -- wouldn't be outdated.

5  If -- and there's a process to that.  So, you know, if they are          04:10PM

6  there then there's no issue.  There's no discrepancy.  If

7  there's a discrepancy, that has to be documented and then the

8  receiving facility gets contacted so that they know there's an

9  issue with it so action can be taken to correct that.

10 Q.  When you say a discrepancy, do you mean a situation where,          04:10PM

11 for instance, an inmate's records list that he has two KOPs, he

12 only shows up with his plastic bag of one KOP, then is Corizon

13 looking to see, hey, can we get that second KOP to him before

14 he leaves, or is that done or the receiving end?  How does that

15 work?                                                                     04:11PM

16          MS. EIDENBACH:  Objection, Your Honor.  Leading.

17 Counsel is testifying.

18          THE COURT:  Hold on just a second.

19          MS. EIDENBACH:  Sure.  Sorry, Your Honor.

20          THE COURT:  Overruled.                                          04:11PM

21          THE WITNESS:  If it was a medication that was needed,

22 then yes, that would -- they would try to get it before they

23 left if they had to take a dose of it.  If it was something

24 that wasn't that necessary, then they would go to the receiving

25 area and get it there.                                                    04:11PM

1    BY MS. LOVE:

2    Q.  And when you say "the receiving area," do you mean --

3    A.  The next -- the institution they are being transferred to,

4    yeah.

5    Q.  What is the next step in the process after Corizon verifies    04:11PM

6    the KOP medications for a particular inmate and checks to see

7    are the KOPs prescribed to the inmate in the possession of the

8    inmate?

9    A.  Then they have to verify the DOT medications.  The DOT

10   medications, the inmate doesn't have possession of those.    04:12PM

11   Those medications are brought by medical to the intake area.

12   They are verified that they are the medications that have been

13   prescribed.  Then they are placed into a bin that all the

14   medications are put into so that -- along with the medication

15   transfer sheets so that the receiving institution has a record    04:12PM

16   of that verification, plus the inmate and the medical person

17   both sign their names to that, to the -- there's a transfer

18   sheet that -- it's a labeling sheet that they sign.

19   Q.  And then the bin that you are speaking of that contains the

20   DOT medications, is that placed on the transport vehicle?    04:13PM

21   A.  Yes, it is.

22   Q.  And is that in a particular location, secure location?  How

23   does that work?

24   A.  Well, normally those things are -- in a bus, let's say, has

25   a compartment area where luggage and stuff is placed.  That's    04:13PM

1   where inmate property is placed as well as that bin.

2   Q.   To you know whether --

3   A.   One other thing, too, it's also red tagged which is a

4   process we use to seal it so that you can tell if it's broken

5   open because the red tag has to be broken.  And it has a number   04:13PM

6   on it, the red tag does.  That number is put on the paperwork

7   so that you can verify that that tag hasn't been tampered with.

8   Q.   Is this tag specific to all DOT medications that are going

9   on that particular transport or red tagged to the specific

10  inmate?                                                           04:13PM

11  A.   No.  It's for all the medications in one bin.  And if you

12  had to, I guess there could be more than one bin.  But one bin

13  normally can handle that.

14  Q.   Do you know how, within the bin, is it identified that a

15  certain DOT medication is for a particular inmate?                04:14PM

16  A.   Yes.  Each one has one of these med transfer sheets.  Those

17  are all recorded on it.  That's placed with that medication.

18  It's in like a same thing, a bag or an area right there in the

19  bin itself so you have those medications singled out.

20  Q.   When -- before an inmate leaves the sending facility, do     04:14PM

21  you know whether or not there is documentation that attests to

22  whether or not the inmate agrees as to whether or not the

23  medications are going with him, for instance, for KOP

24  medications?

25  A.   Well, yeah, the inmate signs for both the KOPs and the DOT   04:14PM

1  medications as well as the medical staff person.  If the inmate

2  refuses then a third person, another staff member, would sign

3  which would probably be the security staff member that's there.

4  Q.  So is this a situation where as the inmate is being

5  processed out of a facility, he is physically sitting with or      04:15PM

6  face-to-face with a Corizon medical staff member who is going

7  through this medication verification process?

8  A.  Yes, they are.

9  Q.  And is this something you have observed yourself personally

10 occur?                                                             04:15PM

11 A.  Yes.  I have seen it happen before.

12 Q.  What if an inmate declines to sign paperwork attesting to

13 whether or not medications are present and accounted for for

14 the transport?

