Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
            adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-DKD |
| | |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISQUALIFY JUDGE DUNCAN FROM ALL FURTHER PROCEEDINGS (DOC. 2641)** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

BACKGROUND ........................................................................................... 1

    I.      COURT-ENFORCEABLE SETTLEMENT ....................................... 1

           A.    Defendants' Duty to Monitor and Report Compliance ..................... 2

           B.    Enforcement and Termination of the Stipulation .............................. 2

           C.    Defendants' Failure to Comply with the Stipulation and Concerns with the Adequacy of Defendants' Self-Monitoring ........ 3

    II.     NEWS ARTICLE REPORTING WHISTLEBLOWER ALLEGATIONS ........................................................................ 4

    III.    DEFENDANTS' MOTION TO DISQUALIFY THE COURT ................... 5

ARGUMENT ............................................................................................... 6

    I.      LEGAL STANDARD ...................................................................... 6

    II.     THIS COURT SHOULD DECIDE DEFENDANTS' MOTION. ............... 8

    III.    DEFENDANTS' MOTION IS UNTIMELY. ......................................... 10

    IV.    DEFENDANTS PROVIDE NO GROUNDS FOR RECUSAL. ................. 12

           A.    Isolated Judicial Remarks, Stripped of Context, Do Not Establish That "Fair Judgment [Is] Impossible." ............................ 12

                 1.    Statements Made Between January and November 2017 ................................................................................... 13

                 2.    July 21, 2017 Emergency Telephonic Status Hearing .......... 18

           B.    The Court Did Not Demonstrate Disqualifying Bias by Ordering a Hearing Regarding Allegations That, If True, Undermine the Court's Ability to Oversee Enforcement of the Stipulation. ...................................................................... 21

                 1.    The Court May Read the News and Listen to the Radio. ..... 21

                 2.    The Court Made No Findings Based on the News Report. ................................................................................ 22

                 3.    The Court Properly Scheduled an Evidentiary Hearing to Protect the Integrity of the Judicial Process ..................... 24

                 4.    The Court Was Rightly Disturbed by Allegations in the News Report. ......................................................................... 26

-i-

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3    C.    Chambers' Receipt of Unsolicited Calls Does Not Require
           Recusal. ........................................................................................ 27

4    D.    The Court Did Not Rely on Extrajudicial Sources. ......................... 32

5          1.    Comments Regarding Prior Experience as Settlement
6                 Judge ................................................................................... 33

7          2.    Comments Regarding Reasonableness of Plaintiffs'
                 Concern About Veracity of Records of Class Member
8                 Who Died by Suicide .......................................................... 34

9    E.    A Reporter's Emails Are Irrelevant to Whether the Court's
           Impartiality Might Reasonably Be Questioned. ............................... 36

10   CONCLUSION ............................................................................................... 37

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allen v. Wine*,
  297 F. App'x 524 (7th Cir. 2008) .................................. 6

*Ball v. Colvin*,
  No. 12-01574, 2014 WL 2569059 (D. Ariz. June 9, 2014) ..................... 6

*Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*,
  289 F.3d 589 (9th Cir. 2002) .................................. 13

*Blixseth v. Yellowstone Mountain Club, LLC*,
  742 F.3d 1215 (9th Cir. 2014) (per curiam)........................ *passim*

*Brown v. Plata*,
  563 U.S. 493 (2011) ................................. 1, 25

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
  No. 06-1381, 2008 WL 169636 (D. Ariz. Jan. 16, 2008) ................ 11

*Cal. Dep't of Soc. Servs. v. Leavitt*,
  523 F.3d 1025 (9th Cir. 2008) .................................. 26

*Cheney v. U.S. Dist. Court for the Dist. of Columbia*,
  541 U.S. 913 (2004) (Scalia, J., mem.).................... 7, 13, 37

*Clemens v. U.S. Dist. Court for Cent. Dist. of California*,
  428 F.3d 1175 (9th Cir. 2005) .................................. 1, 9

*Constantine v. Teachers College*,
  No. 09-9701, 2010 WL 3835174 (S.D.N.Y. Sept. 13, 2010),
  *aff'd*, 448 F. App'x 92 (2d Cir. 2011)....................... 30

*Cordoza v. Pac. States Steel Corp.*,
  320 F.3d 989 (9th Cir. 2003) .................................. 28

*Datagate, Inc. v. Hewlett-Packard Co.*,
  941 F.2d 864 (9th Cir. 1991) ............................. 12, 37

*Doe v. Cabrera*,
  134 F. Supp. 3d 439 (D.D.C. 2015) ....................... 27, 28, 31

*E.&J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992) .................................. 10

*El Fenix de Puerto Rico v. M/Y Johanny*,
  954 F. Supp. 23 (D.P.R. 1996)................................ 29

*First Interstate Bank of Ariz. N.A. v. Murphy, Weir & Butler*,
  210 F.3d 983 (9th Cir. 2000) .................................. 10

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**CASES (CONT.)**

*Ford v. Strickland,*
  696 F.2d 804 (11th Cir. 1983) .................................................................... 28

*Frew ex rel. Frew v. Hawkins,*
  540 U.S. 431 (2004) ........................................................................... 15, 25

*Hagans v. Andrus,*
  651 F.2d 622 (9th Cir. 1981) .................................................................... 16

*Hardy v. City of Milwaukee,*
  99 F. Supp. 3d 883 (E.D. Wis. 2015) ....................................................... 22

*Harris v. Rivera,*
  454 U.S. 339 (1981) (per curiam) ............................................................. 28

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
  322 U.S. 238 (1944) .................................................................................. 25

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.,*
  882 F.2d 1556 (Fed. Cir. 1989) ................................................................ 37

*In re Adbox, Inc.,*
  234 F. App'x 420 (9th Cir. 2007) ............................................................. 27

*In re Aguinda,*
  241 F.3d 194 (2d Cir. 2001) ............................................................... 11, 12

*In re Bernard,*
  31 F.3d 842 (9th Cir. 1994) (Kozinski, J., denying motion to disqualify) .................... 9

*In re City of Detroit,*
  828 F.2d 1160 (6th Cir. 1987) .................................................................. 37

*In re Corrugated Container Antitrust Litig.,*
  614 F.2d 958 (5th Cir. 1980) .................................................................... 31

*In re DeAtley Litig.,*
  No. 06-0278, 2008 WL 375086 (E.D. Wa. Feb. 11, 2008) ........................ 10

*In re Focus Media, Inc.,*
  378 F.3d 916 (9th Cir. 2004) .................................................................... 14

*In re Int'l Bus. Machines Corp.,*
  618 F.2d 923 (2d Cir. 1980) ............................................................... *passim*

*In re J.P. Linahan, Inc.,*
  138 F.2d 650 (2d Cir. 1943) ....................................................................... 8

**TABLE OF AUTHORITIES**
(continued)

Page(s)

CASES (CONT.)

*In re Judicial Misconduct,*
631 F.3d 961 (9th Cir. 2011) ................................................................. 20

*In re Larson,*
43 F.3d 410 (8th Cir. 1994) ............................................................ 12, 36

*In re Marshall,*
291 B.R. 855 (Bankr. C.D. Cal. 2003) ................................................... 37

*In re Marshall,*
721 F.3d 1032 (9th Cir. 2013) .............................................................. 18

*Liteky v. United States,*
510 U.S. 540 (1994) ..................................................................... *passim*

*Little Rock Sch. Dist. v. Arkansas State Bd. of Educ.,*
902 F.2d 1289 (8th Cir. 1990) .............................................................. 37

*M & I Marshall & Ilsley Bank v. McGill,*
No. 10-1436, 2011 WL 2652569 (D. Ariz. June 30, 2011) ........................ 6

*Manion v. Am. Airlines, Inc.,*
251 F. Supp. 2d 171 (D.D.C. 2003) ....................................................... 6

*Melendres v. Arpaio,*
No. 17-2513, 2015 WL 13173306 (D. Ariz. July 10, 2015) ............... 7, 9, 16

*Microsoft Corp. v. United States,*
530 U.S. 1301 (2000) (Rehnquist, C.J., statement on recusal) ..................... 7

*Miller v. Hendricks,*
282 F. App'x 102 (3d Cir. 2008) .......................................................... 22

*Moore v. Publicis Groupe SA & MSL Grp.,*
No. 11-1279, 2012 WL 12528637 (S.D.N.Y. Nov. 8, 2012) ...................... 20

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress,*
257 F. Supp. 3d 1084 (N.D. Cal. 2017) ............................................. 12, 13

*Preston v. United States,*
923 F.2d 731 (9th Cir. 1991) ............................................................... 10

*Schmude v. Sheahan,*
312 F. Supp. 2d 1047 (N.D. Ill. 2004) ................................................... 25

*Schmude v. Sheahan,*
420 F.3d 645 (7th Cir. 2005) ............................................................... 25

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

C<small>ASES</small> (C<small>ONT</small>.)

4

*Simon v. United States*,
123 F.2d 80 (4th Cir. 1941) ....................................................... 25

5

*Skokomish Indian Tribe v. United States*,
410 F.3d 506 (9th Cir. 2005) (en banc) ......................................... 12

6

7

*Teachers4Action v. Bloomberg*,
552 F. Supp. 2d 414 (S.D.N.Y. 2008)............................................. 20

8

*Town of Norfolk v. U.S. Army Corps of Engineers*,
968 F.2d 1438 (1st Cir. 1992)...................................................... 34

9

10

*United States v. Awadallah*,
436 F.3d 125 (2d Cir. 2006).......................................................... 8

11

*United States v. Biagon*,
510 F.3d 844 (9th Cir. 2007) ....................................................... 22

12

13

*United States v. Bonds*,
18 F.3d 1327 (6th Cir. 1994) ....................................................... 22

14

*United States v. Ciavarella*,
716 F.3d 705 (3d Cir. 2013).................................................*passim*

15

16

*United States v. Dalfonso*,
707 F.2d 757 (3d Cir. 1983)......................................................... 30

17

*United States v. Heredia-Fernandez*,
756 F.2d 1412 (9th Cir. 1985) ..................................................... 14

18

19

*United States v. Holland*,
519 F.3d 909 (9th Cir. 2008) ................................................... 9, 36

20

*United States v. Levy*,
390 F. App'x 726 (9th Cir. 2010) .................................................. 27

21

22

*United States v. Lyons*,
739 F.2d 994 (5th Cir. 1984) ....................................................... 22

23

*United States v. Martin*,
278 F.3d 988 (9th Cir. 2002) ................................................... 7, 24

24

25

*United States v. Rogers*,
119 F.3d 1377 (9th Cir. 1997) ..................................................... 12

26

*United States v. S. Fla. Water Mgmt. Dist.*,
290 F. Supp. 2d 1356 (S.D. Fla. 2003) .......................................... 29

27

28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

CASES (CONT.)

*United States v. Sibla*,
   624 F.2d 864 (9th Cir. 1980) ............................................................. 9

*United States v. Siegelman*,
   799 F. Supp. 2d 1246 (M.D. Ala. 2011) ........................................ 33

*United States v. Sierra Pac. Indus.*,
   759 F. Supp. 2d 1198 (E.D. Cal. 2010)............................................. 8

*United States v. Sierra Pac. Indus., Inc.*,
   862 F.3d 1157 (9th Cir. 2017), *petition for cert. filed* (U.S. Feb. 14,
   2018) ................................................................................................ 29

*United States v. Studley*,
   783 F.2d 934 (9th Cir. 1986) ................................................... 8, 9, 12

*United States v. Wecht*,
   484 F.3d 194 (3d Cir. 2007)............................................................. 27

*Williams v. Illinois*,
   567 U.S. 50 (2012)........................................................................... 28

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
   No. 04-9651, 2011 WL 70593 (S.D.N.Y. Jan. 10, 2011) ................. 6

RULES

Fed. R. Civ. P. 73............................................................................... 1, 6

Fed. R. Evid. 611 .................................................................................. 24

STATUTES

18 U.S.C. § 3626(a)(1)(A)..................................................................... 25

28 U.S.C. § 453 ...................................................................................... 25

28 U.S.C. § 455 ........................................................................................ 6

28 U.S.C. § 636(c) .................................................................................... 1

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

OTHER AUTHORITIES

ABA Comm. on Ethics & Prof'l Resp., Formal Op. 478 (Dec. 8, 2017) ........................... 22

ABA Model Code of Judicial Conduct, Rule 2.9(A)(1) ...................................................... 31

Manual of Model Criminal Jury Instructions 7.2 ............................................................... 22

Richard E. Flamm, Judicial Disqualification (3d ed. 2017) ......................................... 28, 30

Jimmy Jenkins, *On the Inside:  Arizona Prison Health Care*, KJZZ
    (Dec. 18, 2017), http://kjzz.org/content/572976/inside-chaos-arizona-
    prison-health-care#two............................................................................................... 4, 5

Ariz. Dep't of Corr., Eyman Location Units,
    https://corrections.az.gov/location/103/eyman
    (last visited Mar. 28, 2018) ............................................................................................ 2

1    Over three years ago, the parties settled this civil rights class action lawsuit to

2    remedy constitutional violations in the Arizona prison system.  The parties agreed that

3    Magistrate Judge David Duncan would oversee compliance with the settlement.  On the

4    eve of a contempt hearing, Defendants for the first time contended that Judge Duncan

5    must be disqualified because he harbors "personal animus" against them and is "devoid of

6    impartiality."  [Doc. 2641 at 4]  In support of their untimely motion, Defendants offer a

7    handful of words and sentences cherry-picked from over 3,600 pages of hearing

8    transcripts from the past year.  To manufacture grounds for disqualification, Defendants

9    stretch, skew, and elide the Court's statements.  Even taken as presented, none meet the

10   high standard for recusal.  As a result, the motion must be denied.  *Clemens v. U.S. Dist.*

11   *Court for Cent. Dist. of California*, 428 F.3d 1175, 1179 (9th Cir. 2005) (noting that "a

12   judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to

13   recuse when the law and facts require." (internal quotation marks and citation omitted)).

