Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
*Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
*Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
*Desiree Licci, Joseph Hefner, Joshua Polson, and*
*Charlotte Wells, on behalf of themselves and all others*
*similarly situated*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
          adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISQUALIFY JUDGE DUNCAN FROM ALL FURTHER PROCEEDINGS (DOC. 2641)** |

LEGAL139246477.1

# TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................... 1

I.   COURT-ENFORCEABLE SETTLEMENT .................................................. 1

    A.   Defendants' Duty to Monitor and Report Compliance ..................... 2

    B.   Enforcement and Termination of the Stipulation .............................. 2

    C.   Defendants' Failure to Comply with the Stipulation and
    Concerns with the Adequacy of Defendants' Self-Monitoring ........ 3

II.   NEWS ARTICLE REPORTING WHISTLEBLOWER
ALLEGATIONS ........................................................................................ 4

III.   DEFENDANTS' MOTION TO DISQUALIFY THE COURT ................... 5

ARGUMENT ...................................................................................................... 6

I.   LEGAL STANDARD ................................................................................ 6

II.   THIS COURT SHOULD DECIDE DEFENDANTS' MOTION. ............... 8

III.   DEFENDANTS' MOTION IS UNTIMELY. ........................................... 10

IV.   DEFENDANTS PROVIDE NO GROUNDS FOR RECUSAL. ................ 12

    A.   Isolated Judicial Remarks, Stripped of Context, Do Not
    Establish That "Fair Judgment [Is] Impossible." ........................... 12

        1.   Statements Made Between January and November
        2017 ...................................................................................... 13

        2.   July 21, 2017 Emergency Telephonic Status Hearing .......... 18

    B.   The Court Did Not Demonstrate Disqualifying Bias by
    Ordering a Hearing Regarding Allegations That, If True,
    Undermine the Court's Ability to Oversee Enforcement of the
    Stipulation. ...................................................................................... 21

        1.   The Court May Read the News and Listen to the Radio. ..... 21

        2.   The Court Made No Findings Based on the News
        Report. .................................................................................. 22

        3.   The Court Properly Scheduled an Evidentiary Hearing
        to Protect the Integrity of the Judicial Process .................... 24

        4.   The Court Was Rightly Disturbed by Allegations in the
        News Report. ........................................................................ 26

-i-

1

**TABLE OF CONTENTS**
(continued)

2

Page

C.   Chambers' Receipt of Unsolicited Calls Does Not Require
     Recusal. ........................................................................................... 27

D.   The Court Did Not Rely on Extrajudicial Sources. ........................ 32

     1.   Comments Regarding Prior Experience as Settlement
          Judge ...................................................................................... 33

     2.   Comments Regarding Reasonableness of Plaintiffs'
          Concern About Veracity of Records of Class Member
          Who Died by Suicide ............................................................. 34

E.   A Reporter's Emails Are Irrelevant to Whether the Court's
     Impartiality Might Reasonably Be Questioned. ............................... 36

CONCLUSION .................................................................................................. 37

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allen v. Wine*,
  297 F. App'x 524 (7th Cir. 2008) ................................................... 6

*Ball v. Colvin*,
  No. 12-01574, 2014 WL 2569059 (D. Ariz. June 9, 2014) .......................... 6

*Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*,
  289 F.3d 589 (9th Cir. 2002) ................................................... 13

*Blixseth v. Yellowstone Mountain Club, LLC*,
  742 F.3d 1215 (9th Cir. 2014) (per curiam) ........................................ *passim*

*Brown v. Plata*,
  563 U.S. 493 (2011) ......................................................... 1, 25

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
  No. 06-1381, 2008 WL 169636 (D. Ariz. Jan. 16, 2008) ......................... 11

*Cal. Dep't of Soc. Servs. v. Leavitt*,
  523 F.3d 1025 (9th Cir. 2008) ................................................. 26

*Cheney v. U.S. Dist. Court for the Dist. of Columbia*,
  541 U.S. 913 (2004) (Scalia, J., mem.) ................................... 7, 13, 37

*Clemens v. U.S. Dist. Court for Cent. Dist. of California*,
  428 F.3d 1175 (9th Cir. 2005) ................................................. 1, 9

*Constantine v. Teachers College*,
  No. 09-9701, 2010 WL 3835174 (S.D.N.Y. Sept. 13, 2010),
  *aff'd*, 448 F. App'x 92 (2d Cir. 2011) ........................................ 30

*Cordoza v. Pac. States Steel Corp.*,
  320 F.3d 989 (9th Cir. 2003) .................................................. 28

*Datagate, Inc. v. Hewlett-Packard Co.*,
  941 F.2d 864 (9th Cir. 1991) .............................................. 12, 37

*Doe v. Cabrera*,
  134 F. Supp. 3d 439 (D.D.C. 2015) ...................................... 27, 28, 31

*E.&J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992) ................................................. 10

*El Fenix de Puerto Rico v. M/Y Johanny*,
  954 F. Supp. 23 (D.P.R. 1996) ................................................. 29

*First Interstate Bank of Ariz. N.A. v. Murphy, Weir & Butler*,
  210 F.3d 983 (9th Cir. 2000) .................................................. 10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

CASES (CONT.)

*Ford v. Strickland,*
   696 F.2d 804 (11th Cir. 1983) ..................................................................... 28

*Frew ex rel. Frew v. Hawkins,*
   540 U.S. 431 (2004)........................................................................... 15, 25

*Hagans v. Andrus,*
   651 F.2d 622 (9th Cir. 1981) ..................................................................... 16

*Hardy v. City of Milwaukee,*
   99 F. Supp. 3d 883 (E.D. Wis. 2015)........................................................... 22

*Harris v. Rivera,*
   454 U.S. 339 (1981) (per curiam)............................................................... 28

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
   322 U.S. 238 (1944)................................................................................ 25

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.,*
   882 F.2d 1556 (Fed. Cir. 1989)................................................................... 37

*In re Adbox, Inc.,*
   234 F. App'x 420 (9th Cir. 2007) ............................................................... 27

*In re Aguinda,*
   241 F.3d 194 (2d Cir. 2001) ................................................................. 11, 12

*In re Bernard,*
   31 F.3d 842 (9th Cir. 1994) (Kozinski, J., denying motion to disqualify) ................... 9

*In re City of Detroit,*
   828 F.2d 1160 (6th Cir. 1987) ................................................................... 37

*In re Corrugated Container Antitrust Litig.,*
   614 F.2d 958 (5th Cir. 1980) ..................................................................... 31

*In re DeAtley Litig.,*
   No. 06-0278, 2008 WL 375086 (E.D. Wa. Feb. 11, 2008) ................................. 10

*In re Focus Media, Inc.,*
   378 F.3d 916 (9th Cir. 2004) ..................................................................... 14

*In re Int'l Bus. Machines Corp.,*
   618 F.2d 923 (2d Cir. 1980)................................................................ *passim*

*In re J.P. Linahan, Inc.,*
   138 F.2d 650 (2d Cir. 1943)........................................................................ 8

# TABLE OF AUTHORITIES
### (continued)

Page(s)

CASES (CONT.)

*In re Judicial Misconduct,*
631 F.3d 961 (9th Cir. 2011) ................................................................. 20

*In re Larson,*
43 F.3d 410 (8th Cir. 1994) ............................................................. 12, 36

*In re Marshall,*
291 B.R. 855 (Bankr. C.D. Cal. 2003) ......................................................... 37

*In re Marshall,*
721 F.3d 1032 (9th Cir. 2013) ................................................................. 18

*Liteky v. United States,*
510 U.S. 540 (1994) ................................................................... *passim*

*Little Rock Sch. Dist. v. Arkansas State Bd. of Educ.,*
902 F.2d 1289 (8th Cir. 1990) ................................................................. 37

*M & I Marshall & Ilsley Bank v. McGill,*
No. 10-1436, 2011 WL 2652569 (D. Ariz. June 30, 2011) ........................... 6

*Manion v. Am. Airlines, Inc.,*
251 F. Supp. 2d 171 (D.D.C. 2003) ............................................................. 6

*Melendres v. Arpaio,*
No. 17-2513, 2015 WL 13173306 (D. Ariz. July 10, 2015) ................... 7, 9, 16

*Microsoft Corp. v. United States,*
530 U.S. 1301 (2000) (Rehnquist, C.J., statement on recusal) ........................ 7

*Miller v. Hendricks,*
282 F. App'x 102 (3d Cir. 2008) ............................................................. 22

*Moore v. Publicis Groupe SA & MSL Grp.,*
No. 11-1279, 2012 WL 12528637 (S.D.N.Y. Nov. 8, 2012) ......................... 20

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress,*
257 F. Supp. 3d 1084 (N.D. Cal. 2017) ............................................... 12, 13

*Preston v. United States,*
923 F.2d 731 (9th Cir. 1991) ................................................................. 10

*Schmude v. Sheahan,*
312 F. Supp. 2d 1047 (N.D. Ill. 2004) ......................................................... 25

*Schmude v. Sheahan,*
420 F.3d 645 (7th Cir. 2005) ................................................................. 25

1

2

**TABLE OF AUTHORITIES**
(continued)

Page(s)

3

CASES (CONT.)

4

*Simon v. United States,*
    123 F.2d 80 (4th Cir. 1941) ........................................................................ 25

5

*Skokomish Indian Tribe v. United States,*
    410 F.3d 506 (9th Cir. 2005) (en banc) ...................................................... 12

6

7

*Teachers4Action v. Bloomberg,*
    552 F. Supp. 2d 414 (S.D.N.Y. 2008)......................................................... 20

8

*Town of Norfolk v. U.S. Army Corps of Engineers,*
    968 F.2d 1438 (1st Cir. 1992)...................................................................... 34

9

10

*United States v. Awadallah,*
    436 F.3d 125 (2d Cir. 2006)........................................................................... 8

11

*United States v. Biagon,*
    510 F.3d 844 (9th Cir. 2007) ...................................................................... 22

12

13

*United States v. Bonds,*
    18 F.3d 1327 (6th Cir. 1994) ...................................................................... 22

14

*United States v. Ciavarella,*
    716 F.3d 705 (3d Cir. 2013)................................................................. *passim*

15

16

*United States v. Dalfonso,*
    707 F.2d 757 (3d Cir. 1983)........................................................................ 30

17

*United States v. Heredia-Fernandez,*
    756 F.2d 1412 (9th Cir. 1985) .................................................................... 14

18

19

*United States v. Holland,*
    519 F.3d 909 (9th Cir. 2008) ................................................................. 9, 36

20

*United States v. Levy,*
    390 F. App'x 726 (9th Cir. 2010) ............................................................... 27

21

22

*United States v. Lyons,*
    739 F.2d 994 (5th Cir. 1984) ...................................................................... 22

23

*United States v. Martin,*
    278 F.3d 988 (9th Cir. 2002) .................................................................. 7, 24

24

*United States v. Rogers,*
    119 F.3d 1377 (9th Cir. 1997) .................................................................... 12

25

26

*United States v. S. Fla. Water Mgmt. Dist.,*
    290 F. Supp. 2d 1356 (S.D. Fla. 2003) ...................................................... 29

27

28

1

2

**TABLE OF AUTHORITIES**
(continued)

Page(s)

3

**CASES (CONT.)**

4

*United States v. Sibla*,
   624 F.2d 864 (9th Cir. 1980) ................................................................ 9

5

*United States v. Siegelman*,
   799 F. Supp. 2d 1246 (M.D. Ala. 2011) ............................................... 33

6

7

*United States v. Sierra Pac. Indus.*,
   759 F. Supp. 2d 1198 (E.D. Cal. 2010).................................................. 8

8

*United States v. Sierra Pac. Indus., Inc.*,
   862 F.3d 1157 (9th Cir. 2017), *petition for cert. filed* (U.S. Feb. 14,
   2018) ..................................................................................................... 29

9

10

*United States v. Studley*,
   783 F.2d 934 (9th Cir. 1986) ......................................................... 8, 9, 12

11

12

*United States v. Wecht*,
   484 F.3d 194 (3d Cir. 2007)................................................................. 27

13

*Williams v. Illinois*,
   567 U.S. 50 (2012)................................................................................ 28

14

15

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
   No. 04-9651, 2011 WL 70593 (S.D.N.Y. Jan. 10, 2011) ...................... 6

16

17

**RULES**

18

Fed. R. Civ. P. 73.................................................................................... 1, 6

19

Fed. R. Evid. 611 ...................................................................................... 24

20

21

**STATUTES**

22

18 U.S.C. § 3626(a)(1)(A).......................................................................... 25

23

28 U.S.C. § 453 .......................................................................................... 25

24

28 U.S.C. § 455 ............................................................................................ 6

25

28 U.S.C. § 636(c)........................................................................................ 1

26

27

28

-vii-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES
## (continued)

Page(s)

OTHER AUTHORITIES

ABA Comm. on Ethics & Prof'l Resp., Formal Op. 478 (Dec. 8, 2017)........................... 22

ABA Model Code of Judicial Conduct, Rule 2.9(A)(1)...................................................... 31

Manual of Model Criminal Jury Instructions 7.2 ............................................................... 22

Richard E. Flamm, Judicial Disqualification (3d ed. 2017)........................................ 28, 30

Jimmy Jenkins, *On the Inside:  Arizona Prison Health Care*, KJZZ
(Dec. 18, 2017), http://kjzz.org/content/572976/inside-chaos-arizona-
prison-health-care#two.................................................................................................. 4, 5

Ariz. Dep't of Corr., Eyman Location Units,
https://corrections.az.gov/location/103/eyman
(last visited Mar. 28, 2018) ............................................................................................. 2

Over three years ago, the parties settled this civil rights class action lawsuit to remedy constitutional violations in the Arizona prison system. The parties agreed that Magistrate Judge David Duncan would oversee compliance with the settlement. On the eve of a contempt hearing, Defendants for the first time contended that Judge Duncan must be disqualified because he harbors "personal animus" against them and is "devoid of impartiality." [Doc. 2641 at 4] In support of their untimely motion, Defendants offer a handful of words and sentences cherry-picked from over 3,600 pages of hearing transcripts from the past year. To manufacture grounds for disqualification, Defendants stretch, skew, and elide the Court's statements. Even taken as presented, none meet the high standard for recusal. As a result, the motion must be denied. *Clemens v. U.S. Dist. Court for Cent. Dist. of California*, 428 F.3d 1175, 1179 (9th Cir. 2005) (noting that "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." (internal quotation marks and citation omitted)).

