Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Assistant Attorney General
15 South 15th Avenue
Phoenix, Arizona 85007
Telephone: (602) 542-1645
Fax: (602) 542-3393
Michael.Gottfried@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-DKD<br><br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISQUALIFY MAGISTRATE JUDGE DUNCAN FROM ALL FURTHER PROCEEDINGS** |

Plaintiffs call Defendants' Motion "absurd," "irresponsible," "baseless," and "self-serving."  (Dkt. 2732 at 31, 40-41; Dkt. 2739 at 2, 7.)  Yet, it takes them 37 pages to oppose it.  They even oppose Defendants' cautionary request for another judge to rule on the Motion.  (Dkt. 2732 at 8-10; Dkt. 2739.)  Their staunch opposition speaks volumes. The substance of their Response, not so much.  They do not even address several of Magistrate Judge Duncan's most controversial statements and actions.  That they cannot defend them at all—and, in one instance, they claim it must be a transcription error—undermines their colorful rhetoric.

"If the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal." *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995). Here, it is not close. Plaintiffs' spin, explanation, and "context" do not change the words on the paper; instead, it shows that a person reading them "might reasonably ... question[]" Magistrate Judge Duncan's impartiality, *Liteky v. United States*, 510 U.S. 540, 548 (1994), if not conclude he is actually biased against Defendants. Magistrate Judge Duncan should either refer the Motion to another judge or recuse himself.

## I.   MAGISTRATE JUDGE DUNCAN SHOULD REFER THE MOTION TO ANOTHER JUDGE.

Plaintiffs argue that the Ninth Circuit has "'rejected' suggestions that 'the Chief Judge or a committee of disinterested judges from the District was *required* to rule' on a recusal motion." (Dkt. 2732 at 17:22-24, emphasis added, citation omitted.) But Defendants have not argued that another judge is *required* to rule on their Motion to Disqualify. They have simply asked Magistrate Judge Duncan to refer the Motion to another judge, as other judges have elected to do "in an abundance of caution." (Dkt. 2642 at 2-3.) *See In re Murchison*, 349 U.S. 133, 136 (1955) ("[O]ur system of law has always endeavored to prevent even the probability of unfairness.").

Magistrate Judge Duncan's recent statements on the record provide even more reason to refer Defendants' Motion to another judge. At the April 11, 2018 Status Hearing, the Court noted that it wanted to schedule a telephone call with a witness for purposes of scheduling her testimony at an upcoming evidentiary hearing. (Exhibit 1, R.T. 4/11/18, at 57.) Plaintiffs' counsel stated that they wanted to be on the call if Defendants' counsel were on it. (Id. at 59.) Magistrate Judge Duncan replied:

> THE COURT: All right. That's fine. I'm not going to do it without giving you both an opportunity to be on the phone. I don't think that there would be anything inappropriate with my staff making a scheduling *but I don't want to engender another distraction with respect to ex parte contacts, and I have seen that we have baseless distractions pretty often here*. So I don't want to have another one if I can avoid it easily.

2

1    (Id., emphasis added.)   This was apparently a reference to Defendants' Motion to
2    Disqualify, which includes an allegation that Magistrate Judge Duncan's chambers
3    engaged in improper ex parte communication with another witness.  Mocking the Motion
4    to Disqualify and referring to it as a "baseless distraction[]"—before briefing is even
5    completed—undermines any appearance of objectivity.  *See In re Kensington Int'l Ltd.*,
6    368 F.3d 289, 318 (3d Cir. 2004) (quoting *United States v. Torkington*, 874 F.2d 1441,
7    1447 (11th Cir. 1989) (disqualification "is necessary to 'preserve not only the reality but
8    also the appearance of the proper functioning of the judiciary as a neutral, impartial
9    administrator of justice'").  The Motion should be referred to another judge who can
10   objectively and fairly assess the allegations.

11       Plaintiffs argue that "Defendants provide no legal authority" and "there is no legal
12   basis" to refer the Motion to Disqualify to another judge.  (Dkt. 2732 at 17:20-22.)  But in
13   their Motion, Defendants cited *four* cases in which district court judges *have* referred a
14   disqualification motion to another judge (Dkt. 2642 at 2-3), including one case in this
15   District.  *See Bronick v. State Farm Mut. Auto. Ins. Co.*, 2013 WL 2390251, at *2 (D.
16   Ariz. May 30, 2013).  Moreover, Plaintiffs have already acknowledged that there is legal
17   authority supporting a referral.  (See Dkt. 2739 at 4:11-13 ["But those cases stand for the
18   unremarkable (and undisputed) proposition that a judge who is the subject of a recusal
19   motion may elect to refer the motion to another judge for decision."].)  *See Skokomish*
20   *Indian Tribe v. United States*, 410 F.3d 506, 519 (9th Cir. 2005) ("Judge Burgess then
21   referred the motion to Chief District Judge Coughenour.").

22       Plaintiffs also argue that a referral is "ill-advised" because Magistrate Judge
23   Duncan "has presided over this case for more than three years," there is a "complicated
24   and lengthy record," and the Motion "relies on statements made between January and
25   December 2017, a period of time that involved over 700 filing, 27 hearing days, and 38
26   live witnesses." (Dkt. 2732 at 18:7-9, 18:17-20.)  But none of this is relevant to resolving
27   the Motion. What is relevant are the specific statements made by Magistrate Judge
28   Duncan, and certain conduct.  That is laid out concisely in the Motion to Disqualify and

1   this Reply, with citations to the relevant record and supporting exhibits.  Plaintiffs'

2   counter-arguments are included in their 37-page opposition and exhibits.  Either

3   Magistrate Judge Duncan's statements and conduct—as reflected in the transcripts

4   provided—amount to actual or apparent bias or they do not.  Another judge is more than

5   capable to rule without having to troll through the entire record, as Plaintiffs suggest.

6   ## II.      THE MOTION TO DISQUALIFY IS TIMELY.

