1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                  _____

4

    Victor Parsons, et al., on    )
5   behalf of themselves and all  )
    others similarly situated;     )
6   and Arizona Center for         )
    Disability Law,                )
7                                  )   No. CV 12-00601-PHX-DKD
                    Plaintiffs,    )
8                                  )
              vs.                  )   Phoenix, Arizona
9                                  )   April 10, 2018
    Charles Ryan, Director,        )   1:03 p.m.
10  Arizona Department of          )
    Corrections; and Richard       )
11  Pratt, Interim Division        )
    Director, Division of Health   )
12  Services, Arizona Department   )
    of Corrections, in their       )
13  Official capacities,           )
                                   )
14                  Defendants.    )
    _____   )
15

16

      BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE
17
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
18
            (*Evidentiary Hearing/Order to Show Cause*)
19                        Day 6
              (*Pages 1120 through 1247, inclusive.*)
20

21

    Official Court Reporter:
22  Laurie A. Adams, RMR, CRR
    Sandra Day O'Connor U.S. Courthouse, Suite 312
23  401 West Washington Street, Spc 43
    Phoenix, Arizona 85003-2151
24  (602) 322-7256
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

1    A P P E A R A N C E S

2  For the Plaintiffs:

3          PRISON LAW OFFICE
           By:  Corene Kendrick, Esq.
4          1917 5th Street
           Berkeley, CA 94710
5
           EIDENBACH LAW PC
6          By:  Kirstin T. Eidenbach, Esq.
           P.O. Box 91398
7          Tucson, AZ 85752

8          ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
           By:  Maya S. Abela, Esq.
9          177 N. Church Avenue
           Suite 800
10         Tucson, AZ 85701

11  For the Defendants:

12         STRUCK LOVE BOJANOWSKI & ACEDO PLC
           By: Daniel Struck, Esq.
13         By: Rachel Love, Esq.
           By: Timothy J. Bojanowski, Esq.
14         By: Richard Valenti, Esq.
           3100 W. Ray Road
15         Suite 300
           Chandler, AZ 85226

16

17

18

19

20

21

22

23

24

25

1

I N D E X

WITNESS:                    DIRECT     CROSS      REDIRECT   RECROSS

CARSON MCWILLIAMS
By Ms. Love (Resumed)       1124

RICHARD PRATT
By Mr. Bojanowski (Resumed)                       1170
By Ms. Kendrick                                              1199

INDEX OF EXHIBITS

| EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|
| 105 | E-mail from Richard Pratt to Scot Ward dated 11-5-17 Regarding Follow-Up on Daily Reporting | 1178 | 1206 |
| 106 | E-mail from Charles Ryan to Richard Pratt dated 11-2-17 Regarding Follow-Up on Daily Reporting | 1177 | 1206 |

1    P R O C E E D I N G S

2         THE MAGISTRATE JUDGE COURTROOM CLERK:  Civil Case

3    Number 12-601, Parsons, et al., versus Ryan, et al., on for

4    continuation of Order to Show Cause hearing.

5         THE COURT:  Good afternoon.  Would counsel please        01:03PM

6    announce.

7         MS. KENDRICK:  Good afternoon, Your Honor.  Corene

8    Kendrick from the Prison Law Office for the plaintiff class.

9         THE COURT:  Good afternoon.

10        MS. EIDENBACH:  Good afternoon, Your Honor.  Kirsten     01:03PM

11   Eidenbach for the prisoner plaintiff class.

12        THE COURT:  Thank you.  Good afternoon.

13        MS. ABELA:  Good afternoon.  Maya Abela for the

14   Arizona Center for Disability Law.

15        THE COURT:  Thank you.  Good afternoon.                  01:03PM

16        MS. LOVE:  Good afternoon, Your Honor.  Rachel Love,

17   Dan Struck, Timothy Bojanowski, and Richard Valenti for

18   defendants.

19        THE COURT:  Thank you.  Good afternoon all.

20        Are we ready to continue with the redirect of Mr.       01:03PM

21   Pratt?

22        MS. LOVE:  Yes, we are, Your Honor.

23        THE COURT:  Mr. Pratt, if you would kindly return to

24   the witness stand.

25        MS. LOVE:  Actually, I'm sorry.  It's Division          01:03PM

1  Director McWilliams is who we were going to continue with.

2           THE COURT:  All right.  That's fine.

3           Sorry, Mr. Pratt.

4           Mr. McWilliams, if you would kindly return to the

5  witness stand.  Appreciate the fact that you have been willing    01:04PM

6  to be bumped from time to time while we deal with the emergent

7  and exigent schedules, I guess, and so thank you, sir.

8           THE WITNESS:  No problem.  You're welcome.

9                       CARSON MCWILLIAMS,

10  a witness herein, having been previously duly sworn by the

11  clerk to speak the truth and nothing but the truth, was

12  examined and testified further as follows:

13                  DIRECT EXAMINATION (Resumed)

14  BY MS. LOVE:

15  Q.  Division Director McWilliams, when we left off with your     01:04PM

16  testimony the last time, we were discussing the DI that governs

17  procedures for medication transports.  Do you recall that

18  testimony?

19  A.  Yes, I do.

20  Q.  And if you need to refer to it, already in evidence is DI     01:04PM

21  361 that's Exhibit Number 2 in front of you just if you need to

22  refer to it.  But just for a short recap, we talked about the

23  transition from the August 30th or the August 2017 memorandum

24  and then which found its way to DI 361 that there were some

25  additions such as procedure for unscheduled and after hours      01:05PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 6 of 128

1125

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1  transports which we talked about, correct?

2  A.  Correct.

3  Q.  Also, in addition to the DI was a distribution list.  Is

4  that correct?

5  A.  Yes, it is.                                                    01:05PM

6  Q.  And that distribution list is something that's on the

7  shared drive that you spoke about before?

8  A.  Yes, it is.

9  Q.  We also talked about the transportation coordinator

10  position that was also created as a result, correct?          01:05PM

11  A.  Correct.

12  Q.  I want to talk to you a little bit more about the duties of

13  the transportation coordinator position with respect to the DI.

14  And we talked last time in general that the transportation

15  coordinator's position, the job is to track the transport      01:05PM

16  statewide on a daily basis, correct?

17  A.  Yes, it is.

18  Q.  And that is for intra-facility transports to state-run

19  complexes?

20  A.  Correct.                                                      01:05PM

21  Q.  How does this one person track the medication transfers for

22  transports that may be happening on a daily basis

23  simultaneously through all 10 state-run complexes?

24  A.  Well, the main part of their job or focus is two main

25  things.  One of them is they have the entire list of all        01:06PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 7 of 128
1126
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    transports that are happening that day, and they have that in

2    advance.  They get that list two days, one day at the

3    worst-case scenario in advance.  And then they adjust

4    transportation groups as necessary.  Let's say on any

5    particular day a large amount of inmates were being moved from          01:06PM

6    Lewis complex.  Well, they might adjust some officers,

7    transport officers over from Perryville because they didn't

8    have very many things happening transportation-wise over to

9    Lewis, just for the day, and they would take the staff and the

10   vehicles so they could help assist in the transports of that          01:06PM

11   particular place.

12           They also run the bus transport system so that they

13   could adjust along with someone, a coordinator in central

14   office.  It's a combination there.  And they -- to ensure that

15   they schedule all what we call statewide transports on our            01:07PM

16   transportation buses on a daily basis.

17   Q.  The transportation coordinator is monitoring whether or not

18   medications are making it with the inmate from the sending

19   facility to the receiving facility, correct?

20   A.  Yes, but they are looking more, because there's such a high       01:07PM

21   volume, they're looking more at some type of discrepancy.  So

22   if there's an issue with one of them then they are contacted,

23   because IR has to be generated.  That IR is electronically sent

24   to the transportation coordinator who then follows up

25   electronically with duty officers, transportation sergeants at       01:07PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 8 of 128
1127
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1  the receiving facility to ensure that that issue is addressed

2  upon arrival.

3  Q.  When you say "IR," is that an information report?

4  A.  Yes, it is.

5  Q.  And an information report then documents a discrepancy in

6  sending or receiving medications?

7  A.  Yes, it does.

8  Q.  Who advises the transportation coordinator of any

9  discrepancies?

10  A.  It would be the person that generates the information

11  report, and that's going to be done at the departing

12  institution and that IR would be generated either at the intake

13  receiving gate area either by the transportation sergeant or it

14  could actually be generated also by a Corizon employee.

15  Q.  And the discrepancies, those are tracked on the tracking

16  form, correct?

17  A.  Yes, they are.

18  Q.  Does any leadership personnel at the facility complex level

19  receive the discrepancy reports in addition to the

20  transportation coordinators looking at all 10 complexes?

21  A.  Yes.  The administrators at that particular facility would

22  also be aware of that.  That would entail the warden also would

23  know as well as the duty officer.  The unit where the inmate

24  was either coming from or going to would also be aware of it.

25  So that goes out to several different staff members.  The major

01:08PM

01:08PM

01:08PM

01:08PM

01:09PM

1  of the complex gets a copy of it.  So there's a lot of people

2  aware of the issue.

3  Q.  What is a duty officer?

4  A.  A duty officer is an administrator that's assigned to work

5  on a seven-day basis to cover outside-hour issues.  So they                01:09PM

6  would be -- they would work physically at the complex between

7  the hours of around 3:00 in the afternoon to around 1:00 in the

8  morning of the next day so that they could address any type of

9  issues that happen after normal business hours.

10  Q.  So does the assignment of a duty officer capture or provide           01:09PM

11  for leadership level personnel to be onsite post 5 p.m., for

12  example?

13  A.  Yes, they do.

14  Q.  Are there any meetings that are conducted on a daily basis

15  at the complex level to discuss whether or not a medication             01:10PM

16  transport discrepancy had occurred that day?

17  A.  Yes.  On a daily basis there's a meeting that occurs, and

18  the warden facilitates that.  And involved in that are the

19  health administrator, facility health administrator is involved

20  in it as well as the warden, the monitor from the department           01:10PM

21  side is involved in that meeting.  The transportation sergeant

22  might be involved in that meeting.  Other key personnel, like

23  the deputy warden of operations, might be involved in it.  But

24  there's several people that are involved in that meeting, and

25  it happens every afternoon during regular business days.               01:10PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 10 of 128

1129

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    THE COURT:  Can I interject for just -- when did this

2  daily meeting start?

3    THE WITNESS:  We used to -- the daily meetings started

4  around -- I'm not sure of the exact date, but I would think it

5  started around early in December, maybe late November.          01:11PM

6    THE COURT:  And it's a daily meeting that occurs at a

7  single place.  It's not a daily meeting at each facility?

8    THE WITNESS:  No.  It's a daily meeting at each

9  facility.

10    THE COURT:  At each complex, and it started sometime    01:11PM

11  in December?

12    THE WITNESS:  Or maybe late February -- or November, I

13  mean.

14    THE COURT:  Okay.  Thank you.

15  BY MS. LOVE:                                                   01:11PM

16  Q.  What is the purpose of the meeting?

17  A.  The meeting is to discuss issues.  It doesn't have to be

18  something with medication being transferred.  It could be other

19  medical issues.  But it is to discuss issues that anyone is

20  having with anything getting accomplished to ensure that we can  01:11PM

21  provide the best, you know, possible care that we can.

22  Q.  Are missed medical appointments discussed?

23  A.  Yes, they would be.

24  Q.  Are any potential missed outside consultation transports

25  discussed?                                                     01:12PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 11 of 128
1130
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   A.  Yes, they would be.

2   Q.  Are any staffing issues that may arise from the medical

3   side or the security side discussed?

4   A.  Yes, they are.

5   Q.  If you would take a look for me at Exhibit Number 77, which   01:12PM

6   should be there in your stack towards the end.

7   A.  Yes.

8   Q.  Do you recognize what this document is?

9   A.  Yes.  It's a tracking form for the medication transfers.

10  Q.  We're going to hold for a second so the judge can get his   01:12PM

11  form.

12         THE COURT:  Sorry.  We had a bench trial last week and

13  there's been an interloper file that remains.  All right.

14  Thank you very much.  I'm sorry.

15         I still don't have the right binder.  Give me a   01:13PM

16  second, please.  I'm sorry.

17         Thank you.  Please continue.

18         MS. LOVE:  Thank you, Your Honor.

19  BY MS. LOVE:

20  Q.  Okay.  So Exhibit Number 77 is a medication transport   01:13PM

21  report?

22  A.  Yes, it is.

23  Q.  And do you know for what time period?

24  A.  It looks like it's for a single day, which would be 2-12 of

25  18.   01:13PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 12 of 128

1131

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1  Q.  And from this document, are you able to tell which complex

2  this refers to?

3  A.  Yes.  It's the Lewis complex.

4  Q.  And how are you able to tell that it's the Lewis complex?

5  A.  The receiving unit locations are all Lewis.  All the IR         01:13PM

6  numbers are Lewis complex.

7  Q.  And how can you tell that the receiving unit codes are

8  Lewis?

9  A.  They have codes based on each unit, and the Ls are the

10  Lewis ones.                                                        01:14PM

11  Q.  And is this the form that is currently used by the Lewis

12  complex to track any medication transport discrepancies?

13  A.  It's used by all the complexes, but yes.

14  Q.  And I just want to go through this form so that we can all

15  understand what this form is showing us.  To the left but in       01:14PM

16  redacted form, the first column we have the inmate number and

17  next to it the inmate name.  Is that correct?

18  A.  Yes.

19  Q.  And then next to that there's the receiving unit?

20  A.  Correct.                                                       01:14PM

21  Q.  And then there's a column for KOP meds.  Do you see that?

22  A.  Yes, I do.

23  Q.  And in this particular example, there's, for particular

24  inmates, there may be an N or a Y.  Do you know what that

25  indicates?                                                         01:14PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    A.  It would be a yes or a no.  So it would -- whether they had

2    those or not.  Not every inmate getting transported is going to

3    have medications.

4    Q.  So if we take the first line, the first inmate whose name

5    is redacted, and it says KOP meds, no, does that mean that                01:15PM

6    particular inmate was not prescribed any KOP meds?

7    A.  Correct.  And then -- yes.  Where it says missing

8    medications, it says it's not applicable.

9    Q.  And there's also a column for the IR number, is that

10   correct?                                                                  01:15PM

11   A.  Yes.

12   Q.  And what is that used for?

13   A.  If there was a discrepancy in it then that IR would detail

14   out what the discrepancy was.

15   Q.  And on this, on Page 1 of Exhibit Number 77, there are               01:15PM

16   columns that have, for instance, like the second line says 18

17   and dash and some numbers.  Does that indicate what the IR

18   number is?

19   A.  Yes.  And so it would be one IR generated for each issue

20   that they -- and they could list more than one medication, but          01:15PM

21   one for each inmate.

22   Q.  And next column says "next dose due by" and there's a date

23   and time.  Do you know what information that is to provide?

24   A.  Yes.  That's the next dose is due that same day, and then

25   the next column a time.  It would be whether it's an a.m. or            01:16PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 14 of 128

1133

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   p.m. dose.

2   Q.  And then the next column it says, at the very top, it says

3   "ADO" for the next two sections.  What does that mean?

4   A.  That's the administrative duty officer.  That is to have

5   them to pay attention to what's being put into here because          01:16PM

6   this is the action that was taken.

7   Q.  And the previous columns that we discussed about starting

8   with inmate number and ending with "next dose by" at the top it

9   says, "Corizon intake nurse."  Do you see that?

10  A.  Yes.                                                             01:16PM

11  Q.  Is that information in those columns under the Corizon

12  intake nurse section, is that information that's actually

13  filled out on this form by the intake nurse?

14  A.  Yes, it is.

15  Q.  And then going back to the two sections delineated under      01:16PM

16  the ADO header, you have action taken, which you talked about,

17  and then time.  Is that just to indicate what time the action

18  was taken?

19  A.  Yes, it is.

20  Q.  Now, at the very bottom of the form do you see three          01:17PM

21  signatures?

22  A.  Yes, I do.

23  Q.  So the first one states complex shift commander signature.

24  What is a complex shift commander's duties?

25  A.  The shift commander would manage the shift for that           01:17PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 15 of 128

1134

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   particular day.  In this particular case, they would be someone

2   that was just ensuring that that inmate received what they were

3   supposed to receive.

4   Q.  There's also a signature line for the ADO, and you talked

5   about the ADO before?                                              01:17PM

6   A.  Yes.

7   Q.  And Corizon staff signature.  Do you see that?

8   A.  Yes.

9   Q.  Do you know at what point in time when this daily transport

10  report is generated what -- at what point do people actually      01:17PM

11  sign off on the report?

12  A.  They shouldn't sign off on it until later in the day when

13  things have been accomplished.  One of the processes with this

14  form -- and this form was developed originally but then tweaked

15  and modified a little bit after we got the position for the       01:18PM

16  coordinator position.  After he looked at everything and saw

17  what was going on he decided to make it a little bit more

18  comprehensive on how we did things and making sure that we had

19  the signatures.

20          So it should be later in the evening.  It should          01:18PM

21  ensure that certain things have been done.  And so the Corizon

22  nurse would be responsible for ensuring that the medication was

23  dispensed to the proper inmate and that the record of that was

24  indicated in eOMIS so that when they sign off on it, that's

25  basically saying all these things were accomplished.              01:18PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 16 of 128

1135

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   Q.  Now, if you take a look at Page 1 of Exhibit Number 77, and

2   five lines down, because we have the inmate's name redacted,

3   it's probably easier to direct you to the right-hand column

4   where it says "Time 1954," do you see that?

5   A.  Yes, I do.                                                01:19PM

6   Q.  If you track that over to the left, under "missing

7   medications yes or no," for this particular inmate there is a

8   Y.  Do you see that?

9   A.  Yes, I do.

10  Q.  So does that indicate that there was a discrepancy that the   01:19PM

11  inmate did not arrive with medication?

12  A.  Yes.  That would indicate that.

13  Q.  And for this particular inmate it was a KOP medication?

14  A.  Yes, it was.

15  Q.  Is that indicated by the Column 2 to the left that says KOP   01:19PM

16  meds and there's a Y there?

17  A.  Yes.

18  Q.  And then we see that there is an IR number written in,

19  correct?

20  A.  Yes.                                                      01:19PM

21  Q.  Would that indicate to you that an IR was written regarding

22  this discrepancy?

23  A.  Yes, it would.

24  Q.  And then to the right under the column for next dose by, it

25  says "2-12-18" and "p.m."  What does that mean to you?        01:19PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

```
 1  A.  Well, the dose for that particular medication would be that

 2  day in the afternoon, the p.m. dose.

 3  Q.  And I know that this document through copying is little

 4  difficult to read, but are you able to see what action was

 5  taken with respect to this particular inmate?                    01:20PM

 6  A.  Yes.  It looks like the pharmacy was notified and they

 7  actually had to go to two Walgreen's to get it.

 8  Q.  And what does the -- under time where it says 1954, what

 9  does that denote?

10  A.  That would denote the time that that actually occurred.      01:20PM

11  Q.  So the inmate was actually given --

12  A.  Yes.

13  Q.  So translation to non-military time, at 7:54 p.m. the

14  inmate did receive the medication?

15  A.  Yes.  That's correct.  1954 would be 7:54, yeah.             01:20PM

16  Q.  And then if you go down following the time column to the

17  right, down to the next one where it says "1953"?

18  A.  Yes.

19  Q.  Follow over to the left, here's another inmate that

20  indicates that there was a missing medication.  Correct?        01:21PM

21  A.  Correct.

22  Q.  And that an IR was written?

23  A.  Yes, it was.

24  Q.  That the inmate's next dose was a p.m. dose for 2-12 of

25  2018?                                                           01:21PM
```

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 18 of 128

1137

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   A.  Yes, it was.

2   Q.  And are you able to tell us what action was taken with

3   respect to that discrepancy?

4   A.  Yeah.  It looks like the same.  It was they had to go to

5   Walgreen's to get the medication.                                01:21PM

6   Q.  And does this form indicate whether or not the inmate did

7   receive a p.m. dose that day?

