1

UNITED STATES DISTRICT COURT

2

FOR THE DISTRICT OF ARIZONA

3

_____

4

5    Victor Parsons, et al., on    )
     behalf of themselves and all  )
6    others similarly situated;    )
     and Arizona Center for        )
7    Disability Law,               )
                                   )    No. CV 12-00601-PHX-DKD
8              Plaintiffs,         )
                                   )
9         vs.                      )    Phoenix, Arizona
                                   )    April 11, 2018
10   Charles Ryan, Director,       )    9:05 a.m.
     Arizona Department of         )
11   Corrections; and Richard      )
     Pratt, Interim Division       )
12   Director, Division of Health  )
     Services, Arizona Department  )
13   of Corrections, in their      )
     Official capacities,          )
14                                 )
               Defendants.         )
15   _____)

16

17      BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18              REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                     (*Status Hearing*)

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiffs:

         PRISON LAW OFFICE
         By:  Corene Kendrick, Esq.
         1917 5th Street
         Berkeley, CA 94710

         ACLU - Washington DC
         By:  David C. Fathi, Esq.
         915 15th Street NW
         7th Floor
         Washington, DC 20005

         EIDENBACH LAW PC
         By:  Kirstin T. Eidenbach, Esq.
         P.O. Box 91398
         Tucson, AZ 85752

         ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
         By:  Maya S. Abela, Esq.
         177 N. Church Avenue
         Suite 800
         Tucson, AZ 85701

For the Defendants:

         STRUCK LOVE BOJANOWSKI & ACEDO PLC
         By: Timothy J. Bojanowski, Esq.
         By: Rachel Love, Esq.
         By: Daniel Struck, Esq.
         By: Richard Valenti, Esq.
         3100 W. Ray Road
         Suite 300
         Chandler, AZ 85226

Also Present (Afternoon Session Only):

         B.J. Millar
         Renee Sobolewski
         David Long

1                    P R O C E E D I N G S

2          THE COURT:  Let me say I'm sorry.  I was a little

3    bit -- it's six minutes after the hour so I'm six minutes late.

4    I think you all called right at nine.  You were ready.  I'm

5    sorry for being delayed.                                              09:05AM

6          The problem was that I had extensive notes that I

7    prepared for the hearing and I couldn't find them, so obviously

8    I have lost them someplace between my home and here.  So that's

9    what the delay was.

10          But I will be up front with you.  I'm going to be --       09:06AM

11    those notes were composed in meetings that I had with the staff

12    attorneys, and so I may, as I work through things, turn to them

13    or ask them to let me know if I'm missing a step.  I will

14    remember much of it but there's a good bit I may not remember

15    that they can alert me.  They were aware of what I wrote down,     09:06AM

16    I think, so they will know where I'm missing the boat.

17          So go ahead.  Please call the case.

18          THE MAGISTRATE JUDGE COURTROOM CLERK:  Civil Case

19    Number 12-601, Parsons, et al. versus Ryan, et al., on for

20    status hearing.                                                    09:06AM

21          THE COURT:  Counsel, please announce.  Thank you.

22          MR. FATHI:  Good morning, Your Honor.  David Fathi of

23    the ACLU National Prison Project for the plaintiff class.

24          THE COURT:  Thank you very much.

25          MS. KENDRICK:  Good morning, Your Honor.  Corene            09:06AM

```
 1    Kendrick from the Prison Law Office for the plaintiff class.

 2            THE COURT:  Thank you.

 3            MS. EIDENBACH:  Good morning, Your Honor.  Kirsten

 4    Eidenbach for the prisoner plaintiff class, and behind me is

 5    Maya Abela from the Arizona Center for Disability Law.              09:06AM

 6            THE COURT:  Thank you.  Good morning to you all.

 7            MS. LOVE:  Good morning, Your Honor.  Rachel Love,

 8    Daniel Struck, Tim Bojanowski, and Richard Valenti for

 9    defendants.

10            THE COURT:  Thank you very much.  Good morning.          09:07AM

11            And good morning, Mr. Pratt.  I'm sorry that we -- I

12    think we're here again on a Wednesday, which interferes with

13    your Wednesday meetings, and I'm sorry about that.

14            Let's talk about scheduling.

15            You all had communicated to the Court that you were       09:07AM

16    proposing that we return to the monitoring issues the last day

17    of May and the first day of June.  I don't know whether you

18    heard back from my staff that I was scheduled be in San

19    Francisco at a Ninth Circuit Information Technology Committee

20    meeting, but I can not attend that meeting.  So those two dates   09:07AM

21    would work for me.  If they all work for you we will put that

22    on the calendar, that being the last day of May and the first

23    day of June.

24            Is that still all right with plaintiffs?

25            MS. KENDRICK:  Yes.                                       09:07AM
```

1        THE COURT:  Ms. Love?

2        MS. LOVE:  Yes.

3        THE COURT:  All right.

4        One of the things preparatory for that that's outside

5  of the control of the counsel is the information that was         09:08AM

6  provided to the Court in the recent affidavit regarding the

7  former Corizon employee Ms. Angela Fisher.

8        And so consistent with the Court's past practice of

9  letting people know that if they wanted to share information

10  the Court would be receptive to it, but going a little bit        09:08AM

11  beyond that, because -- she has talked to plaintiffs but

12  according to the affidavit that discussion maybe has ended.  I

13  don't know whether there's been anything beyond the last report

14  that there was no communication back.

15        But, in any event, what I'd like to do is I'm going to     09:08AM

16  ask my staff to contact her and tell her that we are going to

17  summons her to court on one of those two days and have her let

18  us know what is more convenient for her, and counsel can

19  participate by way of listening in on that phone call if they

20  wish.                                                             09:09AM

21        But that's how we're going to proceed with respect to

22  her.  We'll issue a summons for her appearance for one of those

23  two days if it's possible for her to do that.

24        And then with respect to the other witnesses, we'll

25  address that issue again.  I think those are within the control  09:09AM

1    of counsel so we don't need to -- I don't need to do anything

2    with respect to those at this moment, I think.

3           And then going forward, because of the reality that

4    seems to exist, and that is that we are running into shortages

5    of time, and the expectancy is that we'll have some significant    09:09AM

6    work to do, certainly with regard to being in a position of

7    having the final reports of Mr. Millar and his team, I think it

8    makes sense for us to talk about the possibility of adding some

9    days throughout the summer, at least for the purpose of seeing

10   if we can have a hope that we can carve that time out,    09:09AM

11   understanding that if we need to surrender the time because we

12   don't need it it's easier to surrender it than to grab it at

13   the last minute.

14          So we have these days that are already set on the

15   calendar for through the summer and I would propose that we add    09:10AM

16   the day before and the day after to each of those dates as

17   being court days for continued hearings.  Again, we can visit

18   as we get closer in time about whether or not we will need that

19   much time, but it looks to me like we have been using a lot of

20   time and it just makes sense.    09:10AM

21          What do plaintiffs think about this?

22          MS. KENDRICK:  We can work with that, Your Honor, but

23   taking a step back, there's a couple of other things that we

24   wanted to raise with you about trying to streamline things and

25   make them more efficient, because we are concerned that this    09:10AM

1    process is spinning a bit out of control.

2         Dr. Watson's original allegations were about the beat

3    the monitor, and it appears based upon some of defendants'

4    exhibits and their disclosed potential witnesses that we're

5    getting a little far afield into some sort of discussion about          09:10AM

6    whether the 124 requests that Dr. Watson made for utilization

7    management was medically appropriate.

8         And so, therefore, we are requesting that the expert's

9    oral testimony be time-limited and that his opinions come in

10   partly or mostly in written form, which comports with Your          09:11AM

11   Honor's standing proposed final trial orders that state that

12   the parties should try to present direct expert testimony

13   through summary or written reports.

14        So we propose that the direct written expert testimony

15   be filed with the Court no more than a week before he is          09:11AM

16   scheduled to appear and then there be no more than about 90

17   minutes of additional live expert testimony and full

18   cross-examination.

19        And the reason why is because counsel for defendants

20   have previously said that Khan, who they referred to as          09:11AM

21   Corizon's expert, would testify for at least three days about

22   utilization decision-making, and they have also designated

23   Exhibits 517 through 641 originally for the February 27th

24   hearing that all appear to be requests made for specialty care

25   by Dr. Watson when she was working in the Eyman prison.          09:12AM

1      Our position is whether or not these requests were

2  medically necessary is not relevant to these allegations of

3  beat the monitor, and, in fact, Dr. Stewart already testified

4  to his contrary medical opinion about the specialty consults

5  that were described in the KJZZ story.  So we think, therefore,          09:12AM

6  it would be totally appropriate for the Court to streamline Dr.

7  Kahn's testimony.

8      And if the Court is not inclined to direct the experts

9  to submit the majority of their direct testimony in writing, we

10  still would like the Court to order defendants to have their          09:12AM

11  expert produce a written report pursuant to Rule 26 of the

12  Federal Rules of Civil Procedure because that way both the

13  Court and plaintiffs' counsel will be better prepared, will

14  have had time to digest much of what Dr. Kahn is going to say

15  and be able to cross-examine him and again streamline the          09:13AM

16  process, streamline the days of hearings and hopefully shrink

17  it down from what Ms. Love had predicted would be three days of

18  testimony to perhaps half a day or, you know, most of just one

19  day.

20      THE COURT:  Well, I will say this:  I had not known          09:13AM

21  about three days.  There's no way there's going to be three

22  days from Dr. Kahn.

23      So let me hear from Ms. Love about what she thinks

24  would be the actual length of his testimony.

25      MS. LOVE:  Your Honor, we did not communicate to          09:13AM

1    counsel that Dr. Kahn would take three days.  We talked about

2    doing stepped, additional days to address the beat the monitor

3    issue in which I stated to Ms. Kendrick that Dr. Kahn may take

4    most of one day.  The three-day issue came up when we discussed

5    which other witnesses need to testify.                              09:13AM

6         And while Ms. Kendrick says this issue is spinning out

7    of control, what we talked about additional witnesses was

8    additional witnesses from the Monitoring Bureau, and that is

9    because of the Court's concern beyond the KJZZ article of

10   whether or not there's a beat the monitor system within the       09:14AM

11   Monitoring Bureau that is in addition or apart from the

12   Dr. Watson allegations.  So that is why we were going to

13   present additional witnesses from the Monitoring Bureau,

14   including Vanessa Headstream, Kathleen Campbell, Dr. Taylor,

15   Mr. Pratt perhaps.                                                 09:14AM

16        So that is why we talked about additional days beyond

17   the May 31st and June 1st.  I don't anticipate that Dr. Kahn's

18   testimony would be more than a day and we believe that it is

19   appropriate for the Court to allow the latitude to hear from

20   Dr. Kahn to assess credibility, as you have done with all the     09:15AM

21   witnesses, by seeing and hearing, and it is not a wild goose

22   chase to have Dr. Kahn look at and opine to the specialty

23   consulting and opinion about whether or not those were

24   appropriate for Dr. Watson to make when the basis for her

25   criticisms against Corizon and the Utilization Management team    09:15AM

1   was that she believes that her consults were unreasonably

2   denied.

3           It is appropriate for defendants to be able to present

4   evidence that as a baseline those consults were not appropriate

5   in the first place by someone like an expert who is an          09:15AM

6   objective person from the outside looking in.

7           So that is the reason that we would like to present

8   Dr. Kahn's testimony and not be limited to 90 minutes, and we

9   do not believe that a report is appropriate.

10          Likewise, plaintiffs' counsel themselves have listed   09:15AM

11  Dr. Wilcox as an expert.  So, you know, it's evening out the

12  same issue on both sides to have experts testify.

13          THE COURT:  Okay.  I'm not going to limit the

14  defendants' ability to address these issues of the

15  appropriateness of the referrals with Dr. Watson, but I am     09:16AM

16  going to limit it, and so what I'm going to do is say that you

17  can have two hours with Dr. Kahn addressing this issue in court

18  time as your start.  If I find that, in fairness, if there is a

19  demonstration of efficient and useful presentation to the

20  Court, I will entertain the idea of giving more time.          09:16AM

21          But my impression is that I understand what the point

22  of attack here is and you ought to be able to in two hours let

23  me know whether or not there's enough to undercut the reason to

24  take what we have previously taken from Dr. Watson.

25          So in fairness, I do think that you get that           09:16AM

1    opportunity, but in light of all of the work that we have to do

2    across the board with respect to these issues to address the

3    integrity of the monitoring system, both at Corizon and at the

4    Department of Corrections, we have learned a lot in this

5    process.                                                          09:17AM

6          I wasn't able yesterday to summons up the -- where I

7    came -- where I first read of this notion about the four years,

8    but it's actually an Arizona Republic article in which a

9    Corizon spokesman by the name of Davis said that it was, quote,

10   "The parties have no expectation that there would be full        09:17AM

11   compliance with the performance measures until a minimum of

12   four years have passed."

13         I feel like the little man in The Little Prince,

14   Antoine de Saint-Exupéry's short novel dealing with the

15   baobabs, that you just have to dig these things out at the       09:17AM

16   roots, at the very first instant yank them out and throw them

17   out.  This is just utterly preposterous that somebody from

18   Corizon would say this.

19         So if it's true, it's either one of two things.  It's

20   either Mr. Davis -- is it Mr. or Ms. Davis?  I'm sorry.  It's    09:18AM

21   hard for me to see this.

22         But, in any event, this Davis individual, Corizon

23   spokesman, if he's being accurately quoted, and I don't know

24   whether he's being accurately quoted but The Arizona Republic

25   has put it in direct quotes, and it says that they turn to the   09:18AM

1    spokesperson to give information.

2            And so what I have just read is a direct quote from

3    the story, and I have no reason to doubt that The Republic

4    would get something wrong or right with respect to something in

5    direct quotes.  I'm plenty familiar with the newspapers and          09:18AM

6    news outlets getting things wrong, but typically when there's a

7    direct quote they are more careful about that.

8            In any event, I don't know whether this is true or

9    not, but what I do know is that I had Ms. Love yesterday trying

10   to put on the record something that was consistent with that,       09:18AM

11   and again, this is a baobab that needs to be cut out because

12   it's never been a part of this case, the idea that there was

13   four years.

14           So I just want to make sure that everybody is clear

15   that that is so preposterous that I'm not going to -- I really      09:19AM

16   will treat it like a baobab and dig it up at every instance.

17           So going back to what Davis was attributed to having

18   said, it's one of two things:  It's somebody who doesn't really

19   know what he or she is talking about and is saying something

20   that is just misinformed, or potentially it is a reality of the     09:19AM

21   approach, the view of Corizon that if it is the view of Corizon

22   it could explain a lot as to why it seems so intractable that

23   here I am on a month-to-month basis trying to get compliance

24   with the stipulation, frustrated that we're not making any

25   progress, and if it's true that the provider thinks, oh, we         09:19AM

1    have four years, we're fine, that could explain a lot.

2           So again, there is a lot to look into with respect to

3    these monitoring issues because this kind of information can so

4    infect the operation such that it could explain much that would

5    help me understand what steps I need to take to make sure that          09:20AM

6    this is not a message that still has any vitality.

7           I tried to do that yesterday with the Department of

8    Corrections witness, let him know very clearly that this was

9    not part of what the parties had negotiated, and I certainly

10   can't go into the minds of what people were thinking at the             09:20AM

11   time of the settlement.  I have had some pretty clear

12   indications about that because they spoke to me and I spoke to

13   them and we had conversations.

14          But what I can say for sure is what's happened here in

15   court, and I will say this, that there's never been any                 09:21AM

16   suggestion to me from any of defendants' counsel that the

17   reason we haven't made progress is because we're really not

18   anywhere near the finish line so where our score would be

19   tabulated.

20          So that's just me closing out something I left a                 09:21AM

21   little bit unclosed yesterday because I couldn't get my hands

22   on the source of where it was that I had first encountered this

23   startling information.

24          So that's how we'll deal with the potential limitation

25   on the defendants' testimony regarding the appropriateness of           09:21AM

1    the referrals.

2         And if there are other issues with respect to timing

3    and management that you have that you want to present to me,

4    consider this as an issue that I would like to hear from in

5    advance of the hearing.  If you can't resolve it and need to      09:22AM

6    let me know because I do want to make sure that these two days

7    that we have at least identified at the end of May and the

8    first of June are efficient and useful uses of everybody's

9    time.

10        And then I need to ask the plaintiffs the original          09:22AM

11   question -- I think you gave me the answer on the plaintiffs'

12   side -- that adding the day before and the day after in the

13   summer is something possible for you all?

14        MS. KENDRICK:  Just to clarify, were you meaning

15   starting with May or starting with June?                          09:22AM

16        THE COURT:  No, I think starting with June.

17        MS. KENDRICK:  June?  Okay.

18        THE COURT:  Let me look over to the right.  I think

19   that's what we contemplated.

20        Yes.  That's correct.                                        09:22AM

21        MS. KENDRICK:  And that would go until September or

22   August, or what were you thinking, Your Honor?

23        THE COURT:  I think that we were thinking September,

24   but let me just see if that's -- we didn't discuss that.  All

25   right.  What do you think?                                        09:22AM

| 1 | MS. KENDRICK:  We would certainly hope that we're done |

1     MS. KENDRICK:  We would certainly hope that we're done
2   by August.
3         THE COURT:  Yeah.  Okay.  Optimism is a good thing.
4         How about from defendants' side about these summer
5   add-ons?                                                      09:23AM
6         MR. STRUCK:  Your Honor, as long as you don't mind
7   seeing different faces because I know that I have trials and
8   Ms. Love has trials, there's vacations and thing like that, but
9   I think we have enough people that we can accomplish that.
10        THE COURT:  Okay.  Good.  Good.                         09:23AM
11        All right.  Thank you.
12        It is still all right with you the last day of May and
13  the first day of June?
14        MS. LOVE:  Yes, Your Honor.
15        THE COURT:  We'll set that.                             09:23AM
16        MS. KENDRICK:  And just to clarify, Your Honor, it's
17  June, July, and August will be the three months we will do
18  that?
19        THE COURT:  Yes.  Yes.
20        MS. KENDRICK:  Okay.  I just want to be clear.          09:23AM
21        And then, also, in light of the two-hour limit for
22  Dr. Kahn, are you going to direct defendants to produce a
23  written report pursuant to Rule 26(a)(2)(B)?
24        THE COURT:  No.  I'm going to -- they may choose to do
25  that because it may be a way to efficiently present what they  09:23AM

| | |
|---|---|
| 1 | want to present to everybody but I'm not going to say they have |
| 2 | to do that.  They can make their best argument in the two hours |
| 3 | they want to do it. |
| 4 | MS. KENDRICK:  Okay.  I mean, it's mandatory by the |
| 5 | rules. |
| 6 | THE COURT:  Well, I don't -- it's not mandatory under |
| 7 | the circumstances of this application.  You have somebody who |
| 8 | has been talked about as an expert but he's also somebody who |
| 9 | worked for the company, right? |
| 10 | MS. KENDRICK:  I have no idea, sir. |
| 11 | THE COURT:  That's who -- he's leaving or -- |
| 12 | MS. LOVE:  No, Your Honor.  Dr. Kahn is a retained |
| 13 | expert by Corizon.  He is not an employee of Corizon. |
| 14 | THE COURT:  Oh.  So he is -- I must be remembering |
| 15 | somebody else, then, or maybe I'm just mistaken about it. |
| 16 | MS. KENDRICK:  He's, therefore, not a fact witness, |
| 17 | Your Honor, because he has no personal knowledge of beat the |
| 18 | monitor.  He's only testifying as a putative expert. |
| 19 | THE COURT:  Here's the problem that I have.  I really |
| 20 | don't want to turn this into something that -- this particular |
| 21 | issue about -- it's collateral, really, as you say, but it's |
| 22 | part of what defendants want to present.  So I don't want to |
| 23 | say they can't do it. |
| 24 | On the other hand, I really don't want them spending a |
| 25 | lot of time working on this expert report because I'm not going |

09:24AM

09:24AM

09:24AM

09:24AM

09:25AM

```
 1    to really need that.  I want to hear what their best argument

 2    is so that we can see whether or not it undercuts what

 3    Dr. Watson said.  I think they ought to be able to do that in

 4    two hours, either make their case or not.

 5           If I require this expert report, it is me saying          09:25AM

 6    devote your time to something that is so low on the list of

 7    priorities of what I'm interested in that defendants are doing

 8    that -- and I'm asking them to do a lot.  I'm asking everybody

 9    to do a lot.  I just don't want to ask them to do a task that I

10    don't think is going to be worth it for me in terms of the time 09:25AM

11    that would go into it.

12           So we'll hear from this expert and hear his two hours

13    of direct and then you will have your time for cross, but we'll

14    hear what he has to say.  If it turns out that for some reason

15    that I'm wrong in my impression now, then we'll go down that    09:26AM

16    road, but for my purposes right now that's what we'll do.

17           Okay.  The agendas that have been proposed have been

18    amalgamated, you know, in my mind but what I want to suggest is

19    that the first thing we do is take a look at the February

20    report.  Is there any reason we shouldn't do that from the      09:26AM

21    plaintiffs' perspective?

22           MR. FATHI:  Your Honor, no, no objection to that.

23    Just coming back to Ms. Fisher for a moment, I don't know if

24    the Court was explicitly asking a question but in the interest

25    of transparency I do want to say that after my April 6th        09:26AM
```

```
 1    declaration was prepared Ms. Fisher sent some additional

 2    documents.  They were not solicited by us, we have not

 3    responded to that communication, but we did receive those

 4    additional documents.

 5           THE COURT:  Okay.  My summons would contemplate that        09:26AM

 6    she would come with all of the documents, and if it's possible

 7    for her to produce those to both sides before that probably

 8    would be helpful.

 9           MR. FATHI:  And we would appreciate if the Court would

10    give that instruction.                                             09:27AM

11           THE COURT:  Yeah.  Yeah.  And I will ask my staff to

12    do that when they communicate with her and the summons will

13    also include a subpoena for those documents.

14           MR. FATHI:  Thank you, Your Honor.

15           THE COURT:  Okay.                                           09:27AM

16           MR. STRUCK:  Your Honor, at a minimum, at least, at

17    this point, we would request the plaintiffs provide us with

18    whatever Ms. Fisher has provided them.

19           THE COURT:  Have you done that already in the --

20           MR. FATHI:  We have not, Your Honor.  These came in on      09:27AM

21    Friday, but we're happy to do that.

22           THE COURT:  All right.  Thank you very much.

23           Okay.  Good.  And any reason we shouldn't proceed with

24    hearing about February as the first thing here, Mr. Bojanowski?

25           MR. BOJANOWSKI:  We can proceed.                            09:27AM
```

1        These are all, as you know, preliminary findings and

2   such and are subject to modification.  Typically and

3   unfortunately, we have these hearings before those numbers are

4   closed out, but we will report what we've got and the

5   development of plans accordingly.                          09:28AM

6        THE COURT:  Okay.  And this is what you submitted --

7   you filed, I think -- was it Monday?

8        MR. BOJANOWSKI:  Monday.

9        THE COURT:  Okay.

10       MR. BOJANOWSKI:  Monday evening, I believe, is when it   09:28AM

11  was filed.

12       THE COURT:  Okay.

13       All right.  Thank you.  Please proceed, then.

14       MR. BOJANOWSKI:  Sure.

15       Typically, we -- whatever --                          09:28AM

16       THE COURT:  I think what makes sense to do probably is

17  for you to address the ones that are below the 85 percent

18  benchmark, then we'll hear from the plaintiffs on each of

19  those, and then we'll turn to plaintiffs if there are any that

20  you didn't discuss that they think should be discussed.      09:28AM

21       How's that, Ms. Kendrick?

22       MS. KENDRICK:  That's fine, Your Honor.  However,

23  their filing, again, did not include the performance measures

24  that are part of the pending motion to enforce the stipulation

25  that we filed in January.  So I don't know if you would rather  09:28AM

| | |
|---|---|
| 1 | I ask Mr. Bojanowski now what those scores are for those |
| 2 | performance measures or just wait as we go along. |
| 3 | THE COURT:  I think he's going to say that they all |
| 4 | exceed the benchmark.  Is that what you are going to say, |
| 5 | Mr. Bojanowski? |
| 6 | MR. BOJANOWSKI:  No.  I think that the Court held that |
| 7 | filing in abeyance for now. |
| 8 | MS. KENDRICK:  That was -- |
| 9 | MR. BOJANOWSKI:  That was my understanding. |
| 10 | THE COURT:  Do you know those numbers? |
| 11 | MR. BOJANOWSKI:  I can provide those numbers.  I just |
| 12 | simply don't have -- if she wants me to just read them off, if |
| 13 | she says this number for this facility, I've got the |
| 14 | information to read them off.  I'm not prepared as part of my |
| 15 | report because it doesn't -- the Court has not yet ordered a |
| 16 | remediation plan, so my report is something where the Court |
| 17 | says please prepare a remediation plan for this number.  So -- |
| 18 | THE COURT:  I'm misunderstanding, and I'm sorry for |
| 19 | misunderstanding, but I thought what we were talking about was |
| 20 | Ms. Kendrick's point that the numbers that you had filed Friday |
| 21 | evening did not include the numbers for the facilities and |
| 22 | Performance Measures at issue in the OSC.  Is that -- no, |
| 23 | that's not what -- |
| 24 | MS. KENDRICK:  I was referring to our January 4th |
| 25 | motion to enforce that is still pending -- |

09:29AM

09:29AM

09:29AM

09:29AM

09:30AM

1          THE COURT:  I see.

2          MS. KENDRICK:  -- a final order.

3          THE COURT:  I understand.  All right.  I'm sorry for

4    my misunderstanding.

