**EXHIBIT 1**

**EXHIBIT 1**

Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorney General
15 South 15th Avenue
Phoenix, Arizona 85007
Telephone: (602) 542-1645
Fax: (602) 542-3393
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Hesman, Bar No. 028874
Jacob B. Lee, Bar No. 030371
Kevin R. Hanger, Bar No. 027346
Timothy M. Ray, Bar No. 029191
Richard M. Valenti, Bar No. 031533
Jamie D. Guzman, Bar No. 022095
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
khanger@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-DKD<br><br>**DECLARATION OF JUSTIN THOMAS SCALISE** |

I, **JUSTIN THOMAS SCALISE**, make the following Declaration:

1. I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration. I make this Declaration in support of Defendants' Notice Regarding Collection and Production of Data Regarding December 2017 Compliance with Certain Performance Measures Pursuant to Order to Show Cause (Doc. 2576).

2. I am the Vice President for Contract Compliance for Corizon Health, Inc. ("Corizon"). I have worked for Corizon since September 4, 2017, and have held the position of Vice President for Contract Compliance since the aforesaid date.

3. As Vice President for Contract Compliance, I am responsible for overseeing Corizon's compliance with its health services contract with the Arizona Department of Corrections ("ADC").

4. I am familiar with the Court's October 10, 2017 Order to Show Cause ("OSC") and the requirement to provide a report of all failures for the month of December 2017 for the 11 health care performance measures ("PMs") subject to the OSC.

5. I provide this Declaration in order to provide the written explanation requested by Plaintiffs' counsel and ordered by the Court at the April 11, 2018 status hearing as to how Corizon generated the failure lists filed by Defendants on February 5, 2018 (Doc. 2576) and February 14, 2018 (Doc. 2595) regarding the December 2017 data.

6. Various Corizon personnel were assigned to run reports in Pentaho, Corizon's business intelligence software, in order to generate the December 2017 failure lists for PMs 11, 35, 39, 46, 47, 52, and 66, as follows:

1         a.     Crispina Mata—PM 11, 35, and 46 (December 1-12)

2         b.     Romy Franklin—PM 39 and 47 (December 1-12)

3         c.     Romy Franklin—PM 35, 39, 46, and 47 (December 13-31)

4         d.     Jen Bardzick—PM 66 (December 1-12)

5         e.     Jen Bardzick—PM 11 and 66 (December 13-31)

7. The parameters for each Pentaho report were based on the monitoring methodology prescribed for each PM in the ADC Health Services Contract Monitoring Bureau ("HSCMB") Monitor Guide. For example, PM 66 requires that "In an IPC,[1] a Medical Provider encounter[ ] will occur at a minimum every 72 hours." (Doc. 1185-1.) The report for PM 66 included the following information:

        a.     Inmate number;

        b.     Inmate name;

        c.     Inmate current unit;

        d.     Inmate current location;

        e.     Encounter location;

        f.     Encounter date and time;

        g.     Encounter type;

        h.     Provider name; and

        i.     Provider licensure.

8. Each encounter was listed as a separate instance in the report, such that an inmate who had been seen 11 times while in an IPC would be listed 11 times, one for each encounter.

9. From this document, Corizon generated a list of each instance in which more than 72 hours elapsed between encounters. This resulted in three identified failures at Florence, zero at Lewis, and zero at Tucson.

10. Similar procedures were followed for PMs 11, 35, 39, 46, 47, and 52.

---

[1] Inpatient Component/Infirmary Bed.

2

11. The failure list for PM 44 was not generated using Pentaho, but was based on manual review by Jen Bardzick of the inmate files listed on the source document for that PM, as specified in the Monitor Guide.

12. The failure lists for PMs 50 and 51 were not generated using Pentaho, but were based on manual review by Jennine Gahris (December 1-12) and Amber Puckett (December 13-31) of a report pulled from Cares, which is a billing platform all outside consults are entered into, listing all of the specialty consults that were eligible for review in December 2017 as specified in the Monitor Guide.

13. The failure list for PM 54 was prepared separately as well. PM 54 requires that "Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no [more] than every 180 days unless the provider documents a reason why a longer time frame can be in place." (Doc. 1185-1.) The Stipulation defines a "chronic disease" as one of 19 diseases or categories of diseases. (Id.) Some, such as cancer, require an inmate to be seen every 30 days. Others, such as HIV/AIDS, require an inmate to be seen every 90 days. Still others, such as heart disease, require an inmate to be seen every 180 days.

14. To generate the failure list for December 2017, Corizon started with the source document identified in the ADC Monitoring Guide, which included 8,160 potentially eligible files. After filtering out any conditions that were noted in the electronic medical record ("EMR") as "chronic" but that are not one of the 19 conditions/categories identified in the Stipulation; any inmates that were "temporarily absent" (i.e., out of the facility) between their last two documented chronic care encounters; and any inactive files per the AIMS report, Corizon was left with 4,428 eligible files.

15. Corizon then compiled a "final" list of 440 instances with a number of days between encounters greater than 180 days that was filed with the Court. The reporting is not capable of taking into account the appropriate timeframe between visits as dictated by the provider's treatment plan and/or the standard timeframes that apply to different types

3

of chronic conditions when the provider does not specify a different timeframe, or any encounters in which the patient was seen for the chronic condition but the encounter was not marked as a chronic care encounter in eOMIS. As a result, the "final" list was both over-inclusive (to the extent it included instances in which a provider documented a reason why a longer period was appropriate, which would have required manual review to identify, or where a chronic care encounter was conducted but not designated as such in the EMR) and under-inclusive (to the extent it did not look at instances where a period shorter than 180 days was called for by either provider note or standard timeframes by condition).

