Index of Exhibits to the Declaration of Corene Kendrick

| Exhibit | Description |
|---------|-------------|
| 1 | REDACTED May 4, 2018 letter from K. Eidenbach to T. Bojanowski regarding April 12, 2018 tour of ASPC-Winslow and the systemic issues and class members in need of medical care identified during the tour. |
| 2 | REDACTED April 16, 2018 email from C. Kendrick to T. Bojanowski regarding class member at ASPC-Winslow in need of medical care. |
| 3 | REDACTED April 18, 2018 email from C. Kendrick to T. Bojanowski regarding class member at ASPC-Winslow in need of medical care. |
| 4 | Declaration of Rita T. Lomio, Staff Attorney, Prison Law Office |
| 5 | Declaration of Maya Abela, Staff Attorney, Arizona Center for Disability Law |
| 6 | Declaration of Christian Carlsen, Staff Attorney, Arizona Center for Disability Law |
| 7 | REDACTED May 1, 2018 letter from C. Kendrick to D. Struck regarding April 26-27, 2018 tour of ASPC-Yuma and violations of the Stipulation on March 1-5, 2018 at Cheyenne Unit. |
| 8 | March 2018 Corizon statewide staffing report |
| 9 | REDACTED April 25, 2018 letter from T. Bojanowski to C. Kendrick regarding errors in monitoring in the September 2017 CGARs. |
| 10 | REDACTED April 25, 2018 letter from T. Bojanowski to C. Kendrick regarding errors in monitoring in the October 2017 CGARs. |
| 11 | REDACTED April 13, 2018 letter from R. Valenti to C. Kendrick regarding Plaintiffs' document requests. |
| 12 | April 30, 2018 email sent from D. Fathi to R. Valenti regarding Defendants' production of Directors' Meeting minutes. |
| 13 | April 18, 2018 letter from C. Kendrick to R. Love regarding Defendants' request that Plaintiffs stipulate to the termination of monitoring certain performance measures. |

# Exhibit 1

# (Redacted)

# Eidenbach Law, P.L.L.C.

Kirstin T. Eidenbach, Attorney-at-law (AZ Bar No. 027341)

P.O. Box 91398 • Tucson, AZ 85752 • Phone:  520-477-1475
E-Mail:  kirstin@eidenbachlaw.com

May 4, 2018

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

      Re:    Parsons v. Ryan, 2:12-CV-00601
              Winslow Tour (April 12, 2018)
              (EMAIL ONLY)

Dear Tim:

We write to inform you of prisoners we interviewed during our recent tour of ASPC-Winslow who may require immediate care for serious medical, dental, and mental health conditions. These individuals are in addition to the two persons in urgent need of medical care (one with detached retinas in both eyes and the other with untreated scabies), about whom Ms. Kendrick previously notified you.   We also have identified several broad systemic issues that are impacting the overall provision of healthcare, as well as ADC's ability to comply with the Stipulation.

### Noncompliance with Performance Measure 94

We have repeatedly raised our concern in status hearings that Winslow cannot possibly comply with PM 94 ("All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse") given that the institution has not had a single mental health clinician on staff for approximately two years.  During our tour, the Facility Health Administrator reported that a psychology associate had been hired in the previous two weeks, but confirmed that prior to this person coming on staff, a registered nurse  was performing the required daily checks on all persons



on suicide and mental health watch prior to the prisoner's transport to a corridor facility. This flatly contradicts assertions made to the Court by Dr. Nicole Taylor:

DR. TAYLOR: Correct. So if the individual goes on
watch on a Sunday, that's going to be a registered nurse who
does that first contact. Then when it starts on -- it's a week
day, it's Monday, it's Mr. Metz who does the telepsychology
contacts until the individual is transferred. And so they have
that schedule, he does that daily until that individual is
transferred, which may be one day, it may be two days, it may
be three days.

12/20/17 Tr. at 96:2-9; *see also* Declaration of Nicole Taylor, Doc. 2594-1, ¶ 11 (identifying Mr. Metz as a Licensed Professional Counselor).

### Systemic Issues Identified at ASPC-Winslow

**Flu shots:** We spoke with multiple people with chronic medical conditions who reported that they had not been offered or provided a flu shot this winter pursuant to the requirements of Paragraph 12 of the Stipulation. They and other prisoners described an ad-hoc system of administering vaccinations. On Coronado Unit, class members stated that it appeared that there was one day when flu shots were administered, which was announced in the morning in the housing units. As a result, people with chronic conditions who were not onsite that day due to being out with a fire crew or working off-site did not get a flu shot, while healthy individuals without chronic conditions availed themselves of the opportunity to get a flu shot.



**Fire Camp Restrictions on People with Mental Health Histories:**  Class members told us that under current policy, they cannot attend fire camp if they have an MH-2 or higher designation. Additionally, they are automatically classified as MH-2 at intake if they report that they have ever seen a counselor or sought any sort of mental health treatment in their lives.  This fire camp policy acts as a disincentive to report any history of seeking counseling or assistance, or to  request any sort of counseling or assistance.  Such a blanket policy also violates the Americans With Disabilities Act.  **Class members should not be penalized for seeking mental health care, or for reporting that they have sought mental health care assistance at any time in the past.  We request that this practice be immediately discontinued.**

**Custody Confiscation of Medical Devices:**  Class members on Coronado who had medical Special Needs Orders for wedge pillows for GERD reported that about three weeks ago, the Deputy Warden ordered that all wedge pillows on the unit be confiscated because they were a security risk.  None of the class members interviewed were aware of any other prisoner using a wedge pillow in an improper way, and did not understand why this was done. Medical staff provided them with an additional regular pillow, but they reported that this did not elevate their heads and shoulders in such a way to reduce the acid reflux while sleeping. **We request that ADC either immediately return the wedge pillows that were confiscated or articulate to plaintiffs' counsel and the Court the security basis for their decision to deny necessary medical appliances to people housed on Coronado yard.**

**No Afternoon Open Clinic for Off-Site Workers:** Class members housed at Coronado who work on the fire crew or off-site report that there is no open clinic available in the late afternoon/early evening when they return, and therefore they cannot see medical care without taking a day off from work, or waiting until they have a day off from work. **We**



request that open clinic be run in the late afternoon so that people returning from offsite employment have adequate access to healthcare, as Defendants have repeatedly represented to the Court that their so-called "open clinic" runs from 7 am to 7 pm. (PMs 36, 39, 40, 41, 42)

**Emergency Responses at Coronado Unit:**  There is no man-down bag or man-down emergency medications on the Coronado Unit.  We were told by health care staff that there was no place to store these items at the Coronado Unit clinic.  Therefore, if there is an ICS, nursing staff at Coronado must wait for someone to bring it over from the Kaibab Unit (thus exiting through security through the gate at Kaibab and then entering and passing security at Coronado). Staff insisted that despite the distance and need to go through security twice,  the emergency response time to incidents on Coronado Unit is 5 minutes.  These statements strain credulity.  **We request that a man-down bag and box be *immediately* placed at the Coronado Unit so that emergency responses can take place in a timely manner. (PMs 24, 25)**

**Access to Open Clinic for Kaibab-North Yard:** Class members on Kaibab-North reported that they are only given a 15 minute window of time to get through the gate to Kaibab South where the clinic is located, to show up for open clinic. If they are unable to get to the gate on time, or if a medical problem arises subsequent to that 15 minute window, they have to find a custody officer willing to take them to the clinic, or wait until the next day. The DON confirmed that class members on Kaibab North get a 15 minute window of time to come to the clinic for open clinic.  Such a practice is not consistent with the purpose of open clinics. **This window needs to be expanded such that prisoners can be seen on open clinic on the day their healthcare need arises.  (PMs 36, 39, 40, 41, 42)**

**Denial of Emergency Keep On Person Inhalers:** Class members on Kaibab reported that asthma inhalers are no longer KOP, and therefore people with asthma have to go to pill line to use their inhalers. Obviously this is not helpful when/if people have asthma attacks during times when pill line is not open.  **We request that asthma inhalers again be made KOP and that patients with asthma be provided the inhalers so that they have them at hand in times of emergency asthma attacks.  (PM 13, 14,  25, 53, 54)**

**Inadequate Sanitation Creating a Risk of the Spread of Infectious Disease:** We observed profound lapses in sanitation during the course of our tour, most notably non-functional and/or filthy and moldy showers.  We requested that photographs be taken of these problems, but to date you have not provided them. Class members reported to us that they were unable to properly care for wounds in such unsanitary conditions, not to mention the general threat to a person's health and well-being that such conditions present.  **During our tour, we notified you of an individual living in such a setting who was covered with rashes and open lesions, and whose medical record indicated that he had a history of scabies and the provider had not identified the cause of his skin condition.  We request that proper cleaning supplies be provided to class members, and that communal and bathroom areas be kept functioning, clean, and mold-free in order to reduce the spread of infectious diseases.  We request that you  provide us with all  photographs taken during the Winslow tour.**

<u>**Class Members in Need of Immediate or Urgent Medical, Dental, or Mental Healthcare**</u>

███████████████████████, **Kaibab Unit**

Mr. ████████ saw a urologist on 4/16/18 for a neurologic bladder and testicular swelling. The urologist's report contains extensive treatment and testing recommendations, which his

medical record does not indicate have begun.  Mr. ▮▮▮▮▮ needs to immediately receive the treatment detailed in this report.

▮▮▮▮▮▮▮▮▮▮ **Coronado Unit**

Mr. ▮▮▮▮ is 25 years old and has a heart condition that results in irregular heartbeat. He had a loop monitor implanted in 2004.  He saw a cardiologist on 3/21/18 regarding his likely diagnosis of Brugada Syndrome and irregular heartbeat.  The cardiologist requested genetic testing to confirm Brugada Syndrome, and if the test is positive, then he will need a pacemaker implanted. NP Brathwaite submitted the request on 3/21/18 for follow up. As of 4/14/18, this request is still listed as "Clinical Coordinator Initiated."  Mr. ▮▮▮▮ needs to see the cardiologist and have the diagnostic genetic testing to determine if he needs the pacemaker.

Although Mr. ▮▮▮▮ is a chronic care patient due to his cardiac condition, he reports that he was not offered a flu shot.

▮▮▮▮▮▮▮▮▮, **Coronado Unit**

Mr. ▮▮▮ has a history of seizures as a result of a traumatic brain injury.  He came to Winslow from Red Rock approximately ten months ago, but is not on any anti-seizure medication.  Mr. ▮▮s history and current condition need to be assessed by a provider to ensure that he is receiving the proper care for his documented seizure disorder.

▮▮▮▮▮▮▮▮▮, **Coronado Unit**

Mr. ▮▮▮▮ has HCV. He reports that he was not offered a flu shot even though he is a chronic care patient, because the day that flu shots were administered he was offsite working. He was hospitalized four years ago for pneumonia, and reports that it has been a year since

6



he had a pneumonia vaccine.  His medical record confirms that he was not offered a flu shot this flu season, and his last pneumonia vaccine was in May 2017.

### ████████████  Kaibab North

Mr. ██████ has multiple chronic medical conditions, including cardiac problems (heart attacks and stents), diabetes, hypertension, and hyperlipidemia.  He reports, and his medical record confirms, that he has not seen a cardiologist since March 2016. At that time, the cardiologist ordered that he return within one year.  The Winslow nurse practitioners have submitted multiple requests for a cardiology consult, which Utilization Management has denied as "not medically necessary."  He was recently taken to the hospital after suffering from chest pains and an abnormal EKG; the hospital doctors recommended that he undergo an echocardiogram and a stress test.  The prison provider submitted the request for these recommended diagnostic procedures, which UM again denied as not demonstrating medical necessity.  Strangely, the most recent ATP, dated 2/12/18, was not accepted by the provider who made the request, but rather a scheduler.  See attached excerpts from his medical record. Mr. ██████ needs to be seen by a cardiologist, and undergo all recommended cardiac diagnostic procedures.

### ████████████████, Coronado Unit

Mr. ████████ reports suffering from inner knee pain and back pain when standing and walking. He reports the pain causes his knees to buckle, which often causes him to fall. Mr. ████████ put in an HNR on 2/15/18 regarding this issue, and was told he'd be called in for an appointment.  He has not been called up about this issue: while he was seen by the provider on 2/19/18, 3/28/18 and 4/6/18, his back and knee pain were never addressed. Mr. ████████ needs to be seen by a provider to assess and treat his knee and back pain.

██████████████████, **Kaibab Unit**

Mr. ███████ reports that he has had R side abdominal pain for the past 2 years, and that his pain is a 6-9 on the pain scale. He has submitted numerous HNRs about this problem, and notes that the only thing that has helped in the past was being on antibiotics for a few weeks. As soon as the antibiotics were discontinued in the past, the pain returned.  Nothing in his medical record indicates additional antibiotics are under consideration.

He was diagnosed with Hep C in 2/2010. He saw a provider (NP Rossell) on 3/15/18, who noted in assessment notes: "HCV – worsened, APRI (1/17) 0.55 with abdominal pain and hepatomegaly" and ordered labs and an abdominal ultrasound "for further evaluation of hepatomegaly and tenderness." Labs were taken on 3/29/18 and the results received on 4/3/18 showing normal PT levels. The consult request for radiology was placed on 3/15/18, more information was provided ("Hep C worksheet") on 4/10/18, and the consult was ATP'ed on 4/10/18 stating: "medical necessity not demonstrated. Recommend discontinuing Excedrin, and checking Tylenol level. Then recheck LFT's." The provider noted: "Will d/c Excedrin and check APAP serum level. He will be seen tomorrow on provider line. Will re-check abdomen and hepatomegaly." Mr. ██████ was seen by the provider on 4/11/18 and reports the provider stated there is nothing they can do right now regarding the ultrasound, but that they would take more labs and try to see what his levels are and go from there. He also reported that the provider took him off Excedrin because the Tylenol is bad for his liver. His updated labs for acetaminophen levels came back with low/normal results, and he has a follow up appointment scheduled for 4/16/18 to review these with the provider.

Mr. ██████ needs a specialty consultation to address his abdominal pain and hepatomegaly, and to have the treatment plan recommended by that specialist timely implemented.



## ████████████████ Coronado Unit

Mr. ████ suffers from renal disease so severe it may require a kidney transplant.  He received an abdominal ultrasound on 4/19/18, the results of which have not yet been scanned into his medical record.  Given the severity of Mr. ████ renal disease, we request that a treatment plan be immediately implemented upon receipt of the ultrasound results.

## ████████████████, CDU Suicide Watch

Mr. ████ was housed in the suicide watch cell at the time of our tour, but he was not there due to acts of self-harm.  Rather, he was there on security watch because he was assaulted by other inmates on April 10 on South Unit.  Even though he was not there for suicide watch, he reported that he had been denied all personal property and had not been allowed out of the cell for recreation or a shower after 48 hours.

## ████████████████ Kaibab South

Mr. ████ tore his ACL in his right knee in August playing basketball. He reports, and his medical record confirms, that he has not seen an orthopedist. He finally saw a PT a few weeks ago who recommended weekly PT. He reports experiencing a lot of pain and can't bend his knee. He feels his knee pop out of place when he takes a step down.  According to his medical record, on 3/15/18 NP Brathwaite submitted a request for orthopedic surgery consult for repair of the torn ACL.  As of 4/14/18, this request is still listed as "Sent to UM."  Mr. ████ needs to see the orthopedic surgeon for evaluation, and to have all specialist recommendations implemented.



**████████████████   Coronado Unit**

Mr. ██████ reports suffering from knee pain caused by a knee cap that is out of place and tendons that are displaced.  He reports that the limited treatments he has received (ace bandages that interfere with proper circulation and ibuprofen) have been ineffective.  On 1/3/18, NP Braithwaite noted that the x-rays showed ossified post-traumatic lesions. Mr. ██████ was then ordered and provided with a new knee brace and continued on ibuprofen. The ibuprofen prescription expired in March 2018 and was not renewed.  Mr. ██████ s chronic knee pain needs to be evaluated by an orthopedic specialist and that specialist's orders need to be followed.

**████████████████   Coronado Unit**

Mr. ██████ has COPD and uses a CPAP machine to sleep at night. He reported that the mask is broken, and that he has requested multiple times that he get a new mask that fits his face. Mr. ██████ is a chronic care patient (hypertension, HCV, COPD), and reports that at his last chronic care appointment in December, he was not offered a flu shot.  Please ensure that Mr. ██████ receives a new mask immediately.

**████████████████, Coronado Unit**

Mr. ██████ has unresolved right side pain that has been a problem for over one year. He reports that in the past he has had severe constipation (no BM for 25+ days).  His symptoms include a distended belly in evening following dinner, and while he is not suffering from constipation currently, he still is in a lot of pain (7-8 on pain scale). NP Braithwaite noted on 3/16/18 re: R upper quadrant pain issue, and to discuss labs. NP Braithwaite then submitted a consult request for radiology for an abdominal ultrasound on 3/16/18, which currently has a status note stating "Send to UM," with no further follow up notes from UM or requests for



information. Mr. ███ needs to receive an abdominal ultrasound, as requested by NP Braithwaite, and the treatment indicated by the results of that test.

████████████████  **Kaibab Unit**

Mr. ████ has a pending order for custom-fitted orthotic insoles.  To date, this order has not been filled.  Mr. ████ suffers from debilitating foot pain and needs this order to be immediately filled.

