## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) |
| | ) No. **CV-12-00601-PHX-DKD** |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Phoenix, Arizona |
| | ) May 9th, 2018 |
| **Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their Official capacities,** | ) 9:05 a.m. ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CV-12-601-PHX-DKD – May 9, 2018

1

2                         **A P P E A R A N C E S**

3    For the Plaintiffs:

4            PRISON LAW OFFICE
             By:  **Corene Kendrick, Esq.**
5                 **Rita Katherine Lomio, Esq.**
             1917 5th Street
6            Berkeley, CA 94710

7            ACLU – Washington DC
             By:  **David C. Fathi, Esq.**
8            915 15th Street NW
             7th Floor
9            Washington, DC 20005

10           EIDENBACH LAW PC
             By:  **Kirstin T. Eidenbach, Esq.**
11           P.O. Box 91398
             Tucson, AZ 85752
12
             ARIZONA CENTER FOR DISABILITY LAW – Tucson, AZ
13           By:  **Maya S. Abela, Esq.**
             177 N. Church Avenue
14           Suite 800
             Tucson, AZ 85701
15

16   For the Defendants:

17           STRUCK LOVE BOJANOWSKI & ACEDO PLC
             By:  **Timothy J. Bojanowski, Esq.**
18                **Rachel Love, Esq.**
                  **Timothy Michael Ray, Esq.**
19           3100 W. Ray Road
             Suite 300
20           Chandler, AZ 85226

21

22

23

24

25

UNITED STATES DISTRICT COURT

─────── **CV-12-601-PHX-DKD – May 9, 2018** ───────

1          (Proceedings begin at 9:05 a.m.)

2               THE CLERK:  Civil case number 12-601, Parsons, et al.,

3     versus Ryan, et al, on for status hearing.

4               THE COURT:  Counsel, please announce.

5               MR. FATHI:  Good morning, Your Honor, David Fathi of          09:05:16

6     the ACLU National Prison Project for the plaintiff class.

7               THE COURT:  Thank you.

8               MS. KENDRICK:  Good morning, Your Honor, Corene

9     Kendrick from the Prison Law Office for the plaintiff class,

10    and behind me is Rita Lomio, also from the Prison Law Office.     09:05:28

11              THE COURT:  Thank you.

12              MS. EIDENBACH:  Good morning, Your Honor, Kirsten

13    Eidenbach for the prisoner plaintiff class, and behind me is

14    Maya Abela from the Arizona Center for Disability Law.

15              THE COURT:  Thank you.  Good morning.                     09:05:41

16              The defendants' side.

17              MS. LOVE:  Your Honor, for defendants Rachel Love,

18    Timothy Bojanowski and Timothy Ray.

19              THE COURT:  Thank you.

20              Well, a couple of things to start with.                   09:05:50

21              There's an omnibus perspective that I think needs to

22    be made.  And that is, we'll turn in a bit to the CGARs for

23    March.  But in reviewing them last night after they were filed,

24    I'm left with an impression that -- and, again, we'll talk

25    about it in an individual way -- but the omnibus, the overall     09:06:28

1   view is that here we are in May of 2018, and the failures to

2   meet the stipulation continue.  The excuses sound the same.

3   Somebody left, and the new person didn't know what to do.  The

4   effort that we had before of having, let's just say by way of

5   example, the Assistant Director of Nursing tell everybody what          09:07:05

6   to do.  They didn't do it.  So we're going to have the Director

7   of Nursing, maybe they'll listen to that person.

8            It may all be associated with what I've thought has

9   been the problem all along, and the reason that we have

10  Mr. Millar working so earnestly on this, is this system is just         09:07:27

11  stretched too thin by way of people, so that when somebody

12  leaves the whole thing falls apart.

13           That's what it is.  The whole thing is falling apart

14  on a continual basis.  So we see progress, and then we see

15  just, again, the system falls apart.                                    09:07:47

16           And I just don't think anybody contemplated at the

17  time that the settlement was reached that it would be such a

18  broken system so many years into this.  Especially because so

19  many of the things are so essential and basic.  It's not as if

20  we're asking somebody to fly to Mars.  We're saying, provide            09:08:13

21  the basic healthcare that you agreed to provide, and let's have

22  a report that shows what happened in March of 2018 that shows

23  that we're meeting it.

24           And instead we're invoking the authority of the Court

25  to have to go and fix it.  And that means we go down this               09:08:38

─── **CV-12-601-PHX-DKD – May 9, 2018** ───

1   process continually, that is one where you think on the one

2   hand you are looking at it with respect to just numbers.  On

3   the other hand, the plaintiffs visit -- the plaintiffs' lawyers

4   visit Winslow, and they submit pages of what I think are the

5   human experience of the failures of these numbers.                    09:09:13

6        And I think that the frustration that I have felt in

7   this case must just be so small compared to the suffering that

8   seems to occur out in the prison yards because of people who

9   are not getting this basic healthcare.

10        I don't know how else to interpret it, to read it.         09:09:39

11   Because at some point there is a human impact, a human impact

12   that gets lost, I suppose, in the focus on the numbers of

13   running a big organization.  I don't think that all of it is

14   lost.

15        But I do think that at some point when I see the          09:10:03

16   reports of what inmates are telling their lawyers, that are

17   then shared with me, it makes me think that at some point we

18   have lost a connection to the fact that there are -- people's

19   lives and daily existence are hanging in the balance.

20        And I think that when I see the March reports, with       09:10:33

21   how much worse things are than they had been in the past, and

22   how things continue to fail, I need to reemphasize, reorient

23   the whole process, to try to make sure that we comply with the

24   stipulation, but also that we are speaking to the suffering.

25        So, one of the things I'm going to be talking about       09:11:12

1    is, before I leave -- and I gather you all have heard that I'm

2    leaving the Court.  It will happen in June.

3         I have had a number of strokes in the blood vessels

4    that supply my optic nerves.  I've had them over years.  I had

5    the first one in 1995, the second one in 2004, the third one in    09:11:37

6    2016.  All of those left me with the ability to perform my

7    duties, I could read well enough to do it.  And then in

8    February I had a number of them, more serious than the previous

9    ones, that reduced -- I cannot read out of my left eye anymore

10   at all.  And I have a very small area that I can read out of my    09:12:03

11   right eye.

12        But it is meant that I have requested and will receive

13   a medical disability retirement from the court, and will leave

14   no earlier than the 22nd of June, but likely about that time.

15        I'll continue to perform my responsibilities as best I    09:12:23

16   can in all of my cases.  The other judges have helped me to be

17   able to do that.

18        But I've got a number of hearings, and one of the

19   reasons that I chose the date in June was to make sure that we

20   could accomplish some of that.  I know that I won't be able to    09:12:41

21   tie it all up before the case, like all of my cases, is

22   reassigned.

23        But before then, and in that time period that remains,

24   I will do my work as best I can.  And one of the focuses that I

25   perhaps can do is to visit Winslow and follow up on the things    09:13:02

1    that Miss Eidenbach reported in her letter, take a look at the

2    showers, take a look at the person who's apparently having this

3    unresolvable skin issue, which may be scabies, or not.

4          But again, at some point we need to focus on the fact

5    that there are people's lives that are behind all of this.  And   09:13:34

6    for too long we have conducted this activity to a point where

7    we haven't accomplished what I think everybody intended to be

8    done.

9          So that means -- and that's a necessity to redouble

10   our efforts.  I mean, I honestly thought in the -- perhaps it     09:14:03

11   was a feature of the threat of the OSC, I honestly thought that

12   we were -- we had maybe turned a corner in the case.  But the

13   March CGARs show me that's not the case.

14         And the failure to do that, and the fact that the same

15   excuses are offered as have been offered for three years, means   09:14:27

16   that somebody thinks that it's just going to be the same

17   result, that the same excuses will be offered and we'll just

18   continue along before.

19         Well, as long as I'm around in the case, that won't be

20   the situation.  And I'll take what actions I can, including the   09:14:42

21   OSC order, which we are working on, which will result in an

22   order, a judgment against the State for the payment of

23   penalties associated with failure to comply.

24         The possibility of what the source -- of what that

25   money could be used for includes one of the other topics that    09:15:05

UNITED STATES DISTRICT COURT

1    has become a very serious issue for the Court, and that is the

2    quality of the monitoring program.

3         Again, I don't want to just throw a broad brush here

4    and -- because I have seen that there is quality.  There are

5    people who are conscientious in the monitoring program.  But I          09:15:22

6    also know, as I've talked to you about repeatedly, that there

7    are intrinsic challenges to making sure that that system works

8    perfectly, and works as it must.

9         And there are -- there are so many examples of where

10   it appears that the monitoring program is unmoored to any kind          09:15:43

11   of verifiable and examinable analysis, that I am concerned that

12   we have incomplete information.

13        And so it may well be that the moneys that would be

14   the product of the sanctions against the State can be used for

15   the retention of an expert to assist the Court, a monitor to           09:16:17

16   oversee or overlook, to examine the practices that are being

17   undertaken.

18        And so those are the omnibus issues that I wanted to

19   address before we turn to agenda items.

20        Again, the most particular thing of what I mentioned,             09:16:43

21   and perhaps we'll need to discuss, is if -- after giving

22   counsel an opportunity to be heard, if it is contemplated that

23   we would -- that I would go to Winslow, we would need to pick a

24   day for that, because that would be something that would need

25   to happen between now and the 22nd of June.                            09:17:07

—— **CV-12-601-PHX-DKD – May 9, 2018** ——

1          Okay.  So, I'll turn first to counsel for plaintiffs

2     with respect to the Winslow information, what their view is.

3          MR. FATHI:  Your Honor, before addressing that, I

4     would like to say that we are dreadfully sorry to hear of the

5     reason for your departure.  And on behalf of all of us on the          09:17:30

6     plaintiffs' side, and on behalf of the 34,000 men, women and

7     children we represent, we want to send our good wishes to you

8     and your family in what I'm sure is a very difficult time.

9          THE COURT:  Well, I thank you for that.

10          I must let you know though that I will be fine.  I'm          09:17:48

11    one of those very lucky people who has had a life that has

12    given me a lot of experiences and a lot of things that have

13    helped me understand that even though bad things do happen,

14    good things can come out of it.  And so I've seen that many

15    times in my life, where I've thought horrible things have          09:18:10

16    happened, and I've seen after the fact, looked back upon it.

17          I really will tell you and tell both sides, I

18    understand that the fact that the judge that you have worked to

19    educate over these years, the departure of that judge is a huge

20    imposition on everybody involved.  If there had been any way          09:18:33

21    that I could have avoided this, I would have.  And I'm simply

22    sorry to you more than anybody could be sorry for me.  I'm

23    sorry to you all that I have not the ability to continue to be

24    able to serve in this position, because I understand that it

25    will be, even for the defendants who didn't want me on the          09:18:56

—CV-12-601-PHX-DKD — May 9, 2018—

1  case, it will be more difficult for you all for the new judge,

2  to have to explain things, to not be able to have the

3  institutional memory that's in my head.

4          Obviously the record exists in the case, and there are

5  the lawyers, all of us as lawyers have had to teal with this in   09:19:14

6  our time when we have the judge, and suddenly we don't have the

7  judge.

8          But I appreciate what you said.  Thank you.

9          MS. KENDRICK:  So, Your Honor, in terms --

10         THE COURT:  Do you think -- Miss Eidenbach, do you   09:19:30

11  think that there would be any benefit of having the Court

12  observe firsthand and try to see -- I mean, obviously the

13  defendants will have a different view.  They always have the

14  opportunity to weigh in on this.

15         But the kinds of things that you identify as being   09:19:45

16  issues make me want to take a look at a place that I've never

17  been and prepare the report about that.

18         MS. EIDENBACH:  Your Honor, I do think that your

19  comments this morning are spot on, and that there is a very

20  real human component to this case that does often get lost in   09:20:08

21  the numbers.  And you get a very different quality of

22  information when you see the suffering that goes on firsthand.

23         We just completed a tour of the Yuma complex, and we

24  think, given the size of that complex, and the fact that the

25  conditions there are as deplorable as they were in Winslow,   09:20:31

─── **CV-12-601-PHX-DKD** – May 9, 2018 ───

1  there are more people there, that it might be more useful for

2  Your Honor to visit the Yuma complex.

3        That being said, we are preparing to tour Eyman in

4  June, and so if Your Honor wanted to join us on that tour.

5        THE COURT:  When is that?                          09:20:57

6        MS. EIDENBACH:  That will be the week of June 18th.

7  Which we haven't yet sent notice of, but that's our plan.

8        Eyman, of course, is a little bit different of a

9  situation.  We would be combining that tour with Florence.

10        And I recently visited Mr. Upton, who the Court heard    09:21:18

11  from, about a month ago, to find out that he's once again not

12  receiving his cancer treatment.  His condition has worsened to

13  the point where I imagine he'll be entering hospice soon.  And

14  he found out for the first time that his cancer was incurable

15  stage 4 lymphoma from a filing that Corizon did in his          09:21:48

16  individual civil case.  And so those results had never been

17  communicated to him personally, and he found it out by way of a

18  court filing.

19        So Florence also is a place that Your Honor may want

20  to visit.                                                        09:22:06

21        THE COURT:  Well, do you think that it is as

22  beneficial or is it perhaps obstructive of the process?  I have

23  noticed when I've visited before that I have a sense that

24  things are different because I'm there.  I'm sure things are

25  different because you're there.  But I don't know whether I      09:22:25

1  confound or compound that problem.

2      MS. EIDENBACH:  I think that things are certainly

3  different when you're there.  And they're different when we're

4  there.  But I also think that the system is so profoundly

5  broken that there's still a lot of really important qualitative    09:22:41

6  information that we can glean, even with your presence on the

7  tour.

8      And what we have discovered is that the tours are

9  particularly useful for our class members because we find that

10  they actually get the treatments that we've seen delays in in    09:22:57

11  advance of our arrival.  And so there's sort of that tangential

12  impact.

13      One of the things that might be most useful, if you

14  were to join us on the Eyman and Florence tour, there's an IPC

15  at Florence, so you would be able to see what the conditions    09:23:18

16  are like at -- in an infirmary setting.

17      It's also -- there's max custody at both Eyman and

18  Florence.  And there's also at North Unit is a -- North Unit is

19  essentially a Tent City.  And so you would be able to see the

20  conditions that folks live in during the Summer at all of those    09:23:40

21  different places, at both Eyman and Florence.

22      THE COURT:  What about if I visit at a time that

23  you're also visiting, what about your opportunity to have

24  attorney/client privileged communications with your clients?

25      MS. EIDENBACH:  I think that we would still be    09:24:04

1    able -- the way that the tours are structured, I don't think

2    that your presence would obstruct that.

3              MS. KENDRICK:  Just to add something, Your Honor,

4    based upon my experience in other cases where we have either

5    court experts or special masters or monitors who occasionally         09:24:18

6    might drop in for one day of a monitoring tour, oftentimes

7    people may or may not want to talk to the judge.  But we will

8    talk to them privately and say, you know, the judge or the

9    court's expert or the special master is here, would you like to

10   speak with them?                                                      09:24:36

11             So it wouldn't be, per se, like you and counsel for

12   defendants coming and barging in and sitting when we're having

13   private meetings.  We would speak with people privately and

14   find out if they were willing to speak with you openly there.

15             So, you know, basically they would waive any sort of        09:24:49

16   privilege that they may have had with regards to what they told

17   us.  But we wouldn't just preemptively bring you into an

18   interview room with us.  That's what we've done historically

19   when independent court experts have joined us on tour.

20             MS. EIDENBACH:  And I think in general the information       09:25:07

21   we receive from our clients is that they would be more than

22   happy to speak with you and share their stories, because

23   ultimately almost everyone we talk to wants to get the story

24   out to help improve the provision of medical care and prevent

25   future instances of failures.                                         09:25:25

14

1          And so I think that you'd find that the majority of

2     the people who we would talk to would be more than happy to

3     speak with Your Honor.

4          THE COURT:  And you say you're going on the 18th and

5     19th --                                                          09:25:38

6          MS. EIDENBACH:  We -- usually we do a four-day tour of

7     Eyman and Florence, so it would be probably the 18th through

8     the 21st, or Tuesday to Friday.  But we can certainly work

9     around Your Honor's schedule.

10          THE COURT:  Would you contemplate that I would be        09:25:55

11     there for one of those days?

12          MS. EIDENBACH:  Perhaps -- yes.  And we could -- what

13     we could do is, so that if you wanted to speak to people at

14     both Eyman and Florence, we could do a morning at Eyman and an

15     afternoon at Florence, or vice versa.  And that way you could   09:26:09

16     select what areas or yards are most important.  We can, of

17     course, give you feedback as to where we think you should go.

18          And then we would continue our tour on the remaining

19     three days the way that we normally run them.

20          THE COURT:  And would it be -- I've gathering from       09:26:28

21     what you just said that you think that it would be okay for me

22     to come at the start rather than at the end of your four-day

23     period, or do you have a preference there?

24          MS. EIDENBACH:  It doesn't matter.  We can even do it

25     in the middle.  We are quite flexible.                          09:26:42

1    We find -- we've found in our experience with the

2    tours that they tend to be organic, and we go into each tour

3    knowing that.  Because a lot of what we look at and where we go

4    is based on feedback we're receiving in real-time from the

5    people we talk to.  And so each day our plan changes and morphs          09:26:59

6    depending on the information that we find.  Because like you

7    said, there's a lot more information behind all of the numbers

8    that we talk about in this court every month.

9         THE COURT:  Let me hear from the defendants on this.

10        MR. BOJANOWSKI:  Your Honor, on behalf of the                       09:27:18

11   defendants, we too are sorry that you're undergoing these

12   medical issues, and hope that you have a good and strong

13   recovery --

14        THE COURT:  If it would get better I'd stick around.

15   It won't get better.                                                     09:27:34

16        MR. BOJANOWSKI:  I'm sorry to hear that.

17        THE COURT:  Just so you know.  It's not as if -- but

18   again, it's not -- you know, everybody's got their own cross to

19   bear, and so this is mine, and it's fine.  But it's not as if

20   it will get better.  I've lost the vision in my eyes, it's gone          09:27:46

21   forever.

22        MR. BOJANOWSKI:  We certainly wish you the best.

23        THE COURT:  Okay.  Thank you.

24        MR. BOJANOWSKI:  So with regard to the tours, these

25   are typically run by myself in coordination with the                    09:27:57

1    plaintiffs.  Unfortunately I'm scheduled out of town that week.

2    Perhaps the previous week is available?

3         MS. KENDRICK:  We have the hearings the previous week.

4         MS. EIDENBACH:  Yeah, that's the difficulty, is we

5    have hearings so often.                                              09:28:18

6         MR. BOJANOWSKI:  Your Honor, I'm not trying to be a

7    stick in the mud here, but I like to take ahold of these tours

8    because they just run a little bit better if I'm there, to be

9    quite frank.

10        What about -- what about the first week of June?            09:28:36

11        Your last day is the 22nd, Your Honor?

12        THE COURT:  Yes.

13        MR. BOJANOWSKI:  Okay.

14        MS. EIDENBACH:  Your Honor, you know, we're certainly

15   happy to work with your schedule, but per the terms of the          09:28:53

16   stipulation and your recent order, I mean, this is now well

17   over a month's notice of the tour date.  And that's the date

18   that we would have given notice where there wouldn't really

19   have been the opportunity for defendants to decline.

20        That's really the only date -- unless Your Honor has       09:29:17

21   difficulty working his schedule around those dates, that's the

22   only date that works for all of the plaintiffs' counsel that

23   needs to be present on the Eyman Florence tour.

24        MR. BOJANOWSKI:  Your Honor, if you -- if they insist

25   on that week, then I'm sure that it can be made to happen.  I      09:29:34

1    would just not be there, which, you know, is fine.

2              THE COURT:  I understand.  I understand.

3              It looks like we are in a situation where there is no

4    choice, just because of the hearings that we have the previous

5    week, and my departure.                                    09:29:55

6              I want to do this work for the new judge, so that I

7    can at the very least prepare a report for that judge to

8    consider, understanding that I may have the availability to go

9    out in this week whereas another judge might not.

10             So, what --                                      09:30:18

11             MS. EIDENBACH:  Your Honor, I apologize for

12   interrupting you.  But I just conferred with Miss Kendrick, and

13   we could be available the week of June 4th as well.

14             MR. BOJANOWSKI:  Your Honor, how about if counsel meet

15   and confer and let the Court know?                         09:30:40

16             THE COURT:  Well, the problem is --

17             MR. BOJANOWSKI:  You want to lock it in.

18             THE COURT:  Well, the week of the 4th is a problem for

19   me because I've already thrown a wrench in the works with

20   respect to my colleagues here, and that's a week that I'm on   09:30:53

21   criminal duty.

22             And so what I'm thinking is that we should have it

23   occur the week that unfortunately that you're out,

24   Mr. Bojanowski, and have me go on the 21st.  That's the

25   Thursday.  That way the organic process, if it produces new   09:31:16

1    information on the days that you've been there, that might be

2    something that you might want to share with me at the end

3    rather than at the beginning.

4         So I would suggest that, unless you think that that's

5    not a good idea.                                              09:31:30

6         MS. EIDENBACH:  That sounds like a great idea,

7    Your Honor.

8         THE COURT:  Okay.

9         MR. BOJANOWSKI:  We'll make it work, Your Honor.

10        THE COURT:  All right.  I appreciate that.  Thank you     09:31:35

11   very much.

12        MR. BOJANOWSKI:  And then as far as Winslow,

13   Your Honor, we are preparing a response to the plaintiffs'

14   letter to provide the Court.

15        THE COURT:  Okay.  All right.                              09:31:42

16        MR. BOJANOWSKI:  Information as to the status of each

17   one of the individuals mentioned.  And the course of treatment

18   with regard to the gentlemen with the skin condition, as well

19   as the gentleman with the detached retinas.  And will provide

20   that to the Court quickly.                                      09:31:59

21        THE COURT:  And also address the suggested conflict

22   between what we have heard in court with respect to the

23   telepsychiatry information and what is reported as having said

24   by a Corizon person to the lawyer for the plaintiffs' class.

25        MR. BOJANOWSKI:  Correct.  Yes, we will address all of     09:32:17

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD — May 9, 2018—

1    the issues in the letter and get that filed with the Court so

2    the Court can then review it.

3            THE COURT:  Where do you stand on the timing of that?

4            MR. BOJANOWSKI:  I think we could probably have that

5    done within seven days, Your Honor.                           09:32:30

6            THE COURT:  Okay.  All right.  So do that, please.

7            On the subject of filings, the data that I had asked

8    you to supplement regarding the order to show cause information

9    that you filed at 2790, the -- it doesn't comply with our

10   administrative manual in the court with respect to having      09:32:59

11   documents that are filed so that we can search them.  They

12   apparently are photographic images of some kind, I think.

13           So I don't know, have the plaintiffs observed what I'm

14   saying about this as well?

15           MS. KENDRICK:  They were not OCR searchable.           09:33:21

16           THE COURT:  Is that what it is?  That's the term to

17   use, it's not OCR searchable.  So that's what we noticed as

18   well.

19           And the local administrative manual that we use for

20   ECF filings I believe requires that documents be OCR           09:33:34

21   searchable.

22           MS. LOVE:  We will correct that, Your Honor.

23           THE COURT:  Okay.  Thank you very much.

24           The next item on my agenda was checking in with you

25   all about where you stood regarding the agenda for the         09:33:51

—CV-12-601-PHX-DKD — May 9, 2018—

1   evidentiary hearing continuing on the 31st of May and June 1st.

2   I couldn't tell from what you all have filed whether you have

3   the need for me to intervene at this point with respect to the

4   order, or the witnesses.  So I need an update on that.

5             MS. KENDRICK:  Yes, Your Honor.                          09:34:17

6             So we anticipate that Miss Fischer, who the Court

7   subpoenaed to come to testify on May 31st, will be here the

8   full day.

9             Dr. Wilcox, our expert, is available on June 1st.  And

10  we had planned to present him in the morning, pursuant to the     09:34:32

11  Court's instruction with regard to limiting direct testimony

12  from experts to two hours.

13            And then Miss Edwards is the clinical coordinator at

14  Yuma, and we issued a subpoena to her to testify on June 1st in

15  the afternoon session.                                            09:34:55

16            The reason we called her, we had not previously

17  disclosed her, as the Court is well aware over the past few

18  months, plaintiffs' counsel has stated repeatedly that we

19  reserve the right to call additional witnesses on the issue of

20  the reliability of the monitoring data and the underlying        09:35:12

21  information based upon our review of the documents produced

22  late by ADC and Corizon.

23            And so as a result, you know, the production,

24  including the documents previously withheld as privileged, were

25  not completely produced to us until mid to late April.  So we     09:35:33

1    are still going through them.  But identified documents related

2    to Miss Edwards that we thought would be useful evidence for

3    the topic.

4            As well as the fact that while we were at the Yuma

5    complex a week and a half ago, Miss Eidenbach and I met with          09:35:52

6    Miss Edwards, with counsel for Corizon and Mr. Bojanowski

7    present, and spoke with her about 20 to 30 minutes about the

8    process for locating specialists and scheduling them and using

9    eOMIS and Cares and all these things we've heard about.  And

10   Miss Edwards was very forthright and informative, and provided        09:36:15

11   a lot of educational information to us.

12           And so combined with the fact that we couldn't sit and

13   talk to her for two hours, but we did feel that we had more

14   questions for her that would be appropriate to ask so that you

15   could hear the answers as well, as well as questioning her            09:36:32

16   about some of the documents that we received in the late

17   productions, that's why we issued the notice of intent to

18   subpoena her.  And the subpoena has been issued to her.

19           THE COURT:  And so you think she'd be able to

20   be -- your direct examination and any cross for her could occur       09:36:53

21   in just the afternoon of the 1st, you believe?

22           MS. KENDRICK:  I think so.  I don't anticipate direct

23   taking more than an hour and a half.

24           THE COURT:  Okay.  And so then that would put us into

25   June for the June dates, and then we would be on defendants'          09:37:09

—CV-12-601-PHX-DKD — May 9, 2018—

1    witnesses?

2           MS. KENDRICK:  Yeah.  I mean, we're -- like I said,

3    we're still finalizing.  But at this point in time we don't

4    anticipate wanting to call anyone else.  I mean, we obviously

5    still reserve that right.  But I think at that point if          09:37:27

6    defendants have their witnesses to put on the June 12th week,

7    that would be their scheduling.

8           MS. LOVE:  Your Honor, the objection that we have to

9    calling Miss Edwards -- which we appreciate the explanation

10   today as to the relevancy, as I had requested from             09:37:47

11   Miss Kendrick the nature of her testimony, since she wasn't

12   previously listed as a witness.  Our objection to calling

13   Miss Edwards now is that we still haven't finished the

14   presentation, just chronological subject matter, and to avoid

15   disjointed presentation.  We haven't finished the presentation  09:38:06

16   of evidence regarding the allegations that Dr. Watson made

17   regarding Eyman.

18          Dr. Stewart has testified, but he's still subject to

19   cross-examination by plaintiff and redirect.  So we had had him

20   scheduled to testify on June 1st.                               09:38:22

21          So we would request that we finish witnesses before we

22   start a new subject matter, especially since this relates to

23   Yuma and not Eyman.

24          MS. KENDRICK:  Your Honor, we notified defendants --

25          THE COURT:  Hold it just a second.  I've already          09:38:35

─── **CV-12-601-PHX-DKD – May 9, 2018** ───

1   decided.

2         What we'll do is we'll go forward with the way that

3   the plaintiffs have proposed it.  We'll have the schedule which

4   has Miss Edwards on the afternoon of the 1st, then we'll turn

5   to the defendants' witnesses and finish up with the Dr. Watson     09:38:49

6   issue, and whatever else we need to do on the other witnesses

7   that the defendants want to present at that time.

8         So that's what we'll do.

9         On the agenda is always how to make sure that we have

10  a definitive Monitoring Guide in place.  I think what needs to    09:39:15

11  happen here is we need to hold this in abeyance until I get

12  this additional evidence that will come in at the end of May,

13  the 1st of June and in the middle of June.

14        But if there are discovery issues related to this, as

15  it is suggested in what the counsel have submitted, I need to     09:39:39

16  hear about that today.  Is there anything more on that?

17        MR. FATHI:  I'm sorry, Your Honor, which item were you

18  referring to?

