**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **Victor Antonio Parsons,** | ) | |
| **et al.,** | ) | |
| | ) | No.   **CV 12-00601-PHX-DKD** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | May 31, 2018 |
| **Charles Ryan, et al.,** | ) | 9:10 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**EVIDENTIARY HEARING (AM SESSION)**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2

**For the Plaintiffs:**
3        PRISON LAW OFFICE
         By:  **Corene T. Kendrick**, Esq.
4        1917 5th Street
         Berkeley, CA 94710
5
         ACLU - Washington DC
6        By:  **David C. Fathi**, Esq.
         915 15th Street NW, 7th Floor
7        Washington, DC 20005

8        EIDENBACH LAW PLLC
         By:  **Kirstin T. Eidenbach**, Esq.
9        P.O. Box 91398
         Tucson, AZ 85752
10
         ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
11       By:  **Maya S. Abela**, Esq.
         177 N. Church Avenue, Suite 800
12       Tucson, AZ 85701

13
**For the Defendants:**
14       STRUCK LOVE BOJANOWSKI & ACEDO PLC
         By:  **Rachel Love**, Esq.
15            **Daniel P. Struck**, Esq.
              **Timothy J. Bojanowski**, Esq.
16            **Richard M. Valenti**, Esq.
         3100 W. Ray Road, Suite 300
17       Chandler, AZ 85226

18

19

20

21

22

23

24

25

1                        <u>I N D E X</u>

2

<u>WITNESSES FOR THE</u>           <u>DIRECT</u>    <u>CROSS</u>    <u>REDIRECT</u>    <u>RECROSS</u>
3 <u>PLAINTIFF:</u>

4 **Angela Fischer**
   By Mr. Fathi                   8
5

6

7                      <u>E X H I B I T S</u>

8 <u>NO.</u>                     <u>DESCRIPTION</u>                        <u>REC'D</u>

9   221    Non-Uniform Employee of the Month, Alhambra        19
           Unit, January 2017 for Angela Fischer
10
    222    PSY 87704 On-Site Supervisor's Final Evaluation    21
11         of Student for Angela Fischer

12  220    Certified Correctional Health Professional         23
           Certificate for Angela Fischer, LPC, CCHP
13
    223    10/23/17 Email between Angela Fischer, Lynn         29
14         Calcote, Lynn Cole, et al.

15  234    9/29/17 Letter from Angela C. Fischer, LPC,         39
           CCHP to Jeff Goldberg, Corizon Board Chair
16
    240    10/12/17 Email from Angela Fischer to Lynn         46
17         Calcote, Leonel Urdaneta, et al. (REDACTED)

18  252    9/27/17 Email from Angela Fischer to Lynn          51
           Calcote and Stephanie Leonard (REDACTED)
19
    224    Weekend Watch Notes Instructions - Phoenix         64
20
    254    Shawn P. Smith (ADC No. 174287) and Robert         72
21         Osorio (ADC No. 108309) medical records

22  235    11/3/17 Email from Angela Fischer to Jeff          80
           Goldberg and Mariann Burnetti-Atwell (REDACTED)
23
    253    Samuel T. Jobes (ADC No. 21766) medical records    83
24

25

                   UNITED STATES DISTRICT COURT

239   7/24/17 Email from Angela Fischer to Richard        89
      Watts (REDACTED)

236   1/3/18 Email from Angela Fischer to Richard         92
      Watts, Eddie Taylor, et al. (REDACTED)

247   Excerpts of Doc. 2531-1 (pages 18 and 19)          96
      (12/19/17 Letter from Rita Lomio to Lucy Rand)

238   1/25/18 Email from Angela Fischer to Lynn         102
      Calcote (REDACTED)

242   12/13/17 Email from Angela Fischer to Eddie       106
      Taylor, Ashley Pelton, and Leonel Urdaneta
      (REDACTED)

243   11/21/17 Email from Angela Fischer to Richard     110
      Watts and Eddie Taylor (REDACTED)

244   1/2/18 Email from Angela Fischer to Maureen       112
      Santry, Wendy Eccles, et al. (REDACTED)

**P R O C E E D I N G S**

1

2 (Proceedings commenced at 9:10 a.m.)

3 THE CLERK:  Civil Case No. 12-601, Parsons, et al.,

4 versus Ryan, et al., on for evidentiary hearing.

5 THE COURT:  Would counsel please announce.

6 MR. FATHI:  Good morning, Your Honor.  David Fathi of

7 the ACLU National Prison Project for the plaintiff class.

8 THE COURT:  Thank you.

9 MS. KENDRICK:  Good morning, Your Honor.  Corene

10 Kendrick from the Prison Law Office for the plaintiff class.

11 THE COURT:  Thank you.

12 MS. EIDENBACH:  Good morning, Your Honor.  Kirstin

13 Eidenbach for the plaintiff class.  And behind me is Maya Abela

14 from the Arizona Center for Disability Law.

15 THE COURT:  Thank you very much.

16 MS. LOVE:  Your Honor, for defendants, Rachel Love,

17 Daniel Struck, Timothy Bojanowski, and Richard Valenti.

18 THE COURT:  Thank you very much.  Good morning.

19 In the past, Mr. Acedo has appeared on behalf of

20 defendants.  I notice he's not present this morning.  Is he

21 anticipated to be present tomorrow morning?

22 MS. LOVE:  He is not scheduled to be, but if you would

23 like him to, of course he --

24 THE COURT:  Is he available?  Is he in town?

25 MS. LOVE:  He is.  We'll have to check and make sure

1    that he's available tomorrow.

2             THE COURT:  If he's available and in town, I'd like to

3    bring up a matter with him at first tomorrow morning, if you

4    would kindly arrange for that.

5             Thank you.  Are we ready to proceed?

6             MR. FATHI:  Your Honor, before we proceed I'd like to

7    raise a housekeeping matter, if I may.

8             In light of the Court's impending retirement, we need

9    to timely conclude this proceeding so that you who have heard

10   the witness testimony and are the sole judge of the credibility

11   of that testimony and the trier of fact can assimilate the

12   evidence and render a decision.  We now have four days of

13   hearings left, and we have quite a number of witnesses that

14   have been listed.

15            So we'd ask that before we conclude tomorrow

16   afternoon, the Court establish a schedule for the witness --

17   for the witnesses with time limits for direct and

18   cross-examination for each witness so that we don't get into

19   the position we have sometimes been in in the past where one

20   witness runs over into a second day, thereby pushing other

21   witnesses further down the pike, so that we can be sure that we

22   conclude all of the witnesses by the end of the last day of

23   hearing, which is currently scheduled to be June 14th.

24            THE COURT:  I think it does make sense at the close of

25   tomorrow to take a look at where we stand and to see what we

```
 1    have yet to do and to make a plan as best we can to deal with
 2    that, so I think that's a good suggestion.
 3              MR. FATHI:  Thank you, Your Honor.  And as a first
 4    step in that, we would ask that to ensure that we conclude with
 5    Ms. Fischer today, that direct and cross-examination each be
 6    limited to no more than two and a half hours.
 7              THE COURT:  You're saying each side, but wouldn't that
 8    yield more time for you than for the defendants?
 9              MR. FATHI:  No, Your Honor.  Two and a half hours
10    each.
11              THE COURT:  Okay.
12              All right.  And any comment on that from the
13    defendants' side?
14              MS. LOVE:  That's fine, Your Honor.
15              THE COURT:  All right.  Let's do that, then.
16              MR. FATHI:  Ms. Kendrick is going to keep time, so if
17    she can have a moment to -- all right.
18              Your Honor, we -- plaintiffs call Angela Fischer.
19              THE COURT:  Thank you.
20              Ms. Fischer, if you'd please step forward.
21              MR. FATHI:  I'm sorry, Your Honor.  One additional
22    thing.  Plaintiffs invoke the rule excluding of witnesses.
23              THE COURT:  Are there any witnesses present in the
24    courtroom to either counsels' views?
25              MR. FATHI:  Yes.  I believe Ms. -- Dr. Taylor has been
```

UNITED STATES DISTRICT COURT

1    listed as a witness.

2            THE COURT:  Thank you.  I see Dr. Taylor is preparing

3    to leave, which she probably will take as a relief.

4                              ANGELA FISCHER,

5    called as a witness herein by the Plaintiffs, having been first

6    duly sworn or affirmed, was examined and testified as follows:

7                            DIRECT EXAMINATION

8    BY MR. FATHI:

9    Q.  Good morning, Ms. Fischer.

10           THE COURT:  Hold on just a second.  The court

11   reporter's not up yet.

12           (Discussion off the record.)

13           THE COURT:  Thank you.  You may proceed.

14           MR. FATHI:  Thank you, Your Honor.

15   BY MR. FATHI:

16   Q.  Please state your full name.

17   A.  Angela Christine Fischer.

18   Q.  And what is your occupation?

19   A.  I'm a licensed professional counselor.

20   Q.  Could you describe your education for the Court.

21   A.  I have a master's degree in counseling, and I am one

22   defense away from a doctoral degree in clinical psychology, so

23   I have to defend my dissertation and then I will graduate.

24   Q.  And when do you anticipate graduating?

25   A.  August 4th.

1   Q.  Of this year?

2   A.  Of this year.

3   Q.  Do you hold any professional licenses?

4   A.  I do.  I hold a licensed professional counselor license.

5   Q.  And that is in the state of Arizona?

6   A.  Yes, it is.

7   Q.  Is it current?

8   A.  It is.

9   Q.  At one point were you employed by the State of Arizona as

10  the statewide HIPAA coordinator?

11  A.  Yes, I was.

12  Q.  What were the dates of that employment?

13  A.  2002 through 2012.

14  Q.  And, first of all, what is HIPAA?

15  A.  HIPAA is the Health Insurance Portability and

16  Accountability Act that protects people's privacy and allows

17  people to take their health insurance from one employer to

18  another and a variety of security rules.  It's pretty big.

19  Q.  What were your duties as statewide HIPAA coordinator for

20  the State of Arizona?

21  A.  They changed over time, but at the beginning when the State

22  was trying to understand how they were impacted by HIPAA, I was

23  employed with AHCCCS and I was helping them with their

24  transactions and code sets and making sure that they were

25  following the rules, but the relationship between entities in

1  an organization is important in HIPAA, so I put together a

2  proposal for the governor and the director of AHCCCS outlining

3  a proper organizational structure for HIPAA so we could

4  determine our covered entity status and how we might relate to

5  each other without violating people's privacy.

6  Q.  Did you interact with various state agencies in that

7  capacity?

8  A.  I did.  Many state agencies.

9  Q.  Did those state agencies include the Arizona Department of

10 Corrections?

11 A.  It did.

12 Q.  We are here today to talk about your employment in the

13 Arizona Department of Corrections.  But did you ever work in

14 corrections before that?

15 A.  I did.  I was employed by the Maricopa County correctional

16 system, correctional health system.

17 Q.  So you worked in the Maricopa County Jail?

18 A.  Many of them.

19 Q.  And what were the dates of that employment?

20 A.  I think I started there in 2012, and I left just before I

21 started with Corizon, so I think that might have been 2016.

22 Q.  And what was your job title when you were working in the

23 jails?

24 A.  It changed over time.  So I started out as a registry

25 staff, then I became a mental health professional, and then I

1    became a mental health professional supervisor, so I supervised

2    people.

3    Q.  And what were your duties in the jail system?

4    A.  When I was a registry staff and a mental health

5    professional, I provided direct care to patients:  counseling,

6    groups, treatment planning, reentry planning, the whole gamut

7    of correctional mental health services.

8           At the end, I was a supervisor.  I supervised Estrella

9    Jail mental health program, where we conceived and developed

10   the MOSAIC program, which was a mental health treatment program

11   for women who had co-occurring disorders, serious mental

12   illness and substance use issues.  It was a six-week

13   residential kind of program that had its own little house in

14   the women's jail.

15          I also created the Pathfinders organization, which

16   brought together 15 state and county organizations to see what

17   we could do to reduce recidivism and create services for people

18   that would keep them out of the correctional system.

19   Q.  Did you supervise any other mental health staff?

20   A.  At Estrella, I supervised nine mental health staff members.

21   Q.  And how many patients' mental health treatment was under

22   your supervision?

23   A.  900.

24   Q.  Have you done any other work as a mental health clinician?

25   A.  Yes.  Years and years worth.

1  Q.  Could you briefly describe that for the Court.

2  A.  Well, I started out as a child protective service worker.

3  I worked in community entities.  I've had my own private

4  practice.  I've worked on a Board of Prisons contract in the

5  State of California.  I've worked in many different mental

6  health positions.

7  Q.  Tell us a little bit about the Board of Prisons contract in

8  the State of California.

9  A.  In that position, I did assessments for people who were

10  recently released from prison.  So I would see people, you

11  know, on their first day out eating their first McDonald french

12  fries after 20 years of being incarcerated, and my job was to

13  assess their ability to reenter into society and set up

14  services for them so that they could be successful.

15  Q.  And what time period was that?

16  A.  Oh, my goodness.  1996, maybe, '7.  I can't remember the

17  exact date.

18  Q.  The late 1990s?

19  A.  I would say.

20  Q.  Okay.  How did it happen that you came to work in the

21  Arizona Department of Corrections?

22  A.  I was at the point of my education in my doctoral program

23  where I had finished my course work, and I was at the point

24  where I needed an internship.  And Corizon was able to offer me

25  an internship and supervise my hours that I needed for my

1    internship.

2    Q.  When did you begin work in the Arizona Department of

3    Corrections?

4    A.  October 2016.

5    Q.  And when did you leave?

6    A.  March 2018.

7    Q.  So about a year and a half?

8    A.  Yes.

9    Q.  And who was your employer during that time?

10   A.  Corizon.

11   Q.  What was your job title?

12   A.  Psychology associate.

13   Q.  Sometimes abbreviated "psych associate"?

14   A.  Uh-huh.  Yes.

15   Q.  At what prison complex did you work?

16   A.  I worked in the Phoenix complex.  It's sometimes called

17   Alhambra or Flamenco, but it was all in Phoenix at 24th and Van

18   Buren.

19   Q.  Does the Phoenix complex have any special role within the

20   Arizona Department of Corrections that's different from other

21   prison complexes?

22   A.  The entire function of it is different.  The first part of

23   it is an intake facility, so men that come into the

24   correctional system go through an intake process where there's

25   health and mental health assessments to understand if they have

1    any specific needs.  So that's kind of on one side.

2          And then on the other side, that facility manages the

3    most acutely mentally ill patients within the entire

4    correctional system.

5    Q.  Did you work in both of those portions in the Phoenix

6    complex?

7    A.  I did.

8    Q.  What was the approximate division of your time between the

9    reception portion and the mental health treatment portion?

10   A.  I would say I probably worked 90 percent in the mental

11   health treatment portion and was called over to intake when

12   there was a need to be filled where they didn't have people

13   that could do the assessments that day or for a period of time.

14   Q.  And when you say "assessments," are you talking about

15   mental health assessments of incoming prisoners?

16   A.  Correct.  Intake assessments.

17   Q.  Can you describe the various different mental health units

18   that exist in the Phoenix complex.

19   A.  Yes.  There are two units that house the most seriously

20   mentally ill.  One is called Baker Ward, and that's for men;

21   the other is called George Ward, and that's where the women,

22   the most acute women live.

23          There is something called step-down units.  In my

24   mind, you know, when someone's in an inpatient psychiatric

25   setting, they move from there into a less restrictive

1    environment where they can receive services but enjoy the

2    opportunity for more social interaction and engagement with

3    other people.

4         So in that tier, we had Ida Ward, which was for

5    patients that were vulnerable in some way; either they had

6    developmental issues or physical issues that prevented them

7    from being in the general population.  We had King Ward, which

8    was for -- the step-down unit for people who had mental illness

9    that were not in closed custody.  There was John Ward that were

10   the closed custody patients.  That was sort of the step-down.

11        And then the most acute patients, you know, that are

12   in crisis, like psychiatric crisis, would be housed in Quiet

13   Ward.  And Quiet Ward is made up of a number of cells where

14   people are on suicide watch.

15   Q.  Did you ever work at any other ADC prison besides Phoenix?

16   A.  I did not.

17   Q.  What were your duties as a psychology associate?

18   A.  To provide direct care, program development, advocacy, case

19   management, reentry planning, staffing.  A whole gamut of

20   services to try to make sure that the patients would be stable

21   and move to the least restrictive environment or assist them

22   when they're leaving the prison system so they could be

23   successful.

