**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

————————————————

| | | |
|---|---|---|
| **Victor Antonio Parsons,** | ) | |
| **et al.,** | ) | |
| | ) | No.  **CV 12-00601-PHX-DKD** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | June 1, 2018 |
| **Charles Ryan, et al.,** | ) | 1:18 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**EVIDENTIARY HEARING - DAY 2 (PM SESSION)**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

**For the Plaintiffs:**
    PRISON LAW OFFICE
    By:  **Corene T. Kendrick**, Esq.
    1917 5th Street
    Berkeley, CA 94710

    ACLU - Washington DC
    By:  **David C. Fathi**, Esq.
    915 15th Street NW, 7th Floor
    Washington, DC 20005

    EIDENBACH LAW PLLC
    By:  **Kirstin T. Eidenbach**, Esq.
    P.O. Box 91398
    Tucson, AZ 85752

    ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
    By:  **Maya S. Abela**, Esq.
    177 N. Church Avenue, Suite 800
    Tucson, AZ 85701


**For the Defendants:**
    STRUCK LOVE BOJANOWSKI & ACEDO PLC
    By:  **Rachel Love**, Esq.
         **Daniel P. Struck**, Esq.
         **Timothy J. Bojanowski**, Esq.
         **Richard M. Valenti**, Esq.
    3100 W. Ray Road, Suite 300
    Chandler, AZ 85226


**For the Witness:**
    THORPE SHWER, PC
    By:  **Adam T. Reich**, Esq.
    3200 N. Central Avenue, Suite 1560
    Phoenix, AZ 85012

1                          **I N D E X**

2

**WITNESSES FOR THE**              **DIRECT**      **CROSS**      **REDIRECT**      **RECROSS**
3  **PLAINTIFF:**

4  **Cecilia Edwards**
   By Ms. Kendrick              4                          123
5  By Mr. Bojanowski                        106

6

7                          **E X H I B I T S**

8  **NO.**                    **DESCRIPTION**                          **REC'D**

9  77     12/29/17 Email from E. Barlund to JT Scalise      102
10
   180    8/25/17 Email from Y. Serrato to K. Barcklay      102
11
   226    11/8/17 Email from Cecilia Edwards to Lori        103
12         Johnson, et al.

13 231    11/8/17 Email from Cecilia Edwards to Carrie      103
          Smalley
14
   507    Corizon memorandum re: Important CARES & UM       103
15         Core Process Information

16 509    Training Slides:  UM Core Process Overview        103

17 510    Launching UM Core Process in Arizona on           103
          Thursday, April 6th
18
   512    Corizon Policy UM004, Authorization for           104
19         Outpatient Referrals - All States, revised
          September 25, 2017
20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                          **P R O C E E D I N G S**

2              (Proceedings resumed at 1:18 p.m.)

3              THE COURT:  Thank you very much.  Please be seated.

4         Except I'm looking about for the witness.

5              MS. KENDRICK:  Yeah.

6              THE COURT:  Oh, I'm sorry.  Reminded occasionally that

7    I don't see quite so well.  Thank you very much.

8              MR. STRUCK:  Your Honor, I just wanted to let you know

9    that I have a 3:30 telephonic with Judge Campbell, so if we're

10   still going then, I'll be stepping out.

11             THE COURT:  All right.  Thank you very much.  Thank

12   you.

13             Thank you, ma'am.  Sorry I didn't see you back there

14   straight away.

15             You may continue if you're ready.

16             MS. KENDRICK:  You ready?

17             THE WITNESS:  Yes, sorry.  My sleeves.

18             MS. KENDRICK:  That's all right.

19                          CECILIA EDWARDS,

20   called as a witness herein by the plaintiffs, having been

21   previously duly sworn or affirmed, resumed the stand and

22   continued to testify as follows:

23                     DIRECT EXAMINATION (Continued)

24   BY MS. KENDRICK:

25   Q.  So we were about to go to Exhibit 518, but before we do

1    that I just want to ask a few questions based on what we were

2    talking about before we went to lunch, and that was about the

3    utilization management process.

4           And we had talked about the deadlines, and you had

5    described the deadlines.  And to your knowledge, are the

6    deadlines tracked or is there any accountability for

7    utilization management not responding according to those time

8    frames?

9    A.  I don't know.  I'm not aware of it.

10   Q.  Okay.  And based on your experience, what percentage of the

11   time does utilization management meet those time frames?

12   A.  My experience has been it's pretty quick.  I mean, they

13   tend to stay within those time frames.

14   Q.  And if utilization management doesn't respond within those

15   time frames, how do you know that?

16   A.  I would follow up and see that I have not received the

17   response on a certain consult that I put out and then contact

18   whoever it's assigned to.

19   Q.  Do you use that spreadsheet you were talking about earlier?

20   A.  Yes, and the spreadsheet as well.

21   Q.  So do you check that daily or --

22   A.  Yes.

23   Q.  -- how frequently?

24   A.  Yes.

25   Q.  Daily?

1    A.  Yes.

2    Q.  Okay.  And you had previously testified that of the

3    requests, that 2 percent of them are ATPs or NMIs.  And I just

4    want to confirm, did you mean both or just the need more infos?

5    Because we were talking about the need more information

6    responses.

7    A.  Okay.  So the NMIs I would say probably are 2 percent, and

8    then maybe the ATPs are 2 to 3 percent.  I apologize.  I didn't

9    specify.  I thought you were talking --

10   Q.  So your --

11   A.  -- in general.

12   Q.  Your testimony is that of all the requests submitted on a

13   weekly basis, only 2 percent of them would be denied via an

14   ATP?

15   A.  More or less, yes.  An average.

16   Q.  Okay.

17            THE COURT:  So just to go to real numbers for a

18   second, there are 40, about, right now.

19            THE WITNESS:  Yes.

20            THE COURT:  So of those 40, how many do you think,

21   just in rough -- rough sense, come back with an ATP?

22            THE WITNESS:  Right now, I would say I have two right

23   now at this moment that I know of, and two NMIs.  So more or

24   less two or three of each, I would say, a week.  But sometimes

25   more.

1        THE COURT:  Okay.  And is that different than how it

2   was several months ago, or is it about the same?

3        THE WITNESS:  I think it's less.  I do believe that

4   it's less.

5        THE COURT:  Thank you.

6   BY MS. KENDRICK:

7   Q.  So you're saying they're approving them more frequently

8   now?

9   A.  I would say yes.  We have less ATPs and NMIs.  I guess that

10  would be the better way --

11       THE COURT:  And if you have less ATPs and NMIs, that

12  means that there are more straight-out approvals?

13       THE WITNESS:  Approvals, yes.

14       THE COURT:  Because there's no third category?

15       THE WITNESS:  No.

16       THE COURT:  Oh, there's no fourth category.

17       THE WITNESS:  No.

18       THE COURT:  Okay.  Thank you.

19       THE WITNESS:  No.

20  BY MS. KENDRICK:

21  Q.  And also, I'm not sure I got this down in my notes.  You

22  may have already said it.  When we were talking about the

23  providers and the provider lines, and you had said Dr. Barcklay

24  left, did you also say that Nurse Practitioner Brisbois had

25  left?

1  A.  Yes.

2  Q.  When did he leave?

3  A.  I believe sometime in February, to the best of my

4  knowledge.

5  Q.  Okay.  If you can turn to Exhibit 518 now, please.

6        Do you recognize the name Sara Neese?

7  A.  Yes.

8  Q.  Who is she?

9  A.  I believe she was a clinical coordinator at one of the

10  other sites, maybe Tucson or Lewis.  Not positive.  But she was

11  a clinical coordinator.

12  Q.  Could it have been Eyman?

13  A.  Possibly, yeah.

14  Q.  I notice you used the past tense.  Is she no longer

15  employed with Corizon?

16  A.  No.

17  Q.  Do you know when she left Corizon?

18  A.  I do not.  I found out about a week ago.

19  Q.  Okay.  If you look at this spreadsheet, this is Defendants'

20  Exhibit 518, and it's got different columns.  And the column

21  that's second from the right is titled "Action."

22        Do you see that?

23        MR. BOJANOWSKI:  Note an objection.  Can we have some

24  foundation as to whether she recognizes this and knows what it

25  is?

 1          MS. KENDRICK:  I'm not showing this for the truth of

 2   the matter asserted.

 3          THE COURT:  Go ahead and ask some --

 4          MS. KENDRICK:  However, I would just --

 5          THE COURT:  Go ahead and ask some foundational

 6   questions.

 7          MS. KENDRICK:  Yeah.  I would also just note this is

 8   defendants' exhibit.

 9   BY MS. KENDRICK:

10   Q.  Ms. Edwards, if you go approximately seven lines down, do

11   you see an entry that says "Accepted by Neese in Dr. Watson's

12   name"?

13          MR. BOJANOWSKI:  Same objection.

14          THE COURT:  Well, let me ask, have you seen a document

15   like this before?

16          THE WITNESS:  The format looks different, but it

17   might -- no, I haven't seen this.  No.

18          THE COURT:  Okay.

19   BY MS. KENDRICK:

20   Q.  Well, this is not for your prison.

21   A.  No.

22          THE COURT:  So this is not a form that you see in

23   another context, but as you look across these headings here,

24   these are, I gather, informational headings that have some

25   meaning to you?

 1              THE WITNESS:  Yes.

 2              THE COURT:  Is that true?

 3              THE WITNESS:  Yes.

 4              THE COURT:  All right.  So I'll overrule the objection

 5    for now, but we'll be sensitive to the foundational issues that

 6    arise.

 7    BY MS. KENDRICK:

 8    Q.  Okay.  So, again, about seven lines down, it says, quote:

 9    Accepted by Neese in Dr. Watson's name, close quote.

10              Do you see that?

11    A.  Yes.

12    Q.  Have you, as a clinical coordinator, ever accepted an ATP

13    in a provider's name?

14    A.  Yes.

15    Q.  When?

16    A.  When we get the response from the doctor in eOMIS and then

17    we have to copy and paste into CARES, I usually copy and paste

18    everything, including their time stamp, and then I add it to

19    CARES and then put "Accepted."  But that's the doctor accepting

20    it.

21    Q.  Have you ever in eOMIS accepted it for a provider?

22    A.  No.

23    Q.  So a provider has never verbally instructed you, "Can you

24    go into eOMIS and accept the ATP for me"?

25    A.  No.

```
1   Q.  And then if you go down to almost the bottom of that

2   column, the fourth entry from the bottom says, quote:  6/29/17,

3   consult canceled by Neese.  9/30/17, consult ATP accepted by

4   Dr. Steward.

5           Do you see that?

6   A.  Yes.

7   Q.  Have you ever canceled a specialty consult in a provider's

8   name?

9   A.  Yes.

10  Q.  When did you do that?

11  A.  I do it for optometry in particular, because I'm able to

12  put those consults in.  They're technically outside consults,

13  even though they're on-site providers.  So I can cancel those

14  if the provider tells me to.  They don't go into CARES, though.

15  Q.  Okay.  So you're canceling it in eOMIS?

16  A.  Yes.

17  Q.  And do you cancel those requests if the optometrist is not

18  going to be able to see the person within 60 days?

19  A.  If I'm instructed to, yes.

20  Q.  Have you ever been instructed to cancel consult requests

21  for optometry?

22  A.  Yes.

23  Q.  When?

24  A.  Probably three months ago, we were told that we needed to

25  start adding them as outside consults instead of the way we had
```

1  been doing it, which was appointments.  The appointments have a

2  time frame of 14 days to be seen by the provider.  The consults

3  have the longer time frame, and they are technically outside

4  consults.

5         And so I had to go in and cancel pending,

6  quote/unquote, appointments that needed to be -- that were on

7  the list but then I entered them in as consult requests to be

8  seen by the optometry.  It was just a difference in the way

9  that we were entering those consults.

10 Q.  And who asked you to do that?

11 A.  My admin, Lori Johnson.

12 Q.  Ms. Johnson asked you to --

13 A.  Yes.

14 Q.  And when you canceled the ones that were in the system as

15 pending appointments and then resubmitted them as outside

16 consults, what date did you use for the date of the request?

17 A.  I'm sorry, the date of which request?  The consult request

18 or the appointment request?

19 Q.  The consult request.  Did you use the date that you were

20 entering them into the system?

21 A.  Yes.

22         THE COURT:  Can you see how that might be a problem

23 with respect to the performance measure that calls for a

24 particular time frame?

25         THE WITNESS:  Yes.

1          THE COURT:  And did you see that at the time?  Did you

2     realize that at the time?

3          THE WITNESS:  Yes.

4          THE COURT:  Did you raise that with anybody?

5          THE WITNESS:  Yes.

6          THE COURT:  And whom did you raise it with?

7          THE WITNESS:  My admin, administration.

8          THE COURT:  Can you tell us what you said?

9          THE WITNESS:  I explained to them that we were

10    probably going to fall out of compliance because of the amount

11    of appointments that had to be resubmitted, so to speak.  What

12    I did is I tried to -- I did my very best to try to go back and

13    catch the latest appointments that had not been seen and put

14    those first.

15          And then we had the disturbance, and then that also

16    put us a bit behind on the consults because they -- we were not

17    having optometry that month.  We had it towards the end of the

18    month, but there was a lapse because of that as well.

19          But, yes, I raised the concern.  What I did is I would

20    try to, if I had the HNR date, I tried to put the HNR date in

21    there in the notes so that we would know when that HNR was

22    written so that we would know when to -- by the time that he

23    needed to be seen, the date would be in there so that we could

24    be cognizant of it.

25          THE COURT:  But with respect to what the monitors

1    would be looking at, they wouldn't necessarily see that or

2    would they?

3              THE WITNESS:  See what?

4              THE COURT:  See the HNR date.

5              THE WITNESS:  Yes.

6              THE COURT:  So do you know whether or not the monitors

7    were scoring whether these records were in compliance based

8    upon the HNR date or the date of your rescheduling?

9              THE WITNESS:  I'm not sure --

10             THE COURT:  Now, one of --

11             THE WITNESS:  -- which they used.

12             THE COURT:  One of the ways to have dealt with this, I

13   suppose, was to have -- you said you wanted to cancel because

14   of a change in procedure.  When you canceled those, one of the

15   ways that you could have made sure that you were, I guess,

16   honest in the reporting process -- or make sure that you didn't

17   impose any dishonesty in the reporting process is you could

18   have used the original date.

19             Do you understand what I'm saying?

20             THE WITNESS:  Yes.

21             THE COURT:  And you chose not to do that?

22             THE WITNESS:  I did not know I was allowed to do that.

23   Because that's the time that I'm putting in the consult, so I

24   did not.  To me, I believed that that was probably worse than,

25   you know what I mean?  I felt like I would be putting an

1    inappropriate date on there because that wasn't the date.  It

2    was from the HNR date that our time begins.

3              Does that make sense?

4              THE COURT:  Well, it makes sense, but one of the

5    concerns I have, it seems like this method that you used gave

6    an additional period of time that did not allow for an accurate

7    assessment of whether or not there had been compliance with

8    this performance measure.

9              THE WITNESS:  Yes.

10             THE COURT:  Thank you.

11   BY MS. KENDRICK:

12   Q.  How many specialty consults did you have to cancel and then

13   reenter, roughly?

14   A.  Hundreds.  200.

15   Q.  And you stated that you tried to start with the ones that

16   were the most overdue?

17   A.  Yes.

18   Q.  Does that mean that it was a multiple-day process of

19   entering everything in?  You didn't do all 200 or so one day?

20   A.  No.

21   Q.  So what was the time period over which you resubmitted the

22   new entries?

23   A.  So I was doing optometry -- let me just give you some

24   background, because I was doing optometry from maybe

25   April to -- of 2017 to about December, beginning of December.

1   After that, Ms. Johnson told me that I was no longer going to

2   do that, and then she took it on.

3          So then she took it from -- she was responsible for it

4   from December to March 16th was when I started -- when my admin

5   finally sent out the email and told everyone, this is the new

6   process.  This is what we're going to do.  They have to be done

7   as consults.

8          So at that point was when I started -- maybe in

9   February when I was told that we were going to have to use this

10  new process to be put in as consults, no longer as

11  appointments.  So I went back and I started going through all

12  those old appointments.

13         But those, you know, weren't appointments I had made,

14  and I didn't feel right putting in a different date.  And I did

15  my best, like I said, to try to make sure that those dates were

16  in there, but there may have been dates -- I did tell them,

17  "We're going to be out of compliance.  There is going to be

18  things that are missed."  I tried my best to make sure every

19  single one got caught.

20         There was an issue with the delivery of the glasses as

21  well.  They received no orders for two months.  So I had to

22  work on that in between as well.

23  Q.  And you said that Ms. Johnson was responsible for this from

24  December to March.  We were told when we were at Yuma last

25  month that she had been on an extended medical leave.  Do you

1    know when she went on medical leave?

2    A.  I believe it was sometime in maybe March, February or

3    March.  It was before the disturbance, maybe a week or so.  So

4    I would say the end of February, maybe.

5    Q.  So do you know, was anybody responsible in the time period

6    between when she left in late February and you started doing

7    this yourself on March 16th?

8    A.  She had someone helping her, Amy Simpson.  She's a medical

9    record clerk and very capable and works well with -- you know,

10   in all the time frames.  So I kind of gave her a little

11   background when we passed it off to her and Amy, to Lori

12   Johnson and Amy Simpson, and she was doing some of it but not

13   all of it.  Because she was only able to do the front end,

14   which was making the appointments, getting the transport list

15   done, and adding the appointment into eOMIS and then filling

16   out all the paperwork for the appointments for the 48 patients.

17   Q.  And how frequently is -- optometry is done on site;

18   correct?

19   A.  Yes.

20   Q.  How frequently per week or per month is -- do they come on

21   site?

22   A.  Every other week.

23   Q.  For one day?

24   A.  So, yes, one day.  We have two clinics in one day.  48

25   patients.

CECILIA EDWARDS - DIRECT EXAMINATION

18

1    Q.  48 patients a day?

2    A.  Yes.

3    Q.  Is there still a backlog of people with pending specialty

4    requests for optometry?

5    A.  No.

6    Q.  They've all been seen?

7    A.  I've -- yes.  We're caught up.

8    Q.  Besides this time with optometry, have you ever been

9    instructed by anyone to cancel a pending consult because of

10   time frames?

