UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Victor Antonio Parsons, et al., | ) ) ) | |
| Plaintiffs, | ) ) | CV-12-00601-PHX-DKD |
| vs. | ) ) | Phoenix, Arizona May 31, 2018 |
| Charles Ryan, et al., | ) ) | 1:17 p.m. |
| Defendants. | ) ) ) | |

_____)

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>EVIDENTIARY HEARING (PM SESSION)</u>

Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003-2151
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    <u>A P P E A R A N C E S</u>

2     For the Plaintiffs:

3                PRISON LAW OFFICE
                 By:  Corene T. Kendrick, Esq.
4                1917 5th Street
                 Berkeley, CA  94710
5

6                ACLU — Washington DC
                 By:  David C. Fathi, Esq.
7                915 15th Street NW, 7th Floor
                 Washington, DC  20005
8

9                EIDENBACH LAW PLLC
                 By:  Kirstin T. Eidenbach, Esq.
10               P.O. Box 91398
                 Tucson, AZ  85752
11

12               ARIZONA CENTER FOR DISABILITY LAW — Tucson, AZ
                 By:  Maya S. Abela, Esq.
13               177 N. church Avenue, Suite 800
                 Tucson, AZ  85701
14
      For the Defendants:
15
                 STRUCK LOVE BOJANOWSKI & ACEDO PLC
16               By: Rachel Love, Esq.
                     Daniel P. Struck, Esq.
17                   Timothy J. Bojanowski, Esq.
                     Richard M. Valenti, Esq.
18               3100 W. Ray Road, Suite 300
                 Chandler, AZ  85226
19

20

21

22

23

24

25

1

2

3

4                        INDEX OF WITNESSES

5    WITNESS FOR THE          Direct      Cross      Redirect
     PLAINTIFF:

6
     Angela Fischer              4          68

7

8

9                        INDEX OF EXHIBITS

10   EXHIBIT NO.:        DESCRIPTION:                        RECEIVED:
     647        3/2/18 email from A. Fischer to A. Fettig

11              and D. Fathi re State ADOC/Corizon
                Deliberate Indifference                        8

12   648        3/7/18 email from A. Fischer to Jennifer Onka re:
                State ADOC/Corizon Deliberate Indifference     10

13   649        3/22/18 email from A. Fischer to J. Onka
                re: State ADOC/Corizon Deliberate Indifference 12

14   650        3/29/18 email from A. Fischer to A. Fettig
                and D. Fathi Az State Prison/Corizon            13

15   651        4/5/18 email from A. Fischer to D. Fathi re:
                A. Fischer – Redacting                         14

16   652        Compilation of documents from A. Fischer
                submitted to the Court by D. Fathi (001-008)   62

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  Ms. Fischer, if you would please return to

3      the witness stand.

4          ANGELA FISCHER, PLAINTIFF'S WITNESS, RESUMES STAND

5              THE COURT:  Sorry about that.  Oh, dear.  I have used

6      and enabled a feature that reads my iPad screen to me.  And

7      that's what you just had the benefit of.  I maybe have crossed

8      the point of activating it but not crossed the point of

9      figuring out how to turn it off.

10          You may proceed, Ms. Love.

11              CROSS-EXAMINATION (Continued)

12  BY MS. LOVE:

13  Q.  Ms. Fischer, do I understand your testimony from earlier

14  today to be correct in that you worked with Corizon from

15  October of 2016 through about the 21st of March of 2018?

16  A.  Correct.

17  Q.  And during at least a portion of your time that you worked

18  for Corizon, it was on an internship basis.  Did I understand

19  that correctly?

20  A.  It was -- I had an internship that was going on, yes.

21  Q.  Was the entirety of your employment with Corizon as an

22  internship, or did it change at some point?

23  A.  It was both, employment and internship.

24  Q.  I'm sorry?

25  A.  It was both employment and internship.

1    Q.  So it was a paid internship?

2    A.  Yes.

3    Q.  But the entirety of your employment from October of 2016

4    through March of 2018 was an internship basis that was paid?

5    A.  I was a Corizon employee, so I was employed by them.  My

6    internship happened to fall while I was employed with them.  So

7    there were portions when I was not an intern and portions when

8    I was.

9    Q.  So you -- were you going to school then, during the time

10   period that you were working with Corizon?

11   A.  The whole time.

12   Q.  And did you obtain your license as a licensed -- the LPC

13   during the time period you worked with Corizon?

14   A.  No.  I've been an LPC since 2004.

15   Q.  And during the time that you were working for Corizon and

16   going to school, was that while you've been working on your

17   Ph.D?

18   A.  Yes.

19   Q.  And through -- who is that through, the Ph.D program?

20   A.  Cal Southern.

21   Q.  And you testified earlier with regards to how many hours a

22   week you would work while you worked for Corizon, and I believe

23   you told us that there were instances where you would go at

24   home and you were able to get into eOMIS and do some work from

25   home; is that correct?

1   A.  Correct.

2   Q.  And you testified that you didn't receive overtime pay for

3   that; is that correct?

4   A.  Correct.

5   Q.  Were you a salaried employed or an hourly?

6   A.  Salary.

7   Q.  During the time period that you worked for Corizon,

8   obviously you were never terminated because you voluntarily

9   resigned, correct?

10  A.  Correct.

11  Q.  And you were never formally disciplined for any reason,

12  correct?

13  A.  I would say, um, there was one memorandum that I received

14  saying that I -- my documentation wasn't proper.

15  Q.  And was that the memorandum that you received from

16  Dr. Calcote on or about July 12 of 2017?

17  A.  Yes.

18  Q.  You have some exhibits in front of you to the -- I left

19  them parsed out.  Okay?  So to your left are the ones that you

20  spoke about earlier today, which we're going to go through some

21  of those.  And on the other side, I've got some additionals for

22  you.

23          So if you could turn for me to Defendant's Exhibit

24  Number 647.  Ma'am, do you recognize the document that is at

25  Defendant's Exhibit 647?

1    A.  Yes.

2    Q.  What is that?

3    A.  It is an email that I sent to the ACLU.

4    Q.  And did you send that email on Friday, March 2nd of 2018?

5    A.  I did.

6    Q.  And that was addressed to Ms. Fettig and Mr. Fathi, right?

7    A.  Yes.

8    Q.  And Mr. Fathi is here in the courtroom, correct?

9    A.  Yes.

10   Q.  How did you get their contact information, Ms. Fettig and

11   Mr. Fathi?

12   A.  A lot of detective work.  I went and looked at Parsons

13   versus Ryan court documents and then saw, um, that there were

14   various lawyers attached to that, and that's where I became

15   aware that he was handling the National Prison Project and that

16   Ms. Fettig also worked on that.

17   Q.  And when you contact -- when you sent this email on

18   March 2nd of 2018, had you yet resigned from Corizon?

19   A.  No.

20   Q.  That was the next day or a couple days later?

21   A.  No.  It was -- I think I resigned on the 21st, maybe.  I

22   can't remember the actual date my letter was dated.

23   Q.  And looking at the second sentence of your email, you state

24   that "I have a plethora of evidence that demonstrates

25   deliberate indifference for patient mental health and medical

1    needs in the Arizona state prison system."  Correct?

2    A.  Correct.

3    Q.  And the purpose -- is it fair to say the purpose of

4    contacting Ms. Fettig and Mr. Fathi was to provide them

5    information regarding what you saw in your job duties working

6    with Corizon?

7    A.  Yes.  I didn't know how to get in touch with the judge.  I

8    might have done that.  I didn't know if that was appropriate.

9    But I knew the ACLU worked to help patients get the proper care

10   that they needed.

11   Q.  And now if you can --

12            MS. LOVE:  Well, defendants move to admit.

13            THE COURT:  Any objection?

14            MR. FATHI:  No objection, Your Honor.

15            THE COURT:  647 is received.

16            (Exhibit 647 is received.)

17   BY MS. LOVE:

18   Q.  If you would next turn to Exhibit Number 648.  That's also

19   in the stack there before you.  Do you recognize the document

20   that is marked as Defendant's Exhibit 648?

21   A.  Yes.

22   Q.  What is that?

23   A.  It's an email first that I sent to Jennifer Onka and then a

24   response -- well, let's see.  No, she sent me a response to my

25   email, and then I responded back to her.

1    Q.  And you responded back to Jennifer Onka on March 7th of

2    2018?

3    A.  Correct.

4    Q.  Who is Jennifer Onka?

5    A.  She is somehow related to the Prisons Project.  I don't

6    recall exactly how I got her contact information.  Oh, you know

7    what, it might have been a bounce-back from an email that I

8    originally sent, and she was somebody who responded.

9    Q.  And if you could read the first three sentences of your

10   email for me.

11   A.  "Thank you for the response, Jennifer.  I resigned on

12   Monday.  My last day with Corizon will be March 21st.  I

13   would" --

14   Q.  Go ahead.  I'm sorry.

15   A.  "I would prefer that Corizon not be made aware of my

16   identity until I am no longer working there."

17   Q.  Okay.  So you resigned on that Monday, but then your last

18   day with Corizon was going to be on the 21st?

19   A.  Yes.

20   Q.  And you also advised that you prefer that Corizon was not

21   made aware of your identity, correct?

22   A.  Correct.

23   Q.  Did you ever receive any information that anybody had made

24   your identity known to Corizon with respect to those contacts

25   you were having with the ACLU in early March of 2018?

1    A.  You have the totality of all the communications, so no, no

2    one told me that they had been made aware.  I have no idea.

3            MS. LOVE:  Defendants move to admit Exhibit 648.

4            THE COURT:  Any objection?

5            MR. FATHI:  Just a question, Your Honor.  It looks as

6    if something has been redacted.  I'm not clear if that's -- and

7    perhaps Ms. Love can answer.  Is this a redaction that was made

8    by defendants, or was this as the documents was filed?

9            MS. LOVE:  This was the document filed.  You can see

10   at the top of this exhibit it's filed on the court document at

11   2742-1.  So it's not any redaction that was made by us.  This

12   is how it was submitted to the court.

13           MR. FATHI:  In that case, no objection, Your Honor.

14           THE COURT:  648 will be received.

15           (Exhibit 648 received.)

16   BY MS. LOVE:

17   Q.  Next exhibit is Exhibit 649, if you could take a look at

18   that one for me.

19           MR. FATHI:  I beg your pardon.  Which number?

20           THE COURT:  649.

21           MS. LOVE:  649.

22   BY MS. LOVE:

23   Q.  Do you recognize the document at Exhibit 649?

24   A.  Yes.

25   Q.  What is that?

1   A.   It is a communication in response to what we just looked

2   at, saying I am no longer a Corizon employee and would

3   appreciate the opportunity to speak with the ACLU about my

4   concerns.

5   Q.   Thereafter, were you able to speak to anybody from the ACLU

6   about your concerns?

7   A.   Let me recall how the process went.  At some point I talked

8   to Mr. Fathi on the phone for a very brief amount of time.

9   Q.   But this was after you had left Corizon, correct?

10  A.   Correct.

11          MS. LOVE:  Defendants move to admit Exhibit Number

12  649.

13          THE COURT:  Any objection?

14          MR. FATHI:  Sorry, Your Honor, one moment.

15          MS. KENDRICK:  Again, this document has -- the top

16  third of it is blank, and so we're just trying to confirm that

17  it was filed on the docket with that blank space there and that

18  nothing has been redacted.

19          THE COURT:  Do you know, Ms. Love, the answer to that

20  question?

21          MS. LOVE:  Yeah.  You can see at the top of the

22  exhibit it states -- it's the file stamp filed with the court

23  document 2742-1.

24          MR. FATHI:  The question, Your Honor, is whether after

25  the document was filed there's been an additional redaction.

```
 1            THE COURT:  Just for the purposes of this hearing, I
 2   think --
 3            MS. LOVE:  No.
 4            THE COURT:  -- they are trying to understand whether
 5   or not this gap, this space here, is one that was previously
 6   occupied by something, for the purpose of your exhibit here
 7   that you decided to remove it.
 8            MS. LOVE:  Yeah no, we have done no redactions
 9   whatsoever to anything filed with the court.
10            THE COURT:  Thank you.
11            MR. FATHI:  No objection.
12            THE COURT:  649 will be received.
13            (Exhibit 649 received.)
14   BY MS. LOVE:
15   Q.  Next exhibit in front of you is Exhibit Number 650, 650.
16   If you could take a look at that for me.
17            Do you recognize this document?
18   A.  I do.
19   Q.  What is it?
20   A.  It's another email to Amy Fettig and David Fathi.
21   Q.  The third sentence down reads, "I have attached a few
22   documents that demonstrate substandard patient care in the
23   facility where I was assigned."
24            Do you see that?
25   A.  Yes.
```

ANGELA FISCHER – CROSS-EXAMINATION

1  Q.  Do you remember the quantity of documents that you had

2  provided to Ms. Fettig and Mr. Fathi at that point?

3  A.  Well, there are attachments, 1, 2, 3, 4, 5.

4  Q.  Did you subsequently later, at any date, provide the ACLU

5  with any additional documents?

6  A.  Yes, I think I did.  And they were filed with the court.

7  Q.  And you, yourself, did file documents with the court or

8  provide documents to the court, correct?

9  A.  I just filed one document.

10 Q.  One piece of paper?  One document?

11 A.  One piece of paper.

12       MS. LOVE:  Defendants move to admit Exhibit Number

13 650.

14       THE COURT:  Any objection?

15       MR. FATHI:  No objection, Your Honor.

16       THE COURT:  650 is received.

17       (Exhibit 650 is admitted.)

18 BY MS. LOVE:

19 Q.  Exhibit Number 651, if you could take a look at that for

20 me.  When you've had a chance, let me know if you recognize the

21 document, please.

22 A.  I recognize the document.

23 Q.  What is it?

24 A.  It's another email.  It's sort of a chain of emails.

25 Q.  And at the top, is it an email from you to Mr. Fathi dated

UNITED STATES DISTRICT COURT

ANGELA FISCHER – CROSS-EXAMINATION    14

 1   Thursday, April 5th, 2018?

 2   A.  It is.

 3   Q.  And reading the first sentence, it says, "I have about a

 4   half of ream of documents that demonstrates issues."  Did I

 5   read that correctly?

 6   A.  Yes.

 7   Q.  And that half a ream of documents, is that what you

 8   provided to Mr. Fathi, ultimately?

 9   A.  It's everything that the court had, yes.

10   Q.  Did you retain any documents that you perhaps had printed

11   off while you were working at Corizon that you decided not to

12   send Mr. Fathi?

13   A.  I have some documents.

14   Q.  Are they related to medical care or mental health care

15   provided to the inmates at ASPC Phoenix?

16   A.  No.

17            MS. LOVE:  Defendants move to admit Exhibit Number

18   651.

19            THE COURT:  Any objection?

20            MR. FATHI:  No objection, Your Honor.

21            THE COURT:  651 is admitted.

22            (Exhibit 651 is admitted.)

23   BY MS. LOVE:

24   Q.  Since your initial contact where you sent that first email

25   to Mr. Fathi and Ms. Fettig, have you had any telephone calls

1    with either regarding this case?

2    A.   After I was subpoenaed to testify -- trying to remember --

3    there was a phone call, I think, to set up an appointment to go

4    over my testimony, you know, to prepare.

5    Q.   And did you indeed then have an appointment to meet with

6    any of the attorneys for plaintiffs to go over your testimony?

