UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Victor Antonio Parsons, et al., | ) ) ) | |
| Plaintiffs, | ) ) | CV-12-00601-PHX-DKD |
| vs. | ) ) | Phoenix, Arizona June 1, 2018 |
| Charles Ryan, et al., | ) ) | 9:47 a.m. |
| Defendants. | ) ) ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING (AM SESSION)


Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003-2151
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
1                      A P P E A R A N C E S

2      For the Plaintiffs:

3                  PRISON LAW OFFICE
                   By:  Corene T. Kendrick, Esq.
4                       Donald Specter, Esq. -  Appearing Telephonic
                   1917 5th Street
5                  Berkeley, CA  94710

6

7                  ACLU - Washington DC
                   By:  David C. Fathi, Esq.
8                  915 15th Street NW, 7th Floor
                   Washington, DC  20005
9

10                 EIDENBACH LAW PLLC
                   By:  Kirstin T. Eidenbach, Esq.
11                 P.O. Box 91398
                   Tucson, AZ  85752
12

13                 ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
                   By:  Maya S. Abela, Esq.
14                 177 N. church Avenue, Suite 800
                   Tucson, AZ  85701
15
       For the Defendants:
16
                   STRUCK LOVE BOJANOWSKI & ACEDO PLC
17                 By: Rachel Love, Esq.
                       Daniel P. Struck, Esq.
18                     Timothy J. Bojanowski, Esq.
                       Richard M. Valenti, Esq.
19                 3100 W. Ray Road, Suite 300
                   Chandler, AZ  85226
20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1              <u>INDEX</u>

2      <u>SUMMARY OF COURT PROCEEDINGS</u>                          <u>PAGE</u>:

3      Judge addresses Mr. Acedo                              5

4

5

6

7                      <u>INDEX OF WITNESSES</u>

8      <u>WITNESS FOR THE</u>        <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>
       <u>PLAINTIFF</u>:

9
       Cecilia Edwards         26
10

11                     <u>INDEX OF EXHIBITS</u>

12     <u>EXHIBIT NO.</u>:        <u>DESCRIPTION</u>:              <u>RECEIVED</u>:

13     225        10/4/17 email from L. Johnson to J. Taylor  63

14

15

16

17

18

19

20

21

22

23

24

25

                   UNITED STATES DISTRICT COURT

1          P R O C E E D I N G

2          THE COURT:  Call the case.

3          THE CLERK:  Civil case number 12-601, Parsons, et al.

4    versus Ryan, et al., on for evidentiary hearing.

5          THE COURT:  Will counsel please announce.

6          MR. FATHI:  Good morning, Your Honor.  David Fathi

7    from the ACLU National Prison Project for the plaintiff.  Good

8    morning.

9          MS. KENDRICK:  Good morning, Your Honor.  Corene

10   Kendrick from the prison law office for the plaintiff class.

11         MS. EIDENBACH:  Good morning, Your Honor.  Kirstin

12   Eidenbach for the plaintiff class.  And behind me is my

13   co-counsel Maya Abela from the Arizona Center for Disability

14   Law.

15         THE COURT:  Thank you.  Good morning.

16         MS. LOVE:  Good morning, Your Honor.  Rachel Love, Tim

17   Bojanowski, who will be entering soon, Daniel Struck, Nick

18   Acedo, and Richard Valenti for defendants.

19         THE COURT:  Thank you.  Good morning, all.

20         And do we have anybody on the telephone?

21         All right.  Mr. Acedo, thank you for coming in this

22   morning.  Who is on the phone?

23         MR. SPECTER:  Don Specter, Your Honor, sorry.

24         THE COURT:  All right.  Thank you very much.  Anybody

25   else on the phone?

1          Okay.  All right.  If you would come forward to the

2     lectern, please.

3          The reason that I asked that you come in, and I only

4     had to ask that because typically you have made appearances --

5     not typically but often you have made appearances in court

6     here, and so you have also signed a number of filings with the

7     court.

8          And there was one that I didn't fully understand, and

9     I didn't have an opportunity to engage in an oral argument or

10    an oral discussion with counsel about it because I ruled before

11    the opportunity or the need for that.  I ruled because I didn't

12    feel that there was a need for anything further from the court.

13         But in particular, this is Docket Number 2829,

14    defendants' motion for expedited status conference in

15    consideration of their motion for district court judge to

16    vacate magistrate judge referral for lack of subject matter

17    jurisdiction.

18         There were a couple of things in this filing that

19    troubled me, and I wanted to give you a chance to respond to

20    the issues that had been in my mind.

21         And the first is on page 5 of that.  And if -- I have

22    left a copy of it on the lectern, so you may find it there.  I

23    turned it upside down so people wouldn't be able to -- or

24    wouldn't be inclined to collect it with their own papers,

25    thinking that it was something that they had brought up to the

UNITED STATES DISTRICT COURT

1    lectern.

2             But on page 5, at line 9, you say that Magistrate

3    Judge Duncan is mistaken.  And as I read this, it appears to me

4    that you are saying that I was mistaken in my belief that the

5    referral to me to conduct this settlement conference in this

6    case was a random selection under the wheel that the clerk

7    uses.

8             And first let me ask, is that what you mean when you

9    say that I am mistaken?  Have I captured that correctly?

10            MR. ACEDO:  Your Honor, before I answer that question,

11   I would like to make an objection.  Judge Humetewa has denied

12   our request for any argument on this motion, and she further

13   ordered that no reply will be permitted.  So I'm in the

14   uncomfortable position of being brought in here today to argue

15   and discuss the motion that's before her with you, when I am

16   staring at her orders that have instructed me not to reply and

17   not to conduct oral argument.

18            THE COURT:  Well, that's an odd thing to hear from

19   you, because you are now before the judge who is presiding in

20   the case, and the judge has asked you a question, and you're

21   saying that you don't feel that you can answer that question

22   because you have been told not to reply in response to the

23   government -- to the plaintiff's response.  And so I'm not

24   asking you to reply.  I am asking you to answer my question

25   here, and that is -- so I will overrule your objection, so you

1    won't have any disquiet about that.

2        But can you now proceed to answering my question?  Am

3    I right in what I interpret here as to be your statement as to

4    what I'm mistaken about?

5        MR. ACEDO:  Docket 2826, Your Honor, you said, "This

6    action was referred to the undersigned to conduct a settlement

7    conference."  And you site Docket Numbers 961 and 968.  961 was

8    the defendant's motion for a settlement conference in which we

9    requested a magistrate judge to preside over that.  Docket 968

10   is an unrelated docket -- docket, pleading -- I believe you

11   meant to say docket 967, which was the order granting the

12   motion for settlement conference and assigning it to you.

13       The comment on line 9, "Magistrate Judge Duncan is

14   mistaken," that was in reference to what appears to be, from

15   our perspective, your mistaken belief that you were selected to

16   be the settlement conference judge following a random draw.

17       THE COURT:  And where do you see that I communicate to

18   you that I had that understanding?

19       MR. ACEDO:  Well, you didn't site plaintiff's

20   docket -- plaintiff's response to our motion.  You only cited

21   our motion and the order.  And when you look just at our motion

22   that says we'd like a settlement conference and Judge Wake's

23   order that says okay, and it is going to be before Judge

24   Duncan, the missing pleading in between those is plaintiff's

25   response.  And it was they who specifically requested you to

1    preside over that, so --

2              THE COURT:  But let me make something clear.  Do I

3    ever in this case state, either on the record in court or in

4    writing, that I thought that I was randomly selected to be the

5    mediation judge in this case?

6              MR. ACEDO:  I'm not aware of any statement, Your

7    Honor.

8              THE COURT:  All right.  So you have quoted, enacted,

9    you've quoted a paragraph in which I stated in my text only

10   order, "This action was referred to the undersigned to conduct

11   a settlement conference.  After that referral and successful

12   negotiation of the stipulation, the parties exclusively

13   consented to the undersigned continuing to exercise

14   jurisdiction over this action pursuant to 28 United States

15   Code, Section 636(c) to promote the interest of judicial

16   economy and efficiency."

17             Your very next statement that you, yourself, wrote, is

18   "Magistrate Judge Duncan is mistaken."

19             How is it possible for you to say that I was mistaken,

20   when you have immediately quoted something that doesn't even

21   suggest that I was randomly suggested?

22             MR. ACEDO:  Well, the reference to Magistrate Judge

23   Duncan was mistaken, references the statement before the block

24   quote, where it says, "The procedural quandary appears to be

25   caused, at least in part, by Magistrate Judge Duncan's

1    misunderstanding in how he came to be involved in this case."

2          And then if you look at line 9, the second sentence,

3    "The referral to him to conduct the settlement conference was

4    not based on a random draw."  And that was the -- to the --

5          THE COURT:  All right.  So going back to line 3,

6    "Magistrate Judge Duncan's misunderstanding of how he came to

7    be involved in this case," where do you see a suggestion that I

8    misunderstood that?

9          MR. ACEDO:  The very first line of that block quote,

10   Your Honor.

11         THE COURT:  Which is "This action was referred to the

12   undersigned to conduct the settlement conference."  Is the word

13   "random" in there?

14         MR. ACEDO:  No, but it --

15         THE COURT:  So why do you think that that sentence

16   conveys an understanding that I thought that I was randomly

17   selected?

18         MR. ACEDO:  Well, there's a suggestion out there.

19   There's at least the suggestion that perhaps you did believe

20   that you were randomly drawn.  There was no comment in the

21   order that said that you were or were not randomly drawn.  And

22   this was a motion that we filed and directed towards Judge

23   Humetewa.

24         THE COURT:  So it's ambiguous.  You can't tell whether

25   or not the judge in this case thought that he was randomly

| | |
|---|---|
| 1 | suggested, but nevertheless you think it's appropriate to say |
| 2 | that I had a misunderstanding and that I was mistaken, even |
| 3 | though it's ambiguous and you can't tell.  Is that fair? |
| 4 | MR. ACEDO:  I don't think it's ambiguous, Your Honor. |
| 5 | THE COURT:  How do you suggest that it is not |
| 6 | ambiguous when I don't use the word "random"?  I never suggest |
| 7 | anywhere on the record in this case that that was my |
| 8 | understanding.  And there's a good reason that I don't suggest |
| 9 | that.  Because I know that it was not random.  What I know is |
| 10 | that you moved for a settlement conference.  Plaintiffs then |
| 11 | responded to that motion and suggested me. |
| 12 | I then was contacted by the presiding judge at the |
| 13 | time, Judge Wake, as is frequently the case here in this |
| 14 | courthouse when there's an imminent trial scheduled and there's |
| 15 | a request for a settlement conference. |
| 16 | The presiding judge then sweeps around to see if |
| 17 | anybody has the capacity to jump in and to do a settlement |
| 18 | conference.  That's what happened in this case.  Judge Wake |
| 19 | contacted me, asked if I had the capacity to preside in this |
| 20 | settlement conference.  I informed him that I could and it |
| 21 | would not interfere with his trial schedule. |
| 22 | He then referred the matter to me.  In fact, that's |
| 23 | something that you admit in your pleading at line 23 and 24. |
| 24 | You say that it was referred to Magistrate Judge Duncan, so you |
| 25 | understood that it was referred by Judge Wake to me. |

1           Let me just say this.  I'm not going to have further

2    argument with you about this.

3           But I know that in my practice, and I am about to

4    leave, and so that is something that means I'm stepping down

5    from being a judge, but I'm probably not going to be stepping

6    down from being a lawyer also, and I think that that's probably

7    a higher post.

8           And I joined this court 30 years ago.  I signed a book

9    in Tucson.  That book contained the signatures of everybody who

10   is admitted to the District Court for the District of Arizona

11   since this state became a district when it became a state in

12   1912.

13          So my signature in that book joins signatures of

14   luminaries, people who set a bar, a benchmark for me on what I

15   thought I should do, luminaries of -- of fame, not only in the

16   state, but in the country.  Morris Udall served in Congress.

17   Bruce Babbitt, who served in the cabinet, was our governor.

18   Jim McNulty, who served in Congress.  Many of the named

19   partners of noteworthy firms in this state.

20          And I imagine there was a similar book in Phoenix for

21   Chief Justice Rehnquist and Justice O'Connor to sign.  So I

22   thought that when I signed that book that it meant something.

