**EXHIBIT 9**

**EXHIBIT 9**

Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
2005 N. Central Ave
Phoenix, Arizona 85004-1592
Telephone: (602) 542-1645
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Hesman, Bar No. 028874
Jacob B. Lee, Bar No. 030371
Kevin R. Hanger, Bar No. 027346
Timothy M. Ray, Bar No. 029191
Richard M. Valenti, Bar No. 031533
Jamie D. Guzman, Bar No. 022095
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
khanger@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-DKD<br><br>**DECLARATION OF RICHARD WATTS** |

I, Richard Watts hereby declare as follows:

1. I am over the age of 18 years and am competent to make this Declaration.
2. Corizon Health Inc. ("Corizon") is employed as an independent contractor for the Arizona Department of Corrections ("ADOC") to provide medical personnel and services to the Arizona State Prison Complex facilities.
3. I am currently employed as the Arizona Regional Director of Nursing for Corizon Health.
4. From February 1, 2018 until May 1, 2018, I also served as the interim Facility Health Administrator ("FHA") at the Arizona State Prison Complex Yuma facility ("Yuma Facility" or "Facility"), while the Yuma Facility FHA, Lori Johnson, was out on medical leave.

**Cecilia Edwards**

5. While serving as the interim FHA at the Yuma Facility, I oversaw the employees and was generally involved in managing the day-to-day operations of the Facility.
6. One of the employees I oversaw was Cecilia Edwards ("Ms. Edwards").
7. Ms. Edwards is employed by Corizon as a clinical coordinator at the Yuma Facility.
8. Ms. Edwards was hired by Corizon as a clinical coordinator in September, 2017.
9. Before being hired as clinical coordinator, Ms. Edwards was employed as the Yuma Facility scheduler, and was employed in that role for six months.
10. Prior to her role as scheduler, Ms. Edwards was employed at the Yuma Facility as a medication technician in pharmacy and inventory control, and was employed in that role for six months.
11. As a clinical coordinator, Ms. Edwards' role is to coordinate outside appointments with specialty care providers.
12. More specifically, her job duties consist of obtaining requests from on-site providers for outside consultation by a specialist, ensuring that approved consultations are scheduled within the designated time period, and making certain

1

that any documentation returned with the patient after the specialty appointment is recorded in the medical record in a timely manner.

13. In addition to her role as clinical coordinator, Ms. Edwards is a certified nursing assistant ("CNA").

14. Ms. Edwards obtained her CNA certification in April, 2017.

15. Unlike Registered Nurses (RN) and Licensed Practical Nurses ("LPN"), who are required to obtain a license after passing a national licensing examination, CNAs receive a CNA certificate after graduating from an approved nursing assistant program and pass a state examination.

16. Given the differences in certification and licensing, there are several clinical care functions that nurses are able to perform that CNAs cannot perform.

17. The Arizona Nurse Practice Act states that a CAN, such as Ms. Edwards, can perform certain tasks that are delegated to the CNA by a licensed nurse. The Nurse Practice Act further states that tasks assigned to the CNA must ensure that "[a]ssessment, interpretation, or decision-making is not required during the performance or at the completion of the task." (R4-19-813. Section A, number 2.d.).

18. Due to the limited scope of practice of the CNA, any discussion with a patient related to a clinical care issue must be conducted by a licensed nurse regardless of any other role, such as Clinical Coordinator, that the CNA may be assigned to complete.

19. On March 20, 2018, during the course of serving as interim FHA at the Yuma Facility, I met individually with Ms. Edwards to discuss the process for scheduling outside specialty appointments for patients. During this discussion about process, I reminded Ms. Edwards that either nurses or medical providers must discuss clinical care issues with patients.

20. I reminded Ms. Edwards that she could advise patients that outside appointments had been scheduled but that communications with inmates about clinical care

2

issues was outside the scope of practice for her CNA certification.

21. Ms. Edwards conceded that she had been communicating directly with inmates regarding clinical care.

22. Ms. Edwards further asserted that she did not realize that she had been exceeding the boundaries of her role as clinical coordinator or her CNA certification in communicating directly with inmates on clinical matters.

23. Ms. Edwards reassured me that she would cease having direct communications with inmates regarding their clinical care needs and would instead filter those conversations through the appropriate nursing and medical personnel.

24. To the extent Ms. Edwards has expressed a belief that the nursing staff at the Yuma Facility has not been adequately responsive to inmates' clinical needs, such beliefs are refuted by facility records and the nursing staff.

25. Ms. Edwards, as a CNA, is not in a position to make determinations regarding the appropriate levels of responsiveness and care provided to inmates.

26. Ms. Edwards has not received the level of training or education that a licensed nurse or medical provider has received.

27. Ms. Edwards is therefore unqualified by training and certification to make clinical judgments regarding clinical care being provided by nurses and medical providers.

28. To the extent Ms. Edwards has testified that a particular inmate was not receiving appropriate cardiac care, a review of the medical record indicates that the cardiac status of the patient has been monitored closely by cardiology consultants for several months prior to Ms. Edwards' testimony.  All medically necessary cardiac interventions were performed on this patient by consultant cardiologists.  Medical and nursing staff members have conducted extensive consultations with the patient about his cardiac status and prognosis.

29. It would be outside the scope of practice for a CNA, such as Ms. Edwards, to have independent clinical conversations with a patient related to the treatment plan being initiated by specialty consultants, regardless of job duties assigned to her at the

time.

30. Nurse lines are held at the Facility daily to provide inmates the opportunity to see a licensed health care provider, either a nurse or a medical provider.

