UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. CV 12-00601-PHX-DKD |
| vs. | ) ) | Phoenix, Arizona June 12, 2018 |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their Official capacities, | ) ) ) ) ) ) ) ) | 9:00 a.m. |
| Defendants. | ) ) | |

_____

BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(*Evidentiary Hearing*)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        A P P E A R A N C E S

2   For the Plaintiffs:

3           PRISON LAW OFFICE
            By:  Corene Kendrick, Esq.
4           1917 5th Street
            Berkeley, CA 94710
5
            ACLU - Washington DC
6           By:  David C. Fathi, Esq.
            915 15th Street NW
7           7th Floor
            Washington, DC 20005
8
            EIDENBACH LAW PC
9           By:  Kirstin T. Eidenbach, Esq.
            P.O. Box 91398
10          Tucson, AZ 85752

11          ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
            By:  Maya S. Abela, Esq.
12          177 N. Church Avenue
            Suite 800
13          Tucson, AZ 85701

14  For the Defendants:

15          STRUCK LOVE BOJANOWSKI & ACEDO PLC
            By:  Timothy J. Bojanowski, Esq.
16          By:  Rachel Love, Esq.
            By:  Daniel Struck, Esq.
17          By:  Richard Valenti, Esq.
            3100 W. Ray Road
18          Suite 300
            Chandler, AZ 85226
19
    Also Present:
20
            Jennifer Finger (Telephonically)
21          Richard Pratt

22

23

24

25

                        I N D E X

WITNESS:                DIRECT    CROSS      REDIRECT   RECROSS
RODNEY STEWART, M.D.
By Mr. Fathi                       6
By Ms. Love                                    62
ERIN BARLUND
By Mr. Bojanowski        98                    165
By Ms. Eidenbach                  130
LISA MCNEAL
By Mr. Struck           170                    194
By Mr. Fathi                      188
NICOLE TAYLOR, Ph.D.
By Ms. Love             198

                    INDEX OF EXHIBITS
EXHIBIT                                                RECEIVED
72        11-29-17 e-mail from E. Barlund to R. Pratt   165
73        11-29-17 e-mail from B. Briddle to
          Perryville Corizon & Custody staff            165
94        11-27-17 e-mail from S. Rucker to B. Briddle  165
109       12-26-17 e-mail from E. Barlund to R. Pratt   165
170       12-26-17 e-mail from R. Patel to D. Robertson  35
196       10-19-17 e-mail from D. Sego to M. Gay et al.  54
197       10-27-17 e-mail from J. Gahris to G. Babich,
          et al.                                         58
199       7-13-17 e-mail from R. Manche to P. Torrez     50
213       11-3-17 e-mail from M. Smith to D. Sego        31
215       11-16-17 e-mail from M. Marino to B. Schmid    62
216       12-4-17 e-mail from D. Sego to G. Babich       24
270       12-1-17 e-mail from Sara Neese to CG Thomas    47
276       12-8-17 e-mail from Chris Johnson, DO          38
415       September 11, 2017 E-mail from Neese, Sara
          to Watson, Jan regarding Consult for
          ██████████                                     47
657       Exemplar 1: Source documents for Performance
          Measure 48 - Compliance                       129
658       Exemplar 2: Source documents for Performance
          Measure 48  Not Applicable                    129
659       Exemplar 3: Source documents for Performance
          Measure 48  Non-compliance                    129
660       Exemplar 4: Source documents for Performance
          Measure 49  Non-compliance                    129
661       Exemplar 5: Source documents for Performance
          Measure 49 - Compliance                       129
662       Exemplar 6: Source documents for Performance
          Measure 49 - Duplicates                       129
705       April 25, 2017 e-mail from Angela Fischer to
          Nicole Taylor re: MHTM                        233

1                    P R O C E E D I N G S

2            THE MAGISTRATE JUDGE CLERK:  Civil Case Number 12-601,

3    Parsons et al. Versus Ryan et al., on for status and

4    evidentiary hearing.

5            THE COURT:  Counsel, please announce.                    09:01AM

6            MR. FATHI:  Good morning, Your Honor.  David Fathi of

7    the ACLU National Prison Project for the plaintiff class.

8            THE COURT:  Thank you.  Good morning.

9            MS. KENDRICK:  Good morning, Your Honor.  Corene

10   Kendrick from the Prison Law Office for the plaintiff class.     09:01AM

11           THE COURT:  Good morning.

12           MS. EIDENBACH:  Kirsten Eidenbach for the plaintiff

13   class.  Behind me is my co-counsel, Maya Abela, from the

14   Arizona Center for Disability Law.

15           THE COURT:  Good morning to you both.                    09:01AM

16           MS. LOVE:  Rachel Love, Daniel Struck, Timothy

17   Bojanowski, and Richard Valenti for the defendants.

18           THE COURT:  Thank you.  Good morning.

19           Is anybody on the phone? Dr. Stewart?  I don't see

20   him in the courtroom.                                           09:01AM

21           MS. LOVE:  I have Corizon counsel out in the hallway

22   calling him to see how close he is.

23           THE COURT:  All right.

24           MS. LOVE:  As soon as she walks back in the courtroom

25   I will have an ETA.                                             09:01AM

```
 1              THE COURT:  Okay.  Is there anything else we can
 2   address in the interim while we wait?
 3              No?
 4              MS. LOVE:  Let me step outside.
 5              THE COURT:  Thank you.  Please.                    09:02AM
 6              (Steps out.)
 7              MS. LOVE:  They are calling his cell phone.  I did
 8   have contact with him last night so he knows that we started at
 9   9.
10              THE COURT:  All right.  Well, let me know when he   09:03AM
11   arrives.
12              MS. LOVE:  Apologize, Your Honor.
13              (Recess from 9:03 a.m. until 9:16 a.m.)
14              THE COURT:  Thank you.  Please be seated.
15              So because our time is so precious I have to ask:   09:17AM
16   What happened?  Why the delay?
17              MS. LOVE:  Dr. Stewart was, unanticipated, delayed in
18   construction.
19              THE COURT:  On the roadway?
20              MS. LOVE:  Yes, on the roadway.                     09:17AM
21              THE COURT:  Dr. Stewart, would you please come forward
22   and sit in the witness stand.  Thank you.
23              I think it was on the 14th of March, Dr. Stewart, you
24   were last here.  You took an oath.  That oath continues to
25   apply.  We had the opportunity for your direct examination then  09:17AM
```

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    so now is the time for the cross-examination from plaintiffs'

2    counsel.

3              THE WITNESS:  I apologize for the delay.

4              THE COURT:  Thank you.

5              MR. FATHI:  Your Honor, may I give Dr. Stewart a copy    09:17AM

6    of his --

7              THE COURT:  You may.

8              MR. FATHI:  -- testimony?

9              Thank you.

10             THE COURT:  I'm happy to have it.  I have it also on    09:18AM

11   my iPad.

12                        RODNEY STEWART,

13   called as a witness herein, having been previously duly sworn,

14   was examined and testified as follows:

15                        CROSS-EXAMINATION                           09:18AM

16   BY MR. FATHI:

17   Q.  Good morning, Dr. Stewart.

18   A.  Good morning.

19   Q.  As Judge Duncan just said, you testified in this case on

20   March 14, correct?                                              09:18AM

21   A.  Yes.

22   Q.  Have you reviewed the transcript of your testimony?

23   A.  I have not.

24   Q.  You have not.  Did you review any other documents to

25   prepare for your testimony today?                              09:18AM

———6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross———

1    A.  I have not.  No.

2    Q.  Did you meet with anybody to prepare for your testimony

3    today?

4    A.  We had a telephone conference just to discuss possible

5    questions.                                                          09:18AM

6    Q.  And I'm sorry, Doctor.  Could you either speak up or move

7    the microphone a little closer?  Thank you.

8            And when was this telephone conference?

9    A.  Yesterday.

10   Q.  Who was on the call?                                           09:19AM

11   A.  The attorney that's present here and one other person, a

12   Corizon attorney.  I can't remember her name, actually, off the

13   top of my head.  Sorry.

14   Q.  Is one of the people who was on the call in the courtroom?

15   A.  I believe so.                                                  09:19AM

16   Q.  And who was it?

17   A.  Young lady back here.

18           THE COURT:  The one at counsel table, Ms. Love, who

19   is --

20           THE WITNESS:  No.  Sitting in the row next to --          09:19AM

21           THE COURT:  Oh.  Thank you.

22   BY MR. FATHI:

23   Q.  And your understanding is that she was an attorney for

24   Corizon?

25   A.  Uh-huh.  Yes.                                                  09:19AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    Q.  And you mentioned another attorney who you can't identify?

2    A.  She's sitting at the table -- the defense table there.

3    Q.  Are you referring to Ms. Love, the female attorney sitting

4    at the table?

5    A.  Yes, ma'am.  Yes, sir.  Yeah.                              09:19AM

6    Q.  Anyone else on the call?

7    A.  I'm terrible with names.  I'm sorry.

8    Q.  Quite all right.

9            Anyone else on the call?

10   A.  No.  Just the three.                                      09:20AM

11   Q.  How long did that call last?

12   A.  20, 30 minutes maybe.

13   Q.  And you said that was yesterday?

14   A.  Yesterday.

15   Q.  Was that the only conversation or meeting that you had with  09:20AM

16   anyone to prepare for your testimony today?

17   A.  Correct.

18   Q.  Doctor, are you board certified in any specialty?

19   A.  No.

20   Q.  In how many states have you applied to practice medicine?   09:20AM

21   A.  Two.

22   Q.  What are they?

23   A.  Ohio and Arizona.

24   Q.  And have you been admitted to practice medicine in both

25   states?                                                        09:20AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    A.   Yes.

2    Q.   Are you currently admitted in Ohio?

3    A.   No.

4    Q.   Are you currently admitted in Arizona?

5    A.   Yes.                                                    09:20AM

6    Q.   How long have you been continuously licensed to practice

7    medicine in Arizona?

8    A.   Since '99, I think.  Since 1999.  Yeah.

9    Q.   Have you ever had your medical license or other credentials

10   revoked or suspended or limited in any way?                 09:21AM

11   A.   No.

12   Q.   Have you ever had hospital privileges revoked or suspended

13   or limited in any way?

14   A.   No.

15   Q.   Have you ever had a court or arbitration judgment against  09:21AM

16   you in connection with your medical practice?

17   A.   No.

18   Q.   Have you or an insurance company or anyone on your behalf

19   ever settled a claim or lawsuit in connection with your

20   practice of medicine?                                       09:21AM

21   A.   No.

22   Q.   And I believe you have never worked in a prison or jail

23   setting before you came to work at Corizon in 2015.  Correct?

24   A.   That's correct.

25   Q.   Now, Doctor, when you testified in March you said that you  09:21AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    had been site medical director at the Eyman facility since May

2    or June of 2017, correct?

3    A.   That's correct.

4    Q.   And that's a full-time position, correct?

5    A.   Yes.                                                        09:22AM

6    Q.   And in addition to that full-time position as medical

7    director, you have at times had to fill in as a provider when

8    various yards at Eyman didn't have one, correct?

9    A.   That's correct.

10   Q.   And in addition to that full-time position as medical     09:22AM

11   director and filling in as a provider at various yards, you

12   also testified in March that you had been interim site medical

13   director at the Florence complex since July or August of 2017,

14   correct?

15   A.   Yes.                                                       09:22AM

16   Q.   And being site medical director at Florence is also a

17   full-time position, isn't it?

18   A.   Yes, it is.

19   Q.   And besides the administrative duties of being medical

20   director at the Eyman facility and medical director at the     09:22AM

21   Florence facility, you also treated patients, correct?

22   A.   Yes.

23   Q.   Now, in response to a question from the Court, you

24   testified that about 80 percent of the prisoners at Eyman have

25   hepatitis C, correct?                                          09:22AM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─

1    A.  80 percent of the patients that we see.

2    Q.  I believe your testimony was 80 percent of the prisoners at

3    Eyman have hepatitis C.

4    A.  We -- it's -- when I look at that statistics that was an

5    estimate of the patients that we come in contact with, so we      09:23AM

6    don't see 100 percent of the medical patients, but probably 80

7    percent of the patients that we see, which is a great number of

8    the patients that are at the prison.

9    Q.  Doctor, would you turn to Page 498 of your testimony,

10   please?  And let me know when you are there.                      09:23AM

11         Do you have it, Doctor?

12   A.  Yes, I do.

13   Q.  Beginning at Page 498, Line 11, the transcript reflects the

14   following testimony:

15         "THE COURT:  Just so that I can understand that,           09:24AM

16   what's the rough number -- the number of people of the 5,000

17   you think are hep C?

18         "THE WITNESS:  I would -- I can only guess.

19         "THE COURT:  Yeah.

20         "THE WITNESS:  But I would -- probably about -- of the     09:24AM

21   5,000, probably 80 percent.

22         "THE COURT:  80?

23         "THE WITNESS:  80 percent."

24         Do you remember giving that testimony, Doctor?

25   A.  Yes, I do.                                                    09:24AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    Q.  That testimony that about 80 percent of the 5,000 prisoners

2    at Eyman have hepatitis C, is that accurate?

3    A.  It's probably -- again, probably more 80 percent of the

4    patients we see, but it's -- like I said, it's still a pretty

5    sizeable number.                                                09:24AM

6    Q.  But my question, Doctor, is, was your testimony that 80

7    percent of the approximately 5,000 prisoners at Eyman have

8    hepatitis C?

9    A.  Yes.

10   Q.  Is that accurate?                                          09:24AM

11   A.  It probably is not accurate.

12   Q.  Probably is not accurate.

13          Since giving that testimony, have you told Corizon

14   management or anyone else that your testimony was inaccurate

15   and needs to be corrected?                                     09:25AM

16   A.  No.  I had a discussion with the DOC staff and -- and kind

17   of thought that through, and again, it just dawned on me that,

18   you know, I cannot speak to the patients that -- not

19   patients -- that the people at Eyman prison are not -- you

20   know, there's a huge number of patients -- of people who are   09:25AM

21   not patients, so I can only speak to the people who are

22   patients, and probably about 80 percent of those that we see.

23   So I really -- it's possible that it's 80 percent of the 5,000

24   but I'm only going to speak to the ones that we see.

25   Q.  So you didn't contact anyone and say that the testimony you 09:25AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1   had given was inaccurate --

2   A.  No.  It's just --

3   Q.  Doctor, please wait for me to finish.

4   A.  I'm sorry.

5   Q.  So you didn't contact anyone and say that the testimony you     09:25AM

6   had given wasn't accurate and needed to be corrected?

7   A.  No.

8   Q.  And you testified also that cancer in general in prisons is

9   off the chart, it's unbelievable, correct?

10  A.  Yes, it is.                                                      09:26AM

11  Q.  And you testified, "We see infections that are off the

12  chart, just unbelievable infections."  Correct?

13  A.  We see a large number of common infections, but, yes,

14  there's a large number of infections.

15  Q.  Okay.                                                            09:26AM

16        And I believe you used the phrase, "We see infections

17  that are off the chart, just unbelievable infections."  Do you

18  remember that testimony?

19  A.  I don't remember that.

20  Q.  Would you turn to Page 501, please.                             09:26AM

21        Looking at Lines 8 and 9 on Page 501, the transcript

22  reads, quote, "We see infections that are off the chart, just

23  unbelievable infections," end of quote.  Did you give that

24  testimony?

25  A.  I'm going to assume so.  I don't recall, but I'm going to       09:27AM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─────

1    assume so since it's here.

2    Q.  You don't have any reason to believe this transcript is

3    inaccurate.

4    A.  No, I don't.

5    Q.  The prevalence of hepatitis C and cancer and infections has    09:27AM

6    an effect on the level of provider and other health care

7    staffing that you need in a prison environment, doesn't it?

8    A.  Repeat your question.  I'm sorry.

9    Q.  The prevalence of hepatitis C and cancer and infections has

10   an effect on the level of health care staffing that you need in    09:27AM

11   a prison setting, correct?

12           MS. LOVE:  Objection.  Foundation.  Exceeds the scope

13   of the stipulation.  And relevance.

14           THE COURT:  Overruled, all three.

15           THE WITNESS:  Okay.  The presence of illness, any    09:27AM

16   illness -- it doesn't matter if it's just those three things or

17   any illness -- that creates work for staff, requires staffing,

18   and yes, it does have an effect on the amount of staff, of

19   course.

20   BY MR. FATHI:    09:27AM

21   Q.  So the more cancer patients you have the more providers you

22   need, right?

23   A.  The more illness there is, the more providers I might need,

24   yes.

25   Q.  But you would agree specifically that the more cancer    09:28AM

1   patients you have the more providers you need?

2   A.  Staff.  I wouldn't say providers specifically.  Provider

3   has a connotation that you are looking at medical doctor and

4   nurse practitioner or PA that would be there.  There are --

5   there are positions for those, according to our SCUD, that fill     09:28AM

6   those spots at each -- I'm talking in particular to Eyman --

7   that fill the spots at Eyman, so we're full there.  There are a

8   couple of spots that we could use that overlap, providers that

9   overlap, but more disease wouldn't increase the number of

10  providers.  But nursing staff, it would increase the need for     09:28AM

11  nursing staff.

12  Q.  So you don't agree that the more cancer patients you have

13  the more providers you need?

14  A.  Yeah, that's -- the way you are saying it, I can't agree to

15  the way you are saying it, but yeah.                              09:29AM

16  Q.  Now, you testified that many of our providers are nurse

17  practitioners and some of them are pretty inexperienced and so

18  we spend a lot of time trying to educate.  Do you remember that

19  testimony?

20  A.  Yes.                                                          09:29AM

21  Q.  And the need to spend time educating inexperienced nurse

22  practitioners has an effect on how much time you as a provider

23  are able to spend on patient care, correct?

24  A.  Me as a site medical director it does, yes.

25  Q.  When you're providing education to an inexperienced nurse     09:29AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    practitioner you are not providing patient care, correct?

2    A.  As a medical director, yes.  The other providers don't

3    teach other providers.  It's the director that does that.

4    Q.  When you, Dr. Stewart, as the medical director, are

5    spending time providing education to an inexperienced nurse          09:29AM

6    practitioner you are not treating patients at the same time,

7    correct?

8    A.  That's correct.

9    Q.  Dr. Stewart, we talked about or you talked about in your

10   earlier testimony eOMIS, and eOMIS is the medical record system     09:30AM

11   that's used in ADC, correct?

12   A.  That's correct.

13   Q.  And you testified that it sometimes goes down or stops

14   functioning.

15   A.  Yes.                                                            09:30AM

16   Q.  When it goes down is that just at one complex or is it

17   system-wide throughout all 10 ADC prisons?

18   A.  Sometimes it's at one place.  Sometimes it's system-wide.

19   Q.  When eOMIS goes down it's sometimes unavailable all day,

20   correct?                                                            09:30AM

21   A.  It has been in the past.

22   Q.  And there's no backup system, is there?

23   A.  Pen and paper.

24   Q.  What I mean is when eOMIS is unavailable you, as a

25   physician, are unable to access your patients' medical records,     09:30AM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─

1   correct?

2   A.   That's not entirely true.  There is a paper record that

3   goes along with the eOMIS system, so we can access that paper

4   record, and again, we can write notes on paper, but it's -- our

5   up-to-date or current information might not be available.      09:31AM

6           THE COURT:  Let's drill down on this paper record that

7   supposedly exists with respect to eOMIS.  My experience from

8   what I understand in eOMIS is that's where all of the medical

9   records are placed for ongoing care for the inmates.  And you

10  are now referring to a paper record.  This is a surprise to me.  09:31AM

11  I have not heard of a redundancy paper record.  Explain to me

12  exactly the details of that paper record that supposedly exists

13  to back up eOMIS.

14          THE WITNESS:  I'm not saying it backs up eOMIS.  What

15  I'm saying is each inmate has a paper record.  So let's say     09:31AM

16  someone comes to see me and eOMIS is down and I say --

17          THE COURT:  Hold it.  What I'm asking about, and I

18  think you know what I'm asking about, and that is, what exists

19  with respect to when eOMIS goes down that you can go back in

20  time in paper to look at?  I don't think there's anything at    09:31AM

21  all like that.

22          THE WITNESS:  No, sir, there isn't.

23          THE COURT:  All right.  Just so we're clear.  Thank

24  you.

25          THE WITNESS:  Okay.                                     09:32AM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─────

1   BY MR. FATHI:

2   Q.  Doctor, you testified about the chronic care backlog at

3   Eyman.  Do you recall that testimony?

4   A.  Yes.

5   Q.  And you testified that Eyman had a huge backlog of chronic    09:32AM

6   care patients.

7   A.  They did.

8   Q.  I'm sorry?

9   A.  Yes, they did.

10  Q.  Would you turn to Exhibit 216, please?    09:32AM

11          Oh.  Doctor, they are in the -- may I approach?

12          THE COURT:  Please help him.

13          In fact, it would be helpful with our witnesses going

14  forward if you have made arrangements for the exhibits you're

15  going to use to have them handy for the witness so the    09:32AM

16  witnesses don't have to go fishing about for them.  That takes

17  time and it's unnecessary to deal with when the witness is on

18  the stand.

19  BY MR. FATHI:

20  Q.  Do you have it, Doctor?    09:33AM

21  A.  Yes.

22          MR. FATHI:  I'm sorry.  Do you have it, Your Honor?

23          THE COURT:  I don't.  I'm still looking.  I'm sorry.

24          Go ahead, please.

25  BY MR. FATHI:    09:34AM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─

1    Q.  Doctor, Exhibit 216 is a December 4, 2017 e-mail from

2    Daniel Sego to Glen Babich, correct?

3            Looking at the top of the first page.

4    A.  Yes.

5    Q.  And who are those people?                                    09:34AM

6    A.  Dr. Babich was a Regional Medical Director and Spencer Sego

7    is the -- was the FHA for -- the FHA health administrator for

8    Florence complex.

9    Q.  Is Mr. Sego still the FHA for Florence complex?

10   A.  No, he is not.                                               09:34AM

11   Q.  Does he still work for Corizon?

12   A.  No, he does not.

13   Q.  When did he leave?

14   A.  About two weeks -- a week or two weeks ago.

15   Q.  Was his departure voluntary or involuntary?                 09:34AM

16   A.  It was voluntary.  He took another job somewhere else.

17   Q.  And Dr. Babich, is he still Regional Medical Director?

18   A.  He is not.

19   Q.  And when did he leave that position?

20   A.  I can't recall when he left.  It's been some time.  I can't 09:35AM

21   tell you when he left.

22   Q.  And does he still work for Corizon?

23   A.  That I do not know.

24   Q.  Was his departure voluntary or involuntary?

25   A.  Again, I don't know the circumstances.                      09:35AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    Q.  So in Exhibit 216 Mr. Sego writes at the top of the page,

2    quote, "Eyman has 649 CC backlog," end of quote.  Do you see

3    that, Doctor?

4    A.  I see that.

5    Q.  And CC means chronic care?                                    09:35AM

6    A.  Yes, it does.

7    Q.  Do you have any reason to doubt that that figure is

8    correct?

9    A.  No, I do not doubt it.

10   Q.  So Eyman had a chronic care backlog of 649 on December 7 of  09:35AM

11   2017, correct?

12   A.  Yes.

13   Q.  And you testified this backlog had been eliminated by

14   January of 2018, correct?

15   A.  It was significantly reduced.  I wouldn't say it was zero    09:36AM

16   but it was -- I couldn't give you a number but it was probably

17   under 100.

18   Q.  So the backlog was reduced but it was not eliminated as of

19   January 2018?

20   A.  2018.  Yeah.  Correct.                                       09:36AM

21   Q.  Has there been any chronic care backlog at Eyman at any

22   time since January of 2018?

23   A.  We have a -- I mean, nothing over, you know, of a hundred.

24   We just have a small backlog right now that we're taking care

25   of.                                                              09:36AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    Q.  What is the chronic care backlog at Eyman?

2    A.  Tough question.  After last weekend, I couldn't tell you.

3    I really -- after last weekend, I would only be guessing so it

4    wouldn't be an accurate number.

5    Q.  Isn't it important for the site medical director to know          09:36AM

6    what the chronic care backlog is?

7    A.  It's important to know that there is a backlog, and I am

8    aware of that.  The actual number is not that important.

9    Q.  Not important for you to know?

10   A.  No.  We put a plan together last weekend, we're putting a          09:37AM

11   plan together for the future weekends to try and overcome the

12   backlog, and it -- it requires a lot of work and voluntary work

13   on the weekends.  So I worked myself last weekend.

14   Q.  Is the current backlog over a hundred?

15   A.  I believe it is.  I believe it is.                                 09:37AM

16   Q.  Is it over 200?

17   A.  I do not think it's over 200, no.

18   Q.  In 2018 has there ever been a chronic care backlog over 200

19   at Eyman?

20   A.  No.  Not in 2018.  The current backlog is -- when I say           09:37AM

21   backlog, it's a number that has to be -- there's a number of

22   patients that -- chronic cares that have to be completed by

23   July 1st.  So that's what we are attempting to take care of so

24   that on July 1st that we don't have a backlog.

25            THE COURT:  So when you refer to last weekend, is that       09:38AM

——6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross——

1    because you were -- I'm confused because you said that the

2    deadline's June 1st, but last weekend is after June 1st.

3              THE WITNESS:  July 1st.

4              THE COURT:  Oh, okay.  I'm sorry.  I misheard.

5              So if we looked at your work records we would find          09:38AM

6    that you were working on weekends, the weekend before the start

7    of every month for the last couple of months?

8              THE WITNESS:  No.  I just -- personally, I worked just

9    last weekend.

10             THE COURT:  I see.                                          09:38AM

11             THE WITNESS:  I've had other providers work -- every

12   weekend there's going to be someone working on chronic cares.

13             THE COURT:  But if we looked at the number of

14   providers who were working on the weekend before the start of a

15   new month, that would give us an indication of how much of a        09:38AM

16   mad dash there is to try to get through the backlog before the

17   next reporting period.  Is that fair?

18             THE WITNESS:  No, I don't think that's fair.  I

19   think -- well, every single weekend, the first weekend of the

20   month, second weekend of the month, third weekend of the month,     09:39AM

21   every weekend we have someone working.

22             THE COURT:  Are there more people working --

23             THE WITNESS:  Always a mad dash.

24             THE COURT:  All right.  Always a mad dash.

25             Are there more providers working on the weekend before     09:39AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    the start of a new month?

2            THE WITNESS:  It's pretty much the same because

3    there's only so much telecom positions and there's only so many

4    treatment rooms that we can put a provider in.  So we fill them

5    every weekend pretty much.                                    09:39AM

6            THE COURT:  I see.  Thank you.

7    BY MR. FATHI:

8    Q.  Doctor, were you running chronic care lines last weekend

9    because of plaintiffs' counsel's upcoming tour of the Eyman

10   facility the week of June 18?                                 09:39AM

11   A.  I'm sorry.  Say that one more time.

12   Q.  Was the fact that you were running chronic care lines on

13   the weekend, last weekend, in any way related to the fact that

14   plaintiffs' counsel were planning to tour the Eyman facility

15   next week?                                                    09:40AM

16   A.  I didn't know that there was a tour next week.

17   Q.  You weren't aware of that?

18   A.  Huh-uh.  No.  Sorry.

19            It -- you know, that might be a FHA question, facility

20   health, for Eyman.  I wasn't aware.  I'm sure they are aware if  09:40AM

21   there was a tour.

22            MR. FATHI:  Your Honor, I move the admission of

23   Exhibit 216.

24            THE COURT:  Any objection?

25            MS. LOVE:  No objection.                             09:40AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1          THE COURT:  216 is received.

2   BY MR. FATHI:

3   Q.  Doctor, would you please turn to Exhibit 215.  It should be

4   in the box behind you.

5          Yes.                                                      09:40AM

6          MR. FATHI:  And I apologize, Your Honor, for not

7   laying these out ahead of time.

8          THE COURT:  Thank you.  If we can work on that in the

9   future that would be helpful.

10         MR. FATHI:  We shall, Your Honor.                         09:40AM

11         THE COURT:  Thank you.

12         MS. LOVE:  Mr. Fathi, did you say 250 or 215?

13         MR. FATHI:  215.

14  BY MR. FATHI:

15  Q.  Is that what you have?                                       09:41AM

16         MS. KENDRICK:  Would you like me to approach and pull

17  the other exhibits?

18         THE COURT:  Yes.  That's a good idea.  Thank you.

19  BY MR. FATHI:

20  Q.  Do you have it, Doctor?                                      09:41AM

21  A.  I do.

22  Q.  Exhibit 215 is a number of November 16, 2017 e-mails to and

23  from Mary Marino.  Who is Mary Marino?

24  A.  She's a chronic care coordinator.

25  Q.  At the Eyman facility?                                       09:41AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1   A.   At Eyman, yes.

2   Q.   Is she still in that position?

3   A.   She is.

4   Q.   And toward the bottom of the page there's an e-mail to her

5   from a Benjamin Schmidt.  Who is Mr. Schmidt?                    09:41AM

6   A.   He's the FHA from Tucson, and he was coming down to give

7   Eyman a hand when the FHA left Eyman.

8   Q.   Is Mr. Schmidt still the FHA at Tucson?

9   A.   He is still the FHA at Tucson.

10  Q.   Is he still providing assistance to Tucson?                 09:42AM

11  A.   He does.

12  Q.   Now, in that e-mail, toward the bottom of the page,

13  Mr. Schmidt writes, quote, "The providers mentioned yesterday

14  the need for labs on the chronic cares," end of quote.  Do you

15  see that?                                                        09:42AM

16  A.   I see that.

17  Q.   And then above on the same page is Ms. Marino's response.

18  Would you please read aloud the first sentence of Ms. Marino's

19  response?

20           MS. LOVE:   Objection.  Foundation.                     09:42AM

21           THE COURT:  What's the foundation objection?

22           MS. LOVE:   There's been no establishing with this

23  witness that he has ever received this e-mail or has seen it

24  before.

25           THE COURT:  He's asked him to read it aloud.  I don't   09:42AM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─────

1    see how there's a foundation objection to that question.

2    Overruled.

3    BY MR. FATHI:

4    Q.  Would you, please?

5    A.  Yes.                                                          09:42AM

6    Q.  Read the --

7    A.  Just the statement on the next page?

8    Q.  No.  On page 215.1, toward the middle of the page, the

9    e-mail from Mary Marino, please read the first sentence.

10   A.  "The issue was that I was told not to order labs on the      09:43AM

11   patients that were backlogged because we didn't know when they

12   would be seen and it would be a wasted lab.  I have been trying

13   to order five labs per day per unit because we only have two

14   techs and if I order more than that they can't keep up."

15       Continue?                                                    09:43AM

16   Q.  One more sentence, please.

17   A.  "If they can't keep up it puts them out of compliance."

18   Q.  Thank you, Doctor.

19       Doctor, were you aware of an instruction not to order

20   labs on chronic care patients who were backlogged?               09:43AM

21           MS. LOVE:  Objection.  Foundation and hearsay.

22           THE COURT:  How can it be a foundation objection when

23   he's asking him whether he's aware?

24           MS. LOVE:  Because again, we're just reading from a

25   document that he has no indication --                            09:43AM

1           THE COURT:  He asked him whether he's aware of what

2      he's just read.  How can there be a foundation objection to

3      that?  Because he's asking him, "Do you know?"  The answer to

4      that is yes or no, likely, and then maybe there will be a

5      follow-up question and maybe there will be an appropriate          09:44AM

6      objection at that point, but there's not -- the foundation

7      objection is overruled and the hearsay objection is overruled

8      because we have an e-mail from somebody who works for the agent

9      of the defendant.

10     BY MR. FATHI:                                                      09:44AM

11     Q.  Doctor, I will repeat the question.

12          Were you aware of an instruction not to order labs on

13     chronic care patients who were backlogged?

14     A.  No.

15     Q.  Is such an instruction medically appropriate?                  09:44AM

16     A.  Not appropriate, no.

17     Q.  Isn't it true that lab tests could show a need for urgent

18     intervention, and if a lab test is delayed a patient could be

19     harmed?

20     A.  Correct.                                                       09:44AM

21          MR. FATHI:  Your Honor, I move the admission of

22     Exhibit 215.

23          THE COURT:  Any objection?

24          MS. LOVE:  We stand on our prior objections.

25          THE COURT:  What's the point of admitting this                09:45AM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─

1    document?  What are you seeking to admit it for?

2         MR. FATHI:  I'm seeking to admit it for the truth of

3    this statement that there was an order -- there was an

4    instruction not to order labs on patients who were backlogged,

5    not because they didn't need the labs but simply because it          09:45AM

6    would put them out of compliance.

7         THE COURT:  Can you lay a foundation with this witness

8    for a hearsay exception?

9         MR. FATHI:  Your Honor, it's -- there's no -- it's a

10   nonhearsay admission of Corizon, which is an agent of the          09:45AM

11   defendant here.

12        THE COURT:  Well, I mean, you're seeking to have me

13   accept the truth of the matter asserted, which I gather is that

14   these labs were not ordered because they would be out of

15   compliance.                                                         09:45AM

16        MR. FATHI:  The statement "I was told" --

17        THE COURT:  Is the statement right?

18        MR. FATHI:  Yes.

19        THE COURT:  So how is it that you find an exception to

20   the hearsay rule because that is an out-of-court statement          09:45AM

21   offered?

22        MR. FATHI:  It's not an exception, Your Honor.

23   Admissions of a party opponent are nonhearsay.

24        THE COURT:  Have you laid a foundation for the

25   admission of a party opponent?                                      09:46AM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─────

1        MR. FATHI:  Yes, Your Honor.  This is defendants' own

2   document that they have produced to us in this litigation.

3   There's no dispute as to the authenticity.  No one denies this

4   is a statement made by a Corizon employee in the course of her

5   duties for the Arizona Department of Corrections.  So there's        09:46AM

6   no -- it's a nonhearsay admission.

7        THE COURT:  Ms. Love?

8        MS. LOVE:  Your Honor, I believe -- it's defendants'

9   position that the element we're missing here for admission of a

10  non -- admission of an agent of a party is laying the                09:46AM

11  foundation that this person in this e-mail was a person that

12  was authorized by Corizon to speak on behalf of Corizon

13  regarding this matter.

14        MR. FATHI:  Your Honor, there's no requirement in Rule

15  801(d)(2) that the person be authorized to speak on the matter.      09:46AM

16  All that is required is that the person be an agent of a party

17  opponent.  There's no dispute, as I understand it, that Ms.

18  Marino was a Corizon employee.  I believe Dr. Stewart testified

19  to that.  If not, I can ask that question.  But there's no

20  requirement that this statement be specifically authorized.         09:47AM

21  All that's required is that it be a statement of an agent of a

22  party opponent, and that is not disputed.

23        THE COURT:  Well, I'll take under advisement the

24  objection and take a look closer at the rule, but you've all

25  laid the evidentiary foundation for your respective positions.      09:47AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1           MR. FATHI:  Thank you.

2    BY MR. FATHI:

3    Q.  Doctor, in case I didn't ask the question, is Ms. Marino a

4    Corizon employee?

5    A.  Yes, she is.                                                    09:47AM

6    Q.  The chronic care backlog at Eyman creates a risk to patient

7    health and safety, doesn't it?

8    A.  Yes.

9    Q.  Would you turn to Exhibit 213, please, Doctor.

10          Doctor, Exhibit 213 is a November 3rd, 2017 e-mail          09:48AM

11   from Matilde Smith to a number of recipients, including you.

12   Do you see that?

13   A.  Give me one second.

14          Yes, I see that.

15   Q.  And who is Matilde Smith?                                      09:48AM

16   A.  She's the assistant FHA, the AFHA.

17   Q.  At Eyman?

18   A.  At Eyman, yes.

19   Q.  Is she still in that position?

20   A.  She is.                                                        09:48AM

21   Q.  Would you please read the body of her e-mail?

22   A.  "Sego, please forgive my objection.  As you are aware,

23   Eyman chronic care backlog continues to climb daily.  We are in

24   desperate need of assistance, per the meeting we have been

25   involved in, Dr. Babich and Dr. Patel has been assisting         09:49AM

1    Florence weekly to assist in your backlog.  NP McGary was to be

2    the full-time provider at Cook unit which is currently not

3    staffed.  I am rotating Eyman providers daily to meet PM 39 and

4    stay in compliance.  In the last month and a half we have sent

5    out three inmates who were on the backlog at Cook unit to local      09:49AM

6    ER with life-threatening issues which correlate with their

7    chronic conditions, one of which expired at the hospital.  NP

8    Okafor did assist three days this past week with Dr. Stewart,

9    which was extremely helpful, with PM 39, but we are in

10   desperate need of an experienced, fasted-paced provider, such       09:50AM

11   as NP McGary.  Please consider everything her start at Eyman

12   under the direction of Medical Director Stewart.  We can

13   accommodate her schedule and assist in any way possible."

14   Q.  Thank you, Doctor.

15            MR. FATHI:  Your Honor, I move the admission of            09:50AM

16   Exhibit 213.

17            THE COURT:  Any objection?

18            MS. LOVE:  No objection.

19            THE COURT:  213 is received.

20            MR. FATHI:  Your Honor, on the previous point,             09:50AM

21   co-counsel has reminded me that in *Braggs versus Dunn*, a prison

22   case from the Middle District of Alabama, 2017 Westlaw

23   426875 --

24            THE COURT:  Hold it just a second.

25            Go ahead again, please.                                    09:50AM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─────

1        MR. FATHI:  Ready?

2        THE COURT:  Yep.

3        MR. FATHI:  2017 Westlaw 426875, Middle District of

4   Alabama, January 31st, 2017, it was specifically held that

5   statements by Corizon mental health staff were nonhearsay          09:51AM

6   admissions because of the -- because Corizon was an agent of

7   the Department of Corrections in that case.

