**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No.  CV-12-0601-PHX-DKD |
| Plaintiffs, | |
| v. | **ORDER AND JUDGMENT OF CIVIL CONTEMPT** |
| Charles L. Ryan, et al., | |
| Defendants. | |

In October 2014, the parties settled this case and signed a Stipulation to end the litigation.  The Court approved the settlement and Stipulation after a fairness hearing in February 2015.  (Doc. 1185 at 16; Doc. 1455)  Under the Stipulation, Defendants agreed to provide health care to the Class Members as measured by 103 Performance Measures. (Doc. 1185)

In April 2016, after Defendants failed to meet many Performance Measures, Plaintiffs filed their first Motion to Enforce the Stipulation.  (Doc. 1555)  At the May 2016 Status Conference, the Court ordered Defendants to submit a responsive remediation plan ("First Remediation Plan").  (Docs. 1582, 1583, 1754)  The Court thereafter informed Defendants of its concerns about the efficacy of the First Remediation Plan but, in deference to the Stipulation's framework, adopted it nonetheless.  (Doc. 1619)

In November 2016, after three months under the First Remediation Plan, the Court "'determine[d] that the Defendants' [First Remediation] plan did not remedy the deficiencies' for the First Non-Compliant PMs. (Stipulation at ¶ 36)."  (Doc. 1754)  Citing to the Stipulation's acknowledgment that "[t]he Court has 'the power to enforce this Stipulation through all remedies provided by law,'" the Court ordered Defendants "to use the health care services in the community to ensure compliance with the" Performance Measures covered by the First Remediation Plan."  ("Outside Provider Order") (Doc. 1754)  The Court noted that "the current data show that Defendants have not been able to meet the Performance Measures by using their current procedures or by adopting the First Remediation Plan."  (Doc. 1754)  The Court further explained that it had "considered and rejected requiring the Defendants to submit a revised plan because of its concerns, expressed earlier on the record, about Defendants' grasp of the problem at hand, the failure, abject in some cases, of its first remediation plan to deliver compliance, and the health and safety danger posed by continued failures to meet the Performance Measures."

In May 2017, Defendant Pratt testified that he did not know of any instances of compliance with the Outside Provider Order.  (Doc. 2071 at 742:1-4)

The Court continued to conduct monthly status conferences with the parties. These monthly status conferences were often lengthy and constituted the Court's efforts to understand the impediments to compliance and to prompt Defendants to meet their obligations under the Stipulation.  The centerpiece of the status conferences, as with the Stipulation, was (and is) Defendants' compliance with the Stipulation as measured by the CGAR (Code Green Amber Red) results.  The CGARs are the monthly report card on Defendants' performance under the Stipulation.  For many of the PM/locations, particularly PMs addressing critical components of inmates' healthcare, compliance remained unattainable.

On June 14, 2017, the Court informed Defendants that, effective immediately, every single failure to comply with certain performance measures at certain prisons

("OSC PMs") would result in an order to show cause as to why a $1,000 fine should not be imposed.  (Doc. 2124)  Based on Plaintiffs' suggestion that Defendants should have time to cure their ongoing failure to comply with the Stipulation, the Court held off until October 2017 to enter its Order "that, effective immediately, Defendants shall comply" with specific performance measures at specified prisons "for every class member" ("OSC Order").  (Doc. 2373 at 3)  The October 2017 Order required Defendants to "file a list of every instance of non-compliance with this Order during December 2017" by Friday, January 5, 2018.  At the November 2017 Status Hearing, the Court added Performance Measure 52 at Eyman.  (Doc. 2456)   An order to show cause hearing was set for Tuesday, January 9, 2018.  (Doc. 2373 at 4)

Defendants requested and received several extensions for submitting the list of every instance of non-compliance (the "OSC List") and for holding the show cause hearing.  (Doc. 2456, 2526, 2605, 2620, 2640)  As part of these extension requests, Defendants informed the Court—for the first time—that there was no system for collecting real time data on compliance with any performance measure covered by the Stipulation.  Defendants submitted a partial OSC List but, without explanation or warning, did not timely comply with the Court's OSC Order for PM 54 at Eyman.  (Doc. 2583)  Subsequently, Defendants filed multiple revised OSC Lists.  (Doc. 2595, 2648, 2662, 2786, 2812)

The Court heard testimony on March 26, March 27, and April 10, 2018, from the following witnesses:  Arizona Department of Corrections Director Charles Ryan, Deputy Director Richard Pratt, Division Director Carson McWilliams, Dr. David Robertson, and William Upton.  (Docs. 2689-1 at 5, 2769, 2770, 2724)   Mr. Pratt has primary responsibility to ensure compliance with the Stipulation's performance measures.  (Doc. 2769 at 48)  Mr. McWilliams is in charge of prison operations.  (Doc. 2724 at 167)  Dr. Robertson works as a physician monitor in ADC's Monitoring Bureau.  (Doc. 2671 at 87)  Mr. Upton is a member of the Plaintiff class.  (Doc. 2671 at 60)

At the conclusion of testimony, Defendants informed the Court that they were re-reviewing the OSC Lists.  (Doc. 2782 at 136-139)  The parties agreed that Defendants would provide the persons most knowledgeable about the procedure used to compile the OSC Lists.  (Doc. 2782 at 148-149)  Because counsel did not timely inform the Court about witness availability, Defendants filed declarations instead.  (Docs. 2807 at 92-93; 2808; 2809)

**LEGAL STANDARD FOR CIVIL CONTEMPT**

The Parties' Stipulation empowered the Court to enforce it "through all remedies provided by law" with two exceptions not relevant here.  (Doc. 1185 ¶ 36)  Thus the Court's remedial power necessarily includes civil contempt proceedings.  *See* 18 U.S.C. § 401(3) ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as [. . .] [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."); *Spallone v. United States*, 493 U.S. 265, 276 (1990) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt") (quotation marks and citation omitted).

