**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No. CV-12-0601-PHX-DKD |
| Plaintiffs, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Defendants have moved to terminate their monitoring of most of the performance measures covered by the Stipulation. (Doc. 2251) Plaintiffs raise several categories of objections and also concede that termination is appropriate in some instances. (Doc. 2344, 2819)

Defendants' motion to terminate is the first of its kind in this case and raises several questions about how to interpret the Stipulation's termination provision contained in paragraph 10(b):

> The measurement and reporting process for performance measures, as described in Paragraph 9, will determine (1) whether ADC has complied with particular performance measures at particular complexes, (2) whether the health care provisions of this Stipulation may terminate as to particular performance measures at particular complexes, as set forth in the following sub-paragraphs.
>
> b. **Termination of the duty to measure and report on a particular performance measure:** ADC's duty to measure and report on a particular performance measure, as described in Paragraph 9, terminates if:

> i. The particular performance measure that applies to a specific complex is in compliance, as defined in sub-paragraph A of this Paragraph, for eighteen months out of a twenty-four month period; and
>
> ii. The particular performance measure has not been out of compliance, as defined in sub-paragraph A of this Paragraph, for three or more consecutive months within the past 18-month period.

(Doc. 1185 at 4-5) Several predicate questions remain unanswered by this text and so the Court must answer these questions before determining which performance measures at which locations can exit the Stipulation.

## **Burden of Proof**

Defendants argue that paragraph 10(b) of the Stipulation provides for an automatic exit and that Plaintiffs have the burden of proving that a performance measure/location should remain covered by the Stipulation. (Docs. 2251, 2407) The Court disagrees; the relevant text is silent as to the termination's mechanism and any burden of proof. Reading the Stipulation as a whole, the Court concludes that Defendants may move to terminate if they contend they have the qualifying months, but the Court's oversight function requires the Court to rule on termination based on all of the information before the Court at the time of the ruling.

The Court notes that this interpretation of the Stipulation is consistent with the Court's statutory obligation under the Prison Litigation Reform Act which states that "prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation." 18 U.S.C. § 3626(b)(3). To satisfy this requirement, the Court must know the current conditions of health care and must know that the CGAR data is accurate and reliable.

## **Which 24 months**

Paragraph 10(b)(i) requires compliance for 18 months out of a 24 month period. By definition, after 25 months of monitoring, there is a choice about which 24 month period applies to this sub-paragraph. The Stipulation does not specify which 24 months

period applies and so this requirement could cover the first 24 months, the most recent 24 months, or something in between.

Paragraph 10(b)(ii) requires a look-back to "the past 18-month period." Reading these two sub-paragraphs together, and in conjunction with 18 U.S.C. § 3626(b)(3), the Court concludes that the proper way to evaluate this requirement is—generally[1]—to look back 24 months from the month the motion is filed.

### **Final Procedures**

Several times, the parties have agreed to modify how the CGAR data is collected and, when agreement could not be reached, the Court has had to order specific reporting procedures ("Final Procedure"). Nearly 18 months ago, and consistent with binding precedent, the Court informed Defendants that they did not have to recalculate CGAR data but could not rely on CGAR data calculated under discredited methods. (Doc. 1951) *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1165 (9th Cir. 2015) ("Once a court has interpreted an ambiguous contract provision that is and has always been the correct interpretation from its formation.") Put another way, the 24-month period required by Paragraph 10(b) begins from the first month of data collected under a Final Procedure and so a performance measure is only eligible for termination under the Stipulation if there are 24 months of accurate and reliable data as measured by a Final Procedure.

Defendant Pratt testified that, with one possible exception, CGARs have not been recalculated under Court-ordered methodologies. (Doc. 2770 at 192-193) The more recent implementation of Final Procedures means that none of the performance measures subject to a remediation plan are eligible to exit the Stipulation and so the Court need not address the currently-hypothetical relationship between a remediation plan and termination.

. . .

