UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their Official capacities, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

No. CV-12-00601-PHX-DKD

Phoenix, Arizona
June 13, 2018 A.M.
9:01 a.m.

BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING — A.M.
(Pages 1 through 116)

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-12-601-PHX-DKD – June 13, 2018 A.M.

1                    **A P P E A R A N C E S**

2    **For the Plaintiffs:**

3            PRISON LAW OFFICE
             By:  **Corene Kendrick, Esq.**
4            1917 5th Street
             Berkeley, CA 94710

5
             ACLU – Washington DC
6            By:  **David C. Fathi, Esq.**
             915 15th Street NW
7            7th Floor
             Washington, DC 20005

8
             EIDENBACH LAW PC
9            By:  **Kirstin T. Eidenbach, Esq.**
             P.O. Box 91398
10           Tucson, AZ 85752

11           ARIZONA CENTER FOR DISABILITY LAW – Phoenix, AZ
             By:  **Asim Dietrich, Esq.**
12           5025 East Washington Street
             Suite 202
13           Phoenix, AZ 85034

14   For the Defendants:

15           STRUCK LOVE BOJANOWSKI & ACEDO PLC
             By:  **Timothy J. Bojanowski, Esq.**
16           By:  **Rachel Love, Esq.**
             By:  **Daniel Struck, Esq.**
17           3100 W. Ray Road
             Suite 300
18           Chandler, AZ 85226

19   Also present telephonically:
             Jennifer Finger
20

21

22

23

24

25

─── **CR-12-601-PHX-DKD – June 13, 2018 A.M.** ───

1

2                              **I N D E X**

3   **DEFENSE WITNESS:**      **DIRECT**      **CROSS**      **REDIRECT**   **RECROSS**

4   NICOLE TAYLOR
    By Ms. Love              11
5   By Ms. Kendrick                          37

6

7

8

9                          **INDEX OF EXHIBITS**

10
    **EXHIBIT**                                          **IDENT**   **RECEIVED**
11
    63         7-26-17 e-mail from N. Taylor
12             to M. Dolny                              51         53

13  69         9-29-17 e-mail from N. Taylor
               to P. Schroeder                          53
14
    97         3-17-17 e-mail from R. Pratt
15             to R. Almanza                            80         82

16  99         10-5-17 e-mail from L. Calcote
               to N. Taylor                             91         114
17
    117        6-29-17 e-mail from D. Dye to
18             Tucson Corizon & custody staff           101        103

19  123        9-5-17 e-mail from Taylor to
               M. Donley                                59         114
20
    176        9-6-17 e-mail from A. Carr to
21             L. Urdaneta                              106        110

22  189        7-5-17 e-mail from L. Johnson
               to J. Taylor                             103        110
23
    224        Weekend Watch Notes Instructions
24             Phoenix                                  29

25

**INDEX OF EXHIBITS**

| EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|
| 235 | 11-3-17 e-mail from Angela Fischer to Richard Watts, Eddie Taylor | 97 | |
| 248 | July and September 2015 Phoenix CGAR pages | 76 | 78 |
| 254 | Shawn P. Smith and Robert Osorio medical records | 33 | |
| 263 | 10-12-17 e-mail from Nicole Taylor to Stephanie Leonard, et al | 95 | 97 |
| 277 | 12-18-17 e-mail from Eddie Taylor to Nicole Taylor, et al. | 68 | 76 |
| 278 | 12-19-17 e-mail from John Keck to Stephanie Leonard | 72 | 76 |
| 279 | 11-21-17 e-mail from Lynn Calcote to Jessica Raak | 87 | 88 |
| 284 | March 2018 Tucson CGAR and medical Record for Robert Ramirez | 84 | 87 |
| 666 | May 19, 2017 Condensed Health Services Encounter record for Johnny Valles, #11404 | 20 | 23 |
| 667 | May 17, 2017 Condensed Health Services Encounter record for Abebaw Feleke, #132272 | 24 | 29 |
| 677 | June 4, 2018 MH Levels Statistical Summary | | 24 |
| 678 | September 5, 2017 e-mail from Michael Dolney to Nicole Taylor regarding RE: Average daily intake at Phx | 45 | 114 |
| 679 | ADC Form 1103-27(e), Initial Mental Health Assessment | | 24 |

1

2                        **INDEX OF EXHIBITS**

3       **EXHIBIT**                                    **IDENT**   **RECEIVED**

4       681      eOMIS records for David Parrish
                 #131089                                79          80
5
        682      eOMIS records for Felipe Guerro
6                #300379                                78          80

7       683      January 12, 2018 e-mail from
                 Eddie Taylor to Nicole Taylor
8                regarding RE: MH Score breakdown
                 with attachment                        57          114
9
        705      April 25, 2017 email from
10               Angela Fischer to Nicole Taylor
                 Re: MHTM                               50
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Proceedings begin at 9:01 a.m.)

 2          THE CLERK:  Civil case number 12-601, Parsons, et al,

 3     versus Ryan, et al, on for status hearing.

 4          THE COURT:  Counsel, please announce.

 5          MR. FATHI:  Good morning, Your Honor, David Fathi of          09:02:08

 6     the ACLU National Prison Project for the plaintiff class.

 7          THE COURT:  Thank you.

 8          MS. KENDRICK:  Good morning, Your Honor, Corene

 9     Kendrick from the Prison Law Office for the plaintiff class.

10          THE COURT:  Thank you.          09:02:19

11          MS. EIDENBACH:  Good morning, Your Honor, Kirstin

12     Eidenbach for the plaintiff class.  And to my left is Asim

13     Dietrich for the Arizona Center for Disability Law.

14          THE COURT:  Thank you.  Good morning.  Welcome.

15          MS. LOVE:  Your Honor, good morning.  Rachel Love,          09:02:32

16     Timothy Bojanowski and Daniel Struck for defendants.

17          THE COURT:  Thank you.  Good morning.

18          And I gather no one is on the phone; is that correct?

19          THE CLERK:  I tried to close in and there was no one

20     there.          09:02:45

21          THE COURT:  All right.  Thank you.

22          Before we return to the testimony from Dr. Taylor, I

23     need to address an issue that was raised in chambers at the

24     request of defendants' counsel.

25          I met with defendants' counsel and plaintiffs' counsel          09:02:56

─ **CR-12-601-PHX-DKD – June 13, 2018 A.M.** ─

1    just now so that I could hear the information from defendants'

2    counsel that Dr. Taylor, Mr. Struck had learned, had reviewed

3    the transcripts for the witnesses for whom the Rule had been

4    invoked.

5            This is troubling extraordinarily so because the Rule          09:03:18

6    had been invoked.  And counsel for witnesses have an obligation

7    to assure that those witnesses are not given access to the

8    court testimony.  And that's part of what a lawyer does when

9    the Rule is invoked, is you have that conversation with the

10   witness saying, you have been excluded from the courtroom          09:03:42

11   because the Rule has been invoked, and that also means that you

12   can't review the transcripts.

13           Mr. Struck and Miss Love explained that they had come

14   to understand that Dr. Taylor had been receiving these

15   transcripts as part of her job, and that they did not          09:03:59

16   understand that until just now.

17           And they -- and then the plaintiffs asked that the

18   witness be excluded as a sanction.  I then said that if that

19   were the course that the Court would take, then the plaintiffs

20   would have to give up their opportunity to cross-examine this          09:04:27

21   witness.  And they then decided that they would prefer not to

22   have that sanction of the exclusion of the witness as a witness

23   in this case.

24           And so we are going to have Dr. Taylor back on the

25   stand.          09:04:46

—— **CR-12-601-PHX-DKD – June 13, 2018 A.M.** ——

1          I'm going to make a further record about this,

2   however, and that is because Dr. Taylor is a licensed member of

3   the State Bar of Arizona and should know better.  And I told

4   counsel in my chambers that I was considering whether a Bar

5   complaint was appropriate in this instance.  It's not as if a          09:05:00

6   lawyer who's been excluded from the courtroom, who's been told

7   you cannot be in the courtroom, should not know that that means

8   that you can't read the transcripts for what happened in the

9   courtroom that you were excluded from.

10          So I don't know.  I have to look at -- I have to look          09:05:17

11   at the Rule.  I have to look at my obligation.

12          But you wear two hats always, Dr. Taylor.  Sometimes

13   I've been wondering in this courtroom which hat you've had on.

14   I thought it was appropriate for you to have only your

15   assistant director hat, because that's why you're here.  But          09:05:36

16   sometimes I've felt that you have worn another hat, and that is

17   as some kind of advocate of a legal nature.

18          And I have seen some things in the courtroom that have

19   been disquieting to me, and I've shared those with your counsel

20   in the off-the-record matter, and I'll share it with you here          09:05:58

21   now.  I have seen you mouth words to witnesses on the stand.

22   You've been sitting there, and I have seen you mouth words,

23   make gestures to witnesses on the stand, which I took to be

24   your effort to try to influence their testimony.

25          I would not countenance that in a lawyer, and I did          09:06:15

1   not bring it up at the time because they looked to be isolated

2   incidents.  But I did not think it was appropriate, and it made

3   me think that sometimes you were not doing what you should be

4   doing in this case, and that is performing your duties that the

5   State of Arizona has hired you to do.                              09:06:41

6        There are, as I say, many crosscutting currents in

7   this case, and one of them is the fact that I have the person

8   who's in charge of the psychological component of the

9   stipulation –- the mental health rather, the mental health

10  component of the stipulation, that you've been in court often.    09:07:01

11  And so I've expected you to be providing that kind of

12  information.

13       So when I'm presented with this situation where you

14  have violated the Rule of the Court, normally with a lay

15  person, nonlawyer person, you would really just hold the          09:07:23

16  lawyers accountable.  But here you're a lawyer, and you're

17  licensed.  And so it seems to me appropriate for me to also

18  address you directly about this, that you should have known

19  better and you shouldn't have done it.

20       So, that's the record that I wanted to make.                  09:07:42

21       I need to turn to respective counsel to see if there's

22  anything they'd like to supplement what I've said.

23       From the plaintiffs' side?

24       MS. KENDRICK:  Your Honor, we would just again invoke

25  Rule 16 in case any other of the pending witnesses are in the     09:07:55

—CR-12-601-PHX-DKD — June 13, 2018 A.M.—

1    courtroom, to confirm that they are excluded.

2         THE COURT:  Miss Love, any --

3         MS. LOVE:  There are none in the courtroom.

4         THE COURT:  And anything the defendants would like to

5    add to the record that I've just made?                              09:08:07

6         MR. STRUCK:  Your Honor, just as lead counsel, I take

7    full responsibility for not instructing all the witnesses not

8    to review the transcripts.  And I apologize to the Court and

9    counsel for that lapse.

10        THE COURT:  Thank you very much.                               09:08:25

11        Dr. Taylor, would you please return to the witness

12   stand?

13        MS. KENDRICK:  Your Honor, before we begin, is it

14   possible to close the computer that has this display up?  It's

15   rather distracting.                                                 09:08:50

16        THE COURT:  There's a simple way.

17     (Discussion held off the record.)

18        MR. STRUCK:  Your Honor, apparently there's someone

19   trying to get on the line, on the phone, Miss Finger, the

20   Corizon assistant general counsel.                                  09:09:29

21        THE COURT:  If she does get on, let us know.

22     (Discussion held off the record.)

23        THE CLERK:  She's now on the line, Judge.

24        THE COURT:  Thank you.

25        Could you announce for the record, please?                     09:10:55

UNITED STATES DISTRICT COURT

─────────── Nicole Taylor – Direct Examination ───────────

1          MS. FINGER:  Jennifer Finger from Corizon.

2          THE COURT:  Thank you.

3          Miss Love, you may continue.

4          MS. LOVE:  Thank you, Your Honor.

5      (NICOLE TAYLOR, DEFENSE WITNESS, PREVIOUSLY SWORN)

6                     DIRECT EXAMINATION

7   BY MS. LOVE:

8   Q.  Dr. Taylor, when we left off yesterday we were speaking

9   about the intake or reception process for inmates that go

10  through the Phoenix Complex.                                    09:11:19

11         Now, when -- are you aware of whether or not there has

12  been a significant change in the number of inmates who on an

13  average daily basis go through reception compared now to the

14  time that you worked at Phoenix and did intakes?

15  A.  Yes.  It's about the same.  We end up really intaking about  09:11:39

16  the same number.  Sometimes we release more in one year than

17  another, but we intake about the same year after year.

18  Q.  And when you worked as a psych associate at Phoenix, part

19  of -- when you did work intake, is that something that you

20  would be assigned to specifically, I'm only working intake and  09:11:58

21  I don't have a case load and I'm not doing anything else?

22  A.  No, I would be assigned to intake in the a.m. side of the

23  day, and then I would go over and do my caseload in the p.m.

24  side of the day.

25  Q.  Are you aware of whether or not at Phoenix in the last      09:12:13

—Nicole Taylor – Direct Examination—

1    year, if that was a similar process for the Corizon mental

2    health staff, where someone would cover intake for part of the

3    day and then also cover their other case load?

4            MS. KENDRICK:  Objection, foundation.

5            THE COURT:  It's an are-you-aware question.                09:12:32

6            So can you answer yes or no?

7            THE WITNESS:  They've talked about it in our out

8    briefs about how they're going to manage some of the intake --

9            THE COURT:  So when I said, can you answer it yes or

10   no, what part of that didn't you understand?                        09:12:46

11           THE WITNESS:  I apologize.

12           THE COURT:  Thank you.

13           THE WITNESS:  Yes.

14           THE COURT:  Okay.  You can answer it yes or no?

15           And so what is the answer, are you aware whether or         09:12:52

16   not at Phoenix in the last year if that was a similar process

17   for the Corizon mental health staff where someone could cover

18   intake for part of the day and then also cover their other

19   caseload?  Are you aware?  Yes or no.

20           THE WITNESS:  Yes.                                          09:13:09

21           THE COURT:  All right.  How are you aware?

22           THE WITNESS:  During the CGAR out briefs when we would

23   talk about outtakes, they would sometimes talk about what their

24   plans were to cover intake, and they would talk about whether

25   they were going to use a licensed individual or the other          09:13:24

1    option they had available to them, which was to use an

2    unlicensed individual, but then a follow-up by a licensed

3    individual.

4              THE COURT:  Thank you.

5              You may ask your next question.                    09:13:33

6    BY MS. LOVE:

7    Q.  When you covered intake or reception as a psych associate,

8    are you -- do you recall how many inmates would pass through

9    intake or reception on a day average or a span range?

10   A.  In general it was between 50 to 70, depending on the day.  09:13:48

11   Sometimes would you have days that were heavier, 80, 90, and

12   sometimes days that were lighter, 30, 40.  But in general, like

13   50 to 70.

14   Q.  And how long would it take you to process through and do

15   the initial mental health intakes for that number of inmates?  09:14:05

16   A.  Between four hours and sometimes four-and-a-half hours.

17   Q.  Are you aware of whether or not that is consistent with how

18   long it may take Corizon staff now in the last year to do the

19   same?

20   A.  I'm not aware of the last year.  I do know that we did a    09:14:23

21   lean evaluation to determine how long that was going to take

22   about two years ago, to look at the process to make sure that

23   it was flowing well.

24             So the department had taken on a lean project.  So

25   that was about two years ago.  So in the last year I don't know 09:14:41

─────────── **Nicole Taylor – Direct Examination** ───────────

1    if that's changed.

2            THE COURT:  Are you going to address what a lean

3    project is?

4            MS. LOVE:  Yes.

5            THE COURT:  Okay.                                  09:14:53

6    BY MS. LOVE:

7    Q.  What is a lean project, Dr. Taylor?

8    A.  It's a project the Department takes on to look at whether

9    there's a flow of process that needs to be fixed.  And so they

10   have key individuals that are assigned.  And I was not assigned   09:15:02

11   to it, I just know that they did this.  And they walk the

12   process and they transition things.

13           So at Phoenix they ended up moving the intake based on

14   the evaluation by the lean team, because they found it wasn't

15   flowing well where it was at and they moved it.              09:15:18

16   Q.  So physically -- like physically moved the location?

17   A.  That is correct.

18   Q.  And do you know from any of the results of the lean project

19   whether or not there was an assessment of how long it takes

20   mental health -- any member of the mental health team on a       09:15:33

21   daily basis to process the inmates in and do their assessments?

22   A.  That was part of the evaluation.  I don't have any specific

23   numbers though.

24   Q.  Let's switch now and talk about suicide watches.

25   A.  Okay.                                                   09:15:48

1  Q.  And are there CGARs -- I'm sorry, are there health care

2  performance measures that govern how and when suicide watches

3  are performed?

4  A.  Yes, there is.

5  Q.  And as you just sit there off the top of your head, are you                    09:16:02

6  able to recall which performance measures govern suicide

7  watches?

8  A.  Specifically Performance Measure 94 governs the daily

9  suicide watches, and then 95 covers the post suicide watch.

10  Q.  Let's talk about Performance Measure 94 specifically as               09:16:21

11  related to daily contacts.

12          And what does Performance Measure 94 require?

13  A.  It requires that an individual is seen on a daily basis

14  while they're on watch by a licensed clinician if it's a

15  weekday, and by a -- it can be by a registered nurse if it is a          09:16:36

16  weekend or a holiday.

17  Q.  Are there any unique requirements at the Phoenix Complex as

18  to who may perform the daily contacts for an inmate on suicide

19  watch?

