UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

————————————

Victor Parsons, et al., on        )
behalf of themselves and all      )
others similarly situated;        )
and Arizona Center for            )
Disability Law,                   )
                                  )   No. CV-12-00601-PHX-DKD
        Plaintiffs,               )
                                  )
    vs.                           )   Phoenix, Arizona
                                  )   June 14, 2018
Charles Ryan, Director,           )   9:02 a.m.
Arizona Department of             )
Corrections; and Richard          )
Pratt, Interim Division           )
Director, Division of Health      )
Services, Arizona Department      )
of Corrections, in their          )
Official capacities,              )
                                  )
        Defendants.               )
_____    )


BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY AND STATUS HEARING


Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    **For the Plaintiffs:**

3            PRISON LAW OFFICE
             By:  **Corene Kendrick, Esq.**
4            1917 5th Street
             Berkeley, CA 94710
5
             ACLU – Washington DC
6            By:  **David C. Fathi, Esq.**
             915 15th Street NW
7            7th Floor
             Washington, DC 20005
8
             EIDENBACH LAW PC
9            By:  **Kirstin T. Eidenbach, Esq.**
             P.O. Box 91398
10           Tucson, AZ 85752

11           ARIZONA CENTER FOR DISABILITY LAW – Tucson, AZ
             By:  **Maya Stock Abela, Esq.**
12           177 North Church Avenue
             Suite 800
13           Tucson, AZ 85701

14   For the Defendants:

15           STRUCK LOVE BOJANOWSKI & ACEDO PLC
             By:  **Timothy J. Bojanowski, Esq.**
16           By:  **Rachel Love, Esq.**
             By:  **Daniel Struck, Esq.**
17           3100 W. Ray Road
             Suite 300
18           Chandler, AZ 85226

19

20

21

22

23

24

25

CR-12-601-PHX-DKD – June 14, 2018

**I N D E X**

| DEFENSE WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

VANESSA HEADSTREAM
By Ms. Eidenbach                5
By the Court                   43
By Mr. Bojanowski                          52

**INDEX OF EXHIBITS**

| EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|
| 61 | 7-17-17 email from M. Haldane to K. Campbell and V. Headstream | 10 | 52 |
| 62 | 7-19-17 email from K. Campbell to V. Headstream | 11 | 12 |
| 70 | 10-17-17 email from M. Bedoya to T. Dumkrieger and V. Headstream | 12 | 14 |
| 92 | 9-28-17 email from S. Deguara to Headstream | 14 | 15 |
| 120 | 7-18-17 email from V. Headstream to M. Bedoya | 15 | 16 |
| 122 | 8-3-17 email from V. Headstream to M. Ortiz | 16 | 18 |
| 125 | 10-20-17 email from B. Briddle to Tucson Corizon staff | 18 | 20 |
| 134 | 12-8-17 email from B. Briddle to V. Headstream | 20 | 21 |
| 135 | 12-8-17 email from B. Briddle to Headstream, Campbell, Pratt | 23 | 24 |
| 137 | 12-11-17 email from D. Knighton to M. Bedoya | 24 | 25 |
| 141 | 8-3-17 email from V. Headstream to Ortiz | 26 | |

—CR-12-601-PHX-DKD — June 14, 2018—

1          (Proceedings begin at 9:02 a.m.)

2          THE CLERK:  Civil case number 12-601, Parsons, et al,

3     versus Ryan, et al, on for status and evidentiary hearings.

4          THE COURT:  Counsel please announce.

5          MR. FATHI:  Good morning, Your Honor, David Fathi of                09:02:31

6     the ACLU National Prison Project for the plaintiff class.

7          THE COURT:  Thank you.  Good morning.

8          MS. KENDRICK:  Good morning, Your Honor, Corene

9     Kendrick from the Prison Law Office for the plaintiff class.

10          THE COURT:  Thank you.  Good morning.                              09:02:42

11          MS. EIDENBACH:  Good morning, Your Honor, Kirsten

12     Eidenbach for the plaintiff class, and behind me is co-counsel

13     Maya Abela from the Arizona Center for Disability Law.

14          MR. BOJANOWSKI:  Good morning, Your Honor, Timothy

15     Bojanowski, Rachel Love, and Daniel Struck for the defendants.          09:02:54

16          THE COURT:  Thank you.  Good morning.

17          And good morning, Mr. Pratt.

18          The e-mail that I saw with respect to Miss Neese I

19     think we should probably address first.

20          What is plaintiffs' position?                                       09:03:06

21          MR. FATHI:  Your Honor, we don't see the need to have

22     her testify live.  We are fine with defendants filing a

23     declaration.

24          We would only ask that for that declaration and for

25     any others that defendants wish to file, the Court set a                09:03:19

UNITED STATES DISTRICT COURT

5

──── Vanessa Headstream – Cross-Examination ────

```
 1   deadline so that the Court has time to receive it and consider
 2   it.
 3              THE COURT:  Mr. Struck, when could the affidavit come
 4   in?
 5              MR. STRUCK:  We could get those to you by close of      09:03:29
 6   business on Tuesday.
 7              THE COURT:  All right.  That's fine.
 8              MR. STRUCK:  Okay.
 9              THE COURT:  Thank you very much.
10              Miss Headstream, if you'd please return to the witness 09:03:37
11   stand.
12              Mr. Bojanowski.
13              MR. BOJANOWSKI:  Your Honor, I think it's
14   cross-examination at this point.
15              THE COURT:  You're right.  I'm sorry.  Thank you.      09:03:56
16   Thank you for that refresher.
17              How are you, ma'am?
18              THE WITNESS:  I'm good.  Thank you.
19              THE COURT:  Thank you, Miss Kendrick -- I mean
20   Miss Eidenbach.                                                    09:04:05
21         (VANESSA HEADSTREAM, DEFENSE WITNESS, PREVIOUSLY SWORN.)
22                           CROSS-EXAMINATION
23   BY MS. EIDENBACH:
24   Q.  Good morning, Miss Headstream.
25   A.  Good morning.                                                  09:04:09
```

UNITED STATES DISTRICT COURT

**Vanessa Headstream – Cross-Examination**

Q.  Just to orient you, I've got the exhibits that

Mr. Bojanowski used to your right, and then there's another

stack that you and I will be going through this morning to your

left.

A.  Okay.                                                    09:04:20

Q.  Yesterday you testified that you have worked for the Bureau

of Monitoring.  How long have you been in your current

position?

A.  I believe it was 2014, four years, approximately.

Q.  Have you ever worked for Corizon?                        09:04:37

A.  No.

Q.  Did you prepare for your testimony today, or yesterday?

A.  I provided the documents that we looked at yesterday.

Q.  Okay.  Did you review any documents beyond those that you

provided?                                                    09:04:57

A.  No.

Q.  Did you review any transcripts from hearings in this case?

A.  No.

Q.  Did you review any summaries of transcripts from hearings

in this case?                                                09:05:06

A.  No.

Q.  Did Dr. Taylor talk with you about the hearings that have

been taking place in this case?

A.  No.

Q.  Did Mr. Pratt talk with you about the hearings that have   09:05:15

Vanessa Headstream – Cross-Examination

1    been taking place in this case?

2    A.  No.

3    Q.  Did you meet with anybody in anticipation of your testimony

4    today?

5    A.  My attorneys -- or the attorneys representing the            09:05:25

6    defendants.

7    Q.  Okay.  And when did that meeting take place?

8    A.  Yesterday during -- in between, when you guys were in here

9    and I was in the little room, this morning out in the hallway.

10   Q.  And those two meetings, are those the only two times that   09:05:43

11   you've met with counsel?

12   A.  I've met with counsel several times.

13   Q.  But in preparation for your testimony.

14   A.  I believe that was all.

15   Q.  And about how long did the meeting yesterday last?           09:05:54

16   A.  It was intermittent.  Maybe a total of an hour during the

17   day.

18   Q.  Okay.  And in the hallway today how long was that meeting?

19   A.  Three or four minutes.

20   Q.  Okay.  Did you meet with anyone else in preparation for     09:06:16

21   your testimony today?

22   A.  No.

23   Q.  Any of your colleagues or other monitors?

24   A.  No.

25   Q.  Any supervisors?                                             09:06:25

Vanessa Headstream – Cross-Examination

1  A.  No.

2  Q.  Thank you.

3       You testified yesterday that you have quite a few

4  duties.  So you don't work full-time as a monitor, that's

5  correct; right?                                              09:06:40

6  A.  Correct.

7  Q.  And you testified that you handle approximately 35 to 40

8  inmate letters per month; correct?

9  A.  Approximately, yes.

10 Q.  And do you have an approximate number of family letters   09:06:49

11 that you address each month?

12 A.  No.  It varies month to month.

13 Q.  Okay.  The exhibits that Mr. Bojanowski walked you through

14 yesterday, all of them involve what you called source

15 documents.  That's correct?                                  09:07:10

16 A.  Yes.

17 Q.  Okay.  And these source documents are provided to you by

18 Corizon; is that correct?

19 A.  Yes.

20 Q.  So they create them?                                      09:07:19

21 A.  Yes.

22 Q.  Do you have any hand in their creation?

23 A.  No.

24 Q.  You also testified yesterday that when you make a finding

25 of noncompliance, Corizon can review and rebut that finding;  09:07:36

Vanessa Headstream – Cross-Examination

1  correct?

2  A.  Yes.

3  Q.  Do they ever -- has there ever been an instance where they

4  complain about a finding of compliance?

5  A.  No.                                                              09:07:55

6  Q.  So they only complain about --

7          Sorry, I've got a frog in my throat this morning.

8          So they only complain about instances of

9  noncompliance; correct?

10 A.  Well, they would like an explanation.  I don't know that     09:08:04

11 it's a complaint.  It's a further review of noncompliance.

12         Once they have -- my understanding is they review the

13 findings, and then noncompliant findings they don't agree with,

14 then they ask about.

15 Q.  Okay.  Thank you.                                             09:08:21

16         Yesterday you testified that you oversee compliance at

17 five of the prisons; is that correct?

18 A.  Yes.

19 Q.  Which prisons?

20 A.  Douglas, Safford, Tucson, Perryville, Yuma.                   09:08:30

21 Q.  And when you were telling us about letters that you get

22 from advocates or family members, do you keep a log of those?

23 A.  Yes.  Well, they're logged into a database, yes.

24 Q.  Okay.

25 A.  I don't maintain it, but they are logged into a database.     09:08:58

```
 1    Q.  Okay.  So there is a log listing all of them?

 2    A.  Um-hum.

 3    Q.  Okay.

 4          MR. BOJANOWSKI:  Is that a yes?

 5          THE WITNESS:  Yes.                              09:09:08

 6          MS. EIDENBACH:  Thank you.

 7    BY MS. EIDENBACH:

 8    Q.  Just give me one second here.

 9          All right.  In front of you is Exhibit 61.  Do you see

10    that?                                                 09:09:29

11    A.  Yes.

12    Q.  That will be the exhibit we're starting with.

13          This is an e-mail sent by Mark Haldane to you and

14    Kathy Campbell on June 17th, 2017; correct?

15    A.  Correct.                                          09:09:45

16    Q.  If you can take a moment to just read the body of the

17    e-mail.  And look up when you've finished.

18    A.  Okay.

19    Q.  So the protocol being discussed in this e-mail changed on

20    or about June 2017; is that correct?                  09:10:24

21    A.  What do you mean the protocol changed?

22    Q.  The protocol that is the subject matter of the -- the pill

23    call protocol changed on or about June 2017; is that right?

24    A.  I'm not familiar with Corizon's protocols regarding --

25    Q.  Okay.                                             09:10:52
```

11

1   A.  I don't know what this e-mail means, other than they need

2   to --

3   Q.  Okay.  Thank you.  That's all I needed to know.

4           All right.  Moving on to Exhibit 62, please.

5           This is an e-mail from Kathy Campbell to you sent on        09:11:14

6   July 19th, 2017; correct?

7   A.  Yes.

8   Q.  And if you look at the attachment line you'll see that

9   there are several provider logs for several facilities that

10  were attached to this e-mail; correct?                              09:11:32

11  A.  Yes.

12  Q.  Miss Campbell states in her e-mail that Eyman is useless.

13  Do you see that?

14  A.  Yes.

15  Q.  Did you understand that to mean that Eyman was continuing      09:11:41

16  to fail in its provider referral logs?

17  A.  I don't know what I meant -- or what she meant or what

18  I -- my interpretation of what that was at that point in time.

19  Q.  So you don't recall?

20  A.  Hum-um.

21  Q.  Can you give me a yes or no?  Sorry.

22  A.  No.

23  Q.  Okay.  Thank you.

24          MS. EIDENBACH:  Your Honor, I'd like to move to admit

25  Exhibit 62.                                                        09:12:05

──────── Vanessa Headstream - Cross-Examination ────────

1          THE COURT:  Any objection?

2          MR. BOJANOWSKI:  No objection.

3          THE COURT:  62 is received.

4      (Exhibit No. 62 admitted into evidence.)

5  BY MS. EIDENBACH:                                       09:12:09

6  Q.  Turning now to Exhibit 70.  This is an e-mail sent by

7  Marlena Bedoya to Trudy Dumkrieger and copying you.  And it was

8  sent on October 17th, 2017; is that correct?

9  A.  Correct.

10  Q.  And the attachment to this e-mail is a document entitled    09:12:28

11  Provider Review of CGAR Requirements; correct?

12  A.  Correct.

13  Q.  If you can turn to page 70.2.  And please read aloud the

14  first line of the document, the attachment.

15  A.  This document will serve as a quick reference guide to the   09:12:49

16  requirements verbiage that will allow a provider to achieve

17  compliance with the Arizona Department of Corrections, ADOC,

18  requests.

19  Q.  Thank you.

20          Now if you can turn to page 70.3.  And look down to     09:13:03

21  the paragraph with the title CGAR number 22.

22          If you can read aloud the non-underlined final

23  paragraph of that -- of CGAR 22, please.

24          MR. BOJANOWSKI:  Note an objection, foundation.

25          THE COURT:  Overruled.                            09:13:29

13

Vanessa Headstream – Cross-Examination

1  BY MS. EIDENBACH:

2  Q.  Please go ahead.

3  A.  These are sent to you via eOMIS, that part?

4  Q.  Yes, please.

5  A.  When you are alerted, please accept the ATP or other action   09:13:40

6  as required.

7  Q.  Thank you.

8        And now if you turn to page 70.5, and look at the

9  paragraph titled CGAR number 50.  If you could read for us the

10  entire second paragraph that's not underlined, beginning with,   09:14:02

11  your responsibility.

12  A.  Your responsibility ends after the consult is entered

13  unless it is sent back as an alternative treatment plan, ATP,

14  or needs more information, NMI.  Please be cognizant that

15  getting appointments in a 30-day turnover is challenging.  Some   09:14:28

16  are necessary, but too many can make this distinction less

17  meaningful.  The clinical coordinator tries to place everyone

18  in the earliest possible appointment when they receive the

19  request.

20  Q.  Thank you.   09:14:46

21        Now turn to page 70.6.  And take a look at the

22  paragraph entitled CGAR number 53.

23        If you could read for us the line that begins with,

24  you must.  It's in the second paragraph.

25        MR. BOJANOWSKI:  I'm sorry, where are you at?   09:15:08

UNITED STATES DISTRICT COURT

Vanessa Headstream – Cross-Examination

1          MS. EIDENBACH:  Page 70.6, CGAR 53, second paragraph.

2          MR. BOJANOWSKI:  Okay.  Thank you.

3          THE WITNESS:  You must enter a measurable time frame

4    in the plan.  Please do not document per protocol.

5          MS. EIDENBACH:  Thank you.                                    09:15:24

6          Your Honor, I would like to move to admit Exhibit 70.

7          THE COURT:  Any objection?

8          MR. BOJANOWSKI:  Objection on foundation.  There's

9    been no foundation laid as to who prepared the document.

10         THE COURT:  This came out of a meeting we had            09:15:38

11   yesterday afternoon.  The warden asked Corizon to do a document

12   of how compliance is achieved for each of these questions.

13         The objection is overruled.

14      (Exhibit No. 70 admitted into evidence.)

15   BY MS. EIDENBACH:                                               09:15:50

16   Q.  Okay.  Please turn to Exhibit 92.

17         If you look near the bottom of the page you'll see an

18   e-mail sent on September 29th, 2017, from Stacy Deguara to an

19   assortment of people copying you.  It's the last e-mail heading

20   on that page.                                                   09:16:30

21   A.  Yes.

22   Q.  Do you see that?

23         Okay.  The June 14th, 2017 appointment was the one

24   canceled as a duplicate; correct?

25   A.  That's what it says, yes.                                   09:16:42

———— Vanessa Headstream – Cross-Examination ————

1    Q.  Okay.  But if you look at the e-mail just above, the July

2    24th, 17 -- 2017 appointment was actually the duplicate entry;

3    correct?

4    A.  That's what the document says.

5          MS. EIDENBACH:  Okay.  Thank you.                    09:16:55

6          Your Honor, I'd like to move to admit Exhibit 92.

7          THE COURT:  Any objection?

8          MR. BOJANOWSKI:  Foundation and hearsay.

9          THE COURT:  92 is received.

10      (Exhibit No. 92 admitted into evidence.)           09:17:04

11   BY MS. EIDENBACH:

12   Q.  Turning now to Exhibit 120.

13          This is an e-mail you sent to the Exchange

14   Administrative Group on July 18th, 2017; correct?

15   A.  Yes.                                                09:17:33

16   Q.  If you could read aloud the second paragraph, beginning

17   with, if documented.

18   A.  If documented counseling occurred within 30 days of the

19   third consecutive refused or missed dose, the finding is

20   compliant regardless of whether each refused miss dose contains   09:17:54

21   a signed completed refusal.  Counseling dates are noted in

22   parentheses below.

23   Q.  There is nothing in the Monitoring Guide that says Corizon

24   has 30 days to do counseling; correct?

25   A.  I don't have the Monitoring Guide in front of me.      09:18:10

16

──────── Vanessa Headstream – Cross-Examination ────────

1    But -- so I don't know.

2    Q.   Okay.  And there's nothing in the stipulation that says

3    Corizon has 30 days to conduct counseling; correct?

4    A.   Again, I don't have the document in front of me, so I

5    couldn't say for sure one way or the other.                    09:18:26

6         MS. EIDENBACH:  Okay.  Your Honor, I'd like to move to

7    admit Exhibit 120.

8              THE COURT:  Any objection?

9              MR. BOJANOWSKI:  No objection, Your Honor.

10             THE COURT:  120 is received.                          09:18:39

11        (Exhibit No. 120 admitted into evidence.)

12   BY MS. EIDENBACH:

13   Q.   Turning now to Exhibit 122.

14             This is an e-mail that you sent to Maricela Ortiz

15   copying several other Corizon employees and monitors on August 09:19:01

16   3rd, 2017; correct?

17   A.   This is dated July 11th, 2017.

18   Q.   Sorry.  That is my mistake.  Thank you.

19             But it is an e-mail that you sent to Maricela Ortiz

20   and several Corizon employees and other monitors; correct?     09:19:26

21   A.   Yes.

22   Q.   Okay.  So you'll count a file as compliant if Corizon finds

23   a document to support it and scans it into eOMIS after your

24   initial review; correct?

25   A.   Can you say that again?                                    09:19:39

─────── **Vanessa Headstream – Cross-Examination** ───────

1    Q.  Sure.  You will count a file as compliant if Corizon finds

2    a document to support compliance and scans it into eOMIS after

3    your initial review; correct?

