UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CV-12-0601-PHX-DKD |
| vs. | ) ) ) | Phoenix, Arizona June 13, 2018 1:15 p.m. |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their Official capacities, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

_____)

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING – P.M.

(Pages 117 through 223)


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    A P P E A R A N C E S

2    For the Plaintiffs:

3              Prison Law Office
               By: CORENE KENDRICK, ESQ.
4              1917 5th Street
               Berkeley, CA  94710

5
               ACLU – Washington DC
6              By: DAVID C. FATHI, ESQ.
               915 15th Street NW, 7th Floor
7              Washington, DC  20005

8              Eidenbach Law PC
               By: KIRSTIN T. EIDENBACH, ESQ.
9              P.O. Box 91398
               Tucson, AZ  85752

10
               Arizona Center for Disability Law – Phoenix, AZ
11             By: ASIM DIETRICH, ESQ.
               5025 East Washington Street, Suite 202
12             Phoenix, AZ  85034

13   For the Defendants:

14             Struck Love Bojanowski & Acedo PLC
               By: TIMOTHY J. BOJANOWSKI, ESQ.
15                 RACHEL LOVE, ESQ.
                   DANIEL STRUCK, ESQ.
16             3100 West Ray Road, Suite 300
               Chandler, AZ  85226

17
     Also Present:
18
               B.J. Millar
19             Rene Sobolewski
               David Long
20

21

22

23

24

25

1                                    **INDEX**

2     SUMMARY OF COURT PROCEEDINGS                              PAGE:

3     B.J. Millar Presentation                                   132

4

5

6

7                          INDEX OF WITNESSES

8     WITNESSES FOR THE          Direct     Cross     Redirect
      DEFENDANTS:

9
      TAYLOR, Nicole                                  120
10    HEADSTREAM, Vanessa         185

11

12

13                          INDEX OF EXHIBITS

14    EXHIBIT NO.:         DESCRIPTION:               RECEIVED:

15       663        Exemplar source documents for monitoring
                       of Performance Measure 47                 221
16       664        Exemplar source documents for monitoring
                       of Performance Measures 50-52             221
17       665        Exemplar source documents for monitoring
                       of Performance Measures 53-56             221
18       680        eOMIS records for Joseph Roberts, #318330    132

19

20

21

22

23

24

25

                  **UNITED STATES DISTRICT COURT**

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
TAYLOR - REDIRECT

1          THE COURT:  Mr. Millar, I see you and your team are

2    here.  I welcome you.  We know we're scheduled to start with

3    you at 1:30.  I expect that there's another 20 minutes of

4    redirect with a witness that will take us to 1:35.  I hope

5    that's probably not too much of an imposition.

6          MR. MILLAR:  It is not.  Where would you like us in

7    the court?

8          THE COURT:  Tell you what.  It won't be distracting to

9    any of us for you to do what you need to do, so you can be

10   wherever you'd like to be.  We'll just pretend that you're

11   those set designers on the Japanese theater who wear black and

12   everybody says, oh, we don't see them or that we make them

13   swing signs, and then we pretend we don't see them.

14          Dr. Taylor, if you'd please return to the witness

15   stand.

16       NICOLE TAYLOR, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

17               CONTINUED REDIRECT EXAMINATION

18   BY MS. LOVE:

19   Q.  Dr. Taylor, on cross-examination you were asked questions

20   about suicide watches and whether or not you utilize or look at

21   the observation records that are filled out by security

22   personnel, correct?

23   A.  Correct.

24   Q.  The observation records, are those filled out by

25   correctional personnel?

TAYLOR - REDIRECT

1   A.  That is correct.

2   Q.  Do you know what kind of information the correctional

3   personnel put on the observation records?

4   A.  There are a number of codes that they can pick from that

5   describe what the individual is engaging in when they do their

6   checks, and so there's an alphabet, A through Z, let's say.

7   And it describes are they standing, sitting, sleeping.  And so

8   they just put those codes down next to the time slot.

9   Q.  The medical personnel or -- I'm sorry.  The correctional

10  personnel are not doing any sort of medical assessment on the

11  inmate; is that correct?

12  A.  That is correct.

13  Q.  Are they doing any sort of mental health observation?

14  A.  No, they are not.

15  Q.  Is that why you do not use those in the course of

16  monitoring the mental health performance measures?

17  A.  Correct.  They would not be useful in the monitoring

18  process.

19  Q.  If you could turn to Exhibit No. 248, which is in evidence.

20          I have an additional copy if it's helpful.

21          THE COURT:  I'm sorry.  Pathetic, isn't it?  There it

22  is.  Thank you very much.  Thank you.

23  Q.  (BY MS. LOVE)  Exhibit 248, which is in evidence and for

24  which you were asked questions about, is the CGAR findings for

25  the Phoenix complex in July of 2015, correct?

UNITED STATES DISTRICT COURT

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
TAYLOR - REDIRECT

1    A.   Correct.

2    Q.   And you were asked questions regarding, towards the bottom,

3    an indication of whether or not a -- and it's the highlighted

4    portion at the bottom of Page 2 -- talking about a mental

5    health psychiatrist's scheduled staff member was actually an

6    RN.  Do you remember being asked questions about that?

7    A.   Yes.

8    Q.   And is -- Which CGAR question or performance measure is

9    this related to, if you know?

10   A.   These findings are related to Performance Measure 5 that

11   talk about whether or not the record is accurate and

12   chronological.  And these were findings against Phoenix for not

13   being what appears to be accurate.

14   Q.   So the questions you were being asked were actually

15   findings of non-compliance; is that correct?

16   A.   That is correct.

17   Q.   And is performance or CGAR question number five something

18   that you or the two persons that work with you monitor for the

19   mental health performance measures?

20   A.   No, we do not.

21   Q.   Exhibit No. 117, this is already in evidence upon

22   cross-examination.  Do you remember being asked on

23   cross-examination questions regarding the -- at Page 3 of

24   Exhibit No. 17, the e-mail from Dennis Dye regarding

25   performance measures marked in blue at the Tucson complex?

CV-12-0601-PHX-DKD – June 13, 2018 P.M.
TAYLOR – REDIRECT

1    A.  Yes, I do.

2    Q.  And in your testimony earlier upon cross-examination you

3    were being asked questions about issues related to these

4    performance measures.  And I believe that you were trying to

5    explain what the issue at hand was.

6    A.  Correct.

7    Q.  What was the issue at hand?

8    A.  The issue during the May CGARs down in Tucson was the fact

9    that the nursing staff were running their nursing lines and not

10   seeing the mental health HNRs on their nurses' line.  They

11   would take those and hand those off to the psych associate or

12   psychologist who worked on that yard.  And so they weren't

13   using the proper methods that had been put into place.  And so

14   although that covers almost all HNRs for mental health, the

15   emergent ones would then be outside of time frames because they

16   were typically then seen the next day outside of those 24

17   hours.

18           So I personally went down and met with the staff down

19   there and talked to them about the fact that they need to be

20   seen on the nurses' line just like any other HNR and handled

21   the same way and then handed off to mental health after they're

22   checked in with; make sure they're doing okay; make sure

23   there's no issues going on.

24   Q.  And the way that this was occurring back in June of 2017

25   where the HNRs were being handed off to the mental health team,

UNITED STATES DISTRICT COURT

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
TAYLOR - REDIRECT

1   those were resulting in findings of non-compliance?

2   A.   Correct.

3   Q.   Do you know whether or not this -- that issue that was

4   present back in June of 2017 at the Tucson complex has been

5   addressed?

6   A.   Well, looking at just their most recent results for April,

7   they're at a 96 percent.  So it does seem to be resolved and

8   has been for quite some time.

9   Q.   Next I'd like for you to look at Exhibit 681, which is in

10  evidence.

11  A.   Okay.

12  Q.   And you were asked questions today both on direct

13  examination and as well as cross-examination regarding

14  discrepancies that may occur in the records as to whether the

15  type of encounter was by a psychiatrist, whether that was

16  performed by somebody other than a psychiatrist.  Do you

17  remember testifying about that subject?

18  A.   Yes.

19  Q.   If you would turn your attention to Page 2 of Exhibit 681,

20  and my question for you is whether or not this example of a

21  condensed health services encounter is a document that for the

22  mental health performance measures you would use in conducting

23  your monitoring.

24  A.   We would review any such note like this to ensure

25  compliance.

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
TAYLOR - REDIRECT

1    Q.   Now, do you see at the top right in the first box at the

2    top right it says type, and then it says

3    MH-psychiatrist-unscheduled?

4    A.   Correct.

5    Q.   Now, if you see a type of encounter such as this,

6    MH-psychiatrist-unscheduled, are you looking on the source

7    document to see which or what kind of staff member performed

8    this encounter?

9    A.   Always.

10   Q.   And are you able to tell by looking at this exemplar source

11   document whether or not the coded type of encounter, mental

12   health-psychiatrist-unscheduled, was actually performed by a

13   psychiatrist?

14   A.   Correct.  Yes, we are.

15   Q.   How would you be able to tell that?

16   A.   So where it says the staff name, if it was a staff that was

17   unknown to me, I would simply go back to our mental health

18   roster that we are provided that has all mental health staff,

19   their position, and their credentials.  And I would compare it

20   to that to ensure the correct person was doing the contact that

21   they say they're doing.

22   Q.   And if there is an encounter made by, for example, in this

23   instance, an RN, but the type of encounter noted is a

24   psychiatrist unscheduled encounter, would that count as

25   compliance on a performance measure?

UNITED STATES DISTRICT COURT

TAYLOR - REDIRECT

1   A.   No, it would not be used.

2   Q.   And when you say it would not be used, what do you mean?

3   A.   We would disregard this note as occurring.   It is not an

4   encounter that we would use for any sort of compliance.   And so

5   I would simply print it out and bring it to the outbrief.

6   Q.   And why would you print it out and bring it to the

7   outbrief?

8   A.   To use those outbriefs to educate them on any issues we're

9   seeing.   Again, they may still be in compliance.   Psychiatry

10  saw this individual in compliance.   That's not the point

11  though.   Yes, you saw the person in compliance, but these are

12  notes that we don't want to continue to have happen.

13          So I print them out, give them to the DON:   The staff

14  member has again, you know, done this; please address that with

15  any such individual.

16  Q.   And in addressing this issue on your outbriefs, did you

17  ever conclude or make any conclusions regarding why it may

18  occur that a record might say a record type of a psychiatrist

19  unscheduled, yet the staff member entering it is an RN?

20  A.   We've talked about it during the CGAR outbriefs, and the

21  two notes are right next to each other.   And as soon as they

22  inadvertently click the wrong note type, they can't change it.

23  They can't close the note.   They can't do anything.   When they

24  do recognize that, a number of staff will write note opened in

25  error and then go back and open the correct one.   But they

TAYLOR – REDIRECT

1    can't delete it.   They can't do anything once they've clicked

2    that button of the note type.   And so as they're going down the

3    dropdown menu, they accidentally click the wrong one even if

4    they recognize that they can't fix that.

5         So we've talked about putting in some sort of

6    safeguards in eOMIS that those just aren't available because

7    right now the whole dropdown menu is available to them.

8    Q.   You were also asked questions on cross-examination

9    regarding whether or not eOMIS is going to pick up entries that

10   are late entries.

11   A.   Correct.

12   Q.   If you could turn to Exhibit No. 680, which has been marked

13   for identification, take a look at 680.

14   A.   Okay.

15   Q.   And 680, for the record, is six pages long.   And take the

16   time you need to look through it, but if you can tell me

17   whether or not you recognize what Exhibit No. 680 is.

18   A.   So this is a health service encounter that's not condensed.

19   So this is the full view that obviously takes up a number of

20   pages when you do it in this format.   But this is how it would

21   look on the screen prior to clicking condensed view.

22        And so this is a contact by Dr. Khilnani in April of

23   2018.

24   Q.   And where did this -- At what complex did this encounter

25   occur?

TAYLOR - REDIRECT

1    A.  At the Lewis Complex.

2    Q.  Now, if I direct your attention to Page 1 of

3    Exhibit No. 680 and the very top left in the first box under it

4    says encounter, header, there is a date, and it says April 16th

5    of 2018 and then an end date of April 17th, 2018.

6            If you saw, for a health services encounter that had a

7    date and then an end date, it's not both saying April 16th of

8    2017 or both saying April 17 of 2018, does that alert you to

9    any concern regarding this encounter?

10   A.  Yes.  The -- Having them one day apart indicates to us that

11   they were done the following day, and the date changed to be

12   consistent with when the encounter happened.  If you don't

13   change that date, you're going to end up with a medical record

14   that is chronologically out of order.  And so changing the

15   first date moves it into the correct slot.  The second date

16   tells you when that was completed.

17   Q.  And when you say the second date tells you when it was

18   completed, what do you mean by when it was completed?  What was

19   completed?

20   A.  The end date would be when the provider or clinician went

21   into eOMIS and put the note into eOMIS.

22   Q.  So does this then show you that the encounter date was

23   April 16th, but the note was actually not closed out till the

24   17th?

25   A.  Correct.  So the encounter was done on the 16th at 10:06,

TAYLOR - REDIRECT

1    and then she went and completed her documentation on the 17th

2    at 7:00 in the morning.

3    Q.   Is there any way within eOMIS to verify or check that there

4    isn't any attempt to create an inaccurate medical record with

5    regards to when this contact actually occurred?

6    A.   Yes.   I was sharing that upon cross that on the screen

7    there's a button that says -- and I'll read it off -- status

8    change history.   And when you click on that button, which

9    cannot be modified in any way by any of the staff, it shows

10   exactly when it was opened and when it was closed.   So they

11   can't change the date of when they opened up the encounter.

12   They can only change when the encounter occurred.   But they

13   cannot make any adjustments.

14          And so on Page 6 -- I think you said it was 6 --

15   that's what would show to us, is that's the status bar that

16   pops up that shows us when it was opened and when it was

17   closed.   I can tell she opened it on the 7th at 7:00, and she

18   finished doing the treatment plan at 7:03.

19   Q.   Okay.   So looking at Page 6 of Exhibit 680, it shows status

20   4-17-2018.   It says closed.   And if you follow that over to the

21   right, there's then a category for last updated.   It also says

22   4-17 of 2018 at 7:03:17.

23          Then if you go to the second line, it's 4-17-2018

24   open.   Read that over, and the time is 7:00:17.

25          How does that information lead you to conclude that

TAYLOR - REDIRECT

1    there was no attempt to be inaccurate in the date that things

2    were being reported here?

3    A.  So on the end date on the note, it is consistent with the

4    end date and time that is in the status bar.  And, again, on

5    the status bar they cannot adjust that.  That's time stamped by

6    the computer.  And so there is no ability to adjust that.

7    That's part of the computer's system.

8           The only adjustment can be made to the encounter when

9    they're changing here's when this happened, here's the time

10   that it happened, because it can be very important to know

11   chronologically what happened.

12          It's really hard to read notes that an hour after

13   another event happened it says this event happened, and when

14   you're reading, it doesn't make sense.

15          So you really need the note to go chronologically in

16   order, but you may not be chronologically writing it with your

17   peers as they're writing their notes.  And so they can't hide

18   that.  And, you know, as needed, we'll look those up if we have

19   concerns about anything, about whether it was put in, when it

20   was put in.  The status change history button cannot be altered

21   by the staff.

