1  Office of the Arizona Attorney General
   Michael E. Gottfried, Bar No. 010623
2  Assistant Attorney General
   2005 N. Central Avenue
3  Phoenix, Arizona 85004-1592
   Telephone: (602) 542-1645
4  Fax: (602) 542-3393
   Michael.Gottfried@azag.gov
5
   Daniel P. Struck, Bar No. 012377
6  Rachel Love, Bar No. 019881
   Timothy J. Bojanowski, Bar No. 022126
7  Nicholas D. Acedo, Bar No. 021644
   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
8  3100 West Ray Road, Suite 300
   Chandler, Arizona  85226
9  Telephone:  (480) 420-1600
   Fax:  (480) 420-1696
10 dstruck@strucklove.com
   rlove@strucklove.com
11 tbojanowski@strucklove.com
   nacedo@strucklove.com
12 *Attorneys for Defendants*

13                 **UNITED STATES DISTRICT COURT**
14                      **DISTRICT OF ARIZONA**

15 Victor Parsons, *et al.*, on behalf of themselves      NO. CV-12-00601-PHX-ROS
   and all others similarly situated; and Arizona
16 Center for Disability Law,
                                          Plaintiffs,
17               v.                                       **DEFENDANTS' MOTION FOR**
                                                         **RELIEF FROM COURT ORDER**
18 Charles Ryan, Director, Arizona Department            **RE: TERMINATION OF**
   of Corrections; and Richard Pratt, Interim           **MONITORING (DKT. 2900)**
19 Division Director, Division of Health Services,
   Arizona Department of Corrections, in their
20 official capacities,
                                          Defendants.
21

22       Pursuant to Fed.R.Civ.P. 60(b)(6), Defendants move this Court for relief from its

23 Order denying Defendants' Motion to Terminate Monitoring, specifically its: (1) refusal

24 to terminate all measures outlined in Defendants' Motion (Dkt. 2251.); and (2) retention

25 of a Rule 706 expert, at Defendants' expense, to review the entire monitoring process.

26 (Dkt. 2900 at 11-12.)

27       Defendants stipulated that they would monitor and comply with 103 Performance

28 Measures (PMs) at ten separate correctional facilities.  It is undisputed that the monitoring

system agreed to by the parties demonstrates that Defendants have brought approximately 75% of these Performance Measures into compliance. (Dkt. 2251.)

Rather than terminate monitoring in accordance with the Stipulation, however, and free up public resources to focus on the remaining issues, the Court relied on small, isolated discrepancies in the thousands of record entries to justify its refusal to allow the termination of monitoring in accordance with the self-operating provisions of the Stipulation.  Throughout the proceedings, Magistrate Judge Duncan made remarks that demonstrated that he had prejudged the results.  In his order scheduling an evidentiary hearing and before hearing evidence, for example, he stated that the purpose of the hearing was "to see how deep this evil goes."  (TR. 12/20/17, at 8:5-7.)

As discussed in more detail below, the minor and isolated anecdotal incidents relied on by the Court to find systematic data manipulation include a single entry where a provider entered his encounter notes late; the limited practice of some providers to use the start time for their rounds as a start time for appointments rather than separately recording the time when they met with each separate patient; a single specialist appointment that had been canceled so that a lab could be ordered; four brief system outages that took place over the course of a year; and a handful of other minor, routine problems of the sort that inevitably occur in the rollout of any complex data collection project or the operation of a large healthcare system.

This ruling would be improper and erroneous in any context, but it is particularly inappropriate here, where the Supreme Court has repeatedly cautioned lower courts to accord "substantial deference to the professional judgment of prison administrators," *Beard v. Bank*, 548 U.S. 521, 528 (2006) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).  It is the Court's role to enforce the Stipulation as agreed by the parties, not to redesign or expand it.  The Court should vacate the Order denying Defendants' Motion to Terminate and appointing a Rule 706 expert, as the Court failed to support its findings with sufficient evidence of a systemic deficiency in the monitoring process.

1    **I.    BACKGROUND AND PROCEDURAL HISTORY.**

2         **A.    The Stipulation**

3         The Stipulation provides a finite monitoring period during which Defendants are

4    required to comply with specific Performance Measures (PMs).  (Dkt. 1185 at ¶10.)  The

5    Arizona Department of Corrections' (ADC) Monitoring Bureau calculates facility

6    compliance rates with each applicable PM.  The results are gathered and input into a form

7    called the CGAR.[1]  To determine compliance rates, the Bureau's Monitors review facility

8    documentation (such as staffing reports) or a randomly selected set of ten (if available)

9    inmate files at each yard.[2]  (Dkt. 1185-1.)

