Office of the Arizona Attorney General
Michael E. Gottfried, Bar No. 010623
Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004-1592
Telephone: (602) 542-1645
Fax: (602) 542-3393
Michael.Gottfried@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. CV-12-00601-PHX-ROS<br><br><br>**DEFENDANTS' MOTION FOR RELIEF FROM COURT ORDER RE: HNR BOXES (DOC. 2901)** |

Pursuant to Fed.R.Civ.P. 60(b)(6), Defendants move this Court for relief from the Order issued by Magistrate Judge Duncan requiring Defendants to revert back to a flawed procedure of collecting and processing inmate Health Needs Request (HNR) forms through an HNR-box system.

In December 2016, Defendants introduced a significant change—and improvement—in the way that ADC manages inmate healthcare requests. Instead of requiring inmates to submit a paper request and wait for a scheduled appointment, inmates

can attend an open clinic and receive services immediately or schedule future visits.  ADC made this change after persistent non-compliance with Performance Measure 37 (described below).  The open-clinic system has resulted in a dramatic improvement in compliance; it provides inmates rapid access to medical care and eliminates wasted time spent on collecting, logging, and processing HNRs. (*Compare* Ex. 1, October 2016 CGAR Report, *with* Doc. 2836, March 2018 CGAR Report).  Despite these improvements, Plaintiffs requested and the Court ordered Defendants to: (1) reinstall the HNR boxes; and (2) resume the previous HNR-box system contemporaneously with the open-clinic system.  (Doc. 2901).  The errors underlying that ruling require relief under Rule 60(b)(6).

First, the Court bypassed the Stipulation's mandated dispute resolution process—a procedural prerequisite to the Court's enforcement authority.  Second, the Court exceeded its authority to enforce the Stipulation and instead invented new detailed requirements for the management of ADC's healthcare system.  Third, the Court improperly shifted the burden of proof; instead of requiring Plaintiffs to prove non-compliance, Defendants were required to prove that any change they made to the healthcare delivery system had "no effect on the measurement of Defendants' compliance with the Stipulation."  (Doc. 2901 at 3). Fourth, the Court ignored substantial evidence, including testimony by clinic providers, correctional officers, administrators, and compliance monitors, as well as detailed statistics collected by the monitoring system, and instead relied exclusively on the testimony of four inmates who were critical of the open-clinic system—one of whom admitted in court that he actually preferred the new system.

Plaintiffs provided no evidence of a systematic failure of the open-clinic system resulting in substantial non-compliance with the Stipulation's Performance Measures.  To the contrary, the open clinic works, and works well.  The Court should vacate the Order because it is based upon unsupported legal findings, it overlooks salient evidence supporting continuation of only the open-clinic system, and compliance with the Order

will result in delayed healthcare.   This Motion is supported by the following Memorandum of Points and Authorities and the extensive record developed on this issue.[1]

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   BACKGROUND

On the eve of trial, the parties entered into a private settlement agreement.  (Doc. 1185).  At no time has there been any finding, verdict, or judgment that Defendants had committed any constitutional violation or otherwise provided inadequate healthcare to any Plaintiff or class member.  Under the terms of the Stipulation, Defendants agreed to comply with 103 healthcare Performance Measures (PMs).  (*Id*.)  Compliance with the PMs is determined based on a review of facility documentation, such as staffing reports, or a random review of 10 inmate medical files at each yard.  (Doc. 1185-1).  Neither the Stipulation nor any of the PMs mandate, address, or even refer to an HNR-box system. The Stipulation (PM 37) requires only that inmates be seen by a registered nurse "within 24 hours after an HNR is received" for non-urgent and non-emergent issues.  (*Id*. at 10).

