Office of the Arizona Attorney General
Michael E. Gottfried, Bar No. 010623
Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004-1592
Telephone: (602) 542-1645
Fax: (602) 542-3393
Michael.Gottfried@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                                              Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                                              Defendants. | NO. CV-12-00601-PHX-ROS<br><br>**DEFENDANTS' MOTION TO STAY JUNE 22, 2018 ORDERS**<br><br>**[Expedited Consideration Requested]** |

# TABLE OF CONTENTS

**Page**

I.   CASE HISTORY ........................................................................................... 1

   A.   The Complaint and Pre-Trial Litigation ........................................... 1

   B.   The Privatization of ADC Healthcare .............................................. 2

   C.   The Stipulation .................................................................................. 2

      1.   Monitoring and Compliance ................................................... 2

      2.   Termination ............................................................................. 3

      3.   Substantial Non-Compliance Procedure ................................. 3

      4.   Enforcement ............................................................................ 4

      5.   Attorneys' Fees ....................................................................... 4

   D.   Defendants' Compliance with the Stipulation .................................. 4

   E.   Prior Rulings Currently on Appeal ................................................... 5

      1.   Outside-Transport Order - Appeal No. 16-17282 ................. 5

      2.   Staffing-Plan Order - Appeal No. 17-15302 .......................... 5

   F.   Defendants' Challenge to Magistrate Judge Duncan's Jurisdiction ............. 6

   G.   Magistrate Judge Duncan's June 22 Orders ..................................... 6

      1.   Contempt/Sanctions Order (Dkt. 2898, 2899) ...................... 6

      2.   Termination Order (Dkt. 2900) .............................................. 7

      3.   HNR-Box Order (Dkt. 2901) .................................................. 7

      4.   Attorneys' Fees Order (Dkt. 2902, 2903) .............................. 8

      5.   Staffing-Plan Order (Dkt. 2904) ............................................ 8

      6.   Compliance-Experts Order (Dkt 2905) .................................. 9

II.  THE COURT SHOULD STAY THE JUNE 22 ORDERS ..................................... 10

   A.   The Court Should Stay Further Proceedings Related to the Non-
        Monetary Orders ............................................................................... 10

      1.   The Court should stay further proceedings related to the
           June 22 Orders until the prior appeals are resolved ............. 10

i

## **TABLE OF CONTENTS (cont.)**

**Page**

     2.    The Court should stay further proceedings related to the June 22 Orders until the appeals from those Orders are resolved ........................................................................................... 12

B.    The Court Should Stay Enforcement of the Monetary Orders..................... 16

CONCLUSION ............................................................................................................. 17

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Addington v. U.S. Airline Pilots Ass'n*
   CV 08-1633-PHX-NVW, 2009 WL 2761928 (D. Ariz. Aug. 28, 2009) ....................... 13

*Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*
   721 F.3d 1122 (9th Cir. 2013) ................................................................... 12, 14

*AirFX.com v. AirFX, LLC*
   CV 11-01064-PHX-FJM, 2013 WL 2458770 (D. Ariz. June 6, 2013) ......................... 13

*All. for the Wild Rockies v. Cottrell*
   632 F.3d 1127 (9th Cir. 2011) .................................................................... 13

*Anderson v. Woodcreek Venture Ltd.*
   351 F.3d 911 (9th Cir. 2003) ..................................................................... 11

*Biltmore Associates, L.L.C., as Tr. v. Twin City Fire Ins. Co.*
   205-CV-04220-PHX-FJM, 2007 WL 2422053 (D. Ariz. Aug. 22, 2007) ..................... 16

*Christina A. ex rel Jennifer A. v. Bloomberg*
   315 F.3d 990 (8th Cir. 2003) ..................................................................... 14

*Clinton v. Jones*
   520 U.S. 681 (1997) ............................................................................... 10

*CMAX, Inc. v. Hall*
   300 F.2d 265 (9th Cir. 1962) ................................................................. 10, 12

*D. Patrick, Inc. v. Ford Motor Co.*
   8 F.3d 455 (7th Cir. 1993) ....................................................................... 14

*Danner Const. Co., Inc. v. Hillsborough County*
   8:09-CV-650-T-17TBM, 2009 WL 3055315 (M.D. Fla. Sept. 24, 2009) ..................... 16

*Dillon v. City of Chicago*
   866 F.2d 902 (7th Cir. 1988) ..................................................................... 16

*Hatch v. United States*
   CR 02-1016-PHX-JJT, 2016 WL 6155363 (D. Ariz. Sept. 30, 2016) ......................... 15

*Hatcher v. Consolidated City of Indianapolis*
   323 F.3d 513 (7th Cir. 2003) ..................................................................... 11

iii

# TABLE OF AUTHORITIES (cont.)

Page

*Hilton v. Braunskill*
  481 U.S. 770 (1987) ...................................................... 13

*Landis v. N. Am. Co.*
  299 U.S. 248 (1936) ...................................................... 10

*Leiva-Perez v. Holder*
  640 F.3d 962 (9th Cir. 2011) ...................................................... 13

*Leyva v. Certified Grocers of Cal., Ltd.*
  593 F.2d 857 (9th Cir. 1979) ...................................................... 10

*Macias v. N.M. Dep't of Labor*
  300 F.R.D. 529 (D.N.M. 2014) ...................................................... 14

*Mediterranean Enters. v. Ssangyong Corp.*
  708 F.2d 1458 (9th Cir. 1983) ...................................................... 10

*Mendez v. Optio Sols., LLC*
  239 F. Supp. 3d 1229 (S.D. Cal. 2017) ...................................................... 10

