Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
*Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
*Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
*Desiree Licci, Joseph Hefner, Joshua Polson, and*
*Charlotte Wells, on behalf of themselves and all others*
*similarly situated*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>         Plaintiffs,<br><br>    v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br>         Defendants. | No. CV 12-00601-PHX-ROS<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR RELIEF FROM COURT ORDER RE: TERMINATION OF MONITORING (DOC. 2931)** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 2

I.     DEFENDANTS' DISSATISFACTION WITH THE COURT'S DECISION DOES NOT SATISFY THE HIGH BAR OF RULE 60(B)(6).............................................................................................. 2

A.    The Court's Well-Supported Finding That It Cannot Be Confident, Based on the Current Record, That Defendants' Self-Reported CGAR Data Is Accurate and Reliable Is Not Subject to Rule 60(b)(6) Review...................................................... 3

1.    Defendants Rely on CGAR Data From "Discredited Methods." .......................................................................... 7

2.    Current and Former Medical Staff Testified That They Were Instructed to Cancel Specialty Appointments to Avoid Violating the Stipulation's Requirements. ................... 8

3.    Plaintiffs Consistently Have Objected to Termination on the Basis of Defendants' Unreliable Monitoring Methodology. ........................................................................ 10

B.    Any Procedural Deficiency in the Court's Initial Notice to the Parties Regarding Appointment of an Independent Expert Was Harmless. ..................................................................................... 11

II.    IT WOULD BE UNJUST TO THE OVER 33,000 CLASS MEMBERS TO TERMINATE MONITORING OF BARGAINED-FOR MEDICAL AND MENTAL HEALTH CARE WITHOUT KNOWING WHETHER THE SOLE BASIS FOR TERMINATION—CGAR DATA—IS ACCURATE. ............................... 15

CONCLUSION .......................................................................................................... 17

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3      CASES

4      *Armstrong v. Brown,*
5          768 F.3d 975 (9th Cir. 2014) ........................................................................ 17

       *Brown v. Plata,*
6          563 U.S. 493 (2011) ..................................................................................... 16

7      *Cooper v. Harris,*
           137 S. Ct. 1455 (2017) ................................................................................... 4
8
       *Coral Const. Co. v. King County,*
9          941 F.2d 910 (9th Cir. 1991) .......................................................................... 3

10     *Ctr. for Biological Diversity v. Norton,*
           304 F. Supp. 2d 1174 (D. Ariz. 2003) ..................................................... 1, 3
11
       *Dunn v. Trans World Airlines, Inc.,*
12         589 F.2d 408 (9th Cir. 1978) .......................................................................... 8

13     *Frew ex rel. Frew v. Hawkins,*
           540 U.S. 431 (2004) ..................................................................................... 16
14
       *Friends of the Earth v. Hintz,*
15         800 F.2d 822 (9th Cir. 1986) .......................................................................... 5

16     *Gates v. Gomez,*
           60 F.3d 525 (9th Cir. 1995), *as amended* (Aug. 3, 1995) ........................... 17
17
       *Gotthardt v. Nat'l R.R. Passenger Corp.,*
18         191 F.3d 1148 (9th Cir. 1999) ........................................................................ 4

19     *Hamilton v. Newland,*
           374 F.3d 822 (9th Cir. 2004) ........................................................................ 15
20
       *Harvest v. Castro,*
21         531 F.3d 737 (9th Cir. 2008) .......................................................................... 2

22     *Hen v. City of Los Angeles,*
           244 F. App'x 794 (9th Cir. 2007) .................................................................. 3
23
       *Henderson v. United States,*
24         846 F.2d 1233 (9th Cir. 1988) ........................................................................ 5

25     *Lal v. California,*
           610 F.3d 518 (9th Cir. 2010) .......................................................................... 2
26
       *Louie v. United States,*
27         776 F.2d 819 (9th Cir. 1985) .......................................................................... 5

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

CASES (CONT.)

4

*Lucky Break Wishbone Corp. v. Sears Roebuck & Co.*,
   373 F. App'x 752 (9th Cir. 2010) ................................. 14

5

*Mattivi Bros. Leasing Inc. v. Ecopath Indus. LLC*,
   No. CV-10-0049-PHX-DGC, 2011 WL 2784609
   (D. Ariz. July 14, 2011) ................................. 2

6

7

*Muniz v. Amec Const. Mgmt., Inc.*,
   623 F.3d 1290 (9th Cir. 2010) ................................. 17

8

9

*Plotkin v. Pac. Tel. & Tel. Co.*,
   688 F.2d 1291 (9th Cir. 1982) ................................. 4

10

*Reed v. Lieurance*,
   863 F.3d 1196 (9th Cir. 2017) ................................. 11

11

12

*Riverbend Farms, Inc. v. Madigan*,
   958 F.2d 1479 (9th Cir. 1992) ................................. 14

13

*Spokane Arcade, Inc. v. City of Spokane*,
   75 F.3d 663 (9th Cir. 1996) ................................. 5

14

15

*State Farm Mut. Auto. Ins. Co. v. White*,
   563 F.2d 971 (9th Cir. 1977) ................................. 5

16

*Sullivan v. Faras-RLS Grp., Ltd.*,
   795 F. Supp. 305 (D. Ariz. 1992) ................................. 4

17

18

*Tech. Res. Servs., Inc. v. Dornier Med. Sys., Inc.*,
   134 F.3d 1458 (11th Cir. 1998) ................................. 1

19

*Title v. United States*,
   263 F.2d 28 (9th Cir. 1959) ................................. 4

20

21

*United States v. Martin*,
   226 F.3d 1042 (9th Cir. 2000) ................................. 11

22

*United States v. Ragghianti*,
   560 F.2d 1376 (9th Cir. 1977) ................................. 14

23

24

*United States v. Working*,
   224 F.3d 1093 (9th Cir. 2000) (en banc) ................................. 4

25

*Vance v. Am. Hawaii Cruises, Inc.*,
   789 F.2d 790 (9th Cir. 1986) ................................. 5

26

27

*W. Pac. Fisheries, Inc. v. SS President Grant*,
   730 F.2d 1280 (9th Cir. 1984) ................................. 5

28

# TABLE OF AUTHORITIES
## (continued)

Page(s)

CASES (CONT.)

