Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen
Swartz, Sonia Rodriguez, Christina Verduzco,
Jackie Thomas, Jeremy Smith, Robert Gamez,
Maryanne Chisholm, Desiree Licci, Joseph
Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly
situated*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS** |

1

# TABLE OF CONTENTS

2

**Page**

3  I.    Introduction ........................................................................................................ 1

4  II.   Plaintiffs are Entitled to Recover Fees ............................................................. 3

5      A.   Plaintiffs are Entitled to Recover Fees under the Stipulation ...................... 3

6      B.   Plaintiffs Are Entitled to An Award of Fees Under 42 U.S.C. § 1988 ........ 4

7
8      C.   Plaintiffs are Entitled to Recover Fees and Costs as a Remedy for
             Contempt ................................................................................................... 6

9
10     D.   Plaintiffs Are Entitled to Recover Fees for their Successful Fee
             Motion ....................................................................................................... 7

11
12     E.   Plaintiffs Are Entitled to Recover Fees for Work Performed by Law
             Students ..................................................................................................... 7

13  III.  Plaintiffs are Entitled to Recover All of Their Requested Fees and Costs and
14        a 2.0 Multiplier ................................................................................................. 8

15     A.   Calculation of Reasonable Attorneys' Fees ................................................ 9

16          1.   Documentation Supporting Reasonableness .................................... 10

17          2.   Determination of the Hourly Rate .................................................... 10

18          3.   Calculation of the Lodestar .............................................................. 12

19     B.   The *Kerr* Factors Support an Award of a Fully Compensatory Fee
20          With a 2.0 Enhancement ........................................................................ 14

21          1.   The Time and Labor Required .......................................................... 15

22          2.   The Novelty and Difficulty of the Issues ......................................... 15

23          3.   The Skill Required to Perform the Legal Services............................. 16

24          4.   The Preclusion of Other Employment by the Attorneys
25               Involved in the Case ........................................................................ 17

26          5.   The Customary Fee in Similar Litigation.......................................... 17

27          6.   Time Limitations Imposed by the Clients or Circumstances........... 18

28          7.   The Results Obtained by the Lawsuit ............................................... 18

**TABLE OF CONTENTS**
(continued)

**Page**

8.    The Experience, Reputation, and Ability of the Attorneys ............. 19

9.    The Undesirability of the Case ........................................................ 19

10.    The Nature and Length of the Professional Relationship with the Clients ........................................................................................ 20

11.    Awards in Similar Cases ................................................................. 20

12.    An Enhancement is Justified by Plaintiffs' Counsel's Superior Performance, Extraordinary Results, and the Need to Attract Competent Counsel ......................................................................... 21

    a.    Superior Performance and Excellent Results ....................... 22

    b.    Attracting Competent Counsel ............................................. 27

C.    Plaintiffs are Entitled to Recover Litigation Expenses and Costs, Including Expert Costs ....................................................................... 27

IV.    Conclusion ................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Blum v. Stenson*,
465 U.S. 886 (1984) ................................................................................... 15

*Carruthers v. Israel*,
274 F. Supp. 3d 1345 (S.D. Fla. 2017) ...................................................... 12

*City of Burlington v. Dague*,
505 U.S. 557 (1992) ................................................................................... 14

*Clark v. City of Los Angeles*,
803 F.2d 987 (9th Cir. 1986) ....................................................................... 7

*Farrar v. Hobby*,
506 U.S. 103 (1992) ................................................................................. 5, 9

*Fischer v. SJF-P.D. Inc.*,
214 F.3d 1115 (9th Cir. 2000) ..................................................................... 8

*Gates v. Deukmejian*,
987 F.2d 1392 (9th Cir. 1992) ................................................................... 11

*Graves v. Arpaio*,
633 F. Supp. 2d 834 (D. Ariz. 2009) ................................................. passim

*Guerrero v. Cummings*,
70 F.3d 1111 (9th Cir. 1995) ....................................................................... 7

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ............................................................................... 9, 10

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*,
774 F.3d 935 (9th Cir. 2014) ....................................................................... 6

*Johnson v. Georgia Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) ............................................................. passim

*Kelly v. Wengler*,
7 F. Supp. 3d 1069 (D. Idaho 2014) ........................................................... 6

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) ........................................................... passim

*Kerr v. Screen Extras Guild, Inc.*,
526 F.2d 67 (9th Cir. 1975) ............................................................... passim

*Klein v. City of Laguna Beach*,
810 F.3d 693 (9th Cir. 2016) ....................................................................... 8

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Turner*,
305 F. Supp. 3d 1156 (D. Or. 2018) ............................................................ 7

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**CASES (CONT.)**

*Missouri v. Jenkins by Agyei,*
  491 U.S. 274 (1989) .................................................................................... 7, 11

*Moore v. James H. Matthews & Co.,*
  682 F.2d 830 (9th Cir. 1982) ............................................................................ 20

*Morales v. City of San Rafael,*
  96 F.3d 359 (9th Cir. 1996) ......................................................................... 14, 15

*Oviatt v. Pearce,*
  954 F.2d 1470 (9th Cir. 1992) ........................................................................... 14

*Padgett v. Loventhal,*
  706 F.3d 1205 (9th Cir. 2013) ............................................................................. 9

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air,*
  478 U.S. 546 (1986) ........................................................................... 15, 16, 19

*Perez v. Cate,*
  632 F.3d 553 (9th Cir. 2011) ............................................................................. 12

*Perry v. O'Donnell,*
  759 F.2d 702 (9th Cir. 1985) ............................................................................... 6

*Planned Parenthood of Cent. & N. Ariz. v. State of Ariz.,*
  789 F.2d 1348 (9th Cir. 1986) ........................................................................... 19

*Rosenfeld v. U.S. Dep't of Justice,*
  904 F. Supp. 2d 988 (N.D. Cal. 2012) .................................................................. 7

*Skinner v. Uphoff,*
  324 F. Supp. 2d 1278 (D. Wyo. 2004) ............................................................. 7, 12

*Stivers v. Pierce,*
  71 F.3d 732 (9th Cir. 1995) ................................................................................. 6

*Texas State Teachers Ass'n v. Garland Ind. School Dist.,*
  489 U.S. 782 (1989) ............................................................................................ 5

*Trueblood v. Wash. State Dep't of Social & Health Svcs.,*
  Case No. C14-1178MJP, 2015 WL 12030114 (W.D. Wash. 2015) ........................... 21

*Webb v. Ada Cty.,*
  285 F.3d 829 (9th Cir. 2002) .......................................................................... 6, 11

*Woods v. Carey,*
  722 F.3d 1177 (9th Cir. 2013) ........................................................................... 27

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3  **S**TATUTES

4  42 U.S.C. § 1988(b) ........................................................................................................ 5

5  42 U.S.C. § 1997e(d). ..................................................................................................... 4

6  42 U.S.C. § 1997e(d)(3) ............................................................................................... 11

7

8  **O**THER **A**UTHORITIES

9  Fed. R. Civ. P. 23(h) ....................................................................................................... 3

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs move for an order awarding their attorneys' fees and costs, including expert costs, incurred in enforcing the provisions of the Stipulation [Doc. 1185] from July 1, 2017 through June 30, 2018 (the "2017-18 Enforcement Period"), and incurred in successfully obtaining enforcement fees for work done through June 30, 2017 [Doc. 2902][1]

## I.    Introduction

In October 2014 the parties reached a settlement agreement ("the Stipulation") in this class action filed on behalf of approximately 34,000 Arizona Department of Corrections ("ADC") prisoners, as well as the Arizona Center for Disability Law ("Plaintiffs"). This Court found the Stipulation to be "fair, adequate, and reasonable," and it went into effect on February 18, 2015. [Doc. 1458 at 1] Under the Stipulation, Defendants are obliged to comply with the Stipulation's terms as well as monitor and report on their compliance with 103 health care performance measures. [Doc. 1185 ¶¶ 8-10]

Since then, Plaintiffs have engaged in extensive and sustained efforts to enforce the terms of the Stipulation, serving upon Defendants multiple notices of non-compliance with the health care performance measures, and filing several motions to enforce, as well as ongoing enforcement documentation requested by the Court.[2] As a result of Plaintiffs'

---

[1] This motion for fees and costs is for the enforcement of the Health Care Performance Measures only. Fees for enforcement of the Maximum Custody Performance Measures will be sought separately. Fees in this motion are only sought for work performed by the ACLU National Prison Project ("NPP") and the Prison Law Office ("PLO"). Plaintiffs do not seek fees for the work performed on this case by the ACLU of Arizona, Perkins Coie, LLP, or the Arizona Center for Disability Law.

