```
1               UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3             _____

4
     Victor Parsons, et al., on    )
5    behalf of themselves and all  )
     others similarly situated;    )
6    and Arizona Center for        )
     Disability Law,               )
7                                  )   No. CV 12-0601-PHX-ROS
                Plaintiffs,        )
8                                  )
          vs.                      )   Phoenix, Arizona
9                                  )   December 6, 2018
     Charles Ryan, Director,       )   2:02 p.m.
10   Arizona Department of         )
     Corrections; and Richard      )
11   Pratt, Interim Division       )
     Director, Division of Health  )
12   Services, Arizona Department  )
     of Corrections, in their      )
13   Official capacities,          )
                                   )
14                Defendants.      )
     _____)
15

16
           BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE
17
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
18
                      (Status Conference)
19

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
```

1                    A P P E A R A N C E S

2    For the Plaintiffs:

3            PRISON LAW OFFICE
             By:  Donald Specter, Esq.
4            By:  Corene Kendrick, Esq.
             1917 5th Street
5            Berkeley, CA 94710

6            ACLU - Washington DC
             By:  David C. Fathi, Esq.
7            By:  Amy Fettig, Esq.
             915 15th Street NW
8            7th Floor
             Washington, DC 20005

9
             ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
10           By:  Maya S. Abela, Esq.
             177 N. Church Avenue
11           Suite 800
             Tucson, AZ 85701

12
     For the Defendants:

13
             STRUCK LOVE BOJANOWSKI & ACEDO PLC
14           By:  Daniel Struck, Esq.
             By:  Rachel Love, Esq.
15           By:  Nicholas Acedo, Esq.
             3100 W. Ray Road
16           Suite 300
             Chandler, AZ 85226

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  Civil Case 12-601, Victor

3    Parsons and others versus Charles Ryan and others.  This the

4    time set for a status conference.

5          Please announce your presence for the record.          02:02PM

6          MR. FATHI:  Good afternoon, Your Honor.  David Fathi

7    of the ACLU National Prison Project for the plaintiff class.

8          MS. KENDRICK:  Good afternoon, Your Honor.  Corene

9    Kendrick from the Prison Law Office for the plaintiff class.

10          MR. SPECTER:  Donald Specter from the Prison Law     02:02PM

11   Office for the plaintiff class.

12          MS. FETTIG:  And Amy Fettig from the ACLU National

13   Prison Project for the plaintiff class.

14          MR. STRUCK:  Daniel Struck, Rachel Love, and Nicholas

15   Acedo for defendants.                                        02:02PM

16          MS. ABELA:  Maya Abela for the Arizona Center for

17   Disability Law.

18          MS. LOVE:  Rachel Love on behalf of defendants.

19          MR. ACEDO:  Nicholas Acedo on behalf of defendants.

20          THE COURT:  All right.  Counsel, this is a status     02:02PM

21   hearing, as you know.  I issued an order.  We have to decide

22   what to do from here.

23          And as I have -- this is a rather complicated matter

24   with many details, many issues about whether or not there has

25   been compliance with the performance measures.  And Judge     02:03PM

1    Duncan has basically found that there hasn't been.  As I read

2    the stipulation, that essentially would allow me to declare a

3    breach of the stipulation and we would then set the matter for

4    trial and I would resolve the underlying issues in the

5    complaint.  And if I found that there was a violation, in other    02:03PM

6    words, that I would grant the request for the remedies, then

7    there is the possibility, of course, like California has done,

8    which makes no sense in this case, considering all the time

9    that was spent, is that I would appoint a receiver, which is

10   extraordinarily expensive.    02:03PM

11        The other option, of course, rather than going that

12   terrible way, is to appoint Dr. Stern, or an expert pursuant to

13   Rule 706.  And the question is, what would the scope of that

14   appointment be?  And that's what we would have to resolve.

15        I think, from what I can tell, and I have -- I am    02:04PM

16   totally and unreservedly devoted to this case.  I will resolve

17   it one way or another.  I am here for all of you and I am free

18   in contrast to what it's costing the taxpayers in this case.

19        So I -- the expert, we would have to give the expert

20   guidance as to what he is to do.  As I see the big problem has    02:04PM

21   been the performance measures and whether or not there's been

22   compliance.  It is very complicated.  And the Court should not

23   be involved in this.  As you all know, the Supreme Court has

24   said, on a number of occasions, and I'm very happy to embrace

25   it, is that the Court should not be involved in running the    02:05PM

1    prison.  I don't want to do that.  I don't think any judge

2    wants to do that.

3         But the Court does use experts to help determine

4    whether or not there is compliance.  And I have sought out

5    other judges who have had cases like this, federal judges, and    02:05PM

6    Dr. Stern was recommended to me.  He has been involved in the

7    Idaho litigation that I know of, at least in that particular

8    case.  He may well have been involved in other matters.

9         I will tell you that I have, because it's not clear as

10   to how much communication that the Court can have with an    02:06PM

11   expert, I have limited my communication to very administrative

12   matters.  And that's what I hope to do in the future.  It will

13   require cooperation from counsel on both sides, and I have no

14   reason to believe that counsel for the plaintiffs and the

15   defense have not acted in good faith in this litigation.  It's    02:06PM

16   just that it is too complicated for everyone.

17        So that's my -- those are my thoughts.  Let me hear

18   from the plaintiffs.

19        MR. SPECTER:  Good afternoon.  As I said, my name is

20   Donald Specter.    02:06PM

21        THE COURT:  Mr. Specter, make sure you are in front of

22   the microphone.  Speak as loudly as you can so we can all hear

23   you.