15 A.  We handle that like any refuse to sign something.  Another     04:15PM

16 person, another staff member signs, so two staff members would

17 sign and you would just write "refuse to sign" on the line.

18 Q.  If there is a discrepancy in the hypothetical that I was

19 giving you such that, for instance, an inmate's records show

20 that he has two KOPs but as he's being processed out there's       04:16PM

21 only one KOP available for him and in the bag, is there any

22 documentation that memorializes this discrepancy?

23 A.  Yes.  There would be an information report written.  The

24 inmate would also be asked what happened to it.  Let's say it

25 was inventoried the night before, and it was there because it's    04:16PM

1   on the inventory that it was there.  So they did verify that

2   part because the officer also verifies it when they do the

3   inventory.  You would also ask the inmate what happened to the

4   medication, and if the inmate says, I threw it away, or I gave

5   it to Inmate Smith, they would be held accountable for that          04:17PM

6   through a disciplinary ticket.

7   Q.  And what is the disciplinary issue with either of those two

8   scenarios that you just shared?

9   A.  Why we would do that?

10  Q.  Yes.                                                              04:17PM

11  A.  To -- the main reason would be to try to recoup the money

12  that the medication cost.  They are going to be charged

13  restitution for it because it's destruction of state property.

14  Q.  And are inmates permitted to give away their medications to

15  other persons?                                                       04:17PM

16  A.  No, they are not.

17  Q.  So then when the inmates are physically put on to the

18  transport vehicle, the DOT medications stay secure in the bin,

19  correct?

20  A.  Yes, they do.                                                    04:17PM

21  Q.  And then the inmates, their KOP medications, do they have

22  them literally in their hands while they are on the transport

23  bus?

24  A.  Yes, they do.

25  Q.  And what is the process, then, on the receiving end for          04:18PM

1   verification that an inmate has the medications that he has

2   been prescribed available to him DOT and KOP?

3   A.  It's pretty much the same process.  When they arrive at the

4   intake area there is a medical staff member there.  They are

5   taken to that area where they check the KOPs to see if they          04:18PM

6   still have them, verify the amount, or the number of

7   prescriptions, and then the DOT medications are verified in the

8   bin itself.

9          So that's all done at the receiving, so if there's

10  some type of discrepancy that wasn't caught on the front end        04:18PM

11  would get caught on the back end to ensure that that medication

12  could be purchased, maybe they have it at the pharmacy in

13  stock, and then administered in a timely manner.

14  Q.  Are there processes in place as of the summer of 2017 and

15  with this memorandum whereby if an inmate comes to the              04:19PM

16  receiving facility is missing a medication, and a medication is

17  not available in stock, that there's action taken to provide

18  the inmate with the medication?

19  A.  Yes, there is action taken.  You can go to a local pharmacy

20  and purchase it.  It can even be delivered through a pharmacy.      04:19PM

21  Q.  Are you aware of whether that has occurred?

22  A.  Yes, it has occurred.

23  Q.  As you walked us through this detailed process in place as

24  of September -- or I'm sorry -- as of August of 2017, can you

25  tell us how this process was different than prior?                  04:20PM

1  A.  Well, they always, you know, accounted for the medication

2  as far as like the KOPs, when you did an inventory you would

3  list the inventory of some KOPs.  You might not know what the

4  medication was.  I mean, a lot of our officers aren't

5  well-versed in medications.  So that would be one thing,                04:20PM

6  because now there's actually a piece of paper that medical

7  fills out that tells you the name of the medication.  So you

8  can actually verify that that is the right medication.  Because

9  you don't know if that inmate is prescribed that medication or

10  not prior to this.  Now you would know it.  So you just know    04:20PM

11  they had five bottles of pills or whatever.

12         So this system actually identifies everything

13  individually by the name of what it is, and then so that

14  officer can tell that they have the medications that they are

15  supposed to have.                                               04:21PM

16  Q.  Division Director, if you could look at Exhibit Number 2,

17  that should be in front of you.  And after you have had an

18  opportunity to look at the document, please let me know if you

19  recognize what it is.

20  A.  Yeah.  I recognize it.  It's DI-361.                        04:21PM

21  Q.  Exhibit Number 2?

22  A.  Yes.

23         MS. LOVE:  May I approach, Your Honor?

24         THE COURT:  You may.

25  BY MS. LOVE:                                                    04:21PM

1   Q.   My mistake.  Could you please look at Exhibit Number 3.

2   A.   Yes.  I recognize this.

3   Q.   And what is Exhibit Number 3?

4   A.   It's the labels.  This is the labeling and signature pages

5   that were putting for the meds and this is actually put onto          04:22PM

6   the meds so that they can identify those.  And it's got a place

7   for a signature for the inmate and it also has one for a staff

8   member.