14                                    **BACKGROUND**

15   Plaintiffs filed this class action lawsuit on behalf of over 34,000 men and women

16   housed in Arizona state prisons—people who are entirely dependent on the state for their

17   health care.[1]  [Doc. 1]  In October 2014, with the consent of all parties, the lawsuit was

18   reassigned to Magistrate Judge David Duncan (hereinafter "the Court") for all purposes

19   pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  [Doc. 1194]

20   **I.      COURT-ENFORCEABLE SETTLEMENT**

21   In February 2015, the Court approved the parties' settlement ("Stipulation"), which

22   overhauled the provision of health care in Arizona prisons.  [Doc. 1458]  In so doing, the

23   Court found that the Stipulation was necessary to correct constitutional violations.  [*Id.*,

---

[1] "To incarcerate, society takes from prisoners the means to provide for their own needs.  Prisoners are dependent on the State for food, clothing, and necessary medical care. . . .  Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care.  A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society."  *Brown v. Plata*, 563 U.S. 493, 510-11 (2011).

Attach. 1]   Subject to two exceptions not relevant here, the Court retained authority to enforce the Stipulation "through all remedies provided by law." [Doc. 1185 at 14 ¶ 36]

## A.   Defendants' Duty to Monitor and Report Compliance

Under the Stipulation, Defendants must measure and report, on a monthly basis, their compliance with 103 health care performance measures at the ten state-run prisons. [Doc. 1185 at 3 ¶ 9; Doc. 1185-1 at 8-15 (Performance Measures)]   The reports are referred to as "CGAR" reports.[2]   Among other things, CGAR reports assign a monthly compliance percentage to each performance measure at each relevant prison.

The Stipulation outlines a basic protocol for calculating the compliance percentage for each performance measure.  [Doc. 1185-1 at 17-36]  Performance Measure 50, for example, requires that "[u]rgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider."  [*Id.* at 26]  The Stipulation explains the general method for measuring compliance:  "At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure."  [*Id.*]  Thus, for example, an auditor must review ten randomly selected records at each of ASPC-Eyman's five yards ("units").[3]   If 35 of the 50 records are compliant, the auditor assigns a compliance percentage of 70% for that particular performance measure, prison, and month.

## B.   Enforcement and Termination of the Stipulation

The Stipulation defines the process for "[d]etermining" whether Defendants have achieved "substantial compliance with a particular performance measure at a particular facility" as follows:

> i.      For the first twelve months after the effective date of this Stipulation, meeting or exceeding a seventy-five percent

---

[2] "CGAR" stands for "Compliance Green Amber Red," which refers to color coding that Defendants use on the reports.  [Doc. 1842-3 at 5 ¶ 16]  This reporting format is referred to as "MGAR" in the Stipulation.  [Doc. 1185 at 3 ¶ 9(a)]
[3] *See* Ariz. Dep't of Corr., Eyman Location Units, https://corrections.az.gov/location/103/eyman (last visited Mar. 28, 2018) (listing the following five units:  Browning, Cook, Meadows, Rynning, and SMU-I).

(75%) threshold for the particular performance measure that applies to a specific complex . . . . ;

ii. For the second twelve months after the effective date of this Stipulation, meeting or exceeding an eighty percent (80%) threshold for the particular performance measure that applies to a specific complex . . . . ;

iii. After the first twenty four months after the effective date of this Stipulation, meeting or exceeding an eighty-five percent (85%) threshold for the particular performance measure that applies to a specific complex . . . .

[Doc. 1185 at 4 ¶ 10(a)]

Whether a particular performance measure at a particular facility is in substantial compliance is relevant to whether the Court can order a remedial plan for that measure (Doc. 1185 at 13, 14-15 ¶¶ 30-31, 36), and termination of Defendants' "duty to measure and report on a particular performance measure." [*Id.* at 4 ¶ 10(b)]

## C. Defendants' Failure to Comply with the Stipulation and Concerns with the Adequacy of Defendants' Self-Monitoring

Since approval of the Stipulation over three years ago, Defendants have not delivered all promised health care to class members. Defendants' own mortality reviews document class member deaths that could have been "prevented or delayed with more timely intervention." [2/28/18 Tr. at 335:8-365:7] The parties and Court thus have actively engaged in enforcement of the Stipulation, including reviewing compliance data and proposed remedial plans, as well as developing detailed monitoring protocols.

Among other things, the Court has examined the accuracy and completeness of Defendants' monitoring process. The Court held several days of evidentiary hearings regarding the monitoring process in 2017. [Doc. 2046] The Court noted that "we still have . . . a chilling amount of failures" and that "the best that can be said overall is that we're treading water." [4/17/17 Tr. at 637:6-7, 17-18] The Court further noted that there were "great chasms of competence" in, and expressed "serious concerns about the quality and dependability of," Defendants' monitoring. [*Id.* at 671:11-13, 18] The Court also has ordered Defendants to recalculate compliance percentages in accordance with court orders

and the parties' agreements if they wish to establish substantial compliance as to a particular performance measure and prison (Doc. 1951 at 1-2; Doc. 1895 at 1)—something Defendants have not yet done.  [Doc. 2338 at 8-39; Doc. 2046; Doc. 2087]

In June 2017, the Court noted that failure to comply with certain performance measures at certain prisons "will result in an order to show cause hearing."  [Doc. 2124] "Because of pervasive and intractable failures to comply with the Stipulation," in October 2017, the Court issued an order to show cause why it "should not impose a civil contempt sanction of $1,000 per incident of non-compliance commencing the month of December 2017."  [Doc. 2373 at 1, 4]  The Court ordered Defendants to produce "a list of every instance of non-compliance with this Order during December 2017."  [*Id.* at 4]  Since then, Plaintiffs' counsel has raised additional concerns with the validity of the compliance data produced by Defendants (Doc. 2502-1 at 4-19), including Defendants' list of every instance of non-compliance with the order to show cause.  [Doc. 2633]

The Court scheduled a hearing on the second order to show cause for February 28, 2018. [11/7/17 Tr. at 27:3-9]

## II.   NEWS ARTICLE REPORTING WHISTLEBLOWER ALLEGATIONS

On December 19, 2017, the National Public Radio (NPR) Phoenix affiliate, 91.5 KJZZ, completed a two-part series entitled, "On the Inside:  The Chaos of Arizona Prison Health Care."  *See* Jimmy Jenkins, *On the Inside:  The Chaos of Arizona Prison Health Care*, KJZZ (Dec. 18, 2017), http://kjzz.org/content/572976/inside-chaos-arizona-prison-health-care#two.[4]  Each part of the series included a short audio piece and a more detailed written article.  *Id.*  The second part focused on whistleblower Dr. Jan Watson, who had served as a medical provider for the Arizona Department of Corrections ("ADC"), and its contractor Corizon Health, Inc. ("Corizon"), as a *locum tenens* contractor through a company called Onyx MD that provides on-call and temporary medical staff to hospitals

---

[4]  The article on the KJZZ website is dated December 18, 2017, the publishing date of the first part of the series, which reported on the in-custody death of Walter Jordan after delays in cancer treatment.  Nine days before his death, Mr. Jordan had filed a handwritten "Notice of Impending Death" with the Court.  [Doc. 2262; *see* Doc. 2496]

and other health care providers.  *Id.*  According to the article, Dr. Watson reported, among other things, that she was told how to "beat the monitor," and that "she was asked to cancel referrals to an infectious disease specialist for HIV patients because according to Corizon, they did not have a contracted infectious disease specialist."  *Id.*  The article included screenshots of emails between Dr. Watson and Corizon staff.  One email, for example, suggested that a Corizon employee had asked Dr. Watson to cancel a request for a specialist so that Defendants would not be sanctioned under the order to show cause:

*Id.*  (The emails later were admitted into evidence without objection.  [2/27/18 Tr. at 38:1-39:9, 43:2-47:10, 129:13-130:13, 218:24-220:15; *see also* 1/18/18 Tr. at 14:10-25])

The Court scheduled a hearing for February 27, 2018, to evaluate the allegations in the news report.  [Doc. 2559; Doc. 2643 at 2]

## III.    DEFENDANTS' MOTION TO DISQUALIFY THE COURT

At 10:00 p.m. on Friday, February 23, 2018, one business day before the scheduled evidentiary and contempt hearings, Defendants filed the instant motion "to disqualify Magistrate Judge Duncan from all further proceedings" (Doc. 2641), as well as a "motion for Magistrate Judge Duncan to disqualify himself" and for reassignment of the upcoming hearings (Doc. 2642).  The Court denied the latter motion and stated that it would rule on the former "after briefing is complete."  [Doc. 2643 at 2, 6]  On March 20, Defendants

filed a "Supplement" based on the February 27 and 28 hearings. [Doc. 2692] That same day, Defendants also filed a Motion for Chief Judge to Rule. [Doc. 2693]

## ARGUMENT

## I.    LEGAL STANDARD

Defendants bring this motion under 28 U.S.C. § 455(a) and (b)(1), which provide:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . .

[*See* Doc. 2641 at 2][5]

---

[5]    Defendants cite, without discussion, Federal Rule of Civil Procedure 73(b)(3), which allows a district court "to vacate a referral to a magistrate judge" "when a party shows extraordinary circumstances." [Doc. 2641 at 2] Defendants do not discuss (or apply) the relevant legal standard and thus have forfeited that argument. In any event, such a claim fails for the same reasons as the § 455 claim fails. *See Allen v. Wine*, 297 F. App'x 524, 529 (7th Cir. 2008) (finding that movant's "allegations of bias are unfounded, not extraordinary"); *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, No. 04-9651, 2011 WL 70593, at *3 (S.D.N.Y. Jan. 10, 2011) ("A magistrate judge's purported 'bias,' as allegedly manifested through his or her rulings, does not meet the 'extraordinary circumstances' standard" of Rule 73(b)(3)); *M & I Marshall & Ilsley Bank v. McGill*, No. 10-1436, 2011 WL 2652569, at *2 (D. Ariz. June 30, 2011) ("Allegations of impartiality [sic] do not constitute 'extraordinary circumstances' to vacate referral to a magistrate judge." (*citing Manion v. Am. Airlines, Inc.*, 251 F. Supp. 2d 171, 175 (D.D.C. 2003) ("[D]efendant has relied solely on serious allegations impugning Magistrate Judge Robinson's impartiality in support of its motion to vacate the referral. . . . [S]uch allegations neither meet the standard under the relevant statute for obtaining the relief sought, nor are they properly before this Court, but rather, must be made, if at all, before the judge whose impartiality is being questioned."))); *Ball v. Colvin*, No. 12-01574, 2014 WL 2569059, at *1 (D. Ariz. June 9, 2014) (noting that "relevant to the Court's consideration of a request to withdraw consent to a Magistrate Judge's jurisdiction include the timeliness of the request [and] whether granting the request would unduly interfere with or delay the proceedings").
    Defendants also reference other sources, including the Model Civil and Criminal Jury Instructions, Judicial Code of Conduct, and ABA Model Code. [Doc. 2641 at 2, 12-15] The citations do not alter the § 455 analysis and thus, for the most part, are not discussed separately in this brief. *See United States v. Ciavarella*, 716 F.3d 705, 722 n.7 (3d Cir. 2013) ("[I]t is possible to violate the Code without creating an appearance of partiality; likewise, it is possible for a judge to comply with the Code yet still be required to recuse herself." (quotation marks and citation omitted)).