## BACKGROUND

Plaintiffs filed this class action lawsuit on behalf of over 34,000 men and women housed in Arizona state prisons—people who are entirely dependent on the state for their health care.[1] [Doc. 1] In October 2014, with the consent of all parties, the lawsuit was reassigned to Magistrate Judge David Duncan (hereinafter "the Court") for all purposes pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. [Doc. 1194]

## I. COURT-ENFORCEABLE SETTLEMENT

In February 2015, the Court approved the parties' settlement ("Stipulation"), which overhauled the provision of health care in Arizona prisons. [Doc. 1458] In so doing, the Court found that the Stipulation was necessary to correct constitutional violations. [*Id.*,

---

[1] "To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. . . . Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 510-11 (2011).

Attach. 1]   Subject to two exceptions not relevant here, the Court retained authority to enforce the Stipulation "through all remedies provided by law." [Doc. 1185 at 14 ¶ 36]

## A.    Defendants' Duty to Monitor and Report Compliance

Under the Stipulation, Defendants must measure and report, on a monthly basis, their compliance with 103 health care performance measures at the ten state-run prisons. [Doc. 1185 at 3 ¶ 9; Doc. 1185-1 at 8-15 (Performance Measures)]   The reports are referred to as "CGAR" reports.[2]   Among other things, CGAR reports assign a monthly compliance percentage to each performance measure at each relevant prison.

The Stipulation outlines a basic protocol for calculating the compliance percentage for each performance measure.  [Doc. 1185-1 at 17-36]  Performance Measure 50, for example, requires that "[u]rgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider." [*Id.* at 26]  The Stipulation explains the general method for measuring compliance: "At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure."  [*Id.*]  Thus, for example, an auditor must review ten randomly selected records at each of ASPC-Eyman's five yards ("units").[3]   If 35 of the 50 records are compliant, the auditor assigns a compliance percentage of 70% for that particular performance measure, prison, and month.

## B.    Enforcement and Termination of the Stipulation

The Stipulation defines the process for "[d]etermining" whether Defendants have achieved "substantial compliance with a particular performance measure at a particular facility" as follows:

> i.    For the first twelve months after the effective date of this Stipulation, meeting or exceeding a seventy-five percent

---

[2] "CGAR" stands for "Compliance Green Amber Red," which refers to color coding that Defendants use on the reports.  [Doc. 1842-3 at 5 ¶ 16]  This reporting format is referred to as "MGAR" in the Stipulation.  [Doc. 1185 at 3 ¶ 9(a)]
[3] *See* Ariz. Dep't of Corr., Eyman Location Units, https://corrections.az.gov/location/103/eyman (last visited Mar. 28, 2018) (listing the following five units:  Browning, Cook, Meadows, Rynning, and SMU-I).

(75%) threshold for the particular performance measure that applies to a specific complex . . . . ;

ii.      For the second twelve months after the effective date of this Stipulation, meeting or exceeding an eighty percent (80%) threshold for the particular performance measure that applies to a specific complex . . . . ;

iii.      After the first twenty four months after the effective date of this Stipulation, meeting or exceeding an eighty-five percent (85%) threshold for the particular performance measure that applies to a specific complex . . . .

[Doc. 1185 at 4 ¶ 10(a)]

Whether a particular performance measure at a particular facility is in substantial compliance is relevant to whether the Court can order a remedial plan for that measure (Doc. 1185 at 13, 14-15 ¶¶ 30-31, 36), and termination of Defendants' "duty to measure and report on a particular performance measure." [*Id.* at 4 ¶ 10(b)]

## C.      Defendants' Failure to Comply with the Stipulation and Concerns with the Adequacy of Defendants' Self-Monitoring

Since approval of the Stipulation over three years ago, Defendants have not delivered all promised health care to class members.  Defendants' own mortality reviews document class member deaths that could have been "prevented or delayed with more timely intervention."  [2/28/18 Tr. at 335:8-365:7]  The parties and Court thus have actively engaged in enforcement of the Stipulation, including reviewing compliance data and proposed remedial plans, as well as developing detailed monitoring protocols.

Among other things, the Court has examined the accuracy and completeness of Defendants' monitoring process.  The Court held several days of evidentiary hearings regarding the monitoring process in 2017.  [Doc. 2046]  The Court noted that "we still have . . . a chilling amount of failures" and that "the best that can be said overall is that we're treading water."  [4/17/17 Tr. at 637:6-7, 17-18]  The Court further noted that there were "great chasms of competence" in, and expressed "serious concerns about the quality and dependability of," Defendants' monitoring.  [*Id.* at 671:11-13, 18]  The Court also has ordered Defendants to recalculate compliance percentages in accordance with court orders

and the parties' agreements if they wish to establish substantial compliance as to a particular performance measure and prison (Doc. 1951 at 1-2; Doc. 1895 at 1)— something Defendants have not yet done.  [Doc. 2338 at 8-39; Doc. 2046; Doc. 2087]

In June 2017, the Court noted that failure to comply with certain performance measures at certain prisons "will result in an order to show cause hearing."  [Doc. 2124] "Because of pervasive and intractable failures to comply with the Stipulation," in October 2017, the Court issued an order to show cause why it "should not impose a civil contempt sanction of $1,000 per incident of non-compliance commencing the month of December 2017."  [Doc. 2373 at 1, 4]  The Court ordered Defendants to produce "a list of every instance of non-compliance with this Order during December 2017."  [*Id.* at 4]  Since then, Plaintiffs' counsel has raised additional concerns with the validity of the compliance data produced by Defendants (Doc. 2502-1 at 4-19), including Defendants' list of every instance of non-compliance with the order to show cause.  [Doc. 2633]

The Court scheduled a hearing on the second order to show cause for February 28, 2018. [11/7/17 Tr. at 27:3-9]

## II.    NEWS ARTICLE REPORTING WHISTLEBLOWER ALLEGATIONS

On December 19, 2017, the National Public Radio (NPR) Phoenix affiliate, 91.5 KJZZ, completed a two-part series entitled, "On the Inside:  The Chaos of Arizona Prison Health Care."  *See* Jimmy Jenkins, *On the Inside:  The Chaos of Arizona Prison Health Care*, KJZZ (Dec. 18, 2017), http://kjzz.org/content/572976/inside-chaos-arizona-prison-health-care#two.[4]  Each part of the series included a short audio piece and a more detailed written article.  *Id.*  The second part focused on whistleblower Dr. Jan Watson, who had served as a medical provider for the Arizona Department of Corrections ("ADC"), and its contractor Corizon Health, Inc. ("Corizon"), as a *locum tenens* contractor through a company called Onyx MD that provides on-call and temporary medical staff to hospitals

---

[4]  The article on the KJZZ website is dated December 18, 2017, the publishing date of the first part of the series, which reported on the in-custody death of Walter Jordan after delays in cancer treatment.  Nine days before his death, Mr. Jordan had filed a handwritten "Notice of Impending Death" with the Court.  [Doc. 2262; *see* Doc. 2496]

and other health care providers.  *Id.*  According to the article, Dr. Watson reported, among other things, that she was told how to "beat the monitor," and that "she was asked to cancel referrals to an infectious disease specialist for HIV patients because according to Corizon, they did not have a contracted infectious disease specialist."  *Id.*  The article included screenshots of emails between Dr. Watson and Corizon staff.  One email, for example, suggested that a Corizon employee had asked Dr. Watson to cancel a request for a specialist so that Defendants would not be sanctioned under the order to show cause:



**CONSULT**

Neese, Sara

To:        Watson, Jan

Monday, September 18, 2017 10:17 AM

• You replied on 9/18/2017 1:23 PM.

Hello Dr.Watson,

        Could you please cancel                    infectious disease consults/there are two. We do not have a provider to send him to. One was approved and has been sitting there for 42 days. After 30 days we get nailed for 1000 bucks a day until they are seen.  Also please look at my previous email and answer the other ATP/NMI's if you would. We really need them answered to get our job done. Thanks I appreciate it.

Sara Neese

*Id.*  (The emails later were admitted into evidence without objection.  [2/27/18 Tr. at 38:1-39:9, 43:2-47:10, 129:13-130:13, 218:24-220:15; *see also* 1/18/18 Tr. at 14:10-25])

        The Court scheduled a hearing for February 27, 2018, to evaluate the allegations in the news report.  [Doc. 2559; Doc. 2643 at 2]

**III.    DEFENDANTS' MOTION TO DISQUALIFY THE COURT**

        At 10:00 p.m. on Friday, February 23, 2018, one business day before the scheduled evidentiary and contempt hearings, Defendants filed the instant motion "to disqualify Magistrate Judge Duncan from all further proceedings" (Doc. 2641), as well as a "motion for Magistrate Judge Duncan to disqualify himself" and for reassignment of the upcoming hearings (Doc. 2642).  The Court denied the latter motion and stated that it would rule on the former "after briefing is complete."  [Doc. 2643 at 2, 6]  On March 20, Defendants

filed a "Supplement" based on the February 27 and 28 hearings.  [Doc. 2692]  That same day, Defendants also filed a Motion for Chief Judge to Rule.  [Doc. 2693]

**ARGUMENT**

**I.     LEGAL STANDARD**

Defendants bring this motion under 28 U.S.C. § 455(a) and (b)(1), which provide:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . .

[*See* Doc. 2641 at 2][5]

---

[5] Defendants cite, without discussion, Federal Rule of Civil Procedure 73(b)(3), which allows a district court "to vacate a referral to a magistrate judge" "when a party shows extraordinary circumstances."  [Doc. 2641 at 2]  Defendants do not discuss (or apply) the relevant legal standard and thus have forfeited that argument.  In any event, such a claim fails for the same reasons as the § 455 claim fails.  *See Allen v. Wine*, 297 F. App'x 524, 529 (7th Cir. 2008) (finding that movant's "allegations of bias are unfounded, not extraordinary"); *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, No. 04-9651, 2011 WL 70593, at *3 (S.D.N.Y. Jan. 10, 2011) ("A magistrate judge's purported 'bias,' as allegedly manifested through his or her rulings, does not meet the 'extraordinary circumstances' standard" of Rule 73(b)(3)); *M & I Marshall & Ilsley Bank v. McGill*, No. 10-1436, 2011 WL 2652569, at *2 (D. Ariz. June 30, 2011) ("Allegations of impartiality [sic] do not constitute 'extraordinary circumstances' to vacate referral to a magistrate judge." (*citing Manion v. Am. Airlines, Inc.*, 251 F. Supp. 2d 171, 175 (D.D.C. 2003) ("[D]efendant has relied solely on serious allegations impugning Magistrate Judge Robinson's impartiality in support of its motion to vacate the referral. . . .  [S]uch allegations neither meet the standard under the relevant statute for obtaining the relief sought, nor are they properly before this Court, but rather, must be made, if at all, before the judge whose impartiality is being questioned."))); *Ball v. Colvin*, No. 12-01574, 2014 WL 2569059, at *1 (D. Ariz. June 9, 2014) (noting that "relevant to the Court's consideration of a request to withdraw consent to a Magistrate Judge's jurisdiction include the timeliness of the request [and] whether granting the request would unduly interfere with or delay the proceedings").

Defendants also reference other sources, including the Model Civil and Criminal Jury Instructions, Judicial Code of Conduct, and ABA Model Code.  [Doc. 2641 at 2, 12-15]  The citations do not alter the § 455 analysis and thus, for the most part, are not discussed separately in this brief.  *See United States v. Ciavarella*, 716 F.3d 705, 722 n.7 (3d Cir. 2013) ("[I]t is possible to violate the Code without creating an appearance of partiality; likewise, it is possible for a judge to comply with the Code yet still be required to recuse herself." (quotation marks and citation omitted)).