7        Plaintiffs ask this Court to disregard the merits and elevate form over substance by

8   denying the Motion as "untimely."  (Dkt. 2732 at 19-21.)  But § 455 "sets forth no

9   procedural requirements," *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir. 1980), and

10  "contains no explicit requirement of timeliness."  *Preston v. United States*, 923 F.2d 731,

11  732 (9th Cir. 1991).  Although the Ninth Circuit has recognized that "timeliness cannot be

12  disregarded in all cases," *United States v. Conforte*, 624 F.2d 869, 880 (9th Cir. 1980),

13  and "recusal motions should be filed with reasonable promptness after the ground for such

14  a motion is ascertained," there is "no per se rule … regarding the time frame in which

15  recusal motions should be filed."  *Preston*, 923 F.2d at 733.

16       As discussed below, Defendants' Motion was reasonably prompt under the

17  circumstances.  But whether or not it was prompt enough for Magistrate Judge Duncan,

18  § 455 "is self-enforcing on the part of the judge." *Sibla*, 624 F.2d at 867-68; *see also* 42

19  U.S.C. § 455(a)-(b) ("Any … magistrate judge of the United States *shall disqualify*

20  *himself* in any proceeding in which his impartiality might reasonably be questioned. … He

21  *shall also disqualify himself* in the following circumstances ….") (emphasis added).  "[I]f

22  the judge sitting on a case is aware of grounds for recusal under section 455, that judge

23  has a duty to recuse himself or herself."  *Sibla*, 624 F.2d at 868.  A judge cannot avoid

24  allegations of partiality simply because he believes a party should have brought the

25  motion sooner.  Rather, "timeliness … is but one of the factors which engages a court's

26  discretion in determining whether a judge shall be relieved from its assignment." *See In*

27  *re Kensington*, 368 F.3d at 312; *see also United States v. Wells*, 873 F.3d 1241, 1250

28  (10th Cir. 2017) ("We believe that it is especially appropriate to reach the merits of this

4

issue because recusal-based arguments uniquely implicate the integrity of the justice system."); *Barry v. United States*, 528 F.2d 1094, 1097 n.7 (7th Cir. 1976) (noting that "the statute is now written in mandatory terms, without the need for a motion by the parties and holding that there can be no waiver based on untimeliness under § 455 to "reach the merits of the petitioner's § 455 claim).

Unlike the cases Plaintiffs rely on, Defendants' Motion is not based on any one comment or single event.[1]  It is based on actual bias and the appearance of bias, which is manifest in the record through a series of escalating statements and conduct over the course of a year.  Magistrate Judge Duncan declared in <u>January 2017</u> that his "preliminary view" of the issues "is probably 8 out of 10 times to agree with what the plaintiffs have said."  (Dkt. 2641-1 at 4.)  In <u>March 2017</u>, he told Defendants that he was "overruling virtually every one of" their objections to testimony.  (Id. at 8.)  In <u>July 2017</u>, he referred to the plaintiff-class as his "client."  (Id. at 25.)  And in <u>November 2017</u>, he stated that he "wish[ed]" Plaintiffs had more "soldiers" to "engage[]" Defendants "in this battle."  (Id. at 89-90.)  As Plaintiffs point out, these are just a handful of statements in the thousands of pages of hearing transcripts during that timeframe.  In isolation, and over the course of several months, a casual courtroom observer could regard these statements as troubling, yet falling short of actual bias.[2]  But collectively, each incident building on the last, they reflect at least apparent bias and provide an appropriate foundation and context for the

---

[1] *Cf. United States v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986) (involving a "motion for recusal filed weeks after the conclusion of a trial" based on litigant's post-trial lawsuit and leafletting against trial judge); *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 871-72 (9th Cir. 1991) ("HP's counsel informed counsel for Datagate of the situation by letter dated June 22, 1988, while HP's summary judgment motion was *sub judice.* Nevertheless, Datagate waited six weeks-one month after judgment had been entered-to file its motion."); *Skokomish Indian Tribe*, 410 F.3d at 519 (moving party should have known grounds for recusal—he was a public utility customer—when it filed complaint and admitted it had grounds for recusal seven months before filing the motion); *United States v. Rogers*, 119 F.3d 1377, 1382 (9th Cir. 1997) (criminal defendant filed motion alleging judge's conflict of interest one and one-half years after he sent informal letter to probation office containing allegations).

[2] This, of course, excludes Magistrate Judge Duncan's July 21, 2017 statement that he has "a client that exists in the prison," because it was made during an emergency telephonic hearing.

statements and events revealed at the <u>December 20, 2017</u> Status Hearing. *See*, *e.g.*, *United States v. Bremers*, 195 F.3d 221, 229 & n.2 (5th Cir. 1999) (concluding that "a reasonable person, aware of all the circumstances, would harbor doubts as to" the judge's impartiality).

At the December 20, 2017 hearing, Magistrate Judge Duncan revealed that he had read the KJZZ article and:

- While standing, visibly upset, and waiving and pointing to his iPad,[3] he said: "Well, I'm standing because in the most literal sense I'm standing up for the inmates of the Arizona Prison System." (Dkt. 2641-1 at 256).

- Without any substantiation or providing Defendants with an opportunity to refute the hearsay allegations in the KJZZ article, he stated:
  - the story was a "smoking gun memo" (Id. at 262);
  - it was his now his "agenda" to "see how deep this evil goes" (Id. at 259);
  - "from the defendants' side of the case" there "is such an egregious departure from honest representation" (Id. at 257); and
  - "people working for" ADC have been "lying through their teeth" (Id. at 259).

- He declared, "I'm not in the typical role of the neutral judge." (Id. at 269).

At that hearing, Magistrate Judge Duncan also informed Defendants' counsel for the first time that he "receive[s] phone calls in chambers" from "people who work for Corizon who say essentially, it is so much worse than you think." (Dkt. 2641-1 at 260.)

---

[3] Plaintiffs contend that the Court's tone and demeanor is not supported "by a factual citation but appear to rely on information reported in the" KJZZ article. (Dkt. 2732 at 22:25-28.) Undersigned counsel was present at the hearing and attests to the fact that Magistrate Judge Duncan was standing, visibly upset, and waiving and pointing to his iPad. Counsel's live observation is corroborated by the KJZZ article and Magistrate Judge Duncan's statement that he was "standing." Plaintiffs' counsel, who were also present, do not deny this description.