8   A.  Yes, it would then 1953, one minute prior to the other one.

9   Q.  Now, if you go down to the next two on the time column,

10  1651 and 1737 hours, do you see those two inmates?               01:21PM

11  A.  Yes, I do.

12  Q.  If you follow this one over to the left, under the missing

13  medications column, it says "no" for both inmates, yet IRs were

14  written.  And for both inmates it says that the LPN Jensen

15  verified meds were given.                                        01:22PM

16          Do you know -- can you explain to us what this means

17  where on the form it doesn't indicate that medications were

18  missing, yet there is some action taken?

19          MS. EIDENBACH:  Objection, Your Honor.  Foundation.

20  There's no way that Mr. McWilliams knows why the LPN or how she  01:22PM

21  was able to verify it.  He can only tell us what he is reading

22  before him.

23          THE COURT:  Well, it's a "do you know" question that

24  starts out but then is "can you explain."  So let's go to the

25  do you know first.  Do you know what this means on this form?    01:22PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 19 of 128

1138

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    THE WITNESS:  I don't know exactly because it's more

2  than one thing it could, but there's a general thing that it

3  could be.

4    THE COURT:  Well, then we don't think you need to

5  answer.  The objection is sustained.                    01:23PM

6  BY MS. LOVE:

7  Q.  Next to time stamps are down -- or the time columns,

8  there's an 1856.  Do you see that?

9  A.  Yes, I do.

10  Q.  If you follow that over for this particular inmate, it    01:23PM

11  indicates that there was a missing medication, correct?

12  A.  Yes.

13  Q.  That an IR was written?

14  A.  Yes.

15  Q.  That the next dose was due by 2-12-18, p.m.?          01:23PM

16  A.  Yes.

17  Q.  And are you able to tell us what action was taken?

18  A.  It looks like this particular medication, they had it in

19  stock, in clinic stock, and so they retrieved it and

20  administered it at 1856.                                01:23PM

21  Q.  So the inmate did receive a dosage that evening, correct?

22  A.  Correct.

23  Q.  Then the last one on Page 1, or in the time column of 1358,

24  if you follow that one over there's another medication

25  discrepancy?                                            01:24PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 20 of 128

1139

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    A.  Yes.

2    Q.  Or actually, did this one, in the missing medication column

3    it indicates no.  Do you see that?

4    A.  Yes, it looks like they had their KOP meds with them, yes.

5    It's an a.m. and the missing medication, yes.                    01:24PM

6    Q.  Do you know what action was taken for that one according to

7    this form?

8           MS. EIDENBACH:  Your Honor, objection.  Foundation

9    again.  It's, once again, asking Mr. McWilliams to speculate on

10   whether -- or what the LPN did.                                  01:24PM

11          THE COURT:  Do you know, sir?

12          THE WITNESS:  In this one it actually tells what they

13   did.  In this one it says that the intake nurse, actually LPN,

14   administered the dose.  So it looks like they gave --

15          THE COURT:  Hold on just a second.  You are using        01:24PM

16   terms that are a little bit troubling because you are saying

17   "it looks like" rather than saying it is.

18          THE WITNESS:  That's what it says.  It says the LPN

19   intake gave --

20          MS. EIDENBACH:  Your Honor.                              01:25PM

21          THE COURT:  Hold on just a second.

22          THE WITNESS:  -- p.m. dose on 2-12-18 at 1358 is when

23   they gave the dose to them.  So that would indicate that that

24   dose was given to this inmate at 1358 on 2-12.

25          THE COURT:  But you had nothing to do with the           01:25PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 21 of 128

1140

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    preparation of this document that indicates that, right?

2              THE WITNESS:  No.  I didn't write this document.

3              THE COURT:  You are essentially doing what I could do

4    and read what it says, but I have no way of knowing whether

5    it's accurate or not.  I don't know.  Can you lay a foundation          01:25PM

6    for this witness?

7              MS. LOVE:  Your Honor, we offer this exhibit and we

8    offer it into evidence as per his testimony as to what are the

9    actions from the operations side taken to address PM 35 and the

10   systems put in place.                                                  01:25PM

11             THE COURT:  Well, he can certainly testify about the

12   systems put in place.  He can't really testify about whether or

13   not in individual incidences these corrective measures have

14   been taken because he's reading a report for which no

15   foundation is laid.  So to the extent that the objection is           01:26PM

16   raised with respect to the truth of whether or not this

17   corrective action was taken, that objection will be sustained.

18   With respect to overall procedure he can testify about the

19   procedure he's giving examples of he's reading this but I'm not

20   going to take anything he said as being pertinent or                  01:26PM

21   determinative of the fact of that being done because I don't

22   have a witness here who can testify about the foundation of

23   that document.

24             MS. LOVE:  Defendants offer this exhibit into evidence

25   with the caveat that you just explained that we offer this           01:26PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 22 of 128

1141

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   evidence to show the systems that ADC is taking from the

2   operations side and how information is tracked and -- tracked

3   and action taken, not for the purpose of Carson McWilliams

4   testifying as to what an LPN did on that particular day.

5           MS. EIDENBACH:  Your Honor, if that is the purpose for   01:26PM

6   which defendants are entering this exhibit then I'm not sure

7   how this line of questioning is relevant because we're going

8   through instance by instance with Mr. McWilliams testifying

9   about what actions were taken and what happened on that day and

10  that time with a particular prisoner.                           01:27PM

11          So I think if that's how -- if that's what defendants

12  want to offer this for, then we would object to this line of

13  questioning.

14          THE COURT:  It doesn't make sense for us to go through

15  inmate-by-inmate experience because of the reasons just         01:27PM

16  expressed by Ms. Eidenbach.  So the information that you are

17  trying to convey in this presentation is one that this witness

18  is competent to testify that there is a mechanism in place that

19  is supposed to address this.  Whether or not it worked in these

20  individual cases, I don't know because I don't have a           01:27PM

21  foundation for that.  So I'm well aware of the nature of the

22  objection and sensitive to that issue.

23          You may continue.

24          MS. LOVE:  And defendants move to admit this exhibit

25  for your consideration for the purpose of evidence as to ADC    01:27PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 23 of 128

1142

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

 1    taking reasonable efforts to comply with your Order to Show

 2    Cause and the systems put in place, for that limited.

 3            THE COURT:  Any objection?

 4            MS. EIDENBACH:  Only insofar as it's being put in in

 5    any way about the veracity of each individual entry, since we          01:28PM

 6    have no way of verifying whether those are accurate or true.

 7            THE COURT:  I think that that limitation is more apt

 8    than the one that you offered, Ms. Love, because yours is

 9    broader because it seems to suggest that this is evidence of

10    reasonable steps, a separate component of whether those                01:28PM

11    reasonable steps were taken, whether it actually is accurate.

12    And so we know that there is, from this witness, a mechanism

13    that was put in place.  We don't know whether or not it

14    actually worked.  But we have a form that suggests that there

15    is somebody who indicated actions that were taken but we can't         01:28PM

16    really take that into evidence because we don't have a witness

17    who can lay the foundation for it.

18            So subject to this reservation, the exhibit will be

19    admitted.

20            MS. EIDENBACH:  Thank you.                                     01:28PM

21    BY MS. LOVE:

22    Q.  And Division Director McWilliams, is it your opinion that

23    ADC from the operations side has taken all reasonable steps to

24    comply with the stipulation and with the Order to Show Cause

25    with respect to Performance Measure 35 and medication                  01:29PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 24 of 128
1143
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    transports?

2         MS. EIDENBACH:  Objection, Your Honor.  This calls for

3    a legal conclusion.

4         THE COURT:  Well, sir, we're not asking you to fill in

5    information that would fit a legal definition.  This is a lower     01:29PM

6    case reasonable steps that your lawyer is asking do you think

7    the Department of Corrections has taken reasonable steps.  It's

8    not going to be determinative of the legal issue but just your

9    opinion about understanding those two words, lower case,

10   meaning they are not some defined term but whether you think     01:29PM

11   the State took all reasonable steps.

12        THE WITNESS:  Yes, I do think so.

13        THE COURT:  And do you think they took them rather

14   late?

15        THE WITNESS:  No, I do not.     01:29PM

16        THE COURT:  Well, I have to ask why that is, because I

17   imagine you have been aware for a considerable amount of time

18   of probably two things:  One, I have been very concerned about

19   this performance measure, and I have raised a lot of concern

20   about it early on for years, literally for years.  And I have     01:30PM

21   also expressed great frustration as to why what seemed to me to

22   be a solvable problem wasn't solved sooner.  And the reason I

23   thought it was solvable was because I knew that you managed

24   tens of thousands of prisoners on a daily basis, and that you

25   did some really significant things on a routine basis and that     01:30PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 25 of 128

1144

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   is you moved them about from complex to complex.  And you had,

2   I have come to understand very quickly, sensitive issues

3   addressed with those movements.  You had to make sure you

4   didn't move someone into a yard where there was a danger

5   because of that movement.                                    01:30PM

6          So you paid attention to what was happening with that

7   move, and it always was amazing to me if you could get all

8   these other things, apparently, in place that with all the

9   resources you had available to you, I couldn't understand why

10  it was month after month I see failures.  In fact, if I look at   01:31PM

11  what happened in January of 2018, two complexes failed here.

12         And so here we are, this measure with this committee

13  that meets on a daily basis that was put in place, again, I

14  would say rather late, November, December of 2017, and even it

15  hasn't resolved in compliance at two complexes in January of   01:31PM

16  2018.

17         So I guess I can understand that you think that

18  reasonable steps have been taken.  I will maybe have some issue

19  with that because we still haven't resolved the issue such that

20  we have complex at -- compliance at two very large complexes.   01:31PM

21  But I guess I have to ask you to explain to me how is it

22  reasonable that you took so long to take these steps when you

23  knew that this was a big issue, a necessary issue, that it

24  mattered.  I don't just say "big issue" because, oh, this was

25  something that was written in the stipulation.  It was put   01:32PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 26 of 128

1145

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

 1  there and negotiated by the parties because of something that

 2  everybody knows.  And that is if you have been prescribed a

 3  medication and you are taking it on a daily basis, for many

 4  medications it's very dangerous to not have that medication on

 5  a daily basis.                                            01:32PM

 6       And so this chronicle that has been part of this case

 7  on the failure of this performance measure is something that is

 8  based upon the importance of the performance measure.  That's

 9  one of the reasons I have been so focused on it.  And I have

10  been greatly puzzled by how it is that it took so long.  So    01:32PM

11  when you say you don't think it was delayed, I want to

12  understand how can that be a reasonable view?

13       Do you have any response to what I have said?

14            THE WITNESS:  Yes.  It's a fairly complicated

15  question.                                                 01:32PM

16            THE COURT:  Actually, if you want I can boil it down

17  to two simple things:  I can boil it down to, one, why is it

18  that it took so long for you to get into place where you had

19  these measures you talked to me about that you think are

20  reasonable?  Most of them you have talked to me about, sounds  01:33PM

21  like the ones you have talked about have been mostly October

22  going forward.  And this committee you talked about was late

23  November/December.

24       So how is it that that's just really not so late, and

25  how is it that it just has been something you still can't even  01:33PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 27 of 128

1146

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    solve here in our most recent reporting?  Actually, it's not

2    the most recent reporting, the second most recent reporting.  I

3    mean, I don't want you to think it's hugely complex because it

4    doesn't seem that way to me.  So if you are thinking it's

5    complex, I'm not communicating well, because I think the                01:33PM

6    problem is not complex.  I mean, identifying the problem, what

7    we know, and again, I mean, I think you could say the same

8    thing about complexity with respect to moving somebody who's

9    got a criminal history pages maybe dozens of pages long,

10   somebody goes through those dozens of pages before you move     01:34PM

11   somebody, I would imagine, to see whether or not they have some

12   incident in the past that would be they would kill one other if

13   they got on a lot together.  Is that fair, reasonable, somebody

14   does that?

15            THE WITNESS:  Yes.  Time frames aren't the same, but    01:34PM

16   yes.

17            THE COURT:  Why can't we do the same kind of attention

18   to detail with respect to the health and safety of these

19   inmates in a different category, and that is that they get

20   their medicine?                                                   01:34PM

21            THE WITNESS:  In my opinion we certainly are taking

22   the steps.  And it didn't just start in November.  Some

23   components didn't start until then.  But we actually started

24   dealing with this early in the summer of last year with the

25   idea about how we could make this work smoother.  And then we    01:34PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 28 of 128

1147

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    did the first direction out about the process of going through

2    the process that's in the DI in 361, that came out in August.

3    And then it got refined and it -- the DI came out in October.

4    Along with that, we also had to select someone to be this

5    coordinator.  This is not an easy job, the coordinator                01:35PM

6    position.  We had to get someone with a real unique skill set,

7    someone that we also knew we had faith in that could do some of

8    these things.

9            So that took a little bit of time because that person

10   had a job already, to get them out of that job and put them          01:35PM

11   into this job.  Then they had a personal issue, we had to wait

12   a couple of weeks for them to physically start working.  So

13   they didn't physically start working until the middle of

14   November.

15           Then the processes that we have to do with that,             01:35PM

16   there's a whole lot of moving parts in this.  There's people

17   from all around the state, transportation.  There's people that

18   are doing inventories in the evening time in different units

19   that are involved with the KOP side of things.  There's a bunch

20   of medical people involved in it and, of course, transportation     01:36PM

21   officers.

22           With the volume of moves and all the people that are

23   involved in this, I do think we are taking progress.  In fact,

24   I look at the preliminary numbers for February, and I see that

25   everyone was over 85 percent in that month.  So I do think it's      01:36PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 29 of 128

1148

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    improving.  And I think it will continue to improve.

2         So I believe, yes, we have put things into place,

3    everything we could possibly do to do that and we continually

4    monitor and try to make this work.

5         THE COURT:  Why did it take three years?                01:36PM

6         THE WITNESS:  Well, I think as part of the

7    stipulation, I think when we went into this stipulation,

8    originally it was a four-year type of plan for things to occur.

9    We knew we weren't going to be able to flip a switch.

10        THE COURT:  Again, I will have to say, I can argue       01:36PM

11   with the lawyers.  I don't want you to say that.  I don't know

12   where that notion comes from that this was a four-year plan.

13   No.  Somebody has been saying that, and that's not true.  The

14   stipulation didn't contemplate a four-year plan.  It

15   contemplated that you would solve the problem immediately once  01:37PM

16   the stipulation was entered into.  There was a plan of how you

17   can get out of the stipulation.

18        But this idea of, oh, we have four years to work on

19   it, that's a notion that was made out of whole cloth.  I was

20   there when the case was settled.  I knew what the contemplation  01:37PM

21   was.  There was no idea that we would have four years to get

22   this right.  That's a preposterous thing.  And to the extent

23   that anybody in the Department of Corrections thinks that's

24   true, it's not from the judge who is presiding in the case.

25   You don't have four years of a run of this.                  01:37PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 30 of 128

1149

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   Otherwise, why would I be doing what I have been doing

2   every month for months now, years now, where I have been

3   addressing it every single month if I had to wait four years to

4   see what would happen.  No.  That's nuts.  That's never been

5   part of this deal.                                          01:37PM

6         THE WITNESS:  I don't think there was four years to

7   get it right.  There was a time frame though.

8         THE COURT:  What do you mean by the four years?

9         THE WITNESS:  Well, I don't think that we can flip a

10  switch and change that type of stuff.  There's too many people   01:38PM

11  involved for that to happen.  So I believe that it takes time

12  to make all of these things, accomplish stuff.  And, of course,

13  my side of the house with the conditions of confinement, the

14  maximum custody site, we look back and look at how that

15  progressed, how we did things.  And we have done the same thing   01:38PM

16  with our medical side of it.  The improvement and progression

17  that has been made over the time period is significant, you

18  know.  It really is.

19        So that part of it, I do think people are trying very

20  hard, and I do think they are making a difference and I do   01:38PM

21  believe that this will eventually be accomplished.  But I don't

22  think it's as easy as some people think.  I don't think it is.

23        THE COURT:  Well, it's important for me to have this

24  conversation with you because I can't go speak at a loud

25  speaker to all of the Department of Corrections employees.  But   01:39PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 31 of 128

1150

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    I do have opportunities to talk to people who are witnesses in

2    the courtroom.  So I do take that opportunity when it is

3    possible and is afforded to me.  And one of the things that I

4    hope that I can communicate to you is that when the director

5    promised in the stipulation to effect these changes there was          01:39PM

6    no expectation other than they would happen at that time.

7    There was a significant appropriation to do it.  There was an

8    identification of what the problem was.

9            And the whole mechanism of having me involved in this

10   or any judge who was to be the enforcer of the stipulation was        01:39PM

11   not contemplated to be sort of a regular feature.  It was what

12   would happen if things didn't work against everybody's

13   expectation.  So it wasn't the idea that this would be a work

14   in progress that would take three years accomplish.  That was

15   never part of this.                                                    01:39PM

16           And part of what I have experienced that you haven't

17   experienced is what started out as periodic and became monthly

18   and then became more regular.  I was hearing from the lawyers

19   for the State they were proposing -- and some day maybe when

20   the case is over I can go and show you how over the months I          01:40PM

21   would receive reports and statements from defense counsel

22   saying this is what we're doing with respect to this particular

23   performance measure.  I'm making sure the inmates are getting

24   their medications.

25           And every month there was some kind of tweak or some          01:40PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 32 of 128

1151

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    kind of suggestion to me that we were on top of it and the

2    problem is going to be solved.  And here I am three years later

3    and I have maybe the first time I have gotten all the complexes

4    in compliance, but this is three years.  And it's after I have

5    been told monthly that we have got it.  And here's what our          01:40PM

6    next proposal is and it doesn't work.  Then the next one

7    doesn't work.

8           Then I hear from you that it looks like people are

9    really getting their attention on this.  There's a meeting

10   every single day at every complex about this problem.  And I        01:40PM

11   think to myself, finally.  And then I ask you, why is it now,

12   here, that this thing happened in late November, in December,

13   why did it take somebody this long to figure out this is what

14   was necessary to get it done and if it does affect it?

15          And so this is not really a question.  This is me            01:41PM

16   speaking to you as I have an opportunity to speak to you to let

17   you know a couple of things, that this frustration has been

18   real and it also has not been something that was ever

19   contemplated by the stipulation.  The stipulation was a promise

20   from the director to make sure this measure was satisfied.  And     01:41PM

21   the way I would get involved is if it turned out you weren't

22   making the mark in a certain percentage of the cases.  And once

23   that happened, I would look into it and that has happened with

24   so many of the facilities, so many of the inmates, that this

25   has become just really a major focus of this activity.              01:41PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 33 of 128

1152

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    So I'm glad, if it's true, that the February numbers

2  show compliance at the complexes but it doesn't really address

3  what is an important issue here.  And that is why it took so

4  long and why the suffering that was imposed for it to take so

5  long occurred and whether there should be a remedy for that.        01:42PM

6    Thank you.  You may continue.

7  BY MS. LOVE:

8  Q.  Division Director McWilliams, you testified either today or

9  the prior time that there is approximately 600 intra-facility

10 transfers statewide a week?                                          01:42PM

11 A.  Yes.

12 Q.  Simple math, about 2400 a month?

13 A.  Yes.

14 Q.  And I believe you testified the last time around that over

15 the course annually it's an average of 30,000 intra-facility        01:42PM

16 transports per year.  Is that correct?

17 A.  That's correct.

18 Q.  And are you aware of the four complexes that are subject to

19 the Order to Show Cause in December, are you aware of how many

20 met or exceeded the current 85 percent stipulation compliance       01:42PM

21 threshold?

22 A.  I don't have it memorized, but I could write some numbers

23 down here.  So I have got the percentages for the month of

24 December here.

25 Q.  How many complexes met or exceeded the current 85 percent       01:43PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 34 of 128

1153

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    compliance rate with the stipulation for the month of December?