5          So if you do have those numbers that would be helpful          09:30AM

6    because it does inform the Court about whether or not this is a

7    wild fire that's raging or a fire that's gone out maybe.  So it

8    would be helpful.

9          MR. BOJANOWSKI:  Right.  I think the most efficient

10   way to do it is if Ms. Kendrick would give me the performance          09:30AM

11   measure and the facility I'll just read them off and go that

12   route.

13         THE COURT:  Okay.

14         MS. KENDRICK:  Okay.

15         So the first one is Performance Measure 19, and in the          09:30AM

16   motion are Eyman, Lewis, Perryville, Phoenix, and Tucson.

17         MR. BOJANOWSKI:  19?  Eyman is 88.  Florence is 96.

18   Did you say Lewis?  Lewis is 72 and what was the other one.

19         MS. KENDRICK:  Perryville, Phoenix, and Tucson.

20         MR. BOJANOWSKI:  Perryville is at 95, Phoenix is at          09:31AM

21   92, and Tucson is at 92.

22         MS. KENDRICK:  Your Honor, I would just observe that

23   the Lewis prison has been noncompliant quite greatly for at

24   least a year on Performance Measure 19, so we encourage the

25   Court to make a finding on that one.          09:31AM

1          THE COURT:  Thank you.

2          So is that a modification of the motion that you now

3    think that it's appropriate to just focus on Lewis for this

4    Performance Measure?

5          MS. KENDRICK:  No, sir, because the Eyman prison has          09:31AM

6    only recently come above the 85 percent compliance but had

7    multiple months in a row where they were noncompliant.

8          THE COURT:  And I'm not trying to say that we don't

9    follow the exact requirements of the stipulation that would

10   give you the opportunity to ask for enforcement, but as you          09:31AM

11   know, I have said in the past sometimes it makes sense to focus

12   our energies where we think there's a real problem.  Are there

13   any that you think could be removed from the motion in this

14   one?

15         MS. KENDRICK:  I believe the Court could hold in          09:32AM

16   abeyance Perryville and Tucson.

17         THE COURT:  Okay.

18         MR. BOJANOWSKI:  Florence has been in compliance since

19   November of 2016 on --

20         MS. KENDRICK:  Florence wasn't in the motion actually.          09:32AM

21         MR. BOJANOWSKI:  Oh, I'm sorry.  I thought I read

22   Florence off.

23         THE COURT:  You did, I think, didn't you?  Maybe you

24   just offered that gratuitously.  Thank you.

25         MR. BOJANOWSKI:  Eyman has been in compliance since          09:32AM

| | |
|---|---|
| 1 | November of 2017. |
| 2 | THE COURT:  I can't really strong-arm more than I have |
| 3 | done so we'll accept the withdrawal or the -- the idea that we |
| 4 | hold in abeyance Perryville and Tucson? |
| 5 | MS. KENDRICK:  Yes. |
| 6 | THE COURT:  All right.  Thank you. |
| 7 | MS. KENDRICK:  And then the next one was Performance |
| 8 | Measure 44 at Winslow. |
| 9 | MR. BOJANOWSKI:  That's at 100 percent. |
| 10 | THE COURT:  And does that affect the plaintiffs' view |
| 11 | on whether that needs to proceed at this time with an |
| 12 | enforcement? |
| 13 | MS. KENDRICK:  Well, sir, seven out of the 10 past |
| 14 | months Winslow was out of compliance, so while we're glad they |
| 15 | got 100 percent this month we're concerned that it's not |
| 16 | sustained. |
| 17 | THE COURT:  Okay. |
| 18 | MS. KENDRICK:  The next one is Performance Measure 48 |
| 19 | at Tucson. |
| 20 | MR. BOJANOWSKI:  That's at 98 percent.  That one has |
| 21 | been in compliance since August of 2017. |
| 22 | THE COURT:  And plaintiffs' reaction? |
| 23 | MS. KENDRICK:  I think we would be willing to put it |
| 24 | in abeyance for now but they -- |
| 25 | THE COURT:  Okay. |

09:32AM

09:33AM

09:33AM

09:33AM

09:34AM

1      MS. KENDRICK:  -- they have sustained noncompliance in

2  2017.

3      THE COURT:  Okay.

4      MS. KENDRICK:  The next one is Performance Measure 50

5  at Tucson.                                                    09:34AM

6      MR. BOJANOWSKI:  It's at 87 percent.

7      MS. KENDRICK:  While we're glad that they are above 85

8  percent, the seven previous months they were below compliance

9  with Performance Measure 50 at Tucson.

10     THE COURT:  Okay.                                         09:34AM

11     MS. KENDRICK:  The next one is Performance Measure 52

12  at Phoenix.

13     MR. BOJANOWSKI:  It's at 93 percent.

14     MS. KENDRICK:  Our concern with this one, Your Honor,

15  is from month to month it's seesawing dramatically.  It's at 93  09:35AM

16  this month but the previous month it was at 67, the month

17  before it was at 93, the month before it was at 82.  So if you

18  look at it it just goes up and down from month to month.

19     THE COURT:  Okay.

20     MS. KENDRICK:  The next one is Performance Measure 67  09:35AM

21  at Florence, Perryville, and Tucson prisons.

22     MR. BOJANOWSKI:  Florence is at 100 percent.

23  Perryville is at 100 percent.  Tucson is at 20 percent.

24     MS. KENDRICK:  So with regard to Tucson, Your Honor,

25  they have only been compliant one out of the past 12 months,   09:36AM

```
 1    and last fall they were at zero percent four months in a row

 2    with this performance measure at Tucson.

 3          THE COURT:  How about the other two?  What's your view

 4    about holding them in abeyance?

 5          MS. KENDRICK:  With Perryville, yes.  With Florence,        09:36AM

 6    yes as well, although we feel this is a critical performance

 7    measure.  This is about registered nurses doing an assessment

 8    every shift of people who are housed in the infirmary.

 9          THE COURT:  Agreed.  It's critical but we'll hold it

10    in abeyance for Florence and Perryville and focus on Tucson      09:36AM

11    with Performance Measure 67.  That's what you just said, right?

12          MS. KENDRICK:  Yes.

13          And then the next one is Performance Measure 73 at

14    Tucson.

15          MR. BOJANOWSKI:  This is at 100 percent and it has         09:37AM

16    been at 100 percent since June of 2017.

17          MS. KENDRICK:  Okay.  We're okay with holding that in

18    abeyance.

19          THE COURT:  73 will be held in abeyance.

20          MS. KENDRICK:  Next one is Performance Measure 95 at       09:37AM

21    Tucson.

22          MR. BOJANOWSKI:  This is at 100 percent and it has

23    been compliant since June of 2017.

24          MS. KENDRICK:  Okay.  There were three consecutive

25    months of noncompliance but we're willing to put it in abeyance  09:37AM
```

1    since it's improved recently.

2            THE COURT:  Okay.  95 will be in abeyance.

3            MS. KENDRICK:  96 at Tucson.

4            MR. BOJANOWSKI:  It is 97 percent and compliant since

5    June of 2017.                                              09:38AM

6            MS. KENDRICK:  Similar to the other performance

7    measure, it was noncompliant for three months in a row before

8    it became compliant, but we're willing to put it in abeyance.

9            And then the final one is Performance Measure 98 at

10   Perryville.                                                09:38AM

11           MR. BOJANOWSKI:  94 percent compliant since July of

12   2017.

13           MS. KENDRICK:  Okay.  This was also noncompliant for

14   three months in a row prior to reaching compliance but we are

15   willing to put it in abeyance for now.                     09:38AM

16           THE COURT:  So there appears to be no reason not for

17   the Court to enter the order with respect to accepting within

18   the enforcement mechanism the performance measures that were

19   identified in the plaintiffs' motion, excepting the ones that

20   on the record today the plaintiff has agreed that the Court may  09:39AM

21   hold in abeyance any present consideration for remedial

22   efforts.

23           Is that acceptable?

24           MS. KENDRICK:  Yes, Your Honor.  Thank you.

25           THE COURT:  Any objection from defendants?          09:39AM

1          MR. BOJANOWSKI:  No, Your Honor.

2          THE COURT:  All right.  Thank you.

3          So now we should move to the other performance

4   measures that are below the 85 percent benchmark.  The first

5   one I have is Eyman.                                          09:39AM

6          Excuse me.  Performance Measure 12.  Eyman.

7          MR. BOJANOWSKI:  This is one where they had to track

8   down some inmates who refused to receive care and then

9   documentation was not scanned in within time frames and so as a

10  result those files were not counted as compliant.            09:41AM

11         So the Corrective Action Plan that was submitted by

12  Corizon was they retained a director of nursing whose duties

13  will be to visit the inmates who refuse treatment and then

14  follow up on assuring that documentation is appropriately

15  scanned in in a timely basis.  Although there's no time frame  09:41AM

16  within the measure itself, standard of care requires that it be

17  scanned in within 24 hours of the refusal.

18         MS. KENDRICK:  So a couple of comments or concerns.

19         First of all, according to the February staffing

20  report that defendants provided that was filed as an exhibit to  09:41AM

21  the declaration of Mr. Fathi at Docket 2742-3, it shows that

22  all the director of nursing and assistant director of nursing

23  positions were filled in the month of February, so it's unclear

24  whether the staffing report doesn't accurately reflect what was

25  happening on the ground in February or what.                 09:42AM

1          The other thing I would notice is, first of all, this

2     refers to inmates refusing to come to the infirmary.  However,

3     the Eyman prison does not have an infirmary.  It has no central

4     medical unit.  Each of the five units have their own clinics.

5     Two of the units, SMU-1 and Browning, are closed custody and so    09:42AM

6     all movement to the medical clinics are done with custody

7     staff, so it's unclear how they were refusing.

8          Secondly, there's a referral to four med pass nurses,

9     but again, that's somewhat perplexing because there are five

10    units geographically separated from each other.                    09:42AM

11         So our concern is that if there's only four med pass

12    nurses for a large complex of five separate units sprawled

13    across great acreage that it may indeed be due to a lack of

14    staffing and it's not actually class members' fault these

15    refusals are not documented.                                       09:43AM

16         THE COURT:  Well, we will see whether or not what you

17    identify as problems appear to be linked to the actual cause

18    in the next month report, but I appreciate the insight that you

19    have provided not only to me but also I hope that the

20    defendants and the Corizon people are listening to that.  Thank    09:43AM

21    you.

22         Next measure, Mr. Bojanowski.

23         MR. BOJANOWSKI:  I believe 15 is compliant.  I'm just

24    double checking to make sure that I don't miss any.

25         THE COURT:  That's good to know.                              09:44AM

 1              MR. BOJANOWSKI:  I believe the next one is 24.

 2         Yes.  24.

 3              THE COURT:  Okay.

 4              MR. BOJANOWSKI:  At Lewis.

 5              THE COURT:  This has dropped off from January's number    09:44AM

 6    of 87.

 7              MR. BOJANOWSKI:  Yes.  It had been compliant since

 8    October of 2017 and was rather consistent and dropped off for

 9    this month.

10              THE COURT:  To what number?                              09:45AM

11              MR. BOJANOWSKI:  75 percent.

12              THE COURT:  All right.  And this is the --

13              MR. BOJANOWSKI:  This is the --

14              THE COURT:  -- medical entries are accurately

15    completed within three business days of the entry in the          09:45AM

16    medical record?

17              MR. BOJANOWSKI:  No.  This is our emergency medical

18    response rate.

19              THE COURT:  Oh, I'm sorry.  You're right.

20              MR. BOJANOWSKI:  Check daily inventory monthly and       09:45AM

21    contain all required essential items.

22              THE COURT:  What does your exploration reveal with

23    respect to why they lost ground on this measure?

24              MR. BOJANOWSKI:  The inventory sheets were not being

25    filled out at the time the bag tags were changed so that the      09:45AM

```
 1    data indicating what the inventory was was not sufficiently

 2    provided.  So that's why they were held to be noncompliant with

 3    their inventory because their inventory sheets were not

 4    appropriately filled out.

 5            THE COURT:  And is there some other way to ascertain      09:46AM

 6    whether or not these inventories have been checked as required

 7    by the performance measure other than to look at these

 8    inventory sheets?  How does the monitor know, as you seem to

 9    say, that it happened but just wasn't recorded?

10            MR. BOJANOWSKI:  It's my understanding that the sheets    09:46AM

11    are provided to the Monitoring Bureau and then they are

12    reviewed, and these sheets --

13            THE COURT:  But you said that they just -- well, I

14    think you just said that they didn't complete the sheets and

15    that's why they failed here, but you also said that -- I think   09:46AM

16    I heard you say that it actually had happened, it just hadn't

17    been recorded, and I'm asking since it wasn't recorded how do

18    we know it happened?

19            MR. BOJANOWSKI:  Yeah.  I didn't mean to mislead the

20    Court as to --                                                   09:46AM

21            THE COURT:  Okay.  I'm glad I recounted it back.

22    Maybe I misheard.  Okay.

23            MR. BOJANOWSKI:  I believe it was the inventory sheet

24    was not appropriately filled out.  I'm not saying that the bag

25    had the appropriate inventory in it.  I don't know the answer    09:46AM
```

1   to that.

2           THE COURT:  All right.

3           MR. BOJANOWSKI:  All I know is that I believe the

4   sheet was not appropriately filled out and that's why it was

5   not counted.                                                    09:47AM

6           THE COURT:  I understand.

7           Any comment?

8           MR. BOJANOWSKI:  Yes.  Do you want to know if the bag

9   was checked?

10          THE COURT:  Yeah.                                        09:47AM

11          MR. BOJANOWSKI:  Yes, the bag was checked.

12          THE COURT:  How do we -- that's my question.  How do

13  you know that?

14          MR. BOJANOWSKI:  Because the bag tag was changed, I

15  believe.  They have to break the seal and --                    09:47AM

16          THE COURT:  You said the bag tag was changed I

17  believe.  How do you know that?

18          MR. BOJANOWSKI:  Because they have to record the

19  number of the tag.

20          THE COURT:  Okay.                                        09:47AM

21          MR. BOJANOWSKI:  So it's a sealed thing.  Once you

22  break it open, and even to do an inventory on the bag you have

23  to break that seal, you have to record the seal that's on there

24  and then you have to record the new seal that you put on.

25          THE COURT:  Where do you record that?                    09:47AM

1          MR. BOJANOWSKI:  The bag tag log.

2          THE COURT:  That's separate from the inventory sheet

3    that the monitors look at?

4          MR. BOJANOWSKI:  I believe it is.

5          THE COURT:  All right.  And somebody told you this or         09:48AM

6    you just know this from other experience?

7          MR. BOJANOWSKI:  Somebody told me and I believe that's

8    what they told me.

9          THE COURT:  Okay.

10         MR. BOJANOWSKI:  I think it would be advisable if I          09:48AM

11   actually went out there and looked and saw how they actually

12   did it, which would be a little bit more helpful for my

13   understanding of this particular measure, but that's what I

14   understand occurred in this particular instance.  This seems to

15   be the only facility that is having difficulty with this.         09:48AM

16         And then during my meetings with the facility about

17   this measure, they are putting in some redundancy as far as

18   having two different individuals check on this so that if it's

19   missed by one it's picked up by another and we have some

20   built-in double checks so to speak to make sure all the          09:48AM

21   appropriate paperwork is filled out, to make sure all the

22   inventory is in the bag that needs to be in the bag, because

23   that's very important.

24         THE COURT:  Okay.  Ms. Kendrick?

25         MS. KENDRICK:  We would just observe that these bag         09:49AM

```
 1    tags that have to be filled out, it's according to the protocol
 2    that after an emergency response bag is used and it's brought
 3    back to the clinic the nursing staff are supposed to document
 4    all equipment that's been used and replace it from medical
 5    stock.                                                          09:49AM
 6              So this -- it's hard to say with any sort of certainty
 7    or assurance that, oh, the equipment was replaced, they just
 8    didn't fill out the tag.  It seems a little strange that if
 9    they were, you know, replacing equipment that was used --
10              THE COURT:  You didn't mean to say tag there.  I'm    09:49AM
11    sorry to interrupt.
12              MS. KENDRICK:  Tag.
13              THE COURT:  We have heard that they did do the tag.
14    What they didn't do is the inventory sheet that gets to the
15    monitor, I think.  Isn't that what --                          09:49AM
16              MS. KENDRICK:  It's -- it's -- well, it says inventory
17    was not being done as the bag tags were changed.  It doesn't
18    talk about an inventory sheet.  What they -- I'm talking about
19    what is actually written in their court filing.
20              THE COURT:  I see.  Thank you.                        09:50AM
21              MS. KENDRICK:  So when the bag tags are changed that's
22    when nursing staff is supposed to be replacing all the
23    equipment that had been taken out and used upon returning from
24    the ICS.
25              THE COURT:  I see.                                    09:50AM
```

1          MS. KENDRICK:  So I guess the bottom line is, our

2     position is, not documented, not done.  You can't say that it

3     was done.

4          THE COURT:  I agree.  I definitely agree with that.  I

5     just was trying to understand whether or not we had some reason          09:50AM

6     to believe that it had been done but just not recorded, and

7     that's why I made the further exploration.  But I agree with

8     respect to the enforcement of this stipulation if it's not

9     recorded in an appropriate way such that the monitors can make

10    a finding based upon the appropriate ascertainment of whether          09:50AM

11    or not this has been satisfied or not we shouldn't consider

12    that it's been satisfied.

13          Next measure.

14          MR. BOJANOWSKI:  The next one I have is Performance

15    Measure 40 at the Eyman facility.          09:51AM

16          THE COURT:  This is urgent provider referrals are seen

17    by a medical provider within 24 hours of referral.

18          MR. BOJANOWSKI:  Right.  And it appears as though --

19    hold on just a second here.

20          Yes, this is one that has a 24-hour turnaround time          09:52AM

21    and they are missing this compliance by within -- literally

22    within minutes.  And so they are being held noncompliant for

23    that.

24          So what they are trying to do is get a better

25    communication set up so they can schedule the inmate in earlier          09:52AM

| | |
|---|---|
| 1 | so that they don't miss that 24-hour deadline.  If they are |
| 2 | seen in the afternoon and it's an urgent referral, they want to |
| 3 | get that person in within that 24-hour period, preferably the |
| 4 | next morning and not the next afternoon where they would stand |
| 5 | a chance of missing the time frame. |
| 6 | THE COURT:  And what is the percentage? |
| 7 | MR. BOJANOWSKI:  I'm sorry.  The percentage is 55 |
| 8 | percent. |
| 9 | THE COURT:  January was 67? |
| 10 | MR. BOJANOWSKI:  It was. |
| 11 | THE COURT:  Okay. |
| 12 | MR. BOJANOWSKI:  So it dropped by 12 percent. |
| 13 | THE COURT:  Ms. Kendrick? |
| 14 | MS. KENDRICK:  Well, Your Honor, we haven't been |
| 15 | provided the February CGARs yet so we don't know which files |
| 16 | were reviewed for this performance measure.  So we have no way |
| 17 | of knowing if it was literally just a matter of minutes that |
| 18 | these performance measures were missed. |
| 19 | We would just note two things.  First of all, |
| 20 | defendants agreed to this requirement in the 24-hour time frame |
| 21 | and so they have got to live by it.  Also, last month both Dr. |
| 22 | Stewart and Dr. Robertson testified regarding problems with |
| 23 | recruiting and retraining providers at Eyman as being a |
| 24 | historic problem.  So we are concerned that could be a possible |
| 25 | link and root cause and the actual true basis for |

09:52AM

09:53AM

09:53AM

09:53AM

09:53AM

1    noncompliance.

2              THE COURT:   Indeed.

3              The next measure?

4              MR. BOJANOWSKI:   42 at Eyman.   This is at 50 percent,

5    up from 38.                                                    09:54AM

6              THE COURT:   This is follow-up sick call will occur

7    within the time frame specified by medical or mental health

8    provider.

9              MR. BOJANOWSKI:   Correct.

10             So we've got a rather robust plan in place, we feel,   09:54AM

11   that we're going to continue with and keep pushing staff with

12   regard to making sure this is met.

13             THE COURT:   My usual questions.   What is the robust

14   plan and when did it start?

15             MR. BOJANOWSKI:   Well, it's been in place since       09:54AM

16   January with the CNA being responsible for the scheduling and

17   doing chart reviews.   We are working with the CNA's

18   administrative assistants and providers to try and make sure

19   that follow-up sick call encounters that are asked for by the

20   provider are actually brought in within that time frame.        09:55AM

21             So it's just a matter of making sure that these people

22   understand what the time frame is and what's required to get

23   that patient in to be seen within what is specified by the

24   provider as to when that provider wants to see a particular

25   patient.                                                         09:55AM

1          THE COURT:  Well, here we have a window into a robust

2  plan that was adopted in January that has produced -- what did

3  you say the number was?

4          MR. BOJANOWSKI:  55 percent.

5          THE COURT:  55 percent.  So there's --                    09:55AM

6          MR. BOJANOWSKI:  Excuse me.  50.  I'm sorry.  It was

7  at 38 and it went up to 50.

8          THE COURT:  42, right?

9          MR. BOJANOWSKI:  Yes.

10          THE COURT:  It went from 38 to 50.                        09:56AM

11     Okay.  So what we've got is a real reason to doubt

12  that the robust plan is sufficient.  And so have there been any

13  changes to the robust plan?

14          MR. BOJANOWSKI:  There have not been any changes to

15  the current plan because we are seeing some improvement on it.   09:56AM

16  We just think that it's a matter of working with the providers

17  and the CNAs and people to make sure that they pick up the fact

18  that this person is scheduled by the provider within a certain

19  time frame that the provider has specified and make sure that

20  that person gets there on time.                                  09:56AM

21          THE COURT:  Well, I guess -- you say that we're making

22  improvement.  I'm not so impressed with the improvement because

23  the failure rate is an F.  So it's a failure.  It's not even in

24  the ballpark.

25          So I guess I would say that there needs to be            09:57AM

```
1    something else done because we're not seeing the results here.

2           And this also doesn't strike me as kind of something

3    that is cumulative in terms of building on experience or

4    whatever.  It seems to me like it's either happening or not,

5    and it looks like it's not half the time on these sampled          09:57AM

6    records.

7           So I think there needs to be some greater effort here

8    than what's been already described as the robust plan.

9           MR. BOJANOWSKI:  We'll exercise that greater effort,

10   Your Honor.  We can -- we can, you know, target this one for       09:57AM

11   extra special review and try and work on it really hard.  I

12   agree with the Court that it has not shown good results since

13   May of 2017.  It's been below 50 percent since that time.  So

14   we need to get a handle on this one and work on that plan.

15          THE COURT:  Any additional points you wanted to make        09:58AM

16   on this one, Ms. Kendrick?

17          MS. KENDRICK:  Yes, Your Honor.

18          First of all, this is the second remedial plan they

19   have tried according to their notes from October 6, 2017.  They

20   had a new policy and procedure implemented November 1st.  And      09:58AM

21   then Mr. Bojanowski said that they got another plan that they

22   implemented January 1st.

23          Also, I'm a little concerned that perhaps they don't

24   understand what this performance measure calls for or the

25   language in their report is confusing.  Because if you look        09:58AM
```

1    underneath where it says update as of January 8, 2018, it says

2    that the clinic CNA, which is the certified nursing assistant,

3    is now responsible for scheduling all follow-up sick call

4    encounters with the provider as the request is being made.

5         Follow-up encounters normally are with the nurse's          09:59AM

6    line because these are things like, you know, I want the guy's

7    blood pressure checked, he has a wound that needs the bandages

8    changed, and that sort of thing.  So follow-up sick call

9    encounters generally are falling to nurses line, not provider

10   line.                                                            09:59AM

11        And then looking at the February staffing report,

12   which is the most recent we have, we have not been provided the

13   March staffing report yet, but for Eyman it shows below level

14   staffing for all types of nurses.  So registered nurses are

15   staffed at only 75 percent, LPNs, licensed practical nurses, at 09:59AM

16   93 percent, and CNAs who apparently are the ones responsible

17   for implementing this remedial plan are only staffed at 69

18   percent according to the report.  And it was equally low

19   staffing numbers in January.