16. After the reports were run and the failure lists generated, Jennine Gahris and Amber Puckett manually reviewed all non-compliant findings for PMs 11, 35, and 46 by opening each file in eOMIS and utilizing the methodology contained in the current version of the Monitor Guide for each PM to determine each file's compliance with the relevant PM.

17. Once the failure lists for all the PMs subject to the OSC were complete, Corizon manually compared the lists to HSCMB's monitoring outcomes for the same PMs, and sent the lists to HSCMB for review. Any inmates/instances identified as failures in the CGAR reports that were not on Corizon's lists were added to the lists. Again using PM 66 as an example, this resulted in one additional failure at Florence and one additional failure at Tucson.

18. Automated, true "real-time" reporting is not feasible under the current health services contract structure and Stipulation. The Stipulation, and the standards as set forth therein, by design require the use of a manual auditing methodology as provided for in the Monitor Guide. Continuous manual auditing and review of each and every health care encounter would be required to provide 100% accurate "real-time" instances of non-compliance. For December 2017, this would result in manual review of 22,670 instances.

19. This is especially true for PMs 39, 44, 46, 52, and 54, which involve subjective elements in their respective monitoring methodologies that cannot be determined by simply running a report.

20. Even for those PMs that do not contain explicitly subjective elements (i.e., PMs 11, 35, 47, 50, 51, and 66), the monitoring process itself includes subjective elements that require more than simply running a report in order to identify instances of non-compliance.

21. Pentaho pulls information from eOMIS (i.e., the EMR). Medical records are, by their nature, highly complex, and involve both objective and subjective elements, the latter of which are difficult to assess via an automated computer program or other form of algorithm.

22. The difficulty in pulling such information is further compounded by variations in the manner in which information is entered into the EMR. For example, again using PM 54 as an example, if a provider sees an inmate for the inmate's chronic condition, but does not check the box in the EMR to document the encounter as a chronic care encounter, a report run to calculate days between chronic care encounters would not include the most recent encounter, making it potentially appear as an instance of non-compliance even though the inmate may have been timely seen for their chronic condition.

23. Unfortunately, without manually reviewing each and every eligible medical file for each performance measure, there is no way to obtain 100% accuracy, which cannot be done with current available resources within the deadlines imposed by the Court.

24. In addition to the limitations identified in Paragraph 15, above, regarding the use of Pentaho reports to identify instances of non-compliance with PM 54, Pentaho reports regarding non-compliance with the following PMs are also subject to limitations.

25. PM 11—Pentaho generates a list of all medications with a new prescription number by prescription date and provides the date the medication was administered. The

report only generates instances where a medication was not administered within 48 hours, and may be over-inclusive to the extent it does not account for instances where there is no lapse in medication based on the patient having medication remaining from a prior prescription (thereby counting an instance as non-compliant even though the new prescription was not administered because the patient had to first use the medications remaining from the prior prescription).

26. PM 35—Pentaho generates a list of all patients that moved on a particular day and are on medications. The report is unable to capture whether or not as-needed ("PRN") and keep on person ("KOP") medications are available to the patient upon arrival at the receiving complex. Directly Observed Treatment ("DOT") medications are captured because they are supported in the Medication Administration Record ("MAR"). However, because KOPs and PRNs are documented at intake, the intake note must be manually reviewed to determine whether a patient received his/her PRN or KOP medication.

27. PM 39—Pentaho generates a list of all patient referrals to a provider from a nursing encounter (i.e., nurse to physician/mid-level referral), including instances in which the patient was referred by a nurse but not timely seen by the provider. Inmate refusals, however, automatically show up as instances of non-compliance on the Pentaho report, as do instances where referrals have been addressed by a provider absent a scheduled appointment. These files need to be manually reviewed to determine whether the refusal was properly documented, such that it is not an instance of non-compliance. Additionally, the source document does not always match the eOMIS record in every case (e.g., the Nurse Encounter Log may have encounters that were not entered into eOMIS).

28. PM 46—Pentaho generates a list of all labs and X-ray results along with the dates the results were received and reviewed. The report indicates those instances for which the timeframe for review was non-compliant, but does not indicate those instances where the timeframe for review was met but the appropriate action was not taken.

29. PM 47—Pentaho generates a list of Health Needs Requests ("HNR") in which diagnostic results were requested but which were not resolved in eOMIS. The Pentaho report is under-inclusive to the extent some HNRs requesting results are not entered into eOMIS.

30. PM 52—Pentaho generates a list of all consults completed/results received and consults completed/results reviewed in instances where the status of the consult is documented appropriately. The report indicates those instances for which the timeframe for review was non-compliant, but does not indicate those instances where the timeframe for review was met but the appropriate action was not taken.

31. PM 66—Pentaho generates a list of patients housed in an IPC location and indicates the timeframe between the last two encounters by a provider in hours. However, the Pentaho report cannot decipher whether or not a corresponding note for the encounter was entered in the SOAPE format. Additionally, the list of patients housed in an IPC does not exclude those patients placed in the infirmary for non-medical reasons, which must be manually filtered out.

32. For December 2017, Corizon and ADC reported 1,313 total instances[2] of non-compliance with the 11 PMs subject to the OSC, out of a total of 22,670 health care instances[3]—an overall failure rate of only 5.8%.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of May, 2018.

JUSTIN THOMAS SCALISE

---

[2] This includes the 242 instances of non-compliance identified after manual review of the 420 allegedly unreported instances of non-compliance identified by Plaintiffs' counsel. (Doc. 2633, 2745.) The additional 242 instances represent only 1.1% of the total health care instances.

[3] These are the total health care instances for the 11 PMs and complexes that are subject to the OSC. This number does not represent the total health care instances for all PMs and complexes statewide.

7