Sincerely,

Kirstin Eidenbach

Attorney/Director

# Exhibit 2

# (Redacted)

**Corene Kendrick**

| | |
|---|---|
| **From:** | Corene Kendrick |
| **Sent:** | Monday, April 16, 2018 11:11 AM |
| **To:** | 'Tim Bojanowski'; 'Elaine Percevecz'; 'Dan Struck'; 'Rachel Love'; 'Jamie Guzman'; 'Ashlee Hesman'; 'Kevin Hanger'; 'Richie Valenti' |
| **Cc:** | Kirstin Eidenbach; Maya Abela; Tania Amarillas; Annelise Finney; Don Specter; Rita Lomio; David Fathi; Jennifer Onka |
| **Subject:** | Winslow tour follow up - ██████████████ |



Dear Tim,

During the Winslow tour on Thursday the 12th, I brought to your attention Mr. ████████████  a class member housed in a dorm in Coronado Unit whose body was covered in open sores and lesions and who complained to me about his skin condition and that the lotion he had been prescribed (triamcinolone acetonide 0.025%) was not helping. A custody officer and multiple other prisoners expressed concern about Mr. ████████s well-being, as well.  During lunch I reviewed his medical record and found the following note by Nurse Practitioner Rossell, dated 4/9/18:

> I/M here for skin issues x 17 months. He has open areas, different sizes, for the past 17 months. He squeezes these areas and he sees has clear fluid come out. He sees a dark bug come out. He gets this infection at a Florence North yard. These sites were biopsied and it was recommended outside visit with dermatologist, and was seen by a dermatologist but was never followed. He was told by the provider in Florence that there was nothing further that could be done for him. He states he has large areas on either side of thighs filled with pus and "little bug" in them.

> SKN: multiple open, large open areas, some vesicles, some shallow large open lesions, some areas with crater-appearing opening in the middle of site, crusting, erythematous area surrounding sites, +pruritis. DX includes arthropod-born infestation including bed bugs, mites, fleas - scabies, though has been treated in the past with no improvement.

> Treatment Plan:
> 1. Health assessment/PE
> 2. Unknown skin infestation - will attempt to get old records from dermatology office this IM was seen in, and results of punch bxs done there
> 3. Ordered PREDNISONE DOSEPAK (21) TABS/10 Mg, USE AS DIRECTED FOR 10 DAYS
> 4. Ordered MINOCYCLINE HCL (PRACT) CAPS/100 Mg PO BID x 30 DAYS - to prevent secondary infection
> 5. Will follow with Dermatology records and treat accordingly
> 6. Ordered SNO for NO DUTY x 30 days due to increased itching and infestation activity in sunlight
> 7. Return to HCP line in 20 to 30 days to check status
> 8. HNR as needed

She then returned him to his dormitory housing unit.  It is unclear why Ms. Rossell stated she needed to get his dermatology records, as the dermatologist's biopsy report from 3/17/17 was scanned to eOMIS (and is attached here). The dermatologist noted "the presence of rare eosinophils within the underlying infiltrate, a traumatized dermal hypersensitivity reaction (e.g. arthropod bite reaction and others) could be considered. Although no mites or mite parts are identified, it is notoriously rare to encounter these on histologic sections. Scabies therefore remains a diagnostic

consideration." The dermatologist ordered that Mr. Fernandez be returned for follow up within two weeks, but that did not occur.

After I brought Mr. ███████ to your attention and requested that he be referred emergently to a dermatologist, the institution staff moved him to the complex detention unit at Kaibab Unit to quarantine him and to prevent an outbreak in his dorm. You told me that the medical staff had ruled out scabies the week before, but I could not locate any such treatment note ruling out scabies, and NP Rossell's treatment notes did not rule out scabies. You also said that Mr. ███████ would be provided his personal property after it was cleaned.  According to his medical record, Mr. ███████ was seen on Friday, the day after our tour, by Dr. Jordan who ordered a food allergy test but did not submit a request for a referral to see a dermatologist.

I reiterate my request that Mr. ███████ be referred emergently to a dermatologist for evaluation and treatment of his skin lesions and infestation.  I also request that you provide an update as to when he was provided his personal property, since he is housed in the detention unit for non-disciplinary reasons.  Also please note that Mr. ███████ does not speak English, therefore all encounters must be held with the assistance of an interpreter pursuant to the Stipulation's requirements.


Thanks,

Corene

Corene Kendrick, Staff Attorney
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA 94710
510-280-2621
ckendrick@prisonlaw.com

Ameripath          WHITE MOUNTAIN DERMATOLOGY - CG3/22/17      04:58 PM    Fax Number: 5207233658      Pg 3 / 4



**D E R M P A T H**
**D I A G N O S T I C S**

TUCSON, ARIZONA

CONFIDENTIAL

| PATIENT INFORMATION | PHYSICIAN INFORMATION |
|---|---|
| ▓▓▓▓▓▓▓▓ | **GERARDO BRUAL, MD**<br>WHITE MOUNTAIN DERMATOLOGY - CG<br>7100 N OVERFIELD RD<br>CASA GRANDE, AZ 85222-0000<br>Phone: 520-723-8182 |

| SPECIMEN INFORMATION | |
|---|---|
| Collected: 3/17/2017<br>Received: 3/20/2017<br>Reported: 3/22/2017 | Accession #: **JC17-010605-JC** |

## DERMATOPATHOLOGY REPORT

### RESULTS

## DIAGNOSIS:

**A. LEFT LOWER CHEST-**
  SUPERFICIAL DERMAL EROSION WITH INFLAMMATORY SCALE CRUST AND SCANT DERMAL
   EOSINOPHILS
  SEE COMMENT

  COMMENT: Please refer to comment below for specimen B.

**B. LEFT LEG UPPER 3RD-**
  SUPERFICIAL DERMAL EROSION WITH INFLAMMATORY SCALE CRUST AND RARE DERMAL
   EOSINOPHILS
  SEE COMMENT

  COMMENT:
  1. Both biopsies demonstrate similar findings which are predominantly those of recent trauma. Due to
  the presence of rare eosinophils within the underlying inflammatory infiltrate, a traumatized dermal
  hypersensitivity reaction (e.g. arthropod bite reaction and others) could be considered. Although no mites
  or mite parts are identified, it is notoriously rare to encounter these on histologic sections. Scabies
  therefore remains a diagnostic consideration.
  2. The case and results were discussed with Maria in Dr. Brual's office (3/22/2017). The specimens are
  reported according to the clinical descriptions and anatomic locations. The labeling of blocks and slides
  have been corrected per communication with the office of Dr. Brual.

*Tracy L. Davis*

**Tracy L. Davis, M.D.**
Electronic Signature: 22 MAR 2017 01:13 PM

### CLINICAL INFORMATION

A-B. R/O SCABIES MITE INFESTATION

### SPECIMEN DATA

**GROSS DESCRIPTION:**
A. Received in a formalin filled container labeled ▓▓▓▓▓▓▓ L lower chest" is a 5 x 5 x 3 mm punch of skin, inked
black and sectioned into 2 pieces. Submitted in 1 block(s). In toto. Although this specimen was received with only one unique
patient identifier, the specimen was processed in order to ensure prompt delivery of the diagnosis. Per the College of
American Pathologists guidelines, two unique patient identifiers are required on all specimen containers and the referring office
is encouraged to provide this information on future specimens.
B. Received in a formalin filled container labeled ▓▓▓▓▓ L leg upper 3rd" is a 5 x 5 x 6 mm punch of skin, inked
black and sectioned into 2 pieces. Submitted in 1 block(s). In toto.

A microscopic examination was performed to arrive at the diagnostic conclusion reported. Appropriate controls were evaluated
and worked properly.

Dermpath Diagnostics Tucson,7485 East Tanque Verde Road,Tucson,AZ 85715. P(520)320-7681. F(520)320-7684.
Medical Director: Tracy L. Davis, M.D. CLIA 03D0980494

FINAL REPORT-ACC FINAL                              PAGE 1 OF 2

Ameripath             WHITE MOUNTAIN DERMATOLOGY - CG3/22/17      04:58:PM   Fax Number: 5207233658    Pg 4 / 4



| PATIENT INFORMATION | SPECIMEN INFORMATION |
|---|---|
| | Accession #: **JC17-010605-JC** |

TUCSON, ARIZONA

CONFIDENTIAL

## DERMATOPATHOLOGY REPORT
### SPECIMEN DATA

**GROSS DESCRIPTION:**

ck

Dermpath Diagnostics Tucson,7465 East Tanque Verde Road.Tucson,AZ 65715. P(520)320-7681. F(520)320-7684.
Medical Director: Tracy L. Davis, M.D. CLIA 03D0980494

**FINAL REPORT-ACC FINAL**                    **PAGE 2 OF 2**

Patient Name: ▓▓▓▓▓▓▓▓▓▓▓▓▓    Account# NF

| DATE | NOTES |
|---|---|
| MAR 17 2017 | Pt. is here for Rash. |
| | Rx: Benzyl Benzoate lotion 25% 30mg OD 3 to 5 days, Permethin |
| | (Elimite Cream) 81. Sig: apply once x repeat 3-5 days to affected area |
| | A) L lower chest |
| | B) L leg upper 3rd ⟶ Punch Biopsy |

**03/17/17:**
**CASA GRANDE PATIENT** ▓▓▓▓▓▓

S:   This patient was referred for evaluation of recurring
     lesions on the trunk and extremities that have become
     worse over the past 4 weeks. They are moderately to
     severely pruritic at times and small mite-like lesions
     were noted to be emerging on the surface of the skin
     after this was scratched or irritated. He has been
     treated with Loratadine and triamcinolone cream without
     any improvement and other topical steroid medications
     were tried. The rash seems to be fading at times but
     does not completely go away. He claims that the cell
     and the shower room that he is using are filthy and he
     has been using antibacterial soap. He denies eating
     outside food. Denies exposure to plants and chemicals
     that can cause this rash. No other lesions were noted
     by the other inmates in his facility. He was also
     given prednisone in tapering doses and also Medrol,
     Bactrim DS and ibuprofen.

O:   On examination, the lesions are mildly excoriated,
     papular and urticarial slightly tender to touch, no
     purulent discharge with some superficial ulceration on
     the exposed areas of the upper extremities, chest,
     abdomen, upper back and legs.

A:   1.   Rule out dermatitis factitia.
     2.   Rule out dermatitis secondary to intake of
          medications including street drugs.
     3.   Rule out scabies and mite infestation.

P:   We did a 5 mm punch biopsy on the left lower chest and
     closed this w/nylon 5-0, and at the left leg upper
     third and closed w/nylon 5-0. Wound care instructions
     given. For the rest of the lesions, he is going to
     clean these with antibacterial soap and apply
     antibiotic ointment and avoid excoriating or scratching
     them. He may continue medications that will help him
     with itching including Loratadine and to use permethrin
     applied to affected areas to be washed off after 8
     hours and repeat after 3-5 days for a second treatment.
     Also use benzoic 25% lotion daily for 5 days. He is
     also advised to clean the cell that he is using and use
     antibacterial soap and other topical lotions. We did
     deep infrared therapy at the office for 30 minutes on
     all affected areas. FU in 2 weeks.

GB/aja

# Exhibit 3

# (Redacted)

**Corene Kendrick**

| | |
|---|---|
| **From:** | Corene Kendrick |
| **Sent:** | Wednesday, April 18, 2018 5:04 PM |
| **To:** | 'Tim Bojanowski'; 'Elaine Percevecz'; 'Rachel Love'; 'Dan Struck'; 'Jamie Guzman'; 'Ashlee Hesman'; 'Kevin Hanger'; 'Richie Valenti'; 'Lucy Rand'; 'mary.beke@azag.gov' |
| **Cc:** | Kirstin Eidenbach; Maya Abela; Don Specter; Rita Lomio; Alison Hardy; Tania Amarillas; Annelise Finney; Amber Norris; David Fathi; Amy Fettig; Jennifer Onka |
| **Subject:** | Winslow Tour Follow Up - ███████████   Coronado Unit |

Tim,

You will remember Mr. ██████ as the class member I informed you about during our lunch break on the April 12 Winslow tour as having bilateral detached retinas.  He has had an outstanding ophthalmology consult request for treatment pending Utilization Management review for six weeks.  Mr. ██████ reported to me that he only had some peripheral vision out of his right eye, but otherwise cannot see. Needless to say this makes it difficult for him to complete activities of daily living or to navigate the prison yard and dorm.  He also must rely upon others to assist him in reading and writing, which has made it difficult for him to submit any HNRs.

He has a history of tears in his retinas and in the past has had to have surgical repair.  The last time he saw an ophthalmologist was 12/27/17, who noted that he had a retinal detachment with a giant tear in his right eye, and his left eye had vitreous degeneration and phthisis bulbi.  This report was received on 1/12/18 but not reviewed by the provider until 1/22/18, in violation of PM 52.

He reported to me that since his December appointment, his vision in his right eye worsened, along with the pain.  He cannot see to write HNRs and reports that he made multiple verbal requests to custody staff and nursing staff that he be seen by a provider. He saw an optometrist on 2/26/18 who recommended referral to ophthalmology.

On 3/5/18 the scheduler, Laura Lee, submitted a request for an ophthalmology consult upon verbal order of the optometrist (but curiously was entered into eOMIS as "Provider – Review") but as of today, this specialty request is still listed in eOMIS as "Send to UM" in violation of PM 48.

During our tour, after I brought Mr. ██████ to your attention, you told me that Corizon staff assured you that Mr. ██████ was going to be taken offsite sometime this week to see the ophthalmologist. There is zero documentation in his medical record that supports this assertion that he is scheduled to be seen by the specialist.  As of this afternoon, any off-site encounter is not documented in his record.  Additionally, there is no documentation of him being seen by any health care staff at the prison since his optometry encounter on 2/26/18.

I reiterate my request that this man be seen urgently by an ophthalmologist and be provided all treatments recommended by the specialist before he is left permanently blind due to the failure to provide him appropriate and needed specialty medical care. Please provide me an update on when Mr. ██████ will be taken to the ophthalmologist.

Thank you,

Corene

Corene Kendrick, Staff Attorney
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA 94710

# Exhibit 4

1  Kathleen E. Brody (Bar No. 026331)
   **ACLU FOUNDATION OF ARIZONA**
2  3707 North 7th Street, Suite 235
   Phoenix, Arizona 85013
3  Telephone: (602) 650-1854
   Email: kbrody@acluaz.org
4
   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
5  *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
   *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
6  *Desiree Licci, Joseph Hefner, Joshua Polson, and*
   *Charlotte Wells, on behalf of themselves and all others*
7  *similarly situated*

   **[ADDITIONAL COUNSEL LISTED ON**
8  **SIGNATURE PAGE]**

9  Sarah Kader (Bar No. 027147)
   Asim Dietrich (Bar No. 027927)
10 **ARIZONA CENTER FOR DISABILITY LAW**
   5025 East Washington Street, Suite 202
11 Phoenix, Arizona 85034
   Telephone: (602) 274-6287
12 Email: skader@azdisabilitylaw.org
          adietrich@azdisabilitylaw.org
13
   *Attorneys for Plaintiff Arizona Center for Disability Law*
14
   **[ADDITIONAL COUNSEL LISTED ON**
   **SIGNATURE PAGE]**
15

16              UNITED STATES DISTRICT COURT

17                  DISTRICT OF ARIZONA

18 | Victor Parsons; Shawn Jensen; Stephen Swartz; | No. CV 12-00601-PHX-DKD |
   Dustin Brislan; Sonia Rodriguez; Christina
19 Verduzco; Jackie Thomas; Jeremy Smith; Robert
   Gamez; Maryanne Chisholm; Desiree Licci; Joseph   **DECLARATION OF**
20 Hefner; Joshua Polson; and Charlotte Wells, on     **RITA K. LOMIO**
   behalf of themselves and all others similarly
21 situated; and Arizona Center for Disability Law,

22                    Plaintiffs,

23            v.

   Charles Ryan, Director, Arizona Department of
24 Corrections; and Richard Pratt, Division Director,
   Division of Health Services, Arizona Department of
25 Corrections, in their official capacities,

26                    Defendants.

27

28

I, Rita K. Lomio, declare:

1.     I am an attorney licensed to practice before the courts of the State of California, and I am admitted *pro hac vice* in this matter.  I am a Staff Attorney at the Prison Law Office, and I am an attorney of record to the plaintiff class in this litigation.  If called as a witness, I could and would testify competently to the facts stated herein, all of which are within my personal knowledge.

2.     On April 26, 2018, I participated in the scheduled monitoring tour of ASPC-Yuma.  That morning, I visited the La Paz Unit's medical clinic, accompanied by Maya Abela and Chris Carlsen of the Arizona Center for Disability Law, attorneys for Defendants and Corizon Health, Inc., and security escorts.

3.     I asked to speak with the charge nurse and was escorted to what appeared to be the medication storage room.  The small room included a desk, chair, computer, and phone immediately to the left of the entrance door.  A woman who identified herself as RN Bradford, the La Paz Unit Assistant Director of Nursing, sat in front of the computer.

4.     I entered the room, turned to face RN Bradford, and began to interview her. RN Bradford remained sitting at the desk by the entrance door.  During the interview, I observed what appeared to be a camera flash.  I turned around and saw an officer standing behind me, at the far end of the room along the wall opposite the entrance door.  The man was holding what appeared to be a camera, which was directed toward where RN Bradford and I were located.

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 3, 2018, in Berkeley, California.