19        THE COURT:  On the Monitoring Guide with respect

20  to -- aren't we in -- where are we with respect to getting that   09:39:51

21  finally --

22        MR. FATHI:  Well, Your Honor, we do not have a final

23  and accurate Monitor Guide.  The thorny issue of the correct

24  monitoring for Performance Measure 86 has been exhaustively

25  briefed and awaits decision by the Court.                         09:40:16

1          In the meantime, the current Monitor Guide that

2    defendants are using, the provisions for Performance Measure 86

3    are consistent neither with the Court's order, nor with what

4    the Court -- what the defendants have said they're actually

5    doing, currently how they are monitoring.                    09:40:34

6          So that is by any measure not an accurate Monitor

7    Guide, at least as pertains to Performance Measure 86.

8          Item -- agenda item 8 involves not the -- what should

9    go in the Monitor Guide, but whether defendants are monitoring

10   compliant with the Court's orders as reflected in the Monitor   09:40:59

11   Guide.

12         And just to be clear, Your Honor, these are

13   highly -- these are mostly highly fact specific disputes --

14         Should I pause for a minute?

15         THE COURT:  No, the reason -- the reason that I have a   09:41:13

16   note is the Court staff has made it plain that I haven't made

17   it plain what I'm talking about to you all.

18         And what I'm talking about is the information that

19   came to light when I was unable to accompany you all to the

20   office to try to identify issues that were unresolved by you   09:41:40

21   all with respect to what a particular counting period was, what

22   would come in to be considered.

23         So the -- what became apparent at this visit at

24   D.O.C. -- well, at the D.O.C. terminal, I suppose, is the right

25   way to say it, the visit to that terminal where the hoped for   09:42:14

—**CV-12-601-PHX-DKD – May 9, 2018**—

1   result would be that there would be an opportunity for people

2   to finally see what was counted, it became evident there that

3   there was some very low level of decision making.  Meaning it

4   was not in the Monitoring Guide, it was not at a higher

5   administrative level, but it was seemingly up to the person who    09:42:35

6   was making the judgment in evaluating whether there was

7   compliance with the stipulation in the sampling as to

8   what -- what records could be counted, what records could be

9   counted in that month or from other months.

10          That's the issue.                                          09:42:54

11          And I think you were touching upon it, but I wasn't

12   direct enough in saying that that's what I am thinking about.

13   I didn't know whether you thought there needed to be more

14   discovery about it, or whether or not, as I started to

15   stay -- or as I said at the very start, this issue has kind of    09:43:10

16   swept in within the overall issue of looking at the quality of

17   the monitoring program, such that it would wait until after we

18   had heard everybody who was going to testify about that.

19          MR. FATHI:  Well, let me address that on a couple of

20   levels, Your Honor.                                               09:43:25

21          First of all, yes, we are in the middle of an

22   evidentiary hearing about whether the monitoring system has any

23   credibility or reliability, and so we do believe that it's

24   important to complete those hearings.

25          In terms of lower level staff giving their own            09:43:40

1  interpretation to the Monitor Guide in ways that are not

2  written in the Monitor Guide, we see that problem over and over

3  again.  That problem is reflected in the issues that are

4  discussed in the correspondence mentioned in agenda item 8.

5      Miss Kendrick will address some of the specific          09:44:02

6  issues, but I think what this shows, again, Your Honor, is the

7  necessity of an expert pursuant to Rule 706 to oversee and

8  supervise the defendants' monitoring.

9      Because when disputes like this arise, the expert

10  could be the one to dig into the records, hear from both sides, 09:44:22

11  and make a recommendation to the Court as to what the final

12  resolution should be.  That is a much more efficient way that

13  conserves judicial resources and frees up the Court's time to

14  do things that only the Court can do.

15      I know the Court wasn't able to go to the ADC terminal  09:44:40

16  that day, but Miss Selzer did, and I'm sure she recalls how

17  very time consuming and labor intensive a process it is.

18      So we believe, Your Honor, that that in-the-weeds work

19  of resolving these disputes can and should be done by a

20  Rule 706 expert.  The Court would remain the ultimate          09:45:01

21  decision-maker, but the data can be sifted and the dispute

22  refined by the expert, who can then make a recommendation to

23  the Court and the Court can make the ultimate decision.

24      These are -- these disputes are critical -- or

25  resolution of these disputes is critical because it goes to    09:45:21

—CV-12-601-PHX-DKD — May 9, 2018—

1   whether our clients are getting the care to which they're

2   entitled under the stipulation.  But we don't think that it

3   requires the Court to be the one to dig through the medical

4   records.

5          And now I think Miss Kendrick has some things to say          09:45:36

6   about the more specific issues that the Court raised at the

7   outset.

8          THE COURT:  All right.  Thank you.

9          MS. KENDRICK:  So the quick answer to your question

10  about whether or not this has been resolved with the specific          09:45:46

11  issues raised in the September and October 2017 CGARs, and then

12  based upon Mr. Bojanowski's responses in his letter dated April

13  25th that were filed at docket 2794-1 as Exhibits 9 and 10, the

14  bottom line is that it appears that the parties may be at an

15  impasse, you know, in terms of this concept of we'll review          09:46:09

16  things that happened in July for the September CGARs.

17         Defendants are taking the position that somehow

18  plaintiffs misunderstand the Monitoring Guide.  And we don't

19  misunderstand it.

20         But in any event, as Mr. Fathi said, we do need          09:46:30

21  somebody to get into the weeds and just decide once and for

22  all.  To be quite candid, Your Honor, we have not been able to

23  cue this up for immediate resolution by you simply because

24  there are a few balls in the air going on right now with this

25  case.  And we have been trying to prioritize issues related to          09:46:50

—CV-12-601-PHX-DKD — May 9, 2018 —

1   the contempt and matters that are impacting the lives of our

2   clients.

3           That said, if you and/or -- you know, if you want

4   Miss Selzer involved, you know, we can kind of get this process

5   started again of doing the meet and confers, the phone calls,        09:47:09

6   et cetera.

7           But that's where we stand.

8           THE COURT:  And you say that -- I mean, hasn't

9   this -- aren't you currently though -- wasn't there an April

10  4th -- am I remembering a letter that addressed this topic, or      09:47:26

11  am I remembering the wrong letter?

12          The most recent correspondence that you've had on this

13  subject with the defendants is when?

14          MS. KENDRICK:  I think that was about discovery.

15          THE COURT:  Okay.                                            09:47:41

16          MS. KENDRICK:  But after -- well, no, what happened

17  was we had our hearing on April 11th, and you told

18  Mr. Bojanowski to respond within 14 days about what we had

19  raised in those letters in the Fall and then in the Winter, and

20  then were the subject of that February 9th meeting that            09:47:57

21  Miss Brown and Miss Selzer attended.

22          So we filed that with the Court last week,

23  Mr. Bojanowski's April 25th letters.  And in them is where he

24  says that we misunderstand the Monitoring Guide.

25          THE COURT:  Okay.  Those are -- I am wrong about the        09:48:14

UNITED STATES DISTRICT COURT

1    dates.  So it is the April 25th correspondence.  Okay.

2              MS. KENDRICK:  Yes, sir.

3              MR. FATHI:  And if I could just cite one more example,

4    Your Honor.  From the same letter, this is document 2794-1,

5    Mr. Bojanowski's April 25th letter, page 76 of the numbering          09:48:36

6    assigned by the ECF system.  And this is, again, about

7    Performance Measure 94 at Winslow.

8              And the question is -- the requirement that the

9    patient on watch be seen daily, does that apply the first day

10   the patient is on watch?  And the defendants say, well, no, we       09:49:00

11   think daily means regular business hours -- during regular

12   business hours.

13             And this is just another example of the defendants

14   coming up with their own unilateral and secret interpretation

15   of what a Performance Measure means without writing it down in       09:49:19

16   the Monitor Guide or otherwise communicating it to plaintiffs

17   or the Court.

18             So this is exactly the sort of thing.

19             Again, we are not asking the Court to rule on this

20   particular dispute right now, but we think that this practice        09:49:32

21   is another illustration of the need for someone to be on top of

22   this and be involved in these disputes to a greater extent than

23   the Court is able, given the Court's other duties.

24             THE COURT:  Well, the correspondence definitely does

25   indicate that there are significant disagreements, and many of       09:49:55

1    them.  And so this issue of making sure that the monitoring

2    system overall is sound, is one that I think will be a major

3    focus of the Court.  Well, I can't speak for the Court going

4    forward.  But it seems to me that that would likely be a major

5    focus going forward, because as things evolve it is becoming          09:50:20

6    increasingly clear that there are reasons to be concerned about

7    whether or not the monitoring practices are consistent with the

8    requirements of the stipulation.  And it does require some

9    great particularized attention.  And so it may well be that an

10   expert is necessary for that.                                         09:50:51

11          But also I can say this, that -- and I'll give the

12   defendants an opportunity to be heard, I won't take any action

13   at this moment.  But I will take a look at -- again, at this

14   correspondence.  I had some difficulty in trying to get it to a

15   way that I could read it.  And so I'm not as fully prepared.          09:51:10

16          But what I did see there were some things that

17   suggested to me that at the very least there was a failure of

18   communication with respect to where people were mounting

19   arguments, but giving conclusory statements as to the basis for

20   the argument without any particular details.  Repeatedly I            09:51:34

21   found myself making annotations that I would have wanted to

22   know, and if I had the person making that argument in front of

23   me I would say, well, exactly what are you talking about?

24   Because I thought that would have been more helpful in the

25   process overall.                                                      09:51:53

————— CV-12-601-PHX-DKD – May 9, 2018 —————

1          So I will see if I can take a look at that again and

2    see if I can give you any further instruction, other than this

3    overall idea that it's collected within this need to focus on

4    the monitoring generally.

5          Anything defendants wanted to add at this point?          09:52:09

6          MR. BOJANOWSKI:  Your Honor, really nothing further in

7    any detail.

8          We agree with plaintiffs that it's not ripe for

9    resolution at this point in time.  And I don't want to get into

10   the weeds, so to speak, in making particularized arguments one   09:52:23

11   way or another.  But there's just been an exchange of letters.

12   We know there are disagreements.  And I think we'll have to

13   move forward with the process.

14         As well, the evidentiary hearings may involve some of

15   these issues as well as we go forward.                           09:52:42

16         THE COURT:  Okay.  Thank you.

17         It may be appropriate to segue then into the

18   defendants' request that certain Performance Measures be

19   removed.

20         My last request to plaintiffs to see if there were        09:52:58

21   some that they could agree that that could happen, the

22   plaintiffs have responded saying that they can't agree because

23   of this monitoring issue, they don't confidence that they are

24   basing any decision on sound numbers.

25         I understand that, but I also wanted to push back a        09:53:20

32

1    little bit more to plaintiffs and to say, are there any of

2    these -- again, everybody here is strapped by way of resources

3    and time.  And so if there are Performance Measures that, in

4    light of experience over the three-year history of the

5    stipulation, that are unlikely to be of a concern to plaintiffs          09:53:50

6    because they may not have -- your gut feeling is that the

7    numbers, although you don't want to make a waiver of any kind

8    of argument, your gut feeling is that the numbers on this

9    particular Performance Measures aren't so -- aren't so likely

10   or susceptible to that infirmity.                                        09:54:10

11          I just -- as I looked at these, I thought, there must

12   be some that you could give up on.  And I would urge you to

13   do -- to do that.  Just because I think that

14   there -- everything that's monitored gratuitous or

15   unnecessarily is taking time away from things that should be             09:54:31

16   monitored that are more important.  I have to think there are

17   some among those.

18          And so can you take another look at that?

19          MS. KENDRICK:  Yes, we can.

20          THE COURT:  Okay.                                                 09:54:46

21          So you'll let the defendants know in a week whether

22   there are some that you can agree to, and then I'll address the

23   others?

24          MS. KENDRICK:  Yes, sir.

25          THE COURT:  Okay.  Thank you.                                     09:54:55

—— **CV-12-601-PHX-DKD – May 9, 2018** ——

1       Does it make sense to turn to the March CGARs now, or

2   is there anything we need to address before we do that?

3       All right.  Mr. Bojanowski?

4       MR. BOJANOWSKI:  Thank you, Your Honor.  Let me get

5   myself situated.                                              09:55:22

6       We did have some changes that unfortunately we had to

7   file I believe this morning, that we did in a separate filing.

8       THE COURT:  I didn't see that.  Okay.

9       MR. BOJANOWSKI:  Yes.  It involved a handful of these

10  PMs.  As the Court is aware, these are all preliminary numbers, 09:55:41

11  and so they're still being looked at, reviewed and re-reviewed.

12      And so I filed it in a separate pleading so that the

13  Court would be aware of which ones were in play.  But I'll

14  review those verbally as we go through as well.

15      So I'm assuming that the Court wants to hear of all of  09:56:09

16  the failing measures and not the ones that are in compliance,

17  as we normally do?

18      THE COURT:  That make sense.

19      MR. BOJANOWSKI:  All right.  So the first one would be

20  Performance Measure 6 at Eyman, which had been tracking in     09:56:23

21  compliance since April 17th, and then dropped this past month.

22      And as the Court had mentioned in its omnibus review,

23  yes, it was due to a lack of back-up personnel taking the reins

24  when somebody was not onboard to make sure that this measure

25  was being accomplished.                                        09:56:54

1          Given the track history, and in discussing this with

2     the Corizon personnel, they believe this is a situation that,

3     as they described it, was a one-off type of situation.  And we

4     don't anticipate that this is going to continue, given the

5     extensive track record with regard to compliance on this                09:57:21

6     particular measure.

7          THE COURT:  Miss Kendrick?

8          MS. KENDRICK:  So I guess the question we have with

9     this is that it says that it was a single person.  And our

10    understanding of how medical practice works, and mental health        09:57:32

11    practice or dental practice works, is that the nurses sign off

12    on the orders, and make sure that they're reviewed and taken

13    off and entered.

14         And so it's unclear whether this -- the fact that it

15    crashed so much when the person who was supposed to just be           09:57:55

16    doing quality control, which is what I interpreted the single

17    person controlling the reviews mean, takes off, begs the

18    question of whether the nursing staff have a practice of not

19    normally writing it off, because they know some Director of

20    Nursing or some person, they don't say the title of who this         09:58:15

21    individual was, would go back and be the stopgap and make sure

22    that they did their job in the first place.

23         THE COURT:  A reasonable question.

24         MR. BOJANOWSKI:  Unfortunately I don't have an answer

25    to it.                                                               09:58:34

1      My understanding of the way it works is that they try

2  to do this on a daily basis.  And so they're checking on it.

3  And they try to stay on top of it.  But I can't answer

4  specifically as to Miss Kendrick's question.

5      THE COURT:  All right.                                09:58:50

6      MS. KENDRICK:  Well, I guess my question is, do you

7  know the title or the position that this individual had who was

8  controlling the review of the orders?

9      MR. BOJANOWSKI:  I believe it was the Assistant

10 Facility Health Administrator.  That's my understanding.      09:59:02

11     THE COURT:  All right.  The next Performance Measure?

12     MS. KENDRICK:  I believe it's Measure 15 at Lewis.

13     MR. BOJANOWSKI:  15?  Okay.  Thank you.

14     Yes, 15 at Lewis at 82 percent, dropping from 96 last

15 month.                                                   10:00:03

16     This was just lack of documentation on medication

17 refusals, and specific retraining to remind everybody to make

18 sure that they are filling out the documentation appropriately

19 with regard to the refusal so that the inmate can be

20 appropriately counseled.                                 10:00:28

21     THE COURT:  I have --

22     MR. BOJANOWSKI:  My understanding is that what

23 happened here is the nursing staff were not appropriately

24 checking the box off to say, education provided on the refusal

25 form.  And that was the basis of non-compliance, because they   10:00:46

1 have to -- when they get a refusal, they have to go through a

2 process.  And then the last item on that is they have to

3 educate the patient as to the consequences of their refusal.

4 And that particular box was not being checked off, which led to

5 the non-compliance in this particular instance.  10:01:12

6    THE COURT:  These alarms that are the Performance

7 Measure reports here, are not necessarily limited to just the

8 individual circumstance of that particular Performance Measure.

9 Taken all together, the fact that it is -- that somebody can

10 have months of complying with this particular measure, and then 10:01:45

11 suddenly the records show that people are not doing it, makes

12 one think about all the other aspects of health care generally,

13 which is, again, the subject that we are focused on.

14    It's not just trying to -- I mean, these are ways to

15 try to analyze whether the spirit and the letter of the 10:02:09

16 stipulation are complied with.  Understanding that it wasn't

17 just an agreement between the parties to make sure that at

18 every given month at every performance level -- every

19 Performance Measure at every facility that these requirements

20 were met, it was because the parties had agreed to resolve a 10:02:35

21 health care case.

22    And so these individual components, when something as

23 basic as this doesn't occur, makes one wonder whether, again,

24 the system is just so strapped and so thin with respect to

25 staffing or coverage otherwise, that these kinds of things fall 10:02:57

1   off, and makes one wonder what other kinds of things that are

2   not being monitored but are actually what are at the core

3   purpose of the stipulation, the provision of health care, are

4   also at issue.

5       So that's an observation of my overall perspective          10:03:15

6   again.

7       Miss Kendrick, do you want to say anything about this

8   one?

9       MS. KENDRICK:  Just -- I don't know if Mr. Bojanowski

10  has the answer to this, but the last sentence of the Corrective    10:03:28

11  Action Plan, after noting that the new plan will not be done

12  until July, it states that, quote, intermediate steps that can

13  help in the interim will begin on May 14th, close quote, and

14  whether he could articulate what those intermediate steps are

15  and who is performing them and who is making sure that they         10:03:47

16  occur.

17      MR. BOJANOWSKI:  I cannot at this time.

18      MS. KENDRICK:  Actually, I apologize, I had jumped

19  ahead to Performance Measure 19.

20      THE COURT:  I was just reading --                              10:04:09

21      MS. KENDRICK:  I apologize, I was reading from page

22  39.

23      MR. BOJANOWSKI:  I can't for that one either.

24      THE COURT:  So for 15, it says, refresher training and

25  education on the necessity of documenting refusals will be          10:04:22

1    provided at the next staff meeting in mid May.

2           One of the things that the Court does observe too is

3    the seeming transitory nature of the Corizon people who are

4    involved in all of this.  It seems like the names change a lot.

5    And I'd be interested to hear what -- what our expert,                10:04:45

6    Mr. Millar, will have to say about that.

7           But I think that if you are going to have a kind of

8    operation that involves such a rotating basis of staff, they

9    come, they go, you do need to make absolutely sure that you

10   have a necessity of continued training such that it doesn't           10:05:07

11   only occur when you have a failure of Performance Measure that

12   you just realize that that's part of the way you have to

13   operate, if that's the reality of your workplace where you have

14   people coming and going, leaving, arriving.

15          MR. BOJANOWSKI:  Your Honor, I can maybe speak to some         10:05:29

16   of those issues.

17          I know in my working with the Corizon management, that

18   there are new training programs that have been implemented and

19   are in place, especially with new employees coming on board,

20   stressing the importance of documentation, the importance of          10:05:49

21   compliance with various CGAR requirements.  There's specific

22   training that is being done on those issues.

23          I also know that there's been, at least for the past I

24   believe two months or more, a targeted effort at each of the

25   facilities to stress and retrain on documentation issues.            10:06:17

1          So as the Court and plaintiffs' counsel and everybody

2     in this courtroom has heard time and again, documentation has

3     been an issue.  And I know that there is active efforts on the

4     part of Corizon to address those types of issues at the

5     facility level.                                                    10:06:42

6          So I can only speak in, as you call it, an omnibus

7     fashion.  That's the thrust of what they're trying to do to

8     address these situations.  And I think with the on -- what they

9     call onboarding training with new staff concentrating on those

10    issues --                                                          10:07:07

11         THE COURT:  What's onboarding?  What do they mean by

12    that?

13         MR. BOJANOWSKI:  I think that's -- I think that's when

14    you have a new employee and you train them.  Instead of

15    training -- my understanding is, is that they -- they are --     10:07:16

16    now have a centralized training for I believe it's three solid

17    days at the regional office, but I can't be sure about that.

18         But new employee comes on, they clear security,

19    they're good to go, they then do this onboarding training where

20    they go through, I'm assuming, a policy procedure manual and      10:07:40

21    such.

22         But a part of that now is this expanded focus upon the

23    documentation issues, the -- you know, the CGAR issues, those

24    types of things.  So that when these people come on board, they

25    are trained now on how to achieve compliance with various         10:08:02

1    measures that may be impacted by their work.

2          So I do know that there's this push, so to speak, by

3    Corizon, to address these types of issues through this

4    onboarding process.  As well as my understanding is a secondary

5    process for current employees.  They bring in people that are                    10:08:30

6    specifically addressing documentation issues at the facility

7    site level.

8          So I don't have anymore specifics than that,

9    Your Honor.  I just am aware of this.  It was discussed at some

10   of the meetings that I've had with them in addressing some of                    10:08:49

11   the CGAR compliance matters, and talking about, well,

12   documentation issues.

13         MS. KENDRICK:  Your Honor, I would just observe that

14   this Performance Measure is not just about documentation.  It

15   involves whether individuals who refuse prescribed medication                    10:09:07

16   or no show after three consecutive refusals are counseled by a

17   qualified health care personnel.

18         And the fact that they are not documenting the

19   refusals -- documenting the refusals in and of itself wouldn't

20   necessarily mean compliance, because first they have to know                     10:09:28

21   the refusal exists.  So this statement that they're not

22   documenting the refusals means they don't know the refusals

23   exist, and so then step two, the counseling, does not occur.

24         So while we certainly hope -- I mean, we're concerned

25   by the fact that it's not just a situation where defendants                      10:09:44

1    often say it's happening, we're just not documenting it.  If

2    they're not documenting the refusal, there's no way for the

3    person to be counseled.

4         So while obviously step one is documenting the refusal

5    so that they know they need to go out and talk to the person        10:10:01

6    and ask him or her why are you refusing your medications,

7    that's not the end all, be all, and that won't put them into

8    compliance, because you still have to have the actual

9    counseling happen, which is what the Performance Measure

10   actually measures.                                                  10:10:18

11        THE COURT:  All right.

12        MR. BOJANOWSKI:  So I believe we're on to Performance

13   Measure 19 at Lewis, which is showing 73 percent.

14        It's apparent since March of 2017 that this -- this

15   measure has not been in compliance at this facility.  And so my     10:10:41

16   understanding is is that a much more detailed remediation plan

17   is being prepared and developed.  It is not contained in this

18   particular submission to the Court because it's not yet

19   prepared.

20        As I've indicated to the Court, I want to get much             10:11:05

21   more detailed plans presented to the Court, and that is what is

22   occurring at this point in time.

23        So once that plan gets then fully developed, if

24   there's training or whatever that needs to be done with regard

25   to that new plan, that's why you have an implementation date       10:11:22

—— **CV-12-601-PHX-DKD — May 9, 2018** ——

1    projected as July of 2018 for the -- for that plan.

2          But that's going to be true on a couple of these

3    measures where I want to get much more robust plans put

4    together, as we've done in some of the other measures.

5          THE COURT:  What are the intermediary steps that can          10:11:49

6    help in the interim that you say will begin on May 14th?

7          MR. BOJANOWSKI:  I do not know specifically,

8    Your Honor.

9          THE COURT:  Miss Kendrick --

10         MR. BOJANOWSKI:  It may be something I can supplement          10:12:07

11   if the Court wants me to provide some supplementation.

12         THE COURT:  Well, it's just hard for me to imagine

13   somebody writing that sentence and not expecting that my

14   question will be immediately, what are the intermediate steps

15   that can help.  If you're saying we have to wait until          10:12:24

16   implementation in July, the intermediate steps would be of

17   great interest to me.

18         Again, this is, perpetual inventory medications will

19   be signed off on the inmate's individual MAR --

20         MR. BOJANOWSKI:  They did not provide me those          10:12:40

21   intermediary steps.

22         THE COURT:  Okay.

23         MR. BOJANOWSKI:  That's why I can't report to the

24   Court.  But I can certainly press them on that and supplement

25   this filing if the Court so desires.          10:12:49

— **CV-12-601-PHX-DKD – May 9, 2018** —

1        THE COURT:  Well, I would appreciate that.

2        Miss Kendrick?

3        MS. KENDRICK:  First of all, the non-compliance didn't

4   start in March 2017, it goes much farther back than that.  I

5   believe this was subject to a Notice of Non-Compliance we did          10:13:02

6   in April or May of last year, which by necessity means there is

7   non-compliance going back farther.

8        This is a Performance Measure that was in -- subject

9   to mediation last Fall.  It was in our motion for a finding of

10  non-compliance that we filed in January.  We have been raising        10:13:23

11  this Performance Measure at each monthly hearing asking

12  defendants to please go ahead and develop a plan.  And they

13  kept saying they wouldn't do it until you found them

14  non-compliant.

15       So at the last hearing on April 11th, you verbally              10:13:36

16  found them non-compliant.  And so now, only now are they

17  embarking upon preparing a plan.

18       Based on the skeletal Corrective Action Plan we've

19  been offered, I would note that it says that the new Director

20  of Nursing who is preparing the remediation plan, the plan will      10:13:57

21  include, quote, inventory books at all seven yards, close

22  quote.

23       That -- having inventory books that -- or logs that

24  list all of the medication that the clinic has on-site as

25  clinic stock is basic pharmaceutical management.  This does          10:14:15

—CV–12–601–PHX–DKD – May 9, 2018 —

1    raise the question of why they weren't keeping any sort of

2    inventory logs before.  Obviously creating inventory logs and

3    books will help.  We're glad they're doing that.  It's a little

4    disturbing that they're just now doing that at this point.

5            THE COURT:  Next measure?                              10:14:42

6            MR. BOJANOWSKI:  Same Performance Measure at Phoenix

7    at 82 percent.

8            THE COURT:  Let me get there.  Just a second.

9            MR. BOJANOWSKI:  Pardon me?

10           THE COURT:  Hold on just a second, I've got a trouble    10:14:56

11   here.  Just a moment.

12           All right.  Thank you.  Go ahead.

13           MR. BOJANOWSKI:  All right.  This was a measure that

14   had been pretty compliant since March of '17.  It did fall off

15   a little bit in October.  But it's been rather consistent in    10:15:15

16   achieving the compliance.  It's three percent below standard,

17   and it was identified that again there was a staff member who

18   was not appropriately filling out the documentation.  And so

19   they have been retrained with regard to duties to accomplish

20   that task.                                                      10:15:41

21           THE COURT:  Anything you wanted to add about this

22   facility, Miss Kendrick?

23           MS. KENDRICK:  Just that I would note that we had

24   agreed to hold this in abeyance last month because of its

25   recent good performance.  But, again, like Lewis, the          10:15:58

1    non-compliance didn't just start a year ago with what's on

2    there.

3           The other concern we have is the one that the Court

4    articulated at the beginning of the hearing, is that the

5    singular is used to refer to the individual, the staff member          10:16:15

6    responsible.  And again, you know, to the extent if this is

7    falling on one person to ensure compliance, the lack of

8    redundancy would be a concern.

9           And finally, again, just reiterating Performance

10   Measure 19, you know, we need to make sure it's not just a lack        10:16:37

11   of documentation, but that the actions are actually happening.

12          THE COURT:  So now Performance Measure 20 at Florence.

13          MR. BOJANOWSKI:  20 at Florence, Your Honor, is at 84

14   percent.  There appeared to be a problem with the interface

15   between the AIMS system and the eOMIS systems in providers             10:16:58

16   entering information into eOMIS which was not being transferred

17   over into AIMS appropriately.  And as a result there was some

18   readings there that do not appear to be accurate.

19          We're undertaking a review of this, because we believe

20   that the providers were appropriately -- may have been                 10:17:27

21   appropriately entering the information, but because the two

22   systems were not communicating appropriately, it shows up in

23   the AIMS system differently than it shows up in the eOMIS

24   system.  And it's the AIMS system that's looked at in doing the

25   evaluation.                                                            10:17:47

1          So we're currently looking at this, it may be an IT

2    issue that we need to tweak one of these systems a little bit

3    to make sure that they're interfacing appropriately with regard

4    to this measure.

5          But this one is under review at this point, and I          10:17:59

6    don't know at this stage what the result of that investigation

7    is.

8          THE COURT:  You say you're undertaking a review, and

9    then the supplemental -- or the information that you provided

10   in your draft report says that's it has been rebutted.          10:18:20

11         What exactly is happening, is this a Corizon rebuttal

12   or is this a separate review that --

13         MR. BOJANOWSKI:  It would be a Corizon rebuttal,

14   Your Honor.

15         THE COURT:  All right.                                    10:18:32

16         MR. BOJANOWSKI:  So Corizon is basically saying, look,

17   here's what the problem is, can you guys look at this and

18   investigate it and let us know whether you can confirm that

19   this was actually the issue.

20         Because what they're saying is that this is what the       10:18:44

21   issue is, this is why there was non-compliance, it wasn't

22   something that wasn't being done, it was a problem with the way

23   these two systems were interfacing.