24   Q.  Now, is it the case that ADC differentiates between

25   licensed and nonlicensed psychology associates?

```
 1   A.  They do.

 2   Q.  And are there certain functions that cannot be performed by

 3   an unlicensed psych associate; they must be performed by a

 4   licensed psych associate?

 5   A.  Yes, there are duties that have to be with a licensed

 6   professional.

 7   Q.  Can you give the Court some examples?

 8   A.  A person who is on suicide watch has to be evaluated on a

 9   daily basis by someone who is a licensed clinician.  I think

10   that was the main issue, is that they would be -- a licensed

11   person would handle the movement on the suicide watch.  So you

12   have 30-minute suicide watch, 10-minute suicide watch, and then

13   constant suicide watch.  And that movement in that process or

14   being taken out of that process required a licensed clinician.

15   Q.  And you were a licensed psych associate; correct?

16   A.  Correct.

17   Q.  So you performed those duties, among others?

18   A.  I did.

19   Q.  Were you full or part time?

20   A.  Full time.

21   Q.  And what was your schedule?

22   A.  On paper, my schedule was about 7:30 to 4:00.  Eight, eight

23   and a half hours were what we had to clock in, but many duties

24   went beyond that.  And we were able to access eOMIS from home,

25   and there was more work than could be done in a day, so often I
```

1  was working past whatever was, you know, clocked.

2  Q.  You mentioned eOMIS.  What is that?

3  A.  eOMIS is the electronic record system that is used to keep

4  track and store the patient data regarding their medical and

5  mental health treatment.

6  Q.  So as a psych associate, would you both put information

7  into eOMIS and review information that was in eOMIS?

8  A.  Yes, I did.

9  Q.  Was your on-paper schedule Monday to Friday?

10  A.  It was.  Oh, you know, except for -- when I first started,

11  the way they described it is, you'll just fill in a couple of

12  hours every other weekend.  We had a schedule where licensed

13  clinicians had to come in on the weekend because the patients

14  needed to be seen by licensed clinicians.

15       So the two hours often, you know, morphed into many

16  more than two hours, because it's not clinically appropriate to

17  see, you know, 16, 20 people that are on suicide watch in a

18  two-hour period.  So my two hours rarely ever was the two

19  hours, so I did work weekends at times.

20  Q.  And when you worked more than your scheduled hours, were

21  you paid overtime?

22  A.  I was not.

23  Q.  Did you receive any feedback on your performance as a psych

24  associate in the 18 months you were there?

25  A.  I did.

1   Q.  And was that feedback mostly positive, mostly negative, or

2   mostly neutral?

3   A.  Mostly positive.

4   Q.  Would you turn to Exhibit 221, please.  It should be behind

5   you.

6   A.  There's a bunch of --

7              MR. FATHI:  May I approach, Your Honor?

8              THE COURT:  You may, please.

9   BY MR. FATHI:

10  Q.  Do you have it, Ms. Fischer?

11  A.  I do.  Thank you.

12  Q.  What is Exhibit 221?

13  A.  It's a Nonuniform Employee of the Month certificate.

14  Q.  And for what month?

15  A.  January 2017.

16  Q.  And I see that it has your name on it?

17  A.  Correct.

18  Q.  How many Nonuniform Employees of the Month are chosen at

19  Alhambra Unit every month?

20  A.  It's my understanding there was one.

21  Q.  And who decides who receives this award?

22  A.  I don't know the body of people that probably went into the

23  decision, but I can see here it was signed by Cathy Cottrell,

24  deputy warden.

25  Q.  And what does this award signify?

```
 1    A.  It's an appreciation for dedication and service to the
 2    patients that are housed in the Alhambra Unit.
 3              MR. FATHI:  Your Honor, I move the admission of
 4    Exhibit 221.
 5              THE COURT:  Any objection?
 6              MS. LOVE:  No objection.
 7              THE COURT:  221 is received.
 8              (Exhibit No. 221 received into evidence.)
 9    BY MR. FATHI:
10    Q.  Would you turn to Exhibit 222, please.
11              Ms. Fischer, what is Exhibit 222?  It's a number of
12    pages, but what is it collectively?
13    A.  Collectively, these are midterm evaluations or final
14    evaluations of my internship when I worked at the prison.
15    Q.  And I see that at the top of the page, it says "Name of
16    Student," followed by your name.  Why were you considered a
17    student?
18    A.  Because I was doing my internship there, as I mentioned.
19    Q.  So are these evaluations of the totality of your work as a
20    psych associate or just some subset that you were doing as a
21    student?
22    A.  The responsibilities encompassed everything that I did in
23    the facility.  So it's basically the totality of what I did
24    there.
25    Q.  All right.  There appear to be six different -- or six
```

1  versions of this form filled out on different dates; is that

2  correct?

3  A.  That's correct.

4  Q.  Who completed these forms?

5  A.  They're signed by Dr. Stephanie Leonard.

6  Q.  And who is Dr. Leonard?

7  A.  She was my supervisor of my internship.

8  Q.  And what was her title?

9  A.  I think associate regional mental health director.

10  Q.  Was she a Corizon employee?

11  A.  She was a Corizon employee, yes.

12  Q.  Now, these forms have a numerical rating scale where the

13  student's performance is rated on a scale from 1 to 6.  Do you

14  see that?

15  A.  I do.

16  Q.  And according to the rating scale on the form, what does a

17  6 mean?

18  A.  Excellent.  Consistently exceeds outcome criteria.

19  Q.  Is there a score higher than 6?

20  A.  There is not.

21  Q.  On all of these performance items on all of these

22  evaluations, did you ever receive a score lower than 6?

23  A.  I did not.

24  Q.  Would you look at the last one in the packet.  It's pages

25  Exhibit 222.11 to 12.

1              Do you see that document?

2    A.  I do.

3    Q.  What is the date on this document?

4    A.  February 5th, 2018.

5    Q.  And what was that in relation to your -- the date you

6    resigned from Corizon?

7    A.  I resigned in March, so a month before.

8    Q.  And would you please read aloud the comment on page 222.12.

9    A.  Ms. Fischer has worked well with patients here,

10   establishing rapport, maintaining appropriate boundaries, being

11   consistent and fair and ethical.  She does well advocating for

12   patients when necessary and follows her clinical intuition.  It

13   has been a pleasure to have Ms. Fischer at our site and working

14   with the patients here.

15   Q.  And that was written by Dr. Leonard?

16   A.  It was.

17   Q.  You read the first line as "Ms. Fischer has worked well."

18   I believe it says "very well."  Do you see that?

19   A.  "Very well."  Yes.

20              MR. FATHI:  Your Honor, I'd move the admission of

21   Exhibit 222.

22              THE COURT:  Any objection?

23              MS. LOVE:  No objection.

24              THE COURT:  222 is received.

25              (Exhibit No. 222 received into evidence.)

1    BY MR. FATHI:

2    Q.  Ms. Fischer, would you please next turn to Exhibit 220.

3         Ms. Fischer, what is Exhibit 220?

4    A.  This is a certificate indicating that I'm a Certified

5    Correctional Health Professional.

6    Q.  And is that sometimes abbreviated CCHP?

7    A.  It is.

8    Q.  Is it mandatory to receive CCHP certification before you

9    can provide healthcare services in a prison?

10   A.  It is not.

11   Q.  So this is something that you did voluntarily?

12   A.  Yes.

13   Q.  Did you do it at your own expense?

14   A.  I did.

15   Q.  Who issues this CCHP certification?

16   A.  NCCHC, the National Commission for Correctional Health

17   Care.

18   Q.  And who are they?

19   A.  They provide industry standards for correctional care in

20   the nation.  There's a set of policies and procedures and rules

21   for best practices, so this certificate requires studying those

22   materials and then passing an examination.

23   Q.  And you did all of those things?

24   A.  I did.

25   Q.  This certificate expired on March 31st of 2018.  Do you see

1   that?

2   A.  I do.

3   Q.  Did you renew the certificate?

4   A.  I did.

5   Q.  So you remain today a Certified Correctional Health

6   Professional?

7   A.  I am.

8           MR. FATHI:  Your Honor, I'd move the admission of

9   Exhibit 220.

10          THE COURT:  Any objection?

11          MS. LOVE:  No objection.

12          THE COURT:  220 is received.

13          (Exhibit No. 220 received into evidence.)

14   BY MR. FATHI:

15   Q.  Ms. Fischer, when you left your position with Corizon in

16   March of 2018, was your departure voluntary or involuntary?

17   A.  Voluntary.

18   Q.  And why did you leave your position?

19   A.  I left my position for a number of reasons, but most

20   important to me was the lack of quality care that the patients

21   were receiving in the facility, and after many months of trying

22   to work on the team to try to improve that treatment, it became

23   a point where I didn't feel like I could be effective in

24   improving that quality.

25          And the second important reason was my safety.  There

1    were things happening at the prison that put the staff members

2    and the other patients in harm's way.  And on the particular

3    day when I resigned, I was -- a patient was brought to me that

4    should have been restrained, wasn't restrained.  Patients were

5    left on the unit outside in the recreation area, and the

6    officer was not on the unit.

7              So things like that jeopardized my safety, and I

8    wasn't comfortable there anymore.

9    Q.  Okay.  We'll return to that in a little bit, but right now

10   I want to go to the beginning of your time with Corizon.

11             When you first began, did you have an orientation?

12   A.  You could loosely call it an orientation.  It was

13   disjointed.  There was very little written material that was

14   provided.

15             During my training, I had a notebook that had a

16   PowerPoint presentation with three, I guess, slides on each

17   page that I could barely read that I was supposed to review and

18   sign that I understood the content of that.  And I asked if

19   there was a bigger copy or a way that I could review it online,

20   and I was told because I didn't have the log-in, that I

21   couldn't review it that way.

22             So I got some bigger readers, or more strong readers,

23   and I did my best, but it's not what I'm used to in an

24   onboarding process.

25   Q.  Was the orientation that you had organized by ADC or

1   Corizon or both?

2   A.  It was a joint effort, it appeared to me.  There was things

3   on the DOC side that had to be checked off and things on the

4   Corizon side that had to be checked off.

5   Q.  And how long did this orientation last?

6   A.  I don't know that it was even a week.  There were some

7   trainings that went on past that.  So I -- in total, I would

8   say probably four or five days.

9   Q.  At some point in this orientation, were you told how you

10  can tell when an inmate is lying?

11  A.  Yes.  That was actually my first interaction with DOC

12  training.  The trainer repeatedly talked disparagingly about

13  patients, and the joke was:  How do you know when a patient is

14  lying?  Their lips are moving.

15          So there was an indoctrination process that started at

16  the beginning, which sort of dehumanized the people that we

17  were treating.  And it was offensive to me, and I brought it up

18  to Corizon management, brought up those concerns.

19  Q.  Who was the person who made the remark about how you can

20  tell when a patient's lying?

21  A.  I think his name was Sheldon.  They went by last names.  It

22  was a trainer.  I think his name was Sheldon.

23  Q.  And was he an ADC or Corizon employee?

24  A.  ADC.

25  Q.  Do you know his rank or position?

1    A.  I just think he was a trainer.  I don't know how the ranks

2    really work there.

3    Q.  Ms. Fischer, are you aware of the Parsons versus Ryan case?

4    A.  I am.

5    Q.  Are you aware that the settlement in that case requires

6    that certain mental health performance measures be met?

7    A.  I'm aware of it.

8    Q.  Are you aware that ADC's reports on its compliance or

9    noncompliance with these performance measures are called CGARs?

10   A.  I'm aware of that, yes.

11   Q.  When you started your employment at the Phoenix complex,

12   what written materials or instructions were you given about the

13   requirements of the Parsons settlement?

14   A.  What happened consistently while I was a Corizon employee

15   is there were these photocopied things that didn't have dates

16   on them that had a list here or a list there with a

17   one-sentence explanation.  I never felt like I fully understood

18   the totality of those CGARs' requirements, although I asked

19   that I could see some bigger documents so that we could

20   understand them better.  I asked that if I could make a

21   training of those things so that my fellow employees would also

22   understand those requirements as well.

23   Q.  And whom did you ask?

24   A.  I asked my supervisors.  I asked Dr. Calcote.  I asked Lynn

25   Cole.  I brought it up to our board chairman.

1    Q.   Okay.  Let's identify those people for the Court.

2              Who is Dr. Calcote?

3    A.   Dr. Calcote, I believe, is the regional mental health

4    director of Corizon Arizona.

5    Q.   Is he in the courtroom today?

6    A.   He was, but I think he left.

7    Q.   And who is Lynn Cole?

8    A.   Lynn Cole, you know, I think she's a vice president.  She

9    works in the regional office.  So you have the prisons and then

10   where the administrative work appears to be done, and she, I

11   think, was a vice president in the regional office.

12   Q.   And is Ms. Cole in the courtroom today?

13   A.   I didn't see her, no.

14             Oh, wait.  Maybe she is.  I see her.

15   Q.   So that's a "yes"?

16   A.   That's a "yes."

17   Q.   And when you said the board chairman, do you mean the board

18   chairman of Corizon?

19   A.   Yes.  His name is Mr. Goldberg, I believe.

20   Q.   Were you ever at any time during your employment given a

21   list of the mental health performance measures that are set

22   forth in the Parsons settlement?

23   A.   I was trying to remember.  I don't know that I was given a

24   whole list.  I think there was -- you know, we had these things

25   called CGAR monthly meetings where they would talk about them,

1    but I don't remember.

2    Q.  Were you ever given any of Judge Duncan's orders on the

3    requirements of the Parsons settlement?

4    A.  I was never given any orders from the judge.

5    Q.  Did you ever ask for written instructions or documentation

6    on the requirements of the Parsons settlement?

7    A.  I did.

8    Q.  And you asked -- again, you may have just said this, but

9    whom did you ask?

10   A.  Officially, in writing, I asked Dr. Calcote and Lynn Cole.

11   Q.  Did you ask more than once?

12   A.  Yes, I did.

13   Q.  Would you please turn to Exhibit 223.

14            Ms. Fischer, what is Exhibit 223?

15   A.  This is an email that I wrote to Dr. Calcote and Lynn Cole

16   and cc'd Dr. Leonard; Dr. Eddie Taylor from Corizon;

17   Dr. Burnetti-Atwell, which is in our corporate office.  She

18   heads mental health there; and then Roland Maldonado, who I

19   believe was over the Arizona corporate office.  I never met

20   him.

21   Q.  So Ms. -- or Dr. Burnetti-Atwell and Mr. Maldonado were

22   Corizon employees?

23   A.  They were.

24   Q.  And what is the date of this document?

25   A.  October 23rd, 2017.

1    Q.  Would you please read aloud the paragraph number 1.

2    A.  CGARs.  I have still not received the CGARs document Lynn

3    Cole mentioned in our meeting which explained the criteria, the

4    monitors we are using to determine if we are in compliance.

5    This information is very helpful to us, and I would like to be

6    able to review it for myself and perhaps make a tool that staff

7    can use to understand the CGARs.

8    Q.  Did you ever receive the CGAR documents that Ms. Cole had

9    mentioned?

10   A.  No, I didn't.

11           MR. FATHI:  Your Honor, I'd move the admission of

12   Exhibit 223.

13           THE COURT:  Any objection?

14           MS. LOVE:  No objection.

15           THE COURT:  223 is received.

16           (Exhibit No. 223 received into evidence.)

17   BY MR. FATHI:

18   Q.  Ms. Fischer, during your employment at the Phoenix complex,

19   did you ever ask to see the Corizon contract?

20   A.  I did.

21   Q.  Whom did you ask?

22   A.  Richard Watts.  I also asked to see the DHS licensing

23   requirements, because whenever I begin a project, I want to

24   understand the, you know, box within what I'm operating.  And I

25   couldn't get a copy of the licensing regulations.  And there

1    were times where I felt uncomfortable that we were not meeting

2    those regulations, but I couldn't validate that or get any

3    information on it.

4    Q.  Okay.  Let's go through these one at a time.

5              So you asked Mr. Watts if you could see the Corizon

6    contract?

7    A.  Yes.  And I may have even asked Dr. Leonard and

8    Dr. Calcote.  I wanted to understand what the rules were.

9    Q.  And who is Mr. Watts?

10   A.  He is the -- was, I don't know what he's doing now, but he

11   was the facility health administrator in Phoenix.  So that's

12   like the, probably, top Corizon person at each facility.

13   Q.  And did anyone ever provide you with the Corizon contract?

14   A.  No.

15   Q.  And then you mentioned that you asked to see the licensing

16   documents for the Phoenix mental health units; is that correct?