11   A.  Yes.

12   Q.  Can you tell us about that?

13   A.  If the utilization management is requesting records that we

14   don't have in our possession that we -- they need to determine

15   whether the approval needs to be approved or denied, then we'll

16   get the release of information signed.  We have to call them

17   up, get them to sign it if they were not incarcerated, and then

18   have that request sent and have those records sent back.

19          And at that point, we've been told -- I've never

20   really gotten a clear answer, but we've been told that we could

21   either cancel it or wait.  But if we wait, it's going to put us

22   out of compliance.  So most of the time I either will get an

23   email from the doctor or the doctor will just cancel it, or UM

24   will say:  Cancel, then resubmit when the information is

25   available.

1           And it might not be just records.  It could be testing

2     that they want done.  Let's get an EKG first, before, so

3     that's -- I have been instructed to do that.

4           I don't personally cancel them.  Other than optometry,

5     I can't.  The doctor can.  But if they tell me, you know, for

6     whatever reason they're not at home or I'm calling them, then

7     they say, "Can you cancel it?"  But I always put "per verbal

8     order of" and then time stamp.

9     Q.  But you do have the ability to get into eOMIS and cancel

10    something that was a pending consult?

11    A.  Yes.

12    Q.  How frequently can you estimate per month does that happen

13    where you're told to cancel because of the scenario you

14    described where we need a lab test or an EKG first?

15    A.  An average?  I would say maybe five times a month.

16    Q.  Okay.  And besides that scenario where, you know, there's a

17    lab test or a diagnostic exam that needs to be done before the

18    specialist can see the person, have you ever been instructed to

19    cancel a pending request because there is no specialist

20    available to see the patient?

21    A.  Yes.

22    Q.  What specialty was it?  Do you remember?

23    A.  For infectious disease.  This was before we had Dr. Po come

24    back.  They still were seen, but that appointment was canceled

25    or that consult was canceled and then we resubmitted and then

1  sent him out.

2  Q.  Do you remember any other specialties besides infectious

3  disease where that happened?

4  A.  Not off the top of my head.

5  Q.  Okay.

6          THE COURT:  Did you hear about it happening otherwise,

7  where specialty consults were canceled because of the

8  unavailability of a specialist?

9          THE WITNESS:  I believe I read somewhere.  I'm not

10  sure if it was in these or in some of the hearing things, but

11  not in our facility.

12          THE COURT:  Okay.  Because one of the things that's

13  been worrisome to me is that I hear about tremendous backlogs

14  and then I see some evidence that there were a number of

15  cancellations of referrals.  And that could be a way to avoid

16  the problem of the backlogs.

17          THE WITNESS:  Yes.

18          THE COURT:  But it's a way that solves the problem of

19  compliance with a performance measure, but it does so on the

20  back of the inmate who needs the referral for the medical care.

21          THE WITNESS:  Yes.

22          THE COURT:  And when I've given you a little bit

23  further explanation about this, have you heard anything or can

24  you remember anything at all about that subject?

25          THE WITNESS:  Yes.  I mean, we've had issues in Yuma

1    as well with providers, but I've gotten on the phone and tried

2    to find somebody.  It may take a while, but I'll find them and

3    if -- I know it sounds terrible and it is, because they're

4    driving five hours one way, but to me, I feel like my job is to

5    make sure that they get seen and that they get taken care of,

6    not so much the CGARs.

7         And I know they're important, but to me, I feel like I

8    need to focus on getting their care as quick as I can and as

9    effectively as I can, so, yeah.  But I have been aware that

10   that's been an issue.  We've talked about it before in clinical

11   coordinator meetings.

12        THE COURT:  So these clinical coordinator meetings

13   where you're talking with the other clinical coordinators at

14   the other facilities in the Department of Corrections, this

15   topic has been raised about canceling provider referrals

16   because there's not an availability of providers to do it?

17        THE WITNESS:  Yes.  And then resubmitting when you

18   have someone that can do it, and then we'll talk about who do

19   you use or where do you go.

20   BY MS. KENDRICK:

21   Q.  And at these meetings when you've talked about the practice

22   of you need to cancel the referral and then resubmit it, who

23   instructed you and the other clinical coordinators that that

24   was the approach to take?

25   A.  We've -- I've personally -- I mean, I've received emails.

1    I've had -- when we were on the call, whoever's on the call

2    usually will say -- if it's Leara Patra, will say:  If you

3    don't have that information, you're not going to be able to get

4    it, you can either cancel or leave it in your bucket, so to

5    speak.

6           And, you know, it depends on the clinical coordinator,

7    I think.  I have never received a clear answer as to yes or no.

8    And when I say that, it doesn't mean that I am canceling it.

9    It means that I'm instructing the doctor:  Hey, we are not

10   going to be able to get these tests done in a timely fashion,

11   or we're going to have to receive these records.  The inmate

12   doesn't remember where he went.  And where -- you know, where

13   are we going to go.

14          And then the doctor will say:  Okay, well, let me just

15   cancel it.  We'll regroup and resubmit when they -- you know,

16   when we obtain all that information.  Because by then, there

17   may be other information that we have to add to the consult

18   anyways for the inmate, so --

19          THE COURT:  But what you were just talking about was a

20   circumstance where I think it could be legitimately said that

21   we are canceling and rescheduling because we are waiting for

22   additional information.

23          One of the things that could be illegitimate is if you

24   have a backlog and a backlog that is fearful to Corizon because

25   it could mean a sanction for failing to meet the performance

1    measure and that somebody at Corizon could think, well, the

2    thing to do here is to cancel all of these referrals because

3    then we don't have that time running, and so the word could be

4    sent out, not to the -- to people in your position but to the

5    providers, cancel these so that we can start the clock again

6    and not be exposed to these fines.

7            It sounds like that also was part of the discussion.

8            THE WITNESS:  My understanding has been that fines

9    have been part of the discussion.

10           THE COURT:  Do any of the written materials that you

11   have in Yuma that we're going to see include this topic?

12           THE WITNESS:  Yes.

13   BY MS. KENDRICK:

14   Q.  And you mentioned the name Leara Patra.

15   A.  Yes.

16   Q.  What is her title?

17   A.  I believe she's an UM nurse.

18   Q.  Oh, right.  She's one of the UM nurses in Arizona regional

19   headquarters or in --

20   A.  She works with us.  I'm not sure if she's here or in

21   Tennessee, but she's our -- she kind of facilitates the phone

22   call and helps keep us on track with the cancer patients and

23   things like that.  We communicate weekly and sometimes daily

24   with her.  She's very helpful.

25   Q.  Okay.  Are you aware of any problems with the date and time

1   of ATPs not being entered into eOMIS?

2   A.  No.

3   Q.  Could you turn to what's marked Exhibit 77, Plaintiffs'

4   Exhibit 77.

5   A.  I'm sorry, what was that?

6   Q.  77.

7   A.  Exhibit 77.

8          THE COURT:  I'm sorry.

9          All right.  I'm up to speed.  Thank you.

10  BY MS. KENDRICK:

11  Q.  What's been marked as Exhibit 77 is an email chain.  What's

12  on top is dated December 30th, 2017.  The subject line is:

13  ATPs (PMs 48/49) and Pharmacy Log.

14         And if you could just turn to page 2.

15         Second paragraph, it states, quote:  Regarding the ATP

16  log, that is definitely worthy of another face-to-face

17  conversation with examples.  I believe the issue is

18  multifactorial.

19         One:  Process.  The clinical coordinators no longer

20  enter the date/time of the ATP into eOMIS.  This seems to be a

21  result of how information is taken --

22         MR. BOJANOWSKI:  Your Honor, we'll note an objection.

23  She's reading the document into the record, and frankly, you

24  know, we haven't even laid a foundation with this witness that

25  she even identified this as something she knows about.  So --

1        THE COURT:  She's using the exhibit to ask a question.

2   Overruled.

3   BY MS. KENDRICK:

4   Q.  This is a result of how information is taken from CARES and

5   entered into eOMIS and ORC rather than UM making the entry into

6   ORC.

7        So you talked earlier about how you take information

8   from CARES and enter it into eOMIS, but you -- your testimony

9   is that you always enter the date and the time of the ATP into

10  eOMIS?

11  A.  I enter the date and time of when I'm doing it into eOMIS.

12  I cut and paste everything that the doctor has said, and so if

13  there was an ATP done Sunday and I come in Monday, then I put

14  Monday's date because, I mean, I was told it's real-time.  And

15  then my tracking will go from the ATP date for myself, and

16  CARES will still be -- have that ATP date that the provider

17  from UM sent it.

18  Q.  And what is ORC?

19  A.  ORC is another one of the management systems.  I believe

20  it's the old system that they used to use but we still use it,

21  but only to enter the outside consults.  I believe it's like an

22  outside request for consultation.

23  Q.  Is this an ADC database system?

24  A.  I believe so.

25  Q.  Is this what you use to arrange transportation services

1   with custody officers?

2   A.  I'm really not sure, because I use the transport list to

3   arrange the transportation in the packets, so it just -- my

4   understanding was it's an old system that they used to use, and

5   now we have CARES.  But we still use it.

6   Q.  Is that part of your job, too, to coordinate with custody

7   to make sure that all the people who have appointments have a

8   way to get there and there's officers available to escort them

9   to their outside appointments?

10  A.  It's my responsibility to coordinate that transportation,

11  so to let transportation know to make sure that they are not

12  mixed in the custody levels, even though transport is really

13  good about catching things like that and making sure that

14  there's no combining of the levels.  And it is our job as well

15  to make sure that they have the appropriate paperwork to be

16  able to just leave the complex in general.

17  Q.  And is there a certain sergeant or lieutenant that you deal

18  with normally on these issues?

19  A.  Yes.  It's Sergeant Bravo, Christina Bravo.

20  Q.  And do you tell Sergeant Bravo the day before, the week

21  before?  How much notice do you give her of these appointments?

22  A.  We've been told we need to have the transport list out by

23  Wednesday.  We try and do our best, and sometimes we have it

24  out on Wednesday or Thursday, and then we will do the phone

25  call as well.  If it's an urgent add-on that we have, we send

1    the email, but I always call as well.  And also I double-check

2    with them to make sure that we have the correct amount of runs

3    for that day.

4    Q.  And how -- could you estimate on average in a given month

5    how frequently a transport doesn't happen either because

6    there's not enough vehicles or there's not enough custody

7    officers to make these outside transport runs?

8    A.  On a daily basis or weekly?

9    Q.  Monthly.

10   A.  Monthly?

11   Q.  An average month.

12   A.  There's been quite a bit lately.  And not -- well, I should

13   say it's not completely DOC's errors.  Our job as coordinator

14   and scheduler is to have all the information before we make the

15   appointment, to make sure that we have everything complete that

16   they're going to need for the appointment.

17          So if we don't have what we're supposed to have for

18   the doctor, then we will have to change that appointment and

19   add them to another day, and then that will kind of throw DOC

20   off as well.

21          So as far as DOC's responsibility in it, issues that

22   have been because they haven't had any, it's enough people.  It

23   happens.  It's not often, but I would say on an average in a

24   month, maybe three.  And then we have -- we reschedule them

25   like to another day or another time.

1   Q.  So back to the --

2            THE COURT:  Hold it just a second.

3            You said that there have been quite a bit lately.  And

4   I gather what you're referring to are sort of the derailments

5   of the inmate being seen by the outside provider by some kind

6   of logistical issue, whether or not it's one in your office

7   with respect to having all the documents lined up or whether

8   it's at DOC with respect to having all the transportation.

9            It doesn't sound to me to be so consistent to say

10  there have been quite a bit lately and then to say just two or

11  three.  So I'm trying to understand that better.

12           THE WITNESS:  Well, part of that issue is that it's

13  been -- I say our fault because I'm the clinical coordinator,

14  but the scheduler that we have had for the last -- since

15  November/October has had many errors that have been happening

16  repeatedly.  And unfortunately, it has caused issues with

17  transportation that have not been their issues, that have not

18  been DOC's issues.

19           Does that make sense?

20           THE COURT:  It makes perfect sense, and I have to tell

21  you, honestly, it makes perfect sense in the context of this

22  case because I hear and have heard pretty much on a monthly

23  basis about the fact that there are either errors of this kind

24  being made, and then your testimony today suggests some of the

25  reasons, and that is there's been incredible turnover.

1    Nobody's in the same position, it seems, for a fortnight.

2         I mean, it just seems like everybody's leaving all the

3    time, and there's no chance to have the gaps filled because

4    there are no people standing on the sidelines who are able to

5    step up except you, who can work practically, it sounds like,

6    all the time on an overtime basis to try to do five jobs.

7         And so when you have a system that's so -- stretched

8    so thinly and people leaving all the time, it's not surprising

9    that you would have difficulties in what is a basic core

10   mission, and that is sick people who need to get seen by a

11   specialist aren't getting there because there are these

12   logistical problems.

13        I'm not looking to cast blame.  I'm looking to try to

14   find the solution to that.  Thank you.

15        THE WITNESS:  Yes.

16        THE COURT:  While I have you for just a second -- and

17   forgive me, Ms. Kendrick.

18        But one of the things I wanted to follow up on is to

19   make sure that I understood that when the utilization

20   management -- remember when I held up the wrong number of

21   fingers?  I just want to make sure that I do understand.

22        If a provider makes a request for a referral, the

23   possible responses back from Nashville can be:  We need more

24   information, that's one; an alternative treatment plan, that's

25   two; approval of the referral, that's three.  Is there a denial

 1   category as well where they just say no?

 2            THE WITNESS:  No.

 3            THE COURT:  Okay.  So that doesn't exist.

 4            And then a follow-up question, additionally:  Are

 5   there -- I've heard about your conscientious efforts to try to

 6   maintain a list and have these things in your mind.  But does

 7   CARE -- do CARES or eOMIS generate a report about the pending

 8   referral so that you can stay on track of them through a report

 9   that's produced by one of these computer programs?

10            THE WITNESS:  I have the -- I've figured out how to do

11   that in eOMIS.  We get emails from someone from CARES that

12   pulls up a report, but I am not aware of how to do that.  We

13   just get the email:  These are still in clinical coordinator

14   initiated status.  Please take care of them.  These are still

15   in ATM or in NMI status.

16            But I have the ability to pull up any report almost

17   that I want.  I can tell you how many cancer patients I have.

18   I can tell you how many podiatry appointments I've had this

19   year.  I can tell you how much a certain provider wrote this

20   year, how many of them, what percentage of them got ATP'd, what

21   percentage got NMI'd, what percentage got approved, which ones

22   are complete and which ones are not.

23            So I do that myself.  That's how I'm able to keep a

24   better grasp.

25            THE COURT:  Well, you generate the reports.  That --

1          THE WITNESS:  Right.

2          THE COURT:  So I gather from your answer what that

3    means, it's possible to type on to a computer keyboard and to

4    say, tell me what happened or -- does that ability to type into

5    the keyboard and ask for a report also include information

6    about the pending referrals, where they stand on the process so

7    that you could monitor compliance with the stipulation with

8    respect to the time periods?

9          THE WITNESS:  No.

10          THE COURT:  And you're not aware of any program or

11    report that does that?

12          THE WITNESS:  No.  But my -- the log does that, but we

13    have to input that information into the log with the dates,

14    like the ATP was sent on this date, and then we put the day the

15    provider is due to review it and then the day it was reviewed

16    and the day he was seen.  And that's the spreadsheet I was

17    telling you about.

18          And, you know, it is a daily thing, but things turn on

19    a dime so there's things that I'm more comfortable looking in.

20    For the up-to-date time frames, I look in CARES because they

21    time stamp and you know when the doctor or the UM nurse sent

22    that back to you.  And then that's when the clock starts.  So

23    for me, that's what I use.  And I always tell my providers I

24    have two days instead of three so that we can make sure we're

25    ahead of the curve.

1          So that -- and then eOMIS has the dates and the

2     consults and the amounts and who wrote them.  But CARES has the

3     most updated times on CARES.  But I'm not aware of how to do

4     that reporting -- how to pull that report at all.

5          THE COURT:  Thank you.

6          THE WITNESS:  Yeah.

7     BY MS. KENDRICK:

8     Q.  Could you turn to the exhibit that's marked 226.

9          MS. KENDRICK:  Does Your Honor have it?

10         THE COURT:  I do.  Thank you.  I'm sorry.

11    BY MS. KENDRICK:

12    Q.  So, Ms. Edwards, this is an email that's dated

13    November 8th, 2017, and it's from you, and it's addressed to

14    Lori Johnson, Priscilla Manry, and James Taylor and copying a

15    couple other people.

16         Who is Priscilla Manry?

17    A.  Priscilla Manry is the assistant -- administrative

18    assistant for, I believe, the DON.

19    Q.  Okay.  And do you remember writing this email?

20    A.  Yes.

21    Q.  Okay.  Let's -- oh, and who is Monica Villicana who's also

22    copied on it?

23    A.  That's the scheduler, the current scheduler.

24    Q.  Okay.  And you said you remember sending this email.  Did

25    you receive a response to this email?

1   A.  Not to my knowledge.

2   Q.  Okay.  So I want to walk through this email that you wrote

3   with you.

4        You open it up saying:  These are the Yuma numbers of

5   the specialty consults written in the last year.  And it lists

6   multiple specialties and numbers.

7        Did you get these numbers by running one of those

8   reports that you were just describing to Judge Duncan?

9   A.  Yes.

10  Q.  That's how you were able to generate the numbers?

11  A.  Yes.

12  Q.  So do you feel that these numbers are accurate and reflect

13  what's in eOMIS?

14  A.  Yes.

15  Q.  Okay.  So the first one you list is urology, and 44.  And

16  you state that there's only one provider in Yuma that accepts

17  inmates.

18       Does that one provider in Yuma today still accept

19  inmates?

20  A.  No.

21  Q.  Are there any providers in Yuma that accept -- urology

22  providers that accept inmates?

23  A.  No.

24  Q.  So where are patients who need a urology specialty consult

25  sent?

1    A.  Maricopa Integrated Health.

2    Q.  Okay.  And the second sentence of your email says:

3    Otherwise, we have to send them to Maricopa Integrated Health

4    Systems (MMC), and they have a 50 PT -- patient -- backlog at

5    the moment.

6            Does Maricopa Health Systems still have a urology

7    backlog?

8    A.  I don't do the scheduling anymore, but I'm not sure if they

9    still have that much of a backlog.  We haven't had as many

10   issues getting them in there, but at the time, yeah.