7    A.   Yes.

8    Q.   Was that an appointment that was in person?

9    A.   Yes.

10   Q.   And when did that occur?

11   A.   Tuesday, the 29th.

12   Q.   Of May?

13   A.   Yes.

14   Q.   How long did that meeting last?

15   A.   I would say three or four hours, maybe.

16   Q.   Between the 29th and as we're sitting here today, have you

17   had any other in-person meetings with any attorneys for the

18   plaintiffs in order to prepare for your testimony here today?

19   A.   No.

20   Q.   Any phone calls?

21   A.   One.

22   Q.   And when was that?

23   A.   Last night.

24   Q.   How long did that phone call last?

25   A.   I would say maybe five minutes.

1    Q.  And in either the preparatory in-person meeting on the 29th

2    or the telephone call last night, were you told the questions

3    that the plaintiffs' attorneys were going to ask you here

4    today?

5    A.  We reviewed some of the topics, yes.

6    Q.  Did you do anything in a rehearsal format where you were

7    asked a question and then you practiced?  Okay, I'm going to

8    ask you this question; what is your answer?

9    A.  We talked about -- he went over the questions, and I gave

10   my answers.

11   Q.  Now, switching now, I'm going to switch and talk to you

12   about your employment with Corizon.

13            Now, in your job duties as a psych associate -- that's

14   correct, right, psych associate?

15   A.  Yes.

16   Q.  Do you want me to say psych associate, or would you like me

17   to call it something else?

18   A.  That's fine.

19   Q.  Okay.  In your capacity, your duties as a psych associate,

20   you were not involved in monitoring the performance measures

21   related to the stipulation in this litigation, correct?

22   A.  In some way.  Um, we had to keep track of our appointments

23   to make sure that, you know, people had been seen -- there was

24   a variety of Excel spreadsheets and ways to kind of look at

25   that.  EOMIS is not terribly friendly in terms of when someone

1    has an upcoming appointment.

2            So there were all these little side tools, I guess,

3    that we were using to try to understand if we were meeting the

4    requirements.

5    Q.  So would it be fair to say that in the course of your

6    duties, you, yourself, were looking to make sure am I -- am I

7    meeting the performance measures, am I doing things in the

8    correct timelines?  Is that what you mean?

9    A.  Yeah.  There was a -- an Excel spreadsheet that the psych

10   techs would take care of that would outline all the patients

11   when they were last seen by psychiatry and that kind of stuff.

12   Q.  So would you then yourself monitor to make sure that, to

13   the best of your ability, inmates were being seen in the proper

14   timelines?

15   A.  Yes.

16   Q.  Now, you're aware, and talked to Mr. Fathi earlier, about

17   you were aware that there are CGAR reports every month,

18   correct?

19   A.  Correct.

20   Q.  And do you know how many of the performance measures under

21   the stipulation would apply to your job duties as a psych

22   associate?

23   A.  I can't tell you off the top of my head how many.

24   Q.  Were you involved in any way in the -- well, let me back

25   up.

ANGELA FISCHER – CROSS-EXAMINATION

1          Are you aware that in determining compliance rates and

2    the CGAR reports, that a certain number of files are randomly

3    drawn and looked at for a particular performance measure to see

4    if that conduct met the requirements of the performance

5    measure?

6    A.  I did hear that there was some randomizing that happened.

7    Q.  But you were not involved in that process, correct?

8    A.  Was not.

9    Q.  At the end of each -- well, when the CGAR reports would

10   come out for a particular month, in your job duties or just on

11   your own, would you review CGAR reports?

12   A.  Yes.

13   Q.  And why would you do that?

14   A.  Well, if there's noncompliance, I want to understand the

15   noncompliance, and I want to understand if there's any errors

16   that were made.  Sometimes the noncompliance was incorrect.

17   Sometimes it was correct.  And so I think in order to learn, we

18   need to understand, and so that's why I did that.

19   Q.  Would you -- were there any specific performance measures

20   that you were particularly concerned about when you would look

21   at the CGAR reports?

22   A.  Only the ones that were in yellow or red.

23   Q.  Would you look back to see if any of -- if -- if there was

24   a finding of noncompliance, if you were any way involved in

25   that patient's care such that there was a noncompliance

UNITED STATES DISTRICT COURT

1    finding?

2    A.  Yes.

3    Q.  Would you do that every month?

4    A.  I often wouldn't receive the underlying report.  So quite

5    often what we would get is a report that was high level that

6    was broken down by unit and then a facility total that showed

7    what that was.  So if I wanted to drill down into something, I

8    would have to ask someone to send me the file.  It was not

9    something that people gave to me.

10   Q.  When you say send the file, what do you mean by that?

11   A.  Well, there was -- there was a spreadsheet that goes

12   underneath that file that actually shows the patients.

13   Q.  And you said that sometimes -- and I'm not going to say the

14   words exactly as you said them, but as I heard 'em it was that

15   sometimes there were -- there were compliance or noncompliance

16   findings that were correct and sometimes there weren't?

17   A.  Uh-huh.

18   Q.  Give me a sense of what you found in that respect when you

19   yourself would go back and look at the data underlying CGAR

20   reports.

21   A.  There were times when I would see that a patient had been

22   seen, but it was showing that they weren't seen.  And so I

23   might send an email saying, you know, this patient was seen.

24   Q.  So in that respect, you were, quote-unquote -- well, for

25   lack of a better term, marked down on a CGAR as having been

ANGELA FISCHER – CROSS-EXAMINATION

1    noncompliant, but when you looked at the record, you thought,

2    hey, this was compliant, we did do it right?

3    A.  Uh-huh.

4    Q.  Fair to say?

5    A.  Yes.

6    Q.  Would you report that to anybody specifically?

7    A.  Uh-huh.  My supervisor.  Sometimes Nicole Taylor.

8    Q.  And your supervisor would be who?

9    A.  Well, depends on what month it was and who was the director

10   at the time.

11   Q.  All right.  But the position, who would you --

12   A.  Mental health director.

13   Q.  When you would do those reports where you found errors in

14   the CGAR reports, would you do that verbally?  Email?

15   A.  Usually email because I wanted to outline what it was and

16   what I saw.  And then sometimes I was corrected, saying no,

17   that actually doesn't meet the requirements.

18        I had a misunderstanding about treatment plans and the

19   face-to-face, and you couldn't be counted properly for the

20   treatment plan if the face-to-face wasn't there.  So it was

21   basically a discussion to make sure that we were doing what we

22   were supposed to be doing and the report accurately reflected

23   that.

24   Q.  So fair to say that it was important to you in your job

25   duties to be compliant where you could with the performance

UNITED STATES DISTRICT COURT

1  measures?

2  A.  Of course.

3  Q.  And to also deliver quality care?

4  A.  Yes.

5  Q.  Were you ever asked by your supervisor who -- whatever

6  person that may have been at the time, to go back and look to

7  see whether the CGAR reports that were showing yellow or red

8  were accurate or not accurate?

9  A.  Yes.  Actually, um, at the CGAR meetings they would say,

10  you know, if you find something that doesn't seem accurate, you

11  should let us know.

12  Q.  And that was let us know as in within the Corizon

13  organization?

14  A.  Well, it was in the CGAR meeting, so we had DOC there and

15  Corizon.

16  Q.  The CGAR meetings were monthly?

17  A.  Mostly.

18  Q.  When you say "mostly," what does that mean?

19  A.  Some months there weren't CGAR meetings.

20  Q.  Do you have any sense of during the entirety of your

21  employment with Corizon how many times there wasn't a CGAR -- a

22  monthly CGAR meeting?

23  A.  I don't.  And I can't say that those meetings didn't happen

24  on a day when I wasn't there or I was on vacation, so I can't

25  really say.  I just know I wasn't at a monthly meeting for that

ANGELA FISCHER – CROSS-EXAMINATION

1    whole 18 months.

2    Q.  Did you have a set days per week that you worked?

3    A.  Monday through Friday.

4    Q.  The CGAR meetings were attended by who, when they occurred?

5    A.  It varied, but psych associates, psych techs sometimes,

6    Dr. Leonard, the mental health director, sometimes the director

7    of nursing.  We had an assistant facility health administrator.

8    Sometimes the facility health administrator was there

9    monitoring.  There was Nicole Taylor.  And I don't remember the

10   name -- there was another lady that works with her.  I don't

11   remember her name.

12   Q.  And the purpose of these meetings was specifically to

13   discuss the prior CGAR reports; is that fair to say?

14   A.  To discuss the outcomes for whatever that time period was,

15   yeah.

16   Q.  During those meetings, were you provided verbal direction

17   by anyone as to if there was an instance where a performance

18   measure wasn't meeting the compliance rate, as to why, what the

19   problem was, why was it not meeting?

20   A.  I'm sorry.  Say that -- ask me that one more time.

21   Q.  During those CGAR meetings, did you receive verbal

22   direction or explanation as to the reason why perhaps a certain

23   performance measure hadn't met the required compliance rate

24   under the stipulation for that time period?

25   A.  I don't know if it would have been the reason why.  It was

1    more a question like why aren't you guys doing this, what's

2    wrong, why can't you do this.  You know what I mean?

3    Q.  Were you ever provided explanations that there perhaps may

4    be documentation or a certain type of documentation missing

5    from the file that the monitor can't mark something compliant

6    even though care may have been actually provided?

7    A.  Yes.  That was the issue with the watch orders, that it

8    couldn't be reconciled because the process wasn't streamlined

9    and set up.

10   Q.  So when you look at, you know, the universe of the

11   performance measures that were at issue for mental health, does

12   that stand out as the one that was problematic as to lack of

13   documentation, made the CGAR compliance rate not meet

14   compliance levels?

15   A.  We talked about every measure that wasn't, you know,

16   according to what the threshold was.  So I don't know if that's

17   the only one.  It's one I recall.

18   Q.  During the monthly CGAR meetings that you had, would you

19   receive any verbal instruction as to rulings that the Court was

20   making in this case?

21   A.  Yes.

22   Q.  Would you receive verbal direction as to any Court rulings

23   that were made in this case where perhaps the methodology that

24   the monitors were using may have changed?

25   A.  I'm trying to think.  The methodology being changed.  I

1    can't recall.  I'm sorry.

2    Q.  During the monthly CGAR meetings, were you provided any

3    sort of, I guess, status briefing on, okay, in the last 30 days

4    this is what has happened in court that may affect the mental

5    health CGARs that pertain to all of you?

6    A.  There were some times when that came up, when there was

7    things that impacted our daily work.

8    Q.  Were there certain members of the CGAR meetings that would

9    be the person that would provide you that information?

10   A.  Well, someone in the CGAR meeting gave us the information.

11   Is that what you mean?

12   Q.  Yes.  But was it a particular person?  Like was it, for

13   instance, Dr. Taylor who would say, okay, this is what happened

14   in court last month or Dr. Calcote saying, here is our briefing

15   on what happened in court last month?

16   A.  Yes, we heard that some.

17   Q.  In addition to the monthly CGAR meetings, would you also

18   have weekly meetings that also involved correctional personnel

19   or the security side of the complex?

20   A.  Weekly meetings were scheduled.  That doesn't mean they

21   were always held, but there were weekly meetings.

22   Q.  Were the weekly meetings when they were held, is that

23   something that you attended?

24   A.  Yes.

25   Q.  What were the purpose of the weekly meetings with the

ANGELA FISCHER – CROSS-EXAMINATION

1    security personnel?

2    A.   It was called the deputy warden meeting, and we would meet

3    to discuss the patients -- well, each unit and kind of what was

4    going on with the units.

5    Q.   And what was the gamut of subject matter that may be

6    discussed during the weekly deputy warden meetings?

7    A.   Placement, patient care, needs in particular units.

8    Q.   And when you say "needs," what do you mean by that?

9    A.   Like I would bring up, we don't have any towels in Quiet

10   ward, you know, we need that.

11   Q.   Did you find the weekly meetings, deputy warden meetings,

12   to be something that was interactive, where you could bring

13   your concerns or mental health -- members of the mental health

14   team could bring their concerns to the security side and then

15   the security side could bring concerns they had to you all?

16   A.   The officers that -- you know, the day-to-day interactions,

17   the people that we worked with were not at those meetings.  And

18   so it was like you had a Corizon, you know, the caregiving

19   level and DOC's administrative level.  So it didn't always

20   quite gel.  We would need to know particularly by unit what

21   those needs were.  Those things happened more on the units than

22   at this deputy warden meeting.

23   Q.   So when you say the "deputy warden meeting," I would assume

24   the deputy warden would attend, when able?

25   A.   Sometimes, yes.

1  Q.  What other level of command staff or security side staff

2  would typically attend?

3  A.  Occasionally there would be a CO4.  CO3s from different

4  units, individuals, would attend when they were able or

5  available.

6  Q.  What about the warden?  Would he ever attend?

7  A.  I do not recall ever seeing the warden at a deputy warden

8  meeting.

9  Q.  Do you know the name of the warden at Phoenix, currently?

10  A.  I can see his face, and for some reason I'm blanking on his

11  name.

12  Q.  Warden Patton?

13  A.  Patton, yes.

14  Q.  Is Warden Patton --

15  A.  But he wasn't the only one.  There was one before that.

16  But he was the current when I left.

17  Q.  Did you ever have any personal interactions with Warden

18  Patton?

19  A.  I did.

20  Q.  Did you find Warden Patton to be somebody who had an

21  open-door policy?

22  A.  Yes.

23  Q.  And would listen to you if you had concerns?

24  A.  Uh-huh.

25  Q.  That's a yes?

1    A.   Yes.

2    Q.   I'm only doing that for the court reporter.

3    A.   Thank you.   I appreciate that.

4    Q.   In addition to the weekly scheduled meetings, was security

5    for the deputy warden meetings, would you also within your

6    mental health team have your own weekly meetings?

7    A.   Um, well, not, um -- on paper we made weekly meetings, but

8    in practice, there were not weekly meetings.

9    Q.   How often per month, typically, would the mental health

10   team meet?

11   A.   Depending on who was the mental health director at the

12   time, um, sometimes once a month.   Sometimes less than that.

13   Sometimes more than that.   Just depends on who was in charge.

14   Q.   What was covered at the meetings when they did occur with

15   the mental health team?

16   A.   There would be, you know, here's the new stuff going on.

17   Here's new staff members.   A lot of time was spent on who's

18   going on work where and, you know, that kind of negotiating.

19   It was also a place where you could bring up concerns.

20   Q.   Would -- an administrative personnel would attend from the

21   mental health team from Corizon?

22   A.   If you mean the mental health director, yes.

23   Q.   Did you ever have any of these team meetings where anybody

24   from the regional office would attend?

25   A.   I think Dr. Calcote came.   And Dr. Leonard was there

1    sometimes.

2    Q.  You talked to Mr. Fathi earlier about, you know,

3    communications that you had had with Corizon administrative

4    personnel, voicing your concerns.  And Chairman Goldberg was

5    one of the persons that you communicated with, correct?

6    A.  Correct.

7    Q.  Did he ever tell you to stop communicating with him or

8    voicing his concerns to you?

9    A.  No.

10   Q.  And he was receptive as far as receiving them, correct?

11   A.  Yes.

12   Q.  And Lynn Cole was also somebody that you had voiced

13   concerns to, correct?

14   A.  Correct.

15   Q.  And you weren't ever shut down by her, were you?

16   A.  What do you mean by shut down?  I mean, are you asking if

17   they told me don't call me again?