23   I will tell you that in 30 years I never told a judge that that

24   judge was mistaken unless I was absolutely sure the judge was

25   mistaken and it wasn't ambiguous.

1          There's nothing in the record that suggests that I was

2     under the impression that I was randomly selected.  You

3     suggested that is what is the fact.  Actually, you state it is

4     the fact.  You don't suggest.  You say "Magistrate Judge Duncan

5     is mistaken."  You don't say, it's possible that he is

6     mistaken.  You don't say it is ambiguous.  You don't say that

7     it's unclear.

8          I will say to you, as I leave my position in 20 days

9     or so, that I hope that every lawyer who is a lawyer in this

10    bar doesn't do that, doesn't suggest that a judge is mistaken

11    unless you know for sure that the judge is mistaken.  And if

12    indeed you think that it's unclear or that it could be

13    interpreted that way, you say in those honest words, it could

14    be interpreted that way, instead of saying the judge is

15    mistaken.

16         I never did anything like that.  And I can't suggest

17    that my practice is what should define yours.  But I do have a

18    voice here.  I have a voice that is one that I should use from

19    time to time when I think that I'm trying to preserve what is

20    the best thing about this court, and that is that the

21    lawyers -- it's a smaller court, the bench and the bar know one

22    another, what goes around comes around.  So I feel an

23    obligation to weigh in and to make a comment about the

24    comments.

25         The two other things that I would like to address that

1    you state in the filing that we are talking about is first, on

2    page 2, at line 19, you make a reference to me ruling less than

3    20 hours later and that I summarily reject defendants, and then

4    you sic me, which is fine because you could argue that the

5    "defendant" should have an apostrophe.

6           And then later, on the next page, at page 3, you refer

7    to, at line 14.5, you refer to my, quote, after-hours ruling

8    close quote.  This sounds like schoolyard name calling to me.

9    I don't like it.  And so to the extent that I think it's

10   schoolyard name calling, and other people may disagree with me,

11   but I would suggest to you that I don't think that's

12   appropriate.

13          I don't think there's anything wrong with me filing

14   what I filed when I did.  I filed it when I was in Stockholm,

15   which is nine hours ahead of Phoenix, and so I don't know what

16   time it was in Phoenix.  But I do know that the motion that

17   we're talking about you filed at 4:53, so that's seven minutes

18   from being off hours.  I do know that Docket Number 2825, the

19   motion to vacate the referral, you filed at 5:19.  And I do

20   know that the motion to disqualify that you filed at Docket

21   2642 you filed at 10:05 p.m.

22          So you're not really in a position to make a claim

23   about someone making after-hours filings.  I think it's a

24   schoolyard call out, and I don't think it's appropriate.

25          Also, the summarily decision-making, I have been

```
1    interested in getting counsel in this case on both sides, in

2    particular the defendant's side, to focus on what's important

3    in this case.  And I have been called out for making -- for

4    mocking the motions that you've made.  Those are motions that

5    you've made that have been distractive -- distracting and have

6    diverted the attention from the focus of what should be the

7    appropriate focus of this case.

8             And so when you say "summarily ruled," I saw this

9    motion that tried to stop everything that we had set in place

10   for the final days to take advantage of the time that I have

11   yet on this case, to take advantage of the information I have

12   and the scheduling that I have done so that I can do what I --

13   the best I can do to tie up the loose ends that are capable of

14   being tied up and to present them to the successor judge.

15            And I don't know what the successor judge is going to

16   do with this, but I at least know what I can do with it, and

17   that is I have to present everything I can in a timely way.  So

18   when I see a motion from the defendants trying to stop

19   everything that we have put in place, a motion that is without

20   any basis in law, as far as I can tell, and I so ruled, I

21   wanted to let you know as soon as possible, because I didn't

22   want anybody, I didn't want the defendants, I didn't want the

23   plaintiffs taking their eye off the ball that we needed to

24   focus on in this case.

25            And so that's why I ruled as quickly as I did,
```

1    "summarily" you say, within 20 hours and after hours.  I

2    thought it was appropriate, and I thought you should hear from

3    the judge who reacted to what you wrote.

4           If you'd like to say anything in response, you may,

5    but I've had my say.

6           MR. ACEDO:  The reference to after-hours ruling, Your

7    Honor, was not intended to be a schoolyard shot.  We were

8    simply -- I was simply pointing out the timing of it.  The fact

9    that we filed this document, 2829, on Monday to try to explain

10   to Judge Humetewa how quickly things have progressed from

11   Friday at 5:00 p.m. to a ruling on Saturday at about noon, and

12   we were just laying out the timeline for that.  And there was

13   no intention to belittle or name call or slight the timing of

14   the ruling whatsoever.  Whatsoever.

15           THE COURT:  All right.  Thank you.  I accept that.

16           MR. ACEDO:  I wish I knew what today was about.  I

17   probably could have some better responses as far as the

18   structure of the beginning of the motion, what we first talked

19   about, referencing the mistaken belief.  I don't have anything

20   more to add to that other than it really was driven by what we

21   saw was failing -- or not citing plaintiff's response.  And so

22   we were just trying to connect the dots.

23           We didn't have argument on this.  We didn't see

24   plaintiffs' response.  No response was allowed to be ruled

25   before that.  So we were really just shooting in the dark and

1    trying to put pieces together and put this document together as

2    quickly as possible so we knew what would happen next.

3            We were in a procedural quandary.  From our

4    perspective, Your Honor, this motion was directed entirely,

5    both aspects, to Judge Humetewa.  And you ruled on one aspect,

6    and that sort of left us hanging, and we didn't know how to

7    proceed.  We didn't know if Judge Humetewa was aware of it, if

8    she agreed with it, or if she was somewhere else out of the

9    country and had no idea.

10            And we quickly put together something on that Monday

11    just to put -- effort to make everyone aware of what was going

12    on so that we could get the quickest resolution so we knew how

13    to proceed, because if these hearings were going to go forward,

14    that we would be prepared for them.  Nothing more, nothing

15    less.  I was not trying to misrepresent anything.  And to the

16    extent that you took that differently, I apologize for that.

17            THE COURT:  Thank you.  I accept that.

18            MR. ACEDO:  And I certainly hear what you have said

19    today about standards of practice.  And I have been practicing

20    for 15 years.  And I have practiced in front of the U.S.

21    Supreme Court, several circuit courts, several district courts,

22    several state law courts, and I hold myself out to be -- hold

23    myself out to the highest ethical standards.  And I in no way

24    intended to deviate from those high standards with anything I

25    have ever written and signed or contributed to in this case.

```
 1            THE COURT:  Thank you, sir.

 2            MR. ACEDO:  I have nothing else.

 3            THE COURT:  All right.

 4            MR. ACEDO:  May I be dismissed?

 5            THE COURT:  You may.  Thank you.

 6       Are we ready with the next witness?

 7            MR. FATHI:  Your Honor, before we call the witness, we

 8  would like to raise a brief scheduling.

 9            THE COURT:  Okay.

10            MR. FATHI:  Your Honor, yesterday we proposed, and I

11  believe the Court agreed, that by the time we leave here today,

12  we need to have in place a schedule for the two remaining days

13  of evidentiary hearings, which are now just 11 days away,

14  June 12th and June 14th.

15            And this is essential so that you, as the trier of

16  fact and the sole judge of the credibility of the witnesses,

17  have an opportunity to issue a decision before your departure

18  and, as the Court just said, to tie up loose ends.

19            And so this morning we emailed the defendants and we

20  ask them to propose a schedule.  We told them that we need 90

21  minutes to cross-examine Dr. Steward, who testified on direct

22  for a full day, but that other than that, the two remaining

23  days can be devoted entirely to the defendants' witnesses.

24            And this is the response we received from Mr. Struck.

25  "We will endeavor to establish a schedule and circulate it next
```

1    week.  Whether two days will be a sufficient amount of time

2    remains to be seen.  Witnesses will have to be added based upon

3    allegations that we heard for the first time yesterday, and

4    that may also be the case with the witness today."

5            Your Honor, at some point these hearings have to

6    conclude.  And more specifically, they have to conclude in time

7    for this Court to render a decision.  And so we would ask that

8    the Court make clear, although we believe it is already

9    abundantly clear, that June 12th and June 14th will be the

10   final days of evidentiary hearings.

11           Now, as far as we're concerned, the defendants can

12   call whatever witnesses they want, but we need to be given

13   reasonable time to prepare for cross-examination, and they need

14   to fit into the two remaining days of evidentiary hearings.

15   And so we ask the defendants provide, on the record, a final

16   witness list and a proposed schedule before we conclude today.

17           THE COURT:  All right.  Well, we certainly can and

18   should come up with a schedule for our remaining days.  The

19   legitimate point the defendants make about not being able to

20   respond to the anticipated or unknown testimony that will

21   happen today and also to know what their witnesses would be

22   necessarily for yesterday means that we do need to respect

23   that.  But that doesn't mean that we can't do it quickly.

24           So what I'm going to do is we're going to have a

25   telephonic status conference, unless lawyers are not available,

1   on the 4th of June at 5:00 p.m.  And at that time, I am going

2   to expect you, defendants, to have submitted your witness list

3   to the plaintiffs, everybody that you think you want for these

4   hearings.  And we are going to parcel out the time so that on

5   the remaining -- if I say two and a half days, because one of

6   the days will be associated with the status -- monthly status

7   report, but if I look at the two and a half days, I will be

8   able to, at 5:00 p.m. on the 4th of June, be able to map out

9   with you who the witnesses are going to be and so that

10  everybody will know who is going to be on the stand when and

11  how much time the respective sides will have.

12          And we will plan it out as precisely we need to do to

13  make sure that we are getting this done in the timetable that

14  we have.

15          Is there any reason the lawyers can't be available at

16  5:00 on Monday?

17          MR. FATHI:  We are available, Your Honor.

18          THE COURT:  How about defendants?

19          MS. LOVE:  We are available.

20          THE COURT:  Okay.  So initiate the call and we'll

21  address that.  If you would kindly submit your witness list at

22  least an hour before that hearing so that the plaintiffs have a

23  chance to look at it.

24          MR. STRUCK:  And, Your Honor, one of the issues with

25  respect to the list and the timing is with Dr. Wilcox.  And

1    Mr. Fathi didn't read the last sentence of my email, which was,

2    are you -- "Based upon the email that you sent me, are you not

3    calling Dr. Wilcox now?"

4              I asked Mr. Fathi this morning whether they were

5    calling him, and they are undecided.

6              MR. FATHI:  They will know by Monday.

7              MR. STRUCK:  But in terms of timing, we really need to

8    know whether they are going to call him or not, because we

9    might need additional --

10             THE COURT:  Can you give a heads-up sooner than the

11   timetable that --

12             MR. FATHI:  Your Honor, I understand the Court to be

13   confirming that the hearing will conclude on June 14th; is that

14   correct?

15             THE COURT:  That's right.

16             MR. FATHI:  In that case, we can inform the Court now

17   that we will not be calling Dr. Wilcox.

18             THE COURT:  Okay.  All right.  There you go.

19             MR. STRUCK:  Thank you, Your Honor.

20             THE COURT:  Anything else on the housekeeping side?

21             MS. KENDRICK:  Yes, Your Honor.  A while back,

22   defendant -- on May 18th, Mr. Bojanowski sent voluminous

23   discovery requests to the Court's expert, Mr. Millar, and

24   plaintiffs had requested a telephonic conference to discuss it

25   because we felt that it would take the expert's eye off the

UNITED STATES DISTRICT COURT

1    ball, so to speak, to be running around responding to this

2    request.

3            And Ms. Selzer had said in response that you had

4    planned to address it at some point during these two days.

5            THE COURT:  Yes.

6            MS. KENDRICK:  So I'm just reminding the Court,

7    whether you want to do it now, this afternoon, whatever.

8            THE COURT:  Well, I have read the letter, and what

9    I -- this is -- the letter I'm referring is to the May 18th

10   letter addressed to Mr. Millar.  And as I understand it with

11   respect to the document requests Numbers 1 through 10, 2

12   through 10, people now understand don't exist.  And so it looks

13   like what is at issue is the number 1, completed copies of each

14   survey, monkey survey, filled out by responding Corizon staff.

15           Is what I said so far consistent with what plaintiffs'

16   and defense counsel understand?