31. While I served as interim FHA at the Yuma Facility, there was never a day that went by without a nurse line being held.

32. To the extent Ms. Edwards disputes this, it should be noted that the location of her workstation does not permit her to observe whether or not nurse lines are being held at the various nursing stations throughout the Yuma Complex.

33. Although Ms. Edwards has helped run the optometry line every other Sunday, she has never been involved with coordinating or managing the nurse lines within the Yuma Facility.

34. Further, while serving as interim FHA at the Yuma Facility, Ms. Edwards never brought this alleged issue to my attention.

35. During a process mapping review focused on how Ms. Edwards scheduled outside consultation appointments in her role as Clinical Coordinator, we discovered that Ms. Edwards was using a scheduling spreadsheet that made tracking appointment information very difficult. Because the scheduling spreadsheet she was using was so inefficient for tracking outside appointments, she was also keeping track of outside appointments by writing the appointment date and time on a desk top monthly calendar thereby creating duplicate work for herself.

36. With the assistance of a Clinical Coordinator from another complex, a new scheduling spreadsheet was introduced on March 20, 2018. The new spreadsheet format permitted anyone reviewing the spreadsheet to easily identify the status of any outside consultation appointment that had been approved for scheduling.

37. Ms. Edwards was resistant to implementing the new spreadsheet format because she believed that the process she was using to schedule appointments "worked better" for her while also acknowledging that the new spreadsheet was easier to use and made tracking of outside appointments easier. I had to advise Ms. Edwards

1  that it was a job expectation that the new spreadsheet be implemented and used.

38. It has come to my attention that Ms. Edwards believes a prison inmate experienced retaliation as a result of him talking to the American Civil Liberties Union (ACLU) when the ACLU was interviewing inmates during a site visit at the end of April, 2018.

39. Specifically, it is my understanding Ms. Edwards believes the inmate was wrongfully placed under investigation by the Arizona Department of Corrections (ADOC) and had his medication confiscated in response to the inmate talking to ACLU attorneys.

40. Ms. Edwards' speculative testimony is misguided and unsupported by the records.

41. Instead, the facts of the situation are that an investigation was initiated several days prior to the ACLU visit after two inmates contacted Facility security alleging that the inmate in question was selling an unauthorized contraband medication to other inmates on the housing unit.

42. A review of the medication records for the inmate under investigation indicated that the inmate had never been prescribed the medication that was being sold on the housing unit.

43. Accordingly, the investigation stemmed from allegations provided by inmate informants and was entirely unrelated to the inmate meeting with the ACLU during the ACLU site visit.

**March, 2018 Inmate Disturbance**

44. On Thursday, March 1, 2018 at approximately 6:30 p.m. , an inmate disturbance occurred on the Cheyenne Unit at the Yuma Facility. The cause of the disturbance is still under investigation.

45. As the disturbance intensified, inmates attacked the medical unit.

46. The Correctional Officer assigned to Medical and the nurse on duty that evening escaped through a back door of the medical unit.  They locked themselves in a building adjacent to the Medical Building until the disturbance was brought under

control later in the evening.

47. The inmates destroyed plumbing and other essential services in all of the housing units on the Cheyenne Yard rendering the housing units uninhabitable.

48. In the medical unit, the inmates broke out windows, destroyed or disabled medical equipment, destroyed or disabled computer equipment, and broke door locks to offices and treatment rooms rendering the medical unit unusable.

49. With the support and assistance of Yuma Complex security leadership, the Cheyenne Yard inmate Library was converted into a triage unit in order to provide medical care to inmates who had been injured during the disturbance.

50. Because all of the housing units were determined to be uninhabitable due to the damage from the disturbance, the inmates had to be housed outside on the two recreation yards for several days.

51. Corizon nursing and medical staff located all diabetic inmates and housed them in the temporary medical unit set up in the inmate Library so that they could be monitored and assessed on a regular basis.

52. Similarly, Corizon nursing and medical staff located the "elder" inmates living on the yard and housed them in the temporary medical unit so that they would not have to sleep on the ground outside on one of the recreation yards.

53. Since the conditions prevented nursing from providing regularly scheduled nurse lines on that unit, nursing staff conducted rounds on the recreation yards every four hours to address any medical or nursing issues that might arise.

54. Inmates who needed nursing or medical treatment were either pulled aside or brought to the temporary medical unit in the library for assessment.

55. On March 2, 2018, Corizon nurses and staff searched the destroyed housing units to locate and collect as many "keep on person" (KOP) medications as possible.

56. A KOP medication is a medication that inmates are permitted to keep with them at all times, such as an inhaler, instead of having to go to the medical facilities to have

the medication administered by a nurse.

57. Although many of the KOP medications had been destroyed during the disturbance, Corizon collected as many usable KOPs as they could find. A medication distribution plan was developed to provide these medications to the inmates on a regular dosing schedule since the inmates were not permitted to keep KOP medications with them while living on the recreation yards.

58. On Friday evening, March 2, 2018, within twenty-four hours of the commencement of the disturbance, and with the help of the ADOC, the Cheyenne medical unit had been repaired to the point that medical and nursing staff could use the medical unit again.

59. On Saturday, March 3, 2018, ADOC had identified alternative housing for the diabetic and senior citizen inmates so that they did not have to continue living in the inmate library area.

60. By Saturday, all diabetic and senior citizen inmates had been moved to the alternate housing units, so the library no longer had to be used for housing or as a temporary medical facility.

61. On March 5, 2018, the housing units were repaired and stabilized, and all inmates were able to return to their normal housing units.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 19th day of June, 2018.

*Richard Watts*
Richard Watts

14003985