8        THE COURT:  Thank you.

9   BY MR. FATHI:

10  Q.  Doctor, would you turn to Exhibit 170, please.                 09:51AM

11       Do you have it, Doctor?

12  A.  I have it.

13  Q.  This is somewhat lengthy, a little over a page.  Please

14  take a moment to look it over and let me know when you are

15  ready to answer questions.                                         09:51AM

16       MR. FATHI:  Do you need a copy, Your Honor?

17       THE COURT:  I'm still looking.  I'm sorry.

18       MS. EIDENBACH:  May I approach, Your Honor?  I've got

19  a copy for you.

20       THE COURT:  You surely may.  Thank you.                       09:52AM

21       Ms. Eidenbach, thank you.  I can give it back.

22  BY MR. FATHI:

23  Q.  Ready, Doctor?

24  A.  I am.

25  Q.  Exhibit 170 is a December 26, 2017 e-mail from Rob Patel to    09:54AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1   a number of recipients, including you, correct?

2   A.   Yes.

3   Q.   Who is Robert Patel?

4   A.   He was the Regional Medical Director at the time.

5   Q.   Is Dr. Patel still Regional Medical Director?          09:54AM

6   A.   He is not.

7   Q.   And when did he leave?

8   A.   I would say probably sometime in March, maybe.

9   Q.   Of 2018?

10  A.   Yeah, 2018.                                             09:54AM

11  Q.   Does he still work for Corizon?

12  A.   No, he does not.

13  Q.   Was his departure voluntary or involuntary?

14  A.   I believe it was voluntary.

15  Q.   Doctor, this e-mail chain involves a 78-year-old man with   09:55AM

16  invasive bladder cancer, correct?

17  A.   Says here 77.  Yes.

18       THE COURT:  Now, as I look at it, albeit I'm the one

19  with vision problem, it looks to me like it says Mr. Burton is

20  a 78-year-old who entered ADOC on 7-17-17.                  09:55AM

21       THE WITNESS:  I was looking down at the bottom.  The

22  patient is a 77-year-old male with --

23       THE COURT:  Right.  So he's 77 or 78.

24       THE WITNESS:  Okay.

25       MR. FATHI:  Thank you, Your Honor.                     09:55AM

—6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross—

1    BY MR. FATHI:

2    Q.  And Dr. Patel is forwarding an e-mail from David Robertson

3    also on December 26.  Do you see that?

4    A.  I see that.

5    Q.  And who is David Robertson?                                      09:55AM

6    A.  He's a medical director for DOC.

7    Q.  Is he still in that position?

8    A.  Yes, I believe so.

9    Q.  Would you please read aloud the first two lines of

10   Dr. Robertson's e-mail in the middle of the page?                    09:55AM

11   A.  Read the first two lines in the middle of the page or --

12   Q.  Right after "Dr. Patel" --

13   A.  "Mr. Burton is a 78-year-old who entered ADOC on 7-17-17.

14   It does not appear he is receiving appropriate follow-up for

15   diagnosed untreated bladder cancer."                                 09:56AM

16   Q.  Thank you.

17          Further down Dr. Robertson quotes an August 4th, 2017

18   note in this patient's record that was made by Dr. Watson?  Do

19   you see that about two-thirds of the way down the page?

20   A.  Where it says "Dr. Watson noted"?                                09:56AM

21   Q.  Yes.

22   A.  Yes.

23   Q.  Would you please read aloud the two sentences beginning,

24   "He had a CT December 2016..."

25   A.  He had a -- that's stated a number of times.  Are you           09:56AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    talking where -- after "it denies pain"?

2    Q.  Yes.  Please read those two sentences.

3    A.  Okay.  "He had a CT December 2016 that showed possible

4    nodules in his chest.  The oncologist recommended that the CT

5    be repeated in July, and that has not been done."                    09:57AM

6    Q.  Okay.  Thank you.

7              And, in fact, as of the date of this e-mail, December

8    26, 2017, a year later, that chest CT still hadn't been

9    repeated, had it?

10   A.  Apparently, it had not been.                                     09:57AM

11             MR. FATHI:  Your Honor, I move the admission of

12   Exhibit 170.

13             THE COURT:  Any objection?

14             MS. LOVE:  No objection.

15             THE COURT:  170 is received.                               09:57AM

16   BY MR. FATHI:

17   Q.  Doctor, you testified that you personally had never

18   deprived a patient medication in order to save Corizon money,

19   correct?

20   A.  Correct.                                                         09:58AM

21   Q.  Are you aware of any providers having difficulty getting

22   necessary medications for their patients because those

23   medications were non-formulary?

24   A.  Yes.  I can say yes to that.

25   Q.  About how many occasions of that are you aware of?               09:58AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    A.  I couldn't give a number.  I'm sorry.

2    Q.  More than 100?

3    A.  No, I wouldn't say more than 100.

4           The reason that -- you know, obtaining a medication on

5    non-formulary has to go through steps and those steps are            09:58AM

6    overseen by regional medical directors, and they deny

7    medications and offer either a more appropriate or another

8    substitution medication that does the same thing that Corizon

9    has -- you know, gets it for a cheaper amount.  That only makes

10   sense.  I mean, all insurance companies do that.                     09:59AM

11   Q.  Excuse me, Doctor.  I think my question was, has it

12   happened more than 50 times that you are aware of?

13   A.  I really -- I can't give you a number.  It's happened a few

14   times, yeah.

15   Q.  And as sometimes is the case isn't it that the provider         09:59AM

16   believes that this patient needs a specific medication and he's

17   not able to get it because it's not formulary, correct?

18   A.  He is unable to get it not because it's not formulary.

19   He's unable to get it because on the formulary it has to go

20   through steps, it's reviewed, and then they determine that          09:59AM

21   there's an alternative medication on the formulary that would

22   do the same thing.

23   Q.  And sometimes the provider disagrees with that conclusion

24   that it would do the same thing, doesn't he or she?

25   A.  Occasionally that happens.                                       09:59AM

────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross────

1    Q.   That does happen, doesn't it?

2    A.   It does happen.   That would be a small number, though.

3    Q.   That would be a small number?

4    A.   Uh-huh.

5    Q.   Would you turn to Exhibit 276, please.                      10:00AM

6    A.   216?

7    Q.   276.

8             MR. FATHI:   May I assist the doctor?

9             THE COURT:   Please.

10            MS. EIDENBACH:   Your Honor, would you like -- I'm not   10:00AM

11   sure --

12            THE COURT:   It's just maddening.   It's almost like a

13   game, that every time Mr. Fathi says one it's one that I cannot

14   find.

15            Please.   Thank you.                                     10:01AM

16   BY MR. FATHI:

17   Q.   We're going to be looking at Page 2 of Exhibit 276.

18   A.   That's the point 2 page?

19   Q.   Yes.   276.2.

20            Do you have it, Doctor?                                  10:01AM

21   A.   I do.

22   Q.   This is a December 8th, 2017 e-mail from Chris Johnson, DO,

23   that was either copied or forwarded to you.   Do you see that?

24   A.   Yes.

25   Q.   Who is Dr. Johnson?                                         10:01AM

—6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross—

1   A.   He's one of the providers at Eyman.

2   Q.   Is he still a provider at Eyman?

3   A.   Yes, he is.

4   Q.   Would you please read his e-mail aloud.

5   A.   Starting down at the middle of the page there?  I put --          10:02AM

6   Q.   Starting there, yes, Doctor.

7   A.   "I put in a request for Granix, which is filgrastim,

8   initially.  It is non-formulary and still hasn't been approved.

9   We are being told that our backup pharmacy does not have Granix

10  and the medication is supposed to be administered today.  I was   10:02AM

11  looking for available alternatives.  If you are comfortable

12  leaving him at risk of infection without this medication until

13  next week, Granix would be fine.

14          The original plan was for the patient to be

15  hospitalized for this treatment.  I have been e-mailing the       10:02AM

16  world about this problem and have stated repeatedly that a yard

17  is not appropriate placement for this patient but he is here,

18  and now I cannot get the medications needed to treat him

19  appropriately.  This was and is still my original concern.

20          Thanks."                                                  10:03AM

21          MR. FATHI:  Your Honor, I move the admission of

22  Exhibit 276.

23          THE COURT:  Any objection?

24          MS. LOVE:  No objection.

25          THE COURT:  276 is received.                              10:03AM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─────

1          I have to say it's staggering to me, and I have used

2     that word before, but here we are, and we read an e-mail which

3     is recent in time, meaning well after the stipulation was

4     entered and well after I had repeated assurances from the

5     defendants that care was being provided, and it's not just one          10:03AM

6     office anymore because if that's what people say on the other

7     side, they say, oh, these are just individual examples and

8     there will be individual examples of problems, but they just

9     become cumulative, overpowering and sickening.

10          MS. LOVE:  Your Honor, for the record, Page 1 of          10:04AM

11    Exhibit 276 was not read, the first e-mail, and Dr. Stewart is

12    on that e-mail and it does discuss that Dr. Stewart made

13    efforts to indeed get that medication.

14          THE COURT:  Right.  But I guess I would think that

15    Dr. Stewart, for all of his commendable attention to matters in          10:04AM

16    the case, is but one person who is stretched between two yards

17    of 5,000 people each, trying to jump in and cover.  And so here

18    we have a report of an extreme emergency reported by the

19    provider, the doctor, who says he's been screaming to the world

20    about this.          10:05AM

21          So one wonders, here's a scream to the world, and

22    great, the defendants tell me the scream to the world has been

23    responded, but you cannot scream to the world at the top of

24    your lungs about every single person who needs care.

25          And so just as the observation could be made that it's          10:05AM

1    commendable to have this list of people that are talked about,

2    that the witness has testified about before, that are raised

3    with Corizon on an emergent basis to try to bypass the

4    procedures and the backlogs and the delays, you can't scream

5    about every single person.                                    10:05AM

6            So the scream that is happening for these most

7    emergent cases is certainly a scream that should be

8    unnecessary, but also one worries if you have this procedure

9    for the most extreme cases then you worry about the extreme

10   cases; you think these extreme cases should be seen but there's  10:06AM

11   no opportunity to raise them because we're already screaming

12   about the extreme ones, the most extreme ones.

13           So the extreme ones get fallen off and then you are

14   almost ignoring the fact that what about the people on the

15   average day who come in who have cancer and are told that they  10:06AM

16   need to be seen by a provider, or have a test, and they're not

17   the most extreme, they're not the extreme, they're just the

18   ones that the State has promised to provide care to.  Who is

19   screaming for them?  Obviously, no one, because they are

20   falling off in this backlog.                                  10:06AM

21           So the suggestion by defendants' counsel that the fact

22   that ultimately Dr. Watson attended to this person doesn't

23   really comfort me very much, because this is an e-mail about

24   the most extreme and the e-mails I know can't possibly be

25   written because there just isn't enough time in the day about  10:07AM

1    the merely extreme cases or the ones who are entitled to this

2    care who don't get it because the system is over strapped,

3    understaffed, and filled with a rotating roster of people such

4    that you would write in any kind of address book everybody's

5    name, it seems, in pencil because you knew you would be erasing   10:07AM

6    it pretty darn soon.

7            And that's --

8            MR. FATHI:  Your Honor --

9            THE COURT:  -- a big problem because, obviously, if

10   you have to train these people constantly you are not able to   10:07AM

11   devote your attention to medical care.

12           And, Doctor, you have testified that you want to be

13   there helping people, but you have also testified that you're

14   the one who has to do the training; if there's this constant

15   influx of new people that you have to train, your ability to   10:07AM

16   jump in and to be the emergency assist is obviously limited.

17           So it's -- it is troubling from every aspect.  The

18   more we learn, the less comforted we have become.

19           MR. FATHI:  Your Honor, I believe you meant to say

20   Dr. Stewart when you said Dr. Watson.   10:08AM

21           THE COURT:  You are right.  I did make that mistake,

22   and I'm sorry, sir.

23   BY MR. FATHI:

24   Q.  Dr. Stewart, let's talk about outside consults and consult

25   requests, and this is when a provider believes that his or her   10:08AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1   patient needs to be sent out to a specialist, like a

2   cardiologist or neurologist, correct?

3   A.  Yes.

4   Q.  And the provider then makes that request by filling out a

5   form in eOMIS, right?                                         10:08AM

6   A.  Yes.

7   Q.  And one of the performance measures in the Parsons case

8   requires that urgent specialty consults and urgent specialty

9   diagnostic services will be scheduled and completed within 30

10  calendar days of the consultation being requested by the      10:09AM

11  provider.  That's Performance Measure 50, correct?

12  A.  Yes.

13  Q.  And another one of the performance measures requires that

14  routine specialty consultations will be scheduled and completed

15  within 60 calendar days of the consultation being requested by  10:09AM

16  the provider.  That's Performance Measure 51, correct?

17  A.  That's correct.

18  Q.  I want to read some testimony you gave on March 14, so if

19  you could turn to Page 567, please.

20  A.  I have it.                                                 10:09AM

21  Q.  Doctor, on Page 567, beginning at line 20, the record

22  reflects that you gave the following testimony:

23          "QUESTION:  Under your direction as medical director

24  at Eyman, are you aware of any Corizon medical personnel at any

25  level ever cancelling an outside specialty consult to avoid a  10:10AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1   finding of noncompliance on timelines?

2           "ANSWER:  No.

3           "QUESTION:  Same question with respect to cancellation

4   of an outside specialty consult to avoid fines that may be

5   potentially at issue in this lawsuit.                              10:10AM

6           "ANSWER:  No."

7           Did I read that correctly, Doctor?

8   A.  Yes.

9   Q.  Did you give that testimony on March 14?

10  A.  Yes.                                                           10:10AM

11  Q.  Would you give the same answers to those questions today?

12  A.  Yes.

13  Q.  Doctor, would you please look at Exhibit 3, which has been

14  already admitted.

15          MR. FATHI:  May I assist?                                  10:10AM

16          THE COURT:  Yes, please.  Thank you.

17          Counsel for both parties may have leave for the

18  balance of the time that I'm on this case to approach a witness

19  to assist in locating and identifying exhibits without making a

20  particular request.                                               10:11AM

21  BY MR. FATHI:

22  Q.  Dr. Stewart, Exhibit 3, which has already been admitted, is

23  a September 18, 2017 e-mail from Sara Neese to Jan Watson.  Do

24  you see that?

25  A.  I see that.                                                    10:11AM

—6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross—

1    Q.  Who is Sara Neese?

2    A.  She was the former clinical care coordinator.

3    Q.  At the Eyman facility?

4    A.  At Eyman, yes.

5    Q.  She is no longer in that position?                    10:11AM

6    A.  She is not.

7    Q.  When did she leave?

8    A.  Right around the time I was last here, right around the

9    time, so March 17 was about that time.

10   Q.  Does she still work for Corizon?                       10:11AM

11   A.  She does not.

12   Q.  Was her departure voluntary or involuntary?

13   A.  Voluntary.

14   Q.  Would you please read aloud the text of this e-mail,

15   Exhibit 3?                                                 10:12AM

16   A.  "Hello, Dr. Watson.  Could you please cancel" -- there's a

17   blank -- "infectious disease consults?  There are two.  We do

18   not have a provider to send them to.  One was approved and has

19   been sitting there for 42 days.  After 30 days we get nailed

20   for 1,000 bucks a day until they are seen.  Also, please look   10:12AM

21   at my previous e-mail and answer the other ATP NMIs if you

22   would.  We really need them answered to get our job done.

23          "Thanks.  I appreciate it.

24          Sara Neese."

25   Q.  Thank you, Doctor.                                     10:12AM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─

1          Would you now look at Exhibit 270.

2          Doctor, Exhibit 270 is a December 1, 2017 e-mail from

3    Sara Neese to CG Thomas.  Do you see that?

4    A.  I see that.

5    Q.  Who is CG Thomas?                                        10:13AM

6    A.  She's a provider at the Rynning Unit at Eyman Prison.

7    Q.  Is she still in that position?

8    A.  She is.

9    Q.  Would you please read aloud the text of this e-mail,

10   please.  Don't read the patients' names or numbers.         10:13AM

11   A.  Okay.

12          "Hello.  Could you please cancel requests for...and

13   they are too far out to put in right now.  We only have a

14   60-day window for routine consults and 30 days for urgents to

15   send them out.  If they are over that allotted amount of time, 10:13AM

16   we get dinged on our CGAR measure and fined every day until

17   they are seen."

18   Q.  Thank you, Doctor.

19          Would you please now look at Exhibit 415.

20          Doctor, Exhibit 415 is a September 11, 2017 e-mail    10:14AM

21   from Sara Neese to Jan Watson.

22          Do you see that?

23   A.  Yes.

24   Q.  Would you please read the text of that e-mail aloud.

25   A.  "Hello, Dr. Watson.  You had put in a consult request    10:14AM

1    for...  It was for a cardiology visit to be scheduled in

2    November.  Could I ask you to cancel the request and put it in

3    at a later date closer to November as we only have a 60-day

4    window to get it processed and scheduled.  If it's past that

5    time frame we get fined a thousand dollars a day just for that          10:15AM

6    one consult.

7         Thank you."

8    Q.  Dr. Stewart, is it still your testimony that you are not

9    aware of any Corizon personnel ever cancelling an outside

10   specialty consult to avoid a finding of noncompliance?                  10:15AM

11   A.  Well, having read these exhibits, I can't say that.  If

12   these are -- if this is Sara Neese's observation there is a

13   problem, but --

14   Q.  Do you have any reason to doubt the authenticity of those

15   three e-mails that you just read?                                       10:15AM

16   A.  No.

17   Q.  Is it still your testimony that you are not aware of any

18   Corizon personnel ever cancelling an outside consult to avoid

19   fines?

20   A.  That, I don't know.  I can't say.  I don't know what                10:16AM

21   happened after these e-mails went out, whether the consults

22   were actually cancelled.  I can't say.

23   Q.  Again, my question is, is it still your testimony that you

24   are not aware of any Corizon personnel ever cancelling an

25   outside consult?                                                        10:16AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    A.  I would have to say yes.  That's still my testimony.

2    Q.  That's still your testimony?

3    A.  Yes.

4    Q.  All right, then.

5         MR. FATHI:  Your Honor, I move admission of Exhibit        10:16AM

6    270.

7         THE COURT:  Any objection?

8         MS. LOVE:  No objection.

9         THE COURT:  270 is received.

10        MR. FATHI:  And I move admission of Exhibit 415.        10:16AM

11        THE COURT:  Any objection to 415?

12        MS. LOVE:  No objection.

13        THE COURT:  It is received.

14   BY MR. FATHI:

15   Q.  Doctor, as a Corizon physician is your compensation        10:16AM

16   affected in any way by the number of outside consults you

17   order?

18   A.  No.

19   Q.  Is your compensation affected in any way by the number of

20   outside consults you order which are approved or denied?        10:16AM

21   A.  No.  My personal pay you're saying?

22   Q.  Yes.  Your compensation from Corizon.

23   A.  No.  I'm sorry.  No, it's not.

24   Q.  Is your compensation affected in any way by the number of

25   your patients who are sent off site?        10:17AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1   A.  No, they are not.

2   Q.  As a Corizon physician, are you eligible for any kind of

3   bonus or incentive payments?

4   A.  No, I'm not.

5   Q.  Let's talk about Dr. Jan Watson.  You testified you became    10:17AM

6   Dr. Watson's supervisor when you became Eyman's site medical

7   director in May or June of 2017.  Correct?

8   A.  That's correct.

9   Q.  And you testified that you had concerns about Dr. Watson's

10  job performance in the summer and fall of 2017.  Correct?        10:17AM

11  A.  Yes.

12  Q.  Would you please look at Exhibit 199.

13          Do you have it, Doctor?

14  A.  Yes.

15  Q.  Exhibit 199 is an e-mail from Paul Torrez to Robert Manche,   10:18AM

16  copying you and Maureen Johnson, dated July 11, 2017, correct?

17  A.  Yes.

18  Q.  And the subject is Jan Watson?

19  A.  Yes.

20  Q.  Did you receive this e-mail on or about July 11, 2017?        10:18AM

21  A.  I don't recall.

22  Q.  Do you have any reason to doubt you received this e-mail on

23  or about July 11, 2017?

24  A.  No.

25  Q.  Who is Paul Torrez?                                           10:18AM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─────

1    A.   He was the former Director of Operations.

2    Q.   For Corizon?

3    A.   For Corizon.

4    Q.   Nationwide or just in Arizona?

5    A.   Just at Florence and Eyman.                                    10:19AM

6    Q.   And is he still in that position?

7    A.   No, he's not.

8    Q.   When did he leave that position?

9    A.   I don't know.  If I had to guess, March, sometime in March

10   maybe.                                                             10:19AM

11   Q.   Of this year?

12   A.   Yes.

13   Q.   And was his departure voluntary or involuntary?

14   A.   It was involuntary, I believe.

15   Q.   What were the circumstances of his departure?          10:19AM

16   A.   I really don't know.  I just know he was asked to step

17   down.

18   Q.   And who is Robert Manche?

19   A.   That name I'm not sure of.

20   Q.   You don't know what his role was?                       10:19AM

21   A.   No.  It says here manager, physician, leadership,

22   acquisition at Corizon, health interim practitioner program.

23   Q.   But other than what it says on this document you have no

24   knowledge?

25   A.   No.                                                          10:19AM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─

1    Q.  Would you please read the first two lines of this e-mail?

2    A.  "My understanding is that she is doing well.  Dr. Stewart

3    and Mrs. Johnson, please provide input to Bob to see if we want

4    to extend Dr. Watson."

5    Q.  And when it says "she is doing well" that refers to          10:20AM

6    Dr. Watson, correct?

7    A.  That's correct.

8    Q.  Did you ever respond to this e-mail?

9    A.  I did not.  Ms. Johnson responded, I believe, to this

10   e-mail.                                                          10:20AM

11   Q.  Do you know that or --

12   A.  I don't know that for a fact.

13   Q.  All right.

14        Did you ever tell Mr. Torrez or Mr. Manche that you

15   disagreed with Mr. Torrez's statement "my understanding is that  10:20AM

16   she is doing well"?

17   A.  I did not.

18   Q.  In fact, at one point you asked Dr. Watson to come on staff

19   permanently, didn't you?

20   A.  I did.                                                       10:20AM

21        MR. FATHI:  Your Honor, I move the admission of

22   Exhibit 199.

23        THE COURT:  Any objection?

24        MS. LOVE:  No objection.

25        THE COURT:  199 is received.                                10:20AM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─

1    BY MR. FATHI:

2    Q.  Now, Dr. Watson worked on Cook unit, correct?

3    A.  Yes.

4    Q.  And you testified that Cook is a tough yard to work on.

5    A.  Yes, it is.                                              10:21AM

6    Q.  There's a lot of illness?

7    A.  Yes, there is.

8    Q.  A ton of cardiac conditions?

9    A.  Yes.

10   Q.  Now, you testified that Dr. Watson had a backlog of chronic   10:21AM

11   care patients, correct?

12   A.  Yes.

13   Q.  But Dr. Watson wasn't the only provider who had a backlog

14   of chronic care patients.

15   A.  No, she was not.                                         10:21AM

16   Q.  You had a backlog of chronic care patients.

17   A.  Everyone had a backlog of chronic care patients.

18   Q.  The problem existed with all providers at Eyman?

19   A.  Yes.

20   Q.  Because Eyman had, as you put it, a huge backlog of chronic   10:21AM

21   care patients.

22   A.  That's correct.

23   Q.  Now, one of the duties of the provider at Eyman is to

24   review various reports that come in, including lab reports and

25   reports from outside consults, correct?                     10:21AM

1    A.  Yes.  That's correct.

2    Q.  And under the Parsons settlement, some of those reports are

3    required to be reviewed within certain time limits, correct?

4    A.  Yes.

5    Q.  So, for example, under Performance Measure 52 specialty          10:21AM

6    consult reports must be reviewed and acted upon by a provider

7    within seven calendar days of receiving a report, correct?

8    A.  That's correct.

9    Q.  Now, you testified that Dr. Watson was behind on her

10   reviews, correct?                                                   10:22AM

11   A.  Say that again.

12   Q.  You testified that Dr. Watson was behind on her reviews?

13   A.  Yes.

14   Q.  Would you look at Exhibit 196, please.

15         This is an October 19, 2017 e-mail from Daniel Spencer        10:22AM

16   Sego to a number of recipients, including you, subject:

17   Reviews must be completed.

18         Did you receive this e-mail on or about October 19,

19   2017?

20   A.  I don't recall but I'm sure I did.                              10:22AM

21   Q.  Given that you are listed as a recipient, you have no

22   reason to doubt that you received this e-mail?

23   A.  Correct.

24   Q.  Would you please read the salutation and the first

25   paragraph?                                                         10:23AM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─

1   A.  "Provider team:  As a whole, we are very bad at completing

2   all of our reviews in a timely manner.  These reviews include

3   labs, x-rays, consults, ATPs and NMIs.  This is both a concern

4   in regards to appropriate patient care and leads us to fail

5   several performance measures, specifically 46 and 52.  We --"   10:23AM

6   Q.  That's fine.

7           So this e-mail is addressed to the provider team,

8   correct?

9   A.  That's correct.

10  Q.  It's not addressed only to Dr. Watson, is it?   10:23AM

11  A.  That's right.

12  Q.  It's addressed to you?

13  A.  Sure.

14  Q.  And other providers?

15  A.  Yes.   10:23AM

16  Q.  In fact, by the date of this e-mail, October 19, 2017,

17  Dr. Watson was no longer working in ADC, correct?

18  A.  October -- I'm not exactly sure on that date.  I know her

19  departure was near there somewhere.  So before or after.  I'm

20  not sure.   10:24AM

21  Q.  Doctor, if I tell you that Dr. Watson has testified that

22  her last day was October 12, 2017, do you have any reason to

23  doubt that testimony?

24  A.  No, I do not.

25          MR. FATHI:  And, Your Honor, for the record,   10:24AM

1   Dr. Watson did give that testimony on February 27, 2018 at

2   Pages 130 and 131, and that testimony has not been

3   contradicted.

4           Your Honor, I move the admission of Exhibit 196.

5           THE COURT:  Any objection?                        10:24AM

6           MS. LOVE:  No objection.

7           THE COURT:  196 is received.

8   BY MR. FATHI:

9   Q.  Doctor, would you next look at Exhibit 197, please.

10          Exhibit 197 is an October 27th, 2017 e-mail from    10:24AM

11  Jennine Gahris and others to you.  Did you receive this e-mail

12  on October 27th, 2017?

13  A.  I'm going to say yes.  I'm terrible with e-mails but --

14  Q.  Again, given that you are listed as a recipient you have no

15  reason to doubt you received this e-mail?                  10:25AM

16  A.  No reason to doubt it.

17  Q.  Who is Jennine Gahris?

18  A.  She was a former Florence clinical coordinator and then she

19  moved to a higher position, and I don't know exactly what that

20  title is.  But she worked in the regional offices.         10:25AM

21  Q.  So she continues to work for Corizon?

22  A.  She does.

23  Q.  She's no longer clinical coordinator at Florence?

24  A.  Correct.

25  Q.  Now, the e-mail, on the first page, 197.1, shows three    10:25AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    attachments.  Did you receive those attachments?

2    A.  Again, I don't recall.  Let me see.

3          I remember seeing this, so I'm going to assume yes,

4    but I don't think I -- I think -- I believe Spencer Sego gave

5    it to me directly, just handed it to me.                          10:26AM

6    Q.  Just so the record is clear, you are talking about the

7    chart that's at Pages 197.2 to 197.10?

8    A.  Yes.

9    Q.  And you're testifying that you have seen that document

10   before?                                                           10:26AM

11   A.  Yes.

12   Q.  All right.

13         Page 197.2 of this document is labeled Outstanding

14   Consultation Reports Number 52, consultation reports received

15   but not reviewed by provider.                                     10:26AM

16         Doctor, this pertains to the requirement under

17   Performance Measure 52 that outside consultation reports be

18   reviewed within seven days of receipt, correct?

19   A.  Yes.

20   Q.  And it's very faint but if you look in the upper right-hand  10:26AM

21   corner this document is dated October 7, 2017, correct?

22   A.  Yes.

23   Q.  Can you explain to us what the three right most columns

24   indicate?

25   A.  Okay.  So the results received date, the date that patient   10:27AM

1    goes out for a consult.  There's an amount of paperwork that's

2    accumulated from seeing that provider.  That comes back to

3    the -- to medical at the prison, and the date that it's

4    received usually goes straight to the clinical coordinator.

5    The date that it's received by the clinical coordinator is          10:27AM

6    listed here in the results received date.  Ordered by the

7    provider is the provider who originally ordered the consult,

8    and date sent results reviewed are the number of days that have

9    occurred where the provider has not reviewed the consult.

10   Q.  And, Doctor, the right-most column says days since results    10:27AM

11   reviewed but it should actually say days since results

12   received, correct?

13   A.  Correct.

14   Q.  So this is a list of all the consults where the results had

15   been received but provider had not yet reviewed them, correct?    10:28AM

16   A.  That's correct.

17   Q.  All right.

18          Just please flip through Pages 197.2 through 197.10

19   and just take a look at the names of the various providers and

20   let me know when you are ready to answer questions.  Okay?        10:28AM

21          Now, not all of these unreviewed consult reports are

22   attributable to Dr. Watson, are they?

23   A.  That's correct.

24   Q.  In fact, most of them are attributable to other providers

25   and not to Dr. Watson, correct?                                   10:29AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    A.   That's correct.

2    Q.   And some of the ones that are being attributed to

3    Dr. Watson are consults in which the results are received

4    after she left her employment, correct?

5    A.   I didn't look that closely at it but I can look.        10:29AM

6    Q.   Well, let's look at, on Page 197.2, the second from the

7    top.  It says the results were received on October 20 of 2017.

8    Correct?

9    A.   That's correct.

10   Q.   So if Dr. Watson left on October 12, she couldn't review   10:29AM

11   results that were received by October 20, correct?

12   A.   That's correct.

13   Q.   And same with the bottom listing on that first page,

14   results received October 20, 2017, correct?

15   A.   That's correct.                                         10:30AM

16   Q.   And if you turn to Page 197.3, there are four more

17   Dr. Watson's consults where the results were received on

18   October 20, correct?

19   A.   That's correct.

20   Q.   And if Dr. Watson left by October 12, she couldn't review   10:30AM

21   these results, correct?

22   A.   That's right.

23   Q.   And if you go through this chart you see that some

24   providers other than Dr. Watson had results that had been

25   received more than 100 or more than 200 or more than 300 days   10:30AM

—6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross—

1    previously and still hadn't been reviewed, correct?

2    A.  That's correct.

3    Q.  So let's look at 197.5, the third item from the top.  Do

4    you see that?

5    A.  Yes.                                                          10:30AM

6    Q.  Order by provider Stephen Graham.  Those results have been

7    received 295 days previously and still not reviewed, right?

8    A.  Right.

9    Q.  And that wasn't Dr. Watson.

10   A.  Correct.                                                      10:31AM

11   Q.  Please turn to Page 197.9.

12          Let's look at the third from the top, provider

13   Hamda Awaal.  These results have been received 352 days

14   previously and still not reviewed.  Correct?

15   A.  Correct.                                                      10:31AM

16   Q.  And that wasn't Dr. Watson, was it?

17   A.  That's correct.

18          MR. FATHI:  Your Honor, I move admission of Exhibit

19   179.

20          THE COURT.  Any objection?                                10:31AM

21          MR. FATHI:  Beg your pardon.  It is 197.

22          THE COURT:  Any objection?

23          MS. LOVE:  No objection.

24          THE COURT:  197 is received.

25   BY MR. FATHI:                                                    10:31AM

—6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross—

1    Q.  Dr. Stewart, you testified that Dr. Watson had a backlog in

2    medication refills, correct?

3    A.  Correct.

4    Q.  But she wasn't the only provider who had a backlog of

5    medication refills, was she?                                    10:32AM

6    A.  No.

7    Q.  Other providers also had a backlog?

8    A.  That's correct.

9    Q.  She wasn't worse than anybody else?

10   A.  She was similar to others, yes.                             10:32AM

11   Q.  Thank you.

12          And you testified that Dr. Watson prescribed an

13   excessive amount of Gabapentin, correct?

14   A.  Yes.

15   Q.  Now, Gabapentin is also known as Neurontin, right?          10:32AM

16   A.  That's correct.

17   Q.  And it's not a narcotic?

18   A.  It's not a narcotic, no.

19   Q.  It's an anti-convulsant or anti-seizure medication?

20   A.  Correct.                                                    10:32AM

21   Q.  It's been approved by the U.S. Food and Drug Administration

22   for that use, correct?

23   A.  That's correct.

24   Q.  And Gabapentin is also approved by the FDA for post-hepatic

25   neuralgia, correct?                                             10:32AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross

1    A.   Yes.

2    Q.   Now, Dr. Watson testified about a patient with advanced

3    heart disease and she testified that you told her to keep the

4    patient comfortable and allow him to die.  Do you remember

5    that?                                                              10:33AM

6    A.   Yes.

7    Q.   And you addressed that in your testimony, correct?

8    A.   Yes.  That's correct.

9    Q.   Would you turn to Page 664, please.

10            Are you there, Doctor?                                    10:33AM

11   A.   I believe so.  Yes.

12   Q.   All right.

13            Now, on Page 664, Ms. Love is questioning you about

14   Dr. Watson's testimony about this cardiac patient, correct?

15   A.   Correct.                                                      10:33AM

16   Q.   And could you please read aloud the testimony you gave at

17   Lines 14 through 20.

18   A.   "One, I never said let somebody die.  Even if I were going

19   to say that I wouldn't say it like that.  We allow inmates to

20   pass not infrequently.  Inmates or patients in the community,     10:34AM

21   it's the same everywhere.  Patients who have chronic terminal

22   illness often request to die and pass.  Patients who have been

23   told there is no other treatment for you are often allowed to

24   pass."

25   Q.   Thank you, Doctor.  Did you give that testimony?             10:34AM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Cross─

1    A.  Yes.

2    Q.  Just to be clear, when you say we allow inmates to pass not

3    infrequently.  By pass you mean die, correct?

4    A.  Die.  Yes.

5    Q.  And similarly, when you say patients who have been told,          10:34AM

6    "There is no other treatment for you" are often allowed to

7    pass.  Once again, by pass you mean die?

8    A.  That's correct.

9    Q.  But it's your testimony on this particular occasion you did

10   not tell Dr. Watson to allow this patient to die, correct?          10:34AM

11   A.  I think that's not how -- how you are expressing it, okay?

12   When I say allow this patient to have comfort means -- and

13   allow them to die, that's not the same thing as just let him

14   die.  There's a difference, significant difference there.

15   Q.  So which did you say in this case?                              10:35AM

16   A.  Allow this patient to pass or allow this patient to die.

17   Q.  You say that?

18   A.  Yes.

19   Q.  Thank you, Doctor.

20        MR. FATHI:  No further questions.                             10:35AM

21        THE COURT:  Let's take 10 minutes and then we'll come

22   back for the redirect.

23        So, sir, you can leave the witness stand, and just be

24   back at quarter till and -- or a little bit after, two minutes

25   after that, and we'll have the redirect examination.               10:35AM

1             Thank you.

2             (Recess from 10:35 a.m. until 10:49 a.m.)

3             THE COURT:  Before we proceed, let me address the

4    under advisement objection.  It was 215.  And I have taken a

5    look at the rule and considered the arguments of counsel and it    10:49AM

6    will be admitted because it is a statement of the party

7    opponent, the defendants' employee, and it is within the scope

8    of that employment.

9             You may proceed, Ms. Love.

10            MS. LOVE:  Thank you, Your Honor.                         10:49AM

11                      REDIRECT EXAMINATION

12   BY MS. LOVE:

13   Q.  Dr. Stewart, at the beginning of your testimony here today

14   you talked about the prevalence of cancer in the inmate

15   population that you see, correct?                                  10:50AM

16   A.  Yes.

17   Q.  The same for hepatitis C, correct?

18   A.  Yes.

19   Q.  Based upon your experience both in the private sector and

20   working in correctional health care, what do you attribute the   10:50AM

21   increased prevalence of cancer and hep C in the inmate

22   population?

23   A.  There hasn't been a study, but if I had to guess it would

24   be lifestyle probably.  Many of the inmates were living on the

25   streets, they abused drugs and alcohol, you know.  They have a   10:50AM

1   very difficult lifestyle, and that more than anything probably

2   contributes to it.

3          THE COURT:  Does -- I'm sorry to interrupt.  Go ahead

4   and finish.

5          THE WITNESS:  It's the same with hepatitis C, because          10:50AM

6   the reason you get hepatitis C is because of exposure, through

7   tattooing and IV drug use and those kinds of things.  I think

8   it's probably the same as far as risk when it comes to cancer

9   as well.

10         MR. FATHI:  Your Honor, I object and move to strike.          10:51AM

11  The question here is whether patients receive the medical care

12  they need.  Why they need that medical care, what it may have

13  been in their earlier life that leads them to need that medical

14  care is entirely irrelevant.  Also, speculation.  The doctor

15  specifically said there hasn't been a study, I would have to          10:51AM

16  guess.

17         So I move to strike the testimony.

18         THE COURT:  Well, I'm going to deny the motion to

19  strike but I am going to make this statement:

20         My recollection is, Dr. Stewart, that you were asked          10:51AM

21  this question and gave almost the identical answer on the 14th

22  of March.  That's my recollection.  So I really don't want to

23  hear things I have already heard before.

24  BY MS. LOVE:

25  Q.  Do you know whether or not Arizona Department of          10:51AM

1    Corrections requires mandatory testing for inmates of Hep C?

2    A.  They do not require mandatory testing.

3            THE COURT:  Can we cut out the phone line that's

4    producing the music?  Thank you.

5    BY MS. LOVE:                                          10:52AM

6    Q.  You testified earlier today regarding instances where eOMIS

7    has gone down at Eyman.  Do you remember that testimony?

8    A.  Yes.

9    Q.  When eOMIS goes down, does that stop the providers or the

10   medical staff from having encounters with the inmates?   10:52AM

11   A.  No, it does not.

12   Q.  And are you still able to triage inmates as to urgent needs

13   for medical care right then and there?

14   A.  You have to treat them.  It's a requirement.  If someone

15   presents to you in an ICS, which is one of those emergent   10:52AM

16   things, you don't say, hey, I can't see you, my eOMIS is down.