Before finding civil contempt, a court must determine by clear and convincing evidence that:  (1) a valid court order exists that is "specific and definite" (*Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989)); (2) the party had knowledge of the order, and notice of and an opportunity to be heard about the alleged noncompliance (*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999)); and (3) the party failed to take "*all* reasonable steps to comply with the order."  *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (emphasis in original).

Civil contempt "need not be willful, and there is no good faith exception to the requirement of obedience to a court order."  *In Re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Motion Picture Ass'n of Am.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotation marks and citation omitted).  Should a party seek to defend against a contempt

finding by arguing inability to comply, it must show "categorically and in detail" why it is unable to comply. *N.L.R.B. v. Trans Ocean Export Packing, Inc*., 473 F.2d 612, 616 (9th Cir. 1973).

## FINDINGS OF FACT

To show that they had taken all reasonable measures, Defendants presented testimony about their engagement with the State's prisoner health care provider Corizon and their efforts with Performance Measure 35, the only Performance Measure on the OSC List that ADC has not delegated to Corizon.

### **ADC's Oversight of Corizon**

### **Written Demands**

(1)     Defendants have chosen to contract with a third-party to provide Plaintiffs with heath care and awarded that contract to Corizon in 2013.  (Doc. 2770 at 61-62, Ex. 99, 103)

(2)     Since the OSC Order was issued, ADC sent at least six letters to Corizon about its lack of compliance.  (Doc. 2770 at 181-182, 199-201; Exs. 18, 30, 35, 36, 87, 193)

(3)     As a result of the OSC Order, ADC's Monitoring Bureau reclassified one staff position from clerical duties to a liaison position.  (Doc. 2770 at 155)  In addition, ADC sent several letters to Corizon demanding performance.  (Doc. 2770 at 108, 114; Exs. 20, 30, 31, 33, 97)

(4)     In February or March 2018, ADC began requiring Corizon to provide additional details about staffing efforts because "additional staff were required to fill a current gap."  (Doc. 2770 at 112, 208:12-13)  Director Ryan testified that he thought Corizon might have flown in additional health care staff but he did not know how many people, what positions, what prison complexes were impacted, when they arrived, how long they stayed, or if they were still here.  (Doc. 2769 at 72-73)

(5)     Deputy Director Pratt testified that he believed Corizon did bring in staff to assist in Arizona but he did not know how many people came.  (Doc. 2770 at 208-209)

Corizon did not provide him with any specifics about flying in additional staff.  (Doc. 2769 at 158)  Mr. Pratt believes that up to a dozen nurses may have come but he does not know when they arrived and there was no testimony about how long they stayed and no written communication about any staffing increases.  (Doc. 2770 at 209-210)  Corizon may add five additional monitors but have not yet done so.  (Doc. 2770 at 153-154)

**Meetings with Defendant Ryan and Defendant Pratt**

(6)     In November 2017, Defendants Ryan and Pratt began to meet every other week with Corizon leadership to discuss performance measures, staffing, and compliance with the OSC Order.  (Doc. 2770 at 112, 130, 179; Doc. 2769 at 22, 35, 39)  In these meetings, ADC had asked Corizon to increase the use of telemedicine because Corizon did not regularly use telemedicine; however, ADC has not made a written demand to Corizon to do so.  (Doc. 2671 at 208; Doc. 2769 at 95, 160-163; Doc. 2770 at 49-51, 23-26; Ex. 160)  In these meetings, ADC had also asked Corizon to fill the staff positions that were required by the then-current contract but had not asked Corizon to add more staff.  (Doc. 2769 at 95)

(7)     In November 2017, Corizon informed ADC that it was "prepared with detailed analyses of the root causes of non compliance."  (Doc. 33)  This analysis consists of flow charts that identify potential fail points for different performance measures.  (Doc. 2770 at 113-114, 133, 147-148; 152-153, 223-224; Doc. 2781 at 72-73; Exs. 52-74)  There is no evidence that these flow charts address or analyze facility-specific fail points.    Further, there is no evidence that these flow charts were based on past performance at Arizona prisons.

(8)     Defendant Ryan had conversations with Corizon's CEO "almost on a weekly basis."  (Doc. 2769 at 35)  But not until January 31, 2018, did Defendants Ryan and Pratt have an ad hoc meeting with Corizon leadership and ADC operations staff about the OSC Order issued in October.

. . .

. . .