---

[1] As detailed herein, this lookback period may be longer in a specific instance depending on, for example, N/A results or changes in data collection.

### "N/A" and Termination of Inapplicable Performance Measures

At a status conference with the parties, the Court stated that "common sense arguments" about N/A results would be accepted. This statement was in the context of counsel's discussion about measuring Pap smears at prisons that only house men. (Doc. 1956 at 67-70)

The Court informed the parties that months with "N/A" results would not count either for or against termination. This means that the lookback period would be extended to capture 24 months of data. For example, PM 14 at Winslow had five N/A results in January 2016, May 2016, October 2016, December 2016, and January 2017. (Doc. 2251-1 at 42) This means that a look back period that begins in June 2017 must extend back another five months to February 2015.[2]

The Court notes that there are several performance measures where the CGARs are inexplicably littered with N/A results. Instead of providing an affidavit or another form of competent and admissible evidence, counsel for Defendants has stated various hypothetical possibilities to explain away the N/A results. (Doc. 2407 at 10-13, 18:7) This is insufficient and is an argument that the Court will not entertain. (Doc. 1956 at 70:9-10)

Defendants have not explicitly moved to terminate monitoring of "common sense" categories but simply informed the Court that they have "no duty" to monitor these performance measures. *See, generally*, Doc. 2251-1. Defendants' posture aside, the Court will terminate monitoring for PM/locations that it understands are inapplicable.[3]

First, the performance measures that apply to infirmaries do not need to be monitored at prisons without an infirmary. The Court understands that the only complexes with infirmaries are Florence, Lewis, Perryville, and Tucson. (Doc. 2251-1 at

---

[2] This also means that, monitoring methodology aside, PM 14 at Winslow cannot exit the Stipulation because the 18 month lookback extends to August 2015 and includes four consecutive months of non-compliance from August 2015 to November 2015.

[3] If Defendants change their operations in a way that impacts this ruling such that, for example, women are at other facilities or the location of intake units is changed, the Court may proceed accordingly.

- 4 -

¶¶ 225, 231, 235, 243, 251) Accordingly, the Court will terminate monitoring of infirmary-related performance measures—PM 63, 64, 65, 68, and 70—at prisons without infirmaries, namely Douglas, Eyman, Phoenix, Safford, Winslow, and Yuma.[4]

Second, performance measures that apply only to women—PM 57, 58, 60, 61, and 74—do not need to be monitored at prisons that only house men. However, Defendant Pratt avowed that one performance measure involving post-natal care (PM74) applies in Perryville and Phoenix. (Doc. 2251-1 at ¶ 261) However, he also avowed that performance measures involving pre-natal care (PM 57 and PM 58) and Pap smears (PM 60) only apply in Perryville. (Doc. 2251-1 at ¶¶ 204, 208, 217) This inconsistency about the women prisoners in Phoenix may have a straightforward explanation but Phoenix cannot exit these women-only performance measures based on the information currently before the Court. Accordingly, the Court will deny without prejudice Defendants' motion to terminate monitoring PM 57, 58, 60, 61, and 74 at Phoenix.

Finally, the Court agrees that performance measures that apply to intake procedures do not need to be monitored at prisons where no intake occurs. Accordingly, the Court will terminate monitoring PM 33, 34, 62, 75, and 76 at Douglas, Florence, Lewis, Safford, Winslow, and Yuma.

Specific Issues. Plaintiffs argue that Defendants' motion should be denied for PM 40 at Tucson. (Doc. 2344 at 41:8) Because Defendants did not move for termination of PM 40 at Tucson, this issue is moot. (Doc. 2251 at 6:5-6; Doc. 2251-1 at 18)

Defendants argue that they are entitled to terminate PM 42 at Lewis. (Doc. 2251 at 6:9, Doc. 2407 at 18:16-20) However, Defendant Pratt's declaration did not include any reference to PM 42 at Lewis. (Doc. 2251 at 19:1-14) Thus, separate from any data collection or monitoring methodology issues, PM 42 at Lewis is not eligible for termination.