20  A.  There is.                                                                     09:16:53

21          Performance Measure 91 also requires that they -- a

22  licensed clinician sees an individual who is classified as an

23  MH-5 on a continuous watch every day of the week.

24  Q.  And those -- am I correct in -- from your testimony

25  yesterday that the MH-5 scored inmates in the Arizona                     09:17:16

─────── **Nicole Taylor – Direct Examination** ───────

1   Department of Corrections system, they are only housed at the

2   Phoenix Complex?

3   A.   That is correct.

4   Q.   Are you aware of what the purpose is of requiring a

5   one-to-one contact with a licensed clinician for the MH-5s that          09:17:40

6   may be on suicide watch?

7   A.   Well, in general the purpose is to work with the patient

8   and help them to get to a place where things are going better

9   for them.   Maybe it's psychosis they're dealing with, maybe

10  they're scared of their surroundings, maybe significant                  09:18:02

11  depression.   Every individual is different.   But working with

12  them to -- you know, do we need to adjust medications?   What is

13  it exactly that's going on for that specific individual?   And

14  you do that through those one-to-one contacts.

15  Q.   Are there different levels of suicide watch, such as the            09:18:19

16  frequency of observation of an inmate on suicide watch?

17  A.   Yes.   There's three different levels.   There's a continuous

18  watch where the officer remains in constant observation of the

19  individual, ten-minute watch, and then a 30-minute watch.

20  Q.   And for all of those three levels of the frequency of the          09:18:40

21  observation of watch, does Performance Measure 94 require a

22  daily contact with the inmate?

23  A.   That is correct.

24  Q.   Are there also any requirements in the Performance Measures

25  as to how the daily contact should take place?   Such as, is            09:18:59

1   there a physical location that these contacts need to be --

2   take place?

3   A.  Yes.  Starting in October of 2016 there was the direction

4   from the Court that those were to be conducted in a

5   confidential setting unless they refused or there was a hard          09:19:22

6   lockdown on the facility.

7   Q.  And is that for all frequency levels of watch; for the

8   30-minute watch, the ten-minute watch and the continuous watch?

9   A.  All levels of the watches.

10  Q.  And Performance Measure 91 is a performance measure that          09:19:37

11  you and the two members of your mental health monitoring team

12  do assess for the monthly CGARs?

13  A.  That is correct.

14  Q.  And if in review -- well, let me back up.

15          So in analyzing Performance Measure 94, you and your          09:20:04

16  team, there's ten random files that are drawn for a certain

17  complex; is that correct?

18  A.  For a number of the performance measures, yes.

19  Q.  And that includes Performance Measure 94?

20  A.  94, yes.                                                          09:20:19

21  Q.  And as of October of 2016, when you do your audit of those

22  ten files, are you and your team looking to see if there's

23  documentation of whether a cell-front contact was offered to

24  the inmate?

25  A.  A confidential --                                                 09:20:36

1    Q.  Yes.

2    A.  -- is offered?

3    Q.  I'm sorry.  Confidential.

4    A.  Yes.  We specifically look to see whether they documented

5    what setting they saw the individual in.  And if it                    09:20:44

6    doesn't -- if they didn't document that they saw them in a

7    confidential setting, then they need to indicate why they did

8    not.

9    Q.  And does an inmate have to agree to a confidential setting?

10   A.  They don't have to.  They're definitely encouraged to.            09:20:59

11   Because, again, as I was talking about yesterday, it's very

12   hard to engage through a cell front with anybody.

13   Q.  And if the inmate refuses to participate in a confidential

14   setting, is it still a requirement that that contact, that

15   one-on-one contact occur with the clinician, or the nurse if          09:21:20

16   it's on a weekend or holiday, for less than MH-5s?

17   A.  Well, we certainly wouldn't force them to.  And so then the

18   contact is done cell front.  But we don't force them out of

19   their cell into that one-to-one confidential setting.

20   Q.  Did you ever, in the course of the time period that Angela        09:21:39

21   Fischer was working at Phoenix, have discussions with

22   Miss Fischer about what the performance measure required with

23   respect to documentation of whether or not a confidential

24   setting was offered to the inmate and the inmate refused?

25   A.  Yes.  As I was talking about yesterday, I've had multiple         09:22:04

1   conversations in the monthly CGAR meetings.  Phoenix

2   specifically struggled with this performance measure for a

3   number of months, specifically due to individuals forgetting to

4   write that.  And then I also had additional conversations

5   specifically just with Miss Fischer.                              09:22:25

6   Q.  And what was -- what was the nature of the conversations

7   with Miss Fischer?  Is it something that you initiated a

8   conversation with her, she initiated with you?  How did that

9   happen?

10  A.  I think -- I can't recall who initiated -- I think it was a   09:22:37

11  phone call was the first time.  And just explaining exactly

12  what needs to be in the notes, what we have to look for.

13  Because, again, I don't want to be in the position where I have

14  to guess at what you meant.  I need to know that we're on the

15  same page about what you meant.  And so those discussions.       09:22:59

16        And I know that she had sent me some e-mails asking

17  for the CGAR results so that she could review her notes with

18  the specific ADC numbers.

19  Q.  In the performance of the audit of Performance Measure 94,

20  whether by you or your two team members, did it ever come about  09:23:21

21  that you found an example that Miss Fischer -- there was a

22  failure to document the appropriate wording as to whether or

23  not a confidential setting was offered such that you could make

24  a finding either way?

25        MS. KENDRICK:  Objection, leading.                          09:23:38

UNITED STATES DISTRICT COURT

1        THE COURT:  Overruled.

2        THE WITNESS:  Yes, there were a number of documents

3   throughout the months that we found specific that Miss Fischer

4   had written, although a very detailed note and had a lot of

5   information in it, it was missing that information where I          09:23:56

6   could discern what type of contact that was.

7   BY MS. LOVE:

8   Q.  Did you ever provide the specific examples of what you

9   found with respect to Miss Fischer's documentation to her

10  personally?                                                        09:24:09

11  A.  She in a couple of the CGAR meetings was sitting next to

12  the lead.  I usually hand it to the lead, but oftentimes we

13  have clinicians who are very much engaged and want to know

14  whether it's their notes.  So she was sitting next to him and

15  was able to have those.                                            09:24:26

16       And if she didn't have the ADC numbers, that's when

17  she would ask me for the CGAR results so she could pull the ADC

18  numbers.

19  Q.  If you could turn to Exhibit No. 666.  That should be in

20  front of you.  Please let me know if you don't have it there.     09:24:39

21  A.  I found it.  They're not in order.  But I got it.  We're

22  good.  Okay.

23  Q.  If you could take a look at the document that's marked for

24  identification as Exhibit 666, and let me know whether or not

25  you recognize this document.                                       09:25:11

———Nicole Taylor – Direct Examination———

1   A.  Yes, I do.

2   Q.  And what is this document?

3   A.  This is a May 2017 watch -- constant watch note for an

4   individual.  And the documentation is completed by

5   Miss Fischer.                                          09:25:27

6   Q.  How do we know as we sit here in the courtroom looking at

7   this document that it is a note for a constant watch?

8   A.  So under -- on the header, under type, it says mental

9   health constant watch contact.  And then additionally in the

10  note, the first part says, the individual was seen for constant  09:25:43

11  suicide watch assessment.

12  Q.  In the column that is marked with an S, so the second

13  section down, second line, it says, confidential setting

14  comments, colon, none.

15      Is that -- you spoke yesterday about a drop-down menu     09:26:05

16  or a drop-down button that would document whether or not a

17  confidential setting was offered.  Is that what this is?

18  A.  It is.  But at the time that this note was created that

19  drop-down didn't exist, I don't think.  I'm not sure quite when

20  the day happened.  But the system went and back filled all the  09:26:23

21  notes with that drop-down that didn't exist at the time.  So it

22  may not have existed in May when she did the document.  And so

23  it might have back filled the "none" in there.

24  Q.  And is this -- is this notation or this record an example

25  of some -- of something that came to your attention as to      09:26:47

**Nicole Taylor – Direct Examination**

1   whether or not there was enough documentation for Performance

2   Measure 9 (sic) to make a finding whether it was in compliance

3   or not with respect to whether or not a confidential setting

4   was offered to the inmate?

5   A.  That is correct.                                        09:27:01

6   Q.  And how did this come to your attention, if you recall?

7   A.  It was either for 94 or 91, they both kind of have similar

8   issues.  And because this is a constant mental health watch, it

9   could have been for also 91.

10       But likely they did not pass the CGARs in May, and so    09:27:19

11   these would be one of the ones I would review to determine what

12   was the reason for the failure.

13  Q.  And based upon the information provided -- actually, let me

14  back up.

15       Is this health services encounter that we're looking    09:27:35

16  at here, would this be considered a source document that you

17  would look to determine whether there was compliance with

18  Performance Measure 94 or 91?

19  A.  That is correct.

20  Q.  And what about this note would cause you concern that you  09:27:47

21  were not able to make a finding of compliance with this

22  encounter?

23  A.  So nothing about the interaction she was having, but simply

24  the lack of a statement that it was conducted in a confidential

25  setting.  Or if it was not conducted in a confidential setting, 09:28:05

────────── Nicole Taylor – Direct Examination ──────────

1    the reason for that.

2    Q.  So when you're not able to tell whether or not a

3    confidential setting was offered, and if the -- whether or not

4    the inmate refused, that is something that's going to result in

5    a finding of noncompliance for Performance Measure 94?                 09:28:24

6    A.  That is correct, and/or 91.

7              MS. KENDRICK:  Move to strike, leading.

8              THE COURT:  Move to strike -- and the word after

9    "strike" you said?

10             MS. KENDRICK:  Leading.  I'm sorry.                          09:28:36

11             She answered before I could object.

12             THE COURT:  Hold on just a second.

13             Overruled.

14   BY MS. LOVE:

15   Q.  You can go ahead and answer.                                       09:29:04

16   A.  Yes, for 94 and for 91.

17   Q.  If you would next --

18             Or defendants move for admission of Exhibit No. 667.

19             THE COURT:  Any objection?

20             MS. KENDRICK:  Were we looking at 667 -- we were             09:29:19

21   looking at 666?

22             MS. LOVE:  666, I'm sorry.

23             MS. KENDRICK:  No objection, I'm sorry.

24             THE COURT:  666 is received.

25        (Exhibit No. 666 admitted into evidence.)

—Nicole Taylor – Direct Examination—

1          MS. LOVE:  Also, yesterday before I forget to do this,

2     defendants move for admission of Exhibits 667 (sic) and 679.

3          For the record, 677 was the mental health statistical

4     summary report.

5          MS. KENDRICK:  No objection to 677.                    09:30:04

6          MS. LOVE:  And also Exhibit No. 679, which was the

7     blank form of the ADC initial mental health assessment form.

8          MS. KENDRICK:  No objection.

9          THE COURT:  679 and 677 are received.

10       (Exhibit Nos. 679 and 677 admitted into evidence.)

11    BY MS. LOVE:

12    Q.  Dr. Taylor, if you will now see if you can find in the pile

13    in front of you Exhibit No. 667.

14    A.  I have it.

15    Q.  Do you recognize the document that is contained in        09:30:31

16    Defendants' Exhibit No. 667?

17    A.  Yes, I do.

18    Q.  What is this?

19    A.  This is another May 2017 watch contact note.

20    Q.  And who is the watch contact note authored by, if you know? 09:30:51

21    A.  Miss Fischer.

22    Q.  And how do you know that, if we look here at this document?

23    A.  At the bottom of the note it indicates, staff, and it

24    automatically when they're signed in puts the name -- their

25    name at the bottom of their notes.                            09:31:07

---

**Nicole Taylor - Direct Examination**

---

1   Q.  And at the very bottom of this document next to staff, it

2   says Fischer, Angela, comma, LPC; correct?

3   A.  That is correct.

4   Q.  Is this specific encounter a document -- a source document

5   that came to your attention in review and auditing of          09:31:22

6   Performance Measure number 94 and/or 91?

7   A.  Yes.  This was another one of the findings for that month.

8   Q.  And when you say "findings," do you mean a finding of

9   noncompliance?

10  A.  That is correct.                                            09:31:37

11  Q.  And what about this source document led -- led to the

12  determination of noncompliance with respect to determining

13  whether or not the inmate was offered a confidential setting

14  for the suicide watch contact?

15  A.  So similar to the last note, there is no indication in the  09:31:55

16  note that the individual was seen in a confidential setting, or

17  if he wasn't seen in a confidential setting, the reason for

18  that.

19  Q.  And in your communications with Miss Fischer, did you have

20  an opportunity to explain to her, by going through specifically 09:32:14

21  Exhibit 667, to show her why you could not make a compliance

22  finding based upon this record?

23  A.  Over a number of months we went through a number of

24  examples.  I don't know if this specific one was one of -- it

25  likely was, because I brought all May ones to the May CGAR out  09:32:37

---

UNITED STATES DISTRICT COURT

───── **Nicole Taylor – Direct Examination** ─────

1    brief.

2    Q.  Did you have -- did Miss Fischer let you know whether or

3    not, in fact, she was providing the opportunity for a

4    one-on-one confidential setting?

5    A.  She was very, very clear about that, that she always does.    09:32:52

6    And she's told me that a number of times, that she clearly sees

7    them in that setting, because it would be very difficult to

8    write such a detailed note if she wasn't.  And I expressed to

9    her that I understood that frustration, that she writes great

10   notes, but I just can't count them without that information.    09:33:12

11   Q.  So did you personally have any doubt whether or not

12   Miss Fischer was indeed offering a one-on-one confidential

13   setting?

14   A.  Not at all.

15   Q.  So -- strike that.    09:33:26

16         Was your concern then in not -- in the inability to

17   make a compliance finding, that it was just a lack of

18   documentation that the one-on-one was offered?

19         MS. KENDRICK:  Objection, leading.

20         THE COURT:  Overruled.    09:33:46

21         But can I ask, what's the purpose of this examination

22   right now, this subject?  Are you trying to impeach

23   Miss Fischer, or are you trying to say that people who do good

24   notes also forget to put in the words that they offered the

25   confidential setting?    09:34:07

 1          MS. LOVE:  It is the latter.  It is not to impeach

 2    Miss Fischer.  As Dr. Taylor just testified, that she never

 3    doubted -- I shouldn't say "never."  She didn't doubt that the

 4    care was being delivered appropriately.  Unfortunately the

 5    compliance finding was a lack of documentation.                    09:34:21

 6          THE COURT:  Right.  Understand.

 7          And so this issue is one where I'm trying to connect

 8    the dots and get where you think you could argue that this is

 9    going to be helpful for me on the quality of the monitoring.

10    Because fundamentally the monitors can't know what this doctor    09:34:40

11    knows in her head, and that is, knows that she's had

12    conversations, as you've been examining about here, with

13    doctor -- with Miss Fischer, soon to be doctor.  And so she

14    knows that, but the monitors can't know that.  So I don't

15    understand how that's going to help.                              09:35:01

16          MS. LOVE:  The connection that we are attempting to

17    make for you is that the accuracy of the Monitoring Bureau and

18    the findings -- like these are specific instances where there

19    was noncompliance found based upon a lack of documentation.

20    Not -- knowing that the delivery of care is happening --         09:35:17

21    because Dr. Taylor didn't doubt that she was, in fact -- in

22    fact, doing the one-on-ones.  But to show that the Monitoring

23    Bureau is not inaccurately reporting their findings.  These are

24    specific examples where noncompliance had to be found based

25    upon the lack of documentation.                                   09:35:38

─────── Nicole Taylor – Direct Examination ───────

1      THE COURT:  So you're demonstrating to me that when

2  the Monitoring Bureau determines that there's noncompliance

3  because these words aren't here, that should be comforting to

4  me because it shows that the monitoring system works?

5      MS. LOVE:  Correct.                                    09:35:56

6      THE COURT:  And so all of these questions about

7  whether or not Dr. Taylor knew that it had been done or not,

8  why does that matter to that question?

9      MS. LOVE:  Because, again, if -- if there were -- our

10  argument is -- our argument is that if there were a beat the   09:36:15

11  monitoring system at play or gamesmanship by the Monitoring

12  Bureau, if they knew that -- you know, or trusted that the care

13  was being given, then perhaps they would be marking things

14  compliant.  Where if you went back to the source document you

15  couldn't make it compliant if you're going off of the rules of   09:36:34

16  the Monitoring Guide and how you assess whether or not a

17  Performance Measure was met.

18      THE COURT:  Miss Kendrick, you're standing.

19      MS. KENDRICK:  Your Honor, we would also object to

20  this line of questioning as cumulative.  Exhibits 667 through   09:36:50

21  676 are a series of printout notes from Miss Fischer where time

22  after time it says, confidential setting comments, colon, none.

23  And if defendants plan on marching us through these nine

24  exhibits, I would just note for the record that Dr. Taylor has

25  already testified that this is a field that was added through   09:37:12

—Nicole Taylor - Direct Examination—

1    the eOMIS system subsequent to the notes being made, and so it

2    was back filled with the entry of "none."

3          So again, we don't see the point of this testimony and

4    we think it's unduly cumulative and wasting the Court's time.

5          THE COURT:  So to address all of these things,                    09:37:28

6    Miss Love, I get the point that you're making.  So you've done

7    enough with that.  So you can move on to the next subject.

8          MS. LOVE:  Okay.  And pursuant to counsel's

9    objection -- and we will be efficient and not go through these

10   examples, does plaintiffs' counsel have an objection for the      09:37:43

11   admission of those additional examples for the Court to review?

12   If the Court is inclined to want to review those.

13         MS. KENDRICK:  Well, again -- I mean, our objection is

14   the concern that the witness has testified that a field --

15   entry field in these encounters was back filled after the time    09:38:00

16   they were made when the system was updated with this drop-down

17   menu.

18         THE COURT:  Well, I get the point.  And I get the

19   point from the exhibit that we've been talking about, 667.  So

20   I'll admit 667.  I don't need to have any of the others,          09:38:15

21   because they are redundant.