4    A.  Okay.  I'm not following, because --

5    Q.  Okay.  So perhaps we just look to the body of the e-mail.       09:19:57

6    If you can read the last sentence of the e-mail that you sent

7    aloud; please.

8    A.  Per the stipulation agreement, the consult should have been

9    completed within 60 days.

10          So are you asking me if I would find this                    09:20:18

11   particular --

12   Q.  Sorry.  I'm talking about the sentence that begins, if you

13   have documentation.  Are we on the same --

14   A.  I don't think so.

15          MS. EIDENBACH:  May I approach, Your Honor?                  09:20:34

16          THE COURT:  You may.

17          THE WITNESS:  122?

18          MS. EIDENBACH:  You're missing the first page.  It got

19   stapled behind.

20   BY MS. EIDENBACH:

21   Q.  Okay.  So this is actually the August 3rd e-mail; correct?

22   A.  Yes.

23   Q.  Okay.  Now, if you could read for us the final sentence in

24   that e-mail that you sent to Miss Ortiz.

25   A.  If you have documentation that is not in eOMIS to refute       09:21:05

18

─── **Vanessa Headstream – Cross-Examination** ───

```
 1   the above, please have it scanned into the inmate's record.

 2   Q.  And you wrote that sentence because you would consider

 3   changing your finding to compliant if they scanned in a

 4   supporting document after your initial review; correct?

 5   A.  No.  They were noncompliant because there's nothing showing      09:21:24

 6   that the -- it says right here, the consult will be found

 7   noncompliant due to lack of documentation to support it was

 8   completed within 60 days.

 9   Q.  So you're asking them to sign in -- I mean, to scan in a

10   document simply to complete the inmate's medical record; is         09:21:48

11   that right?

12   A.  That's most likely, yes.

13   Q.  Okay.  Thank you.

14           MS. EIDENBACH:  Your Honor, I'd like to move for the

15   admission of Exhibit 122.                                            09:21:58

16           THE COURT:  Any objection?

17           MR. BOJANOWSKI:  No objection.

18           THE COURT:  122 is received.

19       (Exhibit No. 122 admitted into evidence.)

20   BY MS. EIDENBACH:                                                    09:22:08

21   Q.  Moving to Exhibit 125.

22           If can you turn -- well, this is an e-mail from

23   Miss Briddle to Tucson Corizon staff, and you're among the

24   people who are copied on the e-mail; correct?

25   A.  Correct.                                                         09:22:24
```

Vanessa Headstream – Cross–Examination

1  Q.  And it was sent on October 20th, 2017; correct?

2  A.  Correct.

3  Q.  Okay.  If you can turn to page 125.2.

4       And look down at the bottom of the page at the

5  paragraph beginning PM 67.                                09:22:41

6  A.  Okay.

7  Q.  If you could read the first four sentences of that

8  paragraph aloud, please.

9  A.  PM 67.  Is an RN conducting and documenting an assessment

10  at least once every shift in the IPC?  I am looking for a RN  09:23:01

11  assessment.  SOAP format.  Every shift.  Can be under seg

12  visits like I believe Florence does, or infirmary rounds,

13  infirmary notes, infirmary admission, or infirmary discharge.

14  If the information is completed under return from offsite, I

15  would accept it.  But it would need to be a complete        09:23:22

16  assessment.

17  Q.  Okay.  Thank you.

18       So a monitor would accept any of these methods;

19  correct?

20  A.  For documentation of an assessment?                    09:23:35

21  Q.  Yes.

22  A.  It appears so, yes.

23       MS. EIDENBACH:  Okay.  Thank you.

24       Your Honor, I'd like to move to admit Exhibit 125.

25       THE COURT:  Any objection?                            09:23:45

1    MR. BOJANOWSKI:  No objection.

2    THE COURT:  125 is received.

3    (Exhibit No. 125 admitted into evidence.)

4    BY MS. EIDENBACH:

5    Q.  If you can turn now to Exhibit 134.                    09:23:51

6    The second e-mail in the chain that you're looking at

7    was sent to you from Becky Briddle on December 8th, 2017;

8    correct?

9    A.  Correct.

10   Q.  If you can read aloud the second sentence of that e-mail,  09:24:13

11   please.

12   A.  So here it goes?

13   Q.  Wait a minute.  No, no, no.  One up.  I was -- yes.

14   MR. BOJANOWSKI:  Where are you at?

15   MS. EIDENBACH:  Here.  This is the first e-mail, the   09:24:30

16   second e-mail.

17   BY MS. EIDENBACH:

18   Q.  The first e-mail is to Richard Pratt, to and from Richard

19   Pratt, with no body.  I'm talking about the e-mail -- the

20   initial e-mail from Becky Briddle to you.               09:24:41

21   A.  Okay.  The second sentence?

22   Q.  Yes, please.

23   A.  At Perryville, we do not audit the methadone as it is all

24   handwritten script, and paper mar.  It does not show up on the

25   pharmacy logs for audit.                                09:24:57

───────── Vanessa Headstream – Cross-Examination ─────────

1  Q.  Patients can only take methadone with a prescription;

2  that's correct?

3  A.  Correct.

4        MS. EIDENBACH:  Your Honor, I'd like to move for the

5  admission of Exhibit 134.                                    09:25:06

6        THE COURT:  Any objection?

7        MR. BOJANOWSKI:  No objection.

8        THE COURT:  It is received.

9     (Exhibit No. 134 admitted into evidence.)

10        MS. EIDENBACH:  Turning now to Exhibit 135?          09:25:12

11        THE COURT:  Miss Eidenbach, can I ask a question about

12  that?

13        MS. EIDENBACH:  Of course.

14        THE COURT:  Because of the methadone being in a

15  handwritten script, it says that you don't audit.          09:25:23

16        THE WITNESS:  Correct.

17        THE COURT:  I guess that poses a problem with respect

18  to whether or not this prescription medication can be evaluated

19  with respect to this performance measure as it implicates

20  prescription medication; is that correct?                  09:25:43

21        THE WITNESS:  I don't do the pharmacy measures.  I

22  don't know.  I don't know how they monitor that.

23        THE COURT:  So here Briddle is sending you this e-mail

24  saying, forgot a question on pharmacy.  And she's saying this

25  statement to you, at Perryville we do not audit the methadone  09:26:06

```
1    as it is all handwritten script.
2            Why is she sending this to you then?
3            THE WITNESS:  She does not measure the pharmacy
4    prescriptions either.  She measures the manifest.  And I don't
5    know -- I don't know how the pharmacy logs work.              09:26:30
6            THE COURT:  I guess my question though was, why was
7    she sending this to you?
8            THE WITNESS:  I get a lot of e-mails that don't
9    necessarily pertain to me.
10           THE COURT:  But she directed this one --            09:26:43
11           THE WITNESS:  She did.
12           THE COURT:  -- straight to you.
13           Do you remember the meeting, I gather, or the time
14   where she asked a question about pharmacy generally that's
15   maybe referred to for product question on pharmacy?          09:27:00
16           THE WITNESS:  Let me look at the rest of this e-mail
17   thread, because there's a number of performance measures here
18   that she is asking about.
19           The only pharmacy related would be 16, 18 and 19 that
20   have to do with documentation of -- has the manifest, and it  09:27:22
21   has documentation of medications removed from -- I forgot the
22   word -- the clinic stock, perpetual inventory.  So those deal
23   with that.
24           THE COURT:  I see.
25           THE WITNESS:  And the methadone is not one of those.  09:27:51
```

─────── Vanessa Headstream – Cross-Examination ───────

1          So I'm not sure why she's even talking about methadone

2    in this.

3          THE COURT:  Okay.  Thank you.

4          MS. EIDENBACH:  Just to make sure, did we complete the

5    admission of that exhibit?                                    09:28:10

6          THE COURT:  Yes.

7          MS. EIDENBACH:  Okay.

8    BY MS. EIDENBACH:

9    Q.  All right.  Turning now to Exhibit 135.

10         This is an e-mail you sent -- or sent to you from        09:28:26

11   Miss Briddle on December 8, 2017; correct?

12   A.  Yes.

13         MR. BOJANOWSKI:  I'm sorry, which number are you on?

14         MS. EIDENBACH:  135.

15         MR. BOJANOWSKI:  Okay.                                   09:28:39

16   BY MS. EIDENBACH:

17   Q.  If you turn now to 135.2, which is on the next page.

18         And then if you can look at the paragraph beginning

19   with PM 66.

20   A.  Okay.                                                     09:28:56

21   Q.  Please read that aloud.

22   A.  PM 66, 72 hours.  End of one visit to the start of the

23   next.  As long as they have not started the 73 hour.

24   Q.  Okay.  Thank you.

25         MS. EIDENBACH:  Your Honor, I'd like to move to admit    09:29:10

UNITED STATES DISTRICT COURT

Vanessa Headstream – Cross-Examination

1   Exhibit 135.

2          THE COURT:  Any objection?

3          MR. BOJANOWSKI:  No objection.

4          THE COURT:  135 is received.

5      (Exhibit No. 135 admitted into evidence.)                    09:29:19

6   BY MS. EIDENBACH:

7   Q.  Okay.  Turn now, please, to Exhibit 137.

8   A.  1 --

9   Q.  Is that in there?

10  A.  I don't have a 137.                                         09:29:33

11      (Discussion held off the record.)

12  BY MS. EIDENBACH:

13  Q.  Okay.  This Exhibit 137 is an e-mail sent to Marlena Bedoya

14  from Desiree Knighton copying you on December 11, 2017;

15  correct?                                                        09:30:47

16  A.  Correct.

17  Q.  If you can read for us the highlighted portion on the first

18  page.

19  A.  We have noticed that some of the source document for the

20  intersystem transfers PM 35 are not matching up to the daily    09:31:01

21  tracking sheet.  At this time Mary and I are working diligently

22  to figure out why the reports are so different.  Please be

23  patient with us.

24  Q.  Thank you.

25          MS. EIDENBACH:  Your Honor, I'd like to move to admit   09:31:16

Vanessa Headstream – Cross-Examination

1    Exhibit 137.

2              THE COURT:  Any objection?

3              MR. BOJANOWSKI:  No objection.

4              THE COURT:  137 is received.

5         (Exhibit No. 137 admitted into evidence.)                09:31:24

6    BY MS. EIDENBACH:

7    Q.  If we can turn now to Exhibit 140, please.

8              Actually, I'm sorry, turn to 141, please.

9              THE COURT:  Before you do that, Miss Eidenbach.

10             MS. EIDENBACH:  Yes.                                 09:31:38

11             THE COURT:  These exhibits that you've been admitting

12   have statements in them that they hint to me perhaps why you

13   seek to have them admitted.  But you never follow up with

14   questions of the witness.  Because so many of these have, I

15   think, a hint as to why the plaintiff in this case would seek   09:32:01

16   to admit them.  But also, they have a manifest hint of

17   something that would be no issue at all.

18             So if you're thinking that just admitting these

19   documents is accomplishing much, it's not.

20             MS. EIDENBACH:  Okay.                                09:32:21

21             THE COURT:  You have to ask questions of this witness,

22   questions that would -- as is usual in cross-examination --

23             MS. EIDENBACH:  Of course.

24             THE COURT:  -- to suggest the advocacy that the lawyer

25   is seeking to accomplish.                                      09:32:34

UNITED STATES DISTRICT COURT

Vanessa Headstream – Cross-Examination

1          MS. EIDENBACH:  Okay.  May I have a moment,

2    Your Honor?

3          THE COURT:  Yes.

4          MS. EIDENBACH:  Thank you.

5      (Discussion off the record between plaintiffs' counsel.)    09:32:40

6          MS. EIDENBACH:  Okay.  So if we look at Exhibit 141,

7    please.

8          And, Your Honor, I will ask followup questions --

9          THE COURT:  Thank you.

10          MS. EIDENBACH:  -- in light of your comment.    09:33:27

11   BY MS. EIDENBACH:

12   Q.  If you look at the bottom of 141.1, this is an e-mail from

13   you to Maricela Ortiz sent on August 3rd, 2017?

14   A.  Correct.

15   Q.  Okay.  If you can read for us the body of that e-mail.    09:33:47

16   Actually the first paragraph, please.

17   A.  Were you able to find documentation that the approved

18   consult was completed?  I did not find a return from offsite

19   nursing note or a special report -- specialty report to confirm

20   that the inmate has gone to speech therapy.  This consult will    09:34:14

21   be found to be noncompliant with PM 51 due to lack of

22   documentation to support that it was completed within 60 days

23   of initiation.

24   Q.  Okay.  And I believe that you testified earlier that

25   scanned documents added to the record after your initial review    09:34:35

UNITED STATES DISTRICT COURT

1   do not change your compliance finding; is that correct?  Yes or

2   no, please.

3   A.   That is not entirely accurate.

4   Q.   Do you change -- do you change your compliance finding if

5   documents are scanned into the record after your initial          09:34:59

6   review?  Yes or no.

7   A.   Again, it's not a yes or no question.

8            THE COURT:  Go ahead, you can give a fuller answer.

9            THE WITNESS:  If documentation is found to support

10  that the consult occurred prior to the expiration of the 60-day   09:35:16

11  time frame for a routine consult, then it was found compliant.

12           THE COURT:  So in your review as a monitor that was

13  associated with this particular e-mail, you had noted that

14  there was no documentation that would show compliance.  And so

15  you send this e-mail because you're double checking to see        09:35:42

16  whether or not there is any documentation, and letting them

17  know that if there isn't it's noncompliant.  But if they find

18  it, then it is compliant; right?

19           THE WITNESS:  If the documentation proves that the

20  encounter occurred within the 60-day time frame, it could be      09:36:00

21  changed to compliant.

22           THE COURT:  All right.  And this is outside of what is

23  also apparently a procedure whereby when your tentative

24  findings are produced to Corizon, if Corizon can come back to

25  you and say, oh, this should be compliant because we found a      09:36:21

────── Vanessa Headstream - Cross-Examination ──────

1    document, if they had -- absent this kind of inquiry from you,

2    had found a document that they could scan in at that point in

3    this initial response time for Corizon, would you then

4    reconsider a noncompliant decision and make it compliant if

5    that document showed that there was compliance?                    09:36:46

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  So there has been issue -- an

8    issue with that in the case, because there's been some concern

9    that there's no documentation of this happening, and that the

10   plaintiffs have been concerned that because there's no            09:37:00

11   documentation of this re-review, it's not listed on the CGAR,

12   it doesn't say that -- there's no notation saying we received

13   after a determination information from Corizon that would

14   indicate compliance.  And so that's caused them some concern to

15   know -- to think that maybe the monitoring process is subject     09:37:22

16   to a weakness, because this isn't documented.

17             If it were documented, then I think their belief is

18   they'd be able to take an extra look to make sure that this

19   wasn't an after-the-fact created document that wasn't true.

20             So that's been the reason for the concern.  And I       09:37:48

21   think the reason for this question being about these kind of

22   exhibits that have been produced is a similar concern.

23             Are you, a monitor, fishing for compliance in every

24   instance when you can find it that would maybe create a

25   situation where Corizon could create a document that wasn't       09:38:12

─────────── **Vanessa Headstream – Cross-Examination** ───────────

1   real?  And so because that concern is a legitimate one, because

2   they suffer a penalty if they don't get compliance, and the

3   State does too, it's a legitimate concern.

4           But I guess the question can be asked to you as a

5   monitor, if a document is produced that indicates compliance,        09:38:40

6   do you look at it with a critical eye to make sure that it

7   wasn't something that was created after the fact, that it was a

8   real document?  I mean, are you turning a blind eye to --

9           THE WITNESS:  Absolutely not.

10          In this particular instance, the documentation has to        09:39:08

11   be a report from the consulting office.  The date of that

12   document would have to be the date that the inmate was at the

13   office, and would have to be prior to the expiration of the

14   60-day time frame on a routine consult, or a 30-day time frame

15   for an urgent consult.                                              09:39:30

16          THE COURT:  So is it fair to say that you are just

17   making sure that no document already exists that doesn't --

18   that does -- that does support compliance, it has not failed to

19   be produced to you, so that you have all of the documents that

20   are relevant to this examination of this particular performance     09:39:53

21   measure?

22          THE WITNESS:  My role, as I see it, is to ensure

23   health care is delivered in a timely manner and in line with

24   the stipulation agreement.  I do not have an opinion whether

25   they are compliant or noncompliant.  I simply review the            09:40:16

—Vanessa Headstream – Cross-Examination—

1    documentation at hand, put down my findings.

2          They are -- Corizon is able to review my findings, to

3    either agree or disagree with them.  If they can provide

4    documentation that my finding is incorrect, then I will review

5    it.  And if I feel, you know, based on the document provided        09:40:43

6    that it's a legitimate document and, yes, this event did occur,

7    then I don't want to be unfair either way.

8          If they were compliant, they were compliant, and if

9    they weren't, they weren't.  I don't look for compliance, I

10   don't look for noncompliance.  I simply review the information     09:41:04

11   provided to me, and based on the medical record make a finding.

12         THE COURT:  But we've seen a number of e-mails where

13   you have initiated inquiries to make sure that there is not a

14   document that exists that would support compliance.  How do you

15   decide when to do one of these e-mails?                            09:41:29

16         THE WITNESS:  If, during my review of -- like in this

17   case, the documentation was not there, I don't think it's fair

18   to automatically find noncompliance if there's a chance the

19   document's there and it just simply wasn't scanned in yet.

20         THE COURT:  Well, it would seem to me that that could        09:41:49

21   be a possibility of virtually everything that you're reviewing.

22   Do you send e-mails in virtually every record that you review?

23         THE WITNESS:  If the need arises, yes.

24         THE COURT:  So if it looks -- so we've seen a number

25   of these, but it's fair to say that you have a lot of traffic      09:42:06

---- Vanessa Headstream – Cross-Examination ----

```
 1   going over to the -- in this case it was sent to --
 2           THE WITNESS:  This was Tucson Complex.
 3           THE COURT:  Yes.  To Maricela Ortiz.
 4           So you have a lot of e-mail traffic to people who were
 5   in a position like Miss Ortiz where you are saying, I've looked
 6   at this, it doesn't look compliant because we're missing this.
 7   Do you have this?
 8           Is that what happens?
 9           THE WITNESS:  Correct.
10           THE COURT:  And again, just to address I think what is
11   the plaintiffs' concern, I gather you're sophisticated enough
12   about this process that if they were ginning up what you were
13   looking for, you'd pick that up?
14           THE WITNESS:  You mean falsifying?
15           THE COURT:  Yes.
16           THE WITNESS:  Absolutely.  I would hope I would, yes.
17           THE COURT:  All right.  Go ahead.
18   BY MS. EIDENBACH:
19   Q.  You testified earlier that nobody checks the compliant
20   files; is that correct?
21   A.  I don't know if they check them or not check them.  I'm not
22   sure who you're speaking of.
23   Q.  Do you check them?  Do you double check them?
24           You wouldn't send a follow-up e-mail about a compliant
25   finding that you found?
```

09:42:33
09:42:46
09:43:12
09:43:25
09:43:40

UNITED STATES DISTRICT COURT

Vanessa Headstream – Cross-Examination

```
 1    A.  No.
 2    Q.  Okay.  So in terms of the files that are initially found to
 3    be noncompliant, the only reason that they're able to be found
 4    compliant is because you send an e-mail to Corizon telling them
 5    which documents they need to add to the file in order to bring        09:43:58
 6    it into compliance; correct?
 7    A.  Not necessarily.  If at the time I do -- I did the audit it
 8    wasn't there, I would send an e-mail asking if they had it
 9    before I make my final determination of noncompliance.
10    Q.  But you would tell them which documents they need to add in       09:44:23
11    order to bring the file into compliance?
12    A.  No, I don't tell them which documents to add.
13    Q.  Okay.  And you send an e-mail for every incomplete file
14    that you encounter?
15    A.  No, I don't send one for every incomplete file.                   09:44:38
16              THE COURT:  How many would you say, what percentage?
17              THE WITNESS:  I honestly couldn't say.  I don't
18    routinely audit these measures.  I was covering for someone who
19    was out at the time.  I honestly couldn't say.
20              THE COURT:  And before when I asked you about how you        09:45:01
21    could pick up on whether or not a document -- I used the words
22    ginned up and you said falsified.  How would you be able to
23    tell if it had been falsified?
24              THE WITNESS:  You should be able to notice that the
25    dates have been changed or altered.  I don't know --                  09:45:17
```

 1           THE COURT:  How would you check to see if the dates

 2    had been altered or changed?