22   Q.  Dr. Taylor, at the beginning of the cross-examination you

23   were asked by plaintiffs' counsel whether or not you had

24   reviewed the testimony of Dr. Robertson.  And I believe that

25   you said that you had reviewed his transcript of testimony; is

TAYLOR – REDIRECT

1   that correct?

2   A.   That is correct.   I was recalling that I may have reviewed

3   some of it, but I actually was in the courtroom during his

4   testimony.

5   Q.   And do you know which hearing Dr. Robertson's testimony was

6   associated with?

7   A.   The OSC hearing.

8   Q.   Have you ever attempted in any of the proceedings here in

9   this case to sit in the courtroom and coach a witness who is on

10  the stand?

11  A.   No, I have not.

12  Q.   Have you ever knowingly mouthed words to a witness on the

13  stand in an attempt to influence their testimony?

14  A.   No, I have not.

15  Q.   Or made any gestures?

16  A.   No, I have not.

17  Q.   During the course of proceedings, have you ever had

18  conversations, while a witness was testifying, with counsel

19  that you may be sitting near during the proceedings?

20  A.   Yes, I have.

21          MS. LOVE:   Thank you, Doctor.   No further questions.

22          THE COURT:   Thank you, Doctor, very much.   Appreciate

23  it.

24          THE WITNESS:   Just leave these here?

25          THE COURT:   Yes, that's fine.

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
MILLAR PRESENTATION

1        Thank you, Mr. Millar.  Thank you, Ms. Love, for

2   staying within the time limit.

3        MS. LOVE:  And, Your Honor, I did forget to move into

4   evidence Exhibit No. 680, which is the last exhibit that we

5   were looking at.

6        THE COURT:  Any objection to 680?

7        MS. KENDRICK:  No, sir.

8        THE COURT:  680 is received.

9        MS. LOVE:  Thank you, Your Honor.

10       THE COURT:  Thank you.

11       All right.  Mr. Millar, thank you so much for your

12   patience.  We've turned off the projector by pressing a button

13   that --

14       MS. LOVE:  Would you like me to attempt?

15       THE COURT:  Yes, please.  Thank you.

16       MS. LOVE:  It says on, so we'll try it.  Power's on.

17       THE COURT:  The button that I pressed was to the right

18   of that button in the middle.

19       MS. LOVE:  I feel like I should -- if Corene wants to

20   be here.

21       MS. KENDRICK:  If we can go off the record for a

22   second.

23       MS. LOVE:  Here we go.

24       THE COURT:  Thank you very much.

25       MR. MILLAR:  It looks like we may need somebody to log

UNITED STATES DISTRICT COURT

MILLAR PRESENTATION

1    into this computer.

2             THE CLERK:  Wait a minute.

3             MR. MILLAR:  We'll hook directly to one of our

4    laptops.

5             We'll have Ms. Sobolewski clean it up.  She had a

6    number of things open for me to reference.

7             THE CLERK:  Will your laptop link into what we have up

8    here?

9             MR. MILLAR:  We believe so.

10            THE CLERK:  I sent Sarah an e-mail.

11            THE COURT:  So the problem is that you can't get to

12   that screen through some computer interface?

13            THE CLERK:  It looks like it's coming up.

14            MR. MILLAR:  We believe it will come up right here.

15   We've usually run off the court laptop, but it was logged out.

16            THE COURT:  Got it.

17            MR. MILLAR:  Does that have it showing on all the

18   screens now?

19            Are we ready to begin?

20            THE COURT:  Yes, please.

21            MR. MILLAR:  What we have is the materials that were

22   sent out last week.  This final slide deck presentation is

23   broken into two parts.  The first part we'll go over will be

24   the summary and findings from the surveys and the interviews,

25   and then we'll go into what we would term our final deliverable

MILLAR PRESENTATION

1    piece of this, which will show the themes, the challenges, the

2    findings, recommendations.

3            I think the one question I would ask up front:  We had

4    sent out information last week.  We had received one, I think,

5    question back about one of the comments, but were there any

6    other concerns we need to be aware of before moving forward, or

7    we'll just take them as they come?

8            THE COURT:  Not from me.

9            MS. KENDRICK:  Just one question.  On Page 8, when you

10   listed the data sources, you listed Corizon monthly hour

11   reports, and it said you use from January to June, 2017, but I

12   believe it was through December.  What did you ultimately use?

13           MS. SOBOLEWSKI:  It was through December.

14           MR. MILLAR:  It was December.

15           MS. SOBOLEWSKI:  They were all the same.  The budgeted

16   hours were all the same.  So we used the Kronos data for the

17   hours, for the actual clinical hours, but we used, for the

18   staffing numbers, it was through December, but all the monthly

19   ones were the same.

20           MS. KENDRICK:  Thank you.

21           MR. BOJANOWSKI:  Did you just want questions before

22   you get started?  Is that what you're --

23           MR. MILLAR:  Just if there were any overall concerns

24   that we need to be aware of before we get into it.  And if you

25   have any questions at certain parts, we can take them at that

MILLAR PRESENTATION

1    stage as well.

2         MR. BOJANOWSKI:  Okay.

3         MR. MILLAR:  So as we look at our three major work

4    streams, this first section of our report out today is the

5    final portion of Work Stream II, which is the interviews of

6    current and past ADC or Corizon employees.  So that is the

7    information that we'll go through first.

8         We utilize two methodologies to gather this

9    qualitative data.  This is, again, reminder, it's a third stool

10   of the quantitative data and the benchmarking data.  We did

11   phone interviews of current and former employees, and we went

12   through and looked at the list of these employees, and we came

13   up with a request for 36 potential interviewees.  We tried to

14   make this across the facilities and across the different

15   provider types to get a good example and cross-section.

16        We then worked closely with the Corizon staff to

17   facilitate interviews with their current employees.  And then

18   we were given contact information to reach out via e-mail and

19   direct telephone contact to the former employees to attempt to

20   schedule phone interviews that endured from, I think, 15 to

21   maybe 40 minutes in length.

22        Of those 36, 16 were current employees; 20 were

23   former.  We were able to complete 13 interviews in total during

24   a two-week period.  Nine of those were current employees.  Four

25   of them were former employees.

UNITED STATES DISTRICT COURT

MILLAR PRESENTATION

1          That's about in line with what we expected, knowing

2    that reaching the former employees would be difficult, and it

3    was at their disposition to speak with us, to do so.

4          But Corizon, the Corizon staff, were very helpful in

5    trying to facilitate that contact and following through with us

6    and worked very closely.  And I think -- Rene, correct me if

7    I'm wrong -- but I believe that there was a Corizon

8    representative that sat in on all of the current employee

9    interviews.

10         MS. SOBOLEWSKI:  Yes, all of the current employee

11   interviews but none of the former.

12         MR. MILLAR:  But none of the former employee

13   interviews.

14         MR. LONG:  Jennifer Finger, associate counsel, sat in.

15         MR. MILLAR:  So Jennifer Finger, associate counsel for

16   Corizon, sat in on the nine current employee interviews.

17         The second modality that we used then was a surveying

18   tool.  It's a technology called SurveyMonkey.  It's a Web-based

19   kind of point and click that allows us to send out an e-mail

20   link to have the employees link in or click in to do that.

21         This link was distributed via e-mail to 171 current

22   employees, including medical and behavioral providers, health

23   directors, physicians, NPs, PAs, psychiatrists, psychologists,

24   the mid-levels, and the psych associates.

25         I think that there were several reminders sent out to

MILLAR PRESENTATION

1    try to get responses to this.  We had a 39 percent response

2    rate; 67 total responses; 24 of them medical providers; 43 of

3    them behavioral health.

4            The survey questions and the blinded results are

5    included in totality in the appendix of the written report.  So

6    it's actually the reports that come out of this technology tool

7    so that they're there for reference or for the court record.

8            Before I move into some of the findings and results,

9    any questions about the methods, modalities, or the folks that

10   we contacted?

11           MR. BOJANOWSKI:  The survey link didn't involve

12   nursing staff or CNAs, anything like that?

13           MR. MILLAR:  It did not.  It was restricted to the

14   medical positions that we had been working with in our other

15   analysis, so provider class from psych associates upward.

16           MR. BOJANOWSKI:  And how did you come up with 171

17   employees for SurveyMonkey out of the thousand employees that

18   are employed with Corizon?

19           MR. MILLAR:  I believe these were -- this was the

20   current number of employees at the job titles that we

21   requested.  So we submitted to Corizon that we wanted all of

22   the current e-mail addresses for the employees in this

23   category, medical and behavioral providers, health directors,

24   et cetera.  So we did not select from the overall employee list

25   of Corizon.  We provided the employee position or class, and

MILLAR PRESENTATION

 1    they provided us with the list of 171.

 2            MR. BOJANOWSKI:  I see.

 3            MS. KENDRICK:  With regard to the 36 interviews that

 4    you requested, did Corizon pick those 36 people?

 5            MR. MILLAR:  They did not.  My team picked those from

 6    the data records that we had.

 7            MS. KENDRICK:  And do you have any idea why there was

 8    only nine of the current employees responded?

 9            MS. SOBOLEWSKI:  They were able to sign up for an

10    interview spot.  We really had no other way to be able to

11    schedule them.  So we had people that essentially opted in to

12    interview, and there were multiple requests back out.  This was

13    through Corizon or associate counsel, multiple requests back

14    out.  We received only nine, and a couple of them cancelled and

15    were not rescheduled.

16            MR. MILLAR:  So I believe that one of the challenges

17    was the time frame we were working under.  We had about a

18    10-day to 14-day window.  I think we probably also have some

19    scheduling issues that we were trying to schedule these

20    fairly -- pretty much during a working day.  We tried to give

21    some extended hours, but there may have been some shift issues

22    as well.

23            MS. KENDRICK:  We're also a little concerned that the

24    Corizon general counsel insisted on sitting in on these

25    interviews with current employees, given the nature of the

MILLAR PRESENTATION

 1    subject matter.  That's not noted in the summary report at

 2    Page 18.

 3             And, you know, it states at the bottom of Page 18 that

 4    the level of job satisfaction for current employees that was

 5    reported was significantly higher.  And we're just concerned

 6    that the willingness of current employees to be forthcoming

 7    might be compromised by the presence of general counsel in

 8    those interviews.

 9             And so we would just think that that needs to be

10    clearly disclosed in the report that the general counsel for

11    Corizon sat in on those phone interviews, because they weren't

12    anonymous, therefore, and there would be concerns about people

13    being fully candid and honest with the interviewer.

14             MR. MILLAR:  Okay.  We will make sure that's noted in

15    the corrected version of the final report.

16             First we'll look at the breakdown of the phone

17    interviews that were completed.

18             The first table on the left shows the facilities that

19    the employee phone interviews represented.  We were able to

20    secure at least one interview from all facilities with the

21    exception of the Phoenix facility.

22             Then on the right-hand side you'll see a breakdown of

23    the -- of the phone interviews by provider type.  Again, our

24    attempt here was to see that -- to ensure that we had at least

25    coverage from all, if not the majority of the sites and the

MILLAR PRESENTATION

1    positions.

2            In the very bottom right-hand side you have just a pie

3    chart that breaks out just the distribution that shows that 60

4    percent of the phone interviews were conducted with current

5    employees and then the 40 percent with former employees.

6            Questions regarding this distribution or this

7    information?

8            MR. BOJANOWSKI:  Your phone interview chart doesn't

9    match your report on the previous page.  You have 15 people

10   listed there, and I thought you said you did 13 interviews.

11           I thought you had a total of 13, and now you're

12   listing 15 on your breakdown.

13           MR. MILLAR:  Do we have folks that worked at two

14   facilities, or is there --

15           MS. SOBOLEWSKI:  No.  We put primary facility.  There

16   was a phone interview that was scheduled with a former

17   employee, and she ended up sending us document review and said

18   she didn't have time for a phone interview but basically

19   outlined everything that was her concern.  So I may have added

20   that to the list of facilities but not added this.

21           MR. MILLAR:  That would cover one.  Do we know what

22   the other will be?

23           We will validate that number and correct it.

24           MS. KENDRICK:  And I have a question.  I notice that

25   there's zero people interviewed from the Phoenix facility.  Do

MILLAR PRESENTATION

1    you know how many from Phoenix you asked to speak with?

2            MS. SOBOLEWSKI:  There were at least one to five, I

3    would say, from each facility.  I can validate that if you

4    would like further information.

5            MR. LONG:  We did request it.

6            MS. KENDRICK:  You requested from each one?

7            MS. SOBOLEWSKI:  Yes, from every facility and

8    physician to get mental and behavioral health from each.

9            MR. MILLAR:  As we went through the data and reviewed

10   this with the team, we started looking first and foremost at

11   position types, and we began to look at our facility profiles

12   where we thought that there was information that we needed

13   insights from to respond.  So some of the facilities had a

14   heavier weighting of requested interviews.

15           Others, then, we tried to balance them with the

16   position type and the location.  But I believe we had -- I

17   think we had at least two or three requests for each facility

18   across the types.  But we did not have a request for a medical

19   director and a physician at all ten of the facilities.  It

20   was -- It was parsed out based on some of the insights and

21   findings we had from the facility profile we had done.

22           MS. KENDRICK:  I have another question.  Last month

23   you had said that Corizon had asked you to not interview Angela

24   Fischer.  Were there any other current or former employees that

25   Corizon asked you to not interview?

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
MILLAR PRESENTATION

1      MR. MILLAR:  I believe that was the only one.

2      MS. KENDRICK:  Okay.

3      MR. BOJANOWSKI:  I also see in your chart under

4  provider type you list psychologists.  Are you considering

5  psychologists providers throughout your report?

6      MR. MILLAR:  Yes.  They are listed amongst all the

7  behavioral health providers that we are listing.

8      MR. BOJANOWSKI:  We don't believe they're providers.

9      MR. MILLAR:  Well, what I would refer back to is that

10 at the very beginning when we defined the titles and types we

11 were including in all of these, that was stated to the Court,

12 to all the parties that this was the methodology we were using.

13 These were the titles that we're using.  We could defer on

14 whether they are an actual provider or not.  But they have been

15 included from day one as the staff for providing behavioral

16 health services that have been included in the budget

17 compliance, in the benchmarking, and in the other elements that

18 we've been looking at.

19     MR. BOJANOWSKI:  Your Honor, can we have Dr. Taylor

20 perhaps -- No?

21     MR. FATHI:  Your Honor, may I address this?

22     THE COURT:  No.  We can continue.

23     Go ahead, Mr. Millar.

24     MR. BOJANOWSKI:  After conferring with counsel, it's

25 fine.  Go ahead.

UNITED STATES DISTRICT COURT

MILLAR PRESENTATION

1              MR. MILLAR:   Okay.   I mean, that is a question that we

2    do face of what constitutes the definition of a provider, but

3    as I've said, all along that's been the grouping that we've

4    had.

5              With the phone interviews, the findings were -- had

6    some interesting elements to them.

7              This table is arrayed with, at the top moving to the

8    bottom, more agreement between the current and former employees

9    at the top moving towards less agreement at the bottom in the

10   comments and findings that we had.