10        Paragraph 10(a) of the Stipulation provides the compliance thresholds.  For the first

11   twelve months, after the effective date of the Stipulation, Defendants must meet or exceed

12   75% for each applicable PM at each facility.  (Dkt. 1185 at 4.)  For the second twelve

13   months, Defendants must meet or exceed 80%, and after twenty-four months, Defendants

14   must meet or exceed 85%.  (*Id.*)  After twenty-four months of monitoring, Defendants'

15   duty to monitor any measure that is in "substantial compliance," terminates.  (*Id.* at 4-5.)

16   A PM is in substantial compliance if:  (1) it meets the compliance thresholds defined

17   above for eighteen out of a twenty-four month period; and (2) it was never below the

18   compliance threshold for three or more consecutive months within the 18-month period.

19   (*Id.* at 4 – 5.)

20        At the time Defendants' filed their Motion to Terminate, 78 of the 103 healthcare

21   PMs were in substantial compliance at various facilities.  (Dkt. 2251.)  Therefore,

22   Defendants had met or exceeded their monitoring requirements for **75%** of the

23   Stipulation's PMs.

24

25

26        _____

     [1] CGAR stands for Compliance Green Amber Red. Measures that meet or exceed
27   the compliance threshold receive a green designation. Measures that fall below the
     compliance threshold receive a red designation.

28        [2] ADC operates ten facilities.  Each facility has multiple yards.

### B.    Defendants' Notice and Subsequent Motion to Terminate

On May 4, 2017, Defendants filed a Notice advising the Court that seventy-eight PMs at numerous facilities had achieved substantial compliance, and that their compliance terminated the requirement to monitor these PMs.  (Dkt. 2040.)  Plaintiffs objected and asked the Court to require Defendants to continue to monitor all PMs until they filed a motion to terminate monitoring and the Court ruled.  (Dkt. 2071 at 90:7-13.)  The Court agreed, and ordered Defendants to file a motion.[3]  (*Id*. at 91:14-92:3.)  On August 25, 2017, Defendants filed a Motion to Terminate Monitoring, again advising that seventy-eight measures at various facilities had achieved—*or surpassed*—substantial compliance and requesting the Court to terminate their monitoring requirements.  (Dkt. 2251.)

Plaintiffs responded, but failed to specifically object to several PMs at various facilities.  (Dkt. 2344.)  For example, Plaintiffs did not object to PM 1 (at any facility); PM 3 (at any facility); PM 4 (at Lewis, Perryville, or Tucson); PM 30 (at any facility); PM 31 (at any facility); PM 32 (at any facility); and PM 58 (at Perryville).  (*Id*.)  At the April 11, 2018 Status Hearing, Defendants advised the Court of Plaintiffs' failures to object. (R.T. 4/11/2018 at 154:2-10.)  Despite the fact that the Motion was fully briefed and pending before the Court, the Court gave Plaintiffs a second chance to object to any measure they failed to object to in their Response. (*Id*. at 154:25-155:14.)  While Plaintiffs sent correspondence to Defendants advising they were now objecting to these measures, Plaintiffs never provided the Court with, or otherwise advised the Court of, their objections.  But the Court still refused to terminate these measures even though Plaintiffs failed to object in their Response and failed to advise the Court of their objections after receiving a second opportunity to do so.

---

[3] Defendants disagree with the Court's conclusion that Defendants are required to file a motion to terminate. Under the terms of the Stipulation, termination is automatic and self-executing once compliance has been satisfied. (Dkt. 1185 at 4-5). The Stipulation does not require Defendants to move for termination. (*Id*.)

### C.   The Court's Ruling on Defendants' Motion to Terminate was Influenced by a KJZZ News Story.

On December 19, 2017, Jimmy Jenkins, a KJZZ reporter, published a story based on allegations by a former temp-agency OB-GYN, Jan Watson, who worked with Corizon at ADC's Eyman facility for approximately five months.[4]  The article denounced Corizon and the provision of medical care at ADC, and was complete with quotations from Plaintiffs' counsel and their paid experts.  The next day, at a regularly scheduled status hearing, the Court recited the article, and declared the story to be a "smoking gun" and evidence of "an end run around the monitoring program, and end run around the Stipulation."  (TR. 12/20/17, at 5:1-7, 8:8-9, 5:18-20, 11:5.)  The Court claimed that the article "call[ed] into question the quality of the State's monitoring program. . ."  (*Id.* at 21:11-16.)   The Court simultaneously set an evidentiary hearing to determine whether there was a conspiracy to "beat the monitor" and "to see how deep this evil goes."  (*Id.* at 7:12-16, 8:5-7, 21:4-10.)  The evidentiary hearing took place over the course of eight days between February 27 and June 14, 2018.