### A.   The Old HNR-Box System.

At the time of the Stipulation, ADC utilized an HNR-box system for processing healthcare requests.  Inmates were required to locate and drop a completed HNR form into a collection box.  (Doc. 2136-1, Pratt Declaration, Ex. 1 at ¶ 42).  Four operational steps then occurred before a medical appointment could be scheduled: (1) a nurse would collect the HNRs from each box daily; (2) the HNRs were then sorted by discipline and triaged by nursing personnel (usually on graveyard shift); (3) nursing personnel would then create an appointment schedule; and (4) after coordinating with medical personnel, correctional personnel would generate, print, and deliver appointment slips to each inmate.  (*Id*. at ¶¶ 42, 44).

Inmates were seen, at the very earliest, the day after they submitted their HNR, but often two days after submission.  (*Id*. at ¶ 43).  Inmates on open yards were called to the

---

[1] *See*, *e.g.*, Docs. 1862, 1873-01, 1889, 1890, 2365, 2416, 2458, and the Transcripts of Evidentiary Hearings at Docs. 2148, 2208, 2243, 2244, 2328, 2349, 2243.

medical clinic in groups and would have to wait in line to be seen by nursing. (*Id*. at ¶ 45). If an inmate did not show up for his/her appointment, correctional personnel would have to suspend their regular duties, track the inmate down, and escort the inmate to the appointment. (Evid. Hr. Tr. 9/13/2017 (Doc. 2328) at 152:18-153:4).

### B.   The New Open-Clinic System.

ADC developed the open-clinic system to increase compliance with PM 37. Under that system, inmates on open yards and in close custody report directly to the medical clinic with a completed HNR form in hand and are seen the same day.[2] (Doc. 1873-1 at ¶ 11; Doc. 2136-1, Pratt Declaration, Ex. 1 at ¶ 41). Nursing personnel assess and triage the inmates on sight. (Doc. 2136-1, Pratt Declaration, Ex. 1 at ¶ 41). The open-clinic system operates like an urgent care facility in the private community; it decreases appointment wait times and increases inmate control over their own medical care. Inmates can explain their ailment face-to-face instead of having to rely on their writing skills, and nurses can assess and triage their needs immediately. (Doc. 1873-1 at ¶ 11; Doc. 2136-1, Pratt Declaration, Ex. 1 at ¶ 41). Inmates who need a medication refill can either drop off a refill request in an HNR box (now renamed "Med Refill" boxes) or be seen in the open clinic. (*Id*. at ¶ 46; Doc. 2244, 8/08/17 Evid. Hr. Tr., at 54:1-3).

The open-clinic system has dramatically improved compliance scores for PM 37. For example, in October 2016, just two months *prior to* the implementation of the open-clinic system, half of ADC's state-operated prison complexes exceeded the 80% compliance benchmark:

| Douglas | 95% | Phoenix | 89% |
|---------|-----|---------|-----|
| Eyman | 48% | Safford | 97% |
| Florence | 88% | Tucson | 79% |
| Lewis | 29% | Winslow | 97% |

---

[2] Depending on the facility, inmate custody levels, and inmate celling issues, some yards may coordinate open-clinic calls based on housing unit and timeframe, but all inmates are seen on the day they come to the clinic.

4

| Perryville | 59% | Yuma | 42% |
|------------|-----|------|-----|

(Ex. 1, October 2016 CGAR Report).  But by March 2018, *all ten* complexes *exceeded* the Stipulation's 85% compliance benchmark:

| Douglas | 100% | Phoenix | 96% |
|---------|------|---------|-----|
| Eyman | 100% | Safford | 93% |
| Florence | 94% | Tucson | 99% |
| Lewis | 96% | Winslow | 100% |
| Perryville | 100% | Yuma | 100% |

(Doc. 2836, March 2018 CGAR Report).  Plaintiffs have not presented any evidence to dispute the accuracy of these scores or the system-wide success of the open clinic.