*Rufo v. Inmates of Suffolk Cty. Jail*
  502 U.S. 367 (1992) ...................................................... 14

*Williams v. King*
  875 F.3d 500 (9th Cir. 2017) ...................................................... 11

**Statutes**

28 U.S.C. § 636(c) ...................................................... 4, 6

42 U.S.C. § 1997e(d) ...................................................... 4

**Rules**

Ariz. R. Civ. P. 62(e)(1) ...................................................... 16

Fed. R. Civ. P. 23(e) ...................................................... 4

Fed. R. Civ. P. 62(b) ...................................................... 13

Fed. R. Civ. P. 62(c) ...................................................... 13

# TABLE OF  AUTHORITIES (cont.)

__Page__

Fed. R. Civ. P. 62(d) ............................................................................................................. 16

**Other Authorities**

2011 Ariz. Legis. Serv. 1st Sess. Ch. 278 (H.B. 2011) ........................................................ 2

v

Defendants respectfully request the Court to stay the June 22, 2018 Orders, until final resolution of the following actions currently pending before the Ninth Circuit: (1) a motion raising the question of whether Magistrate Judge Duncan had jurisdiction to issue the Orders; (2) the consolidated appeals in Nos. 16-17282, 17-15302, and 17-15352; and (3) the appeals from the June 22 Orders (Nos. 18-16358, 18-16365, 18-16368). The June 22 Orders require the appointment of several experts to micro-manage nearly every aspect of inmate healthcare, the implementation of detailed plans that will drastically alter the delivery of healthcare services throughout the prison system, and the compilation of exhaustive performance-measure data indefinitely.

Complying with these Orders will impose an extraordinary administrative burden on ADC and Corizon staff and prison operations, at significant expense to the taxpayers. A stay pending the appeals is therefore critical and justified because the appellate courts' resolution will directly impact the validity of the June 22 Orders and could very well nullify them. If these Orders are ultimately held invalid, then the efforts expended and costs incurred to comply, as well as the judicial resources to enforce them, will have been lost. Moreover, once the Court distributes the sanction monies and Defendants pay the attorneys' fees judgment, as the June 22 Orders require, that money cannot be recovered if the Orders are reversed. A limited stay is therefore warranted.

I.    CASE HISTORY

    A.    The Complaint and Pre-Trial Litigation

Plaintiffs filed this class-action lawsuit in March 2012, alleging inadequate healthcare and unlawful conditions of confinement in violation of the Eighth Amendment, and seeking declaratory and injunctive relief. (Dkt. 1.) In March 2013, the district court (Judge Neil V. Wake) certified a healthcare Class (consisting of all inmates) and a conditions-of-confinement Subclass (consisting of all maximum-custody inmates).[1] (Dkt. 372.) The court dismissed Plaintiffs Parsons and Brislan, but denied summary judgment as

---

[1] Both classes are limited to inmates housed in the ten ADC-operated facilities.

to the remaining Plaintiffs.  (Dkt. 372, 1065.)  Two months before trial, the Clerk reassigned the case to Judge Diane J. Humetewa.  (Dkt. 1074.)

### B.   The Privatization of ADC Healthcare

At the time Plaintiffs filed their Complaint, the State provided healthcare to ADC inmates directly.  But beginning in July 2012, the Legislature privatized the provision of inmate healthcare.  *See* 2011 Ariz. Legis. Serv. 1st Sess. Ch. 278 (H.B. 2011).  Wexford Health Sources, Inc. provided healthcare to ADC inmates from July 1, 2012 to March 3, 2013 (Dkt. 892 at 11-13, ¶¶ 69, 84), and Corizon, Inc. has provided healthcare since March 4, 2013 (Dkt. 344).  As part of the transition to privatized healthcare, ADC created a Health Services Contract Monitoring Bureau to oversee contract compliance.  (Dkt. 892 at 14-15, ¶¶ 95-101.)  Each facility has its own contract-compliance monitor.  (Ex. 1.)

### C.   The Stipulation

A week before trial, the parties entered into a settlement agreement ("Stipulation"), whereby ADC agreed to comply, for a limited, specified period of time, with 103 healthcare performance measures and nine measures related to the conditions of confinement for maximum-custody inmates.  (Dkt. 1185, ¶¶ 8, 18; Dkt. 1185-1, Exs, B & D.)  In the Stipulation, "Defendants den[ied] all the allegations in the Complaint," and the parties agreed that the Stipulation "d[id] not constitute and shall not be construed or interpreted as an admission of any wrongdoing or liability by any party."  (Dkt. 1185, ¶ 5.)  There has never been a finding that Defendants have committed any constitutional violation.

### 1.   Monitoring and Compliance

ADC's Monitoring Bureau measures and reports compliance with the performance measures each month.  (Dkt. 1185, ¶ 9.a.)  For most healthcare performance measures, ADC contract-compliance monitors review a random sample of inmate medical records for each unit at the facility, and determine whether those records comply with the particular measure for the audited month.  (Dkt. 1185-1, Exs. B &C; Dkt. 1842-3, ¶¶ 17-21.)  For example, if a performance measure calls for a sampling of ten medical records and eight of the ten records indicate compliance with the measure, then that unit/facility will receive an 80%

2

for that month (for that measure).[2]  (*Id*.)  The compliance rate for the first 12 months of the Stipulation was 75%; the compliance rate after 12 months was 80%; and the compliance rate after 24 months was (and is) 85%.  (Dkt. 1185, ¶ 10.a.)  Compliance rates for each measure at each applicable facility are tabulated and reported to Plaintiffs' counsel and the court each month.  (Dkt. 1842-3, ¶¶ 16-19.)  The Stipulation requires compliance to be "governed by" ADC's Compliance Green Amber Red ("CGAR") reporting tool (formerly MGAR).  (Dkt. 1185, ¶ 9.a; Dkt. 1842-3, ¶ 16.)  Extrapolated out to each facility, Defendants are required to monitor and report on 849 healthcare performance measures each month.[3]  (Dkt. 1185-1, Ex. B.)