*Walker v. Am. Home Shield Long Term Disability Plan,*
    180 F.3d 1065 (9th Cir. 1999) ...................................................................... 17

*Williams v. C.I.R.,*
    1 F.3d 502 (7th Cir. 1993) ............................................................................ 1

STATUTES

18 U.S.C. § 3626(a)(1)(A) ................................................................................ 16

OTHER AUTHORITIES

Charles Alan Wright *et al.*, 29 Fed. Prac. & Proc. Evid. § 6302 (2d ed.) .......................... 17

Fed. R. Civ. P. 53(b)(1) .................................................................................... 13

Fed. R. Civ. P. 61 ............................................................................................ 14

Fed. R. Evid. 706(a) ........................................................................................ 13

LRCiv 7.2(g)(1) .............................................................................................. 15

**INTRODUCTION**

After extensive hearings on monitoring methodology and related issues, briefing by the parties, and discussion during status hearings over the past two years, the Court concluded that it "cannot be confident that the CGARs demonstrate compliance with the Stipulation," granted in part and denied in part Defendants' motion to terminate, and directed the parties to "submit the names of two proposed experts who can conduct a review of the monitoring process." [Doc. 2900 at 12, 14]  Dissatisfied with this decision, Defendants filed a Rule 60(b)(6) motion and a notice of appeal.  [Doc. 2931; Doc. 2937]

But Defendants offer no extraordinary circumstances to meet their heavy burden under Rule 60(b)(6).  Instead, Defendants retread ground that already has been covered by witness testimony, briefed by the parties, and adjudicated by the Court.[1]  Neither an adverse ruling nor a new judge resets the clock and authorizes yet another round of briefing, argument, and decision in this already protracted litigation.  *See Ctr. for Biological Diversity v. Norton*, 304 F. Supp. 2d 1174, 1178 (D. Ariz. 2003) ("It is not the proper function of a Rule 60(b) motion to reargue matters that have already been litigated."); *Tech. Res. Servs., Inc. v. Dornier Med. Sys., Inc.*, 134 F.3d 1458, 1465 n.9 (11th Cir. 1998) ("In general, when a case is transferred from one district judge to another, the parties should not treat the transfer as an opportunity to relitigate all of the first judge's rulings."); *Williams v. C.I.R.*, 1 F.3d 502, 503 (7th Cir. 1993) ("Litigants have a right to expect that a change in judges will not mean going back to square one.").

---

[1] **Motion to Terminate Monitoring** [Doc. 2251 (Defendants' Motion to Terminate Monitoring); Doc. 2344 (Plaintiffs' Response to Defendants' Motion to Terminate Monitoring); Doc. 2405 (Defendants' Reply in Support of Motion to Terminate Performance Measures)]; **Appointment of Rule 706 Expert** [Doc. 2043 (Plaintiffs' Statement Regarding the Appointment of a Special Master or Court Expert); Doc. 2067 (Defendants' Statement Regarding Appointment of Special Master); Doc. 2083 (Plaintiffs' Reply in Support of Statement Regarding the Appointment of a Special Master or Court Expert); Doc. 2250 (Plaintiffs' Statement Regarding Court Authority to Appoint a Rule 706 Expert)]; **Monitoring Methodology Hearings** [3/8/17 Tr.; 3/21/17 Tr.; 3/28/17 Tr.; 4/17/17 Tr.; 5/10/17 Tr.; Doc. 2046 (Plaintiffs' Statement Regarding Evidentiary Hearings on Monitoring); Doc. 2068 (Defendants' Statement Regarding Evidentiary Hearings on Monitoring); Doc. 2087 (Plaintiffs' Reply in Support of Statement)]; **Other Evidentiary Hearings** [2/27/18 Tr.; 2/28/18 Tr.; 3/14/18 Tr.; 3/26/18 Tr.; 3/27/18 Tr.; 4/10/18 Tr.; 5/31/18 Tr.; 6/1/18 Tr.; 6/12/18 Tr.; 6/13/18 Tr.; 6/14/18 Tr.]

**ARGUMENT**

The Ninth Circuit has "cautioned that [Rule 60(b)(6)] is to be used sparingly as an equitable remedy to prevent manifest injustice and is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *Harvest v. Castro*, 531 F.3d 737, 749 (9th Cir. 2008) (internal quotation marks and citations omitted). "To receive relief under Rule 60(b)(6), a party must demonstrate extraordinary circumstances which prevented or rendered him unable to prosecute his case." *Lal v. California*, 610 F.3d 518, 524 (9th Cir. 2010) (internal quotation marks, brackets, and citations omitted); *see also Mattivi Bros. Leasing Inc. v. Ecopath Indus. LLC*, No. CV-10-0049-PHX-DGC, 2011 WL 2784609, at *3 (D. Ariz. July 14, 2011) ("Rule 60(b)(6) places the burden entirely on Defendant to establish 'extraordinary circumstances' beyond its control.").

**I.    DEFENDANTS' DISSATISFACTION WITH THE COURT'S DECISION DOES NOT SATISFY THE HIGH BAR OF RULE 60(B)(6).**

Defendants challenge the Court's order granting in part and denying in part their termination motion on two grounds.  First, Defendants contend that the order is based on "insufficient evidence."  [Doc. 2931 at 6-17]    Second, Defendants contend that appointment of an expert under Federal Rule of Evidence 706 was "procedurally improper."  [*Id.* at 17-18]   Neither ground supports relief under Federal Rule of Civil Procedure 60(b)(6).    Indeed, Defendants do not even attempt to establish that "extraordinary circumstances prevented [them] from taking timely action to prevent or correct an erroneous judgment."  *Harvest*, 531 F.3d at 749 (internal quotation marks and citations omitted).   Nor could they.   Defendants had ample opportunity to (and did) present witnesses, evidence, and argument before the Court issued its order.[2]

---

[2] [*See, e.g.*, 3/8/17 Tr.; 3/21/17 Tr.; 3/28/17 Tr.; 4/17/17 Tr.; 5/10/17 Tr.; Doc. 2251 (Defendants' Motion to Terminate Monitoring); Doc. 2405 (Defendants' Reply in Support of Motion to Terminate Performance Measures)]; Doc. 2068 (Defendants' Statement Regarding Evidentiary Hearings on Monitoring); Doc. 2067 (Defendants' Statement Regarding Appointment of Special Master)]

### A.     The Court's Well-Supported Finding That It Cannot Be Confident, Based on the Current Record, That Defendants' Self-Reported CGAR Data Is Accurate and Reliable Is Not Subject to Rule 60(b)(6) Review.

As an initial matter, Defendants' sufficiency-of-the-evidence argument is based on a false premise.  Defendants assert that the Court concluded "that not one CGAR statistic is reliable" and further assert that this "conclusion is not supported by [the] evidence." [Doc. 2931 at 7]  But Defendants attack a straw man.  The Court made no such finding.[3] The Court neither found CGAR data reliable nor unreliable.  Instead, after "invest[ing] a significant amount of time understanding the data collection process" over the past several years and "address[ing] various minutiae of this process in an on-going attempt to obtain valid, reliable, and accurate CGAR data," the Court concluded that it "cannot be confident that the CGARs demonstrate compliance with the Stipulation."  [Doc. 2900 at 6, 12]  For that reason, the Court (1) declined to terminate a majority of the performance measures at this time and (2) decided to retain an expert to assist in evaluating the accuracy of CGAR data before ending protections for class members.  [*Id.* at 12 ("[S]ufficient questions have been raised about the audit system's integrity to warrant this expert review.")]