Plaintiffs attempted to reach agreement with Defendants on their fee claim prior to bringing this motion, but Defendants failed to respond to Plaintiffs' settlement offer. [Declaration of David C. Fathi ("Fathi Decl."), filed concurrently herewith, ¶ 27]

[2] [See, e.g., Pls.' Resp. to June 14, 2017 Order (Doc. 2214); Mot. to Enforce the Stipulation (Doc. 2253); Pls.' Statement on the Court's Order Regarding Retaliation (Doc. 2363); Pls.' Statement Regarding Defs.' Removal of Health Needs Request (HNR) Boxes (Doc. 2365); Pls.' Notice Regarding Monitoring Methodology for Performance Measure 86 (Doc. 2765)] Plaintiffs also had to respond to the many motions filed by Defendants. [See, e.g., Defs.' Mot. to Terminate Monitoring (Doc. 2251); Defs.' Mot. for Reconsideration of Court Order (Doc. 2396); Defs.' Mot. for Reconsideration of Court Order (Doc. 2484); Mot. to Disqualify Magistrate Judge Duncan From All Further Proceedings (Doc. 2641); Defs.' Mot. for Reconsideration of Court's Order (Doc. 2640);

efforts, the Court has issued multiple orders finding Defendants non-compliant with numerous provisions of the Stipulation, ordering Defendants to properly monitor their compliance with the Stipulation's requirements, and enforcing its terms.[3]

Defendants' repeated and sustained non-compliance and their dilatory, scorched-earth litigation tactics have forced Plaintiffs' counsel to engage in over three years of ongoing enforcement and litigation activities. Plaintiffs' counsel's efforts culminated in the Court's orders on June 22, 2018 holding Defendants in contempt and imposing fines of over $1.4 million [Doc. 2898] ("Contempt Order") and separately granting Plaintiffs $1.26 million in attorneys' fees and costs for enforcement work performed through June 30, 2017 [Doc. 2902] (the "First Fee Decision").   The $1.26 million fee award was based upon a 2.0 multiplier.   On the same date, the Court issued the following additional orders:

1. Granting in part and denying in part Defendants' motion for leave to cease monitoring certain performance measures.   [Doc. 2900 at 12]   In that same order, the Court concluded that there are "profound and systemic concerns" with Defendants' monitoring methodology and gave notice that it will appoint an expert pursuant to Federal Rule of Evidence 706 to conduct a review of the monitoring process.   [Doc. 2900 at 6, 12-14]

---

Suppl. Mot. to Disqualify Magistrate Judge Duncan From All Further Proceedings (Doc. 2692); Mot. for Chief Judge to Rule on Defs.' Mot. to Disqualify Magistrate Judge Duncan from All Further Proceedings (Doc. 2693); Defs.' Mot. for District Court Judge to Vacate Magistrate Judge Referral for Lack of Subject Matter Jurisdiction (Doc. 2825); and Defs.' Motion for Expedited Status Conference and Consideration of Their Mot. for District Court Judge to Vacate Magistrate Judge Referral for Lack of Subject Matter Jurisdiction (Doc. 2829)]

[3] [See, e.g., Doc. 2209 (finding that Defendants improperly retaliated against prisoners and ordering them to stop); Doc. 2373 (requiring immediate compliance with PMs 11, 35, 39, 44, 46, 47, 50, 51, 52, 54, and 66, and issuing an order to show cause for contempt sanctions); Doc. 2403 (finding noncompliance with PMs 6, 12, 15, 20, 24, 42, 49, 50, 51, 52, 55, 67, 72, 91, 94, 97, 98); Doc. 2504 (denying Defendants' request for reconsideration regarding interpretation of stipulation); Doc. 2583 (finding noncompliance with PM 54 at Eyman and ordering compliance and other relief); Doc. 2764 and Transcript of April 11, 2018 Hearing at 21:22-25:11 (finding noncompliance with PMs 19, 44, 50, 52, and 67); Doc. 2810 (finding PM 50 at Tucson non-compliant and ordering Defendants to file a remedial plan)]

2. Finding non-compliance with numerous performance measures at multiple prison complexes, and giving notice that it will appoint third-party experts to create a remediation plan for these measures.  [Doc. 2905 at 3-4]

3. Directing Defendants to submit a plan to implement the recommendations contained in the final report by the Court's Rule 706 expert.  [Doc. 2904 at 1; final report at Doc. 2940-1, Ex. 1]

4. Directing Defendants to re-install Health Needs Request (HNR) boxes (receptacles for collecting written requests for health care from class members), which Defendants had unilaterally removed from the prison complexes. [Doc. 2901 at 4-5]

In light of their extraordinary success in vindicating the rights of the Plaintiff class, Plaintiffs' counsel are entitled to a fully compensatory fee.  Moreover, for the same reasons the Court found that a fee award with a 2.0 multiplier was appropriate for enforcement work performed through June 30, 2017 (*see* Doc. 2902 at 4-8), a 2.0 multiplier is similarly appropriate for the work performed during the 2017-18 Enforcement Period.  (This includes work performed in obtaining fees, which is separately compensable in this Circuit.)  The enormous amount of work, time, effort and costs expended by Plaintiffs to enforce the Stipulation has continued, and must now be compensated by the plain terms of the Stipulation.  Plaintiffs therefore request an award of attorneys' fees in the amount of $801,477.60 as compensation for enforcement work during the 2017-18 Enforcement Period.  A 2.0 multiplier would bring Plaintiffs' fees to a total of $1,602,955.20.  For costs, Plaintiffs seek $45,082.60.  In total, Plaintiffs seek $1,648,037.80 in fees, costs and enhancements.

**II.     Plaintiffs are Entitled to Recover Fees**

    **A.     Plaintiffs are Entitled to Recover Fees under the Stipulation**

Under Rule 23 of the Federal Rules of Civil Procedure, a court may award attorneys' fees and costs "that are authorized by law or by the parties' agreement."  Fed.

R. Civ. P. 23(h).  In the Stipulation approved by the Court on February 18, 2015, the parties agreed:

> In the event that Plaintiffs move to enforce any aspect of this Stipulation and the Plaintiffs are the prevailing party with respect to the dispute, the Defendants agree that they will pay reasonable attorneys' fees and costs, including expert costs, to be determined by the Court.  The parties agree that the hourly rate of attorneys' fees is governed by 42 U.S.C. § 1997e(d).

[Doc. 1185 ¶ 43][4]

During the litigation that led to the First Fee Decision, Defendants argued that "Plaintiffs are only entitled to fees if they prevailed 'with respect to a specific dispute to enforce the Stipulation.[']"  [Doc. 2902 at 2 (citing Doc. 2402 at 24)]  The Court correctly rejected this argument as "inappropriately narrow," *id.*, instead finding that fees are to be awarded under Paragraph 43 of the Stipulation whenever "Defendants have not satisfied their obligations under the Stipulation" and that failure has required "Plaintiffs to move to enforce it."  [*Id.* at 2-3]

As a result of the Court's straightforward interpretation of the Stipulation, an award of attorney fees here is appropriate for all work performed enforcing the Stipulation during the 2017-18 Enforcement Period.  All the fees sought result from Plaintiffs' successful efforts to require Defendants to satisfy their obligations under the Stipulation.[5]  Accordingly, a fully compensatory award of fees is appropriate.[6]

**B.    Plaintiffs Are Entitled to An Award of Fees Under 42 U.S.C. § 1988**

While the award of attorneys' fees and costs for work done to enforce the Stipulation is authorized by the Stipulation itself [Doc. 1185 ¶¶ 43, 44], the Stipulation

---

[4] [*See also id.* ¶ 44 (annual cap on monitoring fees "shall not apply to any work performed in mediating disputes before the Magistrate pursuant to paragraphs 22, 29, and 31 above, or to any work performed before the District Court to enforce or defend this Stipulation")]

[5] Plaintiffs' counsel has also spent considerable time responding to Defendants' many frivolous motions.  *See, supra* note 2.

[6] Because the Stipulation specifically authorizes fees, the availability of fees is not contingent upon any findings made pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(d) *et seq.*  Pursuant to the plain terms of the Stipulation, the PLRA governs the award of attorneys' fees only as to the hourly rate established under that statute.  *See* section III.A.2, *infra.*

uses the phrases "prevailing party" and "reasonable attorney's fees," terms borrowed from 42 U.S.C. § 1988.  Section 1988 provides that a Court may grant "a reasonable attorney's fee as part of the costs" to the "prevailing party" in a civil rights suit.  *See* 42 U.S.C. § 1988(b).  Analysis of attorneys' fees under Section 1988 begins with a determination of "prevailing party" status.

A prevailing party is one who has "succeeded on *any* significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit." *Texas State Teachers Ass'n v. Garland Ind. School Dist.*, 489 U.S. 782, 791-92 (1989) (emphasis added) (internal quotations omitted); *see also Farrar v. Hobby*, 506 U.S. 103, 111 (1992) ("Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.").