24        MR. SPECTER:  Thank you, Your Honor.

25        As I said, my name is Donald Specter.  I'm from the    02:07PM

1    Prison Law Office.  I will try to respond to your thoughts.

2         First of all, we agree that, as you said in your

3    November 15th order, that the situation here doesn't make sense

4    to go down the same path that's been found to not have worked

5    or failed for the last three years.  So we do think that                    02:07PM

6    something different needs to be done.

7         I will get to the appointment of Mr. Stern in a

8    second, or Dr. Stern in a second.  But first I would like to

9    take issue with one word which you said about the terribleness

10   of a receiver.  As you may know, there's a receiver in                       02:07PM

11   California which is -- who has jurisdiction over the medical

12   care system of the California Department of Corrections.  It's

13   a similar case as to this, but it's much bigger in some ways

14   because there are 36 prisons and more people in prison.

15        However, the receivership has done a lot of good over        02:08PM

16   the years that the receiver has been appointed.  And there are

17   two parallel cases.  One involves mental health care, which is

18   the *Coleman* case; and another is *Plata*, which is the medical

19   care case.  And the receiver has been appointed in the *Plata*

20   case.                                                                        02:08PM

21        And they have both been going on for many, many years.

22   And I can say forthrightly and definitively that the receiver

23   has made a tremendous amount of progress whereas in the mental

24   health care case, the *Coleman* case, they are still fighting

25   about having enough staff and they are still a ways away from     02:08PM

1    resolving the case after 28 years.

2         On the other hand, the *Plata* case where the receiver

3    has been appointed is starting to wind down because the

4    receiver and the courts have found that the State -- well, the

5    receivership and the State is starting to provide adequate          02:09PM

6    medical care.

7         The reason why a receivership is a good idea in this

8    particular case is there are two ingredients which I think are

9    missing from the State at this point, which I think have been

10   abundantly clear from the history of this case.  One is in       02:09PM

11   order to provide adequate, constitutionally adequate health

12   care, you need the will to do it and you need the resources to

13   do it.  And in our estimation, both of those things are lacking

14   from the Arizona Department of Corrections.

15        And as much as Judge Duncan tried to incentivize the         02:09PM

16   State and sanction the State to fulfill their obligations under

17   the stipulation, they haven't shown the will or the necessary

18   resources to comply with the performance measures that they are

19   required to comply with.

20        So I think one thing the Court should consider              02:10PM

21   seriously is the receivership.  And the receiver not only would

22   be responsible for providing the adequate care but also would

23   be responsible for also administering the methodology, which

24   the Court -- the methodology in terms of how well they are

25   performing with the performance measures.  And the receiver       02:10PM

1    would be able to alleviate all those problems as well because

2    as you know, the Court has, Judge Duncan, has found that the

3    methodology that the State is using is basically meaningless.

4         So that brings me to your suggestion about Dr. Stern.

5    Well, there are a couple of comments I have.  First, about him    02:10PM

6    personally, we agree that he is exceptionally well-qualified.

7    He, as you say, he's been special master in the Idaho case.

8    He's worked for the Department of Justice as an expert.  He's

9    testified against the prison case we brought as an expert for

10   the State Department of Corrections.  He's also an expert in    02:11PM

11   two cases which are pending in front of -- an expert for the

12   ACLU National Prison Project in two pending cases.

13        But we do think that he's very qualified and an

14   independent person.  The question is what would he do if he was

15   appointed?    02:11PM

16        THE COURT:  That's what we need to decide.

17        MR. SPECTER:  Right.  And so the couple main things

18   that I can think of are that he would be charged with giving

19   you and the parties a report about the conditions in the

20   prisons, which we think are abysmal.  That should be pretty    02:11PM

21   straightforward.  But the other problem is once he makes those

22   findings and would make recommendations, I'm not that confident

23   that we wouldn't be in the same place we are now in terms of

24   the defendants having the will and the resources to implement

25   those recommendations.  As you probably know from the pleadings    02:12PM

1    in this case that Judge Duncan hired under experts under Rule

2    706 to make some recommendations on staffing, and those

3    recommendations have fallen flat as well.  So I'm not sure that

4    appointing another expert to make further recommendations would

5    satisfy the obligations that the Court has and that we have to          02:12PM

6    ensure a constitutionally adequate system.

7          As to your point about vacating the stipulation and

8    setting the case for trial, we can do that.  We have experts

9    touring right now.  The reports that we have gotten are that

10   the conditions are abysmal and horrifying.  But I just would          02:13PM

11   like to think that through for a minute, because if we went to

12   trial, and we could do that, we're prepared to do that if

13   that's what the Court decides, where we would get to is a

14   situation where the Court would find a constitutional violation

15   and order a remedy.  The remedies that the Court would have at          02:13PM

16   its disposal after trial are essentially the same, or almost

17   the same remedies that the Court has now under the stipulation

18   which, aside from ordering specific staffing, means that the

19   Court has any remedy that's permitted under its inherent

20   authority or equitable cases under the constitution and its          02:13PM

21   inherent authority.

22         So we're not sure that vacating the stipulation would

23   actually progress -- make the case progress or make the

24   conditions better in any meaningful way.  So we think that you

25   should consider a receivership.          02:14PM

1          THE COURT:  Let me interrupt you here.  I see where

2     you are going.

3          MR. SPECTER:  Sure.

4          THE COURT:  I don't know that I have the authority to

5     appoint a receiver federally.  I haven't looked carefully at          02:14PM

6     that yet.  It seems to me that I would -- everything that I

7     have seen is there's been judgments and there has been consent

8     orders issued.  So I haven't really gotten into that.

9          My impression is, is that if I were to appoint a

10     receiver in the method and means that have been appointed in          02:14PM

11     other cases, I would essentially be declaring that this

12     stipulation hasn't been met.