9   Q.   And this is for the departure process?

10  A.   Yes.  It works for both KOP and for DOT meds.                     04:22PM

11  Q.   Do you see at the top of the labels it says, "Labels for

12  interim use."  Do you know what that refers to?

13  A.   When we developed this, we weren't sure how this might

14  evolve but it was for a period of time.  It was something we

15  had to do right then for that period of time, but it wasn't         04:23PM

16  permanent.

17  Q.   Was this during the period of time of the summer of 2017

18  coinciding with the August memorandum regarding the process?

19  A.   Yes.

20  Q.   And if you could then also take a look at Exhibit Number 4      04:23PM

21  and tell me if you recognize this document.

22  A.   Yes.

23  Q.   What is this?

24  A.   It is also labels for DOT meds.  First one was KOP.

25  Q.   And was this -- are these -- were these also labels used       04:23PM

1    for interim use in the summer of 2017 as the system was being

2    developed?

3    A.  Yes.  It was developed that way, yes.

4              MS. LOVE:  Defendants move to admit Exhibits 3 and 4.

5              THE COURT:  Any objection?                              04:24PM

6              MS. EIDENBACH:  No objection, Your Honor.

7              THE COURT:  Exhibits 3 and 4 are received.

8              Ms. Love, what I contemplate is we'll go until 4:45

9    and then we'll take up the other issues that we need to do.

10   Thank you.                                                        04:24PM

11   BY MS. LOVE:

12   Q.  If you will now take a look at Exhibit Number 2 for me.

13   A.  Yes.

14   Q.  And I believe you previously testified when I was making a

15   mistake in exhibit order thank you recognized this document at   04:24PM

16   Exhibit Number 2?

17   A.  Yes, I do.  It's a director's instruction that was written

18   about the medical -- medication transfer process.

19   Q.  Is this Director's Instruction 361 inmate medication

20   transfer process?                                                04:24PM

21   A.  Yes, it is.

22   Q.  Dated October 31st, 2017?

23   A.  Correct.

24   Q.  And at the top it says from Charles L. Ryan?

25   A.  Yes.                                                         04:25PM

—————3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct—————

1   Q.  And that's Director Ryan?

2   A.  Yes, it is.

3   Q.  And the to line says "Distribution."  Do you see that?

4   A.  Yes, I do.

5   Q.  What does distribution mean?                            04:25PM

6   A.  Who it's going to.

7   Q.  And is distribution a code word for a certain category of

8   people within the Arizona Department of Corrections?

9   A.  Well, it's going basically, this particular DI goes out to

10  everybody.  It's part of our director instructions.  We have   04:25PM

11  several of those.  And it goes out to everybody in the

12  Department.  When it's put out it goes to every complex, every

13  unit.

14  Q.  And do you know the process by which director's

15  instructions are put out to quote, unquote, "everyone for      04:25PM

16  distribution"?

17          MS. EIDENBACH:  Objection, Your Honor.  Relevance.  We

18  don't really know the exact process of distribution.

19          THE COURT:  Overruled.  We'll hear where it goes.

20          THE WITNESS:  Yeah.  We have a policy unit.  Once the   04:26PM

21  director signs one of these then it goes back to the policy

22  unite and then they put out an electronic notice to all the

23  prisons and it has this attached to it.  And it says this DI

24  has been authorized by the director, and then it's

25  responsibility of the people in the field to go over that with  04:26PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct

1    staff to make sure that staff are aware of what's going on or

2    any changes.  It goes to numerous people.

3    BY MS. LOVE:

4    Q.  And previously in this case, we have heard testimony that

5    Correctional Officer 2, so Correctional Officer 2 likely will          04:26PM

6    not have an e-mail account.  Is that correct?

7    A.  Well, it depends on what you do.  Everybody that's got an

8    e-mail will get this.  Some CO2s have it, like accountability

9    officers which would be a very important one in this since they

10   have an integral part in it.  They would get it.  Property              04:27PM

11   staff would.  A lot of the support service staff would, because

12   they have e-mail accounts.  And then, of course, all your

13   program staff do, your teachers, chaplains, administrators.

14   That list is quite lengthy.

15   Q.  What I'm interested in is if this is a DI that's necessary          04:27PM

16   to go to all security personnel including CO2s, how does

17   information get drilled down such as we have a new DI and

18   here's our new processes to someone who may not have an e-mail

19   account?