The Supreme Court has recognized that "§ 455(a) expands the protection of § 455(b), but duplicates some of its protection as well," including "with regard to bias and prejudice." *Liteky v. United States*, 510 U.S. 540, 552 (1994). "What matters under § 455(a) 'is not the reality of bias or prejudice but its appearance.' This inquiry is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (Rehnquist, C.J., statement on recusal) (quoting *Liteky*, 510 U.S. at 548). The facts must be considered "as they existed, and not as they were surmised or reported." *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 541 U.S. 913, 914 (2004) (Scalia, J., mem.) (internal quotation marks and citation omitted).

"Recusal for actual bias pursuant to subsection (b)(1) is required only if the moving party can prove by 'compelling evidence' that a reasonable person would be convinced the judge was biased in a way that may prevent a fair decision on the merits." *Melendres v. Arpaio*, No. 17-2513, 2015 WL 13173306, at *7 (D. Ariz. July 10, 2015) (citations omitted). "The party seeking recusal carries a 'substantial burden' of overcoming the presumption that a district court is free from bias." *Id.* (citation omitted).

As relevant here, "in the absence of some *extrajudicial* source of bias or partiality, 'judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'" *United States v. Martin*, 278 F.3d 988, 1005 (9th Cir. 2002) (quoting *Liteky*, 510 U.S. at 555). In such circumstances, a bias or partiality motion will be denied unless the remarks "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. The reason for this is simple:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does

> not mean child-like innocence.  If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."

*Id.* at 550-51 (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)).

Thus, a movant cannot establish bias or partiality through "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune."  *Liteky*, 510 U.S. at 555-56.  Similarly, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."  *Id.* at 555.  "Almost invariably, they are proper grounds for appeal, not for recusal."  *Id.*; *see United States v. Awadallah*, 436 F.3d 125, 137 (2d Cir. 2006) ("Inherent in an adversary system is the reality that typically one side wins and the other loses.  If losses compromised the appearance of justice, this system would grind to a halt.").  Indeed, a court's obligation not to recuse "is perhaps at its highest when the motion has been brought after the party seeking recusal has sustained an adverse ruling in the course of the action."  *United States v. Sierra Pac. Indus.*, 759 F. Supp. 2d 1198, 1205-06 (E.D. Cal. 2010).

## II.    THIS COURT SHOULD DECIDE DEFENDANTS' MOTION.

Defendants contend that due to the "gravity of th[e] evidence," Chief Judge Collins or Judge Humetewa should decide this motion.  [Doc. 2641 at 2]  Defendants provide no legal authority in support of this request.[6]  That is unsurprising, as there is no legal basis for their position.  The Ninth Circuit has "reject[ed]" suggestions that "the Chief Judge or a committee of disinterested judges from the District was required to rule" on a recusal motion.  *United States v. Studley*, 783 F.2d 934, 940 (9th Cir. 1986).  The Ninth Circuit

---

[6]  On March 20, 2018, almost a month after filing their motion for disqualification, Defendants filed a "Motion for Chief Judge to Rule on Defendants' Motion to Disqualify Magistrate Judge Duncan from All Further Proceedings," and sent a copy to the chambers of Chief Judge Collins.  [Doc. 2693; Declaration of Corene Kendrick ("Kendrick Decl."), filed herewith, Ex. 9]  Plaintiffs will respond to that motion separately pursuant to the normal briefing schedule set forth by the Rules of this Court.

has "held repeatedly that the challenged judge himself should rule on the legal sufficiency of a recusal motion in the first instance." *Id.* (citations omitted); *see also United States v. Sibla*, 624 F.2d 864, 868 (9th Cir. 1980) ("[S]ection 455 includes no provision for referral of the question of recusal to another judge" (citation omitted)); *In re Bernard*, 31 F.3d 842, 843 (9th Cir. 1994) (Kozinski, J., denying disqualification motion) (motion "must be decided by[] the very judge whose impartiality is being questioned").

It is true, of course, that district courts in some cases have voluntarily elected to transfer a recusal motion to another judge.   But that is ill-advised here given the complicated and lengthy record.  The recusal analysis "is necessarily fact-driven and may turn on subtleties in the particular case." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008); *see Clemens*, 428 F.3d at 1178 (observing that "analysis of a particular section 455(a) claim must be guided . . . by an independent examination of the unique facts and circumstances of the particular claim at issue" (internal quotation marks and citation omitted)).  Thus, "the judge presiding over the case is in the best position to appreciate the implications of those matters alleged in a recusal motion." *Ciavarella*, 716 F.3d at 719 (internal quotation marks and citation omitted).

Here, the Court has presided over this case for more than three years, after overseeing settlement of the litigation.  Defendants' motion relies on statements made between January and December 2017, a period of time that involved over 700 filings, 27 hearing days, and 38 live witnesses.[7]  *See Melendres*, 2015 WL 13173306 at *10 (challenged judge denied recusal motion "[i]n light of" the case's "history," which included movant's "resist[ance of] the Court's directives after the Court entered its

---

[7]  [3/8/17 Tr. (Kathy Campbell, Mark Owens, Mark Haldane); 3/21/17 Tr. (Martin Winland, Troy Evans, Sarah Cartwright, Jenny Fontaine, Nicole Taylor); 3/28/17 Tr. (Wendy Hackney, Carson McWilliams); 4/17/17 Tr. (Dennis Dye, Erin Barlund, Richard Pratt); 7/14/17 Tr. (Mark Blocksom, Ronald Oyenik, Dominique Keys, Angela Ashworth); 8/8/17 Tr. (Charles Ryan, Richard Pratt, Jeffrey van Winkle, Norman Twyford); 8/9/17 Tr. (Henrietta Western, Robin Coleman); 9/11/17 Tr. (Kim Currier, Elizabeth Oros, Christopher Papworth, Crystal Lee, Ernest Trujillo, Jeffrey van Winkle, John Mattos); 9/13/17 Tr. (Robert Kay, Jason Jardine, Tanna Gualco); 11/8/17 Tr. (Brian Creswell, Jason Monson, Cole Krages, Oswaldo Robles, Ashley Zuerlein, Tara Diaz, Alfred Ramos); 12/20/17 Tr. (Richard Pratt)]

1   permanent injunction and throughout the compliance phase," which constituted at best a

2   "negligent approach to the timely implementation of its orders," and at worst a "pattern of

3   knowing defiance and subversion").

4   **III.   DEFENDANTS' MOTION IS UNTIMELY.**

5          The Court should deny the motion as untimely.  "[R]ecusal motions should be filed

6   with reasonable promptness after the ground for such a motion is ascertained." *Preston v.*

7   *United States*, 923 F.2d 731, 733 (9th Cir. 1991); *see also E.&J. Gallo Winery v. Gallo*

8   *Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992) ("It is well established in this circuit that

9   a recusal motion must be made in a timely fashion." (citations omitted)).  In particular,

10  "recusal issues must be raised at the earliest possible time after the facts are discovered."

11  *First Interstate Bank of Ariz. N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 988 n.8 (9th

12  Cir. 2000).  The timeliness requirement guards against the "risk that litigants would use

13  recusal motions for strategic purposes." *Preston*, 923 F.2d at 733 (citations omitted); *see*

14  *In re DeAtley Litig.*, No. 06-0278, 2008 WL 375086, at *7 (E.D. Wa. Feb. 11, 2008)

15  (observing that judges "must be alert to the possibility that those who would question their

16  impartiality may be in fact seeking to delay or avoid an impending adverse decision").

17         The timing of Defendants' motion strongly suggests that it has been brought for

18  strategic reasons.  At 10:00 p.m. on Friday, February 23, 2018, one business day before

19  scheduled evidentiary and contempt hearings, Defendants filed this motion "to disqualify

20  Magistrate Judge Duncan from all further proceedings" (Doc. 2641), and a "motion for

21  Magistrate Judge Duncan to disqualify himself" and for reassignment of the upcoming

22  hearings (Doc. 2642).  In denying the latter motion, the Court noted that "Defendants have

23  not explained why they waited until the eve of the evidentiary hearing to seek recusal and

24  have not pointed to any recent documentation, rulings, or developments that could

25  otherwise justify the timing of this motion."  [Doc. 2643 at 4]  That remains true.

26         The instant motion relies on comments made by the Court as far back as January

27  2017—over a year before the motion was filed.  [Doc. 2641 at 4]  Defendants waited over

28  seven months after the Court's alleged hostility toward them purportedly was "palpable"

in July 2017.  [*Id.* at 6]  The most recent statements that Defendants assert establish bias were made in December 2017—two months before Defendants filed their motion.  [*Id.* at 7-10]  In the meantime, the Court has expended considerable time and effort reviewing over 700 filings, overseeing 27 days of hearings, and receiving testimony from 38 witnesses.[8]  *See In re Int'l Bus. Machines Corp.*, 618 F.2d 923, 933 (2d Cir. 1980) (noting that a "major practical reason" for the timeliness requirement is to avoid "waste of the judicial resources," which would occur where the "investment of judicial time and energy" was "immense," judge made credibility determinations, and judge's "exposure to the relevant [subject matter] has been intense"); *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, No. 06-1381, 2008 WL 169636, at *11 (D. Ariz. Jan. 16, 2008) (holding motion untimely when movant "does not even try to explain why [one-year] delay was reasonable" for § 455(a) claim, particularly in light of "substantial time and resources" devoted by judge in the interim, or why two-month delay was reasonable for § 455(b) claim).

It appears, then, that this motion was the result of Defendants' "fear that [the] judge may decide a question against" them and impose monetary penalties of around $2 million, instead of a "'reasonable fear' that the judge will not be impartial."[9]  *In re Aguinda*, 241

---

[8] In addition to this case, the Court appears to be assigned to at least 47 open cases involving Defendants Pratt and/or Ryan.  [Kendrick Decl. ¶¶ 6-11 & Exs. 3-8]  It is not clear whether Defendants have sought the Court's recusal in those cases.  Nonetheless, recusal in this case likely would affect those cases.  [Declaration of David Fathi, filed herewith, Ex. 2, Order, *Casey v. Lewis*, No. 90-0054, at 5-6 (D. Ariz. June 21, 1991) ("[I]f, as defendants assert, the court is truly biased against the Department of Corrections and Director Lewis, it would require the Court to disqualify itself from ninety (90) prisoner civil rights cases and eighteen (18) habeas corpus cases involving the Arizona Department of Corrections and Director Lewis.  Such a result is clearly unreasonable.")]

[9] The $2 million amount is based on Defendants' self-reported data.  [Doc. 2373 (setting potential $1,000 fine for each instance of noncompliance); Doc. 2576 (reporting 667 instances of noncompliance in December 2017); Doc. 2595 (reporting 405 additional instances of noncompliance in December 2017); Doc. 2648 (reporting 389 instances of noncompliance in January 2018); Doc. 2662 (reporting 667 additional instances of noncompliance in December 2017)]  Defendants' self-reported data, however, may not account for all instances of noncompliance.  [Doc. 2633 (Declaration of Plaintiffs' Counsel) (listing at least 420 additional instances of noncompliance recorded in Defendants' own documents and/or medical records of class members)]  Defendants conceded after their limited review of the medical records of 50 class members that there were 38 class members who accounted for 43 additional separate instances of noncompliance with the Court's order in December 2017, which Defendants had failed to report to the Court.  [Doc. 2704 at 14-15]

F.3d 194, 201 (2d Cir. 2001) (discussing § 455's legislative history and quoting S. Rep. No. 93-419, at 5 (1973); H.R. Rep. No. 93-1453 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355). Thus, Defendants' motion is untimely. *Studley*, 783 F.2d at 939 (noting that recusal motion "is presumptively untimely" when filed "weeks after" judge exhibited purported bias); *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 871-72 (9th Cir. 1991) (holding movant "fail[ed] to move for disqualification in a timely fashion" by waiting six weeks to file); *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 519 (9th Cir. 2005) (en banc) (affirming denial of recusal motion on timeliness grounds after seven-month delay in filing); *United States v. Rogers*, 119 F.3d 1377, 1382 (9th Cir. 1997) (holding motion untimely when movant waited "more than one and one-half years after he was aware of the grounds for disqualification").

## IV.   DEFENDANTS PROVIDE NO GROUNDS FOR RECUSAL.

Defendants allege a number of grounds for recusal, including isolated remarks, purported reliance on extrajudicial sources, and purported *ex parte* communications. Plaintiffs address each allegation below. *In re Aguinda*, 241 F.3d at 201 ("[T]he grounds asserted in a recusal motion must be scrutinized with care, and judges should not recuse themselves solely because a party claims an appearance of partiality.").