1   The Supreme Court has recognized that "§ 455(a) expands the protection of
2   § 455(b), but duplicates some of its protection as well," including "with regard to bias and
3   prejudice." *Liteky v. United States*, 510 U.S. 540, 552 (1994). "What matters under
4   § 455(a) 'is not the reality of bias or prejudice but its appearance.' This inquiry is an
5   objective one, made from the perspective of a reasonable observer who is informed of all
6   the surrounding facts and circumstances." *Microsoft Corp. v. United States*, 530 U.S.
7   1301, 1302 (2000) (Rehnquist, C.J., statement on recusal) (quoting *Liteky*, 510 U.S. at
8   548). The facts must be considered "as they existed, and not as they were surmised or
9   reported." *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 541 U.S. 913, 914 (2004)
10  (Scalia, J., mem.) (internal quotation marks and citation omitted).

11  "Recusal for actual bias pursuant to subsection (b)(1) is required only if the moving
12  party can prove by 'compelling evidence' that a reasonable person would be convinced
13  the judge was biased in a way that may prevent a fair decision on the merits." *Melendres
14  v. Arpaio*, No. 17-2513, 2015 WL 13173306, at *7 (D. Ariz. July 10, 2015) (citations
15  omitted). "The party seeking recusal carries a 'substantial burden' of overcoming the
16  presumption that a district court is free from bias." *Id.* (citation omitted).

17  As relevant here, "in the absence of some *extrajudicial* source of bias or partiality,
18  'judicial remarks during the course of a trial that are critical or disapproving of, or even
19  hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality
20  challenge.'" *United States v. Martin*, 278 F.3d 988, 1005 (9th Cir. 2002) (quoting *Liteky*,
21  510 U.S. at 555). In such circumstances, a bias or partiality motion will be denied unless
22  the remarks "reveal such a high degree of favoritism or antagonism as to make fair
23  judgment impossible." *Liteky*, 510 U.S. at 555. The reason for this is simple:

24      The judge who presides at a trial may, upon completion of the
25      evidence, be exceedingly ill disposed towards the defendant,
        who has been shown to be a thoroughly reprehensible person.
26      But the judge is not thereby recusable for bias or prejudice,
        since his knowledge and the opinion it produced were properly
27      and necessarily acquired in the course of the proceedings, and
        are indeed sometimes (as in a bench trial) necessary to
        completion of the judge's task. As Judge Jerome Frank pithily
28      put it: "Impartiality is not gullibility. Disinterestedness does

not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."

*Id.* at 550-51 (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)).

Thus, a movant cannot establish bias or partiality through "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky*, 510 U.S. at 555-56. Similarly, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555. "Almost invariably, they are proper grounds for appeal, not for recusal." *Id.*; *see United States v. Awadallah*, 436 F.3d 125, 137 (2d Cir. 2006) ("Inherent in an adversary system is the reality that typically one side wins and the other loses. If losses compromised the appearance of justice, this system would grind to a halt."). Indeed, a court's obligation not to recuse "is perhaps at its highest when the motion has been brought after the party seeking recusal has sustained an adverse ruling in the course of the action." *United States v. Sierra Pac. Indus.*, 759 F. Supp. 2d 1198, 1205-06 (E.D. Cal. 2010).

## II. THIS COURT SHOULD DECIDE DEFENDANTS' MOTION.

Defendants contend that due to the "gravity of th[e] evidence," Chief Judge Collins or Judge Humetewa should decide this motion. [Doc. 2641 at 2] Defendants provide no legal authority in support of this request.[6] That is unsurprising, as there is no legal basis for their position. The Ninth Circuit has "reject[ed]" suggestions that "the Chief Judge or a committee of disinterested judges from the District was required to rule" on a recusal motion. *United States v. Studley*, 783 F.2d 934, 940 (9th Cir. 1986). The Ninth Circuit

---

[6] On March 20, 2018, almost a month after filing their motion for disqualification, Defendants filed a "Motion for Chief Judge to Rule on Defendants' Motion to Disqualify Magistrate Judge Duncan from All Further Proceedings," and sent a copy to the chambers of Chief Judge Collins. [Doc. 2693; Declaration of Corene Kendrick ("Kendrick Decl."), filed herewith, Ex. 9] Plaintiffs will respond to that motion separately pursuant to the normal briefing schedule set forth by the Rules of this Court.

1    has "held repeatedly that the challenged judge himself should rule on the legal sufficiency

2    of a recusal motion in the first instance." *Id.* (citations omitted); *see also United States v.*

3    *Sibla*, 624 F.2d 864, 868 (9th Cir. 1980) ("[S]ection 455 includes no provision for referral

4    of the question of recusal to another judge" (citation omitted)); *In re Bernard*, 31 F.3d

5    842, 843 (9th Cir. 1994) (Kozinski, J., denying disqualification motion) (motion "must be

6    decided by[] the very judge whose impartiality is being questioned").

7         It is true, of course, that district courts in some cases have voluntarily elected to

8    transfer a recusal motion to another judge.  But that is ill-advised here given the

9    complicated and lengthy record.  The recusal analysis "is necessarily fact-driven and may

10   turn on subtleties in the particular case." *United States v. Holland*, 519 F.3d 909, 913 (9th

11   Cir. 2008); *see Clemens*, 428 F.3d at 1178 (observing that "analysis of a particular

12   section 455(a) claim must be guided . . . by an independent examination of the unique

13   facts and circumstances of the particular claim at issue" (internal quotation marks and

14   citation omitted)).  Thus, "the judge presiding over the case is in the best position to

15   appreciate the implications of those matters alleged in a recusal motion." *Ciavarella*, 716

16   F.3d at 719 (internal quotation marks and citation omitted).

17        Here, the Court has presided over this case for more than three years, after

18   overseeing settlement of the litigation.  Defendants' motion relies on statements made

19   between January and December 2017, a period of time that involved over 700 filings, 27

20   hearing days, and 38 live witnesses.[7]  *See Melendres*, 2015 WL 13173306 at *10

21   (challenged judge denied recusal motion "[i]n light of" the case's "history," which

22   included movant's "resist[ance of] the Court's directives after the Court entered its

---

23

24        [7]  [3/8/17 Tr. (Kathy Campbell, Mark Owens, Mark Haldane); 3/21/17 Tr. (Martin Winland, Troy Evans, Sarah Cartwright, Jenny Fontaine, Nicole Taylor); 3/28/17 Tr. (Wendy Hackney, Carson McWilliams); 4/17/17 Tr. (Dennis Dye, Erin Barlund, Richard Pratt); 7/14/17 Tr. (Mark Blocksom, Ronald Oyenik, Dominique Keys, Angela Ashworth); 8/8/17 Tr. (Charles Ryan, Richard Pratt, Jeffrey van Winkle, Norman Twyford); 8/9/17 Tr. (Henrietta Western, Robin Coleman); 9/11/17 Tr. (Kim Currier, Elizabeth Oros, Christopher Papworth, Crystal Lee, Ernest Trujillo, Jeffrey van Winkle, John Mattos); 9/13/17 Tr. (Robert Kay, Jason Jardine, Tanna Gualco); 11/8/17 Tr. (Brian Creswell, Jason Monson, Cole Krages, Oswaldo Robles, Ashley Zuerlein, Tara Diaz, Alfred Ramos); 12/20/17 Tr. (Richard Pratt)]

permanent injunction and throughout the compliance phase," which constituted at best a "negligent approach to the timely implementation of its orders," and at worst a "pattern of knowing defiance and subversion").

**III.     DEFENDANTS' MOTION IS UNTIMELY.**

The Court should deny the motion as untimely.  "[R]ecusal motions should be filed with reasonable promptness after the ground for such a motion is ascertained." *Preston v. United States*, 923 F.2d 731, 733 (9th Cir. 1991); *see also E.&J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992) ("It is well established in this circuit that a recusal motion must be made in a timely fashion." (citations omitted)).  In particular, "recusal issues must be raised at the earliest possible time after the facts are discovered." *First Interstate Bank of Ariz. N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 988 n.8 (9th Cir. 2000).  The timeliness requirement guards against the "risk that litigants would use recusal motions for strategic purposes." *Preston*, 923 F.2d at 733 (citations omitted); *see In re DeAtley Litig.*, No. 06-0278, 2008 WL 375086, at *7 (E.D. Wa. Feb. 11, 2008) (observing that judges "must be alert to the possibility that those who would question their impartiality may be in fact seeking to delay or avoid an impending adverse decision").

The timing of Defendants' motion strongly suggests that it has been brought for strategic reasons.  At 10:00 p.m. on Friday, February 23, 2018, one business day before scheduled evidentiary and contempt hearings, Defendants filed this motion "to disqualify Magistrate Judge Duncan from all further proceedings" (Doc. 2641), and a "motion for Magistrate Judge Duncan to disqualify himself" and for reassignment of the upcoming hearings (Doc. 2642).  In denying the latter motion, the Court noted that "Defendants have not explained why they waited until the eve of the evidentiary hearing to seek recusal and have not pointed to any recent documentation, rulings, or developments that could otherwise justify the timing of this motion."  [Doc. 2643 at 4]  That remains true.

The instant motion relies on comments made by the Court as far back as January 2017—over a year before the motion was filed.  [Doc. 2641 at 4]  Defendants waited over seven months after the Court's alleged hostility toward them purportedly was "palpable"

1   in July 2017.  [*Id.* at 6]  The most recent statements that Defendants assert establish bias

2   were made in December 2017—two months before Defendants filed their motion.  [*Id.* at

3   7-10]  In the meantime, the Court has expended considerable time and effort reviewing

4   over 700 filings, overseeing 27 days of hearings, and receiving testimony from 38

5   witnesses.[8]  *See In re Int'l Bus. Machines Corp.*, 618 F.2d 923, 933 (2d Cir. 1980) (noting

6   that a "major practical reason" for the timeliness requirement is to avoid "waste of the

7   judicial resources," which would occur where the "investment of judicial time and

8   energy" was "immense," judge made credibility determinations, and judge's "exposure to

9   the relevant [subject matter] has been intense"); *Cafasso v. Gen. Dynamics C4 Sys., Inc.*,

10  No. 06-1381, 2008 WL 169636, at *11 (D. Ariz. Jan. 16, 2008) (holding motion untimely

11  when movant "does not even try to explain why [one-year] delay was reasonable" for

12  § 455(a) claim, particularly in light of "substantial time and resources" devoted by judge

13  in the interim, or why two-month delay was reasonable for § 455(b) claim).

14      It appears, then, that this motion was the result of Defendants' "fear that [the] judge

15  may decide a question against" them and impose monetary penalties of around $2 million,

16  instead of a "'reasonable fear' that the judge will not be impartial.'"[9]  *In re Aguinda*, 241

---

17

18  [8]  In addition to this case, the Court appears to be assigned to at least 47 open cases
    involving Defendants Pratt and/or Ryan.  [Kendrick Decl. ¶¶ 6-11 & Exs. 3-8]  It is not

19  clear whether Defendants have sought the Court's recusal in those cases.  Nonetheless,
    recusal in this case likely would affect those cases.  [Declaration of David Fathi, filed

20  herewith, Ex. 2, Order, *Casey v. Lewis*, No. 90-0054, at 5-6 (D. Ariz. June 21, 1991)
    ("[I]f, as defendants assert, the court is truly biased against the Department of Corrections

21  and Director Lewis, it would require the Court to disqualify itself from ninety (90)
    prisoner civil rights cases and eighteen (18) habeas corpus cases involving the Arizona
    Department of Corrections and Director Lewis.  Such a result is clearly unreasonable.")]

22  [9]  The $2 million amount is based on Defendants' self-reported data.  [Doc. 2373
    (setting potential $1,000 fine for each instance of noncompliance); Doc. 2576 (reporting

23  667 instances of noncompliance in December 2017); Doc. 2595 (reporting 405 additional
    instances of noncompliance in December 2017); Doc. 2648 (reporting 389 instances of

24  noncompliance in January 2018); Doc. 2662 (reporting 667 additional instances of
    noncompliance in December 2017)]  Defendants' self-reported data, however, may not

25  account for all instances of noncompliance.  [Doc. 2633 (Declaration of Plaintiffs'
    Counsel) (listing at least 420 additional instances of noncompliance recorded in

26  Defendants' own documents and/or medical records of class members)]  Defendants
    conceded after their limited review of the medical records of 50 class members detailed in

27  Plaintiffs' declaration that there were 38 class members who accounted for 43 additional
    separate instances of noncompliance with the Court's order in December 2017, which

28  Defendants had failed to report to the Court.  [Doc. 2704 at 14-15]

1  F.3d 194, 201 (2d Cir. 2001) (discussing § 455's legislative history and quoting S. Rep.

2  No. 93-419, at 5 (1973); H.R. Rep. No. 93-1453 (1974), reprinted in 1974 U.S.C.C.A.N.

3  6351, 6355). Thus, Defendants' motion is untimely. *Studley*, 783 F.2d at 939 (noting that

4  recusal motion "is presumptively untimely" when filed "weeks after" judge exhibited

5  purported bias); *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 871-72 (9th Cir.