He admitted that those ex parte communications "add[ed] to the filter of how [he] evaluate[ed]" the KJZZ story, stating "it's just disgusting." (Id.) As a result, he ordered Plaintiffs' counsel to substantiate the allegations, set an evidentiary hearing to verify them, and expressly discounted the veracity of Defendants' past compliance with the Stipulation.[4] (Id. at 261, 271, 275.)

In preparing for that ordered evidentiary hearing, Defendants' counsel subpoenaed documents from the source of the KJZZ article, Dr. Jan Watson. Defendants' counsel (and Plaintiffs' counsel) received that documentation on February 14, 2018. (Exhibit 2.) Among them was correspondence between Dr. Watson and the KJZZ reporter who prepared the article. (Id.) That correspondence showed a concerted effort to influence this litigation that could not be ignored. (Dkt. 2641-1 at 630-634.) At that point, Defendants had irrefutable evidence that even a member of the media recognized Magistrate Judge Duncan's apparent bias and acted on it by coordinating with a witness to influence the outcome of this litigation.[5] Defendants filed their Motion nine days later.

---

[4] Plaintiffs contend there is no support for the assertion that Magistrate Judge Duncan discounted Defendants' past compliance. But he clearly did: (See Dkt. 2641-1 at 260-61, 12/20/17 Tr. at 9:25-10:4 ["But the truth of it is -- I can't trust it all until I get to the root of this …."]; id. at 261, 12/20/17 Tr. at 10:12-13 ["I'm now concerned that I cannot trust those numbers without further inquiry."].)

[5] Plaintiffs do not deny that the reporter "recognized the relevance of the allegations to the *Parsons* litigation, and that he was hopeful that the story would result in positive change for people incarcerated in Arizona prisons." (Dkt. 2732 at 45:24-28.) While they try to dismiss his conduct as attempting to clarify the facts before publishing the allegations, Plaintiffs ignore the significance of the emails, which show: (1) the reporter telling Dr. Watson, "As soon as [the story] publishes the attorneys for the plaintiffs in Parsons are going to enter it into the court docket so the judge will see it!"; (2) the reporter boasting, "I think we have them [Corizon] on the ropes"; and (3) the reporter telling Dr. Watson: "I'm serious – this is like a once-in-a-life-time soap box moment – go off!" and Dr. Watson replied, "I know, a friend said it was like a Lifetime movie, we just need the abusive husband!" (Dkt. 2461-1 at 630, 632, 634.) Plaintiffs argue that the media's characterization of a judge as being biased cannot be considered. (Dkt. 2732 at 46.) But the KJZZ reporter did not lament Magistrate Judge Duncan's bias; in fact, he expressly vouched that Magistrate Judge Duncan was not biased. (Dkt. 2733-1 at 6.) Thus, Plaintiffs' cases are inapposite. The emails are evidence of a plan to manipulate an outcome by exploiting a perception—held by a member of the public—that Magistrate Judge Duncan's bias against Defendants can be used to change the outcome of this case. Indeed, his statements and conduct at the December 20, 2017 Status Hearing shows that it worked. *See* ABA Model Code, Canon 2, Rule 2.4(C) ("A judge shall not convey or permit others to convey the impression that any person or organization is in a position to influence the judge.').

Under these circumstances, Defendants' Motion to Disqualify—filed two months after the December 20, 2017 Status Hearing and nine days after receiving Dr. Watson's correspondence to/from the KJZZ reporter—was reasonably prompt.  *See*, *e.g., Preston*, 923 F.2d at 733  (Section 455 motion timely filed 18 months after transfer to judge where party was unaware of disqualification grounds until 10 days before filing motion). Plaintiffs' argument that the Motion was presumptively untimely because of far longer delays in other cases are inapposite.  *Cf. Skokomish*, 410 F.3d at 519 (motion filed "more than one and one-half years" after learning disqualification grounds deemed untimely).

More importantly, Plaintiffs fail to identify any harm resulting from the alleged delay.  One of the reasons for requiring timely motions is to avoid "wasted judicial time and resources."  *Preston*, 923 F.2d at 733.  Another reason is to prevent litigants from strategically withholding a recusal motion while hoping for a favorable ruling, then collaterally attacking the ruling when it is adverse.  *See United States v. Furst*, 886 F.2d 558, 581 (3d Cir. 1989).  Here, the record does not show any time or judicial resources were wasted because only one monthly status hearing (on January 18, 2018) and three brief telephonic hearings occurred between the December 20, 2017 Status Hearing and the filing of the Motion.[6]  There was no witness testimony.  And the Court issued only three (arguably quasi) substantive orders in that time.  (See Dkt. 2551 [resolving impasse on monitoring guide language], 2583 [ordering Defendants to provide December 2017 non-compliance data], 2604 [denying Corizon's renewed motion to appear as amicus curiae].)

Nor was there any strategic purpose behind, or any advantage gained by Defendants, in filing the Motion when they did—five days before the scheduled contempt hearing.  While Plaintiffs argue that this was done for "strategic reasons" (Dkt. 2732 at 19:17-18), they fail to articulate what that strategy was, let alone substantiate it.  Although the Ninth Circuit requires a reasonably prompt filing to combat "a heightened risk that litigants would use recusal motions for strategic purposes," *Preston*, 923 F.2d at 733

---

[6] These three hearings were held on January 12, 2018, February 7, 2018, and February 14, 2018, and were approximately 45 min., 50 min., and 10 min., respectively.

(citing *Ex parte Am. Steel Barrel Co.*, 230 U.S. 35, 43 (1913)), such risks are caused by litigants who wait to file motions until *after* the judge rules on the pending dispute. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992) ("To hold otherwise would encourage parties to withhold recusal motions, pending a resolution of their dispute on the merits, and then if necessary invoke section 455 in order to get a second bite at the apple.") (citing *Preston*); *see also Ex parte Am. Steel Barrel*, 230 U.S. at 44 (noting that timeliness requirement under § 144 "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made … [nor] was it intended to paralyze the action of a judge who has heard the case, or a question in it, by the interposition of a motion to disqualify him between a hearing and a determination of the matter heard."). That risk is not present here because Defendants did not wait to file their Motion until *after* Magistrate Judge Duncan ruled on the contempt issue.