2    A.   In December, there were two that were above the percentage.

3    Q.   Which facilities and what percentage?

4    A.   It would have been Florence at 86 percent and Tucson at 91

5    percent.                                                          01:43PM

6    Q.   And are you aware that per the stipulation there was a

7    graduated compliance percentage with the stipulation where at

8    certain times it was 75 percent then 80 percent and currently

9    85 percent over the last few years?

10   A.   Yes, I am.                                                    01:43PM

11   Q.   Are you aware of whether or not any of the four complexes

12   at issue for Performance Measure 35 in the Order to Show Cause

13   met or exceeded the 85 percent compliance threshold for the

14   month of January?

15   A.   In January Eyman was at 88, and Tucson was at 90.            01:44PM

16           MS. EIDENBACH:   Your Honor, excuse me.  We haven't

17   established how Mr. McWilliams knows these numbers.  And while

18   Ms. Love's questions are phrased in "are you aware of" Mr.

19   McWilliams is then reading information from his notes into the

20   record.  We do have documents that contain these that might be   01:44PM

21   more appropriate for him to rely on in testifying to this.

22           MS. LOVE:   I can lay foundation.

23           THE COURT:   Also, you can pay attention if he says

24   something that isn't accurate because you know and you have in

25   hand.  What this is part of Ms. Love's presentation is to try    01:44PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 35 of 128

1154

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   to meet the burden she has with respect to the OSC.  And so

2   she's using this witness as a way to present these numbers to

3   the judge as part of her presentation.  I'm going to give her

4   some leeway to do that.

5            So the objection is overruled.                          01:44PM

6   BY MS. LOVE:

7   Q.  As division director, do you, on any sort of basis, review

8   the monthly reports as to stipulation compliance levels for the

9   performance measures at issue for the stipulation?

10  A.  Yes.  I receive those reports and do review them.           01:45PM

11  Q.  And do you, in particular, review the compliance levels for

12  Performance Measure 35?

13  A.  Yes, I do.

14  Q.  And do you look only at the four that are subject to the

15  Order to Show Cause, or do you look at all 10 complexes?        01:45PM

16  A.  I look at all 10 complexes.

17  Q.  And the statistics you gave us for December and January,

18  did you derive those statistics from looking at the reported

19  compliance levels for those months?

20  A.  Yes, I do did.                                              01:45PM

21  Q.  You talked to us earlier with respect to Performance

22  Measure 35 that there are daily meetings between Corizon folks

23  and wardens and leadership at the complex level regarding daily

24  happenings related to medical.  Is that correct?

25  A.  Yes.                                                        01:46PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   Q.  And are issues beyond Performance Measure 35 and medication

2   transports discussed in those daily meetings?

3   A.  Yes, they are.

4   Q.  What other issues are discussed, if you know?

5   A.  There could be issues about, transportation issues, sending     01:46PM

6   out people for follow-up consults.  There could be issues

7   involving nurse's lines.  There could be various types of

8   things, internal prescriptions being refilled, anything that is

9   some sort of an issue or an inmate maybe had brought up on a

10  tour or the deputy warden or the warden is walking around the     01:46PM

11  complex or something that is a medical side from Corizon once

12  it's talked about.

13  Q.  Are those daily meetings required to be conducted at any

14  certain portion of the day?

15  A.  We want them in the mid-afternoon, so they normally occur      01:46PM

16  around 3:00.

17  Q.  Why is that that you want them to occur in the

18  mid-afternoon?

19  A.  Because the bulk of the transports have been completed by

20  then so we would know a picture of any discrepancies so that we   01:47PM

21  would have the time to correct those in the same day.

22  Q.  As far as the wardens of the 10 state-run complexes, do the

23  wardens regularly meet together to discuss operations issues

24  that may affect all 10 complexes?

25          MS. EIDENBACH:  Objection.  Foundation.                   01:47PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 37 of 128

1156

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    THE COURT:  Do you know whether or not the wardens of

2    the 10 state complexes regularly meet together to discuss

3    operations issues that may affect all 10 complexes?

4    THE WITNESS:  Yes, I do.

5    BY MS. LOVE:                                                    01:47PM

6    Q.  How do you know that?

7    THE COURT:  Overruled.

8    THE WITNESS:  Couple of ways.  One of them is I

9    conduct meetings myself with all 10 wardens about five or six

10   times a year.  The RODs conduct meetings every Tuesday right    01:47PM

11   after I do a management meeting with the regional directors.

12   And they do a meeting in the afternoon that's a video

13   conference meeting with their respective wardens about the

14   information that we have talked about that morning.

15   BY MS. LOVE:                                                    01:48PM

16   Q.  Do you know whether or not in these weekly meetings

17   operations that may affect compliance with the stipulation, do

18   you know whether that is a subject matter that is discussed?

19   A.  Yes, it is discussed.  I have participated in some of those

20   meetings from time to time, and those are talked about.        01:48PM

21   Q.  How long have weekly meetings with all 10 complex wardens

22   and the regional operations directors, how long have those been

23   going on?

24   A.  Since we had complexes, so I would say since early '80s.

25   Q.  So this is not a meeting that was started because of the    01:48PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 38 of 128

1157

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    Order to Show Cause order?

2    A.   No, it wasn't.

3    Q.   Do you, yourself, as division director, participate in

4    meetings where Corizon leadership and ADC leadership are

5    involved where compliance with the stipulation is discussed?          01:49PM

6    A.   Yes, I do.

7    Q.   In what respect?

8    A.   We have a meeting twice a month with Corizon leadership

9    where we talk about -- we gather information from around the

10   state in different complexes.  And the RODs, myself,                   01:49PM

11   participate in that, as well as Richard and sometimes Dr.

12   Taylor and Corizon staff.  And we talk about issues that have

13   been presented to us from around the state.

14   Q.   If there are operations issues that you become aware of as

15   division director that affect compliance with the stipulation,        01:49PM

16   in your duties as division director do you communicate those

17   issues to the director?

18   A.   Yes, I do.

19   Q.   How often do you meet with the director regarding

20   operations?                                                           01:50PM

21   A.   I meet with the director about operational things daily.

22   Q.   When the director testified there was some questions to him

23   posed about a period of time when the Department had a contract

24   with the University of Arizona hospital and that at some point

25   that contract went by the wayside.  Were you aware of whether          01:50PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 39 of 128
1158
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    or not the Department did, in the past, have a contract with

2    the U of A?

3    A.  Yes, I was aware of a contract there.

4    Q.  How were you aware of it?

5    A.  I was a warden at the time, and it was originally developed    01:50PM

6    when the director returned to the Department in '09.

7    Q.  Do you know whether or not the contract with U of A

8    Hospital, if it came to an end before or after the Department

9    ended self-operation of medical services?

10   A.  It would have been prior to that.    01:51PM

11   Q.  Do you have any personal knowledge as to why that contract

12   came to an end?

13   A.  I met with them a couple of times at the university

14   hospital down in Tucson.  It appeared to me that they were

15   frustrated with a couple of things.  One of them is they didn't    01:51PM

16   feel like we were keeping a constant number of beds with them

17   for money purposes.  They weren't real, I don't think, happy

18   with having armed people in their facility that didn't work for

19   them.  So there was kind of a combination of things centered

20   around money and just some logistical things with it.    01:51PM

21   Q.  Switching subjects now, has the Department taken any action

22   from the operations side to address the need for coordination

23   of transports of inmates to outside medical appointments?

24   A.  Yes.  We have done a couple of things.  One of them is we

25   have given authority to our transportation coordinator so he    01:52PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 40 of 128

1159

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    can move transportation teams and vehicles; buses, vans, cars,

2    whatever he needs to move, he can move those around the state

3    as he deems is necessary to do.

4         Along those lines we also meet with transportation

5    staff and hospital staff to coordinate the hospital stays and          01:52PM

6    also coordinate the outside transport or the outside contacts

7    with physicians.  And we try to work those out by adjusting

8    people.  So if it's a big need for it in one place, we can

9    adjust.  If it's a smaller need we'll take away from those

10   places smaller.  So we do that on a regular basis as well as          01:52PM

11   have that -- we have also tried to change some of the process

12   with, especially in proximity to the institution where the

13   inmate is coming from.  It doesn't make a whole lot of sense to

14   send an inmate from Florence complex to Flagstaff to have a

15   medical procedure done.  So we have worked with Corizon to try          01:53PM

16   to get physicians to do a couple of things; one of them be in

17   closer proximity to that facility or to get physicians to come

18   into the prison and do medical procedures and medical

19   follow-ups inside the institutions themselves.  And both of

20   those have been done.                                                   01:53PM

21   Q.  Does every complex have a transport security team, so to

22   speak?

23   A.  Every place but Florence and Eyman.  Florence and Eyman is

24   combined.  Every place else has an individual team.

25   Q.  So does it work where each complex has a certain number of          01:53PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 41 of 128

1160

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

 1    transport vehicles assigned to that complex, or are they

 2    running statewide with no particular designation to a complex?

 3    A.  No.  There's a certain number of vehicles that are assigned

 4    as well as personnel.

 5    Q.  What kind of vehicles does the Arizona Department of          01:54PM

 6    Corrections have to transport inmates to outside medical

 7    appointments?  Are we talking cars?  Vans?  Buses?  How does

 8    that work?

 9    A.  Buses are normally used for just the inner transfer from

10    complex to complex.  We have vans and we have vehicles, sedans.   01:54PM

11    The vans, we have some handicap vans.  We have several of those

12    at different locations.

13          We have also now, I just purchased three of these.

14    We're going to buy more of them as money allows.  And these are

15    vans that you buy the van.  It's just a shell.  The van has no    01:54PM

16    interior seating or anything.  Then you take it to a company

17    and they retrofit it for you.  And the ones we're getting have

18    three compartments with different access to each compartment so

19    you could actually move three different classifications of

20    inmates.  You could move protective custody inmates in the same   01:55PM

21    vehicle with GP inmates and sex offenders.  So there's security

22    mesh in between each compartment.  Each place has its own door

23    to open and allow access in and out and they all have cameras

24    also in them so we can view the cameras.

25    Q.  How many of these vans have you purchased so far?            01:55PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 42 of 128

1161

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1   A.  So far, three.

2   Q.  Do you believe that the purchase of these vans that can be

3   retrofitted to transport persons of different custody levels

4   will aid in the efficiency of transporting inmates out for

5   outside medical appointments?                                      01:55PM

6   A.  Yes, it will.  Often times you see a transport vehicle, a

7   van, takes one inmate because let's say they are a sex

8   offender.  And now we'll be able to take multiple inmates

9   because we can take more than one classification of inmate.  So

10  that should help out with it, yes.                                 01:56PM

11  Q.  How many officers are required to be present to do a

12  transport in a van?

13  A.  Two.

14  Q.  What about a sedan?

15  A.  Two, unless it's a code red.  If it's a code red, which a     01:56PM

16  code red is an inmate that is a real high profile inmate like

17  maybe they have escaped before and killed somebody or they are

18  a high profile death row inmate, those code red type inmates or

19  validated SGT, security group threat inmate, they have a third

20  person that drives a separate vehicle behind them.                01:56PM

21  Q.  Now with respect to -- you testified to this somewhat

22  earlier.  In a situation now where, let's say -- let me give

23  you a hypothetical.  Let's say that Lewis complex has numerous

24  inmates that need to go out on a particular day for outside

25  medical appointments but there's more inmates than there are     01:57PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    literally vehicles available to transport.  Has ADC addressed

2    this issue to increase the efficiency so that appointments

3    don't have to be cancelled?

4    A.  Yes.  Our coordinator would look at Perryville's movement

5    that day.  They would look at Phoenix complexes.  They would                      01:57PM

6    look at Florence-Eyman if they had to go out that far and they

7    would adjust transportation teams and vehicles into the complex

8    that needed them.

9    Q.  And when did this process start?

10   A.  We started doing this probably about two months ago, about      01:57PM

11   the beginning -- maybe a little bit longer than that.  Maybe

12   around the beginning of the year, shortly after the beginning

13   of the year, calendar year.

14   Q.  Do you have plans to purchase additional vans that you

15   spoke of previously that can be retrofitted to transport          01:58PM

16   multiple custody levels?

17   A.  Yes.  Funds permitting, I plan to buy a few of those, maybe

18   three or four of them every year.

19          MS. LOVE:  Your Honor, we have no further questions.

20          THE COURT:  Thank you very much.                           01:58PM

21          Now it's the opportunity for the plaintiffs' class

22   lawyers to ask questions.

23          MS. EIDENBACH:  Your Honor, may I have just one

24   moment?

25          THE COURT:  You may.                                        01:58PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 44 of 128

1163

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

 1          MS. EIDENBACH:  Your Honor, we have no questions for

 2   Division Director McWilliams.

 3          THE COURT:  Okay.  Let me ask just a follow-up

 4   question to what we talked about before.  And that is that you

 5   have this idea that you had four years to comply with the                01:59PM

 6   stipulation.  I will tell you I don't believe the lawyers in my

 7   case have ever told me that.  So I wondered where did that idea

 8   come from?

 9          THE WITNESS:  Maybe that was not spoken exactly

10   like -- it's not four years to comply with things.  It's                01:59PM

11   because the stipulation has percentages have progressed through

12   it.  So yeah, we would think that when we see that, okay, you

13   don't have to be at 100 percent the first month.  You have got

14   to make the measures, you know, try to make those.  That's what

15   we were going for were those goals.                                     01:59PM

16          And from the things that I reviewed a lot of

17   significant progress has been made.  Hundreds of them have been

18   in compliance.  And so I think there has been a lot of it.  So

19   that's where I'm coming from.

20          THE COURT:  There is no dispute that there has been a            02:00PM

21   great number of performance measures that have been completely

22   satisfied and that I have never ever been activated in my role

23   as being the person to try to fix things that haven't been

24   broken.  But there are a significant number of performance

25   measures that go to real life and death issues that remain             02:00PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 45 of 128

1164

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    unresolved.  And so I just wanted to see whether there was a

2    culture at the Department of Corrections, and you would maybe

3    be the best person to talk about this, that you really thought

4    that you had four years to get this all in place.

5         THE WITNESS:  No, I don't think it's a culture that          02:00PM

6    believes that part of it.  And I think we have a difference of

7    understanding of these things, like on the medication side of

8    this.  To me there's a big difference if someone has some type

9    of, let's say, heart medication, really significant-type

10   medication or if it's a medication that someone takes that       02:01PM

11   might not be significant on life or death that day and they

12   decide to give it away on the yard.  We have a certain amount

13   of that that occurs on a regular basis where inmates trade

14   those drugs for something else, or they sell them or they take

15   them against how they are supposed to be taken.  They try and    02:01PM

16   get high off of them.

17        So those are different types of issues, and we look at

18   that.  All the medication we know we have to comply with that.

19   That's not the issue at all.  But there are other factors in

20   there.  It's not just like someone loses the meds.  A lot of     02:01PM

21   time, especially with the KOP meds, the DOTs are different, but

22   the KOP meds, the inmate might manipulate some of that also.

23        THE COURT:  I guess when I hear you say that it makes

24   me wonder if somebody, as you described, is making a decision

25   among these medicines that have been prescribed for the inmate,  02:01PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 46 of 128

1165

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1  some of them are not so important.  Who is making that

2  decision?  Is it a medical person?

3        THE WITNESS:  No one is making that statement.  It's

4  just a statement.

5        THE COURT:  What do you mean it's just a statement?        02:02PM

6        THE WITNESS:  Let me give you an example.

7        Let's say a prescription is being written now for

8  dandruff shampoo.  Okay.  That might be important to the person

9  but I don't believe that that's as important as heart

10  medication.                                                      02:02PM

11        THE COURT:  So how many of the failures to meet these

12  performance measures have been associated with dandruff

13  shampoo?

14        THE WITNESS:  There's been a few.

15        THE COURT:  What, five out of hundreds?                    02:02PM

16        THE WITNESS:  There have been other ones that are

17  similar type things like Tums.

18        THE COURT:  Tums is not a prescription medication.

19        THE WITNESS:  I don't think it is.

20        THE COURT:  No, it's not.                                  02:02PM

21        THE WITNESS:  But it has been prescribed.

22        THE COURT:  It's not a subject of my stipulation.  The

23  monitors tell me when you fail it's when you fail to make sure

24  that a prescription medication is accompanying the inmate.  And

25  so I have been reported about a number of those.  And when you,   02:03PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 47 of 128

1166

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    in your position, talk to me and say, well, you know, a lot of

2    these are dandruff shampoo, or a lot of them are inmates

3    trading meds on the yard, that makes me think you are not

4    taking this seriously.  That's not for you to decide whether or

5    not the medical provider's prescription that the inmate have            02:03PM

6    this medicine is to be given to them because you think that

7    it's being traded on the yard by some number of people so it

8    can't be a real medication somebody is using, or it's simply

9    Tums or a dandruff shampoo.

10           That suggests to me that you don't understand how            02:03PM

11   serious this is.  And I'm really very shocked to hear that

12   because I think when this performance measure was put in place,

13   it meant what it said and it's very clear.  It says that if

14   somebody has been prescribed a medication you can't transport

15   them unless you have that medication with them.  And this has          02:03PM

16   been an unbelievably intolerable situation for the time of the

17   stipulation.  And here we are now, three years post, and in

18   January two of the biggest complexes have unbelievable failure

19   rates.

20           And so I don't think it's because of dandruff shampoo.        02:04PM

21   I don't think it's because somebody has made a decision even

22   though I don't think, from what you say to me here, I don't

23   think somebody should make that decision who isn't a medical

24   provider who says that for this medication we can transfer this

25   person and we know that it's okay.  The problem is, nobody as          02:04PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 48 of 128

1167

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

 1    far as I can tell is making that decision.

 2         So captured within this problem are not only the

 3    dandruff shampoos, it's the medicine something absolutely needs

 4    to have.  So I have heard testimony about people who are on

 5    drugs that cannot be ceased and they been ceased because the          02:04PM

 6    Department has not been able to be comply with the performance

 7    measure.  And witnesses have testified here, I believe, or I

 8    have seen it in affidavits.  I cannot remember for sure.

 9    Witnesses have testified in court that the medicines they

10    absolutely need are not transferred with them and there is a          02:05PM

11    delay that is impermissible with respect to what is the

12    standard protocol according to these affidavits or testimony.

13         So I'm very disturbed to hear somebody in your

14    position would say we can dismiss this because some number are

15    not prescription drugs really because they are just for              02:05PM

16    dandruff or they are being traded on the yard.  Those problems

17    may exist, but if those problems exist, for instance, with

18    trading on the yard, there's a way to deal with that.  You

19    examine everybody when they take the pill so you make sure when

20    you give it to them, if they are not KOP, you examine it.  If         02:05PM

21    for some reason the Department has decided not to do that, I

22    don't understand why it doesn't do that because it causes

23    people like you to say, we don't know what's happening with the

24    meds that we give these patients so we have to assume that a

25    fair number of them are not using them.  They are trading them        02:05PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 49 of 128

1168

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    on the yard.  So that means when we transfer people it's okay

2    for me to come into court and tell the federal judge that's one

3    of the reasons this hasn't been such a big focus of ours

4    because we know some number of them are trading them on the

5    yard.  I hope that you appreciate how unacceptable I find that          02:06PM

6    to be.

7              THE WITNESS:  And, Your Honor, I certainly don't want

8    you to think -- first of all, I didn't use any of those words

9    about things I don't think it's important.  I do think it's

10   important.  That's why we strive every day to try to make it           02:06PM

11   work.  I would never -- we even try to get the dandruff shampoo

12   to work.  So we make everything work is the goal.  It's never

13   to say if this doesn't or that doesn't.  No one makes a

14   decision like that and I didn't say that.

15             THE COURT:  You did actually tell me as a reason as to       02:06PM

16   why this may not be so important.  I don't know any other way I

17   can take those words that you said to me other than to mean

18   that I am saying to you, Judge, that some number of these

19   medications are being traded on the yard and some of them are

20   just not really significant medications because they are              02:06PM

21   dandruff shampoos or they're Tums.  I don't know any other way

22   to take that based upon what you said.