20        So we are concerned, to the extent they are burdening      10:00AM

21   the unit nursing assistants to do this, that it will be

22   difficult given the vacancy rate, and we're also concerned why

23   they are apparently scheduling sick call encounters with

24   providers when they are also overburdened when perhaps these

25   are things that should be getting done by nurses.  It's just    10:00AM

| | |
|---|---|
| 1 | not clear from their language here what they are focusing on |
| 2 | here. |
| 3 | THE COURT: Well, with respect to the focus, I don't |
| 4 | know what Mr. Pratt's been writing down while you have been |
| 5 | talking but I'm going to assume that he has been writing down |
| 6 | your points so that if they are ones that are potentially an |
| 7 | explanation that can be redressed. Then I'm glad to assume |
| 8 | that's happened here, that you have made this statement and |
| 9 | it's been taken down. |
| 10 | With respect to the staffing issues, of course, those |
| 11 | continue to be -- continue very large with respect to the |
| 12 | Court's impression with respect to what the issues are |
| 13 | concerning these performance measures. |
| 14 | Your next performance measure, please, |
| 15 | Mr. Bojanowski. |
| 16 | MR. BOJANOWSKI: It's the same number at the Lewis |
| 17 | facility. 42. |
| 18 | THE COURT: Oh. |
| 19 | MR. BOJANOWSKI: It is at 76 percent. Although better |
| 20 | than the Eyman facility, still below what we want it to be. A |
| 21 | very similar type of issue here as far as getting the follow-up |
| 22 | orders timely scheduled, and since we're looking at 42 for |
| 23 | Eyman, we're going to do that same type of review here at the |
| 24 | Lewis facility. |
| 25 | THE COURT: Ms. Kendrick? |

10:00AM (lines 5)
10:00AM (line 10)
10:01AM (line 15)
10:01AM (line 20)
10:01AM (line 25)

1          MS. KENDRICK:  Well, confusingly, Lewis and then

2     Florence, which for the first time in 12 months managed to hit

3     85 percent after being below 60 percent for most of the year,

4     have identical explanations for noncompliance and Corrective

5     Action Plans that are actually different from Eyman, and again,          10:02AM

6     these raise some serious questions.

7          First of all, on the basis for noncompliance for

8     February 14th, they state most of the misses are because of

9     standard types of follow-ups, like blood pressure checks and

10    wound care, providers are not putting into eOMIS where it will          10:02AM

11    alert the nurse, and again the point being that blood pressure

12    checks and wound care are supposed to be done by nurses, not

13    medical doctors or physicians' assistants.

14         And then the Corrective Action Plan for Lewis for

15    February 14, which is verbatim to the page before for Florence,          10:02AM

16    says in here that, quote, monitors are seeing that the

17    treatment plans are started but then after several days it

18    stops without explanation, and it's unclear how they know that

19    and how that's going to be addressed.

20         Back up also under basis for noncompliance, they wrote          10:03AM

21    nurses are not reading the entire notes of the provider to see

22    the follow-up orders.  It is unclear how they know the nurses

23    are not reading this unless they are sitting there with the

24    nurse as he or she is doing it.

25         Also in their Corrective Action Plan they have two          10:03AM

1    sentences in a row that appear to contradict each other where

2    it says, "Whoever makes a follow-up order will need to make the

3    appointment themselves.  This will be done by the CNAs."

4           So if the provider is making the follow-up order, that

5    would imply that the provider is responsible for making the          10:03AM

6    appointment, but then the following sentence says, "This will

7    be done by the CNAs."

8           Then under April 9, the basis for noncompliance was

9    providers were entering orders timely but follow-up orders were

10   not being timely scheduled, again in the passive voice.  So          10:04AM

11   it's unclear by whom the orders were not being timely

12   scheduled.

13          And the corrective action plan for Lewis is that

14   starting in mid February providers are now responsible for

15   scheduling the follow-up orders themselves, which would again        10:04AM

16   contradict the previous Corrective Action Plan that said CNAs

17   would be doing it and begs the question why these high-level

18   providers who have a lot on their plate and a lot to do are now

19   doing scheduling because the CNAs apparently are not capable of

20   doing that themselves.                                              10:04AM

21          THE COURT:  Mr. Bojanowski, does it make sense to ask

22   Mr. Pratt if he has any comment about these things?

23          (Discussion off the record.)

24          MR. BOJANOWSKI:  He doesn't have information that he

25   can provide to the Court that would be helpful.                      10:05AM

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | THE COURT:  Okay.  Maybe if I could ask, then, this |
| 2 | question, Mr. Pratt:  Am I right in assuming that you were |
| 3 | paying attention and writing down what was being said and |
| 4 | you're going to follow up on this? |
| 5 | MR. PRATT:  Yes, sir. |
| 6 | THE COURT:  Okay.  Thank you. |
| 7 | The next one below 85 percent, please. |
| 8 | MR. BOJANOWSKI:  That would be Perryville, same |
| 9 | number, 42.  Perryville had been doing well on this measure and |
| 10 | then dropped off this last month, and it appears as though this |
| 11 | was due to a new staff member who didn't understand the |
| 12 | procedure.  That would be Performance Measure 42. |
| 13 | Oh.  Percentage is 79 percent.  I'm sorry, Your Honor. |
| 14 | So they went from 89 down to 79. |
| 15 | THE COURT:  Ms. Kendrick? |
| 16 | MS. KENDRICK:  Well, if you read the basis for |
| 17 | noncompliance as of April 9 in the Corrective Action Plan, it |
| 18 | appears to contradict what was said for Lewis and Florence, in |
| 19 | that here they are saying that it's the assistant director of |
| 20 | nursing who is responsible for scheduling the follow-up sick |
| 21 | call encounters, that a new ADON was new and didn't understand |
| 22 | the procedure, and as such the CNA and provider were scheduling |
| 23 | their own follow-up encounters and failed to include the |
| 24 | deadlines in the scheduling notes and that this caused the |
| 25 | noncompliance, yet the Corrective Action Plan for the prior |

10:05AM

10:05AM

10:06AM

10:06AM

10:06AM

1    ones is that either the provider or the CNA is going to

2    schedule these follow-ups.

3            So it appears that they are taking different

4    approaches for different institutions, which may or may not be

5    appropriate, but it also does raise the question that there is    10:07AM

6    a lot of apparent mass confusion about how to actually

7    implement this Performance Measure so that they are having

8    patients be seen and not be dropped off after a few days and

9    also can report compliance.

10           THE COURT:  Well, we do know that it's not compliant    10:07AM

11   at these facilities and so we know that there is -- something

12   is broken, and it is possible that the reasons that you have

13   suggested could have something to do with that having been

14   broken.

15           And so Mr. Pratt has heard that information and he can   10:07AM

16   check in with these different complexes to see whether or not

17   any of those reasons are reasons that have merit and need to be

18   addressed.  So I appreciate that.  Thank you.

19           The next one.

20           MR. BOJANOWSKI:  The next one is PM 44 at Eyman at 43    10:07AM

21   percent.

22           THE COURT:  This is inmates returning from an

23   in-patient hospital stay or ER transport with discharge

24   recommendations from the hospital shall have the hospital's

25   treatment recommendation reviewed and acted upon my a medical   10:08AM

1    provider within 24 hours.

2           MR. BOJANOWSKI:  Correct.

3           THE COURT:  Okay.

4           MR. BOJANOWSKI:  So this is one where we have had a

5    lot of discussion here about what's required by this and what        10:08AM

6    has been happening as far as monitoring it or to make sure that

7    every single discharge order is individually addressed.  And so

8    that's what this measure is calling for.

9           THE COURT:  So Eyman has moved from January at 38 to

10   43 percent in February?                                             10:08AM

11          MR. BOJANOWSKI:  No.  Eyman has gone from 56 to 43.

12   It has dropped.

13          THE COURT:  Okay.  Thank you.

14          MR. BOJANOWSKI:  Florence -- well, we're at Eyman

15   right now.  So Eyman at 44.                                         10:09AM

16          THE COURT:  All right.  Thank you.

17          So Eyman 44 in February, 38 in January.

18          So we have talked about it a lot.  It doesn't seem

19   that it should be -- I'm sorry to be making mistakes here.  I'm

20   just having some trouble seeing this.                              10:09AM

21          Did I make another mistake, counsel?  Did I say the

22   right thing just now?

23          MR. BOJANOWSKI:  PM 44 at Eyman was at 56 percent and

24   then dropped to 43.  I think you said 38.

25          THE COURT:  Yeah, I did.  I did make that mistake          10:09AM

1    thank you.   Thanks very much.

2          Let's talk about these.   Are there any other complexes

3    that --

4          MR. BOJANOWSKI:   There's also the -- let me -- the

5    Florence complex has well dropped from 67 percent to 43        10:10AM

6    percent.

7          THE COURT:   Oh, dear.

8          MR. BOJANOWSKI:   The Lewis facility for PM 44 went

9    from 75 to 81 percent.   Those are the facilities at issue.   So

10   we've had trouble at Eyman and Florence and we have had a       10:10AM

11   slight improvement at the Lewis facility.

12         And so, again, what is being looked as a -- as a -- to

13   address this is to get some additional people involved in

14   looking at these discharge orders when they come in upon the

15   return of the patient from the hospital.                        10:11AM

16         We're not dealing with a large number of files here,

17   so misses on these things are rather significant.   I think at

18   Eyman we had a total of seven files that were involved for the

19   month.   So missing three put them into where they are at.

20         And so the idea, then, is to have, as we indicated,       10:11AM

21   the ADON and IPC supervisor will look at those recommendations

22   every time an inmate returns and then verify that those are

23   acted upon within the necessary time frames.

24         THE COURT:   What if there's a modest number of files

25   as you suggest?   Because they have drawn at a number that is   10:11AM

1    below the requirement would suggest -- as you say, the seven

2    are the only ones to look at -- suggests that if there's a

3    modest number you ought to be able to accomplish the task,

4    which is extremely important.

5         The idea that somebody has been in the hospital or the     10:12AM

6    emergency department and they have had recommendations made by

7    the health care providers at those facilities and that they are

8    not acted upon or some different action is taken based upon an

9    informed judgment of the medical provider who has got the

10   patient right in front of them is very, very significant and     10:12AM

11   very important.

12        And so I don't know how it is with this one that we

13   continue to talk about it because it just seems like something

14   that can be fixed, and it would be something that also seems

15   like it wouldn't be a problem because it would seem obvious to    10:12AM

16   me, but there's apparently a culture that exists that you don't

17   have to do this.

18        And so I don't know what steps we should be taking to

19   increase the attention because, as you said, we have talked

20   about this a lot and worked through it a lot and we're just --    10:13AM

21   we're losing ground.  So something different has to be done.

22        Ms. Kendrick, do you want to weigh in?

23        MS. KENDRICK:  Just to observe, Your Honor, that PM 44

24   at Eyman was part of the Court's OSC.  Defendants reported in

25   December there were nine instances of noncompliance and in       10:13AM

1    January there were three instances of noncompliance.

2         As Mr. Bojanowski observed, there's a very small

3    denominator in these cases, so he said in February it was four

4    out of seven were compliant and got to 43 percent.  We share

5    the position that given how few there are they shouldn't be                10:14AM

6    falling through the cracks.  It's not like there's seven a day

7    coming back.  There's seven a month.

8         We went back and looked at the CGARs for December and

9    January, and December eight out of the nine were noncompliance

10   and that's why they had an 11 percent compliance level while               10:14AM

11   the OSC was in effect.  So while the instances of noncompliance

12   may have been a single digit number, it shows it's pretty

13   profound when only one was compliant at that institution the

14   entire month.

15        And then in January their CGAR reported five out of                   10:14AM

16   nine were compliant to get to 56 percent, which would mean four

17   instances of noncompliance, which does not comport with what

18   they had reported as the January data at Docket 2662-1 where

19   they had reported three instances of noncompliance for the OSC.

20        We're also concerned that they're not -- they haven't                 10:15AM

21   been giving any plans between February and April here even

22   though the performance has been dismal, and we are concerned

23   that this -- we hope this happens but we notice that on Lewis

24   on the corrective action plan it says that providers were

25   trained on February 2nd, yet there was noncompliance that                  10:15AM

| | |
|---|---|
| 1 | happened the day before the training, which would indicate that |
| 2 | they need to do those sort of training and education with great |
| 3 | deliberate speed. |
| 4 | THE COURT:  Well, it's probably no surprise to anyone |
| 5 | in this room that we'll probably see whether or not the |
| 6 | sanctions envisioned in the OSC will have any effect.  Because |
| 7 | it seems to be little reason not to impose that sanction on |
| 8 | these performance measures, because it is one of the methods |
| 9 | the Court had articulated.  And so it seems to me that this one |
| 10 | has been so difficult that maybe that sanction is what's going |
| 11 | to be necessary. |
| 12 | But, in any event, we'll see. |
| 13 | MS. KENDRICK:  Yeah.  And again, like I said, we |
| 14 | haven't received the February CGARs so with Lewis we're not |
| 15 | quite sure how they reached 81 percent.  But if the compliance |
| 16 | was three compliant out of five, we don't understand how |
| 17 | three-fifths equals 81 percent, but we will try to figure that |
| 18 | out when we get the CGARs. |
| 19 | THE COURT:  All right.  Good point.  Perhaps.  We'll |
| 20 | see. |
| 21 | Next one, Mr. Bojanowski. |
| 22 | MR. BOJANOWSKI:  It's PM 46 at Eyman.  And this |
| 23 | dropped from a 94 percent to an 82 percent. |
| 24 | THE COURT:  Is that the only one that 46 had dropped |
| 25 | off? |

10:15AM

10:16AM

10:16AM

10:16AM

10:16AM

```
1            MR. BOJANOWSKI:  Correct, Your Honor.  All the other

2     facilities are compliant.

3            THE COURT:  And what's the view as to why?

4            MR. BOJANOWSKI:  Well, the provider documented the

5     performance in eOMIS in a location that was not found by the        10:17AM

6     monitor, so -- there's an appeal pending on this that was filed

7     by Corizon so that if, in fact, they can satisfy themselves

8     that, in fact, the action did take place, even though it wasn't

9     put in the right place within eOMIS by the provider, then they

10    would get credit for that and this would become compliant, but    10:17AM

11    that's still pending.

12           But that appears to be what happened here, is that it

13    was just put in the wrong place so the monitor didn't pick up

14    on it because it didn't go to the place where the provider put

15    the information.                                                   10:18AM

16           THE COURT:  Ms. Kendrick?

17           MS. KENDRICK:  Well, Your Honor, this is also a

18    performance measure in an institution that was in the Court's

19    Order to Show Cause, and it's kind of the inverse of the other

20    one.  While the percentage rates are high, it's actually a high   10:18AM

21    volume.

22           So in December when they reported 84 percent

23    compliance in the CGARs, they had 178 instances of

24    noncompliance.  And then January when they were reporting 94

25    percent here, they also reported 67 instances of noncompliance    10:18AM
```

| | |
|---|---|
| 1 | with this performance measure.  Ironically enough, two of them |
| 2 | including Mr. Parsons himself. |
| 3 | So we are concerned that it is more than just |
| 4 | providers -- a provider putting information in the wrong space |
| 5 | given the quantity of noncompliance instances that were |
| 6 | reported to the Court in response to the OSC. |
| 7 | THE COURT:  All right.  Next one, please. |
| 8 | MR. BOJANOWSKI:  The next one is PM 47 at Eyman. |
| 9 | THE COURT:  And this is a medical provider will |
| 10 | communicate the results of the diagnostic study to the inmate |
| 11 | upon request and within seven calendar days of the date of the |
| 12 | request. |
| 13 | MR. BOJANOWSKI:  Right.  This is the one where they |
| 14 | submit an HNR asking for some lab results and then they don't |
| 15 | get them. |
| 16 | So it would be PM 47 at Eyman.  And Lewis -- Eyman was |
| 17 | at 61 percent.  They dropped from 75.  And Lewis was from 36 |
| 18 | they went up to 61. |
| 19 | Perryville on PM 47 is at 83 percent. |
| 20 | PM 47 at Phoenix is at 67 percent. |
| 21 | And 47 at Tucson is at 64 percent. |
| 22 | And finally, at Yuma PM 47 is at 81 percent. |
| 23 | THE COURT:  So again, this is a measure that we've |
| 24 | talked about a lot, which suggests that if we talk about it we |
| 25 | don't necessarily make things better. |

10:19AM

10:19AM

10:20AM

10:20AM

10:21AM

1          Anything you want to say in response to that,

2     Mr. Bojanowski?

3          MR. BOJANOWSKI:  I agree, Your Honor.  This is one

4     that we have talked about for many months and it's -- it seems

5     to be that what, you know, our initial response was, well,          10:21AM

6     we'll send all the results out by communique, we're still doing

7     that, so it's reduced the number of files that are actually

8     getting measured here, but the bottom line is even when you

9     have smaller numbers of files you should be able to pick up on

10    it.                                                                  10:21AM

11         So the HNR need to be reviewed.  The HNRs need to be

12    reviewed on a daily basis to figure out, well, is there a

13    request for some kind of lab results being made by the inmate

14    and then make sure that inmate gets those results even if they

15    received the mass communique situation.                             10:22AM

16         So that's something that needs to be tightened up

17    significantly, and it's, you know, working well at other

18    facilities, like at Florence you've got 100 percent, you've got

19    other passing facilities, but we need to get consistent across

20    the board and make sure that these HNRs are reviewed every day      10:22AM

21    and that somebody then picks up on the fact that the inmate is

22    actually asking for some lab results and get that person in to

23    the provider to get those results.

24         THE COURT:  Well, the idea that other facilities are

25    at 100 percent and so that we should be somewhat comforted is       10:22AM

1   really pretty much as an idea gutted by the idea that we have

2   facilities that were at 100 percent and now are not compliant.

3   So that's not a great argument.

4        And the -- you know, the tinkering with the HNR box

5   may also be relevant here, too, in terms of a way that is          10:23AM

6   making sure that -- it may well be that the disruption to the

7   process that occurred with the removal of the HNR boxes may

8   have something to do with this as well.

9        Ms. Kendrick?

10       MS. KENDRICK:  Your Honor, first of all, we have heard   10:23AM

11  before that part of the reason that the compliance rates are so

12  low is because it's such a small number and so missing one will

13  just put it into noncompliance.

14       At least with Eyman, we went back and looked at the

15  January CGAR where they scored 75 percent and it was --          10:23AM

16  actually, 36 requests total was the denominator.  So that's

17  more than just a handful.

18       So again, we are concerned because this is something

19  that Your Honor's been hammering for months, if not years, and

20  again, also, your Order to Show Cause covered many of these     10:24AM

21  noncompliance institutions, Eyman, Florence, Lewis, Phoenix,

22  Perryville and Tucson.

23       And so it is concerning given the fact that defendants

24  had the notice of the Order to Show Cause and the importance of

25  really focusing on this performance measure in December and     10:24AM

1    January and February that still the compliance rates are so

2    low.

3           And so we do think that whatever they have been doing

4    doesn't appear to be working and maybe needs to be revamped.

5           THE COURT:  All right.  We'll take the 15-minute          10:24AM

6    morning break.  We'll be back then.

7           Thank you.

8           (Recess from 10:24 a.m. until 10:43 a.m.)

9           THE COURT:  Thank you all.  Please be seated.

10          Mr. Bojanowski, we can proceed to the next measure,       10:43AM

11   please.

12          MR. BOJANOWSKI:  Your Honor, before we get going on

13   the next measure, I was going to raise kind of a side issue,

14   and that's with regard to scheduling of the hearings.

15          THE COURT:  Uh-huh.                                        10:43AM

16          MR. BOJANOWSKI:  I'm wondering if plaintiffs' counsel

17   would be amenable to scheduling these hearings the third week

18   of the month as opposed to the second week of the month.  And

19   let me explain why it is that I would prefer that.

20          What we face right now on a month-to-month basis is we     10:43AM

21   get the preliminary numbers in in the first couple days of the

22   month.  We then have to get out to the facilities and contact

23   the facilities to find out, well, what was the problem and

24   what's the solution.  The numbers aren't final until the 15th

25   of the month.  The staffing reports aren't out and the CGARs     10:43AM

1    aren't finalized.

2          And so we're running around, frankly, and I don't

3    think that these reports are as robust as I would like them to

4    be with regard to the explanations and the potential plans that

5    could be put into place.  I'm hopeful that if we were given          10:44AM

6    some additional time and things were more finalized that we

7    would be in a better position to report to the Court.

8          I throw that out there.  I don't know what the

9    plaintiffs' position is as to scheduling the monthly hearings

10   are, I don't know the Court's position on that, so I throw it       10:44AM

11   out there for consideration.

12         At a minimum, if we're stuck with the second week and

13   we're going to have a third day, I would ask alternatively that

14   we have the status conference on the third day to maybe give us

15   an extra day or so to try and get things put together.              10:44AM

16         THE COURT:  I think with respect to the near-term

17   meeting through likely August it's probably unrealistic to

18   think that we can reschedule something along those lines, but I

19   think that it is reasonable for counsel to meet and confer with

20   respect to what dates would work for them going forward beyond      10:45AM

21   that time horizon.  I don't know whether the plaintiffs have

22   any philosophical objection to going to the third week as

23   opposed to the second week beyond just the practical.

24         MR. FATHI:  May we have a moment, Your Honor?

25         THE COURT:  You sure may.                                     10:45AM

1          MR. FATHI:  Your Honor, we certainly have no objection

2    in principle.  We don't understand why Mr. Bojanowski mentioned

3    the staffing report.  The Court has ordered that that be

4    produced 48 hours in advance of the hearing.  We have

5    consistently not gotten it.  I'm not sure why it takes two          10:46AM

6    weeks to generate the staffing report.  But the short answer

7    is, Your Honor, we have no principled objection to moving to

8    the third week.

9          THE COURT:  All right.

10          Well, let's explore that shift starting in September.     10:46AM

11    When I say explore, what that means is that I will ask my staff

12    to take a look at the Court's calendar because we'll see

13    whether there are criminal duty issues.  We may have steered

14    clear of those, meaning we may have already deviated from the

15    standard practice, but the second week, for instance, I notice     10:46AM

16    I think August is earlier and it may be because of criminal

17    duty.

18          Is it August 8 that we're scheduled?  Am I remembering

19    that correctly?

20          MS. KENDRICK:  Yes.                                          10:47AM

21          MS. EIDENBACH:  Yes.

22          THE COURT:  So again, I think that there can be some

23    planning that I can't do at this moment because of other

24    calendar issues that have already caused us to make moves, but

25    what we'll do is we'll take a look at that and then we'll get     10:47AM

1    back to you with an e-mail what it looks like is possible for

2    us with respect to the moving to the third week.

3            The other thing I would like to ask is if the

4    plaintiffs would send via e-mail, a copy, of course, to the

5    defendants -- it looks like it's been redacted, which would          10:47AM

6    maybe suggests that you probably do have Miss -- I can't

7    remember her name.

8            MR. FATHI:  Ms. Fisher, Your Honor?

9            THE COURT:  Yes.  Thank you very much.  Ms. Fisher's

10   telephone number, if you would e-mail that to my staff.             10:48AM

11           MR. FATHI:  Yes, Your Honor.

12           THE COURT:  And then what they will do is coordinate

13   with you a time when we hope to place the call, if you want to

14   let us know if you want to be available for that.

15           MR. FATHI:  Your Honor, we do not feel a need to be on   10:48AM

16   the call with the Court.

17           THE COURT:  Fair enough.  That makes it simpler.

18           I gather the defendants want to be on the call?

19           MR. STRUCK:  Yes, Your Honor.

20           I also -- I did want to mention, I understand the         10:48AM

21   Court's desire to hear what Ms. Fisher has to say, but your

22   having her called on two days that are dedicated towards the

23   Monitoring Bureau issue, at least in the information I have

24   seen, I don't see that there's really any allegation with

25   respect to the Monitoring Bureau that Ms. Fisher is making in   10:48AM

1    the information that we have received.  So I'm wondering if it

2    might make more sense to do that on one of these other dates as

3    opposed to taking up time on the days dedicated towards the

4    Monitoring Bureau issue.

5              THE COURT:  Well, I read closely the exhibit that         10:49AM

6    plaintiffs had submitted that included her statements that

7    might indicate what she knows about and I wrote down one that

8    seems to answer the question in a way that it means it's

9    appropriate to have her in the segment on the quality of the

10   monitoring program.  Because she wrote at one point              10:49AM

11   observations about, quote, conflict in competing priorities

12   between DOC and Corizon.  And so I thought that that was

13   helpful.