///

///

///

///

///

///

1    Dated:  May 4, 2018                    **PRISON LAW OFFICE**

2

3                                           By:   s/ Rita K. Lomio
                                                  Donald Specter (Cal. 83925)*
4                                                 Alison Hardy (Cal. 135966)*
                                                  Sara Norman (Cal. 189536)*
                                                  Corene Kendrick (Cal. 226642)*
5                                                 Rita K. Lomio (Cal. 254501)*
                                                  **PRISON LAW OFFICE**
6                                                 1917 Fifth Street
                                                  Berkeley, California 94710
7                                                 Telephone:  (510) 280-2621
                                                  Email:    dspecter@prisonlaw.com
8                                                           ahardy@prisonlaw.com
                                                            snorman@prisonlaw.com
9                                                           ckendrick@prisonlaw.com
                                                            rlomio@prisonlaw.com
10

11                                                *Admitted *pro hac vice*

12                                                David C. Fathi (Wash. 24893)*
                                                  Amy Fettig (D.C. 484883)**
13                                                Victoria Lopez (Ill. 6275388)*
                                                  **ACLU NATIONAL PRISON
14                                                PROJECT**
                                                  915 15th Street N.W., 7th Floor
15                                                Washington, D.C. 20005
                                                  Telephone:  (202) 548-6603
16                                                Email:    dfathi@aclu.org
                                                            afettig@aclu.org
17                                                          vlopez@aclu.org

18                                                *Admitted *pro hac vice*.  Not admitted
                                                   in DC; practice limited to federal
19                                                 courts.
                                                  **Admitted *pro hac vice*

20                                                Kirstin T. Eidenbach (Bar No. 027341)
                                                  **EIDENBACH LAW, PLLC**
21                                                P. O. Box 91398
                                                  Tucson, Arizona 85752
22                                                Telephone:  (520) 477-1475
                                                  Email:    kirstin@eidenbachlaw.com
23

24                                                Kathleen E. Brody (Bar No. 026331)
                                                  **ACLU FOUNDATION OF
25                                                ARIZONA**
                                                  3707 North 7th Street, Suite 235
26                                                Phoenix, Arizona 85013
                                                  Telephone:  (602) 650-1854
27                                                Email:    kbrody@acluaz.org

28

                                           -2-

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
           agerlicher@perkinscoie.com
           jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

s/ Maya Abela

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:     skader@azdisabilitylaw.org
              adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
    rdalyrooney@azdisabilitylaw.org
        jrico@azdisabilitylaw.org
        jross@azdisabilitylaw.org
        mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

Exhibit 5

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
*Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
*Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
*Desiree Licci, Joseph Hefner, Joshua Polson, and*
*Charlotte Wells, on behalf of themselves and all others*
*similarly situated*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: skader@azdisabilitylaw.org
        adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br><br> **DECLARATION OF MAYA ABELA** |

I, Maya Abela, hereby declare:

1.      I am an attorney licensed to practice before the courts of the State of Arizona, and am admitted to this Court.  I am a staff attorney at the Arizona Center for Disability Law, and an attorney of record for the Plaintiff Arizona Center for Disability Law in this litigation.  I have personal knowledge of the matters set forth herein and could testify competently thereto.

2.      On April 26, 2018, I participated in the scheduled monitoring tour of the ASPC Yuma complex.  Rita Lomio of the Prison Law Office, Chris Carlsen of the Arizona Center for Disability Law, and I began the morning of the tour by visiting the La Paz Unit at ASPC Yuma, where we first visited the La Paz medical unit.  We were accompanied by attorneys for ADC and Corizon, and security staff.

3.      While at the La Paz medical unit, Ms. Lomio asked to speak with the nurse on duty, and our group was led back to the room where the nurse was at that time. The room appeared to be the pharmacy/medication storage room, as it was lined with shelves containing pharmacy stock. The room also included a desk with a computer and phone by the door where the nurse was working.

4.      Ms. Lomio, Mr. Carlsen, a female attorney representing Corizon, and I entered the room and Ms. Lomio began interviewing the nurse, who identified herself as RN Bradford, the Unit Assistant Director of Nursing.

5.      During the course of the interview an unidentified male correctional officer in uniform walked to the far side of the room from where the desk was located and where we were standing talking to RN Bradford.  I observed the officer take photos of the group of us interviewing RN Bradford with a small red camera.

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 4, 2018, in Tucson, Arizona.

///

///

_s/ Maya Abela_____
**ARIZONA CENTER FOR
DISABILITY LAW**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
        adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email: rdalyrooney@azdisabilitylaw.org
         jrico@azdisabilitylaw.org
         jross@azdisabilitylaw.org
         mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for
Disability Law*

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email: dspecter@prisonlaw.com
      ahardy@prisonlaw.com
      snorman@prisonlaw.com
      ckendrick@prisonlaw.com
      rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Victoria Lopez (Ill. 6275388)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email: dfathi@aclu.org
      afettig@aclu.org
      vlopez@aclu.org

*Admitted *pro hac vice*.  Not admitted in DC;
practice limited to federal
courts.
**Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email: kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: kbrody@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
        agerlicher@perkinscoie.com
        jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email: jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm; Desiree
Licci; Joseph Hefner; Joshua Polson; and
Charlotte Wells, on behalf of themselves and
all others similarly situated*

# Exhibit 6

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
*Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
*Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
*Desiree Licci, Joseph Hefner, Joshua Polson, and*
*Charlotte Wells, on behalf of themselves and all others*
*similarly situated*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
        adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

### UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **DECLARATION OF CHRISTIAN CARLSEN** |

I, Christian Carlsen, hereby declare:

1.    I am an attorney licensed to practice before the courts of the State of Arizona, and am admitted to this Court.  I am a staff attorney at the Arizona Center for Disability Law.   I have personal knowledge of the matters set forth herein and could testify competently thereto.

2.    On April 26, 2018, I toured the La Paz unit of ASPC-Yuma with Maya Abela and Rita Lomio. That morning, Ms. Lomio asked to begin the tour at the La Paz clinic. There, Ms. Lomio began interviewing a nurse about clinic procedures. Part of this interview took place in the room where medications and supplies are stored. During this interview, I saw a prison officer photographing Ms. Lomio and the nurse she was interviewing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 4, 2018, in Tucson, Arizona.

                                           s/ Christian Carlsen

**ARIZONA CENTER FOR
DISABILITY LAW**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
         adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email: rdalyrooney@azdisabilitylaw.org
         jrico@azdisabilitylaw.org
         jross@azdisabilitylaw.org
         mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for
Disability Law*

**ADDITIONAL COUNSEL:**          Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email: dspecter@prisonlaw.com
        ahardy@prisonlaw.com
        snorman@prisonlaw.com
        ckendrick@prisonlaw.com
        rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Victoria Lopez (Ill. 6275388)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email: dfathi@aclu.org
        afettig@aclu.org
        vlopez@aclu.org

*Admitted *pro hac vice*.  Not admitted in DC;
practice limited to federal
courts.
**Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email: kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: kbrody@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email: dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email: cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email: jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

# Exhibit 7

# (Redacted)



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Camille Woods
Lynn Wu

May 1, 2018

Mr. Daniel Struck
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
dstruck@strucklove.com

      Re:    *Parsons v. Ryan*
              ASPC-Yuma tour

Dear Mr. Struck:

      During Plaintiffs' Counsel's April 26-27, 2018 monitoring tour at ASPC-Yuma, we spoke with dozens of men who reported that in the aftermath of the March 1, 2018 riot on Cheyenne Unit, they and others were denied access to medical care and medications, and subjected to conditions and treatment that the Ninth Circuit has previously found to be unconstitutional. *See Johnson v. Lewis*, 217 F.3d 726 (9th Cir. 2000). Much of what the class members reported is also documented on ADC's website in its March 5, 2018 press release. *See* https://corrections.az.gov/article/yuma-disturbance-investigation-update, attached hereto.

      The people we interviewed almost uniformly reported that the disturbance occurred after custody officers engaged in an excessive use of force upon a handcuffed person, including kicking, beating, and smashing his head against a wall. Some prisoners came to this man's defense, and attacked the officers who were beating him. Numerous prisoners reported that after the Tactical Support Unit (TSU) took control of the yard on the evening of March 1, every person housed on Cheyenne spent the next five days forced to sleep on the recreation yard with their hands cuffed in front of them in plastic cable zip-ties. The men we spoke with emphasized that it was not just the people who participated in the attack on officers, but that *all* prisoners housed in Cheyenne, including those who were in their housing units at the time of the disturbance, were made to stay seated on the yard for five continuous days.[1] Several prisoners also reported that when the TSU was quelling the disturbance, they threw tear gas bombs into their dormitory runs,

---

[1] Defendants' press release admits as much. It stated that 44 people were moved to Eyman on March 4, 2018, an unspecified number were housed in detention units, an unspecified number who "are considered elderly and in poorer health" were moved to "alternate housing," but that "[a]ll other inmates involved in the disturbance have remained on the recreation yard since Thursday." Class members disputed this assertion that only the people involved in the disturbance were made to live on the yard.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

and that the runs were then locked.  These prisoners reported that they had gone back to their cells to seek refuge and to demonstrate that they were not participating.  With the runs locked, these prisoners had no escape from the choking cloud of tear gas set off by the officers.

Prisoners reported that the people with diabetes and major disabilities were transferred out of Cheyenne the morning of March 2, but otherwise all prisoners were on the yard until at least March 5 or 6.  The men could not stand up from the yard without the threat of being shot by TSU officers holding shotguns.  Class members reported that TSU officers were verbally abusive, would point Tasers and shotguns at prisoners' heads, threatened to attack them with dogs, and encouraged the dogs to urinate or defecate on men sitting on the yard.

According to prisoners, the day after the riot, prison officials brought in three portable toilets for each side of the yard, a total of six toilets for more than 1,100 men.  The prisoners were only allowed to use the toilets at times determined by the officers, and as a result some men urinated and defecated on themselves because they couldn't go to the bathroom except when allowed by staff.  They reported that they were not provided blankets until after at least two nights of sleeping outside.  According to records from the National Weather Service, the temperatures were as low as 46 degrees Fahrenheit the first and second nights that the men were sleeping outside.  These records also show that the daytime temperature was in the 80s and that it was clear and sunny during the day.  *See* attached.  Prisoners reported that it was not until the second or third day outside that they were provided sunblock to protect them from the sun.

Prisoners reported that the staff provided them with two sack meals a day, and after the first night, staff would intermittently pass through the yard with Igloo coolers of water and allow prisoners to have a cup of water.

People we interviewed reported that individuals with chronic medical conditions or mental illness did not get their medications and were not allowed to have their KOP medications.  Some people with disabilities did not have their assistive devices with them. Multiple prisoners reported watching men suffer seizures, and that ICS's were called for people fainting in the sun.  Some examples of these problems include, but are not limited to, the following:

███████████████ has major depressive disorder and is prescribed Prozac as a Keep on Person ("KOP") medication.  He reported that he was not allowed to have his medication with him on the yard, and was not given any Prozac until the last day the men were on the yard.  His medical record confirms his statement.

███████████████, reported that he has schizophrenia and epilepsy, and that temperature extremes can induce more seizures.  He reported that he had a

seizure on March 2, 2018 because he had not received his medication for two days, and that he had two more seizures while on the yard.  His medical record confirms that he is prescribed phenytoin (Dilantin) once a day and levetiracetam (Keppra) twice a day for epilepsy, and that he did not receive the medications on March 1 or 2. He also is prescribed olanzapine (Zyprexa) for schizo-affective disorder, and did not receive the medication those days.  His medical record shows that on March 2, nursing staff responded to an ICS for seizures, that he suffered another seizure during transport to the temporary medical unit in the library, and had another seizure upon arrival to medical.  He was sent out to the Yuma hospital, and the hospital records confirm that he had a grand mal seizure and had subtherapeutic levels of Dilantin in his system. (The hospital discharge papers requested that he be seen by a neurologist within a week, but as of today – nearly two months later -- no specialty consult request has been submitted.)  Mr. ███████ medical record also documents that ICS responses occurred on March 4 and 5, 2018, as he was having multiple full body seizures both on the yard and in the medical unit.

███████████████████ reported that on the fourth day on the yard, he had a reaction to the heat and sun. His medical record confirms this allegation; it shows that on March 5, 2018 he was taken to the clinic and given a breathing treatment due to shortness of breath and difficulty breathing.

██████████████████ reports that he fell while exiting the portable toilet.  The portable toilets were located on a transport trailer, and he had climbed up to use the restroom while still handcuffed.  He tried to break his fall off the trailer but couldn't because he was still cuffed.  He believes he passed out due to dehydration.  Mr. ██████ record confirms that an ICS was called as a result of his fall on March 2, 2018.

███████████████████ Prior to the riot, on February 14, 2018, he had eye surgery to re-attach a detached retina.  During the riot, he did his best to keep the tear gas out of his eyes, but he believes that his retina detached again as a direct result of the riot.  Authorities did transport him to outside provider for a second surgery on April 20, seven weeks after the riot, but he thinks his eyesight is not as good as it was following the first surgery and he reports a higher pain level in the affected area than prior to the riot.

██████████████████ Mr. ██████ has hearing loss, and uses hearing aids.  He was not allowed to have them during the time on the yard, and they

were not in his property – which had been destroyed –when he returned to his
living unit.

Prisoners reported that some people with mental illness began to decompensate without
their medication and some of them appeared to be suffering from auditory or visual
hallucinations.  Others reported that the harsh and terrifying conditions on the yard aggravated
their mental illness.  For example,

████████████████████ is diagnosed with schizophrenia and had recently
been taken off of his psychotropic medications prior to the riot.  He reported
that the stress of being forced to endure the conditions the men were placed in
triggered his symptoms, and that he repeatedly heard voices and felt paranoid.

████████████████████ is diagnosed with bipolar disorder.  He reported
that on the third day, he stood up, delirious, and began walking, but fell head
first into the ground.  He reports he has been told that he fainted due to
dehydration.  Mr. ████████ also reports experiencing extreme mental
decompensation following the riot.  He describes have nightmares, anxiety, and
depression.  He reports TSU officers pointing guns at him, after he and others
were already restrained in handcuffs, and overhearing radio communications
instructing officers to shoot if necessary.  Mr. ████████ medical record
confirms that he takes the generic form of Cymbalta, a psychotropic
medication, and that he was placed on suicide watch on March 5, 2018.

Multiple prisoners reported that the zip-ties were tied so tightly around their wrists that it
took weeks for sensation to return to their hands.  For example,

████████████████████ was transported off-site to the Yuma hospital the
night of March 4, 2018, because he was unable to move his right hand, and his
wrist and forearm were swollen with visible abrasions from the plastic zip-tie.
According to the hospital records, Mr. ████████ was diagnosed with cellulitis
and returned to the prison early in the morning of March 5 with a prescription
for Bactrim and ibuprofen, but there is no documentation that he received these
medications.[2]  He reported that when he returned to the yard with bandages
around his wrist, custody staff promptly put a zip-tie back on him at the same

---

[2] Mr. ████████ also has prescriptions for phenytoin (Dilantin) for epilepsy, and
hydrochlorothiazide (Microzide) for hypertension.  Both medications are KOP, but he stated that
he did not have the medications with him on the yard. His medical record shows that he was
given one dose of each medication on March 3, 5, and 6, 2018.

spot on his wrist.  When we interviewed him on April 26, 2018, there were still visible scabs and abrasions on his wrist.

███████████████████████, still had visible marks on his wrists from the zip-ties, and reported he lost all sensation in his hands for several weeks after they were removed. He reported still having a tingling feeling in his hands.

Other prisoners reported delays in being seen by medical staff while on the yard.  For example, ██████████████, wears contact lenses because he has a negative 9 prescription and suffers from retinal floaters.  He reported that for four days he was not allowed to remove his contact lenses, and when he finally was allowed to go to the medical clinic to remove them, health care staff would not remove the plastic handcuffs.

Prisoners reported that for the five days they were on the yard, the officers went building by building ostensibly searching for weapons, but instead systematically destroyed every person's property – again, regardless of who they were or whether they participated in the disturbance. The officers destroyed televisions and hot pots, removed/tossed fans, poured out hygiene items, threw out all canteen food, and threw out legal/medical/personal papers.  As detailed above, one class member alleged that his hearing aids were thrown out.  The officers tore up and destroyed personal mementos from loved ones like letters or photos. When the men were finally allowed to go back to the housing units, they had to strip naked for group searches, before returning to their bed areas and seeing everything they owned completely destroyed.

In sum, it is clear that numerous and serious violations of the *Parsons v. Ryan* stipulation occurred in the days following the March 1 disturbance.  Prisoners were denied the health care services and medication to which they are entitled, and instead were subjected to conditions that appear designed to punish, humiliate, and terrify them regardless of any involvement in the disturbance.  The Ninth Circuit previously found that such treatment for days after a disturbance has been quelled is unconstitutional.  After 1995 riots at ASPC-Safford, the men at that institution were all forced to sleep on the recreational yard for days, in conditions strikingly similar to those described by prisoners at Yuma.

While prison officials enjoy some deference during an ongoing disturbance, that deference is not indefinite in duration.  "When the inmates were in the yard, however, they were handcuffed, prone, and under armed guard. In these circumstances, the inmates presented no further danger to prison staff, the public, or each other, and prison officials were no longer required to make split-second, life-and-death decisions. Once the inmates were thus secured in the yard, the state-of-mind requirement that sufficed to show an Eighth Amendment violation was deliberate indifference."  *Johnson v. Lewis*, 217 F.3d 726, 734 (9th Cir. 2000).

Mr. Dan Struck
RE: Parsons v. Ryan
ASPC-Yuma
May 1, 2018
Page 6

According to the ADC press release, 28 prisoners were treated at local hospitals for their injuries on March 1, 2018.  We request that Defendants provide us with the names of all persons who were transported off-site for their injuries so that we can have our experts review their medical records.  We are disturbed to note that the ER/Outside Hospitalization report provided us prior to the Yuma tour did not appear to list all 28 class members as being transported from Cheyenne on that day.  *See* ADCM1510519-26.  We also request that Defendants provide us with the names of all persons for whom an ICS was called during the time that class members were housed on the recreational yard.  We also request the name and ADC number of the class member who was the subject of the use of force on March 1 that precipitated the riot.  Please provide us with all names no later than May 8, 2018.

We also are concerned that the health care staff were unable to provide critical health care services such as ensuring patients had their medications, and that apparently class members were not even provided access to their KOP medications.  Disturbances are, unfortunately, a foreseeable occurrence in the prison setting, and ADC and Corizon must have an emergency plan in place to ensure that health care services are provided without interruption, even during a serious emergency. Therefore we request that you detail to us and to the Court all steps taken by Corizon and ADC to attempt to provide health care to the Cheyenne class members from March 1-6, 2018, as well as any emergency plans for future disturbances at Yuma and the other nine Arizona state prison complexes.  Please provide this information no later than June 1, 2018.