24         THE COURT:  And the way that I took what you said was

25   a little bit troubling to me, because you said that -- it        10:18:58

1  almost seemed as if you were saying that we, meaning the

2  defendants in this case, were questioning this when we, you

3  all, the State and the monitoring team, had concluded that

4  there was a violation.  And that it wasn't a we that was

5  challenging it, it was Corizon, the person, the entity you're    10:19:22

6  supposed to be monitoring.

7          So, again, it raises in my mind a little bit this

8  issue of who's guarding whom.

9          MR. BOJANOWSKI:  Well, perhaps I misspoke on that.  It

10 is Corizon --                                                    10:19:37

11         THE COURT:  It certainly is -- it's a misspeaking in

12 terms of what I think should be happening.  And the record says

13 what it says.

14         MR. BOJANOWSKI:  Okay.  We are investigating it.  So

15 the "we" would be ADC is investigating the interface issue.      10:19:49

16         THE COURT:  Am I right to think that we're at 24 at

17 Lewis?

18         MR. BOJANOWSKI:  Yes.  On this one, yes.

19         THE COURT:  Are emergency medical response bags

20 checked daily and inventoried monthly and contain all required   10:20:25

21 essential items.

22         MR. BOJANOWSKI:  We talked about this last month,

23 about the -- about the inventory sheets, and the tag numbers

24 and such.

25         And I know that they have now changed the man down box   10:20:42

—— CV-12-601-PHX-DKD – May 9, 2018 ——

1   and AED check form to try and alleviate these kinds of issues,

2   to try and make sure that it's appropriately signed off on.

3          My understanding is is that the way the form is set

4   up -- I have it here.  The way it's set up, there's a block out

5   of the AED, and so the staff member was not signing off on the      10:21:11

6   AED check.  Because they didn't sign off on the AED check, that

7   means that, from our perspective, from ADC's perspective, it

8   wasn't checked.  And so that's why they were found to be

9   non-compliant.

10         So they're redesigning the form to take those blocks      10:21:31

11  out so that there's not confusion as to the fact that you need

12  to sign off on that -- on that item when you check that AED.

13         So that's what's going on with that one.

14         THE COURT:  And how do we know that it's just a

15  failure to check box issue as opposed to a failure to check the      10:21:52

16  bag issue?

17         MR. BOJANOWSKI:  My understanding is that it was not

18  the bags that were the problem, it was the AED sign off that

19  was -- that was a problem.

20         THE COURT:  But how do we know -- how do we know that?      10:22:05

21  Did somebody check to see whether somebody had -- how would you

22  know whether the bag had been checked as required by the

23  Performance Measure?  What evidence would there be that that

24  happened, other than this form?

25         MR. BOJANOWSKI:  Well, the form is the evidence,      10:22:22

1    because you put the old lock number in --

2            THE COURT:  I'm sorry to interrupt, but I asked about

3    this last month, and I guess I still remain troubled.  Because

4    as I understand it, you told me last month that there was

5    something on the bag itself that was --                          10:22:36

6            MR. BOJANOWSKI:  It's a plastic thing.

7            THE COURT:  Right, was checked.  And that this

8    information needed to be communicated to the form.

9            MR. BOJANOWSKI:  Right.

10           THE COURT:  And so the form is what is checked by the    10:22:45

11   monitors.

12           MR. BOJANOWSKI:  Right.

13           THE COURT:  And not the bag label itself.

14           Was there any additional inquiry made to make sure

15   that what was said last month is really true, that the bag      10:22:58

16   itself had been checked, that the information just hadn't been

17   communicated to the form?

18           MR. BOJANOWSKI:  Correct.

19           THE COURT:  So that did happen?

20           MR. BOJANOWSKI:  Yes, sir.                               10:23:10

21           So the bag tag is one of those ones that in order to

22   open the bag you have to cut it off.  Okay?  And so once you've

23   cut that off, that tag's no good, it can't be used anymore.  So

24   you have to log that tag -- the tag has got a number on it.  So

25   you log that number on the form.  Okay?                         10:23:30

—— CV-12-601-PHX-DKD – May 9, 2018 ——

1        And then like if you're doing, say, a weekly check of

2    the bag or whatever, so you would cut that tag.  Okay?  You

3    would do your check, your inventory, make sure that your

4    inventory is up to snuff.  Then you would put a new tag number

5    on it.  And you have to write in the new tag number.  And then        10:23:51

6    after you write in the old tag number and the new tag number,

7    you then sign off with those next to those two numbers.

8        And so that's your -- how you fill out the form which

9    then shows you, okay, old tag number, new tag number.

10        So when the bag is used, say there's an emergency,        10:24:09

11    it's essentially the same procedure.  So the bag is taken into

12    the field, the tag is cut off, it has to be logged.  And then

13    when you bring the bag back you refill the bag with the

14    inventory.  And then you put the new tag back on to lock

15    it -- lock it, so that it's, you know, secure.        10:24:32

16        THE COURT:  So the Performance Measure says, response

17    bags checked daily.

18        So the form is supposed to verify that that daily

19    check has happened as well?

20        MR. BOJANOWSKI:  Right, right, Your Honor.        10:24:50

21        Can I approach?

22        THE COURT:  Every single day.  So that every single

23    day this form is supposed to be done.

24        MR. BOJANOWSKI:  Right.

25        THE COURT:  But, again, it doesn't seem to me that the        10:24:57

UNITED STATES DISTRICT COURT

1   description that you just gave me about how the bag is used,

2   the seal is broken and then a new seal is put on, that

3   information would be that -- that perhaps could answer the

4   other questions, but couldn't answer that it was checked daily,

5   because I don't think from what you said there's any annotation          10:25:16

6   on the bag itself about the fact that it was checked daily.

7          MR. BOJANOWSKI:  You mean write on the bag?

8          THE COURT:  Yes.

9          MR. BOJANOWSKI:  No, you don't write on the bag.

10          THE COURT:  No.  But I thought you were telling me          10:25:28

11   that when a bag is opened, that there's a seal on that bag that

12   has a date on it about when the bag was created.

13          MR. BOJANOWSKI:  No, it has a number on it.  It's like

14   a serial number.

15          THE COURT:  All right.          10:25:43

16          MR. BOJANOWSKI:  So it's a unique serial number for

17   that tag, plastic tag.

18          THE COURT:  All right.  So what I'm trying to

19   understand is if their form that's supposed to say that -- it

20   says this was checked daily.          10:25:54

21          MR. BOJANOWSKI:  Correct.

22          THE COURT:  So it's -- if that form isn't completed,

23   how do we know that the bag was checked daily?

24          MR. BOJANOWSKI:  If the form's not completed, then it

25   wasn't.          10:26:08

1          THE COURT:  All right.

2          MR. BOJANOWSKI:  Then they're in non-compliance.

3          THE COURT:  I thought you were saying that the bags

4     were being checked daily but that the form wasn't being

5     completed.                                              10:26:18

6          MR. BOJANOWSKI:  No.  If the form's not completed, we

7     have no way to verify that the bag was checked.  The form has

8     to be completed.  That's what we're looking at.  So if the

9     form's not completed correctly, we assume the bag was not

10    checked.                                                10:26:33

11         THE COURT:  Okay.

12         MR. BOJANOWSKI:  And they're in non-compliance.

13         THE COURT:  All right.

14         MR. BOJANOWSKI:  That's the purpose of the form.

15         THE COURT:  I understand that position.  But it is    10:26:38

16    also a position that is different from what I've been told

17    about other things.  And that is, we all agree that if it's not

18    been put in writing, we assume for the question of whether or

19    not the Performance Measure has been met, that the answer is

20    no.  If it's not in writing, it didn't happen.          10:26:58

21         But there have been times that you've told me that it

22    did happen, it just wasn't put in writing.  I was just trying

23    to understand with respect to this Performance Measure whether

24    you were saying, as you've said in other circumstances, it

25    wasn't put in writing, so for the Performance Measure it's a    10:27:12

1   failure, but you can be assured it was happening nevertheless

2   every day.

3           MR. BOJANOWSKI:  No.

4           THE COURT:  And we have no basis to believe that.

5   Okay.  Thank you.                                          10:27:21

6           MR. BOJANOWSKI:  No, I'm not saying that with regard

7   to Performance Measure because there's absolutely no way we

8   would know on each unit whether a bag was, in fact, checked

9   unless we were standing there and saw it.

10          But the form's got to be filled out.  If it's not   10:27:35

11  filled out appropriately, we assume the bag was not checked and

12  it's non-compliant.

13          THE COURT:  Miss Kendrick?

14          MS. KENDRICK:  A couple things.  They're a little

15  disjointed.                                                 10:27:45

16          The first thing is that initially Mr. Bojanowski kept

17  talking about AEDs, automated external defibrillators, but

18  that's a separate Performance Measure, so I'm not quite sure

19  how that relates to 24.

20          But on the issue of the bags, again, I think it's    10:27:58

21  critical to keep in mind that this isn't just about checking

22  boxes and documentation.  The policy requirement is that any

23  time the bag is used and taken out to respond to an emergency

24  and the seal is broken, and equipment is used, the nursing

25  staff are to come back immediately and inventory and replace  10:28:17

1   everything that was in the bag and then reseal it so it's ready

2   to go for the next emergency.

3        So non-compliance, not filling out the log, you know,

4   not showing that the bag was checked, is important, but it also

5   then -- we don't know if it is a situation where the bag wasn't          10:28:36

6   even refilled.  So it's not just about the checking, it's about

7   what's in the bag.

8        I would also just note, this Performance Measure came

9   to the forefront in the Winslow tour as detailed in

10  Miss Eidenbach's letter when we were on the Coronado Unit and            10:28:54

11  learned that there is not a man down bag or a box of man down

12  emergency response medications kept on the Coronado Unit.  And

13  that instead when there's an emergency nursing staff on the

14  Kaibab Unit, which is across the street, exists the Kaibab

15  Unit, goes through security there, then go over to Coronado, go          10:29:17

16  through security there, and then respond to the emergency on

17  the Coronado Unit.

18       Frankly it strains credulity that this response could

19  happen within five minutes.  That's what we were told, that

20  somehow these bags and these medications are brought over.               10:29:32

21       But -- and we have demanded that emergency response

22  bags and emergency response medications be put onto the

23  Coronado Unit immediately.  Because this is not just an

24  abstract fear.  For example, a couple weeks ago at the

25  convening of the Ninth Circuit Prison Litigation Conference,             10:29:51

1    that Judge Pyle led the Arizona delegation, we learned that

2    there are drug overdoses on a weekly basis at all the prisons,

3    six to ten drug overdoses a week state-wide at Arizona prisons.

4            And so Arizona is doing the right thing, it has Narcan

5    available to people.  But if we're having to carry things          10:30:16

6    across units and yards, those minutes count.

7            And so it's not directly related to the Lewis remedial

8    plan or the Lewis issue, but I felt that it was appropriate to

9    bring it up.

10           Finally, on -- back to Lewis itself, on the remedial      10:30:32

11   plan at page 48, it states that there will be a

12   straight -- state-wide training plan distributed May 19th with

13   strategies to achieve compliance.

14           To the extent there's any specifics about what these,

15   quote, strategies, close quote, mean, we'd appreciate it.  But     10:30:51

16   I assume if it's not here, it means that Mr. Bojanowski doesn't

17   have the specifics.

18           MR. BOJANOWSKI:  I don't.

19           THE COURT:  Okay.

20           MR. BOJANOWSKI:  But I would note for the record,         10:31:04

21   Your Honor, that officers have Narcan with them, and it's not

22   something that -- it's available to officers in the yards, in

23   the field.  So --

24           Right, it's not just a man down bag issue, it's

25   something that is recognized as an issue.  And that's how it's    10:31:21

1    addressed.

2         THE COURT:  With respect to the Winslow issue and the

3    fact that this one yard doesn't have it inside the yard, do I

4    have any jurisdiction over that issue?  Is there a Performance

5    Measure that requires that a bag be approximately located to            10:31:38

6    the inmates, or is it only in this aspect that the inventory is

7    what I have?

8         MS. KENDRICK:  Well, Your Honor, as we've gone through

9    this repeatedly, and it's going up to the Ninth Circuit, you

10   retain all Article III powers.  And it doesn't have to be tied          10:31:56

11   to a Performance Measure for you to issue an enforcement order

12   to defendants that they do something to ensure that class

13   members receive the medical care they need.

14        There's nothing that limits your power to only issuing

15   orders that are tied to the Performance Measures.                       10:32:13

16        THE COURT:  But I don't remember all of the

17   Performance Measures in my head at this moment.  Is there a

18   Performance Measure that addresses the availability of such a

19   bag?  Do you happen to remember?

20        MR. BOJANOWSKI:  There is not.                                     10:32:27

21        THE COURT:  Okay.

22        MS. KENDRICK:  Well, I mean, there are three

23   Performance Measures related to emergency response and

24   emergency equipment, 23 to 25.

25        But, again, obviously Performance Measure 24 is                    10:32:37

1    meaningless if there's no bag to check.  So if Winslow is

2    showing great compliance but they don't have a bag, I mean --

3              But, again, I just want to emphasize again that

4    Your Honor's power is not in any way limited to the plain

5    language of Performance Measures.  You can issue enforcement          10:33:00

6    orders on anything, except telling them to hire more staff of a

7    specific type or number, or telling them to build a new prison.

8              MR. BOJANOWSKI:  That's really more of a standard of

9    care issue.  As to the necessity to have a bag in the yard is

10   something that is analyzed and determined by the provider, the       10:33:17

11   Corizon people.  And the need to have extra bags is something

12   that they analyze as part of the need to provide medical

13   services on the yards.

14             So I am unaware of any instance where the fact that a

15   bag was not located on a particular yard at Winslow led to any       10:33:37

16   type of injury to any inmate.  So if the plaintiffs have got

17   such information, I'd certainly like to hear about it.

18             But as far as I know, the system that they've got set

19   in place when an emergency is called, they don't have to stand

20   in line and wait for security to clear them, they are                10:33:57

21   immediately put through.  So it is not a situation where

22   somebody has to go through a scanner and take their shoes off

23   in order to respond to a medical emergency on that yard.

24             THE COURT:  But even you all say it takes five minutes

25   to do that.                                                          10:34:16

—— CV-12-601-PHX-DKD — May 9, 2018 ——

1          MR. BOJANOWSKI:  I don't know that it does.

2          MS. KENDRICK:  And, Your Honor, actually what --

3          THE COURT:  I thought -- isn't that true?

4          MR. BOJANOWSKI:  I don't know that it does,

5    Your Honor.                                              10:34:20

6          THE COURT:  That's just what is being reported.

7          MR. BOJANOWSKI:  I'm not saying I agree with that.

8          MS. KENDRICK:  Well, Your Honor, Mr. Bojanowski was

9    present, along with me and Miss Abela and Miss Eidenbach, when

10   we spoke to the health care staff at the Coronado Unit.  There  10:34:31

11   was no discussion that it was up to a provider's discretion

12   whether we're going to have an emergency response bag and

13   emergency medications on a housing unit housing 1,000 people.

14         MR. BOJANOWSKI:  I'm speaking of --

15         MS. KENDRICK:  Excuse me.                          10:34:47

16         THE COURT:  Hold it just a minute.

17         MS. KENDRICK:  And the staff said, in front of

18   Mr. Bojanowski, and counsel for Corizon, and three attorneys

19   for plaintiffs, that the reason there is no bag or no emergency

20   medication is that they don't have the space for it.  So    10:34:57

21   there's nothing in there that some provider made some sort of

22   decision that it wasn't necessary to have an emergency bag.

23         And they said they're working to get one put in there.

24   So that clearly shows that there is a need for an emergency

25   bag, and that the health care staff recognize that as part of  10:35:14

UNITED STATES DISTRICT COURT

1    responding to emergencies they need a bag there.

2              THE COURT:  Can you help me understand why it is that

3    there's a space problem?

4              MS. KENDRICK:  Well, it's a one-room clinic,

5    Your Honor.                                                      10:35:29

6              THE COURT:  How big is the bag?

7              MS. KENDRICK:  How big is the bag?

8              THE COURT:  I'm just trying to understand.

9              MR. BOJANOWSKI:  It's a duffle bag.

10             MS. KENDRICK:  Yeah, it's the size of a duffle bag.      10:35:35

11   It's not huge.  It's a one-room clinic.  It appears to be a

12   converted office.  They actually for a long time did not even

13   have a clinic over on the Coronado Unit, so people had to go

14   across the street to Kaibab to receive any sort of nursing line

15   care.                                                            10:35:53

16             THE COURT:  Thank you.

17             Well, let's take a 15-minute break.  We'll be back.

18   Thank you.

19        (Recess at 10:36 a.m., until 10:55 a.m.)

20             THE COURT:  All right.  The next Performance Measure.   10:55:09

21             MR. BOJANOWSKI:  Your Honor, before we get to the next

22   Performance Measure, I wanted to updated the Court and

23   plaintiffs' counsel.

24             I know that Miss Kendrick had mentioned there were

25   space issues and the man down bag and such at the Winslow         10:55:32

—CV-12-601-PHX-DKD – May 9, 2018 —

1    facility.  We double checked on that.  It's my understanding

2    that the space is undergoing an expansion, and the man down bag

3    will be finalized and put into place today.

4            THE COURT:  Good.

5            MR. BOJANOWSKI:  So -- at that unit.                              10:55:50

6            I know the expansion of space will not yet be

7    completed, but that is kind of an ongoing process, and she had

8    mentioned earlier that that was what was being talked about, is

9    getting a bag out there.  And I checked and, yes, it is going

10   to be there.                                                             10:56:11

11           So that should ally --

12           THE COURT:  Thank you for that update and for sharing

13   that good news.

14           MR. BOJANOWSKI:  So I think we're on number 35,

15   Your Honor.                                                              10:56:20

16           And this is subject to the late -- or excuse me, this

17   morning's filing.  The last -- the filing last night had PM 35

18   non-compliant at Florence and Lewis.

19           As I reported this morning, the Florence figure is at

20   88 percent after the review, and the Lewis facility is at 86            10:56:49

21   percent after the review.

22           THE COURT:  Do you have the ability to share any

23   information about why it is that this -- or the nature of the

24   subsequent review?

25           MR. BOJANOWSKI:  May I have a moment, Your Honor?                10:57:25

—— **CV-12-601-PHX-DKD – May 9, 2018** ——

1          THE COURT:  You may.

2      (Discussion held off the record.)

3          MR. BOJANOWSKI:  Your Honor, Miss Headstream actually

4  did the review on these to double check them, and found that on

5  each of these facilities there were three individuals who were          10:58:46

6  initially marked non-compliant, as not receiving the med after

7  they arrived at the new facility when, in fact, she went into

8  the eOMIS system and confirmed that they, in fact, did get the

9  medication that they were supposed to get.

10          THE COURT:  I'm sorry, I'm still left wondering --          10:59:18

11  there a couple of things here that make me wonder, simply

12  because there's a change in reporting that is -- you say that

13  these are preliminary numbers, but it's not the usual custom

14  that we ever have such a last-minute correction like this.

15          Also this one is, I think -- and I may be wrong about          10:59:43

16  this, but at least for the ones that we've done so far, I think

17  the only one where there's a failure to meet the Performance

18  Measure benchmark of 85 percent where there wasn't a current

19  corrective plan proposed.

20          So it just makes me wonder, this one just seems to be          11:00:01

21  an outlier in form that makes me wonder.

22          Makes me also wonder what it was -- the error that was

23  made by the compliance team originally, why it is that they

24  made a mistake, what did they not see or what did they not

25  appreciate?          11:00:26

——— CV-12-601-PHX-DKD — May 9, 2018 ———

1       I guess further inquiry just seems justified here.

2       MR. BOJANOWSKI:  It's my understanding they were

3    looking at a daily tracking form that we maintained to try and

4    stay on top of these on a daily basis.  And that tracking form

5    didn't have the information in it.  And as a result when it was          11:00:45

6    looked at again by Miss Headstream upon review, she looked at

7    the actual medical record at that point to confirm that the

8    medication, in fact, was delivered and administered.

9       So -- but there is a plan in place here, Your Honor, a

10   rather extensive one.                                                    11:01:10

11      If you go to the Eyman facility, that's kind of got

12   the big plan in it.  And then everybody -- it's a state-wide

13   plan.  And this is subject to the --

14      THE COURT:  But I guess what my point was, not about

15   the absence of the plan, about -- with respect to all the other         11:01:33

16   Performance Measures where there's a failure for March, there

17   was a May indication about what was going to be done.  Meaning

18   that this corrective plan for Eyman that you're referring to

19   is -- I think the most current date was February 22nd; is that

20   right?                                                                   11:01:57

21      MR. BOJANOWSKI:  I think the departmental order is

22   also in play here.

23      And I'm trying to remember what Mr. McWilliams

24   testified to as to the implementation date of that.  That was

25   at our either last hearing or the hearing before where                  11:02:14

—— CV-12-601-PHX-DKD — May 9, 2018 ——

1    Mr. McWilliams was testifying about this -- this measure.

2              THE COURT:  No, I remember -- I'm an investigator at

3    certain points and trying to understand the information in

4    a -- in an environment where I am -- have been given reason to

5    question whether there's always accuracy.                          11:02:38

6              And so here we have a first blush report of missing

7    the mark, then a revised number of making the mark.  And I just

8    happened to notice that what you had originally submitted in

9    this particular Performance Measure didn't seem to match the

10   way that you reacted to the other ones that you were telling     11:02:58

11   the Court there had been a failure to meet the Performance

12   Measure, and that is a current reevaluation of what the cause

13   was for the drop off in the most recent reported month, this

14   being March, and then what you were doing about it.

15             In all of those other instances, it's a May 2018 date,  11:03:18

16   and there's nothing here in May.  That's what I was just

17   observing and trying to explain to you so that you could

18   further understand why it looked like this one was different

19   than the others in an additional way.

20             Miss Kendrick, anything you wanted to add on this        11:03:36

21   particular measure?

22             MS. KENDRICK:  No, sir.

23             THE COURT:  All right.  Next one?

24             MR. BOJANOWSKI:  The PM 39 at Eyman.

25             This was in compliance for some period of time and      11:03:59

UNITED STATES DISTRICT COURT

1    dropped off this past month to 76 percent.

2              This one is also one that's related to what I had

3    mentioned earlier as far as the onboard -- onboarding training

4    program for nursing staff.

5              THE COURT:  I see that.                              11:04:27

6              Miss Kendrick?

7              MS. KENDRICK:  Nothing to add, sir.

8              THE COURT:  All right.

9              MR. BOJANOWSKI:  39 at Lewis.  This is essentially the

10   same -- the same plan.  That's at 82 percent.                11:04:41

11             Again, this is one that was trending well.  It had a

12   drop off, then it increased, and then it dropped off again this

13   past month.

14             THE COURT:  Miss Kendrick?

15             MS. KENDRICK:  Just to note that Performance Measure   11:04:59

16   39 at Lewis was part of the Court's order to show cause.  So we

17   are concerned that this drop off occurred, given the focus that

18   the institution was hopefully placing upon it.

19             Also I would just note, with this one and with Eyman

20   for Performance Measure 39, there's no identification of what   11:05:19

21   the cause is of the non-compliance.  While we certainly hope

22   that training nursing staff will address it, it's unclear if

23   that was the cause of the problem.

24             THE COURT:  Do you know, Mr. Bojanowski, whether there

25   was it an identification of the --                            11:05:40

1     MR. BOJANOWSKI:  I do not, Your Honor.  This month I

2 was not able to schedule my normal meetings at the facilities.

3 And so some of my information is not as robust as I'd like it

4 to be.  But --

5     The next one is PM 40 at Eyman.  This is showing a                    11:06:00

6 significant drop off, and one that we are doing a rather --

7     Well, my understanding is that the referrals were

8 scheduled outside the required time frame.  And because it's a

9 24-hour time frame, it's apparently been rather hard to hit at

10 this particular facility.                                              11:06:38

11     What I was told by Corizon was that the plan that they

12 had put in place in April has not yet obtained traction and

13 taken hold, so the March data set -- excuse me, that the data

14 set here is not reflecting what the plan is seeking to do.

15     THE COURT:  A question, when you look at the graph,            11:07:20

16 that comes to mind, is that after April of 2017, where you were

17 at 40 percent, you then have a number of months where you meet

18 the Performance Measure benchmark.

19     And one has to wonder, was it -- what could cause

20 something to work and then to break so profoundly when it's            11:07:52

21 also not something that is a feel from what you would expect.

22 That is if an urgent provider referral is made, that that would

23 happen within 24 hours.  So it's not as if this is some kind of

24 secret thing that wouldn't occur to anybody who isn't in health

25 care.  It would seem kind of intuitively correct.  And you say       11:08:17

1   it's a matter of minutes with some unidentified number of them.

2   But that apparently wasn't an issue at all in June of 2017

3   through October of 2017.

4          So I guess I would want to know, and maybe be able to

5   get an answer in a subsequent month, about why it is that -- I                    11:08:40

6   guess I'd like you to answer this question, direct the question

7   to the appropriate person and find out what the people could

8   offer as a possible reason for the ability to meet this

9   Performance Measure suddenly disappearing.

10         MR. BOJANOWSKI:  I will provide that supplemental                           11:09:06

11  information.

12         THE COURT:  Thank you.

13         Miss Kendrick, did you have anything else you wanted

14  to add?

15         MS. KENDRICK:  Yell, Your Honor I would just note that            11:09:20

16  the -- on the first page -- so it's page 80 of the filing, it

17  says that this new plan as of February 14th that started the

18  first week of January 2018, was that an admin assistant would

19  review the log every day and put the provider on first.  And

20  this plan was implemented the first week of January 2018.                         11:09:38

21         And since that plan went into effect it's clearly not

22  working, given the plummeting -- you know, we hope that

23  the -- we don't know, I mean, until we see the CGARs and have

24  the numbers whether this is the case, that's it's really a

25  matter of minutes.                                                                 11:10:00

1        But in any event, the measure is what the measure is.

2    It says 24 hours.  So almost is only close in hand grenades and

3    horse shoes.

4        And finally just in terms of the Corrective Action

5    Plan, it again is just the verbatim onboarding training.  And          11:10:16

6    we certainly hope that this training happens, and that it's in

7    writing so that when there's turnover of nursing staff, that

8    the new nurses are provided the same information.

9        THE COURT:  I agree with everything you said.  In

10   particular I agree with your observation about the April            11:10:34

11   Corrective Action Plan.  And you hope that relying on that is

12   not misplaced, because the previous plan also seemed to talk

13   about having people supervising trying to reemphasize -- the

14   administrative assistant is now looking at the nurse's line log

15   each day.                                                          11:11:05

16        I guess this is one of the examples that I was

17   referring to before, is that you give this particular

18   responsibility to double check and to assure compliance, and

19   then that fails.  And then you add that task to somebody who is

20   maybe a step up.  And then at the end of the day you wonder if         11:11:19

21   you brought that person into court and said, here are all the

22   times in the last three years where additional responsibilities

23   have been put on your shoulders, it would seem like one would

24   be surprised to find it was a very hefty load.

25        And one wonders whether or not, especially in the             11:11:39

UNITED STATES DISTRICT COURT

1  staffing issues, whether that's even possible.  But I make that

2  observation again.

3          All right.  The next one.

4          MR. BOJANOWSKI:  Is 42 at Eyman, Your Honor.  This is

5  one that has been troubling since May of -- well, since April      11:11:52

6  of 2017.  It's been consistently non-compliant.

7          We are -- we implemented a plan that appears to be

8  affecting an upward trend.  At least we've got two months in a

9  row where we're showing increased compliance.  We're going to

10 continue with that current plan at this point in time and        11:12:19

11 see -- see how that -- see how that works.

12         THE COURT:  Miss Kendrick?

13         MS. KENDRICK:  Well, the May 8th Corrective Action

14 Plan refers to the action plan dated April 9th.  The Action

15 Plan dated April 9th refers to the Action Plan dated February    11:12:40

16 14th.  So it appears whatever has been the action plan for four

17 months is not working.

18         I don't know what else to say.

19         THE COURT:  There's not much else to say.

20         42 at Florence.                                            11:13:03

21         MR. BOJANOWSKI:  That's dropped off at 75 percent.

22         Apparently there were numerous scheduling errors where

23 the follow-up sick call encounters occurred a few days out of

24 the required time frame.

25         This one at Florence, we thought we had under good        11:13:23

1    control as of last month, but it dropped off due to those

2    errors.  So, again, this one of those retraining education

3    things that the Court has noted that we've got to continually

4    do with staff in the field.

5              THE COURT:  Miss Kendrick?                            11:13:46

6              MS. KENDRICK:  Well, for this one it refers in the

7    Corrective Action Plan about having a range of time for the

8    patient to be seen in the event that there's a lockdown or

9    other change that impacts scheduling.

10             I just -- I don't know if Mr. Bojanowski can tell us  11:14:04

11   what would an other change be that would impact scheduling.