17   A.  Correct.

18   Q.  Why did you want to see those documents?

19   A.  I was concerned about the way that the beds were being used

20   and what the criteria was for people that were in inpatient

21   psychiatric unit beds and what the State required of us in

22   terms of care for patients that were in an inpatient

23   psychiatric unit.

24   Q.  And whom did you ask to see those licensing documents?

25   A.  I think I asked the director of nursing.  Her name was

1   Barbara D'Alessio.  I asked FHA Watts.  I brought it up to

2   Dr. Leonard.

3   Q.  And were those licensing documents ever provided to you?

4   A.  They were not.

5   Q.  You used a term I just want to make sure everyone

6   understands.  You said "FHA Watts"?

7   A.  Facility health administrator.

8   Q.  So F-H-A?

9   A.  Correct.

10  Q.  Thank you.

11          Did you ever ask to see the monitor guide that the ADC

12  monitors used to determine compliance or noncompliance with the

13  requirements of the Parsons settlement?

14  A.  Yes.

15  Q.  And whom did you ask for that?

16  A.  I asked Dr. Calcote and Lynn Cole, because that was the

17  document that I felt would help us understand what the

18  requirements were.

19  Q.  And was that document ever provided to you?

20  A.  It was not.

21  Q.  Ms. Fischer, at any point during your time as a psych

22  associate, did you begin to have any concerns about the mental

23  health services that were being delivered to patients at

24  Phoenix?

25  A.  Yes, I did.

1   Q.  And what were those concerns globally?

2              MS. LOVE:  Objection, Your Honor.  Relevance.  Exceeds

3   the scope of these hearings related to the accuracy of the

4   monitoring.  Exceeds the scope of the stipulation.

5              THE COURT:  Overruled.

6              THE WITNESS:  Can you say that again?

7   BY MR. FATHI:

8   Q.  Yes.  I would just like you to sort of list your concerns

9   globally on a fairly high level, and then we will discuss them

10  individually.

11  A.  Okay.  Well, my concerns were the actual treatment that was

12  provided, not what was documented but the actually spending

13  time with people and providing healthcare, mental healthcare to

14  them.  The frequency of the care.  The duration of the care.

15  Meeting what I thought was the intent of Parsons versus Ryan

16  rather than the letter.  I felt like we did a lot of box

17  checking and not providing care.

18  Q.  At any point did you become concerned that there was not

19  adequate mental health staffing at the Phoenix complex?

20  A.  Yes.  I was very concerned that there was not adequate

21  staffing.

22  Q.  Did your concerns involve the number of staff, the

23  qualifications of the staff, or both?

24  A.  Both.

25              MS. LOVE:  Objection, Your Honor.  Again, relevance.

1   It exceeds the scope of the stipulation as to staffing and

2   unrelated to monitoring accuracy.

3           THE COURT:  Overruled.

4   BY MR. FATHI:

5   Q.  Was there ever a time in the 18 months that you worked at

6   Phoenix that the mental health department was fully staffed,

7   all positions were filled?

8   A.  No.

9   Q.  Did you work in just one unit at Phoenix, or were you ever

10  asked to cover more than one unit?

11  A.  We were all asked to cover more than one unit.  And then

12  when someone was sick, we had to fill in for those people.  It

13  was a constant, ongoing problem.

14  Q.  And in your experience, was it feasible to do all that in a

15  40-hour workweek?

16  A.  It was not.

17  Q.  At any point did you have a concern about turnover in

18  mental health staff?

19  A.  Yes.

20  Q.  Was there -- were there one or more particular positions

21  that you were concerned about, or was it more global?

22  A.  It was global that there was a shortage of staff, but

23  particularly I was concerned about the people who were

24  providing direct care to the patients.

25  Q.  Did you ever develop a concern about the rate of turnover

1    in the mental health director at Phoenix?

2    A.  Yes, I did.

3    Q.  First of all, was does the mental health director at

4    Phoenix do?

5    A.  Well, what I think the position should do is outlined, I

6    think, in the technical manual that states that that person

7    would supervise the mental health treatment that's provided in

8    the facility.

9    Q.  How many mental health -- how many different mental health

10   directors were there at Phoenix during your tenure?

11   A.  Six, I believe.

12   Q.  Did that turnover have an effect on patient care?

13   A.  Yes, it did.

14           MS. LOVE:  Foundation.

15   BY MR. FATHI:

16   Q.  Can you --

17           THE COURT:  Overruled because the answer had already

18   been received.

19   BY MR. FATHI:

20   Q.  Could you describe how you came to perceive that that

21   turnover had an effect on patient care?

22   A.  One of the key roles that the director plays is in staffing

23   and decision-making.  So where a person is housed and what

24   level they are and what amount of care they get is established

25   by the person in that position.

1          When that position was empty or when that person was

2    overwhelmed, sometimes it could take weeks to do a staffing to

3    get the person the care they needed or get them moved to the

4    correct level of care for their psychiatric condition.

5    Q.  Did you ever develop any concerns about how much or how

6    little time mental health staff were spending with patients?

7    A.  I was concerned about that, yes.

8    Q.  Could you elaborate on that?

9    A.  With the volume of patients that we had to see, if you just

10   evaluated the number of hours in a day -- I was assigned at one

11   point to George Ward which had, you know, routinely 20 to 25

12   patients and also assigned to George Ward, which are the two

13   most acute psychiatric units, that had between probably 8 and

14   15 people.

15          And it was my job to see them, you know, at least once

16   a week, but patients in an inpatient psychiatric unit require

17   more attention than once a week.  I mean, that's minimum of

18   what we would need to do.

19          So I know that I was always assigned to more than one

20   area, and my coworkers were assigned to more than one area.

21   And there was often conversation about the concerns, about

22   feeling like you couldn't get quality work done, particularly

23   in intake.

24          The list of patients that would come in, sometimes

25   there would be, you know, 60 or 80 patients that came in, and

1    one person assigned there and other people coming in to fill

2    in.  And so if you just figure out the number of hours that are

3    in a day and the amount of time you actually have for them to

4    be brought in, sometimes these intakes were, you know, two

5    minutes.  And that's -- that was disturbing to me.

6    Q.  And --

7            THE COURT:  Excuse me just a second.

8            Ms. Fischer, in that last answer, at first you said

9    you were assigned to George Ward, and then you went on to say,

10   "I was also at that same time assigned to George Ward."

11           THE WITNESS:  Baker Ward.  I'm sorry.

12           THE COURT:  So was the first one meant to be Baker?

13           THE WITNESS:  It was meant to be Baker.

14           THE COURT:  And then the second one was George?

15           THE WITNESS:  Correct.

16           THE COURT:  Thank you.

17           MR. FATHI:  Thank you, Your Honor.

18   BY MR. FATHI:

19   Q.  Just to be clear, when you say "intake," are you talking

20   about intake mental health evaluations of people who are coming

21   into the prison system?

22   A.  Yes.

23   Q.  And was it your testimony that sometimes 60 to 80 of those

24   would be done by one person in a single day?

25   A.  I don't -- I didn't keep track as -- you know, I wasn't a

1    supervisor there, but it appeared to me quite often that these

2    lists and the people who were assigned there, it wasn't enough

3    to do in-depth intake assessments.

4           THE COURT:  Can you tell me whether Mr. Fathi is

5    dramatically off the mark with respect to 60?  You can't say

6    exactly, I understand that, but 60 is an incredible amount to

7    be able to accomplish in one day.  Is he dramatically off the

8    mark there, or is he in the range?

9           THE WITNESS:  He's in the range, in the lower end of

10   the range.  I mean, many days there were 80 people that came

11   in.

12          THE COURT:  And how many people would be assessing

13   these 80 people?

14          THE WITNESS:  There was one person assigned, and then

15   people -- what they would say is, "I need you to go work in

16   intake."

17          So the work that I would have to do on George and

18   Baker, I have to put on hold because we have 80 intakes that

19   came in, so what happens to these patients?  And so it was this

20   constant shuffling back and forth, trying to get the intakes

21   done.

22   BY MR. FATHI:

23   Q.  Ms. Fischer, did you ever express any of your concerns

24   about mental health staffing to your superiors in Corizon?

25   A.  I did.

1    Q.  And to whom did you express those concerns?

2    A.  Each of my directors, FHA Watts, Dr. Calcote, Lynn Cole,

3    the board chairman.  I communicated it to everyone more than

4    once.

5    Q.  Would you please turn to Exhibit 234.

6    A.  234?

7    Q.  234.

8         Ms. Fischer, what is Exhibit 234?

9    A.  This is a letter that I wrote to Jeff Goldberg, the Corizon

10   board chairman.

11   Q.  And what is the date of this letter?

12   A.  September 29th, 2017.

13   Q.  Would you please read aloud the second sentence of the

14   third paragraph.

15   A.  "Specifically"?

16        Specifically, with regard to our mental health staff,

17   our facility has been and remains dramatically understaffed.

18   Q.  And then following over to the next page, the top line,

19   where it begins, "Furthermore."  Would you please read the

20   balance of that paragraph.

21   A.  Furthermore, we are often without the necessary equipment

22   and materials to accomplish our tasks as required by our

23   contract and the terms of the lawsuit under which we are

24   operating, Parsons versus Ryan.

25   Q.  Continue.

1    A.  In terms of patient care, we are unable to spend sufficient

2    time with patients to assist in their mental health recovery

3    and spend most of our time in crisis management and

4    deescalation mode.  Tragically, some of the mental distress

5    patients experience is related to either neglect or overt

6    antagonism by correctional staff.  When these issues are

7    reported, no remedies are forthcoming.

8    Q.  Why did you write this letter to the Corizon board chair?

9    A.  It was in response to a company update that he sent out

10   where he outlined his vision for providing the absolute best in

11   our field mental health care consistently and across all

12   staffing levels.  And I felt like he had the heart of what I

13   have for wanting to provide quality care to people.  So I wrote

14   to him in hopes that he would give us some assistance so we

15   could provide the care he was looking for.

16           MR. FATHI:  Your Honor, I'd move the admission of

17   Exhibit 234.

18           THE COURT:  Any objection?

19           MS. LOVE:  No objection.

20           THE COURT:  234 is received.

21           (Exhibit No. 234 received into evidence.)

22   BY MR. FATHI:

23   Q.  Would you next turn to Exhibit 240, please.

24           Exhibit 240 consists of a number of pages.  I'd like

25   to focus on the first three pages, which appear to be some

1    emails between you, Dr. Calcote, and Dr. Urdaneta dated

2    October 11th and 12th, 2017.

3              Do you agree with my characterization?

4    A.  Yes.

5    Q.  Who is Dr. Urdaneta?

6    A.  Dr. Urdaneta was the, I think, regional psychiatric

7    director, so he was over all of Arizona for psychiatry.

8    Q.  And he was a Corizon employee?

9    A.  He was.

10   Q.  You talk of him in the past tense.  Did he leave at some

11   point?

12   A.  I don't know the answer to that.  I haven't been there in a

13   while, so I'm assuming he's still there but I don't know.

14   Q.  Okay.  Would you please turn to page 240.2, a little bit

15   more than halfway down the page.  This is an October 11th email

16   from Dr. Urdaneta to you, Dr. Calcote, Mr. Taylor, Dr. Leonard,

17   and Diane Ortega.

18             Who is Diane Ortega?

19   A.  Diane Ortega is a licensed professional counselor who was

20   tasked with filling in and holding the position of the mental

21   health director when they were having a hard time filling that

22   position or didn't have a candidate for that position.

23   Q.  So she was essentially acting in that capacity?

24   A.  Yes.

25   Q.  All right.  Would you please read the -- read aloud the

1    second sentence of Dr. Urdaneta's October 11th email.

2    A.  Does it start with "Dr. Calcote indicated"?

3    Q.  Yes.

4    A.  Dr. Calcote indicated from his point of view another factor

5    that I generally have a blind spot for, the fact that we are so

6    short of help.

7    Q.  Would you then please read aloud the fourth sentence.

8    A.  The fourth sentence?

9    Q.  Yes.  Beginning, "It then."

10   A.  It then helps me see that perhaps the problem is not so

11   much in the tools but in the fact that we don't realize that we

12   are very short of help to do what we want -- what we all want

13   to do, provide the best care for our patients.  It says "out

14   patients," but it looks like an error.

15   Q.  And then if you turn back a page to 240.1, there's an

16   October 11th, 2017, email from Dr. Calcote later the same day.

17   This email continues over on to page 240.2.

18             Would you please read aloud the second to last

19   paragraph, beginning, "The sad circumstance."

20             MS. LOVE:  Objection.  Foundation and hearsay.

21             THE COURT:  The foundation objection, can you address

22   that first?

23             MR. FATHI:  Yes.

24   BY MR. FATHI:

25   Q.  Ms. Fischer, did you receive this email?

1    A.  I did.

2    Q.  Did you receive it on or about October 11th?

3    A.  I did.

4    Q.  And Mr. Calcote -- Dr. Calcote, I believe you testified,

5    was at that time a Corizon employee?

6    A.  He was.

7              THE COURT:  Anything further to say on foundation?

8              MS. LOVE:  Not on foundation but on hearsay.

9              THE COURT:  All right.  The hearsay objection is

10   overruled because the Court will consider this for the state of

11   mind of the witness and not for the truth of the matter

12   asserted in this particular circumstance.

13             MR. FATHI:  Your Honor, it actually is -- it is a

14   nonhearsay admission of a party under Rule 801.

15             THE COURT:  I can get to its admissibility in a couple

16   of ways, not excluding your way, but the way that I just am

17   addressing it is by way of what I've explained to defense

18   counsel so that they understand that I am interested in the

19   state of mind of this witness, and this kind of information I

20   think is relevant to the state of mind of the witness.  And so

21   that was a signal to defense counsel that if they make this

22   kind of objection in the future, they're likely to get that

23   response from me as well.

24             MR. FATHI:  Thank you, Your Honor.  I just wanted to

25   make the point that it is also an admission by an agent.

1    BY MR. FATHI:

2    Q.  Please go ahead, Ms. Fischer.

3    A.  The sad circumstance is that we are faced with the choice

4    of who do we decide to help, because we cannot give all of them

5    what we wish we could.  Resources are limited, and the more we

6    focus on raising the bar on how we provide treatment, the less

7    able we are to help all who need it.  The less we focus on

8    raising the bar, the less effective are the services we do

9    offer.  I believe in many respects the quality of services our

10   staff provide are amazing given the obstacles we face every

11   day.

12   Q.  Thank you.

13         And finally, would you turn back to page 240.1 at the

14   top of the page.  This appears to be an October 12th, 2017,

15   email from you to Dr. Calcote and Dr. Urdaneta.

16         Did you send this email on or about October 12th?

17   A.  I did.

18   Q.  Would you please read aloud the first three sentences of

19   the second paragraph.

20   A.  By our Corizon mission, we purport to use clinical best

21   practices and evidence-based practices, neither of which are

22   apparent given the fact that the staff is stretched so thin

23   that they barely get time to check in with patients, let alone

24   provide therapy.

25         If we want a stabilization unit, then we have to be

1    staffed for stabilization.  Inmates will not become stable by

2    sitting in their cells alone 23 hours a day or going to

3    recreation or talking about current events and seeing a

4    psychiatric provider, sometimes via Telemedicine, once every 30

5    days.

6    Q.  Ms. Fischer, why did you write those words to Dr. Calcote,

7    Dr. Urdaneta, and the other recipients?

8    A.  Because the patients weren't getting the care that I

9    believe they needed.  Or that I think we were contracted or

10   obligated to provide to them.

11   Q.  Did you receive a response to this email?

12   A.  I don't know the answer to that.

13          MR. FATHI:  Your Honor, I'd move the admission of

14   Exhibit 240.

15          THE COURT:  Any objection?

16          MS. LOVE:  Objection to the -- this is a very long

17   exhibit, and we were only referencing particular emails.  So we

18   object to the portions of this exhibit that were not addressed

19   in the testimony.

20          THE COURT:  Can you tell me which of the portions

21   those are, and I'll address whether I think it should be

22   admitted or not?  I think you've got the burden to tell me

23   which parts you find objectionable.

24          MS. LOVE:  We object to all of the emails that were

25   not addressed in the testimony based upon relevance,

1    foundation, and hearsay.

2         THE COURT:  All right.  Well, I will take a moment to

3    read -- so you're telling me to start reading where, Ms. Love?

4         MS. LOVE:  Well, I believe that we only addressed

5    Ms. Fischer's email at the top of page 1 and then portions and

6    Mr. -- or Dr. Calcote's email at the bottom of page 1, and

7    Dr. Urdaneta's email on page 2.  And I don't believe that any

8    other portions of the emails were discussed at page 3, 4, 5, 6,

9    or 7.