11   Q.  Okay.  And are you aware of any other urology provider in

12   the state of Arizona besides Maricopa Integrated Health Systems

13   that you can send patients to?

14   A.  Banner.

15   Q.  Banner?

16   A.  Uh-huh.  But only for established patients.

17   Q.  Do you know how many patients are currently awaiting to see

18   urology consults?

19   A.  We have probably three that are scheduled and are waiting

20   for their appointment.  I believe we fell out of compliance for

21   a day or two on one of our last ones, and then the rest are

22   just pending.  They're waiting to be seen.

23   Q.  Okay.

24   A.  For follow-ups, like three-month follow-ups or a month

25   follow-up.

1    Q.  Have you ever been told that you cannot try to find

2    specialists outside of the state of Arizona to see patients?

3    A.  Yes.

4    Q.  You were told you cannot?

5    A.  Yes.

6    Q.  So even though Yuma is one mile from the California border,

7    you can't contact a California specialist?

8    A.  No.  I asked.

9    Q.  When did you ask?

10   A.  Oh, I asked when I started doing this job, when I realized

11   the issues that we had had.  And they said no, because it's a

12   state -- it's like AHCCCS, so AHCCCS won't let you go out of

13   state without -- you know, when you don't have AHCCCS in

14   California.  You can't use the Arizona AHCCCS, so no.

15   Q.  Do you remember who told you that?

16   A.  I believe it was probably in a meeting.  I mean, I brought

17   it up a couple of times, but right now I'm not -- I can't

18   remember who exactly I asked.  But it would probably have been

19   during one of our meetings or the previous clinical coordinator

20   or one of my uppers.

21             THE COURT:  Can we follow up a bit on this access to

22   urologists?

23             Is there a reason that's given when you contact the

24   urologists in Yuma or elsewhere that they won't see inmates?

25             THE WITNESS:  When I've called, and I've called

1    everybody, they -- most of them just say either "We're not

2    contracted" or "We don't see inmates."  The current one that we

3    had, Dr. Woldemichael, did start seeing them for a while and

4    then he chose not to see them anymore.

5           And I did call and try and find out why and what had

6    happened, if we had done something, because like I said, there

7    was a lot of errors.  And -- in the scheduling portion of our

8    job.  And I wanted to see what we could do to keep him on

9    board, and I was told that he just decided that he wasn't going

10   to see inmates anymore.

11          And I was later told in an email from Jennifer -- oh,

12   gosh.  I can't think of her name, I'm sorry, but she's the one

13   that does the contracts with the outside providers.  And she

14   obtained different people that could provide services for our

15   inmates in Yuma, and she said that they had had some billing

16   issues.  That was not relayed to me, though.

17          THE COURT:  You said that she had -- I thought you

18   said she had obtained -- let me see.  She obtained different

19   people that could provide services.

20          But none of those ever came to be reality because

21   nobody did that or -- is that right?

22          THE WITNESS:  Not for urology.  She obtained other

23   providers, and she did contact Dr. Woldemichael.  I had a long

24   conversation with her, and she said that -- we went through

25   each provider specialty, and she updated me and sent me a list

1   and an email with all of the information.  And they were able

2   to obtain several providers for the specialties that we needed.

3   Urology is still not one of them.  He would not see inmates.

4           THE COURT:  So the reasons you've identified is some

5   general "I don't see inmates."  We don't know what that reason

6   is.

7           But then there's another one you mentioned; there's

8   contractual.  Is that because people are thinking they don't

9   want to accept the AHCCCS limited amount, or what does the

10  contract mean?

11          THE WITNESS:  That's what -- that's what I've been

12  told.

13          THE COURT:  So that's exactly what it is; it's the

14  fact that these doctors are saying "I don't want to take the

15  AHCCCS limit."

16          And so there are some number of doctors that would be

17  available, from your perception, if the AHCCCS limit no longer

18  applied?

19          THE WITNESS:  Yes.

20          THE COURT:  And with respect to the -- to a general

21  response, "I don't see inmates," is that because you think

22  people don't like to have the inmates come to their office?  Or

23  is there some other reason?

24          THE WITNESS:  I've asked them about that, and said,

25  you know, we're willing to work within your parameters.  If you

```
 1   want us to have them there at 6:00 in the morning when there's

 2   no one else in there, we can do it.  If you want them there at

 3   5:00 o'clock, we can do it.

 4         And they've -- they just say no.  Because we will --

 5   we'll ask them -- part of it is we're supposed to ask them,

 6   what are your special -- any special recommendations, any

 7   special requirements?  You know, we want you to call first and

 8   then come in.  Or send a CO first, tell us you're here, then

 9   pull to the back and we'll let you in through the back,

10   et cetera, et cetera.

11         So we have that ability to do those things for them,

12   but they were still not willing.

13         THE COURT:  Are there specialty providers who don't

14   rely upon machines to do diagnostic work in their own offices

15   such that it would be possible for those doctors to be

16   contracted to come to a prison facility for a half day or an

17   entire day and then they would know that they'd be paid for

18   that period of time and wouldn't be subject to the logistical

19   issues and wouldn't be subject to what are some suggested

20   issues about people not wanting inmates in their office?  Has

21   that ever been thought about?

22         THE WITNESS:  Yes.

23         THE COURT:  And what's happened there?

24         THE WITNESS:  I brought that up -- well, here, back in

25   November and then again over the last several months,
```

1    especially with physical therapy.  Physical therapy is -- we

2    have a lot of appointments.  We have about a hundred in the

3    loop right now that are still being seen.  They're either going

4    every -- twice a week, sometimes three times a week, and they

5    have to go to -- we were sending them to USA Physical Therapy.

6    They do a great job, but it's a long way.

7              THE COURT:  Where is it?

8              THE WITNESS:  USA Physical Therapy.

9              THE COURT:  Where is it?

10             THE WITNESS:  In Mesa.

11             THE COURT:  Oh, in Mesa?

12             THE WITNESS:  I believe in Mesa or Phoenix.

13             THE COURT:  So two to three times a week, people are

14   traveling to Mesa?

15             THE WITNESS:  Yes.

16             THE COURT:  And that's because -- and are there no

17   physical therapy providers in Yuma because --

18             THE WITNESS:  There was not.  I've been told that now

19   just this week we have a contract with Quality Rehab.  And so

20   we're able to send them there, and we have already -- the new

21   patients that I had come in, the new requests, I've been

22   sending there.

23             But I did suggest being able to have a traveling PT

24   person, like I mentioned here, that would come into the

25   facility.  They could get clearance through DOC, be a

1   contracted provider for Corizon, and then they could come in

2   two or three times a week and be able to get the therapy done.

3   And I suggested that several times.

4           THE COURT:  And what came of those suggestions?

5           THE WITNESS:  I don't know.

6           THE COURT:  Was there any response?

7           THE WITNESS:  No.

8   BY MS. KENDRICK:

9   Q.  Ms. Edwards, you also said with urology that another

10  reason -- another problem was -- besides the just "I don't take

11  patients" or the AHCCCS rates, you also mentioned something

12  about billing issues.  Could you explain what the billing

13  issues were with urology?

14  A.  That was something that was relayed to me by Jennifer --

15  I'm so sorry.  I cannot think of her name.  It escapes me now,

16  but the contractor, provider contractor, the one that locates

17  providers and does the contracts for Corizon.  And I've talked

18  to her last week and I believe the week before concerning this,

19  and she said that they had said they had a billing issue.

20          And I -- you know, I get calls on those things and I

21  take care of them.  I don't do billing, but I can say, okay,

22  let me see if we've got the wrong date or if we sent the wrong

23  authorization number.  Let me fix that.

24          And so I'm not aware of any with urology.

25  Q.  And was the billing issue that Corizon did not pay?

1    A.  That's what I was told.

2    Q.  And you said you get this from other -- other specialists.

3    How frequently are you contacted about billing problems a week?

4    A.  I would say maybe three times a month.  About three times a

5    month.

6    Q.  Okay.

7            THE COURT:  We've heard from some other witnesses a

8    suggestion that there's a late pay problem with Corizon, they

9    take too long to pay, and that eventually just rubs providers

10   the wrong way.  Is that something you've experienced?

11           THE WITNESS:  Yes.

12   BY MS. KENDRICK:

13   Q.  What type of providers was that your experience?

14   A.  Ophthalmology and AOC -- I'm sorry, the ENT and

15   ophthalmology.  And for me, that's -- that's it.

16   Q.  Okay.  So speaking of ENT, that's the next paragraph in

17   your email.  You show that there were 30 ENT specialty consults

18   written in the last year, and you state that you were using AOC

19   physicians but have had several issues with them as well.

20   Notes not being sent, poor follow-up, issues with Corizon

21   billing, and they stated they were not going to see inmates

22   anymore.  Currently, no Yuma providers.

23           Was this AOC physicians specialists, were they in Yuma

24   or where were they?

25   A.  In Phoenix, I believe.  Phoenix area.

1    Q.   Okay.  And was that the only ENT option you had available?

2    A.   I believe we had allergy and immunology, but it was -- one

3    of them didn't do audiology or only did audiology, and then the

4    other one didn't do any consultations, so it was kind of split

5    up.  But those were the only ones, to my knowledge, that we had

6    available.

7    Q.   Do you have a full ENT provider now that you can send

8    people to?

9    A.   Yes.

10   Q.   When did you start using that specialist?

11   A.   Probably around this time.  I believe it -- well, we send

12   them to Banner and then we use Allergy ENT for the hearing aids

13   and hearing tests only, because they won't see the allergy and

14   immunologist for the same reasons that AOC had said that they

15   didn't want to see them, because they weren't getting paid.

16   Q.   And you're sending them to Banner in Phoenix or --

17   A.   Banner in Tucson.

18   Q.   Tucson, okay.

19   A.   Yes.

20   Q.   And you state here that AOC physicians had issues with

21   Corizon billing.  Is that, again, that -- the delays in Corizon

22   paying or not paying?

23   A.   That's what I was told by the scheduler and the office

24   manager.

25   Q.   Okay.  And I think the next paragraph may be referring to

1   what you were just talking to, that -- about, that there were

2   nine audiology consults and you are currently using Allergy ENT

3   in Phoenix but they only do audiology so no ENT exams.  And

4   again, no Yuma providers for audiology.

5          Is this still the situation currently?

6   A.  Yes.

7   Q.  Do you have any idea how many audiology consults have been

8   written since you sent this email in November?  Could you

9   estimate?

10  A.  I'd say maybe 10.

11  Q.  Are they experiencing delays in being seen?

12  A.  Yes.  I believe that they have quite a backlog.

13  Q.  Is this --

14  A.  I mean, the provider, Banner, not us, but they're

15  scheduling quite a ways out for surgeries and first-time

16  visits.  The follow-ups are usually not that big of an issue.

17  Q.  And are you talking about just audiology or also ENT?

18  A.  I'm sorry, ENT.

19  Q.  Okay.  And is ENT one of the specialties where you've been

20  told to cancel the request and resubmit?

21  A.  I have no recollection of a particular one and having to do

22  that.  I know we've fallen out of compliance on an ENT.  I

23  don't like to cancel them.  I'd rather just leave them and

24  document the date that we fall out of compliance and then just

25  try to get them in.

```
 1              I usually -- when I was a scheduler, I used to call

 2    every week to try to see if I could get a cancellation or --

 3    Q.  Okay.  And then the next paragraph, it says:  Physical

 4    therapy, 38 consults written in the last year.  Then you state:

 5    Average of 8 to 16 or more visits per inmate.

 6              And I believe this is what you just -- what you state

 7    here is that you're using USA Physical Therapy in Phoenix, but

 8    patients often refuse because of the distance.

 9              And was this -- when you were talking to Judge Duncan

10    about proposing the solution of a traveling PT, is this email

11    the first time you had proposed this?

12    A.  Correct.

13              THE COURT:  It just seems crazy to me that you have

14    people who need physical therapy that you chain them into a van

15    for six hours each way to go have physical therapy.  What could

16    be the meaningful use of that?  This is just nuts.

17              I see you nodding your head.

18              THE WITNESS:  Yes.

19    BY MS. KENDRICK:

20    Q.  And you also note that in your experience, patients will

21    often refuse.

22              Does this happen with other specialties where patients

23    refuse?

24    A.  We have a dermatology provider up in Phoenix -- I'm sorry,

25    in Flagstaff that I've had a refusal for now and then because
```

1    it is too far.  We do have another provider in Phoenix now, and

2    we have a Yuma provider now.

3         I have had one other -- an ophthalmology that asked me

4    if I could switch his provider because he got referred again

5    from optometry because he needed an IOP check.  His pressures

6    were a little elevated, so intraocular pressure check.  And he

7    was asked to go out, and he asked if I could please use a local

8    provider if we had one.

9         And other than that, those are the only ones that I'm

10   aware of personally.  I normally don't do the referrals with

11   them.  They get signed by the nurse.

12   Q.  Who do you guys use for hematology and oncology?

13   A.  Hematology and oncology, we had been using -- we still

14   are -- Palo Verde.  And then I have sent patients to Banner --

15   Q.  And --

16   A.  -- as well.

17   Q.  Palo Verde is in what city?

18   A.  Cancer center.

19   Q.  Is it in the Phoenix area?

20   A.  Yes.  Yes, it is.  Phoenix or Tucson area.

21   Q.  Are you aware of people with cancer who refused going off

22   site for chemotherapy or radiation therapy because of the

23   distance and because they were too sick to travel that far?

24   A.  I am not personally aware.

25   Q.  Have you ever heard of that happening or seen it in the

1   paperwork, that there were refusals for cancer treatment?

2   A.  No.

3   Q.  So the next specialty in your email is dermatology with 16

4   consults.  And you again state that there is a provider for

5   dermatology in Phoenix and one in Flagstaff.  The one in

6   Phoenix only has one clinic a month for inmates.  This causes

7   an issue for the urgent consults.  Flagstaff is a five-hour

8   drive.  Currently no Yuma providers.

9            Does this still accurately describe the situation

10  today?

11  A.  No.

12  Q.  What's the situation today for dermatology?

13  A.  We have a Yuma provider now.

14  Q.  And is the Yuma provider able to meet the needs of the

15  facility?

16  A.  I'm not sure yet.  We literally just got the word this last

17  week and scheduled the first two patients, so I don't have

18  data --

19  Q.  Okay.

20  A.  -- yet.

21  Q.  So until -- until a week ago, at least, were the two

22  providers, this one in Phoenix and the one in Flagstaff?

23  A.  Yes.

24  Q.  Your next specialty is general surgery with 69 consults.

25  You state that they're using Dr. Whitman, who is amazing to

1    work with.  No issues other than the distance.

2            Where is Dr. Whitman located?

3    A.  He is in Chandler.

4    Q.  And it says:  No current Yuma provider.

5            Is that still the case?

6    A.  Yes.

7    Q.  Are you able to use anybody else besides Dr. Whitman right

8    now?

9    A.  They've been meeting our needs extremely well, so I haven't

10   gone anywhere else.  We do have times where if they are seen in

11   the emergency room and they get admitted to the hospital, they

12   see a Yuma general surgeon.  And then we don't have an issue

13   scheduling them afterwards because it's a follow-up.

14   Q.  Okay.  If you could turn the page to page 2.

15           You list hematology and oncology, 10 consults written

16   in the past year.  Do you have an idea of how many consults

17   there have been since November for hematology and oncology?

18   A.  I would say about 10 to 15.

19   Q.  Additional ones?

20   A.  Yes.

21   Q.  So the number 10, that -- does that refer to number of

22   patients or number of requests?  For example, if the provider

23   makes more than one request for the same patient?

24   A.  It would be the provider made more than one request.  All

25   of those requests are this.  So if one patient has two requests

1   or three requests, then that would include it.

2   Q.  Okay.  And you write here what you just testified to, that

3   currently sending patients to Maricopa Integrated Health

4   Services or Banner -- or, no, you testified that it was Palo

5   Verde.  So you're no longer using Maricopa Integrated Health?

6   A.  We were instructed to use Palo Verde because they were in

7   contract.  Maricopa Integrated Health Center and Banner, we

8   still can use, and if they were established there, then I try

9   to keep them there and -- but we have used them.

10  Q.  And are you using any cancer center in Yuma at all?

11  A.  I have -- like I said, I have not had good luck with them

12  at all.  It's not -- just not -- no sense of urgency.  They

13  don't seem to really call -- they don't call us back.  When you

14  call them, they, you know, don't set appointments.  They don't

15  really have any sense of urgency, and it's not a pressing

16  issue.

17       So I don't feel comfortable, I guess, as a clinical

18  coordinator, sending them if the first phone call you have is

19  not conducive to a good relationship that can be built, so I'm

20  not using them now.  We do use the PET center, though, the PET

21  scans we do there, and they're really great to work with.

22  Q.  Okay.  And then the next paragraph is infectious disease.

23  Unlike the other entries, you don't have any number listed.  Is

24  that because no specialty consults were written in the past

25  year for infectious disease?

1    A.  No.  We had -- at this time was when I was in the switch,

2    and I believe that before, they were using Dr. Po and then they

3    stopped using Dr. Po, and then they started using him again.

4    And so this was at the beginning -- second part of him being

5    our provider for infectious disease.  But I can't remember why

6    I didn't put anything in there.  But we did have consults at

7    the time.

8    Q.  Okay.  And I believe you had said earlier that infectious

9    disease was one of the specialties where you were told to

10   cancel the pending requests and that the provider would

11   ultimately resubmit.

12          Do you remember how many patients were impacted by

13   that cancellation?

14   A.  At the time, to the best of my recollection, I had two to

15   three infectious disease consults that were either in process

16   or were going to be needing follow-up.

17   Q.  And in your experience, who is being sent to see infectious

18   disease?  Is it people with diseases like HIV or hepatitis C?

19   A.  Yes.

20   Q.  And there were only two pending consults?

21   A.  At this time, yes.

22   Q.  Okay.  And are you aware of how many people with HIV or

23   with HCV are housed at Yuma prison?

24   A.  My understanding is we have 2,600 chronic care.  I believe

25   about maybe 200 of those are probably HIV or in combination

1  with HIV and then AIDS, and then there's another portion that's

2  hep C.  And I'm not aware of the actual number at the moment.

3  Q.  How long was that period of time between which Dr. Po

4  stopped seeing infectious disease consults and then started

5  seeing them again?