18   Q.  Yeah, yeah.

19   A.  No one told me don't call me again.

20   Q.  If you could turn now to Exhibit Number 652 that's in front

21   of you.  I'm going to direct you to a specific page.

22           So if you could look at -- if you look at the bottom

23   right, you are going to see stamps that say Fischer and then a

24   coding of numbers.

25   A.  Yes.

1    Q.  If you could turn to -- actually, it's the first page, so

2    Fischer 0001.

3    A.  Yes.

4    Q.  This is Defendant's Exhibit Number 652.  If you could take

5    a look at the page numbers that are coded Fischer 001 through

6    006 and let me know if you recognize what this document is.

7    A.  This is a letter that I wrote to Dr. Calcote on July 21st

8    in response to a memorandum that he wrote.

9    Q.  And was this the memorandum that you spoke about earlier

10   from approximately mid-July of 2017?

11   A.  Yes.

12   Q.  Why did you write this letter?

13   A.  Because the memo that he sent me indicated that there was

14   missing documentation and that I was not noting a confidential

15   setting was being offered.  And he cited these instances, and

16   some of them were not accurate.

17   Q.  So once you received the memo, did you go back and check

18   the records to see if what he set forth in the memo was

19   accurate or not?

20   A.  Yes.

21   Q.  Was the memo directed specifically to you and your

22   documentation in the medical record?

23   A.  I think it was.

24   Q.  If you will look at paragraph 2 on page 1, and the first

25   sentence says, "After reviewing the CGAR report for March, I

1    discovered that not a single patient that was found to be

2    noncompliant was on my caseload, nor did I have the opportunity

3    to see them or watch" -- I'm sorry -- "to see them on watch or

4    for follow-ups during the month of March."

5            Did I read that correctly?

6    A.  Yes.

7    Q.  And then set forth -- after the sentence following, you set

8    forth five examples; is that correct?

9    A.  Yes.

10   Q.  So did you go through inmate by inmate and go back and

11   research the record to see whether or not you had documented in

12   such a way that resulted in a noncompliance finding?

13   A.  Correct.

14   Q.  And for the first one, in your review of the records you

15   found that this noncompliance finding was due to six nursing

16   watch notes that did not state whether a confidential setting

17   was offered, correct?

18   A.  Correct.

19   Q.  But that wasn't you?  That wasn't yours?

20   A.  Right.

21   Q.  And did you understand that for the particular performance

22   measure governing watches, that it needed to, A, be offered

23   whether a confidential -- first of all, it needed to be offered

24   to an inmate to have a confidential setting?

25   A.  Well, how I got this was in the report it actually said on

1    nursing notes, you know -- I think it actually indicated these

2    things that were not attributable to me.  So it -- in the

3    underlying report, when you review it, it says noncompliant,

4    and then sometimes it says why it was not compliant.  So this

5    is from that.

6    Q.  Okay.  So you just took that and went back and looked and

7    said, but this wasn't me.  Fair to say?

8    A.  Yes.

9    Q.  But you, in looking at that, did you go back to the records

10   and look to see whether or not it had been actually a failure

11   to document whether a confidential setting was offered to the

12   inmate or documented?

13   A.  No, I did not check the nursing notes.  I was just using

14   that report that was given to me that indicated that this was

15   the case.

16   Q.  If you look now -- let's skip down to paragraph 3 on

17   page 1.

18   A.  Okay.

19   Q.  And it states, "After reviewing the CGAR report for April,

20   I found one patient where I did not document a confidential

21   setting."

22           Did I read that correctly?

23   A.  Yes.

24   Q.  And that was your finding?

25   A.  Yes.

1    Q.   And how did you come about completing this?

2    A.   I must have looked at the record, because it indicates that

3    I saw the patient and I did not indicate whether the patient

4    was offered a confidential setting.

5    Q.   Was it your practice to indeed offer a confidential

6    setting?

7    A.   Every single time.

8    Q.   And you testified earlier today that it was your procedure,

9    personal to you, to have the officer bring the inmate to you

10   rather going -- going cell front and saying, hey, would you

11   like a confidential setting?

12   A.   Right.   I would have the officer -- I would engage them,

13   but my practice was to have the officer bring them to me.

14   Q.   And was there a particular reason that you did it that way

15   versus going to cell front and asking the inmate, would you

16   like to have a confidential setting?

17   A.   Yes.   You get better compliance and better participation if

18   you invite them to their session.   Come to your session, it's

19   time.

20   Q.   Did you find it to be, for you, also a more efficient way

21   of doing it such that you didn't have -- you didn't have to use

22   the time to go to cell front, have a conversation, and then get

23   to a confidential setting?   It was, please go get the inmate

24   and bring them?

25   A.   I wouldn't say that was the reason that I did it, and it

ANGELA FISCHER – CROSS-EXAMINATION

1   didn't even occur to me until you said that.  But I guess that

2   seems like it could be streamlined.

3           Quite often, you know, as the patient is going back to

4   their cell, I would be saying hello to the next patient, and so

5   I wasn't, like, sitting there waiting all the time for them to

6   bring me patients.  And sometimes there's a delay in that,

7   getting the patient actually brought to you, so you'd fill that

8   up with other things you need to do.  I forgot to tell this guy

9   about that thing, and he's on the unit, so let me talk to him

10  while they are getting the next patient ready for me.

11  Q.   So you were multitasking.  You weren't just sitting there

12  waiting, well, when is somebody going to bring me someone new.

13  Fair to say?

14  A.   Fair to say.  I was trying to use the time.

15  Q.   With this particular instance where you found one patient

16  where you didn't document a confidential setting, as you were

17  looking at this, did you recall whether you actually had done a

18  confidential setting or offered?

19  A.   You know what, I don't recall particularly on these.  I

20  think this is, you know, over a year ago.  I don't really

21  remember specifically.  But it was my practice to see people in

22  confidential settings.

23  Q.   Now, if you turn to page 2 of Exhibit Number 652, in the

24  first paragraph it reads, "For the month of May, you indicated

25  that I frequently," and "frequently" is italicized, "did not

1    indicate whether patients were offered to be seen in a

2    confidential setting."

3           You also indicated that "Noting a clinic setting is

4    not sufficient to meet the stipulation requirements.  However,

5    my notes not only indicate the clinic setting, they also

6    indicate that the setting was private.  In reviewing this with

7    Dr. Leonard on 7-17-17, I will change the wording from private

8    to confidential moving forward."

9           Did I read that correctly?

10   A.  Yes, you did.

11   Q.  And that was your finding based upon going back and

12   reviewing the criticisms attributed to your documentation?

13   A.  Well, I brought -- I brought this letter up and said, you

14   know, I did see these people in confidential settings.  And she

15   said that the wording had to say confidential and not private.

16   Q.  So when you had documented in your notes, though, that you

17   did private, what you meant was confidential.  Fair to say?

18   A.  Private in my terminology was confidential.

19   Q.  And also, did you mean the same when you said a clinic

20   setting?

21   A.  Well, no.  That means -- I would say where I saw them, so

22   I'd say, patient seen in the group room, patient seen in the

23   medical observation room.  I would say what setting I saw them

24   in.

25   Q.  But once this was brought to your attention that the -- for

1    purposes of the monitors that the word "private setting" wasn't

2    going to cut it for determining compliance, you, of course,

3    were going to make an effort to change that, correct?

4    A.   I was going to make it clear that this setting, wherever it

5    was, it was me and that person.   It was confidential.

6    Q.   Did you ever have a conversation with Dr. Nicole Taylor

7    regarding documentation to show that a confidential setting was

8    offered?

9    A.   Ask me that again.   I'm sorry.

10   Q.   Did you ever have a conversation with Dr. Nicole Taylor in

11   which she discussed with you, okay, we've had some

12   noncompliance findings because your record didn't say the term

13   "a confidential setting was offered"?

14   A.   I don't know specifically if she talked to me directly

15   about that.   I don't recall that.

16   Q.   At any point, did you have a conversation with

17   Dr. Nicole Taylor in which you asked her, is it okay if I make

18   a mistake and don't say the words "confidential setting," but I

19   know I did it?   Can I do an addendum to my note?

20   A.   They may have suggested that we do that.   I don't remember

21   directly asking her that.

22   Q.   But is that something that you did in order to correct the

23   medical record to say the specific term that was needed, when

24   you knew yourself that you had offered the person a

25   confidential setting?

1    A.   Usually if I was directed.  I don't remember thinking to

2    myself I'm going to go in and add addendums.  It was, like, did

3    you see this person in a confidential setting?  Yes, I did.

4    Okay, add an addendum.

5              Addendums were ways to add to the record.

6    Q.   And so that we and the Court understand, specifically how

7    in eOMIS would you go in and do an addendum?

8    A.   You open a note.  There's a thing that says "add addendum."

9    You click on it and you add an addendum.

10   Q.   If you look at paragraph 2, the second full paragraph 2 of

11   text, on page 2 the last sentence reads, "My failure to

12   document a confidential setting for the months of March, April,

13   and May amounts to a .0067 failure rate."

14   A.   Uh-huh.

15   Q.   And that is based upon your calculation, correct?

16   A.   Correct.

17   Q.   Were you -- were you angry that you had been criticized

18   regarding your documentation, and when you went back and

19   checked, you, yourself, had found maybe different data?

20   A.   Was I angry?

21   Q.   Yes.

22   A.   I wouldn't have classified it in the category of angry.

23   This took a lot of work to go through to find things that I

24   felt were inaccurate.  And what I felt was needed was training

25   on the front end and not, you know, discipline on the back end.

1          So if you want people to do certain things a certain

2    way, provide the documentation and let them do it that way

3    rather than all the verbal communication that went on and then

4    sitting in these meetings and listening to, you did this wrong,

5    you did this wrong.  You know, I felt there were better ways to

6    do that.

7    Q.  And this letter that you wrote to the doctor, it's a

8    six-page letter, correct?

9    A.  Correct.

10   Q.  Is that something that you had to -- or that you did

11   while -- like during your normal work hours, or is that

12   something that you did not during normal work hours?

13   A.  I may have done it during both.

14   Q.  I'm sorry?

15   A.  I may have done it during both.

16   Q.  Are you aware of others within your mental health team

17   there who had also failed to appropriately document that a

18   confidential setting was offered?

19   A.  There were -- there was communication about making sure

20   that the terminology was correct.

21   Q.  And correct me if I'm wrong, but it seems what I'm getting

22   from you, though, is that obviously this was inadvertent,

23   correct?  Any failure to document on your part, to say the

24   words "confidential setting" was not purposeful?

25   A.  No, it wasn't purposeful.

1   Q.  If you will turn to page 3 of Exhibit Number 652.  I'd like

2   to direct your attention to the last paragraph on page 3.  And

3   it states, "Please ensure that we have the resources necessary

4   to do our jobs effectively and efficiently.  For example,

5   there's only one location on the Baker ward to see patients

6   where they can be restrained in a confidential room with

7   computer access."

8           Did I read that correctly?

9   A.  Yes.

10  Q.  Were you ever provided with additional areas in which to

11  see patients on the Baker ward in a confidential setting?

12  A.  Well, this is actually speaking of confidential setting

13  with a computer, so that the computer can be, you know, worked

14  on.

15          The group room had restraint chairs but no computer.

16  Those were the -- in a confidential setting, if the computer is

17  there, you can do your documentation, um, while you're seeing

18  the patient.  So, um, there was just one place on Baker ward to

19  do that.

20  Q.  Where was that at?

21  A.  In the back office in the corner.  I don't know how to

22  describe it.

23  Q.  Did you -- and you were making a request, it seems here,

24  for -- or did you make a request for a laptop, to be able to

25  carry your laptop with you into an area where you could have a

1    confidential setting?

2    A.  Yes.

3    Q.  Did you at any time receive a laptop?

4    A.  I did.

5    Q.  There was an area on Baker that was used as -- my

6    understanding is used as a TV room or a room where there was

7    five restraint chairs in that room.

8    A.  Yeah.  I call that the group room.

9    Q.  Is that a place where you were ever able to do your

10   confidential setting?

11   A.  Yes.

12   Q.  With a laptop?

13   A.  Yes.

14   Q.  During -- how much time did it take between your request

15   for your laptop and when you actually received it?

16   A.  It was over five months, but I don't remember exactly.  I

17   think it was probably six or seven maybe.

18   Q.  And how did you -- how did you do it in that interim before

19   you got the laptop?  Did you go to a confidential setting area

20   and then have to write your notes out on paper and then put

21   them into the computer system later?

22   A.  Yes.  Or wait until the room is available.

23   Q.  And the room was used by who else?

24   A.  The psychiatric provider, if we had a psychiatric provider

25   there.  It was sometimes used by security.  Um, not a lot of

1   medical happened there, but sometimes medical.  Telepsych

2   happened in there.  Just on Baker.

3   Q.  If you will turn to page 4 of Exhibit 652.  First

4   paragraph, about a third of the way down, in the middle.  It

5   says, "Similarly, there's not a single location on the George

6   ward with computer access where patients can be restrained,

7   which was part of the problem that led to the assault I endured

8   at the hands of an unrestrained patient back in February."

9          Is that the assault that you were talking about

10  involving the locking mechanism?

11  A.  Yes.

12  Q.  At any time during your employment there at Phoenix, was

13  there a single location in the George ward that was provided

14  that also had computer access?

15  A.  There was never a time where there were restraint chairs

16  and a computer, so I used the laptop there.

17  Q.  Where would you -- was there a place that you could put --

18  where an inmate could be put in a restraint chair and then you

19  could use your laptop at the same time?

20  A.  That was the group room, on George ward.

21  Q.  Were you ever able, on the George ward, to use the nurse's

22  station or the nurse's office when the nurse wasn't otherwise

23  using it?

24  A.  You mean to see patients?

25  Q.  Yes.

ANGELA FISCHER – CROSS-EXAMINATION

1  A.  No.  Patients weren't in nursing areas where there was

2  medication and stuff like that, no.

3  Q.  Was there a time during your employment there at Corizon at

4  the Phoenix -- at the Phoenix complex where a gate was

5  installed outside of your office on one of the wards to provide

6  you with more security?  The security gate?

7  A.  No.

8  Q.  Not at all?  Not in Quiet?

9  A.  A gate in Quiet?  No.  The gate was there -- I mean, in

10  Quiet, there's the medical provider office, which is a shared

11  office that we all used with computers, telepsych,

12  psychiatrists, medical.

13        And then there's a gate that goes into the run where

14  the patients are.  That gate was there from the first time I

15  walked in.  So it wasn't installed.

16  Q.  If you will turn now to page 5 of your letter at Exhibit

17  652.  The first full paragraph that starts with, "Please open

18  communication lines with us."

19        If I skip down to the next -- not the next sentence,

20  but the one after, it states, "Our patients are often moved

21  without our input and/or against our clinical judgment and

22  without proper opportunity for closure for the patient, which

23  leads to poor patient outcomes, distrust, and decompensation at

24  their next housing unit."

25        Did I read that correctly?

1    A.   Yes.

2    Q.   Are you speaking of movement of an inmate out of the

3    Phoenix complex to a different prison facility, or are you

4    talking about movement within the wards at Phoenix?

5    A.   Both.   So sometimes I'd come in in the morning and I would

6    do my rounds, and so-and-so is gone.   Where are they?

7    Q.   And the decision for an inmate to be moved either out of a

8    specific ward at Phoenix or onto a different facility was made

9    by who?

10   A.   I don't know.   I mean, it could be security.   It could be

11   the mental health director.   It could be Dr. Calcote.