17           MS. KENDRICK:  We had not been informed that documents

18   2 through 10 did not exist.

19           MR. BOJANOWSKI:  Nor had we.

20           MS. KENDRICK:  But, Your Honor, I mean, we would note

21   that to the extent that they are demanding copies of surveys

22   filled out by current Corizon staff, we are extremely concerned

23   about the confidentiality of current and former employees who

24   are speaking with the Court's experts and the fact that

25   individuals will not be completely candid and forthcoming with

1    the Court's experts if they know that their answers and their

2    identities will be shared with counsel for defendants and

3    counsel for Corizon.

4            And this is not an abstract fear.  We heard

5    yesterday --

6            THE COURT:  Let me stop you there, because you don't

7    need to convince me of that.  I am not going to allow the

8    SurveyMonkey surveys.  I will let the defendants make a record

9    if they want, but I agree with what you've said so far.

10           Anything you want to say, Mr. Bojanowski?

11           MR. BOJANOWSKI:  Well, Your Honor, these surveys are

12   already done, completed, and submitted to the experts.  There

13   aren't any further surveys to be done.  So to the extent that

14   somebody -- or the concern is that they are not going to be

15   forthcoming in their responses, that's -- that's already done.

16           So I think that we are entitled to know what the basis

17   of the opinions are, and we should, just like any other expert,

18   we should be able to review that material to assess the results

19   of the expert opinions.

20           THE COURT:  It's not like every other expert.  Every

21   other expert, in our common experience, is usually a retained

22   expert by one side or the other.  This is the Court's expert,

23   so you're not going to pry into the Court's expert's inquiry in

24   his review, unless there's some further reason you think it

25   should be done.  I haven't seen any good basis for it.  So I

1    will deny that request.

2            With respect to the questions on the next page, to me,

3    again, I don't see any reason to have the expert diverted from

4    what the expert's work is engaged -- the work the expert is

5    engaged in.

6            So without prejudice to somebody raising points later

7    on that suggest that the report is -- by its own terms would

8    call for further inquiry, I'm not going to do that.  I'm going

9    to not divert Mr. Millar and his best judgment from performing

10   the duties that he's been assigned as he's outlined to us.

11           And so this additional discovery will not be something

12   that will trouble him under my watch.

13           MR. STRUCK:  Your Honor, I will say one more thing

14   about it.  I understand your position.  It's my understanding,

15   and maybe I'm just dead wrong about this, but I thought the

16   SurveyMonkey surveys were anonymous, so we would only know what

17   people are saying.  We wouldn't know who was saying them.  And

18   that would alleviate plaintiffs' fear that people --

19           THE COURT:  Not necessarily.  The context of the

20   response could suggest who the person was.  I just don't see

21   that there's any utility to this.  Mr. Millar is an expert with

22   a reputation, and everything that he's done in court has

23   impressed me that he knows what he's doing.  So I just don't

24   think we need to be prying open this tin -- you know, this tin

25   can and seeing what's in it, because I think the can looks

1   pretty good from the outside.

2          Anything else?

3          MR. BOJANOWSKI:  As far as the questions are

4   concerned, Your Honor, Mr. Millar invited us to submit those

5   questions at the last hearing, so I thought that that was

6   something that he wanted to have.

7          THE COURT:  Well, he was -- I think that was -- he

8   knows and appreciates, as you've seen here when he has talked

9   about it, that you all know more about the case at the start

10  than he did.  He is learning more in the process.  So he

11  invited you to suggest questions, but that gets an overlay of

12  his expertise.  And then the process that's involved is

13  designed to produce information that's useful for him.  It's

14  not designed to be a traditional discovery route to see what's

15  happening on the ground floor.

16         I don't think that that's going to be anything that

17  would be of use to anybody else in this case.  And as far as

18  I'm concerned also, I do think that if I allow too much of the

19  lawyer presence in the standard litigation mold to infiltrate

20  this process, it can have a chilling effect.  So I just --

21  that's where I'll end on it.

22         Are you ready for the next witness?

23         MS. KENDRICK:  Yes, sir.  Before we begin with

24  Ms. Edwards, as in yesterday, we request that the Court impose

25  time limits of two and a half hours for each side.

1          THE COURT:  Have you talked to defendants about that?

2     Are they all right with that?

3          MR. BOJANOWSKI:  I was told yesterday this witness,

4     you were only going to do about an hour, hour and a half.

5          MS. KENDRICK:  I'm doing outer limits, so no more than

6     two and a half hours for each side.  I do not expect to use the

7     full two and a half hours, sir, but I'm just trying to set some

8     limits here.

9          THE COURT:  Are you all right with that,

10    Mr. Bojanowski?

11         MR. BOJANOWSKI:  I am.

12         THE COURT:  All right.  Thank you.

13         MS. KENDRICK:  Okay.

14         THE COURT:  And the Rule is still invoked?

15         MS. KENDRICK:  Yes, we still invoke the Rule.

16         THE COURT:  Okay.

17         Good morning, ma'am.  If you would please walk forward

18    into the well of the courtroom.  Thank you.  And walk over

19    toward the court reporter, because the clerk of the court will

20    administer you the oath.

21         THE WITNESS:  Cecilia Edwards.

22         THE CLERK:  C-E-C-I-L-I-A?

23         THE WITNESS:  Yes, ma'am.

24          CECILIA EDWARDS, PLAINTIFF'S WITNESS, SWORN

25         THE CLERK:  Thank you.  Please have a seat.

1          THE COURT:  Perhaps we should have an appearance from

2    Ms. Edwards' counsel on the record.

3          MR. REICH:  Yes, Your Honor.  Adam Reich.

4                       DIRECT EXAMINATION

5    BY MS. KENDRICK:

6    Q.  Good morning, Ms. Edwards.  How are you?

7    A.  Good morning.  How are you?

8    Q.  Could you please state your name for the record?

9    A.  Cecilia Edwards.

10   Q.  Okay.  And how do you spell Cecilia?

11   A.  C-E-C-I-L-I-A.

12   Q.  Okay.  And you received a subpoena to testify today?

13   A.  Yes.

14   Q.  Have you ever testified in court before?

15   A.  Yes.

16   Q.  So just to kind of go over some of the basics, we have a

17   court reporter here who is taking down everything, so as a

18   result, we try not to speak over each other.  When I ask you a

19   question, you need to say yes or no and not nod your head or

20   say uh-huh.  Can you do that?

21   A.  Yes.

22   Q.  Also, we ask that you testify fully and honestly and don't

23   make any guesses, but I am allowed to ask you to make your best

24   estimate or your best approximation about something.

25   A.  Okay.

1    Q.   Okay.  And Judge Duncan here from time to time may want to

2    ask you some questions too.  So if he starts talking, you can

3    ask him.

4          I noticed when I came in today that you were meeting

5    downstairs with counsel for defendants.  For how long were you

6    meeting with them this morning?

7    A.   I'm not exactly sure.  Maybe 30 minutes.

8    Q.   Okay.  And what did you discuss?

9    A.   We discussed the exhibits that I received last night and

10   discussed the purpose of today and why they thought I was

11   subpoenaed and just general things about my job.

12   Q.   Okay.  And what exhibits did you receive last night, do you

13   remember?

14   A.   Just some emails of our facility health administrators,

15   something I had sent to one of the providers, and difficulties

16   with providers in Yuma, getting specialty providers.

17   Q.   Okay.  And you said they explained the purpose of today.

18   How did they describe the purpose of today?

19   A.   Just being an evidentiary hearing, that there's no jury and

20   that I just need to tell the truth and the time frames that it

21   would take for me to be up here, more or less, and different

22   things like that.

23   Q.   Okay.  And did you bring any documents today?

24   A.   I did not.

25   Q.   Did you have documents that you were planning to bring two

1   days ago?

2   A.  I did.

3   Q.  Why did you not bring them?

4   A.  I just did not think that they were needed.  They didn't

5   ask me for anything in the subpoena, so I thought maybe it was

6   best not to.

7   Q.  Can you describe these documents that you were planning to

8   bring?

9   A.  I mean, I don't know that I was actually planning to bring

10  them, but I have them.  Emails, documents of conversations

11  between me and my facility health administrator and UM.

12  Q.  About what?

13  A.  About different issues and concerns that I've had.

14  Q.  What were these issues and concerns?

15          MR. BOJANOWSKI:  Note an objection.  Relevance.

16  Foundation.

17          THE COURT:  Relevance, foundation -- the relevance

18  question is overruled.  The foundation question -- the

19  foundation objection doesn't seem to be well taken.  It is

20  simply a question about what issues and concerns that she had,

21  and we don't know where that's going to lead yet.  So

22  overruled.

23  BY MS. KENDRICK:

24  Q.  You described these documents as being communications that

25  include your issues and concerns, so I'm just asking, could you

1    describe what those issues and concerns were?

2    A.   They stem from --

3              MR. BOJANOWSKI:  Same objection, Your Honor.  I mean,

4    the hearing is to determine whether there were mistakes in

5    monitoring.  So if these documents and such have some relevance

6    to that issue, then I could see where the witness would be

7    permitted to testify as to that.  But that's my foundation

8    objection, is that counsel is just saying, well, you know, I

9    have a disagreement with FHA, and it has to do with maybe I

10   showed up late for work one day.

11             Well, what's that got to do with what the Court is

12   trying to attain in these hearings as to mistakes in

13   monitoring?

14             THE COURT:  The problem with your objection is we

15   don't know what the answer is yet about what her concerns are.

16   We don't know whether they're concerns about somebody raising

17   an issue about being late to work or whether there's something

18   that's relevant to the case.

19             So the objection is overruled.  You may proceed.

20   BY MS. KENDRICK:

21   Q.   Do you want me to ask you for the third time?

22   A.   Please.

23   Q.   So you said that these documents that 48 hours ago you were

24   planning to bring, and that you since had a change of heart

25   about bringing them, included concerns and issues you had that

1    you had communicated to the FHA and others.

2            And so I'm just asking you if you could describe those

3    issues and concerns.

4    A.   I had called the corporate compliance line and --

5    concerning some retaliation that I believed was happening.  I

6    don't know if it was or not, but that's what I felt at the

7    time.  And I --

8            MR. BOJANOWSKI:  Well, same objection.  Move to

9    strike.

10           THE COURT:  Please don't interrupt the witness.

11           MR. BOJANOWSKI:  I'm sorry, Your Honor.

12           THE COURT:  I overruled the objection.  The witness is

13   answering the question.  I don't want to have anything said

14   while she's giving the answer.  You can move to strike after

15   the fact, but we have to have the answer in order to strike

16   anything.  So don't interrupt the witness.

17           MR. BOJANOWSKI:  I'm sorry, Your Honor.  I thought it

18   was an appropriate time to make the objection because now we

19   knew where the answer was going.

20           THE COURT:  No.  Overruled.

21   BY MS. KENDRICK:

22   Q.   Please continue.

23   A.   So it was concerning a call that I made to the corporate

24   compliance line and some other issues that arose that I was

25   told about that there might be a possible investigation.  I've

1    been told that there isn't by DOC, but at the time I was very

2    very scared and very defensive and nervous about coming and

3    testifying because of that issue on that day.

4    Q.  So I just want to make sure -- I need to break down what

5    you just said.  So you said that you called the corporate

6    compliance line.  When was that?

7    A.  I believe it was about two weeks ago, maybe three.

8    Q.  And you said that you had been told you were subject of a

9    possible investigation.  Do you remember when you were told

10   that and who told you that?

11        MR. BOJANOWSKI:  Same objection, Your Honor.  I mean,

12   again, we're talking about a perceived problem that this

13   particular witness had that apparently has resolved itself, and

14   now we're going to get into these issues which are side issues

15   as to the scope of what this hearing is supposed to be about.

16        THE COURT:  I don't view them as side issues based

17   upon the questions asked.  Overruled.

18        MR. BOJANOWSKI:  Thank you, Your Honor.

19        MS. KENDRICK:  Your Honor, we would ask you to

20   instruct counsel for defendants not only to stop interrupting

21   the witness, but if she is pausing to gather her thoughts or

22   breathe, that he not interrupt her either.