17   You have to see them.  You put down what you can on paper.

18   There was medicine long before EMR.

19           THE COURT:  Well, hold it.  I don't want to hear any

20   more about this.  There was medicine before EMR.  It was called   10:53AM

21   a paper file.  It existed in an office, and if you had an ICS

22   and a patient came in you could check that file and see is this

23   person allergic to sulfa drugs and you would know instantly

24   about that.  If eOMIS is down there is no record for you to

25   look to to see whether or not your patient has an allergy to a   10:53AM

1   particular drug or something else that you should know that you

2   don't know because the medical system is down.

3          I know of no provider that treats anybody competently

4   that doesn't have an immediate backup facility for its medical

5   records, meaning some kind of ability to go to a fall-over data    10:53AM

6   source to get information.  I cannot imagine that I would ever

7   hear testimony that any hospital or any provider that treats

8   patients would be down for an entire day.

9          So I don't want to hear any more testimony about some

10  supposed record that could exist or some world that we're no      10:54AM

11  longer in where there's paper records where it's undeniably

12  true in this case that when eOMIS goes down there is no way for

13  anybody who treats patients in the ER to look to see what the

14  previous medical records were.

15         Is that true, Doctor?                                       10:54AM

16         THE WITNESS:  Not exactly.

17         THE COURT:  Well, what can you look at?

18         THE WITNESS:  There's a paper record.  They have

19  charts like this big.  Each inmate has paper charts.

20         THE COURT:  That's news to me.  So I -- again, I            10:54AM

21  wouldn't be on this high horse if I thought that was true.  You

22  say there's a paper record chart for every inmate?  So there's

23  a redundant system?

24         THE WITNESS:  I'm not saying for every inmate.  For

25  most inmates there's a paper chart.  It's not a redundant         10:54AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1  system.  It doesn't have all the information that eOMIS has but

2  their allergies, past medical history, that's in the paper

3  chart.

4          THE COURT:  Let me step back and pause about this

5  because this is very different than what I have heard and come    10:54AM

6  to understand from other witnesses.

7          You're telling me that when someone is treated that

8  there is some of kind of paper record that accompanies every

9  single inmate.  Is that true?

10          THE WITNESS:  Not for every instance.  For instance,    10:55AM

11  if a patient gets a stat lab, stat labs will not come back in

12  eOMIS.  Absolutely not.  They go to -- I think I can say the

13  name of the hospital, right?  So they go to Phoenix St. Lukes

14  and then Phoenix St. Luke's faxes us a paper sheet.  We have to

15  sign off on the paper sheet.                                    10:55AM

16          THE COURT:  And my understanding is those were scanned

17  and put into eOMIS.

18          THE WITNESS:  They are scanned -- those are scanned

19  but the paper isn't discarded.  It's put in their permanent

20  file.                                                           10:55AM

21          THE COURT:  And this permanent file, where is that

22  maintained?

23          THE WITNESS:  In medical records.

24          THE COURT:  Where is medical records?

25          THE WITNESS:  Each unit has a medical record.           10:55AM

1          THE COURT:  If I go to the facility I will be able to

2    look at these medical records for each of the inmates?

3          THE WITNESS:  Absolutely.

4          THE COURT:  And tell me, so that I understand the

5    nature of this circumstance, what kinds of documents are in the          10:56AM

6    paper medical record and what kinds of documents are not in the

7    medical record.

8          THE WITNESS:  Anything that's ever come back on paper.

9    So the paper consults that come back from the providers, that

10   goes in their medical record.  Their labs that come back on          10:56AM

11   paper go in their medical record.  When they have their initial

12   intake there's some paperwork that's done, things they sign,

13   that goes into their medical record.

14          So they all have a --

15          THE COURT:  What about if somebody is seen by a          10:56AM

16   provider and the provider sits across from the inmate and

17   considers that person's health situation and makes decisions

18   based upon the information that that inmate has provided.

19   Where does that go?

20          THE WITNESS:  So if -- that goes in eOMIS.  Anything          10:56AM

21   that I generate on paper.  So like if the inmate says, hey, I

22   need a hat or I need medical shoes or something or I need -- we

23   need to get, you know, crutches or something like, that goes on

24   a SNO, a Supply Needs Order, and that goes on paper.  So that

25   would go into their medical record.  So there's a lot of paper          10:57AM

1    still.  Even though we're EMR based, there's still a lot of

2    paper that's generated about each visit that goes into their

3    medical record.

4             THE COURT:  But if I'm a patient of yours and I sit

5    down for our medical visit and I report to you that I have had        10:57AM

6    continued symptoms that have been associated with this cancer

7    that I have and you decide that it's appropriate for me to have

8    further care and you want the person who is providing this

9    further care to know about what my present situation is that I

10   have just reported to you, does that get placed in paper?            10:57AM

11            THE WITNESS:  So are you asking me if what I want gets

12   placed on paper?

13            THE COURT:  No.  I'm saying I have reported to you

14   what my current situation is, you've taken that information,

15   which you will document in a progress note.                           10:57AM

16            THE WITNESS:  Right.

17            THE COURT:  That progress note, I understand, is only

18   in eOMIS.

19            THE WITNESS:  It's only in eOMIS.  Correct.

20            THE COURT:  So the action you take based upon that          10:57AM

21   progress note is only in eOMIS?

22            THE WITNESS:  The orders are written only in eOMIS,

23   yeah.

24            THE COURT:  So it's fair to say most of the

25   information related to a patient's ongoing care is in eOMIS          10:58AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    only.

2         THE WITNESS:  I would agree with you.  Progress notes

3    are extremely important and they are in eOMIS only most of the

4    time.

5         THE COURT:  And when these medical records are put in          10:58AM

6    paper and that paper file exists, I must say that I don't

7    recall ever seeing any big paper files.  I mean, I know what

8    they look like because I have been to doctors before the days

9    of electronic medical records and I know what these files look

10   like, and I don't recall ever seeing any when I visited.  How    10:58AM

11   often are they used by the providers?

12        THE WITNESS:  Probably not very often because we have

13   eOMIS all the time.

14        THE COURT:  You may continue.

15   BY MS. LOVE:                                                      10:58AM

16   Q.  You testified earlier today as well regarding plans to

17   address chronic care backlogs.  Do you remember that testimony?

18   A.  Yes.

19   Q.  And you testified that last weekend you personally worked.

20   A.  Yes.                                                          10:59AM

21   Q.  At Eyman.  Is that correct?

22   A.  Yes.

23   Q.  And that there was a plan for last weekend and for this

24   weekend to address chronic care deadlines.

25   A.  Yes.                                                          10:59AM

1  Q.  You mentioned or testified that the chronic care deadlines

2  that you were addressing were chronic care deadlines related to

3  a date of July 1st.

4  A.  Yes.

5  Q.  And that's July 1st of 2018?                                    10:59AM

6  A.  Yes.

7  Q.  What is -- can you describe for us what deadlines you are

8  addressing that come into play on July 1st?

9  A.  It's primarily chronic care backlogs.

10          So what happened was when we had such really severe       10:59AM

11  backlogs previously we did one of those blitzes.  So a lot of

12  people from different parts of the state come and help Eyman

13  get over this backlog.  So a bunch of people come and work or

14  do telemetry, you know, see inmates at other facilities or

15  whatever.  It's required to get caught up so that these people   11:00AM

16  get their medical needs taken care of.

17          When you do it all at one time, like that, the next

18  time that they are due for chronic care they are all going to

19  be due again at the same time.  So what we tried to do was

20  stagger as many as we could.  We saw people earlier than their  11:00AM

21  chronic care date so that we could start separating those

22  people out so that they all wouldn't show up on -- you know,

23  everybody's due -- you know, 600 people are due on July 21st,

24  so we tried to see some earlier.  But it still left a pretty

25  hefty number each month for us to try to stay caught up on.      11:00AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    So we see the number in advance.  We see it's going to

2  be a big one, so we just try and get as many people as we can

3  on the weekends to try and cover that number.

4  Q.  Please describe for us what was the plan for last weekend

5  on how to address the chronic care?                              11:01AM

6  A.  Last weekend we had -- we had one, two, three, four -- we

7  had four providers come in to work on the weekend that were

8  physically present and I think two or three people that were

9  doing off site, seeing patients from an off site telemetry type

10  thing.                                                           11:01AM

11    So it was a -- last weekend was a very difficult

12  weekend because the inmates were -- there was a lot of havoc

13  last weekend and there was a lot of assaults and things like

14  that, so the providers had to stop doing what they were doing,

15  go deal with those things, and I had to do the same thing.      11:01AM

16    They take up your room time when they come in and so

17  you can't really see the chronic cares you had scheduled.  So

18  we didn't get through our schedules like we were supposed to,

19  but we did see a significant number of chronic cares, strictly

20  chronic care.                                                   11:02AM

21  Q.  What was the nature of the telemedicine that was provided

22  last weekend to address the chronic care backlogs?

23  A.  Telemedicine is -- you know, they -- you set up a computer

24  and some off-site provider then sits -- they sit the inmate

25  down, you can see them, you can talk to them, ask them          11:02AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    questions what their issues are.  You can review their labs

2    with them, those kind of things, and address their future needs

3    and the future chronic care.

4    Q.  And so the telemedicine that was used last weekend was

5    specifically for chronic care versus a specific outside                11:02AM

6    specialty type situation?

7    A.  Yeah.  We pretty much just use it almost entirely on

8    chronic care.  Occasionally in order to catch up on some HNR

9    thing that might be an issue we use it, but mostly it's chronic

10   care use.                                                              11:02AM

11   Q.  What is the plan for this weekend, if you know, to address

12   the chronic care backlog?

13   A.  It will be the same.  We're going to try to get as many

14   providers as we can.  I haven't been able to work on it because

15   I'm here but that's what I would be doing today, is talking to     11:03AM

16   Mary Marino, who is our chronic care coordinator, figuring out

17   who can work and get a patient log for them, you know, set up a

18   line for them, and then have them come in on the weekend, do it

19   usually between 9 and 3, 9 and 4.

20   Q.  Last weekend when you were addressing the chronic care          11:03AM

21   backlog were you using providers that are already assigned to

22   Eyman, or were you bringing providers from other locations?

23   A.  Just from Florence.  So we had a couple of people from

24   Florence come over and then Eyman providers.  Not everybody at

25   Eyman wants to volunteer on the weekend.  They don't like to       11:03AM

1    give up their weekends.  That's understandable.  But we can

2    find people who will fill in there.

3    Q.  Is that the same plan you have for this weekend, to draw

4    providers from Eyman and Florence?

5    A.  Yes.                                                              11:03AM

6    Q.  Do you have plans to draw from any other locations?

7    A.  Just for the telemetry people who usually do telemetry, you

8    know, they will volunteer.  There's a provider up north who

9    comes down to -- he wants to be an Eyman provider actually, so

10   he comes down and helps often.  I don't think anybody -- I         11:04AM

11   don't think we have anybody else other than those.

12          THE COURT:  Excuse me, Doctor.  It seems odd to me

13   that you have described a chronic problem that has been going

14   on for months that you know will repeat and your methodology of

15   dealing with that problem is on the week of an attempt to         11:04AM

16   schedule weekend work by additional providers.  You do that.

17   Why wouldn't you do it in advance of more than a week so that

18   you could get a greater sense of whether or not you would be

19   able to identify the people and if you knew that you couldn't

20   you could look to other resources?                                 11:04AM

21          It just seems to me not to make a lot of sense to do

22   it just a couple days before you expect people to say, oh,

23   yeah, I can be there.  I know my schedule.  It would be hard

24   for me to be able to say a couple of days before that I could

25   do something because I have already scheduled something else.     11:05AM

1       THE WITNESS:  It's hard to get commitments, especially

2  this time of year, you know, their kids are out of school,

3  things like that.  So it's hard to get commitments from people

4  because they want to do other things with their family and

5  stuff.                                                              11:05AM

6       But like I said earlier, we try to stagger out this

7  whole chronic care thing as much as possible so we wouldn't get

8  hit with this previous blitz problem and we wouldn't have to do

9  another blitz.  So we tried to stagger it out but again the

10  numbers were so high that we had to -- even with staggering it   11:05AM

11  out we couldn't get the number down enough that we wouldn't be

12  crunch time in the month of June and crunch time in the month

13  of July, and so we'll just -- we have to deal with what we

14  have.

15       And so each week we look at trying to -- each week of     11:05AM

16  the month of June we try to get as many done as we can and see.

17  During the week we increase the numbers for each provider.  We

18  still have to see the HNRs but we increase the number of

19  chronic cares each provider has to see on that particular day.

20       THE COURT:  Where do they find that room?                 11:06AM

21       THE WITNESS:  We see fewer HNRs.  Because we have

22  time, you know, and we see two more, we're adding two more

23  chronic cares.  So normally the number would be four.  Now

24  we're keeping that number at about six.

25  BY MS. LOVE:                                                    11:06AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1   Q.  If you would turn now, Doctor, to Exhibit Number 276.  It

2   should be hopefully there in the stack from when you testified

3   this morning.

4           Doctor, if you would, take a look at Page 2 of Exhibit

5   Number 276.  You previously read the e-mail from about the              11:07AM

6   middle of the page for the Court.  Do you recall doing that?

7   A.  Yes, I do.

8   Q.  And these were e-mails regarding the provision of a

9   medication called Granix, correct?

10  A.  Yes.                                                                 11:07AM

11  Q.  Do you know what Granix is prescribed for?

12  A.  Yes.

13  Q.   What?

14  A.   It's a white blood cell stimulator.  It stimulates growth

15  of white blood cells.                                                    11:07AM

16  Q.  If you will turn to Page 1 now of Exhibit Number 276, and

17  at the top of the page do you see that this is an e-mail to

18  Mark Moyers from Mario Nunez?

19  A.  Yes.

20  Q.  And it is dated December 8, 2017.                                    11:07AM

21  A.  Yes.

22  Q.  Sent at 9:47 a.m.

23  A.  Yes.

24  Q.  Do you also see in the cc line your name appearing there,

25  Rodney Stewart?                                                          11:08AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    A.  Yes.

2    Q.  Now, if you look back at Page 2 of this same exhibit to the

3    e-mail that you were talking about earlier in your testimony,

4    do you see that that e-mail was also sent on December 8, 2017?

5    A.  Yes.                                                          11:08AM

6    Q.  At 7:57 a.m.?

7    A.  Yes.

8    Q.  Now back to Page 1 of Exhibit Number 276.

9    A.  Okay.

10   Q.  The text of the e-mail reads -- and this is the e-mail      11:08AM

11   between Mario Nunez and Mark Moyers -- "I spoke with Dr.

12   Stewart at Facility 4410.  They are willing to go pick up

13   Granix at Phoenix" -- in parenthesis, 4437, end parenthesis --

14   since Facility 4410 does not support Saturday delivery.  We

15   will send Number 5 syringes of Granix 480 mcg to clinic stock.  11:08AM

16   Thank you for your help, Dr. Stewart.  Note:  A profile only

17   order for Granix must be entered for the inmate in order to

18   document administration."

19          Did I read that correctly?

20   A.  Yes.                                                         11:09AM

21   Q.  Do you remember this particular instance with an issue

22   regarding finding Granix for a patient?

23   A.  Yes.

24   Q.  And did you, in fact, assist with procuring Granix for the

25   patient?                                                         11:09AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    A.   Yes.

2    Q.   What did you do to do that?

3    A.   First, there was a conversation between the pharmacy.   They

4    don't do deliveries on the weekend, but in this particular

5    instance they were able to get -- to find some transportation        11:09AM

6    for this particular medication.   They send it overnight on

7    Friday and I had to drive to Phoenix to pick it up on Saturday

8    and I took it to them sometime midday Saturday.

9    Q.   So you yourself drove to go get the medication?

10   A.   Yes.                                                            11:09AM

11   Q.   And where did you go in Phoenix to get it?

12   A.   It's that prison -- I forget the name of it.   It's right --

13   right around -- what's that street?   I can't remember the

14   street.   I could take you there but I can't remember the name

15   of the street.   But it's right in -- not the greatest               11:10AM

16   neighborhood in the world.

17   Q.   Are you speaking of an Arizona Department of Corrections

18   prison?

19   A.   Yes.

20   Q.   Where was -- do you know where the medication came in to        11:10AM

21   get to the prison that you drove to?

22   A.   No, I do not.

23   Q.   Do you know if it was a medication that this other Arizona

24   Department of Corrections prison had on hand or did they have

25   to get it from somewhere?                                            11:10AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    A.  I really don't recall where it came from.

2    Q.  You were also asked about provision of non-formulary

3    medications in the general sense and you testified that if a

4    medication is a non-formulary that there are steps that the

5    regional medical directors take to decide whether a medication    11:11AM

6    would be provided.  Is that correct?

7    A.  Yes.

8    Q.  Are you aware of what the steps are that the regional

9    medical correct directors would take?

10   A.  No, I'm not aware exactly what they do.  I don't do their    11:11AM

11   job, but I just know that they always come back with

12   recommendations, and oftentimes the drug is just, you know,

13   authorized.  It's just another authorization step.  When it's

14   denied, though, there is an alternative.  They never -- you

15   know, they're not going to say no, they can't have that.  They    11:11AM

16   are going to give you something that's comparable or better at

17   times than the previous request.

18   Q.  If you could turn to now Exhibit Number 3.  It's already in

19   evidence, as was the previous exhibit, for the record, already

20   in evidence, 276.    11:12AM

21   A.  Okay.

22         THE COURT:  Go ahead, please.

23   BY MS. LOVE:

24   Q.  Exhibit Number 3 that you testified to earlier was a

25   consult by Sara Neese.  At least the title of the document says    11:12AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1   consult, correct?

2   A.  Yes.  I think it's an e-mail.

3   Q.  It's an e-mail from Sara Neese to Dr. Jan Watson?

4   A.  Yes.

5   Q.  This was the e-mail regarding Sara Neese requesting                11:13AM

6   cancellation of an infectious disease consult, and it says

7   there are two.  Correct?

8   A.  Yes.

9   Q.  Do you have any personal knowledge of the circumstances

10  surrounding this cancellation request?                                 11:13AM

11  A.  No.

12  Q.  Do you know whether or not the consult was actually

13  cancelled?

14  A.  I have no idea.

15  Q.  Is a clinical coordinator such as Sara Neese permitted, to         11:13AM

16  your knowledge, to cancel a consult without the permission of a

17  provider?

18  A.  No.

19  Q.  So she would have to seek and obtain the approval of

20  Dr. Watson to indeed cancel the consult?                               11:13AM

21  A.  That's right.

22  Q.  Exhibit Number 270, which is already admitted into

23  evidence --

24  A.  270?

25  Q.  Yes.  2-7-0.                                                       11:14AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    A.   Okay.   I've got it.

2    Q.   Exhibit Number 270 that you testified to earlier is an

3    e-mail from CG Thomas -- I'm sorry -- from Sarah Neese to

4    CG Thomas, correct?

5    A.   Yes.                                                    11:14AM

6    Q.   This is also an e-mail that you were asked questions by

7    plaintiffs' counsel as to a request to cancel a consult,

8    correct?

9    A.   Yes.

10   Q.   Do you know whether or not specifically these consults were   11:14AM

11   actually cancelled?

12   A.   No, I do not.

13   Q.   Do you see on the second line of this e-mail where it says

14   they are too far out to put in right now?

15   A.   Yes.                                                    11:14AM

16   Q.   Do you have any sense, based upon your experience as

17   medical director at Eyman, what that might mean, that they are

18   too far out to put in right now?

19   A.   Yeah.   So if a person goes to a consultant and he sees the

20   consultant, the consultant says I want to see you back in six   11:15AM

21   months, and they come back with the paperwork, sometimes,

22   especially younger providers will write the consult right then

23   when they shouldn't really write it right then.   It would put

24   us out of compliance.   If the person doesn't want to be seen

25   for six months, wait until about a month away or sometime in   11:15AM

1   the month just prior to when they want to be seen then write

2   the consult.  It just makes sense.

3   Q.  So when you say that they shouldn't write it right then can

4   you explain?

5   A.  There's no need to write it right at the moment that the   11:15AM

6   consult comes back, okay?  We get the paperwork back within a

7   week or so when the patient returns.  We are told to write in

8   the comment section when we review the consult to write your

9   plan, what you want to do.  So you write, okay -- so you write,

10   okay, wound care, you know, whatever, and then return to clinic   11:16AM

11   or return to that off-site provider in six months.

12         But then they -- so then they could stop right there,

13   they wouldn't have to necessarily do that.  The monitors do

14   look to see if you have acted on all of those provisions but

15   there's a six-month window you have before you can act on that   11:16AM

16   provision of returning.

17         But a lot of the providers will go ahead and write it

18   right then, say I'm not going to remember in five months to

19   write this consult so they write it then.

20         Well, there is no -- there's nothing in the system   11:16AM

21   that helps us when it comes to compliance if we haven't already

22   ordered the consult, acted on the consult within that time

23   period.  It will kill us doing it that way.  So if she catches

24   that she goes back to the provider and says, hey, you really

25   don't need this for six months or you don't need this for three   11:17AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    months, why write the consult now, why don't you just write it

2    in a month before it's due.

3            THE COURT:  You just told us why.  Because the doctor

4    would forget.

5            THE WITNESS:  The provider would forget.                    11:17AM

6            THE COURT:  Yeah.

7            THE WITNESS:  But the problem is the consult wouldn't

8    happen.

9            THE COURT:  Well, it's at least in the chart so that

10   somebody has written "I think what needs to happen here to      11:17AM

11   treat this patient is this patient should be seen in six

12   months."

13           So that's a medically-necessary comment put in the

14   chart, which you are saying should be removed so that you don't

15   get into trouble with the monitoring team.                     11:17AM

16           THE WITNESS:  Yes.

17           THE COURT:  That's turning it upside down as far as I

18   see.  You oughta figure out a different way to deal with the

19   problem rather than instructing your providers to pull out

20   information that you have said they want to put in there        11:17AM

21   because they are worried they might forget otherwise and they

22   want to fully report what their impressions are and their

23   treatment plan is for the patient at the time.  That's just

24   common sense.

25           And you're saying don't put that in there even though   11:18AM

1      it's common sense and because it's what the provider thinks is

2      appropriate to do because we'll get in trouble with the

3      monitors.

4              Well, I'm not really excited to hear that the health

5      care provider has decided that it makes more sense to worry                11:18AM

6      about being killed by the monitoring team than put in a note

7      that might save somebody's life.

8              THE WITNESS:  No, it's not the note.  The notes go in.

9      The notes have to go in.  That's not -- the problem is writing

10     the actual consult.  So it's a different section in the chart.            11:18AM

11             Like I said, they are required to put in the comment

12     section that the patient will return to clinic provider in six

13     months, and they can write a note outside of that, outside of

14     that review even, to say that.

15             The problem is that when they do write the note                     11:19AM

16     outside of that they go to the consult section and they write

17     the consult.  Well, the consults aren't held back.  They go

18     right to the UM, the UM sees it, approves it, does whatever,

19     but six months from now our stipulation is that those patients

20     have to be seen within a certain time period.  They're not                 11:19AM

21     going to make that time period because of the consult six

22     months from now.  They shouldn't write the consult until we're

23     within that time period we can actually be done.  That's where

24     we're getting stuck.

25             So she's just saying just not -- not do it.  She's                  11:19AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    just saying don't write the consult now, write it when we're

2    four months out or, you know, a month out and then we'll get

3    the consult going.  It's not that we're not wanting to do it.

4    It's just --

5             THE COURT:  What's going to remind the provider to do    11:19AM

6    this in four months?

7             THE WITNESS:  And therein lies the problem.  That is

8    the problem.  They could put it on their calendar.  We have a

9    calendar system in our e-mail system.  They could put it on

10   their calendar.    11:20AM

11            THE COURT:  Does anybody do that?

12            THE WITNESS:  No.

13            THE COURT:  No, because there's no time because you

14   have just been told that you have to see an additional chronic

15   care or two patients in addition.  So, you know, the idea,    11:20AM

16   well, they could put it on their calendar, well, sure, in a

17   perfect world, but you're far from a perfect world.

18            THE WITNESS:  Very far from a perfect world.  I agree.

19   BY MS. LOVE:

20   Q.  Exhibit Number 415, which is in evidence.    11:20AM

21   A.  I see it.

22            THE COURT:  You may go ahead.

23   Q.  Exhibit Number 415 was an e-mail from Sara Neese to Dr. Jan

24   Watson.

25   A.  Correct.    11:21AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    Q.   The e-mail is dated September 11, of 2017?

2    A.   Yes.

3    Q.   This is also an e-mail that you were shown by plaintiffs'

4    counsel regarding a request by Sara Neese to cancel a consult,

5    correct?                                                    11:21AM

6    A.   Yes.

7    Q.   And the third sentence of that e-mail says it was for a

8    cardiology visit to be scheduled in November, correct?

9    A.   Yes.

10   Q.   So is this the same situation that you were speaking of a   11:21AM

11   moment ago where the consult was to be scheduled for a time

12   period somewhere in the future beyond the time periods at issue

13   with the performance measures?

14   A.   Yes.

15        MR. FATHI:  Objection, Your Honor.  Calls for            11:21AM

16   speculation.  He was not involved in the care of this patient.

17        THE COURT:  Overruled.

18   BY MS. LOVE:

19   Q.   Do you have any personal knowledge as to whether or not

20   specifically this consult was indeed cancelled by Dr. Watson?   11:22AM

21   A.   I do not.

22   Q.   You were also asked questions about some reports regarding

23   how long there were consults or labs out for review that were

24   outstanding by your providers at Eyman.  Do you remember

25   looking at that chart?                                         11:23AM

1  A.  Yeah.  It was a Pentaho report.

2  Q.  And in that chart plaintiffs' counsel directed you to a few

3  instances where the timing of reports not reviewed were out in

4  the 200-plus mark days or the 300 days.  Do you remember that?

5  A.  Yes.                                                          11:23AM

6  Q.  Do you have any information based upon your experience

7  there at Eyman as to why there could be a situation that that

8  report shows reports awaiting review for 2 or 300 days?

9  A.  Yeah.  The inmate may not be in the prison anymore.  So if

10 the inmate is not in the prison the chart doesn't reflect that.  11:23AM

11 It just sits there.  A Pentaho report is a notoriously

12 inaccurate document.  So it doesn't reflect -- it's not always

13 a reflection of what is actually there.  It changes every day.

14 It's a static document.  It changes every single day.

15       So we use the Pentaho report and remove what is           11:24AM

16 actually a delay, whatever is late or whatever hasn't been

17 taken care of for review.  However, a lot of times you will go

18 through there and just say, oh, it's already been reviewed,

19 it's still in the Pentaho report, or the patient has been

20 released from prison and is still in the Pentaho report.         11:24AM

21       So there's no way to get it out.  They just stay

22 there.

23       THE COURT:  With respect to the exhibit that Ms. Love

24 is referring to, you don't know whether in any of those cases

25 the reason that the days are so many, in the hundreds, is        11:24AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    because of the reason you just suggested, that it could be that

2    they were transferred.  You don't know whether that's a fact

3    for any of them, is that right?

4              THE WITNESS:  For a couple of those on there I would

5    know.                                                         11:25AM

6              THE COURT:  So two out of the 20 or so --

7              THE WITNESS:  Yeah.

8              THE COURT:  -- you know they were --

9              THE WITNESS:  I wouldn't know for a fact but I know

10   that they -- we look at the Pentaho report every day.  In --  11:25AM

11             THE COURT:  I'm sorry to interrupt you, but this

12   Pentaho report was not your everyday report.  This one was

13   given to you in accompanying an e-mail about needing to address

14   the fact that so many referrals were not conducted within --

15   not referrals -- the evaluation of the referred reports were   11:25AM

16   not conducted within time frames.  So we know that for sure.

17   This was given to you because somebody is saying here's

18   evidence of the problem we have.  Right?

19             THE WITNESS:  Yes.

20             THE COURT:  I'm done.                                11:26AM

21   BY MS. LOVE:

22   Q.  The Pentaho report that you reviewed today, which we are

23   currently speaking about, is that a report that was unique or

24   is that a report that you can pull up on a daily basis and

25   review?                                                        11:26AM

1    A.  I personally can't pull it up, but it's sent to us every

2    day, and that's what we use as a source document for our

3    providers.  So we make copies and we send them every day to the

4    provider so that they can see what they have outstanding and do

5    it.                                                         11:26AM

6              So if -- back then, if -- you know, the reviews

7    were -- there were a number of reviews that had to be done that

8    were high and there is that possibility that those -- some of

9    those numbers, you know, may be at 20 might have been there,

10   but 300, it's not -- there's a -- I can tell you there's a     11:27AM

11   problem with that inmate's chart or with that inmate, either

12   they are not present or they have died or something.  I don't

13   know.  There's no way it's going to be sitting there 300 --

14   that's over a year.  That's not possible.

15   Q.  To your knowledge, at the Eyman complex if today the report 11:27AM

16   is sent out to your providers and there's a report that shows

17   not reviewed for, let's say, 197 days, to your knowledge is

18   anybody going to take any action to see if we're talking about

19   a situation where the inmate is no longer in custody versus

20   something just hasn't been reviewed for 197 days?             11:27AM

21             MR. FATHI:  Objection, Your Honor.  Calls for

22   speculation, and leading.

23             THE COURT:  Sustained as to leading.

24   BY MS. LOVE:

25   Q.  Is there any effort taken to your knowledge as medical     11:28AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    director of the Eyman complex by any of your providers to check

2    to see if there is a review that has been outstanding for

3    200-plus days if it's a situation where the inmate is no longer

4    in custody?

5              MR. FATHI:  Same objection.                        11:28AM

6              THE COURT:  Both objections are overruled.

7              When you say same objection I'm taking that you are

8    making the leading objection as well as the speculation

9    objection.

10             MR. FATHI:  Correct, Your Honor.                   11:28AM

11             THE COURT:  Overruled.

12   BY MS. LOVE:

13   Q.  You can go ahead.

14   A.  Answer?

15   Q.  Yes.                                                     11:28AM

16   A.  I can't answer to what my providers do.  I know what they

17   are required to do and I know what I do.  They should actually

18   look -- you go through and you pull up the inmate's number, you

19   look for the consult, you will see that it's, you know,

20   standing there.  That's -- and you do that only if you can      11:29AM

21   actually open the chart.  Generally, those inmates are gone.

22   So you try to open a chart and you can't.  So there's no way to

23   even review it.  And they just sit there.  There's nothing you

24   can do.  We have mentioned it to the FHAs and there's nothing

25   that they can do.  It just doesn't come out of eOMIS once that   11:29AM

1    chart is closed.

2    Q.  If you are unable to open a chart does that mean the inmate

3    is no longer in the custody of the Department of Corrections?

4    A.  Usually.

5    Q.  When you say usually, are there some exceptions?                11:29AM

6              THE COURT:  This is actually not helpful.  What we

7    have is in evidence a document that somebody who was concerned

8    about the backlog and concerned about the failure to have

9    providers review these medical reports within time submitting a

10   document that shows many, many beyond the performance measure    11:30AM

11   delays.

12             Whether there is some issue with that or not what I

13   know for sure is that a person who thought it was worth your

14   time attached this document to it, and so if it's got problems

15   with it then that itself is a problem because why are you        11:30AM

16   having your time taken by a report that doesn't accurately

17   report what is on the scene?

18             So in both circumstances it's a failure.  So I don't

19   need to hear more about that.

20             MS. LOVE:  Your Honor, just for the record, and I will  11:30AM

21   not ask more questions about the subject matter, but when there

22   are allegations and issues raised as to what you or plaintiffs'

23   counsel may see as deficits in the provision of medical care it

24   is relevant for defendants to be able to explain what efforts

25   are being made to address those issues.                          11:31AM

1          THE COURT:  So great, you're making an argument that I

2     shouldn't count the delays that are evident in the report that

3     some Corizon person provided to this witness as evidence of how

4     they were behind, and you're saying, well, this report actually

5     is so flawed it really isn't helpful.  Why then do you have a          11:31AM

6     system that has this person providing that information to this

7     very busy person so that he is fretting about something you

8     don't think is worth anything?

9          So again, that's my point, but go on.

10    BY MS. LOVE:                                                            11:31AM

11    Q.  Dr. Stewart, if you could please take a look at Exhibit

12    Number 196.

13          THE COURT:  196?

14          MS. LOVE:  Yes.

15          THE COURT:  Thank you.                                           11:31AM

16    BY MS. LOVE:

17    Q.  Exhibit Number 196 is already in evidence, and this was an

18    e-mail that you reviewed in response to plaintiffs' counsel's

19    questions dated October 19, 2017, an e-mail from Daniel Sego to

20    the provider team regarding completion of reviews in a timely          11:32AM

21    manner.  Correct?

22    A.  Yes.

23    Q.  As a medical director in October of 2017, did you take

24    steps to have your providers increase their review, their

25    timely review?                                                         11:32AM

UNITED STATES DISTRICT COURT

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    A.  Yes.

2    Q.  What steps did you take?

3    A.  Again, presenting them with a Pentaho report, having them

4    review their -- to do their reviews every single day.  We

5    declared a time period in the morning where they would take an          11:32AM

6    hour and do that for 46 and 52, and then if they are not -- we

7    review what they have done in the afternoon and if they haven't

8    completed those reviews then I personally call them in the

9    afternoon and say, hey, you haven't done these reviews, what's

10   your plan to do these; I know you are in the middle of your            11:33AM

11   busy day and you are seeing patients but we have to have these

12   done.  So a lot of them will do it at the end of the day or

13   during the 4:00 inmate count where they are not really seeing

14   patients.

15   Q.  And regarding the chart that we were just speaking of that        11:33AM

16   showed by provider and the outstanding reviews with the time

17   frames on them, you testified and talked to plaintiffs' counsel

18   regarding the time periods at issue of when Dr. Jan Watson had

19   left versus when the report was generated, correct?

20   A.  Yes.                                                              11:33AM

21   Q.  And before Dr. Watson left, did you take any steps to

22   ensure that any outstanding reviews she may have were reviewed

23   to the extent she could before she left?

24   A.  Yes.

25           The DO -- it wasn't me personally.  The DO and the          11:34AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    FHA, at the time Maureen Johnson, asked her to come in.  She

2    worked a short week the last week she was there and for those

3    days during that week -- I think it was two or three -- all she

4    did was reviews.  So her only job was to clear out all the

5    things she had reviewed so it wouldn't fall on someone else who    11:34AM

6    was replacing her.

7            THE COURT:  Doctor, would you take a look at 196.1,

8    please.

9            THE WITNESS:  Yes.

10            THE COURT:  I'm having trouble understanding the    11:34AM

11    second to the last paragraph that starts, "There should be no

12    reviews prior to 10-21 on Monday morning."  That doesn't make

13    sense to me.  Does that make sense to you?

14            THE WITNESS:  It doesn't out of context.  So let me

15    see.    11:35AM

16            So this was sent send Thursday 10-19.  So I think what

17    he was saying was he wanted all the reviews completed by Monday

18    morning.  I think that's what he was trying to do.

19            THE COURT:  Isn't that the opposite of saying there

20    should be no reviews prior to 10-21 on Monday morning?    11:35AM

21            THE WITNESS:  Yeah.  The gist of it, I think, is what

22    he was saying is if you have reviews that are still outstanding

23    after 10-21 disciplinary action will be taken.

24            THE COURT:  He's certainly not saying there should be

25    no reviews prior to 10-21.  He's certainly not meaning to say    11:35AM

1    there should be no reviews prior to --

2          THE WITNESS:  That's correct.  I think he's just

3    saying get your reviews done by the 21st.

4          THE COURT:  Do you read this to be that he's just put

5    the wrong word in here?                                        11:35AM

6          THE WITNESS:  I think so.

7          THE COURT:  Instead of saying there should be no

8    reviews prior he meant to say after.

9          THE WITNESS:  There certainly was a better way to say

10   it.                                                           11:35AM

11         THE COURT:  Doesn't it look like he said it exactly

12   the opposite of what he meant to say?

13         THE WITNESS:  Yes.

14         THE COURT:  So it's not better.  It's flat out 100

15   percent wrong.                                                11:36AM

16         THE WITNESS:  Yes.

17         THE COURT:  Thank you.

18         MS. LOVE:  No further questions.

19         THE COURT:  Thank you.

20         Doctor, you are done.  Thank you very much for your     11:36AM

21   time here today.  I hope that you can get back to work and work

22   through what is a very difficult task of assignments.  You said

23   that you have trouble with names.  I don't think you have

24   trouble with names.  You just have too many names thrown at you

25   with all of these people that are constantly changing and the  11:36AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1    positions that are critical.  I don't blame you if you can't

2    remember people's names because they just aren't there very

3    long.

4           THE WITNESS:  I apologize about that, too.

5           THE COURT:  All right.  Are you ready with your first    11:36AM

6    witness?

7           MS. LOVE:  Yes, Your Honor.

8           Defendants call Dr. Nicole Taylor.

9           THE COURT:  Do you have the exhibits that Dr. Taylor

10   is going to be asked to take a look at, if any, available to    11:37AM

11   her on the stand?

12          MR. BOJANOWSKI:  They have already been put up there.

13          THE COURT:  Do you want to just take a look and make

14   sure they are not obscured or obstructed or confused by the

15   ones that Dr. Stewart left.                                     11:37AM

16          Thank you.

17          MR. FATHI:  Your Honor?

18          THE COURT:  Yes, sir.

19          MR. FATHI:  Your Honor, the defendants, pursuant to

20   the Court's order, provided a witness list providing -- listing 11:37AM

21   the witnesses in the order they would be called, what day they

22   would be called, et cetera.  Dr. Taylor was not the next

23   witness on the list.  There were two before her.  So unless

24   they are simply deciding not to call those witnesses at all, we

25   would object to their deviation from the witness list on which  11:37AM

1    we have relied in our preparation and in having appropriate

2    counsel here on the appropriate day.

3            THE COURT:  Ms. Love, what you missed was Mr. Fathi

4    saying that Dr. Taylor was not the next witness on the list.