**Meetings with Regional and Site Staff**

(9)     In November or December 2017, ADC began to conduct daily meetings at each facility to discuss facility-level issues such as inter-facility transportations, missed medical appointments, staffing issues, and nursing lines.  (Doc. 2781 at 9-10, 36)  These meetings are attended by the warden, facility health administrator, ADC monitor, transportation sergeant, and deputy warden of operations.  (Doc. 2781 at 9)

(10)     ADC Wardens are expected to have daily meetings with their prison's health administrator to solve problems.  (Doc. 2769 at 44)  Corizon conducts monthly meetings at each prison to discuss corrective actions plans.  These meetings have been expanded to include ADC Monitoring Bureau staff and ADC's outside counsel.  (Doc. 2770 at 84, 113, 133-134)  Corizon posted training materials for its field staff but there were no classes for staff.  (Doc. 2770 at 138-147; Exs. 41-51)

(11)     ADC regional operations staff meets every other week with the Corizon team to discuss the performance measures in the OSC Order and staffing levels.  (Doc. 2770 at 112; Doc. 2769 at 35-36)  Specific performance measures are discussed at this meeting.  (Doc. 2770 at 129)  As a result of the OSC Order, ADC expanded its weekly meeting with Corizon to include more people.  (Doc. 2770 at 112, 128, 129)

**Mortality Reviews**

(12)     ADC conducts mortality reviews for each inmate who dies in custody.  (Doc. 2671 at 95-100)  Starting in February or March 2018, an individual from Corizon's Continuous Quality Improvement ("CQI") team started to call into ADC's mortality reviews.  (Doc. 2671 at 131:15-16; Doc. 2770 at 7, 28-29)  The ADC Mortality Review team has made recommendations to Corizon's CQI representative and those recommendations have received "a mixed response" and have not generated a solution for expediting specialty consults.  (Doc. 2770 at 8:25, 9)

(13)     These mortality reviews consistently show a failure to properly document the medical care provided to inmates and a failure in written and verbal communication among the health care staff.  (Doc. 2671 at 137-138)  Of the 18 mortality reviews

submitted into evidence during the OSC hearing, ADC checked "yes" 6 times to the question: "Could the patient's death have been prevented or delayed by more timely intervention."  (Exs. 30, 35, 36, 37, 40, 47)  ADC checked "yes" 8 times to the question: "Is it likely that the patient's death was caused by or affected in a negative manner by health care personnel."  (Exs. 30, 33, 35, 36, 37, 40, 46, 47)

**Escalation List**

(14)   In the summer of 2017, Dr. Robertson was speaking to Dr. FallHowe, Corizon's Western Regional Director, almost daily about obtaining specialty care for specific patients because their consults were languishing and prisoners were not being seen on a timely basis.  (Doc. 2671 at 146-147)  Dr. Robertson felt "that Utilization Management was being arbitrary."   (Doc. 2671 at 147:15-16)   Subsequently, Dr. FallHowe "and her team decided to have meetings on every one of the[] cancer patients in the Tucson complex."  (Doc. 2671 at 147:16-18)

(15)   By August 2017, Tucson's Assistant Facility Health Administrator had started circulating a weekly email update to ADC and Corizon staff about high acuity inmates at Tucson with cancer.  (Doc. 2671 at 143-144, 148; Ex. 84)  These emails were "to make sure the patients that were high acuity that needed care got the care."  (Doc. 2671 at 143:21-22)  There was a regular meeting about the patients on this email list. (Doc. 2671 at 143-144)  There is no evidence in the record whether a similar system was employed to track high acuity patients in other facilities.  (Doc. 2671 at 143, 144)

(16)   Around December 2017, the meeting about high acuity Tucson cancer patients evolved into a weekly, system-wide meeting between ADC and Corizon staff to discuss high acuity patients who did not seem to be obtaining care ("Escalation Meeting").  (Doc. 2671 at 144, 148-150; Doc. 2770 at 31)

(17)   The agenda for the weekly Escalation Meeting is a spreadsheet listing individual patients who have come to the attention of Dr. Robertson ("Escalation List"). (Doc. 2671 at 144, 150-153, 156; Ex. 95 at 2)  There are no formal criteria to include someone on the Escalation List.  (Doc. 2770 at 13-15, 38)  Sometimes an individual in

ADC will advocate for an individual.  (Doc. 2671 at 206-207; Ex. 158)  Sometimes family members write a letter to Dr. Robertson and he will contact Corizon to bring attention to that individual's case.  (Doc. 2770 at 11)  The University of Arizona's Cancer Center has contacted Dr. Robertson about an individual who needs expedited care.  (Doc. 2770 at 38)  Corizon line staff have also contacted Dr. Robertson to complain about delays in specialty care.  (Doc. 2770 at 42)

(18)   Dr. Robertson testified that when Class Counsel writes to ADC's counsel about individuals, those individuals are added to the Escalation List.  (Doc. 2671 at 151) However, it appears that as late as July 2017, Dr. Robertson had not been informed of these letters.  (Doc. 2671 at 171)

(19)   Dr. Robertson asks the ADC field monitors to track the care provided to the inmates on the Escalation List.  (Doc. 2770 at 11-12)  Defendants Pratt and Ryan also get involved in individual patient care.  (Doc. 2770 at 135-138)

(20)   Corizon's Utilization Management ("UM") Team manages the Escalation List and circulates it ahead of the weekly calls.  (Doc. 2770 at 35)  Dr. Robertson believes that the UM team participates in the weekly meeting but it could be "their clerks or somebody."  (Doc. 2671 at 157:5)

(21)   Dr. Robertson testified that the system of weekly meetings about the Escalation List is "working" to obtain care for individual inmates but acknowledged that if the system worked as it should then high acuity patients would receive appropriate care as a matter of course and there would be no need for the Escalation List.  (Doc. 2671 at 154:19; Doc. 2770 at 40-41)

(22)   Dr. Robertson believes Corizon's site and regional medical directors have become more responsive to his calls about individuals.  (Doc. 2770 at 32)  As of August 2017, Dr. Robertson has noticed an improvement in that "morphine is given on the yards if it's needed.  And nursing notes are much more thorough."  (Doc. 2671 at 115:2-3)

. . .