. . .

---

[4] The Court notes that Defendants' Motion does not address PM 66. *Compare* Doc. 2251 at 7:11-12 *with* Doc. 2251-1 at ¶¶238-39.

Plaintiffs' Stipulations. Plaintiffs have agreed to terminate monitoring of PM 7, 38, 56, and 71. (Doc. 2819) The Court will do so.

## **The Validity, Reliability, and Accuracy of the CGAR Data[5]**

Defendants collect and report the CGAR data that determines whether they are in compliance with the Stipulation's performance measures. Thus, the CGAR data that is the foundation for the operation of the Stipulation is entirely within Defendants' control. For the past several years, Plaintiffs have raised various challenges to the collection and verification of that data. In response, and as detailed on the record, the Court has invested a significant amount of time understanding the data collection process and the implications of Defendants' different data reporting methods. The Court had addressed various minutiae of this process in an on-going attempt to obtain valid, reliable, and accurate CGAR data. At this point, the inescapable conclusion is there are profound and systemic concerns with the monitoring process at every stage of the process.

eOMIS. eOMIS is the electronic medical record system that Corizon providers use to document their care to inmates. ADC's Monitoring Bureau, in turn, relies on eOMIS records to calculate the CGARs. Therefore, the integrity of eOMIS is crucial.

The evidence before the Court is that eOMIS is not an accurate reflection of the care provided because providers can back-date entries in eOMIS and do not have to document that a late entry is late. In other words, "the health care staff at Corizon are able to go into eOMIS and change and manipulate the dates of requests to an earlier date." (Doc. 2671 at 166; Ex. 190)

The Court heard testimony from Cecilia Edwards, a credible witness and a Corizon employee, that she was instructed to cancel consults because Corizon had not yet obtained additional information, such as charts from outside providers or testing, or

---

[5] This Order will only discuss the problems with the CGAR data and will not detail the related and concerning information presented to the Court such as exhibits where the date and day did not match (Doc. 2329 at 38, 104-105,166, 241-242, 277), testimony that Corizon does not pay its outside providers (Doc. 2244 at 93-97; Doc. 2876 at 40-42, 58), and Defendants apparently incorrect allegations that one of the oncology providers had filed for bankruptcy without any prior notification (Doc. 2635).

because there was no specialist available to see the patient. (Doc. 2876 at 18-19) Utilization Management instructed Edwards to cancel and then resubmit the consult request when the additional information was available. (Doc. 2876 at 18, 113, 126) This was done to avoid violating the Stipulation's timelines. (Doc 2876 at 128) She understood that she could wait but also that waiting would create non-compliance: this is a decision made by providers. (Doc. 2876 at 18) She was instructed to cancel a pending consult for these reasons an average of five times a month. (Doc. 2876 at 19) For ENT care, she has not cancelled consults and instead left them in place. (Doc. 2876 at 43-44)

Other examples of potential systemic weaknesses exist. Corizon does not provide all new providers with their own username/password immediately and so providers share. (Doc. 2670 at 29-31; Ex. 4) This means that an entry in eOMIS may be attributed to the wrong provider.

The Court recently heard from multiple witnesses about changes and limitations in eOMIS. Approximately four times last year, eOMIS "[went] down" and was sometimes inoperable all day. When that happens, providers had to "write the full note on a piece of paper and hang on to it until eOMIS is back up and running and then [providers] have to spend time inputting that information." (Doc. 2690 at 74-75) When eOMIS is down, there is no backup for the "extremely important" information in eOMIS such as progress notes or written orders. (Tr. 6-12-18 at 68) There is no evidence that Corizon has implemented any kind of eOMIS back-up or that busy providers do, in fact, input the paper information when eOMIS is working again.