22      (Exhibit No. 667 admitted into evidence.)

23   BY MS. LOVE:

24   Q.  Dr. Taylor, if you could turn to Exhibit No. 224, please.

25   A.  Are these possibly behind me?                                 09:38:39

UNITED STATES DISTRICT COURT

─────Nicole Taylor – Direct Examination─────

1   Q.  Yes.  I'll get it for you.

2          MS. LOVE:  Exhibit No. 224 is previously admitted into

3   evidence, for the record.

4   BY MS. LOVE:

5   Q.  Dr. Taylor, do you recognize the photograph -- or a copy of          09:39:07

6   a photograph as Exhibit 224?

7   A.  Yes, I have seen this before.

8   Q.  What is it?

9   A.  It is a photograph of a note -- a signage that was up in

10  Phoenix I believe in the nurse's station.          09:39:26

11  Q.  Do you know whether or not this -- this is still posted in

12  Phoenix in the nursing area?

13  A.  I have not seen it.

14  Q.  Do you know who drafted this notification and placed it in

15  the nursing station?          09:39:45

16  A.  I don't know.  I actually was on the tour and didn't see

17  it.  So I only know it from the picture.

18  Q.  Are you aware of whether or not there was any direction

19  from the Monitoring Bureau to document weekend watch notes with

20  this, quote, offered a confidential setting and the inmate          09:40:04

21  refused?

22  A.  I can speak for myself.  During the CGAR out briefs, the

23  DON or ADON was often in attendance, and I would continuously

24  talk to her about the nursing staff also not documenting

25  whether or not it was in a confidential setting or whether they          09:40:23

---

**Nicole Taylor – Direct Examination**

---

1    offered it and it was refused.

2    Q.  Are you aware of any directives -- or let me strike that.

3    Let me go back.

4         Have you ever directed in your monthly out briefs that

5    Corizon staff make an entry into their records with respect to        09:40:41

6    suicide watches that says, offered a confidential setting and

7    the inmate refused, if indeed that wasn't the case and that

8    didn't happen?

9    A.  No, definitely not, if it didn't happen.

10   Q.  Are you personally aware of any instances where an entry         09:40:58

11   into a medical record was made with respect to a suicide watch

12   where the phrase or wording of, offered a confidential setting

13   and the inmate refused, was documented, however, that did not

14   occur?

15   A.  I can't recall any, no.                                           09:41:16

16   Q.  Did you have any reason to believe that any Corizon

17   personnel were making entries into medical records saying,

18   offered a confidential setting and the inmate refused, when

19   indeed that was not true?

20   A.  No.                                                               09:41:33

21        THE COURT:  But I gather, if somebody had asked you,

22   we should put up a note -- a sign to let people know what the

23   words that would be most helpful for us to make sure that we

24   can have our monitors accurately assess whether the Performance

25   Measure is complied with, that it would have been better to          09:42:08

---

———Nicole Taylor – Direct Examination———

1    have said, if the inmate was offered a confidential setting and

2    refused, use these words, rather than just a sign saying, use

3    these exact words without putting in that qualification.

4         I mean, this does look like a sign that somebody could

5    take to mean, just put this in, this subjective note, no matter    09:42:27

6    what.

7         THE WITNESS:  I mean, honestly I was surprised that it

8    was taken that way.  When I looked at it, I read it to mean

9    that they were directing them exactly as I've said over and

10   over again, I need you to be as clear as possible about what    09:42:42

11   happened.

12        And so I wouldn't -- I didn't see the sign on the

13   tour, but I saw the picture.  I don't take that to mean,

14   document that even if it didn't happen.  I don't find people to

15   be underhanded.  And I don't -- I just -- these are my peers,    09:42:57

16   these are people that I've engaged with for years.  And so, I

17   wouldn't assign that negativity to a sign like that.  I would

18   assign it to them attempting to try to get in front of the

19   issue that continued to plague them month after month.

20        THE COURT:  Well, I mean, they are your peers, but    09:43:18

21   they also -- I mean, I don't know in the particular

22   circumstances of the people who were working in mental health,

23   but I have a general impression that there aren't very many

24   people who are there a long time, who are providing health care

25   under the employ of Corizon.  That people are there for a short    09:43:35

1   period of time.  It seems to me that training isn't emphasized.

2   And so in that context one would worry that if you did have a

3   sign to somebody who perhaps had not had the experience of time

4   to understand what was required, would think that when they

5   were presented with a sign that said, use this exact sentence          09:44:00

6   for writing the setting in subjective note, without any kind of

7   qualifier or caveat, they could take it the wrong way, even if

8   they weren't, as you fear –– or I'm suggesting, that they had

9   bad motives.

10          THE WITNESS:  I understand what you're saying.  I             09:44:19

11  just –– the mental health staff that I work with have been

12  fairly consistent.  There's a lot of the same individuals who

13  have been working for years and years.

14          On the nursing side, I don't know those individuals as

15  well.                                                                  09:44:34

16          THE COURT:  Thank you.

17  BY MS. LOVE:

18  Q.  Dr. Taylor, if you would turn to Exhibit 254 –– which I'm

19  going to run up there because I think you may not have in front

20  of you.                                                                09:44:44

21          We have a lot of stacks.

22          So, Dr. Taylor, if you'd turn to Exhibit 254, which

23  has been previously admitted into evidence.  And tell us, do

24  you recognize what this screen shot is at page 1 of Exhibit

25  254?                                                                   09:45:38

Nicole Taylor – Direct Examination

1    A.  It is a screen shot of an eOMIS for the health services

2    encounters for this individual.

3    Q.  Is a health services encounter a source document for any of

4    the mental health performance measures that you and your team

5    monitor?                                                    09:45:58

6    A.  Yes.  It includes both medical and mental health when you

7    click on the health services encounters.

8    Q.  And do you -- are there any specific performance measures

9    on -- as related to mental health, that this would be a source

10   document that you or your team would analyze?               09:46:15

11   A.  All of our -- almost all of them are used from this screen.

12   Q.  If you would take a look down -- and I'm going to have to

13   count for you -- about 16 lines down in the middle column there

14   is an entry in the middle column that says, MH psychiatrist

15   hyphen unscheduled.  And then next to it it says the name of   09:46:50

16   Roxanne Ezell.  Do you see that?

17   A.  Yes, I do.

18   Q.  Now if you turn to Exhibit No. 254.2, so the second page of

19   Exhibit No. 254, do you see that at the bottom of this health

20   services encounter it says, staff, and then it says, Ezell,    09:47:08

21   Roxanne, RN?

22   A.  Yes, I do.

23   Q.  Do you know -- do you have any personal knowledge as to why

24   there would be an entry in a mental -- or in the health

25   services encounters that would list Roxanne Ezell as a         09:47:24

─────── **Nicole Taylor – Direct Examination** ───────

1   psychiatrist, and then on her mental -- or her health services

2   encounter it lists her as an RN?

3          MS. KENDRICK:  Objection, speculation.

4          THE COURT:  She's asking if you have any idea.

5          Do you have any idea?                                    09:47:41

6          THE WITNESS:  Yes.

7          THE COURT:  Why do you have this idea?  How do you

8   have an idea?

9          THE WITNESS:  During our monthly CGAR out briefs I

10  brought these exact issues up with the DON, where I would      09:47:48

11  provide her notes on the nursing staff who would accidentally

12  click the wrong form type.  Because we're very much aware when

13  those happen, it's very clear to us they are not a psychiatric

14  provider.  And so I've provided those copies over to the DON to

15  address.                                                        09:48:12

16         THE COURT:  Overruled.

17  BY MS. LOVE:

18  Q.  In monitoring whether or not there was a psychiatric

19  encounter with a patient, would -- when you're looking at page

20  1 when it shows a psychiatric unscheduled encounter by         09:48:32

21  Miss Ezell, would that count as a psychiatric encounter if she

22  is indeed an RN?

23  A.  It would not.

24  Q.  Now in review of source documents with respect to

25  monitoring the health -- the mental health care performance    09:48:47

─────────────── **Nicole Taylor – Direct Examination** ───────────────

1  measures, how would a monitor -- if you know, how would a

2  monitor know whether or not a psychiatric encounter should be

3  counted if you're just looking across at a name, and there

4  could be this discrepancy in the records as to if the person's

5  a psychiatrist or the person is an RN?                              09:49:05

6  A.  If we didn't specifically know the individual, which we

7  know most of the individuals, we actually have a staff listing

8  from Corizon that has all mental health staff listed, their

9  titles and their credentials.

10  Q.  If you come across a discrepancy -- if you or your -- the   09:49:23

11  people that help you, the two people in your bureau that help

12  you on mental health, came across and saw that this was a

13  psychiatric encounter by someone listed on the encounter list

14  that's a psychiatrist but indeed is an RN, would that count as

15  compliance towards a performance measure?                         09:49:45

16  A.  No, it would not.

17       MS. LOVE:  May I have a moment, Your Honor?

18       THE COURT:  You may.

19    (Discussion off the record between defense counsel.)

20  BY MS. LOVE:                                                      09:50:54

21  Q.  Dr. Taylor, in the course of your duties in monitoring the

22  mental health performance measures and supervising the two

23  under you that also do so, are you aware of any instances where

24  there was knowingly a finding of compliance with respect to a

25  mental health care performance measure when the underlying data  09:51:30

—————— **Nicole Taylor – Cross-Examination** ——————

1   would show indeed it was not compliant?

2   A.  Specific to the example you were talking about?

3   Q.  In general.

4   A.  I think we've probably had some back and forth with the

5   plaintiffs.  Some of that is more about methodology.  Certainly    09:51:46

6   not knowingly saying that something's compliant when it isn't.

7   But around -- more around methodology.  But not specific to

8   this kind of an example that we're talking about.

9   Q.  Are you aware of any system in place or any practice

10  whereby those that are doing the mental health performance care    09:52:11

11  monitoring are engaging in a practice where knowingly finding

12  compliance when indeed the source documents are going to show

13  noncompliance?

14  A.  No, I'm not.

15          MS. LOVE:  I've no further questions.                       09:52:28

16          THE COURT:  Thank you.

17          Cross-examination.

18                      CROSS-EXAMINATION

19  BY MS. KENDRICK:

20  Q.  Good morning, Dr. Taylor.                                       09:52:45

21  A.  Good morning.

22  Q.  Who did you meet with to prepare for your testimony

23  yesterday and today?

24  A.  Initially on Thursday I met with Mr. Bojanowski for about

25  an hour.  And then I spoke on the phone with Miss Love on           09:53:06

1    Friday for about an hour.  And then I met in her office with

2    her on Monday, I believe it was -- yes, Monday, for about two

3    hours.

4    Q.  And did you speak with anybody else about your testimony?

5    Mr. Pratt?                                                      09:53:23

6    A.  I have not spoken to Mr. Pratt, no.

7    Q.  Director Ryan?

8    A.  No, I have not.

9    Q.  Anybody else who works for ADC?

10   A.  When I was speaking with Mr. Bojanowski there were three of   09:53:32

11   us in the room.  So we were all sitting in there.

12   Q.  And did you participate in creating any of the exhibits

13   that were used in your testimony yesterday or today?

14   A.  Yes.  I pulled a couple of CGARs that I was reviewing,

15   looking at exactly what the issues were on those.  I'm trying    09:53:55

16   to think what some of the exhibits that were used.

17        I think I recommended that they put the mental health

18   technical manual in, although I think it's already in at some

19   point.  I'm trying to think -- I'd have to look at the exhibit

20   list.                                                           09:54:19

21   Q.  Okay.  But the point is that you did make some of the

22   exhibits that were used?  Yes or no.

23   A.  Yes.

24   Q.  What documents did you review?

25   A.  I reviewed a number of documents.  I reviewed prior CGARs    09:54:29

1   that we've had.  I reviewed some statutes that we have in

2   place.  The mental health technical manual, again, just to make

3   sure I was on top of that.  Some e-mails that I had back and

4   forth with Miss Fischer.

5   Q.  Which statutes did you review?                                    09:54:58

6   A.  Looking at the DHS rules around licensed facilities in

7   Phoenix.

8   Q.  Are you counsel of record to Director Ryan?

9   A.  No.

10  Q.  Are you counsel of record to Mr. Pratt?                          09:55:12

11  A.  No.

12  Q.  Did you read Miss Fischer's testimony transcript?

13  A.  Honestly "read" would be a strong word.  I unfortunately

14  don't have the time.  I still have the --

15  Q.  Did you review Miss Fischer's transcript?                        09:55:27

16  A.  I reviewed a potion of it.  I flipped through it, reviewed

17  a couple portions, things that stood out.

18  Q.  Who else's transcript did you review or flip through?

19  A.  For these hearings?

20  Q.  Yes.                                                             09:55:41

21  A.  None, I don't think.  I'm trying to think.

22  Q.  Dr. Stewart?

23  A.  No.

24  Q.  Dr. Watson?

25  A.  No.                                                              09:55:49

Nicole Taylor – Cross-Examination

1    Q.  Dr. Robertson?

2    A.  Dr. Robertson was for the other hearing.

3    Q.  Did you review Dr. Robertson's transcript?

4    A.  You asked me if I reviewed them for these hearings, so I'm

5    just trying to answer that.                                09:56:02

6    Q.  Did you review Dr. Robertson's transcript?

7    A.  Yes, I did, parts of it.  I don't think I got all the way

8    through it.

9    Q.  You testified you got your JD from Golden Gate Law School

10   in San Francisco?                                          09:56:13

11   A.  That is correct.

12   Q.  Is evidence a required course at Golden Gate?

13   A.  Yes, it is.

14   Q.  You testified that you participate in weekly telephonic

15   calls with all of the monitors, the Corizon regional office,  09:56:21

16   and the FHAs?

17   A.  That is correct.

18   Q.  How long are the calls, on average?

19   A.  About an hour.

20   Q.  Who circulates the agenda?                             09:56:32

21   A.  I'm not sure I've seen an agenda.

22   Q.  So your testimony is there's no agenda for these calls?

23   A.  I'm not positive on that.  I don't know.

24   Q.  Your testimony is you've never seen an agenda?

25   A.  I have not seen an agenda, no.                         09:56:50

UNITED STATES DISTRICT COURT

Nicole Taylor – Cross-Examination

Q.  Who leads the meeting?

A.  Whoever is in our regional -- in our central office.

Usually it's Mr. Pratt, if he's available, or somebody else

will lead it.  I'm usually calling in.

Q.  And do you guys talk about a whole range of things;                    09:57:06

medical, mental health, dental care?

A.  Yes.

Q.  Any medication, pharmacy issues that may have come up?

A.  Yes.

Q.  Noncompliant performance measures?                                     09:57:17

A.  Sometimes, yeah.

Q.  Upcoming or past status hearings?

A.  Yes.

Q.  Does anybody keep notes or circulate notes from these

weekly calls?                                                              09:57:31

A.  Not that I'm aware of.  I haven't seen any.

Q.  So your testimony is you've never seen minutes from these

weekly calls?

A.  I have not.

Q.  Do you take notes or minutes during these calls?                       09:57:39

A.  I do not.

Q.  You also testified that you have these monthly meetings --

the CGAR meetings at four facilities?

A.  That is correct.

Q.  And I believe you said Eyman, Florence, Perryville and                  09:57:52

**Nicole Taylor – Cross-Examination**

1  Phoenix?

2  A.  Yes.

3  Q.  You said they're an hour and a half?

4  A.  Sometimes an hour, sometimes two.

5  Q.  And do you discuss anything besides CGAR findings?          09:58:02

6  A.  If there's been a recent court ruling that affects mental

7  health, I will discuss those issues too.

8  Q.  I believe you testified that at one meeting you talked

9  about how people had told you they didn't have access to AIMS?

10 A.  Correct.                                                     09:58:19

11 Q.  So do you talk about other things like that, you know, just

12 kind of random issues that have come up?

13 A.  Yes.

14 Q.  Do you discuss any mortalities or serious incidents that

15 occurred in the past month?                                      09:58:33

16 A.  Yes.

17 Q.  Are these also known as the CQI meetings?

18 A.  No, they are not.

19 Q.  These are separate from the CQI meetings?

20 A.  Yes, I don't attend those.                                   09:58:42

21 Q.  And you testified yesterday that you discuss all the

22 performance measures, including the ones that are 100 percent?

23 A.  That is correct.

24 Q.  You testified that there are 27 mental health performance

25 measures?                                                        09:58:55

_____ Nicole Taylor – Cross-Examination _____

1    A.  I believe it's 27.

2    Q.  So if we were to assume that a meeting's an hour and a

3    half, and they were devoted to nothing but CGAR findings, the

4    90 minutes would work out to about three minutes per

5    performance measure?                                              09:59:09

6    A.  Well, each facility doesn't have all 27.  So there's a

7    number of performance measures that are only specific to that

8    site.  Pregnant women, for example, would not be at every site.

9    Minors not at every site.

10           So there's a number of those that are not discussed,    09:59:22

11   because they're not specific to it.

12   Q.  What are the sites that the minors' performance measures

13   are applicable to?

14   A.  Perryville and Tucson.

15   Q.  When did you first meet Angela Fischer face-to-face?         09:59:32

16   A.  Sometime in early 2017, I would think.  Maybe even earlier

17   than that.

18   Q.  And you didn't supervise Miss Fischer, did you?

19   A.  No, I did not.

20   Q.  She was a Corizon employee and you're an ADC employee?       09:59:50

21   A.  That's correct.

22   Q.  And you don't supervise any of the mental health staff at

23   Phoenix; correct?

24   A.  That's correct.

25   Q.  And you're not involved in the direct provision of mental    09:59:59

─────────── Nicole Taylor – Cross-Examination ───────────

1    health services; correct?