 3           THE WITNESS:  Well, I can contact -- because I work

 4    out of central office, I can contact a site person to have them

 5    go pull the paper document and give me an opinion on it.  Or I          09:45:36

 6    can go down to a site and pull the paper documents from a chart

 7    should I feel the need.

 8           THE COURT:  Do you have a heightened sense of cynicism

 9    when you've identified a document that could be documenting

10    compliance that hasn't been provided when that document does          09:45:57

11    come in?  I mean, do you look at it as -- I guess auditors

12    sometimes -- I mean, to a certain extent you are an auditor,

13    and the old lore about that is that they have a sharp eye, in

14    the traditional sense.  Maybe there are some who do look the

15    other way.          09:46:17

16           But the old idea of the green eye shade kind of

17    indicated a certain focus, which I think also meant a certain

18    skepticism.  You had to keep in your mind the possibilities of

19    cheating rather than just assuming everybody was always doing

20    everything right.  Because if you didn't keep in your mind that          09:46:32

21    people were cheating, you'd miss it.

22           Do you have that heightened sense of skepticism when

23    something comes in after the fact?

24           THE WITNESS:  I think I do.

25           MS. EIDENBACH:  Your Honor, I think a lot of what you          09:46:48

─── Vanessa Headstream - Cross-Examination ───

```
 1   said mirrors what the plaintiffs are concerned about.  The
 2   problem with after-the-fact documentation done only at the
 3   monitor's prompting is that they're essentially coaching
 4   Corizon on how to bring the files into compliance.  And that's
 5   a lot of what we're trying to demonstrate by admitting these          09:47:05
 6   documents.  Because nobody checks the compliant files.  And
 7   really but for the coaching that Corizon receives with -- from
 8   the monitors' e-mails --
 9           MR. BOJANOWSKI:  Your Honor, this is argument.
10           THE COURT:  I'm all right with it.  Please, let her          09:47:23
11   finish.
12           MS. EIDENBACH:  But for the coaching that they receive
13   from the monitors, these files would be noncompliant and
14   incomplete.  And if you think about the impact that that has on
15   medical care itself, that's tremendous.  Because these reports       09:47:37
16   are not in the records that the documents and the nurses are
17   using to provide treatment.  That's part of the point of the
18   stipulation.  In fact, it's probably the primary purpose, is to
19   make sure people are getting the care they need.
20           What this is doing is it's essentially undermining our       09:47:57
21   ability to hold Corizon's feet to the fire and make sure that
22   the charts used to make medical decisions and support medical
23   care and treatment are complete.  Because now if Corizon is
24   able to go back after the fact and add reports that were not in
25   there, those consults, whether they were done or not, were not       09:48:17
```

─────── Vanessa Headstream – Cross-Examination ───────

 1   taken into consideration when treatment was provided.

 2          And we're not getting any reflection of that in the

 3   CGAR reports when Corizon is able to add documentation back in

 4   after the fact.

 5          MR. BOJANOWSKI:  Your Honor, there's been --                09:48:35

 6          THE COURT:  Hold it just a second.

 7          I think there's part of what you say that

 8   Miss Headstream would likely agree.  And that is, if there is a

 9   failure to have documentation that's in eOMIS that would be

10   necessary for treatment decisions, she wouldn't want to          09:48:50

11   participate in some kind of system that allowed that to

12   perpetuate.

13          However, I think the part that she disagree -- and

14   we'll hear from her directly about this, because it's my

15   reaction too, that's why I suggest these words in her mouth.      09:49:07

16   She is looking to see that the compliance numbers reflect what

17   really happened.  If there's a failure in a piece of paper,

18   she, I think, is hoping by pointing this out that they

19   will -- Corizon will get the idea that if they do it right, if

20   they get the pieces of paper in the file, that will result in    09:49:32

21   compliance.

22          So this is part of her education effort.  It's

23   not -- it's couching to that degree, it's education to say,

24   this is what we need, and it wasn't here.  If it exists, you

25   will be determined to be compliant.  And I think her hope is      09:49:47

Vanessa Headstream – Cross–Examination

1     that two things come out of that.

2             One is, there is education for Corizon understanding

3     what is happening.

4             And two, if it was a compliant record, they are not

5     contributing to what could be sending us on a detour and folly.   09:50:03

6     And that is because if we are alerted that this falls below the

7     benchmark, then that means that people focus on it and try to

8     address an issue where the care was actually provided, but that

9     perhaps there was a problem with the documentation.

10             This is wholly separate from not documented, not   09:50:29

11    occurring.  This is, I think, a much more granular level of

12    where the monitor is trying to coach Corizon to understand what

13    is necessary to make sure that should be in the file, so that

14    going forward in the next month it's there, rather than being

15    missed.   09:50:52

16             But that's why I'm not entirely embracive of thinking

17    that this kind of examination with this witness is particularly

18    indicative of a failure in the monitoring system.  Because I

19    think that this kind of coaching that she's talked about,

20    especially a coaching with a cynical eye, is not -- is not   09:51:11

21    contrary to the purposes of the stipulation.

22             I've said my peace, now you can --

23             THE WITNESS:  I agree with what you said.

24             Education of what's required in the medical records so

25    that the care can be provided appropriately is part of my role.   09:51:33

Vanessa Headstream – Cross-Examination

1   And again, it's more advocating for the inmates, because if the

2   record's not complete, there is a chance the care won't be

3   provided as it should be.

4        So if they have the record and it's just not in there,

5   the care was provided, it just wasn't added to the record.  And      09:51:57

6   I -- documentation is an ongoing issue with -- in the health

7   records.  And it's one that we address continuously with

8   Corizon staff.

9        MS. EIDENBACH:  So --

10       THE COURT:  Just a second.                                       09:52:16

11       MS. EIDENBACH:  I'm sorry.

12       THE COURT:  These documents that come in that are in

13   response to your e-mails, where do you suppose they've been if

14   they've not been scanned in before?  Or do they go back to a

15   provider and say, make it?  Or do they go to the outside            09:52:32

16   referral provider and say, do you have that?  What do you think

17   happens?

18       THE WITNESS:  It's a combination.  Sometimes the

19   outside consulting office is lax in sending the reports over.

20   Sometimes they are received and they are left in an inbox or on     09:52:52

21   a desk without being scanned into the record.

22       I don't know why.  It's a question I've often

23   wondered.

24       THE COURT:  Have you ever seen a case where a document

25   came in after the fact and you suspected that it had been           09:53:15

─────Vanessa Headstream – Cross-Examination─────

```
 1    forged?

 2              THE WITNESS:  No, not on consults, no.

 3              THE COURT:  Any area where you think that people have

 4    been making up documents?

 5              THE WITNESS:  Not that I have seen.                      09:53:28

 6              THE COURT:  Have you ever heard about that?

 7              THE WITNESS:  I've heard rumors that there are -- that

 8    I have not -- I haven't dealt with them.

 9              THE COURT:  Okay.  Of all of the -- we heard the

10    number -- early in your testimony about the number of            09:53:46

11    interactions with inmates and health issues per month, it's

12    just a huge number.

13              THE WITNESS:  Correct.

14              THE COURT:  But you were auditing a sample.  And so

15    the plaintiffs' concern might be legitimate, that if you are      09:54:00

16    only auditing a sample, that even though you're pointing out to

17    Corizon the failures in an effort to try to coach them, they

18    could well think, well, I only have to worry about one out of

19    ten, so I don't really need to be that focused on this, because

20    if I get caught, I get an e-mail from Miss Headstream that        09:54:18

21    tells me how to fix it.  So I only have to fix those, I don't

22    really have to fix across the board, because I know that

23    nothing bad will happen because nine out of ten don't get

24    looked at.  And the ones that do get looked up, she'll give me

25    a heads up if there's a problem.                                  09:54:35
```

1          Do you understand what I'm saying?

2          THE WITNESS:  I do.  Is that a question?

3          THE COURT:  Yeah.  As I sit here trying to decide what

4    the fair thing is to do with respect to somebody who's sending

5    e-mails back to Corizon with a good faith hope that it will                    09:54:50

6    produce something, it could be that it actually will have no

7    effect and could be -- as the plaintiffs say, could be

8    counterproductive.

9          THE WITNESS:  That's a possibility when you're dealing

10   with humans.  My hope is that repeated notifications to                        09:55:05

11   their -- to Corizon staff would prompt them to do it right

12   every time.  I have no control over their actions.  But

13   when -- if I don't see -- it's elevated, that's why their

14   management on each side is copied on the e-mail so that they

15   have a chance to address it with the staff member that works              09:55:42

16   for them.

17         As a supervisor, to me that's part of their duty, is

18   to follow up and make sure that the subordinate is doing what

19   they're supposed to be doing.

20         Does that answer your question?                                     09:56:00

21         THE COURT:  It's helpful.

22         In the cases where you send e-mails, in how many of

23   those would you say roughly are they able to produce what's

24   missing?

25         THE WITNESS:  Actually it's -- I don't know.                        09:56:15

—— Vanessa Headstream – Cross-Examination ——

1          THE COURT:  Most of them or more than 50 percent?

2          THE WITNESS:  I doubt it's -- no, I don't know.  I

3   don't know.  I can't even give you a number.  I have sent

4   probably hundreds and hundreds of e-mails.  I couldn't tell you

5   what --                                                          09:56:39

6          THE COURT:  The e-mails don't say a time limit.  How

7   much time do they have to get this back to you?

8          THE WITNESS:  I usually give them two days.  And, you

9   know, the -- I didn't see my responses -- you know, on e-mails

10  that I may have been copied on or initiated, I don't see, you   09:56:57

11  know, the next e-mail to acknowledge whether they did it or

12  not.

13         THE COURT:  Okay.  All right.  Thank you.

14         You may continue.

15         MS. EIDENBACH:  Okay.  Thank you, Your Honor.          09:57:08

16  BY MS. EIDENBACH:

17  Q.  If you could flip back to Exhibit 135, please.  And then

18  turn to page 135.2.  Looking back at the paragraph we spoke

19  about earlier, that begins with PM 66.

20  A.  Yes.                                                         09:57:40

21  Q.  Okay.  So according to this protocol, 72 hours and 30

22  minutes would be compliant; correct?

23  A.  No.  72 hours is 72 hours.

24  Q.  So then this is a misrepresentation of the protocol that's

25  used; is that correct?                                          09:58:09

Vanessa Headstream – Cross-Examination

1   A.  This is a statement made by someone else.  I don't --

2   Q.  And you're saying that it's not the protocol that's used;

3   correct?  You don't count 72 hours and 30 minutes as compliant

4   as this statement indicates; correct?

5   A.  There seems to be a difference in interpretation of 72                09:58:36

6   hours.  So -- go ahead.

7   Q.  So this is not how you monitor -- or review when you're

8   looking at anything dealing with Performance Measure 66.  In

9   your estimation 72 hours means 72 hours; is that correct?

10  A.  Correct.                                                              09:58:56

11  Q.  Okay.  And so there is inconsistencies then between the way

12  that different monitors monitor a given performance measure;

13  correct?

14  A.  Not necessarily.  The person who does the IPC does all of

15  the IPCs.                                                                 09:59:12

16  Q.  Right.

17  A.  So there is consistency there.

18  Q.  But you're telling me that this is not your interpretation

19  of PM 66, and yet we have another person who's monitoring up

20  until the 73rd hour.                                                      09:59:26

21          So my question to you is, there's inconsistency in the

22  way that the performance measures are monitored between

23  monitors; correct?

24          MR. BOJANOWSKI:  Well, note an objection, Your Honor.

25  There's no evidence that this particular monitor is monitoring           09:59:38

─────── Vanessa Headstream – Cross-Examination ───────

1    up to 73 hours.

2         THE COURT:  Well, here's what I have to say:  We know

3    from your view that if you were monitoring 66 and the visit

4    occurred at 72 hours and two minutes, you would find that

5    noncompliant; right?                                        09:59:54

6         THE WITNESS:  They have been found noncompliant, yes.

7         THE COURT:  Okay.  And so what this language here is

8    saying, as long as they have not started the 73rd hour, on one

9    interpretation you could mean that to be that once the 73rd

10   hour started, that means that's what happened the second after  10:00:09

11   72 hours and 59 minutes.  That's -- but that is not something

12   that you would countenance.

13        Also, there is this idea in the world, some people say

14   that someone is one year old if they are three months old,

15   because they're in the one year.                           10:00:31

16        So again, we don't need to really focus on that more.

17   We know what you know.  We don't know what this person meant.

18   But we all would agree between everybody in this room that if

19   it's 72 hours and two minutes it's not compliant.

20        THE WITNESS:  Correct.                                10:00:51

21        My question would be, when does the 72 hours start for

22   you?

23        MS. EIDENBACH:  Well, luckily I'm not on the witness

24   stand.  So I appreciate your question though.

25        And I have no further questions for you.              10:01:02

─────────── Vanessa Headstream – Cross-Examination ───────────

1          That you so much for your time.

2          THE COURT:  I have a couple of questions.

3                        CROSS-EXAMINATION

4    BY THE COURT:

5    Q.  Because of your role in receiving these letters, have you          10:01:22

6    been receiving letters that have been raising an issue about

7    whether there's an extraction only policy for dealing with

8    cavities?

9    A.  No, I haven't seen anything on that.

10   Q.  Never heard about that as an issue?                                10:01:44

11   A.  In the past.

12   Q.  In the past?

13   A.  Now, there was -- there have been complaints that -- not

14   anything recently.

15   Q.  Okay.  The plaintiffs did a tour in Yuma recently, and a          10:01:57

16   number of -- the plaintiffs' lawyers.  And a number of their

17   clients said that they have been told that there is an

18   extraction only policy, and that the dental providers had joked

19   in front of them that there's a contest to see who can remove

20   the most teeth on a given day.                                        10:02:17

21          You haven't heard anything at all?

22   A.  I'm not aware of that.

23   Q.  All right.

24          MR. BOJANOWSKI:  Your Honor.

25          THE COURT:  Yes.                                               10:02:27

─────── Vanessa Headstream – Cross-Examination ───────

 1          MR. BOJANOWSKI:  I have information with regard to

 2   that issue.

 3          THE COURT:  Oh, okay.  All right.  Well, we can take

 4   that up in the status conference, unless you think it would be

 5   helpful.                                                          10:02:37

 6          MR. BOJANOWSKI:  I can do it now or during the status.

 7          THE COURT:  Well, let's do it in the status hearing so

 8   we don't take more time from Miss Headstream.

 9   BY THE COURT:

10   Q.  When plaintiffs do these tours, sometimes they produce a     10:02:46

11   letter to defendants' counsel saying, we heard from our

12   clients, they said these particular things, and they give a

13   summation of the situation.

14          Do you get those letters to?

15   A.  Yes.                                                         10:03:05

16   Q.  And when you get those letters do you act on those issues?

17   A.  I review the allegations made in the letters -- I review

18   the charts, you know, related to the allegations made.  If I

19   have concerns or find evidence to -- in line with the

20   allegations, I will contact the site to follow up and address    10:03:29

21   the problems that are shown to be present.

22   Q.  I want to understand a little bit more about sort of what

23   kinds of things go into your thinking about this process.  I'm

24   going to use what has fairly been -- well, I'm going to use

25   what has been a subject of plaintiffs' recent letters.  But I'm  10:03:52

45

─────── **Vanessa Headstream – Cross-Examination** ───────

1    going to not ask you to consider it as this particular case,

2    instead it's a hypothetical.

3            The hypothetical is an inmate who says, I have

4    difficulty standing because of health issues.  I have

5    difficulty walking.  They've given me a wheelchair.  I don't          10:04:11

6    want a wheelchair because I want to continue to be as active as

7    I can.  So I would like to have a walker.

8            What would you do in that situation?

9    A.  Contact the site health administrator.  After -- I would

10   review the medical file to see if there's a contraindication to      10:04:31

11   a walker versus the wheelchair, and contact the site and ask if

12   there was a reason that they could not provide a walker versus

13   a wheelchair.

14   Q.  When Dr. Robertson testified, he testified, I believe,

15   about delays associated with providing assistive devices.  I         10:04:53

16   gather you probably see a fair number of letters about that

17   subject?

18   A.  I don't.

19   Q.  You don't?

20   A.  On occasion.  I have one now I'm working on where he wants        10:05:07

21   a walker with a chair, with a seat in it, versus a regular

22   walker, that I'm working on.

23   Q.  And one of the issues there is it's been delayed, or no?

24   A.  In his mind it's been delayed, yes, yes.

25   Q.  What is a delay that's wrong in your view?                        10:05:25

1   A.   If accommodations have not been provided at the time

2   they're needed, then outside of a day or two, that's a delay to

3   me.   I try and make it as if it were me or my family member.

4   Q.   Early in your testimony you talked about how sometimes when

5   you raised an issue with Corizon about these kinds of issues,          10:05:53

6   you would have to go to a routine of sending it again every two

7   days.

8            How often do you have to do that?

9   A.   When they have new people going in usually.   It takes a

10   couple of times of me copying the regional, and then they start       10:06:17

11   answering me within two days.

12   Q.   So --

13   A.   When they have a changeover in management staff is usually

14   when I have that issue.

15   Q.   But your sense is that you ultimately get to an answer, and       10:06:33

16   it just doesn't go on perpetually, you get to an answer?

17   A.   Correct.

18   Q.   One of the issues that's come up has been that part of

19   Corizon's method to deal with the backlog is to urge the

20   provider to cancel a referral because they can't meet it within       10:07:04

21   the time frame.   This has been suggested as being a

22   possibility.

23            Without getting into whether it actually happens or

24   not, when you are in a position to review a referral and you

25   see it's been canceled, does that raise a red flag in your mind       10:07:24

UNITED STATES DISTRICT COURT

1  about whether a further inquiry is necessary on your part to

2  make sure it's not been canceled for an improper reason?

3          And I think it would be fair to say an improper reason

4  would be a backlog.

5  A.  If a consult or referral is canceled, then it has to                    10:07:39

6  contain a justification for the cancellation.  Simply because

7  it's outside of time frames is not an acceptable justification.

8  Q.  But I guess one of the things that could be a fair concern

9  is that for someone who understands that there is a monitor

10  looking at it, and that this monitor requires that there be a           10:08:05

11  reason, that you would look for a reason that could be a

12  legitimate one, but in this particular case wasn't.

13          And I guess I could think of maybe an example of that.

14  You wrote, more medical records were necessary.  If you saw

15  this kind of situation, would you want to -- again, would you          10:08:26

16  have your cynical eye looking at it where there had been a

17  referral that was canceled?

18  A.  Let me think.  Now that one is kind of a -- if you have a

19  consult, and they -- paraphrase what you just said.