11             And so as we spoke with both of these sets of

12   employees, there was agreement around satisfaction with the

13   level of compensation.   All of them, both former and existing,

14   had at least a positive approach that we're using the thumb

15   signals here to give indications of their -- overall.   And,

16   again, this is not a quali -- this is not a quantitative thing

17   where we asked them to score it.   This is a qualitative

18   measurement from the responses and input that we had from them

19   and comments.

20             Equally they agreed around their dissatisfaction with

21   the EMR and its impact on their day-to-day work.

22             There was also agreement, which was a disagreement --

23   I shouldn't say that.   There was alignment with the sufficiency

24   in training and onboarding, that you had equal parts of both

25   existing and former employees.   Some thought it was sufficient.

MILLAR PRESENTATION

1    Some thought it was not sufficient.

2           And so we've seen other evidence that will be pulled

3    up in later slides that reflects that as well.

4           As we move down through the table, when we start

5    looking at adequate staffing and coverage, the current

6    employees were -- some felt it was sufficient, some not, but

7    all of the former employees stated that as a concern that they

8    had had and an issue with their employment.

9           Satisfaction with work hours and work environment,

10   current employees were generally positive about that, with

11   former employees having a negative view.

12          And then their ability to deliver adequate care,

13   again, was seen by current employees as sufficient or positive

14   and former employees as not so.

15          Questions here?

16          MR. STRUCK:  Just with respect to the adequate

17   staffing and coverage, there are issues here with respect to

18   vacancies.  So when the staff was asked questions, were they

19   asked questions with respect to if the positions were

20   completely filled, or were they just asked simply with the

21   staff that are boots on the ground that you've got is it

22   adequate?  Do you understand my distinction?

23          MR. MILLAR:  I do.  And the question was stated

24   generally was the staffing sufficient for you to -- was there

25   sufficient staffing and coverage for you to do your work?  We

MILLAR PRESENTATION

1    did not specify with or without vacancies filled.  It was a

2    very general response.  Is that correct, Rene?

3              MS. SOBOLEWSKI:  Correct.

4              MR. STRUCK:  Thank you.

5              MR. MILLAR:  And I believe that all of the -- Are the

6    questions included in the appendix materials for the report

7    out?

8              MS. SOBOLEWSKI:  I believe we have provided them.  I

9    don't know if they were in the appendix materials.  We can

10   definitely make sure we resend them.  They have been provided.

11   I would say, however, due to the nature of conversation, we're

12   not always following one, two, three, four, five, but we always

13   tried to hit these six topics.

14             MR. LONG:  I don't believe they were included in the

15   report, but they were sent out prior to the interviews.

16             MR. MILLAR:  And those questions were also -- yeah,

17   they were reviewed prior.

18             Okay.  As we move on then to the online survey, the

19   graphic you see to the left is essentially a screenshot of what

20   the screens look like that have the questions, so it's a fairly

21   straightforward survey that has a common answer type where

22   there's a question asking their disposition on something and

23   then five categories that they can rank it on where strongly

24   agree, agree, negative, disagree, or strongly disagree.  So

25   there's a weighting or a rating for this.

MILLAR PRESENTATION

1              Of the 171, if you look to the right, by facility or

2    complex, what you're seeing in the white bar is the number of

3    employees that this survey request was sent to at each of those

4    facilities.  So the Perryville complex, just under 30, and then

5    the gray bar shows the number of respondents, so 12.  And then

6    going down you can see that we got a fairly proportional

7    response given the size that was asked for those and where

8    those came from.

9              Due to the very small numbers at Winslow and Douglas,

10   we did not have any respondents from those two facilities on

11   the survey.

12             MR. BOJANOWSKI:  Not that I'm a math major, but I

13   think you only have 60 responses there, and you reported 67

14   total.  So I'm not sure that your graph is reflecting truly

15   what -- I'm assuming you got 67 since you reported it.

16             MR. MILLAR:  That is my assumption as well.  We will

17   double check that.

18             Okay.  Arraying then the respondent -- the responses

19   weighted by their level of agreement, generally speaking, what

20   we would say from these responses is there's a strong element

21   of agreement or satisfaction.  And the questions were crafted

22   such that way that if there was agreement, that the agreement

23   was representative of satisfaction.

24             Starting from the top to the bottom, though, we've got

25   those with areas where there is less satisfaction.  So in this

MILLAR PRESENTATION

1    benefits package section, what we also tried to do is use some

2    of the written comments that were allowed for at the end of the

3    survey with an open response to tie to these.  The benefits

4    package was the area that had the least amount of satisfaction

5    and/or the greatest amount of dissatisfaction.

6            Elements listed around this were the expensive

7    insurance premiums; inconsistencies with PTO, paid time off;

8    difficulty obtaining reimbursements for continuing education,

9    CE, or licensure requirements.

10           If we move down to the access to resources, similar

11   theme with a lack of educational resources, evidence-based

12   practice materials; comments about limited access to computers;

13   and then several comments around no dedicated space or space

14   for psych consults.

15           The third element around adequate training, again,

16   this is where we saw responses in the interviews one way or the

17   other.  Here as well we saw actually more agreement but some

18   dissatisfaction around training of individuals in leadership;

19   the amount of onboarding or training to start the job or

20   additional training opportunities.

21           Let me pause there for questions.

22           Again, because we had some open-ended -- an open-ended

23   question at the very end, we've included here some of the

24   quotes that came through that and I believe as well as through

25   some of the phone interviews.  Is that correct, Rene?

MILLAR PRESENTATION

1          MS. SOBOLEWSKI:  Just survey.

2          MR. MILLAR:  Okay.  These are just from the survey.

3   So these are direct quotes submitted with the survey.  Judge,

4   this was provided ahead of time.  I'm glad to read through

5   these.  If there are any questions, if the parties have

6   reviewed them, we can take questions.  Is there a preference?

7          THE COURT:  I don't think you need to read it.

8          MR. MILLAR:  Okay.  So then that was the final piece

9   of Work Stream II, which was essentially our gathering of the

10  qualitative data to augment the quantitative data that we had

11  been through.

12          That being said, then, what we'll be looking at for

13  the balance is to go through then the key findings, the

14  recommendation, and then, as we had spoken with you about last

15  month, we've identified a couple of areas that we think might

16  be areas for further explanation, things that were -- that came

17  to our attention that might be beyond the scope of what we were

18  doing or would be areas of further investigation if this were a

19  project that we were going to carry forward to look more deeply

20  at.

21          Again, the timeline for this project are beginning in

22  January, wrapping up at this point on June 13th.

23          And then this Work Stream III that we're doing now

24  which we'd call our final deliverable.

25          Slide number 14, I asked my team to put this together

MILLAR PRESENTATION

1    so that we could identify the component parts of all of the

2    deliverables that have been provided throughout this engagement

3    with the Court.

4            So beginning on February 27th, we had the first slide

5    presentation from the market profiles.  Then in April we had

6    the facility profiles with the corrected data.

7            On May 9th then we came with the analytical data, the

8    budget compliance, turnover, and compensation analysis.

9            Then in today's presentation we've gone through the

10   survey and interview results.  We'll be going through the final

11   recommendations.

12           And then we've also provided to the Court a Word

13   document that is a companion to the five slide decks that

14   contain additional information, some of the narrative that

15   would have been from our presentations that gives some

16   rationale and justification for the approaches we took.

17           And then in the appendix of that we've actually

18   included the totality of the prior five slide decks along with

19   survey results and several reference materials that we've

20   utilized.

21           Are there any questions about what constitutes what we

22   would call the deliverables for this engagement?

23           At the very highest level when we first began

24   conversations in the engagement here, I believe in my mind, if

25   I put it as succinctly as I can, the question was -- there was

MILLAR PRESENTATION

1    a question as to why the budgeted FTEs were not being fully

2    staffed.  There were some thoughts or questions or hypotheses

3    that it could be around compensation or something else.

4            So as we've approached this, that compliance to

5    meeting the budget of FTE staffing has been the primary thing

6    we've been -- we've looked to validate with the data and

7    discover any causes to that and to test the hypothesis of

8    whether or not compensation or lack of compensation might be a

9    contributor to the staffing challenges.

10           What we have seen overall -- and this is actually a

11   rolled-up number from all ten facilities together -- on the

12   compliance side I'll remind the Court that percentage

13   represents the percent of weeks for the 53 weeks in 2017 that

14   the staffed budget -- that, excuse me, that the budged staffing

15   was actually staffed.

16           And so for the medical providers, 57 percent of the

17   time they met that FTE requirement for budgeted staff.  For the

18   behavioral health providers, there was not a single week in the

19   53 for 2017 that across the system that that was met.

20           Primary contributors to that was the fact that two of

21   the locations did not have any weeks in compliance.  One other

22   had a two percent compliance, and one had a four percent

23   compliance.

24           So in rolling that up, it results in that zero

25   compliance number on the behavioral health side.

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
MILLAR PRESENTATION

1          The one exception I would note, I believe it's the

2     Yuma complex -- in the prior report that we've provided in the

3     appendix, you'll see where it has its individual breakout --

4     the Yuma complex or facility had 85 percent compliance of

5     behavioral health throughout the year.

6          It was the one site that did.  And that was primarily

7     because, as we look at the staffing profile, there was a -- was

8     it psychiatrist? -- there was a psychiatrist staff there for

9     almost the entire year but not budgeted there.  And so we don't

10    know if that's just a change in the budget and staffing and it

11    showed up as a data anomaly or not, but we call that to the

12    Court's attention.

13         The turnover element for this, though, seems to be at

14    least common in its magnitude across both the medical and the

15    behavioral health providers.  But what I will state is it's not

16    common across all facilities or even within facilities.

17         So there's some facilities that have much lower

18    turnover in one as opposed to the other, and others they may be

19    close to equal.

20         But across the board, a 40 percent turnover, you know,

21    is not ideal, although it's not unexpected, given the nature of

22    healthcare and other things.  As we said, the green target

23    would be something less than 25 percent, which would align much

24    more closely to what we see in a commercial setting, but that's

25    the magnitude and equal across both modalities.

UNITED STATES DISTRICT COURT

MILLAR PRESENTATION

1          The compensation element, which is one of the first

2     things that we were looking at hypothetically, at least by my

3     opinion, would not appear to be a strong contributor to the

4     staffing compliance challenges.  With the medical providers,

5     they are close to the 75th percentile of staffing across the

6     system.  There is some variation there, and we'll talk about

7     that in later slides.

8          With the behavioral health, they're above the 75th

9     percentile.  And, again, to remind the Court, as we talk about

10    percentiles, median would be what we consider the average pay

11    within a marketplace.  And so if you're looking to have either

12    very highly productive providers or you're trying to induce

13    providers to work in a less than desirable environment, you

14    would expect a higher level.  And so we are seeing that in at

15    least our benchmark comparisons.

16         Any comments or questions here?

17         MR. BOJANOWSKI:  I just wanted to clarify that the

18    turnover is -- Are you defining turnover as somebody just

19    leaving a facility?  I mean, does it include somebody who goes

20    from one facility to another facility but still works for

21    Corizon?

22         MR. MILLAR:  It does not.  These were people that were

23    either employed or contracted to Corizon and then left.

24         MR. BOJANOWSKI:  Totally left Corizon.

25         MR. MILLAR:  It's actually a separate count.  So we

MILLAR PRESENTATION

1    count how many people came into the Corizon system and then how

2    many left the Corizon system.

3                MS. SOBOLEWSKI:  The data, we have a start and term

4    date.

5                MR. MILLAR:  So if they moved from one facility to

6    another, they would not be reflected.

7                MR. BOJANOWSKI:  They would not be included in the

8    weight.

9                MR. MILLAR:  Correct.  These would be those --

10   turnover being defined here as those that left the system

11   entirely.

12               MR. BOJANOWSKI:  Okay.

13               MR. MILLAR:  So given everything that we have looked

14   at, analyzed, and collected to date, we grouped our findings

15   into three themes and have found evidence, both quantitative

16   and qualitative, to support these.

17               Granted, we have not done exhaustive, you know,

18   on-site work to develop all of these fully, but these align

19   with the findings and the analysis to date.

20               The first theme is the recruitment and retention is an

21   ongoing issue, and it results in the staff being stretched thin

22   to provide coverage for those vacancies.

23               Even if that's providing coverage within units within

24   their same facility from one yard to another or to other

25   facilities, we believe from the comments and things that we've

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
MILLAR PRESENTATION

1    seen, that that's being done to cover the backlogs that may be

2    generated elsewhere.  But in not backfilling where that other

3    provider is leaving, it creates additional backlogs from where

4    they are cross-covering from.

5           Also, I think we've identified that new employees

6    without prior experience in correctional medicine tend to be

7    more difficult to retain.  I think that's -- makes common

8    sense, but we've borne that out in the interviews and the

9    information we've seen.

10          Also, while the remote areas are difficult work

11   environments, those may also create barriers to recruitment

12   just because of the lack of qualified candidates to bring into

13   those areas.

14          The second theme we see is around training and

15   onboarding, is that there's some inconsistencies both across

16   facilities and across the provider types.  Again, our team

17   pushed pretty hard in some of the interviews because we're

18   hearing a very wide range of responses of the adequacy or the

19   effectiveness of the training.  So in multiple interviews, you

20   know, we noted those inconsistencies of the training and

21   onboarding.

22          This creates a difficulty with recruit -- We

23   understand that the difficulty of recruitment, if there's been

24   a longstanding vacancy, that that may create some pressure for

25   tight time frames to get newly found providers in place to fill

CV-12-0601-PHX-DKD — June 13, 2018 P.M.
MILLAR PRESENTATION

1    the vacancy, and this poses a threat to the sufficiency of

2    training and onboarding.

3            And then the third theme is that operational and --

4    there are some operational and benefits issues beyond

5    compensation we believe are impacting employee -- employee

6    engagement, morale, and effectiveness.

7            And so several of the comments that have been listed

8    there, even though they expressed satisfaction with their teams

9    on site, there were comments and elements that we observed that

10   they feel a disconnect with upper level management, to use a

11   broader general term, but a connection with a higher level of

12   supervision.

13           They've also cited a lack of compensation for call

14   coverage, minimal autonomy in determining courses of treatment,

15   an inability to use their PTO, as reasons for potential

16   dissatisfaction.

17           Questions around these themes?

18           MS. KENDRICK:  No questions from plaintiffs.

19           MR. MILLAR:  What I have following here now are a

20   handful of support slides for those themes.  It's a little bit

21   more detailed to drill down into them.

22           Once we go through this, then what we've done is we've

23   arrayed a series of nine recommendations that align with the

24   themes.

25           But as we look at the recruitment and retention as

MILLAR PRESENTATION

1    kind of a consistent challenge, as we look over the last three

2    years, that turnover rate calculation has varied between 30 and

3    as high as 42 percent across Corizon, again, for these

4    identified positions.  So this is not the broader Corizon

5    employee base.  These are those provider positions that we have

6    identified and been working with all along.

7            2017 appears that both the medical and the behavioral

8    health turnover rate has increased.  I don't know reasons for

9    that.

10           We believe some of the things we've identified through

11   the interviews is recruiting in rural parts of Arizona can be

12   difficult.  Providers indicate importance of hiring providers

13   with the right skill sets rather than any willing individual.

14   We recognize the challenges of filling those vacancies, and

15   that's not always the ideal.  Vacancies are difficult to fill

16   in a timely manner.