On June 22, 2018, just days after the evidentiary hearing concluded, the Court issued its Order on Defendants' Motion to Terminate.  (Dkt. 2900.)  The Court refused to terminate sixty of the seventy-eight PMs, finding the "evidence presented to the Court was . . . enough to raise questions about the integrity of the state's CGAR system."  (*See* Dkt. 2900 at 11.)   The eighteen PMs the Court terminated were PMs Plaintiffs agreed to terminate, or those that clearly did not require monitoring, e.g., female-specific PMs at male facilities.  The Court's Order also stated, "[t]he Court will retain a Rule 706 expert, paid for by Defendants, who will review the entire monitoring process."  (*Id.* at 12.)

## II.   LEGAL STANDARD

A court may relieve a party from a final judgment or order for any "reason that justifies relief." Fed.R.Civ.P. 60(b)(6). Rule 60(b)(6) "provides courts with authority adequate to enable them to vacate judgments whenever such action is appropriate to

---

[4] Corizon is the health care provider for ADC.

accomplish justice." *Gonzalez v. Crosby*, 545 U.S. 524, 542 (2005) (internal quotations omitted); *accord Phelps v. Alameida*, 569 F.3d 1120, 1135 (9th Cir. 2009).   Relief is warranted under this rule upon a timely motion showing exceptional circumstances. *Lal v. California*, 610 F.3d 518, 524 (9th Cir. 2010).   "In determining whether extraordinary circumstances are present, a court may consider a wide range of factors." *Buck v. Davis*, 137 S. Ct. 759, 778 (2017).   Among these factors are "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–864 (1988).

## III.   LEGAL ARGUMENT

### A.   The Court's Order is Based Solely on Anecdotal and Isolated Instances.

It is well-settled that Courts should defer to prison officials regarding the safe, secure and efficient operation of prisons. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986).   Courts must give "substantial deference to the professional judgment of prison administrators." *Beard v. Bank*, 548 U.S. 521, 528 (2006) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).   Courts "afford considerable deference to the expertise and decision making of prison administrators." *Prison Legal News v. Cook,* 238 F.3d 1145, 1140 (9th Cir. 2001) (citing *Thornburgh v. Abbott,* 490 U.S. 401, 407–08 (1989)).   Indeed, the Supreme Court has long held that federal courts should "respect the role of states in the administration of their correctional systems." *Johnson v. Robinson*, 987 F.2d 1043, 1050 (4th Cir. 1993) (citing *Bell v. Wolfish,* 441 U.S. 520, 547 (1979)).   That deference "extends not only to internal security concerns, but also to the comprehensive planning and commitment of resources that are 'peculiarly within the province of the legislative and executive branches of government.'" *Id.* (quoting *Procunier v. Martinez,* 416 U.S. 396, 405 (1974)).   Here, the Court not only refused to accord any deference to the expertise of Defendants, but it completely disregarded their detailed reports and statistics simply because of a handful of minor data entry errors and isolated allegations.

1   Isolated instances do not establish sufficient evidence of systemic issues. *Parsons*

2   *v. Ryan*, 289 F.R.D. 513, 521 (D. Ariz. 2013), *aff'd*, 754 F.3d 657 (9th Cir. 2014). While

3   anecdotal evidence may suffice to prove individual claims, rarely, if ever, can such

4   evidence show a systemic pattern. *See Coral Const. Co. v. King County*, 941 F.2d 910,

5   919 (9th Cir. 1991); *see also Graves v. Penzone*, CV-77-00479-PHX-NVW, 2017 WL

6   782991, at *10 (D. Ariz. Mar. 1, 2017) ("proof of some individual failures does not

7   establish systemic constitutional failures."). "Isolated, anecdotal evidence of a relatively

8   few individual members . . . experiencing issues in obtaining services would not mean that

9   an organization is generally not making such services available." *G. v. Hawaii*, 794 F.

10   Supp. 2d 1119, 1152 (D. Haw. 2011).

11   The Court concluded that "there are *profound* and *systemic* concerns with the

12   monitoring process *at every* stage of the process." (Dkt. 2900 at 6, emphasis added.) But

13   the Order does not specify which results at which facilities are unreliable, or explain why.

14   Instead, the Court concludes, generally, that not one CGAR statistic is reliable. As

15   detailed below, the Court's conclusion is not supported by evidence of systemic

16   deficiencies in the CGAR monitoring or data collection process of the 849 measures

17   monitored by ADC each month;[5] rather, the Court's Order is based solely upon sporadic

18   allegations regarding individual inmate care, the Court's belief there is theoretical

19   potential for error, and the Court's disagreement with what and how the parties agreed to

20   monitor the PMs pursuant to the Stipulation. None of this calls into question the integrity

21   or effectiveness of the monitoring process itself, let alone establishes that there are

22   profound and systemic concerns.