## C.   Plaintiffs Attack the Open-Clinic System and the Court Orders an Evidentiary Hearing.

The success of the open-clinic system spurred Plaintiffs' criticism of it.  Plaintiffs complained that the new system produced unreliable inflated compliance scores; they speculated about hypothetical barriers to access to medical care for some inmates; and they requested the Court to reinstate the HNR-box system. (Doc. 2365, 2458).  Over Defendants' objection that the parties did not mediate the issue, as required by the Stipulation,[3] Magistrate Judge Duncan held an evidentiary hearing over numerous days, spanning three months, to examine Plaintiffs' complaints about the open-clinic system[4]. Many witnesses testified, however, Plaintiffs provided only four inmate witnesses, from two prison complexes, representing only four housing units state-wide.  Those four inmates offered anecdotal complaints and opinions regarding the open clinic, and speculated regarding alleged barriers to access to the open clinic.[5]  But even with these

---

[3] (Docs. 2365 and 2458).

[4] (Docs. 2208, 2244, and 2328).

[5] Inmate Ashworth testified regarding the San Pedro Unit at ASPC-Perryville (Doc. 2208 at 173:24-213:21), Inmate Keys testified regarding the Santa Cruz unit at ASPC-Perryville (*id.* at 103:1-172:2), Inmate Blocksom testified about the East Unit at ASPC-

four witnesses, one of the inmates admitted that he *preferred* the open clinic over the previous HNR box submission process and saw no benefit to the previous HNR box process:

> THE COURT:  But if we just focus on that issue, which is better, open clinic, HNR, are there any advantages that you saw to the HNR system over the open clinic system with respect to this contact with the nursing line?
>
> THE WITNESS:   No. I can't see any real advantages to the HNR box, honestly.  In terms of access, the open clinic is actually better.

(Evid. Hr. Tr. 7/14/2017 at 30:12-18).

### D.    Magistrate Judge Duncan Orders ADC to Reinstate the Old System.

Magistrate Judge Duncan's Order rests almost entirely on these four inmates' anecdotal and speculative testimony. (Doc. 2901).   The Order requires Defendants to revert to the HNR-box system of collecting, logging, and processing submitted HNRs. (*Id*.) Although the Order "allows" Defendants to simultaneously operate both the previous HNR box system and the new open clinic system (*id*. at 4), running both an open clinic and an operationally burdensome drop box/scheduled care system at the same time unnecessarily exhausts already limited correctional and medical personnel. As such, the Order wiped out the open-clinic system and required Defendants to revert to a largely unsuccessful and flawed HNR-box system that will result in episodes, if not patterns, of Stipulation substantial non-compliance.

In so ordering, Magistrate Judge Duncan found that the open clinic "*may impermissibly constrict the numbers of HNRs submitted for [compliance] measurement and so it cannot replace the HNR boxes for purposes of measuring compliance with the Stipulation.*" (Doc. 2901 at 3, emphasis added).  He also found that "[b]ecause the parties identified the HNR boxes as the triggering event with some of the performance measures, this practice cannot be abandoned *without proof that it would have no effect* on the

---

Florence (*id.* at 14:7-53:13), and Inmate Oyenik testified about the South Unit at ASPC-Florence (*id.* at 56:5–99:21).

measurement of Defendants' compliance with the Stipulation." (*Id.*, emphasis original). This negative burden of proof was imposed upon Defendants, and Magistrate Judge Duncan concluded that Defendants failed to meet it. He further surmised that "it is likely that some class members would not be able to brave the gauntlet of making it to a nurse at the open clinic." (*Id.*) The Order rejects Defendants' position that the Stipulation does not require HNR boxes and therefore neither he nor Plaintiffs can require it. In doing so, Magistrate Judge Duncan determined that, although not required by the Stipulation, Plaintiffs had no reason to believe that system would change for the life of the Stipulation and the Court has the discretion to determine whether a change in health care delivery "complies with the letter and spirit of the Stipulation." (*Id.*) He also rejected Defendants' objection to the procedural flaw of failing to mediate the issue as mandated by the Stipulation and as a prerequisite to the Court's enforcement power.