## 2. Termination

The Stipulation's measurement and reporting provisions dictate not only whether Defendants have complied with a particular performance measure, but also whether and when Defendants' obligation to comply with a performance measure terminates.  (Dkt. 1185, ¶ 10.)  Defendants' duty to measure and report on a measure terminates if it is in compliance for 18 months out of a 24-month period and has not been out of compliance for three or more consecutive months within the previous 18-month period.  (*Id*., ¶ 10.b.)

## 3. Substantial Non-Compliance Procedure

In the event Plaintiffs' counsel believe ADC has failed to substantially comply with the Stipulation "in some significant respect," they must provide Defendants a notice of substantial non-compliance.[4]  (Dkt. 1185, ¶ 30.)  The parties are then required to meet and confer in good faith to try and resolve the dispute informally.  (*Id*.)  If they cannot resolve the dispute informally, the parties are required to mediate the dispute before Magistrate

---

[2] The Stipulation sets forth the protocol to be used for measuring each performance measure. (Dkt. 1185, ¶ 9.b; Dkt. 1185-1, Ex. C.) Defendants have also prepared a Monitor Guide to ensure that contract-compliance monitors are measuring performance measures consistently. The Monitor Guide is not required under the Stipulation. It is a living document and constantly changing to improve the quality of care.

[3] Not every performance measure applies to every facility.  (Dkt. 1185-1, Ex. B.)

[4] A performance measure is substantially non-compliant if either (a) it is not in compliance for 18 out of 24-four months, or (b) it has been non-compliant for three or more consecutive months in an 18-month period.  (Dkt. 2644.)

3

1   Judge Bridget S. Bade.  (*Id*., ¶ 31; *see also* Dkt. 1666.)  If the dispute is not resolved in

2   mediation, Plaintiffs may then file a motion to enforce the Stipulation.  (*Id*.)

3                   **4.     Enforcement**

4           As part of the Stipulation, the parties agreed to reassign the case to Magistrate Judge

5   David K. Duncan, pursuant to 28 U.S.C. § 636(c), for all further proceedings.  (Dkt. 1186,

6   1194.)  If he finds that ADC has not complied with the Stipulation, he must first order ADC

7   to submit a remediation plan. (Dkt. 1185, ¶ 36.) If that plan does not remedy the

8   deficiencies, he has the "power to enforce this Stipulation through all remedies provided by

9   law," except that he cannot "order Defendants to construct a new prison or to hire a specific

10  number or type of staff unless Defendants propose to do so as part of a plan to remedy a

11  failure to comply with" the Stipulation.  (*Id*.)  He is also authorized to resolve any other

12  disputes arising out of the Stipulation. (*Id*., ¶ 35.) However, the Stipulation expressly states

13  that "[t]he parties agree that [it] shall not be construed as a consent decree" and "may not

14  be altered or modified," except by the parties. (*Id*., ¶¶ 35, 40.)

15                  **5.     Attorneys' Fees**

16          Defendants are required to compensate Plaintiffs' counsel for any "work reasonably

17  performed or costs incurred to monitor or enforce" the Stipulation "up to $250,000 per

18  calendar year." (Dkt. 1185, ¶ 44.)  Plaintiffs' counsel are also entitled to their "reasonable

19  attorneys' fees and costs, including expert costs," "[i]n the event that Plaintiffs move to

20  enforce any aspect of [the] Stipulation and Plaintiffs are the prevailing party with respect to

21  the dispute." (*Id*., ¶ 43.)  The parties agreed, however, that the hourly rate of attorneys' fees

22  is governed by 42 U.S.C. § 1997e(d).  (*Id*.)

23          **D.     Defendants' Compliance with the Stipulation**

24          On February 25, 2015, Magistrate Judge Duncan approved the Stipulation, as

25  required by Fed. R. Civ. P. 23(e). (Dkt. 1458.) Thus, monitoring and compliance began in

26  March 2015.  Since that time, Magistrate Judge Duncan has found Defendants to be

27  substantially non-compliant with only 35 performance measures at some facilities—a total

28  of 103 out of 849, or 17%.  (Dkt. 2960.)

                                              4

### E.     Prior Rulings Currently on Appeal

Several of Magistrate Judge Duncan's rulings have been appealed to the Ninth Circuit.  Those appeals have been consolidated, they are fully briefed, and the panel held oral argument on October 18, 2017.  (*See* No. 16-17282, Doc. 13, 32, 105.)  The Ninth Circuit's forthcoming decision will significantly impact Defendants' obligations under the Stipulation going forward, as well as the scope of the Court's authority to enforce it.

### 1.     Outside-Transport Orders – Appeal No. 16-17282

Magistrate Judge Duncan ordered Defendants to "use all available community health care services … to provide the health care services … immediately following the expiration of the [performance measure's] time-frame." (Dkt. 1754.) Thus, "if a performance measure requires Defendants to provide an inmate with a specific type of care within 24 hours (or 14 days), then Defendants shall have this inmate seen by an appropriate Outside Provider in hour 25 (or day 15)." (*Id.*)  Magistrate Judge Duncan further ruled that his order applied to *every* inmate not seen within the performance measure's time-frame, concluding that "the Stipulation requires 100% compliance." (Dkt. 1917.) Defendants have appealed these rulings. (No. 16-17282, Doc. 22, 78.)