Those decisions are not subject to review under Rule 60(b)(6).  "It is not the proper function of a Rule 60(b) motion to reargue matters that have already been litigated." *Norton*, 304 F. Supp. 2d at 1178 (citations omitted); *see also Hen v. City of Los Angeles*, 244 F. App'x 794, 797 (9th Cir. 2007) (observing that "a motion for reconsideration is not a means to reargue a previous position").  And that is all Defendants do here:  ask the

---

[3]  For this reason, the cases relied on by Defendants are inapposite.  [Doc. 2931 at 7]  The Court did not conclude that "[i]solated instances" in fact established a "systemic" problem.  [*Id.*]  To the contrary, the Court properly noted that, in its "oversight function" and pursuant to its statutory obligations under the Prison Litigation Reform Act, it "must know that the CGAR data is accurate and reliable" before terminating protections for class members on the basis of that data.  [Doc. 2900 at 2]  The Court then found, based on the record before it, that Defendants' self-reported CGAR data may be unreliable and that additional fact finding thus was warranted.  If anything, the cases cited by Defendants support that decision.  *See Coral Const. Co. v. King County*, 941 F.2d 910, 919, 922 (9th Cir. 1991) (holding that "[n]ot enough has been told so far to meet [Defendant]'s burden that its program passes the 'compelling governmental interest' requirement" in employing a racial classification where "the written testimony of the numerous affiants suggests that there *may* be a systemic discrimination," noting that "the picture is incomplete," and remanding to district court for further fact finding in light of consultant reports).

Court to re-evaluate witness testimony, documentary evidence, and arguments already thoughtfully considered and adjudicated.   [*Compare* Doc. 2931 at 6-17 (contending that Court improperly relied on "[a]necdotal and [i]solated [i]nstances"), *with* Doc. 2068 at 4 (Defendants' Statement Regarding Evidentiary Hearings on Monitoring) (contending that Plaintiffs improperly relied on "isolated instances of potential mistakes")][4]

The proper vehicle to challenge a district court order typically is an appeal.  *Plotkin v. Pac. Tel. & Tel. Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982) ("correction of legal errors committed by the district courts is the function of the Court of Appeals"); *Title v. United States*, 263 F.2d 28, 31 (9th Cir. 1959) ("Rule 60(b) was not intended to provide relief for error on the part of the court or to afford a substitute for appeal."); *Sullivan v. Faras-RLS Grp., Ltd.*, 795 F. Supp. 305, 309 (D. Ariz. 1992) ("Arguments that the court was in error on the issues it considered should be directed to the court of appeals.").  Defendants filed a notice of appeal the day after filing their Rule 60(b) motion.  [Doc. 2937]  There, too, Defendants face an uphill climb, because a court's findings of fact "are subject to review only for clear error."  *Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017) (citations omitted).  "Under that standard, [the reviewing court] may not reverse just because [it] would have decided the [matter] differently.  A finding that is 'plausible' in light of the full record— even if another is equally or more so—must govern."  *Id.* (internal quotation marks and citation omitted); *see also United States v. Working*, 224 F.3d 1093, 1102 (9th Cir. 2000) (en banc) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (citations and quotation marks omitted)).

And the reviewing court examines the record "in its entirety," *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1155 (9th Cir. 1999) (quotation marks and citation omitted), with "due regard . . . given the opportunity of the trial court to judge the

---

[4]  In their introduction, Defendants assert that the Court "prejudged the results" of certain evidentiary hearings.  [Doc. 2931 at 2]  That assertion is meritless and already has been briefed by the parties and disposed of by the Court.  [*See* Doc. 2641 (Defendants' Motion to Disqualify Magistrate Judge Duncan From All Further Proceedings); Doc. 2732 (Plaintiffs' Response to Motion to Disqualify); Doc. 2777 (Defendants' Reply in Support of Motion to Disqualify); Doc. 2791 (Order)]

credibility of the witnesses." *Spokane Arcade, Inc. v. City of Spokane*, 75 F.3d 663, 665 (9th Cir. 1996); *see also Louie v. United States*, 776 F.2d 819, 823 (9th Cir. 1985) ("We may affirm a judgment on the basis of any evidence in the record that supports it."); *W. Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1285 (9th Cir. 1984) ("A judge is not required, in making findings, to mention every item of evidence and either adopt it or reject it.  We presume that the judge considers all of the evidence, and relies on so much of it as supports the finding and rejects what does not support the finding, unless the judge states otherwise."); *State Farm Mut. Auto. Ins. Co. v. White*, 563 F.2d 971, 977 (9th Cir. 1977) (observing that reviewing court is "required to take the evidence as a whole").

Defendants thus cannot prevail on appeal—much less through a Rule 60(b)(6) motion—simply by disagreeing with several "examples" listed in the order and ignoring other evidence in the record that supports the Court's decision, as they do here.[5] [Doc. 2900 at 12; *see* Doc. 2931 at 6-17]  There is ample evidence to support the Court's "'ultimate' finding," *Vance v. Am. Hawaii Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir. 1986)—namely, that the CGAR data produced by Defendants may not be accurate or reliable.  Plaintiffs already have identified a number of concerns with Defendants' monitoring process, "with representative illustrations from witness testimony." [Doc. 2046 at 6]  Plaintiffs divided their concerns into five categories:

1. Defendants have failed to properly randomize source documents used by monitors;

2. Problems and questions raised by the source documents themselves—who is preparing them, who is inputting the information that is used in the source documents, and whether the source documents listed in the Monitoring Guide are what the monitors actually use to determine compliance;

---

[5]  Plaintiffs agree with Defendants that one paragraph of the decision is incorrect—the use of Performance Measure 51 at Florence as an example of the "Monitoring Bureau pick[ing] a seemingly arbitrary number of records to review for each Performance Measure."  [Doc. 2900 at 8; *see* Doc. 2931 at 12-13]  That error was harmless.  *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986) (noting that "in view of the factual record any error would be, in any event, harmless"); *Henderson v. United States*, 846 F.2d 1233, 1235 (9th Cir. 1988) ("Although we find the first two explanations offered by the district court insufficient to support the finding that the accident was not foreseeable, we find that the district court's third reason adequately supports its conclusion.").

3.   Idiosyncratic auditing and reporting practices of the individual monitors which lead to inconsistent results for the same performance measure, prison-by-prison or from month-to-month, and sampling of cases or files for which it is mathematically or temporally impossible for there to be noncompliance;

4.   Defendants' 'rebuttal' system, created without notification to the Court or Plaintiffs, which allows headquarters staff to change monitors' date and time stamped entries and findings in the CGARs at Corizon's request, without notice to the monitors, or any indication apparent on the face of the CGARs; [and]

5.   An unwillingness by Defendants to identify the root causes of sustained noncompliance, to follow the Court's orders, and to hold Corizon accountable for noncompliance.