Here, Plaintiffs have continuously and repeatedly prevailed in their efforts to enforce the Stipulation.  As a result of Plaintiffs' efforts during the 2017-18 Enforcement Period, this Court (1) held Defendants in contempt, imposed a substantial fine, and issued a number of additional remedial orders; (2) found Defendants substantially noncompliant with a myriad of performance measures at multiple institutions; (3) ordered Defendants to comply with the performance measure requirements; (4) ordered Defendants to develop remediation plans; and (5) found evidence of retaliation and ordered that Defendants cease such conduct.  [*See, e.g.*, Docs. 2209, 2373, 2403, 2810, 2898, 2900, 2901, 2904]

That Plaintiffs did not obtain every single aspect of relief they sought over the course of multiple motions to enforce and multiple findings of Defendants' non-compliance with the Stipulation is irrelevant to the prevailing party determination.  Likewise, the fact that the Court's ultimate findings of substantial noncompliance do not encompass every performance measure at every institution originally identified in a Notice of Noncompliance does not negate the fact that Plaintiffs are the prevailing party.  To be considered a prevailing party "[i]t is enough that [plaintiff] succeed 'on any significant claim affording some of the relief sought, either *pendente lite* or at the

conclusion of the litigation.'"  *Stivers v. Pierce*, 71 F.3d 732, 751 (9th Cir. 1995) (quoting *Texas State Teachers Ass'n*, 489 U.S. at 791); *see also* Doc. 2902 at 2-3.

### C.   Plaintiffs are Entitled to Recover Fees and Costs as a Remedy for Contempt

Even if the Stipulation did not provide for an award of fees and costs, the Court's finding of contempt constitutes an independent ground for a fully compensatory award. *See, e.g.*, *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 958 (9th Cir. 2014) ("We hold that the Plaintiffs are entitled to recover attorney's fees and costs incurred in bringing and prosecuting these contempt proceedings."); *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985) ("Attorneys' fees frequently must be expended to bring a violation of an order to the court's attention. . . . We therefore conclude that the trial court should have the discretion [in contempt proceedings] to . . . decide whether an award of fees and expenses is appropriate"); *Webb v. Ada Cty.*, 285 F.3d 829, 834-35 (9th Cir. 2002) (affirming award of attorneys' fees as a remedy for contempt in jail conditions case).

In *Kelly v. Wengler*, 7 F. Supp. 3d 1069, 1075 (D. Idaho 2014), the district court held defendant prison officials in contempt and imposed relief, including monetary sanctions and the appointment of an independent monitor.  The court also awarded plaintiffs their attorneys' fees and costs associated with the contempt proceedings, and the Ninth Circuit affirmed the fee award.  *Kelly v. Wengler,* 822 F.3d 1085 (9th Cir. 2016). Similarly in this case, the Court has held Defendants in contempt, imposed monetary sanctions, and directed the appointment of independent experts.  [*See* Doc. 2898 at 23-24; Doc. 2905 at 3-4]  All of Plaintiffs' time and expenses during the 2017-18 Enforcement Period were directed toward demonstrating Defendants' noncompliance with the Stipulation and obtaining the contempt finding and associated remedies.  Accordingly, in addition to the explicit attorneys' fee provisions of the Stipulation, the Court's contempt finding furnishes an independent ground on which to award Plaintiffs a fully compensatory fee.

**D.     Plaintiffs Are Entitled to Recover Fees for their Successful Fee Motion**

A portion of the time expended during the 2017-18 Enforcement Period was devoted to Plaintiffs' successful motion for attorney fees and costs incurred through June 30, 2017.  [*See* Doc. 2902 (awarding Plaintiffs approximately $1.26 million in fees and costs)]  As a general matter, "time spent in establishing entitlement to an amount of fees awardable under section 1988 is compensable."  *Clark v. City of Los Angeles*, 803 F.2d 987, 992 (9th Cir. 1986) (citations omitted); *see also Guerrero v. Cummings*, 70 F.3d 1111, 1113 (9th Cir. 1995) (same).  Thus, Plaintiffs are entitled to recover attorneys' fees for the work performed in securing the First Fee Decision.

**E.     Plaintiffs Are Entitled to Recover Fees for Work Performed by Law Students**

The Court's First Fee Decision stated that Plaintiffs' counsel should not be awarded fees for the time expended on the case by law students, because the Court thought that they were unpaid.  [*See* Doc. 2902 at 9]  Plaintiffs have cross-appealed that portion of the First Fee Decision.  [*See* Notice of Appeal, No. 18-16424 (Doc. 2957); Notice of Appeal, No. 18-16365 (Doc. 2936)]  Plaintiffs therefore have included law student time in the instant calculations.

The law is clear that nonprofit organizations may recover fees for time expended by unpaid volunteer attorneys and law students.  *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 286-87 (1989) (noting the "'increasingly widespread custom of separately billing for the services of paralegals and law students who serve as clerks,'" and approving such fees as long as they are "consistent with market rates and practices" regardless of actual pay received (citing *Ramos v. Lowry*, 713 F.2d 546, 558-59 (10th Cir. 1988)); *Rosenfeld v. U.S. Dep't of Justice*, 904 F. Supp. 2d 988, 1006 (N.D. Cal. 2012) (approving fees for unpaid law students); *Skinner v. Uphoff*, 324 F. Supp. 2d 1278, 1285-86 (D. Wyo. 2004) (volunteer attorneys); *see also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Turner*, 305 F. Supp. 3d 1156, 1170 (D. Or. 2018) (rejecting government's argument regarding rate of compensation).  Additionally, in the

1     instant case, some of the law students employed by the ACLU National Prison Project,

2     and all of those employed by the Prison Law Office, *are* paid for their work. [*See* Fathi

3     Decl. ¶ 9; Declaration of Corene Kendrick (Kendrick Decl.), filed concurrently herewith,

4     ¶ 7] Those who are not paid receive credit from their law schools. [Fathi Decl. ¶ 9]

5         Plaintiffs thus request that the Court award fees for all time spent by law students

6     during the 2017-18 Enforcement Period. In light of the Court's previous ruling, Plaintiffs

7     have separately calculated fees with and without the amounts attributable to the work of

8     unpaid law students. [*See* Fathi Decl. ¶ 9][7] If the time of unpaid law students is excluded,

9     the lodestar is reduced from $801,477.60 to $794,019.60.

10

11     **III.**    **Plaintiffs are Entitled to Recover All of Their Requested Fees and Costs and a 2.0 Multiplier.**

12         Having determined that Plaintiffs are prevailing parties, calculating the fee award is

13     a two-step process. First, the court calculates the "lodestar figure by taking the number of

14     hours reasonably expended on the litigation and multiplying it by a reasonable hourly

15     rate." *Fischer v. SJF-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (internal quotations

16     marks omitted); *see also Klein v. City of Laguna Beach*, 810 F.3d 693, 698 (9th Cir. 2016)

17     (same).

18         Second, the court must "decide whether to enhance or reduce the lodestar figure."

19     *Fischer*, 214 F.3d at 1119. In *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 69-70 (9th

20     Cir. 1975), the Ninth Circuit adopted as appropriate factors in determining a reasonable

21     attorneys' fee the twelve guidelines originally set forth in *Johnson v. Georgia Highway*

22     *Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). In *Fischer*, the Court explained that the

23     adjustment of the lodestar is "based on an evaluation of the *Kerr* factors that are not

24     already subsumed in the initial lodestar calculation." 214 F.3d at 1119; *see also Graves v.*

25     *Arpaio*, 633 F. Supp. 2d 834, 842 (D. Ariz. 2009) (citing an evaluation of the *Kerr* factors

26     as the basis for enhancing or reducing the lodestar).

27     _____

28     [7] Law students receiving only course credit worked a total 45.2 hours amounting to $7,458 in fees.

1    In the First Fee Decision, the Court reviewed the *Kerr* factors, and found that a 2.0
2    multiplier was appropriate.  [Doc. 2902 at 4-8]   Critically, the Court analyzed these
3    factors in an opinion dated June 22, 2018, from the vantage of "the last two years" since
4    "April 2016."  [*Id.* at 1-3]   In other words, the Court's analysis already covered the
5    Enforcement Period for which fees are sought in this motion.  Nothing has changed that
6    would suggest a different multiplier for the fees sought now.