13          So I'm a little concerned about that.  And that's why

14     my -- I think it's advisable, really, to appoint an expert in

15     depth, more so.  So on that first issue on whether or not I          02:15PM

16     have the authority to do so, maybe defense counsel has an idea

17     about that too.  We'll hear from them.

18          MR. SPECTER:  Certainly, Your Honor.  We would be

19     happy to brief the authority that you have on that.

20          THE COURT:  I'm wondering why you haven't recommended          02:15PM

21     that in the first place.

22          MR. SPECTER:  Well, it had a lot to do with the

23     context in which Judge Duncan was overseeing the case and his

24     judgments.

25          THE COURT:  The stipulation doesn't require or allow          02:15PM

```
1    for appointment of a receiver.

2             MR. SPECTER:  It does, Your Honor, in my opinion.

3    There's a section at the end of the stipulation which

4    provides -- I will get it.

5             THE COURT:  I have the stipulation in front of me and    02:16PM

6    I am sure --

7             MR. SPECTER:  Paragraph -- it's Paragraph 36, Your

8    Honor.

9             THE COURT:  So where does it say that I have the

10   authority to appoint a receiver?                                  02:17PM

11            MR. SPECTER:  On Line 25.

12            THE COURT:  I'm reading each -- I'm familiar with

13   this.  But are you saying -- well, you tell me.

14            MR. SPECTER:  Okay.  Paragraph 36, Line 24:  In the

15   event the Court subsequently determines that defendants plan      02:17PM

16   did not remedy the deficiencies, the Court shall retain the

17   power to enforce the stipulation through all remedies provided

18   by law, except. . .  So all remedies provided by law.  The

19   receivership is a remedy provided by law.

20            THE COURT:  So in other words, if I appointed a          02:17PM

21   receiver, we all know that there are conditions here; not

22   construct a new prison or to hire a specific number of their

23   staff unless the defendants propose to do so.  So the receiver

24   could not even do that.

25            MR. SPECTER:  He could not do that but he could do       02:18PM
```

 1    other things.

 2              THE COURT:  Well, according to this agreement.  That's

 3    why I'm wondering.

 4              MR. SPECTER:  Right.

 5              THE COURT:  This agreement has conditions.                02:18PM

 6              MR. SPECTER:  Yes, it does.

 7              THE COURT:  All right.

 8              MR. SPECTER:  Thank you, Your Honor.

 9              THE COURT:  Thank you.

10              Mr. Struck.  So you know what the agenda is.            02:18PM

11              MR. STRUCK:  I do.  And I will respond to your

12    questions as well as respond to some of the issues that were

13    raised by Mr. Specter just now.

14              At the outset, though, in terms of the stipulation, I

15    think it is important to note, and I know plaintiffs dispute      02:18PM

16    this, but out of the 849 performance measures, the Court has

17    already dropped off 140 of the health care performance

18    measures.  Out of 849 there's 814 health care performance

19    measures.  And what I mean there's that many, when you count

20    all the -- every health care measure at every facility, that's   02:19PM

21    how the math adds up.

22              THE COURT:  Are you saying that there has been

23    compliance with, you said --

24              MR. STRUCK:  Judge Duncan has dropped 140 of the --

25              THE COURT:  When you say "dropped" that means he's      02:19PM

1    found compliance?

2         MR. STRUCK:  Yes, and that they no longer have to be

3    monitored.  They are not subject to the stipulation.  Now, they

4    are still monitored by the Monitoring Bureau pursuant to the

5    contract between Corizon and the Department of Corrections.          02:19PM

6    But with respect to this litigation, 140 of those performance

7    measures have dropped off.

8         Now, the Monitoring Bureau has, every month, and the

9    Court has seen it, is monitoring the compliance with the

10   stipulation and monitoring compliance with the contract.  Based    02:19PM

11   upon the stipulation, there are 627 health care performance

12   measures that should be dropped off the stipulation.  So we're

13   talking about 81 percent of the --

14        THE COURT:  I'm sorry.  I'm not following your math

15   here.  But you have to realize, Mr. Struck, I'm very new to         02:20PM

16   this.

17        MR. STRUCK:  I apologize.

18        THE COURT:  So I'm only familiar -- that's okay.  I'm

19   not in as deep as we need to be.  I would have to turn to

20   plaintiffs' counsel to see if they agree.  It sounds like you       02:20PM

21   are saying there's been basically compliance.  Have I missed

22   something?

23        MR. STRUCK:  Well, here's what I'm trying to say, and

24   I'm not saying it very artfully or clearly.  But there are 774

25   health care performance measures left under the stipulation         02:20PM

| | |
|---|---|
| 1 | that need to be monitored and is subject to the Court.  There |
| 2 | are 35 max custody measures that are still -- none of those |
| 3 | have dropped off yet.  But our position is that they should be |
| 4 | dropped off. |
| 5 | But of the 774 current health care performance |
| 6 | measures, pursuant to the stipulation, 627 of these performance |
| 7 | measures have been complied with and, pursuant to the |
| 8 | stipulation, should drop off.  So we're talking -- |
| 9 | THE COURT:  Have been complied with? |
| 10 | MR. STRUCK:  Yes, under the -- |
| 11 | THE COURT:  That surprises me.  You are saying that |
| 12 | doesn't leave many where there hasn't been compliance.  When |
| 13 | you say they should be dropped off, has that been brought to my |
| 14 | attention or to Judge Duncan's attention so that he has |
| 15 | resolved them one way or another? |
| 16 | MR. STRUCK:  Some of them -- and that was the subject |
| 17 | of the 140 being dropped off.  And then others were not dropped |
| 18 | off because of Judge Duncan's concerns with respect to the |
| 19 | accuracy of the monitoring. |
| 20 | THE COURT:  That's right.  And that I do understand. |
| 21 | MR. STRUCK:  Okay. |
| 22 | THE COURT:  But, I mean, it's your view that some 600 |
| 23 | should be dropped off, but that's in contrast to where we are |
| 24 | now with Judge Duncan's ruling that the monitoring aspect is |
| 25 | not complied with. |