20   A.  We do that different ways.  One is a briefing.  You go over         04:27PM

21   all policy issues in briefing and you talk about those things

22   with the staff, which are officers.  It also gets put on up

23   on -- we have electronic briefing boards that are in the

24   briefing rooms.  And this kind of information is put on those.

25   You know, most staff come to work for a briefing a little bit          04:28PM

1   early.  They don't get there right at the moment when the shift

2   starts.  So they might be in that briefing room for 15 minutes

3   before the shift starts.  That scrolls constantly and you can

4   read that information.

5          We also have these electronic bulletin boards in the          04:28PM

6   entryways of our custody -- a lot of our custody units that you

7   can read while you are standing in line to get checked through

8   at a scanner, an entry point.

9          So we have those things, plus you also have meeting.

10  Deputy wardens have meetings with officers; chiefs of security      04:28PM

11  have meetings with the officers; wardens have meetings with the

12  officers and they talk about all those things.

13  Q.  Is it your expectation as the division director who

14  supervises the 10 state-run facility wardens and the 40-plus

15  deputy wardens that when a director's instruction is released       04:29PM

16  for distribution that that command level staff drills down this

17  information to the necessary personnel who need to know this,

18  implement this, and abide by it?

19  A.  Yes, I do.

20  Q.  Did you, in your capacity as division director, review and,     04:29PM

21  for your purposes, approve Director Instruction 361 before it

22  went to Director Ryan for final approval?

23  A.  Yes, I did.

24  Q.  And Director's Instructions pertaining to operations are

25  documents that are generated in the normal course of operations    04:29PM

———3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct———

1   for the Arizona Department of Corrections?

2   A.  Yes, they are.

3           MS. LOVE:  Defendants move to admit.

4           THE COURT:  Any objection?

5           MS. EIDENBACH:  No objection, Your Honor.          04:29PM

6           THE COURT:  And this is number --

7           MS. LOVE:  This is defendants' Exhibit 2.

8           THE COURT:  Thank you.  2 is received.

9   BY MS. LOVE:

10  Q.  Does Director Instruction 361 dated October 31st of 2017     04:30PM

11  encompass the processes that were set forth in Exhibit Number

12  1, which was the August 2017 memorandum regarding the

13  medication transfer process?

14  A.  Yes, it does.

15  Q.  Does DI-361, to your knowledge, change any of the departure   04:30PM

16  and arrival processes that you have previously testified to

17  here today?

18  A.  Not any of the basic ones.  I think it elaborates a little

19  more on some things.  It doesn't change any of the basic issues

20  with it, no.                                              04:30PM

21  Q.  If you turn to Page 4 of Exhibit Number 2, at the top there

22  is a Section 4.0, and it says, "Unscheduled/After Hours

23  Transport/Delayed Arrival."  Do you see that?

24  A.  Yes, I do.

25  Q.  To your knowledge, is that a section that was -- that        04:31PM

1   appears here in this DI but was not present in the August 2017

2   memorandum?

3   A.  Yes.  It's an addition, yes.

4   Q.  Could you please explain for us what the addition was?

5   A.  Well, we found that we were having some issues with                        04:31PM

6   after-hour transports, and a lot of that is, you know, the

7   staffing and there's several little issues with it.  So we

8   thought it would be better if we structured that a little

9   differently, made it more of a command decision to move

10  somebody after hours and to reduce this, reduce the after hours   04:31PM

11  transports themselves.  We have actually narrowed this down

12  even more in the past month, month and a half.

13  Q.  And when you say that this unscheduled or after hours

14  transports and delayed arrivals went more to command staff,

15  what do you mean by that?                                                      04:32PM

16  A.  Well, what we were trying to make sure didn't happen was

17  someone authorized some type of after hours transport and

18  everybody wasn't aware of it, to make sure that we were

19  following up on things so that we wouldn't -- no one would slip

20  through the cracks.  So the level of who would either authorize  04:32PM

21  it or who would be involved in making that decision was just at

22  a higher level.  Because your transports ordinarily are made

23  through central office, but that only happens during 8 to 5

24  hours.  Everything after that is made in a different way.

25  Q.  Were these additional processes for the unscheduled after                 04:33PM

1  hours transports put into place so that whether on the

2  departure or receiving end the necessary personnel were

3  available to go through the departure and arrival process to

4  ensure medications are delivered?