### A.   Isolated Judicial Remarks, Stripped of Context, Do Not Establish That "Fair Judgment [Is] Impossible."

Defendants attempt to manufacture disqualifying bias by lifting from their context words, phrases, and sentences spoken by the Court in over 3,600 pages of hearing transcripts since January 2017. But whether viewed in isolation or in combination, none of the remarks "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555 (explaining when judicial remarks, absent extrajudicial source, "support a bias or partiality challenge"); *In re Larson*, 43 F.3d 410, 413 (8th Cir. 1994) (finding "selective quotation and creative emphasis of elements of the quoted portion" of transcript insufficient to demonstrate impossibility of fair judgment); *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 257 F. Supp. 3d 1084, 1092 (N.D. Cal.

2017) (rejecting argument that judge's remarks had a "cumulative effect" because "[e]ach of defendants' arguments adds up to a zero").  To the contrary, viewed in context, they demonstrate the Court's patient and thoughtful administration of this complex case.

As an initial matter, Plaintiffs note that Defendants contend that the Court's "relinquishment of his impartiality and his hostility toward Defendants were palpable during at least two status hearings."  [Doc. 2641 at 6]  In particular, Defendants assert that the Court "shouted" and "yelled" at their attorneys during two hearings.  [*Id.* at 7]  Defendants, however, provide no evidence of this; "arguments and statements of counsel are not evidence."  *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) (internal quotation marks and citation omitted).[10]  As a result, Plaintiffs do not address those assertions further and instead confine review to the words as recorded in the transcripts—the only evidence offered by Defendants.  [Doc. 2641-1]

## 1.      Statements Made Between January and November 2017

Defendants stitch together words from unrelated judicial remarks in an attempt to concoct disqualifying bias.  [Doc. 2641 at 4-6]  Their scattershot, drive-by approach is difficult to respond to in a concise and organized manner.  For ease of reference, however, Plaintiffs have numbered Defendants' bullet points and address each one in turn, with the exception of the last bullet point (the only bullet point to allege an extrajudicial source).  Plaintiffs separately address that last bullet point in Part IV(D), below.

**1.**      Defendants improperly string together three incomplete quotations from three separate hearings.  [Doc. 2641 at 4]  First, Defendants contend that the Court "declared that his 'preliminary view' of the issues 'is probably 8 out of 10 times to agree with what the plaintiffs have said.'"  [*Id.* (quoting 1/26/17 Tr. at 7:17-8:1)]  Even considered in isolation, that statement provides no grounds for disqualification. *Int'l Bus.*

---

[10]  For the Court's demeanor during the December 20, 2017 hearing, Defendants provide no factual citation but appear to rely on information reported in the KJZZ news report.  [Doc. 2641 at 7, 16 n.2]  A news report, of course, is insufficient to prove the facts reported therein, *see Cheney*, 541 U.S. at 922-24—something Defendants recognize later when urging disqualification of the Court for purportedly relying on "uncorroborated hearsay allegations in the KJZZ article."  [Doc. 2641 at 10]

1  *Machines Corp.*, 618 F.2d at 929 ("A trial judge must be free to make rulings on the

2  merits without the apprehension that if he makes a disproportionate number in favor of

3  one litigant, he may have created the impression of bias.").

4  In any event, Defendants do not accurately characterize the statement.  The

5  statement was made at the outset of a hearing regarding the monitoring guide that

6  Defendants must use to evaluate compliance with the Stipulation.  Two days before the

7  hearing, Plaintiffs filed their concerns with the methodologies contained within the guide.

8  [Doc. 1889]  Defendants did not file a response.  The Court noted that it had reviewed

9  Plaintiffs' filing and that its "preliminary view" was to agree with Plaintiffs on a number

10  of matters regarding proper monitoring methodology.  The Court thus structured the

11  hearing to allow Defendants to respond in the first instance:

12  
13  
14  
15  
> So as it happens, my preliminary view is probably 8 out of 10 times to agree with what the plaintiffs have said, so I will be turning to the defendants to tell me why it is that what they have said doesn't seem to be or shouldn't be right.  So that's why I will be proceeding that way, to give people a chance to talk and not going the normal fashion of one after the other.

16  [1/26/17 Tr. at 7:19-25; *see id.* at 8:11-21 (allowing attorney for Defendants to confer with

17  clients before presenting response)]  There is "nothing in the record to suggest that the

18  [Court] was unwilling to hear and respond to [Defendants]' concerns and arguments."  *In*

19  *re Focus Media, Inc.*, 378 F.3d 916, 931 (9th Cir. 2004) (affirming denial of recusal

20  motion).  Quite the contrary: the Court asked to hear from Defendants first.  Such efforts

21  to streamline proceedings certainly cannot be viewed as making "fair judgment

22  impossible."  *Liteky*, 510 U.S. at 556 (affirming denial of recusal order where complained-

23  of behavior included "routine trial administration efforts"); *see United States v. Heredia-*

24  *Fernandez*, 756 F.2d 1412, 1416 (9th Cir. 1985) ("The trial judge has traditionally

25  enjoyed a wide discretion in the management of proceedings before the court.").

26  Second, Defendants attempt to locate disqualifying bias in the Court's statement,

27  made over seven months later, that it "would 'micromanage' ADC until 'the promise that

28  was made to the inmates is being delivered, and that's what I'm here for.'"  [Doc. 2641 at

4-5 (quoting 7/21/17 Tr. at 25:10-20; 8/8/17 Tr. at 38:5-16)][11]  But "micromanaging" is not synonymous with personal bias that makes "fair judgment impossible." *Liteky*, 510 U.S. at 555.  Reviewed in context, the Court's remarks, far from "display[ing] a deep-seated favoritism or antagonism" (*id.* at 555), instead show its faithful service to the enforcement role it was assigned by the parties.  [Doc. 1185 at 14 ¶ 36; *see Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance.")]  In particular, the Court explained:

> Director Ryan, let me assure you the last thing I want to do is micromanage your prisons.  I only do that because you haven't been able to deliver what you promised to deliver, and that was compliance with the stipulation's requirements with respect to providing health care.  And so the stipulation has a mechanism to address that failure, and that mechanism requires me to first give an opportunity to you all to try again, to try something else to see if you can work it out on your proposal.  If that fails, then one of the options that's open to me is to come up with the mechanism myself.  That's not the best method.  That means micromanaging.  It means me jumping into your chair and trying to figure out what I can't figure out, and that is all of the years of knowledge and experience that you have.
>
> But notwithstanding all of those years and experience, you haven't been able to perform what I thought would be at the time we settled the case pretty straightforward and likely to occur, and that is compliance with the stipulation.  And what we have now, more than two years out, is what I previously described as abject failures to comply with the stipulation.  So that means I jump into your chair and I micromanage.  And I don't want to do that.

[8/8/17 Tr. at 33:14-34:10; *see id.* at 38:5-16 (asking Defendant Ryan to "get [the Court] out of this business of micromanaging your operation" and stating its "hope [that] you

---

[11]  Defendants oddly cite to the July 21, 2017 hearing for the word "micromanage." [Doc. 2641 at 4-5 (quoting 7/21/17 Tr. at 25:15)]  At the July hearing, the Court noted that in many areas, "I will do everything in my power to *not* micromanage."  [7/21/17 Tr. at 25:12-14 (emphasis added)]  But in one narrow respect—whether class members who testify in court are later retaliated against—the Court stated that it would pay close attention, particularly where Defendants' attorney and a deputy warden had provided the Court with contradictory accounts.  [*Id.* at 25:6-9]  Defendants do not explain how this establishes disqualifying bias against them, particularly when the resulting order was narrow (Doc. 2209), and the Court granted their request for an evidentiary hearing regarding alleged retaliation against testifying class members (7/21/17 Tr. at 25:21-23), which lasted several days.  [Doc. 2363 at 2]

do")]  "There is simply no evidence that the judge acted out of an improper or corrupt motive."  *Blixseth v. Yellowstone Mountain Club, LLC*, 742 F.3d 1215, 1221 (9th Cir. 2014) (per curiam).  The need for increased judicial involvement was the product of Defendants' failure to comply with the Stipulation.  [8/8/17 Tr. at 9:17-10:2 ("For years, your promise to provide the health care required by the stipulation has failed."); *Melendres*, 2015 WL 13173306 at *10 (denying recusal motion and noting that movant's failure to implement court orders "necessitated substantial judicial corrective action")]  Notably, Defendants do not identify any particular instance of perceived improper "micromanaging."  [Doc. 2641 at 4-5]  Even if they had, it would be, "[a]t most," an "error that [they] w[ere] free to raise on appeal."  *Blixseth*, 742 F.3d at 1221.

> **2.**     Defendants next contend that the Court said "he was '*overruling virtually every one of* ' [Defendants'] objections to testimony without any evidentiary basis and was '*on a fishing expedition*' into whatever he is interested in."  [Doc. 2641 at 4 (emphasis added) (quoting 3/21/17 Tr. at 189:7-17; 8/24/17 Tr. at 7:18-20)]  But Defendants improperly link five words spoken during an evidentiary hearing in March 2017 (the first quotation), with four words spoken during an unrelated telephonic hearing over five months later (the second quotation).  And neither quotation provides any basis for recusal.

In support of the first quotation (related to overruling Defendants' objections), Defendants cite without explanation eleven (of the over 1,200) transcript pages from hearings in April, May, July, September, and November 2017, which together contain seven overruled objections.  [Doc. 2641 at 5 (citing 4/17/17 Tr. at 556:15-557:23; 5/10/17 Tr. at 759:19-760:6; 7/14/17 Tr. at 109:23-110:25; 9/11/17 Tr. at 48:9-49:3; 11/8/17 Tr. at 7:21-9:22)]  Defendants do not explain what, exactly, they were objecting to; why the Court erred in overruling their objections; or—as is relevant here—how the Court demonstrated disqualifying bias in doing so.  Nor could they.  "It is not a ground for disqualification that the judge has ruled against the moving party or that he may have committed an error of law."  *Hagans v. Andrus*, 651 F.2d 622, 628 (9th Cir. 1981).

With the second quotation, Defendants misleadingly excerpt a few words from the Court's detailed explanation of why it was allowing limited discovery to ensure that class members who testify in court are not retaliated against.  In so doing, the Court noted that *Defendants' attorney* believed the Court was "on a fishing expedition":  "And so *if I'm on a fishing expedition as you* [Defendants' attorney] *are certain of*, I am less concerned about it when I know that these are waters that I'm interested in."  [8/24/17 Tr. at 7:18-20 (emphasis added)]  The Court noted that its decision to allow limited discovery was in response to previous witness testimony, including a finding that one of the state's witnesses was not credible, and that its ruling on this specific matter would not necessarily "define how everything goes forward in the future."  [*Id.* at 7:9-8:11]  Again, Defendants do not explain how this manifests disqualifying bias against them.

**3.**      Defendants next scramble six words from two sentences to suggest that the Court "'*wish*[*ed*]' Plaintiffs had more '*soldiers'* to '*engage*[]' Defendants '*in this battle.*'" [Doc. 2641 at 5 (emphasis added) (quoting 11/7/17 Tr. at 37:20-21, 39:8)]   Again, Defendants distort the record.  The Court did not urge a war against Defendants, as Defendants insinuate.  At the hearing, Defendants' attorneys complained that it was overly burdensome to respond to letters from Plaintiffs' counsel.  [11/7/17 Tr. at 33:21-37:5] The Court noted the relative size of the legal teams:  "And the availability of soldiers to be engaged in this battle, I can just look at the fact that you have a law firm that is larger than the plaintiffs' lawyers."  [*Id.* at 37:20-22]  The Court expressed a desire for Plaintiffs' counsel to devote more time to the case—just as it wished that it and Defendants could (or would) do so.  [*Id.* at 37:6-39:14]   Those statements do not demonstrate that "fair judgment [is] impossible."  *Liteky*, 510 U.S. at 555.  Instead, they show the Court's support of what should be a common goal—full engagement by both sides to facilitate expeditious compliance with the Stipulation.   And, as to the initial complaint by Defendants that prompted the judicial remarks, the Court properly noted that if Plaintiffs' letters "become abusive, you can talk to me about individual letters just as both sides have done that in the past and I have engaged in that."  [11/7/17 Tr. at 38:11-14]

1    **4.**    Defendants next assert that the Court "scolded" Defendants' attorney after

2   he complained about the number of letters sent by Plaintiffs' counsel.  [Doc. 2641 at 5]

3   The attorney had suggested that Plaintiffs' counsel—responsible for defending the

4   interests of more than 34,000 class members and enforcing 103 performance measures

5   and other settlement provisions at ten state-run prisons—should limit all correspondence

6   with Defendants' attorneys to a single letter sent "once a month."  [11/7/17 Tr. at 36:7-18]

7   The Court properly explained that Defendants should focus on complying with the

8   Stipulation, which would eliminate the need for such letters, and, as noted above, agreed

9   to review individual letters.  [*Id.* at 36:1-6 ("We have been at this for a long time and

10   getting nowhere.  So the plaintiffs have been writing you about this and you have the

11   chutzpah to say they have been sending us too many letters.  Well, solve the problem.