6  1991) (holding movant "fail[ed] to move for disqualification in a timely fashion" by

7  waiting six weeks to file); *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 519

8  (9th Cir. 2005) (en banc) (affirming denial of recusal motion on timeliness grounds after

9  seven-month delay in filing); *United States v. Rogers*, 119 F.3d 1377, 1382 (9th Cir.

10  1997) (holding motion untimely when movant waited "more than one and one-half years

11  after he was aware of the grounds for disqualification").

12  **IV.   DEFENDANTS PROVIDE NO GROUNDS FOR RECUSAL.**

13      Defendants allege a number of grounds for recusal, including isolated remarks,

14  purported reliance on extrajudicial sources, and purported *ex parte* communications.

15  Plaintiffs address each allegation below. *In re Aguinda*, 241 F.3d at 201 ("[T]he grounds

16  asserted in a recusal motion must be scrutinized with care, and judges should not recuse

17  themselves solely because a party claims an appearance of partiality.").

18

19      **A.   Isolated Judicial Remarks, Stripped of Context, Do Not Establish That "Fair Judgment [Is] Impossible."**

20      Defendants attempt to manufacture disqualifying bias by lifting from their context

21  words, phrases, and sentences spoken by the Court in over 3,600 pages of hearing

22  transcripts since January 2017. But whether viewed in isolation or in combination, none

23  of the remarks "reveal such a high degree of favoritism or antagonism as to make fair

24  judgment impossible." *Liteky*, 510 U.S. at 555 (explaining when judicial remarks, absent

25  extrajudicial source, "support a bias or partiality challenge"); *In re Larson*, 43 F.3d 410,

26  413 (8th Cir. 1994) (finding "selective quotation and creative emphasis of elements of the

27  quoted portion" of transcript insufficient to demonstrate impossibility of fair judgment);

28  *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 257 F. Supp. 3d 1084, 1092 (N.D. Cal.

1    2017) (rejecting argument that judge's remarks had a "cumulative effect" because "[e]ach

2    of defendants' arguments adds up to a zero").  To the contrary, viewed in context, they

3    demonstrate the Court's patient and thoughtful administration of this complex case.

4          As an initial matter, Plaintiffs note that Defendants contend that the Court's

5    "relinquishment of his impartiality and his hostility toward Defendants were palpable

6    during at least two status hearings."  [Doc. 2641 at 6]  In particular, Defendants assert that

7    the Court "shouted" and "yelled" at their attorneys during two hearings.  [*Id.* at 7]

8    Defendants, however, provide no evidence of this; "arguments and statements of counsel

9    are not evidence."  *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589,

10   593 n.4 (9th Cir. 2002) (internal quotation marks and citation omitted).[10]  As a result,

11   Plaintiffs do not address those assertions further and instead confine review to the words

12   as recorded in the transcripts—the only evidence offered by Defendants.  [Doc. 2641-1]

13              **1.    Statements Made Between January and November 2017**

14         Defendants stitch together words from unrelated judicial remarks in an attempt to

15   concoct disqualifying bias.  [Doc. 2641 at 4-6]  Their scattershot, drive-by approach is

16   difficult to respond to in a concise and organized manner.  For ease of reference, however,

17   Plaintiffs have numbered Defendants' bullet points and address each one in turn, with the

18   exception of the last bullet point (the only bullet point to allege an extrajudicial source).

19   Plaintiffs separately address that last bullet point in Part IV(D), below.

20         **1.**    Defendants improperly string together three incomplete quotations from

21   three separate hearings.  [Doc. 2641 at 4]  First, Defendants contend that the Court

22   "declared that his 'preliminary view' of the issues 'is probably 8 out of 10 times to agree

23   with what the plaintiffs have said.'"  [*Id.* (quoting 1/26/17 Tr. at 7:17-8:1)]  Even

24   considered in isolation, that statement provides no grounds for disqualification.  *Int'l Bus.*

25   _____

26         [10]  For the Court's demeanor during the December 20, 2017 hearing, Defendants
     provide no factual citation but appear to rely on information reported in the KJZZ news
27   report.  [Doc. 2641 at 7, 16 n.2]  A news report, of course, is insufficient to prove the facts
     reported therein, *see Cheney*, 541 U.S. at 922-24—something Defendants recognize later
28   when urging disqualification of the Court for purportedly relying on "uncorroborated
     hearsay allegations in the KJZZ article."  [Doc. 2641 at 10]

1  *Machines Corp.*, 618 F.2d at 929 ("A trial judge must be free to make rulings on the

2  merits without the apprehension that if he makes a disproportionate number in favor of

3  one litigant, he may have created the impression of bias.").

4        In any event, Defendants do not accurately characterize the statement.  The

5  statement was made at the outset of a hearing regarding the monitoring guide that

6  Defendants must use to evaluate compliance with the Stipulation.  Two days before the

7  hearing, Plaintiffs filed their concerns with the methodologies contained within the guide.

8  [Doc. 1889]  Defendants did not file a response.  The Court noted that it had reviewed

9  Plaintiffs' filing and that its "preliminary view" was to agree with Plaintiffs on a number

10 of matters regarding proper monitoring methodology.  The Court thus structured the

11 hearing to allow Defendants to respond in the first instance:

12          So as it happens, my preliminary view is probably 8 out of 10
            times to agree with what the plaintiffs have said, so I will be
13          turning to the defendants to tell me why it is that what they
            have said doesn't seem to be or shouldn't be right.  So that's
14          why I will be proceeding that way, to give people a chance to
            talk and not going the normal fashion of one after the other.
15

16 [1/26/17 Tr. at 7:19-25; *see id.* at 8:11-21 (allowing attorney for Defendants to confer with

17 clients before presenting response)]  There is "nothing in the record to suggest that the

18 [Court] was unwilling to hear and respond to [Defendants]' concerns and arguments."  *In

19 re Focus Media, Inc.*, 378 F.3d 916, 931 (9th Cir. 2004) (affirming denial of recusal

20 motion).  Quite the contrary: the Court asked to hear from Defendants first.  Such efforts

21 to streamline proceedings certainly cannot be viewed as making "fair judgment

22 impossible."  *Liteky*, 510 U.S. at 556 (affirming denial of recusal order where complained-

23 of behavior included "routine trial administration efforts"); *see United States v. Heredia-

24 Fernandez*, 756 F.2d 1412, 1416 (9th Cir. 1985) ("The trial judge has traditionally

25 enjoyed a wide discretion in the management of proceedings before the court.").

26        Second, Defendants attempt to locate disqualifying bias in the Court's statement,

27 made over seven months later, that it "would 'micromanage' ADC until 'the promise that

28 was made to the inmates is being delivered, and that's what I'm here for.'"  [Doc. 2641 at

4-5 (quoting 7/21/17 Tr. at 25:10-20; 8/8/17 Tr. at 38:5-16)][11]   But "micromanaging" is

not synonymous with personal bias that makes "fair judgment impossible." *Liteky*, 510

U.S. at 555.   Reviewed in context, the Court's remarks, far from "display[ing] a deep-

seated favoritism or antagonism" (*id.* at 555), instead show its faithful service to the

enforcement role it was assigned by the parties.   [Doc. 1185 at 14 ¶ 36; *see Frew ex rel.*

*Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving

consent decrees and hoping for compliance.")]   In particular, the Court explained:

> Director Ryan, let me assure you the last thing I want to do is micromanage your prisons.  I only do that because you haven't been able to deliver what you promised to deliver, and that was compliance with the stipulation's requirements with respect to providing health care.  And so the stipulation has a mechanism to address that failure, and that mechanism requires me to first give an opportunity to you all to try again, to try something else to see if you can work it out on your proposal.  If that fails, then one of the options that's open to me is to come up with the mechanism myself.  That's not the best method.  That means micromanaging.  It means me jumping into your chair and trying to figure out what I can't figure out, and that is all of the years of knowledge and experience that you have.
>
> But notwithstanding all of those years and experience, you haven't been able to perform what I thought would be at the time we settled the case pretty straightforward and likely to occur, and that is compliance with the stipulation.  And what we have now, more than two years out, is what I previously described as abject failures to comply with the stipulation.  So that means I jump into your chair and I micromanage.  And I don't want to do that.

[8/8/17 Tr. at 33:14-34:10; *see id.* at 38:5-16 (asking Defendant Ryan to "get [the Court]

out of this business of micromanaging your operation" and stating its "hope [that] you

---

[11]   Defendants oddly cite to the July 21, 2017 hearing for the word "micromanage." [Doc. 2641 at 4-5 (quoting 7/21/17 Tr. at 25:15)]  At the July hearing, the Court noted that in many areas, "I will do everything in my power to *not* micromanage."  [7/21/17 Tr. at 25:12-14 (emphasis added)]   But in one narrow respect—whether class members who testify in court are later retaliated against—the Court stated that it would pay close attention, particularly where Defendants' attorney and a deputy warden had provided the Court with contradictory accounts.  [*Id.* at 25:6-9]  Defendants do not explain how this establishes disqualifying bias against them, particularly when the resulting order was narrow (Doc. 2209), and the Court granted their request for an evidentiary hearing regarding alleged retaliation against testifying class members (7/21/17 Tr. at 25:21-23), which lasted several days.  [Doc. 2363 at 2]

do”)]   "There is simply no evidence that the judge acted out of an improper or corrupt motive."  *Blixseth v. Yellowstone Mountain Club, LLC*, 742 F.3d 1215, 1221 (9th Cir. 2014) (per curiam).   The need for increased judicial involvement was the product of Defendants' failure to comply with the Stipulation.  [8/8/17 Tr. at 9:17-10:2 ("For years, your promise to provide the health care required by the stipulation has failed."); *Melendres*, 2015 WL 13173306 at *10 (denying recusal motion and noting that movant's failure to implement court orders "necessitated substantial judicial corrective action")]  Notably, Defendants do not identify any particular instance of perceived improper "micromanaging."  [Doc. 2641 at 4-5]  Even if they had, it would be, "[a]t most," an "error that [they] w[ere] free to raise on appeal."  *Blixseth*, 742 F.3d at 1221.

**2.**     Defendants next contend that the Court said "he was '*overruling virtually every one of* [Defendants'] objections to testimony without any evidentiary basis and was '*on a fishing expedition*' into whatever he is interested in."  [Doc. 2641 at 4 (emphasis added) (quoting 3/21/17 Tr. at 189:7-17; 8/24/17 Tr. at 7:18-20)]   But Defendants improperly link five words spoken during an evidentiary hearing in March 2017 (the first quotation), with four words spoken during an unrelated telephonic hearing over five months later (the second quotation).  And neither quotation provides any basis for recusal.

In support of the first quotation (related to overruling Defendants' objections), Defendants cite without explanation eleven (of the over 1,200) transcript pages from hearings in April, May, July, September, and November 2017, which together contain seven overruled objections.  [Doc. 2641 at 5 (citing 4/17/17 Tr. at 556:15-557:23; 5/10/17 Tr. at 759:19-760:6; 7/14/17 Tr. at 109:23-110:25; 9/11/17 Tr. at 48:9-49:3; 11/8/17 Tr. at 7:21-9:22)]  Defendants do not explain what, exactly, they were objecting to; why the Court erred in overruling their objections; or—as is relevant here—how the Court demonstrated disqualifying bias in doing so.  Nor could they.  "It is not a ground for disqualification that the judge has ruled against the moving party or that he may have committed an error of law."  *Hagans v. Andrus*, 651 F.2d 622, 628 (9th Cir. 1981).

With the second quotation, Defendants misleadingly excerpt a few words from the Court's detailed explanation of why it was allowing limited discovery to ensure that class members who testify in court are not retaliated against.  In so doing, the Court noted that *Defendants' attorney* believed the Court was "on a fishing expedition":  "And so *if I'm on a fishing expedition as you* [Defendants' attorney] *are certain of*, I am less concerned about it when I know that these are waters that I'm interested in."  [8/24/17 Tr. at 7:18-20 (emphasis added)]  The Court noted that its decision to allow limited discovery was in response to previous witness testimony, including a finding that one of the state's witnesses was not credible, and that its ruling on this specific matter would not necessarily "define how everything goes forward in the future."  [*Id.* at 7:9-8:11]  Again, Defendants do not explain how this manifests disqualifying bias against them.