Plaintiffs' argument that the timing of Defendants' Motion was motivated by fear of monetary sanctions is also a non sequitur. Magistrate Judge Duncan announced in October 10, 2017 that he would be holding a contempt hearing. (Dkt. 2373, 2474.) But under Plaintiffs' logic, filing the Motion any time after that date would serve a "strategic purpose" because Defendants knew at that time that they could be subject to sanctions. To avoid a "strategic purpose" of avoiding sanctions, as Plaintiffs contend, Defendants therefore would have had to file their Motion *before* they were aware of the facts that gave rise to the purported strategy itself. Plaintiffs' argument is nonsensical—a logical fallacy because Defendants' Motion could never be timely.

At the same time, Plaintiffs recognize that "a court's obligation not to recuse is perhaps at its highest when the motion has been brought *after* the party seeking recusal has sustained an adverse ruling in the course of the action." (Dkt. 2732 at 17:14-17, internal quotation marks and citation omitted.) They cannot have it both ways. Defendants filed when they did only after acquiring *all* of the information supporting the Motion, which included Magistrate Judge Duncan's statements and revealed conduct at the December 20, 2017 Status Hearing and the Dr. Watson-KJZZ communications.

9

Plaintiffs also incorrectly imply that Defendants filed when they did hoping the contempt hearings would not take place. But that implication is belied by the fact that Defendants contemporaneously requested Magistrate Judge Duncan to reassign the contempt hearings to another judge or magistrate judge or, in the alternative, continue the hearings until after the Motion was resolve. (Dkt. 2642 at 3-4.) Defendants did not move to vacate the hearings and were prepared to move forward with them regardless of the Motion or its outcome. They simply sought a fair and impartial adjudication of the facts at a proceeding before a neutral and unbiased judicial officer.

Finally, Plaintiffs make no argument that Defendants' Supplement was untimely. (Dkt. 2692.) The Supplement raises *new* allegations based on Dr. Watson's testimony on February 27, 2018, and statements made by Magistrate Judge Duncan on February 28, 2018, which relate back to statements made by him at the December 20, 2017 Status Hearing. (Id.) It is thus undisputed that the Supplement was timely made. The Supplement provides independent grounds for disqualification, and supports Magistrate Judge Duncan's actual and apparent bias in previous proceedings.[7]

## III.   MAGISTRATE JUDGE DUNCAN'S STATEMENTS AND CONDUCT DISQUALIFY HIM.

In their Response, Plaintiffs isolate each statement and event and ignore the cumulative nature of Magistrate Judge Duncan's conduct and its effect on his impartiality or, at least, its objective appearance. That is a fatal omission because "the whole is sometimes greater than the sum of the parts. The cumulative effect of a judge's individual actions, comments and past associations could raise some question about impartiality, even though none (taken alone) would require recusal." *In re Martinez-Catala*, 129 F.3d 213, 221 (1st Cir. 1997); *see also United States v. Rivera-Rodriguez*, 761 F.3d 105, 112

---

[7] Plaintiffs suggest in a footnote that Magistrate Judge Duncan should not recuse himself in this case because it would necessarily mean he would have to recuse himself in 47 other cases involving Defendants Ryan and/or Pratt, in which he presides. (Dkt. 2732 at 20 n.8.) It should go without saying that a judge's bias should not be excused because of the impact it could have on his caseload. Moreover, a review of those dockets reveal that of the 47 open cases involving Director Ryan, he is no longer a defendant in eight of them; and Pratt is no longer a defendant in the 6 open cases involving him.

(1st Cir. 2014) ("[I]n cases with multiple judicial interventions, determining the appearance of bias and the prejudicial effect of that bias generally involves a cumulative effect inquiry."). Though Defendants maintain that Magistrate Judge Duncan's statements and conduct, even individually, evince bias, they conclusively do so in the aggregate.

Plaintiffs also focus almost exclusively on actual bias, arguing that each of the statements, when read in context, are innocuous because of what Magistrate Judge Duncan meant to say and do—instead of what he actually said and did—so there are no technical violations of 28 U.S.C. § 455(b) or the ethical codes. But the mere *appearance* of impropriety by his statements or conduct is enough for disqualification. *See* 28 U.S.C. § 455(a). Plaintiffs spend only about 1.5 pages addressing this in their Response. Apparent bias is an objective standard that requires disqualification if "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Preston*, 923 F.2d at 734. The lengths Plaintiffs go through to give each word "context" is telling because it is an apparent recognition that the statements on their face are troubling. It is Plaintiffs who distort Defendants' arguments and who "stretch, skew, and elide the Court's statements" to argue no actual bias exists. And what they do not address at all are some of the most biased statements in the record.

### A.    Magistrate Judge Duncan's Statements Demonstrate He Is No Longer Impartial.

Plaintiffs do not deny that, at the December 20, 2017 Status Hearing, Magistrate Judge Duncan stood up and declared: "I'm standing up for the inmates of the Arizona Prison System." They also do not deny that he declared, "I'm not in the typical role of the neutral judge" and that it was now his "agenda" "to see how deep this evil goes" ("evil" referring to Defendants' purported conduct). And they do not deny that he said, "I've run out of a way to communicate what is such an egregious departure from honest representation in a case, from the defendants' side of this case." Plaintiffs do not even try to justify or put these statements in "context." These undisputed statements evince a "personal bias or prejudice" against Defendants and show that Magistrate Judge Duncan

has abandoned his role as a "neutral judge" and is instead "acting as a lawyer in the proceeding." *See* 28 U.S.C. § 455(b)(1), -(b)(5)(ii). At a minimum, any reasonable observer would question his impartiality. *See*, *e.g.*, *Nicodemus v. Chrysler Corp.*, 596 F.2d 152, 155-57 (6th Cir. 1979) (disqualifying a district court judge who stated, "I don't believe anything that anybody from [the defendant-corporation] tells me"; who called the defendant's employees "a bunch of villains"; and who claimed the defendant "is deliberately and calculatedly trying to defy the Court").