23             So if there's some way I have misinterpreted what you

24   have said, tell me how I should try to evaluate those words

25   that you said other than the way that I took it, and that is          02:07PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 50 of 128
1169
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    you are telling me some number of these medications are not

2    that important.

3              THE WITNESS:  I don't think I used the word

4    "important."  But they are not the same as what I said.  And

5    I'm not saying that gives it an excuse or anything.  We're not          02:07PM

6    trying to say, oh, gosh, that drug isn't something we think is

7    important at all.  Every drug is important.  We're trying to

8    say that, yes, we take it seriously and we do look at it daily

9    with all kinds of different eyes trying to make it work.

10   That's what, you know, there's all kinds of people involved in          02:07PM

11   this.

12             What the reality was that you asked how can something

13   happen and I said well, one of the things that can happen is

14   inmates can manipulate things.  That's a reality.  It doesn't

15   excuse it that we don't try to fix it.  That's just a reality          02:07PM

16   of what prison is about.

17             THE COURT:  Well, in fairness, because I have asked

18   you questions after both the State and the plaintiffs have

19   passed on you as a witness, I need to give them, both lawyers,

20   an opportunity to see if they want to ask any questions based          02:08PM

21   on what I have asked.  Ms. Love.

22             MS. LOVE:  No further questions.

23             THE COURT:  Anything from the plaintiffs?

24             MS. EIDENBACH:  No, Your Honor.

25             THE COURT:  Thank you, sir.  I appreciate your          02:08PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 51 of 128

1170

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-McWilliams-Direct

1    testimony I appreciate you listening to me.  I hope that you

2    have some tolerance with my intolerance because I have been

3    asked to be tolerant for a long time.  And I have been told a

4    lot of things were going to happen, and so I have become --

5    cynical is too strong -- skeptical is probably the right word.          02:08PM

6    That's why I push back pretty hard because I have been told a

7    long time things were going to be fixed next month and what I

8    have found is they weren't fixed next month.  So I have to be

9    skeptical because I have learned a lesson from being around

10   that track.                                                             02:08PM

11            You may continue with your next witness.

12            MS. LOVE:  Your Honor, defendants call Richard Pratt.

13            THE COURT:  Thank you.  Mr. Pratt, if you would kindly

14   return to the stand.  Thank you, sir.

15            Welcome back, sir.                                             02:09PM

16            THE WITNESS:  Thank you.

17                          RICHARD PRATT,

18   a witness herein, having been previously duly sworn by the

19   clerk to speak the truth and nothing but the truth, was

20   examined and testified further as follows:

21                      REDIRECT EXAMINATION

22   BY MR. BOJANOWSKI:

23   Q.  Good afternoon, Mr. Pratt.

24   A.  Good afternoon.

25   Q.  I want to ask you some questions here to try and clarify           02:09PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 52 of 128

1171

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1  some things that were brought up on cross-examination.

2          Do you remember testifying about the amendments to the

3  contract Number 11 and 14, that would be plaintiffs' Exhibits

4  202 and 205.  Those were contract amendments 11 and 14.  Do you

5  remember those?                                                02:10PM

6  A.  I do.

7  Q.  And those talked about a CPI increase was provided to

8  Corizon as a part of the amendment.  Do you recall that

9  testimony?

10  A.  Yes.                                                      02:10PM

11  Q.  Do you know, in part, why that CPI increase was provided in

12  that contract amendment to Corizon?

13  A.  CPI, cost per inmate, increase, it's an increase that will

14  help to offset rising costs of health care.

15  Q.  And are you aware that health care costs during 2016 and   02:11PM

16  2017 were increasing?

17          MS. KENDRICK:  Objection.  Vague and foundation.

18          THE COURT:  Overruled.

19          THE WITNESS:  I have seen different studies, different

20  reports that health care costs rise approximately 5 percent per 02:11PM

21  year.

22  BY MR. BOJANOWSKI:

23  Q.  Was part of the business decision to allow the increase to

24  occur in these amendments based upon an increase in costs to

25  provide health care?                                          02:11PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 53 of 128

1172

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    A.  Yes.  As I testified before, it was a business decision

2    that was involved in allowing that increase.

3    Q.  You had also indicated in cross-examination by a series of

4    questions that were repeatedly asked about whether you were

5    satisfied with Corizon's performance, and I think you indicated   02:12PM

6    no.  Do you recall that testimony?

7    A.  I do.

8    Q.  Are you currently satisfied with their overall performance

9    with regard to the performance measures as a whole?

10   A.  Currently on an overall basis, yes.  I am satisfied.  Based   02:12PM

11   on the current overall results that we're getting, 94 percent

12   compliance, I'd say that's a good score.  Again, that's

13   overall.  That is not to diminish the fact that I am

14   dissatisfied with certain performance measures and extremely

15   dissatisfied with a few of them that we continually miss the      02:12PM

16   mark on.

17   Q.  And some of those ones that you are still dissatisfied

18   with, are those some that are contained in the Court's order of

19   October 10th, what I call the contempt order?

20   A.  Yes.                                                          02:13PM

21   Q.  Are you striving to work with Corizon to focus in on those

22   measures to get them into compliance?

23   A.  Yes.  We have in the past, and we will continue to do that.

24   Yes.

25   Q.  And the judge has expressed some frustration about, well,     02:13PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1   how come it takes so long to get these things in compliance.

2   And I should ask you, when did you start working on getting

3   measures into compliance?

4   A.   From the date of the stipulation.  But I will tell you,

5   and, Judge Duncan, I share your anger and frustration at not          02:13PM

6   having these things done more quickly.  I totally agree with

7   that.  I get that.  The thing that I would probably like to

8   impress upon you as my thoughts is these performance measures

9   involve people and people have to do the jobs.  I don't know

10  that we actually had the right people in the mix for several         02:14PM

11  years.  We have gone through a lot of different iterations on

12  the people that are involved in this process.  At this point,

13  as of last fall, I think we do have the proper mix of people to

14  now start getting the job done.

15  Q.   Is that being reflected in the numbers that we're seeing        02:14PM

16  since last fall?

17  A.   Yes.  Again, overall basis, we were sub 90 percent, and the

18  most recent results were 94 percent.

19  Q.   Okay.  You were asked by Ms. Kendrick about the gross daily

20  revenue of Corizon being approximately $450,000 a day.  Do you      02:14PM

21  remember that line of questioning?

22  A.   I do.

23  Q.   Do you know what their operating costs are on a daily

24  basis?

25  A.   I specifically don't know the daily operating costs.  I        02:15PM

Case 2:12-cv-00601-ROS Document 2781 Filed 04/20/18 Page 55 of 128

1174

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    know we get financial statements from Corizon in accordance

2    with the contract on a quarterly basis.

3    Q.  And in the last couple or several quarters, what are those

4    financial statements showing you?

5              MS. KENDRICK:  Objection.  Foundation.  He said he          02:15PM

6    didn't know the particulars.

7              THE COURT:  Sustained.  I don't see how this witness

8    is confident to talk about those financial statements.

9    BY MR. BOJANOWSKI:

10   Q.  Well, have you reviewed the financial statements that were        02:15PM

11   provided to you?

12   A.  I have been provided the information that's in the

13   financial statements from my staff, yes.

14   Q.  And what information have you received with regard to

15   those?                                                                02:15PM

16   A.  They indicated that there was a loss in the Arizona

17   contract.

18   Q.  For how many quarters?

19   A.  The last two that I'm aware of.  I wouldn't want to speak

20   to more than that because I'm not sure.                              02:16PM

21   Q.  You were also -- there was some inquiry made during

22   cross-examination as to the removal of the incentives in the

23   contract.  I think we're talking about carrots and sticks and

24   such.  Do you recall that?

25   A.  I do.                                                            02:16PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 56 of 128

1175

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    Q.  You also, I believe, indicated at some point that the

2    incentives will run out.

3    A.  Yes.  There was a cap of three and-a-half million dollars

4    on the incentives.

5    Q.  Is the stick going to remain?                          02:16PM

6    A.  Yes.  The stick will remain.

7    Q.  Is it going to remain into the future, the foreseeable

8    future?

9    A.  Yes.  There is no cap on the sanctions, and they will

10   remain that way in the future.                             02:17PM

11   Q.  What about the staffing offsets?

12   A.  Staffing offsets will also remain in the future and they

13   will be at 100 percent of the staffing levels.

14   Q.  Do you have Exhibit 103 in front of you by chance?

15          MR. BOJANOWSKI:  May I approach?                    02:17PM

16          THE COURT:  You may.

17          Mr. Bojanowski, could you pause for just a moment?

18   Could I ask Ms. Selzer or Ms. Brown, whoever is here, to come

19   help me find -- I couldn't find 103.  I have got a 103 that's

20   the wrong one, I think.                                    02:18PM

21          MR. BOJANOWSKI:  If I may approach, Your Honor, to

22   show you what it looks like.

23          THE COURT:  Yeah.  I looked over and saw that that's

24   what it looked like.  Thank you very much.  Now I have found

25   it.  Thank you so much.                                    02:19PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 57 of 128

1176

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1   BY MR. BOJANOWSKI:

2   Q.   Would you go to Page 3 of that document?

3   A.   Okay.

4   Q.   And this is -- I think you testified earlier about this is

5   the tracking of the incentive that was initiated pursuant to          02:19PM

6   the contract amendment?

7   A.   Correct.

8   Q.   All right.  And does it also show how many measures have

9   been brought into compliance since the incentives were put into

10  place?                                                                02:19PM

11  A.   Yes.  This is based on the rules and the stipulation over

12  the past 24 rolling months if they haven't missed more than six

13  performance measures during that time frame or three in a row

14  during the most recent 18 months of that period.

15  Q.   How many, total, have come into compliance under the            02:20PM

16  incentive program?

17  A.   Since when?

18          MS. KENDRICK:  Your Honor, I'm going to object to this

19  being outside the scope of redirect.  The purpose of redirect

20  is not to simply repeat testimony from the direct examination.       02:20PM

21  And Mr. Pratt already testified to this exhibit in direct

22  testimony on March 26th.

23          THE COURT:  And also he just told us about the 94

24  percent for January.  So is there something beyond that that we

25  will get out of this, Mr. Bojanowski?                                02:20PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 58 of 128

1177

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    MR. BOJANOWSKI:  I just wanted to, because there was

2    some questions with regard to the effectiveness of the

3    incentive program on cross-examination, I wanted him to

4    indicate to the Court that there were a total of 42 measures

5    brought into compliance since the program had been put into          02:20PM

6    place.

7         THE COURT:  Is that true, Mr. Pratt?

8         THE WITNESS:  Yes.  That's correct.

9         THE COURT:  All right.  So we're done with the exhibit

10   now.                                                                  02:21PM

11        MR. BOJANOWSKI:  We are done with that exhibit, Your

12   Honor.

13        THE COURT:  Okay.

14   BY MR. BOJANOWSKI:

15   Q.  Mr. Pratt, would you get Exhibits 105 and 106, please.          02:21PM

16   A.  Okay.

17   Q.  Going to 106 first, what is that?

18   A.  106 is an e-mail from Director Ryan to me dated Thursday,

19   November 2nd.

20   Q.  Is there also an e-mail from you to Mr. Scot Ward as a          02:22PM

21   part of this on page -- on the second page?

22   A.  Yes.

23   Q.  And in that e-mail, did you indicate at all a request for

24   Corizon to provide real time reporting regarding the measures

25   that were subject to the Court order?                               02:22PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 59 of 128
1178
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    A.  Yes.

2    Q.  Would you read into the record that paragraph where you

3    directed them to do that?

4    A.  "The plans for realtime reporting must be provided before

5    November 10th, however, so the Court can be appropriately          02:23PM

6    advised.  The next status hearing is Tuesday, November 7th.

7    The 10th of November is not a deadline that will work and is

8    unacceptable."

9         Do you want me to continue reading?

10   Q.  Go down to the paragraph where, "The director and I          02:23PM

11   also". . .

12   A.  "The director and I also reiterate that all reasonable

13   measures must be taken to comply with Judge Duncan's October

14   10th, 2017 order.  It is essential for Corizon to provide,

15   quote, 'realtime,' end quote, reporting regarding these          02:23PM

16   measures at the affected facilities in order to comply with

17   this order.  If that means Corizon must add more monitors to

18   accomplish this, they must do so immediately.  We will meeting

19   again with you on Monday, November 6th, to finalize the action

20   plans for all the PMs before the Court.  I will need you to      02:24PM

21   report then what plans have been made."

22   Q.  Go to Exhibit 105, and again, here's another e-mail from

23   you to Mr. Ward.  Is this another demand for performance?

24   A.  Yes.

25   Q.  And in this, did you request that Corizon meet 100 percent   02:24PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 60 of 128
1179
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1  compliance with the performance measures?

2  A.  I don't see 100 percent.

3       MR. BOJANOWSKI:  May I approach the witness, Your

4  Honor?

5       THE COURT:  You may.                            02:25PM

6  BY MR. BOJANOWSKI:

7  Q.  Why don't you indicate to the Court what your request was.

8  A.  In the body of the e-mail, it indicates, "We reiterate that

9  the Court is requiring 100 percent compliance with these

10  performance measures which were found to be in substantial      02:25PM

11  noncompliance one year" says age, should be ago.  "The Court

12  has made clear that nothing short of all reasonable measures

13  taken to comply with its orders will result in substantial

14  sanctions for the defendants."

15  Q.  You indicated in previous testimony that there was a system  02:25PM

16  set up using Pentaho to gather some information?

17  A.  Yes.

18  Q.  For the realtime reporting?

19  A.  Yes.

20  Q.  Does the Department have the ability on its own to do         02:26PM

21  realtime reporting?

22  A.  No.

23  Q.  Why not?

24  A.  The realtime reporting is drawn from eOMIS information

25  through a standalone program called Pentaho, which is           02:26PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 61 of 128

1180

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1   Corizon's.

2   Q.  Were you told by Corizon that they would set up a system

3   and put it in place to do realtime reporting?

4   A.  Yes.  Corizon indicated they would make every effort to

5   come up with real time reporting for us.                    02:26PM

6   Q.  Do you know what was involved in establishing the real time

7   reporting?

8   A.  On the surface, yes.  It's going to be determining what

9   aspects of information in the electronic medical record would

10  need to be pulled out through Pentaho to be matched up against  02:27PM

11  the performance measure to see if compliance could be

12  determined.

13  Q.  Can it be determined solely by Pentaho?

14  A.  No.

15  Q.  Why not?                                                02:27PM

16  A.  Most of the performance measures have some aspect of

17  subjective information that's in them.  And I testified to this

18  before.  Pentaho works on numbers, dates, things that happen.

19  But without actually opening the record up and looking at each

20  individual case, you are not going to be able to truly         02:27PM

21  determine if the performance measure was met in that instance.

22  Q.  Do you know approximately how many records would have to be

23  reviewed in a month to do a real time report on just the

24  measures that the Court is concerned with?

25  A.  On the OSC measures, those 11 measures, the pool of        02:28PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 62 of 128

1181

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    information right now, I believe, is about 17,000 per month.

2    Q.  Do you know how much manpower Corizon dedicated to the

3    development of data collection and review of records?

4    A.  I don't know specifically.  I'm not exactly sure.  But I

5    know it was probably five or six people that I'm aware of.          02:28PM

6    Q.  And how about ADC?  Did you set up some kind of somebody to

7    look at records as well?

8    A.  Yes.  I put Vanessa Headstream in charge on my team to help

9    with that process in vetting that information, and she

10   identified another three staff that are available for that          02:29PM

11   process as well.

12   Q.  Did she, in fact, vet various records that were to be

13   utilized in preparing a report for the Court?

14   A.  She did.

15   Q.  And do you know how many records she looked at?                 02:29PM

16   A.  I believe she looked at 420.

17   Q.  Do you know how long it took her to do that?

18   A.  About 40 hours.

19        THE COURT:  So that we can get a better appreciation

20   of the scope of work, it's not very helpful to be told, "about      02:29PM

21   17,000" because then we can't appreciate individual performance

22   measures in individual complexes because that number would seem

23   to be across the board whereas we have a much narrower focus.

24   Do you have the knowledge about the individual performance

25   measures at individual complexes about how many records would       02:29PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 63 of 128

1182

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1   have to be reviewed to look into those?

2            THE WITNESS:  I don't have it broken down, Your Honor.

3   I know it was a total of 17,000.

4            THE COURT:  That's not a very helpful number, though,

5   because we don't know what components are -- again, it sounds          02:30PM

6   like an off-putting number.  But again, at some point if you

7   are not meeting the performance measures, as you write in your

8   e-mail, as I said also, you have to look at whether or not it's

9   happening.  And the way to make sure that you are addressing it

10  in a way that can avoid the harm in the case beyond just the          02:30PM

11  patient harm -- the harm I'm referring to here beyond is the

12  sanction -- is you have to know on a realtime basis whether or

13  not it's happening.

14           So I guess in order for me to decide whether or not

15  you have taken all reasonable steps, I would have to know what        02:30PM

16  the number were with respect to individual complexes that were

17  at issue.  For instance, if you are just one mark off of 85

18  percent, that would be different, perhaps, with the amount of

19  resources it would be reasonable to address it than, let's say,

20  you were at 20 percent and you would think, oh my goodness,           02:31PM

21  this is a fire so we're going to have not just one battalion

22  we're going to have six come in and deal with that, whereas you

23  may not think it would be appropriate to bring in six

24  battalions if you were one mark off.

25           Do you see what I'm saying, why that's important to          02:31PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 64 of 128

1183

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

 1   know this?

 2            THE WITNESS:  Yes.

 3            THE COURT:  Okay.  Thank you.

 4   BY MR. BOJANOWSKI:

 5   Q.  So just to clarify, the 17,000 records you are talking        02:31PM

 6   about is the records that would have to be looked at pursuant

 7   to the judge's order for realtime reporting.  It doesn't

 8   include other records at other facilities or other measures?

 9   A.  That's correct.  And that's not just looking at the

10   noncompliance.  That's the number of hits in the pool that        02:31PM

11   would show up that had to be vetted to determine compliance or

12   noncompliance.

13   Q.  So if I understand what you are saying, the process would

14   be that you would first gather potential files that would be

15   eligible for review, and then you would subsequently review      02:32PM

16   them to determine compliance/noncompliance?

17   A.  Correct.

18   Q.  Okay.  And so with regard to the measures that the Court

19   has issued its order, that's what you are talking about is

20   there's a pool of about 17,000 records that are contained        02:32PM

21   within the potentials that you would have to look at?

22   A.  Correct.  That's -- and again, that's compliant and

23   noncompliant.

24            THE COURT:  I have been asked to take a break now so

25   we can give the court reporter an opportunity to -- as I have    02:32PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 65 of 128

1184

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1   mentioned in the past, she really is the one who works every

2   second that we're working.  We get some breaks.  She doesn't.

3   And we make it especially challenging when we, sometimes it is

4   done, don't respect the rules that we should only be speaking

5   at one time.  So we tax in an unfair way.                    02:33PM

6            So we'll take a 15-minute break and come back about

7   quarter to 3.  Thank you very much.

8            (Recess from 2:33 p.m. until 2:53 p.m.)

9            THE COURT:  Thank you very much.  I'm sorry we kept

10  you waiting a couple minutes after you called and said you are   02:53PM

11  ready.  The 17,000 records has touched upon an issue that we

12  have been focusing on, the Court meaning, we have been

13  ourselves somewhat concerned that maybe we're not focusing on

14  the exact right information because of the mechanism that gets

15  us to the place where the OSC is considered, we're not          02:53PM

16  necessarily appropriately relying on the mechanism that would

17  identify the areas of concern.  The CGAR numbers, for instance,

18  are based upon a sampling mechanism where the stipulation calls

19  for at least 10 records to be drawn, whereas the OSC wants to

20  know about every single one of the failures.  And so the        02:54PM

21  discussion about the 17,000 records and my follow-up question

22  about whether you knew about whether there were these

23  individual components -- not whether you knew, how accessible

24  that was in your mind presently or whether you had some piece

25  of paper now with you that told us, is of somewhat interest to  02:54PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 66 of 128

1185

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    me because it tells me more accurate information with respect

2    to what I should be focused on with the incidence.  And also it

3    helps me understand better about the appropriateness of the

4    sanction that I would be contemplating, because this mechanism

5    of the 17,000 where you said you looked at both compliant and          02:54PM

6    noncompliant of every single one that are the subject of the

7    OSC for each of these complexes would give me more accurate

8    information.