14             I also thought that I wanted to have her sooner rather

15   than later because of what she may have knowledge about          10:49AM

16   regarding staffing issues.  Again, I don't know whether this

17   would be helpful for Mr. Millar but we can at least hear what

18   her observations are.

19             So I disagree, but I understand what you said,

20   Mr. Struck.                                                      10:50AM

21             Also, Mr. Pratt, I don't think we have received the

22   nominator reports of the incidents.  Have you sent them over?

23             MR. PRATT:  No, Your Honor.  No, sir, I have not sent

24   them yet.  I'm working with Corizon to get them in a format

25   that's going to be acceptable to the Court.                      10:50AM

1          THE COURT:  All right.

2          MR. PRATT:  I just spoke with Corizon leadership on

3    that and I'm anticipating that before the end of the day.

4          THE COURT:  All right.

5          MR. PRATT:  So by the end of the day.                    10:50AM

6          THE COURT:  Thank you very much.

7          MR. FATHI:  Your Honor, with respect to the call with

8    Ms. Fisher, we think it would be preferable if the Court had

9    that communication by itself.  If defendants wish to be

10   present, then plaintiffs wish to be present, also.            10:50AM

11         THE COURT:  All right.  That's fine.  I'm not going to

12   do it without giving you both an opportunity to be on the

13   phone.  I don't think that there would be anything

14   inappropriate with my staff making a scheduling but I don't

15   want to engender another distraction with respect to ex parte  10:51AM

16   contacts, and I have seen that we have baseless distractions

17   pretty often here.  So I don't want to have another one if I

18   can avoid it easily.

19         MR. FATHI:  Thank you, Your Honor.

20         THE COURT:  So everybody will be on the phone call and  10:51AM

21   you will send over the phone number.

22         Okay.  The next measure, please.

23         MR. BOJANOWSKI:  Thank you, Your Honor.

24         The next measure is 52 at the Eyman, Florence and

25   Tucson facilities.  Eyman came in at 58 percent, Florence at 67 10:51AM

1     percent, and Tucson at 64 percent.

2          As you are well aware, Your Honor, this is another one

3     of those measures that has been a problem for quite sometime

4     and one that probably -- well, not probably.  This one does

5     need the attention, as well as 42, that the Court had mentioned    10:52AM

6     earlier.  We have had some plans in place that don't appear to

7     be working and so even though we've got a plan for each one of

8     these I think we're going to have to take a much deeper review

9     of this one at these facilities to see if we can't figure out

10    what the problem is and get to the root of that problem and get    10:52AM

11    it fixed.

12          THE COURT:  Right now you don't have an idea as to

13    what the cause is.  You say you needed a different remedial

14    measure but you don't have an idea what the cause is?

15          MR. BOJANOWSKI:  The cause is that the -- some of it     10:52AM

16    is documentation issues, such as the provider is documenting

17    that he reviews the report, that he timely acted upon them.

18    But he is not documenting what the action was that he took.

19          And so it's somewhat frustrating that the providers

20    are not putting into the documentation the things that are     10:53AM

21    needed to bring it into compliance.  I mean, there are several

22    things that the provider needs to put in there when he's, you

23    know, or she's reviewing this, and then acting upon it and then

24    saying, well, what action is being taken?  You know, are you

25    going to go along with the report or not?  And if you are not     10:53AM

1    going to go along with what the recommendation is, well, why,

2    or what else are you going to do.

3          So it, at least at two of these facilities, was a

4    documentation problem.  One involved at Florence was a new

5    provider who wasn't appropriately documenting the performance          10:53AM

6    so he was reeducated.  The one at Tucson was the same type of

7    situation where they weren't putting in appropriate -- an

8    appropriate description of what action was being taken.

9          So they are not hitting on all cylinders, so to speak,

10   with regard to this measure, and so we've got people now              10:54AM

11   looking over this measure.  We've got the FHA and AFHAs looking

12   at this as well an other personnel tracking it on a daily basis

13   to make sure that it gets done.

14          THE COURT:  When did that start, the daily basis

15   tracking?                                                              10:54AM

16          MR. BOJANOWSKI:  April 1st, 2018 the FHA and AFHAs

17   were tasked with that duty at these facilities.

18          THE COURT:  Okay.  Ms. Kendrick?

19          MS. KENDRICK:  Well, first of all, Your Honor, if you

20   look at the information for December 15 for Eyman, it talks          10:55AM

21   about how this would be tracked daily, and it had been tracked

22   daily since October 20, 2017 and the site medical director was

23   being contacted to address the problem.  So it's unclear why if

24   they have been doing daily tracking since October 20 they still

25   haven't come into compliance.                                          10:55AM

1          THE COURT:  Let me stop you there.

2          Do you have any response to what sounds like a really

3   good observation, Mr. Bojanowski?

4          MR. BOJANOWSKI:  I can't really speak to why that was

5   a failure on the part of the site medical director to follow up          10:55AM

6   on that.  I think that the Corrective Action Plan is to shift

7   that daily review over to other personnel to follow up on.

8   So --

9          THE COURT:  So is your suggestion that this

10  representation of what would be done wasn't done because just          10:56AM

11  the site medical director didn't do it?

12         MR. BOJANOWSKI:  It appears that's the case, Your

13  Honor, so it was not something that the site medical director

14  was doing and so it wasn't effective as a Corrective Action

15  Plan.  So it shifted to other personnel to see if that would be          10:56AM

16  more effective in making sure that these follow-ups occur and

17  that the documentation is put into the file appropriately.

18         THE COURT:  And when did you find out that the site

19  medical director wasn't doing what you said the site medical

20  director was going to be doing?          10:56AM

21         MR. BOJANOWSKI:  Well, I didn't find out until we met

22  with the site a couple of weeks ago when I go to the site to

23  try and prepare these.  So --

24         THE COURT:  Do you express shock to the site medical

25  director, you know, you hung me out here, I told the Court you          10:57AM

1    were going to be doing this and you are not doing it?

2         MR. BOJANOWSKI:  I don't -- I don't think I would

3    describe my response as being shock.  I just am disappointed

4    that we can't seem to get this measure on track, and it hasn't

5    been on track for a long time, and I mentioned that to that            10:57AM

6    personnel to say, look, this is not acceptable, we've got to

7    get these things on track and we've got to get a plan in place

8    to make sure we can get this accomplished.

9         So part of what I'm doing here, Your Honor, is I'm

10   physically -- I'm personally going out to the sites and I am          10:57AM

11   meeting with the site medical directors, the directors of

12   nursing, the FHAs, operation staff.  I mean, there's 15 or so

13   people in this meeting that I am going through this stuff with

14   in an effort to try and address these problems.

15        So that's why I mentioned the third week.  It gives me          10:58AM

16   a little more flexibility to try and maybe get a little more

17   time spent there to address some of these problems and to then

18   go back and say, well, wait a minute, you know, six months ago

19   we tried this and now you are proposing that again.  Well,

20   that's no the going to work, okay?                                     10:58AM

21        And so this is kind of what we're trying to do to get

22   ahold of these things.

23        And then, you know, frankly, we use some of the

24   suggestions from plaintiffs as well at the hearings and raise

25   those issues as well.                                                  10:58AM

1        So just so you understand how it is that these are put

2   together, that's where I get the information from.

3        THE COURT:  Well, I have come to understand that the

4   remedial measures that are articulated in these monthly reports

5   come from Corizon, and we have talked in the past about how it          10:59AM

6   is that once the lawyer has placed -- the lawyer for the

7   defendants has placed his or her imprimatur on the

8   recommendations that it becomes an expectation of the Court

9   that it's not only something that is going to happen because

10  the lawyers have represented it's going to happen but that the          10:59AM

11  lawyer will stay on top of the issue to make sure that it does

12  happen.

13       And so the question I ask about when you found out is

14  related to that second part of it, sort of the lawyer's

15  monitoring of it, to make sure that what you have told me is           10:59AM

16  going to happen does happen.  So this is another example of

17  where I was told something was going to happen and it didn't

18  happen, and there is, unfortunately, a long legion of such

19  incidents.

20       So I have to re-emphasize that when the lawyer says             11:00AM

21  that this is going to be done that it's not just done at that

22  moment for the lawyer, the lawyer needs to make sure that it is

23  being done on an ongoing basis so that the lawyer doesn't run

24  afoul of his or her obligation to the Court, both

25  professionally and also in the circumstances of the case.             11:00AM

1          I mean, if I -- I have been very good, I think, about

2     taking the lawyer's word when I have been asked repeatedly by

3     the plaintiffs to require that the underlying commitment,

4     statement be supported by an oath or affirmation.  I have been

5     inclined to trust what the lawyer tells me is true and that          11:00AM

6     when the lawyer says something is going to happen that it is

7     going to happen.

8          I think that that trust requires the lawyer, also, as

9     I think I have mentioned in the past, to verify that it has

10    been happening and to be on top of the question about whether       11:01AM

11    or not what he or she has said to the Court is actually a

12    continued reality.

13         And so here it looks to me like this reality that was

14    represented to me pretty quickly fell off and it wasn't an

15    actual reality.                                                      11:01AM

16         So it's very worrisome to me on how I deal with the

17    aspects of the case that would be my normal inclination and

18    pushes me into a place where I'm not originally oriented to be

19    but find myself necessarily present.

20         Ms. Kendrick?                                                   11:01AM

21         MS. KENDRICK:  Yes, Your Honor.

22         Just as kind of final observations with Eyman, the

23    April 9th and February 14th updates do not include a basis for

24    noncompliance so there's no information given that the problem

25    -- the continuing problem was going to be -- was because the        11:02AM

1    site medical director wasn't doing this, but then that calls

2    into the question the Corrective Action Plan beginning April

3    1st is that providers will get daily updates and then the site

4    medical director, Dr. Stewart, will address it.

5           If Mr. Bojanowski just said that the site medical          11:02AM

6    director wasn't doing that, it's concerning that it's -- the

7    Corrective Action Plan relies upon him to do that.

8           Turning to Florence, that facility says that starting

9    September 1st of 2017, the clinical coordinator was going to do

10   the daily review and reminder, and that also appears to not be  11:02AM

11   working.

12          Actually, Florence was in the Court's Order to Show

13   Cause recently and despite that in December and January

14   reported failing marks of 65 and 69 percent in December and

15   January and then 67 in February, and defendants had admitted 26 11:03AM

16   instances of noncompliance in December and 15 in January.

17          And again, for this one, even though the clinical

18   coordinator's doing the reviews and reminding the providers,

19   the April 9 update for Florence says the reason that this

20   wasn't done was because a provider wasn't documenting his       11:03AM

21   performance, which again, given the numbers, seems that there

22   might be more than just one person responsible.

23          And also, I think it would be relevant to what

24   Mr. Millar is doing in terms of the retention of the employees,

25   and if there's constant churning of providers that they are not 11:03AM

1    being trained on how to properly document information if indeed

2    that is what's going on here and it's not that these are just

3    not being reviewed at all.

4        THE COURT:  All right.  Well, it's my hope that the

5    conversation that we have just had will produce a following                11:04AM

6    phone call to the people who are presently supposed to be

7    assuring that this performance measure is being satisfied to

8    make sure that they are actually doing what they said they

9    would do and what's being represented to be occurring in court.

10       So we have learned previously that when the task's                     11:04AM

11   been assigned it hasn't been performed.  We now have the

12   identification of new people who will be tasked, I guess, and I

13   am hopeful that there will be a telephone call placed to make

14   sure these people are actually doing it.

15       Next measure, please.                                                  11:04AM

16       MR. BOJANOWSKI:  The next measure is PM 66 at Florence

17   that came in at 70 percent.  This is IPC rounds every 72 hours.

18       This measure at Florence had been in compliance for

19   several months and what had happened was a different -- hold on

20   just a second.                                                             11:05AM

21       Yes.  This had been in compliance since November of

22   2017 and what had happened was they've got this scheduled on

23   alternating days for IPC coverage and there was a

24   miscommunication over a weekend in February when the normal

25   provider who covered that shift was on vacation.  The fill-in            11:05AM

1   provider misunderstood which day came up in the rotation and

2   rounded the wrong unit.

3       So in order to prevent that from occurring in the

4   future, the IPC schedule is then reflected in the chart showing

5   which units need to be seen on which days to prevent that                11:06AM

6   confusion from occurring again.

7       My understanding is there was a verbal communication

8   between the two providers prior to the vacation being taken and

9   it was based upon that communication that the providers were

10  providing the coverage -- or the -- the other provider was           11:06AM

11  providing coverage and just made a mistake as to what unit was

12  supposed to be rounded on what day.

13      THE COURT:  So this is the performance measure that

14  requires that inmates who are in the little hospital at the

15  facility have to be seen a minimum of every 72 hours by the            11:06AM

16  medical provider, and then you hear that because somebody

17  didn't understand when they were supposed to go check on people

18  that people who were in that little hospital didn't have

19  somebody seen in 72 hours.

20      So this goes into that category of things that you           11:07AM

21  learn about that just stagger you, similar to the testimony

22  from the Corizon senior medical person about how the computer

23  goes down, and that last year, I think, that there were a

24  number of days, if I'm remembering correctly, where the

25  computer was down for the entire day and all of the medical          11:07AM

1    records for everybody in the prison system, many of whom have

2    chronic diseases that at any moment subject them to the need

3    for emergent care that is appropriate to their illness, all of

4    their medical records are on the computer so if they have such

5    an emergent event there's no way to see what is the appropriate          11:07AM

6    action to take based upon the medical records of that inmate

7    because if the computer is down there is no medical record, and

8    it was the testimony that there's no backup.

9         I don't have any evidence in the case that would

10   suggest that that's wrong, but maybe I don't need any evidence          11:08AM

11   in the case because as a matter of common sense, as I mentioned

12   before, the U.S. Courts has a failover provision so that our

13   two servers can back up one another.  They're two opposite

14   sides of the country.  And we're not a life-and-death operation

15   here.                                                                    11:08AM

16        But medical care is life and death, and I would be

17   really pretty shocked if there was any medical provider who ran

18   something equivalent to the prison system with respect to its

19   responsibility for the patients, and I guess the rough analogy

20   would be some big -- you know, the witnesses have testified          11:08AM

21   that this isn't the Mayo Clinic, but I don't think it's a Mayo

22   Clinic standard that's being violated here, and that is that

23   you have some immediate backup such that if you ever have a

24   fail that produces no medical records that it last for minutes

25   and not a day or multiple days in a year.                               11:09AM

1          And so this one, too, seems just to be as just really

2     pretty frightened to me that it's a basic idea that if you are

3     going to run a little hospital in your prison complex that you

4     ought to be able to be in a situation where there's no mistake

5     that could be described as, oh, we had no medical provider          11:09AM

6     looking at that person for 72 hours.  I don't know any other

7     way to respond to it.

8          So I have said these words.  At some point we'll have

9     to do something other than words, I feel compelled to say.

10         Ms. Kendrick?                                                  11:09AM

11         MS. KENDRICK:  Yes, Your Honor.

12         The Florence infirmary, based on our understanding,

13    is approximately 60 beds, and so we were wondering if

14    Mr. Bojanowski has information about what that translates to

15    in terms of how many patients or class members were not seen,     11:10AM

16    because, obviously, this is just a sample of 10, and so we

17    would want to know beyond just the three that hit in the

18    sampling what the total number was.

19         THE COURT:  Do you happen to know that?

20         MR. BOJANOWSKI:  I do not.  I don't have the CGARs            11:10AM

21    themselves.

22         MS. KENDRICK:  Well, it wouldn't be the CGARs but

23    just the fact -- I know it's about 60 beds but I don't know how

24    many beds are in one unit and therefore, you know, one unit

25    wasn't seen.  What does that mean?  Is that 15, 20?               11:10AM

1           THE COURT:  Oh, so that's a different question.

2           MS. KENDRICK:  Right.  Right.

3           THE COURT:  Okay.  I misunderstood the question, too.

4    I think Mr. Bojanowski and I were understanding differently.

5           That question, do you happen to know the answer to it,    11:10AM

6    Mr. Pratt?  Do you know the answer to that question?

7           MR. BOJANOWSKI:  I don't know which unit was involved.

8    That's the problem.  So I don't know what -- I don't know what

9    the total -- do you know which unit it was?

10          MR. PRATT:  Your Honor, I'm not sure.  There's 57 beds    11:11AM

11   at that facility.  I'm not sure of the split or how they are

12   divided by the providers to see which half if that is the case.

13   I would have to find out.

14          THE COURT:  Okay.  Thank you.

15          Anything else you want to say on this one,              11:11AM

16   Ms. Kendrick?

17          MS. KENDRICK:  No, sir.

18          THE COURT:  Next one, please.

19          MR. BOJANOWSKI:  67 at Lewis.

20          And this is conducting assessments at least once every    11:11AM

21   shift.  Graveyard shift assessments can be welfare checks.  The

22   basis of noncompliance were the IPC nurses were not adequately

23   documenting the assessments and welfare checks.

24          So starting on the 6th of this month, the director of

25   nursing is going to review the IPC charts every shift, twice a    11:11AM

1     day, to ensure completion and adequate documentation.  ADON

2     will provide backup.  And instead of doing the welfare check at

3     night, we want to do two assessments so that we've got an

4     assessment in the morning and an assessment in the evening

5     shift and not try to get away from the graveyard shift of a          11:12AM

6     welfare check.  So that's kind of the plan here.

7          THE COURT:  And a welfare check is to look to see if

8     the person is still breathing?  What is it?

9          MR. BOJANOWSKI:  Correct.

10         So instead of actually, you know, doing an assessment      11:12AM

11    of the patient they can just walk by and have a look.  So

12    instead of doing that welfare check we want to move to two

13    assessments a day.  So that's the plan.

14         THE COURT:  And what is the percentage on this

15    Performance Measure?                                                 11:12AM

16         MR. BOJANOWSKI:  It is 60 percent.  It has fallen from

17    January, which was at 70 percent.  It has fallen from December,

18    which was at 90 percent.

19         THE COURT:  Ms. Kendrick?

20         MS. KENDRICK:  Well, Your Honor, in the Corrective            11:13AM

21    Action Plan that defendants offered in December of -- December

22    15, 2017, because the October scores were at 60 percent they

23    said that the checklist was going to be created for the nurses

24    to complete and that the senior assistant directors of nursing

25    were doing spot checks of the checklists and the documentation.     11:13AM

1          So we are concerned that since before Thanksgiving

2     they have been doing this kind of checking and reviewing

3     supposedly of the nurses' documentation, yet we're told here

4     now in April that the reason for the continued noncompliance is

5     that the nurses are not documenting the assessments properly,          11:14AM

6     which then begs the question of whether or not the spot checks

7     were being done since the second to last week in November.

8          THE COURT:  All right.  So the comments that I made

9     earlier with respect to the following up are pertinent here as

10    well.                                                                   11:14AM

11         MS. KENDRICK:  Yeah.

12         THE COURT:  The next measure?

13         Oh.  You have more to say.

14         MS. KENDRICK:  Actually, I think we're going to move

15    into the mental health measures, but before we do, there were          11:14AM

16    actually a couple of medical performance measures where

17    defendants were above 85 percent for this month but they

18    weren't in past months, and the Corrective Action Plans that

19    they offered previously we were unable to review in March, and

20    so I just had some questions for those.                                 11:14AM

21         THE COURT:  You may.

22         MS. KENDRICK:  The first one was for Performance

23    Measure 49 at Tucson, and this month it's at 91 percent but for

24    January it was at 76 percent.  The corrective action plan,

25    which is at Page 134 of the filing, has a pretty long                   11:15AM

1    discussion about how the -- it implies that the entire

2    utilization management process is being reviewed and

3    potentially overhauled.

4         I just had a lot of questions about what was going on

5    with this and what was happening with this, because this          11:15AM

6    obviously is something that we have been hearing about a lot

7    and it implicates multiple specialty care results, but the only

8    discussion of this overhaul is right here in this document.

9         THE COURT:  So is your question one that is to ask is

10   it working and because we see this number at where it is, or      11:15AM

11   what's your question?

12        MS. KENDRICK:  Well, I -- yeah.

13        So, for example, it says on Page 134, "Utilization

14   management is being reviewed by Corizon to establish new rules

15   to expedite the UM process so that treatment to the inmates can   11:16AM

16   be more streamlined for certain conditions, i.e., if a patient

17   has surgery then there is automatic follow-up without ATP

18   delay."

19        And, you know, so that raises the questions of like,

20   you know, has this review been done, have changes been made,      11:16AM

21   who is doing the review, was it people in Tennessee or here in

22   Arizona?  I mean, it sounds like a good idea but it just

23   doesn't give enough specificity to it to indicate whether this

24   actually occurred and was implemented.

25        THE COURT:  But you want to learn more so that you can      11:16AM

1   see whether or not it makes sense to apply this approach to

2   other performance measures that might be amenable to such

3   remedial measures?

4           MS. KENDRICK:  Correct.  And to the extent if indeed

5   there were changes made to the UM process and that is the                 11:16AM

6   reason why they went up from 76 to 91 percent, that's great,

7   but, you know, it doesn't really show necessarily that that was

8   the cause or what happened.

9           THE COURT:  No, it doesn't, but again, how best to

10  find out.  I mean, maybe the right thing to do is we have                 11:17AM

11  highlighted this area of questioning for Mr. Bojanowski and

12  maybe he would be willing to make an inquiry to see what the

13  answers are to some of these questions that you raised, and

14  then to, in an informal meet and confer, share that with you to

15  see if that would be helpful.                                             11:17AM

16          Is that something you would consider doing,

17  Mr. Bojanowski?

18          MR. BOJANOWSKI:  Certainly.

19          THE COURT:  So why don't we do that with respect to

20  those questions.                                                         11:17AM

21          MR. BOJANOWSKI:  I can follow up.  I mean, if

22  Ms. Kendrick wants to contact me for a meet and confer...

23          THE COURT:  If you think it would be helpful for you

24  to be more explicit with respect to the questions, you can send

25  an e-mail to Mr. Bojanowski and identify those questions, but           11:17AM

```
1    it seems like what you are talking about makes sense.

2           Because where we do see success we would like to know

3    whether it's just fortuity or whether it's some other thing

4    that has occurred, but where there have been articulated,

5    detailed remedial measures and we see a success then we don't    11:18AM

6    want to import that to other remedial measures if it turns out

7    that it wasn't really done or wasn't as we expected or

8    understood, but if it turns out that it was so done then

9    assuredly we should know about that and apply it to other

10   places.                                                          11:18AM

11          MR. BOJANOWSKI:  An e-mail would be preferable --

12          THE COURT:  Okay.

13          MR. BOJANOWSKI:  -- to initiate the process so I

14   understand exactly what she's looking for.

15          MS. KENDRICK:  Okay.                                      11:18AM

16          The next one is Performance Measure 50 at Florence,

17   which is about the urgent consults, and this month they were at

18   87 percent, which is the first month they have been above the

19   threshold for a year.

20          So again, and maybe the Court prefers to postpone this    11:19AM

21   because this was a separate agenda item, but the Corrective

22   Action Plan was that -- from last month was that they were

23   going to locate additional specialty providers, and so perhaps

24   that's why they are now at 87 percent at Florence.  I don't

25   know.                                                            11:19AM
```

1          I would note, though, at Page 137, their basis for

2     noncompliance that they gave on January 8th was with regard to

3     the fact that the oncology provider at Florence was using, AON,

4     had filed bankruptcy and I just wanted to bring to the Court's

5     attention that Dr. Sra, who was the operator for AON, filed an          11:19AM

6     affidavit with the Court --

7          THE COURT:  I read it.

8          MS. KENDRICK:  -- stating that indeed that was not the

9     case.

10         And so, you know, I know that this is a growing,          11:19AM

11     evolving document, but there is this information in here that

12     has just been contradicted by Dr. Sra about the circumstances

13     that form the basis for the noncompliance with that performance

14     measure.

15         THE COURT:  Well, I think with respect to those          11:20AM

16     performance measures that show compliance, it is sometimes

17     appropriate for the Court to continue to be involved, and I

18     just did that with respect to the previous performance measure

19     and encouraged people to share information with respect to

20     identifying exactly what the cause here is of now the          11:20AM

21     turnaround on this measure.

22         I think it is reasonable to ask Mr. Bojanowski if he

23     happens to know now and can report to me now what it is he

24     believes made the difference here.