Thank you for your attention to this matter.

Sincerely yours,

Corene Kendrick
Staff Attorney

  

☰ State Agencies    ⚙ State Services    📖 Visit OpenBooks      Ombudsman-Citizens Aide

🔍 Search AZ.Gov    



**Arizona Department of Corrections**

[Search ADC]

Select Language ▼

Powered by Google **Translate**

# Yuma Disturbance Investigation Update

March 5, 2018

## Arizona Department of Corrections



## NEWS RELEASE
## For Immediate Release

**YUMA** (Monday, March 5, 2018) – The investigation of Thursday's major disturbance at ASPC-Yuma's Cheyenne unit is ongoing from an administrative and criminal standpoint, however, some additional information is now available.

On Friday, ADC Director Charles Ryan traveled to Yuma to personally assess and communicate with staff onsite.

Over the weekend, ASPC-Yuma reopened and resumed normal operations at its other four units (La Paz, Cibola, Cocopah and Dakota), which had been locked down following the disturbance at Cheyenne.

The incident that triggered the disturbance began with an inmate being escorted across the recreation yard who appeared to be under the influence.

This inmate attempted to assault the escorting officers and then ran away from them. The officers pursued him on the yard. This activity resulted in other inmates spontaneously attacking the officers.

Case 2:12-cv-00601-ROS Document 2794 Filed 05/04/18 Page 47 of 92

Most of the inmates of this 1,124 bed, medium custody, dormitory environment were outside on the yard at this time (approximately 6:18 p.m.).

Both sides of the unit began attacking prison employees, breaking property (windows, toilets, sinks, etc.), and gained access to the dormitory officer stations as well. Inmates pulled mattresses and other property outside of the dormitories and started fires on the yard.

Two quick response weapons teams were deployed to prevent inmates from trying to gain access to the 'no man's zone' fenced area. Yuma's tactical support unit (TSU) team was activated to regain order from the inmates who had broken into the medical/health unit building. Inmates were attacking prison personnel using tables as shields when shotguns were deployed.

Preliminary autopsy results of inmate Adam J. Coppa, ADC# 180398, indicates that he died as a result of a gunshot wound. His death remains under investigation.

ADC personnel brought the disturbance under control by approximately 9:00 p.m., and all inmates were secured in the outside recreation enclosures and placed in flex cuffs.

The local law enforcement response from Yuma County Sheriff's Office, Yuma & San Luis Police Departments, FBI, U.S. Customs and Border Protection and others provided resources to maintain the perimeter.

ADC transferred 44 inmates on Sunday from Cheyenne to the maximum-custody Eyman complex in Florence. Additional inmates have been placed in detention units, pending criminal investigations and/or movement.

Inmates that are considered elderly and in poorer health have been placed in alternate housing.

All other inmates involved in the disturbance have remained on the recreation yards since Thursday. They are receiving necessary provisions and care, including meals, water, prescribed medications, blankets, coats, and sunscreen and have access to medical care and porta-johns.

TSU teams from Lewis, Tucson and Perryville have been onsite to provide rotation relief for the Yuma team.

The initial damage estimate is approximately $475,000 and repairs remain in process, with many priority repairs having been completed already.

As we reported Friday, 11 employees sustained minor injuries and were treated.

Up two from Friday's update, a total of 28 inmates were treated at the hospital. 25 have returned to the complex.

Staffing levels were not a factor in leading to Thursday's disturbance. 33 of the unit's 35 designated posts were staffed by correctional officers on duty at the time, along with two shift supervisors. Moreover, the Yuma complex has the lowest staff vacancy rate of all state-run prisons. Currently, the complex has zero correctional officer vacancies.

The department's administrative and criminal investigations are ongoing.

### ###

*Safer Communities Through Effective Corrections*
*Visit our website at corrections.az.gov (https://corrections.az.gov) and follow us on Twitter (https://twitter.com/azcorrections) and Facebook (https://www.facebook.com/AZCorrections) at @AZCorrections*

© 2018 Copyright Arizona Department of Corrections

Contact Us   |   Sign In   |   Privacy Policy   |   Web Page Disclaimer



timeanddate.com

# 🇺🇸 Past Weather in Yuma, Arizona, USA — March 2018

◣

Now

83 °F

High level clouds.

Feels Like: 80 °F
Forecast: 61 / 84 °F
Wind: 12 mph →from West

| Location: | Yuma Marine Corps Air Station |
| Current Time: | Apr 30, 2018 at 4:12:35 pm |
| Latest Report: | Apr 30, 2018 at 2:57 pm |
| Visibility: | 7 mi |
| Pressure: | 29.77 "Hg |
| Humidity: | 19% |
| Dew Point: | 36 °F |



| Place or country... | Search |

Time/General    Weather    Time Zone    DST Changes    Sun & Moon

Weather Today/Tomorrow    Hour-by-Hour Forecast    14 Day Forecast    Yesterday/Past Weather    Climate (Averages)

**Select month:**  March 2018

## March 2018 Weather in Yuma — Graph



Tuesday, March 6, 2018, 12:00 pm — 6:00 pm

79 / 72 °F
Passing clouds.

| Humidity: | 6% | | NNW |
| Barometer: | 30.03 "Hg | | Wind: 9.321 mph |

Thu, Mar 1    Fri, Mar 2    Sat, Mar 3    Sun, Mar 4    Mon, Mar 5    Tue, Mar 6    Wed, Mar 7    Thu, Mar 8    Fri, Mar 9    Sat, Mar 10    Sun, Mar 11    Mon, Mar 12    Tue, Mar 13    Wed, Mar 14    Thu, Mar 15    Fri, Mar 16    Sat, Mar 17    Sun, Mar 18    Mon, Mar 19    Tue, Mar 20    Wed, Mar 21    Thu, Mar 22    Fri, Mar 23    Sat, Mar 24    Sun, Mar 25    Mon, Mar 26    Tue, Mar 27    Wed, Mar 28    Thu, Mar 29    Fri, Mar 30    Sat, Mar 31

See weather overview ›

Exhibit 8

**Arizona Monthly Staffing Report**
**Roll-Up**
*(Excludes Regional Office)*
**March 2018**

Working Days = 22

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 10.00 | 4.80 | 48% | 5.16 | - | - | - | 5.16 | 52% |
| Staff Physician | 14.00 | 9.25 | 66% | 8.94 | - | - | 0.63 | 9.57 | 68% |
| Administrator | 10.00 | 8.00 | 80% | 8.01 | - | - | - | 8.01 | 80% |
| Correctional RN Supervisor II / DON | 10.00 | 9.00 | 90% | 8.46 | - | - | - | 8.46 | 85% |
| Asst. Correctional RN Supervisor II / ADON | 3.00 | 39.00 | 1300% | 35.65 | - | - | - | 35.65 | 1188% |
| Administrative Services Officer | 7.00 | 7.00 | 100% | 5.28 | - | - | - | 5.28 | 75% |
| Nurse Practitioner | 26.00 | 37.30 | 143% | 36.85 | - | 0.24 | 1.12 | 38.22 | 147% |
| Correctional RN Supervisor I | 34.00 | - | 0% | 0.58 | - | - | - | 0.58 | 2% |
| RN | 178.90 | 161.20 | 90% | 174.37 | - | 17.49 | - | 191.86 | 107% |
| LPN | 156.60 | 152.60 | 97% | 151.81 | - | 19.44 | 0.47 | 171.72 | 110% |
| Nursing Assistant | 94.50 | 107.80 | 114% | 112.68 | - | 8.98 | - | 121.65 | 129% |
| Lab Technician | 2.00 | 3.00 | 150% | 2.83 | - | 0.73 | - | 3.56 | 178% |
| X Ray Tech | 8.50 | 7.00 | 82% | 8.28 | - | 0.44 | - | 8.72 | 103% |
| Pharmacy Tech | 23.50 | 27.00 | 115% | 21.99 | - | 1.44 | - | 23.43 | 100% |
| Secretary / Administrative Assistant | 21.00 | 18.80 | 90% | 16.33 | - | 0.39 | - | 16.72 | 80% |
| Med Records Supervisor | 10.00 | 9.00 | 90% | 8.28 | - | - | - | 8.28 | 83% |
| Med Records Clerk | 32.00 | 30.50 | 95% | 29.73 | - | 0.32 | - | 30.05 | 94% |
| Scheduler | 9.00 | 9.50 | 106% | 9.94 | - | 0.30 | - | 10.24 | 114% |
| Clinical Coordinator | 8.00 | 7.00 | 88% | 6.53 | - | 1.10 | - | 7.63 | 95% |
| Dental Director | 10.00 | 5.45 | 55% | 6.68 | - | - | - | 6.68 | 67% |
| Dentist | 20.00 | 20.71 | 104% | 16.97 | - | - | - | 16.97 | 85% |
| Dental Hygienist | 1.80 | 2.10 | 117% | 1.28 | - | - | - | 1.28 | 71% |
| Dental Assistant | 43.00 | 42.75 | 99% | 38.93 | - | - | - | 38.93 | 91% |
| Psychiatric Director | 0.50 | 0.50 | 100% | - | - | - | - | - | 0% |
| Psychiatrist | 7.50 | 6.00 | 80% | 5.81 | - | - | - | 5.81 | 78% |
| Psychologist | 19.00 | 17.15 | 90% | 13.47 | - | - | 0.47 | 13.94 | 73% |
| MH Director (PH.D) | 1.00 | 1.00 | 100% | 1.03 | - | - | - | 1.03 | 103% |
| MH Clerk | 4.00 | 3.00 | 75% | 2.45 | - | 0.02 | - | 2.48 | 62% |
| MH Nurse Practitioner | 11.50 | 12.20 | 106% | 9.61 | - | - | 1.27 | 10.88 | 95% |
| MH RN | 36.40 | 33.20 | 91% | 32.70 | - | 2.53 | - | 35.23 | 97% |
| Rec Therapist | 5.00 | 1.00 | 20% | 0.99 | - | - | - | 0.99 | 20% |
| Psych Associates | 52.40 | 57.75 | 110% | 45.93 | - | - | - | 45.93 | 88% |
| Psych Tech | 25.40 | 20.60 | 81% | 23.18 | - | 0.31 | - | 23.49 | 92% |
| MH RN Supervisor | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT | - | 1.00 | 0% | 2.60 | - | 0.00 | - | 2.60 | 0% |
| Clerk | - | 1.00 | 0% | 0.97 | - | 0.00 | - | 0.97 | 0% |
| Total Contract | 896.50 | 873.16 | 97% | 854.31 | - | 53.74 | 3.96 | 912.01 | 102% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

## Arizona Monthly Staffing Report
## Douglas Region

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Administrator | 1.00 | 1.00 | 100% | 1.30 | - | - | - | 1.30 | 130% |
| Correctional RN Supervisor II / DON | 1.00 | 1.00 | 100% | 1.03 | - | - | - | 1.03 | 103% |
| Nurse Practitioner | 1.00 | 2.00 | 200% | 1.70 | - | - | - | 1.70 | 170% |
| Correctional RN Supervisor I | 1.00 | - | 0% | 0.58 | - | - | - | 0.58 | 58% |
| RN | 8.60 | 9.30 | 108% | 7.86 | - | 0.09 | - | 7.95 | 92% |
| LPN | 3.90 | 3.90 | 100% | 3.88 | - | - | - | 3.88 | 99% |
| Nursing Assistant | 3.40 | 3.00 | 88% | 1.85 | - | - | - | 1.85 | 54% |
| X Ray Tech | 0.50 | - | 0% | - | - | - | - | - | 0% |
| Secretary / Administrative Assistant | 2.00 | 2.00 | 100% | 1.79 | - | 0.00 | - | 1.80 | 90% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.96 | - | - | - | 0.96 | 96% |
| Med Records Clerk | 1.50 | 1.50 | 100% | 2.47 | - | - | - | 2.47 | 165% |
| Clinical Coordinator | - | 1.00 | 0% | 1.00 | - | 0.00 | - | 1.00 | 0% |
| Dental Director | 1.00 | - | 0% | 0.61 | - | - | - | 0.61 | 61% |
| Dentist | 1.00 | 2.01 | 201% | 0.89 | - | - | - | 0.89 | 89% |
| Dental Hygienist | 0.20 | 0.25 | 125% | - | - | - | - | - | 0% |
| Dental Assistant | 3.00 | 3.00 | 100% | 2.76 | - | - | - | 2.76 | 92% |
| Psych Associates | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Psych Tech | - | - | 0% | - | - | - | - | - | 0% |
| MH RN Supervisor | - | - | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT Clerk | - | - | 0% | - | - | - | - | - | 0% |
| Total Contract | 32.10 | 30.96 | 96% | 28.66 | - | 0.10 | - | 28.76 | 90% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**Arizona Monthly Staffing Report**
**Eyman Region**

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Contract Breakdown | | | | | |
| Medical Director | 1.00 | 1.00 | 100% | 1.04 | - | - | - | 1.04 | 104% |
| Staff Physician | 1.00 | 1.00 | 100% | 0.70 | - | - | - | 0.70 | 70% |
| Administrator | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Correctional RN Supervisor II / DON | 1.00 | 1.00 | 100% | 1.26 | - | - | - | 1.26 | 126% |
| Asst. Correctional RN Supervisor II | - | 6.00 | 0% | 5.73 | - | - | - | 5.73 | 0% |
| Administrative Services Officer | 1.00 | 1.00 | 100% | 1.05 | - | - | - | 1.05 | 105% |
| Nurse Practitioner | 3.00 | 4.00 | 133% | 4.66 | - | 0.20 | - | 4.86 | 162% |
| Correctional RN Supervisor I | 5.00 | - | 0% | - | - | - | - | - | 0% |
| RN | 20.60 | 15.45 | 75% | 14.92 | - | 1.62 | - | 16.53 | 80% |
| LPN | 23.20 | 24.30 | 105% | 25.23 | - | 2.26 | - | 27.50 | 119% |
| Nursing Assistant | 10.80 | 8.40 | 78% | 8.02 | - | 0.46 | - | 8.48 | 79% |
| X Ray Tech | 1.00 | 1.00 | 100% | 0.96 | - | 0.02 | - | 0.98 | 98% |
| Pharmacy Tech | 3.00 | 4.00 | 133% | 3.33 | - | 0.56 | - | 3.89 | 130% |
| Secretary / Administrative Assistant | 2.00 | 2.00 | 100% | 0.94 | - | - | - | 0.94 | 47% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.96 | - | - | - | 0.96 | 96% |
| Med Records Clerk | 6.00 | 5.00 | 83% | 5.13 | - | 0.11 | - | 5.24 | 87% |
| Scheduler | 1.00 | 2.00 | 200% | 2.92 | - | 0.17 | - | 3.09 | 309% |
| Clinical Coordinator | 1.00 | 1.00 | 100% | 0.92 | - | 0.75 | - | 1.67 | 167% |
| Dental Director | 1.00 | 0.20 | 20% | - | - | - | - | - | 0% |
| Dentist | 2.50 | 2.75 | 110% | 2.31 | - | - | - | 2.31 | 92% |
| Dental Hygienist | 0.20 | - | 0% | 0.23 | - | - | - | 0.23 | 114% |
| Dental Assistant | 5.00 | 5.00 | 100% | 4.54 | - | - | - | 4.54 | 91% |
| Psychiatric Director | - | | 0% | - | - | - | - | - | 0% |
| Psychiatrist | 1.00 | 1.00 | 100% | 1.04 | - | - | - | 1.04 | 104% |
| Psychologist | 4.00 | 3.00 | 75% | 2.62 | - | - | - | 2.62 | 66% |
| MH Director (PH.D) | - | | 0% | - | - | - | - | - | 0% |
| MH Clerk | 1.00 | 1.00 | 100% | 0.53 | - | 0.01 | - | 0.54 | 54% |
| MH Nurse Practitioner | 2.00 | 2.00 | 100% | 1.88 | - | - | - | 1.88 | 94% |
| MH RN | 3.00 | 1.60 | 53% | 3.75 | - | 0.04 | - | 3.79 | 126% |
| Rec Therapist | - | - | 0% | - | - | - | - | - | 0% |
| Psych Associates | 9.00 | 9.75 | 108% | 8.44 | - | - | - | 8.44 | 94% |
| Psych Tech | 5.10 | 4.00 | 78% | 4.43 | - | 0.04 | - | 4.48 | 88% |
| Education Coordinator - FT | - | 0.50 | 0% | 1.17 | - | - | - | 1.17 | 0% |
| | | | | | | | | | |
| Total Contract | 116.40 | 108.95 | 94% | 108.73 | 0.00 | 6.24 | 0.00 | 114.97 | 99% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**Arizona Monthly Staffing Report**
**Florence Region**