12             MR. BOJANOWSKI:  I don't know, Your Honor.  I would

13   assume that it would be -- a lockdown would impact scheduling.

14             THE COURT:  We know that.  That says that.

15             MR. BOJANOWSKI:  Yeah.                                11:14:37

16             THE COURT:  We also were told there are other reasons,

17   we don't know what those are.

18             MR. BOJANOWSKI:  I don't know what the other one would

19   be.

20             THE COURT:  Absence of staff, I gather.               11:14:43

21             All right.

22             MR. BOJANOWSKI:  42 at Lewis is at 74 percent.

23             Again, this one has not been in compliance since

24   September of 2017.  Corizon is going to continue to utilize the

25   same Corrective Action Plan, indicating that they don't believe 11:15:08

1    there's been enough time for the plan to take effect.

2          The next one --

3          THE COURT:  Hold on.  Sorry to interrupt you, but I'm

4    just reviewing the Corrective Action Plan from February 14th,

5    and then the additional explanation given for the failure in          11:16:23

6    April 9, and the additional explanation -- or rather, the

7    Correction Action Plan says that it will utilize the one that's

8    listed above but it would take a few months.

9          And then I look at the plan, and I guess what's talked

10   about in the Corrective Action Plan for February 14th, it seems     11:16:44

11   to me that it wouldn't take months, that -- for instance,

12   another plan is to have a white board which will have the name

13   and the treatment plan of the inmate with an expiration date.

14         So if there's a white board that says when the

15   expiration date is, presumably everybody knows what they have      11:17:06

16   to do by when.  Why wouldn't that work?  What's gone on with

17   this white board?

18         MR. BOJANOWSKI:  You know, I know the white boards are

19   in place.  I know they've been put up, because I've seen them

20   when I'm on tour.  And I know they're being used.                    11:17:20

21         As to the specifics as to why those white boards may

22   not be working the way we anticipated, I don't have an answer.

23   But I know they're being utilized, and that people are being

24   trained as to the procedures with regard to making sure the

25   follow-up sick call encounters are occurring within the time        11:17:40

1    that the provider says that they want to see that particular

2    patient.

3              THE COURT:  So there's a deadline by when you have to

4    do something.  And in the office where you work the deadline by

5    when you have to do that has been put up on a white board that          11:18:05

6    you've seen.  So how many deadlines per provider are up on that

7    board?  It would seem like there would be just a lot.

8              MS. KENDRICK:  These people aren't actually being seen

9    by the provider, this is for follow-up sick call with the

10   nurses.  So it's when they see the provider, and then the            11:18:28

11   provider says you need to come back to the nurse's line,

12   whether it's to have your wounds changed, or your blood

13   pressure taken, or to see if the infection has cleared up.

14             THE COURT:  I see.  So these are providers deciding

15   that somebody needs to be seen by -- seen in follow-up, and         11:18:43

16   there's a time limit on that.  And the responsibility to make

17   sure that the inmate is seen is on the nurse -- the nurse

18   provider or the nurse?

19             MS. KENDRICK:  The nursing staff.

20             THE COURT:  The nursing staff.                             11:19:02

21             So the white board, again, would seem to me to list

22   just a lot.

23             Have you seen the white boards, Miss Kendrick?

24             MS. KENDRICK:  I've seen them on tours, and they have

25   people's names on them.                                             11:19:14

─── CV-12-601-PHX-DKD — May 9, 2018 ───

1              THE COURT:  How many names per --

2         MS. KENDRICK:  Yeah, I mean -- I'm thinking half a

3    dozen maybe what I saw in a clinic in Yuma a week and a half

4    ago.

5              THE COURT:  And so is the way that it works, that       11:19:28

6    every day there's a new list of -- do you have any idea about

7    that?

8         MS. KENDRICK:  I don't know about that, sir.

9              But, I mean, what this Performance Measure is about is

10   a provider says, you need to see the nurse X number of times       11:19:40

11   for Y number of weeks.  So there's no specific time frame in

12   the Performance Measure, it's up to the provider herself or

13   himself to articulate the time frame.

14             And in the previous explanations they had said that

15   the nursing assistant was going to -- on the February plan they   11:19:59

16   said the nursing assistant would make sure that those follow-up

17   nurse appointments were scheduled.  But then in April 9th they

18   said that starting in mid February the providers took over

19   responsibility for scheduling the follow-up orders themselves.

20             And what we've been told on tours is that the nursing   11:20:19

21   line appointments are set and scheduled by nursing staff,

22   whereas the provider line schedule is made by the certified

23   nursing assistants who basically kind of shadow and are the

24   personal assistants to the providers.

25             But what we've been told is the nurses don't -- they    11:20:41

UNITED STATES DISTRICT COURT

73

1    don't necessarily cross.  They're kind of separate universes.

2              So I don't know if this is just, you know, the

3    providers really have the ability to go in and put things on

4    the nurse's schedules, or if the certified nursing assistants

5    are conveying the message.  But it doesn't quite match up with          11:20:58

6    what we've been told is the actual process for putting things

7    on the sick call appointment list.

8              THE COURT:  And do you remember whether the white

9    board that you saw had an inmate's name with a deadline next to

10   that?  What information was on the white board, do you                  11:21:16

11   remember?

12             MS. KENDRICK:  The four of us were just at Yuma, but

13   we can't remember that level of detail, unfortunately.

14             THE COURT:  Do you happen to know, Mr. Bojanowski?

15             MR. BOJANOWSKI:  You know, I don't recall as well.  I         11:21:31

16   remember seeing the board, I remember seeing the list of names,

17   like Miss Kendrick did, but I didn't really study it to see if

18   there were dates and such.

19             THE COURT:  I ask, because I'm just trying to

20   understand that if there is, at this place where you work, an          11:21:44

21   assignment that says these particular things have to happen by

22   this particular deadline, and then it doesn't happen, I don't

23   understand why we're waiting for that to continue to work when

24   it looks like it hasn't worked.

25             So that's a question that, I guess, I would raise in         11:22:04

1    response to what has been said here for the Correction Action

2    Plan that Corizon and ADC will continue to utilize the same

3    Corrective Action Plan as listed above, as it takes a few

4    months to identify issues with the plan and implement necessary

5    modifications.                                                    11:22:26

6          It seems like we've had enough time to do that.  It

7    also seems like there's something really wrong if the white

8    board mechanism here that just seems plain and obvious to me

9    isn't working.

10         So 44 at Eyman.                                            11:22:48

11         MR. BOJANOWSKI:  44 at Eyman is -- this is the one

12   where we had -- I know we've had a lot of discussion about the

13   patients returning from the hospital, and the discharge

14   recommendations being reviewed and acted upon by the provider.

15         So although there's been a plan in place, that plan is    11:23:10

16   being -- as well as other things, we're implementing these

17   Smart Card checklists to help in reminding the line staff as to

18   what to do specifically with regard to certain measures.  This

19   would be one of those measures.

20         So --                                                     11:23:38

21         THE COURT:  Maybe this is a good time for you to

22   explain Smart Cards.

23         MR. BOJANOWSKI:  Smart Cards are these things.

24   (Indicating.)

25         And what they are is they -- they list like a            11:23:55

1   Performance Measure, or they list, you know, certain things

2   maybe with regard to net usage or shift reports, or things like

3   that.  And so it gives them a little checklist of saying, this

4   is what you've got to do to address these issues.

5           THE COURT:  So this is the new Smart Card packet that          11:24:21

6   you have here, is that what you have there?

7           MR. BOJANOWSKI:  Yes, Your Honor.

8           Do you want to see this?

9           THE COURT:  Could I?  Please.

10          MR. BOJANOWSKI:  Sure.                                          11:24:40

11          I tweaked my back a little so I'm moving a little

12   slow.

13          THE COURT:  I'm sorry.  Backs are a problem for those

14   of us who sit at desks all day.

15          MR. BOJANOWSKI:  I only have the one set of those, so           11:24:51

16   I'll have to --

17          THE COURT:  Well, here's --

18          MR. BOJANOWSKI:  So my understanding is, Corizon is

19   rolling out this workflow Smart Card idea to try and make it

20   easier for line staff to address various issues with regard to        11:25:22

21   performance, because it gives maybe, as you can see, some steps

22   in there.

23          THE COURT:  So this is going to happen on May 18th?

24   Is that when everybody gets their Smart Card?

25          MR. BOJANOWSKI:  These are being distributed this               11:26:02

1    week, Your Honor.

2              THE COURT:  Okay.  I'd like to take a more -- a closer

3    look at them.  So when you have extras, would you send one over

4    to chambers and send one to the plaintiffs so they can have a

5    look at it too?                                                  11:26:20

6              MR. BOJANOWSKI:  Yes, Your Honor.

7              THE COURT:  Thank you.

8              Miss Kendrick, did you want to say anything about 44?

9              MR. BOJANOWSKI:  So it's going to be used --

10             THE COURT:  Oh, you have more to say?

11             MR. BOJANOWSKI:  It's going to be used in

12   various -- as they can see, it's going to be used in various

13   different Performance Measures.  So you may see it mentioned

14   as --

15             THE COURT:  I did, I saw it.                           11:26:42

16             MR. BOJANOWSKI:  -- part of the plans.

17             And so that's kind of one of the things that they're

18   trying to do to get these -- get these things into compliance.

19             THE COURT:  Miss Kendrick, did you want to say

20   anything about 44 at Eyman?                                     11:27:12

21             MS. KENDRICK:  No, sir.

22             THE COURT:  Okay.

23             MR. BOJANOWSKI:  Same as with Florence, it's the same

24   situation.

25             MS. KENDRICK:  We would just note for the record,     11:27:34

1    Your Honor, that Performance Measure 44 at Eyman was in the

2    Court's order to show cause for contempt, so it's incredibly

3    troubling that it's so profoundly non-compliant given the

4    amount of focus on the measure.

5           The next one is Performance Measure 47 at Eyman on                11:27:56

6    page 112.

7           MR. BOJANOWSKI:  Yes, that's what I have.  That's at

8    76 percent.

9           This is the communicating the results of diagnostic

10   studies to inmates upon request within seven calendar days.             11:28:24

11   And we've had multiple things that we've done with regard to

12   making sure that these results get communicated.  We still do

13   the communiques, which has reduced the number of requests for

14   lab results and such from inmates.  So we're only receiving a

15   handful of these requests each month.                                    11:28:49

16          But we still want to make sure that if, in fact, an

17   HNR is received with a request for a diagnostic study, that we

18   actually provide that study to the inmate.  And we've clarified

19   that nursing staff can provide that to the inmates upon

20   request.                                                                 11:29:15

21          So -- and this is, again, one of the Smart Card things

22   that we've distributed here.

23          THE COURT:  With a performance level here of 76

24   percent at Eyman, which follows 61 percent, 75, 54, 61, 60.  So

25   it seems as though the previous corrective measures that                 11:29:53

—— CV-12-601-PHX-DKD — May 9, 2018 ——

```
 1    involved providing additional instruction to people, and the
 2    April plan, which will have -- the Assistant Director of
 3    Nursing will have a one-on-one with staff who fail to comply
 4    with these procedures, with the rotation of the staff, that
 5    doesn't seem to be very promising.                              11:30:18
 6          The Smart Card idea, I haven't looked at it closely
 7    enough to see what the Smart Card does on this particular
 8    measure, but I suspect it probably repeats the Corrective
 9    Action Plan measures specified in February.  I imagine, because
10    that's what was identified as the problem.                      11:30:37
11          And that's a paragraph of many sentences with many
12    steps.  And I, again, haven't looked at the Smart Card, but it
13    would be surprising to me if the Smart Card included all of
14    those steps.
15          So I'm wondering, without knowing the answer, and not     11:30:57
16    expecting one really right now, how it is that a Smart Card,
17    which seems to be where the effort is focused, is going to be
18    able to accomplish this.  It just doesn't seem to make sense
19    from a systems analysis perspective, given what the problem has
20    been previously identified as involving the previous remedial   11:31:24
21    measures, and now we're being told essentially that these
22    remedial measures will be somehow included on a series of ten
23    plastic pages cards.
24          I guess I'm presaging for you, I would really be
25    surprised if this Smart Card thing made a difference on this    11:31:48
```

1    Performance Measure.

2              MR. BOJANOWSKI:  I think it's also part of the Vizios

3    that we use for these things when we're meeting with the staff,

4    when we go to talk about, well, this is what this measure

5    involves.  And those Vizios that I think the Court has seen,            11:32:05

6    which breaks it down into step-by-step processes, and then

7    gives a list of an itemized step-by-step process as well.

8              So the cards are, in part, a part of that whole

9    process as well.

10             And then the regular postings that we try to put up to    11:32:25

11   remind people of their obligations under these things.

12             THE COURT:  I have a vision of a room covered with

13   Post-it notes, thousands of Post-it notes, do this, do this.

14   They get lost in a sea of Post-it notes.

15             But go ahead, Miss Kendrick.                                  11:32:45

16             MS. KENDRICK:  May I approach?

17             THE COURT:  Yes.

18             MS. KENDRICK:  If you look at this card, it's actually

19   dated March 2017, not May 2018.  So it's unclear whether these

20   cards have already been used, or if these are things that           11:33:03

21   they're just recycling from somewhere else.

22             That particular card is for nurses that work in an

23   infirmary.  There's no reference to Performance Measures in it.

24   And it appears to be pretty generic and not Arizona specific.

25             So given the fact that multiple Performance Measures       11:33:21

1   are relying upon these so-called Smart Cards to be the solution

2   to non-compliance, we're concerned, first of all, whether or

3   not they have a complete set, if they are Arizona specific and

4   actually reflect the requirements of the Performance Measure,

5   or just generic nursing and provider practice.

6           And when and if these Smart Cards are deployed, we

7   would ask for a full set of them for each Performance Measure

8   to review.

9           THE COURT:  Well, let's ask some questions, because

10  obviously what you've pointed out, even to an ignorant person,

11  about how they would be proposed to be used, and a person who

12  had only been told that this was a Performance Measure that had

13  dogged the Court for a long time, that then when you're told in

14  May of 2018 that we're going to give these cards to the staff,

15  cards that were created in 2017, based upon the notation on

16  each of the cards at the bottom it says copyright 2017 Corizon

17  Health, and the front of it is, as you say, marked with the

18  date March 2017, one would really wonder how it is that

19  somebody could put a lot of faith in the idea that providing

20  these cards in May of 2018 in a way that could not possibly

21  reflect the learning and the experience and the particularized

22  learning of things that did not work, could be at any help at

23  all.

24          So let's ask a couple questions.

25          Mr. Bojanowski, what you've shown us here today, this

11:33:41

11:33:57

11:34:28

11:34:50

11:35:10

CV-12-601-PHX-DKD – May 9, 2018

1    is what's going to be distributed next week to everybody, this

2    same set?

3              MR. BOJANOWSKI:  I don't believe so, no.  It's just

4    that those are the cards that I could lay my hands on to be

5    able to show the Court, this is what it's all about.                    11:35:25

6              THE COURT:  I'm really -- I'm sorry to interrupt, but

7    I'm really surprised about that answer.  I have to tell you.

8    And you've been out on limbs before that I've sawed off, and I

9    thought that I've told you that the sound of that thud was

10   something that stays in my ears a long time.                            11:35:40

11             But I certainly was left with the impression that what

12   you showed me was what would be distributed next week.

13             MR. BOJANOWSKI:  Your Honor, the cards need to be

14   prepared.  But what I have is, if you want to look at -- this

15   is the -- this is the Arizona workflow Smart Card --            11:35:57

16             THE COURT:  So those are the galley proofs for these

17   cards, you're saying?  Or do you know what --

18             MR. BOJANOWSKI:  This is --

19             THE COURT:  What you're holding up there, on looks

20   like photocopy paper with -- in color, are those the images        11:36:14

21   that you're saying are going to be printed for the Arizona

22   cards?

23        (Discussion held off the record.)

24             MR. BOJANOWSKI:  Can I have a moment, Your Honor?

25             THE COURT:  Yes.                                              11:36:31

1          MR. BOJANOWSKI:  I want to confirm that this contains

2     the things that you're asking about.

3          (Discussion held off the record.)

4          MR. BOJANOWSKI:  May I approach, Your Honor?

5          THE COURT:  You may.                                    11:37:03

6          MR. BOJANOWSKI:  I want to confirm for the Court that

7     what's going to be on the set of cards that's going to go to

8     the -- into the field is what I'm seeing here.  They don't have

9     them finalized yet, and so I want -- when we say a Smart Card,

10    I want everybody to say, well, this is what it looks like.      11:37:22

11    Okay?  I didn't mean to mislead the Court that this is what's

12    getting distributed.  Okay?  I just wanted to be clear.  I just

13    wanted everybody to understand, this is what a Smart Card is

14    when I say we're distributing Smart Cards.

15         THE COURT:  Okay.                                         11:37:37

16         MR. BOJANOWSKI:  Okay?

17         (Discussion held off the record.)

18         MR. BOJANOWSKI:  Yes, Your Honor, what's here is going

19    to be on the cards.  Okay?  These are core processes that apply

20    companywide.                                                   11:38:32

21         THE COURT:  So what you're holding in your left hand,

22    the photographed pages, could you turn to the one that

23    addresses Performance Measure 47?

24         MR. BOJANOWSKI:  Okay.

25         THE COURT:  And tell me what it says.  Or show it to      11:38:41

—CV-12-601-PHX-DKD — May 9, 2018—

1    me.

2           MR. BOJANOWSKI:  May I approach, Your Honor?

3           THE COURT:  Please.

4           MS. KENDRICK:  May I approach, sir?

5           THE COURT:  You may.                                    11:38:49

6           MR. BOJANOWSKI:  I'm assuming -- well, this -- this

7    may be one part of it.  Okay?

8           THE COURT:  So it appears that there are one,

9    two -- no -- so this set that you have here is the workflow

10   Smart Cards that will be printed and will be distributed in   11:40:07

11   that form that you just showed us.  And there are no others,

12   just these?

13          MR. BOJANOWSKI:  For now.

14          THE COURT:  All right.

15          MR. BOJANOWSKI:  I believe that they're talking about   11:40:20

16   maybe doing others.  But for now it may be the core ones and

17   these Arizona specific ones.

18          THE COURT:  All right.  So what I'll do is I'll ask my

19   judicial assistant to make a photocopy of this so we can all

20   have it today.                                               11:40:37

21          MR. BOJANOWSKI:  Certainly.

22          MS. KENDRICK:  Okay.

23          THE COURT:  Thank you.

24          MS. KENDRICK:  We would just ask for some

25   clarification, because originally Mr. Bojanowski said the cards   11:40:54

UNITED STATES DISTRICT COURT

——— CV-12-601-PHX-DKD – May 9, 2018 ———

1   were being handed out next week.  And then after I pointed out

2   that this was from a different year, he said that the cards

3   needed to be prepared.

4         So to the extent we could have a little more specifics

5   about when they will be complete and distributed, that would be          11:41:10

6   helpful to know.

7         THE COURT:  Please.

8      (Discussion held off the record.)

9         MR. BOJANOWSKI:  The cards are shipping today.  They

10  arrive on Friday the 18th.  And there needs to be a staff          11:42:04

11  meeting held where the cards will be introduced to the staff,

12  and they will be instructed that the use of the cards is

13  mandatory.

14        THE COURT:  And these cards that you just showed us,

15  the galley proof is what I called it, were for Performance          11:42:27

16  Measures 44 and 47; is that correct?  Or you do don't have it

17  in front of you because I took it away from you.

18        MR. BOJANOWSKI:  Whatever was in that packet is the

19  initial --

20        THE COURT:  Yeah, I think it was 44 and 47.          11:42:39

21        And the people who will be receiving these Smart

22  Cards, do they -- have they also previously received other

23  Smart Cards?

24        MR. BOJANOWSKI:  I don't believe so, Your Honor.

25        No, it has not -- it is not a system that has been          11:42:52

─── CV-12-601-PHX-DKD ─ May 9, 2018 ───

1   used in Arizona.

2            THE COURT:  I understand.  All right.  Thank you.

3            Any independent thought, other than what's already

4   been said, as to why 47 at Lewis should drop off so

5   precipitously to 23 percent?                              11:43:40

6            MR. BOJANOWSKI:  I don't have that information,

7   Your Honor.  And I don't want to guess.

8            THE COURT:  I guess if I had a guess it would be that

9   counting upon these pieces of plastic cards to address this

10  failure, one that has been the subject of Corrective Action  11:44:11

11  Plans for many months, and significant staff involvement, would

12  unlikely be adequately addressed by something that requires

13  somebody to act upon pieces of plastic that they've been handed

14  as opposed to direction and supervision by people, all of which

15  look like have failed.                                     11:44:49

16           And so the idea that people could on their own figure

17  this out with pieces of plastic with lots of writing on it,

18  again, I would be surprised if it worked.

19           MS. KENDRICK:  Just, Your Honor, one explanation that

20  has been offered by defendants in the past for non-compliance  11:45:10

21  with Performance Measure 47, is that there's somehow a very

22  small number of requests being made, and so it's -- you know,

23  we miss one and the whole thing is skewed.

24           At least in terms of Eyman prison, when we got the

25  CGARs, what we found was there was a universe in December of 37  11:45:29

— CV-12-601-PHX-DKD — May 9, 2018 —

1    requests, and only 20 were compliant.  So that's how they got

2    54 percent non-compliance.

3           And the January CGARs, there were 36 applicable files.

4           So I think that puts to rest any argument that the

5    reason there's sustained non-compliance with this Performance                11:45:48

6    Measure is because there's so few files that are applicable or

7    are being reviewed.

8           THE COURT:  All right.  Thank you for that.

9           The next measurement.

10          MR. BOJANOWSKI:  It would be 49 at Eyman.                              11:46:06

11          MS. KENDRICK:  Well, I would just note that

12   Performance Measure 47 we talked about Eyman, but also at

13   Florence and Lewis, they're out of compliance.  Lewis is

14   profoundly out of compliance at 23 percent, which is

15   extraordinarily troubling given that the Court's order to show            11:46:23

16   cause covered these three facilities, among others, for this

17   Performance Measure.

18          And so again, you know, while these Smart Cards might

19   be helpful, it's unclear if the system is what's going to fix

20   it, why that hasn't been used before, if Corizon had that                11:46:41

21   system in place in other jurisdictions.

22          THE COURT:  All right.  Go ahead, Mr. Bojanowski.

23          MR. BOJANOWSKI:  49 at Eyman was doing well since

24   October of 2017.  It was compliant, and then dropped off in

25   this past month.                                                         11:47:06

1          THE COURT:  And I'll just note that the word

2     "training" in the Corrective Action Plan for May 8th, 2018, is

3     echoed I think in every one of the previous Performance

4     Measures.  So again, it's the same old refrain, which hasn't

5     produced success, so one wonders why it would produce success          11:47:58

6     going forward.

7          Anything you wanted to add, Miss Kendrick?

8          MS. KENDRICK:  Well, there's no explanation given

9     under the May 8th update as to the basis for the recent

10     non-compliance.  And I don't know if the Corrective Action Plan       11:48:13

11     is -- the implication that it's the clinical coordinators

12     weren't doing the job.  But the past plans that seem to have

13     worked for a little while did talk about the fact that clinical

14     coordinators were going to be trained in November and December.

15          So I don't know if this Corrective Action Plan is some          11:48:34

16     sort of reflection of perhaps staff turnover and that's why

17     there's the sudden drop.

18          We'd also just note in the filing that plaintiffs'

19     counsel filed this morning at docket 2802 that was looking at

20     the new contract extension amendment 15, the plan for staffing       11:48:55

21     that was attached to the amendment to the contract actually

22     cuts the clinical coordinator position at Eyman from 1.0 to 0.5

23     full-time equivalent based on what the defendants have filed.

24          So we're also concerned about that, given how large

25     Eyman is, if that is indeed what the plan is in the coming          11:49:22

1    months when the new contract goes into effect.

2         THE COURT:  So the Corrective Action Plan that says

3    there will be an additional training provided to the clinical

4    coordinators, that S on coordinator under the new staffing plan

5    needs to be gone?                                    11:49:41

6         MS. KENDRICK:  I don't know, sir.  All I know is what

7    they filed yesterday that had the staffing plan, it showed a

8    clinical coordinator position for Eyman at 0.5.  And in prior

9    months it had been a 1.0 full-time equivalent assigned to the

10   prison.                                              11:50:03

11        I don't know if it means their staffing plans don't

12   accurately reflect what's going on or what.  But looking at

13   those two things side by side, it is concerning.

14        THE COURT:  Do you know, Mr. Bojanowski, how it is

15   that these clinical coordinators, in whom the task has been    11:50:18

16   vested for addressing this Performance Measure, will be

17   accomplished going forward if the clinical coordinator position

18   is reduced to half of a full-time equivalent person?

19        MR. BOJANOWSKI:  Well, first, I can't really speak to

20   what Miss Kendrick is saying that, in fact, that's going to     11:50:41

21   occur.  I don't know the answer to that because I've not

22   reviewed the staffing plan, so I can't confirm nor deny what

23   she is saying is, in fact, going to occur.

24        But, I mean, the clinical coordinators are the ones

25   that are scheduling these things, so I don't know -- I don't    11:50:58

1    know how to answer your question, Your Honor, because I simply

2    don't have the information to answer it.

3              THE COURT:  The question will survive because it's an

4    important one, and that is if these clinical coordinators are

5    tasked with the responsibility, and there are more now then                    11:51:17

6    there will be in the future, one wonders how they can get that

7    job done.

8              So look into that, find out whether or not this

9    representation that the clinical coordinators will receive

10   additional training such that there is a representation to the                  11:51:31

11   Court that this is going to remediate this failure, can that

12   still happen or is it implicated by any staffing change that

13   would cause this not to be an accurate plan?

14             MR. BOJANOWSKI:  I'm going to try and find some

15   information out over the lunch hour, Your Honor, and maybe                      11:51:50

16   report to the Court once I identify that.

17             THE COURT:  Okay.

18             MR. BOJANOWSKI:  And give you an update on that.

19             THE COURT:  Thank you.

20             MS. KENDRICK:  All I can tell you, Your Honor, is that                11:52:01

21   at docket 2799-1, page 5, there is the chart that shows the

22   revised staffing plan for amendment 15, which is a government

23   contract signed by the chief procurement officer of the State

24   of Arizona.

25             And if you look at page 5 of that filing, on the                     11:52:21

1   chart, the second column says Eyman, and if you go down about

2   half way down the page there's an entry that says clinical

3   coordinator, and it says 0.5 for clinical coordinator under

4   Eyman.

5          And this was filed with the Court, this is a contract    11:52:40

6   between the State of Arizona and this corporation.  So needless

7   to say it would be extremely troubling if what was filed with

8   the Court and entered into in the State somehow is not correct.

9          THE COURT:  What I thought maybe you had been

10  researching and would be presenting to me was the most recent   11:53:00

11  staffing report that you received from ADOC, and indicate if

12  it's broken down specifically so that you can tell me about

13  what the clinical coordinator staffing level is at Eyman.

14         MS. KENDRICK:  Yes, sir.  So that's the March report,

15  it's at docket 2794-1 at page 53.  And for Eyman it shows 1.0   11:53:20

16  clinical coordinator position in the contract, and it is filled

17  with a 1.0 FTE.

18         THE COURT:  So it seems that at best the clinical

19  coordinator's reference is wrong as an error; right,

20  Mr. Bojanowski?                                                 11:53:45

21         MR. BOJANOWSKI:  I'm not going to say that's an error.

22  What I can say is that there's going to be an additional one

23  FTE of a scheduler that's increasing at Eyman.  So although the

24  clinical coordinator may be taken back .5, a full FTE is being

25  assigned to Eyman for scheduling.                               11:54:04

1          And I'm checking on some other data here to try and

2     inform the Court as to scheduling duties and how those are

3     going to be impacted by the new budget.  But I can report to

4     the Court that a scheduler position is part of the increase in

5     staff at Eyman.                                              11:54:28

6          MS. KENDRICK:  Well, actually, Your Honor, I think

7     what he's referring to is on page 6 of docket 2799-1.  It's the

8     continuation of Amendment 15.  And it does not -- it refers to

9     a chronic care scheduler at Eyman being a 1.0.

10         Chronic care is medical care that's provided within   11:54:47

11    the facility, not specialty care.  So it's a little unclear why

12    the chronic care scheduler would be involved in making sure

13    that reports are reviewed, specialist reports are reviewed.

14    But that's just what their own contract says.

15         THE COURT:  Well, the monthly meetings that we have    11:55:07

16    together in which I try to make intelligent observations and

17    decisions and prompts to the defendants to make sure that what

18    is being proposed as a remediation is fully understood by

19    everyone, so that the Court can monitor it from month to month.