10        THE COURT:  So you want me to read 3, 4, 5, 6, and 7,

11   is that right, for consideration of these three evidentiary

12   objections?

13        MS. LOVE:  Yes, since there was not even any testimony

14   to the nature or the subject matter of any of the other emails

15   contained in this multi-email exhibit.

16        THE COURT:  Why are they attached together, Mr. Fathi?

17        MR. FATHI:  Your Honor, they were -- this is a chain

18   of emails, and I wanted to preserve the integrity and not

19   invite wondering about what had been omitted.

20        THE COURT:  Ms. Fischer, is it true that this is a

21   chain email that started -- and that continuing from the

22   earlier one to the latest one, it's a response back and forth?

23        THE WITNESS:  It is -- it started with the last -- the

24   email that was the last, and these are all responses and a

25   communication that went back and forth between the parties.

1              THE COURT:  All right.  Give me just a moment.

2          I've skimmed these remaining pages which are subject

3     to the objection, and I can tell from the skim that they do at

4     the very least provide a context that is useful in the

5     consideration of the discussed portions of the exhibit.

6              So all of the objections will be overruled, and 240

7     will be received.

8              (Exhibit No. 240 received into evidence.)

9              MR. FATHI:  Thank you, Your Honor.

10    BY MR. FATHI:

11    Q.  Ms. Fischer, in your employment prior to ADC, had you done

12    project management?

13    A.  I have.

14    Q.  Had you done strategic planning?

15    A.  I have.

16    Q.  At -- I believe you testified at Maricopa County Jails, you

17    supervised nine mental health staff?

18    A.  I did.

19    Q.  Did you at one point during your employment with ADC

20    prepare a proposed staffing plan for mental health at Phoenix?

21    A.  I did.

22    Q.  Why did you do that?

23    A.  What it appeared to me is that the staffing numbers were

24    developed based on number of patients and number of clinicians.

25    In an inpatient psychiatric unit, you're not only providing

1    direct care; there's a lot of other facets of care that I

2    didn't think were being considered, and so I wanted to outline

3    what the real duties are so that there could be an

4    understanding of how many staff were really needed to provide

5    care in an inpatient setting.

6    Q.  And how did you go about developing that proposed --

7    proposal?

8    A.  There were -- I first put a list of all the duties.  I made

9    a list of all the things that I had observed over the time

10   working there that were things that were expected of us and

11   then worked to establish an Excel spreadsheet that sort of

12   quantified those things so that it could be made

13   understandable.

14   Q.  Would you turn to Exhibit 252, please.

15          Ms. Fischer, what is Exhibit 252?

16   A.  This is an email that I sent to Dr. Calcote and Dr. Leonard

17   regarding mental health staffing at the Alhambra facility.

18   Q.  If you look ahead to pages 6 through 10, can you tell us

19   what that is?

20          MS. LOVE:  Objection, Your Honor.  Foundation,

21   relevance, and lack of any testimony regarding qualifications

22   to render a staffing report.

23          THE COURT:  Well, the question is "Can you tell us

24   what this is," so those objections will be overruled.

25          Do you know what this is?

UNITED STATES DISTRICT COURT

1          THE WITNESS:  I know what this is.

2          This is a document that I put together and emailed to

3   Dr. Leonard and Dr. Calcote regarding the duties that were

4   actually performed at that facility, and then a matrix of best

5   practices and then okay practices and then in my mind what we

6   were actually providing.

7          THE COURT:  So this is no more than your observations

8   about staffing corrections that could be taken to -- additional

9   steps with respect to staffing based upon your perspective as

10  somebody who is not an expert in the field necessarily but

11  somebody who's on the floor seeing what's happening and just

12  giving your observations about what could happen here; no more,

13  no less.  Is that fair?

14         THE WITNESS:  That's fair.

15         THE COURT:  All right.  Well, the Court will receive

16  that.  The objections are overruled.

17         MR. FATHI:  Thank you, Your Honor.

18  BY MR. FATHI:

19  Q.  Would you turn to page -- starting on page 6, pages 6

20  through 10.

21         Could you please just walk us through this document.

22  I don't mean every line.  I just mean what each column is and

23  so on.

24  A.  So this is the PA, psychology associate, psychologist

25  caseload calculator.  And it's broken down into direct care

1    services, quality of care services, project management.  It has

2    different areas.  Prior to that, there are explanations for

3    what these categories are.

4            So if you follow number of sessions, so if you look at

5    individual weekly sessions, it says 20; and then the time there

6    assumes that we would only spend 10 minutes with patients in

7    individual weekly sessions.  That would take a person 3 hours

8    and 20 minutes to do in a week.

9            So if you just follow each line like that, you'll

10   understand how it gets to the total at the end.

11           On the farthest right side of it is best practices.

12   And that number of time is bumped up from 10 minutes to 30

13   minutes, showing then what that weekly amount would be the

14   person would spend in terms of direct care with a patient.

15   Q.  So is it fair to say that the first columns are what was

16   actually being done and the second column is what you believed

17   should be done?

18   A.  No.  The last column is what I think should be done; the

19   middle column is bare bones, not enough; and the reality is

20   less than that.  So the reality isn't on this page.

21   Q.  So you're saying that the left column here overstates the

22   amount of, for example, time that's being spent with patients?

23   A.  Yes.  Yes.

24           THE COURT:  And the way that we would find out about

25   how much time was actually spent with the patients would be to

1    look at each of their progress notes and see what the time

2    devoted -- would the notes reflect that?

3            THE WITNESS:  Well, not always.  If the person does

4    the note while they're with the patient, you know, you could

5    see them opening up the note, spending the time, working with

6    the patient, closing the note, and then you would see how long

7    that was.

8            But because of the volume of patients that needed to

9    be seen, quite often clinicians would meet with patients and

10   then do their notes at home on their couch through eOMIS that

11   they could get to online, rather than stay the hours to do that

12   documentation.

13           Technically, those notes should say "late entry."

14   Sometimes they did, sometimes they didn't.  So I don't know

15   that you would get a very accurate picture of how long.

16           THE COURT:  But it wasn't your custom and practice to

17   note on the note itself how much time you devoted to providing

18   care on that particular encounter; instead, if there was any

19   kind of time notation, it was a feature of the automatic

20   process of eOMIS of noting when the file was opened and when it

21   was closed?

22           THE WITNESS:  Correct.

23           THE COURT:  Thank you.

24   BY MR. FATHI:

25   Q.  So you submitted this proposed staffing plan to Dr. Calcote

1   and Dr. Leonard on September 27th, 2017; is that correct?

2   A.  Correct.

3   Q.  Were any staffing changes made in response to your proposed

4   staffing plan while you were employed at Phoenix?

5   A.  What I was told was that this might be used to inform the

6   contract renewal or amendment or new contract that they were

7   using to show how many staff we really needed.

8   Q.  But in terms of actual staffing on the ground, was there

9   any change in staffing at Phoenix during your employment

10  that -- in response to this proposal?

11  A.  None that were observable to me, no.

12          MR. FATHI:  Your Honor, I'd move the admission of

13  Exhibit 252.

14          THE COURT:  Any objection?

15          MS. LOVE:  We just preserve our objections previously

16  made.

17          THE COURT:  Subject to those objections and their

18  overruling, Exhibit 252 is received.

19          (Exhibit No. 252 received into evidence.)

20  BY MR. FATHI:

21  Q.  Ms. Fischer, you provided mental health services and

22  supervised mental health services at the Maricopa County Jail

23  for approximately four years; is that right?

24  A.  Correct.

25  Q.  How did the mental health staffing at the Phoenix complex

1   when you worked there compare to the mental health staffing at

2   the Maricopa County Jail when you worked there?

3            MS. LOVE:  Objection.  Foundation, relevance.

4            THE COURT:  Overruled.

5            THE WITNESS:  When I was at Estrella, we had 900

6   patients.  Not all of them were psychiatric patients.  And I

7   had eight clinicians that worked for me, licensed level

8   clinicians that saw patients.

9            At DOC and Corizon, I don't think we had eight

10  full-time psychology associates/psychologists that worked with

11  the hundreds of patients and intakes in an inpatient

12  psychiatric unit.  Estrella wasn't inpatient.  So the

13  difference, there were many, many less bodies at DOC for the

14  number of people we had to address.

15  BY MR. FATHI:

16  Q.  When you say "bodies," you mean mental health staff?

17  A.  I mean mental health staff.

18  Q.  Were there any other differences you noted between mental

19  health care at Maricopa County Jail and mental health care at

20  Phoenix?

21  A.  Yes.

22            MS. LOVE:  Same objections.

23            THE COURT:  Overruled.

24            THE WITNESS:  Both are under, you know, a lawsuit, and

25  so I'm not new to the experience of meeting monitoring

1   requirements, et cetera.  The flavor at Maricopa County was,

2   these are good ideas.  We need to learn how to implement them.

3   Here's the new process.  We can do this.  It was, we wanted to

4   provide that.

5           At Corizon, the feeling was, how do we make sure we're

6   documenting this?  Where do we check this box?  It didn't feel

7   like we wanted to do it.  It felt more like, now they're making

8   us do this.  That's not the spirit that our chairman asked of

9   us.

10  BY MR. FATHI:

11  Q.  Did the staffing issues that we've discussed today that

12  you've identified at the Phoenix complex have any effect on

13  patient care?

14  A.  Yes, they did.

15          MS. LOVE:  Foundation.

16          THE COURT:  Overruled.

17  BY MR. FATHI:

18  Q.  Could you describe that, please.

19  A.  When a patient's in an acute, you know, situation or

20  they're in distress, they need someone who can stand there and

21  be with them and counsel them and help them.  If the list of

22  patients is 20 to 25 patients long, it takes -- you feel like

23  you're pulled, and it's hard to give that person the time that

24  they need.

25  Q.  I'd now like to talk about access to mental health care.

1        Ms. Leonard, what is an HNR -- excuse me.

2   Ms. Fischer.

3   A.  HNR is an abbreviation for a health needs request.  It's a

4   form that a patient can use to request medical, mental health,

5   or dental care in a correctional setting.  Because they can't

6   just get up and walk to the emergency room, this is their way

7   of saying, "Hey, I need some help."

8   Q.  And in ADC, is an HNR the primary or usual way that a

9   patient is expected to request mental health care?

10  A.  It is.

11  Q.  Are you aware that in the Parsons settlement, there is a

12  performance measure that tracks the timeliness of responses to

13  mental health HNRs?  In other words, whether those HNRs are

14  responded to within a particular time?

15  A.  I'm aware of that, yes.

16  Q.  Did you ever become aware of any limitations on the ability

17  of mental health patients to obtain HNR forms?

18  A.  Yes.

19  Q.  Could you tell the Court about that.

20  A.  I repeatedly heard from patients that they couldn't get

21  health need request forms when they asked for them.  When I

22  would go to the officers and say, "I need an HNR for this

23  patient," they would say, "I don't have any."  I would have to

24  go look for them.

25        They were not given grievance forms.  Inmate letters

1    is another way they communicate.  I often heard from patients

2    that they could not get those forms they needed to communicate.

3    Q.  Did you ever become aware of patients who wanted to submit

4    an HNR but were not able to for those reasons?

5    A.  Yes.

6    Q.  Did that happen more than once?

7    A.  Yes, it did.

8    Q.  Did you ever ask, yourself, an officer for HNR forms?

9    A.  I did.

10   Q.  And were you ever told in response that there weren't any

11   or they weren't available?

12   A.  Yes.

13              MS. LOVE:  Hearsay.

14              THE COURT:  Overruled.

15   BY MR. FATHI:

16   Q.  Did that happen more than once?

17   A.  Yes, it did.  And I reported it to FHA Watts and asked that

18   every unit be amply stocked with the health needs request forms

19   that they needed and the inmate letters and the grievance forms

20   on more than one occasion.

21   Q.  And by the time of your departure in March of 2018, had

22   that problem been resolved?

23   A.  It hadn't, actually.  Within probably the week of my

24   leaving, a patient wrote to me indicating that he had asked for

25   forms and was told that -- on Baker Ward, we don't have those

1    forms here.

2    Q.  Was that specifically an HNR?

3    A.  I think it may -- I think it was an HNR and a grievance

4    form, because the patient said he had a broken wrist and wasn't

5    getting proper treatment for it.

6    Q.  Are you aware that there is a requirement in the Parsons

7    settlement that treatment plans for mental health patients be

8    updated either every three months or every 12 months, depending

9    on the patient's mental health score?

10   A.  Yes, I'm aware.

11   Q.  Did you ever receive any instruction on what you should do

12   if you found out that a patient's treatment plan had not been

13   updated within the required time frame?

14   A.  Yes.

15   Q.  And what were you instructed?

16   A.  What we were instructed is that if the patient's treatment

17   plan was missed, you had to do it as quickly as possible.  And

18   then the next day or as soon as possible after that, put

19   another one in.  Because what the monitor is looking for is the

20   distance between one treatment plan and another.

21          So if you do them one day after the other, when

22   they're looking for that 30, 90, or whatever -- 90, 120 days,

23   that last one looks like it meets that criteria.

24   Q.  And you were told that that's what you do in the case of a

25   patient whose treatment plan has not been updated during the

1    required time frame?

2    A.  Yes.

3    Q.  And who instructed you to do that?

4    A.  I don't remember specifically.  It was something that we

5    talked about in the CGAR monthly meetings that we had, and it

6    may have been Dr. Pratt, who was for a short time the mental

7    health director at the Phoenix complex where I was working.

8    Q.  Tell the Court about those monthly CGAR meetings.  Who

9    would typically attend?

10   A.  The psychology associates, the mental health director, the

11   monitor, Dr. Nicole Taylor.  Sometimes Dr. Calcote and

12   Dr. Leonard were there.  Sometimes they would invite the psych

13   techs.  But mainly it was the licensed people who were doing

14   the work.  Sometimes medical was there.

15   Q.  And you believe it was at one of these -- one or more of

16   these CGAR meetings where this technique of doing two treatment

17   plans within a few days was discussed?

18   A.  Yes.

19   Q.  Was it discussed on only one occasion or more than once?

20   A.  More than one occasion.

21          THE COURT:  Is that because this issue came up

22   somewhat frequently with respect to missing the obligations

23   under the stipulation for seeing patients?

24          THE WITNESS:  Yes.  It was in response to us missing

25   the treatment plans or them not being done on time.

1              THE COURT:  But it came up more than once because this

2    problem was repeating itself?

3              THE WITNESS:  Yes.

4    BY MR. FATHI:

5    Q.  Are you aware that there are a number of requirements in

6    the Parsons settlement agreement that patients be seen every 30

7    days or every 90 days, or if they're on watch, every day?

8    A.  Yes.  I'm aware of that.

9    Q.  And are you aware that the patient must be seen outside the

10   cell in a confidential setting unless the patient is offered a

11   confidential setting and declines that offer?

12   A.  Yes.

13   Q.  When you were seeing patients, how did you comply with that

14   requirement?

15   A.  I was in the habit of doing rounds on my units, so I would

16   come through in the morning:  "Good morning, everybody.  Hi,

17   how are you?  You have a session today.  Just getting you

18   ready."

19              Then I would -- when it was time for their session, I

20   wouldn't ask them.  I didn't say, "Do you want to come out?"

21              I would have the officer go and I would tell them,

22   say, "It's time for your session."  Not, "Do you want to come

23   out for your session?"

24              And then the officer would report back to me if the

25   patient declined, and then I would go to the door and say,

1    "It's not optional.  You need to come out for your session.

2    Get up."  And so I would get them to come out like that.

3    Q.  And about what percentage or proportion of the patients

4    that you saw were you successful in getting to come out of

5    their cells to a private setting?

6    A.  If I had to guess a number, I would say over 90 percent.

7    Q.  Did you ever become aware of other psych associates who

8    took a different approach to offering a confidential setting?

9    A.  Yes.

10   Q.  Can you give us some examples?

11   A.  Well, in my first day of training on suicide watches, there

12   was a rolling cart and I had a laptop, and they're like, "You

13   just go outside of the cell, and you talk to them."  And so I

14   wasn't trained at that time on, you know, that they needed to

15   come out of the cell.

16        Later, it became aware -- we became aware that, you

17   know, you have to offer them a confidential setting.  But I

18   observed people saying, "Do you want to come out for your

19   session or can we talk right here?"  Or "You don't want to come

20   out for your session," you know, in a way that didn't encourage

21   them to participate in their treatment.

22   Q.  And just to be clear, those were other mental health

23   clinicians who were doing that?