6  A.  I'm not aware.

7  Q.  When did he start seeing them again?

8  A.  I would say probably around -- I started working as a

9  scheduler in about March or April, and at that time, that's

10  when the current clinical coordinator had said that they were

11  using him before and they just started using him, so I would

12  imagine maybe around the summertime.  Maybe September, October.

13  Maybe the end of the summer, towards the beginning of the fall,

14  was when we started -- we were told we were going to be using

15  Po.

16  Q.  So you were told that at the end of October.  When did you

17  actually start using him?

18  A.  I believe the first consults that I submitted were probably

19  then, in October/November.  Maybe.  December is my best

20  recollection where I know that was all on me and I had to

21  gather all the information and -- yeah.  Because Serrato was

22  still -- the other clinical coordinator was still doing, you

23  know, all of that submitting, so...

24  Q.  And Dr. Po sees the patients, the infectious disease

25  patients, via telemedicine; correct?

1  A.  Yes.

2  Q.  And how many times a month does he do a telemedicine clinic

3  for Yuma prisoners?

4  A.  Once a month.

5  Q.  The entire day or for how many hours?

6  A.  Usually about 8:00 to 12:00 or 1:00 o'clock for all of the

7  complexes.  Yuma, Lewis.  It's -- all of the consults are seen.

8  But for Yuma, it's maybe an hour depending on how many patients

9  we have.

10  Q.  So one hour a month is for Yuma infectious disease

11  patients?

12  A.  I'm not sure how she schedules.  I just know that he only

13  sees, I believe it was maximum of 10 patients a day.  So in

14  that one day, in that month period, there will only be 10

15  patients at the most seen by him.  So it's split up between all

16  of the complexes.

17         Does that make sense?

18  Q.  Yeah.  So basically, 10 patients statewide, once a month,

19  are seen by infectious disease?

20  A.  To my knowledge.  By Dr. Po in telemed.

21  Q.  And there are 10 institutions, so to your knowledge, every

22  month does Yuma get one, one of those slots, or how does that

23  work?  How are those 10 appointments a month divided between

24  the 10 institutions?

25  A.  First come, first serve basis.  That's what I was told.

1    Q.  And who do you come to to --

2    A.  Phyllis -- I'm sorry.  Phyllis is his nurse, his RN.  And

3    she will send out a list of the dates and the times usually

4    every quarter.  And then we will -- once we have a patient that

5    needs to be seen, then we'll get all the documentation

6    together, send it out to her, she reviews it, doctor reviews

7    it, Dr. Po, and then they get back to us with the time for

8    the -- whatever date has been preestablished that he's going to

9    have the telemed line.

10   Q.  And you've testified you estimate there's about 200

11   patients at Yuma?

12   A.  To the best of my knowledge.

13            THE COURT:  And maybe I missed it, but how many

14   inmates are blocked out of the opportunity to have time in this

15   one -- one-a-month day -- one day a month?

16            THE WITNESS:  I don't know.

17            THE COURT:  Is there a reason to think there are some

18   that are blocked out, or no?

19            THE WITNESS:  I wouldn't know.  Because I don't

20   normally do chronic care other than if they have outside

21   appointments.  So, like, infectious disease, I do the

22   ultrasounds, CTs, the EGDs for varices.  Those types of things

23   are what I schedule, so I'm not sure about the infectious

24   disease as far as the other facilities go and whether they're

25   seen or not.

1          I can say we did fall out of compliance with them for

2     that issue.

3          THE COURT:  Forgive me if I --

4          THE WITNESS:  So I would say three.  To my knowledge,

5     there's been three patients that have not received what they

6     needed in that time frame.  Or forget about the time frames,

7     just didn't -- weren't able to get the visit and the treatment

8     that they needed prior to our new infectious disease doctor now

9     in Yuma that we have this week, and we scheduled -- the new

10    patient is scheduled, and he's going this week.

11         THE COURT:  And forgive me if I missed this, but with

12    infectious disease, unlike the other specialty consults,

13    there's no number listed.

14         THE WITNESS:  And I'm not sure why that is.  I don't

15    recall.  I have my own paperwork, but I'm not sure why there's

16    no number or if that was my mistake, if I just didn't put it on

17    there or what.  But I'm not -- I'm not sure.  But I could pull

18    up the number, just put the dates in and see what we have.  No

19    problem.

20    BY MS. KENDRICK:

21    Q.  Do you think the providers are no longer submitting

22    requests for infectious disease consults because of the lack of

23    specialty -- specialists?

24         MR. BOJANOWSKI:  Note an objection.  Foundation.

25         THE COURT:  Overruled.

1          THE WITNESS:  For our providers, no.  No.

2          THE COURT:  It would seem that that would be a logical

3    question to ask, though.

4          THE WITNESS:  Absolutely.

5          THE COURT:  Why do you think it is that the providers

6    are still going ahead -- I mean, it's sort of like banging your

7    head against a post, because you know there's no provider

8    providing the service.  You work for a company that's going to

9    get potentially sanctioned for not being able to meet these

10   requirements.

11         Why wouldn't that cause someone to say, "I'm not going

12   to make this referral because I've learned it can't happen"?

13         THE WITNESS:  Right.  And for infectious disease, the

14   provider that normally does those is Smalley, and she is

15   amazing.  The lady is amazing.  She cares a lot.  She is very,

16   very communicative.  She's able to --

17         THE COURT:  This is the new person?

18         THE WITNESS:  No, no.  This is -- she's our chronic

19   care NP.  She sees all the chronic cares.  And I believe

20   there's an email in here that I had sent to her regarding these

21   issues.

22         But she -- she still puts in the consult.  I mean, she

23   won't not put in a consult because it's not going to get

24   approved or it's going to get -- we don't have a provider.  I

25   mean, we talk and she -- we communicate and she'll ask me:  Who

1    do you have for this?  When can we get them seen?  This isn't

2    urgent, or this is something that he needs to be seen within

3    two months.

4           So my knowledge has been, my experience has been that

5    my chronic care doc and the other doctors that I have worked

6    with like Barcklay, Jordan, and Smalley, which are my current

7    providers, are very, very committed and very, very concerned

8    and able to make judgments and still go forward regardless of

9    what UM will do.

10          You know, I think that they still have their ethics.

11   They still have their ability to make a decision and a choice

12   based on patient care, not UM.  I don't know what it's like for

13   the rest of the state, but I can tell you that those three

14   providers are -- I'm very, very lucky, very lucky to work with

15   them.

16          THE COURT:  And how long have you been working with

17   them?

18          THE WITNESS:  Two years.

19          THE COURT:  All three of them?

20          THE WITNESS:  Almost two years.  Yes.

21          THE COURT:  All three of them have been there this

22   whole time?

23          THE WITNESS:  All three, yes.

24          THE COURT:  All right.  Thank you.

25

1    BY MS. KENDRICK:

2    Q.  Except you testified Dr. Barcklay left?

3    A.  Yes.  And now Dr. Barcklay's gone, so it's just Smalley and

4    Dr. Jordan and our new NP Delp [phonetic], who seems like he's

5    going to be a great addition as well.

6    Q.  Looking at this exhibit, are there any other specialties

7    not listed here where you have encountered difficulties

8    locating specialists to schedule appointments within the time

9    frames?  I believe you had mentioned ophthalmology earlier.

10   A.  Ophthalmology.  The issue that we had with them, we have

11   providers, and we began using Southwest Eye about -- right

12   around this time.  And they've been really good.  They're in

13   Yuma, and they take great care of our patients.

14          So we're trying to -- unless they're established and

15   they're very difficult cases, we try to put them in with

16   Southwest Eye -- Southwestern Eye Center in Yuma.  And then we

17   also found another provider that was accepting inmates just on

18   her own.  It's the Arizona Retinal -- for retinal, so the -- I

19   believe it's Arizona Retinal Consultants.

20   Q.  Okay.

21   A.  And they're good.

22   Q.  Great.

23          And how about gastroenterology?

24   A.  Gastroenterology, we have one provider in Yuma that will

25   see inmates, but they have a three-month backlog.

1   Q.  Okay.  How about nephrology?

2   A.  Nephrology, we have one provider in Yuma currently that

3   will see inmates.

4   Q.  And does that specialist have a backlog?

5   A.  Not to my knowledge.

6   Q.  To your knowledge, has there ever been a discussion about

7   why people with serious specialty medical needs are housed at

8   Yuma and not a prison that's closer to the metropolitan areas

9   of Phoenix or Tucson?

10  A.  I believe we are considered a corridor, they call it, so

11  we're able to take patients that have more critical health

12  issues because we are ADA approved or -- I'm not sure what the

13  term is, but we have the ability to house certain special needs

14  people and, you know, with physical disabilities.  That's what

15  I've been told.

16  Q.  And are you aware of any patients who have suffered adverse

17  problems due to the shortage of specialists or delays in seeing

18  specialists?

19          MR. BOJANOWSKI:  Note an objection.  Foundation.

20          THE COURT:  Overruled.

21          THE WITNESS:  Yes.

22  BY MS. KENDRICK:

23  Q.  Can you please tell us about it, without using the person's

24  name or persons' names?

25  A.  With this urology, people that we used to use, Western

1    Urology, I believe, we had -- at least two to three patients,

2    to my knowledge, that were being seen by them had had a

3    procedure and then needed a follow-up, and this was where that

4    came about where I was -- when I was a scheduler, kept calling

5    and calling and calling and trying to get them to be seen.

6             And that's when I was told, well -- and then this was

7    just from the scheduler, that they were doing us a favor by

8    seeing our inmates and that they were not getting paid and that

9    they had other things -- she had other things to do than to

10   schedule -- call me back and schedule our inmates.

11            And at that point, that's when I stopped using them,

12   because I felt like that wasn't at all appropriate.  We did try

13   to call the manager.  We did leave voicemails.  We did call

14   back to inform them.

15            But we did have those patients that were not seen for

16   some time until we were able to get them reestablished with

17   MIHS.  At that point, it took a while.  I would say about two

18   months to be able to get them in.

19            And I did document the -- I did fill out the paperwork

20   too.  We have a form that we can use where the provider can

21   call.  If we're going to be over a certain time frame, we can

22   have them fill out that paperwork, and they can say, "I've

23   called this provider and talked to them myself and tried to get

24   them in sooner, but the soonest they have is," et cetera.

25   Q.  Right.

1  A.  So...

2  Q.  What about cancer patients or people with HIV?  Are you

3  aware of any of them suffering adverse effects because of

4  delays in seeing a specialist or not enough specialists?

5          MR. BOJANOWSKI:  Same objection.

6          THE COURT:  Overruled.

7          THE WITNESS:  I'm not a doctor, so I'm not sure how I

8  can answer that.  I --

9          THE COURT:  Well, some things are pretty obvious to

10  you, because you look at medical records all the time and you

11  see that there are people who have medical issues.  And it

12  doesn't take a doctor to see that if somebody has cancer, they

13  shouldn't go for months without getting cancer treatment.

14          And so some of those things -- I understand we're not

15  going to hold you to a medical doctor's credentials here, but

16  you've got pretty substantial credentials to be able to

17  recognize where a need exists.  And so I'd ask you to do the

18  best you can to answer this question.

19          THE WITNESS:  Okay.  I would have to say yes.

20  BY MS. KENDRICK:

21  Q.  And what happened?

22  A.  He passed away last week.

23          THE COURT:  I'm sorry.  Can you talk about the

24  circumstances of how it is that the delay --

25          THE WITNESS:  Yeah.

1            THE COURT:  -- resulted in --

2            THE WITNESS:  Yeah.

3            THE COURT:  -- or contributed to his death?

4            THE WITNESS:  We -- we had a patient that got very

5    ill.  We sent him to the emergency room.  Of course, afterwards

6    I get all the documentation back.  I see what he needs.  They

7    recommended a DEB-TACE procedure because they found spots on

8    his liver, and it needed to be taken care of.

9            We also had a -- he had a hernia, umbilical hernia,

10   and I believe another hernia.  And they recommended surgery

11   within a week.

12           Dr. Barcklay saw the paperwork as soon as it came in.

13   I always make sure if it's anything urgent like that, I call

14   them myself or get on the -- shoot an email and then I call

15   them to make sure that, you know, they're getting all the

16   different updates.  Because even though they get the email from

17   eOMIS, sometimes that's a lot in a day.  So -- and they have

18   seven days to go through those, so I'd rather get to them as

19   quickly as I can.

20           She put in the request the same day that we got the

21   paperwork.  We got a denial from the -- for the surgery and

22   then -- or an ATP, I'm sorry, alternative treatment plan.  And

23   then we received a denial -- an ATP, I'm sorry, on the

24   radiology, interventional radiology for the liver biopsy with a

25   chemoembolization.  And they had recommended that they comment

1    on the LI-RADS 5 scale.  And so I had to copy and paste all

2    that, get it in to the doctor.

3            We sent that information over to YRMC, which was where

4    he had the procedures done.  We actually had to send him to

5    Phoenix because I sent them there and they didn't respond, so I

6    called Phoenix.

7            And then once we got that back, they agreed to the

8    consult for the -- we put it in again, the radiology,

9    interventional radiology, and they agreed to the consult for

10   the interventional radiologist just to make extra sure that

11   that was the procedure that was correct for him and his

12   situation of the spots that they found on his liver.

13           At that point, we sent him out.  They recommended the

14   same thing, the DEB-TACE, and that was probably right around

15   the time that Dr. Barcklay left.  And then we had the procedure

16   submitted for the DEB-TACE, and he died before it even got --

17   but I believe they ATP'd it.

18   BY MS. KENDRICK:

19   Q.  Were you aware that the attorneys for the plaintiffs

20   advocated for this gentleman while they were at Yuma in April?

21           MR. BOJANOWSKI:  Note an objection.

22           THE COURT:  Overruled.

23           THE WITNESS:  Yeah.  I -- being that we did -- we

24   didn't have a provider all the time on site, there was times

25   where either Dr. Jordan would call or Dr. Barcklay would call

1    or someone would call and say, hey, can you call him up and see

2    if, you know, he -- get his weight or get -- you know, things

3    in my scope, get his blood pressure, see how he's doing or see

4    if the nurse can check him out.

5           So he had come up, and I had explained to him like

6    where the process was.  Because he kept coming up and having

7    issues with pain and with his weight, and he just was looking

8    really, really pretty bad.

9           And so I had called him up one time and he had said

10   that he did see the chronic care provider, Dr. -- or

11   NP Smalley, and that she explained to him what he had.  At this

12   point, I was aware that he had cancer.  I did not, you know,

13   divulge any of his information to him.

14          But he told me that the doctor had told him what he

15   had.  He didn't say what he had.  But -- and at that point,

16   he -- I told him that we were doing the best that we could to

17   make sure that he got his treatment and that I was going --

18   told him about the ATP, but I said, this is why, and I

19   explained they want more information.  We're going to send for

20   it and get it as soon as possible to get you out.

21          He said:  Thank you very much.  It means a lot to me.

22   You three ladies have been wonderful to me, and I appreciate

23   it.  And then he left.

24          At that point, he took a bad turn for the worse.  When

25   you guys came, a few days after you guys came, he came -- I'm

1   sorry.  He came in.  I believe that -- I don't know if the

2   nurse, the same Nurse Mesa called him in or if she was -- or if

3   he was on the line to be seen.  I'm not sure.  But he was in

4   there, and she had said:  Why did you tell the ACLU that you

5   were coughing up blood for four days?  Why?  Why did you say

6   that?

7           And he was pretty weak at that time.  And he just kept

8   saying, you know, "Well, I have."

9           And she said, "No, you haven't.  You haven't turned in

10  anything.  You haven't come up here.  You haven't said anything

11  to us."

12          And he came up on a regular basis because he took a

13  lot of meds and he was on medication, on morphine.  And so I'm

14  not sure what that -- but I was there.  I heard that when I was

15  going to the office.

16          Shortly after that, he was moved to the detention

17  unit.  I would say a day or two after you guys came.  Not sure

18  what happened.  He had told me that they had -- this is what he

19  told me that day, before he saw Mesa.  He said, "I don't know

20  what's happening, but they just -- they just scooped me up and

21  took me to the SSU," the special service unit.  I'm not sure

22  what the acronym stands for, but it's basically the

23  investigation unit.

24          And he said that "They found some meds on me and they

25  weren't even mine."  So I didn't get into that, because that's

1    a DOC thing, and so I just told him about what had happened

2    and -- but he was very concerned.  He said he wasn't well.

3    Because I asked him, "How are you doing, Mr." et cetera

4    et cetera.

5            And he said, "I'm not well."  He said, "They just said

6    that, you know, they were investigating me for these --

7    these -- selling these medicines.  I need my medicine."  He

8    said, "I'm not selling it."  And he says, "I know that they can

9    just take a lab test and see."

10           And I knew that, too.  I didn't -- you know, I didn't

11   say anything, but I thought maybe that's what they'll do.  To

12   my knowledge, they didn't.

13           But he disappeared.  He was gone the next day, I

14   believe, to the Cheyenne Detention Unit.  And he declined very

15   quickly, and he ended up passing away on Monday or Sunday, the

16   30th, I believe.  Or, I mean, I'm sorry, so Monday or Sunday

17   this last week.

18           And I found out because I put him in for the ER trip

19   that I put those consults in as well.  And I saw that he went

20   out and then -- and he passed.

21           THE COURT:  The case is not about individuals.  It's

22   about compliance with performance measures.  But those

23   performance measures all reflect what happens to individuals.

24           And so I overruled the defendants' objection because I

25   think it's important in this courtroom for people to hear about

1     individuals.  It may or may not be that there was a failure of

2     a performance measure that resulted in or hastened this

3     inmate's death.  I don't know about it.

4          But anybody who's paid attention to this case for any

5     period of time, and I have, knows that so much is broken with

6     this system that it's reasonable to conclude that it's likely

7     that your impression here is right; and that is, that there was

8     a failure in the healthcare system because of its many

9     deficiencies and failures to work properly.

10         Those failures we've heard about from you today, but

11    they're not new to me.  You talked to me about how people are

12    strapped and about how they are asked to do more jobs than they

13    can do, that there are backlogs and that there are

14    inefficiencies.  All of these things are not news to me and are

15    all essentially boiling down to what is a fact here.  And that

16    is, that there aren't enough people to provide the services

17    that need to be provided to these inmates.

18         I don't have the power to effect what is the obvious

19    solution here.  The stipulation that -- the agreement between

20    the parties restricted me in two respects:  I can't order the

21    State to build new prisons, and I can't order them to hire a

22    particular type or number of employees.