12   Q.   Wasn't there discussions within the mental health team if a

13   decision was being made to move an inmate out of Phoenix, for

14   instance back to Perryville, a discussion within the team as to

15   whether or not the inmate was appropriate to be moved back to a

16   different complex?

17   A.   Not routinely.   So there -- you know, after

18   Dr. Eddie Taylor came, and I insisted we need interdisciplinary

19   staff meetings on the units.   The deputy warden meeting isn't

20   the place where we can do everything that needs to be done.

21   And some units those things -- those meetings happened

22   regularly, but it felt to me like where those decisions were

23   being made was on a conference call that the clinicians were

24   not part of.   And quite often they didn't have all the data

25   regarding how the patient was doing to make those decisions.

1              And I'm simply asking here for a mechanism for us to

2    be able to inform that group with data about the progress that

3    this patient may be making or not making.

4    Q.  If you came into work one day and a patient had been moved

5    off of a particular ward, say they were moved to Quiet, to some

6    other location within Phoenix, were you able to -- if you had a

7    concern that there hadn't been closure, were you able to go to

8    that inmate and have a discussion with the inmate to provide

9    the closure that you thought the inmate deserved?

10   A.  If there was enough time and if they were still in Phoenix,

11   that could happen.  Sometimes they were moved to different

12   facilities.

13   Q.  Do you know whether or not before the inmate was moved they

14   were -- had any contact with any member of the mental health

15   team?

16   A.  I can't say.  I mean, there was hundreds of patients, so I

17   can't.

18   Q.  Page 5 of Exhibit 652, going down to the third full

19   paragraph.  It states, "Please protect our safety and

20   compensate those of us working in hazardous work environments.

21   Since I joined the Corizon team, I have been required to wear a

22   safety vest daily."

23              Did I read that correctly?

24   A.  Uh-huh.

25   Q.  That's a yes?

1    A.   Yes.

2    Q.   And when you interviewed for your position, were you

3    provided information that that would be part of the safety gear

4    that you would have to have, that you would have to wear a vest

5    daily?

6    A.   No.

7    Q.   When did you find that out?

8    A.   When I arrived for work.  I didn't even tour Phoenix.  I

9    actually toured -- I actually interviewed at Perryville.

10   Q.   Did you have to wear a vest no matter which ward you worked

11   in at Phoenix?

12   A.   Yes.

13   Q.   And is that something that surprised you the first day that

14   you showed up for work at the Phoenix complex?

15   A.   Surprised me?  Yeah, I think I was surprised by that.

16   Q.   When you worked for the Maricopa County jail system prior

17   to Corizon, did you ever have to wear a vest in the performance

18   of your duties?

19   A.   No.

20   Q.   And where do you work now?

21   A.   I don't want to disclose that.

22   Q.   Have you ever in any capacity of employment had to wear a

23   protective vest in the performance of your duties at any other

24   location?

25   A.   No.

1             THE COURT:  What is the vest?  Is it a bulletproof

2    vest like we see --

3             THE WITNESS:  Stabproof.

4             THE COURT:  Pardon me?

5             THE WITNESS:  Stabproof.  And so it's a big vest that

6    has Velcro on it.  And it has a protective layer that's, like,

7    almost plasticky so that if someone tries to stab you, they

8    can't get through the vest.

9             THE COURT:  All right.  Thank you.

10   BY MS. LOVE:

11   Q.  Is wearing the protective vest something that you thought

12   was unnecessary when you worked at Phoenix?

13   A.  No.  I thought it was necessary.

14   Q.  So you didn't take issue with actually having to wear the

15   vest, right?

16   A.  No.  I mean, it was part of the job.  So they said you're

17   going to have a vest.  They gave me a vest.  I wore the vest

18   every single day.

19   Q.  In that paragraph that I just read from you say, "Please

20   protect our safety and compensate those of us working in

21   hazardous work environments."

22             What did you mean by that?

23   A.  Well, it wasn't till, I think, many months after I started

24   there that I was made aware that other Corizon employees at

25   other prisons were being compensated for wearing vests, for

1    wearing protective gear, the eye things and the vests.  And so

2    I started to inquire why -- why aren't we being compensated if

3    other facilities are being compensated.

4    Q.  Who told you that?

5    A.  Katie Masters, Diane Ortega.  I talked to Dr. Leonard about

6    it.  I talked to Dr. Calcote about it.  It was a known thing.

7    I talked to FHA Watts about it, that there were Corizon

8    employees that were being provided vests -- or compensation for

9    having to wear safety gear.

10   Q.  And specifically the compensation was related only to the

11   fact that they had to wear a vest?

12   A.  That was my understanding.

13   Q.  From each of the people that you just named?

14   A.  I think that Dr. Calcote might have said, well, it was

15   these other people because it's hard to find people to work in

16   these settings.

17          And I said, well, put that aside and let's address the

18   actual safety part of it, because we're obviously struggling to

19   get employees here as well.  So I wanted to discuss what was

20   possible with compensation for that.

21   Q.  Were you aware of the custody levels for the persons that

22   worked at Corizon that you were told were provided hazard pay

23   for wearing a vest?

24   A.  So are you meaning did they work in max security

25   environments?  Is that what you mean?

1    Q.  Yeah.  Were you aware of -- was there a differential based

2    upon the custody level of the inmates that those persons worked

3    with?

4    A.  I don't remember.  Some of the employees, like Diana

5    Ortega, actually worked in a facility, and she said that she

6    had received that compensation before.  But I don't know if she

7    said it was maximum custody or not.

8    Q.  Are you aware whether or not the officers -- well, let me

9    back up.

10          The officers who worked at Phoenix, did any of them

11   wear vests?

12   A.  Yes.

13   Q.  All of them?

14   A.  Well, an absolute is hard, but in my recollection, the

15   officers wore vests on a daily basis.

16   Q.  And you don't have any information, do you, as to whether

17   or not the officers received, there at Phoenix, hazard pay for

18   wearing vests?

19   A.  I do have information about that.  The deputy warden

20   indicated that they received a stipend for -- because it was

21   considered a hazardous site because there was maximum security

22   inmates in that facility.

23   Q.  Which deputy warden told you this?

24   A.  Cottrell.

25   Q.  And do you know the time period that it was that you

1    received this information from Cottrell?

2    A.   Probably Septemberish.

3    Q.   Of 2017?

4    A.   Yes.

5    Q.   Who was the deputy warden when you left in March?

6    A.   Eccles.

7    Q.   And the deputy warden's office is located where you would

8    walk through the gates to get into the complex on a daily

9    basis; is that true?

10   A.   So you walk in, and her office is over here, and where you

11   clock in is over here.  So if you walk this way, you walk by

12   her office.  If you walk that way, you don't walk by her

13   office.

14   Q.   Okay.  But fair to say when you either come in in the

15   morning or you leave, it's in close proximity to where you

16   would clock in and then go about your duties, the deputy

17   warden's office?

18   A.   I don't know what you mean by close proximity.  I mean, I

19   could walk there, if that's what you mean.  I could walk there.

20   Q.   Please turn to page 6 of Exhibit Number 652.  I'd like to

21   direct your attention to the second paragraph.  And it's the

22   second sentence that reads, "We strive to use the information

23   report system set in place to address problems in the facility.

24   However, quite often when serious issues are written up, there

25   appears to be no action taken to rectify the problems."

1             Did I read that correctly?

2    A.  Yes.

3    Q.  What is the information report system?

4    A.  It's what I indicated where I was reporting sleeping

5    officers.  It's a form that you fill out.

6    Q.  And that is a form -- that's not a Corizon form, correct?

7    It's an ADC form?

8    A.  It's an ADC form.

9    Q.  And what is your understanding as to what kind of events

10   need to be written up in an incident -- I'm sorry -- an

11   information report?

12   A.  I don't think I ever got training on exactly what I'm

13   supposed to write up.  So I'd be talking to someone or in a

14   meeting and I would say this happened.  They'd say, oh, you

15   have to put it in an information report.  And then I would

16   start to understand, okay, someone sleeping, I have to put it

17   in this information report.  If someone is antagonizing a

18   patient, that's -- you need to do this.

19            And it was, like, learn as you go.  So I don't know

20   the full spectrum of things that I should have been writing

21   information reports about.

22   Q.  Did you understand that operational issues that may affect

23   the safety and security of the facility should be written in IR

24   reports, such as officers sleeping?

25   A.  I knew that officers sleeping should be reported that way.

1   Q.  And was it your understanding that the IR reports go to the

2   deputy warden of that complex for review on a daily basis?

3   A.  How I was instructed to do this is fill this out.  You can

4   call the yard office, which is where, like, the lieutenant sits

5   or someone, you know, that's elevated in rank.  They would give

6   you a number.  You sign it and you bring it to them.

7            At some point, those things should go to the deputy

8   warden, but sometimes they didn't go to the deputy warden.  So

9   we'd be at the deputy warden meeting and I would say, you know,

10  I -- it would be, did you fill out an information report?  I

11  did.  Well, I didn't get it.  Okay.  So then I started emailing

12  and then, you know, hand walking them over there.

13  Q.  When you say hand walk, you would hand walk the IR to the

14  yard officer?

15  A.  Yes.

16  Q.  On how many occasions did it come about that the deputy

17  warden informed you that she didn't receive the IR that you

18  filled out?

19  A.  I don't have a way to quantify that.  More than once.  More

20  than a handful of times.

21  Q.  Do you remember the specific situations where you had -- or

22  what was the subject matter of the IRs that you wrote that

23  didn't make it to the deputy warden?

24  A.  I'm trying to remember.  There was one in particular.  I

25  don't remember the subject matter.

ANGELA FISCHER – CROSS-EXAMINATION

1    Q.  Do you have any sense of, over the totality of the time

2    that you worked for Corizon, how many IRs you did fill out --

3    A.  No.

4    Q.  -- and submit?

5    A.  I don't have a number.

6    Q.  Less than 50?  More than 50?

7    A.  I'd say less than 50.

8    Q.  Less than 20?

9    A.  No, I wouldn't say less than 20.  I would say maybe in the

10   30 range.  I don't know.

11   Q.  Did you keep copies of the IRs that you filled out?

12   A.  For a period of time, and then I would dispose of them.

13   Q.  So in any of the documents you retained personally after

14   your employment with Corizon, does that include any IRs that

15   you filled out?

16   A.  In everything it was turned in, yes.

17   Q.  So if it isn't in the documents that were turned in to

18   Mr. Fathi, then it's not something that you kept, correct?

19          THE COURT:  You need to answer orally.

20          THE WITNESS:  Correct.

21   BY MS. LOVE:

22   Q.  You talked earlier today about what you experienced as

23   challenges and -- as to how many inmates or how many patients

24   that you could see on a daily basis?

25   A.  Yes.

ANGELA FISCHER – CROSS-EXAMINATION

1   Q.  And was there a breakdown in your mind as to sufficient

2   time that you needed to see a patient for any particular issue?

3   Like if it was a watch, was there a certain amount of time that

4   you felt you needed with each patient, or would it vary

5   depending on the needs or the presentation of that patient?

6   A.  Well, it depends on what the intent is of it.  I mean, if

7   you want to provide treatment, it takes a certain amount of

8   time.  If the goal is just to, you know, say this person was

9   seen in a confidential setting, that takes less time.

10          So in my mind, we should have been spending and should

11  spend 30 minutes with these patients.  A person doesn't become

12  not suicidal because they're sitting naked in a cell for days

13  at a time, seeing someone five minutes a day.

14  Q.  Were you required to see patients on a one-on-one basis for

15  any other reasons besides doing the suicide watch?

16  A.  Yes.

17  Q.  What -- in what context?

18  A.  I was the treating clinician on Baker ward, and most of

19  those patients were not on suicide watch.  So I was working on

20  a treatment plan that I would develop with them to help them

21  meet whatever their therapeutic goals were.

22          And in the programs where I worked, I had graduation

23  requirements and things that they would work towards to

24  demonstrate their stability so they could move to a less

25  restrictive environment.  So I was continually working with

1    them on those items.

2    Q.  And as to the daily contacts for the inmates on suicide

3    watch, on weekends the persons on -- or the patients on

4    constant watch had to be seen by someone who's licensed,

5    correct?

6    A.  Correct.

7    Q.  Those inmates who were on a 10-minute watch or a 30-minute

8    watch could be seen by an RN, correct?

9    A.  No.  My understanding was we had to see all the patients on

10   watch over the weekend.

11   Q.  So weekends and holidays, absolutely had to be seen, based

12   upon your understanding, by somebody who was licensed, like

13   you, for -- to be seen while on watch if they are on a

14   10-minute watch or a 30-minute watch?

15   A.  What I was instructed is that every person on watch needed

16   to be seen on the weekend.  That changed over time.  I don't

17   recall exactly at the beginning, but I know for a fact near the

18   end of the time I worked on the weekends or on holidays, that

19   every single person on watch had to be seen.

20   Q.  I'm not saying that they didn't have to be seen no matter

21   their type of watch, but that an RN could see those that were

22   on a 30-minute watch or a 10-minute watch?

23   A.  I was instructed by my supervisor, if I was the person

24   doing watches on the weekend, that I should see all the people

25   on watch.  So even if it was by policy permissible, what I was

1    instructed is that I needed to see those patients.

2    Q.  On average, how many weekends a month would you have to

3    work, to come in on the weekends and do the watches?

4    A.  It depended on how many staff we had.  So it was a rotating

5    thing.  So if you have four or five, then you're every fifth

6    week, every sixth week.  Near the end there, they hired

7    somebody who did work weekends.

8    Q.  Do you know when that occurred?

9    A.  I don't.  I don't know the dates.

10   Q.  Do you know a sense of was it six months before you left, a

11   year before you left?

12   A.  It was Dr. Sauls, and I can't remember when he started.

13   Q.  And on those weekends that it was your weekend to work, to

14   come in to do the watches, would you have to come in on both

15   Saturday and Sunday?

16   A.  Yes.

17   Q.  And how many hours would it take you to do the watches, on

18   average, on a Saturday or Sunday?

19   A.  I can't say.  I don't -- I really can't recall.

20   Q.  Was it a full day of work both Saturday and Sunday?  Full

21   eight hours?

22   A.  Not always.  Not always.

23   Q.  Do you have any recollection of was it a half day?  Full

24   day?

25   A.  It would depend on how many patients there were.  So in the

1    yard office there's this list of everybody who's on watch.  So

2    when I would come in, I would look at that list and then I

3    would -- you know, you can tell if there's three people on

4    watch what kind of day that's going to look like and if there's

5    17, what that's going to look like.

6    Q.  In February of 2018, so just a few months ago, did a change

7    occur where you were assigned to cover all the watches,

8    including Delta and Echo, on Mondays through Wednesdays of

9    every week?

10   A.  Yes.

11   Q.  Do you know the reason that that change came about?

12   A.  Well, officially or unofficially?

13   Q.  Let's start with officially.

14   A.  Officially, um, I was just assigned that.  I mean, there

15   was no reason given.  It's like you need to start doing this.

16   Unofficially, the gentleman that was working in Baker ward was

17   exhausted and couldn't keep up the pace that he was working at.

18   So something had to change.

19   Q.  Who was that who was exhausted on Baker?

20   A.  Dr. -- or Mr. Straab.

21   Q.  Mr. Who?  I'm sorry.

22   A.  Straab.

23   Q.  Was someone else, then, covered to do the watches on

24   Thursday and Fridays for all the wards?

25   A.  I think Dr. Sauls did it.  The schedule was a fluid

1    instrument.  I mean, we had iteration after iteration of

2    schedules that came out.  You're in charge of this, you're in

3    charge of that on these days.