23        THE COURT:  Well, here's the thing.  We will make

24   another rule, and that is that you will ask a question.  That

25   is the time, after the question is asked, that you may make an

```
 1    objection.  If the witness is answering, then I don't want to
 2    hear any interruption from anybody so that the witness can have
 3    an opportunity to speak.  Thank you.
 4   BY MS. KENDRICK:
 5    Q.  So again, when did you hear that you were potentially the
 6    subject of a possible investigation?  And do you remember who
 7    told you that?
 8            MR. BOJANOWSKI:  Same objection.
 9            THE COURT:  Overruled.
10            THE WITNESS:  Yes.  I found out -- it's been a rough
11   week -- I think it was Wednesday or Tuesday, and it was from
12   one of the assistant director of nursing, Nurse Mesa, RN, at
13   Cibola.
14   BY MS. KENDRICK:
15    Q.  And so this would have been last Tuesday?
16    A.  This Tuesday.
17    Q.  Oh, the 29th?
18    A.  Yes.  Yes.
19    Q.  Okay.  So three days ago?
20    A.  Yes.
21    Q.  Okay.
22    A.  Or two.  The 29th or the 30th.  I apologize.  I don't have
23   my paperwork with me.
24    Q.  That's fine.  So you decided to not bring the documents and
25   the emails that you had previously planned to bring because of
```

1    this conversation with corporate compliance and the news that

2    you were the subject of a possible investigation?

3              MR. BOJANOWSKI:  Same objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes.

6    BY MS. KENDRICK:

7    Q.  That's the reason why?

8    A.  Yes.

9    Q.  So I want to go back to my original question, which was

10   these documents that until about two or three days ago you had

11   plans to bring and share with the Court, what sort of issues

12   were in them?  If you can just kind of describe globally what

13   subjects they covered.

14             MR. BOJANOWSKI:  Same objection.

15             THE COURT:  Overruled.

16             I don't know what I can do to help you feel more

17   comfortable with this process.  I think that it's probably

18   something you already know, and that is that the Department of

19   Corrections and the plaintiffs settled a lawsuit about prisoner

20   healthcare.

21             And in that settlement, they said that we hope that

22   we'll be able to work things out and provide this healthcare

23   that's promised in the settlement, but if we aren't able to

24   work those things out, then they wanted me to be the one who

25   would figure out how to solve the problem, and that is getting

1    healthcare provided to the -- to the plaintiffs' class.

2           I am a federal judge.  I am not somebody who works in

3    the healthcare environment, either in prison or not, and so in

4    order for me to make wise and informed decisions, I have to

5    hear from people who know things.

6           And so in your chair have sat people who do know

7    things, from the director on down.  And I have learned a lot

8    from people who have talked to me about what happens, because I

9    can't delegate my decision-making to somebody else.  I have to

10   make the decision.  And in order to make that decision wisely,

11   I have to learn as much as I possibly can.

12          So people sometimes come here voluntarily.  The

13   parties present them, each side, and say, Judge, you should

14   listen to this person.  Sometimes people come involuntarily.

15   And what I mean by that is they've been subpoenaed.  It's a

16   command from the court to that person to come and tell the

17   truth.

18          It's sometimes uncomfortable to do that, but it really

19   is important that you do and that you -- and what -- I'm not

20   suggesting that you haven't been doing that, but I'm suggesting

21   that the emotions that are associated with this are troubling

22   to you in a way that I don't understand, meaning I don't know

23   what all the background is, but I do see that you are

24   emotionally troubled about this.

25          I don't want that to be the case.  Like anybody who is

1    in close proximity to somebody who is suffering, you don't want

2    them to suffer, and so -- but on the other hand, I can't solve

3    the problem because you are in a little bit of a difficult

4    position.

5            You know things I need to know, and that means that

6    you have to tell me about them when asked questions either by

7    the lawyers or from me.  If it causes difficulty, I can say

8    that I'm sorry, I can say that we can pause and give you a

9    chance to collect yourself.

10           But I have to explain that it really is important to

11   the entire process that I have an information flow from the

12   people who know the most, like you, to me, that is unimpeded by

13   fear and concern.

14           I can't solve the problem of what could be the basis

15   for all of those fears and concern.  I am not going to be in

16   the workplace every day saying, "That's not fair.  She's doing

17   what she's supposed to do.  You can't say bad things about

18   her."

19           But I will say this, and I'm hopeful that it is

20   helpful to anybody who's in this position.  It is critically

21   important that people like you share this information with the

22   Court, and that if bad things do happen to them because of

23   that, I hope that the words that I just said are helpful in

24   that process.  That's probably as much help as I can offer.

25           If I hear about particular instances of retaliation, I

1   have let the lawyers know, and I have been very engaged in

2   those processes to try to learn more about them, to try to

3   quell, to end any kind of chilling effect of retaliation.  But

4   understand this.  I can't solve every problem in the world, and

5   I'm not omniscient, and I'm not omnipresent.  So I do what I

6   can by saying the words I've just said.

7          And I will be engaged as long as I am in this position

8   to try to protect people who have come forward to say what they

9   are asked to say when questions are posed to them.

10         Thank you.  You may continue.

11         MS. KENDRICK:  Thank you, sir.

12  BY MS. KENDRICK:

13  Q.  Ms. Edwards, did anybody ask you to not bring the documents

14  you had planned to bring?

15  A.  No.

16  Q.  Did anybody tell you to not bring the documents that you

17  planned to bring?

18  A.  No.

19  Q.  So this was of your own volition that you decided to not

20  bring the documents?

21  A.  Yes.

22  Q.  And could you again -- I think we still haven't heard, what

23  generally are these documents about?

24         MR. BOJANOWSKI:  Same objection.

25         THE COURT:  Overruled.

1          THE WITNESS:  Basically concerning my -- they were

2     about my concerns with patient care and the issues that were

3     happening where some of the patients were coming up and were

4     getting turned away, and they were not receiving treatment or

5     allowed to put their HNR in.

6          There was issues with a scheduler that I had that had

7     continually made errors for quite a while, and people were

8     either getting sent to the wrong place or weren't getting the

9     treatment that they needed because it was scheduled wrong.

10          And there was a lot of communication back and forth

11     from me to my uppers to detail how concerned I was about the

12     patient care and the fact that they weren't receiving what they

13     needed.

14          It's tough enough in this job to get things to happen

15     not just because it's a prison, but just because it's

16     healthcare, but it's even tougher when someone is, you know,

17     making mistakes.  So I felt like I needed to say something

18     about those issues.  And that's what they are about.

19     BY MS. KENDRICK:

20     Q.  Okay.  And I just want to take a pause here, because I

21     realized that we kind of jumped right into this and we didn't

22     go through the formalities.

23          So could you please state your position and who you

24     work for and where you work.

25     A.  Yes.  My position is a clinical coordinator and a certified

1    nursing assistant.  And I am currently in medical assistant

2    school as well.  And my job is with the Corizon -- with Corizon

3    healthcare, and they are the contractor for Arizona Department

4    of Corrections to provide the healthcare.

5    Q.  And which prison facility do you work at?

6    A.  Yuma complex.

7    Q.  And what is your title, ma'am?

8    A.  Clinical coordinator.

9    Q.  And --

10   A.  NCA.

11   Q.  Sorry.  I apologize.

12          And for how long have you been in the clinical

13   coordinator position?

14   A.  Eight months.

15   Q.  Eight months.  So you started in September?

16   A.  Yes.

17   Q.  And did you work in any other position at Yuma before the

18   clinical coordinator position?

19   A.  Yes.  I was the scheduler.

20   Q.  And how long were you the scheduler?

21   A.  Six months.

22   Q.  And did you work in any other position at Yuma before

23   scheduler?

24   A.  Yes.  I was the med tech, medication tech, in pharmacy and

25   inventory control.

1    Q.  And where is that located?  Is that on the main medical, or

2    where were you working as the pharmacy tech?

3    A.  At Dakota, the maximum security unit.

4    Q.  And how long were you the medication tech?

5    A.  I was PRN at that point.  It was about six months.

6    Q.  So all told, you've worked eight months as clinical

7    coordinator, approximately six months as scheduler, and

8    approximately six months in pharmacy, so total that's about 20

9    months, less than two years?

10   A.  Yes.  August will be two years.

11   Q.  Okay.  And --

12           THE COURT:  Can I interrupt for just a second?

13           MS. KENDRICK:  Of course.

14           THE COURT:  I want to go back -- these foundational

15   questions are very important, but I have a reason for wanting

16   to jump back to the subject we were just talking about, and

17   that is the documents.

18           Those documents now are at your home?

19           THE WITNESS:  Yes.

20           THE COURT:  And about how many of them are there?

21           THE WITNESS:  A lot.  I don't know how many.

22           THE COURT:  Can you describe for the record, if you

23   will hold your fingers.

24           So it's about 5 or 6 inches stack of paper?  All

25   right.

1          And these documents concern generally the issue

2     associated with getting outside referrals for inmates; is that

3     right?

4               THE WITNESS:  Primarily.

5               THE COURT:  And the other subject that's contained

6     therein --

7               THE WITNESS:  The issue with the patient care with the

8     nurse line and.

9               THE COURT:  -- HNRs.

10              THE WITNESS:  HNRs.

11              THE COURT:  I'm sorry to speak over you.  You did

12     mention HNRs before.  Okay.

13          Those are issues that are very important in the case,

14     and I think that these documents that you have collected would

15     be very useful for me to understand and to have a chance to

16     review.

17          I can see from your eyes you're not happy about that.

18     I don't know why that is exactly.  But the truth of it is these

19     documents exist.  You've talked about them.  You know about

20     them.  I need to see them.  So I would like to make an

21     arrangement for that to happen.

22          And I would like to also make it possible for you not

23     to have to spend more time on that stand than is necessary.  I

24     am concerned that if we go forward this morning without those

25     documents, those documents will engender a lot of questions,

```
 1    which will mean that you will have more time on the witness

 2    stand, and I don't think that's a good idea.

 3              So what I'm thinking about doing is asking you to

 4    bring those documents to the court.  You can do it through your

 5    lawyer.  Your lawyer can review them.  If any documents are

 6    removed from that pile, I want to know about it, and I want the

 7    lawyer to let me know what the basis is for withholding those

 8    documents.

 9              If they are letters from you to a lawyer, for example,

10    then they may want to make an objection.  I would have to

11    consider that.  But if they are documents that are associated

12    with just back and forth between healthcare providers and

13    people in the system, I need to see those documents.

14              And so I don't know where you live, how far away you

15    live, whether it's the kind of thing that I could impose upon

16    you to get them and bring them back and get back to this this

17    afternoon and take advantage of that time or whether that's not

18    possible.  So I have to ask you that.  What are the logistics?

19              THE WITNESS:  I live in Yuma, so it would be a

20    three-hour drive.

21              THE COURT:  Okay.  I feared that that was the case.

22    Let me talk to the lawyers now, here with you, but let me --

23    because they have now heard what my thinking is.  And I want

24    to, again, have the advantage of what their insight is

25    possibly.
```

1          Ms. Kendrick, any response to what I have said?

2          MS. KENDRICK:  Well, Your Honor, we actually do have,

3     you know, some documents and exhibits already that we are -- we

4     obtained during the discovery process that we were planning to

5     question Ms. Edwards about and frankly was the big part of the

6     basis for the subpoena that we issued to her.  So, you know, we

7     feel that we do have material that we could question her about

8     today.

9          Like you, we obviously would like to see these

10    documents that she has, but I was hoping --

11         THE COURT:  There's no way for Ms. Edwards to know

12    whether or not there's an overlap between these because they

13    came through the discovery process.

14         MS. KENDRICK:  Well, she said that last night counsel

15    for defendants provided her some of the exhibits, so I imagine

16    that they were probably the exhibits that have her name on it

17    that were --

18         THE COURT:  So what you're suggesting is it makes

19    sense to go forward with what we have.  At the end of that

20    process, you might be in the position to say, oh, this covers

21    everything, so we don't need have to go through it again, or

22    you might say, oh, no, there are some other things as well.  So

23    I understand, and that makes sense to me.

24         Mr. Bojanowski?

25         MR. BOJANOWSKI:  I want to make sure I understand what

1    Ms. Kendrick is saying.  So what we are saying here is that she

2    wants to proceed with the questioning, use the documents that

3    we've got, and then if that covers all the issues, then we're

4    not going to produce the documents?