5            MR. FATHI:  The next witness was Lisa McNeal followed          11:38AM

6    by Erin Barlund.

7            MR. STRUCK:  Your Honor, we -- Dr. Taylor was listed

8    for today.  We do have Lisa McNeal available.  We can put her

9    on the stand right now.  This isn't changing any of the

10   witnesses.  All of the witnesses that we're going to call today   11:38AM

11   we're going to call today.

12           THE COURT:  Let's go with the order that was

13   announced.

14           MR. STRUCK:  All right.  Then we'll call Lisa McNeal.

15           THE COURT:  Thank you.                                     11:38AM

16           MR. FATHI:  Thank you, Your Honor.

17           THE COURT:  Ms. McNeal, if you would please step

18   forward to the clerk of the court so she may administer the

19   oath.  Just right here.

20           THE MAGISTRATE JUDGE CLERK:  The correct spelling of      11:39AM

21   your last name is M-C-N-E-A-L?

22           THE WITNESS:  I'm sorry.  I'm Erin Barlund.

23           MR. STRUCK:  Your Honor, I had Ms. McNeal coming at

24   2:00.  I think Ms. Love, when she spoke to me, misspoke and

25   said -- she meant to say Ms. Barlund can go.  She is here.         11:39AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Stewart-Redirect

1          THE COURT:  Okay.  Ms. Barlund is the one we need

2     next.

3          I'm sorry, Ms. McNeal.  We called you too soon.

4          THE WITNESS:  I'm Erin Barlund.

5          THE COURT:  Ms. Barlund.  I meant to say we called you    11:40AM

6     too soon.  We meant to call Ms. McNeal.

7          MR. STRUCK:  Your Honor, Ms. McNeal is not here.  I

8     will have to get her here.  She was coming at 2:00.

9          THE COURT:  Ms. Barlund, not so fast.

10          The thing is, I expected that we would have witnesses    11:40AM

11     standing ready, and I made this very clear to everybody.  So

12     I'm not happy to hear that the witness that's next on the list,

13     again, plaintiffs were entitled to rely upon that and I made it

14     clear to everybody that we were going to be following a strict

15     protocol with respect to timing of witnesses.               11:40AM

16          So I'm not happy to hear about that, but we're going

17     to take advantage of the fact that you are here now,

18     Ms. Barlund, and ask you to come forward and be sworn.

19          THE MAGISTRATE JUDGE CLERK:  E-R-I-N, B-A-R-L-U-N-D?

20          THE WITNESS:  That is correct.                          11:41AM

21          (The witness was sworn.)

22          THE MAGISTRATE JUDGE CLERK:  Thank you.  If you will

23     please have a seat.

24          THE COURT:  The microphone is something people aren't

25     comfortable, it seems, having as close to their mouth as we   11:41AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    find it necessary, so please don't be shy about that.

2              THE WITNESS:  Thank you, Your Honor.

3              THE COURT:  Counsel, what we'll do is stop at noon and

4    come back at 1:00.

5                        ERIN BARLUND,

6    called as a witness herein, having been first duly sworn, was

7    examined and testified as follows:

8                      DIRECT EXAMINATION

9    BY MR. BOJANOWSKI:

10   Q.  Would you please state your name for the record?          11:42AM

11   A.  Erin Barlund.

12   Q.  Ms. Barlund, are you employed?

13   A.  Yes, I am.

14   Q.  Where are you employed?

15   A.  With the Arizona Department of Corrections Health Services  11:43AM

16   Contract Monitoring Bureau.

17   Q.  And how long have you been so employed?

18   A.  For approximately five years.

19   Q.  What is your job title?

20   A.  My official job title is Quality Assurance Nurse Manager.   11:43AM

21   My working title is Health Services Coordinator.

22   Q.  And as part of -- what are your job duties on a day-to-day

23   basis?

24   A.  I supervise a few employees and I monitor performance

25   measures.                                                      11:43AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    Q.  What performance measures do you monitor?

2    A.  I currently monitor Performance Measures 14, 61, 48, and

3    49.

4    Q.  Do you do that statewide or is that just for specific

5    facilities?                                                          11:43AM

6    A.  I do that statewide for those performance measures.

7    Q.  Is that something you do each month?

8    A.  Yes, it is.

9    Q.  For how long have you been doing that?

10   A.  We restructured approximately a year ago and so I have been    11:44AM

11   doing those performance measures for at least a year.

12   Q.  And Performance Measures 48 and 49, what do those involve?

13   A.  Performance Measure 48 essentially looks at if an ATP was

14   written or if it was communicated to the provider within 14

15   calendar days.                                                       11:44AM

16          Performance Measure 49 looks to see if the ATP that

17   was written was communicated to the inmate within 30 calendar

18   days.

19   Q.  Okay.  So this is -- is this a real specific type of

20   measure that's being looked at?                                      11:44AM

21   A.  Yes, it is.  It has very concrete dates and there is very

22   little subjectivity to these performance measures.

23   Q.  What's an ATP?

24   A.  Alternative Treatment Plan.

25   Q.  How does an ATP come about?                                      11:45AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1   A.   A provider writes a consult, it is entered into eOMIS, it

2   is then taken and entered into both CARES and ORC.   The UM

3   department then responds to it and they may take the originally

4   requested service and deviate from that.   Sometimes it's very

5   slightly.   Sometimes it's more significant.                     11:45AM

6   Q.   All right.

7           So the ATP is part of the utilization management

8   process?

9   A.   Yes, it is.

10  Q.   What types of things can happen when a consult request is   11:45AM

11  made to Utilization Management?   What are the options?

12  A.   In CARES what we see is an approval, an ATP or a needs more

13  information status.

14  Q.   Now when you are measuring Performance Measures 48 and 49,

15  what specifically are you looking for from the UM?               11:46AM

16  A.   I am looking for an ATP, I'm looking for the date in which

17  the ATP recorded.   And for Performance Measure 48 I am then

18  looking for a subsequent date at which time that ATP was

19  communicated to the provider.   And for 49 I'm looking at a

20  subsequent date at which time the ATP was communicated to the    11:46AM

21  inmate.

22  Q.   So if I'm understanding your testimony correctly, are you

23  only looking for ATPs or are you looking at consult requests

24  that are granted or denied as well?

25  A.   I am looking only for ATPs.                                 11:46AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1          We are required, I believe, by the plaintiffs to

2     monitor anything that is either considered denied or ATP'd as

3     being applicable to Performance Measures 48 and 49.

4     Q.  So as part of your measurement, are you measuring instances

5     where Utilization Management grants the consult request without        11:47AM

6     a any more information on an alternative treatment plan?

7     A.  So sometimes what we do find is that an ATP is written.  It

8     would show on my source document and if there is an indication

9     that that consult actually occurred I would therefore identify

10    it as not being denied and would exclude it for monitoring.  So   11:47AM

11    there may be a treatment plan offered but the final status of

12    that consult may be that the consult occurred, it was approved

13    it was scheduled and it occurred.

14    Q.  All right.  So I'm going to walk you through some examples

15    of this so we can have the Court understand exactly how these       11:47AM

16    measures are monitored and how you can attain consistency and

17    accuracy in your monitoring.

18          Okay?

19    A.  Okay.

20    Q.  So the first thing I want you to do is look at Exhibit          11:48AM

21    Number 657, which should be in front of you.

22    A.  Okay.

23          MR. BOJANOWSKI:  Do you have those, Your Honor?

24          THE COURT:  I do.  Thank you.

25    BY MR. BOJANOWSKI:                                                   11:48AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1  Q.  Exhibit 657 is seven pages long so I want you to look at

2  page two of that exhibit.

3          Do you have that in front of you?

4  A.  Yes, I do.

5  Q.  What is that?                                          11:48AM

6  A.  Page 2 is the source document that I would use to monitor

7  that performance measure.  It contains a list of inmates that

8  had ATPs at one point.  And I would then take this list, this

9  randomized list, and I would identify the first ATPs and I

10 would monitor each of those unless I can ascertain that a      11:49AM

11 consult occurred and then I would exclude it from monitoring.

12 Q.  So how do you get this particular list?

13 A.  I get this list from Corizon.

14 Q.  Do you get this list each month?

15 A.  Yes, I do.                                              11:49AM

16 Q.  And of the list that we have here, is it broken down by a

17 facility and a unit?

18 A.  The list I receive is broken down by facility at this point

19 and then I filter for the specific unit that is to be

20 monitored.                                                  11:49AM

21 Q.  So you get a much larger list than the one that is depicted

22 on Page 2 of Exhibit Number 657?

23 A.  That is correct.

24 Q.  And then you said you filter it.  How do you go about

25 filtering it?                                               11:49AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1   A.  At the top of Excel there is a list of rows, my header row,

2   for which I can apply a filter if the filter is not already

3   there, and then I make the selection for the unit that I am

4   intending to monitor at that moment.

5   Q.  And in this particular example, which facility and unit are       11:50AM

6   you looking at?

7   A.  This particular source document is for Eyman facility, the

8   Meadows Unit.

9   Q.  And in this particular exhibit I don't want you to read the

10  name of the patient or the number of the patient but you            11:50AM

11  selected, it appears to be, the first patient there?

12  A.  That is correct.

13  Q.  And why did you select that particular patient?

14  A.  My randomized order indicates that that should be the first

15  patient that I would monitor.                                        11:50AM

16  Q.  So what's your next step after you have got this particular

17  list that's narrowed down to a unit level?

18  A.  I would look at this, I would determine that that

19  particular inmate had a urology consult that was ATP'd on

20  November 30, and I would then, for Performance Measure 48,          11:51AM

21  determine if that ATP was communicated to the provider within

22  14 calendar days.

23  Q.  So let's look at Exhibit 657, Page 3.  Do you see that

24  document?

25  A.  Yes, I do.                                                       11:51AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1   Q.  What is that document?

2   A.  This document is from eOMIS.  It indicates that the consult

3   was written on November 21st.  It provides information that

4   supports the consult and provides on Page 4 information that

5   that Alternative Treatment Plan was recommended and that --          11:51AM

6   actually, it's the next page that will indicate it was sent to

7   the provider within 14 calendar days.

8   Q.  Let's back up just a second.

9       Now, the -- Page 3 of the document --

10  A.  Yes.                                                            11:51AM

11  Q.  -- 657, is what I see as a condensed consultation request.

12  Is that what you are seeing?

13  A.  Yes, it is.

14  Q.  Now, when a provider wishes to trigger a consult, is this

15  the document they need to fill out to send to UM for               11:52AM

16  consideration?

17  A.  Yes, it is.

18  Q.  So is this document something that is contained in eOMIS or

19  is it contained in CARES?

20  A.  This document is from eOMIS.                                   11:52AM

21  Q.  So what you are doing, then, is after you get your list of

22  10 you then go to eOMIS and look at the consultation request.

23  Is there a section in eOMIS or something that you have to

24  look at or --

25  A.  Yes.  I would input the patient's identification number.  I   11:52AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    would then go under inmate consult request, I would identify

2    the particular consult that I intend to monitor, I would open

3    that consult, and this is essentially what I would see.

4    Q.   How did you know to pick this one, though?

5    A.   I have a date of an ATP, I have the consult type, and I          11:52AM

6    have a date that indicates when the consult was written,

7    although sometimes that date can be off a day or two.

8    Q.   So the date that you are looking at in your review on

9    Page 3 is the request date that we have highlighted here.  Is

10   that it?                                                             11:53AM

11   A.   Yes.  I would match that to the source document as best as

12   I can.

13   Q.   To the list we have that we were looking at?

14   A.   Correct.

15   Q.   All right.  So is that the first date that then triggers        11:53AM

16   the measure as to the -- you said 14 days?

17   A.   No.  The date I would be looking at is the ATP recommended

18   date.

19   Q.   All right.  So why do you look at the request date for this

20   measure?                                                             11:53AM

21   A.   Simply to ensure that I'm monitoring the correct consult

22   request.  At larger facilities or at facilities where there is

23   a higher acuity of inmates there could be multiple requests on

24   the same day or within a very short time period so I do want to

25   make sure that I am monitoring what my source document           11:54AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    indicates I should monitor.

2    Q.  And so if we go to Page 4, then, what is Page 4 of Exhibit

3    657?

4    A.  Page 4 is a continuation of Page 3.  This information comes

5    from eOMIS.  And toward the bottom of the entry there's an          11:54AM

6    action taken section, and that provides some information about

7    when different statuses occurred related to that consult

8    request.

9    Q.  So is -- it looks as though it's in reverse date order, in

10   other words, the most recent date is at the top and the oldest     11:54AM

11   date is at the bottom.  Is that what you are seeing?

12   A.  Yes, it is.

13   Q.  So do you use this information at all at the bottom part of

14   Page 4?

15   A.  I use the alternative treatment recommended date as the        11:54AM

16   general guideline.  However, I would select that hyperlink to

17   confirm that the ATP was communicated to the provider and at

18   what time.

19   Q.  So if you go to Page 5 of Exhibit 657, what is that?

20   A.  That would be the information I see after I select the         11:55AM

21   hyperlink from what we just discussed on Exhibit -- Page 4.

22   Q.  So you click on the hyper link and then this appears in

23   eOMIS, this screen?

24   A.  Yes, it does.

25   Q.  This is a screen shot of what appears in eOMIS.                11:55AM

1      And so what are you looking at with regard to Page 5,

2  then?

3  A.  So in this particular case, I would go back to my source

4  document.  I believe that the ATP was written on 11-30.  And

5  here I would look to make sure that the ATP is included in this     11:55AM

6  page on eOMIS.  I would compare the 11-30 to the action date,

7  which in this case is 11-30, and the action type, which is an

8  alternative treatment recommended, and I would look at the

9  forward staff to ensure that a provider was notified that this

10 ATP had occurred.     11:56AM

11 Q.  How do you know that a provider was notified?

12 A.  I can see the forward staff and I know that eOMIS allows

13 one to communicate with additional Corizon staff and so I can

14 see this ATP was sent to that provider because it was forwarded

15 to them.     11:56AM

16 Q.  So if I understand your testimony correctly, on Page 5 we

17 can see that the alternative treatment plan was recommended and

18 sent to the provider on November 30, 2017?

19 A.  That is correct.

20 Q.  All right.     11:56AM

21      And then what do you do with that information?

22 A.  So the ATP was written on 11-30.  It was communicated to

23 the provider on 11-30.  I then indicate on my worksheet that it

24 was communicated on 11-30, which is certainly within 14

25 calendar days, and I identified it as compliant.     11:57AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1   Q.  So if we go to Exhibit 657, Page 6 -- are you there?

2   A.  Yes.

3   Q.  Is the inmate that you just talked about listed on -- well,

4   let me back up.  What is this document?

5   A.  This is the worksheet that I was maintaining at that time.      11:57AM

6   Q.  And so this is your handwriting in there that you fill this

7   out?

8   A.  Yes, it is.

9   Q.  And each one of these on the left there is an inmate

10  number.  Do you see that?      11:57AM

11  A.  Yes, I do.

12  Q.  And so when you are evaluating a particular file you write

13  the inmate number down.  Do you see that?

14  A.  Yes, I do.

15  Q.  And then what else do you put in there?  And let's just      11:57AM

16  take the first patient here, and if you could just kind of

17  indicate to the Court what it is that these entries are and

18  what they signify.

19  A.  11-21 indicates that the consult was written on November

20  21st.  The URO simply indicates that it was a urology consult,      11:58AM

21  and ATP was written on 11-30, and below where it says ATP 11-30

22  I have written 11-30 with a C circled, which indicates to me

23  that the ATP was communicated on the day which it was written

24  and is therefore compliant.

25  Q.  So it's within the 14 days as the measure requires?      11:58AM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    A.  Yes, it is.

2    Q.  What is the 12-11 date?

3    A.  That is for Performance Measure 49, and so that indicates

4    to me that the inmate was seen for this ATP on December 11, and

5    it, too, was compliant because the inmate was given the ATP          11:58AM

6    information within 30 calendar days of ATP being written.

7    Q.  All right.

8            Then we go to Exhibit 657, Page 7?

9            THE COURT:  Why don't we stop right there and pick up

10   at that one at 1:00.                                                  11:59AM

11           MR. BOJANOWSKI:  Thank you, Your Honor.

12           THE COURT:  Ms. Barlund, it's the noon break.  If you

13   would kindly be back in that spot at 1 p.m.

14           THE WITNESS:  Yes, sir.

15           THE COURT:  Thank you very much.                             11:59AM

16           THE WITNESS:  Thank you.

17           (Recess from 11:59 a.m. until 1:02 p.m.)

18   BY MR. BOJANOWSKI:

19   Q.  Ms. Barlund, when we left off I believe we were talking

20   about Exhibit 657.  Do you have that in front of you?               01:02PM

21   A.  Yes, I do.

22   Q.  I believe we left off on Page 6 of that exhibit.  That was

23   your handwritten notes?

24   A.  Yes, it is.

25   Q.  Now, after you get done doing the worksheet you have            01:03PM

1  identified as 657 Page 6, what do you do next?

2  A.  Generally I would monitor the other complexes and then I

3  would enter this as a Word document.  And I would take that

4  Word document and enter it into the CGAR database.

5  Q.  So if you go to Page 7 of Page 657, is that the CGAR                01:03PM

6  database?

7  A.  Yes, it is.  It's an entry from that.  And it simply

8  indicates that the inmate that we have been discussing was

9  identified as compliant for that facility and for that yard.

10  Q.  All right.  Do you know, over the course of a month, how          01:03PM

11  many files you review when you measure 48 and 49 statewide?

12  A.  My source document has approximately 350 to 400 ATP's

13  listed I generally probably monitor 250 plus, although I do

14  generally go through additional ones to make sure I am

15  recognizing patterns and communicating adequately with the           01:04PM

16  sites.

17  Q.  Are there instances where you communicate with the site

18  with regard to things that you are seeing?

19  A.  Absolutely.  I consider it a pleasure to spend time in the

20  field.  I do want everybody to understand the expectation, and       01:04PM

21  so if I can assist in people understanding what the performance

22  measures are, what we intend to measure, and how they could be

23  successful with these measures, I do want to communicate that.

24  Q.  How often do you go into the field to work with site level

25  Corizon people showing them how the measures work?                    01:04PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1   A.   I believe this month I have been to Phoenix and Perryville.

2   I have been rather busy these last few months so I haven't

3   spent as much time in the field as I would like.   But

4   historically I'm at least three or four sites probably every

5   month.                                                          01:05PM

6   Q.   What do you do when you go to the site?

7   A.   Generally I want to understand what's going on.   If they

8   are unsuccessful, if there is a process in place at another

9   facility that can be replicated, I do want to communicate that.

10  If there's a misunderstanding about what needs to be documented  01:05PM

11  to have compliance recognized I want to communicate that.

12  Generally, I want to make sure I have done nothing that would

13  contribute to their noncompliance; that they understand these

14  measures; and that they have the opportunity to do the action

15  required to be compliant.                                       01:05PM

16  Q.   Who do you meet with?

17  A.   So for these performance measures I would meet with the

18  clinical coordinator and the scheduler.   I do discuss other

19  performance measures so I would meet with the relevant parties

20  regarding those performance measures.                           01:05PM

21  Q.   Do you actually go into eOMIS and walk through the measure

22  with them?

23  A.   Absolutely.   For example, at Douglas, there is a brand new

24  clinical coordinator and we tried to do it telephonically.   She

25  just didn't have the understanding at that point, so I actually  01:06PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    drove out in the afternoon, met with her, and came back that

2    night.  But I wanted to make sure that she had every

3    opportunity for compliance, even though they did end up being

4    noncompliant, I believe, that month and the subsequent month.

5    But after that, with a better and improved understanding, they          01:06PM

6    were able to be compliant.

7    Q.  Okay.  Ms. Barlund, would you go to Exhibit 658, please.

8    A.  Yes.

9    Q.  And 658 is, again, involving Performance Measure 48.  All

10   right?                                                                   01:07PM

11   A.  Okay.

12   Q.  This is an example of what would be considered an N/A file.

13   Do you know what an N/A file is?

14   A.  Yes.  It's a not applicable and it's one in which we would

15   not monitor.                                                             01:07PM

16   Q.  And what are the criteria to determine an N/A when you are

17   working with these measures?  Give me an example.

18   A.  So in this particular example, the inmate did at one point

19   have an ATP but because an ATP is not really a denial, that

20   inmate actually went out and was seen by the specialist as               01:08PM

21   originally ordered on this consult.  So this particular consult

22   request went through multiple status changes indicating that

23   the consult was sent in, somebody continued to advocate on the

24   inmate's behalf so the ATP, in fact, was not the last status.

25   The last status was that the consult was completed and the               01:08PM

1    results received.

2    Q.  So why don't you walk us through this so the Court has an

3    idea of what it is you were looking at and why you made the

4    decision you made to designate this particular file as not

5    applicable for Measure 48 at this facility and unit.                    01:08PM

6    A.  So the source document indicates that there was an ATP

7    written on 11-2 for oncology.  That is, in fact, true.  If I

8    look at subsequent pages in this exemplar I would find that

9    there was an ATP, but then that ATP was overturned.  The inmate

10   went out multiple times and was seen as the off-site specialist   01:09PM

11   requested.

12   Q.  All right.  Well, let's take a look at -- all right.  So

13   you had identified in Exhibit 658, Page 2, that an ATP was

14   requested on 11-2-2017?

15   A.  Yes.  And a consult was requested and the ATP was given.      01:09PM

16   Q.  I'm sorry.  The ATP was -- a consult was requested so Page

17   3, again, is the consult request.

18   A.  That is correct.

19   Q.  And so that consult request was on October 26, 2017.  Page

20   4, is that -- we've looked at this before.  So this is kind of    01:09PM

21   the actions taken with regard to this particular consult?

22   A.  That's true.  Beginning at the bottom of Page 3, and then

23   continuing on Page 4 are a variety of status changes indicating

24   that this consult was sent to the UM team and that ultimately

25   was scheduled, the consult was completed, results were           01:10PM

1  received, and, in fact, this inmate saw that specialist

2  multiple times even though there was an ATP.

3  Q.  All right.  So Page 5 of this exhibit, what does this show

4  us?

5  A.  This shows that there was, in fact, an ATP.                    01:10PM

6  Q.  And this has the 11-2-17 date on it?

7  A.  It actually has the 10-31 date.

8  Q.  Why is that date there?

9  A.  In order to capture the ATP at the earliest possible point

10 we use CARES.  The CARES ATP date is the earliest date at which   01:10PM

11 an ATP was written and the consult date in CARES is captured

12 based on when the clinical provider entered it into CARES.  So

13 in this particular instance, the clinical coordinator may have

14 had a day or two delay in entering that consult into CARES, but

15 the ATP would be the earliest and most accurate date.  So we     01:11PM

16 use this as a source document to indicate so we know we have

17 captured the ATP at this point of origin.

18 Q.  So if it's not in eOMIS you are looking into CARES to try

19 and get that trigger date as to when this ATP was issued?

20 A.  I look into CARES and sometimes ORC.                          01:11PM

21 Q.  ORC?

22 A.  But CARES would be the earliest date so it's the date that

23 I rely upon.

24 Q.  So in calculating your 14 days you are relying on the CARES

25 date?                                                             01:11PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1   A.  I'm relying on the CARES date as it's populated on the

2   source document.

3   Q.  Okay.  And so if we go to Page 6 of Exhibit 658, what is

4   this?

5   A.  This is a screen shot of this inmate indicating that a                01:11PM

6   consult was written on 10-27.  If we go back a page we can see

7   in ORC an ATP was written on 11-2, but ultimately this inmate

8   did go out and did have that consult completed and had results

9   received as early as December.

10  Q.  How do you know that?                                                 01:12PM

11  A.  I can see at the bottom of the page, I can see every time

12  results were returned.  And above that where it says "action

13  taken" I can find the multiple status changes that this consult

14  went through.  And it would cause me to realize that this

15  consult had most likely occurred, and I would then go into the           01:12PM

16  scanned documents to ensure that it occurred.

17  Q.  So let's look at Pages 7, 8, 9, 10.

18  A.  I apologize.  I seem to be missing some pages.

19  Q.  Oh, really?

20          THE COURT:  My notebook doesn't have those pages,                01:13PM

21  either.

22          MS. EIDENBACH:  Correct.  I don't have those either.

23          MR. BOJANOWSKI:  Your Honor, may I have a moment to

24  see if I have an extra copy of this material I can provide?

25          THE COURT:  Yes.                                                  01:14PM

─6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct─

 1          MR. BOJANOWSKI:  Well, Your Honor, since you don't

 2    have a copy of it and I'm the only one that appears to have a

 3    copy of it, I can have her testify but I don't know how you

 4    want to handle it.  I mean, I can submit this later.  It's

 5    marked on my notebook with the exhibit number and page number          01:15PM

 6    and it goes up to Page 20.

 7          THE COURT:  If you want to put it before the witness

 8    we'll see how we go.

 9          MR. BOJANOWSKI:  Okay.

10          MS. EIDENBACH:  Your Honor, we would like to object          01:15PM

11    just because these -- the pages, the additional pages of this

12    document, were not provided to us in advance in order for us to

13    properly prepare for this testimony.

14          THE COURT:  That's a reasonable objection.

15          MR. BOJANOWSKI:  I'm just going to briefly show          01:16PM

16    counsel what it is I'm handing the witness.

17          THE COURT:  If you can overcome the objection with

18    that, see if that works.

19          MR. BOJANOWSKI:  So you know.

20          Your Honor, may I show the witness the documents?          01:16PM

21          THE COURT:  Did we overcome the objection?

22          MR. BOJANOWSKI:  She's still objecting.

23          THE COURT:  Well, I'll sustain the objection.

24          MR. BOJANOWSKI:  All right.

25    BY MR. BOJANOWSKI:          01:17PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1   Q.  Actually, there are two documents that are the same.  If

2   you go to Exhibit 657.

3   A.  Yes.

4   Q.  And you go to 657, Page 6.

5   A.  Yes.                                                          01:18PM

6   Q.  Do you see the particular inmate that you are evaluating in

7   658 listed on this particular document?

8   A.  I do.

9   Q.  All right.  And what does it show that your entry is?

10  A.  It shows that I determined that the consult, in fact,        01:18PM

11  occurred.  I did not use that particular consult for that

12  particular inmate.  So I eliminated, it looks like, Number 9 on

13  my randomized list and I substituted it with Number 11.

14  Q.  All right.  And when you went to determine whether the

15  consult occurred, what was it that you looked at to make that    01:18PM

16  determination?

17  A.  I went under scanned documents, and I was able to identify

18  the appointments for -- with the oncologist and for

19  chemotherapy and I was able to identify the desired schedule

20  that the off-site provider had requested that the inmate was     01:19PM

21  seen by.

22  Q.  So you verified it through records that -- well, where did

23  the records come from that you used to verify?

24  A.  From eOMIS.

25  Q.  And you said they were scanned in.  So if they were scanned  01:19PM

1    in, did they come from an off-site provider?

2    A.  In this case they did come from an off-site provider.  I

3    suppose it's possible that some scanned documents are actually

4    on site but in this case they were off site.

5    Q.  And in this particular case, you used -- did you use the                01:19PM

6    scanned documents then to verify that the original consult

7    request was fulfilled?

8    A.  Yes, I did.

9    Q.  But the ATP still existed on the system?

10   A.  There was an ATP that was written, and somebody advocated            01:20PM

11   on the inmate's behalf and probably provided more information

12   to ensure that that inmate received the care they needed and

13   deserved.

14   Q.  All right.  So because they got the care they needed, the

15   ATP no longer was effective because they got the care                     01:20PM

16   originally requested?

17   A.  The plaintiffs have argued that an ATP is a denial.  In

18   this case, the care was not denied.  The care occurred as

19   originally ordered.  Therefore, it was excluded from audit as a

20   denial.                                                                    01:20PM

21   Q.  So let's look at Exhibit 659.  Do you have that in front of

22   you?

23   A.  Yes, I do.

24   Q.  And again, this is pretty much the same type of

25   documentation we have seen before.  Could you walk us through            01:21PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    this particular example as an example for the Court to show how

2    you determined noncompliance for PM 48?

3    A.  I would begin with my source document, and I would see that

4    this particular inmate had a consult written for hematology

5    that was ATP'd September 13 of 2017.                              01:21PM

6    Q.  Is that on Page 2?

7    A.  Yes, that is.

8    Q.  Is that the highlighted item on that page?

9    A.  I am on that page.

10   Q.  Is it highlighted?                                           01:22PM

11   A.  Yes, it is.

12   Q.  Then the next page is?

13   A.  The next page is the actual consult that was entered into

14   eOMIS.

15   Q.  And the next page, Page 4?                                   01:22PM

16   A.  That is a continuation of the consult request entered into

17   eOMIS.

18   Q.  All right.  And then what is Page 5?

19   A.  Page 5 is the status for the requested ORC.  And here it

20   indicates that the ATP was communicated -- the ATP, while being  01:22PM

21   written in September, was not communicated until October 2nd at

22   which time the provider signed off on it.  However, this

23   exceeded 14 calendar days; therefore, it was identified as

24   noncompliant.

25   Q.  So it's noncompliant with the time frame for the provider    01:23PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    to sign off on it, you said?

2    A.  Yes.  At this particular facility, the providers seem to

3    prefer these printouts from ORC.  At other facilities we often

4    see that the communication occurs in eOMIS as an ATP

5    recommended and forwarded to the provider.                          01:23PM

6    Q.  In this case, there's this ORC document.  Is this from the

7    ORC system that is printed?

8    A.  Yes, it is.

9    Q.  Was this scanned into the system, or how is it that you

10   came about looking at this particular document from ORC?          01:23PM

11   A.  Generally speaking at this facility they scan these in.  I

12   can generally find them under inmate consult requests in eOMIS.

13   If I don't find it there, if it's not attached to that

14   particular consult request, I will look under scanned documents

15   and attempt to find it there.                                     01:24PM

16   Q.  So is -- and you mentioned that this particular facility or

17   the providers at this facility like to use ORC printouts as

18   opposed to eOMIS?

19   A.  Yes.

20   Q.  Is that just something you know or I mean --                  01:24PM

21   A.  It's something I know.  I have been auditing these

22   performance measures for a while.  I also used to cover Safford

23   so I was familiar with the providers at that time and I was

24   familiar with their processes.  And it is an acceptable means

25   of communication just as it would be entering the information     01:24PM

1  directly into eOMIS and forwarding to a provider.

2  Q.  And so then we go to the next page, Page 6.  Again, this is

3  your worksheet.  And have you highlighted this particular

4  inmate?

5  A.  Yes, I have.                                              01:24PM

6  Q.  And could you indicate to the Court what your handwritten

7  notes are for this particular inmate?

8  A.  It indicates that a consult occurred on September 11th.  It

9  was for hematology.  There was an ATP written on 9-13, and that

10 ATP was given to the provider on October 2nd.  It exceeded 14   01:25PM

11 calendar days; therefore, I have identified it as noncompliant.

12 Q.  Then on the bottom of this particular column you have got 7

13 of 9 and then next to it 8 of 9.  What does that mean?

14 A.  It means that while the consult was late in being given to

15 the provider, it was timely in that -- the ATP was late when it  01:25PM

16 was given to the provider; the ATP was not late when it was

17 given to the inmate.  So it is reflected as noncompliant under

18 performance measure 48 and it is identified as compliant on

19 Performance Measure 49.

20 Q.  And then again, Page 7 of this exhibit identifies the        01:25PM

21 inmate that we have been talking about?

22 A.  Yes, it does.  It identifies this inmate as being

23 noncompliant because the ATP was not communicated within the

24 required time frame.

25 Q.  Does it also show compliance under Item 49?               01:26PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    A.  Yes, it does.

2    Q.  Now, we have mentioned Item -- or Performance Measure 49 as

3    part of the review that you do.  And again, what is Performance

4    Measure 49 measuring?

5    A.  The performance measure measures the time from which the          01:27PM

6    ATP was written to the time that the ATP was communicated to

7    the inmate.

8    Q.  And how many days is there to do that?

9    A.  30 calendar days.

10   Q.  So if I understand what is happening here correctly, are         01:27PM

11   you using the same start date for both 48 and 49?

12   A.  Yes, I am.

13   Q.  And then it's 14 days for 48, 30 days for 49?

14   A.  That is correct.

15   Q.  So let's look at an example of 49, Exhibit 660.                   01:27PM

16          THE COURT:  Is this going to tell me something

17   different about this process than what I learned with respect

18   to 48?

19          MR. BOJANOWSKI:  I think, Your Honor, I'm just trying

20   to give you examples of the --                                       01:28PM

21          THE COURT:  I understand the methodology.

22          MR. BOJANOWSKI:  Correct.

23          THE COURT:  What you said is the same.

24          MR. BOJANOWSKI:  Yes.

25          THE COURT:  So I don't think I need to go through it           01:28PM

1    again.

2         MR. BOJANOWSKI:  Maybe I can just ask a general

3    question.

4         THE COURT:  All right.

5         MR. BOJANOWSKI:  How's that?                    01:28PM

6    BY MR. BOJANOWSKI

7    Q.  So as the judge has mentioned, the methodology that you

8    have used and that we have talked about before in the source

9    documents and such are the same for 49 as reflected in Exhibit

10   660 -- just a second, Your Honor.                   01:28PM

11        Well, in 660, 49, the same methodology that we talked

12   about in the other exhibits is the same for this?

13   A.  Essentially.  One requires communication to the provider;

14   one requires communication to the inmate.  And we have 14

15   calendar days and 30 calendar days respectively.    01:29PM

16   Q.  And the same -- it's the same source documents that you are

17   looking for?

18   A.  Yes.

19   Q.  The same consult request?

20   A.  Yes.                                            01:29PM

21   Q.  The same ATP designation in CARES?

22   A.  Yes.

23   Q.  And that is going to be true for Exhibit 660 and 661?

24   A.  Yes.  That is correct.

25   Q.  All right.  So let's go to 662.  And go to Page 2.  01:29PM

-6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct-

1          And do you see the source document that's reflected on

2   Page 2?

3   A.  Yes, I do.

4   Q.  Do you see that there are two entries highlighted there?

5   A.  Yes, I do.                                                      01:30PM

6   Q.  And why are two entries highlighted there?

7   A.  These two entries are unique consult requests for the same

8   inmate.  The plaintiffs have suggested that these are

9   duplicates when, in fact, these are unique consults that are

10  written for the same inmate.  They may occur on the same date   01:30PM

11  or they may occur on a different day.

12  Q.  What do you mean by that?

13  A.  So the provider for a higher acuity patient, they may have

14  multiple consults during a monitor, during a month in which the

15  consult request may be ATP'd, it may be approved, it may be     01:31PM

16  NMI'd.  In this case the same inmate had two consult requests;

17  one for ophthalmology and one for an ENT.

18  Q.  Are you measuring both those requests as part of your

19  audit?

20  A.  I am if they are on my randomized list.                     01:31PM

21  Q.  And I take it that these two appeared on your randomized

22  list.

23  A.  They did, so they were audited and independent of one

24  another.

25  Q.  All right.  So is the auditing of ATPs, or is the auditing  01:31PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1  of inmate files?

2  A.  It's the auditing of ATPs as written in the monitoring

3  guide.

4  Q.  Okay.  So in this particular instance, let's walk through

5  this so the Court understands how this would work.  So Page 2          01:31PM

6  is our randomized list again?

7  A.  Correct.

8  Q.  And then Page 3 is the consult request for the

9  ophthalmology?

10 A.  That is correct.          01:32PM

11 Q.  And then Page 6 is what?

12 A.  Page 6 is the consult request for ENT.

13 Q.  All right.  And then in this particular case, even though

14 it was the same inmate file, you did two separate analyses to

15 determine compliance.  So what did you find in going through          01:32PM

16 this?

17 A.  In this example, I found that the ophthalmology ATP was

18 written 11-30.  It was communicated 11-30.  It was identified

19 as compliant for Performance Measure 48.  It was communicated

20 to the inmate on 12-11.  It was identified as compliant on 49,          01:33PM

21 and for the ENT consult request, it was ATP'd on 11-30

22 communicated to the provider on 11-30, identified as compliant,

23 and it was communicated to the inmate on 12-11 and it, too, was

24 identified as compliant.

25 Q.  Then we go to your worksheet on Page 9?          01:33PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    A.   Yes.

2    Q.   You list both of them at the bottom?

3    A.   Yes, I do.

4    Q.   As part of the 10 entries that you are looking at?

5    A.   That is correct.                                        01:33PM

6    Q.   And then, again, reported on Page 10 into the CGAR report?

7    A.   That is correct.

8    Q.   And that is the process that you use each month for 48 and

9    49 statewide?

10   A.   Yes, it is.                                             01:33PM

11   Q.   Do you have a method by which you double check your results

12   or make sure that they are accurate when you prepare them?

13   A.   So in one of these examples the plaintiffs brought it to my

14   attention that I had a typo on one inmate.  Subsequent to that

15   I began using an electronic spreadsheet to eliminate the        01:34PM

16   opportunity to have a typo.

17   Q.   What do you mean by a typo?

18   A.   I believe I had transposed a number.  So by using the

19   spreadsheet it should eliminate any of that type of action.

20   Q.   So you use an Excel spreadsheet?                        01:34PM

21   A.   I use an Excel spreadsheet.

22   Q.   Do you use the Excel spreadsheet to help you out with any

23   other aspects of monitoring?

24   A.   I do.  If there are complicated date calculations I will

25   use a DATEDIF or I would subtract one date from another.  If     01:34PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    I'm trying to determine business days between one action and

2    another action, I will use NETWORKDAYS.  There is also a

3    component of the spreadsheet that identifies true duplicates,

4    or it identifies duplicates during inmate number and I would

5    therefore research it more to identify if that is truly a                    01:35PM

6    duplicate or if it is simply a unique consult request or a

7    unique pharmacy request depending on what performance measure

8    I'm monitoring.

9    Q.   So you double check your own work after you're done as part

10   of your monitoring duties?                                                   01:35PM

11   A.   I do.

12   Q.   Does anybody else check your work?

13   A.   If I have a concern I might ask Marty Winland to just

14   double-check my work.  It's also possible that people within

15   the Bureau are double-checking it.  We do submit some                        01:35PM

16   information upwards, so it is possible that it is being checked

17   besides by me.