. . .

1    (23)    There is no version of the Escalation List for chronic care patients or patients of a slightly lower acuity to ensure that they receive care before they become high acuity patients.  (Doc. 2770 at 39)

**Carrots and Sticks:  Fines, Sanctions, and Incentives**

(24)    Originally, the ADC contract with Corizon was for three years.   This Contract included an offset for failing to meet staffing requirements.  (Doc. 2770 at 75-77, 121)   ADC has assessed this staffing offset penalty every month of the Corizon contract which, at the time of the hearing, had totaled $3,800,000.  (Doc. 2770 at 77; Exs. 7, 9, 13, 14, 15, 103, 205)

(25)    In May 2015, ADC amended its contract with Corizon to extend the contract to a fourth year, or from March 2016 to March 2017 ("Amendment 10").  (Ex. 201)  Amendment 10 increased the amount paid to Corizon to $11.60 per inmate per day. (Ex. 201.3 at ¶ 8)

(26)    Amendment 10 included a sanctions provision whereby ADC would sanction Corizon $5,000 for each performance measure at each prison that did not satisfy the Stipulation's requirements but the total for this sanction was capped at $90,000 per month.  (Doc. 2770 at 93, 98, 183-184; Doc. 2769 at 55-56; Ex. 201.3 at ¶ 6)   Director Ryan testified that it was "a smart business decision."   (Doc. 2769 at 70)   Deputy Director Pratt also testified that this cap "was an appropriate business decision" and that he thought it was "reasonable" but acknowledged that the $90,000 per month was only "a small percentage" for Corizon.  (Doc. 2770 at 197-198)  Director Ryan testified that the cap was "part of the negotiation process" and thought that the sanction was likely to have a significant effect on Corizon's behavior.  (Doc. 2769 at 57-58)

(27)    In Amendment 10, Corizon agreed to extend the contract to a fifth year "if ADC requests 4.0% CPI increases in its annual budget request for contract Years 4 and 5."  (Ex. 201.1 at ¶ 2)  While negotiating Amendment 10, Corizon indicated that it would cancel the contract if it did not receive the 4.0% increase.  (Doc. 2769 at 18)  Mr. Pratt testified that this increase was a business decision and reflected increased health care

1    costs.  (Doc. 2781 at 52-53)  At the time of Amendment 10, Director Ryan was not

2    satisfied with Corizon's performance.  (Doc. 2769 at 50, 60)

3         (28)    Amendment 10 includes a revised indemnity provision.  (Doc. 2769 at 114;

4    Ex. 201.1-201.2 at ¶ 4)  Deputy Director Pratt and Director Ryan understand this

5    indemnity language to mean that the State would look to Corizon for any monies assessed

6    for contempt from the Court.  (Doc. 2770 at 205; Doc. 2769 at 74-75)  Director Ryan

7    believes that this was appropriate because Corizon is "the entity or organization

8    [responsible] for the delivery of health care to the inmate population" while ADC "was

9    overseeing Corizon in terms of its accountability in the delivery of health care to the

10   inmate population."  (Doc. 2769 at 21)

11        (29)    In September 2015, ADC sent Corizon a letter detailing sanctions for

12   failure to perform between April 1 and June 30, 2015.  (Ex. 12)

13        (30)    In June 2016, Director Ryan was not satisfied with Corizon's performance

14   but nevertheless extended Corizon's contract to a fifth year, March 2017 to March 2018,

15   because ADC had received approval for the retroactive application of the 4% increase

16   described in Amendment 10 ("Amendment 11").  (Doc. 2769 at 59-60; Exs. 18, 20, 202)

17   Amendment 11 increased the inmate health care per diem from $11.60 to $12.06.  (Doc.

18   2770 at 183, 185; Ex. 202)

19        (31)    In June 2016, ADC sent Corizon a letter detailing sanctions for failure to

20   perform in April 2016.  (Ex. 18)  In July 2016, ADC sent Corizon a letter detailing

21   sanctions for failure to perform in May 2016.  (Doc. 2769 at 64-65; Ex. 20)

22        (32)    In June 2017, ADC again amended its contract with Corizon to extend the

23   contract from March 2018 through June 2018 and increased Corizon's payment to $12.54

24   per prisoner per day ("Amendment 13").  (Doc. 2770 at 185-186; Ex. 202)  Between

25   March 2016 and June 2017, Corizon paid ADC a total of $1,440,000 in sanctions but

26   would have paid $7,350,000 without the cap.  (Doc. 2770 at 199; Ex. 206)  Between July

27   and October 2017, the cap on sanctions meant that Corizon paid $1,260,000 less than it

28   would have paid without the cap.  (Doc. 2770 at 202)  From March 2016 to October

2017, ADC could have offset $6.8 million against Corizon's payment but for the negotiated cap.  (Doc. 2770 at 203)