Plaintiffs have raised other concerns about eOMIS documentation. For example, Plaintiffs noted nearly two dozen instances where IPC encounters started at precisely the start of the hour. (Doc. 2426-1 at 20-21) Also, during recent testimony, the Court heard that a new drop-down menu was going to be added to eOMIS. (Doc. 2895 at 215) Lisa McNeal, an ADC employee, testified that she had learned at a meeting that "a non-formulary button had kind of disappeared within eOMIS." (Doc. 2895 at 184:1) Finally, the Court learned that Corizon does not want providers to schedule consults 6 months

ahead of time but there is no tickler system for reminding providers to schedule consults, and there is no system to ensure that consults are scheduled even if there is provider turnover. (Doc. 2895 at 80-84)

Simply put, the credible evidence before the Court indicates that eOMIS allows providers to create dishonest and untraceable entries in an inmate's medical record, that Corizon has manipulated categories of records to comply with the Stipulation's time frames, and that Corizon has not ensured the integrity of its electronic medical records system.

Number of Records Reviewed. The Monitoring Bureau picks a seemingly arbitrary number of records to review for each Performance Measure. Although the Court understands that using more than 10 records could lead to more accurate information—the larger the pool reviewed, the more information gleaned—there is no apparent rhyme or reason to the number of records ADC reviews. These decisions can be dispositive to a finding of non-compliance.

For example: in January 2018's CGAR report, PM 51 at Florence listed 49 of 56 records as compliant. (Doc. 2711 at 112-113) Thus, according to the CGAR report, there were at least 7 instances of non-compliance. The first list submitted for the Order to Show Cause hearing ("OSC List") had 5 instances of non-compliance for PM 51/Florence in January 2018 and the amended list had 12 instances where each instance was a different inmate. (Doc. 2815-2 at 15) Adding the 12 instances of non-compliance from the final OSC list and the 49 instances of compliance from the CGAR report, it appears that there was a pool of 61 instances that the Monitoring Bureau could have included in the CGAR.[6] If all 61 instances had been included, this performance measure would not have met the Stipulation's threshold of 85%: 49/61=80%. But because only 56 records were included, the performance measure was documented on the CGAR report as compliant: 49/56=88%.

---

[6] There could be many more than 61 records for PM 51 at Florence in January 2018.

- 8 -

Escalation Cases vs CGAR Report. The Court expected that recent testimony would buttress the integrity of the CGAR reports. The opposite occurred.

For example, on Friday, July 28, 2017, Karen Padron, a Program Evaluation Specialist in the ADC Monitoring Bureau, emailed Dr. Robertson about Inmate 40 at Phoenix:

> I am working on PM 50-52 and ran across this consult that was cancelled by the regional medical director and wondered if you were aware and that nothing has been pursued since 4/20. . . . Thought you might want to be aware that this IM appears to not be getting an evaluation he needs in order to be appropriately treated.

(Ex. 85) Ms. Padron's email indicates that Inmate 40's care was not compliant with the Stipulation and that his records were part of her review for that months' CGAR. On Monday, July 31, 2017, Ms. Padron entered the June 2017 CGARs for PM 50, PM 51, and PM 52 in Phoenix. She reviewed 5 records for PM 50, 9 records for PM 51, and 11 records for PM 52. Inmate 40 is not included in the CGARs for PM 50, PM 51, or PM 52. (Doc. 2247 at 264-265) Because of the Stipulation's monitoring requirements of reviewing at least 10 records, and the fact that Ms. Padron reviewed fewer for PM 50 and 51, the Court concludes that Ms. Padron should have reviewed the entire universe of possible records for PM 50 and PM 51 in Phoenix for the June 2017 CGARs.[7] (Doc. 1185-1 at 26) Thus, it is inexplicable that Ms. Padron reviewed Inmate 40's records on a Friday and then did not include him on Monday's report. The system is not working when an individual Monitor flags someone for not receiving timely care and then doesn't include that person in the CGAR analysis.