2    A.  Correct.

3    Q.  I'm going to read to you something that defendants filed

4    with the Court on June 7th regarding what you are here to

5    testify about.                                          10:00:16

6    A.  Okay.

7    Q.  And this was filed at docket 2861 at page 2.  And it states

8    that you will be testifying regarding your responsibility and

9    methodology in overall monitoring of the mental health

10   performance measures for State-run prison complexes,      10:00:33

11   utilization of telemedicine for the provision of mental health

12   care, operation of the mental health program at ASPC

13   Phoenix --

14          THE COURT:  Slow down, please.

15   BY MS. KENDRICK:

16   Q.  -- including procedure and expectations for suicide watch,

17   documentation and monitoring of the same, supervision of Angela

18   Fischer, and expectations slash performance of Angela Fischer

19   as to her performance of duties and the failures of obtaining

20   stipulation compliance at ASPC Phoenix due to documentation or  10:01:03

21   care provided by Angela Fischer.

22          Which performance measures were found noncompliant at

23   Phoenix during Miss Fischer's employment there?

24   A.  Routinely Performance Measure 94 and 91.

25   Q.  And is it your testimony that every single one of those    10:01:21

———— **Nicole Taylor – Cross-Examination** ————

1    findings --

2            THE COURT:  Slow down, please.

3    BY MS. KENDRICK:

4    Q.  Is it your testimony that every single one of these

5    findings of noncompliance is the fault of Miss Fischer?      10:01:33

6    A.  Absolutely not.

7    Q.  Is it your testimony that most of them are her fault?

8    A.  There was a period of time where most of them were

9    attributed to the lack of documentation in her notes, yes.

10   Q.  And which performance measures was that?                 10:01:52

11   A.  94 and 91.

12   Q.  And what months?

13   A.  I'd have to specifically review the CGARs to be exact.  But

14   I know May was one of the months, as we were looking at the

15   notes for May.  I think August was possibly one of the months, 10:02:09

16   and maybe June.

17   Q.  This is all of 2017?

18   A.  Correct.

19   Q.  And could you turn to Exhibit 678?  I believe it's in the

20   pile up there.                                               10:02:30

21            MS. KENDRICK:  And does Your Honor have it?

22            THE COURT:  I do.  Thank you.

23   BY MS. KENDRICK:

24   Q.  So this is an e-mail that was sent to you on August 25th,

25   2017, by somebody named Michael Dolny, D-O-L-N-Y.            10:02:56

1          Who is Mr. Dolny?

2    A.  He is an ADC employee that works in the research

3    department.

4    Q.  Okay.  And you write him on the day before August 24th and

5    say, can you please give me a rough estimate of how many          10:03:16

6    inmates come through intake at Phoenix on a daily basis?

7          Do you see that at the bottom?

8    A.  Yes, I do.

9    Q.  And he tells you in response that in fiscal year '17 there

10   were 14,313 inmates that went through Phoenix reception.  That    10:03:29

11   works out to approximately 39.2 per day, close quote.

12         So 39.2 would just be an average; right?

13   A.  That's correct, yes.

14   Q.  So average means some days it's more?

15   A.  That's how -- yes, correct, more and less.                    10:03:49

16   Q.  And Phoenix has a giant intake processing room that the men

17   go through when they're brought from the county jails; correct?

18   Is that what they use?

19   A.  That's -- now they do.  I just saw it for the first time on

20   our tour that we just had.                                        10:04:08

21   Q.  Okay.  Were you on the tour that plaintiffs' counsel did in

22   June 2017?

23   A.  I was, but for some reason I was not on the group that went

24   to intake.  So I hadn't seen -- that's why I was surprised by

25   the room.                                                         10:04:23

1   Q.  Okay.  Is there some name that they call this giant intake

2   room?

3   A.  I don't know.

4   Q.  Okay.  And could you describe approximately how large it

5   is, how many people it can hold in there?                          10:04:36

6   A.  There were maybe six different segregated like cubicles.  I

7   think there were six.  And I don't know how many staff were in

8   each of them because I stood kind of outside.  But typically

9   there were about two or three inmates that were in there

10  waiting to go through their intake process.                        10:05:04

11  Q.  But there's also a giant processing room where it can hold

12  anywhere between 40 to 80 men at once.  Did you see that room

13  when you went on the tour last week?

14  A.  I actually stood outside during that part.  I only went in

15  when we were looking at the -- where they do the processing,       10:05:20

16  where they talk to them, in that room.

17  Q.  Okay.  So not the holding -- not the holding room but the

18  processing room?

19  A.  I think they said it was crowded, so I didn't go in there.

20  Q.  Okay.  So are the new arrivals seen for their mental health   10:05:32

21  assessment in the holding area or in the processing area?

22  A.  What was explained to me is that they're seen in the

23  processing area.

24  Q.  And that's where those cubicles are?

25  A.  That is correct.                                               10:05:47

1   Q.  And so are the mental health staff sitting in the cubicles

2   seeing the patients?

3   A.  I believe they had a space off to the side.  Again, that

4   was the first time I've seen it.  But I thought when we walked

5   around the corner they had a space off to the side that was                    10:06:04

6   dental and mental health down around the corner.

7   Q.  And are they seen one by one in that space?

8   A.  That was my understanding, yes.

9   Q.  And do the men walk in unescorted, or are they brought in

10  by officers to speak to mental health staff?                                   10:06:20

11  A.  They appeared to be walking on their own.  There was

12  officers around, but nobody was being escorted.

13  Q.  Okay.  So if they're seeing people in the cubicle one by

14  one, it's not like the mental health staff is just going up to

15  the men in a line without interruption; correct?                              10:06:38

16  A.  That is correct.

17  Q.  So there's some time lag between each patient coming and

18  sitting down and speaking to mental health staff; correct?

19  A.  There didn't seem to be a time lag.  They were standing

20  behind each other when we were in there.                                       10:06:50

21  Q.  I wasn't with you.

22  A.  Oh, I'm sorry.  When we were in there.

23          They were standing -- two or three were inside there,

24  and then there were like three or four on the outside just

25  standing there waiting.  So I don't know that there would be a                 10:07:04

**Nicole Taylor – Cross-Examination**

1    time lag.

2    Q.  Oh, so other prisoners were standing right there when

3    they -- people were having their mental health intakes done?

4    A.  No, they're standing in line waiting for their turn to go.

5    Q.  Okay.  And you testified that -- yesterday that the higher            10:07:18

6    the acuity the longer it would take to do somebody's intake

7    because you can't skip through all the boxes on that form?

8    A.  Correct.

9    Q.  Okay.  And I believe you said in your experience an MH-1

10   would take about two minutes?                                             10:07:35

11   A.  That is correct.

12   Q.  And an MH-2 would take about five minutes?

13   A.  That's correct.

14   Q.  What would an MH-3D take?

15   A.  Depending on the level of information that they shared --             10:07:43

16   because you can be an MH-3 for -- I was on meds a month ago,

17   and that would make you an MH-3.  So that would obviously be a

18   shorter period of time.  But if they had a substantial history

19   where they went into hospitalizations, for instance, and

20   symptoms that they were having, and you're assessing those               10:08:03

21   portions, it would be a longer period.

22          So I would say that seven to ten minutes would be

23   where the average would be, between those ranges of MH-3s.

24   Q.  Okay.  And the clinician is also supposed to read the jail

25   intake form?                                                             10:08:20

1   A.  If it's been scanned in, yes, they are.

2   Q.  Okay.  And you said that this is -- this was the first time

3   you had seen this process, and this was like a new setup for

4   you, for your experience?

5   A.  That is correct.                                    10:08:32

6   Q.  So intake has changed since you did it 13 years ago;

7   correct?

8   A.  That is correct.

9   Q.  Okay.  So yesterday you testified with regard to Exhibit

10  705, and that was an e-mail when you sent Miss Fischer the   10:09:00

11  mental health technical manual.

12  A.  Yes.

13  Q.  Do you remember that?

14  A.  I do.

15  Q.  Okay.  And what version of the technical manual did you   10:09:07

16  send her?

17  A.  I sent her the active mental health technical manual 2015.

18  Q.  Did she subsequently respond to your e-mail and ask you for

19  a more current version of it?

20  A.  Not to my knowledge, no.                            10:09:25

21  Q.  So your testimony is you don't remember her doing that?

22  A.  I don't believe that that happened, no.

23  Q.  So the technical manual isn't up to date, is it?

24  A.  It is up to date.

25  Q.  It's supposed to be updated annually, but it hasn't, has   10:09:38

1   it?

2   A.  Well, updated annually would suggest that we have the

3   freedom to make changes in it.  And we've been a bit restricted

4   by the -- this settlement.  And so the changes -- I can't make

5   the changes that I would like to make.                          10:09:59

6   Q.  It's supposed to be updated annually?  Yes or no.

7   A.  It is supposed to be updated with the changes that you need

8   to make, yes.

9   Q.  And it was last updated in 2015?

10  A.  That is correct.                                            10:10:10

11  Q.  And you said there's a copy of the mental health technical

12  manual that is somewhere on-site for staff?

13  A.  They should have a copy in the administrative --

14  administration area.

15  Q.  Is that pursuant to a policy?                               10:10:22

16  A.  No, more of a practice.

17  Q.  And have you ever checked an institution to see if a copy

18  of the mental health technical manual is actually available in

19  the admin building?

20  A.  I have not checked, no.                                     10:10:39

21  Q.  Okay.  And it sometimes happens that these mental health

22  rosters that list patients along with their scores are

23  inaccurate; correct?

24  A.  That has happened on occasion, yes.

25  Q.  Okay.  Could you turn to what's labeled as Exhibit 63,      10:10:52

**Nicole Taylor – Cross-Examination**

1    Plaintiffs' Exhibit 63?

2          And this is an e-mail between you and Mr. Dolny and

3    Jacob Gable; correct?

4    A.   That is correct.

5    Q.   And who is Mr. Gable?                                          10:11:23

6    A.   He worked -- I'm not quite sure what his title was.  But he

7    oversaw the department that Mr. Dolny work -- Dr. Dolny worked

8    in.

9    Q.   Okay.  If you could turn to page 3 of the exhibit, at the

10   top of the page there's a paragraph 4.  And this is something    10:11:52

11   that you wrote on July 26th, 2017?

12   A.   Yes.

13   Q.   And you state, quote, here are a few of the lines that were

14   a bit off.  I believe that these individuals released at the

15   time -- the time the report was run, but they were there as of   10:12:09

16   6-30-16.  The odd thing is that they were actually MH-2 at the

17   time of release, but they showed up as MH-3s, close quote.

18          You wrote that?

19   A.   Yes, I did.

20   Q.   Okay.                                                        10:12:23

21          MS. KENDRICK:  I move to admit Exhibit 63.

22          THE COURT:  Any objection?

23          MS. LOVE:  Objection, relevance, and exceeds the scope

24   of direct.  And I'm not sure what it's being offered for.

25          THE COURT:  Can you address that second question?         10:12:36

─────── **Nicole Taylor – Cross-Examination** ───────

1          MS. KENDRICK:  Well, yesterday she was testifying

2    about mental health rosters, and so this is another example of

3    mistakes in the mental health rosters.

4          THE COURT:  Overruled.  It will be received.

5       (Exhibit No. 63 admitted into evidence.)                 10:12:49

6          THE WITNESS:  Can I clarify that that's not what this

7    is?

8    BY MS. KENDRICK:

9    Q.  So could you turn to Exhibit 69, please?

10          THE COURT:  Well, let's hear what she has to say about   10:12:53

11    it.  I mean, obviously -- are you going to make some -- 69,

12    you're going back to 63 again?

13          MS. KENDRICK:  No, I was going to go on to more

14    examples.

15          THE COURT:  All right.  So what you've done with 63     10:13:05

16    hasn't helped me.  I don't understand what 63 means.  So having

17    it admitted is not helpful.  Usually people go through with the

18    witness and help the fact finder understand what the relevance

19    is.

20          Here are a few lines that were a bit off.  I believe    10:13:21

21    that these individuals were released at the time --

22          So is the point here that they were misclassified?

23          MS. KENDRICK:  Yes.

24          THE COURT:  Okay.  All right.

25          THE WITNESS:  Your Honor --                             10:13:35

UNITED STATES DISTRICT COURT

—— **Nicole Taylor – Cross–Examination** ——

1          MS. KENDRICK:  The point is that the reports were not

2     accurate, the source reports.

3          THE COURT:  So you've just heard the point that the

4     plaintiffs' counsel was hoping to make with respect to these

5     were misclassifications.  If you want to say something, go          10:13:47

6     ahead.

7          THE WITNESS:  Thank you, Your Honor.

8          We were attempting to get a different report from IT

9     that gave us start dates, because that's something that we were

10    working with you on removing individuals who can't possibly          10:13:58

11    have been there long enough.

12         So I had asked IT to run a report for me.  And their

13    report was off, not my report.  And so I was sharing with them,

14    your report's not working for me, can you please correct it.

15    And so he asked for examples.  These are the examples.  As far          10:14:17

16    as you're not reading the correct -- the data correctly, I need

17    you to rerun that and figure out where your error is.  Of which

18    we did not use their report until they corrected those errors.

19    BY MS. KENDRICK:

20    Q.  And so an error in a mental health score would affect the          10:14:35

21    frequency of the services that a patient receives; correct?

22         If a person is misclassified -- okay.  Let's take a

23    step back.

24         The performance measures have different requirements

25    for the frequency of contacts based upon their acuity and their          10:14:48

—— **Nicole Taylor – Cross-Examination** ——

1    MH score; correct?

2    A.   That is correct.

3    Q.   So an error in the MH score would affect the frequency with

4    which they had contact with mental health staff; correct?

5    A.   With regards to this report, no, because this is not a                10:15:02

6    report that's used for --

7    Q.   I wasn't asking about the report, I was asking if a person

8    has the incorrect score and, therefore, they are not being seen

9    with the frequency they are required to be seen with; correct?

10   A.   That's correct.  I'm just trying to connect what you're         10:15:17

11   trying to -- I'm confused why you're connecting a start date

12   report with when the clinicians would see somebody, because

13   this is not something they would use.  They're using the same

14   report that we've always used.

15   Q.   But the point is that if a person has been given the wrong      10:15:33

16   mental health score, they may not be seen with the frequency

17   that they are supposed to be seen, either due to clinical

18   requirements and/or the requirements of the stipulation;

19   correct?

20        MS. LOVE:   Objection, foundation, relevance and               10:15:47

21   exceeds the scope of direct examination.

22        THE COURT:   Overruled.

23        THE WITNESS:   Again, I'm struggling with your

24   question, because --

25        MS. KENDRICK:   Okay.  I'll break it down for you.            10:15:59

1    THE COURT:  Let me try a question, if I may.

2    This exhibit, 63, which is -- you've now explained

3    your response to your effort to try to obtain a report,

4    identifies in it places where you say that there were inmates

5    who were misclassified, they were MH-2 at the time of release,     10:16:17

6    but they showed up as MH-3.

7    Is this subparagraph of this report evidence of times

8    where there have been misclassification of inmates?

9    THE WITNESS:  Absolutely not.

10   THE COURT:  Because what you're saying then is that     10:16:31

11   this is something that was a feature of the report that was

12   generated that somehow botched -- the report process itself

13   that is reported to you here botched the classification.  It

14   wasn't that it was drawing information that would be incorrect

15   with respect to the inmates.     10:16:51

16   THE WITNESS:  Correct.  Their report was pulling the

17   wrong start date, indicating they were a different score than

18   they, in fact, were.  Which has nothing to do with when the

19   clinicians would be seeing them, because that's a different

20   report.  So I was trying to show them where their programming     10:17:08

21   they put into place to pull these start dates for me was

22   pulling some errors.

23   THE COURT:  So, Miss Kendrick, that seems to resolve

24   this issue.  This doesn't seem to be evidence of

25   misclassification, it seems to be that people whose     10:17:23

1  classifications changed, this report that she requested doesn't

2  give her the time period she wanted, and that's what she's

3  pointing out.

4  BY MS. KENDRICK:

5  Q.  Are these rosters used as source documents?                    10:17:36

6  A.  They are now that we have gotten the programming corrected

7  in the fact that they give me a start date but not their mental

8  health score.

9  Q.  So at this time in July 2017 were you using these rosters

10 as source documents?                                                10:17:52

11 A.  No, we were not.

12 Q.  When did you start using them as source documents?

13 A.  Let me see if I responded to them.

14      So in August it appears that I'm responding to them

15 that their report seems to be better.  And I said, we will know   10:18:05

16 more when the auditing for the month is done.

17      So I'm using our original source document that doesn't

18 have start dates and comparing their source document that gave

19 me start dates to see if there were continued errors in their

20 report.                                                             10:18:20

21      So probably in September would be about the time where

22 I was able to take their start dates.  Again, I didn't take

23 their mental health scores, I took their start dates and placed

24 them on so that we had that data available to us.

25 Q.  Okay.  Could you turn to Defendants' Exhibit 683?             10:18:37

—— Nicole Taylor – Cross-Examination ——

1    A.  I'm sorry, what was the number?

2    Q.  Defendants' 683.

3        I think she may have already used it with you.

4    A.  Okay.

5    Q.  And this is an e-mail that you sent on January 10th, 2018,    10:19:17

6    to a variety of people, subject line, mental health score

7    breakdown.  And you say, attached please find the list of

8    mental health scores around the state.  I've highlighted some

9    that appear to possibly be miscoded or in the wrong location.

10       And then if you turn the page, it appears to be one of    10:19:43

11   these reports and there's yellow highlighting on it.

12   A.  Yes.

13   Q.  And did you do that yellow highlighting to that document?

14   A.  Yes, I did.

15   Q.  And was this the document that you're using as the source    10:19:56

16   report now since September?