20  Q.  Surely.                                                              10:08:50

21  A.  There's a consult to cardiology.  It's approved and it's

22  scheduled.  And then something occurs where it has to be

23  canceled to be rescheduled.  Is that --

24  Q.  Well, it's different here because the -- your hypothetical

25  is one where the cardiology consult has been scheduled.  The           10:09:13

─────── **Vanessa Headstream - Cross-Examination** ───────

1    problem that I'm worried about is where you have -- the Corizon

2    provider has said there needs to be a cardiology consult and it

3    hasn't been scheduled.  And perhaps it hasn't been scheduled

4    because they can't find enough cardiologists.  So they would be

5    concerned, we're running up on our time frame here, we have to      10:09:36

6    cancel these or else we're going to get dinged.

7    A.  Those would be noncompliant.

8    Q.  All right.  Well, what if somebody figured out, well, our

9    monitor is looking for a reason, so we have to put in a reason.

10   And they put in one.                                                10:10:00

11        I guess my question is, would this be a red flag that

12   would cause you to just look a little bit deeper to make sure

13   the reason was legitimate?

14   A.  Yes.  If you see a spike in the number of cancellations,

15   that would require further investigation as to why.  And they      10:10:15

16   do show on the data extraction for consults.

17        So if you see a number of -- a large number of

18   cancellations, to me that's a red flag and needs to be looked

19   at.

20   Q.  Have you seen such a large number of cancellations?           10:10:37

21   A.  Not really, no.

22        And they are looked at to make sure that they're being

23   canceled for the right reasons.  You know, that it was done

24   during the hospitalization, that the inmate didn't refuse -- or

25   refused the consult, they're out to court, they're not able to    10:10:53

UNITED STATES DISTRICT COURT

—Vanessa Headstream – Cross-Examination—

1    complete it for that reason.  I mean, there are occasions where

2    a consult is not completed as scheduled because of issues

3    outside the control of Corizon.

4    Q.  I understand.

5             As I try to perform the role in my case, and I think                    10:11:20

6    you have an understanding of what that is, that the parties

7    settled a case and intended to have these performance measures

8    met, and there would be a test to see -- and you're part of

9    that test, you're part of that Monitoring Bureau that looks at

10   this.                                                                             10:11:39

11            Over the time since the settlement was accomplished,

12   we haven't made a lot of progress in a number of performance

13   measures.  Maybe not ones that have been yours.  But it's fair

14   to say that there are a number of critical performance measures

15   that continue to fail.  And much of that is associated with     10:11:55

16   reasons that I think people who are involved in the system

17   could identify and articulate.

18            I don't want to miss the chance to ask you whether

19   there are things that you think that on a broad basis could

20   make a difference.                                               10:12:24

21   A.  In meeting the measures?

22   Q.  Yes.

23   A.  I'm sure there are.  There's again, the documentation,

24   following through with scanning records, scanning information

25   into the record.                                                 10:12:48

UNITED STATES DISTRICT COURT

—— Vanessa Headstream – Cross-Examination ——

1  Q.  And I guess that failure is probably attributable to not

2  having enough people to get that job done.

3  A.  Not necessarily.  They can have ten people to do the job,

4  if none of them will do it, it still won't get done.

5  Q.  So it could be something different.                                10:13:08

6        You know, we see this problem over and over again.

7  And one wonders why it is that somebody internally, i.e., at

8  Corizon can't figure out how to get it done.

9  A.  I don't -- I don't know the reasons.  I mean, I can sit and

10 list a number of what I think it might be, but that doesn't      10:13:25

11 mean that's correct.

12       I think they have good staff who want to do what's

13 right.  I think they get sidetracked with -- working in the

14 field is a challenge.  There's a number of issues that occur on

15 a daily basis with ICSs, movements that present challenges to   10:13:58

16 getting your assigned tasks for that day done.  I think they

17 get caught up in the -- what they're doing and they forget the

18 little things that we look at, the documentations, which are

19 critical to the medical record and, of course, our monitoring

20 of it.  I think the -- I think they're trying in the field.     10:14:28

21       THE COURT:  I don't have a doubt that there are a

22 number of people who are trying.  The problem is, and I think I

23 said this to Dr. Robertson, is what happens is, people are

24 stretched so thin that, as you say, there are ICSs and things

25 like that there.                                                 10:14:50

1        And the analogy I used, that they were always putting

2   out fires and that when the documentation time came to be

3   documenting what happened at the fire, they're called to the

4   next fire.  And so they go to that fire, and the documentation

5   that these points that are critical lack, or are never done at          10:15:04

6   all.

7        And I think that the solution there is likely more

8   firefighters.  So that the firefighters who put out the fire

9   can finish the job that's important to finishing that job, and

10  that is documenting what they did.  And another group of          10:15:24

11  firefighters get called off to the next fire.

12        But it seems what happens is that because everything

13  is stretched so thin in many cases the contract levels of

14  staffing are not met.  But even those contracted levels where

15  they exist we have the same problems.  And so it does suggest          10:15:42

16  to me that it's not enough firefighters.

17        Well, I have to give Mr. Bojanowski an opportunity to

18  do any redirect examination that he'd like to do now, and also

19  to check in with Miss Eidenbach to see if any of my questions

20  engendered any questions.          10:16:04

21        In fairness, if the judge asks questions I should let

22  the lawyers follow up.

23        Miss Eidenbach?

24        MS. EIDENBACH:  Before I move on to that, Your Honor,

25  I neglected to move to admit Exhibit 61.  So I'd like to do so          10:16:12

—— Vanessa Headstream – Redirect Examination ——

1    now.

2             THE COURT:  Any objection to 61?

3             MR. BOJANOWSKI:  No objection, Your Honor.

4             THE COURT:  61 is received.

5         (Exhibit No. 61 admitted into evidence.)                    10:16:30

6             MS. EIDENBACH:  I have no further questions.

7             THE COURT:  Mr. Bojanowski, any questions?

8             MR. BOJANOWSKI:  Very briefly, Your Honor.

9                          REDIRECT EXAMINATION

10   BY MR. BOJANOWSKI:                                               10:16:41

11   Q.  Miss Headstream, when you're doing monitoring -- or when

12   monitors are doing monitoring, we talk about source documents.

13   And you're familiar with those?

14   A.  Correct.

15   Q.  And source documents include not only the things that      10:17:02

16   Corizon provides to you, but also the things that you look at

17   on your own, such as eOMIS or AIMS or Cares.  I mean, those are

18   documents that are not provided to the monitor, but the monitor

19   goes out and obtains to verify whatever it is they're looking

20   at.  Is that fair to say?                                       10:17:22

21   A.  Correct.

22             MS. EIDENBACH:  Objection, Your Honor, leading.

23             THE COURT:  It is a leading question, but overruled.

24   BY MR. BOJANOWSKI:

25   Q.  You had talked about Exhibit No. 70.  If you would look at  10:17:33

                      UNITED STATES DISTRICT COURT

—Vanessa Headstream – Redirect Examination—

1   that again.  And if you would go to page 2 through 7 of that

2   document.

3           Was this a document that was prepared by the

4   Monitoring Bureau?

5   A.  I do not know who prepared this document.                    10:18:07

6   Q.  Is this part of the Monitoring Guide or monitoring

7   requirements that monitors utilize to monitor measures in the

8   field?

9   A.  Not to my knowledge, no.

10  Q.  When you are contacting Corizon by e-mail, are you          10:18:28

11  attempting to validate your findings, or are you looking for

12  more information?

13  A.  Yes.  More information, I would say, more than validate.

14  Q.  And I think you said you're not inclined to either find

15  compliance or find noncompliance, so you remain neutral in your 10:19:25

16  analysis?

17  A.  That's correct.

18  Q.  And it doesn't matter to you if Corizon disagrees with you

19  or not, whatever your finding is, your finding is going to be

20  based upon your analysis?                                        10:19:40

21          MS. EIDENBACH:  Objection, Your Honor, leading.

22          MR. BOJANOWSKI:  She was asked on cross --

23          THE COURT:  Hold on.

24          Overruled.

25          You can answer.                                          10:19:59

UNITED STATES DISTRICT COURT

1        THE WITNESS:  Okay.  Repeat the question.

2        THE COURT:  Does it matter to you whether Corizon

3   disagrees or not whatever your finding is?

4        THE WITNESS:  No, it does not matter.

5   BY MR. BOJANOWSKI:                                        10:20:13

6   Q.  You're not looking to help out Corizon in reaching

7   compliant findings so they avoid fines or something like that?

8        MS. EIDENBACH:  Objection, leading.

9        THE COURT:  Here's the thing:  The leading questions

10  are a danger where the witness can be led.  I've had enough     10:20:26

11  experience with this witness, I don't think she can be led.

12  She's going to tell what she thinks is the situation or not.

13        He's asking questions that are really not useful, I

14  will say, Mr. Bojanowski, with all due respect.  But -- because

15  I think I know already what the answer is based upon having     10:20:46

16  listened to this witness.

17        So the objection is overruled.

18        Do you remember the question?

19        The question is, are you looking to help out Corizon

20  in reaching compliance findings so that they can avoid fines or 10:20:58

21  something like that?

22        THE WITNESS:  No.

23        MR. BOJANOWSKI:  May I have a moment, Your Honor?

24        THE COURT:  You may.

25        MR. BOJANOWSKI:  No more questions, Your Honor.        10:21:12

1          THE COURT:  Thank you.

2          Thank you very much, ma'am, appreciate your time.

3          THE WITNESS:  Thank you.

4          MR. BOJANOWSKI:  Your Honor, it's my understanding

5    there are no more live witnesses to be called, and that the          10:21:31

6    remaining witnesses are going to be submitting declarations to

7    the Court pursuant to previous discussions --

8          THE COURT:  Okay.

9          MR. BOJANOWSKI:  -- both with the Court and counsel.

10          THE COURT:  Okay.  So we'll take a ten-minute break          10:21:43

11   now and we'll come back and take up with the monthly status

12   report.

13          Thank you.

14       (Recess at 10:21 a.m., until 10:33 a.m.)

15          THE COURT:  Since we have the time, we'll go through          10:33:01

16   the April CGAR Performance Measure report in the way that we

17   traditionally do it.

18          But I want to restate on the record what I told

19   counsel yesterday, and that is that as we go through these,

20   there will be a theme that will emerge.  At least it was a          10:33:25

21   theme that was evident to me when I reviewed them.  And that

22   is, it is continuing to be a situation where there are

23   failures, some failures in new areas.  But in those new areas,

24   it's the same problem oftentimes, and that is associated with

25   inadequate staffing.          10:33:51

1      Inadequate staffing that's reflected in the fact that

2  you can make the inference that the number of times there's a

3  vacant position or a number of times that there is somebody who

4  is out on leave, or the number of times that there are new

5  employees that weren't trained.                                          10:34:12

6      And so this boils down to a confirmation of what has

7  been a theme of mine from the get go, and that is that there

8  just aren't enough people doing the job that needs to be done.

9      And that -- I mean, simply if you have -- what did we

10  learn yesterday, a 44-percent turnover rate, if I'm remembering  10:34:40

11  right.  If you have this turnover rate, and you have two people

12  doing a task, you don't really have much of a reserve when that

13  one person leaves as compared to if you have ten people doing

14  the job.  You have many more people left around who can be the

15  continuum of knowledge base that says, this is how we do it,     10:35:08

16  and can stand shoulder to shoulder and say this is what you

17  need to do.  Whereas the mad dash of trying to be two places at

18  once just doesn't work out.

19      And, you know, the stipulation doesn't give me the

20  power, as I've said repeatedly, to address this obvious need,    10:35:27

21  because I can't order a particular kind of staff or number of

22  staff unless the defendants decide to do it themselves.

23      And so having been blocked from that most helpful and

24  direct remediative measure, I have to embark on alternatives.

25  And the reality is that we are in a situation where there        10:35:53

1    continues to be failures associated with this very problem, and

2    I have to somehow figure out a way to get there.

3            And so my OSC order will be one method to do that.

4    And other methods will continue.

5            And the other method is to just do what I've given you        10:36:10

6    a foreshadowing of, and that is to highlight as we go through

7    these failed performance measures how often it is the case that

8    it's associated with something that can be attributed to a

9    staffing deficit.

10           So with that preamble, we'll do what we usually do,        10:36:26

11   and that is --

12           MR. BOJANOWSKI:  Your Honor.

13           THE COURT:  Go ahead.

14           MR. BOJANOWSKI:  I didn't mean to interrupt.

15           THE COURT:  Go ahead.        10:36:35

16           MR. BOJANOWSKI:  But my availability today is somewhat

17   limited, and I was hoping that I could address some of the

18   other things, and leave the review for last, if that's at all

19   possible with the Court.

20           THE COURT:  All right.  That's fine.  Go ahead.        10:36:48

21           MR. BOJANOWSKI:  So that I can address as much as I

22   can in the status.  And then if we get into these, I can run

23   through them as much as we can until my time is expired, so to

24   speak.

25           THE COURT:  All right.        10:37:05

─ CV-12-601-PHX-DKD – June 14, 2018 ─

1          MR. BOJANOWSKI:  And then have counsel -- co-counsel

2    take over in my stead.

3          But if we could take things out of order, that would

4    be perhaps more productive to the Court.

5          THE COURT:  All right.  What would you like to address     10:37:15

6    first?

7          MR. BOJANOWSKI:  Well, I'm just going to start with

8    the Smart Cards, and then I'm going to have Dr. Robertson call

9    in to provide us an update on the telehealth.  And then if I

10   could get into some of the contract issues, the incentive      10:37:29

11   payments, I can knock those off rather quickly, and just maybe

12   work that way, if that's acceptable with the Court and counsel,

13   and try and attend to those issues, so that while I'm here we

14   can do that without shifting that burden.  Because

15   unfortunately I expected to be doing this yesterday.            10:37:49

16         THE COURT:  Okay.

17         MR. BOJANOWSKI:  So my personal plan got kind of

18   turned around.

19         In any event --

20         THE COURT:  I've read the Smart Cards.  They were         10:37:58

21   attached as an exhibit.

22         MR. BOJANOWSKI:  I have the actual ones with me.  If I

23   could present that to you.  I'm not sure --

24         THE COURT:  Aren't those the same ones -- are they not

25   the same ones --                                               10:38:11

1      MR. BOJANOWSKI:  I believe that they are, but there

2   may be some extras.  Since I just obtained these the other day

3   prior -- or after my submissions.  So I'd like to at least

4   allow counsel to have some and allow you to have them.

5      THE COURT:  I'll take a look.                          10:38:26

6      MR. BOJANOWSKI:  Just because I promised that I'd get

7   them.

8      I believe it's the same thing, Your Honor, but I don't

9   want to take a chance that I got something different.

10      Now, in my meetings with Corizon at some of the        10:38:54

11   facilities, it's my understanding that these have now been

12   distributed and there's been training occurring on the

13   utilization of these.

14      It's also my understanding that additional cards may

15   be developed in the future to assist line staff in addressing  10:39:16

16   some of the -- some of the performance measures and some of the

17   issues that arise.

18      So I believe that this is the first step in

19   utilization of these types of things.

20      And like I said, it's my understanding that they're    10:39:37

21   out in the field now.  All of the facilities that I have

22   visited in the past several weeks, we specifically asked, have

23   these been put out, and they've assured us that they're out and

24   that the training is ongoing.

25      So unless there's a question as to what's going on     10:39:56

1  with these, that's pretty much the information I have.

2          THE COURT:  Any questions from plaintiffs?

3          MS. KENDRICK:  Well, do you have any information

4  specifically which performance measures it was going to be?

5  Because my understanding from last time was that it was going          10:40:14

6  to be for all of the noncompliant ones.

7          MR. BOJANOWSKI:  I think these ones have the measure

8  on them.  So we have PM 44, 47, 52 are the ones -- are the ones

9  that are reflected in this set of cards.

10          Again, I don't have specifics as to additional cards          10:40:37

11  at this point and what measures may be set forth on those

12  cards.

13          Is there any other questions?

14          THE COURT:  Well, I'm just -- hold on just a second.

15          Okay.  All right.  Go ahead.          10:41:11

16          MR. BOJANOWSKI:  So the next item that I'd like to

17  cover would be the update from Dr. Robertson, who is calling in

18  on our line.

19          THE COURT:  You want to go ahead --

20          THE CLERK:  Dr. Robertson, are you there?          10:42:16

21          DR. ROBERTSON:  This is Dr. Robertson.

22          THE COURT:  Good morning, Dr. Robertson.  This is

23  David Duncan.

24          And I am going to ask Mr. Bojanowski to address you

25  perhaps with some questions to provide the update on the          10:42:29

1    telemedicine.

2            I'm happy that this is happening because of what we

3    have learned in the past about previous inattention to

4    telemedicine.  And so I'm happy to have it here in court now

5    today so that we can hear an update about it.                    10:42:43

6            But after Mr. Bojanowski asks you some questions, I

7    may have some, and then the plaintiffs' counsel may have some.

8            DR. ROBERTSON:  Sure.  That's fine.  Thank you.

9            MR. BOJANOWSKI:  Dr. Robertson, this is Tim

10   Bojanowski.                                                      10:42:59

11           Why don't you just give us an update as to what has

12   been going on since the last time you appeared in court with

13   regard to the provision of telemedicine within the system and

14   work with the University of Arizona.

15           DR. ROBERTSON:  Sure.  I've been instructed by the      10:43:16

16   director to pursue this with all fervor.

17           And I've been in touch with the Arizona Telemedicine

18   Program regularly, both with Dr. Po and with Phyllis Webster,

19   who is the coordinator, she's been there since the inception of

20   the program.                                                    10:43:41

21           Corizon's team is Dr. Ladell and Curtis Schmid, who is

22   now assigned to advance the telemedicine initiative.  The

23   telemedicine program says -- they seem quite sincere, in that

24   this is the best team that they've worked with so far.

25           They're waiting for changes over a quarter.  For        10:44:03

1    example, they've had an ongoing infectious disease clinic once

2    a month for half a day.  And at the low point they were getting

3    no appointments.  And they're up to about seven appointments

4    each clinic.  They have time for up to nine.

5            So what they're talking, and what the development plan          10:44:31

6    is, is that as Corizon demonstrates its good faith to utilize

7    what's being offered -- because they've got to block out a

8    physician, and the physician's going to get paid, you know.

9    And so it's best to have patients in front of the physician.

10           But they're looking at expanding in the next few               10:44:56

11   months at another clinic, which has not been determined yet.

12           And that's my report on the Telemedicine Program.

13   We've very optimistic.

14           THE COURT:  And what field would the other clinic be

15   in?                                                                    10:45:13

16           DR. ROBERTSON:  Oh, good -- it could be anything.

17   Infectious disease could expand to include HIV.  Right now

18   they're usually using it -- well, they are using it for HIV,

19   but for more complicated cases.  Often times HIV can just be

20   managed on-site, you don't need to have a specialist.  It's          10:45:31

21   pretty much become routine now as far as standard of care.

22           But they can go into cardiology, they could go into

23   ophthalmology -- it could go to ophthalmology for retinal exams

24   for diabetic patients.  I mean, the patient doesn't have to

25   have their eyes dilated to get the consult done.  They don't          10:45:53

1    have to leave the complex, someone comes in and takes a picture

2    of their retina, it's stored and forwarded to the

3    ophthalmologist for reading.  You can do 50 patients a day, if

4    it's coordinated right.  That's what I'm trying to get going.

5         Another one that can be done is pulmonology.  Oncology        10:46:13

6    is starting to go with telemedicine, after the initial visit.