17           We've had comments anecdotally about the state's

18   process for approvals, authorizations, licensures, et cetera.

19   It was beyond the scope of our engagement to actually dig into

20   what those actually are but want to acknowledge that this may

21   not be an issue that's completely within the control of Corizon

22   or the ADC or even the applicant if there are some licensure

23   elements and things that might be addressed.

24           One thing we do note that Corizon has shown success in

25   bringing in locums tenens and then hiring them to full-time

MILLAR PRESENTATION

 1    positions.  And so trying to identify some of the best

 2    practices or elements that seem to be working.

 3              As we look at the bottom, these are raw numbers of

 4    hires and departures.  And this speaks a little bit to the

 5    question you had asked earlier, is what is included in this.

 6    This doesn't show anybody that's moving to a different system.

 7              The other thing that we have done, because initially

 8    the data that we received did not allow us to identify locums

 9    contractors that may be on short term.  They'd be hired and

10    leave within one year.  We excluded any individual that was

11    hired and left within 2017.  We did receive, towards the end,

12    some listings that showed us that the numbers that we excluded

13    would closely approximate what their locums were, but we did

14    not have the ability.

15              And so to not overinflate the numbers of hires and

16    departures, any individual that was hired and departed within

17    2017 calendar year was not included in the numbers on the

18    bottom graph.

19              What we do have, though, in the bottom right-hand

20    corner, when we look at retention, we did look at medical

21    providers and behavioral health providers who were not locums

22    providers that hired and left during the year.  And there were

23    five of them in the medical provider class and ten in the

24    behavioral health provider class.

25              So the way you could interpret that is under the 2017

MILLAR PRESENTATION

1    data where we had 38 additions and 24 departures, you could add

2    a ten to both of those numbers top and bottom that would

3    include those ten non-locums.  But, again, we were able to do

4    that in an isolated case to show 2017 but excluded those

5    numbers across the three years in order to not overly inflate.

6              Questions?

7              MS. KENDRICK:  No questions.

8              MR. MILLAR:  This was one of the elements where we

9    tried to find some data -- we tried to find data that could

10   demonstrate what we were hearing in some of the interviews, and

11   that's this concept of the staff feeling stretched thin,

12   stretched thin to cover vacation for their colleagues at the

13   same site or for working in multiple sites.

14             One thing that came to mind, though, is that we do not

15   believe that all of the cross-coverage that's happening is

16   accurately reflected in the Kronos data.  We can't confirm

17   that, but we believe that there's times when people can check

18   in, and it may be if they're coming from a district office or

19   someplace else, they stay with their primary facility, and we

20   can't necessarily tell if they are moving.

21             What we can tell through the data was that there were

22   23 percent of providers that worked in two or more facilities

23   throughout the year.

24             And so we know there's at least that level of

25   cross-coverage.

CV-12-0601-PHX-DKD – June 13, 2018 P.M.
MILLAR PRESENTATION

1          The other thing that we tried to do is we looked at

2     the facility profiles, and that's the element that we have, you

3     know, here on the bottom left.  These are the facility profile

4     charts that we had before that show the staffing by week.

5          And what it's pointing out is you can see where there

6     appear to be vacancies that are being covered by other

7     positions but may in fact create shortages in other areas.

8          So, again, this was something that I believe that the

9     pattern of staffing goes beyond the scope of what we were

10     doing.  We were not asked to opine on the delivery of the care

11     but the meeting of the budgeted FTEs.

12          And I think you'll see in one of our follow-on items,

13     this is an area we think may bear additional -- additional

14     investigation or analysis to determine both some positive and

15     negative benefits from that.

16          Questions here?

17          MR. STRUCK:  No questions.

18          MR. MILLAR:  Thank you.  What we've pulled up here is

19     two specific sites in Perryville and Florence where we got the

20     data regarding the onboarding and the training that seemed to

21     be equally split between it being agreed that it was good or

22     disagreed that it was not.  And you can see in Perryville with

23     the 12 -- 12 responses there, five disagreed with the

24     sufficiency of the training, five agreed, and two were neutral.

25          But then we broke it down to the positions to see if

MILLAR PRESENTATION

1    was this a medical provider issue, was this a behavioral health

2    provider issue, was it a mid-level issue.  And what we found,

3    it was not.  I mean, you've got physicians on both sides,

4    mid-levels on both sides, and behavioral health on both sides

5    as well.

6              The Florence complex, similar, four, four, and one, so

7    almost the same type of distribution.

8              And equally -- We do have in the disagreement here

9    behavioral health on both sides plus mid-level medical provider

10   on the other side.

11             Again, I cannot, Your Honor, tell you what the root

12   cause of this is, whether there was a certain time of the year

13   that this happened and the dissatisfaction was with a certain

14   group or not.  We can only show that there's a split in the

15   response to this question of I had sufficient training to be

16   successful in my role.

17             Questions regarding this element?

18             MS. KENDRICK:  So I just want to confirm you -- it was

19   outside the scope of the appointment, so you weren't actually

20   looking at or asking them what sort of training did you get to

21   try to dig down whether the reason they disagreed had something

22   to do with the type of training they did?

23             MR. MILLAR:  We were not.

24             MS. KENDRICK:  Okay.

25             MR. MILLAR:  I mean, the question we asked is -- the

MILLAR PRESENTATION

1    question was I had sufficient training to be successful in my

2    role.  I agree or disagree.  There are lots of different

3    elements that could weigh into that, but we did not dig deeper

4    into the cause for their response.

5           MS. KENDRICK:  Would you recommend that would be an

6    area for perhaps additional inquiry as to whether the type of

7    training they received or didn't receive impacted the response?

8           MR. MILLAR:  Yes.  I think as you see, our

9    recommendations -- I think we have two recommendations right

10   around the training programs and the way to approach that.  So

11   I don't think -- Our recommendation wasn't necessarily that

12   there needs to be more analysis around it, but you could

13   immediately have some improvements by some changes or

14   modifications in that program.

15          MR. LONG:  We did try to hit on training in

16   interviews, but I think most would agree that the relative

17   sample size is going to be not something to draw massive

18   conclusions from.  But I would say it was somewhat similarly

19   split in feelings towards adequacy and sufficiency of the

20   training.

21          MR. MILLAR:  This slide here speaks to the adequacy of

22   sufficient pay.  I think the one thing that we can acknowledge

23   is that there's a certain floor, that sufficient pay is the

24   floor to reaching recruiting success, retention, and

25   satisfaction.

MILLAR PRESENTATION

1          There are other things that will impact that.  The box

2     in the -- The gray box in the lower outlines some of those

3     beyond just my paycheck issues that were brought up.

4          One thing that I would point out here, though, is you

5     can see that on the behavioral health side, which is the

6     right-hand side of the bar chart at the top, you have very

7     high -- very high compared to benchmark compensation for your

8     psychiatrists and your behavioral health nurse -- non-physician

9     providers.  Psychologists not nearly as high.

10          Similar pattern on the medical side where medical

11     directors are slightly above the median.  The mid-level or

12     non-physician providers are more significantly above.  But your

13     physicians in fact overall are paid below the median.

14          With that being said, I asked my team to inlay the

15     chart on the right, which was the physician benchmark

16     compensation by facility, to see where those are.  With only

17     one of the facilities being just at or just above median and

18     all the rest falling below.

19          And so I think you'll see from one of our

20     recommendations that kind of a rationalization or a creation of

21     integrity in the compensation methodology.  Even though overall

22     the compensation did not appear to be a factor, it may actually

23     be in some selected positions and would be worth review.

24          Questions here?

25          MS. KENDRICK:  I noticed the first bullet point in the

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
MILLAR PRESENTATION

1    gray box said that compensation's generally above, but call

2    coverage and additional work hours are without additional

3    compensation or incentives.  I didn't see that specifically

4    called out in the recommendations in the report.  Would that be

5    another one that call coverage and working the additional work

6    hours receive some sort of compensation?

7           MR. MILLAR:  I think that -- I'm not sure that was

8    something that we called out directly, because I'm not

9    confident that just paying additional would address the

10   concerns that had been stated by the employees.  A lot of what

11   they had stated is they felt it was difficult to take paid time

12   off because they came back to all of the work that had not yet

13   been done.  And so some call coverage could incent that.  But I

14   think it is more an issue of the need of more bodies, not

15   paying the bodies you have more.

16          And so I don't think that would be a direct

17   recommendation.  It could potentially be a short-term fix, but

18   I don't think it addresses the long-term.  So for that reason

19   it wasn't recommended.

20          MS. KENDRICK:  Thank you.

21          MR. MILLAR:  So with that being said, as we move into

22   our recommendations, what we did is we've broken them into the

23   three categories.  There's a category with challenge one that I

24   think is about finding the professionals and the providers to

25   fill the positions.

MILLAR PRESENTATION

1      The second element is how they are trained, how they

2  are onboarded, how they are kept trained, and some elements

3  there.

4      And then the third one is how do you retain them?

5      I mean, this is a classic challenge that all

6  businesses face in every industry.  And so as we've looked at

7  our recommendations, we formulated nine recommendations that

8  align with these three challenges and these three goals of

9  finding, training, and retaining.

10     And so what I will do is go through each of them in

11 their groupings and talk about what those -- what the rationale

12 behind that is.

13     The first one -- and this is around challenge number

14 one with recruitment and retention -- is to develop a stronger

15 screening process.  We believe that there is a -- there are

16 some attributes to the potential hires that could be

17 characteristics that are more contributive to success.

18     The one thing that we would note is many of the

19 employees that are with the ADC and with Corizon have been

20 there for quite a long time.  To understand what it is in their

21 characteristics that make them more ideally suited for this and

22 developing processes, including potentially behavioral based

23 interviewing or assessments, that would allow you to identify

24 those candidates with a higher likelihood of success up front,

25 recognizing that this does -- the more robust screening process

MILLAR PRESENTATION

1    would lengthen that defined process.

2            What it does, though, is it hopefully decreases the

3    pressure on the retaining piece.  But then as referenced in

4    this bottom sentence with recommendation number one,

5    recommendation number four is to create a more robust and more

6    permanent provider pool to cover vacancies and time off.

7            Recommendation number one would require that to be

8    more robust because it would take longer to fill the vacancies.

9    So there's an intent if it takes longer to find the right

10   person, you need to also have strategies and processes in place

11   to cover for that.

12           And what I'll do is I'll pause at each one of these in

13   case there's questions you'd like to go more deeply in

14   regarding any of the recommendations.

15           Recommendation number two is strengthen and create a

16   more standardized referral and retention bonus plan.  In

17   some of our conversations with Corizon, we know that at times

18   in the past they have had referral bonuses.

19           But what we have -- what we believe is a true strength

20   of the environment that you work in is if current employees are

21   incentivized to find and support the efforts of bringing in new

22   colleagues through some bonus or referral type elements, they

23   are likely to identify better candidates.

24           And, again, a recent study that we've quoted at the

25   bottom found that 46 percent of employee referrals stay for

CV-12-0601-PHX-DKD – June 13, 2018 P.M.
MILLAR PRESENTATION

1    three years or more in a job while only 14 percent of those

2    hired directly from, like, a job board without a connection

3    stay.

4                And so we believe due to the cost of onboarding and

5    finding each new provider, that some of that could be invested

6    in a bonus program for the referral.

7                Also then to reinforce what I would call a non-formal

8    mentoring or peer-to-peer support system, look at offering an

9    additional retention bonus if that new hire stays for the year.

10   And that bonus could be in the nature of the employee that

11   stayed receive something but also the employee that referred

12   them might receive something as well.

13               Again, it's leveraging those providers that are within

14   the Arizona Department of Corrections that have developed the

15   skills and found the right balance to make this work, to

16   encourage them to help others get to that point and find those

17   that could be at that point.

18               Pause for questions on the referral and retention

19   recommendation.

20               Recommendation number three is around compensation

21   methodology integrity.  That's probably the big consultant way

22   of saying if you're going to pay at a higher than median

23   average for most of your positions, you should attempt to do so

24   at all of them.

25               When we looked through the facility profiles, some of

MILLAR PRESENTATION

1   the areas that seem most hard hit by vacancies and by lack of

2   compliance to budget are around the physicians and were around

3   the psychologists.  And there were those two positions that

4   seem to be out of sync with the payment methodology for other

5   areas.

6           So even though in general overall, as I made my

7   opening statement here, I don't believe that compensation is an

8   issue for the retention -- for the hiring and retention, I

9   believe it actually may be an issue with physicians in

10  particular and potentially with psychologists as well.

11          Questions on the compensation integrity?

12          And then item number four, establishing a permanent

13  regional provider pool.  And we acknowledge that, in our

14  conversations with Corizon, that they currently have some

15  number of staff identified at their regional office level to

16  provide coverage at the different sites.

17          As we inquired about it, we do not believe that it's a

18  formalized program or that it is regionalized, because you have

19  the ten facilities in distinctly different areas of the state.

20          What we are recommending is that you intentionally and

21  permanently provide covering for staffing gaps both due to paid

22  time off and due to the anticipated vacancies.

23          What this is, another way of saying it is it's

24  proactive hiring.  In other words, you're anticipating a

25  certain amount of turnover in each of the different types.

MILLAR PRESENTATION

1          And so knowing that you're going to have that, knowing

2   that it's going to take a certain amount of time to find the

3   right candidate for it, you create a provider pool that's a

4   permanent element.

5          In other words, it's overstaffing to the total

6   budgeted numbers but putting it in a pool, recognizing that

7   that individual potentially assigned to three or four

8   facilities, so they would become familiar with it, but they

9   would fill in for vacation coverage, and they would fill in for

10  vacancies.

11         And although we have not run the mathematical modeling

12  to say what that would look like, that would be the next step

13  in doing this.

14         If you know that you have three weeks of vacation, you

15  have this many providers, you have this many weeks of vacation

16  coverage, you might be able to say, okay, I need .6 of a

17  physician FTE at these three facilities just to cover their

18  vacation time and their training.

19         I also know that historically the turnover rate at

20  these facilities has been 42 percent.  That means I would

21  anticipate that across those facilities as well I would need an

22  additional .35 of an FTE of a physician to cover my anticipated

23  vacancies.

24         That in and of itself would justify essentially a full

25  FTE of a physician in a permanent provider pool assigned to

MILLAR PRESENTATION

1    those facilities.  We believe that has a couple of benefits.

2           Number one, it takes away those periods of time where

3    there isn't coverage and backlogs of care become created and

4    that then stress the delivery.  It also allows some flexibility

5    when there are non-health issues that interrupt care.

6           We acknowledge that within a corrections environment,

7    there are security situations and other things, court

8    appearances.  There are elements around the management of the

9    prisoner population that has a detrimental effect on the

10   efficiency of the delivery of care.

11          If those were to happen, these pool providers are

12   available to come in and add assistance, so to augment the

13   providers that are there, not just leave the providers on their

14   own to try to work down those backlogs.

15          The other thing that we believe it does by making it

16   regionalized is it creates familiarity between the staff that

17   work at the facilities and the facilities themselves,

18   acknowledging that for any of us we function better in an

19   environment where we have some connections and some

20   familiarity.

21          But beyond the scope of what we are doing here, we

22   believe that the creation of this pool could be done

23   essentially with mathematical and probability modeling of what

24   that pool size should be.  And in essence over time it should

25   close to or not too much more than offset the gap in budgeted

MILLAR PRESENTATION

1    FTEs at this point.  But it is a different way of looking at

2    staffing.