23   As discussed below, the Court's findings are based on insufficient evidence which,

24   if allowed to stand, would create serious injustice for Defendants. Such injustice includes

25   the requirement to continue to monitor PMs which long-ago met or exceeded the

26

27   [5] There are a total of 112 healthcare PMs, each of which may be applicable at
28   some, but not all facilities. The total number of PMs monitored by ADC each month is
849.

Stipulation's compliance thresholds, and the substantial cost, time, and effort required to continue to monitor these complaint PMs.  That injustice is compounded by the costs associated with having to pay for a Rule 706 expert to review, understand, and "fix" a monitoring system that is not broken.

        1.    *"The evidence before the Court is that eOMIS is not an accurate reflection of the care provided because providers **can** back-date entries in eOMIS and do not have to document that a late entry is late."*  (Dkt. 2900 at 6, emphasis added.)

In reaching this conclusion, the Court relied on an email from Greg Campbell, a registered nurse at ASPC-Phoenix, and Dr. Robertson's testimony regarding Mr. Campbell's email.  (Dkt. 2671 at 166; Ex. 190.)  In that email, Mr. Campbell explained why he missed an inmate's audiology consult:

> It's because the provider didn't actually create the eOMIS[6] encounter until mid-July.  However, because he used the entry date of 6/22/17 (when he actually saw the inmate), the consult he wrote in the encounter generated with the date of 6/22/17.  But, in reality, he didn't write the consult until 7/10/17.

(*Id*.)

This provider did not backdate this entry.  The provider's entry correctly indicates the inmate was seen on June 22, 2017, and that he input his notes on July 10, 2017.  (TR. 6/13/2018, 128:2–129:2.)  The entry is late, and should have indicated such, but there is no evidence that the provider manipulated any date.[7]  In fact, the date the entry is opened cannot be changed.  While the encounter date can be incorrectly recorded, because it depends on a human operator, any change is tracked in eOMIS.  (*Id*. at 70:19–24; 129:3–130:21.)  Specifically, the "status bar" tracks and catalogs all changes made to the entry, including what change was made, who made the change, and at what date and time.  (*Id*. at 129:3–130:21.)

---

[6] eOMIS is the software Corizon utilizes for inmate medical records.

[7] Providers are required to document late entries.  In May 2018, ADC codified it into a formal policy.  If a record is randomly selected for review to determine CGAR compliance, and an entry was input late (after 24 hours), the file is automatically marked non-compliant regardless of whether the provision of healthcare was compliant with the applicable PM.  (TR. 6/13/2018, 69:16–70:16.)

1    At the March 7, 2018 hearing, Plaintiffs' counsel, who assumed the provider
2    discussed above intentionally manipulated dates in eOMIS, questioned Dr. Robertson
3    regarding the alleged ability to manipulate dates in eOMIS:

4        Q. Are you aware that the health care staff at Corizon are able
5        to go into eOMIS and change and manipulate the dates of
         requests to an earlier date?

6        A. I know that it's possible to do that.

7        Q. How do you know that?

8        A. Through examples brought to my attention.

9        Q. Tell me about those examples.

10       A. I don't have them with me.

11       Q. How many of them do you remember?

12       A. I wouldn't be able to speak to that.

13   (Dkt. 2671 at 166.)

14   The Court cited no evidence of providers manipulating dates in eOMIS.  Instead, it
15   concluded eOMIS is unreliable based on the possibility that entries *could be* modified.
16   This is not evidence of a "profound and systemic" deficiency.

17   The Court also cited Cecilia Edwards' testimony that, approximately five times a
18   month, she is instructed by providers to cancel specialty consults because a lab test or
19   EKG needs to be ordered first.  (Dkt. 2876 at 19.)  Edwards also testified that consults can
20   be canceled because Corizon needs additional medical records or because there is no
21   specialist available to see the patient.  (*Id*. at 119-20.)  But she did not testify how often
22   consults are canceled due to lack of records, and the only specialty she could recall being
23   unavailable is infectious disease.  (*Id*.)  And while she testified these cancelations are done
24   to meet the Stipulation's timeframes, she clarified that this was just her belief as to why
25   they are done.  (*Id*. at 113.)  Her testimony does not establish a "profound and systemic"
26   deficiency in the monitoring system.  Waiting until the specialist has reviewed pertinent
27   medical records or until the inmate has received necessary diagnostic tests or labs before
28   referral is just good medical practice—not a nefarious attempt to "beat the monitor."

1   Indeed, as Vanessa Headstream testified, if there is not a legitimate reason to cancel the

2   consult, the file is marked non-compliant. (TR. 6/13/2018, 205:16–17.)