## II.   LEGAL ARGUMENT

A court may relieve a party from a final order for any "reason that justifies." Fed.R.Civ.P. 60(b)(6). Rule 60(b)(6) "provides courts with authority adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Gonzalez v. Crosby*, 545 U.S. 524, 542 (2005) (internal quotations omitted); *accord Phelps v. Alameida*, 569 F.3d 1120, 1135 (9th Cir. 2009). Relief is warranted under this rule upon a timely motion showing exceptional circumstances. *Lal v. California*, 610 F.3d 518, 524 (9th Cir. 2010). "In determining whether extraordinary circumstances are present, a court may consider a wide range of factors." *Buck v. Davis*, 137 S. Ct. 759, 778 (2017). Among those factors are "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-864 (1988).

### A.   The Court Bypassed the Stipulation's Mandatory Dispute-Resolution Process.

Paragraph 30 specifically provides that if Plaintiffs allege that Defendants failed to substantially comply with the Stipulation, they must first "provide Defendants with a

1    written statement describing the alleged non-compliance (Notice of Substantial Non-
2    Compliance." (Doc. 1185 at 13, ¶ 30). Defendants then must respond to Plaintiffs'
3    Notice. (*Id*.) Thereafter, the parties must informally meet and confer to attempt to resolve
4    the dispute. (*Id*.) If unable to resolve the dispute, the parties must mediate. (*Id*. at 13,
5    ¶ 31). If still unresolved, either party can file a Motion to Enforce the Stipulation. (*Id*.)
6    Only then did Magistrate Judge Duncan have the authority to make a finding as to
7    substantial non-compliance. (*Id*. at 14, ¶ 36). Even upon a finding of substantial non-
8    compliance, Defendants were required to submit a proposed remedial plan, and only if
9    that plan proved unsuccessful, was Magistrate Judge Duncan authorized to take further
10   judicial action. (*Id*.). *None* of these steps occurred here. (*See also* Doc. 2416). Both the
11   evidentiary hearing and the resulting Order ignored the Stipulation's procedural
12   prerequisites and cannot be allowed to stand.

13           **B.     The Order Exceeds the Scope of the Stipulation.**

14           Magistrate Judge Duncan previously acknowledged that his authority is restricted
15   to "enforcement of the performance measures" and that he does not have "a general
16   habitability dominion." (R.T. 7/13/2017 at 6:22-25). Indeed, courts "afford considerable
17   deference to the expertise and decision making of prison administrators." *Prison Legal*
18   *News v. Cook,* 238 F.3d 1145, 1140 (9th Cir. 2001) (citing *Thornburgh v. Abbott,* 490
19   U.S. 401, 407-08 (1989)). That deference extends "to the comprehensive planning and
20   commitment of resources that are 'peculiarly within the province of the legislative and
21   executive branches of government.'" *Id*. (quoting *Procunier v. Martinez,* 416 U.S. 396,
22   405 (1974)). Ordering Defendants to revert back to a flawed HNR-box system unduly
23   micromanages prison operations and ADC's delivery of healthcare. Furthermore, the
24   Order is not tethered to any provision in the Stipulation.

25           Magistrate Judge Duncan justified his Order by dubbing the HNR box the
26   triggering event for healthcare delivery and thus tied it to compliance with the Stipulation.
27   (Doc. 2901 at 3). He identified twelve PMs that require Defendants to act within certain

28

time frames.[6]  None of these PMs, however, requires an inmate to deposit a piece of paper into an un-manned HNR box and wait a day or more for collection, triage, and appointment scheduling.  Instead, the time frames governing the provision of care are

_____

[6] **PM 5** – requires medical records to be filed in the inmate's file within two business days. Methodology – the HNR triage date is used to measure compliance.

**PM 7** – requires medical records to be legible, and complete with name stamp and signature within the monitored month.  Methodology – the HNR triage date is used to measure compliance.

**PM 36** – requires an LPN or RN to screen HNRs within 24 hours of receipt. Methodology – the date the HNR is received by medical is used to measure compliance.