### 2.     Staffing-Plan Order – Appeal No. 17-15302

Plaintiffs requested Magistrate Judge Duncan to order Defendants to develop a staffing plan, with the assistance of an appointed expert's staffing analysis, and then to order Defendants to implement that staffing plan.  (Dkt. 1576, 1739, 1790, 1790-1, 1863.) Magistrate Judge Duncan rejected that request, finding that the Stipulation's no-staffing provision precluded him from ordering it because, "in distillation," it would "necessarily violate the Stipulation's proscription." (R.T. 11/9/16 at 5-6; Dkt. 1910.)  Plaintiffs then requested Magistrate Judge Duncan to exercise his "equitable power to modify the Stipulation" and delete the no-staffing provision.  (Dkt. 1790 at 9-19.)  Magistrate Judge Duncan denied that request as well.  (Dkt. 1910.)  Plaintiffs have appealed both rulings. (*See* No. 16-17282, Doc. 19, 60.)

### F.    Defendants' Challenge to Magistrate Judge Duncan's Jurisdiction

As discussed in their motion to vacate the magistrate-judge referral (Dkt. 2825, 2829), Defendants argued that the parties' selection of Magistrate Judge Duncan violated § 636(c).  After Magistrate Judge Duncan and Judge Humetewa denied the motion (Dkt. 2826, 2856), Defendants filed a motion to dismiss the appeals in the Ninth Circuit (on June 27, 2018), arguing that the court lacks appellate jurisdiction because Magistrate Judge Duncan lacked magistrate jurisdiction and therefore all of his rulings are void.  (*See* No. 16-17282, Doc. 110.)  That motion is fully briefed and before the same panel that is deciding the prior appeals.  (*Id*., Doc. 112, 113.)

### G.    Magistrate Judge Duncan's June 22 Orders

On June 22, 2018, Magistrate Judge Duncan issued six Orders.  (Dkt. 2898, 2900, 2901, 2902, 2904, 2905.)  Defendants have appealed each one.  (Dkt. 2935, 2936, 2937; *see also* Nos. 18-16358, 18-16365, 18-16368.)

#### 1.    Contempt/Sanctions Order (Dkt. 2898, 2899)

In October 2017, after finding that ADC had failed to substantially comply with 11 of the 103 performance measures at certain facilities (27 out of 849, or 3%), Magistrate Judge Duncan issued an order to show cause ("OSC"), threatening to hold Defendants in civil contempt and sanction them $1,000 "for every single violation of [those performance measures], not just those below 85%," in December 2017, January 2018, and February 2018.  (Dkt. 2373, 2456, 2659.)  After a three-day hearing, Magistrate Judge Duncan ruled that Defendants did not take all reasonable steps to comply with the OSC and held them in contempt.  (Dkt. 2898, 2899.)  He sanctioned Defendants a total of $1,445,000.  (*Id*.)  Defendants were required to pay the Clerk within 14 days (*id*.), which they did (Dkt. 2913).

Magistrate Judge Duncan further ordered the parties to submit proposals for the best use of the funds within 30 days, noting it "will distribute the monies after considering their proposals."  (Dkt. 2898.)  The parties timely submitted their proposals.  (Dkt. 2941, 2945.)  Finally, in a significant departure from the current sampling and reporting process in place,

Magistrate Judge Duncan ordered Defendants to file "monthly reports reflecting every instance of noncompliance [below 85%]" for the same performance measures.  (*Id*.)

### 2.    Termination Order (Dkt. 2900)

In August 2017, Defendants moved to terminate 78 performance measures at certain facilities, for a total of 463 out of 849—or nearly 55%—of the healthcare performance measures because those measures had achieved or exceeded the Stipulation's compliance threshold for the requisite amount of time.  (Dkt. 2251, 2407.)  Magistrate Judge Duncan denied the motion,[5] finding that he "cannot be confident that the CGARs demonstrate compliance with the Stipulation."  (Dkt. 2900.)  That conclusion, however, is inconsistent with the basis for the Contempt Order, in which Magistrate Judge Duncan found the CGAR data reflecting *non*-compliance to be *reliable*.

Magistrate Judge Duncan further ruled that he was going to appoint an expert—at Defendants' expense—to review the entire monitoring process.  (Dkt. 2900 at 12.)  If the expert concludes that any of the CGARs are not reliable or accurate, the expert is to develop remedial measures.  (*Id*.)  Magistrate Judge Duncan did not explain what should occur if the expert concludes that the CGARs *are* reliable or how Defendants should monitor and report going forward.  Thus, Magistrate Judge Duncan created an indefinite delay in Defendants' ability to terminate any performance measure.  He ordered the parties to submit the names of two proposed experts within 30 days (*id*. at 14), which they did (Dkt. 2940, 2946), and stated he would "pursue a selection process that may include interviewing a finalist" (Dkt. 2900 at 14).  Defendants have filed a Rule 60 Motion challenging the order.  (Dkt. 2931.)

### 3.    HNR-Box Order (Dkt. 2901)

At the time of the Stipulation, ADC employed an HNR-box system to receive and process inmate health needs requests ("HNR").  As discussed in their Rule 60 Motion,

---

[5] Magistrate Judge Duncan granted the motion in part. He terminated 19 performance measures at certain facilities (for a total of 140 performance measures), but only because either Plaintiffs stipulated to their termination or they were clearly "inapplicable" to the facility. (Dkt. 2900 at 4-6.)