[*Id.* at 5; *see also id.* at 6-45 (detailing the factual basis for these five areas of concern); Doc. 2087]   Even this was not an exhaustive survey of the relevant evidence.   In 2017 alone, there were over 600 filings, 27 hearing days, 38 live witnesses, and over 80 exhibits admitted into evidence.[6]   Between January 1 and June 22, 2018 (the date of the Court's order), there were over 300 filings, 19 hearing days, 15 live witnesses, and 221 exhibits admitted into evidence.[7]   Subsequent evidentiary hearings and documents produced by Defendants have only deepened and confirmed Plaintiffs' concerns.   [*Compare* Doc. 2046 at 12-21, *and* Doc. 2087 at 10-11 (discussing concerns with underlying source documents), *with* 4/17/17 Tr. at 605:8-609:14 (discussing Pentaho reports, which may be

---

[6] **Witnesses** [3/8/17 Tr. (Kathy Campbell, Mark Owens, Mark Haldane); 3/21/17 Tr. (Mark Haldane; Martin Winland, Troy Evans, Sarah Cartwright, Jenny Fontaine, Nicole Taylor); 3/28/17 Tr. (Wendy Hackney, Carson McWilliams); 4/17/17 Tr. (Dennis Dye, Erin Barlund, Richard Pratt); 5/10/17 Tr. (Richard Pratt); 7/14/17 Tr. (Mark Blocksom, Ronald Oyenik, Dominique Keys, Angela Ashworth); 8/8/17 Tr. (Charles Ryan, Richard Pratt, Jeffrey van Winkle, Norman Twyford); 8/9/17 Tr. (Henrietta Western, Robin Coleman); 9/11/17 Tr. (Kim Currier, Elizabeth Oros, Christopher Papworth, Crystal Lee, Ernest Trujillo, Jeffrey van Winkle, John Mattos); 9/13/17 Tr. (Robert Kay, Jason Jardine, Tanna Gualco); 11/8/17 Tr. (Brian Creswell, Jason Monson, Cole Krages, Oswaldo Robles, Ashley Zuerlein, Tara Diaz, Alfred Ramos); 12/20/17 Tr. (Richard Pratt)]; **Exhibits** [7/14/17 Tr. at 3; 8/8/17 Tr. at 3-4; Doc. 2324; 9/11/17 Tr. at 4; Doc. 2326; Doc. 2327; 9/13/17 Tr. at 2; 11/8/17 Tr. at 4; Doc. 2454; Doc. 2453]

[7] **Witnesses** [1/18/18 Tr. (Kathy Campbell, Juli Stover); 2/27/18 Tr. (Janice Watson); 2/28/18 Tr. (Janice Watson, William Upton, David Robertson); 3/14/18 Tr. (Rodney Stewart); 3/26/18 Tr. (David Robertson, Richard Pratt); 3/27/18 Tr. (Charles Ryan, Richard Pratt, Carson McWilliams); 4/10/18 Tr. (Carson McWilliams, Richard Pratt); 5/31/18 Tr. (Angela Fischer); 6/1/18 Tr. (Cecilia Edwards); 6/12/18 Tr. (Rodney Stewart, Erin Barlund, Lisa McNeal, Nicole Taylor); 6/13/18 Tr. (Nicole Taylor, Vanessa Headstream); 6/14/18 Tr. (Vanessa Headstream)]; **Exhibits** [Doc. 2883; Doc. 2666; Doc. 2737; Doc. 2758; Doc. 2884]

1  used as the source document for many performance measures), 6/12/18 Tr. at 86:11-22

2  (Testimony of Dr. Rodney Stewart, ASPC-Eyman Medical Director) ("A Pentaho report

3  is a notoriously inaccurate document."), *and* Evidentiary Hearing Exhibits, Plfs.' Exhibit

4  62 (Email from K. Campbell to V. Headstream, Program Evaluation Administrator,

5  Health Services Contract Monitoring Bureau (July 19, 2017) (forwarding provider referral

6  logs and noting: "This may be helpful for PM #42 (if filled out correctly). Eyman is

7  useless."); 6/13/18 Tr. at 185:7-16; *see also* 5/31/18 Tr. at 64:20-65:25 (confirming that a

8  nurse can "create an entry that shows up as an entry made by a psychiatrist")]

9      Accordingly, there is no basis to disturb the Court's decision. Plaintiffs set forth

10  below just a few examples of Defendants' inaccurate and restrictive view of the record.

11          **1.     Defendants Rely on CGAR Data From "Discredited Methods."**

12      Defendants assert that "[i]t is undisputed that the monitoring system agreed to by

13  the parties demonstrates that Defendants have brought approximately 75% of [all]

14  Performance Measures into compliance." [Doc. 2931 at 1-2]  This could not be further

15  from the truth. The Court has, on numerous occasions, ruled that Defendants' monitoring

16  methodology for various Performance Measures is invalid.[8]  And much of the CGAR data

17  relied on by Defendants to claim compliance remains invalid and based on "discredited

18  methods." [Doc. 2344 at 3; Doc. 2900 at 3]  As the Court explained:

19  _____

20      [8] [*See, e.g.*, Doc. 1673; Doc. 1833; Doc. 1907; Doc. 1915; Doc. 2119; Doc. 2124;
    Doc. 2225; Doc. 2344 at 8-39 (Plaintiffs' Response to Defendants' Motion to Terminate
21  Monitoring) ("For a large number of Performance Measures, the parties have agreed to
    change the methodology used, and/or the Court has found Defendants' initial monitoring
22  methodology to be invalid and has provided the correct methodology." (discussing
    Performance Measures 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 25,
23  26, 28, 29, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55,
    57, 59, 60, 62, 63, 64, 65, 66, 68, 72, 74, 75, 76, 78, 79, 89, 91, 93, 94, 95, 96, 97, 99, 101,
24  102, 103)); Doc. 2046 at 3 (Plaintiffs' Statement Regarding Evidentiary Hearings on
    Monitoring) ("The Court already has found that much of the methodology that Defendants
25  have used for the past two years is faulty. After listening to several days of testimony by
    the people who do the actual monitoring and their supervisors, the Court found that there
26  remain 'great chasms of competence' in the monitoring. Despite the Court's finding,
    Defendants rely on the CGAR scores using a methodology that the Court has rejected—
27  and instructed them that they would need to recalculate—to announce that they
    unilaterally stopped monitoring numerous Performance Measures before notifying the
28  Court or Plaintiffs' counsel." (internal citations omitted)); Doc. 2087 at 5 (Plaintiffs'
    Reply Regarding Evidentiary Hearings on Monitoring)]

1
2
3
4

> Nearly 18 months ago, and consistent with binding precedent, the Court informed Defendants that they did not have to recalculate CGAR data but could not rely on CGAR data calculated under discredited methods. . . . Defendant Pratt testified that, with one possible exception, CGARs have not been recalculated under Court-ordered methodologies.