7        **A.    Calculation of Reasonable Attorneys' Fees**

8        The "most critical factor" in determining the reasonableness of a fee award in a
9    civil rights suit "is the degree of success obtained."  *Farrar*, 506 U.S. at 114 (quoting
10   *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).   In *Hensley*, the Supreme Court
11   considered whether the district court could grant attorneys' fees for time expended on
12   claims on which plaintiffs did not prevail.  The Court held that even though a plaintiff was
13   not entitled to an award of fees for time spent on unsuccessful claims that were unrelated
14   to successful claims, 461 U.S. at 434-35, "[w]here a lawsuit consists of related claims, a
15   plaintiff who has won substantial relief should not have his attorney's fee reduced simply
16   because the district court did not adopt each contention raised."  *Id.* at 440.   Thus, a
17   court's duty in a complex case is not to parse out and determine fees on a claim-by-claim
18   basis, since "[m]uch of counsel's time will be devoted generally to the litigation as a
19   whole, making it difficult to divide the hours expended on a claim-by-claim basis."  *Id.* at
20   435.   Rather, where the plaintiff presents different claims for relief that "involve a
21   common core of facts" or are based on "related legal theories," the district court "should
22   focus on the significance of the overall relief obtained by the plaintiff in relation to the
23   hours reasonably expended on the litigation." *Id.*; *see also Padgett v. Loventhal*, 706 F.3d
24   1205, 1209 (9th Cir. 2013) ("Often, attorney work will bear on multiple claims, only some
25   of which are successful.  Fees for work which relates *only* to unsuccessful claims should
26   not be awarded.  But where attorney work proves beneficial to a successful claim, district
27   courts should generally award these fees in full, even if the work is also useful to an
28   unsuccessful claim") (citing *Hensley*, 461 U.S. at 436)).

-9-

The overwhelming majority of the hours spent by Plaintiffs related to their successful attempts to enforce the Stipulation in the face of Defendants' substantial and ongoing noncompliance, and their successful efforts responding to Defendants' baseless motions to disqualify the Court and motions for reconsideration. All of Plaintiffs' claims of noncompliance involved a common core of facts and were based on related legal theories. Accordingly, Plaintiffs' counsel should recover a fully compensatory fee. The hours spent prosecuting the motions to enforce, evaluating Defendants' efforts to comply, informing the Court of Defendants' continuing noncompliance, and litigating the issue of Defendants' contempt are essentially indistinguishable; all involved the common issue of Defendants' failure to comply with the Stipulation and their resulting failure to provide class members the health care to which they are legally entitled. Accordingly, the hours spent on these enforcement activities, including responding to Defendants' frivolous motions, are fully compensable. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Hensley*, 461 U.S. at 435.

### 1.    Documentation Supporting Reasonableness

Counsel has attached documentation indicating the identity of the biller, time spent on the activity, specific description of the activity, and hourly rate charged by the biller. [Kendrick Decl., Exs. A & B; Fathi Decl., Exs. A & B]  Billers kept contemporaneous records of their time and entered it in their organization's respective billing system. [Kendrick Decl. ¶ 6; Fathi Decl. ¶ 10]  As appropriate, billing judgment was exercised to reduce the total number of hours for which compensation is sought.  [Kendrick Decl. ¶ 6; Fathi Decl. ¶ 6]

### 2.    Determination of the Hourly Rate

Having determined the number of hours reasonably spent on various activities, the next step is to determine appropriate hourly rates for the attorneys, paralegals, and law clerks who billed time.

1       Given the lack of available counsel, see *infra* Section III.B.9, this case falls under

2  an exception to the "local forum" rule for attorneys' fees.  *See Gates v. Deukmejian*, 987

3  F.2d 1392, 1405 (9th Cir. 1992) ("[R]ates, other than those of the forum, may be

4  employed if local counsel was unavailable, either because they are unwilling or unable to

5  perform because they lack the degree of experience, expertise, or specialization required

6  to handle properly the case.").  Accordingly, Washington, D.C. and San Francisco Bay

7  Area rates should be used as a starting point for calculating NPP and PLO's lodestar.

8       However, because the Stipulation adopts the PLRA limit on the hourly rate for

9  attorneys' fees—150 percent of the hourly rate established for payment of court-appointed

10  counsel (Doc. 1185 ¶ 43; 42 U.S.C. § 1997e(d)(3); Doc. 2902 at 3)—the rate here is

11  already pre-determined.

12       The Ninth Circuit has held that the baseline for the PLRA hourly rate is "the

13  amount authorized by the Judicial Conference." *Webb*, 285 F.3d at 839.  The current rate

14  authorized by the Judicial Conference for the payment of court-appointed counsel is $147

15  per hour for FY 2018,[8] and accordingly, 150 percent of that rate is $220.50 per hour for

16  federal FY 2018, which began on October 1, 2017.  Thus, even if the Court were to award

17  fees at Arizona rates rather than Washington, D.C. or San Francisco Bay Area rates, the

18  result would be the same, as $220.50 is below the Arizona market rate even for first-year

19  attorneys.  [*See* Doc. 2279 ¶ 7 (Declaration of Kathy Brody); *see also* Doc. 2902 at 6

20  (finding that PLRA rate "is comparable to private practice rates for a first year lawyer")]

21       Supreme Court and Circuit precedent establish that attorneys' fees are to be paid at

22  current rates. *See Jenkins by Agyei*, 491 U.S. at 282 (Compensation for fees over time is

23  made "either by basing the award on current rates or by adjusting the fee based on

24  historical rates to reflect its present value."); *Gates*, 987 F.2d at 1406 ("[P]laintiffs'

25  counsel began preparing this lawsuit over three years ago.  Since that time they have

26  expended an enormous amount of time and money without compensation.  An award

27

---

28       [8] http://www.uscourts.gov/sites/default/files/fy_2018_congressional_budget_summary_0.pdf at 37.

1   based on current rates is reasonable to adjust for this delay").   This holds true in the

2   context of fees under the PLRA as well.   "[T]he hourly rate at which compensation is

3   awarded should reflect rates in effect at the time the fee is being established by the court,

4   rather than those in effect at the time the services were performed.   The language of the

5   PLRA does not indicate any intention of changing this long-standing policy."   *Skinner*,

6   324 F. Supp. 2d at 1283 (internal quotation marks and citations omitted); *Carruthers v.*

7   *Israel*, 274 F. Supp. 3d 1345, 1355 (S.D. Fla. 2017) (awarding the NPP attorney fees at an

8   hourly rate of $219 in 2017 for work done from 2001 to 2016, and law clerk fees at the

9   requested rate of $160).[9]

10      Like attorney fees under the PLRA, the hourly rate for paralegals is also capped by

11   the PLRA at 150% of the hourly rate determined by the Judicial Conference.   *See Perez v.*

12   *Cate*, 632 F.3d 553, 556-58 (9th Cir. 2011) (paralegal fees awarded to prevailing plaintiffs

13   in prison civil rights litigation are subject to same hourly cap under the PLRA as attorney

14   fees where award is below paralegal market rate in relevant area).   [*See* Kendrick Decl.

15   ¶ 10 (the hourly market billing rate for paralegals in the San Francisco Bay Area is $275);

16   Fathi Decl. ¶ 16 (hourly billing rate for paralegals in the Washington, D.C. area is $165)]

17                      **3.      Calculation of the Lodestar**

18      Plaintiffs' counsel spent a total of 3,702.30 hours enforcing the Stipulation between

19   July 1, 2017 and June 30, 2018.   Multiplying these hours by the hourly rate of each biller

20   yields a total of $801,477.60:

21   **Prison Law Office**

| Attorney/Staff | Hours | Hourly Rate | Total |
|---|---|---|---|
| *Attorneys* | | | |
| Corene Kendrick | 1241.10 | 220.50 | $273,662.55 |
| Rita Lomio | 163.70 | 220.50 | $36,095.85 |
| Donald Specter | 157.90 | 220.50 | $34,816.95 |

---

[9]   In the First Fee Decision Judge Duncan awarded fees based on the Judicial Conference Rate for fiscal year 2016 and 2017, finding that Plaintiffs should have applied for their 2016 fees prior to September 2017.   [Doc. 2902 at 3-4]   Here, Plaintiffs have not delayed in filing a fee motion for the 2017-18 Enforcement Period and therefore are entitled to fiscal year 2018 rates.

| Attorney/Staff | Hours | Hourly Rate | Total |
|---|---|---|---|
| Thomas Nosewicz | 36.20 | 220.50 | $7,982.10 |
| Mae Ackerman-Brimberg | 22.90 | 220.50 | $5,049.45 |
| Alison Hardy | 20.40 | 220.50 | $4,498.20 |
| Camille Woods | 6.00 | 220.50 | $1,323.00 |
| Sara Norman | 4.30 | 220.50 | $948.15 |
| Lynn Wu | 1.50 | 220.50 | $330.75 |
| *Local Counsel* | | | |
| Kristin Eidenbach | 631.30 | 220.50 | $139,201.65 |
| *Paralegals/Investigators* | | | |
| Tania Amarillas | 58.30 | 220.50 | $12,855.15 |
| Amber Norris | 42.70 | 220.50 | $9,415.35 |
| Megan Lynch | 36.20 | 220.50 | $7,982.10 |
| Sarah Hopkins | 11.10 | 220.50 | $2,447.55 |
| Annelise Finney | 8.70 | 220.50 | $1,918.35 |
| *Law Clerks* | | | |
| Claudia Cesena | 34.20 | 220.50 | $7,541.10 |
| Bernadette Rabuy | 10.60 | 220.50 | $2,337.30 |
| Briana Zweifler | 9.00 | 220.50 | $1,984.50 |
| **Total** | **2496.10** | | **$550,390.05** |
| **Total with 2.0 Multiplier** | | | **$1,100,780.1** |