02:21PM
02:21PM
02:21PM
02:21PM
02:22PM

1       MR. STRUCK:  Not necessarily.  Because at least it's

2   our position that what Judge Duncan wanted to do was to appoint

3   a 706 expert to audit what the Monitoring Bureau has done to

4   ensure the accuracy of what they did.  And we're confident that

5   with respect to those 627 measures, an objective auditor coming    02:22PM

6   in to see what the Monitoring Bureau has done with respect to

7   auditing will say they all pass and they should be dropped off.

8       So the ones that the Court is hearing about, the ones

9   that we're in contempt on, those aren't the 627.  Those are the

10  remaining health care measures that are left that either have     02:22PM

11  been found to be substantially noncompliant or are not

12  compliant to the extent that they drop off under the terms of

13  the stipulation.

14      So what we are proposing is that in order to ensure

15  that the Court is satisfied with the manner in which the          02:23PM

16  Monitoring Bureau has done their work, that an objective

17  auditor take a look at what the Monitoring Bureau did and

18  determine whether what we're saying is true:  The 627 health

19  care performance measures should drop off.  That makes the

20  universe of what we're dealing with here far smaller and far      02:23PM

21  less complex.  And so we would suggest that in order --

22      THE COURT:  I understand what you are --

23      MR. STRUCK:  Okay.

24      THE COURT:  I think I'm presaging what your suggestion

25  is.  So this 624, Mr. Struck, have those not been litigated       02:23PM

1   already before Judge Duncan?  So I mean, I understand he has

2   found that the method of determining compliance is problematic.

3   That's what I understand so far.  But the 624, have they ever

4   been brought to the judge's attention?

5        MR. STRUCK:  And I apologize.  It's 627.  Some of them

6   have been brought -- were brought to Judge Duncan's attention

7   but because of his concerns that were raised by the plaintiff

8   with respect to the accuracy of the monitoring, he didn't drop

9   those off.  He just dropped off 140 of them.  So there are 627

10  that we assert should be dropped off.  And if we satisfy the

11  Court that the Monitoring Bureau did actually monitor these

12  accurately, that would reduce the scope of this case

13  tremendously.

14        THE COURT:  Okay.  So the 627, though, Judge Duncan

15  has either explicitly or implicitly already decided that the

16  method that was being used to establish compliance was not

17  acceptable.  And that -- and what you are asking for is for the

18  expert to determine whether or not that method is acceptable?

19        MR. STRUCK:  And let me clarify, of the 627 -- I

20  apologize, I can get that number to the Court.  There were some

21  that we asked to drop off and he did not drop them off because

22  of the concerns about whether or not the monitoring was

23  accurate.

24        THE COURT:  Okay.  So if that's the case, and that I'm

25  correct, he's already said with respect to some of those, he

02:24PM
02:24PM
02:25PM
02:25PM
02:25PM

1   said that the monitoring method and means of determining

2   compliance is not acceptable.  So if that's the case, then it

3   probably applies, that issue applies to all of the 627 that

4   remain so that we can have our expert determine and get into

5   the weeds, which Judge Duncan, in all good faith and all the          02:26PM

6   effort he could possibly apply to this case, tried to do.  But

7   we need somebody who has the expertise.  Not me.  Perhaps you

8   have more expertise than I do.

9           Is that what you are proposing?

10          MR. STRUCK:  Yes.  We're proposing that the -- the          02:26PM

11  Court has already determined that a 706 expert is in order.

12  And it's our reading of Judge Duncan's June 14th order that

13  part of the duties of that 706 expert would be to go back and

14  audit what the Monitoring Bureau had done to ensure the

15  accuracy of it.                                                        02:27PM

16          So we're suggesting that we move forward with that,

17  that they take a look at what the Monitoring Bureau has done,

18  take a look at what records they are looking at, and determine

19  whether or not those 627, or at least the majority of them,

20  should drop off.  And that would limit or reduce the scope of          02:27PM

21  what we're all dealing with here.

22          THE COURT:  And, I'm sorry to interrupt you, that's

23  what you are saying, but you have said that a couple of times.

24          MR. STRUCK:  Yes.

25          THE COURT:  And it's gotten through to me now.              02:27PM

1          MR. STRUCK:  Okay.

2          THE COURT:  So what you are saying is that the expert

3     would determine if there's compliance.  But in order to get to

4     that point before he determines whether there's compliance, and

5     all he can do, as you know, is make a recommendation to me, I          02:27PM

6     make that determination, is that he needs to look at the method

7     for determining each one of these performance measures.

8     Correct?

9          MR. STRUCK:  Yes, and look at the data that the

10    Monitoring Bureau looked at and ensure that what the Monitoring     02:28PM

11    Bureau had reported is accurate.

12         THE COURT:  Okay.

13         MR. STRUCK:  Yes.

14         THE COURT:  The other aspect, though, and again, here

15    I am presaging what the expert might do, is that if the expert     02:28PM

16    finds that the method is not appropriate and that he cannot

17    determine whether there is compliance based upon that method,

18    or if he decides that the method is okay but he finds that

19    there isn't compliance, then what?