5  A.  Yes, so that process wouldn't slip through the cracks so                   04:33PM

6  that they would have -- everybody's got to go through the

7  designated areas, but you also have to ensure that everything

8  is accounted for.  So, yes, the medication would be something

9  that would have to be looked at and to ensure that it was

10  transported with the inmate.                                                  04:33PM

11  Q.  And do the unscheduled or after hours transports require

12  approval of a warden or a regional operations director?

13  A.  Yes, they do.

14  Q.  And why is that?

15  A.  Just to take it to that level where it's at a high level              04:33PM

16  organization, but it also does something a little simpler than

17  that.  It reduces them dramatically unless it's an emergency.

18  Q.  If you would look at Page 5 of Exhibit 2.  At the top

19  there's Section 5.0, distribution lists.  Is this a subject

20  matter area that was added to the DI that was not present in              04:34PM

21  the August 2017 memorandum?

22  A.  Yes, because we wanted to use the shared drive and -- yes.

23  This is another addition just making sure that we had that

24  bridge between the contract staff and the operations staff.

25  Q.  When you say "use the shared drive" what do you mean?                 04:34PM

1  A.  Well, everything is on that drive.  So let's say you had an

2  issue with some type of medication there would be two things

3  that would be done:  One of them would be you would send

4  something electronic to the receiving area.  You would also

5  follow up with a phone call.  The list for transfers are on          04:35PM

6  that drive so that other people can look at it.  The

7  accountability officer has to see it.  The medical staff need

8  to see that so they know who the transfers are because you have

9  to make sure you have the right people on the transfer list.

10 So that now is something everybody can use.                          04:35PM

11 Q.  And with the implementation of the DI, were there

12 additional documentation requirements as to daily operations at

13 either the departure or arriving facility to document what

14 transports were happening that day and whether the medications

15 arrived?                                                             04:35PM

16 A.  Well, the transfer lists normally occur, they can occur a

17 couple of days out.  But before the transfer actually happens

18 we have to have some type of time lapse in there to get

19 everything done.

20        But, yes, so everyone knows to look at that but you          04:36PM

21 also have to verify that again, because sometimes those change.

22 So you have to verify it again on the day of, on the

23 information itself.  I mean, the medication list, that's how

24 Corizon staff would get the list of people to send to the

25 officers on shift to do the roll-ups, would be by looking at       04:36PM

1    this list to see who was on the transfer list.

2    Q.  And you testified previously, I believe, that most

3    transports come out of the central office.  Did I understand

4    your testimony correctly?

5    A.  Yes, they do.                                              04:36PM

6    Q.  What do you mean by "most transports come out of the

7    central office"?

8    A.  Well, the classification and movement, daily movement, is

9    generated and controlled by central office.  After hour things

10   are either emergencies or things that occur that dynamics have 04:37PM

11   changed with someone, let's say, requesting protection, things

12   like that that happen outside of those.  But regular movement

13   where it's a planned transport where someone decides that

14   inmate X is going to this institution, that is all planned in

15   advance.                                                       04:37PM

16   Q.  And is there one person who holds the position that is the

17   coordinator of transport statewide on a daily basis?

18   A.  In the central office there is, yes.

19   Q.  And what is that position entitled?

20   A.  Transportation coordinator.                                04:37PM

21   Q.  Do you know the name of the person?

22   A.  Yes, I do.  You want me to say it?

23   Q.  Yes.

24   A.  Christine Harkins.

25   Q.  And how far in advance are the transportation lists        04:37PM

1  created?  Really what I'm asking is, what kind of lead time

2  does a departure facility have knowing who is going to be

3  transferred when and how many do we have going?

4  A.  Normally, it's two days.  There could be exceptions to that

5  if you were doing some type of massive mass movement, but        04:38PM

6  normally it's two days.

7  Q.  In conjunction with the DI that we have been speaking about

8  today, were any new positions created within the Department of

9  Corrections to facilitate the DI?

10  A.  Yes, there was.                                             04:38PM

11  Q.  What was the position that was created?

12  A.  We created a position down that we placed in Tucson that

13  oversees more of the -- they don't develop the movement.  They

14  oversee the process.  So they would get the move list just like

15  anyone else, and then they would follow up with -- any type of  04:39PM

16  discrepancy that happens with a medication transfer goes into

17  this office and this person helps coordinate trying to correct

18  it.

19          So they deal with the transportation sergeants; they

20  deal with the deputy wardens; they sometimes deal with FHAs.    04:39PM

21  But they get involved in that for every complex.

22  Q.  So this person's job is on a daily basis statewide

23  transport to coordinate and determine whether or not the

24  medications that an inmate needs are making it to the receiving

25  facility?                                                       04:39PM

1  A.  Yes.  They would be keeping track of that.  And they

2  actually work for Christine Harkins, but yes.  So they actually

3  work with her, this person.