12   Meet the stipulation.  You won't get these letters.")]  That is not evidence of disqualifying

13   bias.  *Liteky*, 510 U.S. at 555 ("judicial remarks . . . that are critical or disapproving of, or

14   even hostile to, counsel . . . ordinarily do not support a bias or partiality challenge"); *In re*

15   *Marshall*, 721 F.3d 1032, 1041, 1043 (9th Cir. 2013) (finding no basis for recusal in

16   "'critical' statements" toward attorney, noting that they could "be reasonably seen as the

17   product of [the judge]'s frustration with [the client]'s behavior throughout the litigation").

18                    **2.    July 21, 2017 Emergency Telephonic Status Hearing**

19        Defendants' next claim of disqualifying bias arises from an emergency telephonic

20   hearing held on July 21, 2017, regarding potential retaliation against testifying class

21   members—in particular, the Court's (a) alleged use of a word ("client") that in fact was

22   inaccurately transcribed by the court reporter (it should be "climate"), (b) purported denial

23   of an evidentiary hearing that in fact was granted, and (c) supposedly hostile responses to

24   Defendants' attorney that in fact were patient and measured.  [Doc. 2641 at 6-7]

25        First, Defendants contend that the Court said, "I have a client that exists in the

26   prison."  [Doc. 2641 at 6 (quoting 7/21/17 Tr. at 14:12-17)]  That is a transcription error.[12]

27   _____

28        [12]  Plaintiffs' counsel received a copy of the transcript on July 27, 2017.  The next
     morning, Plaintiffs' counsel informed the court reporter that "the word 'client' should

The Court in fact referenced a "climate" (not "client") in prison during the hearing when addressing "[t]he specter of retaliation" against testifying class members and the potential "chilling effect." [7/21/17 Tr. at 8:9-23] The context makes the Court's intention clear:

> And I think I have to emphasize what is critical to me, and that is, we have a common interest, the plaintiffs, the Court, the defendants, in making sure that I get true information about what is going on. I have given you every opportunity to cross-examine, to ask for a hearing, to challenge any allegations of retaliation.
>
> And what I have to do is I have, at the end of that process, to make sure that I have a <u>climate</u> that exists in the prison in which inmates feel completely safe in communicating their views to the Court. Their views may not be right. Their views may be wrong. Their views may be lies. But I have to have the opportunity to hear what those views are. You will have the chance to cross-examine and to present contrary evidence. But I need to make sure there is nothing happening in the process such that people have a fear that there will be retaliation for what they have done.

[7/21/17 Tr. at 6-21 (underscore added)]

Second, Defendants contend that the Court "refus[ed] to give [them] an opportunity to present evidence refuting the inmate's [sic] claim" and "ordered" that class member witnesses are "'off limits.'" [Doc. 2641 at 7 (quoting 7/21/17 Tr. at 20:2-16)] Defendants distort the record. The Court did, in fact, grant the requested evidentiary hearing. [7/21/17 Tr. at 25:21-23][13] It planned to calendar the hearing "as soon as there's an availability to do so." [*Id.* at 27:19-25] In fact, a few weeks later, it held four days of hearings and accepted extensive briefing on whether class members were chilled in their abilities to communicate with the Court and Plaintiffs' counsel. [Doc. 2363; Doc. 2423] And, if anything, the "order" Defendants complain of (which was a statement made

---

actually be 'climate.'" [Kendrick Decl. ¶¶ 2-4 & Ex. 1 at 1] The court reporter responded that "[i]t was a little difficult [to hear] with everyone being on the phone," and that she could not change the word unless asked to by the Court. [*Id.*] (The telephonic hearing took place while the Court was at circuit headquarters in San Francisco and the court reporter was located in Phoenix. [7/21/17 Tr. at 3:5-8])

[13] The Court also noted that it previously had granted Defendants an evidentiary hearing to address possible retaliation against class members during a November 2016 tour of ASPC-Tucson by Plaintiffs' counsel, and that "defendants never followed up on that despite repeated invitations from the Court to note that we have not progressed to that evidentiary hearing." [7/21/17 Tr. at 5:15-23; *see also* 8/8/17 Tr. at 6:1-7:5]

1    during the hearing and not the order (Doc. 2209)) is "proper grounds for appeal, not

2    recusal." *Liteky*, 510 U.S. at 555; *see In re Judicial Misconduct*, 631 F.3d 961, 963 (9th

3    Cir. 2011) ("Adverse rulings do not prove bias").

4        Third, Defendants complain that the Court called their attorneys' arguments

5    "'preposterous'" and "'hyperbole.'" [Doc. 2641 at 7 (quoting 7/21/17 Tr. at 20:17-21:7,

6    29:14-31:1)]   But "expressions of dissatisfaction with deficient lawyering [and]

7    overbearing advocacy" are, without more, "not sufficient to disqualify a judge from a

8    case." *Teachers4Action v. Bloomberg*, 552 F. Supp. 2d 414, 415-16, 417 (S.D.N.Y. 2008)

9    (finding no basis for recusal where judge described attorneys' filing "as containing

10   unnecessary 'junk' and 'garbage'"); *Liteky*, 510 U.S. at 556 (affirming denial of recusal

11   where complained-of behavior included "ordinary admonishments (whether or not legally

12   supportable) to counsel"); *Moore v. Publicis Groupe SA & MSL Grp.*, No. 11-1279, 2012

13   WL 12528637, at *2-3 (S.D.N.Y. Nov. 8, 2012) (finding no grounds for recusal in

14   "expressions of annoyance, frustration or anger grounded largely on the Magistrate

15   Judge's dissatisfaction with certain actions of Plaintiffs' counsel," and noting that such

16   expressions "at times . . . may be called for or understandable").

17       As Plaintiffs explain below, the Court responded patiently and clearly to the

18   exaggerated and repetitive arguments made by an attorney for Defendants.   At the

19   hearing, the Court expressed concerns about perceived retaliation against class members

20   "close in time" to speaking with their counsel or testifying in court.  [7/21/17 Tr. at 15:4-

21   15]  Defendants' attorney asked:  "[W]hat does close in time mean?  Does it mean two

22   hours?  Two days?  27 days?  67 days?"  [*Id.* at 16:25-17:1]  The Court responded that it

23   would engage in a case-by-case analysis to determine "whether or not it is close in time or

24   not," and noted that the situation currently before it involved a class member who

25   purportedly was retaliated against five days after testifying in court. [*Id.* at 17:13-23; *see*

26   Doc. 2190 (Notice of Retaliation)]   After allowing Defendants' attorney to present

27   argument on why she believed there was no retaliation in that particular case, the Court

28   explained that it had a plane to catch, that the parties still needed to "address a number of

1   issues" on the call, and that in no way was it "closing the door to hearing other

2   arguments" on the matter.   [7/21/17 Tr. at 19:23-20:16]   Nonetheless, the attorney

3   immediately demanded whether the cellmate of a testifying class member could not "be

4   moved . . . for the entirety of this stipulation which could continue *for years*[.]"   [*Id.* at

5   20:17-20 (emphasis added)]   The Court correctly noted that this was an improper

6   argument and explained again that in the case before it, the "close proximity [five days] is

7   very suggestive of retaliation" for a "reasonable observer."   [*Id.* at 20:21-21:24]

8          Later during the hearing, the Court explained its desire to assure class members

9   that they "can safely communicate to the Court and to their counsel the circumstances that

10  are relevant to the enforcement of the stipulation."   [7/21/17 Tr. at 27:8-18]   Defendants'

11  attorney asked whether that meant she had to "monitor on a daily basis" the housing of all

12  "33,000" class members.   [*Id.* at 30:1-18]   The Court replied that "the hyperbole does not

13  advance the argument" and explained why:   "We haven't seen very many [class member]

14  affidavits over time. . . .   [A]nd only once in the history of this case, have plaintiffs ever

15  presented to me that they believed that there was retaliation . . . ."   [*Id.* at 30:19-32:2]   The

16  Court's patience with an attorney's cascading queries certainly is not evidence that "fair

17  judgment [is] impossible."   *Liteky*, 510 U.S. at 555.   Indeed, as noted above, the Court

18  held an evidentiary hearing that lasted several days on the matter, at Defendants' request.

19          **B.     The Court Did Not Demonstrate Disqualifying Bias by Ordering a
                     Hearing Regarding Allegations That, If True, Undermine the Court's**

20  **                 Ability to Oversee Enforcement of the Stipulation.**

21          Defendants next make a series of arguments for recusal because the Court read a

22  news report and called for an evidentiary hearing to determine whether the stunning

23  allegations contained therein were true.   [Doc. 2641 at 7-10]   That cannot support recusal.

24                  **1.     The Court May Read the News and Listen to the Radio.**

25          Defendants contend that the Court "engaged in . . . prohibited conduct when he *sua*

26  *sponte* researched and read the KJZZ article outside the court proceedings."   [Doc. 2641 at

27  12; *see also id.* at 13 ("if a juror had done what Magistrate Judge Duncan has done, a

28  mistrial would be declared or, at the very least, that juror would be removed from the

jury")]  That argument is absurd.  "Like everyone else, judges watch television, read newspapers and magazines," and listen to the radio.  *United States v. Lyons*, 739 F.2d 994, 999 (5th Cir. 1984); *cf. United States v. Biagon*, 510 F.3d 844, 850 (9th Cir. 2007) (recognizing that "[j]udges read newspapers [and] look at blogs").  A judge is not disqualified on that basis.[14]  *Hardy v. City of Milwaukee*, 99 F. Supp. 3d 883, 892 (E.D. Wis. 2015) ("I attempt to stay informed by reading the news from various sources, which clearly is not inappropriate." (collecting cases)); *Miller v. Hendricks*, 282 F. App'x 102, 105 (3d Cir. 2008) (noting that "recusal [is] not required where judge 'reads newspaper articles, magazines, or books that may relate to a case that may come before him'" (quoting *United States v. Bonds*, 18 F.3d 1327, 1330 (6th Cir. 1994))).

## 2.   The Court Made No Findings Based on the News Report.

Defendants next assert that the Court "refus[ed them] an opportunity to refute the hearsay allegations in the KJZZ article," and, "based on what he read, he concluded Defendants were not telling the truth about their reported compliance."  [Doc. 2641 at 12, 13]  That is not true.  Rather, the Court repeatedly stated that it was not accepting the allegations in the KJZZ article as true.  [*See, e.g.*, 12/20/17 Tr. at 6:6-8 ("I don't know what is going on here.  If this is entirely true.  This is certainly not something that has a foundation laid in court."); 7:23-8:7 ("I'm going to find out exactly what's going on.  . . . to see if it's true."); *id.* at 8:8-10 ("I've said already that I don't know what's on my iPad from the KJZZ website is something that's true or not.  It could all be made up."); *id.* at 11:5-16]  The Court then set an evidentiary hearing on the matter.[15]  [*Id.* at 12:3-19; *see*

_____

[14]  The codes and ABA opinion cited by Defendants do not address this scenario.  [Doc. 2641 at 12]  Instead, they involve situations where a judge actively engages in "independent fact-finding not tested by the adversary system."  ABA Comm. on Ethics & Prof'l Resp., Formal Op. 478 at 1, 6 (Dec. 8, 2017) (listing as example of improper behavior reviewing Yelp to evaluate attorney's claim "that the plaintiff could not have worked more than 40 hours per week because defendant's restaurant is in an 'industrial area' and only open for breaks and lunch during the work-week and not on weekends").

[15]  The Model Civil Jury Instructions and Model Criminal Jury Instructions relied on by Defendants are inapposite.  [Doc. 2641 at 12-13]  Those instructions are meant to ensure that jury verdicts are based on "'a fair trial based on the same evidence that each party has had an opportunity to address.'"  [*Id.* at 13 (quoting Manual of Model Criminal Jury Instructions 7.2)]  That does not apply here, where the Court (not a jury) is the fact-

1    *also* 1/18/18 Tr. at 5:14-16 ("I have not made any findings.  I have initiated a discovery

2    process to determine whether there is a plan in place to beat the monitor."); Doc. 2643 at 2

3    ("The Court explicitly recognized that there was no foundation for these allegations

4    because they had not been tested in an evidentiary hearing and offered the parties an

5    opportunity to weigh in on the procedure for setting such a hearing.")]