**3.**      Defendants next scramble six words from two sentences to suggest that the Court "'*wish*[*ed*]' Plaintiffs had more '*soldiers'* to '*engage*[]' Defendants '*in this battle.*'" [Doc. 2641 at 5 (emphasis added) (quoting 11/7/17 Tr. at 37:20-21, 39:8)]   Again, Defendants distort the record.  The Court did not urge a war against Defendants, as Defendants insinuate.  At the hearing, Defendants' attorneys complained that it was overly burdensome to respond to letters from Plaintiffs' counsel.  [11/7/17 Tr. at 33:21-37:5]   The Court noted the relative size of the legal teams:  "And the availability of soldiers to be engaged in this battle, I can just look at the fact that you have a law firm that is larger than the plaintiffs' lawyers."  [*Id.* at 37:20-22]  The Court expressed a desire for Plaintiffs' counsel to devote more time to the case—just as it wished that it and Defendants could (or would) do so.  [*Id.* at 37:6-39:14]   Those statements do not demonstrate that "fair judgment [is] impossible."  *Liteky*, 510 U.S. at 555.  Instead, they show the Court's support of what should be a common goal—full engagement by both sides to facilitate expeditious compliance with the Stipulation.   And, as to the initial complaint by Defendants that prompted the judicial remarks, the Court properly noted that if Plaintiffs' letters "become abusive, you can talk to me about individual letters just as both sides have done that in the past and I have engaged in that."  [11/7/17 Tr. at 38:11-14]

**4.**      Defendants next assert that the Court "scolded" Defendants' attorney after he complained about the number of letters sent by Plaintiffs' counsel.  [Doc. 2641 at 5]  The attorney had suggested that Plaintiffs' counsel—responsible for defending the interests of more than 34,000 class members and enforcing 103 performance measures and other settlement provisions at ten state-run prisons—should limit all correspondence with Defendants' attorneys to a single letter sent "once a month."  [11/7/17 Tr. at 36:7-18]  The Court properly explained that Defendants should focus on complying with the Stipulation, which would eliminate the need for such letters, and, as noted above, agreed to review individual letters.  [*Id.* at 36:1-6 ("We have been at this for a long time and getting nowhere.  So the plaintiffs have been writing you about this and you have the chutzpah to say they have been sending us too many letters.  Well, solve the problem.  Meet the stipulation.  You won't get these letters.")]  That is not evidence of disqualifying bias.  *Liteky*, 510 U.S. at 555 ("judicial remarks . . . that are critical or disapproving of, or even hostile to, counsel . . . ordinarily do not support a bias or partiality challenge"); *In re Marshall*, 721 F.3d 1032, 1041, 1043 (9th Cir. 2013) (finding no basis for recusal in "'critical' statements" toward attorney, noting that they could "be reasonably seen as the product of [the judge]'s frustration with [the client]'s behavior throughout the litigation").

## 2.      July 21, 2017 Emergency Telephonic Status Hearing

Defendants' next claim of disqualifying bias arises from an emergency telephonic hearing held on July 21, 2017, regarding potential retaliation against testifying class members—in particular, the Court's (a) alleged use of a word ("client") that in fact was inaccurately transcribed by the court reporter (it should be "climate"), (b) purported denial of an evidentiary hearing that in fact was granted, and (c) supposedly hostile responses to Defendants' attorney that in fact were patient and measured.  [Doc. 2641 at 6-7]

First, Defendants contend that the Court said, "I have a client that exists in the prison."  [Doc. 2641 at 6 (quoting 7/21/17 Tr. at 14:12-17)]  That is a transcription error.[12]

_____

[12]  Plaintiffs' counsel received a copy of the transcript on July 27, 2017.  The next morning, Plaintiffs' counsel informed the court reporter that "the word 'client' should

1   The Court in fact referenced a "climate" (not "client") in prison during the hearing when

2   addressing "[t]he specter of retaliation" against testifying class members and the potential

3   "chilling effect." [7/21/17 Tr. at 8:9-23]  The context makes the Court's intention clear:

> And I think I have to emphasize what is critical to me, and that
> is, we have a common interest, the plaintiffs, the Court, the
> defendants, in making sure that I get true information about
> what is going on.  I have given you every opportunity to cross-
> examine, to ask for a hearing, to challenge any allegations of
> retaliation.
>
> And what I have to do is I have, at the end of that process, to
> make sure that I have a <u>climate</u> that exists in the prison in
> which inmates feel completely safe in communicating their
> views to the Court.  Their views may not be right.  Their views
> may be wrong.  Their views may be lies.  But I have to have
> the opportunity to hear what those views are.  You will have
> the chance to cross-examine and to present contrary evidence.
> But I need to make sure there is nothing happening in the
> process such that people have a fear that there will be
> retaliation for what they have done.

13  [7/21/17 Tr. at 6-21 (underscore added)]

14       Second, Defendants contend that the Court "refus[ed] to give [them] an opportunity

15  to present evidence refuting the inmate's [sic] claim" and "ordered" that class member

16  witnesses are "'off limits.'"  [Doc. 2641 at 7 (quoting 7/21/17 Tr. at 20:2-16)]  Defendants

17  distort the record.   The Court did, in fact, grant the requested evidentiary hearing.

18  [7/21/17 Tr. at 25:21-23][13]   It planned to calendar the hearing "as soon as there's an

19  availability to do so."  [*Id.* at 27:19-25]  In fact, a few weeks later, it held four days of

20  hearings and accepted extensive briefing on whether class members were chilled in their

21  abilities to communicate with the Court and Plaintiffs' counsel.  [Doc. 2363; Doc. 2423]

22  And, if anything, the "order" Defendants complain of (which was a statement made

---

actually be 'climate.'"  [Kendrick Decl. ¶¶ 2-4 & Ex. 1 at 1]  The court reporter responded
that "[i]t was a little difficult [to hear] with everyone being on the phone," and that she
could not change the word unless asked to by the Court.  [*Id.*]  (The telephonic hearing
took place while the Court was at circuit headquarters in San Francisco and the court
reporter was located in Phoenix.  [7/21/17 Tr. at 3:5-8])

[13]  The Court also noted that it previously had granted Defendants an evidentiary
hearing to address possible retaliation against class members during a November 2016
tour of ASPC-Tucson by Plaintiffs' counsel, and that "defendants never followed up on
that despite repeated invitations from the Court to note that we have not progressed to that
evidentiary hearing."  [7/21/17 Tr. at 5:15-23; *see also* 8/8/17 Tr. at 6:1-7:5]

1   during the hearing and not the order (Doc. 2209)) is "proper grounds for appeal, not

2   recusal." *Liteky*, 510 U.S. at 555; *see In re Judicial Misconduct*, 631 F.3d 961, 963 (9th

3   Cir. 2011) ("Adverse rulings do not prove bias").

4   Third, Defendants complain that the Court called their attorneys' arguments

5   "'preposterous'" and "'hyperbole.'" [Doc. 2641 at 7 (quoting 7/21/17 Tr. at 20:17-21:7,

6   29:14-31:1)]   But "expressions of dissatisfaction with deficient lawyering [and]

7   overbearing advocacy" are, without more, "not sufficient to disqualify a judge from a

8   case." *Teachers4Action v. Bloomberg*, 552 F. Supp. 2d 414, 415-16, 417 (S.D.N.Y. 2008)

9   (finding no basis for recusal where judge described attorneys' filing "as containing

10   unnecessary 'junk' and 'garbage'"); *Liteky*, 510 U.S. at 556 (affirming denial of recusal

11   where complained-of behavior included "ordinary admonishments (whether or not legally

12   supportable) to counsel"); *Moore v. Publicis Groupe SA & MSL Grp.*, No. 11-1279, 2012

13   WL 12528637, at *2-3 (S.D.N.Y. Nov. 8, 2012) (finding no grounds for recusal in

14   "expressions of annoyance, frustration or anger grounded largely on the Magistrate

15   Judge's dissatisfaction with certain actions of Plaintiffs' counsel," and noting that such

16   expressions "at times . . . may be called for or understandable").

17   As Plaintiffs explain below, the Court responded patiently and clearly to the

18   exaggerated and repetitive arguments made by an attorney for Defendants.   At the

19   hearing, the Court expressed concerns about perceived retaliation against class members

20   "close in time" to speaking with their counsel or testifying in court.  [7/21/17 Tr. at 15:4-

21   15]  Defendants' attorney asked:  "[W]hat does close in time mean?  Does it mean two

22   hours?  Two days?  27 days?  67 days?"  [*Id.* at 16:25-17:1]  The Court responded that it

23   would engage in a case-by-case analysis to determine "whether or not it is close in time or

24   not," and noted that the situation currently before it involved a class member who

25   purportedly was retaliated against five days after testifying in court. [*Id.* at 17:13-23; *see*

26   Doc. 2190 (Notice of Retaliation)]   After allowing Defendants' attorney to present

27   argument on why she believed there was no retaliation in that particular case, the Court

28   explained that it had a plane to catch, that the parties still needed to "address a number of

1    issues" on the call, and that in no way was it "closing the door to hearing other

2    arguments" on the matter.   [7/21/17 Tr. at 19:23-20:16]   Nonetheless, the attorney

3    immediately demanded whether the cellmate of a testifying class member could not "be

4    moved . . . for the entirety of this stipulation which could continue *for years*[.]"   [*Id.* at

5    20:17-20 (emphasis added)]   The Court correctly noted that this was an improper

6    argument and explained again that in the case before it, the "close proximity [five days] is

7    very suggestive of retaliation" for a "reasonable observer."   [*Id.* at 20:21-21:24]

8         Later during the hearing, the Court explained its desire to assure class members

9    that they "can safely communicate to the Court and to their counsel the circumstances that

10   are relevant to the enforcement of the stipulation."   [7/21/17 Tr. at 27:8-18]   Defendants'

11   attorney asked whether that meant she had to "monitor on a daily basis" the housing of all

12   "33,000" class members.   [*Id.* at 30:1-18]   The Court replied that "the hyperbole does not

13   advance the argument" and explained why:   "We haven't seen very many [class member]

14   affidavits over time. . . .   [A]nd only once in the history of this case, have plaintiffs ever

15   presented to me that they believed that there was retaliation . . . ."   [*Id.* at 30:19-32:2]   The

16   Court's patience with an attorney's cascading queries certainly is not evidence that "fair

17   judgment [is] impossible."   *Liteky*, 510 U.S. at 555.   Indeed, as noted above, the Court

18   held an evidentiary hearing that lasted several days on the matter, at Defendants' request.

19        **B.    The Court Did Not Demonstrate Disqualifying Bias by Ordering a**
            **Hearing Regarding Allegations That, If True, Undermine the Court's**
20          **Ability to Oversee Enforcement of the Stipulation.**

21        Defendants next make a series of arguments for recusal because the Court read a

22   news report and called for an evidentiary hearing to determine whether the stunning

23   allegations contained therein were true.   [Doc. 2641 at 7-10]   That cannot support recusal.

24               **1.    The Court May Read the News and Listen to the Radio.**

25        Defendants contend that the Court "engaged in . . . prohibited conduct when he *sua*

26   *sponte* researched and read the KJZZ article outside the court proceedings."   [Doc. 2641 at

27   12; *see also id.* at 13 ("if a juror had done what Magistrate Judge Duncan has done, a

28   mistrial would be declared or, at the very least, that juror would be removed from the

1    jury")]  That argument is absurd.  "Like everyone else, judges watch television, read

2    newspapers and magazines," and listen to the radio.  *United States v. Lyons*, 739 F.2d 994,

3    999 (5th Cir. 1984); *cf. United States v. Biagon*, 510 F.3d 844, 850 (9th Cir. 2007)

4    (recognizing that "[j]udges read newspapers [and] look at blogs").  A judge is not

5    disqualified on that basis.[14]  *Hardy v. City of Milwaukee*, 99 F. Supp. 3d 883, 892 (E.D.

6    Wis. 2015) ("I attempt to stay informed by reading the news from various sources, which

7    clearly is not inappropriate." (collecting cases)); *Miller v. Hendricks*, 282 F. App'x 102,

8    105 (3d Cir. 2008) (noting that "recusal [is] not required where judge 'reads newspaper

9    articles, magazines, or books that may relate to a case that may come before him'"

10   (quoting *United States v. Bonds*, 18 F.3d 1327, 1330 (6th Cir. 1994))).

11            **2.    The Court Made No Findings Based on the News Report.**

12            Defendants next assert that the Court "refus[ed them] an opportunity to refute the

13   hearsay allegations in the KJZZ article," and, "based on what he read, he concluded

14   Defendants were not telling the truth about their reported compliance."  [Doc. 2641 at 12,

15   13]  That is not true.  Rather, the Court repeatedly stated that it was not accepting the

16   allegations in the KJZZ article as true.  [*See, e.g.*, 12/20/17 Tr. at 6:6-8 ("I don't know

17   what is going on here.  If this entirely true.  This is certainly not something that has a

18   foundation laid in court."); 7:23-8:7 ("I'm going to find out exactly what's going on.  . . .