Regarding Magistrate Judge Duncan's statement that he has "a <u>client</u> that exists in the prison," Plaintiffs argue this is merely a "transcription error" that should read, "climate" instead of "client." (Dkt. 2732 at 27:25-27:13.) But they have no proof a transcription error was made; the certified transcript states "client," which naturally fits in the context of the sentence. What Plaintiffs' argument reveals, however, is an acknowledgment that Magistrate Judge Duncan's reference to his "client" was so shocking, even to them, that they emailed the court reporter, ex parte, and tried to get her to change it. (Id. at 27-28 n.12.) When the court reporter refused, Plaintiffs left it alone and did not bring this purported error to either Defendants or the Court's attention (until their Response). Only now that it has been exposed as actual and apparent bias do they say it is wrong. Like Plaintiffs' counsel, a reasonable person would be troubled enough by this remark to question whether Magistrate Judge Duncan has abandoned his role as a neutral judge by advocating for one side.

Plaintiffs' other attempts to spin biased statements are likewise unavailing. They argue Magistrate Judge Duncan's statement that his "<u>preliminary view is probably 8 out of 10 times to agree with what the plaintiffs have said</u>" is, by itself, not prejudicial because a judge must be free to make rulings "without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias." (Dkt. 2732 at 22:23-23:3.) Defendants do not disagree with that proposition, but it does not apply here. Magistrate Judge Duncan stated that he *presumes Plaintiffs* are right 80% of the time before even hearing from Defendants:

> That said, I will, in the first instance, I think let you know what my preliminary view is and then naturally turn to the side that would disagree with that. So as it happens, my preliminary view is probably 8 out of 10 times to agree with what the plaintiffs have said, so I will be turning to the defendants to tell me why it is that what they have said doesn't seem to be or shouldn't be right. So that's why I will be proceeding that way, to give people a chance to talk and not going the normal fashion of one after the other. I will be really focusing it.

(Dkt. 2641-1 at 4.)   It is this sudden pronouncement of an arbitrary presumption that Defendants must overcome on nearly every issue in this case that calls into question his ability to decide the issues impartially.  Plaintiffs alternatively argue that Magistrate Judge Duncan telegraphed only that he tended to agree with Plaintiffs with respect to the particular issues before him that day.  Not so.  Although Magistrate Judge Duncan was set to discuss several agenda items that day, his "preliminary view" was a general one and not limited to those items or that hearing.  (Id.)  Moreover, Magistrate Judge Duncan "asked to hear from Defendants first" (Dkt. 2732 at 23:20) because, as he just stated, his preliminary view is to agree with Plaintiffs and have Defendants "tell me why it is that what they have said doesn't seem to be or shouldn't be right."  (Dkt. 2641- at 4.)

Plaintiffs do not dispute that Magistrate Judge Duncan told Defendants that he was "overruling virtually every one of" their objections to testimony, but argue Defendants do not explain why his subsequent orders overruling Defendants' objections were legally incorrect.  (Dkt. 2732 at 25:11-27.)  They miss the import of Magistrate Judge Duncan's statement.   Again, he imposed a blanket order overruling *all* of Defendants' objections before they have even raised an objection and before even hearing the testimony or basis for the objection.   Such conduct creates an appearance, to a reasonable observer of the proceedings, that Magistrate Judge Duncan has lost his ability to be impartial.

Regarding Defendants' assertion that Magistrate Judge Duncan "told Defendants that he 'wish[ed]' Plaintiffs had more 'soldiers' to 'engage[]' Defendants 'in this battle,'" Plaintiffs argue this is a distortion of the record because Magistrate Judge Duncan "did not urge a war against Defendants" and simply "expressed a desire for Plaintiffs' counsel to

devote more time to the case." (Dkt. 2732 at 26:12-22.")  But their sanitized version of Magistrate Judge Duncan's statements do not change what he actually said:

> And the availability of soldiers to be engaged in this battle, I can just look at the fact that you [Defendants] have a law firm that is larger than the plaintiffs' lawyers. … If I could have full time engagement of the plaintiffs' lawyers on this case, I would be pleased about that. I understand as a practical reality that they have other cases. … And unfortunately, just as I can't devote full time to it, they can't either, but I wish they could. I wish they could be on this more than they are.

(Dkt. 2641-1 at 89-91.)  Stating that he wished Plaintiffs had more lawyers to battle against Defendants shows that he has aligned himself with Plaintiffs in that metaphorical war and further calls into question his impartiality.

Finally, Plaintiffs argue it was perfectly fine for Magistrate Judge Duncan to say that he thought "the people that are lying through their teeth were the people at the Department of Corrections" and that "the people that I have thought have lied to me … have been the people working for the prison" because he is the factfinder and simply noted his "previous credibility determinations." (Dkt. 2732 at 32:23-33:12.)  But Magistrate Judge Duncan has never pronounced any credibility determinations or made any factual findings based on testimony in this case.  Though he has heard testimony from ADC employees, he has not issued rulings that reflect that he believed they were not telling the truth.   More importantly, Magistrate Judge Duncan did not make these statements after hearing testimony.  He made them after announcing that he read the unsubstantiated hearsay allegations in the KJZZ article.  The timing underlies his personal animosity towards Defendants and ADC in general.[8]

### B. Magistrate Judge Duncan Allowed Extrajudicial Sources (the KJZZ Article) to Influence His Decisionmaking and Issues in this Case.

Plaintiffs argue that judges are not prohibited from reading the news, and that Magistrate Judge Duncan did not make any factual findings regarding the allegations in

---

[8] Plaintiffs' attacks on every other statement raised in the Motion are similarly unavailing and do nothing to alleviate the actual and apparent bias reflective in the aforementioned (and undisputed) statements. For brevity, Defendants will not re-hash them here. The transcripts speak form themselves.

the KJZZ article and instead ordered an evidentiary hearing.  (Dkt. 2732 at 30:19-36:4.)