9            So if you have that information, I mean, we know the

10   ones that you have identified where there was a failure to meet        02:55PM

11   the performance measure, so we know the numerator.  We don't

12   know the denominator.  And you know the denominator.  So I

13   wonder since the 17,000 is a sum, obviously there must be the

14   individual components of that sum.  Somebody has that.  Can we

15   get that so that we can see what the numbers were for the               02:55PM

16   individual complexes and for the performance measures that are

17   subject to the OSC?

18           THE WITNESS:  Absolutely, and easily.  We've got that

19   information.

20           THE COURT:  If you could bring it tomorrow morning.            02:55PM

21           THE WITNESS:  We can.

22           THE COURT:  Okay.

23           MR. BOJANOWSKI:  So I understand, Your Honor, you want

24   them -- I will call them hits of, you know, per facility and

25   per measure?                                                           02:55PM

1       THE COURT:  In order to get to the 17,000 number of

2   records that were reviewed, that means that there was this idea

3   of what individual records would have to be reviewed at each of

4   the complexes for each of the performance measures.  So Mr.

5   Pratt knows the sum of those components exists.  He knows what          02:56PM

6   they are.  That's how he got to the sum.  He added them

7   together.  We would like to know the total number for each of

8   the ones, not just the ones that were the incidence but also

9   the total number of records that were reviewed.

10       MR. BOJANOWSKI:  I see.  I just want to make sure I'm          02:56PM

11   providing the Court the information it wants.  You want it

12   broken down by performance measure, complex, and total number

13   of files reviewed?

14       THE COURT:  Tell you what, when we finish here today

15   we will send an e-mail to you and to plaintiffs' counsel that          02:56PM

16   specifically identifies so we don't take more witness time.

17   Seems more efficient to do it that way.

18       MR. BOJANOWSKI:  That's fine.  I want to make sure I'm

19   getting to the Court the appropriate information.

20       THE COURT:  So that the Court is an open court as          02:56PM

21   well, the public trial right is an important one, we'll also

22   cause the e-mail to be on the Court docket.

23       MR. BOJANOWSKI:  That's fine, Your Honor.

24       THE COURT:  Okay.  Thank you.  Thank you, sir.

25   BY MR. BOJANOWSKI:          02:57PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 68 of 128

1187

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    Q.  We had talked about the 17,000 files that were looked at,

2    but then you also mentioned these 420 files that you said you

3    had Vanessa Headstream look at.  Do you remember that

4    testimony?

5    A.  Yes.                                                          02:57PM

6    Q.  When did that review take place?

7    A.  That review took place last week.  That was subsequent to

8    the plaintiffs filing some information that said that our

9    information was incorrect.

10   Q.  Is that why it was conducted?                                 02:57PM

11   A.  Yes.

12   Q.  Was that information that had been provided to you

13   previously by Corizon, or was that another source?

14   A.  No.  I didn't receive this from Corizon.

15   Q.  Okay.  And so how much time did Ms. Headstream take to       02:57PM

16   review that 420 files?

17   A.  It was about 40 hours, as I recall.

18   Q.  We have talked about an increase in the compliance, overall

19   compliance rate at all of the facilities.  Do you know if the

20   compliance rate has increased even though the vacancy rate has    02:58PM

21   remained the same?

22         MS. KENDRICK:  Objection.  Assumes facts not in

23   evidence and also relevance.  The overall compliance rate that

24   defendants keep talking about is not part of the stipulation

25   and not relevant to the Order to Show Cause.                      02:58PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 69 of 128

1188

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    THE COURT:  It's a very troubling question.  It is not

2  precise enough to be of any assistance or to be reasonably

3  assured of producing an answer that would be meaningful because

4  of the objection.  So the objection is sustained.

5  BY MR. BOJANOWSKI:                                              02:59PM

6  Q.  Do you know, has the vacancy rate changed at all during the

7  time period in which the incentives have been in place and

8  compliance has increased?

9  A.  No.

10    MS. KENDRICK:  Objection.  Vague.  He doesn't say            02:59PM

11  which vacancies, which positions, or what he's talking about.

12    THE COURT:  Again, there's no overall vacancy rate.

13  As I understand it's been reported for different positions.  So

14  the objection to that is sustained as well.

15  BY MR. BOJANOWSKI:                                             02:59PM

16  Q.  Is there an overall staffing fill rate number that you are

17  aware of?

18  A.  Yes.  The overall staffing rate, vacancy rate, is

19  typically -- well, the fail rate is typically 88 to 90 percent.

20    THE COURT:  Whose vacancy rate is this?  Corizon's or        02:59PM

21  ADC's or both?

22    THE WITNESS:  Corizon.

23  BY MR. BOJANOWSKI:

24  Q.  When we talked about sanctions being imposed the last time

25  in direct exam and cross-exam, was that what we were talking     02:59PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 70 of 128
1189
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    about was the overall vacancy rate?

2    A.  Yes.

3    Q.  So we have talked -- or you have presented some evidence to

4    the Court with regard to that rate and how it has changed or

5    not changed over a period of time.  Do you recall that           03:00PM

6    testimony?

7    A.  Yes.

8    Q.  And that was part of the sanction letters that we had

9    talked about in your direct testimony.  Do you remember that?

10   A.  Yes.                                                          03:00PM

11   Q.  And so has the compliance rate increased even though that

12   vacancy rate has remained the same?

13           MS. KENDRICK:  Objection, Your Honor.  Relevance.

14           THE COURT:  Overruled.

15           THE WITNESS:  Yes.  Again, the overall compliance has    03:00PM

16   gone up from sub 90 to over 94 percent.

17           THE COURT:  But that doesn't really tell me very much

18   about the ones that are the subject of the OSC because you are

19   not linking up any staff that would be relevant to those

20   issues, the ones I'm looking at here now, with respect to the    03:00PM

21   number of people who are not there for those particular

22   performance measures.

23           THE WITNESS:  Correct, Your Honor.  The staffing -- no

24   additional staffing has been put directly to any of the OSC

25   performance measures that I'm aware of.                          03:01PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 71 of 128

1190

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    THE COURT:  So I gather this overall vacancy rate

2  could include people who were moving trash at the end of the

3  day?

4    THE WITNESS:  I'm sorry?

5    THE COURT:  Could it be people, Corizon employees who    03:01PM

6  have not filled the positions that are not health care

7  providers, for example?  Is this vacancy rate just health care

8  providers?

9    THE WITNESS:  This vacancy rate is just health care

10  providers.  I don't want to say just health care providers but    03:01PM

11  separate from their regional office this is licensed people,

12  this is people that provide the care.

13    THE COURT:  So this vacancy rate is a licensed health

14  care provider only number?  That's what you are focusing on?

15    THE WITNESS:  No, sir.  It's not restricted to that    03:01PM

16  but it includes all of them.

17    THE COURT:  I see.  So I'm just trying to understand

18  whether or not, was it Ms. Kendrick's objection, I think, is

19  one that is, again, as I listen to this conversation, I want to

20  be receptive to information that will help me make a better    03:02PM

21  decision.  It seems that she's making an objection that it

22  can't really be possibly helpful for me because it's not

23  specific to the performance measures that I have focused on.

24  And it sounds to me like that's essentially right what she's

25  saying.  Do you disagree?    03:02PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 72 of 128

1191

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

```
 1                THE WITNESS:  I disagree.

 2                THE COURT:  Okay.  Why?

 3                THE WITNESS:  Because I think the overall staffing

 4    addresses every performance measure, not just the ones in the

 5    OSC.                                                              03:02PM

 6                THE COURT:  But again, why should I be focusing on the

 7    94 that are now, you say, in compliance as opposed to the six

 8    that remain my problem?  Especially because the six that remain

 9    my problem are very, what I have learned so far in this case,

10    is they are unique circumstances.  It's sui generis for each     03:03PM

11    particular yard.  That's why I focused on each yard and that's

12    why Mr. Millar is looking at particular areas, particular

13    staffing needs at that place because it really doesn't matter

14    if I have a problem -- or it doesn't really matter if I have a

15    problem in Safford what's going on in Phoenix.                    03:03PM

16                THE WITNESS:  Understood.

17                THE COURT:  All right.  Thank you.

18    BY MR. BOJANOWSKI:

19    Q.  Do you recall the testimony that was given with regard to

20    what was called the root cause analysis?                         03:03PM

21    A.  Yes.

22    Q.  And I don't really want to get too deeply into this, but

23    there, in my mind, seems to be some confusion with regard to

24    documents that were involved in that and what that constituted.

25    Do you know what documents are part of that root cause analysis  03:03PM
```

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 73 of 128
1192
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    that we had talked about earlier?

2    A.  The ones that I recall were the visios, and the ones that

3    didn't come out too well that were hard to read as part of that

4    root cause analysis.

5    Q.  So when we were talking about the root cause analysis it          03:04PM

6    was the visios and the analysis of how those visios are used

7    for the Court's 11 measures to obtain the 100 percent

8    compliance?

9    A.  To try to get the 100 percent compliance and the visios

10   were laid out the process to try and identify any of the fail      03:04PM

11   points laid out in that process.

12   Q.  Have you and Mr. Ryan taken all actions that you believe

13   you can to prepare and verify the daily realtime reports that

14   were filed with the Court?

15   A.  Yes.  I think we have.                                          03:04PM

16   Q.  Do you consider yourself and Director Ryan to be in civil

17   contempt of the Court's OSC order?

18   A.  No.

19   Q.  Why not?

20   A.  Well, we do everything we can to hold Corizon accountable.      03:05PM

21   We have since the beginning.  I have testified as to the

22   methods and the things that I do.  I won't speak for the

23   director.  I will speak for myself.  He has testified on his

24   own as to our communications and our expectations and trying to

25   hold Corizon accountable for the performance measures.  I think    03:05PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 74 of 128

1193

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1  the efforts that we have made in conjunction with removal of

2  caps has shown some positive results.  So I like the direction

3  this is going.  And it's not -- and we're not going to quit

4  holding them accountable at this point.  We've got a lot of

5  work to do.  That's obvious by some of the continued failures       03:06PM

6  that we have got.

7          But again, the goal is 100 percent compliance

8  regardless of the OSC.  I mean, that's the goal.  Is it

9  realistic?  No, I don't believe it's a realistic goal.  In real

10  life nobody is 100 percent at anything.  But that's what we're      03:06PM

11  going to strive for and that's what we're going to continue to

12  push Corizon to do.

13          THE COURT:  Mr. Pratt, I wonder, having listened to

14  your testimony and the director's testimony and having presided

15  in this case, if there is a certain barrier to the State here      03:06PM

16  achieving all reasonable methods to try to comply with the

17  items specified in the Order to Show Cause.  And that is

18  because it occurs to me that because the State has chosen to

19  contract with an outside provider rather than having its own

20  responsibility for providing this care that you deal with the      03:07PM

21  marketplace reality, as we have heard, that there are at most

22  three possible entities out there who could do this kind of

23  work.  And you are dealing with an entity now who has the

24  ability to walk from the contract with notice and leave you hi

25  and dry completely.                                                 03:07PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 75 of 128

1194

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    So that would seem to make me think that always in the

2    back of your head if we push too hard they will walk.  And it

3    also made me think that's why the contract, over time, became

4    more lucrative for Corizon meaning they received more money by

5    the contract amendments and that they received money associated          03:07PM

6    with the carrot, that seemed to have, as I talked to Director

7    Ryan about, didn't seem to make economic sense to me.  But then

8    I stepped back from it and I thought in my mind, well, maybe

9    there's a word out there that Corizon is saying, if you don't

10   make this worth our measure, meaning give us more money at the          03:08PM

11   same time you are insisting we do all these many things to meet

12   the stipulation because you are saying we have to do these

13   things, we will walk.  So you are faced with a situation that

14   causes you to not push as hard as you might want to because of

15   that reality.                                                            03:08PM

16       Is that a fair conclusion?

17       THE WITNESS:  I understand the argument.  It doesn't

18   prevent us from pushing.  The budget realities are exactly what

19   they are.  We were legislatively mandated to privatize.  This

20   wasn't the Department of Corrections decision to do that.  The          03:08PM

21   law was made.  We have to follow the law.

22       The reality is that it's a small limited number of

23   players that can provide this amount of services on this level.

24   We don't have a lot of control over that, and the reality is

25   that any contractor with notice can walk.  That would leave us          03:09PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 76 of 128

1195

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    in an extremely vulnerable position.  But on the other side of

2    that equation I have the taxpayers and the budget that I have

3    to adhere to.  So there are limitations on my side as to what

4    we can do in addition to the demands that we're making.

5         THE COURT:  And I appreciate that the Department can        03:09PM

6    only spend what the legislature has authorized it to spend.

7    And you referred to it as we have to follow the law.  But there

8    is a fundamental law in the country.  That is the constitution

9    and its amendments.  And the case here, the law that I'm

10   applying, is one that comes from that foundational document.    03:10PM

11   And so if there are conflicts between the requirements of the

12   foundational document and the state law, and said in other

13   words, if the State isn't spending enough to get that kind of

14   contractor it needs to be able to do that job such that if that

15   contractor, if asked to do what is the requirements of the       03:10PM

16   stipulation, would then respond that's asking us to do too much

17   with the resources you have given us.  If you ask us to do that

18   we will walk.  And so if that causes you to back off from those

19   kinds of requirements, you are following the law of the State

20   of Arizona but you are potentially violating the Constitution    03:10PM

21   of the United States which is the supreme document that would

22   control in existence of a conflict between the two.

23         So I appreciate what you say.  I just want you to also

24   understand that the dilemma that I have is that I cannot

25   respect the constitution if I allow the subordinate document,    03:11PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 77 of 128

1196

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1  the law of Arizona, the legislative action of the State of

2  Arizona to predominate.  In our federal system that was not the

3  arrangement that was originally agreed to by the 13 states and

4  every state that came into the union such as Arizona did in

5  1912.  Arizona agreed to be subject to the supremacy clause and          03:11PM

6  also to understand and embrace the idea that if there was a

7  conflict between the constitution of the United States and the

8  law or constitution of the State of Arizona, that there would

9  be the federal document that would control.

10          Go ahead, Mr. Bojanowski.                                       03:11PM

11          MR. BOJANOWSKI:  May I have a moment, Your Honor?

12          Your Honor, may I have a moment?

13          THE COURT:  Oh.  Of course.  Yes.  I'm sorry.  I gave

14  you an impermissible visual cue.

15          MR. BOJANOWSKI:  I just wanted to make sure I wasn't            03:12PM

16  leaving the podium without you acknowledging.

17          THE COURT:  The court reporter did not report that I

18  had waved you over to counsel table as you wished.

19          MR. BOJANOWSKI:  Thank you, Your Honor.

20          THE COURT:  Surely.                                            03:12PM

21  BY MR. BOJANOWSKI:

22  Q.  Mr. Pratt, the Court has asked you some questions about

23  available contractors and such.  Has that fact become an

24  impediment to you to actually push them to do what you need

25  them to do to get into compliance?                                     03:12PM

Case 2:12-cv-00601-ROS Document 2781 Filed 04/20/18 Page 78 of 128
1197
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1    A.  No.  As I said, that's not stopping the demand process and

2    the requirements that you have laid out in the OSC.

3             THE COURT:  Ask a harder question.  That thought's

4    never entered your head?

5             THE WITNESS:  Which thought?                              03:13PM

6             THE COURT:  If we push too hard on this Corizon will

7    walk?

8             THE WITNESS:  No.  That thought has entered my head.

9    Absolutely, Your Honor.

10            THE COURT:  Okay.  Thank you.                            03:13PM

11   BY MR. BOJANOWSKI:

12   Q.  Has that stopped you from making the demands?

13   A.  No.

14   Q.  And you are going to continue to make those demands?

15   A.  Yes.  If any vendor would choose to walk, we do have         03:13PM

16   insurance policies that back that up.  But still, that would

17   ultimately leave the inmate population in a tremendous lurch.

18   And I don't want to see that.

19   Q.  Have we been faced with a contractor in Arizona walking

20   from a contract before?                                          03:13PM

21   A.  Yes, we have.

22   Q.  And have we dealt with that to provide a continuity of

23   care?

24   A.  Yes.  The first contractor that was awarded the original

25   contract, Wexford, chose to leave after only nine months in the  03:14PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 79 of 128
1198
4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Redirect

1   contract.  That's when we went through the contract in

2   practicable process through state procurement and we were able

3   to go back to the remaining two bidders on the original RFP to

4   ask them to resubmit a bid.

5   Q.  And so although in the back of your mind there's that        03:14PM

6   possibility, there are, I call them, contingency plans in place

7   to address that scenario should it arise?

8   A.  Yes.  But that would be also potentially at the expense of

9   inmate health care.

10        MR. BOJANOWSKI:  May I have another moment, Your          03:14PM

11   Honor?

12        THE COURT:  You may.

13        MR. BOJANOWSKI:  Thank you.

14        Nothing further, Your Honor.

15        THE COURT:  One more question, Mr. Pratt.  In your        03:15PM

16   dealings with Corizon over the time that they have been the

17   contractor, have they ever threatened you to walk?

18        THE WITNESS:  No.

19        THE COURT:  Thank you.  Well, you are done, sir.

20        THE WITNESS:  Thank you.                                  03:15PM

21        THE COURT:  Thank you very much.

22        MS. KENDRICK:  Your Honor.

23        THE COURT:  Why do you think you should have some

24   recross?

25        MS. KENDRICK:  Yes, sir, with the new exhibits.          03:15PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 80 of 128

1199

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Recross

1     THE COURT:  That was a new exhibit?

2          MS. KENDRICK:  Yes.  Exhibit 105 was a new exhibit.

3          THE COURT:  Fair enough.  You may.

4          You are not quite done, Mr. Pratt.  In fairness

5     something was presented to you that was not available to the          03:15PM

6     plaintiffs at a time -- well, at least it wasn't something that

7     the State had used.  So now it's fair that the -- that

8     cross-examination should be reopened to that issue.

9          THE WITNESS:  Okay.

10          MS. KENDRICK:  I promise to try to be quick.          03:15PM

11                    RECROSS-EXAMINATION

12    BY MS. KENDRICK:

13    Q.  Can you look at Exhibit 105?

14    A.  Okay.

15    Q.  And this is the e-mail that you sent to Mr. Ward on          03:16PM

16    November 5th about the daily reporting?

17    A.  Yes.

18    Q.  And do you see that about seven or eight lines down in the

19    paragraph there's a sentence that reads, "As a result, ADC

20    demands that Corizon bolster its current complement of monitors          03:16PM

21    to capture the information necessary to not only comply with

22    the order but to identify problem issues in areas immediately

23    for resolution"?

24    A.  Yes.

25    Q.  How many additional monitors did Corizon bring in?          03:16PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 81 of 128

1200

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Recross

1    A.  I don't know the number on that.  I know they did bring

2    additional staff to supplement this.

3    Q.  So did you ever follow up with Mr. Ward about how many

4    monitors were being brought in?

5    A.  At the time I know there were additional staff brought on,    03:16PM

6    but I don't know the number.  I'm thinking two or three.

7    Q.  Okay.  And on the second page of Exhibit 105 is an e-mail

8    that you sent to Mr. Ward on November 3rd saying that you

9    didn't want to wait until Monday the 6th to receive a complete

10   response.  Do you remember, was that because you were going --    03:17PM

11   there was going to be a status hearing that week?  Maybe if you

12   look at Exhibit 106 that will remind you if there was going to

13   be a status hearing that week.

14   A.  I was asking for as much information that they had

15   currently at that time, and I didn't care if it took them        03:17PM

16   through the weekend to continue working on that process.