25         MR. BOJANOWSKI:  I know that all of the cancer          11:20AM

1    patients that were involved in that were placed with different

2    specialty providers, but to be honest with you, I can't really

3    say, well, that was the result for the increase.  I would have

4    to look into it and it could be added to Ms. Kendrick's e-mail

5    if she wants to find out some more information on that.  I can          11:21AM

6    explore that further and certainly let her know.

7              THE COURT:  All right.  Thank you.

8              MS. KENDRICK:  Well, I mean, I guess it's also just a

9    part of the broader request that we had a separate agenda item

10   about whether or not there were any updates on increasing the          11:21AM

11   use of telemedicine and specialty care.

12             MR. BOJANOWSKI:  I can provide those updates when that

13   agenda item --

14             THE COURT:  Good.

15             MR. BOJANOWSKI:  -- comes up.                                 11:21AM

16             MS. KENDRICK:  Thank you.

17             THE COURT:  All right.  So moving into the mental

18   health area.

19             MR. BOJANOWSKI:  Your Honor, the rest of the

20   performance measures are all in compliance.                            11:21AM

21             THE COURT:  Are there any, Mr. Fathi, you wanted to

22   address in this area?

23             MR. FATHI:  Yes, Your Honor.  I would like to address

24   Performance Measure 94 at Phoenix, which begins at Page 202.

25             Apparently, the preliminary numbers for February show        11:21AM

1    100 percent, which we're happy to see, but this measure was

2    noncompliant in December and January.  And similar to the

3    measures Ms. Kendrick just addressed, because we didn't have a

4    status hearing last month there's some new information here

5    that this is our first chance to comment on.                    11:22AM

6              On Page 204, and this is the measure that requires

7    that all prisoners on a suicide watch, on mental health watch,

8    be seen daily by a licensed mental health clinician or on

9    weekends or holidays by a registered nurse, and it says on Page

10   204, quote, "There was a breakdown in seeing patients during    11:22AM

11   the Christmas holiday period.  Some staff did not understand

12   that this performance measure means calendar days regardless of

13   which days are counted as holidays.  Christmas, for example."

14             Your Honor, December of 2017 was the third Christmas

15   since the stipulation went into account -- went into effect,    11:23AM

16   and it is surprising and it is alarming that apparently staff

17   had still not been instructed that suicide watches need to

18   occur over Christmas as well, patients on suicide watch need to

19   be checked over Christmas as well.

20             We are happy to see 100 percent in February and we    11:23AM

21   hope that results -- we will not see the same problem at the

22   Christmas of 2018.

23             THE COURT:  All right.  Thank you.

24             Any other mental health performance measures?

25             MR. FATHI:  None, Your Honor.                         11:23AM

1          THE COURT:  All right.

2          Mr. Bojanowski, is this a good time, then, to turn to

3     telemedicine and the other measures with respect to the

4     specialty providers?

5          MR. BOJANOWSKI:  Certainly.  Let me readjust my stacks    11:23AM

6     of paper.

7          THE COURT:  Of course.

8          MR. BOJANOWSKI:  So as I mentioned earlier, the

9     patients that were with AON have been transferred to other

10    specialty providers.                                           11:24AM

11         THE COURT:  Did you ever follow up on to see whether

12    or not Corizon's representations that this provider was in the

13    previous one was entering bankruptcy?  Did we ever address

14    that?

15         MR. BOJANOWSKI:  I did not specifically.  I asked         11:24AM

16    Mr. Pratt about that, and it appears as though it may have been

17    just a rumor.  I don't know for sure but that's what was

18    reported to me and that's what was put into the document.

19         But based upon what the plaintiffs have provided, I

20    mean, I can certainly modify this documents, but it was -- I    11:25AM

21    tried not -- well, when I prepared the document initially I

22    said that I would not modify things that had happened in the

23    past so the Court would have a track record of what occurred.

24         THE COURT:  No, no.  I'm not saying you should have

25    done that.  I just wondered whether --                         11:25AM

1          MR. BOJANOWSKI:  It turns out that the plaintiffs are

2     correct on that.  I believe the affidavit, I don't have any

3     reason to dispute that, and I'm not going to do so.  So that is

4     an incorrect representation in this particular document.

5          THE COURT:  All right.                                    11:25AM

6          MR. BOJANOWSKI:  As the Court is aware, and we had --

7     we are continuing and Corizon is continuing efforts to retain

8     additional specialty consult entities.  In the OSC hearing I

9     think we put in a rather large spreadsheet detailing that out,

10    which plaintiffs have.  That is still occurring on a weekly     11:26AM

11    basis.

12          With regard to telemed, in early March a conference

13    call was conducted with Dr. John Po, P-O, who is the medical

14    director of the Arizona Telemed Program.  A representative from

15    Corizon by the name of Dr. Robert Patel attended that as well   11:26AM

16    as Mr. Curtis Schmid, who is Arizona Director of Operations-At

17    Large for Corizon Health.  The initial call was essentially to

18    do some introductions of Corizon and begin discussions on

19    opportunities for the Arizona Telemed Program to provide

20    additional telemed encounters.                                 11:27AM

21          The conference call ended with an agreement that there

22    be a meeting in person.  The face-to-face meeting with Dr. Po

23    and his team is set for later this month.  In the meantime,

24    Corizon is working internally with the UM team to identify

25    specialty clinics most commonly used so they can target as an  11:27AM

```
 1    initial matter which specialty services they would like to use

 2    with the Arizona Telemed Program.

 3              So that's the status of what's being done, what's

 4    happening with specialty --

 5              MR. STRUCK:  Before we move on to that, Your Honor --    11:27AM

 6    I'm sorry -- I just wanted to point out or state that we are

 7    going to follow up with Corizon and get more real-time

 8    information with respect to when this meeting is taking place,

 9    what specialty areas that they --

10              THE COURT:  That's of interest to me, too, what         11:28AM

11    specialty areas.

12              MR. STRUCK:  And so as soon as we find that out we'll

13    just report it to the Court and counsel rather than waiting

14    until next month since something is supposed to be happening

15    this month.                                                      11:28AM

16              THE COURT:  Thank you.

17              MR. BOJANOWSKI:  I can also report that current

18    telemed and telepsych encounters for February of 2018, total

19    telepsych encounters were 1,545, telemed encounters were 627,

20    and telepsychology encounters were 315.                         11:28AM

21              MR. FATHI:  I beg your pardon.  Could we have those

22    again?

23              MR. BOJANOWSKI:  The telepsych, which I believe is a

24    psychiatrist, Mr. Fathi, was 1,545, telemed encounters, 627,

25    and telepsychology encounters 315.                              11:29AM
```

1          THE COURT:  Is there some place in the record,

2     Mr. Bojanowski, that there are reports for earlier months

3     regarding these three categories so --

4          MR. BOJANOWSKI:  I don't believe so but --

5          THE COURT:  -- we can make a comparison?                    11:29AM

6          MR. BOJANOWSKI:  I don't believe so but I can report

7     to the Court what the totals are from September of 2017 forward

8     if the Court would like that information.

9          THE COURT:  Yes, please.

10         MR. BOJANOWSKI:  Do you want just the grand totals?         11:29AM

11         THE COURT:  No.  Give me the three categories for

12    September through --

13         MR. BOJANOWSKI:  I only have one category for

14    September, and the grand total was -- it's telemed -- 1,101.

15         THE COURT:  All right.                                      11:29AM

16         MR. BOJANOWSKI:  October, telepsychiatry was 1,887,

17    telemed was 1,272.  I don't have any information on

18    telepsychology at this point.

19         November of 2017 I have telepsychiatry totalling

20    1,173, telemed 1,223, and I do not have information for          11:30AM

21    telepsychology.

22         December 2017 telemed was 1,065, telepsychiatry was

23    1,708, telepsychology was 277.

24         January 2018, telepsychiatry was 1,564, telemed was

25    924, and telepsychology was 340.                                11:30AM

1          THE COURT:  And do you know anything about the

2  particulars of the telemed?  Were those in-house Corizon people

3  for the most part?

4          MR. BOJANOWSKI:  I don't have that information.  I

5  would assume they are employees of Corizon.                    11:30AM

6          THE COURT:  Who are at different locations.

7          MR. BOJANOWSKI:  Correct.  I don't know whether they

8  are here in state or out of state but they are all licensed to

9  practice in Arizona.

10          THE COURT:  So getting a rough sense, and it may be   11:31AM

11  too rough to be of any help, but I will say my rough sense is

12  those numbers from September through to now are roughly in the

13  same order of magnitude, which would suggest that there's been

14  sort of no change with respect to greater employment of

15  telemedicine generally over this time period.                 11:31AM

16          So the phone meeting with the University of Arizona

17  and the anticipated in-person meeting is, I gather, designed

18  primarily to focus on the telemed component for specialty

19  providers.

20          MR. BOJANOWSKI:  Right.  I think we're trying to      11:31AM

21  concentrate on the chronic care delivery.  Initially, that's my

22  understanding.

23          But you are correct, Your Honor.  It is to expand into

24  certain specialty areas, and as Mr. Struck indicated, once we

25  know what those are, when they narrow those down, then we can  11:32AM

1      report that to the Court.  I wanted to just give the Court some

2      data as far as usage.

3            THE COURT:  Did you want to say anything,

4      Ms. Kendrick?

5            MS. KENDRICK:  Just a couple things on the telemed          11:32AM

6      that's currently being done.

7            Our understanding is that this is primarily

8      chronic-care appointments, so this is stuff that would have

9      been in house anyway.  This isn't seeing the specialist.  So

10     the University of Arizona thing is a little bit separate from    11:32AM

11     what's been going on.  And I guess we're a little concerned

12     because I believe -- I can't remember -- I think it was

13     Dr. Robertson had testified that Dr. Patel has now left Corizon

14     and that there's a new regional medical director.  So I hope

15     that this individual will be going to the meeting.               11:33AM

16           The other thing that I didn't hear Mr. Bojanowski

17     saying is what, if anything, ADC or Mr. Pratt or Dr. Robertson

18     would be doing in terms of these meetings and these

19     conversations, but plaintiffs' position is that they -- we

20     strongly encourage them to participate, especially              11:33AM

21     Dr. Robertson given his knowledge of telemedicine, and this is

22     an obligation for Mr. Pratt.

23           And so this is something that's very important and we

24     wouldn't want them to just leave it to Corizon and encourage

25     them to participate as well in these meetings and identifying    11:33AM

1    the specialties that are needed.

2         THE COURT:  There is an element of curiosity that

3    wonders whether Dr. Robertson is involved in this.

4         MS. LOVE:  Your Honor, Mr. Pratt would like to address

5    the Court on this issue.                                    11:34AM

6         THE COURT:  Please.

7         MR. PRATT:  Your Honor, after Dr. Robertson's

8    testimony he and I had a discussion.  He will most definitely

9    be involved in further discussions on telemedicine.

10        THE COURT:  And you as well, I gather.                 11:34AM

11        MR. PRATT:  Yes.

12        THE COURT:  All right.  We'll wait to hear the further

13   report on this.  Thank you.

14        Perhaps we can turn to the privilege log issues,

15   Mr. Fathi.                                                  11:34AM

16        MR. FATHI:  I believe that's a Ms. Kendrick item.

17        THE COURT:  Please.

18        MS. KENDRICK:  Just to update the Court, last Friday

19   we did receive from Corizon a revised privilege log and

20   yesterday and Monday we received Corizon's additional documents   11:34AM

21   that they released.  So we're hopeful that once we have a

22   chance to review that and review the privilege log that the

23   issue would be put to bed.

24        We haven't received a revised privilege log yet from

25   ADC and I don't know if there are more documents that we're   11:35AM

```
 1    going to be receiving.

 2              So hopefully Ms. Love can update us.

 3              MS. LOVE:  Yes, I can give an update, Your Honor.

 4              So far, since Ms. Kendrick and I came to an agreement

 5    how to handle this issue, we have produced an additional 910    11:35AM

 6    documents and we have 553 remaining to review and then we will

 7    update our privilege log and we seek to put this to rest and

 8    complete this by next Friday.

 9              THE COURT:  Okay.  Good.  Thank you.  Thank you very

10    much.                                                          11:35AM

11              Is there anything that defendants are able to say with

12    respect to the contract negotiations and also to give an update

13    on the penalties and incentives?

14              MR. STRUCK:  There's no update that we can provide the

15    Court at this time with respect to the contract negotiations   11:36AM

16    but I believe we do have information with respect to the

17    penalties.

18              MR. BOJANOWSKI:  With regard to the agenda item called

19    incentive payments -- may I have a moment, Your Honor?  I need

20    to confer with Mr. Pratt, because I'm a little confused here.  11:36AM

21              THE COURT:  You may.

22              MR. BOJANOWSKI:  All right.

23              Your Honor, because it's -- because the performance

24    measure findings are not final, this is preliminary information

25    based on what we're reporting subject to the finalization, but  11:37AM
```

1   we've got Corizon coming into an additional 11 performance

2   measures that were brought into compliance, resulting in a

3   total incentive payment, if that becomes final, of $785,000.

4           The sanctions, again, preliminarily, based on the

5   current information, is $150,000.                              11:38AM

6           The staffing offset component is again not finalized

7   but it looks to be $129,553.61.

8           THE COURT:  Anything plaintiffs want to say in

9   response?

10          MS. KENDRICK:  Yes, Your Honor.                        11:39AM

11          We would ask with regard to the fact that defendants

12  state that they cannot provide an update right now on the

13  status of the RFP and the negotiations that the Court close the

14  courtroom -- it could do it this afternoon for some period of

15  time -- so that we can have that discussion confidentially     11:39AM

16  without the public -- closed to the public and strike that

17  portion of the transcript because we feel that this is

18  critically important.

19          As we requested that the Court -- yesterday we

20  requested that the Court actually review the pending RFP and   11:40AM

21  contract before it is signed precisely to see if the contract

22  is in the best interests of class members, and so we renew our

23  request that Mr. Fathi made last hearing that the court be

24  closed for some period of time so that Mr. Struck or Mr. Pratt

25  can provide that information to the Court and to plaintiffs'   11:40AM

1    counsel.

2         THE COURT:  Well, Ms. Kendrick, I must say I'm not

3    sure I am where you are with respect to what you think is the

4    appropriate action that the Court should take vis-à-vis the

5    State's decision whom to contract with.  Again, I'm not saying      11:40AM

6    I have decided one way or another with respect to your request

7    for relief yesterday, but I think I have intimated and maybe

8    stated rather directly in the past that I do think it is

9    appropriate for me to focus on the obligations of the obligor

10   in the stipulation.                                                 11:40AM

11        So I think it is appropriate for me to be primarily

12   focused on the State and not to reach down with respect to

13   their decision-making process on the contractor.  There are a

14   number of reasons for that.  Again, it may be that I

15   necessarily would have to go into that area but it is an area       11:41AM

16   in which the dangers that I have previously discussed about me

17   trying to manage the components of the prison system could be

18   dangerous because of the opportunity to make a mistake because

19   of inexperience or lack of understanding of the complexity of

20   it all.                                                             11:41AM

21        Again, I don't know for sure whether or not that

22   forecloses such an involvement but I do think it is safer for

23   me to deal in the other methods that I have employed to try to

24   accomplish the satisfaction of the obligations of the

25   stipulation.                                                        11:41AM

1          So I'm not inclined to think that it is appropriate to

2     interfere at this stage with the State's procurement mechanism,

3     one that involves some level, apparently, of secrecy because of

4     the nature of the enterprise and to make sure that it is not

5     one that becomes tainted in a way that would violate what is an          11:42AM

6     understanding of common appropriate practices with respect to

7     government procurement.

8          So for now I'm not going to go down that road as you

9     suggest for the reasons I have just presented.

10          So then the next issue we perhaps have time to take up          11:42AM

11     is the one that you have raised, Mr. Fathi, about the flu

12     shots.  In reading what you submitted, my first reaction was

13     whether or not you have heard from your clients whether this is

14     a problem.  Are people not getting the shot who think they

15     should be getting the vaccine?          11:43AM

16          MS. KENDRICK:  We don't know, Your Honor, and that's

17     why we were trying to find out from the defendants, because we

18     run into this problem with when we raise issues that we learn

19     of in the mail that it is dismissed as purely anecdotal or just

20     a handful of cases, and so we thought that the Court had raised          11:43AM

21     very valid points at the January hearing where you asked, "I

22     wonder what is happening with these people?"

23          So rather than try to do the piecemeal, you know, this

24     person wrote us and said he didn't get a flu shot, we did

25     attach an example of an advocacy letter we did for a person who          11:43AM

```
 1    was very ill.  We thought it would be more appropriate and more

 2    productive to just ask them, you know, give us the numbers.

 3    How many shots were given at each institution?  How many

 4    diagnoses treated?  How many cases did you have to treat?  How

 5    many people passed away?                                          11:44AM

 6            So that was kind of the impetus, frankly, was the

 7    Court's remarks, a few, you know, isolated things that had come

 8    in to us about immunizations, but we felt it would be a much

 9    more complete and accurate picture to get this sort of systemic

10    information institution by institution about how the Department  11:44AM

11    and Corizon responded to what was and in some parts of the

12    country still is a virulent flu season.

13            THE COURT:  When is your next prison visit?

14            MS. KENDRICK:  Tomorrow we're going to Winslow.

15            THE COURT:  What I will do is put off your discovery     11:44AM

16    request here until I hear back from plaintiffs that they have

17    some reason to think that there is an issue or problem here.

18            I raised it by way of an example of just seasonal

19    things that occur that impose obligations upon the defendants

20    and I just wanted to make sure that they were on top of it.  I   11:44AM

21    didn't have any reason to think that they weren't on top of it,

22    this particular issue, but it just was a seasonal thing, like

23    the changes of the seasons in Arizona when it becomes very hot,

24    that I just wanted to make sure they were on top of it.

25            If it turns out that it's not a big issue, that your     11:45AM
```

1    clients are not saying we feel like we don't know about this, I

2    mean, that would suggest that maybe the flyer mechanism needs

3    to be more robust.

4         But the danger of me wading into this without having

5    you first check with your clients is again I'm imposing work on          11:45AM

6    the defendants where I have got them doing a lot of work, and I

7    really don't want to do it unless I think there's a good reason

8    to do it and I just don't think there's a good reason right now

9    to do all of that that you suggest.

10        So we'll hold off until you can have a chance to talk          11:45AM

11   with your clients and see if you can represent to me whether

12   there's a problem or not.

13        MS. KENDRICK:  That's fine, sir, and we're going to

14   Yuma for a two days in a couple weeks, and Ms. Eidenbach also

15   some legal visits set up with class members and named          11:46AM

16   plaintiffs.

17        The broader concern is the response that we received

18   just a day or two ago that was filed yesterday as an attachment

19   to Mr. Fathi's declaration is the position that defendants are

20   taking is that they don't have to provide us this information          11:46AM

21   because it's not relevant to the stipulation, and it's a

22   paragraph in the stipulation.

23        And so that, for us, was also concerning, you know,

24   that we can't even make this sort of inquiry into this

25   information because they take the position that it's not          11:46AM

1      relevant to Performance Measures, but it's in the actual body

2      of the stipulation itself.

3              THE COURT:  I can satisfy your concern there.  If

4      there is a problem with respect to this promise in the

5      stipulation to make notice available to the class members about   11:46AM

6      the availability of the flu shot and I'm getting word from you

7      that there's a problem with respect to that commitment, then I

8      would be open to the idea of the discovery that you seek to see

9      whether or not there is any meat to that allegation.

10             One of the ways that you could find out about that are   11:47AM

11     the ways that you reasonably spelled out in your

12     interrogatories and requests for production.

13             And so I will go down that road if there's a necessity

14     to do so because I don't think it's foreclosed from me of a

15     fair enforcement of this particular performance measure, but I   11:47AM

16     don't want to go down that road unless I have to.

17             MS. KENDRICK:  Thank you.

18             THE COURT:  I'm looking at the list to see if there's

19     anything that probably can be addressed in 13 minutes.  Does

20     anybody have of a suggestion of something that could fit within   11:47AM

21     that time frame constraint?

22             MR. FATHI:  Your Honor, with respect to agenda Item

23     8A, defendants' failure to produce revised monitor guide, I'm

24     happy to report that late yesterday afternoon we did receive

25     from the defendants what they represent to be the current   11:47AM

1   version of the monitor guide.

2           Obviously, we have not yet had a chance to compare it

3   to the previous version.  We have not had a chance to compare

4   it to the Court's orders.  We will do so and notify the Court

5   if there are any issues.                                          11:48AM

6           But again, I'm happy to report that we have received

7   that, so Number 8A can be removed from the agenda.

8           THE COURT:  All right.  Any others you think we can

9   address now in 11 and half minutes?

10          MR. FATHI:  Well, Your Honor, with respect to just      11:48AM

11  monitoring methodology for Performance Measure 86, the Court

12  had suggested the parties discuss modifying the stipulation to

13  de-couple the source documents for Performance Measures 85 and

14  86.

15          THE COURT:  And you declined.                            11:48AM

16          MR. FATHI:  No, Your Honor.  We accepted.

17          THE COURT:  Oh.

18          MR. FATHI:  The defendants declined.

19          THE COURT:  Right.

20          MR. FATHI:  We regret that decision by the defendants.   11:48AM

21  We think that the Court's suggestion was a promising line

22  forward BUT in light of that suggestion we think that the Court

23  needs to conclude this protracted dispute with a ruling.

24          So we would ask that the Court do two things.  First,

25  order the defendants to immediately comply with the Court's      11:49AM

```
 1    existing order on Performance Measure 86, which can be found at

 2    Document 2160 at Page 4, and secondly, adopt the plaintiffs'

 3    proposed monitor guide language for Performance Measure 86,

 4    which is at Document 2368-1 at pages 35 and 36.

 5              THE COURT:  Defendants wish to be heard?              11:49AM

 6              MR. BOJANOWSKI:  Your Honor, this matter is fully

 7    briefed and is pending before the Court.  I think the briefs

 8    spell out exactly what the issue is.  I think the Court's very

 9    familiar with it.  I would note for the record that defendants

10    continue to comply with the Court's order with regard to        11:49AM

11    monitoring methodology.

12              THE COURT:  This is one of the areas where my missing

13    notes -- the dog didn't eat them.  I think I just -- as I now

14    reflect upon it, I think I must have left them on my desk at

15    home.  I think that's possibly where they are.              11:50AM

16              Was there anything I needed to raise additionally with

17    counsel regarding this?  I remember writing something down

18    about this.  I just don't remember what it was.

19              All right.  We'll get an order out.  Thank you.

20              Mr. Fathi, any -- we're now down to, it looks like, 10  11:50AM

21    minutes.

22              MR. FATHI:  The universe of possible items is

23    shrinking, Your Honor.

24              THE COURT:  All right.

25              MR. BOJANOWSKI:  8C is a -- it's the re-audited CGARs   11:50AM
```

| | |
|---|---|
| 1 | for August 2017.  Again, I -- those are in the process of being |
| 2 | prepared. |
| 3 | THE COURT:  So you're still working on that? |
| 4 | MR. BOJANOWSKI:  Yes. |
| 5 | THE COURT:  Okay. |
| 6 | MR. BOJANOWSKI:  Unfortunately, the Monitoring Bureau |
| 7 | has been pulled in many directions recently with regard to |
| 8 | verification of different things that have been raised, and so |
| 9 | this has, unfortunately, not been completed yet, but word is |
| 10 | that it should be completed soon. |
| 11 | 8D is -- |
| 12 | MR. FATHI:  Just before we move on, Your Honor, these |
| 13 | re-audited CGAR reports were first promised on December 13, so |
| 14 | we're happy to hear they are in process, but we would |
| 15 | appreciate if the Court would set at least a presumptive |
| 16 | deadline. |
| 17 | THE COURT:  Are you in a position to be able to commit |
| 18 | to a deadline? |
| 19 | MR. BOJANOWSKI:  May I have a moment? |
| 20 | THE COURT:  Sure. |
| 21 | MR. BOJANOWSKI:  Your Honor, how about 14 days? |
| 22 | THE COURT:  Very well.  So 14 days from today the 8C |
| 23 | issues will be produced. |
| 24 | MR. BOJANOWSKI:  8D is in our office and a written |
| 25 | response is being prepared to their correspondence. |

11:50AM

11:51AM

11:51AM

11:51AM

11:52AM

1          THE COURT:  And the deadline for that?  When do you

2     think --

3          MR. BOJANOWSKI:  I would say 14 days, Your Honor.

4          THE COURT:  All right.

5          MS. KENDRICK:  On that matter, sir, this was the issue       11:52AM

6     where we provided a letter and the initial response from

7     defendants was that we had to provide the responsive documents

8     from each class member's medical records because the position

9     that they took in a court hearing was that we didn't know where

10    we were looking and we were looking at the wrong spot.       11:52AM

11         And so we set the time for February 9 where we went to

12    the Monitoring Bureau, and you, unfortunately, were unable to

13    join us but your staff attorneys were, and at that meeting we

14    actually did provide physical copies of every single person's

15    medical record, the relevant charts that backed up what we       11:53AM

16    said.