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | - | 0% | 0.41 | - | - | - | 0.41 | 41% |
| Staff Physician | 2.50 | 1.00 | 40% | - | - | - | - | - | 0% |
| Administrator | 1.00 | 1.00 | 100% | 1.10 | - | - | - | 1.10 | 110% |
| Correctional RN Supervisor II / DON | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Asst. Correctional RN Supervisor II | 1.00 | 6.00 | 600% | 5.17 | - | - | - | 5.17 | 517% |
| Administrative Services Officer | 1.00 | 1.00 | 100% | 0.85 | - | - | - | 0.85 | 85% |
| Nurse Practitioner | 2.00 | 4.75 | 238% | 4.58 | - | 0.01 | 1.00 | 5.59 | 280% |
| Correctional RN Supervisor I | 5.00 | - | 0% | - | - | - | - | - | 0% |
| RN | 16.40 | 20.10 | 123% | 25.55 | - | 3.03 | - | 28.57 | 174% |
| LPN | 24.40 | 18.10 | 74% | 19.13 | - | 4.97 | - | 24.10 | 99% |
| Nursing Assistant | 15.40 | 15.50 | 101% | 17.08 | - | 1.58 | - | 18.66 | 121% |
| X Ray Tech | 1.00 | 1.00 | 100% | 1.03 | - | 0.00 | - | 1.03 | 103% |
| Pharmacy Tech | 3.00 | 2.00 | 67% | 2.05 | - | 0.00 | - | 2.05 | 68% |
| Secretary / Administrative Assistant | 2.00 | 2.00 | 100% | 1.92 | - | 0.01 | - | 1.93 | 96% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 1.28 | - | - | - | 1.28 | 128% |
| Med Records Clerk | 5.00 | 5.00 | 100% | 4.59 | - | 0.00 | - | 4.59 | 92% |
| Scheduler | 1.00 | 2.00 | 200% | 1.71 | - | 0.01 | - | 1.73 | 173% |
| Clinical Coordinator | 1.00 | 1.00 | 100% | 0.77 | - | 0.01 | - | 0.79 | 79% |
| Dental Director | 1.00 | 1.00 | 100% | 0.97 | - | - | - | 0.97 | 97% |
| Dentist | 3.00 | 2.25 | 75% | 2.44 | - | - | - | 2.44 | 81% |
| Dental Hygienist | 0.20 | 0.20 | 100% | 0.13 | - | - | - | 0.13 | 65% |
| Dental Assistant | 5.00 | 5.00 | 100% | 4.30 | - | - | - | 4.30 | 86% |
| Psychiatrist | 1.00 | 1.00 | 100% | 0.96 | - | - | - | 0.96 | 96% |
| Psychologist | 2.00 | 1.80 | 90% | 1.65 | - | - | - | 1.65 | 82% |
| MH Clerk | 1.00 | 1.00 | 100% | 0.92 | - | - | - | 0.92 | 92% |
| MH Nurse Practitioner | 2.00 | 2.00 | 100% | 1.92 | - | - | - | 1.92 | 96% |
| MH RN | 2.00 | 2.00 | 100% | 1.16 | - | 0.01 | - | 1.17 | 58% |
| Rec Therapist | - | - | 0% | - | - | - | - | - | 0% |
| Psych Associates | 6.50 | 7.00 | 108% | 6.63 | - | - | - | 6.63 | 102% |
| Psych Tech | 4.10 | 4.00 | 98% | 3.55 | - | - | - | 3.55 | 87% |
| MH RN Supervisor | - | | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT Clerk | | 0.50 | 0% | - | - | - | - | - | 0% |
| | | | 0% | - | - | - | - | - | 0% |
| Total Contract | 112.50 | 109.20 | 97% | 111.85 | - | 9.63 | 1.00 | 122.49 | 109% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**Arizona Monthly Staffing Report**
**Lewis Region**

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Contract Breakdown | | | | | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | |
| Medical Director | 1.00 | 1.00 | 100% | 1.08 | - | - | - | 1.08 | 108% |
| Staff Physician | 2.50 | 1.00 | 40% | 0.55 | - | - | - | 0.55 | 22% |
| Administrator | 1.00 | - | 0% | 0.67 | - | - | - | 0.67 | 67% |
| Correctional RN Supervisor II / DON | 1.00 | 1.00 | 100% | 0.76 | - | - | - | 0.76 | 76% |
| Asst. Correctional RN Supervisor II | - | 5.00 | 0% | 3.88 | - | - | - | 3.88 | 0% |
| Administrative Services Officer | 1.00 | 1.00 | 100% | 0.10 | - | - | - | 0.10 | 10% |
| Nurse Practitioner | 3.00 | 6.00 | 200% | 6.18 | - | - | - | 6.18 | 206% |
| Correctional RN Supervisor I | 3.00 | - | 0% | - | - | - | - | - | 0% |
| RN | 21.80 | 25.95 | 119% | 26.78 | - | 3.44 | - | 30.22 | 139% |
| LPN | 21.10 | 26.20 | 124% | 27.77 | - | 3.69 | - | 31.46 | 149% |
| Nursing Assistant | 13.90 | 16.50 | 119% | 14.60 | - | 1.02 | - | 15.62 | 112% |
| X Ray Tech | 1.00 | 1.00 | 100% | 0.97 | - | 0.33 | - | 1.30 | 130% |
| Pharmacy Tech | 3.00 | 4.00 | 133% | 2.31 | - | 0.31 | - | 2.62 | 87% |
| Secretary / Administrative Assistant | 2.00 | 3.00 | 150% | 2.84 | - | 0.04 | - | 2.88 | 144% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.93 | - | - | - | 0.93 | 93% |
| Med Records Clerk | 3.00 | 3.00 | 100% | 2.94 | - | 0.01 | - | 2.94 | 98% |
| Scheduler | 1.00 | 1.00 | 100% | 0.91 | - | 0.01 | - | 0.92 | 92% |
| Clinical Coordinator | 1.00 | 1.00 | 100% | 0.89 | - | - | - | 0.89 | 89% |
| Dental Director | 1.00 | 0.25 | 25% | - | - | - | - | - | 0% |
| Dentist | 3.00 | 3.00 | 100% | 2.85 | - | - | - | 2.85 | 95% |
| Dental Hygienist | 0.20 | 0.25 | 125% | 0.19 | - | - | - | 0.19 | 94% |
| Dental Assistant | 5.00 | 5.00 | 100% | 5.13 | - | - | - | 5.13 | 103% |
| Psychiatrist | 1.00 | 1.00 | 100% | 0.93 | - | - | - | 0.93 | 93% |
| Psychologist | 3.00 | 3.25 | 108% | 2.49 | - | - | - | 2.49 | 83% |
| MH Nurse Practitioner | 2.00 | 2.00 | 100% | 1.96 | - | - | - | 1.96 | 98% |
| MH RN | 2.00 | 2.00 | 100% | 1.95 | - | 0.51 | - | 2.47 | 123% |
| Psych Associates | 7.00 | 7.00 | 100% | 6.83 | - | - | - | 6.83 | 98% |
| Psych Tech | 1.00 | 4.00 | 400% | 3.33 | - | 0.10 | - | 3.42 | 342% |
| MH RN Supervisor | - | - | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT | - | - | 0% | 0.45 | - | - | - | 0.45 | 0% |
| Clerk | | | | - | - | - | - | - | 0% |
| Total Contract | 106.50 | 125.40 | 118% | 120.26 | 0.00 | 9.44 | 0.00 | 129.70 | 122% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**Arizona Monthly Staffing Report**
**Perryville Region**

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Contract Breakdown | | | | |
| Medical Director | 1.00 | 0.80 | 80% | 0.66 | - | - | - | 0.66 | 66% |
| Staff Physician | 2.50 | 2.50 | 100% | 2.58 | - | - | 0.63 | 3.21 | 129% |
| Administrator | 1.00 | 1.00 | 100% | 0.94 | - | - | - | 0.94 | 94% |
| Correctional RN Supervisor II / DON | 1.00 | 1.00 | 100% | 0.65 | - | - | - | 0.65 | 65% |
| Asst. Correctional RN Supervisor II | 1.00 | 5.00 | 500% | 4.90 | - | - | - | 4.90 | 490% |
| Administrative Services Officer | 1.00 | 1.00 | 100% | 1.04 | - | - | - | 1.04 | 104% |
| Nurse Practitioner | 5.00 | 5.55 | 111% | 5.13 | - | - | - | 5.13 | 103% |
| Correctional RN Supervisor I | 5.00 | - | 0% | - | - | - | - | - | 0% |
| RN | 22.70 | 19.40 | 85% | 21.76 | - | 2.17 | - | 23.93 | 105% |
| LPN | 21.10 | 22.25 | 105% | 19.93 | - | 2.20 | - | 22.14 | 105% |
| Nursing Assistant | 11.80 | 14.00 | 119% | 14.05 | - | 0.84 | - | 14.89 | 126% |
| Lab Technician | 1.00 | 2.00 | 200% | 1.89 | - | 0.01 | - | 1.89 | 189% |
| X Ray Tech | 1.00 | 1.00 | 100% | 0.69 | - | - | - | 0.69 | 69% |
| Pharmacy Tech | 4.50 | 4.00 | 89% | 3.66 | - | 0.03 | - | 3.69 | 82% |
| Secretary / Administrative Assistant | 2.00 | 2.00 | 100% | 1.91 | - | - | - | 1.91 | 96% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.76 | - | - | - | 0.76 | 76% |
| Med Records Clerk | 3.00 | 3.00 | 100% | 2.59 | - | 0.01 | - | 2.60 | 87% |
| Scheduler | 2.00 | 1.50 | 75% | 1.45 | - | 0.01 | - | 1.46 | 73% |
| Clinical Coordinator | 1.00 | 1.00 | 100% | 0.95 | - | 0.02 | - | 0.97 | 97% |
| Dental Director | 1.00 | 1.00 | 100% | 1.11 | - | - | - | 1.11 | 111% |
| Dentist | 2.50 | 4.250 | 170% | 3.68 | - | - | - | 3.68 | 147% |
| Dental Hygienist | 0.20 | 0.20 | 100% | 0.37 | - | - | - | 0.37 | 185% |
| Dental Assistant | 6.00 | 6.75 | 113% | 5.69 | - | - | - | 5.69 | 95% |
| Psychiatrist | 1.00 | 1.00 | 100% | 0.97 | - | - | - | 0.97 | 97% |
| Psychologist | 3.00 | 4.10 | 137% | 2.37 | - | - | 0.47 | 2.84 | 95% |
| MH Clerk | 1.00 | - | 0% | - | - | - | - | - | 0% |
| MH Nurse Practitioner | 2.00 | 2.20 | 110% | 1.13 | - | - | 0.74 | 1.88 | 94% |
| MH RN | 2.00 | 2.00 | 100% | 1.91 | - | 0.05 | - | 1.95 | 98% |
| Rec Therapist | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Psych Associates | 6.50 | 5.00 | 77% | 4.74 | - | - | - | 4.74 | 73% |
| Psych Tech | 3.10 | 3.60 | 116% | 2.69 | - | - | - | 2.69 | 87% |
| MH RN Supervisor | - | - | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT | | - | 0% | - | - | - | - | - | 0% |
| Clerk | | | | - | - | - | - | - | |
| Total Contract | 117.90 | 118.10 | 100% | 110.21 | 0.00 | 5.34 | 1.84 | 117.38 | 100% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**Arizona Monthly Staffing Report**
**Phoenix Region**

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Staff Physician | 1.00 | 1.00 | 100% | 1.21 | - | - | - | 1.21 | 121% |
| Administrator | 1.00 | 1.00 | 100% | 1.70 | - | - | - | 1.70 | 170% |
| Correctional RN Supervisor II / DON | 1.00 | 1.00 | 100% | 0.72 | - | - | - | 0.72 | 72% |
| Asst. Correctional RN Supervisor II | - | 2.00 | 0% | 1.40 | - | - | - | 1.40 | 0% |
| Administrative Services Officer | 1.00 | 1.00 | 100% | 1.27 | - | - | - | 1.27 | 127% |
| Nurse Practitioner | 4.00 | 4.00 | 100% | 3.97 | - | - | - | 3.97 | 99% |
| Correctional RN Supervisor I | 1.00 | - | 0% | - | - | - | - | - | 0% |
| RN | 12.40 | 9.70 | 78% | 9.80 | - | 1.21 | - | 11.00 | 89% |
| LPN | 4.20 | 3.40 | 81% | 3.43 | - | 0.71 | - | 4.14 | 99% |
| Nursing Assistant | 2.00 | 2.00 | 100% | 2.73 | - | 0.18 | - | 2.90 | 145% |
| Lab Technician | 1.00 | 1.00 | 100% | 0.94 | - | 0.72 | - | 1.66 | 166% |
| X Ray Tech | 1.00 | 1.00 | 100% | 0.99 | - | 0.01 | - | 0.99 | 99% |
| Pharmacy Tech | 3.00 | 4.00 | 133% | 2.56 | - | 0.14 | - | 2.71 | 90% |
| Secretary / Administrative Assistant | 3.00 | 1.00 | 33% | 0.88 | - | 0.00 | - | 0.88 | 29% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 1.13 | - | - | - | 1.13 | 113% |
| Med Records Clerk | 4.00 | 3.00 | 75% | 2.56 | - | 0.02 | - | 2.58 | 65% |
| Scheduler | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Clinical Coordinator | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Dental Director | 1.00 | - | 0% | 0.85 | - | - | - | 0.85 | 85% |
| Dentist | - | 0.70 | 0% | - | - | - | - | - | 0% |
| Dental Assistant | 2.00 | 2.00 | 100% | 1.97 | - | - | - | 1.97 | 99% |
| Psychiatric Director | 0.50 | 0.50 | 100% | - | - | - | - | - | 0% |
| Psychiatrist | 1.50 | 1.00 | 67% | 1.14 | - | - | - | 1.14 | 76% |
| Psychologist | 3.00 | 2.00 | 67% | 1.70 | - | - | - | 1.70 | 57% |
| MH Director (PH.D) | 1.00 | 1.00 | 100% | 1.03 | - | - | - | 1.03 | 103% |
| MH Nurse Practitioner | 1.00 | 1.00 | 100% | - | - | - | 0.53 | 0.53 | 53% |
| MH RN | 22.40 | 21.60 | 96% | 20.28 | - | 1.72 | - | 22.00 | 98% |
| Rec Therapist | 2.00 | 1.00 | 50% | 0.99 | - | - | - | 0.99 | 50% |
| Psych Associates | 6.40 | 6.00 | 94% | 5.30 | - | - | - | 5.30 | 83% |
| Psych Tech | 12.10 | 5.00 | 41% | 5.39 | - | 0.03 | - | 5.43 | 45% |
| MH RN Supervisor | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT | - | | 0% | - | - | - | - | - | 0% |
| Clerk | | | | - | - | - | - | - | |
| | - | - | | | | | | | |
| Total Contract | 97.50 | 77.90 | 80% | 73.92 | 0.00 | 4.76 | 0.53 | 79.21 | 81% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

## Arizona Monthly Staffing Report
### Safford Region

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Staff Physician | - | | 0% | - | - | - | - | - | 0% |
| Administrator | 1.00 | 1.00 | 100% | - | - | - | - | - | 0% |
| Correctional RN Supervisor II / DON | 1.00 | 1.00 | 100% | 0.87 | - | - | - | 0.87 | 87% |
| Asst. Correctional RN Supervisor II | - | 2.00 | 0% | 1.96 | - | - | - | 1.96 | 0% |
| Nurse Practitioner | 1.00 | 2.00 | 200% | 0.90 | - | - | 0.12 | 1.02 | 102% |
| Correctional RN Supervisor I | 2.00 | - | 0% | - | - | - | - | - | 0% |
| RN | 9.80 | 8.10 | 83% | 9.51 | - | 0.85 | - | 10.36 | 106% |
| LPN | 6.10 | 2.00 | 33% | 1.79 | - | 0.13 | - | 1.93 | 32% |
| Nursing Assistant | 2.80 | 4.00 | 143% | 3.90 | - | 0.16 | - | 4.05 | 145% |
| X Ray Tech | 0.50 | - | 0% | - | - | - | - | - | 0% |
| Secretary / Administrative Assistant | 2.00 | 1.00 | 50% | 0.74 | - | 0.01 | - | 0.75 | 37% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.22 | - | - | - | 0.22 | 22% |
| Med Records Clerk | 0.50 | 1.00 | 200% | 0.84 | - | - | - | 0.84 | 168% |
| Dental Director | 1.00 | 1.00 | 100% | 1.00 | - | - | - | 1.00 | 100% |
| Dental Hygienist | 0.20 | 1.00 | 500% | - | - | - | - | - | 0% |
| Dental Assistant | 2.00 | 2.00 | 100% | 1.70 | - | - | - | 1.70 | 85% |
| Psych Associates | 1.00 | 1.00 | 100% | 0.94 | - | - | - | 0.94 | 94% |
| Psych Tech | - | - | 0% | - | - | - | - | - | 0% |
| MH RN Supervisor | - | - | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT | | | 0% | - | - | - | - | - | 0% |
| Clerk | | | | - | - | - | - | - | |
| Total Contract | 32.90 | 28.10 | 85% | 24.38 | - | 1.15 | 0.12 | 25.64 | 78% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**Arizona Monthly Staffing Report**
**Tucson Region**