20         A difficulty arises where there is a representation    11:55:35

21    that certain tasks will be performed by clinical coordinators,

22    and then to learn that that's not possible because there's no

23    more than one clinical coordinator, so there is no possibility

24    for clinical coordinators.  Then I'm told that, no, this is

25    actually okay because there are these schedulers.           11:55:54

1          But I can't keep people's feet to the fire, I can't

2     require that -- or know whether people are meeting the promises

3     that they've made, the representations that they've made in the

4     monthly meetings if different terms are used or if I'm not

5     given full information.                                          11:56:10

6          I take this sentence to mean what it says, and that is

7     the clinical coordinators.  And so if it's not a fact that

8     clinical coordinators are going to be doing that, such that

9     either there's only one of them, or that there's a task is

10    being shared by these schedulers, I need to be told that so    11:56:26

11    that I can in a meaningful way engage with the task that I

12    have, and that is to make sure that what is being proposed is

13    something that we can measure and evaluate.  And that requires

14    a greater level of precision than is oftentimes provided.

15         So it's the noon hour.  We'll take a break until 1:30     11:56:51

16    when Mr. Millar will join us.

17         And then after that we'll talk some, hopefully, if his

18    schedule allows, about the information that is associated with

19    the defendants' filing of the new contract and the new staffing

20    specifications in the contract, because I think it would be     11:57:14

21    helpful for Mr. Millar to be present for that.

22         Thank you.

23         MS. LOVE:  Your Honor, if I may, one of the agenda

24    items that plaintiffs put on the agenda was the information

25    we've provided as to how the December data was reported to the  11:57:27

—CV-12-601-PHX-DKD — May 9, 2018—

1    Court.

2         You had said last time that you wanted persons most

3    knowledgeable present or available to answer any questions that

4    the Court may have.

5         As to -- if that is something that's still at issue,       11:57:37

6    unfortunately from the Corizon side J.T. Scalise, who is the

7    person most knowledgeable, is only available until 1:45 today.

8    I'm not sure whether or not the Court had more questions.

9         In the alternative, perhaps if there are more

10   questions, we can -- due to his availability we could follow up   11:57:55

11   with a written submission.

12        THE COURT:  All right.  If I'd known about that

13   earlier, I probably would have acted in a different way.

14        I don't know whether I can do what I need to do in the

15   time frame that I have in light of what we've specified for       11:58:10

16   Mr. Millar and his schedule.  I don't know.

17        So we'll look into that first thing when we come back.

18        Thank you.

19     (Recess at 11:58 a.m., until 1:29 p.m.)

20        THE COURT:  Welcome, Mr. Millar.                             13:29:38

21        Before we turn it over to you, let me just see if

22   there's anything that the defendants wanted to share after

23   their lunch time.

24        MR. BOJANOWSKI:  Are you speaking as to the --

25        THE COURT:  Is there anything that you learned more         13:29:53

1   that you wanted to tell us now before Mr. --

2            MR. BOJANOWSKI:  I learned that the -- when we were

3   talking about the positions, the scheduler positions at Eyman,

4   that the designation of chronic care scheduler is

5   just -- apparently that's a corporate nationwide designation of     13:30:08

6   a position.  And so it's not limited to just scheduling chronic

7   care.  Okay?

8            So there are three scheduler positions at the Eyman

9   facility.

10           Miss Kendrick is correct, the FTEs for the clinical      13:30:28

11  coordinator are being reduced by .5.  But there's an additional

12  scheduler that I had mentioned.  And then there's a third -- a

13  third FTE involved as well.

14           But the net effect is, there's not a change in total

15  FTEs for scheduling positions.                                    13:30:55

16           In addition to that, the Eyman facility coordinates

17  with the Florence facility on specialty care scheduling because

18  they -- and I think you're aware of this, they've kind of

19  merged some of their transportation activities to make it more

20  efficient and to get more people seen.                            13:31:18

21           And so there's been an increase in scheduler positions

22  at Florence, which works with Eyman, because they're right next

23  to each other, on scheduling positions.

24           So that's the additional information that I can report

25  to the Court.                                                     13:31:36

——— CV-12-601-PHX-DKD — May 9, 2018 ———

1        THE COURT:  Let me ask this question:  The idea that I

2   think you just expressed that the responsibilities that are

3   given to the care coordinators in the remediation plan are

4   going to be shared by people who also have a different title;

5   is that right?                                                    13:31:57

6        MR. BOJANOWSKI:  My understanding is, is that the

7   schedulers already do some specialty care scheduling.

8        Is that answering your question?

9        THE COURT:  Well, the remediation plan said that the

10  care coordinators would have the responsibility going forward   13:32:22

11  to double check to make sure that this is being done.

12       MR. BOJANOWSKI:  The clinical coordinator.

13       THE COURT:  The clinical coordinator.

14       MR. BOJANOWSKI:  Yes.

15       THE COURT:  Thank you.  The clinical coordinator.         13:32:33

16       MR. BOJANOWSKI:  Yes.

17       THE COURT:  You now have said -- I think you've said

18  that those duties will be shared by people who have a different

19  title in the corporate structure in Corizon.

20       MR. BOJANOWSKI:  My understanding is that's been done,    13:32:44

21  and has been done for some period of time.

22       THE COURT:  Well, the reason I was asking is in terms

23  of my ability to follow up on this to make sure that it's being

24  done.  One of the things that comes up to my mind is, if you

25  have different titles and different responsibilities, and I'm   13:32:59

1    being told that this is a responsibility of X person, but it's

2    really being shared by people who have titles that are X, Y,

3    and Z, how do I know that everybody on the floor knows who's

4    supposed to do what?

5            That's the question, I guess, I would just ask back to    13:33:14

6    you to turn over to ask back also, to make sure that the fact

7    that you've told me that it's going to be performed by the

8    clinical coordinators, that if it's being also performed by

9    other people, that that doesn't mean that there's confusion on

10   the floor about who's supposed to be doing what.    13:33:35

11           MR. BOJANOWSKI:  Right.

12           Because when I go on tour and you go into like the

13   clinical coordinator's office, typically there are other people

14   in there who are the schedulers.  They all work in the same

15   group, so to speak.    13:33:51

16           THE COURT:  All right.  Well, again, when I'm told

17   something with a particular title, and it's a title that's used

18   frequently so we think we have some idea of who those people

19   are, I just don't want to have my ability to be precise in my

20   understanding and directions with respect to the remedial    13:34:11

21   measures adversely impacted by an imprecision in names.  So

22   keep that in mind.

23           Thank you.

24           Mr. Millar, welcome.

25           I understand you have your associates on the phone as    13:34:25

—CV-12-601-PHX-DKD – May 9, 2018 —

1    well.  But the floor is yours, sir.

2              MR. MILLAR:  I do.  Thank you.

3              You have on the phone Rene -- Miss Sobolewski, who is

4    actually driving the PowerPoint presentation for me.  So I'll

5    be trying to give voice prompts to that.                          13:34:44

6              Mr. Long, are you also on the phone?

7              MR. LONG:  Yes, I am.

8              MR. MILLAR:  Okay.  So we do have the team here.

9              Glad to be back again this month to give our updates.

10             So if you'll move to the next slide.                    13:34:59

11             What we'd like to cover today is to give a project

12   status update of where we are with the efforts we've made over

13   the last month to accelerate the work to get back on the

14   schedule to meet the Court's needs.

15             And then we will go through the staffing budget        13:35:16

16   compliance analysis by site.  And then we'll be able to give

17   you a verbal update to the interview process that's in process

18   as we speak.

19             To speak just a little bit to the update, we did

20   recognize just prior to us being in court last month that we     13:35:35

21   needed to redo the base set of data that we were using to run

22   our staffing profiling.

23             We have been working very closely with Miss Finger at

24   Corizon to get that data, to understand it, and to redo the

25   work.  We actually brought in an additional analyst from our     13:35:53

—CV-12-601-PHX-DKD – May 9, 2018 —

1   advisory board practice to help complete that.  And we've done

2   that.

3            That full report for all ten of the facilities was

4   sent out to the parties of the court at the end of April.  And

5   so we're not going to show that updated version.  It's the same    13:36:12

6   layout of what was done with the payroll data, now done with

7   the Kronos or Swipe data.

8            But what it does is, that was the second leg of a

9   three-legged stool, if I could use the metaphor.

10           So the first leg of the stool were the market profiles    13:36:30

11   where we looked at the supply of providers that would exist

12   within the market.  So that's leg number one.

13           The second leg of the stool are the staffing profiles

14   that we've generated from the raw data to anticipate what the

15   staffing looked like by position, by facility.                    13:36:51

16           And then that was the presentation that was given last

17   month and the update was sent out at the end of April.

18           I do have -- Miss Sobolewski has all three of those

19   pulled up if we need to move between them today.

20           What we're presenting today, and what was sent out to     13:37:09

21   the parties of the court I think either late last week or early

22   this week is the third leg of the stool.  It's the analysis of

23   how the first two legs interact with one another.

24           And so, Rene, if you'll move to the next slide,

25   please.                                                           13:37:29

1          What we've done, this evaluation framework has three
2     primary components to it.
3          The first we're defining as compliance.  This is
4     compliance to the staffing budget as it was set for calendar
5     year 2017.  So we will show that as a percent of weeks of the        13:37:48
6     year that the site reached budgeted staffing levels.
7          One of the assumptions that we're using is that
8     reaching budgeted staffing levels is reaching the 90 percent
9     mark of the budgeted FTE to account for non-work time, paid
10    time off, paid sick leave, and administrative time.  These were       13:38:09
11    numbers that we calculated, then vetted, and got explanation
12    from the folks at -- the personnel at Corizon to say that they
13    did -- they were in agreement that ten percent was a reasonable
14    mark.
15         With that being said then, we have used a comparable          13:38:29
16    color scale that you've seen before with a red, yellow, green.
17    And we've identified that any week -- if 75 percent of the
18    weeks of the year were within staffing compliance, that we
19    would mark them as green.  If 50 percent to 75 percent were
20    between half and three fourths of the year of those weeks were       13:38:54
21    in compliance, we would mark them yellow.  And if it fell below
22    50 percent, they would be marked red.
23         The intent of this is so that as we look at the
24    different analytical profiles or dashboards for each of the
25    facilities, or for each of the groupings of facilities, that we      13:39:11

CV-12-601-PHX-DKD – May 9, 2018

1  can begin to see similarities or differences so that we can

2  draw conclusions or comparisons.

3          My intent in court today is to walk you through the

4  details of what we're seeing here, but we're not yet -- we have

5  not yet moved to the point where we're drawing conclusions.          13:39:32

6  We're making observations.  These observations are helping to

7  inform some of the questions in our interviews and some of the

8  follow-ups.

9          What I would ask too of the parties of the court is to

10  understand that, as opposed to this being just a straight          13:39:48

11  presentation to the Court, giving the timing that we're looking

12  at, we are -- I'm hoping that both the defendants and the

13  prosecution will be able to look at the three different

14  PowerPoint reports that we've given and be able to provide any

15  feedback, either criticisms, concerns, or other things within    13:40:10

16  the next couple of weeks, so that that can be taken into

17  account as we begin to craft our conclusions and our

18  recommendations.

19          What I failed to do, I wanted to do at the beginning,

20  was talk a little bit about the dates, Judge.                     13:40:28

21          So we are scheduled to be back on June 13th to give

22  our final report out.  We are in the process of finishing the

23  interviews at this point in time.  The goal was to have them

24  done by the 11th.  I think they may push into next week just a

25  little bit.                                                       13:40:49

1          But what I would request of the parties of the court,

2    is with the materials that have been presented and discussed

3    today along with the others, that between now and a week from

4    Friday, which would be the 18th of May, that any concerns or

5    feedback be provided to us so that we can make those                13:41:03

6    adjustments in a timely fashion in putting together our final

7    report.

8          Because the charge and deadline that I have given to

9    my team is to have this report delivered to the parties of the

10   court no later than June 6th, which would be one week prior to     13:41:19

11   our final report out to the Court.

12         I would hope that we might be able to provide that as

13   soon as the end of business on Monday the 4th.  But we will

14   have it at the very least one week prior.

15         THE COURT:  And your assignment to us of the deadline        13:41:40

16   of the 18th of May for getting responses to the information

17   that you've provided, that seems very reasonable.  Thank you.

18         MR. MILLAR:  Okay.  Can I just ask if there's any

19   questions from either of the parties?

20         THE COURT:  Surely.                                          13:41:55

21         MS. KENDRICK:  No.

22         MR. BOJANOWSKI:  What is the availability of the

23   underlying data used to reach the conclusions?

24         MR. MILLAR:  I think that can be made available.  Some

25   of it's in pretty raw format, but if there are questions, we       13:42:11

1   can do that.

2          And I think at the disposition of the Court or the

3   direction of the Court we could -- that could be reviewed or

4   looked at.

5          I mean, our goal here is, we want this to be as                    13:42:23

6   accurate as possible and as fair of a view of the situation as

7   we can derive.  The hope is that we can identify, as we stated

8   earlier, best practices and challenges that maybe even within

9   the system itself might pose some beneficial recommendations.

10  And then also for us to bring from our outside of the                     13:42:46

11  correctional health care realm, commercial health care field,

12  some potential recommendations, might be a little out of the

13  box thinking to help resolve some of this.

14         But we can --

15         MR. BOJANOWSKI:  So logistically we would just e-mail           13:43:00

16  you, is that what you're saying?

17         MR. MILLAR:  I believe so.  I think the easiest way if

18  there are concerns of any type to e-mail us.  I think what's

19  been done before is all parties have been copied on the e-mails

20  as they've gone out so that people are aware based on the           13:43:14

21  e-mail stream of what the conversations are.

22         And then we can -- if there's a request for data, we

23  can work to schedule that, we'll make ourselves available for

24  that.

25         THE COURT:  Good.                                              13:43:27

1          MR. MILLAR:  Very good.

2          The second portion of then the evaluation is we looked

3     at turnover.  Filling a position is one dimension of looking at

4     staffing, but knowing how often you're having to fill that with

5     a new position or to train is an element as well.          13:43:45

6          And so with this we were able to look at a three-year

7     average of the percent of providers who terminated their

8     contracts each year.

9          And so it was based on all employees from 2005 to 2017

10    within the designated positions that we've been analyzing.     13:44:04

11    They were developed by role, by facility.  The primary facility

12    was determined based on the Kronos or Swipe data where they had

13    done the most work.  And so if somebody worked at multiple

14    facilities but worked more at one, if they -- we would show

15    that termination at that facility.          13:44:28

16          And again, we used a red, yellow, green indicator for

17    that, with those numbers being similar to the first, less than

18    25 percent turnover green, 25 to 50 percent yellow, and greater

19    than 50 percent red.

20          And the 25 percent number being green, that's a pretty   13:44:49

21    solid, even industry number for well-run health facilities.

22    Well-run health facilities might have turnovers in the high

23    teens to low twenties, even when things are running well.

24          The final element of the analytical evaluation was a

25    compensation comparison.  So what we have done is we explained  13:45:13

1    in the first report out that we gave to the Court in the

2    profiles, is we created benchmarks based on MGMA, the Medical

3    Group Management Association, by specialty; for primary care,

4    for nurse practitioners, psychiatrists, psychologists, nurse

5    practitioners, and nurse practicing psychiatry.          13:45:35

6         We did not have benchmark data available for the

7    psych -- psych associates.  And so you'll see we've noted that

8    where we were not able to do that crosswalk.

9         So we used the 2017 payroll data, W-2 data, and the

10   hours reported in Kronos, because what we needed to do is we     13:46:02

11   needed to convert all of the data to FTE equivalents.  And so

12   the analyst that we brought in, that was her primary

13   responsibility, is to ensure that those are right.

14        Oftentimes the math with doing FTEs can get really out

15   of whack if you're not careful with that.  And so we've done    13:46:24

16   those adjustments with those hours and with the pay.

17        The primary facility, again, was determined by the

18   Kronos Swipe data.

19        And as I said, the psychology associates were excluded

20   because we did not is a national benchmark to use against that.  13:46:41

21        Now the color coding here is just slightly different,

22   and that is because of what we found in the data.  So we have

23   here a red, green and a blue identifier.  Red would be anything

24   that's less than the 50th percentile.  Green is between the

25   50th and 75th percentile.  And greater than 75th percentile is  13:47:04

—CV-12-601-PHX-DKD — May 9, 2018 —

1    blue.

2          Let me pause here for just a moment to explain what

3    the percentiles are.  Because with MGMA it's the way that they

4    look at the full sample set of the information that they are

5    analyzing.  It's not a percentage, and that's why it's written          13:47:24

6    as a percentile and not a percentage.

7          So the median or the 50th percentile would be the

8    middle of their data set.  So it would represent an average

9    wage paid.

10         And so when we look at that, the 50th percentile would          13:47:43

11   be just that.  For all primary care physicians, or family

12   physicians, or physician assistants, MGMA surveys nationwide,

13   and then based on the regions that we're looking at, will tell

14   you, this is the middle of the pay range for all of these

15   physicians.                                                              13:48:04

16         And then as it moves upward, what they're doing is

17   they're slicing, based on the sample size that they have, the

18   percentile that they fall into.  So at the 75th percentile,

19   75 percent of all of the doctors below -- would be paid below

20   that, 25 percent would be paid above.                                    13:48:25

21         But why they use percentiles is it's not -- it's not a

22   straight line curve.  So the 50th percentile is not going to be

23   25 percent more pay than the 75th percentile.

24         We actually use internally an index that puts the 50th

25   percentile at 1.0.  And so then you can take a pay -- if a               13:48:49

UNITED STATES DISTRICT COURT

——— CV-12-601-PHX-DKD - May 9, 2018 ———

1   person was -- if a person was paid $100,000, and that was at

2   the median, then $100,000 for one FTE would equal a 1.0.

3           If you had a person paid at $125,000, that does not

4   necessarily mean that they are at the 50th plus 25 percent or

5   the 75th percentile.  That could actually put them at the 60th          13:49:18

6   percentile or even the 90th percentile, depending on the

7   distribution.

8           And so you can think about it as a percentage, but

9   don't -- what I'm encouraging is that you don't try to do the

10  math to unravel it to say that $100,000 at the 50th percentile        13:49:36

11  means that you're at a $150,000 at the 75th percentile, that

12  the math won't work out.

13          But it's a standardized way of measuring both

14  compensation and productivity for health care providers in the

15  commercial space.                                                      13:49:59

16          Let me pause there and see if there's questions about

17  those three.

18          And I will note that these scales are in the bottom of

19  each of the slides, because even as I go through them I find I

20  have to keep reminding myself of where the scale resides.              13:50:14

21          But let me ask if there's any questions from the

22  parties.

23          MS. KENDRICK:  No.  Thank you.

24          MR. BOJANOWSKI:  No.  Thank you.

25          MR. MILLAR:  Okay.  Then what I would like to do for           13:50:24

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – May 9, 2018

1    the balance of our time now is we're going to move through and

2    look at these.

3         We have grouped these according to where they fall out

4    in these colored cohorts or groupings based on the provider

5    supply in each of their areas.  So we'll look at the green          13:50:39

6    areas first, which are your larger, more metropolitan areas in

7    Phoenix and in Tucson.  Then we will look at the middle two,

8    which are your Winslow and Safford facilities.  And then

9    finally we'll look at that group of four that are at the bottom

10   that have a more significant supply gap in their areas.            13:51:02

11        And the intent of doing this, again, is to see where

12   there are commonalities between those that have similar market

13   supply opportunities or challenges, and see what that would

14   inform us.

15        We'll move forward.                                           13:51:19

16        So on the first or green cohort -- and for reference

17   when you go back to look at these, we've tried to put in a

18   couple of prompts.  There's going to be ten or 15 of these

19   slides, that they begin to look very, very similar, and very

20   repetitive.  But you'll note in the top left corner there's the    13:51:39

21   green dot and the description of less than 25 percent supply

22   gap.  So on all four of the facilities that fall in that

23   grouping, that green dot will show up.

24        Then we go to the two in yellow there will be a yellow

25   dot, and the four in red in a red dot.                             13:51:58

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – May 9, 2018

1      So just a couple of elements so that you can orient

2  yourself on each slide and try to reduce the amount of back and

3  forth of any given deck.

4      This first slide here puts all four of the facilities

5  in one picture, with the medical provider analysis on the left,          13:52:14

6  and the behavioral health provider analysis on the right.

7      And then you can see the three different metrics that

8  we're using; compliance, turnover, compensation.  And then it

9  repeats for both as well.

10      And so when we pause here to look at this, what I am          13:52:34

11  doing and what my teams are doing is, we're beginning to ask

12  questions about the patterns that we see.  And so these

13  patterns are what's going to inform our thinking over the next

14  35 days as we move towards our findings and our recommendations

15  as we draw these conclusions together.          13:53:00

16      That's why that the feedback from the parties of the

17  court by the 18th are going to be fairly critical.  We've had

18  some feedback already from Miss Finger at Corizon on some

19  elements and things that will be important to inform us.

20      So if you look at the medical provider side, what          13:53:18

21  you'll see -- what draws my attention first is the compensation

22  element.  So all of these are in a green or blue compensation

23  rating.  Which is what we would have anticipated to see.  Given

24  that correctional health care many times is perceived as a more

25  difficult setting, would not anticipate that you'd be          13:53:46

─ **CV-12-601-PHX-DKD – May 9, 2018** ─

1   successful in staffing below what the median or average

2   staffing was in a marketplace, and very well could require it

3   being higher.

4         So on the medical provider side you can see that we

5   are green or better on all of those.                          13:54:03

6         On the behavioral health side, all four of them are at

7   or above the 75th percentile.

8         And we'll see the details for each of these as we go

9   into a page for each individual facility.

10        When you look at the turnover rates, on the medical      13:54:17

11  provider side, this is one that we highlight as an area that we

12  need to ask questions, because in comparable marketplaces, you

13  have very different turnover.  You've got two in the yellow

14  range, one in the green range, which is quite good, at just 19

15  percent at Perryville.  But then you have 52 percent turnover   13:54:40

16  in Tucson, where you actually have almost 80 percent staffing

17  compliance.

18        So what that tells you is the staffing is staying

19  very, very close to the budgeted staffing in that area.  We'll

20  ask the question why and how are they accomplishing that.  But  13:54:59

21  they're doing it even with a very high rate of turnover.  So

22  that creates stress on a system in and of itself.  So those are

23  things that we would investigate.

24        And the blue 75th percentile would tell me that

25  they're likely doing that, they're able to recruit and keep the 13:55:15

——— CV-12-601-PHX-DKD – May 9, 2018 ———

1    staffing within compliance, even with all the turnover because

2    they are paying at a premium to do so.

3              Let me pause there with just that first explanation

4    and see if there are questions about how this table is laid

5    out, what some of the different parts might be.  And what is          13:55:37

6    clear to me, because I have spent hours looking at it, might

7    not be clear to the parties of the court, to be able to provide

8    some additional guidance or description.

9              MS. KENDRICK:  No questions.

10             MR. BOJANOWSKI:  No.  Thank you.                            13:55:53

11             MR. MILLAR:  Okay.  I'll comment too that on the

12   behavioral health side, the fact that these all have the same

13   ranking pattern I think is telling.  Especially the fact that

14   we're in the supply group where we're anticipating that there

15   is a fairly good supply of behavioral health providers in these      13:56:12

16   markets, and yet even though they're paying at above the 75th

17   percentile, their turnover is still well above that 25 percent

18   mark, and their staffing is not even close to compliance.

19             Some of these as we'll look into it can be a small

20   numbers issue as well.  So I want to at least caveat that to         13:56:38

21   say, you could be at zero percent because you need to staff one

22   person and that didn't happen.  And so those are some of the

23   things that we're looking at.  But as we dig deeper, that's

24   what we will look into.

25             This summary view though is where we start to begin to     13:56:55

UNITED STATES DISTRICT COURT

1    inform how we sift through the haystack, for lack of a better

2    term, to find the needle.

3           So let's move to the first facility, to Lewis.

4           So what we have then done is we have created a profile

5    page, or an analytic page for each of the ten facilities.          13:57:19

6    Again, set up in a similar methodology with the medical

7    providers on the right, the behavioral health providers on the

8    left.

9           Here though now we have the three analytic components

10   laid out in a vertical format instead of horizontal, done so      13:57:34

11   that we can add some context or descriptions to what we're

12   seeing and what represents the numbers.  And here you can see

13   the exact numbers.  So the percentages here.

14          So if we look at the medical providers first, their

15   medical staff met budgeted levels, which remember that is at 90   13:57:59

16   percent or higher of budgeted hours, 25 weeks out of the year.

17   So that represented a 47-percent compliance rate.

18          They were fully staffed in the nonphysician providers.

19   So your nurse practitioners, your physician assistants, were

20   fully staffed for 52 weeks of the year.                           13:58:20

21          And, Miss Sobolewski, correct me, we're using a

22   53-week year; is that correct?

23          MS. SOBOLEWSKI:  Correct.  The last week begins

24   December 30th -- or 31st, so there's one day left in that 53rd

25   week.                                                             13:58:44

———— **CV-12-601-PHX-DKD – May 9, 2018** ————

1        MR. MILLAR:  So it's a bit of an anomaly, but because

2    we're using weeks as our baseline, we do have 53 instead of 52.

3            So 52 of the 53 weeks they were short here -- no, they

4    were fully staffed in the nonphysician providers, but they

5    continually fell short on the physician staffing.                    13:58:59

6            And then another element here is they did not have any

7    medical director coverage for 33 weeks of the year.

8            And so the staffing compliance is at a total FTE

9    level.  So as we look into these sites and as you go back to

10   the second report that we sent, this is where you would be able    13:59:20

11   to go back and see more of the detail on a week-by-week basis.

12           So if we could switch to the Lewis Complex on their

13   medical provider side.

14           I don't intend to go through this with all of the

15   locations, but I'd like to show the parties of the court how I      13:59:43

16   would interact with this data to understand it.

17           So go to the first page, the page 4.

18           So as you look at this, they were 47 percent

19   compliant.  And so the line that you're seeing in green would

20   be the 100 percent staffing mark at six-and-a-half FTEs.            14:00:02

21           So to meet our compliance number, they would be at

22   90 percent of that, or at just about six FTEs.  So as you look

23   along that line for the 6.0, you can see approximately half of

24   the time they have reached that.

25           Now where you're looking, the dark color on the bottom      14:00:25

113

—CV-12-601-PHX-DKD – May 9, 2018 —

1   is the director number.  You can see there was a director staff

2   weeks 1 through 9 and 44 through 53, but nothing in weeks 10 to

3   43.

4           You can see that the physician staffing floated in the

5   middle a little bit lighter at the beginning of the year, a          14:00:44

6   little bit more robust at the end of the year, which as we go

7   to the next slide you'll be able to note that.

8           So here you can see that we hit about week 38, and you

9   have two physicians that are working full time, they're hitting

10  that 2.0 line.  So much closer to the 2.5 budgeted position.         14:01:01

11  And, therefore, making this a strong push.

12          Down below the nonphysician providers, or NPP would be

13  an acronym that you'll see on some of the slides, you can see

14  that they were actually overstaffed to the 3.0 budget.  We

15  believe that that's to compensate for or alleviate for the         14:01:25

16  staffing challenges with physicians.

17          And so that would be the way that you could interact

18  with these two data sets.  As you're starting to think of some

19  of the raw data, we've tried to provide you with some of it in

20  visual format that you can actually look at it first.  That may     14:01:44

21  also then drive questions that would want you to look at the

22  raw data itself, or some different slices of that data.

23          So that is what we're proposing is that these three

24  documents together, with the market profiles, these detailed

25  staffing profiles, and the analytic view evaluation, would         14:02:04

UNITED STATES DISTRICT COURT

1    provide the materials you need to review.

2         So, Rene, I think we can switch back.

3         So moving down on the medical side then you can look

4    at the turnovers.  We're trying to see what the turnovers look

5    at -- look like.                                        14:02:31

6         There was -- in the Lewis Complex there was a

7    significant increase in both hiring and turnovers in 2017.  And

8    with a significant increase in hiring of nonphysician

9    providers, despite limited terminations.  That's where we see

10   the jump in staffing.                                   14:02:49

11        This would be one of the areas then, as we look

12   through it we'd say, okay, at Lewis they were successful in

13   getting and keeping a set of those midlevel providers, those

14   nonphysician providers.  So then, what was happening there that

15   might be lessons learned or best practices that can be    14:03:08

16   leveraged at other locations?

17        So their compensation for medical was at approximately

18   the 50th percentile overall.  The physicians and medical

19   directors, however, were paid below median.  Why this draws to

20   approximately meeting, is that the nonphysician providers were  14:03:28

21   paid just above the median.

22        So we begin to start to see some of the rationale for

23   how they're able to retain and keep if they are paying at a bit

24   of a premium in the market.