24   A.  Yes.

25   Q.  Did you see that once or more than once?

1    A.  I can think of more than one occasion.

2              THE COURT:  And more than one provider?

3              THE WITNESS:  Yes.

4    BY MR. FATHI:

5    Q.  Would you please turn to Exhibit 129.12.  This will be --

6    this may be in a different box.

7              Do you have it, Ms. Fischer?

8    A.  Yes, I do.

9    Q.  Exhibit 129 is an email exchange or email exchanges between

10   Defendant Richard Pratt and some others.  Then there's a chart

11   attached.  Do you see --

12             MR. FATHI:  Oh, I'm sorry.

13             THE COURT:  No, that's all right.  Thank you.

14   BY MR. FATHI:

15   Q.  Do you see the chart, Ms. Fischer?

16   A.  I do.

17   Q.  Would you turn to page 129.12, please.

18   A.  Okay.

19   Q.  And then the left column says Measure Number.  Would you go

20   down to Measure 78, please.

21   A.  Okay.

22   Q.  And would you please read Measure 78 aloud.

23   A.  All mental health treatment plan updates shall be done

24   after a face-to-face clinical encounter between the prisoner

25   and the mental health provider or mental health clinician.

1    Q.  And then a few columns over, under Description, would you

2    read what it says for Exhibit -- for Measure 78?

3    A.  At the higher custody units, at times the correctional

4    officer staffing does not allow or create significant time lags

5    in having inmates removed from their cells to have face-to-face

6    discussion regarding their treatment plans.

7    Q.  And would you now do the same thing with Performance

8    Measure 80.  Please first read the text of the measure.

9    A.  Mental health 3A prisoners shall be seen a minimum of every

10   30 days by a mental health clinician.

11   Q.  And now please read what it says under Description.

12   A.  Willingness of ADOC staff or availability of ADOC staff to

13   bring patients to a secure private location can be challenging

14   and in some cases not possible.

15   Q.  Ms. Fischer, did you ever become aware of officers who

16   would not bring the patient out of his or her cell when you or

17   another associate, psych associate, asked them to?

18   A.  Yes.

19   Q.  Did that happen more than once?

20   A.  Well, they would say they couldn't do it more than once,

21   but I'm persistent, so I would persist and get the patients

22   brought to me.

23   Q.  Did it happen more than once that their initial -- the

24   officer's initial response was, "We're not going to bring this

25   patient out"?

1    A.  Yes.

2    Q.  And was that just one single officer, or did more than one

3    officer say that to you?

4    A.  More than one officer.  Sometimes on the units that I was

5    working on -- there's John, King, and Quiet.  So each of those

6    units has their own station where the officers can sit, but

7    there's the center station where the officers can sit in there.

8           And sometimes I would learn, sitting there, that there

9    was not an officer on John Ward.  So if that clinician needed

10   to see somebody, it would be difficult for that clinician to

11   get somebody -- you know, get an officer to bring a patient to

12   them.

13   Q.  So putting aside the situation where the officer would

14   refuse, did you ever encounter a situation where you wanted to

15   bring a patient out of the cell and there simply wasn't an

16   officer available?

17   A.  Yes.

18   Q.  Did that happen more than once?

19   A.  Yes.

20   Q.  Would you turn to Exhibit 224, please.

21          Ms. Fischer, have you seen Exhibit 224 before?

22   A.  I have.

23   Q.  And where did you see it?

24   A.  In the nurses' station.

25   Q.  At the Phoenix complex?

1   A.  At the Phoenix complex.

2   Q.  In just one nurses' station or more than one?

3   A.  I can only firmly recall seeing it on the George Ward

4   nurses' station.  I can't --

5   Q.  And about when did you first see it?  When did it appear?

6   A.  I don't know time frame.  I can't recall the time frame.

7   Q.  Was it there the first time you walked into that nurses'

8   station?

9   A.  No.  It came after we were told that this was the statement

10  that had to be used.

11  Q.  And for how long did this document remain posted in the

12  nurses' station?

13  A.  It remained posted until I heard that somebody took a

14  picture of it, and it got -- somebody got wind of it and it had

15  to be taken down.

16  Q.  So at some point, this document disappeared from the

17  nurses' station?

18  A.  Yes.

19  Q.  And do you recall approximately how long it was between its

20  appearance and its disappearance?

21  A.  I don't.  But I would say months, I guess.

22  Q.  Would you please read this document aloud.

23  A.  Weekend watch notes.  Use this exact sentence for writing

24  the setting in subjective notes.  Quote:  Offered a

25  confidential setting and the inmate refused, period.

1    Q.  What was your interpretation of this document when you saw

2    it posted in the nurses' station?

3    A.  Well, that this was what you're supposed to write.

4    Q.  Was your interpretation that this is what you're supposed

5    to write if this is what you've actually done or this is what

6    you're supposed to write regardless?

7    A.  It felt like this is what needs to be in the note.  We

8    weren't encouraged not to, you know, see the patients at

9    their -- or we weren't encouraged to lie, but there was an

10   overriding feeling that this is what it had to be.  Because one

11   time I wrote "private setting" and not "confidential setting,"

12   and I was told that it has to be this sentence.

13           MR. FATHI:  Your Honor, I move the admission of

14   Exhibit 224.

15           THE COURT:  Any objection?

16           MS. LOVE:  No objection.

17           THE COURT:  224 is received.

18           (Exhibit No. 224 received into evidence.)

19   BY MR. FATHI:

20   Q.  Ms. Fischer, we talked a little bit about eOMIS.  Do you

21   recall that discussion?

22   A.  Yes.

23   Q.  And eOMIS is the electronic medical record that's used

24   in -- by Corizon in the Arizona Department of Corrections?

25   A.  Yes.

1    Q.  And you used eOMIS when you worked for Corizon?

2    A.  I did.

3    Q.  Are you familiar with how it works?

4    A.  I am.

5    Q.  Is there a capability in eOMIS to go back and change an

6    entry after the entry's been made?

7    A.  Yes.

8    Q.  Is there a capability in eOMIS to create an entry and give

9    it a different date?  So could I create an entry on June 15th

10   but date it June 1st and then it would look like the entry was

11   made on June 1st?

12   A.  Yes.  You could click on the date and set that date.  There

13   was a place, I think, that actually captured when the note was

14   created, but you could go back and say this date.

15   Q.  So I could create on June 15th an entry that looked like it

16   was made on June 1st?

17   A.  Yes.

18   Q.  In eOMIS, can one category of staff create an entry that

19   looks like it's been made by another category of staff?

20   A.  Yes.

21   Q.  So, for example, could a nurse create an entry that shows

22   up as an entry made by a psychiatrist?

23   A.  Yes.

24   Q.  Are you aware of that ever happening?

25   A.  Yes.

1    Q.  Would you please turn to Exhibit 241.

2            Ms. Fischer, what is Exhibit 241?

3    A.  It's an email that I sent to Dr. Eddie Taylor and FHA

4    Watts.

5    Q.  And just to refresh our recollection, who is Dr. Eddie

6    Taylor?

7    A.  He was the mental health director of Phoenix.

8    Q.  And the date of this email is November 28th, 2017; correct?

9    A.  Correct.

10   Q.  Did you send it on or about that date?

11   A.  I did.

12   Q.  Would you read the first line aloud, please.

13   A.  I am becoming increasingly uncomfortable with the lack of

14   psychiatric documentation with our patients.

15   Q.  And then would you please read aloud the second sentence in

16   that next paragraph.

17   A.  A psychiatrist unscheduled note was erroneously entered by

18   a mental health RN on 11/27/2017.

19   Q.  And RN stands for registered nurse?

20   A.  Yes, it does.

21   Q.  And what did you mean by that sentence that you wrote?

22   A.  I felt it was an error because a mental health RN doesn't

23   do psychiatric interactions with a patient.  So this appeared

24   to document a psychiatric appointment was kept with a patient

25   when the RN isn't a person who does that.

1  Q.  So is what you're saying that as you look at the list of

2  encounters, this was listed as a note by a psychiatrist?

3  A.  Yes.

4  Q.  But the note was actually made by an RN?

5  A.  Correct.

6  Q.  Would you please read aloud the final sentence in the third

7  paragraph.

8  A.  This record also has an erroneous note dated 11/22/2017

9  labeled "psychiatrist unscheduled," which was entered by an RN.

10  Q.  So is this the same situation as we just discussed?

11  A.  It is.

12  Q.  And is this the same patient or a different patient?

13  A.  It's a different patient.

14  Q.  Did you ever receive a response from this email?

15  A.  Not that I can recall.

16          MR. FATHI:  Your Honor, I'd move the admission of

17  Exhibit 241.

18          THE COURT:  Any objection?

19          MS. LOVE:  No objection.

20          THE COURT:  241 is received.

21          (Exhibit No. 241 received into evidence.)

22          THE COURT:  Mr. Fathi, would now be a good time to

23  take a 10-minute break?

24          MR. FATHI:  It's fine, Your Honor.

25          THE COURT:  Ma'am, we're going to take a 10-minute

1  break.  Feel free to leave the witness stand, but we'll come

2  back in 10 minutes and you'll be back there.  Thank you kindly.

3           (Recess taken, 10:33 a.m. to 10:51 a.m.)

4           THE COURT:  Please be seated.  Except for Ms. Fischer,

5  if you would make your way back to the witness stand.  Thank

6  you.

7           MR. STRUCK:  Your Honor, may I -- before we begin, we

8  checked and Mr. Acedo is available to come in tomorrow morning.

9           THE COURT:  Thank you.

10          MR. STRUCK:  He would like some guidance as to what

11  you would like to discuss with him so he could be prepared.

12          THE COURT:  I'd like to talk with him about one of his

13  recent filings with the Court.

14          MR. STRUCK:  All right.  Thank you.

15          THE COURT:  Thank you.

16          MR. FATHI:  You ready, Ms. Fischer?

17          THE WITNESS:  Yes, I am.

18  BY MR. FATHI:

19  Q.  Before the break we were talking about entries in eOMIS

20  that looked like they were made by a psychiatrist but actually

21  were made by another kind of staff.  Would you please turn to

22  Exhibit 254.

23  A.  Okay.

24  Q.  Now, looking at the first page of 254, what is this?

25  A.  This is an eOMIS record on a patient.

1    Q.  And are you familiar with this patient?

2    A.  I am.

3    Q.  Is this one of the patients that was discussed in

4    Exhibit 241?

5    A.  Yes.

6    Q.  Now, on this page -- and I apologize for the small type --

7    if you look about two-thirds of the way down, there's an entry

8    made at 4:05 on 11/27/17.

9            Do you see that?

10   A.  Yes.

11   Q.  And under -- in the sort of wide middle column, what does

12   it say?

13   A.  "Mental health psychiatrist unscheduled."

14   Q.  And so what does that indicate about the kind of encounter

15   this patient had at 4:05 on 11/27?

16   A.  This indicates he saw a psychiatrist.

17   Q.  Okay.  Would you turn to the next page, please, page 254-2.

18            What is this?

19   A.  This is -- hmm.  It's a note that comes out of eOMIS.

20   Q.  And if you'll notice, this is dated 11/27/17, time 4:05.

21   So can we be confident that this is -- this note corresponds to

22   the entry that we just discussed?

23   A.  Yes.  It's written -- the staff is the same person on the

24   other page.

25   Q.  So who actually made this entry that's labeled psychiatrist

1    unscheduled?

2    A.   Roxanne Ezell, RN.

3    Q.   Is Ms. Ezell a psychiatrist?

4    A.   Not that I'm aware of.  It says here she's an RN.

5    Q.   And again, RN stands for registered nurse?

6    A.   Correct.

7    Q.   Would you turn to page 3, please.  254.3.

8    A.   Okay.

9    Q.   And what is this?

10   A.   An eOMIS note on another patient.  Or it's like an entry of

11   encounters.

12   Q.   So this is sort of a summary list of encounters?

13   A.   Yes, it is.

14   Q.   And are you familiar with this patient?

15   A.   Yes, I am.

16   Q.   Is this one of the patients that we discussed in connection

17   with Exhibit 241?

18   A.   Yes.

19   Q.   So on page 254.3, if you look about a third of the way

20   down, there's an entry on 11/22/17 at 2125.

21           Do you see that?

22   A.   Yes, I do.

23   Q.   And what does it say in the broad middle column?

24   A.   Mental health -- or MH psychiatrist unscheduled.

25   Q.   And so what does that indicate about the kind of encounter

1    this patient had?

2    A.  It was a psychiatry encounter with a psychiatrist.

3    Q.  Would you turn to the next page, please, 254.4.

4    A.  Okay.

5    Q.  What is this?

6    A.  This will be a note from eOMIS on that day.

7    Q.  And does this note, looking at the date and time,

8    correspond to the entry we just discussed?

9    A.  It does.

10   Q.  And if you look in the upper right-hand corner where it

11   says Type, it says "mental health psychiatrist unscheduled."

12          Do you see that?

13   A.  Yes, I do.

14   Q.  So who actually made this entry that's labeled

15   "psychiatrist unscheduled"?

16   A.  It says Jacqueline Scroggins, RN.

17   Q.  Is Ms. Scroggins a psychiatrist?

18   A.  She is not.

19   Q.  What is she?

20   A.  From this, it appears that she's a registered nurse.

21          MR. FATHI:  Your Honor, I'd move admission of

22   Exhibit 254.

23          THE COURT:  Any objection?

24          MS. LOVE:  No objection.

25          THE COURT:  254 is received.

1              (Exhibit No. 254 received into evidence.)

2    BY MR. FATHI:

3    Q.  Now, Ms. Fischer, were you specifically looking for notes

4    that were inaccurate in this way, or did you simply come across

5    them in the course of providing services to your patients?

6    A.  I came across them.  These patients were on my unit, and I

7    routinely would look to see when the last time they saw the

8    psychiatrist, what med changes were made, or things like that.

9    Q.  Are you aware that under the Parsons versus Ryan

10   settlement, there is a level of compliance that has to be

11   reached on each performance measure?

12   A.  Yes.

13   Q.  And are you aware that the Phoenix complex has actually

14   reported passing scores on many of the mental health

15   performance measures during the period when you were there?

16   A.  Yes, I'm aware of that.

17   Q.  And in particular, are you aware that Phoenix reported

18   passing scores on many of the mental health measures in

19   November and December of 2017?

20   A.  Yes.

21   Q.  Do you believe those scores are accurate?

22           MS. LOVE:  Foundation.

23           THE COURT:  Overruled.

24           THE WITNESS:  Well, I was surprised by them because in

25   November and December I know that there were patients that were

1    on suicide watch that weren't seen.  And it was not reflected

2    in the scores for the CGARs for those two months.

3    BY MR. FATHI:

4    Q.  When a patient is on suicide watch, are records kept of the

5    contacts that occur with that patient?

6    A.  There's eOMIS documentation, and there's also supposed to

7    be written documentation.  There's a watch sheet that gets

8    done.

9    Q.  So is there something called watch sheets or watch records?

10   A.  Yes.

11   Q.  And what are those?

12   A.  It's a form that is filled out that is two parts.  One part

13   goes to the ADC officer that's running the unit, and the other

14   part goes into the mental -- or medical area so that people are

15   aware of who's on watch.

16   Q.  Did you ever come to have concern about the integrity or

17   the accuracy of the watch records?

18   A.  Yes.

19   Q.  Could you tell the Court about that?

20   A.  I'm not sure why.  There was always a difficulty in the

21   process for recording those handwritten notes and ensuring that

22   they're where they're supposed to be and that they're filled

23   out appropriately.  The process was never -- we just couldn't

24   seem to get it so that it went smoothly.

25          So sometimes when I would go see a patient, I would

1   have no watch sheet.  And I wasn't comfortable writing the last

2   watch sheet, you know, making a duplicate of it, but I can't

3   find that one so I would go to eOMIS and try to look for, you

4   know, what level of watch this person was on.

5          This is indicative of something I mentioned in one of

6   my letters, these quick solutions to things that don't handle

7   the fundamental problem underneath them.  The disorganization

8   and the inability to cause that process to flow smoothly is

9   essential in an inpatient psychiatric unit, especially with

10  patients that are contemplating ending their lives.

11         So it was problematic to me.  I reported it

12  repeatedly.

13  Q.  Are you saying that the watch sheets were sometimes

14  displaced or misplaced?

15  A.  Misplaced.  We couldn't find them in the record.  When the

16  monitor was trying to review them, she couldn't find them in

17  the record.  It was a thing that came up often.

18  Q.  And when you say "the monitor," are you referring to

19  Dr. Nicole Taylor?

20  A.  Yes, I am.

21  Q.  Did you ever hear her express any concerns about the watch

22  records?