23         And that's frustrating for me, has been for a long

24    time, because that's the obvious solution.  But it's a solution

25    that has a price tag to it, a price tag that apparently is too

1    high for the State of Arizona to pay.

2              So I look for the next best solution, and I've talked

3    about what that's going to be, and that's going to be the

4    imposition of a financial sanction that will perhaps be a price

5    that the State will find is too high to pay.  And they'll

6    choose, as they're free to do under this stipulation, to hire

7    more people, to get the people in, the contractor or otherwise,

8    to be able to perform the services that they need to perform.

9              It's wrong and it's -- it's not wrong.  It's difficult

10   for me to sum up what is something that needs to have

11   particular facts in it.  Anybody who looked at the record in

12   this case could go back and on their own sum it up and see that

13   it dictated one answer.  And that is, you need to have more

14   people providing these services than you've arranged in your

15   contract to have.

16             And so that summing up that's obvious to everybody is

17   not something that I can recapitulate in detail right now.  But

18   I can leave the very firm impression that that is what has come

19   to be my understanding in this case, and until and unless we

20   have the appropriate number of providers and staffing people

21   providing care to the inmates in the Arizona correctional

22   system, we will continue to have stories like you just told.

23             And it's moving to you.  It's moving to me.  It should

24   be moving to any decent human being.

25             We'll take a 15-minute break.  Thank you.

1          MS. KENDRICK:  Thank you.

2          (Recess taken, 2:49 p.m. to 3:07 p.m.)

3          THE COURT:  Please be seated.

4          It's later than I said that we would be back, and the

5     reason for that delay was that I was trying to consider a

6     logistical issue about how to get the records that you have in

7     Yuma here.

8          And as you've heard, the lawyers are going to be under

9     some tight time schedules to try to come up with how they'd

10    like to schedule the remaining testimony in the case.  And if

11    it turns out that the documents suggest that we need to have

12    you back, that needs to be factored into their calculation.

13         They can't make that calculation until they do have

14    the documents, so that created for me the conundrum of how do I

15    get the documents that are in Yuma here.

16         You're represented by Mr. Reich, so I want to have

17    Mr. Reich an opportunity to take a look at those documents

18    before they're distributed.  And so I was contemplating a

19    number of things that could try to make it happen quickly, but

20    as always, I need to check in with the lawyers to see if

21    they've already thought through this and maybe have their own

22    good suggestions.

23         Mr. Reich, do you have any suggestion?

24         MR. REICH:  Your Honor, we've discussed her sending

25    them to me directly when she gets back to Yuma.  And from

1    there, I can turn them around the same day I get them.  I

2    understand the time constraints.  I can turn them around fairly

3    quickly.

4           THE COURT:  All right.  Here's the thing.  I don't

5    want to impose upon you any more than I have to.  But it is

6    possible that there could be overnight -- meaning you could go

7    take them to Federal Express on a Saturday and they could get

8    to Mr. Reich's office on Monday morning.  Is that something

9    that would be possible for you to do without too much

10   interruption to your personal schedule?

11          THE WITNESS:  Absolutely.  Yeah.

12          THE COURT:  Okay.  Then the question becomes how do we

13   pay for it.  You shouldn't have to pay for this, because

14   it's -- they're actually documents that I'm commanding that

15   would be produced.  And so I was looking to see whether it's

16   possible for us to give you the Court's account number.

17          It's not clear to me that -- in the couple of minutes

18   that I had that I can do that because of the fact that it

19   wouldn't match up with the -- we just -- we're not in a

20   position of distributing the number for remote people to use.

21          Mr. Reich, any idea here?

22          MR. REICH:  Yes, Your Honor.  My firm could pay for it

23   and then --

24          THE COURT:  All right.  So what will happen is that --

25   the following:  You'll go home and you'll -- this group of

1   documents, you'll put in a Federal Express -- or I don't mean

2   to say you only have to use them, but some company that can

3   arrange for overnight delivery to Mr. Reich's office Monday

4   morning.

5            Then, Mr. Reich, if you would please go through those

6   documents and do -- and segregate them possibly in two ways.

7   If there are no attorney-client privileged documents, then the

8   entire set of documents that you receive, make a copy and

9   produce three sets, one for defendants, one for plaintiffs, one

10  for the Court, and deliver them.

11           If there are documents for which you assert an

12  attorney-client privilege, put those documents in a separate

13  sealed envelope that you deliver only to the Court.  I won't

14  open it or review it until I give you a chance to take what

15  will be necessary the time to prepare a privilege log.  But I

16  want to make sure that I preserve the chain of custody with

17  respect to the documents in a tight fashion.

18           And so then when you receive the documents, and you

19  say you'll have a chance to look at them Monday morning and

20  turn them around in a day, I would ask you if it's at all

21  possible to get those documents to the plaintiffs and to the

22  defendants as quickly as possible.  I don't know whether it

23  means that scanning them -- whether you have a machine in your

24  office that scans quickly, in which case it could happen in

25  light speed, or whether or not they need to be copied and

```
 1    delivered.  But I'd ask you to do that just because there are a

 2    lot of scheduling issues that do hinge on this.

 3              MR. REICH:  Yes, Your Honor.  We can send them

 4    electronically to the parties on Monday.

 5              MS. KENDRICK:  Could we ask that they be Bates stamped

 6    so that all the parties are working off the same --

 7              MR. REICH:  Yeah.

 8              THE COURT:  Well, that -- you know, unless the machine

 9    can do that in an instantaneous way, I worry about the --

10    what's the current technology?

11              MR. REICH:  We have the technology to scan and Bates

12    at the same time.

13              THE COURT:  Okay.  Perfect.  Thank you very much.  And

14    I'm sorry.

15              MR. FATHI:  Your Honor?

16              THE COURT:  Yes.

17              MR. FATHI:  I beg your pardon.

18              Just in light of the short time frame that we have, I

19    would just ask that Mr. Reich be advised of the Court's

20    previous ruling that a privileged document is only one that is

21    to or from an attorney.  A cc of an attorney does not render it

22    privileged.

23              THE COURT:  Well, that's certainly not only my ruling;

24    that's the law.

25              MR. FATHI:  Indeed.
```

1          THE COURT:  And so if there are some documents for

2    which a privilege would apply, Mr. Reich can put those in a

3    separate envelope.  And then ultimately, I will get a privilege

4    log and it would suggest a -- it would identify the basis for

5    the privilege.  If the point that you're making is one that is

6    asserted as a basis for the privilege, I'll have an opportunity

7    to rule on that.

8          Okay.  Thank you.  Thank you, Mr. Reich.

9          You may continue.

10   BY MS. KENDRICK:

11   Q.  Ms. Edwards, before the break we were talking about --

12         MR. BOJANOWSKI:  Your Honor?

13         THE COURT:  Yes.

14         MR. BOJANOWSKI:  Have we reached the

15   two-and-a-half-hour mark yet?

16         THE COURT:  I don't know.  I'm going to suspend that

17   rule.

18         MR. BOJANOWSKI:  Okay.

19         THE COURT:  As long as this information is productive

20   for the Court, Ms. Kendrick may have free rein of it.  And I'll

21   give you an equal amount of time.

22   BY MS. KENDRICK:

23   Q.  Before we went to the break, you were describing a

24   gentleman who died last week.  You reported having a

25   conversation with him and then also overhearing a conversation

1  he had with a nurse regarding the ACLU attorneys reporting that

2  he was spitting up blood.

3          And I believe you stated that he told you that after

4  the -- speaking to the ACLU attorneys, he was taken to SSU for

5  an investigation?

6  A.  Yes.

7  Q.  And he was then moved into a detention unit?

8  A.  Yes.

9  Q.  Do you think that this investigation and this move to the

10  detention unit was in retaliation for speaking with me?

11          MR. BOJANOWSKI:  Objection.  Foundation.  Speculation.

12          THE COURT:  Overruled.

13          THE WITNESS:  I don't know.  But it happened very

14  quickly after, so...

15  BY MS. KENDRICK:

16  Q.  Did he convey to you that he thought it was punishment for

17  speaking with the attorneys?

18          MR. BOJANOWSKI:  Objection.  Hearsay.

19          THE COURT:  Overruled.

20          THE WITNESS:  He said that he had talked to you, and

21  then he said that after he spoke with you, that they called him

22  up and they checked his cell and they found contraband on him,

23  that it was not his, that it wasn't his.  And he said that he

24  didn't understand why.

25          He was very shaken, and he didn't look good to me.

```
 1    And he had, you know, been looking a little bit better because

 2    Dr. Barcklay had -- right away had put him on morphine when I

 3    called her and told her about the results and we need to get

 4    his consult put in.  She said, "Let me just call him in some

 5    morphine."

 6            And so he had a few days where he was looking a little

 7    bit better, moving a little bit better, but this day he looked

 8    pretty bad.  And then that's when he said, "I just came back

 9    from there.  They handcuffed me and took me away."

10            And so that was what he told me.  I believe that he

11    may have probably felt like it was.

12    BY MS. KENDRICK:

13    Q.  Did you think it was?

14            MR. BOJANOWSKI:  Same objection.

15            THE COURT:  She's answered the question.  She said she

16    doesn't know.

17    BY MS. KENDRICK:

18    Q.  Okay.  Could you turn to Exhibit 231, please.

19            And this is an email chain.  On the top of page 1,

20    it's listed as being sent from you to Carrie Smalley on

21    November 8th, 2017.

22            Who is Ms. Smalley?

23    A.  She is the nurse practitioner that I spoke about.  She does

24    all our chronic care and also some other -- she helps with

25    provider reviews and things like that when we need her to.
```

1    Q.  Okay.  If you can turn to the second page of this email, it

2    appears that it begins with an email that was sent with high

3    importance on November 7th, 2017, from Phyllis Webster to

4    multiple individuals, including you, with the subject line:

5    Tele-Infectious Disease Clinic Scheduling.  Please Read.

6    A.  Yes.

7    Q.  I believe you had mentioned earlier that to see infectious

8    disease, it's first come, first serve.  Is Ms. Webster the

9    person with whom you coordinate these appointments?

10   A.  Yes.

11   Q.  So is this how the process normally works, that Ms. Webster

12   sends an email to you and others and says here is the date of

13   the next clinic, and then you respond?

14   A.  Yes.

15   Q.  Okay.  And I believe you had said that you weren't sure of

16   the exact date that the Yuma prisoners began seeing infectious

17   disease, but you knew it was definitely by December.  Would

18   that be December 20th?

19   A.  I believe so.

20   Q.  Okay.  Do you -- and she states here in her email:  Hi,

21   all.  Please note that our next tele-infectious disease clinic

22   scheduled on November 29th is full.

23        Were any Yuma prisoners seen by infectious disease

24   telemedicine on November 29, 2017?

25   A.  November 29th?  I can't recall.

1  Q.  And then you forward this email to several people.  And --

2  at the top of page 2, and it says:  Looked like -- looks like

3  the November is full.  Are we good to go for December with

4  blank and blank?  I'm not going to say the names of the

5  prisoners.

6         Do you remember sending that email?

7  A.  Yes.

8  Q.  And then if you turn to the bottom of page 1, Ms. Smalley

9  writes you back and says:  Will they still be in compliance

10 with the 60 days, delaying treatment for HIV-positive patients,

11 question mark.

12        In your experience with working with Nurse

13 Practitioner Smalley, has she expressed frustration with the

14 inability to have patients with HIV or hep C seen in a timely

15 manner?

16 A.  Yes.

17 Q.  One time or more than one time?

18 A.  More than one time.

19 Q.  Often?

20 A.  Yes.

21 Q.  Okay.  And then at the top of the page, you write her and

22 respond and say:  I do not think we will be.

23        Are you referring to the question about being in

24 compliance with the 60 days?

25 A.  Yes.

1   Q.  Could you read the rest of that paragraph after "I do not

2   think we will be"?

3   A.  This was a huge issue before I came.  I don't know why they

4   went back to using Dr. Po.  He is great, but the requirements

5   are so extensive and such unique labs.  I let Jim and Lori know

6   again that they are an issue.  I think only one has been in

7   compliance since I have been here for six months because he was

8   not a new consult.  Maybe we should just order all of the

9   required labs, tests, radiology, et cetera, first.  Then once

10  they come in, put in the actual consult.  We may have to cancel

11  and resubmit.

12  Q.  Do you remember if Nurse Practitioner Smalley responded to

13  this email?

14  A.  I do not.

15  Q.  Do you remember if she told you to cancel and resubmit the

16  consults for the two class members that you wrote her about?

17  A.  She would have done it herself.  This wouldn't be something

18  that I would cancel.

19  Q.  If she had done it herself, would you be notified in some

20  way?

21  A.  Yes.

22  Q.  How would you be notified?

23  A.  I get an email if she tags me in eOMIS, just like they get

24  one when I tag them.  Sometimes we don't get tagged.  Sometimes

25  they tag the wrong Edwards, but that's how I would have known.

1   Q.  So why are you canceling the consults?  Was that to meet

2   the time frames?

3   A.  It would have been, yes.

4   Q.  Could you turn to Exhibit 180, please.

5           So this is a long email chain dated August 25th, 2017.

6   And if you go to the bottom paragraph, it is sent from Karen

7   Barcklay to Yolanda Serrato and copying you, dated August 25th,

8   2017, and it's regarding a class member.

9           Who is Yolanda Serrato?

10  A.  Yolanda Serrato is the previous clinical coordinator.

11  Q.  Was this the time frame when you were coming over to become

12  the clinical coordinator?  Or were you still the scheduler?

13  A.  I was still the scheduler, but close to it.

14  Q.  Okay.  And what does Dr. Barcklay write there, in that

15  entry there?

16  A.  Which one?  The second page?

17  Q.  Page 1, on the bottom.

18  A.  Do you want me to cancel it with a notation that we will

19  resubmit when dictated reports are available?

20  Q.  Right.

21          And then two paragraphs up, you are again copied on

22  this email.  And Dr. Barcklay writes:  Thanks.  I appreciate

23  that, but I think they have to show these MNI --

24          Would that be NMI reports?

25  A.  Yes.

1   Q.  -- to the courts --

2         MR. BOJANOWSKI:  Note an objection.  There's some

3   other -- note an objection, Your Honor.  There's some other

4   information here that's being left out, and it's being taken

5   out of context.  I mean, there's --

6         THE COURT:  Can you say what that information is that

7   you think is --

8         MR. BOJANOWSKI:  Well, it's just another email that

9   was being skipped.

10        THE COURT:  And what information do you think should

11  be presented to this witness, in fairness, so that we don't

12  hear testimony --

13        MR. BOJANOWSKI:  Well, the reasoning for the

14  cancellation was due to a lack of having a dictated report

15  available.

16        THE COURT:  Okay.  So you've made that point apparent

17  to the witness, so the objection is moot, I think.

18        MR. BOJANOWSKI:  Well, okay.

19  BY MS. KENDRICK:

20  Q.  Dr. Barcklay writes that they have to show these reports to

21  the courts and it affects our fines, followed by a frowny face.

22        You had testified earlier that you had been told that

23  you were fined a thousand dollars for every day that something

24  was late?

25  A.  Yes.

1    Q.  Do you understand that to be what Dr. Barcklay is somehow

2    referring to here?

3    A.  Yes.

4    Q.  Do you remember this patient and what type of specialty he

5    was awaiting?

6    A.  Yes.  I know the patient, and I'm aware of him.  And I

7    believe it was an orthopedic specialty, but I'm not positive.

8    Q.  And where are the orthopedic specialists available for you

9    guys?

10   A.  The orthopedics, at the time we were using TOCA, I believe,

11   The Orthopedic Clinic.  And then we began using Dr. Runyan, who

12   is in Yuma, and he's at the Arizona Bone and Joint.  And -- but

13   at the time, I can't remember exactly where he was going.  My

14   assumption is that he was going to Phoenix.

15   Q.  Okay.  So when you were describing those documents that you

16   had, one of the things you said that they covered was access to

17   HNRs.  Did you mean access to HNR forms?

18   A.  I'm not understanding the question.

19   Q.  This morning when we were talking about the documents that

20   you had gathered but you didn't bring, and I asked you

21   generally what topics they covered, one of the ones that I

22   wrote down that you said was "access to HNRs."  And so I was

23   just trying to figure out what you meant by that.

24   A.  Oh, okay.  I'm not quite sure.  I know that they pertain to

25   HNRs and HNR requests that possibly the inmates have put in and

```
 1    haven't been addressed or that -- along those lines, but I
 2    don't exactly know what I meant by access to HNRs at the
 3    moment.
 4    Q.  Did you mean forms, access to forms?
 5    A.  Well, it would be -- it would be very similar to this, to
 6    the emails back and forth that I've communicated on different
 7    situations and different issues.  That's the type of documents
 8    that I would have.
 9    Q.  Okay.  Would it be about not being able to submit HNRs?
10    A.  Yes.
11    Q.  Does Yuma still use the HNR box system for prisoners to
12    request medical care?
13    A.  Yes.
14    Q.  So you said "yes" when I asked not being able to submit
15    HNRs.  Do you mean that they don't have access to the boxes or
16    what?
17    A.  Well, they have access to the box, but they don't
18    necessarily always have access to the nurse line, the open
19    nurse line call.  That's what I -- that's what I meant.
20    Q.  Can you explain what you meant?
21    A.  Well, it's -- they can either put an HNR in the box or they
22    can be seen if it's an urgent issue.  If they have pain, they
23    have to be seen that day.  They should be seen that day.  And
24    they are able to come up with the HNR in their hand and be
25    seen.
```

1          My understanding is that at that point, the LPN can

2     see them, the one that's during the nurse -- the med call, pill

3     call, but she has to stop her line and see them.  So the RN has

4     the nurse line that's supposed to be open, my understanding is

5     7:00 to 7:00.  That's been my understanding.  But those are the

6     times.

7          So if they come up with that HNR and they want to be

8     seen, there are instances where they are turned away and they

9     have to put it in the box, or they just take it back home and

10    then come back another day with it in their hand to see if they

11    can get seen.

12    Q.  And this is based on your personal observations of having

13    your office in the Cibola clinic?

14    A.  Yes.

15    Q.  And is the Cibola clinic open from 7:00 to 7:00 for

16    patients to come in?

17    A.  No.  The times, that's what I was told that they were, but

18    no.