4          So I think it was Dr. Sauls, but I can't say for what

5    period of time.

6    Q.  So prior to February of 2018, you were assigned to cover

7    watches in only specific areas, fair?

8    A.  When -- say that again.

9    Q.  Prior to February of 2018, were you assigned to cover and

10   do the suicide watches in only particular locations?

11   A.  I was in charge of George Ward and Quiet ward.

12   Q.  And then it changed after, that anybody who is on a suicide

13   watch in any location, Monday through Friday, you were in

14   charge of doing those watches -- or doing those cell fronts or

15   watches or confidential face-to-face?

16   A.  Monday through Wednesday, not Friday.

17   Q.  Were you -- did you like that assignment?  Were you unhappy

18   with the assignment?  Did you have any opinion one way or

19   another?

20   A.  Well, it's not a matter of happiness.  It's a matter of do

21   I feel good about myself when I leave at the end of the day.

22   Do I feel like I provided care to these patients so that they

23   could function optimally.  So it's not that I liked or didn't

24   like working with anybody.  It was the volume that was really

25   stressful.

1   Q.  And how much did the volume increase with the Monday

2   through Wednesday assignment?

3   A.  Well, I sent an email that listed, here's all the people on

4   watch.  I don't think that I can do all this in a day.  So when

5   I became concerned about that, Dr. Leonard came sometimes and

6   helped.  It was a matter of trying to figure out how to get

7   everything that needed to get done done.

8   Q.  And did any others ever chip in and assist you besides

9   Dr. Leonard when you said, hey, you know, this is -- the volume

10  is too much for me today, I need some help to get in here and

11  help me?

12  A.  I would communicate to Dr. Eddie Taylor that I didn't

13  believe I could finish, you know, whatever needed to be done,

14  and he could assign someone else the work.  I would say, this

15  is what I'm capable of doing.

16  Q.  And did you get that help?

17  A.  Well, basically I wasn't getting help.  I was saying here

18  is what I can do.  The rest is yours.  And then he took care of

19  those, I assume.

20  Q.  When this assignment changed where Monday through Wednesday

21  or -- you were seeing as many of the watches that you could,

22  what -- what was the volume that you were able to see on a

23  daily basis and feel good about yourself when you left for the

24  day?

25  A.  Well, it depends -- depends on what's going on in the other

1   units.  So when you're the only licensed staff on a psychiatric

2   unit, if there's a man down, say, you have to go to the man

3   down.  You have to, you know, deescalate that patient.  Or you

4   get called to other places or you get called to meetings.

5          So it's -- thinking of it in terms of number of

6   patients, that's why I put that matrix together.  The job is

7   not just seeing patients.  The job is providing quality care,

8   comprehensive quality care.  So on some days, if I had no other

9   meetings, say 30 minutes at a time and you add up those number

10   of patients, that's a certain number.  But if I have four

11   meetings, that makes it difficult.

12          And in an inpatient psychiatric unit, I don't think

13   that the state intends for us to see patients five minutes a

14   week.  And so that's the dilemma that most of us were

15   confronted with.

16   Q.  When that change came that you were doing the watches

17   Monday through Wednesday, did you change how you managed your

18   day or your provision of care as to Thursday and Friday?

19   A.  So are you saying did I move more appointments that way?  I

20   was always managing my weekly schedule, shifting, moving

21   things.  I can wait and write up this reentry plan or discharge

22   plan on Friday because I know I'm going to have time.  So yes,

23   the work was always fluid.

24   Q.  And you said at the beginning of your testimony that you

25   sometimes worked in intake, correct?

1    A.   Sometimes I was assigned to intake.

2    Q.   I'm sorry?

3    A.   Sometimes I was assigned to intake.

4    Q.   On -- let's take the last six months of your employment

5    with Corizon.  How often would you be assigned to intake in an

6    average week?

7    A.   Not often.  But it was if you could -- you know, if you

8    have any spare minutes, you know, we have 100 people, can

9    everybody go for a couple hours.  So in terms of I'm the

10   assigned person there, no.  But helping, sometimes, yes.

11   Q.   So it wouldn't necessarily be the case that you were

12   assigned to intake, like you are the intake person for the day.

13   You may go and take, let's say, two hours and go help out in

14   intake and then go back to your other duties?

15   A.   Yes.

16   Q.   Describe for us the intake process from your duties.  How

17   did you do your intake?

18   A.   Um, in the place where they all come in and they are sort

19   of processed through, there's a board that says how many people

20   are going to come in that day.  And it's updated the day

21   before, so you know tomorrow you have this number of patients.

22          So the officers start bringing patients at a certain

23   time, so you sort of set up shop in one of the two offices that

24   are basically used for intakes, unless the patients are nature

25   of charge patients that won't be brought into a setting with

1    other people or they are closed custody.  Those patients don't

2    get brought to the medical clinic.  So you go to other units to

3    see them.

4              But say you set up shop where they're bringing you

5    patients.  There's just a long line of patients that sit

6    outside.  Then they come into the chair.  They're getting their

7    health assessment also.  And you're seeing them one after the

8    other.  There's a sheet that you can get to kind of check off

9    who it is.  They have a card with them that indicates that they

10   have been seen by mental health, by medical, and maybe even

11   dental.  I can't remember.

12             So you see them.  You have them sign the consent.  You

13   initial that this portion is done.  And then they go through

14   the process.

15   Q.  And the mental health intake entails you asking the

16   incoming inmate a series of questions?

17   A.  Yes.

18   Q.  And questions about the inmate's background as it relates

19   to mental health?

20   A.  Yes.

21   Q.  Questions related to have you had mental health treatment

22   on the outside?

23   A.  Yes.

24   Q.  And whether or not you have a mental health diagnosis?

25   A.  Yes.

1   Q.  And whether or not you're currently taking any medications?

2   A.  Yes.

3   Q.  So fair to say that you're trying to get the basic

4   information as that inmate comes into the system of does

5   this -- is this a person who has mental health needs that we

6   need to address?

7   A.  Yes.  And there's more than one way to get information.  I

8   mean, one way is for me to ask them questions, but if you have

9   a patient that's not a great historian, you have to look at

10  other things.  And so we might have scanned documents from

11  Maricopa County.  We have any illness any other time that they

12  may have been incarcerated to look and see what kind of

13  treatment they got, because often what they told us didn't

14  match.

15          But during the course of an assessment, you can get --

16  now, you're doing a mental status exam, and so they can start

17  out for five minutes looking, you know, pretty good, and slowly

18  you understand that there's some kind of thought processing

19  problem that's happening.  So in that interaction, there's a

20  lot of data that's being considered.

21  Q.  And this is for all the inmates coming into the system,

22  correct, not just somebody, hey, you're going to be at Phoenix

23  and stay, correct?

24  A.  Correct.  This is -- most of them don't stay in Phoenix.

25  Q.  When you previously worked for Maricopa County jail system,

1    were you also involved in the intake process?

2    A.  No.

3    Q.  If you can turn now to the stack on the other side of you.

4    We're going to leave my stack, which actually I forgot.

5            MS. LOVE:  Your Honor, for Exhibit Number 652,

6    defendants move to admit only pages 1 through 8, which is the

7    July 21st, 2017, letter from Ms. Fischer to Dr. Calcote.  Only

8    that portion of Exhibit 652, we move for admission.

9            THE COURT:  Any objection?

10           MR. FATHI:  I'm sorry.  It's pages 1 through 8 of

11   Exhibit 652?

12           THE COURT:  Correct.

13           MR. FATHI:  No objection, Your Honor.

14           THE COURT:  Pages 1 through 8 of 652 will be received.

15           (Pages 1 through 8 of Exhibit 652 admitted.)

16   BY MS. LOVE:

17   Q.  If you can now, look at the stack on the other side of you

18   and turn to Exhibit Number 252, please.

19   A.  I didn't keep them in number order.  Hold on.

20           MS. LOVE:  For the record, 252 has been previously

21   admitted into evidence.

22   BY MS. LOVE:

23   Q.  Ma'am, if you could take a look at -- again, we've got page

24   numbers on the bottom right.  This coding is a little different

25   from the one that I use.  So if you look at Exhibit 252.6.  See

1   on the bottom right the coding?

2   A.   Yes.

3   Q.   And this is the caseload calculator that we discussed

4   previously today, correct?

5   A.   Yes.

6   Q.   When you testified regarding this caseload calculator

7   earlier today, this was related to caseload calculator for a

8   psych associate or a psychologist, correct?

9   A.   Well, the first number of pages are, but if you look at 71

10  it -- so it's 252.10.  That's an intake caseload calculator.

11  Q.   All right.  So 252.6 through 252.9 is your caseload

12  calculator for a psych associate and psychologist, correct?

13  A.   Let me make sure.  Yes.

14  Q.   And then 252.10 is the caseload calculator for intake,

15  correct?

16  A.   Yes.

17  Q.   Now, these caseload calculators that you came up with, is

18  this something that someone within Corizon asked you to do or

19  you wanted to do on your own?

20  A.   This was something that I wanted to be made to help people

21  understand what the real work was that we were doing.

22  Q.   Had you ever done a caseload calculator before in your

23  career?

24  A.   Well, I worked at Maricopa County, and I had to manage the

25  mental health professionals there.  So in some regard, yes.

1  Q.  When you say "in some regard," how was the caseload

2  calculator that you did while you were at Maricopa County

3  different from these two for the psychologist/psych associate

4  and intake?

5  A.  Well, where I was at Maricopa County was an outpatient

6  psychiatric setting.  It's different because you have different

7  obligations in an outpatient setting.  There's different level

8  of needs and different levels of coordination.  So it wasn't as

9  specific as this.

10  Q.  When you were explaining to us what the categories are --

11  and let's just look at 252.6 so that we're looking at the same

12  page.  Are you there?

13  A.  Yes.

14  Q.  The column that says "total weekly time," I wrote down a

15  note, and I could be wrong, but I wrote down a note that you

16  explained that as bare bones but not enough.

17  A.  Well, there's two columns that say "total weekly time."

18  Which one are you referring to, the one on the right or the one

19  on the left?

20  Q.  The one -- the one in the middle, if you look at -- because

21  it says -- okay.  It says "number of sessions."

22  A.  Okay.

23  Q.  And then it says "time," correct?

24  A.  Uh-huh.

25  Q.  Okay.  Then that next block says "total weekly time."

1    A.   Yes.

2    Q.   What does that denote?

3    A.   So those three columns are -- the number of sessions is the

4    same regardless of whether it's best practices or the other.

5    It was just the number that I used.  And I don't think that all

6    the sessions were 10 minutes long, given the other duties that

7    had to be done there.  I thought that's probably bare bones,

8    and then best practice might be 30 minutes.

9    Q.   And when you -- okay.  So can we talk about the categories

10   as bare bones and best practice?

11   A.   Okay.

12   Q.   The category for bare bones, did you derive that from your

13   personal experience performing your duties at Corizon?

14   A.   No, not necessarily my personal experience, but that of

15   what I observed of the people around me.  There was a lot of

16   talk amongst the psychology associates.  You know, I'm barely

17   able to spend time with these people.  So it was just a

18   cumulation of different voices and experience.

19   Q.   So your own plus what you heard the others on your team

20   talking about?

21   A.   Uh-huh.

22   Q.   That's a yes?

23   A.   Yes.  Thank you.

24   Q.   Did you do any sort of formal survey or a poll to go around

25   and ask the others how much time do you think that it takes to

ANGELA FISCHER - CROSS-EXAMINATION

1   perform a specific task?

2   A.  No, I didn't survey anyone.

3   Q.  Now, the best practices column, what is the source of a

4   best practice?  What were you relying upon?

5   A.  I looked, I did a search to try to understand in

6   correctional health what a session consists of.  So I looked at

7   a number of different references.  I don't know exactly which

8   one or compilation of them I came up with that.

9   Q.  Do you recall or can you tell us what the gamut of the

10  references you relied upon to come up with best practice?

11  A.  What do you mean, gamut?

12  Q.  You said that you looked and you researched a number of

13  references.  So were you looking at --

14  A.  So like California, what I could find about them.  This

15  state.  Other reference material.  It was Internet search.

16  Q.  But not relying on one specific source, correct?

17  A.  Correct.  But also I used my own, you know, thinking and

18  experience.  I mean, this is an inpatient psychiatric unit,

19  individual weekly session, 30 minutes.  So one time in a week,

20  30 minutes, this patient is getting treatment.  That's what

21  this indicates.

22  Q.  And your time at Maricopa County jail system, it was not

23  inpatient, correct?

24  A.  Well, I did work in the mental health unit in a step-down

25  unit, so it would have been like John or King.  Very rarely was

1    I in the most acute setting there.

2    Q.   If you could turn to Exhibit 244.

3           MS. LOVE:  Your Honor, I don't mean to be bossy about

4    time, but if we are -- this might be a good time to take a

5    break before we move on, if --

6           THE COURT:  Appreciate the suggestion.  So let's take

7    a 10 to 15-minute break.  When you all get back, we will get

8    back started.

9           MS. LOVE:  Thank you, Your Honor.

10          THE COURT:  Thank you, Ms. Fischer.

11          THE WITNESS:  Thank you.

12          (Recess taken at 2:45; resume at 3:01 p.m.)

13          MS. KENDRICK:  Your Honor, we have a slight

14   housekeeping matter and announcement with regard to tomorrow

15   that we just learned about and wanted to raise with the Court.

16          THE COURT:  Okay.

17          MS. KENDRICK:  Dr. Todd Wilcox, who was called to

18   testify tomorrow morning, contacted us and said he has a severe

19   respiratory infection, and he has no voice, and so he cannot

20   travel tomorrow morning to testify as we had originally

21   planned.

22          So I don't know if this is possible, but we were told

23   earlier today that Ms. Edwards, who was subpoenaed for 1:00 in

24   the afternoon, now has an independent attorney, about

25   contacting this person and seeing if possibly she could come

1   earlier in the morning to get started so hopefully we can get

2   done sooner.

3            THE COURT:  I see no problem with trying to pursue

4   that.  Any objection, Mr. Bojanowski?

5            MR. BOJANOWSKI:  Well, Your Honor, I've had contact

6   with counsel for Ms. Edwards, and I understand that they will

7   be meeting tomorrow at 10:00.  And they were adjusting their

8   schedule accordingly.  So frankly, I don't know if it is

9   possible to do that or not.

10           THE COURT:  Well, there is no harm in making the

11  inquiry.

12           MS. KENDRICK:  I could just contact that attorney.  I

13  mean, Mr. Bojanowski and I could even just step out while you

14  guys go on and have a phone call made.

15           MR. BOJANOWSKI:  I can do that, Your Honor, and see.

16           MS. KENDRICK:  We will report back, sir.

17           THE COURT:  Thank you very much.

18                CROSS-EXAMINATION (Continued)

19

20  BY MS. LOVE:

21  Q.  Exhibit 244.  For the record, 244 was previously admitted

22  into evidence.

23           Ma'am, if you look at page 1 of Exhibit Number 244,

24  you were asked questions earlier today about this email that I

25  understand is from you dated January 2nd of 2018, regarding, in

1    part, a strong smell of urine on the unit.