5              THE COURT:  No.  What we're hoping is -- well, I don't

6    know.  "Hoping," that's probably the wrong word to say.  I

7    don't know whether or not there's a complete overlap or not

8    between the documents that are presently contemplated for use

9    today and the ones that you have at home.  I want to have those

10   documents at home in any event.  I'd like to have those.  And

11   so we will get those.

12             But if it's true that we've covered everything when we

13   finish here today, then we know we can save her time, and we

14   don't have to have her back.  But I fear that may not be the

15   case.

16             But in any event, I have heard from the lawyers now.

17   What we will do is we will continue with the questioning.  We

18   can go back to the foundation questions.  When I say foundation

19   questions, she went back to sort of the start to sort of lay

20   the groundwork about what your position is and how you would be

21   in a position to know anything about the issues that are

22   relevant to the case.

23             For somebody who just came into the case at this

24   moment, they wouldn't know how you would be in a position to

25   know.  So Ms. Kendrick now is going to ask questions to set the

UNITED STATES DISTRICT COURT

```
1    foundation as to why you would know anything that would be
2    relevant to this case.
3              MR. BOJANOWSKI:  Your Honor, just so I know, I may be
4    a little slow on the uptake here, but -- so Ms. Kendrick is
5    going to proceed with the documents that we gave her, which is
6    about a quarter of an inch or maybe an eighth of an inch.  And
7    then she's going to stop and we're going to get these other
8    documents, and then we're going to have to recall this witness?
9              THE COURT:  We may.  I don't know whether we'll have
10   to recall this witness or not.  But we are going to get those
11   documents and make a decision.  Both the lawyers will make a
12   decision and I will make a decision.
13             MR. BOJANOWSKI:  My point --
14             THE COURT:  I may have more questions that I want to
15   ask.
16             MR. BOJANOWSKI:  Certainly.  And my point is, is that
17   I don't -- I don't want to proceed until I see those documents.
18   I mean, I'm sorry, but, I'll be honest with you.  I mean, if
19   we're proceeding, we are going to go through a portion of this
20   today, and then --
21             THE COURT:  Well, Ms. Kendrick, she thinks she has
22   about an hour based upon what you have.  Is that right?
23             MS. KENDRICK:  Well, if I could speak and ask
24   questions and get answers, I could take an hour.
25             THE COURT:  Now, that's schoolyard.
```

1        MS. KENDRICK:  I apologize, sir.

2        Yeah, I mean, he's correct.  It's probably an eighth

3    of an inch or a sixteenth of an inch of documents here.  But by

4    the same token, I don't have the documents either, so we're

5    equally operating in the dark.

6        So I think that I should be allowed to go forward with

7    what I have, which was produced to us by Corizon and ADC, which

8    they were given as potential exhibits two days ago.  So they

9    know the universe of what I know and what is going to be asked

10   about today.

11       MR. BOJANOWSKI:  So -- sorry, Your Honor.

12       THE COURT:  Go ahead.

13       MR. BOJANOWSKI:  So I guess that if Ms. Kendrick

14   proceeds with what she's got, she can stop and then we'll break

15   until we get the documents and pick up on another day?

16       THE COURT:  When she stops, you will have the

17   opportunity, if you want, to cross-examine based upon what has

18   already gone before.  We will then get the documents, and

19   everybody will make a collective decision.  Plaintiffs and

20   defendants will tell me whether they would like to have more

21   time with Ms. Edwards, and I will make a decision about whether

22   or not I'd like to have more time with Ms. Edwards.

23       MR. BOJANOWSKI:  I see.

24       THE COURT:  You may continue.

25       MS. KENDRICK:  Thank you.

1          THE COURT:  Let me just, before you start, I know that

2     before I came into the courtroom, the court reporter was here.

3     I just need to be respectful of providing an appropriate break

4     time.  When would you like that?

5          (Discussion held off the record between the Court and

6     the Court Reporter.)

7     BY MS. KENDRICK:

8     Q.  All right.  We had just talked about in August it will be

9     two years that you worked at Yuma prison.  What sort of work

10    experience did you have before going to the Yuma prison?

11    A.  I was a resident liaison and scheduler for the cardiology

12    department at Children's Hospital Colorado.  And I was there

13    for two years as well.

14    Q.  And where in Colorado is that?

15    A.  Denver.

16    Q.  Denver?

17    A.  Aurora, the main campus.

18    Q.  Okay.  And you said that you are a CNA, certified nursing

19    assistant.  What is your educational background?

20    A.  I have several hours, probably about 80 to 100, in early

21    childhood development.  I have about 30 credits left for my

22    bachelor's in business management.  And my CPR certification in

23    basic life support for healthcare providers.  Those are the

24    type of medical, educational certificates that I have in

25    education.

1    Q.  Okay.  And did you ever work in any sort of correctional

2    setting prior to going to Yuma?

3    A.  No.

4    Q.  Okay.  And who is your supervisor as your current position

5    as the clinical coordinator?

6    A.  Lori Johnson.

7    Q.  And what is Ms. Johnson's title?

8    A.  Facility health administrator.

9    Q.  And that position is often referred to as the FHA, F-H-A?

10   A.  Yes.

11   Q.  And do you supervise other people in your position?

12   A.  No.

13   Q.  And do you have a written job description?

14   A.  Yes.

15   Q.  Have you ever seen it?

16   A.  Yes.

17   Q.  Can you describe generally what you do on any given day?

18   A.  I obtain the consult requests that are submitted by the

19   providers, and I work those through the day to get all of the

20   supporting documents, labs, x-rays, and prior visits for the

21   consult requests.

22        And then I submit it into the different systems, ORC,

23   CARES, and eOMIS.  I change statuses, and I submit them to the

24   Utilization Management Team for review.  And that's the first

25   part.

1          And then when they either get approved or denied, then

2    I will end up working it on the back end as well and gather the

3    follow-ups that are needed, find out what was requested, and

4    make sure that those things are completed and, if not, document

5    it why.

6    Q.  Okay.  And could you describe the training that you

7    received for this clinical coordinator position?

8    A.  I was the scheduler, so I had some part of the background

9    for six months, but I received about two days of training from

10   the clinical coordinator that was there prior, because our job

11   kind of meshed as it was because we worked real well together.

12   So I was aware of a lot of the functions already, but that was

13   about the basic of it.

14   Q.  Did you receive any sort of written training manual or

15   guide or anything like that as part of those two days of

16   training, or was it more sitting next to her and kind of

17   watching her go through her day?

18   A.  More sitting next to her and, um, having her explain why

19   things were done a certain way.  I did receive -- well, I found

20   a binder with documentation of how you place a consult.  How

21   you complete consult, and those steps in that, and that's

22   what I used.

23   Q.  And do you receive any ongoing training?

24   A.  No.

25   Q.  And do you interact with the clinical coordinators at the

1    other nine institutions?

2    A.  Yes.

3    Q.  Could you describe how that interaction works?

4    A.  Yes.  I communicate with them concerning patients that are

5    getting transport -- inmates that are getting transported to

6    their facilities and just ensure that they have the consult

7    follow-up that is needed.  I can call them sometimes and email

8    for questions that I have on whether certain care was received

9    or not.

10          And I also do -- I'm sorry.  I forgot about optometry.

11   I also work optometry.  I do the line at CCNA on Sundays, every

12   other Sunday, and so I communicate with them largely on that

13   basis, because if there's a transport -- transfer, then I want

14   to make sure that the inmate gets followed up on and that they

15   see the optometrist or the ophthalmologist as an outside

16   consult.  Those are considered consults as well.

17   Q.  Okay.  And so when you spoke about transfers, are you

18   talking about a situation where, for example, a person may

19   have -- the provider put in a request for him to see a

20   cardiologist, and now he's being transferred to Eyman and it

21   hasn't occurred, so you call the coordinator at Eyman and say,

22   look, Mr. Jones still needs to see this cardiologist, so

23   there's a handoff?

24   A.  Yes.

25   Q.  And do you interact with the other clinical coordinators

1   if, for example, you can't locate a specialist who is needed?

2   A.  Yes.

3   Q.  How frequently does that happen?

4   A.  I would say probably once a month, maybe once every two

5   months.  It's not as common.

6   Q.  So is that a situation where, just using the cardiologist

7   example, you can't necessarily find a cardiologist, so you

8   might call another coordinator and say, hey, who do you use?

9   A.  Yes.

10  Q.  Is there any sort of master list that you get from Corizon

11  regional headquarters that says here are all the cardiologists

12  and all the urologists that will accept inmates, or are you

13  kind of each institution on your own in terms of locating

14  specialists?

15  A.  We have a list that we received.

16  Q.  And if you're having a hard time finding a specialist that

17  a provider has requested and that utilization management has

18  approved, who are you supposed to notify at Corizon?

19  A.  My understanding is that I notify my facility health

20  administrator and then someone at UM.

21  Q.  Okay.  And do the clinical coordinators kind of

22  collectively, do you guys have any sort of monthly or every

23  other month conference call where you can all talk or any sort

24  of meeting like that?

25  A.  We do.  It's every week.

1    Q.  Every week?

2    A.  Yes.

3    Q.  And do you know if minutes are kept from these meetings?

4    A.  I do not.

5    Q.  Who coordinates those calls?

6    A.  Leara Patra.

7    Q.  Could you spell that person's name?

8    A.  Yes.  L-E-A-R-A, and her last name is Patra, P as in Paul,

9    A-T-R-A.

10   Q.  And do you know, is she in regional headquarters or --

11   A.  I believe so, but I'm not sure right now.

12   Q.  Okay.  After you received your subpoena and before you came

13   here today, did you talk to anybody at Corizon about your

14   testimony today?

15           MR. BOJANOWSKI:  Note an objection, Your Honor, that

16   she may have spoken to counsel, and so that certainly would be

17   covered by a privilege.

18           MS. KENDRICK:  I wasn't asking about counsel.

19   BY MS. KENDRICK:

20   Q.  Did anybody at Corizon?

21           THE COURT:  Other than lawyers.

22           THE WITNESS:  I'm sorry.  Can you repeat the question?

23   BY MS. KENDRICK:

24   Q.  Did you speak with anybody at Corizon about your testimony

25   today, anybody who works for Corizon?

1   A.  Yes.

2   Q.  Who was that?

3   A.  I spoke with Jennifer Finger.

4        MR. BOJANOWSKI:  Your Honor, she is counsel for

5   Corizon.

6        THE COURT:  That's fine.  The fact that she had a

7   communication with counsel is not privileged.  What she said

8   might be privileged, but we can know about the date, time, and

9   persons involved in the telephone call or the communication.

10  Overruled.

11  BY MS. KENDRICK:

12  Q.  So you were saying Ms. Finger.  Anybody else?

13  A.  Todd Kartchner.  And that was yesterday, I believe.

14  Q.  Okay.  How about anybody who works at Yuma?

15  A.  Yes.

16  Q.  Who?

17  A.  Richard Watts.

18  Q.  And who is Mr. Watts?

19  A.  He is -- he was our interim FHA while Ms. Johnson is out.

20  And he is our new regional director of nursing.

21  Q.  Anybody else?

22  A.  I spoke to Mr. Kartchner, and that was yesterday as well.

23  And I believe that that was it.

24  Q.  Okay.  Anybody else that works at the prison?

25  A.  Yes.

1   Q.  Besides Mr. Watts?

2   A.  Yes.

3   Q.  Who else?

4   A.  I made a call to the compliance line for Arizona Department

5   of Corrections, Aaron Reece.

6   Q.  Anyone else that you can remember?

7   A.  I believe that's it.

8   Q.  You said you spoke with Ms. Finger.  When did you speak

9   with her?

10  A.  To the best of my knowledge, it was a week after the

11  subpoena.

12  Q.  Is that in person or by phone?

13  A.  By phone.

14  Q.  Did she contact you?

15  A.  Yes.

16  Q.  How long did you speak?

17  A.  30 or 45 minutes.

18  Q.  Was that the only time you spoke with her?

19  A.  No.

20  Q.  When was the next time you spoke with her?

21  A.  Probably the next week when I spoke with her before

22  speaking with Mr. Kartchner, I believe.

23  Q.  Okay.  You said you spoke with Mr. Kartchner yesterday.  So

24  did you speak with him more than one time too?