18   Q.   Does Corizon have a check of your information, are you

19   aware?

20   A.   Corizon is provided with preliminary results oftentimes                 01:35PM

21   before they receive those written results I have communicated

22   by phone.  And if they are in disagreement with one of the

23   findings they would have the opportunity to ask me to look

24   somewhere else.  So, for example, with Performance Measures 48

25   and 49, if I happen to miss a hospital report, I might go look          01:36PM

1    there because some of these procedures do happen in the

2    hospital even though they were ATP'd.

3    Q.  Do you know if Corizon has any compliance-type people they

4    are utilizing at the site level to work with the Monitoring

5    Bureau in determining accuracy and such with the measures?          01:36PM

6    A.  Yes.  Corizon does have a compliance team.  They have

7    multiplied the number of people that are part of that

8    compliance team and so there are more site-wide people,

9    particularly at the larger complexes and then they do have

10   staff that deal with the compliance issues that may share some     01:37PM

11   of the smaller facilities.  I believe they are in the process

12   of still hiring a couple of those people, but they do have

13   people in place now that have the opportunity to check our

14   findings and that are available to us to explain where we see

15   deficiencies or patterns that are problematic or to discuss        01:37PM

16   process improvement.

17   Q.  And are you working with these teams of compliance people

18   from Corizon to assure that appropriate and accurate monitoring

19   is occurring?

20   A.  Absolutely.                                                    01:37PM

21          MR. BOJANOWSKI:  May I have a moment, Your Honor?

22          THE COURT:  You may.

23          MR. BOJANOWSKI:  Your Honor, I only need to move for

24   the admission of the exhibits that we have reviewed with this

25   particular witness.  If you want me to do them individually,       01:39PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Direct

1    that's fine, or collectively.

2            THE COURT:  Are there any objections?

3            MS. EIDENBACH:  Yes, Your Honor.  On Page 5 of Exhibit

4    659 there's an unredacted social security number.  We would

5    object to the unredacted admission of that page.                01:39PM

6            THE COURT:  So with that correction are there other

7    objections?

8            MS. EIDENBACH:  No, Your Honor.

9            THE COURT:  So if you would make that correction on

10   the filed admitted exhibit they will be received.              01:39PM

11           MR. BOJANOWSKI:  We'll make the redaction, Your Honor.

12           THE COURT:  Thank you.

13           MR. BOJANOWSKI:  We have no further questions.

14           THE COURT:  Now is the time for plaintiffs' counsel to

15   ask you questions.                                             01:40PM

16           MS. EIDENBACH:  Thank you, Your Honor.

17           MR. BOJANOWSKI:  Your Honor.

18           THE COURT:  Yes.

19           MR. BOJANOWSKI:  Did you need a description of those

20   exhibits?  I mean, they are --                                 01:40PM

21           THE COURT:  Let me see if the clerk of the court needs

22   any further -- do you want to announce what they are?

23           THE MAGISTRATE JUDGE CLERK:  They are 657, 658, 659

24   with the redacted entry, 660, and 662.

25           MR. BOJANOWSKI:  Your Honor, 661, was that not         01:40PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    included?

2         THE MAGISTRATE JUDGE CLERK:  I did not write that down

3    as one we reviewed.

4         MR. BOJANOWSKI:  Move for the admission of 661 as

5    well.                                                          01:41PM

6         THE COURT:  Any objection?

7         MS. EIDENBACH:  Your Honor, the only objection is that

8    nothing about this exhibit was identified.  Ms. Barlund didn't

9    describe for the Court whether she had any personal knowledge

10   of this exhibit.  But beyond that we have no other objections.  01:41PM

11        THE COURT:  So this witness didn't say anything at all

12   about 661?

13        MR. BOJANOWSKI:  I think I was doing a collective

14   grouping when the Court had said well, is it the same procedure

15   for all of them, and I said yes.  And then I only moved to the  01:41PM

16   one that was different.

17        THE COURT:  661 pertains to it.  661 will be received.

18   Thank you.

19        MS. EIDENBACH:  I'm just going to make sure she has my

20   set.                                                           01:42PM

21        THE COURT:  Yes.

22                    CROSS-EXAMINATION

23   BY MS. EIDENBACH:

24   Q.  Good afternoon Ms. Barlund.

25   A.  Good afternoon.                                            01:42PM

—6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross—

1   Q.  You testified earlier that you have been a monitor, or you

2   currently work as a monitor for the Department of Corrections,

3   is that correct?

4   A.  That is correct.

5   Q.  And how long have you been in that position?                    01:42PM

6   A.  Approximately five years.

7   Q.  And what did you do prior to working as a monitor?

8   A.  I began working corrections in January of 2006.  My -- I

9   had a job for approximately one year prior to working for the

10  Monitoring Bureau in which I did case management.                   01:42PM

11  Q.  Okay.  So in 2006, where did you work?

12  A.  In January of 2006 I was working in the State of Maryland.

13  Q.  And who was your employer?

14  A.  It was Correctional Medical Services.

15  Q.  And the State of Maryland, you mean the Department of           01:43PM

16  Corrections for the State of Maryland?

17  A.  I did not work for the Department of Corrections.

18  Q.  But you worked --

19  A.  I'm sorry.

20  Q.  Did you work in the Department of Corrections?                  01:43PM

21  A.  I worked at three separate prison complexes.  I was

22  employed by a vendor.

23  Q.  Okay.  And from there, how long were you employed there?

24  A.  I don't have my resume in front of me, so it's a little bit

25  difficult to answer.  I believe it was -- a gross approximation    01:43PM

1    would be two years.

2    Q.  And where did you work after that?

3    A.  I worked for the Arizona Department of Corrections.

4    Q.  And what was your position at that point?

5    A.  I don't recall the exact position title, but I was a nurse    01:43PM

6    with the Arizona Department of Corrections.

7    Q.  Did you work in the field?

8    A.  Yes, I did.

9    Q.  Did you work at a particular complex or series of

10   complexes?    01:44PM

11   A.  In Arizona I worked at one complex.

12   Q.  Which complex?

13   A.  Perryville.

14   Q.  And how long did you do that?

15   A.  Again, a gross approximation would be two years.    01:44PM

16   Q.  And during your time at Perryville, were you employed only

17   by the Arizona Department of Corrections?

18   A.  Yes.

19   Q.  Okay.  And from there, where did you go?  What was your

20   next position?    01:44PM

21   A.  We moved back to Maryland and I worked for Correctional

22   Medical Services and they merged with Prison Health Services,

23   and I worked -- and so I worked there.  I worked for them.

24   Q.  Okay.  Have you ever worked for Corizon?

25   A.  Yes, I have.    01:45PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    Q.  And when did you work for Corizon?

2    A.  To the best of my recollection, CMS merged with PHS

3    sometime during my second stint of employment in Maryland.

4    Q.  And was that the only time that you worked for Corizon?

5    A.  Yes.  And again, I can't recall exactly when the merger          01:45PM

6    happened so I hope that I am not misspeaking.

7    Q.  That's fine.  Thank you very much.

8          Did you prepare for your testimony today?

9    A.  Yes.

10   Q.  What did you do to prepare?                                      01:45PM

11   A.  I had a meeting with Mr. Bojanowski one day, and we briefly

12   went over testimony and expectation that we be honest.

13   Q.  Okay.  And about how long did that meeting last?

14   A.  Maybe an hour.

15   Q.  Do you remember when that meeting occurred?                      01:46PM

16   A.  I don't right now.  I'm sorry.

17   Q.  Approximately?  Was it this week?  Last week?

18   A.  I met with him briefly this week, and I believe we had a

19   meeting last week, a general meeting last week.

20   Q.  And did you review any documents in preparation for your        01:46PM

21   testimony today?

22   A.  I supplied the documents that were used as these examples,

23   so yes.  I reviewed them and I provided them.

24   Q.  Okay.  Thank you.

25          Who is your direct supervisor in your current               01:46PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1   position?

2   A.   Mr. Richard Pratt.

3   Q.   Is he your only supervisor, direct supervisor?

4   A.   Yes.

5   Q.   And do you supervise anyone?                          01:46PM

6   A.   Yes, I do.

7   Q.   Who?

8   A.   Jeanne Chastain, Martin Winland, and Carol Pearson.

9   Q.   In terms of an organizational chart, where is Vanessa

10  Headstream in relation to your position?                  01:47PM

11  A.   So if we were to look at an organizational chart it would

12  be lateral; however, she does have -- her grade, I believe, is

13  two grades above mine.

14  Q.   Okay.  But you don't report to her?

15  A.   No, I do not at this time.                            01:47PM

16  Q.   Do you collaborate with her?

17  A.   Yes.

18  Q.   In what way?

19  A.   We sometimes talk about performance measures.  We attend

20  mortality reviews together, so there will be some discussion of  01:47PM

21  inmate care.  I think in general there's just a collaboration

22  that occurs when one is dealing with inmate health care.

23  Q.   Okay.  Can you take a look at Exhibit 72 which should be on

24  the top of the pile in front of you?

25  A.   Yes.                                                  01:48PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1   Q.  It's a little bit small, so take your time.  If you could

2   just familiarize yourself with the contents of the exhibit that

3   would be helpful.

4          MS. EIDENBACH:  Your Honor, do you have a copy?

5          THE COURT:  I don't think so.                          01:48PM

6          Thank you kindly.

7          THE WITNESS:  While I don't recall this exact e-mail,

8   I have briefly reviewed it.

9   BY MS. EIDENBACH:

10  Q.  Do you have any -- it appears to be an e-mail that you sent   01:49PM

11  to Richard Pratt.  Is that accurate?

12  A.  I believe it is.

13  Q.  Do you have any reason to believe that it's not the e-mail

14  that you sent to Richard Pratt?

15  A.  I have no reason to believe that.  I believe I sent it.     01:49PM

16  Q.  And the other e-mails that are contained in this chain are

17  e-mails on which you were copied.  Is that correct?

18  A.  It appears that I was copied on some of them.  It appears

19  that I was not copied on others.

20  Q.  Okay.  But they are all contained in an e-mail that you     01:49PM

21  sent to Mr. Pratt.  Correct?

22  A.  That is correct.  I'm sorry.  I'm looking at this trying to

23  figure out how -- I'm not on the e-mail, yet later on I'm on

24  the e-mail chain.  That part is a little confusing to me and I

25  don't recall the exact circumstances.  But I can definitely see   01:50PM

1    at some point I definitely ended up on this e-mail.

2    Q.  So in this e-mail, you expressed frustration and tell Mr.

3    Pratt when you reported your concerns and frustrations to

4    Vanessa.  Does Vanessa refer to Ms. Headstream?

5    A.  Yes.  That would be appropriate.                          01:50PM

6    Q.  You wrote it, so that's why I'm asking you.  Vanessa here

7    refers to Ms. Headstream?

8    A.  Yes.

9    Q.  That you were asked to call many things noncompliant.  Can

10   you explain what you meant by that?                           01:50PM

11   A.  We have some performance measures that are very objective.

12   Did an action occur within a required time frame?  Those

13   generally are very easy to answer.  We have other performance

14   measures that truly require more subjectivity.  And I think any

15   time we're discussing the quality of health care or            01:51PM

16   documentation there may be differences of opinion.

17         And so there are probably circumstances under which I

18   would identify something as compliant and somebody else would

19   identify something as noncompliant.

20   Q.  And when that happens between you and Ms. Headstream, how   01:51PM

21   is the issue resolved?

22   A.  It depends on if I'm supervising the person that has the

23   finding.  If I'm not supervising them, it would not be up to me

24   to make the decision whether it is compliant or noncompliant.

25   Q.  Here you indicate that the disagreement between the two of  01:51PM

1    you resulted in you submitting your resignation.  Is that your

2    recollection?

3    A.  I did at one time submit my resignation.

4    Q.  And you are still in your position, though, is that

5    correct?                                                           01:52PM

6    A.  Yes, I am.

7    Q.  So was your resignation not accepted, or did you rescind

8    it?

9    A.  I essentially rescinded it.

10   Q.  Why?                                                           01:52PM

11   A.  Because I believe in inmate health care.  I believe that we

12   can make a difference.  I want to see this get better and

13   better and better and I'm so excited by what I see currently.

14   I see inmates getting care that I never thought was possible.

15   And I want to remain a part of that, but there are frustrations   01:52PM

16   just like there are in any position.

17   Q.  So you also write in this e-mail, quote, "How much

18   compliance is buried in many of these historical findings?"

19          So is it accurate to say that you suspect that there

20   is data buried in historical CGAR findings that would undermine   01:52PM

21   the accuracy of the CGAR results?

22   A.  I don't think it would undermine the accuracy.  Again, I

23   think that some performance measures have a higher level of

24   subjectivity than others.

25   Q.  But you say that there's compliance buried in many of the     01:53PM

1    historical findings.  Wouldn't it also follow, then, that

2    there's also noncompliance buried in the historical CGAR

3    findings?

4    A.  I don't think so.  I don't think under any circumstances

5    that there are people burying noncompliance.  I think there          01:53PM

6    are, perhaps, differences of opinion.  I think we as the Bureau

7    specifically tend to identify actions as noncompliant rather

8    than compliant.  And on a personal level, not as a

9    representative of the Bureau, I often disagree with that.

10   Q.  So you would say, then, that the inaccuracies trend only         01:53PM

11   towards an overreporting of compliance?

12            MR. BOJANOWSKI:  Note an objection.  She did not

13   testify there were inaccuracies.

14            THE COURT:  Overruled.

15            THE WITNESS:  I believe we overreport noncompliance.        01:54PM

16   And it is very frustrating to me.

17   BY MS. EIDENBACH:

18   Q.  And you believe that because you found Ms. Headstream's

19   approach to incorporate, quote, "a tremendous amount of

20   subjectivity."  Is that correct?                                     01:54PM

21   A.  I believe that there are certain performance measures that

22   just by the manner in which they were written incorporate more

23   subjectivity.  I don't think that it's that people want to

24   bring that subjectivity to the job, I just think that these

25   performance measures are not always clearly defined.                 01:54PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    Q.  But in your e-mail, you say that Ms. Headstream

2    incorporates a tremendous amount of subjectivity.  So if the

3    performance measure by its definition is subjective then that

4    would not be something that Ms. Headstream was doing that you

5    should agree with.  Because anyone's interpretation of that          01:54PM

6    CGAR or performance measure would be equally as subjective,

7    isn't that right?

8    A.  I believe in this particular e-mail that the discussion was

9    about identifying a certain category of note as noncompliant

10   even though in my opinion the action occurred.  Under no            01:55PM

11   circumstances do I think this Bureau overreports compliance.

12   Q.  And what do you base that on?

13   A.  Based on the discussions that we have regarding findings

14   and regarding rebuttals.  I am usually the person that objects

15   to some of this, and therefore, I cannot imagine any               01:55PM

16   circumstances in which compliance is overreported.

17   Q.  Can you take a look at Exhibit 73, please?  Should be the

18   next folder.

19   A.  Yes.

20   Q.  Do you recognize this?                                         01:56PM

21   A.  I don't.

22   Q.  Okay.  Well, the heading says that it is an e-mail from

23   Adelia Cerrillo to you.  Do you have any reason to doubt that

24   this e-mail was not sent to you?

25   A.  No.  I have no reason.  It doesn't appear that there's any      01:56PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    content from Adelia to me.  So I think that causes me to be

2    substantially unfamiliar with this e-mail.

3    Q.  So if you look at the subject it says:  Forward, Perryville

4    IPC audit.  Do you see that?

5    A.  Yes, I do.                                          01:56PM

6    Q.  Wouldn't you say that it's reasonable to believe that this

7    was Ms. Cerrillo forwarding you an e-mail, forwarding you the

8    e-mail chain contained below?

9    A.  I do believe that's reasonable but I do not recall.

10   Q.  Did you read this e-mail?                           01:57PM

11   A.  I generally try to at least skim e-mails that I receive so

12   I would imagine that I probably had spent at least a minute or

13   two trying to look at this.  But I do not recall this e-mail.

14   Q.  So you don't read all the e-mails that you get?

15   A.  I said I skim them.  We get things such as field briefing  01:57PM

16   reports which are 30-something pages.  We get very long

17   documents.  And to read and retain every detail, I believe,

18   would be unreasonable.

19   Q.  Why don't you read it for us now.  Let me know when you are

20   complete, when you have finished.                       01:57PM

21   A.  Would you like me to read it in detail or would you like me

22   to skim it?

23   Q.  As you are reading it, does it look familiar?

24   A.  I don't recall this e-mail.  I get a lot of e-mails,

25   sometimes e-mails with a great deal of content and very    01:58PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    lengthy.

2    Q.  Do you see anyone else copied on the forward subject line

3    either as a cc or an additional recipient from Ms. Sorillo?

4    A.  I do not.

5    Q.  Do you have any idea why she would have forwarded you this          01:58PM

6    e-mail and you alone?

7    A.  It is possible that during a telephonic conversation or a

8    face-to-face conversation that something in here was discussed

9    and, therefore, forwarded to me.  But I do not specifically

10   recall that.  But it is what makes sense to me.                        01:58PM

11   Q.  Okay.  So given that you don't recognize this e-mail, is it

12   fair to assume that you didn't take any action on it?

13   A.  No, it's not fair to assume that.

14   Q.  You just wouldn't remember?

15   A.  I do not recall this specific e-mail from November 29th of         01:59PM

16   2017.

17   Q.  So you don't recall taking any action on it?

18   A.  I don't recall taking action; I don't recall inaction.

19   Q.  Thank you.  Please turn to 77.

20   A.  Yes.                                                               01:59PM

21   Q.  Do you recognize this e-mail?

22   A.  Yes, I do.

23   Q.  This is an e-mail that you sent to a variety of people on

24   December 30, 2017.  Is that correct?

25   A.  Yes, it does appear that way.                                      02:00PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    Q.  If you turn to 77.2, which is just the second page.

2    A.  Okay.

3    Q.  If you look under the salutation, "Hi, JT."

4    A.  Yes.

5    Q.  And you go to the line that says, "CGAR entry will be          02:00PM

6    noncompliant," about four lines down the middle of the page.

7    Do you see that?

8    A.  Yes, I do.

9    Q.  It says, "The CGAR entry will be noncompliant but it is my

10   hope that the final CGAR entry will be compliant once a revised   02:00PM

11   source document is received."

12           Did I read that correctly?

13   A.  Yes, you did.

14   Q.  So you say that you are hoping that it would be compliant.

15   Is that right?                                                   02:01PM

16   A.  It's always my hope that we recognize compliance because

17   the action occurred within the required time frame.

18   Q.  Isn't it your job to measure compliance not have a stake in

19   it being compliant or noncompliant?

20   A.  I don't have a stake in it.  I believe I'm generally a       02:01PM

21   positive person and I would ideally like to ensure that inmates

22   are receiving care and that there is compliance recognized if

23   and when it occurred.

24   Q.  So here you were looking for a source document that would

25   support your hope that there was going to be compliance.         02:01PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1   Correct?

2   A.  Absolutely not.  What I was looking for was an accurate

3   source document, one in which I could basically testify to the

4   veracity of it.

5   Q.  But that's not what you said in this e-mail.  You said that   02:01PM

6   you hoped that you would find a source document that would

7   support compliance.

8   A.  I always hope that there will be compliance recognized

9   based on an action.  It doesn't mean that there will and I

10  think that my findings speak for themselves.   02:02PM

11  Q.  Ma'am, if you could answer --

12  A.  I do remain hopeful.  It does not mean that I would change

13  any findings or ever intentionally be inaccurate with what I'm

14  doing and what I'm monitoring and what I'm reporting.

15  Q.  So do you recall sending this e-mail?   02:02PM

16  A.  Yes, I do.

17  Q.  And did you find a source document that supported

18  compliance?

19  A.  I don't recall that.

20  Q.  Do you recall what types of source documents you would have   02:02PM

21  been looking for in order to support compliance?

22  A.  I believe, if I recall correctly, that I received a

23  pharmacy log.  The dates for some of the entries for some of

24  the rows on Excel documents were incorrect.  The dates might

25  have been off a day.  Might have been off two days.  Might have   02:02PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1   been off a couple days.  And I refuse to monitor a document

2   that I know is inaccurate.  One of the first things that I do

3   when I receive a document is go through it, make sure the data

4   makes sense, make sure names and numbers make sense, make sure

5   that the approximate number of entries on last month's document   02:03PM

6   agrees with this month's document.

7           And so if I find an error, I will not monitor it.  I

8   will not monitor anything that I know is intentionally

9   inaccurate.  And while the documents coming from Pentaho and

10  some other sources are extremely accurate, this particular log   02:03PM

11  is maintained at the site level and so on occasion there have

12  been some inaccuracies.  The document has been returned and I'm

13  able to confirm that the dates have been corrected.

14  Q.  So you believe Pentaho produces very accurate reports?

15  A.  Yes, I do.                                                   02:03PM

16  Q.  Thank you.  Please turn to Exhibit 94.

17  A.  Yes.

18  Q.  I'm going to turn your attention down to the second e-mail

19  in the chain.

20  A.  On the first page?                                          02:04PM

21  Q.  On the first page.

22  A.  Okay.

23  Q.  Do you see that you are copied on an e-mail sent from

24  Sheila Rucker?

25  A.  Yes, I do.                                                  02:04PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    Q.  This was sent November 7th, 2017?

2    A.  I do see that.

3    Q.  If you look down to the second highlighted entry for the

4    person ending in 27.

5    A.  Yes, I do.                                                        02:04PM

6    Q.  And just a reminder, we are not using full numbers or names

7    on the record to protect their identity.

8    A.  Thank you for the reminder.

9    Q.  Could you read the highlighting into the record for me,

10   please?                                                              02:04PM

11   A.  It looks like it's an inmate number.  I'm guessing that

12   must be their name, but I can't confirm that.  It says,

13   "Optometry consult from 10-8-16 was cancelled due to being out

14   of date and rewritten 8-16-2017 and completed 9-20-2017.  Part

15   of our cleanup slash organization process is to ensure inmates     02:05PM

16   were seen by optometry.  Scheduled in compliance of requested

17   consult from optometry self-audit not viewed in the audit at

18   that time, 10-8-2016.  See documentation.

19   Q.  In the first line that you read where it says that -- I'm

20   sorry.  What?  Were you saying something?                           02:05PM

21   A.  No.  I'm sorry.

22   Q.  Sorry.  Where it says that it was cancelled due to being

23   out of date and then rewritten, what is your interpretation of

24   that?

25             MR. BOJANOWSKI:  Note an objection.  Foundation.  I       02:05PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1   think she needs to identify if this witness actually measures

2   PM 51.

3   BY MS. EIDENBACH:

4   Q.  If you came across those words measuring performance

5   measures that you do measure, what would your interpretation          02:05PM

6   be?

7             MR. BOJANOWSKI:  Same objection.  Speculation now.

8             THE COURT:  Overruled.

9             THE WITNESS:  I don't believe I would have any

10  interpretation with this limited information.  I believe I           02:05PM

11  would ask for clarification, probably both in an e-mail and

12  telephonically to make sure that I completely understand the

13  issue.  But it appears that I'm on a cc line from an e-mail in

14  November 27 of 2017 of which I have absolutely no recollection.

15  BY MS. EIDENBACH:                                                    02:06PM

16  Q.  So if you saw the words, "Cancel D/T being out of date,"

17  that means nothing to you?

18            MR. BOJANOWSKI:  Same objection.  Asked and answered.

19            THE COURT:  Overruled.

20            THE WITNESS:  It means nothing to me because I don't       02:06PM

21  understand the circumstances.  I don't understand if the inmate

22  was at the hospital.  I don't understand if the consult was

23  intended to be written.  There are so many things I do not

24  understand about this that I can't possibly formulate an

25  opinion on an e-mail written in November of 2017 on which I was      02:06PM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross─────

1    cc'd of which I have no knowledge.

2    BY MS. EIDENBACH:

3    Q.  So you have never come across these words in your

4    monitoring duties?

5              MR. BOJANOWSKI:  Same objection.                    02:06PM

6              THE COURT:  Overruled.

7              THE WITNESS:  Cancelled?  I probably have.

8              THE COURT:  But before today, you have never heard of

9    any suggestion that there was a practice at Corizon to cancel

10   referrals because they would be out of date and result in      02:07PM

11   noncompliance?

12             THE WITNESS:  I believe, to the best of my

13   recollection, that there was a moment in time in which I had a

14   concern that consults were being cancelled, but I did not know

15   if they were being monitored because it was no longer within my 02:07PM

16   purview.  So I believe at that point I had sent an e-mail to

17   somebody, but I would under no circumstances tolerate

18   cancellations that should not have been cancelled.  I know that

19   there's been a recent discussion about consults that are

20   retained on paper and they are intended, say, to happen in a    02:07PM

21   year so they don't put them into eOMIS quite yet because a year

22   will exceed a 60-day requirement.  So if a provider does that

23   accidentally because they don't know what they were going to do

24   I believe I have heard the word "cancellation."  I believe I

25   have seen consults that say "cancelled" but to the best of my   02:08PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    recollection, those are monitored.  I don't believe we, under

2    any circumstances, that we would tolerate a cancellation that

3    is not explainable by facts that would support the

4    cancellation.

5            So if an inmate dies, they go to the hospital, they          02:08PM

6    are no longer there, that type of thing, that might be a

7    circumstance in which a consult would be appropriately

8    cancelled.  But I certainly would never look away from

9    inappropriate health care that could potentially harm an

10   inmate.                                                              02:08PM

11   BY MS. EIDENBACH:

12   Q.  If you can turn now to Exhibit 109.

13   A.  Yes.

14   Q.  This is an e-mail that you sent to Richard Pratt on

15   December 26, 2017.  Is that correct?                                 02:09PM

16   A.  It does appear that way.

17   Q.  Do you have any reason to doubt the veracity of this

18   exhibit?

19   A.  May I review it briefly?

20   Q.  Sure.                                                            02:09PM

21   A.  Thank you.

22           I believe I recall this e-mail.  I don't recall the

23   exact details, and I don't recall the exact circumstances, but

24   I do believe it's something I would have sent.

25   Q.  So you don't recall having any doubts about whether Corizon      02:10PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    was capable about real time reporting?

2    A.  I had concerns about real time reporting.  I had concerns

3    because we monitor a very specific date range.  And the real

4    time reporting monitors actions due during the monitored month.

5    And so one of my thoughts was because there are different          02:10PM

6    reporting capabilities now that can capture the date on which

7    an action is due that we could basically use those reports for

8    the CGAR since they are being used for real time reporting.

9    Q.  In this e-mail you ask Mr. Pratt if he's asked Corizon if

10   they are capable.  Do you recall if you received a response?     02:10PM

11   A.  I don't know if a response was received.  I don't recall.

12   Q.  Did you remember whether you followed up with him?

13   A.  We have a lot of meetings, a lot of conversations.  And so

14   there probably was some follow-up.  Whether it was done by me

15   or it was done by somebody else, I do know that there have been  02:11PM

16   conversations regarding real time reporting and how we can make

17   sure that that is 100 percent accurate and that our CGAR

18   findings are 100 percent accurate and that it might be

19   beneficial to use the same date range.

20   Q.  And did the real time reporting, in your estimation, ever    02:11PM

21   achieve 100 percent accuracy?

22           MR. BOJANOWSKI:  Note an objection.  Relevance.

23           THE COURT:  Overruled.

24           THE WITNESS:  I have no idea.  I'm not involved in

25   that.  I was involved briefly when I believe people were on      02:11PM

1    vacation.  And I was involved only from a source document

2    standpoint because I had proposed that we look at the date in

3    which an action is due rather than the date in which the

4    originating action occurred.

5    BY MS. EIDENBACH:                                               02:12PM

6    Q.  So you sent this e-mail listing your concerns to Mr. Pratt

7    about the real time reporting, and then you are unaware as to

8    whether it was ever resolved.  Is that correct?

9    A.  Not to the best of my recollection.

10   Q.  So you can't tell us today whether or not Corizon's real   02:12PM

11   time reporting is 100 percent accurate.  Is that correct?

12   A.  I believe any reporting requires people.  I don't think it

13   can be automated.  I think there are too many circumstances

14   that don't fall into a category of compliant or noncompliant.

15   Q.  My question, ma'am, was whether Corizon's real time        02:12PM

16   reporting is 100 percent accurate.

17        MR. BOJANOWSKI:  Note an objection.

18        THE WITNESS:  I would have no knowledge of that.

19        THE COURT:  Overruled.  Overruled.

20   BY MS. EIDENBACH:                                               02:12PM

21   Q.  If you could turn to 109.3, please.

22   A.  Yes.

23   Q.  If you look at the second entry for Performance Measure 52,

24   do you see that?  It's about two-thirds of the way,

25   three-quarters of the way down the page.                       02:13PM

1   A.  Yes.  I see that.

2   Q.  So there generally are not standardized entries used to

3   input data into eOMIS.  Is that correct?

4           MR. BOJANOWSKI:  Foundation.

5           THE COURT:  Overruled.                              02:13PM

6           THE WITNESS:  There should be standardized entries,

7   and I believe they have improved month after month after month.

8   I think that sometimes a consult is written.  I think sometimes

9   that consult does not happen with the originally intended

10  off-site practitioner.  It may, for example, happen in the      02:13PM

11  emergency room and we, may find those scanned in returned from

12  a hospital or under scanned documents.  So although the consult

13  occurred and results were received, they weren't necessarily

14  placed where they should have been so Corizon probably would be

15  likely using the process of automation to identify that as      02:13PM

16  noncompliant.

17  BY MS. EIDENBACH:

18  Q.  Why did you identify the need for standardized entries for

19  all consult-related notes, reports, dictated reports, and

20  pathology reports as a point that you needed to clarify with     02:14PM

21  Corizon if there are, indeed, standardized entries?

22          MR. BOJANOWSKI:  Same objection.

23          THE COURT:  Overruled.

24          THE WITNESS:  For example, a pathology report might be

25  found under a lab, or it might be found under a scanned          02:14PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    document.  I don't believe real time reporting is the best way

2    to monitor compliance.  I think people have to make decisions

3    about this.  They have to follow the monitoring guide.  They

4    have to look at inclusion and exclusion criteria.  I think this

5    is a very difficult proposition.  And to say that we can          02:14PM

6    eliminate people in any kind of decision-making process and

7    report with 100 percent accuracy that something occurred or did

8    not occur is unfortunate.  We need people to make some of these

9    decisions.  And I understand we have to provide this

10   information to the Court, and I believe wholeheartedly that       02:15PM

11   everybody wants to provide 100 percent accurate information.

12   BY MS. EIDENBACH:

13   Q.  Ma'am?

14   A.  But people are needed to make some of these decisions and

15   there's not enough time.                                          02:15PM

16   Q.  I'd like to instruct you to please listen to my questions

17   and answer the questions that I'm asking you instead of --

18   A.  Which question did I just miss?

19        MR. BOJANOWSKI:  Your Honor, I mean, we object.  If

20   the witness is giving an answer the witness should be able to     02:15PM

21   complete their answer.

22        THE COURT:  What's the next question, please.

23   BY MS. EIDENBACH:

24   Q.  Okay.  So if you look at the next line down, which is also

25   about Performance Measure 52 as well, do you see that?           02:15PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1   A.  Yes, I do.

2   Q.  Okay.  So here, you are asking whether the source document

3   for the Monitoring Bureau, which is where you work, could be

4   changed to match the standardized entries assuming that

5   standardized entries were created.  Is that correct?                    02:15PM

6   A.  Yes.

7   Q.  And why did you feel that was important?

8   A.  Because I think sometimes documentation is found in

9   multiple places or it may be found in one place rather than

10  another.  I don't believe that automating the process allows      02:16PM

11  for recognition of the documents, and I also think that there

12  is a difference in the date ranges.  One is looking at the date

13  due and one is looking at when something originated.

14  Q.  So if I'm understanding correctly, the source document used

15  by the Bureau is not the same as a standardized entry used by     02:16PM

16  Corizon.  Is that correct?

17  A.  I believe they both are using Pentaho.  I believe Corizon's

18  document is able to count down days.  I do believe Corizon

19  bases their document, or at least they did when I would have

20  written this e-mail, on the date that the consult is to be        02:16PM

21  reviewed and we would base our document on the date in which

22  the off-site practitioner's report was received.  So I believe

23  there would be some variations in the data reported, but I

24  wholeheartedly believe that both sets of data are accurate.

25       MS. EIDENBACH:  Just one second.                            02:17PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    BY MS. EIDENBACH:

2    Q.  You testified earlier about your source document, do you

3    recall that, that you used to do your monitoring for

4    Performance Measures 48 and 49?

5    A.  Yes, I do.                                          02:17PM

6    Q.  And you testified that that document is given to you by

7    Corizon, is that correct?

8    A.  That is correct.

9    Q.  Do you know -- you have no knowledge of how Corizon

10   generates that document, is that right?                 02:17PM

11   A.  I have some knowledge, but I do not generate the document

12   and so I would be unable to state the details.

13   Q.  And you don't check the accuracy of the document you

14   receive?

15   A.  I absolutely do.                                    02:18PM

16   Q.  How do you do that?

17   A.  As I mentioned earlier, I start with is the title of the

18   Excel spreadsheet the same as what I received last month; does

19   the data appear to be in the same format; do the inmate names

20   and numbers make sense; does the location make sense; do the  02:18PM

21   dates reported make sense; does it appear to be missing any

22   data.  So I do look through these and I try to make sure that

23   this is what I am intending to monitor.

24   Q.  And have you discovered inaccuracies in reviewing?

25   A.  Yes, I have.                                        02:18PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    Q.  What do you do when that happens?

2    A.  I would contact the vendor, I would explain the problem,

3    and if it's not corrected, I would identify the inmates for

4    that yard as noncompliant.  If it is corrected, I would then --

5    I would recheck the document and then I would monitor it if I          02:19PM

6    believe that it is accurate.

7    Q.  Can you take a look at Exhibit 657 and turn to -- which is

8    one of the exhibits that Mr. Bojanowski had you look at earlier

9    so it will be another pile and turn to Page 6 and 7.

10   A.  Yes.                                                              02:19PM

11   Q.  And we have established earlier that these two pages are --

12   the first one, Page 6, is your worksheet that you use in

13   tracking your compliance findings.  Is that correct?

14   A.  Yes.

15   Q.  And then Page 7 is the data that you input into -- it's the        02:19PM

16   correlated data that you input into the CGAR system?

17   A.  Yes.  That is correct.

18   Q.  If you look at the dates -- well, actually, turn to Page 7

19   first for me.

20   A.  Okay.                                                             02:20PM

21   Q.  If you can read the title of that document for us, please.

22   A.  CGAR finding for December 2017 Eyman complex.

23   Q.  And so when you are inputting data for December 2017, the

24   data that you have reviewed occurred in December 2017.  Is that

25   correct?  So December CGARs contain data from December 2017.          02:20PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    Is that correct?

2    A.  I don't understand what you mean by "data."  You are

3    talking about the originating action, or are you talking about

4    the subsequent action?

5    Q.  I am talking about the fact that for the December CGAR you    02:20PM

6    are measuring situations and instances that occurred in

7    December 2017.  Is that correct?

8    A.  It depends on -- no.  In some cases no, I'm not.

9    Q.  So the December CGAR data contains data that did not occur

10   in December 2017?                                               02:21PM

11   A.  So this goes back to our conversation about real time

12   reporting versus some of the source documents we use.  We tend

13   to use source documents that have an originating action.  So,

14   for example, if a provider is supposed to review something in

15   five days, we would -- our source document might contain        02:21PM

16   documents received for the entire monitored month which would

17   then possibly carry over up to seven days and into the new

18   month whereas real time reporting would not.

19   Q.  So the December CGARs could contain seven days into

20   January.  Is that what you are saying?                          02:21PM

21   A.  On some performance measures.

22   Q.  What about on the performance measure that was at issue

23   here, which I believe is Performance Measure 48.  Would that?

24   Is that a possibility?

25   A.  It's more than a possibility.  In this particular case I am  02:22PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1   monitoring ATPs written the preceding month.  Performance

2   Measure 49 allows them 30 days and I am monitoring Performance

3   Measure 48 using that same source document because of the

4   difficulty in which one is able to determine if it was truly

5   denied or ATP'd or if the consult occurred.                    02:22PM

6   Q.  So looking at Page 6, we see that every single origination

7   date which you have listed on the left side of the second

8   column did not actually occur in December 2017.  Is that

9   correct?  Yes or no, please.

10  A.  Yes, it is correct.                                        02:22PM

11  Q.  In fact, they all are in -- they all occurred in November

12  2017.  Correct?

13  A.  That is correct.

14  Q.  So the December 2017 CGARs contain data from November,

15  2017.  Correct?                                                02:23PM

16  A.  That is correct.  Are we talking about 48 or 49?

17  Q.  We're talking very specifically about 657.  So this would

18  be not in general.  I'm talking about the documents that are

19  actually sitting right in front of you.

20  A.  Yes.  So as we have discussed before, I have --           02:23PM

21  Q.  Ma'am, I asked you just a yes or no question which you have

22  answered.  I appreciate that.  Thank you.

23         MR. BOJANOWSKI:  We object, Your Honor.  The witness

24  should be able to have the opportunity to explain her answer.

25         THE COURT:  Overruled.  Go ahead.                       02:23PM

-6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross-

1        MS. EIDENBACH:  Thank you.

2   BY MS. EIDENBACH:

3   Q.  You testified earlier that you used to work at Safford.  Is

4   that correct, at the ASPC Safford.

5   A.  I never testified to that.                                  02:23PM

6   Q.  I apologize, please, have you monitored Safford?

7   A.  Yes, I have.

8   Q.  When did you monitor Safford?

9   A.  I don't recall the exact dates.

10  Q.  Do you recall approximately?                                 02:24PM

11  A.  Probably as early as 2014, and I would have covered it

12  after that depending on absences of employees that I used to

13  supervise.

14  Q.  But you have worked there and worked with the people at

15  Safford long enough to familiarize yourself with the procedures  02:24PM

16  that they use for reporting?