(33)   In September 2017, ADC made a business decision to amend its contract with Corizon to remove the previous cap on performance-based sanctions and to add performance-based incentives ("Amendment 14").  (Doc. 2770 at 73-74, 122-123, 125, 126; Doc. 2769 at 23-24; Ex. 205)  Amendment 14 does not specify that Corizon has to spend the incentive payments on anything specific.  (Doc. 2770 at 196; Doc. 2769 at 70)  This amendment was made in anticipation of the Court's OSC Order.  (Doc. 2770 at 124-125; Doc. 2769 at 24, 27)

(34)   During the first four months of Amendment 14, ADC has paid Corizon $2,550,000 in incentive payments.  (Doc. 2770 at 189-90; Doc. 2769 at 92).  The incentive payments are capped at $3,500,000.  (Doc. 2770 at 127)  The incentive payments will be paid in the first part of FY 2018 and then there will be no further funds available to Corizon.  (Doc. 2770 at 194-195; Doc. 2769 at 106)  Corizon's CEO asked Director Ryan to consider providing Corizon with additional incentive funds and Director Ryan told him that there would not be any.  (Doc. 2769 at 108-109)

(35)   Director Ryan testified that Amendment 14's incentive money came either from a contingency fund or from vacancy savings accrued from vacant Correctional Officer positions.  (Doc. 2769 at 27, 92-93)  After his testimony, Defendants submitted a declaration correcting this testimony and stating that the incentive funds came only from funds appropriated for health care.  (Doc. 2716)

(36)   The disparity between the sanctions and the incentive payments in Amendment 14 was "the negotiated business decision that [ADC] made to try and compel and encourage Corizon to achieve much better performance."  (Doc. 2769 at 104:22-24)  Director Ryan thinks this decision "was, and still is, a good idea."  (Doc. 2769 at 106:9-10)

. . .

. . .

(37)   Director Ryan believes that Amendment 14 worked to increase compliance because the CGAR numbers increased shortly after ADC and Corizon executed Amendment 14.  (Doc. 2769 at 24)

(38)   For FY2014 to FY2017, ADC assessed $2,071,000 in sanctions against Corizon for Corizon's failure to comply with its contract with the State for the delivery of health care.  (Doc. 2770 at 189)  Through January 2018 of FY2018, ADC had assessed $945,000 in sanctions against Corizon.  (Doc. 2770 at 189)

(39)   Director Ryan testified that Corizon paid ADC's outside counsel's fees and the annual fee to Plaintiffs' counsel that is required by the Stipulation.  (Doc. 2769 at 51-53)  On re-direct, he testified that he did not know.  (Doc. 2769 at 112)

(40)   Mr. Pratt assumes that the Amendments' various increases in the inmate health care per diem are used by Corizon to compensate for the increased cost of doing business.  (Doc. 2770 at 188-189)  But there is no contractual requirement that Corizon use money to increase salaries for health care staff or to hire more staff.  (Doc. 2769 at 160)  Mr. Pratt understands that Corizon operated at a loss in Arizona during the previous two quarters.  (Doc. 2781 at 55)

(41)   Mr. Pratt has not been satisfied with Corizon's performance.  (Doc. 2770 at 181-185)  Mr. Pratt has thought that if ADC pushes Corizon too hard, Corizon will terminate its contract.  (Doc. 2781 at 78)

**Performance Measure 35**

(42)   PM 35 states "All inmate medications (KOP [keep on person] and DOT [direct observation therapy]) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption."  (Doc. 1185-1 at 10)

(43)   Compliance with PM 35 is "a true partnership" between ADC and Corizon and requires ADC to follow its own rules.  (Doc. 2770 at 162:9-11; Doc. 2769 at 42)  ADC transfers 30,000 inmates every year between complexes.  (Doc. 2769 at 174)

(44)   ADC began collaborating with Corizon on PM 35 in June 2017 because compliance with PM 35 was "a failed process."  (Doc. 2769 at 172; Doc. 2770 at 161,

163:18)  As a result of that collaboration, during the summer of 2017, ADC conducted a series of meetings and developed an outline of a process to transfer medication with an inmate.  (Doc. 2769 at 178; Ex. 1)  As part of this process, ADC and Corizon developed a flowchart with possible fail points.  (Doc. 2770 at 163-164; Ex. 78)

(45)   There was no evidence presented to the Court indicating that ADC understood the fail points at specific prisons.

(46)   ADC began to develop DI-361 in August 2017 and adopted it on October 31, 2017.  (Doc. 2781 at 28; Ex. 78, 98)   DI-361 was submitted to the Court shortly thereafter.  (Ex. 2)  DI-361 was distributed to ADC employees with an email address. (Doc. 2769 at 191)  For ADC employees without an email address, ADC generally distributes new Director's Instructions through electronic briefing boards and through discussions at briefings.  (Doc. 2769 at 191-192)  There is no evidence that this process was, in fact, completed for DI-326.