A different email indicates different concerns. On Monday, August 7, 2017, Marlena Bedoya, a Monitor for ASP-Tucson, emailed Dr. Robertson and several others about Inmate 23:

> I think I found another Cancer. I came across this chart while auditing and saw his Cancer diagnosis, went into the latest consult – and found these

---

[7] Inmate 40 does not appear in the July 2018 CGARs for PM 50, 51, or 52. (Doc. 2333)

- 9 -

> comments. I just don't understand why they continue to state "need more info" if he has ongoing cancer. . . .

Ms. Bedoya then detailed portions of Inmate 23's July 2017 medical record. As part of the response emails, Vanessa Headstream told Ms. Bedoya, "When you find oddities or areas of concern in any i/m [inmate] record, please alert both Dr. Robertson and myself to them. Each case is added to my tracking and f/u caseload." (Ex. 154)

For the July 2017 CGARs, Ms. Bedoya documented Inmate 23 as compliant in several CGARs, including performance measures for access to care (PM 40, 41, 43, 44) and specialty care (PM 50, 51, 52). (Doc. 2333 at 332-333, 337-339) In other words, a conscientiousness individual was so concerned that she escalated his records to a supervisor but the established system did not catch any concerns with his care. Again, something is not working when an individual Monitor flags someone for receiving insufficient care and then still marks that inmate as compliant with the CGARs.

This lacuna indicates that the Monitoring Guide was written, or is being used, in a way that documents compliance even when appropriate care is not being provided to inmates.

Monitoring Guide. The Monitoring Bureau uses a document called the "Monitoring Guide" to determine whether the eOMIS records are compliant with the Stipulation. The Court has repeatedly attempted to understand the monitoring process and specific issues therein. (Doc. 1915 at 3) These investments have had limited returns. For example, the Court attempted to understand the CGARs for PM 85 and 86 and Defendants' explanation did not clarify the matter. (Doc. 2587)

Defendants' Filings. Other submissions by Defendants are inexplicably inconsistent. For example, when Defendants first submitted their March 2018 charts, PM 35 at Florence was listed at 82% and, in an amended filing, it was listed at 88%. (Doc. 2801-1 at 61; 2803-1 at 2) Subsequently, Defendants filed their monthly CGAR report for March 2018 which listed PM 35 at Florence at 86.27%. (Doc. 2836 at 107-108) This means that this PM/location was modified at least twice—first up to 88% and then down

to 86%—with no explanation and no paper trail. This lack of audit integrity causes the Court to question the audit process overall.

<u>Evidentiary Hearing</u>. The Court recently concluded an extensive evidentiary hearing into allegations that Corizon had instructed a provider on ways to "beat the monitor." The evidence presented to the Court was also enough to raise questions about the integrity of the state's CGAR system.

In one example, Ms. Edwards testified that Defendants—in an apparently unilateral decision—changed optometry from the "appointments" category to the "consults" category. (Doc. 2876 at 11-12) By making this change, Defendants moved optometry care from a shorter timeframe under the Stipulation to a longer one and gave themselves additional time to provide the same care. (Doc. 2876 at 11-12)

As part of this change from appointments to consults, Corizon cancelled all pending appointments and initiated consult requests. (Doc. 2876 at 12-13) The consult requests did not accurately capture the previous appointment request date. In other words, Corizon re-categorized a category of care in a way that allowed them to take additional time to provide the care and that did not permit an accurate assessment of whether or not there had been compliance with the relevant performance measure. (Doc. 2867 at 15)

Examples like this indicate that Defendants and their contractor are at times more interested in obtaining compliance with the Stipulation by playing a shell game than by providing care to the Plaintiff Class.