17   A.  Oh, no, this doesn't have anybody's start dates or ADC

18   numbers or anything.

19   Q.  So what do you use this report for?

20   A.  When I remember -- I try to remember to pull it every    10:20:12

21   Monday, and review it to see if there are mental health scores

22   that don't make sense and send them out to the field.

23       I wasn't sure if you were asking a question.

24       What we have -- what I've found today though is that

25   it's not a very useful thing.  When I will tell them, hey, you    10:20:34

**Nicole Taylor – Cross-Examination**

1    have an MH-3 who is out in Douglas, how does that happen?  And

2    each time I've looked it up, we found that they're out to

3    court, and so they've transferred them there and they're out to

4    court.

5            So I don't really do it much anymore.  But that was        10:20:49

6    the purpose back in January when I sent that.

7    Q.  Okay.  Are AIMS reports used to generate the list of people

8    with mental health scores for monitoring purposes?

9    A.  That's correct.

10   Q.  But sometimes the AIMS reports are inaccurate?             10:21:02

11   A.  I've not found any inaccuracies with the AIMS report that

12   we run.

13   Q.  Okay.

14   A.  There's a number of AIMS reports.  Are you referring to the

15   DA --                                                          10:21:14

16   Q.  So could you turn to Exhibit 123 and maybe we could walk

17   through --

18   A.  Which one?

19   Q.  123.

20   A.  Okay.  Did you say that's plaintiffs'?                     10:21:22

21   Q.  Yes.

22   A.  Okay.

23   Q.  And so this is an e-mail that you sent on September 5th,

24   2017, to Mr. Michael Dolny by the subject of AIMS errors?

25   A.  Um-hum.                                                    10:21:52

--- **Nicole Taylor – Cross-Examination** ---

1   Q.  And you write in the second sentence, quote, I hid the ones

2   that I did not look up, but know that the scores are incorrect,

3   as we don't have 3Ds that are older than 1-1-2017, close quote.

4       3Ds refers to patients with a mental health score of

5   3D; correct?                                                          10:22:15

6   A.  That's correct.

7   Q.  And what does 3D means?

8   A.  It means that the individual's been discontinued off of

9   their medications.

10  Q.  Okay.  And this was in relation to an AIMS report that you        10:22:22

11  were using to extract lists of patients?

12  A.  This is in relation to what you were previously asking me

13  about getting a start date from the IT department.  This is a

14  continued conversation with them that appears into September.

15  Q.  So this is a -- this a different AIMS report than the one         10:22:46

16  you used to get the candidates for monitoring review?

17  A.  That is correct.

18  Q.  Okay.  And once AIMS generates the list of people with a

19  certain score or a list of HNRs, the monitors randomize the

20  list; correct, with Excel?                                            10:23:10

21  A.  That question was a little connected in a way that I

22  don't -- so once they generate an AIMS report, once

23  that's -- and then you said, or the HNRs from AIMS.  That

24  didn't make sense to me.

25  Q.  Okay.  So I'll ask two separate questions.                        10:23:25

_____ **Nicole Taylor – Cross-Examination** _____

1    A.  Okay.

2    Q.  Once AIMS generates a list of patients that you are going

3    to possibly review, as a monitor, does the monitor then

4    randomize the list of names using Excel?

5    A.  It is randomized for the monitor.                        10:23:42

6    Q.  Who –– by whom?

7    A.  It depends on which performance measure you're speaking of.

8    But on the mental health side, specifically I can talk about

9    those, I randomize all of those for the staff.

10   Q.  You testified yesterday that you're not doing any        10:23:54

11   monitoring anymore, except for Performance Measure 99?

12   A.  That is correct.

13   Q.  But –– so is your testimony that you're still randomizing

14   the lists for them?

15   A.  I do randomize, yes.                                     10:24:10

16   Q.  The most recent CGARs, did you do the randomization for the

17   monitors?

18   A.  Yes, I did.

19   Q.  Why are Mr. Dye and Miss McCray not randomizing the lists

20   themselves?                                                  10:24:27

21   A.  You know, sitting in court it's seen that your guys'

22   preference was that those are not randomized by the person

23   doing the monitoring, and so because I don't specifically

24   monitor those performance measures, I randomize them to ensure

25   that there's that separation between who's randomizing and then  10:24:42

─────── **Nicole Taylor – Cross-Examination** ───────

1    who's doing the monitoring.

2    Q.   Okay.  And you said you do a review of Mr. Dye and

3    Miss McCray's findings to see if any of them on their face just

4    looks off?

5    A.   Yeah.                                                          10:25:02

6    Q.   And you do not go into eOMIS at that stage to check the

7    underlying record, do you?

8    A.   Yes, I do actually.

9    Q.   You do?

10   A.   Um-hum.                                                        10:25:09

11   Q.   Do you check the source documents?

12   A.   Yes, I do.

13   Q.   And I believe you testified yesterday that you had reviewed

14   letters from plaintiffs' counsel describing mistakes in the

15   mental health monitoring results for the July 2017 CGARs;          10:25:31

16   correct?

17   A.   The ones that were about the July, August and September, is

18   that what you're --

19   Q.   Right, right.  But you specifically just mentioned July

20   yesterday.                                                          10:25:48

21   A.   Yes.

22   Q.   And you testified yesterday that these mistakes were,

23   quote, typos?

24   A.   Many of them were, yes.

25   Q.   You testified that the monitors had simply transposed         10:25:56

—— Nicole Taylor – Cross-Examination ——

1    numbers?

2    A.  Many of the errors that were on there were transposing of

3    numbers or forgetting to put a hash mark in there, or the wrong

4    year at the end of it, instead of 2017, 2016, or something like

5    that.  Many of them were.                                    10:26:15

6    Q.  So your testimony is that these mistakes were -- the vast

7    majority were typographical errors?

8    A.  A majority of them were typographical errors, yes.

9    Q.  Would it refresh your recollection to look at these letters

10   about the mistakes?                                          10:26:33

11          MS. LOVE:  Objection, Your Honor.  Those letters are

12   written by counsel.

13          THE WITNESS:  It would help to have our response,

14   which is what I looked at.  Do we have those?

15          MS. KENDRICK:  Yes.                                  10:26:55

16          THE COURT:  I can't rule on the objection until I see

17   them.  Thank you.

18   BY MS. KENDRICK:

19   Q.  So what I've handed you are --

20          THE COURT:  The objection is overruled.             10:27:09

21   BY MS. KENDRICK:

22   Q.  -- are three separate letters.  The first is dated October

23   4th, 2017, written by Mr. Fathi to Mr. Bojanowski and filed on

24   the docket at 2368-1.

25          The second letter is dated October 20th, 2017, and is   10:27:24

**Nicole Taylor – Cross-Examination**

1    from Ashlee Fletcher to Mr. Fathi.

2         And the third document is a letter dated October 24th,

3    2017, addressed to Miss Fletcher from myself.

4         Could you turn to page 7 of Mr. Fathi's letter, the

5    October -- the October 4th one?                                10:27:52

6    A.  Okay.

7    Q.  And you see about half way down it states, multiple errors

8    in CGARs at Eyman and Tucson?

9    A.  Yes, I see three at Eyman and two at Tucson.

10   Q.  Okay.  And this is in regard to Performance Measure 77 at   10:28:15

11   both facilities?

12   A.  That is correct.

13   Q.  Okay.  And according to footnote 5, that performance

14   measure requires that treatment plans shall be updated a

15   minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners,   10:28:33

16   and a minimum of 12 months for all other MH-3 prisoners;

17   correct?

18   A.  Correct.

19   Q.  And so in this chart Mr. Fathi lists patients, their MH

20   categories, the date of their most recent treatment plan, and  10:28:55

21   the date of the second most recent treatment plan before that;

22   correct?

23   A.  Correct.

24   Q.  And he goes on to do that for the Tucson prison as well?

25   A.  Correct.                                                    10:29:09

—————— **Nicole Taylor – Cross-Examination** ——————

1    Q.  And then if you turn to the next page of his letter, he

2    details encounters for Performance Measure 80 and 81 that he

3    alleges are outside the time frame; correct?

4    A.  That is correct.

5    Q.  Okay.                                                    10:29:26

6            THE COURT:  Could we take a ten-minute break now?

7            MS. KENDRICK:  Sure.

8            THE COURT:  All right.  Thank you.  We'll be back.

9        (Recess at 10:29 a.m., until 10:40 a.m.)

10           THE COURT:  Please continue.                         10:40:31

11   BY MS. KENDRICK:

12   Q.  All right.  Dr. Taylor, before we broke we were looking at

13   the letter dated October 4th, 2017, regarding Performance

14   Measure 77.

15           Then the second document in there is a letter that was 10:40:46

16   sent by counsel for defendants on October 20th.  If you can

17   turn to page 3, at the bottom of that letter.

18   A.  Yes.

19   Q.  And then the discussion of Performance Measure 77.

20           And then also if you could just look at that side by   10:41:04

21   side with the third letter, which was from Mr. Fathi, at page

22   4.

23   A.  On which page on that one?

24   Q.  It's from me, I apologize.  The October 24th letter from me

25   at page 4.                                                   10:41:20

———— **Nicole Taylor – Cross–Examination** ————

1        So on the letter from Miss Fletcher regarding

2   Performance Measure 77, at the bottom of page 3 she lists five

3   patients, and states that for the first one, who ends in 81,

4   and then the last two in the list who end in prisoner number 78

5   and prisoner number 95, that their mental health treatment plan   10:41:52

6   was updated within 12 months as required and correctly counted

7   as compliant.

8        And then if you look at page 4 of my letter, it lists

9   those three same patients and notes that the treatment plans

10  were more than one year apart.                                    10:42:12

11       Do you see that?

12  A.  Yes, I do.

13  Q.  And the point was at that time your attorneys were stating

14  that it was okay to have 13 months between the treatment plans;

15  correct?                                                          10:42:26

16       MS. LOVE:  Objection, foundation and hearsay.  It

17  seems to be testimony of counsel as to what all the letters are

18  saying without a question actually to the doctor.

19       THE COURT:  Can you rephrase the question?

20       MS. KENDRICK:  Sure.                                         10:42:39

21  BY MS. KENDRICK:

22  Q.  At that time were you monitoring Performance Measure 77 to

23  find files compliant if, for example, a treatment plan was done

24  on July 1st of one year and July 20th of the following year?

25  A.  Under the -- prior to the Court order we were doing that      10:42:58

1    because that's 12 months and 19 days.

2    Q.  So at that time your position was that 12 months plus 19

3    days equals 12 months?

4    A.  That is correct.

5    Q.  And the Court later ruled against you; correct?          10:43:15

6    A.  That is correct.

7    Q.  Okay.  That is not a typographical error, is it?

8    A.  I don't find those to be errors at all.

9    Q.  But it's not a typographical error; correct?

10   A.  Well, you asked me the errors that were listed in here,   10:43:29

11   were a majority typographical.  Those are not errors.

12   Q.  Okay.  So that's -- so your position is, A, those are not

13   errors, but also those are not typographical typos?

14   A.  Correct.

15   Q.  Great.                                                     10:43:45

16         So with the CGARs, it sometimes happens that a measure

17   is initially found to be noncompliant, but then it's later

18   changed to be compliant; correct?

19   A.  Yes.

20   Q.  There's a rebuttal process that's in place where Corizon  10:43:59

21   can come to you guys and say, we think you got this wrong, and

22   you review it?

23   A.  That's correct.

24   Q.  Okay.  And do you review any challenges that Corizon makes

25   to mental health performance measure findings?                10:44:13

───────── **Nicole Taylor – Cross-Examination** ─────────

1    A.   There has been only one.  And that one was at Yuma.  And

2    the argument was the sample size was too small.  And my

3    response was, the sample size is all you had.  And it was on

4    the number of watches, they didn't have ten.

5            So that's the only one that I've reviewed, that's the          10:44:36

6    only one that's come forward on mental health.

7    Q.   Okay.  Have they ever brought to your attention a compliant

8    finding that they realized was actually noncompliant?

9    A.   On the mental health ones, no.

10   Q.   Okay.  Could you turn to Plaintiffs' Exhibit 277, please?        10:44:51

11           THE COURT:  Thank you.

12           MS. KENDRICK:  Do you have it, Your Honor?

13           THE COURT:  Yes, I do.  Thank you.

14   BY MS. KENDRICK:

15   Q.   This is a December 18th, 2017 e-mail that was forwarded to       10:45:31

16   you by Eddie Taylor, subject line, psychiatric backlog.

17           Who is Eddie Taylor?

18   A.   He is the mental health lead at the Phoenix Complex.

19   Q.   Okay.  And he is forwarding a message that he received that

20   same day from somebody at Phoenix named Sally Mason about a           10:45:50

21   backlog report?

22   A.   Okay.

23   Q.   Do you see that?

24   A.   Yes.

25   Q.   Okay.  The second line of Miss Mason's e-mail says, quote,       10:46:01

1  although there is no note from Keck that he actually saw blank

2  on 11-29-17, she signed the hard copy document verifying that

3  she was seen.  I don't know if a late entry is possible from

4  Keck.

5          Who is Keck?                                              10:46:26

6  A.  Mr. Keck is a psychiatric provider.

7  Q.  Is he a doctor or nurse practitioner?

8  A.  Nurse practitioner.

9  Q.  Okay.  And Mr. Taylor forwards to you Miss Mason's e-mail

10 and asks you, can a late entry be entered for a provider note.  10:46:42

11         Do you see that?

12 A.  Yes, I do.

13 Q.  What's the answer to that question?

14 A.  You mean in this specific instance?  I don't know what I

15 answered to this one.                                             10:46:54

16 Q.  In general what's the answer to that question?

17 A.  They -- there are time frames in which they can enter late

18 entries.  It's been codified at this point into 24 hours after

19 the encounter occurred.

20 Q.  Isn't that an addendum, they have 24 hours to do an          10:47:12

21 addendum?

22 A.  No.

23 Q.  So your testimony is they only have 24 hours to do a late

24 entry?

25 A.  That is correct.                                              10:47:26

**Nicole Taylor – Cross-Examination**

1   Q.  And when did that policy change?

2   A.  About a month ago, I think, where it was formalized.

3   Q.  Where was this formalized?

4   A.  There were a number of memos that have gone out regarding

5   that direction, have gone out regarding that, and about how you          10:47:45

6   document the late entry.

7   Q.  And who sent those memos?

8   A.  Mr. Pratt has sent them to Corizon indicate -- and to the

9   Monitoring Bureau.  We were cc'd on that.

10  Q.  And to your knowledge has Corizon changed the eOMIS program          10:48:09

11  so that you can't do that after 24 hours?

12  A.  I don't know if they've made any modifications at this

13  time.

14        But we would not be able to count them as compliant.

15  So without -- even without the change, we can't count them as          10:48:31

16  compliant if they're not done.

17  Q.  So you're familiar with eOMIS; correct?

18  A.  Yes.

19  Q.  And prior to this directive coming out a month ago, there

20  was a capability for Mr. Keck to go into eOMIS on December 18th          10:48:45

21  when he got this e-mail and change the date and field so that

22  there was an entry dated November 29th?

23  A.  Not without that being known.  I mean, we would know that

24  he did that.  But yes.

25  Q.  Well, he would -- if he changed the date and the time he          10:49:03

**Nicole Taylor – Cross-Examination**

1    would have -- he would have to put "late entry" in the

2    subjective section of the notes; correct?

3    A.  They're supposed to write that; correct.

4            But there isn't a way to hide that if he didn't write

5    that, because we're able to click on a button and it tells you                10:49:17

6    when it was opened.

7    Q.  But doesn't it say that it was entered on that date and

8    time?

9    A.  No.  They can't change -- they can't change the date and

10   time that it's stamped by the computer, which is under                         10:49:31

11   the -- there's a button that you can push on any note that says

12   when was this opened.  He can't change that.  So there's always

13   a record of when it was opened.  And if he opened it on

14   December 18th, he clearly didn't write it on 11-29.

15   Q.  Are you aware that multiple witnesses have testified that                  10:49:49

16   they can go into eOMIS and change the date and the time on the

17   note?

18   A.  Yes.  They can change the date and time in the note that

19   prints out in the header.  But they cannot change the

20   computer's time stamping of when it was opened.  That can't be                 10:50:03

21   modified.

22   Q.  But if you were looking at the entries of the health

23   services encounters, it would show up as an entry being made on

24   November 29th; correct?

25   A.  Correct.  On the outside screen, the health services                      10:50:19

1   encounters where it's just listed, it would show up on there,

2   and then when you click on it you're able to click on the

3   button that tells you when it was opened.

4   Q.  And have the monitors been trained to open the note and

5   look at the date the record was opened?                      10:50:33

6   A.  Prior to having any sort of formalized rule, probably not.

7   But at this point, we would have to open every one of them.

8   Q.  Okay.  And if you could turn to Exhibit 278, please.  And

9   if you turn to page 2, you can see that it's the same e-mail

10  that Miss Mason sent.                                        10:51:06

11          I'm sorry, I'm ahead of you.

12  A.  Sorry.  Okay.

13  Q.  So that appears to be the same original message that was

14  forwarded to you in 277?

15  A.  Yes, that first part.                                    10:51:25

16  Q.  Yeah, page 2 of 278 matches --

17  A.  Yes.

18  Q.  Okay.

19  A.  It gets confusing when it says Dr. Taylor, but it was to

20  the other Dr. Taylor.                                        10:51:36

21  Q.  I agree.

22          So as you can see, if you turn to page 1, it appears

23  that Dr. Eddie Taylor sent this to some of the other staff.