7         There's a myriad of applications.

8         THE COURT:  I'm sorry to interrupt.

9         Would the University of Arizona be in the position to

10   support all of these ones you've just described or are they        10:46:27

11   more limited?

12        DR. ROBERTSON:  Absolutely.  If you go on the Arizona

13   telemedicine website, there's a resource page.  They can

14   connect people to other providers that offer telemedicine

15   services.  This is an expanding field.  It will continue to        10:46:43

16   expand as technology becomes more and more in your pocket.

17        But this October, like I was saying, there's a big

18   conference in Glendale with telemedicine, you know, everything

19   that telemedicine has to offer for providers, for users, for,

20   you know, people like Corizon, contractors, whatever, it's just    10:47:07

21   like a symposium for everybody.  It's a pretty big deal.

22        THE COURT:  And what is your ongoing role monitoring

23   how this program continues to be utilized?

24        DR. ROBERTSON:  I'm following.  I'm getting counts,

25   I'm getting numbers.  I'm making phone calls, you know.  I'm       10:47:27

1    doing face-to-face visits.  It's something that you just have

2    to keep -- you just have to keep advancing.  Like a good

3    marketing campaign, the effects are cumulative over time.  So

4    the more I keep it in people's noggins to use telemedicine, the

5    more they're going to use it.  And the more they use it, the          10:47:48

6    more I'll keep it in their noggins.

7             THE COURT:  Any questions from the plaintiffs?

8             MS. KENDRICK:  Yes.  Thank you.

9             Good morning, Dr. Robertson.  This is Corene Kendrick.

10   How are you doing?                                                     10:48:00

11            DR. ROBERTSON:  All right.  How are you?

12            MS. KENDRICK:  Good, good.

13            So I'm curious, what is the time frame for getting

14   these other specialties up and rolling?  And do you guys have

15   any sort of written work plan with action items and responsible       10:48:12

16   parties, kind of setting out how the various specialties will

17   be rolled out?

18            DR. ROBERTSON:  (Inaudible.)

19            MR. BOJANOWSKI:  Dr. Robertson, you're breaking up in

20   your cellphone, I believe.                                            10:48:34

21            And so could you repeat your response?

22            DR. ROBERTSON:  Okay.  I'm not privy to what's -- the

23   ATP and Corizon are doing.

24            My understanding talking with Phyllis and Dr. Po is

25   that they will expand the program as indicated.  They're not          10:48:51

1   going to say -- you know, they're not going to go into a
2   contractual thing with Corizon because they found that didn't
3   work in the past.
4           So they're offering the infectious disease clinic
5   right now.  It's consistently bringing in patients.      10:49:08
6           So now once they feel that Corizon is serious about
7   this, then they'll go ahead and discuss with Corizon what
8   specialties they want to have offered.
9           MS. KENDRICK:  So to your knowledge has there been any
10  sort of needs assessment done so that, you know, they could   10:49:25
11  say, we have X number of patients who need to see nephrology,
12  or how many need to see a different specialty, so that there's
13  an estimate of what the need would be so they could plan
14  accordingly?
15          DR. ROBERTSON:  Unknown.      10:49:41
16          MS. KENDRICK:  No, you don't know or, no, there isn't
17  one?
18          DR. ROBERTSON:  I don't know if there is one or not.
19          MS. KENDRICK:  And on the infectious disease you said
20  it's still once a month for half a day that Dr. Po is seeing   10:49:57
21  people?
22          DR. ROBERTSON:  Yes, ma'am.
23          MS. KENDRICK:  And it's between seven and nine
24  patients.  So that would be seven and nine patients a month?
25          DR. ROBERTSON:  (Inaudible.)      10:50:13

UNITED STATES DISTRICT COURT

1          THE COURT:  We couldn't hear your answer, Doctor.

2          DR. ROBERTSON:  Yes.

3          THE COURT:  Thank you.

4          MS. KENDRICK:  Okay.  Is that enough to meet the need,

5   given the number of patients in the ten prisons who are HIV          10:50:22

6   positive or have advanced hepatitis C or other infectious

7   diseases, or do you think it needs to be expanded?

8          DR. ROBERTSON:  Well, I'm always in favor of

9   expanding.  But there's no sense sending someone to the

10  specialist if they can manage it on site.                            10:50:43

11         Now I'm not going to get into numbers, I can't.  I

12  don't know how many HIV patients are complicated or how many

13  hepatitis C patients are complicated, and who's able to handle

14  them on-site.  That's beyond my scope.

15         But I can say that as the need is expressed by            10:51:05

16  increased numbers in the clinic, the Arizona Telemedicine

17  Program is ready to expand.

18         MS. KENDRICK:  Right.  I guess my concern, sir, is

19  that this is kind of a chicken and egg situation where, you

20  know, there's this weird position where the Arizona               10:51:24

21  Telemedicine Program isn't going to start offering things until

22  Corizon is asking for them.  But if Corizon is not asking for

23  them, then it's not going to start happening.

24         So it seems like we're at this bizarre impasse

25  situation.                                                         10:51:40

1          DR. ROBERTSON:  I wouldn't say it's an impasse.  It's

2     just that as infectious -- as Corizon proves to the

3     Telemedicine Program that they mean what they say, which is

4     what they're doing right now, then the Arizona Telemedicine

5     Program will expand services.                                    10:51:58

6          MS. KENDRICK:  I guess my question is --

7          DR. ROBERTSON:  You know, and then if the clinics that

8     they offer -- say if they go into cardiology, well, if the

9     cardiologist is scheduled and there's no patients, they'll drop

10    it.                                                              10:52:13

11         MS. KENDRICK:  Right, right.  I guess my question is,

12    what would the tipping point be for the University of Arizona?

13    I mean, would it take eight cardiology -- telemedicine

14    cardiology consults all coming in at the same time for them to

15    say, okay, we'll do one day of cardiology?                       10:52:24

16         DR. ROBERTSON:  They usually wait until the clinic

17    fills up.

18         MS. KENDRICK:  And have all the --

19         DR. ROBERTSON:  But I don't know -- I don't know if

20    the cardiologist is going to want to have ten patients before    10:52:35

21    lunch or five or 20.  You know, I don't know.  It's whatever

22    they think they can handle.

23         MS. KENDRICK:  Right.  But I guess I'm saying, what --

24    do you know what the triggering point would be for the

25    University of Arizona to say, yes, we'll offer a cardiology       10:52:50

1    clinic?  Like how many requests need to come in around the same

2    time for whatever specialty?

3           DR. ROBERTSON:  Right.  I would have to -- I would

4    have to refer you to Miss Webster for that, because she's the

5    chief coordinator.  She schedules everything.  So, yeah, you'd          10:53:12

6    have to talk to Phyllis.

7           MS. KENDRICK:  And she's at Corizon or U of A?

8           DR. ROBERTSON:  U of A.

9           MS. KENDRICK:  Okay.  Are you getting any written

10   reports from Corizon about how many requests they're making?          10:53:26

11          DR. ROBERTSON:  I'm going to the Arizona Telemedicine

12   Program and talking to them about infectious disease.  That's

13   where we are at this point.  I haven't heard anything about any

14   other specialties coming on board or what.

15          I'm just -- I'm just happy to see that Corizon is          10:53:48

16   filling up Dr. Po's schedule.  Now that Dr. Po's schedule is

17   being filled up on a regular basis, they're going to start

18   discussions with Corizon to expand.

19          THE COURT:  Dr. Robertson, David Duncan again.

20          One of the things that occurs to me is that somebody          10:54:11

21   at the Department of Corrections needs to be taking a look to

22   make sure that areas for opportunities to use telemedicine are

23   taken advantage of.  And I don't know, because of Corizon's

24   past sort of recalcitrance about this, but it may be well that

25   it just needs to be somebody in the department who is saying,          10:54:52

1    we've noticed that there's a backlog in cardiology here, but

2    we're –– we've not taken advantage of the telemedicine

3    opportunities.  We've noticed that we have a number of

4    nephrology consults that are necessary and we haven't taken

5    advantage of telemedicine there.                              10:55:12

6         Somebody needs to be looking at the demand –– the

7    demand for services that could be good further uses of

8    telemedicine and be advancing those, because I think that's

9    necessary.

10        DR. ROBERTSON:  Yes, sir.

11        THE COURT:  Who do you think this person could be?

12        DR. ROBERTSON:  That would be –– I would be part of

13   that –– part of that team.  And believe me, we know.  It's

14   just, we're proceeding with caution and due diligence to make

15   sure that we aren't burning out specialty providers.          10:55:43

16        And the re –– the Arizona Telemedicine Program, I

17   believe, is acting in a very prudent business manner in order

18   to ensure that their clinics are going to be filled when they

19   bring on the specialties.  They're looking at doing

20   that –– they were looking at a three-month window.  I think   10:56:04

21   we're in the second month of improvement.  So at the end of

22   another month I'm going to make –– because I can say, there's

23   tons of cardiologists, tons of nephrology, there's tons of

24   this, tons of that that can be utilized.  It's just that ATP is

25   like, okay, you know, show us the money.                       10:56:19

1          And so what they're doing is they're behaving in a

2   prudent manner and advancing their program cautiously.  They

3   went back to a reset a couple months ago.  But with

4   Dr. Ladell's leadership, and with the designated coordinator

5   for Corizon, they're coming along.                        10:56:40

6          I'm happy with progress and so is the ATP.

7          MS. KENDRICK:  I want to go back to something that you

8   said, Dr. Robertson.

9          You said that you weren't getting information from

10  Corizon and you were getting your information from the Arizona   10:56:56

11  Telemedicine Program.  And I'm curious why you're not getting

12  information from Corizon, which is ADC's contractor, and you're

13  having to go to a third party to get information on the status

14  of the progress here.

15         DR. ROBERTSON:  Okay.  I'm talking to the Arizona        10:57:13

16  Telemedicine Program because I have personal relationships with

17  them, and I want to know, where is Corizon in the process?  And

18  they're sharing that information with me.  And I'm fine with

19  that.

20         I mean, until ATP says, okay, let's expand, there's no   10:57:29

21  sense in me going to Corizon saying, how many of this and how

22  many of that?  Because we know they're there.  Let's just get

23  the Arizona Telemedicine Program to expand their services that

24  they see fit.  Because we don't want to lose them.

25         THE COURT:  I guess my reaction to that is that we've    10:57:51

```
1    seen in the past that we need to push Corizon on this.  And in

2    order for that push to continue to happen, there needs to be

3    some -- at the very least an informed dialogue with them

4    saying, we've noticed this backlog here, why aren't you using

5    telemedicine for it.                                        10:58:13

6         DR. ROBERTSON:  That would be Mr. Pratt's purview and

7    the director.

8         I do know that the Arizona Telemedicine Program is at

9    a limited step at this point, and once they decide to open up

10   the faucet, we can have numerous clinics going on.  But it's a  10:58:29

11   matter of the relationship with Corizon to the Arizona

12   Telemedicine Program.

13        And I'm happy with the progress that's being made in

14   the last couple months.  The clinic is full.  Let's keep it

15   full.  Okay, it's been full for a while, Corizon means what   10:58:52

16   they're saying, let's expand.  And we'll expand prudently.

17        So what's the next one to add?  Let's talk to our

18   providers.  You know, ATP will find its providers who would

19   want to have a clinic and make that contract, and then expand

20   that.                                                        10:59:11

21        You know, it's not something you can just roll out

22   horizontally and do a full court press on, you have to --

23   you're building.  And you're building relationships too.  And

24   the way things have gone, everyone's being very cautious.

25        THE COURT:  No more questions?                         10:59:36
```

1          DR. ROBERTSON:  But they're proceeding.

2          THE COURT:  All right.  I just don't want an

3     opportunity to be missed to make sure --

4          DR. ROBERTSON:  No.

5          THE COURT:  -- that we don't keep that momentum.          10:59:47

6          DR. ROBERTSON:  It will.

7          THE COURT:  All right.

8          DR. ROBERTSON:  Believe me.

9          THE COURT:  Good.

10          All right.  Anything else, Mr. Bojanowski?          10:59:53

11          MR. BOJANOWSKI:  Not from the defendants, Your Honor.

12          THE COURT:  Miss Kendrick?

13          MS. KENDRICK:  Just, Dr. Robertson, I would just

14     strongly encourage you to stay on Corizon on this.  And I would

15     strongly encourage you and Corizon to develop a written work          11:00:08

16     plan with time frames, action items, responsible people, and do

17     a needs assessment so we don't get stuck into some sort of

18     weird impasse where every -- each side is waiting for the other

19     party to make the first move.

20          DR. ROBERTSON:  We're in regular contact, believe me.          11:00:28

21     And, you know, it will expand as we can.

22          And, of course, I understand what you're saying.  And

23     I'll bring that up to my superiors.

24          THE COURT:  All right.  Very well.

25          Thank you, Doctor.  Appreciate it.          11:00:43

1          DR. ROBERTSON:  Thank you all.

2          THE COURT:  Bye-bye.

3          DR. ROBERTSON:  Bye.

4          THE COURT:  All right.  The contract, Mr. Bojanowski?

5          MR. BOJANOWSKI:  There's an item 4, defendants'                    11:00:56

6  contract extension with Corizon.  I don't know what that is.  I

7  mean, I know that the contract was extended, and I think we've

8  provided that documentation.  So I'm not quite sure -- yeah, I

9  don't have any further information on that.  I think we

10 provided all the parts of the contract.                                    11:01:19

11         THE COURT:  What does that agenda item address?

12         MS. KENDRICK:  It's just to close the loop on the last

13 hearing when you asked us to file our comments and their

14 response, and so we did.  And it's before you and it is what it

15 is.  So it's there for you.                                                11:01:31

16         THE COURT:  Okay.  Thank you very much.

17         Okay.  That addresses that.

18         MR. BOJANOWSKI:  Okay.  The next item is the incentive

19 payment, payments for violations, and then the staffing level

20 payments that I typically give the amounts on.                             11:01:51

21         Mr. Struck is going to report on that.

22         MR. STRUCK:  Your Honor, with respect to the amount of

23 money awarded Corizon as incentive payments under subsection A,

24 in March they received $100,000, and that capped out the

25 incentive payments.  So the April incentive payment is zero.               11:02:12

1        With respect to the money assessed against Corizon for

2   violations of the stipulation, they were assessed $155,000 in

3   March.  And they haven't been assessed anything yet in April.

4   That's still in progress.

5        Regarding the amount of money assessed against Corizon          11:02:38

6   for failure to maintain staffing levels of key positions above

7   90 percent in March and April.  In March they were assessed a

8   fine of $121,266.32.  And in April $120,096.77.

9        THE COURT:  Any questions?

10        MS. KENDRICK:  No, sir.                                         11:03:07

11        THE COURT:  All right.  Are we now ready to proceed

12   with April's report?

13        MR. BOJANOWSKI:  No, the last item was plaintiffs'

14   counsels' reports regarding recent monitoring tours.

15        THE COURT:  So that's part of your agenda too,                  11:03:23

16   Mr. Bojanowski?  You said you had some information about the

17   dental situation.

18        MR. BOJANOWSKI:  I only have information concerning

19   the dental.  I mean, that's all I can respond to --

20        THE COURT:  All right.                                          11:03:35

21        MR. BOJANOWSKI:  -- at this point.

22        THE COURT:  Go ahead and respond to that.

23        MR. BOJANOWSKI:  There was some allegation in the -- a

24   letter from, I believe it was Miss Eidenbach, concerning an

25   extraction only policy at the Yuma facility.  So upon receiving     11:03:50

1    that letter, what I did was I tried to track down what was

2    going on at the Yuma facility, and met with Dr. Chu, the

3    monitor, to try and explore that allegation.

4         And I was provided a scheduling report which indicates

5    that no such policy is in existence.  And Dr. Chu was unaware    11:04:14

6    of any such policy and, in fact, was surprised to hear

7    something along those lines.

8         There were approximately -- for the month of April,

9    there were approximately 380 treatments or appointments or

10   whatever at the Yuma facility.    11:04:39

11        Of those --

12        THE COURT:  Are those dental appointments?

13        MR. BOJANOWSKI:  Dental, yes, just dental at the

14   facility for that one month.

15        So there are 380 -- approximately 380 contacts.    11:04:48

16        Of that total number there were 75 extractions, where

17   a tooth was pulled.  There were 155 fillings.

18        And these are approximate.  I may be one or two off

19   because it's small and I have trouble counting.

20        There were about 66 cleanings going on.  And there    11:05:08

21   were around 87 urgent appointments that were attended to during

22   that time.

23        So I can certainly provide this chart to the Court, if

24   you want, that lists by inmate number, name, date of request,

25   date of service, time, the specialty action that was taken, the    11:05:30

1    provider that provided that care, and the housing location of

2    that particular individual.

3          So the statement that there's an extraction only

4    policy going on at Yuma is -- I don't know where that came

5    from, but it certainly is not true based upon what I'm looking          11:05:55

6    at.

7          THE COURT:  Well, the fact that you report fillings

8    suggest that there is not an extraction only.  It would make me

9    think that in order for plaintiffs to advance this issue what

10   they would need to do is have an expert take a look at the 70          11:06:12

11   who were extracted and see if there was a medical documentation

12   that would indicate that that was the appropriate treatment as

13   opposed to a filling.

14         But Miss Eidenbach or Miss Kendrick?

15         MS. KENDRICK:  Yes, Your Honor.                                   11:06:29

16         So first of all, you know, policy doesn't mean written

17   policy that says, only extract teeth.  I mean, so -- again,

18   maybe we should have phrased it as an extraction only practice.

19         But this is something that our dental expert

20   identified during the litigation of the case, was that there          11:06:46

21   was a disproportionate number of extractions that were not

22   medically indicated or supported by the patient's needs.  And

23   so an overreliance upon extractions versus doing procedures

24   such as root canals or crowns.

25         So it's not necessarily extraction versus filling,          11:07:06

1    it's a little more nuance than that.  We would welcome to have

2    that kind of information and those kind of details to the

3    extent that, you know, we would want to drill down, so to

4    speak, into what was going on.

5        But I can tell you that multiple monitors on different          11:07:25

6    yards heard the same thing from people that we spoke to that,

7    you know, I go and my crown is broken, I have a cavity and I'm

8    told all they can do it pull the teeth.  Multiple class members

9    on different yards reported that the dentist would make jokes

10   about how many teeth they were going to pull that week.            11:07:44

11       And so we don't just put something in the letter if we

12   hear it from one or two people, but when it's across yards and

13   multiple monitors hearing it, that's something that raises to

14   the level that we would include it in a letter as a potential

15   systemic issue.                                                    11:08:03

16       So we would be very happy to get that information that

17   Mr. Bojanowski was just reading that he said was provided by

18   Dr. Chu.

19       THE COURT:  If you'd provide that to the plaintiffs.

20       And my own view is that the issue of this dental care         11:08:13

21   is something under the stipulation that I need to be mindful

22   of, because it appears that the State has blatantly contracted

23   in violation of the stipulation by procuring fewer dentists

24   than the stipulation calls for.

25       And so I want to follow up on whether or not there is         11:08:34

1    patient harm, apart from the violation of the stipulation.

2            Defendants make the argument that the 85 percent --

3    somehow they meet the 85 percent argument.  If I've read that

4    correctly, that's ridiculous.  And so that's an argument that

5    just is without any rectitude at all.                          11:08:57

6            So, Mr. Bojanowski, when can you provide those to the

7    plaintiffs?