3           It's a proactive, to use a medical term, PRN or

4    as-needed staffing that goes beyond just the posted openings or

5    budgeted openings across the facilities individually or in

6    total.

7           Let me pause there and ask for any questions.

8           Moving on then to the second challenge, the training

9    portion, the elements that we have seen there, we believe that,

10   first and foremost, that there would be a benefit to more

11   consistent staffing of directors across all locations.

12          A director plays a unique role in oversight and

13   leadership, both through vacancies or through non-budgeted time

14   for directors.  We think that even for the mid-level and down

15   to the nursing staff, that the reporting structures, the

16   support structures could be benefited from that.

17          We believe in some of the larger facilities there may

18   be even the consideration of assistant directors.

19          Now, again, beyond the scope of our engagement here, I

20   understand that there's not always sufficient volume to warrant

21   a full-time position of one of these in every location.  What

22   we have seen done in other areas, though, is you create a

23   standard pattern where you have a director that is working in

24   two locations.  So they cover one week or another, but there's

25   ways to stretch that.  But we believe that, at least in what

MILLAR PRESENTATION

1   we've seen in the data, that there could be a benefit to more

2   consistent staffing at that level and the consideration of how

3   that can be done at every location both at the medical and more

4   primarily the behavioral health level.

5            Questions on the director recommendation?

6            Good to move on.

7            Item number six, enhancements of tracking and building

8   a more robust training and mentoring program.

9            We believe that the current training process might be

10  augmented by assigning dedicated senior staff members to train

11  new hires.  And, again, we did not go in-depth as to exactly

12  how the ADC programs, the Corizon programs are built out.  But

13  from comments and things that we gathered in our interviews,

14  these are some of our findings.  And so I will qualify that we

15  have not analyzed the details of the training program.

16           But, in general, having common senior staff that do

17  the training reduces the burden on facility staff.  So, for

18  example, if you have a new person coming in, if you have

19  someone from a regional level that comes in to do that training

20  side by side with them instead of maybe who their co-worker is.

21  And the intent is not to develop any backlogs as we move

22  forward.

23           And then to establish a mentoring program, actually a

24  formal mentoring program going forward.  One of our later

25  suggestions under the challenge number three is around some

MILLAR PRESENTATION

1    provider leadership committees.  And a mentoring program could

2    be very easily monitored or administered through that type of a

3    committee structure as well.

4              Questions on the mentoring program?

5              Okay.  Item number seven, we recommend reinforcing a

6    culture that supports ongoing learning and development.  I

7    think we're all aware, but we state this to state the obvious,

8    but that clinical providers always have to meet established

9    minimum professional requirements to maintain their licensure.

10   In most healthcare delivery organizations, this is perceived as

11   a benefit to those providers to be able to maintain their

12   professional accreditation and status.

13             It's important that you recognize that this takes time

14   and effort, and it takes resources, whether it's application

15   fees or attendance at conferences or others.

16             Our indication is, from our interviews and the

17   surveys, is that the Corizon and ADC culture, the benefits of

18   this process of getting these benefits is not simple, that it's

19   not something that's focused on.

20             We believe that some focus in this area, which is a

21   non-compensation issue, could be one that could engender some

22   real satisfaction and engagement from these clinical and

23   behavioral health providers to support them in those endeavors.

24             Questions around the learning and development cultural

25   recommendation?

MILLAR PRESENTATION

1          Our final area, then -- and this is on the retain

2     piece -- and really this is where you would hope to see with

3     some of these improve -- with some of these recommendations the

4     greatest amount of improvement.  I think historically what

5     we've seen in the data is if the right people are here working

6     in the right conditions and supported in the right way, there's

7     longevity.  They're willing to stay here, and they have a

8     degree of satisfaction being here.

9          And so two recommendations of ways to actually do

10    this, and the first one actually stems from a comment that came

11    from one of the nurse practitioners.  It was a fairly

12    enthusiastic comment that just said, "As a provider, I

13    appreciate you asking for my input in possibly assisting with

14    the decision-making process and developing planning in

15    enhancing our healthcare system and process.  Thank you."

16          I mean, one thing I know from my years in healthcare

17    and in correctional healthcare in particular, the providers

18    that work in the space, they have personal reasons and

19    passionate reasons for being here.  We all like to be part of a

20    solution.  And I think especially as we move into the next

21    generation of providers where those providers come from the

22    millennials and the new folks, they are much more driven by

23    their social awareness, and their involvement is a key piece.

24          So item number eight is one that's actually very akin

25    to the work that my company does outside of corrections in

MILLAR PRESENTATION

1    value-based care or population healthcare delivery.  And it's a

2    way for engaging the providers to be a key portion of a

3    solution.

4            And that is creating a provider-led committee

5    structure.  And so the rationale behind that is by empowering

6    them or involving them, especially those that are on the front

7    lines, they're able to identify things in ways that if they

8    have a voice, to be able to push that back up the chain of

9    command and oftentimes head off issues and challenges before

10   they become overly complex.  And many times they are the ones

11   most ready to see innovative or new solutions.

12           And so with this one, in addition to the rationale,

13   we've given what's a recommended structure for how this might

14   look.

15           And I do acknowledge that with the facilities, you run

16   a very lean staff.  I mean, you're not going to form groups at

17   every one of these ten facilities because that would take every

18   single provider that you have in the facility.

19           But we would recommend redesigning the management

20   reporting structure to streamline communications and align

21   organizational efforts.  This could run through a committee

22   structure, create a little bit more empowerment.

23           The provider-led care and quality committee, for lack

24   of -- I mean, it's a generic term.  You would figure out your

25   own name for that committee.  Would constitute maybe 10 or 12

MILLAR PRESENTATION

1    members, including representation from both medical and

2    behavioral health.  It could be from nursing.  It could have an

3    administrative representative and even some folks from security

4    on it.  It becomes kind of a quality operations,

5    problem-solving committee.

6         Where we see these work is that these committees get

7    together face to face no less than quarterly.  They do that so

8    that relationships begin to build.  They are able to interact

9    with one another.  But then augment these quarterly meetings

10   with phone conferences or Webexes.  And we are aware in some of

11   the conversations that we've had and I think in some of the

12   testimony from court that Corizon does have some form of phone

13   calls and things that go on.

14        We believe that a very structured approach and a

15   commitment to providing some leadership and engagement

16   opportunities for the different physicians and providers at

17   these levels could bring some significant returns for retaining

18   employees.

19        Let me pause there about this committee structure

20   recommendation for questions.

21        Finally, then, recommendation number nine is a bit of

22   a bullet list of other -- other employee issues, feedback that

23   we received from them.  We believe that looking with some

24   intention at some of the comments that were made -- and

25   possibly this is a level where additional surveying might be

MILLAR PRESENTATION

1   warranted before you put too much effort into changing them --

2   but we believe that some of these small things where their

3   voices are heard and elements are addressed could be

4   significant.

5            And, again, I will caveat this by saying that we have

6   not followed up on these with site visits or confirmation.

7   These are based on the comments and insights gained from the

8   interviews and the surveys.  But we've had multiple comments

9   about dedicated space for site visits, increased computer

10  access, a simplified process for scheduling external training

11  and continuing education and reimbursement for that either in

12  covered time or in expenses.

13           Ensure the ability for the employees to take PTO, paid

14  time off.  This was one that we did hear on multiple occasions,

15  that they acknowledged that they have time off, but when they

16  take the time off, it's costly when they come back to, you

17  know, the work that hasn't been cross-covered or when a

18  colleague takes that time off and the coverage is required for

19  those that stay.

20           MR. LONG:  Or they don't take it because they feel

21  like they can't.

22           MS. SOBOLEWSKI:  Or they take it, and they're on call

23  full time and managing things from afar.

24           MR. MILLAR:  So this can be heard on the court record,

25  some comments from the interview said that people don't take

MILLAR PRESENTATION

1    their PTO.  They just let it lapse, because they don't feel

2    like they have the opportunity to do so.  Or some that have

3    taken their paid time off but end up being on call for the time

4    they're off as well.

5              So, again, I believe multiple root causes -- and,

6    again, we did not dig into all of those -- would just echo, I

7    think, for of any us we see our paid time off as one of our

8    premier benefits for any job that we have.  But to feel that

9    that's not something that we can take or that we take it at our

10   own detriment becomes a job dissatisfier.

11             And then I guess maybe I was wrong.  There's my last

12   bullet.  Incentivize call coverage during vacations.

13             So in the short term or in other ways I think there

14   are some ways we could cover that to work within the system.

15             Any questions around those -- the employee feedback

16   and potential benefits and operational change opportunities?

17             Okay.

18             So, again, on a single slide, here's the reference,

19   the three themed categories, the nine recommendations that

20   align with that.

21             The final question, Judge, that you did ask us about

22   is would there be other things?  And as we've dug into this, by

23   the nature of the work we do, we've seen some other directions

24   that might warrant from either an operational standpoint -- I

25   won't speak to a legal standpoint if they need looking into.

1    This is coming -- This is coming from my clinical operations

2    mind, management consultant mind.  If this were a project, not

3    a court event, this is what I would say next steps or next

4    things to look at would be.

5            And so some of these follow-up questions, one is

6    around staffing appropriateness.

7            And the reason that this is up here is because we've

8    actually heard some anecdotal evidence both ways.  I'm not so

9    sure that there might not be some areas where people are

10   staffed and they don't have a real sufficient amount of work

11   where there are others that feel like they're overburdened.

12           So there's a staffing and budgeting methodology that

13   Corizon or the ADC may be dealing with off the standard budget.

14   But, again, without further investigation, I cannot tell you

15   that.

16           But I think some of the things we've talked about here

17   about shifting -- staggered shifts, shared facility positions

18   would be some of the elements I think might warrant some

19   additional operational consideration.

20           The second element then was around telemedicine and

21   telepsych.  We did speak with how many providers that were

22   telepsych providers?  A handful.

23           MS. SOBOLEWSKI:  Handful.

24           MR. MILLAR:  Two or three.  But expressed significant

25   levels of job satisfaction with that modality.  This is also

MILLAR PRESENTATION

1    something that we're seeing in the commercial healthcare space

2    as a real push for leveraging where there are provider

3    shortages, especially geographically.

4            And so the question would be how consistently is the

5    staffing strategy to deploy telehealth or telemedicine

6    statewide?

7            We haven't looked into which facilities are doing it,

8    which aren't, how could that be effective.  Could it be

9    leveraged more broadly for short-term absences or vacancies or

10   even as a long-term solution or possibly both.

11           And so this would be one area where our recommendation

12   around a provider pool, there may be certain elements that that

13   could be done, you know, telephonically or through

14   videoconferencing that technology might provide some responses

15   or some opportunities from.

16           And then the third one, the third one we actually

17   referred to this a little bit earlier, but the, I guess,

18   onboarding process prior to training, that licensure piece.

19           Is there a way to look at where those bottlenecks

20   might be and with the ADC in particular being a state agency,

21   are there considerations or anything that could be done if

22   there are bottlenecks or hurdles with licensure for

23   out-of-state providers and others, especially where you are

24   contracted with Corizon, who's a multi-state provider, you

25   know.

CV-12-0601-PHX-DKD – June 13, 2018 P.M.
MILLAR PRESENTATION

1          Are there some regulatory or licensing issues that

2    could be addressed that may be hurdles or bottlenecks that

3    could improve even Corizon's ability to work more broadly

4    across its organization to meet its contractual obligations to

5    the state.

6          Let me pause there and ask if there's any questions on

7    these three follow-on themes.

8          And again this was provided, I think, at your request

9    as a next step.

10         MS. KENDRICK:  I guess, again, going back to what I

11   had asked you earlier as to whether you think an area for

12   possible further investigation would be analyzing why you got

13   such disparate responses about people who felt that they were

14   trained and prepared and whether training maybe needs to be

15   standardized or, you know, whatever idiosyncratic approach

16   there was to training should be addressed or investigated a

17   little more further.

18         MR. MILLAR:  I believe that is one area.  I mean, if

19   we were pursuing this, we would say we do not have a sufficient

20   body of responses to know where the training should be changed.

21   And if you're going to endeavor to make fairly wholesale change

22   to that, it would probably warrant a pretty extensive surveying

23   process where you would pursue it over a greater length of time

24   so that you had a sufficient number of respondents to be more

25   representative.

MILLAR PRESENTATION

1          MS. KENDRICK:  Thank you.

2          MR. LONG:  I think we got the sense at some facilities

3     there were some standardized processes for onboarding and

4     training, but it was unclear how strictly adhered to those were

5     and if they even existed in some facilities.

6          MS. KENDRICK:  And do you think that if your

7     recommendation six was about establishing and assigning

8     dedicated staff members who were in charge of training new

9     hires, that that might right there address some of the

10    discrepancies?

11         MR. LONG:  Yes.

12         MS. SOBOLEWSKI:  And that was a direct recommendation

13    in the open-ended response of having dedicated trainers as well

14    as in some ways incentivizing, if there is a lack of training,

15    incentivizing providers to provide that training coverage.

16    That seems like that has not been addressed thus far.

17         MS. KENDRICK:  Thank you.

18         MR. MILLAR:  That concludes the amount of prepared

19    materials we have.  If there are any -- I mean, sorry, we're

20    consultants.  We end everything with a question and discussion

21    bullet.

22         But if there are any further questions or concerns, we

23    will follow up on the two data elements where we have the

24    discrepancy.  We will ensure we identify which of those numbers

25    was correct.  And then we'll resubmit to the Court and to the

MILLAR PRESENTATION

1    parties updated final slide deck and written report.

2           THE COURT:  Well, I do appreciate, Mr. Millar, what

3    you brought to this case, and that is your background and

4    experience in this field looking at a question that I thought

5    that I had some intuition about based upon my own experience

6    and based upon what had been developed in the case.  But I was

7    hesitant to proceed on that because it was not tested by

8    somebody who would have a greater ability to make these

9    qualitative and quantitative assessments upon a background of

10   experience in the field.

11          I will say that overall what you reported, with the

12   exception that the compensation issue is more nuanced than I

13   would have thought, that the particular focus on the physicians

14   is not surprising to me.  The overall number was surprising,

15   but it may well be that what I was focusing on was indeed

16   providers or physicians.

17          And I think that I've seen many examples, over the

18   time that the case has given me windows to those situations in

19   the ten facilities that are present before us, evidence that's

20   consistent with what you reported.

21          But I think that this validation, which is what I

22   think it's fair to call it at this point, is helpful and causes

23   me to feel that I can with greater confidence enter orders in

24   the case that make sense based upon a practical and learned

25   analysis of what went on, even though it may to some people

MILLAR PRESENTATION

1    seem to be what I can say is a reasonable conclusion; well,

2    that's not surprising.  But the truth of it is the -- whether

3    it's surprising or not, I didn't have the background that you

4    and your team did to look at this subject to make sure that we

5    were not pursuing a folly that was based upon intuition or

6    based upon experience in other fields.

7          And so the fact that there is a validation shouldn't

8    be taken, I think, as suggesting that the enterprise was

9    unnecessary, because you told us, in fairness, I think it's

10   fair to say, what I knew, but I did not know it for sure.