3    The Court also relied upon a few instances where eOMIS experienced technical

4   difficulties.  For example, the Court determined Corizon does not provide *all* new users

5   with their own username/password immediately, which "means that an entry in eOMIS

6   *may* be attributed to the wrong provider." (Dkt. 2900 at 7, emphasis added.)  This finding

7   was based on Jan Watson's testimony that she utilized a nurse practitioner's login

8   information before she was given her own. (Dkt. 2670 at 29-31.)  Other than this isolated

9   incident, the Court cited no other evidence to support this finding.  Next, the Court cited

10   to the fact that eOMIS was down on approximately four occasions in 2017 and that, at one

11   point, a non-formulary button temporarily disappeared in the eOMIS software.[8]  (Dkt.

12   2900 at 7.)  The Court relied on the non-formulary button issue to support its conclusion

13   that the entire monitoring process is flawed, despite Lisa McNeal's testimony that the

14   disappearance of the button was a "technology hiccup" that was eventually resolved, and

15   that information was directly input into AIMS[9] while the button glitch was being resolved.

16   (Dkt 2895 at 184.)  There is no evidence that any PM's compliance rate, or that inmate

17   care, was impacted in any way as a result of these unpredictable technological problems.

18    Additionally, the Court relied upon an October 25, 2017 letter from Plaintiffs'

19   counsel to Defense counsel, in which Plaintiffs requested an explanation as to why

20   approximately 24 IPC[10] encounters started at "precisely the start of the hour." (Dkt. 2426-

21   1 at 20-21.)  In their letter, Plaintiffs questioned "how a provider is able, day after day, to

22   open entries precisely on the hour." (*Id.*)  On November 17, 2017, Defendants provided

23   Plaintiffs with a declaration from Natalie Morales, which explained why the encounters

---

24     [8] The Court also noted that "the Court heard that a new drop-down menu was going
25   to be added to eOMIS", but the Court's Order did not explain how that additional drop-
    down menu contributed to "profound and systemic concerns" with the monitoring system.
26   (Dkt. 2900 at 7.)

27     [9] AIMS stands for Adult Information Management System and is ADC's inmate
    database.

28     [10] IPC is the inpatient care unit.

1   were started on the hour.  *See* Exhibit 1 (November 17, 2017 correspondence, and

2   attachment, from Hesman to Kendrick).  Specifically, Ms. Morales explained that it is

3   some providers' practice to enter round times after rounds are complete.  (*Id.* at ¶ 4.)  This

4   allows the provider to enter the start time and associated notes concerning the encounter

5   with the patient.  (*Id.*)  For example, "if they start rounds at 8:00 p.m. and complete their

6   rounds at 11:00 p.m., they can open the entry after they complete rounds and designate the

7   start time as 8:00 p.m. for all patients seen on those rounds which reflects when the rounds

8   began."  (*Id.*)  This approach is intended to reflect that the patient was seen as part of the

9   specified rounds (i.e., 8:00 p.m. rounds).  (*Id.*)  While Plaintiffs advised the Court they

10   disagreed with this practice, the Court never ordered briefing on the issue, and therefore

11   never heard Defendants' evidence prior to ruling.

12       Finally, the Court criticized Corizon for not having a "tickler system" to remind

13   providers to schedule consults, or a system to ensure consults are scheduled, but did not

14   explain how that made the entire monitoring process and all CGAR results unreliable.

15   (Dkt. 2900 at 8.)  Based on the above, the Court found:

16           Simply put, the credible evidence before the Court indicates
            that eOMIS *allows* providers to create dishonest and
17           untraceable entries in an inmate's medical record, that Corizon
            has manipulated categories of records to comply with the
18           Stipulation's time frames, and that Corizon has not ensured
            the integrity of its electronic medical records system.
19

20   (Dkt. 2900 at 8, emphasis added.)

21       Without more, these sporadic occurrences do not evidence systemic deficiencies

22   throughout the entire monitoring process.

23       2.   *"There is no apparent rhyme or reason to the number of records
            ADC reviews.  These decisions **can** be dispositive to a finding of non-
            compliance."* (Dkt. 2900 at 8, emphasis added.)
24

25   ADC reviews records in accordance with the Stipulation and Monitor Guide

26   requirements.  For performance measures which require the review of inmate medical

27   records, the Stipulation states that ten records are to be randomly selected and reviewed *at

28   each yard*.  (Dkt. 1185-1 at 17-47, emphasis added.)  The Monitor Guide echoes the ten

11

1   record at each yard requirement, and clarifies that if ten records are not available on a

2   particular yard, all available files should be reviewed. (Dkt. 2766-1, e.g., 33, 68, 70, 72,

3   130, 134.)