**PM 37** – requires the inmate to be seen by an RN within 24 hours after the HNR is received (or immediately if identified with an emergent need, or the same day if identified as having an urgent need).  Methodology – the date the HNR is received by medical is used to measure compliance.

**PM 39** – requires routine provider referrals being addressed by a Medical Provider and referrals requiring a scheduled provider appointment be seen within fourteen calendar days of the referral.  Methodology – the timeline from date the referral is made is used to measure compliance.

**PM 40** – requires urgent provider referrals being seen by a Medical Provider within 24 hours of the referral.  Methodology – the timeline from date the referral is made is used to measure compliance.

**PM 41** – requires emergent referrals being seen immediately by a Medical Provider. Methodology – the timeline from date the referral is made is used to measure compliance.

**PM 42** – requires follow-up sick call encounters occurring within the time frame specific by the Medical or Mental Health Provider.  Methodology – the timeline from date the HNR is received by medical and referral is made is used to measure compliance.

**PM 47** – requires Medical Providers to communicate the results of diagnostic studies to the inmate upon request and within seven calendar days of the date of the request. Methodology – uses the "date received" from the HNR Log.

**PM 98** – requires mental health HNRs to be responded to within the timeframes set forth in the Mental Health Technical Manual. Methodology – the date the HNR is received by medical is used to measure compliance.

**PM 102** – requires routine dental care wait times to be no more than 90 days from the date the HNR was received. Methodology – the date the HNR is received by medical is used to measure compliance.

**PM 103** – requires urgent dental care wait times, as determined by the contracted vendor, no more than 72 hours from the date the HNR was received by dental. Methodology – the date the HNR is received by medical is used to measure compliance.

(*See* Monitor Guide Excerpts, Doc. 2766-1 at 24, 26, 59, 60, 62, 63, 64, 65, 72, 149, 155, 156). The Monitor Guide remains in draft form. While it is a work in progress, subject to change, the methodology for monitoring is in place for the relevant PMs addressed herein.

analyzed by the date the HNR is *received in hand, dated, and logged* by medical personnel—not the mechanism or manner by which the HNRs reach medical. (*See* Monitor Guide, Doc. 2766-1). None of the Performance Measures require that HNRs be received via any particular method, let alone via an HNR box system. (*Id.*) Likewise, none of the methodologies for measuring compliance with the PMs specify that the HNR box must be the only method of submission. (*Id.*) The finding that the HNR box is the triggering event that precedes compliance with the Stipulation is clearly erroneous.

Finally, the Order is not otherwise validated by Magistrate Judge Duncan's finding that, at the time the parties negotiated the Stipulation, there was no indication that the HNR-box system would change. (Doc. 2901 at 4 & fn. 3). The purpose of the Stipulation was to encourage and require Defendants to *improve* its system for delivering healthcare to prisoners, not to remain static. The Stipulation neither requires the HNR-box system, nor does it prohibit improvement and change. Additionally, as the Order recognizes, the parties had expected at least one major change—a transition to electronic medical recordkeeping. (*Id*. at n.3). Plaintiffs surely anticipated that operational changes to the delivery of healthcare would ensue as compliance was tested over the minimum four-year life span of the Stipulation. Defendants regularly communicate improvement plans designed to improve operations to address failing compliance scores to the Court and Plaintiffs, all without prior permission from the Court or Plaintiffs to regulate and improve upon Defendants' own operational processes.

**C.   The Order Erroneously Shifts the Burden to Defendants to Prove a Negative.**

Plaintiffs complained that the open-clinic system erected barriers to access to care and artificially inflated PM compliance. But Magistrate Judge Duncan did not require Plaintiffs to prove their speculative hypothesis. Instead, he ruled that Defendants could not alter their HNR-box system "without proof that it would have no effect on the measurement of Defendants' compliance with the Stipulation." (Doc. 2901 at 3). That

1  ruling improperly shifted the burden of proof to Defendants and required them to prove a

2  negative fact.