Defendants replaced that system with an open-clinic system to provide inmates faster, direct access to healthcare and cure non-compliance with several performance measures. (Dkt. 2932.)  After compliance rates increased, Plaintiffs challenged the system, arguing that it posed barriers to some inmate's access to care. (*Id*.)  Following a four-day evidentiary hearing, Magistrate Judge Duncan ruled that the open-clinic system "impermissibly constrict[s] the numbers of HNRs submitted for measurement," and ordered ADC to reinstate the HNR-box system within 30 days. (Dkt. 2901.)  Defendants complied with that directive. (Dkt. 2947, 2947-1.)

### 4.    Attorneys' Fees Order (Dkt. 2902, 2903)

In September 2017, Plaintiffs' counsel filed a fee application, pursuant to Paragraph 43 of the Stipulation, requesting fees and costs purportedly incurred for moving to enforce the Stipulation. (Dkt. 2276.) The fee application, however, failed to connect the fee entries to a successful motion to enforce; instead, Plaintiffs' counsel made a blanket demand for all fees incurred to date. (Dkt. 2402.)  Magistrate Judge Duncan ruled that all fees are "driven by Plaintiffs' attempts to enforce the Stipulation" and therefore recoverable under Paragraph 43. (Dkt. 2902.)  He also found that a 2.0 multiplier was appropriate, and awarded Plaintiffs' counsel $1,107,361.40 in fees and $152,630.58 in costs, for a total judgment of $1,259,991.98. (*Id*. at 10-11.)

### 5.    Staffing-Plan Order (Dkt. 2904)

Over Defendants' objection (Dkt. 2067, 2138; R.T. 8/18/17 at 4), Magistrate Judge Duncan ordered Braxton Millar of the Advisory Board Company to review healthcare staffing issues and to provide recommendations at Defendants' expense. (Dkt. 2124, 2236, 2245, 2249; 2483; R.T. 8/9/17 at 175-176.)  On June 13, 2018, Millar presented his Report to the court and parties. (Dkt. 2880.)  His recommendations, which ignore basic factors present in the correctional healthcare setting as well as limitations agreed-upon by the parties in the Stipulation, included: (1) develop a faster screening process;[6] (2) strengthen

---

[6] This ignores numerous security concerns in the correctional context that are simply not present in private payer healthcare.

and create a more standardized referral and retention bonus plan; (3) offer more compensation to physicians; (4) create a regional provider pool by "overstaffing to the total budgeted numbers" a pool of employees who are assigned to multiple facilities so that they can fill vacancies;[7] (5) create a director position to work at two facilities; (6) require senior staff to provide on-the-job training and create a formal mentoring program; (7) pay for employees' professional accreditation and licensing programs; and (8) redesign the management reporting structure by forming a committee to involve providers in the decision-making process.[8]  (R.T. 6/13/18 at 163-176.)  Magistrate Judge Duncan then ordered Defendants to "file a plan to implement these recommendations."  (Dkt. 2880, 2904; *see also* Dkt. 2905 at 3 n.1.)  He did so despite his prior order acknowledging he had no authority under the Stipulation to require Defendants to do this.  (R.T. 11/9/16 at 5-6; Dkt. 1910.)  Defendants complied with that order.  (Dkt. 2948, 2948-1.)

### 6.    Compliance-Experts Order (Dkt. 2905)

Because Defendants had been substantially non-compliant with 17 performance measures (out of 103) at certain facilities (28 out of 849) for an extended period of time, Magistrate Judge Duncan ordered Defendants to "hire outside experts who can perform the analysis necessary to understand why [these] deficiencies persist and to opine as to the policies and procedures necessary to compel compliance with the Stipulation."  (Dkt. 2905.) He stated that he "expects that the experts will review existing policies and procedures, create a remediation plan based on their expertise, and that Defendants will then adopt the expert's remediation plan."  (*Id.*)  He ordered the parties to submit two proposed experts for

---

[7] The Report gives the impression that staffing is key to addressing all correctional healthcare issues. But that is directly contrary to the Report's own findings. For example, the Report asserts that behavioral health purportedly suffers consistent problems with staffing and turnover. Yet, the performance measures relating to behavioral health are consistently compliant across virtually all ADC facilities.  If the reason for non-compliance was staffing, it would logically follow that behavioral health performance measures would be non-compliant, which they are not.

[8] This ignores the fact that the Stipulation dictates the course of treatment, including mandates about the types of care that must be provided and the timeline for doing so.

seven specific categories of care within 30 days.  (*Id.*)  The parties complied with that directive.  (Dkt. 2939, 2949.)

## II.   THE COURT SHOULD STAY THE JUNE 22 ORDERS.

### A.   The Court Should Stay Further Proceedings Related to the Non-Monetary Orders.

A district court has "broad discretion" to stay proceedings.  *Clinton v. Jones*, 520 U.S. 681, 706-07 (1997).  That discretion stems from the court's inherent authority "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  A court may "find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case."  *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979). "Discretion to stay a case is appropriately exercised when the resolution of another matter will have a direct impact on the issues before the court, thereby substantially simplifying the issues presented."  *Mendez v. Optio Sols., LLC*, 239 F. Supp. 3d 1229, 1232 (S.D. Cal. 2017) (citing *Mediterranean Enters. v. Ssangyong Corp.*, 708 F.2d 1458 (9th Cir. 1983)).  A court should also weigh "the competing interests which will be affected by the granting or refusal to grant a stay."  *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).  Competing interests include "[1] the possible damage which may result from the granting of a stay, [2] the hardship or inequity which a party may suffer in being required to go forward, and [3] the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."  *Id.* (citing *Landis*, 299 U.S. at 254-55).