5

6

[Doc. 2900 at 3 (citing Doc. 1951; *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Res. v. California*, 813 F.3d 1155, 1165 (9th Cir. 2015); 3/26/18 Tr. at 876-77)]

7

8

>    **2.    Current and Former Medical Staff Testified That They Were Instructed to Cancel Specialty Appointments to Avoid Violating the Stipulation's Requirements.**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Cecilia Edwards, a Clinical Coordinator at ASPC-Yuma, testified that she would cancel specialty consult requests at times "to avoid violating the [Stipulation's] timelines." [6/1/18 AM Tr. at 37:23-38:14; 6/1/18 PM Tr. at 73:18-77:3, 113:3-21, 128:1-5; *see also* Plfs.' Exhibit 231 (Email from C. Edwards to C. Smalley, Nurse Practitioner (Nov. 8, 2017)]  The Court found Ms. Edwards to be "a credible witness."  [Doc. 2900 at 6; *cf. Dunn v. Trans World Airlines, Inc.*, 589 F.2d 408, 414 (9th Cir. 1978) ("The original trier of fact is also in the best position to survey the evidence and to draw conclusions regarding the credibility of the witnesses.  In evaluating such evidence, the trial court's appraisal of the credibility of the witness is to be accepted; no challenge to such appraisal is permitted at the appellate level.")]  Defendants impermissibly attempt to minimize Ms. Edwards's testimony by characterizing it as "just her belief" and by ignoring other evidence in the record.  [Doc. 2931 at 9]   But ample evidence showed that cancelling specialty consults to inflate CGAR data, or inexplicably denying consults when specialists were not available (and thus raising CGAR scores), was not limited to ASPC-Yuma.

23

24

25

26

27

28

For example, Dr. Janice Watson, who previously worked at ASPC-Eyman, reported that she had been instructed how to "beat the monitors" and that she received emails from a Clinical Coordinator instructing her to cancel specialty consults to avoid violating the Stipulation's requirements.  [2/27/18 Tr. at 23:7-24:3, 96:2-97:25; *see also* Evidentiary Hearing Exhibits, Plfs.' Exhibit 3 (Email from S. Neese, Clinical Coordinator, to J. Watson, (Sept. 18, 2017) ("Could you please cancel . . . infectious disease

consults/there are two.  We do not have a provider to send him to.  One was approved and

has been sitting there for 42 days.  After 30 days we get nailed for 1000 bucks a day until

they are seen."); Plfs.' Exhibit 13 (Email from S. Neese, Clinical Coordinator, to J.

Watson (Sept. 13, 2017) ("please cancel infectious disease consults as we do not currently

have a provider for that")]  There are similar emails between other medical staff members

at ASPC-Eyman.  [*See* Evidentiary Hearing, Plfs.' Exhibit 270 (Email from S. Neese,

ASPC-Eyman Clinical Coordinator, to S. Thomas (Dec. 1, 2017)) ("Could you please

cancel requests for [two class members].  They are to [sic] far out to put in right now.  We

only have a 60 day window for routine consults and 30 days for urgents to send them out.

*If they are over that allotted amount of time we get dinged on our CGAR measure and*

*fined every day until they are seen*." (emphasis added)); Plfs.' Exhibit 215 at 1 (Email

from M. Marino, ASPC-Eyman Chronic Care Coordinator, to B. Schmid, ASPC-Tucson

Facility Health Administrator (Nov. 16, 2017)) ("I was told not to order labs on the

patients that were backlogged, because we didn't know when they would be seen and it

would be a 'wasted' lab.  I have been trying to order 5 labs per day per unit, because we

only have 2 techs, and if I order more than that, they can't keep up.  *If they can't keep up,*

*it puts them out of compliance*." (emphasis added)); 6/12/18 Tr. at 24:3-30:1, 62:3-8][9]

Emails related to ASPC-Perryville, ASPC-Winslow, ASPC-Tucson, and ASPC-

Phoenix raise similar concerns.  [*See* Evidentiary Hearing Exhibits, Plfs.' Exhibit 94 at 1

(Email from S. Rucker to B. Briddle (Nov. 27, 2017) (reviewing PM 51 at ASPC-

Perryville and noting that "[o]ptometry consult from 10/08/2016 was *cancelled d/t [due*

*to] being out of date*—and then rewritten 08/16/2017 and completed in 09/20/2017. . . .

Scheduled in compliance of requested consult from optometry self audit." (emphasis

---

[9]  The Stipulation requires routine specialty consult requests to be "scheduled and
completed within 60 calendar days of the consultation being requested by the provider."
[Doc. 1185-1 at 11 (Performance Measure 51)]  Urgent specialty consult requests must be
"scheduled and completed within 30 days of the consultation being requested by the
provider."  [*Id.* (Performance Measure 50)]  Last year, the Court issued an order to show
cause as to why it "should not impose a civil contempt sanction of $1,000 per incident of
non-compliance" with certain performance measures at certain facilities.  [Doc. 2373 at 3-
4; *see also* Doc. 2124; Doc. 2236]

added)); *id.* (Email from S. Rucker to B. Briddle (Nov. 27, 2017) (noting that "[o]ptometry consult from 01/21/2017 was *cancelled d/t* [*due to*] *being out of date*—new consult requested—and then rewritten 08/23/2017 and completed 09/21/2017[.]" (emphasis added)); Plfs.' Exhibit 190 (Email from E. Johnson to G. Campbell, ASPC-Phoenix Registered Nurse (Aug. 18, 2017)) (responding to concern about "how I missed the audiology consult" with: "LOL it is ok I cancelled the consult and the provider will re-eval him and resubmit if necessary."); Plfs.' Exhibit 95 at 2 (Email from D. Randles, ASPC-Winslow Facility Health Administrator, to R. Patel (Dec. 7, 2017)) ("There have been many submissions for approval of outside consults (urology/surgical etc.) and many were denied . . . I really don't want us to see us have this case as another headline. As the Facility Health Administrator I have to express grave concerns that we may be viewed as NOT doing what is expeditious or RIGHT in this regard. Bottom line for me is that . . . unless there is compelling evidence to the contrary, I just feel that we have not and are not doing the right thing in this case. I ask you to please stop . . . reevaluate this case and help to set it on the right path."); Plfs.' Exhibit 84 at 2 (Email from B. Schmid to M. Bedoya, ASPC-Tucson Medical Services Contract Monitor, *et al.* (Aug. 9, 2017) (noting entry in medical record that said: "When I resubmitted [oncology consult request], it was sent to UM review, and then a few days later was no longer in the system.")]

### 3. Plaintiffs Consistently Have Objected to Termination on the Basis of Defendants' Unreliable Monitoring Methodology.