## ACLU National Prison Project

| Attorney/Staff | Hours | Hourly Rate | Total |
|---|---|---|---|
| *Attorneys* | | | |
| David Fathi | 820.60 | 220.50 | $180,942.30 |
| Amy Fettig | 75.00 | 220.50 | $16,537.50 |
| Desiree Sholes | 39.00 | 220.50 | $8,599.50 |
| Rekha Arulanantham | 3.50 | 220.50 | $771.75 |
| *Paralegals* | | | |
| Ada Lin | 107.40 | 165.00 | $17,721.00 |
| Jennifer Onka | 95.30 | 165.00 | $15,724.50 |
| *Law Clerks* | | | |
| Hadrian Luo | 24.10 | 165.00 | $3,976.50 |
| Phoebe Kasdin | 15.50 | 165.00 | $2,557.50 |
| Laura Frye | 10.00 | 165.00 | $1,650.00 |
| Abigail DeHart | 5.70 | 165.00 | $940.50 |
| Grace Gohlke | 3.60 | 165.00 | $594.00 |
| Bridget Lynn | 4.50 | 165.00 | $742.50 |
| Ashton Hoselton | 2.00 | 165.00 | $330.00 |

| Total | 1206.20 | | $251,087.55 |
|---|---|---|---|
| Total with 2.0 Multiplier | | | $502,175.10 |

### B. The *Kerr* Factors Support an Award of a Fully Compensatory Fee With a 2.0 Enhancement

The lodestar method of calculating fees is strongly presumed to be reasonable. *Oviatt v. Pearce*, 954 F.2d 1470, 1482 (9th Cir. 1992) ("There is a strong presumption that the lodestar figure is reasonable"); *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.8 (9th Cir. 1996) (same).  However, the twelve factors set forth in *Kerr* may be used to make adjustments to the lodestar.  *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir. 1975) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).  The *Kerr* factors include:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.* at 70.

*Kerr* factors 1 through 4 are used by the court to determine the reasonableness of the award.  *See Kerr*, 526 F.2d at 70; *Graves*, 633 F. Supp. 2d at 846.  Factor 6 was also used to determine reasonableness, but the Supreme Court has turned away from considering the fixed or contingent nature of the fee being charged.  *City of Burlington v. Dague*, 505 U.S. 557, 566 (1992) ("Contingency enhancement is therefore not consistent with our general rejection of the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee."), and is thus no longer relevant. Any decision to adjust the initial lodestar figure is then informed by *Kerr* factors 5 and 7 through 12. *Kerr*, 256 F.2d at 70; *Graves*, 633 F. Supp. 2d at 847.  Such enhancements to the lodestar for attorneys' fees in prisoner rights cases for declaratory and injunctive relief are

-14-

recognized by the Ninth Circuit.  *See Kelly*, 822 F.3d at 1102-06 (affirming 2.0 enhancement in prisoner rights class action where attorneys demonstrated superior performance and the need to attract competent counsel).

For the same reasons a 2.0 multiplier was awarded in the First Fee Decision, the same multiplier is warranted here.  [*See* Doc. 2902 at 4 ("As detailed below, the Court concludes Plaintiffs satisfy the *Kerr* factors")]  Plaintiffs set forth each of the *Kerr* factors in turn:

### 1.    The Time and Labor Required

The first *Kerr* factor, the time and labor required, is already included in the calculation of the lodestar.  *Morales*, 96 F.3d at 364 n.9.  Nevertheless, some general comments about counsel's efforts are warranted.  Counsel staffed this case efficiently. Kirstin Eidenbach, local counsel in Arizona, being closest to the prisons, performs client visits and coordinates nearly all prison site visits.  [Kendrick Decl. ¶ 9]  The PLO relies upon paralegals (under attorney supervision) to triage and respond to the hundreds of letters received each month from class members.  [*Id*. ¶ 9]  The PLO and NPP use lower-billing law students to perform legal research and related tasks.  [*Id*. ¶ 9; Fathi Decl. ¶ 11] Whenever possible, intensive document review and analysis was conducted by paralegals, investigators, and law students.  [Kendrick Decl. ¶ 9; Fathi Decl. ¶ 11]

### 2.    The Novelty and Difficulty of the Issues

The novelty and difficulty of the issues presented is presumably reflected in the calculation of the lodestar.  *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564–65 (1986) (citing *Blum v. Stenson*, 465 U.S. 886, 898-900 (1984)). However, it is important to note that, for the purpose of determining fees, Congress considered civil rights cases to be as complex as antitrust cases.  *See Blum*, 465 U.S. at 893. Indeed, the issues presented in enforcing compliance with the Stipulation were uncommonly difficult.  While it is not unusual for pre-judgment cases to be hard fought,

1   in most cases once there is agreement on a remedy there is much more cooperation and

2   much less rancor between the parties.  As the Court noted in its First Fee Decision:

3           [Enforcement] could have been simple if Defendants had been
            able to comply with the Stipulation's requirements, had timely
4           responded to document requests, had promptly developed a
            final version [of the Monitor Guide], and had not raised
5           spurious legal arguments.  However, *the last two years have
            not been simple* and so the Court concludes that this prong is
6           met.

7   [Doc. 2902 at 5 (footnote omitted) (emphasis added)]  This is not a run-of-the-mill case

8   for other reasons as well: it required the marshalling and analysis of complex evidence,

9   often from thousands of pages of medical records and other documents; working with

10  prisoner, staff, and expert witnesses; drafting declarations; participating in multiple

11  mediations and numerous evidentiary hearings; preparing, briefing and arguing multiple

12  issues; and keeping up to date on ADC's compliance or noncompliance with 103 health

13  care performance measures at ten prison complexes.  [Kendrick Decl. ¶ 5]

14              **3.      The Skill Required to Perform the Legal Services**

15          Likewise, the skill required to perform the legal services provided is presumably

16  reflected in the calculation of the lodestar.  *Del. Valley Citizens' Council*, 478 U.S. at 565.

17  Nevertheless, "the trial judge should closely observe the attorney's work product, his

18  preparation, and general ability before the court.  The trial judge's expertise gained from

19  past experience as a lawyer and his observation from the bench of lawyers at work

20  become highly important in this consideration." *Johnson*, 488 F.2d at 718.  This complex

21  case required highly skilled lawyers and advocates. As the Court noted in its First Fee

22  Decision:

23          Defendants have been unable to comply with multiple
            performance measures and so the post-Stipulation
24          enforcement work has required a deep dive into the minutiae
            of prison health care operations, from refilling prescriptions to
25          informing patients of test results.  Any suggestion that skill is
            not required to solve the problem of compliance is belied by
26          the fact that, notwithstanding their various proposed
            remediation plans, the problem remains. Based on their
27          experience, Plaintiffs' counsel has brought ideas from other
            jurisdictions to this matter and this has assisted the Court (and
28          Defendants) with solutions.

                                    -16-

1   [Doc. 2902 at 6]  Plaintiffs' attorneys have again met this standard.

2

3          **4.      The Preclusion of Other Employment by the Attorneys Involved
                      in the Case**

4          "This guideline involves the dual consideration of otherwise available business

5   which is foreclosed because of conflicts of interest which occur from the representation,

6   and the fact that once the employment is undertaken the attorney is not free to use the time

7   spent on the client's behalf for other purposes." *Johnson*, 488 F.2d at 718; *see also Kerr*,

8   526 F.2d at 70.  As the Court previously observed, "[t]here are only so many hours in a

9   day and working on one case necessarily precludes work on another." [Doc. 2902 at 6]

10         Plaintiffs' counsel already represented the certified class of ADC prisoners at the

11  beginning of the period for which fees are now sought.  Nevertheless, all of the work

12  performed for which compensation is requested came with a significant opportunity cost.