20         MR. STRUCK:  Well, I think that -- I mean, there's a          02:28PM

21    couple issues there.  One of them is whether you are saying

22    the -- whether the expert says, hey, whatever this methodology

23    they used is just simply not accurate and they were looking at

24    the wrong records, or whatever it is that he says, again, we're

25    confident that when he looks at --                                 02:28PM

1          THE COURT:  I know what you are confident about.

2    Let's assume my hypothetical, and let me answer my own

3    hypothetical, since I'm the judge.  And let's pretend like I'm

4    the judge.

5          Okay.  So my answer would be then we would have this     02:29PM

6    expert, Dr. Stern, then propose how there can be compliance.

7    Of course, just like when something is, a matter by the

8    district court is referred to a magistrate judge, what then

9    happens is there can be objections to it and then I can hold a

10   hearing.  We can have the expert testify.  You can bring your   02:29PM

11   own experts.  Hopefully we won't get there.  Hopefully you will

12   resolve it and we won't have to incur further expenses.

13         So I'm not opposed to that, but I need to -- we need

14   to talk about that.  But it seems to me that I'm presuming you

15   do not have an objection to the appointment of an expert, and   02:29PM

16   am I also to take it that you do not have an objection to

17   appointing Dr. Stern?

18         MR. STRUCK:  Okay.  And just a couple things.  I

19   believe there's an appeal on that issue, so I don't want to say

20   that there's no objection because that issue, I believe, is in  02:30PM

21   the Ninth Circuit.

22         But right now, we are where we are.  We have an order

23   from the Court, and the Court has ordered that the 706 expert

24   be appointed.

25         THE COURT:  Well, I am strongly suggesting it.  And       02:30PM

1    that's what I think is the best course.  But I have offered the

2    alternatives.  I still say the alternative of going to trial is

3    terrible.  And that's a legal term.  So I think we're getting

4    closer to agreeing that an expert -- I'm not persuaded I'm

5    going to appoint a receiver.  We're going to take little steps      02:30PM

6    for little feet.  And I'm going to appoint an expert.  I have

7    proposed Dr. Stern.  Any objection?

8           MR. STRUCK:  Yes.  We actually do.  In the amount of

9    time, and we're still actually trying to do our due diligence

10   on Dr. Stern, I have been doing this for a long time.  I'm not     02:31PM

11   familiar with him.  I know plaintiff counsel are very familiar

12   because they have hired him in the past.  And he's actually

13   working on a case with them called *Dockery versus Epps* which is

14   a case in Mississippi.

15          THE COURT:  I'm sorry, Mr. Struck.  In my order, I          02:31PM

16   think you understand my order is clear.  I wanted you to make a

17   determination and do an investigation as to whether or not you

18   had a problem with him.

19          MR. STRUCK:  And we do.

20          THE COURT:  You didn't say.  What is it?  I thought         02:31PM

21   you said you were going to have to investigate further.

22          MR. STRUCK:  I said we were still doing our due

23   diligence.  But we have learned sufficient information in order

24   to give us concerns about Dr. Stern.

25          THE COURT:  What is the information?  You need to put        02:31PM

1    it on the record.

2           MR. STRUCK:  Yes.  Dr. Stern was hired by the National

3    Prison Project, which Mr. Fathi is the head of, as an expert to

4    provide a medical opinion relating to the Eastern Mississippi

5    Correctional Facility.  There are -- average daily population    02:32PM

6    at the EMCF is about 1200 inmates.  It's a facility.  It's --

7    it was privately run.  I don't know if it still is in the state

8    of Mississippi.

9           When he did his evaluation with respect to the --

10   whether or not there was a systemic constitutional violation he   02:32PM

11   only reviewed 23 records.  That's it.  And based on those 23

12   records, Dr. Stern -- and they weren't random either.  They

13   picked people who they knew were sick in order to skew his

14   analysis.  And he issued a report that is replete with

15   defendants are deliberately indifferent, they are violating the   02:32PM

16   Eighth Amendment, which really isn't an appropriate opinion of

17   a medical provider.  That is something that's left for the

18   Court or in the case of a jury for the jury and the judge to

19   determine, not Dr. Stern.  And every single report we have been

20   able to find that he issued, he always stated there's a -- it's   02:33PM

21   deliberate indifference, there's a constitutional violation,

22   it's an Eighth Amendment violation.

23          In the case in Illinois, where he was an expert for

24   the plaintiffs called *Carlock versus Williamson*, the Central

25   District of Illinois, struck Dr. Stern's opinions with respect   02:33PM

1    to the constitutionality of the health care delivery system.

2    And he has been challenged with respect to that, I believe it

3    was in the *Dockery* case, and I am not sure what the ultimate

4    outcome of that case is.  I'm sure Mr. Fathi knows.

5           But we have concerns with respect to the fact that it      02:33PM

6    appears Dr. Stern, when he's hired as an expert, it's almost

7    exclusively for the plaintiff, and we could only find one case

8    where he was hired for the defendant.

9           THE COURT:  You found one case?

10          MR. STRUCK:  Found one case.  It was a state of          02:34PM

11   Washington case where he actually came from.  He worked --

12          THE COURT:  Well, that means he has tremendous

13   expertise then in Washington.

14          So okay.  What else.  What else?  Did you take a look

15   at what he did in Idaho?                                        02:34PM

16          MR. STRUCK:  Yes, I did.  I'm familiar with the *Balla*

17   case.  I had similar cases that were going on at a different

18   facility in Idaho.  The *Balla* case had been going on for 30

19   years.  It was a consent decree case.

20          THE COURT:  Yes.  I'm aware.                             02:34PM

21          MR. STRUCK:  With respect to one facility in the state

22   of Idaho.  He was appointed by Judge Winmill to be a special

23   master and provide him an opinion regarding whether or not the

24   care, medical and mental health care, I think he had an

25   assistant --                                                   02:35PM

1          THE COURT:  I think actually Judge Carter from the

2    Central District of California, who essentially took over this

3    case, was responsible for appointing him.