4  Q.  How does the person in this position keep track of whether

5  or not the medications are making it from the departure          04:40PM

6  facility to the receiving facility?

7  A.  Anyone that has some type of discrepancy has to record

8  that.  And this person would be on that list of notification of

9  that.  So then they would follow up with it.

10  Q.  And then once the discrepancy is reported, what happens     04:40PM

11  with that information?

12  A.  Well, it would be a combination of things.  One of the

13  things that we do daily is we have a meeting Monday through

14  Fridays with the FHAs and the wardens, and sometimes the

15  transportation sergeants are there also.  But anyway, they meet  04:40PM

16  and they discuss issues and that's in the late afternoon.  So

17  if there's been something that happened in the morning, they

18  would be talking about that.

19           Then we have duty officers that follow up with that,

20  and the person that's doing the coordinating out of Tucson they  04:41PM

21  just developed a form that's another form that elaborates even

22  a little bit more, gets a little more detail on this transfer

23  process.  The first month that we used in all of our

24  institutions was the month of February.  And it does seem to be

25  a good form to use and it looks like it's going to be           04:41PM

1   beneficial for us.  But anyway, that form tracks everything

2   including action taken at the end of what the final action was.

3          Now, in a perfect world of this what should happen is

4   the duty officer or the shift commander should take that form,

5   they should go over to medical around 7:00 in the evening, say          04:41PM

6   have all these -- we had six inmates arrive today, were all of

7   them that had medication, were all of them administered their

8   medication?  The medical staff would record yes, they were or

9   no, they weren't.  If it was no, it would be okay, what are we

10  going to do right now to make sure that medicine is          04:42PM

11  administered?  And then the next question would be has it been

12  entered into eOMIS.  So that would also be something they would

13  follow up with that particular form.

14         Then that would be signed so we have a record now of

15  everything happening.  That's how it's supposed to work.          04:42PM

16         MS. LOVE:  Your Honor, I was about to move on to a new

17  exhibit so it's probably a good place to stop.

18         THE COURT:  Very good.

19         Mr. McWilliams, thank you for your time today.  I'm

20  sorry we will have to have you come back to finish.          04:42PM

21         THE WITNESS:  It's okay.

22         THE COURT:  I appreciate it.  Thank you, sir.  Just

23  before you leave, though, one question:  The DI that we have

24  just been talking about, the date that it's issues on, is that

25  the date that it becomes effective or --          04:43PM

3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct

1    THE WITNESS:  Yes, it is.  It becomes effective on

2  that date.

3    THE COURT:  So when a director issues such a thing as

4  these directives, it's sometimes a prospective date than the

5  date it's prepared if it needs time to be to prepared, but we    04:43PM

6  should expect the date we see here is the date it should be in

7  place.

8    THE WITNESS:  Yes, it is.

9    THE COURT:  Thank you very much.  Thank you, sir.  You

10 may step down.                                                    04:43PM

11    The first question I have is were you able to confer

12 about the possible next time so that we can conclude the taking

13 of the testimony on the Order to Show Cause?

14    MS. EIDENBACH:  Your Honor, we weren't entirely able

15 to confer about that because we weren't sure how you were going   04:43PM

16 to rule on the order of the witnesses this afternoon.  But I

17 will be covering the hearings, and I am available on all of the

18 days and times that you have offered.

19    THE COURT:  Mr. Struck gave a hint as to what his

20 preference was.  Is that still the case?                          04:44PM

21    MR. STRUCK:  Our preference would be the April 10th,

22 afternoon of April 10th since it's right before the status

23 hearing anyway.

24    THE COURT:  So that would be all right with you, Ms.

25 Eidenbach?                                                        04:44PM

———3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct———

1    MS. EIDENBACH:  That is fine with me.  The only

2  concern I have is that we are able to finish -- I'm sorry -- or

3  whether we need an additional day, which our preference would

4  be to plan now if we're going to need an additional day.  And

5  we would also just like to clarify whether defendants plan to      04:44PM

6  redirect Mr. Pratt or whether we'll just be doing Mr.

7  McWilliams, Division Director McWilliams the rest of his direct

8  and then my cross-exam and redirect.