6        In addition, as explained below, Defendants' specific claims of improper

7    "findings" based on the KJZZ report cannot bear even minimal scrutiny.  First, the Court

8    did not "characteriz[e] the monitoring reports as 'complete fabrication.'"  [Doc. 2641 at

9    10 (quoting 12/20/17 Tr. at 11:16)]  Defendants again misrepresent the record.  Instead,

10   the Court recognized the possibility that the *news report* was "a complete fabrication."

11   [12/20/17 Tr. at 10:19-11:16]  That is why the Court ordered an evidentiary hearing.

12       Second, although the Court said Plaintiffs "were making a 'stronger, stronger

13   argument'" regarding the inadequacy of Defendants' monitoring (Doc. 2641 (quoting

14   12/20/17 Tr. at 11:2-4)), Defendants omit the fact that the Court said Plaintiffs' arguments

15   already were on the Court's "agenda" "before today" (*i.e.*, the day the Court read the news

16   report) (12/20/17 Tr. at 5:6-7, 11:2-4), and thus the statement was not "in light of the

17   KJZZ article," as Defendants incorrectly suggest.  [*See* Doc. 2641 at 10]

18       Third, the Court did not "discredit[] all prior evidence of Defendants' compliance

19   with the Stipulation."  [Doc. 2641 at 12]  Defendants provide no citation for their claim.

20   [*Id.*]  The Court rightly expressed concern with the validity of compliance data, based on

21   Plaintiffs' previous arguments and evidence, as well as the allegations in the news report,

22   which is why it set an evidentiary hearing to address the issue.  [12/20/17 Tr. at 5:1-11:16]

23       Fourth, the Court did not "call[] ADC employees/witnesses liars" based on the

24   news report.  [Doc. 2641 at 12]  It simply noted its previous credibility determinations:

25           There are decent and honorable people on the correction side,
             and there are liars on the prisoners' side.  But I tell you that as

26

27   finder, and where the Court expressly made no findings based on the news report and
     instead, as discussed below, directed that the allegations be tested through the adversarial

28   process, allowing each party the opportunity to address them.

1

2

3

> a fact finder in this case in my role, the people that I have thought have lied to me have not been the prisoners, they have been the people working for the prison.  And I've laid that out for you.

4

5

6

7

8

9

10

11

12

[12/20/17 Tr. at 8:12-9:1]  Those determinations are the Court's to make.  "[T]he trial judge has the obligation to form judgments as to the veracity of the witnesses before him." *Int'l Bus. Machines Corp.*, 618 F.2d at 931 ("His asperity and incivility may well be due to his feeling that a witness is not forthright, that he is trying to protect a position, or is otherwise attempting to obfuscate the fact finding process."); *Ciavarella*, 716 F.3d at 724 ("[A] judge's negative view of a defendant based on evidence in the record does not constitute actual or apparent bias for the purpose of a recusal motion."); *Martin*, 278 F.3d at 997 (affirming denial of recusal where judge stated that witness "had no credibility with me based on his direct testimony, which was just a crock of baloney").

13

14

### 3.    The Court Properly Scheduled an Evidentiary Hearing to Protect the Integrity of the Judicial Process.

15

16

17

18

19

20

Next, the Court did not "abandon[ its] role as a neutral arbiter."  [Doc. 2641 at 10] The Court expressly noted that Plaintiffs were responsible for "developing the presentation . . . and deciding what witnesses would be appropriate" at the evidentiary hearing, and that Defendants then would "test[] by cross-examination and . . . by challenging evidence" (12/20/17 Tr. at 19:10-22)—that is, the Court simply ordered that the allegations in the news report be tested through the usual adversarial process.[16]

21

22

23

24

25

That the Court called for the hearing *sua sponte* does not mean that it was "acting as a lawyer in the proceeding."  [Doc. 2641 at 11 (quotation marks and citation omitted)] That was well within its authority.  If true, as the Court recognized, the allegations call into question the very foundation of the Stipulation's enforcement provisions—the compliance data self-reported by Defendants.  [*See* 12/20/17 Tr. at 12:18-19 (noting that

26

27

28

---

[16]  The Court offered only to assist in the appearance of witnesses, which was fully within its power under Federal Rule of Evidence 611(a).  [12/20/17 Tr. at 19:10-22; *see* Doc. 2607 (petition for writ of habeas corpus ad testificandum); Doc. 2625 (order)]

1    the allegations in the news report, if true, are "gravely threatening to the Court's ability to

2    administer the Stipulation"); *id.* at 11:8-11 (noting the need to determine "whether or not

3    there is a corruption in the system that is depriving the Court of its ability to perform its

4    monitoring responsibilities in a fair and appropriate way")]   As one district court has

5    explained, federal courts need not be "'impotent,'" the "'mute and helpless victim[] of

6    deception and fraud.'"  *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1060-61, 1064, 1070

7    (N.D. Ill. 2004) (declining to recuse itself, holding that it properly issued an order to show

8    cause *sua sponte* after learning through an article in the Chicago *Tribune* that defense

9    counsel may have "acted improperly," and noting that it was not accepting "the truth of

10   the facts" in the article but rather taking action to "'preserv[e] the integrity of the judicial

11   process'" (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246

12   (1944)));[17] *see also Simon v. United States*, 123 F.2d 80, 83 (4th Cir. 1941) ("It cannot be

13   too often repeated, or too strongly emphasized, that the function of a federal trial judge is

14   not that of an umpire or of a moderator at a town meeting.  He sits to see that justice is

15   done in the cases heard before him . . . ."); 28 U.S.C. § 453 (oath to "administer justice").

16          Here, not only did the parties agree that the Court should retain authority to enforce

17   the Stipulation "through all remedies provided by law" (Doc. 1185 at 14 ¶ 36), but the

18   Supreme Court also has instructed courts "not [to] shrink from their obligation to enforce

19   the constitutional rights of . . . prisoners."[18]  *Brown v. Plata*, 563 U.S. 493, 511 (2011)

20   (internal quotation marks and citation omitted); *see Frew ex rel. Frew*, 540 U.S. at 440

21

22          [17] This case involved the legal question of whether attorneys could apply in state
     court to be appointed as Special State's Attorneys under 55 Ill. Comp. Stat. § 5/3-9008
23   (2003), after an action had been removed to federal court.  The district court later issued
     sanctions against attorneys for doing just that.  The Seventh Circuit subsequently vacated
24   the sanctions order, concluding that it was "based on a misunderstanding of the state
     court's authority to appoint Special State's Attorneys and handle their fees and expenses."
25   *Schmude v. Sheahan*, 420 F.3d 645, 652 (7th Cir. 2005).
            [18] Defendants continue to deny that the Court found the Stipulation necessary to
26   remedy constitutional violations, stating instead that they "denied all allegations in the
     complaint."  [Doc. 2641 at 3]  For present purposes, Plaintiffs note only that a party need
27   not admit liability to be found liable, and that the Court made all necessary findings under
     the Prison Litigation Reform Act at the parties' joint stipulation and request.  [Doc. 1458,
28   Attach. 1; Doc. 1185 at 13 ¶ 36; 18 U.S.C. § 3626(a)(1)(A)]

("Federal courts are not reduced to approving consent decrees and hoping for compliance."); *Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008) (noting that "courts have inherent power to enforce compliance with their lawful orders" (quotation marks and citation omitted)).  The Court thus properly recognized its role as "enforcer of the Stipulation," and took necessary action to protect the integrity of the judicial process and the health and safety of class members.  [12/20/17 Tr. at 18:17-18]

### 4.    The Court Was Rightly Disturbed by Allegations in the News Report.

Defendants take issue with the Court's voiced frustration upon reading the KJZZ news report.  [Doc. 2641 at 8-10, 12]  Defendants' failure to appreciate the gravity of the allegations in the report is even more troubling.  The parties and the Court have invested tremendous time and resources in enforcement of the Stipulation for more than three years.  The Court has been exceedingly patient with Defendants.  It has granted Defendants numerous extensions and opportunities to present evidence and argument, and it has given them the benefit of every doubt.[19]  The Court's patience has been rewarded with attempts to undermine its authority (Doc. 2222-1 at 8-9; 8/8/17 Tr. at 6:1-10:19), and "pervasive and intractable failures to comply with the Stipulation."  [Doc. 2373 at 1]

This lack of progress has consequences.  Class members suffer from serious—and sometimes fatal—lapses in medical care and unspeakable pain.  [Doc. 2496; Doc. 2531-1 at 16-40; Doc. 2628-1; 2/28/18 Tr. at 335:8-365:7 (discussing mortality reviews in which Defendants concluded that class member deaths could have been "prevented or delayed with more timely intervention")]  To then learn that a whistleblower has come forward and alleged that providers were instructed how to "beat" monitoring in this case, and that requests for specialty care may have been cancelled by the for-profit health care

---

[19]  [*See, e.g.*, 11/9/16 Tr. at 8:13-18 (noting that it had "allowed . . . a quarter to pass" out of a sense of "fairness" and "respect for defendants' presumed good faith . . . that they were actually proposing something that they thought would work"); 7/21/17 Tr. at 25:21-23 ("I will grant you the wish of an evidentiary hearing.  I have always told you that I would give that to you in every case, so I will hear full testimony."); Doc. 2559 at 1]

1    contractor to avoid judicial scrutiny, is nothing short of stunning.  "Judges, while expected
2    to possess more than the average amount of self-restraint, are still only human.  They do
3    not possess limitless ability, once passion is aroused, to resist provocation."  *Int'l Bus.*
4    *Machines Corp.*, 618 F.2d at 932 (internal quotation marks and citation omitted).

5              **C.      Chambers' Receipt of Unsolicited Calls Does Not Require Recusal.**

6              Defendants assert that the Court must recuse itself due to *ex parte* communications.
7    [Doc. 2641 at 9]  "It is important at the outset to clarify what these 'communications'
8    are."  *United States v. Wecht*, 484 F.3d 194, 214 (3d Cir. 2007).  Defendants do not allege
9    "that the Judge met with [Plaintiffs' counsel] or otherwise discussed matters in the case
10   with them outside the presence of defense counsel."  *Id.* (finding "no bias" in adjudication
11   of *ex parte* motion).  Instead, Defendants cite only chambers' receipt of unsolicited calls
12   from "potential fact witnesses" (Doc. 2641 at 9)—people who claim to work for Corizon.

13             As a threshold matter, it is not clear that such contacts are *ex parte*.  *Blixseth*, 742
14   F.3d at 1219 ("An *ex parte* contact with a judicial officer is one where a party who has a
15   right to be present is excluded.").  Even if they are, that is not *per se* grounds for recusal.
16   *Id.* (holding that *ex parte* communications "aren't always improper and don't necessarily
17   call for recusal" (citations omitted)).  There is "no evidence that those communications
18   affected the [Court]'s rulings."  *In re Adbox, Inc.*, 234 F. App'x 420, 421 (9th Cir. 2007)
19   (affirming denial of recusal motion); *see United States v. Levy*, 390 F. App'x 726, 728
20   (9th Cir. 2010) (finding recusal unnecessary where *ex parte* telephone conversation "could
21   not have affected [the judge's] decision"); *Doe v. Cabrera*, 134 F. Supp. 3d 439, 453-54
22   (D.D.C. 2015) (collecting cases).  To the contrary, the Court informed the parties:  "I
23   really haven't acted on it because it's not testimony.  It's just people calling on the
24   telephone.  I can't act upon it."  [12/20/17 Tr. at 9:2-10:17]

25             And so the additional thing that I get is something I can't work
              with because it's impermissible under the rules.  We receive
26             phone calls in chambers, my staff receives phone calls in
              chambers from people who work for Corizon who say
27             essentially, it is so much worse than you think.  And we
              cannot do anything other than to say, if you would like to
28             come forward, we will have you in court any day to talk to us

1
2

> about that.  Then they ask us, can you protect us?  And my staff is told to instruct them, no, we cannot protect you.  I can't guarantee what can happen.

3
4
5

> And so some of those—some of those people may have told us something that would be relevant, but I really haven't acted on it because it's not testimony.  It's just people calling on the telephone.  I can't act upon it.

6

[12/20/17 Tr. at 9:2-15]

7       Put differently, the Court noted that its chambers had received unsolicited calls

8  from people purporting to work for Corizon, that it recognized those calls were not

9  testimony, that the callers declined to testify, and that the Court thus had not acted (and

10 could not act) on the calls.  To the extent the calls "add[ed] to the filter" of how the Court

11 "evaluate[d] what I see on the website from KJZZ" (12/20/17 Tr. at 9:16-20), it had no

12 adverse effect and provides no evidence of bias.  The December status conference resulted

13 in the scheduling of an evidentiary hearing to test the allegations in the KJZZ news report

14 through the adversarial process—that addressed any concerns about improper *ex parte*

15 communications.  *See* Richard E. Flamm, Judicial Disqualification § 45.3 at 708 (3d ed.