19   to see if it's true."); *id.* at 8:8-10 ("I've said already that I don't know what's on my iPad

20   from the KJZZ website is something that's true or not.  It could all be made up."); *id.* at

21   11:5-16]  The Court then set an evidentiary hearing on the matter.[15]  [*Id.* at 12:3-19; *see*

22

23            [14]  The codes and ABA opinion cited by Defendants do not address this scenario.
     [Doc. 2641 at 12]  Instead, they involve situations where a judge actively engages in
24   "independent fact-finding not tested by the adversary system."  ABA Comm. on Ethics &
     Prof'l Resp., Formal Op. 478 at 1, 6 (Dec. 8, 2017) (listing as example of improper
25   behavior reviewing Yelp to evaluate attorney's claim "that the plaintiff could not have
     worked more than 40 hours per week because defendant's restaurant is in an 'industrial
     area' and only open for breaks and lunch during the work-week and not on weekends").
26            [15]  The Model Civil Jury Instructions and Model Criminal Jury Instructions relied
     on by Defendants are inapposite.  [Doc. 2641 at 12-13]  Those instructions are meant to
27   ensure that jury verdicts are based on "'a fair trial based on the same evidence that each
     party has had an opportunity to address.'"  [*Id.* at 13 (quoting Manual of Model Criminal
28   Jury Instructions 7.2)]  That does not apply here, where the Court (not a jury) is the fact-

*also* 1/18/18 Tr. at 5:14-16 ("I have not made any findings.  I have initiated a discovery process to determine whether there is a plan in place to beat the monitor."); Doc. 2643 at 2 ("The Court explicitly recognized that there was no foundation for these allegations because they had not been tested in an evidentiary hearing and offered the parties an opportunity to weigh in on the procedure for setting such a hearing.")]

In addition, as explained below, Defendants' specific claims of improper "findings" based on the KJZZ report cannot bear even minimal scrutiny.  First, the Court did not "characteriz[e] the monitoring reports as 'complete fabrication.'"  [Doc. 2641 at 10 (quoting 12/20/17 Tr. at 11:16)]  Defendants again misrepresent the record.  Instead, the Court recognized the possibility that the *news report* was "a complete fabrication."  [12/20/17 Tr. at 10:19-11:16]  That is why the Court ordered an evidentiary hearing.

Second, although the Court said Plaintiffs "were making a 'stronger, stronger argument'" regarding the inadequacy of Defendants' monitoring (Doc. 2641 (quoting 12/20/17 Tr. at 11:2-4)), Defendants omit the fact that the Court said Plaintiffs' arguments already were on the Court's "agenda" "before today" (*i.e.*, the day the Court read the news report) (12/20/17 Tr. at 5:6-7, 11:2-4), and thus the statement was not "in light of the KJZZ article," as Defendants incorrectly suggest.  [*See* Doc. 2641 at 10]

Third, the Court did not "discredit[] all prior evidence of Defendants' compliance with the Stipulation."  [Doc. 2641 at 12]  Defendants provide no citation for their claim.  [*Id.*]  The Court rightly expressed concern with the validity of compliance data, based on Plaintiffs' previous arguments and evidence, as well as the allegations in the news report, which is why it set an evidentiary hearing to address the issue.  [12/20/17 Tr. at 5:1-11:16]

Fourth, the Court did not "call[] ADC employees/witnesses liars" based on the news report.  [Doc. 2641 at 12]  It simply noted its previous credibility determinations:

> There are decent and honorable people on the correction side, and there are liars on the prisoners' side.  But I tell you that as

finder, and where the Court expressly made no findings based on the news report and instead, as discussed below, directed that the allegations be tested through the adversarial process, allowing each party the opportunity to address them.

1
2
3

> a fact finder in this case in my role, the people that I have thought have lied to me have not been the prisoners, they have been the people working for the prison.  And I've laid that out for you.

4   [12/20/17 Tr. at 8:12-9:1]   Those determinations are the Court's to make.  "[T]he trial

5   judge has the obligation to form judgments as to the veracity of the witnesses before him."

6   *Int'l Bus. Machines Corp.*, 618 F.2d at 931 ("His asperity and incivility may well be due

7   to his feeling that a witness is not forthright, that he is trying to protect a position, or is

8   otherwise attempting to obfuscate the fact finding process."); *Ciavarella*, 716 F.3d at 724

9   ("[A] judge's negative view of a defendant based on evidence in the record does not

10  constitute actual or apparent bias for the purpose of a recusal motion."); *Martin*, 278 F.3d

11  at 997 (affirming denial of recusal where judge stated that witness "had no credibility with

12  me based on his direct testimony, which was just a crock of baloney").

13
14

### 3. The Court Properly Scheduled an Evidentiary Hearing to Protect the Integrity of the Judicial Process.

15     Next, the Court did not "abandon[ its] role as a neutral arbiter."  [Doc. 2641 at 10]

16  The Court expressly noted that Plaintiffs were responsible for "developing the

17  presentation . . . and deciding what witnesses would be appropriate" at the evidentiary

18  hearing, and that Defendants then would "test[] by cross-examination and . . . by

19  challenging evidence" (12/20/17 Tr. at 19:10-22)—that is, the Court simply ordered that

20  the allegations in the news report be tested through the usual adversarial process.[16]

21     That the Court called for the hearing *sua sponte* does not mean that it was "acting

22  as a lawyer in the proceeding."  [Doc. 2641 at 11 (quotation marks and citation omitted)]

23  That was well within its authority.  If true, as the Court recognized, the allegations call

24  into question the very foundation of the Stipulation's enforcement provisions—the

25  compliance data self-reported by Defendants.  [*See* 12/20/17 Tr. at 12:18-19 (noting that

26

---

27     [16]  The Court offered only to assist in the appearance of witnesses, which was fully
28  within its power under Federal Rule of Evidence 611(a).  [12/20/17 Tr. at 19:10-22; *see* Doc. 2607 (petition for writ of habeas corpus ad testificandum); Doc. 2625 (order)]

the allegations in the news report, if true, are "gravely threatening to the Court's ability to administer the Stipulation"); *id.* at 11:8-11 (noting the need to determine "whether or not there is a corruption in the system that is depriving the Court of its ability to perform its monitoring responsibilities in a fair and appropriate way")]  As one district court has explained, federal courts need not be "'impotent,'" the "'mute and helpless victim[] of deception and fraud.'"  *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1060-61, 1064, 1070 (N.D. Ill. 2004) (declining to recuse itself, holding that it properly issued an order to show cause *sua sponte* after learning through an article in the Chicago *Tribune* that defense counsel may have "acted improperly," and noting that it was not accepting "the truth of the facts" in the article but rather taking action to "'preserv[e] the integrity of the judicial process'" (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)));[17] *see also Simon v. United States*, 123 F.2d 80, 83 (4th Cir. 1941) ("It cannot be too often repeated, or too strongly emphasized, that the function of a federal trial judge is not that of an umpire or of a moderator at a town meeting.  He sits to see that justice is done in the cases heard before him . . . ."); 28 U.S.C. § 453 (oath to "administer justice").

Here, not only did the parties agree that the Court should retain authority to enforce the Stipulation "through all remedies provided by law" (Doc. 1185 at 14 ¶ 36), but the Supreme Court also has instructed courts "not [to] shrink from their obligation to enforce the constitutional rights of . . . prisoners."[18]  *Brown v. Plata*, 563 U.S. 493, 511 (2011) (internal quotation marks and citation omitted); *see Frew ex rel. Frew*, 540 U.S. at 440

---

[17]  This case involved the legal question of whether attorneys could apply in state court to be appointed as Special State's Attorneys under 55 Ill. Comp. Stat. § 5/3-9008 (2003), after an action had been removed to federal court.  The district court later issued sanctions against attorneys for doing just that.  The Seventh Circuit subsequently vacated the sanctions order, concluding that it was "based on a misunderstanding of the state court's authority to appoint Special State's Attorneys and handle their fees and expenses." *Schmude v. Sheahan*, 420 F.3d 645, 652 (7th Cir. 2005).

[18]  Defendants continue to deny that the Court found the Stipulation necessary to remedy constitutional violations, stating instead that they "denied all allegations in the complaint."  [Doc. 2641 at 3]  For present purposes, Plaintiffs note only that a party need not admit liability to be found liable, and that the Court made all necessary findings under the Prison Litigation Reform Act at the parties' joint stipulation and request.  [Doc. 1458, Attach. 1; Doc. 1185 at 13 ¶ 36; 18 U.S.C. § 3626(a)(1)(A)]

1 ("Federal courts are not reduced to approving consent decrees and hoping for
2 compliance."); *Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008)
3 (noting that "courts have inherent power to enforce compliance with their lawful orders"
4 (quotation marks and citation omitted)).  The Court thus properly recognized its role as
5 "enforcer of the Stipulation," and took necessary action to protect the integrity of the
6 judicial process and the health and safety of class members.  [12/20/17 Tr. at 18:17-18]

7
8              **4.      The Court Was Rightly Disturbed by Allegations in the News
                         Report.**

9         Defendants take issue with the Court's voiced frustration upon reading the KJZZ
10 news report.  [Doc. 2641 at 8-10, 12]  Defendants' failure to appreciate the gravity of the
11 allegations in the report is even more troubling.  The parties and the Court have invested
12 tremendous time and resources in enforcement of the Stipulation for more than three
13 years.   The Court has been exceedingly patient with Defendants.   It has granted
14 Defendants numerous extensions and opportunities to present evidence and argument, and
15 it has given them the benefit of every doubt.[19]  The Court's patience has been rewarded
16 with attempts to undermine its authority (Doc. 2222-1 at 8-9; 8/8/17 Tr. at 6:1-10:19), and
17 "pervasive and intractable failures to comply with the Stipulation."  [Doc. 2373 at 1]

18        This lack of progress has consequences.  Class members suffer from serious—and
19 sometimes fatal—lapses in medical care and unspeakable pain.  [Doc. 2496; Doc. 2531-1
20 at 16-40; Doc. 2628-1; 2/28/18 Tr. at 335:8-365:7 (discussing mortality reviews in which
21 Defendants concluded that class member deaths could have been "prevented or delayed
22 with more timely intervention")]  To then learn that a whistleblower has come forward
23 and alleged that providers were instructed how to "beat" monitoring in this case, and that
24 requests for specialty care may have been cancelled by the for-profit health care

25

26        [19] [*See, e.g.*, 11/9/16 Tr. at 8:13-18 (noting that it had "allowed . . . a quarter to
27 pass" out of a sense of "fairness" and "respect for defendants' presumed good faith . . .
   that they were actually proposing something that they thought would work"); 7/21/17 Tr.
28 at 25:21-23 ("I will grant you the wish of an evidentiary hearing.  I have always told you
   that I would give that to you in every case, so I will hear full testimony."); Doc. 2559 at 1]

1    contractor to avoid judicial scrutiny, is nothing short of stunning.  "Judges, while expected

2    to possess more than the average amount of self-restraint, are still only human.  They do

3    not possess limitless ability, once passion is aroused, to resist provocation."  *Int'l Bus.*

4    *Machines Corp.*, 618 F.2d at 932 (internal quotation marks and citation omitted).

5             **C.    Chambers' Receipt of Unsolicited Calls Does Not Require Recusal.**

6             Defendants assert that the Court must recuse itself due to *ex parte* communications.

7    [Doc. 2641 at 9]  "It is important at the outset to clarify what these 'communications'

8    are."  *United States v. Wecht*, 484 F.3d 194, 214 (3d Cir. 2007).  Defendants do not allege

9    "that the Judge met with [Plaintiffs' counsel] or otherwise discussed matters in the case

10   with them outside the presence of defense counsel."  *Id.* (finding "no bias" in adjudication

11   of *ex parte* motion).  Instead, Defendants cite only chambers' receipt of unsolicited calls

12   from "potential fact witnesses" (Doc. 2641 at 9)—people who claim to work for Corizon.

13            As a threshold matter, it is not clear that such contacts are *ex parte*.  *Blixseth*, 742

14   F.3d at 1219 ("An *ex parte* contact with a judicial officer is one where a party who has a

15   right to be present is excluded.").  Even if they are, that is not *per se* grounds for recusal.

16   *Id.* (holding that *ex parte* communications "aren't always improper and don't necessarily

17   call for recusal" (citations omitted)).  There is "no evidence that those communications

18   affected the [Court]'s rulings."  *In re Adbox, Inc.*, 234 F. App'x 420, 421 (9th Cir. 2007)

19   (affirming denial of recusal motion); *see United States v. Levy*, 390 F. App'x 726, 728

20   (9th Cir. 2010) (finding recusal unnecessary where *ex parte* telephone conversation "could

21   not have affected [the judge's] decision"); *Doe v. Cabrera*, 134 F. Supp. 3d 439, 453-54

22   (D.D.C. 2015) (collecting cases).  To the contrary, the Court informed the parties:  "I

23   really haven't acted on it because it's not testimony.  It's just people calling on the

24   telephone.  I can't act upon it."  [12/20/17 Tr. at 9:2-10:17]

25                      And so the additional thing that I get is something I can't work
                        with because it's impermissible under the rules.  We receive
26                      phone calls in chambers, my staff receives phone calls in
                        chambers from people who work for Corizon who say
27                      essentially, it is so much worse than you think.  And we
                        cannot do anything other than to say, if you would like to
28                      come forward, we will have you in court any day to talk to us

1
2

> about that.  Then they ask us, can you protect us?  And my staff is told to instruct them, no, we cannot protect you.  I can't guarantee what can happen.

3
4
5

> And so some of those—some of those people may have told us something that would be relevant, but I really haven't acted on it because it's not testimony.  It's just people calling on the telephone.  I can't act upon it.