These arguments miss the mark.  Of course a judge can read the newspaper or watch the

news.  But what he cannot do is "investigate facts in a matter independently" or consider

extrajudicial facts.  ABA Model Code, Canon 2, Rule 2.9(C).  The cases Plaintiffs cite

make this distinction.  *See United States v. Bonds*, 18 F.3d 1327, 1330 (6th Cir. 1994)

(distinguishing between acquiring "extra-judicial knowledge of disputed facts" and simply

reading a newspaper article "that may relate to a case"); *Hardy v. City of Milwaukee*, 99 F.

Supp. 3d 883, 892 (E.D. Wis. 2015) ("The Flynn statements also do not evidence any sort

of wrongful, excessive, or preordained view of the facts, law, or parties in the cases before

me.").[9]  The ABA Formal Opinion explains why:

> Information discovered on the Internet may be highly
> educational and as useful to judges as judicial seminars and
> books. But information gathered from an Internet search may
> not be accurate. It may be biased, unreliable, or false. And,
> whether truthful or not, information discovered by a judge via
> the Internet that does not qualify for judicial notice and is not
> disclosed to the parties is untested by the adversary process.

ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 478 at 1 (Dec. 8, 2017).

Thus, "adjudicative facts that are needed to determine an issue in a case, but which are not

properly subject to judicial notice, may not be researched without violating Rule 2.9(C).

Stated simply, a judge should not gather adjudicative facts from any source on the Internet

unless the information is subject to proper judicial notice." *Id*. at 11.  Plaintiffs are wrong

that this ABA Formal Opinion is inapplicable.

As Plaintiffs agree, Magistrate Judge Duncan's primary responsibility is to enforce

the terms of the Stipulation, including monitoring Defendants' compliance.[10] [See Dkt.

---

[9] Plaintiffs' citation to *United States v. Lyons*, 739 F.2d 994, 999 (5th Cir. 1984), is to a dissenting opinion, and their citation to *United States v. Biagon*, 510 F.3d 844, 850 (9th Cir. 2007), is to a concurring opinion. (Dkt. 2732 at 31:1-4.)  Neither case involved an allegation that a judge's research of or reference to a news article was grounds for disqualification.

[10] Defendants disagree with Plaintiffs' suggestion that the parties entered into the Stipulation "to remedy constitutional violations," or that "the Court found that the Stipulation was necessary to correct constitutional violations." (Dkt. 2732 at 1:1-2, 1:23, 34:25-28.)  These arguments, as well as the scope of Magistrate Judge Duncan's enforcement authority, are currently at issue on appeal and not appropriate for comment.

2732 at 12:21-22 [agreeing "the Court has examined the accuracy and completeness of Defendants' monitoring process"].)  The allegations in the December 19, 2017 KJZZ article included extrajudicial information involving disputed facts about Defendants' compliance with the Stipulation.  It was not an article describing the case in general or recounting what had occurred at a particular hearing (i.e., facts subject to judicial notice).  Upon seeing the article and recognizing that it contained allegations not subject to judicial notice, Magistrate Judge Duncan not only read it, but he allowed it to affect his perception of this case.  He did not simply read the article and order an evidentiary hearing.

Upon taking the bench (and for 15 minutes), Magistrate Judge Duncan immediately discussed the article.  (Dkt. 2641-1 at 256-263.)  He referred to it as a "smoking gun memo"; considered it "prima facie" evidence; declared it to be an "end run around the monitoring program, an end run around the Stipulation"; said it "undercuts [his] entire agenda"; and stated that he is "now concerned that [he] cannot trust those numbers without further inquiry."  (Id. at 256, 258, 261-262, 270.)  Plaintiffs do not dispute any of this.  This is also when he said that he was "standing up for the inmates"; that there has been "an egregious departure from honest representation in a case, from the defendants' side of this case"; and that "the people that are lying through their teeth were the people at the Department of Corrections."  (Id. at 256-257, 259.)  And because of the article's influence, he vowed "to see how deep this evil goes" and ordered "plaintiffs to marshal the case, to verify or not." (Id. at 259, 270.)

Importantly, Magistrate Judge Duncan made all of these statements *before* allowing Defendants' counsel, who had not even read the article, to say a word.  (Dkt. 2641-1 at 270-271.)  Magistrate Judge Duncan later stated that "if there is this beat the monitoring program going on … it would still call into question the quality of the State's monitoring program *if it didn't know about it*."  (Id. at 272.) He then ordered an evidentiary hearing "on the issue of the credibility of the reporting."  (Id. at 275.)  This is unrefuted evidence that the KJZZ article influenced the proceedings, and it calls into question his ability to be impartial.

16

Plaintiffs argue that it does not matter what he said because Magistrate Judge Duncan noted he was not wholesale accepting the allegations in the article as true and he ordered a hearing to prove them.  But his statements show that the article impacted his views of the case and that he harbored bias and prejudice against Defendants, regardless of the outcome of the hearing.  Anyone in the courtroom that morning would reasonably question his impartiality.  Magistrate Judge Duncan's reaction was so notable that the KJZZ reporter described it in his December 21, 2017 article.[11]  And it was all based on an extrajudicial, unsubstantiated media report.