17   Q.  Right.  So Exhibit 106 is also a new exhibit that your

18   attorneys have added.  Could you turn to that?

19   A.  Okay.

20   Q.  On the top of the second page is an e-mail from you to Mr.   03:18PM

21   Ward again about the daily reporting.

22   A.  Yes.

23   Q.  And in the second paragraph you state the next status

24   hearing is Tuesday, November 7th, and so you go on to say that

25   a deadline of November 10th would not work.  Does that refresh   03:18PM

Case 2:12-cv-00601-ROS Document 2781 Filed 04/20/18 Page 82 of 128

1201

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Recross

1  your memory that perhaps there was a status hearing on November

2  7th?

3  A.  Sure.

4  Q.  Do you remember telling the Court at the November 7th

5  hearing that Corizon was incapable of realtime reporting?          03:18PM

6  A.  Not specifically, no.

7  Q.  Do you remember telling the Court at the December 20th

8  status hearing that Corizon was incapable of realtime

9  reporting?

10  A.  No.                                                            03:19PM

11         MR. BOJANOWSKI:  Objection.  Outside the scope.

12         THE COURT:  Overruled.

13  BY MS. KENDRICK:

14  Q.  Do you remember telling the Court at the January 18th, 2018

15  status hearing that Corizon was not capable of doing complete     03:19PM

16  realtime reporting?

17         MR. BOJANOWSKI:  Same objection.

18         THE COURT:  Overruled.

19         THE WITNESS:  No.

20  BY MS. KENDRICK:                                                   03:19PM

21  Q.  And I believe Mr. Bojanowski had asked you about the carrot

22  and the stick and that the incentives are capped at 3.5

23  million, correct?

24  A.  Correct.

25         MR. BOJANOWSKI:  I thought her recross was limited          03:19PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 83 of 128

1202

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Recross

1   to --

2          THE COURT:  Tell me how this is legitimate subject for

3   recross.

4          MS. KENDRICK:  Because I need to clarify something

5   that he said on redirect because I don't think it's accurate,     03:19PM

6   Your Honor.

7          THE COURT:  Is it just one question or how many?

8          MS. KENDRICK:  It should be one question if he can

9   answer it.

10          THE COURT:  Okay.                                          03:20PM

11          MR. BOJANOWSKI:  Same objection.

12          THE COURT:  Overruled.

13   BY MS. KENDRICK:

14   Q.  So you testified that the stick remained, that the cap, the

15   fines would keep going even when the incentives ran out.          03:20PM

16   Correct?

17   A.  Correct.

18   Q.  But that's only until June 30th, correct?

19   A.  That's the end of the contract.

20   Q.  So it doesn't go on indefinitely.  It goes on for three       03:20PM

21   more months, correct?

22   A.  In this contract, yes.

23          MS. KENDRICK:  Okay.  Thank you.

24          THE COURT:  All right.  Thank you, sir.  You are now

25   indeed done.                                                      03:20PM

Case 2:12-cv-00601-ROS Document 2781 Filed 04/20/18 Page 84 of 128

1203

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Recross

```
 1              MR. BOJANOWSKI:  Your Honor, could I ask --

 2              THE COURT:  Your own lawyer is wanting to get back

 3       into this.  I'm trying to let you go but he's holding you.  Go

 4       ahead Mr. Bojanowski.

 5              MR. BOJANOWSKI:  Could I have a moment to confer     03:20PM

 6       before I ask this question?

 7              THE COURT:  You can have a moment then you will tell

 8       me why it is you get to have re-re-redirect.

 9              MR. BOJANOWSKI:  Your Honor.

10              THE COURT:  Yes.                                    03:21PM

11              MR. BOJANOWSKI:  I have been convinced not to ask any

12       questions.

13              THE COURT:  Finally, sir.  Thank you kindly.

14              THE WITNESS:  I'm going to go now.

15              THE COURT:  Yes.  I would run.                      03:21PM

16              THE WITNESS:  Thank you.

17              THE COURT:  Your next witness, please.

18              MS. LOVE:  Your Honor, defendants are finished with

19       their witnesses.  We would like to note for the record that

20       based upon testimony of Division Director Carson McWilliams  03:21PM

21       regarding his understanding of the stipulation that

22       contemplated at least four years to achieve full compliance and

23       the Court's questions regarding the same, defendants note for

24       the record that the stipulation that was filed at Docket 1185

25       on October 14th, 2014, which was signed by the parties --    03:21PM
```

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 85 of 128

1204

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Recross

1        THE COURT:  Right.  I'm aware of the paragraph that

2    refers to -- I'm very much aware of that.  Also, the point is

3    that no one in this courtroom, I think, has ever said the words

4    to me that think that they have a four-year time to be able to

5    effect the stipulation, and that we have worked on a basis that        03:22PM

6    was identified from the very start when the failure to meet the

7    benchmark that was then in place caused the Court to engage in

8    remedial measures.  And never once did anybody say we shouldn't

9    be doing this now.  We could wait four years.  And that's what

10   I thought I heard him say and I wanted to clear that up.              03:22PM

11        Now what the language means in the stipulation with

12   respect to the four years is it says it's a limitation on the

13   ability of anybody to move for the closure of the stipulation

14   and it does include the preamble that says -- I can't remember

15   it off the top of my head -- essentially words to allow for the      03:22PM

16   remedial measures to be effective or to take effect.

17        In any event, that general language is ambiguous

18   enough that it is completely overlapped by the previous

19   language in the stipulation, which I think I can't again -- if

20   I could pull it up immediately I would read it to you, which I       03:22PM

21   think is in the first or second operative paragraph of the

22   stipulation.  I may be off by a couple paragraphs there where

23   it essentially includes the promise to meet all of those

24   stipulations with no reservation about time at all.

25        So to the extent that there was anybody who thought on          03:23PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 86 of 128

1205

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing-Pratt-Recross

1   the yard, or anybody who, outside in the community, who

2   believed that there was a four-year time period to accomplish

3   the stipulation, the fact that I have never heard you, Mr.

4   Struck, or Mr. Bojanowski -- and maybe you can find it in a

5   transcript where you said it to me -- but it has certainly not          03:23PM

6   been a refrain that has commonly been presented to me.  I don't

7   remember any of the lawyers saying, Judge, we don't need to be

8   all over this because we have four years.  Instead what I hear

9   every single month is we are going to fix this next month by

10  doing the exact same thing rather than saying I've got four              03:23PM

11  years.

12          So I just wanted to make it very clear that this

13  judge, who was present in the settlement discussions and can

14  read the stipulation and has been present in the courtroom as

15  lawyers have been operating with their knowledge of what this           03:24PM

16  stipulation requires this suddenly hatched idea that appeared

17  someplace in the last month for the first time I had ever seen

18  it about four years is not something that I think is an

19  operative in this stipulation.

20          So you are making a record which now is the first time         03:24PM

21  that I have never heard that's something that has ever been

22  argued to me and I completely reject it.

23          MS. LOVE:  Your Honor, we understand that you reject

24  it.  For the record, defendants request permission to read in

25  Paragraph 37.                                                           03:24PM

─4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing─

1      THE COURT:  Unnecessary.  Overruled.  It's in the

2  stipulation.  I know what it says.  And to the extent that it

3  is needed to be added to the record, Ms. Love, it's in the

4  record already.  Isn't it?

5      MS. LOVE:  Yes.                                    03:24PM

6      THE COURT:  Anything else we need to address?

7      MR. BOJANOWSKI:  Your Honor, could I move for the

8  admission of Exhibits 105 and 106 that were testified to?

9      THE COURT:  Any objection.

10      MS. KENDRICK:  No, sir.                           03:24PM

11      THE COURT:  105 and 106 will be received.

12      MR. BOJANOWSKI:  Thank you, Your Honor.

13      THE COURT:  Thank you.  So are we ready to proceed to

14  argument?

15      MS. KENDRICK:  Yes.  Plaintiffs are ready.        03:24PM

16      THE COURT:  No more witnesses, right, from the

17  defendants?  And the defendants have the burden, so they go

18  first.

19      MR. STRUCK:  Yes.  And, Your Honor, we request that

20  there be Findings of Fact and Conclusions of Law submitted.  03:25PM

21      THE COURT:  I don't need that.  I need you to make

22  argument and I will issue an order based upon the argument.  I

23  am not going to wait any longer for you to prepare Findings of

24  Fact and Conclusions of Law.  When I issue my order it will

25  include Findings of Fact and Conclusions of Law.  But if you  03:25PM

─4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing─

1    are asking permission to submit proposed Findings of Fact, I'm

2    not going to allow that.

3                MR. STRUCK:  Thank you, Your Honor.  I will proceed.

4                THE COURT:  Okay.

5                MR. STRUCK:  Your Honor, the plaintiffs presented two    03:25PM

6    witnesses with respect to whether or not the defendants were in

7    civil contempt.  Neither of those witnesses provided any

8    evidence with respect to the Department, that being Director

9    Ryan and Mr. Pratt, not taking all reasonable steps to comply

10   with the Court's October 10th, 2017 order.                          03:26PM

11               THE COURT:  And that's a curious first argument to

12   hear from the State, because the plaintiffs could remain silent

13   because you have the burden.  And so it could be that they have

14   concluded, but they didn't conclude that, they put on evidence.

15   But they could have concluded that the record already would      03:26PM

16   demonstrate that there was a failure to show that all

17   reasonable steps were taken.  You have to show that.  That's

18   your burden.

19               So starting off with the argument that the plaintiffs

20   didn't present their own evidence is not one that I find         03:26PM

21   particularly compelling, because again, they could have said

22   nothing.  And if they believed, and if the record would

23   support, you could still end up in the situation of not being

24   able to meet your burden.  So I guess I would like to hear

25   about what you think that you presented that demonstrated that   03:27PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    you did not take all reasonable steps.

2         MR. STRUCK:  Certainly, Your Honor.  I believe the

3    evidence demonstrated, and not just in this Order to Show Cause

4    hearing but throughout the pendency of whether it be a status

5    conference or other evidentiary hearings that have occurred          03:27PM

6    over the past two and a half, three years, that the defendants

7    are taking steps and continue to take steps on a daily basis

8    with respect to ensuring that the contractor, the third party

9    contractor, Corizon, who is not a party to the lawsuit, I

10   understand the Court has -- I understand that it is a                03:27PM

11   non-delegable duty.  The defendants understand that which is

12   why they do take the steps that they take, whether that be

13   meeting on a daily basis with respect to how health care is

14   provided to the 34,000 inmates underneath the auspices of this

15   particular order.  And the director has testified that there        03:28PM

16   isn't a day that goes by that he doesn't address and deal with

17   issues, the myriad of issues that pop up with respect to the

18   Parsons order.

19        And it's not just the 11 performance measures that

20   we're talking about here, it's all aspects of health care.          03:28PM

21   Because as the Court has stated on numerous occasions, and the

22   defendants don't disagree, it's the provision of health care to

23   the entire class under the stipulation that is important, not

24   simply looking at 11 performance measures at these particular

25   facilities that have failed over the course of the pendency of      03:28PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1   the stipulation.

2          The Department, through the director and Richard Pratt

3   and his team, have pushed Corizon to comply with those

4   particular performance measures at those facilities.  And if

5   the Court will review the -- track the performance of those          03:29PM

6   performance measures, they have continuously gone up over the

7   last several months.

8          THE COURT:  You can't say that across all of them.

9          MR. STRUCK:  Well, I think that they have gone up,

10  Your Honor.  If you look at -- if you track it over, say, the       03:29PM

11  last year, at those particular facilities, they have gone up

12  considerably.

13         THE COURT:  Well, but you are saying continuously.

14  That would suggest I always had a positive slope.  I didn't

15  always have that.                                                   03:29PM

16         MR. STRUCK:  In terms of where they began when this

17  process began with respect to the Court determining that --

18         THE COURT:  I mean, it's one thing to say that

19  everything has been going along, and everything every day we're

20  marching on these and we're getting better every single day,       03:29PM

21  that's not true because we have had cliffs that we have fallen

22  off and dropped down again on the way.  You may say we resumed

23  the march, but it would be a very different thing to say we

24  have never had anything but a positive improvement along the

25  entire course.  We just haven't seen that.                         03:30PM

─────4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing─────

1    MR. STRUCK:  What I'm trying to say, Your Honor, since

2    these first got on our radar screen and your radar screen, they

3    have gone up.  Now, have they gone up incrementally every

4    month?  No, they haven't.  And I apologize if --

5    THE COURT:  That's how I took the word "continuously"          03:30PM

6    but I now understand what your position is.

7    MR. STRUCK:  The director takes very seriously the

8    provision of health care within the Department of Corrections.

9    He takes very seriously the provision of health care to every

10   single inmate that's in his charge.  And he has done everything   03:30PM

11   he can to get Corizon to act, whether that be bringing in extra

12   people to get these performance measures in compliance, pushing

13   them on a continual basis, having direct communications with

14   the Corizon CEO on a weekly basis, sometimes more than a weekly

15   basis with respect to these performance measures at these        03:31PM

16   facilities.

17        And Corizon makes promises, and they have been able to

18   improve it, but there, again, there have been some performance

19   measures in the last few months among those 11 that have not

20   met the 85 percent threshold.  But they are close.              03:31PM

21        With respect to the Court's order that the defendants

22   must -- that these performance measures have to be 100 percent

23   compliant, that is simply, at least under the defendants'

24   belief, not something that's possible.  We understand that the

25   Court may not require 100 percent compliance but it is simply a   03:32PM

─4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing─

1    monumental task not only to reach 100 percent compliance but

2    for Corizon to even determine who it is that isn't under

3    compliance.  It was -- the Department has set up -- the

4    Monitoring Bureau has set up --

5            THE COURT:  Why did you enter into a contract that       03:32PM

6    required that?

7            MR. STRUCK:  100 percent compliance.

8            THE COURT:  You obviously now how to make a percentage

9    benchmark because you employed that in the contract that you

10   entered into.  But you didn't create a carveout saying we never   03:32PM

11   have to do more than 90 percent.  We never have to do more than

12   95.  You promised to meet the performance measure with respect

13   to every inmate and every performance measure.

14           MR. STRUCK:  The manner in which the monitoring was

15   set up was on a -- they would take a sample size and come up      03:32PM

16   with whether or not Corizon has met, whether it be 75 percent,

17   80, or 85 percent performance.

18           THE COURT:  Right.  But that's not a test with whether

19   or not you are in compliance with the stipulation.  That's the

20   measure that invokes my enforcement role.                         03:33PM

21           MR. STRUCK:  Defendants take the position that that

22   monitoring which is set up in the stipulation is what the

23   benchmark needs to be for the Court to determine whether or not

24   the defendants are in noncompliance.

25           THE COURT:  Right.  And I don't read the stipulation      03:33PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1  that way because none of that language that exists in the

2  stipulation, perhaps the Ninth Circuit will elucidate in its

3  pending matters under review about whether or not my view --

4  and again, we probably don't need to go into it again because I

5  know you have a different view.  And I have a view that is         03:33PM

6  controlling in this case until the Ninth Circuit tells me

7  otherwise, and that is the benchmark of compliance level is not

8  whether you are meeting compliance of the stipulation.  It's

9  whether or not you invoke my enforcement powers.

10         And I stay away from everything where you don't fail      03:34PM

11  to meet presently at 85 percent.  If you are above 85 percent I

12  have no business in that performance measure.  But if you get

13  below 85 percent then I do have business there and I am

14  concerned about what is the promise of the stipulation and that

15  is every single inmate will receive the benefit of the          03:34PM

16  stipulation.  Because there's no qualification as I read it in

17  the stipulation that says we only have to do it for 85 percent

18  of the inmates.

19         MR. STRUCK:  With respect to the Order to Show Cause

20  order that came out on October 10th, the defendants presented   03:34PM

21  evidence with respect to what steps the director and Richard

22  Pratt took with Corizon to get them to comply with the Court's

23  order and to get them to exceed the 85 percent and actually

24  demanded 100 percent compliance as the Court did.  The

25  defendants have taken great -- made great effort to try and get 03:35PM

—4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing—

1    Corizon to comply with these performance measures at these

2    facilities.  There are constraints that the defendants have

3    with respect to how this can be accomplished, and the director

4    and Richard Pratt worked within the constraints that they had

5    in order to attempt to get the third party health care provider    03:35PM

6    to comply with the Court's October 10th, 2017 order.

7             THE COURT:  Do you want to illustrate what those

8    constraints are?

9             MR. STRUCK:  Well, there's -- they have a third party

10   health care provider.  That's one of the constraints.  They    03:35PM

11   aren't self-operating.  And the director testified that they

12   haven't been self-operating since he came on board in 2009.

13   They self-operated for a period of three years until Wexford

14   was awarded the RFP.

15            THE COURT:  Why is that a limitation that I should    03:36PM

16   recognize?  If the State undertook an obligation to perform

17   something and they went out and hired somebody else to satisfy

18   that obligation and that somebody else wasn't able to meet the

19   requirements of the obligation, why should I say the State gets

20   a pass because this third party wasn't able to accomplish the    03:36PM

21   task when fundamentally, it was the responsibility of the State

22   to serve that purpose, to provide that service.  And upon its

23   failure why should I say that they get a pass because they

24   turned it over to somebody else who hasn't done that?

25            MR. STRUCK:  Because the Order to Show Cause came out    03:36PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    on October 10th, 2017.  And the Order required 100 percent

2    compliance as of beginning December 1st of 2017.

3            THE COURT:  Let's keep in mind that you had notice

4    about this in the summer of 2017.  So this wasn't a big

5    surprise.  In fact, it was the plaintiffs who said that I          03:37PM

6    needed to back off and give you more time.  So you got this

7    extra time.

8            So the idea that you would have been sort of rushed or

9    surprised by what came in the Order to Show Cause order in

10   October when in July of 2017 you had been fully informed about    03:37PM

11   the Court's intention.

12           MR. STRUCK:  I'm trying to respond to the Court's

13   question.

14           THE COURT:  I just wondered about limitation.  So the

15   first limitation is they have a third party contractor.  And I    03:37PM

16   said why should that mean the State should get a pass?  That's

17   the answer I'm interested in right now.

18           MR. STRUCK:  And the answer is even if you go back to

19   June when you indicated that you were going down the road of

20   contempt sanctions if these performance measures aren't met,      03:37PM

21   there is simply nothing that the director can do with respect

22   to getting rid of a third party health care provider and

23   self-operating.

24           THE COURT:  Wait.  Wait a minute.  Why couldn't the

25   State say you are not meeting the function.  You need to meet      03:38PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    the function.  And then in the reality of the situation, in my

2    question for Mr. Pratt reveals is that I do appreciate that

3    there are certain limitations with a contractor who can walk

4    and the State doesn't want that contractor to walk.  So

5    consequently when the State comes to that third party          03:38PM

6    contractor there are things you can do.  And I guess I'd like

7    to hear why it is that these things that are in my mind as

8    possible things to do aren't realistic or reasonable.

9          The first is, you could say, well, if you thinking

10   about walking or if we're fearful you are going to walk, we're  03:38PM

11   going to give you more money to be able to perform the service.

12   So that's something the State could do.  If they are not

13   amenable to taking more money, for whatever reason, or that's

14   unworkable, and you have a particular performance measure that

15   says you are not meeting this need, the State can jump in and    03:38PM

16   assume that responsibility and make it happen.  Because

17   ultimately it has the responsibility.

18         So if you take as an illustration of performance

19   measure that requires that a provider review a medical -- a

20   medical lab report with the inmate in a certain number of days   03:39PM

21   and Corizon doesn't have the staff to do it, the State simply

22   says we will hire somebody and put them in the place in the

23   office in our prison to make sure that that happens.  Why is

24   that not possible?