17         And at that point the position that the defendants and

18    the monitors took was not so much disputing the veracity of

19    what we had alleged, because in many cases we said, you know,

20    you have got these things that are counted in the September       11:53AM

21    CGAR but it's something that happened in July, and at that

22    point they took the position that with regard to some of these

23    Performance Measures they didn't have to just look at the

24    applicable month, they could look at other months.

25         So that was an area where how we left it, quite       11:53AM

1    frankly, was that we were going to need to queue that up to you

2    at some point.

3           The other kind of broad issue that came out of it was

4    that, you know, some of the things we noted was, well, we

5    checked and there was no entry that said infirmary rounds, and          11:53AM

6    then it came out that there was absolutely no consistency on

7    how a nurse or provider could characterize or enter a specific

8    encounter.  So we were being told, oh, well, if you -- you

9    know, it actually happened, it just wasn't called something.

10          So that was something else that was problematic to           11:54AM

11   learn, was this lack of consistency in the documentation.

12          And so I -- perhaps we need to wait until we see the

13   written response, but I guess just as an initial point I would

14   point out that it wasn't that we were looking in the wrong

15   space, it was that a different interpretation was being used as      11:54AM

16   to the methodology.

17          So I guess more just to give you a preview that

18   depending upon what their written response to us states this

19   may be something we will have to bring before you to more

20   thoroughly review and resolve.                                       11:54AM

21          THE COURT:  Well, we have the opportunity to do that

22   in the continuation of the evidentiary hearing on the

23   monitoring issues because the person who was involved in the

24   statement about who decides which month gets included, won't

25   that person likely be a witness then?                                11:55AM

1          MS. KENDRICK:  I don't believe -- that's Erin Barlund

2     and I don't believe that defendants --

3          THE COURT:  Maybe not Barlund but the other one who

4     didn't say this but -- let me just say this:  I'm aware of that

5     issue and concerned about it and so that is part of the reason          11:55AM

6     that I'm continuing to run down this issue of the quality of

7     monitoring because I need to know whether there are people who

8     think they can decide that kind of thing.  So if that's a

9     reality, that's a big concern.

10          The other aspect of it is the reality now also that          11:55AM

11     although there were some missteps with respect some arrows that

12     the plaintiffs had fired with respect to attacking the

13     reporting, your most recent marksmanship has been much better,

14     And so consequently, I do think that this is something that is

15     appropriate for the Court to be engaged in.          11:56AM

16          So I don't really need a preview that you talk about.

17     I will be anxious to see what the defendants' response is and

18     then fully expect I will necessarily need to engage to a

19     specific degree on this issue.

20          MS. KENDRICK:  And I don't know if this happened but          11:56AM

21     there was a court reporter present there who created the

22     transcript.  I don't know if your staff attorneys were provided

23     a copy of it for the Court's review.

24          THE COURT:  I don't think so.  No.  I think defendants

25     brought their own court reporter.          11:56AM

```
 1          MS. KENDRICK:  Correct, they did, and they provided us
 2   a copy of the transcript.
 3          THE COURT:  You have a copy of it.  So feel free to
 4   send us a copy, unless that's violating some rule or something.
 5          MS. KENDRICK:  Not that I'm aware of.                    11:56AM
 6          THE COURT:  Okay.  So I believe we've gone through our
 7   time.  We'll come back at 1:30.  The first thing we'll take up
 8   is Mr. Millar and his presentation.
 9          Thank you all.
10          (Recess from 11:57 a.m. until 1:34 p.m.)              11:57AM
11          THE COURT:  Thank you very much.  Please be seated.
12          And welcome back.
13          MR. MILLAR:  Thank you very much.
14          THE COURT:  It's nice to have you here, Mr. Millar and
15   Ms. Sobolewski.  Did I get it closer that time?               01:34PM
16          And remind me, sir.
17          MR. LONG:  Mr. Long.
18          THE COURT:  Thank you very much.  I'm sorry for that.
19          You may proceed, Mr. Millar.
20          MR. MILLAR:  We are glad to be back.  We are not back   01:34PM
21   with the analysis today that we had anticipated, and I think as
22   we get into that we'll describe that.
23          The slide deck that we sent out yesterday represents
24   about 85 percent of what we have and showing here today.  We
25   have been working on the new data as we received it and so we   01:34PM
```

1    will supply this to the Court right after this presentation.

2           What we suggest our objectives for today are is to go

3    through a project status and an updates discussion, changes due

4    to some issues that came about regarding the data that our

5    analysis was based on, and then we have an updated Perryville        01:34PM

6    facility profile.

7           So because there was an alteration in the base data

8    set that we needed to use, we have redone what we presented

9    last month.  We will take a look at the impact that the new

10   data have on it and essentially reset, then, with the next         01:35PM

11   steps going forward.

12          THE COURT:  Okay.

13          MR. MILLAR:  So the driver diagram is that one-page

14   element that we use to track the status.  The top half we all

15   have completed in black.  We did have the ADC Corizon data         01:35PM

16   request in black as well.  With what has transpired with what

17   we found out in the last week, we've shifted that from black

18   back to red.

19          We do believe that in the last 48 hours we now have

20   received the correct set of data.  We will talk through that       01:35PM

21   today and look for some consensus again from the parties here

22   in the Court of moving forward.  That element in and of itself

23   is impacting other pieces of this work plan downstream that put

24   them in yellow and red status as well.

25          If we look at our timeline essentially what has             01:36PM

1    occurred is we are cycled back at least a full month in our

2    timeline.  So what we've presented in March we're now

3    representing in April.

4            As we look to move that forward we do not know yet if

5    we will be able to accelerate the rework enough to get back on          01:36PM

6    track to finish in the June time frame.  We believe that we'll

7    know that within the next three weeks, so prior to our next

8    time coming to court, and we would be able to give you, sir, an

9    estimation if we think we can complete under the current scope

10   or if we would require an extension to make up the time for the         01:36PM

11   rework for this month.

12           That being said, what I'd like to talk through is the

13   changes.  When we look at our data sources for corrections and

14   updates, we have now been in contact with an additional person

15   at Corizon to help us identify and work through the data.  We           01:37PM

16   had been working with Ms. Jennifer Finger and now Stephanie

17   Morris, who is the senior director of Strategic Labor

18   Management.

19           So they were the ones that asked for a call with us

20   last week to express some concerns around the Perryville                01:37PM

21   information that we presented last month, and as they brought

22   to our attention what was going on we realized that the payroll

23   data that we had requested for did not represent in the exact

24   same manner what their Kronos data represents.

25           So payroll comes from how the employees are paid.  The          01:37PM

1    Kronos is a swipe or a time entry timecard data that's on site

2    at the different locations that as the employees come on and

3    off.

4         And what we realized is that there was a working title

5    that identified whether a physician was working as a staff              01:38PM

6    physician or a medical director, and there may have been other

7    anomalies as well, and so we, as we dug into that, came to

8    realize that the data behind the monthly staffing reports that

9    the Court is receiving now is generated from the Kronos data.

10        And so not knowing that those two data sets existed or            01:38PM

11   that there was a disparity between them, we had asked for the

12   payroll, and it gave a job title which did not always reflect

13   exactly how that individual was working at the time of their

14   shift.

15        And so we have now substituted this Kronos swipe data,            01:38PM

16   as they are calling it, as our base data set, which is the same

17   set that the monthly reports are built upon.

18        THE COURT:  Because the providers fit into broader

19   categories than the narrower category that you just mentioned,

20   someone who is also a medical director, and that would be              01:39PM

21   identified as a missing spot for that, I understand that that's

22   relevant to what you are doing, but it's also because of the

23   broader classification not so portending of a pernicious,

24   misleading informational source.

25        Because we know that if these are providers who are              01:39PM

| | |
|---|---|
| 1 | either there or not there in the general sense, we can evaluate |
| 2 | what is, I think, the most significant part of what you are |
| 3 | doing, and that is the reasons for somebody in the provider |
| 4 | capacity not to be there, and I wonder if it means that when |
| 5 | you come to sort of push come to shove how comfortable are we |
| 6 | of going forward with data that may be a little bit errant with |
| 7 | respect to the subclassifications, that it may not be so |
| 8 | worrisome to go forward because we can focus on what is the |
| 9 | more significant issue, and that is, why is it that people are |
| 10 | turning over or not coming up to want to do the job. |
| 11 | MR. MILLAR:  I think I would agree, and I think |
| 12 | another way of, I think, describing what you said is if we can |
| 13 | look at the data that we presented off payroll last month and |
| 14 | this that we're doing off Kronos this month and what you are |
| 15 | seeing is an offset. |
| 16 | At Perryville, there were X number of physician |
| 17 | providers there.  Whether they were classified as working as a |
| 18 | physician or a medical director, together they were doing the |
| 19 | same function, and so we would see that as coverage and as we |
| 20 | move forward will acknowledge that. |
| 21 | We see also in some of the early data that we need to |
| 22 | revalidate with the new Kronos is that in places where there |
| 23 | might be a shortfall from physician positions they have been |
| 24 | able to overstaff in the midlevel or non-physician providers, |
| 25 | and I believe is at least a viable alternative to try to meet |

01:40PM

01:40PM

01:40PM

01:40PM

01:41PM

01:41PM

1    that need.

2            And so I think we'll look at the sites in total and in

3    their constituent parts and take that under advisement.

4            THE COURT:  Okay.

5            MR. MILLAR:  Not looking to dissect it to be          01:41PM

6    meaningless but looking for patterns.

7            THE COURT:  Okay.

8            MR. MILLAR:  We also then did receive in

9    electronically-readable format, Excel formats, the monthly

10   budgeted hours reports for the entire calendar year, which give  01:41PM

11   us a secondary source to validate against.

12           So from that perspective that was the change in data

13   elements.

14           Probably more substantial than just the change in the

15   base data that we're running from was an assumption that we put  01:42PM

16   forth -- we had put forth this question in e-mail format for an

17   answer, and this was with regard to the pay codes.  There's six

18   levels of pay codes of the different types.  Our original

19   assumption based on responses to our first request is that the

20   level 1 pay codes represented actual hours worked and that the  01:42PM

21   level 2 and above pay codes represented a pay differential but

22   not a worked-hour component.

23           In review of the data, we got more clarification from

24   the Corizon representatives that that was not true, and so the

25   updated assumption is that level 1 through 6 pay codes all      01:42PM

1    represent actual hours worked.

2         What they are is it's within this Kronos swipe or

3    time-keeping system that each day is broken into three

4    eight-hour blocks.  Monday through Friday the eight-hour blocks

5    are shift 1, 2, and 3, and then on the weekends the eight-hour          01:43PM

6    blocks are shifts 4, 5, and 6.

7         So as we went back to see what the material difference

8    was of that corrected assumption, there was a 27 percent

9    increase in the amount of worked hours.  26 of that 27 percent

10   comes in shift 2, which is the afternoon shift, which is what          01:43PM

11   we would anticipate.  If these providers there working 10 or

12   12-hour shifts, they work the bulk of it in shift 1, some of it

13   in shift 2, with very little night or weekend coverage.

14        That in and of itself is probably the most substantial

15   correction over the assumptions that were brought forward last         01:43PM

16   month because that represents almost a third of what the

17   staffing would be.  And so where we might have been showing

18   substantial understaffing to budget, this will represent it

19   much more accurately for the work that's being done.

20        The second assumption that we put forward last month             01:44PM

21   also is that we were going to use FTE calculations for

22   productive working time only.  As we move forward we are still

23   proposing to do that.

24        And so a worked FTE, which is for actual time worked,

25   would include everything that's on a pay code for shifts 1             01:44PM

1     through 6 but would exclude paid time off, paid sick time,

2     training, or off-site administrative time.  As we looked at

3     that we wanted to see what the magnitude of it was, and for

4     both the medical provider group and the behavior health

5     provider group that non-productive paid time is a little less        01:44PM

6     than 9 percent.

7          And so our proposal going forward would still be the

8     same, is that our updated assumption would be for worked FTEs

9     but with the understanding that hitting a 91 percent compliance

10    to the budgeted number would be within the range of budgetary        01:45PM

11    compliance.  I think that will allow us then to see as we map

12    out all 10 facilities if there was an extended leave of absence

13    or something else that would manifest itself in the work time

14    that might not manifest itself if we were looking at full paid

15    time.                                                                01:45PM

16         THE COURT:  Is it worth thinking about whether or not

17    our respect or consideration of these absences such as

18    significant leave time are appropriate to consider in a context

19    where you would have a very lean staffing situation as opposed

20    to a more fulsome one where in the fulsome one there would be a      01:46PM

21    greater capacity of the remaining providers to be able to fill

22    in, whereas if you were in a situation where you had just one

23    position and that person was gone the impact is much more

24    dramatic than -- or if you had just a few positions and one of

25    them was gone it would still be more dramatic?  Is that a right      01:46PM

1      thing to be thinking of here or just immaterial?

2              MR. MILLAR:  No, I don't think it is.  It's a

3      reasonable train of thought to follow.  I think when we get

4      down into the behavioral health section of this Perryville

5      profile we'll see one case where you have seen a very                01:46PM

6      consistent level of staffing for one of the positions and then

7      you can see one week where that drops and then it's back up,

8      and I think it represents exactly what you are talking about

9      where you have lean staffing of like one person.  It may not

10     always be reasonable to think that you would back-fill them for    01:47PM

11     one or two days off.

12             Where we would start to call into consideration or

13     further investigation is if you saw multiple weeks where that

14     drops down, because you do need to have some form of back-fill,

15     and then we would look to see was that back-filled with another   01:47PM

16     level of provider with a medical director and what are the

17     strategies for doing that.

18             I think that's one of the elements, too, that may

19     manifest itself in some of the face-to-face employee

20     interviews.                                                         01:47PM

21             When you run on a very lean staff it can be a real

22     dissatisfer or a challenge if to take time off means when you

23     come back you have everything left on your plate that wasn't

24     done in your absence.

25             And so that may play into some of the narrative and        01:47PM

1        the explanation for challenges that we'll see.

2                THE COURT:  And it's the narrative that has obviously

3        been mostly what I have been familiar with, because I haven't

4        known how to read the numbers, the staffing numbers, with

5        respect to what they may really mean because I just don't have

6        the sophistication about that that you have, and that's one of

7        the things that you bring to the table.

8                But what I have had as my narrative has been in the

9        context of the weekly status and -- monthly rather, status,

10       sessions where I address with defendants those areas where the

11       performance measures are below the benchmark and I hear two

12       things.

13               I hear from -- pursuant to our practice, I hear from

14       the defendants their explanation as to why they believe it has

15       happened, where we have missed the mark, and two, their

16       proposed remediation for it.

17               So from month to month we go to hear that, and I have

18       heard just many, many, many times where there is a problem

19       because there is just no backup, somebody is gone, and that

20       person is gone.  I have also heard, and it's probably no

21       surprise to you, that because of the turnover situation -- I

22       just heard one today at our status -- monthly status hearing

23       where there was a turnover issue, a new person that's in place,

24       the person is not trained on how to do it, and so that person

25       misses out on knowing how to accomplish the performance

01:48PM

01:48PM

01:48PM

01:48PM

01:49PM

1    measure.

2          I think that that kind of thing may not happen as

3    often if you are not running such a lean operation because it

4    is more likely there will be somebody who is standing shoulder

5    to shoulder has done it before, has the capacity to say this is          01:49PM

6    how you do it, but if everybody is dealing with their own fire

7    they don't have a chance to even look at somebody else's fire,

8    and that sort of focused on your own fire, just again from the

9    narratives I hear, may seem more likely to occur where you just

10   are too thin staff wise where there's no backup.                          01:49PM

11         MR. MILLAR:  And I think forward to where the

12   recommendations continue to fall places where we have seen

13   other strategies employed.  When you are running on very lean

14   staffing there's a need to anticipate the turnover, and so

15   tracking that turnover and doing proactive recruiting.                    01:50PM

16         And what you do is you can recruit into a temporary or

17   a flow pool for certain positions or certain areas, but it's

18   understanding that that is part of the dynamic of running a

19   very lean staffing system, is you have to have a backup plan or

20   proposal to deal with those.  And it can't be just when this             01:50PM

21   happens then we'll figure it out, it's anticipatory, and that

22   may be something we would bring to the table in recommendations

23   as well.

24         THE COURT:  Okay.

25         MR. MILLAR:  What you see here are just some screen               01:50PM

1    shots or detailed views of the different data sets.  You can

2    see this is the point right here where we actually have the

3    same exact provider the exact same week for the same 44 hours

4    that they were working, that in payroll data their job title

5    put them under physician staff, in the Kronos data it puts them    01:51PM

6    under medical director.

7            So that's just highlighting where the correction, the

8    data is going to fall.

9            The other thing that I'm trying to call attention to

10   here on the bottom is because this Kronos is considered time    01:51PM

11   tracking or swipe data we are able to see in some of the views

12   of the data the check in and check out times to validate where

13   there is or isn't overlap.

14           So the data will give us the ability to drill down if

15   there are questions or anomalies to try to ascertain more cause    01:51PM

16   and effect.  I think all in all being on the same data set that

17   your monthly performance reports are being based on is a

18   positive.

19           We have had the opportunity, we spoke with Stephanie

20   and Jennifer at Corizon last week.  We also then reviewed our    01:52PM

21   loading of the data with them prior to coming into court today

22   to see if we were interpreting the field names and other things

23   correctly, and we believe now that we have at least their

24   acknowledgment or vetting that we are using the data correctly

25   and that it addressed their concerns with what they had seen in    01:52PM

1    the original profile.

2         The next four slides will show us the impact between

3    the changes in the data.  Overall staffing for medical staffing

4    at Perryville went from -- in the payroll data only four of 53

5    weeks met or exceeded the 91 percent range of the budgeted          01:53PM

6    staffing.  When we pulled the Kronos data and made the

7    adjustment for including all shifts, that rose to 33 out of 53

8    weeks, so a fairly significant impact, and I think one that

9    having not made this correction would have led us towards

10   recommendations and assumptions for the problems that just were    01:53PM

11   not true.  So I think we will have a much better picture.

12        We were beginning to derive some system-wide

13   assumptions and theories of the case based on the payroll data.

14   We will have to reset on that now because at this point I don't

15   trust the points we were going down, but as we re-create that I     01:53PM

16   think we will be able to see a true representation of the

17   staffing.

18        And I think to your earlier point, Judge, what that

19   does say is if this problem is not as much the ability to fill

20   the staffing but it is to keep the staffing or what the work        01:54PM

21   environment or job requirement is, hopefully it will, you know,

22   unveil or make visible to the Court other potential avenues for

23   correction or resolution that are beyond just, you know, we

24   need to pay more to hire more, so beyond just an anecdotal

25   response that give you some more strategic or tactical ways to      01:54PM

1    look at this.

2          You can see here these two graphs are the

3    representation of the medical director, and it's very clear

4    that this Director Number 9 on the blinded label was the one

5    that in the prior payroll data showed up under the staff          01:54PM

6    physicians and this one shows up here.

7          So the staffing really didn't change other than just

8    the categorization of where the doctor lies or was applied.

9    Our understanding is that both the site medical directors and

10   the staff physicians all have face-to-face clinical time with    01:55PM

11   the patients and so they really are seeing -- should be seen as

12   a combined clinical resource.

13         So that being the case, where it looked like they were

14   close to fully staffed with physicians, under staffed in

15   medical directors, now at this point you are seeing what we       01:55PM

16   would say is under staffing on the physician side because that

17   doctor is being counted there.  It still leaves them

18   essentially 27 or 30 percent shy of the budgeted staffing but I

19   think it gives a better picture of where the situation is and

20   will help lead us towards better questions and solutions.         01:55PM

21         The bigger impact is when you look at the

22   non-physician providers in the initial run of the payroll data,

23   they exceeded the budget several times, but when we add in the

24   different shift numbers and add back in that 27 percent of

25   additional hours you will see that they are running what I        01:56PM

```
 1    would call at full budgeted numbers for this non-physician

 2    staffing, and I think again, having that understanding will

 3    give us an appropriate view of what we're looking at.

 4            If I can, I will pause there before I jump into the

 5    updated profile and just see if there are any questions from    01:56PM

 6    you, sir, or others.

 7            THE COURT:  I have been asking my questions.  How

 8    about counsel?

 9            MS. KENDRICK:  If you could, go back a few slides to

10    where it shows the swipe data.                                  01:56PM

11            That one.

12            I noticed that the time in and time out is all on the

13    quarter hour.  So is this kept manually and then entered in or

14    do you know?

15            MR. MILLAR:  I do not know that.  My assumption -- I    01:57PM

16    will ask my colleague David.  Have you worked physically with

17    the Kronos system?  I believe it's a card swipe system so I do

18    not believe it's manual.  I believe it's a swiped magnetic card

19    but then the system registers it, and I believe it may default

20    to register on a quarter hour.                                  01:57PM

21            MS. KENDRICK:  Okay.  Thank you.

22            THE COURT:  Any questions from defendant?

23            MR. BOJANOWSKI:  No questions, Your Honor.

24            THE COURT:  Thank you.

25            MR. MILLAR:  So the Perryville profile will be fairly   01:57PM
```

1    similar to what we saw last month, except at this point now you

2    will see that they did reach budgeted staffing levels about a

3    third or fourth of the time, recognizing as well that we are

4    looking at the 91 percent level as within budget, within

5    compliance of budgeted staffing.                                    01:58PM

6           And you can see that a lot of that is being carried by

7    the non-physician providers, which is exactly what we would

8    anticipate within this setting, but it helps set, I think, a

9    clear picture, especially as we start to group these with the

10   other nine facilities and group them in different -- by          01:58PM

11   different characteristics by either region or by level of

12   supply within their market.  I think that it will start to show

13   us some similarities or some potential problems or best

14   practices.

15          The medical director budgeted profile here is the         01:58PM

16   budget was for one.  What we have is two of the providers that

17   are clocking in as the medical director.

18          Our understanding in asking some follow-up questions

19   with this data with the Corizon representatives is that the

20   individual Director Number 9 was a former medical director for  01:59PM

21   this site and then during that 15-week period where there was

22   not Director 5 that person filled in as the director again, and

23   they believe that this may just be a characteristic of the card

24   reader system.  They might have to manually change whether

25   they're the director or a physician, they are just clocking in  01:59PM

1    at the same time.

2           So again, as we look at these going forward we will

3    likely look at the combined view of physicians and medical

4    directors to understand the appropriate staffing levels.

5           This would be on the physician side of the coin where          01:59PM

6    we have seen before where they were consistent.  We see here

7    Perryville you had the same physician working pretty much one

8    full FTE, so you do have some consistency here.

9           This would be one of the areas were highlighted where

10   we're looking to do some on-site interviews that likely this          02:00PM

11   would be a provider we would want to talk with, somebody who

12   has been here consistently that works in a full-time basis and

13   really understand what is working well and what is not, why are

14   they there and the challenges or opportunities that they see.

15          And so as we complete these same level of profiles for          02:00PM

16   all of the other nine facilities it will be these types of

17   things that will help guide our request for the round of

18   interviews that we look to pursue.

19          And again a closer look here at the use of the

20   non-physician providers, and again, very consistent.  Fairly          02:00PM

21   full staffing.  We don't know how representative this will be

22   of the other nine facilities but in Perryville it is what it

23   is.

24          The one piece that we have to add, though, in

25   addition, is we just showed the medical staffing for Perryville        02:00PM

1    last month.  We do now have the behavioral health staffing to

2    add to that as well.  Even with the addition of the shifts 2

3    through 6, there is still a very substantial shortfall in

4    overall staffing for behavioral health services at Perryville.

5    They average just around 58 percent of the targeted budgeted          02:01PM

6    staffing.

7            And so as we look at that, actually here there are no

8    medical directors in the budget but one of the persons working

9    as they clocked in and out clocked in as a behavioral health

10   director, and we think that is likely a characteristic of the        02:01PM

11   system internally.  We would look to combine them with the next

12   level of providers, which as I flip back and forth you can see

13   where this person slots in there was a lack of psychiatric

14   coverage at that point as well.

15           And so my belief is if we dug into the details behind        02:02PM

16   that, this may have been one of the behavioral health directors

17   either from a regional level or someplace else that was

18   back-filling an absence at this point.

19           So that would be something that we would investigate

20   to see if that's being done consistently or effectively and          02:02PM

21   would be a strategy to be employed.

22           I mean, as you talked about earlier, running on a very

23   lean staffing model, another potential solution might be having

24   regional staff that are there to actually fill in in cases such

25   as these.  I think as we look over the whole year we will be         02:02PM

1    able to see if that is something that would be a viable

2    alternative.