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | 1.00 | 100% | 0.97 | - | - | - | 0.97 | 97% |
| Staff Physician | 3.50 | 1.75 | 50% | 2.84 | - | - | - | 2.84 | 81% |
| Administrator | 1.00 | 1.00 | 100% | 1.16 | - | - | - | 1.16 | 116% |
| Correctional RN Supervisor II / DON | 1.00 | 1.00 | 100% | 1.14 | - | - | - | 1.14 | 114% |
| Asst. Correctional RN Supervisor II | 1.00 | 8.00 | 800% | 6.63 | - | - | - | 6.63 | 663% |
| Administrative Services Officer | 1.00 | 1.00 | 100% | 0.98 | - | - | - | 0.98 | 98% |
| Nurse Practitioner | 3.00 | 5.00 | 167% | 5.34 | - | 0.03 | - | 5.38 | 179% |
| Correctional RN Supervisor I | 6.00 | - | 0% | - | - | - | - | - | 0% |
| RN | 39.10 | 28.35 | 73% | 30.79 | - | 1.87 | - | 32.66 | 84% |
| LPN | 35.90 | 39.80 | 111% | 41.26 | - | 4.14 | - | 45.41 | 126% |
| Nursing Assistant | 22.00 | 32.50 | 148% | 32.53 | - | 3.35 | - | 35.88 | 163% |
| X Ray Tech | 1.00 | 1.00 | 100% | 1.04 | - | 0.05 | - | 1.09 | 109% |
| Pharmacy Tech | 4.00 | 5.00 | 125% | 4.38 | - | 0.02 | - | 4.40 | 110% |
| Secretary / Administrative Assistant | 2.00 | 2.00 | 100% | 1.97 | - | 0.31 | - | 2.27 | 114% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 1.08 | - | - | - | 1.08 | 108% |
| Med Records Clerk | 6.00 | 6.00 | 100% | 6.20 | - | 0.03 | - | 6.23 | 104% |
| Scheduler | 1.00 | 1.00 | 100% | 0.97 | - | 0.09 | - | 1.06 | 106% |
| Clinical Coordinator | 1.00 | 1.00 | 100% | 0.45 | - | 0.02 | - | 0.48 | 48% |
| Dental Director | 1.00 | 1.00 | 100% | 0.97 | - | - | - | 0.97 | 97% |
| Dentist | 4.00 | 3.00 | 75% | 2.85 | - | - | - | 2.85 | 71% |
| Dental Hygienist | 0.20 | 0.20 | 100% | 0.36 | - | - | - | 0.36 | 180% |
| Dental Assistant | 6.00 | 6.00 | 100% | 5.69 | - | - | - | 5.69 | 95% |
| Psychiatrist | 2.00 | 1.00 | 50% | 0.51 | - | - | - | 0.51 | 26% |
| Psychologist | 4.00 | 3.00 | 75% | 2.64 | - | - | - | 2.64 | 66% |
| MH Clerk | 1.00 | 1.00 | 100% | 1.00 | - | 0.02 | - | 1.02 | 102% |
| MH Nurse Practitioner | 1.50 | 2.00 | 133% | 1.70 | - | - | - | 1.70 | 114% |
| MH RN | 4.00 | 3.00 | 75% | 2.68 | - | 0.09 | - | 2.76 | 69% |
| Rec Therapist | 2.00 | - | 0% | - | - | - | - | - | 0% |
| Psych Associates | 10.00 | 16.00 | 160% | 8.96 | - | - | - | 8.96 | 90% |
| Psych Tech | - | - | 0% | 3.78 | - | 0.13 | - | 3.92 | 0% |
| MH RN Supervisor | - | - | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT | - | - | 0% | 0.47 | - | - | - | 0.47 | 0% |
| Clerk | | 1.00 | 0% | 0.97 | - | 0.00 | - | 0.97 | 0% |
| | | | | | | | | | |
| Total Contract | 166.20 | 173.60 | 104% | 172.33 | 0.00 | 10.14 | 0.00 | 205.44 | 110% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**Arizona Monthly Staffing Report**
**Winslow Region**

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Staff Physician | - | - | 0% | 0.24 | - | - | - | 0.24 | 0% |
| Administrator | 1.00 | 1.00 | 100% | 1.15 | - | - | - | 1.15 | 115% |
| Correctional RN Supervisor II / DON | 1.00 | 1.00 | 100% | 0.99 | - | - | - | 0.99 | 99% |
| Asst. Correctional RN Supervisor II | - | 2.00 | 0% | 1.68 | - | - | - | 1.68 | 0% |
| Nurse Practitioner | 1.00 | 2.00 | 200% | 2.14 | - | - | - | 2.14 | 214% |
| Correctional RN Supervisor I | 2.00 | - | 0% | - | - | - | - | - | 0% |
| RN | 11.80 | 12.60 | 107% | 13.94 | - | 1.62 | - | 15.56 | 132% |
| LPN | 5.20 | - | 0% | - | - | - | - | - | 0% |
| Nursing Assistant | 4.00 | 2.90 | 73% | 3.49 | - | 0.28 | - | 3.77 | 94% |
| X Ray Tech | 0.50 | - | 0% | 0.34 | - | - | - | 0.34 | 68% |
| Pharmacy Tech | 1.00 | 1.00 | 100% | 0.77 | - | 0.00 | - | 0.77 | 77% |
| Secretary / Administrative Assistant | 2.00 | 2.00 | 100% | 1.57 | - | 0.00 | - | 1.58 | 79% |
| Med Records Supervisor | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Scheduler | 1.00 | 1.00 | 100% | 0.99 | - | 0.01 | - | 0.99 | 99% |
| Clinical Coordinator | 1.00 | - | 0% | 0.52 | - | 0.01 | - | 0.53 | 53% |
| Dental Director | 1.00 | 1.00 | 100% | 1.18 | - | - | - | 1.18 | 118% |
| Dentist | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Dental Hygienist | 0.20 | - | 0% | - | - | - | - | - | 0% |
| Dental Assistant | 3.00 | 2.00 | 67% | 1.82 | - | - | - | 1.82 | 61% |
| Psychiatric Director | - | | 0% | - | - | - | - | - | 0% |
| Psychiatrist | - | - | 0% | - | - | - | - | - | 0% |
| Psychologist | - | - | 0% | - | - | - | - | - | 0% |
| MH Director (PH.D) | - | - | 0% | - | - | - | - | - | 0% |
| MH Clerk | - | - | 0% | - | - | - | - | - | 0% |
| MH Nurse Practitioner | - | - | 0% | - | - | - | - | - | 0% |
| MH RN | - | - | 0% | - | - | - | - | - | 0% |
| Rec Therapist | - | - | 0% | - | - | - | - | - | 0% |
| Psych Associates | 1.00 | 1.00 | 100% | 0.63 | - | - | - | 0.63 | 63% |
| Psych Tech | - | - | 0% | - | - | - | - | - | 0% |
| MH RN Supervisor | - | - | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT | | | 0% | - | - | - | - | - | 0% |
| Clerk | | | | | | | | | 0% |
| Total Contract | 39.70 | 29.50 | 74% | 31.45 | 0.00 | 1.93 | 0.00 | 33.38 | 84% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**Arizona Monthly Staffing Report**
**Yuma Region**

**March 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | 1.00 | 100% | 1.01 | - | - | - | 1.01 | 101% |
| Staff Physician | 1.00 | 1.00 | 100% | 0.82 | - | - | - | 0.82 | 82% |
| Administrator | 1.00 | 1.00 | 100% | - | - | - | - | - | 0% |
| Correctional RN Supervisor II / DON | 1.00 | 1.00 | 100% | 1.05 | - | - | - | 1.05 | 105% |
| Asst. Correctional RN Supervisor II | - | 3.00 | 0% | 4.30 | - | - | - | 4.30 | 0% |
| Administrative Services Officer | 1.00 | 1.00 | 100% | - | - | - | - | - | 0% |
| Nurse Practitioner | 3.00 | 2.00 | 67% | 2.25 | - | - | - | 2.25 | 75% |
| Correctional RN Supervisor I | 4.00 | - | 0% | - | - | - | - | - | 0% |
| RN | 15.70 | 12.25 | 78% | 13.46 | - | 1.59 | - | 15.06 | 96% |
| LPN | 11.50 | 12.65 | 110% | 9.38 | - | 1.33 | 0.47 | 11.19 | 97% |
| Nursing Assistant | 8.40 | 9.00 | 107% | 14.44 | - | 1.11 | - | 15.54 | 185% |
| X Ray Tech | 1.00 | 1.00 | 100% | 2.26 | - | 0.03 | - | 2.28 | 228% |
| Pharmacy Tech | 2.00 | 3.00 | 150% | 2.93 | - | 0.38 | - | 3.31 | 166% |
| Secretary / Administrative Assistant | 2.00 | 1.80 | 90% | 1.76 | - | 0.03 | - | 1.79 | 89% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.95 | - | - | - | 0.95 | 95% |
| Med Records Clerk | 3.00 | 3.00 | 100% | 2.41 | - | 0.14 | - | 2.55 | 85% |
| Scheduler | 1.00 | 1.00 | 100% | 0.99 | - | 0.01 | - | 1.00 | 100% |
| Clinical Coordinator | 1.00 | 1.00 | 100% | 1.03 | - | 0.27 | - | 1.30 | 130% |
| Dental Director | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Dentist | 3.00 | 2.75 | 92% | 1.95 | - | - | - | 1.95 | 65% |
| Dental Hygienist | 0.20 | - | 0% | - | - | - | - | - | 0% |
| Dental Assistant | 6.00 | 6.00 | 100% | 5.33 | - | - | - | 5.33 | 89% |
| Psychiatrist | - | - | 0% | 0.27 | - | - | - | 0.27 | 0% |
| MH Nurse Practitioner | 1.00 | 1.00 | 100% | 1.01 | - | - | - | 1.01 | 101% |
| MH RN | 1.00 | 1.00 | 100% | 0.96 | - | 0.12 | - | 1.08 | 108% |
| Rec Therapist | - | - | 0% | - | - | - | - | - | 0% |
| Psych Associates | 4.00 | 5.00 | 125% | 3.46 | - | - | - | 3.46 | 87% |
| Psych Tech | - | - | 0% | - | - | - | - | - | 0% |
| MH RN Supervisor | - | - | 0% | - | - | - | - | - | 0% |
| Education Coordinator - FT | | | 0% | - | - | - | - | - | 0% |
| Clerk | | | | - | - | - | - | - | 0% |
| **Total Contract** | 74.80 | 71.45 | 96% | 72.04 | 0.00 | 5.01 | 0.47 | 77.51 | 104% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

# Exhibit 9

# (Redacted)



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

April 25, 2018

**_VIA EMAIL ONLY_**
Corene Kendrick
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA  94710

Re:     ***Parsons v. Ryan***
**Mistakes in September 2017 CGAR Reports**

Dear Corene:

I write in response to your December 11, 2017 letter regarding the alleged mistakes in the September 2017 CGAR Reports.  Based on our review, the claim that there are "systemic problems" with Defendants' monitoring is unfounded.

Plaintiffs' incorrect claims of error stem from Plaintiffs' misunderstanding of source documents or inmate medical records and not from the faulty monitoring allegations Plaintiffs have repeatedly presented to the Court.  The purpose of this letter is to respond to each allegation raised in your December 11, 2017 correspondence.

**PM 44**

Eyman

- ████████     This file is compliant.  Prior to the inmate's ER visit, a consultation was requested on August 23, 2017 for the inmate to be seen by a cardiologist. The inmate was scheduled with Dr. Kumar for the week of September 18, 2017. The inmate was thereafter seen on September 19, 2017 by Dr. Shennib.  The action taken was to keep the scheduled appointment, as there was no need to schedule an additional cardiology appointment.

- ████████     This file is compliant.  The prescription written for the inmate on September 21, 2017 listed four different medications: (1) Tamsulosin, (2) Xifaxan, (3) Lactulose, and (4) Keflex.  The same day, the inmate had an encounter with Registered Nurse Rodriguez.  Under the "Active Drug

Corene Kendrick
April 25, 2018
Page 2

Prescription Orders" it clearly shows this inmate already had an active prescription for Tamsulosin, so no additional action was required by the provider. In the "Ordered Drug Prescriptions" section, three drugs were ordered: (1) Cephalexin, (2) Lactulose, and (3) Rifaximin. Cephalexin is the generic name for Keflex and Xifaxan is a brand name for Rifaximin. Therefore, Cephalexin and Rifaximin are appropriate, and all four medications recommended by the hospital were acted upon. The hospital orders were entered into the Health Services Encounter form on September 21, 2017 by Nurse Practitioner ("NP") Gay. In the Encounter Orders Review section, NP Gay indicated she would follow up on Saturday (9/23) for hospital returned visit. The inmate was seen again on September 23, 2017.

- ████████    This file is compliant. The hospital discharge paperwork did not recommend a specific adjustment in the seizure medication, Keppra, upon discharge – it is noted that the patient received IV Normal Saline with a Keppra piggyback while in the hospital. The recommendation for the 1-2 day onsite provider follow-up was documented by the nurse and it was relayed to the onsite provider, via phone, in the Return from Offsite encounter on 09/20/2017. Since communication with the provider took place and an action was taken (i.e. scheduling of the appointment by the RN to which the provider confirmed), credit was issued based on the following statement in the Monitor Guide: "Review the nursing notes or provider notes in eOMIS for any language noting that treatment recommendations were reviewed and read back to the provider within 24 hours. Documentation of communication with the Provider indicates that discharge instructions were reviewed. This includes and is not limited to medications, wound care, follow-up, etc."

The issue of seizure medication adjustment did not need to be further explained because, again, there was no specific recommendation for an adjustment in seizure medications upon discharge – the patient simply received a different dosage, given via different route (i.e. intravenous), while he was in the hospital. If a specific adjustment in seizure medications was recommended by the hospital, the paperwork usually comes with a script which lists the medication name, strength, dose, route, and frequency – this was not included in the hospital paperwork. The provider educated the patient, in the 09/30/2017 encounter, to take all medications as prescribed following her review of all the patient's active medications, to include the Keppra. This is based on the fact that the patient had Keppra levels drawn before, and after, his hospital stay – on 07/11/2017 and 10/25/2017. Both lab results are reported as "Normal" and were within therapeutic ranges at the original dosage.

- ████████    This file is compliant. Minocycline is the formulary equivalent of doxycycline. Follow up wasn't done, but there was nothing more to do. The provider was spoken to and the decision was made to handle in-house. The

Corene Kendrick
April 25, 2018
Page 3

Primary Care Physician ("PCP") is onsite providing care and has override authority over hospital recommendations. Here, NP Weigel made the decision, as the provider, to override the doxycycline prescription with a formulary equivalent. The onsite provider was providing care, and there was no need for follow up. The action taken was to provide onsite care. This is evidenced in the Health Services Encounter on September 27, 2017. The Plan was to change the dressing (clean and dress wound) daily (as specified by the Practitioner) for 30 days.

Lewis

- ████████ This file is compliant. Prior to the inmate's hospitalization, the inmate was on omeprazole (Prilosec) which is a PPI (proton pump inhibitor). Omeprazole and pantoprazole are both PPIs and do the same thing. The action taken was to continue the inmate on his current medication.

- ████████ This file is complaint. As noted, the patient returned from the hospital with instructions to increase Metoprolol and follow up with the cardiologist within 5-7 days. The Metoprolol was increased, and on September 7, 2017, NP Smith noted the increase and stated there were no other actions needed. NP Smith also noted that she would see the patient in one week. Therefore, no follow up with the cardiologist was needed as he was being followed at the facility by the provider. The September 14, 2017 cardiology consult request was due to a separate event.

Tucson

- ████████ This file is complaint. The September 28, 2017 return from nephrology appointment was not on the Monitor's source document and, thus, wasn't subject to audit. The Monitor audited the September 6, 2017 discharge from Banner UMC South.

- ████████ This file is complaint. The hospital discharge recommendations state that the "patient was given instructions to follow-up with PCP," but do not say when, i.e., within 2-4 days, etc. The Provider, Dr. Abel Salazar, reviewed the discharge instructions on October 1, 2017, within 24 hours of discharge. There was nothing further to act on. Dr. Salazar saw the inmate on October 3.

- ████████ This file is compliant. By the time the Monitor audited this file, the inmate had transferred to another facility. As noted, the hospital discharge paperwork recommended a follow up with the surgeon within 2-3 weeks and six prescription medications. The referral was simply a recommendation, as no

Corene Kendrick
April 25, 2018
Page 4

scheduled appointment was documented, which there usually is.  Further, the discharge paperwork stated that the inmate was tolerating a regular diet, pain was improving, ambulating, and voiding spontaneously, PICC & IR drain were discontinued, and the staples were even removed.  There was no need to return, given the documentation, unless complications arose.

There are numerous examples in the inmate's medical records that support the finding that no follow up with the surgeon was necessary:

- 9/8: On-call Nurse Practitioner Easley notified with Discharge Instructions read back.
- 9/9 (Saturday): Notes in chart state: "PT performing self-care with no complaints."
- 9/10 (Sunday): Notes in chart state: "PT performing self-care with no complaints."
- 9/11: The inmate was seen by NP Theus and prescriptions were ordered.
- 9/12: The inmate's chart reflects that he was complaining of still being in the IPC and was requesting to be discharged.
- 9/12 & 9/13: The inmate began refusing his discharge medications. The refusals were scanned into his chart.
- 9/13 – 10/09: The inmate's chart reflects that he voiced no complaints, submitted no HNRs related to this event, was going out to REC, was showering, and was performing self-care
- 10/10: Transferred to Lewis.

The above shows there was no need to return to the Surgeon for follow-up, therefore, credit was given as a positive finding on the CGAR.

- ███████  We agree this file is noncompliant.  An addendum will be produced.

- ███████   This file is compliant.  On September 18, 2018, the inmate had an encounter with NP Castillo.  NP Castillo noted that the hospital discharge instruction had a recommended follow up with gastroenterology for HCV (Hepatitis C), RNA VL 5.30 log IU/ml.  She also noted that there was no documented history of Hepatitis C.  Thus, a follow up with gastroenterology was not needed.

Discharge Instructions:

Gabapentin 300 ma (two times daily). Provider ordered Tylenol 3 w/Codeine 30/300 mg (two times dally as needed). There was no documentation in his chart that he ever experienced pain that this medication did not take care of for him.

Corene Kendrick
April 25, 2018
Page 5

Sodium chloride with Cefepime - Ordered & administered.

Gastroenterology consult - Not Indicated & Provider explained why in note, HEP C (HCV) labs were drawn and verified on September 18, 2017 by Corizon. Chronic condition noted in chart on Problem list for September 23, 2017, and Chronic Care appointment was scheduled for November 3, 2017.

Cardiothoracic consult - Was pre-scheduled by Hospital with no Urgency indicated. Upon the inmate's return, approval was requested by September 25, 2017 (within 10 days), and the inmate was seen on October 17, 2017, which was the first available appointment.

I&D follow up - Achieved within IPC with continued wound vac therapy and dressing changes until healed. The inmate has been discharged and is back in general population.

Weekly labs - Hospital discharge instructions did not specify what testing was to be done however; Corizon did do weekly labs as indicated by the treating IPC Physician.