25        On the behavioral health side we can see here there   14:03:41

—CV-12-601-PHX-DKD — May 9, 2018 —

1   was consistent staffing of the psychiatrists.  The very

2   inconsistent staffing of the psychologists and the mental

3   health nurse practitioners, with five different NPs across very

4   short portions of the year.

5         The psychiatric -- the psych associates did meet their         14:04:02

6   budgeting levels at 70 percent of the year.  So this would be

7   one where we go and we'd look at some more of the details to

8   see.

9         So you're only about 45 percent -- 50 percent

10  compliant about 24 weeks out of the year.  But that's not the    14:04:18

11  case for psych associates and your psychiatrists.  And so there

12  would be directed areas where you could look at those to see

13  how that work's being covered.

14        On the turnover element here, turnover has steadily

15  decreased each year since 2015.  There's been a steady          14:04:35

16  retention of the psychologists across all three years, and then

17  an additional hire in 2017.

18        So, again, this starts to the point out where we would

19  look for best practices or circumstances, or even what we would

20  call clinical champions, to say, if we've got psychiatrists     14:04:54

21  here that's figured out how the system works, makes things

22  good, how do you leverage that resource across other facilities

23  where there might be struggles to try to build a similar type

24  of retention?

25        On the compensation front, the psychologist was paid      14:05:15

1    at median, but the psychiatrist and the behavioral health nurse

2    practitioners were paid well above the 75th.  So this gives us

3    kind of two different stories.  We know the psychiatrist has

4    been there and stayed there.  If they're getting compensated

5    well and they work well within the Corizon systems and                    14:05:36

6    processes, that explains that.  It doesn't explain why we're

7    having the cycling through of nurse practitioners when they

8    have a similar compensation premium.

9            And so that will be areas that we would investigate

10   under our interviews as well.                                             14:05:53

11           Let me pause there and ask if there's questions about

12   the layout for each facility or where you might find

13   information there?

14           MS. KENDRICK:  No.

15           MR. BOJANOWSKI:  No questions.  Thank you.                        14:06:04

16           MR. MILLAR:  We'll go ahead and move forward, Rene.

17   Oh, I think you already did.  We're at Perryville.

18           I'll talk at these a little bit more of a high level.

19   Perryville medical providers.

20           Again, recall that we are in the green supply gap                 14:06:22

21   group.  So these are areas that have what we believe is

22   sufficient supply.  62 percent compliant over 33 weeks of the

23   year.  Directors and NPs were fully staffed 47 to 45 weeks.

24           So, again, this would fall to the physician staffing

25   element.  It begins to give us some guidances of where the               14:06:43

─── CV-12-601-PHX-DKD – May 9, 2018 ───

1    focus needs to be on improvement or different actions.

2           Turnover, very good, at just 19 percent.  And

3    compensation, 50th to 75th percentile overall.  50 percent

4    overall with pay for the nonphysician providers, just above the

5    75th, which was the same element that we saw in the prior        14:07:09

6    complex.

7           And then physicians are paid below median.  Directors

8    are paid below median.

9           So where we're seeing challenges with the physician

10   level, that begins to manifest potential areas to investigate,   14:07:22

11   whether it's compensation levels or specialties that are being

12   considered for that, et cetera.

13          Behavioral health, zero percent compliance here.

14   There was consistent understaffing of all provider types for

15   the majority of the year.  There was a consistent 1.0 FTE        14:07:43

16   psychiatrist that became staffed in mid June.  So this would be

17   one where we'd go back in to look at the details to say, is

18   this a small numbers problem or is this another issue.

19          So, Miss Sobolewski, if we could switch to the

20   facility profile for Perryville and look at the behavioral       14:08:05

21   health profile pages.

22          So here you can see the budgeted staffing was 12.5

23   FTEs.  The most that it ever reached throughout the entire year

24   was only ten.  And most of the year it hovered in that eight to

25   eight-and-a-half to nine range.                                  14:08:29

UNITED STATES DISTRICT COURT

1           If we go to the next page, please.

2           We can see here that there was not a budgeted

3      behavioral health director, but there was one there during the

4      early part of the year.  That looks to be an offset for not

5      having steady psychiatrist staffing at 1.0.                    14:08:46

6           But when that psychiatrist was brought in, that would

7      be behavioral health provider 27, they were consistent

8      throughout the year.

9           Week 40 was likely a week that they were on vacation

10     or at a conference or something.  And so that in and of itself    14:09:05

11     bodes well for a good trend.

12          But then the psychologists, you can see, were budgeted

13     at 3.0 and reached on average just a little below 2.0.  So that

14     was the element missing that.

15          And I think one more page to this profile.                 14:09:24

16          You can see the nurse practitioners, and even the

17     psych associates, also never quite reached that level.

18          So that's where we drawn those conclusions there, and

19     would ask the question, is there something here other than just

20     a supply gap from what we're looking at.                        14:09:43

21          We can go ahead and go back, Rene.

22          What I'd like to do here, Judge, is just pause and ask

23     the question, are the parties of the court finding that this

24     way of looking at or dissecting or discussing the staffing in

25     each of the facilities is helpful?  Is it bringing to light     14:10:10

119

1   questions or concerns?  I guess for lack of a better term, have

2   we come close to hitting the mark for something that's going to

3   be -- have some value and usability for the parties of the

4   court?

5           THE COURT:  Well, it seems to suggest that the                    14:10:27

6   conclusions that you will come to in the recommendations are

7   things that suggested by this, but we'll be interested -- I'll

8   be interested to hear what your on-the-ground conversations

9   produce with respect to whether or not they affirm what looks

10  to be present.                                                            14:10:46

11          MR. MILLAR:  Others?

12          MS. KENDRICK:  Just to confirm, psych -- those

13  psychiatry and psychology FTEs, that includes telepsychiatry

14  and telepsychology?

15          MS. SOBOLEWSKI:  Yes, it does, which we've confirmed            14:11:01

16  through the interviews.

17          MS. KENDRICK:  Okay.

18          MS. SOBOLEWSKI:  At least that's what -- we've talked

19  in several individuals who we assume from the Kronos data that

20  they were on-the-ground psychiatrists, and then reaffirmed            14:11:12

21  through the interviews that they are actually all through

22  telepsychiatry.  Which makes us assume that all of that -- all

23  those hours are captured in the data that we've looked at.

24          What is not captured in the data that's on the screen

25  is any coverage from the Arizona regional office.  Their hours        14:11:31

UNITED STATES DISTRICT COURT

120

—— CV-12-601-PHX-DKD — May 9, 2018 ——

1    are tagged to the Arizona regional office, not to the

2    individual facilities that they're covering staffing.

3           So we are unable to see that, but we do recognize that

4    there is often some coverage provided from the regional office.

5           THE COURT:  And do you have an idea what that total                14:11:51

6    coverage is so that you can see whether or not it's possibly a

7    threat to the validity of the data otherwise?

8           MS. SOBOLEWSKI:  We're unable to do so because there

9    is no clear breakdown of their hours, it's just their time

10   cards have been submitted.  So that could be anything from       14:12:09

11   training to providing care to meeting times, really anything.

12          So we can't really see the clinical coverage provided

13   through the hours.

14          I don't know if that's something further that we could

15   hear or find out from the Corizon folks.  But from what we       14:12:28

16   understand, it's more anecdotal than data driven.

17          MR. MILLAR:  And if I can comment, this feedback came

18   to us from Corizon just the end of last week.

19          I think what we will attempt to do is have Corizon

20   identify for us which of their regional providers are the ones   14:12:45

21   that are primarily designated to do that.  And I don't think

22   we'll be able to identify facility by facility how much of an

23   impact that is, but I believe we'll be able to look at the gap

24   overall and to be able to identify the number of FTEs

25   regionally that they believe are deployed against those gaps     14:13:08

1    and see if that is a material issue.

2         So we will attempt to work out a best case answer as

3    we can.  But as Miss Sobolewski indicated, we don't have any

4    way within the data as it's currently tracked, because there's

5    an inconsistency, usually not a Swipe on the Kronos data when          14:13:28

6    they are on-site.  Sometimes there is, but generally there is

7    not.

8         THE COURT:  I'm at least heartened to hear that you

9    have at least an eye towards this, so if you saw something or

10   heard something in your discussions that would indicate that it       14:13:45

11   was a major issue, you'd be picking up on that.

12        MR. MILLAR:  We do.  And the way I intend to look at

13   this -- and we haven't been able to compile the data yet in a

14   way to do it.  But if we have ten FTEs for staff physicians,

15   and we know that the shortfall on average across the year of          14:14:00

16   2017 was three, but the regional office tells us that they have

17   two-and-a-half FTEs dedicated to filling those slots, then we

18   would look further into it.

19        If they told me they had half an FTE dedicated to

20   that, then I would assume that the impact was not material and        14:14:21

21   we would take that in consideration for our findings and our

22   recommendations.

23        THE COURT:  That makes sense.

24        MR. MILLAR:  Any questions or comments?

25        MR. BOJANOWSKI:  No.                                              14:14:36

1          MR. MILLAR:  Okay.  Rene, let's move onward.

2          So in the Phoenix complex -- at this point I'm going

3    to refrain from reading down through all of the detail, but

4    just call out the patterns and the colors for where we will be

5    going to look.                                                     14:14:57

6          So the medical providers here are in a yellow, yellow,

7    green.  In my mind then in Phoenix that looks like a fairly

8    stable medical staffing location.  Turnover is a little bit

9    high.  Compliance was in the yellow, but not quite in the

10   green.                                                            14:15:16

11         And so then we would look -- so here they had

12   consistent nonphysician provider staffing with four or five

13   providers.

14         Okay.  That's not our screen.

15         But then the challenge to meet physician staffing.      14:15:30

16         So that becomes a question.  We've now seen this in

17   two or three of the locations in what we would deem to be some

18   of the easier markets for recruiting physicians.  So that's

19   something that we will look into.

20         Behavioral health, similar pattern to others, with the  14:15:49

21   red, yellow, blue pattern.  And what we're seeing is it looks

22   like the attempt is to have a premium compensation to try to

23   get folks in there.  There's still a turnover issue, so then

24   it's where is that issue, at what level of provider?  Is it the

25   psych associates, is it the behavioral nurses, psychologists?   14:16:11

— **CV-12-601-PHX-DKD – May 9, 2018** —

1    And then we'll look to see if there are common patterns in

2    these groupings, and also across the full contingency of

3    facilities.

4            Next.

5            So finally we have Tucson.                                    14:16:27

6            So the first three were actually in Maricopa County.

7    We now have the Tucson market.

8            You see some differences here.  Compliant on the

9    medical side.  Still significant turnover with the nonphysician

10   providers.  Relatively consistent retention of physicians over   14:16:45

11   a three-year period.  So there's something different in the

12   Tucson market than the Phoenix market with regard to

13   physicians.

14           Their compensation is higher in the Tucson market.

15   Some of this may be differences just between the benchmarks.      14:17:03

16   The -- actually the pay scale for Corizon -- and we haven't

17   looked at this in detail -- could be the same in both markets,

18   just the benchmarks for Phoenix could be higher because of your

19   nature as a metropolitan area and the ability for doctors to

20   earn at a premium.                                                14:17:25

21           Behavioral health though here in Tucson, same patterns

22   we've seen in the others, with a red, yellow, blue.  So we're

23   seeing consistencies around behavioral health which leads us to

24   believe that we can identify common challenges and

25   opportunities to be able to focus findings and recommendations    14:17:42

UNITED STATES DISTRICT COURT

1    around it.

2            Okay.  We'll move on.

3            Move on to our middle group.  This is supply group

4    with the 25 to 75 percent supply gap.  We have just two

5    facilities here.                                              14:18:00

6            Rene, if you could bump back over to our colored state

7    slide that's on that third deck.  There you go.

8            So we're looking at these two eastern most facilities

9    that fall in the yellow range.  So there's a geographic kind of

10   contingence or comparableness with those.                     14:18:26

11           So go ahead and jump back.  Thanks, Rene.

12           So you'll see in this area that we've got some

13   similarity between the medical and behavioral health.  Red on

14   compliance, green on turnover, blue on compensation.

15           A really interesting thing that we would look at is    14:18:51

16   the difference in turnover between Safford and Winslow, where

17   you've got one at zero and one at 50 percent.  So is there some

18   marked difference between these marketplaces, these locations,

19   these geographies, or is there something going on with the

20   staffing budget model or other elements?  So we'll be looking  14:19:09

21   at those things in detail.

22           And you can see here the compensation on these is a

23   NA.

24           Go ahead and go to that next slide.

25           And it's explained there, that because the staffing   14:19:21

UNITED STATES DISTRICT COURT

— CV-12-601-PHX-DKD — May 9, 2018 —

1   for behavioral health in these facilities, that are the

2   outlying facilities, is just with the psych associates.  And so

3   there isn't the benchmarking data to work from.

4           But again, similar patterns.  There's a challenge in

5   meeting that, but there's good -- there's good retention.  And          14:19:42

6   so this starts to raise in our minds the question of, if you've

7   got good retention, and if you don't have supply, what are some

8   things you could do to just get that one more position filled?

9   Because it looks like if you're able to fill it, that the

10  working environment or the situation there is such that they         14:20:04

11  retain the people once they're there.

12          And so that brings a different set of questions or

13  potential recommendations to the table, that's different from,

14  you know, in a Phoenix or a Tucson where you're churning

15  through a lot of people, that's a recruitment and a finding        14:20:21

16  possibility.  Here in these outlying areas, there may be

17  different ways to approach it.  So that's where our thinking is

18  going as we start to investigate what that might lead us to.

19          Let's go ahead to the next one.

20          Here, almost the same as the other side, except             14:20:43

21  there's a higher turnover here.  But this is where we have just

22  one psych associate that was there, and they were terminated in

23  June 2016, and they had not logged any hours, and the position

24  was not refilled despite the budget.

25          So, Rene, if we could switch to the Winslow complex         14:21:06

—CV-12-601-PHX-DKD – May 9, 2018—

1   behavioral health profile, we'll be able to see that here in

2   this last slide, that slide 33.

3           Looks like we're even missing –– so there must have

4   been no staffing there.  So there was a budget but not filled.

5           That would be one that we would question with the          14:21:36

6   Corizon folks.  Is this an anomaly in the budget, was this

7   filled by a regional person, or was it just left open?  Is

8   there still a need there?

9           It goes –– it brings questions to my mind, Judge, that

10  go beyond the scope of what we've been asked to do as experts,   14:21:56

11  that goes more towards the demand, the process at each of the

12  facilities.  And that's something that's beyond the scope of

13  what you've asked us to do.  But that's where the questions

14  would begin to lead me.  Is this an anomaly of a change in

15  demand or need, or is it truly that gaping of a miss on          14:22:15

16  compliance that you need a psych associate there and never had

17  one?  And/or was it covered by a regional person that didn't

18  log in?

19          So those would be the type of questions we would ask.

20          THE COURT:  And those are good questions for you to       14:22:36

21  give us.

22          And also the questioning process, I can try to

23  encourage that as well.  To the extent that you think that

24  there's something that is evident to you but outside of the

25  scope, and you're not sure that you're able to opine because it  14:22:53

1   was outside of the scope, to the extent that there are

2   questions that are raised, I gather from our previous

3   conversations you're going to let us know about those too.

4           MR. MILLAR:  We will.  I think I envision -- when you

5   look at our final report, we'll probably have three primary     14:23:08

6   components that you'll see; at a facility level, at a supply

7   group level, and then overall.  But we would give observations,

8   things that we can identify or opine on.  We would give

9   recommendations based on seeing these things, what would we see

10  as potential solutions to resolve what we've observed?  And     14:23:29

11  then we will is provide a list of questions that we think the

12  data suggests that would merit further investigation, that

13  would be beyond -- beyond the scope of the data that we have,

14  but in my mind would be the next logical next steps if I put

15  myself in the shoes of the operator, saying, if this is what    14:23:51

16  I'm looking at for my business, and this is what I'm seeing, I

17  need to ask, X, Y and Z so I can determine what direction do I

18  go towards.  And we would attempt to provide that.

19          So observations or findings, recommendations, and then

20  a list of questions that might be indicated by the data and the  14:24:10

21  findings.

22          Okay.  Before we move on to the last group, any

23  questions from any of the parties about these two middle

24  groups, the lack of bench marking information for the psych

25  associates, any questions?                                       14:24:33

UNITED STATES DISTRICT COURT

——— **CV-12-601-PHX-DKD** – May 9, 2018 ———

1           MS. KENDRICK:  No.

2           MR. MILLAR:  Okay.  Then moving to our last cohort,

3    the supply gap greater than 75 percent.

4           So this is Douglas, Eyman, Florence and Yuma, in very

5    different parts of the state.  So really the one commonality          14:24:56

6    they have is the supply challenges that they face.

7           The one thing that you will note though is on the

8    compensation side, both for medical providers and behavioral

9    providers, all in the green or blue.

10          Similar challenges with turnover, and with compliance.          14:25:13

11   Three of the four in medical are in the red compliance

12   category.  Three of the four in behavioral health.  You do

13   have -- Yuma stands out with 85 percent compliant in behavioral

14   health providers, one of the few locations where we see

15   behavioral health compliance in the green.          14:25:36

16          So, again, this is one area that my team has noted or

17   highlighted we'll look at.  I think we've attempted to direct

18   some interviews that way to ask those questions.

19          Let's move to the Douglas page.

20          So as you can see here, that sometimes we see a red,          14:25:52

21   yellow, blue or red, yellow, green.  What we've seen in

22   compliance and turnover are just the opposite.  Compliance

23   you're in a yellow state.

24          The interesting thing here is their nonphysician

25   providers met budget 52 out of the 53 weeks of the year.  So          14:26:16

—— **CV-12-601-PHX-DKD — May 9, 2018** ——

1    98 percent compliance with those nonphysician providers.  So

2    there's something going really right here.

3         But the medical staff, which is comprised of NPPs, had

4    three terminations and hired two.  So there's a 75-percent

5    turnover.  So that may be part of why it was in the yellow.        14:26:41

6    The one FTE of medical director was budgeted and never staffed.

7    So this may be one of those occasions where an offset for

8    somebody from a regional office could be a part of that.  But I

9    would be a little bit -- it would be hard for me to believe

10   that the regional office was filling -- backfilling that 100        14:27:10

11   percent of the time.  And so even at that point there would be

12   just some partial coverage.

13        As we investigate those, that's one of the areas that

14   we'll look at.  If we see medical director gaps or behavioral

15   health director gaps across regions, as we seek some of the        14:27:29

16   feedback from the regional office about their coverage, that

17   will likely lead to some of our recommendations of how you can

18   provide that on a broader scale than facility by facility.

19   Because when you have small staffing, that is likely one of the

20   ways that you fill those gaps of departures or turnover or          14:27:49

21   vacation, that we'll look into.

22        And then the behavioral health on this side was red

23   and red.  Again, with 100 percent turnover.  So there are some

24   issues there to be addressed.

25        We'll go to the next.                                          14:28:10

UNITED STATES DISTRICT COURT

1        MS. KENDRICK:  Excuse me, before we move on, shouldn't

2   under medical providers for compliance, it actually be red

3   because it's 36 percent, which is less than 50?  Because on the

4   previous chart it was red.

5        MR. MILLAR:  That's right.                                    14:28:23

6        Can you shift back, Rene?

7        I think that is a -- yep, that is a formatting

8   correction.

9        MS. KENDRICK:  Okay.

10        MR. MILLAR:  That is correct.                                14:28:31

11        MS. KENDRICK:  Okay.

12        THE COURT:  Good catch.

13        MR. MILLAR:  Rene, if we can just jump right at this

14   moment -- can we go to the very end?  Can you just confirm that

15   we have that in red on the final summary page as well for --     14:28:45

16        That was Eyman; correct?

17        MS. KENDRICK:  Douglas.

18        MR. MILLAR:  Yeah, okay, we're good there.

19        Okay.  We can go back to Florence.  Or -- there we go.

20        Okay.  So here in the Eyman Complex, medical                 14:29:00

21   providers, behavioral health, similarly red, yellow, green or

22   red, yellow, blue, a common pattern that we're seeing.  And,

23   again, we would take that into consideration and look at the

24   different characteristics of how it compares to the other three

25   facilities in its cohort grouping, and what that informs of the   14:29:29

1  others as well.

2       So, again, part of what you're seeing is our

3  methodology manifest.  It's a way to take a very complex set of

4  data elements and begin to group them in ways that we can

5  recognize patterns and associations, and be able to ask

6  questions.

7       Okay.  Moving on.

8       Florence Complex.  A little bit better than some of

9  the others with the yellow, yellow, green.  But still in

10  behavioral health a red, yellow, blue pattern.

11       So, again, taking into account some of these would be

12  expected because as a reminder we are in that red supply group

13  where there are some fairly significant challenges within these

14  marketplace.

15       And the final, the Yuma complex.

16       This is one where there's a little bit of pause,

17  because you see a bit of a disconnect.  On the behavioral

18  health side you see 85 percent compliance, paying at a premium

19  at the 75th percentile, with a midrange turnover.  But then on

20  the medical side 50th to 75th percentile, so some premium pay

21  there.  But the physicians were below the median, the

22  director's at the median.  Very low turnover.  So there are

23  staff there that stay there.  But you're only meeting your

24  staffing compliance 30 percent of the time.

25       So is this a market factor, you just can't find

14:29:47
14:30:04
14:30:20
14:30:47
14:31:11

1   another provider to fill that slot in that market because of

2   its rural location?  Or is this one that was consistently

3   covered by a regional FTE that we -- that doesn't manifest in

4   the data?

5          But that's one that jumps out as a bit of an oddity,          14:31:32

6   where you have two greens and a red.  So that would be one that

7   we would look into as well.

8          And to our final page, the combined summary.

9          This is actually where I start my analysis or thinking

10  or conversation with the data, as it were.  Because this is          14:31:56

11  where it puts all of the patterns in front of me.  Very, very

12  telling.

13         On the behavioral health side where there is

14  compensation bench marking data, it's always at a premium of

15  greater than the 75th percentile.                                    14:32:12

16         So we had the question early on, you know, is this an

17  issue of not being able to meet supply demand because of

18  compensation constraints?  You know, you can't pay much higher

19  of a premium than you are for behavioral health, so then that

20  leads us to have to ask different questions.                         14:32:32

21         But there's some real similarity between all of those.

22  The turnovers, middle of the road for all but two of the

23  facilities.  And that may be a small numbers problem.  But with

24  the exception of Yuma, all in the red as far as compliance, and

25  not many even approaching close to that 50 percent mark.            14:32:53

UNITED STATES DISTRICT COURT

1        And so there is something common amongst all of the

2   behavioral health staffing that we will be trying to find

3   questions -- or answers to the questions of why.  Where are the

4   commonalities?  Are they for the same reasons or for different

5   reasons?  And then hopefully be able to bring to the Court some     14:33:14

6   recommendations and some key questions of how to move forward.

7        On the medical side, it's a little bit more of a mix.

8   The very interesting thing is to see how common the Safford and

9   Winslow elements are with their situation.  You can see Douglas

10  is similar to that.                                                 14:33:38

11       Tucson's quite a bit different.  Tucson's got that

12  flip flop where they're staffing well, but high turnover, and

13  they've found a way to keep the new providers coming in the

14  door.

15       Again, from the compensation side, nothing in the red.        14:33:57

16  So paying on average median or better.

17       We do know that there are occasions where for the

18  staff physician positions and the medical director positions,

19  that it's not at median.  So we will attempt to quantify that

20  to be able to identify if that is an area that you're having       14:34:14

21  compliance issues to keep staff in and you're consistently

22  under median that there needs to be -- there needs to be a

23  question asked and addressed of how can that be adjusted or

24  worked through?

25       Let me pause here at this point, with kind of all ten         14:34:31

—CV-12-601-PHX-DKD – May 9, 2018—

1   of the facilities up there, and ask if there are any questions

2   or comments or concerns that immediately have come to mind

3   during this presentation.

4           MS. KENDRICK:  I have a question about the turnover

5   category.  Do you guys do any sort of breakdown between the         14:34:54

6   turnover due to individuals being terminated versus people

7   quitting?

8           MR. MILLAR:  Rene, did you hear the question?  Can you

9   respond?

10          MS. SOBOLEWSKI:  I did.                                       14:35:07

11          No, in the data all we can see is their start and term

12   date.  But that's not necessarily the end of their contract and

13   they chose to depart.

14          So the answer is, no, we're not able to differentiate.

15          MS. KENDRICK:  Okay.  Thank you.                              14:35:20

16          MR. LONG:  We are planning on speaking to a number of

17   former employees, so if we get some anecdotal evidence as to

18   reasons for leaving.  Because we know there's -- it's not

19   always -- leaving is not necessarily always dissatisfaction

20   with the job.  So we are going to dig into that with our           14:35:44

21   interviews.

22          MR. MILLAR:  Any questions?

23          MR. BOJANOWSKI:  No, not at this time.

24          MR. MILLAR:  So, again, as I stated at the beginning,

25   what we would ask of the parties is that with this now third       14:36:00

UNITED STATES DISTRICT COURT

─── CV-12-601-PHX-DKD ─ May 9, 2018 ───

1   report, and the other two that you received, if over the next

2   ten days, between now and the 18th, you can look at this to

3   highlight where there are things that are -- you think may be

4   inconsistent or may be not representing accurately what things

5   look like, or areas that you think that would require some more        14:36:24

6   enlightenment or elucidation, please let us know.

7           Okay.  Rene, if we can move to the next slide.

8           This is our interview update.

9           I'm going to ask Miss Sobolewski to give us an update

10  on that.  She and Mr. Long have had the lead on scheduling           14:36:43

11  these, once we identified a list.  And I think Miss Sobolewski

12  will tell us how large that list was, and where we stand on the

13  process towards our goal date of completion this Friday the

14  11th.

15          MS. SOBOLEWSKI:  Sure.  Thanks, BJ.                           14:37:02

16          So as you mentioned, we have requested and completed

17  several phone interviews to basically capture those qualitative

18  insights to pair with the quantitative data.

19          Sometimes in the quantitative data, as we've mentioned

20  today, you're unable to see some of the nuances that are taking       14:37:21

21  place.  So is there coverage?  Was that staffing level

22  necessary?  Different elements like that that we've been able

23  to pull out of some of the interviews.

24          So in this update I'll describe our methodology, how

25  many interviews have been completed, and really what our next        14:37:38

1    steps are to be able to reach the finish line.

2           So through our analysis we have identified individuals

3    of different provider types, different sites, and different

4    tenure for whom we'd like to speak to and better understand

5    their experience working for Corizon and in the Arizona      14:37:54

6    Department of Corrections.

7           So this way we'll be able to draw those conclusions

8    based on their qualitative experience and be able to see

9    experience through many different lenses, based on position,

10   based on, like I said, different sites, and just number of   14:38:10

11   years that they've been with Corizon or in the Arizona

12   Department of Corrections.

13          So we've requested a total of 26 phone interviews.

14   And so far we've completed six, with another three scheduled

15   for tomorrow.                                                 14:38:25

16          And our contact has been Jennifer Finger at Corizon

17   who has worked to schedule these interviews and is in the

18   process of scheduling the rest of them.

19          I say that seven of the remaining interviews are with

20   individuals that have left Corizon within the past year.  So we  14:38:37

21   are struggling to make initial contact with these individuals

22   via e-mail.  However, we will be contacting them directly

23   through cold calling them by phone if we don't hear back by

24   tomorrow.

25          And I think that we've actually even since the         14:38:53

UNITED STATES DISTRICT COURT

1    beginning of this court report that we've gotten a couple of

2    responses.  So we're hopeful to be able to get the input from

3    the position -- or some of the providers that have since left

4    the organization to understand some of their reasons for

5    leaving and, you know, their experience now outside of the ADC          14:39:08

6    and Corizon workspace.

7              So I'll pause there for a second if there's any

8    questions on who we've asked to be interviewed and the number

9    of test points we've had thus far.

10             THE COURT:  Well, I think --                                   14:39:26

11             MS. KENDRICK:  What --

12             THE COURT:  I'm sorry, go ahead, Miss Kendrick.

13             MS. KENDRICK:  What is the source of the names of the

14   seven people who left in the past year?

15             MS. SOBOLEWSKI:  The source was from our data              14:39:34

16   analysis.  Basically finding individuals across a broad range

17   of experience.  We've seen some individuals that were working

18   far over 40 hours per week that left within six months.  And

19   then we saw some that were very inconsistently staffed.  We

20   tried to really identify people across a broad range of sites         14:39:56

21   and different provider types to understand the experience and

22   get a broad range of perspective.

23             MR. MILLAR:  It was the combination of the payroll

24   data and the Kronos data that showed their working patterns

25   that then my team went through and we looked at those, and at        14:40:13

1    each of the position levels.  As we began to look at this, we

2    said where do we need to have some insights and identify them

3    at that level.