23  A.  Yes.  She indicated that she couldn't validate -- like, the

24  documentation didn't support -- there's a log.  I never saw the

25  log and I was never responsibile for the log, but it didn't

1    reconcile.  That was something I heard more than once.

2    Q.  You heard Dr. Nicole Taylor say that more than once?

3    A.  Yes.

4    Q.  Are you aware that ADC has a mental health rating system

5    from mental health 1 to mental health 5?

6    A.  Yes, I am.

7    Q.  And are you aware that under the Parsons settlement, the

8    services that have to be delivered to a patient depend in part

9    on whether she is an MH-3 or 4 or 5, with those at the higher

10   numbers needing more services?

11   A.  Yes, I'm aware.

12   Q.  Did you ever, during your time at Phoenix, become aware of

13   any pressure to lower patient mental health scores?

14   A.  When they were moving from unit to unit, there was

15   sometimes an issue with that that would come up.  When I

16   interacted with patients and believed that they were of a

17   critical nature and would change them to a mental health 5,

18   sometimes there would be communications that said this person

19   wasn't a mental health 5, and so there was some communication

20   about that.

21   Q.  And who would those communications come from?

22   A.  Sometimes other clinicians.  Sometimes the director,

23   because when a person leaves an inpatient psychiatric unit,

24   they get -- their score gets changed, and so that indicates a

25   difference in the amount of times that they would be seen.

1          And so who's supposed to do it?  Do you do it in the

2    unit that's leaving?  When they arrive at the new unit, are

3    they supposed to do it?  There was just -- it wasn't smooth.

4    Q.  Was there ever discussion at the CGAR meetings about the

5    need or desirability to assign lower CGAR scores when possible?

6    A.  Yes.

7    Q.  Excuse me, lower MH scores.

8    A.  Yes.  So the mental health scores should be as low as

9    possible so that they would be seen according to that, whatever

10   that score was.

11   Q.  And that was said in the CGAR meetings?

12   A.  Yes.  To make sure that they were labeled the right score.

13   Q.  Let's turn to Exhibit 223 that was previously admitted.

14          MS. LOVE:  I'm sorry.  Which exhibit was that?

15          THE COURT:  223.

16          MR. FATHI:  223.

17   BY MR. FATHI:

18   Q.  And this is an email from you to Dr. Calcote, Dr. --

19   Ms. Cole, and others, October 23, 2017.

20          Do you have it, Ms. Fischer?

21   A.  I do.

22   Q.  Would you please read aloud the second sentence of

23   paragraph 5.

24   A.  Since we met on October 5th, 2017, numerous officers have

25   been found sleeping on constant watches, and an inmate on a

1    constant watch was able to hang himself/restrict his airway to

2    the point of unconsciousness while on a constant watch

3    October 17th, 2017.

4    Q.  Do you need a moment, Ms. Fischer?

5    A.  No.

6    Q.  Do you have tissues?

7    A.  I have tissues.  Thank you.

8    Q.  Are you ready?

9    A.  Yes.

10   Q.  What is a constant watch?

11   A.  A constant watch is a watch level that indicates that this

12   person is in imminent danger of harming themselves, and so it

13   requires a person look directly at that person 24/7.

14   Q.  Are there other kinds of watches?

15   A.  Yes.  There's a 10-minute watch where the officer has eyes

16   on the patient every 10 minutes to ensure their safety, and

17   then a 30-minute watch which is every 30 minutes.

18   Q.  And how does a constant watch compare to a 10-minute watch

19   or a 30-minute watch in terms of the acuity or the risk posed

20   by the patient?

21   A.  A constant watch indicates that this person is in imminent

22   danger and needs to be watched constantly.  It is the highest

23   level of care that is provided in the correctional setting.

24   Q.  And how is a constant watch accomplished?  What's done?

25   A.  The officer -- there's an officer assigned one-to-one to

1    that person, who is supposed to be sitting in front of the

2    patient, eyes on the patient, observing their behavior to

3    ensure that they don't harm themselves.

4    Q.  And that officer is supposed to be there at all times?

5    A.  Yes.

6    Q.  You write here, quote:  Numerous officers have been found

7    sleeping on constant watches, end of quote.

8             Is that something you personally observed?

9    A.  Yes.

10   Q.  Is that something you observed more than once?

11   A.  Yes.

12   Q.  Would you turn to Exhibit 235, please.

13            Ms. Fischer, what is this?

14   A.  This is a letter I wrote to Dr. Burnetti-Atwell and our

15   board chairman, Mr. Goldberg.  It's an email.

16   Q.  And these are both people in Corizon leadership in

17   Tennessee; is that correct?

18   A.  Correct.

19   Q.  In the second paragraph -- you begin the second paragraph

20   by writing, quote:  I met this patient on 10/17/2017, prior to

21   his suicide attempt --

22   A.  Yes.

23   Q.  -- end of quote.

24            Is this the same patient we were just talking about in

25   Exhibit 223?

1  A.  Yes.

2  Q.  Would you please read aloud the second half of the second

3  paragraph, beginning with the words "After speaking."

4  A.  After speaking with the deputy warden and Dr. Taylor, the

5  patient was placed on a constant suicide watch and was placed

6  back in his cell without incident.  Once in his cell, he took

7  strips of sheets that he found in the legs of the bed, tied

8  them around his neck, attached to the sink, and was found

9  unconscious less than 30 minutes later, all while on a constant

10  suicide watch.

11          He was taken to the hospital, and fortunately he came

12  through this event physically unscathed.  Since his suicide

13  attempt, I routinely see officers either sleeping while posted

14  on their constant suicide watches, or they have abandoned their

15  posts altogether and are nowhere to be found.  I report these

16  issues each and every time they occur, yet it happens day after

17  day after day.

18  Q.  Is this a true and accurate account of what happened on

19  October 17th?

20  A.  It is.

21          MR. FATHI:  Your Honor, I move the admission of

22  Exhibit 235.

23          THE COURT:  Any objection?

24          MS. LOVE:  No objection.

25          THE COURT:  235 is received.

```
 1              (Exhibit No. 235 received into evidence.)

 2    BY MR. FATHI:

 3    Q.  Would you please turn to Exhibit 253.

 4              And, Ms. Fischer, what is Exhibit 253, just

 5    collectively?

 6    A.  This is an encounter.

 7    Q.  First of all, is this the patient that we have just been

 8    discussing?

 9    A.  Yes, it is.

10    Q.  On page 253.1, continuing over onto .2, this appears to be

11    a note that you wrote about this patient; is that correct?

12    A.  Yes.

13    Q.  And it's -- the time is 11:17:08 on 10/17/2017.  Did you

14    write this note at about that time?

15    A.  Yes.

16    Q.  Would you please read what you wrote in the final

17    paragraph, in the section labeled S about halfway down the

18    page.

19    A.  Starting with "The writer"?

20    Q.  "The case was staffed."

21    A.  The case was staffed with the mental health director, and

22    the inmate was -- and the IM, which is how we abbreviate

23    inmate -- was placed on constant suicide watch due to DTO,

24    which stands for danger to others.  This should have said

25    danger to self.  I'm sorry, DTO and risk for self-harm, so DTO
```

1    and DTS.

2    Q.  And CSW stands for continuous suicide watch?

3    A.  Yes, it does.

4    Q.  Would you turn to page 3, please.

5           And is this another note from the record of the same

6    patient?

7    A.  It does -- it appears to be.

8    Q.  What is the date and time of this note?

9    A.  October 17th, 2017, 12:40.

10   Q.  So about a little less than an hour and a half after you

11   wrote your note?

12   A.  Yes.

13   Q.  And what does this note indicate?

14   A.  It indicates that an ICS, which stands for incident command

15   support -- system, incident command system -- was called at

16   12:42 for an inmate hanging attempt.

17   Q.  And, again, this is the same patient we've been discussing?

18   A.  It is.

19   Q.  Did you personally observe the emergency response when this

20   patient was found hanging?

21   A.  Yes.

22   Q.  What was done with this patient after he was cut down?

23   A.  When I arrived, he was lying on the floor.

24   Q.  Was he taken to a hospital at some point?

25   A.  After this.  He was laying on the floor and they were

1    trying to use this tool to cut the thing off his neck.  And the

2    blade wasn't sharp enough to cut it, and so it took extra time

3    to get it off of his neck and he was -- they dragged him out of

4    the cell.

5           I don't know what they did to bring him to

6    consciousness.  I think they broke a thing or something for him

7    to smell.  And then he -- he was then conscious and then he was

8    transported.

9    Q.  Do you know where he was transported?

10   A.  No, I don't.

11   Q.  Would you turn to page 5, please.

12          And under -- on page 5, under the paragraph labeled O,

13   would you please read the first sentence there, "Upon return."

14   A.  Upon return from the ER after an SA -- which is a suicide

15   attempt -- by hanging, IM reports he found a piece of metal

16   inside the van to cut his arm and then swallowed the 7-inch

17   metal object.

18   Q.  So does this record entry indicate that he was taken to the

19   emergency room after his hanging?

20   A.  It does.

21   Q.  To your knowledge, was the officer who was supposed to be

22   doing a constant watch on this patient when he hanged himself

23   ever disciplined?

24   A.  I have no knowledge of that.

25          MR. FATHI:  Your Honor, I move the admission of

1    Exhibit 253.

2            THE COURT:  Any objection?

3            MS. LOVE:  No objection.

4            THE COURT:  253 is received.

5            (Exhibit No. 253 received into evidence.)

6    BY MR. FATHI:

7    Q.  Would you please turn to Exhibit 239.

8            Beginning on 239.1, what is this document?

9    A.  This is an email that I sent to FHA Watts, Dr. Leonard, and

10   Diane Ortega.

11   Q.  And what's the date?

12   A.  July 24th, 2017.

13   Q.  And would you please read the final paragraph.

14   A.  Then on Sunday when I came in to do my weekend shift around

15   8:00, I found three officers asleep on Quiet.  Two of them were

16   on constant watches.  The third was asleep in the control room.

17   I spoke to CO-4 blank.

18   Q.  And remind us, what is Quiet?

19   A.  This is the unit where the most acute patients are housed

20   when they're on suicide watch.

21   Q.  And when you write "two of them were on constant watches,"

22   what does that mean?

23   A.  That means there were two patients that needed direct

24   observation; you know, one here, one there, that are supposed

25   to be looking in the cells at the patients, that were sleeping.

1   Q.  The officers who were supposed to be observing the patients

2   on constant watch were sleeping?

3   A.  Yes.

4   Q.  Is this a true account of what you observed that day?

5   A.  Yes, it is.

6   Q.  Did you ever receive a response to this email?

7   A.  I don't recall.

8   Q.  Would you turn to the next page, please.

9           And this is a series of emails between you and

10  Mr. Watts and Mr. Taylor on October 24th, 2017; is that

11  correct?

12  A.  Yes.

13  Q.  On page 239.2, the first email of the chain, would you

14  please read the first three sentences.

15  A.  When I arrived on Quiet Ward, two officers were sleeping --

16  and I don't mean dozing, I mean sleeping -- Officer blank in

17  the control room and the officer sitting on blank.  I can't

18  keep writing IRs on these things or it will become impossible

19  for me to get cooperation from the officers in getting patients

20  or having them secured properly.

21  Q.  So this is an email that you wrote?

22  A.  Yes.

23  Q.  What is an IR?

24  A.  An incident -- incident report or information report.  I

25  can't remember the exact.

1    Q.  And as a Corizon employee, when were you expected to write

2    IRs?

3    A.  When there was something that needed to be communicated

4    that wasn't going properly.

5    Q.  Did you ever write IRs about sleeping officers?

6    A.  Yes.

7    Q.  Did you do that more than once?

8    A.  Yes.

9    Q.  Would you turn to page 239.6, please.

10            What is this?

11   A.  This is an information report from February 15th, 2018.

12   Q.  Did you write this IR?

13   A.  Yes, I did.

14   Q.  On February 15th, 2018?

15   A.  I did.

16   Q.  Would you please read what -- the first sentence of what

17   you wrote under Summary.

18   A.  On the February 15, 2018, at approximately 12:50, I walked

19   down to Quiet and into the control room and found CO-2 blank

20   slouched over in his chair sleeping.  On the same date, at

21   approximately 1325, after my session with Inmate blank was

22   over, Officer blank brought the inmate out of the medical

23   office with no restraints.

24   Q.  And are these -- is this the same officer in both incidents

25   or two different ones?

1    A.  Same officer.

2    Q.  Did you submit this IR?

3    A.  I did.

4    Q.  Did you ever receive any response or learn of any action

5    taken in response to this IR?

6    A.  I did not.

7    Q.  To your knowledge, was the officer who was the subject of

8    this IR disciplined for sleeping on the job?

9    A.  I think I heard rumors, but I never got any official word.

10   Q.  You heard rumors that?

11   A.  That there was something that happened as a result of this.

12   Q.  Some sort of disciplinary or corrective action?

13   A.  Uh-huh.

14   Q.  Yes?

15   A.  Yes.

16   Q.  Please turn back to pages 239.2 and .3.

17         Page 239.3, there's an email from Mr. Watts that

18   appears to be responding to your earlier message.  Do you see

19   that?

20   A.  Yes.

21   Q.  And will you please read aloud Mr. Watts's email.

22   A.  What time this morning did you see this?  Just had a

23   conversation about sleeping staff.  Déjà vu.

24   Q.  How did you interpret Mr. -- or Dr. Taylor's response?

25   A.  I think this -- Watts wrote this.

1    Q.  Excuse me.  Mr. Watts.

2    A.  Okay.  So how I interpreted that is he had addressed

3    sleeping officers with somebody.  I don't know who.  And it

4    seemed like a repeat of the same thing he just discussed.

5    Q.  And finally, higher up on the same page, 239.3, is an email

6    from you at 10:19.  Would you please read that email aloud.

7    A.  Correction.  The officer that was on blank was sleeping.

8    Blank is not on a constant watch.  The officer's name is blank,

9    and just two minutes ago this officer was found in the control

10   room chatting with another officer and messing around with a

11   water bottle while blank, who is on a constant watch, has an

12   ACE bandage around his arm sitting there unobserved.

13          Just last week we had an inmate, blank, hang himself

14   while on constant watch.  I'm not sure what we need to do to

15   get these guys to have constant observation.

16   Q.  Why is it significant that the patient had an ACE bandage

17   around his arm?

18   A.  Because he's suicidal, and you can hang yourself with an

19   ACE bandage.

20   Q.  Did you ever receive a response to this email?

21   A.  Not that I recall.

22   Q.  Please turn to the next page, 239.4.

23          This is an October 30, 2017, email from you to

24   Dr. Taylor; is that correct?

25   A.  Yes.

ANGELA FISCHER - DIRECT EXAMINATION

1  Q.  Would you please read the first two sentences.

2  A.  There are currently two officers sleeping in the Quiet

3  control room.  One of them is snoring.  Would you please notify

4  whomever needs to be made aware of this?  There are two other

5  officers on the unit.  One is retrieving patients for me, and

6  the other is on blank's constant watch.  I do not know the

7  names of the sleeping officers.

8  Q.  Did you ever receive a response to this email?

9  A.  Not that I'm aware of.

10  Q.  On page 5, a November 16th, 2017, email from you to

11  Dr. Taylor.

12          Would you please read the first two sentences.

13  A.  At approximately 8:56 a.m., I observed Quiet Ward Officer

14  blank sleeping in the control room.  He is the only officer on

15  the unit this morning.

16  Q.  Why is it significant that he was the only officer on the

17  unit?

18  A.  Because there's no one observing the patients or taking

19  care of them.

20  Q.  Did you ever receive a response to this email?

21  A.  Not that I recall.

22  Q.  Are there any implications for patient safety if an officer

23  who is supposed to be conducting a constant watch is actually

24  sleeping?

25  A.  Yes.

1   Q.  And what is the range of possible outcomes of that

2   situation?

3   A.  Well, the worst outcome is that they could kill themselves,

4   but another outcome is that they injure themselves.  Those are

5   the two outcomes.

6   Q.  Do these documents we've just reviewed reflect all the

7   cases in which you saw officers sleeping on the job or were

8   there additional cases?

9   A.  There was additional cases.

10          MR. FATHI:  Your Honor, I'd move the admission of

11  Exhibit 239.

12          THE COURT:  Any objection?

13          MS. LOVE:  No objection.

14          THE COURT:  239 is received.

15          (Exhibit No. 239 received into evidence.)