19    Q.  What times are they generally open?

20    A.  If they have a nurse, it is generally between 7:00 and

21    maybe 10:00 o'clock.  Sometimes not at all.

22    Q.  7:00 a.m. to 10:00 a.m.?

23    A.  Yes.  I'm sorry, yes.  7:00 a.m. to 10:00 a.m.

24    Q.  And you said if they have a nurse.  How often do they not

25    have a nurse?

1    A.  Often.

2    Q.  How many times a week?

3    A.  Three to four.

4    Q.  There's no nurse?

5    A.  Yes.

6    Q.  So there's no nurses' line?

7    A.  Yes.

8             THE COURT:  How long has this been going on?

9             THE WITNESS:  As long as I can remember.

10   BY MS. KENDRICK:

11   Q.  And you said that you've seen patients come up who are

12   turned away?

13   A.  Yes.

14   Q.  And do you remember the last time you saw that happen?  Was

15   that this week, last week?

16   A.  Yes.  It was -- I believe the week before last.  It was

17   the -- close around to the time that I called the compliance

18   line.

19            And it was concerning exactly that, an inmate that had

20   came in with an HNR in his hand.  He's one of our very sick

21   guys.  And he -- we were waiting on some liver re-reads that I

22   had sent out, and I was just -- I would update him from time to

23   time just so that he knew that we're not forgetting him, that

24   we're still waiting on A, B, C, D.

25            And he had come in because he wasn't feeling well.  He

1    had told me that he was defecating blood and mucus.  And I had

2    told him if I see him on the yard and he asks me or I see him,

3    he's not looking good or he's not feeling good, hey, put in an

4    HNR, you know, so you can be seen or just come up to the nurse

5    line.

6            And at that point, he had came up.  The officer came

7    and asked if I had time to talk to him, and I said yes, because

8    I had just gotten back the results of his re-read.  And so I

9    said:  Yes, let me just update him.  I was going to call him up

10   anyways.

11           So we went and walked down the hall.  I went to get

12   him out front and walked down the hall and was getting ready to

13   go into the provider room, because we don't have a provider so

14   I use that office.

15           And as we were in the hallway, this nurse, the RN,

16   Mesa, had seen that he had an HNR in his hand.  I'm fully aware

17   of what my boundaries are and my scope of practice is, and I

18   had noticed, you know, that he had the HNR, but obviously I'm

19   not going to work that.  I'm not an RN.  And I know the policy

20   and I follow it to the best of my knowledge.

21           So we were walking and -- into the office and she was

22   walking down the hall, started walking after him, and said:

23   What are you doing?  Why do you have that HNR?  You don't give

24   it to her.  Go put it in the box.

25           And I looked at him and I said:  Do you need to be

1  seen?

2          Because obviously -- I mean, if he has an HNR -- and

3  he is very sick.  If he needs to be seen, he can be seen.  And

4  he just shook his head and said:  No.  I'm just going to wait.

5          And we went into the office and we started talking.  I

6  told him about the liver re-reads.  I said:  We've got the

7  results back.  Obviously I can't give them to you, but I can

8  tell you we've got them.  I said:  I'm going to either put you

9  on provider line or call Dr. Jordan or -- and have him review

10  them.

11          And I also sent those to Dr. Verma, who is our GI doc.

12  He's excellent, in Phoenix.  And I said:  As soon as I hear

13  from them, you know, we'll have a better plan of what your care

14  is going to be, and I'll keep you in the loop.  And I said:

15  How are you feeling?

16          And he said:  I feel terrible.  He's lost weight.  He

17  said he'd been defecating blood and mucus and he was starting

18  to break out again.  He -- his skin.

19          And so I said:  Do you want to be seen?  Because I can

20  get you seen today.

21          And he just put his head down and shook his head, and

22  he said:  You know how Mesa is.  And he said:  No.  It's okay.

23  I'll wait.

24          So then he left, and she came into my office after

25  that and was very upset and said:  What was he doing here?  Why

1    are they -- why are they taking up your time?

2          And, I mean, it literally took one minute to do what

3    we did and say what I said and ask him how he was doing and

4    then go back to my office.  But she said:  Why are they taking

5    up your time?  Why -- what did he want?

6          And at that point, you know, I said:  Well, it's

7    concerning a consult.

8          Well, was he going to give you that HNR?

9          And I just looked at her, and I said:  You know better

10   than that.  You know that I know that I can't take HNRs.  I

11   said:  But he had came in to ask about a consult.  That was

12   what he was talking to me about.  And I told him to come back

13   if he felt bad or if he wanted to be seen.

14         And at that point, she said:  Well, he's a liar.  He

15   blank lies.

16         And I just turned around and said, I have things to

17   do, and I started working.  And, you know, I did -- I did tell

18   her, you know, he is -- he's very sick.  And I said, hopefully

19   we've got some results coming back and we can figure out what

20   we're going to do.

21         "Well, he lies," and she just threw her arm up and

22   stormed out.

23         And then at that point, I did not have any other

24   interactions with him.  I believe he saw the provider after

25   that, about a few days, maybe a week, just this last week.

1    Q.  Ms. Edwards, this morning when you started testifying and I

2    asked you if you were concerned about retaliation, you said

3    yes.  And I asked you if you had seen other people face

4    retaliation, and you said yes.

5              And could you describe that for us?

6              MR. BOJANOWSKI:  Note an objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  I've had -- so I've -- I've read some of

9    the documents that you have had and that you guys have made

10   available.  I've read some of the issues with the retaliation

11   and how it happens very closely in proximity from one event to

12   the other to where it can be deemed as it is retaliation.

13             So I've seen things like that.  I don't know that they

14   are retaliation or not, like with Mr. -- with the inmate that

15   passed away.  I was -- I was working with another patient that

16   we had who had a pacemaker, and he had obtained counsel and was

17   going to try to retry his case, I guess.

18             He had came in for an issue with his pacemaker.  He

19   wasn't feeling well.  And he ended up -- I sent him out.  We

20   got him taken care of.  He got his pacer checked -- I'm sorry,

21   he got his generator changed.

22             And when I saw him on the -- I'm sorry, I'm

23   backtracking.  Okay.

24             So the first -- my first contact with this particular

25   inmate, who is also in CVU at the moment but -- well, I think

1    he's still there, but first contact with him as I was walking

2    in and he was walking out of medical with his HNR in his hand.

3    And I knew who he was, that I had sent him out.  I didn't

4    really know him personally, but I recognized him, and I said:

5    How did your pacer check go?  Did you get -- or your generator

6    changed?  Did you get everything done?  Are you feeling okay?

7         He said:  Yes, I am.  He said:  Except I have an issue

8    with my SNO.  He said:  I can't get the SNO, and I was told

9    that it's going to be two weeks.

10        But the SSU, when they have searches, a couple of

11   weeks before he had had the wand put over and over and over.

12   This is his document -- his comments of his pacer.

13        And, I mean, obviously if someone tells me that, I'm

14   going to be concerned.  Both my parents have pacemakers and,

15   you know, I have kind of worked with the cardiology in

16   Children's.

17        And I said:  You know, let me look into that.  Would

18   you feel better if I called the doctor?  Do you need to be seen

19   right now?  Are you having chest pain?  You're welcome to come

20   in.  We can, you know, take care of you.

21        And he said:  No.  He said:  I was told that I had to

22   wait, that I wasn't going to get another SNO.

23        The SNO is a special needs order that would allow him

24   not to have to go through the metal detectors and be wanded.

25   But this is just supposed to be a quick wand.

1          So at that point, I talked to -- the provider at the

2     time was Provider Brisbois, and I had told him what had

3     happened.  And I said:  Do you want me to get him back in so

4     that we can recheck his pacemaker in case it got decalibrated?

5     What do you want me to do?

6          And he said:  You know, let me put in another consult

7     for him and see if we can get him out.

8          So in the meantime, he had said he wasn't feeling

9     good.  He had came in for, I think, another appointment and

10    just in passing in the hall, I said:  Hey, how are you doing?

11    Because he was looking very, very worn, very tired.

12         And he said:  I'm not feeling good.  I'm really

13    worried about this.

14         And I said:  You know what?  I said:  We've got

15    another consult put in for you.  We're going to get you back

16    out, maybe get you another recalibration, see how it goes.  You

17    know, hopefully it will get approved.  We'll let you know.

18         It didn't, and he didn't go out.  At that point I was

19    still concerned, so I called Dr. Barcklay personally and I

20    said:  Can you please try to -- can you just see him and see so

21    you can give him a quick check?

22         Because he didn't want to come up to the nurse line

23    because he was -- he said he had been turned away and that they

24    didn't want to see him and that I knew how it was.

25         So, anyways, I just said:  Okay.  Well, let's see if

1    we can do this.

2         So Dr. Barcklay asked me to put him on her line and

3    that she would check him over again and just see, you know,

4    what he needed.  She reviewed the documents and said that, you

5    know, she didn't -- you know, wasn't sure if it -- she didn't

6    think that it would have affected him.

7         I had called the doctor, though, because she told me:

8    Call the doctor.  Call the -- I'm sorry.  Backtrack.

9         So I called the doctor, his provider, and I called the

10   other provider, Dr. Askari, because I thought that they -- they

11   usually do a lot of our patients.  And when I couldn't get

12   ahold of this one, I called them to just ask a general question

13   about pacers and what is the effect -- what would the effect be

14   if he had that continually wanded.

15        And both doctors said:  Absolutely, that is not a good

16   situation.  It can decalibrate it.  He needs to get in.

17        So that's when I put him on the doctor line for

18   Dr. Barcklay.

19   BY MS. KENDRICK:

20   Q.  Did you think that the wanding by SSU was in retaliation

21   for him seeking counsel and assistance and getting care?

22        MR. BOJANOWSKI:  Note an objection.

23        THE WITNESS:  I don't know.

24        THE COURT:  Overruled.

25        THE WITNESS:  Yeah, I don't know.

1    BY MS. KENDRICK:

2    Q.  Okay.  And earlier you said that you were concerned about

3    retaliation.  Are you concerned about potentially losing your

4    job or having some other work discipline?

5    A.  Yes.

6    Q.  Has anybody made any threats or promises to you regarding

7    your testimony?

8    A.  Other than saying that there won't be any retaliation,

9    nothing's going to happen.

10   Q.  Who told you that?

11   A.  The DOC.  Because I did call them and I -- I made, like I

12   said, another corporate compliance line but to DOC, not just

13   Corizon.  I called DOC when I was told that I was potentially

14   under investigation and that I might be compromised.

15        So I was very, very concerned, and they assured me

16   that there is -- Ms. Reese, Ann Reese, said:  There will be no

17   retaliation against you.  We're not aware of any investigation,

18   but I'm going to bring this up to the warden and I have to

19   report this, she said.

20        You know, and I understood that, and I wanted her to

21   in a way of -- I felt very defensive at that time.

22   Q.  And how many days or weeks was that after you got the

23   subpoena?

24   A.  I believe two weeks, maybe.

25   Q.  Are you concerned --

CECILIA EDWARDS - DIRECT EXAMINATION                91

1    A.  A week.

2    Q.  -- at all regarding your personal safety or the personal

3    safety of your family?

4            MR. BOJANOWSKI:  Note an objection.

5            THE COURT:  Overruled.

6            THE WITNESS:  Because of this?

7    BY MS. KENDRICK:

8    Q.  Yes.

9    A.  Yeah.  Yes.

10   Q.  Why is that?

11   A.  Because I'm a mother.  I'm a single mother.  I take care of

12   my mom, and it's just my mom mode, you know, of being

13   protective and, you know, the State and Corizon and, you know,

14   no offense, but they're big -- big corporations, big people.

15   And I'm not.  So I believe that other people feel this way,

16   other people know things, and they do not want to come forward

17   because of this.

18           And it's -- literally one week after I called the

19   corporate line that the dogs came into our building.  And I'm

20   not sure if they were there for me or if they were there for

21   something else, but they were there.  And that's when Mesa told

22   me that I was under investigation.  I could potentially be

23   under investigation, and that she was asked by ADW Aguilar if I

24   was compromised, if she thought I was compromised.

25           And so, yeah, that's been a concern.

1   Q.  So ADC brought in the K9 unit, the dogs that sniff for

2   drugs, into your office?

3   A.  I don't know if they went into my office.  My door was

4   unlocked that day.  But they were in the building in medical.

5   I came in late that day, so I don't know what they were there

6   for.  But they were there.

7   Q.  In the two years prior to that, had ADC ever sent dogs into

8   your work space or a medical clinic where you worked?

9   A.  Once.

10  Q.  Why did you come testify?  Why did you compile all these

11  documents?

12  A.  I guess, like I said, I've -- maybe it's a bad thing, but I

13  have read the Parsons versus Ryan.  I am not a bleeding heart,

14  I guess, if that's a bad thing.  I don't know that it is.  I am

15  a very hardworking mother who has worked two and three jobs at

16  a time and gone to school full time and still raised very

17  decent, caring, productive members of society, by God's grace.

18          But I feel that, you know, my -- my duty was to find

19  out what was going on and what was happening and why there was

20  so much pressure on us for -- to meet these dates and these

21  times.  And I looked into it because they told us to.  They

22  said we should -- when you get hired, you need to read this

23  Parsons versus Ryan so that you're aware of what happened and

24  why we need to do what we need to do.  So I did that.

25          And as I read -- as I read it, a few things were very

1    evident to me.

2            THE WITNESS:  One, that you were a very smart man and

3    not much escaped you.

4            And, two, that both sides probably had issues, and

5    that's why this was still going on.

6            But as I read, I realized that as many improvements as

7    we've made and for the short time that I've been here, in the

8    two months, that it was like I could have been reading that

9    today, because certain things are still happening.

10           And so I had to keep going back and looking at the

11   date, because I thought this couldn't have been, you know, in

12   2014, in 2012.  Why is this -- how is this still happening?

13           So for me, it was a -- it was a bad thing.  I should

14   have never read it.  And I couldn't sleep.

15           You asked who in the State -- I believe you asked

16   Mr. Ryan -- no, Mr. Pratt about the cancer patients.  Who in

17   the State, who is it that's accountable for these patients?

18   Who is losing sleep over this?

19           And it --

20           THE COURT:  You.

21           THE WITNESS:  And I did.  So that's why I -- I mean,

22   I've struggled with it.  It's been extremely hard.  But like

23   I -- you know, I told Mr. Reich, I don't -- I haven't found

24   that "I don't care" button yet in my life.  I think I'm a fully

25   established human being with my morals and my values and my,

1    you know, set of value systems that I lead my life by, and I

2    feel like in the back of my mind, I think I was always maybe,

3    just in case something happens, I need to protect myself as

4    well.

5            I still did patient care.  I still took care of my

6    job, did what I needed to do, but that's the main reason why I

7    started keeping all of that information, all of the emails, all

8    of the back and forth.  Because we live in the real world, and

9    when people say that, you know, there's not going to be any

10   retaliation, you want to believe it.

11           But, you know, when the rubber hits the road and I got

12   subpoenaed -- you know, I'm employee of the month, December,

13   and have never been written up for anything in my life, ever,

14   and I've -- I just -- I don't understand why I would be under

15   investigation.  I don't know why that is.  I'm not -- whether

16   it's retaliation or not, it's what's happened right now.

17           So I just can't -- I struggled with it, but I realized

18   that I had to come.  I had to tell the truth and, you know,

19   what happens, happens.

20           And he's -- you've asked me direct questions and I've

21   answered, I believe, as truthfully as I can regardless of

22   what -- what may or may not happen.  And it may not -- nothing

23   may happen, and things may change and that would be wonderful.

24           MS. KENDRICK:  Ms. Edwards, on behalf of my 34,000

25   clients, thank you for coming and testifying fully and

1    honestly.

2           Your Honor, in light of Ms. Edwards' testimony, we

3    request that the Court enter an anti-retaliation order directed

4    at ADC and Corizon that Ms. Edwards face no retaliation as a

5    result of testifying here today.

6           THE COURT:  Well, here's the thing about retaliation.

7    You perceived some events that you thought could have been

8    retaliation.  We don't know whether Ms. Mesa was right about

9    there being an investigation.  You've been told there wasn't an

10   investigation.  We don't know whether the dogs came as a

11   coincidence or whether they were associated.  We don't know

12   about that.

13          But I gather it's fair to say that in the time that

14   you've worked for Corizon in Yuma for the Department of

15   Corrections, that there have been enough things that you have

16   observed that have fit into the category of retaliation that

17   you would say that it is possible that this is a climate where

18   retaliation can occur.  Is that fair?

19          THE WITNESS:  Yes.

20          THE COURT:  I've heard that from other witnesses.  I

21   don't know for sure in the particular incidences.  But I can

22   talk about some other things that I've heard.

23          I've heard a witness testify that when she had her

24   training, that she was told by the trainer that, how do you

25   know when a prisoner is lying?  When the prisoner's lips are

1    moving.

2            The idea that a trainer could say that in a department

3    can so infect how people react and interact with one another

4    that it creates a climate and culture that's completely

5    consistent with a climate and culture of retaliation.

6            It's true that inmates lie.  It's true that Department

7    of Corrections officers lie.  It's true that people lie.  But

8    it's not true that everybody in a class of people lie.

9            It's also -- well, the plaintiffs have asked me to

10   enter an order.  What I'm -- I'm not going to enter an order

11   because there is always an order to that extent.  I have said

12   that already to the defendants, and I don't want anything that

13   even comes close to being suggestive of retaliation because

14   that chills the kind of information exchange that is vital from

15   people like you to the Court.

16           So I don't need to enter that order, but I will tell

17   you that as long as I'm here, and I think every judge who is

18   presiding in this case will be interested in hearing about

19   circumstances that could fit in within that potential culture

20   of retaliation.

21           Again, I don't mean to say that I think every single

22   incident that looks like retaliation is retaliation.  I don't

23   believe that retaliation is an automatic assumption.

24           I also have to tell you that I don't believe that the

25   Department of Corrections is free of retaliation.  I've learned

1    enough in this case to come to that conclusion.  I've heard

2    enough in this case, as demonstrated by the very sick joke that

3    I just gave you, that there is misplaced understanding of what

4    the role is and what people are capable of doing.

5         So I don't need to do that.  But I do need to give the

6    defendants an opportunity to take advantage of the time that we

7    have yet remaining today to ask you any questions that they'd

8    like to ask.