2            Do you recall testifying about this email?

3    A.  I do.

4    Q.  In this email, and I'm summarizing, you also report that

5    there's dirty clothes strewn about, a meal tray on a trash can,

6    trash can in medical office is overflowing, among other issues.

7            And this is -- this is an email that sent to Eddie

8    Taylor, which is Dr. Taylor, correct, with Corizon?

9    A.  Yes.

10   Q.  And also Mr. Watts, correct?

11   A.  Yes.

12   Q.  Who is Maureen Santry?

13   A.  She's a CO4, a DOC employee.

14   Q.  And also Wendy Eccles?

15   A.  She's a deputy warden.

16   Q.  In response to your sending this email, weren't these

17   issues addressed by Deputy Warden Eccles?

18   A.  When -- one of the issues that I have had, or I had when I

19   was working there, are what I called symptomatic solutions,

20   where a problem gets brought up, you throw a resource at it, it

21   gets handled for that moment, but fundamentally the issue

22   hasn't been addressed.

23           So these issues recurred over and over again through

24   the course of time that I was working at ADC.

25   Q.  Did you ever write an IR report regarding a cleanliness

1    issue or strong smell of urine?

2    A.   Yes.

3    Q.   And are those IRs that made their way to the deputy warden,

4    as far as you know?

5    A.   I don't know the answer to that, but one of them is in here

6    where there's an unrestrained patient on the unit in Quiet,

7    cleaning feces off of a cell from a previous inmate.  When the

8    air conditioning turned off, you could smell the feces, and he

9    was really upset.

10            So the officer let him out of the cell, so he was,

11   like, in between the door.  So he's trying to clean off the

12   feces on the door of that cell.  There is an IR in the

13   documents that I have included.

14   Q.   And did the officer make any effort to rectify the

15   situation, the cleanliness of the cell?

16   A.   Well, when I came out of my office, there was no officer.

17   There was an unrestrained patient on suicide watch cleaning

18   the -- it's sort of like the doorway.  And the officer wasn't

19   on the unit.  I didn't see him.  So I walked to the control

20   room, and I said, "What's happening here?"  And he said, "Well,

21   he's just cleaning up because there's feces on the cell."

22   Q.   In the course of your employment over at the Phoenix

23   complex, did you understand that it was also responsibility of

24   officers that had to go in and clean when an inmate may have

25   spread feces or urinated in the cell, it was their job that

1    they had to clean it as well?

2    A.  I, from time to time, saw different people cleaning.  I saw

3    ADC inmates cleaning.  I saw, um, officers.  You know, they

4    have this powder you put down if somebody vomits or if there's

5    blood.

6          So I never got a list of the job descriptions and who

7    is supposed to do what.  I reported to whoever I thought could

8    help me.

9    Q.  If you look at page 2 of Exhibit 244.  This is an email

10   from you to Dr. Taylor and Richard Watts, correct?

11   A.  Yes.

12   Q.  On December 6th of 2017?

13   A.  Yes.

14   Q.  This is about what you testified earlier, that the

15   temperature being cold in Quiet?

16   A.  Well, there's cold and dead bugs and dirty clothes and

17   sparsely stocked clothing for the inmates.  It covers a gamut.

18   Q.  But this is not an email that you addressed to anybody on

19   the security side, correct?

20   A.  Correct.

21   Q.  Is this something that -- are these complaints something

22   that you specifically on this date wrote an IR about?

23   A.  I'm not sure that I did.

24   Q.  And do you understand that the purpose of an information

25   report on the security side is so that the administration can

1    address operational issues they see and take action if

2    necessary?

3    A.   That makes sense to me.

4    Q.   Why would you not then address an email like this,

5    complaining of these conditions, to Deputy Warden Eccles, for

6    instance?

7    A.   I mentioned in another email that I can't keep writing

8    these information reports because it makes it difficult for me

9    to do my job.  So the more I communicated those things, the

10   more retaliation I received, I wanted to go through my

11   supervisors to have my supervisors handle these problems.

12        It was well within Watts' or Dr. Taylor's ability to

13   write an information report if they felt that that was

14   necessary.  I had to be able to still see my patients and get

15   some cooperation from the officers.

16   Q.   And when you say "retaliation," what do you mean?

17   A.   As I explained earlier, officers with long delays getting

18   me patients, bringing me patients that were not restrained

19   properly, not speaking to me, not being where they are supposed

20   to be, leaving the unit when inmates are walking around when

21   the Corizon staff is on the floor.

22        You know, our safety is important, and I felt like as

23   time went on, it was harder and harder for me to do my job and

24   I was at more and more risk.

25   Q.   That list of retaliation instances that you just described,

1    did you write IRs on those?

2    A.   Some of them.

3    Q.   And -- but you didn't retain any copies?

4    A.   No.

5    Q.   In the weekly meetings that you had, the deputy warden

6    meetings, did you address issues like in this particular email

7    at page 2 of Exhibit 244, cleanliness, temperature, and the

8    issue of retaliation?  Did you address that in those deputy

9    warden meetings?

10   A.   I did.  And the unfortunate fact is there are no meeting

11   minutes that happened.  The only meeting minutes that started

12   in the tenure that I was there were the meeting minutes that I

13   started producing and saying we need to start documenting this

14   stuff.  And so I have no record of that.  My memory is that I

15   brought these things up repeatedly to anybody who was

16   listening.

17   Q.   And nobody -- nobody from the security side ever addressed

18   any of the complaints that you made?

19   A.   They did.  Like I said, a symptomatic solution is she's

20   saying there's dirty clothes there.  Get someone up there to

21   clean up.  But a fundamental solution is who is in charge on a

22   daily basis of keeping this unit clean so that the inmates can

23   recover or we can address their mental health problems.

24   Q.   When you would encounter a cleanliness issue, would you

25   call the sergeant --

1    A.   Sometimes.

2    Q.   -- on duty that day?

3    A.   Yes.  And I would sometimes call the sergeant when officers

4    were sleeping.  And I would call the deputy warden directly on

5    her cell phone or on the ADC.

6         I eventually stopped doing that because I called the

7    sergeant when there was a sleeping officer, and the sergeant

8    called in.  When I went to get my next patient, they said,

9    "who's sleeping here?  Sergeant so-and-so said that somebody is

10   sleeping here.  Who's sleeping here?"

11        That puts me in a really bad position with all of the

12   officers that are sitting there.

13   Q.   But how can anybody on the security side and the

14   administration of that facility take action if what you see as

15   inappropriate conduct by the officers isn't reported to them?

16   A.   Well, I don't think it's fair to characterize that I wasn't

17   reporting.  I routinely reported, consistently reported over

18   months and months and months so --

19   Q.   But you did stop, as you just said?

20   A.   No.  I still called.  I still -- the incident where the

21   officer said "Who was sleeping?" was within the last month of

22   my working there.  I have meeting minutes that I included in my

23   exhibits where during the George ward meetings, I communicated

24   that the officers were leaving the unit with patients walking

25   around.  So it -- I was still reporting.

1   Q.  And you also testified, I believe earlier today, that with

2   regards to one of the reports that you made about officers

3   sleeping, you didn't know specifically, but you had heard that

4   some action had been taken against the officer?

5   A.  Yes.

6   Q.  Exhibit Number 243.  If you could look at that for me,

7   please.  Exhibit Number 243, which has been previously admitted

8   into evidence, these are emails from you to various Corizon

9   personnel regarding insects?

10  A.  And mice.

11  Q.  And mice?

12  A.  Uh-huh.

13  Q.  And are your complaints regarding seeing insects or mice

14  topics that made its way into an IR authored by you so that the

15  security side of the facility could address your complaint?

16  A.  I don't know that it made it into an IR, but it definitely

17  made it into the deputy warden meeting more than once.  We

18  talked about the inmates actually ordering Styrofoam coolers to

19  put their food in.  Deputy warden Cottrell finally bought them,

20  you know, like little bins that they could put some of their

21  things in because the mice were eating their food.

22  Q.  Were you also informed by the security side administration

23  personnel that there was an extermination service that came

24  regularly to the facility?

25  A.  Yes.  And I actually referenced the Orkin man, and they did

1    come and spray.

2    Q.  Exhibit 239, please.  If you will take a look at Exhibit

3    239.  This was previously admitted into evidence.  And it's

4    seven pages of one IR and various emails.

5          Do you remember testifying regarding emails and an IR

6    related to officers sleeping?

7    A.  Yes.

8    Q.  If you look at page 1 of Exhibit Number 239, this is an

9    email from you dated Monday, July 24th, to Richard Watts,

10   Stephanie Leonard, and Diane Ortega, correct?

11   A.  Correct.

12   Q.  Who is Diane Ortega?

13   A.  She is a mental health profession -- or a psych associate,

14   licensed at the same level that I am, that was interim facility

15   mental health director.

16   Q.  Turning your attention to the last paragraph of this email,

17   you state that "Then on Sunday, when I came to do my weekend

18   shift around 8:00 a.m., I found three officers asleep on Quiet.

19   Two of them were on constant watches.  The third was asleep in

20   the control room.  I spoke to CO4," and then the name is

21   redacted, correct?

22   A.  Yes.

23   Q.  On that Sunday when you were there and observed the

24   officers asleep, did you call the sergeant to say, hey, you've

25   got officers down here who are asleep?

1   A.   I called the CO4, who is above a sergeant, my

2   understanding.

3   Q.   There when you observed the officers sleeping, at that same

4   time?

5   A.   Yeah.   I went back into the office where I see patients,

6   and I called the CO4.

7   Q.   What did you tell the CO4?

8   A.   There's officers sleeping on Quiet ward.

9   Q.   What was the response?

10  A.   Probably like we'll handle it.   I don't remember her exact

11  words.

12  Q.   And your concern with seeing officers asleep is inmate

13  safety, correct?

14  A.   Absolutely.

15  Q.   And your safety, correct?

16  A.   Um, at that particular time on Quiet ward, they are all in

17  locked cells.   And then there's a gate that's locked.   So it's

18  less my safety in that setting than it would be, say, if you

19  have a bunch of inmates walking around.   So in this particular

20  instance, it was for the individuals that were on suicide

21  watch.

22  Q.   Other times that you observed officers asleep, were they on

23  different wards other than Quiet?

24  A.   Yes.

25  Q.   So in those circumstances, did you consider it a safety

1    issue for staff as well if there was officers asleep?

2    A.  Yes.

3    Q.  In those situations, why wouldn't you say to the officer,

4    wake up, or knock on a control room window or a door?

5    A.  I don't know why you're assuming I didn't.

6    Q.  Did you?

7    A.  I did.  And I'm, you know, a friendly person just by

8    nature.  So I'd be like, hey, dude, what are you doing?  Come

9    on, we got things to do.  And I would rouse them.

10            I didn't just walk away from people sleeping on

11   constant suicide watches.

12   Q.  Did you ever report in any of the emails that you sent

13   making a report of officers sleeping that in fact you did do

14   that, you roused the officers?

15   A.  So you're asking did I document it?  No, I didn't document

16   it.

17   Q.  If you could turn to now Exhibit 224, please.  For the

18   record, 224 has been previously admitted into evidence.

19            This was the -- a photograph of a paper notification

20   that you saw posted at ASPC Phoenix, correct?

21   A.  Yes.

22   Q.  And it was in which particular ward?

23   A.  It was in Baker ward, but it was also in King ward.  It

24   was -- not Baker.  I'm sorry.  George ward.  It was in George

25   nursing station.  And then we had treatment rooms, and there

1    was one on the King treatment -- in the treatment room.

2    Q.  Did you ever have any conversation with any Corizon

3    personnel asking why is this posted and what is the purpose?

4    A.  No.

5    Q.  You weren't curious?

6    A.  Well, I was made aware of why it was put there.  It was put

7    there because they want that sentence to be in the notes.

8    Q.  Who is "they" want?  Who is "they"?

9    A.  Let's see.  I would say, um, my supervisor, Dr. Calcote,

10   the mental health director, Nicole Taylor.  In the CGAR's

11   meetings, this sentence, and as you walked me through the other

12   exhibit, this was the sentence that they wanted -- I had no

13   reason to ask.  I think I understood that they wanted this

14   sentence there.

15   Q.  And they wanted that sentence there when it was a situation

16   where a confidential setting was offered and the inmate

17   refused, that this is the kind of -- the words that the

18   documentation needed to say, correct?

19   A.  I think that's accurate.

20   Q.  So not a situation where you took this as you need to lie

21   and falsify your records?

22   A.  I think I testified earlier that, um, we were not

23   encouraged to lie, so that wasn't -- that wasn't what was

24   happening.  But it was very clear that this is what had to

25   happen.

```
1            So you could say to the person you don't want to come
2    out for your session, do you?  Well, if they say no, is that
3    offered and refused?  So the implication is this has to be
4    written down.  If the person refuses, they refused.
5    Q.  But that's not how you conducted yourself when you offered
6    a confidential setting, correct?
7    A.  Correct.
8    Q.  But were there others that you personally observed do the
9    offering in that way that you just described?
10   A.  Yes.  And as I mentioned, when I was trained, I was
11   actually given a cart that at that point there was a laptop
12   that could be used to stand in front of the cells and do
13   assessments cell front.
14   Q.  And who specifically -- do you recall by name who -- which
15   other members of the mental health team did the offering in the
16   way you just described?
17   A.  I think -- I don't remember her name.  She was -- she left
18   shortly after I started.  She was a little blond-haired lady,
19   but I can't remember her name.
20   Q.  Did you ever have a conversation with this woman saying,
21   hey, I don't think that's the way we should do it?
22   A.  It was my first day.  I was in training.  No.  I was trying
23   to learn what the ropes were there.  I didn't know about this
24   sentence or anything else, you know, to even ask that question.
25   Q.  During the time that you were employed at Corizon at
```

UNITED STATES DISTRICT COURT

1    Phoenix, did you ever conclude that any other member of the

2    mental health team were lying in their documentation of the

3    medical records?

4    A.  Did I conclude?  I may have suspected.  I don't know that I

5    concluded that.  When we would get these summaries of the

6    subjective information for patients, anyone who was on watch

7    every day -- so say there's 17 people on watch.  12 of them

8    were offered and refused.  I don't know.  It is hard for me to

9    say.

10   Q.  Who did you suspect specifically by name?

11   A.  A number of people.

12   Q.  How many?

13   A.  The emails are available.  I don't -- here's the people we

14   had working there.  Dr. Sauls, Dr. McGately, Straab, Ortega.  I

15   mean, we were all working there.  So on any given day, that

16   subjective information was available in an email that went to

17   Corizon management that indicated whether a confidential

18   setting was offered and refused or not.

19        When you looked at some of those, or when I looked at

20   them, on some days, a good majority of the people refused

21   confidential settings.  So I don't know the answer to that.

22   Q.  What I'm asking is, did you suspect any certain individuals

23   of not being truthful in their documentation?

24   A.  I don't have a name that I could give you, yes, I think

25   that person was lying.

1          THE COURT:  But that wasn't the question.  The

2     question was, did you suspect any certain individuals of not

3     being truthful in their documentation?  Not asking for the

4     names, just asking whether you suspected any certain

5     individuals of not being truthful in the documentation.

6          THE WITNESS:  I did.

7     BY MS. LOVE:

8     Q.  What is the name of the person or persons that you

9     suspected were not being truthful in their documentation?

10    A.  So this is where I start hitting on my retaliation fear.

11    So my fear about giving you a name of a person is if that

12    person then is reprimanded, then there's a liability for me,

13    and I'm worried about that.