25  A.  No.

1    Q.  And you spoke with me and Ms. Eidenbach, who's sitting at

2    the table there, when we were at Yuma in April on a tour,

3    correct?

4    A.  Yes.

5    Q.  And the Corizon attorneys and the ADC attorneys were there,

6    too?

7    A.  Yes.

8    Q.  And you called my office on Tuesday and asked to speak with

9    me, correct?

10   A.  Yes.

11   Q.  And my receptionist gave you my cell phone number; is that

12   correct?

13   A.  Yes.

14   Q.  And you called and left me a voice mail on Tuesday,

15   correct?

16   A.  Yes.

17   Q.  Why did you call me?

18   A.  That was the day that I was supposed to speak with

19   Mr. Kartchner and Ms. Finger, and that was the day that I found

20   out that I -- well, I was told that I was potentially being

21   under investigation by DOC, and I did not feel comfortable

22   speaking to them.

23          And I did talk to Jennifer and told her that I did not

24   want to talk to them without my own lawyer because of the

25   issues that had happened that day.

1    Q.  My understanding is that yesterday you were provided an

2    independent attorney to speak to.

3    A.  Yes.

4    Q.  Okay.  Do you feel comfortable speaking with him?

5    A.  I do.

6    Q.  Okay.

7         I believe you said it was a Nurse Mesa who told you

8    that you were under investigation?

9    A.  Yes.

10   Q.  Did she tell you for what you were under investigation?

11        MR. BOJANOWSKI:  Note an objection.  Relevance.

12        THE COURT:  Overruled.

13        THE WITNESS:  She said that everyone -- and these are

14   just her words -- had told her that I talk to the inmates,

15   quote-unquote, and that I was potentially compromised and that

16   the ADW, the assistant deputy warden on the yard, Mr. Aguilar,

17   had came to her and asked her if she thought that I was

18   compromised because of a paper, a letter that she wrote.

19        And she said she did not write it but that was the --

20   the thing that she told me, that he came to her and asked her

21   if she thought I was compromised, and she said no.

22   BY MS. KENDRICK:

23   Q.  Were you scared when she told you that?

24        MR. BOJANOWSKI:  Same objection.

25        THE COURT:  Overruled.

CECILIA EDWARDS - DIRECT EXAMINATION                    56

```
 1              THE WITNESS:  Yes.

 2    BY MS. KENDRICK:

 3     Q.  Were you afraid that you might potentially lose your job?

 4     A.  Yes.

 5     Q.  Did you feel that this allegation made against you was

 6    because you had received the subpoena to come testify?

 7              MR. BOJANOWSKI:  Same objection.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  Yes.

10    BY MS. KENDRICK:

11     Q.  Did you interpret it as a warning?

12              MR. BOJANOWSKI:  Same objection.

13              THE COURT:  Overruled.

14              THE WITNESS:  Yes.

15    BY MS. KENDRICK:

16     Q.  Are you concerned that if you testify fully today, that you

17    might face adverse actions?

18              MR. BOJANOWSKI:  Same objection.

19              THE COURT:  Overruled.

20              THE WITNESS:  Yes.

21    BY MS. KENDRICK:

22     Q.  Why?  Have you seen this happen to other people?

23              MR. BOJANOWSKI:  Same objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  Yes.
```

UNITED STATES DISTRICT COURT

1   BY MS. KENDRICK:

2   Q.  So -- do you need a minute?  There's some water in front of

3   you.

4           You understand that you do need to testify fully and

5   honestly today?

6   A.  Yes.

7   Q.  Okay.  All right, ma'am.  There's a stack of folders in

8   front of you that have labels on them, and they are in

9   numerical order.  If you could turn to one that's marked

10  Exhibit 225.

11          Do you have that in front of you?

12  A.  Yes.

13  Q.  And this is an email dated October 4th, 2017, from Lori

14  Johnson to James Taylor.  I believe you testified earlier that

15  Ms. Johnson is the FHA at Yuma?

16  A.  Yes.

17  Q.  Do you know who James Taylor is?

18  A.  Yes.

19  Q.  Who is he?

20  A.  He was our regional facility health administrator.  I

21  believe he's retired now.

22  Q.  Okay.  And in Ms. Johnson's email, it begins and it says

23  "ASPC Yuma staff opening."  And labeled as number 9, it says

24  "Scheduler 1 FTE."  Is that referring to your position or a

25  different one?

1    A.   It's the position that I had left when I obtained the

2    clinical coordinator position.

3    Q.   Okay.  And so you had said you became the clinical

4    coordinator about six months ago, so this would reflect your

5    previous position that's now vacant?

6    A.   Correct.

7    Q.   How long did it take to fill that scheduler position?

8    Rather, should I say was it filled?

9    A.   Yes.  I would say six weeks to two months.

10   Q.   After this email or after -- or ago?

11   A.   In total is what I mean, from the moment -- the time that I

12   went to clinical coordinator to the time that I had a full-time

13   permanent scheduler.  About two months.

14   Q.   So in that two-month period, were you essentially doing

15   both tasks?

16   A.   I was, with some help from another person, Priscilla Manry,

17   that used to do the scheduling before.

18   Q.   Okay.  And I believe you had said something about how you

19   work as a CNA on the optometry line every other Sunday.

20   A.   Yes.

21   Q.   Have you ever been asked to come and fill in, in kind of a

22   clinical services position because somebody is out sick or, you

23   know, there is a lot of demand for help and they are asking

24   people to come work?

25   A.   Yes.

1    Q.   When is the last time you did that, roughly?

2    A.   Last Sunday and Saturday of last week.

3    Q.   Do you get paid overtime for doing this?

4    A.   Yes.

5    Q.   How frequently are you asked to come and help on nurses

6    lines or provide other medical services?

7    A.   About every other week, because I do the optometry, and

8    that's part of something that we don't have someone else to do

9    it.  I am training someone right now, but we haven't.  So every

10   other week.

11   Q.   How about working after hours or an extra shift?  Have you

12   been asked to do that too?

13   A.   Yes.

14   Q.   How frequently has that happened?

15   A.   I do it every day.

16   Q.   So are you paid for the overtime you work every day?

17   A.   Yes.

18   Q.   Is it voluntary or are you told that you have to do it?

19   A.   Voluntary, but it needs to be done, so I want to get my

20   work done.

21   Q.   And if you go down on Ms. Johnson's e-mail, the first

22   paragraph, the second sentence of it, it's talking about

23   intersystem transfers.  And it says, "The arrival log is never

24   accurate.  Many times there are inmates on the bus.  We had no

25   notice that they were coming."

1          Would this arrival log include information like you

2     described about the fact that a person has a pending outside

3     consult?

4     A.   I have never seen the log.

5     Q.   So the only way you are informed that somebody is coming in

6     who has a pending request, you know, say somebody is being sent

7     from Lewis, would be only if that clinical coordinator picks up

8     the phone and calls and notifies you?

9     A.   Yes.  But I also check the transport list.  I used to, when

10    I had little more help, I would check the list, because I

11    wanted to know if they had a consult or not that was in either

12    pending or wasn't taken care of for whatever reason.  Sometimes

13    they move them because they are protective custody.

14          So I would take that upon myself and look and see if

15    they had a consult that they needed to be seen for.

16    Q.   And that's just --

17    A.   But I don't know if that's the log that they're talking

18    about.

19    Q.   Okay.

20    A.   I know the transport list I did get.

21    Q.   And who did you get that from?

22    A.   It's, I believe, from Department of Corrections.

23    Q.   Okay.  And if you go down a little further, the second

24    paragraph, it says, "Yuma is the only complex that has two

25    arrival times, which we are not staffed for that."

1          Do you know that to be true?

2          MR. BOJANOWSKI:  Note an objection, Your Honor.  This

3    email is not to her.  She didn't write it.  And it's hearsay to

4    begin with.  And so, you know.

5          MS. KENDRICK:  It's not hearsay.

6          THE COURT:  It doesn't seem to be outside of the

7    statement of the party opponent.  So it looks to me like that

8    would come in.

9          MR. BOJANOWSKI:  This is a Corizon document, not an

10   ADC --

11         THE COURT:  This is your agent.  This is defendants'

12   agent, the healthcare provider.

13         But in any event, the question was, do you know this

14   to be true that they are not staffed for that.  I think that

15   that's a yes or no question, and there's no harm there, so the

16   objection is overruled.

17         Do you know whether that's true?  Do you know what I'm

18   talking about?  The fact that there were two transport

19   schedules for Yuma, and that you are the only one.  Is that

20   true, in your opinion?

21         THE WITNESS:  I don't know.

22         THE COURT:  Okay.  All right.

23         THE WITNESS:  At this time.

24   BY MS. KENDRICK:

25   Q.  But do you receive two transport lists a day or just one

1    for the whole day?

2    A.   Usually two.

3    Q.   Two.  So that would confirm the fact that Yuma is the only

4    complex that has two arrival times?

5            MR. BOJANOWSKI:  Same objection.

6            THE COURT:  No, wait a minute.  Is that necessarily

7    true, Ms. Kendrick?  Because she knows that Yuma gets two, but

8    she doesn't know whether the others get two or not as well.

9            MS. KENDRICK:  Good point.

10   BY MS. KENDRICK:

11   Q.   Does that confirm that Yuma generally has two arrival times

12   a day?

13   A.   Yes.

14   Q.   I apologize.

15           If you go down to the bottom of the page, the last

16   paragraph, Ms. Johnson writes, "Staffing continues to be a

17   struggle, but we continue to work to do what we can to meet the

18   needs of our patients and do the best we can with what we have

19   and are thankful that the staff are and work together as a

20   team, because without each other, we would not be as successful

21   as we are.  Everyone wears multiple hats here at Yuma."

22           Would you agree with Ms. Johnson's statement that the

23   employees at Yuma have to wear multiple hats?

24   A.   Yes.

25   Q.   What do you do besides clinical coordinator and working the

1    optometry line?

2    A.  Clinical coordinator, the optometry line.  I do the

3    provider line sometimes.  I do the, um, HNR scanning.  I

4    apologize, I forgot I did that while I was going to school for

5    CNA as well.  So the clerk, I believe it's called the unit

6    clerk.  I do the psych line when they need it.

7            MS. KENDRICK:  We move to admit Exhibit 225.

8            THE COURT:  Any objection?

9            MR. BOJANOWSKI:  Yes, Your Honor.  Hearsay.

10           THE COURT:  Ms. Kendrick?

11           MS. KENDRICK:  It is the admission of a party

12   opponent.

13           THE COURT:  The objection is overruled.

14           (Exhibit 225 is admitted.)

15   BY MS. KENDRICK:

16   Q.  So I am done asking you about that.

17           Ms. Edwards, are you familiar with the case of Parsons

18   versus Ryan?

19   A.  Yes.

20   Q.  Can you tell us generally what you know about the case?

21   A.  I believe the plaintiffs brought a suit against the state

22   for failing to provide adequate healthcare, and it was -- they

23   won, and I believe that it confirmed or -- that the reason was

24   that there was failures in healthcare and that they weren't

25   receiving the healthcare that they needed, either at all or in

1    a timely fashion, that was adequate to not cause harm.

2    Q.  Okay.  And do you remember ever receiving any sort of

3    written memos or updates related to the case, things saying the

4    judge decided this issue today or something like that?

5    A.  Yes.

6    Q.  Can you describe those, if you remember?

7    A.  Yes.  Periodically we would receive the emails stating what

8    the new regulations were, what the new compliance requirements

9    were, if anything had changed, the fees, what we would be

10   charged with if we failed to comply, and the caps.  Those types

11   of things.

12   Q.  What do you mean you would be charged with -- you would be

13   charged for failure to comply?

14   A.  I mean the -- I can't find the word.  The $3,000 per inmate

15   and then the thousand dollars for every day afterwards that it

16   was not completed.

17   Q.  You were told that Corizon would be charged a thousand

18   dollars for every day that something was late?

19   A.  I believe that ADOC had to pay it.

20   Q.  Do you remember who told you that?

21   A.  It's been in the emails, and we've gone over it in the

22   meeting, the facility health administrator.

23   Q.  That's the FHA's understanding, that they are fined $1,000

24   for every day?

25   A.  Yes.

1    Q.   Okay.  Are you aware that the case is set up with what they

2    call performance measures?  You kind of referred to them.  And

3    that there are ADC staff monitors who check medical records to

4    see if they are compliant with these performance measures?