17  A.  No.

18  Q.  You testified earlier that you knew that at Safford that

19  they used the ORC instead of eOMIS, isn't that correct?  You

20  don't recall that testimony?                                     02:24PM

21  A.  I do recall that testimony, but I don't think that that

22  testimony -- I think that your question did not just ask about

23  that so my answer would be not -- yes.

24  Q.  Okay.  So how did you gain -- well, so you are familiar

25  with the fact that at Safford they use ORC instead of eOMIS, is  02:24PM

1    that correct?

2    A.  In most cases, yes.

3    Q.  Okay.  That's their general practice, correct?

4    A.  Yes.

5    Q.  Okay.  So in that case, the patient's eOMIS record is not          02:25PM

6    complete, isn't that correct, because it's missing the data

7    that was in ORC?

8    A.  It is not missing any data.

9    Q.  So the ORC data gets put in there how?

10   A.  It's scanned in.          02:25PM

11   Q.  Okay.  You testified earlier in conjunction with Exhibit

12   658 that the patient in that exhibit was -- I just want to make

13   sure that you hear my question.

14          So you testified that the patient in question in 658

15   received, quote, the care they need and deserve because          02:25PM

16   somebody took the time to advocate for them.  Is that correct?

17   A.  Yes, it is.

18   Q.  So in order to receive the care that they need and deserve,

19   someone needs to affirmatively advocate on their behalf?

20          MR. BOJANOWSKI:  Foundation.          02:26PM

21          THE COURT:  Overruled.

22          THE WITNESS:  If the consult that is requested goes

23   into ATP status it would require further intervention most

24   likely.  I can't think of any circumstances under which it

25   would not require further intervention.          02:26PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    BY MS. EIDENBACH:

2    Q.  And if that doesn't happen the patient doesn't get the care

3    that they need?

4    A.  No.

5    Q.  Can you turn your attention now to Exhibit 662?  You        02:26PM

6    prepared this exhibit, correct?

7    A.  Yes, I did.

8    Q.  Can you turn to Page 3 for me.

9    A.  Yes.

10   Q.  If you look down to the subjective notes.                   02:27PM

11   A.  Yes.

12   Q.  And I believe it's the second sentence, begins with the

13   word "Denies."  Do you see that?

14   A.  Just to make sure I'm in the right place, Exhibit 662 under

15   subjective notes, the second sentence?                         02:27PM

16   Q.  Right, so 662.003.

17   A.  Okay.

18   Q.  Under subjective notes, second sentence which begins with

19   "Denies."

20   A.  I see "States."  States hit with baseball while in the     02:27PM

21   yard.  Third sentence, "Denies."

22   Q.  That's very weird.  And you are on 662.003?

23   A.  662.003.

24   Q.  I'm sorry.  It's the third sentence, the one that begins

25   with "Denies."  Do you see that?  We're in the same place?     02:28PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    A.   Yes.

2    Q.   Okay.   Great.   Can you read that for me, please?

3    A.   "Denies any increased facial dicomtort" appears to be a

4    misspelling, "nasal bleeding, diplopia, changes in vision.   DOC

5    not notified until three days after injury."                        02:28PM

6    Q.   Can you read the next sentence?

7    A.   "Attempted fascia bone and orbits X-ray but machine down

8    and was informed patient would be sent to another building for

9    X-ray completion but X-rays did not occur."

10   Q.   Now, when you are monitoring, would that piece of          02:28PM

11   information change your findings?

12   A.   No.   I'm monitoring for an ATP.   This indicates there was a

13   problem at the facility so they wanted the patient to get an

14   off-site X-ray.   It doesn't necessarily reveal to me if ATP was

15   communicated to the provider or communicated to the inmate.   02:29PM

16   Q.   And when you are monitoring, do you read the full condensed

17   consultation request?

18   A.   I generally do not read the full consultation request.   I

19   generally read parts of it that seem pertinent to what I'm

20   doing, or if it's outside of what I'm doing, if it's a CGAR, I   02:29PM

21   try to ascertain if there might be an opportunity to follow up

22   with the site.

23   Q.   Okay.   So you are looking very specifically at the dates

24   pretty much when you are monitoring Performance Measures 48 and

25   49?                                                               02:29PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross

1    A.   The dates and if the ATP itself was communicated, yes.

2    Q.   But you are not going to read the entire consultation

3    report?

4    A.   There are times that I do, but probably most times I do

5    not.                                                            02:30PM

6    Q.   What would you do if you had read that subjective note?

7    Would you bring it to the attention of someone?

8            MR. BOJANOWSKI:  Note an objection.

9            THE COURT:  Overruled.

10           MR. BOJANOWSKI:  Speculation.                           02:30PM

11           THE WITNESS:  Not necessarily.

12   BY MS. EIDENBACH:

13   Q.   You wouldn't follow up if you saw that someone who needed

14   x-rays wasn't getting them?

15   A.   I would read the remainder of the note.  I would then go   02:30PM

16   into the chart and I would try to determine if the inmate

17   received the X-ray or if there was some sort of alternative or

18   if they determined for some reason the inmate did not need the

19   X-ray.  So there are multiple places in which I would look to

20   make a determination.                                           02:30PM

21   Q.   So you would follow up with your own research first?

22   A.   I do not follow up on every circumstance.  My primary duty

23   is to do the monitoring, and then if there is something that I

24   believe needs to be followed up on, I would follow up.

25   Q.   Okay.                                                      02:31PM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross─────

1           MS. EIDENBACH:  May I have a moment, Your Honor?

2           THE COURT:  You may.

3           MS. EIDENBACH:  I have no further questions.  Thank

4    you, Ms. Barlund.

5           THE WITNESS:  Thank you.                          02:31PM

6           THE COURT:  Ms. Barlund, Mr. Bojanowski will get a

7    chance to ask any follow-up questions if he has any.  But

8    before he does that, I wanted to make sure I understood

9    something.  The source document that you say you receive from

10   Corizon with respect to 48 and 49 is if there are 10 ATPs for   02:31PM

11   that performance measure at that facility, those 10 are

12   presented to you.  Is that right?

13           THE WITNESS:  If there are 10, I would receive those

14   10.  If there are more I would receive more.  If there are

15   fewer I would receive fewer.                             02:31PM

16           THE COURT:  And they are randomized?

17           THE WITNESS:  Yes.

18           THE COURT:  Who does that?

19           THE WITNESS:  We randomize them.

20           THE COURT:  So when you were talking about you gave an   02:31PM

21   example, I think, sometimes there are 300 records.  Are those

22   the 300 records from which the randomization is done?

23           THE WITNESS:  Yes.

24           THE COURT:  And then the sample is taken from that

25   randomization?                                          02:32PM

—6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross—

1          THE WITNESS:  That is correct.

2          THE COURT:  And then you look into the records to see

3    whether or not there was an ATP and when it was communicated to

4    the provider for 48 and when it was communicated to the inmate

5    for 49.                                                02:32PM

6          THE WITNESS:  Correct.

7          THE COURT:  If a particular record for that month

8    contains multiple referrals and therefore potentially multiple

9    start dates, how do you address that?

10          THE WITNESS:  I monitor each unique consult request    02:32PM

11    independent of any other consult requests.  Some of them may be

12    approved and may occur.  Some of them may have an ATP so they

13    would fall under different performance measures.  Therefore, I

14    monitor them independent of one another.

15          THE COURT:  So to make sure that I understand, with    02:32PM

16    respect to 48, whether or not it was -- an ATP was communicated

17    to the provider, if there were multiple ATPs in a month because

18    there were multiple referrals, you would evaluate each of those

19    independently to see whether or not there was compliance with

20    the time frame?                                         02:33PM

21          THE WITNESS:  Yes, I do.

22          THE COURT:  And if one was compliant and one wasn't

23    compliant, in that hypothetical how would you proceed?

24          THE WITNESS:  I would identify one as compliant and

25    one as noncompliant both on the worksheet and the CGAR    02:33PM

———6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Cross———

1    findings.

2              THE COURT:  Thank you.  Mr. Bojanowski.

3              MS. EIDENBACH:  Your Honor, may I?

4              THE COURT:  You can.

5              MS. EIDENBACH:  I need to move the admission of the    02:33PM

6    exhibits that we talked about.

7              THE COURT:  Any objection?

8              MS. EIDENBACH:  The numbers are 72, 73, 94, and 109.

9              MR. BOJANOWSKI:  I'm reviewing them, Your Honor.

10             THE COURT:  Thank you.                                 02:34PM

11             MR. BOJANOWSKI:  No objection, Your Honor.

12             THE COURT:  They will be received.

13             Any redirect?

14             MR. BOJANOWSKI:  Very briefly, Your Honor.

15             THE COURT:  Please.                                    02:34PM

16                        REDIRECT EXAMINATION

17   BY MR. BOJANOWSKI:

18   Q.  Could you go to Exhibit 109, please?

19   A.  Yes.

20   Q.  This is an e-mail that you were asked about that dealt with 02:35PM

21   some issues concerning real time reporting.  Do you recall

22   that?

23   A.  Yes.

24   Q.  Were you actually involved in providing real time reporting

25   at all?                                                         02:35PM

1  A.  No, I was not.

2  Q.  And the listing of items on Pages 3 and 4, is that

3  something you prepared?

4  A.  It looks like something I prepared, but I'm not positive.

5  Q.  All right.  That's fine.  If you could go to Exhibit 657.  02:36PM

6  And you were asked some questions about Pages 6 and 7.

7  A.  Yes.

8  Q.  And those questions had to do with why is it that you are

9  looking at November dates when you are monitoring December.

10  Can you explain to the Court why it is you would do something  02:37PM

11  like that?

12  A.  Yes.  It's been very difficult to monitor ATPs as denials.

13  These consults do occur.  They may start out with a sent to UM

14  status and then proceed at some point to an ATP recommended.

15  And then they can be approved, they can be scheduled, and they  02:37PM

16  can occur and documentation can be received.  And in order to

17  monitor as accurately as I possibly can, I use an expanded time

18  frame of approximately two weeks to allow these to be approved

19  and to occur and to monitor them accurately.  I don't want to

20  just say, okay, this was denied when, in fact, it occurred.  I  02:38PM

21  don't want to say it occurred when, in fact, it was denied.

22  It's not easy to monitor an alternative treatment plan as a

23  denial when, in fact, that may be far from the last status.

24  Q.  What do you mean by that, far from the last status?

25  A.  In one of the examples I provided, what we saw was that a  02:38PM

1  consult was -- off-site consult request was submitted to UM.

2  It was ATP'd, but ultimately that inmate went out and he got

3  care based on that original consult request.  I don't want to

4  miss that.  I think it's -- my personal opinion is that it's in

5  some respects unfortunate that we clog up the system in some of    02:38PM

6  these appointments if a consult occurred or even some of these

7  slight deviations.  Bringing an inmate in to describe an MRI

8  versus an MRA or CT was substituted with an MRI, I think this

9  is just very difficult to do sometimes.  And so in particular,

10  for those consults that actually occur, that may have appeared   02:39PM

11  initially to have been denied, I want to make sure that I have

12  enough time to really make a determination.

13  Q.  And it goes to the what you feel is the accuracy of the

14  reporting that you are engaging in?

15  A.  Absolutely.  I do not want to inadvertently exclude          02:39PM

16  anything, and I don't want to inadvertently include anything.

17  Q.  And an ATP does not mean that no care is being provided,

18  does it?

19  A.  Absolutely not.  I mean, there are instances where there is

20  a consult written that isn't approved.  But many times what      02:39PM

21  isn't approved receives a slight modification.  So one type of

22  orthotic is substituted for another orthotic.  So we expect

23  that that that be communicated to the inmate, and we expect that

24  that that be communicated from the provider to the inmate.  It takes

25  an appointment away from a need that may actually exist.  We     02:40PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Barlund-Redirect

1    have to, you know, we allow them to substitute, say, an MRA for

2    an MRI, and we bring up the inmate and I would imagine it's

3    very difficult to explain to an inmate the difference because I

4    think it's difficult for many of us in the room to understand

5    those differences.  But sometimes these are slight deviations    02:40PM

6    and sometimes the original consult occurs as originally

7    ordered.

8    Q.  So you want to capture all of that is what you want to do?

9    A.  I want to capture all of that as accurately as I can.  If

10   there's a deviation, it is monitored.  It is included.  I think   02:40PM

11   personally that it is unfortunate that it occupies an inmate

12   appointment space.  If, however, the consult occurred as

13   originally written I do not monitor that because I would argue

14   that that is not a denial.  It was an approval and it occurred.

15   Q.  Let's go to Exhibit 662, Page 3.                              02:41PM

16   A.  Yes.

17   Q.  You read a couple of sentences in there at the behest of

18   counsel.  Could you read the last sentence in the subjective

19   notes?

20   A.  "Without eye entrapment noted."                              02:41PM

21   Q.  I'm sorry.  The next to the last sentence.

22   A.  "Admits continued discomfort nasal bones and eye sockets.

23   CT scan facial bone reviewed with patient this visit showed

24   positive left orbit wall fracture and fracture of maxillary

25   sinus tracks."                                                   02:41PM

1  Q.  Does that mean that the inmate, although he didn't get an

2  X-ray, got a CT scan that day?

3              MS. EIDENBACH:  Objection, Your Honor.  Foundation.

4  We have not established this witness can interpret medical

5  records in terms of what care was provided and what the medical    02:42PM

6  notes specifically say about the care provided.

7              THE COURT:  I gather just to cut this to the quick,

8  you can't tell from this condensed consultation request when

9  the failed X-ray or the CT scan were conducted.  Is that right.

10             THE WITNESS:  That is true.                            02:42PM

11             MR. BOJANOWSKI:  May I have a moment, Your Honor?

12             THE COURT:  You may.

13             MR. BOJANOWSKI:  No further questions, Your Honor.

14             THE COURT:  Thank you very much, Ms. Barlund.  I

15  appreciate your time coming in and helping us out with this        02:42PM

16  today.

17             THE WITNESS:  Thank you, Your Honor.

18             THE COURT:  Are we ready to proceed with Ms. McNeal?

19             MR. STRUCK:  We are, Your Honor.  If we could take a

20  break I would greatly --                                          02:43PM

21             THE COURT:  We'll take a 10-minute break now then.

22  Thank you.

23             (Recess from 2:42 p.m. until 2:55 p.m.)

24             THE COURT:  Mr. Struck.

25             MR. STRUCK:  Your Honor, we would like to call Lisa     02:55PM

─────6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Direct─────

 1  McNeal.

 2          THE COURT:  Thank you.  Ms. McNeal, if you would

 3  please step forward by the court reporter so the clerk of the

 4  court could administer the oath.

 5          (The witness was sworn.)                          02:56PM

 6          THE MAGISTRATE JUDGE CLERK:  Thank you.  Please step

 7  around.

 8                          LISA MCNEAL,

 9  called as a witness herein, having been duly sworn, was

10  examined and testified as follows:

11                      DIRECT EXAMINATION

12  BY MR. STRUCK:

13  Q.  Would you state your name, please?

14  A.  My name is Lisa Marie McNeal.

15  Q.  Have you ever testified before?                       02:56PM

16  A.  This is my first time.

17  Q.  Okay.  Well, I'm going to ask you some questions.

18  Plaintiff counsel will as you questions, but Judge Duncan may

19  have questions for you as well.  So we just have some questions

20  about your name has come up in the course of these hearings so  02:56PM

21  we wanted to ask you about that.

22          What do you do for a living?

23  A.  I am currently with the Arizona Department of Corrections

24  Health Services Contract Monitoring Bureau as the compliance

25  monitor for Eyman complex.                                02:57PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Direct

1   Q.  How long have you been in that position?

2   A.  I started at the end of May, 2017.

3   Q.  Going back a little bit, can you tell us a little bit about

4   your educational background?

5   A.  I graduated from the University of Southern California in

6   2002 with a Bachelor of Science in Public Policy and

7   Management.  I had an internship towards graduation working on

8   the succession project with the City of LA in which the San

9   Fernando Valley, the Hollywood area, the LA Harbor at the time,

10  they all wanted to break up and become their own cities.  So I

11  did that for a little bit.

12          I then decided that I was a little too restless at the

13  age of 22 and decided to become a flight attendant for about

14  four and-a-half years and then realized it's very difficult to

15  get back into the work force.  So I went to nursing school,

16  graduated from Central Arizona College in 2013, obtained my RN

17  licensure in April of 2013, and I joined Corizon in May of

18  2013.

19  Q.  And where did you work?  Which facilities did you work at?

20  Was it here in Arizona?

21  A.  It was.  I did work at the Florence complex.  I started off

22  as the Central Unit infirmary RN.

23  Q.  And how long were you in that position?

24  A.  I was in that position for approximately eight months.  I

25  promoted to the North unit nursing supervisor in December of

02:57PM
02:57PM
02:57PM
02:58PM
02:58PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Direct

1    2013.

2    Q.  And where did you go after that?

3    A.  I remained in that position until March of 2015, and I

4    promoted to the Assistant Facility Health Administrator at the

5    Tucson complex up until September of 2016.                          02:58PM

6    Q.  Where did you go in September of 2016?

7    A.  I left Corizon, and I joined a company called Correct Care

8    Solutions.  They are a subcontractor of GEO and worked as the

9    Health Services Administrator.

10   Q.  Which facility was that?                                        02:59PM

11   A.  At Florence West.

12   Q.  What type of inmates are housed at Florence West?

13   A.  They are minimum custody.  750 inmates are there.

14   Q.  And how long were you in that position?

15   A.  I was there from September 2016 until I got hired on with       02:59PM

16   the Arizona Department of Corrections in May of 2017.

17   Q.  Can you tell us what type of training you went through with

18   the Arizona Department of Corrections with respect to learning

19   how to be a site monitor?

20   A.  I actually had a really good working relationship with the      02:59PM

21   monitors while I was with Corizon.  And as far as the training

22   goes, my boss, Kathy Campbell, was definitely a resource for me

23   when I first started teaching me a lot about these source

24   documents, a lot of things of how we're basically monitoring.

25   But to obtain kind of a more hands-on approach, I actually          03:00PM

1   shadowed the Florence complex monitor for a month and stayed in

2   contact with her as far as she was kind of, I guess, my trainer

3   in the field as you would call it.

4   Q.  And when did you become, I guess, the full time Eyman

5   contract monitor?                                                    03:00PM

6   A.  My first day on site for the Eyman complex was at the

7   beginning of July, That first Monday of July.

8   Q.  Of 2000 --

9   A.  Of 2017.  I'm sorry.

10  Q.  And tell us, if you would, kind of give us a day in the         03:00PM

11  life of the contract monitor at the Eyman facility.  How do you

12  go about monitoring compliance with the performance measures at

13  that facility?

14  A.  In regards to the -- well, first, if I may say this, it's

15  imperative to get to know to complex itself, become familiar        03:01PM

16  with the staff, become familiar with the units, the unit

17  operations, the patients that you are dealing with.  And that,

18  coupled with your monitoring practices in terms of just you are

19  given the monitoring guide, you're told how the audit is

20  supposed to go, you use those guidelines.  And any questions        03:01PM

21  you may have you can actually reach out to the supervisors, to

22  any one of the supervisors that are there as well as the

23  Florence monitor also came over and assisted me during, like,

24  meetings and things of that nature to help me become a little

25  bit more familiar.                                                   03:01PM

1  Q.  Why did you say you felt it was imperative to get to know

2  to complex, the people, the patients?  Why do you say that?

3  A.  You develop a working relationship with a lot of different

4  people in a lot of different capacities.  You even develop

5  relationships with some of the patients that you are involved          03:02PM

6  in their care with or you want to follow up on their care.  You

7  want to get to know the staff; the nursing staff, the provider

8  staff, the mental health staff.  You want to become familiar

9  with the security leadership; the deputy wardens, ADWs, the

10 captains, CO4s, the warden, the DWOP.  There's a lot of people          03:02PM

11 you actually meet.  You become a part of that complex.

12 Q.  Your name came up a few months ago during the testimony of

13 Dr. Jan Watson.  Do you remember Dr. Watson?

14 A.  I do remember Dr. Watson.  I had very, very little

15 interaction with her, just one-on-one interaction.  But I do          03:03PM

16 remember her, yes.

17 Q.  Okay.  How many interactions do you recall, one-on-one,

18 that you had with Dr. Watson?

19 A.  I only had one.  I do not recall the date.  It was shortly

20 after I arrived to Eyman complex.  I was observing a pill pass          03:03PM

21 on Cook unit where she was the provider.  And I watched the

22 nurse pass out pills to the patients.  I actually watched a

23 nurse waste a narcotic, meaning that they have to go and

24 there's certain procedures that they have to follow by signing

25 it out of the book and doing all of the things, you know, that          03:03PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Direct

1    they do there.

2            And I was looking kind of over her shoulder and just

3    watching her, and I noticed that the pill call times between

4    Cook unit and this patient -- this patient was on a narcotic

5    three times a day.  Cook unit's pill call lines, it's an open    03:04PM

6    yard, which means that patients walk about freely where they

7    come up to the pill call windows, they were kind of close

8    together.  And I just, after the pill call and everything was

9    done, I walked into the provider's office where Dr. Watson was

10   sitting.  And she was typing on a computer, and I asked her, I   03:04PM

11   said, "Are you Dr. Watson?"  You know, I introduced myself and

12   said who I was:  "I'm Lisa McNeal.  I'm the Health Services

13   Compliance Monitor."

14           I said I just kind of wanted to ask you a question as

15   far as some of the pill call times and I'm seeing this one      03:04PM

16   patient who is on a narcotic medication three times a day

17   that's seemingly -- that's being administered a little bit

18   close together.  And she basically looked up and at me and

19   said, "Are you telling me how to do my job?"  And I said, "No,

20   ma'am.  I'm not."  And I just backed out of the room, and I     03:05PM

21   brought it to the attention of the FHA.  I was not there to get

22   into a debate with her.  It's not productive for me to get

23   involved with that type of -- when I get that type of response

24   it really doesn't do anything.

25           So I just left and I brought it to the attention of     03:05PM

1   the FHA and I said, you know, will you please do a check of the

2   pill call times, the narcotic medications, is there anything we

3   can do to make the environment a little bit more safer.  And so

4   the FHA at the time said she would look into that.

5   Q.  Now, that was something that you noticed, and that was very          03:05PM

6   early on once you had started?

7   A.  Yes.

8   Q.  As the monitor?  Is that the only time you have ever --

9   where you have noticed something that maybe you thought there

10  might be an issue and you brought it to somebody's attention or          03:06PM

11  is that something that you --

12  A.  Oh, no.  It's -- I mean, we, me personally, if there is an

13  issue that I can actually assist with, I work very, very

14  closely with the Corizon staff.  I call them.  I do a lot of

15  follow-up with them.  I try and assist with their processes by          03:06PM

16  acting as that liaison between Corizon and if there's an issue

17  between, let's say, you know, security, for example.  I will be

18  that go-between.  I will do what I need to do.  It is about

19  working collaboratively with Corizon.  That's how to get things

20  done.  It's the most productive way to get things done.                 03:06PM

21  Q.  How would you describe the interaction you had with Dr.

22  Watson in terms of her reaction?

23          MR. FATHI:  Objection, Your Honor.

24          THE COURT:  Overruled.

25          THE WITNESS:  I just -- I took it, me personally, I            03:06PM

1    just took it as a very hostile kind of response.  It was just

2    the look that was -- that I was given.  I have never had a

3    provider actually say anything like that to me in any capacity

4    that I have ever been with in any of my positions.  It just

5    came across immediately as defensive, like I was criticizing.          03:07PM

6    And that was really not my intention.  I just wanted to make

7    sure that she was aware that some of these patients could

8    potentially be getting their medications a little bit too close

9    together in terms of that narcotic.

10   BY MR. STRUCK:                                                          03:07PM

11   Q.  With respect to the other occasions where you have worked

12   with Corizon, when you say you have noticed a potential issue

13   what kind of a response typically do you get from the staff

14   there?

15   A.  They are actually very receptive as far as the Corizon        03:08PM

16   staff, or I should say they have become more receptive.  There

17   have been numerous changes within the leadership positions at

18   Eyman complex.  I must say that some are definitely a lot

19   easier to work with than others; however, all have been

20   generally responsive.  It's -- some would like us to get a          03:08PM

21   little bit more involved than other leadership members.  But we

22   will offer suggestions, we, you know, whether they choose to

23   take them or not is solely up to them.  But definitely relaying

24   what we see and identifying where the problems lie within

25   certain process areas can definitely be very helpful and          03:08PM

1    beneficial to them.

2    Q.  Ms. McNeal, when you are doing your job as a monitor and

3    you are monitoring these performance measures, how do you go

4    about letting the Corizon folks at the Eyman facility know how

5    they have scored?  How is that done?                          03:09PM

6    A.  So after I do my audit, for example, or conduct an audit of

7    a specific performance measure, I send out a preliminary e-mail

8    with all the findings.  And I do include as much detail as I am

9    able to so that way they can go in and take a look at their

10   findings and see what I'm looking at as well.  They are welcome  03:09PM

11   to contact me with any questions that they may have as far as,

12   well, we're seeing this, what are you seeing?  And we'll go

13   through the whole explanation.  We'll talk.  Sometimes they

14   will even ask, well, what can I do to improve this?  And we'll

15   even talk about potential solutions so that way they can avoid  03:09PM

16   maybe that finding in the future.

17          So there's a lot of education that goes along with it.

18   Q.  Is that something that happens every month?

19   A.  It does happen every single month since I have been there.

20   Since I have been there, I do have to say now that every single  03:10PM

21   month the Corizon regional team is now coming out once a month

22   to the sites to where they go over all the performance measures

23   that are read.  And we talk with the Corizon regional team, the

24   FHAs there; our warden always attends.  And it's just so that

25   everybody kind of knows where we're at, what are some things  03:10PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Direct

1   that we are seeing on our end so that way if it is -- if a

2   performance measure is red, and it can be red for numerous

3   reasons, it could be something as simple as a single staff

4   member just documenting something in the medical record a

5   certain way.  It could be a scheduling issue.  It could be so          03:11PM

6   many different things.  And targeting where those things are

7   is -- has been very helpful to them.

8   Q.  Now, how many performance measures do you currently monitor

9   at the Eyman facility?

10  A.  I am currently monitoring 23.                                      03:11PM

11  Q.  And has that always been the case?

12  A.  Last month was the first month I actually was monitoring

13  25.  Performance Measure 5 and 7 were actually given to another

14  monitor who is now doing those for the State, is from my

15  understanding.                                                         03:11PM

16  Q.  Okay.  So that started in -- so was March the last month

17  you monitored 25?

18  A.  It was taken, let's see, so it was taken in May which would

19  have been April's.

20  Q.  Now, in addition to these monthly CGAR reviews that you            03:12PM

21  just mentioned, have you ever had any other meetings with

22  Corizon providers, nurses to talk about compliance, how to

23  comply with the performance measures?

24  A.  Well, I do have to say that my first one of those -- and

25  yes.  The answer is yes.  The first one was actually the one           03:12PM

1    where Dr. Watson attended.  That was the first time that I have

2    ever done something like that.

3    Q.   What was the purpose of that meeting?

4    A.   The purpose -- well, if I may explain a little bit of the

5    history if that's okay.                                          03:12PM

6    Q.   Sure.

7    A.   It has always been my belief that you need to openly

8    communicate and you need to understand the CGAR audit.  When I

9    was an Assistant Facility Health Administrator of Tucson, I

10   remember when the Corizon regional compliance team was put into   03:13PM

11   place.  And I remember looking and pulling up that e-mail for

12   the preliminary findings, and I remember going through those

13   findings one by one.  And I pulled up the charts.  And I

14   remember looking at it and thinking, well, I can see why this

15   chart here is grossly deficient.  I can see why this one is       03:13PM

16   noncompliant.  But I don't understand why this third one here,

17   I don't understand why we're noncompliant on it.  I did all the

18   same things there so I'm not really understanding what

19   happened.

20         So I went to my Facility Health Administrator and I         03:13PM

21   asked her, would you mind if I sat with the monitor?  And I

22   literally watched her do an audit so I can understand what do

23   we need to do to fix this?  Because I have to generate a

24   Corrective Action Plan to say how we're going to fix this.  But

25   I can't do that if I don't understand where we're going wrong.    03:14PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Direct

1      And so I was -- she said, well, let me ask, you know,

2  the Director of Operations and they both came back to me and

3  said no, we have this Corizon regional compliance team and you

4  can ask your question to them.  They will relay it to the

5  Monitoring Bureau.  The Monitoring Bureau will get back to them    03:14PM

6  and then they will get back to you.  So I said okay, and I did

7  that.  I asked, you know, I'm not understanding the compliance.

8  And what I got back was a generalized response of

9  noncompliance.  And that didn't help me.  That didn't help me

10  target specifically what the issue was, and I didn't understand    03:14PM

11  it.

12      When I left Corizon and I started working for Correct

13  Care Solutions, and Correct Care Solutions is subcontracted by

14  a company called GEO.  So GEO does one big audit every March.

15  And they come out to the facilities at approximately maybe    03:15PM

16  seven to eight months, and they do kind of like a follow-up.

17  Well, I was hired on with CCS during the follow-up period, and

18  I started talking to the monitor that was there.  And I asked

19  her, I said, "Hey, look, CCS, we" -- Florence West, meaning we,

20  "We took 44 findings in March."  And I said, "I'm not    03:15PM

21  understanding."  And I said, "Would you mind if I sat with you

22  and would you mind explaining why these 44 findings were

23  assessed?"  And so she said, "Not at all."

24      And so I sat with her for about three days and I would

25  ask her questions.  So we would be going through a chart and    03:16PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Direct

1    she said this is why this one is noncompliant.  This one is why

2    this is not compliant.  You need a signature on this one.  And

3    this person should have been seen within a 72-hour time frame

4    instead of, you know what I mean, instead of a week time frame,

5    for example.  So that actually really helped me understand what    03:16PM

6    their auditors were looking at and what they were looking for.

7            So when the audit came around in March of 2017, I took

8    Florence West down to 12 findings, from 44 down to 12 and I got

9    a $500 bonus in my check for it.

10   Q.  So when you started up with ADC --                             03:16PM

11   A.  Right, when I started up with the Monitoring Bureau.

12           MR. FATHI:  Excuse me.  Objection.  Could we have a

13   question?  This has turned into quite a narrative.

14           THE COURT:  Go ahead and ask a question.

15   BY MR. STRUCK:                                                     03:17PM

16   Q.  How did you decide to take your experience at Florence West

17   and use it in your job in the Monitoring Bureau?

18   A.  Well, this is something that I always believed in, even

19   from when I was an Assistant Facility Health Administrator.  So

20   that experience at CCS just kind of reinforced my belief that     03:17PM

21   this is something that could work and this is something that

22   could be very beneficial.  And when I went to the Eyman

23   complex, I thought, you know, let's give it a shot.  Let's

24   start talking to the leadership there, see what we think.  And

25   I told her all of this, and she invited me to a meeting that      03:17PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Direct

1    they were having in the warden's hut.  And that's the first one

2    of those that I did.  I have done many since then.

3    Q.  Why don't you tell us about the meeting.  What occurred at

4    the meeting?

5    A.  So at that -- and I do not recall the date.  I apologize.          03:17PM

6    But I remember the food service liaison, his name is Chris

7    Bowden, he was in attendance at that meeting because he had

8    expressed some concerns about well, hey, look, these diet

9    orders, he goes I'm seeing how these providers are putting in

10   these diet orders.  And he goes, I think they just need some,          03:18PM

11   you know, a good reeducation about, you know, what we could do

12   to improve the entering of the diets into medical records to

13   efficiently process into the system that he was able to view,

14   which is AIMS.

15         So he was there, and that's actually how the meeting           03:18PM

16   started, was he did some diet education.  He went over with the

17   providers about what a formulary medical diet is, what a

18   non-formulary medical diet is.  He brought examples.  I was

19   there to reinforce, well, hey, look, even though he needs this

20   for CGAR compliance, I need, for example, an allergy is a big         03:19PM

21   one.  I need the allergy listed specifically as part of these

22   special instructions in this section here, so that will keep us

23   within CGAR compliance.

24         It was during that time that I actually learned -- we

25   even solved a problem at that meeting, in which I learned their     03:19PM

1    non-formulary button had kind of disappeared within eOMIS.  So

2    the providers were not able to enter the non-formulary diets

3    into the computer system like they always had, which we were

4    taking findings on because they were entering them under

5    different things.  So how do we get that button back?  What do          03:19PM

6    we do?  How are we going to solve this problem?  And it ended

7    up being that until they received that button back, we had -- I

8    contacted somebody up in central office, and they would go

9    ahead and put the entry in directly into AIMS so that way it

10   was the most efficient way where we weren't taking findings.          03:20PM

11   Now, the patient was still getting the diet because that would

12   be -- there was a general understanding all sides that they are

13   not able to do this, they are not able to enter this.  More

14   clarification was needed from the provider to the food service

15   liaison and all we were missing was that little hiccup, that          03:20PM

16   technology hiccup until we could get that problem resolved.

17   Q.   There was a suggestion in Ms. Watson's testimony that at

18   this meeting there was -- at least her impression was that your

19   message was how to either beat the monitor or cheat the system.

20   What was your message at the meeting?                                  03:20PM

21   A.   My message was not -- I don't recall it being a beat the

22   monitor, because just the way the CGAR is designed, if I may

23   use an analogy.

24   Q.   Sure.

25   A.   You have to look at the CGAR like the engine of a car.           03:21PM

1    Okay.  And the engine of a car, you have all different people

2    working in all different capacities with different specialties,

3    different licensures, different days, different times that all

4    need to work together in order to make the car move in a

5    certain direction whether it be forward, backwards, whatever.          03:21PM

6           And the CGAR essentially takes snapshots of different

7    pictures of different parts of the engine and is expected to be

8    a generalized overview of how that complex is functioning or

9    how the car is running, let's say.  And if the processes are

10   there, if your processes are solid, the CGAR will naturally           03:22PM

11   fall into place.  But you can take one process, even a simple

12   process of a patient, one patient submitting one HNR, and that

13   will cross over into multiple CGAR measures.  They are all

14   intertwined.

15          So if you have a process problem and you are looking           03:22PM

16   at the snapshot of one thing like let's say the battery, okay,

17   if the problem isn't the battery, then I could replace it all

18   day long but it's not going to matter because my problem is,

19   you know, maybe somewhere else.

20          So the whole idea is when I went to Corizon I guess            03:22PM

21   you can say I wanted to help them work smarter, not harder,

22   while improving the care.  So may I use an example?

23   Q.   Uh-huh.

24   A.   Okay.  So let's take our three medication refusals.

25   Performance Measure 15 is medical counseling, providing               03:23PM

1    counseling to a patient who refuses their medication three

2    times in a row.  I told them, I said, there's numerous

3    encounters between providers and nursing, I said, whether it be

4    nurse sick call, nurse follow-up, provider chronic care,

5    provider sick call, provider follow-ups, I said every single          03:23PM

6    person that is qualified to be able to do so, I said, should go

7    ahead and just look at the MAR.  Every time they see a patient

8    face to face, take a look at their MAR.

9    Q.  MAR is a?

10   A.  Medication Administration Record.  It's the area of the           03:23PM

11   medical record which shows medication administration.  And I

12   said, take a look at it.  It doesn't really any extra time.

13   You are already there.  The patient is already there.  Provide

14   that counseling right then and there every single time.  And

15   guess what?  I said if you document it, it will also help your        03:24PM

16   Performance Measure Number 9, your SOAPE formats on your

17   education piece.  And boom, the patient gets his education, the

18   provider documents and we can cover two performance measures.

19   Q.  You said you have had several of these meetings with

20   respect to -- how many do you think you have had?                     03:24PM

21   A.  Well, I am including the monthly regional --

22   Q.  Okay.

23   A.  -- monthly regional ones where they actually do come out.

24   But I have met with the providers, you know, a few times, I

25   wouldn't want to give you an exact number, to where they say         03:24PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Direct

1    hey, come over.  We have a question about something.  We have a

2    question about we're looking at this.  How do you improve this

3    specific performance measure?  What can we do that -- what are

4    we seeing or what do you see that maybe can help us out?

5         Both myself and the clinical monitor, my co-worker,            03:25PM

6    Edna Franklin, she has also attended as well.

7    Q.  And as you are monitoring these performance measures, if

8    it's a fail, are you failing them?

9    A.  I'm not understanding.

10   Q.  When you monitor a performance measure, if you have done     03:25PM

11   what you need to do to monitor, you have looked at the

12   sufficient number of records, are you failing the Eyman unit at

13   that particular performance measure if it's a below 85 percent?

14   A.  They are red.  I can't hide that.  Something is either in

15   the medical record or it's not.  I can't make it appear.  I am    03:25PM

16   not responsible for putting that documentation in.  Can I

17   assist Corizon as far as, hey, is a time frame coming up?

18   Please make sure that this gets done, serving them reminders to

19   say hey, look, keep an eye on this performance measure, you

20   know.  Watch your time frames on this performance measure.        03:26PM

21   Absolutely.  Because the only person who is going to benefit

22   from that is the patient.

23   Q.  Okay.

24        MR. STRUCK:  Your Honor, I don't have any more

25   questions.                                                         03:26PM

1      THE COURT:  Thank you very much.  Now the plaintiffs'

2  lawyer can have a chance to ask you questions.

3                      CROSS-EXAMINATION

4  BY MR. FATHI:

5  Q.  Good afternoon, Ms. McNeal.                              03:26PM

6  A.  Hello.

7  Q.  You testified that you have been the compliance monitor at

8  Eyman since about July of 2017, is that correct?

9  A.  It is May of 2017.

10  Q.  So you have been working as a compliance monitor at the    03:26PM

11  Eyman complex since May of 2017?

12  A.  I did not start directly out there.  I worked at the

13  Florence complex shadowing that monitor for approximately a

14  month.

15  Q.  So you began at Eyman in June or July of 2017?             03:27PM

16  A.  My first day on site was that first Monday of July.  I

17  don't recall the --

18  Q.  So by December of 2017 you had been monitoring at Eyman for

19  five or six months, correct?