(47)   If an inmate arrives at the new complex and his medications are not available, DI-361 dictates that Corizon will "obtain the medications from the back-up pharmacy."  (Ex. 2 at ¶3.5)  There have been instances when a local pharmacy was used to obtain medications for a transferring inmate.  (Doc. 2769 at 186)

(48)   In March 2018, Mr. Pratt wrote to Roland Maldonado, Corizon's Vice President of Operations for Arizona, about Corizon's controlled substance audits and stated that the quarterly controlled substance findings "have been a great concern for years as related to non-adherence to the stated policies."  (Ex. 96; Doc. 2769 at 154) ADC has not asked Corizon to stop relying on an out-of-state pharmacy to provide medications to prisoners but it has asked Corizon to increase the stock of pharmaceuticals maintained on site.  (Doc. 2769 at 96)  Mr. Ryan does not know if this request was made in writing.  (Doc. 2769 at 96)  Mr. Ryan understands that Corizon is not willing to relocate a pharmacy into Arizona.  (Doc. 2769 at 127)

. . .

. . .

### Real Time Monitoring

(49)   ADC cannot monitor health care in real time.  (Doc. 2781 at 60)  Two weeks after the Court issued its October 2017 OSC Order, ADC leadership asked Corizon leadership to institute real-time data tracking for the performance measures covered by the OSC Order.  (Doc. 2769 at 28; Ex. 31)  Deputy Director Pratt understood that Corizon would implement such a program in part to find fail points.  (Doc. 2770 at 211)

(50)   In early November 2017, Mr. Pratt exchanged emails with Corizon's EVP/CAO about real-time reporting on the performance measures covered by the OSC Order.  (Doc. 2781 at 58-60; Exs. 105, 106)

(51)   In response, Corizon's interim CEO and chair of their Board wrote a letter to Director Ryan that stated Corizon would "not implement any daily real-time monitoring data program."  (Doc. 2770 at 211:2-3; Doc. 2769 at 31-32; Ex. 33)  Ryan and Pratt co-signed a response letter demanding that Corizon hire additional staff to monitor the OSC Order performance measures.  (Doc. 2769 at 34-35; Doc. 2769 at 150; Ex. 34)  Mr. Pratt thinks that, as part of complying with the OSC Order, Corizon brought in three or four people to assist with real time data collection.  (Doc. 2769 at 150; Doc. 2781 at 81)

(52)   In January 2018, Ryan and Pratt co-signed a letter to Mr. Maldonado that concluded there had been 2,481 incidents covered by the OSC Order in December 2017. (Doc. 2769 at 37-38; Ex. 37)  In February 2018, they sent a clarification letter stating that they had recalculated the number of incidents to be 668.  (Doc. 2769 at 38-39; Ex. 39)

(53)   In March 2018, the week before the hearing in this matter, Ryan and Pratt co-signed a letter to Mr. Maldonado about real time reporting.  (Doc. 2769 at 82; Ex. 97) This letter noted that, for January 2018, Corizon had compiled the number of incidents and concluded that there were 891 incidents of non-compliance for the PMs covered by the OSC Order.  (Ex. 97.002)

(54)   In March 2018, Corizon informed ADC that it had implemented real-time reports for some performance measures.  Neither Mr. Ryan nor Mr. Pratt know or could

remember which performance measures have real-time reports.  (Doc. 2770 at 211; Doc. 2769 at 82-83)

(55)   There is still no real-time monitoring program for all performance measures. (Doc 2704 at 3:25-26; Doc. 2770 at 108, 210; Ex. 31.002)

(56)   In March 2018, ADC made its first written demand to Corizon for a written description of its "efforts taken over the last five months to document Corizon's commitment to comply with the [OSC Order's] performance measures and to fill vacant positions on your rosters."  (Doc. 2769 at 85)

(57)   Pentaho, a Corizon-owned program, can run reports from eOMIS, Corizon's electronic medical records program.  (Doc. 2769 at 147-148)  ADC does not have access to Pentaho and has to ask Corizon for any specific Pentaho reports.  (Doc. 2769 at 148-149)

(58)   ADC had, and has, "serious concerns" with using Pentaho to generate lists of incidents for the OSC Order.  (Doc. 2769 at 156; Ex. 38, 97)  ADC worked with Corizon to run different Pentaho reports for the OSC Order in an attempt to increase the accuracy of the reports.  (Doc. 2769 at 155-156)   ADC demanded "significant improvement" in Corizon's next report.  (Doc. 2769 at 157:21; Ex. 97)  ADC did not disclose its concerns to the Court or to Plaintiffs about the December 2017 real time data until Mr. Pratt's cross-examination as a part of the OSC hearing.  (Doc. 2769 at 156-157; Doc. 2781 at 81-82; Ex. 97)

(59)   Plaintiffs alleged that ADC had missed 420 instances of non-compliance in the December 2017 OSC List.  ADC reviewed Plaintiffs allegations and added 238 names to the December 2017 OSC List.  (Doc. 2690 at 21; Doc. 2781 at 62, 68; Docs. 2745, 2755)  Plaintiffs made no similar allegation about the January 2018 or February 2018 OSC List.

## CONCLUSIONS OF LAW

(a)   Defendants' contract with Corizon does not obviate their non-delegable duty to provide Plaintiffs with health care under state law.   Ariz. Rev. Stat. §§ 31-

201.01(D); 41-1604(B)(1)(d) (the director may delegate functions or duties "that the director believes can be competently, efficiently and properly performed"); *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (relying on fact that the defendant sheriff was required by state statute to take charge of county jails and was answerable for prisoner's safekeeping).  (Doc. 2781 at 89:11)  Similarly, Defendants' contract with Corizon does not modify their position as obligors on the Stipulation.