<u>Expert Review</u>. Although the Stipulation is focused on aggregate numbers, compliance can be a life-or-death matter for inmates. (Doc. 2876 at 59-66) In one example, in November 2017, Matilde Smith, the Eyman Assistant Facility Health Administrator, told her supervisor that "[i]n the last month and a half we have sent out 3 Inmates who were on the [chronic care] Backlog at Cook unit to local ER with life threatening issues which correlate with their chronic conditions, 1 of which expired at hospital." (Ex. 213)

Because the stakes could not be higher, the Court cannot release Performance Measures from the Stipulation without confirmation that a compliant CGAR is a valid, reliable, and accurate indicator that Defendants have provided Class Members the care required by the Stipulation. Each of the examples above, when taken together, demonstrates that the Court cannot be confident that the CGARs demonstrate compliance with the Stipulation. To provide confidence, the Court will retain a Rule 706 expert, paid for by Defendants, who will review the entire monitoring process. This review shall include the issues noted above and shall include, but is not limited to, a review of eOMIS, the Monitoring Guide as written and as applied including the sampling process and the number of records reviewed, the ADC/Corizon challenge process, and the metadata/trail of any subsequent modifications. If the expert concludes that any of the CGARs are not, in fact, valid, reliable, or accurate, the expert shall develop remedial measures that will permit the collection and submission of valid, reliable, and accurate CGARs.

Although the Court has determined that an expert is necessary to evaluate the efficacy and reliability of the Monitoring Guide and its procedures, the Court also recognizes that committed and conscientious overseers exist within the system. Nevertheless, sufficient questions have been raised about the audit system's integrity to warrant this expert review. As the Court has explained previously, the state and its contractor have incentives to under report noncompliance. This fact does not mean such conduct is ineluctable—indeed the many months or reported failures to meet the Performance Measures suggest otherwise —however the potential bias of not wanting to report one's errors and the evidence of structural weaknesses in the monitoring program demand a high level of audit integrity.

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendants Motion to Terminate Monitoring (Doc. 2251). The following performance measures at the following locations will be terminated for the reasons described above:

- PM 7 at all 10 facilities;
- PM 33 at Douglas, Florence, Lewis, Safford, Winslow, and Yuma;

- PM 34 at Douglas, Florence, Lewis, Safford, Winslow, and Yuma;
- PM 38 at all 10 facilities;
- PM 56 at all 10 facilities;
- PM 57 at Douglas, Eyman, Florence, Lewis, Safford, Tucson, Winslow, and Yuma;
- PM 58 at at Douglas, Eyman, Florence, Lewis, Safford, Tucson, Winslow, and Yuma;
- PM 60 at Douglas, Eyman, Florence, Lewis, Safford, Tucson, Winslow, and Yuma;
- PM 61 at Douglas, Eyman, Florence, Lewis, Safford, Tucson, Winslow, and Yuma;
- PM 62 at Douglas, Florence, Lewis, Safford, Winslow, and Yuma;
- PM 63 at Douglas, Eyman, Phoenix, Safford, Winslow, and Yuma;
- PM 64 at Douglas, Eyman, Phoenix, Safford, Winslow, and Yuma;
- PM 65 at Douglas, Eyman, Phoenix, Safford, Winslow, and Yuma;
- PM 68 at Douglas, Eyman, Phoenix, Safford, Winslow, and Yuma;
- PM 70 at Douglas, Eyman, Phoenix, Safford, Winslow, and Yuma;
- PM 71 at all 10 facilities;
- PM 74 at Douglas, Eyman, Florence, Lewis, Safford, Tucson, Winslow, and Yuma;
- PM 75 at Douglas, Florence, Lewis, Safford, Winslow, and Yuma; and
- PM 76 at Douglas, Florence, Lewis, Safford, Winslow, and Yuma.

. . .

. . .

. . .

. . .

. . .

. . .

**IT IS FURTHER ORDERED** that, within 30 days of the date of this Order, the parties shall each submit the names of two proposed experts who can conduct a review of the monitoring process, along with their CVs and confirmation of their availability. Thereafter, the Court will pursue a selection process that may include interviewing a finalist.

Dated this 22nd day of June, 2018.

_____
David K. Duncan
United States Magistrate Judge