24  And about half way down Mr. Keck sends an e-mail stating,

25  quote, I am not sure I saw her, close quote.                 10:51:58

UNITED STATES DISTRICT COURT

**Nicole Taylor – Cross-Examination**

1          Do you see that?

2     A.  Yes.

3     Q.  Okay.  And Miss Leonard -- or Dr. Leonard says in response,

4     quote, she signed the slip, I guess, the sign in sheet, close

5     quote.                                                        10:52:16

6          Do you see that?

7     A.  Yes.

8     Q.  And what does Mr. Keck say in response at the top of that?

9     A.  Again, I wasn't cc'd on any of this, so I would just be

10    reading you --                                               10:52:31

11    Q.  Can you just read the first sentence out loud, please?

12    A.  Sure.  He wrote, I believe that part but that does not mean

13    I actually saw her.

14    Q.  Okay.  So in your experience, has there been times when

15    logs do not match what might be in a medical record?         10:52:45

16    A.  So, I mean, that's a very general question.  Specific to

17    this situation?

18    Q.  No.  In your experience have you ever seen -- had the

19    experience where logs that were kept did not match prisoner's

20    medical records?                                             10:53:06

21    A.  I don't use logs as you would describe them.  I use eOMIS

22    Excel stuff.  So those wouldn't come into play -- I wouldn't

23    have seen anything like that.  I don't use logs.

24    Q.  Have you ever said that you could not reconcile suicide

25    logs with medical records?                                   10:53:24

**Nicole Taylor – Cross-Examination**

1  A.  Not in relationship to what you just asked, no.

2  Q.  So you've never said that you couldn't reconcile suicide

3  logs -- watch logs with people's mental health records?

4  A.  So -- not specific to what you're asking, no.

5  Q.  So what do you think I'm asking if you're saying not          10:53:45

6  specific to what I'm asking?

7  A.  So, for instance, a suicide log would say they were on

8  watch from this date to this date.  That's fine.  The issue

9  that I've had in the record is the fact that I am not able to

10  track them through each of those days as far as, were they on a   10:54:03

11  ten, were they on a 30.  But that's not captured on the log.

12  The log just has kind of a stop and start date.

13  Q.  Have you ever said that you could not reconcile watch logs

14  with a patient's mental health records?  Yes or no.

15  A.  Potentially I said that.  I'm trying to explain what that     10:54:22

16  must have meant, if I did say that.  Because what I'm saying is

17  is that the in between does not make sense of the person's

18  watch, because I can't track them through.  They're on the

19  watch log; right?  The watch log says they're on watch from

20  here to here, but I'm not able to track them through while       10:54:46

21  they're on watch.  Were they on a ten to a 30, or was it a

22  continuous to a 30?  So it's not inconsistent, because that's

23  what you were asking me, whether it was inconsistent.

24  Q.  No.

25           MS. KENDRICK:  I move to strike as nonresponsive.       10:54:59

UNITED STATES DISTRICT COURT

──────── **Nicole Taylor – Cross-Examination** ────────

1   BY MS. KENDRICK:

2   Q.  My question is, have you ever said that you could not

3   reconcile watch logs with a patient's mental health records?

4   Yes, no, or I don't remember.

5   A.  I don't recall.                                                      10:55:11

6   Q.  Thank you.

7           MS. KENDRICK:  Your Honor, I move to admit Exhibits

8   277 and 278.

9           THE COURT:  Any objection?

10          MS. LOVE:  Objection as to foundation and hearsay.          10:55:25

11   And relevance as to 278 where Dr. Taylor is not cc'd, nor are

12   any of the e-mails to her.

13          MS. KENDRICK:  Well, is that for 277 or 278?

14          MS. LOVE:  278.

15          THE COURT:  So 278 you're objecting on hearsay.          10:55:49

16          MS. KENDRICK:  It's not hearsay under 801(d)(2)(D).

17          THE COURT:  The hearsay objection is overruled.

18          And then the next objection to 278?

19          MS. LOVE:  Objection as to foundation, where the

20   witness has testified that she is not cc'd, nor are any of the    10:56:17

21   e-mails to her.  She was asked questions based upon what others

22   said.

23          THE COURT:  Right.  Overruled.

24          Next objection here?

25          MS. LOVE:  And objection as to relevance and exceeds      10:56:33

─── **Nicole Taylor – Cross-Examination** ───

1    the scope of the direct examination.

2           THE COURT:  278 is received.  The objection is

3    overruled.

4           And then was the other Exhibit 27 --

5           MS. LOVE:  277, defendants have no objection.                    10:56:51

6           THE COURT:  Okay.  277 is received.

7       (Exhibit Nos. 277 and 278 admitted into evidence.)

8           THE COURT:  Thank you.

9    BY MS. KENDRICK:

10   Q.  So I think earlier Miss Love took you through some entries    10:56:57

11   where the entries in the medical record were being shown as

12   being made by a psychiatrist when they were actually done by a

13   nurse; correct?

14   A.  Yes.

15   Q.  Okay.                                                              10:57:09

16   A.  That's correct.

17   Q.  Could you look at Exhibit 248, please?

18          So page 248.1 is the September 2015 CGAR for the

19   Phoenix facility.  Do you see the highlighted text about two

20   thirds of the way down?                                               10:57:58

21   A.  Yes, I do.

22   Q.  And it states, for one patient whose number ends in 61,

23   quote, health services encounter 9-9-15 states psychiatrist and

24   psychiatrist progress note, staff evaluator is not a

25   psychiatrist.                                                         10:58:22

1        The next one ending in 74 says, mental health 9-30-15

2   inaccurate, psychiatrist and psychiatrist progress note, staff

3   evaluator is not a psychiatrist.

4        You had testified that nursing staff had been trained

5   on properly doing entries.  Do you know when they were trained?    10:58:44

6   A.  In relation to what training?

7   Q.  When you were looking at those exhibits previously with

8   Miss Love, you said that nursing staff had been instructed to

9   tell the nurses to make these proper entries and not to say

10  they were psychiatry entries.  Do you know when that training    10:59:05

11  occurred?

12  A.  So I instructed the DON, not nursing staff.

13  Q.  When did you instruct the DON?

14  A.  Every month that it came up I brought any examples that I

15  had.  So it would have been any one of those months.  So this    10:59:22

16  may have been one of the months too.  This is 2015.

17  Q.  2015.

18  A.  Right.

19  Q.  Okay.  And did you ask the DONs to get back to you and let

20  you know that they had done the training?    10:59:39

21  A.  The following month I would follow up with the DON and ask

22  where they were at with that, and whether they had asked for

23  there to be an eOMIS fix that would assist them with this.

24  Q.  Okay.  And if you turn to page 2 of Exhibit 248.  This is

25  the July 2015 CGAR.  And you see the highlighted text about two    11:00:04

**Nicole Taylor – Cross-Examination**

1   thirds of the way down?

2   A.  Yes, I do.

3   Q.  And do you see that for five separate patients it notes

4   that entries that were labeled as psychiatrists and

5   psychiatrist progress notes were done by nursing staff?          11:00:22

6   A.  Yes, I do.

7           MS. KENDRICK:  Okay.  Move to admit Exhibit 248.

8           THE COURT:  Any objection?

9           MS. LOVE:  No objection.

10          THE COURT:  248 is received.                              11:00:38

11      (Exhibit No. 248 admitted into evidence.)

12   BY MS. KENDRICK:

13   Q.  Sorry to make you skip around.  But could you look at

14   Defendants' Exhibit 682?

15   A.  Was it previously --                                         11:00:48

16   Q.  It should be.

17   A.  I mean, just barely this morning.  I have not been keeping

18   them --

19           Thank you.

20   Q.  And this is a health services encounter dated 12-11-2017?   11:01:11

21   A.  That is correct.

22   Q.  And it says the encounter type is mental health

23   psychiatrist unscheduled?

24   A.  That is correct.

25   Q.  And at the bottom it lists for staff RN Marcus Konyi        11:01:33

Nicole Taylor – Cross-Examination

1   Kometa?

2   A.  Correct.

3   Q.  What does RN mean?

4   A.  Registered nurse.

5   Q.  Is an RN a psychiatrist?                                    11:01:47

6   A.  No.

7   Q.  And again, if you were not looking at this expanded

8   encounter and just the list of health services encounters on

9   the main screen, it would appear to be a psychiatrist entry;

10  correct?                                                        11:02:02

11  A.  No, because the individual's name is listed on that screen

12  also.

13  Q.  Right.

14  A.  So it would not appear as --

15  Q.  But it would list as a psychiatrist unscheduled?           11:02:09

16  A.  That would be the note type.  But the person's name is

17  there, so it would not appear to be a psychiatrist.

18  Q.  Oh, when it lists the people's name, does it say that

19  they're not a psychiatrist?

20  A.  No, but those are things we know.                          11:02:25

21  Q.  You just know that people are not psychiatrists?

22  A.  Yes, I do.

23  Q.  All right.  Could you turn to Exhibit 681, which -- and if

24  you could turn to page 2 of this -- of defendants' exhibit.

25          And this is, again, a condensed health services       11:03:09

**Nicole Taylor – Cross-Examination**

1    encounter dated January 28, 2018?

2    A.  That's correct.

3    Q.  And it's of the type mental health psychiatrist

4    unscheduled?

5    A.  Correct.                                              11:03:20

6    Q.  And staff is listed as Roxanne Ezell, RN?

7    A.  Correct.

8          MS. KENDRICK:  Your Honor, I move to admit Defendants'

9    Exhibits 681 and 682.

10          THE COURT:  Any objection?                          11:03:36

11          MS. LOVE:  No objection.

12          THE COURT:  These will be received.

13       (Exhibit No. 681 and 682 admitted into evidence.)

14   BY MS. KENDRICK:

15   Q.  And it sometimes happens that a patient's denied transfer   11:03:43

16   to a prison because of a concern of finding noncompliance with

17   a CGAR; correct?

18   A.  To my knowledge that came up one time where an individual

19   doctor denied somebody's movement.  When I was notified, I

20   corrected that.                                            11:04:02

21   Q.  Okay.  Could you turn to Plaintiffs' Exhibit 97, please?

22   A.  Sure.

23   Q.  If you could just turn to page 2 of that exhibit.

24          And this is an e-mail that you sent on March 17th,

25   2017, to Mr. Pratt; correct?                              11:04:40

UNITED STATES DISTRICT COURT

**Nicole Taylor – Cross-Examination**

1    A.  That is correct.

2    Q.  And you state, quote, Richard, please see the e-mail below

3    from Dr. Malachinski.  He is denying inmates be placed in

4    inmate setting because they are, quote, out of compliance with

5    two CGAR measures, close quote.  This needs to stop            11:04:58

6    immediately, close quote.

7            And then if you go to page 3 it appears that this is

8    an e-mail that was somehow forwarded to you that

9    Dr. Malachinski sent to two other individuals on March 7th.

10   And he writes, quote, this PT -- patient -- is out of          11:05:23

11   compliance with two CGAR measures related to chronic care and

12   newly diagnosed chronic care.  He is not medically cleared for

13   Phoenix.  Leon Malachinski.

14           Do you see that?

15   A.  Yes, I do.                                                  11:05:39

16   Q.  And Dr. Malachinski's e-mail is referring to a patient;

17   correct?

18   A.  That is correct.

19   Q.  But your e-mail uses the plural, inmates; correct?

20   A.  That's correct.                                             11:05:52

21   Q.  Were there more than one patient?

22   A.  There were two.

23   Q.  There were two?

24   A.  Yes.

25   Q.  Okay.  So your testimony is that there were two patients    11:05:58

**Nicole Taylor – Cross-Examination**

1    this happened to?

2    A.  That is correct.

3    Q.  Is Dr. Malachinski still working at the Phoenix facility,

4    to your knowledge?

5    A.  No, he is not.                                              11:06:08

6    Q.  Is he still working for Corizon, to your knowledge?

7    A.  I don't believe so.

8          MS. KENDRICK:  Okay.  We move to admit Exhibit 97.

9          THE COURT:  Any objection?

10         MS. LOVE:  No objection.                                  11:06:20

11         THE COURT:  97 is received.

12      (Exhibit No. 97 admitted into evidence.)

13   BY MS. KENDRICK:

14   Q.  And you've been talking a bit about how confidential

15   settings are preferable to cell fronts.  In your professional  11:06:30

16   opinion, are there some patients for whom telepsych is

17   inappropriate for similar reasons?

18   A.  Not for similar reasons, but for different reasons.

19   Q.  Okay.

20   A.  Yes.                                                        11:06:47

21   Q.  And what are those reasons?

22   A.  Some patients do not like that setting.  They don't like to

23   speak to somebody through the TV or monitor, and that medium

24   doesn't work for them.

25   Q.  Okay.  And we talked a little bit earlier about Performance 11:07:06

Nicole Taylor – Cross–Examination

1   Measure 77 and the frequency of the treatment plans; correct?

2   A.  Correct.

3   Q.  And that the Court had clarified what 12 months meant.

4   A.  Correct.

5   Q.  Okay.  And to monitor compliance, the monitor looks at the          11:07:23

6   two most treatment plan dates and then he or she measures the

7   interval between them; correct?

8   A.  Correct.

9   Q.  Okay.  And you testified yesterday that one of the problems

10  you said frequently comes up at these monthly meetings is            11:07:38

11  confusion about what every X day means?

12  A.  Correct.

13  Q.  With frequency.

14          And you had said that Corizon staff get frustrated

15  with you about this?                                                 11:07:51

16  A.  Yes, they do.

17  Q.  And you also testified that mental health staff ask you,

18  what do I have to do to get compliant?

19  A.  Yeah.  What's wrong with this file?

20  Q.  So what do they have to do to get compliant?                     11:08:04

21  A.  Well, unfortunately they have to do double the amount of

22  work.  And as I continue to tell them, this is an unfortunate

23  situation, but you have to do double the amount of work.  If

24  you don't do things in time, then you're going to have to work

25  that much harder.                                                    11:08:22

**Nicole Taylor – Cross-Examination**

1   Q.  So if -- with regard to Performance Measure 77, have you

2   ever told them, you need to do another treatment plan?

3   A.  Yes.

4   Q.  Do a second treatment plan?

5   A.  You need to do it again, and it will be out of compliance          11:08:33

6   until you do.

7   Q.  Okay.  Could you turn to Exhibit 284, please?

8   A.  That's yours; correct?

9   Q.  Plaintiffs.

10          THE COURT:  I have it.                                          11:09:05

11  BY MS. KENDRICK:

12  Q.  And if you turn to page 2, there's a highlighted entry for

13  a patient.

14  A.  Yes.

15  Q.  And you see that?                                                  11:09:17

16  A.  Yes, I do.

17  Q.  Okay.  And he's MH-3A, so his treatment plan needs to be

18  updated every 90 days; right?

19  A.  That is correct.

20  Q.  Okay.  And the CGAR shows that his treatment plan was             11:09:27

21  updated on January 29th, 2018, and then two days later on

22  January 31st, 2018; correct?

23  A.  Correct.

24  Q.  And so his record got counted as a Y, as compliant;

25  correct?                                                              11:09:47

**Nicole Taylor – Cross-Examination**

1    A.   That's correct.

2    Q.   Okay.  So if you turn to page 3, it's the eOMIS screen shot

3    for this same patient.  And if you look at his treatment plan,

4    there's -- four entries down it says, January 31st, mental

5    health treatment plan.  Then it says two lines down, January        11:10:15

6    29th treatment plan.  Do you see that?

7    A.   Yes, I do.

8    Q.   And then the next entry for treatment plan is not until

9    almost to the bottom of that screen on October 12th, 2017.  Do

10   you see that?                                                       11:10:32

11   A.   Yes, I do.

12   Q.   So if the monitor had looked at the October 12th and

13   January 29th treatment plans, the record would have been

14   counted as noncompliant; correct?

15   A.   Actually it would not have.  What you don't seem to have      11:10:45

16   connected here is the movement screen that would show that the

17   individual was not in the facility for a number of months.

18   Q.   What does the -- why do you think that he was moved out of

19   the facility?

20   A.   Because when I looked at your exhibit, I looked the           11:11:03

21   individual up and went under the prison tab, looked up his

22   movement, and he was not in the facility for the months prior

23   to that.

24   Q.   So you -- when I asked you earlier what documents you had

25   reviewed to prepare, you also reviewed plaintiffs' exhibits?      11:11:20

1    A.  Yes, I did.

2    Q.  And then you went into the medical records of all the

3    people who were in the exhibits?

4    A.  Oh, goodness, probably not all of them.  These two I did.

5    Q.  So what is your testimony, that he was moved to a different      11:11:31

6    facility?

7    A.  No, he was -- this individual -- one of them was out to

8    court, and the other one was out to the hospital.  So I'd have

9    to pull them up.

10   Q.  Okay.  Could you show me where in the screen that it says      11:11:47

11   he had his intake from returning from being out to court, on

12   the screen right here?

13   A.  There isn't an intake that's done when they return from

14   court, when they're already an individual, they're not a parole

15   violator and they're not a new intake.  So that would not show      11:12:06

16   up on here.

17   Q.  So you're not aware that people are supposed to go to the

18   health clinic when they transfer back into a facility?

19   A.  Yes, but that's not an intake.

20   Q.  Okay.  Could you show me where the return from off site      11:12:19

21   entry is on this person's screen?

22   A.  I don't see that in here.

23   Q.  Okay.

24       (Discussion off the record between plaintiff counsel.)

25           MS. KENDRICK:  All right.  I move to admit Exhibit      11:12:43

1  284.