8            MR. BOJANOWSKI:  I can provide this -- I mean, I can

9    provide it within the next day or so.  I mean, it's -- all I

10   have to do is take it back to my office, get it copied, and   11:09:18

11   then e-mail it -- well, I probably need to get it numbered.  So

12   it might take a couple of days by the time I get it through the

13   production process and get it Bates numbered and all of that.

14           So what is today?  Thursday.  Monday?

15           THE COURT:  All right.  So Monday, please, by close of  11:09:38

16   business.

17           Now, you say that you don't have any responses to

18   anything else in the plaintiffs' letters with respect to their

19   visits.  And I've read those letters.  And the -- they provided

20   the source for at least you heard a couple of my questions, and 11:10:03

21   I have some further thoughts about it.

22           Is it your intention to respond to each of these

23   identified inmate health care issues that were raised in the

24   yard?

25           MR. STRUCK:  Yeah, it is.  And you're talking about    11:10:22

1    the individuals?

2              THE COURT:  Yes.

3              MR. STRUCK:  Yes.  I mean, we have provided that

4    information to both ADC and Corizon.  And it's our intention to

5    look into that and respond.                                    11:10:35

6              THE COURT:  Okay.  And when do you think you'd be able

7    to get back to plaintiffs?

8              MR. STRUCK:  I don't have that information for you, so

9    I don't want to provide you with anything that -- or with

10   inaccurate information.  But as soon as practicable.          11:10:47

11             THE COURT:  Can we set a deadline of 30 days?

12             MR. STRUCK:  That seems reasonable to me.

13             MS. KENDRICK:  Your Honor, I would just note that

14   we're glad to hear that Mr. Struck is now willing to respond,

15   because in his response to us on June 11th, which was filed at  11:11:03

16   docket 2865-1, page 38, he stated that the issues raised in our

17   letters regarding the Yuma and Phoenix tours, quote, none of

18   these issues have anything to do with monitoring, nor do they

19   have anything to do with the stipulated settlement agreement.

20             He questioned why we were raising systemic issues such 11:11:25

21   as the suicide enclosures, the cleanliness of facilities, which

22   in our opinion relates to the spread of infectious disease.

23   And housing people in watch cells without toilets had nothing

24   to do with the case.

25             And he instructed us that, quote, we request that you  11:11:42

1    stick to the issues relating to performance measures and

2    discontinue your efforts at expanding the scope of the

3    stipulation, close quote.

4         We would just add -- ask that it's clear that not only

5    that they respond with regard to the individual class members        11:11:56

6    whose issues we raised, but also the systemic issues that we

7    identified in the three letters -- actually four letters, two

8    about Yuma, one about Winslow, and one about Phoenix.

9         THE COURT:  All right.  Well, I will require a

10   response, because I do think it is relevant to the stipulation.      11:12:14

11   The stipulation is about inmate health care.  And one of the

12   things that informs me about whether or not the remedial

13   measures that I am employed and employing, and the

14   consideration of the respective positions regarding the counsel

15   on the performance measures and the compliance, is how it's         11:12:38

16   working in the actual reality of what it matters for, and that

17   is the health of the inmates.

18        And so this window where I have particularized

19   descriptions of what I think is fair to describe as a prima

20   facie case of areas of concern, there may be responses, as          11:12:59

21   we've -- don't know.

22        But I think it's fair to require a response so that I

23   can see whether or not the measures that the Court has taken

24   and the Court will take are having an effect.  Because some of

25   the matters are completely aligned with issues that have been       11:13:18

1    raised by the State's own monitors and supervisors with respect

2    to the care that Corizon has been providing.

3            And so using those particularized examples as a way to

4    determine or to evaluate whether the remedial measures that are

5    being proposed, and have been imposed already, are working.  We        11:13:45

6    need to know what's happening on the floor.

7            And so that's why it is relevant and it makes sense.

8            And so 30 days response to the letters will be

9    required.

10           MR. STRUCK:  Your Honor, may I just briefly respond?        11:13:59

11   And I understand your position.  But at least I'd like to

12   address what is the frustration from the defendants.

13           And that is, some of these issues appear to us to be

14   an expansion beyond the stipulation and beyond the performance

15   measures.  For example, housing of transgendered inmates.  If,        11:14:17

16   in fact, there is some performance measure that addresses that,

17   I would invite the plaintiffs to let us know.

18           This -- although the stipulation is about the

19   provision of health care, it's not a consent decree about the

20   overall provision of the health care delivery system.  There        11:14:38

21   are specific performance measures, as you well know, that we're

22   trying to address.  And when we expand beyond that, with

23   respect to this case, with respect to your duties, we think

24   that it takes the eye off the ball of the stipulation.

25           Now, if the plaintiffs have issues that are outside        11:14:56

1    the stipulation that they would like to address to us, that

2    they have concerns about, that's one thing.  And we can address

3    that with them individually.  But to bring it into the confines

4    of this case, when it doesn't appear to be linked to a

5    performance measure, seems to be unnecessary and an unnecessary          11:15:13

6    expansion on the stipulation.

7           Like I said, I understand what your position is, but

8    that's where I'm coming from -- or where the defendants are

9    coming from with respect to some of these things.

10          THE COURT:  Well, I think in theory your argument          11:15:28

11   could be appropriate in certain instances.  But, for instance,

12   you cite the transgender paragraph.  Is my recollection right,

13   that these inmates were in a mental health unit or no?

14          MS. EIDENBACH:  Yes, Your Honor.  They were housed in

15   Baker Ward --          11:15:50

16          THE COURT:  That's what I thought.

17          MS. EIDENBACH:  -- at the Phoenix unit.  And it was in

18   what's called the back -- well, the staff told us what's called

19   the back pocket.  Which is, essentially they're detention

20   cells, so they're different than the rest of the housing on          11:15:59

21   Baker Unit.

22          THE COURT:  But because it's Baker --

23          MS. EIDENBACH:  Oh, Ida.  I'm sorry, it was Ida.  My

24   apology.

25          THE COURT:  That is also a mental health unit?          11:16:06

1          MS. EIDENBACH:  Yes.  That's part of the Flamenco

2     Unit.

3          THE COURT:  Because it was a mental health unit, and

4     because that means that issues related to the performance

5     measures of mental health are at issue here with respect to how     11:16:20

6     these transgender inmates are detained, I think it's reasonable

7     to say that there is a connection there that it's not -- that

8     that's not far afield from the performance measures.

9          With respect to the general conditions, with respect

10    to cleanliness and the odor of urine, and bugs, and mice, to     11:16:41

11    me, again, are relevant concern with respect to the mental

12    health of the people who are in custody.

13         Same thing with respect to the cage outside of the

14    cell.  One can't look at that and not wonder whether that's an

15    appropriate way to deal with someone who is on a suicide watch.     11:17:07

16    Where, again, just to say that it's enough, as I described as a

17    prima facie case to allow the further inquiry, without having

18    committed an offense to the scope of review that's permitted by

19    the stipulation, if someone is on a suicide watch and they are

20    in a place where they have nothing to do at all, and in a place     11:17:30

21    where guards can fall asleep and thereby somebody on a suicide

22    watch can remove their eyelids, I think there needs to be some

23    other method.

24         And so I do think it's reasonable to require a

25    response on this.     11:17:53

1        And so I say all of this in response to what you say,

2    suggesting that it is ultra vires of the Court's duties,

3    responsibilities, and permissible areas of inquiry.  I don't

4    think it is.

5        MS. KENDRICK:  Your Honor, I would just also respond          11:18:11

6    to Mr. Struck on a couple of points.

7        There's nothing in the stipulation that requires that

8    we have to tie some performance measure to everything in the

9    case.

10       As we are awaiting the Ninth Circuit to decide, the          11:18:24

11   performance measures are what triggers further involvement by

12   this Court.  The stipulation is crystal clear that you retain

13   all Article III powers.  The stipulation is about the provision

14   of adequate medical, mental health, and dental care.  It also

15   includes the conditions in isolation and max custody.           11:18:42

16       So to the extent there are issues involving detention

17   units, not only does it implicate people's mental health, but

18   it also implicates maximum custody, which is also up before the

19   Ninth Circuit about whether the definition of the subclass is

20   defined by the word "and" or the word "or."                     11:19:02

21       And unless and until the Ninth Circuit does issue

22   rulings, the Court's previous rulings do control.  And so I

23   think that it shows that we can raise these issues.  We don't

24   have to go into the minutia of saying, transgender housing

25   implicates performance measure blah, blah, blah.  Any person    11:19:21

 1   with common sense would recognize that these conditions do

 2   implicate mental health care, the conditions in isolation.

 3            THE COURT:  All right.  Well, both sides have made

 4   their record.  And you'll have the response within 30 days.

 5            One thing that I didn't mention with respect to the          11:19:39

 6   dental care, and this is maybe something the plaintiffs have

 7   already pursued.  But I gather that the dental practitioners

 8   are subject to the jurisdiction of the Arizona Dental Board.  I

 9   don't know what its full title is.  But that's something that I

10   think that if there is an area of concern, in addition to          11:20:01

11   obtaining information from your expert that you might present

12   to the Court, you could present these issues to the Arizona

13   Dental Board to see if they've found failure to address a

14   broken crown by repairing a crown as opposed to removing the

15   tooth is appropriate.          11:20:26

16            Again, the Court, I think, should consider this issue

17   because of the performance measures related to dental care.

18   And the fact that the contract doesn't have enough dentists

19   makes one wonder whether they're taking a less time-consuming

20   approach because they don't have enough people to do it.          11:20:41

21            All right.  So now can we move to the April report?

22            MR. BOJANOWSKI:  I believe so.

23            THE COURT:  Okay.  So let's go through them and hear

24   what you have to say with respect to the ones that are failing,

25   and hear what Miss Kendrick has to say with respect to any          11:21:01

1   response to what the defendants have written with respect to

2   their June updates.

3           And if you could help me out, tell me which is the

4   first we should be looking at.

5           MR. BOJANOWSKI:  6.                                  11:21:21

6           THE COURT:  Thank you.

7           So 6, are provider orders noted daily with time, date,

8   and name of person taking the orders off.

9           48 percent at Eyman, dropping off from 62 percent.

10          The software glitch was recently discovered, and while   11:21:39

11  Corizon works on a software solution to this problem, the

12  nurses have been given access to the provider only screens.

13  This access should mitigate the effects of the glitch until a

14  permanent solution is found.

15          Any comment, Miss Eidenbach?                          11:21:53

16          I'm sorry, Miss Kendrick.  I apologize.  I don't know

17  why I've done that so much today.

18          MS. KENDRICK:  We look so much alike.

19          No, sir.  No comment.

20          THE COURT:  Anything you wanted to add,               11:22:05

21  Mr. Bojanowski?

22          MR. BOJANOWSKI:  No.  I will note that there

23  are -- and I'm not sure which other measures were impacted by

24  this.

25          THE COURT:  There's at least one other.               11:22:14

UNITED STATES DISTRICT COURT

1      MR. BOJANOWSKI:  There was one other, I believe, that

2  was mentioned.  But I don't have any other information than

3  what I've provided in the report.

4      THE COURT:  All right.

5      So is 12 the next?                                    11:22:32

6      MS. KENDRICK:  PM 12.

7      THE COURT:  At Eyman, do medical records contain

8  documentation of refusals or no shows.

9      53 percent, dropping off from 86 percent.  Before that

10  it was 80.                                               11:22:46

11      And the basis for noncompliance is, a change was made

12  to the process for nurses' refusal log requirements, which

13  requires more forms to be completed.  Previously, the log only

14  included refusals for nurse line, but now includes refusal for

15  provider appointments, including mental health and dental.   11:23:09

16      Compliance with this measure often requires tracking

17  down inmates that refuse to come to the infirmary and then

18  traveling to their cells in order to document their refusals,

19  making it difficult on days when med pass nurses are busy

20  administering to sick or injured inmates.  As such, some of the  11:23:25

21  necessary documentation was not being completed despite the

22  refusals occurring.

23      So this is the first example of many to come where

24  there is a fact that there's too much work for the people on

25  hand to get it done.                                     11:23:43

1          The Corrective Action Plan is, a training memo was

2   sent out statewide by regional headquarters on May 11, 2018, to

3   re-educate nurses regarding compliance with requirements for

4   refusal forms.  In addition, the medical records department is

5   doing a quality assurance check on the refusal forms to ensure          11:24:00

6   they comply with requirements outlined in the memo.

7          A new Director of Nursing is starting June 11, 2018.

8   This person will continue the practice of visiting inmates who

9   refuse treatment or fail to appear for appointments.

10          So my comment here, in addition to what I said          11:24:21

11   previously, is that we have a new staff person, and we have

12   training that's being contemplated on a performance measure

13   that for many months was compliant.

14          So the fact that for many months it was compliant, and

15   then it drops off, makes me think that yet again this example          11:24:38

16   that I've suggested is appropriate here -- or explanation that

17   is appropriate here, is that the turnover, or the fact that the

18   staff was just too busy to get this job done, means that you

19   need to address it by something other than just having more

20   training.          11:25:02

21          You have to make sure that that training can happen on

22   an informal method of having enough people on-site to do it, so

23   that if there is a new person, the person there working next to

24   you knows how to do it.

25          Any comment from plaintiffs?          11:25:16

UNITED STATES DISTRICT COURT

1          MS. KENDRICK:  Just with regard to the new Director of

2     Nursing.  Is that a Director of Nursing or Assistant Director

3     of Nursing, do you know?

4          MR. BOJANOWSKI:  I don't.

5          MS. KENDRICK:  Okay.                                    11:25:31

6          MR. BOJANOWSKI:  For sure.  It indicates a Director of

7     Nursing, so I'm assuming that's what it is.

8          MS. KENDRICK:  Okay.

9          MR. BOJANOWSKI:  But I don't want to swear to that.

10          MS. KENDRICK:  It's just, if you look up for the          11:25:40

11     previous action plan, it said that as of late March Corizon

12     retained a full-time Director of Nursing.

13          So it was unclear if that person had already left and

14     is being replaced by a new Director of Nursing, or if it's

15     referring to an Assistant Director of Nursing.  Because we had  11:25:58

16     been notified a few weeks ago that four or five of the

17     Assistant Directors of Nursing at Eyman had all quit.

18          So we didn't know if those positions have been

19     refilled yet.

20          THE COURT:  And when the Corrective Action Plan refers    11:26:14

21     to the Director of Nursing starting at Eyman, it looks like the

22     remediation plan doesn't include that for Florence.

23          Did you say that the Director of Nursings had resigned

24     at Florence or Eyman?

25          MS. KENDRICK:  At Eyman, sir.                           11:26:39

1          THE COURT:  Okay.  Thank you.

2          Anything you wanted to say, Mr. Bojanowski, in

3   addition?

4          MR. BOJANOWSKI:  I don't have any further information.

5          THE COURT:  Sorry, it takes me a while, because of the    11:26:56

6   smaller print, but it looks like 13 is next at Yuma; is that

7   correct?

8          MR. BOJANOWSKI:  13 appears to me to be compliant,

9   unless I'm missing one.

10          THE COURT:  83 percent.                                    11:27:11

11          MR. BOJANOWSKI:  Oh, I'm sorry, all the way at the

12   end, Yuma.  Yes, you're correct.

13          THE COURT:  In this performance measure, are chronic

14   care and psychotropic medication renewals completed in a manner

15   such that there is no interruption of lapse in medication.        11:27:22

16          Basis for noncompliance, until recently, the stop date

17   report concerning medication renewals were sent only to the

18   FHA.  The FHA, however, was out on FMLA leave and therefore

19   other staff was not receiving necessary information on

20   medication removals.                                              11:27:43

21          The correction action plan, in mid April, PharmaCorr

22   added the Lead IC, chronic care nurse, and mental health nurse

23   to the distribution list, so they are now also receiving the

24   stop date report.  The FHA has also returned from FMLA leave.

25   The additional individuals receiving the stop date report will    11:28:01

91

1    provide further redundancy to ensure timely medication

2    renewals.

3            So this is another example where there's been a

4    problem because somebody wasn't there.  The concern that I have

5    with distributing it to a greater number of people for                    11:28:18

6    redundancy is that this is a frequent remediation tool, and one

7    wonders just how many tasks you can hang on one person.

8            I have this nightmare vision of these Smart Cards

9    ad infinitum hanging on somebody's neck because there's just

10   dozens of them.                                                           11:28:41

11           But anything that you wanted to say, Miss Kendrick?

12           MS. KENDRICK:  Nothing more, Your Honor.

13           THE COURT:  Mr. Bojanowski?

14           MR. BOJANOWSKI:  No, Your Honor.

15           I mean, this is one of those measures that's been in             11:28:49

16   compliance for quite a long time system-wide.  So it just

17   appears as though that this was a situation where, in fact, it

18   just -- it just fell off for the one month at this facility.

19           I have 14 --

20           THE COURT:  14 at Eyman.                                         11:29:17

21           Are refills for chronic care -- are refills for

22   chronic care or requested by a prisoner between three and seven

23   business days prior to the prescription running out completed

24   in a timely manner such that there is no interruption or lapse

25   in medication.                                                           11:29:34

1          Eyman at 81 percent.

2          The reason for noncompliance, the monitor was unable

3    to attain requested information to assess compliance with this

4    measure.  Specifically, the monitor requested more information

5    from the FHA and the assistant FHA, however, at the time no FHA

6    was in place at the Eyman facility and the assistant FHA was

7    out on maternity leave.

8          Again, another example of failure to have the right or

9    appropriate number of people in place so that there is a

10   backup.

11         The correction action plan is, Corizon and the

12   Department of Corrections believe this is an isolated incident,

13   especially considering the facility's compliance with this

14   measure for the past 12 months.  Therefore, this facility will

15   continue to utilize existing practices and procedures, and

16   anticipates full compliance going forward.

17         All of that's well and good.  But the problem is, when

18   you have somebody leave, you shouldn't have this problem.

19   Because we're not in an environment where we can drop the ball.

20   And so you have to make sure there's somebody always there to

21   catch it.  And if you're stretched too thin, this happens over

22   and over again.

23         Anything you wanted to say, Miss Kendrick?

24         MS. KENDRICK:  Just since Your Honor was reading the

25   performance measure as it was written on the document into the

1  record, I would just note that it is –– does not have the words

2  "psychotropic medication" in it.

3       The performance measure as in the stipulation actually

4  says –– it's refills for chronic care or psychotropic

5  medications requested by a prisoner.                          11:31:03

6       THE COURT:  Thank you, I appreciate that.

7       Mr. Bojanowski, anything?

8       MR. BOJANOWSKI:  I don't have anything further to add.

9       THE COURT:  All right.

10      MS. KENDRICK:  15 at Eyman.                               11:31:23

11      THE COURT:  15 is, are inmates who refuse prescribed

12  medication, or no show, being counseled by a QHCP after three

13  consecutive refusals?

14      And Eyman in April has 78 percent.

15      Goodness.  Somebody needs to read it other than I, or     11:31:44

16  just tell me what the ––

17      MR. BOJANOWSKI:  The problem is, they're just not

18  completing the documentation, Your Honor.  And it primarily

19  focused on the counseling portion of the documentation, that

20  was missing.  And so as a result the department found them     11:32:02

21  noncompliant because that –– that last portion was not in

22  the –– in the paperwork.

23      THE COURT:  I wish I had the chance to have in my head

24  just currently the previous explanations for this one that has

25  been lagging for a long, long time.                           11:32:29

1        Anything you wanted to say, Miss Kendrick?

2        MS. KENDRICK:  Well, Your Honor, as one of the

3   exhibits that plaintiffs presented this morning with

4   Miss Headstream showed, ADC has taken the position when

5   monitoring that they'll count a record as compliant with this      11:32:46

6   so long as there's documentation that counseling occurred at

7   some point within 30 days after the third refusal.