11         And I also had lawyers for the defendants telling me

12   that this wasn't the case, that there weren't issues in the

13   field with respect to staffing problems.  And I think that what

14   you have demonstrated is that there are those issues, and we

15   have to be aware of them, and we have to address them.  And

16   that greater knowledge that's provided by this process I think

17   has been helpful.

18         Are there any comments from plaintiffs?

19         MS. KENDRICK:  We also thank you, Mr. Millar, and your

20   team.  This has been really thorough and extremely helpful.

21   And I think you've illuminated some factors that we had not

22   picked up on because we don't have the experience and skills

23   that you guys do, so we really appreciate that.  So thank you.

24         THE COURT:  Defendants have anything to say?

25         MR. STRUCK:  No, Your Honor.

UNITED STATES DISTRICT COURT

MILLAR PRESENTATION

1    THE COURT:  Well, thank you very much.  Appreciate all

2    of your effort, especially I imagine the fact that we

3    accelerated the schedule that you had originally proposed, one

4    that probably would have been more comfortable for you, you

5    agreed to accelerate the schedule so that it could result in

6    the final deliverable today.  And I thank you very much for

7    that.

8         MR. MILLAR:  It's been our pleasure.

9         THE COURT:  Well, we'll take a ten-minute break and be

10   back at 3:10.

11      (Proceedings recessed from 2:58 p.m. until 3:14 p.m.)

12        THE COURT:  We're ready now with the defendants' next

13   witness, I gather?

14        MS. KENDRICK:  Your Honor --

15        THE COURT:  Yes.

16        MS. KENDRICK:  Before we start that, we would just ask

17   that in light of the Court's expert's report, that the Court

18   enter an order directing defendants that within 14 days of the

19   receipt of the final version of Mr. Millar's report, that they

20   file a plan with the Court on how they plan to implement the

21   recommendations of the Court's expert.

22        THE COURT:  Well, I will take that under advisement.

23        MS. KENDRICK:  Thank you.

24        THE COURT:  Mr. Bojanowski, you may proceed.

25        MR. BOJANOWSKI:  Thank you, Your Honor.  We will call

HEADSTREAM - DIRECT

 1    Vanessa Headstream to the witness stand.

 2            THE COURT:  Ms. Headstream, if you would please step

 3    forward to the clerk of the court so that the clerk could

 4    administer the oath.

 5            VANESSA HEADSTREAM, DEFENDANTS' WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7    BY MR. BOJANOWSKI:

 8    Q.  Would you please state your name for the record.

 9    A.  Vanessa Headstream.

10    Q.  Ms. Headstream, are you employed?

11    A.  Yes.

12    Q.  Where are you employed?

13    A.  The Arizona Department of Corrections.

14    Q.  In what capacity?

15    A.  I am a Program Evaluation Administrator with Health

16    Services Contract Monitoring Bureau.

17    Q.  Could you tell us something about your educational

18    background.

19    A.  I have a college degree, ADN, and then I have some

20    additional certificates in legal nurse consulting.

21    Q.  Are you licensed?

22    A.  Yes.

23    Q.  In what capacity?

24    A.  As a registered nurse.

25    Q.  How long have you been so licensed?

HEADSTREAM - DIRECT

1    A.   36, 37 years.

2    Q.   Have you practiced as an RN outside of the correctional

3    setting at all?

4    A.   Yes, sir.  I have been a medical-surgical nurse in the

5    hospital.  I've done some alcohol and drug rehab treatment as

6    an inpatient setting and then also worked in an allergy and

7    asthma clinic.

8    Q.   What hospital system did you work with?

9    A.   In Oregon years ago with Douglas Community Hospital and

10   then in Blythe, California, with their hospital.  Let's see.

11   And then the last was in John C. Lincoln in north Phoenix.

12   Q.   So how many years did you say you've been a registered

13   nurse?

14   A.   I think 1981.  37 years.

15   Q.   Okay.  Could you give me your job title again with the

16   Arizona Department of Corrections.

17   A.   Program Evaluation Administrator.

18   Q.   Okay.  And what do you do as your job duties?

19   A.   I research inmate complaints, family complaints, advocate

20   inquiries, oversee the -- five of the sites.  I have oversight

21   for the compliance and clinical monitors at five of the state

22   prisons.  I spot check some of their work.

23   Q.   Do you actually engage in monitoring for the Health

24   Services Monitoring Bureau?

25   A.   I do.  I perform the audits on Performance Measures 26, 28,

HEADSTREAM - DIRECT

1    29, and forty --

2         (Musical alarm sounds.)

3            THE COURT:  Sorry about that.  It happens every day at

4    this time to keep us awake.  You wouldn't be the challenge

5    there.  It would be somebody else, and so no offense.

6            I'm sorry.  No offense I hope.

7         (Reporter interrupts for clarification.)

8            THE WITNESS:  47.

9    Q.  (BY MR. BOJANOWSKI)  And you monitor those statewide.  Is

10   that my understanding?

11   A.  Correct.

12   Q.  And you oversee other monitors and check the accuracy of

13   their monitoring?

14   A.  I do, yes.

15   Q.  Are there specific measures that you look at when you're

16   checking accuracy of other monitors?

17   A.  Not specifically.  If there's a question or concern raised,

18   then I will review the measure and look at the findings to

19   check for accuracy, and then I try and look at some of the

20   clinical, 50, 51, 52; the chronic care, 53 to 56; sometimes 44.

21   Q.  Are you familiar with the methodology -- methodology with

22   regard to how those measures are monitored?

23   A.  I am, yes.

24   Q.  Have you actually monitored those measures in the past, the

25   50, 51, 47?

HEADSTREAM - DIRECT

1    A.  Yes.

2    Q.  All right.  Let's go back to one of your duties you

3    mentioned was that you attend to inmate letters was it?

4    A.  Yes.

5    Q.  And what do you mean by an inmate letter?  What is it?

6    A.  The inmates have the ability to follow through the

7    grievance process at the local level.  At some times they

8    decide to not use the grievance process, and they'll write

9    directly to Central Office to either the director or Mr. Pratt

10   or myself or any other health services -- ADC health services

11   person.  Those letters are forwarded to me, and I research and

12   investigate the claims made to validate them or respond to the

13   inmates.

14   Q.  Well, give -- if you could, maybe give the Judge a better

15   idea of what the content of one of those letters would entail

16   so that we have a better sense of what it is they're asking

17   about.

18   A.  Okay.  One I did while I was waiting earlier today was

19   complaining that he had cataract surgery a year ago on one eye,

20   and he wanted to have the other eye done because he was having

21   difficulty seeing.  So in the letter he reported that he was

22   not being afforded the opportunity to get the second eye done.

23   So he wrote asking if there was something that I could do to

24   help.

25           In researching the letter, he did have one eye done.

HEADSTREAM - DIRECT

1    He is having blurred vision.  And he does not have 20/40 vision

2    with correction in both eyes.  Therefore, I contact the site

3    health administrator and say, you know, this is -- he does not

4    meet the requirements or the criteria to not have the surgery;

5    therefore, what are you going to do to get him taken care of?

6    Q.  So are you advocating on behalf of the inmate to get

7    medical care from Corizon?  Is that what you're doing?

8    A.  If that is what's required based on my investigation of the

9    letter, yes.

10   Q.  Okay.  We had had Dr. Robertson in here testifying before,

11   who I think has a similar type of job that you do.  Are you

12   doing something like Dr. Robertson does when you --

13   A.  Yes.

14   Q.  -- involve yourself?

15   A.  If it is something that I feel is -- it's an issue that's

16   not being addressed in the manner that I, with my background,

17   think it should be, then I will elevate it to Dr. Robertson,

18   and he actually works with me on getting some cases resolved.

19   Q.  All right.  So you handle about how many of these types of

20   letters, say, in a month?

21   A.  Probably 35 to 40.

22   Q.  And are they all medically related?

23   A.  I only address medical related issues, yes.

24   Q.  All right.  Are these letters that come directly to you, or

25   are they just letters that happen to be sent to the ADC Central

HEADSTREAM - DIRECT

1   Office?

2   A.  Both.

3   Q.  I take it then that the letters sent to the Central Office

4   then are forwarded to you to be addressed?

5   A.  Correct.

6   Q.  What if -- So you advocate on behalf of the inmate to get

7   medical care, and then you say if you're not successful, you

8   elevate it to Dr. Robertson?

9   A.  Well, if it's a case where I have questions that exceeds my

10  scope of practice, then I will elevate them.

11  Q.  I see.  And how do you ensure that the care that you think

12  should be provided in fact is provided?

13  A.  I follow up my initial e-mail.  If I don't hear back in two

14  days, I send a second e-mail.  If I don't hear back two days

15  after that, I elevate it to the Corizon regional leadership and

16  their regional medical director.

17  Q.  And what is generally the response that you receive from

18  Corizon with regard to asking them to provide care?

19  A.  It varies site to site.  Initially they acknowledge that

20  they received it, and they'll look into it.  Then after, you

21  know, if they respond to me within the two days, they've looked

22  into it, and they'll give me their plan of action to be taken

23  or why they may not want to take that -- any plan of action.

24  And I just -- I continue following until the care that they

25  need is done.

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
HEADSTREAM - DIRECT

1    Q.  Okay.

2            THE COURT:  I forgot when did you start doing this

3    part of your job?

4            THE WITNESS:  Let's see.  Probably 2014 maybe.

5            THE COURT:  Thank you.

6    Q.  (BY MR. BOJANOWSKI)  So this has been part of your job

7    duties since you've joined ADC, or is this something that you

8    took over due to a job change, or how did you come to be the

9    person to do this?

10   A.  I started as a field monitor and then promoted into --

11   well, the position's no longer there, but I oversaw the nursing

12   staff, and then I promoted into the position I'm in now I think

13   it was 2014.

14   Q.  Did you ever work as an RN at any facilities within the ADC

15   system?

16   A.  Yes.  I was field staff at Perryville for five years.

17   Q.  And after you were at Perryville for five years, where did

18   you go from that position?

19   A.  That's when the health care was privatized, and I became a

20   monitor, field monitor with the Bureau.

21   Q.  And how long were you a monitor?

22   A.  Well, I technically still am.  About a year and a half,

23   maybe two years before I -- but even when I was the --

24   supervising the clinical staff, I still did field -- I still

25   went out and did monitoring, and I still monitor, so --

UNITED STATES DISTRICT COURT

CV-12-0601-PHX-DKD – June 13, 2018 P.M.
HEADSTREAM – DIRECT

1    Q.  Okay.  So do you have knowledge as to the structure of the

2    monitoring bureau?

3    A.  Yes.

4    Q.  How many total monitors are there?

5    A.  Well, let's see.  I think there's 32 staff in the bureau,

6    so it would be 28 maybe, 29.

7    Q.  Somewhere around there.

8    A.  If you subtract the clinical or the non-clinical out, yeah.

9    Q.  Okay.  Are there different types of monitors that are in

10   the, so-to-speak, in the field?

11   A.  There are what are known as the compliance, which are each

12   assigned to a site, with the exception of Douglas and Safford.

13   They share a site monitor.  And then there's what we term

14   clinical monitors.  They're required to be licensed RNs.  And

15   there are five.  Tucson is site specific.  The rest of them

16   share sites.

17   Q.  And why would you need clinical monitors?

18   A.  Historically we had the auditing was split into a

19   compliance or contract compliance and clinical compliance.

20   That was changed with the stipulation and the questions and

21   whatnot were changed.

22   Q.  Is there something different between, say, clinical

23   monitoring and compliance monitoring that requires the

24   licensure?

25   A.  Well, the clinical side of it allows for the monitor, when

HEADSTREAM - DIRECT

1    they come across something that may not look right or may need

2    a clinical evaluation with the delivery of care, then they have

3    the ability to look at that, whereas a non-clinical person may

4    not have that knowledge base.

5    Q.  Is that because they're doing evaluations based upon

6    medical records, and they need to be familiar with how medical

7    records work, medical practice, that type of thing?

8    A.  It could be, yes.

9    Q.  And do each of the monitors then have a specified number of

10   measures that they work with on a month-to-month basis?

11   A.  Yes.  The site monitors have a specific set of measures,

12   and then the clinical staff have a specific set of measures.

13   Q.  So each monitor is not dealing with all 103 monitoring

14   requirements?

15   A.  No.

16   Q.  Okay.  And they do it each month, the same measures at the

17   same units and same location?  Is that the way it works?

18   A.  Correct.

19   Q.  So each monitor is assigned to a facility to work at that

20   facility involving the measures that they have been assigned?

21   A.  Correct.

22   Q.  All right.  Are there what I would call statewide monitors?

23   A.  There are some measures that are done by one person on a

24   statewide basis.

25   Q.  All right.  And those monitors, are they located at the --

HEADSTREAM - DIRECT

1    what I'll call the home office here in Phoenix, or are they out

2    at the site level?

3    A.   Some are -- Let's see.   We have one out in the field who

4    does a couple of the measures statewide, and then I do some.

5    Mostly they're done out of the central office location.

6    Q.   All right.   Now, you had mentioned, I think, that you

7    review some findings for accuracy purposes.   Do you do that

8    each month?

9    A.   Yes.

10   Q.   And what do you do when you're doing that?

11   A.   I get the preliminaries from the person who did the audit,

12   and then I will review each of the persons listed in the audit

13   to see if the findings are accurate with the methodology in the

14   manual.

15   Q.   And what if there's a mistake?

16   A.   I contact the person that completed the original audit, and

17   we discuss it and figure it out from there.

18   Q.   All right.   How long have you been doing the review for

19   accuracy?

20   A.   I don't know how far back it goes.   A ways, because since I

21   have the people that work under me, I kind of have a

22   responsibility to make sure their work is right.

23   Q.   All right.   And the measures are measuring certain aspects

24   of healthcare encounters in the system?

25   A.   Yes.

HEADSTREAM - DIRECT

1    Q.  Do you know how many healthcare encounters there were in

2    the month of April?

3    A.  Over 34,000.

4    Q.  And is the number of healthcare encounters on a monthly

5    basis at or around that 34,000 level each and every month

6    within the system?

7    A.  I have not -- I couldn't specifically say.  I would assume

8    that they would be in that neighborhood.

9    Q.  All right.  Now, in front of you are some exhibits in

10   folders, and I'm going to ask you to talk about those a little

11   bit.

12           And we're going to go to Exhibit 663, which is on the

13   top of your stack.  Now, there should be 11 pages there.

14   A.  Okay.

15   Q.  So have you had the opportunity or do you monitor

16   Performance Measure 47?

17   A.  Yes.

18   Q.  And so does Exhibit 663, is that part of an analysis of

19   Exhibit or -- excuse me -- of Performance Measure 47?

20   A.  Yes.

21   Q.  What is the first page of Exhibit 663?

22   A.  This is the randomized source document, the HNR log.

23   Q.  And where do you get this from?

24   A.  From Corizon.

25   Q.  And what are you looking to find with Performance Measure

HEADSTREAM - DIRECT

1    47?

2    A.   HNR requests for diagnostic results.

3    Q.   Is this the measure:  "Medical providers communicating the

4    results of diagnostic studies to inmate upon request and within

5    seven calendar days of the date of the request"?  Is that

6    Performance Measure 47?

7    A.   Yes.

8    Q.   And so what you're trying to do is you're trying to -- What

9    are you trying to measure here under this performance measure

10   in a general sense?