4         To support its finding that "no apparent rhyme or reason" exists with respect to

5   how many records are reviewed for each performance measure, the Court cited to the

6   January 2018 CGARs and real-time data for PM 51 at Florence. (Dkt. 2900 at 8.) The

7   CGAR reflects there were fifty-six records reviewed that month, and that forty-nine of

8   them were compliant, which resulted in a passing score of 88%. (Dkt. 2711 at 112-113.)

9   The Court questioned this result because the real-time data for PM 51 indicated twelve

10  instances of non-compliance. (Dkt. 2815-2 at 15.) By adding the twelve instances of non-

11  compliance to the forty-nine compliant files, the Court determined there were (at least)

12  sixty-one files that should have been reviewed for PM 51 that month at Florence, and

13  criticized ADC for not reviewing all sixty-one files. (Dkt. 2900 at 8.) The Court's Order

14  conflates the number of records reviewed for CGAR results (ten per yard) with the real-

15  time reporting which requires Defendants to report *every* instance of non-compliance.

16  Indeed, because the Stipulation only requires a random sample review of ten inmate files,

17  there will be both compliant and non-compliant inmate files that are not reviewed in

18  preparation of the monthly CGAR.

19        The Order also failed to appreciate that the Stipulation only requires ten files, *if*

20  *available,* be reviewed *at each yard* to calculate the CGAR results. To illustrate, Florence

21  has seven yards: Central, East, Globe, IPC, Kasson, North, and South. If Central had

22  fifteen eligible files, and East only had seven, the Stipulation does not require that an

23  additional three files be pulled from Central to make up for the fact East only had seven.

24  Instead, ten files would be reviewed at Central and all seven files would be reviewed at

25  East. Therefore, the Court's finding that "there was a pool of 61 instances that the

26  Monitoring Bureau could have included in the CGAR" is misplaced. A maximum of ten

27  files are reviewed at each yard, regardless of how many files were reviewed at other

28  yards.

Contrary to the Court's suggestion, there is a documented policy and practice as to how many files are reviewed at each yard. (Dkts. 1185-1, 2766-1.)  And the January 2018 CGAR results for PM 51 at Florence (the only evidence cited by the court), does not suggest that the monitoring was done contrary to the Stipulation's requirements.

Next, relying on two email exchanges regarding individual inmate care, the Court criticized the Monitors for learning of potentially non-complaint inmate files, but not selecting them for that month's CGAR review.  First, the Court cites to a July 28, 2017 exchange from Karen Padron, a Program Evaluation Specialist in the ADC Monitoring Bureau, and Dr. Robertson.  (Dkt. 2900 at 9.)  In her email, Ms. Padron states:

> I am working on PM 50–52 and ran across this consult that was canceled by the regional medical director and wondered if you were aware and that nothing has been pursued since 4/20. . . Thought you might want to be aware that this IM appears to not be getting an evaluation he needs in order to be appropriately treated.

(Ex. 85.)

The Court, assuming this record was randomly selected for review, faulted Defendants for not utilizing it in the June or July CGAR reports for PMs 50–52.  (Dkt. 2900 at 9.)  But this email does not indicate this inmate's file was randomly selected for the CGARs, just that Ms. Padron "ran across" the consult and inquired into it.  (Ex. 85.) Even if this record was randomly selected for review, there is no evidence it was eligible for review for PMs 50–52.  And while the Court states, "[t]he system is not working when an individual Monitor flags someone for not receiving timely care and then doesn't include that person in the CGAR analysis," the Stipulation does not require Defendants to include every seemingly problematic inmate file in the CGAR reports, simply because a Monitor became aware of an issue during the regular course of his or her duties.  Indeed, in addition to monitoring randomly selected records for calculation of CGAR scores, the monitors visit the facilities and speak to healthcare staff, correctional staff, and inmates. Issues may be brought to their attention during these visits.  They listen to these concerns and investigate them.  They should not be penalized for proactively resolving these issues.

1    The Stipulation requires compliance percentages to be calculated based upon a *random*

2    *sample* review of ten files; it does not require a review of all files brought to a monitor's

3    attention during the monitoring month. (Dkt. 1185-1.)

4         Second, the Court cited to an August 7, 2017 email from Ms. Bedoya, the Monitor

5    at ASPC-Tucson, to Dr. Robertson. (Ex. 154.)  In the exchange, Ms. Bedoya inquired into

6    what additional information was needed to get an inmate his requested cancer treatment.

7    (*Id.*) The Court criticized Defendants for marking the inmate's file compliant with several

8    PMs, even though the inmate was "receiving insufficient care." (Dkt. 2900 at 10.)  The

9    Stipulation does not require Defendants to mark a file non-compliant with all PMs if the

10   file is non-complaint with one PM.  Indeed, each PM measures a different aspect of an

11   inmate's file and/or provision of care, the same file may be compliant with certain

12   measures, and non-complaint with others.[11]

13        There is a policy and procedure in place for what files are to be reviewed.

14   Defendants conduct the review in compliance with the Stipulation's requirements.  That

15   the Court disagrees with how the parties agreed to monitor does not render the CGAR

16   reports unreliable.