3        Plaintiffs had the burden of proving a violation of the Stipulation. (Doc. 1185,

4  ¶ 30).  *See also Thomas v. Montelucia Villas, LLC*, 302 P.3d 67, 96 (Ariz. 2013) (plaintiff

5  has the burden of proving the existence of a contract, breach, and resulting damages).

6  The Stipulation does not require Defendants to prove that a change in healthcare

7  operations will not negatively impact compliance before implementing it.  (Doc. 1185).

8  Obviously, requiring Defendants to prove this negative imposes an insurmountable burden

9  to prove the absence of an "effect." (Doc. 2901 at 3).  "[A]s a practical matter it is never

10  easy to prove a negative." *Elkins v. United States*, 364 U.S. 206, 218 (1960). "For this

11  reason, fairness and common sense often counsel against requiring a party to prove a

12  negative fact, and favor, instead, placing the burden of coming forward with evidence on

13  the party with superior access to the affirmative information."  *United States v. Cortez-*

14  *Rivera*, 454 F.3d 1038, 1041-42 (9th Cir. 2006) (quoting *Sissoko v. Rocha*, 440 F.3d 1145,

15  1162 (9th Cir. 2006).

16        Even if Magistrate Judge Duncan had the authority to micromanage specific prison

17  operations, it is still Plaintiffs' burden to prove that the open-clinic system was a systemic

18  failure, resulting in substantial non-compliance with the twelve PMs the Order references.

19  Plaintiffs failed to present any such proof.  Plaintiffs have unfettered access to all the

20  information needed to prove a systemic failure—the inmates, their medical records,

21  inmate grievances complaining they cannot get to the clinic, PM source documents

22  establishing inaccurate CGAR reporting, etc.  Plaintiffs' presentation of a mere four

23  inmate witnesses, three offering their personal negative opinion of the open clinic and one

24  supporting it, fails to prove systemic substantial non-compliance.

25        **D.    There is No Evidence of a Systemic Deficiency in the Open Clinic**
           **System Resulting in Substantial Non-Compliance to Justify Reversion**
26           **to the Flawed HNR Box System.**

27        Isolated instances do not establish sufficient evidence of systemic issues.  *Parsons*

28  *v. Ryan*, 289 F.R.D. 513, 521 (D. Ariz. 2013), *aff'd*, 754 F.3d 657 (9th Cir. 2014).  While

anecdotal evidence may suffice to prove individual claims, rarely, if ever, can such evidence show a systemic pattern. *See Coral Const. Co. v. King County*, 941 F.2d 910, 919 (9th Cir. 1991); *see also Graves v. Penzone*, CV-77-00479-PHX-NVW, 2017 WL 782991, at *10 (D. Ariz. Mar. 1, 2017) ("proof of some individual failures does not establish systemic constitutional failures."). "Isolated, anecdotal evidence of a relatively few individual members . . . experiencing issues in obtaining services would not mean that an organization is generally not making such services available." *G. v. Hawaii*, 794 F. Supp. 2d 1119, 1152 (D. Haw. 2011).

Magistrate Judge Duncan speculated that "it is likely that some class members would not be able to brave the gauntlet of making it to a nurse at the open clinic." (Doc. 2901 at 3). As speculative barriers, he cites to the hypothetical inability of some inmates to attend the open clinic during the designated hours, inmates too ill or disabled to get to the clinic, and inmates claiming they had to wait outside in 100-plus degrees to wait to see the nurse. (Doc. 2901 at 2). More specifically, Magistrate Judge Duncan relied upon the testimony of (only) four inmates to conclude that there must be some actual state-wide systemic barriers to access to medical care imposed by the open clinic system.

Magistrate Judge Duncan also referred to snippets of testimony of an ASPC-Perryville correctional officer to conclude that inmates "were unable to attend the open clinic during designated hours. (*Id*. at 2:20-22 citing R.T. 8/9/17 at 12:2-6, 13:13-14; 15-2-4 [testimony of Officer Western]). But this ignores the fact that the officer testified that the subject inmate *was permitted* to go to the medical unit outside of the normal clinic hours – and was pushed in a wheelchair by another inmate. (Doc. 2243 at 14:2-23).[7]

---

[7] Q. So you told her that she could go ahead and go to medical; correct?
A. Yes.
Q. And you said she was in a wheelchair at that time?
A. Yes.
Q. And did she have another inmate that was there pushing her or did she have to wheel herself?
A. She had another inmate push her to medical.