### 1.   The Court should stay further proceedings related to the June 22 Orders until the prior appeals are resolved.

The outcome of the pending appeals will determine whether the June 22 Orders are valid and the extent to which they are enforceable.  In consolidated appeals Nos. 16-17282, 17-15302, and 17-15352, the Ninth Circuit is deciding whether Magistrate Judge Duncan had jurisdiction to proceed as a magistrate.  (*See* No. 16-17282, Doc. 110, 112, 113.)  If the

10

panel concludes that the parties' selection of him violated § 636(c) and was invalid, *see Hatcher v. Consolidated City of Indianapolis*, 323 F.3d 513, 519-20 (7th Cir. 2003), the June 22 Orders are void. *Williams v. King*, 875 F.3d 500, 502-05 (9th Cir. 2017). The panel *must* address this threshold jurisdictional issue before it reaches the merits of the appeals. *Anderson v. Woodcreek Venture Ltd.*, 351 F.3d 911, 911 (9th Cir. 2003).

If the panel reaches the merits, it will then decide two issues that bear directly on the validity of the June 22 Orders or, at least, the scope of the Court's authority to enforce them. First, it will decide whether the Stipulation requires 100% compliance. (*See* No. 16-17282, Doc. 22, 78.) Magistrate Judge Duncan based his finding of contempt, in part, on his continued belief that "[t]he Stipulation requires 100% compliance with each of its Performance Measures." (Dkt. 2898 at 18.) If the Ninth Circuit concludes that the Stipulation does not require 100% compliance, the Contempt Order—and the OSC it was predicated on—cannot stand. (*See* Dkt. 2373 ["Accordingly, any contempt sanction ultimately imposed by the Court will be for every single violation of the Stipulation, not just those below 85%."].)

The Ninth Circuit will also decide whether Magistrate Judge Duncan had the power to order Defendants to implement a staffing plan, given the Stipulation's no-staffing provision, or the "equitable" authority to unilaterally modify it. (*See* No. 16-17282, Doc. 19, 60.) In deciding these issues, the court will necessarily determine the scope of Magistrate Judge Duncan's authority to "enforce" the Stipulation and this Court's authority going forward. If it affirms Magistrate Judge Duncan's ruling, Defendants may not be required to implement Millar's staffing recommendation (Dkt. 2904). [9] Any recommendations by the other proposed experts may also be curtailed. The Ninth Circuit's analysis regarding the scope of Magistrate Judge Duncan's "equitable" authority will also necessarily inform on whether the Stipulation is a judicial decree—if it is not, then

---

[9] As discussed above, the recommendations focus largely on hiring more staff, including Directors, and establishing a constantly manned Provider Pool, making it nothing more than an end-run around the Stipulation's express limitations.

Defendants cannot be held in contempt for failing to perform. *See Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013). The court could also inform on whether this Court can appoint experts or force Defendants to implement plans that are not required under the Stipulation. Before the Court proceeds any further on the June 22 Orders, it should wait to see if they are valid.

> **2.      The Court should stay further proceedings related to the June 22 Orders until the appeals from those Orders are resolved.**

The interests also weigh heavily in favor of a stay until the Ninth Circuit resolves the appeals from the June 22 Orders. *See CMAX*, 300 F.2d at 268. The stay request is narrow and limited only to these Orders. Defendants will continue providing all constitutionally-required healthcare, performing under the Stipulation, and complying with all other, prior orders. If the Court appoints any experts to conduct a review of ADC's monitoring or compliance issues, those experts will immediately begin to incur expenses. Defendants are required to pay for those experts, and, if the Orders are later vacated, they cannot get that money back because the work will have been done.[10] Moving forward with appointing more experts will also lead to requiring Defendants to implement their recommendations and materially modifying the structure for providing health services, as will requiring Defendants to implement Millar's staffing recommendations. Indeed, Millar has recommended hiring more people, paying people more, developing on-the-job training, and redesigning the management reporting structure. This will have permanent effects. And Defendants cannot recoup the significant expense it will take to implement any plan. The Court will also have to oversee and enforce the Orders, potentially wasting judicial resources. Before moving forward, the orderly course of justice warrants a stay. Allowing the appellate courts to first resolve the issues on appeal will simplify the proceedings and provide a clear path for the Court and the parties. Without a stay, that path becomes byzantine, and Defendants will suffer irreversible financial and operational hardship if the

---

[10] Defendants were required to pay Millar/Advisory Board a total of $168,420.00 for his review and recommendations.

1    Orders are later vacated.  At a minimum, the Court should stay the Termination Order and

2    HNR-Box System Orders until it resolves Defendants' Rule 60 Motions.  *See* Fed. R. Civ.

3    P. 62(b) (court may "stay the execution of a judgment—or any proceedings to enforce it—

4    pending disposition of" a Rule 60 motion).