Defendants assert that "Plaintiffs never provided the Court with, or otherwise advised the Court of, their objections" to termination of monitoring of specific performance measures at specific facilities. [Doc. 2931 at 4] This is untrue. On May 4, 2018, Plaintiffs filed with the Court a copy of the letter they had sent to Defendants that listed their objections to termination of monitoring of those performance measures, and requested that the matter be placed on the agenda for the next status conference. [Doc. 2793 at 3 (Plaintiffs' Proposed Agenda); Doc. 2794 at 5 ¶ 13 (Declaration of C. Kendrick) ("Attached herein as Exhibit 13 is a true and correct copy of a letter I sent to

1   Defendants on April 18, 2018, pursuant to the Court's instruction, regarding Defendants'

2   request that Plaintiffs stipulate to the termination of monitoring certain performance

3   measures."); Doc. 2794-1 at 89-92 (Exhibit 13, Letter from C. Kendrick, Plaintiffs'

4   Counsel, to R. Love, Defendants' Counsel, Defendants' Request to Terminate Monitoring

5   of Certain PMs (Apr. 18, 2018)); *see also* Doc. 2819 at 2 (Plaintiffs' Statement re:

6   Defendants' Request to Suspend Monitoring of Certain Performance Measures)

7   ("Plaintiffs will not stipulate to the termination or suspension of monitoring of any of the

8   other performance measures requested by Defendants for the reasons set forth in their

9   April 18, 2018 correspondence to Defendants, filed with the Court at Docket 2794-1,

10  Ex. 13.")]

11

12  **B.      Any Procedural Deficiency in the Court's Initial Notice to the Parties
          Regarding Appointment of an Independent Expert Was Harmless.**

13  Defendants next contend that "the Court's appointment of a Rule 706 expert is

14  procedurally improper." [Doc. 2931 at 17]  But the Court has not yet appointed an expert.

15  Defendants' challenge under Rule 60(b)(6), which "applies only to motions attacking

16  final, appealable orders," therefore is premature. *United States v. Martin*, 226 F.3d 1042,

17  1048 n.8 (9th Cir. 2000).  Here, the order simply directed the parties to "submit the names

18  of two proposed experts who can conduct a review of the monitoring process[.]"

19  [Doc. 2900 at 14]  It is not a final, appealable order because it does not "evidence[] the

20  judge's intention that it be the court's final act in the matter." *Reed v. Lieurance*, 863

21  F.3d 1196, 1212 (9th Cir. 2017) (internal quotation marks and citation omitted).  To the

22  contrary, the Court expressly stated its intention to "pursue a selection process that may

23  include interviewing a finalist." [Doc. 2900 at 14]

24  In any event, Defendants' argument is baseless.  Defendants assert that they "have

25  not had an opportunity to be heard on whether a Rule 706 expert is necessary after the

26  recent evidentiary hearings." [Doc. 2931 at 18]  That is false.  As explained below,

27  Defendants briefed whether a Rule 706 expert was warranted after the conclusion of the

28

five-day evidentiary hearing on monitoring methodology and then declined repeated opportunities over the next year to provide additional briefing or oral argument.

On April 17, 2017, the Court informed the parties that it was considering appointing a special master to, among other things, "monitor[] the monitoring program." [4/17/17 Tr. at 673:24-674:15]  The Court then set a briefing schedule.  [*Id.* at 674:16-676:6; Doc. 2029 at 2 (Civil Minutes)]  Plaintiffs filed two statements on May 8, both contending that a Rule 706 expert, and not a special master, was warranted.  [Doc. 2043 at 2; Doc. 2046 at 46]  On May 22, after the conclusion of the evidentiary hearing on monitoring methodology, Defendants filed a statement "regarding the significance of testimony" from the hearing and a statement arguing that a Rule 706 expert was not appropriate in this case.[10]  [Doc. 2068 at 2; Doc. 2067 at 6-12]

At the next status conference, Plaintiffs again noted "that the Court needs to appoint a Rule 706 expert with knowledge and expertise in methodology and monitoring and auditing, because the testimony shows that the system that has been used to date is broken." [6/14/17 Tr. at 106:17-20]  The Court discussed appointing an expert to evaluate staffing levels and a Rule 706 expert to address "potential systemic vulnerabilities of the monitoring system."  [*Id.* at 102:8-13, 108:5-11]  Defendants requested leave to file a brief, which the Court allowed.  [*Id.* at 100:2-108:12]  Defendants did not file a brief related to an expert to evaluate monitoring.[11]  During a status conference on November 7, the Court again noted "that at some point it may be that we will need to engage in another 706 expert with respect to evaluating the quality of the monitoring program," and offered the parties the opportunity to state, "in court, on the record, what they want to say about it." [11/7/17 Tr. at 18:11-22]  Plaintiffs presented a short argument, referring to previous briefing.  [*Id.* at 23:17-23]  Defendants provided no argument.  And that was not the end of the matter.  Over the next seven months, Plaintiffs consistently raised the need for a

---

[10]  The hearing concluded on May 10, 2017, after Plaintiffs completed cross-examination of Defendant Pratt.  [Doc. 2061; 5/10/17 Tr. at 685:8-774:22]

[11]  Defendants did file a "Brief re: 'Staffing' Expert."  [Doc. 2138 (under seal)]  The Court later appointed a Rule 706 expert to evaluate staffing issues.  [Doc. 2483]

Rule 706 expert and stated that it was ripe for decision, without argument or objection from Defendants.[12]

It is true, of course, that the Court initially informed the parties that it was considering appointing a special master under Federal Rule of Civil Procedure 53, as opposed to an expert under Federal Rule of Evidence 706.  *See* Fed. R. Civ. P. 53(b)(1) ("Before appointing a master, the court must give the parties notice and an opportunity to be heard.  Any party may suggest candidates for appointment."); Fed. R. Evid. 706(a) ("On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations.").  But, as Defendants acknowledge, "[t]he policy of requiring an order to show cause allows a party 'an opportunity to be heard on the matter.'"  [Doc. 2931 at 17 (citation omitted)]  And Defendants had full opportunity to be heard here.

The central issue was the same under either Rule:  whether a neutral party should assist the Court in assessing the accuracy of CGAR data.  And after Plaintiffs stated that a Rule 706 expert was warranted, Defendants briefed the issue.  [Doc. 2043 at 2 (Plaintiffs' Statement Regarding the Appointment of a Special Master or Court Expert) ("Plaintiffs do not support the appointment of a Rule 53 Special Master.  Instead, Plaintiffs believe that the Court should appoint an expert under Rule 706 of the Federal Rules of Evidence.");