13  David Fathi, Director of NPP, is a senior litigator who devoted the overwhelming majority

14  of NPP's total hours on this portion of the case.  He was precluded from accepting new,

15  potentially fee-generating work while he worked on this case both prior to and during the

16  2017-18 Enforcement Period. [Fathi Decl. ¶ 17]  Corene Kendrick and Rita Lomio, senior

17  attorneys at the PLO, were likewise limited in the new work that they could take on both

18  prior to and during the period covered by this motion. [Kendrick Decl. ¶ 4]

19         **5.      The Customary Fee in Similar Litigation**

20         Plaintiffs have indicated the market hourly rates for their attorneys and other staff.

21  The rates charged by the PLO are set based on prevailing market rates in the San

22  Francisco Bay Area. [*See* Kendrick Decl. ¶ 10]  The rates charged by NPP were set with

23  reference to the "Laffey Matrix," which is intended by the U.S. Department of Justice to

24  be used to determine rates in the Washington, D.C. area in cases in which a fee-shifting

25  statute permits the prevailing party to recover reasonable attorneys' fees. [*See* Fathi Decl.

26  ¶¶ 13-15; *id.*, Ex. C]  These rates would ordinarily be the "customary fees" charged in

27  similar litigation.  However, because the Stipulation adopts the PLRA's cap on hourly

28  rates, the customary fee becomes the PLRA rate cap of $220.50 per hour.  This is orders

of magnitude less than would be recovered in litigation not governed by the PLRA.  [*See*
Doc. 2280 ¶ 12 (Declaration of Larry A. Hammond); *see also* Doc. 2902 at 6 (PLRA cap
"is comparable to private practice rates for a first year lawyer; comparable to what
Defendants' RFP authorized to outside counsel; and less than half the hourly rate for an
experienced private sector attorney")]

### 6. Time Limitations Imposed by the Clients or Circumstances

"Priority work that delays the lawyer's other legal work is entitled to some
premium." *Johnson*, 488 F.2d at 718; *see also Kerr*, 526 F.2d at 70 (listing preclusion of
other employment opportunities due to attorneys' acceptance of case as one of the factors
courts must consider); *see also*  Doc. 2902 at 6-7 ("the Court long ago concluded that the
most efficient way to manage enforcement was to conduct monthly status conferences.  In
other words, the pace of this matter is on-going and does not allow counsel to pause this
case and work on other matters").

### 7. The Results Obtained by the Lawsuit

Plaintiffs' counsel's hourly billing rates do not reflect a surcharge for exceptional
results.  [Kendrick Decl. ¶ 10; Fathi Decl. ¶ 19]  However, as discussed above, there can
be no dispute that Plaintiffs' counsel obtained excellent results for the class, vigorously
and repeatedly enforcing the terms of the Stipulation in the face of Defendants' sustained
intransigence, and ultimately securing a finding of contempt and the imposition of a
substantial fine, as well as a number of additional remedial orders.  *See supra,* Section I.
As the Court noted in the First Fee Decision:

> Defendants argue that Plaintiffs' fee application should be
> limited to discreet "successes." . . . Again, this is too narrow
> an understanding of the enforcement phase of this Stipulation
> and does not reflect the reality of monthly status conferences
> where many, related enforcement issues are reviewed,
> developed, and discussed such as access to the electronic
> medical records, useable temperature logs, or how to offer
> every female inmate a mammogram.

[Doc. 2902 at 7]

8.      **The Experience, Reputation, and Ability of the Attorneys**

The use of this factor has been limited since *Kerr* was decided.   *Del. Valley Citizens' Council*, 478 U.S. at 565 ("'novelty [and] complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of representation,' and the 'results obtained' from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award") (quoting *Blum,* 465 U.S. at 898-900).   It is nonetheless true that class counsel in this matter are leading national experts in prisoners' rights litigation.   The NPP, founded in 1972, is one of the most experienced groups of prisoners' rights litigators in the nation.   It has more than forty years of experience litigating prison conditions class actions such as this case.   [Fathi Decl. ¶¶ 3-4]   Federal courts have repeatedly recognized the special expertise of NPP staff.   [*Id.* ¶ 4]   Similarly, the PLO has decades of experience bringing successful system-wide class action prisoner rights suits, including seminal cases in the Ninth Circuit and the U.S. Supreme Court.   [Kendrick Decl. ¶ 2]   In the First Fees Decision, the Court noted that counsel have "deep experience in prison litigation and have used that experience to accelerate the Court's focus on issues."   [Doc. 2902 at 7]

9.      **The Undesirability of the Case**

Class action cases on behalf of prisoners are generally considered "undesirable" even by the civil rights bar, in part because they are so time-consuming and expensive to litigate.   *See* Fathi Decl. ¶ 18; *see also Planned Parenthood of Cent. & N. Ariz. v. State of Ariz.*, 789 F.2d 1348, 1354 (9th Cir. 1986) ("We recognize that the 'undesirable' nature of a case is an appropriate factor in determining attorneys' fees.").   The PLRA's fee cap serves to make such cases even more undesirable by cutting market rates substantially. *See, e.g.*, *Graves*, 633 F. Supp. 2d at 847 ("This case is considered 'undesirable' because § 1983 class actions on behalf of prisoners involving the conditions of confinement are exceedingly fact-intensive, time-consuming, and expensive to litigate, and the PLRA restricts the hourly rate for attorneys' fees below market.").

In the present case, finding counsel to represent the class was difficult.  There are no offices in Arizona like the PLO and the NPP.  [*See* Doc. 2279 ¶ 5 (Declaration of Kathy Brody)]  No lawyers in Arizona have the degree of experience in prisoner rights litigation or the expertise to litigate a complex, statewide, prisoner rights class action, and as a result it was necessary to bring in outside legal expertise to conduct this case.  [*Id.*]  It is also the case that no qualified lawyers in Arizona would have been willing to bring this case and others like it for the low fee rate set by the PLRA.  [*Id.*; Doc. 2280 ¶¶ 11-12]  Moreover, if the NPP and the PLO had not joined the *Parson v. Ryan* legal team, this case would not have been brought by the ACLU of Arizona or other local counsel.  [*See* Doc. 2279 ¶ 6; Doc. 2280 ¶ 10]

### 10.  The Nature and Length of the Professional Relationship with the Clients

Plaintiffs' counsel began their relationship with the plaintiff class more than seven years ago, when the NPP and the PLO began investigating conditions in the Arizona Department of Corrections.  [Fathi Decl. ¶ 5]  Since then, counsel has maintained close contact with individual prisoners and the class as a whole, through regular visits, tours, and interviews.  [*Id.*; Kendrick Decl. ¶ 3]  Therefore, as the Court noted in the First Fees Decision, this *Kerr* factor weighs in favor of an enhancement.  [Doc. 2902 at 8]

### 11.  Awards in Similar Cases

"The reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit."  *Johnson*, 488 F.2d at 719; *see also Moore v. James H. Matthews & Co.*, 682 F.2d 830, 838 (9th Cir. 1982).  Other than the previous fee award in this case—which included a 2.0 multiplier and a total award of $1.26 million—it is difficult, if not impossible, for the sake of comparison, to identify cases with identical fact patterns, procedural histories, or time necessary to obtain relief.  Nevertheless, the cases discussed below may be instructive.  In *Graves*, a case decided in 2008, the attorneys representing a plaintiff class of people detained in the Maricopa County Jail successfully defeated a motion to terminate a judgment involving conditions

of confinement, although some provisions of the judgment were terminated.  As a result of the litigation in *Graves*, the Court issued an amended, enforceable judgment.  633 F. Supp. 2d at 841.  The Court also awarded the NPP the full amount of attorneys' fees requested, even though some provisions of the original judgment were terminated.  *Id.* at 856 (awarding attorneys' fees in the amount of $1,239,491.63).  Similarly, in *Trueblood v. Wash. State Dep't of Social & Health Svcs.*, Case No. C14-1178MJP, 2015 WL 12030114, at *2 (W.D. Wash. 2015), the court awarded $1,267,769.10 in fees for 3,232.77 hours of class action enforcement work on behalf of prisoners.

### 12. An Enhancement is Justified by Plaintiffs' Counsel's Superior Performance, Extraordinary Results, and the Need to Attract Competent Counsel

Taken together, the *Kerr* factors support both the reasonableness of the fees requested and the addition of a 2.0 enhancement.  In *Kelly v. Wengler,* a class action involving prison conditions, the Ninth Circuit held that in both PLRA and non-PLRA cases, "the district court may enhance the lodestar when plaintiffs' counsel's 'superior performance and commitment of resources' is 'rare' and 'exceptional' as compared to run-of-the-mill representation in such cases." 822 F.3d at 1103 (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553-54 (2010) (internal citations omitted)).  The Ninth Circuit further noted that the district court had appropriately justified an enhancement to the lodestar in finding that "plaintiffs' counsel provided 'extraordinary performance yielding extraordinary results,' and that 'the quality of the work that produced these results [was] underrepresented in the hourly fee.'" *Id.* (citing *Perdue*).  The district court had enhanced the lodestar because it found that "the limited fees available in prisoner civil rights cases, without enhancement, are insufficient to induce private attorneys…" *Id.* at 1104.  The Ninth Circuit affirmed the district court's enhancement, holding that "[w]hen the lodestar figure based on the PLRA rate is insufficient to induce competent attorneys to accept appointment in meritorious civil rights cases, it is by definition not a reasonable fee." *Id.* (citing *Perdue*, 559 U.S. at 552). This Court also noted in its First Fee Decision,

1    "Defendants have not cited to any class action matters where an enhancement was sought
2    and denied."  [Doc. 2902 at 8]

3                    **a.    Superior Performance and Excellent Results**

4           Like the attorneys in *Kelly*, Plaintiffs' counsel here demonstrated superior
5    performance, extraordinary commitment of resources, and excellent results for their
6    clients, justifying an enhancement to the lodestar.  *Id*. at 1102-04.  In the face of sustained
7    intransigence by Defendants, Plaintiffs' counsel have vigorously, repeatedly, and
8    successfully moved to enforce the terms of the Stipulation, producing excellent results for
9    the class.  This work has taken an enormous amount of resources to achieve.  The outlay
10   of resources and continuous work required in this case are largely a product of
11   Defendants' conduct and litigation strategy.