4          MR. STRUCK:  Okay.

5          THE COURT:  That's right.  I'm familiar with that          02:35PM

6    case.  So what's the problem with what he did there?

7          MR. STRUCK:  Well, one of the problems is this:  The

8    health care, third party health care provider at that facility

9    happened to be Corizon, which is a third party health --

10          THE COURT:  They are everywhere.                          02:35PM

11          MR. STRUCK:  They are not everywhere.  And I'm sure we

12    could find an expert that could be objective that is not

13    familiar with Corizon or has been extremely critical of Corizon

14    which Dr. Stern was.  And this is another case where you have

15    got a relatively large facility, and he sampled 45 records and   02:35PM

16    found that there was deliberate indifference and constitutional

17    violations.  In some instances he could only cite to one or two

18    instances in support of his opinion that there was a systemic

19    constitutional violation.  One or two instances of something

20    happening is not a systemic constitutional violation.          02:36PM

21          After he found that Corizon was deficient and

22    unconstitutional and was deliberately indifferent with respect

23    to health care at that facility, the National Commission of

24    Correctional Health Care came in and audited the facility, I

25    think at the request -- I believe at the request of Corizon and   02:36PM

1    found that the facility actually met national standards with

2    respect to delivery of health care.

3            And after that happened, Corizon issued a press

4    release regarding Dr. Stern, blasting Dr. Stern saying his

5    report was incomplete, misleading, and erroneous.  The concern,    02:36PM

6    of course, is that Dr. Stern is going to have difficulty

7    setting aside his feelings with respect to Corizon or, as I

8    have seen in other cases that he's handled, he does not like

9    privatization, whether that be an entire facility or just

10   privatization of health care.  So we feel like we're already    02:37PM

11   coming in, if we have Dr. Stern, he's already coming in with

12   this predisposed bias because we have a third party provider.

13           He is also a consultant for the Human Rights Watch,

14   and he called for the closure of all private ICE detention

15   facilities even though at most of the private ICE facilities    02:37PM

16   the government is actually the one providing health care.  It

17   is clear that he has a bias with respect to favoring inmates or

18   detainees and whatever reason.  And that's fine, but in terms

19   of being objective, that's not fine for us to have somebody who

20   has that inherent bias.                                         02:38PM

21           He also determined -- made a determination that

22   Florence, Arizona, which is where, as you know, a large number

23   of our facilities are, is a, quote, "health care resource

24   challenged area," and he requested that ICE never house

25   detainees in Florence.  So we've got a problem there because we    02:38PM

1    have facilities in Florence.  We provide health care in

2    Florence.  And he's already made this determination that there

3    aren't enough health care providers in Florence, even though

4    they can easily drive up from Tucson or down from Phoenix,

5    which is what most of them do.                              02:38PM

6         I found an article this morning regarding Corizon

7    dated January 20th, 2015, where he was quoted criticizing

8    Corizon and private health care.  And he was quoted right

9    underneath a quote from Mr. Fathi.  They were both quoted

10   talking about perils of privatization of health care.       02:39PM

11        I found a January 4, 2016 article with respect to the

12   New Mexico Department of Corrections who also contracted with a

13   provider, not Corizon, but a third party provider called

14   Centurion.  And I have not seen that contract, but it sounds

15   like from the article it's very similar to the contract that   02:39PM

16   Arizona has with Corizon in which there are certain performance

17   measures that Centurion was supposed to meet, and as long as

18   they meet 85 percent, then they comply with the contract.  And

19   Dr. Stern criticized the contract because he stated it allows

20   the vendor to remain contractually compliant as long as it     02:39PM

21   meets 85 percent threshold with respect to performance

22   measures, and he took issue with the fact that there might be

23   15 percent noncompliance.

24        So we don't believe that somebody could come in and be

25   objective with respect to our contract with Corizon or the     02:40PM

1   stipulation if they already have this preconceived notion that

2   there's an inherent problem with the manner in which the

3   stipulation, which was negotiated by the plaintiffs and us, was

4   entered into.

5          So for those reasons we would object to Dr. Stern from   02:40PM

6   being the 706 designee by the Court.

7          THE COURT:  Okay.  But at bottom, you do not have an

8   objection to the appointment of a 706 expert?

9          MR. STRUCK:  Other than the objections that we have

10  already made, we think in terms of where we are in this case   02:40PM

11  and what orders we have in front of us, we think that's the

12  best way to go is to have the 706 expert come in, as I said.

13  I'm not going to say it again.

14         THE COURT:  Okay.  Thank you.

15         MR. STRUCK:  The other thing I wanted to point out,   02:41PM

16  Your Honor, is there has never been a finding of a systemic

17  unconstitutional violation with respect to the health care

18  delivery system.  There never has been.  And we think that the

19  stipulation actually exceeds what a constitutionally

20  sufficient --   02:41PM

21         THE COURT:  I'm sorry.  You think that the stipulation

22  does what?

23         MR. STRUCK:  It exceeds the constitutional minimum

24  standards.

25         THE COURT:  You agree to it?   02:41PM

1      MR. STRUCK:  That's true.  But the point I'm trying to

2   make is if, you know, the Court was talking about going down

3   the road of going to trial and those types of things, we don't

4   think simply because there are a couple of performance

5   measures -- or there are some performance measures, not a                02:41PM

6   couple, more than a couple that aren't being complied with by

7   Corizon that that comports to a systemic constitutional

8   violation.