9    THE COURT:  I think if we start -- I mentioned 1:30

10  before but if we start at 1:00 on the 10th, we should be able     04:45PM

11  to, I think, in light of what I understand the remaining

12  witnesses that have been talked about in time seem to me that

13  we would be able to conclude.  If not, we can grab a little bit

14  from the 11th.  But I think that would work.

15    Did you have real fear that it would not, wouldn't be      04:45PM

16  enough time, Ms. Eidenbach?

17    MS. EIDENBACH:  Your Honor, I probably will not need

18  that much time with Mr. McWilliams, so I'm not sure that I'm

19  the deciding factor in this equation.

20    MR. STRUCK:  I think that will be enough time.          04:45PM

21    THE COURT:  So that's what we'll do, 1:00.  I said

22  before 1:30 because oftentimes we start at 1:30.  But there's

23  no reason we can't start at 1:00.  So 1:00 then we'll continue

24  the OSC hearing on the 10th of April.

25    And then the other issues that I wanted to address is      04:45PM

─────3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct─────

1   the timetable with respect to addressing these other issues of

2   the names.  I really do believe that the fact that 38 out of 50

3   of the sort of spot check produced such an error rate raises a

4   real concern, and so I do think that the defendants need to go

5   back and reevaluate and take a serious look at the, what I will    04:46PM

6   call, a prima facie case that the plaintiffs made with respect

7   to the other 370 names.  I think we need to have that in

8   advance of the continuation of the hearing for certain.

9          So, I mean, I will give you a chance to be heard about

10  it, but I'm about to set a deadline.                              04:46PM

11         MR. STRUCK:  Your Honor, we intend to get to the

12  bottom of it as well, and I don't know what time parameters you

13  are talking about but it seems we're going to need to talk to

14  our folks and Corizon and figure out how to accomplish this

15  based upon the information that we receive from Corizon          04:47PM

16  regarding the apparent burden of doing this.

17         THE COURT:  What I would propose is that you complete

18  this task and identify all the names as you were required

19  originally to do no later than the 6th of April.  I will hear

20  from plaintiffs on their opinion of that date.                   04:47PM

21         MS. KENDRICK:  April 6th is fine, sir.

22         THE COURT:  6th.  So I'm going to order that you

23  comply with the original order no later than the 6th, and that

24  includes the reevaluation of -- well, the directly addressing

25  the issues that have been raised by plaintiffs with respect to   04:48PM

1    the questions about the names and that at the end of the

2    process that the appropriate person with the competency to do

3    so execute an affidavit testifying to the veracity of the

4    process and also to the veracity of the names that are

5    included.                                                        04:48PM

6             The other two issues that I have looked at in terms of

7    sort of housekeeping is I think I have allowed to remain open a

8    sufficient long period of time Docket Number 1819.  And that is

9    the issue arising out of the Tucson retaliation claim.  I have

10   heard about that from the witnesses.  I have addressed it in a   04:48PM

11   way that I think has been constructive.  I think that in light

12   of the issues that are presently before the Court, it doesn't

13   make much sense for the Court to devote further time to that.

14            So I would propose to conclude 1819 as now having been

15   addressed and rendered moot by the Court's inquiry.  I don't     04:49PM

16   propose to take any further action, because I have not heard

17   about -- it seems to me that if there are fee issues associated

18   with it it can be included in another fee issue and in terms of

19   sanction, I don't think it's appropriate to devote more

20   attention to it at this time.                                    04:49PM

21            But I will give plaintiffs a chance to address that.

22            MS. EIDENBACH:  Your Honor, I think it was addressed

23   sufficiently at the time, and we have no objection to Your

24   Honor's proposal.

25            THE COURT:  All right.  The defendants wanted to have   04:49PM

-------3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct-------

1    the opportunity to be heard.  I gave them that opportunity to

2    be heard on the issue, so I think I would be surprised if you

3    were going to want to hold on to this one as well.  But I will

4    give you a chance to say that.

5            MR. STRUCK:  Well, if I understand, you aren't making    04:50PM

6    any kind of determination.

7            THE COURT:  I'm making no determination.  I have made

8    the inquiry and I have heard about it.  I wanted to make sure

9    you had your side heard.  I heard about it from the plaintiffs.

10   I had an initial reaction that you disagreed with and we        04:50PM

11   heard -- I was educated to the extent that the limitation

12   always exist.  I had representations that were made that were

13   very concerning to me, and I have had such representations and

14   I made inquiry.  Sometimes those produce results; sometimes

15   they don't.  But sometimes the inquiry enough is sufficient and 04:50PM

16   so that's where I am on that.