16 2017) ("the ex parte contacts rule is justified by the need to protect the adversarial nature

17 of judicial proceedings"); *Cordoza v. Pac. States Steel Corp.*, 320 F.3d 989, 1000 (9th Cir.

18 2003) ("Any inference that [the judge] acted on *ex parte* information to prejudge

19 [movant], rather than to protect the interests of the fund and its beneficiaries and the

20 integrity of the court, cannot be sustained" in light of judge's providing movant with

21 "ample due process," including discovery and a four-day hearing).

22       Defendants' insinuation to the contrary (Doc. 2641 at 14) is "speculative and

23 unsupported by any facts, at best, and wildy inflammatory, at worst." *Doe*, 134 F. Supp.

24 3d at 447.  "That judges are capable of disregarding that which should be disregarded is a

25 well accepted precept in our judicial system." *Ford v. Strickland*, 696 F.2d 804, 811 (11th

26 Cir. 1983); *see Williams v. Illinois*, 567 U.S. 50, 69-70 (2012) ("There is a well-

27 established presumption that the judge has adhered to basic rules of procedure, when the

28 judge is acting as a factfinder." (internal quotation marks and citations omitted)); *Harris v.*

1    *Rivera*, 454 U.S. 339, 346 (1981) (per curiam) ("In bench trials, judges routinely hear

2    inadmissible evidence that they are presumed to ignore when making decisions.").

3    Defendants' objection now appears more strategic than earnest.  Defendants did not object

4    to, or seek clarification regarding, the Court's stated manner of handling such calls during

5    the remainder of the status hearing, which lasted over six hours.  [12/20/17 Tr. at 19:24-

6    192:11]  Nor did they raise concerns during a subsequent status conference.  Instead, they

7    waited 65 days—until the eve of a contempt hearing—to raise the issue.  [Doc. 2641]

8        The two district court cases relied on by Defendants are inapposite.[20]  [Doc. 2641

9    at 2, 14-15]  In *El Fenix de Puerto Rico v. M/Y Johanny*, 954 F. Supp. 23, 24 (D.P.R.

10   1996), a judge overseeing a four-day admiralty trial invited his friend, "an avid

11   yachtsman," to attend the trial.  The friend, who knew one of the testifying experts,

12   conceded during deposition that "he met with the district judge in chambers or at lunch

13   various times during the trial" and that "he did discuss at least some disputed evidentiary

14   facts with the district judge," including the "testimony and credibility of witnesses."  *Id.* at

15   25-26.  The court concluded that "the public could reasonably question whether the

16   district judge did rely on [his friend]'s appreciation of the testimony."  *Id.* at 27.

17       Next, *United States v. S. Fla. Water Mgmt. Dist.*, 290 F. Supp. 2d 1356 (S.D. Fla.

18   2003), involved litigation by the federal government against the South Florida Water

19   Management District and the Florida Department of Environmental Protection.  The judge

20   overseeing enforcement of the consent decree, among other things, met with reporters in

21   interviews that were "not merely one-way conversations" and made a number of critical

22   comments in news outlets and in a court order about new legislation that could affect the

23   litigation, the Governor who signed the legislation, and a party to the case.  *Id.* at 1360-61.

24

25

26       [20] In the third case relied on by Defendants, *United States v. Sierra Pac. Indus.,*
     *Inc.*, 862 F.3d 1157 (9th Cir. 2017), *petition for cert. filed* (U.S. Feb. 14, 2018) (No. 17-
27   1153), the Ninth Circuit concluded that recusal was *not* warranted after the court
     purportedly "followed" the U.S. Attorney's Twitter account and later tweeted a news
28   article related to the litigation.  *Id.* at 1166, 1174-75.

1     Neither case, therefore, involves the issue here.  This case involves the "not at all
2  uncommon" scenario where a judge "receive[s] calls or letters from members of the
3  public—especially when they are presiding over high-profile cases."  Richard E. Flamm,
4  Judicial Disqualification § 47.7 at 747 (3d ed. 2017).  But "the mere fact that an
5  unsolicited *ex parte* communication from a member of the public has been made to an
6  adjudicator does not, standing alone, necessarily warrant disqualifying that adjudicator in
7  the event that she entertained the communication."  *Id.*  Were the rule otherwise,
8  dissatisfied litigants or third parties could disqualify a judge simply by picking up the
9  phone or sending a letter (or asking another person to do so).  That is not the law.  *United*
10  *States v. Dalfonso*, 707 F.2d 757, 761 (3d Cir. 1983) ("We cannot reasonably call into
11  question the impartiality of a presiding judge upon so tenuous a basis as a telephone call,
12  made by a meddler . . . , suggesting that the judge might succumb to improper
13  inducements."); *Constantine v. Teachers College*, No. 09-9701, 2010 WL 3835174, at *3
14  n.1 (S.D.N.Y. Sept. 13, 2010), *aff'd*, 448 F. App'x 92 (2d Cir. 2011) (recusal not required
15  after court received anonymous letter "expressing a view of this case and enclosing a $5
16  bill"); *Ciavarella*, 716 F.3d at 721-23 (affirming denial of recusal motion where judge
17  "received nearly 200 letters from the public regarding the case").

18     Almost a month after filing their motion to disqualify the Court, and three days
19  before the deadline for Plaintiffs' response, Defendants filed a "Supplement to Motion to
20  Disqualify Magistrate Judge Duncan from All Further Proceedings."  [Doc. 2692]  In
21  support, Defendants cite Dr. Watson's testimony that, apparently after she had worked as
22  a *locum tenens* contractor in an Arizona prison, she had called the Court's chambers, and
23  "'they'" provided her with "'the name of another attorney.'"  [Doc. 2692 at 2 (quoting
24  2/27/18 Tr. at 225:10-18)]  That is no basis for disqualification.

25     First, there is no suggestion that substantive information was shared during the call.
26  *Blixseth*, 742 F.3d at 1220 (affirming denial of recusal motion where movant merely
27  "suggest[ed] that, during [*ex parte*] meeting, the judge and the parties must have discussed
28  [movant]'s claim").  Instead, it appears that Dr. Watson tried to contact Plaintiffs' counsel

1  and, being unsuccessful, called the Court's chambers and received the name of another

2  (unnamed) attorney, whom Dr. Watson then tried to contact (again unsuccessfully).

3  [2/27/18 Tr. at 225:10-18]  There was no error in that.  As the Court explained:

> If [people who call chambers] ask us for particular names of the lawyers, if they say, who are the plaintiffs' lawyers or who are the defendants' lawyers, that is not contrary to my instruction that that information may be given.  It's a matter of the public docket.  A public docket is not as easily available to everyone . . . .

8  [2/28/18 Tr. at 243:7-18]

9  Defendants' characterization of a staff person's ministerial act (providing a

10 member of the public with information from the public docket) as an improper "act" that

11 contradicts the Court's previous statement that it "'can't act'" upon any potentially

12 relevant information people offer by phone is nothing short of irresponsible.  [Doc. 2692

13 at 3 (quoting 12/20/17 Tr. at 9:12-15)]  The Court clearly understands that information

14 offered by third parties outside the parties' presence cannot affect its decision-making in

15 this case.  [12/20/17 Tr. at 9:2-15]  The February transcript reveals nothing more than the

16 fact that a staff person answering the phone in chambers may have given out the name of

17 an attorney of record at the caller's request—something that cannot establish the Court's

18 bias or partiality.  *Blixseth*, 742 F.3d at 1220 ("*Ex parte* communications with judicial

19 staff concerning routine administrative matters do not raise any inference of bias."); ABA

20 Model Code of Judicial Conduct, Rule 2.9(A)(1) (permitting "*ex parte* communication for

21 . . . administrative . . . purposes, which does not address substantive matters").

22 Second, the action or views of whomever accepted the call in chambers cannot be

23 grounds for disqualification of the Court.  It is well-settled that "a law clerk's views

24 cannot be attributed to the judge for whom the clerk works."  *In re Corrugated Container*

25 *Antitrust Litig.*, 614 F.2d 958, 968 (5th Cir. 1980) (finding "no basis" for disqualification

26 of judge); *see Doe*, 134 F. Supp. 3d at 452-53 (collecting cases).

27 Third, Defendants insinuate that the Court improperly hid its chambers' contact

28 with Dr. Watson "more than two months after he set the hearing based on Dr. Watson's

1    allegations." [Doc. 2692 at 3] Again, Defendants ignore the record. The Court, after

2    hearing Dr. Watson's testimony, promptly "checked with [its] staff" and the next morning

3    reported that it "had no knowledge that [Dr. Watson] had contacted the Court." [2/28/18

4    Tr. at 242:20-23] The Court ordered an evidentiary hearing to evaluate Dr. Watson's

5    allegations only *after* learning of her allegations through a detailed news report, which

6    included corroborating emails. The Court took no action in response to Dr. Watson's call

7    to chambers; indeed, it does not appear the Court was informed of the call at all.

8         Fourth, Defendants assert that Dr. Watson's phone call to chambers "ultimately led

9    to publication of the allegations in the KJZZ article." [Doc. 2692 at 4] That is absurd.

10   There is no allegation that the staff person directed Dr. Watson to a reporter, much less to

11   the KJZZ reporter. The allegation simply is that a staff person provided Dr. Watson with

12   the name of an attorney on the public docket. That did not "lead" to anything at all;

13   Dr. Watson testified that the attorney did not call her back. [2/27/18 Tr. at 225:10-18]

14        Finally, Defendants note "that when 'family members of the plaintiff class' call his

15   chambers, '[the Court's] staff has been providing the name of Miss Eidenbach [Plaintiffs'

16   counsel].'" [Doc. 2692 at 3 (quoting 2/28/18 Tr. at 243:19-244:9)] That, of course, is not

17   error, disqualifying or otherwise. The parties have been on notice of that protocol since

18   September 2017, and have raised no objection. [9/13/17 Tr. at 131:14-23][21]

19        **D.   The Court Did Not Rely on Extrajudicial Sources.**

20        Defendants assert that the Court "deferred to extra-judicial sources in resolving

21   evidentiary issues." [Doc. 2641 at 6] Under this theory, "[r]ecusal is only warranted if

22

23

---

24        [21] In September 2017, the Court also noted that it sends all *ex parte* written
     communications to attorneys for both parties. [9/13/17 Tr. at 130:22-133:16 ("I don't
25   think it's appropriate for me to be sending an *ex parte* communication back to one side
     without communicating with the other.")] Defendants properly do not object to that
26   practice. *Ciavarella*, 716 F.3d at 721-23 (finding no basis for recusal where judge's
     letters to third parties "abide by the Code of Conduct's standards because they merely
27   provided 'explanations of court procedures,' and took 'particular care so that the comment
     does not denigrate public confidence in the judiciary's integrity and impartiality'"
28   (quoting Code of Conduct 3A(6) and Commentary to Code of Conduct Canon 3A(6))).

1   rulings are based on extrajudicial 'knowledge that the [judge] ought not to possess.'"

2   *Blixseth*, 742 F.3d at 1220 (quoting *Liteky*, 510 U.S. at 550).  That is not the case here.

3                   **1.    Comments Regarding Prior Experience as Settlement Judge**

4           Defendants contend that the Court "stated he has resolved disputed allegations of

5   retaliation based upon his prior settlement judge experiencing in inmate lawsuits against

6   ADC."  [Doc. 2641 at 15 (alleging improper *ex parte* communications); *see also id.* at 6

7   (alleging improper reliance on "extra-judicial sources," and citing 7/14/17 Tr. at 127:3-

8   128:24)]  That is untrue, as the surrounding context easily establishes.

9           During a hearing regarding Defendants' removal of locked boxes in which class

10  members could place Health Needs Requests ("HNRs") for medical, mental health, or

11  dental care, Plaintiffs' counsel reported that, while "interviewing potential witnesses for

12  today's hearing at Perryville, the majority of people I spoke with declined to come testify

13  . . . because they were too afraid of retaliation."  [7/14/17 Tr. at 126:10-14]  Plaintiffs'

14  counsel explained that class members reported fear that, among other things, "their

15  property would be missing upon their return."  [*Id.* at 126:15-127:8]  Plaintiffs did not

16  request any particular relief (*id.* at 127:9-12), and the Court did not make any particular

17  ruling.  [*Id.* at 127:13-128:24]  Instead, the Court simply noted that "if it becomes known

18  to me that there is any retaliation I will certainly be interested in hearing about it and

19  acting upon it if it's warranted to do so."  [*Id.* at 127:13-15]  As an aside, the Court noted

20  that it was "sensitive to the idea that this does happen" due to his experience presiding

21  over "settlement conferences" involving "people who have been in custody."  [*Id.* at

22  127:15-21]  (This is the statement relied on by Defendants.  [Doc. 2641 at 6])

23          That statement is not error, much less disqualifying error.  The Court did not rely

24  on its settlement experience to find that any retaliation had, in fact, occurred in this case.