6

[12/20/17 Tr. at 9:2-15]

7       Put differently, the Court noted that its chambers had received unsolicited calls

8   from people purporting to work for Corizon, that it recognized those calls were not

9   testimony, that the callers declined to testify, and that the Court thus had not acted (and

10  could not act) on the calls.  To the extent the calls "add[ed] to the filter" of how the Court

11  "evaluate[d] what I see on the website from KJZZ" (12/20/17 Tr. at 9:16-20), it had no

12  adverse effect and provides no evidence of bias.  The December status conference resulted

13  in the scheduling of an evidentiary hearing to test the allegations in the KJZZ news report

14  through the adversarial process—that addressed any concerns about improper *ex parte*

15  communications.  *See* Richard E. Flamm, Judicial Disqualification § 45.3 at 708 (3d ed.

16  2017) ("the ex parte contacts rule is justified by the need to protect the adversarial nature

17  of judicial proceedings"); *Cordoza v. Pac. States Steel Corp.*, 320 F.3d 989, 1000 (9th Cir.

18  2003) ("Any inference that [the judge] acted on *ex parte* information to prejudge

19  [movant], rather than to protect the interests of the fund and its beneficiaries and the

20  integrity of the court, cannot be sustained" in light of judge's providing movant with

21  "ample due process," including discovery and a four-day hearing).

22      Defendants' insinuation to the contrary (Doc. 2641 at 14) is "speculative and

23  unsupported by any facts, at best, and wildy inflammatory, at worst."  *Doe*, 134 F. Supp.

24  3d at 447.  "That judges are capable of disregarding that which should be disregarded is a

25  well accepted precept in our judicial system."  *Ford v. Strickland*, 696 F.2d 804, 811 (11th

26  Cir. 1983); *see Williams v. Illinois*, 567 U.S. 50, 69-70 (2012) ("There is a well-

27  established presumption that the judge has adhered to basic rules of procedure, when the

28  judge is acting as a factfinder." (internal quotation marks and citations omitted)); *Harris v.*

1   *Rivera*, 454 U.S. 339, 346 (1981) (per curiam) ("In bench trials, judges routinely hear

2   inadmissible evidence that they are presumed to ignore when making decisions.").

3   Defendants' objection now appears more strategic than earnest.  Defendants did not object

4   to, or seek clarification regarding, the Court's stated manner of handling such calls during

5   the remainder of the status hearing, which lasted over six hours.  [12/20/17 Tr. at 19:24-

6   192:11]  Nor did they raise concerns during a subsequent status conference.  Instead, they

7   waited 65 days—until the eve of a contempt hearing—to raise the issue.  [Doc. 2641]

8          The two district court cases relied on by Defendants are inapposite.[20]  [Doc. 2641

9   at 2, 14-15]  In *El Fenix de Puerto Rico v. M/Y Johanny*, 954 F. Supp. 23, 24 (D.P.R.

10  1996), a judge overseeing a four-day admiralty trial invited his friend, "an avid

11  yachtsman," to attend the trial.  The friend, who knew one of the testifying experts,

12  conceded during deposition that "he met with the district judge in chambers or at lunch

13  various times during the trial" and that "he did discuss at least some disputed evidentiary

14  facts with the district judge," including the "testimony and credibility of witnesses."  *Id.* at

15  25-26.  The court concluded that "the public could reasonably question whether the

16  district judge did rely on [his friend]'s appreciation of the testimony."  *Id.* at 27.

17         Next, *United States v. S. Fla. Water Mgmt. Dist.*, 290 F. Supp. 2d 1356 (S.D. Fla.

18  2003), involved litigation by the federal government against the South Florida Water

19  Management District and the Florida Department of Environmental Protection.  The judge

20  overseeing enforcement of the consent decree, among other things, met with reporters in

21  interviews that were "not merely one-way conversations" and made a number of critical

22  comments in news outlets and in a court order about new legislation that could affect the

23  litigation, the Governor who signed the legislation, and a party to the case.  *Id.* at 1360-61.

24

25

---

26         [20] In the third case relied on by Defendants, *United States v. Sierra Pac. Indus.,
    Inc.*, 862 F.3d 1157 (9th Cir. 2017), *petition for cert. filed* (U.S. Feb. 14, 2018) (No. 17-

27  1153), the Ninth Circuit concluded that recusal was *not* warranted after the court
    purportedly "followed" the U.S. Attorney's Twitter account and later tweeted a news

28  article related to the litigation.  *Id.* at 1166, 1174-75.

1    Neither case, therefore, involves the issue here.  This case involves the "not at all
2  uncommon" scenario where a judge "receive[s] calls or letters from members of the
3  public—especially when they are presiding over high-profile cases."  Richard E. Flamm,
4  Judicial Disqualification § 47.7 at 747 (3d ed. 2017).  But "the mere fact that an
5  unsolicited *ex parte* communication from a member of the public has been made to an
6  adjudicator does not, standing alone, necessarily warrant disqualifying that adjudicator in
7  the event that she entertained the communication."  *Id.*  Were the rule otherwise,
8  dissatisfied litigants or third parties could disqualify a judge simply by picking up the
9  phone or sending a letter (or asking another person to do so).  That is not the law.  *United*
10 *States v. Dalfonso*, 707 F.2d 757, 761 (3d Cir. 1983) ("We cannot reasonably call into
11 question the impartiality of a presiding judge upon so tenuous a basis as a telephone call,
12 made by a meddler . . . , suggesting that the judge might succumb to improper
13 inducements."); *Constantine v. Teachers College*, No. 09-9701, 2010 WL 3835174, at *3
14 n.1 (S.D.N.Y. Sept. 13, 2010), *aff'd*, 448 F. App'x 92 (2d Cir. 2011) (recusal not required
15 after court received anonymous letter "expressing a view of this case and enclosing a $5
16 bill"); *Ciavarella*, 716 F.3d at 721-23 (affirming denial of recusal motion where judge
17 "received nearly 200 letters from the public regarding the case").

18    Almost a month after filing their motion to disqualify the Court, and three days
19 before the deadline for Plaintiffs' response, Defendants filed a "Supplement to Motion to
20 Disqualify Magistrate Judge Duncan from All Further Proceedings."  [Doc. 2692]  In
21 support, Defendants cite Dr. Watson's testimony that, apparently after she had worked as
22 a *locum tenens* contractor in an Arizona prison, she had called the Court's chambers, and
23 "'they'" provided her with "'the name of another attorney.'"  [Doc. 2692 at 2 (quoting
24 2/27/18 Tr. at 225:10-18)]  That is no basis for disqualification.

25    First, there is no suggestion that substantive information was shared during the call.
26 *Blixseth*, 742 F.3d at 1220 (affirming denial of recusal motion where movant merely
27 "suggest[ed] that, during [*ex parte*] meeting, the judge and the parties must have discussed
28 [movant]'s claim").  Instead, it appears that Dr. Watson tried to contact Plaintiffs' counsel

1   and, being unsuccessful, called the Court's chambers and received the name of another
2   (unnamed) attorney, whom Dr. Watson then tried to contact (again unsuccessfully).
3   [2/27/18 Tr. at 225:10-18]  There was no error in that.  As the Court explained:

> If [people who call chambers] ask us for particular names of
> the lawyers, if they say, who are the plaintiffs' lawyers or who
> are the defendants' lawyers, that is not contrary to my
> instruction that that information may be given.  It's a matter of
> the public docket.  A public docket is not as easily available to
> everyone . . . .

8   [2/28/18 Tr. at 243:7-18]

9        Defendants' characterization of a staff person's ministerial act (providing a
10  member of the public with information from the public docket) as an improper "act" that
11  contradicts the Court's previous statement that it "'can't act'" upon any potentially
12  relevant information people offer by phone is nothing short of irresponsible.  [Doc. 2692
13  at 3 (quoting 12/20/17 Tr. at 9:12-15)]  The Court clearly understands that information
14  offered by third parties outside the parties' presence cannot affect its decision-making in
15  this case.  [12/20/17 Tr. at 9:2-15]  The February transcript reveals nothing more than the
16  fact that a staff person answering the phone in chambers may have given out the name of
17  an attorney of record at the caller's request—something that cannot establish the Court's
18  bias or partiality.  *Blixseth*, 742 F.3d at 1220 ("*Ex parte* communications with judicial
19  staff concerning routine administrative matters do not raise any inference of bias."); ABA
20  Model Code of Judicial Conduct, Rule 2.9(A)(1) (permitting "*ex parte* communication for
21  . . . administrative . . . purposes, which does not address substantive matters").

22       Second, the action or views of whomever accepted the call in chambers cannot be
23  grounds for disqualification of the Court.  It is well-settled that "a law clerk's views
24  cannot be attributed to the judge for whom the clerk works."  *In re Corrugated Container*
25  *Antitrust Litig.*, 614 F.2d 958, 968 (5th Cir. 1980) (finding "no basis" for disqualification
26  of judge); *see Doe*, 134 F. Supp. 3d at 452-53 (collecting cases).

27       Third, Defendants insinuate that the Court improperly hid its chambers' contact
28  with Dr. Watson "more than two months after he set the hearing based on Dr. Watson's

allegations." [Doc. 2692 at 3]  Again, Defendants ignore the record.  The Court, after hearing Dr. Watson's testimony, promptly "checked with [its] staff" and the next morning reported that it "had no knowledge that [Dr. Watson] had contacted the Court." [2/28/18 Tr. at 242:20-23]  The Court ordered an evidentiary hearing to evaluate Dr. Watson's allegations only *after* learning of her allegations through a detailed news report, which included corroborating emails.  The Court took no action in response to Dr. Watson's call to chambers; indeed, it does not appear the Court was informed of the call at all.

Fourth, Defendants assert that Dr. Watson's phone call to chambers "ultimately led to publication of the allegations in the KJZZ article." [Doc. 2692 at 4]  That is absurd.  There is no allegation that the staff person directed Dr. Watson to a reporter, much less to the KJZZ reporter.  The allegation simply is that a staff person provided Dr. Watson with the name of an attorney on the public docket.  That did not "lead" to anything at all; Dr. Watson testified that the attorney did not call her back. [2/27/18 Tr. at 225:10-18]

Finally, Defendants note "that when 'family members of the plaintiff class' call his chambers, '[the Court's] staff has been providing the name of Miss Eidenbach [Plaintiffs' counsel].'" [Doc. 2692 at 3 (quoting 2/28/18 Tr. at 243:19-244:9)]  That, of course, is not error, disqualifying or otherwise.  The parties have been on notice of that protocol since September 2017, and have raised no objection. [9/13/17 Tr. at 131:14-23][21]

**D.     The Court Did Not Rely on Extrajudicial Sources.**

Defendants assert that the Court "deferred to extra-judicial sources in resolving evidentiary issues." [Doc. 2641 at 6]  Under this theory, "[r]ecusal is only warranted if

---

[21]  In September 2017, the Court also noted that it sends all *ex parte* written communications to attorneys for both parties. [9/13/17 Tr. at 130:22-133:16 ("I don't think it's appropriate for me to be sending an *ex parte* communication back to one side without communicating with the other.")]  Defendants properly do not object to that practice.  *Ciavarella*, 716 F.3d at 721-23 (finding no basis for recusal where judge's letters to third parties "abide by the Code of Conduct's standards because they merely provided 'explanations of court procedures,' and took 'particular care so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality'" (quoting Code of Conduct 3A(6) and Commentary to Code of Conduct Canon 3A(6))).

1  rulings are based on extrajudicial 'knowledge that the [judge] ought not to possess.'"

2  *Blixseth*, 742 F.3d at 1220 (quoting *Liteky*, 510 U.S. at 550).  That is not the case here.

3  **1.   Comments Regarding Prior Experience as Settlement Judge**

4  Defendants contend that the Court "stated he has resolved disputed allegations of

5  retaliation based upon his prior settlement judge experiencing in inmate lawsuits against

6  ADC."  [Doc. 2641 at 15 (alleging improper *ex parte* communications); *see also id.* at 6

7  (alleging improper reliance on "extra-judicial sources," and citing 7/14/17 Tr. at 127:3-

8  128:24)]  That is untrue, as the surrounding context easily establishes.

9  During a hearing regarding Defendants' removal of locked boxes in which class

10  members could place Health Needs Requests ("HNRs") for medical, mental health, or

11  dental care, Plaintiffs' counsel reported that, while "interviewing potential witnesses for

12  today's hearing at Perryville, the majority of people I spoke with declined to come testify

13  . . . because they were too afraid of retaliation."  [7/14/17 Tr. at 126:10-14]  Plaintiffs'

14  counsel explained that class members reported fear that, among other things, "their

15  property would be missing upon their return."  [*Id.* at 126:15-127:8]  Plaintiffs did not

16  request any particular relief (*id.* at 127:9-12), and the Court did not make any particular

17  ruling.  [*Id.* at 127:13-128:24]  Instead, the Court simply noted that "if it becomes known

18  to me that there is any retaliation I will certainly be interested in hearing about it and

19  acting upon it if it's warranted to do so."  [*Id.* at 127:13-15]  As an aside, the Court noted

20  that it was "sensitive to the idea that this does happen" due to his experience presiding

21  over "settlement conferences" involving "people who have been in custody."  [*Id.* at

22  127:15-21]  (This is the statement relied on by Defendants.  [Doc. 2641 at 6])

23  That statement is not error, much less disqualifying error.  The Court did not rely

24  on its settlement experience to find that any retaliation had, in fact, occurred in this case.