Plaintiffs thus fail to meaningfully distinguish *United States v. South Florida Water Management District*, 290 F. Supp. 2d 1356 (S.D. Fla. 2003), as a case involving two-way communications with the media.  There, the judge was disqualified because it was "evident that extrajudicial sources" influenced his decisionmaking "or at least, there [was] a reasonable appearance of such influence."  *Id.* at 1360.  Such extrajudicial influences included media coverage of proposed legislation that gave him "considerable apprehension" regarding the grounds for a prior ruling, and were evident in quotes he made in published articles and in interviews with reporters.  *Id.* Thus, it was the appearance that the judge was being influenced by the media that disqualified him, not just *because of* the ex parte communications.  *Id.*

That case is persuasive because the facts are in many ways similar.  Like the media report of proposed legislation that influenced the district court judge in *South Florida Water Management District*, the KJZZ article influenced Magistrate Judge Duncan by causing him to call into question—on the public record—the entire monitoring process as well as Defendants' veracity.  Although Magistrate Judge Duncan did not have a two-way conversation with the KJZZ reporter or give an interview, the reporter's published account of Magistrate Judge Duncan's in-court reaction to the KJZZ article was effectively the

---

[11] *See* https://kjzz.org/content/583172/federal-judge-calls-hearing-after-kjzz-report-arizona-prison-health-care (noting that Magistrate Judge Duncan "furiously addressed the courtroom," "[w]aving his iPad and pointing to" the KJZZ article).

same, even quoting him extensively for yelling at Defendants because he was both literally and figuratively "standing up" for inmates.

Because the facts here show a reasonable appearance of bias from extrajudicial sources of influence, it is on all fours with *South Florida Water Management District*. Indeed, Plaintiffs do not dispute that the KJZZ article was an extrajudicial source of information that influenced his view of the issues, rendering disqualification also necessary under § 455(b)(1). Nor can they make the argument, as the reporter's emails with Dr. Watson leave no doubt of their intent to communicate with and influence him, even if there was no two-way ex parte communication.

### C. Magistrate Judge Duncan Allowed Ex Parte Communications (with Corizon Employees) to Influence His Decisionmaking and Issues in this Case.

For similar reasons, Plaintiffs incorrectly argue that receiving unsolicited calls from the public are harmless because Magistrate Judge Duncan stated he did not act on them. (Dkt. 2732 at 36-39.) Plaintiffs again miss the point. Magistrate Judge Duncan stated that he "receives phone calls in chambers from people who work for Corizon who say essentially, it is so much worse than you think." (Dkt. 2641-1 at 260.) And although he stated he tells the callers he "cannot protect" them and that he "can't act upon it," he acknowledged that these calls "add[] to the filter of how I evaluate what I see on a website from KJZZ that indicates that a memo went from the contractor to the contractor's doctors instructing them how to do an end run around my Stipulation-monitoring responsibilities." (Id.) Thus, he acknowledged that these ex parte communications corroborated—for him—the extrajudicial KJZZ article, which, in turn, incited a series of biased statements and caused him to discredit evidence of Defendants' compliance and monitoring process. Thus, it *did* have an "adverse effect." (Dkt. 2732 at 37:10-12.) Moreover, judges cannot "consider ex parte communications." ABA Model Code, Canon 2, Rule 2.9(A). Contrary to Plaintiffs' assertions, Magistrate Judge Duncan did not disregard the information, and this is not mere speculation. (Id. at 37:22-25.) Magistrate Judge Duncan acknowledges he *did* consider them and, as discussed above, it profoundly affected his decisionmaking.

1   Plaintiffs attempt to distinguish *El Fenix de Puerto Rico v. M/Y Johanny*, 954 F.

2   Supp. 23, 24 (D.P.R. 1996), as a factually dissimilar case because it involved a judge's

3   reliance on his friend's view of the evidence in an admiralty case.  But Defendants cited

4   *El Fenix* to support their contention that the ex parte communications that Magistrate

5   Judge Duncan admitted receiving in chambers from Corizon employees, like the KJZZ

6   article, served as a "filter" to influence his views of the adjudicative issues.  That is

7   precisely why the district court judge in *El Fenix* was disqualified for apparent bias under

8   § 455(a).  *Id.* at 26.  And to the extent that the judge's friend's views influenced his

9   determination of witness credibility in that case—as the ex parte communications from

10   Corizon employees did by influencing Magistrate Judge's "filter" in this one—he would

11   have also been disqualified for actual bias under § 455(b)(1).  *Id.*

12   **D.  Magistrate Judge Duncan's Chambers Referred an Adverse Witness**
13   **(Dr. Watson) to an Attorney and Did Not Disclose that Ex Parte Communication or Referral To Defendants.**

14   Plaintiffs incorrectly characterize the Court's referral as a "routine administrative"

15   or "ministerial" act and argue it did nothing more than "answer[] the phone in chambers"

16   and "give[] out the name of an attorney of record at the caller's request."  (Dkt. 2732 at

17   40:9-18.)  That misstates the record.  First, Dr. Watson testified that she called Magistrate

18   Judge Duncan's chambers because she wanted to *report her allegations*.  (Dkt. 2692-1 at

19   224-226.)   Her described purpose for the call is consistent with Magistrate Judge

20   Duncan's statement that he "receives phone calls in chambers from people who work for

21   Corizon who say essentially, it is so much worse than you think."  (Dkt. 2641-1 at 260.)

22   This was not a mere ministerial matter.  The substance went to the heart of this litigation:

23   Defendants' compliance with the Stipulation.  Second, Dr. Watson testified that, when she

24   called, his chambers gave her "the name of another attorney."  (Dkt. 2692-1 at 226.)  Dr.

25   Watson never testified that she *requested* the name of any attorney, much less the name of

26   an "attorney of record," nor did she testify that she was given the name of an "attorney of

27   record."  Thus, the evidence is that Magistrate Judge Duncan's chambers *voluntarily*

28   referred Dr. Watson—someone hoping to disclose untoward allegations on the merits

19

against a party in a pending matter—to an attorney.  In no way was this ministerial or administrative.

Plaintiffs chalk this up to court protocol. But the circumstances do not fit. Magistrate Judge Duncan stated that his staff is instructed to give the name of Plaintiffs' or Defendants' counsel *if the caller asks for their names* because it is a matter of public record.  (Dkt. 2692-2 at 10 ["If they ask for particular names of the lawyers, if they say, who are the plaintiffs' lawyers or who are the defendants' lawyers, that is not contrary to my instruction that that information may be given. It's a matter of the public docket."].) But Dr. Watson did not ask for the names of either Plaintiffs' counsel or Defendants' counsel. (Dkt. 2692-1 at 226.)  His staff was also instructed to give "family members of the plaintiff class" Ms. Eidenbach's name.  (Dkt. 2692-2 at 10-11.)  But Dr. Watson is not a family member.  Thus, there was no valid reason for his chambers to give Dr. Watson the name of "another attorney."