25         MR. STRUCK:  There are two.  And I will address the        03:39PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1   first one.  The first one is why doesn't the State pay Corizon

2   more money to hire more staff.  The testimony has been, and the

3   Court is aware, that Corizon hasn't been able to fill the full

4   time equivalent positions that they were awarded under the

5   contract.                                                      03:39PM

6        THE COURT:  That's for the ones that are affected with

7   staff people of medical providers.  Those are not the sole

8   limitation of the subject of the OSC.  But the idea that

9   perhaps there is some problem with respect to Corizon, Corizon

10  has a big incentive not to pay these people extra money whereas   03:40PM

11  the State has an incentive to avoid the peril of failing to

12  meet the stipulation requirements by making sure those people

13  are in place.  Corizon doesn't have the same incentive.  The

14  State does.  This is the State's obligation.  So why couldn't

15  the State do that?                                             03:40PM

16       MR. STRUCK:  Well, they worked with Corizon to try and

17  get Corizon the fill those FTEs.

18       THE COURT:  By sending letters, some number of letters

19  Corizon comes back with rather snippy responses to its

20  employer, its contracting officer in this one letter that is   03:40PM

21  now in evidence in the case.  So I guess there are reasons to

22  suspect that the State's desire to rely upon Corizon's

23  representations are sometimes not valid.

24       MR. STRUCK:  The evidence that was presented at this

25  hearing is that Corizon actually pays higher than the going    03:40PM

1    rate for health care providers.

2          THE COURT:  Maybe it's not enough.  You said going

3    rate for where?  Mr. Millar is going to talk to us about that.

4    We have an expert who is going to tell us whether or not we're

5    at the place you need to be paying to get the right number of          03:41PM

6    people.  Testimony is indeed true there has been a person here

7    who testified that Corizon pays more than the State pays.

8    Well, there's no limitation on the State deciding what to pay

9    that it can't fix.

10         MR. STRUCK:  Well, there's a limitation with respect          03:41PM

11   to the current budget.

12         THE COURT:  The State can fix that.  They can allocate

13   more money.

14         MR. STRUCK:  Between June and --

15         THE COURT:  There are these things called special          03:41PM

16   sessions.  I grew up in Arizona.  I know about them.  The

17   governor can call the legislature at any time.

18         MR. STRUCK:  Well, what the defendant did was work

19   with Corizon with respect to getting Corizon to hire more

20   staff.  The problem appeared to be with respect to turnover of          03:41PM

21   the Corizon staff not necessarily being able to hire them, and

22   so that is something that the State, the defendants continue to

23   work with Corizon to --

24         THE COURT:  I would like to be able to count, Mr.

25   Struck, sorry to interrupt, but the number of times, we can go          03:42PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 99 of 128

1218

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    back to the transcripts, where I said it was a staffing issue

2    you said no, it's not.  It's not.  It's not.

3               MR. STRUCK:  I think, Your Honor, if I may, when I

4    said it's not, I said not in terms of number of staff.  Because

5    there are two issues with respect to staff.  And that is, is          03:42PM

6    the staffing pattern sufficient with respect to the health care

7    providers that have been budgeted under the contract, that's

8    the first issue.  The second issue is whether or not it's

9    sufficient if those positions have been full.  And they haven't

10   been full over the life of the contract and it's defendants'         03:42PM

11   position that they believe that these performance measures

12   would be met if Corizon was at 100 percent in terms of staffing

13   those FTEs and was working with decreasing their turnover with

14   respect to every time you lose a staff member you have to bring

15   somebody in and train them.  And there's been testimony about        03:43PM

16   that.  The Court's well aware of it.  And the defendants have

17   been working with Corizon to do that.

18               And simply -- the argument that simply throwing more

19   money at Corizon will somehow solve the -- or solve the 11

20   performance measures that have fallen short, is simply               03:43PM

21   speculation.  And what the defendants have done is try to get

22   Corizon to fill those positions to see if it would make a

23   difference.  And throwing more money at them for positions that

24   they can't fill doesn't necessarily mean that --

25               THE COURT:  I guess if you are not filling the           03:44PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

```
 1    positions because you are not paying enough, then it would be a

 2    good thing to throw more money at this for the purpose of

 3    praying these people more.  Again, I'm completely embraced with

 4    the idea of what happens in a market-driven economy such as

 5    ours where if you have a lower supply you simply increase the          03:44PM

 6    attraction to people who want to be in that position that you

 7    are offering for them.  And the way you do that is you offer

 8    more money.  That's what everybody knows.  And it's not a

 9    completely errant supposition that led me to believe -- I

10    needed to make sure it wasn't errant but again, what I have           03:44PM

11    learned about my beloved country is that we have this common

12    understanding that this is what drives us.  It's a market-based

13    economy.  So the economics that I learned in college and

14    learned later on in life from real practical experience was it

15    wasn't exactly true.  Sometimes it is throwing money at people       03:45PM

16    whom you attract to do a job in a place where maybe they don't

17    want to do that job in the current rates they are being

18    offered.

19            So if you increase the pay you will find a couple of

20    things that I think will either be proved right or wrong by Mr.      03:45PM

21    Millar, and that is, if you offer more money you will get a

22    lower turnover rate and you will be able to fill the positions

23    that are empty.  And I guess I would be surprised to see if any

24    reasonable person could say that logic wasn't right.

25            MR. STRUCK:  I suppose if you pay a nurse an                  03:45PM
```

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    exorbitant amount of money you might get --

2         THE COURT:  I wasn't interested in paying an

3    exorbitant amount of money.  I was interested in paying the

4    amount of money that was necessary to accomplish the task and

5    that is to make sure we had sufficient number of people with        03:45PM

6    the right qualifications to do the job.  And I don't think that

7    was necessarily something I ever entertained would be

8    exorbitant.  It was simply what was necessary.  I'm not

9    interested in asking anybody to spend exorbitant amounts.  I'm

10   interested in people spending what's necessary.                     03:46PM

11        MR. STRUCK:  Well, there's been testimony in this case

12   that, for example, at the Yuma facility they offered $400,000

13   for a psychiatrist position and they couldn't even get anyone

14   applying for that position.

15        THE COURT:  If they have to have a psychiatrist             03:46PM

16   position in Yuma and no psychiatrist wants to do it for 400,000

17   the next step is to figure out what can we do to get people to

18   be interested in being in Yuma and to be a psychiatrist if we

19   find we need to have one.  It may mean that you pay 425.  It

20   may mean that you pay 450.  Again, in this market-based economy    03:46PM

21   that's what drives us in our decision making.  That's what we

22   do.

23        So consequently your suggestion that the analysis is

24   closed by the reality that what sounds to me like a salary that

25   is twice my salary by much more would cause me to want to go to    03:47PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    school to maybe become a psychiatrist at some point.  But that

2    being said, maybe the market is so difficult, so provider

3    favored that you do have to do that in certain circumstances

4    because the State has an obligation to provide psychological

5    psychiatric care to its inmates.  So you have to get it one way    03:47PM

6    or the other.  If you are going to decide to incarcerate people

7    in Yuma, you are going to have to pay what it takes in a way

8    that complies with the law.

9          MR. STRUCK:  The point I was trying to make was they

10   were working with Corizon to increase the amount of money that    03:47PM

11   was being offered to fill these positions.  And Corizon was

12   doing that and they did increase and they didn't -- weren't

13   always successful at filling those positions.

14         And in terms of the confines I was talking about, the

15   budgetary confines and the fact there's a third party health     03:47PM

16   administrator, I think the second example the Court gave was

17   well, why didn't the State go out and hire their own health

18   care staff, they are precluded from doing that by state

19   statute.  They can't go out and hire health care staff.

20         THE COURT:  Again, if that's the impediment that can        03:48PM

21   be fixed.

22         MR. STRUCK:  Well, those are what's tying the hands of

23   Director Ryan when you issue your order on October 10th, 2017

24   to come into compliance, 100 percent compliance by December 1st

25   of 2017.  He simply is -- to suggest that he can go out and       03:48PM

1   have -- and hope the legislature will change the legislation to

2   allow the State to appropriate him more money and allow the

3   State to hire their own folks to meet these certain performance

4   measures at 100 percent is not a reasonable measure.

5       THE COURT:  Well, seems pretty reasonable to me                    03:49PM

6   because on the calculus that I envision is the State failing to

7   meet the performance measures over such an intractable period

8   of time is told by the federal court that you are facing a risk

9   of significant financial penalties for failing to do this.  And

10  so the financial issue would seem to be one that presents the        03:49PM

11  following choices:  You can pay to provide the medical care

12  that you are obligated to provide to your staff at certain

13  number of dollars, or you can pay a penalty that will not solve

14  the problem directly as it would otherwise if you were hiring

15  somebody to do the job.                                               03:49PM

16      So that's something that is reasonable for the State

17  to consider and to me doesn't sound like handcuffs.  It sounds

18  like part of intelligent decision making about what are the

19  choices we have and what's the best choices to make with the

20  fiscal fisc of the State of Arizona.  Do we continue to be in a       03:50PM

21  situation where some law exists that limits us from being able

22  to provide the services that we're supposed to provide, or does

23  that handcuff that we have the key to, that we choose not to

24  open, compel the Court to impose sanctions that could be many

25  millions of dollars that don't accomplish the goal?                   03:50PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    MR. STRUCK:  Well, in terms of efforts that were made,

2    I think that the Court heard evidence from Director Ryan and

3    Richard Pratt as to everything they did to try and accomplish

4    this, including also with respect to Performance Measure 35,

5    Carson McWilliams testified with respect to how things were          03:50PM

6    changed to try and track and get that performance measure met

7    in terms of the transportation of inmates from one facility to

8    another.  There has been no evidence that -- nor was there any

9    effort for the legislature to come in and appropriate more

10   money.                                                              03:51PM

11        THE COURT:  I'm sorry.  I didn't hear what you just

12   said.

13        MR. STRUCK:  I said the legislature did not come in

14   and appropriate more money between October 10th and December

15   1st.  That is true.                                                 03:51PM

16        THE COURT:  It could have asked the legislature to do

17   that.  The legislature was in session.

18        MR. STRUCK:  And the defendants did not threaten

19   Corizon or force them to quit and try and take over as

20   self-operating because then those performance measures would       03:51PM

21   certainly not have been met doing something like that.  As the

22   director testified, they at this point in time, he couldn't get

23   enough money to be self-operating at this point.

24        THE COURT:  And that's a choice that the State of

25   Arizona makes and the State of Arizona would have to come up        03:51PM

1    with the money if it failed to comply with its constitutional

2    obligations and if it failed to comply with the obligations

3    under the stipulation.

4           So there is the idea that exists in the world that the

5    State has to deal straight up with the fact that this                        03:52PM

6    obligation in the stipulation and the constitutional

7    obligations to its inmates it has in custody will not be one

8    that you can pretend that you are able to make a decision on

9    the amount of money that you are going to allocate to the

10   problem if it turns out that amount of money is not sufficient                03:52PM

11   you cannot hide behind saying that's all we could do.  The

12   State has other means available to it to try to be able to

13   amass the money that's necessary to do to meet its obligations.

14          This obligation is one that is significant.  The

15   director testified that there has been a placeholder placed of                03:52PM

16   $30 million with respect to health care for the next budget.

17   That would seem to make sense to the Court as to an appropriate

18   response to trying to decide how best to deal with the

19   circumstances of the State's obligations.

20          MR. STRUCK:  And that budget has increased every year                  03:53PM

21   with respect to health care.

22          In terms of something the Court said with respect to

23   the their constitutional obligation to provide health care,

24   defendants agree that they have a constitutional obligation to

25   provide health care.  But what the defendants don't agree is                  03:53PM

1    that not meeting these performance measures, these 11

2    performance measures at these facilities is a violation of the

3    constitution.  It's a violation of the stipulation.

4           THE COURT:  Just so you know, I wasn't giving you the

5    constitutional statement that I was making was to accompany the      03:53PM

6    obligation under the stipulation.  I think there are two.  You

7    are not -- it's not a surprise to you that I preside in a

8    number of cases in which the State is facing liability because

9    of constitutional deprivations wholly apart from the

10   stipulation and I am personally aware of substantial                 03:53PM

11   settlements that the State has paid for cases where it deemed

12   that it did not want to go before a trier of fact before a jury

13   here and instead would pay significant dollars to try to settle

14   the case in advance.  Those numbers add up.

15          And so my sense is that the State needs to understand         03:54PM

16   that it's really facing two threats to its fiscal fisc with

17   respect to failing to provide for the inmates in its custody.

18   On the one hand, there is the exposure that comes from the

19   stipulation, failure to meet those requirements; on the other

20   hand, there is the overriding that will last long and forever        03:54PM

21   beyond the stipulation, I hope.  I hope the stipulation has an

22   ending at some point.  But the constitutional obligation will

23   always be there and it simply is a circumstance that those

24   cases can be very expensive for the State.  And I think that I

25   don't prejudge them, but in some number of these cases don't         03:54PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    produce any kind of a result that's favorable to the plaintiff

2    and adverse to the State.  But a significant number do.  And

3    that's just something that needs to be understood by not only

4    the executive but also the 90 people at the two houses.

5         MR. STRUCK:  And we certainly understand that, Your          03:55PM

6    Honor.  One thing that is with respect to this particular

7    contract, it does provide -- Corizon does indemnify the State

8    with respect to those kinds of claims that you are talking

9    about.  So if the claim -- somebody sues the State of Arizona

10   or Director Ryan with respect to improper or constitutionally     03:55PM

11   deficient health care and it occurred while Corizon was

12   providing the health care then Corizon and its insurance

13   carrier step in and defend and make the decision with respect

14   to whether or not that case goes to trial or settles.

15         THE COURT:  I see.                                          03:55PM

16         MR. STRUCK:  But with respect to what the Court is

17   saying, yes, the, you know, can the Court issue sanctions

18   against the State of Arizona?  It absolutely can.  But did

19   Director Ryan and Richard Pratt take all reasonable measures in

20   order to comply with the October 10th, 2017 order?  They did.     03:56PM

21   That's the defendants' position, that they took this very

22   seriously.  You saw the letters.  You heard the testimony of

23   Director Ryan.  He's a very serious man and he's been doing

24   this for a long time and he cares about doing a good job.  And

25   nothing distresses him more than the fact that he has a health    03:56PM

Case 2:12-cv-00601-ROS  Document 2781  Filed 04/20/18  Page 108 of 128

1227

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    care provider that's not meeting these performance measures

2    under the contract and the stipulation.  And he works on that

3    every day to try and get them to comply.  I'm sure that's what

4    he's doing right now.

5         In any event, I think that the record is very clear        03:56PM

6    with respect to what the Department did, what the director did,

7    what he had people do in order to get compliance with the

8    order.

9         THE COURT:  Thank you, sir.

10        Plaintiffs.                                                  03:57PM

11        MS. KENDRICK:  Thank you, Your Honor.

12        As the Court correctly observed, defendants have the

13   burden of proof to show that they took all reasonable steps to

14   comply with the order.  And defendants have failed completely

15   in making their showing of proof.  The Ninth Circuit has        03:57PM

16   spelled out exactly what is required to show all reasonable

17   steps.

18        First of all, contempt need not be willful, and

19   there's no good faith exception to contempt.  So while Mr.

20   Struck argues that Director Ryan, quote, takes very seriously   03:57PM

21   the Court's order and is distressed by these violations of the

22   constitution and the Court's order, the bottom line is the

23   Ninth Circuit case law is clear that this good faith attempt is

24   not enough to invalidate a contempt order.

25        Second, the Ninth Circuit requires that the parties        03:58PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 109 of 128

1228

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    show categorically and in detail all steps that they took.

2    What we got from evidence from these two defendants is they

3    wrote letters and had meetings.  But what they specifically

4    requested Corizon to do was only two things:  They asked

5    Corizon to fly in more health care staff, and they asked          03:58PM

6    Corizon to do realtime monitoring.  And what we learned in the

7    testimony is that neither of those things appear to have been

8    done.

9            Mr. Pratt could not speak to what types, how many, or

10   when health care staff, if any, were brought in.  He could not     03:58PM

11   testify to how many additional monitors could come in.

12   Defendants have admitted that they and their contractor are not

13   capable of doing the realtime reporting.  So those are the only

14   two specific steps that defendants direct Corizon to do and

15   none of them worked.                                               03:59PM

16           Finally, the third component of the burden of proof

17   under the Ninth Circuit case law is impossibility is not a

18   defense if the party itself is responsible for the ability to

19   comply.  And defendants can't escape contempt here by saying

20   their hands are tied when they used their own rope to tie their    03:59PM

21   hands.  The State did it to itself.  The State passed a law

22   saying ADC had to privatize health care.  The state passed a

23   law limiting the amount of money that ADC can pay outside

24   specialists for outside specialty medical care.

25           And finally, they can't argue they are not liable          03:59PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1  because of the contract with Corizon or use the contract's

2  limitations as some sort of defense for contempt.  They

3  voluntarily signed and entered into that contract in those

4  terms.  So again, their hands are tied but they tied the rope

5  themselves.                                                    04:00PM

6       Specifically going back to the reasonable steps, Mr.

7  Pratt testified that it was a pure guess that a dozen nurses

8  were flown in after he sent that letter asking Corizon to send

9  people in, but he took no notes and in no way tracked what

10  staff were brought in from out of state.  Director Ryan said he  04:00PM

11  didn't keep track of these things and he deferred it all to Mr.

12  Pratt.  Mr. Pratt also testified at one point that the sanction

13  letters he sends to defendants are, quote, boilerplate that I

14  have to fill in each month.  And again, we don't think that

15  shows reasonable efforts were being made.                     04:00PM

16       And defendants have failed to meet the requirement

17  that they show, quote, categorically and in detail why they are

18  unable to comply.  They have testified about these root cause

19  analysis process flows that they called the visio charts.  But

20  as was noted last month when they testified, these do not break  04:00PM

21  down by institution and show, for example, why there is more

22  compliance with one performance measure in the contempt order

23  at one institution versus another.  It just shows what the

24  process is supposed to be.

25       So at most they could point to a flow chart that         04:01PM

1    showed the process but they didn't explain what was going wrong

2    at each prison, nor did they explain for each performance

3    measure at each institution all the causes of noncompliance in

4    December and January and what steps they took.

5           For example, Performance Measure 11 and 35 are both          04:01PM

6    performance measures that have to do with pharmaceuticals.  And

7    there's an obvious step that the Department could have done to

8    help with delivery of medication and the transfer of

9    medication, and that is to keep a greater supply of medications

10   on site at the institutions as clinical stock.  But none of      04:01PM

11   their witnesses testified that they ever asked Corizon to do

12   that, and none of the letters that they showed us ever asked

13   that they did it.  Furthermore, to the extent they even asked

14   Corizon to do something, it's not clear how it would go to

15   specific performance measures.  So, for example, flying in more   04:02PM

16   medical providers might help in terms of timeliness of

17   referrals to see a doctor, but it's unclear how that would

18   affect Performance Measure 11 which is how long it takes from

19   the medication to get from Oklahoma to Arizona.

20          Mr. Struck also said that the legislature didn't          04:02PM

21   appropriate money between October 10th and December 1st.  But

22   notably Director Ryan testified that he did not ask the

23   legislature or the governor to appropriate more money to

24   address the problems in the Order to Show Cause.  So the point

25   is that the liability is clear.  The defendants have failed      04:02PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    utterly to meet the tests laid out by the Ninth Circuit case

2    law to defend against contempt.  They haven't provided any sort

3    of detailed or comprehensive explanation as to the root causes

4    of noncompliance with the Court's order or what steps they took

5    for each performance measure at each institution.                    04:03PM

6         So with regard to the remedies, plaintiffs have some

7    thoughts that we would like to share with you.  First of all,

8    according to the defendants' filings, the most recent one last

9    Friday that was filed in response to our declaration setting

10   out 420 apparent instances of noncompliance they have now        04:03PM

11   admitted to 1,314 instances of noncompliance in the month of

12   December.  In the month of January they admitted to 869

13   instances of noncompliance.  That adds up to 2,183 admitted

14   instances of noncompliance.  And the Court had threatened a

15   $1,000 sanction so that would be $2,183,000.                      04:03PM

16        The defendants have had plenty of time to purge this

17   contempt sanction.  They had notice of it.  They could fix

18   their behavior and begin living up to their promise to meet the

19   stipulation.  So to the extent that they may face a fine of

20   over $2.1 million defendants have nobody but themselves to        04:04PM

21   blame.