3         With the psychologist staffing, fairly consistent

4    staffing here but still reaching just below the 60 percent

5    level of the budgeted staffing.                                  02:03PM

6         I'll pause there and ask if there's any questions on

7    the medical or behavioral health profiling for Perryville.

8         THE COURT:  Not from me.

9         Plaintiffs?

10        MS. KENDRICK:  Just to clarify, on the one with the      02:03PM

11   medical director there was multiple weeks where it was like at

12   1.5 FTE.

13        MR. MILLAR:  On the medical side here?

14        MS. KENDRICK:  Yeah.  But that's just that one person

15   like from weeks 12 to 36, that person is just -- it's one      02:03PM

16   person working the equivalent of 1.5?  I want to make sure I'm

17   reading the chart right.

18        MR. MILLAR:  Correct.

19        So as you look at that, you can see the darker bar is

20   all Director Number 9.  So that is one person.  That's that    02:03PM

21   person likely working overtime to cover duties.  And if they

22   are fulfilling the duties of both the medical director and

23   staff physician, that would be a reasonable assumption and an

24   appropriate strategy for covering those shortfalls.

25        If we look at like weeks 21 and 23, 21 and 23 you         02:04PM

1    actually have the staff physician there working at least one

2    FTE or more than one FTE as well.

3            So another way of looking at that is you really had

4    two people there trying to cover the work for three and a half

5    budgeted positions, and you would anticipate them working some     02:04PM

6    overtime to attempt to compensate for that.

7            MS. KENDRICK:  So I guess, kind of going back to the

8    slide, even though it's above the red dotted line of what's

9    budgeted that may not necessarily be a positive, sustainable

10   thing because that just means that Director 9 was working 1.5     02:04PM

11   times what he or she should have been?

12           MR. MILLAR:  Correct.  And I think as we look at

13   interviews and other things that would be something that we

14   would investigate.

15           There are situations, though, within the health care     02:05PM

16   field and others where providers do regularly work more than a

17   40-hour week and it's not considered excessive.

18           So I don't know that I would go at this time to the

19   point of saying it's not sustainable.  It is something that is

20   worthy of investigating to see.                                   02:05PM

21           But in the cases where you do have difficulties in

22   maintaining staff, an overtime strategy with a methodology for

23   rewarding or compensating that is oftentimes a viable solution,

24   because oftentimes it's easier to pay the person you have a

25   little bit more, to work a little bit longer than to find that    02:05PM

1    additional body.

2            So those are the elements we look into to see if this

3    is manifest in other areas, other locations and other staffing

4    levels.

5            THE COURT:  We had a recent reveal in court in which          02:05PM

6    we learned that as part of its operation backlog that Corizon

7    was seeking providers to work overtime.  So that was something

8    that they were doing.

9            But I also know from the previous summer from last

10   summer when I visited one of the complexes and asked about the        02:06PM

11   ability to get through the work, one of the Corizon providers

12   told me that they were not authorizing overtime, that the

13   employees, some number of them, were willing to work overtime

14   but there was a strict prohibition on it.

15           So I think that it is possible that you can use               02:06PM

16   overtime as a way to address a staffing issue in a way that's

17   commensurate with employees doing something that they think is

18   a positive as opposed to a negative.

19           MR. MILLAR:  Uh-huh.  Yeah.  And the one thing that I

20   will acknowledge because in any health care setting an overtime      02:06PM

21   strategy for coverage is always going to be more expensive than

22   straight staffing.

23           THE COURT:  Ah.

24           MR. MILLAR:  Because if you think about it, if you

25   have to cover one FTE of overtime you are usually paying time        02:07PM

```
 1    and half, and that starts to put some financial constraints on

 2    the characteristics.

 3         So having that as a short-term strategy is one way of

 4    covering that.  If it's a long-term strategy, there needs to be

 5    a matching fiscal adjustment to make that sustainable.          02:07PM

 6         THE COURT:  Understood.

 7         Anything from defendants at this point?

 8         MR. BOJANOWSKI:  I did not see psych associates as a

 9    category of employees in the behavioral health slides.  Was

10    that in there?                                                  02:07PM

11         MR. MILLAR:  Can you speak to that for me?  I mean,

12    the psych associates came up but I think it did not show up in

13    the data.

14         MS. SOBOLEWSKI:  Right.  There are licensed social

15    workers and a couple of other classifications that don't fall  02:07PM

16    into the scope of our analysis.  It wasn't just psychologists

17    or psychiatrists.

18         MR. MILLAR:  So we are -- what we're tracking to is

19    the behavioral nurse practitioners but we have not included

20    either the budget or the staffing for the psych associates at  02:08PM

21    this point in time.

22         THE COURT:  Mr. Fathi, did you want to say something

23    to that?

24         MR. FATHI:  Yes, Your Honor.

25         I believe that we had discussed this and it was agreed    02:08PM
```

1    that the psych associates would be included for, among other

2    reasons, the fact that the Department relies very heavily on

3    psych associates for the provision of mental health services.

4           Ms. Kendrick is getting the numbers, but looking at

5    the latest February 2018 staffing reports the Department is                   02:08PM

6    budgeted for system-wide 19 FTE psychologists, 52.40 psych

7    associates, so they are a very important part of the mental

8    health delivery system and we would ask that they be included,

9    as I believe had previously been agreed.

10          THE COURT:  And there's been some discussion about the          02:09PM

11   particular title associated in this area and maybe there was

12   some miscommunication based upon that but it sounds like we do

13   need to focus on these people as well.

14          MR. MILLAR:  Okay.  That's the exact input we need to

15   make sure that what we're doing is relevant to the needs of the          02:09PM

16   Court.  So we will augment the behavioral health to add that as

17   a category and we will move forward.

18          MS. LOVE:  Your Honor, defendants agree.

19          THE COURT:  Thank you.

20          MR. BOJANOWSKI:  We also, in our -- in the provision          02:09PM

21   of documentation we did not receive the behavioral health

22   component of the slides, so if those could be e-mailed to us

23   again we would like to have that portion of the presentation.

24          MR. MILLAR:  They will be.  As I indicated in the

25   beginning of our conversation here, we had only been able to          02:10PM

1    e-mail you about 85 percent of what we had.  We received the

2    updated data at about 4 p.m. on Monday, and so in order to meet

3    the minimal needs of the courts we've given you as much as we

4    have.  We sent that out yesterday afternoon.  The behavioral

5    health pieces were completed this morning.  So we will provide    02:10PM

6    the full set of these slides to you shortly hereafter.

7             MR. BOJANOWSKI:  Thank you.

8             MR. MILLAR:  Okay.  So as we look now at our next

9    steps, we are still focused to complete the work stream number

10   2, which are these facility profiles and baselines now for the    02:10PM

11   entirety of the 10 facilities.  We will make the adjustments

12   that we have acknowledged today on the data.  We will add the

13   psych associates piece to fill out the behavioral health

14   component.

15           The only other thing we would ask is as the parties      02:11PM

16   continue to review what we have sent you if there are

17   additional concerns, through whatever means are appropriate,

18   Judge, within the court, to make us aware sooner rather than

19   later because this is a substantial amount of work to replicate

20   this for the 10 facilities and we would hope to not redo it       02:11PM

21   multiple times.

22           THE COURT:  I gather you would be amenable to either

23   side communicating with you in e-mail about any issues they

24   would have.  They can copy those to the other side and copy it

25   also to the Court staff, not an official filing but in the        02:11PM

1   e-mail, so that we would be aware of what issues that perhaps

2   need to be addressed.  But I gather you don't have any issue if

3   that's how they communicate with you in regard to what you are

4   just asking now for.

5           MR. MILLAR:  We don't.  I think given what we found in   02:11PM

6   the last two weeks if something comes forward that we think

7   merits more than just an e-mail exchange, I think it would be

8   important to be able to set up a phone call with folks to do

9   that just for clarity of what we're asking.

10          THE COURT:  I don't mean to cut that off as an   02:12PM

11   alternative as well.

12          MR. MILLAR:  What I would like is because I want to

13   make sure we have the correct direction from the Court.  We

14   have been working over the last week with the two

15   representatives from Corizon, and I am not an attorney so I   02:12PM

16   apologize, but I understand they are not party to this

17   settlement and so they don't have a voice here in the court.

18          We need to understand, because they are the operators

19   of the data and have much of the explanation of some of the

20   things that we're looking for, what is the latitude we have as   02:12PM

21   the expert of the Court to interface with them?  And do we need

22   to set up phone calls that have counsels represented on them as

23   well.

24          So I just need to know what latitude we have to not

25   put --   02:13PM

1          THE COURT:  Well, I have addressed this before so that

2     counsel are, I think, familiar with it, but I have been

3     encouraging of the idea that you would have access to people

4     free of what is sometimes the cumbersome accoutrement of having

5     lawyers all around in the room.  So I think the fact-finding          02:13PM

6     mission that you have as the Court's expert would be

7     facilitated by that.

8          That said, I have limited ability to force that to

9     happen, so I have invited counsel to allow it to happen, and I

10    think to good measure it has happened.  I think it's been free       02:13PM

11    of that cumbersome element of it and so I have been pleased by

12    it.

13         That said, it's not unusual for an expert to have to

14    talk to people who are not parties but have relevant

15    information, so your process will also involve talking to            02:13PM

16    people who have no connection to the Department of Corrections

17    presently, not providers who are working there and no

18    connection to Corizon but maybe people who are in the

19    employment pool and you would maybe want to talk to them and

20    say, well, what would it take for you to want to go to               02:14PM

21    Florence?  I'm just guessing.

22         So that is, of course, perfectly okay for you to have

23    it but if at some point some lawyer for somebody, whether it

24    was that person in the community, wanted to pop up and say, you

25    know, my person here doesn't want to talk to you unless I'm          02:14PM

1    present, then we'll have to have that conversation with that

2    lawyer present, or some other person.

3         But my hope is that people would understand that your

4    process is one that probably would be assisted by being able to

5    ask the questions and get the answers.                    02:14PM

6         Because the truth of it is, if you want the question

7    answered, unless it involved some kind of attorney/client

8    privilege, if I'm brought into the picture I will say answer

9    the question.

10        Does that help at all?                              02:15PM

11        MR. MILLAR:  It does.

12        And I think -- if I can restate what I have heard and

13   how I would purport to go forward, just to make sure it meets

14   was the needs of the Court, the two folks at Corizon have been

15   willing to meet with us and been open.  What I will seek to do   02:15PM

16   is to be very transparent when we're in the court of any

17   information we're presenting where it's coming from and what

18   interactions we have had with them just to make sure all

19   parties are aware of what interactions are occurring.

20        THE COURT:  That's a good point, too.              02:15PM

21        Anybody want to be heard on this point?

22        MS. KENDRICK:  We would just note that we really hope

23   that Mr. Millar and his team are able to have very thoughtful

24   and, you know, confidential potentially conversations when you

25   move into the stage of speaking to staff.  So we certainly hope  02:15PM

1    that that is a phase where the attorneys are not involved, and

2    we trust your discretion.

3         I would also note one other thing for the Court is,

4    you know, the Court's expert can speak to the Court without

5    counsel present.  He works for you.  So I guess just in terms        02:16PM

6    of that, we don't -- plaintiffs' counsel don't feel like we

7    need to be involved with every interaction that the Court's

8    expert has either with Corizon staff or with Your Honor

9    himself.

10        THE COURT:  All right.                                          02:16PM

11        Anything you want to say from the defendants' side,

12   Mr. Bojanowski?

13        MR. BOJANOWSKI:  No, Your Honor.

14        THE COURT:  Thank you.

15        MR. MILLAR:  Thank you.  Appreciate that                        02:16PM

16   clarification.

17        As we begin looking at working with the 10 facilities,

18   we started to develop our methodology out on the prior data.

19   What we are proposing to do is group the 10 facilities into

20   three groups based on the market supply gaps that exist.            02:16PM

21        So the Phoenix, Perryville, Lewis and Tucson areas or

22   facilities will be in Group 1.  We believe that these should

23   manifest similar staffing supply challenge characteristics

24   within the markets, and our hope is by grouping them this way

25   we will begin to see patterns that will emerge.                     02:17PM

1          Group 2, which is that middle supply gap, would be

2     Safford and Winslow.

3          And then the Group 3, which would be at the lower

4     end.

5          So as we move forward to try to rationalize how we          02:17PM

6     will approach that, this is one of the first filtered sets or

7     dimensions that we'll look at with these.

8          What also might come forward is we may see that there

9     are a group of facilities that are using the non-physician or

10    mid-level providers to compensate for a physician supply gap,     02:17PM

11    and regardless of where they fall here we may group them based

12    on their staffing characteristics as well.

13         But again, the attempt is to try to derive some

14    information and intelligence from the data that will then give

15    us some real direction as to where to go to start with the        02:17PM

16    interviews and the on-site observations to try to marry what's

17    actually going on with what the data represents.  I don't

18    pretend that the data will answer our question fully but that

19    we use the data to guide where we go instead of just a shotgun

20    approach to say hopefully we land in the facility that we need     02:18PM

21    to.

22         THE COURT:  Okay.

23         MR. MILLAR:  That being said, then the next steps for

24    our next report out here in court on May 9 would be the

25    following:                                                         02:18PM

1          To redo the medical staffing and behavioral health

2    analysis for all the facilities, and then to redo the staffing

3    profiles, which would be a series of those slides that you have

4    seen now but for all 10 of the facilities.  We'll then use that

5    to reevaluate what needed interviews and requests in the                    02:18PM

6    scheduling that we will put forth.

7          This is the piece that we hope that we can accelerate

8    and complete in several weeks rather than the four-plus weeks

9    we spent the last time, which will get us back on track for our

10   May 9th court report.                                                        02:19PM

11         THE COURT:  And with respect to the delay, you said

12   you thought you would have an idea about whether or not you

13   would be able to catch up or not in a couple of weeks?

14         MR. MILLAR:  I believe so.  My hope would be is we

15   could let you know several weeks before our May 9th.  So I'm     02:19PM

16   hoping to know within two weeks how much rework is going to be

17   entailed.  The data sets are fairly similar but it is a bit of

18   an intensive process.  So if we can catch up we'll try to

19   accelerate and get back to our June -- mid June deadline.

20         THE COURT:  This is the part where the person tries to  02:19PM

21   be more of a task master and tries to figure out if there's

22   anything that one can do other than to simply say -- it's --

23   it's correct to apply the term time is of the essence here.

24         So if there's anything that you can do that you would

25   need to seek further authorization to do to that we should      02:20PM

```
 1   consider to make sure that we can try to be as expeditious as

 2   possible I'd be interested in hearing about that, because do

 3   think time is of the essence.

 4          So I understand how these things do occur and it makes

 5   perfect sense what you have explained, but if there's anything        02:20PM

 6   that can be done that you want to raise with me as an

 7   alternative step to try to get us back up to that schedule,

 8   please let me know.

 9          MR. MILLAR:  Okay.  And I will regroup with my team

10   and we'll come up with some recommended strategies as to how we       02:20PM

11   might do that.

12          THE COURT:  Okay.

13          All right.  Are there any other questions from

14   counsel?

15          MS. KENDRICK:  No.  Thank you.                                 02:20PM

16          MR. BOJANOWSKI:  Nothing from defendants, Your Honor.

17          THE COURT:  All right.  Mr. Millar, thank you very

18   much.  Mr. Long, Ms. Sobolewski, thank you all very much for

19   your efforts on behalf of this enterprise.  Appreciate it.

20          MR. MILLAR:  Thank you.                                        02:21PM

21          THE COURT:  Okay.

22          So then if we can turn to what I think is one of the

23   items that we didn't address in the tight time frame before

24   lunch, and that is the plaintiffs' position with respect to the

25   current numbers that were presented on the OSC and also with         02:21PM
```

1    respect to implications of going forward regarding other month

2    reporting periods.

3            Can you give me a heads up on that issue from the

4    plaintiffs' side?

5            MS. KENDRICK:  Yes, Your Honor.                          02:21PM

6            So on Monday we did file a statement.  It's filed at

7    Docket 2750.

8            THE COURT:  And I read that.

9            MS. KENDRICK:  Okay.  And so that probably sums up

10   most everything that was going to be in the agenda items since  02:21PM

11   we submitted the agenda before we submitted this item.  So

12   there's really not much more for us to say beyond what's

13   already set out in that writing.

14           THE COURT:  So with respect to going forward, you said

15   a lot there, but in terms of constructive things to help us all 02:22PM

16   benefit from this experience where you have devoted all this

17   time to work through the plaintiffs' submission and identified

18   the areas that looked to be underreporting and then the

19   defendants engaged in a process and at the end of it all with

20   respect to the submitted months we find that there were         02:22PM

21   problems, do you think that -- I mean, it looks to me like the

22   subsequent -- is it after -- is it January going forward but

23   it's the mon -- it's the ADOC monitoring that's going to be

24   pulling the numbers and we thought in December it was Corizon

25   that was doing it?                                              02:22PM

```
 1              Is that -- am I reading that right?

 2              MS. KENDRICK:  That's not a question for me, sir.  I

 3      don't know.

 4              THE COURT:  I know, but did you say that at some

 5      point?                                                        02:23PM

 6              MS. KENDRICK:  No.  I mean, my understanding based

 7      upon the testimony was that Corizon did the tracking for

 8      January as well.

 9              THE COURT:  As well.

10              MS. KENDRICK:  Yeah.                                   02:23PM

11              THE COURT:  Okay.  I thought I had read someplace,

12      maybe an e-mail or something, I thought, but maybe I misread

13      it.

14              So let me turn to defendants and see if this is just

15      I'm off on a goose chase here.  Do you know what I'm talking  02:23PM

16      about?

17              The issue is the pool of the incidents that are

18      violative of the OSC order, who pulls those, did that ever

19      change, was it always Corizon that was doing it, was it the

20      monitoring bureau that was doing it?                          02:23PM

21              MR. BOJANOWSKI:  It's Corizon.  That has not changed.

22              THE COURT:  Okay.  I guess I made that up.

23              MR. BOJANOWSKI:  The Monitoring Bureau, once the

24      issues was raised, then did a vetting.

25              THE COURT:  Okay.  That's probably where I --         02:23PM
```

1          MR. BOJANOWSKI:  That's --

2          THE COURT:  So the vetting that occurred, when

3    plaintiff raised the issues you then went back to the

4    Monitoring Bureau and that's where -- in many cases where was

5    the ratification of the plaintiffs' view, and in some cases          02:24PM

6    the -- there wasn't an additional issue.

7          So then what does that suggest with respect to what's

8    being done going forward to make sure that we have the right

9    numbers?  Does it suggest that there's a different way that we

10   should be doing it?                                                   02:24PM

11         I guess that's my question, Ms. Kendrick.

12         MS. KENDRICK:  Well, sir, just as a threshold matter,

13   and I'm probably being a little pedantic here, it's not so much

14   plaintiffs' view.  What it was is we had these documents that

15   the Department kept as source documents and, you know, for many      02:24PM

16   of them we said we don't know if this is accurate or not but

17   this contradicts.

18         So maybe I'm being a little sensitive to this idea

19   that, like, you know, I said these were inaccurate or

20   incomplete or should have been included and they weren't.  It       02:24PM

21   was more one set of documents that the Department maintained

22   said X and then another said Y and we're saying how do you

23   reconcile them.

24         So that being said, you know, it's very troubling that

25   of the 420 apparent instances that appeared as I laid out in        02:25PM

1    the filing on Monday and in the original declaration, you know,

2    this was just random days of months at certain institutions

3    that came up in e-mail.  So this was no sort of systematic

4    review of every single daily tracking report of every single

5    institution.                                                    02:25PM

6            The fact that of the 420 that we flagged more than

7    half of them, 242, were indeed noncompliant and for whatever

8    reason the Corizon monitors doing this tracking for the Court's

9    OSC were unable to get it.  It's incredibly problematic.

10           And honestly, sir, I don't know what the answer is to    02:25PM

11   this because it appears from the testimony by the defendants

12   and in their filings that they have conceded that Corizon is

13   not capable of doing this tracking.  I'm certainly not capable

14   of, you know, going through and getting a source document for

15   every institution for every day and comparing them.  I do enjoy  02:26PM

16   sleeping.

17           So I just don't know, unfortunately, and so that might

18   be part of the reason we're bringing it to you is because we're

19   not sure how to proceed in terms of checking the accuracy of

20   this information in the future.                                  02:26PM

21           I mean, I think -- you know, what we have been saying

22   repeatedly is --

23           THE COURT:  Hire the auditors.

24           MS. KENDRICK:  Again shows the need for --

25           THE COURT:  I know what you're going to say.            02:26PM

1          MS. KENDRICK:  You probably know what Mr. Fathi just

2     wrote in front of me.

3          THE COURT:  Hire the auditors.  Right.

4          Well, I will say this:  That we, too, haven't had the

5     luxury of never sleeping or devoting full time to this, but                    02:26PM

6     nevertheless, where the Court has internally looked at numbers

7     that have been available to us we have seen inexplicable

8     anomalies, and these inexplicable anomalies fit in with a

9     general basis, a good grounds for concern about whether or not

10    the numbers that we have received are accurate.                                02:27PM

11         And so we have this broader look at it with respect to

12    monitoring overall, but then the question becomes, in this

13    narrower context of the OSC, is there something that can be

14    done to try to assure that we are capturing all that we should

15    capture in the first instance?                                                 02:27PM

16         And I guess maybe I could turn to the defendants and

17    say what exactly is -- I mean, I heard about the 17,000

18    records, and so I -- there has been some testimony about the

19    volume here but this is fundamentally an obligation of the

20    defendants, and since we have this track record of error with                 02:28PM

21    respect to relying upon Corizon to identify the errors, which

22    apparently are errors that if they result in sanctions will be

23    sanctions that will be passed over to Corizon to pay so they do

24    have an incentive -- cross current incentive to not fully

25    report.                                                                        02:28PM

1           And so I wonder if it is a mistake to continue to rely

2    upon that method of monitoring for the OSC.  That leaves really

3    two options.  One is to turn to the State's Monitoring Bureau,

4    to pool in the first instance, or the second is to employ as a

5    court expert a team of auditors to do this to find out.  Maybe          02:29PM

6    there are other alternatives, but those are two that come to

7    mind.

8           Who could respond to this issue on the defendants'

9    side?

10          MS. LOVE:  Your Honor, I can respond to this.                     02:29PM

11          The challenge here becomes, as I think has been clear

12   from both sides' pleadings, that the tracking reports that

13   plaintiffs were able to -- plaintiffs discovered in the ESI are

14   tracking reports that are used by the wardens and the facility

15   FHAs to look at a daily picture of what's going on.                      02:29PM

16          This is a working document for them.  This is not a

17   document that's relied on by either the monitors or Corizon to

18   pull those numbers because they are looking at a snapshot of

19   what's happening during the day to look at concerns which might

20   not necessarily result in noncompliance.                                02:30PM

21          THE COURT:  In all the areas where you have agreed

22   that the plaintiffs identified errors in fully reporting the

23   incidents that were required to be reported for the OSC, what

24   did you rely on?  Did you rely on the tracking reports?  Did

25   you rely on the monitors to go back and look at all of the ones        02:30PM

1     that were at issue in the OSC?  What did you do?

2           Because you took the position that you are right,

3     plaintiffs, on a number of them, and when you did that what had

4     you done to give you the view that they were right and that

5     Corizon was wrong?                                        02:30PM

6           MS. LOVE:  What Vanessa Headstream did is for 420

7     instances originally brought to the Court's attention by

8     plaintiffs she went back and did the normal per the methodology

9     and per the source documents of looking at the medical records

10    and the documents required to be looked at by the Monitoring   02:30PM

11    Bureau in monitoring the stipulation of what did those records

12    show.  She was not looking at the daily tracking reports that

13    were used by the facility because it's the medical records that

14    are going to show the results.

15          What we also found, too, which has -- I'm not going to   02:31PM

16    belabor the issue but has been brought to the attention of the

17    Court, is that Corizon in attempting to do real-time monitoring

18    were relying on computer programs in the Pentaho reports, and

19    as we have set forth in our briefing, much of whether there was

20    compliance or not can't necessarily be derived from a report   02:31PM

21    that pulls numbers.

22          Because many of the -- for the 11 performance issues

23    or performance measures at issue, at least six of them require

24    the subjective of looking into the medical records of was there

25    action taken, which somebody has to read the medical records.   02:31PM

1    So that was an additional challenge in this.

2           What I will tell the Court, and I -- there were

3    Corizon -- both ADC is working on getting me a status report as

4    to when this can be completed.  My -- both ADC -- as Richard

5    Pratt testified to yesterday, Richard, his Monitoring Bureau,                02:32PM

6    through Vanessa Headstream and her three additional staff, are

7    currently working with Corizon to go back to that December

8    universe of documents and source documents and inmates that may

9    be at issue and are literally doing this manual review of

10   medical records, of looking at each instance, looking at each               02:32PM

11   inmate's records to derive the information that Pentaho may or

12   may not have been able to pick up if it's looking at, for

13   instance, a ticker of a seven-day period of time but that extra

14   component of taking action.