Repeat Imaging - Hospital discharge instructions did not specify what type of Imaging, or when; Corizon did a repeat (L) Rib x-ray on November 27, 2017 that came back normal with no abnormalities.

The Provider did everything except for infectious disease and gastroenterology. The patient was on IV antibiotics and wound care. They were following him internally and there was no need for those additional follow ups.

- ▪ ▬▬▬▬  This file is compliant. Ibuprofen was prescribed because the inmate requested it. Inmate has a history of polyabuse in chart. On September 22, 2017 the Provider, NP Baskas, followed up with the inmate. The inmate reported some post-surgical pain. NP Baskas then prescribed Tylenol 3 with codeine. A total of 15 pills were prescribed, but according to the MAR, the inmate only came up for a total of seven pills. On September 29, the inmate was seen by nursing to do a final follow up post-op. He was advised to come to Medical or submit an HNR if needed for the issues. No HNRs were submitted.

The follow up with Dr. Ghaderi was unnecessary due to the documentation in the chart that the sites were well healed, the patient didn't take all of his prescribed pills, and there were no further HNRs citing any remaining issues.

Corene Kendrick
April 25, 2018
Page 6

**PM 48: Eyman, Lewis, and Tucson**

It is important to note that many of the "errors" referenced in Plaintiffs' December 11 correspondence were not "errors" and, instead, were the result of Plaintiffs' misunderstanding of the Monitor Guide language.

**PM 52: Eyman, Lewis, and Tucson**

<u>Eyman</u>

The reported finding, 3 out of 8 compliant, is accurate. The Monitor inadvertently forgot to input one inmate number— ▮▮▮▮▮ Defendants will issue a correction and add the number.

<u>Lewis</u>

- ▮▮▮▮▮ The ortho report rec'd 9/13, reviewed 9/19 identified by Plaintiffs wasn't on the September source document, but was for October. Instead the ortho consult ordered 7/17, results rec'd 8/9 and reviewed 8/9 (more results rec'd 8/15 and reviewed 8/15) was on the September source document.
- ▮▮▮▮▮ The GI consult Plaintiffs refer to was not within the first 10 consults and, therefore, was not reviewed for this audit.
- ▮▮▮▮▮ The consults Plaintiffs looked at were not on the September source document.
- ▮▮▮▮▮ Plaintiffs reviewed the wrong report, i.e., podiatry report rec'd 8/29, reviewed 9/6, action taken (8 days). This was not on the source document. These results would be on the next set of source documents, if randomly selected. The report on the source document was for a podiatry consult on 7/10, first results rec'd 8/22 and reviewed 8/27 (compliant).

<u>Tucson</u>

- ▮▮▮▮▮ The retinal specialist report rec'd on 8/25 was not used for audit purposes. The 7/12 ophthalmology consult was used for audit purposes. The report was received on 8/8 recommending surgery. The surgery was completed on 8/17.
- ▮▮▮▮▮ Defendants concur that this is an error as no action was taken on the consult report. Defendants will issue an addendum.
- ▮▮▮▮▮ Defendants concur that this is an error as no action was taken on the consult report. Defendants will issue an addendum.
- ▮▮▮▮▮ Plaintiffs reviewed the wrong consult report. The consult on the source document was an oral surgeon report rec'd on 7/24 and reviewed 8/3. Further, the 8/3 report had no treatments indicated and no recommendations were made.
- ▮▮▮▮▮ Plaintiffs reviewed the wrong report. For purposes of the audit, the 7/14 orthotics consult was used.

Corene Kendrick
April 25, 2018
Page 7

- ██████   The 7/25/17 hematology/oncology consult was used for audit purposes, not the 8/25 hematology/oncology consult.
- ██████   Plaintiffs wrote the wrong inmate number.  The correct number is ██████
- ██████   The chest CT consult was used for auditing purposes.  The report was received 8/18 and reviewed 8/20, with recommendations followed.

The following inmate files were inadvertently included in the September CGAR findings. This did not change the performance measure from being non-compliant.  An addendum will be completed.

- ████
- ████
- ████
- ████
- ████
- ████
- ████
- ████
- ████

The remaining alleged inmate files are compliant and are not an "error" but, instead, are the result of Plaintiffs' misunderstanding of the Monitor Guide language.   Consults are permitted 30 days (urgent) or 60 days (routine) for completion; therefore the source document data is extracted from consult requests initiated 60 days prior to the audited month.

Example:  Consults and their corresponding reports due for review in September would be extracted from consult requests placed in July and/or August, assuring time for completion during the audited month.  On occasion, a consult is completed prior to the allotment of time allowed under PMs 20 and 51.  Therefore, review and action by a Provider within seven calendar days of receiving the report may occur before September.

In addition, inmates that have multiple separate consults are appropriately included in auditing, as each consult is a unique request.  Thus, it is possible for an inmate to have more than one unique consult that is subject to monitoring if the consult falls within the audit period.

Corene Kendrick
April 25, 2018
Page 8

**PM 77: Eyman, Lewis, Perryville, Tucson**

This is not a mistake in auditing.  The September 2017 CGARs were being audited under the assumption that if a mental health treatment plan originated on January 1, 2017, Defendants would have until January 31, 2018 to update the plan. In November 2017, the Court invalidated Defendants methodology and instead required a plan to be updated every 365 days.  It is accurate under the methodology at the time.  Defendants used the methodology as directed by the Court and reevaluated the September 2017 CGARs.  To the extent there needed to be corrections, those corrections were made.

Regards,

Timothy J. Bojanowski

TJB/eap
cc:      Counsel of record

Exhibit 10

(Redacted)



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

April 25, 2018

**_VIA EMAIL ONLY_**
Corene Kendrick
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA 94710

Re:     **_Parsons v. Ryan_**
        **Mistakes in October 2017 CGAR Reports**

Dear Corene:

I write in response to your February 5, 2018 letter regarding the alleged mistakes in the October 2017 CGAR Reports.

**PM 66**

Florence

- ████████   This file was appropriately reviewed for the October CGARs. The inmate's first October encounter occurred on October 1, 2017 at 16:00. To ensure the October 1, 2017 encounter was timely, the monitor looked at the prior encounter, in this case September 28, 2017 at 18:00. If the prior encounter was more than three days prior, it would not have been compliant. This file would have been compliant had there been a provider encounter on October 8, 2017 before 18:00.

Perryville

- ████████   This file was appropriately reviewed for the October CGARs. The methodology for PM 66 requires the monitor to "[m]onitor the first admission for the first ten (10) inmates during the monitored period." This inmate was admitted to the IPC on October 30, 2017 and the first encounter was November 11, 2017 at 11:18. Thus, it was appropriate to include this file in the October findings. Excluding IPC admissions that

Corene Kendrick
April 25, 2018
Page 2

occur within 72 hours of a given month potentially excludes those admissions from monitoring, which isn't appropriate.

- ███████ This file is compliant. The inmate was admitted to the IPC the evening of October 4, 2017. Thereafter, there was an encounter on October 5, 2017 at 11:11 and the inmate was subsequently discharged on October 6, 2017 at 10:06. PM 66 requires an encounter by a Medical Provider at a minimum every 72 hours, meaning an encounter can be made prior to the 72 hours and still be considered in compliance with the measure.

Tucson

- ███████ This file should not have been reviewed. The error occurred as a result of an issue in AIMS, where some files were pulled without factoring in the year. It was a technical glitch, IT was notified, and the issue has been corrected. Defendants will issue an addendum.

- ███████ This file was appropriately reviewed for October. This inmate was admitted to the IPC on October 28, 2018 at 20:14. There were encounters on October 30, 2017 at 08:00 and on November 1, 2017 at 08:00. The provider noted in the notes that she was "admitted over the weekend to infirmary . . . ." The inmate was housed in IPC housing over 72 hours. As stated before, excluding IPC admissions that occur within 72 hours of a given month potentially excludes those admissions from monitoring, which isn't appropriate.

- ███████ This file is compliant. There was an encounter on September 29, 2107 at 10:00, October 2, 2017 at 08:00 (labeled as CC encounter), and October 4, 2017 at 08:00. He was discharged on October, 6, 2017 at 10:00. This PM does not require specific labeling of provider encounters by type.

- ███████ This file is compliant. Between October 25, 2017 at 08:00 and October 29, 2017 at 08:00, there was an encounter (labeled as CC encounter) on October, 27, 2017 at 10:00. This PM does not require specific labeling of provider encounters by type.

Corene Kendrick
April 25, 2018
Page 3

**PM 67**

By way of information, shifts in the IPC are broken into 12-hour shifts. The first shift (day shift) is from 06:00-18:00 (6:00 a.m. to 6:00 p.m.) and the second shift (night or graveyard) is from 18:00-06:00 (6:00 p.m. to 6:00 a.m.).

Florence

- ███████   This file is compliant.  The ICS response on October 27, 2017 at 18:25 (6:25 p.m.) had an assessment documented.  This Performance Measure does not require specific labeling of nursing encounters by type.  The assessment was completed on the night shift.

Lewis

- ███████  This file is complaint.  The Performance Measure requires an assessment every shift.  As noted in your letter, there was an assessment on the day shift on October 5, 2017 at 15:46 (3:46 p.m.) and a refusal at 21:13 (11:13 p.m.).  Further, on October 6, 2017, there was a day shift assessment at 14:15 (2:15 p.m.) and a night shift assessment at 23:36 (11:36 p.m.).

- ███████   This file is compliant.  The Performance Measure states that an assessment will occur and be documented at least once *each shift*.  An assessment on the day shift was done on October 6, 2017 at 14:33 (2:33 p.m.) and the night shift at 20:37 (8:37 p.m.).

- ███████   This file is compliant.  The Performance Measure states that an assessment will occur and be documented at least once *each shift*.  An assessment on the day shift was completed on October 5, 2017 at 14:57 (2:57 p.m.).  On October 6, 2017, the day shift was completed at 14:42 (2:42 p.m.).

- ███████   As noted, this file is non-compliant.  This Performance Measure, however, doesn't require specific labeling of nursing encounters by type.  Therefore, the "infirmary note" on the assessment that was done on October 18, 2017 is sufficient.

Tucson

- ███████   This inmate file was erroneously included on the source documentation.  Defendants will issue a correction.

- ███████   As noted, this file is non-compliant due to no rounds on October 4, 2017, but, contrary to your assertion, there was an assessment documented on October 29, 2017 at 10:30.

Corene Kendrick
April 25, 2018
Page 4

- ████████  This file is compliant.  It is unclear why the October 13, 2017 encounter listed in eOMIS as a Nurse – Segregation Visit has a start time of 08:02.  Defendants believe this in inaccurate for two reasons.  First, the RN who recorded the encounter was scheduled on night shifts.  Second, the encounter was closed at 02:05 on October 14, 2017.  And under the terms of the Monitor Guide, a night shift Health & Welfare visit is completed in lieu of an assessment.
- ████████  This file should have been marked as compliant.  There was a day assessment completed on October 11, 2017 at 07:00.  Defendants will issue a correction.
- ████████  This file was correctly counted as non-complaint.  Although there was a round on October 11, 2017, there was no assessment documented from the encounter.

**PM 94**

As Plaintiffs note, the Court's November 7, 2017 Order states that "if all requirements cannot be checked off due to a transfer then that particular person will not be evaluated.  Only those inmates who are in the facility the entire time may be counted."  Dkt. 2456 at 4.  Each inmate file identified by Plaintiffs involved inmates who were placed on watch at one facility and were shortly thereafter transferred to another facility.  Thus, these files should not have been selected and Defendants will issue a correction.

Notwithstanding the above, there are a few additional global issues that need to be addressed had the inmate *not* transferred to another facility during the monitored period.  This applies to all facilities subject to monitoring for PM 94, not just Winslow and Safford, where all requirements must be checked off in a monitored month.

Winslow

- ████████
- ████████
- ████████
- ████████

Plaintiffs do not appear to raise any specific issue with the way Defendants monitored the above inmate files.  If Plaintiffs have a specific issue with the way these files were monitored, please let us know so we may address it.

- ████████  Although this file should not have been selected due to a transfer, the Defendants reiterate that telepsych appointments are not conducted cell front and are instead conducted in a confidential office setting.  As Dr. Taylor testified during the December 20, 2017 status hearing, Patrick Metz performs contacts with inmates through telepsychology at Winslow.  12/20/17 Status Hearing at 96:2-14; *See also* Dkt. 2594-1 (Declaration of Dr. Nicole Taylor at ¶ 11).  In addition, telepsych at Winslow is done in a confidential setting.

Corene Kendrick
April 25, 2018
Page 5

*See* Dkt. 2594-1 (Declaration of Dr. Nicole Taylor at ¶ 11) ("These telepsychology contacts are performed in a confidential setting."). Furthermore, at the time of Mr. Metz's contact, there was no hard-stop in eOMIS for a mental health clinician or registered nurse to select whether the contact had been conducted in a confidential format. Typically the individual providing the contact would indicate the setting of the contact in the text section in eOMIS. A recent eOMIS update now requires the individual to select, from a dropdown menu, whether it was confidential or not. But the update had an unintended consequence in that the dropdown menu was put into documentation that had already been completed, and automatically input "unknown" into this field. In other words, when Mr. Metz did the contact, there was no dropdown menu to choose whether the contact was offered in a confidential setting because it did not exist. For the above reasons, a file such as this one, where the inmate remained at the complex during their entire watch would be correctly marked as compliant.

- Winslow: ██████████████████
- Safford: █████

Although these files should not have been selected due to a transfer, an important issue arises for future inmate files who are not transferred, but placed on watch after hours. Each of these files involved an inmate being placed on watch after Regular Business Hours or arriving at a receiving complex after Regular Business Hours. Defendants believe that "Daily" means during "Regular Business Hours."[1] This has been ADC's working premise per its policies which were in effect (and still are) at the time the Stipulation was entered into. *See* attached MHTM Chapter 1, Section 7.0 (Mental Health Urgent Responder Protocols) and portion of DO 807. This Performance Measure has been monitored consistent with these policies since the beginning of the monitoring process. Defendants question why, after three years, Plaintiffs now complain about this when Plaintiffs should have known Defendants were monitoring in this manner.

In addition, Plaintiffs' assumption that daily should include non-business hours is unreasonable. For example, under Plaintiffs' interpretation, if an inmate was placed on watch at 11:59 p.m. on a weekday, the inmate would be required to be seen within one minute in order to have been seen "daily." This is simply untenable. Defendants' monitoring process is a far more reasonable and workable approach.

**PM 95**

- Eyman: ████████████████
- Florence: ████████
- Yuma: ██████

---

[1] Attachment A to the Stipulation defines "Regular Business Hours" as: "Monday through Friday, 0800 am – 1600 pm or similar 8-hour time frame; excluding weekends and holidays."). *See* Dkt. 1185-1 at p. 5.

Corene Kendrick
April 25, 2018
Page 6


        By the time the Court had ordered on November 7, 2017 that Defendants were to change
how it monitored PM 95, monitoring had already been completed.  Consistent with Ms. Hesman's
December 19, 2017 email, Defendants endeavored to review the already completed data and filter
out those inmate files that conflicted with the Court's Order.  Despite Defendants' best efforts,
however, a few files were inadvertently missed.  Defendants will issue a correction.


                                    Regards,

                                    Timothy J. Bojanowski


TJB/eap
cc:     Counsel of record

Exhibit 11

(Redacted)



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Richard M. Valenti
480.420.1615
rvalenti@strucklove.com

April 13, 2018

***VIA EMAIL ONLY***
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA  94964

     **Re:**   ***Parsons v. Ryan***
                  **Monthly Document Production**

Dear Corene,

This is a response to your April 3, 2018 letter regarding monthly document production.

## I.    Standard Monthly Requests

**CGAR Corrective Action Plans and Rebuttals:**
CAPs and Rebuttals for the post-August 2017 time period are not available at this time. Defendants are awaiting a response from Corizon and will supplement when available.

**Death records:**

    **A.    Mortality Reviews**
Defendants produced 25 mortality reviews on April 6, 2018. *See* ADCM1496613-1496725.

    **B.    Medical Records**
Plaintiffs have access to deceased medical records through eOMIS and can make copies of those records. Because Plaintiffs have access to the requested records, Defendants have met their obligation under Paragraph 29 of the Stipulation with respect to the healthcare records of deceased inmates. *See* ¶ 29 of Dkt. 1185.

Corene Kendrick
April 13, 2018
Page 2

Therefore, Defendants will not be producing paper or electronic copies of deceased medical records.

**C.     Psychological autopsies of** ███████████████████
███████████████

The requested psychological autopsies for these three individuals are not yet available.   Defendants will supplement when the psychological autopsies are completed.

## CQI Meeting Minutes:

Defendants produced the January and February 2018 CQI Minutes on April 6, 2018. *See* ADCM1496459-1496535 (January 2018) and ADCM1496536-1496612 (February 2018); *see also* March 2018 CQI Minutes produced herewith as ADCM1505262-15053307; ADCM1505315-1505342.

## II.     Supplemental Requests

**Request 55:**
All agendas and minutes of Director's Meetings (also known as ADC & Corizon Bi-Weekly Meetings) from January 1, 2017 to the present (agendas for 5/2/17, 5/15/17, and 6/6/17 have been produced and need not be re-produced). *See* D. Fathi 1/4/18 letter requesting confirmation that there were no other meetings in 2017; if there were please produce the missing agendas and meetings.

**Defendants' response:**
Defendants produced responsive documents on April 6, 2018. *See* ADCM1496430-1496443; see also April 2, 2018 Agenda produced herewith as ADCM1505364.