4         THE COURT:  I think these interviews can be very

5    informative, because they may well answer a question that the          14:40:32

6    data doesn't answer, and that is, when you've described the pay

7    that it's at 75th percentile, I may be reading too much into

8    what you said, but sounded as though you were saying that it

9    couldn't be that it's a compensation issue because we're at

10   75 -- the 75th percentile.                                              14:40:56

11        But it may well be that the people in the field say,

12   well, that is true -- or while that is true, our own experience

13   is, that's not enough, meaning that the premium is far short of

14   what they would find necessary.

15        And I think the only way to find that out is to ask          14:41:15

16   the people.  Because otherwise you're just relying on the data

17   that shows, indeed, it is higher.  And so that would maybe

18   suggests that you would be able to get the numbers that you

19   want in any other circumstance, but maybe this is an unusual

20   circumstance because of the environment.                               14:41:31

21        MR. MILLAR:  Correct.

22        And I think, Miss Sobolewski, also there was

23   one -- there was one, I think it was a nonphysician provider

24   that we had identified as well, that I think at the time we had

25   identified them we didn't realize that they were going to          14:41:47

—— CV-12-601-PHX-DKD – May 9, 2018 ——

1    appear in court as part of the ongoing proceedings.  And so it

2    was requested of Corizon that we not include them on this

3    interview at this time, and we agreed that that was

4    appropriate.

5            THE COURT:  Okay.  Well, if it's possible, when that      14:42:03

6    person does come to court, if you want to listen in and to send

7    us questions that you would have asked as part of your normal

8    process, and you think we can do that there to assist you,

9    we'll be happy to do that.

10           MR. MILLAR:  Okay.                                        14:42:20

11           MS. SOBOLEWSKI:  And to give you -- I'm sorry.

12           MR. MILLAR:  Go ahead.

13           MS. KENDRICK:  No, I was --

14           MS. SOBOLEWSKI:  To give you a --

15           MS. KENDRICK:  I was asking, who is that person?         14:42:31

16           MR. MILLAR:  Do you recall, what's the name of that

17   individual, Rene?

18           MS. SOBOLEWSKI:  Her name is Angela Fischer.

19           THE COURT:  And she's scheduled to testify on the 31st

20   of May.                                                          14:42:46

21           MR. MILLAR:  Go ahead, Rene.

22           MS. SOBOLEWSKI:  So just to give you a taste for

23   what's been covered in these interviews, to your point,

24   Judge Duncan, we have asked each individual to describe their

25   typical work day, to describe how they interfaced with other    14:43:03

UNITED STATES DISTRICT COURT

1    staff members, their level of job satisfaction, and if they had

2    enough resources to be successful in their role.  And usually

3    end the discussion with what, if anything, could improve your

4    experience with Corizon or working in the Arizona Department of

5    Corrections.                                           14:43:22

6         So we plan to share the results of these phone

7    interviews prior to our June report out, as well as tie

8    together these findings with our data analysis to be able to

9    draw conclusions and develop those recommendations that we'll

10   share with you in our final presentation.             14:43:36

11        So, also in addition to the phone interviews, we've

12   created an on-line survey to create feedback from all current

13   employees of those provider types that we've determined are in

14   scope for our analysis, simply so that we can really cast that

15   wider net and gather as much input as possible.       14:43:53

16        So I think we sent the survey last Friday to 172

17   current employees, and have so far received about 52 responses.

18   So we'll send a few more reminders e-mails prior to closing out

19   the survey by the middle of next week.  And will use that to

20   combine with the phone interview input as well.       14:44:12

21        MR. MILLAR:  Very good.  Thank you.

22        We'll move to our next step slide.

23        So as we look towards what would be the next 35 days,

24   these are the steps that we have to complete in order to meet

25   the request of the Court.  We'll finalize our analyses based on  14:44:33

1    any feedback that come from the Court or the parties of the

2    court.  We'll finalize the phone interviews and the Survey

3    Monkey -- that's actually the tool we use.  So that is actually

4    a tradename.  And then aggregate those results.

5            My team will then work to establish our final                    14:44:51

6    recommendations in a combination of the qualitative and

7    quantitative data.  We will work to follow that format, Judge,

8    that I outlined for you earlier, with findings and

9    observations, recommendations, and additional questions.

10           And then we're scheduled for our final court report         14:45:11

11   out on Wednesday, June 13th.  As I indicated it's our intent no

12   later than Wednesday June, 6th, that we would have the final

13   report materials for the Court.

14           They will probably be in two forms.  There will be a

15   PowerPoint presentation that allows us to make the final report    14:45:31

16   out here in the Court.  But we're also taking all the

17   information that's been compiled across all of the PowerPoint

18   slide decks into a Word document that can be submitted to the

19   Court as a final deliverable for the work that you've

20   contracted for us.                                                  14:45:51

21           THE COURT:  Okay.  Good.  Thank you.

22           We will do our best, everybody, I'm sure, to get you

23   the feedback on the market profile and the staffing profile

24   information that you requested by the 18th of May.  And we'll

25   look forward to the next report.                                   14:46:06

1          Are there any additional questions for Mr. Millar?

2          MS. KENDRICK:  Well, Mr. Millar, yesterday the

3    defendants provided to the Court and plaintiffs' counsel a new

4    staffing plan for the next year for the Department.  And I

5    don't -- it may be too late for you guys to incorporate any          14:46:23

6    sort of analysis or comments into that.

7          But one of the things that we noticed is some of these

8    higher-level positions, such as physicians, medical directors,

9    are being cut back in terms of what the contracted amount is.

10   And so I don't know if, given the time crunch, you guys would        14:46:39

11   be at all able to opine upon that, or if it would impact your

12   analysis.

13         MR. MILLAR:  Two comments.

14         I think we -- we would be glad to take a look at it at

15   a macro level.  Because the data that we're using is the 2017        14:46:57

16   data, it would be difficult to integrate it into the rankings

17   that we've had.  But I believe that we can take a look at that

18   at least opine on what those shifts entail.

19         But, again, that goes to the question of, is the

20   staffing level sufficient, which is not the question we've been      14:47:18

21   asked.  We've just been asked, are the staffing levels --

22   budget staffing levels being met.

23         So at that level it's a little bit beyond our ability

24   to do anything other than just observe.

25         It may be the case that, you know, this year there             14:47:34

1    were 20 directors and staff physicians, and the overall

2    staffing was at 15.  And the new proposed staffing is at 18, so

3    the variance to budget was three FTEs, not five.

4         But beyond that, it would be difficult to take it down

5    to a facility level or to really use much of that to inform, I        14:47:59

6    think, our recommendations.

7         THE COURT:  Well, I think at some point we'll have to

8    address this issue, because the next steps will have to reflect

9    the current landscape.  And to the extent that the new contract

10   defines that landscape, and to the extent that we have an           14:48:21

11   expert who might be able to give us some insight about that,

12   we'll have to figure out a way how to get that insight from

13   you.

14        MR. MILLAR:  Okay.

15        THE COURT:  Also, the other aspect of it is, I               14:48:31

16   understand that you just learned about this today, we learned

17   about it I think yesterday, but I had contemplated that there

18   would be some discussion today after your presentation, not

19   knowing whether or not your flight schedule would be that you

20   would be present in the courtroom to be able to hear it.  But I    14:48:54

21   think there needs to be some discussion between you and Corizon

22   and/or the Department as to what this means.  Because it's

23   cryptic to us, at least in my first review of it.  And I don't

24   know whether I'll be able to get a better sense of what it

25   means in the time that will follow immediately your              14:49:17

1    presentation now.

2          But I think that everybody in this room needs to

3    understand what that document means, because this is a focus of

4    the Court with respect to the staffing question.

5          MR. MILLAR:  Okay.                                    14:49:35

6          THE COURT:  And so to the extent that you can be

7    involved in this dialogue and maybe point us in the right

8    direction, or suggest that we don't need to be concerned about

9    it because it's not something that is dramatically different

10   than what's been before, that would be helpful.             14:49:52

11         MR. MILLAR:  Okay.  And I think the Court indicated

12   that we would get -- we would be provided a copy of that

13   document.

14         THE COURT:  Yes.

15         MR. MILLAR:  So that we can -- yeah, we'll look at    14:50:03

16   those.  We'll take it under consideration.

17         And then what I'll commit to you, Judge, is that we

18   will get a response back that either we believe that this

19   merits additional discussion and understanding, because of its

20   impact on our findings and recommendations, or if we believe  14:50:21

21   it's impact is negligible.

22         THE COURT:  Are you table to stay here for a little

23   bit today yet?

24         MR. MILLAR:  I am.

25         THE COURT:  Can I give you this?  This is it.  You    14:50:34

—CV-12-601-PHX-DKD — May 9, 2018 —

1    don't have to wait for it to come to you.

2         What I'm handing to Mr. Millar is the document 2799

3    filed by the defendants yesterday.

4         All right.  Thank you, sir.

5         MR. MILLAR:  You're very welcome.                    14:50:53

6         THE COURT:  And thank you everybody on the phone.

7         MR. LONG:  Thank you.

8         MR. MILLAR:  So there's going to be more discussion of

9    this right now that I --

10        THE COURT:  Yes.

11        MR. MILLAR:  -- could be privy to if I can remain here

12   and listen for a while?

13        THE COURT:  Yes.

14        MR. MILLAR:  Okay.  I'll be glad to do so.

15        Thank you.                                           14:51:12

16        THE COURT:  I guess there are a number of questions

17   that arise associated with this adoption of a year contract

18   with Corizon.

19        One of them is related to the request that I had filed

20   earlier this week asking the defendants to inform the Court  14:51:31

21   about whether or not the $30 million request that would be

22   included in the new budget had ultimately made it to the final

23   budget.

24        Since the time of my request I understand that

25   available on the public website for the State of Arizona is   14:51:57

1   information that suggests that the $30 million wasn't realized,

2   but that there was a $15 million increase.

3         When I look at those numbers and compare them to what

4   Director Ryan said, and what I quoted in the order, he gave a

5   number that doesn't reflect what is reported in the news about          14:52:25

6   the total value of the contract.

7         The news reports that it's $188.6 million.  And the

8   Director Ryan said that the current budget was $148.8 million.

9   And so if I added $30 million to that, what he had talked

10  about, it would be 178.8.  But if it's just $15 million, it's          14:52:54

11  163.8.

12        So I've got these different numbers.  I would

13  appreciate, the first instance, before we go to the specifics

14  of the contract, to the extent that we can in terms of the fact

15  that we've only just received the information now, I wanted to         14:53:15

16  get an answer to this overall question about what the total

17  cost of the contract is and how that relates to what

18  Director Ryan was telling me about what the current budget was

19  and what the additional request was for.

20        Can somebody on the defendants' side illuminate these           14:53:32

21  issues?

22        MS. LOVE:  Your Honor, the only thing that we're able

23  to report at this time is that, consistent with what

24  Director Ryan testified to, it is anticipated, as projected in

25  and set forth in the pleadings, the contract -- the new               14:53:48

147

1   contract amendment and the competition impracticable, that it

2   is estimated that the increase of -- the increase of this new

3   amendment is approximately 29 million, as to Director Ryan, as

4   he testified 29 or 30 million.  And then also in the

5   competition impracticable it also gave a number of 32.6                  14:54:10

6   million.

7           There is variance in the projected estimated total

8   value because of differentials like population fluctuations, as

9   well as Medicare reimbursement, and as well as the increased

10  per diem rate that also fluctuates with the population.                   14:54:30

11          As to the $30 million projection and the 15, we are

12  not privy to any further information as to that differential at

13  this time.  If we do get further information on that, we'll

14  certainly provide it to the Court.

15          THE COURT:  And I don't have the ability to talk with            14:54:49

16  you precisely about that, because I'm just relating what I've

17  been told what is available on public websites.  But apparently

18  there are places where there was a time where there was a

19  $30 million number that was consistent with what Director Ryan

20  had said, and that at the final budget that number turned to              14:55:10

21  15.

22          So I'm just trying to understand a better sense of

23  what the State's overall commitment is to increased funding for

24  health care in light of the circumstance that we have in this

25  case, where there is a failure to meet promised provision of              14:55:28

—— CV-12-601-PHX-DKD – May 9, 2018 ——

1   health care pursuant to the stipulation.

2           So I need to have a better sense about that.

3           And it may be after Miss Kendrick has provided a

4   filing that raises some questions about it.  And obviously she

5   has done some analysis.  But there needs, I think, to be an                14:55:51

6   opportunity for the defendants to respond so that maybe you can

7   use that format of communicating with the Court so that I can

8   understand more precisely what the circumstances are, what the

9   budget is this coming budget year as compared to last budget

10  year, what the real differences are, if any.  And also                     14:56:18

11  understand that foundation so that I can be involved in the

12  discussion about what Miss Kendrick has suggested may be a

13  topic of discussion, where it appears that there are some items

14  in what the defendants have filed with respect to the new

15  contract that appear to be in conflict with the stipulation;               14:56:42

16  the dental –– the dentist, for example.

17          Miss Kendrick.

18          MS. KENDRICK:  Well, Your Honor, first of all with

19  regard to the amount of the increase, what plaintiffs' counsel

20  are privy to are the official State of Arizona documents that              14:56:59

21  were filed with the Court, specifically at docket 2800-1, what

22  they called the competition impracticable document.

23          And under estimated cost it says, total increase will

24  be around $32.6 million because they're raising the per inmate

25  per day –– the per diem from $12.54 to $15.164.                            14:57:23

CV-12-601-PHX-DKD – May 9, 2018

1       And so those numbers are just what defendants or I

2   guess the procurement office has stated publically.  So that's

3   where I think 32.6 million increase came from.  So it says the

4   total contract value is 188.6 million.

5       Your Honor referred to a Declaration that I filed this        14:57:51

6   morning which did set out the analysis that we had from looking

7   at the chart that they filed with Amendment 15, the one that we

8   looked at briefly earlier with regard to the clinical

9   coordinators, and comparing it to the March 2018 staffing

10  reports.                                                          14:58:13

11      I will get into that shortly, but as an initial

12  matter, while we were in court this morning at 9:47

13  Mr. Bojanowski filed with the Court a Declaration signed under

14  penalty of perjury by Mr. Pratt.  And the things that Mr. Pratt

15  swore to he said were true.  But, in fact, they are false.       14:58:33

16      And it appears to be attempting to contradict what I

17  had stated.  But when you look at it compared to my Declaration

18  that was filed at docket 2802 it, in fact, appears that

19  Mr. Pratt's attempting to refute a news article that was

20  published yesterday by KJZZ, and attributes to me some quotes    14:58:54

21  that -- attributes as quotes or statements made by me and the

22  Prison Law Office that were not the case.

23      And so, therefore, we're asking the Court to move to

24  strike Mr. Pratt's Declaration because it contains multiple

25  falsehoods.                                                       14:59:15

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – May 9, 2018

1          First of all, it claims to refute a policy statement

2    that I made at paragraph 9.  But what it's apparently working

3    off of is an article titled Arizona Department of Corrections

4    Extends Prison Health Care Contract with Corizon that was

5    published yesterday at kjzz.org.                                      14:59:29

6          Paragraph 11 of Mr. Pratt's declaration quotes

7    me -- says that I am quoted as saying that the 20 percent

8    increase was surprising.  That is a direct quote from the news

9    article.  However, then he trots out that discredited argument

10   that this is not accurate because overall they're in compliance     14:59:49

11   with most of the 849 instances of non-compliance.

12         And as it's been made abundantly clear to defendants,

13   that's not what we're looking at.  That's not relevant.

14         Paragraph 12 of his Declaration states that, quote,

15   the PLO states that when pressed in court about previous per         15:00:11

16   diem increases, Arizona Department of Corrections Director

17   Charles Ryan called them the price of doing business.

18         If you look at the actual article, I did not say that.

19   The reporter is quoting what Mr. Ryan said in open court a

20   month ago.  So this should not be attributed to me.                  15:00:29

21         It then appears to just cut and paste in paragraph 12

22   directly from the news article where there are affirmative

23   statements saying that the contract specifies more than

24   5 million for hepatitis C treatment.  That is true.

25         It then quotes the news article where it incorrectly           15:00:47

UNITED STATES DISTRICT COURT

1    states that at a recent hearing a Corizon employee estimated

2    that more than 80 percent of inmates had hepatitis C.

3          What Dr. Stewart testified was that he told you that

4    he thought 80 percent of the people at Eyman had hepatitis C.

5          So then Mr. Pratt appears to refute this and says,          15:01:05

6    quote, the PLO and the Corizon employee are wrong in their

7    estimations of the total number of hep C infected inmates.

8          I never said that.  That was a statement made by a

9    Corizon doctor under penalty of perjury what he thought was the

10   case at Eyman.  So, again, this is another falsehood in his       15:01:20

11   declaration.

12         Then at paragraph 13 they attribute quotes to the

13   staffing expert, without citing the source for it, so there's

14   no way to know whether or not it's true.  But they do concede

15   that they are cutting the number of physician positions and      15:01:36

16   adding midlevel practitioners with less training.

17         So they don't refute what I had asserted in my

18   Declaration or what was stated in the news article.

19         Paragraph 14 is where we get into defendants' creative

20   interpretation of compliance with the contract, and that's with  15:01:57

21   the dentist positions.  Our settlement agreement clearly says

22   that defendants are to have 30.0 dentist positions.  And they

23   do admit that they have cut this to 26 FTEs, but they justify

24   it by the fact that this is above 85 percent of the threshold.

25         And as the Court is well aware, this 85 percent            15:02:19

1    doesn't mean that defendants can choose 15 percent of class

2    members who won't receive medical care, or decide that 15

3    percent of the time people don't get dental care.

4         These requirements are things that they are supposed

5    to achieve to -- aim to achieve at 100 percent.  The 85 percent          15:02:36

6    is what triggers the Court's involvement.

7         So it is in utter and complete bad faith for them to

8    say that it's okay to cut the number of dentists from what they

9    agreed upon to 26 instead of 30, which was what the parties had

10   agreed to.                                                                15:02:56

11        There's case law that says that you can't just pick a

12   group of a class to not serve.  And our position is that's what

13   they're doing.

14        The other matter is that with those other Performance

15   Measures regarding staffing, which are Performance Measures 1,            15:03:09

16   2 and 4, the Court has taken the position that the defendants

17   can't take a partial credit approach.  If they are now taking

18   this sort of approach that it's okay to have 26 instead of 30,

19   then our position would be that, again, is taking a partial

20   credit approach.                                                          15:03:27

21        Finally, going down, paragraph 16 of Mr. Pratt's

22   Declaration, he then says -- he states that the PLO asserts

23   that ADC and Corizon staff have testified in Federal Court that

24   the lack of provider positions is having a negative impact on

25   inmate health care.                                                       15:03:48

1      Again, they are asserting a neutral statement made by

2   the reporter in his news article to me.  While that is true

3   that people have testified at length about the impact on inmate

4   health care due to not getting proper treatment, in no way did

5   I assert this.                                              15:04:07

6      Defendants then do go on to admit that they're cutting

7   the number of FTE physicians by 2.8, which in our mind, when

8   you combine that with Mr. Millar's analysis, it will perhaps

9   take them out of the red or the yellow zone and make them look

10  a little more green if they just keep cutting the number of   15:04:23

11  provider positions.

12      Finally, paragraph 17, again is talking about the

13  statements regarding the Phoenix prison that were in the news

14  article, but that is also in my Declaration.  They do admit

15  that there are more than five FTEs being cut in one category   15:04:43

16  alone.  As detailed in my Declaration there are multiple other

17  mental health positions that they are cutting, including the

18  psychiatrist.

19      And so, again, I think that this is yet another

20  example of when they are admitting that the actual facts and   15:05:04

21  the numbers are correct, that they're cutting it, but just --

22      Again, this Declaration has a bunch of statements in

23  it that are supposedly asserted to me or to my organization

24  that were not made by me or my organization.  To the extent

25  there are any inaccuracies, those were not things that came out  15:05:26

——CV-12-601-PHX-DKD – May 9, 2018 ——

1    of my mouth but were in the news article itself.

2              So we are going to ask the Court to strike Mr. Pratt's

3    Declaration.  It's unclear if he even read it, since he was in

4    court when it was filed with the Court.  But statements under

5    penalty of perjury, that means something.  And these are        15:05:46

6    careless and reckless and false mistakes that are made in

7    Mr. Pratt's declaration.

8              THE COURT:  I have two responses to what you've said.

9              You filed a document with the Court in which you

10   raised questions about the new contract, and you made certain   15:06:06

11   assertions therein.  The defendants decided that they wanted to

12   respond to that, and they chose to respond to it by way of

13   including Mr. Pratt's declaration.

14             You have just articulated reasons why you think that

15   some of those positions asserted in the defendants' filing are  15:06:28

16   not valid.  You've asked to strike it.

17             But the reality is, you get the opportunity, just as

18   they got the opportunity, to respond.  So you can file a reply.

19   In some ways you can say that you've just given me the reply,

20   but I'm not going to hold you to do that.  I'll give you the     15:06:46

21   opportunity to respond in a way that is not in such a break

22   neck pace and having to do it on the day of the filing without

23   having an opportunity to do what we usually do, and that is to

24   be more deliberate and to set things out in writing.

25             So you'll have an opportunity to file that, that      15:07:05

UNITED STATES DISTRICT COURT

155

1   reply.

2           The second thing that I would have to say is, I don't

3   really need to be so focused on whether there are issues that

4   are arising out of incorrect, as you say, recitations of what

5   happened in a press report, because I have actual testimony          15:07:25

6   here.  I have actual filings with the court.

7           I use the press to alert me of areas to bring into

8   court so that can he can use the Rules of Evidence and the

9   rules of the Court to explore areas that are worth exploring.

10  And I don't rely on, as I don't think you do either, or           15:07:45

11  anybody, as what is the meeting the standard, a very strict

12  standard, that we apply in court.

13          So we are very thorough about evidentiary standards

14  before we take action on matters in court.

15          I do need to figure out a way though to                   15:08:04

16  understand -- you say at the very start that the contract talks

17  about an additional amount that results in about $30 million

18  for Corizon under the contract.  I can't tell whether that's

19  the same amount of money that the Director was referring to

20  when he testified.                                                 15:08:30

21          So I don't understand whether or not this -- the

22  numbers just presently don't add up, because the number that

23  Director Ryan cited to me is less than the number that is the

24  Corizon contract.  So presumably the State asked -- the

25  Department of Corrections asked the State to fund it at a level   15:08:51

1    that I presume is not necessarily exactly linked to what the

2    Corizon contract is.  Maybe it is, I don't know.

3           But I do think I need to find out exactly where we

4    stand with respect to what Director Ryan told me before, what

5    his hope and expectation was, and whether or not that was                15:09:10

6    realized.

7           And I'd ask the defendants to let me know that.  And

8    from what Miss Love said, is that she's not able to give me the

9    answer to that question, as to whether or not the $30 million

10   that Director Ryan was referring to has indeed been perfected           15:09:28

11   in the final budget, or whether it was reduced to $15 million.

12          I'd like to know the answer to that question, because

13   that's something that happened right in front of me, two feet

14   away from me.  So I can know what the nature of that is.  And

15   to the extent that there are additional questions, I would like         15:09:47

16   to have the answers to those so that I can better understand

17   it.

18          I think it makes sense --

19          Miss Love, you've heard what I've said and what the

20   problem I've had.  Am I right in assuming that you don't have           15:10:08

21   the answer to the question that I was aiming for?

22          MS. LOVE:  You're correct, I do not have the answer at

23   this time.  But as soon as we do have the answer, we will

24   certainly provide it to the Court.

25          Yesterday when we provided this filing to the Court,            15:10:22

157

```
 1    it was literally probably within 30 minutes of us receiving the
 2    information.  But we do understand your question as to the
 3    differential in the monetary, and as soon as we have the answer
 4    to that we will provide it to you.
 5              THE COURT:  All right.  So what I'll do now is on this        15:10:38
 6    issue of the new contract, I think that -- I'm trying to figure
 7    out what the order should be with respect to who should file
 8    what first, because I want to give both sides an opportunity to
 9    try to educate me in this mechanism of filing.
10              So I think what we'll do is this:  The plaintiffs will        15:11:07
11    have an opportunity to file whatever they want on this subject,
12    responsive generally to what was filed by the defendants today,
13    but addressing the subject of what the meaning is of the new
14    contract.
15              Then in five days the defendants will have an                 15:11:30
16    opportunity to respond to what the plaintiffs have filed.  And
17    then three days thereafter the plaintiffs can file a response
18    to what the defendants have filed.
19              I think that will be a good way to help get this
20    information presented in a way that will be helpful for me to           15:11:50
21    better understand the questions that exist, and other
22    observations that people may make about the significance, if
23    any, of the changes that are set forth in the new contract.
24              MS. KENDRICK:  Your Honor.
25              THE COURT:  Yes.                                              15:12:09
```

1        MS. KENDRICK:  I don't know if they can do this, but

2   in the past when they've changed or amended the contract, the

3   defendants and Corizon provide a breakdown of the budget where

4   it actually shows the allocation of where money is going.  So

5   there's line items for staff, line items for training, line          15:12:24

6   items for specialty care, every component you would need of a

7   functioning health care system.

8        And here in Amendment 15 there is no such budget

9   breakdown, so we have no idea, you know, of the 30 million

10  increase, how much of it is actually going to hire new staff,        15:12:41

11  how much is going to this or that.  The only breakdown that we

12  have at all is -- in Amendment 15 is $5.1 million.

13       So this absence of information also impacts our

14  ability to do any sort of analysis, because we can't tell you,

15  well, Your Honor, two years ago they had budgeted X amount of        15:13:02

16  dollars for staff, and this year they budgeted Y amount for

17  staff.  We can't assume that that addition 30, 27, whatever

18  amount it is, is all going to staff or to medication or what.

19       So we would ask that the State provide that sort of

20  breakdown so that we can look at that and analyze it.               15:13:20

21       And just, sir, one final point about this Declaration

22  of Mr. Pratt.  You were correct to state that we are in court

23  and we have high standards, and we have high standards of

24  evidence.  And Mr. Pratt's Declaration fails every single one

25  of them.                                                            15:13:40

1      The point is that there are number of statements in

2   his Declaration that are falsely attributed to me, and he

3   signed that Declaration -- or somebody put his signature on the

4   Declaration under the penalty of perjury.  And, therefore,

5   that's why we move to strike it, because there is a number of          15:13:53

6   false statements in there.  It doesn't matter whether it's from

7   a news article or the like.  I did not say those things, and he

8   says I did.  And, therefore, it needs to be stricken.

9      THE COURT:  Well, you can make that -- you can make

10   both of the points that you just made in the filing that you          15:14:08

11   submit.  The first point being you're asking for a budget

12   breakdown to see if one exists, you can make that request, and

13   give an example of how it's been provided in the past.  And

14   then the defendants have an opportunity to respond to that.

15      And also you can make your second argument about why           15:14:24

16   the Court shouldn't consider anything that's set forth in

17   Mr. Pratt's Affidavit.

18      I just would say that the focus should be not so much

19   on whether or not -- to the extent that he makes what you think

20   is something that's not incorrect, point that out, incorrect          15:14:43

21   information.

22      But incorrect information that is -- that you, as

23   described, you believe may be as you use the words cut and

24   pasted from a news article, that's not going to be a battle

25   that's going to be particularly helpful to the Court, because         15:14:59

1   the Court's going to understand that oftentimes things are not

2   accurately reported in the press, or because they're reporting

3   what other people are saying about things, that it's not

4   getting it from what we have here in court, the people who have

5   the foundation and the competency to testify about matters that     15:15:20

6   they have personal knowledge of.  Oftentimes, understandably,

7   that's not the standard that is employed in the press.

8           So focus, I think, on what are the issues at hand and

9   that is trying to understand the implications, if any, of this

10  new contract with respect to how the Court will be going           15:15:42

11  forward with trying to bring about a resolution of the promises

12  in the stipulation.

13          And I guess I have to say, I can't comment further on

14  anything that you've said, Miss Kendrick, because I haven't

15  read it.  And so I don't think it's wise or prudent for me to      15:16:05

16  make any kind of preliminary or even any kind of comment on

17  anything about it, because I haven't read it.

18          And so I'll have a chance to do that, and also have a

19  chance to consider the papers that the respective sides file on

20  the schedule that I've outlined to help me understand the          15:16:25

21  implications of this new contract extension.

22          MS. LOVE:  Your Honor --

23          MR. FATHI:  Speaking of the schedule, Your Honor, I

24  don't believe you gave plaintiffs a time limit for the initial

25  filing, or if you did I missed it.                                 15:16:37

1          THE COURT:  You're right, I didn't.

2          How much time do you need to do that?

3          MR. FATHI:  Could we have two weeks, Your Honor?

4          THE COURT:  Do you really need two weeks?  I mean, is

5    there some reason that you can't focus on this on a sooner          15:16:53

6    time.  I mean, if there's something that's going on in your

7    court calendars or your life calendars.  But it just seems --

8    as can you see, I've cut the dates very short with respect to

9    the dates that I did identify, five days and then three days.