16  BY MR. FATHI:

17  Q.  Ms. Fischer, what is Telepsych?

18  A.  It's a modality used to provide psychiatric care.

19  Q.  Was Telepsych used for patients at Phoenix while you were

20  there?

21  A.  Yes.

22  Q.  What proportion of psychiatry encounters for Phoenix

23  patients were done in person and what proportion were done in

24  Telepsych while you were there?

25  A.  Most of them were done by Telepsych.

1    Q.  Was there ever a time period while you were there when all

2    psychiatry encounters at Phoenix were done by Telepsych?

3    A.  Yes.

4    Q.  And was that because there were no psychiatrists actually

5    on site?

6    A.  Yes.

7    Q.  Did you ever make any observations about the efficacy of

8    Telepsych compared to seeing a psychiatrist in person?

9    A.  Yes.

10   Q.  Could you describe those for the Court?

11   A.  Depending on the level of serious mental illness that a

12   person had, they -- a person who's really psychotic sometimes

13   can't differentiate between -- you know, they're looking at --

14   it's like a computer monitor, and sometimes it looks like

15   they're watching TV.  It doesn't appear to them that there's a

16   person there.

17          We have psych techs or psych associates sometimes that

18   would facilitate these Telepsych encounters, and sometimes the

19   patients would just look at the thing, even though the

20   psychiatrist is asking them a question, and not being able to

21   answer that question.  And then if the person that was

22   facilitating would say, "He's asking you a question.  He wants

23   to know this," then they would look at that person and answer

24   the question.

25          But depending on the acuity level of that person's

1   illness, it didn't appear to be effective to me.

2   Q.  And did you see that with just one patient, or was this

3   something that happened more than once?

4   A.  More than once.

5   Q.  Would you turn to Exhibit 236, please.

6           And, Ms. Fischer, what is Exhibit 236?

7   A.  This is an email that I wrote to FHA Watts, Director Eddie

8   Taylor, Nurse Gurnsey, psychiatry -- I think she was maybe a

9   physician's assistant or a nurse practitioner Oliver,

10  Dr. Urdaneta, and psych tech Mason.

11  Q.  And does this pertain to a particular patient?

12  A.  Yes.

13  Q.  Are you familiar with this patient?

14  A.  I am.

15  Q.  Was she being seen via Telepsych?

16  A.  She was.

17  Q.  Would you please read the second paragraph.

18  A.  Dr. Urdaneta and NP Oliver:  Inmate blank seems unable to

19  connect with a psych provider via Telepsych.  At her last visit

20  with Dr. Carr, he noted that although she had a flat affect,

21  she was hopeful and not in distress.  This presentation is very

22  different than the one we see on the unit, and I am afraid the

23  psych providers are not able to see the severity of her grief

24  and despondence.

25          During the Telepsych meetings, it is as if she were

1    watching television.  It is pretty unusual.  Would it be

2    possible for her to be seen in person?  She was last seen on

3    December 9th, so she will be due for her follow-up next week.

4    Q.  Who is Dr. Carr that you refer to here?

5    A.  A Telepsych psychiatric provider.

6    Q.  And is this patient's response to Telepsych something you

7    personally observed?

8    A.  I think I did.

9    Q.  And did you make similar observations about other patients

10   who were being seen by Telepsych?

11   A.  Yes.

12          MR. FATHI:  Your Honor, I'd move the admission of

13   Exhibit 236.

14          THE COURT:  Any objection?

15          MS. LOVE:  No objection.

16          THE COURT:  236 is received.

17          (Exhibit No. 236 received into evidence.)

18   BY MR. FATHI:

19   Q.  All right.  Would you please turn to Exhibit 247.

20          Ms. Fischer, are you familiar with this patient?

21   A.  I am.

22   Q.  Is this someone you saw as a patient at Phoenix?

23   A.  Yes.

24   Q.  And what happened with this patient?

25   A.  This patient bit his fingers and hurt himself while he was

1    in our facility.

2    Q.  Did he sever portions of his fingers?

3    A.  I -- I can't say specifically.  I didn't observe that

4    myself.

5    Q.  Would you please turn to page 247.2.

6            And at the top of the page is an excerpt from this

7    patient's medical record.  Would you please read the first

8    sentence under -- excuse me, the first two sentences under

9    Subjective.

10           MS. LOVE:  Objection.  Foundation, hearsay, and

11   relevance.  This is a letter from Lucy Rand to plaintiffs'

12   counsel.

13           MR. FATHI:  Your Honor, it's actually --

14           MS. LOVE:  I'm sorry, from plaintiffs' counsel to Lucy

15   Rand at the Attorney General's Office.

16           THE COURT:  And can you make any representation,

17   Mr. Fathi, about the depiction from the medical record that you

18   are about to ask the witness to --

19           MR. FATHI:  Yes, Your Honor.  I can represent that

20   this is a verbatim excerpt, cut and pasted from the eOMIS

21   medical record of this patient.

22           THE COURT:  Subject to the defendants' opportunity to

23   correct the record if that representation is erroneous, the

24   objection is overruled.

25

1    BY MR. FATHI:

2    Q.  So would you please read those first two sentences,

3    Ms. Fischer.

4    A.  ICS initiated.  Inmate was engaging in self-harm, chewing

5    his finger.  Pieces of his finger have been recovered.

6    Q.  Okay.  And what does the photograph on page 247.1 depict?

7              MS. LOVE:  Objection.  Foundation.

8              THE WITNESS:  It --

9              THE COURT:  Do you know?

10             THE WITNESS:  Yes.

11             THE COURT:  And how do you know?

12             THE WITNESS:  I met with this patient.

13             THE COURT:  Overruled.

14             THE WITNESS:  This is a picture of his arm with many

15   scars and fingers missing.

16   BY MR. FATHI:

17   Q.  Do you have any concerns about the mental health care this

18   patient received at Phoenix?

19   A.  Yes.

20   Q.  Could you describe those concerns?

21   A.  My concern is that when this patient came in and had his

22   intake assessment, that the records may not have been reviewed

23   thoroughly.  When I went back and looked at his intake, I

24   observed that MCSO had sent information regarding this patient

25   self-harming that didn't appear to be taken into account.

ANGELA FISCHER - DIRECT EXAMINATION                    95

1    Q.  When you say MCSO, that's the Maricopa County Sheriff's

2    Office?

3    A.  Yes.

4    Q.  Do you know how long this patient's mental health intake

5    took when he arrived at ADC?

6    A.  I don't know the exact time.

7    Q.  Do you have any reason to -- do you have any sense of how

8    long that took?

9    A.  I did, because when I heard about it, and this was a

10   patient that was someone that I worked with, I went and looked

11   and saw the number of intakes that came in that day and the

12   number of patients that were seen by a clinician, and it

13   appeared to me a very quick intake assessment.

14   Q.  Did you do the math?  Did you divide this many patients by

15   this many hours and come up with an average of how long these

16   intake assessments took?

17   A.  Minutes.

18   Q.  Do you remember how many?

19   A.  Under five minutes.  Some of them were two minutes, where

20   one entry after the next was just minutes apart.

21          MR. FATHI:  Your Honor, I'd move admission of

22   Exhibit 247.

23          THE COURT:  Any objection?

24          MS. LOVE:  The objections previously noted.

25          THE COURT:  Subject to those and their overruling, 247

1    is received.

2              (Exhibit No. 247 received into evidence.)

3    BY MR. FATHI:

4    Q.  Will you next turn to Exhibit 238, please.

5              Ms. Fischer, what is Exhibit 248 -- 238, excuse me.

6    A.  This is an email that I forwarded to Dr. Calcote after I

7    had sent it to our director, expressing concern that I had

8    about a patient on Baker Ward.

9    Q.  And you're familiar with this patient?

10   A.  Yes.

11   Q.  You saw him as a patient at Phoenix?

12   A.  For a considerable amount of time.

13   Q.  And at the time you wrote these emails, where was this

14   patient housed?

15   A.  Baker Ward.

16   Q.  And do you have concerns about the mental health care that

17   this patient received?

18   A.  Yes.  So much so that it was my only time that I went past

19   Corizon and communicated directly with Nicole Taylor from the

20   department -- from ADC to express my concern about this patient

21   and his suicide watch.

22   Q.  Okay.  Let's -- we'll get to that in a moment, but for now,

23   would you please read the December 15th, 2017, email that you

24   sent to Dr. Taylor.

25   A.  I was reviewing Inmate blank's chart, and it appears that

1   he has been on some kind of watch over 230 days this year.  He

2   has repeated incidents of self-harm, including removing his

3   toenails several times, removing part of his eyelids, ears,

4   picking at his scalp until he has large infected wounds.  He

5   does not appear to go outside and has been indoors in that

6   cage -- and has possibly been indoors in that cage for many

7   months.

8           I believe he should have the opportunity to visit with

9   his family even if he is on watch.  CO-3 Jones said he speaks

10  to the patient's mother weekly, and she's very concerned about

11  her son.  Perhaps it is time for a change of scenery for him.

12  Ideally he would go to ASH, as I believe he needs a level of

13  care that is not available in the prison system.

14          If this is not possible, I wonder if he could be moved

15  up to Quiet, if only to see if we could move him out of the rut

16  he seems to be in.  I am working on a treatment plan, as we

17  discussed this morning, which is another reason I think it

18  might be better if he came up to Quiet if ASH is not an option.

19  Q.  And ASH is the Arizona State Hospital?

20  A.  Yes.

21  Q.  Which is located right next door to the Phoenix facility?

22  A.  Yes.

23  Q.  You refer to this patient being in a cage.  Why did you use

24  that word, calling it a cage?

25  A.  Because on Baker Ward, there are cells and they -- some of

1    them have cages in the front of them.  So the cell door is

2    closed, and it is about the size of, I don't know, three and a

3    half by six or seven.  And a mattress just lays there.  There's

4    no bathroom.  The patients are urinating in urinal containers.

5    It looks like a cage.  It provides better visibility than when

6    the person is, you know, in the actual cell, but it appears to

7    be a cage.

8    Q.  Tell us about this patient's mental health condition, his

9    behaviors.  What does he do?

10   A.  Well, it depends on how well or not well he is treated and

11   medicated.  When I first met him, he came from another facility

12   into the Quiet Ward, and he was completely psychotic.

13   Disorganized thinking.

14        He was then medicated to a state where he was doing

15   much better.  He was transferred to Baker, and I worked with

16   him in Baker.  And he had gotten to the point where he even had

17   a roommate.

18        And he wanted desperately to leave Phoenix and to go

19   to a yard or a facility where he could be outdoors more.  He

20   seems like kind of a country boy.  And wanted to walk around a

21   track.  He'd been to Meadows.  He kept saying he wanted to go

22   to Meadows.  And he was -- I couldn't get him approved for

23   movement, and he just started then to slowly decline, refusing

24   his medications, only taking the ones he wanted.

25        I at times requested a PMRB saying, you know, he needs

1    medication.  We need to -- even if he doesn't want to take the

2    antipsychotic, we can't have him here hurting himself like

3    this.  He ripped off part of his ear with a pencil.  I mean, he

4    really was hurting himself.  His eyelids are terribly scarred.

5    Q.  And that's from things he's done to himself?

6    A.  Yes.

7    Q.  Now, you said -- you write in this email:  Ideally he would

8    go to ASH, the Arizona State Hospital.

9           Why did you write that?

10   A.  Because with that level of acuity, even on constant watch,

11   he was able to do these things to himself.  That level of care

12   doesn't provide the protective element that he needed or needs

13   to ensure his safety.

14          So I have been over at ASH and seen individuals

15   walking around with two aides, mental health aides that

16   actually -- with helmets and mittens and a level of care that

17   I've never seen in DOC's repertoire of treatment options.  So I

18   felt ASH would be better for him because we couldn't protect

19   him from himself.

20   Q.  And you mentioned that you had discussions with Dr. Nicole

21   Taylor about sending this patient to ASH?

22   A.  I did.  I called her.

23   Q.  And what was the outcome of those discussions?

24   A.  She said that he couldn't go to ASH, that it was a rule or

25   something about money that they get treated at DOC.

ANGELA FISCHER - DIRECT EXAMINATION

1   Q.  But the upshot was he could not go to ASH?

2   A.  Yes.

3   Q.  And Dr. Nicole Taylor told you that?

4   A.  Yes.

5           THE COURT:  And it was the inmate that you saw at ASH

6   who was wearing the helmet and the mittens, and the mittens

7   were designed to stop the inmate from -- or that person, the

8   patient there, rather -- from self-harm?

9           THE WITNESS:  Well --

10          THE COURT:  Any idea?

11          THE WITNESS:  The mittens actually do prevent a person

12  from hurting themselves, but this patient was in mittens, and

13  he would routinely take them off on constant suicide watch.

14          THE COURT:  Who was in mittens?

15          THE WITNESS:  The patient -- my -- this patient here

16  we're talking about.

17          THE COURT:  I see.  So what you're saying is giving

18  mittens don't work; you need to have somebody watching that

19  person all the time to make sure they keep the mittens on?

20          THE WITNESS:  Yes.  And so we did have a constant

21  suicide watch on him, and that person wasn't engaging him.

22          THE COURT:  But what you saw over at ASH was that two

23  people were watching this one person with the mittens?

24          THE WITNESS:  And he was outside walking around and,

25  you know, in a place where he could have some of his other

UNITED STATES DISTRICT COURT

1    needs met.

2              THE COURT:  I see.  So for someone who's on a constant

3    watch over at ADOC, is it possible for them to be outside?

4              THE WITNESS:  Technically, they're supposed to get

5    recreation, but many times they were not offered recreation.

6    And so as this person declined, the less and less he was

7    willing to go outside.

8              So you can have negative psychiatric symptoms where

9    the person just folds into themselves and doesn't want to

10   engage with life anymore.  The only engagement he would do was

11   hurt himself.

12             THE COURT:  Thank you.

13   BY MR. FATHI:

14   Q.  Are you familiar with the level of mental health staffing

15   at ASH?

16   A.  No.

17   Q.  Higher up on this same page, 238.1, there is an email from

18   you to Dr. Calcote.

19             Do you see that?

20   A.  Yes.

21   Q.  Would you please read that aloud.

22   A.  Per your request, this is a reminder to staff Inmate blank

23   for movement.  As seen below, I staffed this case with

24   Dr. Taylor in mid-December, and at that time the Baker team

25   decided he should stay at Baker.  I wonder if a change of

1    scenery can help him move forward.

2    Q.  Did you ever receive a response to that email to

3    Dr. Calcote?

4    A.  I don't recall.

5              MR. FATHI:  Your Honor, I'd move the admission of

6    Exhibit 238.

7              THE COURT:  Any objection?

8              MS. LOVE:  No objection.

9              THE COURT:  238 is received.

10             (Exhibit No. 238 received into evidence.)

11   BY MR. FATHI:

12   Q.  Ms. Fischer, you used a term a moment ago I'd like to ask

13   you to define, PMRB.

14   A.  Psychiatric medication review board is a process that can

15   be used to medicate individuals against their wishes.

16   Q.  And what does a -- how does a PMRB happen?

17   A.  Someone initiates the need for one, and it begins with

18   psychiatry preparing a PMRB statement, delivering it to the

19   patient, setting up a team of people who can participate in the

20   review board.

21   Q.  And are there certain participants who have to participate

22   in the review board?

23   A.  Yes.  There is a treating psychiatrist, a psychiatrist who

24   facilitates the board, a psychologist, deputy warden or

25   designee, treating clinicians are usually there, but not

1    everybody votes.

2    Q.  And I think you testified the PMRB occurs when a patient

3    is -- needs medication but refuses to take it and is not

4    competent?  Is that correct?

5    A.  If they're not willing to take the medication and their

6    danger to self or others is to a degree that they need to be

7    medicated.

8    Q.  Were you aware at the time you were at Phoenix of delays in

9    convening PMRBs?

10   A.  Yes.

11   Q.  Did that happen once or more than once?

12   A.  Many times.

13   Q.  What's the longest that you recall it taking to convene a

14   PMRB?

15   A.  Three or four weeks.

16   Q.  Would you turn to Exhibit 242, please.

17          Are you familiar with this patient?

18   A.  Yes.

19   Q.  You saw him as a patient at Phoenix?

20   A.  Yes, I did.

21   Q.  Would you please read the December 12th email at the bottom

22   of page 242.1.

23   A.  Hi all.  Inmate blank has been refusing his medication and

24   has not been eating.  He lays in his cell most of the days and

25   is plagued by some paranoia and hopelessness.  I think we may

1   need to PMRB him.  Who can initiate this?

2   Q.  And then apparently Dr. Taylor responds that a provider

3   will need to initiate the process?