9         But before I do that, I'm going to interject again.

10        And that is, pending before the Court is a motion or

11   an action, a request from the defendants that we do away with

12   the HNR boxes.  As associated with that request, I believe the

13   defendants represented to me that there would be this new open

14   line of healthcare and that it meant that that would be a more

15   efficient and assured method of making sure the people who

16   needed healthcare received it.

17        Is there some reason to think that the testimony that

18   we've just heard about Yuma would be outside of those

19   representations that you made to me, Mr. Bojanowski?

20        MR. BOJANOWSKI:  No.  I think I've accurately

21   represented what's going on.  I don't know the circumstances

22   that she's talking about of what happened --

23        THE COURT:  First of all, there's still an HNR box in

24   Yuma.

25        MR. BOJANOWSKI:  Well, there may be --

1          THE COURT:  Is that consistent with what you talked to

2     me about, doing away with the HNR boxes --

3          MR. BOJANOWSKI:  Well, there may be --

4          THE COURT:  -- and now there's a pending motion or a

5     pending action of the Court to have me put them back in place?

6     Again, this is another example of things happening out in the

7     yard that are inconsistent with what you've told me.

8          MR. BOJANOWSKI:  There may be HNR boxes out there.  I

9     don't know what yard she is talking about.  I mean, in the

10    maximum custody units, we still use the HNR process.

11         THE COURT:  Obviously.

12         MR. BOJANOWSKI:  There are boxes that are out there

13    that are to be used for --

14         THE COURT:  Do you have any maximum custody people in

15    Yuma?

16         MS. KENDRICK:  Your Honor, she works on the Cibola

17    yard.  And when we were there on the tour, counsel for

18    plaintiffs were accompanied by Mr. Bojanowski, and we observed

19    HNR boxes.  And we were told by medical staff at Cibola that

20    the method was to put the HNRs in the boxes to be called for

21    nurses' line.

22         So that's what we were told.  Ms. Eidenbach was with

23    me when we were at the Cibola Unit, and we were told that was

24    how it was done.  And Cibola Unit is not a maximum security

25    yard.

1              THE COURT:  And it strikes me that that's inconsistent

2  with everything the defendants have told me about this move to

3  the new plan.

4              MS. KENDRICK:  Yes, sir.

5              THE COURT:  All right.

6              MR. BOJANOWSKI:  My understanding is that --

7              THE COURT:  Anything you want to say at this point,

8  Mr. Bojanowski?

9              MR. BOJANOWSKI:  Pardon me?

10             THE COURT:  Anything you want to say at this point?

11             MR. BOJANOWSKI:  My understanding is the boxes are

12  supposed to be used for medication renewals and that the

13  inmates are not supposed to be using those boxes to process

14  HNRs, but they still do.

15             And so as a result, nursing is still picking them up

16  and processing them, but that's not supposed to be the way it's

17  done.

18             THE COURT:  All right.  So let's get to the other

19  point, and that is, when there are no nurses, there's no

20  nurses' call line.  How is that consistent with the new plan?

21             MR. BOJANOWSKI:  I don't know anything --

22             THE COURT:  All right.

23             MR. BOJANOWSKI:  -- about that.

24             THE COURT:  It's not fair to expect you to answer

25  about something you don't know about.  That's news to you too?

1          MR. BOJANOWSKI:  It is news to me.

2          THE COURT:  Is this the first time you've heard about

3     it?

4          MR. BOJANOWSKI:  It is news to me.

5          THE COURT:  All right.

6          MR. BOJANOWSKI:  So I have to take this witness's

7     testimony and now go back and find out if, in fact, what she is

8     saying is accurate.

9          THE COURT:  And well you should.

10         MR. BOJANOWSKI:  Because I don't know that.

11         THE COURT:  Well you should, because I'm relying upon

12    the lawyers for the defendants to accurately represent to me

13    what's going on in these ten facilities, and I don't like to

14    hear news from the field that is contrary to what the lawyers

15    have been telling me.

16         Because I expect the lawyers to know that.  If it's

17    not true that there are nurses that are present that are able

18    to meet this nursing line need, I want the lawyers to be on top

19    of that.  And the idea that I would have somebody come and tell

20    me that this is so regular, that it is so often the case, and

21    it so obstructs the method that you had said would be providing

22    for the needs of these inmates and in lieu of the HNR requests,

23    I would expect you to know about that.

24         And the fact that you don't suggests that you all, for

25    all the great number of people that you have in your firm, and

1    the State of Arizona and the Attorney General's Office, you're

2    not doing your job here and fairly representing the facts of

3    this case to me.

4         Because you've made representations to me that I've

5    acted upon, and I have presently under advisement another

6    motion with respect to this HNR box, and I was poised to act on

7    that based upon representations that I had heard from the

8    defendants.  And again, I rely upon that, and I've said that to

9    you before.

10        And I just -- again, this is not like some little

11   insignificant breakdown.  This is the nursing line that is

12   supposed to be the first responder for people who are sick.

13   And previously we had a plan where people would -- and the

14   stipulation contemplated this, that the HNRs would be submitted

15   and that those would result in a process that could be

16   evaluated and -- by the monitors, and it would result in the

17   patients being seen.

18        I now hear from someone who is in close proximity to

19   the office that this -- the nursing line, the new proposal

20   doesn't happen often because there are no nurses, that it's

21   supposed to be open from 7:00 to 7:00 but it's not because

22   there's not somebody to do it.

23        Now, because I have the witness still on the stand, I

24   don't want to have my failure to appreciate what she said and

25   make -- and my perhaps making a mistake go forward if I can ask

1    her to say:  Did I, in restating what I took the import of your

2    testimony to mean -- meaning what it meant -- when restating

3    that, did I get anything wrong?

4              THE WITNESS:  No.  No.

5              THE COURT:  All right.  Thank you.

6              And thank you, Ms. Kendrick.

7              MS. KENDRICK:  Well, Your Honor, I'm more than willing

8    to cede the podium to Mr. Bojanowski, but both of my co-counsel

9    have kindly reminded me that I need to move exhibits into

10   evidence, so --

11             THE COURT:  All right.

12             MS. KENDRICK:  -- as soon as we do that, I can step

13   down.

14             THE COURT:  Please go ahead.

15             MS. KENDRICK:  Plaintiffs' Exhibit 77.

16             THE COURT:  Hold on just a second.

17             Is there any objection?

18             MR. BOJANOWSKI:  No objection, Your Honor.

19             THE COURT:  77 is received.

20             (Exhibit No. 77 received into evidence.)

21             MS. KENDRICK:  Plaintiffs' Exhibit 180.

22             MR. BOJANOWSKI:  No objection, Your Honor.

23             THE COURT:  180 is received.

24             (Exhibit No. 180 received into evidence.)

25             MS. KENDRICK:  Plaintiffs' Exhibit 225.  It's already

1   in?  Okay.

2           THE COURT:  All right.  225 is admitted already.

3           MS. KENDRICK:  226.

4           MR. BOJANOWSKI:  No objection, Your Honor.

5           THE COURT:  226 is received.

6           (Exhibit No. 226 received into evidence.)

7           MS. KENDRICK:  Plaintiffs' 231.

8           MR. BOJANOWSKI:  No objection, Your Honor.

9           THE COURT:  231 is received.

10          (Exhibit No. 231 received into evidence.)

11          MS. KENDRICK:  Defendants' Exhibit 507.

12          MR. BOJANOWSKI:  No objection, Your Honor.

13          THE COURT:  507 is admitted.

14          (Exhibit No. 507 received into evidence.)

15          MS. KENDRICK:  Defendants' Exhibit 509.

16          MR. BOJANOWSKI:  No objection, Your Honor.

17          THE COURT:  509 is admitted.

18          (Exhibit No. 509 received into evidence.)

19          MS. KENDRICK:  Defendants' Exhibit 510.

20          MR. BOJANOWSKI:  No objection, Your Honor.

21          THE COURT:  510 is admitted.

22          (Exhibit No. 510 received into evidence.)

23          MS. KENDRICK:  Defendants' Exhibit 512.

24          MR. BOJANOWSKI:  No objection, Your Honor.

25          THE COURT:  512 is admitted.

1              (Exhibit No. 512 received into evidence.)

2          MS. KENDRICK:  Defendants' Exhibit 518.

3          MR. BOJANOWSKI:  Foundation and hearsay, Your Honor.

4          THE COURT:  And I think we do have a foundation issue

5     here, and because of that, it's difficult to fully assess the

6     hearsay objection.

7          Any response to that objection, Ms. Kendrick, the

8     foundation objection?

9          MS. KENDRICK:  Well, seeing as how this is defendants'

10    exhibit, maybe Mr. Bojanowski could explain what this document

11    is.

12         THE COURT:  Well, but that's not the test here.  I

13    mean, obviously this was produced in discovery.  He made a call

14    as to -- or somebody made a call as to that it would be

15    responsive to one of your discovery requests.

16         This witness hadn't seen this type of form before,

17    hadn't seen this document, was familiar with the headings but

18    little beyond that.  So I don't -- and you were able to use it

19    for the purpose of asking questions.  But I don't see that

20    there's any -- based upon what you've said to me, any reason

21    not to fully accredit the foundation objection here.

22         MS. KENDRICK:  Well, it was not produced to us in

23    discovery as you can tell, because it doesn't have the Bates

24    stamps.

25         THE COURT:  Well, how was it -- tell me how --

1           MS. KENDRICK:  This appears to be a Federal Rule of

2    Evidence 1006 exhibit prepared by defendants.

3           THE COURT:  Well, let's hear about that.  Is that

4    true?

5           MS. KENDRICK:  Because it has Dr. Watson's name on it,

6    it appears that it may have been prepared for her testimony or

7    for someone else's testimony regarding her specialty care.

8           THE COURT:  Do you know anything about the provenance

9    of this document, Mr. Bojanowski?

10          MR. BOJANOWSKI:  I do not, Your Honor.  But, I mean,

11   the bottom line is that this witness has to identify the

12   document.  There needs to be a foundation laid with regard to

13   the document.  Just because it's marked as an exhibit doesn't

14   mean that it is something that is admissible.  We certainly did

15   not move for its admission.

16          THE COURT:  Yeah, and you answered the question that I

17   asked right at the very start, and that is, do you know

18   anything about its provenance.  You said you didn't.  And so I

19   don't really have a foundation, so I'm going to sustain the

20   objection.

21          Mr. Bojanowski, you may proceed.

22          Ma'am, can I -- are you planning to drive back to Yuma

23   tonight?

24          THE WITNESS:  No.

25          THE COURT:  Okay.  So it's all right that we're

1    keeping you till 5:00?

2              THE WITNESS:  Yes, that's fine.

3              MR. BOJANOWSKI:  May I have just a moment --

4              THE COURT:  You may.

5              MR. BOJANOWSKI:  -- Your Honor?  Thank you.

6              Thank you for that moment, Your Honor.

7              THE COURT:  You're welcome.

8                        CROSS-EXAMINATION

9    BY MR. BOJANOWSKI:

10   Q.  Hi, Ms. Edwards.

11   A.  Hi.

12   Q.  I'm going to try not to repeat anything that's already been

13   covered so that we don't waste any time here with you.

14            Now, part of your job duties involve essentially

15   scheduling appointments, outside appointments for the patients

16   that are within the Yuma facility; correct?

17   A.  I don't do the scheduling usually, but that is part of my

18   office's job.

19   Q.  Okay.  So -- and I want to be clear here.  So your job

20   duties are to arrange for outside consults, work with UM, and

21   make sure that people are seen within time frames to get care

22   that is recommended by the provider; right?

23   A.  Yes.

24   Q.  And as part of your job duties, you track that to make sure

25   that these patients are being seen in a timely fashion;

1    correct?

2    A.  Yes.

3    Q.  And then there's about 5,000 inmates at the Yuma facility;

4    is that right?

5    A.  Yes.

6    Q.  And so if you could go to Exhibit 226, which is one that

7    you had talked about earlier, that was an email that you had

8    sent to Ms. Johnson --

9    A.  Yes.

10   Q.  -- responding to, I assume, a request for an update as to

11   specialty consults for the year.  Is that my understanding?

12   A.  Yes.

13   Q.  All right.  And it appears to me in this email that what

14   you are doing is you are totaling up the total amount of

15   consults that occurred throughout the course of one year at the

16   Yuma facility involving the 5,000 inmates.  Right?

17   A.  Yes.

18   Q.  And so I thought that -- and I want to be clear on this,

19   that it is -- it is not -- when you say urology 44, the 44 is

20   the number of consults, not the number of inmates that were

21   involved in the consults?

22   A.  Correct.

23   Q.  All right.  So if I understand your testimony correctly, it

24   could be, say, five inmates that were seen multiple times

25   throughout the year?

1   A.  Yes.

2   Q.  Okay.  Are you currently current with all your consults at

3   Yuma?

4   A.  No.

5   Q.  How many consults are behind schedule, so to speak?

6   A.  Without having the numbers right in front of me, I would

7   say we have three ATPs, two ATPs or three, and two or three

8   NMIs that needed reviewed.  We have about -- there's, I

9   believe, five consults pending to be put in and sent out.  I

10  did not finish those yesterday.  There's probably 40 provider

11  reviews that still need to be done.

12          So it's not a typical month for us.  I'm usually very

13  on top of things.

14  Q.  All right.  You had mentioned a disturbance at some point

15  that impacted your ability to get consults done.  Is that part

16  of what is happening there?

17  A.  This was in March, and it affected mainly optometry.  We

18  had several that we had to reschedule because there was no

19  transport, but mainly it was optometry.

20  Q.  All right.  The disturbance, what do you mean by a

21  disturbance?

22  A.  It was a riot.

23  Q.  Okay.  And what happened as a result of that?

24  A.  The inmates rioted.  They went to medical and did a ton of

25  damage.  There was several injured, one dead.  I believe I had

CECILIA EDWARDS - CROSS-EXAMINATION

1    36 ER send-outs or so and about -- well, the one death.

2          And then there was about four others that I sent out

3    that were not related to the riot but they either, you know,

4    had to go to the ER for some other reason, for stress or for --

5    they were found passed out.  So there wasn't -- they weren't

6    all directly related to the riot.

7    Q.  All right.  And did that impact you getting your consults

8    done?  You said optometry was a problem.  Were there other

9    consults that were impacted by that?

10   A.  Yes.  There was the optometry, and then there was some

11   appointments that we had set up that they were not able to make

12   so we had to reschedule them.

13         There was some consults that I did the best I could,

14   but I was not able to get in in a timely fashion that I'm

15   comfortable with, because I was having to input all of those

16   emergency room visits, and I think I was there like 16 hours

17   doing that.

18   Q.  You said there was some damage done to the medical unit.

19   What do you mean by that?

20   A.  It was very damaged.  There was --

21   Q.  Was it functional?

22   A.  No.

23   Q.  For how long?

24   A.  My understanding is about a day, maybe.  24 to 48 hours, I

25   believe that they had the medical set up in the library.

1    Q.  Okay.  So they made other arrangements to make sure that

2    medical care was provided even though the medical unit was

3    damaged?

4    A.  Yes.

5    Q.  All right.  Now, one of the -- some of the questioning that

6    you had was involving infectious disease, and you were talking

7    about Dr. Po.  And I'm a little bit confused, because

8    apparently there was a discussion about cancellations with

9    Dr. Po, and I was wondering why those cancellations were

10   occurring with Dr. Po.

11          Was that because of the fact that there were labs and

12   such that needed to be done that weren't done and that was what

13   was causing these cancellations?

14   A.  It was the delay, yes.  They had two pages of labs and

15   testing that had to be done before he would even see the

16   patient.

17   Q.  Okay.  In the Exhibit 226, I see you mentioned that this is

18   a real issue due to the many extensive lab and testing that the

19   office requires before it will even see them.

20          So how is it that during the process, the consultation

21   process, that things get out of time frame because of this kind

22   of issue?

23   A.  The labs that he was requesting were extremely specific,

24   and they were certain labs that either our lab or the lab

25   tech -- she's pretty sharp, our lab tech.  But there's some

UNITED STATES DISTRICT COURT

1   that maybe they weren't as familiar with and they sent out.

2         There were some issues with the lab itself,

3   BioReference Lab, in the fact that they were not resulting

4   results.  We weren't getting them.  So I was able to get a

5   log-in, my own personal log-in, to be able to get it off of

6   that website directly so that I could send them out and not

7   wait until it got into eOMIS.  Because it goes from us to them

8   and then BioReference back to us.

9         And sometimes there would be a lapse there because

10  they were so specific, so maybe the lab didn't -- the blood

11  didn't get there in time or there was something very particular

12  with the labs that he wanted.

13        And like I said, it was extensive.  There was a stack

14  like that for every consult that I sent.

15  Q.  Like about an inch or so thick?

16  A.  I'd say about at least a quarter of an inch.  And then all

17  the other records, if they would have other tests, other labs

18  from other places, I would also send those to Dr. Po so he

19  would have those to review.

20  Q.  Well, what I'm trying to get at here is the fact that the

21  appointment is canceled is not something that is being done to

22  dodge time frames.  It's being done so that you can have the

23  appropriate information available so the doctor can review it.

24  Otherwise, the appointment is really worthless; right?

25        MS. KENDRICK:  Objection, Your Honor.  Counsel is

1    testifying.

2              MR. BOJANOWSKI:  Your Honor, this is

3    cross-examination.  I think I can lead the witness.

4              THE COURT:  It's a leading question.  The objection is

5    overruled.

6              You can answer.

7    BY MR. BOJANOWSKI:

8    Q.  Do you understand what I'm saying?

9    A.  Oh, yes.  If you can ask again, please.

10   Q.  Sure, sure.

11             You know, we're talking about cancellations here, and

12   I'm saying that part of the process in making sure that these

13   outside consults happen is to make sure that we have whatever

14   the -- the consult doctor requires certain things be done

15   before the patient arrives to their office.  Correct?

16   A.  Yes.

17   Q.  All right.  And Dr. Po was very specific about what he

18   wanted.  He wanted various, very extensive lab work done before

19   the patient would be seen by him.  Is that correct?

20   A.  Yes.

21   Q.  Okay.  And so the cancellations that we talked about with

22   regard to Dr. Po were due to the fact that given his

23   requirements and specificity as to the lab results that he

24   wanted to see, that would then lead to some delay in getting

25   the patient to him because he would not see the patient before

1   those labs were complete and in front of him?

2   A.  Yes.

3   Q.  Okay.  It wasn't -- the appointment was not being canceled

4   simply because it would go beyond time frames.