14         THE COURT:  Well, how many people do you think were

15    not being honest in the documentation in this area?  What

16    number would you say?

17         THE WITNESS:  A couple.  And in other settings, you

18    know, we were also supposed to do groups for patients.  So on

19    Baker ward, these are people who are in their cells 23 hours a

20    day.  I want them in the group room.  I want them interacting.

21    And when the list would come out of who came to group or who

22    didn't come to group, refused, refused, refused.  And then when

23    I would speak to the patient, the patient would say, nobody

24    asked me; I want to come to group.

25         THE COURT:  The purpose of you being here today, in

1   particular for me, is to assess whether or not the monitoring

2   program can be trusted.  And in this particular incidence, it

3   is whether or not a representation that somebody was offered

4   the opportunity for an out-of-cell confidential consultation

5   or, as you just mentioned, with respect to group.

6           You observed and have testified about some greater

7   number of people declining those opportunities than is

8   consistent with your experience.

9           Is that fair so far?

10          THE WITNESS:  Fair.

11          THE COURT:  Which causes you to doubt it.  I don't

12  need to have any names in particular.  What I need to know is

13  whether or not there's some reason for the Court to be

14  concerned about whether or not I can trust the monitoring

15  program or whether I have to have a monitor of the monitor,

16  somebody who is auditing what the monitor is doing to make sure

17  that it's honest, to make sure that people see the kind of sign

18  that is depicted in Exhibit 224, although you don't think that

19  it was an instruction to anybody to lie, you thought that it

20  maybe created a climate -- and tell me if I'm wrong about this,

21  but I take what your testimony is, that you thought it created

22  a climate where the spirit of the stipulation wasn't being

23  complied with because people were given a pathway to say magic

24  words that would allow for these to be counted as compliant,

25  when you believe that with respect to certain individuals who

1    were providing these services, that there was not a compliance

2    with the stipulation.  There was a use of magic words to

3    demonstrate it had been satisfied when, in fact, you didn't

4    think it had.

5            Is that all fair?

6            THE WITNESS:  Yes.

7            THE COURT:  All right.  Go ahead.

8    BY MS. LOVE:

9    Q.  The persons that you suspect were perhaps not truthful in

10   their documentation, you're not speaking of the Arizona

11   Department of Corrections monitors, are you?

12   A.  No.  When I was just talking to you, I was speaking of the

13   email that went out that indicated who was offered and wasn't

14   offered a setting, you know, confidential setting.

15   Q.  So persons that were members of the mental health team

16   there at Phoenix?

17   A.  Yes.

18   Q.  If you could turn to Exhibit 241, please.

19   A.  241?

20   Q.  Yes, 241.  For the record, 241 has been previously admitted

21   into evidence.

22           Exhibit 241 is an email from you to Dr. Eddie Taylor

23   and Richard Watts dated Tuesday, November 28th, 2017, correct?

24   A.  Correct.

25   Q.  And this was the email about becoming increasingly

1  uncomfortable with the lack of psychiatric documentation,

2  correct?

3  A.  Correct.

4  Q.  You go on in the next two paragraphs to say -- and I won't

5  summarize, I'll just read it.  Say in the second paragraph,

6  "Inmate [redacted] has been at this facility for almost 40

7  days, and there's not a single note from a psychiatrist in his

8  record.  A psychiatrist-unscheduled note was erroneously

9  entered by a mental health RN on 11-27-2017.  Based upon

10 Dr. Araneta's note below, he has seen him.  However, there's no

11 documentation that supports this.  There's a verbal order for

12 medication by Dr. Araneta on 10-20-17 with no accompanying

13 note."

14          Did I read that correctly?

15 A.  Yes.

16 Q.  If you go on, then, to look at the next paragraph, the

17 third paragraph of this email, is it fair to say that it was

18 your understanding that Dr. Araneta was actually seeing the

19 patient, correct?

20 A.  Correct.

21 Q.  But for some reason, the fact that he's seeing the patient

22 is not reflected in the medical record?

23 A.  Correct.

24 Q.  Did you have any explanation or hypothesis as to why that

25 was occurring?  If you knew that this doctor is seeing the

1    patient, why isn't it in the medical record?

2    A.   That's what I'm asking them.  I don't know why it's not in

3    there.  I mean, Dr. Araneta really cares about the patients.

4    So I saw him interacting with patients, so the note not being

5    in there is problematic.  I mean, it could be that he put it in

6    and he almost had a hiccup.  It could be that he is behind in

7    his notes.  It could be, you know, any number of things.

8            I was bringing to it their attention so that the

9    documentation could be put in the record.

10           When a person, you know, sees an on-site psychiatrist

11   and they don't put the note in, when the telepsych

12   psychiatrist, which even has a more distant relationship, that

13   data is really important for making the next therapeutic

14   decision.

15           It's important to the clinicians as well that the data

16   is in there, why this action, why was it taken.  Then we can

17   all work together toward the best interests of the patient.

18   Q.   Because obviously it's a concern.  If you know that patient

19   care is being provided and then there's no documentation, where

20   is the disconnect, correct?

21   A.   Right.

22   Q.   You testified earlier today as well about the issue of

23   telepsych, and you testified regarding a particular inmate that

24   you had concerns that the telepsych provider may not be really

25   seeing the full gamut of what this particular inmate was

1    experiencing.

2            Is that a fair, very basic summary?

3    A.  It is.

4    Q.  Did you have the opportunity with this particular patient

5    to be able to contact that telepsych provider on your own and

6    say, hey, I have some additional information I'd like to

7    provide you?  Was that something that you were able to do?

8    A.  Given enough time, yes.  I mean, interdisciplinary

9    communication and staffing is really important, so yes.

10   Q.  Do you know whether or not on this particular occasion you

11   were able to do that?

12   A.  I didn't do that.  This was after the fact, or that was

13   after the fact, and I -- to -- the remedy to the problem, in my

14   experience, would have been to change her to an on-site

15   psychiatrist.

16           When you have psychotic patients that are hearing

17   voices and thinking the television is talking to them, putting

18   them in front of a screen exacerbates that clinical situation.

19   So in this case in particular, I wanted her to have the direct

20   care.

21   Q.  I'm paring things down, so bear with me.

22   A.  No problem.

23   Q.  You testified today as well about the subject matter of the

24   HNRs.

25   A.  Yes.

1    Q.  And you testified that you received reports from inmates

2    that they were not able to get HNRs?

3    A.  Yes.

4    Q.  How many reports from inmates did you receive?

5    A.  Many.

6    Q.  You say "many."  Does that mean five?  Does it mean 50?

7    Can you categorize in any way?

8    A.  I'm trying to think.  I don't know how to quantify 18

9    months of, you know, that experience.  I often talk to the

10   medical nurse, whoever was assigned to the unit.  If the

11   patient had a complaint, I would directly email that person.

12           Where I was trying to get a fundamental solution in

13   place was who is going to walk around and make sure every area

14   is stocked with HNRs.  When inmates are on suicide watch and

15   they can't have a pencil because they might hurt themselves

16   with it, what is the mechanism to get the HNR done.  So I don't

17   have a count for you, but that was the gist of my concerns.

18   Q.  As far as also you had a correctional officer say to you

19   that HNRs were not available, did I understand your testimony

20   correctly?

21   A.  Yeah.  We don't have any, yes.

22   Q.  How many times did you receive a response from a

23   correctional officer saying we don't have any HNRs?

24   A.  Twice at least.  I even went to medical, and I said, this

25   guy needs an HNR.  Do you have any HNRs?  And I remember

1    speaking to the nurse who said, we don't have any.

2    Q.  Did you write IRs about the situation where either inmates

3    reported to you or these two COs reported to you that HNRs were

4    not available?

5    A.  I don't recall writing an HNR about it.  I remember sending

6    emails to bringing it up to FHA Watts, bringing it up in the

7    deputy warden meeting.

8    Q.  And when you brought it up in the deputy warden meeting,

9    was the issue -- was there a conversation about the issue?  Was

10   it addressed?

11   A.  Yes.  The deputy warden -- there was a want for those

12   things to be in place where they needed to be in place.  There

13   wasn't an intention of not giving people HNRs that I

14   experienced.  To me, it felt more like not a mechanism in place

15   to ensure that the things were happening that needed to happen.

16   Q.  But once you reported it to the deputy warden, you saw that

17   there was some action taken to try to rectify that situation,

18   that the inmates would receive the HNRs?

19   A.  I can't -- I can't say that I went back to look and saw the

20   stack of HNRs sitting there.

21   Q.  But you took it that the deputy warden took that concern to

22   heart and was -- that was a valid concern if the inmates don't

23   have an HNR?

24   A.  Yes.

25              THE COURT:  When you were there and the HNR form was

| | |
|---|---|
| 1 | completed, somebody had a form or you obtained a form and they |
| 2 | were able to fill it out, whom was that given to? |
| 3 | THE WITNESS:  I think nursing picked up the HNR form. |
| 4 | So, like, if you think -- Baker ward is contained cells.  You |
| 5 | know, they're sort of behind, you know, the cell door.  They |
| 6 | could slip them under the door.  The officers are not allowed |
| 7 | to take the HNRs. |
| 8 | So what would happen is they would get under the door. |
| 9 | They would roll it up and put it in the handle of the door. |
| 10 | And then the next -- |
| 11 | THE COURT:  Of the nurse's office? |
| 12 | THE WITNESS:  No, of the cell, their particular cell. |
| 13 | THE COURT:  Their own cell? |
| 14 | THE WITNESS:  Yes. |
| 15 | THE COURT:  And then nursing would circulate and |
| 16 | collect them? |
| 17 | THE WITNESS:  Yes. |
| 18 | THE COURT:  There was a time in other yards, open |
| 19 | yards, where there were HNR boxes.  Do you know about that? |
| 20 | THE WITNESS:  I am familiar with that way of having |
| 21 | HNRs handled. |
| 22 | THE COURT:  Okay.  I saw you nod your head.  That's |
| 23 | why I asked whether you were familiar with that.  And then |
| 24 | there was a time when the Department of Corrections changed the |
| 25 | policy in these open yards and did away with the HNR boxes and |

1    instead had a nurse's line where people could show up in the

2    morning.  None of that's relevant to what happened in your

3    facility because people didn't have that freedom of movement.

4            I'm just wondering whether or not it's possible that

5    the fact that you encountered circumstances where there were no

6    HNR forms was a product of switching away from a system where

7    there were forms that would be put in a box.  When you do away

8    with the box, maybe you do away with the forms.  I'm just

9    speculating about that, raising it only to see if you heard

10   anything that might be consistent with what I just said.

11           THE WITNESS:  No.  My feeling was that we needed to

12   have the HNRs.  Oh, gosh, we need to get the forms there.  If

13   they aren't there, we need them there.

14           THE COURT:  Okay.  Thank you.

15   BY MS. LOVE:

16   Q.  You testified earlier today that there were -- there was at

17   least a circumstance where an officer would not bring an inmate

18   out of a cell?

19   A.  Yes.

20   Q.  And that was under what circumstances?  Why did you need to

21   see the inmate?  Was that for the suicide watch?

22   A.  It could be for the suicide watch.  It could be for their

23   individual session.  It could be for group.

24           Just one situation in particular, there's just one

25   officer on Quiet.  They have ton of other things to do.  They

1    can't bring the patient.  You know, with the amount of work

2    that needs to be done, this is my time to be on Quiet.  And I

3    could call, then, the sergeant and have someone -- you know, a

4    sergeant sometimes would even come and bring patients, if need

5    be.

6    Q.  So you had a mechanism by which if an officer, because they

7    had other duties to perform, weren't able to bring the inmate

8    out of the cell, you could call the sergeant, I'm going to come

9    help?

10   A.  Yes.  And that happened on Delta, when we were doing

11   special intakes there, because that is, you know, hundreds of

12   patients that they have to deal with, and they are trying to

13   pull patients for me.

14   Q.  You also testified today about circumstances where officers

15   would bring inmates to see you, and the inmates would not be

16   restrained.

17   A.  Yes.

18   Q.  And those were circumstances, I take it from you, where it

19   was your opinion that that particular inmate needed to be in

20   restraints, correct?

21   A.  Yes.

22   Q.  And when that would occur, did you tell the officer, hey, I

23   really need this inmate in restraints?

24   A.  Sometimes.

25   Q.  And when you would tell the officer that the inmate needed

1    to be in restraints, would the officer then cooperate with you

2    and do that?

3    A.   Yes.   Therapeutically, it's not the best situation because

4    you would then create a barrier with that patient.   We need to

5    do that in correctional settings, I understand that, but if the

6    policy says bring restrained patients, just do that and we can

7    avoid at that altogether.

8    Q.   So fair to say kind of in a Catch-22 from a security

9    standpoint and a therapeutic standpoint, that maybe the inmate

10   is required to be in restraints because of custody level, but

11   it's not really the best setting for you to do it because of

12   that barrier?

13   A.   No.   They should be in restraints, especially maximum

14   security, because if you want to have a therapeutic interaction

15   with someone, sometimes they get irritated.   And so what you

16   can address with them changes dependent on their ability to get

17   up and slug you if they don't like what you just said.

18           So if the rule is, let's just have them restrained,

19   you don't have to have the interaction in front of the patient

20   and say, hey, can you put the restraints on that guy.

21           In one of the IRs that I wrote, I'm walking back to

22   the office on Quiet, the inmate is walking right toward me with

23   no restraints on.   And the officer steps behind him.   So the

24   opportunity, you know, for a violent interaction is present.

25   Things like that.

1   Q.   Do you feel that the IR that you wrote about that situation

2   was addressed by the administration, the security

3   administration at the facility?

4   A.   I honestly had no way to tell when things were addressed or

5   they weren't addressed.   What I experienced a lot over time is,

6   you know, I would have very serious concerns about officers

7   antagonizing patients, not restraining them.   I would write an

8   IR, and then they would show up next Tuesday, working.   I would

9   hear anything.

10          Sometimes they would seem cold or angry, and I

11   wouldn't know, did someone say that I said this or not.

12   Q.   How many officers did you have that experience with where

13   you believed that they were antagonizing the patients?

14   A.   On the Quiet ward, it was difficult sometimes to be there,

15   to hear the way that the officers talked about the patients.

16   So maybe it wasn't directly to the patient.   But the patients

17   can hear what's going on.   So I mean, I just counted quickly in

18   my head five.

19   Q.   Five different officers?

20   A.   Yes.

21   Q.   And were there times, however, where those officers that

22   you had concerns about were rotated off that particular ward?

23   A.   It wasn't like they were -- the only unit where officers

24   were, like, positioned was Baker.

25          So in every other unit you didn't know from day to day

1    who would be on the unit.

2    Q.  If you could turn to Exhibit 238, please.  238 has

3    previously been admitted into evidence and is an email from you

4    to Dr. Calcote dated January 25th, 2018, regarding the inmate

5    that you talked about earlier today that had a history of

6    self-harm, correct?

7    A.  Correct.

8    Q.  And you state that in -- well, let me back up.

9         In the second part of page 1 of Exhibit 238, there's

10   also an email from you to Dr. Eddie Taylor dated Friday,

11   December 15th, 2017.  Do you see that?

12   A.  Yes.

13   Q.  You state, about a third of the way down, a little bit in

14   the middle, "He does not appear to go outside and has possibly

15   been indoors in that cage for many months."

16        Do you see that?

17   A.  Yes.

18   Q.  You don't have any personal knowledge as to actually

19   whether or not that inmate had been outdoors; is that correct?

20   A.  No, I do have knowledge.  When we are -- when we were in

21   the deputy warden meeting, we would discuss especially the

22   patients that were in critical condition.  And it would come

23   up, you know, are they doing recreation.

24        That was a hard thing for Corizon staff to track,

25   because we didn't get reports of when a person went to

1    recreation or didn't go to recreation.  So if the next day you

2    have a different officer on the unit, and he wasn't there last

3    night, you don't know if he went or he didn't go.

4          But in discussing this particular patient, it was

5    discussed that he wasn't going outside.

6    Q.  Was it discussed after you wrote this email?  Because you

7    say "He does not appear to go outside."  That's where my

8    disconnect is.

9    A.  It might be a poor choice of words.  This patient was

10   discussed quite a bit.

11   Q.  And the reason that he wasn't going outdoors was because of

12   his history of self-harm?

13   A.  No.  In psychotic conditions, there's positive and negative

14   symptoms.  So this patient, when you have the negative

15   symptoms, they simply withdraw.  So he's sort of, like I

16   mentioned earlier, folded into himself.  And what he needs is

17   somebody therapeutically interacting with him.

18         An officer on a 24/7 watch is not a mental health --

19   they're not trained.  So that person isn't engaging them in

20   therapeutic activities.  When I was on Baker, I had a treatment

21   plan for him where he had to be brought out of his cell and sit

22   in a chair.  And there's at least a TV to look at that does

23   something that stimulates anything, you know, just outside of

24   his internal life.

25         So part of my concern here was that the ones that are

| | |
|---|---|
| 1 | quiet, that are kind of folding into themselves, are just left |
| 2 | alone.  They're not receiving the treatment that they need |
| 3 | because they refuse.  Well, at some point you have to step in |
| 4 | and take care of them. |
| 5 | There was a gentleman on Baker who has been |
| 6 | incarcerated for, I think, 30 years, holds things in his hands |
| 7 | like this.  His muscles are atrophied to the point he can't |
| 8 | even open his hands.  But he is a little difficult to deal |
| 9 | with, so he ends up staying in that cell month after month.  We |
| 10 | could do better.  That's what I was saying.  Let's do better. |
| 11 | Q.  In your experience in treating and providing mental health |
| 12 | care to inmates, whether in the Maricopa County system or in |
| 13 | Arizona Department of Corrections system, have you had the |
| 14 | experience where you're encouraging and it may be allowed that |
| 15 | an inmate can come out of their cell or even perhaps go |
| 16 | outside, but because of the circumstances that you're saying, |
| 17 | the inmate won't do it?  They won't agree to come out? |
| 18 | A.  If that's the case, and if they aren't engaging in some |
| 19 | meaningful way in life, then we should look at psychiatry.  We |
| 20 | should look at the medication that they're taking.  It's not |
| 21 | good for them.  So are they a danger to themselves, anyone |
| 22 | else, persistently and acutely disabled?  If they are any of |
| 23 | those three things, we can PMRB them, and we would then |
| 24 | prescribe the medication that we believe that they need and |
| 25 | they brighten up. |

1              So outside of the DOC system, I have not had a patient

2    where I can't get the care that they need to elevate them to

3    some at least level to participating minimally in life,

4    interest in anything.

5    Q.  As to this particular inmate, you were advocating for the

6    inmate to have a change of scenery to help him move forward,

7    correct?

8    A.  That was one of my ideas.  I had a treatment plan that I

9    was developing.

10   Q.  And by a change in scenery as one of the -- as one of the

11   options, you wanted him to be just moved to a different ward at

12   Phoenix; is that correct?

13   A.  No.  I wanted him to be moved to ASH.

14   Q.  And you testified earlier that you had a conversation with

15   Dr. Nicole Taylor regarding movement of this particular inmate

16   to ASH, correct?

17   A.  Yes.

18   Q.  And she, in her response, she said something to the effect

19   of something that had to do with dollars?

20   A.  Money came up, and then there's a rule or something that

21   you can't do it.

22   Q.  Did she explain to you that pursuant to Arizona statutes,

23   that ASH will not accept a male inmate incarcerated in the

24   Arizona Department of Corrections system?

25   A.  She didn't say that to me.

1   Q.  Okay.  You also testified as to an inmate being in what you

2   described as a cage.  Is that this same particular inmate we're

3   talking about?

4   A.  Yes.

5   Q.  And that is on which ward?

6   A.  Baker.

7   Q.  When you say a cage, in fact it's a cell, correct?

8   A.  It's a cell with a cage attached to the front of it.  So

9   the cell doors close, and there's a cage right in front of it,

10  yes.

11  Q.  So it's a cell where if you and I are walking into the

12  cell, we can walk into the cell, but then there's a partition,

13  a metal partition, correct?

14  A.  No, that's not exactly it.  So any -- any cell has a door.

15  Right?  And you could just see a whole row of them.  So what

16  they would do is build a cage onto the front of a cell door.

17  So you would go through that cage, and then you'd be in that

18  small area.  And if -- if the inmate was able or it was

19  therapeutic or, you know, they could open the cell door and let

20  the person go there.  So it was just placed outside of a cell.

21  Q.  So basically, it's a separate enclosure before you're able

22  to enter the main space of the cell?

23  A.  Yes.

24  Q.  Okay.

25          MS. LOVE:  Your Honor, we have no further questions.

1          THE COURT:  Thank you.  Why don't you remain at the

2     lectern for just a moment, Ms. Love, because I have a couple of

3     questions, and my questions might engender questions from

4     defense counsel.

5          The first area that I'd like to ask about is when you

6     were testifying about when patients you'd been seeing were

7     spirited away, and you had been given no notice about that.  It

8     made me want to understand better, to make sure that I

9     understood it, exactly what the number and type of person who

10    was treating these inmates were.

11         So you were a psychological associate, and so you

12    would see your patients, it sounds like in your units, on a

13    weekly basis; is that right?

14         THE WITNESS:  Well, the CGAR requires this once

15    weekly, but an inpatient unit, I saw them every day.  Not

16    necessarily in a, you know, confidential setting.  I spoke to

17    every patient every single day.

18         THE COURT:  So when you rounded on your patients, you

19    spoke to them every day in rounds like we're familiar with?

20         THE WITNESS:  Yes.

21         THE COURT:  So then beyond that, there was the

22    psychiatrist or psychologist who would have to have an

23    interaction with the inmate on a monthly basis at least; is

24    that right?

25         THE WITNESS:  What's not correct technically about

1    that is a psychologist is, you know, PsyD or Ph.D, so we work

2    on the counseling and the like.  The psychiatry handles the

3    medication portion.  So it could be a psych associate, it could

4    be a psychologist that would meet one on one for counseling

5    sessions.

6              THE COURT:  So when we refer to provider, the level

7    above you, was that generally a psychiatrist or Ph.D.

8    psychologist?

9              THE WITNESS:  When you're talking about provider,

10   you're talking about, you know, someone who's -- can prescribe

11   medication.  They are a prescriber.

12             THE COURT:  All right.  So that person is involved

13   with the inmate at least on a monthly basis for the people that

14   you were looking after?

15             THE WITNESS:  Yes.

16             THE COURT:  With respect to the transfer of inmates to

17   a different unit where they would leave your care, the people

18   who could opine about the circumstances that would be

19   appropriate or the facts that would be appropriate to consider

20   with respect to the movement of that patient and special issues

21   that might need to be considered because of psychological

22   things that either the provider or you had observed, the kinds

23   of people who would be in a position to opine about that would

24   be the psychological associate who was treating the person, as

25   you say, on the -- at least a weekly basis, but more often in

1    your circumstance, and the provider who was meeting with the

2    patient at least on a monthly basis.

3                Are there other people who would be qualified to opine

4    about this circumstances that should be considered with respect

5    to a transfer?

6                THE WITNESS:  Yes.  So the mental health director.  If

7    we had interdisciplinary staff meetings and we talked about

8    patients routinely, they would have an understanding, and they

9    could look in the records.

10               Dr. Calcote would probably be aware of the patients

11   that are most acute, and I think he was on those calls.

12   Dr. Leonard was on those calls.  But meaningful psychiatric

13   participation wasn't something that happened.  So if we have

14   our telepsych provider in Texas, he's not on the phone call to

15   talk about medicationwise is this person in a stable enough

16   state to move.

17               THE COURT:  All right.  So the calls that you're

18   talking about are where you're having -- not interdisciplinary

19   but collective conversations among the number of people

20   involved in the treatment.  That's what that is?

21               THE WITNESS:  My level never got on those calls.

22               THE COURT:  You were never on those calls?

23               THE WITNESS:  So it was mental health directors from

24   all of the different facilities making these decisions with

25   Dr. Leonard and Dr. Calcote without the information.  This is

1    what I wanted to do.  I wanted to say, okay, we need to be able

2    to, you know, give this information and talk about it.

3             Sometimes I was told, you need to pick three patients

4    that are moving because we have three more coming, whether they

5    were in condition to leave or not.

6             So what I was hoping for was to talk about how we

7    could do that and what criteria that we could use to make sure

8    that all the right players were in the room to talk about it.

9             THE COURT:  But sometimes -- well, let me ask this.

10   Do you know that there was this call, this telephone call,

11   among these people when people were transferred?

12            THE WITNESS:  Yes.

13            THE COURT:  So that always happened?

14            THE WITNESS:  I wouldn't say always, but mostly.

15            THE COURT:  Yeah, okay.  All right.  Thank you.  That

16   addresses that area for me.  I appreciate that.

17            The second question I had is that in your matrix, it

18   looked to me like you had observed the circumstances of

19   something that wasn't working.  You tried to apply your

20   experience and knowledge to identify a quantitative method to

21   get to a solution that involved additional staffing.  That was

22   the example that you -- where you looked to me like you

23   observed and tried to make recommendations.

24            I wonder, do you know of any reason that it wouldn't

25   be possible for someone external to the system to come in and

1    observe how things were being done, let's say at the three

2    units that you were involved in, and to make recommendations to

3    the Court about things that could be done to address those

4    problems?  Is there any reason that that couldn't work?

5           THE WITNESS:  There's no reason that that couldn't

6    work.  And actually, in other places that I've worked, the

7    leadership goes to other prisons or jails around the country

8    and says, how do you guys do this?  You know, let's try to

9    figure this out.  Like at Maricopa County, things changed based

10   on that data that was collected from other places.  So I think

11   you could have someone come in and observe and give

12   recommendations if they have the requisite experience and

13   understanding of what's required.

14          THE COURT:  Okay.  Thank you.

15          THE WITNESS:  I failed to mention, I wanted to say --

16   she asked me did I conduct a survey of my fellow employees to

17   try to understand what their real experience was working with

18   patients.  I asked to do a survey.  I even presented a survey

19   and was told I could not do a survey.  I had forgotten that.

20   So I think we can inquire with the people that work there too.

21   They know.

22          THE COURT:  Thank you.  Any additional questions,

23   Ms. Love?

24          MS. LOVE:  No further questions.

25          THE COURT:  Now, Mr. Fathi, from my calculation, if

1    I'm not generous, you've exhausted your time.  If I'm generous,

2    you probably only have 10 minutes left.  So I would give you 10

3    minutes for redirect and any questions that are prompted by my

4    questions.

5              MR. FATHI:  May I have a moment, Your Honor?

6              THE COURT:  You may.

7              (Discussion between Mr. Fathi and Ms. Kendrick.)

8              MR. FATHI:  I will decline your generous offer, Your

9    Honor.  No redirect.  Thank you.

10             THE COURT:  So, Ms. Fischer, what that means is that

11   the lawyers are done with you.  That means that all that

12   remains, I think, is for me to say a couple of things that I

13   think are appropriate to say.

14             I have found you to be exceptionally articulate and

15   perspicacious with respect to trying to observe and address

16   problems in an environment where you worked.

17             It's not surprising to me that you received the

18   highest marks in the evaluation that was presented as evidence

19   in this case.

20             That said, most people don't do what you did, and that

21   is go on some kind of Sherlock Holmes mission to try to figure

22   out whom you could give this information to.  And you did that.

23             And oftentimes people who do this, people who bring

24   something to the attention of others that -- whistleblowing so

25   to speak, doesn't really redound to any tangible benefit for

1    the individual.  And I think it's maybe for that reason that

2    most people don't do this.

3            But I have learned a lot today through your testimony,

4    and I want you to understand that I appreciate that you did

5    this.  I appreciated that you made the extra effort to try to

6    communicate this information to the Court in an environment, as

7    I say, where it oftentimes is just the nature of life that

8    these kinds of things are not reported.  So I thank you very

9    much.  Best wishes to you.

10            THE WITNESS:  Thank you.

11            THE COURT:  So it's 4:00.  Do we have another witness

12   that we can move to and take advantage of this additional time?

13   It's towards the defendants' side now.

14            MR. BOJANOWSKI:  No, Your Honor.  There are no further

15   witnesses today.  I will confirm with the Court that we got in

16   contact with the -- yes -- Ms. Edwards due to Dr. Wilcox's

17   unavailability.  We are able too have her here at 10:00 to

18   complete her testimony tomorrow.  It's my understanding she is

19   the only witness that is going to go forward tomorrow, and so

20   we've got her set to go at 10:00.

21            THE COURT:  So you don't -- I mean, I saw the

22   exclusion of Dr. Taylor under the rule.  But you wanted to wait

23   until after we had the plaintiffs' witness tomorrow before she

24   testified?  Is that what you would like to do?

25            MR. BOJANOWSKI:  Right.

UNITED STATES DISTRICT COURT

1          THE COURT:  So what we find, then, that we are in the

2     situation that we don't have anything to do at 4:00 and nothing

3     to do until 10:00 tomorrow?  Is that what you are telling me?

4          MR. BOJANOWSKI:  Well, you had asked for Mr. Acedo to

5     be here tomorrow morning at 9:00.  And I don't know how long --

6          THE COURT:  I don't know how long with Mr. Acedo.

7          MR. BOJANOWSKI:  Didn't know so --

8          THE COURT:  I assumed we would be starting at 9:00 as

9     we always do.  But now because of this circumstance, perhaps we

10    could start at 9:45 and then be ready to go at 10:00.  Would

11    that be all right?

12         MR. BOJANOWSKI:  That's fine with me.  Myself and

13    Ms. Kendrick thought 10:00 would be a good time to start

14    because we didn't know what the Court's intention was tomorrow

15    morning.

16         THE COURT:  Well, I don't think that the matter that I

17    was going to address with Mr. Acedo is one that would be one

18    that Ms. Edwards' counsel would need to hear, so I don't think

19    that's a problem.

20         So I think what I would propose is that we convene

21    again at 9:45, address the issue that I wanted to address, and

22    then at 10:00 proceed with Ms. Edwards.

23         All right with plaintiffs?

24         MS. KENDRICK:  That's fine, sir.

25         THE COURT:  Anything else we need to take up now?

1          MR. BOJANOWSKI:  Not that I'm aware of, Your Honor.

2          MS. KENDRICK:  No, sir.  Not from plaintiffs.

3          THE COURT:  All right.  Thank you.  We are at recess.

4          (Court adjourns at 4:01 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                        <u>C E R T I F I C A T E</u>

2

3            I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6            I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11           DATED at Phoenix, Arizona, this 4th day of June, 2018.

12

13                              <u>s/Elva Cruz-Lauer</u>
                                Elva Cruz-Lauer, RMR, CRR
14

15

16

17

18

19

20

21

22

23

24

25