5    A.   Yes.

6    Q.   Okay.  I'm going to read you a couple of performance

7    measures from the case, and can you tell me if you think that

8    your position plays a role in them?

9    A.   Yes.

10   Q.   Okay.  So there's one, it's performance measure 48.  And it

11   says that "Documentation, including the reasons for the denial

12   of utilization management, requests for specialty services will

13   be sent to the provider in writing within 14 calendar days and

14   placed in the patient's medical record."

15           Do you have a role in making sure that that is

16   complied with?

17   A.   Yes.

18   Q.   Okay.  There's another one that's performance measure 49

19   where it says, "Patients for whom requests for specialty

20   services is denied is told of the denial by the provider at the

21   next appointment, no more than 30 days after the denial."

22           Do you play a role in making sure that they comply

23   with that?

24   A.   Yes.

25   Q.   Okay.  There's another one that I suspect you are familiar

1  with.  It's performance measure 50, and it requires that urgent

2  consultations and diagnostic services be completed within 30

3  days.

4  A.  Yes.

5  Q.  And there's another one similar to that performance measure

6  51 that says "Routine specialty consults will be completed

7  within 60 calendar days."

8  A.  Yes.

9  Q.  And then finally, there's one that's performance measure 52

10  that says that "Specialty reports will be reviewed and acted

11  upon by the provider within seven calendars from receiving the

12  report."

13  A.  Yes.

14  Q.  You play a role in that?

15  A.  Yes.

16  Q.  So I want to ask, you mentioned earlier utilization

17  management.  I take it you are familiar with Corizon's

18  utilization management process?

19  A.  Yes.

20  Q.  Can you tell us in your own words what you think

21  utilization management means?

22  A.  I believe utilization management is basically trying to

23  make the best decision with utilizing whatever is available for

24  you, and I believe that they are the ones that make the final

25  decision as whether something gets approved or not.  Managed

CECILIA EDWARDS – DIRECT EXAMINATION

1    care.  I know it to mean managed care, if that's okay to say.

2    Q.  Yeah.  And you had said that you previously worked at the

3    Children's Hospital in Aurora.  Did you have any sort of

4    similar role dealing with utilization management or managed

5    care, getting approvals, that sort of thing, in that position?

6    A.  I did.  Being the scheduler, we worked with the referrals.

7    I worked on the referral log to make sure that the insurance

8    was in contract or not in contract and what we needed to obtain

9    before we could get the approval -- I'm sorry -- get the

10   appointment made.

11   Q.  So you were working for the hospital, and you were dealing

12   with outside insurance companies?

13   A.  Yes.

14   Q.  What were you -- thinking back to that experience and what

15   you're doing now, how would you compare the Corizon utilization

16   management process to what you dealt with when you were at

17   Children's hospital, dealing with insurance companies?

18   A.  It's different in that at that time, most of the decision

19   was on the provider to decide what kind of care they were going

20   to get, and now it's different in that it's other providers, I

21   believe, maybe a committee or several, that will review the

22   information and then send back the determination.

23   Q.  Okay.  To make sure I understand what you're saying, I'm

24   going to use an example.  So if a general practice pediatrician

25   at Children's felt that a child needed to go see a pediatric

UNITED STATES DISTRICT COURT

1    cardiologist, there would be more deference to what that

2    pediatrician felt was necessary in terms of specialty care?

3    A.  Yes.

4    Q.  If you could look at the stack in front of you and turn to

5    Defendants' Exhibit 507.

6              MS. KENDRICK:  Do you have it, sir?

7              THE COURT:  I don't think I know where it is.

8              (Discussion off the record regarding locating Exhibit

9    507.)

10             MS. KENDRICK:  Defendants' 507.  Would you like to use

11   plaintiff's?

12             THE COURT:  No.  I think we found it.  Thank you.  I'm

13   sorry.

14   BY MS. KENDRICK:

15   Q.  So you have this in front of you?

16   A.  Yes.

17   Q.  So this is a memo that's titled "Important CARES and UM

18   Core Process Information."  And the first sentence says, 'We

19   will be launching cares and utilization management core process

20   April 1st in Arizona."

21             You had mentioned earlier that you use CARES.  What is

22   CARES?

23   A.  CARES is the system that we input all of the information

24   concerning outside providers -- outside consult requests and

25   emergency room send outs, that type of things.  And we entered

1   information, and then it gets sent and reviewed by UM, and then

2   they send it back to us in that system.

3   Q.  Okay.  And this document doesn't have a year on it.  Did

4   CARES begin April 1st of this year or, to your knowledge,

5   April 1st of 2017?

6   A.  I believe it was 2017.

7   Q.  Okay.  And did you participate in any sort of training on

8   how to use cares?

9   A.  I believe we did have a Webex.  I can't remember if it's

10  this particular one with Rachel Durham, I believe is the lady

11  that handles all of the CARES training.

12  Q.  And as part of this Webex training you did, were you

13  provided some sort of written manual or handbook that you can

14  keep at your desk if you have questions?

15  A.  Yes.  I believe that's what I was speaking of, the several

16  pages of explanation of how to do -- that take the steps to

17  enter the information and finish the information in cares.

18  Q.  Okay.  And if you have a problem using the cares system, is

19  there somebody at Corizon who you can call or email and ask for

20  help troubleshooting it?

21  A.  Yes.

22  Q.  Who is that?

23  A.  Leara Patra or Minion Ernst.

24  Q.  And do they -- they work for Corizon?

25  A.  Yes.

1    Q.   Do you know where they work?

2    A.   I believe in Tennessee.

3    Q.   In the headquarters?

4    A.   I believe, yes.

5    Q.   Okay.  Do providers have access to CARES?

6    A.   They do.

7    Q.   Has that always been the case?

8    A.   Not to my knowledge.

9    Q.   Do you know when providers received access to CARES?

10   A.   I believe about four months ago.

11   Q.   Okay.  And if you could turn to what's labeled Exhibit 509

12   in the binders in front of you.  This is a PowerPoint by

13   Corizon Health that says "UM Core Process Overview."  And if

14   you look at the top right corner, there are page numbers.  So

15   if you could turn to what is page 8 of the document.

16          It says at the top "Meet your utilization management

17   medical directors."  Are you on that page?

18   A.   Yes.

19   Q.   Do you interact with these four people?

20   A.   No.

21   Q.   Do you recognize any of their names?

22   A.   Yes, Dr. Bartles.

23   Q.   How do you recognize Dr. Bartles' name?

24   A.   I have had to speak with her on an occasion concerning a

25   consult request that I had sent, and I believe she's one of the

1   people who, when it comes back to us as approved or authorized

2   or not, she's one of the names on there who it's from.

3   Q.  So she's one of the people who makes the decision about

4   whether or not to approve or deny a request?

5   A.  Yes.

6   Q.  If you could turn to the next page, page 9.  And this is a

7   flow chart.  It's titled "Outpatient Referral Process."  Have

8   you ever seen a flow chart like this before?

9   A.  No.

10  Q.  Okay.  Hopefully, you can help walk us through it.  Do you

11  see in the top left corner it says "Outpatient referral

12  request"?  And then there's an arrow, and it says "UM nurse

13  review and documentation."

14          Are you the UM nurse?

15  A.  No.

16  Q.  Could you take a moment to review this spreadsheet and then

17  tell us where you would fall in this process flow chart.

18  A.  First part would be right after the outpatient referral

19  request, because it comes directly to me.

20  Q.  So all the requests come to you, and then what do you do?

21  A.  Then I gather the information and send it to the

22  utilization management for review.

23  Q.  So are you saying that you would kind of be in between the

24  box at the top left and then the box immediately under it?

25  There should be a little box that says "Ms. Edwards."

1    A.   Yes.   Clinical coordinator.

2    Q.   Okay.   You said that you get the requests.   How are the

3    requests sent to you?

4    A.   Through our offender management information systems.   eOMIS

5    is what we call it.

6    Q.   The electronic health record system?

7    A.   Yes.

8    Q.   And that doesn't interact with CARES?

9    A.   No.

10   Q.   So you have to physically take what you are sent in eOMIS

11   and copy it over to CARES?

12   A.   Yes.

13   Q.   And when you do that, do you cut and paste everything the

14   provider wrote and cut it from eOMIS and paste it into CARES?

15   A.   Yes.

16   Q.   Do you add any information?

17   A.   On occasion, if they were sent to the emergency room, I

18   might tell them that there's another consult that they can look

19   at, that he was sent to the emergency room, because I don't get

20   them until the next day.   So sometimes things happen, so I try

21   to communicate with them.   There's a note section where I can

22   add my own nonclinical note.

23   Q.   Okay.   Do you ever take things out of what the provider has

24   written in eOMIS?

25   A.   As in what?

73

1   Q.  So if she has, you know, written the notes, do you just

2   copy and paste over?

3   A.  Yes.

4   Q.  You don't go through and change or delete anything?

5   A.  No.

6   Q.  Okay.  If you could just continue to look at this flow

7   chart and tell us where you think that you might also appear in

8   the process.

9   A.  So then after the referral is authorized, it would come

10  back to me again.  So in between the referral authorized,

11  and -- I'm sorry.  After the referral authorized, it comes back

12  to me.

13  Q.  Okay.  So stay on the far left side and go down the arrows.

14  There's a box -- a triangle -- a box that says "UM, MD review."

15  And then it says "Not approved," and there's an arrow that goes

16  to "Alternate treatment plans and rationale."

17          Do the alternate treatment plans come to you?

18  A.  Yes.

19  Q.  Okay.  Are you familiar with a response that's called "Need

20  more information," or NMI?

21  A.  Yes.

22  Q.  And do those go to you too?

23  A.  Yes.

24  Q.  So when the alternate treatment plan goes to you, are you

25  kind of turning -- making a right turn -- are you involved

1    where it goes from alternate treatment plan to site provider

2    review?

3    A.  Yes.

4    Q.  How do you sent the alternate treatment plan to the

5    providers?

6    A.  I send it to them in CARES.  I make a note that they've

7    been emailed and signed, because I will copy and paste what UM

8    said and put it in eOMIS and tag them and send them an email.

9    And then I also assign it to them in CARES.

10   Q.  So is it only since the providers got access four months

11   ago that you started sending things to them using CARES?

12   A.  No.  We always sent it through eOMIS, and then they would

13   respond in eOMIS, and then we would again cut and paste and

14   send it back to UM.  Now they have the access -- now we assign

15   it to them directly so that they can respond if it's something

16   medical that needs to be addressed.

17            THE COURT:  I'm sorry to interrupt.  And they do that

18   through CARES now?

19            THE WITNESS:  Yes.

20            THE COURT:  Is that the only involvement that the

21   providers have with CARES?  The only time they engage with this

22   program?

23            THE WITNESS:  To my knowledge, yes.

24            THE COURT:  So they don't have anything to do with

25   respect to providing the information to utilization management?

 1    They don't have anything to do with responding to inquiries

 2    that -- well, other than the need more information category, I

 3    guess there wouldn't be any other interim way or practice for

 4    utilization management to be reaching out to the providers.

 5    They do that just in the need more information channel; is that

 6    right?

 7              THE WITNESS:  To my understanding, yes.

 8    BY MS. KENDRICK:

 9    Q.  So are you still documenting in eOMIS the alternate

10    treatment plans?

11    A.  Yes.

12    Q.  And we had mentioned the need more information response

13    earlier.  What do you do when you get that from utilization

14    management?

15    A.  The same process as the alternate treatment plan.  I would

16    copy and paste, send it to the provider in eOMIS, and then

17    document the -- in CARES, I apologize, that I've sent it to

18    them, the provider.

19              THE COURT:  So I have to interject again.  So I was

20    wrong a moment ago where I assumed the need more information

21    channel would also be a way for the provider's involvement.

22    That's not true?  That doesn't happen?  I mean, through CARES?

23    You do it through eOMIS?

24              THE WITNESS:  Well, it comes in through CARES first.

25    Then I copy and paste into eOMIS.  And then it goes from eOMIS

1    back to CARES again for both the ATP and the NMI.

2              THE COURT:  Okay.  I should have waited.  Probably

3    Ms. Kendrick would have gotten to that point.

4              MS. KENDRICK:  Okay.

5    BY MS. KENDRICK:

6    Q.  And I noticed, Ms. Edwards, there aren't any, like, time

7    frames or dates on this thing.  Are you aware of any timelines

8    for this process occurring?

9    A.  Yes.

10   Q.  What are they?

11   A.  If it is an urgent consult request, UM has, I believe, two

12   days to get back to us, either accept or deny or NMI or ATP.

13   And then we also have two days to respond to them.  And then if

14   it's a urgent -- I'm sorry -- a routine consult request, then

15   it's -- the respond time on those is three days for ATPs and

16   NMIs.

17   Q.  And are those calendar days or business days?

18   A.  I believe it to be calendar days.  That's what I was told.

19   Q.  Okay.  If you could turn to the next page, page 10.

20   There's three bullet points, and the last one says, "While we

21   would like site MDs aware of all requests for off-site care, we

22   understand that due to staffing shortages, this is not always

23   possible."

24              Is it your role to tell the site medical director of

25   all requests for specialty that the providers have made?

1    A.  No.

2    Q.  If it's not you, do you know if the providers are supposed

3    to be notifying her?

4    A.  No.

5    Q.  Is the site medical director Dr. Barcklay at Yuma?

6    A.  Not anymore.

7    Q.  Oh.  Who is the site medical director?

8    A.  We don't have one right now, to my knowledge.

9    Q.  When did Dr. Barcklay quit?

10   A.  I believe -- I'm sorry -- May -- the beginning of May.  May

11   2nd or May 1st.

12   Q.  Do you know if her departure was voluntary?

13   A.  I do not.

14   Q.  If you could turn to Exhibit 510.  This is a document where

15   it says in the subject line "Launching UM core process in

16   Arizona on Thursday, April 6th."

17          If you just go down, there's a bolded question that

18   says, "What is the new process?"  And the second bullet point

19   says, "UM nurse reviews the complete referral and adds

20   information (including interqual as needed)."

21          Is that you?  Is that referring to you?

22   A.  No.

23   Q.  Do you know who the UM nurse is?

24   A.  I believe we have a few.  We have a regional UM nurse,

25   which is -- there's two.  There's Amy Shencol and Brenda

1    Nguyen.  And those are our local, our regional.  But I believe

2    that we have other ones that are in Tennessee or somewhere else

3    centralized that do the UM process.

4    Q.  So stepping back to that flow chart process we just went

5    through, so when you submit something to CARES, does it go off

6    to Tennessee, or does it make a stop to visit the UM nurse, the

7    two nurses, do you know?

8    A.  I believe it goes directly to Tennessee.

9    Q.  Okay.

10   A.  Unless it's -- I apologize.  Unless it's an emergency room

11   send out.  At that point, I email those two regional nurses.

12   That's part of my job.

13   Q.  Okay.  But other than emergency send outs, you wouldn't

14   normally send a request to these UM nurses, like it says here?

15   A.  Not to my knowledge, no.

16   Q.  Do you know what interqual is?

17   A.  No.

18   Q.  How do you track all the requests that have been submitted

19   to utilization management?

20   A.  I have the ability to track them in our eOMIS system and

21   also a spreadsheet that I have that has all of the patients

22   that are submitted with dates with what they are being seen for

23   and when it's complete.

24   Q.  And is that just a spreadsheet that you came up with

25   yourself as a way to have the information in front of you?

1    A.   I believe it was already set up, and then I had help

2    with -- from Greg Campbell, one of the other clinical

3    coordinators at Phoenix, that helped to kind of streamline it,

4    and it works a lot better now.

5    Q.   And why are you using a spreadsheet instead of the eOMIS or

6    CARES system?

7    A.   Because that's what I was told to do.

8    Q.   Okay.  And you had mentioned the NMI, or the needs more

9    information process.  Can you give a rough estimate, based on

10   your experience, of what percentage of the requests you submit

11   get an NMI in response?

12   A.   Can you repeat the question?

13   Q.   Just kind of thinking of in general, you know, you submit,

14   and then do you have a sense of, you know, this percent of the

15   responses are approved, roughly this percent are ATP, this

16   percent say need more info?

17   A.   Right now?

18   Q.   Sure, we can start with right now.

19   A.   Yeah.  I would say maybe 2 percent are NMIed or ATPed.  I

20   mean, it varies week by week.  It's hard to say.  Sometimes

21   it's more.

22   Q.   What about eight months ago, when you started working?

23   Were there more need more information responses?

24            MR. BOJANOWSKI:  Note objection.  Relevance.

25            THE COURT:  Overruled.

1          THE WITNESS:  Yes, because I believe we had more

2     providers at that time.

3     BY MS. KENDRICK:

4     Q.  Can you explain how those two are related, how having more

5     providers would result in more NMIs?

6     A.  Well, we had more providers that were able to do more

7     lines, I believe.  And so we did have quite a bit.  Plus we had

8     a new provider that was submitting consults quite a bit, and

9     they were ATPed or NMIed.

10    Q.  So you're just -- I don't want to put words in your mouth.

11    Are you saying that it was because there were more requests for

12    specialty care being submitted?  There were therefore more NMIs

13    coming back?

14    A.  There were, yes.

15    Q.  Can you give us an estimate of roughly how many specialty

16    consults you submitted last week?

17    A.  Rough estimate, I would say about 45.  And then that

18    doesn't include the optometry or the emergency room send outs.

19    Q.  Holding aside the optometry and the ER send outs, is 45

20    kind of a stable number over the past -- in the time you've

21    done it, or is that a decrease from --

22    A.  It's a decrease.

23    Q.  How much of a decrease?

24    A.  I would say 75 percent -- I mean -- so I would say right

25    now I'm doing about 40, and back -- several months back, maybe

1    eight months back, I believe that I was doing about 60 or so a

2    week.

3    Q.  And you had mentioned the providers.  Is the reason for the

4    drop, in your mind, that there's fewer providers?

5              MR. BOJANOWSKI:  Note objection, Your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  Possibly.

8              THE COURT:  Any other reason you can think of as to

9    why the number has dropped off?

10             THE WITNESS:  They're just not being -- there's not

11   being as much submitted.

12             THE COURT:  Any idea why?

13             THE WITNESS:  No.

14   BY MS. KENDRICK:

15   Q.  Do you know how frequently the provider lines are being run

16   at Yuma?

17   A.  Not now, not at this time.

18   Q.  Do you know in the past?

19   A.  Yes.

20   Q.  What did it used to be?

21   A.  We had provider line Monday through Friday, not on every

22   yard, but there was provider line on probably at least three of

23   the yards Tuesday, Wednesday, and Thursday.  And then on

24   Friday -- on Monday and Friday there would be two lines.

25   Q.  Has that changed, to your knowledge?

1    A.   Yes.

2    Q.   Do you know what it has changed to?

3    A.   No.

4    Q.   But you know it has changed?

5    A.   Yes.

6    Q.   How do you know it has changed?

7    A.   Because I haven't had a provider at Cibola for a month,

8    other than in the afternoon if he swings in to catch the ER

9    send outs.

10        I know that we're sending them to Dakota now.  They

11   are transporting them over to another unit.  But me,

12   personally, having knowledge of that provider line happening at

13   Cibola, we have not.

14   Q.   And your office is in the Cibola unit, medical clinic, so

15   you are able to observe when provider line happens at Cibola?

16   A.   Yes.

17   Q.   You said it has been about a month.  Has that been since

18   Dr. Barcklay left?

19   A.   Yes.

20   Q.   Did she used to cover the provider line in Cibola?

21   A.   Yes.

22   Q.   Have any other providers left in the last month or two?

23   A.   Not to my knowledge.

24        THE COURT:  Other than Cibola, are you aware of any

25   other units that have reduced the provider line?

1          THE WITNESS:  Dr. Barcklay worked the Cheyenne unit as

2    well, and Pete Brisbois used to work La Paz and Cocopah.  So

3    Dr. Jordan worked Dakota, and now it's Dr. Jordan, and I

4    believe, like I said, I think they are transporting them, I

5    don't know how many a day.  I do know that he has a pretty big

6    load, about 25 a day.

7          THE COURT:  Wow.

8    BY MS. KENDRICK:

9    Q.  And Cibola is a medium security yard?

10   A.  Yes, ma'am.

11   Q.  And Dakota is a maximum security yard?

12   A.  Yes, ma'am.

13   Q.  So if they are transporting people from Cibola to Dakota,

14   do you know, are the Dakota prisoners not being seen at the

15   same time?  Do they mix the patients?

16         MR. BOJANOWSKI:  Foundation.

17         THE COURT:  Overruled.  Do you know whether they mix

18   the patients?

19         THE WITNESS:  To my knowledge, they cannot mix them.

20   It doesn't mean they don't get seen in the same day.  It just

21   means that there has to be more coordination between Department

22   of Corrections and Corizon to be able to manage who is in view

23   of who.  And that's more DOC policy for security purposes.  So

24   there are times where we have both medium security and maximum

25   security, but they're separated.

CECILIA EDWARDS – DIRECT EXAMINATION                    84

```
 1    BY MS. KENDRICK:
 2    Q.  So one group might be in the morning and the other group in
 3    the afternoon?
 4    A.  Right.
 5    Q.  But you can't have a mixture sitting in the waiting room
 6    together?
 7    A.  No.
 8    Q.  Could you turn to Exhibit 512, please.
 9               THE COURT:  Ms. Kendrick, please be looking for a good
10    place to take the noon break.
11               MS. KENDRICK:  Yes, sir.  I have this and one other
12    exhibit.
13    BY MS. KENDRICK:
14    Q.  If you could turn to page 3 of Exhibit 512.  You see number
15    8.  It says, "The time frame for handling the outpatient
16    referrals is as follows unless mandated by contract."
17               And it says, "Routine referral, five to ten business
18    days.  Urgent referral, one to two business days.  Emergent,
19    same day to be handled by site/nurse."
20               I believe you testified earlier that routine was
21    supposed to be handled within two days and urgent within three?
22    A.  That was for the --
23    Q.  Or I mean urgent within two and routine within three?
24    A.  Right.
25    Q.  Okay.  So what you're testifying to as the requirements is
```

UNITED STATES DISTRICT COURT

CECILIA EDWARDS – DIRECT EXAMINATION                    85

1    more stringent than was written here?

2    A.   I was —— I apologize.   Maybe I was speaking about need more

3    information and ATPs.   That's the time frame for that.   For UM

4    to respond is are these time frames.   My apologies if I ——

5              THE COURT:   Well, my recollection of the testimony is

6    you were talking about internal time frames with respect to the

7    utilization management review process.   Interim steps not

8    necessarily when the time frame for handling the outpatient

9    referral from start to end must be.

10             So what you said earlier seemed to make sense to me,

11   that it would be shorter periods of time because these were

12   interim steps within the broader steps for a routine referral

13   just five to 10 days.   Maybe I'm misstating what I understood

14   you to mean, but I'm just saying that because what you said now

15   and what you said before, putting my head together, still seems

16   like it could fit.

17             THE WITNESS:   Yes.   That makes sense, yes.   These are

18   the time frames for UM concerning these referrals, but for me

19   to respond, it's a less —— the time frame is less.

20   BY MS. KENDRICK:

21   Q.   Okay.   Now if you could turn to Defendants' Exhibit 518.

22             THE COURT:   Ms. Kendrick, when you said you had one

23   more exhibit, did you mean ——

24             MS. KENDRICK:   Exhibit 518 is the last one I was going

25   to do before the lunch break.

1          THE COURT:  All right.  I thought you said you had

2     more beyond that.

3          MS. KENDRICK:  I do have more beyond that.

4          THE COURT:  Let's stop right now.  So we will pick up

5     518 at 1:15 p.m.  So we will take the lunch break.  We will

6     come back at 1:15, and we will just start with that exhibit.

7          Thank you very much.

8          (Recess taken at 11:46 a.m.)

9          *          *          *          *          *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7     a full, true, and accurate transcript of all of that portion of

8     the proceedings contained herein, had in the above-entitled

9     cause on the date specified therein, and that said transcript

10    was prepared under my direction and control.

11          DATED at Phoenix, Arizona, this 4th day of June, 2018.

12

13                                      s/Elva Cruz-Lauer
                                  Elva Cruz-Lauer, RMR, CRR
14

15

16

17

18

19

20

21

22

23

24

25