20  A.  Yes.  I would say yes.                                    03:27PM

21  Q.  If you turn to Exhibit 133, please, it should be in the

22  pile in front of you.

23  A.  Okay.  I have it.

24      MR. FATHI:  Do you need a copy, Your Honor?

25      THE COURT:  I'm still looking.  Give me just a second.   03:27PM

1   I have it here.  Thank you.

2   BY MR. FATHI:

3   Q.  Ms. McNeal, Exhibit 133 is a December 8, 2017 e-mail to you

4   from Richard Pratt and some other recipients.  Correct?

5   A.  Correct.                                              03:28PM

6   Q.  And I think we just agreed that by this time you had been

7   monitoring at Eyman for five or six months?

8   A.  Correct.

9   Q.  But you still needed some guidance on how to do your job,

10  correct?                                                  03:28PM

11  A.  Is -- I'm sorry.  I'm not understanding.  In relation to

12  this e-mail, correct?

13  Q.  Let me ask a different question.

14  A.  Okay.

15  Q.  Right after the salutation, "Hi, Mr. Pratt" would you     03:28PM

16  please read the following sentence?

17  A.  Sure.

18  Q.  Aloud.

19  A.  Sure.  "Below are the general clarifications I would like

20  on the compliance PMs.  Please note all of the below issues   03:28PM

21  have been brought to the attention of the Eyman Corizon site

22  leadership on different occasions."

23  Q.  Okay.  So as of this date, December 8, 2017, you needed

24  some clarification on some of these performance measures.

25  Right?                                                    03:29PM

1   A.  On these specific ones I would like additional

2   clarification.

3   Q.  On how you should be monitoring on these performance

4   measures?

5   A.  Well, these examples that are in this e-mail are not a                03:29PM

6   standard.  These are some of the --

7   Q.  Excuse me, Ms. McNeal.  My question was just:  As of this

8   date you believe you needed some additional clarification as to

9   how to monitor these performance measures, correct?

10  A.  No.  That is not what in relation to this e-mail or what            03:29PM

11  this e-mail was sent.

12  Q.  So you didn't think you needed any additional

13  clarification?

14  A.  I did have some additional clarifications, but it was in

15  relation to a subject as the title states, follow-up to our            03:29PM

16  video conference.  That was the topic brought up.

17  Q.  Would you please read the first sentence of Item 1?

18  A.  Sure.  "Performance Measure 5, 7, and Performance Measure

19  36.  Are we to utilize 10 inmates or 10 HNRs?"

20  Q.  Okay.  That's enough.                                              03:30PM

21  A.  Sorry.

22  Q.  Performance Measure, Paragraph 2, would you please read

23  about the first half of that paragraph.

24  A.  "Performance Measure 9.  I am finding several cases in both

25  nursing and provider encounters where the documentation will          03:30PM

1   simply stop in the middle of the encounter.  Example:  The top

2   half of the NET is completed but the bottom half of the

3   encounter is blank.  However, a second encounter was opened

4   usually within the same hour, and the remaining documentation

5   continues.  Since this populates on my source document twice as    03:30PM

6   two different encounters, and if only one of those encounters

7   are within my sample for audit, what is the best way to

8   proceed?"

9   Q.  Okay.  Next, would you please read the first sentence of

10  Paragraph 3?                                                       03:30PM

11  A.  Sure.  "Performance Measure 12.  Would the compliance

12  monitor take into consideration the documented reason for the

13  scanned refusal to determine compliance for this measure."

14  Q.  And finally, would you please read the first sentence at

15  Paragraph 4?                                                       03:31PM

16  A.  "Performance Measure 38.  Depending on the nature of the

17  medical request and/or medical encounter, what additional vital

18  signs would be necessary to determine compliance for this

19  measure?"

20          MR. FATHI:  Thank you.  Your Honor, I move admission        03:31PM

21  of Exhibit 133.

22          THE COURT:  Any objection?

23          MR. STRUCK:  No.  No objection, Your Honor.

24          THE COURT:  133 is received.

25  BY MR. FATHI:                                                       03:31PM

1  Q.  Now, you testified, Ms. McNeal, that you believe in working

2  very closely with the Corizon staff, correct?

3  A.  I do.

4  Q.  And you believe in working collaboratively with Corizon?

5  A.  I do.                                                          03:31PM

6  Q.  In fact, you worked for Corizon for about three and-a-half

7  years?

8  A.  I did.

9  Q.  From May of 2013 to December of 2016?

10 A.  It was May of 2013 to September of 2016.                      03:31PM

11 Q.  Okay.  Thank you.

12         When you started as a monitor with the Arizona

13 Department of Corrections, you went through a formal training

14 course, correct?

15 A.  No.  There was no formal training course.  We are given the   03:32PM

16 monitor guide, and we are explained the performance measures.

17 And then to see real life examples and we basically shadow

18 another monitor, watch how the audit is done and completed.

19 Q.  But there's no formal training course?

20 A.  I don't really see how there could be.                        03:32PM

21 Q.  So the answer to my question is no?

22 A.  No, I guess.  Yes.

23 Q.  Now, you talked about that when you convey your preliminary

24 results to Corizon sometimes they will come back with

25 challenges or questions about findings that appear to be         03:32PM

1    noncompliant but they believe should be compliant, correct?

2    A.   So I -- may I ask a clarifying?  So I just want to make

3    sure I have this right.  So I am finding them noncompliant.

4    They believe they are compliant and they are calling me.

5    Q.   Correct.  So that happens?                                03:33PM

6    A.   Absolutely.  Yes.  I'm sorry.

7    Q.   But it never happens that Corizon says, okay, you found us

8    compliant on this measure but it really should be noncompliant?

9    A.   I have not had that experience happen, no.

10   Q.   You talked about your encounter with Dr. Watson at which   03:33PM

11   you discussed the frequency with which this prisoner, this

12   patient, was receiving his medication, correct?

13   A.   I was just -- it was a concern.  I was just kind of

14   noticing in the times that it was signed out, they were signed

15   out a little too close together.                              03:33PM

16   Q.   Dr. Watson doesn't determine the times that pill call is

17   run on Eyman, does she?

18   A.   She does not, but Dr. Watson is the provider who prescribes

19   that medication.

20   Q.   Dr. Watson doesn't decide the times pill call is run on    03:33PM

21   Cook unit, does she?

22   A.   No, but she is the prescribing provider.

23   Q.   Ms. McNeal, have you ever, in conversation with any Corizon

24   personnel, ever used phrase "beat the monitor"?

25   A.   I have not.                                               03:34PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Cross

1   Q.  It's your testimony under penalty of perjury you have never

2   used that phrase --

3   A.  I have never --

4   Q.  Let me finish my question.

5   A.  I'm sorry.  I apologize.                                          03:34PM

6   Q.  It's your testimony under penalty of perjury that you have

7   never uttered the phrase "beat the monitor" in conversation

8   with any Corizon employee?

9   A.  That is correct.

10          MR. FATHI:  May I have a moment, Your Honor?                  03:34PM

11          THE COURT:  You may.

12          MR. FATHI:  Nothing further.  Thank you, Ms. McNeal.

13          THE COURT:  Any redirect?

14          MR. STRUCK:  Just briefly, Your Honor.

15                      REDIRECT EXAMINATION                              03:34PM

16  BY MR. STRUCK:

17  Q.  Ms. McNeal, if you could take a look at Exhibit 133 in

18  evidence that Mr. Fathi asked you and had you stop reading, do

19  you have it open there?

20  A.  I do.                                                            03:35PM

21  Q.  You wanted to explain the purpose of this, and he didn't

22  allow you to.  Can you please explain what the purpose of this

23  was and what you were trying to accomplish here?

24  A.  Sure.  So the -- we have a monthly video conference, and

25  the consistency of monitoring and making sure that our audit    03:35PM

1   practices are consistent throughout the state amongst each

2   monitor, that became a topic of conversation.  And it's very

3   difficult when you are looking at patient charts, numerous

4   patient charts, because you are dealing with individuals.  You

5   are dealing with different people who document and write things   03:35PM

6   in different ways.  And so things are not specific to a

7   particular audit, it is just some of the things that have -- we

8   were told to, hey, come up with some questions that you may

9   need clarification on or that may be kind of confusing.  And so

10  I was literally sitting there to where I was like, you know,   03:36PM

11  what happens if I come across something of this nature?

12          So, for example, Performance Measure 9 and Number 2,

13  where it says, "The top half of the NET is completed but the

14  bottom half of the encounter is blank."  So if a provider, for

15  instance, is documenting it, and this can be frequent, provider   03:36PM

16  is doing some documentation after seeing a patient and another

17  emergency occurs, another, what we call an ICS occurs, that

18  provider is not -- the provider is going to stop that

19  documentation and go attend to the emergency and then they will

20  often come back, once that emergency is completed, and they may   03:37PM

21  finish up that documentation.  However, if a nurse goes in and

22  closes out, needs to document on something as well, they need

23  to share a computer, I don't know, whatever the situation may

24  call for, it will have two different encounters.

25          So if I'm looking at two different performance   03:37PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-McNeal-Redirect

1    measures, like let's say our SOAPE formats which we had talked

2    about earlier, which is Performance Measure 9, the two

3    encounters will actually populate on my source document two

4    different times.  Now, can I take those two encounters and link

5    them together to make them one complete note?  I absolutely          03:37PM

6    can.  But if the other one doesn't populate on -- if the first

7    part comes up within the first 10, I can look at it but it will

8    also populate somewhere else within that document.  I can't say

9    whether it would be in the first 10 or not in the first 10.

10   So, I mean, if all the documentation for that one encounter is      03:38PM

11   there the question then becomes, well, how do we handle the

12   situation?  What's the best way to proceed?  Shall we look at

13   this as one encounter or should we look at it as two separate

14   encounters?  Should the provider at Corizon be penalized for

15   stopping the documentation to attend to something like an           03:38PM

16   emergency, a patient emergency.  And in my case -- and they

17   absolutely should.  They absolutely should.

18   Q.  Now, this monthly video conference, that's something that

19   the entire Monitoring Bureau does?

20   A.  Yes.  So all the monitors, we get together from our sites       03:38PM

21   and we link up to a video conference and we have an opportunity

22   to ask questions.  A lot of the things, you know, actually will

23   come out as far as new changes that are occurring, things --

24   any changes from the Court, you know, such as that nature.  And

25   in this particular one here, we just needed some additional         03:39PM

1    clarification now in terms of consistency to make sure that we

2    are all doing things the same way.  Because the idea is that if

3    I'm experiencing this at Eyman, there has to be some other

4    monitor also throughout the state experiencing this and having

5    to question potentially when this arises.  And we just want to        03:39PM

6    make sure when that does occur that we both look at that

7    situation the same way.

8              MR. FATHI:  Excuse me, Your Honor.  Objection.  This

9    is getting rather far beyond the scope of the

10   cross-examination.                                                   03:39PM

11             THE COURT:  You may finish.

12             THE WITNESS:  So I do have to say that that

13   consistency is important amongst monitoring, and that has been

14   recognized by Mr. Pratt.  And we now have a position where Mark

15   Haldane has taken that position to bring consistency to -- and        03:39PM

16   make sure that we, as monitors out in the field, are monitoring

17   the same way or if questions such as these may arise we can go

18   to that one person and say how should we be looking at this?

19   Because should that question arise again that person can also

20   give that same direction to somebody else who may be seeing the       03:40PM

21   same things.

22             MR. STRUCK:  One moment, Your Honor.

23             No further questions.

24             THE COURT:  Thank you.  Just a moment, please.

25             Thank you very much.  Appreciate your time.                 03:41PM

—6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct—

 1          THE WITNESS:  Thank you.

 2          THE COURT:  You may call Dr. Taylor.

 3          Dr. Taylor, please step forward to the clerk and be

 4   sworn.

 5          (The witness was sworn.)                          03:42PM

 6          THE MAGISTRATE JUDGE CLERK:  Please step around.

 7                      NICOLE TAYLOR, Ph.D.,

 8   called as a witness herein, having been duly sworn, was

 9   examined and testified as follows:

10                      DIRECT EXAMINATION

11   BY MS. LOVE:

12   Q.  Will you please state your name for the record?

13   A.  Yes.  Nicole Taylor.

14   Q.  Who is your employer?

15   A.  Arizona Department of Corrections.                   03:43PM

16   Q.  What is your current position?

17   A.  I am the Mental Health Director.

18   Q.  And how long have you held that position?

19   A.  Just over five years.

20   Q.  Who do you report to up your chain of command?       03:43PM

21   A.  Richard Pratt.

22   Q.  Do you hold any professional licenses?

23   A.  I do.  I have a psychologist license with the Arizona board

24   and then a law degree with a license through Arizona.

25   Q.  And is your license as a psychologist in good standing?  03:43PM

1    A.   Yes.

2    Q.   How long have you held your license as a psychologist?

3    A.   So almost 12 years.

4    Q.   What is your educational background?

5    A.   I have a Ph.D. in clinical psychology and a JD.          03:43PM

6    Q.   Where did you obtain your Ph.D.?

7    A.   The school is now called the Palo Alto University.  At the

8    time it was called the Pacific Graduate School of Psychology.

9    Q.   Where is that located?

10   A.   In Palo Alto, California.                               03:44PM

11   Q.   And where did you get your JD?

12   A.   From Golden Gate University.

13   Q.   And you have been employed by the Arizona Department of

14   Corrections since when?

15   A.   Since 2005.                                             03:44PM

16   Q.   And can you take us over the course of your career with the

17   Arizona Department of Corrections what positions you have held?

18   A.   Sure.  I started out at the Phoenix facility as a

19   psychology associate and worked there for about a year.  And

20   then I moved down to Eyman, and I worked there as a           03:44PM

21   psychologist once I was licensed in 2006 until, I believe, 2009

22   or 10.  And I then moved down the road about three miles, two

23   miles, to Florence and I was there as -- at the time they

24   called them Psychologist IIIs, which is like a lead

25   psychologist.                                               03:44PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    And I worked there until we privatized, and then I

2    worked for Wexford for the eight months that they were there as

3    the Regional Mental Health Director.  And then when we switched

4    over to Corizon, I worked for Corizon, only ended up being

5    about five weeks when the position I'm in now became available.    03:45PM

6    And then I switched over to this position.

7    Q.  When you worked at the Phoenix complex, the Eyman complex,

8    and the Florence complex, were you involved in direct patient

9    care?

10   A.  Yes, I was.                                                    03:45PM

11   Q.  During the time period that you worked at the Phoenix

12   complex, can you tell us what your duties were?

13   A.  I was routinely assigned to John ward.  That was my patient

14   population.  And I also covered intakes often for about six

15   months and the watches.                                           03:45PM

16   Q.  And describe for us when you worked on the ward, what were

17   the duties?  What was your day to day?

18   A.  So conducting one on ones; we provided a number of groups

19   each day.  I usually did about two groups a day, crisis

20   assessments and interventions as needed, and then attended       03:46PM

21   staffings with the psychiatry and psych nurse on a sometimes

22   every two weeks to one a month depending on the needs.

23   Q.  When you worked on intake, was that a specific assignment

24   where you would work only intake and not work on the ward?

25   A.  I typically conducted intakes in the first half of the day,   03:46PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    and then I would finish up the second half of the day over on

2    John ward.

3    Q.   In your current position as Mental Health Director, have

4    you had the opportunity to tour other prison systems in which

5    you were looking at the provision of mental health care by          03:46PM

6    other prison systems?

7    A.   Yes.  I have toured a number of prison systems.  I have

8    toured four of the Bureau of Prisons facilities, their

9    in-patient, their intake, their female in-patient.  I have

10   toured two different jail system, LA County Jail and Dallas        03:47PM

11   County Jail.  And then I have toured probably about five other

12   state DOCs; Oklahoma, Kansas, North Carolina, South Carolina,

13   California.  And then our juvenile correctional system here in

14   Arizona.

15   Q.   And what was the purpose of you touring these other            03:47PM

16   systems, prisons or jails?

17   A.   We often, as the Mental Health Directors, we get together

18   once a year under the National Institution of Corrections and

19   we attempt to tour a Bureau of Prisons facility and then also

20   tour a state facility or a county jail.  And we spend probably      03:47PM

21   about five hours touring through their mental health areas

22   asking questions, understanding exactly how they do their

23   system.  How do you guys do your intakes?  How do you guys

24   provide programming?  What are your challenges?  So that we can

25   take things back to our system and try to figure out how to        03:48PM

UNITED STATES DISTRICT COURT

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1   implement things that were working really well.

2   Q.  Your current position, describe for me what your duties

3   are?

4   A.  In general, sort of just overseeing kind of the mental

5   health treatment.  But because of *Parsons versus Ryan*, there's          03:48PM

6   a whole lot of monitoring that goes into this position that

7   wasn't there previously.  And so I review the audits that are

8   completed and then try to conduct that and the Mental Health

9   Director position as it was created, which is to stay engaged

10  in the care that's happening, issues that arise, questions that          03:48PM

11  come up and, you know, work hand in hand with our provider in

12  figuring out best ways to provide the care and overcome

13  obstacles.

14  Q.  And your involvement in the monitoring processes in this

15  litigation, is that focused on the mental health performance            03:49PM

16  measures?

17  A.  That is correct.

18  Q.  Do you supervise anyone who is involved in the monitoring

19  of the mental health performance measures?

20  A.  Yes.  I supervise two master's level clinicians who conduct         03:49PM

21  the initial CGAR reviews for our performance measures.

22  Q.  And do the two people that you supervise hold any

23  professional licenses?

24  A.  Yes.  Mr. Dye is a licensed social worker, and Ms. McCray

25  is a licensed associate counselor -- or I'm sorry, she's a              03:49PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    licensed substance abuse counselor.

2    Q.   How many mental health performance measures do you and the

3    two persons that you supervise monitor?

4    A.   I believe there's 27.

5    Q.   And is it the entirety of the mental health performance          03:50PM

6    measures at issue in the stipulation?

7    A.   Yes, it is.

8    Q.   Are there any performance measures that you, yourself, are

9    responsible for monitoring exclusively?

10   A.   I monitor Performance Measure 99, which is the peer reviews      03:50PM

11   question.

12   Q.   And what, if you can just summarize here today, what is

13   Performance Measure 99 looking at?

14   A.   It's looking at whether the psychologist and the

15   psychiatric providers have an up-to-date peer review that needs       03:50PM

16   to be completed on an annual basis.

17   Q.   Is there a reason you are exclusively monitoring that

18   performance measure versus the two people working with you also

19   monitoring?

20   A.   To be honest, it's because it's the easiest one.  So I           03:50PM

21   offered to take that one.  It doesn't take a whole lot of time.

22   Their performance measures take all month and require extensive

23   amount of ability to be available to do that.  And the peer

24   review one does not take me that long so I said I would take

25   that one.  Plus it's not assigned specifically to a complex,          03:51PM

1   and my two staff are split.  And that one is looked at across

2   the entire state.  We do it for each facility so it was a lot

3   easier to have one person do that.

4   Q.  So the persons you supervise who monitor the mental health

5   performance measures, do they split up their monitoring duties          03:51PM

6   by prison complex?

7   A.  Yes, they do.

8   Q.  For each prison complex that that person monitors, they are

9   monitoring all of the performance measures under the

10  stipulation related to mental health care?                              03:51PM

11  A.  That is correct.

12  Q.  Do you interact with your two monitors on a daily basis?

13  A.  Every day that I am in the office we meet.  Typically I

14  come in in the morning, we sit down in my office and go through

15  any questions that they have, any monitoring, you know.  If             03:52PM

16  there's an HNR and we want to look at it together.  Only on the

17  days I'm not in the office we don't meet but otherwise every

18  other day.  I'm lucky we sit two feet from each other so we're

19  able to do that.

20  Q.  When questions arise, if they do, from the two monitors             03:52PM

21  that you supervise, are you able to get the three of you

22  together to discuss what maybe the answer would be to any

23  questions they have?

24  A.  Right.  We have found that to be helpful because that way

25  we could ensure whoever is monitoring it would look the same.           03:52PM

1 And so anything that is different than what we have seen in the

2 past, any response or anything that's just kind of out of the

3 ordinary that we have not seen before, we sit down and the

4 three of us discuss what we think that should look like.

5 Because there's always anomalies, so it's really helpful to          03:52PM

6 have the three of us doing that so any one of us would have

7 basically the same answer.

8 Q.  And when you used the phrase "so that it looks the same"

9 what did you mean by that?

10 A.  Meaning that no matter who is monitoring, it's monitored in     03:53PM

11 exactly the same way so it's not different depending on, well,

12 if you are at this facility it means it's this monitor so you

13 are going to get a different result.  We do our best to ensure

14 that regardless of who is monitoring the same methodology is

15 always used.                                                        03:53PM

16 Q.  Do you and the two monitors that work with you meet with

17 other members of the Monitoring Bureau in any formal meetings,

18 those that are involved in monitoring the health care

19 performance measures versus the specific mental health?

20 A.  We have a monthly meeting where we meet with all of the         03:53PM

21 monitors within the Bureau, and then there's a weekly

22 telephonic meeting that is with Corizon and then all of the

23 monitors.

24 Q.  When you meet weekly, who attends those meetings?

25 A.  All of the monitors that are able to get on the call and        03:54PM

1    then the Facility Health Administrators get on the call from

2    each of the facilities.  And then the regional office for

3    Corizon gets on and Mr. Pratt is there, all of us in our office

4    when we're in the office are there on the call.

5    Q.  And during the weekly meetings, are there ever discussions            03:54PM

6    as to court rulings regarding the monitoring process?

7    A.  Yes.  Those have come up when they have had questions

8    regarding what's happened in court.  We can clarify some of

9    those questions because sometimes they have heard it second or

10   thirdhand, and we want to make sure that it's the same message.            03:54PM

11   Q.  And we know that you regularly attend hearings in this

12   matter.  Correct?

13   A.  Correct.

14   Q.  And why is that?

15   A.  I find that it's kind of hard to read a transcript and            03:54PM

16   understand what exactly was going on.  And so being in court

17   allows for that direct flow of information back to, especially

18   Corizon.  If there's things that affect what they are doing

19   it's very important to be able to share with them here's

20   exactly what happened.  Here's what the orders are.  Here's how            03:55PM

21   it affects you.  Because without that understanding, it could

22   be confusing.

23   Q.  Do you employ any processes where you regularly meet with

24   Corizon staff at the complex level?

25   A.  I -- at four of the complexes I do what we call out briefs            03:55PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1   at four of the complexes; so Florence, Eyman, Perryville, and

2   Phoenix.  I request that they bring in all of the clinicians,

3   the providers, the behavioral health technicians, all the

4   mental health staff.  And once a month I go over the CGAR

5   results and then other things that have come up.  There may          03:55PM

6   just be sort of issues that have come up.  And I encourage them

7   to bring those issues up.  I ask the wardens and the FHAs and

8   DONs to attend those because sometimes the issues are, hey, we

9   have -- I'm trying to think of some of the more recent

10  issues -- a gate issue that I don't have a key access to.  If        03:56PM

11  they haven't been able to discuss that with operations prior we

12  discuss it during those meetings.  Recently, that was right,

13  one of the issues was some staff did not have access to what's

14  called AIMS, it's the offender management system that we have

15  so there were some new employees who didn't have that access.        03:56PM

16  So I was speaking with them and I said, oh, okay that's an

17  issue.  Let's figure out who to send your paperwork to.  Let's

18  get the paperwork over there and problem-solve that issue.

19  Q.  Why do you request that the clinicians attend the meeting?

20  A.  You know, over the years of doing this I have found that to      03:57PM

21  be much more helpful for me to personally share with them

22  directly their notes; hey, when you wrote this, I want you to

23  understand why that was confusing to me or why I was having a

24  difficult time really understanding what you are doing.  I need

25  you to do a better job of -- let's say, for instance, with the       03:57PM

1    providers, if they are indicating that they are reviewing the

2    treatment plan, and every provider puts it in a different spot

3    in the note, that becomes challenging for me to remember that

4    this provider puts it up in the F section and this provider

5    puts it all the way down in the plan section.  So meeting with      03:57PM

6    them saying it's really helpful if you are doing the same thing

7    as everyone else, because I need to be able to find it.  I need

8    you to be able to show me where it is.  So I will give them

9    examples of when I was reading this, I had a hard time finding

10   it.  Could you please do that differently?                          03:57PM

11          So that's been helpful to give them that direct

12   feedback, I think.

13   Q.  Do either of the two monitors that you supervise also

14   conduct these out brief meetings with the six other state-run

15   complexes?                                                          03:58PM

16   A.  Yes.  Mr. Dye does the other facilities.  We

17   transitioned -- when Ms. McCray started, I didn't have anybody

18   in that position so I had just taken over that process of doing

19   the auditing, did the out briefs.  So I have just continued the

20   out briefs on the facilities that she took on the monitoring       03:58PM

21   process.

22   Q.  For the complexes that aren't in the Phoenix metropolitan

23   area like Winslow or Douglas, are your monitors physically

24   going out to the site to do the out brief meetings?

25   A.  No.  He conducts those over the telephone so we don't lose     03:58PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    time.  Even sometimes Yuma he will do -- we have video

2    conferencing so we can use that system or just over the

3    telephone.  He will go out on site maybe every three months to

4    four months and do it in person because it just -- it's easier

5    to do in person.  But that is six hours, seven hours of       03:59PM

6    driving.

7    Q.  And during these out brief meetings, do you discuss the

8    CGAR reports and findings for the prior month?

9    A.  That is correct.

10   Q.  Do you discuss the areas in which perhaps that complex had  03:59PM

11   a finding of noncompliant?

12   A.  Correct.

13   Q.  What if there's a situation where -- let me back up.

14          Are you aware of what the current percentage threshold

15   is for compliance with a performance measure at this stage in  03:59PM

16   the stipulation time period?

17   A.  Yes.

18   Q.  What is that?

19   A.  85 percent.

20   Q.  If, let's say, the Eyman complex had a finding on one of    03:59PM

21   the mental health performance measures and their percentage

22   compliance was 92 percent so they exceed the 85 percent

23   threshold but there was a finding.  Will you discuss those

24   findings as well, or are you only looking at what findings fell

25   below the required compliance rate?                            04:00PM

1  A.  We actually discuss every performance measure, even the

2  ones that are at 100 percent.  Because regardless of what's

3  going on, it's important for them to understand exactly what is

4  happening at their complex, especially the mental health lead,

5  for them to fully understand that.  So one file, five files, we          04:00PM

6  discuss everything that we find.  We discuss anything that they

7  have questions on around those performance measures.  So they

8  usually take about an hour and a half when we do them.

9  Q.  Where there is a finding of noncompliance, do you provide

10  the persons that attend the meeting with specific -- with a              04:00PM

11  specific example of why compliance was not met?

12  A.  Yes.  I attempt to do that anonymously while they are all

13  in the room.  And so I will have the note, let's say, that

14  doesn't have -- that the individual was offered a confidential

15  appointment and the inmate refused.  So that phrase isn't in            04:01PM

16  there so I will try to discuss that as in this is one of the

17  findings and then on the side try to give it to the lead to try

18  to discuss specifically with them.  Some staff recognize fairly

19  quickly it's their note, because when you are reading them they

20  have different styles.                                                   04:01PM

21          But I try to give everybody the same information

22  because although that may be one clinician making that mistake,

23  everybody in the room is hearing the same message around this

24  is a problematic thing.  This is why it's a problem so they

25  aren't accidentally making the same mistake.                            04:01PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    Q.   If the Court has made a ruling regarding methodology as to

2    how a performance measure is audited, is that a subject that

3    you would discuss in your out brief?

4    A.   Absolutely.   We cover those extensively when there's been a

5    change.                                                              04:01PM

6    Q.   And do you also expect that your two monitors also express

7    the same information when they do the out brief with other

8    complexes?

9    A.   Yes, I do.

10   Q.   And do you know that that actually occurs?                      04:02PM

11   A.   Yes, it does.   I attended a number of out briefs with Mr.

12   Dye, and he will cover those things.   But we discuss exactly

13   kind of what it is that would be helpful to be covered at the

14   out briefs based on what's happened the month prior.

15   Q.   If you take the -- let's take the last time period of the       04:02PM

16   last two years.   As you look back during the out briefs that

17   you have done, are there any particular issues that come to

18   mind that have been subjects of repeat discussion?

19   A.   Yes.   The mental health watches continues to be a

20   discussion of repeat, or a repeat discussion where we continue      04:02PM

21   to have the same conversation about exactly what the Court

22   order says around what is allowed and what is not allowed.

23        Many of the clinicians feel the need to individualize

24   their notes, which is a great thing.   But sometimes in the

25   individuality, whether or not it meets exactly kind of what was     04:03PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    laid out in the court order makes it difficult.  So if, for

2    instance, on the watches they need to offer a confidential

3    appointment and the individual needs to refuse or you need to

4    see them in a confidential setting, sometimes they end up

5    getting creative with the way they are writing it.  And they          04:03PM

6    will write it, you know, "Inmate requested to be seen in their

7    cell."  So we have told them, I can't give you credit for that.

8    That's not -- you didn't say you offered and they refused.  And

9    they get frustrated and they are like, that's what I meant by

10   that.  I said, well, you didn't write that.  You can't assume        04:03PM

11   that I can assume that we're on the same page.

12          So even today we're still having that same discussion

13   around I need you to use the phrase that the judge has ordered.

14   This is what it means.  Because I can't have you putting me in

15   a position where I have to guess if that meets that, you know,        04:04PM

16   requirement.  So that's been a very frustrating situation, but

17   it's become the topic.  We have had it less so probably in the

18   last two to three months, but frustrating topic.

19   Q.  Now, when you say you have seen phrases and you used the

20   term "creative," do you mean creative in that you had a concern      04:04PM

21   whether or not the information reported was accurate?  What do

22   you mean by using the word "creative"?

23   A.  Well, they will want each note to show that they were

24   individualized.  It's not a cut and paste job.  And so for this

25   individual, they may say that they declined to come out of          04:04PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    their cell.  For these individuals they will indicate that they

2    were not interested in coming out of their cell, all these

3    different ways you can say refused without saying "refused."

4    So what I have asked of the clinicians is please just use the

5    word "refused" if they refused.  I don't need you to come up          04:05PM

6    with unique ways to write that.  We're so used to trying to

7    make things unique that they have tried to find phrases that

8    mean the same thing that shows they are individualizing their

9    notes.

10          And I have explained, that's not what we need in this          04:05PM

11   part of it, which is why the drop-down menu was created so that

12   truly, everybody is on the same page.  If they refused, use

13   that term.  If they didn't refuse, then don't use that term.

14   But I don't need you to try to figure out how to show us that

15   this conversation with this person was different than this          04:05PM

16   conversation.  You can put that in the actual words and put it

17   into quotes.  And that allows you that.

18   Q.  Was your concern when you saw individualized ways of

19   communicating whether the inmate wanted to come out of cell or

20   not problematic because you just didn't know one way or another          04:06PM

21   whether the inmate was offered a confidential setting and then,

22   in fact, refused?

23   A.  I didn't want to be -- I didn't want to find myself in the

24   position of having to defend my subjective understanding of

25   what they wrote.  If this is what we're talking about, if you          04:06PM

1    are saying that you offered this and they refused, just tell me

2    that.  I don't want to have to guess the underlying meaning of

3    inmate requested to remain in their cell when offered a one on

4    one when "requested to remain in cell" is a different phrasing

5    than "refused."  And if they didn't refuse, then don't write      04:06PM

6    that.  If they did refuse, please make sure we're all on the

7    same page because it is really difficult when we've got all

8    these different versions of ways to say that and I'm supposed

9    to subjectively decide whether it meets the standard or not.

10   So that was really challenging.                                   04:07PM

11   Q.  What was the drop-down menu that you spoke about created?

12   A.  That's a really good question.  I believe I would sort of

13   be guessing maybe October of 2017, November.

14   Q.  Whose idea was it to create a drop-down menu, if you know?

15   A.  We had had discussions around the challenges that we were     04:07PM

16   having.  And so I had shared with Corizon that I was struggling

17   with, I need things to be very clear.  I don't want to find

18   myself in a position where I'm using any subjective standards.

19   I need you guys to be clear.  And when you leave it open to

20   that, and sometimes they would just put the inmate's statements  04:07PM

21   into quotes and want me to guess from what they said, you know.

22   He stated, "Nope, I don't want to come out," and that I was

23   supposed to assume that that meant he refused.  I just don't

24   want to find myself in that position so it was a lot easier to

25   have the discussion around, it's helpful if you put things into   04:08PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1   place so that we know we're all on the same page.  If this is

2   what we're talking about, everybody is on the same page.

3   Q.  This drop-down menu, is that part of eOMIS?

4   A.  Yes, it is.

5   Q.  Describe for us what does that drop-down menu look like?        04:08PM

6   Where are you clicking?  When you click the drop-down menu what

7   does it say?

8   A.  So I have not actually put a note into eOMIS since it went

9   live, so I don't actually know what it looks like.  I only know

10  where it ends up on a completed note, which is at the top.  It   04:08PM

11  asks whether or not there was -- the individual was seen in a

12  confidential setting.  I don't know how many options they have

13  to pick from, but I have seen that confidential setting was

14  offered and inmate refused; they were seen in a confidential

15  setting; and I have seen other.  And then under other, they can  04:09PM

16  put whatever it is they need to regarding that.  So there may

17  be more options.  I haven't seen those, though.

18  Q.  Which performance measure or measures does this requirement

19  that an inmate be offered a confidential setting pertain to?

20  A.  It was really focused towards the watches, because that's   04:09PM

21  where we were mostly struggling.  But it's also towards all

22  contacts by the clinicians that could potentially be done cell

23  front.  So if they are doing a segregation visit then we have

24  never counted those if they have not said they were in a

25  confidential setting.  Since the beginning we have always        04:09PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    required that and so there's been a period of time where they

2    have ended up with a finding because they have not written

3    that.  They are seeing them cell front, but don't get credit if

4    they don't indicate that they had offered them to come out and

5    they had refused.  So all contacts for the clinicians.          04:10PM

6    Q.  Are you aware of what the purpose is to require that the

7    inmate be offered the opportunity to come out and see the

8    clinician in a confidential setting versus speaking to the

9    clinician cell front?

10   A.  Yeah.  You get a very different source of information when   04:10PM

11   they come out.  It is very challenging for them to want to

12   share information when they are in their cells, especially if

13   it's around protective issues.  So if they have requested

14   protection, they don't want to talk about that because that

15   gets them into more trouble.  So those are conversations that   04:10PM

16   they would not engage in if you were cell front.  And that

17   makes it really challenging because if you are trying to gather

18   information about how you are doing, they are not going to

19   share a lot of that.

20           Also, doing therapy through a door is not ideal.  So    04:10PM

21   it's the best setting when you can sit down and engage in that

22   level of therapeutic intervention where you are engaged with

23   them and providing that service.

24   Q.  In the time span of the last two years, are there any other

25   issues related to the mental health care performance measures  04:11PM

1    that have come up repeatedly in your complex level out brief?

2    A.   Every X order has come up multiple times in the out briefs.

3    The Corizon staff are very frustrated with not understanding

4    why there is a finding.  And even today we still have this

5    question where they will call me up and say, I'm looking in the    04:11PM

6    file and I did his treatment plan last month.  Why are you

7    dinging me for that?  Why did I pick up a finding?  And I

8    explain, yes, I know you did it last month but it's still a

9    finding this month because last month it was late.

10          And that has been a very challenging concept.  They    04:12PM

11   are very frustrated by that.  They say, well, I have now fixed

12   it.  What is the problem?  And so then they say what do I have

13   to do so that it's not a problem anymore?  And they have been

14   very frustrated by that.  I try to proactively share that piece

15   of it, because I think they are looking at a snapshot in time.    04:12PM

16   They look in the file and they say, is this individual out of

17   compliance or not?  They look in the file and they say no, the

18   individual is not which is different than the way when you are

19   monitoring you say but were they in the past out of compliance.

20          So it's not really how they look in the record, so I    04:12PM

21   continually explain monitoring is a little bit different than

22   when you are looking at a patient trying to decide right now is

23   there a problem with their file.

24   Q.   And the every X days, or X period of time ruling that you

25   speak of, which performance measures on the mental health care    04:12PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    side does this affect?

2    A.   Almost all of them.   It's a high proportion of the mental

3    health performance measures fall into the every X.

4    Q.   Are you speaking of health care performance measures where,

5    for instance, a patient may -- something may be required in the    04:13PM

6    time frame of 90 days or yearly?   Is that where that comes up?

7    A.   Correct.

8    Q.   Now, you and the two monitors that you supervise, let's

9    talk about how you and your team perform the audits of the

10   health care performance measures.    04:13PM

11          How does it occur that inmate fines are selected for a

12   particular performance measure at a specific complex?

13   A.   All of our source documents come in the format of Excel,

14   and so then we employ the randomization process that we have

15   spoken about at length in here.   And so the source document is    04:14PM

16   randomized, and then the first 10 records or more, if you have

17   to eliminate some, are reviewed for each performance measure at

18   each unit for each site.

19   Q.   Are the two monitors that you supervise when they are doing

20   their audits, are they out at the complex when they do their    04:14PM

21   audits, or are they able to do it at the office remotely?

22   A.   They do it at the office remotely.

23   Q.   And but for Performance Measure 99 that you do yourself,

24   the other two monitors are taking care of all the rest, right?

25   A.   That's correct.    04:14PM

1   Q.  And is there any review process that you, yourself, employ

2   to take a second look at whether or not your monitors are

3   accurately reporting their findings?

4   A.  So we had a couple of these things into place, but

5   certainly after the letter we got from the plaintiffs about the          04:15PM

6   July CGARs, which frankly was embarrassing to see that we had

7   made typos such that we did, we have a process now that we

8   have, I believe, that we have corrected most of those issues.

9   So at this point, there's no transcribing of numbers.  It's

10  copy and pasted from one source document to the worksheet that          04:15PM

11  is also in Excel so that nobody is hand typing numbers in.

12  Because the keystroke issue that you can find is one of the

13  easiest mistakes.  And after that process is done and they

14  complete their audits, we have learned a lot about Excel and I

15  have done some research on formulas.  So we have created          04:16PM

16  formulas that we can put the dates into the columns and it will

17  generate out for us a yes or a no to ensure that we're counting

18  our dates apart correctly so that if we have made a mistake and

19  we compare our yeses and nos to -- we're calling it the CGAR

20  checker, then we can check to make sure that we have done that          04:16PM

21  math correctly.

22          And then we have also learned how to create a formula

23  that if you have duplicates then they will get highlighted red

24  so that for those few performance measures that we had issues

25  with duplicates, we are able to eliminate that issue.  So they          04:16PM

1   have put them into, quote, the CGAR checkers, then they send

2   their audits to me.  I then go back through their audits.  I

3   put them back through the CGAR checker to make sure we are all

4   on the same page.  Then I go through each of their performance

5   measures and look for things that don't make sense, things that    04:17PM

6   look like they couldn't possibly be, or there's issues.  And

7   then any performance measure that fails, I want to understand

8   the reason they failed because I usually am in court having to

9   answer why they might have failed.

10          So I go through each of those failures so I fully           04:17PM

11   understand exactly what the problem is and then we're able to

12   hopefully move it forward to not have those issues anymore.  We

13   do each of those layers to try to protect against any sort of

14   continued typos that we may have, and I think it's pretty much

15   fixed the issue.                                                   04:17PM

16   Q.  You said a moment ago that once the two monitors that you

17   work with put their information through this check system that

18   you go back and put it back through the CGAR checker again.

19   What exactly -- what kind of information are you putting

20   through the checker system?                                       04:17PM

21   A.  The two dates of the last events, the two contacts,

22   whatever it may be.  And we have a formula set up for 30 days,

23   one set up for 90, and one set up for 180, and one set up for a

24   year.  And that ensures that none of us are missing that issue

25   at all, that we didn't accidentally think that it was a yes       04:18PM

1    when it was a no or accidentally typed a Y instead of an N

2    because I'm double-checking to make sure their audits are

3    consistent with that.

4    Q.  Now, are you physically re-putting in all the numbers such

5    that you are doing a re-audit, or are you verifying that the        04:18PM

6    information from the source documents that's put into the

7    checker is correct?

8    A.  That's correct.  The latter.  I don't re-audit.  I review

9    their audits.

10   Q.  Now, you also said that you will look to see when you are       04:18PM

11   doing this review, look to see if there's anything that may not

12   make sense.  Can you give us any concrete examples of what you

13   are looking at that might raise a red flag to you if this

14   doesn't make sense?

15   A.  Recently there was one for the watch follow-ups where the       04:19PM

16   individual came off watch.  It was like March 20th.  And then

17   the only watch follow-up date that was in there was in April

18   but it was in the first slot, which is the 24 to 72 hours.  So

19   immediately I can tell, that can't be the 24 to 72 hours

20   because if they came off watch March 20th, you must be talking     04:19PM

21   about their last one.  So my staff member had put that date in

22   the wrong column.  And those are things that are obvious when

23   I'm looking over those CGARs, I can tell that can't be.  That

24   date doesn't work with that.

25           So those are the things that I'm looking for that          04:19PM

1   clearly can't be correct, and so I go back through and ensure

2   what is it that you missed, and it was just they put it in the

3   wrong column so I move it over to the correct column.

4   Q.  You said that you also, when performing your review, will

5   look at any failures.  Do you mean failures as in on a specific   04:20PM

6   performance measure a complex didn't meet or exceed the 85

7   percent, or are you looking at a particular inmate's file that

8   didn't meet compliance?

9   A.  I end up reviewing a lot that didn't meet compliance just

10  to ensure, especially if I'm doing the out brief, I want to be   04:20PM

11  sure I can accurately tell you what the problem was.  Because

12  the clinicians have a lot of pride in what they do, and they

13  get very concerned when they personally have made a mistake.

14  And I would hate to go to an out brief and say, I don't know

15  why there was an error.  And so especially for the sites I'm   04:20PM

16  going to out brief, I review all of those so I can personally

17  talk about well, here's what the issue was.  Here's what was

18  wrong with it, whether it's you saw them late or you didn't

19  document something, whatever that is.

20          But definitely any performance measure that is close   04:21PM

21  to not passing, probably anything below 90, definitely

22  reviewing those, because this month maybe it's 89 percent.  But

23  those problems aren't going to fix themselves if they are

24  unaware of them.  So next month it could be 84 or 82.  So

25  trying to stay on top of those issues.   04:21PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    Q.  In completing your monthly review of the two monitors of

2    the results you look at, do you look to see if there are any

3    findings on the CGAR reports that look atypical for a

4    particular complex?

5    A.  I do look for that, because there's complexes that are          04:21PM

6    consistently meeting the mark, doing amazing, 100 percent or 98

7    percent, and then if I all of a sudden see 86 percent that

8    would be a red flag to me that something has happened.  So yes,

9    maybe you didn't fail, but what is happening that you have lost

10   traction?  So sometimes I won't even wait for the out brief and   04:22PM

11   I will pick up the phone, call the lead, and say what happened

12   last month?  You have lost traction in what you normally do.

13   That's weird.  What's going on?

14          And often times they already know, well, we had, for

15   instance, at Yuma the mental health lead had a collapsed lung.     04:22PM

16   So they already knew they were going to have issues because his

17   caseload for that whole week, his staff, they were, you know,

18   like a little bit out of it and they didn't cover his caseload.

19   So they knew they were going to have some findings.  But we try

20   to catch those as early as possible and say, hey, what's going    04:22PM

21   on with your staff if we see even anything that looks lower

22   than what they are typically at, because you get kind of used

23   to where the complexes fall on their performance measures.

24   They are fairly consistent.

25   Q.  If you see an atypical trend for a particular complex are      04:22PM

1   you interested in drilling down to figure out whether it's a

2   documentation error versus whether there is, perhaps, an issue

3   or a challenge in the actual delivery of care?

4   A.   Yeah.   I think that's a very different solution depending

5   on whether that's a documentation issue or anything else.   They   04:23PM

6   can't create a solution if they don't know the reasons for the

7   failures.   And even if there are individual records that are

8   failures and they are still above 85, they still need to

9   understand what it is that's not meeting the mark.   So that

10  information, I think, is very important to them to be able to   04:23PM

11  ensure compliance throughout time, which is what -- I'm pretty

12  proud of what they do.   They work really hard and they do a

13  great job in providing the care.

14         And they have a lot of pride in what they do, and it's

15  really neat to see the level of engagement.   They come to these   04:23PM

16  meetings and they are excited about what they are doing and

17  they, you know, call their friends up and say, I don't know how

18  well you guys did but my unit, I knocked it out of the park.   I

19  did a great job.   And that pride is necessary.   You have to

20  enjoy your job.   So they have to fully understand what's going   04:24PM

21  on, what's working, what's not.

22  Q.   Now, in your position as the Mental Health Director, if a

23  particular complex is not meeting a performance measure,

24  meeting right now the 85 percent threshold and you are seeing

25  that it's a process issue versus a documentation issue, in your   04:24PM

—6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct—

1    capacity as Mental Health Director, are you taking off your

2    monitoring hat and putting on your director hat and saying we

3    also need to find a solution to the challenge?

4              MS. KENDRICK:  Objection.  Leading.

5              THE COURT:  Sustained.                         04:24PM

6    BY MS. LOVE:

7    Q.  As part of your duties, are you involved in attempting to

8    find solutions to problems or challenges that on the process

9    side may be leading to findings of noncompliance?

10             MS. KENDRICK:  Same objection.                 04:25PM

11             THE COURT:  Overruled.

12             THE WITNESS:  Yes.  I spend a lot of time if it's

13   specific to a unit, or a complex, then I will work with the

14   mental health lead there.  But if it's something that is coming

15   up at more than one complex then we start bringing the mental   04:25PM

16   health leads together and working with Dr. Calcote on solution

17   driven process.  Because sometimes we have to engage operation

18   staff in that, or medical in that.  And so it takes a number of

19   us coming together to understand what the issue is when it's a

20   process issue.                                            04:25PM

21   BY MS. LOVE:

22   Q.  I want to switch gears now and talk to you about the

23   Phoenix complex and the mental health program there.  But first

24   I would like to ask you specifically, do you know who Angela

25   Fischer is?                                               04:25PM

UNITED STATES DISTRICT COURT

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1   A.  Yes, I do.

2   Q.  Who is Angela Fischer?

3   A.  She is in the courtroom, and she was a psych associate at

4   Phoenix for, I think, over a year.

5   Q.  Do you know what position -- she was a psych associate,          04:26PM

6   right?

7   A.  Correct.

8   Q.  So were you aware of what her duties were at the Phoenix

9   complex as a psych associate?

10  A.  I was aware of her general duties when she was assigned at       04:26PM

11  Baker, because when I'm reviewing the records you can see

12  that's the patients that she's seeing.  And then when she was

13  assigned to George, I can see those are the patients she was

14  seeing.

15  Q.  Are you aware whether or not she currently works for            04:26PM

16  Corizon?

17  A.  She does not.

18  Q.  And are you aware of why she no longer works for Corizon?

19  A.  I have not spoken to her about why she is no longer working

20  there.                                                              04:26PM

21  Q.  During the time period that Ms. Fischer worked at the

22  Phoenix complex, did you have any personal interaction with

23  her?

24  A.  Yes, I did.

25  Q.  In the course of performing monitoring duties?                  04:26PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1   A.  That is correct.

2   Q.  And did you have -- and what were the contexts of the

3   personal interactions?  Are we talking in person?  Phone calls?

4   E-mails?  All of the above?

5   A.  All of the above, yeah.                                    04:27PM

6   Q.  You spoke a moment ago in general in which you were

7   expressing your excitement over saying that clinicians have

8   pride in what they do.

9   A.  Yes.

10  Q.  Did you find Ms. Fischer to be one of those clinicians that  04:27PM

11  had pride in what she did?

12  A.  Yes, I did.  She had a lot of pride in the treatment that

13  she was providing, and often what I was sharing with her was

14  the level of detail in her notes was substantial and incredibly

15  helpful.  And anybody could pick up one of those records and    04:27PM

16  know what was going on with that individual.

17  Q.  And if, in your review of any notes as to other psych

18  associates at the Phoenix complex when Ms. Fischer worked

19  there, would you put her in the category of on the better side

20  of the detailed notes in comparison to others?                 04:28PM

21  A.  Yes, I would.  I recommended that other staff look at some

22  files she had done to see the level of detail she was able to

23  get into those notes around the treatment she was providing,

24  their responses to that treatment, and sort of the plan going

25  forward.                                                        04:28PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    Q.  And when you conducted -- and the out briefs that you do on

2    a monthly basis, Phoenix is one of those complexes, correct?

3    A.  That is correct.

4    Q.  And during the time period that Ms. Fischer worked at the

5    Phoenix complex, did she attend these monthly out brief          04:28PM

6    meetings that you conducted?

7    A.  She attended most of them, I think.  There might have been

8    some when she was on vacation or something else, but she

9    attended most of them.

10   Q.  Did you find Ms. Fischer to be somebody who would            04:28PM

11   participate in those meetings?

12   A.  Yes.  And she was receptive to the information and engaged

13   in the discussion that we would be having, yeah.

14   Q.  Is there a Mental Health Technical Manual that you utilize,

15   you and the two persons that you supervise, utilize in the       04:29PM

16   performance of your job duties?

17   A.  Yes, there is.

18   Q.  What is the Mental Health Technical Manual?

19   A.  It is a manual for the practitioners, for the providers and

20   clinicians that relate directly to how to do something, what it  04:29PM

21   should look like.  It's the technical information that's behind

22   sort of the care exactly sort of how things should be

23   documented; watches, for instance, how to cancel them out, how

24   to transition them from a 10 to a 30.  That stuff is in a

25   technical manual.                                                04:29PM

1   Q.  Is the technical manual that you utilized derived from the

2   health care performance measures that are part of the

3   stipulation in this case?

4   A.  Yes.  So when we were setting up the agreement, the

5   performance measures came directly out of the standards that we   04:30PM

6   had in care regarding how long between the times you can see

7   the people.  So those standards were already set to there and

8   then the mental health technical manual simply adds on to that

9   about how to do that.

10   Q.  Do you or the two monitors that work with you provide the   04:30PM

11   mental health technical manual to the Corizon folks that work

12   in the provision of mental health health care to the inmate

13   population?

14   A.  Whenever it's requested, we will send that.  They do have

15   one at every site, printed out at the site.  But I have had a   04:30PM

16   number of staff, Ms. Fischer is one of them, asked to have that

17   sent over to them.  So I did e-mail that to Ms. Fischer.

18   Q.  And is it a requirement, to your knowledge, that each site

19   have a copy of the Mental Health Technical Manual?

20   A.  A requirement?  I don't know that it's written down   04:31PM

21   anywhere as a requirement.  But it definitely would be

22   something that would be located in their administration area

23   for sure.

24   Q.  And to your knowledge, and in your own personal experience,

25   how many people, if you know, from Corizon have requested that   04:31PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1   you personally provide them with a copy of the Mental Health

2   Technical Manual?

3   A.   I have probably been requested maybe three times.  I think

4   most of them have it.  It is something that I have been told is

5   provided to them when they come on board.  It's one of the          04:31PM

6   on-boarding documents.  So I don't get that many requests for

7   them, but I have gotten them.

8   Q.   Is the Mental Health Technical Manual something that you

9   utilize or refer to when you conduct your monthly on site

10  debriefs?                                                          04:32PM

11  A.   We can't -- if questions come up, I will end up referring

12  to it so there's things that are not in the performance

13  measures, for instance, like a hunger strike.  A hunger strike

14  is not one of our performance measures but it's in the

15  technical manual so those discussions can come up related to       04:32PM

16  other issues on top of that.  But things like how to cancel a

17  watch, I would refer them back to the technical manual that has

18  these steps written out as opposed to the performance measure

19  that just simply says that you need to be seen daily.  It

20  doesn't have anything about the steps.                             04:32PM

21            So the technical manual is what assists them in

22  exactly knowing what they have to do.

23  Q.   So is it fair to say that the performance measures -- and

24  this is very general -- but the performance measures tell

25  Corizon mental health team member what has to happen, but the      04:32PM

1   Mental Health Technical Manual tells them how to do it?

2   A.  Exactly.  Yeah.  It gives you the step-by-step as to what

3   you need to do, not simply what the standard of time frames.

4   Those performance measures tend to be mostly just time frames:

5   Did this happen within this time frame, which is not exactly          04:33PM

6   how you do it.  So the technical manual gives you the steps you

7   need to know how to do your job, which may not affect your

8   performance measure at all but it's part of your daily duties

9   of figuring out how to do your job.

10  Q.  If you could turn to, hopefully, in your stack behind you         04:33PM

11  or in front of you defendants' Exhibit Number 705.

12          MS. KENDRICK:  Your Honor, plaintiffs object to the

13  use of Exhibit 705.  It was not provided to us by the Court's

14  ordered deadline of Saturday at 5 p.m.  It was provided to us

15  this morning.                                                          04:34PM

16          THE COURT:  Let me take a look at it, please.

17          I can't tell what it is.

18          MS. LOVE:  Yes, Your Honor.  Ms. Kendrick is correct.

19  I did hand them a copy of this this morning.  I realize that

20  inadvertently it did not make the exhibit list per my review.         04:34PM

21  What this is, it's simply an e-mail from Dr. Taylor to Ms.

22  Fischer enclosing the Mental Health Technical Manual.

23          THE COURT:  So simple it seems, I wonder, Ms.

24  Kendrick, what the prejudice is.

25          MS. KENDRICK:  Well, there's no attachment so, I mean,         04:35PM

1   we're just taking the avowal of counsel that the technical

2   manual was attached to it.  So again, it appears that it may be

3   incomplete.  It was late and it didn't comply with the Court's

4   order.

5               THE COURT:  We'll hold the objection in abeyance to          04:35PM

6   see whether or not there's any prejudice that develops from

7   this inadvertent late disclosure.

8   BY MS. LOVE:

9   Q.  Dr. Taylor, do you recognize the document before you at

10  Exhibit Number 705?                                                      04:35PM

11  A.  Yes, I do.

12  Q.  What is it?

13  A.  It is my e-mail to Ms. Fischer sending her the Mental

14  Health Technical Manual.  She had requested that during one of

15  our out briefs, had asked if I could e-mail that over to her.            04:35PM

16  So I did, and this is her response of "Thanks."

17  Q.  And how do we know from reading this e-mail that what you

18  indeed sent to Ms. Fischer was the Mental Health Technical

19  Manual?

20  A.  So the subject line says MHTM, which is Mental Health                04:36PM

21  Technical Manual.  And I imagine if I didn't attach something

22  she probably would have said you forgot to attach your

23  attachment as opposed to "thanks."

24  Q.  Do you, as you sit here today, specifically recall that Ms.

25  Fischer asked you for the Mental Health Technical Manual and             04:36PM

1    you sent it to her?

2    A.  Yes, I do recall that since I don't get that many requests.

3          MS. LOVE:  Defendants move for admission of Exhibit

4    705.

5          THE COURT:  Are you sticking with the objection?          04:36PM

6          MS. KENDRICK:  No, Your Honor.

7          THE COURT:  It will be received.

8    BY MS. LOVE:

9    Q.  There's also a monitoring guide in this case that sets

10   forth what?                                                      04:37PM

11   A.  That is a step by step instruction as to how you monitor

12   each performance measure; what's the source document, what are

13   the steps to determine compliance or lack thereof.

14   Q.  And to your knowledge, is the monitoring guide provided to

15   the Corizon employees that are involved in the provision of     04:37PM

16   mental health care to the inmate population?

17   A.  I believe they can ask for it.  I have never been asked for

18   it.  I have been asked for them -- I have been asked to explain

19   it verbally.  But I have never been asked to e-mail it to

20   anybody.                                                        04:37PM

21   Q.  Do you know whether or not there is a reason why the

22   monitoring guide is not provided to the Corizon employees that

23   are involved in the provision of mental health care to the

24   inmate population?

25   A.  I honestly don't know that it would be that helpful to      04:38PM

1    them.  I think the interaction in person is a lot more helpful.

2    Unfortunately, some of those have been written with a lot of

3    jargon, you know.  No offense you get attorneys involved and

4    they end up with a lot of jargon in there that doesn't

5    necessarily make sense.  And so I don't know that anybody has          04:38PM

6    suggested that they have found that helpful.  And so instead,

7    having just an in-person conversation regarding, hey, this is

8    why this specific one went out of compliance.  Well, here's why

9    it is.  Here's what the rule is.  Here's where you didn't meet

10   the rule as opposed to Step 1, I pull from this source document        04:38PM

11   and then I look into this file then I look into that and I

12   compare these two.  And if it's no more than 30 days before

13   this date, no more than 30 days after this date, it's out of

14   compliance.  That starts to get confusing, I think.

15          So that may be why it's not asked for.  If anybody did          04:39PM

16   ask for it, we would send it over.  It's not any sort of

17   secret.

18   Q.  In the course of performing your monitoring duties as part

19   of this case, have you ever had a Corizon employee ask you,

20   hey, can I sit down with you while either you or the members of        04:39PM

21   your team actually audit to see how that is occurring?

22   A.  That has happened.  We have had a couple of the -- I think

23   they call them compliance monitors.  I may have their

24   terminology wrong.  But they had hired a number of compliance

25   monitors to oversee kind of that, and they ask to sit down and        04:39PM

1    watch us monitor certain performance measures to better

2    understand it.  I have had some leads ask me if they can sit

3    and watch.  Obviously they've got a lot to do so that's not

4    been a lot of time, maybe a couple hours but just to sort of

5    see what does your source document look like.  Where are you          04:40PM

6    looking.  What are you doing so that I can better show you what

7    we need to do.

8    Q.  What is a mental health lead?

9    A.  Each of the complexes that are considered corridor,

10   everything except for Winslow, Safford, and Douglas, has an          04:40PM

11   assigned either a master's level clinician or a psychologist

12   whose job is to -- they're basically the Mental Health Director

13   for that complex as opposed to for the state.  So they manage

14   the mental health issues that arise, staffing issues, making

15   sure that people are assigned to certain units, that they are        04:40PM

16   all covered.  Many of them will communicate with the regional

17   office if there are issues.  So they are kind of like the point

18   of contact at each site.

19   Q.  Are you aware of what custody levels are incarcerated at

20   the Phoenix complex?                                                 04:40PM

21   A.  Yes, I am.

22   Q.  What custody levels?

23   A.  So all custody levels can be assigned there.  There are

24   facilities that have -- or there's units that have designations

25   that their custody level is not as important, let's say.  So,        04:41PM

1   for instance, reception, it covers all levels because some of

2   them haven't been classified yet.  So you could be a medium

3   custody, minimum custody, maximum custody and be at the

4   reception center.

5          Baker ward is designated as max custody, although you          04:41PM

6   could be a medium custody individual who is there where the

7   facility, the unit, is max custody.  Flamenco, which covers

8   John, King, Ida, George, and the watch area is close custody

9   and then MTU or Aspen is medium custody.

10  Q.  When you used the phrase "reception," is that also -- are          04:41PM

11  you speaking of the same operations as earlier we were using

12  the phrase intake?

13  A.  That is correct.  It's been a harder transition for me to

14  use the term that I think we have all agreed on is calling it

15  reception.  Yes.                                                       04:42PM

16  Q.  So if we interchangeably use the terms "reception" and

17  "intake," we're talking about the same thing?

18  A.  That is correct.

19  Q.  Is that the operations side of the Phoenix complex where

20  inmates who are new to the system are processed into the               04:42PM

21  Arizona Department of Corrections?

22  A.  That is correct.

23  Q.  Is this for both males and females?

24  A.  Just for males.

25  Q.  So anyone coming into the system is going to go to the             04:42PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1  Phoenix complex first, is that correct?

2  A.  If they are a new admit.  But if they are a parole violator

3  then not necessarily.

4  Q.  Is there any unique aspect to the Phoenix complex with

5  regards to the provision of mental health care to the inmate          04:42PM

6  population?

7  A.  Baker ward and Flamenco are designated as our licensed

8  behavioral health beds.  So the Department of Health Services

9  licenses the beds that are located in those facilities.

10  Q.  When you say they are licensed beds, does that mean those      04:43PM

11  inmates are in clinical in-patient status?

12  A.  That is correct.  And DHS, Department of Health Services,

13  conducts an audit every year to ensure the continued licensing

14  of those beds.

15  Q.  Are you aware of how many approximately licensed beds the      04:43PM

16  Phoenix complex has total?

17  A.  I believe there are just over 150 licensed beds.  We have

18  found it very challenging to use all of the licensed beds.  I'm

19  not sure that it was -- when it was set up a while ago, I'm not

20  sure that kind of the concept was thought well through and it      04:44PM

21  was set up a long time ago.  But Baker ward specifically has

22  some cells that have six beds in there.  And if you are at the

23  level that you are in Baker ward, then being in a cell with six

24  other individuals is likely beyond what they are able to do at

25  that time.  And so we have not been able to utilize all of the      04:44PM

1    beds that are designated.

2           So the census is typically closer to about 90 to 100

3    month by month at Phoenix for in-patient out of the 150-plus

4    beds.

5    Q.  When you were speaking of the challenge as to Baker ward      04:44PM

6    and the example of six beds in one cell, is that because Baker

7    can house maximum custody inmates?

8    A.  Maximum custody, individuals who may not have another

9    individual that -- they are specialty population.  For

10   instance, a death row individual could not be housed with a      04:45PM

11   general population individual in the same cell.  And so if we

12   ended up, let's say, with a death row individual they would

13   need to be housed alone so if you have got a cell with six beds

14   you have got five you are not utilizing.

15   Q.  If you could turn to Exhibit Number 677.                      04:45PM

16          Do you recognize the document at defendants' Exhibit

17   677?

18   A.  Yes, I do.

19   Q.  What is this document?

20   A.  This is the statistical summary of all the mental health     04:45PM

21   levels.  So it is not an AIMS report that is run by any of us.

22   In fact, I don't know how to run it.  But it is automatically

23   run by the system and placed into a folder every Monday.

24   Q.  And is this statistical summary a document that you use in

25   the course and scope of your duties as the mental health         04:46PM

1   director?

2   A.   Yes, I do.

3   Q.   What is the date of this statistical summary?

4   A.   This is June 4th of 2018.

5   Q.   What do you use this statistical summary for?                    04:46PM

6   A.   Most commonly, I use it for just on the surface you can

7   tell if there are some anomalies as far as a mental health

8   score.  For instance, if Yuma has an MH-4, an inmate designated

9   as MH-4 out in Yuma, I know there's not a residential program

10  out there.  So I know that there's an individual with their      04:46PM

11  score that has not been updated since they were discharged from

12  a residential program.

13          So I routinely will take this document, highlight the

14  anomalies that stand out, and then I send them out to the

15  mental health leads and ask them -- because it doesn't have the  04:47PM

16  ADC number, so I don't know who the inmates are but I ask them

17  to look them up and determine if there are scores that are too

18  low, for instance, in the BMU if there is somebody who is

19  designated as an MH-2 in our behavioral management program, I

20  know they have to be an MH-4.  So I highlight any of those that  04:47PM

21  couldn't possibly be and then ask them to review those.

22  Q.   If you look at Page 4 of Exhibit Number 677, and first I

23  will ask you, is this summary, statistical summary, broken down

24  by prison complex?

25  A.   That is correct.                                             04:47PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1  Q.  And then also broken down by the mental health scores 5, 4,

2  3, 2, and 1?

3  A.  That is correct.

4  Q.  So if you -- on Page 4 of Exhibit 677, does it show the

5  Phoenix complex?                                                04:48PM

6  A.  Yes, it does.

7  Q.  And does it show that as of June 4th of 2018 at Phoenix

8  there were 89 inmates with a mental health score of 5?

9  A.  That is correct.

10 Q.  And then it's also then within Phoenix complex broken down  04:48PM

11 by unit and ward?

12 A.  That's correct.

13 Q.  If you look through the other pages of Exhibit 677, and

14 it's a total of six pages, do you see whether or not there are

15 any inmates with a mental health score of 5 located at any      04:48PM

16 other complexes besides Phoenix?

17 A.  No.  All 89 of them are located at the Phoenix complex.

18 Q.  Is there a reason why?

19 A.  That is the only location we have that has in-patient, and

20 an MH-5 is -- you can only be an MH-5 if you are admitted to an  04:48PM

21 in-patient program.

22 Q.  Now, at the Phoenix complex we talked about intake slash

23 reception, correct?

24 A.  Yes.

25 Q.  And when you worked at Phoenix, you also worked in, at      04:49PM

1   times, in intake, correct?

2   A.  Yes, I did.

3   Q.  And as a -- were you working as a psych associate when you

4   worked at Phoenix or a psychologist?

5   A.  A psych associate.                                          04:49PM

6   Q.  And what did you do?  What were your duties as a psych

7   associate when you worked in intake or reception at Phoenix?

8   A.  I was assigned to complete the intakes that came in for

9   that day, which usually there was around 60 would probably be

10  the average, somewhere would range 50 to 70 to 80 or -- I mean,  04:50PM

11  there's kind of a range.  But probably around 50 to 60 per day

12  that I would complete at intake on the first half of the day

13  and then I would finish the second half of the day on John

14  ward.

15  Q.  What specifically would you do?                            04:50PM

16          MS. KENDRICK:  Your Honor, I'm going to object to this

17  line of testifying.  Dr. Taylor testified she worked more than

18  13 years ago at Phoenix, so what she did working at Phoenix

19  prior to the settlement of the case or Corizon taking over is

20  not relevant to the matter at hand.                            04:50PM

21          THE COURT:  I was wondering at the same time a similar

22  question about where all this was going.  What can you tell me

23  about that?

24          MS. LOVE:  Well, I can -- I will ask a couple more

25  questions of Dr. Taylor as to whether or not she knows whether  04:50PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1  or not the intake duties have changed, and then we are going to

2  talk about allegations that Ms. Fischer made in this case as to

3  her ability to process the intakes on a daily basis and

4  compared to Dr. Taylor's own personal experience as well as

5  what she knows the course and scope of the duties to be.          04:51PM

6          THE COURT:  All right.  You may continue.

7  BY MS. LOVE:

8  Q.  Are you aware of what the current duties are of the psych

9  associate at the Phoenix complex that performs intake?

10  A.  Yes, I am.                                                   04:51PM

11  Q.  And how do you know that?

12  A.  So the mental health intake form has had very little

13  modification over the years.  There's been an additional

14  question added to it at the -- to be able to comply with PREA

15  but it is the same standard set of questions that the National  04:51PM

16  Health -- I'm sorry -- NCCHC identifies as the questions you

17  would want to go through at an intake facility.  And so it's

18  the form that we have created, and it's pretty standard.

19  Q.  What is PREA?

20  A.  The Prison Rape Elimination Act.                            04:52PM

21  Q.  And are you aware of how long the average stay is at the

22  Phoenix complex for inmates who are coming through reception

23  before they are sent out to complex, to another complex?

24  A.  Yes.  The goal is for them to leave the Phoenix complex

25  within three to five days.  And so operations staff needs those 04:52PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1    individuals to move to their facility that they are going to be

2    housed at fairly quickly.  And so -- because right behind those

3    individuals is another set coming in from county jail.

4    Q.  Are you aware of in the last year on average how many

5    inmates are coming through reception on a daily basis at the          04:52PM

6    Phoenix complex?

7    A.  Yes.  I recently had to look into that to make sure that it

8    was a couple months ago trying to understand exactly what --

9    are we increasing in size, decreasing?  Because our numbers

10   were starting to decrease across the state.  So we received          04:53PM

11   about 14,000 intakes through the Phoenix complex.

12   Q.  If you would take a look for me at Exhibit Number 679.  Do

13   you have that in front of you?

14   A.  Yes, I do.

15   Q.  Do you recognize what Exhibit Number 679 is?                     04:53PM

16   A.  Yes.  This is the mental health intake assessment I was

17   referring to, and it appears to be last updated in 2012.

18   Q.  Are you aware of whether or not this is the mental -- the

19   initial mental health assessment form that is currently used at

20   the Phoenix complex?                                                 04:54PM

21   A.  It is the paper version.  They have converted it into

22   eOMIS, into an electronic version that they can click the same

23   button.

24   Q.  Do you know whether or not this same form was in use in

25   2017?                                                                04:54PM

6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-Taylor-Direct

1  A.  Yes, it was.

2  Q.  And a psych associate who is performing an initial mental

3  health assessment of an incoming inmate, how do they use this

4  form, to your knowledge?

5  A.  So you go through the questions asking them a yes or no,          04:54PM

6  and if they answer no to some of the questions you don't have

7  to ask the follow-up questions.  For instance, if they say that

8  they have never been treated for mental health issues, you

9  don't need to go on to ask if they have received counseling or

10 psychotropic medications.                                            04:55PM

11 Q.  Are you aware, based upon your personal experience or your

12 duties in -- performance of your duties as the Mental Health

13 Director how long it generally takes to go through this initial

14 mental health assessment with an inmate who would be considered

15 an MH-1?                                                             04:55PM

16        MS. KENDRICK:  Objection.  Foundation.

17        THE COURT:  Overruled.

18        THE WITNESS:  Yes.  An MH-1 indicates that they do not

19 have a history of mental health services.  And so this form is

20 fairly easy to get through.  I would say max about two minutes     04:55PM

21 because mostly the only thing that they would say yes to is the

22 substance use.  The rest of that would not be relevant to them.

23 They don't have the mental health history.  They have not tried

24 to hurt themselves.  They don't have a history of significant

25 depression, those sorts of things.  And so the form's fairly       04:55PM

1    quickly gone through when they are an MH-1.

2    BY MS. LOVE:

3    Q.  And what is the baseline purpose of conducting an initial

4    mental health assessment of an inmate coming through reception?

5    A.  We need to determine what level of mental health care that                04:56PM

6    they need because that determines where we place them in all of

7    our facilities.  And so our MH-3s, for example, cannot go to

8    our non-corridors, so we need to make sure this assessment is

9    accurate as to what are your current needs, what are your prior

10   needs, and make sure we make the best determination based on                 04:56PM

11   that by classifying you with a mental health score.

12   Q.  During this initial mental health assessment, is the person

13   performing the assessment coming up with a treatment plan for

14   the patient if a treatment plan would be indicated by the

15   score?                                                                        04:56PM

16   A.  At most, they could do a very baseline, just based on what

17   the individual was telling them, hey, out in the community I

18   was diagnosed with anxiety.  So at most, that would be them

19   creating a treatment plan that just simply related that

20   information.  But as far as coming up with an actual --                       04:57PM

21   developing a treatment plan would not be something that was

22   completed as part of an intake assessment.

23   Q.  Based upon your experience and your knowledge derived from

24   your duties as mental health director, do you know or do you

25   have an estimate of how long it may take to do an initial                     04:57PM

1   mental health assessment on an inmate who would be considered

2   an MH-2?

3   A.  That one would likely take a little bit longer, maybe

4   around at max like five minutes; again, usually have very

5   remote histories of services that they have received out in the        04:57PM

6   community, harm to themselves out, you know, when -- many of

7   them they will say, well, when I was 10 I was diagnosed with

8   ADHD and was on Ritalin.  So we will still classify those

9   individuals as an MH-2 because that's prior mental health

10  history.  But if they have anything significant about what they        04:58PM

11  are sharing about hospitalizations and those are much more

12  recent, they are not going to be designated as a 2.

13  Q.  So would it be fair to say that as someone who is

14  ultimately, their score is higher like MH-3, MH-4, or MH-5,

15  it's going to take longer to do the initial assessment because        04:58PM

16  of the history that the particular inmate may be providing to

17  you?

18  A.  That is correct, yes.

19  Q.  During the mental health assessment is it available to the

20  person who is doing the assessment records from, you know,             04:58PM

21  coming from -- incoming from a county jail or any prior history

22  of the inmates?

23  A.  There's a transfer of summary from the county jails that

24  has very basic information whether or not they are on

25  medications from county jail, and sometimes it will indicate           04:58PM

1   whether they have a history of self-harm.  I have seen a couple

2   that they will say whether or not they are SMI, but we luckily

3   have a system that automatically updates from the community and

4   tells us that.  But it's one page, sometimes three pages, that

5   comes over with basic information from the county jail.      04:59PM

6           THE COURT:  Ms. Love, how many minutes more do you

7   think you have with Dr. Taylor?

8           MS. LOVE:  Probably total examination, maybe about an

9   hour left.

10          THE COURT:  Okay.  Dr. Taylor, we'll start with that   04:59PM

11   at 9 a.m. tomorrow morning.

12          THE WITNESS:  Wonderful.

13          THE COURT:  Thank you very much.

14          Mr. Struck.

15          MR. STRUCK:  Yes, Your Honor.  I did want to alert the  04:59PM

16   Court and counsel with respect to scheduling.  There are a

17   couple witnesses that are simply not going to be available, Dr.

18   Kahn being one of them.  So we're going to take up your

19   suggestion that we just provide a declaration.  Dr. E. Taylor

20   is going to be out of town and not available.  And there were a  05:00PM

21   couple witnesses that we decided that you already indicated you

22   don't really need to hear it.

23          So as a result, we're redoing some of the schedule,

24   mostly of the Corizon people.  And right now, we have the same

25   witnesses going tomorrow, Dr. Taylor and Vanessa Headstream.    05:00PM

1    But on Thursday, ADON Meza and Richard Watts are available, and

2    we're trying to see if Sara Neese, who doesn't work for Corizon

3    any longer, we don't know if she's going to be available on

4    Thursday or not.  But that's our goal.

5            And there will only be one other witness, and that        05:00PM

6    would be Lori Johnson out of Yuma.  We're told she's only

7    available on Monday, but we're trying to get her here as well

8    on Thursday.  So there's a possibility that we could complete

9    it this week.  At latest we would be done Monday morning unless

10   for whatever reason these end up going longer than expected.    05:01PM

11           So I think --

12           THE COURT:  I appreciate that heads up.

13           MR. STRUCK:  We have, I think, Monday, Wednesday, and

14   Thursday next week.  So Wednesday and Thursday we probably

15   won't need to have testimony.  And I know the plaintiffs are    05:01PM

16   interested in touring as is the Court.  So I just wanted to

17   give everybody a heads up.

18           THE COURT:  All right.  Good.

19           MR. FATHI:  Thank you, Your Honor.  May I ask a couple

20   of clarifying questions?                                        05:01PM

21           THE COURT:  Of course.  Did you want to handle those

22   off the record?

23           MR. FATHI:  Depending on the answer we may require the

24   Court.

25           Deputy Warden Eccles will not be testifying?            05:01PM

-6-12-18-CV 12-601-Parsons v Ryan-Evidentiary Hearing-

1          MR. STRUCK:  That's correct.

2          MR. FATHI:  And the unnamed ADC employee regarding

3    providing training to Ms. Fischer will not be testifying?

4          MR. STRUCK:  Those are witnesses that --

5          THE COURT:  I said I don't need to hear.                05:02PM

6          MR. STRUCK:  Right.  We may submit an offer of proof

7    with a declaration, but they are not going to be testifying.

8          MR. FATHI:  Thank you, Your Honor.

9          THE COURT:  Okay.  Thank you.  Thank you all.

10          (Proceeding recessed at 5:02 p.m.)                     05:02PM

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                                C E R T I F I C A T E

8

9              I, LAURIE A. ADAMS, do hereby certify that I am duly

10   appointed and qualified to act as Official Court Reporter for

11   the United States District Court for the District of Arizona.

12              I FURTHER CERTIFY that the foregoing pages constitute

13   a full, true, and accurate transcript of all of that portion of

14   the proceedings contained herein, had in the above-entitled

15   cause on the date specified therein, and that said transcript

16   was prepared under my direction and control.

17              DATED at Phoenix, Arizona, this 13th day of June 2018.

18

19                                  s/Laurie A. Adams

20                                  _____
                                    Laurie A. Adams, RMR, CRR

21

22

23

24

25