(b)     Defendants' management of Corizon does not indicate that they have any real ability to spur Corizon's compliance with the Stipulation. The Demand Letters evince ADC's frustrations with Corizon, frustrations that are similar to the frustration that the Court has expressed to Defendants. Specifically, ADC's communication with Corizon demonstrates a concern about the quality of internal audits, about staffing levels, and about performance.

(c)     Obtaining care for high acuity patients depends on committed individuals advocating for the care that the State has already paid Corizon to provide. Notwithstanding Defendants' use of the Escalation List, Defendants are not entitled to congratulations for developing an extraordinary method, which identifies a subset of high acuity patients, in order to ensure that they receive the care that all high acuity inmates are entitled to receive under the Stipulation.  To be clear, these high acuity patients made it to the Escalation List because they had not received the health care to which <u>all</u> inmates are entitled.  If the system worked as it should, there would be no need for this Escalation List.

(d)     Instead, Defendants' "good business decision" was to provide incentive payments to a contractor who had already committed to the State to provide that very service and had repeatedly and consistently failed to meet that obligation.  The wisdom of a business decision that so rewards a failing contractor escapes the Court but is, for these purposes, irrelevant.

(e)     Of the performance measures covered by the OSC Order, only PM 35 involves ADC operations.  When undertaking a remediation plan for PM 35, ADC did

not review operations at each prison to determine why PM 35 was, or was not, working. ADC did not begin working on a procedure to address PM 35, DI-361, until after the Court first announced it was contemplating the OSC.  This is no evidence before the Court to show that ADC understands why DI-361 did not create compliance in Eyman or Lewis in December 2017, why DI-361 did not create compliance in Florence or Lewis in January 2018, or why Tucson attained compliance in August 2017 without DI-361.

(f)     The OSC Order has not resulted in ADC's compliance with the Stipulation, which requires that <u>every single inmate receive the benefit of each Performance Measure</u>. The Stipulation requires 100% compliance with each of its Performance Measures.  As this Court has repeatedly stated, the Stipulation's 85% threshold is simply a triggering point for the Court's intervention.   And since the OSC Order, the following PM/Locations have remained below the Stipulation's 85% threshold:

- Performance Measure 35 at Eyman in December 2017;
- Performance Measure 35 at Florence in January 2018;
- Performance Measure 35 at Lewis in December 2017 and January 2018;
- Performance Measure 39 at Lewis in January 2018 and March 2018;
- Performance Measure 44 at Eyman in December 2017, January 2018, February 2018, and March 2018;
- Performance Measure 46 at Eyman in December 2017 and February 2018;
- Performance Measure 47 at Eyman in December 2017, January 2018, February 2018, and March 2018;
- Performance Measure 47 Florence in January 2018 and March 2018;
- Performance Measure 47 Lewis in December 2017, January 2018, February 2018, and March 2018;
- Performance Measure 47 Phoenix in December 2017, January 2018, and February 2018;
- Performance Measure 47 Tucson in January 2018 and February 2018;
- Performance Measure 50 at Florence in December 2017 and January 2018;

- Performance Measure 51 at Eyman in January 2017;

- Performance Measure 51 at Florence in December 2018;

- Performance Measure 52 at Florence in December 2017, January 2018, February 2018, and March 2018;

- Performance Measure 54 at Eyman in December 2017;

- Performance Measure 66 at Florence in February 2018 and March 2018; and

- Performance Measure 66 at Tucson in March 2018.

(Docs. 2373, 2801-1)

(g)     Defendants did not introduce any evidence to the Court about specific efforts to bring PMs 39, 44, 47, 50, 51, 52, 54, or 66 into compliance. With respect to PM 35, the testimony Defendants presented was generic in nature and not geared toward the specific issues precluding compliance at each facility. This failure alone supports the conclusion that Defendants have not taken "all reasonable steps to comply with the [OSC] order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016).

(h)     Because ADC remains noncompliant with these portions of the Stipulation, the Court concludes that civil contempt sanctions against Defendants are warranted here to address Plaintiffs' "injuries resulting from [ADC's] noncompliance." *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983) (citing *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 448-49 (1911)).

(i)     The evidence shows that the mere threat of monetary sanctions was not sufficient to generate ADC's compliance with the Stipulation. More importantly, the evidence presented to the Court indicates that wide-spread and systemic failures remain. In one recent example, Defendants had no information about what could be done to improve compliance for PM 50 at Tucson and failed to even attempt to provide a corrective action plan at the May 2018 Status Conference. (Doc. 2810). In another example, instead of presenting a corrective action plan aimed at trying something new, Defendants informed the Court at the June status hearing that they will continue to use their previous plan even though the CGARs reflect that the previous plan has not

obtained consistent compliance for PM 39 at Lewis.   (Doc. 2874-1 at 81)   That Defendants should exhibit such nonchalance about addressing on-going failures to comply with the Stipulation—even as the sword of sanctions loomed above them—is considerable evidence that a contempt order and monetary sanctions are necessary.

(j)      The inescapable conclusion is that Defendants are missing the mark after four years of trying to get it right.  Their repeated failed attempts, and too-late efforts, to take their obligation seriously demonstrate a half-hearted commitment that must be braced.  The evidence suggests that the States' recalcitrance flows from its fear of losing its contracted healthcare.  But even if true, such fear is not a factor that can properly be considered in determining what steps the State must take to meet the health care needs of its inmates.  If a private contractor is pushed to the door because it cannot meet the State's obligations, then so be it.  Such a result would flow directly from the state's decision to privatize health care to save money.  That goal of privatization cannot be achieved at the expense of the health and safety of the sick and acutely ill inmates. Indeed, Arizona for most of its history, and many states, do not privatize their healthcare services.  The Court must place a clear and focused light on what is happening here:  the State turned to a private contractor which has been unable to meet the prisoner's health care needs.  Rather than push its contractor to meet those needs, the State has instead paid them more and rewarded them with financial incentives while limiting the financial penalties for non-compliance.   Accordingly, it appears the Court must do what Defendants will not: compel compliance with the Stipulation.

## CIVIL SANCTIONS

The OSC Order was valid, specific, and definite.  Defendants had knowledge of the OSC Order and an extended opportunity to be heard about their non-compliance.  As detailed herein, the Court has concluded that Defendants did not take all reasonable steps to comply with the Court's order.  As a result, and as previewed in the OSC Order, Defendants shall pay a financial penalty of $1,000 per failed instance for the

PM/Locations in the OSC Order that fell below the Stipulation's threshold of 85%.  The information provided to the Court by Defendants showed 1,445 such violations:

| December 2017 | | |
|---|---|---|
| (Docs. 2600, 2747, 2815) | | |
| *PM/Location* | *CGAR %* | *# of Instances* |
| PM 35 at Eyman | 74 | 26 |
| PM 35 at Lewis | 84 | 26 |
| PM 44 at Eyman | 11 | 9 |
| PM 46 at Eyman | 84 | 161 |
| PM 47 at Eyman | 54 | 17 |
| PM 47 at Lewis | 53 | 11 |
| PM 47 at Phoenix | 50 | 1 |
| PM 50 at Florence | 60 | 34 |
| PM 51 at Florence | 80 | 21 |
| PM 52 at Florence | 65 | 26 |
| PM 52 at Eyman | 57 | 23 |
| PM 54 at Eyman | 60 | 542 |
| **Subtotal** | | **897** |

. . .

. . .

. . .

. . .

. .

. . .

. . .

. . .

| January 2018 | | |
| --- | --- | --- |
| (Doc. 2650, 2664, 2675, 2815) | | |
| *PM/Location* | *CGAR %* | *# of Instances* |
| PM 35 at Florence | 82 | 13 |
| PM 35 at Lewis | 70 | 44 |
| PM 39 at Lewis | 81 | 5 |
| PM 44 at Eyman | 56 | 4 |
| PM 47 at Eyman | 75 | 9 |
| PM 47 at Florence | 82 | 8 |
| PM 47 at Lewis | 36 | 7 |
| PM 47 at Phoenix | 83 | 1 |
| PM 47 at Tucson | 62 | 9 |
| PM 50 at Florence | 77 | 35 |
| PM 51 at Eyman | 68 | 17 |
| PM 52 at Florence | 69 | 21 |
| PM 52 at Eyman | 60 | 34 |
| **Subtotal** | **207** | |

. . .
. . .
. . .
. . .
. . .
. . .
. . .
. . .
. . .
. . .

| February 2018 | | |
| --- | --- | --- |
| (Doc. 2786-2) | | |
| *PM/Location* | *CGAR %* | *# of Instances* |
| PM 44 at Eyman | 43 | 4 |
| PM 46 at Eyman | 82 | 157 |
| PM 47 at Eyman | 61 | 20 |
| PM 47 at Lewis | 61 | 11 |
| PM 47 at Phoenix | 67 | 1 |
| PM 47 at Perryville | 83 | 3 |
| PM 47 at Tucson | 64 | 5 |
| PM 52 at Eyman | 58 | 60 |
| PM 52 at Florence | 67 | 60 |
| PM 66 at Florence | 70 | 20 |
| **Subtotal** | **341** | |

The Court will impose these sanctions and collect these funds with the understanding that they will be used to further compliance with the healthcare requirements of the Stipulation. To that end, the parties will submit proposals for use of the funds and the Court will distribute the monies after considering their proposals.

**IT IS THEREFORE ORDERED** that Defendants are held in civil contempt for failure to comply with the Stipulation as detailed in the Court's Order to Show Cause.

**IT IS FURTHER ORDERED** that Defendants shall pay $1,445,000 for their December 2017, January 2018, and February 2018 violations of the Court's Order to Show Cause. Within 14 days, Defendants must remit payment to the Clerk of Court in the amount of $1,445,000.

**IT IS FURTHER ORDERED** that the Clerk of Court must enter judgment against Defendants reflecting contempt fines for December 2017, January 2018, and

February 2018 totaling $1,445,000.  This total is due and payable into the Registry of the Court, to be kept in the Registry until further order of the Court.  This judgment shall bear interest at the federal statutory rate until satisfied.

**IT IS FURTHER ORDERED** that Defendants shall continue to file monthly reports reflecting every instance of noncompliance for PMs at facilities under the October 10, 2017 Order to Show Cause that are at less than 85% compliance.

**IT IS FURTHER ORDERED** that, within 30 days of the date of this Order, the parties shall submit their respective proposals regarding the best use of these funds.

Dated this 22nd day of June, 2018.

_____
David K. Duncan
United States Magistrate Judge