2        THE COURT:  Any objection?

3        MS. LOVE:  No objection.

4        THE COURT:  284 is received.

5    (Exhibit No. 284 admitted into evidence.)                    11:12:49

6  BY MS. KENDRICK:

7  Q.  Could you turn to Exhibit 279, please?

8  A.  Okay.

9  Q.  And about half way down it's an e-mail dated November 21st

10 from Dr. Calcote to at least some people as it appears Jessica   11:13:18

11 Raak responded.

12 A.  Okay.

13 Q.  And he's writing about how, quote, Judge Duncan just

14 ordered that treatment plans due every 12 months have to be

15 completed by the same day of the next year, close quote.        11:13:35

16        That's what we've been talking about; right?

17 A.  Correct.

18 Q.  And Miss Raak above that writes in response, quote, isn't

19 this how it's always been audited?

20        And Mr. Calcote writes in response, yes and no.  I      11:13:54

21 would have to answer that off line.

22        Do you have any idea what Dr. Calcote is referring to

23 with "yes and no"?

24 A.  I have no idea.

25        MS. KENDRICK:  Move to admit 279.                       11:14:12

─── **Nicole Taylor – Cross-Examination** ───

1        THE COURT:  Any objection?

2        MS. LOVE:  Objection, hearsay and foundation.  As the

3   witness testified, she has no idea -- and speculation, she has

4   no idea what Dr. Calcote was talking about with his yes and no

5   answer.                                                          11:14:25

6        THE COURT:  Any response?

7        MS. KENDRICK:  It's not hearsay.  And it goes -- and

8   it goes to Dr. Calcote's state of mind.

9        THE COURT:  The hearsay objection is overruled.

10        MS. LOVE:  Your Honor, may we make a further record?    11:14:38

11   As I understand your hearsay -- although we disagree with your

12   hearsay ruling, but as to foundation there's no foundation as

13   to the context of these e-mails through this witness, as she is

14   not party to this discussion, nor does she know what it means

15   by the answer.  So there's no foundation for the context of     11:14:58

16   this.

17        THE COURT:  Well, it's self-explanatory what its

18   context is, it's an issue that is obviously very present in the

19   Court's mind.  So that objection is overruled.

20        (Exhibit No. 279 admitted into evidence.)                11:15:13

21   BY MS. KENDRICK:

22   Q.  And you talked previously with Miss Love about Performance

23   Measure 94, which is about the suicide watches?

24   A.  That is correct.

25   Q.  And I just want to confirm something.  You had testified    11:15:22

**Nicole Taylor – Cross-Examination**

1   that ten files are reviewed for Performance Measure 94?

2   A.   Currently we review a different number for each complex.

3   Initially it was set up as ten, but there's 15 at some, all the

4   way up to 35 at Eyman.

5   Q.   So at Phoenix is it 15 files that are supposed to be          11:15:45

6   reviewed?

7   A.   For 94, yes.

8   Q.   What are the source documents that you use for Performance

9   Measure 94?

10  A.   We use the suicide watch log.                                  11:15:54

11  Q.   And who creates and maintains these logs?

12  A.   Corizon.

13  Q.   What -- does Custody create and maintain suicide logs?

14  A.   Not to my knowledge.

15  Q.   Does Custody maintain any sort of documentation or records     11:16:06

16  of encounters with people who are on watch?

17  A.   They would have SIRs potentially if -- so when they're

18  placed on watch, an initial Significant Incident Report is

19  opened.  So they would have that.

20  Q.   Aren't there pieces of paper on each person's cell that the    11:16:30

21  officers are supposed to come up and sign when they're doing

22  the ten-minute or 30-minute rotations?

23  A.   The observation logs?

24  Q.   Yes.

25  A.   Yes.                                                           11:16:41

1   Q.  Do you use the observation logs to double check the

2   accuracy of other source documents that you're using?

3   A.  No.  I wouldn't find that helpful.

4   Q.  Okay.  And are there any other ways, besides the Corizon

5   suicide watch logs, to have a record of who was on watch in a          11:17:00

6   given month?

7   A.  Not to my knowledge.

8   Q.  Does Custody maintain its own records beyond those

9   observation log papers that are on the cell doors?

10  A.  I believe I just said I don't believe so.  Other than          11:17:16

11  there's an initial SIR that's created.  It's not a log, per se.

12  Q.  Do you know what happens to those paper documents that are

13  put on people's cell doors when they're on watch?

14  A.  Well, one of the paper documents is the watch order.  And

15  so those are maintained in the electronic medical record.  The          11:17:34

16  observation logs that are filled out by the officers are

17  provided over to the supervisor, and then collected.  And then

18  the supervisor moves them into their file retention area.

19  Q.  So to your knowledge they're not scanned to eOMIS?

20  A.  No, they're not.          11:17:55

21  Q.  Are they scanned to the prisoner's master record that ADC

22  keeps?

23  A.  No, they're not.

24  Q.  And the stipulation's definition of seen had stated that

25  mental health encounters needed to be in a confidential          11:18:15

—————— **Nicole Taylor – Cross-Examination** ——————

1   setting; correct?

2   A.   That's correct.

3   Q.   And Judge Duncan issued an order in 2016 making it clear

4   that that also applies to people on suicide watch; correct?

5   A.   That's correct.                                         11:18:28

6   Q.   Okay.  And could you take a look at Plaintiffs' Exhibit 99,

7   please?

8          And can you turn to the second page, about half way

9   down, it's an e-mail sent by Dr. Calcote to multiple people,

10  with a subject line of court order dated October 5th, 2016.    11:18:57

11         Do you see that?

12  A.   Yes, I do.

13  Q.   And Dr. Calcote writes, quote, not the best of news.

14         In court today Judge Duncan ordered that all inmates

15  on suicide watch be offered to be taken out of cell in order to 11:19:12

16  speak confidentially with a mental health clinician or nurse

17  performing the suicide rounds.

18         This is going to represent a hardship all the way

19  around.  Just brainstorming, there may be a benefit in terms of

20  manpower and efficiency if a set time during the day was        11:19:30

21  scheduled for the watches to occur, close quote.

22         Do you share Dr. Calcote's view that Judge Duncan's

23  ruling was, quote, not the best of news?

24  A.   In the sense that it dramatically changed the process that

25  we had been doing for the years that I've been working in the   11:19:47

UNITED STATES DISTRICT COURT

─────── **Nicole Taylor – Cross-Examination** ───────

1   department.  It's hard to turn things around quickly.

2   Q.  Okay.  And you had testified, I believe, earlier that staff

3   had been trained about this ruling; correct?

4   A.  They've been provided -- I mean, you're saying training,

5   but they were provided notification of that, yes.                    11:20:08

6   Q.  So what did the -- the training consisted of some sort of

7   notification that they needed to do this?

8   A.  I'm not sure all what Corizon provided to their own staff.

9   But I have seen -- obviously I'm cc'd on some of the e-mails

10  that were sent out regarding that.                                   11:20:25

11  Q.  So you didn't go out and train mental health staff about

12  this new requirement?

13  A.  I got on a lead call with all the leads and discussed this

14  order immediately after that, and discussed sort of how could

15  we quickly create the area that they could take them to so that     11:20:41

16  we could get into compliance immediately.

17         Because this happened on the 5th of October and we're

18  trying to adjust quickly.

19         So I spoke with the leads.  And then on every out

20  brief, that's when we started the process of talking with           11:21:00

21  them -- because all the mental health staff come to those -- in

22  talking with them about, here's the issue, here's what, you

23  know, the Court order is.  And are you having any challenges --

24  which is why I asked the wardens to be there -- around getting

25  inmates out?  Do you have a space for that?  Are there              11:21:19

93

**Nicole Taylor – Cross-Examination**

1    challenges about time?  Do we need to problem solve any of your

2    issues related to having the space to do that?  Because we

3    didn't have the spaces to do that and we had to create those.

4    Q.  Okay.  So did -- so you said you had a call and you told

5    people.                                                          11:21:39

6    A.  Correct.

7    Q.  To your knowledge did written instructions go out?

8    A.  From Dr. Calcote to his staff written instructions went

9    out.  I think he was in court and he did it right then and

10   there, which is what I think this is here.                       11:21:49

11   Q.  Are you aware of any sort of written training materials

12   being prepared for future hires?

13   A.  It is my understanding that Corizon has implemented a

14   number of training things on their onboarding for mental health

15   staff that covers that extensively.                              11:22:06

16   Q.  Including this ruling?

17   A.  Yes.

18   Q.  And when was that done?

19   A.  I don't know.  You'd have to ask Corizon.

20   Q.  Was it done two months ago?                                  11:22:13

21   A.  I honestly don't know.

22   Q.  So you have no idea when written materials, if any, were

23   developed by Corizon about this requirement?

24   A.  It is my understanding that they developed the written

25   materials.  That's what we've discussed.  I don't know when it   11:22:30

**Nicole Taylor - Cross-Examination**

1    was created and/or implemented.

2    Q.  Have you seen these written training materials?

3    A.  I think -- they may have sent some over to me from

4    Miss Puckett regarding -- it would have been kind of all their

5    training.                                                           11:22:52

6            But I know that Dr. Calcote went out and met with all

7    the current staff.  And then I believe they were taking

8    whatever that document was, that information, and implementing

9    that into the orientation process.

10   Q.  Okay.  But, again, you can't testify to when it happened?   11:23:07

11   A.  No, because I don't provide that.

12   Q.  Okay.  And Miss Love showed you Exhibit 224, which was a

13   photograph of the weekend watch poster.

14           You can look at it if you want to look at it again.

15   A.  Yeah.                                                          11:23:24

16   Q.  The yellow sign.

17   A.  It would be all watches, but --

18   Q.  Okay.  But the yellow sign?

19   A.  Yes.

20   Q.  Okay.  And that photograph was taken during the 2017 tour     11:23:29

21   of Phoenix?

22   A.  That's my understanding, yes.

23   Q.  Okay.  And was this sign up at other institutions?

24   A.  Not to my knowledge.

25   Q.  And this sign was taken down after the June 2017 monitoring   11:23:48

─── **Nicole Taylor – Cross-Examination** ───

1  tour and the photo was taken of it; correct?

2  A.  I believe that was the direction from the Court.  That was

3  my understanding.

4  Q.  Your understanding was the Court ordered it be taken down?

5  A.  I don't think it was an order.  But there was discussion          11:24:03

6  while we were in court about the concerns of how that would be

7  viewed.  And so I think they understood that to mean to remove

8  it.

9  Q.  Okay.  And you testified that you can't recall anyone ever

10 entering that into a SOAP note when it wasn't true; correct?       11:24:19

11 A.  Not purposefully, no.

12 Q.  Okay.  How would -- how would you know that it wasn't true?

13 Did you go and talk to the patients?

14 A.  I have talked to some patients, but not -- not auditing and

15 then going to talk to the 15 or whatever that I've audited on.     11:24:38

16 Not in that way, no.

17 Q.  So you didn't independently confirm it?

18 A.  No, I did not.

19 Q.  Okay.  Could you turn to Exhibit 263, please?

20         And if you turn to page 2 at the bottom, it's -- or         11:25:23

21 about half way down, it's e-mails back and forth between Joe

22 Profiri and Ernie Trujillo, and you're copied on it.

23         Who is Mr. Profiri?

24 A.  He is the Southern Regional Director of Operations.

25 Q.  And who is Mr. Trujillo?                                         11:25:45

——— **Nicole Taylor – Cross-Examination** ———

1    A.  He's the Northern Regional Director of Operations.

2    Q.  Okay.  And Mr. Profiri writes at the bottom, October 11th,

3    2017, this evening inmate blank, who was on constant watch, was

4    able to remove the elastic from her underwear and wrap it

5    around her neck while under her watch blanket.  Both were          11:26:08

6    approved items for the watch.  She is alert and conscious and

7    transported to Abrazo West as a precaution.

8         The assigned officer has been removed from his watch

9    post and will be served a supervisor complaint for not

10   maintaining constant watch on this inmate.                          11:26:25

11        Warden Currier will discuss with local medical mental

12   health personnel to modify the watch order to a smock as she

13   attempted the same while on watch this past weekend with her

14   bra.

15        Do you see that?                                               11:26:41

16   A.  Yes, I do.

17   Q.  Do you remember this incident?

18   A.  Vaguely.

19   Q.  Okay.  And then if you turn to the bottom of page 1, it's

20   an e-mail that you wrote the next day, October 12th.                11:26:55

21   A.  Correct.

22   Q.  And you write, the mental health staff documented today

23   that they were told by security that they could not bring her

24   out to a confidential setting.

25        Correct?                                                       11:27:11

1   A.  Correct.

2   Q.  So it sometimes happens that the officers refuse to bring a

3   patient out of her cell for a confidential encounter; correct?

4   A.  It appears that that does happen, and then the mental

5   health staff document that in their note.                        11:27:23

6   Q.  Okay.

7   A.  Yeah.

8       MS. KENDRICK:  All right.  I move to admit Exhibit

9   263.

10      THE COURT:  Any objection?                                   11:27:31

11      MS. LOVE:  No objection.

12      THE COURT:  263 is received.

13   (Exhibit No. 263 admitted into evidence.)

14   BY MS. KENDRICK:

15   Q.  And this isn't the only time that a seriously mentally ill  11:27:37

16   person on constant watch has managed to hurt himself or

17   herself, is it?

18   A.  I know of one other incident.  But beyond that I haven't

19   heard of any others.

20   Q.  Could you turn to what's previously been admitted as        11:27:51

21   Exhibit 235?

22   A.  Okay.

23      MS. KENDRICK:  Do you have it, Your Honor?

24      THE COURT:  I don't yet.

25      THE WITNESS:  There's an additional copy here, if            11:28:28

98

Nicole Taylor – Cross-Examination

1    that's helpful.

2           THE COURT:  Thank you.

3           Go ahead.

4    BY MS. KENDRICK:

5    Q.  And this is an e-mail dated November 3rd, 2017, from Angela    11:28:35

6    Fischer to Jeff Goldberg and Mariann Burnetti-Atwell?

7    A.  It appears so.

8    Q.  Huh?

9    A.  It appears so.

10   Q.  Yeah, yeah.                                                    11:28:48

11          And if you go down to the second paragraph, about

12   seven lines down there's a sentence that reads, quote, after

13   speaking with the deputy warden and Dr. Taylor -- which I

14   believe that is actually, looking up, referring to the other

15   Dr. Taylor, not you --                                            11:29:06

16   A.  Right.

17   Q.  -- the patient was placed on constant suicide watch and was

18   placed back in his cell without incident.  Once in his cell, he

19   took strips of sheets that he found in the legs of the bed,

20   tied them around his neck, attached it to the sink, and was      11:29:17

21   found unconscious less than 30 minutes later, all the while on

22   a constant suicide watch, close quote.

23          Is this the other incident you were referring to?

24   A.  Yes.

25   Q.  Okay.  Is it your opinion that Corizon has adequate number    11:29:29

UNITED STATES DISTRICT COURT

1    of mental health staff to address the patient needs at the

2    prisons?

3              MS. LOVE:  Objection, Your Honor, exceeds the scope of

4    direct and exceeds the scope of the stipulation.

5              THE COURT:  Overruled.                                   11:29:56

6              THE WITNESS:  You know, this is something that we've

7    been working on for years and years.  And when I worked out in

8    the facility, I didn't feel like there were enough staff.  And

9    the numbers have substantially increased since I worked in the

10   field.                                                             11:30:16

11             So it's harder to say now, because I don't actually

12   work in the field.  And by all accounts mental health does a

13   wonderful job in seeing everybody who needs to be seen.

14             So if you asked me this five years ago, I would have

15   said that the 760 total staff that ADC had was insufficient.      11:30:33

16   Because I worked in the field, I could say that.  From where I

17   work, they've substantially added staff -- staffing numbers to

18   that, and they're doing a great job with meeting the

19   performance measures.

20             But that doesn't mean that I don't always want more.     11:30:55

21   And so with the contract amendment, there is more.  And part of

22   that comes from the feedback from the staff that they feel

23   stressed out and overwhelmed.  And again, these are my peers.

24   These are people, many of them I've worked with for years.

25             And so we listen to that.  And those are concerns that   11:31:18

─────── **Nicole Taylor – Cross-Examination** ───────

1  I want them to feel a lot of pride in what they're able to do,

2  and like their job and stay in their job.

3  BY MS. KENDRICK:

4  Q.  There's a lot of turnover, huh?

5  A.  Not necessarily in the mental health staff.  There is more          11:31:31

6  with the nursing staff.  I don't know more than any other

7  health care agency.  I've not reviewed turnovers for --

8  Q.  How many -- it's true that only three mental health staff

9  at Phoenix were actually working there five years ago; correct?

10  Everyone else has turned over.                                          11:31:52

11  A.  Some of them have left and come back.  So Dr. Ekeinde

12  was there and then left and came back.  And then some of the

13  staff have rotated to other facilities.  So they haven't

14  necessarily turned over.  They haven't quit.  They've wanted to

15  work at Lewis or Perryville, or because where they live,         11:32:09

16  Florence and Eyman.  So I don't necessarily consider that to be

17  a turnover.

18  Q.  And you've referred several times to the staff as your

19  peers; correct?

20  A.  That's correct.                                                     11:32:21

21  Q.  Aren't they the employees of a contractor to the State?

22  A.  Correct.  But professionally they're my peers.

23  Q.  And your job is, as a State employee, a fiduciary duty, to

24  ensure that the contractor is providing the services needed to

25  the State?                                                              11:32:38

**Nicole Taylor – Cross-Examination**

1    A.  That is correct.

2    Q.  Okay.  Could you turn to Plaintiffs' Exhibit 117, please?

3    A.  Sure.

4    Q.  Can you turn to page 3 of this exhibit?  It's an e-mail

5    from Dennis Dye to a multitude of people, including you.  And    11:33:05

6    it's dated June 29th, 2017, subject line, May mental health

7    CGAR.  Do you see that?

8    A.  Yes.

9    Q.  And this is regarding Tucson?

10   A.  Correct.                                                     11:33:21

11   Q.  Okay.  And it's talking about various measures that he

12   found in the audit that had failed in the month of May;

13   correct?

14   A.  Correct.

15   Q.  Okay.  And the first one is regarding minors.  And you      11:33:36

16   testified minors just applies at Tucson and Perryville;

17   correct?

18   A.  Correct.

19   Q.  Okay.  And then if you go down about half way, he writes,

20   considering the performance measures marked in blue.            11:33:54

21        And what does blue mean, do you know?

22   A.  So we just sort of made the blue up for ourselves to bring

23   attention to it, hey, guys, this is something that's been

24   slipping.  It may still be in compliance, but I need to bring

25   your attention to it.                                           11:34:15

─────────── **Nicole Taylor – Cross-Examination** ───────────

1   Q.  Okay.  And he has three comments.  And the third one

2   labeled number 3 says, HNRs, and he writes, quote, not having

3   the daily nursing line for HNRs is hurting Tucson, close quote.

4   Do you see that?

5   A.  Correct.                                           11:34:31

6   Q.  So the failure to have daily nurse's line has an adverse

7   effect on mental health care and not just medical care; right?

8   A.  Well, the daily nursing line was in the sense that they

9   were not seeing the mental health ones on their line.

10  Q.  So the failure to have a daily nursing line adversely     11:34:47

11  affects mental health; correct?

12  A.  Well, that's not what this is saying.  They had the line.

13  They're not seeing the mental health ones on the line, was the

14  issue at Tucson.  That affected mental health's performance

15  measures.                                              11:35:04

16  Q.  Well, he goes on to write, three urgent HNRs were not seen

17  within 24 hours, but a nursing line would have remedied this.

18        You're aware that they're supposed to have nursing

19  line daily, seven days a week?

20  A.  Correct.                                           11:35:16

21        And what I was sharing with you --

22  Q.  So my question again is:  Not having daily nursing line

23  adversely affects mental health care; correct?  Yes or no.

24  A.  I honestly can't answer yes or no, because you're assuming

25  facts that are not in this e-mail.                     11:35:32

1    Q.  I just read to you the two sentences that he wrote.

2    A.  Right.

3    Q.  And he said that somebody with an urgent HNR was not seen

4    within 24 hours, but a nursing line would have remedied that.

5    A.  Correct.  They were not seeing the mental health HNRs on          11:35:44

6    nurse's line at Tucson.

7    Q.  So your testimony is, therefore, that not having daily

8    nursing line has no impact on mental health care?

9    A.  It would, but that's not the issue that was at Tucson.

10   Because I specifically went down to Tucson and met with them on       11:35:59

11   their HNR issue.

12   Q.  But the point is, your employee said, not having a daily

13   nursing line for HNRs is hurting Tucson.  And then describes

14   three urgent HNRs that were not seen.  And he writes, but a

15   nursing line would have remedied this.  Correct?                      11:36:18

16   A.  Correct.

17   Q.  Okay.

18          MS. KENDRICK:  Move to admit Exhibit 117.

19          THE COURT:  Any objection?

20          MS. LOVE:  No objection.                                       11:36:27

21          THE COURT:  117 is received.

22      (Exhibit No. 117 admitted into evidence.)

23   BY MS. KENDRICK:

24   Q.  Could you turn to Plaintiffs' Exhibit 189, please?

25   A.  Sure.                                                             11:36:36

───── **Nicole Taylor – Cross-Examination** ─────

1      MS. LOVE:  Which one was it?

2      THE WITNESS:  189.

3      MS. KENDRICK:  189.

4      THE COURT:  189.

5  BY MS. KENDRICK:                                              11:36:57

6  Q.  And this is an e-mail between Lori Johnson and James Taylor

7  dated July 5th, 2017?

8  A.  Okay.

9  Q.  Do you know who Lori Johnson is?

10 A.  She is the FHA at Yuma.                                   11:37:09

11 Q.  She's the Facility Health Administrator at Yuma, according

12 to this?

13 A.  Correct.

14 Q.  And do you know who James Taylor is?

15 A.  He -- I believe he retired.  But he was the Corizon       11:37:23

16 regional -- I don't know what they call them -- directors of

17 operation, I think they call them also.

18 Q.  Okay.  And do you see about half way down the page the

19 third paragraph?

20 A.  Which -- I'm sorry, which page are you on?                11:37:41

21 Q.  Page 1.

22 A.  Okay.

23 Q.  Miss Johnson, the Facility Health Administrator, writes,

24 quote, I am down a psych associate, and with Bucio out we have

25 been down two people and no psychiatrist.  Then get told today 11:37:52

**Nicole Taylor – Cross-Examination**

1    we need to clean up a backlog of 85 people by close of business

2    today.  With the already scheduled lines that are scheduled

3    would be asking a lot.

4         I believe yesterday you had said that somebody working

5    at Yuma had been out for medical leave.  Was that Mr. Bucio?       11:38:10

6    A.  Yes.

7    Q.  Okay.  And for how long has Yuma had no psychiatrist?

8    A.  I don't know that they don't have a psychiatrist.  I mean,

9    she's saying, we don't have a psychiatrist, and that's on

10   Wednesday, July 5th, 2017.  I don't know that they don't have a   11:38:33

11   psychiatrist.

12   Q.  So who's the psychiatrist?  What's his or her name?

13   A.  I mean, I would have to look.  They may not be specifically

14   assigned to Yuma.

15   Q.  So do you review the monthly staffing reports?               11:38:53

16   A.  Do I?  No.

17   Q.  Okay.

18   A.  But they do have a psychiatric provider -- actually I think

19   two covering Yuma, and they just rotate around who may be

20   covering.  Sometimes it's people who want to be on-site,         11:39:08

21   sometimes it's telepsychiatry that wants to cover.

22        So, again, in July I can't speak to what was going on

23   right then.

24   Q.  Okay.  And if you go to the last paragraph of

25   Miss Johnson's e-mail, the last sentence, she says, quote,       11:39:22

1    nursing and mental health are drowning, close quote.

2         Were you aware of these staffing shortages in mental

3    health staff at Yuma last Summer?

4    A.  I was aware of Mr. Bucio being out.  We had discussed that

5    on a lead call.                                            11:39:39

6    Q.  Were you aware that they were also down a psych associate

7    and had no psychiatrist last Summer?

8    A.  I was not aware that they did not have a psychiatric

9    provider for any period of time, that would have come to my

10   attention.                                                11:39:54

11   Q.  Okay.  And could you turn to Exhibit 176, please?

12        And this is an e-mail that starts off from somebody

13   named Leonel Urdaneta to Antonio Carr dated September 6, 2017,

14   subject line, extra time.  And Mr. Urdaneta writes, quote, do

15   you have any extra time to help us via tele from regional     11:40:33

16   office to catch up with a backlog at the Yuma facility?

17        Do you know who either of these individuals are?

18   A.  Dr. Urdaneta is the regional psychiatric director for

19   Corizon.  And Dr. Carr is a staff psychologist -- I'm sorry,

20   psychiatrist.                                             11:40:54

21   Q.  Okay.  And this is dated September 6th, so it's two months

22   after the previous exhibit I showed you; right?

23   A.  Correct.

24   Q.  Okay.  So were you aware in September that Yuma was still

25   trying to catch up with a backlog of mental health care?    11:41:09

**Nicole Taylor – Cross-Examination**

1    A.  I would have to look -- I used the CGARs to help tell me

2    where those -- where they're struggling.  And so off the top of

3    my head, eight months ago do I remember that being an issue?  I

4    don't know if it was September.  I know one month they did not

5    pass the MH-3As being seen, and I believe it was by the        11:41:35

6    psychiatric provider, for one month.

7    Q.  And you do the CGARs approximately -- anywhere from 30 to

8    45 days after the end of the month?  So like you do the March

9    CGARs in April and May; correct?

10   A.  We do the March CGARs by April 30th.                      11:41:57

11   Q.  Right.

12   A.  So no more than 30 days after the last day.

13   Q.  Okay.

14   A.  Maybe 31.

15   Q.  So if you were just using the CGARs, you would find out a  11:42:07

16   month later that there was something that could potentially be

17   affecting the outcomes?

18   A.  Correct.  That would tell me whether it was substantial

19   enough that it affected the outcomes.  Because although there

20   may be a backlog, it doesn't necessarily mean that -- because   11:42:23

21   unfortunately they classify a backlog as people who are due

22   that week.  And that's how they term their backlog.  And so

23   that's not how I would use the term of backlog, but that's how

24   they use it.

25            And so if they're concerned about, we have these     11:42:39

—— **Nicole Taylor – Cross-Examination** ——

1    patients who need to be seen this week and we don't have a

2    provider, that would be their backlog for the week.

3    Q.   Okay.

4    A.   It could include people who are overdue, but it also

5    includes people who are due the rest of the week.          11:42:50

6    Q.   Okay.  Great.

7         Could you look up and see at the top of the e-mail

8    what Dr. Carr says in response?  He writes, quote, I am

9    available a few weekends.  However, I have yet to be fully

10   compensated for extra hours worked at Lewis Complex.  I worked   11:43:06

11   a total of 32 hours in August and have not received the

12   appropriate amount of compensation.  Last week I received a

13   debit card with an amount of money, no pay stub, no

14   verification of the hours paid.  The amount of money on the

15   debit card did not cover the hours worked.  I would like to   11:43:24

16   resolve pay issues before I work additional hours.

17        Are you aware of any other Corizon mental health staff

18   who were not paid for overtime?

19        MS. LOVE:  Objection, Your Honor, relevance,

20   foundation and hearsay, as there's -- counsel's reading from an   11:43:39

21   e-mail that there's no guarantee of veracity as to the

22   allegations that this person is making regarding a pay issue.

23        THE COURT:  Overruled.

24        The question is, are you aware?

25        THE WITNESS:  No.                                      11:43:54

**Nicole Taylor – Cross-Examination**

1    BY MS. KENDRICK:

2    Q.  Okay.  Do you know who Dr. Carr is?

3    A.  Yes.

4    Q.  Did he ever complain to you that he was paid in a debit

5    card for working overtime?                                        11:44:02

6    A.  No, that would not be a topic of our conversations.

7    Q.  You would probably remember that if somebody had told you

8    that?

9    A.  Yeah, I don't -- yeah.  He comes to the out briefs and so

10   we talk about what's going on at the Florence Complex.            11:44:17

11   Q.  Okay.  But, I mean, you had testified earlier that

12   sometimes just other random things come up like, I don't have

13   AIMS access.

14   A.  Right.

15   Q.  So I didn't know if maybe a random thing was, Dr. Taylor, I   11:44:28

16   got paid in a debit card.

17   A.  No.

18   Q.  Okay.

19   A.  It wasn't shared.

20        THE COURT:  Have you ever heard that Corizon was            11:44:35

21   paying providers for overtime with this debit card?

22        THE WITNESS:  I have never heard of that.

23        MS. KENDRICK:  We would move to admit Exhibits 189 and

24   176.

25        THE COURT:  Any objection?                                  11:44:52

UNITED STATES DISTRICT COURT

─────── **Nicole Taylor – Cross-Examination** ───────

1          MS. LOVE:  For both exhibits we object to relevance,

2    foundation and hearsay, for the reasons previously mentioned.

3    And Dr. Taylor is not part of any of these e-mails.

4          THE COURT:  All right.  The objections are all

5    overruled.                                                      11:45:04

6       (Exhibit Nos. 189 and 176 admitted into evidence.)

7          MS. KENDRICK:  Just a minute, sir.

8       (Discussion off the record between plaintiff counsel.)

9    BY MS. KENDRICK:

10   Q.  All right.  I believe you testified earlier that Phoenix   11:45:42

11   was not compliant for Performance Measure 94 in May 2017, and

12   that it was because of Miss Fischer.

13   A.  94 or 91.  Because those are together looking at the exact

14   same issues.

15   Q.  Okay.  So just for the record, I will represent to you -- I  11:46:05

16   mean, if you want we can pull it up.  But the score for 94 in

17   May 2017 was actually 87 percent.

18   A.  And 91 failed or passed?

19   Q.  The point is that 94 was not noncompliant.

20   A.  Okay.                                                       11:46:29

21   Q.  Okay.  So you had said that if you were asked five years

22   ago that you would have said that the staffing is not adequate,

23   but now Corizon is hiring more staff; correct?

24   A.  They added a number of staff when they took over the

25   contract initially.                                             11:46:48

**Nicole Taylor – Cross-Examination**

1   Q.  Yeah.  And you testified you started working in 2005 for

2   the Department; right?

3   A.  Correct.

4   Q.  And so that was before privatization; right?

5   A.  Correct.                                          11:46:58

6   Q.  And are you aware of what the staffing numbers were for the

7   institutions and state-wide when the State provided health care

8   to incarcerated people?

9        MS. LOVE:  Objection, relevance.

10       THE COURT:  Overruled.                           11:47:13

11       THE WITNESS:  I'm aware of the staffing numbers

12  where -- the facilities I worked at.

13  BY MS. KENDRICK:

14  Q.  And after the legislature privatized health care, did a lot

15  of people quit that you worked with?                  11:47:23

16  A.  Unfortunately they did.

17  Q.  Yeah.  And so then the staffing numbers went down, didn't

18  they?

19  A.  The positions did not, but the filled went down, yes.

20  Q.  Right.  And so that was about five years ago?     11:47:34

21  A.  It started earlier than that.  When the notification went

22  out that health care was going to be privatized, a number of

23  people began looking for positions that would continue their

24  retirement program.

25  Q.  Right.  Okay.                                     11:47:54

─────── **Nicole Taylor - Cross-Examination** ───────

1       And so are you aware as to whether the new and

2   improved staffing numbers in the contract extension even gets

3   it back to what it was back in 2005 when you worked as a

4   provider?

5           MS. LOVE:  Objection, foundation, relevance.                    11:48:11

6           THE COURT:  Overruled.

7           THE WITNESS:  It's substantially higher.

8   BY MS. KENDRICK:

9   Q.  So your testimony is that what Corizon is contracted to do

10  is substantially higher than what it was prior to                       11:48:20

11  privatization?

12  A.  Correct.

13  Q.  And on what basis are you saying that?

14  A.  There are 100 clinicians, between psych associates and

15  psychologists, in the contract amendment.                               11:48:32

16  Q.  And how many were there in 2005?

17  A.  Substantially less than that.

18  Q.  And what are you basing your assertion that it was

19  substantially less?  Do you have the numbers?  Have you looked

20  at the numbers?                                                         11:48:44

21  A.  I don't have the exact numbers, but I know at the

22  facilities that I worked at, there are so many more mental

23  health staff assigned to these facilities then there was when

24  we were providing services.  We didn't have mental health techs

25  at all, those weren't even a --                                         11:49:01

─────── **Nicole Taylor – Cross-Examination** ───────

1   Q.  You said "assigned."  So what about filled positions?

2   A.  Well, we haven't hit July 1st.  So that will --

3   Q.  But what about currently filled?

4   A.  It's substantially higher than when -- just before

5   privatization.  As I was sharing with you, I worked at Florence      11:49:14

6   when privatization was announced, and there were three of us

7   who were clinicians.  There was a psychologist and two psych

8   associates.  So, yes, substantially higher.

9   Q.  Okay.  Thank you.

10          Are you aware that the April 2018 staffing report      11:49:28

11  shows no psychiatrist at Yuma?

12  A.  Psychiatric provider or psychiatrist?

13  Q.  Psychiatrist.

14  A.  That's potentially correct.  But a psychiatric provider is

15  there.                                                             11:49:40

16  Q.  Who is that?

17  A.  Miss Martin works Yuma.

18  Q.  Full time?

19  A.  She doesn't work any of the other sites so, yeah.

20  Q.  And she's telemedicine?                                        11:49:51

21  A.  Correct.  I believe so.

22          MS. KENDRICK:  Okay.  Your Honor, I have no further

23  questions.

24          I would like to move to admit a couple other exhibits

25  that I may have missed.                                            11:50:00

1          Exhibit 99.

2          THE COURT:  Any objection?

3          MS. LOVE:  No objection.

4          THE COURT:  99 is admitted.

5     (Exhibit No. 99 admitted into evidence.)                    11:50:12

6          MS. KENDRICK:  Exhibit 123.

7          THE COURT:  Objection?

8          MS. LOVE:  I'm searching for it.  123?

9          THE COURT:  Yes.

10         MS. KENDRICK:  Yes.                                     11:50:36

11         MS. LOVE:  No objection.

12         MS. KENDRICK:  Defendants' Exhibit 678.

13         MS. LOVE:  No objection.

14         THE COURT:  Number 123 is admitted.

15         678 is admitted.                                        11:50:55

16    (Exhibit Nos. 123 and 678 admitted into evidence.)

17         MS. KENDRICK:  Defendants' Exhibit 683.

18         MS. LOVE:  No objection.

19         THE COURT:  683 is admitted.

20    (Exhibit No. 683 admitted into evidence.)                   11:51:09

21         MS. KENDRICK:  I have nothing further, sir.

22         THE COURT:  All right.

23         How much on redirect, do you think?

24         MS. LOVE:  Probably 20 minutes.

25         THE COURT:  All right.  Why don't we come back at       11:51:17

1   1:00 o'clock and we'll do your redirect at that time, and we'll

2   be able to finish before we hear Mr. Millar at 1:30.

3          Thank you all.

4      (Lunch recess at 11:51 a.m.)

5      (Further proceedings held on the record are contained in a

6   separate transcript.)

7

8                              -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, CANDY L. POTTER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 18th day of June, 2018.

s/Candy L. Potter_____
Candy L. Potter, RMR, CRR