8        There is absolutely nothing in the stipulation or

9   Monitoring Guide that says that there is a 30-day window to

10  complete the counseling.  And it is concerning because of the      11:33:05

11  fact that oftentimes if people are refusing chronic care

12  medications or psychotropic medications, the physical or

13  psychological decompensation will occur much more quickly than

14  30 days.

15       That also calls into question the accuracy of the            11:33:24

16  compliance numbers, and if compliance has been overestimated if

17  they're giving Corizon 30 days to get around to counseling

18  patients who have been refusing their psychotropic and chronic

19  care medication.

20       THE COURT:  Well, I wished you'd asked Miss Headstream        11:33:40

21  why -- or where she got this 30 days.  And if I were in your

22  shoes, if she said, well, I got it from someplace, I would have

23  said, well, as an RN do you think it's appropriate for somebody

24  to have 30 days to address a refusal to have prescribed

25  medication?  I think I'd rather have that cross-examination       11:34:00

1   argument.

2          But again, you know, as we were going through all of

3   those exhibits, there were so many instances of that where I

4   thought, maybe it's coming later.  But I just couldn't keep

5   track of it myself.                                          11:34:15

6          But again, I don't know.  You can reurge it to the

7   Court to consider by filing a motion saying that this is an

8   inappropriate application of the performance measure, give the

9   defendants an opportunity to respond, and have the Court rule

10  on whether or not this 30 days is permissible.              11:34:36

11         But we lost an opportunity I think here today to

12  address it.

13         Anything you want to say on this one, Mr. Bojanowski?

14         MR. BOJANOWSKI:  No, Your Honor.

15         THE COURT:  All right.  So is it 19 at Lewis?        11:34:53

16         MR. BOJANOWSKI:  Yes.

17         THE COURT:  Perpetual inventory medications will be

18  signed off on the inmate's individual MAR.

19         Chronic failure here with respect to 70 percent.

20         Update as of June 1, on May 14 Corizon staff began   11:35:10

21  developing a written process concerning the use and handling of

22  clinic stock for inclusion in every stock binder.  Corizon

23  staff also began drafting a PowerPoint presentation concerning

24  the use and handling of clinic stock to be presented on every

25  yard at Lewis with a hands-on doc demonstration.  The        11:35:30

1   presentation will also be presented at the monthly staff

2   meeting.

3          On May 31st, 2018, Corizon inserted a step-by-step

4   compliance process into every perpetual inventory log binder,

5   and those binders were circulated to every unit at this          11:35:47

6   facility.

7          And so this didn't pan out.  Meaning, we wouldn't see

8   any result for April because this happened -- well, I

9   guess -- well, I guess we obviously wouldn't.

10          Additional training materials are continuing to be        11:36:04

11   revised and refined.  PowerPoint program.

12          And then Corizon, as of June 11, inserted a

13   step-by-step compliance process into every perpetual inventory

14   log binder, and those binders were circulated to every unit at

15   this facility.  Additionally, training will occur at staff       11:36:26

16   meetings on June 19, June 21, which will utilize the PowerPoint

17   created by Regional.

18          Miss Kendrick?

19          MS. KENDRICK:  There's nothing to add to what we've

20   said before about this performance measure.                      11:36:39

21          THE COURT:  Mr. Bojanowski?

22          MR. BOJANOWSKI:  Nothing to add, Your Honor.

23          THE COURT:  Same thing for Phoenix at 72 percent.

24          MR. BOJANOWSKI:  Correct.  I don't have anything --

25          THE COURT:  It's just that -- it's the puzzler how it     11:36:54

CV-12-601-PHX-DKD – June 14, 2018

1    is that the policies and procedures are identified at the

2    prison units where the measure fails.  And you just -- you

3    wonder why it is that this is a problem when they do it right

4    at other places.  It just doesn't seem to make sense to me.  If

5    you know how to do it, and it's been demonstrated for months          11:37:17

6    you know how to do it, why didn't you when you first had a hint

7    of this, that it wasn't working at the others, figure out what

8    was working at the place that you had success at and apply that

9    to the others.  I don't understand.

10          Is 24 at Lewis the next?                                       11:37:35

11          MS. KENDRICK:  Yes.

12          THE COURT:  Are emergency medical response bags

13   checked daily, inventoried monthly, and contain all required

14   essential items.

15          13 percent at Lewis.                                           11:37:55

16          The Corrective Action Plan is to continue to do a

17   daily check, and to have somebody have an administrative

18   assistant informing other people.  Again, holding more things

19   around their neck, or putting more Post-it notes on their desk.

20   And additional training.                                             11:38:16

21          Anything else you wanted to say, Miss Kendrick?

22          MS. KENDRICK:  No, sir, nothing.

23          THE COURT:  Mr. Bojanowski?

24          MR. BOJANOWSKI:  No, Your Honor, I have nothing

25   further.                                                             11:38:24

1        THE COURT:  Okay.  One of my favorites, yet again.

2        35.  For intersystem transfers, complex to complex,

3   are all inmate medications, KOP and DOT, transferred with and

4   provided to the inmate or otherwise provided at the receiving

5   prison without interruption?                                        11:38:43

6        So not only did we continue the trend -- the downward

7   trend here, but it's a significant drop off, down to 72

8   percent.

9        And it goes on for pages.  The efforts that have been

10  tried to deal with this in the past.  And then at the end of      11:39:04

11  many, many pages we come down to an update as of June 11th.

12       When an inmate was transferred between facilities,

13  medications traveled with the inmate.  Upon arrival at the new

14  facility, the inmate and the medications were initially brought

15  to complex medical.  If the inmate had no medical need at that    11:39:22

16  time, he was brought to the housing yard.  However, his

17  medication remained at complex medical.

18       Additionally, the assistant FHA was tracking

19  compliance with this measure daily, but she went on maternity

20  leave in April.                                                   11:39:36

21       Well, that's not a great explanation for something

22  that has been failing for all but one month -- no, all but

23  three months in the last year.

24       But again, if that's the explanation as to why it

25  failed in April, it's another highlight of what I've been        11:39:53

1   talking about, that there's no redundancy in the system that

2   needs to have redundancy to make sure that people's lives are

3   not lost or serious injuries.

4          Let's see here.  Health care delivery facilitator for

5   the facility was hired and started at the facility on June          11:40:21

6   11th.  This person will track this measure going forward.

7          I hope that in addition to tracking, that the person

8   actually does something to make sure that what's identified as

9   a problem here doesn't happen anymore.

10         Anything else you want to say, Miss Kendrick?          11:40:38

11         MS. KENDRICK:  No, sir.  We'll be at Eyman next week,

12   so hopefully we can get some more information on this.

13         THE COURT:  Mr. Bojanowski?

14         MR. BOJANOWSKI:  I don't have anything further,

15   Your Honor.          11:40:49

16         THE COURT:  All right.  The same measure at Lewis, 82

17   percent.

18         Is it 39?  Is that next?

19         MS. KENDRICK:  Well, it's just for Lewis at 35.  It's

20   a different action plan that seems to involve custody staff.          11:41:21

21   But it looks very similar to the one that was previously

22   submitted in February.

23         THE COURT:  A lot of words but no action -- or no

24   results.  How's that?

25         39.  Are routine provider referrals being addressed by          11:41:51

1    a medical provider and referrals requiring a scheduled provider

2    appointment being seen within 14 calendar days of the referral.

3            And Eyman at 66 percent, dropping off from 76 percent.

4            And the basis for the noncompliance, the provider

5    assigned to complex medical went on medical leave in mid April.        11:42:18

6    Additionally, a provider assigned to one of the housing yards

7    was out.  As a result, there was less availability for provider

8    referrals.

9            Also, the Assistant Director of Nursing was scheduling

10   referral appointments outside of the 14-day window.                    11:42:35

11           Again, you'd think that that can only happen by

12   somebody who doesn't know because they haven't been trained,

13   and maybe they haven't been there long enough.  But, again,

14   this is another basis given of having people on leave and out.

15           And the Corrective Action Plan is, the Assistant          11:42:52

16   Director of Nursing at issue has been transferred to a

17   different role.  Another ADON is in the process of being put in

18   place.  Additionally, the provider that was out has returned,

19   and the provider that was on medical leave is scheduled to

20   return on June 12, 2018.                                                11:43:07

21           Again, you can't have a system where people leave and

22   the health care isn't delivered.  There needs to be redundancy,

23   there needs to be backup.

24           Anything you want to say, Miss Kendrick?

25           MS. KENDRICK:  Just that this is a perfect                      11:43:24

UNITED STATES DISTRICT COURT

1   illustration of the problem that the Court's expert Mr. Millar

2   highlighted, about how the providers are spread so thinly.  And

3   this would be an example of where the proposed recommendation

4   of developing a regional provider pool might address these

5   sorts of problems and keep them from happening.                    11:43:42

6            THE COURT:  Good point.

7            Mr. Bojanowski?

8            MR. BOJANOWSKI:  I have nothing further, Your Honor.

9            THE COURT:  39 at Lewis, 81 percent.

10           Corizon and ADC will continue to utilize the same        11:44:04

11   Corrective Action Plan as set forth in the May 2018 update.

12           They're rolling out a more robust onboarding training

13   program for nursing staff.  This plan was implemented in March

14   included all new nurses attending a three-day intensive

15   training program.                                                 11:44:24

16           So it was performed in March.  And the result in April

17   is a decrease from 82 to 81 percent in April.  So it doesn't

18   look like it worked.  But nevertheless, Corizon and ADC will

19   continue to utilize the same Corrective Action Plan even though

20   it didn't work.                                                   11:44:45

21           Anything you want to say, Miss Kendrick?

22           MS. KENDRICK:  No, sir.

23           THE COURT:  Mr. Bojanowski?

24           MR. BOJANOWSKI:  No, sir.

25           THE COURT:  So at Yuma, 78 percent.                       11:44:57

1          This is a falloff from a site that had been performing

2     in this performance measure.

3          A new provider began training on May 15th.

4          Well, goodness me, that's the reason that we have a

5     falloff.  Again, another example of what happens when you don't        11:45:14

6     have enough staff to provide the redundancy that's necessary.

7          Performance Measure 40, are urgent provider referrals

8     being seen by a medical provider within 24 hours of the

9     referral.

10          And Eyman is at 50 percent, an increase from 14        11:45:34

11     percent in March.

12          And the update as of June 11, the sample size of this

13     performance measure is very small, leading to large percentage

14     fluctuations if a limited number of patients are not seen

15     within the 24-hour time frame.        11:45:54

16          Again, my reaction there is, well, if this is a small

17     sample size because there's a small number of people who meet

18     the need for this, since it is an established need and

19     performance measure, that would maybe seem like the problem

20     should be easier, because you don't have so many people that        11:46:10

21     you have to provide this to.

22          But the Corrective Action Plan is, approval by a

23     nursing supervisor will be required prior to writing an urgent

24     referral in order to ensure the condition is truly urgent.

25          When I read this I was a little bit alarmed that you        11:46:26

1  had people who seem to be genuinely fairly hardened, meaning

2  that there are a lot of bad things happening with the health of

3  inmates at the yard.  And if the nurse says that it's urgent,

4  the idea that you have to have a supervisor saying, is this

5  really urgent -- I mean, I haven't seen many examples of          11:46:52

6  overreactive or catastrophizing nurses on the front line.  They

7  seem in a fair number of cases to be completely appropriate and

8  in a fair number of cases seem to be rather blind to obvious

9  problems right in front of them.

10         Anything you want to say, Miss Kendrick?                   11:47:11

11         MS. KENDRICK:  Well, again, we definitely share the

12  concern that nursing supervisors have to get involved before

13  urgent referrals will be written and made.  You know, that they

14  can't rely upon the training and judgment of the nurse.

15         The issue of the sample size being small, it's            11:47:29

16  something that we've heard repeatedly with some of the

17  performance measures.  And there's -- we have two responses to

18  it.

19         First, what you said, that if there's a small sample

20  size, then it should be manageable and it should be known to     11:47:45

21  everybody.  If there's only three urgent referrals at an entire

22  institution in a month, everyone should know about that.

23         The second thing is, small sample size cuts both ways.

24  You know, we have some performance measures where people are

25  repeatedly at 100 percent because there was only one patient.    11:48:02

1          So it is what it is, a small sample size.  It cuts

2     both ways.  So that in and of itself doesn't justify and it's

3     not an excuse for noncompliance.

4          THE COURT:  And just by further explanation of why

5     it's appropriate to take a look at what's happening with          11:48:23

6     respect to the actual patient experience, that is the only way

7     for the Court to be able to have any window at all to whether a

8     concern that's raised in the response for remediation proposal

9     to have supervising nurses verifying that the front line nurse

10    who says this is urgent is really identified something that is   11:48:48

11    urgent and not crying wolf.

12         And so we find oftentimes, as also the State's doctors

13    have found oftentimes, that when they drill down into the

14    medical records they find things that are disquieting to them.

15    And so we cannot consider these performance measures in          11:49:11

16    isolation of what's actually happened with patient care.

17    Because that patient care is what is the goal here, but also it

18    informs whether or not we should take a pejorative view of this

19    remedial measure that's been proposed of having a second

20    evaluation of whether something's truly urgent or not.           11:49:34

21         MS. KENDRICK:  Well, and we would just also note, the

22    concern that if the nursing director is not there because the

23    position is vacant, the person is on FMLA leave, the person is

24    on vacation, the person is sick, whether the line nurse would

25    have the authority and ability to make that urgent referral, or  11:49:51

1    if the response is, well, my supervisor isn't here, so I guess

2    I can't make an urgent referral.  That would be another example

3    of the lack of redundancy and the vacancies adversely affecting

4    patient care.

5            THE COURT:  Well, I mean, what you just said would be        11:50:09

6    part of what I think a plaintiff's case would be in a 1983

7    case.  If somebody died because the rule was, we had to have a

8    supervisor and there was no supervisor available to say that

9    this urgent referral shouldn't be treated as urgent.

10           MS. KENDRICK:  Well, yes, I agree, Your Honor.              11:50:26

11   But --

12           THE COURT:  I'm not dismissing what you're saying.

13           MS. KENDRICK:  No, no, I'm just saying, we don't want

14   to wait for our clients to die before ADC takes this seriously.

15   It shouldn't take our clients dying or a 1983 case for them to    11:50:38

16   do the right thing.

17           THE COURT:  Right.

18           Anything you want to say, Mr. Bojanowski?

19           MR. BOJANOWSKI:  No.

20           THE COURT:  Please tell me which the next one is.          11:50:49

21           MS. KENDRICK:  42 at Eyman.

22           THE COURT:  Thank you.

23           So Eyman is at 51 percent.  June 11.  A recent -- oh,

24   this is the software glitch again.

25           Anything else you wanted to say, Miss Kendrick?            11:51:13

1          MS. KENDRICK:  No, sir.

2          THE COURT:  Mr. Bojanowski?

3          MR. BOJANOWSKI:  No.  This is the other one that we

4  had mentioned.

5          THE COURT:  And it also does include as part of the          11:51:29

6  corrective action plan, regional medical director will conduct

7  training for providers at the June 14, 2018 regional provider

8  meeting on this issue.

9          42 at Florence, the same thing, with a 72 percent.

10          Lewis 66.                                                    11:51:52

11          Curious again how it is that Perryville doesn't seem

12  to be subject to the software glitch.  I don't understand that.

13          44.  Are inmates that are returning from an inpatient

14  hospital stay or ER transport with discharge recommendations

15  from the hospital having the hospital's treatment               11:52:25

16  recommendations reviewed and acted upon by a medical provider

17  within 24 hours.

18          So this has been great.  January, 56 percent.

19  February, 43 percent.  March, 40 percent.  April, 23 percent.

20          Update is June 11, 2018, one provider was on vacation    11:52:45

21  and another one was on FMLA in April, leaving fewer providers

22  to review hospital recommendations.  Additionally, some

23  providers were failing to properly document justifications from

24  hospital recommendations.

25          This is a performance measure that the Court has said    11:53:02

1    matters, because if you have somebody who has dealt with

2    someone who has been in the hospital, they're obviously very

3    sick.  And you have people who are caregivers there who have

4    made a plan, and if you don't consider that plan and act upon

5    it, any common sense analysis would say that's a great risk.          11:53:21

6    Because these people are just emerging from the hospital.

7            Anything you wanted to say, Miss Kendrick?

8            MS. KENDRICK:  No, sir.

9            THE COURT:  Mr. Bojanowski?

10           MR. BOJANOWSKI:  No, Your Honor.                               11:53:36

11           THE COURT:  So this one is another one for the hash

12   mark on people missing.

13           Florence, is that the next one?

14           MS. KENDRICK:  Yes, sir.

15           THE COURT:  54 percent, a drop from 74 percent.               11:53:51

16   Before that it was 43.

17           Corrective Action Plan, it says that there was not

18   documentation.

19           Again, this is hard to believe that there isn't

20   documentation about this, because this is one that the Court         11:54:10

21   has been addressing for a long time, and that documentation was

22   addressing only some of the recommendations.  Again, that's

23   really hard to accept that people who are told that they have

24   to document a deviation from the recommendation or

25   acknowledgement of the recommendation, they are not responding      11:54:25

UNITED STATES DISTRICT COURT

1    to all of them.

2          The Corrective Action Plan, the facility is

3    interviewing a candidate to serve as the health care delivery

4    facilitator.  Once hired and on board, that person will be

5    responsible for tracking this performance measure daily.        11:54:39

6          And the Smart Cards are also identified here.

7          Anything you want to say, Miss Kendrick?

8          MS. KENDRICK:  No, sir.

9          THE COURT:  Mr. Bojanowski?

10         MR. BOJANOWSKI:  Nothing beyond what we've laid out      11:54:49

11   here.

12         THE COURT:  Okay.  If I were sticking around in this

13   case I would say that the color that you use on the bar graphs,

14   you should use the red for where you're noncompliant, and green

15   for where you are, rather than just changing the color every    11:55:16

16   box for no rhyme or reason.

17         Performance Measure 46, are medical providers

18   reviewing the diagnostic report, including pathology reports,

19   and acting upon the reports with abnormal values within five

20   calendar days of receiving the report at the prison.           11:55:36

21         Phoenix is at 81 percent.

22         And the explanation is that the new Phoenix Medical

23   Director began on April 15th and began reviewing this measure

24   daily for compliance.

25         Again, another hash mark for change, rollover,           11:55:53

1    turnover, new people.

2            Anything you want to say, Miss Kendrick?

3            MS. KENDRICK:  No, sir.

4            THE COURT:  Mr. Bojanowski?

5            MR. BOJANOWSKI:  No, Your Honor.                    11:56:07

6            THE COURT:  Is it 47 at Eyman?  Is that the next one?

7            MS. KENDRICK:  Yes.

8            THE COURT:  Thank you.

9            Are medical providers communicating the results of the

10   diagnostic studies to the inmate upon request within seven      11:56:22

11   calendars days of the date of the request.

12           76 percent at Eyman.

13           And the explanation for the continued failure, nurses

14   continue to be hesitant to provide inmates with printed

15   diagnostic results.  Moreover, nurses are hesitant to provide   11:56:43

16   diagnostic results without interpretation, because interpreting

17   results is outside the scope of the nurse's practice.

18           As a result, upon receiving an HNR for diagnostic

19   results, nurses have been scheduling diagnostic appointments

20   for the provider to interpret and communicate the diagnostic    11:56:59

21   results, but these appointments sometimes fall outside the

22   seven-day window.

23           And I suspect they fall outside the seven-day window

24   because there aren't enough providers to do it.  And I suspect

25   we really can't fault the nurses for thinking this, because a   11:57:14

1   nurse who is presented with an abnormal diagnostic result and

2   an inmate who wants to know what that means, would naturally

3   think, I think you should be entitled to hear what that means

4   from somebody who is competent to talk to you about it.

5          So I'm going to put this one in the continued hash     11:57:30

6   mark of not having enough people to do the right job.

7          Anything you wanted to say, Miss Kendrick?

8          MS. KENDRICK:  No, sir.

9          THE COURT:  Mr. Bojanowski?

10         MR. BOJANOWSKI:  No, Your Honor.                        11:57:40

11         THE COURT:  So at Lewis, 68 percent.

12         Corizon and the Department of Corrections will

13  continue to utilize the May 8th, 2018 Corrective Action Plan

14  noted above.  This is Smart Cards.

15         Anything you wanted to say, Miss Kendrick?             11:58:16

16         MS. KENDRICK:  We certainly hope the May results show

17  improvement with the Smart Cards being used.

18         THE COURT:  Mr. Bojanowski?

19         MR. BOJANOWSKI:  We hold that same hope, Your Honor.

20         THE COURT:  All right.  47 at Phoenix, 67 percent.     11:58:27

21         The sample size for this performance measure was

22  extremely small.  The one that was counted as noncompliant was

23  due to a nurse that delivered and reviewed the diagnostic

24  results with the inmate, but did not leave a paper copy of the

25  diagnostic results with the inmate.                           11:58:56

111

1          Two weeks ago, that nurse received education on the

2     requirement to give the inmate a paper copy of the diagnostic

3     results.

4          And then Smart Cards.

5          Anything you wanted to say, Miss Kendrick?                          11:59:06

6          MS. KENDRICK:  No, sir.

7          THE COURT:  Mr. Bojanowski?

8          MR. BOJANOWSKI:  Your Honor, I'd just mention that --

9     and I know the sample size was three files.  And it was my

10    understanding that this one was being reviewed.  So this        11:59:17

11    preliminary result may change.

12         THE COURT:  On the ones where you've noted that you've

13    had the review in the written report -- or that you have a

14    review ongoing and that the results may change, are there any

15    that you do have additional information now?                    11:59:39

16         MR. BOJANOWSKI:  I do not.

17         THE COURT:  Okay.

18         MR. BOJANOWSKI:  When they're under -- when they're

19    being reviewed, Your Honor, the monitors are going back and

20    looking at the documentation again.                             11:59:49

21         THE COURT:  It's just that I think that there were

22    times where --

23         MR. BOJANOWSKI:  Yes, there were several.

24         THE COURT:  -- you said that you'd have it by the

25    15th, which I guess is tomorrow.                                12:00:00

1          MR. BOJANOWSKI:  Yes.

2          And I can't remember which ones those were, but I

3   remember there were several, or maybe two, that I said that we

4   had not yet completed and didn't have a preliminary on.

5          THE COURT:  Let me check in with the court reporter          12:00:15

6   and also with counsel.

7          It looks to me like we're within striking distance of

8   finishing the status report.  I wonder, could you give us

9   another 15 minutes?

10         COURT REPORTER:  Of course.

11         THE COURT:  Is that all right with you, Mr. Struck?

12         MR. STRUCK:  Yes.

13         MS. KENDRICK:  Yes.

14         THE COURT:  Which is the next one, please?

15         MS. KENDRICK:  PM 49 at Eyman.                              12:00:40

16         THE COURT:  Thank you.

17         MR. BOJANOWSKI:  I think this is one of the ones that

18  I just mentioned, Your Honor, that is currently being reviewed.

19  So the --

20         THE COURT:  So it's at 75 percent, previous month it       12:01:00

21  was --

22         MR. BOJANOWSKI:  Well, I'm not sure that that --

23         THE COURT:  Well, we're saying, at least.  I'm just

24  wondering what the -- if it's a one off that's evident from

25  previous months, then you would be inclined to spend less time    12:01:14

1    on it now and wait until you had the final number.

2           But you were at 75, as preliminarily reported for

3    April, and at 66 for March.  And there were five compliance

4    months previous to that, but then really poor performance

5    before that.                                              12:01:36

6           So we'll have to follow it.

7           Is the same true for 57 at Phoenix?

8           MR. BOJANOWSKI:  Yes.

9           THE COURT:  All right.  That is looking like it could

10   be a one off.  But again, I say that because I've got        12:01:57

11   this -- who was the witness who said she's an optimist?

12          MR. BOJANOWSKI:  Erin Barlund.

13          THE COURT:  Yeah, I tend to want to be an optimist

14   too.  But the truth of it is, the idea that there are one offs

15   in this really doesn't exist, because every time it's not an  12:02:18

16   explanation that would be that it's just a failure to note

17   something that really was a fact.  It usually is an actual

18   failure of the performance measure.

19          So 49 at Tucson?  No.  So 49 at Tucson, is that the

20   next one?                                                 12:02:42

21          MR. BOJANOWSKI:  Yes.

22          THE COURT:  Okay.  This is the people who provider

23   requests for specialty services is denied, are the inmates

24   told.

25          And so in Tucson it's 67 percent.  It's been       12:02:56

1    marginally compliant previously.  But again, the basis for

2    noncompliance, two new providers were hired on February 12 and

3    April 9 to replace other providers that left the facility.

4         So this is not an additional person, this is just

5    replacement.                                              12:03:19

6         These two new providers did not fully understand the

7    steps needed to ensure compliance with this performance

8    measure.

9         Again, I continue to think that if people are working

10   shoulder to shoulder with people who know what they're doing  12:03:29

11   and they have time to lean over and look at the other person's

12   work and say, how do you do that, what do you do, what's the

13   right way, then you don't run into this problem.  But if

14   everybody is in a mad dash to try to get work that's beyond the

15   human capability of individual people, that doesn't happen.   12:03:44

16         Anything you wanted to say, Miss Kendrick?

17         MS. KENDRICK:  No, sir.

18         THE COURT:  Mr. Bojanowski?

19         MR. BOJANOWSKI:  No, Your Honor.

20         MS. KENDRICK:  51 at Eyman is the next one.           12:03:54

21         THE COURT:  Thank you.

22         MS. KENDRICK:  78 percent.

23         THE COURT:  Are routine consultations being scheduled

24   and completed within 60 calendar days of the consultation being

25   requested by the provider.                                 12:04:07

UNITED STATES DISTRICT COURT

1          And Eyman is at 78 percent.

2          And the basis for noncompliance, there were delays in

3    consultation reports being scanned into eOMIS for review.

4    Rather than being scanned the day they were received, it could

5    have taken a day or two to get them scanned in.  Providers were          12:04:23

6    not aware that the scan was not done on the same day it was

7    received.  As a result, some consultations were scheduled

8    outside the compliance window, despite being scheduled within

9    60 days of the scan date.

10         Well, obviously the scan date really doesn't matter.          12:04:37

11         And then two clinical coordinators were hired to, in

12   part, assist with this performance measure.  One clinical

13   coordinator started in May and the other starts at the end of

14   June.  Moreover, an administrative assistant will be

15   responsible for scanning in consult requests when received.          12:04:53

16         Additionally, Corizon Regional is developing statewide

17   training on compliance for this measure that should be rolled

18   out by the end of June.

19         Miss Kendrick?

20         MS. KENDRICK:  We don't understand what the -- why the          12:05:05

21   receipt of consultation reports has anything to do with

22   scheduling and completing the encounters with the specialist,

23   because the consultation report is what comes in after the

24   patient actually goes and sees the specialist and the

25   appointment is completed.          12:05:21

1          This performance measure has to do with the time from

2     when the yard provider submits a request to Utilization

3     Management asking to send somebody to a specialist, Utilization

4     Management approves it, it gets scheduled, the person gets sent

5     out, and they get seen by the specialist within 60 days.          12:05:37

6          The consultation report would be the very last step in

7     the process and outside the context of this performance

8     measure.  The scanning consultation reports has to do with

9     Performance Measure 54, which is the timeliness of the review

10    of the reports.                                                   12:05:56

11         THE COURT:  I gather you don't know whether or not

12    this was a typo or whether it's a complete erroneous

13    non sequitur?

14         MR. BOJANOWSKI:  I honestly do not know the answer to

15    that, Judge.  I don't want to make a misrepresentation.          12:06:08

16         THE COURT:  Can you find out and file a notice with

17    the Court?

18         MR. BOJANOWSKI:  We can do a supplemental report on

19    PM 51 at Eyman, so that I can --

20         THE COURT:  So --                                            12:06:19

21         MR. BOJANOWSKI:  -- clear that up.

22         I know that it was dealing -- my notes indicate that

23    this was an optometry issue and use of on-site optometry.  And

24    the documentation, I understood, was not being scanned in to

25    show that the appointment was actually completed.                12:06:37

1              So not that it was being scheduled, as Miss Kendrick

2     indicated.

3              So I'm going to have to circle back and do a

4     supplemental on this one.

5              MS. KENDRICK:  Well, if you go down to Yuma, that's at       12:06:55

6     page 164 and 165, that's the one where it had to do with

7     something related to optometry consults.

8              But as Miss Edwards testified, you know, they

9     recently had deemed optometry to not fall within the 14-day

10    time frame and she had to resubmit them with the 60-day time       12:07:15

11    frame and rescan them.  So that may be what this is referring

12    to.

13             But Eyman doesn't say anything about optometry.

14             MR. BOJANOWSKI:  My notes indicate at my meeting at

15    Eyman that it was based in optometry.  So that's what          12:07:28

16    I -- that's what was discussed at Eyman.  So I'll have to

17    circle back, Your Honor.

18             THE COURT:  So on Monday when you do this additional

19    filing, maybe you can let us know about the ones that you will

20    get the results on the 15th of June, but also update on whether   12:07:41

21    this is correct or not.

22             So you alluded to 51 at Yuma.  That's at 81 percent?

23             MS. KENDRICK:  Yes, sir.

24             THE COURT:  Anything you want to say in addition on

25    that?                                                          12:08:03

———— CV-12-601-PHX-DKD — June 14, 2018 ————

1          MS. KENDRICK:  No, sir.

2          THE COURT:  Mr. Bojanowski?

3          MR. BOJANOWSKI:  No, Your Honor.

4          THE COURT:  Then Performance Measure 52, at Eyman 61

5   percent.  This is after 84 percent.  So that was an improvement          12:08:13

6   of the previous month at 58 percent.  But really we have been

7   in the cellar on this measure for a long time.

8          Basis for noncompliance was reported as June 11, 2018.

9   There were delays in consultation reports being scanned in

10  eOMIS for review.          12:08:40

11         So this is the same problem, do you think, that we

12  have to have an update on?

13         MS. KENDRICK:  No, that seems like -- that seems more

14  appropriate for this performance measure, that that would be

15  the root cause.          12:08:53

16         THE COURT:  So you think that's maybe what this

17  language was taken and inappropriately plugged in in the

18  previous one?

19         MS. KENDRICK:  Correct.

20         THE COURT:  Anything further you wanted to say on this          12:09:09

21  one?

22         MS. KENDRICK:  No, sir.

23         THE COURT:  Mr. Bojanowski?

24         MR. BOJANOWSKI:  No, Your Honor.

25         THE COURT:  Same thing with respect to 52, I gather,          12:09:14

1    at Florence, which is at 60 percent?

2                MR. BOJANOWSKI:  Correct.

3                MS. KENDRICK:  Next one we saw was Performance Measure

4    66 at Florence at 50 percent.

5                THE COURT:  Thank you.                                  12:09:42

6                MR. BOJANOWSKI:  You said 66?

7                MS. KENDRICK:  That's the next one I saw.

8                MR. BOJANOWSKI:  Okay.

9                THE COURT:  So 50 percent.  Are medical provider

10   encounters occurring at a minimum of 72 hours for IPC inmates.     12:09:54

11        And the basis for noncompliance, providers are doing

12   rounds every 48 hours to ensure compliance.  However,

13   encounters for inmates that are at other appointments when the

14   rounds occur require additional scheduling, which has caused

15   encounters to be delayed beyond the 72-hour window.                12:10:18

16        It's unclear to me what that really means.  Is it the

17   inmates who are subject to this performance measure who are at

18   other appointments, or is it other inmates who are at other

19   appointments?

20        The Corrective Action Plan is, the facility is             12:10:36

21   interviewing a candidate to serve as the health care delivery

22   facilitator.  Once hired and on boarded, that person will be

23   responsible for tracking this performance measure daily.

24        Tracking sounds after the fact on this one.  I just

25   wish there would be somebody hired to get the job done.           12:10:49

1          Miss Kendrick?

2          MS. KENDRICK:  Nothing to add, sir.

3          THE COURT:  Mr. Bojanowski?

4          MR. BOJANOWSKI:  Your Honor, I can report that there

5     were ten files reviewed here.  There were a total of 99 rounds          12:10:59

6     complete -- 99 total rounds involved.  92 of them were

7     completed.  But because of the way it's scored, if you miss one

8     round on a file, the whole file is deemed noncompliant for the

9     month.

10          So I can report that 92.93 percent of the rounds were          12:11:22

11    completed, but because of those misses, once, that ended up

12    with five files being noncompliant out of the ten.

13          THE COURT:  So these are people who are sick enough to

14    be in the infirmary at the prison.  It doesn't seem to be

15    expecting too much to think that every single one of them          12:11:48

16    should have a rounding every 72 hours.

17          MR. BOJANOWSKI:  Yes.  This is a provider rounding,

18    Your Honor.

19          THE COURT:  Right.  I understand.

20          MR. BOJANOWSKI:  I know there's nurse rounding that          12:12:03

21    goes on at the same time.

22          THE COURT:  Again, these are sick people.  And that's

23    why the performance measure calls for it.

24          MR. BOJANOWSKI:  Exactly.

25          MS. KENDRICK:  The next one appears to be Measure 67          12:12:14

1    at Tucson at 80 percent.

2            THE COURT:  This is, in an IPC, do registered

3    nurses –– do registered nurses will conduct a document?

4    There's a word missing, I guess.

5            Document an assessment at least once every shift.    12:12:43

6    Graveyard shift assessments can be welfare checks.

7            80 percent, an increase from 40 percent in March.  In

8    February was 80.  And then before that the previous two months

9    was at 72 months (sic).

10           This was the result of a residual issue with the       12:13:01

11   nursing staff not conducting assessments at least once a shift.

12           Again, it's just really surprising how it is that we

13   still have this problem when we've addressed it previously and

14   seem to get compliance, and then somebody just didn't remember

15   that you had to do this?  Again, you can only think that that   12:13:21

16   can happen in really two situations:  One, people have too much

17   work otherwise to do, they can't do this.  Or two, they didn't

18   know they were supposed to do it.

19           And both of those, I think, relate to turnover in

20   staffing and redundancy issues.                                12:13:36

21           Anything else you wanted to say, Miss Kendrick?

22           MS. KENDRICK:  No, sir.

23           The next one appears to be Performance Measure 72 at

24   Eyman at 42 percent.

25           THE COURT:  Do inmates who refuse prescribed diets for  12:13:57

UNITED STATES DISTRICT COURT

1   more than three consecutive days receive follow up nutritional

2   counseling.

3          And the Corrective Action Plan -- or the basis for

4   noncompliance, one Assistant Director of Nursing was on

5   intermittent FMLA leave throughout April and another Assistant          12:14:16

6   Director of Nursing left the Eyman facility.

7          So I can put that on my list of issues associated with

8   staffing.

9          The Corrective Action Plan is, the food service

10  liaison is sending out weekly reminders to ensure compliance            12:14:33

11  with this measure.  In addition, the medical records

12  department has been trained to conduct quality assurance on

13  this measure.

14         Anything you wanted to say, Miss Kendrick?

15         MS. KENDRICK:  No, sir.                                          12:14:47

16         THE COURT:  Mr. Bojanowski?

17         MR. BOJANOWSKI:  Your Honor, I see that's a

18  significant drop off.  I mean, this has been at 100 percent

19  level since September of 2017.

20         THE COURT:  Once you figure it out and how you get it           12:14:58

21  going, I think it would be reasonable to think that it

22  would always be --

23         MR. BOJANOWSKI:  We certainly --

24         THE COURT:  -- compliant if you didn't have people who

25  weren't there who didn't know they were supposed to do it when         12:15:06

1    it was always done successfully.  And then they're there, and

2    they don't have that historical knowledge how it was supposed

3    to be done or how to do it well.

4            MS. KENDRICK:  We didn't see any other ones.

5            THE COURT:  Okay.  Thank you.                          12:15:26

6            Anything else we need to address?

7            MS. KENDRICK:  Just, Your Honor, with regards to next

8    week and going on the tour, we would like to have you come at

9    8:00 o'clock at the Florence Central Administrative Building.

10   We can obviously work with counsel for defendants and          12:15:47

11   Miss Herrera about any other logistical things.

12           THE COURT:  8:00 a.m. at the Florence Central

13   Administration Building.

14           And to answer the question that was asked yesterday,

15   Miss Brown and Miss Selzer will accompany me.                  12:16:01

16           MS. KENDRICK:  Okay.

17           THE COURT:  Thank you all very much.

18           MR. STRUCK:  Your Honor, there was one other thing I

19   wanted to address, and it was with respect to something that

20   occurred I think on the June 1st hearing when you had Mr. Acedo  12:16:12

21   here, and you were -- it was an issue that you were very upset

22   about.  So that's why I wanted to bring your attention

23   to -- and it's something in the record that the Court may not

24   be aware of.

25           If you recall, you asked Mr. Acedo whether there was   12:16:30

1   anything ever on the record in which he thought that you were

2   randomly selected to be the mediation judge in the case.

3           THE COURT:  Right.  You're going to cite to me where I

4   said that I don't honestly at this moment recall.

5           MR. STRUCK:  That's correct.                          12:16:47

6           THE COURT:  When I was on the bench at that moment I

7   did not recall.  But when I thought about it more afterwards, I

8   did.  And I remembered exactly how it happened.  But as not to

9   be a surprise, at the moment of that time when I said that on

10  the bench I didn't know.                                      12:16:59

11          I would think -- and you can tell Mr. Acedo this, that

12  if you have a record that includes a statement of a judge

13  saying that he does not recall, perhaps that's not the time to

14  say that the judge was wrong.  It's probably fair to say the

15  judge did not recall.  But to say that he was wrong when he    12:17:16

16  says he doesn't recall, that's still a misstep in my view.

17          MR. STRUCK:  Okay.

18          MR. FATHI:  Your Honor, I beg your pardon.

19          This is apparently the last time we will be together

20  in this courtroom.  And so we thank you for the time and effort 12:17:33

21  and energy you have devoted to this case over the last four

22  years.  We thank you for the patience that you have shown with

23  all of us.  And we wish you well in this next chapter of your

24  life.

25          THE COURT:  I thank you for that.                     12:17:51

UNITED STATES DISTRICT COURT

CV-12-601-PHX-DKD – June 14, 2018

1          Thank you all.

2          MR. STRUCK:  And we do as well.

3          THE COURT:  Okay.  Thank you kindly.

4      (Proceedings concluded at 12:17 p.m.)

5

6                          -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV-12-601-PHX-DKD – June 14, 2018

1

2

3

4                    C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 18th day of June,

15   2018.

16

17

18                               s/Candy L. Potter_____
19                               Candy L. Potter, RMR, CRR

20

21

22

23

24

25