11   A.   Whether the inmates received their requested results within

12   seven days of medical's receipt of the HNR requesting them.

13   Q.   So how does an inmate go about requesting results?

14   A.   They can submit an HNR to medical requesting their

15   diagnostic results.

16   Q.   All right.  And so Exhibit 663, Page 1, what does this

17   depict?

18   A.   The randomized source document.

19   Q.   All right.  But what is -- what is this a listing of?

20   A.   HNR requests.  It's the HNR log.  So it's any HNR that was

21   received by medical.

22   Q.   All right.  And so what do you do with this document once

23   you receive it?

24   A.   The total document is between usually 2,500 to 3,000 lines.

25   I sort it or filter it down by HNRs requesting diagnostic

HEADSTREAM - DIRECT

1    results.

2    Q.  All right.  And is there an example of this filtering

3    process in the Exhibit 663?

4    A.  Page 2 is a filtered -- it's a sampling of the source

5    document that shows the HNRs that have requested some type of

6    results.

7    Q.  All right.  So what you've done is you've taken your 3,000

8    list and reduced it down to only those where the inmate is

9    requesting some kind of test result?

10   A.  Correct.

11   Q.  And so that's what's at Page 2 of Exhibit 663?

12   A.  Correct.

13   Q.  And then what do you do after you have it down to HNR

14   requests looking for results?

15   A.  On Page 3 after the only diagnostic results are listed on

16   the random log, then it is filtered by unit to extract only

17   requests for the specific units at the complex.

18   Q.  And why do you break it down to the unit level?

19   A.  Because the auditing is done by unit ten -- a minimum of

20   ten files per medical unit or health unit.

21   Q.  So 663, Page 3, shows the Stiner Unit at the Lewis

22   facility?  Is that accurate?

23   A.  It shows a portion of it, correct.

24   Q.  Okay.  Then once you get this list, what do you do next?

25   A.  I pull -- I go into eOMIS with the ADC number of each

HEADSTREAM - DIRECT

1    inmate listed on this form and find the HNR to compare the

2    dates it was written with the date it showed as received and

3    did they get their requested results within the seven days.

4    Q.  All right.  And so is that process depicted here in the

5    exhibit somewhere?

6    A.  Page 4 is a sampling of my audit.

7    Q.  And so what is this showing us?

8    A.  It's showing -- Basically I copy from the randomized source

9    document onto a spreadsheet to reduce typographical -- or

10   errors, transcription errors, and then I've added a column for

11   compliance and comments.

12          And if they're compliant, there's a yes.  If they're

13   non-compliant, there's a no.  And in the comments I will put

14   why they're compliant or not compliant.

15   Q.  So Page 4 of Exhibit 663, is that your -- what I'll call a

16   worksheet?

17   A.  Yes.

18   Q.  And this is something you prepare?

19   A.  Yes.

20   Q.  And so what you're doing is you're breaking down the --

21   from eOMIS for each individual patient the date of their HNR

22   and then to determine whether they got their results within

23   time frame.  Is that --

24   A.  Correct.

25   Q.  -- essentially what's happening?

HEADSTREAM - DIRECT

1    A.  Yes.

2    Q.  And then the comment section is for what purpose?

3    A.  If they're non-compliant, I put the reason why I found them

4    non-compliant.  And if they're compliant, I put why they were

5    found to be compliant.

6    Q.  Okay.  Why do you do that?

7    A.  Well, I think you should have a reason for your finding.

8    Q.  Okay.  Do you then communicate that to anybody at Corizon?

9    A.  Yes.  This completed spreadsheet is e-mailed to them.

10   Q.  Okay.  And then on Exhibit 663, 5, 6 and 7 and 8, is this

11   just another example of the same process when you're trying to

12   do PM 47?

13   A.  Yes.

14   Q.  All right.  And then Exhibit 663, Page 9, what is this?

15   A.  It is a copy of the HNR where the inmate requested a copy

16   of the results.

17   Q.  And so this is just to show the Court this is what you see

18   when you open in eOMIS and read the HNR?

19   A.  Correct.

20   Q.  And so the HNRs are scanned into eOMIS, and that's what you

21   look for?

22   A.  Yes.

23   Q.  And is there any other information you're looking at on the

24   HNR in determining compliance?

25   A.  Under the plan of action, Section 4, it is sometimes

HEADSTREAM - DIRECT

1   documented there that they were given their results with the

2   time and the date or, as in this case, that they were not given

3   their results with the time and the date.

4   Q.  And so the particular document we're looking at was

5   non-compliant?

6   A.  Correct.

7   Q.  And the same is true with Exhibit 663 point or -- excuse

8   me -- 663, Page 10.  That's another HNR?

9   A.  Yes.

10  Q.  And was this one compliant or non-compliant?

11  A.  This one I can't tell off of the HNR because there may have

12  been documentation in a -- in an encounter note or a chart note

13  that said -- because it says you have an appointment with the

14  provider, but that doesn't tell me when or if they received

15  their results.

16         So in this case I would go to the health service

17  encounters and look for an encounter that documents this person

18  received their results.

19  Q.  If you go to 663, Page 11, does that depict the encounters?

20  A.  Yes.  It's a copy of the health services encounters.

21  Q.  Is that the page you would go to in the health record to

22  determine whether they were seen and communicated the results

23  pursuant to the HNR note?

24  A.  Yes.

25  Q.  Do you know if this one was compliant or non-compliant?

HEADSTREAM - DIRECT

1   A.   It was compliant.   If you carefully read the smaller -- the

2   lower one, it shows where the provider gave the inmate their

3   results; normal left knee x-ray.

4   Q.   Okay.   And so the top part of Page 11 is kind of a page

5   that you open in eOMIS that just lists health encounters?

6   A.   Correct.

7   Q.   And then the second part of Page 11, the lower portion is a

8   hyperlink that you click on, and it opens that particular

9   encounter?

10  A.   Correct.

11  Q.   And then you can read that encounter and determine whether

12  they complied or did not comply?

13  A.   Correct.

14  Q.   And is that the methodology and the method that you use

15  each and every time you do PM 47?

16  A.   Yes.

17  Q.   And do you say you do that one statewide?

18  A.   Correct.

19  Q.   And how do you go about double checking to make sure that

20  your findings are accurate?

21  A.   When I complete all of the complex -- well, actually as I

22  complete the complex, I send my findings to Corizon and -- for

23  review.

24  Q.   Anything else?

25  A.   No.

HEADSTREAM - DIRECT

1   Q.  Okay.  If you go to Exhibit 664, do you recognize this

2   document?

3   A.  This is the source document for consults.

4   Q.  All right.  And there's some handwriting on this particular

5   exhibit.  Do you see that?  It says Yuma PM 50-52, original

6   source document.  Do you see that?

7   A.  Yes.

8   Q.  Did you write that on there?

9   A.  Yes.

10  Q.  All right.  And so is this then the source document for the

11  Yuma facility to evaluate Performance Measures 50 through 52?

12  A.  Yes.

13  Q.  And what does this source document show you?

14  A.  Urgent and routine consults that were ordered in July.

15  Q.  And where do you get this from?

16  A.  It is supplied by Corizon.

17  Q.  All right.  After you received this particular -- Well, you

18  have actually performed the auditing for Measures 50 to 52?

19  A.  Yes.

20  Q.  All right.  So after you received this source document,

21  what do you do?

22  A.  They -- The consults are separated into routine or urgent.

23  And then urgent consults are cut and pasted from this source

24  document onto a separate spreadsheet to be audited.

25  Q.  All right.  So could you run us through the process you use

HEADSTREAM - DIRECT

1    for Performance Measure 50, identifying which pages are tied to

2    that measure, kind of in a step-by-step process so that maybe I

3    cannot have to ask you --

4    A.  Well, it's very similar to 47 in that once the -- 50 is

5    urgent consult.  So once the urgent consults have been removed

6    from the combined source document, then they're put onto a

7    separate spreadsheet.  And then each inmate listed is opened in

8    eOMIS.  And under the consult section you click on the consult

9    that is specific to what's listed on the source document in the

10   case.  On Page 2 it shows a hand surgery.  And so then you

11   would go to the hand surgery consult, open that consult to see

12   when it was completed to check and make sure it was done within

13   the 30-day period and so on down --

14   Q.  Page 2 shows this is the filtered -- filtered list

15   showing urgents?

16   A.  Yes.  These are only urgents.

17   Q.  And so then where does it show whether the consult occurred

18   in a timely fashion or not?

19   A.  Well, on this one I don't have comments listed.  They

20   are -- But it says compliant, yes or no, and it's yes.

21   Q.  Okay.  And so this is -- your worksheet is Page 2?

22   A.  Yes.

23   Q.  All right.  So you actually went into eOMIS and then

24   determined between the date of the consult and the date of

25   service is it?

1    A.  The encoun -- yeah, the specialty encounter.

2    Q.  All right.  What do you mean by a specialty encounter?

3    A.  Well, the consults are for off-site consults usually for

4    specialized, like a hand surgeon, cardiology, ophthalmology.

5    And so if the consult was completed within 30 days, they're

6    compliant with the measure.

7    Q.  All right.  Now, the -- I'm looking at the Dakota Unit

8    entry.

9    A.  Yes.

10   Q.  And it's got a date consult written 7-19-2017, and it's got

11   compliant NA-ATP.  What does that mean?

12   A.  That particular consult is excluded from review under

13   Measure 50 because it is an ATP and was not completed.  It

14   would go under -- be reviewed under 48 or 49.

15   Q.  Okay.  Now, there's been some discussion in court

16   concerning cancellations of appointments.  Do you in your

17   review of this measure see cancellations of appointments within

18   the record?

19   A.  On occasion.

20   Q.  All right.  And what do you do when you see a cancellation?

21   A.  Look for the reason the consult was cancelled.

22   Q.  All right.  And how do you handle that as far as

23   compliance/non-compliance with regard to cancellations?

24   A.  If there is not a reason given for the cancellation, then

25   it is non-compliant.

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
HEADSTREAM - DIRECT

1              If there is justification for the cancellation such as

2     the inmate was in the hospital, the consult was completed while

3     he was at the hospital, the consultant themselves cancelled and

4     rescheduled the encounter for whatever reason, it's a duplicate

5     consult, and I can show that or I can find the first consult

6     that is there and was completed.  Those would be actually --

7     let's see -- they would be excluded because they were

8     duplicates or already done.

9              There should be -- I think that's it.

10    Q.  All right.  So if there's no --

11    A.  If an inmate refuses and it's cancelled, then it would be

12    not non-compliant.

13    Q.  So there are certain justifications for cancelling an

14    appointment that don't affect compliance?

15    A.  Correct.

16    Q.  But if there's no legitimate justification, what do you do?

17    A.  It's non-compliant.

18    Q.  Okay.  Now, if we go to 6640 -- excuse me -- 664, Page 3,

19    you've handwritten something on that particular exhibit.  Do

20    you see that?

21    A.  Yes.

22    Q.  And it says Yuma PM 51?

23    A.  Correct.

24    Q.  So -- Well, what is this?

25    A.  This is the worksheet for Performance Measure 51 broken

HEADSTREAM - DIRECT

1    down by units at Yuma complex.

2    Q.  And Performance Measure 51 is:  Are routine consultations

3    being scheduled and completed within 60 calendar days of the

4    consultation being requested by the provider?  Is that correct?

5    A.  Correct.

6    Q.  How do you determine the date of the request by the

7    provider?  I mean, what are you looking at?

8    A.  The encounter wherein the provider actually ordered the

9    consult.

10   Q.  All right.  Would you look at the date that, say, maybe the

11   scheduler used or the clinical coordinator?

12   A.  No.

13   Q.  So you actually use the consult request date based on a

14   consult request sheet that's in eOMIS?

15   A.  It's the provider encounter where the consult was ordered.

16   Q.  I see.  Okay.  Now, PM 51 is very similar to PM 50.  It's

17   just a different time frame?

18   A.  Correct.

19   Q.  And you used the same methodology in evaluating 51 as you

20   did 50?

21   A.  Correct.

22   Q.  And so if we were to go to Page 4, this is your worksheet

23   again?

24   A.  Yes.

25   Q.  And it essentially is the same procedure through, it looks

HEADSTREAM - DIRECT

1    like, Page 5?

2    A.  Yes.  It's each of the health units at Yuma.

3    Q.  Okay.  And so on Page 5 you've got a few comments in there.

4    Now, when it's out of time frame -- and I'm just going to use

5    the La Paz entry at the bottom on Page 5 -- and you've got

6    9-6-2017, no optometry documentation located, do you see where

7    I'm at?

8    A.  Yes.

9    Q.  Okay.  What's the meaning of the comment?

10   A.  I'm not sure, because they were compliant, so --

11   Q.  So the time frame may be compliant, but it may not be

12   appropriately documented?

13   A.  Well, I'm not -- I don't -- Without the -- Without looking

14   it up, I don't know.  I don't know why -- what that means.

15   Q.  You can't say for sure at this point?

16   A.  Yes.

17   Q.  Let's go to 664, Page 6.  And once again there's some

18   handwriting there, Yuma PM 52.  That's your handwriting?

19   A.  Yes.

20   Q.  And PM 52 is:  Are specialty consultation reports being

21   reviewed and acted on by a provider within seven calendar days

22   of receiving the report?  Is that the measure?

23   A.  Yes, yes.

24   Q.  So what are you generally looking for when you're

25   evaluating this measure?

HEADSTREAM – DIRECT

1   A.  If the provider has reviewed and acted upon the consult

2   report within the time frame for -- after receipt by the site.

3   Q.  All right.  So the consultation report, the consult is --

4   it happens offsite.  Is that what happens?

5   A.  Correct.

6   Q.  And so as a result of that consult, there's paperwork

7   generated by that doctor, which is then sent back to the

8   facility?

9   A.  Yes.

10  Q.  All right.  And when that gets back to the facility, it has

11  to get into the medical record somehow?

12  A.  Yes.

13  Q.  All right.  And once it gets into the medical record and is

14  received, then what?  What has to happen in order to be

15  compliant?

16  A.  It has to be reviewed and acted upon within the five days.

17  I think it's five days, five or seven days.

18  Q.  Seven.

19  A.  Seven days.

20  Q.  Okay.  And what do you mean by acted upon?

21  A.  Some type of action needs to occur, follow-up, generate a

22  new consult, order the medication.

23  Q.  All right.  So the doctor back at the prison facility has

24  to get the report and has to do something with it?

25  A.  With any recommendations that may be made on it, yes.

HEADSTREAM – DIRECT

1    Q.  Okay.  So let's look at Page 6 of Exhibit 664.  What is

2    this list?

3    A.  This is a list of consults.

4    Q.  Is this the worksheet?

5    A.  Yes.

6    Q.  Okay.  And then you do the yes/no as to whether it's

7    compliant or not.  And then, again, the NA-ATP, those aren't

8    counted because --

9    A.  Correct.

10   Q.  -- those are excluded?

11   A.  They're measured under a different -- They're audited under

12   a different performance measure.

13   Q.  Okay.  Now, if we go to 664-01, are you using the same

14   source document for PM 52 that you used --

15   A.  At that time, yes.

16   Q.  Okay.  Are you using something different now?

17   A.  The consult reports are pulled by the audited month now.

18   Q.  Okay.

19   A.  So --

20   Q.  What do you mean by that?

21   A.  Well, there's reports received in April are reviewed in

22   May.  Results received in May are audited in the following

23   month, June.

24          When this -- When I did this back in August or

25   September, we were using the consults that were written.  And

HEADSTREAM - DIRECT

1   regardless of when the results were reported, we would just

2   find the results or the reports and use those to review for

3   action.

4   Q.  Okay.  And the same methodology was used to determine

5   compliance as to when the report was received, did they take

6   the action, review it and take action within seven days of the

7   receipt of the report?

8   A.  Correct.

9   Q.  Because that's what you're looking for compliance-wise, is

10  to determine whether that report was reviewed, acted upon?

11  A.  Correct.

12  Q.  Okay.  Now, what happens if the report is received by the

13  doctor, you can see that it was received by the doctor, but

14  that doctor, maybe she doesn't put on -- say she addresses,

15  say, three of the four recommendations on the report.  Is that

16  a compliant file or a non-compliant file?

17  A.  It would be non -- It would be non-compliant if the

18  recommendations weren't all addressed.

19  Q.  Okay.  So with regard to this particular measure,

20  documentation of action taken is crucial?

21  A.  Correct.

22  Q.  Now -- Strike that.

23          Let's go to Exhibit 665.  And 665, once again, has

24  some handwriting on it.  Is that yours?

25  A.  Yes.

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
HEADSTREAM - DIRECT

1   Q.  And it says PM 53, Tucson, 11-2017, original source

2   document.  Is that what is written on there?

3   A.  Yes.

4   Q.  And PM 53 is:  Treatment plans will be developed and

5   documented in the medical record by a provider within 30

6   calendar days of identification that the inmate has a chronic

7   disease.

8          Is that the measure?

9   A.  Yes.

10  Q.  And so what you're looking for is a treatment plan in the

11  medical record?

12  A.  Correct.

13  Q.  And you're also looking to see that that treatment plan is

14  in the record within 30 days of the provider determining or

15  diagnosing an inmate with a chronic disease?

16  A.  Yes.

17  Q.  So let's look at Page 1 of the Exhibit 665.  You say this

18  is the original source document.  What is depicted on this

19  list?

20  A.  This is a randomized chronic -- newly diagnosed chronic

21  condition.

22  Q.  All right.  Is that a special log that's kept?

23  A.  It is an extraction from eOMIS, my understanding.

24  Q.  And so this, when you say newly diagnosed chronic

25  condition, what do you mean by that?

CV-12-0601-PHX-DKD – June 13, 2018 P.M.
HEADSTREAM – DIRECT

1    A.   That means that the -- the inmate has not -- did not carry

2    a diagnosis for that chronic condition prior to the date that's

3    listed on this.

4    Q.   And so what date are you looking at on this list?

5    A.   The problem initiated onset date.

6    Q.   Okay.  So that's almost -- Well, that's, like, the

7    third-from-the-last column?

8    A.   Yes.

9    Q.   Okay.  Then what do you do with this list?

10   A.   The applicable conditions are copied over, cut and pasted

11   or copied and pasted over onto a separate spreadsheet, because

12   on here you'll see several conditions that are not recognized

13   as chronic conditions that are reviewed or that are monitored.

14   Q.   And is that because within the monitoring protocols, there

15   are only certain conditions which are monitored?

16   A.   Correct.

17   Q.   And so we filter the list to eliminate the non-applicable

18   conditions to get only those conditions which are subject to

19   monitoring?

20   A.   Correct.

21   Q.   And so is that the list that is then generated and

22   reflected on Page 2 of the exhibit?

23   A.   Yes.

24   Q.   And is this a worksheet that you did?

25   A.   Yes.

UNITED STATES DISTRICT COURT

HEADSTREAM - DIRECT

1    Q.  This is something you prepared?

2    A.  Yes.

3    Q.  All right.  And so what is depicted in this?  I mean, why

4    do you put this worksheet together?

5    A.  Well, these are the newly diagnosed conditions for Tucson

6    Health Unit that were subject to review.

7    Q.  All right.  So let's take the first unit, which is

8    Catalina?

9    A.  Yes.

10   Q.  And so we have our first entry is Hep C?

11   A.  Correct.

12   Q.  And the problem initiated onset date, what is that?

13   A.  That is the date of diagnosis.

14   Q.  And then the compliant/non-compliant is either a yes or no?

15   A.  Yes.

16   Q.  And then what is RTC 30 days?

17   A.  Return to clinic in 30 days.

18   Q.  How do you know that there was a treatment plan in the

19   medical record?

20   A.  The presence of a measurable time frame as stated in the

21   monitoring guide --

22   Q.  So you found --

23   A.  -- determines compliance with a treatment plan.

24   Q.  I'm sorry.  I missed that again.  Can you repeat it.

25   A.  The presence of a measurable time frame to return to a

1   clinic is, as stated in the monitoring guide, is used to

2   determine compliance.

3   Q.   Okay.  And Page 3 and 4, are these just more examples of

4   the same thing?

5   A.   Yes.  This is the actual findings of the audit that was

6   done November I guess.

7   Q.   So it looks on Page 4 that there were a total of 43

8   applicable files of which 37 were compliant --

9   A.   Correct.

10  Q.   -- resulting in an 86 percent compliance rate?

11          Let's go to Exhibit 665, Page 5.  And on that page we

12  have, again, more handwriting, I assume by you, Tucson PM

13  54-56, 11-2017, original source document.

14          You have a range of performance measures here, 54 to

15  56.  Are you measuring with this source document Performance

16  Measures 54, 55, and 56?

17  A.   Yes.

18  Q.   So you used the same source document then for those three

19  measures?

20  A.   Yes.

21  Q.   And 54 is:  Are inmates with chronic disease being seen by

22  a provider as specified in the inmate's treatment plan no less

23  than every 180 days unless the provider documents a reason why

24  a longer time frame can be in place?  Is that the measure for

25  54?

1    A.  Yes.

2    Q.  And then 55 is:  Are disease management guidelines

3    implemented for chronic diseases?

4    A.  Yes.

5    Q.  And then 56 is:  Inmates with a chronic disease will be

6    provided education about their condition, disease, which will

7    be documented in the medical record.

8    A.  Correct.

9    Q.  All right.  So in 54, you're looking to see if the inmate

10   is seen within time frames?

11   A.  Correct.

12   Q.  Okay.  For their chronic care condition?

13   A.  Yes.

14   Q.  And then what is 55:  Are disease management guidelines

15   implemented for chronic diseases?  What does that mean?

16   A.  Those are guidelines that -- for lab tests, diabetic eye

17   exams, various diagnostic tests that are recommended to be done

18   prior to a chronic care or on an annual basis, depending on the

19   condition.

20   Q.  And what are you looking for in the medical record to

21   determine compliance?

22   A.  If those lab tests were ordered and are available for

23   review at the time of the chronic care visit, if the annual

24   diabetic eye exam was done within the prior 12 months.  What

25   else is on there?  Latent TB, the annual signs and symptoms are

1   done within the prior 12 months.

2   Q.  Those are some examples of what you mean by --

3   A.  Yes, those are guidelines.

4   Q.  And then with regard to 56, inmates with a chronic disease

5   will be provided education about their condition/disease, which

6   will be documented in the medical record, what are you looking

7   for there?

8   A.  Documentation that education was provided to them.

9   Q.  Okay.  Is that part of the SOAPE note?

10  A.  Yes.

11  Q.  And so this Exhibit Page 5 of 665, this is what -- Well,

12  what is this?

13  A.  Page 5?

14  Q.  Yes.

15  A.  Is the randomized source document.  So it is then filtered

16  by the unit, and then the applicable chronic care -- again,

17  those that are recognized for monitoring -- are reviewed by

18  each individual as shown on the worksheet.

19  Q.  Okay.  So this worksheet on Page 6, could you run us

20  through -- Well, you've got the worksheet addressing all three

21  measures, 54, 55, and 56.  Is that the way it's set up?

22  A.  At that time, yes.

23  Q.  Okay.  And so we'll just take the first person here at the

24  Catalina Unit.  Do you see that one at the top?

25  A.  Uh-hmm, yes.

CV-12-0601-PHX-DKD – June 13, 2018 P.M.

HEADSTREAM – DIRECT

1    Q.  All right.  So do you then go into that person's medical

2    record?

3    A.  Yes.

4    Q.  And with regard to their locations, you put this into your

5    sheet?

6    A.  Well, I take the source document, the original, divide it

7    out by the housing units or health units, and then I take

8    usually 13 to 15 that I copy over onto my worksheet.  And then

9    I look up, going down the list, those with applicable chronic

10   conditions and until I have ten that are used for the

11   reporting.

12   Q.  All right.  And then how do you determine the compliance?

13   You've got the next -- You have compliant, yes/no.  PM 54

14   you've got a yes.

15   A.  This person was seen 9-22, was supposed to return in 90

16   days.  The audit was done in November, so he was compliant.  90

17   days had not passed without him not being seen.

18   Q.  And then with regard to PM 55, can you tell why they were

19   compliant there?

20   A.  There was nothing out of compliance.  Offhand I couldn't

21   say.

22   Q.  Off the top of your --

23   A.  But the guidelines must have been met.

24   Q.  Okay.  And then the same for 56?

25   A.  And there was education documented.

UNITED STATES DISTRICT COURT

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
HEADSTREAM - DIRECT

1   Q.  So you found in the medical record that education was

2   documented, and you also found the other requirements for 55?

3   A.  Yes.

4   Q.  Okay.

5   A.  If you go down to Tucson Health, the middle of the page,

6   you see where there was non-compliance because the annual

7   diabetic eye exams were not done.  That's the guideline 55.

8   Q.  Let's have a look at that, the diabetes Type II entry at

9   the Tucson Health Unit.

10  A.  Yes.

11  Q.  All right.  So you've got compliance on 54?

12  A.  Yes.

13  Q.  And non-compliance on the 55?

14  A.  Correct.

15  Q.  And non-compliance was because there was no annual eye exam

16  in the record?

17  A.  Correct.

18  Q.  But you have compliance on 56?

19  A.  Correct.

20  Q.  Now, if there is some form of mistake found by Corizon with

21  regard to your findings, is that brought to your attention?

22  A.  Yes.

23  Q.  What do you do when that happens?

24  A.  Relook at it and explain why I was right.

25          THE COURT:  Fair enough.

UNITED STATES DISTRICT COURT

HEADSTREAM - DIRECT

1      MR. BOJANOWSKI:  I'll just leave that answer stand.

2    Q.  (BY MR. BOJANOWSKI)  As far as methodology is concerned, is

3    that sometimes discussed amongst monitors within the Health

4    Monitoring Bureau?

5    A.  What do you mean?

6    Q.  Well, I mean, are there sometimes unique situations that

7    arise at a particular facility where the monitor may have a

8    question as to, well, is this particular file compliant or

9    non-compliant?

10   A.  Yes, that happens.

11   Q.  Okay.  And do -- Are you involved in evaluating those kinds

12   of issues to determine, well, based on my view, this would be

13   compliant or non-compliant?

14   A.  At times, yes.

15   Q.  Okay.  In a general sense, is the files you're looking at

16   and such, you're looking for the same information in the same

17   locations pretty much each month for each measure?

18   A.  Yes.

19   Q.  And over time you become probably a little more efficient

20   at being able to locate and find those things fairly quickly?

21   A.  Yes.

22   Q.  Okay.  Do you ever go to Corizon and instruct them as to

23   how it is that you're making your findings to educate them on

24   better practices with regard to compliance?

25   A.  Do I go to Corizon and --

CV-12-0601-PHX-DKD - June 13, 2018 P.M.
HEADSTREAM - DIRECT

1    Q.  Well, I mean, do you participate in meetings and such where

2    performance measures are discussed and there is discussion

3    about, well, if you were to do this, that, or the other thing,

4    you know, your compliance would probably be better, such as

5    making sure your doctors document the fact that they're taking

6    action on a particular report?

7    A.  Well, I've been present in meetings where that occurs.

8    Q.  Do you give input?

9    A.  Sometimes.

10   Q.  Okay.  Are you aware of Corizon recently bringing on

11   additional compliance individuals to work with the performance

12   measures?

13   A.  Yes.

14   Q.  Do you know what they're going to be doing yet, or are you

15   not yet privy to that?

16   A.  They -- The most recent information that I received is that

17   the -- they are -- they have created a position to work with --

18   for a person to work with CGAR in establish -- in kind of spot

19   checking, basically what we do, only by Corizon, with

20   monitoring charts and looking to make sure that the care is

21   being done, given.

22   Q.  All right.  Is that something that you want to assure is

23   happening, is that care is being delivered?

24   A.  Yes.

25   Q.  And do you do that as part of your monitoring function?

HEADSTREAM - DIRECT

1   A.   Yes.

2   Q.   And how do you go about doing that?

3   A.   Reviewing charts, looking at other people's work,

4   researching the inmate advocate family inquiries.

5            MR. BOJANOWSKI:  May I have a moment, Your Honor?

6            THE COURT:  All right.

7            MR. BOJANOWSKI:  No further questions, Your Honor.

8            THE COURT:  Thank you.  Now will be the opportunity

9   for the plaintiffs' lawyers to ask questions.

10           MR. BOJANOWSKI:  Before I sit down, I do want to move

11   for the admission of 663, 664, and 665.

12           THE COURT:  Any objection?

13           MS. EIDENBACH:  No objection, Your Honor.

14           THE COURT:  Those will be received.  Thank you.

15           MS. EIDENBACH:  Your Honor, with the Court's

16   permission, I anticipate having about an hour and a half to two

17   hours of cross.  And it seems like it makes the most sense to

18   start that in the morning, given that we have a pared-down

19   witness list for tomorrow.  I understand we have a lot on our

20   agenda, but given that we only have about half an hour of time

21   left this evening, with your permission I'd like to start and

22   keep the momentum going in the morning session.

23           THE COURT:  Ms. Headstream, are you able to come back

24   tomorrow morning?

25           THE WITNESS:  Yes.

UNITED STATES DISTRICT COURT

HEADSTREAM – DIRECT

1          THE COURT:  I've pushed people pretty hard yesterday

2    and today, and so I can appreciate the thought there.  It's not

3    just the lawyers, who we kind of expect to be pushed hard, but

4    there's also the court support staff, the court reporter in

5    particular.  So with your leave, we will conclude for today and

6    come back tomorrow morning at 9:00.

7          THE WITNESS:  Okay.

8          MS. EIDENBACH:  Thank you, Your Honor.

9          THE COURT:  Thank you, all.

10        (Proceedings recessed at 4:18 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                   **C E R T I F I C A T E**

2

3         I, LINDA SCHROEDER, do hereby certify that I am duly

4 appointed and qualified to act as Official Court Reporter for

5 the United States District Court for the District of Arizona.

6         I FURTHER CERTIFY that the foregoing pages constitute

7 a full, true, and accurate transcript of all of that portion of

8 the proceedings contained herein, had in the above-entitled

9 cause on the date specified therein, and that said transcript

10 was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 15th day of June,

12 2018.

13

14

15                            s/Linda Schroeder

16                         Linda Schroeder, RDR, CRR

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**