17             3.     *"Other submissions by Defendants are inexplicably inconsistent."*
                       (Dkt. 2900 at 10.)

18

19        At the monthly status hearings, Defendants present the previous month's

20   *preliminary* CGAR results to the Court.  In anticipation of the hearing, Defendants submit

21   graphs which showcase each Performance Measure's historical performance, and include

22   preliminary results for the prior month.  As their name suggests, preliminary numbers are

23   not final and are subject to change before finalization.

24

25         [11] The Court also noted that it "attempted to understand the CGARs for PM 85 and

26   86", but that "Defendants' explanation did not clarify the matter." (Dkt. 2900 at 10.) The
Court's Order did not explain, however, how this contributed to its determination that

27   there are "profound and systemic concerns with the monitoring process at every stage of
the process."  (Dkt. 2900 at 6.)

28

In finding Defendants' submissions are inconsistent, the Court relied upon a single performance measure, at a single facility, for a single month—the March 2018 result for PM 35 at Florence. (Dkt. 2900 at 10-11.) On May 8, 2018, in anticipation of the May 9, 2018 hearing, Defendants submitted Performance Measure graphs. (Dkt. 2801-1.) At that time, the preliminary number for PM 35 at Florence was 82%. (*Id*. at 61.) After the graphs were submitted, based on ADC's ongoing review, the preliminary number was changed to 88%. (R.T. 5/9/2018, 60:14-61:9.) As such, to ensure the Court had the most up-to-date preliminary numbers, on May 9, 2018 Defendants submitted revised graphs. (Dkt. 2803-1 at 2.) The final CGAR result for PM 35 at Florence in March 2018, however, was 86.27%. (Dkt. 2836 at 107-108.) Therefore, Defendants' filings were not inconsistent; rather, they were filed at different stages of the CGAR finalization process and accurately reflected the percentage at the time of filing. Recognizing the problems associated with reporting preliminary numbers, Defendants had asked the Court to move the status hearing to the third week of the month, to allow them to present final (as opposed to preliminary numbers) at the status hearings.[12] (TR. 4/11/18, 54:12-57:2.) The Court agreed to possibly change the schedule beginning in September 2018. (*Id*. at 56:10-17.) Defendants provided the Court with preliminary numbers to promote transparency and to assist with the monthly status hearings. They should not be penalized if the preliminary numbers change before finalization, simply because of the timing of the monthly status hearing.

> 4. *The evidence presented to the Court during the evidentiary hearings "was also enough to **raise questions** about the integrity of the state's CGAR system."* (Dkt. 2900 at 11, emphasis added.)

The Court cited to one example to support its finding that the entire CGAR system was fatally flawed—Cecilia Edwards' testimony that, in approximately March 2018, optometry referrals were changed from being input as "appointments" to being input as "consults." (Dkt. 2876 at 11-12.) The Court assumed that, because consults have a longer

---

[12] Currently, the monthly status hearing is held on the second Wednesday of each month, before the prior month's CGAR results are completed.

timeframe to be completed under the Stipulation, Defendants must have made the change to allow "themselves additional time to provide the same care." (Dkt. 2900 at 11.) But Ms. Edwards testified that this change occurred because optometry consults are "technically outside consults, even though they're on-site providers." (Dkt. 2876 at 11.) The change was to correct a reasonable misunderstanding as to whether an on-site specialty was considered an "outside" consult. Defendants submitted a sworn declaration from Ms. Edwards' supervisor, which explained this misunderstanding and why the change was made. (Dkt. 2890-4 at 4.) The Court's Order does not mention this Declaration. That mere existence of a brief confusion at a single facility as to whether an on-site specialist was considered a "consult" or an "appointment" is not evidence that the monitoring system is broken.

5. *"[C]ompliance can be a life-or-death matter for inmates."* (Dkt. 2900 at 11.)

Finally, the Court cited to a November 3, 2017 email from Matilde Smith, the Eyman Assistant Facility Health Administrator. In the email, Ms. Smith informed her supervisor that three unidentified inmates were sent to the emergency room with life threatening injuries (one of which expired), and that each inmate was on the chronic care backlog at Eyman. (Ex. 213.) She also stated she believed their chronic care issues were the cause for their hospitalization. (*Id*.) But there is no evidence as to the identity of these three inmates, nor is their medical expert testimony to corroborate Ms. Smith's belief that their life threatening injuries were the result of a failure to be seen for their unidentified chronic care issues. While Defendants are tasked with providing constitutionally adequate healthcare to ADC inmates, the purpose of monitoring the Stipulation's Performance Measures is not to analyze the provision of individual inmate care. Instead, it is to provide compliance percentages based upon a random sample of records. As discussed above, and as the Court previously acknowledged, the Stipulation does not require 100% compliance. (Dkt. 2118 at 3.) ("[T]he Stipulation does not require 100% compliance, nor does it set a floor for compliance . . . [T]his means that individual examples of non-

16

compliance and a hypothetical month of zero percent compliance do not, in and of themselves, violate the Stipulation. . .").  Therefore, Defendants can be compliant with a performance measure despite the fact that not every inmate's file is compliant with that measure.

### B.   The Court's Order Appointing a 706 Expert Was Procedurally Improper.

In addition to denying Defendants' Motion to Terminate, the Court used the evidence discussed above to determine that a Rule 706 expert should be appointed, and paid for by Defendants, to review the entire monitoring process.  (Dkt. 2900 at 12.)  For the same reasons the evidence cannot support a denial of Defendants' Motion to Terminate, it cannot support an appointment of a Rule 706 expert.  Additionally, as detailed below, the Court's appointment of a Rule 706 expert is procedurally improper.

1.   *The Court Failed to Follow the Procedural Requirements in Fed. R. Evid. 706.*

Rule 706(a) has a mandatory precondition before an expert can be appointed:

> **Appointment Process.**  On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations.  The court may appoint any expert that the parties agree on and any of its own choosing.  But the court may only appoint someone who consents to act.

In other words, a court may appoint an expert "*only* on a motion for an order to show cause why such an expert should not be appointed."  29 Fed. Prac. & Proc. Evid. § 6302 (2d ed.) (emphasis added).  The policy of requiring an order to show cause allows a party "an opportunity to be heard on the matter."  *Id*.; *see also Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999) ("The district court followed the dictates of Rule 706(a) by issuing an order to show cause why an expert should not be appointed, ordering briefing, holding a hearing and then appointing an expert of its own selection.").

Here, the Court did not follow the procedural requirements mandated by Rule 706(a).  Instead, the Court ordered that within 30 days, the parties submit two candidates

to review the monitoring process.  (Dkt. 2900 at 14.)  Therefore, Defendants have not had an opportunity to be heard on whether a Rule 706 expert is necessary after the recent evidentiary hearings.  Knowing now what specific evidence the Court believes warrants appointment of a 706 expert, Defendants are entitled to present tailored evidence to address the Court's concerns.

## IV.    CONCLUSION

For these reasons, Defendants request that the Court vacate its Order denying their Motion to Terminate and appointing a Rule 706 expert, and terminate Defendants' monitoring responsibilities on all PMs as requested in their Motion.

DATED this 20th day of July, 2018.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/Daniel P. Struck
      Daniel P. Struck
      Rachel Love
      Timothy J. Bojanowski
      Nicholas D. Acedo
      3100 West Ray Road, Suite 300
      Chandler, Arizona  85226

      Office of the Arizona Attorney General
      Michael E. Gottfried
      Assistant Attorney General
      2005 N. Central Avenue
      Phoenix, Arizona 85004-1592

      *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:            ahardy@prisonlaw.com

Amelia M. Gerlicher:     agerlicher@perkinscoie.com;docketPHX@perkinscoie.com,
                         kleach@perkinscoie.com

Amy B. Fettig:           afettig@npp-aclu.org

Asim Dietrich:           adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org;
                         phxadmin@azdisabilitylaw.org

Caroline N. Mitchell:    cnmitchell@jonesday.com; mlandsborough@jonesday.com;
                         nbreen@jonesday.com

Corene T. Kendrick:      ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:     DBarr@perkinscoie.com; docketphx@perkinscoie.com;
                         sneilson@perkinscoie.com

David Cyrus Fathi:       dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:          dspecter@prisonlaw.com

Jessica Pari Jansepar Ross:   jross@azdisabilitylaw.org

John Howard Gray:        jhgray@perkinscoie.com; slawson@perkinscoie.com

John Laurens Wilkes:     jlwilkes@jonesday.com, dkkerr@jonesday.com

Jose de Jesus Rico:      jrico@azdisabilitylaw.org

Kathleen E. Brody        kbrody@acluaz.org

Kirstin T. Eidenbach:    kirstin@eidenbachlaw.com

Maya Abela               mabela@azdisabilitylaw.org

Rose Daly-Rooney:        rdalyrooney@azdisabilitylaw.org

Sara Norman:             snorman@prisonlaw.com

Rita K. Lomio:           rlomio@prisonlaw.com

Victoria Lopez:          vlopez@aclu.org

/ / /

/ / /

/ / /

1

2           I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

3           N/A

4                /s/Daniel P. Struck

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28