Next, the finding that inmates cannot get to the clinic during the designated hours is belied by testimony presented by Defendants. Specifically, Deputy Wardens of Operations Van Winkle and Twyford, along with Deputy Warden Mattos, all testified that inmates appearing at the open clinic will be seen the same day and are not turned away. (Doc. 2244 at 117:9-195:6, 195:13-253:6; 2329 at 233:7-245:19, 245:21-283:3).   Where inmates are scheduled to go to the clinic during certain hours designated by housing unit, they too are not turned away until they are seen. (Evid. Hr. Tr. 8/8/2017 (Doc. 2244) at 121-122, 129:7-135:2; 197:12-200:24; 203:16-205 and associated admitted exhibits). Likewise, inmates already at the clinic during count are not ordered to return to their housing units, but instead are included on the "out-count sheet" and are permitted to stay in line at the medical clinic. (*Id.*) Additional access is provided for inmates who are on work crews, providing for those workers to report to medical after work (or be absent from work if too sick to go to work). (*Id.*)  The Order ignores all of this uncontroverted evidence.

Moreover, Defendants' operations witnesses testified that if an inmate were too ill to get to the clinic, an ICS (emergency) may be called for a medical response to the inmate. (Evid. Hr. Tr. 8/8/2017 (Doc. 2244) at 123:6-129:6, 135:2-140:7; 149:20-155:13; 161:7-171:7;  176:24-186:4;  200:25-203:15;  206-211:10;  215:14-218:16;  242:7-244:12 and associated admitted exhibits; 9/11/18 Evid. Hr. Tr. (Doc 2329) at 233:20-238:24; 253:15-257:25 and associated admitted exhibits).  Likewise, operations provides support to disabled inmates.  (*Id.*) Inmates in wheelchairs are provided inmate aides to push them to the open clinic (a paid position). (*Id.*)  Inmates who walk with canes are provided an aide to assist them where necessary. (*Id.*)  Depending on the distance from the housing unit to the medical clinic, disabled inmates are also offered advanced call time to go to the

---

Q. And did you permit that other inmate to push her down to medical at that time?

A. Yes, I did. Inmate agreed to push her and we do that if they agree to help.  We have wheelchair pushers that are specified if someone has a Chrono for a wheelchair pusher; but if she agreed, we let them.

(Doc. 2243, Evid. Hr. Tr. at 14:10-23).

clinic. (*Id.*)   Moreover, contrary to Plaintiffs' unsubstantiated allegations, sidewalk conditions do not impede access to the clinics and ADA accommodations are appropriately provided for – despite ADA accommodation not being part of the underlying lawsuit or the Stipulation provisions. (*Id.*)   The Order also ignores all of this uncontroverted evidence and ignores the fact that these issues would all be present under the HNR box submission system.

The Order also ignores evidence of significant improvements made by Defendants to assist inmates who may have to wait outside before moving to the indoor waiting room (where applicable).   At the outset, the temperature issue cited by the Order does not exist all year round and therefore is not a continuous barrier to access, even if believed. (Doc. 2317 at p. 3).   Defendants also presented substantial evidence of significant improvements made by Defendants to address outdoor waiting conditions; specifically, indoor waiting room improvements/expansions, and the addition of shade structures, benches, and misting systems. (8/8/2017 Evid. Hr. Tr. (Doc. 2244) at  140:9-149:19; 155:14-161:6; 180:8-194:4; 211:11-215:13; 218:17-222:7 and associated admitted exhibits). Defendants have appropriately addressed outdoor waiting temperature concerns and Plaintiffs failed to produce any credible evidence of actual barriers to access to care.

Additionally, since the open-clinic system was put into place, compliance for the PMs predicated upon submission of an HNR has consistently improved. (Docs. 2063, 2166, 2213, 2247, 2333, 2399, 2468, 2511, 2570, 2626, 2711, 2783, 2836, 2921 Monthly CGAR Reports). Yet, Plaintiffs try to spin this as a problem, arguing that the improved performance under the new system must be a statistical artifact, or even the result of data manipulation.   The record is devoid of any evidence of artificial inflation of the PM scores.

Simply put, Plaintiffs' unsubstantiated and speculative allegation of the unreliable inflation of compliance scores generated by the change to the open-clinic system is insufficient as a matter of law to support an Order that ADC must now revert to the prior flawed HNR box system.   Plaintiffs' lamentations over what they see on the evidentiary

horizon nevertheless fail as a matter of law to justify the reversal of this significant operational success or otherwise empower the Court to micromanage prison operations in violation of federal law.

Nothing relied upon by Magistrate Judge Duncan demonstrated a systemic failure of the open clinic system that results in substantial non-compliance with the Stipulation. To the contrary, the open clinic system substantially increases compliance. While the evidentiary hearing spanned days, over months, the Order relies upon anecdotal inferences and speculation elicited from three inmates out of nearly 34,000 to conclude that the open clinic system somehow impedes access to medical care. (Doc. 2901 at 2-3). This Court should conclude that anecdotal and speculative testimony from 0.01% of the inmate population (4 out of 33,950 inmates) is woefully insufficient to prove a systemic failure. Plaintiffs failed to prove systemic substantial non-compliance resulting from the implementation of the open clinic system. Magistrate Judge Duncan dismissed or ignored overwhelming evidence that the new system works and substantially improves the delivery of care. This Court therefore should vacate the Order and thereby defer to Defendants to operate their prisons at their professional discretion, in the best interest of the inmate population and efficient prison operations.

## CONCLUSION

Neither the Stipulation nor the applicable Performance Measures require the flawed HNR-box process. Defendants have discretion to implement operational changes that improve compliance with the Stipulation. Magistrate Judge Duncan's encroachment into micro-management of prison operations exceeds the scope of the Stipulation and is prohibited by well-settled case law. Anecdotal and opinion evidence offered by a mere four inmates is insufficient to establish systemic demise of the inmate healthcare delivery system. The open clinic works. It is a demonstrated and irrefutable success. Magistrate Judge Duncan's Order should be vacated.

DATED this 20th day of July, 2018.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/Daniel P. Struck
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona  85226

Office of the Arizona Attorney General
Michael E. Gottfried
Assistant Attorneys General
2005 N. Central Avenue
Phoenix, Arizona 85004-1592

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 20, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:           ahardy@prisonlaw.com

Amelia M. Gerlicher:     agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

Amy B. Fettig:         afettig@npp-aclu.org

Asim Dietrich:         adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Caroline N. Mitchell:     cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:    ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:    DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

David Cyrus Fathi:     dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:       dspecter@prisonlaw.com

Jessica Pari Jansepar Ross:   jross@azdisabilitylaw.org

John Howard Gray:     jhgray@perkinscoie.com; slawson@perkinscoie.com

John Laurens Wilkes:    jlwilkes@jonesday.com, dkkerr@jonesday.com

Jose de Jesus Rico:     jrico@azdisabilitylaw.org

Kathleen E. Brody:     kbrody@acluaz.org

Kirstin T. Eidenbach:    kirstin@eidenbachlaw.com

Maya Abela:           mabela@azdisabilitylaw.org

Rose Daly-Rooney:      rdalyrooney@azdisabilitylaw.org

Sara Norman:          snorman@prisonlaw.com

Rita K. Lomio:          rlomio@prisonlaw.com

Victoria Lopez:        vlopez@aclu.org

/ / /

/ / /

/ / /

1

2        I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

3        N/A

4                                        /s/Daniel P. Struck

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28