5          If the Court believes that the Orders requiring Defendants to provide monthly real-

6    time compliance data and reinstate the HNR-box system are injunctive in nature, their

7    obligations to comply should still be stayed. A court has the discretion to suspend a

8    particular order pending an appeal.  *AirFX.com v. AirFX, LLC*, CV 11-01064-PHX-FJM,

9    2013 WL 2458770, at *1 (D. Ariz. June 6, 2013); *see also* Fed. R. Civ. P. 62(c).  Courts

10   generally consider: "(1) whether the stay applicant has made a strong showing that he is

11   likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent

12   a stay; (3) whether issuance of the stay will substantially injure the other parties interested

13   in the proceeding; and (4) where the public interest lies." *Addington v. U.S. Airline Pilots*

14   *Ass'n*, CV 08-1633-PHX-NVW, 2009 WL 2761928, at *1 (D. Ariz. Aug. 28, 2009); *see*

15   *also Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  However, the Ninth Circuit employs

16   a sliding-scale approach.  Under that approach, a stay is warranted if: (1) there are serious

17   questions going to the merits;[11] (2) the balance of hardships tips sharply in the movant's

18   favor; (3) there is a likelihood of irreparable injury; and (4) an injunction is in the public

19   interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

20         The Court should stay Defendants' obligation to provide monthly real-time

21   compliance data.  (Dkt. 2898 at 24.)  That order arises from the Contempt Order and is

22   presumably the groundwork for subsequent findings of contempt.  In addition to the

23   question of whether Magistrate Judge Duncan had jurisdiction to issue the Order, there are

24   many serious questions about its merits.  (*See* Dkt. 2228, 2241, 2271, incorporated here.)

25   Even Magistrate Judge Duncan had reservations about exercising contempt authority.  (*See*

26   R.T. (amended) 8/9/17 at 65-69 [asking parties to brief "whether there remains some legal

---

27   [11] This factor has been articulated in several ways. *See Leiva-Perez v. Holder*, 640
28   F.3d 962, 967 (9th Cir. 2011) ("fair prospect" or "reasonable probability").

13

power for me aside from contempt to use this mechanism"].)  The Stipulation is a private settlement agreement, not a judicial order or consent decree.  Indeed, the parties expressly agreed in the Stipulation that it was *not* a consent decree.  (Dkt. 1185, ¶ 35.)  *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 378 (1992) (a consent decree "is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees").  A court's authority to hold a party in contempt stems only from a violation of a court order.  *Ahearn*, 721 F.3d at 1129.  However, a "violation of a settlement agreement over which the court has retained jurisdiction is subject to state contract law."  *Macias v. N.M. Dep't of Labor*, 300 F.R.D. 529, 553 (D.N.M. 2014); *see also Christina A. ex. rel Jennifer A. v. Bloomberg*, 315 F.3d 990, 993 (8th Cir. 2003) (district court's "approval of the settlement agreement does not, by itself, create a consent decree" and that "the district court's enforcement jurisdiction alone is not enough to establish a judicial 'imprimatur' on the settlement contract"); *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir. 1993) (although "the district court retained jurisdiction to enforce the settlement agreement, that was not sufficient to transform the agreement into a court order enforceable through a contempt proceeding").  Thus, Defendants cannot be held in civil contempt for violating the Stipulation and should not be required to provide monthly real-time non-compliance data.

The order is also overly burdensome.  Before the order, Corizon would review the CGARs, investigate the primary causes of noncompliance, and then prepare a corrective action plan to improve performance.  Now, Corizon is being tasked with reporting on each and every incident of non-compliance, both past and prospective. That requires unnecessarily duplicative work, as it does not vitiate ADC's existing monitoring practices, meaning two independent sets of review for the same files will be taking place.  Additionally, many of these reviews must be done manually and cannot be automated or pulled solely from database reports, making a full patient file review on a monthly basis impossible to complete.  Thus, the order ignores the realities of the facilities, patient populations, and the administrative burden that such a review would impose.  For example,

1   some months have yielded upwards of 17,000 to 20,000 encounters for review.  Based on

2   prior experience, it has taken a team of three members approximately 37 hours to complete

3   a review of 420 files.  Based on those same numbers, it would take the same team of three

4   approximately 1,496 hours (or 62 days) to review 17,000 files per month.  By way of further

5   comparison, it takes ADC's monitoring team, comprised of 32 members, an entire month

6   to review and report on a small sampling of files each month.

7        In sum, the magnitude of resources it would take to pull and evaluate all patient files

8   for the applicable performance measures/facilities every month is staggering and simply not

9   possible.  And once those resources are expended and expenses are incurred, they cannot

10  be recovered.  Conversely, Plaintiffs will suffer no harm if a stay is granted.  As noted

11  above, Defendants will continue to comply with the Stipulation.  Finally, the public has an

12  interest in the efficient use of judicial resources. *Hatch v. United States*, CR 02-1016-PHX-

13  JJT, 2016 WL 6155363, at *3 (D. Ariz. Sept. 30, 2016), *report and recommendation*

14  *adopted in part,* CR 02-01016-PHX-JJT, 2016 WL 6143047 (D. Ariz. Oct. 21, 2016).

15  Requiring monthly real-time reporting will exhaust precious resources and generate even

16  more litigation.  Until the Ninth Circuit determines whether these reports are required, the

17  order to provide them should be stayed.

18       The Court should also stay Defendants' obligation to resume the HNR-box system.

19  (Dkt. 2901 at 4.)  Again, there are many serious questions about the validity of the Order

20  beyond the question of Magistrate Judge Duncan's authority to issue it.  Defendants' Rule

21  60 Motion, which they incorporate here, sets forth the many reasons why that order should

22  be reversed on appeal.  (*See* Dkt. 2932; *see also* Dkt. 2136, 2416.)  The order ignored the

23  Stipulation's mandatory dispute-resolution process; the order exceeded Magistrate Judge

24  Duncan's authority under the Stipulation, which does not require Defendants to use any

25  particular HNR-delivery system; and there is insufficient evidence to support the finding

26  that the open-clinic system constricts access to healthcare.  (*Id*.)  Moreover, reverting back

27  to the flawed HNR-box system will delay care for inmates and cause non-compliance with

28  the 12 performance measures that depend on an HNR, month after month.  (Dkt. 2901 at 1

15

n.1.)  As discussed in the Rule 60 Motion, the open-clinic system significantly *improved* compliance with these performance measures.  (Dkt. 2932 at 4-5, 14.)  The speculative testimony of four inmates that others may have been denied access to care does not outweigh the statistical data that shows marked improvement in timely care.  The Court, the parties, and the public have an interest in seeing improvement, not decline.

### B.  The Court Should Stay Enforcement of the Monetary Orders

The June 22 Orders require Defendants to pay Plaintiffs $1.25M in attorneys' fees and costs (Dkt. 2902 at 11; Dkt. 2903), and pay the Clerk $1.44M in sanction monies (Dkt. 2898 at 23; Dkt. 2899).  Enforcement of a monetary order is automatically stayed if the appellant posts a supersedeas bond. *Biltmore Associates, L.L.C., as Tr. v. Twin City Fire Ins. Co.*, 205-CV-04220-PHX-FJM, 2007 WL 2422053, at *1 (D. Ariz. Aug. 22, 2007); *see also* Fed. R. Civ. P. 62(d).  However, a court can waive the bond requirement upon consideration of the following criteria:

> (1) the complexity of the collection process; (2) the amount of time required to collect a judgment after it is affirmed on appeal, (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the [appellant's] ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the [appellant] is in such a precarious financial position that the requirement to post a bond would place other creditors of the [plaintiff] in an insecure position.

*Id*. (citing *Dillon v. City of Chicago,* 866 F.2d 902, 904-05 (7th Cir. 1988)).

The Court should waive the bond requirement and stay enforcement of the Attorneys' Fees Order.  Under the Arizona Civil Rules, the State is exempt from having to post a supersedeas bond to stay a state court judgment.  *See* Ariz. R. Civ. P. 62(e)(1).  Federal courts have extended the same exemption to states for judgments in federal court. *See, e.g.*, *Danner Const. Co., Inc. v. Hillsborough County*, 8:09-CV-650-T-17TBM, 2009 WL 3055315, at *3 (M.D. Fla. Sept. 24, 2009).  Moreover, as explained in the attached declaration by ADC's Division Director of Administrative Services, Defendants can and will promptly pay the judgment upon the conclusion of the appeal (if the award is affirmed).  (Exhibit 1, attached.)  Just as Defendants paid the $1.44M sanctions fee within 14 days of

16

the order, the collection process will not be complex or delayed.  The Court can have confidence that the State will pay its debt timely and in full.

The Court should also refrain from distributing the sanctions monies, which Defendants have already paid to the Clerk.  That full payment can serve as security while Defendants appeal the Contempt Order. Without a stay, once the Court distributes the sanctions monies, it cannot get that money back if the Contempt Order is later vacated.[12]

## CONCLUSION

For these reasons, Defendants respectfully request the Court to stay the June 22 Orders until the pending appeals are finally resolved, and, at least, refrain from:

1. appointing an expert to review the monitoring process;

2. taking any further action on Braxton Millar's staffing recommendations, including ordering Defendants to implement any staffing plan;

3. appointing any experts to review compliance deficiencies.

4. requiring Defendants to tabulate and provide monthly reports reflecting every instance of noncompliance (below 85%) with the performance measures identified in the October 10, 2017 Order to Show Cause;

5. requiring Defendants to resume the HNR-box system;

6. requiring Defendants to pay the judgment awarding attorneys' fees and costs; and

7. distributing or using the sanction monies.

---

[12] Plaintiffs' counsel have proposed to use 90% of the funds to pay more medical experts to investigate and resolve "concerns about the medical care" and 10% of the funds to compensate class members who accounted for the non-compliance with the OSC in December 2017 and January 2018. (Dkt. 2941.)

DATED this 9th day of August, 2018.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/ Nicholas D. Acedo
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona  85226

Office of the Arizona Attorney General
Michael E. Gottfried
Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004-1592

*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:              ahardy@prisonlaw.com

Amelia M. Gerlicher:       agerlicher@perkinscoie.com;docketPHX@perkinscoie.com,
                           kleach@perkinscoie.com

Amy B. Fettig:             afettig@npp-aclu.org

Asim Dietrich:             adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org;
                           phxadmin@azdisabilitylaw.org

Caroline N. Mitchell:      cnmitchell@jonesday.com; mlandsborough@jonesday.com;
                           nbreen@jonesday.com

Corene T. Kendrick:        ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:       DBarr@perkinscoie.com; docketphx@perkinscoie.com;
                           sneilson@perkinscoie.com

David Cyrus Fathi:         dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:            dspecter@prisonlaw.com

Jessica Pari Jansepar Ross:   jross@azdisabilitylaw.org

John Howard Gray:          jhgray@perkinscoie.com; slawson@perkinscoie.com

John Laurens Wilkes:       jlwilkes@jonesday.com, dkkerr@jonesday.com

Jose de Jesus Rico:        jrico@azdisabilitylaw.org

Kathleen E. Brody          kbrody@acluaz.org

Kirstin T. Eidenbach:      kirstin@eidenbachlaw.com

Maya Abela                 mabela@azdisabilitylaw.org

Rose Daly-Rooney:          rdalyrooney@azdisabilitylaw.org

Sara Norman:               snorman@prisonlaw.com

Rita K. Lomio:             rlomio@prisonlaw.com

Victoria Lopez:            vlopez@aclu.org

/ / /

/ / /

/ / /

19

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/ Nicholas D. Acedo