---

[12]  [Doc. 2493 at 2 ¶ 3 (Plaintiffs' Proposed Agenda for December 20, 2017 Status Hearing) ("Plaintiffs' proposal that Defendants retain an expert in monitoring to advise them and/or conduct monitoring."); Doc. 2530 at 4 ¶ 2 (Plaintiffs' Proposed Agenda for January 18, 2018 Status Hearing) (listing, as "Matter[] Fully Briefed and Awaiting Decision From the Court," "Plaintiffs' proposal that Defendants retain an expert in monitoring to advise them and/or conduct monitoring."); Doc. 2680 at 5 ¶ 2 (Plaintiffs' Proposed Agenda for March 14, 2018 Status Hearing) (same); Doc. 2741 at 4-5 ¶ 1 (Plaintiffs' Proposed Agenda for April 11, 2018 Status Hearing) (same); Doc. 2793 at 3 ¶ 2 (Plaintiffs' Proposed Agenda for May 9, 2018 Status Hearing) (same); Doc. 2864 at 3 ¶ 3 (Plaintiffs' Proposed Agenda for June 13, 2018 Status Hearing) (same); 1/18/18 Tr. at 149:9-13 ("[T]he Court needs to consider appointing a Rule 706 expert on monitoring, because this is not sustainable."); 4/10/18 Tr. at 1233:5-8 ("[T]he Court may need to take matters into its own hand and appoint a Rule 706 expert or experts on auditing and monitoring, because what defendants are doing is not working and it's broken."); 5/9/18 Tr. at 26:5-27:4 ("[T]hat in-the-weeds work of resolving these disputes can and should be done by a Rule 706 expert.  The Court would remain the ultimate decision-maker, but the data can be sifted and the dispute refined by the expert, who can then make a recommendation to the Court and the Court can make the ultimate decision.")]

Doc. 2046 at 46 (Plaintiffs' Statement Regarding Evidentiary Hearings on Monitoring) ("Plaintiffs request that the Court appoint a Rule 706 expert . . . whose duties would include, *inter alia*, evaluating the reliability and accuracy of ADC's monitoring program, including the CGARs . . . ."); Doc. 2067 at 6-12 (Defendants' Statement Regarding Appointment of Special Master) (arguing that "[t]he Stipulation does not allow the Court to appoint a third party to oversee the monitoring program," "Plaintiffs' authorities do not authorize a Rule 706 expert in this case," and "[i]f the Court does appoint a[n] . . . expert, the judiciary or the parties should share the costs")]  The Court later referenced Rule 706 specifically and, as noted above, offered Defendants additional opportunities to present argument.  [*See* 6/14/17 Tr. at 105:5-10 ("So you can certainly feel free to submit anything you would like and the plaintiffs can respond. . . .  I will read what you submit.  I always do."), 108:7-11; 11/7/17 Tr. at 18:11-22 ("Now I'm going to turn to respective counsel so that we can hear in court, on the record, what they want to say about it[.]")]

As a result, any perceived error in the form of initial notice to the parties was harmless.  *See* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *Lucky Break Wishbone Corp. v. Sears Roebuck & Co.*, 373 F. App'x 752, 758 (9th Cir. 2010) ("Because [party] was given an adequate opportunity to be heard, any procedural irregularities were harmless."); *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992) (noting as example of "proper application of the harmless error rule" case where Secretary of the Interior gave notice and held hearings under the National Environmental Policy Act (NEPA), and not the Federal Land Policy and Management Act (FLPMA), and stating that the "purposes of FLPMA's notice requirement were fully satisfied" by the opportunity to be heard during NEPA hearings); *United States v. Ragghianti*, 560 F.2d 1376, 1380 (9th Cir. 1977) (observing that not "every one of the Federal Rules of Evidence is a 'specific command of Congress' so that a violation of one requires reversal" (quoting *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946))).

Finally, Defendants assert without citation to authority that they were entitled to first know "what specific evidence the Court believes warrants appointment of a 706 expert." [Doc. 2931 at 18]  But that argument finds no support in the plain language of Rule 706(a).  Defendants had ample notice of the grounds for appointment of a Rule 706 expert in this case.  [*See, e.g.*, 4/17/17 Tr. at 673:24-675:6; Doc. 2043; Doc. 2046]  If Defendants required more guidance, they could have asked for it during the many evidentiary and status hearings.  Defendants' dissatisfaction with the Court's decision does not warrant another round of briefing.  *Hamilton v. Newland*, 374 F.3d 822, 825 (9th Cir. 2004) (affirming denial of Rule 60(b) motion that was a "belated attempt to argue a legal theory [movant] should have raised earlier"); LRCiv 7.2(g)(1) (requiring motions for reconsideration to "point out with specificity . . . any new matters being brought to the Court's attention for the first time and the reasons they were not presented earlier . . . .").

## II.     IT WOULD BE UNJUST TO THE OVER 33,000 CLASS MEMBERS TO TERMINATE MONITORING OF BARGAINED-FOR MEDICAL AND MENTAL HEALTH CARE WITHOUT KNOWING WHETHER THE SOLE BASIS FOR TERMINATION—CGAR DATA—IS ACCURATE.

Defendants assert that "'the risk of injustice to the parties'" supports vacating the Court's order.  [Doc. 2931 at 6 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64 (1988))]  In particular, Defendants reference the "injustice" of requiring them to "continue to monitor PMs which long-ago met or exceeded the Stipulation's compliance thresholds, and the substantial cost, time, and effort required to continue to monitor these complaint [sic] PMs." [*Id.* at 7-8]  But Defendants could have avoided this problem by providing transparency into their monitoring process and establishing "that the CGAR data is accurate and reliable"—something "entirely within Defendants' control."  [Doc. 2900 at 2, 6]  Defendants have not done that.  [*See, e.g.*, *id.* at 4 (noting that Defendants have not "provid[ed] an affidavit or another form of competent and admissible evidence" to explain why "the CGARs are inexplicably littered with N/A results"); *id.* at 10 (noting that Defendants did not adequately explain the CGARs for Performance Measures 85 and 86)]  Similarly, Defendants have been on notice for over a

1    year and a half that the Court will terminate many performance measures only after they

2    have "been recalculated under Court-ordered methodologies." [*Id.* at 3]  Defendants have

3    failed to do so.  [*Id.*]  That also is why the costs of the Rule 706 expert are properly

4    assigned to Defendants—an issue that the parties already have briefed.[13]

5          There is a considerable risk of injustice to class members who rely entirely on the

6    State of Arizona for their medical and mental health care should the Court vacate its order.

7    Class members continue to suffer from serious—and sometimes fatal—lapses in medical

8    care and unspeakable pain.  [*See, e.g.*, Doc. 2496; Doc. 2531-1 at 16-40; Doc. 2628-1;

9    2/28/18 Tr. at 335:8-365:7 (discussing mortality reviews in which Defendants concluded

10   that class member deaths could have been "prevented or delayed by more timely

11   intervention")]  The Court has a duty to enforce the Stipulation, which was approved as

12   necessary to remedy constitutionally inadequate medical and mental health care.  [Doc.

13   1458 at 6; Doc. 1185 at 13 ¶ 36; 18 U.S.C. § 3626(a)(1)(A); *see Brown v. Plata*, 563 U.S.

14   493, 511 (2011) ("Courts . . . must not shrink from their obligation to enforce the

15   constitutional rights of . . . prisoners." (internal quotation marks and citation omitted));

16   *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced

17   to approving consent decrees and hoping for compliance.")][14]  In performance of this

18   _____

19   [13] [Doc. 2043 at 5-6 (Plaintiffs' Statement Regarding the Appointment of a Special
     Master or Court Expert) ("Because the appointment of an expert is necessary solely due to
20   Defendants' failure to honor the terms of the Stipulation through 'great chasms of
     competence' and an utter unwillingness to force Corizon to live up to the terms of the
21   contract, Defendants should bear the full financial burden. . . .  Defendant Pratt testified
     that the State has received $3 million in fines from Corizon for failing to perform its
22   contractual obligations.  Since those funds were allocated initially by the State to pay for
     health care to be delivered to prisoners, it is eminently reasonable and perfectly equitable
23   to use that money to monitor and improve Defendants' efforts to comply with the
     Stipulation through the appointment of a qualified expert." (internal citations omitted));
24   Doc. 2067 at 12-14 (Defendants' Statement Regarding Appointment of Special Master);
     Doc. 2083 at 11 (Plaintiffs' Reply in Support of Statement Regarding the Appointment of
25   a Special Master or Court Expert) ("Defendants argue that they should not have to pay the
     price of their own noncompliance, and that it should instead be borne by indigent
26   prisoners and Plaintiffs' counsel out of the relatively small (and capped) amount of money
     Plaintiffs' counsel receives each year pursuant to its monitoring duties.")]

27   [14] Defendants cite an assortment of cases regarding deference to "prison officials
     regarding the safe, secure and efficient operation of prisons."  [Doc. 2931 at 6]  But those
28   cases are of little relevance where, as here, the issue is the interpretation and enforcement
     of a settlement agreement that already has been found by the Court, at the parties' joint

1  duty, the Court "invested a significant amount of time understanding the data collection

2  process and the implications of Defendants' different data reporting methods" and

3  "addressed various minutiae of this process in an on-going attempt to obtain valid,

4  reliable, and accurate CGAR data."  [Doc. 2900 at 6]  This is critical.  CGAR data "is the

5  foundation for the operation of the Stipulation."  [*Id.*]  It is the basis for determining

6  compliance with and termination of bargained-for medical and mental health protections

7  for class members.  [Doc. 1185 at 3-5 ¶¶ 9-10]

8       Even after two years of evidentiary hearings and argument by the parties, however,

9  the Court still cannot determine whether Defendants' CGAR data is valid.  As a result, the

10  Court properly determined that expert assistance is warranted to ensure that Defendants

11  have lived up to their end of the bargain before removing protections provided by the

12  Stipulation for over 33,000 class members.  *See* Charles Alan Wright *et al.*, 29 Fed. Prac.

13  & Proc. Evid. § 6302 (2d ed.) ("The policy goal of Rule 706 is to promote accurate

14  factfinding."); *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1297 (9th Cir. 2010)

15  (affirming district court's appointment of expert where "district court conducted a review

16  of the record and determined it could not rely solely on [certain medical] records due to

17  their inconsistent and incomplete nature"); *Walker v. Am. Home Shield Long Term*

18  *Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999) (affirming district court appointment

19  of expert "to assist the court in evaluating contradictory evidence").

20                                    **CONCLUSION**

21       The Court should deny Defendants' Motion for Relief from Court Order re:

22  Termination of Monitoring [Doc. 2931].

23

24

---

25  request, to be necessary to remedy constitutional violations.  [Doc. 1458 at 6]  In such
   circumstances, deference is given to the district court.  *See Gates v. Gomez*, 60 F.3d 525,

26  530 (9th Cir. 1995), *as amended* (Aug. 3, 1995) ("[W]e give deference to the district
   court's interpretation based on the court's extensive oversight of the decree from the

27  commencement of the litigation." (internal quotation marks and citation omitted));
   *Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014) ("The ongoing, intractable nature

28  of this litigation affords the district court considerable discretion in fashioning relief.").

1    Dated:  August 17, 2018              **PRISON LAW OFFICE**

2

3                                         By:   s/ Rita K. Lomio
                                               Donald Specter (Cal. 83925)*
4                                              Alison Hardy (Cal. 135966)*
                                               Sara Norman (Cal. 189536)*
5                                              Corene Kendrick (Cal. 226642)*
                                               Rita K. Lomio (Cal. 254501)*
6                                              1917 Fifth Street
                                               Berkeley, California 94710
7                                              Telephone:  (510) 280-2621
                                               Email:     dspecter@prisonlaw.com
8                                                          ahardy@prisonlaw.com
                                                           snorman@prisonlaw.com
9                                                          ckendrick@prisonlaw.com
                                                           rlomio@prisonlaw.com

10                                             *Admitted *pro hac vice*

11                                             David C. Fathi (Wash. 24893)*
                                               Amy Fettig (D.C. 484883)**
12                                             Victoria Lopez (Ill. 6275388)*
                                               **ACLU NATIONAL PRISON**
13                                             **PROJECT**
                                               915 15th Street N.W., 7th Floor
14                                             Washington, D.C. 20005
                                               Telephone:  (202) 548-6603
15                                             Email:     dfathi@aclu.org
                                                          afettig@aclu.org
16                                                        vlopez@aclu.org

17                                             *Admitted *pro hac vice*.  Not admitted
                                               in DC; practice limited to federal
18                                             courts.
                                               **Admitted *pro hac vice*
19
                                               Kirstin T. Eidenbach (Bar No. 027341)
20                                             **EIDENBACH LAW, P.L.L.C.**
                                               P. O. Box 91398
21                                             Tucson, Arizona 85752
                                               Telephone:  (520) 477-1475
22                                             Email:     kirstin@eidenbachlaw.com

23                                             Kathleen E. Brody (Bar No. 026331)
                                               **ACLU FOUNDATION OF**
24                                             **ARIZONA**
                                               3707 North 7th Street, Suite 235
25                                             Phoenix, Arizona 85013
                                               Telephone:  (602) 650-1854
26                                             Email:     kbrody@acluaz.org

27

28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

**ARIZONA CENTER FOR
DISABILITY LAW**

By:   s/ Maya Abela
 Rose A. Daly-Rooney (Bar No.
 015690)
 J.J. Rico (Bar No. 021292)
 Maya Abela (Bar No. 027232)
 Jessica Jansepar Ross (Bar No. 030553)
 177 North Church Avenue, Suite 800
 Tucson, Arizona 85701
 Telephone:  (520) 327-9547
 Email:
  rdalyrooney@azdisabilitylaw.org
   jrico@azdisabilitylaw.org
   mabela@azdisabilitylaw.org
   jross@azdisabilitylaw.org

 Asim Dietrich (Bar No. 027927)
 **ARIZONA CENTER FOR
 DISABILITY LAW**
 5025 East Washington St., Ste. 202
 Phoenix, Arizona 85034
 Telephone: (602) 274-6287
 Email:    adietrich@azdisabilitylaw.com

*Attorneys for Arizona Center for Disability
Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2018, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
Jamie D. Guzman
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com

*Attorneys for Defendants*

s/ D. Freouf