12          Unlike the pre-July-2017 period, the 2017-18 Enforcement Period included not
13   only extensive motion practice but also extensive evidentiary hearings and mediations.
14   These hearings and mediations were a direct result of the Defendants' persistent failure to
15   comply with the Stipulation.  During this time, there was a July 2017 and November 2017
16   mediation (*see* Doc. 2253 (referring to July mediation); Doc. 2470 (mediation hearing,
17   November 28, 2017)).  There were also at least *40 days* of hearings.[10]

18   _____

19   [10] These hearing dates included: July 10, 2017 (discovery dispute hearing,
     Doc. 2180); July 11, 2017 (evidentiary hearing, Doc. 2165); July 13, 2017 (evidentiary
20   hearing, Doc. 2185); July 14, 2017 (status and evidentiary hearing, Doc. 2186); July 21,
     2017 (emergency status hearing, Doc. 2205); August 8, 2017 (evidentiary hearing,
21   Doc. 2233); August 9, 2017 (status and evidentiary hearing, Doc. 2236); August 18, 2017
     (status hearing, Doc. 2245); August 24, 2017 (status hearing, Doc. 2249); September 11,
22   2017 (retaliation hearing, Doc. 2305); September 12, 2017 (status hearing, Doc. 2317);
     September 13, 2017 (evidentiary hearing, Doc. 2318); September 25, 2017 (miscellaneous
23   hearing, Doc. 2342); October 11, 2017 (status hearing, Doc. 2403); October 24, 2017
     (status hearing, Doc. 2437); November 7, 2017 (status hearing, Doc. 2456); November 8,
24   2017 (evidentiary hearing, Doc. 2457); November 21, 2017 (status hearing, Doc. 2474);
     December 20, 2017 (status hearing, Doc. 2526); January 12, 2018 (discovery dispute
25   hearing, Doc. 2560); January 18, 2018 (status hearing, Doc. 2559); February 7, 2018
     (status hearing, Doc. 2586); February 14, 2018 (status hearing, Doc. 2601); February 27,
26   2018 (evidentiary hearing, Docs. 2657, 2658); February 28, 2018 (evidentiary, order to
     show cause, and status hearing, Doc. 2659); March 14, 2018 (status hearing, Doc. 2686);
27   March 19, 2018 (status hearing, Doc. 2700); March 22, 2018 (status hearing, Doc. 2720);
     March 26, 2018 (evidentiary and show cause hearings, Doc. 2722); March 27, 2018
28   (evidentiary and show cause hearings, Doc. 2735); April 10, 2018 (show cause hearing,
     Doc. 2757); April 11, 2018 (status hearing, Doc. 2764); May 9, 2018 (status hearing,

                                        -22-

1    As explained in the Court's Contempt Order, the "often lengthy" "monthly status

2    conferences … constituted the Court's efforts to understand the impediments to

3    compliance and to prompt Defendants to meet their obligations under the Stipulation."

4    [Doc. 2898 at 2]  Compliance "remained unattainable."  [*Id.*]  In other words, all of this

5    work was necessitated by the Defendants' failure to comply with the Stipulation.

6    Despite agreeing to the terms of the Stipulation, Defendants have persistently and

7    pervasively failed to comply with them.  Plaintiffs' counsel has worked tirelessly to

8    enforce Defendants' compliance with the obligations they voluntarily assumed nearly four

9    years ago.  This work has uncovered repeated violations of multiple measures across

10   multiple prison complexes.  During the 2017-18 Enforcement Period alone, the Court

11   found major deficiencies with multiple performance measures across multiple facilities,

12   including Performance Measures ## 6, 11, 12, 15, 19, 20, 24, 35, 39, 42, 44, 46, 47, 49-

13   52, 54, 55, 66, 67, 72, 91, 94, 97, 98.  [*See* Docs. 2373, 2403, 2583, and 2810; Transcript

14   of April 11, 2018 Hearing at 21:22-25:11 and Doc. 2764]  It also held Defendants in

15   contempt and imposed fines of $1,445,000, representing 1445 separate violations of the

16   Stipulation over the December 2017-February 2018 period alone.  [Doc. 2898 at 20-23]

17   The Court noted that failure to comply with the Stipulation remains, to this day, "wide-

18   spread and systematic."  [*Id.* at 19]  And despite the Plaintiffs' best efforts, the Court

19   correctly concluded that the Defendants were not voluntarily complying:

20             In one recent example, Defendants had no information about
              what could be done to improve compliance for PM 50 at
21            Tucson and failed to even attempt to provide a corrective
              action plan at the May 2018 Status Conference.  In another
22            example, instead of presenting a corrective action plan aimed
              at trying something new, Defendants informed the Court at the
23            June status hearing that they will continue to use their
              previous plan even though the CGARs reflect that the previous
24            plan has not obtained consistent compliance for PM 39 at
              Lewis.  That Defendants should exhibit such nonchalance
25

26   Doc. 2816); May 30, 2018 (status hearing, Doc. 2843); June 1, 2018 (evidentiary hearing,
     Doc. 2850); June 4, 2018 (status hearing, Doc. 2854); June 6, 2018 (status hearing,
27   Doc. 2860); June 12, 2018 (status and evidentiary hearing, Doc. 2879); June 13, 2018
     (status and evidentiary hearing, Doc. 2880); and June 14, 2018 (status and evidentiary
28   hearing, Doc. 2882).

                                      -23-

> about addressing on-going failures to comply with the Stipulation—even as the sword of sanctions loomed above them—is considerable evidence that a contempt order and monetary sanctions are necessary.

[*Id.* at 19-20 (citations omitted)]   Indeed, the Defendants' actions in failing to address their obligations puzzled the Court:

> Defendants' "good business decision" was to provide incentive payments to a contractor who had already committed to the State to provide that very service and had repeatedly and consistently failed to meet that obligation.  The wisdom of a business decision that so rewards a failing contractor escapes the Court but is, for these purposes, irrelevant.

[*Id.* at 17]  Among the many major failures underlying Defendants' noncompliance were:

- Defendants had no adequate supervision of their for-profit health care contractor, Corizon.  [*Id.* at 5-6]

- Defendants failed to "properly document the medical care provide to inmates," as established by mortality reviews.  [*Id.* at 7]

- By Defendants' own admission, at least six class members died in spring 2018 alone (out of 18 deaths total) due to untimely medical care, and in at least eight instances death was "caused by or affected in a negative manner by health care personnel."  [*Id.* at 7-8]

- Defendants paid Corizon additional sums "and rewarded [Corizon] with financial incentives while limiting the financial penalties for non-compliance." [*Id.* at 20; *see also id.* at 10-13]

- Defendants' compliance with PM 35, requiring medication to be provided without interruption despite any transfer of facility, was "a failed process."  [*Id.* at 13-14]

- Despite a Court order to do so, Defendants were unable to "monitor health care in real time."  [*Id.* at 15-16]

The Court concluded that Defendants' conduct "demonstrate[s] a half-hearted commitment that must be braced."  [*Id.* at 20]  In a separate order, the Court noted that "pockets of non-compliance persist" despite "more than three years" of opportunity to remediate, making it "clear to the Court that Defendants are unable or unwilling to meet several of the Stipulation's requirements."  [Doc. 2905 at 1]  Accordingly, the Court decided to "require Defendants to hire outside experts who can perform the analysis necessary to understand why deficiencies persist and to opine as to the policies and

procedures necessary to compel compliance with the Stipulation," with the "expect[ation] … that Defendants will then adopt the expert's remediation plan." [*Id.* at 3]  As of today, chronic noncompliance with the Stipulation continues, as documented in the most recent data reported by Defendants. [*See, generally*, Doc. 2992; Doc. 2988-1]

A separate area of significant effort by Plaintiffs involves Defendants' persistent failure to implement a monitoring system that is consistent with the Stipulation's requirements.   [*See* Doc. 1185-1 at 16-36 (setting forth agreed-upon monitoring methodology for each performance measure)]   At Plaintiffs' request, the Court has repeatedly invalidated Defendants' monitoring methodology for multiple performance measures. [*See, e.g.*, Docs. 2551, 2225]

In its order of June 22, 2018, the Court concluded that "an expert is necessary to evaluate the efficacy and reliability of the Monitoring Guide and its procedures[.]" [Doc. 2900 at 12]  The Court went on to explain that although some "committed and conscientious overseers exist within the system….[n]evertheless, sufficient questions have been raised about the audit system's integrity to warrant this expert review."   [*Id.*] Accordingly, the Court gave notice of its intention to appoint an expert pursuant to Fed. R. Evid. 706 to conduct a review of the monitoring process. [*Id.* at 14]

Defendants have also created a climate of fear that makes it even more difficult for Plaintiffs' counsel to monitor compliance with the Stipulation because prisoners face the legitimate fear of retaliation for even speaking with their counsel, much less testifying before the Court. [*See* Doc. 2276 (describing past retaliation issues); Doc. 2209 (finding retaliation against class members and ordering Defendants and their counsel to take no further action to harass, intimidate, or otherwise retaliate against Plaintiffs; ordering Defendants and their counsel to provide the Court a written declaration of steps taken to enforce the Court's order)]

As the Court explained in the First Fee Decision:

> During the last two years [since April 2016, *i.e.*, including the Enforcement Period], Plaintiffs have filed several other Motions to Enforce and have used the monthly status

> conferences to prosecute enforcement claims …. Prosecution
> of these claims has resulted in findings of substantial non-
> compliance, evidentiary hearings, Court tours of prison units,
> and some have resulted in Court imposed remedial measures.

[Doc. 2902 at 1-2]   Plaintiffs' extraordinary efforts were required to establish, and remedy, the Defendants' noncompliance described in this subsection.   That work was "inextricably intertwined with enforcement." [*Id.*]

The last two years "have not been simple," due to the Defendants' failures to (1) "comply with the Stipulation's requirements," (2) "timely respond[] to document requests," (3) "promptly develop[] a final version of the Monitoring Guide," and (4) [avoid] rais[ing] spurious legal arguments." [*Id.* at 5]   Indeed, Defendants' intransigence went so far as the filing of a groundless Motion to Disqualify Judge Duncan. [Doc. 2641]  The Court rejected this desperate maneuver:

> Amid Defendants' continuing failure to meet many of the
> requirements of the Stipulation, Defendants devote energy and
> time to an effort to remove the judge they chose to hold their
> feet to the fire.  This is a meritless distraction.

[Doc. 2791 at 1]

Undeterred, Defendants noticed an appeal of this denial [Doc. 2838] and separately moved Judge Humetawa to vacate the referral to Judge Duncan for lack of jurisdiction [Doc. 2825].   The Ninth Circuit dismissed Defendants' appeal for lack of jurisdiction [Order, No. 17-17324, (Doc. 2872)] and Judge Humetawa rejected Defendants' Motion to Vacate [Doc. 2856].  Defendants' groundless efforts to rid themselves of Judge Duncan ultimately became moot when he retired and the case was re-assigned.  [Doc. 2911]

This is but one example among many of Defendants' scorched-earth litigation tactics.  Notwithstanding those tactics, Plaintiffs have won multiple significant victories for their clients, including the Contempt Order and the various remediation orders described in this section and footnote 3 above.  These excellent results justify a lodestar enhancement.  *See Kelly*, 822 F.3d at 1102-1105 (affirming 2.0 enhancement where attorneys demonstrated superior performance).

1

### b. Attracting Competent Counsel

Like the plaintiffs' counsel in *Kelly*, counsel here have also demonstrated the need to attract competent counsel to difficult and important cases, such as this one, as a justification for lodestar enhancement. *See* 822 F.3d at 1104-05. Attracting competent counsel to this critically important case brought on behalf of 34,000 prisoners was extremely difficult due to the absence of lawyers in Arizona willing and able to bring such a complicated, time-intensive case, with the prospect of compensation (if any) only at the severely reduced rates set by the PLRA. *See, supra*, Section III.B.9. In Plaintiffs' prior enforcement fee application, experienced Arizona practitioner Larry A. Hammond stated that the low rates available to attorneys under the PLRA fee cap prevent qualified lawyers in Arizona from taking these important cases, despite the great need in the State for such representation. [Doc. 2280 ¶ 9-14] As in *Kelly*, an enhancement here is justified by the evidence demonstrating that an increased attorneys' fees award is necessary to ensure competent counsel in comparable cases. 822 F.3d at 1105.

### C. Plaintiffs are Entitled to Recover Litigation Expenses and Costs, Including Expert Costs

A reasonable attorneys' fee includes reimbursement for expenses incurred in the litigation. *See Woods v. Carey*, 722 F.3d 1177, 1179 n.1 (9th Cir. 2013) (§ 1988 "allows for recovery of reasonable out-of-pocket expenses that would normally be charged to a fee paying client," including "photocopying, paralegal expenses, and travel and telephone costs") (internal quotation marks, citations omitted). Moreover, the Stipulation specifically allows Plaintiffs to seek costs, including expert costs. [Doc. 1185 ¶ 43]

Itemized lists of expenses are appended to the Kendrick and Fathi Declarations. [Kendrick Decl., Ex. B; Fathi Decl., Ex. B; *see also* Fathi Decl. ¶¶ 20-26] Expenses for which reimbursement is sought include, but are not limited to, expert consultation fees, photocopying, out-of-town travel (e.g., airfare, taxis, meals, hotel), long-distance telephone charges, postage and courier fees, transcripts, and other expenses that would

1   typically be billed to clients.   [*See generally* Kendrick Decl. ¶ 8; Fathi Decl. ¶ 20][11]

2   Finally, as the Court noted in its First Fee Decision, time spent by Plaintiffs' experts in

3   reviewing health care records is compensable.  [Doc. 2902 at 5]

4   **IV.   Conclusion**

5          For the foregoing reasons, Plaintiffs respectfully request that the Court award them

6   $801,477.60 in attorneys' fees, a $801,477.60 enhancement to those fees under the *Kerr*

7   factors, and $45,082.60 in expenses.  In total, Plaintiffs seek $1,648,037.80 in fees, costs

8   and enhancements.

9          Respectfully submitted,

10  Dated:  September 26, 2018                    **ACLU NATIONAL PRISON PROJECT**

11

12                               By:    s/ Amy Fettig
                                        David C. Fathi (Wash. 24893)*
13                                      Amy Fettig (D.C. 484883)**
                                        Victoria Lopez (Ill. 6275388)*
14                                      915 15th Street N.W., 7th Floor
                                        Washington, D.C. 20005
15                                      Telephone:  (202) 548-6603
                                        Email:    dfathi@aclu.org
16                                                afettig@aclu.org
                                                  vlopez@aclu.org

17                                      *Admitted *pro hac vice*.  Not admitted
                                         in DC; practice limited to federal
18                                       courts.
                                        **Admitted *pro hac vice*

19

20

21

22

23  _____
    [11] Judge   Duncan   previously   placed   presumptive   caps   on   travel   and
24  accommodations: $350 for a roundtrip airfare from Oakland; $550 for roundtrip airfare
    from Washington, D.C.; and $200/night for hotel accommodations.  [Doc. 2503 at 2]
25  However, Judge Duncan added that "The Court will remain amenable to common sense
    arguments about travel costs associated with evidentiary hearings or other matters that
26  require counsel to make later, and therefore more expensive, travel arrangements."  [*Id.*]
    Plaintiffs have scrupulously respected the caps on travel and accommodations.  Any
27  deviations are the result of required travel during holidays or high season when less
    expensive flights to Phoenix and accommodations in the city were simply not available, or
28  when hearing dates were unexpectedly scheduled or changed by the Court with little
    advance notice.  [Kendrick Decl. ¶ 8; Fathi Decl. ¶ 25]

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
               agerlicher@perkinscoie.com
               jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    kbrody@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
               ahardy@prisonlaw.com
               snorman@prisonlaw.com
               ckendrick@prisonlaw.com
               rlomio@prisonlaw.com

*Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.L.L.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:    kirstin@eidenbachlaw.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 26, 2018, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
Jamie D. Guzman
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com

*Attorneys for Defendants*

Asim Dietrich
Rose A. Daly-Rooney
J.J. Rico
Jessica Jansepar Ross
Maya Abela
ARIZONA CENTER FOR DISABILITY LAW
adietrich@azdisabilitylaw.org
rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org
mabela@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

s/ D. Freouf

-31-