9      So if we have a 706 expert, and if the expert comes in

10   and advises you that the Monitoring Bureau is right, we can              02:42PM

11   concentrate on the performance measures that aren't being met.

12   And if for whatever reason those things aren't going to be met

13   maybe we could just have a trial on those small number of

14   performance measures that aren't being met to determine whether

15   or not, in the Court's opinion, the constitution is being               02:42PM

16   violated.

17      We agree with the Court.  We don't think a receiver is

18   appropriate here.  We don't want this to become California,

19   which is why we -- one of the reasons why the stipulation was

20   entered in the first place.  California is the highest annual           02:42PM

21   per-inmate health care in the nation.  They pay four times more

22   than the Bureau of Prisons does per inmate with respect to

23   health care.  We don't want that in Arizona.

24      So we would like to drop off as much as we can on the

25   stipulation and work with the Court and the 706 expert to try          02:43PM

1    and determine how we can get these performance measures above

2    the 85 percent threshold so the Court doesn't have to be

3    involved with respect to running the prison health care system.

4        THE COURT:  Let me hear from plaintiffs' counsel in

5    response to issues raised about Dr. Stern.                    02:43PM

6        Mr. Specter.

7        MR. SPECTER:  Yes, Your Honor.

8        While I note that his CV that you attached to your

9    order contains the fact that he worked for Corizon, Mr. Struck

10   mentioned that he testified for the Department of Corrections   02:43PM

11   in Washington.  As I mentioned before, he testified for the

12   Department of Corrections in California in one of our cases.  I

13   don't think the fact that he finds constitutional violations

14   necessarily means that he's biased.  I would -- it's also more

15   probable that he actually -- that there were constitutional    02:44PM

16   violations as there are in this case.  And none of what Mr.

17   Struck is saying is evidence.  It's all multiple hearsay, and

18   we don't credit what he has been saying.

19       I think that he is quite capable.  He's been doing

20   this a long time and there's no -- what I haven't heard is      02:44PM

21   anything to suggest that his investigative techniques or his

22   particular decisions were inaccurate.

23       One thing I would like to mention is, first of all,

24   we agree with the Court and with the State that he should

25   evaluate the methodology of all the performance measures and   02:45PM

1    make findings and, if necessary, recommendations on those.  But

2    I also think he should do more than that.  I mean, we are most

3    concerned with the care that our clients are getting.  And we

4    have example after example after example of care which is life

5    threatening.  And we would also like him to explore the                    02:45PM

6    barriers to complying with the other performance measures which

7    were subject to the contempt proceeding and others which are

8    extremely important in this case and make recommendations to

9    that as well.

10            He has -- the Court has identified various areas in              02:45PM

11   its Document Number 2905.  Judge Duncan identified six

12   categories of care for which an expert should be focused on:

13   Pharmacy, transfers, access to care, specialty care and the

14   like.  That's found on Page 3 of that document.  We think Dr.

15   Stern or another expert should be appointed to look into those            02:46PM

16   issues because that's what the case is really about, is getting

17   these people the care that they deserve.

18            We think the Court could appoint, or should appoint

19   Dr. Stern.  That's fine with us.  If the Court feels like or

20   believes that Mr. Struck's objections are well taken, which we            02:46PM

21   do not agree with, we nominated two other highly qualified

22   experts which the Court should consider appointing as well.

23   Thank you.

24            THE COURT:  Thank you.  Well, it's not unusual when a

25   court asks for the suggestions for appointment of an expert               02:47PM

1    that counsel do not agree.  So you did not suggest Dr. Stern.

2    I'm going to appoint Dr. Stern as the expert here.  I find that

3    he is more than qualified to resolve issues that will be

4    presented to him and that his opinions, of course, will be

5    tested on whether or not they are reliable based upon the facts      02:47PM

6    that are presented to him in his investigation.

7         And what we will do, then, is if there are objections

8    to those findings then those will be -- and Dr. Stern will make

9    those findings in an order of some sort, or actually a report,

10   to the Court and, if necessary, then the Court will resolve          02:47PM

11   that.  And you know, we're going to decide what the scope is.

12   At this point, I don't know what Dr. Stern frankly was asked to

13   do in these other cases where he made findings that there were

14   violations.  I suspect that he was asked to do so.  Here, what

15   we're talking about are the facts.                                    02:48PM

16        And so he is going to look at what has been the real

17   problem here that Judge Duncan has focused on and counsel have

18   focused on, and that's the performance measures and whether or

19   not they have been complied with.

20        Mr. Struck has said that there are approximately 627             02:48PM

21   that remained.  The others have been excused by Judge Duncan.

22   I don't know if that's the case.  I'm not sure what plaintiffs'

23   counsel would say about that.  But there's a starting point at

24   least somewhere.  And there were 774, so we will assume that

25   some of them have been excused.  But the remainder of them are       02:49PM

1   what the focus of Dr. Stern will be; that is, what are they and

2   whether or not there's -- and the method and means of

3   determining compliance, and that is the method that is chosen

4   by the Department of Corrections; and whether or not it all

5   comes down to reliability and whether or not the monitoring or          02:49PM

6   the method of determining compliance with those measures is

7   reliable.  And Judge Duncan, in the past, has found that with

8   respect to some of it, at least, it hasn't been reliable.  So

9   that's where we're going to start.

10          But there are a couple other things, and now that I        02:49PM

11  have decided I'm going to appoint an expert, and I have

12  resolved from hearing from counsel that we shouldn't go forward

13  with the Court declaring that there is a violation of the

14  stipulation and we go to trial, and I'm very pleased to hear

15  that.  You are trying to cooperate, as you have in the past,         02:50PM

16  and I am going to presume you will continue to do so.

17          So we have a very, I think, distinct scope of Dr.

18  Stern's investigation now.  And that will be the performance

19  measures.  We need to decide how much communication there will

20  be with counsel, and I, frankly, think there should be as much     02:50PM

21  communication as possible to save some time.  The

22  communication, of course, for the defense is going to require

23  your communicating with your client.

24          Just as a footnote, I have, as you all know, I have

25  been receiving correspondence from some of the prisoners.           02:51PM

1    That's not for me to decide.  I have sent it on to you.  So

2    whether or not that's within the scope of the class action, I

3    don't know.  But I basically issue in orders that those kinds

4    of ex parte communications are not to come to me.

5        Then also we have to have a timeline for Dr. Stern    02:51PM

6    finishing what he needs to do.  He may not know that.  I expect

7    he doesn't know yet precisely how much time it's going to take.

8    And then there's the issue of how he is to be paid, when he is

9    to be paid.  So that's another very important issue.  And also,

10   the updates to the Court, I am not prepared to make a    02:51PM

11   suggestion on all of that other than what I have outlined in

12   the beginning, which is performance measures are the starting

13   point.  If, as the defense says, that it's your position that

14   there has been compliance now with the stipulation for the 627,

15   that will be presented to me.  And perhaps you will be correct.    02:52PM

16   So far, that hasn't been the case.

17       If, however, Dr. Stern finds that the method of

18   determining compliance is not reliable or it's faulty in one

19   way or another, then that will be presented to you before it's

20   presented to me, and perhaps that can be worked out so that we    02:52PM

21   get a reliable basis for determining compliance.

22       All right.  So simply today, I am appointing Dr. Stern

23   as our 706 expert.  He will then be providing opinions to the

24   Court today on the method of determining compliance with the

25   performance measures, and he will work with both counsel in    02:53PM

```
 1    making those determinations on -- do you agree that there are

 2    627 performance measures remaining?

 3              MR. STRUCK:  I'm sorry, Your Honor.  There's 774

 4    health care performance measures remaining.

 5              THE COURT:  I'm sorry.  700 and --                        02:53PM

 6              MR. STRUCK:  -- 74 health care performance measures

 7    remaining.

 8              THE COURT:  Remaining.

 9              MR. STRUCK:  Yes.

10              THE COURT:  And you said 35 of the maximum --            02:53PM

11              MR. STRUCK:  35 max custody, yes.

12              THE COURT:  Do you agree?

13              MS. KENDRICK:  Well, our position is that in the

14    performance measure that is not explicitly listed in Docket

15    2900 by Judge Duncan as terminating monitoring is still in        02:54PM

16    play.  I haven't done the math, so if that's your math.

17              THE COURT:  Okay.  You are going to confer on that.

18    Because something has to be provided to Dr. Stern so that he

19    knows what he's supposed to look at.

20              Now, I am strongly going to recommend, almost to the     02:54PM

21    point of ordering, but I'm not prepared to do that yet, that

22    you confer together, that you don't -- each side submits

23    something to him and then the opposing counsel submits

24    something and then you reply, it's going to take too much time.

25    You are going to have to work this out with him.  So you are      02:54PM
```

1    going to have to spend time talking to him about this issue.

2    So that's -- I'm telling you that that's what you have to do.

3    I guess I have ordered that.

4         So I'm going to issue an order, and let me just ask

5    you first some of these things that I outlined here.  I don't          02:55PM

6    know what the timeline is going to be.  Dr. Stern can decide

7    that after he initially meets with you about how much time its

8    going to take for him to do that, how he's going to be paid.

9    The defense is going to pay for this.  I don't know if an

10   amount needs to be deposited.  I'm not sure how that's been          02:55PM

11   done in the past.  I'm going to hire Dr. Stern at his hourly

12   rate, and I'm going to ask for periodic reports.

13        MS. KENDRICK:  Just for clarification, the Court's

14   order at Docket 2905 also wanted to appoint an expert with

15   regard to specific performance measures at specific                  02:55PM

16   institutions.  Is Your Honor thinking that he would also cover

17   these issues?

18        THE COURT:  Okay.  Yes.  You are reminding me of so

19   much I don't know since 2013 that this case has been pending.

20   Yes.  That would be correct.  And if I have missed something         02:56PM

21   else that you think our expert needs to take a look at, then

22   you will let me know.  But before you let me know, talk to each

23   other and try to reach an agreement on it.  Because I would

24   like for you to present to Dr. Stern a stipulated agreement on

25   the issues he is to investigate and try to resolve and give          02:56PM

1   opinions, just like the stipulation you entered into which you

2   all fully agreed to, that is, the initial stipulation of 2014.

3           Any questions from the plaintiffs?  I'm going to issue

4   an order to be a little clearer.  Any questions?

5           MR. SPECTER:  No, Your Honor.                              02:57PM

6           THE COURT:  Defense?  Mr. Struck?

7           MR. STRUCK:  No, Your Honor.

8           THE COURT:  All right.  We're adjourned.

9           MR. FATHI:  Your Honor, I beg your pardon.  Plaintiffs

10  had submitted an agenda with a number of items.                    02:57PM

11          THE COURT:  Yeah.  We're not getting into the agenda,

12  but thank you for that.

13          MR. FATHI:  Thank you, Your Honor.

14          (Proceeding concluded at 2:57 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                  **C E R T I F I C A T E**

6

7         I, LAURIE A. ADAMS, do hereby certify that I am duly

8  appointed and qualified to act as Official Court Reporter for

9  the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15        DATED at Phoenix, Arizona, this 14th day of December,

16  2018.

17

18                      s/Laurie A. Adams

19                      Laurie A. Adams, RMR, CRR

20

21

22

23

24

25