17           Turning to the Motion to Enforce at Document 2253, I

18   don't think that there is any further action that's necessary

19   at this time, so I would deny that without prejudice to having

20   it being reurged if it turns out that the further reporting     04:50PM

21   indicates that we need to return to that.  So that's what I

22   would do there.  If anybody has an objection they can raise it

23   now.

24           MS. KENDRICK:  Are you referring to the motion to

25   enforce with the non-compliant performance measures?           04:51PM

1    THE COURT:  These are the ones where it looks to me

2    like you all -- I held in abeyance because you were saying they

3    were subject to the triggering device but it looked like the

4    trending was such that we shouldn't be devoting more energy to

5    it.  So that's the one I'm talking about.                          04:51PM

6              MS. KENDRICK:  What was the docket number, sir?

7              THE COURT:  2253.

8              MR. FATHI:  May we have a moment, Your Honor?

9              THE COURT:  Yes.

10             Here's what I would do with it:  What I have done in   04:51PM

11   the past is I said yes, you are right.  It was triggered.  But

12   it doesn't make much sense to continue to go on it, because it

13   looks like among the things we're addressing this one doesn't

14   seem to be presently still as serious.  So it's a granting in

15   part and a denial in part.                                        04:52PM

16             MS. KENDRICK:  Correct.  You granted part of them

17   several months ago.  The Motion to Enforce that's outstanding

18   is the one that was filed January 4th of 2018.  And that one is

19   still outstanding.

20             THE COURT:  Which one is that again?  Please remind    04:52PM

21   me.

22             MS. KENDRICK:  Sorry.  This is not my computer.

23             THE COURT:  No.  Beggars can't be choosers.  If you

24   can come up with it, it would be helpful.

25             MS. KENDRICK:  It's Docket 2520, sir.                  04:52PM

1    THE COURT:  2520.  Let me see if we have a copy of it

2  here in the courtroom.  I will get back to you on that one.

3    So then the other thing that is looming is the

4  conclusion of the evidentiary hearing on the veracity of the

5  monitoring program.  And I don't know whether you all talked          04:53PM

6  about that when you were discussion possible going forward

7  dates, but there seems to also be a need to take a look at what

8  the summertime dates are in light of people's travel schedules

9  and things like that.  And I wonder if maybe it makes sense for

10 you in the next week to meet and confer about other dates that        04:53PM

11 are necessary, make a short-term plan that would include the

12 time that's necessary to address these evidentiary -- the

13 evidentiary hearing on the monitoring issues and also to

14 address the status reports going forward to make sure that

15 we've got a timetable that works for everybody through the           04:54PM

16 summer.  I just want people to take a look at that.

17    MR. FATHI:  Yes, Your Honor.

18    THE COURT:  If you could do that within -- by the

19 close of business next week and report back to Ms. Selzer on

20 what you think is necessary we'll let you know whether we can        04:54PM

21 accommodate the dates you have talked about.  Is that all

22 right?

23    MR. FATHI:  I'm sorry, Your Honor, you said close of

24 next week meaning April 6th?

25    THE COURT:  Yes.                                                  04:54PM

─────3-27-18-CV 12-601-Evidentiary Hearing-Day 5-McWilliams-Direct─────

1           MR. FATHI:  Very good.  Thank you.

2           THE COURT:  Is there anything else anybody would like

3    to raise?  That's what's on my agenda.  Let me check.  That's

4    it.  All right.  No?

5           All right.  Thank you all very much for the                    04:54PM

6    presentations these two days and for the accommodation of

7    working out the schedules that we had to do.  And I'm sorry

8    that we're not able to be readily available just for an

9    important matter in both parties' interest.  But unfortunately

10   we just have to deal with the restrictions that exist, and      04:55PM

11   that's a fact of life.

12           Thank you all very much.  We're at recess.

13           (Proceeding concluded at 4:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                           C E R T I F I C A T E

4

5              I, LAURIE A. ADAMS, do hereby certify that I am duly

6      appointed and qualified to act as Official Court Reporter for

7      the United States District Court for the District of Arizona.

8              I FURTHER CERTIFY that the foregoing pages constitute

9      a full, true, and accurate transcript of all of that portion of

10     the proceedings contained herein, had in the above-entitled

11     cause on the date specified therein, and that said transcript

12     was prepared under my direction and control.

13             DATED at Phoenix, Arizona, this 28th day of March,

14     2018.

15

16                                   s/Laurie A. Adams

17                                   _____
                                     Laurie A. Adams, RMR, CRR

18

19

20

21

22

23

24

25