25  Instead, it reiterated that it would consider any specific allegations brought to its attention.

26  [7/14/17 Tr. at 127:13-128:24]   And a judge's prior settlement experience alone, of

27  course, is not a basis for recusal.  *United States v. Siegelman*, 799 F. Supp. 2d 1246, 1257

28  (M.D. Ala. 2011) ("Every judge lives in a community and presides over multiple cases.

1   That a judge might receive information in connection with the judge's other duties,

2   without the parties' knowledge, should come as no shock.  Nor should it come as a shock

3   that the information will sometimes be relevant to an issue in a case.  When this occurs,

4   the judge must decide the issue without considering the extrinsic information in any way.

5   Doing this is second nature to any judge who has long served."); *Town of Norfolk v. U.S.*

6   *Army Corps of Engineers*, 968 F.2d 1438, 1462 (1st Cir. 1992) ("[O]ur system of justice

7   does not require that judges be empty vessels, wholly ignorant of all of the antecedents of

8   a case." (quotation marks and citation omitted)).

9        **2.    Comments Regarding Reasonableness of Plaintiffs' Concern
            About Veracity of Records of Class Member Who Died by
10           Suicide**

11       Defendants further contend that the Court "acknowledged that he based an

12   evidentiary ruling rejecting Defendants' *expert's* opinion on the medical principles of

13   rigor mortis solely upon his personal life experience rather than the actual medical

14   evidence before him." [Doc. 2641 at 15 (alleging improper *ex parte* communication); *see*

15   *also id.* at 6 (alleging improper reliance on "extra-judicial source," and quoting 11/7/17

16   Tr. at 183:1-9)] Yet again, Defendants grossly distort the record.  The Court did not reject

17   expert opinion based on "personal life experience."   There was no "actual medical

18   evidence" formally before the Court.  Instead, as explained below, the Court simply noted

19   that Plaintiffs had raised a reasonable question as to the veracity of Defendants' records,

20   and asked Defendants to respond in writing to Plaintiffs' letter requesting information.

21       On October 23, 2017, Plaintiffs sent a letter to Defendants raising concerns related

22   to the death of a class member "who was found hanging in his cell at Tucson-Cimarron

23   unit." [Doc. 2426-1 at 81]  According to the psychological autopsy, which was prepared

24   by Defendant's own employees:

25          "DOC staff reported checking on [the class member] 31
            minutes prior to finding him hanging."  However, video of the
26          efforts to resuscitate [the class member] showed "partial rigor
            mortis involving the buccal musculature which would make
27          placing an ET tube difficult."  As the psychological autopsy
            acknowledges, "[t]hese findings bring into question the belief

28

that he had been observed alive and healthy by correctional staff 31 minutes prior to being discovered."

[*Id.* (citations omitted)]  Plaintiffs' counsel noted in their letter that "[o]ur medical expert advises us that rigor mortis 31 minutes after death is a medical impossibility.  In other words, the correctional officers' statements that they observed [the class member] alive and healthy 31 minutes before he was found dead are false."  [*Id.* (footnote omitted)] Plaintiffs' counsel requested "all documents reflecting any investigation that was undertaken into these false statements and any staff discipline that resulted."  [*Id.* at 82]

During the November 7, 2017 status hearing, Plaintiffs' counsel informed the Court of the letter; noted that "this would not be the first time, as we noted in the letter, that custody officers have lied about checking on someone who subsequently died by suicide"; and noted that they had not yet received a response from Defendants.  [11/7/17 Tr. at 179:11-180:7]  Defendants' attorney responded that "the allegation that there's some falsification going on here is totally unfounded" and that "I asked our medical expert whether rigor mortis can set in in the neck area within 30 minutes, and he said absolutely."  [*Id.* at 180:8-12]  Another attorney for Defendants then stated that Plaintiffs' inquiry was outside the scope of the Stipulation.  [*Id.* at 181:9-182:2]

The Court disagreed, noting that the litigation "is looking at performance measure compliance that require data and verified and truthful reporting":

> I don't think . . . we're getting into areas that are turning this case into individual wrongful death cases.  What we're doing is encouraging the plaintiffs to ask questions where a reasonable person could ask this question.  I know when I have dealt with dead animals and dead people that I have encountered in my life I never saw rigor mortis within 30 minutes but now you tell me that's possible.  So it's a reasonable thing for someone to wonder about, to ask a question about in a context where there are these biases and incentives that are contrary to truth telling.  I have heard and seen . . . some of it in the witness box here.
>
> So to ask these questions based upon that I have now, I think, talked a bit about it to let you know that I don't think asking the questions are inappropriate.  I think the answers that you just gave in court here, Mr. Bojanowski [Defendants' attorney], are answers that can be—could have been tendered

1
2
3
>in a written response that would be a reasonable thing to happen in a case like this that is looking at performance measure compliance that require data and verified and truthful reporting.

4  [11/7/17 Tr. at 182:21-183:17]  That thoughtful response cannot require recusal.

5
6
### E.  A Reporter's Emails Are Irrelevant to Whether the Court's Impartiality Might Reasonably Be Questioned.

7   Finally, Defendants assert that, "[a]t minimum, there is an appearance of

8   impropriety" by the Court.  [Doc. 2641 at 16]  In support, Defendants rely on the same

9   transcript excerpts offered to show actual bias.  A reasonable person, however, knowing

10  all the circumstances, would know the full context of the Court's remarks (as opposed to

11  only the words surgically removed by Defendants).  That person, moreover, would know

12  that the Court has "'lived with'" this litigation—a case with over 2,700 docket entries—

13  for over three years.  *Larson*, 43 F.3d at 415 (denying petition for writ of mandamus

14  requiring recusal where judge had presided over litigation with over 350 docket entries for

15  over two years).  "In light of [the Court]'s familiarity and lengthy association with the

16  case, a reasonable person simply would not view . . . isolated remarks as an occasion for

17  concern."  *Id.*; *see Holland*, 519 F.3d at 914 ("[T]he judge's conduct during the

18  proceedings should not, except in the rarest of circumstances form the sole basis for

19  recusal under § 455(a)." (internal quotation marks, citation, and footnote omitted)).

20  The only new "evidence" offered by Defendants to "buttress[]" the "appearance of

21  impropriety" are emails between the KJZZ news reporter and Dr. Watson.  [Doc. 2641 at

22  16]  Defendants contend that the emails "reveal that even the media readily saw

23  Magistrate Judge Duncan's animosity toward and bias and prejudice against

24  Defendants and (successfully) sought to exploit it."  [*Id.* at 17]  The emails, however, do

25  little more than show that the reporter asked his source for clarification of certain matters

26  before publishing her allegations, that he recognized the relevance of the allegations to the

27  *Parsons* litigation, and that he was hopeful that the story would result in positive change

28  for people incarcerated in Arizona prisons.  [Doc. 2641-1, Ex. 15]  The emails in no way

1    suggest that the reporter questioned the Court's impartiality.  In fact, the reporter publicly

2    tweeted the following on February 26, 2018:

3
> I've been following this case for a year now and I can honestly
4
> say - Judge Duncan has never displayed any bias - he is
> incredibly fair and patient and thoughtful - the fact that the
> state has gone for years without sanction is proof of that.
5

6    [Kendrick Decl. ¶ 5 & Ex. 2]

7         Regardless, even if the reporter *had* publicly voiced concern about the Court's

8    impartiality (which he did not), it is well-settled that "[t]he characterizations of newspaper

9    articles and journalists are not grounds for recusal."  *In re Marshall*, 291 B.R. 855, 860

10   (Bankr. C.D. Cal. 2003); *see also Cheney*, 541 U.S. at 923-24 (noting that "press

11   editorials" "cannot determine the recusal question"); *Datagate*, 941 F.2d at 871 (citing *In

12   re City of Detroit*, 828 F.2d 1160, 1168 (6th Cir. 1987) ("articles cited by the City do not

13   necessarily mean that the public believes [the] Judge . . . is biased")); *Little Rock Sch.

14   Dist. v. Arkansas State Bd. of Educ.*, 902 F.2d 1289, 1292 (8th Cir. 1990) ("Various

15   newspaper articles had questioned the judge's impartiality, but they did not necessarily

16   show what the public thought."); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 882 F.2d

17   1556, 1569 (Fed. Cir. 1989) (rejecting argument that "actual evidence that reasonable

18   observers *did* question the court's impartiality" could be established by the fact that "the

19   press questioned the trial judge's non-recusal in this case in several articles").

20                                **CONCLUSION**

21        The Court should deny Defendants' Motion to Disqualify Magistrate Judge Duncan

22   from All Further Proceedings.

23   . . .

24   . . .

25   . . .

26   . . .

27   . . .

28   . . .

1    Dated:  March 30, 2018                    **PRISON LAW OFFICE**

2

3                                         By:   s/ Rita K. Lomio
                                             Donald Specter (Cal. 83925)*
                                             Alison Hardy (Cal. 135966)*
4                                            Sara Norman (Cal. 189536)*
                                             Corene Kendrick (Cal. 226642)*
5                                            Rita K. Lomio (Cal. 254501)*
                                             1917 Fifth Street
6                                            Berkeley, California 94710
                                             Telephone:  (510) 280-2621
7                                            Email:     dspecter@prisonlaw.com
                                                        ahardy@prisonlaw.com
8                                                       snorman@prisonlaw.com
                                                        ckendrick@prisonlaw.com
9                                                       rlomio@prisonlaw.com

10                                           *Admitted *pro hac vice*

11                                           David C. Fathi (Wash. 24893)*
                                             Amy Fettig (D.C. 484883)**
12                                           Victoria Lopez (Ill. 6275388)*
                                             **ACLU NATIONAL PRISON
                                             PROJECT**
13                                           915 15th Street N.W., 7th Floor
14                                           Washington, D.C. 20005
                                             Telephone:  (202) 548-6603
15                                           Email:     dfathi@aclu.org
                                                        afettig@aclu.org
16                                                      vlopez@aclu.org

17                                           *Admitted *pro hac vice*.  Not admitted
                                              in DC; practice limited to federal
18                                            courts.
                                             **Admitted *pro hac vice*
19
                                             Kirstin T. Eidenbach (Bar No. 027341)
20                                           **EIDENBACH LAW, P.L.L.C.**
                                             P. O. Box 91398
21                                           Tucson, Arizona 85752
                                             Telephone:  (520) 477-1475
22                                           Email:     kirstin@eidenbachlaw.com

23                                           Kathleen E. Brody (Bar No. 026331)
                                             **ACLU FOUNDATION OF**
24                                           **ARIZONA**
                                             3707 North 7th Street, Suite 235
25                                           Phoenix, Arizona 85013
                                             Telephone:  (602) 650-1854
26                                           Email:     kbrody@acluaz.org

27

28

LEGAL139246477.1                    -38-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

1

**ARIZONA CENTER FOR DISABILITY LAW**

2

3

By: <u>  s/ Maya Abela  </u>

4

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)

5

5025 East Washington Street, Suite 202
Phoenix, Arizona 85034

6

Telephone:  (602) 274-6287
Email:    skader@azdisabilitylaw.org

7

          adietrich@azdisabilitylaw.org

8

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)

9

Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)

10

**ARIZONA CENTER FOR DISABILITY LAW**

11

177 North Church Avenue, Suite 800
Tucson, Arizona 85701

12

Telephone:  (520) 327-9547
Email:

13

   rdalyrooney@azdisabilitylaw.org
          jrico@azdisabilitylaw.org

14

          jross@azdisabilitylaw.org
          mabela@azdisabilitylaw.org

15

*Attorneys for Arizona Center for Disability Law*

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on March 30, 2018, I electronically transmitted the above

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Michael E. Gottfried
Lucy M. Rand

7

Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

8

9

Daniel P. Struck
Rachel Love

10

Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman

11

Jacob B. Lee
Kevin R. Hanger

12

Timothy M. Ray
Richard M. Valenti

13

Jamie D. Guzman
STRUCK LOVE BOJANOWSKI & ACEDO, PLC

14

dstruck@strucklove.com
rlove@strucklove.com

15

tbojanowski@strucklove.com
nacedo@strucklove.com

16

ahesman@strucklove.com
jlee@strucklove.com

17

khanger@strucklove.com
tray@strucklove.com

18

rvalenti@strucklove.com
jguzman@strucklove.com

19

20

*Attorneys for Defendants*

21

s/ D. Freouf

22

23

24

25

26

27

28