25  Instead, it reiterated that it would consider any specific allegations brought to its attention.

26  [7/14/17 Tr. at 127:13-128:24]   And a judge's prior settlement experience alone, of

27  course, is not a basis for recusal.  *United States v. Siegelman*, 799 F. Supp. 2d 1246, 1257

28  (M.D. Ala. 2011) ("Every judge lives in a community and presides over multiple cases.

1  That a judge might receive information in connection with the judge's other duties,

2  without the parties' knowledge, should come as no shock.  Nor should it come as a shock

3  that the information will sometimes be relevant to an issue in a case.  When this occurs,

4  the judge must decide the issue without considering the extrinsic information in any way.

5  Doing this is second nature to any judge who has long served."); *Town of Norfolk v. U.S.*

6  *Army Corps of Engineers*, 968 F.2d 1438, 1462 (1st Cir. 1992) ("[O]ur system of justice

7  does not require that judges be empty vessels, wholly ignorant of all of the antecedents of

8  a case." (quotation marks and citation omitted)).

9          **2.     Comments Regarding Reasonableness of Plaintiffs' Concern**

10              **About Veracity of Records of Class Member Who Died by**
                **Suicide**

11          Defendants further contend that the Court "acknowledged that he based an

12  evidentiary ruling rejecting Defendants' *expert's* opinion on the medical principles of

13  rigor mortis solely upon his personal life experience rather than the actual medical

14  evidence before him." [Doc. 2641 at 15 (alleging improper *ex parte* communication); *see*

15  *also id.* at 6 (alleging improper reliance on "extra-judicial source," and quoting 11/7/17

16  Tr. at 183:1-9)]  Yet again, Defendants grossly distort the record.  The Court did not reject

17  expert opinion based on "personal life experience."   There was no "actual medical

18  evidence" formally before the Court.  Instead, as explained below, the Court simply noted

19  that Plaintiffs had raised a reasonable question as to the veracity of Defendants' records,

20  and asked Defendants to respond in writing to Plaintiffs' letter requesting information.

21          On October 23, 2017, Plaintiffs sent a letter to Defendants raising concerns related

22  to the death of a class member "who was found hanging in his cell at Tucson-Cimarron

23  unit." [Doc. 2426-1 at 81]  According to the psychological autopsy, which was prepared

24  by Defendant's own employees:

25              "DOC staff reported checking on [the class member] 31
                minutes prior to finding him hanging."  However, video of the
26              efforts to resuscitate [the class member] showed "partial rigor
                mortis involving the buccal musculature which would make
27              placing an ET tube difficult."   As the psychological autopsy
                acknowledges, "[t]hese findings bring into question the belief

28

1    that he had been observed alive and healthy by correctional
     staff 31 minutes prior to being discovered."
2

3    [*Id.* (citations omitted)]  Plaintiffs' counsel noted in their letter that "[o]ur medical expert

4    advises us that rigor mortis 31 minutes after death is a medical impossibility.  In other

5    words, the correctional officers' statements that they observed [the class member] alive

6    and healthy 31 minutes before he was found dead are false."  [*Id.* (footnote omitted)]

7    Plaintiffs' counsel requested "all documents reflecting any investigation that was

8    undertaken into these false statements and any staff discipline that resulted."  [*Id.* at 82]

9        During the November 7, 2017 status hearing, Plaintiffs' counsel informed the

10   Court of the letter; noted that "this would not be the first time, as we noted in the letter,

11   that custody officers have lied about checking on someone who subsequently died by

12   suicide"; and noted that they had not yet received a response from Defendants.  [11/7/17

13   Tr. at 179:11-180:7]  Defendants' attorney responded that "the allegation that there's

14   some falsification going on here is totally unfounded" and that "I asked our medical

15   expert whether rigor mortis can set in in the neck area within 30 minutes, and he said

16   absolutely."  [*Id.* at 180:8-12]  Another attorney for Defendants then stated that Plaintiffs'

17   inquiry was outside the scope of the Stipulation.  [*Id.* at 181:9-182:2]

18       The Court disagreed, noting that the litigation "is looking at performance measure

19   compliance that require data and verified and truthful reporting":

20           I don't think . . . we're getting into areas that are turning this
             case into individual wrongful death cases.  What we're doing
21           is encouraging the plaintiffs to ask questions where a
             reasonable person could ask this question.  I know when I
22           have dealt with dead animals and dead people that I have
             encountered in my life I never saw rigor mortis within 30
23           minutes but now you tell me that's possible.  So it's a
             reasonable thing for someone to wonder about, to ask a
24           question about in a context where there are these biases and
             incentives that are contrary to truth telling.  I have heard and
25           seen . . . some of it in the witness box here.

26           So to ask these questions based upon that I have now, I think,
             talked a bit about it to let you know that I don't think asking
27           the questions are inappropriate.  I think the answers that you
             just gave in court here, Mr. Bojanowski [Defendants'
28           attorney], are answers that can be—could have been tendered

in a written response that would be a reasonable thing to happen in a case like this that is looking at performance measure compliance that require data and verified and truthful reporting.

[11/7/17 Tr. at 182:21-183:17]  That thoughtful response cannot require recusal.

### E.     A Reporter's Emails Are Irrelevant to Whether the Court's Impartiality Might Reasonably Be Questioned.

Finally, Defendants assert that, "[a]t minimum, there is an appearance of impropriety" by the Court.  [Doc. 2641 at 16]  In support, Defendants rely on the same transcript excerpts offered to show actual bias.  A reasonable person, however, knowing all the circumstances, would know the full context of the Court's remarks (as opposed to only the words surgically removed by Defendants).  That person, moreover, would know that the Court has "'lived with'" this litigation—a case with over 2,700 docket entries—for over three years.  *Larson*, 43 F.3d at 415 (denying petition for writ of mandamus requiring recusal where judge had presided over litigation with over 350 docket entries for over two years).  "In light of [the Court]'s familiarity and lengthy association with the case, a reasonable person simply would not view . . . isolated remarks as an occasion for concern."  *Id.*; *see Holland*, 519 F.3d at 914 ("[T]he judge's conduct during the proceedings should not, except in the rarest of circumstances form the sole basis for recusal under § 455(a)." (internal quotation marks, citation, and footnote omitted)).

The only new "evidence" offered by Defendants to "buttress[]" the "appearance of impropriety" are emails between the KJZZ news reporter and Dr. Watson.  [Doc. 2641 at 16]  Defendants contend that the emails "reveal that even the media readily saw Magistrate Judge Duncan's animosity toward and bias and prejudice against Defendants and (successfully) sought to exploit it."  [*Id.* at 17]  The emails, however, do little more than show that the reporter asked his source for clarification of certain matters before publishing her allegations, that he recognized the relevance of the allegations to the *Parsons* litigation, and that he was hopeful that the story would result in positive change for people incarcerated in Arizona prisons.  [Doc. 2641-1, Ex. 15]  The emails in no way

1   suggest that the reporter questioned the Court's impartiality.  In fact, the reporter publicly

2   tweeted the following on February 26, 2018:

> I've been following this case for a year now and I can honestly
> say - Judge Duncan has never displayed any bias - he is
> incredibly fair and patient and thoughtful - the fact that the
> state has gone for years without sanction is proof of that.

6   [Kendrick Decl. ¶ 5 & Ex. 2]

7       Regardless, even if the reporter *had* publicly voiced concern about the Court's

8   impartiality (which he did not), it is well-settled that "[t]he characterizations of newspaper

9   articles and journalists are not grounds for recusal."  *In re Marshall*, 291 B.R. 855, 860

10  (Bankr. C.D. Cal. 2003); *see also Cheney*, 541 U.S. at 923-24 (noting that "press

11  editorials" "cannot determine the recusal question"); *Datagate*, 941 F.2d at 871 (citing *In

12  re City of Detroit*, 828 F.2d 1160, 1168 (6th Cir. 1987) ("articles cited by the City do not

13  necessarily mean that the public believes [the] Judge . . . is biased")); *Little Rock Sch.

14  Dist. v. Arkansas State Bd. of Educ.*, 902 F.2d 1289, 1292 (8th Cir. 1990) ("Various

15  newspaper articles had questioned the judge's impartiality, but they did not necessarily

16  show what the public thought."); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 882 F.2d

17  1556, 1569 (Fed. Cir. 1989) (rejecting argument that "actual evidence that reasonable

18  observers *did* question the court's impartiality" could be established by the fact that "the

19  press questioned the trial judge's non-recusal in this case in several articles").

20                                   **CONCLUSION**

21      The Court should deny Defendants' Motion to Disqualify Magistrate Judge Duncan

22  from All Further Proceedings.

23  . . .

24  . . .

25  . . .

26  . . .

27  . . .

28  . . .

1   Dated:  March 30, 2018                    **PRISON LAW OFFICE**

2
                                              By:   s/ Rita K. Lomio
3                                                  Donald Specter (Cal. 83925)*
                                                   Alison Hardy (Cal. 135966)*
4                                                  Sara Norman (Cal. 189536)*
                                                   Corene Kendrick (Cal. 226642)*
5                                                  Rita K. Lomio (Cal. 254501)*
                                                   1917 Fifth Street
6                                                  Berkeley, California 94710
                                                   Telephone:  (510) 280-2621
7                                                  Email:     dspecter@prisonlaw.com
                                                              ahardy@prisonlaw.com
8                                                             snorman@prisonlaw.com
                                                              ckendrick@prisonlaw.com
9                                                             rlomio@prisonlaw.com

10                                                 *Admitted *pro hac vice*

11                                                 David C. Fathi (Wash. 24893)*
                                                   Amy Fettig (D.C. 484883)**
12                                                 Victoria Lopez (Ill. 6275388)*
                                                   **ACLU NATIONAL PRISON
13                                                 PROJECT**
                                                   915 15th Street N.W., 7th Floor
14                                                 Washington, D.C. 20005
                                                   Telephone:  (202) 548-6603
15                                                 Email:     dfathi@aclu.org
                                                              afettig@aclu.org
16                                                            vlopez@aclu.org

17                                                 *Admitted *pro hac vice*.  Not admitted
                                                    in DC; practice limited to federal
18                                                  courts.
                                                   **Admitted *pro hac vice*
19
                                                   Kirstin T. Eidenbach (Bar No. 027341)
20                                                 **EIDENBACH LAW, P.L.L.C.**
                                                   P. O. Box 91398
21                                                 Tucson, Arizona 85752
                                                   Telephone:  (520) 477-1475
22                                                 Email:     kirstin@eidenbachlaw.com

23                                                 Kathleen E. Brody (Bar No. 026331)
                                                   **ACLU FOUNDATION OF**
24                                                 **ARIZONA**
                                                   3707 North 7th Street, Suite 235
25                                                 Phoenix, Arizona 85013
                                                   Telephone:  (602) 650-1854
26                                                 Email:     kbrody@acluaz.org

27

28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:   dbarr@perkinscoie.com
         agerlicher@perkinscoie.com
         jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:   cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:   jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARIZONA CENTER FOR DISABILITY LAW**

By:   s/ Maya Abela
          Sarah Kader (Bar No. 027147)
          Asim Dietrich (Bar No. 027927)
          5025 East Washington Street, Suite 202
          Phoenix, Arizona 85034
          Telephone:  (602) 274-6287
          Email:     skader@azdisabilitylaw.org
                         adietrich@azdisabilitylaw.org

          Rose A. Daly-Rooney (Bar No. 015690)
          J.J. Rico (Bar No. 021292)
          Jessica Jansepar Ross (Bar No. 030553)
          Maya Abela (Bar No. 027232)
          **ARIZONA CENTER FOR DISABILITY LAW**
          177 North Church Avenue, Suite 800
          Tucson, Arizona 85701
          Telephone:  (520) 327-9547
          Email:
             rdalyrooney@azdisabilitylaw.org
                         jrico@azdisabilitylaw.org
                         jross@azdisabilitylaw.org
                         mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

1
## CERTIFICATE OF SERVICE

2
    I hereby certify that on March 30, 2018, I electronically transmitted the above

3
document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4
Notice of Electronic Filing to the following CM/ECF registrants:

5

6
Michael E. Gottfried
Lucy M. Rand
7
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov
8

9
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
10
Nicholas D. Acedo
Ashlee B. Hesman
11
Jacob B. Lee
Kevin R. Hanger
12
Timothy M. Ray
Richard M. Valenti
13
Jamie D. Guzman
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
14
dstruck@strucklove.com
rlove@strucklove.com
15
tbojanowski@strucklove.com
nacedo@strucklove.com
16
ahesman@strucklove.com
jlee@strucklove.com
17
khanger@strucklove.com
tray@strucklove.com
18
rvalenti@strucklove.com
jguzman@strucklove.com
19

20
*Attorneys for Defendants*

21
       s/ D. Freouf

22

23

24

25

26

27

28

LEGAL139246477.1       -41-