Plaintiffs argue there is no bias or harm because Magistrate Judge Duncan disclaimed knowing Dr. Watson had called his chambers.  But even assuming he (or his staff) did not know, at the time, that it was *Dr. Watson* who called, the fact of the matter is they still referred her (an adverse witness) to an attorney.  The referral itself is bias, both actual and apparent.  And the harms are to Defendants as well as the public confidence in the integrity of the judiciary.  *See* ABA Model Code, Canon 1.  For that same reason, Plaintiffs' assertion that "[t]he Court took no action in response to Dr. Watson's call to chambers" is also inaccurate and insufficient.  (Dkt. 2732 at 41:6-7.)

Plaintiffs try to insulate Magistrate Judge Duncan by arguing that the "views" of his staff cannot be imputed to him. (Dkt. 2732 at 40:22-26.)  The cases they cite for that proposition are inapposite because the basis for disqualification is not his staff's views or opinions about the case.  *Cf. In re Corrugated Container Antitrust Litig.*, 614 F.2d 958, 968 (5th Cir. 1980) ("[T]he law clerk voiced her opinions on the resolution of the criminal case"); *Doe v. Cabrera*, 134 F. Supp. 3d 439, 441 (D.D.C. 2015) (disqualification based on law clerk's comments "in jest to members of defense counsel's law firm" "that she

20

influenced the Court's decisionmaking process with respect to certain discovery rulings in this case"). The basis for Magistrate Judge Duncan's disqualification is his staff's *conduct*—prohibited ex parte communications on substantive issues—while *in chambers*. Court staff "is forbidden to do all that is prohibited to the judge" and it is their "duty" to "avoid any contacts outside the record that might affect the outcome of the litigation." *Hall v. Small Business Admin.*, 695 F.2d 175, 179 (5th Cir. 1983) (internal quotations and citation omitted). Thus, staff, like judges, must avoid the appearance of impropriety. Code of Conduct for United States Judges ("Judicial Code of Conduct"), Cannon 2; *see also Hamid v. Price Waterhouse*, 51 F.3d 1411, 1416 (9th Cir. 1995) ("Even if the judge has no reason to recuse herself based upon her own circumstances, a law clerk's relationships might cause the impartiality of decisions from that judge's chambers in which the clerk participates reasonably to be questioned."). Referring an adverse witness to an attorney *creates* the appearance of impropriety. *See Klein v. Walker*, 1:14-CV-00509-RC, 2016 WL 9244670, at *1 (E.D. Tex. Sept. 1, 2016) (noting that in another case the district court judge recused himself in "an abundance of caution" because of allegations of ex parte communications between law clerk and litigant gave appearance of bias and "what matters is not the reality of bias or prejudice but its appearance") (citing *Liteky*, 510 U.S. at 548).

Plaintiffs do not respond to perhaps the most egregious violation relating to this event:  Magistrate Judge Duncan did not disclose this ex parte communication when it occurred, as he should have done.  *See* Judicial Code of Conduct, Canon 3A(4) ("If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested."). Dr. Watson disclosed it during her testimony.  Magistrate Judge Duncan also did not disclose the fact that his chambers has referred or will refer Corizon employees to an attorney when they call to report substantive allegations against Corizon and/or ADC.  If that was a "routine" "administrative" procedure, it should have been conveyed to Defendants.  But it

was never disclosed and, in fact, Magistrate Judge Duncan previously told Defendants, "I really haven't acted on it … I can't act upon it."  (Dkt. 2641-1 at 260.)  Had Defendants known in December 2017 that this was going on, they would have objected.  *See* 28 U.S.C. § 455(e) (no waiver of disqualification under § 455(b); no waiver under § 455(a) unless preceded by a full disclosure on the record of the basis for disqualification").  But it was never brought to their attention. At a minimum, any observer would conclude that these circumstances call into question Magistrate Judge Duncan's impartiality.

### CONCLUSION

Because Magistrate Judge Duncan's statements and conduct exhibit actual and apparent bias against Defendants, he should be disqualified from all further proceedings.

DATED this 17th day of April 2018.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/Daniel P. Struck
    Daniel P. Struck
    Rachel Love
    Timothy J. Bojanowski
    3100 West Ray Road, Suite 300
    Chandler, Arizona  85226

    Arizona Attorney General Mark Brnovich
    Office of the Attorney General
    Michael E. Gottfried
    Assistant Attorneys General
    15 South 15th Avenue
    Phoenix, Arizona 85007

    *Attorneys for Defendants*

22

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:            ahardy@prisonlaw.com

Amelia M. Gerlicher:     agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

Amy B. Fettig:           afettig@npp-aclu.org

Asim Dietrich:           adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Caroline N. Mitchell:    cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:      ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:     DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

David Cyrus Fathi:       dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:          dspecter@prisonlaw.com

Jessica Pari Jansepar Ross:   jross@azdisabilitylaw.org

John Howard Gray:        jhgray@perkinscoie.com; slawson@perkinscoie.com

John Laurens Wilkes:     jlwilkes@jonesday.com, dkkerr@jonesday.com

Jose de Jesus Rico:      jrico@azdisabilitylaw.org

Kathleen E. Brody        kbrody@acluaz.org

Kirstin T. Eidenbach:    kirstin@eidenbachlaw.com

Maya Abela               mabela@azdisabilitylaw.org

Rose Daly-Rooney:        rdalyrooney@azdisabilitylaw.org

Sara Norman:             snorman@prisonlaw.com

Sarah Eve Kader:         skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org

Rita K. Lomio:           rlomio@prisonlaw.com

Victoria Lopez:          vlopez@aclu.org

1

2        I hereby certify that on this same date, I served the attached document by U.S.
Mail, postage prepaid, on the following, who is not a registered participant of the
3   CM/ECF System:

4        N/A

5                                    /s/Daniel P. Struck

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28