22        Additionally, plaintiffs request that in addition to

23   fine and penalties, your order should include a provision that

24   ADC cannot be indemnified by Corizon because otherwise this

25   fine is going to have zero coercive effect on Director Ryan and   04:04PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 113 of 128

1232

————4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing————

1    Defendant Pratt.  Mr. Struck talked about indemnification for

2    individual lawsuits.  Again, that shows that the two people who

3    have the nondelegable duty and responsibility to ensure that

4    people in their custody get constitutionally adequate medical

5    care don't have skin in the game.  They are not feeling the          04:04PM

6    hurt.  So other courts in other cases have included

7    non-indemnification clauses in contempt orders, and we urge the

8    Court to do so.

9              THE COURT:  Do you have citations for those cases?

10             MS. KENDRICK:  One is *Intervert, Incorporated versus*      04:05PM

11   *Merial,* M-E-R-I-A-L, *Limited*, 241 FRD 55, the district of the

12   District of Columbia, 2007; also *U.S. versus Sungard Data*

13   *Systems*, 173 F. Supp 20, again, from the District of Columbia

14   District from 2001.

15             And there's an analogous Supreme Court case that has       04:05PM

16   to do with Rule 11 sanctions in which the Supreme Court said

17   that Rule 11 sanctions, that there can be a requirement that

18   the indemnification not come from a law firm or a client but

19   rather from the attorney himself or herself.  And that case is

20   *Pavelic*, P-A-V-E-L-I-C, *and LeFlore*, L-E-F-L-O-R-E *versus*       04:05PM

21   *Marvel Entertainment*.  And the cite is 493 U.S. 120, 1989.

22             So we believe that the sanctions should go to the

23   Court fund and the Court should use that money to hire experts

24   on auditing and monitoring, which is something that plaintiffs

25   have been asking for over a year because defendants have proven      04:06PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    time and again that they are either incapable or unwilling to

2    do monitoring accurately in such a way that the Court has

3    meaningful information.  And they have now testified and argued

4    that their contractor is incapable of doing this sort of

5    monitoring.  So it appears the Court may need to take matters          04:06PM

6    into its own hand and appoint a Rule 706 expert or experts on

7    auditing and monitoring, because what defendants are doing is

8    not working and it's broken.

9            Finally, we ask the Court to include some injunctive

10   relief in its order.  The Court has broad powers to include an        04:07PM

11   injunctive relief and a remedy, and we request that the Court's

12   order forbid the defendants from signing the new contract with

13   Corizon or any other contractor to provide health care for the

14   next five years until the Court, or your designee or expert,

15   reviews the proposed contract to see if it is in the best            04:07PM

16   interest of the plaintiff class.  We have heard endlessly that

17   the current contract ties the defendants' hands, so therefore

18   the Court needs to review the pending contract to see if all of

19   the same problems are still in there.  This is not something

20   unusual or out there in the case of *Plata versus*                   04:07PM

21   *Schwarzenegger,* the District Court for the Northern District of

22   California issued an order that directed the California

23   Department of Corrections to work with the Court's expert to

24   develop and ensure standards for medical contract management

25   with specialists for the Court to review and to approve to make      04:08PM

1    sure that it ensured the best interest of the plaintiff class.

2              If the Court likes, I have a copy of the order for you

3    and for defendants.  It was issued in 2006 prior to the

4    electronic case filing on PACER so you can't get it that way.

5              And we believe that you issuing an order forbidding          04:08PM

6    ADC from extending the Corizon contract or entering in with a

7    new business is completely within your bounds and your powers

8    because the arrangement with Corizon apparently has led to the

9    current dire situation.  And so it makes no sense for us to sit

10   here and watch them enter into another contract that will, this        04:08PM

11   time, cover five years and tie their hands in such a way.

12             Finally, we ask that your injunctive relief also

13   examine and, if necessary, invalidate the state laws that deal

14   with the specialty care caps and, if needed, with

15   privatization.  One possible alternative would be to modify it         04:09PM

16   so that the requirement is that the contract has to be with

17   not-for-profit organizations or universities.  Other states,

18   including Texas, have the university medical system providing

19   and overseeing the medical care.  And while that's not

20   necessarily perfect or things would change, it does remove the         04:09PM

21   profit motive that the Court has alluded to multiple times with

22   a for-profit corporation.

23             Finally, we ask that until there's further notice the

24   Court needs to make clear that this Order to Show Cause is in

25   effect for future months and future fines could be issued.             04:09PM

1   Thank you.

2           THE COURT:   Thank you very much.

3           You may submit to defendants and to the Court the

4   written order that you have procured that you mentioned in your

5   closing.                                                          04:10PM

6           Last word, Mr. Struck.

7           MR. STRUCK:   Yes, Your Honor.

8           Your Honor, of course we disagree with the plaintiffs

9   recitation of what the evidence showed here.  We believe that

10  the evidence showed that we did take all reasonable steps in    04:10PM

11  order to comply with your October 10th order.

12          With respect to the plaintiffs' requested relief, we

13  believe that your October order addressed the month of

14  December, not January, so whatever -- if sanctions are to be

15  considered by the Court, it should be for the month of          04:10PM

16  December.  With respect to the plaintiffs' argument that the

17  director and the State need have to skin in the game, the

18  contract between Corizon and the State require that Corizon

19  indemnify the State in the event Corizon fails.  Corizon is the

20  entity that needs skin in the game in order to comply with its  04:11PM

21  contract, and that is -- there was testimony with respect to

22  the sticks that the director had to get Corizon to comply with

23  the contract.  That is a big stick.  And the defendants

24  negotiated for that stick and need it in order to get

25  compliance.  That is the most effective way to get the third    04:11PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    party health care provider's attention.

2         THE COURT:  What is your view with respect to what Ms.

3    Kendrick said regarding the indemnification obligation that may

4    exist if there is a contempt sanction imposed in this case upon

5    the defendants?  Do they have an indemnification right from        04:11PM

6    Corizon?

7         MR. STRUCK:  There is, and there was testimony about

8    that from Director Ryan.  And he -- they pointed out on, I

9    think, I believe it was contract Amendment 14, provided -- or

10   excuse me, 10 -- provided that in the event that the Court       04:12PM

11   determined that there had been a failure with respect to the

12   health care, and I'm not talking about the max custody or

13   anything to do with that the Department would be responsible

14   for, but in the event that the Court determined that there was

15   noncompliance with medical provisions of the stipulation that   04:12PM

16   Corizon would indemnify the State with respect to those

17   particular sanctions.  And that was specifically negotiated for

18   by the State in order to gain compliance.  They -- the State

19   needed that particular provision in order to get someone's

20   attention to people that are providing health care.            04:13PM

21        THE COURT:  Specifically just to make sure there's no

22   doubt about this, if the Court enters a sanction pursuant to

23   its OSC order against the defendants in this case, your view is

24   that the current indemnification obligation that exists under

25   the contract with Corizon requires Corizon to indemnify the    04:13PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    defendants in this case for such OSC penalties.

2            MR. STRUCK:  Yes.  That is the provision in the

3    contract.  And that would --

4            THE COURT:  So then Ms. Kendrick's retort to that

5    would be that shows the defendants in this case, the obligors      04:13PM

6    on the stipulation, don't have skin in the game because if they

7    are sanctioned for failing to meet the stipulation any sanction

8    just gets passed off to somebody else.

9            MR. STRUCK:  Well, a couple of things.  First, I'm not

10   certain that Corizon would agree.  And I suspect that there       04:14PM

11   will be some discussion with respect to whether or not Corizon

12   believes that they are responsible for it.

13           THE COURT:  So you anticipate that Corizon would say

14   that with respect to an OSC sanction that they are not

15   obligated under the contract amendment?                           04:14PM

16           MR. STRUCK:  I'm speculating, but I think my

17   speculation is probably pretty accurate.

18           THE COURT:  Okay.

19           MR. STRUCK:  But as far as my clients, their position

20   is that they specifically negotiated for that in order to help    04:14PM

21   gain compliance with the stipulation as an incentive for

22   Corizon to comply and to meet these performance measures.

23           With respect to Ms. Kendrick was talking about the

24   failure, the utter failure of the particular contract, and I

25   think that there has been evidence in this case that 94 percent   04:15PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    compliance has been achieved, and that isn't utter failure.

2    Now, I understand the Court is concerned about the 11

3    performance measures at issue.

4         THE COURT:  And I'm also concerned about whether or

5    not the 94 percent is an accurate measure because there are        04:15PM

6    incorporated within that 94 percent errors of evaluation that

7    are errors that are borne out of inconsistent -- well, not --

8    application of measures that are inconsistent with the Court's

9    rulings on how the stipulation should be applied.  There are

10   also issues with respect to whether or not we can trust overall   04:15PM

11   the State's numbers where the focus of the light of the Court

12   is not looked upon because we saw recently that when you had

13   the obligation to tell us every single case where you had

14   failed to comply with the performance measures in December you

15   got it wrong a significant number of times.                       04:16PM

16        So if I see where I am shining my flashlight with

17   great intensity that you don't get it right, what comfort do I

18   have in these 94 percent where the flashlight isn't even

19   looking that you are telling me the right story?

20        MR. STRUCK:  Let me respond to those two areas.  First       04:16PM

21   the 94 percent utilizes the appropriate methodology.  There are

22   two performance measures that are still at issue that the Court

23   hasn't determined and the parties have been going back and

24   forth on.  I believe those are 85 and 86.  In terms of the 94

25   percent compliance, that uses the appropriate methodology and     04:16PM

1    it's my understanding under 85 and 86, under the methodology,

2    either the one that is being proposed by Mr. Fathi or the one

3    that is being proposed by the defendants, under either, the

4    performance measure will be met.  So the 94 percent is

5    accurate.                                                              04:17PM

6            With respect to the second argument, the plaintiffs

7    have been planting the seed with this Court for months and

8    months and months without showing any objective evidence that

9    the Monitoring Bureau is making all these mistakes.  Every

10   single time we have gotten a letter from them articulating      04:17PM

11   these mistakes we have reviewed it and found approximately 1

12   percent mistake rate.  That is not -- that doesn't show failure

13   by the Monitoring Bureau.  And, in fact, one of the reasons why

14   we're here is because the Monitoring Bureau said that these 11

15   performance measures are failing and some of them are still     04:17PM

16   failing.

17           THE COURT:  Right.  And so what I have seen in

18   fairness as an interim report to you, what I have seen is that

19   there are some people in the Monitoring Bureau whose actions

20   have come to the Court attention that we think they are doing    04:17PM

21   exactly what is expected and that they are honorable and that

22   they are monitoring the performance measures in a fair and

23   reasonable way.  There has also been evidence in the case where

24   that's called into question and that's unclear whether or not

25   the monitors have been acting appropriately.  That is a subject  04:18PM

Case 2:12-cv-00601-ROS   Document 2781   Filed 04/20/18   Page 121 of 128

1240

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    that remains open that the Court is continuing to take evidence

2    on that subject and will continue to take evidence on the

3    subject about whether or not we can trust the entire monitoring

4    process.

5            But I just raise it as something that should be part          04:18PM

6    of this record, and that is there have been sufficient examples

7    to demonstrate that this is an area of concern and so we have

8    to run it down.

9            MR. STRUCK:  And you are right.  That evidence hasn't

10   come in yet, and we're confident that the Court will find that   04:18PM

11   the allegations of Ms. Watson, who is, in the defendants' view,

12   confused with respect to her testimony regarding that

13   particular issue, will fall in favor of the defendants; that,

14   in fact, the monitor in question is one of those monitors that

15   the Court just mentioned that is doing their job and holding     04:19PM

16   Corizon's feet to the fire.

17           But with respect to the numbers that you are talking

18   about in December and the failure to provide the Court with

19   accurate numbers regarding December, those were numbers that

20   were put together by Corizon, not the Monitoring Bureau.  So I   04:19PM

21   want the Court to clearly understand that those numbers Ms.

22   Kendrick filed the declaration on were not put together by the

23   defendants.  They were put together by Corizon.

24           THE COURT:  If they're flawed numbers, I need to

25   inquire into them because they become the basis for the         04:19PM

1   enforcement action in this stipulation.

2         MR. STRUCK:  I agree, Your Honor, and you did inquire

3   into them.  The point I want to make is that isn't a Monitoring

4   Bureau failure.  That was a failure of the numbers we received

5   from the third party health care provider.                      04:19PM

6         So I guess in closing, the defendants request that the

7   Court not find them in civil contempt and that should the Court

8   determine that some -- but should the Court determine some sort

9   of civil sanction is in order that the Court not determine that

10  the contract with respect to who might be required to pay that  04:20PM

11  particular sanction isn't valid and it would have to come

12  directly from the State.  That takes away the biggest hammer

13  that the State has in order to gain compliance.  And that

14  defendants request that the Court not make that determination

15  in the event that the Court determines that some sort of        04:20PM

16  sanction is appropriate.

17        With respect to the plaintiffs' request for injunctive

18  relief in asking for the Court to order the legislature to

19  change legislation or order the State to not contract with a

20  particular provider, it's the defendants' position that the     04:21PM

21  stipulation doesn't allow for you to do that, and that the --

22  in terms of relief, the relief should be narrowly tailored with

23  respect to complying, getting the defendants to comply with the

24  11 performance measures that are at issue, not throwing out an

25  entire contract because of these 11 performance measures        04:21PM

 1    particularly when we have 94 percent compliance on the

 2    performance measures.

 3          THE COURT:  I understand that you have filed papers

 4    with the Court in which you argue that the stipulation doesn't

 5    authorize the imposition of sanctions that the Court's          04:21PM

 6    contemplating.  But what you just raised now, I want to

 7    understand whether when you state that the Court is not

 8    authorized to do, and the example you used, to order the

 9    legislature to do something, when you say I'm not empowered to

10    do that, is it because I don't have this OSC power or is it     04:22PM

11    something different you see that limits my role in the

12    stipulation beyond that, limits my role to enforce the

13    stipulation that's in the stipulation when you say the

14    stipulation doesn't permit that?

15          MR. STRUCK:  Well, we believe the stipulation is a        04:22PM

16    contract, and that the particular contractual remedies are

17    probably what would apply.  And in this particular case --

18          THE COURT:  Why should I think that?  Because it says

19    all remedies permitted by law.  Again I may be missing one of

20    the words but that's essentially what it says, doesn't it?      04:22PM

21          MR. STRUCK:  The stipulation does say that.  It does.

22    But in terms of what the plaintiffs are asking, we believe that

23    goes far beyond certainly what the stipulation envisioned and

24    certainly what is required to remedy what is at issue in this

25    Order to Show Cause, and that is these 11 performance measures  04:23PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    at these five facilities.

2            THE COURT:  I'm trying to understand where the

3    limitation is in the words "all remedies permitted by law."  If

4    it's something the courts have done otherwise, I assume that

5    it's lawful.  So why would the statement that all remedies          04:23PM

6    permitted by law restrict me in that way?

7            MR. STRUCK:  Your Honor, it's defendants' position

8    that this is not a consent decree as plaintiffs are trying to

9    liken it to.

10           THE COURT:  No.  It's wholly apart from that.  But as       04:23PM

11   I read the stipulation it says that I have the two limitations

12   that we all know about, can't order -- the State to hire

13   particular type or number of employees, and I can't order you

14   to build new prisons.  But it says otherwise I have all

15   remedies permitted by law.  And you have said because it's not     04:23PM

16   a consent decree I'm somehow limited.  But I'm not focusing on

17   that.  I'm focusing on these words, all remedies permitted by

18   law.  And I'm just trying to understand what the State's

19   position is with respect to where you are finding the

20   restriction where it says all permitted by law.                    04:24PM

21           MR. STRUCK:  The State's position is remedies that

22   will correct the particular contractual breach, that's what the

23   State's position is, that this is a contract and --

24           THE COURT:  Does it say that in the stipulation

25   someplace?                                                          04:24PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1      MR. STRUCK:  That it's a contract?

2      THE COURT:  Those words that you just said that are

3  the qualifiers.

4      MR. STRUCK:  I was informing the Court what the

5  State's position was with respect to the stipulation that was      04:24PM

6  negotiated.

7      THE COURT:  Mr. Bojanowski is bringing in some kind

8  of --

9      MR. BOJANOWSKI:  I just want to give him the language,

10  Your Honor, so he can have it.      04:24PM

11      THE COURT:  My battery just went dead.  The iPad I

12  have been waving is apparently not generating energy on its

13  own.

14      MR. STRUCK:  The court's familiar with the

15  stipulation.      04:25PM

16      THE COURT:  I'm trying to understand -- can you read

17  the me the language?

18      MR. STRUCK:  Sure.  It's in Paragraph 36.

19      THE COURT:  Thank you.

20      MR. STRUCK:  The language says, "In the event the      04:25PM

21  Court finds that the defendants have not complied with the

22  stipulation, it shall in the first instance require the

23  defendants to submit a plan approved by the Court to remedy the

24  deficiencies identified by the Court.  In the event the Court

25  subsequently determines that the defendants' plan did not      04:25PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    remedy the deficiencies, the Court shall retain the power to

2    enforce the stipulation through all remedies provided by law.

3            THE COURT:  So all remedies provided by law.  Those

4    are the operative terms.  And I just wonder where it is either

5    in those words or someplace else in the stipulation where you          04:25PM

6    think I'm limited to not have equitable powers.

7            MR. STRUCK:  To enforce the stipulation.

8            THE COURT:  Why wouldn't it be something saying all

9    remedies permitted by law restrict me to use the Court's

10   equitable powers?                                                      04:26PM

11           MR. STRUCK:  The Court's limited powers go beyond

12   what's required to enforce the stipulation.  It's the

13   defendants' position that the Court is going beyond what is

14   allowed in the stipulation because those words enforce -- the

15   power to enforce the stipulation precede the --                        04:26PM

16           THE COURT:  If I make a finding that nothing else

17   could work then employing as part of the remedial measure the

18   Court's equitable and legal powers, why would it be

19   inconsistent with that?

20           MR. STRUCK:  And again, I don't know what the Court is         04:26PM

21   going to remedy.

22           THE COURT:  I don't either.  You are saying I don't

23   have the ability to even consider equitable remedies, and I'm

24   just wondering why it is that you think that stripped away from

25   the Court's understood and accepted powers and certainly all           04:26PM

4-10-18-CV 12-601-Parsons et al. V. Ryan et al.-Evidentiary Hearing

1    permitted by law, so the law certainly permits me to exercise

2    equitable powers.  Why would it be?

3             MR. STRUCK:  Your Honor, in terms of the equitable

4    remedies proposed by the plaintiffs, we believe that that goes

5    beyond the stipulation because that goes beyond what's          04:27PM

6    required.

7             THE COURT:  I understand your argument.  All right.

8             Thank you very much.  Thank you for the presentation

9    of evidence on the Order to Show Cause and the argument.  I

10   will take it under advisement and get an -- issue an order     04:27PM

11   addressing this matter very promptly.

12            The other matter is that we'll also work on and get

13   out shortly the e-mail that I mentioned earlier with respect to

14   the records that would be helpful for the Court to have in

15   considering this issue.  So we'll take up tomorrow.  I'm going  04:27PM

16   to give the court reporter the rest of the day off.  So we'll

17   take up tomorrow at 9 a.m. and proceed with the agenda items

18   that we have.

19            Anything that we have to just address at this

20   immediate moment?                                              04:27PM

21            MS. KENDRICK:  No, sir.  Thank you.

22            THE COURT:  From defendants?

23            MR. STRUCK:  No, Your Honor.

24            THE COURT:  Thank you all very much.

25            (Proceeding concluded at 4:28 p.m.)                   04:28PM

1

2

3

4

5                        C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 12th day of April,

16   2018.

17

18                             s/Laurie A. Adams
                              _____
19                             Laurie A. Adams, RMR, CRR

20

21

22

23

24

25