15          So in the background, as the questions have come up as                02:32PM

16   to the veracity of those reports that were run, ADC and Corizon

17   are working together right now.

18          My understanding is that of the approximate 17,000

19   source documents or source files that Richard Pratt testified

20   to yesterday, they may be near maybe half done reviewing, but               02:33PM

21   we are taking those steps on both the Corizon and ADC side to

22   manually review every single one of those.

23          THE COURT:  So the half done point that you are at

24   reflects a start date of when so that I can maybe extrapolate

25   when the end date is?                                                        02:33PM

```
1              (Discussion off the record.)
2              MS. LOVE:  Your Honor, Richard Pratt has just informed
3     me that about a week and a half ago that Corizon came to the
4     Monitoring Bureau and asked can you -- can -- Monitoring
5     Bureau, can you help us with additional resources to do these    02:34PM
6     manual reviews?
7              So the ADC Monitoring Bureau has been involved in this
8     team work process for about a week and a half.  I do not know
9     specifically when Corizon started the process.
10             THE COURT:  So that week and a half, is -- is it fair    02:34PM
11    to say, then, that we probably are, if we're at the middle, a
12    week and a half from the finish?
13             MS. LOVE:  I -- that I do not know for sure, and
14    Richard Pratt is checking with Vanessa to assess and we would
15    be happy to report that back to the Court just as soon as we     02:35PM
16    can, because I'm not sure how many resources from Corizon's
17    side was devoted to it, how many personnel, and when they
18    started.
19             THE COURT:  What will assist me in sort of getting a
20    better handle on this problem are not only the results of that   02:35PM
21    process.  I'm not sure that it's going to be definitive because
22    it still raises questions, because I just have seen enough that
23    has raised real concern, but what also will assist me is when
24    we get the enumerator data of the incidents, and so when that
25    comes in we'll be able to make our independent determination     02:35PM
```

1    about that.

2           MS. LOVE:  As to the numerator data, Mr. Pratt and

3    Corizon are still compiling that information.  We request

4    whether the Court -- and we propose that once we are able to

5    get that data, which we hope to get by this evening, that we          02:36PM

6    just e-mail that information to the Court and to plaintiffs'

7    counsel.

8           THE COURT:  Yes, that's acceptable.

9           MS. LOVE:  And I can report back -- perhaps we could

10   do a conference call between the Court and counsel as to the          02:36PM

11   projected plan on the completion of the project for December

12   data.

13          THE COURT:  Okay.

14          MS. LOVE:  We would request that the manual redo of

15   the December data, which looks that it may be requiring a             02:36PM

16   manual review of perhaps 17,000 files, be constrained at this

17   time to the December data since that is the data that is

18   subject to the Order to Show Cause.

19          THE COURT:  Well, and again, I'm not sure that that's

20   a fair reading of the order, because the order does say that          02:36PM

21   defendants shall show cause as to why the Court should not

22   impose a civil contempt sanction of $1,000 per incident of

23   noncompliance commencing the month of December 2017.

24          And so I think that if I had chosen a word such as for

25   the month of December of 2017 you would have a much better            02:37PM

1    argument, but because I said commencing the month of December

2    '17 I certainly contemplated that we would be continuing to

3    look at this.

4         Because, again, if the sanction isn't enough in one

5    month, then maybe the sanction is going to accomplish it in         02:37PM

6    multiple months.  That's why I'm spending all the time talking

7    about this, is because there are real reasons to -- so much in

8    the case -- both the issue of whether the benchmarks are

9    appropriately triggered for further Court action, also with

10   respect to whether past reporting is going to justify a motion    02:38PM

11   for exit from the stipulation for a particular measure, all

12   turns on whether or not we can trust the data.  It just so

13   happens that we have a subset now where we are able to focus on

14   it and it revealed some things that are troubling.

15        And so I think that what you asked for with respect to       02:38PM

16   focusing on December, I am focused on December right now and so

17   I want to have that December information as soon as possible.

18        So I don't want people to be spending time on January

19   until December is done, but I don't mean to suggest that we're

20   not going to be interested in January going forward as long as    02:38PM

21   there are these issues, and we heard that earlier this morning

22   with respect to a number of performance measures at different

23   sites where we still have reason to be very concerned that for

24   whatever reason that sanction where we are now didn't appear to

25   be enough.                                                        02:39PM

1          You wanted to say something, Ms. Kendrick?

2          MS. KENDRICK:  Yes.

3          I'm glad to hear that they are doing this, but

4   Ms. Love didn't answer two fundamental questions, and those are

5   how and why.                                              02:39PM

6          And first is how was Corizon doing the monitoring in

7   the first instance and who was doing it?  They have said they

8   are not sure how much resources Corizon put into this.

9   Mr. Pratt testified yesterday that he wasn't sure how many

10   monitors Corizon sent to do this real-time tracking.  And so   02:39PM

11   there still seems to be a black hole of information about how

12   these numbers were generated in the first instance and that

13   they were off.

14          And then the next question is why?  You know, we've --

15   they concede that 242 out of the 420 apparent instances of   02:39PM

16   noncompliance were indeed noncompliant.  Why did that happen?

17   Why didn't the system, however Corizon was doing the

18   monitoring, catch those or collect those in the first instance?

19          So, you know, I'm glad that they are now -- you know,

20   I still don't quite understand how they got this 17,000 number   02:40PM

21   that they are looking at, but it's still unclear what Corizon

22   did to come up with the December numbers, and whatever they

23   did, whatever methodology, is that what they used for the

24   January numbers that they reported to the Court last month, and

25   is that what they are going to do with the February numbers   02:40PM

1      that they are reporting at the end of the month?

2            So we're very glad to hear that Ms. Headstream and the

3      others are doing this but at the same time it seems like we

4      need to go kind of further upstream and figure out what the

5      source of the original problem was with this data, because this      02:40PM

6      is a lot of work for everybody to come back after the fact and

7      try to figure out where the breakdowns were in Corizon doing

8      the reporting.

9            And the fact that they don't know how Corizon did it

10     or how many people are doing it is incredibly troubling because      02:41PM

11     it appears that there's some sort of failure to communicate

12     with their contractor on something of critical importance as to

13     like how are you doing this?  How many people are doing it?

14     Why are you doing it that way?  How are you doing spot checks

15     of what you are pulling through Pentaho?      02:41PM

16            And so I guess, for us, it's -- I'm concerned that

17     this will be a lot of work but then the same root problem is

18     going to exist with future months if there's not a way to

19     address what the original cause was.

20            THE COURT:  Well, you have addressed this in part by      02:41PM

21     your assertion that there should be an affidavit accompanying

22     future numbers as used in the prior remake of the numbers, but

23     the affidavit is -- might answer some of the how question but

24     there would be also some other questions that would occur

25     perhaps to plaintiff and maybe to the Court about the how, and      02:42PM

1    the affidavit wouldn't satisfy that.

2         So what kind of method would you suggest that would

3    allow us to understand the how and the why?

4         MS. KENDRICK:  I can't necessarily predict an offer of

5    method because I am not an expert on auditing.  I mean --          02:42PM

6         THE COURT:  Well, do you think that if you had the

7    presentation of --

8         MS. KENDRICK:  Well, I think for one thing,

9    potentially what they could do is first the Department needs to

10   find out how Corizon did this and then whether it involved        02:42PM

11   doing things like spot checking it against the daily trackers,

12   and Ms. Love says they are not used by the monitors but they

13   are offering a daily snapshot of what's going on at each

14   institution.

15        And if you looked at them, it would say here are the         02:43PM

16   five people whose lab results have not been reviewed or acted

17   upon, and cross-referencing that with whatever the Pentaho

18   report is pulling up just to make sure, you know, should this

19   person have been included, too, even if they didn't get caught

20   up when we ran the Pentaho report.                                02:43PM

21        So it seems more of that kind of spot checking with

22   other source documents that are being created at the same time

23   may be a way to fill the gap.  Because that's how we found

24   them.  We just looked at some of those reports and compared it

25   and looked for the names and the names weren't there.             02:43PM

1          THE COURT:  So would it address your concern to be

2     able to have the appropriate person at the monitoring bureau to

3     testify about what occurred with respect to the recheck and to

4     also have testimony from the Corizon person about what happened

5     in the first instance?                                      02:43PM

6          MS. KENDRICK:  I think that would go a long way to

7     addressing the concerns if we could find out how Corizon did it

8     in the first instance and then what, if any, spot checks

9     occurred.

10         According to the initial response that the defendants    02:44PM

11    filed a few weeks ago, they stated that the monitoring bureau

12    didn't do a spot check of the reports.  So, you know, any spot

13    check would be better than no spot check.

14         THE COURT:  I can't as I sit here remember whether or

15    not the defendants have previously told me, and maybe Ms. Love  02:44PM

16    can inform me about what I should have remembered, about what

17    the method was that Corizon used to identify its first -- the

18    numbers that became the first presentation from the State on

19    the incidents.

20         MS. LOVE:  Your Honor, it is the Pentaho reports that    02:44PM

21    were culled.  I admit that I am obviously jumping into this

22    issue when these issues have come to light and so we have been

23    working with Richard Pratt and the Monitoring Bureau to

24    understand fully what the limitations were on the original

25    numbers and how the system was put into place and how that     02:45PM

1      information was culled.

2             I'm wondering -- I was talking out loud and maybe this

3      is something that if both parties brain-storm about and come up

4      with a plan versus having an evidentiary hearing.  My concern

5      is we have an evidentiary hearing and we bring in persons to          02:45PM

6      testify and then we're in the situation where because there's

7      so many players involved from both the Corizon and the

8      Monitoring Bureau side that it becomes a situation of one

9      person testified who says I'm not the best person for that

10     information.                                                          02:45PM

11            I'm just talking out loud here and I'd like to time to

12     brainstorm and talk with plaintiffs about this as well, but if

13     we came up with perhaps a -- some sort of a written narrative

14     as we track down what happened, where were the holes, what are

15     the players involved and how did they do their separate and          02:46PM

16     together analysis, present that to the plaintiffs and to the

17     Court so that we can then discover what -- not discover.

18     That's a fancy word.  But just know what plaintiffs' questions

19     are to fill in the gaps so that we can get the right people

20     necessary to answer questions versus a traditional evidentiary       02:46PM

21     hearing.

22            THE COURT:  And I'm not sure about that as a way to go

23     because it seems to be likely to engender the standard kind of

24     responses that reflect one person's response to a static and so

25     we sometimes miss the boat.                                          02:46PM

1          So I wonder if it does make more sense to say who is

2     the person most knowledgeable about what Corizon did to pull

3     the incidents and the person most knowledgeable about what the

4     Monitoring Bureau did.

5          It looks to me like I have got availability to do this    02:47PM

6     on the 27th of April.  We could maybe decide it would be a

7     morning or afternoon, not a whole day, and take a first crack

8     at it.

9          I wonder if that's something that would be possible

10    for counsel.                                                    02:47PM

11         MR. BOJANOWSKI:  I believe that's a day of the Yuma

12    tour.

13         THE COURT:  Oh.  Okay.

14         MR. BOJANOWSKI:  It is.

15         THE COURT:  That doesn't work.  Okay.                      02:47PM

16         MS. KENDRICK:  Your Honor, just to respond to what

17    Ms. Love said, I agree with her that I don't think necessarily

18    a full-blown evidentiary hearing would be the most productive

19    way.  I think what might be the more efficient approach is to

20    have the person who is most knowledgeable from Corizon about    02:47PM

21    how this was done and the person who is most knowledgeable at

22    ADC about the kind of sweep-up, clean-up work they did, submit

23    detailed written affidavits perhaps a week before our next

24    status hearings and then have those people available to answer

25    any questions that the Court may have or that plaintiffs'       02:48PM

1    counsel may have upon reading the written declaration so that

2    we can at least kind of streamline and go straight to the heart

3    of the matter and have time to digest, you know, what they have

4    spelled out in writing.

5           So that would be our proposal on kind of how to move          02:48PM

6    it along.

7           THE COURT:  You are both asking for the same thing, so

8    that makes it more difficult for me to say that it's a bad

9    idea.

10          The other notion is something you might want to              02:48PM

11   entertain is whether it would be efficient for you all just to

12   have a meet and confer that would bring the people most

13   knowledgeable you could have an informal question-and-answer

14   session with them, sort of what I envisioned with respect to on

15   the 9th of March when I wasn't able to attend.                       02:49PM

16          But I will go forward with what you have contemplated

17   and ask you to do this:  Meet and confer about the timetable

18   that you think is most reflective.  That will give Ms. Love an

19   opportunity to talk to her people about who it would be that

20   she would need to enlist and what they are doing and what their     02:49PM

21   availability is.

22          And I'm very anxious to get this information quickly

23   because I just don't want to be relying on information that we

24   don't understand where it came from and I just think that

25   illuminating the process is a good idea.                            02:49PM

1          So I would be interested in it happening as quickly as

2     it possibly can but if you find that one side thinks the other

3     side is not being reasonable in the timing, get me on the phone

4     and get me involved and I will hear what the respective sides

5     are and decide what the timing should be.                        02:50PM

6          MS. KENDRICK:  I guess just plaintiffs' final comment

7     is we urge the Court to move forward with any order with regard

8     to the OSC.

9          THE COURT:  I'm not -- I'm not convinced that I need

10    to pause because some of what I have learned would suggest that  02:50PM

11    it's not susceptible to concerns about this.  The concern is

12    one of generally am I missing the mark on other applications?

13    I'm not so sure that it's wrong for me to take a hard look at

14    whether or not I should based upon the information I presently

15    have move forward, but it may be that that moving forward will   02:50PM

16    not capture some other bases for moving forward.

17          But based upon the record that I have now I think that

18    I do have sufficient information to not say I need to wait.

19          Okay.  That was a timing issue.

20          So that's what we'll do to address that concern that       02:51PM

21    you just had, Ms. Kendrick.  I think that gives you the answer

22    you were hoping to hear.

23          All right.  So we have addressed that.  The next

24    issue?

25          MR. FATHI:  Your Honor, if we return to the agenda,        02:51PM

```
 1    plaintiffs' agenda, where we were before the lunch break,
 2    Number 8E, errors and improper monitoring methodology in
 3    October of 2017, CGAR results, this is a letter that we sent to
 4    defendants on February 2nd and have not yet received a
 5    response.                                                          02:51PM
 6         MR. BOJANOWSKI:  I believe prior to the break I had
 7    indicated we were responding to both of these.  So we're
 8    working on that one as well.
 9         THE COURT:  So the same 14 days you asked about
10    before?                                                            02:51PM
11         MR. BOJANOWSKI:  Yes, sir.
12         THE COURT:  All right.
13         MR. FATHI:  And then also, Your Honor, as mentioned
14    before the break, notwithstanding the Court's order, the March
15    staffing reports have not yet been produced.  So we would ask     02:51PM
16    those be produced as soon as possible.
17         THE COURT:  Where do we stand on those?
18         MR. BOJANOWSKI:  Your Honor, the staffing reports are
19    not finalized until the 15th of the month.  So as I explained,
20    you know, we have these hearings before the finalization of       02:52PM
21    data.  I mean, once the data is finalized I will get it out,
22    but it's never going to be before the 15th of the month that
23    the staffing report is complete.
24         So that's --
25         MR. FATHI:  Well, Your Honor --                              02:52PM
```

```
 1            MR. BOJANOWSKI:  -- just -- internally, it's prepared

 2     and then it's sent over to Mr. Pratt, he then gets it

 3     distributed off to various entities, aside from the Court.  So

 4     that's when he receives it.  That's when we process it and get

 5     it out.  I can't make it go any faster.                        02:52PM

 6            MR. FATHI:  Well, Your Honor, this is the first we're

 7     hearing about that.  The Court previously ordered that it be

 8     produced by the 15th of the month or 48 hours before the

 9     monthly status hearing, whichever is earlier, and the

10     defendants never raised the objection that it's impossible to  02:53PM

11     produce it before the 15th of the month.

12            THE COURT:  Okay.  Well, given where we are we'll sit

13     with the 15th this month, and based upon what Mr. Bojanowski

14     said we know that it sounds like it's never going to be earlier

15     than the 15th, so that other idea of getting it within the     02:53PM

16     status hearing will probably also be addressed by the potential

17     changing it to the third week.  So I don't think we need to

18     spend any more time on this one.

19            MR. BOJANOWSKI:  Okay.

20            MR. FATHI:  Finally, Your Honor, Agenda Item Number 9    02:53PM

21     involves a number of document requests from the plaintiffs,

22     some that were made as early as August of 2017, to which we

23     have not yet received either any response or a complete

24     response.  There was an exchange of letters between counsel

25     last week.  We asked for a meet and confer last week.          02:53PM
```

1    Defendants declined.  They said they would be producing some

2    documents on April 5.  They did not.

3           I'm not proposing that we go through each and every

4    item today but we appreciate the Court's direction that the

5    parties meet and confer by a date certain and then if there are     02:54PM

6    any remaining disputes we can bring those to the Court either

7    in a telephonic hearing or next month.

8           THE COURT:  Who can comment on this issue?

9           MS. LOVE:  Your Honor, I will.

10           The letter that Mr. Fathi speaks of came from     02:54PM

11   plaintiffs' counsel on April 3rd and requested a meet and

12   confer two days later.  We did not decline the meet and confer.

13   We said it wasn't fruitful within two days to be able to have a

14   meaningful conversation.  We did then via e-mail communications

15   say that we planned to make a production on the 5th.     02:54PM

16           Based upon so much that's going on in this case we

17   didn't make it on the 5th.  Indeed, we made a production on the

18   6th of mortality reviews, CQI meeting minutes and director

19   meeting agenda.  We then provided a response as to the

20   vaccination issue, which has already been addressed today, on     02:55PM

21   the 9th.  And then yesterday -- I believe it was last

22   evening -- we made another production.

23           I am working specifically on this issue with

24   Mr. Valenti and we plan to have a response out to the April

25   3rd letter to the plaintiffs by Friday, at which time, A, there     02:55PM

1    will be some productions and explanations given, especially on

2    the operations side, which I'm usually the head of the

3    operations side, and then we'll be in a place to have a

4    meaningful meet and confer thereafter if there's any other

5    issues.                                                    02:55PM

6            So it's not a situation of not working on it.  The

7    balls are rolling and Friday we will get that letter out.

8            THE COURT:  Okay.  So we'll look forward to perhaps

9    you getting this resolved.  If not, you'll give me a call next

10   week.                                                      02:56PM

11           MR. FATHI:  Thank you, Your Honor.

12           May I have one moment?

13           THE COURT:  You may.

14           MR. FATHI:  Your Honor, we're unable to confirm that

15   we have received the documents that Ms. Love says were       02:56PM

16   produced.

17           THE COURT:  There's a simple solution for that.

18           MR. FATHI:  Indeed, Your Honor.  So if there remains

19   an issue with that, again, we will raise it with the Court if

20   we're unable to resolve it with counsel.                   02:56PM

21           MS. LOVE:  And if for some reason you don't receive

22   the production just let me know and we'll reproduce it.

23           THE COURT:  I imagine that will be the response.

24           MR. FATHI:  Your Honor, I believe that concludes

25   plaintiffs' agenda.                                        02:56PM

1          THE COURT:  How about defendants?

2          MS. LOVE:  Your Honor, the one issue that we had added

3    to our agenda is that as to defendants' motion to terminate

4    that was filed in August, Docket 2251, and then plaintiffs

5    responded in September at 2344, as to pending issues on                    02:56PM

6    performance measures that could terminate, between the parties'

7    agreements or disagreements on everything there were 12 that

8    were not at issue and that plaintiffs didn't bring any issues

9    up with, which were Performance Measures 1, 2, 3, 4, 30, 31,

10   32, 38, 56, 58, 70 and 71.                                                 02:57PM

11         Where plaintiffs did not take issue with the

12   monitoring scores on those we would request that the Court be

13   able to rule on those that are not at issue so that in the

14   universe of what we're dealing with where those are not

15   contested they can fall off of monitoring, which allows our      02:57PM

16   Monitoring Bureau to be able to devote resources to not have to

17   monitor things that are no longer at issue and direct their

18   resources to concentration on the matters that the Court and

19   everyone, Corizon and ADC and plaintiffs, are concerned about

20   to devote resources to where we can fix problem versus          02:58PM

21   continuing to monitor things that are no longer at issue.

22         THE COURT:  Ms. Love has given words back to me that I

23   said just today and so that's a good thing to loop those things

24   back to any person in the conversation.

25         Overall, I have been hesitant to move on any              02:58PM

1    terminations until we get the soundness of the reporting issue

2    resolved, but if there are issues in which you haven't

3    suggested that there's any reason to believe that those numbers

4    are in question then I would be open to actually encouraging

5    they be removed, notwithstanding my overall view, because if          02:58PM

6    there's not a particular issue where those are implicated I

7    would not want to take that step.

8              I can say that I would expect plaintiffs be able to

9    respond off the cuff and I wonder if maybe the thing to do

10   would be to say if perhaps by the end of this week if you would     02:58PM

11   provide a notice to the defendants and to the Court about

12   whether or not you would agree that any of these that were

13   suggested for removal for the reasons suggested that you would

14   alert us to that.

15             MR. FATHI:  Your Honor, I'm just a little unclear.          02:59PM

16   Are these performance measures that are in -- were in the

17   defendants' motion or these or at least some of these

18   performance measures that were not included in the motion?

19             THE COURT:  We can ask.

20             MS. LOVE:  These are performance measures that were         02:59PM

21   included in defendants' August motion to terminate at Docket

22   2251.

23             MR. FATHI:  Your Honor, we're happy to provide the

24   kind of notice the Court requests.  We'd ask for a little more

25   time than the end of this week.                                       02:59PM

1          THE COURT:  Okay.

2          MR. FATHI:  We would also point out that subsequent to

3     the completion of briefing on the defendants' notice -- or

4     motion the Court ordered changes to the defendants' monitoring

5     methodology on at least Performance Measures 1, 2, and 4, so we    02:59PM

6     will not be agreeing that the Court can grant termination on

7     those.

8          THE COURT:  All right.

9          MR. FATHI:  And we will respond on the balance if we

10    could have till the middle or end of next week.                    03:00PM

11         THE COURT:  So seven days.  And take a look at the

12    ones other than the ones that you know that you have a position

13    on right now to see if there are any that can be removed.

14         Thank you.

15         MR. FATHI:  Thank you, Your Honor.                            03:00PM

16         THE COURT:  The last thing that I wanted to raise is

17    back to the issue of contacting the -- the other witness.  I'm

18    sorry.  I'm not able to keep her name in my mind.

19         MR. FATHI:  Fisher.

20         THE COURT:  Yes.  Thank you.  Ms. Fisher.                     03:00PM

21         My staff has raised what is a true issue, and that is

22    sometimes when the Court contacts people, because we have a

23    cloaked phone number that doesn't reveal who is calling, and we

24    don't know how to turn that off, maybe there's a way, we don't

25    know what it is, so oftentimes people never answer the phone       03:00PM

1    for us.  What we would propose to do is instead of contacting

2    by phone if you let us know what the e-mail is we'll send an

3    e-mail copy to both sides saying we want you to know your

4    availability to respond to a summons for these days.

5            MR. FATHI:  We will do so, Your Honor.                    03:01PM

6            THE COURT:  Anything else?

7            MR. FATHI:  Nothing from plaintiffs, Your Honor.

8            MS. LOVE:  Nothing from defendants, Your Honor.

9            THE COURT:  Thank you all very much for your time.

10   Appreciate it.                                                    03:01PM

11            What time is your conference call?

12            MR. PRATT:  We've got one at, I believe, 2 o'clock.

13            THE COURT:  So we missed it again.

14            All right.  Thank you, sir.

15            (Proceeding concluded at 3:01 p.m.)                      03:01PM

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                        C E R T I F I C A T E

6

7            I, LAURIE A. ADAMS, do hereby certify that I am duly

8     appointed and qualified to act as Official Court Reporter for

9     the United States District Court for the District of Arizona.

10           I FURTHER CERTIFY that the foregoing pages constitute

11    a full, true, and accurate transcript of all of that portion of

12    the proceedings contained herein, had in the above-entitled

13    cause on the date specified therein, and that said transcript

14    was prepared under my direction and control.

15           DATED at Phoenix, Arizona, this 12th day of April,

16    2018.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25