**Request 62:**
Any documents relating to the discontinuation of narcotic pain medications, including instructions or directives given to prescribing providers, and protocols for tapering patients off the medication. (Requested July 2017, revised January 2018)

**Defendants' response:**
Defendants reiterate the objections set forth in their April 2, 2018 letter. *See* 4/2/18 letter from Richard Valenti to David Fathi at 2. Without waiving any objections, Defendants made a request to Corizon "for any **instructions** or **directives** that were given to prescribing providers about the new approach adopted by Corizon in response to Governor Ducey's directive" and "any and all **protocols** that were developed to properly taper

Corene Kendrick
April 13, 2018
Page 3

patients off the medication". Defendants will supplement upon discovery of whether responsive documents exist.

**Request No. 67:**
All documents reflecting (1) the rejection by Dr. Malachinski, or by any other person, of patients for housing at ASPC-Phoenix based on alleged noncompliance with CGAR measures; and (2) any disciplinary or corrective action taken against Dr. Malachinski or any other person for this behavior. See RP230000025.0001-0004. (Requested August 2017).

**Defendants' response:**
As Defendants previously informed Plaintiffs, once we receive a response from Corizon and have an opportunity to review the information, we will update Plaintiffs. *See* 1/25/18 letter from Richard Valenti to David Fathi at 1.

**Request 70:**
All policies, directives, post orders, and any other written instructions governing (1) the taking of temperatures at ADC facilities; (2) requirements to initiate remedial measures when certain temperatures are reached; and (3) compliance with the requirements set forth in Paragraph 15 of the Stipulation. (Requested September 2017)

**Defendants' response:**
Defendants object to this request as it seeks information that is beyond the scope of the Stipulation, Performance Measures, and ADC HSCMB Monitor Guide. Defendants object that the phrases "requirements to initiate remedial measures when certain temperatures are reached" and "the taking of temperatures" are vague and fail to describe the documents sought with requisite particularity. *See* Fed. R. Civ. P. 26(b)(1)(A). Additionally, the request is overbroad as it fails to specify a timeframe. Based on the foregoing, the burden of identifying and producing documents responsive to this request substantially outweighs any likely benefit of production. *See* Fed. R. Civ. P. 26(b)(1) and ¶ 29 of Dkt. 1185. Without waiving any objections, Defendants produced responsive documents on December 19, 2017 and January 25, 2018. *See* ADCM1045375-1045995 and ADCM1049649-1049723. *See also* Memorandum from Ernie Trujillo, NROD/Joe Profiri, SROD, dated 4/6/18 regarding Standardized Temperature Checks, Temperature Log Guide, and Standard Temperature Log Template, produced herewith as ADCM1505365-1505706. Defendants will also produce applicable temperature logs on a rolling basis, as previously agreed.

Corene Kendrick
April 13, 2018
Page 4

**Request 71:**
All "heat reaction lists" or similar documents listing prisoners possibly suffering a heat reaction (*see, e.g., ADCM1001607*) from February 18, 2015 to the present. (Requested September 2017)

**Defendants' response:**
Defendants produced responsive documents on October 5, 2017 and November 6, 2017. *See* ADCM1036461-1036470 and ADCM1038183-1038190.

**Request No. 74:**
All documents reflecting any planned or implemented changes in policy governing suicide or other mental health watches from April 1, 2017 to the present. (Requested November 2017)

**Defendants' response:**
Without waiving any previous objections (*see* Defendants' January 12, 2018 correspondence to Plaintiffs), refer to DI 357 and 366, which are available on ADC's website. Defendants will supplement this response if additional responsive documents are identified.

**Request No. 75:**
All documents reflecting plans to concentrate seriously mentally ill (SMI) prisoners at Tucson-Rincon Unit or in any other location. (Requested November 2017)

**Defendants' response:**
Defendants stand by their previous response and objections. *See* Defendants' January 12, 2018 correspondence to Plaintiffs.

**Request No. 76:**
Any documents, emails, communications, policies, post orders, training materials and curricula, and plans (draft or final) relating to the implementation of monitoring of the Max Custody Performance Measures at converted "close custody" units at Florence Central Unit. (Requested November 2017)

**Defendants' response:**
Without waiving any previous objections (*see* Defendants' January 12, 2018 correspondence to Plaintiffs), Defendants will supplement with a written update regarding progress of the pilot program to be implemented at Florence/Central.

Corene Kendrick
April 13, 2018
Page 5

**Request No. 79**:
All documents showing implementation of the recommendations set forth in the psychological autopsies of ███████████████████ (see ADCM980299) and ████████████████████ (see ADCM1038311-12). (Requested December 2017)

**Defendants' response:**
Defendants reiterate their objections from their April 2, 2018 letter. *See* 4/2/18 letter from Richard Valenti to David Fathi at 3.[1] Without waiving any objections, refer to the January 2018 CQI Meeting Minutes from Eyman, which were produced on April 6, 2018. *See* ADCM1496466-1496479.

**Request No. 80**:
All documents regarding the issuance of Inmate Disciplinary Reports against class members who fail to pick up watch swallow medications at their assigned time. (Requested January 2018)

**Defendants' response:**
Defendants stand by their objections set forth in Defendants' April 2, 2018 letter. *See* 4/2/18 letter from Richard Valenti to David Fathi at 4.

**Request No. 81**:
All documents regarding (1) the standards and criteria used to select patients for Hepatitis C treatment, and (2) the annual budget of ADC and/or Corizon for Hepatitis C treatment. (Requested January 2018)

**Defendants' response:**
Defendants stand by their objections set forth in Defendants' April 2, 2018 letter. *See* 4/2/18 letter from Richard Valenti to David Fathi at 4-5.

---

[1] Defendants' letter should have referred to Paragraph 16 of the Stipulation, not Paragraph 14.

Corene Kendrick
April 13, 2018
Page 6

**Request No. 82**:
For all ten Arizona State Prison Complexes for the previous 90 days, a list of (1) all pending requests for specialty referral pending Utilization Management review, and (2) all pending specialty appointments. (Requested January 2018)

**Defendants' response:**
Your letter is incorrect. Rather, Defendants are working with Corizon to obtain responsive documents. We continue our efforts in this regard. *See* 4/2/18 letter from Richard Valenti to David Fathi at 5.

**Request No. 83**:
All source documents used by monitors to evaluate compliance with PM 25 for the most recent month's CGAR report. See Docs. 2368-1 at 5-6; Doc. 2426-1 at 5, 10. (Requested January 2018)

**Defendants' response:**
Defendants produced responsive documents on April 10, 2018. *See* ADCM1505168-1505261.

**Request No. 84**:
All minutes, notes, or other documents from all Hepatitis C committee meetings and/or any Utilization Management committee meeting at which decisions were made regarding whether to treat a patient for Hepatitis C with Direct Acting Agents (DAA), since January 1, 2017. (Requested February 2018)

**Defendants' response:**
Defendants stand by their objections set forth in Defendants' April 2, 2018 letter. *See* 4/2/18 letter from Richard Valenti to David Fathi at 6.

**Request No. 85**:
All documents regarding (1) the standards and criteria used to exclude patients with Hepatitis C from Direct Acting Agents (DAA) treatment since January 1, 2017, and (2) a list of all patients Corizon and/or ADC have excluded from receiving Hepatitis C treatment with DAAs. (Requested February 2018)

**Defendants' response:**
Defendants stand by their objections set forth in Defendants' April 2, 2018, letter. *See* 4/2/18 letter from Richard Valenti to David Fathi at 7.

Corene Kendrick
April 13, 2018
Page 7

**III.    January 26 2018 letter from Corene Kendrick regarding Paragraph 12 of
Stipulation**

**<u>Defendants' response</u>:**
*See* April 9, 2018 letter from Richard Valenti regarding vaccinations. Moreover, the Court
ruled during the April 10th status conference that discovery on this issue is premature at
this time.

Sincerely,

Richard M. Valenti

RMV/eap

cc:    Counsel of Record

Exhibit 12

**Corene Kendrick**

| | |
|---|---|
| **From:** | David Fathi |
| **Sent:** | Monday, April 30, 2018 11:16 AM |
| **To:** | Tim Bojanowski; Rachel Love; Richie Valenti |
| **Cc:** | Corene Kendrick; David Fathi |
| **Subject:** | Director's meeting agendas and minutes - Request No. 55 |
| **Attachments:** | ADCM1496430-1496431 - 01 08 18 Director's Meeting.pdf; ADCM1496432-1496435 - 01 22 18 Director's Meeting.pdf; ADCM1496436-1496439 - 02 05 18 Director's Meeting.pdf; ADCM1496440-1496443 - 02 21 18 Director's Meeting.pdf |

Counsel:

After our call today we reviewed the Bates range referenced at p. 2 of Richie's April 13, 2018 letter.  These documents (attached) are dated 1/8/18, 1/22/18, 2/5/18, and 2/21/18.  We were also able to locate minutes dated March 19 and April 2, 2018.  Please let us know when the remaining agendas and minutes from January - April 2018 will be produced.

Also, the 1/8/18 document, unlike the others, has no section labeled "Meeting Agenda/Minutes."   Please confirm that you have produced the complete agenda and minutes from the 1/8/18 meeting.

Finally, it appears that you have not produced any agendas or minutes from meetings held in November and December 2017.  *See* 1/4/18 letter from Fathi to Valenti at 1-2.  Our request asked that you **"please confirm that there were no other meetings in 2017; if there were, please produce the missing agendas and minutes."**  *Id.*  Please let us know when the November and December 2017 documents, and any other 2017 documents not yet provided, will be produced.

Thanks very much.

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
dfathi@aclu.org
@DavidCFathi

*Not admitted in DC; practice limited to federal courts

# Exhibit 13



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Mae Ackerman-Brimberg
Rana Anabtawi
Steven Fama
Alison Hardy
Sia Henry
Corene Kendrick
Rita Lomio
Margot Mendelson
Millard Murphy
Thomas Nosewicz
Camille Woods
Lynn Wu

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

April 18, 2018

VIA EMAIL ONLY

Ms. Rachel Love
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
rlove@strucklove.com

RE: *Parsons v. Ryan*, 2:12-CV-00601
Defendants' Request to Terminate Monitoring of Certain PMs

Dear Rachel:

I write to follow up on your request at the April 11, 2018 status hearing that Plaintiffs stipulate that Defendants can terminate monitoring with regard to certain performance measures. 4/11/18 Tr. at 154:2-10. Specifically, you stated that Plaintiffs did not object in our response to Defendants' termination motion to the termination of monitoring of PMs 1, 2, 3, 4, 30, 31, 32, 38, 56, 58, 70, and 71. *Id.*

As an initial matter, this is not accurate. We repeatedly have objected to the termination of monitoring of *any* measure (which would therefore include these 12 measures) on the basis that Defendants' monitoring methodology has been shown to be profoundly unreliable. *See, e.g.*, Docs. 2046, 2087, 2338. Plaintiffs have asked the Court to appoint an independent Rule 706 expert whose duties would include evaluating the reliability and accuracy of ADC's monitoring program, including the CGARs. *See* Doc. 2046 at 46.

The parties are currently in the midst of evidentiary hearings regarding the integrity of the monitoring process. It is inappropriate to terminate any monitoring so long as Judge Duncan has not ruled on Plaintiffs' request that he appoint a Rule 706 expert (which he has stated he is considering doing), and while the evidentiary hearings regarding the integrity of the underlying data are ongoing.

As detailed in our briefing regarding the evidentiary hearings held last year on monitoring methodology, (Doc. 2046), the testimony of Defendants' own employees illuminated multiple categories of concern with regard to methodology, including but not limited to:

1. Failure to properly randomize source documents;
2. The source documents used to generate the "randomized" lists;
3. Idiosyncratic and inconsistent auditing and reporting practices; and,

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Ms. Rachel Love
RE: Parsons v. Ryan
Defendants' Request to Terminate Monitoring of Certain PMs
April 18, 2018
Page 2

4.   A lack of transparency in the "rebuttal" process.

We also objected to the termination of monitoring any measure on the basis that Defendants failed to create an audit trail by listing all records reviewed for the CGAR reports.  [*See* Doc. 2338 at 6-7, *citing* Doc. 1992-1 at 5, 10].  This basis for objecting to the termination of monitoring of any measure still stands today, as Defendants continue to disregard the requirement of Paragraph 32 of the Stipulation that they provide the underlying documents that form the basis of their findings of compliance.

For all of these reasons, we are at this time unwilling to stipulate to the termination of monitoring on any performance measure.  Moreover, we have additional concerns specific to the following measures:

**PM 1: Each ASPC will maintain, at a minimum, one RN onsite 24/7, 7 days/week.**

**PM 2: Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on-call at all other times.**

**PM 4: Infirmary staffing will be maintained with a minimum staffing level of 2 RNs on duty in the infirmary at all times at Tucson & Florence infirmaries and a minimum of one RN on duty in the infirmary at all times at Perryville and Lewis infirmaries.**

Subsequent to the completion of briefing on Defendants' motion, the Court issued orders modifying Defendants' monitoring methodology for Performance Measures 1, 2, and 4, among others.  *See* Doc. 2474 at 1 (11/21/17 Minute Entry).  Therefore, unless and until the measure is re-audited using the Court-ordered methodology, we cannot consider stipulating to a termination of monitoring.

**PM 3: Dental staffing will be maintained at current contract levels – 30 dentists.**
Defendants have reported statewide compliance levels at or above 85% for this measure, *see, e.g.,* 2251-1 at 39 (through June 2017); see also ADCM1042693 (July 2017, 87%); ADCM1037639 (August 2017, 87%); ADCM1041505 (September 2017, 87%); ADCM1045033 (October 2017, 90%); ADCM1057398 (November 2017, 90%); ADCM1487929 (December 2017, 90%); ADCM1489312 (January 2018, 90%).

While the overall staffing levels for all dentists have been above the 85% requirement to avoid a finding of noncompliance, this belies the fact that Corizon's staffing reports show a disproportionate lack of staffing at the Dental Director positions.  The contract calls for 20 FTE dentists and 10 FTE Dental Directors, one Director for each prison.  In fact, for at least the past six months, the Dental Director positions have not been above filled above 78% FTE: July 2017, 78%

Ms. Rachel Love
RE: Parsons v. Ryan
Defendants' Request to Terminate Monitoring of Certain PMs
April 18, 2018
Page 3

(Doc. 2348-1 at 42); August 2017, 75% (Doc. 2352-1 at 4); September 2017, 75% (Doc. 2494-1 at 92); October 2017, 73% (Doc. 2494-1 at 80); November 2017, 73% (Doc. 2509-1 at 2); December 2017, 73% (Doc. 2634-1 at 27); January 2018, 73% (Doc. 2634-1 at 39); February 2018, 55% (Doc. 2742-3 at 37); March 2018, 55% (ADCM1505707).  Therefore, given this discrepancy in compliance with the contracted staffing requirements, we will not stipulate to a termination of monitoring of PM 3.

**PM 30: The initial mortality review of an inmate's death will be completed within 10 working days of death.**

**PM 31:  Mortality reviews will identify and refer deficiencies to appropriate managers and supervisors, including CQI committee, and corrective action will be taken.**

**PM 32: A final independent clinical mortality review will be completed by the Health Services Contract Monitoring Bureau for all mortalities within 10 business days of receipt of the medical examiner's findings.**

Dr. Robertson recently confirmed in testimony that "the purpose of the mortality review is to improve the quality of care, medical care, that is rendered to the inmate population," (3/26/18 Tr. at 690:4-8), and so we are perplexed by Defendants' desire to stop monitoring whether Corizon is providing this information in a timely manner.  Dr. Robertson also testified that there are at most two mortality reviews a week statewide, (2/28/18 Tr. at 331:9-10), and thus the burden on Corizon to comply, and for ADC to monitor compliance, is *de minimis*.  Given the critical importance of the mortality reviews to identifying and ameliorating problems in medical care that may have led to untimely or preventable deaths, we cannot agree that Defendants can stop monitoring compliance with these three measures.

Additionally, while the mortality reviews identify deficiencies, Dr. Robertson testified that he does not "follow through" or take any steps to ensure that Corizon actually takes corrective action, which belies any findings of compliance with PM 31.  *See* 2/28/18 Tr. at 333:18-19.

**PM 38:  Vital signs, to include weight, will be checked and documented in the medical record each time an inmate is seen during sick call.**

Dr. Robertson recently testified as to a mortality review timeline that he prepared (ADCM1048137-49; Plaintiffs' Exhibit 30), in which he documented that the patient rapidly lost weight due to delays of treatment in metastatic cancer.  *See* 2/28/18 Tr. at 339:2-343:7.  Had this information not been recorded in the patient's medical record, the reviewer would have lacked a critical piece of information in evaluating the adequacy of the care.  Therefore, we cannot stipulate to the termination of this performance measure.

Ms. Rachel Love
RE: Parsons v. Ryan
Defendants' Request to Terminate Monitoring of Certain PMs
April 18, 2018
Page 4

**PM 58: Results of an inmate's prenatal screening tests will be documented in the medical record.**

The burden for Corizon to comply with this requirement, and for ADC to monitor it, is *de minimis*, as it applies only at Perryville, and there are only a handful of pregnant women who would have a prenatal screening test in the applicable monitored month. (However, it should be noted that the January 2018 CGAR appears to monitor prenatal screening tests ordered in December 2017, see ADCM1489492; and the December 2017 CGAR monitors prenatal screening tests ordered in November 2017, see ADCM1488109).  In any event, Plaintiffs believe that this performance measure is a critical component of providing adequate prenatal care to pregnant women, and will not stipulate to the termination of monitoring of this measure.

**PM 70: All IPC patients have properly working call buttons, and if not, health care staff perform and document 30-minute patient welfare checks.**

This performance measure only applies to four institutions that have infirmaries:  Florence, Lewis, Perryville, and Tucson.  Given the precarious medical conditions of the class members housed in the infirmaries (a matter on which Judge Duncan has frequently commented), we believe this PM is critical to ensure patients can summon assistance in cases of emergencies, and that ADC should as a general practice be checking the call buttons on a monthly basis.  Therefore, we will not stipulate to the termination of monitoring of this measure.

Sincerely yours,

Corene Kendrick
Staff Attorney