10   I'd like to --          15:17:08

11         Miss Kendrick I think gave us all the outline, she

12   just needs to fill it in.

13         MS. KENDRICK:  I have a vacation planned, sir --

14         THE COURT:  Tell me.

15         MS. KENDRICK:  I'll do it.  There's other people,          15:17:21

16   there's other people here.  It can be done.  It will be done.

17   Seven days.

18         MR. FATHI:  One week from today, Your Honor?

19         THE COURT:  When's your vacation, Miss Kendrick?

20         MS. KENDRICK:  Tomorrow through Wednesday.          15:17:43

21         But there are other people.  So if the Court needs it

22   we can do is sooner.

23         THE COURT:  Here's what we'll do, we'll say the

24   plaintiffs will do theirs -- the deadline will be the -- I'm

25   sorry, just make sure I understand looking at the calendar,          15:18:22

—— CV-12-601-PHX-DKD – May 9, 2018 ——

1    it's hard for me to see it, I'm sorry, but you said that you

2    leave on Saturday and come back on Wednesday?

3            MS. KENDRICK:  No, sir, tomorrow.

4            THE COURT:  You leave on Thursday and come back on

5    Wednesday.                                                    15:18:34

6            MS. KENDRICK:  Yes.

7            THE COURT:  All right.  So then plaintiffs' filing

8    will be due on the 21st.  One, two, three, four, five days

9    after that is the 25th for the defendants' response.  And then

10   the plaintiffs' reply will be due on the 29th.                15:18:55

11           MR. BOJANOWSKI:  I think you said 25th, Your Honor.

12   You meant 26th?

13           THE COURT:  The 25th is Friday.  You're saying I

14   should have not counted the first day and that's why you're

15   getting the 26th?                                             15:19:16

16           If you'd like it have to Saturday the 26th that would

17   be fine.

18           MR. BOJANOWSKI:  I just was adding five to 21.

19           THE COURT:  No, I understand.

20           MR. BOJANOWSKI:  And I thought I heard 25, and I just  15:19:24

21   wanted to make sure that you meant 25.

22           THE COURT:  So you can have the 26th, by the close of

23   business on the 26th.  Because otherwise you would have done

24   the close of business on the 25th probably, or later in the

25   evening, I gather, and that wouldn't make much difference for  15:19:38

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD — May 9, 2018—

1    the plaintiffs, I suppose.

2            So then the plaintiffs will have until the 29th.  Or I

3    can actually make it the 30th.  Because we're back in court on

4    the 31st.

5            So it will be the 26th for the defendants, and then          15:19:56

6    the final reply from the defendants on -- the plaintiffs, from

7    the plaintiffs on this subject on the 30th.

8            MR. FATHI:  Thank you, Your Honor.

9            THE COURT:  All right.

10           MS. LOVE:  Your Honor, quickly, I just wanted to give        15:20:09

11   you context as to Miss Kendrick's allegations, just a quick

12   summary of what occurred.

13           First and foremost, the allegation that Mr. Pratt

14   didn't read the Declaration, or someone slapped his name on it,

15   is untrue.  He reviewed it and then it was electronically filed   15:20:24

16   after he approved it, with Mr. Bojanowski and I standing there

17   as he reviewed it.

18           How this came about and how the Declaration came about

19   is because we know that KJZZ or other media may trigger or may

20   alert the Court to issues.  And Miss Kendrick gave an interview   15:20:41

21   with her take on the contract.  We were attempting to get ahead

22   of the game of what we knew the Court would probably start

23   asking questions about, because Miss Kendrick had given an

24   interview as to her criticisms of the new contract,

25   anticipating she would then file probably a declaration.          15:20:57

—— CV-12-601-PHX-DKD – May 9, 2018 ——

1        So what we did is we had Mr. Pratt, he worked last

2   night, last evening, through late night, to respond to the

3   criticisms that we figured would be before the Court as to the

4   contract, so that we could inform the Court, and if the Court

5   had questions today, whether based upon the KJZZ article or          15:21:14

6   based upon if Miss Kendrick filed a Declaration, Mr. Pratt

7   would be here and available to answer those questions.

8        So that's how that came about.  It was not in response

9   to Miss Kendrick's Declaration, because we didn't know –– we

10  only knew that it was filed as we were driving here today.          15:21:27

11        THE COURT:  All right.

12        MR. FATHI:  Your Honor, the problem is that

13  Mr. Pratt's Declaration attributes to Miss Kendrick statements

14  that she never made ––

15        THE COURT:  No.                                                15:21:39

16        MR. FATHI:  –– that she was not quoted as making in

17  the article, and ––

18        THE COURT:  Your position is very clear to me.

19        MR. FATHI:  Thank you.

20        THE COURT:  What I'm sad isn't clear is that I've only        15:21:44

21  turned to news articles when they bring me information about

22  people who are not in the courtroom.  I don't communicate,

23  meaning I don't talk to people through the press, to the people

24  who are in the courtroom, the lawyers, and I don't expect that

25  the lawyers are communicating to me through the press either.      15:22:03

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD – May 9, 2018—

1    I read what the parties file.  And that's how I communicate,

2    meaning receive information from the parties.  It's only

3    through what's filed.

4        And the only exception to that rule about taking in

5    the outside information, I made very clear to you, it's when          15:22:20

6    it's just giving me an alert about something that we haven't

7    heard about before that's happened outside of court that needs

8    to be brought into court to see whether or not there's anything

9    there.

10        So let's take a 15-minute break and we'll be back.           15:22:33

11   Thank you.

12      (Recess at 3:22 p.m., until 3:38 p.m.)

13      THE COURT:  Can we pick up where we were on the

14   Performance Measures from March?

15      MR. BOJANOWSKI:  I think we were at number 50,              15:39:06

16   Your Honor, if I am correct.

17      THE COURT:  So far I have no disagreement with that.

18   Okay.

19      MR. BOJANOWSKI:  And I did file this morning a

20   modification.  The only one affected was PM 50 in Tucson.  It        15:39:27

21   is still non-compliant, but it is at 80 percent instead of the

22   76 percent.

23      THE COURT:  There's this clinical coordinator again

24   that's been hired and is currently in the process of

25   onboarding.  Effects of this action should be reflected in the       15:39:54

UNITED STATES DISTRICT COURT

1    May audit.

2         MR. BOJANOWSKI:  And I believe that was part of the

3    problem here, is that there was a transition in that position,

4    and that led to some delays associated with computing of the

5    consultations.                                                    15:40:19

6         THE COURT:  Is there a good reason to think that

7    that's true because of the past track record on this, that

8    it's, as you say, a transition issue?

9         I mean, just as I look at the numbers going back to

10   August at 31 percent, and then getting into compliance only in   15:40:34

11   one month, and that's in February of '18, otherwise all below,

12   it doesn't seem like that would be the likely explanation,

13   transition.  It wouldn't be a transition from anything good.

14        MR. BOJANOWSKI:  I know that we have a rather robust

15   plan in place that we're utilizing, so I don't have anything     15:41:02

16   beyond that at this point to communicate to the Court.

17        THE COURT:  Miss Kendrick?

18        MS. KENDRICK:  Again, Your Honor, there's no remedial

19   plan listed here.  I mean, no basis given for the

20   non-compliance.  So it's hard to figure that one out.            15:41:25

21        I would just note that this is another one of those

22   Performance Measures that we actually issued the Notice of

23   Non-Compliance for almost a year ago, and the motion to have a

24   finding of non-compliance was found in January.  And in past

25   months we had asked defendants to develop Corrective Action      15:41:43

─── **CV-12-601-PHX-DKD – May 9, 2018** ───

1    Plans, and they had refused to do so until the Court had made a

2    finding of non-compliance.

3            So we're concerned that if there is actually a, quote,

4    robust plan, we haven't been provided it.

5            And also, if the cause is that a clinical coordinator          15:42:01

6    was -- they were lacking a clinical coordinator, their February

7    and March 2018 staffing reports for Tucson that have been filed

8    with the Court, neither of them show any sort of vacancy, they

9    both show 100 percent FTE for the clinical coordinator position

10   at Tucson in both months.                                             15:42:23

11           THE COURT:  So that's a good question.  When it says a

12   new clinical coordinator, does that mean an additional clinical

13   coordinator, or does it mean a different person serving the

14   function of clinical coordinator?

15           MR. BOJANOWSKI:  I was under the impression it was a          15:42:36

16   new person, Your Honor, but I don't want to swear to that.

17           THE COURT:  All right.  Do this:  In the supplement

18   that we talked about earlier, let us know the answer to that

19   question, whether this is an additional position or a new

20   person.  And if it's a new person, let us know when the old        15:42:55

21   person left and when the new person started.

22           It says, in the process of onboarding.  I guess from

23   what I've heard you say earlier that sounds like a three-day

24   process of training.  Can you confirm whether that is actually

25   happening in these three days that we're in the middle of?         15:43:15

—CV-12-601-PHX-DKD – May 9, 2018—

1        I guess I want more detail on this.

2        To me --

3        MR. BOJANOWSKI:  I will provide that, Your Honor.  And

4   that's why I say I think it's a new person is because of the --

5   the term "onboarding" is typically used for new hires.  So          15:43:28

6   that's why I'm kind of making that assumption.  But I don't

7   want to swear to it.  But I will supplement that information.

8        THE COURT:  It's hard for me to accept you say it's

9   typically used, because I don't think I've ever heard that word

10  before in this case.                                                 15:43:44

11       Has it ever -- let me ask plaintiffs, do you recall

12  that ever being mentioned before?

13       MS. EIDENBACH:  Your Honor, the first time I remember

14  hearing that was on our recent tour of Yuma.

15       THE COURT:  All right.  I don't think it's ever been         15:43:56

16  in any kind of filing with the court.  So it's not typical, I

17  don't think.

18       But, again, I'm just trying to encourage precision as

19  best that I can.  And so the supplement will answer these

20  questions and help me be even more precise going forward.            15:44:15

21       Let me just add this:  Performance Measure 50, are

22  urgent consultations and urgent specialty diagnostic services

23  being scheduled and completed within 30 calendar days of

24  consultation being requested by the provider?

25       This has been a topic that has been of very sharp             15:44:35

1   focus of the Court's inquiry, not only because it seems so out

2   not of the question to require that such urgent consultations

3   take place, but also the question could have been raised about

4   how the provider has dealt with this issue.

5          And so I'm a little bit puzzled and troubled by the         15:45:02

6   fact that there is on this area of extreme focus so little

7   written on the page of the update as of May 8th, 2018, that it

8   doesn't include a statement about why.  We heard that from

9   Mr. Bojanowski's hypothesis about it here today.  And then the

10  Corrective Action Plan, no real explanation as to why we would    15:45:27

11  think that this would meet the failures that we've seen all

12  along.

13         Again, a new person, how do we know this new person is

14  going to do anything differently?

15         Okay.  Go ahead.                                            15:45:45

16         MR. BOJANOWSKI:  PM 51 at Yuma is at 77 percent.

17         And then I filed this morning -- yeah, I filed this

18  morning the change in that particular measure at 80 percent.

19  So it's still non-compliant.

20         And this is apparently a problem with on-site              15:46:27

21  optometry, wherein the individuals simply were not seen within

22  the 60-day time frame with the optometrist coming on site to

23  provide services.

24         So this is one of those ones where an

25  additional -- additional plan is being developed at this time,    15:46:52

1   and is going to be provided at the June status, unless we get

2   it sooner with our other supplements, and we can provide that

3   to the Court together with those other supplements, which would

4   be my preference.

5          THE COURT:  Well, yes, good.  Thank you.                    15:47:16

6          Miss Kendrick?

7          MS. KENDRICK:  Nothing, sir.

8          THE COURT:  All right.  52?  Eyman.

9          MR. BOJANOWSKI:  52 Eyman is at 84 percent.  That is a

10   rise from 58 percent.  We think that perhaps the plan that's in   15:47:34

11   place is taking hold.  We're going to continue with that plan

12   and see what those results look like over the next month.

13          THE COURT:  I hope so.  In the past I've been more

14   inclined to accept that idea, but the turnarounds that we saw

15   in March in other Performance Measures caused me to be wary of   15:47:56

16   that optimism.

17          Anything you want to say on this one, Miss Kendrick?

18          MS. KENDRICK:  No, sir.

19          MR. BOJANOWSKI:  52 at Florence is at 73 percent.

20          Again, we're going to continue with the -- with the       15:48:16

21   current plan on this particular measure.  It is showing some

22   improvement from 67 to 73, so we'd like to give that an

23   opportunity to take hold.

24          THE COURT:  All right.  So you look at the previous

25   months before 67, I guess 69, then 65, then 79, then 63, then    15:48:41

1    56 and 48.

2          Again, what you hope to take hold isn't so compelling

3    here because the hands grabbing out are some hands that are

4    some pretty low numbers.

5          All right.  Anything you want to say, Miss Kendrick?    15:49:02

6          MS. KENDRICK:  Just to observe that this was one of

7    the Performance Measures that the Court included in its order

8    to show cause, and so -- and the institution of 52 at Florence.

9    So the fact that despite the redoubled effort and focus, that

10   the CGARs don't reflect those efforts that were hopefully made.  15:49:19

11         THE COURT:  Very good point.

12         Next.

13         MR. BOJANOWSKI:  This is 66 at Florence, at 80 percent

14   up from 70.  This is still a carryover from the past month's

15   problem with providers having some confusion as to who was     15:49:44

16   covering what with regard to making sure that the patients were

17   seen every 72 hours.

18         So we're going to continue with our current Plan of

19   Action on this.

20         THE COURT:  So when you write -- or you tell me or you  15:50:01

21   write who was seeing what -- whom was seeing whom, is that a

22   circumstance where people are not being seen because nobody

23   understood that it was their assignment to see them?  So

24   they're just languishing there in this urgent

25   facility -- urgent care facility, this IPC facility?          15:50:22

1       MR. BOJANOWSKI:  I think they were -- they were seen

2   not within time frames, but I can't -- I can't provide any

3   other information.  I recall that there was some scheduling

4   that was going on, and the two providers had a discussion, and

5   the one -- and they said, make sure you round in this                    15:50:45

6   particular unit, which was the wrong unit to round in.

7       So that's my understanding of what happened.

8       And I can't speak to whether the other unit that was

9   supposed to be rounded was actually rounded or not.

10      THE COURT:  Isn't this shocking though to think that        15:51:08

11  you've got people who are in an IPC, and the process that has

12  external forces, external monitors looking at it, both the

13  monitoring team and the Court looking at it, in an area that

14  has been a focus of inquiry for the Court, to hear that there

15  went a period of time of 72 hours where it appears, because          15:51:41

16  somebody was told to go to the wrong room, people who were

17  supposed to be seen weren't seen?

18      And I say "shocking," because you wonder, how could

19  that happen, how could you be in charge of someone in an IPC

20  situation, which is just one step down from the hospital, I         15:52:02

21  gather, and allow that to happen?

22      It just doesn't -- are we becoming inured somehow to

23  thinking that things are acceptable, when I imagine you'd ask

24  anybody on the street, if you took somebody into your Intensive

25  Care Unit that you had in the prison, it's not the hospital,          15:52:21

—— **CV-12-601-PHX-DKD** — May 9, 2018 ——

 1   but it's not the -- it's the place that we would put them where

 2   they need to be looked at because they've got a serious

 3   condition that they can't live in their housing unit.  Would it

 4   be okay if a medical provider didn't check in on that person at

 5   least every 72 hours?                                          15:52:38

 6          I can't imagine anybody saying, well, of course not.

 7   That would not be okay.

 8          MR. BOJANOWSKI:  I agree.

 9          THE COURT:  Okay.  All right.

10          MR. BOJANOWSKI:  Yeah, no, it should not have            15:52:49

11   happened.  And we want to make sure that it doesn't happen.

12   And that's why, like I said before, we're trying to shorten

13   these rounds and make sure people are on top of it.

14          So you're absolutely correct, Your Honor, it should

15   not happen in an IPC unit that is a high acute unit.  And we    15:53:07

16   want to make sure that those patients are seen by the providers

17   as they should be.

18          THE COURT:  Anything you wanted to say, Miss Kendrick?

19          MS. KENDRICK:  Your Honor, we share the Court's

20   concern.  I mean, we looked ahead and -- you know, not to break 15:53:22

21   any surprises, but Tucson for Performance Measure 66 they're at

22   50 percent.  So whatever is happening, it doesn't seem that

23   it's just one person forgot to go to the wrong area.

24          These four institutions, Florence, Lewis and Tucson,

25   were all subject to your OSC, so we're concerned about that.    15:53:45

—— CV-12-601-PHX-DKD — May 9, 2018 ——

1       Florence and Tucson are major IPC hubs.  Tucson is the

2   largest, followed by Florence.  And obviously when you come on

3   the 21st we hope that you will be able to go to the infirmary

4   and talk.

5       The interesting thing about -- jumping ahead to 66,          15:54:02

6   the reason given for not doing it was that it wasn't

7   documented.  But strangely we have had a problem in the past

8   where they had the providers, as we've documented, entering in

9   multiple entries all simultaneously at the same time.

10  So -- and they've said that that's okay to do that.            15:54:27

11      So it's unclear, you know, whether documentation could

12  really be the cause, and that it really -- and that the visits

13  actually happened.  Because defendants have taken in the past

14  the position that they can just enter in these entries, that

15  everybody was seen at 8:00 a.m. on the dot.                    15:54:44

16      If it's truly a documentation error, then perhaps it

17  was just they didn't do that entry.  It's unclear.  We will

18  have to --

19      THE COURT:  Well, we know that didn't happen with

20  respect to Florence, because the explanation doesn't include   15:54:56

21  any kind of documentation error.  It's just, we didn't send the

22  person to the right room.

23      MR. BOJANOWSKI:  I think she was talking about the

24  Tucson --

25      THE COURT:  No --                                          15:55:08

—— CV-12-601-PHX-DKD – May 9, 2018 ——

1      MS. KENDRICK:  Right.  But I guess my point is, you

2  know, again, as we've said repeatedly, not documented, not

3  done.  I mean, there's this assertion that it was done, but it

4  just wasn't documented.  And for us that's not necessarily an

5  adequate excuse and we're concerned about that.                    15:55:24

6      MR. BOJANOWSKI:  It was documented late.  And we

7  refused to accept that type of documentation.  That's why the

8  Department said, no, we're not going to give you credit for it.

9      MS. KENDRICK:  Well, and just as a final observation,

10 sir, in the past they had said that even though the Performance   15:55:39

11 Measure required 72 hours, that they were adopting a policy

12 that the rounds would be done every 48 hours so we wouldn't

13 have this issue of, you know, it was just a few minutes late

14 sort of thing.

15      So if there was that stopgap, of 48 –– of things being   15:55:53

16 done every 48 hours, then it's unclear why that would have

17 caused the non-compliance with the 72 hour time frame if they

18 had an unofficial practice that they were implementing as part

19 of a remedial plan to do it every 48 hours.

20      THE COURT:  So 67 for Lewis.  Is that where we are    15:56:14

21 next?

22      MR. BOJANOWSKI:  Yes.  So this is –– was okay in

23 December, then dropped in January, February, and now has jumped

24 up in March.  So we're going to continue with our current plan

25 on this measure at this facility.                                   15:56:43

—— CV-12-601-PHX-DKD – May 9, 2018 ——

1          The Tucson facility dropped from 80 percent to 40

2     percent in one month.  And this was due to an individual RN who

3     was not conducting and documenting the assessment once every

4     shift as required.  And that resulted in that significant drop

5     there.                                                          15:57:13

6          THE COURT:  Any comment on 67?

7          MR. BOJANOWSKI:  I believe the rest of the measures in

8     the filing are compliant.

9          MS. KENDRICK:  I have a question about -- I guess --

10    I'm still reading 67 at Tucson.                                 15:57:47

11         How -- the fact that IPC staff were told that they

12    need to do assessments at all shifts is not going to be

13    reflected until April or May?  Was there just -- I mean, how

14    could just one nurse not doing the assessments have such a

15    profound effect for three months?  That is something that's    15:58:16

16    concerning, especially given the past history.  While

17    Mr. Bojanowski points out that they hit 90 percent in November,

18    the months prior to that were abysmal, including four months in

19    the Summer of 2017 where they hit zero percent every month.

20         MR. BOJANOWSKI:  This is the effect of the partial        15:58:37

21    credit ruling of the Court, where if there is one round missed

22    by one person, then the entire file is non-compliant.

23         So this -- a person may have been rounded 90 or 99

24    times, but if you miss that 100th round, then the entire file

25    for the month is no good.  So that's why one person can have    15:59:01

—— CV-12-601-PHX-DKD – May 9, 2018 ——

1    such a drastic affect on the results with regard to these kinds

2    of rounds.  It's because of the way the Court has interpreted

3    and the plaintiffs have insisted that this measure be scored.

4            MS. KENDRICK:  Well, I guess our point is that people

5    are in the IPC for a reason, they have acute medical conditions          15:59:28

6    and needs.  It's urgent that nursing staff see them at least

7    every shift, given the fact that the providers are seeing them

8    every 72 hours.  And it's not happening.

9            The nonperformance goes back long before the Court

10   issued the order regarding no partial credit.  Even when                  15:59:45

11   awarding partial credit there was definitely months when it was

12   below compliance levels.

13           MR. BOJANOWSKI:  I think it would be helpful to the

14   Court if I provide the actual numbers.  And maybe as part of my

15   supplemental information, Your Honor, I can maybe give the                16:00:04

16   Court a little better context on this particular measure and

17   the other measures that are subject to the partial credit

18   analysis so the Court can actually see how many rounds are

19   actually being conducted during the month and how many misses

20   there are during the month so the Court can have a better                 16:00:19

21   picture as to what this compliance score means.

22           THE COURT:  Well, it would be hard for you to make an

23   argument to me that the small numbers of people mean that if

24   you miss one out of, let's say, two that it's no big deal,

25   because this is an IPC environment.  And so it's not as if it's           16:00:38

UNITED STATES DISTRICT COURT

1    a foul that doesn't have the real potential for harm.  It's

2    just, again, to me the idea that there's not someone being

3    checked as the Performance Measure requires, seems -- I mean, I

4    would have expected that this would be something that's never

5    missed, just because of the acuity.                          16:01:01

6            And I worry that if this kind of situation is missed,

7    where there is an obvious acuity that's open and notorious,

8    people are in the IPC, and if you're missing that, where the

9    risk is grave I would think, the potential risk is graver than

10   many of the other situations where you can imagine that there  16:01:20

11   will be harm surely.  But you think that the risk is a somewhat

12   less then maybe you would be not so alarmed.  But here it is

13   alarming.

14           All right.  So we've completed the update for March.

15   There were a couple of other things on the plaintiffs' agenda  16:01:42

16   that haven't been touched upon, and on the defendants' agenda

17   as well.  And we can now turn to that.

18           The plaintiffs had let you know, Miss Love or

19   Mr. Bojanowski, that they'd like further information about the

20   status with respect to telemedicine.                         16:02:08

21           MR. BOJANOWSKI:  So the telemedicine issue and usage

22   is now on track with regard to increasing -- increasing our

23   work with the University of Arizona.

24           So there was a video conference meeting held on April

25   24th, 2018.  The Department has representatives, Mr. Pratt, and  16:02:47

—— CV-12-601-PHX-DKD — May 9, 2018 ——

1    we've brought Mr. -- or excuse me, Dr. Robertson into -- into

2    these -- into these meetings to provide the structure, as

3    Dr. Robertson testified to.

4           Mr. Maldonado, Miss Cole, Dr. Ladell, Mr. Schmid,

5    Miss Durham and Mr. Carr of Corizon Health were participants in    16:03:20

6    this.

7           Dr. Po and Miss Webster of the Arizona Telehealth

8    entity were present at this.

9           And so they discussed multiple issues concerning

10   connectivity, delays caused by Corizon Health staff, custody    16:03:40

11   issues, referral processes.

12          And so it was decided that a proposed partnership plan

13   would be created.  There would be a proposed communication

14   checklist for patient referrals established, directory of

15   Corizon Health telemedicine compacts provided, and referral    16:04:02

16   logs for tracking metrics that encompass the referral data

17   submissions, connectivity testing and appointment dates.

18          That was accomplished on May 2nd, 2018, with

19   communications from Corizon Health to the Arizona telemedicine

20   folks, and several proposals were put into place.    16:04:30

21          There's some additional timelines, personnel

22   designations.  Corizon has established a primary contact for

23   telemedicine at their regional office, Miss Dunham.  And they

24   are going to have biweekly meetings to ensure implementation of

25   the plans and continuation of the plans and expansion of the    16:05:02

UNITED STATES DISTRICT COURT

—CV-12-601-PHX-DKD – May 9, 2018 —

```
1     programs.

2          So it is now moving forward in a structured fashion

3     with participation by the ADC representatives, Corizon

4     representatives, in cooperation with the Arizona telehealth to

5     get the ball rolling, get it put into place, get the systems      16:05:24

6     cooperating with each other electronically, and then getting

7     them scheduled.

8          THE COURT:  So when does it go live?

9          MR. BOJANOWSKI:  May I have a moment, Your Honor?

10         (Discussion held off the record.)                            16:05:43

11         MR. BOJANOWSKI:  We're live now.

12         THE COURT:  So these biweekly meetings between Corizon

13    and the University of Arizona to identify issues associated

14    with going forward, they're already happening?

15         MR. BOJANOWSKI:  Yes, Your Honor.                            16:06:01

16         THE COURT:  And so maybe it would be appropriate at

17    some point for us to hear from Dr. Robertson again to see what

18    his observations are about how things are going.

19         MR. BOJANOWSKI:  Probably a good idea.

20         THE COURT:  Maybe he could call in for just a               16:06:18

21    ten-minute update, either -- maybe in June, in the three days

22    in June.

23         MR. BOJANOWSKI:  We'll make that arrangement.

24         THE COURT:  Okay.  Thank you.

25         Anything you wanted to add on this point,                   16:06:35
```

——— **CV-12-601-PHX-DKD – May 9, 2018** ———

```
1    Miss Kendrick?
2           MS. KENDRICK:  Just whether or not it would be
3    possible for defendants to share this telemedicine plan with
4    the Court and plaintiffs' counsel for comment or feedback.
5           THE COURT:  Is there a written plan that's been                16:06:45
6    adopted?
7           MR. BOJANOWSKI:  Yes, Your Honor.
8           THE COURT:  Could you file that?
9           MR. BOJANOWSKI:  Sure.
10          THE COURT:  Thank you.                                         16:06:53
11          How about the incentive payments and penalty payments?
12          MR. BOJANOWSKI:  Your Honor, those have not yet been
13   calculated because the numbers are not final.  So I think I
14   reported last month on February numbers.  But since the
15   staffing and all of that is not due to be finalized until the        16:07:16
16   15th, as well as the CGARs, those incentive payments and
17   sanction items have not yet been calculated.
18          I'm assuming shortly after the 15th they'll be in
19   place.
20          THE COURT:  And can you file those as well?                    16:07:38
21          MR. BOJANOWSKI:  Certainly.
22          THE COURT:  Thank you.
23          From my list it looks like that addressed the
24   plaintiffs' issues.  Were there other issues that the
25   plaintiffs wanted to raise today?                                     16:07:54
```

—**CV-12-601-PHX-DKD** – May 9, 2018 —

1          MS. KENDRICK:  No, sir.

2          THE COURT:  All right.  From the defendants, they are

3    interested, of course, in the continuing urging of the motion

4    to terminate.  I've addressed that earlier with respect to

5    trying to jawbone the plaintiffs into conceding on some.  And          16:08:08

6    then the Court will, once the dust settles on that, take what

7    steps it needs to do.

8          Are there any other issues that the defendants need to

9    raise now?

10          MR. BOJANOWSKI:  No, Your Honor.          16:08:22

11          THE COURT:  Thank you all for your time today.  I will

12    see you at the end of the month.

13          It's ordered granting the pending motions to seal.

14          MR. BOJANOWSKI:  What?

15          THE COURT:  The pending motions to seal, it's ordered          16:08:52

16    granting them.

17          Thank you.

18       (Proceedings concluded at 4:08 p.m.)

19

20                              -oOo-

21

22

23

24

25

CV-12-601-PHX-DKD – May 9, 2018

1

2

3

4                        C E R T I F I C A T E

5

6            I, CANDY L. POTTER, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9            I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14           DATED at Phoenix, Arizona, this 10th day of May,

15  2018.

16

17

18

                                    s/Candy L. Potter_____
19                                  Candy L. Potter, RMR, CRR

20

21

22

23

24

25