4   A.  Yes.

5   Q.  Is that your understanding of the rules?

6   A.  Yes.  That a psychiatric provider writes the initial

7   paperwork.

8   Q.  And then would you please read your December 13th email at

9   the top of the page.

10  A.  Inmate blank remains on constant suicide watch and has not

11  eaten anything substantial in seven days.  The DOC log reflects

12  a few bites here or there.  He does not appear to be taking in

13  much fluid either, per the DOC log.  He sporadically takes his

14  medication but remains disorganized and appears to be

15  responding to internal stimuli.  I'm becoming increasingly

16  worried about him.  What are the next steps for this inmate?

17  Q.  Was a PMRB eventually convened for this patient?

18  A.  Yes.

19  Q.  How long did it take for the PMRB to be convened?

20  A.  I don't know the exact days.  It was three or four weeks.

21  Q.  And what happened to this patient while he was waiting for

22  PMRB to be convened?

23  A.  He punched himself in the face and gave himself two black

24  eyes.  He lost 19 pounds.  He refused to sleep on the bed.  He

25  would stay in the corner.  He was not well.

1    Q.  How long should a PMRB take to convene?

2           MS. LOVE:  Form and foundation -- I'm sorry,

3    foundation.

4           THE COURT:  Overruled.

5           THE WITNESS:  Well, there's a technical manual that

6    probably outlines what that is, but in my professional opinion,

7    I would say 72 hours max.  I mean, it doesn't take long for a

8    person to die from not eating, not drinking.

9    BY MR. FATHI:

10   Q.  Does the technical manual provide that it should occur

11   within 72 hours?

12   A.  I don't recall exactly what it states, but I do recall that

13   I was repeatedly reminded that it wasn't up to date.  So I

14   don't know what -- you know, if that was an area that needed to

15   be updated or not.

16   Q.  You're talking about the mental health technical manual?

17   A.  Yes.

18   Q.  And you were repeatedly told it was not up to date?

19   A.  Yes.

20   Q.  Who told you that?

21   A.  My supervisors, Nicole Taylor, that they were updating it.

22   It was like an ongoing -- it's going to be updated.

23   Q.  But you were told that there was information in the mental

24   health technical manual that was not currently up to date?

25   A.  Yes.

1          MR. FATHI:  Your Honor, I'd move admission of

2    Exhibit 242.

3          THE COURT:  Any objection?

4          MS. LOVE:  No objection.

5          THE COURT:  242 is received.

6          (Exhibit No. 242 received into evidence.)

7    BY MR. FATHI:

8    Q.  Ms. Fischer, did you ever have occasion to observe the

9    environmental conditions in the mental health units of the

10   Phoenix prison where you were?

11   A.  I did.

12   Q.  And what did you observe?

13         MS. LOVE:  Foundation.  Relevance.

14         THE COURT:  Overruled.

15         THE WITNESS:  I observed sometimes temperatures that

16   were too cold for me to feel comfortable working in.  I

17   observed and heard from many patients saying they couldn't

18   sleep because of the temperatures, either too cold or too hot.

19   I observed not enough clothing for patients.  I observed trash

20   cans with biohazard materials falling out the sides.  I

21   observed blood, feces, things that were not cleaned up.

22         Food left laying around from patients -- specifically,

23   I'm thinking right now about Quiet Ward -- laying on the

24   floors.

25

1    BY MR. FATHI:

2    Q.  And I want to be clear.  You're talking about conditions

3    you observed in the mental health treatment units?

4    A.  Yes.

5    Q.  Let's break that down.

6            Did you ever notice that one or more units smelled

7    like urine or feces?

8    A.  Yes.

9    Q.  Did that happen once or more than once?

10   A.  More than once.

11   Q.  Were the cells always cleaned after one occupant left and

12   before another occupant arrived?

13   A.  No.

14   Q.  Did you ever observe blood or feces in a cell?

15   A.  Yes.

16   Q.  Did that happen more than once?

17   A.  Yes.

18   Q.  Did you ever observe insects or other vermin?

19   A.  Yes.

20   Q.  Did you see gnats?

21   A.  Yes.

22   Q.  Cockroaches?

23   A.  Yes.

24   Q.  Mice?

25   A.  Yes.

ANGELA FISCHER - DIRECT EXAMINATION

1   Q.  Was there always enough clothing for the patients in the

2   mental health units?

3   A.  There was not.  There wasn't always enough clothing on

4   Delta.  Like, sometimes I would have to wait to see a patient,

5   and an officer would have to go to another unit to get pants

6   for the patient.

7   Q.  Did that happen once or more than once?

8   A.  The clothing issue was pervasive throughout the time I was

9   there.  And also towels.  We had patients that were drying off

10  either with their dirty shirts or not having anything to dry

11  themselves with.

12  Q.  Any other environmental conditions that concerned you?

13  A.  Not that I can think of.  We didn't always have enough

14  places to see patients where they could be restrained properly

15  for sessions.

16  Q.  Did you report these conditions to -- either to your

17  superiors in Corizon or to ADC?

18  A.  Both.  Repeatedly.

19  Q.  Would you turn to Exhibit 243, please.

20          Exhibit 243 consists of four pages.  Can you just tell

21  us what these four pages are, collectively?

22  A.  These are my attempts at humor for a disturbing problem

23  where I sent emails to people expressing the various rodents

24  and other environmental hazards in the unit.  I think this was

25  all George Ward.

1  Q.  Will you turn to page 243.3, please.

2  A.  Okay.

3  Q.  And this is an email from you to Richard Watts, Stephanie

4  Ortega -- excuse me, Stephanie Leonard, and Diane Ortega,

5  September 12th, 2017; correct?

6  A.  Correct.

7  Q.  Would you please read the first two sentences.

8  A.  I just wanted to let you know I'm working in the counselor

9  office in George today, and there are literally mice feces on

10  the desk.  I saw one scurry throughout the unit yesterday, and

11  Mason said one was crawling about on our shelves last week.

12  Q.  Exhibit 243 consists of four separate emails that you sent

13  about vermin infestation; is that right?

14  A.  Yes.

15  Q.  Did you ever receive a response to any of these emails?

16  A.  I did, indicating that they would be handled.  I don't

17  remember specifically.

18  Q.  Did the problem ever improve before you left in March of

19  2018?

20  A.  There were periods of time where it was better than what

21  this shows, so sometimes.

22  Q.  Did it improve in a sustained way, or was it more up and

23  down?

24  A.  Up and down.

25          MR. FATHI:  Your Honor, I'd move admission of

1    Exhibit 243.

2              THE COURT:  Any objection?

3              MS. LOVE:  No objection.

4              THE COURT:  243 is received.

5              (Exhibit No. 243 received into evidence.)

6    BY MR. FATHI:

7    Q.  Would you turn to Exhibit 244, please.

8              And, again, could you tell us what these documents

9    are, collectively.

10   A.  Collectively, this is the many emails that I sent regarding

11   temperature, cleaning, clothing, just needs that weren't being

12   tended to.

13   Q.  Would you turn to page 244.1, please.

14   A.  Okay.

15   Q.  This is a January 2nd, 2018, email from you to a number of

16   recipients.  Could you please read the entire email.

17   A.  I am working up in Quiet this afternoon, and there is a

18   strong smell of urine on the unit.  It appears to be coming

19   from an empty cell.  There are also dirty clothes strewn about.

20   There is a metal tray sitting on a trash can with disheveled

21   stacks of suicide blankets.  The trash can in the medical

22   office is overflowing, and there are used gloves and trash on

23   the floor.

24             Inmates are having to use T-shirts as towels as we do

25   not seem to have a supply of towels on this unit.  Has a porter

1    been assigned to take care of this unit and make sure supplies

2    are stocked in the cells/units are cleaned routinely?  Any help

3    would be greatly appreciated.

4    Q.  Ms. Fischer, when you read the -- on the second line, you

5    read "There is a metal tray."  I believe it says, "There is a

6    meal tray."

7            Is that correct?

8    A.  It says "meal."

9    Q.  Will you please turn to 244.4.

10   A.  Point 4?

11   Q.  Yes.  Again, I apologize for the tiny type.

12           This is a November 9th, 2017, email from you to Eddie

13   Taylor; correct?

14   A.  Yes.

15   Q.  Would you please read the text of that email.

16   A.  I have had two inmates complain today that they were unable

17   to sleep due to the temperature in Quiet Ward at night.  They

18   are both without clothing due to 10-minute mental health watch.

19   What can we do to help them out?  Sleep is imperative in good

20   mental health.

21           It is also -- capitalized -- freezing in the medical

22   office where I have to meet with patients.  My finger are numb,

23   and I'm having back spasms, and my nose is an ice cube while I

24   am typing this.  I have two shirts on, a long-sleeved sweater

25   and a jacket, and it is still cold.  How about a heater or some

1    way to close the vents in this office?

2            MR. FATHI:  Your Honor, I move admission of

3    Exhibit 244.

4            THE COURT:  Any objection?

5            MS. LOVE:  No objection.

6            THE COURT:  244 is received.

7            (Exhibit No. 244 received into evidence.)

8    BY MR. FATHI:

9    Q.  Ms. Fischer, do the environmental conditions that we've

10   just discussed have any effect on mental health or any

11   implications for successful mental health treatment?

12           MS. LOVE:  Objection.  Relevance, foundation.

13           THE COURT:  Overruled.

14           THE WITNESS:  Yes.  Cleanliness affects a person's

15   health.  Their mental health is affected when they are exposed

16   to smells that are not okay, temperatures that are not okay.

17   They decompensate.

18   BY MR. FATHI:

19   Q.  And I think you said in your email that conditions that

20   interfere with sleep also have implications for mental health

21   care; is that correct?

22   A.  Correct.

23   Q.  Ms. Fischer, did you ever have any concerns about your

24   personal safety when you worked at Phoenix?

25   A.  I did.

1    Q.  Could you describe those concerns for the Court.

2              MS. LOVE:  Objection.  Relevance.  Exceeds the scope

3    of the stipulation.  Has nothing to do with monitoring.

4              THE COURT:  Overruled.

5              THE WITNESS:  I did fear for my safety, and I was

6    assaulted by a patient when I was working in George Ward.

7    Often patients were brought to me that were not properly

8    restrained.

9              One of the ways that ADC handles the mental health

10   units is they can be overridden.  So you can take a maximum

11   custody patient, and in order to get in certain programs, they

12   have to be downgraded to a different level.  So the officers

13   don't react or respond to them like they're maximum security

14   inmates, and so they're brought to us or we're seeing them in

15   rooms alone when they're not restrained.

16   BY MR. FATHI:

17   Q.  You said you were assaulted at one point?

18   A.  I was.

19   Q.  Could you describe that incident?

20   A.  I was in a room meeting with a patient.  The unit is a long

21   unit, and the cells are kind of over here and the officer was

22   at this end.  So my office was over here, and there's a

23   barrier, a door, that would separate the nursing station and my

24   office from the run where the patients are.

25              That door required a lock to do both sides of it.  And

1    I felt uncomfortable enough in that room that I wrote to ADC

2    and said, "I need you to change that lock to a self-latching

3    lock so I can just close it."

4          And I was meeting with a patient.  The lock had not

5    been changed.  I had sent several emails.  The patient became

6    angry.  I invited her to go to her cell.  "You know, you don't

7    have to stay.  This is voluntary."

8          She went to her cell but grabbed something and threw

9    it up.  You know, the thing that says the floor is wet.  And I

10   was worried that she was going to hurt a patient, so I walked

11   into the hallway to ask her to go into her room.

12         She briefly went into her room, started growling, and

13   then came out at me.  I went behind that door, and I couldn't

14   get to my office in time, so I just pushed the door closed and

15   held it with my body as she was banging the door against me.

16         The next day, that lock was changed to a self-latching

17   lock.

18   Q.  Did you -- and I gather the patient you just described

19   during that incident was unrestrained?

20   A.  Unrestrained.

21   Q.  Did you communicate these concerns about your personal

22   safety to your superiors?

23   A.  I did.

24   Q.  To whom did you communicate that?

25   A.  My supervisor, Dr. Leonard, the deputy warden, FHA Watts.

1    Q.  Dr. Calcote?

2    A.  I probably mentioned that we needed more restraint chairs

3    and ways to see patients where they were not able to get up if

4    they got angry.

5    Q.  And did the situation improved in any -- improve in any

6    significant way by the time you left in March of 2018?

7    A.  It did in one way.  George Ward, there were some restraint

8    chairs that were put in there.  But there was always a fight

9    for rooms where there were restraint chairs to see patients.

10   So with the crushing list of patients we had to see plus the

11   lack of restraint areas, it made it difficult.

12   Q.  And is the lack of restraint areas an issue in other units

13   besides George?

14   A.  Yes.

15   Q.  And that remained an issue at the time that you left in

16   March of 2018?

17   A.  Yes.

18   Q.  Ms. Fischer, do you have any concerns about retaliation,

19   possible retaliation for the documents you've shared with the

20   Court or for your testimony today?

21   A.  I do.

22   Q.  What are those concerns?

23   A.  Well, when I would report that people were sleeping -- I

24   mean, these are just the emails.  I made phone calls.  When I

25   would report that, the sergeant would call the unit and say,

1   "Who's sleeping up there?"  Well, they know I'm the only person

2   up there.

3          So as those things would continue, the officers would

4   bring me unrestrained patients, refuse to talk to me.  And I

5   don't know what the ramifications of this will be if someone is

6   let go of their job, if that will be a cause for them to become

7   very angry with me or hurt me or my family.

8   Q.  So while you were still working at -- in ADC, did you

9   experience behavior from officers that you believed was

10  retaliatory or thought was possibly retaliatory?

11  A.  Yes.

12  Q.  What behaviors were those?

13  A.  Not getting me patients.  So if -- the guy that was joking

14  around with the water bottle in the -- on the constant watch,

15  at that -- following that point, if I asked him for something,

16  he wouldn't even speak to me.  I would be talking to him, and

17  he would turn away from me and not talk to me.

18         And then one of the sleeping officers routinely would

19  bring me -- after that incident was all over, bring me patients

20  that were not restrained.  Maximum custody patients that were

21  incarcerated for murder, not restrained.

22  Q.  Do you fear retaliation by Corizon?

23  A.  It's crossed my mind that they might be irritated with me.

24  Q.  Ms. Fischer, are you aware that the Court has appointed a

25  team of experts to study the recruitment and retention of

1   medical and mental health care staff in the Arizona prisons?

2   A.  I became aware of that recently, yes.

3   Q.  And are you aware that those experts are talking to some

4   former Corizon staff to get their insights about what might be

5   effective in terms of recruitment and retention?

6   A.  Yes.

7   Q.  Are you aware that Corizon has specifically asked those

8   experts not to talk to you?

9   A.  I was told that.

10  Q.  Do you know why that is?

11  A.  I don't think they want them to talk to me.

12  Q.  Would you be willing to talk with the experts?

13  A.  I would.

14  Q.  Ms. Fischer, Corizon has issued a public statement which

15  it's distributed to the press calling you a disgruntled

16  employee.

17          Do you have a response to that?

18          MS. LOVE:  Objection.  Relevance and foundation.

19          THE COURT:  Overruled.

20          THE WITNESS:  Well, if "disgruntled" means angry or

21  upset, I would say I fit that criteria.  I spent 18 months

22  trying to work within the system to help the patients get the

23  care that I believe that they need and are entitled to.  I

24  think Corizon's being paid to provide that care, and many

25  patients are not getting the treatment that they need or

1    deserve.  So if that's the definition, I would say I'm

2    disgruntled.

3              MR. FATHI:  May I have a moment, Your Honor?

4              THE COURT:  You may.

5              MR. FATHI:  Your Honor, I just want to confirm that

6    Exhibit 253 was admitted?  I believe it was, but co-counsel has

7    some doubts.

8              THE COURT:  My note is that it was received into

9    evidence.

10             MR. FATHI:  Thank you, Your Honor.  In that case, I

11   have nothing further.

12             Thank you very much, Ms. Fischer.

13             THE COURT:  So, Ms. Fischer, this has concluded the

14   time that plaintiffs have an opportunity to ask you questions,

15   but the defendants get the opportunity to ask you that as well.

16   And so we'll come back at 1:15.  And if you'd kindly come back

17   to the courtroom at that time, that will be the opportunity for

18   defendants to ask you their questions.

19             Thank you all.

20             (Proceedings recessed at 11:54 a.m.)

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 2nd day of June,

13  2018.

14

15

16

                    s/Jennifer A. Pancratz_____ _____ ____
17                  Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25