5   A.  I -- I would have to say yes, because it is the ultimate

6   reason for canceling it.  We don't really have another reason

7   to cancel it other than it's not necessary anymore.  So I'm

8   not --

9   Q.  Well, what do you mean by that?

10  A.  Well, the reason that we would cancel it is because we

11  don't have the paperwork and the information to be able to

12  submit it and stay within the time frames.

13          Does that make sense?

14  Q.  Okay.

15  A.  Yeah.  So then it was canceled -- well, in my opinion, it

16  was canceled due to the time frame because we can't get all of

17  these things done and meet the time frame and get the patient

18  seen in that time frame.

19  Q.  Okay.

20  A.  And there were some that I didn't cancel that we just -- we

21  left open, and we were just out of compliance.

22  Q.  All right.  And so who's making the decision to cancel the

23  appointment?  Is it the doctor that makes that decision?

24  A.  Ultimately, it is the doctor.  UM will tell us as well, and

25  say:  Please cancel, then resubmit when the information is

1    available.

2    Q.  All right.  In your experience, is that something that

3    normally happens, like when you were at the Children's

4    Hospital?

5    A.  No.

6    Q.  Okay.  This is unusual?  It only happens here?

7    A.  To my knowledge, yes.

8    Q.  Okay.

9            THE COURT:  People get it done in the other

10   environments.  They have a time frame that -- with infectious

11   disease where time is of the essence.  That's why we have this

12   time frame.  It's time is of the essence, and the idea is that

13   you get it done.  And there are obstructions to getting it done

14   that we've heard about.

15   BY MR. BOJANOWSKI:

16   Q.  And how many times has that happened?

17   A.  I couldn't say -- I couldn't come up with a number.  I

18   would say it happens maybe -- I think maybe three to five times

19   a month.

20   Q.  Okay.

21   A.  Maybe.

22   Q.  Does the patient then get ultimately seen?

23   A.  Yes.

24   Q.  All right.  Have you ever had an occasion where a patient

25   was not seen?

1    A.  Yes.  When they've passed away.

2    Q.  Okay.

3    A.  Or got -- or got moved.

4    Q.  Okay.  But those are the only circumstances where -- I

5    mean, you make sure that the patient is seen even if an

6    appointment is canceled; right?

7    A.  I do.  Personally, I do.

8    Q.  Right.

9    A.  I take responsibility for that, finding one way or another

10   to get them seen.

11   Q.  Exactly.

12   A.  Yes.

13   Q.  And that's -- and that's what I'm asking you is that, you

14   know, one of the things that you've undertaken is your charting

15   and your flow charts and such to make sure that people are

16   getting seen, and even if they're out of time frame, you make

17   sure that the person gets seen.  Right?

18   A.  Yes.

19   Q.  Okay.  You don't do any type of auditing for the

20   department; correct?

21   A.  No.

22   Q.  You've never done that; is that right?

23   A.  Not me personally.  I've been with the pharmacy auditor

24   when he's been down, and I -- when I worked in pharmacy, and

25   I've gone around and checked, you know, done the audits with

CECILIA EDWARDS - CROSS-EXAMINATION

1    him but not --

2    Q.  But you're not --

3    A.  -- myself.

4    Q.  I'm sorry.

5         You're not the one that's actually doing the audit.

6    You're just --

7    A.  No.

8    Q.  Okay.  And you've not done auditing with regard to -- you

9    have never audited PM 48, 49, 50, 51, or 52?  You've never

10   performed those audits for ADOC; correct?

11   A.  No, not formally.

12   Q.  You've not done any kind of auditing of any other measures

13   at all either at the facility; correct?

14   A.  No.

15   Q.  Because that's not your job?

16   A.  No.

17   Q.  You're a CNA; is that right?

18   A.  Yes.

19   Q.  All right.  And a CNA -- I'm not real familiar with all of

20   your job duties, but I think you described some of them.

21   There's very limited patient care; is that right?

22   A.  Yes.

23   Q.  Okay.  You don't do any diagnosis?

24   A.  No.

25   Q.  Prescribing?

CECILIA EDWARDS - CROSS-EXAMINATION

1    A.  I report.

2            No.

3    Q.  You're not in a position to recommend any kind of treatment

4    plan or course of care or anything of that nature?

5    A.  No.

6    Q.  And, of course, you don't do that; right?

7    A.  No.

8    Q.  Do you work with a monitoring bureau in your current

9    position when they're monitoring the performance measures that

10   are subject to your job performance?

11   A.  Not formally.  They attend our CGAR meetings and that's how

12   I interact with them, but no, not formally.

13   Q.  You don't sit down and go through logs with them and

14   determine various dates; right?

15   A.  No.

16   Q.  Okay.  You don't go and generate logs for them either, do

17   you?

18   A.  No.

19   Q.  You don't randomize lists of inmates to be reviewed by

20   them?

21   A.  No.

22   Q.  Okay.  You don't work with them on a day-to-day basis?

23   A.  No.

24   Q.  You can't testify to what it is exactly that they do on a

25   day-to-day basis; correct?

1    A.  No.

2    Q.  You can't testify as to the manner and method by which

3    they're evaluating the performance measures that they're

4    grading you on; correct?

5    A.  No.

6    Q.  Now, you had said that there were very few outside consults

7    for infectious disease, and I think you said that there were

8    200 chronic care patients that may have some form of infectious

9    disease at the facility.  Am I accurate in that?

10   A.  My best estimate or guess, yes.

11   Q.  Okay.  So that would be your hep C patients, your HIV

12   patients; is that accurate?

13   A.  Yes.

14   Q.  Okay.  Now, the patients, the 200 patients that are there

15   are being seen by the other providers like Dr. Smalley and such

16   for their infectious disease conditions; correct?

17   A.  Yes.

18   Q.  So the outside consult situation is not -- it doesn't

19   involve all 200 of those inmates; right?

20   A.  To my understanding, I would say I don't know that number.

21   Q.  Okay.

22   A.  But --

23   Q.  Well --

24   A.  I don't know.

25   Q.  What I'm getting at is there was some discussion about the

CECILIA EDWARDS - CROSS-EXAMINATION

1   limitations on the numbers of patients that Dr. Po could see in

2   any given month.

3   A.  Yes.

4   Q.  Do you remember that?

5   A.  Yes.

6   Q.  All right.  And I was just wondering, because it involves

7   an outside consult, that would be something that, say,

8   Dr. Smalley or someone else would then say:  Well, I need to

9   have something special done with this inmate that I'm treating

10  for their infectious disease, and I need to send them to an

11  outside specialist for further treatment of that disease.

12          Correct?

13  A.  Yes.

14  Q.  Okay.  It's not that Dr. Po is the only one providing

15  infectious disease services to the facility.  That's not

16  accurate; correct?

17  A.  Yes.

18  Q.  Now, you don't go out, I take it, and search for additional

19  providers to be used by Corizon at Yuma for purposes of

20  providing outside consult care; correct?  Specialty care?

21  A.  No.  I've suggested it.  I'm willing to do it, yes.  I've

22  made calls, but I haven't literally gone out physically.

23  Q.  Are you aware that there is a person within Corizon that

24  their job is to do that; correct?

25  A.  Yes.

CECILIA EDWARDS - CROSS-EXAMINATION

1   Q.  And have you then provided your input to that particular

2   person?

3   A.  Yes.

4   Q.  All right.  And that's the appropriate manner in which to

5   communicate your desires for a particular doctor to provide

6   consult services, is to report that to that person; correct?

7   A.  Yes.

8   Q.  And once you do that, you may or may not hear from that

9   person again; correct?

10  A.  Correct.

11  Q.  But -- and you don't receive any kind of report as to,

12  well, that person then contacted the doctor you suggested or

13  not; correct?  You don't have any information with regard to

14  that?

15  A.  I do.  I just got some last -- I believe last week or the

16  week before, so I've got --

17  Q.  Oh, so they gave you --

18  A.  -- an update.

19  Q.  -- some update --

20  A.  Yes.  I just got that.

21  Q.  -- with regard to some new providers in Yuma to provide

22  specialty care services?

23  A.  Correct.

24  Q.  And I think you had mentioned some of those.  I know that

25  you've now got an infectious disease doctor there; correct?

1   A.  Yes.

2   Q.  And some others.  What were the others?

3   A.  Yes.  We have infectious disease.  We have physical therapy

4   now.  We have a dermatologist now.  And I believe we have a

5   dialysis place as well.  We do have a nephrologist, but a

6   dialysis place that I just wasn't aware that we had, but I

7   think they were in contract.  But I haven't had to send anyone

8   for dialysis, so...

9   Q.  And you said you've done other jobs as well.  Are you able

10  to keep up with your UM duties while doing these other -- like

11  helping out on a line or something?

12  A.  It's tough.  For the most part, yes.  I do -- if I get

13  behind, I'm able to come in and try and catch it up.

14  Q.  Okay.  Do you mind working overtime?

15  A.  No.

16  Q.  You said that Corizon is down one provider at the Cibola

17  Unit; is that right?

18  A.  Yes.

19  Q.  Have they hired somebody new?

20  A.  Yes.

21  Q.  Okay.  And when is that person starting?

22  A.  He started, I believe, on the line last week.

23  Q.  Okay.  So that you now have the provider back in place?

24  A.  Well, I don't have him at Cibola.  He's still at Dakota in

25  training; but, yes, we have the two full-time providers now.

1    Q.  Okay.  Now, when the monitor is looking at the dates in

2    eOMIS to determine your compliance with the particular

3    performance measures you said you were involved in, do you know

4    exactly what records they're looking at or what portions of the

5    records they're looking at?

6    A.  My understanding, it's the day that the HNR was received.

7    Q.  Okay.  And so the HNR is scanned into the eOMIS, and the

8    date that it is received is on the HNR; correct?

9    A.  Yes.

10   Q.  So regardless of what date you may put in as to the

11   initiation of the consult request, you're being graded, so to

12   speak, on the HNR date?

13   A.  That is my understanding.

14   Q.  Okay.

15   A.  Yes.

16   Q.  And you don't have the ability to change that date at all.

17   That date is written on the HNR; correct?

18   A.  Yes.

19   Q.  All right.  You had mentioned near the end of your

20   testimony that you saw some improvements in patient care over

21   time since you started.  Am I correct in that or not?

22   A.  I don't remember that.

23   Q.  Okay.

24   A.  Maybe -- in the -- this issue right here with the

25   providers, yes, absolutely.  With the specialty providers, we

1    have a lot more providers now available.

2    Q.  Okay.  And that's helped --

3    A.  Yes.

4    Q.  -- with the delivery of healthcare?

5    A.  Yes.

6    Q.  All right.

7              MR. BOJANOWSKI:  May I have a moment, Your Honor?

8              THE COURT:  Surely.

9              MR. BOJANOWSKI:  Your Honor?

10             THE COURT:  Yes.

11             MR. BOJANOWSKI:  Based on the testimony that we've

12   heard today, I don't have any further questions.  But once we

13   get a look at those documents, we may have some additional

14   questioning that we'd like to undertake.  But at this point, I

15   don't have anything else.

16             THE COURT:  All right.  Thank you.

17             Ms. Kendrick, redirect.

18                        REDIRECT EXAMINATION

19   BY MS. KENDRICK:

20   Q.  Try to get this done as quickly as possible so you can go

21   home.

22   A.  That's okay.

23   Q.  Mr. Bojanowski was asking you about your knowledge or

24   involvement of how the monitors do the monitoring.  Have you

25   ever seen a copy or been given a copy of the monitoring guide

1   that explains how they do the monitoring?

2   A.  No.

3   Q.  You had mentioned that you have that spreadsheet that you

4   keep to keep track of all the pending specialty requests.  Has

5   the monitor or anybody else ever asked you for copies of the

6   spreadsheet so that they can make sure to get the entire

7   universe of pending requests?

8   A.  No.

9   Q.  And with that spreadsheet, do you archive the document or

10  is it a living document?

11  A.  It's a living document.

12  Q.  Okay.  And to just be clear, what I mean is as people are

13  seen, you delete them off the spreadsheet; as people are added,

14  you put them on the spreadsheet?

15  A.  Yeah.  I move them over to an archived sheet now.  And it

16  used to be where they would just -- we'd start a new month.

17  And now it's different.  It's better, because I can keep track

18  of the active versus the archived.  So I don't delete them.  I

19  just move them over and then delete them off of the active one.

20  Q.  So it's like another Excel workbook or something?

21  A.  Yes.

22  Q.  And when did you start keeping the archive?

23  A.  I would say March.

24  Q.  Of this year?

25  A.  Yes.

1 Q.  Were you told to start archiving it, or is it something you

2 decided to do on your own?

3 A.  No.  The -- they've always been archived.  To my knowledge,

4 they -- we just quit using them and then moved them over to

5 somewhere.  And then they end up -- we ended up doing a new

6 month, so we would go by month.

7       So then we would remove -- move that month and then we

8 would start a new month.  So they've always been kind of

9 archived, but now they're -- there's more communication between

10 the archived and the active.

11 Q.  Okay.  And you mentioned CGAR meetings that you attend with

12 the monitors.  What are the CGAR meetings?

13 A.  Well, it's -- they call them CQI meetings, and we discuss

14 the CGARs, the findings, and sometimes there is a monitor

15 there.  I don't know if -- you know, I believe he's just the

16 DOC monitor, but I know he's always there.

17       The other monitor that I was talking about, the

18 pharmacy one, comes probably from Corizon, I believe.  Maybe.

19 But he's -- or DOC.  But he's not from here.  But this other

20 monitor is here.

21 Q.  What's the name of the Yuma monitor?

22 A.  I believe it's Anthony Medel, M-e-d-e-l.

23 Q.  And is the pharmacy monitor Martin Winland?

24 A.  I'm not sure.  I don't remember his name.  He's really

25 tall.

CECILIA EDWARDS - REDIRECT EXAMINATION

1    Q.  Okay.  When you were speaking -- answering Mr. Bojanowski's

2    questions, you said that on occasion utilization management

3    will tell you to cancel and resubmit a request.  And I was

4    wondering who at utilization management tells you to do that.

5    A.  Anyone.  Whoever is assigned to that consult.  It could be

6    the UM nurse or -- I mean, usually that's who it is because

7    they usually get it first, my understanding.  So different

8    people have stated that.

9    Q.  Okay.  And he had some questions about Dr. Po, but I wanted

10   to confirm that you previously testified that Dr. Po only has

11   one day a week available for all ADC patients who need to be

12   seen?

13   A.  One day a month.

14          THE COURT:  One day a month.

15   BY MS. KENDRICK:

16   Q.  I mean one day a month.  Thank you.

17   A.  Sorry.

18   Q.  One day a month?

19   A.  One day a month.

20   Q.  And you said roughly from like 8:00 to 2:00 or so?

21   A.  Yes.

22   Q.  Okay.  And you mentioned that you just got a nephrologist

23   in Yuma, and you said that nobody at Yuma is currently on

24   dialysis.  But are you aware of any patients who need dialysis

25   but have been waiting to begin dialysis?

1    A.  No.

2    Q.  And Mr. Bojanowski also asked you about this March 1st

3    disturbance.  Just to be clear, that disturbance occurred on

4    the Cheyenne yard; correct?

5    A.  Yes.

6    Q.  So it was only the clinic at Cheyenne that was shut down

7    for a while?

8    A.  Yes.

9    Q.  So Cibola, Dakota, La Paz, and Cocopah clinics were not

10   affected by this destruction?

11   A.  They were locked down.  Oh, I'm sorry.  They were not

12   affected by the destruction, but they were on lockdown so there

13   was no movement.

14   Q.  When they're on lockdown, can the officers accompany people

15   up for their medical appointment?

16   A.  Yes.  Or the nurse can go to the yard.

17   Q.  Okay.  And he had also asked you to clarify about, for

18   example, the urology thing where you had said there were 44

19   consults, and he said could it have been five inmates seen

20   multiple times.

21   A.  Yes.

22   Q.  Could it also be that the provider had to put in multiple

23   requests in the past year for the same patient because of ATPs

24   or NMIs or cancellations?

25   A.  Yes.

1   Q.  And I just want to clarify your earlier testimony that the

2   only reason to cancel these consults, other than just to leave

3   it pending, is because you want to avoid violating the

4   timelines?

5   A.  Yes.

6           MS. KENDRICK:  Okay.  I have nothing further.

7           THE COURT:  Thank you.

8           I wish I could say that I think we're done and that we

9   won't have to meet again, but I fear that that's not the

10  circumstance.  And so we will be in contact with your lawyer.

11          I will say a couple of things.

12          First, if you do experience anything that you think is

13  worrisome with respect to retaliation, let your lawyer know,

14  and I'd ask Mr. Reich to let me know.

15          Secondly, I just would like to say, you mentioned that

16  your children were decent.  I would suggest that they're decent

17  because their mother is decent.  Thank you very much.

18          THE WITNESS:  Thank you.  Thank you.

19          THE COURT:  So at 5:00 o'clock on Friday, I'll hear

20  from you all.  If something arises between now and then

21  logistically that you think I need to know about, I'm here.  My

22  travels outside of the district are over, and so I am readily

23  available.

24          MS. KENDRICK:  Sir, I believe you had said it was

25  June 4th that you wanted to talk at 5:00 p.m.?

UNITED STATES DISTRICT COURT

 1              THE COURT:  Isn't that --

 2              MS. KENDRICK:  Did you say Monday or Friday?

 3              THE COURT:  I think that's Monday.  That's what I

 4    meant.

 5              MS. KENDRICK:  Okay.  Monday, yeah.

 6              THE COURT:  And I think that makes sense.

 7              MS. KENDRICK:  Yes.  Yes, of course.  I misheard you

 8    as saying Friday; that's all.

 9              THE COURT:  Oh, I'm sorry.  If I said Friday, I was

10    wrong.

11              MS. KENDRICK:  Yes.

12              THE COURT:  Okay.  Anything else we need to take up at

13    this moment?

14              MR. BOJANOWSKI:  No, Your Honor.

15              MS. KENDRICK:  No, sir.

16              THE COURT:  All right.  Thank you all.

17              Thank you, ma'am, very much.

18              THE WITNESS:  Thank you.

19              (Proceedings adjourned at 4:41 p.m.)

20

21

22

23

24

25

C E R T I F I C A T E

I, JENNIFER A. PANCRATZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 3rd day of June, 2018.

s/Jennifer A. Pancratz
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC